UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Gerald D. Barnett v. Merck & Co, Inc. | * | CASE NO. 06-0485 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION IN LIMINE TO EXCLUDE (1) EVIDENCE OF MOTIVE
AND (2) EVIDENCE RELATING TO THE ASSETS AND PROFITABILITY OF
MERCK OR TO THE COMPENSATION
AND FINANCIAL DECISIONS OF EMPLOYEEES**

*(Plaintiff's Opposition to Defendant's Motion in Limine No. 1)*

Plaintiff Gerald Barnett, by and through his undersigned counsel, urges the Court to deny

Merck's motion in limine relating to evidence of Merck's motive in marketing Vioxx, profit

plans, and assets or to the compensation and financial decisions of its employees. This evidence

reveals Merck's notice and knowledge of the cardiovascular safety dangers associated with

Vioxx, and its motives for failing to warn physicians and patients of the cardiovascular dangers

associated with Vioxx in order to maximize sales of the drug. In addition, the evidence shows

the tremendous efforts undertaken by Merck to suppress the truth about Vioxx's safety profile in

order to sell more of the drug. Such evidence is relevant to Plaintiff's claims, provides helpful

context for the events surrounding Mr. Barnett's heart attack, and should be admitted at trial.

___ Fee_____
___ Process_____
_X_ Dktd_____
_✓_ CtRmDep_____
___ Doc. No._____

## ARGUMENT

### I.    The Trial of this Case Should Not Be Bifurcated

Merck argues in its motion that this evidence should neither come into evidence during the compensatory phase of the trial nor the punitive phase of the trial. Plaintiff disagrees. If the trial is bifurcated, it is appropriate for both phases of the trial.

That having been said, Plaintiff urges the Court not to bifurcate the trial of this case. In South Carolina there is no rule that punitive damages cases must be bifurcated. While courts there have discretion to bifurcate issues, not all trial courts choose to bifurcate punitive damages claims. *Webb v. CSX Transp., Inc.* ,364 S.C. 639, 652, 615 S.E.2d 440 (2005) (In wrongful death action involving collision between car and train, issue of trial court's refusal to bifurcate liability and punitive damages was waived by defendant's failure to appeal ruling.)

Even where courts bifurcate actions involving punitive damage claims, some try the issue of willful, wanton or reckless disregard in the liability phase, and bifurcate only the issue of the amount of punitive damages. *Durham v. Vinson*, 360 S.C. 639,644-645, 602 S.E.2d 760, S.C. (2004) ("Durham brought a medical malpractice action against Dr. Vinson. After the liability phase of the bifurcated trial, the jury found Dr. Vinson was liable to Durham for $2,250,000 in actual damages, and the jury found his conduct to be willful, wanton, or in reckless disregard of Durham's rights. The trial then proceeded to the punitive damages phase. The jury awarded Durham $15,000,000 in punitive damages.") *Orangeburg Sausage Co. v. Cincinnati Ins. Co.*, 316 S.C. 331, 450 S.E.2d 66 (S.C. 1994) (In bad faith, negligence and breach of contract action arising from insurance coverage dispute, jury awarded actual damages and responded to a special interrogatory finding the defendants acted recklessly, willfully, wantonly, or in conscious disregard for plaintiff's rights. By agreement the court then held a separate hearing on punitive damages wherein the jury returned a verdict for plaintiff for punitive damages.) At the very

least, if the Court chooses to bifurcate the trial of this case, the liability for both compensatory and punitive damages, as well as the amount of compensatory damages, should be tried in phase one and the amount of punitive damages tried in phase two.

## II.   Evidence of Merck's Motives is Relevant To Plaintiff's Claims

Merck seeks to exclude evidence relating to Merck's motives in marketing Vioxx.[1] Specifically, Merck urges the Court to exclude any evidence that Vioxx was in a race against Celebrex and that Merck needed Vioxx to reach blockbuster status in order to replace other Merck drugs that had gone or were soon to go "off patent."

Plaintiff began taking Vioxx in early 2000 and continued to take the drug until just weeks before it was withdrawn from the market. Each of the documents referred to below were created and each plan was executed while Plaintiff was taking Vioxx. Such evidence is relevant to Plaintiff's failure to warn and negligence claims. Therefore, the exhibits should be admitted into evidence during the trial of this case; if the Court chooses to bifurcate the trial, the exhibits should be admitted during phase one of the trial.

Why didn't Merck delay the sale of Vioxx until the VIGOR trial was completed in March 2000, rather than beginning to market the drug in May 1999? The simple answer is the Merck was in competition with Pfizer to have the first COX-2 inhibitor on the market and the predicted difference in being the first to market was $611 million in sales. Former President of Merck's

---

[1] "An order in limine excludes only clearly inadmissible evidence; therefore, evidence should not be excluded before trial unless it is clearly inadmissible on all potential grounds. Such evidentiary rulings should be reserved until trial so that questions of foundation, competency, relevancy, and potential prejudice may be resolved in the proper context." *Auenson v. Lewis*, 1996 WL 457258, at *1 (E.D. La. Aug. 12, 1996) (internal quotation and citation omitted). The purpose of a motion in limine is not to exclude evidence that is damaging to a defendant.
   A premature determination on these evidentiary issues, in the absence of a developed trial record, could unfairly prejudice Plaintiff. See *In re Diet Drugs*, 369 F.3d 293, 314 (3rd Cir. 2004) ("Unduly sterilizing a party's trial presentation can unfairly hamper her ability to shape a compelling and coherent exposition of the facts."); *Old Chief v. United States*, 187 U.S. 172, 187 (1997) ("Evidence thus has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.").

U.S. operations, David Anstice, has admitted that Merck was in a race to beat Pfizer's Celebrex to the market. In his testimony during the *Cona/McDarby v. Merck & Co.* trial, Mr. Anstice testified as follows:

> Q.    All right. Just as a fact, y'all did rush, you had reasons to hurry to market with VIOXX, true?
> A.    We were in a competitive race, and we were doing things as fast as we could and consistent with an appropriate development program.
> Q.    Okay. You were very anxious to get it to market first. This time you were noticing you were in a competitive race?
> A.    That's correct.
> Q.    Those are your words, aren't they, sir?
> A.    Yes, they are.
> Q.    In other words, your company was racing against another company that was making a similar-type drug, wasn't it?
> A.    Yes.
> Q.    And these drugs were very -- VIOXX was a very important drug for your company, wasn't it?
> A.    Yes, it was.

*Cona/McDarby v. Merck & Co.*, No. ATL-L-1296-05MT, (N.J. Sup. Ct.), transcript at 181-182 (March 6, 2006) (Exhibit A). Evidence of Merck's haste to get Vioxx to the market is directly relevant to Plaintiff's failure to warn claim. Had Merck waited until they received the VIGOR results before marketing the drug or quickly added a cardiovascular warning in March 2000, Mr. Barnett would have either never started taking the drug or at the very least, his prescribing physicians would have the benefit of knowing the dangers associated with the drug and never prescribed medication to him.

The Profit Plans listed in Merck's motion are also directly relevant to Plaintiff's failure to warn claim. The 2001 Profit Plan, for example, outlines Merck's intent to spend $410 million dollars on marketing for the purposes of maximizing sales (yearly sales of $2.5 billion are predicted). See P1.0009, at 3-4 (Exhibit B). This evidence shows that Merck spent millions of dollars on sales representative visits to physicians, on marketing pieces for physicians (including the CV card), and on direct-to-consumer advertising, but in none of these efforts so much as mentioned that that Vioxx significantly increases the risk of an adverse cardiovascular event, such as a heart attack. Similarly, the Profit Plan 2002 – Merck A

& A Franchise, indicates that Merck has calculated the amount of sales that would be lost if a CV precaution (not a warning) was added to the label in October rather than February -- $229 million. See P1.0966, at 4 (Exhibit C). This is evidence is directly relevant to Plaintiff's claim for failure to warn.

Moreover, after the VIGOR results were received in March 2000, why didn't Merck add a warning to the label for potential cardiovascular risks associated with the drug? The simple answer is sales – adding a CV warning would have resulted in a 50% reduction in sales, upwards of a $1 billion dollar loss of sales. See P1.1135, at 17 (US Long – Range Operating Plan Franchise: Analgesic & Anti-Inflammatory Products: Vioxx, Etoricoxib) (Exhibit D).

Though just a few examples, the exhibits listed in the motion contain similar information. These plans provide relevant evidence that Merck had every opportunity to warn of potential CV risks – indeed Merck was engaged in a marketing strategy that exceeded in terms of direct to consumer advertising Nike and Budweiser and Pepsi -- but failed alert both physicians and patients of the dangers associated with the drug. This evidence is relevant and should be admissible in phase one, if the trial is bifurcated.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Here, the evidence Merck seeks to exclude is "of consequence" and highly relevant to elements of Plaintiff's failure to warn and negligence claims as well as to the plausibility of Merck's proffered defenses. Among other things, Plaintiff must establish that Defendant failed to use reasonable care in the marketing and promotion of Vioxx and that they intentionally distributed false information pertaining to the dangers associated with Vioxx. Evidence of Merck's financial pressures and motivation with respect to the marketing of Vioxx bear directly on those issues. "[E]xcessive concern with the image and marketing of . . . drugs at the expense of . . . efforts toward determining whether they

were safe could be probative as to whether [Drug Manufacturer] breached a duty of care towards the plaintiffs." *In re Diet Drugs,* 369 F.3d 293, 314 (3rd Cir. 2004).

Furthermore, the personal interest that many Merck executives had in insuring that Vioxx was a block-buster drug is relevant to critical marketing and safety-assessment decisions made by those executives.  In addition to bearing directly on the elements of Plaintiff's claim, the financial information Merck seeks to exclude is critical to the jury's assessment of Merck's credibility.  Merck will likely argue that the evidence reveals a company that acted reasonably and promptly with patient safety first and foremost amongst its concerns at all times.  Evidence of the personal financial incentives of Merck employees as they made critical safety and marketing decisions, evidence of the profit incentive for the company as it chose between safety studies, and evidence of the financial pressures Merck faced during the time that it made these critical decisions, is without question admissible.  Such evidence bears directly on the credibility of Merck's interpretation of the evidence and the testimony of its witnesses.

## II.   The Admission of the Evidence at Issue Would Not Cause Unfair Prejudice, Confusion, or Waste Time

Merck's alternative argument, that this motive and financial evidence should be excluded under Rule 403, should also be rejected.  Virtually all evidence is prejudicial or it is not material.  The prejudice must be "unfair."  *Dollar v. Long Manufacturing, N.C., Inc.,* 561 F.2d 613, 618 (5th Cir. 1977).  Unfair prejudice within the context of Rule 403 "means an undue tendency to suggest (a) decision on an improper basis, commonly, though not necessarily, an emotional one."  Notes of the Advisory Committee on Proposed Federal Rules of Evidence, Rule 403 at 102.  Just because the evidence is damaging or prejudicial to Merck's case does not mean that the evidence should be excluded.  *United States v. McRae,* 593 F.2d 700, 707 (5th Cir. 1979).

In relevant part, Federal Rule of Evidence 403 directs that relevant evidence is inadmissible if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. Fed. R. Evid. 403.   The careful use of "substantially" demonstrates the emphasis placed on this balancing test.  "Rule 403 is an extraordinary remedy that should be used sparingly because it allows the court to exclude admittedly probative evidence." *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994).   Moreover, slight prejudice is insufficient to warrant granting a motion in limine. *Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 863 (5th Cir. 1983) (quoting, *United States v. Hearod*, 499 F.2d 1003 (5th Cir.1974)).  Given this weight, it is difficult to make a pre-trial determination on these evidentiary issues without a substantive background.  See *Hines v. Consolidated Railroad Corporation*, 926 F.2d 262, 274 (3d Cir. 1991) ("Excluding evidence under Fed.R.Evid. 403 at the pretrial stage is an extreme measure.").  Moreover, as this Court has noted, "Rule 403 rulings are best made at the time of trial when the Court may balance relevant factors before it." *Minshew v. Brown*, NO. 95-2507, 1996 WL 601436 (E.D. La. 1996) (Fallon, J.).

Evidence of Merck's motives to rush Vioxx to the market and to succeed in making Vioxx the number one seller in the Coxib market over Celebrex is not unfairly prejudicial. Likewise, evidence of the financial incentives that Merck executives had to maximize sales at the expense of patient safety is also not unfairly prejudicial.  Just because the evidence is damaging or prejudicial to Merck's case does not mean that the evidence should be excluded.  Such evidence will not confuse the jury but give them necessary context and insight as they evaluate the credibility of Merck's employees as well as the validity of Plaintiff's claims and Merck's defenses.  Lastly, such evidence is not cumulative but helpful in giving the jury a clear picture of the decision making process relating to Vioxx, specifically, the market and profit forces and

pressures that were impacting Merck's decisions not to inform physicians and patients about the potentially harmful side effects associated with Vioxx.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's motion in limine on the basis of varying grounds for potential admissibility of motive, assets, profitability, compensation, and employee financial decision evidence.

Date: June 19, 2006                          Respectfully submitted,

By _____

Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Counsel for Plaintiff



Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
*Co-Lead Counsel*

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Shelly Sanford
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas 77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Drew Ranier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1371

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3875
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone: (202) 783-6400
Facsimile: (307) 733-0028

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8, on this 19th day of June, 2006.

MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson

SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY/CIVIL DIVISION
------------------------------x
THOMAS CONA AND JOYCE CONA,      DOCKET NO. ATL-L-3553-05MT
            PLAINTIFFS,
        VS.
MERCK & CO.,INC.,
            DEFENDANT.
------------------------------x
JOHN MCDARBY,               DOCKET NO. ATL-L-1296-05MT
            PLAINTIFF,
        VS.
MERCK & CO., INC.,                - TRIAL -
            DEFENDANT.
------------------------------x
            PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                    1201 BACHARACH BOULEVARD
                    ATLANTIC CITY, NJ 08401

            DATE:   March 6, 2006

B E F O R E :
        THE HONORABLE CAROL E. HIGBEE, P.J.Cv.

TRANSCRIPT ORDERED BY:
        W. MARK LANIER, ESQUIRE
        CHRISTY D. JONES, ESQUIRE
A P P E A R A N C E S :

        W. MARK LANIER, ESQUIRE
        THE LANIER FIRM
        JERRY KRISTAL, ESQUIRE
        ROBERT GORDON, ESQUIRE
        WEITZ & LUXENBERG
            ATTORNEYS FOR PLAINTIFFS CONA & McDARBY

        CHRISTY D. JONES, ESQUIRE
        BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
        KEVIN J. DUNNE, ESQUIRE
        SEDGWICK, DETERT, MORAN & ARNOLD, LLP
        MICHAEL BROCK, ESQUIRE
        HOPE FRIEWALD, ESQUIRE
        DECHERT, LLP
            ATTORNEYS FOR THE DEFENDANT
                *       *       *       *       *       *
                        REGINA A. TELL, CSR-CRR-RPR
                        OFFICIAL COURT REPORTER
                        1201 BACHARACH BOULEVARD
                        ATLANTIC CITY, NJ  08401

PLAINTIFF'S
EXHIBIT
A
tabbies

7ae2b056-9283-44c5-92f1-f88a1aee57d5

Direct - Anstice

Page 181

1   A.   No.   No.   We were very anxious to get VIOXX to

2   market quickly, so, there was a rush to get it to

3   market.   It did not mean that we cut any corners with

4   the development program.

5        Q.   Well, we'll discuss whether you cut corners

6   totally apart from whether or not y'all were rushing or

7   moving more quickly than you normally would or were

8   motivated to move as quickly as feasible and possible,

9   are you with me?

10  A.   Uh-huh.

11           (Witness nodding head in the affirmative).

12       Q.   All right.   Just as a fact, y'all did rush,

13  you had reasons to hurry to market with VIOXX, true?

14  A.   We were in a competitive race, and we were doing

15  things as fast as we could and consistent with an

16  appropriate development program.

17       Q.   Okay.   You were very anxious to get it to

18  market first.   This time you were noticing you were in

19  a competitive race?

20  A.   That's correct.

21       Q.   Those are your words, aren't they, sir?

22  A.   Yes, they are.

23       Q.   In other words, your company was racing

24  against another company that was making a similar-type

25  drug, wasn't it?

Direct - Anstice

1   A.   Yes.

2       Q.   And these drugs were very -- VIOXX was a very

3   important drug for your company, wasn't it?

4   A.   Yes, it was.

5       Q.   It was very important for your company's

6   bottom line, wasn't it?

7   A.   Yes, it was important, and all of our products are

8   important.

9       Q.   But there's a difference between VIOXX and

10  some of your other products.  VIOXX is what you called

11  a blockbuster drug, right?

12  A.   Some people referred to it that way, yes.

13      Q.   Some people within Merck --

14  A.   Yes.

15      Q.   -- call it that?

16  A.   Yes.

17      Q.   And y'all save that term "blockbuster" for a

18  drug that's going to make at least a billion dollars a

19  year, right?

