Michael Mikola, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE: VIOXX                  * MDL Docket No. 1657
PRODUCTS LIABILITY            *
LITIGATION                    * Section L
                      *
THIS DOCUMENT RELATES TO:  * Judge Fallon
GERALD BARNETT v. MERCK    * Mag. Judge Knowles

****************************



VIDEOTAPE
DEPOSITION OF:MICHAEL MIKOLA, MD

DATE:          April 25, 2006

TIME:          8:27 AM

LOCATION:      Law Offices of
               Motley Rice, LLC
               28 Bridgeside Boulevard
               Mt. Pleasant, SC

TAKEN BY:      Counsel for Plaintiff

REPORTED BY:   TERRI L. BRUSSEAU,
               Registered Professional
               Reporter, CP, CRR



        GOLKOW LITIGATION TECHNOLOGIES

        Four Penn Center, Suite 1210
        1600 John F. Kennedy Blvd.
        Philadelphia, PA 19103
            877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

## Page 2

1 APPEARANCES OF COUNSEL:
2   ATTORNEYS FOR THE PLAINTIFF
    GERALD BARNETT:
3
    LAW OFFICES OF
4   ROBINSON, CALCAGNIE & ROBINSON
    BY:  MARK P. ROBINSON, JR.
5        TED B. WACKER
         LEXI W. MYER
6   620 Newport Center Drive, Seventh Floor
    Newport Beach, California  92660
7   (949) 720-1288
    twacker@rcrlaw.net
8
    ATTORNEYS FOR THE DEFENDANT:
9
    BARTLIT, BECK, HERMAN,
10  PALENCHAR & SCOTT, LLP
    BY: ANDREW L. GOLDMAN
11       ADAM K. MORTARA
    Courthouse Place
12  54 West Hubbard Street
    Chicago, IL  60610
13  (312) 494-4469
    andrew.goldman@bartlit-beck.com
14  adam.mortara@bartlit-beck.com
15
    ALSO PRESENT:
16
    Alan Metts, Video Technician
17
18  (INDEX AT REAR OF TRANSCRIPT)
19
20
21
22
23
24
25

## Page 3

1     VIDEO TECHNICIAN:  This is the
2 videotape deposition of Dr. Michael Mikola in the
3 matter of the Vioxx products liability litigation
4 relating to Gerald Barnett versus Merck, being
5 Docket Number 1657 pending in the United States
6 District Court, Eastern District of Louisiana.
7     Today's date is April 25, 2006.  The
8 deposition is being held at the law firm of Motley
9 Rice, 28 Bridgeside – Bridgeside Boulevard, Mount
10 Pleasant, South Carolina.  I am Alan Metts, the
11 Videotape Technician.  The Court Reporter is Terri
12 Brusseau.  The time is approximately 8:28 AM.
13     Will the Court Reporter swear in the
14 witness.
15     MICHAEL G. MIKOLA, MD
16 being first duly sworn, testified as follows:
17     VIDEO TECHNICIAN:  And will counsel
18 introduce themselves.
19     MR. ROBINSON:  Yeah, Mark Robinson for
20 Plaintiff.
21     MS. MYER:  Lexi Myer for the Plaintiff.
22     MR. WACKER:  Ted Wacker for Plaintiff.
23     MR. GOLDMAN:  Andy Goldman for Merck.
24     MR. MORTARA:  Adam Mortara for Merck.
25     EXAMINATION

## Page 4

1 BY MR. ROBINSON:
2     Q.  Hi, Doctor, I'm Mark Robinson.  I
3 represent Gerald Barnett, your patient.  Do you
4 want to tell the jury what kind of doctor you are?
5     A.  I'm an internist.  I practice internal
6 medicine.
7     Q.  And where do you practice right now?
8     A.  Where?
9     Q.  Yes.
10    A.  In Mount Pleasant, South Carolina.
11    Q.  And from approximately 1999 to 2004,
12 was Jerry Barnett your client --
13    A.  He was my patient.
14    Q.  -- or your patient?  Yes.  And where
15 were you practicing at that time?
16    A.  Myrtle Beach, South Carolina.
17    Q.  Do you remember Jerry Barnett?
18    A.  Yes, sir.
19    Q.  And you actually took care of him
20 almost four-and-a-half years, is that right?
21    A.  I believe that's correct, yes.
22    Q.  And what were you taking care of Jerry
23 Barnett for?
24    A.  At the time, high cholesterol.  He had
25 a history of gastroesophageal reflux disease and

## Page 5

1 allergies as well as routine health maintenance
2 issues.
3     Q.  And were you helping him with pain
4 medication for his back?
5     A.  Yes.
6     Q.  Okay.
7     A.  He also had – I think he had neck
8 problems.
9     Q.  And was one of the drugs that Jerry
10 Barnett was taking from, say, sometime in 2000 up
11 to 2004 Vioxx?
12    A.  That's correct.
13    Q.  And initially is it your understanding
14 that Dr. McCaffrey, a neurologist from Myrtle
15 Beach, prescribed Vioxx for Mr. Barnett?
16    A.  I believe that's correct, yeah.
17    Q.  And then you continued with that
18 prescription, is that right?
19    A.  Correct.
20    Q.  And is it your understanding that
21 Mr. Barnett saw Dr. McCaffrey up through I think
22 something like December 30th of 1999 --
23    A.  I believe that's correct.
24    Q.  -- is that correct?  Is it also true
25 that Jerry Barnett started with you as a patient in

Golkow Litigation Technologies - 1.877.DEPS.USA

Michael Mikola, M.D.

Page 6

1  October of 1999?
2      A.  Yes, sir, that's correct.
3      Q.  In fact, let me -- let me give you what
4  will be Exhibit Number 1.
5      (PLF. EXH. 1, Carolina Health
6  Specialists medical record for Gerald Barnett, was
7  marked for identification.)
8  BY MR. ROBINSON:
9      Q.  It's a record from October 22nd, 1999.
10  Give the defense a chance to look at it.
11      Is this the record of your first seeing
12  Mr. Barnett?
13      A.  That's correct.
14      Q.  And --
15      A.  This is Page 2. I have -- I believe I
16  have a copy of Page 1.
17      MR. GOLDMAN:  Can you give him Page 1
18  so we have it for the record, also?
19      MR. ROBINSON:  Let me see what you
20  have.
21      THE WITNESS:  Page 2 is the labs.
22      MR. ROBINSON:  Oh, I'm sorry. Here,
23  let me give you -- here's Page 1.
24      THE WITNESS:  Okay.
25  BY MR. ROBINSON:

Page 7

1      Q.  And at Page 2 it talks about the
2  assessment and plan, is that right?
3      A.  Correct.
4      Q.  And why don't you read the five
5  categories without going into the detail, but what
6  are the five categories under the assessment and
7  plan?
8      A.  The five diagnoses are hyperlipidemia,
9  osteoarthritis, reflux with dilatation and
10  esophagitis, cancer screening and sinusitis.
11      Q.  And what is hyperlipidemia?
12      A.  That's an elevated sugar and blood
13  lipids are commonly referred to as cholesterol
14  levels.
15      Q.  And at some point you put him on a drug
16  called Lipitor, is that right?
17      A.  I'll refer to the records, but I
18  believe he was started on -- let me check. I know
19  he was on Lipitor. I believe I started that. Yes,
20  that's correct. I wasn't clear if I started that
21  medicine or not, but according to my notes, in
22  August he was on it.
23      Q.  August of 2000?
24      A.  Yes.
25      Q.  Okay.

Page 8

1      A.  I believe I prescribed that for him.
2      Q.  Okay. And then if you go back to
3  Exhibit Number 1.
4      A.  Yes, I did start him on Lipitor.
5      Q.  Okay.
6      A.  Okay.
7      Q.  And that was for his hyperlipidemia, is
8  that right?
9      A.  Correct.
10      Q.  And Lipitor, what type of drug is
11  Lipitor?
12      A.  It's a drug class called a statin.
13  It's a drug designed to lower cholesterol.
14      Q.  Okay. Now, going back to Exhibit
15  Number 1 under the assessment and plan on Page 2 of
16  Exhibit Number 1.
17      A.  Yes, sir.
18      Q.  Do you see Number 2, it says,
19  osteoarthritis, continue Feldene?
20      A.  Yes, sir.
21      Q.  Now, so when he first came to you, he
22  was on Feldene, right?
23      A.  Correct.
24      Q.  And the note says, he takes it fairly
25  regularly and it seems to be effective for him?

Page 9

1      A.  Correct.
2      Q.  I'm going to now show you a record
3  dated January 19th and January 20th, here you go,
4  which will be Exhibit Number 2.
5      (PLF. EXH. 2, Grand Strand Regional
6  Medical Center medical record for Gerald Barnett,
7  was marked for identification.)
8  BY MR. ROBINSON:
9      Q.  There you go. Now, Exhibit Number 2
10  has --
11      MR. GOLDMAN:  Mr. Robinson, it looks
12  like you've got a number of documents here that at
13  least are combined as one.
14      MR. ROBINSON:  Right.
15      MR. GOLDMAN:  Some have Bates numbers,
16  some don't.
17      MR. ROBINSON:  In any event, what I'll
18  do is I'll sort of reference them.
19      THE WITNESS:  I can probably clarify a
20  little if you'd like. The typed notes are -- that
21  say Carolina Health Specialists at the top are my
22  office notes, the typed notes that say Grand Strand
23  Regional Medical Center would be the hospital --
24  hospital notes and the handwritten note is a
25  progress note from the hospital.

## Michael Mikola, M.D.

Page 10

1     MR. GOLDMAN: Thank you.
2     MR. ROBINSON: Okay.
3   BY MR. ROBINSON:
4     Q.  So just to get the order here, if we go
5   to the typewritten notes dated 1/19/2000, it
6   appears that Mr. Barnett had a stuttering-type
7   presentation of chest discomfort, is that right?
8     A.  Yes, sir.
9     Q.  And apparently it progressed throughout
10  that day of January 19th, 2000?
11    A.  I believe that's correct, yes.
12    Q.  It says that he tried some
13  over-the-counter antacids in addition to his usual
14  Prilosec, is that right, but that did -- the
15  Prilosec did not give him significant relief?
16    MR. GOLDMAN: Object to the form.
17    THE WITNESS: That's correct.  If they
18  object, I answer anyway, is that correct?
19    MR. GOLDMAN: Yes.
20    THE WITNESS: Okay.  All right.
21    MR. GOLDMAN: Yes, yes, just to make a
22  record, that's all.
23    THE WITNESS: Okay.
24    MR. ROBINSON: For the record, your
25  objection was to leading, right?

Page 11

1     MR. GOLDMAN: Yes, and I've not
2   objected because I don't want to unnecessarily
3   delay it, but when a leading objection I feel is
4   important, I'll make it.  When it's not, I won't.
5     MR. ROBINSON: Okay.  Well, I just was
6   reading to speed up the process.
7     MR. GOLDMAN: I understand.
8     MR. ROBINSON: Okay.
9     THE WITNESS: There is a typo on this
10  page as well.  Where it says, an EKG was obtained,
11  it did show any significant ischemic changes, it
12  should say, it did not show any significant
13  ischemic changes.
14  BY MR. ROBINSON:
15    Q.  Okay.  So there was an EKG that did not
16  show any significant ischemic changes, right?
17    A.  That's correct.
18    Q.  Now --
19    MR. GOLDMAN: It might be helpful if
20  it's okay with you, Mr. Robinson, if Dr. Mikola can
21  actually write in not.
22    THE WITNESS: I did.
23    MR. GOLDMAN: That's great, so we have
24  an accurate...
25    MR. ROBINSON: He wrote it on the --

Page 12

1     THE WITNESS: I wrote it on the copy
2   that he gave me.
3     MR. GOLDMAN: Thank you.
4   BY MR. ROBINSON:
5     Q.  So when he presented with his chest
6   pain, what did you do for him?
7     A.  I did the EKG.  It did not show any
8   acute cardiac problems.  I was concerned given his
9   risk factors that it may be indicative of coronary
10  artery disease so I gave him a prescription for
11  sublingual nitroglycerine to take in the event that
12  his symptoms recurred.  And then it -- it appears
13  that he paged me that evening stating his chest
14  discomfort recurred.  He took a nitroglycerine and
15  it resolved.
16    Q.  Okay.  Was one of the concerns you had
17  was that the chest pain might have been angina?
18    A.  Correct.
19    Q.  What is angina?
20    A.  Angina is chest -- typically chest
21  pain, but it's -- refers to symptoms caused by an
22  inadequate blood supply to the heart muscle.
23    Q.  And apparently from his description of
24  this pain, it was a different type of pain than has
25  been his normal pain that had been -- chest pain

Page 13

1   that had been alleviated by antacids, is that
2   right?
3     MR. GOLDMAN: Object to the form.
4   BY MR. ROBINSON:
5     Q.  Up above there.  Tell you what, I'll
6   withdraw that question and we'll go to the second
7   page of the exhibit.
8     A.  Okay.
9     Q.  Do you see under assessment plan --
10  would you read into the record Number 1, please.
11    A.  Yes, sir.  Recurrent chest discomfort.
12  Diagnostic possibilities would include esophageal
13  spasm or esophagitis.  Given the fact that he takes
14  his Prilosec regularly, I think it would be a
15  little less likely, and I am also concerned given
16  the family history of coronary disease and a
17  personal history of hyperlipidemia, that it could
18  represent an unstable angina pattern.
19    Q.  You can stop at that point.  What does
20  an unstable angina pattern refer to?
21    A.  Unstable angina generally refer --
22  refers to an unstable plaque in the coronary
23  arteries.  Inadequate blood supply to the heart
24  muscle that we refer to as angina generally occurs
25  in two patterns commonly.  One is stable angina,

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Page 14

which is thought to represent a gradual progression of plaque build-up in the artery, and that typically occurs when the heart muscle demand for blood and oxygen is impeded by plaque build-up in the arteries. Unstable angina is felt to represent a plaque that is in the process of rupturing and that is -- puts patients at a higher risk of a heart attack or an impending event.
Q. Okay. Going to Number 2, will you read that into the record, please.
MR. GOLDMAN: Did you want him to read the entire paragraph?
MR. ROBINSON: No, no.
MR. GOLDMAN: I'm going to have to come back to it.
MR. ROBINSON: No, you can come back.
BY MR. ROBINSON:
Q. Number 2.
A. Hyperlipidemia. Certainly if he has significant coronary disease, he will need his LDL below 100. Given the family history of coronary disease in the absence of documented disease, I think his LDL goal would be closer to 130. He did lower his LDL from 190 to 152 with dietary changes and further decisions regarding his therapy will be

Page 15

made after the results of his cardiac work-up.
Q. And now will you read Number 3, please.
A. Number 3 says, gastroesophageal reflux. We will continue the Prilosec. Certainly if his cardiac work-up is negative, we'll consider an upper GI series for further evaluation to evaluate his esophagus and he will also have a PA and lateral chest x-ray on admission.
Q. Okay, for the Court Reporter's sake, sometimes --
COURT REPORTER: Slow down.
THE WITNESS: Okay. Do you want me to reread it?
BY MR. ROBINSON:
Q. No, I think she's got it.
A. Okay.
Q. Could we go to Page 3 of Exhibit Number 2, please, Doctor.
A. Is that the page with handwriting? It's not numbered.
Q. Yes. Yes.
A. Okay.
Q. It says in the second line, patient -- can you read that into the record, please.
A. Yes, sir. It says, patient had acute

Page 16

onset severe precordial chest pain in the emergency room promptly relieved by one sublingual nitroglycerine. EKG obtained, however, chest pain resolved -- I can't make out the next word -- within 30 seconds of sublingual nitroglycerine.
Q. What is precordial chest pain?
A. That refers to the area located over the heart on the left side of the chest.
Q. And is that pain different than pain that you get when you have a gas -- gas-type pain in your esophagus?
A. It varies from individual to individual.
Q. Okay. But is precordial pain something that would be associated or could be associated with angina?
A. Correct.
Q. Okay, could we go to the fourth page of Exhibit Number 2, Doctor. This is a note that was, I guess, dictated by you?
A. Correct.
Q. Okay, I think we should read this into the record so let's just -- let's read the first -- first paragraph into the record.
A. Okay. And if I remember correctly,

Page 17

this was the office note from earlier in the day.
Q. Okay. So this is your first note --
A. That day.
Q. -- that day?
A. Yes, sir.
Q. Do you know what time this was?
A. No, sir.
Q. Okay, go ahead.
A. Do you want me to read?
Q. Yes.
A. The history of present illness on Gerald Barnett. He's a 55-year-old gentleman seen for evaluation of chest pain. He recently recovered from an upper respiratory infection. He had about one day of fever and myalgias followed by a productive cough. He was treated with two weeks of antibiotics and then discontinued them.
Q. Okay, can I stop at this point? At that point, you're talking really about an upper respiratory infection that he had had previously, is that right?
A. Correct.
Q. Okay. Now you're -- you're going to go to the event that occurred that day?
A. Correct.

Michael Mikola, M.D.

Page 18

1    Q.  Okay.  Could you read on, please.
2    A.  He developed left-sided precordial
3    chest discomfort that occurred intermittently
4    throughout the day.  It became progressively worse.
5    Approximately one hour ago it resolved.  It did not
6    radiate.  No palpitations, nausea, vomiting,
7    diaphoresis.  It was not associated with physical
8    activity.  He exercised last night per his routine
9    of lifting weights, et cetera.
10   Q.  Okay.  Could you go down to assessment
11   and plan and read into the record Number 1, please.
12   A.  Yes, sir, it says, chest pain.  He has
13   a history of hyperlipidemia, but his ratio has been
14   fairly acceptable.
15   Q.  What does that refer to, his ratio?
16   A.  That refers to the ratio of what we
17   call the good cholesterol to the bad cholesterol.
18   Patients' risk of developing vascular disease in
19   part is related to the different fractions of
20   cholesterol in the bloodstream.
21   Q.  Okay.  Could you read on.
22   A.  I am giving him sublingual
23   nitroglycerine to take on an as-needed basis.  I am
24   going to schedule him for a stress thallium
25   tomorrow.  If his stress thallium is abnormal, we

Page 19

1    will admit him for catheterization.  If it is
2    normal, I will probably attribute it to esophageal
3    spasm or possibly muscle spasm and will not pursue
4    further work-up.
5    Q.  If a person has angina, how does
6    sublingual nitroglycerine work to resolve pain from
7    angina?
8    A.  Generally it's believed to cause
9    dilatation of the coronary arteries.  It opens up
10   the arteries to the heart, so to speak.
11   Q.  Dilatation means opening it up?
12   A.  Yes, to improve the blood flow.
13   Q.  And if a person has esophageal pain and
14   are given Prilosec, how does Prilosec help the
15   esophageal pain?
16   A.  It generally doesn't right away.
17   Prilosec works by blocking acid production in the
18   stomach.  Esophageal pain caused by reflux disease
19   often results from one of two things, a chemical
20   irritation of the esophagus that would cause
21   esophagitis or muscle spasm in the esophagus
22   generally related to the chemical irritation.  What
23   Prilosec does is it changes the acidity of any
24   material that comes from the stomach into the
25   esophagus so that people with reflux disease, the

Page 20

1    refluxant or the material that comes in the
2    esophagus is not acidic and it doesn't chemically
3    irritate the lining of the esophagus.  It generally
4    takes several hours to start working.
5    Q.  So if a person has angina-type pain and
6    the -- the nitroglycerine is taken and stops the
7    pain, would that be sort of a cause-effect
8    relationship?
9         MR. GOLDMAN:  Object to the form.
10   BY MR. ROBINSON:
11   Q.  Or could that be?
12   A.  I'm not sure if I understand the
13   question.
14   Q.  Let me rephrase the question.
15       If a person has chest pain and he's
16   given nitroglycerine and the nitroglycerine
17   resolved the chest pain, could that be some
18   evidence that his chest pain was due to angina?
19   A.  It could be, yes.
20   Q.  Okay.  Could we go to the next
21   page, Doctor.  Now, do you -- do you know when this
22   next page would have been dictated?
23   A.  Sometime the following day, I'm not
24   sure.  Generally -- Vicki Allen was the physician's
25   assistant for the cardiology group in Myrtle Beach

Page 21

1    and generally they were pretty efficient at seeing
2    patients in a timely manner.  I would assume it
3    would have been relatively early in the day, but I
4    don't know that to be a fact.
5    Q.  The date of this report is 1/20/2000,
6    is that right?
7    A.  Correct.
8    Q.  And what kind of doctor is Vicki Allen?
9    A.  She's a physician's assistant who works
10   for the cardiologist.
11   Q.  So she's not a doctor then, right?
12   A.  Correct.
13   Q.  Under the problem list up at the top,
14   can you read that into the record, please.
15   A.  Yes, sir.  Chest pain.  Rule out
16   ischemia.  Hypercholesterolemia.  History of
17   cervical disc herniation secondary to motor vehicle
18   accident in 1979.  Followed by Dr. McCaffrey.
19   History of multiple normal stress EKG's as the
20   patient was in the FBI and they were required every
21   other year.  GERD, which is gastroesophageal reflux
22   disease.  EGD one year ago normal.  Followed by
23   Dr. Cornell.
24   Q.  For the record, what is ischemia?
25   A.  Ischemia generally refers to an

6  (Pages 18 to 21)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 22**

1  inadequate blood supply to a muscle or tissue to an
2  organ.
3      Q.  Now, at some point he was seen by a
4  cardiologist, is that right?
5      A.  Yes, generally the routine is that the
6  physician's assistant would see the patient.  When
7  they rounded with the cardiologist that day, they
8  would give the cardiologist a report.  He or she
9  would then go see the patient, review the
10  information with the patient and then make the
11  medical decisions.
12      Q.  Well, the reason I brought that up is
13  that if you look at the -- Page 3 of 3, it was
14  signed by Dr. Swami.
15      A.  Yes.
16      Q.  And I'm wondering does that appear to
17  show that Dr. Swami -- Swami actually dictated this
18  report?
19      A.  No, sir.
20      Q.  Oh, okay.
21      A.  Vicki Allen most likely dictated it.
22  Dr. Swami overread it and signed it is how -- the
23  normal routine.
24      Q.  Okay.
25      A.  Or the usual routine.

