## Michael Mikola, M.D.

Page 158

1    prescribing it to him as opposed to what would you
2    have done if you had all of this information that
3    was obtained subsequent to your treatment of
4    Mr. Barnett, correct?
5         MR. ROBINSON:  Objection.
6         THE WITNESS:  I'd say the difference is
7    at the time I didn't know that Vioxx was going to
8    be withdrawn from the market and knowing that it
9    was going to be withdrawn from the market, I would
10   not have used it.
11   BY MR. GOLDMAN:
12        Q.  You also understand that there was a
13   placebo-controlled study done involving Alzheimer's
14   patients called the APPROVe study.  You remember
15   that?
16        MR. ROBINSON:  Objection.
17        THE WITNESS:  Vaguely.
18   BY MR. GOLDMAN:
19        Q.  That was a study that led Merck to
20   voluntarily withdraw Vioxx from the market.
21        A.  Okay.
22        Q.  That wasn't a study you had available
23   to you while you were making treatment decisions
24   for Mr. Barnett, right?
25        A.  That's correct.

Page 159

1         Q.  My question about hindsight, sir, is
2    whether when you were making your treatment
3    decisions for Mr. Barnett, you were making them
4    based on best medical information you had
5    available -- before -- that time, right?
6              When you were prescribing Vioxx to
7    Mr. Barnett, sir, you were making your treatment
8    decision based on the medical information that you
9    had available to you at the time, right?
10        A.  Correct.
11        MR. ROBINSON:  Objection, leading.
12   BY MR. GOLDMAN:
13        Q.  When you were making treatment
14   decisions for Mr. Barnett and prescribing Vioxx,
15   were you or were you not relying on the medical
16   information that was available to you at the time?
17        A.  That's correct.
18        Q.  You obviously could not have made a
19   treatment decision about whether to use Vioxx or
20   Feldene for Mr. Barnett based on the APPROVe study
21   that hadn't been completed at that time, right?
22        A.  That's correct.
23        Q.  By the way, on the New England Journal
24   of Medicine expression of concern that you were
25   sent -- remember that?

Page 160

1         A.  Is that the Bombardier?
2         Q.  Yes.
3         A.  Yes, sir.
4         Q.  Did the Plaintiff's lawyers ever send
5    you Dr. Reicin's response to what Dr. Kirschman had
6    to say about the VIGOR study?
7         A.  No.
8         Q.  Did the Plaintiff's lawyers ever send
9    you either Dr. Reicin's deposition or
10   Dr. Kirschman's deposition so that you could have a
11   complete picture of the circumstances around the
12   VIGOR publication?
13        A.  No, sir.
14        Q.  Let's move now, Dr. Mikola, to your
15   medical practice --
16        A.  Yes, sir.
17        Q.  -- just so the jury can get a better
18   understanding of the nature of your practice and,
19   in particular, what you were doing as a doctor
20   during the time that you were treating Mr. Barnett.
21        A.  For the most part, I practiced internal
22   medicine in an office setting.  Monday through
23   Friday generally I would see patients in the
24   office.  The group that I was affiliated with also
25   had a hospital service, which are a group of

Page 161

1    internists who only work in the hospital.  I would
2    do probably 10 to 20 percent of my own hospital
3    admissions in addition to the office.  The
4    hospitals would probably do 80 to 90 percent of my
5    admissions depending on how busy they were or I
6    was.  We sort of helped each other out, but they
7    saw a fair number of my patients.
8         Q.  Did you work for a outfit called the
9    Carolina Health Specialists?
10        A.  Yes, sir.
11        Q.  Can you describe that to the ladies and
12   gentlemen of the jury.
13        A.  Yes, sir.  That was a multispecialty
14   medical group at that time probably composed of
15   about 40 physicians that included internists,
16   family practitioners, rheumatologists,
17   pulmonologists, endocrinologists and ER physicians
18   in several different office locations.
19        Q.  In South Carolina?
20        A.  In South Carolina.
21        Q.  Can you tell us some of the common
22   medical problems that you treat as a physician,
23   sir.
24        A.  The common ones would include high
25   blood pressure, high cholesterol, diabetes,

41 (Pages 158 to 161)

# Michael Mikola, M.D.

**Page 162**

1  respiratory infections, routine sort of sick visits
2  to the office, predominantly what we call diseases
3  of metabolism.
4      Q.  Is it fair to say that you've had a
5  fair amount of experience treating patients who
6  have risk factors for heart disease like high
7  cholesterol?
8      A.  Yes, sir.
9      Q.  Have you also treated patients like
10  Mr. Barnett who had a condition called
11  osteoarthritis?
12      A.  Yes, sir.
13      Q.  You mentioned on your examination with
14  Mr. Barnett that you prescribed Vioxx to
15  Mr. Barnett because -- withdrawn, I think I said
16  Mr. Barnett.
17          MR. ROBINSON:  I like him.  He's my
18  buddy.
19  BY MR. GOLDMAN:
20      Q.  I believe you said in response to
21  Mr. Robinson's questions that you prescribed Vioxx
22  to Mr. Barnett because he had osteoarthritis?
23      A.  Yes, sir, that was the indication for
24  the prescription.
25      Q.  What is osteoarthritis?

**Page 163**

1      A.  Osteoarthritis is a degenerative
2  disease involving the joints summarized largely by
3  wearing out and deterioration of the cartilage
4  which serves not only as a cushion between the
5  bones so that they articulate smoothly with one
6  another, but it also makes joint fluid that bathes
7  the joint to keep the inflammation down to keep
8  movement smooth and range of motion preserved.
9      Q.  So if people have healthy cartilage,
10  that allows their bones to sort of glide over one
11  another without causing pain?
12      A.  Um-hum.  Usually, yes.
13      Q.  Do you agree that for many people,
14  including Mr. Barnett, osteoarthritis is a serious
15  health problem?
16      A.  Yes.
17      Q.  Why is that?
18      A.  Especially for someone like
19  Mr. Barnett, if their arthritis is untreated, it
20  can limit their ability to exercise and stay
21  active.  And in an individual with a family history
22  of heart disease and high cholesterol, exercise is
23  an important part of reducing his risk factors for
24  vascular disease.  It can also lead to other
25  debilitation that makes weight loss more difficult.

**Page 164**

1  If you're unable to exercise due to the pain of
2  arthritis and -- it can complicate a lot of other
3  medical issues.
4      Q.  When you said that osteoarthritis might
5  prevent individuals like Mr. Barnett from
6  exercising, why is that a problem for somebody like
7  Mr. Barnett?
8      A.  It causes them pain.  Generally if they
9  do a lot of physical activity, the joints that are
10  involved will become painful and it can limit their
11  ability to exercise, walk --
12      Q.  Ex --
13      A.  -- specifically walk.  Jogging is very
14  painful for them.  Some people can ride a
15  stationary bicycle depending on if their knees are
16  involved, but if their knees are significantly
17  involved, that may be limited as well.
18      Q.  Is it true that the more exercise
19  people like Mr. Barnett are able to do, the lower
20  their chances are of developing heart disease or a
21  heart attack?
22      A.  Yes, sir.  I would say the more
23  exercise that they do do versus able to do reduces
24  their chance of heart attacks and vascular events.
25      Q.  Has it been your experience, sir, that

**Page 165**

1  osteoarthritis can adversely affect a patient's
2  quality of life?
3      A.  Yes, sir.
4      Q.  Have you seen that osteoarthritis can
5  be so painful that it can lead to depression and
6  stress?
7      A.  Yes, sir.
8      Q.  Are you aware of whether osteoarthritis
9  is one of the most frequent causes of disability in
10  the United States?
11      A.  I know it's a frequent cause of
12  disability, yes, sir.
13      Q.  In your years of treating
14  osteoarthritis, have you tried different pain and
15  antiinflammatory medication for your patients?
16      A.  Yes, sir.
17      Q.  Have you used narcotics on occasion for
18  your patients who have osteoarthritis?
19      A.  Yes, sir.
20      Q.  Can you describe for the ladies and
21  gentlemen of the jury what the benefits and some of
22  the significant risks are of narcotics to treat
23  osteoarthritis?
24      A.  The benefits are that they're very
25  effective in terms of pain control.  Typically

Michael Mikola, M.D.

### Page 166

1  there is sort of a ceiling effect of
2  antiinflammatory medicines on how much pain they
3  will relieve and in some patients -- and I've used
4  both together. Some patients are not adequately
5  relieved by antiinflammatory medicines and
6  nonnarcotic analgesics. And the narcotics are more
7  potent and they're able to provide relief of more
8  severe pain generally than the antiinflammatory
9  medicines are.
10        Some of the complications, constipation
11  is a very common problem, impairment in
12  coordination. In elderly persons, narcotics can
13  increase the risk of falling and having fractured
14  bones as a result and more commonly in elderly
15  patients, it can cause confusion. I should say
16  confusion is more common in elderly patients
17  treated with narcotics.
18     Q.  Can narcotics also be addictive?
19     A.  Yes, sir.
20     Q.  Can they also impair thinking of those
21  who take them?
22     A.  Yes, sir.
23     Q.  Can narcotics also have a side effect
24  of causing drowsiness?
25     A.  Yes, sir.

### Page 167

1     Q.  Have you also used aspirin in trying to
2  treat osteoarthritis?
3     A.  Very rarely.
4     Q.  Why is that?
5     A.  Generally the dose of aspirin necessary
6  to treat the symptoms of osteoarthritis have a
7  higher risk of causing gastrointestinal problems
8  than effective doses of especially specifically
9  COX-2 inhibitors.
10     Q.  What are some of the gastrointestinal
11  problems that you understand aspirin can cause?
12     A.  Gastritis, which is an inflammation in
13  the lining of the stomach. It can cause gastric
14  erosions and ulcerations and they can also cause --
15  or aspirin can also cause intestinal ulceration as
16  well.
17     Q.  Can aspirin also cause stomach bleeds?
18     A.  Yes, sir.
19     Q.  Have you also tried prescribing
20  traditional or nonselective NSAIDs?
21     A.  Yes, sir.
22     Q.  Which NSAIDs have you prescribed to
23  your patients in the past, sir, if you can remember
24  them?
25     A.  Relafen, which is nabumetone,

### Page 168

1  Piroxicam, Voltaren, which is diclofenac, Clinoril,
2  which is sulindac, Naproxen, ibuprofen, Ketorolac,
3  salicylate of magnesium or magnesium salicylate,
4  which is a nonacetylated salicylate similar to
5  aspirin but a little bit different.
6     Q.  I don't understand what that means.
7  Can you --
8     A.  It's the way the molecule is produced
9  chemically. It is in theory a little bit less
10  likely to cause stomach ulceration than plain
11  aspirin in theory.
12     Q.  Okay.
13     A.  And I think those are probably the main
14  ones.
15     Q.  Do you still prescribe most of those
16  NSAIDs today?
17     A.  Not that often since Advil and Aleve
18  are over-the-counter now. I usually would
19  prescribe the over-the-counter medication because
20  it's a lot less expensive for most folks. And I do
21  also prescribe some Celebrex still.
22     Q.  Can you describe some of the potential
23  side effects of NSAIDs that you've seen in your
24  practice, sir.
25     A.  Same -- it would be essentially the

### Page 169

1  same as aspirin, stomach problems including --
2  ranging from ulcers to bleeding. They can
3  occasionally raise blood pressure. It can cause
4  edema.
5     Q.  What is edema?
6     A.  Swelling, fluid retention, most
7  prominently seen around the ankles.
8     Q.  Can they cause kidney complications as
9  well?
10     A.  Yes, sir.
11     Q.  Are you aware that the stomach
12  complications of NSAIDs can be a serious health
13  problem?
14     A.  Yes, sir.
15     Q.  Do you know, sir, and did you while you
16  were prescribing Vioxx to Mr. Barnett that
17  thousands of people are hospitalized or die each
18  year from GI bleeds as a result of taking NSAIDs?
19        MR. ROBINSON: Objection.
20        THE WITNESS: Yes, sir.
21  BY MR. GOLDMAN:
22     Q.  When did you start prescribing COX-2
23  inhibitors or selective NSAIDs?
24     A.  Probably within a few months of their
25  introduction into the United States market. I

43 (Pages 166 to 169)

Michael Mikola, M.D.

Page 170

1  don't remember the exact year. I believe Vioxx and
2  Celebrex came to market relatively close in time.
3  If I remember correctly, within a few months after
4  they hit the US market or were approved by the FDA
5  for sale in the United States.
6      Q.  Why did you prescribe Celebrex and
7  Vioxx rather than traditional NSAIDs for some of
8  your patients?
9      A.  Generally because I believed that the
10 safety specifically for gastrointestinal
11 complications was superior with the COX-2
12 inhibitors versus the traditional nonselective
13 NSAIDs.
14     Q.  And do you know why that is that COX-2
15 inhibitors are more beneficial to the stomach than
16 traditional NSAIDs?
17     A.  COX-2 inhibition reduces
18 inflammation -- generally reduces inflammation.
19 COX-1 inhibition reduces the production of
20 prostaglandin E2, which is a prostaglandin
21 necessary for the stomach to make a protective
22 mucous coating, and if you block that prostaglandin
23 with a nonselective agent, number one, the stomach
24 is unable to make the protective mucouses
25 effectively and it makes them prone to develop

Page 171

1  erosions and ulcerations from the stomach acids.
2      Q.  Did you consider the availability of
3  COX-2 inhibitors to be a major advance for the
4  treatment of arthritis and acute pain?
5      A.  In terms of GI safety, yes.
6      Q.  Can you describe, sir, your general
7  experience with Vioxx while you were prescribing it
8  when it was on the market, sir?
9      A.  I had very good success with it.
10 Occasionally I would see some patients with stomach
11 upset and GI side effects. If I -- and don't quote
12 me on the number, but I saw over the course of
13 several years maybe three or four patients with GI
14 bleeding, but for the most part, it was very well
15 tolerated, very effective. In my experience
16 treating patients with COX-2 inhibitors or
17 nonselective agents, much of the treatment
18 unfortunately is sort of trial and error. Some
19 people will get a really good response to one drug
20 and not such a good response to another. So you'll
21 generally put them on one. If they do well on it,
22 continue it, if not, then we'll switch to another.
23     Q.  Were you pleased while you were using
24 Vioxx to have it as a choice to treat patients
25 with?

Page 172

1      A.  Yes, sir.
2      Q.  Did you feel that Vioxx was effective
3  at treating pain?
4      A.  Yes, sir.
5      Q.  Did you feel that Vioxx allowed
6  patients to lead more active and functional lives?
7      A.  Yes, sir.
8      Q.  Did you feel that Vioxx was more
9  tolerable than many of the other NSAIDs?
10     A.  Yes, sir.
11     Q.  Did you also feel while you were
12 prescribing Vioxx that some patients who could not
13 tolerate Celebrex or Bextra would do better on
14 Vioxx?
15     A.  That's a possibility, yes.
16     Q.  The COX-2 inhibitors that you
17 prescribed over time include Vioxx and Celebrex?
18     A.  And Bextra.
19     Q.  Let me ask it this way --
20     A.  Okay.
21     Q.  -- what COX-2 inhibitors have you
22 prescribed, sir?
23     A.  Celebrex, Vioxx and Bextra.
24     Q.  You prescribed Celebrex and Bextra even
25 though your wife worked as a sales representative

Page 173

1  at Merck?
2      A.  Correct.
3      Q.  Why is that?
4      A.  My first alliance is to my patients'
5  health and benefit and Vioxx doesn't work for -- as
6  I mentioned before, one drug doesn't work for
7  everyone. And some people either had side effects
8  or didn't get improvement with Vioxx and I would
9  use the others.
10     Q.  Mr. Robinson asked you about whether
11 your wife -- what's her name, Sharon?
12     A.  Sharon.
13     Q.  -- whether Sharon made sales calls or
14 detailed you on Vioxx. Do you remember that?
15     A.  She generally did not.
16     Q.  Why not?
17     A.  It was Merck policy because of our
18 relationship that she not call on me. I was -- she
19 called on my partners and she could come in the
20 office, but she wasn't supposed to sample or detail
21 me if I remember correctly.
22     Q.  Did she?
23     A.  No.
24     Q.  Would it be uncomfortable?
25     A.  She -- she -- she may have come by a

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

Page 174

1   couple times, but she generally didn't detail me.
2   I helped her study to some degree for a lot of the
3   products that she learned about so I kind of
4   already got detailed, you know.
5        Q.   Was your wife's job as a sales
6   representative for Merck ever a factor in your
7   decision to prescribe Vioxx to your patients?
8        A.   Was it a factor.  I would say that if I
9   had a patient who would benefit from a COX-2
10  inhibitor and at that time, and to this day I still
11  probably don't believe that any of the three that
12  were available were more effective than the others,
13  I may be inclined to use Vioxx first, but if -- as
14  I mentioned, if it didn't work for the patient, I
15  would not hesitate to switch them or if a patient
16  came in, for instance, and asked for Celebrex or --
17  or Bextra, I would not be opposed to putting them
18  on it first.
19       Q.   Did your decision to recommend that
20  Mr. Barnett use Vioxx have anything to do with your
21  wife being a sales representative for Merck?
22       A.   No, sir.
23       Q.   If Mr. Barnett --
24       A.   That's -- I did not start Mr. Barnett
25  on Vioxx, Dr. McCaffrey did.

Page 175

1        MR. ROBINSON:  And we're not claiming
2   that I'll just tell you.  McCaffrey started him.
3        THE WITNESS:  Due to the fact that it
4   was working well for him at that time and I felt it
5   was a safe drug, I didn't see any reason to change
6   it.
7   BY MR. GOLDMAN:
8        Q.   If there's a suggestion at trial that
9   you prescribed Vioxx to Mr. Barnett because your
10  wife sells Vioxx -- or sold Vioxx at Merck, would
11  that be accurate, sir?
12       A.   That would not be accurate.
13       Q.   You were also -- withdrawn.
14            You also prescribed Bextra and Celebrex
15  even though you participated in certain programs
16  for Merck, right?
17       A.   Yes, sir.
18       Q.   Remember you were asked about whether
19  you were a speaker for Zocor?
20       A.   I was asked if I was a speaker for
21  Vioxx and I stated not to my recollection, I was a
22  speaker for Zocor -- for Merck about the drug
23  Zocor.
24       Q.   Were you compensated, sir, for your
25  time when you were a speaker for Zocor?

Page 176

1        A.   Yes, sir.
2        Q.   Was there anything inappropriate in
3   your mind about being compensated for your time?
4        A.   No, sir.
5        Q.   Why not?
6        A.   My compensation involved educational
7   programs with other physicians.  For instance, I
8   generally would go to their office -- to another
9   physician groups' office at lunch and talk to them
10  about Vioxx and give them information, answer
11  questions, so I really was, you know, basically
12  providing a consulting service to some extent.
13       Q.   Why did you want to do that, sir?
14       A.   Mainly because my wife asked me to.
15       Q.   Did you think --
16       A.   But I have spoken for other
17  pharmaceutical companies that my wife didn't work
18  for.  It's -- it's an alternative source of some
19  income that gives you a break from the daily grind,
20  so to speak, and it also is a good way to learn
21  more about the products and the class of drugs.
22       Q.   Have you participated in programs that
23  other pharmaceutical companies have had?
24       A.   Yes, sir.
25       Q.   Have you been a speaker for companies

Page 177

1   like Pfizer.
2        A.   I have not -- don't believe I've spoken
3   for Pfizer.
4        Q.   But you have for other pharmaceutical
5   companies?
6        A.   I've spoken for Bayer Pharmaceuticals
7   and I've spoken for Coast Pharmaceuticals.  I think
8   those are the main ones.
9        Q.   Were you compensated for your time by
10  those pharmaceutical companies?
11       A.   Yes, sir.
12       Q.   Did you feel that when you were a
13  speaker for Merck concerning Zocor that you had to
14  prescribe Zocor to your patients?
15       A.   No, sir.
16       Q.   Even though you were a speaker for
17  Merck and you were compensated for speaking about
18  Zocor, did that influence you in deciding whether
19  to prescribe Zocor to your patients?
20       A.   No, sir.  I should say that part of the
21  reason that I spoke on behalf of Zocor is because I
22  believed it was an effective drug and that's the
23  reason that I prescribed it.  I wouldn't speak for
24  a drug that I didn't believe in, that I didn't
25  believe was effective or safe.  So I guess there is

45 (Pages 174 to 177)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 178**

1 some relationship, but it's probably inverse of
2 what you asked.
3    Q. Tell me how it's inverse.
4    A. I didn't — I didn't write Zocor
5 because I was paid to speak for it. I spoke on
6 behalf of Zocor because I believed it was a good
7 drug and that's why I prescribed it.
8    Q. You were also asked questions, sir,
9 about visits by sales representatives?
10    A. Yes, sir.
11    Q. You were shown a document that
12 contained a number of visits by sales
13 representatives, some of which were detailing Vioxx
14 and some detailing other Merck products, right?
15    A. Correct.
16    Q. Has it been your experience that large
17 pharmaceutical companies like Merck employ a fair
18 number of sales representatives to try to detail
19 their drugs?
20    A. Gracious plenty.
21    Q. Too many?
22    A. Yes, sir, a gracious plenty.
23    Q. Has it been your experience, sir, that
24 it's common in the pharmaceutical industry for
25 sales representatives to try to sell medicine that

**Page 179**

1 they think would help patients?
2    A. Yes, sir.
3    Q. I think you mentioned that on any given
4 day, there might be up to five sales
5 representatives in your office at once?
6    A. Ten to 15, um-hum.
7    Q. And that's not all for Merck?
8    A. That's correct.
9    Q. Did you see anything wrong with Merck
10 or these other pharmaceuticals companies sending
11 out their sales representatives to try to promote
12 their products to you?
13    A. No, sir. It's pretty much the nature
14 of the business.
15    Q. How would you describe your
16 interactions with the Merck sales representatives
17 who were dealing Vioxx?
18    MR. ROBINSON: I'm going to stipulate
19 that he likes at least one of them very — very
20 deeply. Do you mean the other ones?
21 BY MR. GOLDMAN:
22    Q. Apart from your relationship with your
23 wife, how would you describe your interactions with
24 Merck representatives while you were selling Vioxx?
25    A. Very --

**Page 180**

1    Q. I'm sorry, withdrawn.
2    A. Yes.
3    Q. How would you describe your
4 interactions with Merck sales representatives who
5 were detailing Vioxx other than your wife?
6    A. Generally not only Merck but most of
7 the pharmaceutical reps I would typically prefer
8 not to be detailed to extent and generally I would
9 ask them for copies of the original articles from
10 which they drew their detail pieces.
11    When you practice medicine, I'll see
12 the Pfizer rep come in and tell me why Lipitor is
13 the best drug. Three minutes later, the Merck rep
14 comes in and tells me why Zocor is the best drug.
15 Three minutes later, the Novartis rep will come in
16 and tell me why Lescol is the best drug. They
17 can't all be right. They have a lot of glossies
18 and detail pieces which contain factual
19 information, but it generally doesn't contain all
20 the information available. So I would generally
21 ask that they not particularly detail me but
22 present me with the original articles from -- that
23 I could read it and draw my own conclusion.
24    Q. Was that your practice while you were
25 prescribing Vioxx, sir?

**Page 181**

1    A. Yes, sir.
2    Q. Did you find that Merck sales
3 representatives were professional with you?
4    A. Yes, sir.
5    Q. Did you feel that they were trying to
6 hide any information about safety?
7    A. No, sir.
8    Q. Did any representative of Merck ever
9 refuse to answer or avoid questions you had about
10 Vioxx?
11    A. If I had questions that they could not
12 answer, they would -- either because they didn't
13 know the answer or they weren't allowed to speak
14 off label, they would generally submit my question
15 to Merck for a written response so no.
16    Q. What do you mean when you say they
17 could not speak about Vioxx off label?
18    A. As I understand it, the FDA has rules
19 and regulations about what drug reps can and can't
20 say to physicians. They are allowed to give you
21 information from the package insert, but in order
22 for them to present us with a detail piece of
23 information, it has to be approved first by either
24 the FDA or some regulatory board to make sure that
25 they don't presumably pass misinformation.

Michael Mikola, M.D.

Page 182

1    Q.  Did you find that Merck sales
2  representatives who were detailing you on Vioxx
3  were responsive to your questions?
4    A.  Yes, sir.
5    Q.  Did you ever feel that Merck sales
6  representatives were dodging or trying to avoid
7  your questions?
8    A.  No, sir.
9    Q.  In fact, as you mentioned a minute ago
10  and I think Mr. Robinson used this as Exhibit 23,
11  sales representatives would suggest to Merck that
12  they send you letters about products like Vioxx?
13    A.  In response to my questions, correct.
14    Q.  And in each of the letters that you
15  would receive in response, they would include the
16  package insert that was approved by the FDA?
17    A.  Typically, yes.
18    Q.  And typically Merck would include
19  references that were cited in the letters to you?
20    A.  Yes, sir.
21    Q.  Did you find the letters — withdrawn.
22      Was it helpful to you to be able to
23  obtain scientific information directly from Merck
24  *about questions you had rather than a sales*
25  representative?

Page 183

1    A.  Yes.
2    Q.  Why is it that --
3      MR. ROBINSON:  Go ahead.
4      THE WITNESS:  I mean, there's more
5  information — more detailed information available
6  in a printed handout that I received than a rep
7  would be able to memorize in all likelihood and
8  spew back.  It wouldn't have mattered to me if it
9  came directly from rep -- from Merck or if the rep
10  had an article in their hand and gave you the same
11  package.  So the source — it was nice to be able
12  to have the information, but whether it came from
13  Merck directly or the rep it didn't matter, if that
14  makes sense.
15  BY MR. GOLDMAN:
16    Q.  It does.  Let's talk a little bit, sir,
17  about your practice when you prescribe medications,
18  okay?
19    A.  Yes, sir.
20    Q.  When you prescribe medications to
21  patients, do you make a risk-benefit assessment of
22  the drug that you're prescribing?
23    A.  Yes, sir.
24    Q.  Can you explain what that means.
25    A.  Yes.  As I alluded earlier, all drugs

Page 184

1  have potential side effects and most drugs
2  hopefully that we -- all drugs hopefully that we
3  prescribe have potential benefits.  And when you --
4  or when I prescribe a drug to a patient, I evaluate
5  the potential risks versus the potential benefits.
6  Generally I'll discuss it with the patient and then
7  you come up with a decision regarding whether that
8  drug is appropriate for that patient or that the
9  benefits outweigh the risks basically.
10    Q.  Are there risks with every medicine
11  that's sold in the United States?
12    A.  Yes, sir.
13    Q.  Do you attempt to weigh those risks,
14  however tiny, against the benefits of a medicine
15  and make the best medical judgment you can?
16    A.  Yes, the -- the — if you have a drug
17  that has a lot of potential benefit and a very,
18  very, very rare but serious complication, from a
19  statistical standpoint, patients are much more
20  likely to get the benefit from the side -- adverse
21  effect even though the adverse effect may be
22  serious.  So the frequency of adverse effects is
23  important to determine the ratio.
24    Q.  Is it true that people have died while
25  taking aspirin?

Page 185

1    A.  Yes, sir.
2    Q.  Is aspirin a medicine that you
3  *prescribe quite often despite the risk of death?*
4    A.  Yes, sir.
5    Q.  That's an example where a serious side
6  effect might not occur very often and therefore you
7  determine that the benefits of the medicine
8  outweigh those risks?
9    A.  Yes, we believe *that the benefits would*
10  outweigh the risks.
11    Q.  Is it true that FDA-approved package
12  inserts are one of your primary sources of
13  information concerning the benefits and risks of
14  medicines you prescribe?
15    A.  Yes, sir.
16    Q.  When you review package inserts for
17  medicines you prescribe, you make sure you're
18  familiar with all aspects of the package insert,
19  right?
20    A.  I read the all package — all aspects
21  of the package insert, yes, sir.
22    Q.  So for Vioxx you make it a point to
23  review the contraindications, the warnings and the
24  precautions section, right?
25    A.  Yes, sir.

47 (Pages 182 to 185)

## Michael Mikola, M.D.

**Page 186**

1    Q.   Do you also monitor a -- well,
2  withdrawn.
3         You were asked a number of questions
4  about e-mails that were internal within Merck.
5  Remember that?
6    A.   Yes, sir.
7    Q.   And you were asked questions, did Merck
8  ever show you this information.  Do you remember
9  those questions?
10   A.   Yes, sir.
11   Q.   There were articles that were in the
12 public domain that you were asked about and
13 Mr. Robinson said, did Merck ever show you this
14 article, right?
15   A.   Correct.
16   Q.   As a physician, I assume that you don't
17 have time to review e-mails from every drug company
18 that makes medicine in the United States, do you,
19 sir?
20   A.   That's correct.  Correct.
21   Q.   Do you rely on the Food and Drug
22 Administration to review the scientific data about
23 a medicine and determine what the risks and the
24 benefits are?
25   A.   To a very large extent, yes, sir.

**Page 187**

1    Q.   Because you're not capable of reviewing
2  every e-mail or every theory that somebody within a
3  drug company might have?
4    A.   That's correct.
5    Q.   And as a responsible physician, you
6  *expect that the Food and Drug Administration will*
7  take all studies into account in deciding what the
8  risks and the benefits are for medications sold in
9  the US?
10   A.   All studies presented to the FDA, yes.
11   Q.   Mr. --
12   A.   I don't know if all studies are
13 presented to the FDA.  I would assume studies done
14 in other countries may not be, but...
15   Q.   It's your expectation that -- do you
16 expect that the Food and Drug Administration would
17 be familiar with all the clinical trials concerning
18 a medicine that they approve as safe and effective?
19   A.   I would certainly hope so.
20   Q.   When you prescribe a medication to your
21 patients, do you monitor them to see if they're
22 experiencing any side effects?
23   A.   Generally, yes, sir.
24   Q.   If a patient were experiencing an
25 adverse side effect on a medication you prescribed,

**Page 188**

1  would you take that patient off of that medicine?
2    A.   If the adverse side effect was
3  potentially serious or if the severity of the side
4  effect outweighed the benefit of the drug, yes.
5  For instance, I'll pick edema.  Edema or swelling
6  in the ankles is a -- is a common side effect of
7  many medicines, ranging from blood pressure
8  *medicines to arthritis medicines to diabetes*
9  medicines.  Many people will get edema and it's
10 very mild, but in many cases, keeping their blood
11 pressure under control or their diabetes under
12 control is thought to confer more health benefit
13 than the adverse effect that edema can cause.  So
14 the risk-benefit ratio still pertains.
15   Q.   If an adverse event is serious and you
16 see a patient experiencing one on a medication,
17 then you would determine whether or not the
18 medicine was causing the side effect and take that
19 person -- person off if you determined that it was?
20   A.   If I determined that it was, yes.
21   Q.   Let's turn now to Mr. Barnett and talk
22 about his medical condition, okay?
23   A.   Okay.
24   Q.   Did you first meet Mr. Barnett on
25 October 22nd of 1999?

**Page 189**

1    A.   Yes, sir, my first office visit with
2  him is when we first met.
3    Q.   Were you Mr. Barnett's primary care
4  physician from October 22nd of 1999 until about May
5  of 2004?
6    A.   Yes, sir.
7    Q.   Were you familiar with Mr. Barnett's
8  medical condition during that time?
9    A.   Yes, sir.
10   Q.   Did you find that Mr. Barnett was a
11 careful patient who would come to you if he was
12 experiencing a problem?
13   A.   Yes, sir.
14   Q.   If Mr. Barnett were experiencing angina
15 or heart pain, he would make it a point to tell you
16 about that, right?
17   A.   Usually.  Not always.  But Mr. Barnett
18 is a very complicated case in the fact that he had
19 *more than one potential cause for chest pain.*  He
20 had known esophageal disease.  Esophageal spasm,
21 which is common -- can be common in people with
22 reflux, is almost identical to angina in terms of
23 the symptoms and it's very difficult in many
24 patients to differentiate the two.  He also had a
25 fairly high anxiety level and as you may remember

Michael Mikola, M.D.

Page 190

1  from Dr. Pamela Pyle's note, that was the first
2  time she had ever seen him, she noted that he was
3  very anxious. Anxiety can cause chest pain.
4        So he had several things going on at
5  one time that can manifest as chest pain and he had
6  several different patterns of chest pain so in his
7  case, it was very difficult to try to determine is
8  his chest pain from the esophagus. Sometimes it
9  got better with Prilosec and sometimes it didn't.
10  Is it anxiety, is it angina. It was -- it was very
11  unclear in Mr. Barnett's case.
12        Q.  And we'll go through some of his
13  records and see what judgments you made --
14        A.  Okay.
15        Q.  -- and what you thought about his
16  particular chest pain on a given occasion, okay?
17        A.  Um-hum.
18        Q.  Let me hand to you what I'll mark --
19        VIDEO TECHNICIAN:  We will now go off
20  the record. The time is approximately 2:20 PM.
21        (Off-the-record conference.)
22        (DFT. EXH. 30, Carolina Health
23  Specialists medical records for Gerald Barnett, was
24  marked for identification.)
25        VIDEO TECHNICIAN:  We're back on the

Page 191

1  record. The time is approximately 2:22 PM.
2  BY MR. GOLDMAN:
3        Q.  Mr. Mikola -- I'm sorry, Dr. Mikola,
4  I've handed you Exhibit 30, which appears to be a
5  set of Mr. Barnett's medical records from your
6  former office, doesn't it?
7        A.  That's correct.
8        Q.  Rather than refer to some of the
9  exhibits that Mr. Robinson used, I'm going to refer
10  quite often to Exhibit 30 and ask you to go to
11  particular pages referenced at the bottom Huberty
12  and then a number --
13        A.  Yes, sir.
14        Q.  -- okay? Starting on the first page,
15  October 22nd of 1999, this is the first day that
16  Mr. Barnett came to see you?
17        A.  Yes, sir.
18        Q.  What do you do when a patient first
19  comes to see you?
20        A.  Generally we do what's called a history
21  and physical, which basically entails taking a
22  history of their previous medical problems, current
23  medications, drug allergies, family history and
24  current symptoms. After that we'll do an exam -- a
25  physical examination and typically develop a plan

Page 192

1  for their ongoing healthcare and any acute needs
2  that they have at the time.
3        Q.  The first two pages of Exhibit 30 are
4  your office notes from that first visit with
5  Mr. Barnett, right?
6        A.  That's correct.
7        Q.  Turning your attention in the first
8  page to past medical history, do you see the first
9  entry, elevated lipids?
10        A.  Yes, sir.
11        Q.  What does that mean?
12        A.  That means his cholesterol has been
13  high in the past.
14        Q.  Was that important to you when you were
15  evaluating Mr. Barnett's health?
16        A.  Yes, sir.
17        Q.  Why?
18        A.  Because it is a risk factor for the
19  development of vascular disease. And an important
20  part of what I do on a daily basis, or at least try
21  to do, is prevent health consequences of modifiable
22  things like that.
23        Q.  When somebody has elevated lipids or
24  high cholesterol, you're concerned that that might
25  be a risk factor for heart disease or a heart

Page 193

1  attack?
2        A.  Yes, sir.
3        Q.  The second entry says, disc bulge in
4  the cervical spine times three.
5        A.  Yes, sir.
6        Q.  Can you describe what that means, sir.
7        A.  Yes, that would mean that he has three
8  bulging discs in the neck. The spine -- cervical
9  spine is the spine in the neck.
10        Q.  Did the bulging discs in Mr. Barnett's
11  neck cause him pain?
12        A.  Yes, sir.
13        Q.  Was that one of the ways that his
14  arthritis would manifest itself?
15        A.  Yes, sir. That's probably not
16  accurate. It is one of the causes of his pain.
17  Disc bulge and arthritis are two different
18  processes. They can occur concomitantly, but they
19  are not necessarily related.
20        Q.  When you prescribed Vioxx eventually
21  for Mr. Barnett, was one of the reasons you
22  prescribed it because he had neck pain as a result
23  of his bulging discs?
24        A.  That's correct.
25        Q.  What is the third entry under past

49 (Pages 190 to 193)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 194**

1  medical history?
2       A.  Gastroesophageal reflux.
3       Q.  Can you briefly describe what that
4  means.
5       A.  That's a condition where stomach
6  contents, including stomach acid, moves from the
7  stomach back up into the esophagus. The stomach is
8  made to handle acid that it produces, it has
9  protective mucous as I mentioned before. The
10  esophagus is not able to handle repeated exposures
11  to acid without potential problems.
12       Q.  And what are the problems?
13       A.  Esophageal stricture, which is a
14  narrowing in the esophagus. Heartburn is a very
15  common symptom and it can also increase the risk of
16  malignancy in the esophagus, cancer, in certain
17  patients.
18       Q.  Did Mr. Barnett struggle to control his
19  reflux while he was seeing you?
20       A.  He had symptoms that were consistent
21  with reflux while he saw me, yes, despite taking
22  medicine for it.
23       Q.  You also wrote here, lumbar bulging
24  disc. Can you describe what that is.
25       A.  That's a disc in the lower spine, in

**Page 195**

1  the lower part of the back that's also moved out of
2  its normal position slightly called a bulge,
3  bulging disc.
4       Q.  Did that cause Mr. Barnett back pain?
5       A.  That would cause -- yes, it caused low
6  back pain.
7       Q.  Was one of the reasons that you
8  prescribed Vioxx to Mr. Barnett the fact that he
9  had a bulging disc in his lower back and was
10  suffering back pain?
11       A.  That's correct.
12       Q.  Can you briefly describe Number 5.
13       A.  Yes, that's esophageal dilatation,
14  which is a procedure -- when people develop a
15  narrowing in their esophagus most commonly related
16  to reflux, the esophagus will almost develop some
17  scarring and it gets narrowed. And when people
18  swallow food, will get stuck and it can be painful
19  to swallow. Dilatation is when the
20  gastroenterologist passes a flexible scope down
21  into the esophagus, blows up a balloon and dilates
22  or widens the esophagus.
23       Q.  Why does he do that?
24       A.  To restore the patency to the esophagus
25  so they can swallow and the food doesn't get stuck

**Page 196**

1  and it's not as painful to swallow. That's a --
2  stricture is a complication of reflux disease and
3  the dilatation is the -- one of the treatments for
4  it. And sigmoidoscopy in 1997 is a screening test
5  for colon cancer.
6       Q.  By the way, Mr. Barnett was never
7  diagnosed with colon polyps, was he?
8       A.  Let me look at the records. I do not
9  believe that he was diagnosed with colon polyps,
10  that's correct. He had diverticulosis in the colon
11  but no polyps.
12       Q.  In light of the fact that -- withdrawn.
13          Was it important to you in deciding to
14  prescribe Vioxx to Mr. Barnett the fact that he had
15  reflux and he had these stomach-related problems
16  and you knew that Vioxx as a COX-2 inhibitor would
17  be more beneficial on his stomach than traditional
18  NSAIDs?
19       A.  I can't say that NSAIDs or Vioxx affect
20  reflux, but the reduction in complications between
21  the two classes of drugs is mainly in terms of
22  stomach symptoms and ulcers and bleeding.
23       Q.  Let's look at the next section of your
24  first meeting with Mr. Barnett under family
25  history. Can you please read 1, 2 and 3.

**Page 197**

1       A.  Yes, sir. His mom is alive at 84 and
2  healthy except for hypertension and mini strokes.
3  That's a layman's term for TIA's, transient
4  ischemic attacks.
5       Q.  What is a transient ischemic attack?
6       A.  It's a stroke that doesn't result in
7  permanent damage. The body's clot-dissolving
8  system is able to dissolve the clot that's formed.
9  We have a clot-forming and a clot-dissolving
10  system. When a clot forms, our body is able to
11  dissolve it before it causes permanent damage to
12  the brain so you'll develop stroke symptoms that
13  resolve in less than 24 hours and they don't leave
14  permanent neurologic damage.
15          Father died at 68 of coronary disease
16  and possible hypertension. Sister with mini
17  strokes at age 45 who is not a smoker.
18       Q.  You can read 4 and 5 also.
19       A.  Other siblings are healthy and there is
20  a family history of reflux.
21       Q.  Did Mr. Barnett tell you these things
22  about his family history when you first met him in
23  October of 1999?
24       A.  Yes, sir.
25       Q.  Was it significant to you that his

50 (Pages 194 to 197)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 198**

```
 1   mother had TIA's, hypertension, his father had died
 2   of coronary disease and possibly hypertension and
 3   his sister had mini strokes at age 45?
 4        A.  Yes, sir.
 5        Q.  Why?
 6        A.  It tells me that he may be genetically
 7   at higher risk of having vascular disease.
 8        Q.  Was it your belief --
 9        A.  I should say arterial vascular disease.
10        Q.  Was it your belief, Dr. Mikola, that
11   Mr. Barnett was at risk of heart disease and a
12   heart attack given his family history?
13        A.  Yes, sir.
14        Q.  Did you subsequently become aware that
15   Mr. Barnett's father also had a nonfatal heart
16   attack in his fifties or early sixties?
17        A.  My notes say that he had coronary
18   disease.  I don't know from this note if it was a
19   nonfatal MI.  It could have been bypass surgery,
20   angioplasty stint or a heart attack.  Those would
21   all be classified as coronary disease.
22        Q.  When we get to some of the later
23   records, I'll show you some of the entries and
24   maybe that will refresh your recollection --
25        A.  Okay.
```

**Page 199**

```
 1        Q.  -- about Mr. Barnett's family history.
 2        A.  Okay.
 3        Q.  On Page 2, sir, under assessment and
 4   plan, you indicate, osteoarthritis.  Continue
 5   Feldene.  He takes it fairy regularly and it seems
 6   to be effective for him.  Do you see that?
 7        A.  Yes, sir.
 8        Q.  The reason that you wanted him to
 9   continue Feldene was because at that point at
10   least, it seemed to be doing a good job?
11        A.  Correct.
12        Q.  You didn't choose to switch Mr. Barnett
13   to Vioxx because your wife worked at Merck or
14   because sales representatives had called on you
15   about Vioxx?
16        MR. ROBINSON:  I'm going to object,
17   that's ambiguous.  Could you read that back, the
18   question.
19   BY MR. GOLDMAN:
20        Q.  I'll ask it differently.  New question.
21        In October of 1999 when you first met
22   Mr. Barnett and he was doing well on Feldene, did
23   you switch him to Vioxx at all?
24        A.  No, sir.
25        Q.  You didn't switch him to Vioxx because
```

**Page 200**

```
 1   Sharon worked at Merck, right?
 2        A.  I didn't switch him to Vioxx at all,
 3   that's right.
 4        Q.  You recommended that Mr. Barnett stay
 5   on Feldene because at that point at least, you felt
 6   it was in his best interest to do so?
 7        A.  Yes, sir.  It had been effective for
 8   him and he seemed to be tolerating it without any
 9   apparent adverse effects.
10        Q.  When -- withdrawn.
11        I think earlier you said that
12   Dr. McCaffrey is the physician who first prescribed
13   Vioxx to Mr. Barnett?
14        A.  Yes, sir.
15        Q.  Did Mr. Barnett ever tell you, sir,
16   that he wanted to be on Celebrex because of
17   advertisements he had seen but that Dr. McCaffrey
18   was urging him to stay on Vioxx?
19        A.  I don't recall that conversation.
20        Q.  Did Mr. Barnett ever tell you he felt
21   Dr. McCaffrey was pushing him to use Vioxx even
22   though he had requested Celebrex?
23        A.  No, sir.
24        Q.  If you felt that Celebrex or Feldene or
25   another drug were a better choice for Mr. Barnett,
```

**Page 201**

```
 1   you would have suggested what?
 2        A.  What I would have suggested, I would
 3   have likely given him samples of one of the two,
 4   either Celebrex or Feldene.  Probably wouldn't have
 5   given him samples of Feldene because we already
 6   know it's effective.  I would have given him
 7   samples of Celebrex and said, take it for two
 8   weeks.  If it's as effective, either you or I
 9   should talk to Dr. McCaffrey about changing it
10   because I think this is a safer drug.
11        Q.  Did Mr. Barnett ever ask you to switch
12   him to Celebrex or some other medication because of
13   advertisements he saw?
14        A.  I think he did at one point, let me
15   refer to the records.
16        Q.  Well, let me make sure that you are
17   with me on the question.
18        A.  Okay.
19        Q.  My question is:  Did Mr. Barnett ever
20   approach you and say, I saw advertisements about
21   Celebrex on TV?
22        A.  I don't believe so.
23        Q.  Will you switch me?
24        A.  I don't believe so.
25        Q.  It's unclear when Mr. Barnett began
```

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

## Page 202

1  using Vioxx, sir, but he says January 10th or
2  January 11th, okay?
3      MR. ROBINSON: Actually, he said
4  January 10th. You tried to say January 11th so
5  we're going to stick with the 10th.
6  BY MR. GOLDMAN:
7      Q. Well, Mr. Barnett said either January
8  10th or January 11th, but for our purposes, let's
9  just say January 10th of 2000, okay?
10     A. Okay. All I can tell you is between --
11 according to my notes, January 27, 2000, continue
12 Feldene, 20 milligrams a day, so he had not
13 informed me that he had changed as of that date.
14     Q. Was it your understanding that as of
15 January 27, 2000, Mr. Barnett was taking Feldene
16 and not Vioxx?
17     MR. ROBINSON: Objection.
18     THE WITNESS: That's my understanding.
19     MR. ROBINSON: That's from your record,
20 right?
21     THE WITNESS: Correct.
22     MR. ROBINSON: Okay.
23     THE WITNESS: And then March 21st,
24 2000, he is on Vioxx. So from my records, it was
25 sometime between those two dates.

## Page 203

1  BY MR. GOLDMAN:
2      Q. I believe your first prescription of
3  Vioxx for Mr. Barnett was on December 28th of 2001
4  based on those pharmacy records we reviewed
5  earlier?
6      A. That's very possible.
7      Q. Even though Dr. McCaffrey was the
8  physician who first suggested Vioxx to Mr. Barnett,
9  did you concur that Vioxx was an appropriate
10 medication for him?
11     A. Yes, sir.
12     Q. You then continued to refill Vioxx for
13 Mr. Barnett until he stopped using it?
14     A. Yes, sir.
15     Q. How often did you tell Mr. Barnett to
16 use Vioxx, sir?
17     A. I don't know if it's documented. I do
18 recall seeing one entry in the record that says
19 he's using it on an as-needed basis. Generally in
20 someone with discogenic pain and arthritis and
21 their problem is a daily -- pretty close to daily,
22 generally I would tell people to use the lowest
23 effective dose. If you can get by on two times a
24 week, take it a few times a week. If you need it
25 every day, take it every day.

## Page 204

1      Q. Did you tell Mr. Barnett at any point
2  that he would need to be on Vioxx for the rest of
3  his life or some other pain medication for the rest
4  of his life?
5      A. I don't know if I told him that, but
6  it's probably true.
7      Q. Why?
8      A. Because degenerative disc disease and
9  degenerative joint disease get worse with age, not
10 better, and as he continues to age, those diseases
11 are going to get worse unless he has surgical
12 intervention.
13     Q. Did you record in various medical
14 records here, sir, that Mr. Barnett was stable
15 while taking Vioxx?
16     A. Yes, sir.
17     Q. What did that mean when you said stable
18 on Vioxx?
19     A. That meant that his symptoms were under
20 control and he did not show evidence of significant
21 side effects.
22     Q. Is that why you continued to prescribe
23 Vioxx, sir, to him?
24     A. Yes, sir.
25     Q. You were asked some questions about

## Page 205

1  Mr. Barnett's January 2000 ischemia. Do you
2  remember that?
3      A. Yes, sir.
4      Q. Mr. Robinson kept referring to it as
5  angina and I'm going to refer to it as the medical
6  records do as ischemia, okay?
7      A. Okay.
8      Q. Let me mark an exhibit I don't think
9  you were shown.
10     MR. ROBINSON: For the record, I'm
11 going to -- the records say both angina and
12 ischemia at various points, but let's -- let's go
13 on.
14 BY MR. GOLDMAN:
15     Q. I'm going to mark as Exhibit 31 a
16 medical record, sir --
17     (DFT. EXH. 31, Grand Strand Regional
18 Medical Center medical record for Gerald Barnett,
19 was marked for identification.)
20 BY MR. GOLDMAN:
21     Q. I think you need to look at that.
22     A. Okay.
23     Q. That I'll identify as
24 BarnettG-GrandStrandRMC 15. You can just take a
25 minute to look at it and I'll ask you some

Golkow Litigation Technologies - 1.877.DEPS.USA

86ee2519-35e8-4f59-b8ea-6c8725dd3eda

## Michael Mikola, M.D.

### Page 206

1  questions.
2      A.  Okay.
3      Q.  Is this your dictation of what occurred
4  with Mr. Barnett in the January 19th, 20th time
5  frame of 2000?
6      A.  Yes, sir.
7      Q.  Directing your attention to the fifth
8  sentence. What does it say starting with after,
9  after he was told?
10     A.  After he was told he may require
11  cardiac catheterization, he became quite anxious.
12     Q.  You can continue.
13     A.  This lasted a few seconds and resolved
14  without any specific treatment. He had an episode
15  of chest pain, fairly severe, in the ER. He took a
16  sublingual nitroglycerin and pain was resolved
17  within 30 seconds.
18     Q.  You can stop there. Do you remember,
19  Doctor, that you thought he might need to have a
20  cardiac catheterization in January of 2000?
21     A.  Yes, sir.
22     Q.  What is a cardiac catheterization and
23  why did you think that he might need one?
24     A.  A cardiac catheterization is a
25  diagnostic test where the cardiologist threads a

### Page 207

1  catheter into an artery either in the arm or the
2  leg and runs it through the artery up into the
3  heart. They then inject dye which they can see on
4  fluoroscopy or on moving x-ray into the coronary
5  arteries and take pictures of the dye filling the
6  arteries.
7      Q.  What are the coronary arteries?
8      A.  Arteries to the heart.
9      Q.  Please continue.
10     A.  That gives them an indication or an
11  idea about plaque development, movement of the
12  heart muscle to see if there are areas not -- that
13  are not moving properly that you may see in a
14  previous heart attack and also how well the heart's
15  pumping, the strength of the heartbeat.
16     Q.  So you thought that -- that it was
17  possible that he would need a cardiac
18  catheterization in January of 2000, but as I
19  understand it, Mr. Barnett didn't want to go that
20  route?
21     A.  That's correct.
22     Q.  Why not?
23     A.  My best guess is he was just too scared
24  of the procedure. With -- with a heart
25  catheterization when the cardiologist talks to the

### Page 208

1  patient about it, generally they'll quote odds of
2  about one to a thousand -- one to a thousand chance
3  of dying or one to 10,000. Those statistics are
4  for all heart catheterizations and many of the
5  people that get heart catheterizations are in the
6  midst of an acute MI or an acute heart attack and
7  their risk is a lot higher, but Mr. Barnett was
8  quite anxious and didn't want to have the
9  catheterization done.
10     Q.  Did Mr. Barnett want to follow a more
11  conservative approach?
12     A.  That's correct.
13     Q.  If you look further down in Exhibit 31,
14  do you see where it says, he was ruled out for
15  myocardial infarction with serial enzymes?
16     A.  Same page?
17     Q.  Yes.
18     A.  Yes, sir.
19     Q.  Myocardial infarction is a fancy term
20  for a heart attack?
21     A.  Correct.
22     Q.  What are serial enzymes?
23     A.  Generally when an individual has a
24  heart attack, as the heart muscle is damaged, the
25  proteins that are contained in the heart muscle are

### Page 209

1  released into the bloodstream. As the cells die,
2  they release their contents. The heart has certain
3  enzymes that are relatively unique to heart muscle
4  called CPK. If an individual has an event that
5  damages -- that damages their heart muscle,
6  generally those enzymes will increase over the next
7  24 hours as they're released into the bloodstream,
8  you draw the blood, measure the levels of CPK. And
9  they can also tell you if it's MB, which is myo --
10  heart muscle, or MM, which is skeletal muscle,
11  because they both contain CPK. And we'll do a set
12  of three enzymes eight hours apart. If they've had
13  damage to the heart, generally those enzymes will
14  increase above normal limits and that's what serial
15  enzymes are, a series of three.
16     Q.  In January of 2000, Mr. Barnett had
17  serial enzyme tests and they showed no elevation?
18     A.  Correct.
19     Q.  In January of 2000, Mr. Barnett did not
20  have a heart attack, did he?
21     A.  That's correct.
22     Q.  In January of 2000, you believed he
23  didn't have --
24     MR. GOLDMAN:  I think we have to go off
25  the tape because it's about to finish. Do you need

53 (Pages 206 to 209)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 210

1  to take a quick break?
2        THE WITNESS: I'll take a quick break.
3        VIDEO TECHNICIAN: This is the end of
4  Tape Number 4 in the deposition of Dr. Michael
5  Mikola. The time is approximately 2:45 PM. The
6  date is April 25th, 2006. We will now go off the
7  record.
8        (A recess transpired.)
9        VIDEO TECHNICIAN: We're back on the
10  record. This is the beginning of Tape Number 5 in
11  the deposition of Dr. Michael Mikola. The time is
12  approximately 2:52 AM. The date is April 25th,
13  2006.
14  BY MR. GOLDMAN:
15     Q.  Dr. Mikola, while we were at a break,
16  you told us that there was something you wanted to
17  clarify in this Exhibit 31.
18     A.  Yes, sir. I probably dictated it out
19  of order. What occurred when I talked to him about
20  the heart catheterization, it says he did brady
21  down into the 30's after he was told he may require
22  a cardiac catheterization.
23     Q.  What does that mean, first of all,
24  brady down into the 30's?
25     A.  When I talked to him about the cardiac

Page 211

1  catheterization, that he may need one, he almost
2  passed out. Brady down means his pulse went down
3  to 30, 30 beats a minute, and he almost lost
4  consciousness. He fainted basically and
5  fortunately he was in bed and didn't fall. But
6  that's how apprehensive he was about the heart
7  catheterization.
8     Q.  Is that one reason why you felt it
9  wasn't necessary to do the catheterization and to
10  go a more conservative route?
11     A.  I don't think he would have agreed to a
12  catheterization. And that's the decision made
13  between the patient and the cardiologist
14  ultimately, but he was not at that time interested
15  in having a cardiac catheterization.
16     Q.  Do you see under discharge meds or D
17  meds, what pain medication is identified?
18     A.  It says Feldene, 20 milligrams a day.
19     Q.  And this is dated when?
20     A.  January 20th -- or actually, it was
21  dictated on January 20th, 2000 and transcribed on
22  the 21st.
23        MR. ROBINSON: Andy, for completeness,
24  I want to --
25        MR. GOLDMAN: If you have another

Page 212

1  document, you can use it.
2        MR. ROBINSON: I -- it's the same
3  hospital -- I want to point out so we don't mislead
4  the record here --
5        MR. GOLDMAN: I'm going to go through
6  them.
7        MR. ROBINSON: On the same -- same
8  hospitalization, Dr. Swami takes a history of Vioxx
9  and Prilosec.
10        MR. GOLDMAN: Okay. You should -- you
11  should use that then because I'm going through in
12  order.
13        MR. ROBINSON: Okay. I'm just trying
14  to show you. There's no --
15        MR. GOLDMAN: I've read the records.
16        MR. ROBINSON: Okay.
17  BY MR. GOLDMAN:
18     Q.  You remember that Mr. Robinson was
19  asking you about aspirin and whether Mr. Barnett
20  used it prior to his heart attack?
21     A.  I remember.
22        MR. ROBINSON: No, I asked if he
23  consistently used it.
24  BY MR. GOLDMAN:
25     Q.  Do you remember that?

Page 213

1     A.  I remember, yes, sir.
2     Q.  I said that I would show you some
3  documents to see if your refresh -- your
4  recollection might be refreshed.
5     A.  Um-hum.
6     Q.  Let me hand you what I'll mark as
7  Exhibit 32.
8        (DFT. EXH. 32, Grand Strand Regional
9  Medical Center medical records for Gerald Barnett,
10  was marked for identification.)
11  BY MR. GOLDMAN:
12     Q.  This is a document Bates stamped
13  BarnettG-GrandStrandRMC 19 through 21. And is this
14  an office note that you dictated on January 19th of
15  2000?
16     A.  No, sir, this would be the history and
17  physical to admit him to the hospital on the 19th.
18  It is a note that I dictated, yes.
19     Q.  Did you dictate Exhibit 32 on or about
20  January 19th?
21     A.  Correct.
22     Q.  I want to direct your attention to the
23  second page under assessment plan.
24     A.  Yes, sir.
25     Q.  The last sentence says, we will also

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-8c8725dd3eda

Michael Mikola, M.D.

**Page 214**

```
1    give supplemental oxygen and start him on a
2    low-dose beta blocker metroprolol (sic) --
3        A.   Metoprolol.
4        Q.   -- metoprolol, 25 --
5        A.   BID, which means twice a day.
6        Q.   And what is the next two words?
7        A.   Daily aspirin.
8        Q.   And then it continues.
9        A.   Yes.
10       Q.   Recognizing that Mr. Barnett was
11   indicated for aspirin in light of his ischemia
12   condition in January of 2000, did you recommend
13   that he should take aspirin on a daily basis?
14       A.   I don't recall specifically. I
15   would -- I would have assumed that I did, but I
16   don't recall specifically. My -- my page with my
17   medicine list in it, which is where I would record
18   the medicines that I had him on, are not in the
19   documents.
20       Q.   Do you agree in light of Mr. Barnett's
21   age at this time, 56 years old, his family history
22   of heart disease, his high cholesterol and his
23   ischemia in January of 2000 that he was indicated
24   for aspirin?
25       A.   Yes, sir.
```

**Page 215**

```
1        Q.   That's why you told him to take daily
2    aspirin on January 19th according to this record?
3        A.   On January 19, it doesn't exactly say
4    that I told him to take aspirin. It says that I
5    started him on aspirin while in the hospital.
6        Q.   And it says, aspirin daily?
7        A.   Yes.
8            MR. ROBINSON: In the hospital he said.
9    BY MR. GOLDMAN:
10       Q.   As you sit here today -- I'll go to the
11   next topic.
12           MR. ROBINSON: Good.
13   BY MR. GOLDMAN:
14       Q.   Mr. Robinson showed you certain
15   documents about Mr. Barnett's cholesterol and on
16   occasion, you had indicated that his cholesterol
17   ratios were acceptable. Do you remember that?
18       A.   Yes, sir.
19       Q.   Do you see in the document that I just
20   showed you that at this point in January of 1999
21   under hyperlipidemia, Page 2 --
22       A.   January of 1999?
23       Q.   That's the document --
24       A.   2000.
25       Q.   Sorry.
```

**Page 216**

```
1        A.   Okay.
2        Q.   January 2000.
3        A.   All right.
4        Q.   Under hyperlipidemia on the second page
5    it indicates in the middle he did lower his LDL
6    from 190 to 152 with dietary changes and further
7    decisions regarding his therapy will be made after
8    the results of his cardiac work-up. Do you see
9    that?
10       A.   Yes, sir.
11       Q.   How would you describe an LDL level of
12   190?
13       A.   High.
14       Q.   How would you describe an LDL level of
15   152?
16       A.   Still high. I should clarify if I may,
17   the recommendations for lipid levels have changed
18   in the last few years. Prior to that time, it was
19   recommended that if you don't have two or more risk
20   factors for heart disease, a goal of LDL less than
21   130 is acceptable. They've subsequently lowered it
22   to 120. If you have coronary disease, it's
23   recommended that you get it below 100. So that's
24   why -- that's just -- the target is different
25   depending on risk factors or the presence of
```

**Page 217**

```
1    disease.
2        Q.   Mr. Barnett had multiple risk factors
3    for heart disease, didn't he?
4        A.   He had two, yes, sir.
5        Q.   High cholesterol?
6        A.   Well, three, male sex, he's a male.
7        Q.   Male, high cholesterol?
8        A.   Family history.
9        Q.   Family history. Did you consider
10   Mr. Barnett's sex -- gender, male, his high
11   cholesterol and his family history to be risk
12   factors for heart disease in January of 2000?
13       A.   Yes, sir.
14       Q.   I'm going to mark as Exhibit 33, sir,
15   an exhibit Bates stamped
16   BarnettG-CardiogasAssoc 51.
17           (DFT. EXH. 33,
18   Cardiology/Gastroenterology Associates medical
19   record for Gerald Barnett, was marked for
20   identification.)
21   BY MR. GOLDMAN:
22       Q.   And this is a Cardiolite stress test
23   that was done on January 24th of 2000. Do you see
24   that?
25       A.   Correct.
```

Michael Mikola, M.D.

Page 218

1    Q.  You are listed as a referring
2  physician?
3    A.  Yes, sir.
4    Q.  What does that mean?
5    A.  That means I -- this was the stress
6  test that was done from his follow-up
7  hospitalization.  At the time he was hospitalized
8  in January of 2000 when he came in with the chest
9  pain, he was seen in consultation by the
10  cardiologist if I remember correctly.  She thought
11  that he was stable and that the stress test could
12  be done as an outpatient, so then I referred
13  Mr. Barnett to their office to have the stress test
14  done and this is the stress test.
15    Q.  Do you see toward the top of the page,
16  it says, stress, the patient exercised 15 minutes
17  zero seconds into a Bruce protocol?
18    A.  Yes.
19    Q.  What is a Bruce protocol?
20    A.  A Bruce protocol is the way that they
21  change the speed and the slope of the treadmill.
22  You start out in a moderate speed on a flat
23  surface.  Every three minutes the slope increases
24  so you walk progressively more and more uphill and
25  they'll also increase the speed incrementally.  So

Page 219

1  to go 15 minutes on a Bruce protocol stress test
2  means that you're in pretty good shape to do that.
3    Q.  Would you consider Mr. Barnett's
4  ability to last for 15 minutes on the treadmill
5  given this Bruce protocol to be an excellent
6  exercise tolerance?
7    A.  Yes, sir.
8    Q.  That's what it says actually in
9  conclusions, excellent exercise tolerance.
10    A.  Yes, sir.
11    Q.  Do you see that?  Looking further down
12  under perfusion report, can you just briefly
13  describe what a perfusion report is.
14    A.  The concept of stress testing is to
15  determine the adequacy of the arteries to the heart
16  to provide the heart muscle with the necessary
17  blood and oxygen that it needs.  When you and I or
18  anyone who's sitting at a table at rest, our heart
19  really doesn't need a lot of oxygen to do its job.
20  When you and I are walking up a hill at a fast pace
21  and the heart is really pumping to feed the
22  muscles, it requires much more flow.  The concept
23  is if you have fixed plaques or plaque in the
24  arteries that are 70 percent occlusive or more, the
25  narrowing in the artery will prevent the provision

Page 220

1  of adequate blood supply to the heart muscle.
2    When they -- the way that they measure
3  that is they inject you with a radioactive dye.
4  They follow it into the heart muscle and this
5  dye -- they'll use thallium or a sestamibi goes
6  preferentially into the heart muscle.  They'll use
7  a camera to take pictures of the heart muscle and
8  what they really take a picture is -- a picture of
9  the amount of dye that's being emitted -- or the
10  radiation that's being emitted from the dye.
11    If you have an area of significant
12  plaque build-up, you will not get as much dye to
13  that area because there's limitation in the blood
14  flow and it's carried by the bloodstream.  If you
15  have an old heart attack, you'll see an area that
16  doesn't take up any dye because it's dead scar
17  tissue and it's not metabolically active.  So
18  lateral wall ischemia -- a small area of lateral
19  ischemia would suggest that there is -- an ischemia
20  is different than a scar.  Ischemia means that it
21  does take up dye but not as rapidly as the rest of
22  the heart.  So it is alive and it's getting blood
23  supply, but the blood supply is slow to that -- to
24  that area.
25    Q.  And when blood supply is slow to that

Page 221

1  particular area, you mean that there is plaque that
2  is preventing the blood flow from going through?
3    A.  That's the general presumption, yes,
4  sir.
5    Q.  And the more plaque you have, the
6  harder the blood supply is -- withdrawn.  Let me
7  ask you another one.
8    The more plaque you have, the less
9  blood flow you have through your arteries?
10    A.  Yes.  And one thing that may be
11  important for the jury to understand is that the
12  coronary arteries have tremendous amount of
13  reserve.  If you and I had every artery in our
14  heart 50 percent blockages, we could get up and run
15  a marathon or run whatever you want to do.  It's
16  not until about 70 percent vessel occlusion that
17  flow limitation occurs.  So stress tests are very
18  good at picking up blockages greater than 70
19  percent, but you can have a normal stress test and
20  have five 50 percent blockages in your arteries,
21  which subsequently is what turned out to some
22  degree with Mr. Barnett.
23    Q.  You understand that in September of
24  2002 when Mr. Barnett had a cardiac
25  catheterization, it was determined that he had six

56 (Pages 218 to 221)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

## Page 222

1  vessels that were occluded, several of which were
2  above 80 percent?
3       A.  Yes.  He had at least five.
4       Q.  And it's your understanding that if you
5  have normal stress tests over time, that doesn't
6  mean that you don't have plaque build-up in your
7  arteries?
8       A.  That's absolutely correct.
9       Q.  It's only until you have 70 percent, in
10  your view, or more occlusion that a stress test
11  might pick up the reduced blood flow?
12       A.  That's correct.
13       Q.  Turning back to the Cardiolite exam, do
14  you see under conclusions, left ventricular
15  ejection fraction 56 percent?
16       A.  Yes, sir.
17       Q.  What does that mean briefly?
18       A.  That means that his heart ejects
19  approximately 56 percent of the blood that it fills
20  with.  Normally a heart of a healthy individual
21  will pump out about 55 to 60 percent of the blood
22  that it's filled with at any time.  The heart
23  doesn't completely empty.  It empties about 60
24  percent of the blood that's in it when it pumps.
25  When they do this dye test, they also do what are

## Page 223

1  called gated images where they time the heart
2  contractions.  They measure the amount of dye that
3  comes in and the amount that goes out and they give
4  you an ejection fraction and that's -- that's an
5  indication that the heart muscle is pumping well.
6       Q.  Is a 56 percent ejection fraction
7  normal for a man of 56?
8       A.  That's correct.
9       Q.  Does that mean that in January of 2000,
10  Mr. Barnett's heart was pumping adequately?
11       A.  Yes, sir, that's correct.
12       Q.  Mr. Robinson asked you whether it was
13  possible that the stress test in January of 2000
14  was a false positive.  Do you remember that?
15       A.  I don't remember if he asked me that,
16  but I remember stating that.
17       Q.  Am I right, Dr. Mikola, that the
18  cardiologist and you at the time reviewed the
19  stress test and your best medical judgment at the
20  time was that Mr. Barnett had ischemia, right?
21       A.  Yes, the stress test suggested he did
22  have a small area of ischemia.
23       Q.  If that's true and the test accurately
24  described his ischemia, then am I right that
25  Mr. Barnett had coronary artery disease and plaque

## Page 224

1  build-up in January of 2000?
2       A.  I believe that's true.
3       Q.  Do you understand that coronary artery
4  disease or atherosclerosis is a process that
5  develops over decades?
6       A.  Yes, sir.
7       Q.  Coronary heart disease and
8  atherosclerosis doesn't appear after ten days, does
9  it?
10       A.  Atherosclerosis does not appear after
11  ten days, correct.
12       Q.  Atherosclerosis is a chronic process
13  that takes many years to develop, correct?
14       A.  Atherosclerosis, that's correct.  It's
15  thought that the fatty streaks of atherosclerosis
16  generally begin during childhood.
17       Q.  Is it also your understanding,
18  Dr. Mikola, that atherosclerosis builds up over
19  time and gets progressively worse?
20       A.  Atherosclerosis, yes, sir.
21       Q.  I know you didn't look inside
22  Mr. Barnett's arteries in January of 2000, but
23  based on the diagnosis of ischemia, that would
24  suggest that he had plaque and atherosclerotic
25  lesions before January of 2000, right?

## Page 225

1       A.  Yes, sir.
2       Q.  Plaque and atherosclerotic lesions are
3  things that take awhile to develop --
4       A.  Correct.
5       Q.  -- to the point where you start having
6  ischemia, correct?
7            MR. ROBINSON:  Objection, leading.
8            THE WITNESS:  That is correct.
9  BY MR. GOLDMAN:
10       Q.  Is it your understanding or not, sir,
11  that it takes many years for plaque to develop and
12  atherosclerotic lesions to develop to the point
13  where you have ischemia?
14            MR. ROBINSON:  Objection, vague.
15            THE WITNESS:  Yes, sir, that's correct.
16  BY MR. GOLDMAN:
17       Q.  Did you understand my question?
18       A.  Yes, sir.
19       Q.  You were shown a single study about
20  mice.  Do you remember that?
21       A.  Yes, sir.
22       Q.  Mr. Barnett (sic) showed you Exhibit 18
23  and if you wouldn't mind, Dr. Mikola, could you
24  just find that.  I only have one copy.
25       A.  It's not Mr. Barnett.

57 (Pages 222 to 225)

Michael Mikola, M.D.

**Page 226**

1    MR. ROBINSON: I'm here for Mr. Barnett
2  so I'll -- it's okay. Let it go.
3    MR. GOLDMAN: Sorry.
4    THE WITNESS: No problem. I have it.
5    (Off-the-record conference.)
6  BY MR. GOLDMAN:
7    Q.  Dr. Mikola, have you found the mice
8  study --
9    A.  Yes, sir.
10    Q.  -- that Mr. Robinson marked as Exhibit
11  18?
12    A.  Yes, sir.
13    MR. ROBINSON: By the way, I don't
14  think it's called mice study. It's something like
15  atherogenesis or something like that.
16    THE WITNESS: I have it.
17  BY MR. GOLDMAN:
18    Q.  Well, if you just look at the title, do
19  you see -- I can't even pronounce half the words,
20  but do you see at the end, it says, knockout mice?
21    A.  Yes, sir.
22    Q.  I know you weren't given much of an
23  opportunity to review this study. In fact, you
24  weren't given any. Do you see --
25    MR. ROBINSON: I'm going to move to

**Page 227**

1  strike.
2  BY MR. GOLDMAN:
3    Q.  Do you see, sir, you can take as long
4  as you want, that this animal study involved mice
5  and not human beings?
6    A.  Yes, sir.
7    Q.  When you make treatment decisions for
8  your patients, do you rely on human clinical trials
9  or animal studies?
10    A.  Human clinical trials.
11    Q.  When you're deciding whether to
12  prescribe Vioxx to Mr. Barnett, are you interested
13  in knowing how Vioxx did in a clinical trial with
14  human beings?
15    A.  Yes, sir.
16    Q.  Is the information that's contained in
17  the FDA-approved package insert information about
18  human beings or animals? I know there are certain
19  animal studies in there, but they're clinical
20  studies that the FDA reports on?
21    A.  On human beings, yes. They usually
22  will do teratogenesis studies on mice just because
23  we don't like to give massive amounts of drugs to
24  pregnant women to see if it affects the fetus or
25  not.

**Page 228**

1    MR. ROBINSON: That sounds pretty good.
2  BY MR. GOLDMAN:
3    Q.  Mr. Robinson showed you this and said
4  did Merck ever tell you about this study. Do you
5  remember that?
6    A.  Yes, I do.
7    Q.  This was a study that was published in
8  the Journal of the American College of Cardiology.
9  Do you see that?
10    A.  Yes, sir.
11    Q.  In 2003.
12    A.  Yes, sir.
13    Q.  I'm not going to spend much time on
14  this study because I think it's going to be the
15  subject of maybe some discussion at trial, but can
16  you turn just to the second to last page.
17    MR. ROBINSON: I'm going to move to
18  strike just the first comment about what your goal
19  is at trial, but go from there.
20  BY MR. GOLDMAN:
21    Q.  Turning your attention to the second to
22  last page of this mouse study, do you see in the
23  second to last paragraph, second sentence, however,
24  extrapolation of our results obtained in a mouse
25  model to humans taking COX-2 inhibitors may not

**Page 229**

1  necessarily be valid?
2    A.  Yes, sir, I see that.
3    Q.  And there is other discussion in this
4  article about other studies showing a COX-2
5  inhibition reduces the rate of atherosclerosis. Do
6  you see that anywhere or do you want to take your
7  time and look?
8    A.  I'll have to review it.
9    Q.  Let me do it this way: You don't have
10  to read it all. If you had this mouse study back
11  at the time you were prescribing medicine to Dr. --
12  to Mr. Barnett, would it have made any difference
13  in your decision to prescribe Vioxx to him?
14    A.  It's very unlikely.
15    Q.  Do you also know that there are
16  inconsistent results in animal studies on occasion?
17    A.  Yes, sir, and in human studies as well,
18  that's correct.
19    Q.  Did Mr. Robinson show you any of the
20  studies involving mice or other animals where the
21  inhibition of COX-2 reduced the rate of
22  atherosclerosis?
23    A.  No, sir.
24    Q.  Would you be surprised to learn that
25  this one mouse study is the only animal study out

58 (Pages 226 to 229)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

### Page 230

1   of eight different articles on this issue that
2   shows the potential for the development of an
3   atherosclerotic lesion --
4          MR. ROBINSON: Objection.
5   BY MR. GOLDMAN:
6          Q.  -- from COX-2 inhibition?
7          MR. ROBINSON: Objection.
8          THE WITNESS: Yes. One -- one thing
9   about the ApoE knockout mice --
10  BY MR. GOLDMAN:
11         Q.  Wait. I want to make sure I understand
12  your --
13         A.  Okay.
14         Q.  -- answer because I don't think you
15  meant it or maybe I didn't ask the question --
16         A.  Would I be interested in --
17         Q.  No, I asked you would be you surprised.
18  I'll ask both.
19         A.  Okay.
20         Q.  Before deciding whether or not a single
21  mouse study would be interesting to you, would you
22  want to know what all of the animal studies
23  concerning the issue about atherosclerosis and
24  COX-2 inhibition said?
25         A.  Yes, sir.

### Page 231

1          Q.  Would you be interested in knowing the
2   eight other animal studies that show either no
3   effect of COX-2 inhibition on atherosclerosis or
4   show that it reduces the rate of atherosclerosis?
5          A.  Yes, sir.
6          MR. ROBINSON: Objection.
7   BY MR. GOLDMAN:
8          Q.  You were going to say?
9          A.  The ApoE knockout mice is a
10  genetically-modified mouse that develops
11  atherosclerosis. It's not a -- it's a
12  genetically-modified mouse. Mice don't get
13  atherosclerosis, humans do. In order to do studies
14  with them, they have to change them genetically so
15  that they -- or either feed them a very high-fat
16  diet. They have to do things to them to make them
17  develop plaque so you can see if they have vascular
18  events or not.
19         Q.  Why would that be significant to you in
20  determining the relevance of a mouse study
21  involving knockout mice?
22         A.  Studies with -- in animals that were
23  more similar to humans in terms of atherogenesis
24  would also be very helpful to have.
25         Q.  Do you know if mice have heart attacks?

### Page 232

1          A.  On their own, I don't know. I don't
2   know. Do they?
3          Q.  I don't think so.
4          A.  I don't think so, but I'm not sure.
5          Q.  Turning back to the January 2000
6   ischemia. Did Mr. Barnett's chest pain resolve
7   promptly?
8          A.  In January 2000?
9          Q.  Yes.
10         A.  I believe it resolved with the
11  nitroglycerine.
12         Q.  What is nitroglycerin?
13         A.  It is a medication that relaxes smooth
14  muscle. Smooth muscle is the type of muscle cells
15  present in the esophagus and also the coronary
16  arteries. The arterial wall of arteries contain
17  muscles, muscle cells, and the muscles cells
18  regulate the tone of the artery, whether it
19  contracts or relaxes. Nitroglycerin relaxes the
20  smooth muscle cells in places including the
21  arterial wall of the coronary artery so if you have
22  an arterial wall with spasm or it's clamped down
23  for various reasons, nitroglycerin helps it to
24  relax and dilate.
25         Q.  And Mr. -- Mr. Barnett responded well

### Page 233

1   to the nitroglycerine and his chest pain resolved I
2   believe in 30 seconds?
3          A.  Yes, sir.
4          Q.  Turning your attention to Exhibit 30 on
5   the Bates stamp at the bottom Huberty 4. Tell me
6   when you're there.
7          A.  Okay. Yes, sir.
8          Q.  Is this an office record of yours for
9   Mr. Barnett dated January 27th of 2000?
10         A.  That is correct.
11         Q.  Do you see at the top under history of
12  present illness you wrote that he was admitted to
13  the hospital with chest pain and underwent a stress
14  thallium test and then indicate his chest pain is
15  improving?
16         A.  Yes, sir, and that postoperatively is a
17  typo.
18         Q.  What should it say?
19         A.  Underwent a stress thallium...
20         Q.  I think he underwent a stress thallium
21  test after he left the hospital?
22         A.  After he left the hospital, yes. Post
23  hospitalization.
24         Q.  Can you read what you wrote out loud in
25  the second and third sentence -- second and third

59 (Pages 230 to 233)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

---

**Page 234**

1  to the last sentence.
2      A.  In the first paragraph?
3      Q.  Let me back up.
4          Can you please read, Dr. Mikola, what
5  you wrote in the second to last and last sentence
6  under history of present illness.
7      A.  Yes, sir, it's referring to chest pain.
8  He thinks it may have been related to stress and
9  exercising after a layoff and overuse.  It is
10  nearly resolved.
11     Q.  What did you understand Mr. Barnett to
12  mean -- to mean when he said that he thought it may
13  have been related to stress?
14     A.  The episode of chest pain.
15     Q.  Do you know what stress Mr. Barnett was
16  under in January of 2000?
17     A.  Not specifically, no, sir.
18     Q.  Do you remember that Mr. Barnett's wife
19  was unfortunately diagnosed with neck and head
20  cancer in 1999?
21     A.  Now that you mention it, I do recall
22  that, yes, sir.
23     Q.  Can that be a stressful event?
24     A.  Definitely.
25     Q.  Can stress affect plaque formation and

---

**Page 235**

1  the development of heart disease?
2      A.  Yes, we believe that it can.
3      Q.  Can stress be related to the
4  development of ischemia?
5      A.  Yes.
6      Q.  The end of that sentence you wrote that
7  Mr. Barnett thinks it may have been related to
8  stress and exercising after a layoff and overuse.
9  What did you understand that to mean?
10     A.  He exercised fairly regularly and
11  lifted weights.  It's not unusual for people to
12  develop muscle soreness if they lift weights and
13  they haven't been doing it for a period of time,
14  it's very common.  And he from what I gathered
15  talking to him thought that his chest pain may have
16  been related to muscle soreness from resuming his
17  weight-lifting activity.
18     Q.  You indicate your view of what caused
19  his chest pain under assessment and plan and you
20  wrote, chest pain.  It is probably related to a
21  combination of things.
22         What did you think, sir, Mr. Barnett's
23  chest pain was related to other than the
24  development of plaque that you said predated
25  January of 2000?

---

**Page 236**

1      A.  I thought it was probably related to
2  anxiety as well.  It's a very common symptom of
3  anxiety to develop chest pain.  He also had a
4  history of esophageal symptoms.
5          And the one thing that probably bears
6  mention in his stress test is that he did not
7  develop the same symptoms while his stress test was
8  showing inadequate blood supply.  Again,
9  Mr. Barnett is one of those patients who just
10  doesn't fit the typical patterns.  If a patient has
11  a stress test that suggests ischemia and they get
12  their pain and they say, oh, yeah, that's the pain
13  I've been having, that's pretty good evidence to
14  suggest that it's angina that's causing their pain.
15  If they have a stress test and it shows ischemia
16  and they feel great, then that sort of is not quite
17  as clear-cut.
18     Q.  Um-hum.
19     A.  Is the ischemia an incidental finding?
20  How is it that they have chest pain sometimes from
21  ischemia but not when they are walking up a steep
22  hill fast?
23         I think if he had developed chest pain
24  when he was on the treadmill, the cardiologist and
25  myself probably would have pushed him a lot harder

---

**Page 237**

1  for catheterization.  So in his case, it's -- his
2  chest pain is very difficult to determine what's
3  actually causing it.  He's not a clear-cut, you
4  know, when I walk I get chest pain, when I slow
5  down it stops person.
6      Q.  Based on your experience with ischemia
7  and these stress test results, I think you said
8  before that you would believe that the patient who
9  was diagnosed with ischemia would have developed
10  plaque and coronary artery disease?
11     A.  The patient diagnosed with ischemia is
12  likely to have significant coronary disease and
13  plaques, yes.
14     Q.  And --
15     A.  The exception to that would be -- there
16  are probably a couple exceptions, cocaine use,
17  which causes spasm which I don't believe he's ever
18  used cocaine and had no reason to believe that, or
19  there's a disorder called coronary vasospasm where
20  people have spasm in the arteries that can cause
21  ischemia but they don't have plaque build-up, but I
22  don't think that was -- I don't think that was the
23  case in his case.
24     Q.  To be clear, Mr. Barnett in January of
25  2000 had coronary heart disease that had been

---

60 (Pages 234 to 237)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 238

1  developing over years?
2       A.  I believe that's the case, yes, sir.
3       Q.  What did you write on January 27th
4  under osteoarthritis concerning the medication that
5  Mr. Barnett was using?
6       A.  Continue Feldene, 20 milligrams a day.
7       Q.  Was it your belief that Mr. Barnett was
8  using Feldene at that point and not Vioxx?
9       A.  That's correct.
10      Q.  Do you see just above that in chest
11 pain, the last sentence you say, we will treat him
12 conservatively and treat his modifiable risk
13 factors.
14          Can you describe what you meant by
15 that --
16      A.  Yes, sir.
17      Q.  -- and how you did that.
18      A.  There are really two approaches to
19 treating coronary artery disease.  There is
20 aggressive and conservative.  Aggressive treatment,
21 it involves heart catheterization and vascular
22 intervention if indicated at that time.
23 Conservative therapy is generally treating with
24 medications to try to prevent subsequent plaque
25 build-up and subsequent angina or ischemic

Page 239

1  episodes.  Most of the studies would show that in
2  patients with a very small area of ischemia,
3  especially if it's not a large area of the anterior
4  wall which is supplied by a really large artery,
5  either one of those two approaches is about
6  equivalent at the end of a year.  So you can treat
7  him conservatively with medicines, you can put him
8  through the -- the catheterization, the other test,
9  and the outcome at the end of the year is not
10 dramatically different with mild, small area of
11 ischemia that's not involving a major arterial
12 distribution.
13      Q.  And in your medical judgment and the
14 cardiologist's was that it was okay to treat his
15 condition conservatively?
16      A.  Yes, sir.  And -- that and also by the
17 fact that he did not want to have cardiac
18 catheterization.  If he had said, you know, yes,
19 I'm all for a cardiac cath, it would have been done
20 I'm pretty sure.
21      Q.  The --
22      A.  Cardiologists like to do caths.
23      Q.  Well, you would have been in favor of
24 Mr. Barnett having a cardiac catheterization if
25 Mr. Barnett was willing to do that back in January

Page 240

1  of 2002?
2       A.  I would have largely due to the fact
3  that his chest pain came on at rest and that
4  confers a higher risk than chest pain that comes on
5  with exertion.  There's a difference between stable
6  and unstable angina.
7       Q.  Okay.  Let me hand you a document I'll
8  mark as Exhibit 34.
9           (DFT. EXH. 34, Physician's Orders, was
10 marked for identification.)
11 BY MR. GOLDMAN:
12      Q.  This is a record from -- I'll just
13 identify the Bates number, Barnett PPR, which means
14 Plaintiff produced record, 467.
15          Can you identify what this is, sir.
16      A.  That's the admission orders when he was
17 admitted to Grand Strand Hospital that I wrote on
18 January 19th.
19      Q.  If you look toward the bottom of the
20 page in the fourth line under aspirin --
21      A.  Yes, sir.
22      Q.  -- what did you write?
23      A.  Enteric-coated aspirin, 325 milligrams
24 QD, or daily.  And the nurse note out to the side
25 says, took prior to arrival.

Page 241

1           Generally when someone is admitted to
2  the hospital with a possible coronary syndrome,
3  standard of care is to give them a full dose of
4  aspirin.
5       Q.  What do you write in the next line?
6       A.  Feldene, 20 milligrams QD, hold, which
7  means I listed it as a medicine so I wouldn't
8  forget it, but I didn't want him to receive it at
9  that time.
10          (DFT. EXH. 35, Medication
11 Administration Record, was marked for
12 identification.)
13          (DFT. EXH. 36, VOID.)
14 BY MR. GOLDMAN:
15      Q.  Let me hand you Exhibit 35, which is a
16 document Bates stamped BarnettG-PPR 476.  What is
17 this, sir?
18      A.  This is the medication list from the
19 hospital.  We call it a MAR, medication
20 administration record.
21      Q.  Who is it prepared by?
22      A.  It's prepared -- I don't know if it's
23 the nurse or the pharmacy, but it's the hospital
24 staff.  I think the pharmacy prepares it.
25      Q.  What does the person who prepared this

61 (Pages 238 to 241)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 242**

1  write in the second to last box?
2      A.  Feldene, 20 milligrams PO QD, hold.
3      Q.  Is that consistent with your
4  understanding that Mr. Barnett was taking Feldene
5  as of January – January 19th of 2000?
6      A.  That is consistent with the orders that
7  I wrote and I wrote the order because I thought he
8  was taking Feldene.
9      MR. ROBINSON:  Now, and really to be --
10  I'm going to make the record again to be for
11  completeness, on the same day, October 20th, the
12  record here at the hospital from Swami says meds,
13  Prilosec and Vioxx.  So someone got --
14      MR. GOLDMAN:  You can use the one
15  document that refers to Vioxx.
16      MR. ROBINSON:  Well, where did he come
17  up with Vioxx?  Come on.
18  BY MR. GOLDMAN:
19      Q.  Based on your discussions with
20  Mr. Barnett and to the best of your knowledge, sir,
21  based on the records that we've reviewed so far,
22  was Mr. Barnett taking Vioxx or Feldene in January
23  of 2000 before his ischemia diagnosis?
24      MR. ROBINSON:  Before he answers for
25  completeness, I want him to see the record I'm

**Page 243**

1  talking about, which is Exhibit Number 2.  Thank
2  you.
3      THE WITNESS:  Will you repeat the
4  question.
5  BY MR. GOLDMAN:
6      Q.  To the best of your knowledge, sir,
7  based on the medical records you prepared and your
8  discussions with Mr. Barnett, did you believe he
9  was taking Vioxx or Feldene at the time he was
10  diagnosed with ischemia in January of 2000?
11      MR. ROBINSON:  Object, you changed the
12  question, what he believed.
13  BY MR. GOLDMAN:
14      Q.  Can you answer the question?
15      MR. ROBINSON:  Are you asking him what
16  he believes now or what he believed then?
17  BY MR. GOLDMAN:
18      Q.  Can you answer the question?  Do you
19  understand?
20      MR. ROBINSON:  I'm going to object as
21  vague.
22      THE WITNESS:  On January 19th, 2000, I
23  believe he was taking Feldene.  At this point in
24  time, I'm not certain.
25  BY MR. GOLDMAN:

**Page 244**

1      Q.  Either way, whether he was taking
2  Feldene or Vioxx, you didn't believe that either
3  one contributed in any way to his ischemia
4  condition, true?
5      MR. ROBINSON:  He didn't know.
6      THE WITNESS:  I don't believe that
7  either one contributed to his atherosclerosis.
8  BY MR. GOLDMAN:
9      Q.  And the Feldene that you wrote in your
10  records that you thought he was taking is a
11  medication that you felt he should continue to
12  take?
13      A.  I'm sorry, say that again.
14      Q.  You believe that as of January of 2000
15  when you said continue Feldene, you felt that that
16  would be an appropriate medication for him even in
17  light of his ischemia condition?
18      A.  Yes, sir.
19      Q.  Let me just show --
20      A.  Let me clarify.  I probably would
21  feel -- or I felt that it would be appropriate
22  medicine for him to take at the time of discharge.
23  I held it on admission to the hospital until we
24  determined whether he had coronary disease or was
25  going to have tests such as a dye contrast study

**Page 245**

1  where you don't want patients taking a lot of
2  additional antiinflammatory drugs, if that -- if
3  that's clear.
4      Q.  It is.  I want to talk now about
5  Mr. Barnett's medical condition between January of
6  2000 and September of 2002 when he had his heart
7  attack, okay?
8      A.  Yes, sir.
9      Q.  If you turn to Huberty 5 in Exhibit 30.
10      A.  Yes, sir.
11      Q.  Now, this is two months after
12  Mr. Barnett was diagnosed with ischemia, right?
13      A.  That's correct.
14      Q.  And you see here that he's on Vioxx,
15  toward the bottom, stable on the Vioxx?
16      A.  Yes, sir.
17      MR. ROBINSON:  Where did he get on
18  Vioxx, how did he get on Vioxx?
19  BY MR. GOLDMAN:
20      Q.  And assuming that Mr. Barnett was
21  taking Vioxx every day in, let's say, January and
22  February and March of 2000, do you see that he was
23  not experiencing any angina at that time in March
24  of 2000?
25      A.  No, he was not according to what he

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 246

1 told me.
2 Q. On this occasion, Mr. Barnett indicated
3 that he went skiing and really didn't have any
4 chest pain suggestive of angina. Do you see that?
5 A. Yes, sir.
6 Q. Was it Mr. Barnett's and your judgment
7 that whatever chest pain Mr. Barnett was
8 experiencing in March of 2000 related to his reflux
9 condition and not to his heart?
10 A. Skiing is essentially a stress test. I
11 mean, you're at high altitudes, the oxygen levels
12 are low, depending on where you go skiing.
13 Mr. Barnett and I both felt that if he was able to
14 ski without symptoms, that it was unlikely that he
15 was having -- that he had significant angina at
16 that time.
17 Q. And in fact, it indicates that he did
18 not have any chest pain suggestive of angina. You
19 see that?
20 A. Yes, sir.
21 Q. And then when you wrote, stable on the
22 Vioxx, does that mean that Vioxx was working to
23 control Mr. Barnett's osteoarthritis neck and back
24 pain?
25 A. Yes, sir.

Page 247

1 Q. And he wasn't having any adverse
2 effects on it?
3 A. Correct.
4 Q. Can you read your handwriting down at
5 the bottom under H/P, history/physical, the first
6 one.
7 A. That's A/P, assessment/plan.
8 Q. Oh, okay.
9 A. It's my handwriting. This -- just so
10 everyone's clear, I generally dictate my notes and
11 you see the reason why. This is an office visit
12 between March 21st and August 2nd. I can look at
13 that sheet with the blood pressures on it and tell
14 you what the day is. I did not write the day.
15 Q. That's okay.
16 A. But this is a separate office visit
17 from that day, but I'm going to be glad to read it.
18 Q. So between March of 2000 and August of
19 2000, you wrote this note. And what did you write
20 under A/P or assessment/plan?
21 A. Increase -- increase cholesterol, trial
22 Lipitor, ten milligrams QD, or daily. What had
23 conspired is that Mr. Barnett told me he preferred
24 not to take medicine -- and this is from memory,
25 it's not in the chart -- wanted to get his

Page 248

1 cholesterol down with diet and exercise. We tried
2 that and he got it from 190 to 152. I didn't think
3 that 152 was adequate given his risk factors. He
4 was supposed to have labs done before he came in
5 March 21st. Generally that way I have them in
6 front of me when I see the patient and can make the
7 medical decision. He forgot, didn't have his blood
8 work, so I had him come in in the near future to
9 get the blood work done. Then I brought him in to
10 discuss it with him and tell him about the side
11 effects to the medicine that I thought he --
12 MR. ROBINSON: Can we find out what the
13 date of -- is there -- is there a blood test record
14 or something where we have a date?
15 THE WITNESS: Yeah, I think it was on,
16 I think, one of the exhibits that you gave me. It
17 was a one-page sheet with all the blood pressure
18 readings.
19 MR. ROBINSON: Actually, it's the first
20 page of the exhibit.
21 MR. GOLDMAN: You know, I'll let you do
22 it this time, but --
23 MR. ROBINSON: I'm doing it just one
24 time.
25 MR. GOLDMAN: Just let me finish and

Page 249

1 then you can.
2 THE WITNESS: I'm sorry.
3 MR. GOLDMAN: Okay.
4 MR. ROBINSON: I'm just trying -- I'm
5 just trying to get a date. Go ahead. Go ahead.
6 MR. GOLDMAN: We'll do it afterward.
7 MR. ROBINSON: All right.
8 BY MR. GOLDMAN:
9 Q. And then what did you write under
10 assessment plan under Number 4?
11 A. 4, that's a symbol meaning psychiatry
12 or psychological. Worried about wife's tongue
13 cancer which has spread into her neck nodes.
14 Q. Why did you write psych?
15 A. That's -- we -- generally in the
16 assessment plan, we list the illness that we're
17 addressing such as high cholesterol, leg cramps,
18 gastroesophageal reflux, psychological issues.
19 Q. And you felt he was having some in
20 light of his wife's cancer condition?
21 A. Yes, sir.
22 Q. Can you turn in Exhibit 30 to Huberty
23 29.
24 A. Yes, sir.
25 Q. Is this a blood test based on blood

63 (Pages 246 to 249)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

## Page 250

1  drawn on March 24th of 2000, sir?
2      A.  Yes, sir.
3      Q.  What does this indicate about
4  Mr. Barnett's LDL cholesterol?
5      A.  This is the blood that he had -- that
6  he was supposed to have before the 21st that I
7  asked him to come back and get.  It indicated that
8  his cholesterol is significantly elevated.
9      Q.  What is the number indicated after LDL
10  cholesterol?
11      A.  174.
12      Q.  Is that significantly high to you, sir?
13      A.  Yes, sir.
14      Q.  And how about his total cholesterol?
15      A.  250.
16      Q.  I'm not sure if this will come up by
17  the time the jury sees this video, but what is LDL
18  cholesterol?
19      A.  LDL is the subfraction of cholesterol
20  that we attribute largely to the plaque-forming
21  process.  Cholesterol generally doesn't float
22  around in the bloodstream on its own.  It's bound
23  to proteins and a protein-cholesterol complex is
24  referred to as HDL, LDL, VLDL, IDL.  There are
25  several different types, but epidemiologically most

## Page 251

1  data would suggest that high levels of LDL
2  cholesterol in appropriate patients will increase
3  the risk of vascular disease.
4      Q.  And is LDL cholesterol otherwise known
5  as bad cholesterol?
6      A.  Yes, sir.
7      Q.  That's what you don't want to have in
8  your arteries?
9      A.  That's correct.
10      Q.  And high cholesterol is good
11  cholesterol and you do want to have that?
12      A.  HDL --
13      Q.  I'm sorry.
14      A.  -- is high density, yes.  HDL is the
15  good cholesterol.
16      Q.  Let me ask again.  Is HDL considered
17  the good cholesterol and you want that to be
18  higher?
19      A.  That's correct.
20      MR. ROBINSON:  For completion,
21  completeness on this document, so his HDL of 50 was
22  within normal limits.
23      MR. GOLDMAN:  You know --
24      MR. ROBINSON:  His total cholesterol --
25  5.0 was normal.

## Page 252

1      MR. GOLDMAN:  Mr. Robinson, do you want
2  to -- if you want to examine --
3      MR. ROBINSON:  No, I'm just going to do
4  what you did this morning.
5      MR. GOLDMAN:  I asked you first to read
6  for completeness.
7      MR. ROBINSON:  I'm reading it right
8  now.
9      MR. GOLDMAN:  No, I asked you if it --
10  it would be okay to read for completeness.  Please
11  ask me.
12      MR. ROBINSON:  Oh, I apologize.  I
13  didn't know.  You were just reading, but I
14  appreciate it.  Can I ask -- can I have him read
15  for completeness?
16      MR. GOLDMAN:  Sure.
17      MR. ROBINSON:  Doctor, would you read
18  the HDL and the total cholesterol portion that's
19  under the normal column.
20      THE WITNESS:  Yes, sir.  The
21  triglycerides were 130 and normal is considered
22  currently to be less than 150, although this
23  reference at the time was below 200.  In either
24  event, that would be normal.  The HDL was listed as
25  50.  Normal we consider to be anything above 40.

## Page 253

1  At that time, the normal range -- as I mentioned
2  earlier, the recommended levels of blood lipids
3  have changed in the last few years.  The VLDL
4  cholesterol is 26 and the total cholesterol-to-HDL
5  ratio was 5.0.
6  BY MR. GOLDMAN:
7      Q.  Can you turn now to Huberty Exhibit 6,
8  sir.  This is an August 2nd of 2000 record of a
9  visit that you had with Mr. Barnett.
10      A.  Yes, sir.
11      Q.  I just want to ask you about the second
12  to last sentence in the first paragraph.  You
13  write, he has not had any angina.
14      A.  Second to last in the first paragraph.
15  He has not had any angina, yes, sir.
16      Q.  By angina you're referring there to
17  heart pain due to reduced blood flow?
18      A.  Yes, sir.
19      Q.  So at this point Mr. Barnett is taking
20  Vioxx every day and if he was taking it after his
21  January 19th, 2000 visit, he'd be taking it for
22  seven or so months every day, right?
23      A.  Yes, sir.
24      Q.  And as of August 2nd of 2000, he was
25  not having any heart trouble?

Michael Mikola, M.D.

Page 254

1      A.  Yes, sir.
2      Q.  I'm not going to go through each one of
3  these records.  I just want you, if you wouldn't
4  mind, to review each of the visits between August
5  of 2000 and September of 2002 and those visits are
6  on Huberty 7, Huberty 8, Huberty 9, Huberty 10,
7  Huberty 11 and Huberty 12.  And those are visits
8  from October 24th of 2000, December 28th of 2000,
9  July 12th of 2001, February 18th of 2002 and August
10  20th of 2002.  And my question for you, sir, after
11  you do that is whether you see any indication in
12  the medical records of you believing that
13  Mr. Barnett had angina or heart pain, heart
14  problems.
15      A.  I did not see anything to that effect.
16      Q.  Mr. Barnett was taking Vioxx every day
17  during that time period through August 20th of 2002
18  and you didn't see any symptoms of angina in any of
19  the visits that we just mentioned?
20      A.  The only potential one would be on
21  2/18/02 when he has some discomfort in his left
22  shoulder.  In retrospect, that may have been a
23  symptom, but at the time I did not think it was
24  suggestive of angina.
25      Q.  And this is Huberty 11.  You're looking

Page 255

1  in February 18th of 2002 and your best medical
2  judgment at the time was that it wasn't angina and
3  now you think, well, maybe it is?
4      A.  The retrospectoscope is 20/20, but at
5  the time I did not think it was angina.
6      Q.  And to the extent he had any angina, if
7  he did then, that would be a surprise given his
8  ischemia condition back in January of 2000,
9  wouldn't it?
10      A.  Can you say that again?
11      Q.  If he had angina in February of 2002,
12  that wouldn't be a surprise given his ischemia
13  condition diagnosed in January of 2000?
14      A.  That's correct.
15      Q.  Based on your review of the record,
16  sir, would you agree that between January of 2000
17  when Mr. Barnett was diagnosed with ischemia and
18  September 6th of 2002 when he had a heart attack,
19  he did not have symptoms of ischemia?
20      A.  Let me review the note from 8/20.  That
21  is correct.
22      Q.  During that time frame after January of
23  2000 through September of 2002, he didn't have any
24  angina?
25      A.  Correct.

Page 256

1      Q.  Any chest pain that Mr. Barnett was
2  experiencing between January of 2000 and September
3  of 2002 was chest pain that was typically relieved
4  with Prilosec and that you believe was related to
5  reflux?
6      A.  Yes, sir, either reflux or possibly
7  anxiety.
8      Q.  Do you also see in Huberty 11, which is
9  the February 18, 2002 visit, that you indicate
10  under assessment plan difficulty losing weight?
11      A.  Yes, sir.
12      Q.  Number 4?  Do you remember a time when
13  Mr. Barnett had gained weight and was trying to
14  lose it on a high-protein diet?
15      A.  Vaguely, yes, sir.
16      Q.  I think you testified before you
17  thought that he was mildly overweight?
18      A.  Um-hum, yes.  Can I --
19      Q.  Let me ask you for -- I'm sorry.
20      A.  Can I comment on that?
21      Q.  Sure.
22      A.  His overall weight he was never
23  morbidly obese.  He had -- tended to have abdominal
24  obesity.  So he wasn't markedly overweight, but he
25  had the type of obesity or the fat deposition in

Page 257

1  the abdomen that is generally associated with an
2  increased risk of metabolic syndrome and
3  atherosclerotic disease, vascular disease.  So
4  although he wasn't markedly overweight, his weight
5  was concentrated in an area that confers a little
6  bit higher risk than if it was distributed, say, in
7  his thighs or buttocks or elsewhere.
8      Q.  Higher risk for heart disease and heart
9  attack?
10      A.  Yes, sir.
11      Q.  Now I want to turn your attention to
12  September 6th through the 14th of 2002.  That was
13  the time that Mr. Barnett was in the hospital for
14  his heart attack?
15      A.  Yes, sir.
16      Q.  He was admitted to a hospital called
17  Grand Strand Regional Medical Center?
18      A.  Yes, sir.
19      Q.  Is that a respected hospital?
20      A.  Yes, sir.
21      Q.  Do you know a cardiologist named
22  Dr. Karavan?
23      A.  Yes, sir.
24      Q.  He was primarily responsible for
25  evaluating Mr. Barnett's heart condition during the

65  (Pages 254 to 257)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 258**

1  hospitalization, right?
2      A.  Yes, sir.
3      Q.  And Dr. Karavan diagnosed Mr. Barnett
4  with a heart attack back then?
5      A.  Yes, sir.
6      Q.  Did you understand that Mr. Barnett had
7  a mild heart attack?
8      A.  Yes, sir.
9      Q.  Why do you say that?
10      A.  Two reasons.  The elevation of his
11  enzymes, if I remember the numbers, his CPK went to
12  217 or possibly a little higher.  The degree of
13  elevation of the CPK is an indicator of the amount
14  of heart muscle that's been damaged by the heart
15  attack.  A large heart attack would most likely
16  give you CPK's in the 2, 3, 4,000 range.  A CPK in
17  the 200's would indicate a small area of heart
18  muscle has been damaged.
19          The other reason is he was diagnosed
20  with a non-Q wave MI, which means the heart attack
21  did not involve the entire thickness of the heart
22  muscle.  The arteries to the heart don't exactly
23  branch out through the heart muscle like muscles --
24  skeletal muscles.  They are located on top of the
25  heart.  They perfuse through the heart muscle and

**Page 259**

1  sort of almost percolates through the wall of the
2  heart muscle, the blood does.
3          In a larger heart attack, generally the
4  entire thickness of the cardiac muscle, of the
5  heart muscle wall, will be damaged and that's what
6  we call a Q wave MI.  He had a non-Q wave MI which
7  suggested it wasn't the entire thickness of the
8  heart muscle.
9      Q.  And what is the basis, Mr. -- I'm
10  sorry, what is the basis, Dr. Mikola, for your
11  assessment that -- that a small elevation in CK
12  (sic) and what you just described about the nature
13  of Mr. Barnett's heart attack -- what makes you
14  comfortable, sir, concluding that Mr. Barnett's
15  heart attack was mild given what you just
16  described?
17      A.  It indicates the information I just
18  shared with you as well as the fact that after the
19  heart attack, the function of his heart, the
20  pumping ability, was still relatively well
21  preserved and maintained.  If you had a large,
22  massive MI, for instance, that knocked out a large
23  part of the heart muscle, you would expect an
24  individual's ejection fraction to go from 55 to 25,
25  30 percent and to the best of my recollection,

**Page 260**

1  they -- his ejection fraction was still fairly well
2  preserved after the MI.
3      Q.  I believe his ejection fraction during
4  the period when he had his MI was 50 percent.
5      A.  Okay.
6      Q.  Does that ring a bell?
7      A.  Okay.  That's about the figure that I
8  recall.
9      Q.  That's still in the normal range,
10  right?
11      A.  Pretty close, yes, sir.
12      Q.  And then subsequently in July of 2003,
13  Mr. Barnett had another stress test and that's when
14  his ejection fraction was 58 percent.  Do you
15  remember that?
16      A.  I don't specifically --
17      Q.  We'll get to that.
18      A.  Okay.
19      Q.  Dr. Curtis Bryan performed a quintuple
20  bypass surgery on Mr. Barnett?
21      A.  Yes, sir.
22      Q.  And then you were saying --
23      A.  Can I ask a quick question?
24      Q.  Yes.
25      A.  What -- which exhibit number is the

**Page 261**

1  hospital record?  I got it.  Okay.
2      Q.  Do you remember that Mr. Barnett was
3  diagnosed with coronary artery disease in his
4  discharge summary?  I'll show it to you if you
5  don't remember.
6      A.  Yes, sir, I remember.  Discharge
7  summary from September.
8      Q.  Yes.  Let me hand it to you.
9          (DFT. EXH. 37, Grand Strand Regional
10  Medical Center medical records for Gerald Barnett,
11  was marked for identification.)
12  BY MR. GOLDMAN:
13      Q.  This is Exhibit 37.  Do you see that --
14      MR. ROBINSON:  I'm sorry, there's
15  writing on this.
16      COURT REPORTER:  What number?
17      MR. ROBINSON:  Is this -- do I have the
18  wrong one?  Just hope he doesn't have writing on
19  it.
20  BY MR. GOLDMAN:
21      Q.  It's Exhibit 37 and it's GrandStrandRMC
22  64 to 65.  Do you see at the top of the page
23  there's a diagnosis, Number 2, coronary artery
24  disease?
25      A.  Yes, sir.

# Michael Mikola, M.D.

Page 262

1      Q.  Do you understand that that is a
2  condition that takes years and years to develop?
3      A.  That's correct.
4      Q.  Mr. --
5      A.  I should say atherosclerotic coronary
6  artery disease takes years and years to develop.
7      Q.  And that's what Mr. Barnett had?
8      A.  Yes.
9      Q.  Do you see in the -- under -- is it
10 procedure, P-R-O-C?
11     A.  Yes, sir.
12     Q.  -- that there's a reference to
13 Mr. Barnett having significant three-vessel
14 coronary artery disease?
15     A.  Yes, sir.
16     Q.  Based on your experience, sir, does it
17 take many years to develop significant three-vessel
18 coronary artery disease?
19     A.  Yes, sir.
20     Q.  Is coronary artery disease and heart
21 attacks among the leading causes of death in the
22 United States?
23     A.  Correct.
24     Q.  Do you know whether since 1990
25 cardiovascular disease has been the number one

Page 263

1  cause of death other than during World War I?
2      A.  I believe that's correct, yes.
3      Q.  The discharge summary also indicates
4  that -- under discharge diagnosis that Mr. Barnett
5  had hyperlipidemia, Number 3, that's high
6  cholesterol?
7      A.  Correct.
8      Q.  And then 4 says, systemic hypertension.
9  Do you see that?
10     A.  Yes, sir.
11     Q.  Does that mean that Mr. Barnett had
12 high blood pressure?
13     A.  That's correct.
14     Q.  Is high blood pressure a risk factor
15 for heart disease or heart attack?
16     A.  Yes, sir.
17     Q.  Let me ask the question in a more clean
18 way.
19        Is hypertension a risk factor for heart
20 disease or a heart attack?
21     A.  No, sir.
22     Q.  Based on your review of the discharge
23 summary from the time Mr. Barnett spent in the
24 hospital, did he recover quickly from his heart
25 attack being released four days after his bypass

Page 264

1  surgery?
2      A.  Yes, sir.
3      Q.  I'm going to review as quickly as I can
4  so I don't irritate the jury the visits that you
5  had with Mr. Barnett after September of 2002.
6      A.  Okay.
7      Q.  And you understand that after
8  December -- I'm sorry --
9        MR. ROBINSON:  I'm going to move to
10 strike the last sentence about the irritating a
11 jury.  I don't want that --
12        MR. GOLDMAN:  You want me to irritate
13 them?
14        MR. ROBINSON:  Judge Fallon doesn't
15 like that.  I want you to irritate them.  No, but
16 rephrase it.
17 BY MR. GOLDMAN:
18     Q.  Dr. Mikola, I want to review the visits
19 that you had with Mr. Barnett after he had a heart
20 attack in September of 2002, okay?
21     A.  Yes, sir.
22     Q.  And I'm trying to do this as quickly as
23 I can --
24     A.  Okay.
25     Q.  -- for your sake and others.

Page 265

1      A.  All right.
2      Q.  If you --
3        MR. ROBINSON:  Move to strike.  Move to
4  strike.
5  BY MR. GOLDMAN:
6      Q.  If you turn to Huberty 13, do you see
7  this is a visit that Mr. Barnett had with you on
8  December 24th of 2002?
9      A.  That's correct.
10     Q.  That's three months after his
11 hospitalization for a heart attack?
12     A.  Correct.
13     Q.  As far as you know, Mr. Barnett was
14 taking Vioxx every day after his heart attack
15 through December of 2002, right?
16     A.  I believe so, yes.  I don't know
17 exactly when he restarted it, but it's my
18 understanding he continued to take it, yes.
19     Q.  In the second sentence you indicate he
20 was admitted with an MI, underwent bypass surgery,
21 he has done well since then.
22     A.  Correct.
23     Q.  What did you mean by that?
24     A.  That means he felt relatively well.  He
25 was not having any prolonged setbacks or

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

Page 266

1  complications from the procedure.
2      Q.  Then do you see a few sentences later
3  you say, no angina?
4      A.  Yes, sir.
5      Q.  Does that mean that he was not
6  experiencing heart pain related to limited blood
7  flow?
8      A.  Yes, sir.
9      Q.  Further down in that paragraph you
10  write, he has been exercising.
11     A.  Yes, sir.
12     Q.  Is that an indication that Mr. Barnett
13  recovered quickly from his heart attack?
14     A.  Yes, sir.
15     Q.  And then --
16     A.  It's fairly standard.  Generally at
17  Grand Strand after a heart attack, patients will be
18  enrolled in a cardiac rehab program where they go
19  to supervised exercise to get them up and mobile
20  again.
21     Q.  In the last sentence you indicate, I
22  spent approximately 30 minutes today answering
23  numerous questions about his medicines, BP, or
24  blood pressure, heart disease, plaque build-up, et
25  cetera.

Page 267

1          Do you see that?
2      A.  Yes, sir.
3      Q.  Did you, sir, attempt to determine
4  after Mr. Barnett's heart attack whether any of the
5  medication that he was taking might harm his heart?
6      A.  Yes, sir.
7      Q.  And you understood that Mr. Barnett was
8  taking Vioxx in December of 2002, right?
9      A.  Yes, sir.
10     Q.  You understood that he was going to
11  continue taking Vioxx after that point because it
12  was helping his pain?
13     A.  Yes, sir.
14     Q.  You would have stopped Mr. Barnett from
15  using Vioxx if you believed it contributed in any
16  way to his heart attack, correct?
17     A.  Yes, sir.
18     Q.  And if you thought Vioxx might cause
19  Mr. Barnett heart problems in the future, you would
20  have told him to stop using it?
21     A.  Yes, sir.
22     Q.  Therefore, you didn't believe the Vioxx
23  had anything to do, sir, with Mr. Barnett's heart
24  attack in September of 2002?
25          MR. ROBINSON:  Objection.  Two

Page 268

1  objections.  Number one, it's leading and number
2  two --
3          MR. GOLDMAN:  Okay.  I'll cure that.
4          MR. ROBINSON:  -- I have an objection
5  to -- to time.  You're saying at the time that he
6  was treating Mr. Barnett versus now.
7          MR. GOLDMAN:  Oh, I'd love to ask him
8  now.
9          MR. ROBINSON:  No, I understand.
10  BY MR. GOLDMAN:
11     Q.  But let me stick with the judgment at
12  the time first and then we'll go further.
13          Mr. -- Dr. Mikola, when you determined
14  that it was okay for Mr. Barnett to continue to
15  take Vioxx after his heart attack, that was in part
16  because you believed at the time that Vioxx had
17  nothing to do with his heart attack?
18     A.  That's correct.
19     Q.  I believe you answered in response to
20  Mr. Robinson's questions that today based on
21  information that you've seen that you would
22  consider Vioxx as a possible -- I can't remember
23  your exact testimony, but you were shown
24  information today and you were asked whether or not
25  you would consider it a possible cause.

Page 269

1          MR. ROBINSON:  Okay, I'm going to
2  move -- I'm going to object, misstates what the
3  testimony was.
4  BY MR. GOLDMAN:
5      Q.  Well, I believe your testimony was that
6  based on everything you've seen today that maybe
7  you would consider Vioxx as a possible cause.  Was
8  that your testimony?
9          MR. ROBINSON:  Your Honor, I'm going
10  to --
11          MR. GOLDMAN:  Your Honor, that's good.
12          MR. ROBINSON:  -- I'm just going to
13  make -- I object and I think prior testimony speaks
14  for itself.  If you want to ask him a question --
15  but to go back and recite what my question was
16  without having the question and looking at the
17  answer, I mean, it's not fair.
18  BY MR. GOLDMAN:
19     Q.  When you testified previously, sir,
20  about the role that you think Vioxx might have in
21  Mr. Barnett's heart attack today, you were basing
22  that on information that you've seen since you
23  stopped prescribing Vioxx, right?
24     A.  Yes, sir.
25     Q.  And you didn't form the opinion one way

68 (Pages 266 to 269)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

Page 270

1  or the other about whether Vioxx contributed?
2           MR. ROBINSON: I'm going to object.
3           MR. GOLDMAN: Okay.
4           MR. ROBINSON: Leading.
5  BY MR. GOLDMAN:
6      Q.  Have you reviewed all of the literature
7  concerning COX-2 inhibition and the possible
8  imbalance that that creates in the body?
9      A.  No, sir.
10     Q.  And there are other people who have
11 reviewed all the literature concerning COX-2
12 inhibition and whether that may or may not put
13 patients in a prothrombotic or proclotting state,
14 right?
15     A.  I don't know that. I assume there are,
16 but I -- I don't know if anyone's reviewed all the
17 literature.
18     Q.  And you haven't reviewed all the
19 literature relating to any possible imbalance that
20 there might be from taking Vioxx or Celebrex in
21 terms of putting patients in a prothrombotic state,
22 true?
23          MR. ROBINSON: I object.
24          THE WITNESS: That's correct. I
25 haven't reviewed all the literature. There's

Page 271

1  tremendous amounts of medical literature on a lot
2  of subjects that -- it's just not feasible to
3  review every article that's been -- and every study
4  that's been done.
5  BY MR. GOLDMAN:
6      Q.  Can you turn to Huberty 14 for me, sir,
7  which is a March 24th, 2003 visit that you had with
8  Mr. Barnett --
9      A.  Yes, sir.
10     Q.  -- Bates stamped Huberty 14.
11     A.  Yes, sir.
12     Q.  This indicates that Mr. Barnett was
13 hospitalized at the end of February 2003 for
14 atypical chest pain. And what did you write in the
15 third sentence in the first paragraph?
16     A.  Is that where he had seen Dr. Karavan?
17     Q.  Dr. Hollingsworth.
18     A.  Dr. Hollingsworth admitted him and
19 ruled out MI and discharged him.
20     Q.  And then the next sentence.
21     A.  He had seen Dr. Karavan who, per the
22 patient's report, did not think his chest pain was
23 cardiac.
24     Q.  Was it your understanding that in
25 February of 2003, Mr. Barnett was not suffering any

Page 272

1  angina or heart trouble?
2           MR. ROBINSON: Objection.
3           THE WITNESS: That's correct.
4  BY MR. GOLDMAN:
5      Q.  And then do you see further down it
6  indicates, however, it does not occur during
7  cardiovascular stress such as a treadmill, et
8  cetera, only when he lifted weights. When he cut
9  back on his weights, it got better.
10     A.  Yes, sir.
11     Q.  Why did you write that?
12     A.  Generally angina from plaque build-up
13 occurs at times when the heart muscle needs more
14 blood supply. As I mentioned before, if you're
15 sitting around doing nothing, your heart doesn't
16 need a lot of blood to meet its demands. When you
17 do cardiovascular exercise such as walking on a
18 treadmill, the heart needs more blood supply and
19 more oxygen because it has to work harder. And if
20 you have angina -- or I should say if you have
21 significant atherosclerotic disease, those are
22 generally times when angina will present itself.
23 So if your chest pain has come from significant
24 plaque build-up in the coronary arteries, it's more
25 likely to become apparent during emotional stress

Page 273

1  or during physical activity than it is at other
2  times.
3      Q.  And you understood that in July of
4  2003 -- or not in July.
5      A.  March.
6      Q.  In March. In March of 2003,
7  Mr. Barnett was still taking Vioxx every day,
8  right?
9      A.  Yes, sir.
10     Q.  Let's turn to the next visit, August
11 19th of 2003 on the next page.
12     A.  I have -- okay. I have 7/15/03 and
13 8/19/03.
14     Q.  Let's skip one visit for the benefit of
15 the jury and go to August 19th of 2003.
16     A.  Okay.
17     Q.  Is this a medical record indicating
18 that Mr. Barnett had a question of SVT while he was
19 walking on the treadmill at the health club?
20     A.  Yes, sir.
21     Q.  What is SVT?
22     A.  SVT is supraventricular tachycardia.
23 It's a rapid heart rate that generally is initiated
24 by areas of the top part of the heart, the atrium,
25 other than the normal sinus -- normal pacemaker of

69 (Pages 270 to 273)

## Michael Mikola, M.D.

### Page 274

1  the heart. And typically the rate will be very
2  fast. It tends to come on suddenly. It can end
3  suddenly or it can last for quite some time. But
4  at that time his history was that when he was
5  walking on the treadmill, his pulse would suddenly
6  shoot up and that suggests an irregular rhythm.
7      Q.  Is that the reason -- I'm sorry. Are
8  you done?
9      A.  Yes.
10     Q.  Is that the reason why, Dr. Mikola, you
11  suggested a stress test?
12     A.  Yes, sir.
13         (DFT. EXH. 38,
14  Cardiology/Gastroenterology Associates medical
15  record for Gerald Barnett, was marked for
16  identification.)
17         (DFT. EXH. 39,
18  Cardiology/Gastroenterology Associates medical
19  record for Gerald Barnett, was marked for
20  identification.)
21  BY MR. GOLDMAN:
22     Q.  Let me hand you Exhibit 38.
23     A.  The reason is -- the other reason is
24  that ischemic disease can sometimes present with
25  rhythm disturbances.

### Page 275

1      Q.  This is a document Bates stamped
2  Cardiogas Associates 54. It's dated July 18th,
3  2003. Does it identify you as the referring
4  physician?
5      A.  Yes, sir.
6      Q.  Is this the same type of stress test
7  that was conducted back in January of 2000,
8  Cardiolite?
9      A.  Yes, that's correct.
10     Q.  Directing your attention just to the
11  impression. What does it say under Number 1?
12     A.  Excellent exercise tolerance.
13     Q.  How long if you look above under stress
14  procedure did Mr. Barnett last on the treadmill
15  that involved a Bruce protocol?
16     A.  Again, 15 minutes.
17     Q.  What did that indicate to you about the
18  condition of Mr. Barnett's heart in July of 2003?
19     A.  It would really indicate two things,
20  one, that he's in pretty good cardiovascular
21  condition and two, that he's unlikely to be able to
22  exercise that long with significant plaque
23  build-up.
24     Q.  If you look under impression again,
25  Number 4, it says, left ventricular ejection

### Page 276

1  fraction. What is the number there?
2      A.  58 percent.
3      Q.  Do you remember that that is actually
4  higher than what it was in January of 2000?
5      A.  It was 56 percent, I think, just --
6  yes. 1 or 2 percent may be splitting hairs, but
7  it's certainly as good as it was before.
8      Q.  And an ejection fraction of 58 percent
9  in July of 2003 you would consider to be normal?
10     A.  Yes, sir.
11     Q.  Turning back to Huberty 16, in the
12  first paragraph do you see that you wrote in the
13  middle, he had a list of about six questions today
14  that were answered at length. He has not had any
15  recurrent angina. He is going to -- it says give
16  but I think you mean dive in Cozumel if possible.
17     A.  Yes, sir.
18     Q.  Did you believe that Mr. Barnett's
19  heart was in good enough condition to go scuba
20  diving in Cozumel if he wanted to?
21     A.  Yes, sir.
22     Q.  Did you ever tell Mr. Barnett that he
23  couldn't go scuba diving because he had had a heart
24  attack?
25     A.  No, sir.

### Page 277

1      Q.  Was it your understanding that
2  Mr. Barnett intended when he went to Cozumel here
3  in August of 2003 that he was going to scuba dive?
4      A.  Yes, sir.
5          MR. GOLDMAN: Let's go off the video --
6          MR. ROBINSON: Do you want to take a
7  break?
8          MR. GOLDMAN: -- and take a quick
9  break.
10         VIDEO TECHNICIAN: This is the end of
11  Tape Number 5 in the deposition of Dr. Michael
12  Mikola. The time is approximately 4:10 PM. The
13  date is April 25th, 2006. We will now go off the
14  record.
15         (A recess transpired.)
16         VIDEO TECHNICIAN: This is the
17  beginning of Tape Number 6 in the deposition of
18  Dr. Michael Mikola. The time is approximately 4:19
19  PM. The date is April 25th, 2006. We are now back
20  on the record.
21  BY MR. GOLDMAN:
22     Q.  Dr. Mikola, can you turn with me,
23  please, to Huberty 17.
24     A.  Yes, sir.
25     Q.  This is a December 8, 2003 visit that

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

| Page 278 |
|---|
| 1    you had with Mr. Barnett, right? |
| 2        A.   That's correct. |
| 3        Q.   Is this 13 months after his heart |
| 4    attack?  Actually, 12? |
| 5        A.   12, 13, 14, 15.  14 and a half. |
| 6        Q.   How many months after Mr. Barnett's |
| 7    heart attack is this visit? |
| 8        A.   Approximately 14 and a half, I believe. |
| 9        Q.   Do you see any indication, sir, that |
| 10   he's suffering from angina or heart trouble? |
| 11       A.   No, sir. |
| 12       Q.   And to your knowledge, he's taking |
| 13   Vioxx every day? |
| 14       A.   Yes, sir. |
| 15       Q.   Turn, please, to Huberty 18.  This is |
| 16   January 20th of 2004.  Do you see under assessment |
| 17   plan Number 2, chest pain, I do not think it is |
| 18   *suggestive of angina?* |
| 19       A.   Yes, sir. |
| 20       Q.   Do you also see that above the end of |
| 21   the history, he has inquired -- or he also inquires |
| 22   about Viagra use? |
| 23       A.   Yes, sir. |
| 24            MR. ROBINSON:  Do you know what -- |
| 25            MR. GOLDMAN:  Oh, you're going to drop |

| Page 279 |
|---|
| 1    that?  For the record -- |
| 2            MR. ROBINSON:  Put it this way -- |
| 3            MR. GOLDMAN:  We're glad.  We're glad. |
| 4            MR. ROBINSON:  You can read that in -- |
| 5    off the record. |
| 6            VIDEO TECHNICIAN:  One sec.  We will |
| 7    now go off the record.  The time is approximately |
| 8    4:21 PM. |
| 9            (Off-the-record conference.) |
| 10           VIDEO TECHNICIAN:  We're back on the |
| 11   record.  The time is approximately 4:22 PM. |
| 12   BY MR. GOLDMAN: |
| 13       Q.   Dr. Mikola, did you understand that |
| 14   Mr. Barnett was complaining about erectile |
| 15   dysfunction in January of 2004? |
| 16       A.   Yes, sir. |
| 17       Q.   Do you have any reason to believe that |
| 18   had anything to do with Vioxx? |
| 19       A.   The erectile dysfunction? |
| 20       Q.   Yes. |
| 21       A.   No, sir. |
| 22       Q.   Any reason to think that the erectile |
| 23   dysfunction had anything to do with Mr. Barnett's |
| 24   heart attack? |
| 25       A.   Indirectly.  I think that |

| Page 280 |
|---|
| 1    atherosclerotic disease can contribute to both. |
| 2    It's quite possible the erectile dysfunction is a |
| 3    complication of the beta blocker therapy that he |
| 4    had to take after his heart attack.  Almost all |
| 5    patients after an MI are put on beta blockers. |
| 6        Q.   And he was? |
| 7        A.   A side -- yes.  And a side effect can |
| 8    be erectile dysfunction. |
| 9        Q.   And just quickly, I want to turn back |
| 10   to before his heart attack, the Huberty 9.  This is |
| 11   a July 12th, 2001 visit.  Do you see under |
| 12   subjective, the last sentence, Mr. Barnett is |
| 13   explaining that he is experiencing symptoms of |
| 14   erectile dysfunction back then? |
| 15       A.   Yes, sir. |
| 16       Q.   This was before his heart attack? |
| 17       A.   That's correct, about two months -- his |
| 18   heart attack was in '02?  That's correct, before |
| 19   his heart attack. |
| 20       Q.   You never told Mr. Barnett that he |
| 21   ought to refrain from intercourse because of his |
| 22   heart attack, did you? |
| 23       A.   No, sir.  After his heart attack, he |
| 24   had bypass and after bypass he should be okay |
| 25   because he's got new patent vessels to plaque. |

| Page 281 |
|---|
| 1        Q.   Just a couple more visits and then |
| 2    we're going to move on.  February 11th of 2004, |
| 3    I'll show you a document from Dr. Karavan that he |
| 4    e-mailed -- that he sent to you.  It's Bates |
| 5    stamped CardiogasAssociates 39 to 40.  And do you |
| 6    see that you are cc'd on the second page at the |
| 7    bottom? |
| 8        A.   Yes, sir. |
| 9        Q.   And Dr. Karavan indicates at the top |
| 10   that he's -- Mr. Barnett is walking an hour a day |
| 11   without any exertional chest pain.  Do you see that |
| 12   on the first page? |
| 13       A.   Yes, sir. |
| 14       Q.   And at the bottom of the page, he |
| 15   indicates that Mr. Barnett is doing well from a |
| 16   cardiac standpoint? |
| 17       A.   Yes, sir. |
| 18       Q.   Is that consistent with your assessment |
| 19   of Mr. Barnett's heart condition in February of |
| 20   2004? |
| 21       A.   Let me refer to my notes.  Yes, sir, |
| 22   that's correct. |
| 23       Q.   The last visit that you had was May 19, |
| 24   2004 and I think it's Huberty 19. |
| 25       A.   Yes, sir. |

71 (Pages 278 to 281)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

Page 282

1      Q.   And then here you indicate --
2  withdrawn.
3            What do you say in the second sentence
4  under history?
5      A.   No angina PND --
6      Q.   You can actually stop there.  I was
7  interesting in no angina.
8      A.   Okay.
9      Q.   And then in the sentence after that, he
10  had some atypical chest discomfort usually
11  associated with abdominal bloating, what did you
12  mean by that?
13      A.   That means when he gets his chest
14  discomfort, he also gets a bloating sensation in
15  his abdomen.
16      Q.   The chest discomfort that Mr. Barnett
17  was experiencing around May of 2004 was not the
18  type that was in the upper part of the chest and
19  went out to the left of the heart?
20      A.   That's correct, it was dissimilar from
21  that type of pain.
22      Q.   Let me ask you to please turn to
23  Huberty 19 again.  Oh, you're still on it?
24      A.   Yes, sir.
25      Q.   Do you see Number 5, elevated

Page 283

1  homocysteine?
2      A.   Yes, sir.
3      Q.   Is that a vitamin deficiency?
4      A.   It is actually an elevation of amino
5  acid that is thought to be -- thought to increase
6  the risk of vascular disease and it's treated with
7  vitamin supplementation.
8      Q.   Okay.  Homocysteine, is that a genetic
9  condition?
10      A.   It can be, yes.  Severe -- there are
11  genetic conditions that result in severe elevations
12  of homocysteine and those patients tend to have
13  heart disease in their twenties and early thirties.
14      Q.   I'm not sure when the first time you
15  diagnosed Mr. Barnett with elevated homocysteine
16  was, but was it your understanding that Mr. Barnett
17  had that condition before his heart attack?
18      A.   I don't know the answer to that.
19      Q.   Based on your --
20      A.   I can -- if you want, I can review the
21  labs, but I'd have to see when I documented it
22  first.
23      Q.   That's okay.
24            MR. ROBINSON:  What page are you on
25  now?

Page 284

1            MR. GOLDMAN:  My outline, 21.
2  BY MR. GOLDMAN:
3      Q.   Is there any indication in your medical
4  records, sir, for Mr. Barnett that he was suffering
5  any psychological or emotional problems as a result
6  of his heart attack?
7      A.   No, sir.
8      Q.   Has Mr. Barnett ever told you in the
9  years that you've seen him that he believes he
10  cannot do certain activities because of his heart
11  attack?
12      A.   No, sir.
13      Q.   Has Mr. Barnett ever told you that he
14  did not believe --
15            MR. ROBINSON:  Well, I'm going to
16  object.  Okay, you mean up until May of --
17            MR. GOLDMAN:  Up until May of 2004.
18            MR. ROBINSON:  Yeah, okay.
19  BY MR. GOLDMAN:
20      Q.   Through May of 2004, which is --
21            MR. ROBINSON:  Two years ago.
22            THE WITNESS:  Two years almost.
23  BY MR. GOLDMAN:
24      Q.   -- two years ago -- let me phrase it
25  differently.

Page 285

1            As of May of 2004 -- which is more than
2  a year and a half after his heart attack, right?
3      A.   Correct.
4      Q.   -- Mr. Barnett never said that he felt
5  that his physical activities were limited, is that
6  true?
7      A.   Correct.
8      Q.   Did Mr. Barnett at any point up until
9  May of 2004 tell you that he didn't think he could
10  golf as much as he would like to because of his
11  heart condition?
12      A.   I don't recall that --
13      Q.   Did Mr. Barnett ever --
14      A.   -- conversation.
15      Q.   I'm sorry?
16      A.   I don't recall that conversation.
17      Q.   Do you see any indication in the
18  medical records that Mr. Barnett said he cannot ski
19  because of his heart?
20      A.   No, sir.
21      Q.   Do you see any indication in the
22  medical records that Mr. Barnett cannot dance as
23  often as he wants to because of his heart attack?
24      A.   No, sir.
25      Q.   Did Mr. Barnett ever tell you that he

Golkow Litigation Technologies - 1.877.DEPS.USA
66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 286

1   felt he could not exercise as much because of his
2   heart attack?
3       A.  No, sir.
4       Q.  As of your last visit with Mr. Barnett,
5   was it your view that he could do all of those
6   things?
7       A.  Yes, sir.
8       Q.  Let's switch subjects to the VIGOR
9   study, okay?  You testified that part of your
10  understanding of the risks associated with Vioxx
11  were based on the publication of the VIGOR study,
12  is that right or am I wrong?
13      A.  Can you say that again?
14      MR. ROBINSON:  Object.  I'm going to
15  object.  Well, you're striking it, right?
16      MR. GOLDMAN:  Yeah, I'll strike it.
17  BY MR. GOLDMAN:
18      Q.  During the time that you were treating
19  Mr. Barnett, did you know about the GI Outcome
20  study or the VIGOR study that Merck had conducted?
21      A.  Yes, sir.
22      Q.  Prior to Mr. Barnett's heart attack,
23  did you read the article that was published about
24  (sic) the New England Journal of Medicine?
25      A.  I don't know about the exact date.  Was

Page 287

1   it published before September '02?
2       Q.  It was published in November of 2000.
3       A.  Yes, sir.
4       Q.  Did you read the New England Journal of
5   Medicine article about the VIGOR study or the GI
6   Outcome study on or about November of 2000?
7       A.  Yes, sir.
8       Q.  I want to show you a copy of that and
9   ask you a few questions about it.
10      MR. GOLDMAN:  I'll mark this as Exhibit
11  40.
12      (DFT. EXH. 40, Article entitled
13  Comparison Of Upper Gastrointestinal Toxicity O
14  Rofecoxib And Naproxen In Patients With Rheumatoid
15  Arthritis, was marked for identification.)
16  BY MR. GOLDMAN:
17      Q.  And this is the publication by the New
18  England Journal of Medicine about the VIGOR study,
19  okay?
20      A.  Yes, sir.
21      Q.  I want to talk a little bit about the
22  study itself and if you need to review this
23  article, feel free.  Do you remember whether the
24  study involved patients with rheumatoid arthritis?
25      A.  I believe it did.

Page 288

1       Q.  Is that a chronic condition?
2       A.  Yes, sir.
3       Q.  Did Mr. Barnett have rheumatoid
4   arthritis?
5       A.  No, sir.
6       Q.  Did the VIGOR study involve a
7   comparison of 50 milligrams of Vioxx versus 1,000
8   milligrams of Naproxen or 500 milligrams twice a
9   day?
10      A.  Yes, sir.
11      Q.  Did Mr. Barnett use 50 milligrams of
12  Vioxx?
13      A.  No, sir.
14      Q.  What did he use?
15      A.  I believe it was 25 milligrams.
16      Q.  Did you understand --
17      A.  My --
18      Q.  I'm sorry?
19      A.  My medicine list is not present, but
20  I'm almost certain it was 25 milligrams.
21      Q.  Do you understand the purpose of the
22  VIGOR study was to determine if Vioxx reduced pain
23  and inflammation and serious GI events more than a
24  thousand milligrams of Naproxen daily?
25      A.  Can you say that again?

Page 289

1       Q.  Sure.  Did you understand that the
2   purpose of the VIGOR study was to compare how 50
3   milligrams of Vioxx compared with a thousand
4   milligrams of Naproxen in terms of its ability to
5   reduce pain and inflammation and in terms of its
6   ability to reduce GI events?
7       A.  Yes, sir.
8       Q.  Were you aware that the result of the
9   study, at least the GI portion, indicated that
10  Vioxx reduced serious GI events by 50 percent
11  compared to Naproxen?
12      A.  Yes, sir.
13      Q.  I want to turn your attention, please,
14  to first in the abstract of this article under
15  results.  In the last sentence, did you know on or
16  about November of 2000 that the incidence of
17  myocardial infarction was lower among patients in
18  the Naproxen group than among those in the Vioxx
19  group, .1 percent versus .4 percent?
20      A.  Yes, sir.
21      Q.  Did you understand that that indicated
22  that there were four times as many heart attacks in
23  the patients using Vioxx 50 milligrams compared to
24  the patients using a thousand milligrams of
25  Naproxen?

73  (Pages 286 to 289)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

Page 290

1    MR. WACKER:  Objection, misstates
2  the -- the way it's written here, that's flipping
3  it.
4  BY MR. GOLDMAN:
5    Q.  Do you understand?  I want to -- I want
6  to get your understanding of the .1 percent versus
7  .4 percent, okay?
8    A.  Yes.  Yes, that would indicate there
9  were four times more likely -- four times more
10  events.
11    Q.  Did you know in about November of 2000
12  that there were four times as many heart attack
13  events in the Vioxx arm of the VIGOR study compared
14  to the Naproxen arm?
15    MR. WACKER:  Again, that's flipping the
16  data, objection.
17    THE WITNESS:  Yes, sir.
18  BY MR. GOLDMAN:
19    Q.  And there's been an allegation, sir,
20  that Merck and the non-Q Merck authors should have
21  included the actual number of heart attacks in this
22  study as opposed to the percentage, okay?  Are you
23  with me?
24    A.  Not exactly.  Say that again.
25    Q.  There's been an allegation that Merck

Page 291

1  should have -- and the non-Q Merck authors should
2  have included the number of heart attacks, 17
3  versus 4 or as it started out ultimately 20 versus
4  4, in the VIGOR publication as opposed to referring
5  to percentages.
6    MR. ROBINSON:  Objection.
7  BY MR. GOLDMAN:
8    Q.  Okay.
9    A.  Yes.
10    MR. ROBINSON:  Objection.  Objection to
11  the question as misstating the allegation.  You
12  state one part of the allegation.
13  BY MR. GOLDMAN:
14    Q.  We'll go through the other parts.
15  Would it have made a difference to you, Dr. Mikola,
16  if in that sentence the non-Q Merck authors and
17  Merck had written that there were 17 heart attacks
18  in the Vioxx arm versus 4 heart attacks in the
19  Naproxen arm?
20    A.  Probably not.
21    Q.  Do you also understand from reading the
22  VIGOR study that there was a
23  statistically-significant difference in the number
24  of heart attacks that occurred in the Vioxx arm
25  versus the Naproxen arm?

Page 292

1    A.  Yes, sir.
2    Q.  And the difference was four times,
3  right?
4    A.  Roughly, yes.
5    Q.  There's been an allegation that Merck
6  should have updated information that occurred after
7  *the cutoff date in this study.*  Do you know what I
8  mean by cutoff date?
9    A.  Yes, sir.
10    Q.  And that Merck should have included
11  three additional heart attack events that occurred
12  after the cutoff date, okay?
13    A.  Yes, sir.
14    Q.  Now, if Merck had included three
15  *additional heart attacks that occurred after the*
16  cutoff date of this study, that would have changed
17  the percentages to five times, in other words,
18  there would have been five times as many heart
19  attacks in the Vioxx arm versus the Naproxen arm.
20  Are you with me?
21    A.  Yes, sir.
22    Q.  Would it have made a difference to you
23  if the number was five times as opposed *to four*
24  times?
25    A.  I don't believe so.

Page 293

1    Q.  The conclusion that I believe you said
2  you drew from the VIGOR study was that the reason
3  there was a difference in heart attacks in this
4  study was because Naproxen has aspirin-like
5  effects.  Is that your testimony?
6    A.  My testimony was that that was the
7  conclusion of the authors.
8    Q.  And if you look on the second to last
9  page and the last page of this study, on the last
10  sentence, the right column, it says, thus, our
11  results are consistent with the theory that
12  Naproxen has a coronary protective effect and
13  highlight the fact that Vioxx does not provide this
14  type of protection, and then it continues.
15    Do you see that?
16    A.  Yes, sir.
17    Q.  And then it says, the finding that
18  Naproxen therapy was associated with a lower rate
19  of myocardial infarction needs further confirmation
20  in larger studies.
21    A.  Yes.
22    Q.  Do you see that, sir?
23    A.  Yes, sir.
24    Q.  I believe that Mr. Robinson asked you
25  about e-mails involving Dr. Patrono.  Do you

74 (Pages 290 to 293)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 294**

1  remember that?
2      A.  Yes, sir.
3      Q.  Could you find for me, sir, Exhibit 7
4  that was used by the Plaintiff's attorneys.
5      A.  Yellow 7, correct.  Yes, sir.
6      Q.  This was also one of the e-mails that
7  Miss Myer sent to you in advance of your
8  deposition, okay?
9      A.  For Exhibit 7 I have the office note.
10     Q.  Let me find out what this exhibit is.
11  It's -- I'm looking for the Alan Nies to Barry
12  Gertz e-mail.  Let me just check my notes.
13         MR. ROBINSON:  If you hand me that
14  stack, I can find it for you.
15         THE WITNESS:  Sorry, I'm not used to
16  juggling 45 different stacks of paper.
17         MR. ROBINSON:  You get to leave it.
18  Okay.  I'm going to find it.  Who's got it?  Which
19  one is it that -- which --
20         MR. WACKER:  Patrono.
21         MR. ROBINSON:  Okay.
22         MR. GOLDMAN:  Have you found it?
23         MR. ROBINSON:  No, I found another one
24  we were looking for.  Hold on, we'll find it.
25  We'll put those in order.  Let me look at these.

**Page 295**

1         MR. GOLDMAN:  6.
2         VIDEO TECHNICIAN:  We will now go off
3  the record.  The time is approximately 4:41 PM.
4         (Off-the-record conference.)
5         VIDEO TECHNICIAN:  We're back on the
6  record.  The time is approximately 4:42 PM.
7  BY MR. GOLDMAN:
8      Q.  I'm handing you one of the documents
9  that Mr. Barnett's lawyers sent you in advance of
10  your deposition and it's an e-mail from at the
11  bottom Martine Arenzi (ph) to various people and it
12  is referencing the subject of Carlo Patrono on
13  VIGOR.
14         And this is the document that was
15  highlighted when it was sent to you, right?
16     A.  Yes, sir.
17     Q.  I want to direct your attention to a
18  portion that was not highlighted and that's in the
19  third paragraph.  Follow along with me and -- when
20  I read, quote, Carlo does not think that the CV
21  effect can be explained by the inhibition of
22  prostacyclin given that Vioxx inhibits only the
23  COX-2 component of prostacyclin secretion and he
24  has conceptual difficulties in explaining how this
25  could translate in an increase of the CV risk of

**Page 296**

1  the magnitude that we observed.  His conclusion is
2  that what we saw in VIGOR is to be attributed to a
3  large extent to chance.  Do you see that?
4      A.  Yes, sir.
5      Q.  Merck didn't show you that portion of
6  this e-mail back when you were treating
7  Mr. Barnett, did they?
8      A.  That's correct.
9      Q.  Nobody from Merck ever said to you that
10  Mr. Patrono thinks that the reason for the
11  difference in heart attacks in VIGOR is because of
12  chance, did anyone?
13     A.  That's correct.
14     Q.  Is this an example of why it's
15  important to have the context of a document before
16  you reach a conclusion about the importance of it
17  to you?
18     A.  Yes.
19     Q.  Let me also show you an article that
20  Mr. -- I'm sorry, that Dr. Patrono wrote.
21         MR. GOLDMAN:  I'll mark this as Exhibit
22  3 -- I'm sorry, 41.
23         (DFT. EXH. 41, Article entitled
24  Platelet-Active Drugs:  The Relationships Among
25  Dose, Effectiveness, and Side Effects, was marked

**Page 297**

1  for identification.)
2         THE WITNESS:  Do you want this back?
3  BY MR. GOLDMAN:
4      Q.  Yes.  Thanks.  This is an article
5  called, platelet-active drugs, the relationships
6  among dose, effectiveness, and side effects.  And
7  do you see that Dr. Patrono is one of -- is the
8  first author?
9      A.  Yes, sir.
10     Q.  Do you recognize the publication that
11  this is in, CHEST Journal?
12     A.  Yes, sir.
13     Q.  Is that a reputable journal?
14     A.  Yes, sir.
15     Q.  Do you know if that's peer reviewed?
16     A.  I believe it is.
17     Q.  Which means that other doctors who
18  don't write the article review it for accuracy?
19     A.  Yes, sir.
20     Q.  I want to direct your attention, sir,
21  to the page at the bottom that is 245S.  It doesn't
22  have a Bates number, but that's the page of the
23  article.
24     A.  Yes, sir.
25     Q.  Do you see the Section 2.1 called,

75 (Pages 294 to 297)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 298

1   coxibs and cardiovascular disease?
2       A.  Yes, sir.
3       Q.  And the first paragraph there,
4   Dr. Patrono is talking about the VIGOR study in
5   part.  Do you see that?
6       A.  Yes, sir.
7       Q.  If you turn the page --
8           MR. WACKER:  Which page?
9   BY MR. GOLDMAN:
10      Q.  -- to 246S, as in Sam, toward the end
11  of the first paragraph, do you see Dr. Patrono
12  wrote, quote, while the cause of the apparent
13  excess risk of MI in the Vioxx GI Outcomes Research
14  trial, that's VIGOR, cannot be conclusively
15  established, a combination of some cardioprotective
16  effect of Naproxen and the play of chance does seem
17  to offer a plausible explanation for these
18  unexpected findings.  While other mechanisms cannot
19  be discounted, there is currently little evidence
20  in humans to support a prothrombotic effect for
21  coxibs.
22          Do you see that, sir?
23      A.  Yes, sir.
24      Q.  And the date of this article is in 2004
25  if you look at the bottom of the abstract on the

Page 299

1   first page.
2       A.  Okay.
3       Q.  Okay?
4       A.  Yes, sir.
5       Q.  Did Mr. Barnett's lawyers show you what
6   Dr. Patrono had to say in this article?
7       A.  No, sir.
8       Q.  Is this article the type of thing that
9   you would want to know before drawing a conclusion
10  about whether Naproxen is or is not a reasonable
11  explanation for the difference in heart attacks in
12  the VIGOR study?
13      A.  Can you rephrase -- or restate it?
14      Q.  Is Dr. Patrono's article the type of
15  information that you would want to know before
16  reaching a conclusion about the reasonableness of
17  the theory that Naproxen explained the difference
18  in heart attacks in the VIGOR study?
19      A.  I would say yes.
20          MR. ROBINSON:  Can we take a break?  I
21  have to go.  I'm going to miss my last plane out of
22  here.  I'd like to have been here for the whole
23  depo.  Doctor, I want to thank you for today.
24          VIDEO TECHNICIAN:  We will now go off
25  the record.  The time is approximately 4:48 PM.

Page 300

1           (Off-the-record conference.)
2           VIDEO TECHNICIAN:  We're back on the
3   record.  The time is approximately 4:49 PM.
4   BY MR. GOLDMAN:
5       Q.  Even though you read in the VIGOR
6   article that the authors concluded that Naproxen
7   was a reasonable explanation for the heart attack
8   difference in the VIGOR study, did you also
9   understand, sir, that there were others who
10  disagreed with that?
11      A.  At the time that I read the VIGOR study
12  or since that time?
13      Q.  Since that time.
14      A.  Yes.
15      Q.  Were you aware, sir, that there were
16  others in the medical community in the 2002 and
17  2001 time frame who questioned whether Naproxen was
18  the appropriate explanation for the VIGOR results?
19      A.  Yes, sir.
20      Q.  And there was much public discussion --
21  was -- withdrawn.
22          Was there much public discussion about
23  the VIGOR study and whether or not the results in
24  the VIGOR study were due to Naproxen or due to
25  Vioxx causing heart attacks?

Page 301

1       A.  I don't recall if there was a lot of
2   public discussion.  I know there was after the
3   colon polyp study.
4       Q.  Do you remember that after the VIGOR
5   study even before -- withdrawn.
6           Do you -- after Merck reported the
7   results of the VIGOR study in March of 2000, did
8   you hear from sales representatives from
9   competitors of Merck about their interpretation of
10  the VIGOR study?
11      A.  Oh, yes.
12      Q.  Tell me a little bit about that.
13      A.  Basically the Pfizer reps who sell the
14  competitor Celebrex tried to say that Celebrex was
15  a safer drug than Vioxx.
16      Q.  Did the Pfizer reps indicate that they
17  believed that Vioxx was causing heart attacks?
18      A.  I don't know if I could say that.
19      Q.  How would you describe the way that
20  Pfizer representatives were discussing the VIGOR
21  study?
22      A.  They essentially said that the risk of
23  vascular complications is totally higher with Vioxx
24  than with Celebrex.
25      Q.  And Pfizer representatives were out

76  (Pages 298 to 301)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

**Page 302**

1 there taking that position before Mr. Barnett's
2 heart attack, correct?
3    A.  Yes.
4    Q.  Which was in December of 2002?
5    A.  Correct.
6    Q.  Let me ask it differently.
7       Were Pfizer representatives who visited
8 you taking the position that -- withdrawn.
9       Shortly after Merck announced the
10 results of the VIGOR study in March of 2000, were
11 Pfizer representatives telling you that they
12 believed there was a higher risk of vascular
13 complications with Vioxx than with Celebrex?
14    A.  Yes, sir.
15    Q.  Mr. Robinson showed you an FDA briefing
16 document from February of 2001.  Do you remember
17 that?
18    A.  Yes, sir.
19    Q.  He asked you whether Merck gave you at
20 the time you were prescribing Vioxx to Mr. Barnett
21 this FDA briefing document which is Exhibit 24.
22    A.  That's correct.
23    Q.  Do you remember that?
24    A.  Yes, sir.
25    Q.  And do you understand from reading the

**Page 303**

1 few portions that Mr. Robinson covered with you
2 that this is a document that a member of the Food
3 and Drug Administration prepared based on her
4 assessment of the clinical trials involving Vioxx?
5    A.  Can I refer to the document?
6    Q.  Sure.
7    A.  What -- I can look for it, but --
8    Q.  It's Exhibit 24.
9    A.  Okay.  Okay.  Now go on.
10    Q.  Okay.  Let me ask it differently, sir.
11       Do you see that -- on Page 2 of Exhibit
12 24 that there are different sections to this
13 briefing document and concerning cardiovascular
14 safety Section 3, there's a Dr. Shari Targum listed
15 there?
16    A.  Yes, sir.
17    Q.  Dr. Targum works for the FDA as you
18 probably can tell from this document, right?
19    A.  Yes, sir.
20    Q.  This document, sir, was prepared for
21 members of an advisory committee that met to
22 discuss the safety of COX-2 inhibitors in February
23 of 2001, okay?
24    A.  Yes, sir.
25    Q.  You remember, sir, that because of the

**Page 304**

1 results of the Vioxx and Naproxen study in VIGOR --
2 withdrawn.
3       Do you understand back in February of
4 2001 that the question about whether Vioxx was
5 causing heart attacks in the VIGOR study or
6 Naproxen was preventing them was a discussion that
7 was the subject of an advisory committee meeting
8 with the FDA?
9    A.  One of the subjects, yes, sir.
10    Q.  Did you understand back in February of
11 2001 that the advisory committee, who made
12 recommendations to the FDA, was deciding what
13 should be done in light of the VIGOR results in
14 terms of changes to the warning label, et cetera?
15       MR. WACKER:  Objection as to time.  Are
16 you talking about as to his knowledge then --
17       MR. GOLDMAN:  Yes.
18       MR. WACKER:  -- back in February or to
19 his knowledge today looking back?
20       MR. GOLDMAN:  Yes, February.
21       THE WITNESS:  In February of 2001, I
22 was not aware of that.
23 BY MR. GOLDMAN:
24    Q.  Did you -- did you know at any point
25 during the time that you were prescribing Vioxx to

**Page 305**

1 Mr. Barnett that the Food and Drug Administration
2 held an advisory committee meeting to discuss the
3 question about how to interpret the results of
4 VIGOR?
5    A.  I don't believe that I did.
6    Q.  Do you now know, sir, that the Food and
7 Drug Administration was well aware of the VIGOR
8 results and analyzed the question about what was
9 the difference between -- in the heart attacks in
10 VIGOR, whether it was due to Vioxx or Naproxen?
11       MR. WACKER:  Objection, calls for
12 speculation.
13       MR. GOLDMAN:  So did half the questions
14 that Mr. Robinson asked.
15 BY MR. GOLDMAN:
16    Q.  Based on your very brief review of
17 Exhibit 24 during Mr. Robinson's examination, do
18 you see that the FDA was intimately aware of the
19 VIGOR study in February of 2001?
20    A.  Yes, sir.
21    Q.  And do you expect the scientists at the
22 FDA to analyze clinical trials like the VIGOR study
23 and determine whether or not the drug should stay
24 on the market?
25       MR. WACKER:  Objection, calls for

77 (Pages 302 to 305)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 306**

1  expert testimony.
2  THE WITNESS: That's one of their jobs.
3  BY MR. GOLDMAN:
4  Q.  Do you see based on the briefing
5  document here, Exhibit 24, that Merck didn't
6  withhold any information about the VIGOR study or
7  Study 085 or Study 090 or any of the other studies
8  that Mr. Robinson was discussing with you earlier?
9  MR. WACKER: Objection, calls for
10  speculation, also vague and ambiguous.
11  BY MR. GOLDMAN:
12  Q.  Do you see that?
13  A.  It would appear that the FDA had
14  information about all those studies.
15  Q.  And would you defer to the Food and
16  Drug Administration to determine whether or not a
17  drug should stay on the market based on clinical
18  trials that are ongoing while the drug is on the
19  market?
20  MR. WACKER: Objection, calls for
21  speculation and expert testimony beyond the scope.
22  THE WITNESS: Would I defer to the FDA
23  to make recommendations whether the drug that was
24  under scrutiny should be allowed to remain -- to
25  stay on the market?

**Page 307**

1  BY MR. GOLDMAN:
2  Q.  Yes.  Yes.
3  A.  Yes.
4  Q.  You said that one of the sources of
5  information that you turn to to gain an
6  understanding of the risks of medicines that you
7  prescribe are journal articles, right?
8  A.  Yes, sir.
9  Q.  I want to show you an article that I'll
10  mark as Exhibit 42.
11  (DFT. EXH. 42, Article entitled Risk of
12  Cardiovascular Events Associated With Selective
13  COX-2 Inhibitors, was marked for identification.)
14  BY MR. GOLDMAN:
15  Q.  This is an article published in JAMA in
16  2001. Are you familiar with JAMA?
17  A.  Yes, sir.
18  Q.  Is that one of the more reputable
19  medical journals?
20  A.  Yes.
21  Q.  And it's called risk of cardiovascular
22  events associated with selective COX-2 inhibitors,
23  and among the authors is Dr. Topol.  Do you see
24  that?
25  A.  Yes, sir.

**Page 308**

1  Q.  I want to show you just a few portions
2  of this document, okay, sir?
3  A.  Yes, sir.
4  Q.  If you turn to the third to last page,
5  which is 957, in the first column, last paragraph,
6  do you see that Dr. Topol writes, quote, the
7  results of the VIGOR study can be explained by
8  either a significant prothrombotic effect from
9  Vioxx or an antithrombotic effect from Naproxen or
10  conceivably both?  Do you see that?
11  A.  Yes, sir.
12  Q.  Do you interpret that to mean that
13  Dr. Topol was saying that one possible explanation
14  of the VIGOR study was that the Naproxen was
15  protecting the heart and preventing heart attacks?
16  A.  Yes, sir.
17  Q.  And that another possibility is that
18  Vioxx was prothrombotic and causing heart attacks
19  in the VIGOR study?
20  A.  Yes, sir.
21  Q.  And then in the middle column, first
22  full paragraph after Dr. Topol discusses Naproxen's
23  significant antiplatelet effects, he says, quote,
24  because of the evidence for an antiplatelet effect
25  of Naproxen, it is difficult to assess whether the

**Page 309**

1  difference in cardiovascular event rates in VIGOR
2  was due to a benefit from Naproxen or to a
3  prothrombotic effect from Vioxx.
4  Do you see that?
5  A.  Yes, sir.
6  Q.  And you're not expected, sir, to be
7  familiar with every journal article that's out
8  there on medicine you prescribe, but having
9  reviewed the -- well, let me stand back and ask the
10  foundation question.
11  Do you remember whether you reviewed
12  Dr. Topol's article on or about August of 2001?
13  A.  I don't remember specifically.  I read
14  many of the articles in the JAMA, but I don't
15  remember this specific article.
16  Q.  It's conceivable that you did, but
17  you're not sure?
18  A.  It's conceivable.
19  MR. WACKER: Objection, calls for
20  speculation.
21  BY MR. GOLDMAN:
22  Q.  Do you think that you might have
23  reviewed this article back in August of 2001?
24  MR. WACKER: Objection, asked and
25  answered. He's already testified and it misstates

78 (Pages 306 to 309)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

---

Page 310

1 prior testimony that he didn't recall. To try
2 to --
3     MR. GOLDMAN: You objected so I'm
4 curing the objection.
5     MR. WACKER: Well, what you're trying
6 to do is have him adopt your answer, but in any
7 event, go ahead.
8 BY MR. GOLDMAN:
9     Q. Can you answer my question?
10     A. I may have read it.
11     MR. WACKER: Misstates prior testimony.
12 BY MR. GOLDMAN:
13     Q. Did you know that because there was no
14 placebo arm of the VIGOR study that it was
15 impossible to know for sure whether Vioxx was
16 causing the heart attacks in the VIGOR study or
17 Naproxen was preventing them?
18     A. Yes.
19     Q. Can you explain a little bit about why
20 that's so.
21     A. Yes. When a study is done, the
22 assumption is that the placebo really doesn't do
23 much of either.
24     Q. And that's a sugar pill?
25     A. It's a pill that doesn't have

---

Page 311

1 metabolically -- or active medication in it. The
2 concept is that a placebo should not reduce the
3 risk of heart attacks and in a study like that,
4 should not increase the risk of heart attacks. If
5 you compare, and I'll use Vioxx for an example, to
6 placebo in a study, let's say the VIGOR trial, if
7 there were a difference between the two groups in
8 terms of the heart attacks, for example, you would
9 expect that difference if it was statistically
10 significant to be due to effects of the Vioxx much
11 less so than any effect of the placebo because the
12 assumption is the placebo should not have
13 significant effects.
14     When you compare a drug to another drug
15 and you're comparing two drugs that both have
16 effects, then it makes it much more difficult to
17 tease out how much is due to a beneficial effect of
18 one drug versus a disadvantageous effect of another
19 drug. It clouds the water, so to speak, so it
20 really makes the comparison very -- it makes
21 drawing the conclusion which one contributed to the
22 outcome much more difficult.
23     Q. And for those people who believe like
24 Merck that there was evidence showing that Naproxen
25 explained the difference in the VIGOR study --

---

Page 312

1 terrible question.
2     Based on all that you knew, sir, about
3 the VIGOR study during the time that you were
4 prescribing Vioxx to Mr. Barnett before his heart
5 attack, did you believe the benefits of Vioxx
6 outweighed the risks?
7     A. Yes, sir.
8     Q. And before Mr. Barnett had his heart
9 attack, you understood that you couldn't be certain
10 whether the difference in the VIGOR trial was due
11 to Vioxx or Naproxen, right?
12     A. I couldn't be certain that the
13 difference was due to --
14     Q. Did I ask that? Wait, I didn't ask the
15 question right.
16     Because there was no placebo arm in the
17 VIGOR study, you understood while you were
18 prescribing Vioxx to Mr. Barnett before his heart
19 attack that you couldn't be certain whether Vioxx
20 was contributing to heart attacks or Naproxen was
21 preventing them in the bigger study?
22     A. That's correct.
23     Q. And there was debate in the medical
24 community about that question?
25     A. There was --

---

Page 313

1     MR. WACKER: Objection, calls for
2 speculation, asked and answered.
3 BY MR. GOLDMAN:
4     Q. What was the answer?
5     A. -- much debate.
6     Q. Let me now show you what I'll mark as
7 Exhibit 43.
8     (DFT. EXH. 43, Merck Prescribing
9 Information, was marked for identification.)
10 BY MR. GOLDMAN:
11     Q. Mr. Robinson didn't show you this
12 exhibit, but it is a dear healthcare professional
13 letter that Merck sent to 300,000 or so physicians
14 to inform them about the results of the change in
15 the label for Vioxx, okay?
16     A. Um-hum.
17     MR. WACKER: Objection, assumes facts
18 not in evidence, strike the commentary, it's not a
19 question.
20 BY MR. GOLDMAN:
21     Q. Do you see that Exhibit 43 is a dear
22 healthcare professional letter that Merck sent in
23 April of 2002 indicating in the second paragraph,
24 the prescribing information has been revised to
25 reflect the results of the VIGOR study and the FDA

---

79 (Pages 310 to 313)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 314**

1  approval of Vioxx for the relief of the signs and
2  symptoms of rheumatoid arthritis in adults?
3       A.  Yes, sir.
4       Q.  And then I'm going to ask you a number
5  of questions about this, but do you see on the
6  first page, it says, important prescribing
7  information, and on the second it says the same
8  thing at the top?
9       A.  Yes, sir.
10      Q.  And you periodically receive from
11  pharmaceutical companies updated information about
12  changes to the label based on new information about
13  the drug, right?
14      A.  I receive stacks of mail from
15  pharmaceutical companies on a routine basis.
16      Q.  This is I don't think going to be a
17  *dispute or anything, but the information that we*
18  *have is that your name appears on the address list*
19  and you were one of the prescribers who was sent
20  this letter.
21      A.  Okay.
22      MR. WACKER:  Objection, strike the
23  commentary and the prefatory statement.
24  BY MR. GOLDMAN:
25      Q.  Do you have any reason to believe that

**Page 315**

1  you didn't receive Exhibit 43 back in April of
2  2002?
3       MR. WACKER:  Why don't you ask him if
4  he recalls he received it?
5  BY MR. GOLDMAN:
6       Q.  Can you answer the question I asked?
7       A.  Can you restate it, please?
8       Q.  Do you recall one way or the other
9  *whether or not you received the dear healthcare*
10  professional letter in April of 2002?
11      A.  I don't specifically recall.
12      Q.  Do you have any reason to dispute that
13  you were sent the letter and that it arrived at
14  your office?
15      A.  No.
16      MR. WACKER:  Objection, calls for
17  speculation.
18  BY MR. GOLDMAN:
19      Q.  What was your answer?
20      A.  No.
21      Q.  I want to show you portions of the
22  letter.  Do you see how in the first page Merck is
23  including under clinical studies the portion of the
24  label change -- the label that was changed to
25  reflect the VIGOR study?

**Page 316**

1       A.  Yes, sir.
2       Q.  So if you turn to the second page, do
3  you see under study results, there's
4  gastrointestinal safety in VIGOR?  Do you see that,
5  sir?
6       MR. WACKER:  Which label, are you
7  talking about this watered down -- this one?
8       MR. GOLDMAN:  If you make any more
9  comments like that, I'll call Judge Fallon, so
10  don't do that, please.
11      MR. WACKER:  Which -- which label are
12  you talking about?
13      MR. GOLDMAN:  I'm talking about the one
14  I'm looking at.
15      THE WITNESS:  Table 1?
16      MR. WACKER:  Well -- well, you've shown
17  him two, so I want to know which -- there's been
18  two labels in the deposition.  Which one are you --
19  BY MR. GOLDMAN:
20      Q.  The document that you're looking at,
21  sir, do you see that Merck is indicating the study
22  results of the gastrointestinal safety of VIGOR?
23      A.  Yes, sir.
24      Q.  And then there's a table.  Do you see
25  that?

**Page 317**

1       A.  Yes, sir.
2       Q.  Then there's other safety findings and
3  it describes cardiovascular safety at the bottom of
4  Page 2, correct?
5       A.  Yes, sir.
6       Q.  On Table 2, do you see that it --
7  there's a comparison of patients with serious
8  cardiovascular thrombotic adverse events over time?
9       A.  Yes, sir.
10      Q.  And that if you look in the table on
11  the far right, do you see that for Vioxx 50
12  milligrams, there were 45 events at ten-and-a-half
13  months compared to 19 events for Naproxen?
14      A.  Yes, sir.
15      Q.  And that's 1.81 percent of the patients
16  who had serious cardiovascular adverse events in
17  the Vioxx arm and .60 percent in the Naproxen arm?
18      A.  That's the cumulative rate, yes, sir.
19      Q.  Do you also see the asterisk above the
20  1.81 percent and that that is a
21  statistically-significant difference as evidenced
22  at the bottom of the table where it says, P value
23  is less than .002?
24      A.  Yes, sir.
25      Q.  You were asked a question about whether

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda