Michael Mikola, M.D.

Page 318

1    or not if you had seen the FDA's proposed label
2    change about using caution in patients with angina
3    that you would have prescribed Feldene for
4    Mr. Barnett?
5            MR. WACKER: Objection, prior
6    statement --
7    BY MR. GOLDMAN:
8        Q.   Am I characterizing it right or wrong?
9            MR. WACKER:  Prior statement speaks for
10   itself.
11           THE WITNESS:  I believe I was asked if
12   I had all the available -- the data available to me
13   now versus that I had -- if I had all the data
14   available to me now, would I prescribe Vioxx for
15   him at that time and my answer was no.  That's how
16   I recall the question.
17   BY MR. GOLDMAN:
18       Q.   To the extent that there's any
19   confusion about the previous question that
20   Mr. Robinson asked you and your answer, is it your
21   testimony that if you had just seen a proposed
22   warning label from the FDA saying use caution in
23   patients with angina that that wouldn't have caused
24   you to put Mr. Barnett on Feldene?
25           MR. WACKER:  Objection, misstates prior

Page 319

1    testimony.
2            THE WITNESS:  Can you restate that to
3    me?  I'm sorry.
4    BY MR. GOLDMAN:
5        Q.   To the extent that there's any
6    confusion about the previous testimony, I know it's
7    been a long day, I want to know if your testimony
8    is that if you had seen the proposed label change
9    in language that the FDA had included about using
10   caution in patients who have a history of angina --
11       A.   Okay.
12       Q.   My question is:  If you had seen that
13   back when you were prescribing medicine to -- Vioxx
14   to Mr. Barnett --
15       A.   Yeah.
16       Q.   -- would that have caused you not to
17   prescribe Vioxx and instead to prescribe Feldene?
18           MR. WACKER:  Objection, misstates prior
19   testimony.  Go ahead.
20           THE WITNESS:  It's quite possible.
21   BY MR. GOLDMAN:
22       Q.   And that if you had seen a --
23       A.   Again, it sort of depends.  I think to
24   some degree here is a dose issue.  This is a
25   50-milligram dose.  I rarely prescribed 50

Page 320

1    milligrams.  Would the safety issues be the same at
2    25 milligrams or 12.5 milligrams?  That would
3    probably make a difference.  If the FDA said that
4    25 milligrams may not be safe and unstable in
5    patients with risk factors for heart disease, then
6    that probably would have had a significant impact
7    on my prescribing ability.
8        Q.   And that's not what Mr. Robinson showed
9    you the FDA said, right?
10       A.   Correct.
11       Q.   So focusing just on that FDA draft
12   document that you saw earlier today, are you in a
13   position to say one way or the other whether that
14   would have altered your decision to prescribe Vioxx
15   to Mr. Barnett?
16       A.   May I review that again, that document?
17       Q.   Sure.
18       A.   I'm sorry, I just want to make sure I
19   answer accurately.  That is --
20       Q.   Exhibit 11.
21       A.   11, yeah.
22       Q.   And I just want to focus on the
23   language they asked you about, okay?
24       A.   Yes, sir.
25       Q.   Because you didn't have a chance to

Page 321

1    review the entire document here, did you?
2        A.   I did not review it in detail.
3        Q.   Do you see that on the page that ends
4    8572 --
5        A.   Okay.
6        Q.   -- on the top, it says, Vioxx should be
7    used with caution in patients at risk of developing
8    cardiovascular thrombotic events such as those with
9    a history of myocardial infection and angina in
10   patients with preexisting -- preexisting
11   hypertension and congestive heart failure?
12           Do you see that?
13       A.   Yes, sir.
14       Q.   If you had read that particular
15   statement at the time you were prescribing Vioxx to
16   Mr. Barnett before he had his heart attack, would
17   that statement in the warning label have changed
18   your decision to use Vioxx?
19       A.   Probably so.
20       Q.   Would a statement in a package insert
21   that said that caution should be exercised when
22   Vioxx is used in patients with a medical history of
23   ischemic heart disease have impacted your decision
24   to prescribe Vioxx to Mr. Barnett?
25       A.   I would definitely not have prescribed

81 (Pages 318 to 321)

# Michael Mikola, M.D.

## Page 322

1 it after September 2002, after his heart attack,
2 yes. Does that answer your question?
3     Q.   Yes, but if you had known before
4 Mr. Barnett's heart attack that you should use
5 caution in prescribing Vioxx in patients who had a
6 medical history of ischemic heart disease, in light
7 of Mr. Barnett's January 2000 ischemic event, would
8 you have prescribed Vioxx to Mr. Barnett?
9     A.   I don't believe so.
10         MR. WACKER: Objection, incomplete
11 hypothetical.
12         MR. GOLDMAN: We'll take a quick break,
13 okay?
14         VIDEO TECHNICIAN: We will now go off
15 the record. The time is approximately 5:16 PM.
16         (A recess transpired.)
17         (DFT. EXH. 44, Vioxx Label Description,
18 was marked for identification.)
19         VIDEO TECHNICIAN: We're back on the
20 record. The time is approximately 5:20 PM.
21 BY MR. GOLDMAN:
22     Q.   I've handed you what I've marked as
23 Exhibit 44 --
24     A.   Yes, sir.
25     Q.   -- a package insert that is dated April

## Page 323

1 of 2002 approved by the Food and Drug
2 Administration, okay?
3     A.   Yes, sir.
4     Q.   When you were prescribing Vioxx to
5 Mr. Barnett in the April 2002 time frame, were you
6 familiar with the risks and benefits of the label
7 that was in existence at the time?
8     A.   Yes, sir.
9     Q.   So you would have been familiar with
10 the information contained in Exhibit 44?
11     A.   Yes, sir.
12     Q.   Do you see that in the right-hand
13 column there's a description of the VIGOR study and
14 it describes the design of the study, right column?
15     A.   Yes, sir.
16     Q.   Then there are study results in the
17 middle of the column, gastrointestinal safety in
18 VIGOR. Do you see that?
19     A.   Yes, sir.
20     Q.   And under Table 1 there's an indication
21 that says, quote, the risk reduction for PUB's and
22 complicated PUB's for Vioxx compared to Naproxen,
23 approximately 50 percent, was maintained in
24 patients, and then it continues.
25         Do you see that?

## Page 324

1     A.   Yes, sir.
2     Q.   That's an indication that Vioxx did
3 what it was supposed to do by reducing the number
4 of GI bleeds relative to Naproxen?
5     A.   Yes, sir.
6         MR. WACKER: Well, it misstates the
7 document.
8 BY MR. GOLDMAN:
9     Q.   And you --
10         MR. WACKER: And just -- just so that
11 my objection is clear, I don't know that it
12 specifically says GI bleeds.
13         THE WITNESS: PUB I think is peptic
14 ulcer bleeds.
15 BY MR. GOLDMAN:
16     Q.   Perforations, ulcers, bleeds?
17     A.   Yeah.
18     Q.   What is your understanding of the
19 acronym PUB's?
20     A.   It stands for symptomatic ulcers, upper
21 GI perforation obstruction, major or minor, upper
22 GI bleed.
23     Q.   And did you understand from reading
24 this -- from knowing the VIGOR study while you were
25 prescribing Vioxx to Mr. Barnett before his heart

## Page 325

1 attack that Vioxx had reduced by 50 percent the
2 number of -- the frequency of PUB's relative to a
3 thousand milligrams of Naproxen?
4     A.   Yes, sir.
5     Q.   And then further down where it says,
6 other safety findings, cardiovascular safety, do
7 you see that it indicates the VIGOR study showed a
8 higher incidence of adjudicated serious
9 cardiovascular thrombotic events in patients
10 treated with Vioxx 50 milligrams once daily as
11 compared to patients treated with Naproxen 500
12 milligrams twice daily?
13     A.   Yes, sir.
14     Q.   You understood that information back in
15 November of 2000 when you read the VIGOR study,
16 right?
17     A.   Yes, sir.
18     Q.   And then you see there's Table 2, which
19 again --
20         MR. WACKER: I'm sorry, let me just lay
21 a late-founded objection to the last question that
22 that's not -- not what the VIGOR study shows. That
23 misstates the VIGOR study specifically.
24         MR. GOLDMAN: Okay. Well, this is a
25 Food and Drug Administration-approved label and I'm

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 326

1 just reading what it says.
2     MR. WACKER: Right, but you're --
3 BY MR. GOLDMAN:
4     Q.  Do you see --
5     MR. WACKER: This is what this says and
6 now you're relating that back to what the VIGOR
7 study said in the Bombardier article and that's not
8 what it says in the Bombardier article.  It never
9 says there was a significant --
10     MR. GOLDMAN: Can you just make your
11 objection and not a speech, please?
12     MR. WACKER: Well, I want the record to
13 be clear.
14     MR. GOLDMAN: Okay.  You can clear that
15 up.
16 BY MR. GOLDMAN:
17     Q.  Do you see Table 2 in the bottom of the
18 right-hand corner, VIGOR summary of patients with
19 serious cardiovascular thrombotic adverse events
20 over time?  Do you see that?
21     A.  Yes, sir.
22     Q.  And that, again, is the same
23 information we just had in the dear healthcare
24 professional letter where there's a 45-to-19
25 numerical difference in serious cardiovascular

Page 327

1 thrombotic events at ten-and-a-half months between
2 Vioxx 50 milligrams and Naproxen a thousand
3 milligrams?
4     A.  Yes, sir.
5     Q.  And then if you look on the next page
6 where it says, Table 3, serious cardiovascular
7 thrombotic adverse events, in the middle of that
8 table, do you see that under cardiac events, if you
9 look at nonfatal MI, the label indicates that there
10 were 18 events on Vioxx 50 milligrams and 4 on
11 Naproxen thousand milligrams?
12     A.  Yes, sir.
13     Q.  And that's a four to five times
14 difference?
15     A.  Yes, sir, four-and-a-half times
16 difference.
17     Q.  And you understood in April of 2002
18 that -- that there was a four to five times
19 difference in the number of heart attacks between
20 Vioxx and Naproxen for this dosage?
21     A.  Yes, sir.
22     Q.  And then if you look in the precautions
23 section -- so that -- those tables were on the
24 front page and the top of the second page of the
25 label and that's information that you read back in

Page 328

1 April of 2002, right?
2     A.  This came out April 2002?
3     Q.  Yeah.
4     A.  Yes, sir.
5     Q.  And if you look on the right-hand
6 column under precautions under cardiovascular
7 effects, the information below should be taken into
8 consideration and caution should be exercised when
9 Vioxx is used in patients with a medical history of
10 ischemic heart disease and then it continues to
11 describe the VIGOR study.
12     Do you see that?
13     A.  Not yet.
14     Q.  Right-hand column under precautions,
15 cardiovascular effects.
16     A.  Oh, yes, sir.
17     Q.  Do you see the sentence, the
18 information below should be taken into
19 consideration and caution should be exercised when
20 Vioxx is used in patients with a medical history of
21 ischemic heart disease?  Do you see that?
22     A.  Yes, sir.
23     Q.  But this is, I think, really important
24 as well, sir, that I want to ask you about.
25     MR. WACKER: Objection, strike the

Page 329

1 commentary.
2 BY MR. GOLDMAN:
3     Q.  Do you see how in that next paragraph,
4 there is a description of the number of serious
5 cardiovascular thrombotic events that says that the
6 number of serious cardiovascular thrombotic events
7 was significantly higher in patients treated with
8 Vioxx versus Naproxen?  Do you see that?
9     A.  I don't find that yet.
10     Q.  Okay.  It's the second sentence --
11 actually, it's in the first sentence of the second
12 paragraph under cardiovascular effects.  It says,
13 in VIGOR, and it describes it.
14     A.  Yes, sir.
15     Q.  And after the comma, it says, the risk
16 of developing a serious cardiovascular thrombotic
17 event was significantly higher in patients treated
18 with Vioxx 50 milligrams once a day as compared to
19 patients treated with Naproxen 500 milligrams twice
20 a day.  Do you see that?
21     A.  Yes, sir.
22     Q.  And then further down, it says, in a
23 placebo-controlled database derived from two
24 studies with a total of 2,142 elderly patients,
25 mean age 75 with a median duration of exposure of

83 (Pages 326 to 329)

*66ee2519-35e8-4f59-b6ea-6c8725dd3eda*

Michael Mikola, M.D.

**Page 330**

1   approximately 14 months, the number of patients
2   with serious cardiovascular thrombotic events was
3   21 versus 35 for patients treated with Vioxx 25
4   milligrams once daily, versus placebo.
5        A.   Yes, sir.
6        Q.   What's the significance of that to you?
7        A.   I would have to know the P value to
8   know if it was statistically significant, but I
9   could state that in that data, there were less
10  cardiovascular events in patients on Vioxx 25
11  milligrams than on placebo.
12       Q.   And knowing that back in April of 2002,
13  why was that significant to you?
14       A.   Well, comparing that to the VIGOR
15  trial, and it's not always valid to compare one
16  trial to the other due to a number of variables, it
17  seemed to indicate that at least in elderly
18  patients, 25-milligram dose of Vioxx daily for I
19  think up to nine months did not increase their risk
20  of vascular -- of major cardiovascular events.
21       Q.   And when you have results in a
22  placebo-controlled environment like they're
23  describing here and there is no difference between
24  Vioxx and placebo concerning serious cardiovascular
25  thrombotic events, that would suggest that there is

**Page 331**

1   no increase in risk associated with Vioxx, correct?
2        A.   That would suggest that there's no
3   increased risk, yes, sir.
4        Q.   And it was your understanding back in
5   April of 2002 that the positive results of the
6   placebo-controlled studies, in other words, that
7   Vioxx did not increase cardiovascular events,
8   supported the interpretation of VIGOR that Naproxen
9   was cardioprotective and not that Vioxx was causing
10  heart attacks?
11       MR. WACKER:   Objection, calls for
12  expert testimony beyond the scope.   It also
13  misstates the evidence.   It doesn't say
14  placebo-controlled studies.   It says a database
15  that apparently Merck selected.
16       THE WITNESS:   You're asking me if --
17  you're going back to the VIGOR trial and asking me
18  if my interpretation --
19  BY MR. GOLDMAN:
20       Q.   I'll ask it differently.
21       A.   Okay.
22       Q.   To you as a prescribing physician when
23  you were prescribing Vioxx to Mr. Barnett before
24  his heart attack, was the most important clinical
25  trial evidence concerning heart attack risk

**Page 332**

1   evidence that would be generated in
2   placebo-controlled studies?
3        A.   I think conclusions drawn from
4   placebo-controlled studies are easier to interpret
5   cause and effect and probably more generalizable
6   when you're looking at safety and efficacy.
7        Q.   And when you say they are more -- well,
8   you say that placebo-controlled studies are easier
9   to interpret cause and effect and probably more
10  generally able to --
11       A.   Generalizable.
12       Q.   I couldn't --
13       A.   I don't know if that's a word, but --
14       Q.   Let me ask the question.
15       A.   Okay.
16       Q.   When you say that placebo-controlled
17  studies are easier to interpret cause and effect
18  and probably more generalizable to safety and
19  efficacy, what do you mean?
20       A.   That means that there are less
21  potentially-confounding variables when you look at
22  the results of the study if a drug is compared to
23  placebo versus a drug that's compared to another
24  drug because the adverse or beneficial effects of
25  the other drug also have to be taken into

**Page 333**

1   consideration.   And it varies dramatically between
2   different patient populations, the way the study's
3   set up, the way the questions are asked.   It
4   induces a lot more variability into interpreting
5   the outcomes.
6        Q.   If you skip down to the next sentence,
7   the significance of the cardiovascular findings
8   from these three studies, VIGOR and two
9   placebo-controlled studies, is unknown.
10       Do you see that?
11       A.   Not yet.   I'll find it, though.   Yes,
12  sir.
13       Q.   That was information you knew in April
14  of 2002, right?
15       A.   Yes, sir.
16       Q.   And when you were deciding to prescribe
17  Vioxx to Mr. Barnett who needed to have pain
18  relief, you were weighing the risks and the
19  benefits associated with Vioxx, right?
20       A.   That's correct.
21       MR. WACKER:   Objection, leading.
22  BY MR. GOLDMAN:
23       Q.   Are you weighing the risks and benefits
24  of Vioxx based on how they're described in the
25  package insert when you're deciding whether to

84  (Pages 330 to 333)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

## Page 334

1  prescribe Vioxx to Mr. Barnett?
2      A.  That's one part of the decision-making
3  process.
4      Q.  And here in April of 2002, the
5  FDA-approved label is indicating that the reason
6  for the difference in VIGOR and these
7  placebo-controlled studies is uncertain.  Do you
8  see that?
9      A.  Yes, sir.
10     Q.  When you're making a risk-benefit
11 decision about whether to prescribe Vioxx to
12 Mr. Barnett, it's important that you know that --
13 when you were prescribing the Vioxx to Mr. Barnett
14 after April of 2002, you understood the
15 FDA-approved label saying that the results of VIGOR
16 and these placebo-controlled studies were unknown,
17 correct?
18     MR. WACKER:  Objection,
19 mischaracterizes the evidence of -- and vague and
20 ambiguous as to FDA approved.
21     THE WITNESS:  I would interpret it as
22 the results of the VIGOR and the other two studies
23 are not definitive.
24 BY MR. GOLDMAN:
25     Q.  And you understood that back in April

## Page 335

1  of 2002?
2      A.  Yes, sir.
3      Q.  Based on that, you felt that the
4  benefits of Vioxx outweighed the risks for
5  Mr. Barnett --
6      MR. WACKER:  Objection, assumes
7  facts --
8  BY MR. GOLDMAN:
9      Q.  -- in part?
10     MR. WACKER:  Objection, assumes facts
11 not in evidence, overbroad, vague and ambiguous.
12     THE WITNESS:  I thought -- I thought
13 that the risk-to-benefit ratio was acceptable for
14 Mr. Barnett.
15 BY MR. GOLDMAN:
16     Q.  Your conclusion that the risk-benefit
17 ratio for prescribing Vioxx -- okay.  You can set
18 that aside now.
19     A.  Okay.
20     Q.  I want to go back to one of the letters
21 that Mr. Robinson was briefly asking you about and
22 it was the March 28th, 2003 letter that Merck sent
23 you.  I'll tell you the exhibit number in a minute.
24 Exhibit 23.
25     A.  Okay.

## Page 336

1      Q.  You found it?
2      A.  Yes.
3      Q.  What is the Bates number at the bottom
4  right?
5      A.  It says -- MRK-AKT 400523 is one of
6  them.  I moved them out of order.
7      Q.  Here, you know what?  I'm going to just
8  show it you.
9      A.  Okay.
10     Q.  Here.  And we don't have to mark it
11 separately.
12     (DFT. EXH. 45, Letter dated 3/28/03 to
13 Michael Mikolajczyk, MD from Leonard I.
14 Silverstein, MD, was marked for identification.)
15 BY MR. GOLDMAN:
16     Q.  I'm marking as Exhibit 45, Dr. Mikola,
17 a letter dated March 28th, 2003 from Merck to you.
18 Do you see that?
19     A.  Yes, sir.
20     Q.  And in the first paragraph, what does
21 it say?
22     A.  Our professional representative, Steven
23 Calder, has referred your request for information
24 regarding Vioxx, in parentheses, Rofecoxib tablets
25 and oral suspension.  Your inquiry concerned the

## Page 337

1  development of cardiovascular thrombotic events in
2  the elderly patient, placebo-controlled data set
3  for Vioxx.
4      Q.  So is this an example where you were
5  inquiring about cardiovascular safety in a
6  discussion you're having with one of Merck's sales
7  reps, Steve Calder?
8      A.  Yes.  Yes, sir.
9      Q.  What's your impression of Mr. Calder?
10     A.  A very nice young man.
11     Q.  Did Mr. Calder ever try to dodge or
12 avoid your question?
13     MR. WACKER:  Well, objection, that
14 assumes facts not in evidence.  He wouldn't know
15 what information --
16     THE WITNESS:  Not to my recollection.
17 BY MR. GOLDMAN:
18     Q.  Is Mr. Calder the type of person who
19 thinks it's important to present fair balance?
20     MR. WACKER:  Objection, calls for
21 character testimony.
22 BY MR. GOLDMAN:
23     Q.  That's a bad question.  Let's just
24 stick with the document.
25     A.  Okay.

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 338

1    Q. Merck then sent you responsive
2 information in March of 2003 and in the third
3 paragraph, one line, it says, a search of the
4 literature has identified the following reference
5 pertaining to your inquiry.
6        Do you see that?
7    A. Yes, sir.
8    Q. In this document, I won't go through it
9 in that much detail, but do you see that Merck is
10 describing Dr. Reicin's analysis of the
11 cardiovascular safety profile of Vioxx in elderly
12 patients with Alzheimer's disease or mild cognitive
13 impairment?
14    A. Yes, sir.
15    Q. And if you turn to the second page, the
16 table at the top, do you see that in that
17 population of elderly patients, if you look at
18 confirmed adjudicated, do you know what that means?
19    A. Not exactly.
20    Q. Okay.
21    A. I know what confirmed is, I'm not sure.
22    Q. What does confirmed mean?
23    A. It means that it's been documented that
24 it met criteria for the reported event, whatever
25 the criteria basically.

Page 339

1    Q. And adjudicated is the process of
2 deciding whether or not the event has met those
3 criteria.
4    A. Okay.
5    Q. Do you see that for confirmed
6 adjudicated serious thrombotic adverse events --
7 cardiovascular adverse events in elderly people
8 that there were 25 cases in the Vioxx 25-milligram
9 arm compared to 39 cases in the placebo arm?
10    A. Yes, sir.
11    Q. And then if you look in the far right
12 column under relative risk.
13    A. Yes, sir.
14    Q. What does .72 mean to you in terms of
15 the risk of serious thrombotic cardiovascular
16 adverse events in this placebo-controlled database?
17    A. It means that there were 28 percent
18 less events in the Vioxx group compared to the
19 placebo group.
20    Q. And then do you see on the third page
21 that Merck is including toward the bottom -- almost
22 done.
23    A. It's okay.
24    Q. On the third page, Merck is including
25 the prescribing information for Vioxx and if you

Page 340

1 flip through, you'll see it's a verbatim
2 description of what is in the April 2002 label
3 concerning VIGOR?
4    A. Yes, sir.
5    Q. And when you were prescribing Vioxx to
6 Mr. Barnett, now this is after his heart attack in
7 March of 2003, you understood this information and
8 you believed that the benefits of Vioxx outweighed
9 the risks?
10    A. Yes, sir, at the doses prescribed, yes,
11 sir.
12    Q. Let me ask you a few questions that
13 don't necessarily relate to one another, okay?
14    A. Okay.
15    Q. Did anybody from Merck ever intimidate
16 you into prescribing Vioxx?
17    A. No, sir.
18    Q. Did anybody from Merck ever take away
19 funding or refuse to give you research grants
20 because you were criticizing Vioxx?
21    A. No, sir.
22    Q. Did you ever meet or talk to anybody
23 named Lou Sherwood from Merck?
24    A. Not that I recall.
25    Q. Have you ever attended an audio

Page 341

1 conference or presentation moderated by Dr. Peter
2 Holt about Vioxx?
3    A. Not that I recall.
4    Q. Whatever Dr. Holt said about Vioxx
5 played no role in your decision to prescribe Vioxx
6 to Mr. Barnett, did it?
7        MR. WACKER: Objection, calls for
8 speculation to the extent that he doesn't know
9 what -- where the information Holt said went to.
10 BY MR. GOLDMAN:
11    Q. I'm asking about your decision to
12 prescribe Vioxx to Mr. Barnett, okay?
13    A. Not to my recollection.
14    Q. Did anything that Dr. Holt say at some
15 audio conference or presentation play any role in
16 your decision to prescribe Vioxx to Mr. Barnett?
17        MR. WACKER: Objection, assumes facts
18 not in evidence to the extent that the foundation
19 has not been laid as to where that information that
20 Dr. Holt presented was circulated to.
21        THE WITNESS: Not to my recollection.
22 BY MR. GOLDMAN:
23    Q. Have you ever seen any video press
24 conferences held by -- well, I don't need to ask
25 that.

86 (Pages 338 to 341)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

### Page 342

1      Were you aware that Merck —
2      MR. GOLDMAN: I guess we have to change
3   the tape. Okay. Go for -- take a minute.
4      VIDEO TECHNICIAN: This is the end of
5   Tape Number 6 in the deposition of Dr. Michael
6   Mikola. The time is approximately 5:43 PM. The
7   date is April 25th, 2006. We will now go off the
8   record.
9      (A recess transpired.)
10      VIDEO TECHNICIAN: This is the
11   beginning of Tape Number 7 in the deposition of
12   Dr. Michael Mikola. The time is approximately 5:46
13   PM. The date is April 25th, 2006. We are now back
14   on the record.
15   BY MR. GOLDMAN:
16      Q. Dr. Mikola, were you aware during the
17   time you were prescribing Vioxx to Mr. Barnett that
18   Merck advertised on television for Vioxx?
19      A. I believe I do recall, yes, sir.
20      Q. Are you aware that Pfizer advertised on
21   TV for Celebrex?
22      A. Yes, sir.
23      Q. Is it common for pharmaceutical
24   companies to advertise their drug products?
25      MR. WACKER: Objection, vague and

### Page 343

1   ambiguous.
2      THE WITNESS: More and more so, yes,
3   sir.
4   BY MR. GOLDMAN:
5      Q. Did the advertisements such as Dorothy
6   Hamill skating about Vioxx play any role in your
7   decision to prescribe Vioxx to Mr. Barnett?
8      A. No, sir.
9      MR. WACKER: Objection, calls for
10   speculation.
11   BY MR. GOLDMAN:
12      Q. What was your answer?
13      A. No, sir.
14      Q. Did Mr. Barnett ever tell you that he
15   believed the advertisements about Vioxx were
16   reassuring to him?
17      A. Not that I recall.
18      Q. Does Mr. Barnett strike you as the type
19   of individual that relies on what doctors have to
20   say and not commercials?
21      MR. WACKER: Objection, calls for
22   complete rank speculation.
23      THE WITNESS: Largely.
24   BY MR. GOLDMAN:
25      Q. You've had much experience with

### Page 344

1   Mr. Barnett over the years?
2      A. Yes, sir.
3      Q. Does -- did Mr. Barnett ask you many
4   careful questions about medications he took over
5   time?
6      A. Mr. Barnett was probably one of the
7   most informed patients that I have ever seen in
8   terms of side effects of medicines, new therapies.
9   He was very aware of new medical therapies, drugs,
10   et cetera.
11      Q. Mr. Barnett even approached you on
12   occasion with studies he found on the Internet
13   about drugs he was taking?
14      A. Yes, sir.
15      Q. Based on your experience with
16   Mr. Barnett and the type of patient he is, does he
17   strike you as somebody who would rely on what a
18   doctor like you had to say about medication as
19   opposed to a commercial?
20      MR. WACKER: Objection, calls for
21   speculation.
22      THE WITNESS: Yes, sir.
23   BY MR. GOLDMAN:
24      Q. Have you ever used something called the
25   Merck Manual in your practice?

### Page 345

1      A. Yes, sir.
2      Q. Have you ever used it specifically to
3   focus on prostacyclin or thromboxane?
4      A. Not to my recollection.
5      Q. Just one more line of questions,
6   Dr. Mikola. When Mr. Robinson was asking you if
7   you had known everything that he showed you today
8   and everything you've learned since the withdrawal
9   of Vioxx, whether you would have prescribed it to
10   Mr. Barnett, you said you would have prescribed
11   Feldene, right?
12      MR. WACKER: Objection, asked and
13   answered.
14      THE WITNESS: Yes, sir.
15      MR. WACKER: Testimony speaks for
16   itself.
17   BY MR. GOLDMAN:
18      Q. Has it been your experience,
19   Dr. Mikola, that new information is learned about
20   medicine after it's on the market sometimes?
21      A. Yes, sir.
22      Q. Has it been your experience that as
23   thorough as clinical trials might be before a
24   medicine is brought to market, oftentimes the FDA
25   and drug companies learn more information about

87 (Pages 342 to 345)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

**Page 346**

1 benefits and side effects of medicine once it's on
2 the market and used by millions of people?
3    A. Yes, sir.
4    Q. Because information evolves over time
5 concerning the risks and benefits of medicine,
6 don't you find it difficult to determine whether in
7 hindsight you would have prescribed Vioxx or not?
8    MR. WACKER: Objection, calls for --
9 well, we'll just leave it as objection.
10    THE WITNESS: No, sir. In hindsight, I
11 wouldn't have prescribed it because I would have
12 known it was going to be the target of a major
13 lawsuit.
14 BY MR. GOLDMAN:
15    Q. So because it was a target of a major
16 lawsuit, of course that would have dissuaded you
17 from prescribing Vioxx and you wouldn't have had to
18 stay with us for the last day?
19    A. Correct. Doctors in general try to
20 avoid lawsuits.
21    Q. I'm sure you haven't had any. I hope
22 you haven't.
23    Let me show you -- well, given the
24 severity of Mr. Barnett's osteoarthritis, his neck
25 and his back condition, was it your medical

**Page 347**

1 judgment that he needed to be on a NSAID or a COX-2
2 inhibitor?
3    MR. WACKER: Objection, leading and
4 misstates the evidence.
5    THE WITNESS: It's my opinion that he
6 needed to be on some type of medical therapy for
7 his arthritis, yes, sir.
8 BY MR. GOLDMAN:
9    Q. The fact that -- does the fact that
10 Mr. Barnett -- is the fact that Mr. Barnett having
11 taken Vioxx every day for years and Feldene for
12 years consistent with your view that he needed to
13 be on an NSAID or a COX-2 inhibitor?
14    MR. WACKER: Objection, compound.
15    THE WITNESS: I think his options would
16 have been an NSAID or a COX-2 inhibitor or a
17 narcotic analgesic.
18 BY MR. GOLDMAN:
19    Q. There was a reason that Mr. Barnett
20 took Feldene for as many years as he did, right?
21    A. Yes, sir.
22    Q. Why was that?
23    A. For pain relief.
24    Q. Was there a reason why Mr. Barnett took
25 Vioxx for so many years?

**Page 348**

1    A. Same reason, pain relief.
2    Q. Do you know that Mr. Barnett continues
3 to take NSAIDs to this day?
4    A. It would not surprise me. I did not
5 know that, but...
6    (DFT. EXH. 46, Feldene package insert,
7 was marked for identification.)
8 BY MR. GOLDMAN:
9    Q. Let me hand you, Dr. Mikola, what I've
10 marked as Exhibit 46. This is a current version of
11 the Feldene package insert, okay?
12    A. Yes, sir.
13    Q. Are you familiar with the current
14 version of the Feldene package insert?
15    A. No, sir.
16    Q. Let me show you --
17    MR. WACKER: I'm sorry, let me just
18 object that this is -- the objection is it's
19 irrelevant.
20    MR. GOLDMAN: Well, that's not an
21 appropriate objection for a deposition and if that
22 applies, we should strike almost everything that
23 was asked before by Mr. Robinson, but...
24    THE WITNESS: May I ask when this
25 updated version --

**Page 349**

1 BY MR. GOLDMAN:
2    Q. Yes. If you look on the fourth to last
3 page, the last page of the package insert before
4 the medication guide --
5    A. Okay.
6    Q. -- it says 2006.
7    A. Okay.
8    Q. That's for Pfizer. And then on the
9 next page under this medication guide for Feldene,
10 it says, revised March of 2006.
11    A. Okay. Thank you.
12    Q. Do you see that the current warning --
13 withdrawn.
14    Do you see on the first page of the
15 Feldene package insert that there is a black box
16 for cardiovascular risk?
17    A. Yes, sir.
18    MR. WACKER: Again, let me -- I'll just
19 make it a standing objection to this document.
20    MR. GOLDMAN: Okay.
21 BY MR. GOLDMAN:
22    Q. Can you read the first bullet point
23 under cardiovascular risk in the black box for
24 Feldene.
25    A. Yes, sir.

Golkow Litigation Technologies - 1.877.DEPS.USA
66e92519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 350**

1      Q.   Out loud.
2      A.   NSAIDs may cause an increased risk of
3  serious cardiovascular thrombotic events,
4  myocardial infarction and stroke, which can be
5  fatal.  This risk may increase with duration of
6  use.  Patients with cardiovascular disease or risk
7  factors for cardiovascular disease may be at
8  greater risk.  See warnings.
9      Q.   And do you see that there are several
10 may references like potentially cause increased
11 risk or may increase --
12     A.   In the paragraph that I read?
13     Q.   Yes.
14     A.   Yes, sir.
15     Q.   If you turn three pages -- to the third
16 page under warnings, do you see under
17 cardiovascular effects -- cardiovascular thrombotic
18 effects, it states, quote, clinical trials of
19 several COX-2 selective and nonselective NSAIDs of
20 up to three years duration have shown an increased
21 risk of serious cardiovascular thrombotic events,
22 myocardial infarction and stroke, which can be
23 fatal?  Do you see that?
24     A.   Yes, sir.
25     Q.   Did you know that back when Mr. Barnett

**Page 351**

1  was using Feldene when he first came to you?
2      A.   No, sir.
3      Q.   The next sentence says, all NSAIDs,
4  both COX-2 selective and nonselective, may have a
5  similar risk.
6          Do you see that?
7      A.   Yes, sir.
8      Q.   Did you know that when you were
9  prescribing Feldene to Mr. Barnett?
10     A.   No, sir.
11     Q.   Are you aware that Celebrex and Mobic
12 and the other NSAIDs have the same black box
13 warning today?
14     A.   Yes, sir.
15     Q.   Is that the type of example of how
16 information changes over time and package inserts
17 get updated over time and you need to -- that's a
18 terrible question.
19         Is the Feldene example of this black
20 box warning an example where package inserts get
21 changed by pharmaceutical companies and the FDA
22 based on new information that is learned over time?
23     A.   Yes, sir, I believe so.
24     Q.   Is it difficult to make a risk-benefit
25 assessment as a doctor back in 2000, 2001, 2002

**Page 352**

1  based on information that isn't available such as a
2  black box warning about Feldene?
3      A.   Yes, sir.
4      Q.   You can't decide whether the risks
5  outweigh the benefits of Feldene concerning
6  cardiovascular effects if there isn't a reference
7  in the label, right, or in other -- in
8  peer-reviewed literature?
9      A.   Yes.  Correct.
10     Q.   Even though there is a black box
11 warning for potential cardiovascular risks, however
12 small, in Feldene and other NSAIDs, you still
13 prescribe those NSAIDs if you think the benefits
14 outweigh the risks, right?
15     A.   Yes, sir.
16     Q.   And even if there's the potential for
17 some small increased cardiovascular risk for a
18 particular patient, that pain that that patient is
19 experiencing every day is a relevant factor in
20 deciding whether or not the benefits outweigh the
21 risks for that particular medicine, true?
22     A.   Yes, sir.  The pain affects their
23 quality of life issues significantly.
24     Q.   Has it been your experience that there
25 have been patients you've treated who have been

**Page 353**

1  willing to take small risks of even serious side
2  effects of medicine because they are getting
3  significant benefits from that medicine?
4          MR. WACKER:  Objection, incomplete
5  hypothetical.
6          THE WITNESS:  Yes, sir.
7  BY MR. GOLDMAN:
8      Q.   Dr. Mikola, I don't believe I have any
9  more questions.  Let me just look through my
10 outline real quickly.
11         Just one more question, Dr. Mikola, do
12 you remember ever seeing something called the CV
13 card?
14     A.   I do not recall seeing the CV card.
15         MR. GOLDMAN:  Thank you, sir.
16         THE WITNESS:  Yes, sir.
17             EXAMINATION
18 BY MR. WACKER:
19     Q.   Dr. Mikola, Ted Wacker again, I
20 introduced myself earlier.  I'm obviously standing
21 in the shoes of Mr. Robinson to finish up the
22 deposition and I feel like it's at the end of the
23 circus here and I've got to do the final sweep
24 after all the animals have left, but --
25         MR. GOLDMAN:  All the mice.

89 (Pages 350 to 353)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 354

1  BY MR. WACKER:
2       Q.  -- let me just ask you a few follow-up
3  questions and then we'll get out of here.
4            In Exhibit 2, and I just wanted to
5  clarify, this was the -- the document that Grand
6  Strand Regional Medical Center -- what appears to
7  be some sort of -- I don't know if it's a discharge
8  summary or a summary by Dr. Swami, but it does
9  indicate that Mr. Barnett was on Vioxx.
10            Do you see that?
11       A.  Yes, sir.
12       Q.  Okay.  And even though your record that
13  we previously went over with counsel didn't
14  specifically indicate Vioxx, you're not disputing
15  that he was on Vioxx at that time?
16            MR. GOLDMAN:  Object to the form.
17            THE WITNESS:  He apparently told
18  Dr. Swami or the PA, I think it was Vicki Allen
19  that saw him at that time, that he was taking
20  Vioxx.
21  BY MR. WACKER:
22       Q.  And it's not completely uncommon for --
23  when patients are providing a list of medications
24  that -- that the medication list is not -- is
25  different between doctors?

Page 355

1       A.  Yes.
2       Q.  You've seen that often?
3       A.  Yes.  And if it's not updated, it's
4  very possible that Dr. McCaffrey put him on Vioxx
5  and according to my records, he was still on
6  Feldene.
7       Q.  And obviously whatever the pharm -- the
8  prescription records indicate, you wouldn't have
9  any reason to dispute what medications he was on
10  from the prescription records?
11            MR. GOLDMAN:  Well, let me object,
12  that's a vague question.  What he was on and what
13  the prescription records say are two different
14  things.
15            THE WITNESS:  I would say that I
16  couldn't draw that conclusion.  I would say that he
17  had the prescription filled.  Sometimes patients
18  will finish old prescriptions before they start new
19  ones.  I would be speculating what he was actually
20  taking.
21  BY MR. WACKER:
22       Q.  And equally, it would be also
23  speculation to say that he was not taking Vioxx?
24       A.  On my part, yes.
25       Q.  Doctor, you're aware that Vioxx

Page 356

1  increases hypertension or at least increases blood
2  pressure?
3       A.  It can, yes.
4       Q.  And increase in hypertension, are you
5  aware of the literature that indicates that an
6  increase in hypertension can also lead to the
7  progression of atherogenesis?
8       A.  The literature states that elevated
9  blood pressure -- would show that elevated blood
10  pressure over time can increase the risk of
11  atherogenesis.  It's not clear whether it's --
12  blood pressure elevations is a cause of medication
13  versus essential hypertension.
14       Q.  Assuming that Mr. Barnett had started
15  Vioxx by Dr. McCaffrey in December of '99 or
16  January -- early January of 2000, would you agree
17  that you can't rule out that the Vioxx could have
18  potentially contributed to the ischemia that you
19  observed in late January of 2000?
20            MR. GOLDMAN:  Object to the form.
21            THE WITNESS:  The question, I think,
22  becomes whether or not Vioxx contributes to
23  instability of plaques and plaque rupture.  I can't
24  say that it does, I can't say that it doesn't.
25  BY MR. WACKER:

Page 357

1       Q.  So in other words, you can't rule that
2  out?
3       A.  That's correct.
4       Q.  Now, Dr. Mikola, if you can turn to
5  Exhibit 40 that defense counsel showed you.
6       A.  Yes, sir.
7       Q.  That is the Bombardier article?
8       A.  Yes, sir.
9       Q.  And can you read the title for the
10  record.
11       A.  Comparison of upper gastrointestinal
12  toxicity of Rofecoxib and Naproxen in patients with
13  rheumatoid arthritis.
14       Q.  Does the title anywhere indicate to
15  you, Doctor, that Vioxx increases the risk of
16  cardiovascular disease or cardiovascular events?
17       A.  No, sir.
18       Q.  Is there anywhere in the abstract that
19  indicates that Vioxx significantly increases the
20  risk of cardiovascular events?
21       A.  No, sir.
22       Q.  And again, going to Page 1526 of the
23  article that counsel pointed out, first of all,
24  this discussion of the cardiovascular events is on
25  the seventh page of this article in the right-hand

Michael Mikola, M.D.

Page 358

1 column, third paragraph down, correct?
2        MR. GOLDMAN: Other than the abstract?
3        MR. WACKER: Of the discussion.
4        THE WITNESS: Seventh page, right
5 column.
6 BY MR. WACKER:
7        Q. Fourth paragraph.
8        A. Fourth paragraph, yes, sir.
9        Q. Would you agree with me that this
10 discussion was not prominently displayed in the
11 beginning of the article --
12        A. Yes, sir.
13        Q. -- for somebody like yourself as a
14 prescriber to review and for the company to
15 highlight?
16        A. Yes, sir.
17        MR. GOLDMAN: Object to the form.
18 BY MR. WACKER:
19        Q. And specifically, if you could read,
20 Doctor, where it starts in the second sentence, the
21 rate of myocardial infarction. Could you read that
22 for the record.
23        A. The rate of myocardial infarction was
24 significantly lower in the Naproxen group than in
25 the Rofecoxib group, parentheses, .1 percent versus

Page 359

1 .4 percent, parentheses. This difference was --
2        Q. That's fine.
3        A. Okay.
4        Q. Just taking that statement alone, that
5 gives you the impression as the prescribing doctor
6 that the difference between the two arms was
7 because of a reduction in myocardial infarctions
8 due to Naproxen, correct?
9        MR. GOLDMAN: Object to the form.
10        THE WITNESS: That sentence does not.
11 The following --
12 BY MR. WACKER:
13        Q. Well --
14        A. That sentence, it doesn't allude to the
15 reason for the difference, it just says that the
16 myocardial infarction was significantly lower.
17        Q. Well, but what it doesn't say is what
18 counsel -- defense counsel indicated. It doesn't
19 say that -- that the -- the rate of myocardial
20 infarctions was significantly higher in the Vioxx
21 arm, right?
22        MR. GOLDMAN: Object to the form.
23 BY MR. WACKER:
24        Q. It doesn't say that --
25        MR. GOLDMAN: That sentence doesn't say

Page 360

1 that, is that what you're saying?
2 BY MR. WACKER:
3        Q. Yeah, that sentence doesn't say that.
4        A. No --
5        Q. The rate of myocardial infarction was
6 significantly higher in the Vioxx group than in the
7 Naproxen group, it doesn't say that?
8        A. Correct, it does not directly say that.
9        Q. And -- and at the last sentence, it
10 says, the difference in the rates of myocardial
11 infarction between the Rofecoxib and Naproxen
12 groups was -- well, back up. Strike that.
13        In the last paragraph, last sentence
14 where it starts thus, do you see that?
15        A. Yes, sir.
16        Q. It says, thus, our results are
17 consistent with the theory that Naproxen has a
18 coronary protective effect and highlights the fact
19 that Rofecoxib does not provide this type of
20 protection owing to its selective inhibition of
21 cyclozygenase-2 at its therapeutic dose and at
22 higher doses.
23        Do you see that?
24        A. Yes, sir.
25        Q. Other than my butchering of the word.

Page 361

1        Dr. Mikola, this conclusion doesn't
2 give you the other side of the coin in terms of
3 indicating that there is a potential prothrombotic
4 effect of Vioxx, does it?
5        A. That's correct, it does not.
6        MR. GOLDMAN: I missed an objection to
7 form.
8        THE WITNESS: It does not indicate a
9 prothrombotic effect.
10 BY MR. WACKER:
11        Q. And you as a prescribing physician rely
12 upon a pharmaceutical company providing you with a
13 fair and balanced presentation of the scientific
14 evidence, correct?
15        MR. GOLDMAN: Object to the form.
16        THE WITNESS: I rely on the
17 presentation of evidence to be fair and balanced,
18 yes.
19 BY MR. WACKER:
20        Q. And that would include that if there's
21 two possibilities that you would expect the company
22 to give you both of those, correct?
23        MR. GOLDMAN: Object to the form.
24        THE WITNESS: The conclusion is there's
25 speculation in this instance. Would I -- they

91 (Pages 358 to 361)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

**Page 362**

1  speculate that the difference is due to a
2  protective effect of Naprosyn. Would I expect them
3  to also speculate that it may be due to a
4  prothrombotic effect of Vioxx? I don't know.
5  BY MR. WACKER:
6      Q.  Well, if -- if they're going to provide
7  you with one area --
8      A.  Yes.
9      Q.  -- area of speculation, would it be
10  equally fair and reasonable to give you the other
11  side of that equation?
12      A.  Yes, sir.
13          MR. GOLDMAN: Objection, asked and
14  answered.
15  BY MR. WACKER:
16      Q.  And that's especially true in light of
17  what you've seen today wherein Dr. Patrono
18  specifically indicated in his e-mail that you
19  couldn't explain the difference because of
20  Naproxen, true?
21          MR. GOLDMAN: Object to the form.
22          THE WITNESS: Yes, sir.
23  BY MR. WACKER:
24      Q.  And nowhere in this article does it
25  indicate what Dr. Patrono's e-mail indicated that

**Page 363**

1  we've already reviewed, correct?
2          MR. GOLDMAN: Object to the form.
3          THE WITNESS: That's correct.
4  BY MR. WACKER:
5      Q.  And in fact, nowhere in this article
6  does it indicate what we've reviewed today that
7  Dr. Scolnick indicated that the CV events are
8  clearly there and it is mechanism based as we
9  worried it was?
10          MR. GOLDMAN: Object to the form.
11  BY MR. WACKER:
12      Q.  Nowhere in that -- in this article does
13  it indicate that?
14          MR. GOLDMAN: Object to the form. That
15  part wasn't read and -- or part of it wasn't read
16  to the witness and there's also a lot of other
17  problems with the question.
18          MR. WACKER: Well, I -- that part was
19  read.
20          MR. GOLDMAN: As to where he was?
21          MR. WACKER: Absolutely. Well,
22  we'll -- we'll let the record speak for itself.
23  We'll let the record speak for itself.
24          MR. GOLDMAN: If that's true, I'm glad
25  you pointed that out.

**Page 364**

1          MR. WACKER: You read the whole thing,
2  Counsel.
3          MR. GOLDMAN: Oh, you're right, I did.
4          MR. WACKER: I've got a good memory.
5          MR. GOLDMAN: In which case, I will --
6  BY MR. WACKER:
7      Q.  And again, similarly, Dr. Mikola, you
8  would also expect that if there were that type of
9  evidence like we've reviewed in the Scolnick e-mail
10  that you would expect a pharmaceutical company to
11  provide you with that type of scientific
12  conclusion?
13          MR. GOLDMAN: Object to the form, vague
14  and leading.
15          THE WITNESS: I would think if they had
16  a belief among their research specialists that
17  there were prothrombotic effects of Vioxx, then it
18  should have been made known, yes, or at least
19  studied further and made known that there were
20  ongoing studies.
21  BY MR. WACKER:
22      Q.  And if they did have that evidence that
23  there were those potential prothrombotic effects of
24  Vioxx and as you indicated that they should have
25  made it known, it would be wrong not to, wouldn't

**Page 365**

1  it?
2          MR. GOLDMAN: Object to the form.
3          THE WITNESS: It could potentially
4  result in -- in problems, yes, sir.
5  BY MR. WACKER:
6      Q.  It could result in misleading a
7  prescriber that's prescribing the drug, correct?
8          MR. GOLDMAN: Object to the form.
9          THE WITNESS: I believe so, yes.
10  BY MR. WACKER:
11      Q.  In other words, here you are, you're
12  treating in this case Mr. Barnett and this is
13  information that you would have wanted to know?
14          MR. GOLDMAN: Object to the form.
15          THE WITNESS: Yes, sir.
16          MR. GOLDMAN: What information? Object
17  to the form.
18  BY MR. WACKER:
19      Q.  If you can pull out Exhibit 41.
20          MR. GOLDMAN: Which one is that, Ted?
21          MR. WACKER: That's the Patrono
22  article.
23          MR. GOLDMAN: If I had bet the chances
24  that Dr. Patrono would be discussed this often in
25  this deposition, I would have placed it pretty low.

92 (Pages 362 to 365)

## Michael Mikola, M.D.

Page 366

1   THE WITNESS: 41?
2        MR. GOLDMAN: Looks like this. Here
3   you go.
4        THE WITNESS: Thanks.
5        MR. GOLDMAN: We'll have to get this
6   disaster together after this.
7        THE WITNESS: Okay.
8   BY MR. WACKER:
9   Q.   Okay, Doctor, do you see anywhere in
10  this article that it indicates that Dr. Patrono was
11  a paid consultant for Merck?
12  A.   No, sir.
13  Q.   Is it your understanding that based on
14  the current status of peer-reviewed medical
15  literature that in order to obtain a fair and
16  balanced and an unbiased review of literature that
17  somebody that's a paid consultant should disclose
18  that fact?
19       MR. GOLDMAN: Object to the form.
20       THE WITNESS: Yes, I think that's
21  information that should be disclosed.
22  BY MR. WACKER:
23  Q.   And you did see earlier in one of the
24  earlier exhibits where Merck had written an e-mail
25  about their consulting with Dr. Patrono on the

Page 367

1   specific issue of -- of Naproxen, correct?
2   A.   Yes, sir.
3   Q.   And a summary of that --
4        MR. GOLDMAN: Object to the form of the
5   last question.
6   BY MR. WACKER:
7   Q.   The summary of that e-mail that was in
8   the Merck files is -- reaches a different
9   conclusion than what this article stands for?
10  A.   I hate to do this, but I'm going to
11  need -- can I see that particular e-mail again that
12  you're referring to?
13  Q.   Yeah.
14       MR. GOLDMAN: Good luck.
15       THE WITNESS: There were several of
16  them.
17       MR. GOLDMAN: It's Exhibit 6.
18       THE WITNESS: I want to make sure --
19       MR. WACKER: It was Exhibit 6.
20       THE WITNESS: -- I'm commenting on the
21  right one. Exhibit 6, okay.
22  BY MR. WACKER:
23  Q.   That's actually not it.
24  A.   Okay.
25  Q.   So it must be -- that's the Scolnick.

Page 368

1   We got the wrong exhibit.
2        MR. WACKER: Hold on, let's go off the
3   record.
4        VIDEO TECHNICIAN: We will now go off
5   the record. The time is approximately 6:18 PM.
6        (Off-the-record conference.)
7        VIDEO TECHNICIAN: We're back on the
8   record. The time is approximately 6:18 PM.
9        THE WITNESS: Okay. Can you restate
10  the question, please?
11  BY MR. WACKER:
12  Q.   Yeah. Do you see in that e-mail,
13  Dr. Patrono is indicating that the difference in
14  the VIGOR study cannot be explained by the
15  cardioprotective effect of Naproxen for various
16  reasons?
17       MR. GOLDMAN: Are you going to ask him
18  to read the rest of it where it talks about chance
19  or are you going to just keep talking about the
20  first part?
21       MR. WACKER: Well, you can -- he can
22  read the whole thing if he wants.
23       MR. GOLDMAN: Objection to the form.
24       THE WITNESS: The answer to the
25  question is yes.

Page 369

1        MR. GOLDMAN: Did you get the
2   objection?
3   BY MR. WACKER:
4   Q.   Let's go to Exhibit 42. Doctor, if you
5   don't have it there, we'll find it, but this is
6   the -- the article by Mukherjee, Nissen and Topol.
7   Do you see that?
8   A.   Yes, sir.
9   Q.   Now, counsel asked you about your
10  awareness of that article and I believe your
11  testimony was you didn't recall specifically
12  reviewing that article at the time, correct?
13  A.   I'm not certain if I reviewed it or
14  not, that's correct.
15  Q.   And for certain, that was not an
16  article that anybody from Merck came and delivered
17  on your -- on your doorstep at your doctor's office
18  to wave in your -- in your -- you know, in your
19  doctor's office that, oh, boy, look, Vioxx
20  increases the risk of cardiovascular disease, was
21  it?
22       MR. GOLDMAN: Object to the form.
23  That's not at all what the -- the article says.
24       THE WITNESS: That is correct.
25  BY MR. WACKER:

93 (Pages 366 to 369)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 370

1    Q.  Well, let me rephrase the question.  It
2  was a horrible question.
3        Merck -- nobody from Merck brought you
4  that article, did they?
5    A.  That's correct.
6    Q.  And nobody from Merck, including sales
7  reps or otherwise, ever called attention to that
8  article in relation to Vioxx as a COX-2 inhibitor
9  increasing the risk of cardiovascular events?
10       MR. GOLDMAN:  Object to the form.
11       THE WITNESS:  Not to my recollection.
12  BY MR. WACKER:
13    Q.  And again, as a prescribing physician,
14  if that is something that Merck was aware of, you
15  would -- would you expect that they would bring
16  that to your attention as a prescribing physician
17  in terms of -- of review and knowledge of the
18  medical literature concerning one of their drugs?
19       MR. GOLDMAN:  Object to the form.
20  You're asking him whether you should bring every
21  article that has to do with a medicine to the
22  attention of a physician?
23  BY MR. WACKER:
24    Q.  Well, an article -- certainly an
25  article of significance indicating the potential

Page 371

1  for increased risk of cardiovascular events.
2    A.  Can you restate the question?
3    Q.  Yeah, would you expect that Merck or
4  somebody from Merck would bring to your attention
5  when they're detailing you or otherwise discussing
6  with you the risks and benefits of Vioxx that they
7  would bring to your attention an article that
8  discusses the risk and not just focus on articles
9  that discuss the benefit?
10    A.  I would --
11       MR. GOLDMAN:  Object to the form.
12       THE WITNESS:  I would prefer it and
13  appreciate it.  I would not expect it because none
14  of the pharmaceutical companies do that,
15  unfortunately.
16  BY MR. WACKER:
17    Q.  Well, whether -- whether they brought
18  the article to your attention, you would expect
19  that they would alert you to potential risks of
20  their own drug like Vioxx?
21       MR. GOLDMAN:  Object to the form.
22       THE WITNESS:  Can you restate it?
23  BY MR. WACKER:
24    Q.  Yeah, you -- whether they brought that
25  particular article to your attention --

Page 372

1    A.  Yes.
2    Q.  -- you would expect that Merck would
3  advise you of the potential of one of their drugs
4  like Vioxx to increase the risk of cardiovascular
5  events?
6    A.  I would think that they would make me
7  aware of it, yes, sir.
8    Q.  And that didn't happen while you were
9  treating Mr. Barnett?
10    A.  Not to my recollection, no, sir.
11       MR. GOLDMAN:  Object to the form.
12  BY MR. WACKER:
13    Q.  If you want to refer to Exhibit 44,
14  which is the product insert or label.
15    A.  I have 45, 46, 40.
16    Q.  Here, you can use this one.
17    A.  Okay.  Thank you.
18    Q.  Doctor, you would agree that in terms
19  of product labeling, there's various levels of --
20  of warnings, correct?
21    A.  Yes, sir.
22    Q.  At the top of that list is a black box
23  warning, correct?
24       MR. GOLDMAN:  Object to the form.
25       THE WITNESS:  Yes, sir.

Page 373

1  BY MR. WACKER:
2    Q.  And -- well, strike that.
3        At the top of that list truly is -- is
4  an absolute contraindication, correct?
5    A.  Correct.
6    Q.  And then from there, there's a relative
7  contraindication?
8    A.  Yes, sir.
9    Q.  And then from there, there's a black
10  box warning, correct?
11       MR. GOLDMAN:  Object to the form.
12       THE WITNESS:  Yes.
13  BY MR. WACKER:
14    Q.  And then below the black box warning is
15  a warning, correct?
16       MR. GOLDMAN:  Object to the form.
17       THE WITNESS:  Yes, sir.
18  BY MR. WACKER:
19    Q.  And then below that is a precaution,
20  correct?
21    A.  Yes, sir.
22    Q.  And you would agree that the -- the
23  proposed label that we showed you earlier that had
24  the cardiovascular events in the warnings section
25  is a more heightened location of that warning than

94 (Pages 370 to 373)

# Michael Mikola, M.D.

## Page 374

1  in -- in the precautions section that it's -- that
2  it ended up in April 2002.
3        MR. GOLDMAN: Object to the form.
4        THE WITNESS: Yes, sir.
5  BY MR. WACKER:
6        Q.  And when you're weighing the risks and
7  benefits of a drug, that's something that you take
8  into consideration, where that warning is placed in
9  the actual product insert?
10       MR. GOLDMAN: Object to the form.
11       THE WITNESS: Yes, sir.
12  BY MR. WACKER:
13       Q.  Now again, if you can take Exhibit
14  40 --
15       A.  I have it.
16       Q.  Oh, you have it.
17       MR. WACKER: And we'll go ahead and
18  mark this as next, which is --
19       (Off-the-record conference.)
20       (PLF. EXH. 47, Memo dated 7/5/00 to
21  Drs. Alise Reicin, Eliav Barr and Dennis Erb from
22  Dr. Deborah Shapiro, was marked for identification.)
23  BY MR. WACKER:
24       Q.  Here you go, Doctor. I'm going to hand
25  you Exhibit 47. This is a memo dated July 5th,

## Page 375

1  2000, correct?
2        A.  Yes, sir.
3        MR. GOLDMAN: I'm -- I'm going to
4  object again to you using an internal memo from
5  Merck that Dr. Mikola has never seen before and
6  you're asking about an issue that is so complicated
7  with such a long history, to ask him to express any
8  opinion on this is wholly improper.
9        MR. WACKER: That assumes that you know
10  what I'm going to ask.
11       MR. GOLDMAN: Well, I know the
12  document. I can predict what you're going to ask.
13       MR. WACKER: Maybe, maybe not.
14       MR. GOLDMAN: Anyway, the objection
15  is -- can I have a standing objection on foundation
16  grounds and it's also beyond the scope?
17       MR. WACKER: You can have a standing
18  objection.
19  BY MR. WACKER:
20       Q.  Doctor, if you look at Exhibit 40,
21  which is the Bombardier article --
22       A.  Yes, sir.
23       Q.  -- and now if you look at Exhibit 47,
24  which is the July 5th memo from Deborah Shapiro.
25       A.  Yes, sir.

## Page 376

1        Q.  And if you go to Figure 1, Page 4 of
2  the -- of the memo.
3        MR. GOLDMAN: Why don't you read the
4  first memo -- first sentence so he understands what
5  this is about.
6  BY MR. WACKER:
7        Q.  Are you with me?
8        A.  Yes, sir.
9        Q.  I'm on this --
10       A.  Table -- Table 3?
11       MR. GOLDMAN: Can you --
12  BY MR. WACKER:
13       Q.  Figure 1.
14       MR. GOLDMAN: For optimal completeness,
15  can you at least let the witness read the memo
16  attaching the tables.
17       MR. WACKER: It says, subject,
18  cardiovascular update, VIGOR.
19       MR. GOLDMAN: Yeah, but you're just
20  turning to a table within a document. You're going
21  to ask him about it and you haven't had him --
22  given him a chance to read the context at all.
23       MR. WACKER: Well, I'll let you do
24  that.
25       MR. GOLDMAN: Okay.

## Page 377

1        MR. WACKER: I want to ask him my
2  questions and you can ask him your questions.
3  BY MR. WACKER:
4        Q.  Do you see Figure 1 on Page 4 of the
5  July 5th memo?
6        A.  Yes, sir.
7        Q.  And do you see that that's a graph, a
8  Kaplan-Meier Curve?
9        A.  Says so.
10       Q.  And it indicates, confirmed
11  thromboembolic cardiovascular serious adverse
12  experiences. Do you see that?
13       MR. GOLDMAN: Object, lacks foundation
14  and beyond the scope.
15       THE WITNESS: Yes, sir.
16  BY MR. WACKER:
17       Q.  And that's for the bigger study,
18  correct?
19       A.  Yes, sir.
20       Q.  Now, turn to the Bombardier article
21  itself.
22       A.  Yes, sir.
23       Q.  Do you see that graph depicted anywhere
24  in the Bombardier article?
25       A.  No, sir.

95 (Pages 374 to 377)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 378**

1    Q. Now, what you do see in the Bombardier
2  article is a graph on Page 1524. That is -- is a
3  graph just discussing the benefit side of the
4  equation, meaning the -- the PUB data, correct?
5    A. Yes, sir.
6    Q. And you were never provided as a
7  prescribing physician this particular Kaplan-Meier
8  Curve that shows the risk side of the equation --
9         MR. GOLDMAN: Object to the form.
10 BY MR. WACKER:
11   Q. -- for Vioxx, correct?
12   A. To the best of my recollection, that's
13 correct.
14   Q. And is that something that you would
15 have wanted to know when reviewing that article in
16 making a decision regarding the risk-benefit of
17 Vioxx?
18        MR. GOLDMAN: Object to the form.
19 You're asking about an isolated figure without any
20 context whatsoever.
21        MR. WACKER: You can state your
22 objection.
23 BY MR. WACKER:
24   Q. Go ahead.
25   A. Yes, sir.

**Page 379**

1         MR. GOLDMAN: The objection is to form.
2         (PLF. EXH. 48, Article entitled
3  Expression of Concern: Bombardier et al.,
4  "Comparison of Upper Gastrointestinal Toxicity of
5  Rofecoxib and Naproxen in Patients with Rheumatoid
6  Arthritis," N Engl J Med 2000;343:1520-8, was
7  marked for identification.)
8  BY MR. WACKER:
9    Q. Dr. Mikola, I'm now going to hand you
10 Exhibit 48. Can you read the title of that article
11 into the record.
12   A. Yes, sir. Expression of concern:
13 Bombardier and others, comparison of upper
14 gastrointestinal toxicity of Rofecoxib and Naproxen
15 in patients with rheumatoid arthritis, New England
16 Journal of Medicine, 2000.
17   Q. And is this an article that you've seen
18 before I just handed it to you?
19        MR. GOLDMAN: As one that you sent to
20 him?
21        THE WITNESS: I don't believe that you
22 guys sent it to me, but I do --
23        MR. GOLDMAN: Oh, yeah, they did.
24        THE WITNESS: Okay. I was going to say
25 *I do believe I've seen it before.*

**Page 380**

1  BY MR. WACKER:
2    Q. Okay. And taken collectively reviewing
3  this article, would you agree that the information
4  that was missing from the underlying Bombardier
5  article as discussed in this expression of concern
6  would have been relevant information that you would
7  have wanted to know --
8         MR. GOLDMAN: Object to the form.
9  BY MR. WACKER:
10   Q. -- regarding the VIGOR study?
11        MR. GOLDMAN: Object to the form, lacks
12 foundation and it is such a sweepingly-broad
13 question without any context at all like the
14 response of the authors.
15        THE WITNESS: Can you restate that,
16 please?
17 BY MR. WACKER:
18   Q. Yeah. Taking -- taking the information
19 from this expression of concern, would you agree
20 that the information that's contained within this
21 expression of concern regarding the -- the missing
22 information from the original Bombardier article
23 would have been information that you would have
24 wanted to know as a prescribing physician --
25        MR. GOLDMAN: Object to the form.

**Page 381**

1  BY MR. WACKER:
2    Q. -- at the time you were prescribing
3  Vioxx to Mr. Barnett?
4    A. Yes, sir.
5         MR. GOLDMAN: Object to the form.
6  BY MR. WACKER:
7    Q. And specifically, Doctor, if you look
8  down to the -- it's the third full indented
9  paragraph, it starts with the fact. Do you see
10 that?
11   A. Yes, sir.
12   Q. The fact that these three myocardial
13 infarctions were not included made certain
14 calculations and conclusions in the article
15 incorrect.
16        Do you see that?
17   A. Yes, sir.
18   Q. And then in the next paragraph, it
19 says, lack of inclusion of these -- of the three
20 events resulted in an understatement of the
21 difference in risk of myocardial infarction between
22 the Rofecoxib and Naproxen groups.
23        MR. GOLDMAN: Object to the form, the
24 document speaks for itself.
25 BY MR. WACKER:

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 382

1    Q.  Do you see that?
2    A.  Yes, sir.
3        MR. GOLDMAN:  And you've given him no
4    context and we've already asked him about it.
5    BY MR. WACKER:
6    Q.   And then it says, it has also resulted
7    in the misleading conclusion that there was a
8    difference in the risk of myocardial infarction
9    between the aspirin indicated and the aspirin
10   not -- not indicated groups.
11       Do you see that?
12       MR. GOLDMAN:  Object to the form,
13   beyond the scope.  I also want to object to the
14   form of the last question before that.
15       THE WITNESS:  Yes, sir.
16   BY MR. WACKER:
17   Q.   And again, had that information been
18   included in the original article, that would have
19   been something that you would have relied upon,
20   correct?
21       MR. GOLDMAN:  Object to the form.
22   You're asking him about an article, you're not
23   giving him any context whatsoever.
24       MR. WACKER:  You've stated your
25   objection.

Page 383

1        THE WITNESS:  Yes, sir.
2        (PLF. EXH. 49, Editorial entitled
3    Expression of Concern Reaffirmed, was marked for
4    identification.)
5    BY MR. WACKER:
6    Q.   This next document is Exhibit 49.
7        MR. GOLDMAN:  You know, you're going so
8    far beyond the scope, now you're showing him
9    documents you didn't even use on direct.
10       MR. WACKER:  I don't know, I thought
11   you -- I thought I'm just responding to some of
12   your -- your cross-examination.
13       MR. GOLDMAN:  I didn't even bring -- I
14   didn't even bring out the -- the articles.  You're
15   showing him another one.
16   BY MR. WACKER:
17   Q.   Okay, Doctor, this is Exhibit 49.  Can
18   you read the title, please.
19   A.   Expression of concern reaffirmed.
20   Q.   And the name of the journal?
21   A.   This is the New England Journal of
22   Medicine.
23   Q.   Can you just read the last paragraph of
24   this article.
25       MR. GOLDMAN:  Object to the form, lacks

Page 384

1    foundation.
2        THE WITNESS:  The information we have
3    indicates that the VIGOR article, because it did
4    not contain relevant safety data available to the
5    authors more than four months before publication,
6    did not accurately reflect the potential for
7    serious cardiovascular toxicity with Rofecoxib.
8    We, therefore, reaffirm our expression of concern.
9    BY MR. WACKER:
10   Q.   And again, this is information that you
11   would have wanted to know at the time when you were
12   prescribing Vioxx to Mr. Barnett?
13       MR. GOLDMAN:  Object to the form.
14       THE WITNESS:  The information about the
15   additional deaths and outcomes, yes, I would have
16   liked to have known that information.
17   BY MR. WACKER:
18   Q.   And Doctor, following the publication
19   of the Bombardier article regarding VIGOR, to your
20   knowledge, the company Merck never updated that
21   article with this -- with any of this updated
22   information regarding the three heart attacks or
23   this table in the July 5th, 2000 Shapiro memo,
24   correct?
25       MR. GOLDMAN:  Object to the form.

Page 385

1        THE WITNESS:  To my knowledge, that's
2    correct.
3        MR. WACKER:  Okay, Doctor, that's all
4    the questions I have.  Thank you.
5            EXAMINATION
6    BY MR. GOLDMAN:
7    Q.   Can you turn back -- let me go in
8    order.  You were asked about whether Vioxx can
9    increase the risk of hypertension.  Do you remember
10   that?
11   A.   Yes, sir.
12   Q.   Or increase hypertension?
13   A.   Yes, sir.
14   Q.   Are you aware that Vioxx and its
15   warning label always warned about the potential
16   increased risk of hypertension?
17       MR. WACKER:  Objection, misstates the
18   evidence in terms of a warning.
19       THE WITNESS:  It was always in the
20   package insert, yes.
21   BY MR. GOLDMAN:
22   Q.   Do you understand -- is it your
23   understanding, sir, that all COX-2 inhibitors and
24   NSAIDs have the potential to increase the risk of
25   hypertension?

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 386**

1    A.  Yes, sir.
2    Q.  In Feldene's warning label that I
3  handed you before, it indicates the whole section
4  on hypotension stating, NSAIDs, including Feldene,
5  can lead to onset of new hypertension and worsening
6  of preexisting hypertension, either of which may
7  contribute to the incidence -- increased incidence
8  of CV events.
9        Do you see that?
10    A.  What page?
11    Q.  It's on Page 4.
12    A.  Yes, sir.
13    Q.  Did you notice at all, sir, while
14  Mr. Barnett was taking Vioxx his hypertension did
15  not increase?
16    A.  I would have to look at my records.
17  Mr. Barnett had what we call white coat
18  hypertension.  His blood pressures in the office
19  were generally elevated -- or frequently, not
20  always, and that's often attributable to
21  apprehension.  When I questioned him about it and
22  he told me he had his blood pressure checked other
23  places, it was generally normal, 120 over 80 range.
24  So outside the office, per his report, his blood
25  pressure wasn't affected.

**Page 387**

1    Q.  You didn't see any evidence while you
2  were treating Mr. Barnett that Vioxx was increasing
3  his hypertension, true?
4    A.  That's correct.
5    Q.  You were asked questions about
6  whether -- you were asked whether you could
7  discount the possibility that Vioxx somehow
8  contributed to Mr. Barnett's ischemia in January of
9  2000.  Do you remember that?
10      MR. WACKER:  Objection, unintelligible.
11      THE WITNESS:  I was asked if I could
12  rule out the fact that it may have contributed to
13  his ischemic event.
14  BY MR. GOLDMAN:
15    Q.  And that line of questioning led to,
16  well, then the question is whether Vioxx can
17  increase the risk of -- withdrawn.
18      That discussion that you had with
19  Plaintiff's counsel then led to the question that
20  you posed of whether Vioxx can cause plaque
21  formation and the acceleration of atherosclerosis.
22  Do you remember that?
23      MR. WACKER:  Objection, the testimony
24  speaks for itself.
25      THE WITNESS:  My question was plaque

**Page 388**

1  destabilization and rupture, can Vioxx contribute
2  to plaque destabilization and plaque rupture.
3  BY MR. GOLDMAN:
4    Q.  Have you ever seen in any peer-reviewed
5  article concerning any clinical study with any
6  human being evidence that Vioxx or any other COX-2
7  inhibitor can increase plaque destabilization or
8  the likelihood of plaque rupture?
9    A.  No, sir, not directly.
10    Q.  And you're not a pharmacologist, are
11  you?
12    A.  That's correct.
13    Q.  I'm handing you what I'll mark as
14  Exhibit 48.
15      MR. WACKER:  I think we're at 50.
16      (DFT. EXH. 50, E-mail dated 2/5/01 to
17  Thomas Rhodes, et al., from Harry A. Guess, was
18  marked for identification.)
19  BY MR. GOLDMAN:
20    Q.  50.
21    A.  Should I change this to 50?
22    Q.  Yes.  Do you remember Mr. Wacker was
23  asking you about an e-mail that Dr. Scolnick wrote
24  in March of 2000 about being worried and thinking
25  that the VIGOR results were mechanism based?

**Page 389**

1    A.  Yes, sir.
2    Q.  I've handed you another e-mail that the
3  Plaintiff's lawyers didn't show you or send you.
4  It's dated February 4th, 2001 from Dr. Scolnick to
5  a number of scientists at Merck, Bates stamped
6  MRK-ACT 0009918.
7      Do you see in the -- first of all, I
8  assume you haven't seen this e-mail just like you
9  haven't seen any of the other e-mails that
10  Mr. Wacker had shown you?
11    A.  I have not seen this e-mail before
12  today, no.
13    Q.  Do you see that in the middle of the
14  bottom e-mail, it says, but I was sick at the
15  thought that we might be doing harm to patients.  I
16  know each of you well enough to know you felt the
17  same way.  With all the data now available, I am no
18  longer worried.
19      Do you see that, sir?
20    A.  Yes, sir.
21    Q.  This is the president of Merck Research
22  Laboratories who wrote that e-mail, okay?
23    A.  I now know that, yes, sir.
24    Q.  And when you were talking before with
25  Mr. Wacker about whether Merck should tell you

## Michael Mikola, M.D.

Page 390

1　information about scientists being concerned about
2　Vioxx being prothrombotic, you understand that
3　scientists can have a theory at one point in time
4　and analyze data and then have a different theory
5　later, right?
6　　A.　Yes, sir.
7　　Q.　So here is an example in February of
8　2001 before you even prescribed Vioxx to
9　Mr. Barnett where the head scientist at Merck is
10　saying he's not worried about Vioxx causing the
11　heart attacks in VIGOR.　Do you see that?
12　　　MR. WACKER: Objection, it misstates
13　the evidence.
14　　　THE WITNESS:　I can't say from this
15　document that he's referring to VIGOR.
16　BY MR. GOLDMAN:
17　　Q.　Okay, he's testified that he had --
18　that he did -- and that's one of the problems with
19　this whole area is you're being asked questions and
20　you're not shown testimony.
21　　A.　Yes.
22　　Q.　Do you have a problem, Dr. Mikola,
23　being shown e-mails that you've never seen before
24　without other documents to give you the full
25　context of them?

Page 391

1　　　MR. WACKER:　Objection, vague and
2　ambiguous.
3　　　THE WITNESS:　Taken out of context, the
4　interpretation is subject to interpretation.
5　BY MR. GOLDMAN:
6　　Q.　And so as a prescribing physician, you
7　wouldn't expect Merck sales representatives to run
8　into your office on one day and say, there's a
9　scientist at Merck who's worried, and then a week
10　later come in and say that same scientist is not
11　worried?
12　　　MR. WACKER:　Well, this isn't a week
13　later.　This is February 5th, 2001, so that's about
14　a year later.
15　　　THE WITNESS:　That's correct.
16　BY MR. GOLDMAN:
17　　Q.　From February 4th of 2001, the date of
18　this e-mail by Dr. Scolnick, through 2004, you
19　continued to prescribe Vioxx believing that the
20　benefits outweighed its risks, correct?
21　　A.　Yes, sir.
22　　Q.　And if Merck had come to you and said
23　in February of 2001 that its head scientist and
24　other scientists were not worried about the results
25　in VIGOR, would that have encouraged you to

Page 392

1　prescribe Vioxx or discourage you?
2　　　MR. WACKER:　Objection, vague and
3　ambiguous, compound.
4　　　THE WITNESS:　It would have been
5　reassuring in providing -- in prescribing Vioxx.
6　BY MR. GOLDMAN:
7　　Q.　You were asked whether the VIGOR
8　publication in the New England Journal of Medicine
9　specifically indicated if the risk was
10　significantly higher -- the heart attack risk was
11　significantly higher in the Vioxx arm than it was
12　in the Naproxen arm.　Do you remember that?
13　　A.　Yes, sir.
14　　Q.　You understand from reading the
15　abstract in the VIGOR article and elsewhere in the
16　VIGOR article that there was a
17　statistically-significant difference in heart
18　attacks in the Vioxx arm versus the Naproxen arm,
19　right?
20　　A.　I remember it from the body, I don't
21　recall it from the abstract.
22　　Q.　In the package insert that you
23　testified you knew about in April of 2002, I'm just
24　going to read it to you, there's a statement that
25　says, the VIGOR study showed a higher incidence of

Page 393

1　adjudicated serious cardiovascular thrombotic
2　events in patients treated with Vioxx 50 milligrams
3　as opposed to patients treated with Naproxen 500
4　milligrams twice a day?
5　　A.　Correct.
6　　Q.　That's not Merck hiding the results of
7　the VIGOR study, is it?
8　　　MR. WACKER:　Objection, vague and
9　ambiguous.
10　　　THE WITNESS:　No, sir.
11　BY MR. GOLDMAN:
12　　Q.　You understood from reading the warning
13　label at the time you were prescribing Vioxx to
14　Mr. Barnett that there was a
15　statistically-significant difference in heart
16　attacks between the Vioxx arm and the Naproxen arm,
17　true?
18　　　MR. WACKER:　Okay, that -- that's --
19　that's a different -- yeah, difference.
20　BY MR. GOLDMAN:
21　　Q.　True?
22　　A.　In the VIGOR study, yes.
23　　　MR. WACKER:　Before you were saying
24　higher incidence, now you're saying different.
25　BY MR. GOLDMAN:

99　(Pages 390 to 393)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

**Page 394**

1    Q.   Well, the package insert says, the
2    VIGOR study showed a higher incidence of
3    adjudicated serious cardiovascular thrombotic
4    events in patients treated with Vioxx 50 milligrams
5    once daily as compared to patients treating with
6    Naproxen 500 milligrams twice daily.  That was what
7    the package insert said in April of 2002?
8        A.   To the best of my recollection, that's
9    correct.
10       Q.   And that information didn't dissuade
11   you from prescribing the medicine to Mr. Barnett,
12   did it?
13       A.   No, sir.
14       Q.   You were shown information about the
15   number of heart attacks -- withdrawn.
16           Mr. Wacker showed you, again, the
17   expression of concern by the New England Journal of
18   Medicine and then a reaffirmation of that
19   expression of concern?
20       A.   Yes, sir.
21       Q.   Do you have any knowledge of the
22   interaction between the Plaintiff's lawyers in this
23   litigation and the New England Journal of Medicine
24   before those editorials came out?
25       A.   I do not.

**Page 395**

1        Q.   Do you have any knowledge, sir, about
2    the timing of when the New England Journal of
3    Medicine published the expressions of concern and
4    that a jury was about to decide the first Vioxx
5    case?
6        A.   I do not.
7        Q.   Did you ever review or did the
8    Plaintiff's lawyers ever bother to show you our
9    cross-examination of Dr. Kirschman about his
10   conclusions in this expression of concern?
11          MR. WACKER:  Objection, argumentative.
12          THE WITNESS:  Did they show me?
13   BY MR. GOLDMAN:
14       Q.   Yes.
15       A.   No, sir.
16       Q.   Before accepting the characterizations
17   of Dr. Kirschman concerning the VIGOR study, would
18   you agree that it would be helpful to know what
19   Dr. Kirschman has to say about basic --
20       A.   Yes, sir.
21       Q.   Would you agree that it would be
22   helpful to know what the authors of the VIGOR paper
23   had to say about the New England Journal or
24   Medicine's criticism of the VIGOR study?
25       A.   Yes, sir.

**Page 396**

1        Q.   I asked you before whether you knew at
2    the time you were prescribing Vioxx to Mr. Barnett
3    beginning around November of 2000 there was a four
4    to five times difference in heart attacks in the
5    Vioxx arm versus the Naproxen arm of VIGOR.  Do you
6    remember that?
7        A.   Yes, sir.
8            MR. WACKER:  That -- that's what you're
9    saying now.  Before you said --
10   BY MR. GOLDMAN:
11       Q.   Do you remember that?
12       A.   Yes, sir.
13          MR. WACKER:  Before you said higher
14   incidence, which the article didn't say.
15   BY MR. GOLDMAN:
16       Q.   I asked you whether there would have
17   been any difference if you knew about three
18   additional heart attacks so that the rate would
19   have been five times versus four times.  Remember
20   that?
21       A.   Yes, sir.
22       Q.   And your testimony was that it wouldn't
23   have made a difference to you.  Remember that?
24       A.   In Mr. Barnett's case, that's correct.
25          MR. WACKER:  Objection, prior testimony

**Page 397**

1    makes it --
2    BY MR. GOLDMAN:
3        Q.   I'm sorry?
4        A.   In Mr. Barnett's case, that's correct.
5            MR. WACKER:  I'm -- I'm sorry, the --
6    it's asked and answered.
7    BY MR. GOLDMAN:
8        Q.   The number of heart attacks in the
9    VIGOR study in the Vioxx arm versus the Naproxen
10   arm was displayed very clearly on the first page
11   and the second page of the April 2002 label.
12   Remember?
13       A.   Yes, sir.
14       Q.   And in Table 3, there is an indication
15   that the number of cardiac events in Vioxx was 28
16   versus 10 in Naproxen, there's an indication that
17   there were 18 nonfatal MI's in Vioxx versus four in
18   Naproxen and there's also information about the
19   number of cardiovascular deaths in the VIGOR
20   study --
21       A.   Yes, sir.
22       Q.   -- okay?  And in knowing all that
23   information, you still believed that the benefits
24   outweighed the risks for prescribing Vioxx to
25   Mr. Barnett before his heart attack, correct?

100  (Pages 394 to 397)



Michael Mikola, M.D.

Page 398

1         MR. WACKER:  Objection, assumes that
2   that's accurate information.
3         MR. GOLDMAN:  Well, it's in the
4   FDA-approved package insert.
5         MR. WACKER:  Well, just because it's in
6   the FDA-approved package insert, we all know that
7   that doesn't always make it accurate --
8         THE WITNESS:  Yes, sir.
9         MR. WACKER:  -- unfortunately because
10  sometimes pharmaceutical companies don't always
11  provide accurate information.  But anyway, that's
12  another story we can get on to.
13        So I guess --
14        MR. GOLDMAN:  Plaintiff's lawyers don't
15  either.
16        MR. WACKER:  I guess in that sense, it
17  assumes facts not in evidence, that the information
18  is accurate.
19        MR. GOLDMAN:  Move to strike all that
20  colloquy.
21  BY MR. GOLDMAN:
22     Q.   The -- the fact that Mr. Patrono --
23        MR. GOLDMAN:  Sorry.
24        MR. WACKER:  Doctor.
25  BY MR. GOLDMAN:

Page 399

1     Q.   The fact that Dr. Patrono in his
2   peer-reviewed article in CHEST where he agrees that
3   Naproxen is a reasonable explanation for VIGOR, do
4   you have any reason to believe that Dr. Patrono
5   published this information for some ulterior
6   motive?
7         MR. WACKER:  Objection, calls for
8   speculation.
9         THE WITNESS:  I don't know the answer
10  to that.
11  BY MR. GOLDMAN:
12     Q.   Dr. Patrono didn't appear to be just
13  telling Merck what they wanted to hear during the
14  time that Vioxx was on the market, right?  You saw
15  an e-mail earlier where he said he had questions
16  about Naproxen.  Remember that?
17     A.   Yes, sir.
18        MR. WACKER:  Objection, that calls for
19  speculation as well.
20  BY MR. GOLDMAN:
21     Q.   Do you remember reading in the e-mail
22  that Dr. Patrono believed the reason for the
23  difference in heart attacks in VIGOR was due to
24  chance?
25     A.   Yes, sir.

Page 400

1     Q.   And in this article that Dr. Patrono
2   published in 2004, the number of heart attacks
3   being 20 in the Vioxx arm and four in the Naproxen
4   arm is specifically mentioned.  Do you know that to
5   be true?
6     A.   May I see it?
7     Q.   Sure.
8     A.   Yes, sir.
9         MR. WACKER:  Let me just lay a
10  late-founded objection to the previous question
11  where you said Patrono played a -- that -- that it
12  was due to play a chance (sic).  The objection is
13  vague and ambiguous because I don't -- I don't
14  think he said it was all due to chance.
15  BY MR. GOLDMAN:
16     Q.   The memo that Mr. Wacker used, Exhibit
17  47, that had the Kaplan-Meier Curve in Figure 1 --
18     A.   Yes, sir.
19     Q.   -- I'd like you to actually read the
20  first page -- I'll read it because you're tired.
21     A.   Okay.
22     Q.   The first page of the memo says, after
23  the February 10th, 2000 cutoff, 11 additional
24  patients experienced serious thrombotic
25  cardiovascular AE's that were sent for

Page 401

1   adjudication, nine on Vioxx and two on Naproxen.
2   Five of the 11 were confirmed events, three
3   confirmed MI's on Vioxx, one confirmed
4   peripheral -- how do you pronounce the rest?
5     A.   Venous thrombosis.
6     Q.   -- on Vioxx and one confirmed ischemic
7   cerebrovascular stroke on Naproxen.  None of the
8   five patients were indicated for prophylactic
9   aspirin.
10        Then it says that table -- then it
11  talks about tables and it says, none of the
12  conclusions have changed.
13     A.   Yes, sir.
14     Q.   Do you understand that the conclusions
15  in the VIGOR study did not change because of the
16  three additional heart attacks on Vioxx?
17        MR. WACKER:  Well, objection, that
18  calls for speculation, calls for expert opinion
19  testimony to the extent that he needs to review all
20  of that.
21  BY MR. GOLDMAN:
22     Q.   Do you understand that the -- when
23  you -- withdrawn.
24        When you read the VIGOR study in
25  November of 2000, you understand -- stood that

101 (Pages 398 to 401)

**Page 402**

1 there was a statistically-significant difference in
2 heart attacks in the Vioxx arm versus the Naproxen
3 arm, correct?
4    A. Yes, sir.
5    Q. And that difference is statistically
6 significant whether it's four times or five times
7 of a difference, true?
8    A. Correct.
9    Q. So the conclusion that you would draw
10 from that study wouldn't change if you knew that
11 there were five times difference in MI's between
12 Vioxx and Naproxen or four times?
13    A. Correct.
14    MR. WACKER: Well, that -- that
15 misstates the evidence because we have already read
16 Kirschman's expression of concern where he
17 indicates --
18    MR. GOLDMAN: I don't care what
19 Kirschman says.
20    THE WITNESS: It also resulted in the
21 misleading conclusion that there was a difference
22 *in the risk of myocardial infarction between the*
23 aspirin indicated and the aspirin not indicated.
24    MR. GOLDMAN: Can you just make an
25 objection instead of reading?

**Page 403**

1    MR. WACKER: Well, it --
2 BY MR. GOLDMAN:
3    Q. Can you answer the question again.
4    MR. WACKER: -- misstates the record.
5 BY MR. GOLDMAN:
6    Q. You said correct?
7    A. Yes, correct.
8    Q. Now, just looking at this one
9 Kaplan-Meier Curve here on Page 4 of this memo, do
10 you see that there is no difference between Vioxx
11 and Naproxen in the first several months of use?
12    MR. WACKER: Objection, that calls for
13 expert opinion testimony in terms of --
14    MR. GOLDMAN: Well, you showed him
15 the --
16    MR. WACKER: -- you know, biostatistics
17 and --
18    MR. GOLDMAN: Well, you showed him the
19 figure and asked him if he wanted to know it.
20    THE WITNESS: It's difficult to
21 ascertain from the graph if the difference is
22 statistically significant. It would appear that a
23 difference appears around nine months.
24 BY MR. GOLDMAN:
25    Q. So --

**Page 404**

1    A. But again, I don't --
2    MR. WACKER: Again, that has to do with
3 *issues of power and --*
4    THE WITNESS: I can't say if it's
5 statistically significantly different.
6    MR. MORTARA: It does not have issues
7 of power.
8    MR. WACKER: Oh, I'm sorry, I forgot
9 you were an expert.
10    MR. MORTARA: I am not.
11    MR. WACKER: I did see he was a
12 Ph.D. in something.
13 BY MR. GOLDMAN:
14    Q. Do you have any reason to believe that
15 if Mr. Barnett started Vioxx on January 10th or
16 11th of 2000, that he developed ischemia on January
17 19th of 2000 because of Vioxx?
18    MR. WACKER: Objection, asked and
19 answered. It's already been covered.
20    THE WITNESS: I don't really know if I
21 can answer that question. I don't know the answer.
22 BY MR. GOLDMAN:
23    Q. Okay.
24    A. I don't think he developed
25 atherosclerosis because of Vioxx. Whether he

**Page 405**

1 developed ischemia, I don't know.
2    MR. WACKER: Thank you, sir. Go home.
3 I appreciate your time.
4    MR. WACKER: I just have a few
5 follow-up questions. Let me just -- can we go off
6 for just a second?
7    VIDEO TECHNICIAN: We will now go off
8 the record. The time is approximately 6:59 PM.
9    (A recess transpired.)
10    VIDEO TECHNICIAN: We're back on the
11 record. The time is approximately 7:00 PM.
12    EXAMINATION
13 BY MR. WACKER:
14    Q. Doctor, do you have the April 2002
15 product insert? Here it is.
16    A. Somewhere.
17    MR. GOLDMAN: You want my highlighted
18 version?
19    THE WITNESS: You want me -- yeah, I'll
20 look for it. I'm sure I have it here.
21 BY MR. WACKER:
22    Q. Here, I've got it here.
23    A. Okay.
24    Q. Dr. Mikola, in the April 2002 package
25 insert, counsel pointed to a specific section where

## Michael Mikola, M.D.

1 he indicated special studies, VIGOR, other safety
2 findings, cardiovascular safety. It says, in a
3 placebo-controlled database derived from two
4 studies with a total of 2,142 elderly patients,
5 mean age 75 with a median duration of exposure of
6 approximately 14 months, the number of patients
7 with serious cardiovascular thrombotic events was
8 21 versus 35 for patients treated with Vioxx 25
9 milligrams once daily versus placebo respectively.
10      Do you see that?
11      A.   What page are you on, first, second?
12      Q.   That is under precautions,
13 cardiovascular effects on the right-hand column.
14      A.   Okay, I remember the text from earlier.
15      Q.   Yeah. And in --
16      A.   Yes, sir.
17      Q.   -- in prescribing the medication to
18 Mr. Barnett as of April 2002, you relied upon that
19 statement as being accurate, correct?
20      MR. GOLDMAN: Object to the form.
21      THE WITNESS: That would be correct.
22 BY MR. WACKER:
23      Q.   And if there was information that was
24 contrary to that, that's something that you're
25 unaware of, correct?

1      MR. GOLDMAN: Object to the form,
2 completely assumes facts not in evidence.
3      THE WITNESS: That would be correct.
4 BY MR. WACKER:
5      Q.   So if there was information that
6 indicated that even at 25 milligrams, there was a
7 statistically-significant increase in risk for
8 Vioxx, that's something that Merck did not share
9 with you, correct?
10      MR. GOLDMAN: Object to the form.
11      THE WITNESS: That would be correct.
12 BY MR. WACKER:
13      Q.   Now, this is part of Exhibit 28.
14      MR. GOLDMAN: I'm going to object to
15 your use of this interim metanalysis by
16 Dr. Shapiro. Is that what you're about to show
17 him?
18      MR. WACKER: Yeah.
19      MR. GOLDMAN: I object. It's beyond
20 the scope. It's a new document on redirect. He
21 has no personal knowledge of it, has never seen the
22 final data. So I object for all those reasons and
23 it lacks foundation.
24 BY MR. WACKER:
25      Q.   Dr. Mikola, if you could look at

1 MRK-MJ 0070394, it's -- it's part of the Vioxx
2 preliminary cardiovascular metanalysis by Deborah
3 Shapiro dated October 18th, 2000. And on that --
4 on that Bates number, you'll see it's entitled,
5 metanalysis, relative risk of MIN points with 95
6 percent CI confidence interval overall and within
7 blocks.
8      Do you see that?
9      MR. GOLDMAN: Okay, now, can you give
10 him a minute to look at the document? And this
11 is -- you're showing him a document that I've
12 already objected to.
13      MR. WACKER: Right.
14      MR. GOLDMAN: So the objection is
15 preserved.
16      THE WITNESS: Yes, sir.
17 BY MR. WACKER:
18      Q.   And do you see down at the bottom of
19 the document it says, total cohort?
20      A.   Yes, sir.
21      Q.   And does that indicate to you that
22 the -- that the total cohort for MI was
23 statistically significant for those studies --
24      MR. GOLDMAN: Object to the form. This
25 is --

1 BY MR. WACKER:
2      Q.   -- for that metanalysis?
3      MR. GOLDMAN: This is -- there are so
4 many issues, heterogeneity issues, there are so
5 many issues that -- that are involved in this and
6 you're just asking him out of nowhere to answer
7 that.
8      MR. WACKER: Just based upon the
9 document.
10      MR. GOLDMAN: Object to the form, lacks
11 foundation.
12 BY MR. WACKER:
13      Q.   That document indicates that the risk
14 of MI is more than double, right, 2.02?
15      MR. GOLDMAN: Same objection.
16 BY MR. WACKER:
17      Q.   Do you see that?
18      MR. GOLDMAN: Allow him to read things
19 so he can answer in an informed way.
20      THE WITNESS: Yes, I can't tell if it's
21 statistically significant, but it suggests what the
22 total cohort is.
23 BY MR. WACKER:
24      Q.   Let me see. Do you see here, Doctor,
25 where the confidence interval does not cross 1?

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 410

1    A.  Yes, okay.  Yes.
2    Q.  And that would indicate the statistical
3  significance?
4         MR. GOLDMAN:  Objection, you're just
5  basing it on that and he needs to read the entire
6  study in order to make that assessment.  Lacks
7  foundation.
8         MR. WACKER:  You're -- you're asking me
9  to rely upon -- on Merck?
10        MR. GOLDMAN:  Yes, I am, and science.
11        MR. WACKER:  Apparently the New England
12  Journal didn't work out too well.
13  BY MR. WACKER:
14   Q.  All right.  And Doctor, on this
15  exhibit, the Scolnick memo from February 4th, 2001,
16  do you have any -- do you have any knowledge as to
17  what motivated Dr. Scolnick to write that e-mail?
18   A.  No, sir.
19   Q.  Do you know what his stock options
20  were --
21        MR. GOLDMAN:  Object, come on.
22  BY MR. WACKER:
23   Q.  -- how much he stood to lose by the
24  fact that Vioxx was going off the market?
25   A.  No, sir.

Page 411

1    Q.  Do you know how much the company
2  estimated its forecast would be if -- if the --
3         MR. GOLDMAN:  Objection.
4  BY MR. WACKER:
5    Q.  -- if the product insert -- if the CV
6  risk was in the warnings section versus the
7  label --
8         MR. GOLDMAN:  Objection.
9  BY MR. WACKER:
10   Q.  -- I mean versus the precaution?
11        MR. GOLDMAN:  Objection, Mr. Wacker,
12  can we please move on?  We have a flight to catch.
13        MR. WACKER:  I understand.
14        MR. GOLDMAN:  This is way, way, way
15  beyond.
16  BY MR. WACKER:
17   Q.  Do you understand --
18   A.  I do not know the answer to that
19  question.
20   Q.  So if -- if it turns out --
21   A.  I don't know how much --
22   Q.  -- that Merck stood to lose 500 million
23  a year in terms of the -- the warnings for CV being
24  in the precaution instead of the warning, would
25  that influence your evaluation of this memo by

Page 412

1  Dr. Scolnick?
2         MR. GOLDMAN:  Object to the form, that
3  completely misstates the fact -- facts.  It has
4  absolutely nothing to do with the memo and -- and
5  the accusation is insulting and the witness is
6  being asked to opine on a document at issue he's
7  never been exposed to before, has no knowledge of.
8         MR. WACKER:  You -- you brought it up.
9         THE WITNESS:  I don't know Mr. Scolnick
10  and -- I don't know.
11        MR. WACKER:  Okay, that's all the
12  questions I have.
13        VIDEO TECHNICIAN:  The deposition is
14  concluded.  The time is approximately 7:07 PM.  We
15  will now go off the record.
16        (WHEREUPON, the proceedings concluded
17  at 7:07 PM.)
18
19
20
21
22
23
24
25

Page 413

1        SIGNATURE OF DEPONENT
2    I, the undersigned, MICHAEL MIKOLA, MD, do
3  hereby certify that I have read the foregoing
4  deposition and find it to be a true and accurate
5  transcription of my testimony, with the following
6  corrections, if any:
7
8  PAGE  LINE       CHANGE           REASON
9
10
11
12
13
14
15
16
17
18
19
   _____
   MICHAEL MIKOLA, MD          Date
20
21
22
23
24
25

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 414**

```
 1          CERTIFICATE OF REPORTER
 2      I, Terri L. Brusseau, Registered
 3  Professional Reporter and Notary Public for the
 4  State of South Carolina at Large, do hereby certify
 5  that the foregoing transcript is a true, accurate,
 6  and complete record.
 7      I further certify that I am neither related
 8  to nor counsel for any party to the cause pending
 9  or interested in the events thereof.
10      Witness my hand, I have hereunto affixed my
11  official seal this 1st day of May, 2006 at
12  Charleston, Charleston County, South Carolina.
13
14
15
16  _____
17          Terri L. Brusseau,
            Registered Professional
            Reporter, CP, CRR
18          My Commission expires
            May 7, 2006.
19
20
21
22
23
24
25
```

**Page 416**

```
 1  PLF. EXH. 16, Scientific Advisors'        87
    Meeting May 3-May 6, 1998 Programmatic
 2  Review Vioxx Program
    PLF. EXH. 17, E-mail dated 10/12/01 to    95
 3  iam_rodgez@merck.com from
    Stephen Epstein@medstat.net, with
 4  attachments
    PLF. EXH. 18, Article entitled Effects    95
 5  of MF-Tricyclic, a Selective
    Cyclooxygenase-2 Inhibitor, on
 6  Atherosclerosis Progression and
    Susceptibility to Cytomegalovirus
 7  Replication in ApoEpoprotein-E
    Knockout Mice
 8  PLF. EXH. 19, Article entitled            98
    COX-2-Derived Prostacyclin Confers
 9  Atheroprotection on Female Mice
    PLF. EXH. 20, Carolina Health            105
10  Specialties/Laboratory medical records
    for Gerald Barnett
11  PLF. EXH. 21, Carolina Health            107
    Specialties medical records for Gerald
12  Barnett
    PLF. EXH. 22, Call Notes                 115
13  PLF. EXH. 23, Letter dated 6/21/99 to    116
    Michael Mikolajczyk from Leonard I.
14  Silverstein, MD with attachments
    PLF. EXH. 24, FDA Advisory Committee     120
15  Briefing Document
    PLF. EXH. 25, PGM expense list           133
16  PLF. EXH. 26, Contact List               135
    PLF. EXH. 27, Scientific Advisors'       140
17  Meeting May 3-May 6, 1998 Programmatic
    Review Vioxx Program, with attachments
18  PLF. EXH. 28, Letter dated 1/31/06 to    141
    Dr. Michael Mikolajczyk from Lexi W.
19  Myer
    PLF. EXH. 29, Letter dated 4/14/06 to    141
20  Michael Mikola, MD from Lexi W. Myer,
    with attachments
21  PLF. EXH. 30, Carolina Health            190
    Specialties medical records for Gerald
22  Barnett
    DFT. EXH. 31, Grand Strand Regional      205
23  Medical Center medical record for
    Gerald Barnett
24  DFT. EXH. 32, Grand Strand Regional      213
    Medical Center medical records for
25  Gerald Barnett
    DFT. EXH. 33,                            217
```

**Page 415**

```
 1        I N D E X
 2  MICHAEL G. MIKOLA, MD             3
    EXAMINATION
 3  BY MR. ROBINSON                   3
    EXAMINATION                     147
 4  BY MR. GOLDMAN
    EXAMINATION                     353
 5  BY MR. WACKER
    EXAMINATION                     385
 6  BY MR. GOLDMAN
    EXAMINATION                     405
 7  BY MR. WACKER
 8      E X H I B I T S
 9  PLF. EXH. 1, Carolina Health       6
    Specialties medical record for Gerald
10  Barnett
    PLF. EXH. 2, Grand Strand Regional 9
11  Medical Center medical record for
    Gerald Barnett
12  PLF. EXH. 3, Vioxx prescription, with  26
    attachments
13  PLF. EXH. 4, Medical records for Gerald 30
    Barnett
14  PLF. EXH. 5, Vioxx box label          40
    PLF. EXH. 6, E-mail dated 3/9/00 to   41
15  Deborah R. Shapiro, Alise S. Reicin and
    Alan S. Nies from Edward M. Scolnick
16  PLF. EXH. 7, E-mail dated 3/28/00 to  46
    Barry J. Gertz from Alan S. Nies
17  PLF. EXH. 8, News Release dated 4/28/00 49
    PLF. EXH. 9, Contact List             51
18  PLF. EXH. 10, E-mail dated 1/31/01 to  53
    Raymond Gilmartin and David W. Anstice
19  from Edward M. Scolnick
    PLF. EXH. 11, Vioxx Label Description  64
20  PLF. EXH. 12, E-mail dated 10/16/01 to 68
    David W. Anstice from Edward M.
21  Scolnick
    PLF. EXH. 13, E-mail dated 2/13/01 to  70
22  Douglas J. Watson, et al., from Harry
    A. Guess
23  PLF. EXH. 14, E-mail dated 11/22/01 to 73
    Thomas R. Cannell, Mark P. Stejbach and
24  Steven R. Viganu from Adam H. Schechter
    PLF. EXH. 15, Grand Strand Regional    76
25  Medical Center medical records for
    Gerald Barnett
```

**Page 417**

```
 1  Cardiology/Gastroenterology Associates
    medical record for Gerald Barnett
 2  DFT. EXH. 34, Physician's Orders       240
    DFT. EXH. 35, Medication Administration 241
 3  Record
    DFT. EXH. 36, VOID                     241
 4  DFT. EXH. 37, Grand Strand Regional    261
    Medical Center medical records for
 5  Gerald Barnett
    DFT. EXH. 38,                          274
 6  Cardiology/Gastroenterology Associates
    medical record for Gerald Barnett
 7  DFT. EXH. 39,                          274
    Cardiology/Gastroenterology Associates
 8  medical record for Gerald Barnett
    DFT. EXH. 40, Article entitled         287
 9  Comparison Of Upper Gastrointestinal
    Toxicity Of Rofecoxib And Naproxen In
10  Patients With Rheumatoid Arthritis
    DFT. EXH. 41, Article entitled         296
11  Platelet-Active Drugs: The
    Relationships Among Dose,
12  Effectiveness, and Side Effects
    DFT. EXH. 42, Article entitled Risk of 307
13  Cardiovascular Events Associated With
    Selective COX-2 Inhibitors
14  DFT. EXH. 43, Merck Prescribing        313
    Information
15  DFT. EXH. 44, Vioxx Label Description  322
    DFT. EXH. 45, Letter dated 3/28/03 to  336
16  Michael Mikolajczyk, MD from Leonard I.
    Silverstein, MD
17  DFT. EXH. 46, Feldene package insert   348
    PLF. EXH. 47, Memo dated 7/5/00 to Drs. 374
18  Alise Reicin, Eliav Barr and Dennis Erb
    from Dr. Deborah Shapiro
19  PLF. EXH. 48, Article entitled         379
    Expression of Concern: Bombardier et
20  al., "Comparison of Upper
    Gastrointestinal Toxicity of Rofecoxib
21  and Naproxen in Patients with
    Rheumatoid Arthritis," N Engl J Med
22  2000;343:1520-8
    PLF. EXH. 49, Editorial entitled       383
23  Expression of Concern Reaffirmed
    DFT. EXH. 50, E-mail dated 2/5/01 to   388
24  Thomas Rhodes, et al., from Harry A.
    Guess
25
```

66ee2519-35e8-4f59-b6ea-6c8725dd3eda