```
                                    Dunn

Dunn (Multi-clip)
JD 0903       9:3-10:4

   9: 3      Q.   Sir, state your name, please.
   9: 4      A.   James Dunn, D-U-N-N.
   9: 5      Q.   And Mr. Dunn, you work for Merck?
   9: 6      A.   Yes, sir.
   9: 7      Q.   How many years have you worked for Merck?
   9: 8      A.   Over 14 years.
   9: 9      Q.   Tell us what you've done with Merck.
   9:10      A.   I've held a number of different positions at
   9:11   Merck.  I've been a hospital representative.  I've been an
   9:12   office space representative.  I've been a marketing
   9:13   analyst.  I've managed some of the data centers within
   9:14   Merck.  I have been a business manager with Merck.  I've
   9:15   been the FIT team leader for Vioxx at Merck.  I was what
   9:16   we call educational program initiative senior director at
   9:17   Merck, and currently I'm a senior business director with
   9:18   Merck/Schering-Plough.
   9:19      Q.   In your role as educational program director for
   9:20   Merck was part of your job to train sales representatives
   9:21   about what they should tell doctors in the field selling
   9:22   products?
   9:23      A.   No, sir.
   9:24      Q.   What was it?
   9:25      A.   The job I had there was to coordinate the
  10: Page 10
  10: 1   scheduling activities for speakers so that we could
  10: 2   schedule speakers to do medical education type of programs
  10: 3   and help the field understand how we would want to execute
  10: 4   those programs.

JD 1202       12:2-12:5

  12: 2      Q.   You had to have material given to you,
  12: 3   scientific material, data that showed safety factors of
  12: 4   Vioxx, and then you would take that material and then give
  12: 5   it to the representatives; is that accurate?

JD 1208       12:8-12:12

  12: 8           THE WITNESS:  I would get data and materials
  12: 9      from other folks and, you know, that process of
  12:10      medical legal approval.  Then I would get that
  12:11      final product.  So it would be given to me in the
  12:12      final form and I would communicate that out.

JD 29107      291:7-291:14      → plaintiff will remove

  291: 7      Q.   [Okay.  Good.  All right.]  Now, let me ask you
  291: 8   something.  Do you know what the Be The Power is?  I know
  291: 9   you've seen this before.  You helped create Be The Power,
  291:10   didn't you?
  291:11      A.   I'm aware of Be The Power, yes, sir.
  291:12      Q.   Well, you helped create Be The Power, didn't
  291:13   you?
  291:14      A.   My team was responsible for it, yes.

JD 29212      292:12-292:20

  292:12      Q.   Well, let's take a look at it.  Why don't you --
  292:13   section number 3, Be The Power, now, you worked on the
                                  Page 1
```

Handwritten annotations (right margin):
- Δ objection: sidebar, 401, 402, 403
- π response: Relevant as to this witness' knowledge and participation in the making of this video. Material to the training practices of Merck re: Vioxx.
- Δ objection: 401, 402, 403
- π response: Relevant as to this witness' participation in the making of this video and knowledge of its character. Material to the training practices of Merck re: Vioxx.

Handwritten (bottom):
Previous rulings:
291:7-14 - Plaintiff agreed to remove sidebar, overruled otherwise

```
                                    Dunn
292:14   team that put this together; is that right?
292:15       A.   Yes, sir.
292:16       Q.   Can we put that up there when you're ready to
292:17   go?  What is the V Squad?
292:18       A.   Well, this is a fictitious rendition and the
292:19   V Squad refers to the actors that are within this DVD.
292:20       Q.   And you showed this to your sales team; right?

JD 29223      292:23-295:7

292:23            THE WITNESS:  This was part of the meeting
292:24       packet that got sent down to them.  It was
292:25       optional so they could view it if they wanted to
293: Page 293
293: 1       or they didn't have to view it at all.
293: 2   BY MR. PAPANTONIO:
293: 3       Q.   But you're trying to tell -- basically this
293: 4   is -- what you're -- you are providing information in this
293: 5   thing, aren't you?
293: 6       A.   No, sir.
293: 7       Q.   There's no information in here?
293: 8       A.   No, sir.
293: 9       Q.   Let's look at it.  Go ahead.
293:10            (Whereupon the DVD was played as follows:
293:11            "What's going on?"  "It's an obstaclizer."
293:12       "How do we get out of here?"  "I don't know.")
293:13   BY MR. PAPANTONIO:
293:14       Q.   What is an obstaclizer?
293:15       A.   Once again, it's fictitious.  This is based on
293:16   futuristic, you know, like Star Trek theme stuff.  You can
293:17   see the way these people are dressed.  Obstaclizer, it's a
293:18   fictitious way to, you know -- computer system that they
293:19   had in here.  So it's all fake, phony stuff that's
293:20   futuristic.
293:21       Q.   So they're talking about an obstaclizer right
293:22   here.  Let's see what the obstaclizer does.
293:23            (Whereupon the DVD was continued as follows:
293:24       " -- while we're in here."  "What happened?"
293:25       "We didn't get a chance to deal with the
294: Page 294
294: 1       obstacles.")
294: 2   BY MR. PAPANTONIO:
294: 3       Q.   Hold it right there.  What are obstacles?
294: 4       A.   Obstacles tend to be -- in the industry it tends
294: 5   to be questions that physicians would ask of us.
294: 6       Q.   A physician would ask you a question like will
294: 7   Vioxx cause cardiovascular events.  That would be an
294: 8   obstacle; correct?
294: 9       A.   Any question a physician might ask would be.
294:10       Q.   An obstacle would be a physician asking you
294:11   Vioxx will cause strokes in human beings.  That would be
294:12   an obstacle; correct?
294:13       A.   Any question.
294:14       Q.   An obstacle would be could you explain to me,
294:15   Mr. Sales Rep or Mrs. Sales Rep, what the chances are for
294:16   a person taking Vioxx to have a myocardial infarction.
294:17   That would be an obstacle; correct?
294:18       A.   Sir, any question a physician would ask would be
294:19   considered that, yes.
294:20       Q.   Go ahead with this obstaclizer.
294:21            (Whereupon the DVD was continued as follows:
294:22            "Send you back in?  You're lucky you made it
294:23       out.  That was a risk you took."  "Risk is my
                                Page 2
```

*Handwritten annotations (right margin):*

Δ objection: 401, 402, 403
π response: please see previous page.
Previous ruling overruled.

Δ objection: 401, 402, 403
π response: Material + Relevant to show representations that sales rep could view this video and also to show Merck's training practices regarding Vioxx. Further clarifies testimony of the content of the video.
Previous ruling overruled.

```
                                    Dunn
294:24       middle name."  "Really?  It's mine too."  "So
294:25       send us back in again so we can finish the job."
295: Page 295
295: 1       "Vince, the truth is I don't think you're ready.
295: 2       You moved slow in there.  You've got to handle
295: 3       obstacles quickly, whether you're in the doctor's
295: 4       office or in an obstaclizer.")
295: 5  BY MR. PAPANTONIO:
295: 6       Q.  Hold it.  Why do you have to handle obstacles
295: 7  quickly?

JD 29509     295:9-297:11

295: 9            THE WITNESS:  Well, once again, this is a
295:10       fictitious piece here, but we would want our
295:11       representatives to be able to give accurate
295:12       information to questions physicians would have
295:13       for a number of reasons.
295:14            Number one, we want them to have that data
295:15       because they're asking for it.  Number two, it
295:16       builds the credibility of the rep.  When the rep
295:17       is viewed as a resource from the physician, one
295:18       of the ways they do that is being able to answer
295:19       questions to physicians accurately and quickly.
295:20  BY MR. PAPANTONIO:
295:21       Q.  And honestly; right?
295:22       A.  All the time; honesty all the time.
295:23       Q.  And honesty always matters, doesn't it?
295:24       A.  Yes, sir, it does.
295:25       Q.  Let's go ahead.
296: Page 296
296: 1            (Whereupon the DVD was continued as follows:
296: 2       "Have to make every second count, two
296: 3       efficacy messages, two GI risk messages,
296: 4       appropriate balancing information and close."
296: 5       "We know.  We've been in workshops.")
296: 6  BY MR. PAPANTONIO:
296: 7       Q.  Now, I heard GI information.  I heard efficacy
296: 8  information.  I didn't hear anything about CV information
296: 9  there, cardiovascular information.  Did you tell
296:10  salespeople not to talk about cardiovascular information
296:11  until they were asked by the doctor?
296:12       A.  No, sir.  In fact, what the statement in there
296:13  was was appropriate balanced information.  Balanced
296:14  information includes the entire product circular safety
296:15  profile and we would discuss the cardiovascular profile as
296:16  part of that balanced information.
296:17       Q.  I thought this morning we saw an article that
296:18  clearly -- a document that you saw -- I saw that said
296:19  don't initiate the discussion about CV unless the doctor
296:20  does.  Didn't we see something?
296:21       A.  I think you're inaccurate on that.
296:22       Q.  I didn't show you a document this morning that
296:23  says don't initiate any discussions about VIGOR and CV
296:24  unless the doctor asks about it?
296:25       A.  I think that was specific to VIGOR, and what I
297: Page 297
297: 1  had responded to you there was that we had other things
297: 2  that could answer questions for physicians and the fact
297: 3  that our representatives were walking into offices and
297: 4  proactively doctors were asking the question as well.
297: 5       Q.  Let's see what the obstaclizer does.  Go ahead.
297: 6            (Whereupon the DVD was continued as follows:
                                Page 3
```

Handwritten annotations (right margin):

Δ objection: 401, 402, 403
π response: Please see previous page. Previous ruling: overruled.

Δ objection: 401, 402, 403
π response: Material and relevant to show what information was being conveyed to Vioxx sales representatives regarding safety information. Previous ruling: overruled.

Δ objection: 611, mischaracterizes the document
π response: witness is not denying that VIGOR document told reps not to initiate conversations, he only said there were other ways to give doctors this information.

Δ objection: Sidebar, no question pending
π response: questioner is preparing video to be played. Needed for clarification.

```
                                    Dunn
   297: 7              "We know the messages."  "But you must do
   297: 8         more.  You must be the power."  "Be the power?"
   297: 9         "Be the power.  It's the only way to reach the
   297:10         full potential of the V Squad.  Come on I'll show
   297:11         you.")

JD 29824     298:24-299:2

   298:24         Q.   Move to strike.  I want to ask the question
   298:25    again.  You very specifically -- field reps were told to
   299: Page 299
   299: 1    make two efficacy presentations, two GI presentations;
   299: 2    correct?

JD 29904     299:4-299:13

   299: 4              THE WITNESS:  I think that they were told to
   299: 5         provide the message flow -- that sounds familiar
   299: 6         to me -- but also and always to provide
   299: 7         appropriate balance.  You wouldn't just say say
   299: 8         this without the appropriate balance.  We always
   299: 9         provide appropriate balance.
   299:10    BY MR. PAPANTONIO:
   299:11         Q.   So this isn't fictitious.  This is what you'd
   299:12    actually tell people to do.
   299:13         A.   No, sir, this is fictitious.

JD 30405     304:5-305:22

   304: 5         Q.   Go ahead with this.
   304: 6              (whereupon the DVD was continued as follows:
   304: 7              "They're coming back."  We're hitting them
   304: 8         with facts.  How about --"  "Be the power.")
   304: 9    BY MR. PAPANTONIO:
   304:10         Q.   All right.  That's enough.  I don't need to see
   304:11    more.)  You don't know how much you spent on this, do you?
   304:12         A.   No, sir.
   304:13         Q.   But the truth was you used this as a training
   304:14    mechanism for salespeople; right?
   304:15         A.   That is not true.
   304:16         Q.   Well, why did you make it?
   304:17         A.   The reason we made this is the
   304:18    representatives -- there's a district meeting plan.  We
   304:19    call it the DMAC, district meeting agenda and content, and
   304:20    that was multiple different training components, modules,
   304:21    and we were training representatives over multiple hours.
   304:22    I think this training day was eight to ten hours long.
   304:23              Consistent with the adult learning model, part
   304:24    of that model is that adults don't learn just from
   304:25    lecture.  They need breaks.  These video clips were
   305: Page 305
   305: 1    designed not to be a training tool at all, nothing more
   305: 2    than a mental break for the representatives so that they
   305: 3    could kind of shut down for a little bit and then get
   305: 4    reengaged and ready to go on the intense training that we
   305: 5    had that are contained in those documents that I referred
   305: 6    to.
   305: 7         Q.   So none of what we just saw is instructional for
   305: 8    your salespeople?
   305: 9         A.   None of it.
   305:10         Q.   There's nothing in there that you hoped to pass
   305:11    on to your salespeople.
   305:12         A.   None of it.
```

*Handwritten annotations (right margin):*

- Δ objection: Sidebar, no question pending
- π response: see previous page
- Previous ruling: sustained
- Δ objection: Sidebar
- Previous ruling: sustained "through the word 'again'"
- Δ objection: 601, 802, 602, 401, 402, 403
- π response:
- Δ objection: 602, 401, 402, 403
- → Question relates to a Merck document witness was in charge of team that developed video.
- Previous ruling: overruled
- Δ objection: 401, 402, 403, 611
- → Plaintiff will remove bracketed portion
- π response to rest: Proper cross examination - relevant and material as to witness' interpretation of this video.
- Previous ruling: Plaintiff withdrew 304:10 and first word of 304:11; otherwise overruled.
- Plaintiff will remove (×2, noted near 298:24-299:2)

```
                              Dunn
305:13        Q.  Including two efficacy presentations and two GI
305:14  presentations.
305:15        A.  The entire video was not meant to pass on
305:16  anything to the reps.  It was meant to give them a mental
305:17  break.
305:18        Q.  A mental break.
305:19        A.  Yes, sir.
305:20        Q.  And that was just a mental break for you?  Was
305:21  that a mental break, just watching that, for you?
305:22        A.  Sir, yes, it was.
```

Handwritten annotation: Δ objection: 401, 402, 403, 611   π response: please see previous page   Previous ruling: overruled

Total Length - 00:10:13