Played Rivas

*[handwritten: No prior Rulings, testimony not designated by π in Irvin II]*

Rivas 1-24 (Multi-clip)
cr 1002       10:2-10:10

```
10: 2         Q.        Good morning, Ms. Rivas.  As you
10: 3 heard, my name is Jerry Kristal.  How are you this
10: 4 morning?
10: 5         A.        Good, thank you.
10: 6         Q.        I represent John and Irma McDarby in
10: 7 a case that they have brought against Merck relating
10: 8 to Vioxx.
10: 9                   Do you understand that?
10:10         A.        Yes.
```
*[handwritten: Withdrawn by π]*

cr 1424      14:24-15:21

```
14:24         Q.        You were recruited by Merck while you
14:25 were in college; is that fair to say?
15: Page 15
15: 1         A.        Yes.
15: 2         Q.        And you went to work at Merck in the
15: 3 summer right after you graduated University of
15: 4 Kansas?
15: 5         A.        Yes.  I started in August.
15: 6         Q.        Of 1988.
15: 7         A.        Correct.
15: 8         Q.        You were 22 years old at that time?
15: 9         A.        Sorry.  I'm doing the math.
15:10                   Yes.
15:11         Q.        And since August of 1988, have you
15:12 worked continuously with Merck up unto the present
15:13 time?
15:14         A.        Yes.
15:15         Q.        So in your adult life, your only
15:16 employer has been Merck?
15:17         A.        Correct.
15:18         Q.        You've had several different
15:19 positions within Merck since 1988 and all of them
15:20 have been in sales; is that correct?
15:21         A.        That's correct.
```

cr 6605      66:5-66:7

```
66: 5                   MR. KRISTAL:  Let me mark as Exhibit 8
66: 6 a document that came -- provided to us by Merck from
66: 7 the -- what's called the FACTS, F-A-C-T-S, Database.
```
*[handwritten: Δ obj = 602-foundation  π response = withdrawn by π]*

cr 7407      74:7-74:14

```
74: 7         Q.        So during the time up until Mr.
74: 8 McDarby had his heart attack, you had paid 27
74: 9 visits, at a minimum, on Dr. Braun; correct?
74:10         A.        According to this document, yes.
74:11         Q.        Well, do you have any reason to doubt
74:12 the accuracy of the Merck database from which this
74:13 came?
74:14         A.        No.
```
*[handwritten: Withdrawn by π]*

cr 22116     221:16-221:23

```
221:16         Q.        You've heard the term "obstacles"
221:17 before in your sales career at Merck.  Right?
221:18         A.        Yes.
```

```
                          Played Rivas
221:19      Q.      And an obstacle in terms of Merck
221:20 sales world is a concern that a physician has about
221:21 something regarding the drug that you were trying to
221:22 sell; is that fair to say?
221:23      A.      Yes, that's accurate.

cr  24819      248:19-250:5

248:19      Q.      All right.  Let me show you the
248:20 obstacle handler book we've been talking about.
248:21              Let me mark as Exhibit 28 --
248:22                      *  *  *
248:23              (Whereupon, the above-mentioned document
248:24 was marked for identification as Rivas-28.)
248:25                      *  *  *
249: Page 249
249: 1 BY MR. KRISTAL:
249: 2      Q.      -- you had a -- a large binder in
249: 3 which you would put materials entitled "Reference
249: 4 Binder"; is that fair to say?
249: 5      A.      Yeah, I believe I received a binder
249: 6 when Vioxx got approved for training materials.
249: 7      Q.      And at times materials would be put
249: 8 in.  You'd be asked to put in additional materials,
249: 9 remove old materials, that kind of thing.
249:10      A.      That sounds pretty accurate.
249:11      Q.      Okay.
249:12              If you look at Bates number that ends
249:13 12 -- strike that -- 0121, it's a memo to all field
249:14 personnel with responsibility for Vioxx from the
249:15 Market Integration Team for Vioxx, and the subject
249:16 is the top 10 obstacle handlers.  Right?
249:17      A.      Right.
249:18      Q.      And it's enclosing the complete
249:19 obstacle handling guide for Vioxx.  Right?
249:20      A.      Right.
249:21      Q.      And under "Cardiovascular Events,"
249:22 there are three obstacles that are there.  Right?
249:23      A.      Right.
249:24      Q.      So this -- the first three obstacle
249:25 events under the top 10 obstacle handlers are the
250: Page 250
250: 1 obstacles for cardiovascular events.
250: 2      A.      Right.
250: 3      Q.      Okay.
250: 4              The second one is obstacle response
250: 5 number 23, which is what the number was in the prior

cr  25018      250:18-251:15

250:18      Q.      And the obstacle is, "I'm concerned
250:19 about the cardiovascular effects of Vioxx."  Right?
250:20      A.      Right.
250:21      Q.      Okay.
250:22              So let's look at that obstacle and
250:23 response number 23.  And that is contained on page
250:24 121, I believe -- I'm sorry -- 120 -- I'll find it
250:25 -- it's on 201.  My apologies.
251: Page 251
251: 1      A.      What?  Am I looking at the wrong
251: 2 thing?
251: 3      Q.      The last three digits are 201.
251: 4      A.      That's (Indicating) not 201.
                          Page 2
```

Handwritten annotations (right margin):

Δ obj = 401-403, irrelevant to Barnett, his doctors, or his sales reps, would be prejudicial

π response = as set forth in our response to Merck's general objections, this testimony is relevant to show Merck's integrated national sales and marketing strategy, testimony is highly relevant to Mr. Barnett's and all cases

```
                                    Played Rivas
251: 5         Q.      And it says, number 23, "I am
251: 6 concerned about the cardiovascular effects of
251: 7 Vioxx."  Right?
251: 8         A.      Yes.
251: 9         Q.      And the obstacle handler you had said
251:10 the first thing you're supposed to do is what?
251:11         A.      Is clarify their concern.
251:12         Q.      Right.
251:13                 "What is your specific concern?"
251:14 Right?
251:15         A.      That's what it says, yes.

cr  25120       251:20-253:4

251:20                 And then the physician may respond A
251:21 or B.  Right?
251:22         A.      Right, that's what it says.
251:23         Q.      And the first one relates to the
251:24 physician saying, "I am hesitant to use Vioxx in my
251:25 patients because it may worsen congestive heart
252: Page 252
252: 1 failure"; correct?
252: 2         A.      Right.
252: 3         Q.      Or the physician may say, "Vioxx has
252: 4 the potential to increase the risk of MI."  Right?
252: 5         A.      Where -- where are you looking?
252: 6         Q.      Under A, it says B.
252: 7         A.      Oh.  Yes.
252: 8         Q.      And MI, again, heart attacks.  Right?
252: 9         A.      Right.
252:10         Q.      And at the bottom of the page, it
252:11 says, "Response to (B) 'Vioxx increases the risk of
252:12 MI.'"  Right?
252:13         A.      Right.
252:14         Q.      And on the next page, you have the
252:15 approved Merck obstacle response that you were given
252:16 to that question; correct?
252:17         A.      That looks like the obstacle response
252:18 in here, yes.
252:19         Q.      That was approved by Merck and given
252:20 to you to handle that obstacle.  Right?
252:21         A.      Right.
252:22         Q.      And it reads, "Doctor, once daily
252:23 Vioxx has no effect on platelet aggregation, and
252:24 therefore would not be expected to demonstrate
252:25 reductions in MI or other CV events."
253: Page 253
253: 1                 Do you see that?
253: 2         A.      Yes.
253: 3         Q.      That's the first sentence.
253: 4         A.      Right.

cr  25310       253:10-253:15

253:10                 Does that first sentence, "Doctor,
253:11 once daily Vioxx has no effect on platelet
253:12 aggregation, and therefore would not be expected to
253:13 demonstrate reductions in MI or other CV events,"
253:14 does that sentence answer a doctor's question as to
253:15 whether or not Vioxx increases the risk of MI?

cr  25317       253:17-254:4
```

*See next pg.*

```
                            Played Rivas
253:17              THE WITNESS:  That sentence does not
253:18 appear to answer that question.
253:19 BY MR. KRISTAL:
253:20      Q.      Okay.
253:21              Next sentence, "Agents such as
253:22 low-dose aspirin are routinely prescribed for
253:23 cardiovascular patients for their effect on the
253:24 inhibition of platelet aggregation."
253:25              Do you see that?
254: Page 254
254: 1      A.      Yes.
254: 2      Q.      Does that sentence answer the
254: 3 question, does Vioxx increase the risk of an MI, if
254: 4 a doctor asked it?

cr   25406      254:6-254:13

254: 6              THE WITNESS:  I -- I don't know.
254: 7 BY MR. KRISTAL:
254: 8      Q.      Well, that sentence doesn't even
254: 9 mention Vioxx.  Right?
254:10      A.      That's right.
254:11      Q.      So it can't possibly answer the
254:12 question as to whether Vioxx increases the risk of
254:13 MI, can it?

cr   25415      254:15-255:3

254:15              THE WITNESS:  It doesn't answer that
254:16 direct question.
254:17              MR. KRISTAL:  Okay.
254:18 BY MR. KRISTAL:
254:19      Q.      Next sentence, "Therefore, once daily
254:20 Vioxx is not a substitute for aspirin for
254:21 cardiovascular prophylaxis."  Do you see that?
254:22      A.      Right.
254:23      Q.      And prophylaxis, you understand, is
254:24 protection.  Right?
254:25      A.      Right.
255: Page 255
255: 1      Q.      That sentence doesn't answer the
255: 2 question whether or not Vioxx increases the risk of
255: 3 MI, does it?

cr   25505      255:5-255:7

255: 5              THE WITNESS:  Well, because -- because
255: 6 I'm not a physician, I don't know if that statement
255: 7 would answer the question.

cr   25517      255:17-255:21

255:17      Q.      The sentence "Therefore, once daily
255:18 Vioxx is not a substitute for aspirin for
255:19 cardiovascular prophylaxis" does not answer the
255:20 question as to whether or not Vioxx increases the
255:21 risk of an MI.  Right?

cr   25524      255:24-256:10

255:24              THE WITNESS:  That statement alone
255:25 does not answer that specific question.
256: Page 256
                            Page 4
```

Handwritten annotations (right margin):

Δ obj = same as above, also 602 - speculation, witness is not a doctor

Π response - same as prior response; also witness is competent to answer this question, even though she is not a doctor, based on her personal knowledge and experience as a sales rep

Δ obj - 401-3, Opinion by sales witness + irrelevant, prejudicial b/e witness not involved w/ Π, his doctors, or his sales reps; hearsay document, speculation, mischaracterizes the document

Π response = Π maintains his response to the general objections in that this is further evidence regarding Merck's national, integrated sales + marketing strategy, their failure to warn of the risks of Vioxx; these sales strategies affected the general perceptions that doctors had re: the safety of Vioxx; document is not hearsay - admission by party opponent; doesn't call for speculation but rather witness' personal knowledge based upon her training and experience as a sales rep for Merck

```
                             Played Rivas
256: 1  BY MR. KRISTAL:
256: 2       Q.     Okay.
256: 3              Next sentence and the last one,
256: 4  "However, once daily Vioxx 50 milligram had no
256: 5  effect on the anti-platelet activity of low dose (81
256: 6  milligram) aspirin when the two were given
256: 7  together."
256: 8              That sentence doesn't answer the
256: 9  question as to whether Vioxx increases the risk of
256:10  MI, does it?

cr   25613       256:13-256:15

256:13              THE WITNESS:  This particular sentence
256:14  in this obstacle handler does not address that
256:15  specific question.

cr   26106       261:6-261:9

261: 6       Q.     And my question to you is, are you
261: 7  saying that you were instructed to give answers to
261: 8  doctors that you don't know whether or not had
261: 9  answered the question the doctor was asking?

cr   26112       261:12-261:16

261:12              THE WITNESS:  Again, I provided the
261:13  appropriate obstacle response after clarifying with
261:14  the physician their question; and if the obstacle
261:15  response did not clarify their question, I would
261:16  offer to submit a PIR.

cr   26304       263:4-263:8

263: 4              How about all the sentences together?
263: 5  Put them all together from both obstacle responses.
263: 6  Do you think that answers the question as to whether
263: 7  or not Vioxx increases the risk of MI?
263: 8       A.     I really don't know.


Rivas 1-26-06 (Multi-clip)
CR 38914       389:14-390:21

389:14              Let me give you Exhibit 45.  It's
389:15  dated February 9th, 2001.  The number is COX 01-007.
389:16  It's entitled "Bulletin for Vioxx:  FDA Advisory
389:17  Committee Meeting for Vioxx."  And one of the groups
389:18  to whom the bulletin was sent was to all field
389:19  personnel with responsibility for Vioxx.
389:20              Do you see that?
389:21       A.     Yes.
389:22       Q.     And in the regular course of
389:23  business, you would have received this bulletin?
389:24       A.     Yes.
389:25       Q.     And the first thing, in bold letters,
Page 390
390: 1  the bulletin is instructing you not to initiate
390: 2  discussions about the FDA Advisory Committee on
390: 3  Vioxx.  Right?
390: 4       A.     Yes, that's what it says.
390: 5       Q.     And it says you may respond to
390: 6  customer inquiries only as outlined below.  Right?
```

*Handwritten annotations:*
- "Same as prior objection responses" (pointing to upper section)
- "Δ obj = 401-403, document is irrelevant. 602-speculation re: how doctors characterize CV events, opinion by a lay witness"
- "π response - document was sent to all 'field personnel with responsibility for Vioxx', relevant to all cases re: Merck's integrated, national strategy not to mention FDA advisory committee for Vioxx w/ doctors and consumers, relates to failure to warn. Question calls for witness' personal knowledge based on her training + experience as a sales rep."

```
                              Played Rivas
390: 7          A.      Yes.
390: 8          Q.      And under "Action Required," you were
390: 9  directed to "Stay focused on the efficacy messages
390:10  for Vioxx."  Right?
390:11          A.      Yes.
390:12          Q.      And efficacy means that the drug is
390:13  working for the purpose with which it was being --
390:14  intended.  Right?
390:15          A.      Yes.
390:16          Q.      Okay.
390:17                  And it's different than safety.
390:18  Right?
390:19          A.      Yes.
390:20          Q.      CV concerns are safety concerns.
390:21  Right?

CR 39024      390:24-392:13

390:24                  THE WITNESS:  In general, yes.  I
390:25  think you have to ask a physician for sure what they
391: Page 391
391: 1  would -- what group they would put that in.
391: 2  BY MR. KRISTAL:
391: 3          Q.      Well, do you think a -- a physician
391: 4  who is expressing a concern as to whether Vioxx was
391: 5  increasing the risk of MI was asking you whether or
391: 6  not it worked to treat pain?
391: 7          A.      No.
391: 8          Q.      Okay.
391: 9                  So CV concerns are safety concerns.
391:10  Right?
391:11          A.      Generally, yes.
391:12          Q.      And efficacy concerns mean, does the
391:13  drug work, in general.
391:14          A.      Right.
391:15          Q.      So you're being directed to stay
391:16  focused on the does the drug work part.  Right?
391:17          A.      Yeah, the bulletin reference -- says
391:18  stay focused on efficacy, yes.
391:19          Q.      And then in bold letters under that,
391:20  there's a separate section that says "Stay Focused
391:21  on Efficacy."  Right?
391:22          A.      Yes, there is.
391:23          Q.      And it's directing you -- it says,
391:24  "It is critical that we remain focused on the 1S HI
391:25  NSAID and HI COXIB messages for Vioxx with our
392: Page 392
392: 1  targeted physicians."  Right?
392: 2          A.      Yes, that's what it says.
392: 3          Q.      Okay.
392: 4                  And 1S means first semester.  Right?
392: 5          A.      Yes.
392: 6          Q.      And targeted physicians, we -- we
392: 7  looked at yesterday -- Tuesday; correct?
392: 8          A.      Yes.
392: 9          Q.      And Dr. Braun was a targeted
392:10  physician for Vioxx, was he not?
392:11          A.      Yes.
392:12          Q.      So you were being directed to remain
392:13  focused on the efficacy messages.

CR 39217      392:17-392:17
```

*[Handwritten annotations: "Objections/responses same as above" (pointing to 390:7–392:8); "392:9–392:11 withdrawn by π"]*

```
                                   Played Rivas
    392:17         Q.       Right?  With respect to Dr. Braun.
CR 39220       392:20-393:5
    392:20               THE WITNESS:  It states in the
    392:21 bulletin that it -- just what you -- in terms of,
    392:22 it's critical that we remain focused on 1S HI NSAID
    392:23 and HI COXIB messages for Vioxx with our targeted
    392:24 physicians.
    392:25 BY MR. KRISTAL:
    393: Page 393
    393: 1         Q.       And Dr. Braun was a targeted
    393: 2 physician.  Right?
    393: 3         A.       Yes.
    393: 4         Q.       And you followed directions.  Right?
    393: 5         A.       Yes, to the best of my ability.

CR 46610       466:10-466:15

    466:10 61 another voice mail.  This is from September 13th,
    466:11 2001.  It's entitled voice -- voice mail for Vioxx,
    466:12 "DWA to USHH field sales force."
    466:13                  And this is from David Anstice;
    466:14 correct?
    466:15               THE WITNESS:  Yes.

CR 46813       468:13-469:1

    468:13                  Down at the bottom, Mr. Anstice is
    468:14 saying, "Now, I can understand why some people are
    468:15 confused about the results of VIGOR that showed
    468:16 differences in CV events of .1 versus .5, if they
    468:17 don't understand the data.  I can even understand
    468:18 why physicians, Wall Street and maybe even lawyers
    468:19 might be confused.  To understand VIGOR, you must
    468:20 understand that naproxen is cardio-protective, like
    468:21 aspirin."
    468:22                  Do you see that?
    468:23         A.       Yes.
    468:24         Q.       And that's consistent with what we've
    468:25 seen all along; correct?
    469: Page 469
    469: 1         A.       Yes.

CR 47313       473:13-474:6

    473:13                  The last document we looked at, the
    473:14 transcript of the voice mail of the president of US
    473:15 Human Health, David Anstice, was dated September
    473:16 13th, '01, was it not?
    473:17         A.       Yes.
    473:18         Q.       You made a call to Dr. Braun with
    473:19 respect to Vioxx on the next day, September 14th,
    473:20 2001.  Right?  That's reflected on the bottom of
    473:21 page 4, onto page 5 of Exhibit 62.
    473:22         A.       That's what's listed on here, yes.
    473:23         Q.       And in the accomplishments, that's
    473:24 what you typed shortly after your call with Dr.
    473:25 Braun; correct?
    474: Page 474
    474: 1         A.       I don't remember the call, so I don't
    474: 2 know when I typed it.
    474: 3         Q.       Well --
```

Handwritten annotations:
- Withdrawn by π 392:17 to 393:5
- D obj = 401-403. Voice mail received by Rivas is not relevant. π response - voicemail was sent to the entire USHH field sales force so it, again, relates to Merck's national, integrated marketing strategy from Anstice - who was president of Human Health and was in charge of marketing for Vioxx nationally
- Withdrawn by π 473:18 - 474:3

```
                              Played Rivas
474: 4         A.    Certainly -- I mean, you could
474: 5 certainly talk about other things than what is just
474: 6 typed in here.
```
*[handwritten right: ↑ Backpocket withdrawn by π 474:4-6]*
*[diagonal strike-through across 474:4-6]*

```
CR 47511      475:11-476:21

475:11                    So the day after you received this
475:12 voice mail from the president, David Anstice, you
475:13 wrote with respect to your call to Dr. Braun,
475:14 "Talked in hall between patients, reinforced Vioxx
475:15 once a day power, efficacy and safety."
475:16                    Do you see that?
475:17         A.         Yes.
475:18         Q.         No question that if that's written
475:19 there, that's what you did with Dr. Braun on that
475:20 day?
475:21         A.         I don't remember September 14th, 2001
475:22 and that particular call.
475:23         Q.         Well, it's fair to say that when you
475:24 typed it in, it was accurate.  Right?
475:25         A.         As I said, I tried to type in
476: Page 476
476: 1 accurate information.
476: 2         Q.         So that this is accurate information.
476: 3         A.         Again, I -- I don't know.  I said I
476: 4 tried to type in accurate information.  I don't
476: 5 remember the call.
476: 6         Q.         Well, after -- sometime after
476: 7 September 14th, 2001, after the call with Dr. Braun,
476: 8 you typed in the words "Talked in hall between
476: 9 patients"; correct?
476:10         A.         Uh-hum.
476:11         Q.         Is that a yes?
476:12         A.         Yes.
476:13         Q.         And you typed in the words
476:14 "reinforced Vioxx once a day power, efficacy and
476:15 safety"; correct?
476:16         A.         Right.
476:17         Q.         And then the next sentence -- you
476:18 typed this in as well; correct -- "he had no
476:19 concerns with Vioxx regarding CV safety."  Do you
476:20 see that?
476:21         A.         That's what's on here, yes.
```
*[handwritten right: Withdrawn by π 475:11-477:1]*
*[diagonal strike-through across 475:11-477:1]*

```
CR 47623      476:23-477:1

476:23                    Do you recall the conversation you
476:24 had with Dr. Braun that led you to say he had no
476:25 concern with CV safety?
477: Page 477
477: 1         A.         No.

CR 47722      477:22-477:25

477:22         Q.         But if a doctor presented a
477:23 cardiovascular obstacle to you, it was your general
477:24 practice to use the resources to address that
477:25 obstacle that you had been provided with.  Right?

CR 47803      478:3-478:6

478: 3                    THE WITNESS:  As in any discussion
478: 4 with a physician, if they raise an obstacle, I would
```
*[handwritten right: Δ obj = 401-3, irrelevant to this case  π response- relevant to how sales force was trained to respond to CV "obstacles" ↓]*

```
                            Played Rivas
     478: 5  use the appropriate resources; and if it couldn't
     478: 6  get addressed, I could offer to submit a PIR.

CR 50320      503:20-503:25

     503:20      Q.   Were you ever told when you were told
     503:21  how to handle a physician's cardiovascular obstacle
     503:22  that another reasonable explanation for the findings
     503:23  in the VIGOR study with respect to myocardial
     503:24  infarctions was that Vioxx may have pro-thrombotic
     503:25  properties?  Were you ever told that?

CR 50403      504:3-504:4

     504: 3            THE WITNESS:  I don't know.  I don't
     504: 4  know.  Could be.

CR 50409      504:9-504:11

     504: 9      Q.   Okay.  Is there any bulletin that
     504:10  we've seen that has that information in it conveyed
     504:11  to you?

CR 50414      504:14-504:22

     504:14            THE WITNESS:  The bulletins we've
     504:15  looked at so far do not mention that.
     504:16            MR. KRISTAL:  Okay.
     504:17  BY MR. KRISTAL:
     504:18      Q.   Anything in the Cardiovascular Card
     504:19  that mentions that an explanation for the results in
     504:20  VIGOR may be that Vioxx has a pro-thrombotic
     504:21  property?  Anything in the CV Card?
     504:22      A.   Not that I recall, no.

CR 50608      506:8-506:15

     506: 8      Q.   In the obstacle handlers that we
     506: 9  looked at where the physician was saying, does Vioxx
     506:10  increase the risk of MI, nothing in those that we've
     506:11  seen that said Vioxx may have pro-thrombotic
     506:12  properties; correct?
     506:13      A.   Not that I remember.
     506:14      Q.   Don't you think, in fair balance, the
     506:15  physician should have been told that by you?

CR 50618      506:18-507:3

     506:18            THE WITNESS:  I can't tell you what --
     506:19  you know, after the scientists discuss amongst
     506:20  themselves and marketing and training, what -- I
     506:21  mean, it's up to them to decide what to be conveyed
     506:22  by the sales representatives; but, I mean, it would
     506:23  be consistent with our current promotional messages
     506:24  and consistent with the label.
     506:25  BY MR. KRISTAL:
     507: Page 507
     507: 1      Q.   Okay.  So you don't know whether what
     507: 2  you were saying to a doctor regarding cardiovascular
     507: 3  safety was fairly balanced or not.

CR 50706      507:6-507:9
```

Handwritten annotations (right margin):

↑ see prior pg.

Δ obj = 401-403, what she was told is irrelevant to this case
π response - relevant to show what sales reps nationally were uniformly told to do and how to respond re: CV risks and what to tell doctors, and what the reps were told about the risks of Vioxx

Δ obj = 401-403, what she believed is irrelevant, argumentative, speculation, opinion by a lay witness
π response - proper cross-examination re: her personal knowledge; relevant to failure to warn/negligence claims. The fact that Merck is objecting that one of its own sales people is not qualified to discuss the risks of Vioxx goes straight to the heart of the failure to warn claim. How could these reps possibly have explained the true CV risk of Vioxx if they aren't even qualified to answer the question.

```
                              Played Rivas
507: 6               THE WITNESS:  I have every confidence
507: 7 that our -- the training that I received and the
507: 8 information we received was consistent with our
507: 9 label and approved for promotion.
```

*↑ See prio pg.*

Total Length - 00:16:54