curfman 11-21-05

Curfman 11-21-05 (Multi-clip)
gc 1213      12:13-12:14

     12:13    Q.  Good morning, Dr. Curfman.
     12:14    A.  Good morning.

gc 1305      13:5-16:18

     13: 5      Q.  And I will be asking you questions
     13: 6 concerning a subpoena that was served on the
     13: 7 Massachusetts Medical Society asking for
     13: 8 designation of someone familiar with the particular
     13: 9 topics; is that understood?
     13:10    A.  That's correct.
     13:11    Q.  And what is your current employment, sir?
     13:12    A.  I am the executive editor of The New
     13:13 England Journal of Medicine.
     13:14    Q.  How long have you held that position?
     13:15    A.  Since July of 2000.
     13:16    Q.  Did you have prior positions at New England
     13:17 Journal?
     13:18    A.  For the previous 14 years I was a deputy
     13:19 editor at The New England Journal.
     13:20    Q.  What is the role of a deputy editor?
     13:21    A.  Deputy editor is an in-house editor who is
     13:22 involved in editing manuscripts, reviewing
     13:23 manuscripts, medical data, and moving those
     13:24 manuscripts to publication in The New England
     14: Page 14
     14: 1 Journal.
     14: 2          Deputy editor also is involved in
     14: 3 soliciting editorial articles to comment on the
     14: 4 original scientific work and to -- is involved in
     14: 5 bringing articles into The Journal.
     14: 6    Q.  What is the difference between the role of
     14: 7 deputy editor and executive editor?
     14: 8    A.  The executive editor has administrative
     14: 9 responsibilities that a deputy editor does not.
     14:10 The executive editor reports directly to the
     14:11 editor-in-chief and serves in the capacity of
     14:12 filling in for the editor-in-chief when he was
     14:13 traveling or otherwise unavailable.
     14:14          Executive editor is in charge of the
     14:15 editorial office, of the day-to-day operations of
     14:16 the editorial office, and is involved in setting
     14:17 editorial policy, editorial directions for The
     14:18 Journal.
     14:19    Q.  And what is the current circulation of The
     14:20 New England Journal?
     14:21    A.  196,000.
     14:22    Q.  Has that been fairly steady over the past
     14:23 several years?
     14:24    A.  Yes, it has.
     15: Page 15
     15: 1    Q.  Is the circulation mostly doctors?
     15: 2    A.  Predominantly physicians.
     15: 3          We do have a website that is accessed
     15: 4 by other members of the -- of the wider community,
     15: 5 including the general public.
     15: 6    Q.  What's the term "impact factor" mean?
     15: 7    A.  "Impact factor" is a measure of how
     15: 8 frequently articles published in The Journal are
                              Page 1

curfman 11-21-05

15: 9 cited in other journals.
15:10           So it is a measure of how important
15:11 other members of the medical research community
15:12 regard those articles.
15:13      Q.  Where does The New England Journal rank in
15:14 the hierarchy of impact factors of peer-reviewed
15:15 journals?
15:16      A.  Among clinical medical journals, The New
15:17 England Journal of Medicine is at the top of that
15:18 ranking.
15:19           The most current listing of The
15:20 Journal's impact factor is 38, approximately 38, 38
15:21 and change, which is the highest impact factor of
15:22 the clinical medical journals.
15:23      Q.  Has The Journal's impact been at the top of
15:24 the hierarchy consistently over the past several
16: Page 16
16: 1 years?
16: 2      A.  Yes, it has.
16: 3      Q.  Do you maintain a clinical practice, in
16: 4 addition to your work for The New England Journal?
16: 5      A.  No.  I do not at the present time.
16: 6      Q.  Do you have a background in any particular
16: 7 field of medicine?
16: 8      A.  I am a board-certified internist.  I was
16: 9 board-certified in 1974, and I am a board-certified
16:10 physician in cardiovascular medicine, cardiology,
16:11 board-certified in 1977.
16:12      Q.  And you maintained a clinical practice
16:13 until you began with The Journal?
16:14      A.  Well -- and I continued practice for a time
16:15 while I was a deputy editor, but I have gradually
16:16 turned back my practice for lack of time to do
16:17 that.  So I'm currently a full-time medical
16:18 journalist.

gc 1722      17:22-18:3

17:22      Q.  For the record, we should probably clarify,
17:23 what is the relationship between the Massachusetts
17:24 Medical Association and New England Journal of
18: Page 18
18: 1 Medicine?
18: 2      A.  The Massachusetts Medical Society owns The
18: 3 New England Journal of Medicine.

gc 2022      20:22-22:1

20:22           Is it -- how would you characterize the
20:23 role you had in the review process concerning the
20:24 VIGOR study in the year 2000?
21: Page 21
21: 1      A.  Well, each manuscript that is submitted to
21: 2 The Journal is assigned to an editor, an associate
21: 3 editor, who's job it is to handle that article
21: 4 through the review process.
21: 5           In addition, that associate editor is
21: 6 teamed with a deputy editor.  So there are two
21: 7 editors who work in tandem to handle the article
21: 8 through the review process.
21: 9           I was not either the associate editor
21:10 nor the deputy editor on the VIGOR article.
21:11           During the time that the VIGOR
                                          Page 2

curfman 11-21-05

```
21:12 manuscript was being handled in our office, between
21:13 May and July, I was still a deputy editor.
21:14           In July, I became the executive editor.
21:15 So it was during the time that the VIGOR article
21:16 was being reviewed that I had a change in my
21:17 position.
21:18           I did, however, attend all of the
21:19 editorial meetings where the VIGOR article was
21:20 discussed.  I was a part of those discussions.
21:21           I had the opportunity to express
21:22 opinions about the manuscript and the data, and so
21:23 I was a part of the process in that sense, but I
21:24 was not the primary editor who was responsible for
22: Page 22
22: 1 taking that article through the process.
```

gc 2202       22:2-22:14

```
22: 2     Q.  Could you describe the role that you had in
22: 3 the review process concerning the APPROVe study?
22: 4     A.  For the APPROVe article, I was the primary
22: 5 in-house editor responsible for taking that article
22: 6 through the process.
22: 7           So I selected the reviewers,
22: 8 communicated with the reviewers, had the article
22: 9 reviewed, communicated back with the corresponding
22:10 author, Dr. John Baron.  I had many discussions
22:11 with Dr. Baron about the article.
22:12           I carried it through the revision
22:13 process and carried it to the point of presenting
22:14 it to the editor-in-chief for final approval.
```

gc 2603       26:3-26:15

```
26: 3     Q.  Does The Journal, as any peer-review
26: 4 journal, rely on the honesty and candor of authors
26: 5 with respect to the veracity of their findings in a
26: 6 manuscript submitted for review?
26: 7     A.  Absolutely.
26: 8     Q.  Can you please explain the statement in
26: 9 this editorial concerning the best interests of
26:10 sick patients?
26:11           In particular, is this statement an
26:12 acknowledgement of the fact that doctors who
26:13 receive The Journal read it to learn about
26:14 practices and medications that they may prescribe
26:15 for the patients they treat?
```

Δ obj = cell-leading

Π response =
not leading, foundation

Ruling in Trun II overruled
(ci 602, 401-3

gc 2617       26:17-27:11

```
26:17     A.  The ultimate purpose of our journal, the
26:18 mission of our journal is to provide information to
26:19 the healthcare community so that they can take care
26:20 of people that are sick.
26:21           Very much in the back of our minds
26:22 every day that we do our work is that we are
26:23 dealing with people who are ill.  We are dealing
26:24 with illnesses.  We are dealing with human lives.
27: Page 27
27: 1 Human suffering.  That's all in the background of
27: 2 our thinking, and our mission is to try to publish
27: 3 information that is going to be helpful to people
27: 4 who are sick.
```

Same as above

Page 3

curfman 11-21-05                                    ↑ see prio pg.

```
27: 5     Q.  Does that mission make it important for the
27: 6 information in The Journal to be accurate?
27: 7     A.  It is essential that it be accurate and
27: 8 complete and free of errors.
27: 9          Errors can be harmful to patients.  So
27:10 it's a very meticulous operation that we try to
27:11 run.
```

gc 4401     44:1-46:3

```
44: 1     Q.  Doctor, Exhibit 8 is from The New England
44: 2 Journal of Medicine, Volume 336.  It's got a
44: 3 copyright "1997" in the lower right.
44: 4     A.  Right.
44: 5     Q.  The page is entitled "Uniformed
44: 6 Requirements For Manuscripts Submitted to
44: 7 Biomedical Journals."
44: 8          Is this a document you are familiar
44: 9 with?
44:10     A.  Yes.  This is an earlier version of the
44:11 document that we were just -- that you were just
44:12 reading from.
44:13          So it has gone through a number of
44:14 iterations over the years.  This would, I believe,
44:15 have been the document in place at the time of the
44:16 consideration of the VIGOR trial.
44:17     Q.  And this again is a joint statement of The
44:18 International Committee of Medical Journal Editors
44:19 that The New England Journal has adopted for its
44:20 own policies; is that right?
44:21     A.  That's right.
44:22     Q.  Turning to Page 315, underneath the heading
44:23 "Sending the Manuscript to the Journal," there is a
44:24 statement that, "Manuscripts must be accompanied by
45: Page 45
45: 1 a covering letter, signed by all co-authors," and
45: 2 underneath that there is Subparagraph C that states
45: 3 the following:  "A statement that the manuscript
45: 4 has been read and approved by all the authors, that
45: 5 the requirements for authorship as stated earlier
45: 6 in this document have been met, and that each
45: 7 author believes that the manuscript represents
45: 8 honest work."
45: 9          Did that establish the policy of The
45:10 New England Journal from 1997 forward?
45:11     A.  Yes.
45:12     Q.  Turning to the actual studies that were
45:13 submitted in manuscript form for review by The New
45:14 England Journal editors, I would like to first show
45:15 you -- I will get that marked first.
45:16          EXHIBIT NO. 9 MARKED
45:17     Q.  Dr. Curfman, Exhibit 9 is a copy of a
45:18 letter date May 18, 2000 from Claire Bombardier and
45:19 to Robert Utiger, Deputy Editor, New England
45:20 Journal of Medicine, dated May 18, 2000.
45:21          Have you seen this letter before?
45:22     A.  Yes, I have.
45:23     Q.  Is it correct that The New England Journal
45:24 received a draft manuscript of the VIGOR study from
46: Page 46
46: 1 Claire Bombardier, along with that letter dated May
46: 2 18, 2000?
46: 3     A.  That's correct.
```

curfman 11-21-05

gc 4608     46:8-48:8

    46: 8      Q.  The letter itself, Dr. Curfman, is
    46: 9  consecutively Bates numbered at Page 2000 NEMJ 1
    46:10  and 2, is that correct, in the document that you
    46:11  have?
    46:12      A.  Yes, uh-huh.
    46:13      Q.  And are the pages marked ending in the
    46:14  numbers 5, 7 and 16 the author statements signed by
    46:15  Drs. Bombardier, Alise Reicin -- that's R-E-I-C-I-N
    46:16  -- and Deborah Shapiro that were submitted with the
    46:17  manuscript?
    46:18      A.  Correct.
    46:19      Q.  In those letters, each of the signatories
    46:20  attested that they had fulfilled the authorship
    46:21  criteria of the uniform requirements that we read a
    46:22  few moments ago from the 1997 standards; is that
    46:23  right?
    46:24      A.  That is right.
    47: Page 47
    47: 1      Q.  Doctor, how long after The New England
    47: 2  Journal received the draft with the May 18, 2000
    47: 3  letter were you assigned in any capacity to the
    47: 4  review process?
    47: 5      A.  I was not assigned to handle this
    47: 6  manuscript through the review process.
    47: 7          So my colleagues Dr. Utiger, Dr. Kaplan
    47: 8  and Dr. Steinbrook were the three editors who
    47: 9  handled this manuscript through the review process.
    47:10          Dr. Utiger and Dr. Steinbrook are
    47:11  deputy editors, and Dr. Steinbrook was the primary
    47:12  deputy editor.  When he was away, Dr. Utiger would
    47:13  step in for him in that capacity; and Dr. Kaplan,
    47:14  Marshall Kaplan, was the associate editor who was
    47:15  primarily responsible for selecting the reviewers
    47:16  and taking the manuscript through the review
    47:17  procedures.
    47:18      Q.  Was the VIGOR article sent for external
    47:19  review?
    47:20      A.  Oh, yes.
    47:21      Q.  Was there a standard as to how many
    47:22  reviewers you would send an article to?
    47:23      A.  Well, in this particular case, the article
    47:24  was sent to two outside reviewers.  It was also
    48: Page 48
    48: 1  reviewed by a statistical consultant who works in
    48: 2  that capacity for The Journal.
    48: 3          It would have also been read very
    48: 4  carefully by Dr. Kaplan, by Dr. Steinbrook, by
    48: 5  Dr. Utiger; and then toward the end of the process,
    48: 6  I also read the manuscript before it was finally
    48: 7  approved, and then accepted by Dr. Jeffrey Drazen,
    48: 8  the editor-in-chief.

gc 5405     54:5-54:9

    54: 5      Q.  Now, is it correct that the authors
    54: 6  submitted a revised manuscript with a diskette
    54: 7  containing three versions of the VIGOR manuscript,
    54: 8  with a letter dated August 20, from Dr. Bombardier?
    54: 9      A.  That's correct.

curfman 11-21-05

gc 5411      54:11-54:21

54:11      Q.  Dr. Curfman, is Exhibit 12 a copy of the
54:12 August 20, 2000 letter from Bombardier to
54:13 Dr. Steinbrook at New England Journal?
54:14      A.  Yes, it is.
54:15      Q.  And if you look at Page 3 of the letter,
54:16 which is the Bates-stamp ending in 042, just before
54:17 the final paragraph, is it stated that, "We have
54:18 included two triple-spaced copies of the revised
54:19 manuscript as well as a diskette with the
54:20 manuscript files"?
54:21      A.  Right.

gc 5516      55:16-58:15

55:16      Q.  Dr. Curfman, the diskette was received
55:17 shortly after August 20, 2000; is that right?
55:18      A.  Yes.  The original diskette.
55:19              This would be a copy, but that original
55:20 diskette was received with this letter
55:21 (indicating).
55:22      Q.  Did the folders on the disk include three
55:23 draft versions of the VIGOR study from May, July
55:24 and August of 2000?
56: Page 56
56: 1      A.  That's correct.
56: 2      Q.  Did you personally review any part of the
56: 3 contents of the disk at any time before the
56: 4 publication of the VIGOR study on November 23,
56: 5 2000?
56: 6      A.  No.
56: 7              And as explanation, at that time, we
56: 8 were still receiving, editing and handling
56: 9 manuscripts in paper form.  We were in transition
56:10 from a paper format to an electronic format, but we
56:11 had not completed that transition.
56:12              So we were requesting diskettes from
56:13 authors, but this was in anticipation of moving to
56:14 an electronic platform, which we had not yet done.
56:15              So in the case of this diskette, the
56:16 authors, at our request, had submitted a diskette,
56:17 but we never accessed it, because we were doing all
56:18 of our editing on paper.  So Dr. Bombardier also
56:19 provided paper copies, and we worked on those.
56:20              The diskette, however, was saved, put
56:21 into an envelope, stapled into the manuscript file
56:22 and made a permanent part of the manuscript file,
56:23 but was not used in any way in the handling of the
56:24 VIGOR manuscript at that time in the year 2000.
57: Page 57
57: 1      Q.  Is it correct then that based on your
57: 2 investigation to prepare for this deposition that
57: 3 none of the editors at The New England Journal
57: 4 reviewed the contents of the diskette before
57: 5 November 23, 2000?
57: 6      A.  Yes, that's correct.
57: 7      Q.  At some point before today, have you seen
57: 8 the contents of the disk, the diskette?
57: 9      A.  Yes, I have.
57:10      Q.  And, in particular, have you seen the
57:11 contents of the May 2000 version on the diskette?
57:12      A.  Yes, I have.

                                    curfman 11-21-05
57:13     Q.  When did you first see the contents?
57:14     A.  We first accessed the contents of the
57:15 diskette on Tuesday, October 5th, 2004, during the
57:16 afternoon.
57:17     Q.  And when you say "we," who are you
57:18 referring to?
57:19     A.  The editor in the office who first found
57:20 the disk is our managing editor, the managing
57:21 editor of The Journal, Dr. Stephen Morrissey.
57:22     Q.  What were the circumstances under which the
57:23 diskette was viewed?
57:24     A.  On September 30, 2004, rofecoxib had been
58: Page 58
58: 1 removed from the market; and in the wake of that
58: 2 decision, we wanted to take a look at the VIGOR
58: 3 file to refresh our memories about certain aspects
58: 4 of the manuscript.
58: 5          We did that, on October 5th, and it was
58: 6 on that day that Dr. Morressey found the diskette,
58: 7 and we accessed it.  We put it into one of our
58: 8 drives, and brought it up and looked at it on the
58: 9 computer screen, and we also made hard copy
58:10 printouts of the three files that were on the
58:11 diskette, and then read them.
58:12     Q.  And during that review, did you determine
58:13 that there were marked-up, edited, tracked changes
58:14 versions of the manuscripts on the diskette?
58:15     A.  That's correct.

gc 5908     59:8-59:15

59: 8     Q.  Dr. Curfman, please take a look at what has
59: 9 been marked as Exhibit 14, that has been Bates-
59:10 stamped 2000 NEJM 000235 through 282, and can you
59:11 tell me if this is an accurate copy of the May 2000
59:12 draft of the VIGOR study that you observed at the
59:13 time you reviewed the contents of the diskette in
59:14 October 2004, as you've testified earlier?
59:15     A.  Yes, it is.

gc 6011     60:11-61:2

60:11     Q.  Now, when you observed this document on
60:12 screen in October 2004, did you observe that there
60:13 had been deletions with respect to the text that we
60:14 looked at earlier?
60:15          In particular, if you look at Page 251,
60:16 under the general "Safety Heading," do you see that
60:17 there is a reference to "Deleted:  8 and 0 patients
60:18 with myocardial infarction in the rofecoxib and
60:19 naproxen treatment groups respectively"?
60:20     A.  Yes.
60:21     Q.  And do you see that in the next sentence
60:22 the information that was deleted refers to the
60:23 absolute numbers of myocardial infarctions in the
60:24 nonaspirin indicated group, 9 for rofecoxib and 4
61: Page 61
61: 1 for naproxen?
61: 2     A.  Yes, I do.

gc 6110     61:10-62:4

61:10     Q.  Okay.  Let's look at the Table 5 on the
                              Page 7

curfman 11-21-05

```
61:11 last page, that's 282.
61:12                 There's highlighting there that was on
61:13 this copy when we received it.
61:14      A.  Right.
61:15      Q.  Was that highlighting visible to you on the
61:16 computer screen?
61:17      A.  On the computer screen, yes.
61:18      Q.  And does this Table 5 on the last page,
61:19 282, show "deleted" at the top?
61:20      A.  Yes, it does.
61:21      Q.  And does it show tracked change indicating
61:22 that the deletion was made by Merck?
61:23      A.  That's correct.
61:24      Q.  Does it show that the deletion was made by
62: Page 62
62: 1 Merck on May 16, 200 at 8:02 p.m.?
62: 2      A.  Correct.
62: 3      Q.  And what was the content of Table 5 that
62: 4 was deleted?
```

gc 6206      62:6-62:16

```
62: 6      A.  Well, as you can see, this was a table that
62: 7 never -- well, what we have in front of us is -- I
62: 8 interpret this as a table that had been proposed,
62: 9 but the data themselves had not been entered into a
62:10 table.
62:11                 In the highlighted area, the yellow
62:12 highlighting, in Footnote No. 1, I think that we
62:13 can conclude that these were the data categories
62:14 that would have been included in this table had the
62:15 data been introduced into the table, but what we
62:16 had in this May version was an incompleted table.
```

gc 6619      66:19-67:19

```
66:19      Q.  And, Doctor, on Exhibit 16, do you see that
66:20 there's similar reference to the tracked change
66:21 deleting the absolute numbers 9 and 4 that states,
66:22 "Merck, May 17, 2000, 11:21 a.m., deleted"?
66:23      A.  Yes.
66:24      Q.  Doctor, I think you had previously
67: Page 67
67: 1 indicated that the letter submitting the VIGOR
67: 2 manuscript from Dr. Bombardier was dated May 18,
67: 3 2000; is that correct?
67: 4                 MR. SHAW:  You are referring to Exhibit
67: 5 No. 9?
67: 6      Q.  Is Exhibit 9 the letter that initially sent
67: 7 the VIGOR article --
67: 8      A.  Yes, that's correct, May 18, 2000.
67: 9      Q.  Does that indicate to you that the
67:10 deletions that we just looked at, referring to
67:11 Table 5, and the absolute numbers of data, were
67:12 made on May 16 and 17, one day or two days before
67:13 the manuscript was sent to you for review?
67:14      A.  That's correct.
67:15      Q.  If someone were to testify that any of
67:16 these deletions were made at the request of The New
67:17 England Journal, that would not be correct, would
67:18 it?
67:19      A.  That would not be correct.
```

Page 8

curfman 11-21-05

gc 7204        72:4-72:8

    72: 4      Q.  I take it you have never seen the data in
    72: 5 this Table 5 before today?
    72: 6      A.  No.
    72: 7      Q.  You have not?
    72: 8      A.  I have not, correct.

gc 7314        73:14-73:18

    73:14      Q.  Would it be consistent with your
    73:15 understanding to state that the test applied here
    73:16 shows a statistically significant result for the
    73:17 difference between Vioxx and naproxen?
    73:18      A.  Yes.

gc 7321        73:21-74:24

    73:21      Q.  With respect to the two categories you
    73:22 testified to previously?
    73:23      A.  That's correct, yes.
    73:24      Q.  In particular, to make the record clear, is
    74: Page 74
    74: 1 it correct that Table 5 shows a statistically
    74: 2 significant result for the difference between Vioxx
    74: 3 and naproxen for myocardial infarction?
    74: 4      A.  Right.
    74: 5      Q.  Is it -- does the Table 5 show a
    74: 6 statistically significant result for the difference
    74: 7 between Vioxx and naproxen for the composite
    74: 8 endpoints of cardiovascular deaths, nonfatal MI or
    74: 9 CVA?
    74:10      A.  Correct.
    74:11      Q.  I believe I was about to direct your
    74:12 attention to Page 12 of this draft, which has the
    74:13 Bates Page 9389 at the end.
    74:14      A.  Right.
    74:15      Q.  And do you see that in the -- about six or
    74:16 seven lines down, there is the same reference to
    74:17 the text that we have seen previously about the
    74:18 percentages of myocardial infarctions, but that
    74:19 there is a reference to Table 5 following that
    74:20 sentence?
    74:21      A.  Yes.
    74:22      Q.  And that was later deleted, correct, before
    74:23 you saw it?
    74:24      A.  Before we saw it, yes.

gc 7507        75:7-75:15

    75: 7      Q.  To the best of your knowledge, has anyone
    75: 8 at The New England Journal seen the data in Table 5
    75: 9 before today?
    75:10      A.  Not to my knowledge.
    75:11      Q.  It would not be correct that anyone at the
    75:12 New England Journal told the authors to take out
    75:13 any such information from the article?
    75:14      A.  No.  No one at New England Journal told
    75:15 them to take this out.

gc 7524        75:24-77:20

    75:24      Q.  Now, Doctor, Exhibit 18 is a memo from
                                Page 9

curfman 11-21-05

```
76: Page 76
76: 1 Deborah Shapiro to Alise Reicin and others dated
76: 2 July 5, 2000.
76: 3           Do you recognize the names of Shapiro
76: 4 and Reicin as the two Merck authors on the VIGOR
76: 5 study?
76: 6     A.  Yes, I do.
76: 7     Q.  Now, I take it you have never seen this
76: 8 document before, or have you?
76: 9     A.  I have probably seen some of these data on
76:10 the FDA Website, I think, but I have never seen it
76:11 as a document per se.
76:12     Q.  If you could take a look -- certainly you
76:13 didn't see it on the FDA Website before the
76:14 publication of the --
76:15     A.  No.
76:16     Q.  -- the article?
76:17     A.  No.  Oh, no.  No.  No.
76:18     Q.  Could you take a look at Table 7, which is
76:19 on Pages 9 and 10 of the document.  You have to use
76:20 the column headings from Page 9 to follow the
76:21 information onto Page 10.
76:22           But do you see that there is
76:23 information in this document dated July 5, 2000
76:24 concerning the number of patients with different
77: Page 77
77: 1 adverse events?
77: 2     A.  (Nodding.)
77: 3     Q.  You have to answer out loud, sir.
77: 4     A.  Yes, sorry.
77: 5     Q.  And under the "Aspirin Indicated" row on
77: 6 Page 9, do you see the MI listing of 8 versus 0 for
77: 7 rofecoxib versus naproxen?
77: 8     A.  Yes, I do.
77: 9     Q.  And there, do you see that the -- on Page
77:10 10, the "Aspirin Not Indicated" group MI row shows
77:11 12 for Vioxx and 4 for naproxen?
77:12     A.  That's correct.
77:13     Q.  Now, the data that had been in the deleted
77:14 text from the May 2000 version showed 9 versus 4
77:15 for the nonaspirin-indicated; is that correct?
77:16     A.  That's correct.
77:17     Q.  And by July 5, 2000, the data of the Merck
77:18 authors showed that those numbers were 12 versus 4;
77:19 is that correct?
77:20     A.  That's correct.

gc 8414     84:14-84:18

84:14     Q.  Exhibit 20 is a letter dated July 7th,
84:15 2000, with attachment, from Bombardier to
84:16 Dr. Kaplan.
84:17           Have you seen this before?
84:18     A.  Yes, I have.

gc 8812     88:12-89:15

88:12     Q.  Now, at Pages 37 and 38 of the document,
88:13 going over in response to Comment No. 7 from the
88:14 reviewer, the authors reiterated and slightly
88:15 modified the text concerning myocardial infarctions
88:16 in the ASA and non-ASA-indicated populations.
88:17           Do you see that?  It's Page 9 and 10 of
```

curfman 11-21-05

```
88:18 the document ending in 3738 for the Bates range.
88:19      A.  Right.
88:20      Q.  And this document -- if you look at Exhibit
88:21 18 and compare Exhibit 18, is the July 5 document
88:22 showing the updated information with 12 events
88:23 versus 4 rather than the 9 versus 4 previously used
88:24 that were deleted from the May version, correct?
89: Page 89
89: 1      A.  Correct.
89: 2      Q.  And the July 17th letter from the authors
89: 3 12 days after this July 5 memo does not anywhere
89: 4 inform The New England Journal of the 12 versus 4
89: 5 figures, does it?
89: 6      A.  That's correct.
89: 7      Q.  Now, is it The Journal's policy to rely on
89: 8 the manuscript authors to submit true and accurate
89: 9 statements of the data?
89:10      A.  Yes.  That is imperative.
89:11      Q.  Do The Journal's readers rely on the truth
89:12 and accuracy of the authors' statements of the data
89:13 in making decisions as to treatment of their
89:14 patients?
89:15      A.  Yes, they do.
```

gc 9016      90:16-90:23

```
90:16      Q.  Now, on the basis of the difference between
90:17 the data in the July 5 memo and the published
90:18 article, would you agree that physicians who read
90:19 The Journal for accurate information about efficacy
90:20 and toxicity did not receive accurate information
90:21 about the relative risk of MI and other
90:22 cardiovascular events in the Vioxx patients
90:23 compared to naproxen?
```

gc 9101      91:1-91:2

```
91: 1      A.  Yes.  The risk would have appeared lower
91: 2 than the real data would support.
```

gc 10413     104:13-104:19

```
104:13     Q.  Is it correct that on September 13
104:14 Dr. Drazen, acting as editor-in-chief of The
104:15 Journal, authorized publication of the VIGOR study?
104:16     A.  You said September 13th?
104:17     Q.  Yes.
104:18     A.  To be sure about the date, I would have to
104:19 see his letter.
```

gc 10421     104:21-105:5

```
104:21     A.  Yes.  Dr. Drazen's acceptance letter is
104:22 dated September 13, 2000.
104:23     Q.  Now, what are "galleys"?
104:24     A.  "Galleys" are the first typeset version of
105: Page 105
105: 1 the article after the manuscript stage.
105: 2             So the manuscript is taken and set into
105: 3 type, and then it is very carefully gone over to
105: 4 look for any errors, any mistakes in the
105: 5 typesetting.
```

Dobj = Speculation, Foundation,
602
Tresponse = appropriate question
given Dr. Curfman's 20+ year
employment @ NEJm
Ruling in Irwin II - Overruled

611

Dobj = 611 leading, Foundation, 602
Speculation, Foundation,
Tresponse = calls for witness to
testify as to his personal knowledge
about the accuracy of the data,
not leading
Ruling in Irwin II - overruled 611,
701.3

Page 11

curfman 11-21-05

gc 10507      105:7-105:22

```
105: 7      Q.  And Exhibit 24 is a letter from Pat Lamy or
105: 8 Lamy --
105: 9      A.  Yes, "Lamy."
105:10      Q.  -- of The New England Journal to
105:11 Dr. Bombardier dated September 30 -- excuse me --
105:12 September 13, 2000; is that right?
105:13      A.  Correct.
105:14      Q.  Letting Dr. Bombardier know that she would
105:15 receive the galleys during the week of October 8th,
105:16 2000 and would be asked to call with any
105:17 corrections within two days?
105:18      A.  Correct.
105:19      Q.  Is it correct that corrections could still
105:20 be made still after the galleys were sent?
105:21      A.  Yes.  Yes.  I mean, that's part of the
105:22 purpose of galleys.
```

gc 10524      105:24-106:23

```
105:24      Q.  Exhibit 25 is a fax cover sheet from Alise
106: Page 106
106: 1 Reicin and Loren Laine on the Merck letterhead,
106: 2 Merck Research Laboratories, to Sandra McLain at
106: 3 the The New England Journal, dated October 17,
106: 4 2000; is that correct?
106: 5      A.  Yes.
106: 6      Q.  And does it state in the text, the body of
106: 7 the fax, "Per your discussion with Drs. Reicin and
106: 8 Laine, please find enclosed the additional
106: 9 agreed-upon text and reference for MS 001401"?
106:10           Do you see that?
106:11      A.  Yes, I do.
106:12      Q.  And that refers to the VIGOR manuscript?
106:13 Well, this was produced as part of the VIGOR file.
106:14      A.  Yes, I think it must be.
106:15      Q.  So as late as of October 17, 2000, The New
106:16 England Journal of Medicine received agreed-upon
106:17 text and reference for the VIGOR manuscript,
106:18 correct?
106:19      A.  Correct.
106:20      Q.  But The Journal did not receive corrections
106:21 at that date concerning cardiovascular risk, did
106:22 it?
106:23      A.  We did not.
```

gc 11006      110:6-110:8

```
110: 6      Q.  Exhibit 20 is the July 17 letter which
110: 7 actually says "July 17" on the first page of the
110: 8 letter but "July 18" on the second page.
```

gc 11013      110:13-111:2

```
110:13      A.  I have it now.
110:14      Q.  Okay.  There was a -- it might be helpful
110:15 to have two documents in front of you to compare,
110:16 and the other would be Exhibit 11, the published
110:17 article.
110:18      A.  Okay.
110:19      Q.  Figure 1 on Page 1524 --
110:20      A.  Right.
```

curfman 11-21-05

110:21    Q.  -- has the legend, "Cumulative Incidence of
110:22 the Primary Endpoint of a Confirmed Upper
110:23 Gastrointestinal Event Among All Randomized
110:24 Patients."
111: Page 111
111: 1           Do you see that?
111: 2    A.  Yes, I do.

gc 11123    111:23-112:7

111:23    Q.  Let's look at -- Exhibit 27 is a
111:24 Kaplan-Meyer figure showing the shape of the curve
112: Page 112
112: 1 for cardiovascular events dated June 20, 2000.
112: 2           Do you see that?
112: 3    A.  Yes, I do.
112: 4    Q.  Is the shape of the cardiovascular risk
112: 5 curve similar to the gastrointestinal benefit
112: 6 curve, only inverted so that the risk with Vioxx is
112: 7 higher?

gc 11209    112:9-112:12

112: 9    A.  The display, the shapes of the curve, rough
112:10 curves look similar; but the axis, the vertical
112:11 axis is different.  The cumulative incidences would
112:12 be different, but, yes, the shapes are similar.

gc 11223    112:23-113:5

112:23    Q.  Did the authors provide The New England
112:24 Journal with both the GI-benefit curve and the
113: Page 113
113: 1 cardiovascular-increased-risk curve, or only the
113: 2 GI-benefit curve?
113: 3    A.  Only the GI-benefit curve.
113: 4    Q.  And would the Vioxx-increased-risk curve
113: 5 have been of interest to your readers?

*[Handwritten margin note: D obj = speculation, foundation, 602; π resp = appropriate question given Dr. Curfman's 20+ years as NEJm; Ruling in Trun II = overruled, 602]*

gc 11307    113:7-113:17

113: 7    A.  Yes.
113: 8    Q.  Why is that?
113: 9    A.  Well, of course, these are data that we
113:10 would -- if we had received them, we would have had
113:11 to review them for validity and accuracy; but in
113:12 assessing a drug, one needs to look not only at its
113:13 benefits but also the adverse events, especially
113:14 such important ones as cardiovascular adverse
113:15 events; and so that a doctor prescribing a drug
113:16 needs to know both sides of the story, not just one
113:17 side of the story.

gc 12404    124:4-126:1

124: 4    Q.  What was it about the APPROVe manuscript
124: 5 that gave the editors the view that the health of
124: 6 the public was at stake such that you wanted to get
124: 7 this information out sooner rather than later?
124: 8    A.  Well, the potential cardiac risks of COX-2
124: 9 inhibitors was a topic that for a long period of
124:10 time was riveting public attention.  It received an
124:11 enormous amount of attention in the media.

curfman 11-21-05
124:12              Millions and millions of patients had
124:13 taken these drugs in one form or another.  Vioxx is
124:14 off the market, but certain others were not, and
124:15 the FDA Advisory Committee, a very distinguished
124:16 committee, headed by Dr. Alistair Wood at
124:17 Vanderbilt University, was due to meet and
124:18 deliberate on this issue, and we felt that by
124:19 having the articles published, assuming that they
124:20 met our standards for publication, would help the
124:21 advisory committee to have that information, not
124:22 just for themselves, but in the public record.
124:23              We thought it would be a public
124:24 service, something that we could do to help get at
125: Page 125
125: 1 the truth about these drugs.
125: 2     Q.  Now, following receipt of the manuscript,
125: 3 what was your role in the review process?
125: 4     A.  Well, I supervised the review process, and
125: 5 the first thing I did was to read the manuscript
125: 6 myself and to do that as quickly as possible, and
125: 7 then sent it out for review to four outside
125: 8 experts.  Four experts outside of our office.
125: 9              You'll recall that with the VIGOR
125:10 manuscript, that was reviewed by two outside
125:11 experts.  I felt that we needed more opinions here,
125:12 given the high stakes; and I had selected four
125:13 outside experts who I already communicated with,
125:14 and who had agreed to review this within about a
125:15 48-hour time frame.  In fact, some of them did it a
125:16 little faster than that.
125:17              We also -- I also at the same time sent
125:18 the manuscript to one of our statistical
125:19 consultants who reviewed it during that same time
125:20 interval.
125:21              So within, roughly, I am estimating,
125:22 36, 48 hours, we had four outside reviews and the
125:23 statistical consultant review, their written
125:24 comments, that were e-mailed in to our office, and
126: Page 126
126: 1 we had all that information.

gc 13004      130:4-130:8

130: 4     Q.  Is it correct that the letter of February
130: 5 9, 2005 informed the authors that the manuscript
130: 6 would not be accepted in its current form in which
130: 7 it had been submitted?
130: 8     A.  That's right.

gc 14120      141:20-142:5

141:20     Q.  Now, going on to some of the specific
141:21 comments in your letter of February 9, there is a
141:22 No. 7 on Page 2, which states, "Remove assertion
141:23 that increased risk was observed only after 18
141:24 months, because event curves for other adverse
142: Page 142
142: 1 events separate early.  Also the focus on the first
142: 2 18 months was not pre-specified and is a post-hoc
142: 3 analysis."
142: 4              Do you see that reference?
142: 5     A.  Yes, I do.

D obj. = 801/802
π response = not
hearsay, state of mind

I run II ruling - overruled

Page 14

gc 14819        148:19-148:20

  148:19     Q.  Is it correct that there has been no trial
  148:20 to test the 18-month hypothesis since APPROVe?

gc 14823        148:23-149:14

  148:23     A.  There has never been a trial at all, at
  148:24 all, to -- where cardiovascular endpoints were the
  149: Page 149
  149: 1 primary endpoints in the trial.
  149: 2             There has never been a trial that was
  149: 3 designed by the sponsoring company to look at
  149: 4 cardiovascular toxicity.
  149: 5             Remember, the APPROVe trial was never
  149: 6 designed to look at cardiovascular toxicity.  It
  149: 7 was a colon polyp prevention trial.  The
  149: 8 cardiovascular was added on a later time.
  149: 9             Now, it's not that that isn't useful,
  149:10 but you asked the question, has there been a trial?
  149:11 No, there never has been any trial -- that I'm
  149:12 aware -- at least that's been published that I'm
  149:13 aware that has ever been designed to look at this
  149:14 question.

gc 15707        157:7-158:5

  157: 7     Q.  If you could look at the published study,
  157: 8 32.  In particular at Page 1097.
  157: 9             Does that display, Figure 2, above
  157:10 Figure 3, with the Figure 3 showing the early
  157:11 separation?
  157:12     A.  That's correct.  And I think this may be an
  157:13 appropriate time for me to mention how the data are
  157:14 displayed on the page.
  157:15             The original display of the data had
  157:16 these two graphs on totally separate pages; but in
  157:17 the page proofs, we saw that the two graphs were
  157:18 displayed on separate pages, and we asked that our
  157:19 layout artist bring them together on the same page,
  157:20 one on top of the other, so that the reader could
  157:21 see in a glance that this 18-month cutpoint in the
  157:22 top curve in Figure 2 is not sustainable by the
  157:23 congestive heart failure data on February 3.
  157:24             So this page layout was very
  158: Page 158
  158: 1 intentional.  It was intended to make a point, and
  158: 2 it was part of our strategy to make sure that not
  158: 3 too much credence was given to the 18-month
  158: 4 cutpoint shown in Figure 2 because of the immediate
  158: 5 separation in Figure 3.

gc 16810        168:10-168:23

  168:10     Q.  And if you look at Page 1100 of the
  168:11 published APPROVe study, there is a discussion of
  168:12 mean arterial pressure in the middle of the last
  168:13 paragraph on the left that says, "Mean arterial
  168:14 pressure did not appear to have a significant
  168:15 association with confirmed thrombotic events."
  168:16             Do you see that?
  168:17     A.  Yes, I do.
  168:18     Q.  Would it be relevant to the editors to know

[handwritten annotation, right margin: "obj = 602 - knowledge, foundation/personal calls for expert 701/702- IT response = witness is able to give a response based upon his personal knowledge, expert testimony not necessary as to whether there has been a trial to test the 18 mo. hypothesis Ruling in Irvin II - No prior ruling, not designated by IT"]

[handwritten annotation: "See next pg"]

curfman 11-21-05

168:19 that another analysis was conducted of the
168:20 thrombotic events that did show a significant
168:21 association among patients who had elevated blood
168:22 pressure of the 160 or greater systolic or 100 or
168:23 greater diastolic level?

gc 16901      169:1-169:9

169: 1      A.  Yes.  One of -- one, of course, of the
169: 2 mechanisms of concern in terms of vascular disease
169: 3 would be hypertension as a substrate leading to
169: 4 vessel damage.
169: 5              So that would be -- if such analysis
169: 6 existed, it would be very appropriate to include
169: 7 that.
169: 8      Q.  And that would have been of interest, not
169: 9 only to the editors, but also to readers?

gc 16911      169:11-169:11

169:11      A.  Yes.

gc 16912      169:12-169:18

169:12      Q.  Now, going back to the February 9th letter,
169:13 the letter that did not accept the manuscript in
169:14 its current form.
169:15              Is it correct that Item 4 was a
169:16 directive to restore the investigator-reported
169:17 category to Table 2?
169:18      A.  That's correct.

gc 18116      181:16-181:20

181:16      Q.  Now, is it correct that up to today you
181:17 have never seen the investigator-reported data that
181:18 appears in the drafts prior to February 6, 2005?
181:19      A.  That's correct.
181:20      Q.  Could you take a look at Exhibit 36.

gc 18123      181:23-182:13

181:23      Q.  We looked at this a moment ago, and I would
181:24 like you to turn to Page 36 of the document, which
182: Page 182
182: 1 ends in 5792 for the Bates range, and this shows a
182: 2 Figure 6 Kaplan-Meyer plot for investigator-
182: 3 reported cardiovascular events.
182: 4              Do you see that?
182: 5      A.  Yes, I do.
182: 6      Q.  And is this a figure that you've never seen
182: 7 before?
182: 8      A.  I have never seen it before.
182: 9      Q.  Do you see the statement above that, "The
182:10 curve of the rofecoxib treatment group was above
182:11 the curve of the placebo treatment group during the
182:12 entire study"?
182:13      A.  I do see the statement, yes.


Total Length - 00:52:13

curfman 1-24-06

Curfman 1-24-06 (Multi-clip)
gc   4315      43:15-43:21

    43:15          Q.     I will hand you what we've
    43:16 marked as Exhibit 3.
    43:17                 Is that a copy of the
    43:18 Expression of Concern?
    43:19          A.     (Witness reviewing
    43:20 document.)
    43:21                 Yes, it is.

gc   4521      45:21-46:11

    45:21          Q.     Whether it was its purpose
    45:22 or not, would you agree that the
    45:23 Expression of Concern was critical of the
    45:24 authors of the VIGOR study?
    46: Page 46
    46: 1          A.     The Expression of Concern
    46: 2 was focused on an article that was
    46: 3 published in the New England Journal of
    46: 4 Medicine, a document, scientific document
    46: 5 that we had obtained evidence that made
    46: 6 us concerned about the procedures that
    46: 7 led to the publication of that document.
    46: 8 And our Expression of Concern was focused
    46: 9 on the scientific document in order to
    46:10 correct the scientific record.  It was
    46:11 not focused on individuals.

gc   6905      69:5-70:16

    69: 5          Q.     And so on December 8th, when
    69: 6 you released this Expression of Concern,
    69: 7 there was no public health emergency --
    69: 8          A.     No.
    69: 9          Q.     Okay.
    69:10          A.     No.  No.  The Expression of
    69:11 Concern, as I said earlier, was intended
    69:12 to set the scientific record straight.
    69:13 In fact, just yesterday, even now, I
    69:14 received a new manuscript submission, and
    69:15 I was scanning through the references
    69:16 cited at the end of this new manuscript,
    69:17 and it contained a reference to the VIGOR
    69:18 article.  So, even now it is still being
    69:19 cited in articles.  And so even though
    69:20 rofecoxib had been removed from the
    69:21 market, and you're right, there was no
    69:22 public health emergency, that wasn't the
    69:23 reason that we issued an Expression of
    69:24 Concern.
    70: Page 70
    70: 1          Q.     What wasn't?  You say that
    70: 2 wasn't the reason.  What wasn't the
    70: 3 reason?
    70: 4          A.     There was no public health
    70: 5 emergency to deal with.  We did it
    70: 6 because that article continued to exist
    70: 7 in our journal archive, and as editors of
    70: 8 the journal, we are responsible for the
    70: 9 integrity of that archive.  And our
                                              Page 1

curfman 1-24-06
```
70:10 Expression of Concern was focused very
70:11 narrowly on trying to set -- trying to
70:12 inform the medical community that we
70:13 believe now that there were some problems
70:14 with that article and how it came out.
70:15 And it was our responsibility to inform
70:16 the medical community about that.
```

gc   12220      122:20-123:9

```
122:20           Q.    I'm handing you Exhibit 11.
122:21 Is this 11?  Yes.
122:22                 Do you recognize this as a
122:23 printout of the ICMJE standards that you
122:24 were referring to?
123: Page 123
123: 1           A.    Right.
123: 2           Q.    If you'll turn, and the
123: 3 pages aren't numbered --
123: 4           A.    No, they're not.
123: 5           Q.    I'm looking for the page
123: 6 that has on its third line Roman Numeral
123: 7 III.B, "Corrections, Retractions and
123: 8 'Expressions of Concern'."
123: 9           A.    Right.
```

gc   12316      123:16-125:7

```
123:16           Q.    And I just want to take a
123:17 few minutes walking you through some of
123:18 these.
123:19                 The first sentence says,
123:20 "Editors must assume initially that
123:21 authors are reporting work based on
123:22 honest observations."  You agree that
123:23 that's appropriate; right?
123:24           A.    Yes, indeed.
124: Page 124
124: 1           Q.    Then it talks about
124: 2 "Nevertheless, two types of difficulty
124: 3 may arise."  And the first has to do with
124: 4 errors that "may be noted in published
124: 5 articles."  Correct?
124: 6           A.    Correct.
124: 7           Q.    And the second has -- it
124: 8 says, "The second type of difficulty is
124: 9 scientific fraud."  And in your judgment,
124:10 when you were dealing with the Expression
124:11 of Concern, which of these two were you
124:12 dealing with?
124:13           A.    Well, we were dealing with a
124:14 situation that involved incomplete
124:15 reporting of crucial data.  And in trying
124:16 to decide about what kind of editorial
124:17 intervention to undertake, should this
124:18 paper be retracted, should there be a
124:19 correction or should there be an
124:20 Expression of Concern, we had lengthy
124:21 discussions about the distinction between
124:22 these three possible types of
124:23 interventions.  And we -- it was our
124:24 editorial judgment that this best fit
125: Page 125
```

curfman 1-24-06
125: 1 with an Expression of Concern.
125: 2        Q.    And the Expression of
125: 3 Concern procedure is at least discussed
125: 4 in connection with the second of those
125: 5 two events that's mentioned in this -- in
125: 6 these standards; right?
125: 7        A.    Right.

gc  13110    131:10-131:14

131:10        Q.    Before you published your
131:11 conclusions in the Expression of Concern,
131:12 did you give any of the authors an
131:13 opportunity to respond to what you were
131:14 proposing to publish?

gc  13119    131:19-132:1

131:19            THE WITNESS:  Yes, we did.
131:20        But their response follows the
131:21        publication of the Expression of
131:22        Concern.  But we did discuss with
131:23        them before we published it that
131:24        they would have an opportunity to
132: Page 132
132: 1        respond.  Yes.

gc  17616    176:16-177:1

176:16        Q.    Dr. Curfman, you were quoted
176:17 in the Forbes article as saying you were
176:18 somewhere between surprised and stunned
176:19 that some cardiovascular data that was in
176:20 a presubmission draft, a draft that was
176:21 prepared before it was submitted to the
176:22 New England Journal of Medicine, had been
176:23 deleted before the draft was submitted.
176:24 Do you remember that and were you
177: Page 177
177: 1 accurately quoted?

gc  17710    177:10-179:3

177:10            THE WITNESS:  Well, I can
177:11        tell you what I was somewhere
177:12        between surprised and stunned
177:13        about, and that was the document
177:14        that was presented to me for the
177:15        first time on November 21st, 2005,
177:16        Exhibit 18, among the exhibits on
177:17        that day, which was an internal
177:18        memorandum dated July 5th, 2000,
177:19        which contained an extensive body
177:20        of data on the cardiovascular
177:21        adverse events in VIGOR that I had
177:22        never seen before.  And that put
177:23        me somewhere between surprised and
177:24        stunned.
178: Page 178
178: 1 BY MR. BECK:
178: 2        Q.    So, this was that there was
178: 3 cardiovascular data that Merck had in its
178: 4 possession in July that you had not seen
Page 3

curfman 1-24-06

178: 5 in connection with the editorial process
178: 6 involving VIGOR; is that right?
178: 7          A.    Yes.  There were two of the
178: 8 VIGOR authors.  One of the authors was
178: 9 the author of the memo.  The other VIGOR
178:10 author was --
178:11          Q.    Well, why don't you give
178:12 their names.  Go ahead.
178:13          A.    Well, the author of the memo
178:14 was Dr. Deborah Shapiro, and one of the
178:15 several recipients of the memo were Dr.
178:16 Alise Reicin, both of whom were authors
178:17 of the VIGOR article, who clearly had
178:18 this extensive body of information on a
178:19 variety of cardiovascular adverse events
178:20 involving four different vascular systems
178:21 in the body that I had never seen before
178:22 during the editorial process, and yet we
178:23 knew from the date on the memo that those
178:24 data were available to those two authors
179: Page 179
179: 1 early in the summer, 4 months and 19 days
179: 2 before we published the VIGOR article,
179: 3 and that was the cause of the surprise.

gc  18717     187:17-188:12

187:17          Q.    Well, one of the things that
187:18 your Expression of Concern talks about
187:19 are three additional MIs -- or can I just
187:20 call them heart attacks for short?
187:21          A.    Sure.
187:22          Q.    Okay.
187:23                -- three additional heart
187:24 attacks that were reported to the FDA and
188: Page 188
188: 1 by the FDA but were not included in the
188: 2 VIGOR publication.  That was one of the
188: 3 subjects of your Expression of Concern,
188: 4 correct?
188: 5          A.    Correct.
188: 6          Q.    Okay.
188: 7                So, just focusing on these
188: 8 three additional heart attacks, do you
188: 9 now know that the three additional heart
188:10 attacks were adjudicated and reported
188:11 after a prespecified cutoff date used in
188:12 the VIGOR study?

gc  18816     188:16-191:7

188:16                THE WITNESS:  We don't
188:17                accept a separate cutoff point for
188:18                the cardiovascular events that was
188:19                weeks earlier than the cutoff
188:20                point for the GI events.  It's not
188:21                only unorthodox, but unacceptable
188:22                to set an earlier cutoff point for
188:23                one set of endpoints and a later
188:24                cutoff point for a separate set of
189: Page 189
189: 1                endpoints.
189: 2                What that means is, that

See next pg.

Page 4

curfman 1-24-06

```
189: 3          you're not counting the two sets
189: 4          of endpoints equally.  They're out
189: 5          of phase by several weeks' time,
189: 6          and that is, as I said, not only
189: 7          unorthodox in clinical trials, but
189: 8          unacceptable in clinical trials.
189: 9               The authors didn't tell us
189:10          that they had done this, and we
189:11          were unaware of it.  There's no
189:12          statement about that in the VIGOR
189:13          article.
189:14               The only statement about the
189:15          analysis of the cardiovascular
189:16          events in the VIGOR article is
189:17          that there was no prespecified
189:18          analysis plan for cardiovascular
189:19          events in VIGOR.  That's the last
189:20          sentence in the methods section of
189:21          the VIGOR article published in the
189:22          New England Journal.
189:23               But that's the only
189:24          information that we had, the
190: Page 190
190: 1          editors, about any kind of cutoff
190: 2          point.  So, this was unorthodox.
190: 3          If we had known about it, we would
190: 4          not have accepted that different
190: 5          cutoff time.
190: 6               I've consulted with people
190: 7          who are experts in clinical
190: 8          trials, and no one has ever heard
190: 9          about this kind of arrangement in
190:10          a clinical trial.
190:11 BY MR. BECK:
190:12          Q.    My question, sir, is, are
190:13 you now aware that the study employed a
190:14 prespecified cutoff date for
190:15 cardiovascular events and that these
190:16 three MIs came in after that date?
190:17          A.    No.  Prespecified means in a
190:18 clinical trial that that item is
190:19 specified before the trial begins in the
190:20 written protocol for the trial, before
190:21 the trial begins.  "Pre" means before the
190:22 trial begins.
190:23               This was in no way
190:24 prespecified.  That's a misuse of the
191: Page 191
191: 1 term "prespecified," and if the authors
191: 2 had told us about this, we would not have
191: 3 accepted it.  We would have required that
191: 4 all of the events that occurred within
191: 5 the same time frame as the GI events be
191: 6 included, and those included those three
191: 7 MIs.
```

gc  24812      248:12-249:10

```
248:12          Q.    Doctor, you had your
248:13 deposition taken on November 21st, 2005?
248:14          A.    Yes.
248:15          Q.    Did you have any intention
248:16 of writing an Expression of Concern about
```

Δobj = non-responsive answer

π response = March did not object at the deposition + move to strike the testimony of give the witness the opportunity to cure/ correct his response; witness gave an appropriate response to the questions asked

Ruling in Irvin II: no prior ruling

curfman 1-24-06

248:17 the VIGOR study before that date?
248:18        A.   No, we did not.
248:19        Q.   Did you formulate an
248:20 intention to write an Expression of
248:21 Concern on or after November 21st, 2005?
248:22        A.   At 8:30 in the morning on
248:23 November 22nd, Dr. Morrissey and I
248:24 initiated discussions about some kind of
249: Page 249
249: 1 editorial intervention, and then we
249: 2 continued those discussions in the
249: 3 subsequent days, leading eventually to an
249: 4 Expression of Concern.
249: 5        Q.   Now, the Expression of
249: 6 Concern itself has previously been marked
249: 7 as Exhibit 3, and do you have that in
249: 8 front of you?
249: 9        A.   I can get that.  Yes, I have
249:10 it.

gc  26014     260:14-261:13

260:14        Q.   Doctor, in the Expression of
260:15 Concern, did you state the relative risks
260:16 in terms of an increase in risk with
260:17 rofecoxib or Vioxx, rather than a
260:18 decrease in risk with naproxen?
260:19        A.   Yes, that's correct.
260:20        Q.   Why did you do that?
260:21        A.   Well, the original VIGOR
260:22 article presented the relative risks in
260:23 the opposite direction, the implication
260:24 being from that presentation that
261: Page 261
261: 1 naproxen was protective against
261: 2 cardiovascular disease, not that
261: 3 rofecoxib increased the risk of heart
261: 4 disease.
261: 5              We now know that that is not
261: 6 the case, and in order to set the record
261: 7 straight, we made the decision in this
261: 8 Expression of Concern to express the
261: 9 relative risks as if rofecoxib increased
261:10 the risk of cardiovascular disease.
261:11              And, again, it was our
261:12 interest here to correct the scientific
261:13 record on this important point.

gc  26321     263:21-264:7

263:21        Q.   Now, compared to the way
263:22 that you have presented the relative risk
263:23 of 5 in Table 2 of the Expression of
263:24 Concern versus the .4 versus the .1
264: Page 264
264: 1 presented in the published VIGOR article,
264: 2 is it correct that there's a 20 percent
264: 3 higher relative risk of the way you've
264: 4 presented the data with all the MIs
264: 5 counted?
264: 6        A.   Yes.  Approximately 20
264: 7 percent, 19, 20 percent.

curfman 1-24-06

Total Length - 00:16:25