# EXHIBIT "A"

```
              SUPERIOR COURT OF NEW JERSEY ATLANTIC
              COUNTY/CIVIL DIVISION DOCKET NO. ATL-L-
              2272-03MT
-------------------------------x
FREDERICK HUMESTON, et al.,
         PLAINTIFFS,
    VS.                     STENOGRAPHIC TRANSCRIPT
                            OF:
MERCK & CO., INC.,
                                  - TRIAL -
              DEFENDANT.
-------------------------------x
         PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                 1201 BACHARACH BOULEVARD
                 ATLANTIC CITY, NJ 08401
         DATE:   OCTOBER 6, 2005


B E F O R E:

    THE HONORABLE CAROL E. HIGBEE, P.J.Cv.


TRANSCRIPT ORDERED BY:
    DIANE P. SULLIVAN, ESQUIRE
    DAVID R. BUCHANAN, ESQUIRE


A P P E A R A N C E S:

    DAVID R. BUCHANAN, ESQUIRE
    CHRISTOPHER SEEGER, ESQUIRE SEEGER, WEISS,
    LLC
ATTORNEYS FOR THE PLAINTIFFS
         DIANE P. SULLIVAN, ESQUIRE
    DECHERT, LLP
    STEPHEN D. RABER, ESQUIRE WILLIAMS AND
    CONNOLLY, LLP CHRISTY D. JONES, ESQUIRE
       BUTLER, SNOW, O'MARA, STEVENS & CANNADA,
       PLLC ATTORNEYS FOR THE DEFENDANT
            *      *      *      *      *      *
                REGINA A. TELL, CSR-CRR-RPR
                OFFICIAL COURT REPORTER
                1201 BACHARACH BOULEVARD ATLANTIC
                CITY, NJ  08401
```

```
                    I N D E X
WITNESS(S)          DIRECT   CROSS   REDIRECT   RECROSS
FOR THE DEFENSE
1). BRIGGS MORRISON
By Mr. Raber         3175
By Mr. Seeger,       3279
By The Court,        3290
```

Page 3199

| EXHIBITS DESCRIPTION | ID. | EVID. |
|---|---|---|
| D-35    11/21/96 Memo | - | |
| D-68    Dog Urinary Prostaglandin Study Summary | -- | 3246 |
| D-93    Study | -- | 3251 |
| D-94    3/8/99 Report | -- | 3254 |

Page 3162

1  Consumer Fraud Acts in the country. New Jersey has a
2  very strong interest in protecting consumers from
3  fraud, from misrepresentations and from omissions. We
4  also have a strong Product Liability Act.
5      Actually, the Idaho Product Liability Act is
6  extremely similar to the New Jersey Act. There's a few
7  differences. There's very little case law in Idaho,
8  actually, but in either case the Court finds that New
9  Jersey has the strong governmental interest in making
10 sure that those who manufacture in New Jersey and
11 market in New Jersey and market to any place from New
12 Jersey if they make their plans and decisions here that
13 those decisions and plans are made with the
14 understanding that they cannot violate the New Jersey
15 Consumer Fraud Act or the Products Liability Act of New
16 Jersey, and the Courts find that the Gantes case and
17 other law, which I had cited previously stands for the
18 proposition that New Jersey has the strongest
19 government interest in this type of matter.
20     There are two claims. One is for failure to
21 warn under the Products Liability Act. Basically, that
22 says that a manufacturer may not sell a product which
23 is defective because it has inadequate instructions or
24 warnings with it, and basically the inadequate warnings
25 or instructions are a failure to warn of the known or

Page 3161

1            PROCEEDINGS
2      THE COURT: You can be seated. All right.
3  Counsel for the defense has made a motion to dismiss at
4  the end of plaintiffs' case both the consumer fraud
5  count and the failure to warn count under the Product
6  Liability Act. The first issue that's presented by
7  defense counsel is choice of law. This was decided
8  pretrial. I'm not going to revisit it now. I will
9  just say that the -- this case involves a New Jersey
10 manufacturer selling a product across the country. The
11 marketing was planned in New Jersey. The decisions
12 about warnings, instructions, advertising were made in
13 New Jersey. The drug was prescribed and purchased in
14 Idaho. New Jersey conflict of law standard is a
15 governmental interest standard, which state has the
16 most interest in the litigation.
17     Obviously, both states would have interest in
18 the litigation, both the consumer and the purchaser
19 state, as well as the place where the person was
20 injured, that's where he had his heart attack in
21 Idaho, as well as New Jersey. But the fact is that New
22 Jersey has a very strong interest in protecting
23 consumers and preventing sellers from making misleading
24 statements and engaging in unconscionable marketing
25 practices, and New Jersey has one of the strongest

Page 3163

1  knowable risks of a product, and there's a requirement
2  that a manufacturer do that, that they warn, that they
3  provide proper instructions and warnings, and if they
4  don't do so it is held under the Product Liability Act
5  that their product is unsafe and shouldn't -- and that
6  they were responsible for damages that were proximately
7  caused by that failure to warn.
8      Under the Consumer Fraud Act basically it
9  provides a private right of action for any person who
10 suffers an ascertainable loss of monies or property,
11 real or personal, as a result of the use or employment
12 of things that are prescribed by the Act, which would
13 include violations of the Act would include there's
14 basically three things, but two of them apply to what
15 the plaintiffs are claiming in this case, affirmative
16 misrepresentations in connection with the advertisement
17 or sale of merchandise and knowing omissions of
18 material facts in connection with the advertisement or
19 sale of merchandise. And in order to prevail under the
20 New Jersey Consumer Fraud Act the plaintiff has to
21 prove a violation of the Act as well as an
22 ascertainable loss as a result of the unlawful conduct.
23 The capacity to mislead is the prime ingredient of
24 deception or an unconscionable commercial practice.
25 Intent is not an essential element. A plaintiff must

Page 3164

1  demonstrate, also, that there's a causal relationship
2  between the unlawful practice and the ascertainable
3  loss.
4  Now, what we have to do under this motion at
5  this point is to look at the evidence and see whether
6  plaintiff has put into evidence which would support a
7  verdict by the jury on either of those or both of
8  those, and I look at the evidence in the light most
9  favorable to the plaintiff. I look at whether or not,
10 in fact, there is evidence presented, and there may be
11 contradictory evidence, obviously, presented by the
12 defense in the future in the days to come or even
13 through cross-examination here, but the issue is
14 whether the plaintiffs' proofs, if accepted as true,
15 whether plaintiffs have enough proofs to prevail and to
16 just to sustain a cause of action really. It is not
17 even really whether they prevail but whether they can
18 simply sustain it, a cause of action if they have
19 enough evidence.
20 In this case the evidence accepting
21 plaintiffs' proofs are as follows: First of all, they
22 have a scientist who has testified that Merck knew that
23 there was scientific evidence that prostacyclin
24 inhibits platelet aggregation and that thromboxane
25 assisted clotting, and that NSAIDs on the market before

Page 3165

1  VIOXX and before Celebrex had blocked both, that VIOXX
2  was a COX-2 inhibitor which only blocked
3  prostacyclin -- prostacyclin and did not block
4  thromboxane, and, therefore, Merck knew or should have
5  known of the risk that VIOXX might have cardiovascular
6  effects on persons taking the same. That was the
7  testimony of Dr. Lucchesi.
8  There is also evidence presented by the
9  plaintiffs that, in fact, Merck did know about this
10 issue and that they were, quote, "worried" about it
11 before they ever put the drug on the market, that they
12 were discussing it, that respected scientists both who
13 had been consultants for the company and both inside
14 and outside out of the company who were worried about
15 this had discussed it with the highest level of people
16 at Merck. The testimony is that, in fact, one
17 scientist, FitzGerald, had advised Merck that there
18 were -- that his findings had been that there were
19 metabolites in urine and by studying those metabolites
20 he had determined that there was less prostacyclin,
21 and, therefore, less in the body was being excreted and
22 that this created a real issue for Merck as to whether
23 or not, in fact, VIOXX was causing or could cause
24 cardiovascular issues. Oates, FitzGerald and others
25 were discussing it, and Merck's own scientists were

Page 3166

1  discussing it. It was, in fact, an issue, and that's
2  the evidence that's been presented by plaintiffs.
3  They have also presented evidence that there
4  was specific recommendations to Merck to include
5  cardiovascular end points in their studies to
6  specifically investigate and have investigators and
7  clinical studies looking for heart attacks as an end
8  point, and they have acknowledged in the evidence that
9  they never did this. Instead, Merck apparently put
10 into place, according to their testimony, some
11 operating procedure or their witnesses' testimony,
12 their representatives' testimony, I should say, it was
13 a witness that plaintiff called, that there was a
14 procedure where they would, in fact, collect
15 cardiovascular risk data in all the tests, but it is a
16 fact that plaintiffs have -- at least a fact that the
17 plaintiffs have attempted to prove and have presented
18 evidence of that they never made it an end point in any
19 study, and a reasonable inference from that could be
20 that they didn't want investigators in the studies to
21 focus on myocardial infarctions and cardiovascular
22 risk.
23 In addition, there were Alzheimer's studies
24 which were done, and the testimony about them was that
25 the death rate was much higher in Alzheimer's studies

Page 3167

1  for people on VIOXX than those people who were on
2  placebo. The biostatistician who testified indicated
3  that this was a significant fact, that it was the type
4  of data that should be of significance to
5  biostatisticians and should -- in fact, it is the type
6  of data that should have been revealed and highlighted,
7  that it was very important data that physicians should
8  have been advised about, and that that was not done.
9  The evidence was further presented that there
10 had been a study, a VIGOR study, which was a clinical
11 study of a large number of people which showed five
12 times as many heart attacks on VIOXX as on Naproxen,
13 and that this study was completed before Mr. Humeston
14 was provided his prescription for VIOXX and that the
15 data from that study showed that there was a split or a
16 difference between the cardiovascular events after six
17 weeks on VIOXX.
18 Merck got the data from the VIGOR study and
19 the plaintiffs' evidence is that they focused on two
20 things, and, again, this is if you assume the
21 plaintiffs' evidence is correct, that they minimized
22 the heart attack warnings and they attempted to
23 highlight the gastrointestinal results of the VIGOR
24 study which were very favorable to them. It is
25 plaintiffs' position, and they have presented evidence,

Page 3168

1  that Merck set out to at that point minimize and
2  basically conceal from doctors the heart attack risk
3  and that they, in fact, chose, instead, to highlight
4  the gastrointestinal results which were favorable to
5  them.
6       Plaintiffs' witnesses have testified that the
7  data was -- in fact, the data was, in fact, published.
8  Results from the VIGOR study were, in fact, published,
9  that the FDA was provided with information about VIGOR
10 and the data.  However, the biostatistician who
11 testified that the VIGOR results and the significance
12 of them were varied in quantities and materials, and
13 particularly the Alzheimer's studies, which were also
14 done, were another study that were done were varied in
15 qualitative material, and the huge material quantity of
16 material given to the FDA and the data was never
17 presented to the public or to physicians in a way that
18 they would have knowledge or the average cardiologist
19 or internist would have knowledge about the risks, and
20 that basically is this particular evidence has been
21 presented by the VIGOR study, and then they went on to
22 present evidence about specifically what was and wasn't
23 shown.
24       They specifically presented evidence that
25 there was a nationwide sales force which was trained by

Page 3169

1  Merck to sell their drug to doctors.  There was
2  testimony that doctors rely on sales representatives to
3  find out about drugs and the dangers of drugs.  There
4  was testimony that the Merck sales force was trained to
5  dodge doctors' questions about CV risks and to treat
6  questions as obstacles to sales.
7       There was testimony that the sales reps were
8  given CV cards or given information basically about CV
9  risks and told what to tell to doctors, and that the CV
10 cards did not include VIGOR data and about the five
11 times greater heart attack rates on VIGOR and that, in
12 fact, the head of marketing testified that the sales
13 reps were told not to discuss VIGOR with the doctors
14 because it was not in the label and they were to
15 confine their conversations to doctors to things which
16 were in the label, the 1999 label, which did not
17 include VIGOR because at that point VIGOR was not out.
18      Merck's marketing president had specifically
19 testified to that, that, in fact, the sales
20 representatives were told not to discuss things that
21 were not in the label with the physicians.  The
22 testimony of the plaintiffs' witness was that Merck, in
23 fact, published the VIGOR results but in doing so they
24 touted the gastro safety effects and that the
25 publications and the sales techniques were designed to

Page 3170

1  highlight the GI safety and to obscure the heart attack
2  data, specifically that plaintiffs had the testimony of
3  Mr. Nies or Dr. Nies that he knew that there were
4  higher rates of heart attacks with VIOXX under the
5  VIGOR study and he knew that the difference was greater
6  than would be expected even if aspirin had been on the
7  other arm of the study or had the drug been taken as
8  opposed to Naproxen, but that -- but, in fact, that
9  Merck had chosen to advertise basically to -- and to
10 set forth to the public and to physicians the position
11 that Naproxen was cardioprotective and that, in fact,
12 VIOXX was not a cardiovascular risk.
13      There are three possibilities the Merck
14 witnesses that plaintiff called testified that there
15 was chance that could have caused the difference in
16 VIGOR, that VIOXX could have caused the heart attacks
17 or that Naproxen could have been cardioprotective, but
18 the plaintiffs have presented evidence that, in fact,
19 what was actually conveyed to doctors was that the drug
20 was safe and that any marketing -- and that the
21 marketing Merck focused on in early 2001 in the spring
22 of 2001 focused on Naproxen being cardioprotective and
23 not in any way suggesting to the public that VIOXX
24 could be causing the heart attacks.
25      Specifically plaintiffs introduced into

Page 3171

1  evidence a press release from May 22nd, 2001 which
2  indicated that Merck confirms a favorable
3  cardiovascular profile.  The FDA found that Merck
4  confirming favorable cardiovascular profile to be false
5  and misleading, and this was the press release that was
6  going out prior to Mr. Humeston having his heart attack
7  during the time when his physician was making decisions
8  about prescribing this drug to him.
9       There is substantial evidence that's been
10 presented by the plaintiff if the jury chooses to
11 believe it that there was misrepresentations and
12 omissions and unconscionable marketing practices by
13 Merck.  Now, understand I'm not saying that there were,
14 I'm saying that there's evidence in this case of that,
15 and that the defense, obviously, still has the
16 opportunity to present their case and, in fact, has
17 presented counter evidence even within plaintiffs'
18 case, but we're dealing here with whether or not there
19 is evidence that's been presented by plaintiffs to
20 sustain a failure to warn claim and a consumer fraud
21 claim.  And the Court finds that there is substantial
22 evidence to support either of those theories.
23      The next question is whether there is a
24 causal link or a proximate cause under whether they
25 presented evidence of that they presented evidence --

Page 3172

1  Dr. Lewer testified that as the treating physician for
2  the plaintiff he never would have prescribed VIOXX if
3  he knew about the risks, that he became aware of the
4  risks after October 2001, that he never prescribed it
5  again for Mr. Humeston, that, in fact, he had dealt
6  with and presented information about VIOXX from
7  multiple salespeople. That evidence was presented, the
8  sales, the fact that there were multiple sales calls
9  was presented by plaintiffs. He indicates that he was
10 never told about VIGOR, never told about the
11 cardiovascular parts of VIGOR which considering -- and
12 then there was also testimony from Dr. Sim, Dr. DePace,
13 two other cardiologists who indicated that they were
14 not aware of the cardiovascular risks, and, in fact,
15 Dr. DePace indicated -- testified that he asked for
16 additional information and that he felt that that
17 information was misleading and that doctors were not
18 provided with adequate information and that the doctors
19 did not know until after the time of Mr. Humeston's
20 heart attack that, in fact, this risk existed.
21       That being the case, if that is the case if
22 that's believed by the jury then they could find that
23 there was proximate causation, and, in fact, the
24 prescription would not -- that Mr. Humeston's physician
25 would have advised him not to take VIOXX based on the

Page 3173

1  evidence. There's also evidence that's been presented
2  that Mr. Humeston purchased drugs which he wouldn't
3  have purchased if, in fact, his physician hadn't
4  prescribed him -- his physicians wouldn't have
5  prescribed it if he knew about the risks and,
6  therefore, the causal link for the Consumer Fraud Act
7  and the proximate causation there's evidence to support
8  both of those.
9        There is a presumption that a drug that's
10 been approved by the FDA has sufficient warnings. The
11 Court finds that there has been sufficient evidence
12 presented by the plaintiffs to overcome that
13 presumption at this point, and the Court denies the
14 application.
15       As for the motion to rule that Dr. DePace was
16 giving evidence which was not based on scientifically
17 sound -- it was not scientifically sound under Kemp the
18 Court finds that Dr. DePace was a qualified
19 cardiologist who testified as to his opinions and that
20 he did, in fact, give his basis for why he felt that
21 the VIOXX had caused Mr. Humeston's heart attack. He
22 gave very specific testimony as a cardiologist can
23 about the fact that he has read the literature, that he
24 has studied the information about VIOXX, that he has
25 reviewed the texts and brought in multiple textbooks

Page 3174

1  and that he has, in fact, based on his own experience
2  as a cardiologist made a determination that VIOXX was
3  most likely the cause of Mr. Humeston's heart attack.
4  I found that his testimony clearly met the level
5  required for scientific admissibility, and the Court
6  finds that the motion to strike his testimony is
7  denied.
8        All right. We'll move on. We're going to
9  start with the defense witnesses now. We'll hear the
10 other side of the story. Mary, do you want to bring in
11 the jury?
12       MR. RABER: Your Honor, we need to go get our
13 first witness. I think he might be in the back room,
14 so if we can take a few minute break to get him here
15 and then we'll be ready to go.
16       THE COURT: Okay. I'm just going to wait for
17 him. Mr. Raber, I guess we will take a break. The
18 jury isn't here yet. They were told 10:00. It is 10
19 of 10.
20       MR. RABER: So should we reconvene?
21       THE COURT: We'll wait until 10. Take your
22 10 minutes with your witness.
23       (Break taken.)
24       THE COURT: You can be seated. You can bring
25 in the jury.

Page 3175

1        (The jury enters the courtroom.)
2        THE COURT: You can be seated. The plaintiff
3  has rested and now we're going to move to the defense
4  case. Counsel for defense, your first witness.
5        MS. SULLIVAN: Yes, Your Honor. Merck calls
6  as its first witness Dr. Briggs Morrison.
7        THE COURT: Dr. Morrison.
8  WHEREUPON, BRIGGS MORRISON, DEFENSE WITNESS, SWORN.
9  DIRECT EXAMINATION BY MR. RABER:
10    Q.  Good morning, Dr. Morrison.
11    A.  Good morning, Mr. Raber.
12    Q.  Dr. Morrison, a couple weeks ago Friday
13 afternoon Dr. Lucchesi sat in that same chair that
14 you're sitting in. Do you remember that?
15    A.  Yes, I do.
16    Q.  And he looked at an e-mail that you had
17 written in February of 1997 and he said that you don't
18 mind killing patients. Do you remember that?
19       MR. SEEGER: Objection, Your Honor. I don't
20 think that's exactly what Dr. Lucchesi said, and it is
21 out of context. It is also inflammatory. The witness
22 can testify about what he wrote.
23       THE COURT: The objection is sustained in
24 that I don't believe Dr. Lucchesi's testimony was
25 Mr. Briggs or Dr. Briggs --

Page 3176

1  MR. RABER: He said they don't mind killing
2  patients.
3  THE COURT: He was speaking about Merck. He
4  wasn't speaking directly about Dr. Morrison.
5  MR. RABER: He was looking at Dr. Morrison's
6  e-mail from February of 1997 and said they don't mind
7  killing patients.
8  MR. SEEGER: It was an emotional moment for
9  Dr. Lucchesi. He demanded an apology out of him. Are
10 we going to beat this horse forever? The documents are
11 what they are.
12 MR. RABER: We are certainly going to talk
13 about it.
14 MR. SEEGER: Let's talk about it. That's
15 fine. I just think that's inflammatory.
16 THE COURT: The objection is sustained.
17 Counsel is characterizing his testimony. You can
18 rephrase your question. I know you're going to discuss
19 the e-mail.
20 BY MR. RABER:
21 Q. Dr. Morrison, was Dr. Lucchesi right about
22 what he said about your e-mail?
23 A. No, he was not, absolutely not.
24 Q. Would you have gone forward with a study if
25 you had felt that VIOXX would cause harm?

Page 3177

1  A. No, I would not.
2  Q. Can you tell us what you did believe about
3  VIOXX when you wrote that e-mail in February of 1997?
4  A. Yes. What I was worried about is if we did a
5  randomized trial of VIOXX versus an NSAID that because
6  of the antiplatelet effects of NSAIDs that those
7  patients would be protected from cardiovascular events
8  and you would see less cardiovascular events in the
9  patients who were on the NSAID. I believe that VIOXX
10 was completely neutral; it wouldn't benefit the patient
11 nor harm the patient with regards to cardiovascular
12 events, but with that result people would misinterpret
13 it, they would think VIOXX caused the events, and a
14 great drug like VIOXX would never make it to patients.
15 Q. Why did you believe VIOXX was a great drug at
16 that time?
17 A. I think to explain why we were so excited about
18 VIOXX it is probably helpful if we talk a little bit
19 about the traditional nonsteroidal anti-inflammatory
20 drugs, so I brought with me a book it is called the
21 Pharmacological Basis of Therapeutics, and,
22 essentially, what it is is a textbook on pharmacology.
23 It talks about the principles of how drugs are
24 administered, principles of how drugs are broken down
25 by the body, and there's a chapter in here on

Page 3178

1  nonsteroidal anti-inflammatory drugs.
2  MR. SEEGER: Your Honor, I have to object.
3  Dr. Morrison is not an expert. There should be a
4  foundational basis as to whether he looked at that book
5  at the time he was studying the drug.
6  MR. RABER: Your Honor, we just would like to
7  show this book as a demonstrative aid. We're not
8  trying to get it into evidence, but I think it is a
9  demonstrable aid to help Dr. Morrison explain why he
10 believed what he believed when he wrote this e-mail.
11 MR. SEEGER: Our position is Dr. Morrison
12 should testify to facts. He is not an expert in
13 pharmacology, so I think it would be improper.
14 THE WITNESS: If I can answer the question,
15 this is my version of this textbook, and this is the
16 1996 version, so this was a textbook that I was using
17 at the time that we were doing the VIOXX development
18 program, if that's helpful.
19 MR. SEEGER: I understand, Dr. Morrison, but
20 I have to address my comments to the Court.
21 THE COURT: Let's approach.
22 (The following side-bar discussion was had:)
23 MR. SEEGER: I don't need -- I'm not trying
24 to flush out Mr. Raber's direct. I expect the witness
25 to testify on documents. I don't expect him to come in

Page 3179

1  here and try to pass himself off with a pharmacology
2  textbook as a pharmacology expert. They have
3  witnesses, experts to do that. So if he wants to limit
4  his testimony, you know, to what he knew at the time as
5  opposed to trying to give the jury a lesson on
6  pharmacology I think that would be appropriate, but if
7  he is going to sit there and start saying, you know, I
8  got this great book and let me demonstrate to you these
9  principles of pharmacology that I have a problem with.
10 MR. RABER: His e-mail was interpreted as to
11 what he thought and what Merck thought about VIOXX. He
12 is here to testify as to, in fact, what he thought at
13 the time, why he wrote what he did and the basis for
14 why he wrote what he did, what is his understanding
15 about what NSAIDs do versus what VIOXX did. He was in
16 the clinical program in VIOXX testing VIOXX, asking and
17 answering some of these questions. He was a co-author
18 of the FitzGerald paper.
19 MR. SEEGER: And I'm going to ask him
20 questions about that.
21 MR. RABER: So we're going to be here for a
22 month if I'm not allowed to try this case and we have
23 an objection every time I ask him very simple questions
24 like this to get out the --
25 THE COURT: The first question that was

Page 3180

1  objected to I think was a clear misinterpretation of
2  what Dr. Lucchesi said. You may or may not, but I do.
3  That's why I sustained the objection. This
4  particular --
5      MR. SEEGER: He has been deposed and never
6  once brought a textbook.
7      MR. RABER: He was never asked.
8      THE COURT: You wouldn't ask for a textbook
9  or a learned treatise from a nonexpert witness.
10     MR. RABER: But, Your Honor, they never asked
11 him the background of this e-mail. They just show him
12 the e-mail and say have I read it correctly and you
13 meant blah, blah, blah but nobody bothered or took the
14 time to ask him what the context of that e-mail was,
15 what was going on.
16     MR. SEEGER: I have the deposition.
17     MR. RABER: And so this is important
18 evidence. It is an important --
19     THE COURT: It is not a question of important
20 evidence. This may very well be the right witness to
21 present evidence. It is about pharmacology.
22     MR. RABER: He needs to be able to testify as
23 to what was in his mind when he was writing that e-mail
24 so that he could say what he meant. They have had an
25 expert who purports to say what he meant, and we have

Page 3181

1  the author of the e-mail here who can testify as to
2  what he meant and what was in his mind and why he meant
3  it, why he said what he said.
4      MR. SEEGER: Look, Judge, this testimony is I
5  don't care by who, if Dr. Morrison went and did
6  research sitting in this room never mentioned a
7  textbook. He mentioned a memo that was written by
8  Dr. Musliner who is hearsay, not scientifically
9  accurate, now all of the sudden the man walks in here
10 with a textbook on pharmacological principles from
11 1996? It is just not appropriate. They have experts
12 they can do this type of testimony with. He should be
13 testifying about what he knew at the time he wrote that
14 e-mail.
15     MR. RABER: Exactly. And one of the things
16 he knew was the 1996 textbook that he has with him to
17 give some background for writing that e-mail.
18     MR. SEEGER: Don't get up there and start
19 giving a demonstration about what's in the textbook
20 because that would be inappropriate.
21     THE COURT: The objection is sustained as far
22 as showing the jury the textbook or having him say this
23 is what the treatise has said, et cetera. He can, in
24 fact, say in my mind I believed at that time X, Y, Z.
25     MR. RABER: No problem.

Page 3182

1      (End of side-bar.)
2  BY MR. RABER:
3      Q. Okay. Dr. Morrison, without looking at the
4  book can you tell us why you believed in February of
5  1997 that VIOXX had had the potential to be such a
6  great drug?
7      MR. SEEGER: Your Honor, I'm sorry to do
8  this, I'm just going to object to the reference
9  "without looking at the book" because the book is not
10 to be used for that, it shouldn't be referred to. I
11 think the question should be what he knew. It suggests
12 that he should be looking at the book.
13     MR. RABER: I just didn't want him to pull
14 out the book, Your Honor.
15     THE COURT: I think that the purpose of
16 counsel's question was to direct him not to use the
17 book, which is what the Court has ordered.
18     MR. SEEGER: Okay.
19     THE COURT: You can proceed, counselor.
20 BY MR. RABER:
21     Q. Dr. Morrison, why do you believe in February
22 of 1997 when you wrote that e-mail that VIOXX had the
23 potential to be a great drug?
24     A. As I said, I think in order to explain the
25 benefits of VIOXX it is important to understand the

Page 3183

1  side effects that are known for nonsteroidal
2  anti-inflammatory drugs. At the time nonsteroidal
3  anti-inflammatory drugs were widely used to treat pain
4  and inflammation, and it was understood that those
5  medications have a common set of side effects, and so
6  what we mean by side effects is these are things that
7  the drug does that the drug is not intended to.
8      The drug is intended to treat pain and
9  inflammation, but all of the nonsteroidal
10 anti-inflammatory drugs have a common set of side
11 effects that are detrimental to patients. The most
12 important of those is the damage that it does to the
13 stomach. So nonsteroidal anti-inflammatory drugs by
14 their mechanism of action damage the protective lining
15 of your stomach and so your stomach is filled with
16 acid, and, in fact, if you take stomach juice and put
17 it in a cup and put your finger in it you will get an
18 acid burn, it is an acid in your stomach. The stomach
19 protects itself from that acid with a protective
20 lining. Nonsteroidal anti-inflammatory drugs damage
21 that protective lining, so now patients get literally a
22 burn to their stomach.
23     As that burn progresses it can actually erode
24 into a blood vessel and you can get bleeding into your
25 stomach, and if that burn progresses even further it

Page 3184

1  can actually put a hole completely through the stomach
2  wall, and, so, now the acid pours out into your
3  abdominal contents, and it was understood that that
4  side effect was common to all the NSAIDs, and it was
5  estimated that somewhere between two and 4 percent of
6  patients who take these medications on a chronic basis
7  would suffer one of these events. And it was estimated
8  that probably in the United States alone on the order
9  of 20,000 people a year -- between 10 and 20,000 people
10 a year die from this complication of NSAIDs.
11        Based upon the biology, which we'll talk more
12 about later, we were excited that VIOXX would not do
13 this, so that side effect of the NSAIDs would not be
14 something that VIOXX did.
15        The second side effect of NSAIDs that we were
16 excited about that VIOXX would not have is that NSAIDs
17 affect your platelets, so it was understood that all
18 NSAIDs effect platelet function and increases your risk
19 of bleeding. Now, there are certain clinical
20 situations where that risk is particularly harmful for
21 patients, so you can imagine patients who are already
22 at risk of bleeding if you now give them a nonsteroidal
23 anti-inflammatory drug which raises their risk even
24 higher that would be particularly bad for those
25 patients. So those kinds of patients are patients who

Page 3185

1  were on blood thinners, patients who have hemophilia,
2  cancer patients who their cancer therapy lowers their
3  platelet count, so you already have very few platelets
4  and they're at risk for bleeding, if you now give them
5  a nonsteroidal anti-inflammatory drug and turn off the
6  platelets it further raises their risk.
7        And in the surgical setting you generally
8  don't want patients to be on NSAIDs because it
9  increases their risk of bleeding in the operating room,
10 increases their risk of bleeding after the operation.
11 So this side effect of NSAIDs of inhibiting your
12 platelets was something we were very excited that VIOXX
13 would not do. So it would not harm your stomach the
14 way NSAIDs did, and it wouldn't cause you to have an
15 increased tendency to bleed the way NSAIDs caused. So
16 those were two of the things we were very excited about
17 that VIOXX would be a great medicine, there would be
18 clearly clinical situations where patients would be
19 much better off with a medication that doesn't damage
20 the stomach and doesn't inhibit your platelets.
21    Q. Dr. Morrison, did Merck do any studies with
22 VIOXX to see whether it had any effect on platelets or
23 had any effect on bleeding time?
24    A. Yes. Actually, the second study that it is called
25 Protocol 2. It is the second human study that Merck

Page 3186

1  ever did and so just a little bit about when we do drug
2  development it is -- one of the hardest things is to
3  figure out exactly what the dose is that you should
4  give to people. So early in the program you will often
5  see that the company studies a very wide range of
6  doses.
7        So in the early studies the doses of VIOXX
8  that were given to normal volunteers went up as high as
9  a thousand milligrams, so 40 times the dose that we now
10 know is the effective dose for patients, but at the
11 time we didn't know. So normal volunteers got up to a
12 thousand milligrams, and in the second study there were
13 studies done to look at the effect of VIOXX on
14 platelets and platelet function. And it was showing
15 that up to a thousand milligrams VIOXX had no effect on
16 platelets, it didn't turn off your platelets, and,
17 again, as I said, that was one of the key things we
18 were hoping that VIOXX would not do, so you would have
19 a medicine that you would be able to give to patients
20 who were at risk for bleeding.
21        The second test that's done in -- to look at
22 platelet function and the ability of the body to clot
23 is what's called a bleeding time. And the way the
24 bleeding time is done is there's a blood pressure cuff
25 put on so you have a constant amount of pressure in the

Page 3187

1  forearm, and the nurse makes a small cut in your arm
2  and they start a stopwatch and see how long it takes
3  you to stop bleeding. It was -- again, we were very
4  hopeful that VIOXX would not affect your bleeding time.
5    Q. Let me ask you this, if VIOXX were
6  prothrombotic, if it led to clotting what would you
7  expect to see in a bleeding study, bleeding time study
8  like that?
9        MR. SEEGER: Objection, Your Honor, beyond
10 this witness' expertise, that question.
11       MR. RABER: It is not a question of
12 expertise. It is a question of protocols that Merck
13 did, Your Honor, and Mr. Morrison was on that protocol.
14       MR. SEEGER: Was he involved in the study?
15 Does he have an expertise in that area? There is a
16 foundational basis that should be established before we
17 use him as a summary witness.
18       MR. RABER: He is just describing results,
19 Your Honor.
20       MR. SEEGER: That he wasn't involved with.
21 He doesn't do these type of studies.
22 BY MR. RABER:
23    Q. Do you have personal knowledge of the
24 protocols that were done at Merck such as the bleeding
25 time study?

Page 3188

1  A.  I have personal knowledge in that I have reviewed
2  all of that data as I gave scientific talks about VIOXX
3  both before the drug was launched and after the drug
4  was launched, so I was very familiar with all the
5  pharmacology experiments Merck had done, and I used
6  that in my scientific presentations.
7       MR. SEEGER:  It still doesn't resolve the
8  objection as to his expertise, and he has to rely on
9  others at Merck.
10      MR. RABER:  I am not asking for an expert
11 opinion, Your Honor.
12      MR. SEEGER:  Well, I think when you're
13 talking about bleeding times you are.
14      THE COURT:  Well, the witness is not being
15 called as an expert witness.  He is being called as a
16 fact witness to testify as to facts of what Merck was
17 considering discussing, what did it know, what it did
18 and didn't do.  He hasn't been presented by the defense
19 to be an expert who they were going to use as an expert
20 witness to testify.  I think you can rephrase your
21 question.  The question as posed is objectionable.
22 BY MR. RABER:
23  Q.  Let me ask you this, what did the protocol
24 show about whether VIOXX clotted?
25  A.  Well, the results of the study show that VIOXX did

Page 3189

1  not decrease your bleeding time, which would be
2  evidence of clotting, nor did it increase your bleeding
3  time, which would be evidence of it affecting your
4  ability to clot, so it was neutral with regards to
5  bleeding time.
6   Q.  I want to talk, if we can, specifically about
7  your e-mail to Alise Reicin in February of 1997.  It is
8  Plaintiff's Exhibit 4.  Okay.  It looks like,
9  Dr. Morrison, on February 25th, 997 you sent an e-mail
10 to Tom Simon, Brian Daniels, Elliot Ehrich and Alise
11 Reicin.  Do you see that?
12  A.  I do.
13  Q.  And at the beginning of your e-mail you say,
14 quick comments, read it late last night.  See that?
15  A.  I do.
16  Q.  What had you read, what did that refer to?
17  A.  What I had read was a document prepared by Alise,
18 which was an early version of protocol that we referred
19 to as the GI outcomes protocol.
20  Q.  Where was Merck in the development process
21 for VIOXX when you wrote this e-mail?
22  A.  In February of '97 we were probably in Phase II.
23  Q.  Okay.  What does that mean?
24  A.  Um, the different phases of drug development Phase
25 I is where we start with the kind of experiments I

Page 3190

1  described earlier, normal volunteers looking at how the
2  body handles the medicine.  Phase II for VIOXX was to
3  really test what was the sort of underlying hypothesis
4  here.  So I already told you we had tested to see if it
5  affected platelets and it didn't.  The second key
6  feature of the product was that it would not damage
7  your stomach.  So one of the Phase II studies was to
8  look at normal volunteers who got either placebo or
9  VIOXX or aspirin or Ibuprofen, and it is called an
10 endoscopy study where the gastroenterologist puts a
11 tube down and looks at the stomach to see if the drug
12 is damaging the stomach in any way if you're seeing any
13 of these ulcerations.
14      So that was a Phase II study that was done
15 with VIOXX to as a first step look and see if the
16 question of whether the drug would damage your stomach
17 less than traditional nonsteroidals, and the results of
18 that study -- again, remember I told you early in the
19 program it is hard to know what the right dose is, so
20 that study was done with 250 milligrams of VIOXX, and
21 patients were treated for about two weeks in a blind
22 way so nobody knows what the patient is on, and in that
23 study when the endoscopist looks at the stomach after
24 we unblinded it it turned out that at 250 milligrams
25 VIOXX was not damaging the stomach; it looked

Page 3191

1  indistinguishable from placebo.  So from our point of
2  view that was evidence to us that, perhaps, this
3  hypothesis was correct and that we would be able
4  to -- that the drug would not damage your stomach.
5       So that was one part of the Phase II program.
6   Q.  So what did this e-mail refer to then?
7   A.  This e-mail is referring to a different kind of
8  trial.  This e-mail is referring to a trial -- when we
9  call it an outcomes trial what it is meant to do is try
10 to mimic sort of the real world practice, so this isn't
11 where we have patients come in at scheduled times and
12 have the doctor do an endoscope, put an endoscope in
13 their stomach, it is patients get randomized to one of
14 two treatments, nobody knows what the patient is on,
15 and you're trying to mimic this general practice of
16 medicine.
17      If the patient develops symptoms enough that
18 the doctor would want to send them to the
19 gastroenterologist they do.  The patients come to the
20 emergency room with a GI bleed, we record that.  But it
21 is meant to be more of an, if you will, a real world
22 study.  There aren't a lot of things mandated the
23 doctor has to do.  The doctor practices medicine that
24 they normally would, so this was a protocol Alise was
25 writing so how we were thinking how do we do an

Page 3192

1  outcomes trial.
2     Q. Now, in Paragraph 5 of your e-mail you say,
3  would allow low dose aspirin. I know this has been
4  discussed to death, but real world is everyone is on it
5  so why exclude, and without COX-1 inhibition you will
6  get more thrombotic events and kill drug.
7     Do you see that?
8  A. Yes, I did.
9     Q. Why were you talking about whether or not to
10 allow aspirin in this study?
11 A. As I said, this is an outcomes trial, so what
12 you're trying to do is to, as best you can, reproduce
13 the general practice of medicine, and so in this
14 particular line you can see I have exaggerated a bit to
15 make my point. I had a point of view that I would
16 think aspirin should be in the study, and I made that
17 point of view known before this e-mail and in this
18 e-mail. The main reason I thought aspirin should be in
19 the study is not that, obviously, everybody is on it
20 because I don't think everybody in this courtroom is on
21 aspirin. I was exaggerating for effect, but it is true
22 that many patients are on low dose aspirin, and it
23 seemed to me that one of the clinical questions that
24 practicing doctors would want to know is if the -- I
25 have a patient who is on low dose aspirin and they now

Page 3193

1  develop pain or arthritis which would be the preferred
2  medicine for me to treat them with VIOXX versus an
3  NSAID.
4     So I thought particularly in an outcomes
5  trial where we're trying to sort of reproduce the
6  general practice of medicine I thought it was important
7  to have some patients in the study who were on aspirin
8  so we could answer that question for doctors.
9     Q. But I take it there were some problems that
10 had been discussed in allowing aspirin in a study like
11 this?
12 A. Yes.
13    Q. Can you just briefly tell us what that issue
14 was?
15 A. Well, briefly, as I indicated at the beginning all
16 NSAIDs damage the stomach, so even low doses of aspirin
17 will increase the risk of patients having
18 gastrointestinal bleeds. And so if you're doing an
19 experiment to try to understand does the drug not
20 damage the stomach if you have the what we call a
21 confounder, something else in the study that also
22 damages the stomach, it makes it harder for you to come
23 to a conclusion. So others were arguing we should not
24 have aspirin in the study.
25    Q. Now, you say in Paragraph 5, without COX-1

Page 3194

1  inhibition you will get more thrombotic events and kill
2  drug.
3     What were you referring to there?
4  A. Um, so, again, just as in the first half of the
5  sentence I'm being a little bit -- exaggerating a bit,
6  but the point I'm trying to make is that, as I said,
7  all NSAIDs inhibit your platelets. So our state of
8  knowledge at this point was that -- and you can see
9  we're talking about using Ibuprofen and diclofenac in
10 this particular study. If you go back to line one it
11 says, diclofenac maximum dose Ibuprofen intermediate
12 dose, so the comparators we were talking about were
13 Ibuprofen and diclofenac, but our general state of
14 knowledge was all NSAIDs do this. So if you have a
15 group of patients who are getting an NSAID they have
16 their platelets turned off. They get cardiovascular
17 protection. You have another group of patients who are
18 getting VIOXX, that is completely neutral on their
19 platelets, it doesn't affect them in any way, but you
20 can see readily that the different -- you're going to
21 have different numbers of cardiovascular events in
22 those two groups you're going to have a decrease in the
23 people getting the NSAID.
24    My concern was, as I said, at the beginning,
25 if you look at that result people will misinterpret it

Page 3195

1  and they'll say, oh, VIOXX must have caused these even
2  though there's no pharmacological reason why VIOXX
3  would cause these, but instead the real reason was
4  because the NSAID protected you and I thought if we get
5  that kind of result people will misinterpret it, and
6  what I thought was a great drug might end up never
7  making it to market.
8     Q. Dr. Morrison, what led you to believe when
9  you wrote this e-mail that VIOXX would be neutral when
10 it comes to heart attacks and strokes?
11 A. So, a number of things led me to believe it.
12 Obviously, I was aware of, although I'm not supposed to
13 talk about the textbook, I was aware of the general
14 science at the time of the pharmacology of these
15 molecules and did a bit of reading to make sure I did
16 understand as I was in the program. A colleague of
17 mine, Tom Musliner, had written a very nice summary --
18    MR. SEEGER: Objection, Your Honor, as to the
19 hearsay of what somebody else told him or wrote.
20    THE WITNESS: The memo was sent to me.
21    MR. SEEGER: The judge has to rule.
22    MR. RABER: I'll lay a foundation, Your
23 Honor.
24    MR. SEEGER: He is not addressed in the
25 e-mail, it does not say to Briggs Morrison.

Page 3196

1  BY MR. RABER:
2      Q.  Dr. Morrison, I would like to show you a
3  document we'll market as Defendant's Exhibit 35.
4  Without telling us anything that's in there can you
5  tell us what this memorandum is, the date and so on?
6      A.  This is a memorandum from November 21st of 1996.
7  The subject of the memorandum is anticipated
8  consequences of NSAID antiplatelet effects on
9  cardiovascular events and effects of excluding low dose
10 aspirin use in the COX-2 GI outcomes megatrial. It is
11 Tom Musliner.
12     Q.  Now, I'm looking at the list of people who
13 received this memo, and it says cc.. Do you see
14 somebody there that says B. Morrison?
15     A.  I do.
16     Q.  Is that you?
17     A.  Yes, it is.
18     Q.  Did you receive this memo?
19     A.  Yes, I did.
20     Q.  Is this the memo that you said led you to
21 believe that VIOXX was neutral?
22     A.  Yes.
23         MR. SEEGER: Your Honor --
24         MR. RABER: Is Defendant's Exhibit --
25         THE COURT: Let him finish with his

Page 3197

1  foundation.
2  BY MR. RABER:
3      Q.  Was Defendant's Exhibit 35 prepared in the
4  ordinary course of business at Merck?
5      A.  Yes.
6      Q.  Was it prepared by someone whose job it was
7  to prepare such business records?
8      A.  Yes.
9          MR. RABER: Your Honor, we would offer
10 Defendant's Exhibit 35.
11         MR. SEEGER: Your Honor --
12         THE COURT: Do you want to go to side-bar?
13         (The following side-bar discussion was had:)
14         MR. SEEGER: Sure. Well, it is --
15         MR. RABER: It comes in two ways. It comes
16 in as explaining his state of mind and his conduct in
17 writing the e-mail, and it also comes in as a business
18 record, and he received it, and there's no question
19 about it.
20         MR. SEEGER: All right. I guess the question
21 is then where does the testimony go because it is about
22 aspirin. Turn page after page there's nothing about
23 NSAIDs. Let me finish my argument. Judge, I have
24 looked at this list. Can I show you one thing on it?
25 The one cite in here that deals with I believe it is

Page 3198

1  16. Let me just, if I might, there's one -- oh, here
2  it is. There's one study involving --
3          THE COURT: Counselor?
4          MR. SEEGER: I thought you were here. Sorry.
5  There's one study cited involving one NSAID, and it is
6  not Naproxen, diclofenac or anything they used in any
7  clinical trial. So the problem is it is the
8  reliability of the document. The aspirin studies are
9  as well established, and I don't have any problem with
10 testimony on aspirin, but to the extent a summary
11 conclusion has been drawn about all NSAIDs because one
12 was studied in 1992 I have a problem with that, and he
13 can use experts.
14         MR. RABER: Your Honor, they can
15 cross-examine on that. It is a business record, and it
16 goes to his state of mind and explains his subsequent
17 conduct. He says it's what led him to write the
18 e-mail, and he believed it was neutral, and it is a
19 business record, no question.
20         THE COURT: Well, just the fact that it is
21 prepared in the course of business doesn't mean that it
22 doesn't include hearsay.
23         MR. SEEGER: It is offered --
24         THE COURT: The whole thing is hearsay,
25 however, I do believe it is an exception to the hearsay

Page 3199

1  rule in the sense that it goes to not for the truth of
2  what it says, but to what he was thinking at the time,
3  and I'll allow it for that purpose with that
4  instruction to the jury.
5          MR. RABER: That's fine, thank you, Your
6  Honor.
7          (End of side-bar.)
8          THE COURT: The document will be admitted
9  into evidence. It is not being admitted for the truth
10 of what it says but being admitted for what this
11 witness had in his mind and what other people at Merck
12 had in their mind at the time. All right?
13         (Defendant's Exhibit No. 35 was admitted into
14 evidence.)
15 BY MR. RABER:
16     Q.  Can we call up Defendant's Exhibit 35,
17 please. If we can do this box here. Okay.
18 So we see this memo dated November 21st, 1996
19 and there is your name, right?
20     A.  Yes.
21     Q.  Okay. Now, the subject here what was this
22 memo talking about?
23     A.  Well, as you can read from the subject line what
24 Tom was summarizing the literature and communicating to
25 his colleagues what in theory might happen in a GI

Page 3200

1  outcomes trial based upon the antiplatelet effects of
2  NSAIDs, and how that has impacted on whether we do or
3  do not use low dose aspirin in the study, same topic we
4  were talking about in the e-mail.
5      Q.  I would like to turn, if we could, to Page 4.
6  And the number three heading it says, Incidence rates
7  of CV events and estimates of treatment group
8  differences likely to be observed in a megatrial of a
9  COX-2 inhibitor versus NSAID comparators.
10         Do you see that?
11 A.  Yes.
12     Q.  First of all, the COX-2 inhibitor that's
13 referred to there, is that VIOXX?
14 A.  Yes, it is.
15     Q.  And the NSAID comparator is what?
16 A.  Well, the -- at the time, as I said, in 1997 we
17 were considering using Ibuprofen and diclofenac.  It
18 actually could be any NSAID comparator.
19     Q.  Okay.  And what is it that Dr. Musliner is
20 telling you and the others on the team in this language
21 that's shown up on the screen in general terms?
22 A.  In general terms he's looked at the sort of
23 general incidence rates of these kind of events in
24 different populations, and he is laying out his
25 predictions of what he thought you would observe in a

Page 3201

1  trial if you had some patients on VIOXX and some
2  patients on the NSAIDs.
3      Q.  Let's look at what Dr. Musliner says.  He
4  says, figures are provided for different assumed CV
5  event rates.  Assumptions underlying these numbers
6  include the following: A, patients treated with
7  standard NSAIDs will experience antiplatelet effects
8  and resultant CV protection similar to that produced by
9  aspirin.  There are good theoretical arguments as well
10 as limited clinical data to support this assumption.
11         Do you see that?
12 A.  I do.
13     Q.  And what does that mean?
14 A.  The assumption he was putting into his table is
15 that as I indicated at the beginning the general
16 medical understanding was that all NSAIDs inhibit
17 platelets, and so he was assuming that any NSAID you
18 would get the same antiplatelet effect and the same
19 protection from cardiovascular events that had been
20 shown with aspirin.
21     Q.  So paragraph B says, the degree of reduction
22 in fatal and nonfatal CV events in the NSAID group will
23 be comparable to that observed with aspirin treatment;
24 i.e., 25 percent, see above.
25         Do you see that?

Page 3202

1  A.  Yes.
2      Q.  Is that what you were just referring to?
3  A.  Yes, and the "see above" is he also summarized the
4  studies that had been done with aspirin to show its
5  cardioprotective effects.
6      Q.  Now let's look at paragraph C.  Does
7  paragraph C talk about VIOXX?
8  A.  Yes.
9      Q.  It says, patients treated with the selective
10 COX-2 inhibitor will experience neither a reduction nor
11 an increase in CV events associated with this therapy.
12         Do you see that?
13 A.  I do.
14     Q.  What did that mean to you?
15 A.  Well, I think it's -- what it meant to me is,
16 again, as I said, we had done studies to look at the
17 effect of VIOXX on platelets.  We knew it did not
18 affect platelets, and so our assumption was that it
19 would neither increase the risk nor decrease the risk,
20 it would be essentially neutral.
21     Q.  And is that what you believed when you wrote
22 your e-mail three months later to Alise Reicin talking
23 about a difference in CV events?
24 A.  Yes.
25     Q.  The fact that one would reduce the rate and

Page 3203

1  VIOXX would be neutral?
2  A.  Correct.
3      Q.  Excuse me.  I want to get that chart, if I
4  may.
5          THE COURT:  Go ahead.
6  BY MR. RABER:
7      Q.  Dr. Morrison, when Dr. Lucchesi was here and
8  when I was asking him some questions on a document
9  that's been marked as D-1003 it has a heading, aspirin
10 study, do you remember when we did that?
11 A.  Yes, I do.
12     Q.  Okay.  And we were comparing a study where
13 you would compare placebo, which is a sugar pill,
14 versus low dose aspirin, correct?
15 A.  Right.
16     Q.  How does this chart that Dr. Lucchesi and I
17 did relate to everything you just told us about what
18 you believed about VIOXX?
19 A.  Well, what I believed about VIOXX is you could
20 simply replace placebo with VIOXX, and you could
21 replace low dose aspirin with any NSAID.
22     Q.  And were you here when Dr. Lucchesi said that
23 it would be a misinterpretation to say that placebo was
24 increasing the risk or causing heart attacks and
25 strokes?

Page 3204

1  Do you remember that?
2      MR. SEEGER: Your Honor, I'm just going to
3  object to the constant mischaracterization of the
4  record of what Dr. Lucchesi testified to. The jury has
5  heard it. They're the ones that I think should make
6  that decision. You can pull one sentence out of two
7  days' of testimony, but there's a context to it, so I
8  object to the characterization.
9      THE COURT: Counsel, what are you
10 specifically referring to? Let me see.
11     (The following side-bar discussion was had:)
12     MR. RABER: Page 1010 and 1011.
13     MR. SEEGER: But there was a half-hour on
14 this chart, and if you remember Dr. Lucchesi resisted
15 the way he did it and didn't agree with it, and,
16 finally, Mr. Raber wrote the chart the way he wanted to
17 and asked him that question so it is the
18 mischaracterization.
19     MR. RABER: It is not a mischaracterization.
20     THE COURT: I'll allow you to use it.
21     (End of side-bar.)
22 BY MR. RABER:
23  Q. More specifically, Dr. Morrison, in looking
24 at that chart I asked Dr. Lucchesi, but the bottom line
25 is it would be a misinterpretation for someone to

Page 3205

1  conclude from this study and say, you know what, this
2  placebo that has no medicine in it actually causes an
3  increase in thrombotic events, true? Answer, that's
4  true. See that?
5  A. Yes, I do.
6  Q. How does that statement by Dr. Lucchesi about
7  this study relate to what you were writing to
8  Dr. Reicin on?
9  A. As I said, if you look at the two columns here my
10 assumption was you could replace VIOXX with placebo,
11 you could replace any NSAID with low dose aspirin, and
12 just as it would be inappropriate to conclude placebo
13 caused things my -- based upon the science we knew it
14 would be inappropriate to say that VIOXX caused things.
15  Q. I want to compare what's on this chart
16 actually to the e-mail you wrote to Dr. Reicin.
17 Looking at Paragraph 5 it says, without COX-1
18 inhibition you will get more thrombotic events and kill
19 drugs. Do you see that?
20 A. I do.
21  Q. What does it say on the chart under placebo
22 here?
23 A. No COX-1 inhibition.
24  Q. What does it say on the chart at the bottom
25 for placebo?

Page 3206

1  A. More potential for thrombotic events.
2  Q. Dr. Morrison, I probably didn't do the most
3  polite thing, I really didn't even ask you to introduce
4  yourself to the jury before we started.
5      Can you tell us a little bit about I want to
6  talk, if we can, a little bit about your personal and
7  professional background. You're a medical doctor, I
8  take it?
9  A. Yes, I am.
10  Q. And you're a medical doctor at Merck?
11 A. Yes, I am.
12  Q. What is your title at Merck?
13 A. Right now I'm a vice-president.
14  Q. How old are you, Dr. Morrison?
15 A. 46.
16  Q. Where do you live?
17 A. I live in Summit, New Jersey.
18  Q. Dr. Morrison, were either of your parents
19 doctors growing up when you were growing up?
20 A. No. My mother was a nurse; my dad was an
21 elementary school teacher, taught math and science.
22  Q. What kind of jobs did you do growing up?
23 A. I had a lot of different odd jobs. I had a
24 newspaper route. I did construction work. I worked in
25 an industrial laundromat where we washed linens for

Page 3207

1  restaurants. I worked as a busboy in restaurants, you
2  know, various odd jobs.
3  Q. You went off to college?
4  A. I did.
5  Q. Where did you go to college?
6  A. Georgetown University in Washington, D.C.
7  Q. When did you graduate from Georgetown?
8  A. 1981.
9  Q. Then you went to medical school?
10 A. Yes, I did.
11  Q. Where did you go to medical school?
12 A. University of Connecticut.
13  Q. Let me just take a moment to get the chart
14 out of the way. It is a little distracting.
15     I'm sorry, and when did you get out of
16 medical school?
17 A. 1985.
18  Q. When you finished medical school -- let me
19 ask you this, while you were in medical school did you
20 do any work while you were in medical school?
21 A. The two summers after the first two years of
22 medical school you get the summers off like you do in
23 college, and those summers I spent at the National
24 Cancer Institute doing basic research on cancer.
25  Q. When you mentioned basic research how does