Page 3260

1   is making prostacyclin. This blood vessel is making
2   prostacyclin. So now what they have is a little
3   section of a blood vessel sitting in a test tube making
4   prostacyclin. And what they can do is experiments to
5   say let's add to the test tube chemicals, drugs, and
6   see what effect it has on the effect of prostacyclin,
7   and this way you can now get at what is the blood
8   vessel the source of the prostacyclin that's affected
9   by VIOXX. Very directly.
10       Q. Stupid question, but why can't you do a study
11   like that in humans?
12       A. Well, I'm not sure we want to randomize humans to
13   high cholesterol versus a normal diet. People make
14   choices about what diet they're going to be on, and
15   taking out a piece of a person's blood vessel I will
16   say some people have begun to do this experiment at the
17   time of bypass surgery they will take out a small piece
18   of blood vessel and are seeing the same results.
19       Q. Okay. All right. So what was the finding --
20   what chemicals or drugs were added to these tests tubes
21   with the blood vessels making prostacyclin?
22       A. Well, the first one that is added, which is
23   probably the one everybody wants us to add to the test
24   tube is VIOXX, right? If you add VIOXX to this test
25   tube what happens to your production of prostacyclin?

Page 3261

1   Pretty relevant question. You're not going to be
2   surprised that it doesn't do anything to the production
3   of prostacyclin because there's not even any COX-2 in
4   the test tube. Normal blood vessels don't have COX-2.
5   So VIOXX can't affect the production of prostacyclin,
6   and it doesn't in this experiment.
7       Q. Are those results summarized anywhere in
8   Defense Exhibit 316?
9       A. There's a figure, figure six.
10             MR. RABER: Any objection to putting this on
11   the Elmo?
12            MR. SEEGER: I'm sorry, which document are
13   you talking about?
14            MR. RABER: Exhibit 316.
15            MR. SEEGER: Well, Your Honor, I have the
16   same objection to the extent it is with this witness,
17   but, you know, I'm not sure that gets resolved by
18   putting it up on the Elmo. This study he is at least
19   involved with. This one he isn't. He can talk about
20   it.
21            MR. RABER: It is showing --
22            THE COURT: Is this a VIOXX study?
23            MR. RABER: Yes.
24            THE COURT: I'll allow it. By Merck.
25            THE WITNESS: Yes. Okay. Actually, I have

Page 3262

1   my own pointer, I think. Okay. So what you see here
2   is does this pointer work? The height of the bar is
3   the amount of prostacyclin. So you have here a
4   control, which is just this blood vessel sitting in the
5   test tube making prostacyclin.
6             And then what you do is you add rofecoxib,
7   that's VIOXX. And you add it in two different
8   concentrations. This first -- two different amounts.
9   So the amount here is the amount that you would see in
10   the blood of a person who has taken 25 milligrams of
11   VIOXX. That's the amount that's added. And here
12   they're adding 10 times that. So that would be a level
13   that you would see in the blood of somebody taking 250
14   milligrams. And what you're looking at is the height
15   of the bars. So here is how much prostacyclin the
16   blood vessel is making and here is how much
17   prostacyclin is made when you add VIOXX.
18            Now, the bars tend to go up a little bit. It
19   actually is not statistically changed, so, if anything,
20   you're making more prostacyclin but from a statistical
21   point of view there's no effect, and, again, that
22   doesn't surprise you because there was no COX-2 in the
23   normal blood vessel. And so the fact that it doesn't
24   affect prostacyclin production is exactly what you
25   would expect.

Page 3263

1       Q. Okay.
2       A. There's other experiment I just want to show
3   because the scientists at Merck are very careful
4   scientists. DFP is another compound that is -- has
5   very much like VIOXX and its effect on COX-1 and COX-2,
6   but it is a completely different chemical, so, again,
7   you get at this question is there a chemical, and it
8   does the same thing, it doesn't affect prostacyclin at
9   all.
10            The next drug that's added is celecoxib.
11   Now, celecoxib is said to be a COX-2 specific
12   inhibitor, but at high concentrations it actually
13   inhibits COX-1, as well. So here you can see celecoxib
14   at high concentration at the 10, which is higher than
15   what you would see in patients who take celecoxib. Now
16   you see the prostacyclin going down. So here is no
17   drug added, here is the prostacyclin going down.
18            And then the final control is indomethacin,
19   which is the drug I told you about we used in the study
20   with Garret, that's a typical NSAID, that clearly
21   decreases prostacyclin in blood vessels, but since the
22   COX-2 inhibitors don't do it that's because that
23   inhibits COX-1. We know COX-1 is in the blood vessel,
24   so it is something that inhibits COX-1, turns off
25   prostacyclin.

Page 3264

1    Q. At the same time, though, indomethacin is
2    also reducing thromboxane, as well; is that right?
3    A. That's correct.
4    Q. So what does this data then show about the
5    effect on VIOXX on a normal blood vessel near the
6    heart?
7    A. Any normal blood vessel is going to be completely
8    unaffected by VIOXX. It doesn't have COX-2 in the
9    blood vessel, and when you add VIOXX to it it doesn't
10   affect its production of prostacyclin, so normal blood
11   vessels are unaffected by VIOXX based on this
12   experiment.
13   Q. Dr. Morrison, you mentioned, also, that you
14   had a group of rabbits that got this high cholesterol
15   diet. Was the same process or procedure followed to
16   analyze those blood vessels?
17   A. Exactly, yes.
18   Q. And what were the findings there?
19   A. Well, that's Figure 7 in the paper. So if it is
20   the same exact experiment in this case when they looked
21   at the blood vessel there is COX-2 present, but they do
22   the same experiment, they will start off adding here is
23   the blood vessel, the amount of prostacyclin made by
24   the blood vessel that there's no drug added. Now they
25   add VIOXX. Again, at a level you would see in a

Page 3265

1    patient that gets 25 milligrams and at a level you
2    would see in a patient who got 250 milligrams. Again,
3    in anything the trend is for there to be more
4    prostacyclin, but from a statistical point of view
5    there was no effect. Same thing happens.
6    Q. Just so I can jump in here, this dark bar
7    here, is that the levels of prostacyclin when you add
8    nothing to the test tube?
9    A. Correct. So when you add nothing you get this
10   amount. When you add VIOXX at either a 25-milligram
11   equivalent or a 250-milligram equivalent, if anything,
12   you get a little more prostacyclin, but the conclusion
13   was statistically there's no difference.
14       Again, DFP, which is chemically unrelated but
15   is a specific COX-2 inhibitor does the same thing that
16   VIOXX does. Celecoxib at high levels, because it is
17   inhibiting the COX-1, decreases prostacyclin. And
18   indomethacin, because it is inhibiting the COX-1,
19   decreases prostacyclin.
20       So the conclusion here is that even in a
21   blood vessel that has plaque that has atherosclerosis
22   and has COX-2 prostacyclin is unaffected by VIOXX.
23   Q. So how does that then relate to
24   Dr. Lucchesi's opinion about this imbalance that he
25   told us about?

Page 3266

1    A. Well, these experiments would say that at least in
2    blood vessels both normal and atherosclerotic blood
3    vessels there's no effect on prostacyclin. In fact,
4    one would conclude from this that VIOXX essentially is
5    neutral on blood vessels.
6    Q. So if a plaque were to rupture in a blood
7    vessel what effect would VIOXX have on that plaque?
8    A. It should have no effect on the prostacyclin
9    production at all. It should have no effect on the
10   ability of that blood vessel to form a clot.
11   Q. And why is there prostacyclin still in the
12   blood vessel?
13   A. Because it is coming from COX-1.
14   Q. And is COX-1 affected in any way by VIOXX?
15   A. No.
16       THE COURT: Is this a good time to break,
17   counselor, or do you want to go a couple minutes
18   longer?
19       MR. RABER: It is up to everybody.
20       THE COURT: It is up to you. We're going to
21   break for lunch soon. You can either take another five
22   minutes --
23       MR. RABER: If I can take another five
24   minutes I might be able to get to a good ending point.
25   Is that okay with everybody?

Page 3267

1       THE COURT: Go ahead.
2    BY MR. RABER:
3    Q. Now, this rabbit study you have just told us
4    about I see a publication date there of 2001. Do you
5    see that?
6    A. Oh, yes.
7    Q. Okay. When did the scientists at Merck
8    actually have this data, these results?
9    A. Early in 1999.
10   Q. Before or after VIOXX came on the market?
11   A. Before.
12   Q. So after we do this rabbit study what's the
13   unanswered question or where are we left?
14   A. Well, the good news about the rabbit study is,
15   remember, I said the results from the study with Garret
16   were unexpected because we didn't think prostacyclins
17   in the blood vessels were coming from COX-2. So that
18   was reassuring. The problem we're left with is where
19   is this prostacyclin coming from because clearly in the
20   study we saw a decrease in the production of
21   prostacyclin. So let me just show you the other places
22   the body makes prostacyclin. What did I do with my
23   marker? Oh, there it is.
24       So prostacyclin what we're looking for we're
25   trying to figure out where in the body does COX-2 make

Page 3268

1  prostacyclin. So we want COX-2 prostacyclin. And the
2  choices are the places that prostacyclin are made. So
3  prostacyclin is made in the lung. Prostacyclin is made
4  in the stomach. It is actually part of that protective
5  layer I told you about in the stomach. It is made in
6  the uterus, which is the big muscular structure where
7  the baby grows. It is made in blood vessels. It is
8  made in the brain.
9      Okay. So we're trying to figure out where is
10 there COX-2 prostacyclin. Well, we can rule out the
11 uterus for the simple reason that in a study we did
12 with Garret there were both men and women. And the
13 prostacyclin goes down in the urine in both men and
14 women. So it is not going to go down in men if it is
15 coming from the uterus. We just ruled out blood
16 vessels as the source based on the experiments that I
17 just went through with the rabbit. And so now we're
18 left trying to figure out, well, which of the remaining
19 ones is the likely source.
20    Q. And did Merck do a study to try to answer
21 that question?
22    A. Yes, they did.
23    Q. I want to show you a document that is Defense
24 Exhibit 415.
25    A. Yes. This is a summary of experiments they were

Page 3269

1  doing trying to figure out where in the body
2  COX-2-derived prostacyclin comes from.
3      Q. Okay. And what -- how did this -- let me see
4  if we can in a few minutes go through this particular
5  study. What did Merck do in this study and what did
6  Merck find?
7      A. Okay. So to explain this study remember we said
8  there's two parts to making prostacyclin. You make COX
9  makes this first thing, and then it's got to get
10 converted into prostacyclin. So there's two different
11 kinds of machinery. There's the COX machinery that
12 works, and then there's what just simple terms the
13 machinery makes prostacyclin.
14     Now, if you think about this the analogy I
15 use is a relay race, okay? In a relay race this person
16 does their job and then passes the baton on to this
17 person to do their job, and in order to do that I have
18 to be standing next to you to give you the baton.
19 Okay. If I have the baton and I'm trying to pass it to
20 somebody back in the room I can't pass the baton. So
21 in order to do this the COX machinery has to be sitting
22 physically next to the machinery that makes
23 prostacyclin.
24     So what the Merck scientists wanted to know
25 is where are these different machineries and are they

Page 3270

1  sitting next to each other. So they look in both blood
2  vessels and the lung. And they can do a very simple
3  experiment that just asks is COX-1 or 2 sitting next to
4  is it physically next to the thing that makes
5  prostacyclin.
6      Make a long story short they find that in
7  blood vessels remember I showed you in the rabbit there
8  is COX-2, it is not anywhere near the thing that makes
9  prostacyclin. They're there, but they're physically
10 separated from each other. In COX-1, however, does sit
11 next to it, which makes perfect sense since COX-1 is
12 making prostacyclin. However, if they look in the lung
13 the airways of your lungs the lining of your airways
14 then you see COX-2 sitting right next to the thing that
15 makes prostacyclin. And we know that prostacyclin is
16 made in the lungs. Prostacyclin is actually a
17 bronchodilator. It opens up your lungs. And so if you
18 just ask where in the body you see these two things
19 together you don't see them together in blood vessels,
20 you do see them together in the lung. So at least one
21 of the potentials -- one of the sources is the lung as
22 where the COX-2 prostacyclin comes from.
23     Q. Did Exhibit 415, which summarizes this study
24 was it prepared in the ordinary course of business at
25 Merck?

Page 3271

1  A. Yes it was.
2     Q. By someone whose job it was to prepared such
3  a document?
4  A. Yes.
5     MR. RABER: Your Honor we would move the
6  admission of Exhibit 415 into evidence.
7     MR. SEEGER: Your Honor, I have to object to
8  this. It is from 2003, and in his deposition he
9  testified after 1999 he had nothing to do with VIOXX,
10 so this is a study that was done years after he was off
11 the project.
12    THE COURT: All right. Let's deal with it
13 out of the presence of the jury. You can proceed with
14 it later.
15 BY MR. RABER:
16    Q. Doctor, just a couple more questions and then
17 we'll break.
18 A. Yes, sir.
19    Q. We heard Dr. Lucchesi talk about this
20 prostacyclin imbalance, and now we have heard you talk
21 about all these animal studies that Merck did. Were
22 all these animal studies that you have just taken us
23 through were they consistent with what Dr. Lucchesi
24 said or inconsistent, do they contradict him?
25 A. My interpretation is they contradict him because

Page 3272

1  he was saying that prostacyclin in the blood vessels
2  came from COX-2, and these experiments don't support
3  that at all.
4       Q.  How could Dr. Lucchesi get it so wrong?
5       MR. SEEGER:  Objection, Your Honor.
6  Dr. Lucchesi is a pharmacologist.  This is
7  inappropriate with this witness.  He is not a
8  pharmacologist.
9       THE COURT:  The objection is that it is not
10 an expert witness?
11      MR. SEEGER:  Or contradicting the opinion of
12 another expert.
13 BY MR. RABER:
14      Q.  Well, let me ask you this, did you hear when
15 I asked Dr. Lucchesi if he looked at any of those
16 animal studies do you remember what his answer was?
17      A.  His answer was he did not.
18      MR. RABER:  I think this would be a good time
19 to break.
20      THE COURT:  All right.  We'll break.
21      (The jury leaves the courtroom.)
22      MR. SEEGER:  Your Honor, do you have one
23 minute?  He has already -- now he is well into
24 pharmacology.  I have points in his deposition where we
25 were asking him questions, and his answers to me 1999,

Page 3273

1  and I'm looking from his December 2003 deposition.
2       MR. RABER:  This is cross-examination.
3       MR. SEEGER:  I'm just talking to the judge
4  about limiting his testimony because he is into areas
5  with him that are way beyond what he testified to.  I
6  stopped having primarily responsibilities for VIOXX at
7  the time it was approved May of '99 and that would have
8  been May or June.  And then he said I asked -- oh, he
9  was asked after May '99 did you pick up primarily
10 responsibilities.  There was a short time he testifies
11 to but basically he says that was it.  So now he is
12 into a lot of things after '99 he is talking about the
13 rabbit study from 2001.  Now he has a study from 2003.
14 He is giving pharmacology opinions.  They couldn't find
15 a pharmacologist to come in here and testify and
16 they're using a guy who is an oncologist, a cancer
17 doctor, who never did research on COX-2s before he was
18 hired at Merck.
19      MR. RABER:  Your Honor, he was a co-author of
20 the FitzGerald paper, and he knows the studies.  He
21 described them.
22      MR. SEEGER:  I came here intending to cross
23 him on that but not on pharmacology.
24      MR. RABER:  And, you know, we're happy to
25 call John Oates if they want a prostaglandin expert,

Page 3274

1  and you know our position on that.
2       MR. SEEGER:  You had your opportunity on
3  that.
4       MR. RABER:  The point is this is a guy who
5  VIOXX, granted, was not his primary responsibility
6  after a period of time, but he knew what was going on,
7  and he knew what Merck was doing in the studies with
8  animals, and he is a Doctor, and he is a co-author of
9  the paper.
10      THE COURT:  You're setting him up to be.  He
11 is setting up specifically in the questions to be a
12 counter expert to Dr. Lucchesi and to basically
13 criticize what Dr. Lucchesi has testified to, which is
14 not the role of a fact witness.
15      MR. RABER:  I think it is, Your Honor.
16      THE COURT:  And I understand that this is a
17 witness who is a doctor and who did research and who
18 did studies, and, certainly, his thoughts at the time
19 if we're talking about a study from 2003 that had
20 nothing to do with.
21      MR. SEEGER:  The rabbit study was 2001.
22      MR. RABER:  They had the results of May of
23 1999 if you want to ask him.
24      THE COURT:  He testified that he got the
25 results in 1999 not for the 2003 study.

Page 3275

1       MR. RABER:  That's right.  I'm just closing
2  the loop.
3       THE COURT:  Now we move a step beyond this
4  explains what VIOXX is.
5       MR. SEEGER:  I think I have to call
6  Dr. Lucchesi in rebuttal, and he is available.
7       MR. RABER:  Dr. Lucchesi had an opportunity
8  to look at this stuff.  They were produced in
9  discovery.
10      THE COURT:  That's fine.  So bring in your
11 expert to say that --
12      MR. RABER:  All I did with this witness is to
13 have him walk through what Merck actually did, the
14 stuff that Dr. Lucchesi didn't look at and describe
15 what they did and what it showed and that's it.  I'm
16 done with this now.
17      MR. BUCHANAN:  The problem, Your Honor --
18      MR. SEEGER:  The damage has been done.
19      MR. BUCHANAN:  The problem is he is not
20 describing what he did.  He is not describing based on
21 his personal knowledge --
22      MR. RABER:  He's a corporate representative.
23      MR. BUCHANAN:  No.  You need to bring in the
24 people with personal knowledge of these studies.  You
25 can't come in before the trial and now he testifies to

Page 3276

1  for the company.
2      MR. RABER: Let us bring Oates. If they want
3  to say somebody is making this up let us bring Oates.
4      MR. BUCHANAN: Why didn't you disclose him
5  when you had a chance to disclose him?
6      MR. RABER: You objected to it.
7      MR. SEEGER: After your witness list was
8  served.
9      THE COURT: Not just after the witness list.
10     MR. SEEGER: The trial was started.
11     MR. BUCHANAN: After Lucchesi testified.
12     MR. RABER: We were given surprising
13 testimony by Dr. Lucchesi that was beyond the scope of
14 his report about what Oates meant.
15     THE COURT: You can't use this witness to
16 contradict him.
17     MR. SEEGER: He has done that, though.
18     MR. RABER: I am done on this topic. I'm
19 going to move on to something else now.
20     MR. SEEGER: He basically used a fact witness
21 to say that Dr. Lucchesi got it wrong. How do I deal
22 with that? I have to be able to call Dr. Lucchesi back
23 now as a rebuttal.
24     MR. RABER: They conclude it was significant.
25 He said I did not look at any animal studies Merck did,

Page 3277

1  and it is important for the jury to understand that he
2  overlooked a very significant body of information
3  before he came to his opinion.
4      MR. SEEGER: A pharmacologist will not say
5  that. This guy will say anything, but a pharmacologist
6  he may not come in and say Lucchesi got it wrong.
7  Remember what Dr. Lucchesi said, none of the animal
8  studies tested thrombosis, and for him to come in here
9  and talk about a rabbit study saying there's no
10 prostacyclin in vasculature when there's study after
11 study saying it is.
12     MR. RABER: Look, Dr. Lucchesi says --
13     MR. SEEGER: That's what you wrote, Steve. I
14 don't care what you wrote. I don't care what you
15 wrote.
16     MR. BUCHANAN: The bottom line is the
17 testimony wasn't based on personal knowledge, that's
18 the problem.
19     THE COURT: What do you want me to do?
20     MR. SEEGER: I want to call Dr. Lucchesi in
21 rebuttal.
22     THE COURT: I'll consider that. At this
23 point the testimony is in. I'm not going the strike
24 it.
25     MR. BUCHANAN: He needs to be limited to his

Page 3278

1  personal knowledge.
2      THE COURT: At this point from now on he
3  shouldn't be asked about Dr. Lucchesi or Dr. Lucchesi's
4  opinions or his own scientific conclusions that are
5  outside of what was in his mind.
6      MR. BUCHANAN: At the time.
7      THE COURT: In before 2001.
8      MR. RABER: What time are we coming back?
9      THE COURT: 1:30.
10     MR. RABER: Did we just blow some of our
11 lunch break?
12     (Break taken.)

Page 3279

1      AFTERNOON SESSION
2      THE COURT: You can be seated.
3      THE WITNESS: Should I come back up?
4      THE COURT: Yes, please. Do we know where
5  counsel is?
6      MR. BUCHANAN: Sorry, Your Honor. We were
7  hiding and didn't realize 10 minutes had passed.
8      MR. SEEGER: Sorry, Judge.
9      THE COURT: That's okay. Counsel, you have
10 an application or do you want to ask some questions of
11 the witness first outside the presence of the jury then
12 make your application.
13     MR. SEEGER: Yes. The application, Your
14 Honor, is we're looking to have the testimony that Dr.
15 Morrison gave to the jury about where he extrapolated
16 from that rabbit study stricken from the record as to
17 what it might mean because he doesn't have -- a couple
18 things, one, he doesn't have the expertise, we believe
19 to give that opinion. But, secondly, Dr. Morrison has
20 been deposed several times in this case and never once
21 has even mentioned the rabbit study. So I would like
22 to ask him questions, if that's possible.
23     THE COURT: Go ahead.
24 BY MR. SEEGER:
25     Q. Dr. Morrison, I have deposed you in this case

31 (Pages 3276 to 3279)

Page 3280

1  a couple times, correct?
2  A.  Once.
3     Q.  Once, but two days?
4  A.  Over two days.
5     Q.  Prior to the time I deposed you you were
6  deposed in 2003 by Dave Michelli?
7  A.  That's correct.
8     Q.  Now, I asked you a lot of questions about the
9  FitzGerald study that Mr. Raber put up on the board for
10 the jury, correct?
11 A.  That's correct.
12    Q.  Specifically, I asked you questions relating
13 to COX-2s ability to inhibit prostacyclin in the
14 bloodstream, correct?
15 A.  That's correct.
16    Q.  Do you remember -- and you were also asked
17 those questions by Mr. Michelli back in 2003, correct?
18 A.  That's correct.
19    Q.  Did you ever tell us an answer to those
20 questions that you were involved in animal studies?
21 A.  I didn't say I was involved in animal studies.  I
22 believe you asked me if I was involved in animal
23 studies, and I told you I wasn't.
24    Q.  Okay.  You weren't involved in animal
25 studies.  In fact, you also testified at that time you

Page 3281

1  had very little to do with VIOXX after March of 1999,
2  correct?
3  A.  After the drug was launched in May of 1999 I
4  continued to have some responsibilities and mostly in
5  giving scientific talks and then, obviously, later I
6  worked on a different COX-2 inhibitor.
7     Q.  Okay.  Now, the rabbit study that you
8  testified to had you ever told me in response to any of
9  my questions -- and I have the depositions I can take
10 it out -- had you ever given as an answer to my
11 questions about what you found in the FitzGerald study
12 had you cited back to me this rabbit study you
13 discussed today for the jury?
14       MR. RABER:  Your Honor, it depends on the
15 question.  You know --
16      THE COURT:  Counselor, just let him ask the
17 questions.  The jury is not here.  Let him explore the
18 issue.
19      MR. RABER:  Okay.
20      THE WITNESS:  I did not talk about the rabbit
21 studies with you.  I don't believe you asked me about
22 them.
23 BY MR. SEEGER:
24    Q.  Well, I did ask you about the implications in
25 that study, correct?  You know what the litigation is

Page 3282

1  about, sir, don't you?
2  A.  Yes, and I indicated to you that my knowledge of
3  all of the data put together would say VIOXX is not
4  prothrombotic, and that was relying upon all those
5  studies I just talked about today.
6     Q.  And do you recall I asked you a lot of
7  questions, and you said through a string -- one of your
8  answers to me was through a string of hypotheticals --
9  I think I have your testimony, that's what I was doing
10 when -- I was flagging this.  Hold on a second.  Oops,
11 I have the wrong transcript.  Here it is.  I talked to
12 you about the Catella/Lawson/FitzGerald study that you
13 were involved with and published, correct?
14 A.  Yes.
15    Q.  I talked to you about Dr. FitzGerald's
16 e-mail.  You recall that e-mail from October of '97?
17 A.  I do.
18    Q.  And he talks if you want to nail the site of
19 the COX-2 -- the VIOXX impact and he recommended some
20 studies to do?
21 A.  I remember that, yes.
22    Q.  I want to make sure we're in the same
23 ballpark here.  And I asked you questions about that
24 e-mail, and let me see if I can find the language.
25      MR. RABER:  Can we have the date?

Page 3283

1       MR. SEEGER:  I'm looking now at the February
2  16th, 2005 deposition, and I'm around Page 62.
3  BY MR. SEEGER:
4     Q.  I say to you, Is it a fair characterization
5  of this e-mail to continue to discuss things that you
6  could do to understand this phenomenon that he is
7  describing.  And the phenomenon that's being described
8  in that e-mail is the impact of VIOXX on prostacyclin,
9  correct?
10 A.  The impact of VIOXX on urinary PGI-M.
11    Q.  Okay.  But that's a measure of prostacyclin in
12 the body, sir, isn't it?
13 A.  We went through all experiments to determine what
14 actually was the cause of the decrease in urinary
15 PGI-M.
16    Q.  Let's just take it step by step.  He was
17 talking about the measurement of total body production
18 of prostacyclin, correct?
19 A.  We were talking about interpretation of an
20 experiment that looked at urinary PGI-M.
21    Q.  Okay.  And one of the things -- and then you
22 said -- I had asked you a bunch of questions and I
23 said -- you said you wanted to give me the context of
24 this, and I'm trying to find the questions, and I'm
25 sorry I'm doing this on the fly.  I asked you if the

Page 3284

1  tests were done, and you say I have to be honest I
2  haven't reviewed the world's literature to know of any
3  of these experiments were published. I can't tell you
4  that. I asked you if FitzGerald's tests were done that
5  were in the e-mail. I asked you if you did them at
6  Merck. Did I personally do them? Yes. You said no.
7  Were you involved in any teams or groups that did these
8  studies at Merck? I personally do not know of these.
9  I personally was not involved in teams that did these
10 experiments. And I asked you --
11       MR. RABER: What page and line are we on?
12       MR. SEEGER: I'm now on Page 63. And I'm
13 asking you questions -- and I'm trying to redo what we
14 have done because that's all.
15       THE WITNESS: That's fine.
16       MR. RABER: These are questions about
17 FitzGerald's urine studies.
18       MR. SEEGER: Mr. Raber, I'm going into it.
19 Give me a minute. I just need a minute or two.
20       THE COURT: I think that's what he said the
21 questions were. You can proceed.
22       MR. SEEGER: Thanks, Judge.
23 BY MR. SEEGER:
24   Q. I apologize. I'm doing a little bit on the
25 fly because I didn't expect to be going back to his

Page 3285

1  deposition. And I asked you, I want to know if you
2  were involved have any knowledge of any of these things
3  that Dr. FitzGerald is asking about if they were done,
4  that's all. And then you went and read them. You
5  said, again, personally I'm not aware that these things
6  were done. They weren't done by me. I'm not
7  personally aware whether they were or were not done by
8  other scientists. And I go on to ask you other
9  questions. Now we starting to into the study a little
10 bit.
11       THE COURT: The FitzGerald study?
12       MR. SEEGER: Yes.
13 BY MR. SEEGER:
14   Q. And then I asked you what Dr. FitzGerald is
15 proposing to do here is to find out to determine
16 whether a COX-2 inhibitor like VIOXX affected the
17 production of prostacyclin in the body. And your
18 answer was, He is describing the variety of different
19 experiments, and we talked about those experiments, do
20 you recall?
21   A. We talked about the experiments that Garret
22 suggested, yes.
23   Q. And we talked about concerns that came out of
24 the study, concerns you may or may not have had at that
25 time, correct?

Page 3286

1   A. You can read me the testimony. I think you were
2  talking about Garret's proposed experiments.
3   Q. Let me see if I can find the specific
4  question. I asked you on Page 68 at the bottom I say,
5  What's the concern. If you actually suppress the
6  production of prostacyclin systemically throughout the
7  body isn't there a concern that there will be an
8  overproduction or too much of this other agent, this
9  thromboxane, floating around out there? And I don't
10 expect you to remember that question, but it is from
11 your deposition, and then you went on to talk about all
12 these possible hypotheticals, what that study could
13 have meant. Do you recall us talking about that?
14   A. Yes, I talked about that today, too.
15   Q. Any of those answers to the questions about
16 the study and e-mail did you ever once tell me you were
17 involved in, looked at or analyzed the rabbit study?
18   A. You didn't ask me about it.
19   Q. Did you offer it to me?
20   A. No.
21   Q. Did you understand at the time you were
22 testifying that you had to testify truthfully to my
23 answers and completely?
24   A. Yes.
25       MR. SEEGER: Judge, I don't think I need

Page 3287

1  to --
2  BY MR. SEEGER:
3    Q. Sir, do you claim to be an expert in animal
4  studies?
5    A. I have done many animal experiments when I was in
6  the department of genetics at Harvard.
7    Q. Okay. Prior to the time you joined Merck had
8  you done any research at all in 1995 on COX-2s?
9    A. No.
10   Q. Okay. So the only work you have done on
11 COX-2s is with Merck, correct?
12   A. That's correct.
13   Q. Okay. And you're not a pharmacologist, and
14 I'm not talking about the fact that you took a course
15 in pharmacology in medical school; you don't hold
16 yourself out as a pharmacologist, do you?
17   A. I don't hold myself out as board certified
18 clinical pharmacologist. I work for the pharmaceutical
19 industry, and a large part of our training at Merck is
20 in pharmacology. I was in Alan Nies's department. He
21 taught us pharmacology, so I do consider myself to know
22 quite a bit about pharmacology since that's my job is
23 to develop pharmaceuticals.
24   Q. Are you a pharmacologist?
25   A. As I said, I'm not a board certified

Page 3288

1 pharmacologist. I do know a lot of pharmacology.
2     Q. So you don't specialize in pharmacology,
3 right?
4     A. Um, I would actually argue the development of
5 pharmaceuticals is pharmacology.
6     Q. When an issue comes up at Merck do they call
7 you in for the pharmacology consult or did they go to a
8 pharmacologist in the company?
9     A. It depends what the question is.
10    Q. Are you a vascular biologist?
11    A. No.
12    Q. Are you an expert in plaque rupture, is that
13 something you study?
14    A. No.
15    Q. The opinion you gave the jury about if plaque
16 were to rupture in a blood vessel what effect would
17 VIOXX have on that plaque, and then your answer was it
18 should have no effect on the PGI production at all, it
19 should have no effect on the blood vessel clotting, is
20 that something you have ever published anywhere?
21    A. They asked me my interpretation of the results in
22 the study.
23    Q. You were asked that by Mr. Raber?
24    A. Yes.
25    Q. To interpret the study?

Page 3289

1     A. Yes.
2         MR. SEEGER: Judge --
3 BY MR. SEEGER:
4     Q. Oh, the opinion you gave the jury that
5 there's no -- that VIOXX should have no effect on the
6 PGI production at all, should have no effect on blood
7 clotting in the vessel have you shared those opinions
8 with the FDA?
9     A. I personally?
10    Q. Yes.
11    A. Um, I have not been asked by the FDA to discuss
12 this topic.
13    Q. In fact, have you made any -- personally you
14 have you made any presentations to the FDA about
15 Merck's data related to VIOXX?
16    A. I did go to an end of Phase II meeting and a
17 preNDA meeting.
18    Q. PreNDA meeting, but you didn't present to the
19 advisory committee, right?
20    A. I did not present to the advisory committee. I
21 was part of the team helping for the preparation for
22 the advisory committee.
23    Q. The view that you gave -- the opinion you
24 expressed to the jury has, anybody given that opinion
25 to the FDA, as far as you know?

Page 3290

1     A. What question is that?
2     Q. Well, when you were asked if a plaque were to
3 rupture in a blood vessel what effect would VIOXX have
4 on it, your answer was, it should have no effect -- it
5 should have no effect on the blood vessel clotting at
6 all. Is that something anybody at Merck has given to
7 the FDA?
8     A. Merck has certainly presented additional
9 experiments, as well, to show that VIOXX is not
10 prothrombotic.
11    Q. I want to know if they gave that opinion, has
12 anybody expressed that opinion to the FDA, the one you
13 gave to the jury?
14    A. I can't answer that question, not in the
15 regulatory affairs group.
16        MR. SEEGER: Judge, I think it is pretty
17 clear why that testimony should not stricken
18 BY THE COURT:
19    Q. Doctor, you weren't involved physically in
20 doing any of the animal studies?
21    A. Not these particular animal studies, no.
22    Q. The three you discuss with the jury?
23    A. That's correct.
24    Q. And did you --
25    A. I can just add though, Your Honor, that my job at

Page 3291

1 Merck as a physician and a scientist is to essentially
2 bridge that area, so my job is to analyze preclinical
3 and animal experiments and to determine what's the
4 likely effect that's going to have on people, that's
5 essentially why they like having people like me who
6 both understand basic science and understand medical
7 care. So I can do that bridging. The person who only
8 does basic science has a hard time understanding the
9 effect in patients. People who only do patient care
10 have a hard time understanding basic science. They
11 like to have people like me who can bridge those
12 things, so a lot of what I do day-to-day in my job at
13 Merck is interpreting preclinical animal experiments
14 and trying to assess what effect will that have in
15 patients.
16    Q. We're taking these particular animal studies
17 that you just described to the jury in what manner were
18 you first given the results of those studies and did
19 you first read the peer-reviewed article when it
20 appeared, did you first look at the -- were you sent
21 the raw data to look at, did you know -- I want to know
22 exactly when you became aware of them and how?
23    A. Okay. My first exposure to the results were in
24 conversations with other Merck scientists, Dr. Nies,
25 Dr. Gertz, and they described to me that in follow-up

Page 3292

1  to Garret's paper some of the basic scientists were
2  doing additional animal experiments to understand where
3  the urinary PGI-M came from. And they explained --
4  and, obviously, I was an author on the paper. We knew
5  what the possibilities were, and they explained to me
6  that there were scientists in the pharmacology group
7  doing animal experiments to rule out those
8  possibilities that we had hypothesized, and they
9  conveyed to me at that point it looked like those were
10 all being ruled out, and then the next question they
11 were working out is where in the body does the
12 prostacyclin come from. So that was communicated to me
13 in day-to-day business working at Merck with Dr. Gertz
14 and Dr. Nies.
15     Q.  Just in conversation?
16     A.  Yes.
17     Q.  But it wasn't communicated to you in the form
18 of here's the data, what do you think it?
19     A.  No, that's correct.
20     Q.  Here is the study, you didn't review them at
21 the time?
22     A.  That's correct.
23     Q.  So you didn't formulate any of the opinions
24 you have given, you're basically giving the opinions --
25 in other words you didn't create those opinions you're

Page 3293

1  giving what you feel are the interpretations that
2  others had of these studies?
3     A.  Um, well you asked me what my first communication
4  of the information.
5     Q.  You're right. That's an unfair question
6  because it sort of steps over two different time
7  frames. Let's stick to what you knew at first. Other
8  than communications where you talked to people about it
9  and they said we're doing these animal studies, it
10 looks like they're not panning out to any of those
11 hypotheticals or whatever, when was the first time you
12 actually saw the data or saw the study, saw the rabbit
13 study?
14     A.  The rabbit study I saw as part of my work on a
15 different COX-2 inhibitor not on VIOXX, so it is true I
16 stopped working on VIOXX when VIOXX got launched. I
17 worked on two separate cancer compounds then I came
18 back to work on a different COX-2 inhibitor. At that
19 point, obviously, many of these same questions were
20 being asked about that second COX-2 inhibitor.
21     Q.  And when was that, that's Arcoxia?
22     A.  That's Arcoxia.
23     Q.  And when did you start working on Arcoxia?
24     A.  I came back to Arcoxia, if I remember, in about
25 June of 2000.

Page 3294

1     Q.  All right. Now, again, other than discussing
2  these studies even when you were in Arcoxia in 2000
3  when did you first look at the data, look at the
4  studies and in what form, if you did?
5     A.  I can't tell you when I first saw the publication
6  of the rabbit study. I can tell you that the first
7  review of the raw data that we looked at today was in
8  preparation for coming to court of the ones that ruled
9  out those first three that I went over, those ones were
10 after my deposition and in preparation for coming. The
11 rabbit study I had seen before, but I can't tell you
12 exactly the date. That was as part of the Arcoxia
13 program.
14     Q.  The others weren't given to -- as part of
15 Arcoxia?
16     A.  No, because, again, they were -- they essentially
17 ruled out the possibility, so they were, you know, in
18 the summary was they're not giving us an answer, the
19 sort of ruling out things, so it wasn't -- I didn't
20 feel a need to review that primary data which
21 essentially was negative, if you will.
22     Q.  As far as the rabbit data that you said you
23 did see it when you were doing Arcoxia?
24     A.  Right.
25     Q.  Did you actually look at the data?

Page 3295

1     A.  I saw the paper, the paper.
2     Q.  The one that was published?
3     A.  Yes.
4     Q.  So what you reviewed was the published study,
5  which is what you talked about to the jury?
6     A.  Correct.
7     Q.  And your opinions were based on what was in
8  that published study?
9     A.  Correct.
10    Q.  You would have received it some time after
11 2000?
12    A.  Correct.
13    Q.  Do you know if it was in the range of 2000,
14 2001 or if it was pre VIGOR or after VIGOR that you
15 first saw the rabbit studies? I mean, I don't know
16 whether this was a topic before VIGOR or not or until
17 after VIGOR or do you recall?
18    A.  Again, so the rabbit studies are getting at the
19 question that was raised in Garret's study of where is
20 the prostacyclin coming from, so it is independent of
21 VIGOR because VIGOR had nothing to do with prostacyclin
22 and thromboxane. That's the antiplatelet effect.
23    Q.  I was really using it as a time frame for
24 when it was being discussed among the Arcoxia group?
25    A.  So I went --

Page 3296

1   Q. If you know if that helps.
2   A. What I can tell you is I went off of Arcoxia into
3   my next job in about when Alise came back, so October
4   of 2001, so that's when I went off, so it was
5   definitely before then.
6   Q. Some time between when you went on in October
7   2001 is when you were seeing the study?
8   A. Correct.
9   Q. But you're not exactly sure when?
10  A. Correct.
11       MR. SEEGER: Your Honor, can I hand you
12  something that might be useful? And I know we're doing
13  this a little on the fly. Mr. Raber, it is from his
14  February 2005 testimony on Page 619 this is in response
15  to questions from Merck's own lawyer and see he
16  mentions the fact he doesn't first see the animal
17  studies until after VIGOR, and he says there are other
18  people better suited to answer those questions. And
19  that he is not an expert and if you keep reading you'll
20  see --
21       MR. RABER: But this talks about studies done
22  since VIGOR. 619 says in the time since Merck --
23  BY THE COURT:
24   Q. Let's read the whole thing. It says, In the
25  time since Merck's VIGOR study did Merck do anything

Page 3297

1   further to investigate the basic science underlying
2   FitzGerald's theory? Answer, there's work that I'm not
3   an expert on, and there are probably other Merck
4   scientists who can tell you more about experiments that
5   were done in animals in some of the Merck Research
6   Labs.
7       Now, when you were giving that answer
8   although the question says since VIGOR were you
9   referring to these studies?
10  A. I don't remember, Your Honor.
11   Q. And then you're talking about a later study,
12  it says, Are you aware of any studies that cast light
13  on whether these hypothesises were discussed in the
14  late '97, '98 time frame have validity. And your
15  answer is, yes, there's a study that came out year or
16  two ago in which scientists tried to get directly at
17  this question of whether there was a decrease in
18  urinary PGI-M coming from the vasculature. The
19  experiment they do is create a wound in the patient's
20  arm, and you went on to describe that.
21  A. That's a clinical study in people.
22   Q. Dr. Morrisonn, you said you just saw the
23  animal data you were shown it for basically for your
24  testimony in preparation of trial?
25  A. The three that had to do --

Page 3298

1   Q. The three before the rabbit study?
2   A. The three before the rabbit study.
3   Q. And the rabbit study you saw between 2002
4   2001 when you were working on Arcoxia?
5   A. Correct.
6   Q. At this point he is asking you whether you
7   have seen the animal studies, and your answer is -- and
8   then he asked you more specifically were you aware of
9   any studies that cast light on whether the hypothesis
10  have validity, and your answer is the ARMS study?
11  A. Uh-huh (witness nodding head in the affirmative).
12   Q. Why didn't you tell him about the rabbit
13  study if you felt it was as important as what you just
14  told the jury?
15  A. I can't answer that question. I Thought he was
16  asking me about studies that were done after VIGOR.
17  These studies were all done -- as I said these are done
18  before VIGOR. They deal with prostacyclin/thromboxane.
19  VIGOR doesn't have anything to do with that. These are
20  things after VIGOR.
21       THE COURT: Counsel, do you other things you
22  want to ask him?
23       MR. RABER: I have a question. Looking at
24  the deposition of February 16th, 2005 Page 167, can I
25  put it on the Elmo?

Page 3299

1       THE COURT: I don't think I need it. I have
2   it right here in front of me.
3       MR. BUCHANAN: What page?
4       THE COURT: Oh, I don't have it in front of
5   me. Okay. Put it on there.
6       MR. RABER: Question by Mr. Seeger, it says,
7   Sitting here today is there any doubt in your mind that
8   VIOXX inhibits prostacyclin production in the
9   vasculature? Answer, absolutely. Sitting here today
10  you doubt that? Answer, absolutely. Is there any
11  doubt in your mind sitting here today that VIOXX is a
12  prothrombotic drug? Absolutely. There are no
13  follow-up questions about, well, why do you say that,
14  what's the basis for your saying that you have doubts
15  about prostacyclin being reduced in the vasculature.
16  We go on to the Graham study and all that other stuff,
17  so the notion that anyone was somehow sand bagged.
18       THE COURT: What is the rest of the page?
19  Show me the rest of the page.
20       MR. RABER: You mean on Page 168 and 169 --
21       THE COURT: Down further.
22       MR. RABER: 167.
23       THE COURT: Let me see the next page. Down
24  further.
25       MR. RABER: Then we go into withdrawal. So

Page 3300

1  rather than asking about what the basis is for his
2  opinion about the vasculature they start asking about
3  Graham and withdrawal, and that's the point, Your
4  Honor, this is not -- should not come as a surprise.
5  This deposition was taken in February of '05, and Dr.
6  Morrison expressed the opinion that he didn't think
7  that the vasculature was a source of prostacyclin, and
8  they didn't follow-up and ask him why.
9       MR. BUCHANAN: Can I explain that, Your
10 Honor? On the prior two pages I'll put it on the Elmo
11 for the Court. The witness is asked questions in this
12 area, and he testifies that this is not his area of
13 expertise, he is not an expert in cardiovascular
14 physiology. Let's talk about it, and the witness
15 talked about plaque rupture. Let's see if we can.
16 There we go. Okay. Now the material, the plaque that
17 ruptures that could form the basis of -- and I think
18 you said this before, and I'm sorry if I'm making you
19 say it again, but that could form the platelets were to
20 stick to that rupture that could form a clot and clog
21 up an artery, correct? So, again, this is not my area
22 of expertise, so I'm giving you sort of what I remember
23 from cardiovascular physiology from 10 years ago.
24      Then it continues, So based on that sort of
25 cursory knowledge plaque rupture is what is the -- it

Page 3301

1  is a typo -- the formation of platelet aggregation.
2  I'm sorry, then it continues to the next question, The
3  body normally produces something that would help break
4  up those clots or stop platelets from clotting like
5  prostacyclin, for example, we know can do that. That
6  would be the body's way of actually trying to prevent a
7  heart attack or the clot from becoming worse or
8  damaging the body, again outside my area of expertise.
9  We just heard testimony from the witness on this today,
10 Your Honor. We talked about earlier the discussion of
11 prostacyclin's role of inhibiting platelet aggregation.
12 It is not surprising that Mr. Seeger would not go into
13 something with somebody who expressed on two occasions
14 that he is not an expert in cardiovascular physiology
15 or vascular biology.
16      MR. SEEGER: I left the deposition thinking
17 he had nothing to do with it after '99, and he was
18 limited in that respect when he was there, and now he
19 is an expert.
20      MR. RABER: That testimony is quite
21 different. That testimony is talking about the
22 mechanism of a heart attack and plaque rupture and so
23 on and so forth, and I think if anythine we can read
24 the doctor being modest about what he is qualified to
25 do there. He is saying, look, you're talking about

Page 3302

1  plaque rupture and heart attacks and that stuff, I'm
2  not an expert in that, but we know that prostacyclin is
3  a vasodilator and inhibits platelets, and so that's its
4  presumed role. That's not inconsistent. He is then
5  asked the more specific question that's pertinent to
6  what he talked about this morning, which was what's
7  your opinion about whether prostacyclin in the
8  vasculature is reduced, and he says, I absolutely doubt
9  that and there's no follow-up on that.
10      MR. BUCHANAN: He said he wasn't an expert.
11      THE COURT: I'm a little concerned,
12 counselor, and I just want to make sure that what the
13 plaintiffs' counsel has indicated to me is accurate.
14 And they have indicated to me you have nine different
15 experts in the case, some of whom may testify and some
16 may not, who have issued reports, and that none of them
17 have given this opinion and that, therefore, they have
18 no written report that gives the opinion that
19 Dr. Briggs gave, that they have, therefore, no
20 knowledge that that was going to be a defense of Merck
21 in this case, is that accurate or inaccurate?
22      MR. RABER: Well, it is accurate to the
23 extent we haven't identified a specific expert on this
24 particular issue; however, this is not a matter of
25 expert testimony. The question is what did Merck know,

Page 3303

1  what should Merck have known, and there has been
2  evidence put on by the plaintiff that Dr. FitzGerald
3  raised a question, raised a theory based on a study in
4  which Dr. Morrison was a co-author, and they actually
5  raised questions in that paper. Dr. Morrison has
6  simply described what Merck did to answer those
7  questions, the studies they did, how Merck interpreted
8  those studies, and that informs Merck's conduct after
9  the fact.
10      If the plaintiffs want to bring in an expert
11 to say Merck did the wrong studies, Merck interpreted
12 its studies incorrectly they can do that. But we don't
13 need expert testimony to say this is what we did and
14 this is how we interpreted it. And that's what
15 Dr. Morrison did this morning,.
16      THE COURT: He never even saw three of the
17 studies, so how is he talking about what they knew at
18 the time? If anything, his testimony suggested to the
19 jury that Merck did know about these three studies at
20 the time when, in fact, he wasn't even shown them.
21      MR. RABER: We know because the documents
22 themselves went into evidence, and they are dated --
23 and they are dated in 1998 and 1999, and then we also
24 know that one of the plaintiffs' exhibits that's been
25 introduced which is the Alan Nies writeup for the board

Page 3304

1  of advisors he says current knowledge would suggest
2  that COX-2 is not an important enzyme in the synthesis
3  of prostacyclin by normal endothelium, exactly what
4  those studies showed, and he refers to the studies
5  being performed at Merck Frosst that are answering
6  those questions in April of 1998. This is Alan Nies
7  writing to the board of scientific advisors, and so,
8  this clearly has been in the case.
9      THE COURT: And then pretrial you took Alan
10 Nies' deposition, and you never asked him about these
11 studies.
12     MR. RABER: Well, Your Honor, he is our
13 witness. We asked him about this attachment. We
14 didn't go into each of the specific animal studies with
15 him, but we did ask him about this document, and he
16 pointed out in his testimony that this was referring to
17 the animal studies that were going on at Merck Frosst.
18     THE COURT: You can certainly play that for
19 the jury. That's a lot different than someone coming
20 in explaining the studies to a level this witness has.
21     MR. RABER: But, Your Honor, he said he saw
22 the rabbit study, which seemed to be the biggest
23 problem that the plaintiffs were complaining about. He
24 said he saw that back in 2000 or 2001. He was asked
25 specifically at his deposition about whether he

Page 3305

1  believed that the vasculature was a source of
2  prostacyclin, and he said, no, and there were no
3  follow-up questions on that. And these --
4      THE COURT: This is a follow-up question at
5  400 he asks, What reason do you have to believe that?
6  And he says, The ARMS study.
7      MR. RABER: But that's asking about post
8  VIGOR studies, Your Honor, after VIGOR, and --
9      THE WITNESS: I can clarify that. My
10 understanding was they were asking me about in humans
11 is there any studies done in people to show that
12 there's prostacyclin in the bloodstream, and the answer
13 to that is no.
14     MR. RABER: And, Your Honor, as to any
15 surprise notion, every single document that the
16 studies -- that this witness testified to this morning
17 were produced in discovery a couple of years ago. They
18 are on our exhibit list. Some of them are actually
19 even double figures, they're in the fifties and
20 sixties, you know, in a case where we have hundreds and
21 hundreds of exhibits, so it is critically important
22 that Dr. Lucchesi has come in and said that Merck
23 ignored FitzGerald, didn't do any of the right studies
24 and, yet, he had never even looked at any of these
25 animal studies that Merck did.

Page 3306

1      THE COURT: And you brought that out.
2      MR. RABER: I brought that out, and he
3  said -- well, he first accused us of not producing the
4  documents, and Your Honor gave an instruction that the
5  lawyers shouldn't be blamed because these documents
6  have been out there. He looked at them overnight. He
7  had really nothing to say about them the next day,
8  other than to just say these look like some animal
9  studies where they're doing a lot of the same things
10 over and over again, and it is critically important for
11 the jury to understand the significance of what
12 Dr. Lucchesi didn't look at. He simply was unaware
13 that Merck had even done these things, let alone what
14 the studies meant, and so this witness is being called
15 as a fact witness to say here is what we did, here is
16 what the people at Merck did, here is how Merck
17 interpreted these results and that is an explanation
18 for what Merck knew or should have known, what they did
19 and how they interpreted it. It is that simple, Your
20 Honor, it is not expert testimony. And we have --
21     THE COURT: You have an expert on the stand,
22 and you have every right to cross-examine him. You
23 could have shown him the rabbit study and said doesn't
24 this study show that COX-2 doesn't exist in the
25 vasculature.

Page 3307

1      MR. RABER: I tried to ask questions of the
2  expert, and the response was he has never seen it, you
3  can't ask him about it. That was the objection, and --
4      MR. SEEGER: I got overruled on that.
5      MR. RABER: How can he talk about things he
6  hasn't seen? And, Your Honor, strategically as an
7  attorney you don't have to ask every single witness
8  every single question. We have to make judgments
9  about, well, maybe there's a better witness to talk.
10     THE COURT: You're right. You have to make
11 judgments, and you have to use the right witnesses.
12 You either have to cross-examine an expert or you have
13 to bring in an expert to give expert opinions.
14     MR. RABER: We cited to you the Novaro case
15 and the Merlack case which stands for the proposition
16 that lay opinion testimony of knowledgeable employees
17 is admissible, is proper, and this was in a products
18 liability case.
19     THE COURT: About how to put screws in a
20 chair.
21     MR. RABER: It is something that may be
22 beyond the kin of the jury, and so he has the knowledge
23 and training certainly to give opinion testimony that's
24 not expert testimony as to how Merck interpreted these
25 things. I would also add that he is a corporate

Page 3308

1  representative here testifying, he has been here the
2  entire trial. He has been identified as a corporate
3  representative for Merck. So we think it would be
4  manifestly unfair, Your Honor, to allow Dr. Lucchesi to
5  come in and say here is everything wrong with what
6  Merck did. Merck totally ignored FitzGerald and then
7  we're not allowed to say as a factual matter what we
8  did and how we interpreted those results and then after
9  that evidence is in after we have gone down that road
10 the evidence is in to have this testimony struck would
11 be about as unfair as anything I can think of in these
12 circumstances.
13         MR. BUCHANAN: Your Honor, first of all, the
14 witness disqualified himself on certain areas of
15 expertise in his deposition, and you can't fault
16 counsel for not going further. He said this is not my
17 area of expertise, talking about cardiovascular biology
18 and other certain particulars with plaque ruptures,
19 COX-2 expression, thrombus formation, things of that
20 nature.
21         He then in court today says so if a plaque --
22 in response to the question, so if a plaque rupture
23 were to rupture in a blood vessel what effect would
24 VIOXX have on that plaque. He answers an opinion, it
25 should have no effect on the prostacyclin production at

Page 3309

1  all. It should have no effect on the ability of that
2  blood vessel to clot. Directly contravening his
3  testimony that he says he is not knowledgeable in this
4  area it is outside of my area of expertise. They have
5  elicited what is essentially expert opinion testimony
6  on this area.
7          Your Honor has also highlighted through your
8  voir dire of the witness a lot of the information he
9  opined on today is not information that he came across
10 as a part of his day-to-day duties at Merck; he came
11 across it in preparation for testimony. That's not lay
12 opinion anymore, that's expert opinion. It is not
13 opinion formulated in the course of his day-to-day
14 responsibilities at Merck. To allow that testimony to
15 the jury would be improper, but, more importantly,
16 there's been no heads up about this. There's been no
17 heads up that this witness is going to come in and talk
18 about something that really they have never discussed
19 with the FDA, that VIOXX doesn't have an impact on
20 vascular prostacyclin. We're hearing it for the first
21 time today in court, and that's just not right.
22         MR. RABER: Your Honor, the Singer paper was
23 submitted to the FDA. The long rabbit study was
24 published in a peer-reviewed journal. This isn't some
25 stuff locked up in a safe somewhere.

Page 3310

1          MR. BUCHANAN: Which doesn't say that, Your
2  Honor. The article doesn't say what the witness said.
3  The witness --
4          MR. RABER: It sure does.
5          MR. BUCHANAN: The witness extrapolated from
6  a rabbit study to humans said that, therefore, in
7  humans you would not have COX-2 in normal human
8  vasculature, and even if you did in diseased human
9  vasculature VIOXX wouldn't be expected to have an
10 impact on the production of prostacyclin. That's not
11 in that article. That's nowhere in that article.
12 That's him extrapolating as a nonexpert, and that's not
13 proper.
14         MR. RABER: If the issue is animals versus
15 human studies Dr. Lucchesi every single study that
16 formed the basis of Dr. Lucchesi's opinions about
17 prostacyclin and thromboxane was based on dogs. He did
18 not do a single human study on that. So that's not the
19 issue. That is a total red herring to say that these
20 things are animals versus humans. In fact, we have the
21 board there that says Dr. Lucchesi says test in
22 animals. I said to Dr. Lucchesi, specifically I said,
23 Dr. Lucchesi, would it be appropriate, would it be an
24 appropriate response for Merck in response to this
25 FitzGerald theory to test VIOXX in animals. He said

Page 3311

1  yes. And I said, in fact, in your opinion that would
2  be the best way, and he said, yes. And I said, in
3  fact, the best way to do it would be in dog hearts and
4  rabbit hearts because that's what the FDA says is the
5  best model, and he says, yes. That is exactly what
6  Merck did.
7          THE COURT: All right. I'll take it under
8  advisement, and I'll see you tomorrow morning. The
9  jury is coming at 10:30, and I want the attorneys here
10 at 9:30.
11         MR. BUCHANAN: Thank you, Your Honor.
12         (End of proceedings.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3312

# CERTIFICATION

I, REGINA A. TELL, C.S.R., C.R.R., License Number 30X100161000, an Official Court Reporter in and for the State of New Jersey, do hereby certify the foregoing to be prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript to the best of my knowledge and ability.

_____  10-6-05
Regina A. Tell, CSR-CRR Official
Court Reporter Atlantic County
Courthouse
Mays Landing, New Jersey