usually relieved and controlled with Prilosec.
Q. Go ahead.
A. His blood pressure when he goes to the walk-in clinic for occasional sinus flare-ups generally is 120 over 80. He has not had any recent decongestants.
Q. Now, if we go back to the first page on
Page 39
the chart, could you read into the record what his blood pressure was on 8/20/02 taken by your nurse.
A. 152 over 90.
Q. And what was his blood pressure on 2/18/02?
A. 170 over 92.
Q. What was his blood pressure on 12/28/2000?
A. 138 over 62.

40:7-40:9

Q. Exhibit Number 5 is a copy of the original box label, is that right?
A. I believe that's correct.

40:17-40:25

Under contraindications, is there any contraindication listed regarding cardiac conditions or events, Page 2 of the label?
A. No, sir.
Q. Was there any warning that related to cardiovascular event in this label under the warnings section?
A. No, sir.
Q. Okay. I'll show you Exhibit Number 6.

41:13-41:18

Q. Now, back in March of 2000 when you were treating Gerald Barnett, did you see this document?
A. No, sir.
Q. Okay. Let's read it into the record. Would you read who it's to and who it's from.

41:25-42:2

A. To Deborah Shapiro, Alise Reicin and
Page 42
Alan Nies from Edward Scolnick and he copied himself on it.

42:8-42:25

Q. Okay. Okay, why don't you read into the record the first three sentences.
A. To all, I just received and went through the data. Thank you for sending it to me. There is no doubt about the pub data. Very, very strong, as expected, general safety is better than could hope for in this patient population. Incidences of hypertension, renal anything, edema, liver, all great - very safe, very, very safe.

Δ objection: 401, 402, 403, 602

π response: The fact that the witness has not seen this document is relevant to show that Merck did not provide CV safety information from its top executives to doctors like Mikola during the time he prescribed Vioxx to π.

Q. Okay. Now I want you to read the next
sentence into the record.
A. The CV events are clearly there.
Q. Now, at any time in the year 2000, 2001 were you told by anybody from Merck or any document from Merck that the president of Merck Research Laboratories, Ed Scolnick, had said in March of 2000 with regard to Vioxx that the CV events are clearly there in the bigger study?

Δ objection: please see previous page for objection and response

43:2-43:2

THE WITNESS: No, sir.

44:20-44:23

Q. Now, let me stop there. Were you ever told that the CV events associated with Vioxx and the bigger trials were believed by the president of Merck Research Laboratories to be mechanism based?

44:25-44:25

THE WITNESS: No, sir.

45:11-45:13

Q. Now, sometime in September of 2002, Mr. Barnett had a heart attack, didn't he?
A. I believe that's correct, yes.

45:23-46:1

Q. Okay. At any time up to September '02 and Mr. Barnett's heart attack were you told anything about what you just read from this
Page 46
exhibit, Number 6?

Δ objection: 401, 402, 403, 602

Π response: The fact that the witness has not seen this document nor been informed of its contents is relevant to show that Merck did not share that there were some within Merck who believed that the CV events from VIGOR could not be attributed to Naproxen.

46:3-46:3

THE WITNESS: No, sir.

46:5-46:5

Q. Let me go to Exhibit Number 7.

46:16-47:11

Q. The Exhibit Number 7, will you read who it's to and from and the date, please.
A. It's to Barry Gertz from Alan Nies. The date is March 28th, 2000.
Q. And what's the subject?
A. Carlo Patrono on VIGOR, in capitals.
Q. So going back to Number 6, what was the -- the one we just read in from Dr. Scolnick regarding the CV events are clearly there, what was the subject of that study?
Page 47
A. The VIGOR trial -- or VIGOR I should say.
Q. And from your prescribing of Vioxx, do

you know what the VIGOR trial refers to?
A. Yes, sir.
Q. What is that?
A. That is a study that was conducted by Merck to assess the safety of Vioxx, mainly in terms of gastrointestinal complications.
Q. Okay. Now could we go back to Number 7, please.

Δ objection: same as previous page
Π response: same as previous page

47:16-49:6

Q. Read the first sentence into the record, please.
A. I met with Carlo Patrono last Saturday in Rome. He has already been informed by other sources about the results of VIGOR and we had an interesting chat about it.
Q. Okay. Would you read the -- the first sentence into the record, please, of the next paragraph.
A. He said that he does not think that the

Page 48

CV effect that we observed can be attributed to Naproxen for a couple of good reasons.
Q. Then he gives the reasons. Could you read those into the record, please.
A. Yes, sir. First there is a weak pharmacological basis and no epidemiological evidence, in parentheses, Garcia Rodriguez and Patrono epidemiology, in press, end of parentheses, for cardio -- for CV protection associated with conventional NSAIDs. Additionally, the magnitude of the effect would not be plausible even if the comparator had been aspirin itself. In fact, in at least three different trials, aspirin has shown no effect on the primary prevention of stroke, while we have seen a 50 percent lower incidence of stroke in the Naprosyn (sic) arm of VIGOR; additionally, we have an overall reduction in the risk of CV events of 47 percent with Naprosyn -- Naproxen, excuse me, while aspirin has shown a reduction of cumulative CV risk of a magnitude between 15 and 18 percent. Aspirin data come from a primary prevention setting, in parentheses, similar to VIGOR, end parentheses, and include the Physicians Health Study, the Thrombosis Prevention Trial, parentheses, Lancet 1998, end parentheses, and the

Page 49

Hypertension Optimal Treatment Trial.
Q. Okay. Let me ask you this: Up until the heart attack that Mr. Barnett encountered in September of 2002, were you ever told by anybody that Carl Patrono had made this statement to Merck regarding Naproxen?

49:10-49:11

Q. Let me show you the next exhibit, which is Number 8.

49:15-49:17

Q. Now, Exhibit Number 8 is dated April

28, 2000, is that right?
A. Yes.

49:24-50:5

Q. So this -- this Exhibit Number 8 is
approximately a month after the Patrono e-mail,
Page 50
correct?
A. Yes, sir.
Q. Will you read the -- strike that.
Exhibit Number 8 is a Merck press
release, right?

Δ objection: 401, 402, 403, 602

π response: The witness is being asked to verify whether, based on his personal knowledge, the information contained within the press release comported with the information he received from sales reps, and is therefore relevant.

50:21-51:6

Q. Would you please read into the record
the heading for this press release.
A. Merck confirms favorable cardiovascular
safety profile of Vioxx.
Q. And would you read the first sentence
Page 51
into the record starting with April 28th.
A. April 28th, 2000, in response to
speculative news reports, Merck & Company, Inc.
today confirmed the favorable cardiovascular safety
profile of Vioxx, parens, Rofecoxib, its medicine
that selectively inhibits COX-2.

52:6-52:8

Q. Would you read into the record the --
just the first four lines of Paragraph Number 4 --
Paragraph Number 3 from the press release --

52:14-53:8

THE WITNESS: In preliminary findings
from Merck's large gastrointestinal, parentheses,
GI, outcome study that compared Vioxx with Naproxen
in patients with rheumatoid arthritis,
significantly fewer heart attacks were observed in
patients taking Naproxen, parentheses, 0.1 percent,
compared to patients taking Vioxx, parentheses, 0.5
percent. This result is consistent with Naproxen's
ability to block platelet aggregation. This is the
first time this effect of Naproxen to reduce these
events has been demonstrated in a clinical study.
Vioxx, like all COX-2 selective medicines, does not
Page 53
block platelet aggregation and therefore would not
be expected to have these events -- these effects,
excuse me, in reducing these events.
BY MR. ROBINSON:
Q. Okay. Now, you would meet routinely
with sales reps for Merck that were detailing you
regarding Vioxx, right?
A. Correct.

54:21-54:23

Q. Now, was this the general message that
you were given during 2000, 2001, 2002 by the Merck

Δ objection: 602

π response: witness is testifying as to the fact that the press release comports with the impression he received from conclusion of VIGOR

see previous page

54:23 sales reps that contacted you?

54:25-55:2

54:25 THE WITNESS: That I don't recall
55: Page 55
55: 1 specifically. That is the impression that I got
55: 2 from the conclusion of the VIGOR trial.

57:11-57:14

57:11 Q. I'll put it this way: Is it true if
57:12 you look at Exhibit Number 9 that you were
57:13 contacted by Merck sales reps on Vioxx over 330
57:14 times --

57:17-57:17

57:17 Q. -- from 1999 to 2004?

57:20-57:22

57:20 THE WITNESS: I can't confirm the
57:21 number, but I can tell you that I was contacted by
57:22 Merck reps many times in that period.

58:11-58:19

58:11 Q. And one of the reps was your wife you
58:12 said?
58:13 A. That's correct.
58:14 Q. What's her name?
58:15 A. Sharon. Now Sharon Mikola. At the
58:16 time, Sharon Mikolajczyk.
58:17 Q. And she actually for a short period of
58:18 time detailed you on Vioxx as well?
58:19 A. She called on me, yes, sir.

59:19-60:1

59:19 Q. Thank you. Now, you know, previously I
59:20 showed you Exhibit Number 6, the Scolnick e-mail,
59:21 and the -- Exhibit Number 7, the Patrono e-mail.
59:22 When you're treating patients such as Mr. Barnett
59:23 and prescribing medicines for them, would you like
59:24 to get complete information regarding the side
59:25 effects or risks concerning the drug you're
60: Page 60
60: 1 prescribing?

Δ objection: 401, 402, 403; 602
π response: The fact that Dr. Mikola has not previously seen these documents nor been informed of their content is relevant to show that the doctor was not given complete safety information.

60:3-60:3

60: 3 THE WITNESS: Yes, sir.

60:5-60:9

60: 5 Q. So in this case with Vioxx, would
60: 6 that -- would information such as contained in
60: 7 Exhibit Number 6 and 7 have been the type of
60: 8 information that you would have liked to have had
60: 9 regarding Vioxx?

60:14-60:16

Please see previous page

THE WITNESS: I think it would have been helpful, yes, to -- to make informed decisions regarding prescribing medicine.

60:18-61:7

Q. And why is that? As a doctor, why is informed decision an important thing for you?
A. In general, the prescribing of medicines is always a risk-versus-benefit decision. All medicines have potential side effects and all medicines -- most medicines hopefully have potential benefits. And when you decide on whether to prescribe a medicine for a condition or which
Page 61
medicine you're going to prescribe for a given condition, it's important that you know the potential risks of using the medicine so that you can weigh the risks versus the benefits and decide if it's appropriate for that patient.
Q. Okay. Let me show you the next exhibit, I guess would be Exhibit Number 10.

61:24-62:5

Δ objection: 401, 402, 403, 602

π response: The fact that the witness has never seen this document or informed of the contents is relevant to show that he was not given a complete picture of CV safety by Merck while prescribing Vioxx.

Q. Would you read the to/from and the date into the record, please, sir.
Page 62
A. To Raymond Gilmartin and David Anstice from Edward Scolnick. The date is January 31st, 2001.
Q. Okay. And why don't we read the first few sentences up until the word certainty.

62:8-62:24

A. Ray and David, as I'm sure you can both tell, I am pretty agitated over the events related to Stanford and Dr. Frees. The VIGOR meeting is next Thursday. On Monday I will show you the essence, an update, of the data that supports Vioxx is safe in the CV sense, but I want to point out to all of you at one time that, one, there is no way to prove that in patients with rheumatoid arthritis that all of the difference between Vioxx and Naproxen is due to the benefit of Naproxen. It is impossible -- in bold letters, it is impossible to prove this; it is impossible to know this with certainty.
Q. Okay. But that would have been the type of information you would have liked to receive when you were deciding which medicines to prescribe for Mr. Barnett?

63:1-63:1

THE WITNESS: Yes, sir.

63:25-63:25

Q. Let me show you Exhibit Number 11.

65:9-65:14

Q. Okay. I want you -- for the purpose of this question, I want you to assume this was the FDA-proposed label change that never was ever put into the Vioxx label.
Do you see at the bottom of -- of 8571 it says cardiovascular disease at the very bottom?

65:16-65:16

THE WITNESS: Yes, sir.

65:23-66:12

Q. Will you read the first paragraph into the record, please.
A. Yes, sir. Vioxx should be used with
Page 66
caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarction and angina and in patients with preexisting hypertension and congestive heart failure.
Q. Okay. Now, given the information that you've read in exhibits I've just shown you and this proposed label, if you had known that information that I've shown you and you had seen a label like this, would you have prescribed Vioxx to Mr. Barnett given his history with possible angina in January of 2000?

66:14-66:15

THE WITNESS: I believe I would have left him on Feldene.

66:19-67:1

Q. You wouldn't have put him on Vioxx?
A. I don't believe so, no, sir.
Q. What is Feldene for the record?
A. Feldene is a nonselective antiinflammatory drug.
Q. And when he first saw you, he was doing okay on it?
Page 67
A. Correct.

Δ objection: 401, 402, 403, 602

π response: The fact that Dr. Mikola did not see or hear about the information contained in this document is relevant to show that he was not completely informed of the CV risk of Vioxx, and if he had been, he would not have prescribed it to plaintiff.

69:6-69:8

MR. ROBINSON: Exhibit Number 12 is -- is Ed Scolnick's response to the proposed label change.

69:22-70:2

Q. Okay, will you read into the record, sir, the comments of -- from the e-mail starting with from?
A. From Edward Scolnick sent Tuesday
Page 70
October 16th, 2001 to David Anstice, subject

Δ objection: 401, 402, 403, 602

π response: The fact that Dr. Mikola did not see or hear about the information in this document is relevant to show that Merck never communicated the CV risk to the doctor

regarding Vioxx label.

Δ objection: see previous page

π response: see previous page

70:9-70:24

Q. Would you read that into the record, please.
A. Yes, sir. David, be assured we will not accept this label. If we need to, we will ask to go to an advisory committee meeting/Ed.
Q. Okay. Now read -- can you read David's response to Ed.
A. Yes, sir. Ed, thanks. I just received a copy five minutes ago and will digest tonight. We knew it would be ugly, in capital letters, and it is. We'll fight back and see where we get. I agree that we should ask for an advisory committee if necessary. David.
Q. Okay, will you read the e-mail back from Edward Scolnick to David Anstice?
A. It is ugly cubed, they are bastards.

71:15-71:22

Q. This is Exhibit Number 13, I believe, and it's an e-mail from Edward Scolnick to various people at Merck, including Douglas Greene, Alise Reicin, Alan Nies, Harry Guess, Deborah Shapiro, Thomas Simon dated February 8th, 2001. And we'll mark a clean one. So will you look at Exhibit Number 13 and read who it was to and then read into the record what the e-mail said.

72:12-72:17

A. Okay. To all, I bit my nails all day. You all were fantastic. You made them look like Grade D high school students and you won big, huge and completely. You should be proud, happy and exhausted. Enjoy and bask in the warmth of having done an impossible job superbly, signed Ed.

72:20-72:22

Were you ever told that Merck was able to negotiate the April 2002 label with the FDA before today?

72:24-72:24

THE WITNESS: No, sir.

73:2-73:13

Did you know that the VIGOR information was -- was placed eventually in the precautions section of the April 2002 warning rather than up in the warnings section as previously proposed by the FDA?
A. No, sir.
Q. And obviously you weren't aware that Mr. Scolnick talked about the FDA as being Grade D high schoolers, right?
A. That's correct.

Δ objection: same as p. 17
Π response: same as p. 17

MR. ROBINSON: I think we're at Exhibit Number 14.

74:4-75:17

Q. Once again, this is from the president of Merck Research Laboratories, Ed Scolnick. Go ahead.
A. To all, I cannot restrain the activist side of me as I continue to mull the results of the low-dose ASA endoscopy study. Looking up Clopidogrel, which is C-L-O-P-I-D-O-G-R-E-L, I think the question we should answer now is not whether Vioxx or any coxib is safe for CV outcomes. I think the question now is what is the best antiplatelet regimen to use with a coxib. I think that is the medical question and if we answer it, the problem will dissipate. The studies, 1, Vioxx low-dose ASA and pump inhibitor versus Naproxen and pump inhibitor in patients with arthritis and some level of CV risk; 2, Vioxx and Clopidogrel versus Naproxen and pump inhibitor in same kind of patients. If you think it through, this will answer the questions that are medically needed. Safety committee monitors the studies and stops them if the arms separate statistically with predefined stopping rules. Power for

75: Page 75

noninferiority based on the incidence and differences seen in our own OA, RA studies/Ed.
Q. And would you read the -- the e-mail from Adam Schechter to Thomas Cannell up above.
A. Yes, sir. I would like to get your thoughts on Ed's message below. Please keep this confidential as the results of the low-dose aspirin study are not widely known.
Q. Did you -- at any time while you were prescribing Vioxx to Mr. Barnett, did you know that they had done a low-dose aspirin study?
A. Not to my recollection, no, sir.
Q. Did you ever receive a warning while you were treating and prescribing Vioxx to Mr. Barnett before his heart attack that you should absolutely give low-dose aspirin with Vioxx when prescribing Vioxx?

75:23-75:23

THE WITNESS: No, sir.

76:6-76:8

Q. Once again, 15 is a series of records at or around Mr. Barnett's heart attack commencing on 9/6/2002.

76:17-76:24

Q. Exhibit 15, Page 1 and 2 appear to be a discharge summary with copies going to you, but -- and Dr. Karavan from Brian D. Schreckengast?
A. Correct.
Q. And who is he?

A. He was a physician's assistant who worked for the cardiothoracic surgeons at Grand Strand Hospital in Myrtle Beach.

77:2-78:19

The date of discharge from his hospitalization was 9/14/2002?

A. Correct.

Q. Apparently he had his heart attack on 9/6/2002, is that right?

A. I believe that's correct, yes.

Q. Can you read the DG meds -- discharge meds into the record, please.

A. Yes, sir. Enteric-coated aspirin 325 milligrams PO QD, which means by mouth daily; Prilosec 20 milligrams PO QD; and Lipitor for home regime, which there are some typos I can correct at the end; Vioxx 25 milligrams PO QD; Darvocet-N 100 one to two tabs every four hours as needed for pain; Lopressor 50 milligrams PO BID; multivitamin one PO QD. And the typo is the DG meds should be DC meds for discharge and it should read and Lipitor per home regimen. Per, not for, which would mean he would be on the same dose as prior to admission.

Q. Okay. And would you also read the discharge diagnosis into the record, please.

A. Non-Q wave myocardial infarction, coronary artery disease, hyperlipidemia, systemic

Page 78

hypertension, gastroesophageal reflux disease and diverticulosis.

Q. And what is -- can you read the procedures that he underwent into the record, please.

A. Diagnostic coronary catheterization performed by Dr. Mark Karavan on September 9, 2002 revealing significant three-vessel coronary artery disease.

Number 2 is a coronary artery bypass grafting times five performed September 9, 2002 by Dr. Bryan with the left internal mammary artery to the left anterior descending artery (sic), saphenous vein graft to the second diagonal coronary artery, saphenous vein graft to the ramus intermedius coronary artery and a blank sequential graft, saphenous vein graft to the posterior descending coronary artery to the left ventricular branch.

78:21-78:23

third page of Exhibit Number 15. Would you read in the note of Dr. Pyle.

A. Yes, sir.

79:3-79:10

A. I'm sorry, 58-year-old white male who states that he was sitting at his desk this evening when he developed symptoms of a, quote, unquote, chest ache. States symptoms were mild in