Mikola 1

six months, parentheses, 265 in OA trials, parentheses; the rest of the exposure to, and another symbol, 50 milligrams was in short-term studies. The division has requested a metanalysis based on dose and duration.

None of the studies were powered to detect differences in serious CV thrombotic events compared to the active comparator, but more important, the studies involved a different population.

Patients with RA have recently reported to have twice the risk of cardiovascular events compared with OA. There is increasing evidence that ongoing inflammation is a risk factor for coronary disease, in parentheses, plaque instability -- or it says unstability. It is likely that RA population is a very sensitive model for detecting differences in the beneficial or deleterious effects of any drug on cardiovascular risk.

Q. Okay. Did -- did Merck ever share any of that information with you that you just read from the FDA document?

133:1-133:2

THE WITNESS: Not to my recollection, no, sir.

Δ objection
please see previous page

π response
please see previous page

Total Length - 01:30:00

Mikola (Multi-clip)

353:19-353:20

Q. Dr. Mikola, Ted Wacker again, I
introduced myself earlier. I'm obviously standing

Plaintiff will remove

Δ objection - lawyer sidebar

π response - needed for clarification as to who is examining witness

354:4-354:15

In Exhibit 2, and I just wanted to clarify, this was the -- the document that Grand Strand Regional Medical Center -- what appears to be some sort of -- I don't know if it's a discharge summary or a summary by Dr. Swami, but it does indicate that Mr. Barnett was on Vioxx.
Do you see that?
A. Yes, sir.
Q. Okay. And even though your record that we previously went over with counsel didn't specifically indicate Vioxx, you're not disputing that he was on Vioxx at that time?

354:17-355:6

THE WITNESS: He apparently told Dr. Swami or the PA, I think it was Vicki Allen that saw him at that time, that he was taking Vioxx.
BY MR. WACKER:
Q. And it's not completely uncommon for -- when patients are providing a list of medications that -- that the medication list is not -- is different between doctors?
Page 355
A. Yes.
Q. You've seen that often?
A. Yes. And if it's not updated, it's very possible that Dr. McCaffrey put him on Vioxx and according to my records, he was still on Feldene.

356:14-356:19

Q. Assuming that Mr. Barnett had started Vioxx by Dr. McCaffrey in December of '99 or January -- early January of 2000, would you agree that you can't rule out that the Vioxx could have potentially contributed to the ischemia that you observed in late January of 2000?

Δ objection. 401, 402, 403 701, 702, 703

π response: witness is testifying from his understanding of Vioxx. Relevant to show that the doctor could not rule it out.

356:21-358:1

THE WITNESS: The question, I think, becomes whether or not Vioxx contributes to instability of plaques and plaque rupture. I can't say that it does, I can't say that it doesn't.
BY MR. WACKER:
Page 357
Q. So in other words, you can't rule that out?
A. That's correct.
Q. Now, Dr. Mikola, if you can turn to Exhibit 40 that defense counsel showed you.

A. Yes, sir.
Q. That is the Bombardier article?
A. Yes, sir.
Q. And can you read the title for the record.
A. Comparison of upper gastrointestinal toxicity of Rofecoxib and Naproxen in patients with rheumatoid arthritis.
Q. Does the title anywhere indicate to you, Doctor, that Vioxx increases the risk of cardiovascular disease or cardiovascular events?
A. No, sir.
Q. Is there anywhere in the abstract that indicates that Vioxx significantly increases the risk of cardiovascular events?
A. No, sir.
Q. And again, going to Page 1526 of the article that counsel pointed out, first of all, this discussion of the cardiovascular events is on the seventh page of this article in the right-hand
Page 358
column, third paragraph down, correct?

Δ objection: please see previous page
Π response: please see previous page

358:4-358:16

THE WITNESS: Seventh page, right column.
BY MR. WACKER:
Q. Fourth paragraph.
A. Fourth paragraph, yes, sir.
Q. Would you agree with me that this discussion was not prominently displayed in the beginning of the article --
A. Yes, sir.
Q. -- for somebody like yourself as a prescriber to review and for the company to highlight?
A. Yes, sir.

Δ objection: 401, 402, 403
Π response: Relevant to show that discussion of CV events was not prominently displayed in the article

358:19-359:3

Q. And specifically, if you could read, Doctor, where it starts in the second sentence, the rate of myocardial infarction. Could you read that for the record.
A. The rate of myocardial infarction was significantly lower in the Naproxen group than in the Rofecoxib group, parentheses, .1 percent versus
Page 359
.4 percent, parentheses. This difference was --
Q. That's fine.
A. Okay.

360:5-360:8

Q. The rate of myocardial infarction was significantly higher in the Vioxx group than in the Naproxen group, it doesn't say that?
A. Correct, it does not directly say that.

360:13-360:24

In the last paragraph, last sentence

Mikola 2

where it starts thus, do you see that?
A. Yes, sir.
Q. It says, thus, our results are consistent with the theory that Naproxen has a coronary protective effect and highlights the fact that Rofecoxib does not provide this type of protection owing to its selective inhibition of cycloxygenase-2 at its therapeutic dose and at higher doses.
Do you see that?
A. Yes, sir.

361:1-361:5

Dr. Mikola, this conclusion doesn't give you the other side of the coin in terms of indicating that there is a potential prothrombotic effect of Vioxx, does it?
A. That's correct, it does not.

Δ objection: 401, 402, 403
π response: Relevant to show Dr. Mikola's interpretation of the article as not indicating the prothrombotic effect

361:8-361:14

THE WITNESS: It does not indicate a prothrombotic effect.
BY MR. WACKER:
Q. And you as a prescribing physician rely upon a pharmaceutical company providing you with a fair and balanced presentation of the scientific evidence, correct?

Δ objection: leading
π response: Proper inquiry into Dr. Mikola's expectations of a pharmaceutical company's presentation of the evidence

361:16-361:22

THE WITNESS: I rely on the presentation of evidence to be fair and balanced, yes.
BY MR. WACKER:
Q. And that would include that if there's two possibilities that you would expect the company to give you both of those, correct?

361:24-362:12

THE WITNESS: The conclusion is there's speculation in this instance. Would I -- they
362: Page 362
speculate that the difference is due to a protective effect of Naprosyn. Would I expect them to also speculate that it may be due to a prothrombotic effect of Vioxx? I don't know.
BY MR. WACKER:
Q. Well, if -- if they're going to provide you with one area --
A. Yes.
Q. -- area of speculation, would it be equally fair and reasonable to give you the other side of that equation?
A. Yes, sir.

362:16-362:20

Q. And that's especially true in light of what you've seen today wherein Dr. Patrono specifically indicated in his e-mail that you

Δ objection: leading, 602
π response: The fact that Dr Mikola was not shown these documents previously shows that he was not given the full CV safety profile of Vioxx. Proper inquiry into Dr Mikola's expectations of a pharmaceutical company

couldn't explain the difference because of Naproxen, true?

362:22-363:1

THE WITNESS: Yes, sir.
BY MR. WACKER:
Q. And nowhere in this article does it indicate what Dr. Patrono's e-mail indicated that we've already reviewed, correct?

363:3-363:9

THE WITNESS: That's correct.
BY MR. WACKER:
Q. And in fact, nowhere in this article does it indicate what we've reviewed today that Dr. Scolnick indicated that the CV events are clearly there and it is mechanism based as we worried it was?

364:7-364:12

Q. And again, similarly, Dr. Mikola, you would also expect that if there were that type of evidence like we've reviewed in the Scolnick e-mail that you would expect a pharmaceutical company to provide you with that type of scientific conclusion?

364:15-365:1

THE WITNESS: I would think if they had a belief among their research specialists that there were prothrombotic effects of Vioxx, then it should have been made known, yes, or at least studied further and made known that there were ongoing studies.
BY MR. WACKER:
Q. And if they did have that evidence that there were those potential prothrombotic effects of Vioxx and as you indicated that they should have made it known, it would be wrong not to, wouldn't it?

365:3-365:7

THE WITNESS: It could potentially result in -- in problems, yes, sir.
BY MR. WACKER:
Q. It could result in misleading a prescriber that's prescribing the drug, correct?

365:9-365:13

THE WITNESS: I believe so, yes.
BY MR. WACKER:
Q. In other words, here you are, you're treating in this case Mr. Barnett and this is information that you would have wanted to know?

Δ objection: Please see previous page

π response: please see previous page

365:15-365:15

THE WITNESS: Yes, sir.

Please see previous page.

366:9-366:18

Q. Okay, Doctor, do you see anywhere in this article that it indicates that Dr. Patrono was a paid consultant for Merck?
A. No, sir.
Q. Is it your understanding that based on the current status of peer-reviewed medical literature that in order to obtain a fair and balanced and an unbiased review of literature that somebody that's a paid consultant should disclose that fact?

366:20-366:21

THE WITNESS: Yes, I think that's information that should be disclosed.

Δ objection: 602
π response: The witness is being asked about the disclosure of paid consultants - proper inquiry

369:4-369:14

Q. Let's go to Exhibit 42. Doctor, if you don't have it there, we'll find it, but this is the -- the article by Mukherjee, Nissen and Topol. Do you see that?
A. Yes, sir.
Q. Now, counsel asked you about your awareness of that article and I believe your testimony was you didn't recall specifically reviewing that article at the time, correct?
A. I'm not certain if I reviewed it or not, that's correct.

370:3-370:9

Merck -- nobody from Merck brought you that article, did they?
A. That's correct.
Q. And nobody from Merck, including sales reps or otherwise, ever called attention to that article in relation to Vioxx as a COX-2 inhibitor increasing the risk of cardiovascular events?

370:11-370:11

THE WITNESS: Not to my recollection.

Δ objection: 602
π response: clarification as to whether Merck showed Dr. Mikola this article

371:24-372:10

Q. Yeah, you -- whether they brought that particular article to your attention --
372: Page 372
A. Yes.
Q. -- you would expect that Merck would advise you of the potential of one of their drugs like Vioxx to increase the risk of cardiovascular events?
A. I would think that they would make me aware of it, yes, sir.
Q. And that didn't happen while you were

Δ objection: leading
π response: inquiry into witness' expectations of Merck re sharing CV risk potential

Mikola 2

treating Mr. Barnett?
A. Not to my recollection, no, sir.

[Handwritten: see previous page]

372:13-372:14

Q. If you want to refer to Exhibit 44, which is the product insert or label.

[Handwritten: Δ objection: misleading
π response: witness is not being asked about contents of this particular label, just the levels of a product warnings insert.]

372:18-372:21

Q. Doctor, you would agree that in terms of product labeling, there's various levels of -- of warnings, correct?
A. Yes, sir.

[Handwritten: Δ objection: Leading
π response: witness is being asked generally about the types of warnings in a label and his emphasis on the placement of content in various sections of the label]

373:3-373:10

At the top of that list truly is -- is an absolute contraindication, correct?
A. Correct.
Q. And then from there, there's a relative contraindication?
A. Yes, sir.
Q. And then from there, there's a black box warning, correct?

373:12-373:15

THE WITNESS: Yes.
BY MR. WACKER:
Q. And then below the black box warning is a warning, correct?

373:17-374:2

THE WITNESS: Yes, sir.
BY MR. WACKER:
Q. And then below that is a precaution, correct?
A. Yes, sir.
Q. And you would agree that the -- the proposed label that we showed you earlier that had the cardiovascular events in the warnings section is a more heightened location of that warning than
Page 374
in -- in the precautions section that it's -- that it ended up in April 2002.

374:4-374:9

THE WITNESS: Yes, sir.
BY MR. WACKER:
Q. And when you're weighing the risks and benefits of a drug, that's something that you take into consideration, where that warning is placed in the actual product insert?

374:11-374:11

THE WITNESS: Yes, sir.

374:24-375:2

Mikola 2

Q. Here you go, Doctor. I'm going to hand you Exhibit 47. This is a memo dated July 5th, 2000, correct?
A. Yes, sir.

375:20-376:2

Q. Doctor, if you look at Exhibit 40, which is the Bombardier article --
A. Yes, sir.
Q. -- and now if you look at Exhibit 47, which is the July 5th memo from Deborah Shapiro.
A. Yes, sir.
Q. And if you go to Figure 1, Page 4 of the -- of the memo.

376:7-376:8

Q. Are you with me?
A. Yes, sir.

376:17-376:18

MR. WACKER: It says, subject, cardiovascular update, VIGOR.

377:6-377:12

A. Yes, sir.
Q. And do you see that that's a graph, a Kaplan-Meier Curve?
A. Says so.
Q. And it indicates, confirmed thromboembolic cardiovascular serious adverse experiences. Do you see that?

377:15-378:8

THE WITNESS: Yes, sir.
BY MR. WACKER:
Q. And that's for the bigger study, correct?
A. Yes, sir.
Q. Now, turn to the Bombardier article itself.
A. Yes, sir.
Q. Do you see that graph depicted anywhere in the Bombardier article?
A. No, sir.
Q. Now, what you do see in the Bombardier article is a graph on Page 1524. That is -- is a graph just discussing the benefit side of the equation, meaning the -- the PUB data, correct?
A. Yes, sir.
Q. And you were never provided as a prescribing physician this particular Kaplan-Meier Curve that shows the risk side of the equation --

378:11-378:17

Δ objection: 401, 402, 403, 602
π response: The fact that the witness has not seen or been informed of the information contained in the Kaplan-Meier curve is relevant to show he was not provided with the full safety profile of Vioxx

Δ objection: Leading
π response: needed for clarification

Δ objection: Leading
π response: Clarifying that the witness never received this data

please see previous page

Q. -- for Vioxx, correct?
A. To the best of my recollection, that's correct.
Q. And is that something that you would have wanted to know when reviewing that article in making a decision regarding the risk-benefit of Vioxx?

378:25-378:25

A. Yes, sir.

379:9-379:16

Q. Dr. Mikola, I'm now going to hand you Exhibit 48. Can you read the title of that article into the record.
A. Yes, sir. Expression of concern: Bombardier and others, comparison of upper gastrointestinal toxicity of Rofecoxib and Naproxen in patients with rheumatoid arthritis, New England Journal of Medicine, 2000.

Δ objection: 401, 402, 403 document speaks for itself, subject to MIL
π response: Relevant to show that Merck did not provide full info to NEJM, subject of MIL

380:18-380:24

Q. Yeah. Taking -- taking the information from this expression of concern, would you agree that the information that's contained within this expression of concern regarding the -- the missing information from the original Bombardier article would have been information that you would have wanted to know as a prescribing physician --

381:2-381:4

Q. -- at the time you were prescribing Vioxx to Mr. Barnett?
A. Yes, sir.

Δ objection: 401, 402, 403 leading, speculation
π response: witness is testifying that the missing information would be relevant to his prescribing practices and is therefore relevant and material

381:7-381:22

Q. And specifically, Doctor, if you look down to the -- it's the third full indented paragraph, it starts with the fact. Do you see that?
A. Yes, sir.
Q. The fact that these three myocardial infarctions were not included made certain calculations and conclusions in the article incorrect.
Do you see that?
A. Yes, sir.
Q. And then in the next paragraph, it says, lack of inclusion of these -- of the three events resulted in an understatement of the difference in risk of myocardial infarction between the Rofecoxib and Naproxen groups.

382:1-382:2

Q. Do you see that?
A. Yes, sir.

Δ objection: 401, 402, 403 document speaks for itself, subject to MIL
π response: Relevant to show that information was left out of Merck's submission to NEJM. subject to MIL

382:6-382:11

Q. And then it says, it has also resulted in the misleading conclusion that there was a difference in the risk of myocardial infarction between the aspirin indicated and the aspirin not -- not indicated groups.
Do you see that?

382:15-382:15

THE WITNESS: Yes, sir.

Δ objection: 401, 402, 403, doc speaks for itself, subject to MIL
π response: please see previous response

382:17-382:20

Q. And again, had that information been included in the original article, that would have been something that you would have relied upon, correct?

383:1-383:1

THE WITNESS: Yes, sir.

Δ objection: 611 leading, 401, 402, 403, doc speaks for itself subject to MIL
π response: Relevant to show that Dr. Mikola would rely on missing information, subject to MIL

383:17-383:24

Q. Okay, Doctor, this is Exhibit 49. Can you read the title, please.
A. Expression of concern reaffirmed.
Q. And the name of the journal?
A. This is the New England Journal of Medicine.
Q. Can you just read the last paragraph of this article.

Δ objection: 401, 402, 403 subject to MIL, doc speaks for itself, beyond the scope of cross-exam by Merck
π response: see previous response

384:2-384:12

THE WITNESS: The information we have indicates that the VIGOR article, because it did not contain relevant safety data available to the authors more than four months before publication, did not accurately reflect the potential for serious cardiovascular toxicity with Rofecoxib. We, therefore, reaffirm our expression of concern.
BY MR. WACKER:
Q. And again, this is information that you would have wanted to know at the time when you were prescribing Vioxx to Mr. Barnett?

Δ objection: 611, 401, 402, 403 subject to MIL, doc speaks for itself, beyond the scope of cross
π response: questions relate to VIGOR questions Relevant to show that Dr. Mikola would have relied on missing info

384:14-384:24

THE WITNESS: The information about the additional deaths and outcomes, yes, I would have liked to have known that information.
BY MR. WACKER:
Q. And Doctor, following the publication of the Bombardier article regarding VIGOR, to your knowledge, the company Merck never updated that article with this -- with any of this updated information regarding the three heart attacks or this table in the July 5th, 2000 Shapiro memo, correct?

Δ objection: 611, 602, beyond the scope of cross
π response: witness is testifying to his knowledge of the VIGOR article and whether it was updated.

Mikola 2

385:1-385:2

THE WITNESS: To my knowledge, that's correct.

405:24-406:19

Q. Dr. Mikola, in the April 2002 package insert, counsel pointed to a specific section where
Page 406
he indicated special studies, VIGOR, other safety findings, cardiovascular safety. It says, in a placebo-controlled database derived from two studies with a total of 2,142 elderly patients, mean age 75 with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 versus 35 for patients treated with Vioxx 25 milligrams once daily versus placebo respectively.
Do you see that?
A. What page are you on, first, second?
Q. That is under precautions, cardiovascular effects on the right-hand column.
A. Okay, I remember the text from earlier.
Q. Yeah. And in --
A. Yes, sir.
Q. -- in prescribing the medication to Mr. Barnett as of April 2002, you relied upon that statement as being accurate, correct?

406:21-406:25

THE WITNESS: That would be correct.
BY MR. WACKER:
Q. And if there was information that was contrary to that, that's something that you're unaware of, correct?

407:3-407:9

THE WITNESS: That would be correct.
BY MR. WACKER:
Q. So if there was information that indicated that even at 25 milligrams, there was a statistically-significant increase in risk for Vioxx, that's something that Merck did not share with you, correct?

407:11-407:11

THE WITNESS: That would be correct.

Δ objection: 611, beyond the scope of cross

π response: Questions refer to examination about package insert previously testified to - proper inquiry into what he relied on when prescribing Vioxx

Total Length - 00:20:39