McCaffrey (Multi-clip)
MM 404 4:4-4:9

Q. Can you please state your name for the record.
A. Michael McCaffrey, MD.
Q. Dr. McCaffrey, my name is Andy Goldman. We haven't met before, have we?
A. No, sir.

MM 509 5:9-6:16

Q. Before today have you had any meetings with Plaintiff's counsel?
A. No, sir.
Q. Can you describe for the ladies and gentlemen of the jury your education and your medical training.
A. How far back would you like me to go?
Q. You can start after college.
A. After college. I went to medical school at St. George's University School of Medicine in Grenada, West Indies starting in 1984. I graduated from St. George's on December 28th, 1988. I started my internal medicine residency in May of -- March of 2000 -- make that March of 1989 at the Western Pennsylvania Hospital in Pittsburgh, Pennsylvania. I did two years of internal medicine at the Western Pennsylvania Hospital.
Page 6
In April -- on April 1st, 1991, I started my neurology residency at Medical College of Virginia in Richmond. My third year of residency I was solo chief resident in addition to my other duties and after my residency was over, I did a one year neuromuscle fellowship at Medical College of Virginia from 1994 to 1995.
I practiced for one year at the Heart and Family Health Institute in Port Saint Lucie, Florida as a solo neurologist for a multispecialty group. I remained there for one year. I came to Myrtle Beach and worked for Executive Court Medical Specialists owned by John Rathman. I worked for them for one year, came to the group I'm presently in, which is Strand Regional Specialty Associates, and I've been here going on my ninth year.

MM 3403 34:3-34:25

Q. When did you first meet Gerald Barnett?
A. Pull his name up here. Mr. Barnett, I first met him on March 26th, 1990 -- I take that back -- yeah, March 26th, 1998.
Q. I'm going to hand you what I've marked as Exhibit 1 to your deposition, sir.
(DFT. EXH. 1, Strand Regional Specialty medical record, was marked for identification.)
BY MR. GOLDMAN:
Q. Is this a document that reflects your first visit with Mr. Barnett on March 26th of 1998?
A. Yes, sir.
Q. We're going to go through this in a

minute, but I want to ask you how many total visits you had with Mr. Barnett, period.
A. Four visits.
Q. When was the last time you saw Mr. Barnett?
A. It was on December 30th, 1999.
Q. So you treated Mr. Barnett from March 28th, 1998 through December 30th of 1999 and during that period, you saw him a total of four times?
A. Yes, sir.

MM 3521 35:21-37:5

Q. Did Mr. Barnett explain to you the medications that he had been taking to try to address his chronic neck pain and back pain?
A. Yes, sir, he did. He said --
Q. What were those?
Page 36
A. He said he had taken Feldene, which is an antiinflammatory, from --
Q. Is that a traditional NSAID?
A. It's a traditional NSAID. It would be in the same family as Mobic, which is a newer medication that's out now -- from December 1980 through October 1996 with significant improvement of his symptoms and he had stopped his medication in 1996, started taking ibuprofen. And I'm not sure at that time, I didn't go into detail why he stopped it.
Q. So Mr. Barnett told you he had taken Feldene for 16 years to try to resolve his back pain and his neck pain and then he had switched to ibuprofen?
A. Over-the-counter ibuprofen.
Q. Did Mr. Barnett tell you that Feldene actually did help him for awhile resolving his pain?
A. Yes, he did.
Q. And did you at this point in time decide that it would be appropriate to put him back on Feldene?
A. And that -- that's what I did, I put him back on Feldene that day and talked to him
Page 37
about doing an MRI scan of his lower back to evaluate for lumbar disc disease and also do a nerve conduction study, EMG, of the left leg to evaluate for any evidence of an active or chronic lumbosacral radiculopathy.

MM 3713 37:13-38:1

Q. The medication that you prescribed on this occasion, March 26th of 1998, was Feldene, right?
A. Yes, sir.
Q. Why did you decide to prescribe Feldene as opposed to some other medication to Mr. Barnett?
A. It's a medication that had worked for him before.
Q. When you prescribe medications to your patients, sir, do you listen to them concerning

what medications have worked and what haven't worked in the past?
A. It's probably the most important part
Page 38
of their history.

MM 3907 39:7-40:19

Q. The next time you saw Mr. Barnett was on -- was it March 31st of 1998?
A. Yes, it was.
(DFT. EXH. 2, Strand Regional Specialty medical record, was marked for identification.)
BY MR. GOLDMAN:
Q. Let me hand you Exhibit 2, sir. Is this a medical record concerning your visit with Mr. Barnett on March 31st, 1998?
A. Yes, it is.
Q. Why did he come to see you on this occasion?
A. We performed a nerve conduction study, EMG, on the patient to evaluate for evidence of a radiculopathy.
Q. And a radiculopathy is again?
A. A pinched nerve in the back.
Q. Did you discuss the results of that test with Mr. Barnett?
Page 40
A. It was discussed at the time of the test itself, yes, I did.
Q. What was your conclusion, sir, about the cause of Mr. Barnett's leg pain and lower back pain?
A. Well, he had evidence on the test from the study that demonstrated a chronic, which means something that had been going on longer than six months, and an active, something going on less than six months -- a chronic active pinched nerve in his back. So he had ongoing changes to the nerve itself from the study so at that time I said, you know, you have a chronic pinched nerve. We talked about we need to schedule you for an MRI or get on with the MRI to see exactly what's going on in your back. We had previously done X-rays on the first visit when he came in that showed some arthritic changes in his lumbosacral spine and we were going to review the MRI once we got the results back.

MM 4023 40:23-41:15

Q. Do you see that you wrote, quote, we will see the patient in follow-up after this MRI is completed, we will continue him on Feldene 20
Page 41
milligrams -- what does PO Q mean?
A. By mouth every day.
Q. He has had a significant improvement in his pain since restarting Feldene.
Do you see that?
A. That's correct.
Q. Why did you decide to continue him on Feldene as opposed to putting him on some other medication to help control his back pain?

A. Because he did well on the medicine.
Q. When did you see Mr. Barnett next?
A. I saw Mr. Barnett next on April 6th, 1998.
Q. 1998?
A. 1998.

MM 4119 41:19-41:19

Q. Let me hand you Exhibit 3, sir.

MM 4122 41:22-41:24

Q. Is this a medical record dated April 6th of 1998 concerning your visit with Mr. Barnett?
A. Yes, it is.

MM 4205 42:5-43:8

Can you describe briefly in terms that I can understand what the results of his MRI scan were.
A. Underwent his MRI on April 3rd, 1998. His MRI demonstrated mild spondylitic changes and these are changes you see with osteoarthritis at all levels with a disc bulge with posterior spurring noted at L-5/S-1. That's the fifth lumbar and the first sacral, which is a very common site.
Q. Is that in the lower back?
A. That's correct.
Q. Is that what was causing his lower back pain?
A. More than likely it was causing his back pain, yes, sir.
Q. In the middle of the paragraph that starts history of present illness, do you see that you wrote, he was started on Feldene 20 milligrams by mouth per day and has been doing fine on this medication, his symptoms have improved by 75 percent?

Page 43

A. Yes, sir.
Q. So he was still doing all right on Feldene at this point?
A. Yes, sir.
Q. Did you continue him on Feldene because the medicine was working at that point to help his back pain?
A. Yes, I did.

MM 5711 57:11-57:17

Q. Dr. McCaffrey, there might be evidence in this trial that you served as a speaker for Merck.
A. Yes, sir.
Q. During what period of time did you serve as a speaker for Merck?
A. I'm still a speaker for Merck.

MM 5922 59:22-61:4

Q. Have you been a speaker for other

pharmaceutical companies?
A. I speak for multiple pharmaceutical companies.
Page 60
Q. Which ones?
A. I speak for Allergan on Botox. My specialty is Botox, I'm a Botox injector. I speak for GlaxoWellcome. I speak for Merck. I speak for Pfizer. I speak for Forest Pharmaceuticals. I speak for UBC -- UCPharma -- UCPharma. I speak for Abbott on Depakote and I've spoken for other companies in the past.
Q. Why have you decided to be a speaker for those pharmaceutical companies that you just mentioned?
A. The main two topics that I speak on, I speak on Alzheimer's/dementia or the different demented disorders and migraine headaches. Those are the two main things that I give lectures on.
Q. Why have you decided to give lectures on those topics, Alzheimer's disease and migraines, on behalf of these pharmaceutical companies?
A. Well, it's -- I call it a double-edged sword. Number one, it's getting out in the community, especially the local community, showing your expertise to the other physicians who want to refer to you. You also get paid for giving the actual talks.
Q. Why do you call it a double-edged
Page 61
sword?
A. Because you get paid, but at the same time, you're trying to get business so you're trying to get paid twice.

MM 6410 64:10-64:14

Q. I'm going to ask you a few questions about the particular programs that you participated in for Merck before and during the time that Vioxx was on the market, okay, sir?
A. Okay.

MM 6508 65:8-65:20

Q. One of the programs you participated in was on September 9th, 1998 and you received a 300-dollar payment on that occasion. It's called a preceptorship.
A. Correct.
Q. What is a preceptorship?
A. Preceptorship is where you actually have one of the drug representatives in the office and they want to -- the company wants them to interact with the doctor, see what they actually do on a daily basis. And back then it was a requirement for the representatives to undergo these preceptorships.

MM 6607 66:7-66:21

Q. On November 16th, 1998, you gave a talk called a new treatment option in migraine.

A. That's correct.

Q. That occurred in a roundtable setting. Do you know what a roundtable is?

A. Yes, I do.

Q. What is a roundtable?

A. Roundtable is sitting around with a group of people. We might use notes where I'll type out notes for patients -- I mean not for patients, for the doctors or nurses or nurse practitioners who are just sitting there so we're not using slides on a screen. So we'll sit there and converse about migraine in general or whatever the topic's going to be that night.

MM 6717 67:17-69:2

Q. On January 21st of 1999, this is, again, before Vioxx is on the market?

A. Yes, sir.

Q. You spoke at a colloquia, do you know what that is?

A. I'm not sure.

Q. It's a -- it's a situation where there are more doctors where maybe you do use a screen to present.

A. Okay, so it was a dinner talk.

Q. A dinner talk?

A. A dinner talk.

Q. Explain what happens at these dinner talks.

A. At the dinner talks there will be a set of slides that talk about migraine itself, the etiology of migraine, the prevalence, different groups of people that suffer from migraine and then treatment options for migraine headache. So I'll go through the slides. There might even be slides at the end to tell you about the drug itself, its side effects of the medication, who should not use the medication and especially people with kidney problems or liver problems or people that are pregnant. And then if there's any questions at the end, you field any questions people have about migraine and you sit down and after that, you just talk about anything from -- you know, doctors are famous for sitting around talking about business all the time so usually the rest of the night you spend talking business about neurology or what other aspects of medicine -- and it's usually shared patients, a primary care doctor that does not see me regularly to say, thanks for taking care

of so and so, how can I do things better? And it might have nothing to do with migraine headaches.

MM 7401 74:1-75:12

Q. Did your role as a speaker, sir, for Merck have anything to do with your decision to prescribe Vioxx to Mr. Barnett on December 30th of 1999?

A. No, sir.

Q. Why do you say that?

A. Because I speak for multiple companies. I have a -- when I go into partnership with a company, and Merck has been the first company to step out this year and say it, is I tell them I'll speak -- I'll present the slides, but after the talk's over, we're going to go free flow on what people want to ask about. If they don't want to talk about migraine, we'll talk about something else. I had to sign a contract with Merck this year saying we're not even going to use slides any more when I give a talk about migraine. We're going to walk in when we're doing a lunchtime talk or dinner talk or a roundtable and let people talk about what they want to talk about about neurology.

So there won't even be information that's given to them anymore. We'll go in and if they want to talk about migraine, talk about migraine. If they want to talk about low back pain, we'll talk about low back pain. But this --

Page 75

you have to sign this contract and show you're not going to talk about anything on label with our -- our product unless asked to talk about it.

Q. Does your testimony here today, sir, have any -- withdrawn.

Does the fact that you are a speaker for Merck influence your testimony here today?

A. No, sir.

Q. Did you ever tell Mr. Barnett that you were a speaker for Merck or other pharmaceutical companies before you prescribed Vioxx to him?

A. I don't think so.

MM 7604 76:4-76:11

Q. Why did you not tell Mr. Barnett and why don't you tell your other patients that you speak on behalf of pharmaceutical companies?

A. If a patient asks me if I speak on a drug, I'll tell them. I mean, otherwise, I only have so many minutes in the room with patients. We concentrate on their disorder, we don't concentrate on what I do in my private time after work.

MM 9704 97:4-98:5

Q. Do you have discussions with sales representatives on occasion?

A. Yes, I do.

Q. Do sales representatives from different pharmaceutical companies come to your office to meet with you sometimes?

A. Daily.

Q. Can you describe a little bit about how often and --

A. Well, I mean, there's --

Q. -- how common that is?

A. It's very common. On a daily basis you have sales representatives that come by that have sample medications for you to try on patients. And so most of the reps are only there for you to sign so the medications are stored in your closet, then they're disbursed to patients to try on them for

Δ objection: 401, 402, 403 irrelevant and prejudicial because the testimony is referring to sales reps generally, not Merck sales reps or Merck sales reps who spoke to Dr. McCaffrey about Vioxx. If this objection is overruled, Merck counter-designates 98:6-11, 98:14, 98:17-18, 98:24-99:2, 99:4-12

π response: Testimony is relevant to show how Dr. McCaffrey interacts with sales reps, particularly how much time he spends with them →

that particular disorder. Others sales reps I
might sit down -- if I have time, I might sit down
and talk to them for five minutes about their drug.
If it's a drug I already know about, that they know
I use the medication, they don't bother me. They
Page 98
just -- you know, as I say, the more you bother me,
the less likely I am to use your drug. So if
you're pushing, I'm not going to use it. I'm only
going to use your drug if I think it's right for
the patient.

π response cont'd: and whether he actually speaks to them. These practices apply to merck sales reps and shows how Dr. McCaffrey gets his information about drugs.

MM 10204 102:4-102:19

Q. Did you do your best to stay familiar
with the current package insert and other
information about the benefits and risks associated
with Vioxx and other medicine you prescribe?
A. Yes, sir.
Q. After you prescribed Vioxx to
Mr. Barnett, sir, did you subsequently come to
learn about a study -- clinical trial called the
VIGOR trial or a GI Outcomes trial for Vioxx?
A. I can't remember.
Q. Do you read the New England Journal of
Medicine?
A. No, sir.
Q. Did you ever read an article about the
VIGOR trial in the New England Journal of Medicine?
A. No, sir.

MM 11204 112:4-112:5

Q. Okay, Doctor, I -- I represent Gerald
Barnett, the patient we're talking about here.

MM 11402 114:2-114:5

Q. Okay. Now, I think you said earlier
that you signed a partnership agreement with Merck
as a paid speaker sometime about four or five years
ago, is that right?

Δ objection: mischaracterizes testimony
π response: see 74:8-9 where Dr. McCaffrey says he enters a "partnership" with a company

MM 11411 114:11-114:25

A. If I -- every year if I'm -- if I'm
going to speak for Merck that year, there's
probably on record someplace where I've signed a
contract with them every year --
Q. Okay.
A. -- since I started speaking when Maxalt
became available, which might have been 1998.
Q. Okay. So you -- you've signed a
contract with Merck to be a speaker for about the
last seven or eight years?
A. That's correct.
Q. And that contract entitled you to be
paid by Merck for your time that you contribute
speaking, is that right?
A. That's correct.

MM 11703 117:3-117:5

Q. And is it true, sir, that for Vioxx you had approximately 374 contacts with the Merck sales reps --

Δ objection: 611(c), leading an independent, third party witness
π response: proper examination

MM 11708 117:8-117:9

Q. -- during the period Vioxx was on the market?

Δ objection: 611(c) leading an independent third party witness
π response: proper questioning into the number of times McCaffrey saw sales reps

MM 11712 117:12-117:20

THE WITNESS: How many years would that be over?
BY MR. ROBINSON:
Q. From '99 through 2004.
A. Once a week at least. Most reps have to see me every week.
Q. And in addition, you were paid for -- by Merck when sales reps sat in your office under what you call preceptorships, is that right?

Δ objection 611(c) leading, misleading
π response: proper follow-up questioning regarding preceptorships (65:8-20)

MM 11722 117:22-118:6

THE WITNESS: That's correct.
BY MR. ROBINSON:
Q. And in addition, is it true that from 1999 through 2004, you were given 8,435 Vioxx
Page 118
samples by Merck?
A. That's probably correct, but with the medications we stock different offices and there's five neurologists and, well, three -- four orthopaedic surgeons now so the medication would get distributed between them.

Δ objection 611(c) leading
π response: proper question regarding the number of Vioxx samples the witness received

MM 11819 118:19-118:24

Were you aware that -- that you were considered a Merck, quote, top earner for Vioxx?
A. I'm a top earner for many -- many pharmaceutical companies. Merck's not special.
Q. But you were aware you were considered a Merck top earner for the drug Vioxx?

Δ objection 611(c) leading an independent third party witness, 602
π response: proper question, witness acknowledges that he used a lot of medication and that he is a top earner for "many pharmaceutical companies"

MM 11901 119:1-119:5

THE WITNESS: I knew that I used a lot of medication, yes.
BY MR. ROBINSON:
Q. And you were a top earner for Vioxx, right?

Δ objection 611(c) leading, answer to an improper leading question
π response: question is proper to determine whether witness was a top earner specifically for Vioxx

MM 11907 119:7-120:7

THE WITNESS: I mean, reps would say, you know, you know, you're doing well with the medication.
BY MR. ROBINSON:
Q. For Vioxx? I just --
A. Yes, for Vioxx, yes.
Q. Okay. That's -- that was my question. And you also were involved in HEL programs with Vioxx, is that right?

Δ objection 611(c) answer to an improper leading question
π response: question is proper to determine whether witness was a top earner specifically for Vioxx