**Issues Report [Michael McCaffrey]**

- **Merck's Counter Designations**

Q. Yes.
A. Yes, very little.
Q. During the time that Vioxx was on the market, did you also prescribe other COX-2 inhibitors?
A. Yes, sir.
Q. Which?
A. Bextra and Celebrex.
Q. Do you know of the three COX-2 inhibitors that you prescribed which ones you prescribed the most often?
A. Probably Bextra and Vioxx.
Q. Which pharmaceutical company manufactured Bextra?
A. Pfizer. Well, Pfizer has the -- or had the drug at the time. I think they were the manufacturers.

# objection: see previous page

[64:6] - [64:9] 5/3/2006 Michael McCaffrey, M.D.

page 64
Did you prescribe to many of your patients Celebrex or Bextra if you thought it was in their best interest to receive that medication?
A. Yes, I did.

[64:15] - [64:21] 5/3/2006 Michael McCaffrey, M.D.

page 64
Q. And just so we're clear, the time period when you treated Mr. Barnett was from March of 1998 to December of 1999, right?
A. Correct.
Q. Our records indicate, sir, that you participated in four programs during that period.
A. Okay.

[65:21] - [65:25] 5/3/2006 Michael McCaffrey, M.D.

page 65
Q. And are those requirements common to all pharmaceutical companies, not just Merck?
A. They were common back then. They're -- with HIPAA guidelines nowadays, they're not -- they're not limited to them.

[66:22] - [67:16] 5/3/2006 Michael McCaffrey, M.D.

page 66
Q. During these roundtable discussions, are you addressing healthcare providers?
A. Yes, I am.
Q. The topic a new treatment option in
page 67
migraine, this occurred before Vioxx was on the market so were you talking about Maxalt then?
A. Talking about Maxalt.
Q. Why were --
A. Maxalt was a fairly new drug on the market in 1998.
~~Q. Why were you telling these healthcare~~
providers about Maxalt in November of 1998?
A. Just about -- trying to increase their knowledge in migraine itself and tell them that there is new medication for migraine and how it can be used.
Q. Are these roundtable discussions one way that doctors and nurses can learn about diseases and medications to treat those diseases?

**Issues Report [Michael McCaffrey]**

- **Merck's Counter Designations**

A. Yes, sir.

[69:3] - [69:15] 5/3/2006 Michael McCaffrey, M.D.

page 69

Q. Did you view and do you view these dinner talks and other programs such as roundtables to be inappropriate in some way?
A. No, sir.
Q. Why not?
A. It's a very good way for the doctors in the community to interact. They actually get to know each other and talk about business and talk about how to take care of patients better.
Q. Am I right that you participate in these dinner talks for multiple pharmaceutical companies, not just Merck?
A. That is correct.

[71:2] - [72:4] 5/3/2006 Michael McCaffrey, M.D.

page 71

Q. So as I understand your testimony, even though you were serving as a speaker for Merck for the medicine Maxalt --
A. Yes, sir.
Q. -- that was not the drug you prescribed the most to treat migraines?
A. No, it was not.

401, 402, 403 irrelevant as to migraines and doctor's prescribing practices as to Maxalt.

Q. The next time you spoke where Merck compensated you for your time was on July 8th, 1999 and that, again, had to do with the treatment of migraine and it was a talk called special considerations in the management of migraine in women.
A. That's correct.
Q. Why did you speak on the topic of management of migraine in women?
A. Well, emerging topic at that time was talking about menstrual migraine and Merck had started to do studies about -- I mean, very common time to have migraine headaches is during the menstrual cycle so we talked about the -- the women's menstrual cycle, went through the different days, ovulation, menses, and talked about how we can use the medication to prevent women from having

page 72

menstrual migraines or to try and prevent headaches during the month. And we started concentrating on it from a women's standpoint instead of -- instead of saying the routine migraine talk.

401, 402, 403 irrelevant as to menstrual migraines

[72:8] - [73:9] 5/3/2006 Michael McCaffrey, M.D.

page 72

Q. Those are the programs that we have records of you participating in before you prescribed medicine to Mr. Barnett on December 30th, 1999, okay?
A. Yes, sir.
Q. Am I right based on what we just discussed that before you prescribed Vioxx to Mr. Barnett on December 30th of 1999, you had participated in four programs for Merck?
A. Yes, sir.
Q. Three of those programs occurred before Vioxx was even on the market?
A. That's correct.
Q. Before you prescribed Vioxx to Mr. Barnett, you did not participate in any

**Issues Report [Michael McCaffrey]**

- **Merck's Counter Designations**

programs for Vioxx and you weren't paid to discuss Vioxx, true?
A. That's correct.
page 73
Q. All of the speeches that you gave on behalf of Merck before you prescribed Vioxx to Mr. Barnett involved migraine treatment and Maxalt?
A. That's correct.
Q. By our count, sir, prior to the time you prescribed Vioxx to Mr. Barnett, you received a total of 3,300 dollars for Maxalt programs and one preceptorship, okay?
A. That is correct.

[73:13] - [73:25] 5/3/2006 Michael McCaffrey, M.D.

page 73
Q. Did the 3,300 dollars that you were paid by Merck dictate what medicine you prescribed to Mr. Barnett or your other patients?
A. No, sir.
Q. Did the 3,300 dollars in payments you received before December 30th, 1999 influence you in any way in deciding to prescribe Vioxx to Mr. Barnett as opposed to Celebrex?
A. No, sir.
Q. Had you been a speaker for Pfizer before you prescribed medicine to Mr. Barnett or other pharmaceutical companies?
A. Yes, sir.

[75:24] - [76:3] 5/3/2006 Michael McCaffrey, M.D.

page 75
Q. If there's a suggestion at trial, Dr. McCaffrey, that Mr. Barnett didn't know that
page 76
you were a speaker for Merck and would have wanted to know that you were a speaker for Merck --
A. I would have told him.

[76:12] - [76:16] 5/3/2006 Michael McCaffrey, M.D.

page 76
Q. If you felt that Celebrex or Feldene or Mobic was a better choice to address Mr. Barnett's osteoarthritis, what would you have done?
A. I would have put him on that medication.

π Objection: Speculation

[77:25] - [78:4] 5/3/2006 Michael McCaffrey, M.D.

page 77
Q. Dr. McCaffrey, is Exhibit 6 a copy of a
page 78
speaker agreement that you entered into with Merck and initialed on every page and signed on December 19th, 2002?
A. Yes, it is.

[78:12] - [81:3] 5/3/2006 Michael McCaffrey, M.D.

page 78
Q. I want to talk about some of the terms in this agreement, okay? Focusing your attention on the second paragraph where it says, scope of work.
A. Yes, sir.
Q. Do you see that your contract says:

• **Merck's Counter Designations**

From time to time, you may be asked to speak at or act as a moderator for educational programs on topics as you and Merck agree?
A. That's correct.
Q. If you don't agree to speak on a particular topic and Merck or Pfizer or GlaxoSmithKline wants you to speak on that topic, would you decline?

page 79

A. That's correct.
Q. If you choose to speak at or act as moderator for such programs, and then it says, except as provided below under compliance with FDA regulations, Merck agrees not to dictate the content of your presentations.
Do you see that?
A. Yes, sir.
Q. Was it your understanding while you were serving as a speaker for Merck that Merck didn't determine the content of your presentations?
A. That's correct.
Q. You decided what you thought was appropriate to talk about a particular disease or a particular medication, right?
A. That's correct.
Q. Then it says: Merck does not guarantee a minimum number of programs or minimum amount of speaker fees.
Do you see that?
A. That's correct.
Q. And then under speaker fees/expense reimbursement, your contract states: Merck agrees to pay you a reasonable fee in return for your services, right?

page 80

A. That's correct.
Q. The amount will be agreed upon in writing at the time that each program is scheduled and then you will be reimbursed for certain expenses.
Do you see that?
A. That's correct.
Q. And then at the bottom it says: Merck will not pay for any travel or subsistence expenses for spouses.
A. Yes, sir.
Q. Do you see that?
A. That's correct.
Q. So you were agreeing to be a speaker for Merck and they were agreeing to pay you reasonable compensation for your time?
A. That's correct.
Q. If you'd turn to the next page, sir, do you see a section called Compliance with FDA Regulations?
A. Yes, sir.
Q. And I won't read the entire paragraph, but if you want to, feel free. In the middle it says: The FDA has decided that programs in which you participate that are scheduled by a company or

page 81

for which you are paid directly by a company are subject to FDA promotion regulations.
A. That's correct.

[81:8] - [82:24] 5/3/2006 Michael McCaffrey, M.D.

page 81

When you were a speaker for Merck or for other pharmaceutical companies, do you

• **Merck's Counter Designations**

understand that what you say about the medicine that you're talking about has to be consistent with FDA-approved labels?
A. Yes, sir.
Q. And then the next sentence says: This is true regardless of the role played by the company in the development of the content of the program. Violations of such regulations can have significant legal consequences for the company and the speaker or moderator who is considered an agent of the company in this context.
Do you see that?
A. Yes, sir.
Q. Did you understand while you were serving as a speaker for Merck that you couldn't violate FDA regulations when you were speaking

page 82

about a particular product?
A. Yes, sir.
Q. And then the next section says: Programs subject to FDA promotion regulations. To help ensure your presentations for Merck are in compliance with FDA promotion regulations, it is necessary for us to impose certain requirements set forth below that apply when Merck schedules you as the speaker or moderator and directly pays your speaker fee. We wish to emphasize that you are not obligated to discuss Merck products during your presentations except as described below, and we'll get to that.
A. Right. Okay.
Q. Did you understand while you were serving as a speaker and do you understand today as a speaker for Merck that there are certain requirements that you have to comply with as a speaker?
A. Yes, sir.
Q. And your initials to the right of Number 1 and 2 indicate that you understand those requirements?
A. Yes, sir.

π objection: asked + answered

[83:2] - [83:6] 5/3/2006 Michael McCaffrey, M.D.

page 83

Do you see the sentence above that says: We wish to emphasize that you are not obligated to discuss Merck products during your presentations, do you see that?
A. Yes, sir.

[83:20] - [84:10] 5/3/2006 Michael McCaffrey, M.D.

page 83

Q. And Number 1 which is under FDA promotion regulations, it states: Your remarks will conform to the package circular for any product discussed whether the product is sold by Merck or another company. Your answers to questions should also conform to the package

page 84

circular.
Do you see that?
A. Yes, sir.
Q. What is a package circular?
A. It's a little package insert that comes with the drug itself. If you -- it's the exact print usually from the Physicians' Desk Reference.
Q. Is a package circular another term for a label that's approved by the FDA?

π objection: asked & answered

• **Merck's Counter Designations**

A. Yes, sir.

[85:1] - [88:1] 5/3/2006 Michael McCaffrey, M.D.

page 85

Q. Dr. McCaffrey, I had asked you about the first two sentences in Point 1. What do you understand the requirement that your remarks conform to the package circular or label mean?
A. That your talk should be on label is what it's called. We talk about on-label use of the medication.
Q. Before you speak about a particular product to healthcare providers and physicians, do you make it a point to understand what's in the package label?
A. Yes, I do.
Q. And are your remarks about the product that you're speaking about consistent with the label?
A. Yes, they are.

π objection: asked & answered

Q. In the second point under FDA promotion regulations, it says: Your presentation will focus on the educational needs of the audience.
What does that mean?
A. That means you'll focus on helping them understand the actual disease state itself.
Q. Point 3 says: You will present balanced information about each drug you discuss covering both the risks and benefits.

page 86

Do you see that?
A. Yes, sir.
Q. Why is it important that you talk about both the risks and benefits associated with medicine?
A. Talking about possible side effects of a particular medication, especially if you're talking about a class of medication, so if chest tightness is a common thing in a class of naratriptan medications, which is usually caused by esophageal spasm, which one causes more, which one causes less, that's fair and balanced. You can open up a package insert on each drug and look at it and it'll tell you exactly what it is so it isn't something I have to make up information about, I can go right to the information on each drug.

π objection: calls for narrative

Q. To be able to make balanced presentations about benefits and risks, do you have to be familiar with the risks that are set forth in the package label?
A. Yes, sir.
Q. When you review a package label, you're familiar with all the risks, the contraindications, the warnings and the precautions, right?

page 87

A. Yes, sir.
Q. What is a contraindication, by the way?
A. A certain disease state or a certain type of patient that you do not use the drug on.
Q. On Point 5 on Page 3, it states: You will present information on products based on scientific methods generally accepted in the medical community. Anecdotal evidence and unsupported opinion must not form a part of your presentation.
Can you explain that, sir.
A. It's talking about different articles that have been written about a particular drug. If