bryan direct

Bryan (Multi-clip)
3:25-4:11

Q. Good afternoon. Can you state your full
Page 4
name for the record, please?
A. Foster Curtis Bryan, II.
Q. And do you have a medical specialty, Doctor?
A. Cardiothoracic surgery.
Q. And could you explain for the jury what cardiothoracic surgery entails, in general?
A. In general? In general my practice involves surgery on the heart and the lungs, everything from bypass surgery to valve replacement to surgery for lung cancer.

6:16-8:20

Q. All right. And, Doctor, if you could kindly tell the jury, please, your education starting with your medical school, where you did your red -- residency, if you have a fellowship, we'll go from there?
A. I graduated medical school cume laude from Emory University School of Medicine in 1988. I finished a general surgery residency at Emory University affiliated hospitals in 1993, did a -- from '93 to '94, did a fellowship in research at the
Page 7
Carlyle Frazier Heart Center, which is part of Emory's cardiac research, and then from '94 to '97, I did my cardiothoracic residency at Emory University affiliated hospitals.
Q. And are you board certified in any specialities?
A. I'm board certified in general surgery and in thoracic surgery and I recertified in general surgery 2004, I think it was.
Q. When did you first receive your board certification with the American Board of Surgery?
A. '94, May 1994.
Q. And same question as to the board of thoracic surgery. When were you board certified?
A. 1998.
Q. And do you have any other speciality certifications?
A. No.
Q. And are you currently affiliated with any professional medical group?
A. I'm a member of -- I'm a fellow of the American College of Surgeons, a fellow of the American College of Cardiology, a fellow of the American College of Chest Physicians, a fellow of the South Eastern Surgical College. I'm a member of
Page 8
the Society of Thoracic Surgeons, a member of the South Atlantic Cardiovascular Society. I believe that covers most of the societies.
Q. All right. And are you an editor in any journals or anything like that?
A. Not an editor, no.

Q. All right. And you mentioned that you're a cardiovascular surgeon, correct?
A. Correct.
Q. And you -- do you currently have your own private practice?
A. I do. I'm a practicing -- practicing manager of Coastal Cardiovascular Surgery here in Myrtle Beach.
Q. And -- and what is Coastal Cardiovascular Surgery?
A. We're currently a two-man cardiothoracic surgery group, myself and Dr. McIntyre, Bryan McIntyre, specializing in open heart surgery as well as surgery of the chest, lung surgery.

9:1-10:7

Q. All right. And how long you been with Coastal Cardiovascular Surgery? What's the history of that?
A. The practice started with Dr. McIntyre in January of 1997 -- I'm sorry -- 1999, January 1999, and then I became a member of the group in 19 -- in July of 1999.
Q. You still have plans to go on with the group?
A. Yes.
Q. All right. And are you affiliated with any local hospitals?
A. Our hospital -- we're affiliated with one hospital, Grand Strand Regional Medical Center.
Q. And so that's where you do all of your cardiothoracic surgery?
A. 100 percent of our surgery is done at Grand Strand.
Q. If you could tell me on a weekly basis how you spend time in your practice in terms of surgeries, inpatient or does it vary?
A. We -- we spend the majority of our time in the hospital. We have -- basically operate four-and-a-half days a week with a half a day of office. And so, usually a typical day would be one
Page 10
or two open heart or thoracic cases and then seeing consultations in the hospital.
Q. And how does it come to be that you're requested to consult? Does that typically come from a cardiologist?
A. The majority of the cardiac cases come from the cardiologists, majority.

10:19-12:19

Q. Do you yourself do -- do more heart surgeries tha -- than thoracic surgery or vascular surgeries or is it equal?
A. I would probably say that nearly 90 percent of what I do is cardiac surgery.
Q. And the cardiac surgery would involve what types of procedure?
Page 11
A. Coronary bypass grafting, valve replacement and some ascending aortic aneurysm work.

Q. And coronary artery bypass graft is what Mr. Barnett had, correct?
A. That's correct.
Q. All right. Could you explain to the jury, please, what a coronary artery bypass graft is in general?
A. In general the patient has blockages in the native or their own coronary arteries on the art -- the heart -- the arteries in the surface of their heart, and bypass grafting is using an artery off of their chest wall or vein from their leg or maybe even artery out of a forearm, bypassing or going around that blockage to restore blood flow to the heart.
Q. Al right. Now, do you cheat -- treat patients with osteoarthritis?
A. Not primarily. We have patients with osteoarthritis. We don't do their primary treatment.
Q. And what about treating patient in terms of pain management?
A. We do manage pain.
Q. All right. And, Doctor, the prevention of
Page 12
heart disease is a concern in our population today, correct?
A. Correct.
Q. All right. And so, Doctor, would it be important that patients and doctors be made aware of drugs that are potentially or have the potential to contribute to heart attack or stroke?
A. Yes.
Q. And likewise, as a cardiovascular surgeon, would it be important for you to know of a drug if it had the potential of causing accelerated plaque development?
A. Yes.
Q. And that would be important because that can cause an injury, correct?
A. Correct.
Q. All right. And once the heart, brain or blood vessel is damaged, it does not regenerate, correct?

12:24-13:10

THE WITNESS: That is if the damage is per -- there can be permanent damage as well as
Page 13
temporary damage.
But anything -- cell death in the heart and the brain typically relieve -- leaves a scar, which is a permanent injury.
BY MS. SHERBANEE:
Q. And that's not a good thing, is it?
A. It can be -- it cannot be a good thing.
Q. A scar in the heart, no matter what size, is not a good thing, correct?
A. It is not a good thing.

13:13-15:4

Q. Okay. So a heart attack is never a

Δ objection: assumes facts not in evidence
π response: General questions posed about the importance of CV safety information

Δ objection: leading
π response: proper question

Δ objection: Leading
π response: proper question

Δ objection leading
π response: proper questions

please see previous page

blessing, is it?
A. No.
Q. All right. So if someone stated that Mr. Barnett's heart attack was a blessing in disguise, you would have to degree -- disagree with that statement, wouldn't you?
A. I would disagree with that, yes.
Q. All right. Now, Doctor, your exposure in this case basically has been as the surgeon taking care of Mr. Barnett when he had his heart attack surgery, correct?
A. That's correct.

Page 14

Q. All right. And just preliminarily, I just want to confirm, do you intend to render any opinions as to the standards of care by Dr. Barnett's past or current treating physicians such as Dr. Mikolojcyk, Dr. Karavan or Dr. McCaffrey?
A. No.
Q. You haven't been asked to do that?
A. No.
Q. All right. And you have not reviewed any of Mr. Barnett's medical records prior to your first involvement; is that correct?
A. That's correct.
Q. All right. And according to my notes here and records, and please correct me if I'm wrong, but I believe the last time you saw Mr. Barnett was sometime in October of 2002. Does that sound about right?
A. That sounds about right. I don't recall seeing him after his postop visit, which would be somewhere between three and four weeks after the bypass surgery.
Q. All right. And you -- I believe you deferred his cardiac care then to Dr. Karavan. Would that be accurate?
A. That would be accurate. We typically,

Page 15

after we've established that they're doing fine from a surgical standpoint, the cardiologist will maintain the long-term cardiac care management of -- of their cardiac care long term.

15:15-15:17

Q. So would it be fair to say that you don't have any understanding or opinions of his current health status?

Δ objection: leading
π response: needed for clarification

15:19-15:20

THE WITNESS: I don't know about his current health status.

same as above

16:4-16:11

Q. All right. Or -- and -- and let me include any professional or otherwise affiliation with Merck?
A. No.
Q. Never spoken for Merck in any capacity?
A. No.

Q. Not a thought leader?
A. No.

17:7-17:12

Q. Have you ever been compensated for speaking regarding certain drugs, and that can be anyone else besides Merck since you said you've never affiliated with them, any other drug companies?
A. No. No. No.

17:24-18:16

Q. During the time that you cared for Mr. Barnett, did you prescribe any COX-2s?

A. Not that I'm aware of.
Q. Any reason why or why not?
A. Most of the time for us we treat their pain medicine -- pain management with narcotics. I mean, that's our -- usually a short term of narcotics. And that's -- at that point, usually by the time they see us in the office they're not requiring anything more than Tylenol for whatever I do. So, you know, it's not real common particularly in the cardiac patients to be prescribing that.
In the thoracic patients, occasionally with post thoracotomy pain, we might prescribe an NSAID or a COX-2 for post thoracotomy discomfort.
Q. Now, Doctor, would you agree that there's a concern in the medical community today in regards to the pro thrombotic effect of Vioxx?

Δ objection: question without an answer
π response: Plaintiff agrees to withdraw portion in blue box

19:5-19:19

Q. Doctor, have you read any of the recent studies regarding Vioxx and it's potential cardiovascular effect?
A. I read the colorectal study when it first came out. There was -- there was concern about the COX-2 inhibitor Vioxx causing increased risk of stroke and -- and MI or myocardial infarction, heart attack.
Q. All right. And that would be the approved study?
A. I believe that's what it was. It was about two or three years ago?
Q. Right. And do you recall reading that selective inhibition of COX-2 may be associated with an increased risk of thrombotic events?

Δ objection: 401, 402, 403 whether π's heart surgeon read info re COX-2s is irrelevant. Bryan did not prescribe Vioxx
π response: Heart surgeon's knowledge of the risk of Vioxx is relevant to his treatment practices

19:21-19:22

THE WITNESS: I've -- I've -- I've read that before, yes.

20:13-20:14

Q. Doctor, do you have any opinion as to whether or not Vioxx is pro thrombotic?

Δ objection: lacks foundation
π response: Question based on witness' clinical experience

20:18-20:18

bryan direct

THE WITNESS: No.

see previous page

20:22-21:4

Q. All right. Doctor, do the majority of heart attacks occur from a thrombosis or a clot?
A. The majority of heart attacks are a thrombotic event.

Page 21

Q. And so, Doctor, as a cardiac surgeon, a cardiologist, would it be important for you to know whether a drug like Vioxx had a role in myocardial infarction or stroke?

Δ objection: 401, 402, 403 assumes facts not in evidence

π response: Relevant to show that the potential CV risk of Vioxx would carry import with it's cardiac surgeon

21:6-21:6

THE WITNESS: Yes.

21:8-21:10

Q. And, Doctor, would it be important for you as a physician to know that a drug such as Vioxx could cause increased plaquing?

Δ objection: 401, 402, 403, 602, assumes facts not in evidence, lacks foundation

π response: Relevant to show doctor would want information regarding Vioxx and plaque when treating patients like Plaintiff

21:13-21:13

THE WITNESS: Yes.

24:1-28:4

Q. All right. All right. Doctor, what I would like to do is start going over some of your care and treatment.
A. Uh-huh.
Q. Why don't we first go to your consult, and I'll give you a copy of it.
A. Sure.
Q. Now, Doctor, just in general, and I'm not sure if you remember or not, how you first were contacted in this case, but can you tell me what the custom and practice would be, and if you specifically know, go ahead, on Mr. Barnett how you were called in on this case?
A. All right. Typically the patient, in this case Mr. Barnett, was admitted with a heart attack and he was admitted to Grand Stand Regional Medical Center when during his heart attack he had developed chest pain. And basically -- I don't have the admission history. Typically, either a hospital -- a hospitalist or internal medicine doctor who works for the hospital or the cardiologist will admit the patient. Undergoes a work-up, undergoes catheterization if indicated and if the catheterization shows surgical disease or disease that would be best treated by having surgery, then

Page 25

I'm consulted by the cardiologist. That's the typical flow of -- of -- of treatment in -- in the hospital.
Q. Any reason to suspect that that did not happen in this case?
A. No.

bryan direct

Q. All right. Do you recall having any specific discussions at all with Dr. Karavan about Mr. Barnett on -- on or before September 9, 2002?

A. Typically, Dr. Karavan would call me after the cath and tell me I have a 58-year-old gentleman who had a non QI and he has three-vessel disease and, you know, would you mind seeing him for bypass.

That's typically the first time I'd hear -- hear from Dr. Karavan about the patient.

Q. All right. And so what would -- what would be the next step? What would happen?

A. Typically, at that point I would review the films that Dr. Karavan did that day, the cardiac catheterization films, and then after that review the chart and examine the patient and talk to the patient about what we thought might need to be done in -- in his particular circumstance.

Q. Aside from the -- the films -- and by the films, just so we're clear, that would be the

26: Page 26

angiography that was performed?

A. That would be the angiography Dr. Karavan performed.

Q. And I'll go into this in a little bit further. But Mr. Barnett did have a Cardiolite stress test in 2000. Would that have been something that you would have reviewed?

A. No. At that point with the amount of disease he had I would want -- like to know what the stress test demonstrated to know which area was active at that time, but it would not really -- with the degree of disease that he had, would not change my treatment plan at all.

Q. Okay. And so you looked at the angiogram. Did you look at any of the EKGs or any of his admitting information?

A. We would look -- I would look at all his lab work, EKG, chest x-ray. I would look at all -- all of that.

Q. All right. Now, going to Exhibit 1, which you have in front of you, which is your consult, there is something that says HPI history?

A. That's present -- history -- history of present illness.

(PLF. EXH. # 1, consult, marked

27: Page 27

for identification.)

BY MS. SHERBANEE:

Q. All right. Now, this history was obtained from whom? Was it the patient? Did you get it from the chart or how -- how did you get this information?

A. Both from the patient and the chart. I usually look at what the chart -- what's given before and then I talk to the patient and confirm everything that's been said and actually maybe even ask a few more questions than -- than what was on -- what was on the chart.

Q. All right. Under the paragraph titled HPI, there is a portion where you say: The patient has a history of chest pain dating back to January of 2000, when he underwent a Cardiolite stress test for his sharp chest pain?

A. Uh-huh.
Q. That would have been something that you obtained by history, correct?
A. History, yes.
Q. All right. And so you did not, just to clarify, on this particular date go and look at the results of the stress test?
A. No. No. I got this off -- if it was in

Page 28

the computer -- in the computer -- if it was done at Grand Strand, it might be on the radiology system or from Dr. Karavan's notes or whomever had seen him before me.

28:22-28:24

Q. All right. And so at that point it sounds like you would have been relying on Dr. Swami's interpretation of the report?

29:1-29:1

THE WITNESS: Yes.

29:3-32:14

Q. All right. Does this report in any way impact the care and treatment that you rendered to him in 2002?
A. No.
Q. All right. Going on where it says: Subsequently, the patient did well with only occasional slight sharp chest pain usually associated with his abdomen being bloated, that would have been something you got from the patient?
A. From the patient.
Q. All right. Next paragraph down, there are findings in regards to the cardiac catheterization?
A. Yes.
Q. And were these your impressions?
A. My impressions could be -- you know, doc -- I usually look at mine, look at the cardiologist's. Sometimes I disagree. I mean, since it might be a little tighter I think or something or maybe not quite as tight.
But typically with Dr. Karavan, we're pretty much in agreement most of the time. It's usually about the -- what he sees is about what I see with him.

Page 30

Q. All right. Dr. Bryan, just for the jury, there are some -- just some basic anatomy. There are some major vessels that profuse the heart; is that correct?
A. That's correct.
Q. And would you agree, the heart is a muscle, and so it requires blood to flow to it to provide it with oxygen?
A. Yes, the heart is a muscle.
Q. All right. And are there certain major coronary arteries that you look at when you're performing a cardiac catheterization?
A. Yes.