thrombotic thromboxane A2."

And again in concise laymen's terms, what exactly is that referring to?

A. So there's COX-1 and COX-2. COX-1 produces thromboxane, which causes platelets to clump and which can then produce a thrombus, which can occlude, which can just obstruct the blood vessels, so blood can't get through.

Prostacyclin which is produced by COX-2 counteracts that. So insofar as you've changed the balance of COX-1 and COX-2, you've changed the balance between pro-clotting and

Page 86

anti-clotting in favor of pro-clotting. That would be one aspect, that is, pro-clotting. But also -- well, that's the Number 3.

Q. You can go ahead and explain that one, yes, sir.

A. So the same thing for proliferative. Proliferative means that cells start dividing, and many more cells are present after this proliferative process. Thromboxane A2 stimulates smooth muscle cells, and smooth muscle cells comprise a large component of the atherosclerotic plaque. Thromboxane A2 leads to smooth muscle cell proliferation, whereas prostacyclin inhibits smooth muscle cell proliferation.

So that could also be a mechanism by which inhibiting COX-2, where you're inhibiting prostacyclin, which inhibits smooth muscle cell proliferation, that could be a mechanism whereby we saw the increase in

Page 87

atherosclerosis.

Q. Okay. Again, in a nutshell, are you and your co-authors here saying that there are three possible mechanisms of action by which COX-2 inhibitors could increase the existence of atherosclerosis?

A. Yes, at least those three and probably others that we're just not aware of, right.

88:12-88:15

How did you first express to Merck or any of Merck's scientists or doctors the findings of you and your co-authors in your study?

88:17-89:23

THE WITNESS: I sent an e-mail to Dr. Rodger, reporting

A. No objection

the -- the way the study was set up was the -- the first analysis that we did was related to viral infectivity, and the first analysis was completed, oh, I guess, it was towards May of 2001.

Page 89

And we found, much to our surprise, that treatment with COX-2 led to an increase in the amount of viruses present in the usual place that CMV resides after infection, in the salivary glands or in the spleen.

And so I sent an e-mail to Dr. Rodger telling him about that finding.

BY MR. SIZEMORE:

Q. Did Dr. Rodger or any of the other Merck scientists offer any input or critiques or criticism of your study?

A. That did not occur until we sent him an abstract. So we decided later on, as we continued our analysis, and maybe this is jumping a little bit ahead of your story, but the analysis and the suggestions occurred after we sent Dr. Rodger and his colleagues an abstract that we wanted to submit to the American College of Cardiology.

91:15-91:19

Q. Did you actually receive edits or critiques or input from Merck at the time or after you submitted this abstract?

A. Yes, I did.

92:22-93:4

A. Right. The gist of it was that Dr. Rodger wanted to make it -- wanted us to make it clear that this was

Page 93

a mouse study, and it was questionable whether the data were applicable to patients and he -- he did object to our having COX-2 inhibitor in the title.

93:10-93:13

Q. Okay. Had your initial proposal indicated the title would include the verbiage, "a selective COX-2 inhibitor"?

93:17-93:17

THE WITNESS: Yes, yes.

93:20-94:1

Δ - No objection

A - No objection

And was that verbiage eventually substituted with the words "MF-tricyclic"?
A. You know, I don't know what the abstract said now, but what I did in
Page 94
the paper was to have both.

A - No objection

97:10-97:19

Q. Doctor, based on your experience and research in this area, do you feel that your study and your co-authors' study was scientifically reliable?
A. Yes, I do.
Q. And you stand behind today the results of that study, is that accurate?
A. That's accurate.

99:8-99:9

Irvin II - No prior ruling

A - 602 lack of personal knowledge - witness has never seen this internal Merck e-mail before

Π response -
This relates specifically to the study Merck requested Dr. Epstein perform. He does have personal knowledge of subject matter.

Q. Move on to the next exhibit, Doctor, Exhibit 9 to your deposition.

100:4-100:23

Q. Doctor, I'll point you out to -- or point you to the bottom e-mail from Dr. Rodger, dated July 27, 2001, to the coxib MSGP committee, again referencing Epstein, Number 213 abstract.
A. Um-hmm.
Q. Do you see that, Doctor?
A. Yes.
Q. Okay. Reading from that, it says, "I cannot say that I like the conclusions - COX-2 inhibitors are immunosuppressive and atherogenetic."
Do you see that, Doctor?
A. Yes, I do see that.
Q. Did Dr. Rodger convey to you that he did not like the conclusions of your study?
A. No, he did not. I mean, the implication was there, but he never expressed that.

107:18-108:10

A - No objection

Doctor, were you informed by Merck that they had conducted other studies in apoE knockout mice to determine the effect of COX-2 inhibition on atherogenetics?
A. Yes.
Q. Who told you about that?
Page 108
A. I believe -- that was from an e-mail -- that was in an e-mail sent to me from Merck. I don't know if it was

Dr. Rodger or Dr. Chang. But they indicated that there was another study that they were supporting.
Q. Did they ever indicate to you that that was a study conducted by Dr. FitzGerald?
A. They did not.

108:8-108:9

Q. Let me show you what I've marked as Exhibit 10 to your deposition.

108:16-109:11

Q. For the record, this is a memo from Dr. Ian Rodger dated June 16th, 2000, to the MSGP review committee for Vioxx.
Doctor, do you know what the MSGP review committee is?
A. Medical School Grant Program, I guess.
Q. Is that the actual program
Page 109
or review committee that had decision-making authority as to whether or not to fund your particular study?
A. I believe so, yes.
Q. And I believe you stated earlier that Dr. Rodger is the executive director or head of that group, is that correct?
A. Yes. His title I think is medical director. So I don't know if he sits as chairman on that.

109:20-110:3

Q. And there's a -- the second proposal on that page, "Proposal Number 270 FitzGerald/USA"?
A. Right. I see it.
Q. It says, "A biochemically
Page 110
selective dose of rofecoxib retards atherogenesis in the DKO mouse."
A. Yes.

112:22-113:16

Q. Okay. Let me just ask you a quick question on this. Under Issues b, let me read it, it says, "There is a
Page 113
commercial/marketing anxiety about a possible downside risk that enhanced mortality may occur in the rofecoxib-treated animals from cardiovascular complications that is mechanism based. This may attach to the cardiovascular events from VIGOR."
Did I read that correctly?

Issue II - No prior ruling
A - 402 - lack of personal knowledge - witness has never seen this internal Merck email before

π response -
Dr. Epstein does have personal knowledge of the MSGP of his dealings w/ Dr. Rodger. This email also relevant to his study as it involves same issue of atherogenesis in mice.

A. Yes.
Q. Did Dr. Rodger or any of the other members of the MSGP ever confer to you that they were concerned about a mechanistic approach for cardiovascular complications being associated with your study?
A. No.

115:11-115:22

A - No objection

Q. Again, this is an internal Merck document to Dr. Ian Rodger from Dr. Stephen Epstein, it appears. Does this document come from you, Doctor, or this e-mail? Excuse me.
A. Let me just look at this.
Q. Sure. Take your time.
A. Yes, this came from me.
Q. Okay. And you're sending this e-mail on or about October 12, 2001, to Dr. Ian Rodger, is that correct?
A. Correct.

116:8-116:11

A - No objection

Q. Sure. Why don't you read it, Doctor. I think it'll sound better in your words.
A. Okay.

116:14-119:3

A. Okay. "Attached is the paper on the effects of selective COX-2 inhibition on susceptibility to CMV infection and to atherogenesis. We plan to send it to Circulation in 30 days. I would be most interested in your comments and suggestions.
"I'm sorry that we didn't get the results we thought we would - but it's better to know about this now than to be blind-sided in one or two years by

Page 117

complications that were totally unexpected. On the other hand, as we tried to emphasize in our paper, our results in mice, using our particular experimental conditions, may not be at all relevant to what happens clinically. I'm therefore very pleased to have learned that Merck is planning to meet this head-on and is planning to consider some definitive clinical study. I would be happy to work with you in any way that would be helpful to such a project.
"Thanks for your help.
"Steve."
Q. Thank you, Doctor.
Now, if I may break this down, the first sentence of the second paragraph says, "I'm sorry that we didn't

get the results we thought we would - but it's better to know about this now than to be blind-sided in one or two years by complications that were totally unexpected."

What did you mean by that,

Page 118

Doctor?

A. Well, our initial proposal to Merck had the hypotheses that Vioxx would be protective against viral infection and protective against the development of atherosclerosis, and we found just the opposite. And, you know, I was in -- I'm not sure what I meant by being sorry, but, you know, those were the results.

And my feeling was that this, although an animal study in mice in a particular model, should serve as a yellow flag so that being aware of the potential for such an adverse effect, albeit in mice, we don't know if it applies to humans, but being aware of that potential, it would be important for Merck to help fund additional studies to define this in a more definitive way.

Q. Is it fair to say, then, Doctor, that you were pleased that this potential adverse effect of Vioxx was discovered at this point in time and not

Page 119

a year or two down the road?

A. Yes, that's exactly my thought.

A - No objection

119:7-120:20

Q. Now, you mentioned -- I'm sorry, let me just read instead of paraphrasing, that the last two sentences of your e-mail here, it says, "I'm therefore very pleased to have learned that Merck is planning to meet this head-on and is planning to consider some definitive clinical study. I would be happy to work with you in any way that would be helpful to such a project."

What kind of definitive clinical study were you referring to there, Doctor?

A. Well, I've read through this memo any number of times in preparation for this deposition, and I tried to recall what that statement was based on. And I'm -- I'm quite certain it was based

Page 120

on a telephone call. I had many telephone calls with Dr. Rodger during the course of this, but I have no e-mail from him indicating what this head-on strategy was. So I can't give you more information than -- than is in this memo.

Issue II - No prior ruling

A - 403; compound; speculation; expert opinion

Π response -

Merck's objection is frivolous. This is Dr. Epstein's own e-mail to Merck regarding Merck conducting additional studies on Vioxx causing atherogenesis.

Only to say that there must have been some communication with Dr. Rodger probably that indicated that Merck was taking this seriously and that they would plan to do some definitive clinical study.

Q. Before we move on to the clinical study and away from this e-mail, Doctor, is it -- based on your experience in this area and your study and your years of research in this area, was Merck given a yellow flag or a warning back in 2001 about the potential harmful effects of Vioxx in humans?

120:23-120:23

THE WITNESS: Yes.

Irvin II - No prior ruling
Δ - 403, expert opinion, speculation
π response -
Dr. Epstein qualified to give opinion. It is his study conducted for Merck. Simply because Merck does not like the answer does not make the answer prejudicial.

123:4-123:5

Doctor, and see if this document that I've marked Exhibit 13 --

123:18-123:23

Q. I'll represent to you that this is an internal Merck document. The front page is entitled "Cardiovascular Outcomes Study Consultants Meeting" and date is Monday, October 29th, 2001 at the Four Seasons Hotel in Philadelphia.

Δ - No objection

124:12-124:16

Q. And was the purpose of this particular meeting, Doctor, to discuss the development and execution of a cardiovascular outcomes study involving Vioxx?

124:19-125:22

THE WITNESS: As I recall, and, again, this is five years ago, the purpose of this meeting was to discuss the evidence that existed at the time as to the potential cardiovascular side

Page 125

effects of Vioxx and how to develop more information as to whether this was, in fact, an important -- of importance clinically.

BY MR. SIZEMORE:

Q. Did you actually attend this meeting --

A. Yes. Yes, I did.

Q. -- Doctor.

And I think if we look on Page 4 with the Bates number NJ0267306 at the bottom, you'll see your name listed,

Irvin II - No prior ruling
Δ - 611(c) leading
π response -
Appropriate examination of 3rd Δ witness. Also he is an expert.

"Stephen E. Epstein, M.D." as one of the consultants.
A. That's correct.
Q. Now, Doctor, during this meeting, is it accurate to say that there was a concern among Merck scientists, as well as the Merck consultants, that Vioxx could cause adverse cardiovascular outcomes?

126:1-126:10

THE WITNESS: There was certainly concern.
BY MR. SIZEMORE:
Q. Yes, sir.
Is it fair to say that Vioxx's association with causing heart attacks and strokes and other adverse cardiovascular outcomes was at least a hypothesis at this time?
A. Yes.

131:13-131:21

Irvin II - No ruling
4 - No objection

Q. Did you indicate to Merck that you thought a cardiovascular outcomes study could be conducted in reference to Vioxx?
A. Yes.
Q. Were you an actual advocate for conducting a cardiovascular outcomes trial in reference to Vioxx?
A. Yes.

134:4-134:9

Q. Good morning, Dr. Epstein.
A. Good morning.
Q. My name is Andy Goldman. I represent Merck. Have we met before today?
A. Not to my recall.

140:18-141:13

4 - No objection

Q. Let's talk briefly again about your experience, Dr. Epstein. Are you the current director of the vascular biology research center at Washington Hospital Center?
A. I'm the executive director of the Cardiovascular Research Institute,
Page 141
which sits astride all of our research. And then I'm particularly the head of the vascular biology laboratory in which this particular study took place.
Q. Were you previously the chief of cardiology at the National Heart, Blood, Lung Institute with the NIH?
A. Yes.

Q. Have you devoted much of your life, sir, to researching issues relating to coronary heart disease?
A. Yes.

4 - No objection

141:19-142:19

You consider yourself an expert in the area of atherosclerosis, right?
A. Yes.
Q. Can you tell us what atherosclerosis is, sir?
Page 142
A. Atherosclerosis is a disease involving arteries, whether they be serving the coronary arteries, the brain, the peripheral -- the legs, which is characterized by an inflammatory response, an accumulation of cholesterol and cholesterol products, as well as scar tissue, which over the course of time enlarges and, thereby, narrows the blood vessel so that blood flow ultimately is compromised and ischemia occurs in whatever tissue is being supplied by that artery.
These atherosclerotic lesions can also rupture which could lead to the development of an acute clot, which would acutely lead to the cessation of flow, which then could lead to a heart attack or a stroke.

207:17-207:22

Q. When you're doing a scientific analysis, Dr. Epstein, is it important to consider all of the relevant scientific literature on a particular topic?
A. Yes.

4 - No objection

210:8-212:5

Q. Focusing back, Dr. Epstein, to your study with Dr. Rott, on Page 1818, I want to now ask you about the first sentence in the second to last paragraph.
And it says, "In conclusion, the results of this investigation raise disturbing questions about possible adverse effects deriving from chronic use of selective COX-2 inhibitors on susceptibility to viral infection and on early atherosclerosis lesion development."
Can you explain to the ladies and gentlemen of the jury what you mean by early atherosclerosis lesion development?
Page 211

Irvin II - No prior ruling
4 - Non-responsive answer
Π response -
Π disagrees ... answer responsive

A. So atherosclerosis is an extremely complex process that progresses in fits and starts that can occur over many years, but also can occur rather rapidly. If one is investigating the development of atherosclerosis and the potential effects of any intervention, like drugs on atherosclerosis, it's really not sufficient to look at an intervention that's given over five years or over ten years or over one month and to say that the true results are only those results seen at five years or ten years.

So during the early phases of drug administration, if there is an increase in atherosclerosis, that in itself is very important, even if, over the course of the long-term therapy, something else may develop, that is, there may be no effect or protective.

So it's important, as you're considering something, to think of the earlier effects, the midterm effects and

Page 212

the late effects. Our study would suggest the possibility that there is an adverse effect of COX-2 inhibitors after relatively early exposure of the mouse to MF-tricyclic.

228:7-229:2

Q. Do you remember in response to Mr. Sizemore's questions, you mentioned that you felt that given that your study was the first to identify a potential risk concerning atherosclerosis, you felt that this study amounted to a yellow flag?

A. Right. The first mouse study. I mean, as you know, the VIGOR study sort of raised that yellow flag before.

Q. In terms of the focus on atherosclerosis specifically, though.

A. Right.

Q. If we're focusing on the potential effect of COX-2 inhibitors on atherosclerosis, you believe that your study raised a yellow flag in that

Page 229

regard?

A. Correct.

A. No objection

230:12-231:14

Q. And would you also agree, Dr. Epstein, that it's appropriate for Merck to consider all the studies as a whole, not just one?

A. I don't agree with that.

Q. Okay.

A. No objection

A. I'd like -- I could elaborate on that if you'd like.
Q. Sure.
A. Because each one of these studies was done either with a different drug or a different duration of study or with a different mouse model, one can't
Page 231
be democratic about how one evaluates these results. So, if four or five show a beneficial effect, a beneficial effect is not the conclusion.
Q. Fair enough.
A. Okay?
Q. That's fair.
So, in other words, it would be inappropriate for Merck to take only the studies that showed a beneficial effect or no effect and conclude definitively that there's a beneficial effect of Vioxx on atherosclerosis?
A. That's true.

237:20-238:19

Q. Do you know whether any study has ever shown that Vioxx or any other COX-2 inhibitor, like Celebrex or Bextra or others, has shown that COX-2 inhibition can increase the likelihood of
Page 238
plaque rupture in these atherosclerotic lesions?
A. Yes.
Q. Did I limit that to human studies?
A. Yes.
I mean, you know, acute myocardial infarction is 95 percent of the time caused by plaque rupture. So if there is a study, a randomized study in which Vioxx was used, and there's a threefold increase in myocardial infarction, you know, that's very good evidence that it increases the incidence of plaque rupture.
Q. Well, if there's the study -- are you speaking about the APPROVE study?
A. The APPROVE.

Issue II - No prior ruling

A - 602 - No foundation; lack of personal knowledge regarding APPROVe; speculation

Pl response:
First, Dr. Epstein is eminently qualified to discuss this area of his expertise.
Second, Dr. Epstein testified he knew of APPROVe results.
Third, Dr. Epstein testified that his answer was independent of that [240:16 - 241:3]

238:22-239:4

THE WITNESS: No. Well, I'm talking, excuse me, about the VIGOR study, where there was no
Page 239
placebo, and that's a whole different issue, and then the APPROVE study, where it was against a placebo.

239:22-240:3