```
                        graham depo cut 6 6 06.txt
19  label that the FDA people in the Office
20  of New Drugs who have the final
21  authority, they approve the drug and they
22  have the authority to say what happens
23  after the drug is on the market, that
24  they have said we can't do that because
page 97
1   the drug companies won't go along with it
2   or that will hurt the drug company's
3   profits.
4                These are remarks that have
5   been passed in internal meetings that I
6   have been present at.  And other
7   colleagues of mine have had similar
8   experiences.  And since I have gone
9   public with my Senate testimony, I have
10  been approached now by probably 10 or 15
11  medical reviewers from different
12  components of CDER with stories of being
13  pressured to change their reviews where
14  they thought a drug should not be
15  approved, but where management was
16  telling them you must now say yes to that
17  drug.
```

\* See previous page.

[110:19] - [115:2]  5/16/2006 David Graham, M.D.

```
page 110
19              All right.  Now, cultural
20  issues, briefly.  A paragraph, not a
21  chapter.
22       A.    We've talked about it
23  before.  FDA views industry as its
24  primary customer, as its client.  And
page 111
1   this gets transmitted to the management.
2   That's how management gets selected, by
3   how well they get along with industry.
4   And it filters downhill.  And so as a
5   result, you have this organization that
6   seeks to work, in quotes, collegially,
7   with industry, we're going to partner
8   with industry.  These are phrases that
9   are frequently used within FDA to
10  describe the relationship that is desired
11  between the regulator and the regulated.
12       Q.    By the way, back to
13  structural issues.
14              Are there not these
15  independent Advisory Committees?  We know
16  you testified in front of an Advisory
17  Committee.  Are these truly independent
18  Advisory Committees?
19       A.    In my opinion, no.  These
20  Advisory Committees are part of the
21  structural problem.  They are selected
22  by -- the members of those committees are
23  generally selected by the division
24  directors within the Office of New Drugs,
page 112
1   whose drugs that committee will talk
                                  Page 14
```

Δ's objections: 401, 402, 403, MIL #6 - irrelevant, waste of time, any probative value substantially outweighed by danger of prejudice.

π: see response to Δ MIL #6; Goes to rebut Merck's FDA approval defense

```
                      graham depo cut 6 6 06.txt
 2  about.  And so they pick people who they
 3  know from the field and frequently can
 4  talk with those people, will talk with
 5  those people about upcoming Advisory
 6  Committee meetings and the type of
 7  direction that they wish that advisory
 8  meeting to go in.
 9           If you look at the Advisory
10  Committees in terms of their financial
11  attachments to industry, it's been in the
12  newspapers quite a bit that a third of
13  FDA committee members have financial ties
14  to industry, some large number.  And if
15  you were to look at the Advisory
16  Committee meeting from February of 2005
17  where we were talking about the
18  nonsteroidal pain relievers and the COX-2
19  drugs including Vioxx and Celebrex and
20  Bextra and the like --
21       Q.   Yes.
22       A.      -- the committee was asked
23  two questions.  It was asked one
24  question, should Vioxx be kept off the
page 113
 1  market or allowed to remain on the
 2  market?
 3           And it was asked a second
 4  question, should Bextra be allowed to
 5  stay on the market or should it be
 6  withdrawn from the market.
 7           And I believe in this
 8  handout, I have a slide that combines the
 9  votes, it's number 42, that combines the
10  votes --
11           MR. KLINE:  We can put it
12  up.
13           THE WITNESS:  -- from these
14  committees based on whether the
15  members of the committee had a
16  financial tie with companies that
17  make COX-2 selective NSAIDs or
18  were working to develop COX-2
19  selective NSAIDs.
20           And what you find is that if
21  you're a committee member who had
22  such a financial tie, you were 13
23  times more likely to vote to keep
24  Vioxx or Bextra on the market than
page 114
 1  if you didn't.  And it's highly
 2  statistically significant.  So,
 3  the question is, well, are these
 4  people being influenced -- you
 5  know, is the financial tie causing
 6  them to vote the way they vote.  I
 7  can't answer that question.  But
 8  what I can say is that the
 9  financial ties, having that
10   financial relationship with the
11   company, is highly predictive of
12   how an individual will vote when
13   it comes to important decisions
14   such as should a drug stay on the
                                        Page 15
```

\* See previous page.

```
                              graham depo cut 6 6 06.txt
15           market or be removed from the
16           market.
17  BY MR. KLINE:
18           Q.    Let me move through -- you
19  believe you've covered -- I know we went
20  back to structural issues, and there are
21  many, as I think you're telling this
22  jury.
23           A.    Yes.
24           Q.    The Advisory Committee being
page 115
1   part of it, is that correct?
2            A.    Correct.


[115:5] - [117:18] 5/16/2006 David Graham, M.D.


page 115
5   BY MR. KLINE:
6            Q.    And now cultural issues,
7   sir.  Have we covered them?
8            A.    I think we've covered those
9   fairly well.
10           Q.    Is there a presumption that
11  a drug is safe until it is, as you say in
12  this public statement, proven guilty?
13           A.    Yes.  If you look at the way
14  that drug safety is evaluated in both
15  preapproval and postapproval, the --
16  what's called the null hypothesis, the
17  assumption is that the drug is safe.  And
18  then what is required is to have
19  overwhelming evidence that says, no, it's
20  not safe before you'll say that the drug
21  is not safe.  And this is done by using a
22  measure called the p-value, which is a
23  measure used by statisticians to talk
24  about how likely or unlikely something is
page 116
1   to have occurred by chance.  And the
2   magic number is .05.  If something has a
3   5 percent or less chance of happening by
4   chance, that is, there's a 95 percent or
5   greater chance that it occurred because
6   of the study that you've done, that the
7   drug works or that it has safety, then
8   we'll believe it.  But if it's only -- if
9   you're only 90 percent sure, we're going
10  to say that the drug is safe.
11                 So, for example, we can
12  have -- and we have examples of this in
13  actually the Vioxx NDA, in the new drug
14  application there, where the medical
15  officer saw evidence of increased
16  cardiovascular risk and said, but we
17  cannot be absolutely certain.  And so
18  it's because FDA insists on absolute
19  certainty about safety that it in my
20  estimation gives the companies a free
21  pass on safety.
22                 Because no company -- here's
23  the situation.  If I'm going to get a
                                         Page 16
```

```
                         graham depo cut 6 6 06.txt
24  drug approved, well, the assumption that
page 117
1   FDA makes is the drug doesn't work.  If
2   I'm a drug company, well, now I have an
3   incentive to do a really good study to
4   show FDA that the drug works.  So, the
5   incentives work in the right direction.
6   The company is going to try to do a
7   really good job to convince FDA to change
8   its mind about the drug because FDA
9   starts off saying the drug doesn't work.
10              On safety, it's just the
11  reverse.  The bigger and better a study
12  the company does, the more likely it's
13  going to find a problem.  And so
14  companies are actually rewarded for doing
15  small studies that aren't able to show a
16  problem because the assumption is that
17  the drug is safe.  And that is the way
18  FDA misuses statistics at FDA.


[118:18] - [120:12] 5/16/2006 David Graham, M.D.


page 118
18           Q.    You analogized this in front
19  of the United States Senate to bullets in
20  a gun.
21           A.    Yes.
22           Q.    Would you tell the members
23  of the jury the same thing so they have
24  the benefit.
page 119
1            A.    Right.  I was trying to get
2   the Senators to understand the statistics
3   of the matter, and I gave the analogy of
4   a gun with 100 chambers.  And I said,
5   let's play Russian roulette.  Now, we're
6   going to put 95 bullets in the gun, so we
7   are 95 percent certain that this drug
8   causes whatever adverse reaction we're
9   talking about.  Let's just say this drug
10  causes liver failure.  This drug causes
11  heart attacks.  We're 95 percent certain.
12           Q.    That's the current test?
13           A.    Right.  So, we put 95
14  bullets in, and we play Russian roulette.
15  And at that point, the FDA says, we
16  believe you, the gun is loaded, the drug
17  isn't safe.  Let's take five bullets out
18  of the chamber.  Now we have 90 bullets
19  in the chamber.  So there's only 90
20  percent chance that when I pull the
21  trigger, a bullet is going to come out of
22  the gun.  FDA says the gun is not loaded.
23  That's the misuse of statistics.
24           Q.    How can that be?
page 120
1            A.    It's a historical artifact,
2   but it is one that is embedded in the way
3   FDA does business.
4            Q.    How should it be, sir?
                             Page 17
```

Δ's objections: 403, MIL#6 — any probative value substantially outweighed by danger of prejudice.

π: see response to MIC#6; Goes to rebut FDA approval defense

```
                       graham depo cut 6 6 06.txt
5        A.    My belief is that it is
6   possible to design studies in advance in
7   which you prespecify a level of risk that
8   you would be willing to tolerate for the
9   anticipated benefit of a drug, and then
10  you design your study large enough to
11  exclude risks greater than that maximum
12  tolerable risk.
```

π: see π response to
Δ MIL #6 for objections on
next 2 pages; Goes to
rebut FDA defense

[120:18] - [121:1] 5/16/2006 David Graham, M.D.

```
page 120
18            MR. KLINE:  I do want to
19       show Exhibit Number 44, if I may.
20       And if we can put it up.  44 to
21       the PowerPoint.
22  BY MR. KLINE:
23       Q.    Now, I know, sir, this is a
24  cartoon, but you did this at a
page 121
1   professional meeting, correct?
```

Δ's objections: 403, MIL#6 - any
probative value substantially
outweighed by danger of prejudice.

[121:9] 5/16/2006 David Graham, M.D.

```
page 121
9             MR. KLINE:  Page 44.
```

Δ's objections: MIL#6 - any probative
value substantially outweighed by
danger of prejudice.

[121:13] - [122:6] 5/16/2006 David Graham, M.D.

```
page 121
13  BY MR. KLINE:
14       Q.    It's a cartoon.  On the left
15  side it's side effects.  On the right
16  side it says the lifeguard is the FDA,
17  "Hey, how am I supposed to hear his
18  request for a new drug approval with all
19  your screaming?"  And the pharmaceutical
20  company is to the right.  Were you making
21  a point, sir?
22       A.    Yes, I was.
23       Q.    What was the point?  Were
24  you making a serious point?
page 122
1        A.    I was making a very serious
2   point.  This, in my view, crystallizes
3   the situation that we have in the United
4   States today and why I said that the
5   United States was defenseless against
6   another Vioxx.
```

Δ's objections: MIL#6 - any
probative value substantially
outweighed by danger of prejudice.

[123:5] - [124:10] 5/16/2006 David Graham, M.D.

```
page 123
5   BY MR. KLINE:
6        Q.    Now, again, a cartoon, but
```