merck counter designations

1 Vioxx 25 milligrams or less compared to
2 people who are not taking pain
3 medication, no difference in risk, right?
4    A.  Right.
5    Q.  And in your analogy of
6 bullets in chambers, there would be zero
7 bullets in the chambers for people who
8 were using 25 milligrams of Vioxx, right?
9    A.  Yeah. They'd be pretty
10 close to zero. There would be five or
11 six, but yes.
12   Q.  Well, there would be --
13   A.  The P is .91. So, what that
14 means is that 91 out of 100 chances that
15 the answer lies between those confidence
16 intervals and that that .98 -- so, it's
17 the most likely answer.
18   Q.  The most likely thing is --
19 and when we say .98, that's actually a
20 little bit lower risk than someone who's
21 not taking any medicine at all. I mean,
22 it doesn't -- it's so little that it
23 doesn't make any difference, but we're
24 talking about Vioxx 25 milligrams is
page 295
1 basically indistinguishable from not
2 taking any medicine at all when it comes
3 to cardiovascular risk, right?
4    A.  Yes.
5    Q.  Okay.
6        And then after this
7 reclassification, the risk that you
8 reported, the relative risk for higher
9 dose goes up substantially, and then it
10 is statistically significant, correct?
11   A.  Yes.
12   Q.  Now, after the e-mail, did
13 you -- I think you said you did something
14 called a poster, you wrote up a poster?
15   A.  Right. That was in August.
16   Q.  August of --
17   A.  Of 2004.
18   Q.  Of 2004?
19   A.  Correct.

[295:24] - [296:13] David Graham

page 295
24         (Whereupon, Deposition
page 296
1     Exhibit Graham-13, "Risk of Acute
2     Myocardial Infarction and Sudden
3     Cardiac Death with Use of COX-2

merck counter designations

```
4     Selective and Non-Selective
5     NSAIDs" (Graham, et al) KP001521
6     - KP001526, was marked for
7     identification.)
8        - - -
9  BY MR. BECK:
10    Q.   And I think I got it right.
11 Is it the ISPE poster that you talked
12 about on direct examination?
13    A.   Yes.
```

[298:5] - [299:5] David Graham

```
page 298
5     Q.   And all I want you to do is
6  confirm for me, sir, after you
7  reclassified people and then changed the
8  regression analysis, is this the relative
9  risk that you recorded for 25 milligrams
10 or less?
11    A.   Yes, it is.
12    Q.   And that is under
13 traditional approach not statistically
14 significant, correct?
15    A.   It's elevated, that's
16 correct.
17    Q.   Correct that it's not
18 statistically significant?
19    A.   Yes, but -- yes.
20    Q.   And then the high dose
21 numbers came down somewhat, but still
22 elevated. And after the reclassification
23 and change in methodology, they remained
24 statistically significant, right?
page 299
1     A.   Yes.
2     Q.   Now, finally you reported
3  these results in The Lancet article that
4  you testified about, right?
5     A.   Yes.
```

[300:18] - [305:6] David Graham

```
page 300
18           So, after the
19 reclassification in May and the change in
20 methodology in August, and then the
21 quality control in 2005, your final
22 result for 25 milligrams and below was a
23 relative risk of 1.23 with a confidence
24 interval from below 1 to above 1, right?
```

merck counter designations

page 301
1   A.   Yes.
2   Q.   And under traditional
3 approach, that is not statistically
4 significant, correct?
5   A.   Correct.
6   Q.   And then the final numbers
7 for the high dose that you had were 3
8 with the confidence interval as
9 indicated, right?
10   A.   Yes.
11   Q.   And that under this analysis
12 remains statistically significant; is
13 that right?
14   A.   Yes.
15   Q.   So, just sort of a summary
16 question that in all four of your reports
17 as to the outcome of your study, the 25
18 milligrams and below, the relative risk
19 at all times remained under traditional
20 views as to statistical significance; is
21 that right?
22   A.   Compared to remote use, but
23 not compared to -- well, compared to
24 remote use.
page 302
1   Q.   Yeah. I'm asking about
2 comparing it to remote use, which is --
3   A.   Basically nonuse.
4   Q.   Right.
5        So, in all four at 25
6 milligrams or below, there was no
7 statistically significant difference
8 between taking that dose of Vioxx and not
9 taking any medicine at all, right?
10   A.   Yes.
11   Q.   I want to focus a bit on, a
12 little bit more on how these changes came
13 about from the abstract to the poster and
14 also what people within the FDA were
15 saying about your analysis, because I
16 think you testified about that this
17 morning. Do you remember that?
18   A.   Uh-huh.
19   Q.   The abstract itself, did you
20 have that reviewed by anybody from the
21 FDA before the abstract was published?
22   A.   What are we referring to?
23   Q.   We're referring to back up
24 on the screen, May of 2004 --
page 303
1   A.   The ACR abstract.
2   Q.   -- ACR abstract.
3   A.   What happened with the ACR
4 abstract is that David Campen at Kaiser

merck counter designations

5 was the first author, and I sent him the
6 quick analysis that we had done, and he
7 submitted the abstract, and I did not put
8 it through FDA clearance, and that was an
9 oversight on my part.
10     Q.   And then because there is a
11 procedure that you are supposed to follow
12 at FDA to show them studies and articles
13 and abstracts and posters that you intend
14 to have your name on, whether you're the
15 first author or second, third, fourth or
16 fifth, right?
17     A.   Yes.
18     Q.   Okay.
19          And then when it came to the
20 poster in August of 2004, after you've
21 reclassified people and changed the
22 methodology, did you submit that for
23 review by folks from the FDA?
24     A.   Yes, I did.
page 304
1      Q.   And I think you indicated
2 that your supervisor reviewed that
3 poster; is that right?
4      A.   Yes.
5      Q.   And what was his name?
6      A.   Paul Seligman.
7      Q.   And at the time, was he the
8 acting head of the Office of the Drug
9 Safety?
10     A.   I think so, yes.
11     Q.   And you said something about
12 how he suggested a change in the
13 conclusion. Was your -- did your initial
14 draft of the poster have a conclusion
15 that the high dose of Vioxx, the 50
16 milligram dose should not be prescribed
17 or used?
18     A.   Let me see what this one
19 says and then I can answer you.
20          (Witness reviewing
21 document.)
22          Yes.
23     Q.   Okay.
24          And then I think you said
page 305
1 that Dr. Seligman did not agree with that
2 conclusion and said that you should take
3 out the conclusion that high dose 50
4 milligrams should not be prescribed or
5 used; is that right?
6      A.   Correct.

*Omnibus — the testimony on this page relates to the internal email (Ex 14) on the next page.*

[305:10] - [305:16] David Graham

merck counter designations

page 305
10      (Whereupon, Deposition
11   Exhibit Graham-14, E-mails with
12   attachment "Comments on ISPE
13   Paper" FDACDER006048 -
14   FDACDER006049, was marked for
15   identification.)
16          - - -

← Omnibus - internal email

[305:20] - [306:11] David Graham

page 305
20   Q.   Do you recognize Exhibit 14?
21   A.   Yes, I do.
22   Q.   What is Exhibit 14?
23   A.   It's an e-mail from Dr.
24 Seligman to me with his comments on the
page 306
1 poster.
2   Q.   All right.
3        And then the next page are
4 his comments, right?
5   A.   Right.
6   Q.   Was Mr. -- is it Dr.
7 Seligman?
8   A.   Dr. Seligman.
9   Q.   Dr. Seligman, is he one of
10 the people that you think was out to get
11 you at the FDA?

Irrelevant

[306:14] - [308:6] David Graham

page 306
14       THE WITNESS: Let's put it
15   this way. Dr. Seligman ordered an
16   illegal criminal investigation in
17   early 2004 to identify the person
18   or persons who spoke to the media
19   about the fact that Dr. Andrew
20   Mossholder, an FDA medical officer
21   who had done a study looking at
22   SSRI antidepressants and
23   suicidality in children, that that
24   had been suppressed.
page 307
1        Dr. Seligman, under oath
2   before the House subcommittee on
3   investigations and oversight for
4   FDA, admitted under oath that he

Page 17

merck counter designations

```
5      had ordered that illegal criminal
6      investigation to identify the
7      source of the leak and that he had
8      named me as a suspect, although he
9      had no grounds to do so, except
10       that he thought that this is the
11       kind of thing that I would do.
12       And so there is that past history
13       with Dr. Seligman to keep in mind.
14          At this point, I wasn't
15       interpreting his comments in that
16       regard except that the reason why
17       I hadn't said in the original
18       version was that high dose
19       rofecoxib should be removed from
20       the market was because I knew the
21       type of reaction it would get, and
22       toning it down a little bit still
23       elicited pretty much the same
24       response, and that's expressed
page 308
1      here.
2  BY MR. BECK:
3     Q.  Well, this morning, didn't
4  you testify, in effect, that there were
5  several people at the FDA who were out to
6  get you?
```

*Irrelevant*

[308:10] - [308:18] David Graham

```
page 308
10         THE WITNESS:  No, I never
11     used those, but I can --
12 BY MR. BECK:
13    Q.  No.  The terms you used were
14 that there was an "organized and
15 orchestrated campaign to smear and
16 discredit me."  Do you remember that
17 phrase?
18    A.  Yes.
```

[308:21] - [311:5] David Graham

```
page 308
21         THE WITNESS:  And we can
22     talk about that in detail if you
23     would like.
24 BY MR. BECK:
page 309
1     Q.  Okay.
2         My question right now is a
```

*Irrelevant*

merck counter designations

— Omnibus - continues questioning on Ex 14

3 narrow one. Is Dr. Seligman one of the
4 people that you were referring to this
5 morning as part of this organized and
6 orchestrated campaign that you thought
7 existed to smear and discredit you?
8     A.   Yes. He would be part of
9 that group.
10    Q.   Okay.
11         So, let's look at what Dr.
12 Seligman said when you submitted the
13 poster to him. He said, "In general an
14 excellent study and analysis of a complex
15 topic."
16         Do you see that?
17    A.   Yes.
18    Q.   And then he says, "As you
19 might expect, my only comment has to do
20 with the conclusion that 'higher-dose
21 rofecoxib should not be prescribed or
22 used.'"
23         That's the conclusion that
24 you and I were talking about a few
page 310
1 minutes ago, right?
2    A.   Right.
3    Q.   Then he went on to explain
4 why he was concerned with having a
5 conclusion like that, didn't he?
6    A.   Yes.
7    Q.   And then he said, "My
8 concern is based both on the small number
9 of cases (10) and the lack of information
10 inherent in such a study regarding the
11 'time-to-event.'"
12         Now, small number of cases
13 being ten, does that mean that there were
14 only ten cases in your study of thousands
15 and thousands of patients where somebody
16 taking high-dose Vioxx had either a heart
17 attack or sudden cardiac death?
18    A.   We had ten patients who were
19 currently exposed to high-dose rofecoxib
20 Vioxx at the time of their heart attack
21 or sudden death.
22    Q.   And the concern expressed by
23 Dr. Seligman, whether you believe him
24 today or not, was that that number is
page 311
1 just too small to draw a meaningful
2 conclusion from, correct?
3    A.   That's what I think he's
4 driving at here, but that's what a
5 confidence interval is for.

merck counter designations

[312:2] - [313:22] David Graham

page 312
2    Q.  But in any event, Dr.
3 Seligman disagreed and said the number of
4 cases is just so small that you cannot
5 legitimately draw such a conclusion,
6 correct?
7    A.  Yes. But he's not referring
8 to the confidence intervals, and, you
9 know, if you ask him the same questions
10 you're asking me, he'd have to say that
11 the confidence intervals permit it.
12    Q.  Well, did others in the FDA
13 express similar concerns that Dr.
14 Seligman expressed about whether you
15 could draw conclusions from such a small
16 number --
17    A.  Yes, they did.
18    Q.  -- of people who used the
19 high-dose Vioxx?
20    A.  Yes, they did.
21    Q.  Who is Dr. John Jenkins?
22    A.  He's the director of the
23 Office of New Drugs.
24    Q.  And is Dr. Jenkins another
page 313
1 one of the FDA people that you think was
2 out to get you?
3    A.  No.
4         - - -
5         (Whereupon, Deposition
6    Exhibit Graham-15, E-mails
7    FDACDER011048 - FDACDER011049,
8    was marked for identification.)
9         - - -
10 BY MR. BECK:
11    Q.  Let me show you Exhibit 15.
12    A.  (Witness reviewing
13 document.)
14    Q.  Exhibit 15 is an e-mail
15 string. The last one appears to be dated
16 August 11, 2004. They're all around that
17 time frame.
18        Do you see that the middle
19 e-mail on Page 1 is from Dr. Jenkins?
20    A.  Yes, I see it. I've never
21 seen this e-mail before, the best I can
22 recollect.



*Irrelevant*

*Omnibus*

[315:4] - [319:7] David Graham