merck counter designations

page 315
4    Q.  So, Dr. Jenkins here, he
5 says -- I put the little red marker where
6 I'm going to begin reading. Second
7 paragraph, "I would also note that I find
8 the conclusions reached in the poster to
9 be far in excess of the available data.
10 For example, 'Rofecoxib use at a dose
11 over 25 milligrams increases the risk of
12 AMI or SCD' is the primary conclusion of
13 the poster. This is a far too definitive
14 conclusion based on the data. Similar
15 language appears in other parts of the
16 poster and implies that a causal
17 relationship has been confirmed."
18        Now, just stopping there.
19 Did you know back in 2004 that Dr.
20 Jenkins was of the same view that Dr.
21 Seligman expressed to you?
22    A.  There was one e-mail from
23 sometime after this date, but in the
24 teens of August, it was like a two-line
page 316
1 e-mail in which Dr. Jenkins suggested
2 what he thought different wording for our
3 conclusions would be acceptable to him
4 were, and that's pretty much the extent
5 of what my knowledge of what Dr. Jenkins
6 thought.
7    Q.  Do you see where he goes on
8 to say: "This is misleading at best and
9 deceptive at worst, since what has been
10 demonstrated as an association between
11 the use of the drug and the events in
12 question. Yes, we have some priors and
13 randomized controlled clinical trials
14 that suggest rofecoxib may be associated
15 with an increased risk of MI, but those
16 priors do not support reaching such a
17 definitive conclusion about the findings
18 in the study"?
19        Were you aware that Dr.
20 Jenkins was expressing the view that the
21 conclusion that you had in your draft
22 poster was misleading at best and
23 deceptive at worst?
24    A.  Nope. No idea.
page 317
1    Q.  And then he goes on to say,
2 "These types of overstated conclusions
3 are typical of David's writing" -- David
4 is you, correct?
5    A.  Correct.
6    Q.  -- "and only serve to
7 undermine his credibility as an objective

*Omnibus cont.*

merck counter designations

8  evaluator of the data at hand."
9        And then he says, "It is
10 even more ridiculous for him to make
11 broad recommendations about not using the
12 drug based on the data from this study,
13 and such sweeping clinical/regulatory
14 conclusions represent the primary reason
15 for difficulties in the interactions
16 between David and staff in OND."
17       That would be Office of New
18 Drugs, right?
19   A.   Correct.
20   Q.   Then before I get to the
21 last couple of sentences, when you write
22 articles like you talked about this
23 morning and including this poster, do you
24 typically have a disclaimer on there that
page 318
1 says these are not necessarily the views
2 of the FDA, they're just the views of the
3 author, David Graham?
4    A.   Oh, we're pretty much
5 required to have that disclaimer.
6    Q.   And do you see here where
7 Dr. Jenkins says, "Perhaps the disclaimer
8 should read that 'The views expressed are
9 those of the author and DO NOT reflect
10 the views of the FDA.'" And "Also,
11 perhaps, the COI statement" -- what's a
12 COI statement?
13   A.   I think that's probably
14 conflict of interest.
15   Q.   Okay.
16       And I think this morning you
17 said in response to questions from
18 counsel that you didn't have any
19 conflicts of interest.
20       Do you see where Dr. Jenkins
21 says that "perhaps the conflict of
22 interest statement should say 'Dr. Graham
23 has no FINANCIAL conflicts of interest,
24 but" systemic "bias in his viewpoints
page 319
1 cannot be excluded."
2        Were you aware that that was
3 Dr. Jenkins' views as to the merits of
4 the poster conclusion?
5    A.   Dr. Jenkins is entitled to
6 his opinions. I wasn't aware of them.
7 The same could be said of the FDA.

*Omnibus cont.*

[320:22] - [326:4] David Graham

merck counter designations

page 320
22  BY MR. BECK:
23      Q.  Who is Sharon Hertz?
24      A.  I think she's a deputy
page 321
1   division director for the analgesic and
2   anti-inflammatory reviewing division, and
3   that would be the reviewing division
4   responsible for NSAID drugs, both
5   naproxen and drugs like Vioxx.
6           - - -
7           (Whereupon, Deposition
8       Exhibit Graham-16, E-mails
9       FDACDER006056 - FDACDER006058,
10      was marked for identification.)
11          - - -
12  BY MR. BECK:
13      Q.  I'm handing you what we've
14  marked as Exhibit 16, which I will put up
15  on the screen.  This is a document that
16  you've seen before, correct?
17      A.  That is correct.
18      Q.  And it's from Sharon Hertz.
19  Is it Dr. Hertz?
20      A.  Yes, it is.
21      Q.  And Dr. Hertz, and it's to
22  you and your boss, Dr. Seligman, right?
23      A.  Correct.
24      Q.  And it copies Dr. Bull, who
page 322
1   we just read an e-mail from, as well as
2   Dr. Jenkins and some others, right?
3       A.  Yes.
4       Q.  Did Dr. Hertz say to you
5   that "There is information to suggest
6   that use of aspirin may mitigate possible
7   CV risk associated with COX-2
8   inhibitors," and go on to ask "why would
9   you choose to study CV risk from a
10  database that does not collect
11  information on something as relevant as
12  aspirin use"?
13      A.  She said it, but she didn't
14  understand the study, the methods, or why
15  her question actually is not pertinent to
16  the analysis that we did because we
17  showed that aspirin is not a confounder
18  of any association between NSAID use and
19  heart attack risk.  And because she
20  doesn't understand epidemiology, she
21  wrote this, but this is a statement
22  that's coming from her lack of
23  understanding of epidemiology.
24      Q.  And she also referred to
page 323

*Omnibus*

Page 23

merck counter designations

1 your conclusion concerning high-dose
2 Vioxx and the fact that that represented
3 "a very small subgroup of a large
4 population," correct?
5      A.   She says that, but high-dose
6 Vioxx represented 18 percent of all the
7 Vioxx use in the country. So, it has
8 public health importance.
9      Q.   And did she tell you that
10 drawing conclusions about this subgroup
11 at all is inappropriate because of the
12 small size of it?
13     A.   She says that, but her
14 statement is incorrect, because the
15 confidence intervals permit that. And it
16 was stated a priori at the beginning of
17 our study that we would do that analysis,
18 that we would take a look as best we
19 could at the effect of dose of rofecoxib,
20 of Vioxx, on heart attack risk. So, she
21 can use words like it's inappropriate for
22 us to do that but the fact is that, she's
23 mistaken. There's nothing inappropriate
24 about it.
page 324
1      Q.   And you'll see at the bottom
2 of the paragraph she said, "This is
3 simply bad science."
4      A.   She's entitled to her
5 opinion.
6      Q.   I forgot to ask you. Is
7 Dr. Hertz one of the people at the FDA
8 that you think was out to get you?
9      A.   I didn't use those terms,
10 but, no, she is not one of those people.
11     Q.   Is she one of the people,
12 who, to use your terms, was part of the
13 very organized and orchestrated campaign
14 to smear and discredit you?
15     A.   She is not a member of that
16 group.
17     Q.   She just disagreed with you
18 and thought you were using bad science,
19 right?
20     A.   That's what she says here.
21 But she's not an epidemiologist, and I'm
22 not sure that she would recognize good
23 epidemiology if she saw it.
24     Q.   And Dr. Jenkins, who we
page 325
1 talked about a minute ago, who commented
2 on what he thought was the invalidity of
3 your analysis, do you think he knows what
4 he's talking about when it comes to
5 epidemiology?

*Omnibus cont.*

6    A.    I think that Dr. Jenkins is
7 not an epidemiologist. He's a
8 pulmonologist. I think that he has broad
9 responsibilities for the approval of
10 drugs, and that it's his office, Office
11 of New Drugs, that approved Vioxx, and
12 that going back to the conflict of
13 interest that we talked about before,
14 that FDA has a vested interest in
15 maintaining the decisions that it's made
16 previously. And that their biggest
17 concern here was that they had, in
18 quotes, done a labeling change in 2002,
19 and that solved the problem. But I
20 contend that it didn't really accomplish
21 very much at all.
22        - - -
23        (Whereupon, Deposition
24    Exhibit Graham-17, E-mails
page 326
1    FDACDER021810 - FDACDER021811,
2    was marked for identification.)
3    - - -
4 BY MR. BECK:

[326:5] - [326:9] David Graham

page 326
5    Q.    I'm going to hand you what
6 we've marked as Exhibit 17. Have you
7 seen Exhibit 17 before?
8    A.    No. I have never seen this
9 before.

[326:17] - [328:20] David Graham

page 326
17    Q.    Lourdes Villalba. Who is
18 Lourdes Villalba?
19    A.    She was the medical officer
20 who was responsible for Vioxx. She may
21 have been the medical officer who
22 reviewed the original Vioxx NDA, but that
23 I'm not absolutely certain about, but she
24 had responsibility for it as the primary
page 327
1 medical officer in the reviewing division
2 of the Office of New Drugs at this time.
3        So, she's the one who would
4 review -- well, actually, she did the
5 original review that we showed on the

merck counter designations

Omnibus cont.

Omnibus
Lack of Foundation
Hearsay

| | merck counter designations |
|---|---|
| 6 slide. So, any supplements or any<br>7 submissions from Merck regarding Vioxx,<br>8 they would come to her desk.<br>9  Q. Was she one of the people<br>10 that was part of the organized and<br>11 orchestrated campaign to smear and<br>12 discredit you that you think existed at<br>13 the FDA?<br>14  A. No, she was not.<br>15  Q. At the bottom of this e-mail<br>16 string, Lourdes writes, "I learned of<br>17 this study a couple of weeks ago when<br>18 Jonca requested my opinion about the<br>19 abstract that was going to be presented<br>20 in France. This study is not a good<br>21 study to address the cardiovascular<br>22 question. The conclusions are not well<br>23 supported by the data."<br>24   Did you learn back in 2004<br>page 328<br>1 that Lourdes Villalba felt that your<br>2 conclusions were not supported?<br>3  A. No. I was never told that,<br>4 but I'm not surprised. This is the<br>5 typical response of people in the Office<br>6 of New Drugs to studies that are done in<br>7 the Office of Drug Safety that we talked<br>8 about earlier where -- and that would<br>9 lead Dr. Galson to say that our office<br>10 doesn't add value to the center.<br>11  Q. Who is Anne Trontell?<br>12  A. Dr. Trontell is the deputy<br>13 director for the Office of Drug Safety.<br>14  Q. And is Dr. Trontell one of<br>15 the people that you were referring to<br>16 this morning when you said that within<br>17 the FDA there was a very organized and<br>18 orchestrated campaign to smear and<br>19 discredit you?<br>20  A. Yes. | Omnibus cont... |

[329:4] - [329:5] David Graham

| | |
|---|---|
| page 329<br>4  Q. Please take a look at<br>5 Exhibit 18. | Omnibus<br>Lack of Foundation |

[329:24] - [333:6] David Graham

| | |
|---|---|
| page 329<br>24  Q. Do you remember whether | Hearsay<br>Witness not familiar with document |

merck counter designations

page 330
1 you've seen this document before?
2    A.   No, I don't think that I
3 have seen this document before.
4    Q.   Do you see that Dr. Trontell
5 is writing to Dr. Seligman in the e-mail
6 on the top?
7    A.   Yes.
8    Q.   Starting with the second
9 paragraph, she says, "I understand John's
10 consternation, but let us all acknowledge
11 the problem arose when David Graham
12 overstepped the bounds of what anyone can
13 conclude from a brief poster of a complex
14 study. He ignored advice from multiple
15 FDA sources by making a strong conclusion
16 without giving enough information or time
17 to others in FDA to evaluate it
18 rigorously."
19         Did Dr. Trontell communicate
20 those views to you even though you didn't
21 see this particular e-mail?
22    A.   She communicated views
23 similar to this. She never said that I
24 overstepped my bounds, and she didn't use
page 331
1 words like I ignored advice. And at the
2 end of the day, the poster was cleared by
3 FDA, so that they can complain all they
4 want, but I didn't -- I stuck to what I
5 believed based on the data, and they
6 cleared it at the end of the day. So, we
7 had honest disagreements about the data
8 and how to interpret it.
9    Q.   And as part of that
10 disagreement, do you see here where she
11 says that you "subverted FDA review as
12 well as the normal standards of peer
13 review by stating an
14 inadequately-supported conclusion based
15 upon the limited data" you "made
16 available for review"? Again, did she
17 express those views to you in substance?
18    A.   No. And that statement
19 actually makes absolutely no sense to me
20 as it's stated. If she's talking about
21 the differences between the ACR abstract
22 and the ISPE abstract, those things I
23 described to both Dr. Seligman and Dr.
24 Trontell between the end of May and
page 332
1 August, as we came upon each of the
2 problems and had to deal with them. And
3 she doesn't recall that.
4         We had many, many