merck counter designations

```
 5 conversations. And I had them with Dr.
 6 Seligman as well. And so looking at
 7 this, that's the only thing that I can
 8 guess she is -- she's saying from that,
 9 but that's just a guess.
10     Q.  She says here, "To publicize
11 findings that have not been fully vetted
12 is irresponsible and professionally
13 suspect."
14     A.  Where are you?
15     Q.  If you look up on the
16 screen, I'm in the middle of the next
17 paragraph.
18     A.  Uh-huh.
19     Q.  Did she communicate those
20 views to you?
21     A.  No. But the fact is, is
22 that I didn't communicate anything to the
23 public that hadn't been cleared by FDA.
24 So, this statement really, in my mind, is
page 333
 1 inaccurate and, you know, she's using a
 2 lot of pejorative terms towards me, so,
 3 she can be very critical of me, but the
 4 fact is, is that the document was
 5 cleared, and I have the signed clearance
 6 form, and so she can have her opinion.
```

[337:6] - [337:20] David Graham

```
page 337
 6          - - -
 7          (Whereupon, Deposition
 8     Exhibit Graham-19, Memo 10-29-04
 9     "Review of reports of FDA/Kaiser
10     Vioxx study: Questions about
11     Inconsistencies and Bias,"
12     FDACDER022462 - FDACDER022470,
13     was marked for identification.)
14          - - -
15 BY MR. BECK:
16     Q.  I'm going to hand you
17 Exhibit 19 here, which is a memorandum
18 from Dr. Trontell to Dr. Seligman. Have
19 you seen this document before?
20     A.  Yes, I have.
```

Omnibus
Lack of Foundation
Hearsay

[340:14] - [345:16] David Graham

page 340
14 BY MR. BECK:

merck counter designations

15   Q.   Is a post hoc analysis where
16 somebody, after a study is conducted,
17 goes back and changes the rules of the
18 study, and the concern then is that the
19 results are invalid? I'm not asking
20 whether you did it. I'm asking whether
21 that's what the post hoc analysis is.
22   A.   When people talk about a
23 post hoc analysis, what they mean is
24 they're referring to an analysis that
page 341
1 wasn't prespecified before the study
2 began or before the analysis began.
3         So, for example, in our
4 study, I know that Dr. Trontell kept
5 insisting that our comparison of Vioxx to
6 Celebrex was a post hoc analysis. But it
7 was there from the beginning of our
8 protocol. And so -- and I had explained
9 that to her multiple times. But that's
10 what a post hoc analysis is.
11   Q.   And data manipulation,
12 again, not focusing on her concerns about
13 you, but what data manipulation is
14 generally is basically rigging the
15 numbers to come out the way you want
16 them?
17   A.   It's scientific misconduct.
18   Q.   And please turn over two
19 more pages. Under, at the bottom,
20 "Recommendations," do you see where Dr.
21 Trontell says, "The authors should
22 document their methods in detail and
23 respond to questions raised in this
24 review in particular the noted
page 342
1 inconsistencies in the study objectives,
2 results and statistical findings of
3 significance of their published ACR
4 abstract and the August 2004 ISPE
5 poster." So, do you see there where
6 she's expressing concern that you've come
7 up with different conclusions and
8 different methodologies between that
9 original ACR abstract, and then your
10 later poster, like we saw in the chart
11 that I showed on the screen? Is that the
12 subject that's being addressed here?
13   A.   Uh-huh. Yes.
14   Q.   And, in particular, what
15 she's saying is that before you submit
16 this article for publication, that you
17 should address these issues and explain
18 them, right?
19   A.   Dr. Trontell is saying that,

merck counter designations

20 but Dr. Trontell is not my supervisor.
21 She wrote this to Dr. Seligman. Dr.
22 Seligman, I believe, e-mailed it to me
23 with basically no instructions. And so
24 Dr. Trontell can have her opinions about
page 343
1 what it is I should do, but she's not my
2 supervisor, and, in fact, has never been
3 someone who reviews any of the work that
4 I do.
5     Q. In any event, you submitted
6 the article to the Lancet without making
7 the responses that Dr. Trontell said you
8 should make, right?
9     A. The responses were actually
10 included in the manuscript, A; B, we
11 submitted the manuscript with the
12 approval of my supervisors. Because I
13 sent multiple e-mails to Dr. Seligman and
14 to Dr. Trontell giving them my
15 interpretation of FDA's clearance
16 policies and asking them to instruct me
17 if I had misinterpreted them in any way,
18 because I was anxious to -- I wanted to
19 be sure that I followed all of FDA's
20 rules and procedures. And that if they
21 didn't get back to me, then I would
22 assume that I had interpreted them
23 correctly and that it is all right for me
24 to submit it.
page 344
1     Dr. Trontell consulted with
2 the head lawyer for the Center for Drug
3 Evaluation and Research, Jane Axelrod,
4 who basically said to Dr. Trontell by way
5 of e-mail that it was fine, that I could
6 submit it. And so Anne did not have a
7 written response to these questions, but
8 I had -- my understanding was I had the
9 permission of FDA to submit the paper.
10 And it was never my understanding, quite
11 honestly, that I was required to give
12 written responses to these questions, and
13 I tried to express that in an e-mail to
14 Dr. Paul Seligman somewhere around
15 November 10th or 9th or somewhere in that
16 neighborhood, because I was about to go
17 on a four-day weekend, because Veterans'
18 Day, which is November 11th, is a Federal
19 holiday, and I was going to take off the
20 12th and then I would have a four-day
21 weekend.
22     And on the 9th, Dr. Seligman
23 said that I could take leave on Friday,
24 but before I left, he needed written

merck counter designations

page 345
1  responses to these questions. And I
2  e-mailed back that I hadn't understood
3  that that's what he wanted. And he never
4  came back. He had an entire day,
5  November 10th, Wednesday, the entire day
6  he had to disabuse me of my understanding
7  if he wanted to, and he never said to me
8  that, no, I misunderstood, I really do
9  want you to give a written response. And
10 so I think that I acted reasonably and
11 tried to get management to communicate
12 with me, and management, in this case,
13 did not answer my e-mails, did not come
14 back to me to communicate with me in
15 clear, unambiguous instructions about
16 what it is that they wanted me to do.

[353:2] - [353:18] David Graham

page 353
2    Q.   And who is Dr. Steven
3  Galson?
4    A.   He is the Center director
5  for CEDR.
6    Q.   And I think you described
7  this morning that CDER, both the Office
8  of New Drugs and the Office For Drug
9  Safety are underneath CDER, which is the
10 Center for Drug Evaluation and Research,
11 right?
12   A.   Right.
13   Q.   And is Dr. Galson one of the
14 people that you think is part of this
15 very organized and orchestrated campaign
16 to smear and discredit you?
17   A.   Yes, he was. He may have
18 been an unwitting participant.

*Irrelevant*
*Omnibus*

[361:23] - [363:2] David Graham

page 361
23      (Whereupon, Deposition
24   Exhibit Graham-23, E-mails,
page 362
1    TOPOLE0000333, was marked for
2    identification.)
3
4  BY MR. BECK:
5    Q.   What's Exhibit 23?
6    A.   It looks like an e-mail

*Omnibus*

merck counter designations

7 dated November 1st from me to Dr. Eric
8 Topol at the Cleveland Clinic. And it's
9 -- it looks like it's kind of like in
10 response to an e-mail that he had sent to
11 me. And there are several other e-mails
12 that went back and forth between Dr.
13 Topol and myself, dating back, I think,
14 to like the end of October when he first
15 telephoned me to ask if I knew who was in
16 FDA he could talk to about COX-2 pain
17 relievers and heart attack risk. And I
18 referred him to Shari Targum, whose
19 review I spoke about earlier.
20    Q.   You referred to Dr. Topol as
21 at the Cleveland Clinic. Is he still at
22 the Cleveland Clinic?
23    A.   My understanding is that
24 he's now at Case Western, but I'm not
page 363
1 really -- it's basically what I read in
2 the newspaper.


[367:19] - [368:15] David Graham


page 367
19         Now, are you saying here
20 that you thought that Merck decided to
21 withdraw Vioxx on September 30 because
22 people at FDA management gave them a
23 heads up that your article was going to
24 be published, and Merck said we'd better
page 368
1 get Vioxx off the market before that
2 article was published?
3    A.   No. I was just pointing to
4 the coincidence of the dates.
5    Q.   Well, you said it wasn't a
6 coincidence, didn't you?
7    A.   Well, I don't think it was a
8 coincidence, but...
9    Q.   So, that's my question.
10         Do you think that Merck's
11 withdrawal on September 30 was timed
12 because people at the FDA told Merck that
13 Dr. Graham is going to publish an
14 article, and so Merck said we'd better
15 get this drug off the market?


[368:17] - [369:1] David Graham


page 368

17      THE WITNESS: No, I don't.
18 BY MR. BECK:
19    Q.  That's what you told Dr.
20 Horton --
21    A.  I know that.
22    Q.  -- though, isn't it?
23    A.  That's what I -- and at the
24 time, I think under the duress that I was
page 369
1 under, that is what I believed.

merck counter designations

*Irrelevant*

[369:11] - [369:20] David Graham

page 369
11    Q.  That was kind of a wild and
12 crazy charge you made to the editor of
13 Lancet concerning --
14    A.  No.
15    Q.  -- FDA management, don't you
16 agree?
17    A.  It's not wild and crazy. If
18 you experienced what I experienced, you
19 would understand -- you would understand
20 better.

[369:11] - [369:20] David Graham

page 369
11    Q.  That was kind of a wild and
12 crazy charge you made to the editor of
13 Lancet concerning --
14    A.  No.
15    Q.  -- FDA management, don't you
16 agree?
17    A.  It's not wild and crazy. If
18 you experienced what I experienced, you
19 would understand -- you would understand
20 better.

[370:14] - [374:21] David Graham

page 370
14    Q.  Dr. Graham, as an
15 epidemiologist, do you deal with the
16 concept of incidence rates?
17    A.  Yes, I do.
18    Q.  And in a sentence or two,
19 can you describe what an incidence rate
20 is?

merck counter designations

21    A.  It's the occurrence of an
22 outcome, a disease, in a defined
23 population over a specified period of
24 time. So, you might express something as
page 371
1 10 per 100,000 per year would be an
2 incidence rate.
3    Q.  I have created a chart that
4 I want to go over with you, and I want to
5 look at some numbers from the Kaiser
6 study that you did, and I understand that
7 an adjustment was applied for a
8 cardiovascular risk score that I'll get
9 to later in the examination, but I want
10 to look at the kind of raw numbers about
11 incidence rates of heart attacks and
12 sudden cardiac death for Vioxx and
13 Celebrex as you saw them in your study.
14 Okay?
15    So, if you will take out
16 Exhibit 4, which is your 2005 Lancet
17 publication, and if you'll look over at
18 the third page in the right column under
19 "Results," tell me if the numbers I
20 filled in on the screen there for number
21 of users for Vioxx of something over
22 26,000, and then for Celebrex, something
23 over 40,000, are those accurate numbers
24 --
page 372
1    A.  Yes.
2    Q.  -- from your study?
3    A.  Yes.
4    Q.  And then if you'll look at
5 Table 3 on that same page or is -- Table
6 3, I guess it's the next page. If you'll
7 look at Table 3, do I have it right that
8 the number of heart attacks and sudden
9 cardiac deaths, Vioxx was 68 and for
10 Celebrex was 126?
11    A.  Yes.
12    Q.  And when we're talking about
13 Vioxx here, that includes both low dose
14 and high dose, right?
15    A.  Correct.
16    Q.  And so just taking the
17 numbers that you report before the
18 adjustments are made, is this correct
19 that the incidence rate of heart attacks
20 and sudden cardiac deaths for Vioxx would
21 be about .25 percent, whereas for
22 Celebrex, it would actually be a little
23 higher, .31 percent?
24    A.  No. That's not an incidence
page 373

merck counter designations

1 rate. That is a proportion. An
2 incidence rate would take into account
3 the amount of time that each of the users
4 was on the drug, and so then what you'd
5 end up having is years of exposure to
6 Vioxx in the denominator and number of
7 cases in the numerator and the same for
8 Celebrex. So, these are proportions, but
9 they are not incidence rates.
10    Q.   Okay.
11         So, proportions.
12         And the proportions of
13 Celebrex users who experienced heart
14 attacks or sudden cardiac deaths was
15 actually slightly higher than the
16 proportion of Vioxx users, correct?
17    A.   That is correct.
18    Q.   And you said that in order
19 to do an incidence rate, you'd want to
20 know how long they were using the drugs,
21 so you'd take into account patient years;
22 is that right?
23    A.   Correct.
24         MR. BECK: Let me mark for

page 374
1    you, please, Exhibit 25.
2         - - -
3         (Whereupon, Deposition
4    Exhibit Graham-25, Chart
5    FDACDER005940, was marked for
6    identification.)
7         - - -
8 BY MR. BECK:
9    Q.   And this Exhibit 25, do you
10 recognize this as a document or a page of
11 a longer document that was created as
12 part of your study?
13    A.   Yes. I don't recall,
14 though, at what stage in the study that
15 this run was done, and so I don't know if
16 it included sort of the modifications
17 that we had to make because of
18 eligibility problems and the like. But
19 it is from our study. I'm not able here
20 to read the column on the right-hand side
21 because of it being smudged.


[375:5] - [386:13] David Graham


page 375
5         In the right-hand column,
6 while we may have to struggle with the
7 exact numbers, it does say, does it not,

*Omnibus*

Page 35

merck counter designations

8 "incidence rate per 1,000 patient years"?
9    A.   That's what it looks like it
10 says to me, yes.
11   Q.   Okay.
12        I mean, there's no doubt it
13 says this?
14   A.   Right, no. This table is
15 set up to calculate incidence rates, so,
16 there's no question about that.
17   Q.   Okay.
18        So, and then if we look down
19 at rofecoxib, that's Vioxx as we know,
20 correct?
21   A.   Right.
22   Q.   And then the rofecoxib
23 number is 7. something, right?
24   A.   Right.
page 376
1    Q.   Again, we'll just blow it
2 up. And does that look like 7.49 to you
3 once it's been blown up?
4    A.   Yes. When I was looking at
5 this (indicating), I would have said
6 7.48, but it looks like 7.49 there
7 (indicating).
8    Q.   Okay.
9         Well, close enough for
10 government work. It's 7.48 or 7.49,
11 right?
12   A.   Right.
13   Q.   And then if we look up at
14 Celebrex, celecoxib, it is like 7.8
15 something?
16   A.   Yes. It looks like 7.84 to
17 me, but...
18   Q.   Okay.
19        Whatever it is, it's
20 actually the incidence rate taking into
21 account the patient years, as you said,
22 the incidence rate for heart attacks and
23 sudden cardiac death for Celebrex is
24 actually higher than the incidence rate
page 377
1 for sudden cardiac death in heart attacks
2 for Vioxx, correct?
3    A.   It's a crude incidence rate,
4 and the number is higher. They're
5 probably at this point with crude rates
6 not statistically different, but Celebrex
7 rate is higher than the rofecoxib or
8 Vioxx rate.
9    Q.   Yeah. And I didn't mean to
10 suggest that there was a statistically
11 significant difference, but the Lancet
12 article, one of the conclusions is that