merck counter designations

there is a statistically significant difference between Vioxx and Celebrex and that Vioxx has a statistically significant higher risk of serious coronary heart disease, right?

A. Right. And that's based on odds ratios as opposed to incidence rates.

Q. But the incidence rates would be basically the same?

A. Yes. The incidence rates form the base of the data, but this is

page 378

before adjustments have been done for the types of patients that are given these different drugs.

Q. And that's what I want to get to now.

So, you start out with actual numbers of users and how long they use the drug and how many of them had heart attacks, and Vioxx and Celebrex look basically identical. And then in your analysis, you applied adjustments to the Vioxx users and Celebrex users, and the end result of those adjustments was that Vioxx ended up appearing to have a higher risk, right?

A. Yes.

Q. And the person who -- first of all, these adjustments, at least one, a significant one is called a cardiac risk score, cardiovascular risk score, right?

A. Right.

Q. Is that the main adjustment that was applied?

page 379

A. That was the main adjustment, and it represented basically a collapsing of 25 or 30 other variables into a single measure.

Q. And the cardiovascular risk score, basically that says, well, people who take one type of medicine might have a whole bunch of other factors that make them prone to have heart attacks more than people who take a different medicine, and we want to take that into account?

A. Right. They have to be differential distribution of risk factors.

Q. And the person who developed the methodology to come up with the

merck counter designations

cardiovascular risk scores for Celebrex and Vioxx in your study was Dr. Wayne Ray, who you mentioned before, right?

A. Well, actually, we reference him as having used it, but the use of this -- it's basically -- it's a confounder's score. The use of a

page 380

confounder's score in case control studies has been well described by Jim Schlesselman in his textbook on case control studies and then by Norman Breslow in his textbook on case control studies. And so this is a technique that's been described before. It's a technique that Dr. Ray has used, but he's not the person who created it, developed it.

Q. Well, he didn't invent the idea of a cardiovascular risk score, but he's the one who came up with the formula to account for all of these variables, and he's the one who did the statistical heavy lifting in order to implement that idea in this case, right?

A. In this case, he taught me how to do it. I was the one who did it, working with him by telecon.

Q. And Dr. Ray and you ended up assigning a higher cardiovascular risk score to the Celebrex users to the Vioxx users, correct?

page 381

A. That's correct.

Q. And the result of that then was that even though the incidence rate was the same --

A. The crude incidence rate.

Q. -- when you applied the cardiovascular risk score that the two of you came up with, that's what accounts for the difference in your paper between risks of Vioxx and risks of Celebrex, right?

A. It's not just the cardiovascular risk score. It's adjusting for these risk factors. And in our paper, we showed that using all of the variables, all of the risk factors in our study to adjust for cardiovascular risk or using the cardiovascular risk score gave us virtually identical answers. But use of this confounder's score was a more efficient, statistically efficient way to deal with the data.

merck counter designations

Q. And, of course, Dr. Ray was involved heavily in the confounder's

page 382

score also, right?

A. He was the person who worked with me in showing me how to derive that score.

Q. Okay.

And here I've put up on the screen a copy of the article, the Lancet article that's already been marked as an exhibit.

When people write articles in scientific journals, are they supposed to disclose any financial conflicts of interest that they have?

A. They should, and I believe that Dr. Ray did.

Q. Okay.

Let's take a look at that.

If you'd go to Page 6. The person who came, who taught you how to make these adjustments that resulted in Vioxx looking like it had a higher risk than Celebrex, he had two [significant] conflicts of interest, didn't he?

Counsels opinion irrelevant

A. Well, he has two potential

page 383

conflicts of interest, and I was unaware of these when I invited him to participate in our study, and I was actually unaware of them until it came time to do our poster, at which time then you need to put on it, you know, the conflict of interest statement, and it had never crossed my mind to ask people about it. So, that was when I learned about it. And --

Q. And I want you to complete this, but before you do, this "WAR," this thing I have up on the screen, that's Wayne A. Ray, right?

A. Yes.

Q. And he's a consultant to Pfizer, it says in this disclosure, correct?

A. Yes.

Q. Who is it that makes Celebrex?

A. Pfizer.

Q. And so he's got a financial interest in making Celebrex look good,

page 384

right?

A. You could argue that he

Lacks Foundation - "financial interest"
Assumes facts not in evidence

merck counter designations

does, but that didn't operate in our study.

Q. And then he's also -- under the conflict of interest, they say that he's a consultant to plaintiffs' attorneys regarding Vioxx, right?

A. Yes.

Q. And did you know that he's actually served as an expert witness in Vioxx trials?

A. I learned about that only like within the last month or so, but I didn't know that beforehand.

Irrelevant Prejudicial

Q. So, anyway, here is Dr. Ray teaching you how to make these adjustments, and these adjustments were made by the time your poster was published, right?

A. Yes.

Q. And it wasn't until after he taught you how to make the adjustments and all the adjustments were made that

page 385

you even found out that he was a paid consultant to the maker of Celebrex and was being paid by plaintiffs' lawyers who were suing Merck in Vioxx cases? Is that right?

A. Yes. But that didn't impact the methodology that was used to derive this adjustment, this confounder's score. This is a way of adjusting for a difference in distribution of risk factors across exposure groups. And so he may have these associations, but that doesn't --

Q. "May have," what do you mean "may have"?

A. Well, he has those associations. They don't affect the way statistics work. They don't affect the way, the methods of how one derives a confounder's score. They don't affect the way one does a regression model and what happens after the computer program spits out the results.

Q. Is there a book you can go

page 386

to or an article that says, here's the formula, here's the exact way to implement this idea of a confounder's score in your study, or did it require some judgment by Dr. Ray as to how he was going to implement this idea when coming up with a confounder's score and the

merck counter designations

cardiovascular risk score?
A. It's described in Schlesselman's textbook and in Breslow's textbook. I don't recall that all the methods are described there, but the notion of how to do this is.

[388:14] - [400:18] David Graham

page 388

Q. And you did say that the fellow who taught you how to do it was Dr. Ray, the guy with the two conflicts, right?
A. Yes, that is correct.

Tone - argumentative
Irrelevant

Q. And I think you said this morning that there are "lies, damned lies and statistics," right?
A. I said that, too. It doesn't apply here, but I did say that.
Q. Let's move to another

page 389

subject.
We talked about how from the original abstract to the poster, the number of high-dose patients changed. Do you remember that?
A. Uh-huh.
Q. So, you had a smaller number of high-dose patients in the abstract when you said there was no statistically significant difference between high-dose Vioxx and basically no use of medicine. And then some people got changed, and the net result was that there was a larger number of high-dose patients when it came time to write up the poster. Do you remember that?
A. Yes.
Q. And we looked at Dr. Trontell's memo where she expressed concern about that. Do you recall that?
A. Yes.

Omnibus
Hearsay

Q. To try to save time, because you may remember the numbers, I suspect you do, in the abstract when you were

page 390

talking about high-dose people, am I right that you had five people who had experienced -- five so-called cases and seven so-called controls?
A. Correct.
Q. And in one sentence, what is

merck counter designations

a case and what's a control?
A. A case is someone who had a heart attack or sudden death. And a control was someone who was randomly selected to compare to that person, who on that date had not, as of that date, had a heart attack or sudden death.
Q. Okay.
And then sort of going forward to by the time your article was published in The Lancet, instead of five cases with the same population group after the reclassification, you now have ten cases, right?
A. Yes.
Q. So, the number of heart attacks and sudden cardiac deaths that you were ascribing to the high-dose Vioxx

page 391

users doubled from when you did the abstract to when you did the article, right?
A. Correct.
Q. And then you also, instead of seven controls, you had eight controls, right?
A. Correct.
Q. And was it your idea to do this reclassification?
A. What I noticed when we were looking --
Q. Before you say what you noticed --
A. Yes.
Q. -- can you answer, was it your idea to do the reclassification?
A. Yes.
Q. And then before -- I think this is clear, but I want to make sure.
Before you did the reclassification, even the high-dose Vioxx users, the difference in risk between them and people who didn't use

page 392

any medicine was not statistically significant, and then after you did the reclassification, then it became statistically significant, right?
A. That's correct.
Q. Now, did any of the authors, your co-authors, express concern about whether this reclassification was proper?
A. Dr. Craig Cheetham from Kaiser did express reservations about the reclassification. His concern was

Omnibus - related to next exhibit

merck counter designations

← Omnibus

primarily that it be adequately described, and that eventually was done to his satisfaction, and he was a co-author on the published paper.

- - -

(Whereupon, Deposition Exhibit Graham-26, E-mail 10-23-04 KP002315, was marked for identification.)

- - -

BY MR. BECK:

Q. Please take a look at Exhibit 26. Have you seen Exhibit 26

page 393

before?

A. Yes, I have.

Q. And this is a -- is this an e-mail from doctor -- how do you pronounce his last name?

A. Cheetham.

Q. -- Cheetham to you and other co-authors in the study?

A. Yes, it is.

Q. Does Dr. Cheetham say here in the first paragraph, "I have never been comfortable with the recoding of Vioxx patients into the high dose category. However, it was done with the full participation of five investigators. The process by which this was done needs to be fully disclosed in the methods section. Therefore, the methods section needs to be clear on three points." And then his first point is the coding "was done post hoc." Do you see that?

A. Uh-huh.

Q. And that "post hoc," did you understand that to mean that that was

page 394

after the fact?

A. The fact that I think he's talking about here is, is that we hadn't planned on doing this at the start of the study.

Q. Okay.

So, this was something that was not part of the original study plan, but then the reclassification took place after -- in fact, it was after you learned of the results reported in the abstract of no statistically significant difference, right?

A. That coincidence in timing is correct.

Q. Okay.