There are no prior rulings because Π did not designate testimony from this witness in Irvin II.

mckines.4.20.2006
Annotations Report [Vioxx]

[16:6] - [17:1] 5/2/2006 McKines - 4.20.06

page 16
Q. Good morning, Ms. McKines.
A. Good morning.
Q. From October of 1996 until May of 2000, you were the executive director of marketing for COX-2s for Merck; is that correct?
A. That's correct.
Q. And at that time Merck only sold one COX-2 inhibitor, Vioxx, correct?
A. That's correct.
Q. So that made you, from October of 1996 until May of 2000, the executive director of marketing for Vioxx, right?
A. Yes, that's correct.
Q. In May of 2000, I believe you made a lateral move to executive director of integrated marketing communications, correct?
page 17
A. Yes.

[17:13] - [17:16] 5/2/2006 McKines - 4.20.06

page 17
You held that position in September of 2004 when Vioxx was withdrawn from the market, correct?
A. Yes.

[17:17] - [18:16] 5/2/2006 McKines - 4.20.06

page 17
Q. And as the executive director for integrated marketing communications, you had responsibilities for Vioxx among other drugs, correct?
A. I oversaw the marketing communications for all of Merck's U.S. portfolio of products.
Q. And that meant that you had
page 18
responsibilities for Vioxx, correct?
A. I oversaw that for Vioxx.
Q. You still work at Merck, correct?
A. Yes.
Q. You still own Merck stock, correct?
A. Yes.
Q. You have more than 20 years of experience in the pharmaceutical

industry; isn't that right?
A. Yes.
Q. In fact, since graduate school, have you worked anywhere other than a pharmaceutical company?
A. No, I have not.

[19:6] - [19:10] 5/2/2006 McKines - 4.20.06

page 19
Q. When you were the executive director for marketing for Vioxx, it was your job to take information that Merck had about the drug Vioxx and package it for presentation to physicians, correct?

[19:12] - [19:16] 5/2/2006 McKines - 4.20.06

page 19
THE WITNESS: It was my job to take the science that we had around Vioxx and communicate that, consistent with our label, to physicians.

[20:19] - [21:1] 5/2/2006 McKines - 4.20.06

page 20
And you packaged information for patients as well, correct, for direct-to-consumer advertising?
A. We developed messages for patients, again, consistent with our label with direct-to-consumer
page 21
advertising.

[22:5] - [22:8] 5/2/2006 McKines - 4.20.06

page 22
Q. That's a critical role, don't you think?
A. I think it's an important role, yes.

[39:12] - [39:23] 5/2/2006 McKines - 4.20.06

page 39
When you go out -- when a sales rep goes out and talks to a doctor or when Charlotte McKines and her team produces direct-to-consumer advertising, television, magazine, what have you, when

you're talking directly to that patient, you need to give them -- you can't give them one side of the story, right? You can't just say, try Vioxx and maybe you'll have a decreased incidence of GI upset, correct? You've got to tell them about the side effects, too, right?

[40:2] - [40:6] 5/2/2006 McKines - 4.20.06

page 40

THE WITNESS: In communicating with consumers, we do share the risks and the benefits consistent with our label.

[41:21] - [41:23] 5/2/2006 McKines - 4.20.06

page 41

Q. And you've got to tell them the bad news about Vioxx, too, like it causes edema and hypertension, right?

[42:2] - [42:5] 5/2/2006 McKines - 4.20.06

page 42

THE WITNESS: We communicate the risks and benefits of Vioxx to physicians, again, consistent with our label.

Δ obj = asked + answered, argumentative, sidebar

Π response = not argumentative, no atty question in this section to be sidebar, proper cross examination

[42:7] - [42:10] 5/2/2006 McKines - 4.20.06

page 42

Q. Do you agree or disagree, and look in the camera and tell the jury, Merck had an obligation to tell patients the bad news about Vioxx?

Δ obj = argumentative - tells witness to look @ camera, asked + answered

Π response = proper cross-examination, question not answered before, telling her to look @ camera is a procedural matter for witness and jury convenience

[43:3] - [43:6] 5/2/2006 McKines - 4.20.06

page 43

THE WITNESS: Merck has an obligation to communicate the risks and benefits of Vioxx consistent with our label.

[43:8] - [43:11] 5/2/2006 McKines - 4.20.06

page 43

Q. How about that Vioxx increased your risk for heart attack, do you consider that bad news about the drug?

[43:14] - [43:15] 5/2/2006 McKines - 4.20.06

page 43

THE WITNESS: I consider it to be one of the risks.

[45:8] - [45:13] 5/2/2006 McKines - 4.20.06

page 45

Q. When did you come to that understanding?
A. I learned about the increased risks of -- I came to that understanding when we actually withdrew the drug in September of '04.

[64:12] - [64:16] 5/2/2006 McKines - 4.20.06

page 64

Q. Ms. McKines, the truth is, in the year 2000, in fact, as early as March of 2000, you knew there was data that showed that Vioxx increased the risk of heart attacks. Isn't that true?

[64:19] - [64:23] 5/2/2006 McKines - 4.20.06

page 64

THE WITNESS: No. My testimony is I was not aware of data that show that Vioxx -- there was an increased risk of heart attacks with Vioxx.

[65:1] - [65:10] 5/2/2006 McKines - 4.20.06

page 65

Q. Just so we're clear for the jury, you're saying you weren't aware in the year 2000, correct?
A. That's correct.
Q. Okay.
Do you want to take a look through your file at Merck that we got to see if there's anything in there that talks about risk of heart attacks and Vioxx in 2000?

Δ obj = does not include answer

Π resp = answer follows in next portion, final question in this clip is for foundation/clarity of question in next section

[65:20] - [66:2] 5/2/2006 McKines - 4.20.06

page 65

Q. Your testimony is clear in 2000 you didn't know. Do you want to look through your file and see if we've got anything that shows that you knew in 2000?

page 66

A. As I stand here today, my testimony is that I don't recall that.

[66:21] - [67:2] 5/2/2006 McKines - 4.20.06

page 66

Q. Ms. McKines, the truth is, in June of 2000, you knew Merck had information that Vioxx increased the risks of heart attack, and you knew that

page 67

they were spinning that information to Wall Street, didn't you?

[67:5] - [67:8] 5/2/2006 McKines - 4.20.06

page 67

THE WITNESS: No, I was not aware of that.

MR. KAUFMAN: Let's take a look at CM.0002.

[67:15] - [68:16] 5/2/2006 McKines - 4.20.06

page 67

Q. You can take as much time as you want to to review this --

A. Yes.

Q. -- but for the jury let's get some things out of the way. You see at the top of this page, not the very top, but the second e-mail on the page is from Jefferey Niekelski. Do you see that?

A. Yes.

page 68

Q. You see he sent that on June 5th, 2000, correct?

A. Yes.

Q. And he sent it to you and a bunch of other people. Do you see that in the "To" field?

A. Yes.

Q. Now, Jefferey reported to you, correct?

A. Jefferey was a member of the

Δ obj = 402, 403, 802
3rd party analysts report on Vioxx

π response- document is non-hearsay admission/ adoptive admission by party opponent, document found in Merck files + circulated by employees,
bulk of designated testimony relates to witness' personal knowledge + not the document

brand team for Vioxx. Can I just read this? I've never seen this. Can I just read this?
Q. Absolutely. Just so we're clear, you know who Jefferey is, correct?
A. Yes.

See prior pg.

[68:17] - [68:20] 5/2/2006 McKines - 4.20.06

page 68
Q. Okay.
And he routinely in the normal course of his business sent you things over e-mail, correct?

[68:23] - [69:1] 5/2/2006 McKines - 4.20.06

page 68
THE WITNESS: Yes. I got things from Jeff, as well as other
page 69
members of my team.

[70:9] - [70:21] 5/2/2006 McKines - 4.20.06

page 70
I want to take a look at the first bullet point. All right? And I'll read it to you. "With respect to increased thromboembolic risk associated with Vioxx in the VIGOR trial."
Now, let's take a step back for a second for the jury.
What was the VIGOR trial?
A. The VIGOR trial was the GI outcomes trial that we undertook with Vioxx where we showed that we met our primary endpoint of fewer perforations, ulcers and bleeds versus naproxen.

[71:11] - [71:14] 5/2/2006 McKines - 4.20.06

page 71
Q. The patients taking Vioxx had an increased incidence of heart attack of about 500 times, correct, or 500 percent, rather?

[71:17] - [71:21] 5/2/2006 McKines - 4.20.06

page 71
THE WITNESS: I wouldn't say it's 500 percent. I believe the

incidence -- I don't recall the actual numbers, but I don't think it was 500 percent.

[71:23] - [72:10] 5/2/2006 McKines - 4.20.06

page 71

Q. Well, let me see if this jogs your memory.

page 72

A. Okay.
Q. How about .1 in naproxen and .5 in Vioxx. Does that sound right?
A. I thought I read it here, it was .4 in Vioxx.
Q. Okay.
Do you know if Merck ever got three more heart attacks that they didn't tell the New England Journal of Medicine about that increased it to .5?

[72:14] - [72:20] 5/2/2006 McKines - 4.20.06

page 72

Q. Do you know?
A. No, I don't know.
Q. Okay.
So, you've got the VIGOR study, and more people taking Vioxx had heart attacks than people who took naproxen. That's right, correct?

[73:4] - [73:11] 5/2/2006 McKines - 4.20.06

page 73

THE WITNESS: There was an increased risk of patients, of Vioxx patients who -- there was increased risk of heart attacks among the Vioxx patients, which was primarily due to the cardioprotective effect of naproxen.

[73:12] - [73:17] 5/2/2006 McKines - 4.20.06

page 73

Q. Okay. Now, I don't want to get off on a tangent, but let's deal with that for a second.
A. Okay.
Q. Are you stating that as a fact or as a Merck theory?

[73:20] - [74:16] 5/2/2006 McKines - 4.20.06

page 73

THE WITNESS: That is the conclusion of MRL regarding the results of the VIGOR trial.
BY MR. KAUFMAN:
Q. That's one alternative,

page 74

correct?
A. That is the conclusion of MRL.
Q. Is another alternative that Vioxx causes heart attacks?
A. I'm unaware if there're other conclusions. The conclusion of MRL based on their review of the data is that it was due to the cardioprotective effect of naproxen.
Q. Ms. McKines, that isn't true. You know that there are two explanations: one, that naproxen prevents heart attacks; the other that Vioxx causes heart attacks. You know that as you sit here today, correct?

[75:20] - [76:1] 5/2/2006 McKines - 4.20.06

page 75

THE WITNESS: I'm aware of the APPROVE study that shows that there was an increased risk of heart attacks with Vioxx which led to the withdrawal of Vioxx from

page 76

the market.

[76:3] - [76:8] 5/2/2006 McKines - 4.20.06

Δ obj = atty sidebar, no answer
π response = foundation + goes w/ question / response in next section

page 76

Q. That's not what I'm talking about.
A. Okay. So --
Q. I want to be very clear for the jury. I'm talking about the VIGOR trial.

[76:9] - [76:21] 5/2/2006 McKines - 4.20.06

see next pg

page 76

You know as you sit here today that there're two possible explanations of why so many more people in that trial had heart attacks who were taking Vioxx. You know there are two explanations, and I'll go through them

for you: one, naproxen actually prevents heart attacks; two, Vioxx causes heart attacks. You know those two alternatives are out there, you knew it in 2001. Moreover, you knew the FDA thought that the naproxen theory was bogus. You know that.

Δ obj = mischaracterizes the evidence, assumes facts, compound

Π resp = proper cross-examination, foundation for next section

[78:4] - [78:11] 5/2/2006 McKines - 4.20.06

page 78

So, we can break it down if you'd like, but, again, as I sit here in 2000, results of the VIGOR trial are, again, based on the cardioprotective effect of naproxen. I don't know what the FDA thought. I wasn't privy to FDA discussions.

Δ obj = same + 403

Π response - same + relevant to FDA + naproxen hypothesis

[78:12] - [78:13] 5/2/2006 McKines - 4.20.06

page 78

MR. KAUFMAN: Let's take a look at Exhibit 1.0006.

Δ obj = 802, 602, 403

Π = FDA letter is non-hearsay, goes to effect on the listener, public notice + effect on the listener, public record exception, full response in our opp to merck MIL re: this document admitted in Irvin II

[79:3] - [79:4] 5/2/2006 McKines - 4.20.06

page 79

Q. We're going to see if you knew what the FDA thought in 2001.

Δ = atty sidebar

Π = foundation

[79:9] - [79:22] 5/2/2006 McKines - 4.20.06

page 79

Q. The document that you're being handed right now, Ms. McKines, is a warning letter that Merck received from the FDA in September of 2001, and you got this letter, didn't you?

A. I don't recall ever getting this warning letter.

Q. You don't't?

A. In 2001, I had moved off of the brand team, and I don't recall getting this warning letter.

Q. You got it two days later, didn't you?

A. I don't recall.

Δ obj = 802, 602, 403

Π = FDA letter is not hearsay, not offered for truth but for notice / effect on the listener, public records exception, see full response in our opp to Δ MIL 2, but relevant for: impeachment, failure to warn, state of mind, motive / intent

Irvin II ruling - document admitted

[80:7] - [81:1] 5/2/2006 McKines - 4.20.06

page 80