Q. Take a look at CM 74, Ms. McKines --

MS. FULTON: It's not in front of her yet.

BY MR. KAUFMAN:

Q. -- and tell me if Diane Tansey didn't send you the FDA warning letter two days later, on September 19, 2001. If you look at the first page in the "to" field --

A. I see I'm copied on the -- one of the two out of the --

Q. No, you're not copied. It was sent to you, correct?

A. Correct. Along with, it appears to be, the entire Merck organization. All right.

Q. You think that that's the

page 81

entire Merck organization?

Same as above

[81:2] - [81:12] 5/2/2006 McKines - 4.20.06

page 81

A. Well, I shouldn't say the entire Merck organization. I think other relevant folks within Merck. That's not the entire Merck organization.

Q. Okay.

Let's talk about that for the jury. You received a copy of a warning letter that we're going to see in a few minutes has some very strong language in it?

A. Uh-huh.

Δ = same as above + lack of foundation, argumentative

Π = same + proper cross exam impeachment of witness

[81:13] - [81:17] 5/2/2006 McKines - 4.20.06

page 81

Q. You got it two days after Merck got it, but because it was sent to 150 people, you felt like you could just throw it in the trash, not worry about it and not read it. Is that your testimony?

[81:21] - [81:22] 5/2/2006 McKines - 4.20.06

page 81

THE WITNESS: That is absolutely not my testimony.

Same as above

[81:24] - [82:4] 5/2/2006 McKines - 4.20.06

page 81

Q. Then why did you bother to

page 82
point out to the jury that it was sent to a bunch of people. The letter was sent to you, was it not?
A. It was sent to me.

Δ = 802 re letter, 602, 403
Π = same as above - document is subject of MIL,
Ruling - document admitted in Irvin II

[82:7] - [82:10] 5/2/2006 McKines - 4.20.06

page 82
Q. So, when you said you don't recall receiving the letter, you guessed wrong, right?
A. No --

Δ = Same as above + argumentative
Π = Same as above + proper cross-examination, impeachment

[82:13] - [82:16] 5/2/2006 McKines - 4.20.06

page 82
THE WITNESS: I do not recall. The letter was, in fact, sent to me. That was your question.

Same

[82:18] - [83:6] 5/2/2006 McKines - 4.20.06

page 82
Q. You got it, right?
A. It was sent to me. I don't recall the specifics around this letter. I do know that we got a warning letter, we take warning letters very seriously in the organization, haven't gotten one since, but I don't recall the specifics
page 83
around this warning letter.
Q. You take it very seriously. You got it, but you couldn't remember two minutes ago that you did get it. It doesn't sound like you took it very seriously.

Same as above

[83:9] - [83:14] 5/2/2006 McKines - 4.20.06

page 83
THE WITNESS: The organization takes warning letters very seriously.
BY MR. KAUFMAN:
Q. But Charlotte McKines doesn't take them very seriously?

Same as above

[83:15] - [84:7] 5/2/2006 McKines - 4.20.06

page 83

A. I take them very seriously, too, but I can't recall the specifics around this warning letter. Yes, it appears that I got the warning letter, but I can't recall the specifics of it sitting here today.

Q. Do you get so many strongly worded warning letters from the FDA that they all run together, and you can't remember when we you got them?

page 84

A. We have not gotten a warning letter from the FDA since we got this letter in 2000 -- whenever we got it, 2001.

Q. Well, then, it seems to me it would have been a big deal, the kind of thing that you would have remembered.

Same as above

[84:10] - [84:14] 5/2/2006 McKines - 4.20.06

page 84

THE WITNESS: Again, I cannot recall specifics around the warning letter. I just can't recall the specifics around that sitting here today.

[84:16] - [87:4] 5/2/2006 McKines - 4.20.06

page 84

Q. Well, let's take a look at the warning letter that you did receive in September of 2001. Take a look at Page 6 of the warning letter. And the page numbers are in the top right-hand corner.

A. Uh-huh.

Q. Do you see the bottom portion where it says "Press Release"?

page 85

A. Uh-huh.

Q. Let's take a look at the -- we're going to read to the jury from this letter that you received in September of 2001. "We have identified a Merck press release," "we" meaning the FDA, "have identified a Merck press release entitled, 'Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx,' dated May 22nd, 2001, that is also false or misleading for similar reasons stated above. Additionally, your claim in the press release that Vioxx has a 'favorable cardiovascular safety profile' is simply incomprehensible given the rate MI" -- that's a heart attack, right, Ms. McKines, MI?

A. Yes.

Same as above

Q. -- "and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDS is misleading; in fact, serious cardiovascular events were twice

page 86

as frequent in the Vioxx treatment group as in the naproxen treatment group in the VIGOR study."

Do you ever recall reading that?

A. I cannot recall reading the specifics around this press release. Do we have a copy of the press release that they're making a reference to? Again, what you say is stated here, and that's what I read.

Q. I'm just asking -- I asked you a simple question.

A. Okay.

Q. Do you remember reading that language?

A. No, I don't. I don't recall that.

Q. But you had it in September of 2001, you knew what the FDA thought about Vioxx back then for sure if you bothered to read this letter, correct?

A. I do not recall -- I do not recall -- I received the letter. I don't

page 87

recall the specifics around the letter.

Q. All right. Let's go back to CM 2. That's the document you already have.

Same as above

[87:12] - [88:11] 5/2/2006 McKines - 4.20.06

page 87

~~said you didn't know~~. Now, we know you got this e-mail from Jefferey Niekelski. And let's go back, now that we've talked about whether or not naproxen explains the VIGOR results, and let's read that first paragraph. We're on the first page, first bullet point. "With respect to increased thromboembolic risk associated with Vioxx in the VIGOR trial, Merck's analytical sequestration of heart attacks into a small, retrospectively defined high-risk group proved impressionistically seductive" to most of

page 88

Wall Street -- or rather, "to most Wall Street observers as far as we could see. But upon closer examination, Merck's analysis raises more questions than it answers, in our view."

Now, you clearly got this e-mail in June of 2000, so you must have

Δ = 802, 402, 403, foundation re "spinning info" - also only part of question is designated

Π = start of question is not relevant but can be added if desired, document is not hearsay but is admission/adoptive admission, document in Merck files + forwarded to employees internally witness received e-mail, goes to notice, effect on the listener, failure to warn

known in June of 2000 that the Merck organization was spinning the results of VIGOR to Wall Street. Isn't that correct?

See prior pg.

[88:14] - [88:22] 5/2/2006 McKines - 4.20.06

page 88

THE WITNESS: In no way do I believe that Merck spins data and spins information to Wall Street. That is not the Merck I know. I don't believe that actually happened. I'm unsure what this person writes and what this means, but in no way do I believe that that's the case.

Δ: Same as above (except not lack of foundation)

π = same

[88:24] - [89:23] 5/2/2006 McKines - 4.20.06

page 88

Q. Well, this person in the

page 89

e-mail is Jefferey Niekelski who works for Merck, correct?

A. And I believe that Jeff -- Jeff does, in fact, work for Merck, and Jeff is lifting this, I think, from something that I saw in the document that someone from -- this Smith Barney report, I'm assuming.

Q. And he sent it to you, correct?

A. He did -- I am cop -- I am one of the two persons on this e-mail.

Q. And he wanted you to read this, correct?

A. I assume that's why -- yes.

Q. Well, look at the first paragraph. "It is worth reading the entire article."

A. Uh-huh.

Q. So, you knew, whether or not it was true, you knew there were Wall Street analysts who thought that Merck was spinning the VIGOR results, correct?

Same as above

[90:2] - [90:24] 5/2/2006 McKines - 4.20.06

page 90

THE WITNESS: Again, I don't recall receiving -- I am on the "to" list. I don't recall receiving this. I don't recall reading this. So I can't say that I knew. I don't believe that Merck was spinning the data.

BY MR. KAUFMAN:
Q. You got the September 2001 warning letter, correct?
A. Yes, I did.
Q. And you forgot about getting that, correct?
A. Again, I am on the "to" list. I'm sure I got the warning letter. I do not recall specifics around the warning letter. So, sitting here today, I don't recall those specifics.
Q. You got this e-mail June 6th -- or June 5th of 2000, and yet you couldn't remember that people thought that Merck was spinning the VIGOR results to Wall Street, correct?

Same as above

[91:4] - [91:17] 5/2/2006 McKines - 4.20.06

page 91
THE WITNESS: I do not believe that Merck spun the information to Wall Street.
BY MR. KAUFMAN:
Q. That was not my question.
A. I do not receive -- I do not recall receiving this. I received -- I do not recall this document as I stand here today.
Q. And it was your testimony earlier that in June of 2000, you were unaware of any data that showed that Vioxx increased the risk for heart attack. Isn't that right?

[91:20] - [91:21] 5/2/2006 McKines - 4.20.06

page 91
THE WITNESS: That was my testimony.

Δ = 802, 402, 403, mischaracterizes the evidence

[91:23] - [92:9] 5/2/2006 McKines - 4.20.06

page 91
Q. Let's look at the last bullet point on that first page: "The
page 92
VIGOR trial appears to reinforce the FDA's concerns, as stated in the April 1999 Arthritis Advisory Committee meeting, with respect to the safety of chronic dosing of Vioxx at the 50 milligram level."
Did you know that VIGOR confirmed FDA concerns about the safety of Vioxx?

Π = same as above re: document, question is a fair + accurate portrayal of the document

[92:13] - [92:18] 5/2/2006 McKines - 4.20.06

page 92
Q. Did you know that, Ms. McKines?
A. No, I did not.
Q. Yes, you did.
A. I don't recall this.
Q. You got this e-mail.

Same as above

[92:19] - [93:3] 5/2/2006 McKines - 4.20.06

page 92
A. Again, I don't recall the specifics around it -- I am on the "to" list. I do not recall the e-mail.
Q. Does it appear in your testimony that you are unaware of any data in June of 2000 that showed that
page 93
Vioxx increased the risk of heart attack? Does that testimony appear now to be wrong?

[93:6] - [93:16] 5/2/2006 McKines - 4.20.06

page 93
THE WITNESS: No. I don't recall any data around that.
BY MR. KAUFMAN:
Q. But you had it? But you had data?
A. I don't recall this -- the data. I don't recall it.
Q. My question is not do you recall it. My question is, are you ready to admit to the jury that you had this information in June of 2000?

Δ= document is 802, 402, 403

[93:19] - [94:5] 5/2/2006 McKines - 4.20.06

π= same as above
document is not hearsay, testimony is about witness' personal knowledge

page 93
THE WITNESS: And I want to understand what "had" means.
BY MR. KAUFMAN:
Q. You don't understand the meaning of the word "had"?
A. Again, I received this
page 94
information. It was there. I do not recall specifics around this information. I don't recall seeing this. Yes, I received it. I do not recall reading it, do not recall it.

[94:6] - [94:24] 5/2/2006 McKines - 4.20.06

page 94

Q. So, you forgot that you had information in June of 2000 that suggested that Vioxx increased the risk of heart attacks?

A. I do not recall. I do not -- so, again, I do not recall the information that you presented here, the letter from Jeff -- the e-mail from Jeff Niekelski or the warning letter.

Q. When you got the e-mail from Jeff, and you've got it in these four bolded bullet points, the bottom of the page "appears to reinforce," "VIGOR appears to reinforce the FDA's concerns, as stated in April 1999," did you go to MRL and ask what was FDA concerned about in April of 1999 with Vioxx before we even started marketing it? Did you bother to do that?

Δ = 802 re: document, mischaracterizes testimony, 402/403

Π = same re: document not hearsay, does not mischaracterize testimony, witness testified that she forgot

[95:3] - [95:5] 5/2/2006 McKines - 4.20.06

page 95

THE WITNESS: I do not recall receiving the e-mail. I do not recall this e-mail.

[95:7] - [96:1] 5/2/2006 McKines - 4.20.06

page 95

Q. Did you go to anyone at MRL and ask them about the FDA's concerns in 1999?

A. I wasn't aware of FDA's concerns in 1999.

Q. Yes, you were. You got this e-mail in June of 2000.

A. Again, I do not recall the e-mail.

Q. Did you go to anyone in MRL and ask what Jeff meant when he summarized that report and it talks about the FDA having concerns about Vioxx all the way back in 1999? Yes or no?

A. I do not recall receiving the e-mail from Jeff. I was not aware of their concerns in 1999 regarding --

Q. You're not answering my

page 96

question. I only have until 4:00 today.

Δ = 802 re: document, argumentative, sidebar not a question, 402/403

Π = Proper cross-examination, impeachment of witness, "sidebar" is attorney's attempt to get the witness to provide a responsive answer

[96:11] - [97:8] 5/2/2006 McKines - 4.20.06

page 96

THE WITNESS: I do not recall receiving this e-mail from Jeff. I have no reason -- I do not recall there being any concerns around Vioxx with the FDA in April 1999.

BY MR. KAUFMAN:

Q. Are you saying no, you did not go to anyone at MRL and ask them what Niekelski meant about FDA concerns about Vioxx in 1999? Is that what you're saying?

A. I do not recall -- the last part of your question -- I do not recall

page 97

this e-mail from Jeff Niekelski.

Q. I know that. You've said that ten times.

I want to know if you remember asking anyone at MRL in June of 2000 about concerns the FDA had about Vioxx all the way back in 1999. Yes or no? Did you do that?

[97:17] - [98:3] 5/2/2006 McKines - 4.20.06

Δ = 802, 402, 403
Π = Same as all prior responses - this document is not hearsay, moreover, this section of testimony is entirely related to the witness' personal knowledge + recollections

page 97

Q. Are you saying you don't remember whether or not you spoke to anyone at MRL about the FDA's concerns?

A. I saw no reason to do that, and from what I recall -- just saw no reason to do that.

Q. Okay.

Well, let's see if there was

page 98

reason to do that. Do you recall just ignoring this report that Jeff sent you that he encouraged you to read?

[98:6] - [98:7] 5/2/2006 McKines - 4.20.06

page 98

THE WITNESS: No, I do not recall ignoring it.

[98:18] - [98:24] 5/2/2006 McKines - 4.20.06

Δ = 802, argumentative
Π = no hearsay, asking re: witness personal knowledge / recollection, proper cross examination / impeachment of witness

page 98

Even in the face of this document that we've just seen, that without any question you received in June of 2000, are you still going to tell the jury that you didn't have any information about data showing that Vioxx increased

the risk of heart attacks in 2000?

See prior pg

[99:3] - [99:11] 5/2/2006 McKines - 4.20.06

page 99

THE WITNESS: I am not aware of any data that shows that Vioxx increased the risk of heart attacks. So, the VIGOR -- with the VIGOR results, again, primary endpoint, and there was heart attacks, but it was due to the cardioprotective effect of naproxen.

[99:13] - [99:17] 5/2/2006 McKines - 4.20.06

page 99

Q. That is 100 percent Merck's spin, isn't it, Ms. McKines? We made our endpoints, we hit our GI endpoints, and naproxen protects the heart. Isn't that true? Isn't that all that is?

[99:20] - [100:3] 5/2/2006 McKines - 4.20.06

page 99

THE WITNESS: No. I don't believe that at all. Those are the results of the study. We met our primary endpoint, which, by the way, was the primary

page 100

hypothesis of the study, and it proved the benefit of the COX-2 class.

[100:5] - [100:9] 5/2/2006 McKines - 4.20.06

page 100

Q. It's your testimony that you didn't know the FDA was concerned about the safety of Vioxx even before it was introduced on the market, correct?

A. That is true.

[100:11] - [100:21] 5/2/2006 McKines - 4.20.06

page 100

THE WITNESS: I'm not aware of the FDA concerns about --

BY MR. KAUFMAN:

Q. You're not aware or you

weren't aware? Let's be clear.
A. I don't recall.
Q. In June of 2000, you were not aware of the FDA's concerns about Vioxx?
A. I don't recall any FDA concerns around Vioxx.

[101:5] - [101:10] 5/2/2006 McKines - 4.20.06

page 101
Q. Were you aware of the FDA's concerns about Vioxx as stated in April of 1999 in June of 2000? Your testimony has been no.
A. I don't recall. I don't recall those.

[103:22] - [103:23] 5/2/2006 McKines - 4.20.06

page 103
Let's take a look at an FDA document from May of 1999, 1.0353.

[105:9] - [105:13] 5/2/2006 McKines - 4.20.06

page 105
Before we start, though, let's look at the front page. And you see that this is a medical officer review of Vioxx, correct?
A. Correct.

[105:14] - [105:20] 5/2/2006 McKines - 4.20.06

page 105
Q. All right.
And it's dated -- it's got a number of dates, but the handwritten date when the medical officer finished was May 20, 1999. Do you see that?
A. Yes.
Q. Okay.

[105:21] - [106:10] 5/2/2006 McKines - 4.20.06

page 105
Now, let me ask you if you remember this. This is dated about a month before you went out to San Francisco to speak to about 3,000 sales
page 106
representatives about Vioxx, is that

Δ = 802 (Villalba medical review), 601/602, 403

Π = document is not hearsay - not offered for truth, goes to notice, effect on the listener, public records exception - authored by FDA, witness has personal knowledge + is competent to testify, if she is not competent, then that further reinforces Π's failure to warn claims. How could she possibly warn / educate doctors (or train other reps to do so) about risks of Vioxx if she isn't trained / educated to do so?

testimony relates to witness' personal knowledge about these matters

- highly relevant if this witness was speaking to Vioxx sales force + never even saw what FDA had to say about safety of the drug or what was in the NDA,

(cont'd on next pg.)