with Charlotte McKines, correct?
A. Correct.

[198:12] - [198:21] 5/2/2006 McKines - 4.20.06

page 198

Ms. McKines, tell the jury what advocate development is.
A. Advocate development is an activity, common activity in the industry whereby we communicate the science of our product, risks and benefits to our product -- the science of our product to key, what we call thought leaders or opinion leaders in a given market. For this market, it was OA and pain.

[201:19] - [201:22] 5/2/2006 McKines - 4.20.06

page 201

Let's talk about the real issue underlying advocate development.
MR. KAUFMAN: Let's look at CM 8.

[202:8] - [202:21] 5/2/2006 McKines - 4.20.06

page 202

Q. The real focus is, you're trying to make -- back in 2000, 1999, you were trying to make Vioxx into Merck's next billion dollar gigabrand, right?
A. We believed we had a wonderful product with Vioxx and that it would satisfy a lot of patients' needs. Again, a very large market, a lot of patients in pain out there, a lot of patients that could benefit from Vioxx.
Q. Do you want to agree with me that the focus back in 1999 was to create -- was to make Vioxx Merck's next billion dollar gigabrand?

Δ objection: 402, 403
π response: relevant to Merck's motives for failing to warn of CV danger to maximize sales
subject to MIL

[202:24] - [203:21] 5/2/2006 McKines - 4.20.06

page 202

THE WITNESS: Our focus in

page 203

1999 in and around the launch of Vioxx was to really bring an innovative product to the market for patients. And there were a lot of patients out there who could benefit from Vioxx, and we thought it was a great product.

Δ objection: 402, 403 argumentative
π response: relevant to failure to warn and Merck's financial motives
subject MIL

BY MR. KAUFMAN:
Q. Now, Ms. McKines, it's about money, right, not about patients?
A. It's about patients. It's about bringing products to market -- bringing a product to market that would benefit a lot of patients in pain.
Q. Let's take a look at CM 8. This is another 2000 profit plan PowerPoint, do you see that, dated July 14, 1999?
A. Yes.
Q. Let's take a look at the page ending 5248, Bates ending 5248.

please see previous page

[203:22] - [204:1] 5/2/2006 McKines - 4.20.06

page 203
MR. KAUFMAN: Blow up that top slide, please, Matt. "Vioxx is Merck's Next Billion Dollar
page 204
'Gigabrand.'"

Δ objection 402, 403, slides on profit plan
π response relevant to Merck's motives for failing to warn of CV danger to maximize sales subject to MIL

[204:8] - [204:21] 5/2/2006 McKines - 4.20.06

page 204
Q. Let's see. I'm going to look for something about patients. "Vioxx established a new product launch paradigm." Do you see the page I'm on, Ms. McKines, 5248?
A. Yes, I am. I'm just reading the document.
Q. "Vioxx will achieve over a $1 Billion in 2000." "Surpassed Arthrotec." Is that not the issue underlying advocate development, that "Vioxx is Merck's Next Billion Dollar 'Gigabrand'"? Is that not -- I mean, that's not the real issue?

Δ objection 402, 403, argumentative sarcastic
π response: please see previous response, counsel is quoting from document

[204:24] - [205:3] 5/2/2006 McKines - 4.20.06

page 204
THE WITNESS: I'm sorry. I
page 205
was reading the document. I didn't hear your question. One more time.

[205:17] - [205:21] 5/2/2006 McKines - 4.20.06

page 205
Q. Okay. You've looked through

Δ objection: 402, 403
π response slides on profit plan relevant to Merck's motives for failing to warn of CV danger to maximize sales, subject to MIL

the document?
A. Uh-huh.
Q. Yes?
A. Yes.

please see previous page

[205:22] - [206:20] 5/2/2006 McKines - 4.20.06

A objection: 402, 403
π response: Profit plan relevant to Merck's motives for failure to warn of CV danger to maximize sales

page 205
Q. This is July 14, 1999, correct?
A. Correct.
page 206
Q. You were still the executive director for marketing for Vioxx on that date, right?
A. That's correct.
Q. And you participated in the profit plan, correct?
A. In this meeting with our extended team.
Q. Yes?
A. Yes.
Q. Okay.
Now, we looked at one slide. "Vioxx is Merck's Next Billion Dollar 'Gigabrand.'" I want to look at another slide, Bates range or Bates ending 5261. We're going to look through this document to see if this is about delivering pain relief to patients or if it's about money. Are you on that Page 5261?
A. Yes.

[208:2] - [208:13] 5/2/2006 McKines - 4.20.06

page 208
Third bullet point: "Achieve sales of $1.2 billion." Correct?
A. That's correct. That's as it's stated here.
Q. "Achieve total prescription market share." See that, that's the last bullet point?
A. Uh-huh.
Q. All right.
Now, is there anything in there about patients and pain relief?

[208:17] - [209:18] 5/2/2006 McKines - 4.20.06

page 208
A. There's nothing on that page, but as you look through the document and you talks -- it talks about some of the issues that we're trying to do. So, the profit plan is really sort

Δ objection: please see previous page

of our budget, what we want to try to accomplish with the product. As you look through the document and you start

page 209

looking at what we're trying to achieve with our audiences, you see different things by audience with physicians, with patients.

Q. Let's see what you want to achieve. Point out something about patients. Give me the last four numbers on the page.

A. On Page 5268?

Q. Now, let's look at the top of that. Is this the first slide?

A. Yes.

Q. Okay.

"Strategic choice number 2. Primary Targets." Is a target a patient?

A. No -- it's -- we reach out. It's a common term that shows how we reach out to consumers and patients.

[233:15] - [233:18] 5/2/2006 McKines - 4.20.06

page 233

Q. Now, you certainly knew that there was a program of neutralization directed at doctors who thought that Vioxx was dangerous; isn't that correct?

[233:21] - [234:14] 5/2/2006 McKines - 4.20.06

page 233

THE WITNESS: No. I'm not aware of any program directed around Vioxx -- around physicians who thought Vioxx was dangerous.

page 234

I'm not aware of that. Neutralization is a common term used in the industry that sort of brings physicians back to center, and we do that by sharing information with them around Vioxx.

BY MR. KAUFMAN:

Q. Let's take a look at what neutralization really means. We're going to take a look at what a lot of words really mean.

MR. KAUFMAN: Let's look at 1.0415.

[235:4] - [235:19] 5/2/2006 McKines - 4.20.06

page 235

This is a memo that you got July 1st, 1999. Do you see the date at the top?
A. Yes.
Q. And you see it is directly to you and Wendy Dixon, right?
A. Correct.
Q. And you worked right below Wendy Dixon, right?
A. Uh-huh. I worked with Wendy.
Q. Okay.
And it's prepared by Susan Baumgartner and Carolyn Yarbrough. These are members of your team, correct?
A. Correct.

Δ objection: 402, 403, cumulative
π response: Neutralization of physicians is relevant to show the efforts undertaken by Merck to suppress the truth about Vioxx's safety profile to sell more of the drug

[236:9] - [237:17] 5/2/2006 McKines - 4.20.06

page 236
Q. Do you see the subject "Advocate Development Opportunity: Physicians to Neutralize"?
A. Yes.
Q. Okay.
Now, let's see who you're going to neutralize. All right?
A. Okay.
Q. Going back to even before Vioxx was on the market, Susan Baumgartner, Carolyn Yarbrough -- who both worked for you, right?
A. Correct.
Q. -- together with Leo Mendez and Bruce Lesser had worked "to identify the top national and regional physicians
page 237
who...Are important from a business perspective," not a health or a patient perspective, "from a business perspective in terms of influence and/or prescribing," who "either do not support or are negative toward Merck and/or Vioxx" and who "provide extensive support and a strong voice for our competitors."
You agree with me those are the kinds of physicians that have been identified to neutralize?
A. This document states that those are the physicians that they identified.
Q. And you got this memo, correct?
A. Correct.

[237:24] - [238:1] 5/2/2006 McKines - 4.20.06

page 237
MR. KAUFMAN: Let's take a

please see previous page

page 238

look at CM 29.

[238:11] - [239:22] 5/2/2006 McKines - 4.20.06

page 238

Q. CM 29 is another copy of a memo that you received July 1st, 1999. Do you see that?
A. Yes.
Q. Okay. And it looks a lot like the memo that's been marked as Exhibit 1.0415. I'll show you a difference, though. Okay?
A. Okay.
Q. You see that you received it, you and Wendy Dixon received it, correct?
A. Correct.
Q. And it was prepared by Susan

page 239

Baumgartner, Carolyn Yarbrough, Leo Mendez and Bruce Lesser, right?
A. Yes.
Q. Is that the advocate development team?
A. Susan and Carolyn were responsible for advocate development.
Q. And they're reporting directly to you and Wendy Dixon about their plan, correct?
A. They sent them to both Wendy and myself.
Q. So, they're reporting to you about their plan, correct?
A. They sent the memo to Wendy and myself.
Q. And they sent it for a reason other than to report to you what they're doing?
A. Again, not recalling the memo, I assume they sent it to us, but to let us know what they were doing.

[239:23] - [241:22] 5/2/2006 McKines - 4.20.06

Δ objection: 402, 403, lack of foundation/argumentative
π response: Relevant to show Merck's efforts to monitor what doctors were saying about Vioxx and suppress the truth about Vioxx's safety profile. Questions needed for clarification about contents of document.

page 239

Q. Okay.
Well, let's look at this.

page 240

Now, we have -- on the first memo, we had three identifiers for the physicians that are going to be neutralized. There's a fourth on this one.
A. Uh-huh.
Q. Let's look at it. "As a team" -- and I'll read the introduction, too.

please see previous page

"As a team, prior to the approval of Vioxx, we identified the top national and regional physicians who," Number 4, "are in need of some extra attention and support beyond what field personnel have provided?"
What do they mean by "in need of some extra attention"? Does that mean extra cash?
A. Absolutely not. I read this as they're certainly -- this is -- there may be information that may be important for them from a science perspective that our field personnel don't have, and so they want to get some extra attention

page 241

from MRL scientists to provide that kind of support to them. But in no way do I read this as meaning extra cash.
Q. Okay.
Earlier you said that you didn't have a team of people to spy on doctors to see what they were saying about Vioxx. Look at the second paragraph right below Item Number 4. "We collected information about these physicians prior to the approval of Vioxx, and the HSAs" -- what are those?
A. Health science associates.
Q. -- "and Specialty Representatives" -- those are sales reps, right?
A. Yes.
Q. -- "and the HSAs and Specialty Representatives have been carefully monitoring the situation with each of them." So, these doctors aren't being spied on?

[242:3] - [242:13] 5/2/2006 McKines - 4.20.06

page 242

THE WITNESS: I would not believe in any way these physicians are being spied on. What we're gathering is typical feedback information we get on physicians. It's really understanding what they're thinking, understanding who the thought leaders are, understanding what their perspectives are. This is in no way spying on physicians.

[243:13] - [244:21] 5/2/2006 McKines - 4.20.06

page 243

Q. Well, what really happens is that you go out and you see that doctors

Δ objection: 402, 403 mischaracterizes the evidence
π response: neutralizing doctors with the greatest potential for damage is relevant to show the lengths to which Merck will go to suppress the truth about Vioxx relevant to motive. counsel attempts to clarify contents of document

please see previous page

are saying negative things about Merck, and then you set up a task force to, at a minimum, neutralize those doctors with the greatest potential for damage. That's what happens, right?
A. Absolutely not.
Q. Well, let's take a look at the next sentence. "In some cases, local task forces have been established to, at a minimum, neutralize those with the

page 244

greatest potential for damage." That's not happening?
A. No. And the way I interpret this is there are individuals, and, again, it could be individuals from sales organizations, individuals from the scientists going out and talking to these individuals. That's what a task force is. Again, the ability -- what we're trying to do here is move physicians from -- to the right, to the center, to really sort of give them the correct information, if there are misconceptions out there around Vioxx, to really give them correct information around Vioxx.
Q. So, sales representatives tell doctors and researchers at places like Johns Hopkins and Harvard, they tell them the real science about Vioxx because a researcher at Hopkins, what does he know?

[244:24] - [245:24] 5/2/2006 McKines - 4.20.06

page 244

THE WITNESS: And again, I

page 245

wouldn't characterize it that way. Sales representatives share within the label around Vioxx. Again, this is very early in the Vioxx launch. There's not a lot of information out there around Vioxx. And again, sales reps, if there's information they cannot communicate to the folks at, as you mentioned, Johns Hopkins, there will be MRL scientists coming out and sort of sharing the science with them.
BY MR. KAUFMAN:
Q. Let's talk about interpretation. Okay? I want to draw your attention back to the subject line. It says, "Advocate Development Opportunity." Now, that phrase, "Advocate Development Opportunity," that's nothing more than Merck doublespeak. What you really mean is, these are problem physicians who need to

please see previous page

mckines.4.20.2006

be dealt with; isn't that true?

[246:3] - [246:20] 5/2/2006 McKines - 4.20.06

Δ objection: 402, 403, mischaracterizes the evidence, lack of foundation/ argumentative

π response: Relevant to Merck's motives to suppress the truth about the CV safety of Vioxx

page 246

THE WITNESS: These are not -- we don't -- I would not characterize these as problem physicians. These are clearly advocates, top national regional physicians, who either may have some misconception, some additional questions around Vioxx, and our goal is to try to address some of their concerns, and in doing that, our feeling is that we would bring them back to center.

BY MR. KAUFMAN:

Q. Let's see if advocate development opportunity isn't just Merck doublespeak for problem physicians.

MR. KAUFMAN: Let's take a look at CM 30.

[247:4] - [248:16] 5/2/2006 McKines - 4.20.06

Δ objection: 402, 403, 802 lack of foundation/argumentative

π response: Witness was copied on this email.

Relevant to show Δs efforts to suppress the truth via monitoring what doctors would say re: Vioxx; suppress truth re: safety of Vioxx

page 247

Q. This page has two e-mails on it, and I want to start with the e-mail that occurred first in time, so it starts a few inches down. It's an e-mail that you received April 29, 1999 from Susan Baumgartner. Do you see that?

A. Yes.

Q. She sent an e-mail to Leo Mendez and copied you. Do you see it?

A. Yes.

Q. Do you recall getting this e-mail?

A. Again, I received it. I don't recall the e-mail.

Q. She writes, "Leo, As we discussed, attached is the list of 'problem' physicians that we must, at a minimum, neutralize."

Now, you got an e-mail that same day, it looks like about four hours later. This was from Leo Mendez to Susan

page 248

Baumgartner and you're copied. Do you see that?

A. Yes.

Q. Well, let's read it. "Susan great job!!! In formatting and gathering this information. Now that we have a formal document to circulate, I would recommend we remove the word 'problem' from the emails...(just in case...) we should use 'future opportunity,' etc."

please see previous page

"Future opportunity" is code for problem physicians, and the only reason that people took it out was because you didn't want the jury seeing information like this. Isn't that the truth?

[248:21] - [250:2] 5/2/2006 McKines - 4.20.06

page 248

Q. Isn't that exactly what "just in case" means?

A. I don't believe that's what this meant. Again, I don't know what Leo

page 249

meant. But I do not believe "just in case" meant anything. Essentially, Leo felt that, you know, that these were not problem physicians. I would not characterize these as problem physicians. These were well respected national/regional thought leaders who, again, for whatever reason, needed some additional information, and we wanted to share that information, share the science of Vioxx with them. It was okay --

Q. But that's not what --

A. Again, I didn't write the e-mail, but in my perspective, this is not what that meant.

Q. Ms. McKines, Leo doesn't say I recommend we remove the word "problem" and replace it with well respected national physicians who need more information about Vioxx. He says, "I would recommend we remove the word 'problem' from the emails...(just in case....)" Just in case what? Just in case these documents have to be produced

page 250

in a lawsuit and the public gets to see them?

Δ objection: 402, 403, 802 lacks foundation / argumentative

π response: Counsel attempting to clarify language / contents of document. Relevant to Merck's efforts to neutralize doctors; which shows lengths Merck will go to suppress truth.
- Witness was copied on this email
- Non-hearsay, admission by party-opponent
- Business record

[250:6] - [251:2] 5/2/2006 McKines - 4.20.06

page 250

THE WITNESS: I don't agree with that characterization, and I don't believe that Leo said "just in case." I don't know why he said that, but my interpretation of this is, again, these were not problem physicians. These were our advocates that we had. These were not problem physicians.

BY MR. KAUFMAN:

Q. Your team certainly thought they were problem physicians because let's look at it. Susan Baumgartner

Δ objection: please see above

π response: please see above