20  A.   Yes, a very large product.

21      Q.   So you didn't have any --

22      MR. BROCK:  Your Honor, could we bring the

23  board around into the front so that he doesn't have to

24  face you and then turn to the jury?  I was going to see

25  if you could bring the board out.

# C E R T I F I C A T I O N

    I, REGINA A. TELL, C.S.R., R.P.R., C.R.R., License Number 30X100161000, an Official Court Reporter in and for the State of New Jersey, do hereby certify the foregoing to be prepared in full compliance with the

current Transcript Format for Judicial Proceedings and

is a true and accurate compressed transcript to the

best of my knowledge and ability.

_____ 03-06-06

Regina A. Tell, CSR-RPR-CRR

Official Court Reporter

Atlantic County Courthouse

Atlantic City, New Jersey

# 2001 Profit Plan for VIOXX®



---

*Confidential Merck & Co., Inc. Document*

P1.0009

Confidential - Subject To Protective Order

MRK-AAO0000073

## Table of Contents

*Executive Summary* ........................................................................ 3

**MARKET ENVIRONMENT** .................................................... 5

**ISSUES** ................................................................................... 12

**OBJECTIVES** ......................................................................... 13

*Strategic Objectives:* ............................................................... 13
    Marketing Choice #1: Identification of Target Audiences ........... 13
    Marketing Choice #2: Identification of the Behavioral Objectives ... 14
    Marketing Choice #3: Articulation of Brand Positioning ........... 16
    Marketing Choice #4: Detailed Implementation Plan ............... 17
    Clinical Development .................................................... 23
    Outcomes Research and Management Programs .................... 25
    Consumer Programs ...................................................... 25
    Core Promotion .......................................................... 27
        Call Activity ........................................................ 28
        Samples ............................................................. 29
        HEL ................................................................. 30
        Non Personal Promotional Support ............................ 31
    Continuing Medical Education (CME) .............................. 32
    Internet .................................................................. 34

**MONITORING STRATEGIC ASSUMPTIONS** ........................ 36

**FINANCIAL SUMMARY** .......................................................... 36

**SENSITIVITY ANALYSIS** ...................................................... 37

*Templates* .................................................................................. 39
    Template B – Investment by Strategic Business Objective .......... 39
    Template F – Investment by Major Marketing Programs ........... 40
    Template O – Base Case Forecast Build ............................. 41
    Template O – Base Case Forecast Build (cont.) ..................... 42
    Template P – Sensitivity Analysis .................................... 43
    Template Q – 2001 P&L ............................................. 44
    Template R – Investment by Media Category ....................... 45
    Template S — Investment by Functional Area ...................... 46

Confidential - Subject To Protective Order          MRK-AAO0000074

## Executive Summary

### "Competitive Victories and VIGORous Growth",

The opportunities for VIOXX in 2001 are enormous. Coming off a very strong 2000, the objective is to establish VIOXX as the treatment standard in OA and pain management by further establishing a differentiated and sustainable positioning for VIOXX based on superior efficacy (pain relief) in the breakthrough coxib class. But the risk is great as well. VIOXX is the sole defense against a formidable competitor, Pharmacia/Pfizer (and their new products). So VIOXX must defend its position while accelerating growth and penetration into the A&A market. In order to accomplish this, it is necessary for USHH to focus the promotional messages and energy behind VIOXX as the best coxib in the class.

The competitive events that pose the most significant threats to VIOXX in 2001 will emerge from Pharmacia on two fronts - continued competitive tactics (comparative studies) with Celebrex and new coxib entrants. Pharmacia/Pfizer have been and will continue to be extremely aggressive in attempting to position VIOXX as an unsafe product with dose-related side effects such hypertension and edema. On the other front, Pharmacia will be launching their first parenteral coxib, parecoxib early in the year, and preparing to launch with Pfizer their second oral coxib, valdecoxib at the end of the year. These near term competitive entrants, as well as etoricoxib, Merck's second oral coxib (launch January 2002), are anticipated to adopt efficacy positions, making it absolutely critical to establish a strong efficacy positioning for VIOXX in 2001. This increased level of competition requires high levels of promotion for VIOXX in the marketplace in 2001.

The future growth of VIOXX requires that more patients are brought into the prescription market, and the penetration into the overall A&A market is increased by capturing (pain share from the remaining branded NSAIDs and the generic NSAID business. Coxib penetration will continue to be influenced by numerous environmental factors such as the establishment of managed care treatment imperatives on coxib use for at risk patients.

The availability of strong favorable data throughout 2001, will fuel the growth of VIOXX. The first key data event is the VIOXX vs. Celebrex Comparative OA Efficacy Study. VIOXX will be the first coxib with head to head efficacy trials, proving superior pain relief to Celebrex. It will be critical to leverage this data with high coxib physicians to differentiate VIOXX and to establish a superior efficacy position vs. Celebrex and pre-position valdecoxib as a "me-too" NSAID.

The second key data event is the anticipated label change based on the VIOXX GI Outcomes Study (VIGOR). VIOXX will be the first and only coxib to prove statistically significant reductions in both complicated GI events and symptomatic ulcers and complicated GI events. The CLASS (Celebrex Long-Term Arthritis Safety Study) study did not meet its primary endpoint of complicated GI events. It is expected that both products will receive revised labeling, however, what is not known is if VIOXX will receive a better label for GI Outcomes based on the VIGOR and if the naproxen difference in MI will be an issue. This data will be leveraged primarily with high NSAID physicians, consumers and managed care. It is expected that this data will support arguments to lessen or remove the current coxib restrictions in managed care.

The third data event is the ADVANTAGE Trial of VIOXX vs. Naproxen. The primary endpoints of the study are tolerability and effectiveness, which will support non-GI safety messages. The other area of importance of this study is that patients were allowed to take low dose aspirin that help address the MI issue that occurred in with VIOXX vs. naproxen in the VIGOR study.

Revenue growth will be accomplished by leveraging the launches of these key data through an investment in traditional channels such as in HEL, samples and direct to consumer initiatives. Merck will continue to implement the segmentation strategy focusing on high coxib and high NSAID physicians with full-year support by six sales representatives and half-year support by the new C sales group.

Successful execution of these strategies with an expanded universe of physicians requires total promotional expenses of $410MM. This is an increase of $14MM vs. 2000 after adjustments for increases in resources needed to support the expanded sales force effort behind the product. Because patients are key drivers of

Confidential - Subject To Protective Order                                    MRK-AAO0000075

influence for both therapy and brand choice decisions, Merck will continue to leverage the buying process by driving patients to action, specifically requesting VIOXX by name. The consumer competitive landscape for VIOXX is heavily cluttered with both OTC and DTC players fighting for their fair share of the arthritis/pain category. As a result of the noise level, spending will be at competitive levels in order to break through the clutter and drive consumer action. As efficacy is the primary driver of action, 2001 consumer programs will continue to link the VIOXX brand to both efficacy and the emotional benefit of "a more fulfilled life." In addition, the anticipated label change will diminish concerns consumers have over safety/tolerability tradeoff decisions in order to have an efficacious medication. Direct to consumer promotion have been budgeted at levels consistent with 2000 to obtain the voice needed to communicate the VIOXX messages and drive action.

Through aggressive positioning and promotion, VIOXX has been forecasted to achieve an unprecedented target of $2.5 billion in only its second full year on the market. This represents a 58% and $915MM increase over the 2000EA. This will be driven by continued growth within the A&A market and continued penetration of the coxib class into the overall A&A market. Consistent with growth in sales, $1.9 billion in controllable income is forecasted for 2001, + 81% increase versus 2000. These strong sales require a 32% NRx growth in 2001, which correspond with 24% NRX share of the A&A market and 55% NRX share of the coxib class for the planning period. The primary risks in the forecast are the inability of VIOXX to neutralize any safety/tolerability concerns and earlier than anticipated approval/launch of valdecoxib.

Confidential - Subject To Protective Order                                          MRK-AAO0000076

## MARKET ENVIRONMENT

### Market Growth

The entrance of the coxibs into the A&A market has had a significant impact on this mature and relatively stable market. In 1999, TRxs for the A&A market totaled 124 million, a 25% increase over 1998, and as of June YTD, the TRx growth is 12%. This growth can be attributed to the blockbuster launches of VIOXX and Celebrex. Prior to the availability of the coxibs, the A&A market was relatively flat, with a 5 year (1994-1998) CAGR of 2.5 %. The 2000 EA for market growth is 10% and it is expected that a comparable level of growth will continue in 2001. The majority of growth for the coxibs came as a result of both overall market growth (new patients entering the market)



TRx Penetration of A&A Market

and erosion of the traditional branded NSAIDs. The traditional branded NSAIDs (not including Ultram) constitute approximately 10% of the market, and it is expected that traditional branded NSAIDs will continue to decline during 2001. Most branded products in the A&A market have adopted a dual safety and efficacy positioning, in an attempt to convince physicians that they will no longer need to make a trade-off between these important attributes. This strategy has proven successful for the coxibs, because physicians perceive them as superior to traditional NSAIDs in GI safety. Unable to match the GI safety perception of coxibs, all traditional branded NSAIDs have experienced negative growth and share loss. Generic NSAIDs are marginally affected, due to their low-cost position which makes them an attractive first line option for managed care. Ultram is the only branded product, which has remained relatively unaffected as a result of its unique mechanism and use as adjunctive PRN therapy to an NSAID.

### Market Share Forecast for VIOXX

Through August 2000, sales for VIOXX were $1 billion. Fueled by physician and consumer promotion, sales for VIOXX are projected to be $1.6 Billion in 2000. In just 15 months on the market, VIOXX has captured 15% annual TRx share of the A&A market and 49% of the coxib class. Approximately 78% sales are 25 mg, 12% 12.5 mg and 10% 50 mg. While this underscores solid growth, managing the competitive challenges of 2001 is a determinant of the long-term success for VIOXX. For 2001, the annualized market share (TRx) for VIOXX is expected to be 26%, with a December exit share of 27%. This forecast assumes successfully executed launches of key data events, influx of consumers and the entrant of parecoxib in the marketplace. The table below includes 2000 and 2001 projected shares for the major brands.

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                                                        MRK-AAO0000077

| Brand | 1999 TRx Actual | 2000 TRx Share | 2001 TRx Share |
|---|---|---|---|
| VIOXX | 4% | 16% | 26% |
| Celebrex | 15% | 19% | 22% |
| Branded NSAIDs | 30% | 21% | 12% |
| Generic NSAIDs | 51% | 44% | 40% |

### Managed Care and VIGOR label

Managed care is a critical customer segment and target audience within the A&A market.   Within the A&A market, Third Party contributed approximately 52% of purchase dollars YTD June 2000; an estimated 14% from high/moderate control plans and 38% from low control plans.  Of the total TRxs in the A&A market contributed by the third party segment, 26% were from the high/moderate control plans and 74% were from low control plans.

Purchase Dollars by Customer Segment
Within the A&A Market



While High/Moderate control plans account for a smaller piece of the business compared to the low control plans, the impact these plans have on coxib penetration is significant in terms of direct restrictions and spill-over to physician perceptions of patient access to coxibs.  For the coxibs, actively managed formularies affect approximately 50% of all purchases.

Physicians indicate that they would initiate coxib therapy in an additional 25-30% of their chronic patients if managed care restrictions were removed. It is hypothesized that the availability of the revised labeling based on the VIOXX GI Outcomes Trial (VIGOR) will result in the lessening or elimination of restrictions on the class, therefore increasing the access for physicians and patients to the coxib class. Even with the label change, however, managed care will have a cost incentive to recommend traditional NSAIDs as first line treatment for patients who are not at GI risk.

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000078

*Physician perceptions of GI Risk*
Another leverage point that will drive coxib penetration into the A&A market is to increase the imperative of physicians to treat patients at risk of GI gastropathy with a coxib.

Physician Audiences
Targeted physician specialties for VIOXX, which includes Rheumatologists, Orthopedic Surgeons and PCPs (GP,FP, IM, DO), will not change in 2001. Additional specialties are covered by office based and hospital sales groups while they promote other Merck brands (ie. urology, neurology, general surgery, nephrology.) The marketing map for VIOXX designates three general distinctions among physician audiences defined as High Coxib, High NSAID and Pain Specialties. A brief description of each audience is noted below.

High Coxib and High NSAID Physicians
This designation centers around the physicians' beliefs related to the management of chronic arthritic conditions and the associated risk of GI gastropathy. High coxib physicians are distinguished from high NSAID physicians by their greater propensity to use a coxib in a chronic patient as first line therapy.

Research demonstrates that both high coxib and high NSAID physicians define patient risk factors for GI gastropathy similarly and deem a similar percentage of their practice to be at risk. Both physician audiences will prescribe a coxib first-line for patients with the history of a GI event (ulcer, bleed, etc.). These distinctions are relatively consistent across specialties though Rheumatologists and Orthopedic Surgeons are generally more likely to prescribe a Coxib than is a Primary Care physician.

This difference between the high coxib physician and the high NSAID physician is largely driven by a greater concern regarding the potential for the occurrence of a GI event. High NSAID physicians view GI events to be rare and unlikely to occur to their patients. High Coxib physicians, however, often have patients who have experienced a bleed or other serious event and are highly concerned about placing their patients at risk. Strategies to encourage high NSAID physicians to prescribe for patients with "moderate risk" represent a change from Business Plan in which the leverage point was identified as expanding the number of patients viewed to be at "above average" risk. It is now more clearly understood that the definition of risk is the same for both high coxib and high NSAID physicians, but their threshold for acting on that risk is different.

Additional distinctions that play a significant role between the groups include how the group perceives the impact of managed care and cost on their patients. High NSAID physicians state that over 50% of their patients are part of a managed care plan. This constrains physicians' use of coxibs. In contrast, high coxib physicians believe only 30-40% of their patients are part of a managed care plan. This perception difference may be an indication of how comfortable and willing a physician is to deal with the prior authorization process imposed by managed care.

Pain Specialty Physicians
The third targeted audience is "Pain Specialty Physicians" which includes a) physicians who sub-specialize in pain management and are considered to be "Pain Experts" and b) surgical specialties that manage post-surgical pain. "Pain Specialty" physicians are interdisciplinary and originate from various board certified specialties such as Anesthesiology, Neurology or Oncology. They are often thought leaders and innovators in pain mechanisms, pain management therapies, and standards of care. Many of these physicians consider Pain Management to be their primary specialty and are associated with pain clinics and chronic pain management programs.

In addition to the Pain Specialist outlined above, all physicians who perform surgical procedures are trained in post-surgical pain management. These physicians utilize a high volume of narcotics and NSAIDs in an acute manner following surgical procedures and include various surgical specialties such as ORS, Urology, OBG-Gyn, ENT, and Podiatry. In addition to post surgical pain, many of these specialists also manage chronic pain in their patient population.

Highly Competitive Marketplace

*Brand Differentiation*
One of the critical issues for 2001 will be to differentiate VIOXX from competitive products, specifically Celebrex. Currently, efficacy (effective pain relief) is identified as the most important single attribute for products in this

---

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                                                                 MRK-AAO0000079

category by consumers and physicians and is still the greatest unmet need in the market. The below graphic represents the association of VIOXX, Celebrex and two traditional branded NSAIDs on select product attributes.



As characterized above, most physicians perceive little overall differentiation between VIOXX and Celebrex. On the attribute of GI safety, both Celebrex and VIOXX are perceived to be superior to traditional NSAIDs. This benefit is perceived to be a mechanistic effect of sparing Cox-1, and it is believed that all coxibs will offer the same benefit, including future entrants.

On the efficacy parameters, VIOXX and Celebrex are perceived comparable to traditional NSAIDs and to each other, though in recent data VIOXX has begun to differentiate slightly on key efficacy measures such as 'Effective Pain Relief'. For non-GI safety such as renal and cardiovascular adverse experiences, the coxibs are again relatively undifferentiated though Celebrex has begun to demonstrate some differentiation from VIOXX in most recent data months. While VIOXX is perceived to be comparable to traditional NSAIDs for non-GI adverse experiences, Celebrex is perceived as slightly safer in this aspect. The results from the comparative OA data vs Celebrex and Tylenol 3 vs VIOXX studies will help to solidify the superior efficacy image of VIOXX.

While VIOXX and Celebrex have met physician expectations with regard to GI safety, both physicians and patients continue to desire agents which provide additional efficacy and are willing to use new agents if they perceive the potential for incremental efficacy versus existing therapies. Near term entrants into the coxib class such as parecoxib and valdecoxib are anticipated to adopt efficacy positions in order to take advantage of the latent dissatisfaction in the market.

*Importance of Consumers and Patients*
Both physician and consumer audits point to the importance of consumer demand in driving both the treatment and brand choice decisions within this market. The Buying Process quantitative research indicated that 14% of total A&A prescribing situations are accompanied by a consumer request for brand. Of these requests, physicians say they comply 75% of the time with brand/treatment requested.

Patients also play a significant role in shaping physicians' perceptions about the overall efficacy and tolerability of products within this category. Since there are no objective measures of efficacy for patients experiencing pain, physicians rely solely on the feedback of patients to evaluate the therapy they have selected.

Pain sufferers exhibit a proactive approach to managing their pain -- constantly searching for new/alternative treatments that provide superior relief or enhanced safety. Recognizing this behavioral pattern, DTC communications play a critical role in directing these sufferers to new treatment alternatives. Analysis of the VIOXX DTC campaign indicates that increases in the number of "new" and "switched" patients has coincided with

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                                                                    MRK-AAO0000080

the growth of brand awareness. Additionally, even within the "satisfied" segment of the market, which is difficult to motivate, DTC advertising can help generate "dissatisfaction" by letting consumers know about a breakthrough alternative. In pre-launch research, this dynamic was seen even among Celebrex patients who were willing to switch to VIOXX after just praising Celebrex as a miracle drug.

Buying process research reveals that the patient is a key driver in determining physician behavior. Of those consumers who saw a DTC advertisement and asked their physician for the advertised medicine, approximately 75% report having their request honored by their physician. Analysis of VIOXX "Everyday Victories" campaign shows that DTC advertising has played an important role in encouraging patient action:

- Patient/physician discussions about VIOXX have increased since the launch of DTC advertising
- Patients aware of VIOXX advertising were significantly more likely to take action than those not aware
- Consumer-initiated action is significantly higher for VIOXX since the start of the DTC campaign
- When a consumer initiates action for a brand, physicians comply with the request

Previous new product launches in the pain relief market have exhibited rapid uptake resulting from physician and patient excitement about new therapy options. However, this excitement quickly tapers off and patients begin to switch. Data indicates that the DTC campaign for VIOXX has helped in aiding retention of VIOXX users. Specifically, a relationship exists between increases in brand awareness and growth in "continuing" patients on VIOXX. Brand loyalty and insulation will be especially important for VIOXX, recognizing the new entrants into the market in the next five years.

The competitive landscape is heavily cluttered with both OTC and DTC players fighting for their "fair share" of the arthritis/pain category. As a result, the noise level within this crowded arena is very high. Competitive spending figures from 1999 show that major OTC spending levels started at $85MM (Aleve®), with Tylenol® and Advil® nearing $100MM. Significant DTC advertising support for both VIOXX and Celebrex® in 1999/2000 will continue throughout 2001/2002 as both brands expect to communicate new benefits/indications to consumers. Most importantly, the anticipated approval and DTC launch of Searle/Pfizer's "next generation" products (valdecoxib/parecoxib) will add increased fragmentation into an already crowded marketplace.

*Promotional Spending Share of Voice*

For physician promotion, the A&A market is highly promotion sensitive and less science-based than other markets in which Merck competes. As predicted, Pharmacia/Pfizer have proven to be a formidable competitor in aggressively positioning Celebrex against VIOXX. The promotional activity has reached unprecedented levels and there is no sign these levels will decrease in 2001. In addition to promoting Celebrex, Pharmacia/Pfizer have waged an aggressive counter-positioning campaign, replete with questionable studies against VIOXX. Because it is likely that Pharmacia/Pfizer will have at least two and potentially three coxibs in the marketplace prior to the launch of etoricoxib, its stake in defending its franchise will be high.

In 2000, Pharmacia/Pfizer have achieved a total greater number of contacts (representative calls) for Celebrex than Merck for VIOXX. For the first six months of the year, this differential has been approximately 20%. This is primarily due to the number of representatives detailing the products as well as the number of details per day. This difference is anticipated to remain the same as Merck increases headcount and Celebrex increases headcount from the Upjohn unit of Pharmacia.

In 2000, share of voice is comparable between VIOXX and Pharmacia on the major physician promotion spending categories HEL, journals and samples. The assumption for 2001 is that these levels of promotion will continue.

*Competitive Overview*
Over the next five years, the A&A market will become increasingly competitive, with the introduction of new products, data, indications, and line extensions. 2001 will be pivotal, as competitive activity will accelerate the development of the market and shape physicians' perceptions of the coxib class. Key events that will strengthen the position of coxibs include labeling revisions for VIOXX and Celebrex based upon results of GI Outcomes studies, the rollout of new clinical data for VIOXX (vs. Celebrex, TS, and Toradol) and approval of parecoxib (2Q 2001) and potentially valdecoxib (4Q 2001).

---

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

Celebrex (celecoxib) - Pharmacia/Pfizer

Celebrex, launched in January 1999, has recently passed ibuprofen in TRx's to become the A&A market leader. In addition to its launch indications of OA and RA, Celebrex was approved in December 1999 for the treatment of FAP. Public statements from Pharmacia indicate that Celebrex is on track to receive an acute pain indication by the end of 2000.

Celebrex initially was positioned as the "breakthrough" coxib, but it is migrating to a position of safety. This is based in part upon the recent release of data from its GI Outcomes trial (CLASS), and Pharmacia/Pfizer have been extremely aggressive in attempting to position VIOXX as an unsafe product with dose-related side effects such as hypertension and edema. Recent findings from the VIOXX GI Outcomes Trial (VIGOR) regarding a statistically significant reduction in thromboembolic events in the Naproxen arm of the trial have further fueled the strategy of Pharmacia/Pfizer.

The majority of Celebrex NRx's (77%) are at the 200 mg dose, b.i.d. usage has grown to 25% of the total utilization. This utilization trend has had an adverse impact on the weighted average cost of Celebrex as shown below, with VIOXX currently at a 11% discount vs. Celebrex.

*Near Term Threat – Parecoxib/ Pharmacia*
Parecoxib is a water-soluble pro-drug of valdecoxib (Pharmacia/Pfizer's second oral coxib entrant) for parenteral administration. Parecoxib is being developed as an IV/IM coxib for use in pre- and post-surgical pain settings primarily in the acute setting. In dose-ranging post-surgical dental pain studies, parecoxib has demonstrated comparability to Toradol (ketorolac), the IV/IM NSAID made by Syntex.

The expected filing date for parecoxib is 4Q00, with an approval by 2Q 2001 (assuming priority (1P) review status, given its unique formulation for a coxib) and as such, essentially represents the launch of valdecoxib, several months in advance of its availability. Under the current contract with Pharmacie, Pfizer is not expected to co-develop or co-market parecoxib. Pharmacia is currently hiring a 300-person hospital sales force to support the launch of parecoxib. As it will be the only parenteral formulation coxib on the market for some time, current assumption is that the price of parecoxib will be anchored to the price of branded injectable Toradol.

The injectable formulation of parecoxib provides a unique opportunity to position parecoxib for surgical and pain specialists. Such a formulation confers an expectation of efficacy, captures the acute pain patient and provides an opportunity for step down therapy to the oral formulation (valdecoxib).

*Hospital Spillover Potential: Parecoxib/valdecoxib (Injectable & Oral Formulations)*

When looking specifically at the potential for "hospital to community" spillover of parecoxib and valdecoxib, unique opportunities exists. If a specific oral agent such as valdecoxib is "available" or "exclusive" at an institution, it may influence the following:
  a) the discharge oral medication being prescribed by a physician
  b) the independent office-based prescribing of the oral agent by a physician who gained experience in the hospital

An additional type of spillover may occur when multiple formulations of an agent are "available" or "exclusive" at an institution. An agent such as parecoxib may influence the following:

  a) a desire to switch to the oral formulation of the same chemical (valdecoxib) either within the hospital or upon discharge
  b) a "Halo effect" from the injectable agent that will impact perceptions around the onset and efficacy of the oral formulation.

*Valdecoxib - Pharmacia/Pfizer*
Valdecoxib is a new coxib in development from Pharmacia/Pfizer with improved selectivity and potency compared to celecoxib. Phase III studies are underway and the NDA is expected to be filed either late 4Q00 with an estimated late 4Q01 approval (standard review) or as recent reports indicate, the filing may be delayed by 3-6 months in order to include additional pain studies (potentially cancer pain), and enabling a priority (1P) review.

---

*Profit Plan Process*                    10                    1-Sep-00

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                    MRK-AAO0000082

Regardless of the strategy Pharmacia/Pfizer take, the timing of approval for valdecoxib will likely be similar (late 4Q01).

Anticipated indications for valdecoxib include: Osteoarthritis, Rheumatoid Arthritis, Acute pain, chronic pain, peri-operative pain and possibly cancer pain.

Given existing physician perceptions as well as the direction of the clinical program for the Pharmacia coxib franchise, positioning for valdecoxib will likely focus on efficacy parameters (pain relief) with the focus of Celebrex on long-term safety, tolerability and efficacy.  Early data for valdecoxib suggest it will be comparable to NSAIDs in efficacy, however, Pharmacia/Pfizer is also conducting studies versus mild narcotics such as Tylox to achieve a more powerful efficacy image for the product.  Parecoxib and valdecoxib are expected to have the same brand name.

OP – Redacted – other prod. c:

---

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000083

*Template A*

**USHH 2000 PROFIT PLAN**
**COMPETITIVE ENVIRONMENT TEMPLATE**
**VIOXX**

| | VIOXX | Celebrex | Parecoxib |
|---|---|---|---|
| **MARKET SHARE (TRx)** | | | |
| 2000 Share | 42.9% | 57.0% | N/A |
| 2001 Share | 52.3% | 47.7% | <1% |
| **SHARE OF VOICE** (based on contact minutes) | | | |
| 2000 Share | 46.1% | 53.9% | N/A |
| 2001 Share | 46.8% | 46.7% | 6.5% |
| **SALES FORCE SIZE*** | | | |
| 2000 | 4,000 | 4,400 | N/A |
| 2001 | 5,750 | 5,400 | 750 |
| **CONTACTS*** (000s) | | | |
| 2000 | 3,360 | 4,070 | N/A |
| 2001 | 4,830 | 4,995 | 594 |
| **CONTACT MINUTES*** (000s) | | | |
| 2000 | 15,986 | 18,683 | N/A |
| 2001 | 22,930 | 22,929 | 594 |
| **JOURNAL $*** (000s) | | | |
| 2000 (ea) | $8,000 | $8,313 | N/A |
| 2001 (est) | $8,000 | $8,313 | 3,185 |
| **REBATES** | | | |
| 2000 | 6% | 6% | N/A |
| 2001 | 12% | 12% | 2% |

Row titles may be changed as appropriate;
*VIOXX 2000 Target Universe
** Assume OBR/Spec. Expansion; Celebrex adds PD/W-L primary care forces; Parecoxib – Pharmacia Hospital Force (450) & 300 specialty reps)
***IMS IPS (June, 2000); Annualized (Contact include internal multiplier=2.75)
****IMS IPS (July, 2000); Annualized); Annualized

## ISSUES

Two identified key issues represent the fundamental drivers of the business for VIOXX in 2001:

**Highly Competitive Marketplace:**
In 2001, with the approval and launch of two new coxibs, existing competitive pressure in the market will increase from Pharmacia – parecoxib in 2001 and valdecoxib in January 2002. Maintaining a strong market position will require that several key areas are addressed in 2001. Key elements raised in the market environment are as follows:

- VIOXX is largely undifferentiated from Celebrex on GI safety and efficacy measures.
- VIOXX is being challenged by Celebrex on non-GI safety (renal/hypertension/MI).
- Valdecoxib/parecoxib appears likely to try to take a dominant position on efficacy to create an image of superiority to VIOXX.
- Formulary position will become key in the market as managed care plans move towards two coxib formularies to maximize rebates.
- Consumer demand for specific brands will continue due to the presence of DTC.

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                    MRK-AAO0000084

**Coxib Penetration into the Analgesic and Anti-inflammatory Market:**

It is imperative to the future growth of VIOXX to increase the penetration into the overall A&A market by capturing share from the remaining traditional branded and generic NSAIDs. Coxib penetration will be influenced by numerous environmental factors of which the following are the most prominent:

- Managed care restrictions on coxib use in favor of generic NSAIDs create a significant barrier for the penetration of coxibs into the A&A market.
- Treatment imperative to select a coxib for at risk patients. New data such as VIGOR must be leveraged to drive increased treatment among high NSAID physicians.

## OBJECTIVES

The 2001 Objectives for VIOXX are defined into two major categories: market performance and strategic objectives. The Market Performance Objectives are focused on sales and income, while the Strategic Objectives address the identified Key Issues.

**Market Performance Objectives:**
- Achieve sales target of $2.5 billion
- Achieve controllable income of $1.9 billion
- Gain and retain formulary status in 80% of contracted lives
- Gain annual A&A market growth of 10%
- Achieve annual A&A Market TRx share of 25% (achieve 27% December exit share)
- Increase coxib leadership to achieve 55% December TRx Exit coxib share of 55%

### Strategic Objectives:

- Differentiate VIOXX on superior pain relief and GI outcomes in the coxib class
- Create a position of superiority vs. valdecoxib/parecoxib
- Neutralize safety concerns around hypertension, edema, and MI
- Increase level of dissatisfaction with GI risk associated with traditional NSAIDs
- Broaden access to coxibs for physicians and patients in managed care
- Drive consumers to request and remain loyal to VIOXX

### Marketing Choice #1: Identification of Target Audiences

In 2001, the plan has been developed to focus resources on the following customer segments and audiences:

| Customer Segment or Audience | Descriptions | Number |
|---|---|---|
| Physician Specialties – High Coxib and High NSAID | Targeted (A+/B) prescribers of A&A medications including PCPs (FP, GP, IM), Rheumatologists, Orthopedic Surgeons and other hospital based specialties. | High coxib –36k High NSAID –72k |
| Customer Segments – HMO/PBMs | High and Medium Control HMO/PBMs Pharmacy/Medical Directors and Other P&T Influencers | 86 national/regional plans |
| Consumer – Proactive consumers as identified on the market map | Chronic pain sufferers who regularly take pain relief medication and who will have a conversation with their physician about VIOXX | 22 MM |
| Thought Leaders | Individuals who, by virtue of their status among their peers, influence treatment patterns, understanding of disease and/or healthcare delivery in the management of arthritis and pain | 1,500 |
| Secondary Targets | Federal and Non-Federal Hospitals | 3,900 targeted hospitals Federal targeted accounts |

Those customers and audiences listed above are the most important influencers in the chronic pain buying process, which constitutes the greatest market opportunity for the brand. The hospital market as a secondary

Confidential - Subject To Protective Order                                                    MRK-AAO0000085

target will be discussed briefly given the potential entry point it offers for valdecoxib through parecoxib. While other customer segments such as LTC and Employer will have some influence on the buying process either through physician perceptions or through influencing managed care decision making, they were not primary influencers of behavior for choosing coxibs, or VIOXX.

## Marketing Choice #2: Identification of the Behavioral Objectives

The following is a summary of strategic choices including drivers, barriers, and behavioral objectives:

### Summary of Strategic Choices 1-3 (Template C)

| Target Audience | Drivers | Barriers | Behavioral Objectives |
|---|---|---|---|
| Physicians High Coxibs | • Broad definition of GI risk (past bleed, corticosteroid use, age, chronic NSAID use, other GI) <br> • Willing to oppose managed care restrictions on Coxibs <br> • Believe GI bleed is serious risk to patients <br> • Fully understand Cox-2 theory <br> • Will respond to patient request for Brand | • VIOXX and Celebrex remain undifferentiated <br> • Do not believe that all patients are at risk <br> • See minimal risk in short term NSAID use <br> • Early adopters of new agents and will likely initiate early trial with new entrants | • Prescribe VIOXX preferentially over Celebrex due to its superior efficacy profile and managed care formulary status <br> • Advocate the use of VIOXX to their patients and peers <br> • View VIOXX as best in class for efficacy and remain loyal through the launch of valdecoxib/parecoxib <br> • Expand the use of VIOXX to additional patient types in terms of risk and duration of therapy |
| Physicians High NSAIDS | • Concerned about "High Risk" patients <br> • Managed Care advocates treatment of High Risk patients with a Coxib <br> • Have large number of dissatisfied patients in practice <br> • Will respond to patient request for Brand <br> • Highly responsive to managed care guidelines | • Believe serious events (bleeds) are rare <br> • Do not consistently evaluate risk <br> • Very narrow definition of risk (history of bleed, advanced age) <br> • Unwilling to fight Managed Care "hassle" | • Understand those patients who can readily receive Coxibs in a managed care setting <br> • Believe that the risk to their patients is great enough to expand use <br> • Prescribe VIOXX preferentially over Celebrex due to its superior efficacy profile and managed care formulary status |
| Consumer | • Pain has a dramatic influence on their lives, but they refuse to give in <br> • Look primarily for Efficacy, secondarily for a safe medication <br> • Open and willing to discuss new treatment options | • Concerned would have to sacrifice safety to achieve desired efficacy <br> • Not aware of new treatment options <br> • May believe OTCs Safer <br> • May rely on physician for information on new therapies | • Proactively request a VIOXX prescription <br> • Remain on VIOXX therapy <br> • Believe that VIOXX offers the pain relief they are seeking <br> • Believe that VIOXX offers a safety/tolerability advantage over traditional medications <br> • Advocate VIOXX to physician and friends |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000086

| Audience | Drivers | Barriers | Behavior Objectives |
|---|---|---|---|
| Managed Care (HMO/PBM) <br><br> Decision Makers (Pharmacy/ Medical Directors) <br><br> Other P&I Influencer | • Physician and consumer demand <br> • Competitive contracting <br> • Advocate development and advocate support for VIOXX <br> • New and expanded treatment indications for VIOXX <br> • Reduction in the prophylactic use of PPIs <br> • Data and messages that support MCO's mission of "quality health care" <br> • Clinical outcomes demonstrate superior GI safety of coxibs over NSAIDs, and product label change supports this benefit <br> • Concern about potential negative ramifications of GI events experienced by patients denied coverage for coxibs, | • Cost of VIOXX versus generics <br> • NSAID class labeling regarding GI gastropathy for coxibs <br> • MCO's narrow definition of GI risk and implementations of formulary restrictions <br> • Large co-pay differentials for coxibs versus generics shifts financial responsibility to patients <br> • Reduce expenditures by limiting the number of coxibs on formulary | • Accept that more patients are appropriate for coxibs and reduce formulary restrictions. <br> • Believe that coxibs support the mission of quality health care and reduce overall costs in appropriate patients. <br> • VIOXX has a superior value proposition to Celebrex, based on efficacy and effective net price. <br> • Provide preferred or at least equal formulary status for VIOXX versus all branded competitors. |
| Thought Leader | • Understand Cox-2 theory <br> • Understand platelet data <br> • Loyal to Merck | • Concerned about appearing biased to one manufacturer and as a result will not differentiate brands without specific data <br> • Unsure of economic benefit of Coxibs <br> • Long-term relationship with Searle, relatively new relationships with Merck | • Champion Coxib class and differentiate VIOXX from Celebrex and new entrants <br> • Manage negative messages directed at VIOXX from competition <br> • Take proactive position regarding Managed Care formularies, guidelines and treatment protocols <br> • Participate in Merck sponsored activities |
| Hospital | • Favorable access – NSAID class relatively unmanaged except in DSH hospitals <br> • Advocate Support by Pain Influencers <br> • Indications – acute pain <br> • JCAHO Guidelines <br> • VIGOR labeling change to stimulate formulary acceptance <br> • Few good non-narcotics analgesics <br> • Convenience – once daily dosing / 50mg tablet <br> • Clinical profile | • Customers asking for additional discounts for exclusive coxib <br> • Celebrex discounts matching DACON differential <br> • NSAID class labeling for GI; NSAID gastropathy not a concern <br> • High volume use of low cost analgesics <br> • Belief that inexpensive NSAIDS are acceptable for Acute Pain <br> • Perception that Narcotics are Superior <br> • Lack of understanding of MOA/Cox – 1 effects by surgical specialties <br> • Competitive noise in the marketplace | • Believe that VIOXX is the "oral coxib of choice" providing superior efficacy in its class, which meets the broad range of hospital needs, for chronic pain, acute pain, and surgical pain conditions <br> • Believe that VIOXX should be used: <br>   - Instead of traditional/generic NSAIDs <br>   - Pre-emptively over the use of an IV/IM NSAID <br>   - In combination with narcotics or earlier step-down from narcotics <br>   - In place of narcotics in appropriate patients <br> • Believe that there is limited use for an expensive, IV COXIB and remain loyal to VIOXX through competitive launches (ultimately minimize the utilization of parecoxib and blunt the uptake of valdecoxib) <br> • Establish VIOXX as the preferred pain agent upon hospital discharge and in the outpatient clinics <br> • Provide equal or preferred formulary status for VIOXX and blunt Valdecoxib addition to the formulary |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                                                                MRK-AAO0000087

### Marketing Choice #3: Articulation of Brand Positioning

The overall positioning for VIOXX has been refined for 2001 to meet the objective of establishing a sustainable and differentiated positioning for VIOXX. The image for VIOXX is "VIOXX provides *superior* efficacy in the breakthrough coxib class". This image is critical to not only differentiate VIOXX from Celebrex, but parecoxib and valdecoxib and NSAIDs.

#### Global Position Statement for Strategic Choices for VIOXX

*Target Audience:*
High prescribing physicians (high coxib and high NSAID); managed care decision makers (pharmacy and medical directors and other P&T influencers); thought leaders.

*Summary Statement:*
For physicians/customers treating patients with OA and chronic pain: VIOXX provides superior efficacy in the breakthrough coxib class that simplifies your management of pain, enabling you to provide MORE RELIEF for MORE OF YOUR PATIENTS.

The following is a summary of positioning statements by target audience. *These positioning statements are currently being researched.*

#### Positioning by Target Audience (Template D)

| Target Audience | Positioning |
|---|---|
| High Coxib | For physicians treating at-risk patients with OA and chronic pain: VIOXX provides superior efficacy in the breakthrough coxib class that simplifies your management of pain, enabling you to provide MORE RELIEF for MORE OF YOUR PATIENTS. |
| High NSAID | For physicians treating patients with OA and chronic pain: VIOXX is answer to the RISK of NSAID related gastropathy, because it provides superior efficacy in the breakthrough coxib class and simplifies your management of pain, enabling you WORRY LESS while you provide MORE RELIEF for MORE OF YOUR PATIENTS. |
| Managed Care (HMO/PBM) | VIOXX is a breakthrough product and the best branded choice for the management of arthritis and chronic pain. *Customer Benefits:* Deliver value to MCOs; Meet the demands of physicians; Meet the demands of patients *Reasons to believe:* <br>• Demonstrates superior GI safety and outcomes versus traditional NSAIDs <br>• Provides superior efficacy versus Celebrex and valdecoxib <br>• Provides competitive contracting strategy versus Celebrex and branded NSAIDs <br>• Reduce overall costs for appropriate patients <br>• Support MCO's mission of providing quality health care to patients <br>• Supports customers' treatment strategies for arthritis and pain. |
| Consumer | For proactive chronic pain sufferers who regularly take pain relief medications, VIOXX is a breakthrough pain relief medication that helps you lead a more fulfilling life because just one small tablet, taken once a day provides 24 hour relief of pain (even of severe pain) with fewer stomach problems. |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

| Thought Leaders | For thought leaders who influence the management of OA and chronic pain: VIOXX provides superior efficacy and the best GI outcomes data in the breakthrough coxib class that is supported by the strongest science and simplifies the management of pain, enabling physicians to provide MORE RELIEF for MORE PATIENTS. |
| Hospital | VIOXX is the oral coxib of choice for the management of chronic pain, acute pain and surgical pain that will deliver value to hospitals because VIOXX provides superior efficacy, fast acting, 24 hour pain relief in addition to Cox-1 sparing safety which will increase the overall quality of patient care within the hospital, upon discharge, and in the outpatient clinic setting. |

## Marketing Choice #4: Detailed Implementation Plan

Achievement of the behavioral objectives and strategic objectives will be accomplished through a well integrated implementation plan leveraging the key data market events and preparing for key competitive events. The key data and competitive events are summarized as follows:

| Trimester One | Trimester Two | Trimester Three |
| --- | --- | --- |
| Comparative OA Efficacy Study | VIGOR label | VIOXX vs Toradol IM |
| Tylenol 3 vs VIOXX | Advantage Trial Results | |
| | Parecoxib Approval | |

Due to the "block and tackle" nature of this marketplace, each of these key data market events will be launched with an integrated mix of core promotional elements such as data specific messaging, promotional literature, samples and HEL.

A general description of the major programs for each strategic audience is as follows:

### Selection of Mix Elements by Audience:
Due to the relative lack of differentiation between VIOXX and Celebrex and the high level of promotional sensitivity of the broader A&A market, branding is an important element in all promotion.

### High Coxib Physician
The key behavioral objective for VIOXX with these physicians is to differentiate the brand on efficacy while defending its safety perception from competitive attacks. High coxib physicians tend to view VIOXX as slightly better on efficacy, while having some level of concern relative to non-GI safety (hypertension/edema, MI).

Based on the behavioral objectives, the TBG is focusing on the following mix elements for high coxib physicians:

- Representative Selling Materials (Core Efficacy Based Selling Aids; Obstacle Handlers)
- Journals
- HEL
- Direct Mail
- Samples/Stock Bottles
- Peer to Peer Teleconferences
- Support Review Article Development
-

### Major Programs – High Coxib Physicians

| Program | Key Message (s) | Behavior Objective (s) Met | Funding |
| --- | --- | --- | --- |
| Representative Materials | • Comparative OA<br>• T#3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Remain Loyal during valdecoxib launch | $0.8 MM |
| Journals | • Comparative OA | • Superior efficacy v. Celebrex | $3.2 MM |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                                                   MRK-AAO0000089

| Program | Key Message (s) | Behavior Objective (s) Met | Funding |
|---|---|---|---|
| HEL | • Comparative OA<br>• 1 & 3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Remain Loyal during valdecoxib launch<br>• Advocate VIOXX to peers and patients | $31.8 MM |
| Direct Mail | • Comparative OA<br>• 1 & 3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Remain Loyal during valdecoxib launch | $0.1 MM |
| Samples/Stock Bottles | • Comparative OA<br>• Effective pain relief | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Remain Loyal during valdecoxib launch | $28 MM |
| Peer to Peer Teleconf. | • Comparative OA<br>• 1 & 3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Remain Loyal during valdecoxib launch<br>• Advocate VIOXX to peers and patients | $2.5 MM |
| Review Articles | • Comparative OA<br>• 1 & 3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Remain Loyal during valdecoxib launch<br>• Advocate VIOXX to peers and patients | $0.2 MM |

These mix elements above will result in following reach and frequency objectives:

| Element | Reach | Frequency |
|---|---|---|
| OBR Calls | 95% | 35% |
| Journals | 93% | 4.3% |
| HEL | 80% | 3/year |
| Direct Mail | A+/A | 6/year |

**High NSAID**

The key behavioral objectives for high NSAID physicians focus on the need to increase their imperative to select a coxib for at-risk patients and once a coxib has been selected to select VIOXX due to superior efficacy. High NSAID physicians currently view GI risk in the majority of their patients not to be significant enough to warrant a coxib. They also tend to have limited experience with the coxibs and as a result are less likely than High Coxib physicians to be able to differentiate the brands.

Also in contrast to high coxib physicians, High NSAID physicians tend to try to manage a broad number of patients with a minimum of customization to each patient's situation. Hence they are less apt to want to deal with the hassle of managed care restrictions associated with coxibs and generally feel they can manage the patients GI risk without this inconvenience.

Based on the above selection criteria, the TBG is focusing on the following mix elements for High Coxib physicians:

• Representative Selling Materials (Core Efficacy Based Selling Aids; Obstacle Handlers)
• Journals
• HEL
• Direct Mail
• Samples/Stock Bottles
• Peer to Peer Teleconferences

**Major Programs – High NSAID Physicians**

| Program | Key Message (s) | Behavior Objective (s) Met | Funding |
|---|---|---|---|
| Representative Materials | • VIGOR<br>• Comparative OA<br>• 1 & 3 Efficacy: Efficacy superior to narcotics in dental pain. | • Increase Imperative to select Coxib<br>• Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs | $ 0.8 MM |

---

*Confidential Merck & Co., Inc. Document*

Confidential – Subject To Protective Order

| Program | Key Message (s) | Behavior Objective (s) Met | Funding |
|---|---|---|---|
| Journals | • Comparative OA | • Superior efficacy v. Celebrex | $4.5 MM |
| HEL | • VIGOR<br>• Comparative OA<br>• 1º3 Efficacy: Efficacy superior to narcotics in dental pain. | • Increase imperative to select Coxib<br>• Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs | $31.5 MM |
| Direct Mail | • VIGOR<br>• Comparative OA<br>• 1º3 Efficacy: Efficacy superior to narcotics in dental pain. | • Increase imperative to select Coxib<br>• Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs | $1MM |
| Samples/Stock Bottles | • Comparative OA<br>• Safety versus non-selective NSAIDs | • Increase imperative to select Coxib<br>• Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs | $28 MM |
| Peer to Peer Teleconf. | • VIGOR<br>• Comparative OA<br>• 1º3 Efficacy: Efficacy superior to narcotics in dental pain. | • Increase imperative to select Coxib<br>• Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs | $2.5 MM |

These mix elements above will result in following reach and frequency objectives:

| Element | Reach | Frequency |
|---|---|---|
| OBR Calls | 95% | 35% |
| Journals | 89% | 4.3% |
| HEL | 80% | 3/year |
| Direct Mail | A+/B | 1/year |

## Thought Leaders

The VIOXX and etoricoxib TBG intend to implement, where appropriate, joint advocate development initiatives in 2001 in order to develop a unified base of advocates and to help ensure that advocates understand and communicate the Company's franchise positioning. As a consequence, many major initiatives – National and Regional Consultant Meetings, selected Advisory Boards, involvement with Professional Societies, and HSA – Initiatives – will be planned and implemented jointly as described in more detail below. In addition, activities are planned throughout the year to optimize the rollout and timing of data and initiatives for both products. Activities for VIOXX will occur earlier in the year (eg. VIGOR, Comparative OA Efficacy Study); and activities for etoricoxib will occur later in the year (phase III results).

One of the most important target audiences for VIOXX in 2001 will be the thought leaders and advocates on a national and regional level. Target audiences include:

- Thought leaders who focus on the management of pain and inflammation within the following specialties: rheumatology and pain management (anesthesiology, emergency medicine, neurology, oncology)
- Orthopedic surgeons who focus on the management of pain and inflammation or who are nationally recognized within the orthopedic community
- Thought leaders in gastroenterology (to decrease tolerance to NSAID-induced gastropathy)
- Thought leaders in cardiology and nephrology (to neutralize competitive messages around the renal and cardiovascular safety and tolerability of VIOXX)

The behaviors of thought leaders align with those of the high coxib physician segment; however, they are not always high prescribers. National thought leaders are nationally recognized by their peers and often affiliated with academic medical centers. They are active in national professional societies, speak regularly at national forums, and are often published in peer-reviewed journals. National thought leaders consist of an audience of 500 physicians and are targeted by the HSAs. Regional thought leaders are recognized by their peers within a specific region, are often active in regional professional organizations, and may influence treatment within a managed care organization, hospital, or integrated health system. Regional thought leaders consist of an audience of 2000 physicians and are targeted by the A&A Specialty Representatives and Hospital Representatives.

Confidential - Subject To Protective Order

MRK-AAO0000091

Another specific target audience for advocate development is speakers. National speakers consist of 250 physicians who speak in national forums and are targeted by the HSAs. Regional speakers present at regional educational programs and HEL programs and include 700 physicians who are targeted by the A&A Specialty Representatives and 300 physicians who are targeted by the Hospital Representatives. Local speakers include an audience of 1000 physicians and are targeted by Office-Based Representatives.

Programs for 2001 will provide opportunities for scientific exchange among thought leaders and advocates. A cascade approach to communication will be utilized to ensure effective and efficient message delivery to thought leaders, as well as to prescribers and organizations in an effort to influence their behavior. The following programs will be developed to achieve the behavioral objectives of thought leaders for VIOXX

- Advisory Board Meetings
- National and Regulatory Consultant Meetings
- Thought Leader Teleconferences
- Medical School grants and CDP studies with top thoughtleaders
- Investigator Meetings
- National and Regulatory Speaker Training Meetings
- Partnerships with APS, ACG, and AGS

## Managed Care (HMO/PBM):

The tactical plan within the HMO/PBM customer segment focuses on the following behavioral objectives:
- Accept that more patients are appropriate for coxibs and reduce formulary restrictions – (VIGOR)
- Believe that VIOXX has a superior value proposition to Celebrex, based on superior efficacy and lower effective net price – (Comparative OA and Weight Average Cost advantage)
- Provide preferred, or at least equal, formulary status for VIOXX versus all branded competitors.
- Believe that coxibs support the mission of quality health care and reduce overall costs in appropriate patients.
- Execute programs to block demand for competition.

The last two program pertaining to the retail pharmacy (MAP, and EXXPERT) listed in the chart below represent approximately 63% of the total spending within the HMO/PBM segment.

## Retail Pharmacy:

The retail pharmacy has become a critical marketing channel for implementing programs that support the behavioral objectives for Consumers. In addition, the volume and type of discussions occurring between VIOXX targeted Consumers and retail pharmacists, provide us with a unique opportunity to develop retail pharmacists as advocates and drive discussions with Consumers benefiting VIOXX.

The tactical plan within the retail pharmacy customer segment focuses on the following behavioral objectives:
- Have patients proactively request a VIOXX prescription from their health care provider.
- Drive persistence and remain loyal to VIOXX.

Confidential - Subject To Protective Order                                                       MRK-AAO0000092

*Investment by Managed Care Customer Segment (Template G)*

| Customer Segment / Program | | Target Audience(s) | Investment |
|---|---|---|---|
| • | HMO/PBM: National Managed Care Consultant Meeting and National Advisory Boards | • 200 Medical and Pharmacy Directors at Merck Targeted Accounts | • $ 0.9 MM |
| • | HMO/PBM: Managed Care Directed HEL Programs | • 180 regional managed care accounts; targets for contracting, resource implementation, or pull-through of national contracts via regional programs | • $ 1.6 MM |
| • | HMO/PBM: Pharmacy Conversion Program with PCS | • 50,000 High Coxib or High NSAID physicians affiliated with PCS Pharmacy Networks | • $ 2.5 MM |
| • | Retail Pharmacy: Merck Adherence Program (MAP) and MAP Platinum for VIOXX | • Project to reach 1.2 million new patients starting VIOXX therapy in 2001. | • $ 6.9 MM |
| • | Retail Pharmacy: EXXPERT and ISPN Programs – In-Store Marketing Program | • Proactive Consumers as defined by Consumer Market Map | • $ 7.0 MM |

## Hospital:

The 2001 mid-year launch of parecoxib and subsequent launch of valdecoxib represent a significant threat to the use of VIOXX in the hospital because of comparable Cox-2 selectivity, a quicker onset of action, and the availability of an IV/IM formulation. The target audience anticipated for parecoxib will be surgical and pain specialties such as anesthesiologists, surgeons (including high prescribing surgical specialties) and particularly Orthopedic Surgeons. The efficacy and power from parecoxib's formulation and onset of action is expected to be leveraged to create a "halo effect" for the oral formulation of valdecoxib to appear more efficacious than VIOXX. Pharmacia most likely will try to leverage parecoxib and valdecoxib as the most efficacious coxib (due to its narcotic and Toradol comparator data) with the availability of multiple formulations for use in the hospital and upon discharge.

Prior to the launch of parecoxib and valdecoxib, the key behavioral objective for VIOXX is for institutional customers (prescribers and formulary influencers) to believe that VIOXX is the "oral coxib of choice" providing superior efficacy in the coxib class which meets their broad range of needs for chronic pain, acute pain, and surgical pain conditions. The demonstrated efficacy of VIOXX (vs. Celebrex, T3 and Toradol IV), its onset of action, Cox-1 sparing mechanism, and its breadth of indications offer customers the broadest range of use for patients while in the hospital, upon discharge, as well as in the outpatient surgical or clinical setting. The concept of "pre-emptive analgesia" with VIOXX will also be supported through (CDP/ MRL studies and Medical School Grants) to demonstrate that therapy with VIOXX prior to surgery provides analgesia and reduces the need for narcotics post-surgery. In addition, it will be critical to leverage our extensive experience and clinical data to influence the inclusion of VIOXX in hospital protocols and standing orders. The greater the utilization of VIOXX by the Department of Medicine (Rheums, GP/FP/IM/DO, OBG, EMD), surgical specialties (ORS, GS, Anesth, Urology, Podiatry) and residency programs, the more difficult it will be for VIOXX to be displaced by Valdecoxib on the oral front.

An additional initiative in 2001 will be to develop promotional materials to leverage the opportunity provided by the new JCAHO mandates. The new JCAHO requirements direct institutions to improve the identification, systematic measurement and monitoring of patients in pain. Due to these strict mandates, more patients in pain are expected to be diagnosed and treated within institutions and upon discharge. There is currently a demand for pharmaceutical companies to help partner with institutions to develop materials around pain education and management.

Based on the desired behavioral objectives, the TBG is focusing on the following mix elements for institutional based customers in addition to the mix elements for High Coxib and High NSAID audiences.

Confidential - Subject To Protective Order                                                                      MRK-AAO0000093

## Major Programs – Institutional Based Customers

| Program | Key Message (s) | Behavior Objective (s) Met | Funding |
|---|---|---|---|
| Representative Materials | • Comparative OA<br>• 1#3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR<br>• Toradol Efficacy Data | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Minimize parecoxib utilization<br>• Utilize Vioxx upon discharge<br>• Remain Loyal during valdecoxib launch | $0.4 MM for Hospital Specific |
| Journals: (Physician Weekly) | • Comparative OA<br>• 1# 3 Efficacy Data<br>• Toradol Efficacy Data | • Superior efficacy v. Celebrex<br>• Minimize parecoxib utilization<br>• Utilize VIOXX upon discharge<br>• Remain Loyal during valdecoxib launch | $ 0.2 MM for Hospital Specific |
| HEL | • Comparative OA<br>• 1#3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR<br>• Toradol Efficacy Data | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Minimize parecoxib utilization<br>• Utilize VIOXX upon discharge<br>• Remain Loyal during valdecoxib launch | See High Cost/ High NSAID<br>(of which $ 6.2 MM is allocated for Hospital) |
| Direct Mail | • 1#3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• Toradol Efficacy Data | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Utilize VIOXX upon discharge<br>• Remain Loyal during valdecoxib launch | $0.4 MM Hospital Specific |
| Protocol and Guideline Development | • Comparative OA<br>• 1#3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR<br>• Toradol Efficacy Data | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Minimize parecoxib utilization<br>• Utilize VIOXX upon discharge<br>• Remain Loyal during valdecoxib launch | $0.1 MM |
| 5TH VITAL SIGN / JCAHO Discharge Initiative | • Comparative OA<br>• 1#3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• Toradol Efficacy Data | • Minimize parecoxib utilization<br>• Utilize VIOXX upon discharge<br>• Remain Loyal during valdecoxib launch | $ 1MM |
| CME Mini Fellowship Programs for ORS/Rheums | • Comparative OA<br>• 1#3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR<br>• Toradol Efficacy Data | • Minimize parecoxib utilization<br>• Utilize VIOXX upon discharge<br>• Remain Loyal during valdecoxib launch | $ 1MM |
| Innovative Power Point Technology | • Comparative OA<br>• 1#3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR<br>• Toradol Efficacy Data | • Superior efficacy v. Celebrex<br>• Comparable Safety v. Celebrex and NSAIDs<br>• Minimize parecoxib utilization<br>• Utilize VIOXX upon discharge<br>• Remain Loyal during valdecoxib launch | $0.5 MM |
| ORE Education Center and Resources | • 1#3 Efficacy: Efficacy superior to narcotics in dental pain.<br>• VIGOR<br>• Toradol Efficacy Data | • Superior efficacy<br>• Minimize parecoxib utilization<br>• Utilize VIOXX upon discharge<br>• Remain Loyal during valdecoxib launch | $1MM |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000094

## Clinical Development

The clinical study program for VIOXX is critical to enhance its efficacy profile to outmaneuver the existing and future competition. Due to CDP's dedicated focus and commitment, the head to head trials versus Celebrex will be completed in record time by the end of 2000. These data are essential for Merck's ability to claim superior efficacy versus Celebrex in the treatment of osteoarthritis beginning in the fourth quarter of 2000. The head to head trials versus Tylenol #3 in dental pain will also be completed at the end of 2000 and will be important to further enhance the narcotic efficacy profile in early 2001.

Prior to the launch of the new coxibs from Pharmacia, a number of clinical trials are planned to enhance the efficacy profile of VIOXX. VIOXX versus IM Toradol in the treatment of acute pain will demonstrate that VIOXX provides comparable pain relief and safety to an IM NSAID. Targeted completion is 2Q01.

Two pre-emptive analgesia trials are planned in early 2001 to demonstrate that therapy with VIOXX prior to surgery provides analgesia and reduces the need for narcotics post-surgery. This pre-emptive approach could also reduce the use of IV analgesics (including parecoxib) for selected surgical procedures. The focus will be on orthopedic and gynecologic disorders that will further enhance the utilization of VIOXX in both the institution and outpatient settings. The study results will be file as a new indication in late 2001.

Once IM parecoxib and valdecoxib are approved and available in the U.S., two head to head studies will be conducted to demonstrate superiority of VIOXX along selected dimensions. See template below for additional information.

Confidential - Subject To Protective Order                                                                                      MRK-AAO0000095

# CLINICAL DEVELOPMENT PLAN TEMPLATE (Template H)

| Study | Target Audience | Objective | Plann ed/On going | # Patients | First Patient In | Data Avail | To Date | 2001 | Balance* | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Vs. Celecoxib (112) | Rheums Orthopedic Surgeons PCPs | Superior efficacy vs. Celecoxib | O | 1500 | 1Q 00 | 4Q 00 | $5.22 | $2.26 | | $8.48 |
| Dental Pain vs. Tylenol #3 (2 studies) | PCPs Rheums Orthopedic Surgeons Dentists | Comp. Efficacy vs. Tylenol #3 | O | 390/study | 2Q 00 | 4Q 00 | $3.13 | $.50 | | $3.63 |
| IM Toradol Comparator (2 studies) | Orthopedic surgeons Pain Specialists Anesthesiology | Comp. Efficacy vs. Toradol | P | 400/study | 4Q 00 | 1Q 01 | $1.64 | $3.58 | | $5.22 |
| Cancer Pain (2 studies) | Oncologists | Efficacy in cancer pain (bony mets) resulting in sparing of narcotics | P | 600/study | 1Q 01 | 3Q 02 | $8.14 | $4.12 | | $12.26 |
| *IM Parecoxib Comparator (2 studies) | Rheums Orthopedic surgeons PCPs Anesthesiology Pain Specialists | Comp. Efficacy/safety vs. Parecoxib | P | 400/study | 3Q 01* | 2Q 02 | | $3.00 | $1.79 | $4.79 |
| NSAID Comparator in soft tissue injury (2 studies)  *contingent on launch and drug availability ***Valdecoxib comp. OA studies will also begin in 3Q if priority review is received | Rheumatologists Orthopedic S. PCPs | Comp. Efficacy vs. NSAIDs in soft tissue injury | P | 1375/stud y | 4Q 01 | 2Q 03 | | $1.26 | $12.98 | $14.24 |
| | | | | | | Total | $10.99 | $18.74 | $18.89 | $48.62 |
| | | | | | | Planned | $1.64 | $15.98 | $18.98 | $36.91 |
| | | | | | | Ongoing | $9.35 | $2.76 | | $12.11 |

Several additional clinical studies are under discussion, but have not yet been sufficiently evaluated to list in the 2001 profit plan. They are worth mentioning because they describe the expanded thinking of the TBG around the A&A market. They include: a) "step down" use of VIOXX from an injectable analgesic to an oral product following an acute situation, b) potential analgesic combinations to expand the pain spectrum for VIOXX and c) cross over studies with etoricoxib to determine percent of patients in a physician practice who can be effectively controlled

Confidential - Subject To Protective Order　　　　　MRK-AAO0000096

with Mercks' coxibx. These concepts will be further developed and prioritized within the VIOXX clinical programs and across the CDP/MRL clinical resources in the coming months.

### Additional Areas of Development

Due to its very exciting pharmacological and clinical profile, VIOXX® is being evaluated for a number of indications outside the A&A franchise. These include the treatment of migraine, colon cancer, Alzheimer's disease, and prostatitis. Each use poses an important opportunity and challenge to the franchise as we developed a consistent brand position and image in the market.

As will be discussed by the Migraine and New Products TBGs, early data will become available in these disease areas during the planning period. Processes are in place across the TBGs to ensure integration around resource planning, advisory meetings, and internal/external communications occurs in 2001. Further, integrated positioning statements are planned to ensure continuity in brand image for the long-term.

### Outcomes Research and Management Programs

The overarching objectives for the Outcomes and Research Management (ORM) program in support of VIOXX are to:

1) Expand access to Coxibs by lessening formulary restrictions in the Managed Care segment,
2) Expand market perceptions about the risk of NSAID gastropathy,
3) Support the differentiation between VIOXX and its current competitors, and
4) Strengthen advocates among High Coxib physicians for the use of VIOXX with peers and patients

These objectives will be met through the development and implementation of Outcomes Research Studies and Programs like the Resource Cost Analysis Tool, the Burden of Illness model, Risk Stratification Algorithms, the development of quality measures, and observational studies highlighting the unique advantages of VIOXX and the Coxib class.

## Outcomes Management and Research (Template I)

| Project / Study Description | Target Audience | Business Objective | Planned/ Ongoing | # Sites/ Pts | Start | End | 2001 | Total |
|---|---|---|---|---|---|---|---|---|
| Observational Study: VIOXX vs. Celebrex<br><br>To provide high coxib physicians with an opportunity to compare the high efficacy of VIOXX vs. Celebrex | High Coxib Physicians | Support Comparative OA launch messages and timing; strengthen and develop advocates for VIOXX among targeted High Coxib physicians; shape customer perceptions on the superior efficacy of VIOXX vs Celebrex and view VIOXX as best in class; defend High Coxib prescriber base through the launch of valdecoxib | Planned | 500 High Coxib Doctors | 01/01 | 07/01 | $ 4.5 MM | $ 4.5 MM |

### Consumer Programs

Across all metrics used to evaluate DTC campaign launches at Merck, the "Everyday Victories" Program for VIOXX® has been the most successful consumer launch in division history. The overall objective of the DTC program was to accelerate trial of VIOXX by leveraging 22 million chronic pain sufferers and their influential role in the buying process for pain and arthritis medications. As a pre-requisite for action, however, awareness had to be established. Because Celebrex had an early lead at launch with regard to consumer awareness (20% higher than

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

VIOXX), a major goal of the campaign was to establish 75% brand awareness for VIOXX among target consumers by the end of 2000, with an interim goal of 50% awareness within the first six months. To achieve these goals, 2000 consumer spending was aggressive. In July 2000, brand awareness for VIOXX among target consumers was at 54% and surpassed awareness for Celebrex after only nine months of promotion. Awareness is currently on track to reach 75% by year-end. Brand awareness growth over this period was higher than any other Merck DTC program launch. In addition, awareness increased in segments not typically activated through physician-directed promotion such as the OTC segment. Overall action also increased dramatically among the target segment from 2% at the start of the DTC campaign to 10% in July 2000.

The 2001 goal is to increase total brand awareness to 80% and maintain this level throughout the year. More importantly, with this higher brand awareness, VIOXX should gain traction in consumer action driving it to 15% or more. This level of action is necessary to achieve the aggressive sales target of $2.5 billion for 2001.

In order to achieve this goal and the consumer action that will follow, the consumer program for VIOXX will continue to build upon the "Everyday Victories" platform. The message theme remains simple and focused in 2001 -- the daily use of VIOXX can provide everyday victory from pain so that the target audience can do the daily activities they enjoy. Interest and emotional appeal will be captured in new creative executions that reinforce efficacy (relief of pain). These new executions will launch in the late 1Q, early 2Q timeframe. Although safety is a distant attribute in terms of importance to the consumer, the revised label anticipated from the VIGOR results will also allow for less clutter in the 2Q message and the ability to communicate that consumers do not have to make an efficacy/safety tradeoff. To ensure that awareness levels are maintained at 80% and messages breakthrough the media clutter, GRPs for television in 2001 will remain strong at 4,580 flighted over 38 weeks. This is comparable to the levels achieved in 2000 for VIOXX, and those seen by market leaders such as Claritin and Zyrtec.

## Selected Media Mix Elements

Not only will the traditional consumer channels such as TV and print be utilized, but the 2001 plan includes a four-month flight of newspapers and radio in the first half of the year. Newspapers have been added to the 2001 media mix based on the success of two pilots conducted in 2000 -- action rates increased significantly when newspapers were added to the mix. Additionally, based upon the assumption of improved safety balance, radio presents a favorable media buy that is synergistic with television. To add to the efficiency of the campaign, 15-second reminder ads and Direct Cable will continue to be part of the television mix for 2001. Based on these efficiencies, the overall media plan for 2001 is $105MM; $10MM less than the 2000 plan.

The Celebrity campaign, which was launched with Bruce Jenner and Dorothy Hamill through the press in August 2000 will be maintained in 2001 and integrated into consumer advertising. Market research indicates that the use of celebrity athletes communicates efficacy to targeted consumers and this blend of Everyday Victories by ordinary people and great athletes will provide compelling imagery throughout 2001.

## Other Consumer Resources

Other mediums such as direct mail, physician in-office materials, and adherence mailings will increase in importance with the goal of establishing a more personal and on-going dialogue with current and potential customers. The following is a brief description of these programs:

Direct mail will complement the general advertising efforts, but provide more in-depth information than the mass media channels, and further motivate consumers who have not yet taken action. Through return surveys, additional names can be captured for the database and barriers to trial can be identified so that subsequent mail can be targeted with these messages. The first large mailing to targeted consumers was delivered in August 2000. 2001 direct mail tactics will be refined based on the response and conversion results of this mailing.

Physician in-office materials such as patient counseling tools and patient education materials where the consumer learns about VIOXX at the "point of care" will continue to be developed and made available in 2001. In addition, the 2001 plan includes the Accent Health Program, which was piloted with great success in 2000. The program places television sets in approximately 9000 targeted physician offices for VIOXX, (30% match rate to top VIOXX physicians). Based on the results of 2000, the program will be utilized for a full year in 2001.

---

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                                                                    MRK-AAO0000098

The Adherence Program for VIOXX will be delivered to consumers from three channels: through the pharmacist, direct to consumer/direct mail, and the Internet. The overall goal of this program is to build a relationship with patients most valuable to VIOXX and insulate them against competitive encroachment. The direct mail pilot phase was launched in August 2000. This mailing was designed to address a major barrier to adherence that was uncovered in research: patients are concerned that they will "build up a tolerance" if they take their medication everyday or remain on any one medication for a long period of time. Through return surveys, additional barriers will be identified. Since this is the first branded adherence program undertaken at USHH, the program will first be piloted. Additional adherence programs using the pharmacy and the Internet will be discussed in more detail in these sections.

### Template J

#### Consumer Investment

| | Target Audience #1 | Target Audience #2 | Shared costs | Total Investment | Trimester 1 Investment | Trimester 2 Investment | Trimester 3 Investment |
|---|---|---|---|---|---|---|---|
| Media | Consumer | | | $105,000 | $40,000 | $40,000 | $25,000 |
| Direct/database Programs | | | | $7,640 | $2,600 | $2,600 | $2,440 |
| • Acquisition DM | | | | | | | |
| • Conversion DM | | | | | | | |
| • Adherence/Retention DM | | | | | | | |
| Database Management & Fulfillment | | | | $1,780 | 600 | $600 | $580 |
| Internet Total | | | | $500 | 175 | $175 | $150 |
| • Website Sponsorship | | | | | | | |
| • Banner Ads Campaign | | | | $3,850 | $1,300 | $1,300 | $1,250 |
| Production/Talent Total | | | | | | | |
| Misc. Production (Promotion Events) | | | | $6,550 | $2,200 | $2,200 | $2,150 |
| Agency Fees Total | | | | $6,600 | $2,200 | $2,200 | $2,200 |
| Other Major Initiatives Total | | | | $2,805 | $900 | $900 | $805 |
| • Physician-Office TV | | | | | | | |
| • Patient Education | | | | | | | |
| • Physician/Patient Interaction Materials | | | | $555 | $185 | $185 | $185 |
| Other (<10% of total) | | | | | | | |
| • Incentives/Rebates | | | | | | | |
| Total | | | | $135,000 | $50,160 | $50,160 | $34,680 |

#### Media Plan Summary

| | Target Audience #1 | Target Audience #2 | Total spend | $ | GRPs | Reach & Frequency | # of weeks | Notes |
|---|---|---|---|---|---|---|---|---|
| TV – General | Consumer | | $63.4MM | 60% | 3865 | 779/4.8 | 36 | $30.5MM currently committed in 1Q-3Q Network TV |
| TV – DRTV | | | $5.4MM | 5% | 1017 | 39%/2.9 | 36 | |
| Print – National | | | $10.4MM | 15% | 1019 | 50%/2.1 | 52 | |
| Print – Regional/Ethnic | | | $11.8MM | 12.5% | 254 | 33%/2.0 | 12 | |
| Radio | | | $5.0MM | 4.5% | 1068 | 32%/5.4 | 12 | |
| Other – Out of Home etc. | | | $2.5MM | 3% | N/A | N/A | TBD | |
| Total plan | | | $105MM | 100% | 7020 | | | |

## Core Promotion

The overall objective for promotional support (details, samples and HEL) for VIOXX has been developed to meet revenue goals, achieve behavioral objectives and maintain competitive share of voice in the coxib market. Successful execution of marketing strategies is needed to reach the targeted number of NRXs in 2001. This plan reflects the support required for a larger sales force and target audience and projected new patient starts. A summary of promotional support investments is outlined below:

---

*Confidential Merck & Co., Inc. Document*

---

Confidential - Subject To Protective Order                    MRK-AAO0000099

| | 2000 | August 2002* | Change |
|---|---|---|---|
| Representatives | 4100 | 5900 | 46% |
| Call Activity | | | |
| Targeted (A+/B) | 2.8MM | 3.7MM | 32% |
| Total | 4.2MM | 4.6MM | 10% |
| Physician Universe | | | |
| Targeted (A +/B) | 99K | 107K | 8% |
| Total | 169K | 155K | -8% |
| HEL Investment | $52MM | $64MM | 22% |
| Sample Investment | $37MM | $56MM | 50% |

\* August sales force configuration (Groups A, B & C)

## Call Activity

Gaining access to key customers, especially targeted A+/B physicians will remain the most critical issue we face during 2001. According to IMS data, even with maximum sales force support in 2000, VIOXX was out detailed among all physicians by Celebrex by nearly 20%. VIOXX was also significantly out detailed among targeted physicians in early 2000. This differential can be attributed to the fact that Pharmacia/Pfizer sales representatives see on average 10 physicians/day, as compared to Merck sales representative seeing an average 7 physicians/day. In addition, Pharmacia is currently deploying an A&A specialty sales force (300) and an additional primary care sales force (550) to promote Celebrex as of June, 2000, taking the total number of representative promoting Celebrex to over 4,400.

In 2001, it will be critical for VIOXX to maintain detailing levels in the 5.0MM range due to fierce competition from Celebrex, parecoxib and later valdecoxib. As such, the assumption is that sales force support for Celebrex to continue at a very high level (total ~5000 representatives from PHA and PFE) producing approximately 5.4 MM details.

In 2001, VIOXX will be supported by Groups A, B, and C (5 months), HSAs, A&A specialty representatives, Hospital representatives, Neuroscience Specialists, Urology Specialists and Collagenex.

In order to motivate the sales force and maximize the key data launches in 1T 2001, RBG level launch meetings have been recommended and budgeted. This meeting will generate the early momentum and ensure the preparation necessary for the field sales organization to achieve the aggressive objectives during the challenging year ahead.
The target audience for each sales force is as follows:

### Office Based Representatives
In 2001, the total audience for VIOXX promotion is 155K physicians. This is based on benchmark output to achieve 4.6MM details. Of this total audience, 107K are A+/B primary care and specialty physicians who represent 77% A&A market and 86% of VIOXX prescriptions, and will be the primary focus for call activity and resource allocation. Calls on physicians outside of the 107,000 targeted audience represent efficiency call as indicated by Benchmark.

The segmentation strategy for VIOXX will continue in 2001. The physician universe is segmented into two main categories: high coxib and high NSAID physicians. The following table summarizes the segments and contribution of prescriptions:

Confidential – Subject To Protective Order

MRK-AAO0000100

|  | Total Audience | Targeted Physicians | % of A&A TRx contribution | % of coxib TRx contribution |
|---|---|---|---|---|
| High Coxib | 52K | 36K | 30% | 40% |
| High NSAID | 105K | 72K | 70% | 60% |
| Total | 157K | 107K | 100% | 100% |

The following call frequencies among OBR targets will be imperative to achieve a parity share of voice within the coxib market. The reach for targeted A+/B physicians is 95% and the frequency is 35.

| Quintile | Universe | Reach | Reach (%) | Frequency | Details | Cumulative Targets | Cumulative Details |
|---|---|---|---|---|---|---|---|
| A+ | 9,501 | 9,025 | 95% | 45.3 | 408,622 | 9,025 | 408,622 |
| A | 19,139 | 18,175 | 85% | 42.1 | 764,569 | 27,200 | 1,173,191 |
| A- | 30,514 | 28,974 | 95% | 38.3 | 1,111,001 | 56,174 | 2,284,192 |
| B+ | 14,139 | 13,400 | 95% | 32.3 | 432,732 | 69,574 | 2,716,924 |
| B | 17,421 | 16,482 | 95% | 29.1 | 479,293 | 86,056 | 3,195,217 |
| B- | 22,530 | 21,175 | 94% | 26.1 | 552,770 | 107,230 | 3,748,988 |
| C++ | 10,452 | 9,168 | 88% | 23.1 | 211,826 | 116,399 | 3,960,814 |
| C+ | 12,109 | 8,454 | 70% | 20.7 | 175,132 | 124,862 | 4,135,946 |
| C | 14,402 | 6,096 | 42% | 19.7 | 120,159 | 130,958 | 4,256,105 |
| C- | 17,843 | 5,349 | 30% | 17.6 | 94,050 | 136,307 | 4,350,155 |
| D | 520,484 | 18,572 | 4% | 14.3 | 264,884 | 154,879 | 4,615,039 |
| Total | 688,544 | 154,879 | 22% | 29.8 | 4,615,039 | | |

**A & A Specialty Representatives**
The target audience for the specialty sales groups includes 14,000 A+/B Rheumatologists and Orthopedic Surgeons and selected Managed Care, Federal and Institutional Thought leaders.

**Hospital Representatives**
Within the hospital marketplace the primary targets include the Department of Medicine (GP, FP, IM, DO, Rheum, Neuro, GE, OBG, EMD) as well as surgical and pain specialties (Anesthesiology, GS, ORS, Urology, Podiatry, ENT).

**Urology/Neurology Specialists**
Existing targets PROSCAR and MAXALT, respectively

**Collagenex**
Top tier Dentists

**Samples**

Samples are extremely important for new patient starts in the A&A market. Since launch, the objective has been to match or surpass the level of Celebrex samples in the marketplace. Per IMS sampling reports, in most months, slightly more sample packages and sample days of therapy were distributed for VIOXX than for Celebrex. The objective to continue to match or exceed the level of samples for Celebrex in 2001.

Throughout 2000, the average number of sample packages produced per NRX was 7.2. Assuming a similar sample rate per NRX, the sample budget requested is $56MM (+ 50% vs. 2000). The biggest driver in for the increase in sample budget is a 39% increase (over 2000) in forecasted NRXs. In addition, in 2001 an additional 1,650 representatives will be promoting VIOXX for six months. The budget of $56MM will allow sampling by all three groups of representatives and A&A specialty representatives at appropriate levels (for all three strengths of VIOXX) of the following:

Confidential – Subject To Protective Order                    MRK-AAO0000101

- Samples (for routine patient starts),
- Stock bottles programs--The POWER Challenge and other marketing campaigns built around the release of new comparative data, new labeling and new competitive entrants and
- Trade complementary bottles (for the Special Promotion Program-SPP).

Sample distribution will increase around the launch of new comparative data and anticipated label changes.  In addition, patient switch kits—The POWER Challenge (with 30 count stock bottles) will be distributed around the same key events.

Summary of Sample Expenditures:

| Configuration | Packages (000s) | Growth | Total Cost  (000s) | % of total |
|---|---|---|---|---|
| 2.5mg Samples | 19,843 | 25% | $7,638 | 13.7% |
| 12.5 mg POWER Challenge | 200 | | $143 | 0.3% |
| 12.5 mg SPP Bottles | 60 | | $43 | 0.1% |
| | | | | |
| 25mg Samples | 88,800 | 37% | $37,047 | 66.3% |
| 25 mg POWER Challenge | 730 | | $698 | 1.2% |
| 25 mg SPP Bottles | 192 | | $184 | 0.3% |
| | | | | |
| 50mg Samples | 18,120 | 60% | $10,102 | 18.1% |
| 50 mg POWER Challenge | 15 | | $14 | 0.0% |
| 50 mg SPP Bottles | 25 | | $24 | 0.0% |
| | | | | |
| | 126,763 | 38% | $55,893 | 100.0% |

## HEL

HEL programs for VIOXX provide 1) a platform to promote discussion of key issues and treatment choices for the treatment of A&A conditions and 2) access for our field personnel to key customers for discussion and training. Feedback from the HEL Planning meetings for VIOXX was that, despite best efforts, a good percentage of customers would not attend programs outside of their office. As such, the TBG is recommending a mix of programs "in the office" and "out of the office". This plan enhances our ability to deliver information via HEL to the spectrum of customers who have varied demands on their time in and out of the office.

The total HEL budget request is $54MM. This will allow each OBR clusters to have an average of ~140 "in the office" and ~230 "out of the office" physician contacts.  On average, this provides for 80% reach and frequency of three for the VIOXX '01 target audience.  In addition, the budget offers hospital representatives and A&A Specialists a similar mix of program offerings for their target customers.

*Group A and B.*  The HEL investment in 1T (40% of annual total) will focus on the comparative OA data versus Celebrex and will be targeted primarily to high coxib customers.  During 2T, HEL investments (40% of annual total) will focus on the comparative data versus Tylenol #3 and addition of the VIGOR data to the label. These programs will be targeted primarily to High NSAID customers.  Finally, the 3T investment will provide programs to proactively position VIOXX and valdecoxib prior to their launch.

*Group C:*  The HEL investments for Group C will accomplish two objectives: 1) enhance the education of our newly-trained representatives via tutorials and preceptorships and 2) provide access to HEL speaker programs to newly targeted customers.  As such, the investments for Group C are split 50% in 2T and 50% in 3T.

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

Hospital:

HEL investments for the hospital audience are similar in mix to those for OBR Groups A and B. Additionally, the investment allocated allows for late 1T HEL Blitz around the release of the T3 data to pre-empt parecoxib as well as a 2T HEL Blitz around the release of Toradol data to minimize the uptake of parecoxib. HEL activities will include Grand Rounds, Representative Centered Conferences, Roundtables, In-services and Pain Specialty Speaker Training and Customer Focus Groups. These grand rounds will be to disseminate new comparative information and to defend against new coxib entrants.

A&A Specialists:

The mix in HEL investments for the A&A group is more heavily weighted to in-office offerings compared to the OBR Groups A&B. This is to support the special relationships A&A Specialists have with their customers. In addition, the budget will provide speaker training programs and customer focus groups to be conducted by the A&A Specialists to certify speakers on the key messages and information surrounding the key data and label changes.

## Non Personal Promotional Support

Journals
Total journal space spending in 2001 is $8MM, which is consistent with 2000 levels. The primary objective of journal spending is to increase message reach for the comparative OA data and maintain brand awareness among physicians. In order to meet these objectives, the average monthly reach for targeted specialties is 93% and the average monthly frequency is 4.3%. Spend levels are targeted to meet and exceed by 10% Celebrex and projected valdecoxib spend levels among target specialties (Rheum, ORS, FP/GP, IM) as well as key customers (HMO/PBM). This is an important promotional channel in 2001 as at first, communicates the superiority of VIOXX vs. Celebrex in OA, and later reinforce strong efficacy platform for VIOXX as valdecoxib prepares to launch.

Direct Mail
Total Direct Mail spending is $2MM targeted to A+A prescribers (25,000). Three primary waves are planned in support of VIGOR, Tylenol #3 and Comparative OA. The messages delivered via Direct Mail will be tailored to the Market Map segment (High Coxib/High NSAID/pain specialties). The reach for high coxibs is A+/A physicians with a frequency of six/year. The reach for high NSAIDs is A+/A physicians with a frequency of 1/year.

Peer to Peer Teleconferences
Peer teleconference spending of $5MM provides a third vehicle whereby to increase promotional frequency through non-personal means. These programs will also be aligned around key scientific data (VIGOR, Tylenol #3 and Comparative OA) occurring in 3 waves in 2001. The first and second waves of programs will occur in 1T to coincide with the comparative OA efficacy and T3 data, while the third wave will occur in 2T with the availability of the VIGOR data. These programs will also tailor messages consistent with the market map specialties identified above. The programs provide Merck with a high level of message control by using professional moderators as well as providing objectivity to discussions as physicians share their clinical experience with the coxibs during the teleconference. The spend level identified will allow for approximately 20,000 HEL-like contacts among targeted physicians in 2001.

Confidential - Subject To Protective Order                    MRK-AAO0000103

# HEL Investment by Target Audience (Template K)

| Target Audience | Behavioral Objective | Messages | Program Mix (# by type by trimester) | Resources | Investment $$ |
|---|---|---|---|---|---|
| High Coxib Groups A & B | - Develop and enhance preference for VIOXX within COXIB class | • VIOXX works faster, longer and stronger than Celebrex | Per Cluster per trimester: 4 preceptors, 4 tutorials, 5 lunch-n-learns, 2 RTs, 1 colloquia; 2 grants per year; 80% reach; 9 contacts per year | Discussion Guide for rec/tutorials, Slide Sets, Speaker training, Program "package" (slides, discussion guides, etc) | $28.5 MM |
| High NSAID Groups A & B | - Enhance Coxibs as treatment choice - Prescribe VIOXX as first-line COXIB - Foster willingness to prescribe VIOXX (and fight for approval) within MCOs | VIOXX causes fewer GI events and complications versus non-selective NSAIDS; VIOXX is less expensive than other branded products | Per Cluster per trimester: 4 preceptors, 4 tutorials, 5 lunch-n-learns, 1 RT, 1 colloquia; 1 grant per year; 80% reach; 9 contacts per year | Discussion Guide for rec/tutorials, Slide Sets, Speaker training, Program "package" (slides, discussion guides, etc) | $28.5MM |
| New VIOXX Targets for Group C | - Enhance representative knowledge of A&A issues - Develop and enhance physician preference for VIOXX within the COXIB class | VIOXX causes fewer GI events and complications versus non-selective NSAIDs; VIOXX is less expensive than other branded products; VIOXX works faster, longer, and stronger than Celebrex | Per Cluster per trimester: 6 preceptors, 5 tutorials, 7 lunch-n-learns, 2 RTs, 1 colloquia; 30 in office contacts; 41 out of office contacts | Discussion Guide for rec/tutorials, Slide Sets | $6.4MM |

## Continuing Medical Education (CME)

CME programs in support of VIOXX for 2001 are meant to supplement HEL initiatives and offer educational opportunities for targeted audiences that are aligned with the TBG marketing objectives. Industry sponsored CME venues are highly regarded by the medical community due to their cutting edge information, scientific rigor and the unbiased content and credibility of the educational provider. The CME investment for VIOXX in 2001 is $5.3 MM and will aim to increase awareness of NSAID-induced gastropathy, decrease physician tolerance for GI risk, and expand the use of Coxibs and VIOXX based on scientific evidence. Significant amounts of new clinical data are

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

planned for 2001 and CME programs offer an excellent venue for education on new data in a timely manner through peer to peer learning programs.

The following are CME Programs that are developed based on the behavioral objectives of key audiences:

# CME Investment (Template L)

| Target Audience and Size | Behavioral Objective | Program Types | Investment |
|---|---|---|---|
| • PCPs, NPs, PAs Invitations to 70,000 A+/B PCPs; 5,000 PAs; 5,000 NPs • Reach: 10,000 PCPs; 700 PAs; 700 NPs | • Believe that risk to patients is great enough to expand definition of risk • Differentiate on efficacy • Neutralize competitive messages | • CME Audioconferences and Internet Webcast Format: 3 waves of 15 audioconferences each; 60-minute audioconference - presentation and Q&A; webcast posted for one year with downloadable slides | • Budget for 45 audioconferences: $1,240MM • Budget for Internet webcast: $.08MM |
| • Target Audience: PCPs • Reach: 47,000 A+/A- PCPs | • Believe that risk to patients is great enough to expand definition of risk • Differentiate on efficacy • Neutralize competitive messages | • Primary Care Case Study Monograph and Internet Program • Case Studies in Pain Management • Timeline: 1T (OA comparative, GI outcomes) | • Budget: $.600MM |
| • Target Audience: PCPs • Reach: 30,000 | • Believe that risk to patients is great enough to expand definition of risk • Differentiate on efficacy • Neutralize competitive messages | • Primary Care AMA Journal Supplement • Timeline: 3T (chronic pain – low back pain, arthritis) | • Budget: $.300MM |
| • Target Audience: Hospital-based pain management specialists (emergency med, anesthesiology, neurology), pharmacists, nurses, PAs, NPs • Reach: 10,000 | • Believe that risk to patients is great enough to expand definition of risk • Differentiate on efficacy • Neutralize competitive messages | • Institutional Pain Management Inservice Program • Practical approach to Institutional Pain Management JCAHO • Timeline: 1T | • Budget: $.300MM |
| • Target Audience: Emergency medicine physicians, neurologists, anesthesiologists, pain management specialists • Reach: 30,000 | • Believe that risk to patients is great enough to expand definition of risk • Differentiate on efficacy • Neutralize competitive messages | • Pain Management Monograph • Advances in assessment and management of chronic/acute pain • Timeline: 1T (OA comparative, GI outcomes) | • Budget: $.600MM |
| • Target Audience: 3,000 rheumatologists (estimated reach of 80%) | • Believe that risk to patients is great enough to expand definition of risk • Differentiate on efficacy • Neutralize competitive messages | • RheumatologyWeb.com | • Budget: $.450MM |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

| Target Audience and Size | Behavioral Objective | Program Types | Investment |
|---|---|---|---|
| • Rheumatologists<br>• Invitations to 3,000 rheumatologists<br>• Reach: 900 rheumatologists | • Believe that risk to patients is great enough to expand definition of risk<br>• Differentiate on efficacy<br>• Neutralize competitive messages | CME Audioconferences for Rheumatologists and Internet Webcast | • 12 audioconferences: $310,000<br>• Internet webcast: 5.06MM |
| • Target Audience: 1 series for rheumatologists, 1 series for pain management specialists<br>• Reach:<br>• 5,000 rheumatologists<br>• 6,000 pain management specialists | • Believe that risk to patients is great enough to expand definition of risk<br>• Differentiate on efficacy<br>• Neutralize competitive messages | • Reprint Reviews and Slides for Key Publications of Coxibs and key thought leaders<br>• Timeline: Quarterly updates throughout 2001 | • Budget: 1.200MM VIOXX |
| • Target Audience: A+/A-PCPs<br>• Reach with dinner programs: 1200 PCPs<br>• Reach with monograph: 47,000 PCPs<br>• Faculty: 48 faculty members (rheumatologists and gastroenterologists) trained via netconference | • Believe that risk to patients is great enough to expand definition of risk<br>• Differentiate on efficacy<br>• Neutralize competitive messages | • Regional CME Dinner Programs<br>• Format: 24 regional CME dinner programs with presentation, case studies, and Q&A, 2 faculty members<br>• Timeline: 3T | • Budget: $1,160MM (24 programs @ $40,000 per program; $75,000 program development and faculty training; $125,000 monograph) |
| | | | TOTAL: $5.320MM |

## Internet

Developed in conjunction with iCommunications, the plan aggressively targets consumers and will serve to test several new concepts around the Internet. The primary objectives of the Internet as a marketing channel for VIOXX are to acquire new customers, to promote adherence among existing patients, and to extend the reach and frequency of messages about VIOXX among key customer segments. Internet programs for 2000 were measured in terms of number of impressions, ad response rates (click-through), customer acquisition (leads), and proportion of customers new or continuing on VIOXX. In the first seven months of 2000, the Internet generated over 12 million impressions for VIOXX, over 300,000 Unique Visitors to VIOXX.COM, and over 11,000 customer leads. Analysis of the Internet leads generated during the first four months of 2000 showed that an average of 32% of Internet respondents were continuing on VIOXX, while 7% received a new prescription for VIOXX.

The primary focus of the Internet in 2001 will be to drive consumers to request and remain loyal to VIOXX. Through online advertising at top-tier health and news websites and the development of an e-Patient Club for chronic arthritis and pain patients, the Internet will be used as an additional media channel that is synergistic with the consumer campaign. In addition to broadening communication to the consumer, a secondary objective will be to continue online relationships with physicians, advocates and other healthcare professionals to support the strategic brand objectives of differentiating VIOXX based on efficacy, increasing the level of dissatisfaction with GI risk, and neutralizing any perceived safety concerns (hypertension/edema, MI).

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000106

## Internet Investment

| Target Audience | Behavioral Objective | Resource Types | Investment |
|---|---|---|---|
| *Consumers* | • e-Acquisition: Drive consumers to request and remain loyal to VIOXX | • Online Advertising<br>• Search Engine Positioning | $5.6MM |
| *Consumers* | • e-Adherence: Drive consumers to request and remain loyal to VIOXX | • Agency Fees: ICommunications<br>• Website Launch/Relaunch<br>• Other Relationship Marketing/Internet<br>• Website Updates<br>• Market Research Studies | $1.2MM |
| *Physicians – High Coxib/High NSAID* | • Differentiate VIOXX based on efficacy | • Website Launch/Relaunch<br>• E-mail Newsletter<br>• Webcast<br>• Online Advertising<br>• Website Updates<br>• Online Ordering – Reprints/Samples | $.2MM |
| *Physicians – High NSAID* | • Broaden definition of GI risk | • Website Launch/Relaunch<br>• E-mail Newsletter<br>• Webcast<br>• Online Advertising<br>• Website Updates<br>• Online Ordering – Reprints | $.2MM |
| *Thought Leaders* | • Differentiate VIOXX based on efficacy<br>• Broaden definition of GI risk<br>• Neutralize any perceived safety concerns (hypertension/edema) | • External Websites - Sponsorships | $.6MM |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000107

# MONITORING STRATEGIC ASSUMPTIONS

Markers and Triggers have been established to monitor the potential market end-state scenarios for VIOXX.

## Measures Markers and Triggers (Template N)

| Metric | How Often Tracked | Marker | Trigger |
|---|---|---|---|
| Growth of A&A Market | Monthly | • Growth of current period vs. the same time period of the previous year | • Re-evaluate forecast |
| Market Share<br>• A/A<br>• Coxib | Monthly | • Penetration into A&A market<br>• Share of coxib class | • Increase focus on safety and tolerability messages;<br>• Re-evaluate contracting strategy |
| Attributes<br>• Efficacy<br>• Tolerability (renal/hypertension)<br>• GI Safety (GI/CV)<br>• OD Use | Six times/ year | No difference vs. Celebrex<br>    • Effective Pain Relief<br>Celebrex has significant advantage vs. VIOXX<br>    • Potent Analgesic<br>    • Safe for long-term use<br>    • Does not cause renal/hypertension<br>Decrease in OD Celebrex use | • Re-evaluate forecast<br>• Re-evaluate message<br>• Focus target on high prescribing physicians<br>• Exploit dosage differences |
| Competitive Activities<br>• Filing/Launch of parecoxib/valdecoxib<br>• Uptake perceptions | On-going | • Filing and approval of valdecoxib/parecoxib | • Re-evaluate forecast<br>• Re-evaluate hospital strategy<br>• Re-evaluate hospital contracting |
| Share Of Voice<br>• Details<br>• Journal<br>• HEL/Journal/Sample spend | Monthly | • Size of competitive sales force<br>• Journal Reach & spend<br>• Sample Volume (days of therapy and packages sampled)<br>• HEL programs | • Determine financial impact<br>• Narrow call deck to concentrate on high prescribers and highest rated A+/A- physicians<br>• Evaluate reach and effectiveness of HEL programs |
| Consumer<br>• Action Rates<br>• Brand Awareness | Monthly | • Brand Awareness has flatted<br>• Action rates remain constant | • Evaluate message<br>• Evaluate channel mix |
| Managed Care | Monthly | • Reimbursable Status is greater than or equal to competition | • Re-evaluate contracting strategy |

# FINANCIAL SUMMARY

In 2001, gross sales of VIOXX® are forecasted to be $2.5 billion. This is a 58% increase over the 2000EA ($1.585MM). To achieve the above-mentioned sales target, strong levels of promotional spend is required, particularly given the competitive marketing battle with Pharmcia/Pfizer. 2001PP promotional spend required are

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                                    MRK-AAO0000108

$410MM, which provides controllable income of $1.9 billion. The largest components of the expenses are resources to support the field sales force (44%) and consumer advertising (33%). The primary components of the field's sales support are HEL ($ 86MM), samples ($ 56MM), and rep. literature ($ 24MM). These have been increased over 2000 to resource the 46% increase in sales representatives promoting VIOXX. After these changes are taken into consideration, the year-to-year change in total resources for VIOXX is $14MM (or 4%). Although expenses have increased slightly from year-to-year, controllable income for VIOXX® will continue to increase significantly in 2001. 2001 controllable income will increase by $865MM or 81% vs. 2000.



The base case forecast for VIOXX was developed using the A&A Dynamic model which incorporates: 1) qualitative and quantitative market research data; 2) quality of drug information; 3) physicians and consumers perceptions of the drug; 4) promotional spend; and 5) historical performance results. Inherent in the base case scenario is the assumption that VIOXX will be able to differentiate itself from Celebrex based on OA comparative efficacy data (anticipated to be released in early 4Q00). Key assumptions in the base case include:

- VIOXX ability to differentiate itself on efficacy vs. Celebrex;
- VIOXX ability to neutralize any safety/tolerability issues and is equal to Celebrex;
- VIOXX label is changed based on VIGOR and greater managed care access is achieved;
- The number of sales calls/details for VIOXX are increased due to the addition of Sales Group C.

In addition, we have evaluated potential activities/events, which could impact the forecast. These are outlined below in the Sensitivity Analysis section.


## SENSITIVITY ANALYSIS

Several sensitivity scenarios have been performed, which could have an impact on our base case forecast. Some of the sensitivities include the following:

- Increase in A&A market growth (comparable to 10% year-to-year growth);
- Valdecoxib receives a 1P review (launched in July '01);
- Valdecoxib receives a 1P review and is more efficacious than VIOXX;
- VIOXX is unable to neutralize safety/tolerability issues;
- Differential advantage on GI safety for VIOXX.

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                    MRK-AAO0000109

The financial impact of the above mentioned scenarios are indicated below and in Template P attached.

Monitoring Strategic Assumptions and Sensitivity Analysis

| Assumption | Probability | Impact vs. Forecast | Revenue Impact ($MM) |
|---|---|---|---|
| **Potential Upside(s)** | | | |
| A&A Market Growth continues to achieve double-digit growth | Medium | ↑ VIOXX TRx | $160MM |
| VIOXX GI label is significantly better than Celebrex | Low | ↑ Managed Care Access ↑ VIOXX TRx | TBD |
| **Potential Downside(s)** | | | |
| Valdecoxib receives 1P review, 3Q01 launch | Medium | ↓ VIOXX TRx | ($219MM) |
| Valdecoxib receives 1P review and is better than VIOXX, 3Q01 launch | Low | ↓ VIOXX TRx | ($281MM) |
| VIOXX is unable to neutralize safety/tolerability issues | Low | ↓ VIOXX TRx | ($437MM) |

As indicated above, the 2001 sales forecast for VIOXX is $2.5 billion. Although, upside potential could reach $2.675 billion (assuming double-digit market growth), there are several downside scenarios which could impact the forecast to decline to as low as $2.1 billion, assuming VIOXX inability to neutralize safety/tolerability concerns. In evaluating the risk in the forecast, $2.5 billion falls within the upper 40% of the high range. (See template P attached for additional information).

Confidential - Subject To Protective Order                                        MRK-AAO0000110

## *Templates*

### *Template B – Investment by Strategic Business Objective*

**VIOXX**

| Investment by Strat. Bus. Objectives / Marketing Mix | Total \$\$ | Determine & Invest on All Products | Neutralize Safety Concerns | Broaden Definition of GI Risk | Broaden NSC Access | Drive Consumers to Request and Remain Loyal | Market Research |
|---|---|---|---|---|---|---|---|
| | ($000) | ($000) | ($000) | ($000) | ($000) | ($000) | ($000) |
| Rep-centered Materials | $ 28,751 | $ 13,985 | $ 5,411 | $ 0 | $ 1,047 | $ 1,850 | $ 0 |
| Peer-Influence Resources | $ 93,771 | $ 43,955 | $ 16,227 | $ 31,960 | $ 2,131 | $ 88 | $ 0 |
| CDP Studies | $ 18,739 | $ 18,739 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Broadcast - Physician | $ 5,305 | $ 2,021 | $ 568 | $ 687 | $ 310 | $ 2,929 | $ 0 |
| Targeted - Physician | $ 10,255 | $ 9,021 | $ 486 | $ 512 | $ 256 | $ 0 | $ 0 |
| Market Research | $ 12,439 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 12,439 |
| Medical School Grants | $ 1,600 | $ 960 | $ 540 | $ 0 | $ 0 | $ 0 | $ 0 |
| Outcomes Research & Management | $ 5,656 | $ 3,725 | $ 1,225 | $ 208 | $ 498 | $ 20 | $ 0 |
| Samples | $ 55,304 | $ 37,167 | $ 8,538 | $ 10,180 | $ 0 | $ 0 | $ 0 |
| Other Physician | $ 5,260 | $ 2,373 | $ 1,245 | $ 1,245 | $ 38 | $ 360 | $ 0 |
| **Physician Oriented Mkt. Expenditures SUB-TOTAL** | $ 236,789 | $ 131,338 | $ 34,321 | $ 91,138 | $ 4,276 | $ 9,346 | $ 12,439 |
| Broadcast - Consumer | $ 130,505 | $ 1,848 | $ 878 | $ 1,116 | $ 200 | $ 126,926 | $ 0 |
| Targeted - Consumer | $ 6,046 | $ 0 | $ 0 | $ 63 | $ 63 | $ 5,921 | $ 0 |
| Retention | $ 8,525 | $ 150 | $ 150 | $ 0 | $ 0 | $ 8,225 | $ 0 |
| Other Consumer | $ 15,350 | $ 0 | $ 0 | $ 0 | $ 0 | $ 15,350 | $ 0 |
| **Consumer Oriented Mkt. Expenditures SUB-TOTAL** | $ 160,427 | $ 1,998 | $ 666 | $ 1,179 | $ 263 | $ 156,422 | $ 0 |
| Managed Care Resources | $ 10,885 | $ 3,684 | $ 3,537 | $ 2,442 | $ 1,207 | $ 15 | $ 0 |
| Other Managed Care | $ 240 | $ 38 | $ 0 | $ 0 | $ 203 | $ 0 | $ 0 |
| **Managed Care Oriented Expenditures SUB-TOTAL** | $ 11,125 | $ 3,722 | $ 3,537 | $ 2,442 | $ 1,410 | $ 15 | $ 0 |
| **Total** | $ 410,422 | $ 137,056 | $ 38,524 | $ 54,778 | $ 5,942 | $ 161,883 | $ 12,439 |
| **Percentage of Total Budget** | 100% | 33% | 9% | 13% | 1% | 39% | 3% |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000111

*Template F – Investment by Major Marketing Programs*

**VIOXX**

| Investment by Primary Target Audiences / Marketing Mix | Total US ($000) | ($000) | ($000) | ($000) | Managed Care ($000) | Advocacy/Thought Leaders ($000) | Other V. Aud. total ($000) |
|---|---|---|---|---|---|---|---|
| Representent Materials | 26,761 | 11,085 | 14,204 | 0 | 924 | 256 | 2,284 |
| Peer-Influence Resources | 93,771 | 38,482 | 42,538 | 963 | 484 | 10,200 | 1,114 |
| CDP Studies | 18,739 | 3,886 | 9,296 | 0 | 965 | 648 | 1,020 |
| Broadcast - Physician | 6,385 | 527 | 699 | 2,867 | 480 | 1,330 | 493 |
| Targeted - Physician | 10,256 | 3,104 | 5,302 | 0 | 250 | 114 | 165 |
| Market Research | 12,438 | 2,485 | 3,583 | 1,200 | 1,255 | 4,382 | 425 |
| Medical School Grants | 1,800 | 0 | 0 | 0 | 0 | 1,280 | 320 |
| Outcomes Research & Management | 5,803 | 4,571 | 183 | 110 | 702 | 0 | 0 |
| Samples | 55,894 | 27,947 | 27,947 | 0 | 0 | 0 | 0 |
| Other Physician | 5,760 | 1,450 | 3,900 | 423 | 100 | 36 | 450 |
| **Physician Oriented Mkt. Expenditures SUB-TOTAL** | **236,799** | **93,564** | **165,341** | **6,342** | **4,725** | **18,172** | **6,910** |
| Broadcast - Consumer | 130,605 | 260 | 420 | 129,461 | 300 | 145 | 0 |
| Targeted - Consumer | 6,045 | 0 | 0 | 5,394 | 0 | 0 | 83 |
| Retention | 8,525 | 0 | 0 | 8,425 | 0 | 0 | 0 |
| Other Consumer | 15,350 | 0 | 0 | 15,350 | 0 | 0 | 0 |
| **Consumer Oriented Mkt. Expenditures SUB-TOTAL** | **160,527** | **260** | **420** | **158,330** | **300** | **145** | **83** |
| Managed Care Resources | 10,866 | 2,190 | 1,185 | 90 | 2,994 | 218 | 4,541 |
| Other Managed Care | 940 | 0 | 0 | 0 | 940 | 0 | 0 |
| **Managed Care Oriented Expenditures SUB-TOTAL** | **11,136** | **2,190** | **1,185** | **90** | **2,904** | **218** | **4,541** |
| **Total** | **$ 410,422** | **$ 100,523** | **$ 105,846** | **$ 165,071** | **$ 7,933** | **$ 18,535** | **$ 11,514** |
| **Percentage of Total Budget** | **100%** | **11%** | **33%** | **40%** | **2%** | **9%** | **9%** |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                                    MRK-AAO0000112

*Template O – Base Case Forecast Build*

**VIOXX® 2001 PROFIT PLAN BASE FORECAST BUILD**

| | ACTUAL | | TREND | |
|---|---|---|---|---|
| | 1999 | Jul 2000 | 2000 | 2001 |
| **BASELINE TREND** | | | | |
| **Tot Trend / Pre-event Trend** | | | | |
| Market Rxs (000s) Trend / Pre-event (1) | 114,488 | 72,219 | 128,176 | 132,065 |
| % Market Growth Trend / Pre-event (YTD or Annual) | 15.3% | 12.3% | 12.0% | 3.0% |
| VIOXX® Rxs (000s) Trend / Pre-event | 4,845 | 10,690 | 20,957 | 31,672 |
| **Share Trend / Pre-event Trend** | | | | |
| VIOXX® | 4.2% | 15.8% | 16.0% | 24.0% |
| Celebrex | 15.3% | 18.9% | 18.7% | 23.5% |
| Generics | 61.0% | 42.9% | 44.7% | 40.1% |
| NSAIDs | 22.5% | 20.4% | 21.4% | 12.4% |
| **Dollar Trend - Merck Product** | | | | |
| Avg. Price Per Tablet (Constant 2000 Prices) | $ 2.02 | $ 2.02 | $ 2.02 | $ 2.02 |
| Merck Price Per Rx (Without Price Increases) (2) | $ 68.11 | $ 73.14 | $ 73.14 | $ 73.14 |
| Gross Sales $ Trend / Pre-event Forecast ($ Millions) (3) | $ 470.0 | $ 781.9 | $ 1,534 | $ 2,316 |

| | ASSUMPTIONS | FORECAST | | EXIT SHARE | |
|---|---|---|---|---|---|
| | Affected Assumption | 2000 | 2001 | 12/00 | 12/01 |
| **PROFIT PLAN FORECAST / KEY EVENTS (4)** | | | | | |
| **Key Events Impacting Profit Plan** | | | | | |
| OA Comparative Activities | Volume & Share Growth | | | | |
| Addition of Group C Sales Force | Volume & Share Growth | | | | |
| **Tot Forecast w/impact of Events** | | | | | |
| Market Rxs (000s) Forecast (1) | | 128,176 | 134,448 | | |
| % Market Growth Forecast | | 0.0% | 4.9% | | |
| VIOXX® Rxs (000s) Forecast (5) | | 20,957 | 34,524 | | |
| **Market Share Forecast w/impact of Events (5)** | | 16.0% | 25.7% | 18.2% | 27.2% |
| VIOXX® Share Forecast (A&A Market) | | 18.7% | 22.0% | 18.8% | 21.9% |
| Celebrex Share (A&A Market) | | 44.7% | 40.0% | 41.1% | 30.0% |
| Generic Share (A&A Market) | | 21.4% | 12.4% | 13.9% | 12.3% |
| NSAID Share (A&A Market) | | 46.2% | 53.9% | 49.6% | 55.5% |
| VIOXX® Share Forecast (Coxib Class) | | 53.8% | 46.1% | 50.0% | 44.5% |
| Celebrex Share (Coxib Class) | | | | | |
| **Dollar Impact on Merck Product (5)** | | | | | |
| OA Comparative Activities | | $ - | $ 123 | | |
| Addition of Sales Force | | $ - | $ 66 | | |
| | | $ - | $ - | | |
| Dollar Impact of All Other Events vs. Trend (Non Key Items) | | | | | |
| **Total Gross Sales Base Plan ($Millions)** | | $ 1,534 | $ 2,528 | | |

Notes:

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000113

*Template O – Base Case Forecast Build (cont.)*



2001PP VIOXX® Forecast Build

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000114

*Template P – Sensitivity Analysis*



*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000115

*Template Q – 2001 P&L*

**VIOXX®**
**2001 Profit Plan**
**($ in Millions)**

| | 2001 | 2000 | 1999 | % +/- PRIOR 2001 | % +/- PRIOR 2000 |
|---|---|---|---|---|---|
| Net Sales | 2,396.7 | 1,466.5 | 400.6 | 63% | * |
| Product Sales @ Catalog | 2,591.0 | 1,585.0 | 420.1 | 63% | * |
| Baseline Sales @ Catalog | 2,591.0 | 1,590.6 | 414.9 | 63% | * |
| Buy In/Out | | (5.6) | 5.1 | -100% | * |
| Medco Sales Impact | (31.8) | (25.2) | (2.5) | 26% | * |
| Rebates/Discounts | (162.6) | (93.1) | (16.9) | 75% | * |
| Cash Discounts | (38.6) | (23.4) | (6.9) | 65% | * |
| Medicaid/State Rebates | (48.2) | (31.8) | (4.9) | 52% | * |
| HMO/PBM | (59.9) | (31.2) | (2.5) | 92% | * |
| Chargebacks | (11.0) | (5.2) | (1.3) | * | * |
| Miscellaneous Rebates | (4.4) | (1.5) | (1.8) | * | -26% |
| On Invoice Discounts | (0.3) | (0.1) | (0.1) | * | 8% |
| Other Revenue | 40.5 | 26.2 | 4.4 | 54% | * |
| Product Cost | | | | | * |
| PGM | 2,356.2 | 1,440.4 | 396.3 | 64% | * |
| TBG Budget | 418.1 | 367.1 | 159.6 | 14% | * |
| Promotion Related | 410.4 | 361.3 | 157.1 | 14% | * |
| Physician Directed | 232.7 | 177.1 | 99.0 | 31% | 79% |
| Personal Promotion | 155.8 | 105.1 | 63.3 | 48% | 66% |
| Field Executed HEL | 59.3 | 46.1 | 28.8 | 50% | 60% |
| Product Meetings | 6.5 | | 0.1 | * | -100% |
| Total Samples to Reps | 55.9 | 38.2 | 19.7 | 46% | 94% |
| Reps Literature | 24.0 | 20.9 | 14.8 | 15% | 42% |
| Nonspec Field Executed | | | | | |
| Non-Personal Promotion | 76.9 | 72.0 | 35.7 | 7% | * |
| TBG Directed HEL | 15.5 | 13.3 | 9.8 | 16% | 36% |
| Market Research | 4.3 | 3.1 | 5.9 | 39% | -48% |
| Other Media | 57.2 | 55.5 | 20.0 | 3% | * |
| Nonspec Marketing Executed | | | | | |
| Consumer Programs | 139.1 | 143.4 | 27.7 | -3% | * |
| Persistence & Compliance | | 4.9 | 0.3 | -100% | * |
| Consumer Marketing | 139.1 | 138.5 | 27.5 | 0% | * |
| Medsa/Grants | 35.4 | 39.7 | 29.2 | -11% | 36% |
| Medsa Executed | 33.8 | 39.2 | 28.8 | -14% | 36% |
| Clinical Development | 18.7 | 30.7 | 24.5 | -39% | 25% |
| Other Medsa Promotion | 15.1 | 8.6 | 4.3 | 76% | 98% |
| Nonspec Medsa Executed | | | | | |
| Medical School Grants | 1.5 | 0.5 | 0.4 | * | 23% |
| Mgd Care Programs | 3.2 | 1.0 | 1.1 | * | -10% |
| Other Promotion Related | | | | | |
| External Alliances | 4.0 | 3.1 | 0.3 | 30% | * |
| Business Groups | 3.7 | 2.7 | 2.2 | 37% | 20% |
| Dedicated TBG Sales Forces | | | | | |
| Telern Expenses | | | | | * |
| Controllable Income | 1,938.1 | 1,073.3 | 736.8 | 81% | * |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order

MRK-AAO0000116

**Template R – Investment by Media Category**

## VIOXX

| Investment by Media Category | Year '98 $ ($000) | Year '99 $ ($000) | Year '00 $ ($000) | % of Total Budget |
|---|---|---|---|---|
| Consultant Meetings | $ 8,129 | $ 4,311 | $ 1,808 | 2,308 |
| MEL - TBD Directed | $ 7,348 | $ 2,827 | $ 2,883 | 1,538 |
| Marketing Directed Programs | $ 18,357 | $ 3,429 | $ 5,784 | 4,134 |
| Marketing Sponsored Group Meetings | $ 0 | $ 0 | $ 0 | 0 |
| Medical School Grants | $ 1,800 | $ 900 | $ 900 | 880 |
| Product Launch Meetings | $ 3,800 | $ 3,800 | $ 0 | 0 |
| Samples | $ 55,994 | $ 18,531 | $ 18,831 | 18,532 |
| **Marketing SUB-TOTAL** | **94,693** | **30,895** | **29,822** | **27,188** |
| CDP Studies | $ 18,728 | $ 9,003 | $ 4,712 | 5,478 |
| **Clinical Development SUB-TOTAL** | **18,728** | **9,003** | **4,712** | **5,478** |
| MEL - Field Directed | $ 66,325 | $ 28,180 | $ 27,819 | 13,287 |
| **Field SUB-TOTAL** | **66,325** | **28,180** | **27,819** | **13,287** |
| Agency Fees: Consumer | $ 7,250 | $ 1,967 | $ 2,087 | 2,776 |
| Consumer Ad Production | $ 3,860 | $ 470 | $ 1,700 | 1,280 |
| Consumer Media Space | $ 102,901 | $ 40,319 | $ 33,117 | 29,488 |
| Consumer Miscellaneous | $ 6,430 | $ 3,277 | $ 3,277 | 2,276 |
| Relationship Marketing | $ 16,016 | $ 5,819 | $ 5,593 | 5,004 |
| **Consumer Marketing SUB-TOTAL** | **136,147** | **51,861** | **44,384** | **40,849** |
| Agency Fees: Prof. Literature | $ 4,000 | $ 2,000 | $ 1,800 | 1,805 |
| Customer Segment Group Kits | $ 296 | $ 148 | $ 50 | 80 |
| M. Care Pull Through Materials | $ 890 | $ 230 | $ 266 | 305 |
| MCA1 Miscellaneous | $ 1,000 | $ 400 | $ 300 | 300 |
| Non-Personal Media (MC81) | $ 11,356 | $ 4,130 | $ 3,886 | 3,886 |
| Office Merchandising | $ 0 | $ 0 | $ 0 | 0 |
| Patient Education Items | $ 0 | $ 0 | $ 0 | 0 |
| Primary Sales Aids | $ 2,966 | $ 943 | $ 986 | 1,286 |
| Reference Items | $ 150 | $ 50 | $ 50 | 60 |
| Reminder Items | $ 5,040 | $ 1,680 | $ 2,180 | 2,180 |
| Reprints | $ 4,030 | $ 1,238 | $ 1,800 | 1,300 |
| Samples Marketing | $ 3,250 | $ 1,080 | $ 1,000 | 500 |
| Secondary Sales Aids | $ 4,863 | $ 1,703 | $ 1,340 | 1,640 |
| Service Items | $ 225 | $ 0 | $ 75 | 150 |
| Sign Sels | $ 660 | $ 270 | $ 220 | 220 |
| **MC81 SUB-TOTAL** | **39,091** | **13,967** | **13,814** | **13,297** |
| MEL - M. Care Directed | $ 3,190 | $ 1,536 | $ 1,486 | 130 |
| M. Care Dir. Mkt. Programs | $ 7,726 | $ 2,173 | $ 2,903 | 1,760 |
| **Managed Care SUB-TOTAL** | **10,895** | **4,709** | **4,398** | **1,880** |
| Market Research | $ 4,310 | $ 1,710 | $ 1,810 | 980 |
| **Market Research SUB-TOTAL** | **4,310** | **1,710** | **1,819** | **980** |
| Academic & Professional Affairs | $ 7,938 | $ 3,374 | $ 1,213 | 3,441 |
| Exhibits & Conventions | $ 1,642 | $ 568 | $ 546 | 538 |
| **Academic & Professional Affairs SUB-TOTAL** | **9,580** | **3,832** | **1,780** | **3,508** |
| Disease Management Tools | $ 400 | $ 180 | $ 120 | 100 |
| CPM Studies | $ 5,095 | $ 3,425 | $ 1,586 | 75 |
| **Outcomes Research & Management SUB-TOTAL** | **5,495** | **3,605** | **1,715** | **175** |
| Agency Fees: Communications | $ 360 | $ 120 | $ 120 | 120 |
| Collateral | $ 0 | $ 0 | $ 0 | 0 |
| Internet | $ 5,250 | $ 4,585 | $ 2,440 | 1,516 |
| Schwab | $ 0 | $ 0 | $ 0 | 0 |
| **Communications SUB-TOTAL** | **5,610** | **4,715** | **2,560** | **1,636** |
| Public Affairs Programs | $ 9,500 | $ 3,700 | $ 3,500 | 2,500 |
| **Public Affairs SUB-TOTAL** | **9,500** | **3,700** | **3,500** | **2,508** |
| **Total** | **$ 410,422** | **$ 153,319** | **$ 137,359** | **110,744** |
| **Percentage of Total Budget** | **100%** | **40%** | **33%** | **27%** |

*Confidential Merck & Co., Inc. Document*

Confidential – Subject To Protective Order

MRK-AAO0000117

*Template S — Investment by Functional Area*

# Investment by Functional Area
## VIOXX

| Investment by Functional Area | Total $ ($ x 1000) | ($ x 1000) | ($ x 1000) | Quarter ($ x 1000) | % of Med Budget |
|---|---|---|---|---|---|
| Academic & Professional Affairs | $ 9,380 | $ 3,832 | $ 1,799 | $ 3,988 | 9% |
| Clinical Development | $ 19,739 | $ 9,053 | $ 4,213 | $ 6,473 | 34% |
| Consumer Marketing | $ 139,147 | $ 51,951 | $ 46,254 | $ 40,942 | 17% |
| Field | $ 68,326 | $ 26,180 | $ 27,919 | $ 13,227 | 8% |
| iCommunications | $ 8,610 | $ 4,715 | $ 2,260 | $ 1,636 | 2% |
| Managed Care | $ 10,886 | $ 4,708 | $ 4,289 | $ 1,890 | 3% |
| Market Research | $ 4,210 | $ 1,710 | $ 1,610 | $ 890 | 23% |
| Marketing | $ 94,839 | $ 36,606 | $ 29,827 | $ 27,103 | 10% |
| MCM | $ 39,901 | $ 13,957 | $ 13,314 | $ 12,620 | 0% |
| Outcomes Research & Management | $ 5,485 | $ 3,603 | $ 1,715 | $ 175 | 2% |
| Public Affairs | $ 9,500 | $ 3,200 | $ 3,900 | $ 2,500 | 2% |
| **Total** | **$ 410,422** | **$ 162,319** | **$ 137,369** | **$ 110,744** | 27% |
| Percentage of Total Budget | 100% | 40% | 33% | 27% | |

*Confidential Merck & Co., Inc. Document*

Confidential - Subject To Protective Order                                    MRK-AAO0000118