**Page 23**

1      Q.  Could you read the assessment plan into
2  the record of the Page 3 of 3, please.
3      A.  Yes, sir.  This is a 55-year-old white
4  male who presents with atypical chest pain.  The
5  patient has ruled out for a myocardial infarction
6  as cardiac enzymes have been negative times two.
7  Given that the patient does have risk factors for
8  coronary artery disease, an exercise stress test is
9  recommended.  Patient states that he prefers this
10  conservative management.  The patient is fairly
11  stable at this time and we feel that this stress
12  test can be performed on an outpatient basis at our
13  office.  This was discussed with the patient and
14  this will be set up through our office.
15      Q.  Okay.  Do you have the -- he was -- he
16  was administered a Cardiolite exam?
17      A.  Yes.
18      Q.  Do you happen to have that record in
19  front of you?
20      A.  I do not believe so.  I have a note
21  from my office visit January 27th that refers to
22  the test, but I don't have a copy of the test
23  results.
24      Q.  Okay.  Do you know what the test
25  results were?

**Page 24**

1      A.  According to my records, they showed a
2  small abnormal area in the lateral wall of the
3  heart.
4      Q.  So there was -- was there lateral --
5  some mild lateral ischemia found?
6      A.  That's what this stress test suggested,
7  yes, sir.
8      Q.  And what does that mean?
9      A.  Generally means one of two things,
10  either some plaque development in the coronary
11  artery that limits flow to that portion of the
12  heart or it could be what's called a false
13  positive, which is where you get an abnormal image
14  without actual coronary disease.
15      Q.  Okay.  Looking back on this event, is
16  one of the possible explanations for this event of
17  January 19th and 20th, 2000 for Mr. Barnett, is
18  that he had a mild bout of angina?
19      A.  Yes, that's possible.
20      Q.  Now, before I go on, I probably should
21  do this.  What -- you said you're an internist?
22      A.  Correct.
23      Q.  And why don't you tell the jury about
24  your education, both undergraduate and med school.
25      A.  I went to College of Charleston for my

**Page 25**

1  undergraduate education.  I attended the Medical
2  University of South Carolina in Charleston for
3  medical school for four years, from 1987 to 1991,
4  and then I completed three years of internship and
5  residency at the Medical University of South
6  Carolina, 1991 through 1994, and received board
7  certification for -- to practice internal medicine
8  in 1994.
9      Q.  And then from 1994 through 1999, where
10  did you practice?
11      A.  In Myrtle Beach, South Carolina,
12  private practice.
13      Q.  And you continued on practicing in
14  Myrtle Beach until 2004?
15      A.  That's correct.
16      Q.  What month in 2004 did you move to
17  Charleston?
18      A.  June of 2004.
19      Q.  So you would have treated Mr. Barnett
20  from October 22nd, 1999 until sometime in June of
21  2004, is that right?
22      A.  Probably sometime in May.  I think -- I
23  believe I moved around the beginning of June.
24      Q.  And from that point in time, my records
25  show that he was treated by Dr. Huberty.  Do you

Michael Mikola, M.D.

Page 26

1 know a Dr. Huberty?
2     A.  Yes, sir.
3     Q.  *How do you know Dr. Huberty?*
4     A.  He's a physician that the group I was
5 previously affiliated with hired to take over my
6 practice.
7     Q.  Okay.  And as I understand it,
8 Dr. Huberty has kept Mr. Barnett's chart, is that
9 right?
10     A.  I believe I've seen some notes in the
11 documents provided.
12     Q.  *And basically my office, Miss Myer had*
13 *to send you, actually, Gerald Barnett's records, is*
14 *that correct?*
15     A.  That's correct.
16     Q.  Because you did not have his chart in
17 your office here in Charleston?
18     A.  That's correct.
19         (PLF. EXH. 3, Vioxx prescription, with
20 attachments, was marked for identification.)
21 BY MR. ROBINSON:
22     Q.  Now, let me show you Exhibit Number 3.
23 Here you go.  Exhibit Number --
24         MR. GOLDMAN:  I have a document that
25 says, confidential, attorney work product on it.

Page 27

1         MR. ROBINSON:  Yeah.  I'm going to --
2 what I'm going to do is this:  I'm using that
3 *unless -- I want to try and work out a stipulation*
4 *later.  And I'm trying to use that as a chronology*
5 *basis, but we may end up just keeping that top page*
6 *and agreeing to not have that be part of Exhibit*
7 *Number 3.*
8         MR. GOLDMAN:  Well, I'd prefer, unless
9 you plan to establish each of the entries here with
10 Dr. Mikola -- I don't know as I sit here whether
11 this is accurate so I prefer you not to use this
12 *with this witness.*
13         MR. ROBINSON:  Oh, that's fine.  So
14 we'll make Exhibit Number 3 --
15 BY MR. ROBINSON:
16     Q.  You can take the chronology off Exhibit
17 Number 3, Doctor.  So Exhibit Number 3 is a group
18 of Merck Medco prescription records for Vioxx that
19 went to Gerald Barnett, is that right, Doctor?
20     A.  It's a form from Merck Medco, yes,
21 *stating the medicines he had ordered.*
22     Q.  And at Page -- I guess if you go
23 down -- if you go four pages in --
24     A.  The fourth page?
25     Q.  Fourth page in, yes.

Page 28

1     A.  Okay.
2     Q.  There's a chronology there.  And you're
3 one of the doctors listed on that page, is that
4 right?
5     A.  Correct.
6     Q.  When Mr. Barnett came to see you in
7 2000, was he on Vioxx as it was prescribed by some
8 other doctor?
9         MR. GOLDMAN:  Object to the form.  What
10 *time in 2000?*
11 BY MR. ROBINSON:
12     Q.  Well, let's say March of 2000.
13     A.  I'll have to refer to my notes.
14     Q.  Sure.
15     A.  March 21st, 2000 he was taking Vioxx,
16 correct.
17     Q.  And is it your understanding *that it*
18 *was prescribed originally by Dr. McCaffrey?*
19     A.  I believe that's correct.
20     Q.  And do you know Dr. McCaffrey?
21     A.  Yes, sir.
22     Q.  What type of doctor is Dr. McCaffrey?
23     A.  He's a neurologist.
24     Q.  Okay.  And so initially Dr. McCaffrey
25 gave Vioxx to Mr. Barnett?

Page 29

1     A.  I believe that's correct.
2     Q.  And at some point did you then
3 prescribe Vioxx for Mr. Barnett?
4     A.  Correct.
5     Q.  And I'm not going to go through the
6 records with you, the records speak for themselves
7 and the dates of the prescription will speak for
8 themselves, but what did you prescribe Vioxx for?
9     A.  For osteoarthritis, the pain associated
10 *with osteoarthritis.*
11     Q.  And as I understand it, you continued
12 prescribing Vioxx until you left for Charleston, is
13 that right?
14     A.  Let me refer to the records.  It
15 appears that in January -- excuse me, September
16 23rd, 2004, I changed him from Vioxx to Celebrex.
17     Q.  Okay.  Was that you or was that
18 Dr. Huberty?
19     A.  Oh, I'm sorry, that's Dr. Huberty, my
20 mistake.  It appears that I continued to prescribe
21 the Vioxx.  I don't see a mention that I changed
22 it.
23     Q.  Okay.  And then you would have left
24 sometime in June for Charleston, is that right?
25     A.  Correct.

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

## Page 30

1   Q. Let me give you the next exhibit, I
2   guess would be Number 4.
3   (Off-the-record conference.)
4   (PLF. EXH. 4, Medical records for
5   Gerald Barnett, was marked for identification.)
6   BY MR. ROBINSON:
7   Q. Now, Exhibit Number 4 is a series of
8   records -- okay.
9   MR. GOLDMAN: Mr. Robinson, this also
10  you can probably tell by flipping through it looks
11  like a compilation of different medical records.
12  MR. ROBINSON: Definitely. That's -- I
13  think one of -- one of them is out of order.
14  BY MR. ROBINSON:
15  Q. Why don't we do this, Doctor? Why
16  don't we put the second page -- let's put that in
17  the sequence where it belongs in Exhibit Number 4.
18  So that would go beyond -- behind the one for 8/2.
19  A. Okay.
20  Q. All right.
21  MR. GOLDMAN: Can I ask you a question?
22  Just off the record for a second.
23  VIDEO TECHNICIAN: We will now go off
24  the record. The time is approximately 9:08 AM.
25  (Off-the-record conference.)

## Page 31

1   MR. GOLDMAN: Mr. Robinson is going to
2   provide us a copy of the documents that are Bates
3   stamped HUB ampersand MIK.
4   VIDEO TECHNICIAN: We're back on the
5   record. The time is approximately 9:09 AM.
6   BY MR. ROBINSON:
7   Q. Doctor, what I tried to do with Exhibit
8   Number 4 is -- is put together a group of your
9   records that preceded the heart attack, but I also
10  attached the first page, which appears to be
11  recordings of blood pressures and other vital signs
12  for Mr. Barnett, correct?
13  A. That's correct.
14  Q. So this would have been something done
15  by your office, is that right?
16  A. My nurse would do it, yes, sir.
17  Q. Okay. Could we go to the second page
18  which would be dated 3/21/00.
19  A. Okay.
20  Q. Under the assessment, will you read
21  that into the record, Number 1, please.
22  A. Yes, sir. Hyperlipidemia. I will
23  check a lipid profile. He inquires about Lipitor.
24  Some of his friends have told them there are
25  very -- and it should read few, which I'll write

## Page 32

1   in, side effects. If his LDL is significantly
2   above 130, we will consider a trial of Lipitor on
3   follow-up in eight weeks. He has a family history
4   of coronary disease.
5   Number 2, osteoarthritis. Stable on
6   Vioxx.
7   Number 3, gastroesophageal reflux
8   disease. We will continue Prilosec lifelong, 20
9   milligrams a day. I will see him in six months for
10  follow-up with lipids or sooner if we start him on
11  Lipitor.
12  Q. Okay. Let's go to the next record,
13  which is August 2, 2000.
14  A. Okay.
15  Q. Will you read the first two sentences
16  into the record, please.
17  A. 55-year-old gentleman with a history of
18  hyperlipidemia seen for follow-up visit. We
19  started him on Lipitor. His lipid profile is under
20  excellent control.
21  Q. Okay. Going down in that same
22  paragraph, could you read into the record the
23  sentence that begins, he has not had any.
24  A. He has not had any angina, shortness of
25  breath, PND, orthopnea.

## Page 33

1   Q. Okay. Now, since he had that episode
2   we talked about previously on January 19, 2000, you
3   were monitoring him to make sure he didn't have any
4   angina, is that right?
5   A. Correct.
6   Q. And why was shortness of breath
7   important?
8   A. Angina -- it can be what we call an
9   anginal equivalent. Some people don't get the
10  typical chest pain when they have ischemia of the
11  heart muscle. One of the symptoms that can
12  indicate angina is shortness of breath with
13  physical activity.
14  Q. Okay. Let's go to the next date, which
15  is 10/24/2000.
16  A. All right.
17  Q. Do you see there's a sentence in there
18  beginning, no angina? Would you read that in the
19  record, please.
20  MR. GOLDMAN: Which -- which document
21  is this now?
22  MR. ROBINSON: 10/24.
23  THE WITNESS: No angina or respiratory
24  complaints. No change in his bowel or bladder
25  habits.

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

Page 34

1  BY MR. ROBINSON:
2      Q.  Okay.  Once again, you're documenting
3  that he's got no angina for the reasons you
4  previously told us about, right?
5      A.  Correct.
6      Q.  Going down to Number -- could you
7  read -- under assessment plan, read Number 2 into
8  the record, please.
9      A.  Yes, sir.  Hyperlipidemia.  He is doing
10  quite well on Lipitor, 10 milligrams.  We will
11  continue the same.  His diet and exercise have been
12  stable.  He's trying to keep his weight under
13  control.
14      Q.  Okay.  Go to the next page, which is
15  12/28/2000.
16      A.  Yes, sir.
17      Q.  Could you read the second sentence into
18  the record, please.
19      A.  Yes, sir.  He has had a couple episodes
20  of chest pain, but they do not sound cardiac.
21      Q.  Go ahead, read on.
22      A.  They seem to be reflux related.  They
23  are quite mild compared to his previous episode.
24  He is concerned about elevation in his lipids.  He
25  is compliant with his diet and exercise and eating

Page 35

1  a low-fat, low-carbohydrate diet.  He has not had
2  any change in his bowel habits, symptoms of
3  progressive bladder outlet obstruction,
4  paresthesias, tingling, numbness, focal neurologic
5  deficits.
6      Q.  Okay.  If we can go to the assessment
7  and plan, can you read that first --
8      A.  Hypertension?
9      Q.  -- note under hypertension.  Yes.
10      A.  Hypertension.  His blood pressure is
11  acceptable although a little elevated today at 138.
12  He states in the community it is under better
13  control.  He is anxious because he is on
14  over-the-counter sinus medicines.
15      Q.  Would you read Number 3 in, which is
16  the hyperlipidemia.
17      A.  Yes, sir, hyperlipidemia.  His lipid
18  control has deteriorated, although it is still
19  acceptable.  Continue Lipitor 10.
20      Q.  Okay.  If we go to the next document,
21  which is July 12th, '01.  Could you read the first
22  two sentences in.
23      A.  A 55-year-old gentleman with
24  hyperlipidemia, tinea unguium, reflux and
25  esophageal stricture seen for follow-up visit.

Page 36

1      Q.  Okay.  Keep going on, read the next two
2  sentences.
3      A.  He has not had any angina.  He had
4  upper respiratory infection recently and treated
5  with Augmentin.
6      Q.  And then under the assessment plan,
7  could you read Number 2 into the record, please.
8      A.  Hyperlipidemia.  Doing well on the
9  Lipitor 10 milligrams and diet and exercise.
10      Q.  Okay.  Could we go to the date -- it
11  would be 2/18/02.
12      A.  Yes, sir.
13      Q.  Could you read the first sentence into
14  the record.
15      A.  55-year-old gentleman with
16  hyperlipidemia and esophageal reflux seen for
17  follow-up.
18      Q.  And if you go down to the AP, read
19  Number 2 under hyperlipidemia into the record.
20      A.  Hyperlipidemia.  He is on a low-fat,
21  low-carbohydrate diet, regular exercise.  I
22  answered several questions for him today.  I will
23  continue his current therapy.
24      Q.  Would you read Number 5 into the
25  record, please.

Page 37

1      A.  Reflux and esophageal dilatation.
2  Continue lifelong Prilosec therapy.  I did
3  recommend some over-the-counter Advil or Aleve for
4  about five to seven days for his shoulder
5  discomfort.
6      Q.  Okay.  So that was in addition to his
7  regular Vioxx that he was getting for his neck or
8  back pain, right?
9      A.  Generally I would have -- it's not
10  clear from the record.  Generally I don't recommend
11  that people take them together.
12      Q.  But if he took Vioxx during that
13  period, would that have been a problem for him?
14      A.  No, it's just that Advil, Aleve and
15  Vioxx generally in terms of pain and inflammation
16  work by the same mechanism and there's probably
17  little additional benefit of taking two different
18  drugs with the same mechanism of action.
19      Q.  But do you know from the records
20  whether or not -- I mean --
21      A.  I don't know.
22      Q.  Okay.
23      MR. GOLDMAN:  What was the question?
24      MR. ROBINSON:  Let me strike that.
25      MR. GOLDMAN:  You guys are reading each

10  (Pages 34 to 37)

66ee2519-35e6-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

## Page 38

1  other's minds.
2      MR. ROBINSON: *I'll ask the question.*
3  BY MR. ROBINSON:
4      Q.  *The record is -- strike that.*
5      We cannot say from the record that you
6  *told him to stop taking Vioxx for those five days?*
7      A.  That's correct.
8      Q.  *Okay. Okay, let's go to the visit*
9  *which is 8/20/02.*
10     A.  Yes, sir.
11     Q.  Read -- can you read the third sentence
12 in, please.
13     A.  He has not had angina, paresthesias,
14 tingling, numbness, heat or cold intolerance, easy
15 bruising or bleeding.
16     Do you want me to continue?
17     Q.  Go ahead.
18     A.  He has atypical chest pain. It is
19 usually relieved and controlled with Prilosec.
20     Q.  Go ahead.
21     A.  His blood pressure when he goes to the
22 walk-in clinic for occasional sinus flare-ups
23 generally is 120 over 80. He has not had any
24 recent decongestants.
25     Q.  Now, if we go back to the first page on

## Page 39

1  the chart, could you read into the record what his
2  blood pressure was on 8/20/02 taken by your nurse.
3      A.  152 over 90.
4      Q.  And what was his blood pressure on
5  2/18/02?
6      A.  170 over 92.
7      Q.  What was his blood pressure on
8  12/28/2000?
9      A.  138 over 62.
10     Q.  Okay. Let's go down to AP under Number
11 1. Would you read that into the record.
12     A.  Tinea unguium. He states the Lamisil
13 was not effective. He took it for three months.
14 *I'm going to give him a trial of a Sporanox*
15 *PulsePak. He will have LFTs after the first week*
16 *of therapy.*
17     Q.  Okay. Now, what is Sporanox?
18     A.  *Sporanox is an antifungal medicine.*
19     Q.  And do you take it once a week?
20     A.  *The PulsePak is dosed the first day of*
21 *each week.*
22     Q.  *Okay. Under weight gain, can you read*
23 *that into the record, Number 3.*
24     A.  *Weight gain. His weight came down on a*
25 *low-carb diet. His blood pressure is a little*

## Page 40

1  high. He has been eating a lot of protein.
2      Q.  Okay. I may come back to that.
3      Now, let me show you Exhibit Number 5.
4      (PLF. EXH. 5, Vioxx box label, was
5  marked for identification.)
6  BY MR. ROBINSON:
7      Q.  Exhibit Number 5 is a copy of the
8  *original box label, is that right?*
9      A.  I believe that's correct.
10     Q.  *And in fact, there's a date, copyright*
11 *by Merck 1998. Do you see that on Page 1 at the*
12 *bottom on the left side there?*
13     A.  Yes, sir.
14     Q.  *Okay. The Bates number for the record*
15 *is MRK-LBL 0000027. Doctor, under warnings --*
16 *strike that.*
17     Under contraindications, is there any
18 contraindication *listed regarding cardiac*
19 conditions or events, Page 2 of the label?
20     A.  No, sir.
21     Q.  Was there any warning that related to
22 cardiovascular event *in this label under the*
23 *warnings section?*
24     A.  No, sir.
25     Q.  Okay. I'll show you Exhibit Number 6.

## Page 41

1      (PLF. EXH. 6, E-mail dated 3/9/00 to
2  Deborah R. Shapiro, Alise S. Reicin and Alan S.
3  Nies from Edward M. Scolnick, was marked for
4  identification.)
5      MR. GOLDMAN: Mr. Robinson, I object to
6  you showing Dr. Mikola selected internal Merck
7  e-mails. And can I have a standing objection, sir,
8  on your use of documents that unless you show them
9  to Dr. Mikola, I presume he hasn't seen them?
10     MR. ROBINSON: Well, in any event, you
11 have a standing objection.
12 BY MR. ROBINSON:
13     Q.  Now, back in March of 2000 when you
14 were treating Gerald Barnett, did you see this
15 document?
16     A.  No, sir.
17     Q.  Okay. Let's read it into the record.
18 Would you read who it's to and who it's from.
19     MR. GOLDMAN: Again, objection, lacks
20 foundation.
21     MR. ROBINSON: You're going to have an
22 objection all the way through this, okay?
23 BY MR. ROBINSON:
24     Q.  Go ahead, Doctor.
25     A.  To Deborah Shapiro, Alise Reicin and

11 (Pages 38 to 41)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 42

1  Alan Nies from Edward Scolnick and he copied
2  himself on it.
3      Q.  Now, it's your understanding that
4  Edward Scolnick is the president of Merck
5  Research -- or was the president of Merck Research
6  Laboratories at this time?
7      A.  I don't know.
8      Q.  Okay.  Okay, why don't you read into
9  the record the first three sentences.
10      A.  To all, I just received and went
11  through the data.  Thank you for sending it to me.
12  There is no doubt about the pub data.  Very, very
13  strong, as expected, general safety is better than
14  could hope for in this patient population.
15  Incidences of hypertension, renal anything, edema,
16  liver, all great - very safe, very, very safe.
17      Q.  Okay.  Now I want you to read the next
18  sentence into the record.
19      A.  The CV events are clearly there.
20      Q.  Now, at any time in the year 2000, 2001
21  were you told by anybody from Merck or any document
22  from Merck that the president of Merck Research
23  Laboratories, Ed Scolnick, had said in March of
24  2000 with regard to Vioxx that the CV events are
25  clearly there in the bigger study?

Page 43

1      MR. GOLDMAN:  Object to the form.
2      THE WITNESS:  No, sir.
3  BY MR. ROBINSON:
4      Q.  Let's -- would you read the next two
5  sentences into the record, please.
6      A.  Since no obvious correlate right now,
7  i.e., not steroids, maybe smoking and prior a bit
8  this is real.  It is important to find out about
9  the cases that Oates told us about.  And Oates is
10  spelled O-A-T-E-S.
11      Q.  At that time in the year 2000, were you
12  told that Dr. Oates from Vanderbilt had discussions
13  with Mr. -- Dr. Scolnick and others regarding the
14  potential for CV events associated with Vioxx?
15      A.  No, sir.
16      Q.  Would you read the next sentence,
17  please.
18      A.  When we present in May, we should
19  present those also if he will let us so it is clear
20  to the world that this is class effect, all the
21  ideas you talked about are important, and then
22  there's a typo, P and lipid antibodies, but I doubt
23  it will correlate.
24      Q.  Would you read on, please.
25      A.  Many vein thrombosis in what is

Page 44

1  probably a somewhat restricted patient group.  I
2  think we should run an ASA, which is aspirin,
3  low-dose endoscopy study, placebo low-dose ASA
4  Vioxx and both to show people that you can sefly,
5  which I believe is safely, use ASA low dose with
6  Vioxx, i.e., that it is no different from ASA alone
7  and then some version of the Tylenol study we
8  discussed to further assess safety.  Also, WPSE
9  should give us a full postmarketing analysis with
10  incidences of whatever as background.
11      Q.  Okay.  Up to the time -- strike that.
12      Up through 2002, had anybody shared any
13  of what you just read with you?
14      A.  No, sir.
15      Q.  Could you read the next sentence into
16  the record, please.
17      A.  I believe I left off at, it is a shame,
18  but it is a low incidence and it's mechanism based
19  as we worried it was.
20      Q.  Now, let me stop there.  Were you ever
21  told that the CV events associated with Vioxx and
22  the bigger trials were believed by the president of
23  Merck Research Laboratories to be mechanism based?
24      MR. GOLDMAN:  Object to the form.
25      THE WITNESS:  No, sir.

Page 45

1  BY MR. ROBINSON:
2      Q.  Okay, could you read on.
3      A.  Oates and Alan and Barry were right
4  about the metabolite meanings, i.e., urine PG data.
5  I believe PG prefers to prostate gland.  It is
6  important that they do (sic) not appear to be
7  different.  This will limit the class somewhat, but
8  the GI safety is superb.  I really would like to
9  know the history of what patients were on and what
10  ulcer history in the data as you dig in.
11      Q.  Now, sometime in September of 2002,
12  Mr. Barnett had a heart attack, didn't he?
13      A.  I believe that's correct, yes.
14      Q.  September 6th, correct?
15      A.  Do I have those documents?  He did -- I
16  have to refer to documents to verify the date.  I
17  have the records from December that showed that he
18  had a diagnosis of coronary artery disease at that
19  time.
20      Q.  Okay.  Up until --
21      A.  From the best I recall, it was in
22  September of '02.
23      Q.  Okay.  At any time up to September '02
24  and Mr. Barnett's heart attack were you told
25  anything about what you just read from this

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

### Page 46

1  exhibit, Number 6?
2        MR. GOLDMAN: Object to the form.
3        THE WITNESS: No, sir.
4  BY MR. ROBINSON:
5        Q.  Let me go to Exhibit Number 7.
6        (PLF. EXH. 7, E-mail dated 3/28/00 to
7  Barry J. Gertz from Alan S. Nies, was marked for
8  identification.)
9        MR. GOLDMAN: Mr. Robinson, I assume
10  you're going to allow me to have a standing
11  objection to another selected Merck e-mail that
12  you're showing the witness, lacks foundation.
13        MR. ROBINSON: Same -- same -- you can
14  have an ongoing continuing objection.
15  BY MR. ROBINSON:
16        Q.  The Exhibit Number 7, will you read who
17  it's to and from and the date, please.
18        A.  It's to Barry Gertz from Alan Nies.
19  The date is March 28th, 2000.
20        Q.  And what's the subject?
21        A.  Carlo Patrono on VIGOR, in capitals.
22        Q.  So going back to Number 6, what was
23  the -- the one we just read in from Dr. Scolnick
24  regarding the CV events are clearly there, what was
25  the subject of that study?

### Page 47

1        A.  The VIGOR trial -- or VIGOR I should
2  say.
3        Q.  And from your prescribing of Vioxx, do
4  you know what the VIGOR trial refers to?
5        A.  Yes, sir.
6        Q.  What is that?
7        A.  That is a study that was conducted by
8  Merck to assess the safety of Vioxx, mainly in
9  terms of gastrointestinal complications.
10        Q.  Okay.  Now could we go back to Number
11  7, please.
12        A.  Yes, sir.
13        Q.  Could you read the -- under -- under
14  the paragraph down here where it says guys.
15        A.  Yes, sir.
16        Q.  Read the first sentence into the
17  record, please.
18        A.  I met with Carlo Patrono last Saturday
19  in Rome.  He has already been informed by other
20  sources about the results of VIGOR and we had an
21  interesting chat about it.
22        Q.  Okay.  Would you read the -- the first
23  sentence into the record, please, of the next
24  paragraph.
25        A.  He said that he does not think that the

### Page 48

1  CV effect that we observed can be attributed to
2  *Naproxen for a couple of good reasons.*
3        Q.  Then he gives the reasons.  Could you
4  read those into the record, please.
5        A.  Yes, sir.  First there is a weak
6  pharmacological basis and no epidemiological
7  evidence, in parentheses, Garcia Rodriguez and
8  Patrono epidemiology, in press, end of parentheses,
9  for cardio -- for CV protection associated with
10  conventional NSAIDs.  Additionally, the magnitude
11  of the effect would not be plausible even if the
12  comparator had been aspirin itself.  In fact, in at
13  least three different trials, aspirin has shown no
14  effect on the primary prevention of stroke, while
15  we have seen a 50 percent lower incidence of stroke
16  in the Naprosyn (sic) arm of VIGOR; additionally,
17  we have an overall reduction in the risk of CV
18  events of 47 percent with Naprosyn -- Naproxen,
19  excuse me, while aspirin has shown a reduction of
20  cumulative CV risk of a magnitude between 15 and 18
21  percent.  Aspirin data come from a primary
22  prevention setting, in parentheses, similar to
23  VIGOR, end parentheses, and include the Physicians
24  Health Study, the Thrombosis Prevention Trial,
25  parentheses, Lancet 1998, end parentheses, and the

### Page 49

1  Hypertension Optimal Treatment Trial.
2        Q.  Okay.  Let me ask you this:  Up until
3  the heart attack that Mr. Barnett encountered in
4  September of 2002, were you ever told by anybody
5  that Carl Patrono had made this statement to Merck
6  regarding Naproxen?
7        MR. GOLDMAN: Object to the form.
8        THE WITNESS: No, sir.
9  BY MR. ROBINSON:
10        Q.  Let me show you the next exhibit, which
11  is Number 8.
12        (PLF. EXH. 8, News Release dated
13  4/28/00, was marked for identification.)
14  BY MR. ROBINSON:
15        Q.  Now, Exhibit Number 8 is dated April
16  28, 2000, is that right?
17        A.  Yes.
18        Q.  And the -- the Exhibit Number 6, which
19  is the Scolnick memo, what was that dated?
20        A.  March 9th, 2000.
21        Q.  And Exhibit Number 7, which related to
22  Carlos Patrono, was dated what date?
23        A.  March 28th, 2000.
24        Q.  So this -- this Exhibit Number 8 is
25  approximately a month after the *Patrono e-mail,*

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

## Page 50

1  correct?
2      A.  Yes, sir.
3      Q.  Will you read the -- strike that.
4          Exhibit Number 8 is a Merck press
5  release, right?
6          MR. GOLDMAN:  Object to the form, lacks
7  foundation.
8          THE WITNESS:  I believe that's correct.
9  BY MR. ROBINSON:
10     Q.  Okay.  And would you read into the
11 record the heading of this press release by Merck.
12         MR. GOLDMAN:  Mr. Robinson, can I have
13 a standing objection?
14         MR. ROBINSON:  Yes.
15         MR. GOLDMAN:  Lacks foundation.
16         MR. ROBINSON:  Yes.
17         THE WITNESS:  Merck --
18         MR. ROBINSON:  Let's go back.  You have
19 a standing objection.  Let me reask the question.
20 BY MR. ROBINSON:
21     Q.  Would you please read into the record
22 the heading for this press release.
23     A.  Merck confirms favorable cardiovascular
24 safety profile of Vioxx.
25     Q.  And would you read the first sentence

## Page 51

1  into the record starting with April 28th.
2      A.  April 28th, 2000, in response to
3  speculative news reports, Merck & Company, Inc.
4  today confirmed the favorable cardiovascular safety
5  profile of Vioxx, parens, Rofecoxib, its medicine
6  that selectively inhibits COX-2.
7      Q.  Okay.  Now, during the 1999 through
8  2002 time period and beyond, did Merck sales reps
9  have contact with you?
10     A.  Yes, sir.
11     Q.  Let me show you the next exhibit, which
12 would be Number 9.
13         (PLF. EXH. 9, Contact List, was marked
14 for identification.)
15         MR. ROBINSON:  Why don't we take a
16 break.  He's got ten minutes left on the tape.
17         VIDEO TECHNICIAN:  This is the end of
18 Tape Number 1 in the deposition of Dr. Michael
19 Mikala -- Mikola.  The time is approximately 9:46
20 AM and the date is April 25th, 2006.  We will now
21 go off the record.
22         (Off-the-record conference.)
23         VIDEO TECHNICIAN:  We are back on the
24 record.  The time is approximately 9:46 AM and this
25 is still Tape Number 1.

## Page 52

1  BY MR. ROBINSON:
2      Q.  Okay, go back to Number -- Exhibit
3  Number 8 for a second, Doctor, that last press
4  release.
5      A.  Yes, sir.
6      Q.  Would you read into the record the --
7  just the first four lines of Paragraph Number 4 --
8  Paragraph Number 3 from the press release --
9          MR. GOLDMAN:  Objection, lacks --
10 BY MR. ROBINSON:
11     Q.  -- please.
12         MR. GOLDMAN:  Objection, lacks
13 foundation, document speaks for itself.
14         THE WITNESS:  In preliminary findings
15 from Merck's large gastrointestinal, parentheses,
16 GI, outcome study that compared Vioxx with Naproxen
17 in patients with rheumatoid arthritis,
18 significantly fewer heart attacks were observed in
19 patients taking Naproxen, parentheses, 0.1 percent,
20 compared to patients taking Vioxx, parentheses, 0.5
21 percent.  This result is consistent with Naproxen's
22 ability to block platelet aggregation.  This is the
23 first time this effect of Naproxen to reduce these
24 events has been demonstrated in a clinical study.
25 Vioxx, like all COX-2 selective medicines, does not

## Page 53

1  block platelet aggregation and therefore would not
2  be expected to have these events -- these effects,
3  excuse me, in reducing these events.
4  BY MR. ROBINSON:
5      Q.  Okay.  Now, you would meet routinely
6  with sales reps for Merck that were detailing you
7  regarding Vioxx, right?
8      A.  Correct.
9          MR. GOLDMAN:  Mr. Robinson, I'm sorry
10 to interrupt.  For optimal completeness purposes,
11 can you have the witness also read the previous
12 paragraph?
13         MR. ROBINSON:  Sure.
14 BY MR. ROBINSON:
15     Q.  Why don't you read that into the
16 record, please.
17     A.  Extensive review of data from the
18 completed osteoarthritis trials and ongoing
19 clinical trials with Vioxx, as well as
20 postmarketing experience with Vioxx, have shown no
21 difference in the incidence of cardiovascular
22 events such as heart attack among patients taking
23 Vioxx or -- excuse me, Vioxx, other NSAIDs and
24 placebo.  More than ten million prescriptions have
25 been written for Vioxx in the United States since

14  (Pages 50 to 53)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 54**

1 its introduction.
2  VIDEO TECHNICIAN: This is the end of
3 Tape Number 1 in the deposition of Dr. Michael
4 Mikola. The time is approximately 9:49 AM. The
5 date is April 25th, 2006. We will now go off the
6 record.
7  (Off-the-record conference.)
8  VIDEO TECHNICIAN: This is the
9 beginning of Tape Number 2 in the deposition of
10 Dr. Michael Mikola. The time is approximately 9:51
11 AM, the date is April 25, 2006. We are now back on
12 the record.
13 BY MR. ROBINSON:
14  Q. Doctor, the last item that you read,
15 quote, this result -- strike that.
16  When you were reading from the press
17 release, it said, quote, this result is consistent
18 with Naproxen's ability to block platelet
19 aggregation. Do you remember that statement?
20  A. Yes, sir.
21  Q. Now, was this the general message that
22 you were given during 2000, 2001, 2002 by the Merck
23 sales reps that contacted you?
24  MR. GOLDMAN: Object to the form.
25  THE WITNESS: That I don't recall

**Page 55**

1 specifically. That is the impression that I got
2 from the conclusion of the VIGOR trial.
3 BY MR. ROBINSON:
4  Q. And was this something that when the
5 sales reps would talk to you, they would discuss
6 with you?
7  MR. GOLDMAN: He just said he doesn't
8 recall.
9  MR. ROBINSON: You know what, you're --
10 let me -- I can ask questions here. Go ahead.
11  THE WITNESS: I don't recall the
12 specifics of the discussions.
13 BY MR. ROBINSON:
14  Q. What generally do you -- can you tell
15 us about the sales rep discussions regarding
16 Naproxen?
17  MR. GOLDMAN: Object to the form.
18  THE WITNESS: Generally -- let me back
19 up and say that my wife was a sales rep and she's
20 worked for different companies over the years.
21 Generally the detailing from the reps, I try to get
22 my medical education from journal articles.
23 Usually I've requested the reps give me the actual
24 articles or reprints of the articles versus
25 detailing so they would generally call on me -- if

**Page 56**

1 I had questions, they would answer them or refer --
2 make a referral for a request from their company
3 for further information, but generally they didn't
4 do a lot of detailing.
5 BY MR. ROBINSON:
6  Q. Okay. But did you have discussions
7 routinely with the reps concerning this Naproxen
8 issue?
9  MR. GOLDMAN: Objection, asked and
10 answered.
11  THE WITNESS: I don't believe I did
12 routinely, no, sir.
13 BY MR. ROBINSON:
14  Q. No, did you have any discussion --
15 strike that.
16  You did have some discussions with --
17 about the Naproxen issue with reps, is that
18 correct?
19  MR. GOLDMAN: Object to the form. He
20 said three times --
21  MR. ROBINSON: Well, wait. You're
22 talking now. You're not allowed to do that.
23  THE WITNESS: I'm not certain. We
24 would see 10 to 15 reps from different companies a
25 day five days a week and this was two, three, four

**Page 57**

1 years ago. I can't honestly say I recall the
2 specific comments.
3 BY MR. ROBINSON:
4  Q. Well, do you remember having
5 discussions, any discussions with the reps
6 regarding Naproxen?
7  MR. GOLDMAN: Objection, asked and
8 answered three times.
9  THE WITNESS: I don't honestly recall.
10 BY MR. ROBINSON:
11  Q. I'll put it this way: Is it true if
12 you look at Exhibit Number 9 that you were
13 contacted by Merck sales reps on Vioxx over 330
14 times --
15  MR. GOLDMAN: Objection.
16 BY MR. ROBINSON:
17  Q. -- from 1999 to 2004?
18  MR. GOLDMAN: Objection, lacks
19 foundation.
20  THE WITNESS: I can't confirm the
21 number, but I can tell you that I was contacted by
22 Merck reps many times in that period.
23 BY MR. ROBINSON:
24  Q. Okay. So if the -- if the -- if you
25 look at Exhibit Number -- would you look at Exhibit

Michael Mikola, M.D.

Page 58

1 Number 9, please.
2    A.   Yes, sir.
3    Q.   And does that appear accurate in terms
4 of the number of contacts the reps would have had
5 with you regarding Vioxx on behalf of Merck?
6        MR. GOLDMAN:  Objection, asked and
7 answered, foundation.
8        THE WITNESS:  I would assume it's
9 reasonable.
10 BY MR. ROBINSON:
11    Q.   And one of the reps was your wife you
12 said?
13    A.   That's correct.
14    Q.   What's her name?
15    A.   Sharon.  Now Sharon Mikola.  At the
16 time, Sharon Mikolajczyk.
17    Q.   And she actually for a short period of
18 time detailed you on Vioxx as well?
19    A.   She called on me, yes, sir.
20        MR. ROBINSON:  Okay, why don't we take
21 the break now.
22        VIDEO TECHNICIAN:  We will now go off
23 the record.  The time is approximately 9:57 AM.
24        (A recess transpired.)
25        VIDEO TECHNICIAN:  We're back on

Page 59

1 record.  The time is approximately 10:05 AM.
2 BY MR. ROBINSON:
3    Q.   So Doctor, we were talking about
4 Exhibit Number 8, this press release, and the
5 explanation for the VIGOR results relating to this
6 result is consistent with Naproxen's ability to
7 block platelet aggregation.
8        Did I read that right?
9    A.   That's correct.
10    Q.   Now, from -- from reading the journal
11 article by Bombardier and from other information
12 you received, was the general message that you were
13 given at this time relating to VIGOR was that the
14 results were explained by Naproxen's ability to
15 block platelet aggregation?
16        MR. GOLDMAN:  Object to the form.
17        THE WITNESS:  I would say yes.
18 BY MR. ROBINSON:
19    Q.   Thank you.  Now, you know, previously I
20 showed you Exhibit Number 6, the Scolnick e-mail,
21 and the -- Exhibit Number 7, the Patrono e-mail.
22 When you're treating patients such as Mr. Barnett
23 and prescribing medicines for them, would you like
24 to get complete information regarding the side
25 effects or risks concerning the drug you're

Page 60

1 prescribing?
2        MR. GOLDMAN:  Object to the form.
3        THE WITNESS:  Yes, sir.
4 BY MR. ROBINSON:
5    Q.   So in this case with Vioxx, would
6 that -- would information such as contained in
7 Exhibit Number 6 and 7 have been the type of
8 information that you would have liked to have had
9 regarding Vioxx?
10        MR. GOLDMAN:  Object to the form.
11 Again, the reason I'm objecting --
12        MR. ROBINSON:  No, you're -- you're
13 objecting -- you've objected.  No comment.
14        THE WITNESS:  I think it would have
15 been helpful, yes, to -- to make informed decisions
16 regarding prescribing medicine.
17 BY MR. ROBINSON:
18    Q.   And why is that?  As a doctor, why is
19 informed decision an important thing for you?
20    A.   In general, the prescribing of
21 medicines is always a risk-versus-benefit decision.
22 All medicines have potential side effects and all
23 medicines -- most medicines hopefully have
24 potential benefits.  And when you decide on whether
25 to prescribe a medicine for a condition or which

Page 61

1 medicine you're going to prescribe for a given
2 condition, it's important that you know the
3 potential risks of using the medicine so that you
4 can weigh the risks versus the benefits and decide
5 if it's appropriate for that patient.
6    Q.   Okay.  Let me show you the next
7 exhibit, I guess would be Exhibit Number 10.
8        (PLF. EXH. 10, E-mail dated 1/31/01 to
9 Raymond Gilmartin and David W. Anstice from Edward
10 M. Scolnick, was marked for identification.)
11 BY MR. ROBINSON:
12    Q.   Exhibit Number 10 is an internal Merck
13 exhibit.  It's Bates numbered MRK-ACR 0008985.
14        MR. ROBINSON:  I give you the same
15 objection, Mr. Goldman.
16        MR. GOLDMAN:  For the record, the
17 objection is lacks foundation showing selected
18 exhibits to a witness --
19        MR. ROBINSON:  I understand.
20        MR. GOLDMAN:  -- he's never seen before
21 and has no personal knowledge about them.
22        MR. ROBINSON:  I understand.
23 BY MR. ROBINSON:
24    Q.   Would you read the to/from and the date
25 into the record, please, sir.

16  (Pages 58 to 61)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 62

1    A.  To Raymond Gilmartin and David Anstice
2  from Edward Scolnick.  The date is January 31st,
3  2001.
4    Q.  Okay.  And why don't we read the first
5  few sentences up until the word certainty.
6    A.  Start at the beginning?
7    Q.  Yes.
8    A.  Ray and David, as I'm sure you can both
9  tell, I am pretty agitated over the events related
10  to Stanford and Dr. Frees.  The VIGOR meeting is
11  next Thursday.  On Monday I will show you the
12  essence, an update, of the data that supports Vioxx
13  is safe in the CV sense, but I want to point out to
14  all of you at one time that, one, there is no way
15  to prove that in patients with rheumatoid arthritis
16  that all of the difference between Vioxx and
17  Naproxen is due to the benefit of Naproxen.  It is
18  impossible -- in bold letters, it is impossible to
19  prove this; it is impossible to know this with
20  certainty.
21    Q.  Okay.  But that would have been the
22  type of information you would have liked to receive
23  when you were deciding which medicines to prescribe
24  for Mr. Barnett?
25    MR. GOLDMAN:  Object to the form.

Page 63

1    THE WITNESS:  Yes, sir.
2  BY MR. ROBINSON:
3    Q.  Also, are you aware that Raymond
4  Gilmartin at that time was the CEO of Merck?
5    A.  I am not -- or was not.
6    Q.  Were you aware that David Anstice was
7  the president of Merck Human Health?
8    A.  No, sir.
9    Q.  And were you aware that Edward Scolnick
10  was the president of Merck Research Laboratories at
11  the time of this e-mail?
12    A.  No, sir.
13    Q.  Now, were you aware in the 2001, 2002
14  time frame that the FDA tried to get Merck to put a
15  warning regarding CV risks into the label for
16  Vioxx?
17    MR. GOLDMAN:  Object to the form.
18    THE WITNESS:  No, sir.
19    MR. GOLDMAN:  And also distorts the
20  facts and -- I'll say assumes facts not in
21  evidence.
22    MR. ROBINSON:  Okay, I got your
23  objection.
24  BY MR. ROBINSON:
25    Q.  Let me show you Exhibit Number 11.

Page 64

1    (PLF. EXH. 11, Vioxx Label Description,
2  was marked for identification.)
3  BY MR. ROBINSON:
4    Q.  Okay, if you go to Bates Number -- it
5  would be the Bates number at the bottom of Exhibit
6  Number 11, 8571.
7    MR. GOLDMAN:  Mr. Robinson, can I have
8  a standing objection --
9    MR. ROBINSON:  Yeah, sure.
10    MR. GOLDMAN:  -- to using testimony
11  about this document?
12    MR. ROBINSON:  Sure.
13    MR. GOLDMAN:  Lacks foundation.
14    MR. ROBINSON:  Sure.
15    THE WITNESS:  Okay.
16    MR. ROBINSON:  For the record, I
17  believe in the trial of this case, this exhibit
18  will come into evidence so obviously if it doesn't
19  come into evidence, then your objection -- you've
20  made your objection, but I believe it's going to
21  come into evidence because of the timing of this
22  heart attack and everything else.
23    MR. GOLDMAN:  Well --
24    MR. ROBINSON:  So I'm just telling you
25  that's my position.

Page 65

1    MR. GOLDMAN:  Then we -- we have
2  different positions --
3    MR. ROBINSON:  I know you object.
4    MR. GOLDMAN:  -- about whether just
5  because a document is admissible, you can't use it
6  with every witness.
7    MR. ROBINSON:  Okay.
8  BY MR. ROBINSON:
9    Q.  Okay.  I want you -- for the purpose of
10  this question, I want you to assume this was the
11  FDA-proposed label change that never was ever put
12  into the Vioxx label.
13    Do you see at the bottom of -- of 8571
14  it says cardiovascular disease at the very bottom?
15    MR. GOLDMAN:  Object to the form.
16    THE WITNESS:  Yes, sir.
17  BY MR. ROBINSON:
18    Q.  Okay.  Go to the next page.  Will you
19  read the --
20    MR. GOLDMAN:  What page?
21    MR. ROBINSON:  Page 8572.
22  BY MR. ROBINSON:
23    Q.  Will you read the first paragraph into
24  the record, please.
25    A.  Yes, sir.  Vioxx should be used with

17 (Pages 62 to 65)

Michael Mikola, M.D.

Page 66

1 *caution in patients at risk of developing*
2 *cardiovascular thrombotic events such as those with*
3 *a history of myocardial infarction and angina and*
4 *in patients with preexisting hypertension and*
5 *congestive heart failure.*
6     Q.  Okay.  Now, given the information *that*
7 *you've read in exhibits I've just shown you and*
8 *this proposed label, if you had known that*
9 *information that I've shown you and you had seen a*
10 *label like this, would you have prescribed Vioxx to*
11 Mr. Barnett given his history with possible angina
12 in January of 2000?
13        MR. GOLDMAN: Object to the form.
14        THE WITNESS: I believe I would have
15 left him on Feldene.
16 BY MR. ROBINSON:
17     Q.  Okay.  You --
18     A.  No.
19     Q.  You wouldn't have put him on Vioxx?
20     A.  I don't believe so, no, sir.
21     Q.  What is Feldene for the record?
22     A.  Feldene is a nonselective
23 antiinflammatory drug.
24     Q.  And when he first saw you, he was doing
25 okay on it?

Page 67

1     A.  Correct.
2     Q.  And he was taking the Feldene with
3 Prilosec for his stomach, correct?
4     A.  Correct.  He was also for clarification
5 taking Prilosec because of a history of reflux and
6 esophageal stricture caused by reflux.  So he would
7 have been on Prilosec either way.
8     Q.  But from your review of the records,
9 did he seem to be doing okay on Feldene?
10     A.  According to my records, he was doing
11 well.
12     Q.  Could you read the next paragraph into
13 the record, please.
14     A.  The risk of developing myocardial
15 *infarction in the VIGOR study was fivefold higher*
16 in patients treated with Vioxx 50 milligrams,
17 parentheses, 0.5 percent, as compared to patients
18 treated with Naproxen, parentheses, 0.1 percent.
19 See -- in parentheses again, see special studies,
20 VIGOR, end of parentheses.  The finding was
21 consistent in a smaller and shorter study using
22 Vioxx 25 milligrams that allowed the use of
23 low-dose ASA, which is an abbreviation for aspirin,
24 again parentheses, see special studies, ADVANTAGE,
25 end of parentheses.  Prospective well-powered,

Page 68

1 long-term studies required to compare the incidence
2 of serious CV events in patients taking Vioxx
3 versus NSAID comparators other than Naproxen have
4 not been performed.
5     Q.  Okay.  Let's just break it down here.
6 *Did you know that there were smaller and shorter*
7 *studies using the Vioxx that -- 25 milligrams such*
8 *as this ADVANTAGE study that allowed the use of*
9 *low-dose aspirin that showed consistent*
10 *cardiovascular findings as is found in the VIGOR*
11 *study?*
12     A.  I don't recall reading the ADVANTAGE
13 study.
14     Q.  Okay.  Let me show you Exhibit Number
15 12.
16        (PLF. EXH. 12, E-mail dated 10/16/01 to
17 *David W. Anstice from Edward M. Scolnick, was*
18 *marked for identification.)*
19 BY MR. ROBINSON:
20     Q.  As I understand it, Exhibit Number 11,
21 which was the proposed FDA label, you'd never seen
22 at any time while you were prescribing Vioxx for
23 Mr. Barnett, right?
24     A.  To the best of my knowledge, that's
25 correct, yes.

Page 69

1     Q.  And had you ever seen *Exhibit Number 12*
2 while you were prescribing Vioxx for Mr. Barnett?
3     A.  No, sir.
4        MR. GOLDMAN: The proposed label
5 change?
6        MR. ROBINSON: Exhibit Number 12 is --
7 is Ed Scolnick's response to the proposed label
8 change.
9        MR. GOLDMAN: Oh.
10        MR. ROBINSON: You have an objection?
11        MR. GOLDMAN: Can you hold on a second?
12 I may have messed up on the exhibit numbers.  So 12
13 is the October 16th, 2001 e-mail?
14        MR. ROBINSON: Yes.
15        MR. GOLDMAN: Can I have a standing
16 objection again?
17        MR. ROBINSON: Yes.
18        MR. GOLDMAN: Lacks foundation showing
19 him selected documents.
20        MR. ROBINSON: Yes.
21 BY MR. ROBINSON:
22     Q.  Okay, will you read into the record,
23 sir, the comments of -- from the e-mail starting
24 with from?
25     A.  *From Edward Scolnick sent Tuesday*

18  (Pages 66 to 69)

Michael Mikola, M.D.

## Page 70

1  October 16th, 2001 to David Anstice, subject
2  regarding Vioxx label.
3      Q.  Okay.  And why don't we read -- I think
4  it appears that -- yeah, why don't you read from
5  the bottom up because it looks like the first
6  e-mail was October 15, 2001 at 6:02 from Scolnick
7  to Anstice, subject Vioxx label.  Do you see that?
8      A.  Yes, sir.
9      Q.  Would you read that into the record,
10 please.
11     A.  Yes, sir.  David, be assured we will
12 not accept this label.  If we need to, we will ask
13 to go to an advisory committee meeting/Ed.
14     Q.  Now read -- can you read David's
15 response to Ed.
16     A.  Yes, sir.  Ed, thanks.  I just received
17 a copy five minutes ago and will digest tonight.
18 We knew it would be ugly, in capital letters, and
19 it is.  We'll fight back and see where we get.  I
20 agree that we should ask for an advisory committee
21 if necessary.  David.
22     Q.  Okay, will you read the e-mail back
23 from Edward Scolnick to David Anstice?
24     A.  It is ugly cubed, they are bastards.
25     (PLF. EXH. 13, E-mail dated 2/13/01 to

## Page 71

1  Douglas J. Watson, et al., from Harry A. Guess, was
2  marked for identification.)
3  BY MR. ROBINSON:
4      Q.  Okay, I'm going to do this:  I'm going
5  to show -- I only have one copy of this one
6  document so I'm going to show you --
7      MR. ROBINSON:  Well, let me -- let me
8  do this:  I'm going to show it to counsel and then
9  I'll give it to the witness and read over his
10 shoulder.
11     MR. GOLDMAN:  Can you identify it for
12 the record, though.
13     MR. ROBINSON:  Yeah, I will.
14 BY MR. ROBINSON:
15     Q.  This is Exhibit Number 13, I believe,
16 and it's an e-mail from Edward Scolnick to various
17 people at Merck, including Douglas Greene, Alise
18 Reicin, Alan Nies, Harry Guess, Deborah Shapiro,
19 Thomas Simon dated February 8th, 2001.  And we'll
20 mark a clean one.  So will you look at Exhibit
21 Number 13 and read who it was to and then read into
22 the record what the e-mail said.
23     MR. GOLDMAN:  Mr. Robinson, can I have
24 a standing objection to the use of this document?
25     MR. ROBINSON:  You have a standing

## Page 72

1  objection.
2      MR. GOLDMAN:  Lacks foundation and
3  you're showing selected documents to a witness
4  without knowledge.
5      MR. ROBINSON:  Yes.
6  BY MR. ROBINSON:
7      Q.  And will you read the part that's in
8  yellow on that into the record, please.
9      A.  Yes, sir.  Do you want me to also read
10 who it's from?
11     Q.  The bottom, the yellow portion, yes.
12     A.  Okay.  To all, I bit my nails all day.
13 You all were fantastic.  You made them look like
14 Grade D high school students and you won big, huge
15 and completely.  You should be proud, happy and
16 exhausted.  Enjoy and bask in the warmth of having
17 done an impossible job superbly, signed Ed.
18     Q.  Now, were you -- have you ever --
19 strike that.
20     Were you ever told that Merck was able
21 to negotiate the April 2002 label with the FDA
22 before today?
23     MR. GOLDMAN:  Object to the form.
24     THE WITNESS:  No, sir.
25 BY MR. ROBINSON:

## Page 73

1      Q.  Were you -- strike that.
2      Did you know that the VIGOR information
3  was -- was placed eventually in the precautions
4  section of the April 2002 warning rather than up in
5  the warnings section as previously proposed by the
6  FDA?
7      A.  No, sir.
8      Q.  And obviously you weren't aware that
9  Mr. Scolnick talked about the FDA as being Grade D
10 high schoolers, right?
11     A.  That's correct.
12     MR. ROBINSON:  I think we're at Exhibit
13 Number 14.
14     (PLF. EXH. 14, E-mail dated 11/22/01 to
15 Thomas R. Cannell, Mark P. Stejbach and Steven R.
16 Vignau from Adam H. Schechter, was marked for
17 identification.)
18 BY MR. ROBINSON:
19     Q.  Okay, would you read the first e-mail
20 from Exhibit 14 into the record.  That would be the
21 one on the bottom and we'll go up to the top.
22     MR. GOLDMAN:  Let me make another
23 objection to the use of internal Merck e-mail --
24     MR. ROBINSON:  Yes.
25     MR. GOLDMAN:  -- the witness has never

19 (Pages 70 to 73)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

### Page 74

1  seen on foundation grounds.
2      MR. ROBINSON: Right. Okay.
3  BY MR. ROBINSON:
4      Q.  Once again, this is from the president
5  of Merck Research Laboratories, Ed Scolnick. Go
6  ahead.
7      A.  To all, I cannot restrain the activist
8  side of me as I continue to mull the results of the
9  low-dose ASA endoscopy study.  Looking up
10  Clopidogrel, which is C-L-O-P-I-D-O-G-R-E-L, I
11  think the question we should answer now is not
12  whether Vioxx or any coxib is safe for CV outcomes.
13  I think the question now is what is the best
14  antiplatelet regimen to use with a coxib.  I think
15  that is the medical question and if we answer it,
16  the problem will dissipate.  The studies, 1, Vioxx
17  low-dose ASA and pump inhibitor versus Naproxen and
18  pump inhibitor in patients with arthritis and some
19  level of CV risk; 2, Vioxx and Clopidogrel versus
20  Naproxen and pump inhibitor in same kind of
21  patients.  If you think it through, this will
22  answer the questions that are medically needed.
23  Safety committee monitors the studies and stops
24  them if the arms separate statistically with
25  predefined stopping rules.  Power for

### Page 75

1  noninferiority based on the incidence and
2  differences seen in our own OA, RA studies/Ed.
3      Q.  And would you read the -- the e-mail
4  from Adam Schechter to Thomas Cannell up above.
5      A.  Yes, sir.  I would like to get your
6  thoughts on Ed's message below.  Please keep this
7  confidential as the results of the low-dose aspirin
8  study are not widely known.
9      Q.  Did you -- at any time while you were
10  prescribing Vioxx to Mr. Barnett, did you know that
11  they had done a low-dose aspirin study?
12      A.  Not to my recollection, no, sir.
13      Q.  Did you ever receive a warning while
14  you were treating and prescribing Vioxx to
15  Mr. Barnett before his heart attack that you should
16  absolutely give low-dose aspirin with Vioxx when
17  prescribing Vioxx?
18      MR. GOLDMAN:  Objection,
19  mischaracterizes the document.
20      MR. ROBINSON:  Go ahead.
21      THE WITNESS:  No, sir.
22      MR. GOLDMAN:  And it's leading.
23      THE WITNESS:  No, sir.
24  BY MR. ROBINSON:
25      Q.  Thank you.  Let's go to the next

### Page 76

1  exhibit, which will be 15.
2      (PLF. EXH. 15, Grand Strand Regional
3  Medical Center medical records for Gerald Barnett,
4  was marked for identification.)
5  BY MR. ROBINSON:
6      Q.  Once again, 15 is a series of records
7  at or around Mr. Barnett's heart attack commencing
8  on 9/6/2002.
9      MR. GOLDMAN:  And this, again, is a
10  compilation, it's not a single exhibit.
11      MR. ROBINSON:  No, it's a compilation
12  of exhibits.  For the record, I'm putting these
13  compilations together because it'll go quicker.
14  You may want to take an exhibit individually,
15  that's fine.
16  BY MR. ROBINSON:
17      Q.  Exhibit 15, Page 1 and 2 appear to be a
18  discharge summary with copies going to you, but --
19  and Dr. Karavan from Brian D. Schreckengast?
20      A.  Correct.
21      Q.  And who is he?
22      A.  He was a physician's assistant who
23  worked for the cardiothoracic surgeons at Grand
24  Strand Hospital in Myrtle Beach.
25      Q.  And let's see, can we read the first

### Page 77

1  section, DG meds, and I guess -- strike that.
2      The date of discharge from his
3  hospitalization was 9/14/2002?
4      A.  Correct.
5      Q.  Apparently he had his heart attack on
6  9/6/2002, is that right?
7      A.  I believe that's correct, yes.
8      Q.  Can you read the DG meds -- discharge
9  meds into the record, please.
10      A.  Yes, sir.  Enteric-coated aspirin 325
11  milligrams PO QD, which means by mouth daily;
12  Prilosec 20 milligrams PO QD; and Lipitor for home
13  regime, which there are some typos I can correct at
14  the end; Vioxx 25 milligrams PO QD; Darvocet-N 100
15  one to two tabs every four hours as needed for
16  pain; Lopressor 50 milligrams PO BID; multivitamin
17  one PO QD.  And the typo is the DG meds should be
18  DC meds for discharge and it should read and
19  Lipitor per home regimen.  Per, not for, which
20  would mean he would be on the same dose as prior to
21  admission.
22      Q.  Okay.  And would you also read the
23  discharge diagnosis into the record, please.
24      A.  Non-Q wave myocardial infarction,
25  coronary artery disease, hyperlipidemia, systemic

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 78

1  hypertension, gastroesophageal reflux disease and
2  diverticulosis.
3        Q.  And what is -- can you read the
4  procedures that he underwent into the record,
5  please.
6        A.  Diagnostic coronary catheterization
7  performed by Dr. Mark Karavan on September 9, 2002
8  revealing significant three-vessel coronary artery
9  disease.
10            Number 2 is a coronary artery bypass
11  grafting times five performed September 9, 2002 by
12  Dr. Bryan with the left internal mammary artery to
13  the left anterior descending artery (sic),
14  saphenous vein graft to the second diagonal
15  coronary artery, saphenous vein graft to the ramus
16  intermedius coronary artery and a blank sequential
17  graft, saphenous vein graft to the posterior
18  descending coronary artery to the left ventricular
19  branch.
20        Q.  Okay.  Can we go to Page -- it's the
21  third page of Exhibit Number 15.  Would you read in
22  the note of Dr. Pyle.
23        A.  Yes, sir.
24        Q.  She's a DO, is that right?
25        A.  That's correct.  The patient is a

Page 79

1  50-year-old white male --
2        Q.  58-year-old.
3        A.  I'm sorry, 58-year-old white male who
4  states that he was sitting at his desk this evening
5  when he developed symptoms of a, quote, unquote,
6  chest ache.  States symptoms were mild in
7  intensity, however, he became somewhat concerned
8  after he remembered reading that Sporanox, which he
9  had started within the past week, could cause heart
10  problems.
11        Q.  Let me stop.  You -- you prescribed him
12  Sporanox?
13        A.  Correct.
14        Q.  Does Sporanox in any way cause heart
15  attack?
16        A.  No, sir.
17        Q.  Okay.  Go ahead.
18        A.  States he took his blood pressure twice
19  and it was noted to be elevated with levels as high
20  as 190 systolic, which he admits seemed to make him
21  *more anxious, and tightness persisted. He then*
22  called EMS and was brought to the emergency
23  department where en route he did receive sublingual
24  *nitroglycerine with improvement of symptoms.*
25  During the ED, he was evaluated with negative

Page 80

1  studies, including no acute changes per EKG despite
2  a recurrence of his chest discomfort.  He reports
3  that two years ago, he had presented with
4  complaints of chest pain.  At that time he had a
5  sharp stabbing-type pain.  He was admitted and
6  evaluated, had a stress thallium.  Reports that he
7  had good exercise tolerance, had an equivocal
8  change at the very end of his stress test, but in
9  view of the negative symptoms despite good exercise
10  tolerance that his risk was low.  Since then his
11  sharp chest pain has been intermittent but has not
12  required further, and the dictation ends.
13        Q.  Okay.  And the two years ago that she
14  refers to was the angina occurrence that was dated
15  January 19, 2000, right?
16            MR. GOLDMAN:  Object to the form.
17            THE WITNESS:  I believe that's the
18  correct date, yes, January 19, 2000.
19  BY MR. ROBINSON:
20        Q.  Right.
21        A.  Yes, sir.
22        Q.  Can we go to the next page, please.
23  *This looks like a three-page document and let's see*
24  something here.  This actually is signed by Roberta
25  Gonzalez, another physician's assistant, right?

Page 81

1        A.  Correct.
2        Q.  Do these physician assistants talk to
3  you and -- to the doctors to get some of this
4  information?
5        A.  Sometimes.  Generally they will review
6  the records that are in the chart.  For instance,
7  when we admit a patient, especially if they come
8  through *the emergency room, they'll have the*
9  emergency room documents.  Pamela Pyle was one of
10  my partners and her dictation or notes may have
11  been available for them to review.  Generally
12  they'll review what notes are available and then
13  they'll interview the patient and take their own
14  history and perform *their own physical exam.*
15        Q.  Okay.  Why don't you read the history
16  into the record.
17        A.  *The patient is a pleasant 58-year-old*
18  white male who underwent exercise Cardiolite stress
19  test January 2000 after presenting to Grand Strand
20  Regional Medical Center with sharp chest pain.  The
21  patient ruled out for myocardial infarction and
22  underwent the stress test on an outpatient basis.
23  The patient exercised *15 minutes of* a standard
24  Bruce protocol and Cardiolite images reveal just a
25  small area of lateral ischemia.

21  (Pages 78 to 81)

Michael Mikola, M.D.

## Page 82

1      Q.  That was the angina issue, the
2  situation back in January of 2000, right?
3      A.  Correct.
4      Q.  Okay.
5      A.  As such, it was felt patient could be
6  treated medically.  He has subsequently done well
7  and states that he still on occasion gets some
8  slight sharp chest pain usually associated with his
9  abdomen being bloated.  He, however, reports that
10 last night he had a new and different pain.  He was
11 just sitting at his computer when he developed a
12 substernal ache, quote, like a flu-type ache but
13 only in the center of my chest, unquote.  He states
14 the discomfort began to radiate outward and through
15 to his back, but he denies any radiation to his
16 neck, jaw or arms.  He denies associated
17 diaphoresis or nausea but did start to become short
18 of breath, part of which he thinks may have been
19 due to anxiety.  The patient states the discomfort
20 was constant but did vary slightly in intensity.
21 He then walked downstairs to check his blood
22 pressure, which was 189 over 111.  Five minutes
23 later it was 194 over 104.  He called Blue
24 Cross/Blue Shield's nurse who suggested he call
25 911.  The patient states he did and en route

## Page 83

1  received a sublingual nitroglycerin spray with
2  complete resolution of his chest ache within a
3  minute to a minute and a half.  The patient states
4  the entire episode of pain lasted about 30 minutes.
5  Then while being evaluated in the emergency room,
6  patient states the discomfort returned but again
7  was relieved by one sublingual nitroglycerin --
8      Q.  Is that a typo, should be relieved?
9      A.  -- relieved, yes, sir, with one
10 sublingual nitroglycerin and the entire duration of
11 the second episode was approximately five minutes.
12 About 45 minutes to an hour later, he had another
13 third occurrence again resolving with sublingual
14 nitroglycerin and lasting six to seven minutes in
15 duration.  The patient was then admitted to 2
16 North, Dr. Pyle's service.  The patient states at
17 about 7:30 this morning, he had a slight heartburn,
18 but it did not particularly worsen and resolved
19 promptly.  He also states that since his initial
20 pain last night, he has had a discomfort that he
21 could -- could localize in his left anterior chest
22 wall that resolves if he massages it.  Patient has
23 subsequently gone on to rule in for a non-Q wave MI
24 with his third CPK being 217 with an MB index of
25 5.8 and a troponin (sic) of 1.4.  We are now seeing

## Page 84

1  patient for cardiology recommendation and
2  evaluation.
3      Q.  Could you read the meds in, please.
4      A.  Yes, sir.  Prior to this admission,
5  meds, Vioxx 25 milligrams QD; Prilosec 20
6  milligrams QD; Lipitor 20 milligrams QD; and
7  Sporanox one per week for a toe fungus.
8      Q.  And once again, the Sporanox in your
9  opinion did not cause this heart attack?
10         MR. GOLDMAN:  And we're not saying that
11 it did.  You don't have to ask him.
12         MR. ROBINSON:  I don't know if you are.
13         MR. GOLDMAN:  We're not.
14         MR. ROBINSON:  I just want to make
15 sure.
16         THE WITNESS:  That would be correct.
17 BY MR. ROBINSON:
18      Q.  Good.  Can you read the family history
19 in.
20      A.  Family history.  The patient's father
21 died at age 68 with his second myocardial
22 infarction.  His first MI was at age 62.  He also
23 suffered a stroke between the two heart attacks.
24 The patient's mother is living at age 86 and has
25 had some TIA's.  The patient has four brothers and

## Page 85

1  one sister.  His sister has had multiple TIA's and
2  is 50 years old.  None of his brothers have had
3  heart problems or hyperlipidemia.
4      Q.  Okay.  Would you read the assessment
5  plan in, please.
6      A.  Assessment plan.  Patient is a
7  58-year-old white male who presents with a non-Q
8  wave --
9      Q.  Is a pleasant, just to get it right.
10      A.  I'm sorry.
11      Q.  We've got to -- we've got to advertise
12 my client.
13         Can you read the -- I'll --
14         MR. GOLDMAN:  We'll stipulate also that
15 he's a very pleasant man.
16         MR. ROBINSON:  I like him.  Thank you
17 very much.
18 BY MR. ROBINSON:
19      Q.  The -- could you read the AP in again,
20 please.
21      A.  Yes, sir.  Assessment plan.  Patient is
22 a pleasant 58-year-old white male who presents with
23 a non-Q wave myocardial infarction.  Patient's
24 third CPK, isoenzyme and troponin I are all
25 elevated and we will obtain a fourth CPK and MB

22  (Pages 82 to 85)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

## Page 86

1 index until we get patient's peak recorded. EKG,
2 however, showed nonspecific ST/T wave changes, but
3 we will recheck an EKG in the morning. We
4 otherwise currently agree with management to date,
5 including Lopressor, Lovenox, Lipitor, aspirin and
6 potassium replacement. Unfortunately, patient was
7 unable to tolerate his nitroglycerine ointment due
8 to significant headache, nausea and becoming
9 clammy. We, however, feel that given his positive
10 enzymes and recurrent chest pain in the emergency
11 room, the patient should be transferred to the PCU
12 for closer observation over the weekend. We will
13 then plan for cardiac catheterization for Monday
14 morning. However, should patient develop evidence
15 of an acute injury pattern during the weekend, we
16 will consider urgent cardiac catheterization.
17 Further recommendations will be made during the
18 patient's clinical course as well as the outcome of
19 his catheterization on Monday. We will continue to
20 follow this patient along with you.
21     Q.   Okay. Could you go to the next page,
22 which was, I think, Mr. -- Dr. Bryan's consult.
23     A.   Yes, sir.
24     Q.   And can you read in the cardiac cath
25 results.

## Page 87

1     A.   Yes, sir. Cardiac catheterization
2 performed today demonstrated the following: 1, a
3 50 percent distal left main stenosis; 2, an 80
4 percent D1 stenosis in a very small vessel; 3, an
5 80 percent mid LAD stenosis; 4, diffuse high-grade
6 disease in a very small circumflex system; 5, an 80
7 percent proximal ramus intermedius stenosis; 6,
8 occlusion of the posterior descending branch with
9 filling via collaterals; 7, an 80 percent
10 posterolateral branch stenosis; and 8, ejection
11 fraction approximately 50 percent with an LVEDP of
12 16. Patient is seen in consultation for
13 consideration of revascularization.
14     Q.   There's probably more to be read in,
15 but I'm going to let counsel read part of it -- or
16 the rest of it in.
17         Let me show you Exhibit Number 16.
18         (PLF. EXH. 16, Scientific Advisors'
19 Meeting May 3-May 6, 1998 Programmatic Review Vioxx
20 Program, was marked for identification.)
21 BY MR. ROBINSON:
22     Q.   At any time up until today has anybody
23 told you that Merck and/or its consultants studied
24 Vioxx's effect on acceleration of atherogenesis?
25     A.   Not to my knowledge, no, sir.

## Page 88

1     Q.   Would you, please, take -- would you
2 read into the record the first line of Exhibit
3 Number 16.
4     A.   Yes, sir.
5         MR. GOLDMAN: Again, can I have a
6 standing objection --
7         MR. ROBINSON: Standing objection.
8         MR. GOLDMAN: -- to the use of the --
9         MR. ROBINSON: Yeah, right. Right.
10         MR. GOLDMAN: Unless you're going to
11 ask him to read the entire thing and put it into
12 context --
13         MR. ROBINSON: Well, I understand.
14         MR. GOLDMAN: -- so he has the context.
15         MR. ROBINSON: I understand, but the
16 record -- the trial will put that in context, but
17 for the short depo unless you want to give me three
18 more hours --
19         MR. GOLDMAN: No. If you're going to
20 ask the witness about --
21         MR. ROBINSON: It's okay. I
22 understand.
23         MR. GOLDMAN: -- documents, I think it
24 would be helpful to understand the context of it.
25         MR. ROBINSON: I understand.

## Page 89

1 BY MR. ROBINSON:
2     Q.   Okay. Let me put it this way: Do you
3 understand that Merck -- Merck had outside advisors
4 that were giving it ideas on Vioxx and the tests
5 that should be done, the studies that should be
6 done?
7     A.   I was not aware of that.
8     Q.   Okay.
9         MR. GOLDMAN: Mr. Robinson, I'm sorry,
10 I got involved with answering. I didn't make the
11 objection I should have, which is standing
12 objection, lacks foundation.
13         MR. ROBINSON: Okay.
14 BY MR. ROBINSON:
15     Q.   Would you read the heading of this
16 document in and the date.
17     A.   Scientific advisors meeting, May 3rd
18 through May 6, 1998, programmatic review, Vioxx
19 program.
20     Q.   Okay. Why don't you just read the
21 first sentence -- background and first sentence
22 into the record.
23     A.   MRL, which I assume is Merck Research
24 Laboratories, has proceeded expeditiously and
25 effectively to elucidate the human pharmacology of

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

## Page 90

1  Vioxx, to establish efficacy in arthritis and acute
2  pain and to examine the potential for
3  gastrointestinal, renal and other short-term
4  adverse effects.
5      Q.  Okay.  I'm going to ask you to go to --
6  let's see, the Bates number on the bottom, it would
7  be 2736.  It's MRK-AE 10002736.
8      A.  Yes, sir.
9      Q.  Could you read under cardiovascular
10 pathophysiology what was being discussed in the
11 scientific advisors meeting report in May of 1998.
12     A.  The board addressed the potential for
13 either benefits or adverse consequences of
14 selective inhibition of COX-2 on coronary heart
15 disease.  The possible effects of COX-2 inhibition
16 on three separate components of the process leading
17 to coronary ischemic events were considered.  These
18 are, Number 1, the development of lipid-rich
19 coronary plaques; Number 2, the destabilization of
20 the cap of these plaques by inflammatory cells,
21 making them, quote, unquote, rupture prone; and 3,
22 the thrombotic occlusion of the vessel at the site
23 of plaque rupture with ensuing consequences of
24 ischemia.
25     Q.  Okay.  Let me ask you this --

## Page 91

1      MR. GOLDMAN:  Can you read the rest of
2  the page, please.
3      MR. ROBINSON:  Yeah, I'm going to --
4  I'm going to -- I'll read -- I'll read it, but I
5  want -- let me ask him a question on this and I'll
6  have him read the next, okay?
7      MR. GOLDMAN:  Um-hum.
8  BY MR. ROBINSON:
9      Q.  When Mr. Barnett came to you back in
10 January of 2000 when he had the angina, did you
11 have any idea that Merck advisors were at least
12 looking to study Number 2, the destabilization of
13 the cap of these plaques by inflammatory cells,
14 making them rupture prone?
15     A.  No, sir.
16     Q.  Okay.  And did you know that they were
17 studying whether or not Vioxx could develop
18 lipid-rich coronary plaques?
19     A.  No, sir.
20     Q.  Okay.  Now, why don't you read in the
21 entire paragraph starting with the development of
22 lipid-rich coronary plaques for completeness here.
23     A.  The formation of phone cell -- foam
24 cells is central to the process of atherogenesis.
25 The development of foam cells is modulated at

## Page 92

1  numerous steps, known and unknown, including
2  adherence of the monocyte precursor to the vessel
3  wall, its migration into the vessel wall and the
4  uptake, export and peroxidation of lipids that
5  occur during the process of differentiation into a
6  lipid-laden foam cell.  This process involves an
7  inflammatory cell type that is the prototype for
8  regulation of COX-2.  There is a growing body of
9  evidence indicating that inflammatory disease is a
10 risk factor for myocardial infarction and such
11 inflammatory processes almost certainly are
12 accompanied by the release of cytokines that affect
13 cells in the monocytic series in general and COX-2
14 expression in particular.  Accordingly, it is
15 appropriate to ask whether COX-2 expression in the
16 monocyte-microphage-foam cell development regulates
17 the progression of the atherosclerosis that
18 accompanies dyslipidemias, either positively or
19 negatively.  If this were the case, then inhibition
20 of COX-2 might be expected to alter the process of
21 plaque formation.
22     Q.  Okay.
23     MR. GOLDMAN:  And the next paragraph,
24 that's all I ask for completion right now on the
25 next page.

## Page 93

1      MR. ROBINSON:  Well, wait.  That's a
2  different subject.
3      MR. GOLDMAN:  You --
4      MR. ROBINSON:  Well, let me ask a
5  question about this one and then I'll go -- I'll
6  have him read that.
7      MR. GOLDMAN:  Okay.
8  BY MR. ROBINSON:
9      Q.  So you were not aware as of 1999 or
10 2000 when you first saw Mr. Barnett that the Merck
11 scientific advisors were recommending analyses of
12 whether or not COX-2 inhibition might be expected
13 to alter the process of plaque formation --
14     MR. GOLDMAN:  Object to the form.
15 BY MR. ROBINSON:
16     Q.  -- is that right?
17     A.  That's correct.
18     MR. GOLDMAN:  Mischaracterizes the
19 sentence.
20 BY MR. ROBINSON:
21     Q.  In addition -- okay, he wants to read
22 the next so let -- why don't you read the next
23 paragraph.
24     MR. ROBINSON:  Just one paragraph,
25 right?

Michael Mikola, M.D.

Page 94

1          MR. GOLDMAN: Agree.
2     BY MR. ROBINSON:
3          Q.   Okay, read the next paragraph.
4          A.   Destabilization of the cap of an
5     atheromatous plaque.  Recent evidence indicates
6     that inflammatory cells are present in the region
7     of the thinned-out cap that covers atheromatous
8     plaques and it is thought that these inflammatory
9     cells contribute to thinning the plaque at its
10    margin that is the frequent site of plaque rupture.
11    As the critical cells in this process are
12    inflammatory cells, the possibility exists that the
13    production (sic) of COX-2 could regulate thinning
14    the cap of plaques and render them rupture prone.
15         Q.   Okay.  You didn't know that when you
16    first prescribed Vioxx to Mr. Barnett, right?
17         A.   That is correct.  I knew about an
18    inflammatory component with plaque rupture, but I
19    did not know that it was mediated by COX-2.
20         Q.   Okay.  And let me ask you to read one
21    other portion of that page -- one other part of the
22    page.  Can you read down -- about this far down
23    starting with not only does prostacyclin.
24         A.   Not only does prostacyclin inhibit
25    platelet activation, but it also potently inhibits

Page 95

1     the development of ischemic ventricular
2     fibrillation in the canine model of myocardial
3     infarction.
4          Q.   Okay.  Now, were you aware that Merck
5     did a study -- or paid for a study that was done on
6     COX-2 inhibition on susceptibility to CMV infection
7     and atherogenesis?
8          A.   No, sir.
9          Q.   Okay.
10         (PLF. EXH. 17, E-mail dated 10/12/01 to
11    ian_rodger@merck.com from
12    Stephen.Epstein@medstar.net, with attachments, was
13    marked for identification.)
14    BY MR. ROBINSON:
15         Q.   And let me give you -- while we're at
16    it, I'm going to give you Number 18 as well.  They
17    go together.
18         (PLF. EXH. 18, Article entitled Effects
19    of MF-Tricyclic, a Selective Cyclooxygenase-2
20    Inhibitor, on Atherosclerosis Progression and
21    Susceptibility to Cytomegalovirus Replication in
22    Apolipoprotein-E Knockout Mice, was marked for
23    identification.)
24    BY MR. ROBINSON:
25         Q.   Number 17 is an e-mail from Ian Rodger

Page 96

1     at Merck to Dr. Stephen Epstein.  Do you see that?
2          A.   Yes, sir.
3          Q.   Or actually from Stephen Epstein to Ian
4     Rodger at Merck, right?
5          A.   Yes.
6          Q.   Would you read that e-mail into the
7     record, please.
8          MR. GOLDMAN: Same objection, lacks
9     foundation.
10         MR. ROBINSON:  Right.
11    BY MR. ROBINSON:
12         Q.   With the subject and the date also.
13         A.   The date is 10/12/2001.  The subject is
14    selective COX-2 inhibition and atherogenesis paper.
15    Ian, attached is the paper on the effects of
16    selective COX-2 inhibition on susceptibility to CMV
17    infection and to atherogenesis.  We plan to send it
18    to circulation in 30 days.  I would be most
19    interested in your comments and suggestions.
20         I'm sorry that we didn't get the
21    results we thought we would, but it's better to
22    know about this (sic) than to be blind-sided in one
23    or two years by complications that were totally
24    unexpected.  On the other hand, as we tried to
25    emphasize in our paper, our results in mice, using

Page 97

1     our particular experimental conditions, may not be
2     at all relevant to what happens clinically.  I'm
3     therefore very pleased to have learned that Merck
4     is planning to meet this head on and is planning to
5     consider some definitive clinical study.  I would
6     be happy to work with you in any way that would be
7     helpful to such a project.
8          Q.   Let me ask you this:  Did you in 2001
9     know that Merck had done such a study?
10         A.   No, sir.
11         Q.   Okay.  Could you go to Exhibit Number
12    18.
13         A.   Yes, sir.
14         Q.   And could you read the topic of the
15    study and that -- the last author into the record,
16    please.
17         A.   Yes, sir.  The title is effects of
18    MF-tricyclic, a selective cyclooxygenase-2
19    inhibitor, on atherosclerosis progression and
20    susceptibility to cytomegalovirus replication in
21    Apolipoprotein-E knockout mice.  The last author is
22    Stephen E. Epstein, MD.
23         Q.   Okay.  Will you read the conclusion
24    from the abstract into the record, please.
25         A.   Yes, sir.  Our study demonstrates that

25  (Pages 94 to 97)

Michael Mikola, M.D.

## Page 98

1 selective inhibition of COX-2 in vivo increases
2 viral load. The finding that inhibition of COX-2
3 increases atherosclerosis development in
4 ApoE-deficient mice suggests, unexpectedly, that
5 this enzyme exerts antiatherosclerosis activity, at
6 least in this model.
7    Q.  Okay.  Do you ever -- before I showed
8 you this today, had you ever seen this -- this
9 study?
10    A.  No, sir.
11    MR. GOLDMAN: Mr. Robinson, for optimal
12 completeness, can I have the witness read other
13 aspects in the conclusion rather than the abstract?
14 BY MR. ROBINSON:
15    Q.  Okay.  Well, let's go on.
16    MR. ROBINSON: Can we do it on your
17 time?  Because I really -- I don't mind you doing
18 it, but just -- it just -- otherwise -- the
19 conclusion is pretty long.
20    MR. GOLDMAN: Okay, we'll do it on my
21 time.
22    MR. ROBINSON: Okay, thanks.
23 BY MR. ROBINSON:
24    Q.  Let me show you Exhibit Number 19.
25    (PLF. EXH. 19, Article entitled

## Page 99

1 COX-2-Derived Prostacyclin Confers Atheroprotection
2 on Female Mice, was marked for identification.)
3 BY MR. ROBINSON:
4    Q.  Were you aware that Garret Fitzgerald
5 was one of the consultants for Merck on Vioxx?
6    A.  No, sir.
7    Q.  Okay.  Will you go to in Exhibit Number
8 19 the -- I guess it's the last page of the article
9 itself and read into the record the paragraph
10 starting with Rofecoxib.
11    MR. GOLDMAN: Objection, lacks
12 foundation.
13    THE WITNESS:  Rofecoxib, a selective
14 inhibitor of COX-2, was withdrawn from clinical use
15 when a placebo-controlled trial revealed an
16 increase in myocardial infarction and stroke.
17 These -- these patients were initially at low
18 cardiovascular risk and the hazard was detected
19 after 18 months of treatment.
20 BY MR. ROBINSON:
21    Q.  Stop there.
22    A.  Yes, sir.
23    Q.  And as I understand it, at least from
24 the records that I've seen, if we start with
25 January of 2000 through September 6th of 2002,

## Page 100

1 Mr. Barnett would have taken Vioxx for longer than
2 18 months for sure?
3    A.  I believe that's correct, yes, sir.
4    Q.  Okay.  Go right ahead.
5    A.  Selective inhibitors of COX-2 depress
6 PGI2 but not platelet COX-1-derived TXA2, which
7 affords a mechanism whereby they might elevate
8 blood pressure, accelerate atherogenesis and
9 augment the thrombotic response to plaque rupture.
10 Depression of PGI2 may accelerate atherogenesis by
11 multiple mechanisms, including augmenting platelet
12 and neutrophil interactions with the vasculature.
13 PGI2 also exerts an antioxidant effect which may
14 retard atherogenesis.  IP deletion augments lipid
15 peroxidation, whereas its overexpression in
16 humans -- excuse me, in human embryonic kidney
17 cells has the opposite effect.  An antioxidant role
18 for PGI2, which may reflect induction of HO1, is
19 consistent with exacerbation of reperfusion injury
20 by IP deletion.
21    Q.  Okay.
22    MR. ROBINSON:  Any part you want to
23 read back in, the next paragraph?
24    MR. GOLDMAN: No.
25    MR. ROBINSON: Okay.

## Page 101

1    VIDEO TECHNICIAN:  We will now go off
2 the record.  The time is approximately 11:07 AM.
3    (Off-the-record conference.)
4    VIDEO TECHNICIAN:  The time is
5 approximately 11:08 AM and this is the end of Tape
6 Number 2 of Dr. Mikola.  The date is April 25th,
7 2006.  We will now go off the record.
8    (A recess transpired.)
9    VIDEO TECHNICIAN:  This is Tape Number
10 3 of the deposition of Dr. Michael Mikola.  The
11 time is approximately 11:26 AM.  The date is April
12 25th, 2006.  We are now back on the record.
13 BY MR. ROBINSON:
14    Q.  I want to go back to Exhibit Number 3
15 and see which prescriptions were yours and which
16 were Dr. McCaffrey.  Okay.  Will you look at --
17 okay, the date on the first one on my sheet is --
18 it says, renew after 3/4/2002, prescription expires
19 12/21/2002.  Do you see that?
20    A.  Yes, sir.
21    Q.  That would have been you, right?
22    A.  Yes, sir.
23    Q.  Okay.  The next one below that -- then
24 go to, I guess, the next page.  You prescribed
25 Lipitor, Prilosec and Vioxx 10/31/2002 and

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

Page 102

1  prescription expires 2/25/2003.
2      A.  I believe the date is above the little
3  bar code, 9/4/2002, and that is when he can have
4  his next refill, 10/29/02.
5      Q.  Okay.
6      A.  They give you a 90-day supply and you
7  can't refill it early.
8      Q.  Okay.
9      A.  So that would probably be the earliest
10 he could have a refill or when he should order his
11 next refill.
12     Q.  Okay.  And would the same be true going
13 back to Page 1 because the date above the bar code
14 is 12/31/2001?
15     A.  I believe that is correct.
16     Q.  Okay.  That would have been the date of
17 prescription?
18     A.  Yes, sir.
19     Q.  Okay.  Let's go to the third page.  So
20 the date above that bar code is 6/7/2002?
21     A.  I believe that's correct.
22     Q.  And that would have been your
23 prescription.  You prescribed him Claritin,
24 Prilosec and 90 Vioxx, right?
25     A.  Yes, sir.

Page 103

1      Q.  And those last two prescriptions were
2  90 also for Vioxx?
3      A.  Yes, sir.  Correct.
4      Q.  Okay.  Then going on the second half of
5  Page 3, the bar code is 3/6/2002 and --
6      MR. GOLDMAN:  What's the Bates number
7  you're on?
8      MR. ROBINSON:  Well, I'm on Page 3.
9      MR. GOLDMAN:  Okay.
10 BY MR. ROBINSON:
11     Q.  It says the bar -- the bar code -- the
12 date above the bar code is 3/6/2002, correct?
13     A.  Yes, sir.
14     Q.  And that would have been 90 tabs -- or
15 90 -- 90 pills?
16     A.  Yes, sir.
17     Q.  Okay.  I'm going to skip the next page.
18 Let's see.  If we go to Bates Number 88158, Merck
19 003 -- 0003.  Do you see that?
20     A.  Yes, sir.  Yes, sir.
21     Q.  Let's see.  So the top prescription
22 would have been by McCaffrey, right?
23     A.  Yes, sir.
24     Q.  And we go down, Cornell prescribed the
25 Prilosec, right?

Page 104

1      A.  Yes, sir.
2      Q.  You prescribed the Lipitor?
3      A.  Correct.
4      Q.  And then you -- McCaffrey prescribed
5  that Vioxx -- that Vioxx for 12/20/2000, right?
6      A.  Yes, sir.
7      Q.  Cornell would have done the Prilosec
8  again.
9          Going to the next page, which is Bates
10 Number 0004.  Looking down for Vioxx, there does
11 not appear to be any Vioxx on that page, correct?
12     A.  That is correct.
13     Q.  Let's go to the next page, 0005.  The
14 third prescription -- the third prescription down
15 was a Vioxx prescription by you, is that right?
16     A.  That's correct.
17     Q.  What was the date of that?
18     A.  March 4th, 2002.
19     Q.  Okay.  And then the last one down there
20 on that page was yours also?
21     A.  Yes, sir.
22     Q.  What was the date of that?
23     A.  It's the same date, March 4th, 2002.
24     Q.  Okay.  So that --
25     A.  I would assume one is a duplication.

Page 105

1      Q.  That's a repeat?  Okay.  Let's go to --
2  let's go two pages ahead to 0007.  That's dated --
3  there's -- the second prescription down was yours,
4  for Vioxx, right?
5      A.  Yes, sir.
6      Q.  The date was?
7      A.  December 28th, 2001.
8      Q.  The next exhibit I want to mark are --
9  look like some blood work when you were the
10 treating doctor for Mr. Barnett and that's
11 Exhibit --
12     MR. ROBINSON:  What number are we on?
13 Exhibit 20.
14     (PLF. EXH. 20, Carolina Health
15 Specialists/Laboratory medical records for Gerald
16 Barnett, was marked for identification.)
17 BY MR. ROBINSON:
18     Q.  Would you go through Exhibit Number 20
19 and see if those appear to be the lab work for
20 Mr. Barnett.
21     A.  Yes, sir, that's correct.
22     Q.  And for the record, will you just sort
23 of go through the documents and tell who -- you
24 know, what labs you used, where the lab is, your
25 office or -- explain.

27 (Pages 102 to 105)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 106

1          MR. GOLDMAN: For each one?
2    BY MR. ROBINSON:
3          Q.   Well, if you can first of all talk
4    about your -- which one would be your -- your labs
5    and which ones would be some other doctors.
6          A.   The ones drawn at Carolina Health
7    Specialists/Lab would be the lab owned by the
8    practice I used to participate in.  Some of the
9    labs, such as the homocysteine levels, were not
10   run -- performed at our laboratory.  They were sent
11   out to a reference lab, Quest.  But I believe I
12   ordered all of them during the period of time when
13   I was treating him, all of these.  Does that answer
14   your question?
15   BY MR. ROBINSON:
16         Q.   I think so.
17         A.   Apparently he had some also at Grand
18   Strand Regional Medical Center.
19         Q.   What are the dates?
20         A.   That was August 23rd, 2000.
21         Q.   Was that -- that was a hospital you
22   practiced at, right?
23         A.   That's correct, yes, sir.
24         Q.   So would you have ordered those?
25         A.   Yes, sir.

Page 107

1          MR. ROBINSON:  The next exhibit, 22.
2    21, okay.
3          (PLF. EXH. 21, Carolina Health
4    Specialists medical records for Gerald Barnett, was
5    marked for identification.)
6          MR. GOLDMAN:  This appears also to be a
7    compilation of documents?
8          MR. ROBINSON:  Right.
9    BY MR. ROBINSON:
10         Q.   Right.  This is another compilation of
11   your medical records, is that right, starting in
12   about March -- actually, not only your medical
13   records but yours and Dr. Huberty and there may be
14   one or two of Dr. Karavan.
15         A.   Yes, and also a note from Dr. Brooks,
16   who was the ER doctor at Grand Strand.
17         Q.   Okay.  And if you look at the first
18   page of Exhibit Number 21, it's a visit that
19   Mr. Barnett made to you after his heart attack,
20   about six months after his heart attack, is that
21   right?
22         A.   Yes, sir.
23         Q.   Could you read that into the record,
24   please.
25         A.   Which part?

Page 108

1          Q.   Let's read the -- let's read just
2    the -- well, why don't we read up through lifting
3    weights.
4          A.   56-year-old gentleman with
5    hyperlipidemia and reflux seen for follow up.  He
6    was admitted to the hospital at the end of February
7    for some atypical chest pain.  Dr. Hollingsworth
8    admitted him and ruled out MI and discharged him.
9    He has seen Dr. Karavan who, per patient report,
10   did not think his chest pain was cardiac.  It was
11   not apparently on an EKG as well.  He has a lengthy
12   history behind the symptoms that took about 15
13   minutes for him to relate.  However, it does not
14   occur during cardiovascular stress such as
15   treadmill, et cetera, only when he lifted weights.
16   When he --
17         Q.   Okay.  Okay.  Go ahead.
18         A.   When he --
19         THE WITNESS:  I'm sorry, am I going too
20   fast?
21   BY MR. ROBINSON:
22         Q.   No.  We're ready to get out of here.
23         A.   When he cut back on his weights, it got
24   better.
25         Q.   Okay.  And then read Number 1.

Page 109

1    Actually, read Number 4 -- Number 4.
2          A.   Four.  Osteoarthritis.  Stable.  He
3    inquires about the safety of Celebrex versus Vioxx
4    for coronary artery (sic) disease.  I informed him
5    that I do not think either drug is
6    cardioprotective, nor do I believe that either is
7    likely to significantly improve -- and that's a
8    typo, it should read increase -- his risk of heart
9    disease, as long as he continues on his baby
10   aspirin and Plavix and treat his modifiable risk
11   factors.
12         Q.   Okay.  And you actually interlineated
13   on the -- on the exhibit to say increased, is that
14   right?
15         A.   Yes, sir.
16         Q.   So from your review of the literature
17   at that point in time, March 24th, '03, it was your
18   understanding that the drug was -- neither Celebrex
19   nor Vioxx was cardioprotective, is that right?
20         A.   That's correct.
21         Q.   And that at that point in time at
22   least, you did not believe that either drug
23   significantly increased the risk of heart disease?
24         A.   That's correct.
25         Q.   And then you said as long as he takes

28 (Pages 106 to 109)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 110

1  baby aspirin and Plavix?
2      A.  Correct.
3      Q.  And treat his modifiable risk factors?
4      A.  Yes, sir.
5      Q.  By the way, in looking at your -- maybe
6  you know this from your record, but in my review of
7  the record up to the heart attack, he wasn't on
8  baby aspirin before the heart attack, is that
9  right?
10         MR. GOLDMAN:  Objection.
11         THE WITNESS:  I believe that's correct.
12  BY MR. ROBINSON:
13     Q.  Okay.  But then after the heart attack,
14  he was put on baby aspirin?
15     A.  Yes, sir.  The part of the record --
16  when he saw me, to clarify, the first time, he was
17  not taking baby aspirin.  The part of my chart that
18  would have had his medicine list is not here, which
19  would have stated whether or not he was on baby
20  aspirin, but I don't see it anywhere in my notes.
21     Q.  Okay.  I didn't see it either, that's
22  why I'm asking.  But if I'm wrong --
23         MR. GOLDMAN:  We'll show you.
24  BY MR. ROBINSON:
25     Q.  -- Mr. Goldman will show me.

Page 111

1         By the way, during the period from the
2  time of his angina to the time of his heart attack,
3  which would have been 2000, 2001 and the first nine
4  months of 2002, were there some times where he had
5  some intermittent chest pain?
6      A.  Yes, if I remember correctly, he had
7  intermittent chest pain, yes, sir.
8      Q.  Was there one time when he took some
9  drug to lose weight and he had some heart
10  fluttering experience with that?  Do you remember?
11     A.  I don't remember.  I can review the
12  records.
13     Q.  No, that's okay.
14     A.  He had come into the office once with
15  his blood pressure a little elevated after taking
16  Sudafed for sinus problems and I don't remember
17  about the weight loss.
18     Q.  I think -- I think it might have been
19  Metabolife or something like that he took for a
20  couple weeks.  You don't remember that?
21     A.  Vaguely.
22     Q.  Okay.  In any event, to your knowledge,
23  he wasn't on it for more than a few weeks?
24     A.  As best I recall.  I don't -- I don't
25  remember him taking it a long period of time.

Page 112

1      Q.  Okay.  Let's go to -- let's go to the
2  next exhibit -- the next page of Exhibit 21, which
3  is dated 7/15/03.  He had a question about
4  Sporanox, is that right?
5      A.  Yes, sir.
6      Q.  And at the bottom there you say you
7  reassured him he does not have heart failure?
8      A.  Correct.
9      Q.  Okay.  Okay.  Let me ask you this:
10  Given that he was on Vioxx for some two-and-a-half
11  years and then had a -- had a heart attack, can you
12  rule out Vioxx as one of the causes of the heart
13  attack?
14         MR. GOLDMAN:  Object to the form, lacks
15  foundation.
16  BY MR. ROBINSON:
17     Q.  Go ahead.
18     A.  I cannot say definitively that Vioxx
19  didn't have a potentially-contributing role.
20     Q.  Why do you say that?
21     A.  Some of the data that was presented
22  today in addition to some of the subsequent data
23  published on the view of the bigger trial stating
24  that the protector effect of Naprosyn was not
25  likely to explain -- there was, I believe, an

Page 113

1  article in the Lancet -- would not explain the
2  difference entirely between the thrombotic events
3  attributed to the Vioxx and the bigger trial would
4  suggest that Vioxx may have some -- however small
5  or large I don't really know -- increased risk of
6  causing thromboses.
7      Q.  So in other words, Vioxx would be -- in
8  your differential diagnoses is one of the potential
9  causes of his heart attack?
10         MR. GOLDMAN:  Object to the form.
11         THE WITNESS:  It would be a
12  consideration, yes.
13  BY MR. ROBINSON:
14     Q.  Thank you.  Now, you're an internist,
15  right?
16     A.  Correct.
17     Q.  And not a cardiologist, is that right?
18     A.  Correct.
19     Q.  Okay.  But that's your opinion?
20     A.  Correct.
21     Q.  But these articles and materials and
22  memos that I've showed you today, you didn't have
23  in your file or you weren't able to read them back
24  before his heart attack, right?
25         MR. GOLDMAN:  Object to the form.

29 (Pages 110 to 113)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

## Page 114

1    THE WITNESS: That is correct.
2  BY MR. ROBINSON:
3    Q.  I noticed that Mr. Barnett's weight
4  fluctuates between 172, 182, in that area. Did you
5  consider him really overweight?
6    A.  No, I would say he was mildly
7  overweight.
8    Q.  Okay. But he did have coronary artery
9  disease in his family, right?
10   A.  Correct.
11   Q.  And given what you've read today, that
12  combined with his angina, would you say that from
13  everything you've read about Vioxx today that you
14  probably would not have prescribed Vioxx for him if
15  you'd known all this information --
16   MR. GOLDMAN: Object to the form.
17  BY MR. ROBINSON:
18   Q.  -- in 2000?
19   MR. GOLDMAN: Object to the form.
20  BY MR. ROBINSON:
21   Q.  Go ahead.
22   A.  Having known today what I know about
23  Vioxx, I would not have prescribed it.
24   Q.  Thank you. We were given some records
25  by Merck of -- I showed you the contact sheets

## Page 115

1  that --
2    A.  Yes, sir, the salespersons.
3    Q.  -- the sales contact sheet.
4    MR. ROBINSON: What number exhibit are
5  we?
6    COURT REPORTER: 22.
7  BY MR. ROBINSON:
8    Q.  I just want to quickly run through --
9  some other records through you to make sure I mark
10  them.
11   A.  Okay.
12   Q.  Here's Exhibit Number 22.
13   (PLF. EXH. 22, Call Notes, was marked
14  for identification.)
15  BY MR. ROBINSON:
16   Q.  Exhibit 22 are the -- are sales call
17  notes that Merck sales reps, I guess, recorded or
18  whatever after meeting with you apparently. I
19  guess from your wife being a sales rep, you knew
20  that there was -- they had to do some recording,
21  right?
22   A.  Yes. Oh, yes.
23   MR. ROBINSON: Let me mark Number --
24  the next order, Number 23, which are -- Number 23
25  will be the PIRs, physician information reports or

## Page 116

1  requests.
2    MR. GOLDMAN: This is another
3  compilation?
4    MR. ROBINSON: Right.
5    (PLF. EXH. 23, Letter dated 6/21/99 to
6  Michael Mikolajczyk from Leonard I. Silverstein,
7  MD, with attachments, was marked for
8  identification.)
9  BY MR. ROBINSON:
10   Q.  Going through Exhibit 23, which are
11  letters from Merck to you, I think there's about 10
12  letters from Merck to you, and going through it, I
13  didn't see any letter where they discussed with you
14  on those ten PIR's the cardiovascular risks
15  associated with Vioxx, but I may be wrong. Can you
16  go through them quickly and see if you see any
17  reference to cardiovascular risks in those letters.
18  I'm sure after lunch if I'm wrong, Mr. Goldman will
19  show me the portions where I'm -- where it does
20  mention it.
21   (Off-the-record conference.)
22   THE WITNESS: The only one that
23  discusses -- there's one that discusses
24  cardiovascular event rates and risk.
25  BY MR. ROBINSON:

## Page 117

1    Q.  What date is that?
2    A.  March 28th, 2003.
3    Q.  What does it -- why don't you read into
4  the record what it says.
5    MR. GOLDMAN: It's long. Do you want
6  him to read the whole letter?
7  BY MR. ROBINSON:
8    Q.  No, I mean just that portion on CV,
9  cardiovascular events.
10   A.  Reicin and others and unpublished data
11  from Merck Research Laboratories assessed the
12  cardiovascular safety profile of Rofecoxib in
13  elderly patients with Alzheimer's disease or mild
14  cognitive impairment. All clinical adverse data as
15  of March 16th, 2001 from these three randomized
16  placebo-controlled studies were pooled for
17  analysis. The analysis included all serious, in
18  parentheses, regulatory definition, thrombotic
19  cardiovascular adverse events. The data was
20  analyzed as three subgroups, investigator-reported
21  serious thrombotic cardiovascular adverse events,
22  confirmed thrombotic cardiovascular events blindly
23  adjudicated by an external committee, in
24  parentheses, according to a predefined standard
25  operating procedure, and three, events meeting the

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 118

1   criteria of the Antiplatelet Trialists'
2   Collaboration, APTC.
3   BY MR. ROBINSON:
4       Q.  Okay.
5       A.  It goes on to describe the patients.
6   The event rates per 100 patient-years and the
7   relative risk ratios with 95 percent confidence
8   intervals calculated for each subgroup are shown in
9   tables below.  A relative risk less than 1.0
10  indicates a reduced risk for Rofecoxib versus
11  placebo.  Studies 1 and 2 reflect the data detailed
12  in the prescribing information for Vioxx.
13      Q.  Okay.
14      A.  And on the subsequent page, Page 2, it
15  lists the relative risk for investigator reported
16  as 0.93, the relative risk for confirmed
17  adjudicated 0.72 and APTC relative risk 0.82.
18          And the next table, confirmed
19  thrombotic cardiovascular serious adverse
20  experiences in elderly population -- excuse me,
21  elderly patients by study.  Studies 1 and 2 and 3
22  show a relative risk of 0.82, 0.41 and 1.03
23  respectively.  And then there's discussion.
24      Q.  Was the discussion about that?
25      A.  Yeah, I'll read it.  The pooled

Page 119

1   analysis was repeated in a subgroup of patients who
2   were at higher risk for cardiovascular thrombotic
3   events.  This groups was defined as those with two
4   or more major risk factors for coronary artery
5   disease, in parentheses, current smoker, history of
6   hypertension, history of diabetes, history of
7   hypercholesterolemia, parentheses, or a prior
8   history of cardiovascular thrombotic event.  A
9   total of 610 patients met the criteria for higher
10  risk.  Distribution of higher-risk patients was
11  comparable between the two treatment groups,
12  parentheses, both 21 percent.  The rates and
13  relative risk for confirmed serious cardiovascular
14  thrombotic adverse events in the higher-risk and
15  lower-risk patients are shown in the table below.
16  These data are consistent with the overall
17  analysis.
18          And in the higher-risk group, the
19  relative risk was .99 and the lower-risk group,
20  0.61.
21      Q.  Did they ever share with you -- strike
22  that.
23          Did Merck in any of those letters ever
24  share with you comments of the FDA medical officer
25  whose responsibility was to review Vioxx

Page 120

1   cardiovascular safety data?
2       A.  No, sir.
3       Q.  Let me show you Exhibit -- the next
4   exhibit, Number 24.
5           (PLF. EXH. 24, FDA Advisory Committee
6   Briefing Document, was marked for identification.)
7           THE WITNESS:  Okay.
8   BY MR. ROBINSON:
9       Q.  Just for the record, will you read
10  the -- the topic and dates of this document,
11  Exhibit 24.
12          MR. GOLDMAN:  Mr. Robinson, same
13  objection, lacks foundation.
14          MR. ROBINSON:  Same objection.
15          THE WITNESS:  FDA advisory committee
16  briefing document, and it has some numbers and
17  letters, Vioxx gastrointestinal safety, February
18  8th, 2001.
19  BY MR. ROBINSON:
20      Q.  Okay.
21          MR. GOLDMAN:  There's also handwriting
22  throughout the document, Mr. Robinson.  Can you
23  please replace it with a clean copy?
24          MR. ROBINSON:  Well, put it this way:
25  I don't know, but we'll -- at the end of the depo,

Page 121

1   we can make it -- if it's not something that was
2   put on by the government, we'll take it off, okay?
3           MR. GOLDMAN:  Okay.
4   BY MR. ROBINSON:
5       Q.  Okay, if you go to Page 5 of that
6   exhibit, do you see they review -- in addition to
7   VIGOR data, they review study 085, 090, 069, 058
8   and study 102, the ADVANTAGE study?
9       A.  Yes, sir.
10      Q.  Okay.  And they say, you know, whether
11  aspirin's allowed or not allowed -- like, for
12  example, aspirin was not allowed in VIGOR.  Do you
13  see that?
14      A.  Yes, sir.
15      Q.  Okay.  And if you go to the next page,
16  do you see Page 6 there?
17      A.  Yes, sir.
18      Q.  Will you read the first -- under safety
19  results where it says deaths, would you read into
20  the record the first two -- the first three
21  sentences there.
22      A.  There were a total of 22 deaths in the
23  Rofecoxib group and 15 in the Naprosyn (sic) group.
24  A listing of deaths is presented in Appendix 1.
25  There were 14 cardiovascular deaths, nine and five

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Page 122

in Rofecoxib and Naproxen groups respectively. Most of the cardiovascular deaths were in patients with known cardiovascular risks.

Q. Okay. Now, if you go to the top of the page, that has to do with study 88C, which is the VIGOR study, right?

A. Yes, sir.

Q. Okay. If we go to Page 10 --

MR. GOLDMAN: Mr. Robinson, can you for completeness read on the next page the last sentence in that section?

MR. ROBINSON: Where is that?

MR. GOLDMAN: Although there were more deaths --

MR. ROBINSON: What page are you talking about?

MR. GOLDMAN: Page 7, MRK-NJ 0293583.

MR. ROBINSON: Okay. What -- what paragraph -- what --

MR. GOLDMAN: Although there were more deaths in the Rofecoxib group.

MR. ROBINSON: Go ahead, you read it.

MR. GOLDMAN: I'm not going to read it.

BY MR. ROBINSON:

Q. Doctor, do you want to read that in for

Page 123

him --

A. Yes, sir.

Q. -- read that?

A. Although there were more deaths in the Rofecoxib group, the small number of cases does not allow statistical comparisons.

Q. Okay. Let's move on here. Do you see the section, Page 9, serious cardiovascular events?

A. Yes, sir.

Q. Would you go to the next page, Page 10, and read into the record the middle paragraph there.

A. An analysis in this subgroup of patients retrospectively identified by the sponsor as candidates for low-dose ASA showed that the risk of developing CV thrombotic events, excuse me, was five times higher in the Rofecoxib group compared to the Naproxen group, in parentheses, 14.3 percent and 2.9 percent respectively, end of parentheses. For those patients in whom neither prospective nor retrospective chart review suggested need for low-dose ASA use, the risk was still twice in the Rofecoxib group compared to the Naproxen group, parentheses, 1.2 percent and 0.6 percent respectively.

Page 124

MR. GOLDMAN: You're putting him to sleep.

MR. ROBINSON: Sorry. I don't want to do that. Actually, for your section I do.

BY MR. ROBINSON:

Q. Okay, let's go to Page 11. Now, will you read into the record the sponsor explanation down at the bottom there.

A. Sponsor explanation for the excess of cardiovascular thrombotic events in the VIGOR study is the potent antiplatelet aggregation effect of Naproxen. However, unopposed thromboxane production leading to an increase in CV thrombotic events cannot be discarded as a potential explanation of the VIGOR findings.

Q. Go on.

A. There are several arguments against the beneficial Naproxen effect being the sole explanation for these findings.

There are no prospective placebo-controlled trials with Naproxen to support -- to support the assumption that Naproxen transient inhibition of platelet aggregation is effective in decreasing the risk of cardiovascular events.

Page 125

The effect size of Naproxen in reducing CV thrombotic events relative to Rofecoxib in the VIGOR study, parentheses, 58 percent, exceeds the effect size of ASA compared to placebo in other trials, in parentheses, 25 to 30 percent.

Q. Do you understand what's meant by that?

A. Yes, sir.

Q. Can you explain to the jury.

A. Yes, sir. The theory is that the reason more patients in the Vioxx farm of the VIGOR trial had thrombotic effects, or the presumption, is that Naprosyn (sic) helps protect against thrombotic events due to its effects on platelets. Platelets are small types of blood cells that are actively involved in acute thromboses and arteriole clot formation.

The -- they further go on to say that the effect of Naproxen preventing events would not be robust enough to explain the difference due to the fact that aspirin, which has even more potent effects on platelets than Naproxen, only showed a 25 or 30 percent reduction in other trials.

Q. Whereas the VIGOR --

A. Showed a 58 percent reduction relative to Rofecoxib for Naproxen.

Michael Mikola, M.D.

## Page 126

1      Q.   Could you read Number C into the
2  record.
3      A.   The absence of a meaningful
4  prothrombotic signal in the original NDA may be
5  explained by the short duration and low doses of
6  Rofecoxib used in the majority of the OA database.
7      Q.   Is that some of those studies that
8  Ms. Reicin was referring to in that letter?
9          MR. GOLDMAN:  Object to the form.
10 BY MR. ROBINSON:
11     Q.   Dr. Reicin, I'm sorry.
12     A.   That I don't know.
13     Q.   Okay.  Can you read D into the record,
14 please.
15     A.   As shown in?
16     Q.   No, go to D.
17     A.   D.   Several other studies, parentheses,
18 085, 090 and 102, to be noted later in this review
19 suggest trends toward higher rates of myocardial
20 infarction in the Rofecoxib group compared to
21 active control groups.  Of note, these studies
22 involved lower doses and duration of exposure to
23 Rofecoxib than the VIGOR trial and allowed the use
24 of low-dose ASA.
25     Q.   Okay.  Thank you.  Did you ever --

## Page 127

1  strike that.
2          Did Merck ever show you this
3  information that was in the FDA files regarding
4  Vioxx?
5      A.   No, sir.
6          MR. GOLDMAN:  Object to the form.
7  BY MR. ROBINSON:
8      Q.   Did you ever see this -- strike that.
9          Did Merck in any way ever share this
10 information that you just read in about these Vioxx
11 studies from the FDA review?
12     A.   I do not remember being informed of
13 them, no, sir.
14     Q.   And then going to Page 16.  Do you see
15 where it says, Studies --
16         (The proceedings were interrupted.)
17 BY MR. ROBINSON:
18     Q.   See where it says, Studies 085 and 090?
19     A.   Yes, sir.
20     Q.   At the bottom would you read into the
21 record starting with there were six.
22     A.   There were six cases of serious
23 cardiovascular events in the Rofecoxib group,
24 parentheses, four MI and two CVA's, parentheses,
25 three in the Nabumetone group, parentheses, one MI,

## Page 128

1  one coronary artery disease and one CHF.
2      Q.   Okay.  Now would you go to Page 17.
3      A.   Yes, sir.
4      Q.   And go -- do you see it says Study 102?
5      A.   Yes, sir.
6      Q.   And that was a 12-week randomized
7  double-blind active-controlled study of Rofecoxib,
8  25 milligrams a day, and Naproxen, a thousand
9  milligrams a day, in approximately 5500 patients
10 with OA who were allowed low-dose aspirin, 81 to
11 325 milligrams a day.  Patients taking low-dose
12 aspirin were 12.1 percent and 12.8 percent in the
13 Rofecoxib and Naproxen treatment group
14 respectively.
15         Did I read that right?
16         MR. GOLDMAN:  Object to the form.
17         THE WITNESS:  Yes, sir.
18 BY MR. ROBINSON:
19     Q.   And it says, this study was completed
20 in March of 2000.
21         Did I read that right?
22     A.   Yes, sir.
23     Q.   Did --
24         MR. GOLDMAN:  Same objection, not so
25 fast.

## Page 129

1  BY MR. ROBINSON:
2      Q.   Did Merck ever tell you about that
3  study?
4      A.   Not that I recall.
5      Q.   Okay.  And then will you read into the
6  record B, which is serious CV events, on the next
7  page.
8      A.   There were six myocardial infarctions,
9  in parentheses, MI, in the Rofecoxib 25-milligram
10 group and one MI in the Naproxen 1,000-milligram
11 group.  Of the six MI in the Rofecoxib group, three
12 were in patients taking low ASA for cardiovascular
13 prophylaxis.  The patient with MI in the Naproxen
14 group was a non-QASA user.
15     Q.   Go ahead.
16     A.   A trend towards an excess of MI's in
17 the Rofecoxib 25-milligram group in a 12-week study
18 is noted.  This observation is consistent with the
19 pattern seen in VIGOR.
20     Q.   Were you ever told about this at any
21 time while you're prescribing Vioxx to Mr. Barnett?
22     A.   Not to my recollection, no, sir.
23     Q.   Can you go to Page 19.
24     A.   Yes, sir.
25     Q.   And in the middle of the page, do you

Michael Mikola, M.D.

1  see where it says, similarly, the sponsor conducted
2  a metanalysis of CV thrombotic events in the OA
3  database?
4      A.  Yes, sir.
5      Q.  And actually, if you go to -- where is
6  the call note -- was it a call note exhibit?  Here
7  it is, the call note exhibit that I gave you
8  earlier, 22.
9      A.  Number 22?  Yes, sir.
10     Q.  I don't know the numbers, I'm sorry.
11     A.  Yes, sir.
12     Q.  Can you go to Page 2 of that exhibit.
13     A.  Yes, sir.
14     Q.  And you see down near the bottom they
15 talk about a metanalysis.  You were asking
16 questions about it or some discussion according to
17 this.
18     A.  Yes, sir.
19         MR. GOLDMAN:  What exhibit is it for a
20 second?
21         MR. ROBINSON:  Exhibit 22, Page 2.
22 BY MR. ROBINSON:
23     Q.  Do you see that?
24     A.  Yes, sir.
25     Q.  Okay.  I'd like you to go back to this

1  Exhibit 24 and I'd like you to read in the record
2  what the FDA medical officer says about the sponsor
3  conducting the metanalysis.
4      A.  The italicized portion on Page 19?
5      Q.  Well, start with similarly.
6      A.  Similarly?
7      Q.  Well, start -- start with the paragraph
8  above it and then go to that.
9      A.  The division has serious concerns with
10 a combined analysis of studies of different length
11 and dosing regimens.  Furthermore, combining
12 multiple different drugs within a single comparator
13 arm may not be reflective of the risk of any one
14 drug.  These concerns were discussed extensively
15 during the advisory committee meeting of April
16 20th, 1999.
17     Q.  Now can you read the next --
18     A.  Similarly --
19     Q.  -- line?
20     A.  -- the sponsor conducted a metanalysis
21 of CV thrombotic events in the OA database.
22         This database overall included
23 short-term low doses of Rofecoxib.  Most of the
24 exposure for more than six months was at the 12.5
25 and 25-milligram QD doses.  272 patients received

1  50 milligrams QD for -- there's a squibble and then
2  six months, parentheses, 265 in OA trials,
3  parentheses; the rest of the exposure to, and
4  another symbol, 50 milligrams was in short-term
5  studies.  The division has requested a metanalysis
6  based on dose and duration.
7          None of the studies were powered to
8  detect differences in serious CV thrombotic events
9  compared to the active comparator, but more
10 important, the studies involved a different
11 population.
12         Patients with RA have recently reported
13 to have twice the risk of cardiovascular events
14 compared with OA.  There is increasing evidence
15 that ongoing inflammation is a risk factor for
16 coronary disease, in parentheses, plaque
17 instability -- or it says unstability.  It is
18 likely that RA population is a very sensitive model
19 for detecting differences in the beneficial or
20 deleterious effects of any drug on cardiovascular
21 risk.
22     Q.  Okay.  Did -- did Merck ever share any
23 of that information with you that you just read
24 from the FDA document?
25         MR. GOLDMAN:  Object to the form.

1      THE WITNESS:  Not to my recollection,
2  no, sir.
3  BY MR. ROBINSON:
4      Q.  When you had discussions -- strike
5  that.
6          Do you remember any discussions you had
7  with some sales rep about a metanalysis --
8          MR. GOLDMAN:  Objection.
9          THE WITNESS:  I do not.
10         MR. GOLDMAN:  Asked and answered.
11 BY MR. ROBINSON:
12     Q.  -- as you sit here now?
13     A.  I do not.
14     Q.  You do not?
15     A.  I do not remember.
16     Q.  But you clearly remember that the FDA
17 didn't -- strike that.
18         I just want to mark quickly some other
19 documents that Merck provided us with that relate
20 to you.  The first is a PGM expense list.
21         MR. ROBINSON:  What exhibit number is
22 this?
23         COURT REPORTER:  25.
24         (PLF. EXH. 25, PGM expense list, was
25 marked for identification.)

34  (Pages 130 to 133)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 134

1 BY MR. ROBINSON:
2    Q.  It's 25, Exhibit 25.  Did you know
3 they're keeping track of meals and things like
4 that?
5    A.  Oh, yes.
6    Q.  Okay.  If you go to Page 3, it looks
7 like -- Page 4, Dr. Conaway -- is the guy named
8 Doug Conaway?
9    A.  Yes, sir, he's a rheumatologist.
10   Q.  Okay.  Looks like he got --
11       MR. GOLDMAN:  Wait, I'm sorry, where
12 are you?
13       MR. ROBINSON:  Page 4 of 16.
14       MR. GOLDMAN:  Yeah.
15 BY MR. ROBINSON:
16   Q.  He got a 3800-dollar meal?
17       MR. GOLDMAN:  Object, lacks foundation.
18 You're asking this witness about another doctor --
19       MR. ROBINSON:  No, I just feel that
20 Dr. Mikola got cheated.
21       MR. GOLDMAN:  The document speaks for
22 itself.
23 BY MR. ROBINSON:
24   Q.  Anyway, it didn't look like you got any
25 3800-dollar meal, right?

Page 135

1    A.  Well, my wife worked for them so that
2 would be on the radar screen.
3    Q.  Okay.  Well, they've got -- it must
4 have been part of a big meal for 17 -- for 1700,
5 but Deanna Guyon -- oh, it's a lecture, right?
6    A.  Um-hum.
7    Q.  Okay.  But she didn't make the 3,000
8 category.  You got candy from Steven Calder.
9       Next document that they sent us was
10 the --
11       (PLF. EXH. 26, Contact List, was marked
12 for identification.)
13 BY MR. ROBINSON:
14   Q.  -- 26.  If you go to Exhibit 26, Bates
15 Number at the bottom 309, Page 309.
16   A.  I have 308, 306, 311, 310, 312.
17   Q.  Out of order?
18   A.  305, 307.  Here's 309.
19   Q.  I don't know how we can read this, but
20 there's incidental expense.  Would there be time to
21 time when Merck would pay an incidental expense?
22   A.  No, these would be most likely speaker
23 fees where I gave a presentation to a group -- a
24 group of doctors.
25   Q.  Okay.  So you would speak to doctors

Page 136

1 about Vioxx?
2    A.  Zocor.
3    Q.  Zocor?
4    A.  Um-hum.
5    Q.  Okay, good.  So it wasn't Vioxx?
6    A.  I don't recall doing any presentations
7 for Vioxx.
8    Q.  For the jury, Zocor is a statin drug,
9 right?
10   A.  Correct.
11   Q.  And it works -- does it work pretty
12 well?
13   A.  Yes, sir.
14       MR. ROBINSON:  Here's what I want to
15 do.  Let's take a lunch break.  I'm not necessarily
16 done, but I'm not going to have that much more.
17 We'll take a lunch break and maybe I'll do 10 or 15
18 minutes when I come back.
19       MR. GOLDMAN:  Okay.
20       MR. ROBINSON:  Okay?
21       VIDEO TECHNICIAN:  We will now go off
22 the record.  The time is approximately 12:28 PM.
23       (A recess transpired.)
24       VIDEO TECHNICIAN:  We're back on the
25 record.  The time is approximately 1:10 PM.

Page 137

1       (Off-the-record conference.)
2 BY MR. ROBINSON:
3    Q.  Doctor, Miss Myer from my office sent
4 you your records because you didn't have them,
5 right --
6    A.  Correct.
7    Q.  -- medical records, at least part of
8 your chart, is that right?
9    A.  Correct.
10   Q.  Okay.  In addition, she sent you
11 certain documents that we haven't yet marked on the
12 record and I wanted to mark them for the record,
13 okay?  I don't know if you reviewed them or not,
14 but some of them have yellow lines so I want to
15 identify them, okay?
16   A.  Yes, sir.[.
17   Q.  One is a December 29, 1999 memo from
18 Dr. Michael Weinblatt regarding VIGOR and we'll
19 call -- we'll mark that Number 27.  And then
20 another one is -- Number 28 is an October 18th,
21 2000 metanalysis, correct?
22   A.  Yes, sir.
23   Q.  Another one is -- we'll make 29 is an
24 article by Juni.  It's another metanalysis.
25       MR. GOLDMAN:  What are you doing,

35 (Pages 134 to 137)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

### Page 138

1  you're just asking him what documents are?  Object
2  on lack of foundation on each of these except for
3  the medical records.
4          MR. ROBINSON:  Okay.
5  BY MR. ROBINSON:
6      Q.  What number was that, 29?
7      A.  29.
8      Q.  Okay.  And then a letter from Grady
9  Kirschman to the New England journal, that would be
10 30.
11         MR. GOLDMAN:  Same objections.
12 BY MR. ROBINSON:
13     Q.  You've already --
14         MR. GOLDMAN:  You're showing him --
15 these are highlighted versions of --
16         MR. ROBINSON:  Oh, these are documents
17 that he highlighted, I believe.
18 BY MR. ROBINSON:
19     Q.  Is that right, Doctor?
20     A.  No, sir.
21     Q.  Are they highlighted -- I highlighted
22 those?
23     A.  I did not highlight them.
24     Q.  Okay.
25         MR. ROBINSON:  So then I am showing him

### Page 139

1  highlighted versions.
2          MR. GOLDMAN:  Are you asking if he's
3  seen these before today?
4          MR. ROBINSON:  Yes.
5          MR. GOLDMAN:  And the answer is?
6          THE WITNESS:  Yes.
7          MR. GOLDMAN:  Okay.
8  BY MR. ROBINSON:
9      Q.  And they are documents that Miss Myer
10 sent you, right?
11     A.  That's correct.
12     Q.  And another one is 3 -- this is
13 Exhibit -- the 3/9/2000 Scolnick memo, right?
14     A.  Yes, sir.
15     Q.  And then another one is an e-mail
16 2/26/97, right?
17     A.  Yes, sir.
18     Q.  And then here's another one, January
19 24th, 2000 from Michael Weinblatt.  And then a
20 February 2nd, 1999 -- 1998 document.
21         MR. GOLDMAN:  Are you marking these as
22 actual exhibits?
23         MR. ROBINSON:  I think what I'm going
24 to do is mark them as a group of documents that we
25 sent him.

### Page 140

1          MR. GOLDMAN:  Okay.
2          MR. ROBINSON:  Maybe we'll -- why don't
3  we -- I want to go back on the record here.  I
4  previously marked them 28 and 29.  I think we can
5  just actually mark this entire group 29 --
6          MS. MYER:  2 --
7          MR. ROBINSON:  2 -- 28.
8          MS. MYER:  No, 27.
9          MR. ROBINSON:  Huh?
10         MS. MYER:  2 -- we started with 27.
11         MR. ROBINSON:  Okay, well, let's mark
12 this entire group 27, documents that Miss Myer sent
13 you.
14         (PLF. EXH. 27, Scientific Advisors'
15 Meeting May 3-May 6, 1998 Programmatic Review Vioxx
16 Program, with attachments, was marked for
17 identification.)
18         MR. ROBINSON:  And then here's another
19 one within that group.
20         MR. GOLDMAN:  Is there a cover letter
21 too?
22         MR. ROBINSON:  Yes.  We'll mark the
23 cover letter as Number 29 --
24         MS. MYER:  28.
25         MR. ROBINSON:  -- 28 with it.

### Page 141

1          (PLF. EXH. 28, Letter dated 1/31/06 to
2  Dr. Michael Mikolajczyk from Lexi W. Myer, was
3  marked for identification.)
4          MR. ROBINSON:  And then we'll mark
5  this -- this group with a cover letter 29.  Okay?
6          (PLF. EXH. 29, Letter dated 4/14/06 to
7  Michael Mikola, MD from Lexi W. Myer, with
8  attachments, was marked for identification.)
9  BY MR. ROBINSON:
10     Q.  There's one -- there's some --
11 there's -- there's another part of 28 that includes
12 your medical chart that was sent, right?
13     A.  Yes, sir.
14     Q.  And I don't know, is that -- that
15 sitting on the table somewhere?
16     A.  Yeah, it was.  Yes, sir.  Labs I think
17 were presented today.  I brought it in with me.
18 Let me just find it.
19     Q.  What are we looking for?
20     A.  The documents I brought, which is the
21 clinical record and the -- the data that Miss Myer
22 sent me.  I brought it in and put it on the table,
23 but I don't see where it is.
24     Q.  Was it your chart you mean?
25     A.  Yes, sir.

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

Page 142

1    Q.  Is that on this --
2    A.  But it wasn't marked as -- it wasn't
3  marked.
4         MR. GOLDMAN: I'd like to just be able
5  to see what was sent if we -- so far all I know
6  what was sent, the highlighted copies are marked as
7  28 and this cover letter, right?
8         THE WITNESS: I remember reviewing this
9  document.
10 BY MR. ROBINSON:
11   Q.  I think the issue is where are the rest
12 of your chart?  Do you -- is it possible they're in
13 your car or something?
14   A.  No, I brought them to this meeting and
15 I haven't taken them out of the room.  I have the
16 records that --
17   Q.  Anyway, the medical -- they were parts
18 of your medical chart?
19   A.  Yes, sir.
20   Q.  Okay.
21   A.  And also, I brought the -- this
22 information that I received previously.
23   Q.  I understand we have that, but we're
24 looking for the chart.
25        MR. GOLDMAN: What do you need it for?

Page 143

1  I know you want it because you brought it, but do
2  you want -- can you finish your exam?
3         MR. ROBINSON: Yeah, I can finish it.
4  I'm just seeing if we can find it, that's all.
5         MR. GOLDMAN: Doctor, would you mind
6  handing me the highlighted copies that you got?  I
7  think it's these.  He marked those.  I think it's
8  documents that you were sent.  Is that what you
9  were sent?
10        THE WITNESS: Yes, sir.
11        MR. ROBINSON: Okay.  Let's go off the
12 record.  We're going to go off the record.
13        VIDEO TECHNICIAN: This is the end of
14 Tape Number 3 in the deposition of Dr. Michael
15 Mikola.  The time is approximately 1:19 PM.  The
16 date is April 25th, 2006.  We will now go off the
17 record.
18        (Off-the-record conference.)
19        VIDEO TECHNICIAN: This is the
20 beginning of Tape Number 4 in the deposition of
21 Dr. Michael Mikola.  The time is approximately 1:25
22 PM.  The date is April 25th, 2006.  We are now back
23 on the record.
24 BY MR. ROBINSON:
25   Q.  So basically what you got was a copy of

Page 144

1  your chart from Miss Myer, is that right?
2    A.  Yes, sir.
3    Q.  And you got certain exhibits, which I
4  think we've now marked as Exhibit 27 --
5         MR. GOLDMAN: 28.  28.
6  BY MR. ROBINSON:
7    Q.  28, okay.  And were there some other
8  exhibits that you also received or was that -- is
9  that one of them in front of you right there?
10   A.  I believe you marked this one.  I don't
11 believe this is -- I did receive a copy of this,
12 but I don't think it was this actual document.
13   Q.  Okay.
14   A.  But I did receive a copy of this
15 document.
16   Q.  Okay.  Okay.  I don't know if it's in
17 that group or not.
18        MR. GOLDMAN: Let me add it to it.
19 Thanks.
20        MR. ROBINSON: Is that an exhibit right
21 now, though?
22        MR. GOLDMAN: No, it's not.
23        MR. ROBINSON: Okay.
24 BY MR. ROBINSON:
25   Q.  And did you receive that document right

Page 145

1  there in front of you?  Yes?
2    A.  Yes, sir.
3    Q.  Okay.  Is that -- is that the copy you
4  received?  Has that got a letter attached?
5    A.  I don't know if this is the actual copy
6  or not.  I didn't mark on it so I'm not sure.
7         MR. GOLDMAN: Can I see that?
8         THE WITNESS: Yes, sir.
9         MR. ROBINSON: Can I look at that too?
10        MR. GOLDMAN: Are these stickers that
11 are yours or are these --
12        THE WITNESS: They're not mine.  The
13 copies I received had stickers on them.
14        MR. GOLDMAN: Okay.
15        MR. ROBINSON: Okay, so let's make this
16 entire group of exhibits an exhibit.
17        MR. GOLDMAN: Well, there are two
18 different dates.  Let's just make -- first, to
19 clean up the record, we have a cover letter dated
20 January 31st, 2006 with documents attached that
21 Mr. Robinson just went through.
22        And then what's the next exhibit
23 number?
24        MR. ROBINSON: 29.
25        MR. GOLDMAN: 29 is a cover letter

37 (Pages 142 to 145)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

**Page 146**

1  dated April 14th, 2006 from Miss Myer to Dr. Mikola
2  enclosing a proposed warning label after Vioxx was
3  *removed from the market,* okay?
4      MR. ROBINSON: Okay.
5      MR. GOLDMAN: I'm going to keep these
6  with me unless you want to use them.
7      MR. ROBINSON: No, that's fine.
8      MR. GOLDMAN: Okay.
9      MR. ROBINSON: As long as they're
10  exhibits.
11      MR. GOLDMAN: Okay.
12  BY MR. ROBINSON:
13      Q.  So Doctor, when was the last time you
14  saw Mr. Barnett?
15      A.  I don't recall.  I believe it was
16  probably in April of 2000 (sic).
17      Q.  And the first time you met me was last
18  night --
19      A.  Yes, sir.
20      Q.  -- is that correct?  I met you for
21  what, about a half hour?
22      A.  *That's correct, yes, sir.*
23      Q.  And --
24      MR. GOLDMAN: I'm sorry, did you say
25  the last time you saw Mr. Barnett was April of

**Page 147**

1  2000?
2      THE WITNESS: I'm sorry, 2004.
3  BY MR. ROBINSON:
4      Q.  And you met me last night with Miss
5  Myer in your office for about a half hour, is that
6  right?
7      A.  Yes, sir.
8      Q.  Have you met face to face with anybody
9  else on this case besides me and Miss Myer?
10      A.  No, sir.
11      Q.  Okay.
12      MR. ROBINSON: I have nothing further.
13  Thank you.
14      EXAMINATION
15  BY MR. GOLDMAN:
16      Q.  Good afternoon, sir.
17      A.  Good afternoon.
18      Q.  My name is Andy Goldman and I represent
19  Merck.  You and I haven't met before today,
20  correct?
21      A.  That's correct.
22      Q.  I want to start with where Mr. Robinson
23  left off on your meetings with Plaintiff's counsel,
24  okay?
25      A.  Yes, sir.

**Page 148**

1      Q.  And other communications that you had
2  with Plaintiff's counsel, I'm going to ask you
3  about that too, okay?
4      A.  Yes, sir.
5      Q.  And I'm not faulting you for this at
6  all, you understand?
7      A.  Yes, sir.
8      Q.  On January --
9      MR. ROBINSON: I'll move to strike your
10  comment.
11  BY MR. GOLDMAN:
12      Q.  On January 31st, 2006, you were sent a
13  letter by Lexi Myer who is one of the lawyers from
14  Mr. Robinson's firm, correct?
15      A.  I believe that's correct.
16      Q.  And the letter that Miss Myer wrote to
17  you says, Dear Dr. Mikola, it was a pleasure
18  speaking with you today regarding the Vioxx case of
19  Gerald Barnett.  Pursuant to your request, I am
20  enclosing his chart and discharge summary from the
21  hospital for your review.  In addition, I am also
22  sending some Merck documents for your
23  consideration.  Please recognize that these
24  documents are confidential and are not to be
25  disclosed.

**Page 149**

1      Is that one of the things that you
2  received on January 31st of 2006 from Plaintiff's
3  counsel?
4      A.  I believe that's correct.  I don't know
5  about the exact date, but...
6      Q.  Did you speak on the phone with
7  Miss Myer before she sent you this material?
8      A.  Yes, sir.
9      Q.  How long did you speak with her?
10      A.  Probably two minutes, three minutes.
11      Q.  In that conversation, you asked to see
12  Mr. Barnett's chart and discharge summary so you
13  could refamiliarize yourself with your treatment of
14  Mr. Barnett?
15      A.  Correct.
16      Q.  But you didn't ask for Merck documents
17  to be sent for your consideration, did you?
18      A.  That's correct.
19      Q.  Miss Myers (sic) chose to send you
20  Merck documents that she and Mr. Robinson's firm
21  wanted you to read before your deposition today?
22      A.  She chose to send those documents, yes,
23  sir.
24      Q.  The documents that Miss Myers and
25  Mr. Robinson's firm sent you include many of the

Golkow Litigation Technologies - 1.877.DEPS.USA
66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

Page 150

1  documents that you were shown today by
2  Mr. Robinson, correct?
3      A.  Yes, sir.
4      Q.  And I'm just going to identify them for
5  the record.  The Plaintiff's lawyers sent you the
6  *scientific advisors meeting minutes from May of*
7  1998, right?
8      A.  May I see those?  Yes, sir.
9      Q.  I noticed that —
10     A.  Excuse me.  I don't recall exactly —
11 this initial deposition was supposed to be in
12 April.  I don't recall if I received them before
13 April or more recently, but I did receive them
14 before today.
15     Q.  I noticed that there are tabs included,
16 orange tabs.  Can you just take a look at those for
17 a minute.
18     A.  Yes, sir.
19     Q.  Were those tabs that you put on the
20 *documents that you were sent or are those tabs that*
21 Plaintiff's counsel included?
22     A.  I assume that Plaintiff's counsel put
23 them on because I did not.
24     Q.  The highlighting that's included on the
25 document there for the scientific advisors meeting,

Page 151

1  that was Plaintiff's counsel's and not yours?
2      A.  I did not put highlighting on the
3  document.
4      Q.  And the next document that Plaintiff's
5  counsel sent you is a e-mail exchange in March of
6  2000 and this had to do with Dr. Patrono.  Do you
7  remember being asked *about that today*?
8      A.  Yes.
9      Q.  Let me show you this document and ask
10 you if the highlighting that you see in that
11 document was highlighting that you made or the
12 Plaintiff's counsel made for you?
13     A.  The Plaintiff's counsel.
14     Q.  This is a letter dated January 24th of
15 2000 from Dr. Weinblatt to Dr. Reicin with
16 highlighting.  I assume that was Plaintiff's
17 counsel's and not yours?
18     A.  Correct.
19     Q.  You were sent another e-mail exchange
20 about a GI Outcomes trial February of 1997 and
21 *there's selected highlighting on this document. I*
22 assume that was the highlighting that Plaintiff's
23 lawyers did and not you?
24     A.  May I see it?
25     Q.  Sure.

Page 152

1      A.  That's correct.
2      Q.  You were shown this document earlier
3  today.  It's a March 9th, 2000 document from
4  Dr. Scolnick to Dr. Shapiro about VIGOR and there's
5  highlighting that says, I just received and went
6  through the data.  The CV events are clearly there.
7          That was another document that the
8  Plaintiff's lawyers wanted you to see before your
9  deposition, right?
10     A.  Yes, sir.
11     Q.  Did you ever see — did they ever send
12 you subsequent e-mails that Dr. Scolnick wrote
13 concerning his view about the VIGOR results?
14     A.  Not that I recall.
15     Q.  Did the Plaintiff's lawyers ever send
16 you Dr. Shapiro's response to Dr. Scolnick in about
17 March of 2000?
18     A.  Not that I recall.
19     Q.  Did the Plaintiff's lawyers send you a
20 article that Dr. Patrono wrote about the Naproxen
21 hypothesis for you to review before your
22 deposition?
23     A.  I don't believe so.
24     Q.  Mr. Barnett's lawyers also sent you a
25 expression of concern that was published in the New

Page 153

1  England Journal of Medicine.  Do you remember that?
2      A.  Yes, sir.
3      Q.  That was a editorial that was written
4  in part by Dr. Kirschman?
5      A.  Yes, sir.
6      Q.  And again, the highlighting on this
7  *document is the Plaintiff's lawyers and not yours?*
8      A.  That's correct.
9      Q.  Did the Plaintiff's lawyers ever send
10 you the response that the authors of the VIGOR
11 study submitted to the New England Journal of
12 Medicine to explain their position on why the New
13 England Journal of Medicine's publication about the
14 VIGOR trial was accurate?
15     A.  I don't believe so, no.
16     Q.  I'm going to show you a document that
17 is also among the materials you were sent.  This is
18 a study by Dr. Peter Juni and it too contains
19 highlighting.  I assume that was highlighting that
20 the Plaintiff's lawyers did, put on here, not you.
21     A.  *I did not put the highlighting on*,
22 correct.
23     Q.  You were also sent a December 22nd,
24 1999 memo from Dr. Weinblatt about the
25 cardiovascular safety analysis of VIGOR, unblinded

## Michael Mikola, M.D.

Page 154

1  minutes, and then you were directed to the second
2  page which contained certain highlighting as well,
3  correct?
4      A.  May I see it?  Yes, sir, that's
5  correct.
6      Q.  And then you were sent by Plaintiff's
7  counsel a February 2nd, 1998 document called final
8  results of an analysis of the incidence of
9  cardiovascular SAE's in the Phase IIb/III Vioxx
10  osteoarthritis clinical trials.  And there are
11  certain pages that are flagged by the lawyers for
12  Mr. Barnett, right?
13      A.  That's correct.
14      Q.  Focusing on a different document which
15  has been marked as Exhibit 29, this is a cover
16  letter from Miss Myers to you April 14th of 2006
17  that says, quote, Dear Dr. Mikola, we would like
18  you to see the following document which was the
19  Merck proposed warning label after Vioxx was
20  removed from the market.
21          Is that what the cover letter says and
22  it attaches a rather thick document from Merck's
23  files?
24      A.  Yes, sir, that's correct.
25      Q.  And that green Post-It is a Post-It

Page 155

1  that was on the document that you received and you
2  didn't put it there, right?
3      A.  Correct.
4      Q.  Did any of the Plaintiff lawyers before
5  your deposition, sir, send to you any of the
6  depositions of the individuals who wrote some of
7  the e-mails that you were shown today so that you
8  could get a full understanding about the meaning of
9  them?
10      A.  No, sir.
11      Q.  Were you ever sent the entire
12  submission -- withdrawn.
13          Do you have any idea, sir, about the
14  circumstances surrounding a proposed warning label
15  after Vioxx was withdrawn from the market?
16      A.  Could you restate that question?
17      Q.  Do you have any personal knowledge of,
18  for example, what's in Exhibit 29 about the
19  circumstances behind this proposed warning label
20  that was generated after Vioxx was withdrawn from
21  the market?
22      A.  No, sir.
23      Q.  When you read the letter from
24  Miss Myers where it says, the following document
25  which was the Merck proposed warning label after

Page 156

1  Vioxx was removed from the market, do you
2  understand, sir, that Merck voluntarily withdrew
3  the medicine from the market?
4      A.  Yes, sir.
5      Q.  When you testified earlier that based
6  on the information that you've seen here today and
7  that you've been subsequent to the withdrawal of
8  Vioxx, you said you would have prescribed Feldene
9  to Mr. Barnett.  Do you remember that?
10      A.  Yes, sir.
11      Q.  Or you would not have prescribed Vioxx.
12  Do you remember that?
13      A.  Yes, sir.
14      Q.  And the materials that you reviewed in
15  forming that judgment include the materials that
16  you were sent by the Plaintiff's lawyers, correct?
17      A.  Correct.
18      Q.  You were not shown all the documents
19  surrounding these issues, were you, Dr. Mikola?
20      A.  I don't know.
21      Q.  We're going to talk about the issue
22  about hindsight and what you would have done four
23  years ago when we get more into Mr. Barnett's
24  medical history, okay?
25          MR. ROBINSON:  I'm going to object to

Page 157

1  just making a statement without a question, move to
2  strike.
3  BY MR. GOLDMAN:
4      Q.  Did you understand, Mr. Barnett, that
5  the questions that you were being asked about what
6  you would have done were based on hindsight?
7      A.  Yes, sir.
8      Q.  You understand that the questions you
9  were asked about what you would have done
10  concerning Vioxx were based on documents that were
11  created -- some of which were created after you
12  treated Mr. Barnett?
13      A.  Yes, sir.
14      Q.  You understand that some of the
15  documents that you saw that you were asked about by
16  Mr. Barnett's lawyers included documents that were
17  generated after the withdrawal of Vioxx?
18      A.  Yes, sir.
19      Q.  And those sorts of materials were not
20  available to you at the time you were making a
21  treatment decision for Mr. Barnett, right?
22      A.  That's correct.
23      Q.  And it's a different thing to ask you
24  why you made the decision you made to prescribe
25  Vioxx to Mr. Barnett back at the time you were

40 (Pages 154 to 157)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda