```
                                    mckines.4.20.2006
19    calls them problem physicians.  Leo
20    agrees with her and says take it out just
21    in case.  And you never wrote an e-mail,
22    and you got all of these to Susan or Leo,
23    saying, we don't call them problem
24    physicians because they're not problem
page 251
1     physicians.  You never did that, did you,
2     Ms. McKines?
```

△ objection: please see previous page.
⁋ response: please see previous page

```
[251:5] - [252:9] 5/2/2006 McKines - 4.20.06

page 251
5                THE WITNESS:  Again, I see
6     Susan a lot.  I don't recall
7     responding to this e-mail, I don't
8     recall receiving this e-mail.  But
9     as I stand here looking at this
10    e-mail, there's no way that I
11    believe that Leo or Susan felt
12    that these were sort of problem
13    physicians.
14    BY MR. KAUFMAN:
15        Q.    Well, tell the jury if the
16    phrase "problem physicians" ever should
17    have been used by people at Merck who
18    worked for you.  Should it?
19        A.    No.  I don't think these
20    folks are problem physicians.  These are
21    our advocates.
22        Q.    Okay.
23              But the phrase was used.  I
24    want to know if you're ready to tell the
page 252
1     jury that that phrase never should have
2     been used to describe physicians.
3         A.    I agree.  I do not think
4     that these -- we would describe our
5     physicians as problem physicians.
6         Q.    Merck described them as
7     problems.  That is beyond dispute.  What
8     I want to know is if you think Merck
9     shouldn't have done that.
```

△ objection: 402, 403, 802, lawyer editorializing

⁋ response:
- Counsel attempting to clarify contents of document
- Counsel attempting to elicit lay opinion from witness regarding a matter within her employment
- Relevant to issue of neutralizing doctors who show potential for damage, which is relevant to show lengths to which Merck will go to suppress truth about Vioxx

- re "editorializing":
  Attorney colloquy, proper examination
- re hearsay: copied on email;
  - witness record exception
  - business record exception
  - admission by party-opponent

```
[252:10] - [252:19] 5/2/2006 McKines - 4.20.06

page 252
10               MS. FULTON:  Object to the
11    form.  You know, you can't --
12               MR. KAUFMAN:  Let her answer
13    the question.
14               THE WITNESS:  I do not
15    believe that we should have used
16    the term "problem physicians."
17    That is not how I would
18    characterize physicians who are
19    our advocates.
```

△ objection: 402, 403
⁋ response:
Relevant to Merck's efforts & motives to suppress truth re: safety of Vioxx.

mckines.4.20.2006

[252:21] - [254:20] 5/2/2006 McKines - 4.20.06

```
page 252
21           Q.   Would you ever use a phrase
22   like "problem physicians" or any kind of
23   language like that to refer to a doctor?
24        A.   I haven't. I don't believe
page 253
1    I have.
2         Q.   There isn't any question
3    that Susan Baumgartner and Leo Mendez and
4    the rest of the advocate development team
5    reported directly to you about their
6    activities when it came to neutralizing
7    physicians, correct?
8         A.   Susan was a member of my
9    team and worked with Caroline Yarbrough
10   around advocate development.  They were
11   members of my team.  We had ongoing
12   discussions around advocate development.
13        Q.   She reported directly to you
14   about her activities, right?
15        A.   Susan reported to Caroline.
16   Caroline reported to me.  We were all
17   part of the brand team.  We were aware of
18   all the activities around what we were
19   doing around Vioxx at the time.
20        Q.   And you specifically asked
21   to be updated on these activities; isn't
22   that true?
23        A.   I asked to be updated on
24   many of the activities around Vioxx at
page 254
1    the time.  As the brand leader, I asked
2    to be updated on many of those
3    activities.
4         Q.   I'm not talking about many
5    activities.  I'm talking about advocate
6    development neutralizing activities.  You
7    specifically asked to be updated on those
8    activities, yes or no?
9         A.   I can't recall if I
10   specifically asked to be updated, but I'm
11   sure I was routinely updated on all the
12   activities related to Vioxx.
13        Q.   Do you remember the name Dr.
14   James McMillen?
15        A.   Yes, I remember his name.
16        Q.   Okay.
17             Now, you know that Ray
18   Gilmartin got complaints that
19   Dr. McMillen thought he was intimidated,
20   correct?
```

Δ objection: 402, 403, 802
Π response:
Non-hearsay, as this is an admission by party-opponent
Business record exception

Relevant to issue of Merck's attempts to neutralize doctors, thus showing propensity and effort to suppress the truth re: safety of Vioxx
Relevant to failure to warn

[254:23] - [255:8] 5/2/2006 McKines - 4.20.06

```
page 254
23             THE WITNESS:  That's as Dr.
24        Fries states in the letter, I
page 255
```

Δ objection: 802, 402, 403 cumulative
Π response:
Business record exception
Relevant to failure to warn of Vioxx safety concerns, thus relevant to Merck's profit plan
Counsel attempting to elicit responsive answer from witness

Page 42

```
                                      mckines.4.20.2006
1            think, as I read it.
2      BY MR. KAUFMAN:
3            Q.     Any idea why Dr. McMillen
4      thought he was intimidated by people at
5      Merck?  As you sit here today, any idea?
6            A.     No.  No.  And I don't
7      believe that anyone at Merck would
8      intimidate Dr. McMillen.
```

Δ objection: please see previous page
π response:  "     "     "     "

[255:14] - [255:20] 5/2/2006 McKines - 4.20.06

```
page 255
14           Q.     Well, let's take a look.
15                  I mean, let's try to get to
16     the bottom of this for the jury, because
17     these people worked for you, and now Dr.
18     McMillen thinks he's being intimidated,
19     and you just don't have any idea why,
20     right?
```

Δ objection: 802, 402, 403 cumulative
π's response: please see previous response

[256:23] - [257:5] 5/2/2006 McKines - 4.20.06

```
page 256
23                  Let's together -- we're
24     going to be like detectives, and we're
page 257
1      going to try to figure out why Dr.
2      McMillen felt he was being intimidated,
3      and then I'm trying to see if I can
4      connect it back up to your team and,
5      ultimately, to you.  Okay?
```

Δ objection: lawyers sidebar 802, 402, 403

proper examination
Counsel attempting to elicit
response from witness
Business record exception
Relevant to Merck's efforts
to suppress truth from
physicians re: safety of Vioxx

[257:15] 5/2/2006 McKines - 4.20.06

```
page 257
15           MR. KAUFMAN:  CM 75, please.
```

Δ objection: 602, 802, 402, 403
π response:
Business record exception
Not hearsay as doc is admission by party-opponent
Witness was copied on this letter & therefore has personal knowledge
Relevant to Merck's efforts to suppress truth re: Vioxx safety, relevant to profit plan

[258:22] - [259:8] 5/2/2006 McKines - 4.20.06

```
page 258
22           Q.     Let's take a look at a
23     letter that I know you've seen before.  I
24     don't know if you remember seeing it.  Do
page 259
1      you see the Bates Numbers?  Go to Page
2      25, please.
3            A.     Uh-huh.
4            Q.     This is a letter dated June
5      6, 2000 to Dr. James McMillen, James
6      McMillen, M.D.  And it's from a guy named
7      John A. Romankiewicz.  Do you know him?
8            A.     Yes.
```

Δ objection: Same as above
π Response: please see above response.

[259:14] - [260:17] 5/2/2006 McKines - 4.20.06

Page 43

mckines.4.20.2006

*Please see previous page*

```
page 259
14              Do you see at the bottom you
15    were carbon copied?
16        A.    Yes.
17        Q.    All right.
18              Let's read the letter. "As
19    a follow-up to my telephone call with
20    your secretary on June 6, 2000, I am
21    confirming that I am rescinding our
22    invitation to you to attend the Vioxx GI
23    Outcome Study (VIGOR) on June 11-12,
24    2000."
page 260
1               Do you know why Dr. McMillen
2     was disinvited from attending the Vioxx
3     GI Outcome Study?
4         A.    I don't know why this
5     invitation was rescinded.
6         Q.    Do you know why John
7     Romankiewicz would copy you with the
8     letter?
9         A.    I'm assuming John copied me
10    on all letters for people who were
11    invited to the meeting, as I think I see
12    the next copy in the next letter. So,
13    it's part of routine correspondence I
14    would get.
15        Q.    Dr. McMillen was disinvited
16    because he thought Vioxx was a dangerous
17    drug; isn't that correct?
```

[260:20] - [260:24] 5/2/2006 McKines - 4.20.06

```
page 260
20              THE WITNESS: I'm not aware
21        why Dr. McMillen was disinvited.
22    BY MR. KAUFMAN:
23        Q.    You don't have any idea?
24        A.    No, I do not.
```

[263:2] - [263:8] 5/2/2006 McKines - 4.20.06

```
page 263
2         Q.    Do you have any idea why Dr.
3     McMillen would think that Merck was out
4     to discredit him?
5         A.    I have no idea why Dr.
6     McMillen would think that. I do not
7     believe that Merck or anybody would be
8     out to discredit.
```

[263:12] - [264:5] 5/2/2006 McKines - 4.20.06

```
page 263
12              Did the advocate development
```

Page 44

mckines.4.20.2006

```
13   team have a plan to discredit
14   Dr. McMillen, to your knowledge, as you
15   sit here?
16        A.   I do not believe that
17   advocate development had a plan to
18   discredit Dr. McMillen. Our advocate
19   development plan was really designed to,
20   again, share the science around that.
21        Q.   I didn't ask you to explain
22   it. I just asked you if you knew that
23   they had a plan. Did they have a plan?
24        A.   I'm not aware of them having
page 264
1    a plan to discredit negatively any
2    physician.
3         Q.   But they did, didn't they?
4    They did have a plan to discredit Dr.
5    McMillen, didn't they?
```

Δ objection: 402, 802, 402, 403
π response: Business record exception. Nonhearsay as document is admission by party opponent. Witness was copied on this letter and therefore has personal knowledge. Relevant to Merck's efforts to suppress truth re: Vioxx safety.

[264:8] - [264:12] 5/2/2006 McKines - 4.20.06

```
page 264
8              THE WITNESS: I don't
9         believe there was a plan to
10        discredit Dr. McMillen.
11             MR. KAUFMAN: Let's take a
12        look at 13. It's 1.0013.
```

[264:21] - [265:20] 5/2/2006 McKines - 4.20.06

```
page 264
21        Q.   Do you see the first page of
22   this is an e-mail, another e-mail from
23   Susan Baumgartner? Do you see that?
24        A.   Yes.
page 265
1         Q.   July 23rd, 1999. Correct?
2         A.   Yes.
3         Q.   This is 22 days after you
4    got a memo, you and Wendy Dixon got a
5    memo about an opportunity, "Advocate
6    Development Opportunity: Physicians to
7    Neutralize," correct?
8         A.   That's correct.
9         Q.   And this is after Susan
10   Baumgartner wrote the e-mail to you
11   calling physicians problem physicians,
12   correct?
13        A.   This is after I received the
14   e-mail.
15        Q.   The title is, "Physicians to
16   Neutralize."
17             Now, we've got a spreadsheet
18   that was attached to the e-mail. Let's
19   take a look through this and see if we
20   can find Dr. McMillen's name. It's on
```

Δ objection: 402, 403, 802, cumulative
π response: Business record exception. Nonhearsay as document is admission by party opponent. Relevant to show Merck was trying to suppress truth re Vioxx safety by "discrediting" and neutralizing doctors.

[266:2] - [266:23] 5/2/2006 McKines - 4.20.06

Page 45

mckines.4.20.2006

```
page 266
2          Q.     Are you on Page 1434?
3          A.     Uh-huh.
4          Q.     Do you see James McMillen in
5     the left-hand column?
6          A.     Yes.
7          Q.     What does it say under James
8     McMillen?
9          A.     It says, "Discredit."
10         Q.     What does that mean?
11         A.     I have no idea what that
12    means.
13         Q.     Well, doesn't it mean that
14    there's a plan to discredit him?
15         A.     I have no idea.  I would not
16    believe that we would intentionally
17    discredit anyone.  So, I'm unsure of what
18    the word "discredit" --
19         Q.     Let's see if we can find a
20    better explanation.
21                MR. KAUFMAN:  Let's go on to
22         the next document.  Let's go to
23         document number CM 5.
```

*Please see previous page*

[267:8] - [268:11] 5/2/2006 McKines - 4.20.06

```
page 267
8          Q.     Do you see this is an e-mail
9     from Susan -- or from Caroline Yarbrough
10    to Susan Baumgartner?
11         A.     Yes.
12         Q.     And this is May 19th, 1999,
13    "Subject:...Physicians to Neutralize"?
14         A.     Uh-huh.
15         Q.     Yes?
16         A.     Yes.
17         Q.     Go to the second page,
18    please.  In the left-hand column, do you
19    see James McMillen?
20         A.     Yes.
21         Q.     Okay.
22                Turn over.  Do you see the
23    column, the right-hand column, it says
24    "Recommendations"?
page 268
1          A.     Uh-huh.
2          Q.     Yes?
3          A.     Yes.  I'm sorry.
4          Q.     Now, in the three lines up
5     on that, three lines up from the bottom,
6     under "Recommendations," in the section
7     that pertains to Dr. McMillen, what's the
8     recommendation that appears?
9          A.     "Discredit."
10         Q.     You were unaware of this
11    plan to discredit Dr. McMillen?
```

[268:14] - [268:23] 5/2/2006 McKines - 4.20.06

mckines.4.20.2006

```
page 268
14                THE WITNESS:  Not only am I
15         unaware, I don't think that there
16         were any plans to discredit any
17         physician.
18   BY MR. KAUFMAN:
19         Q.   So, what does that mean?
20         A.   I have no idea what this
21   means.
22                MR. KAUFMAN:  Let's take a
23         look at another document, CM 26.
```

[269:7] - [270:11] 5/2/2006 McKines - 4.20.06

```
page 269
7          Q.   We're working through it,
8    and maybe one of these documents provides
9    a clear explanation.
10               Now, this is another
11   spreadsheet of physicians, and on this
12   spreadsheet, you're actually listed as
13   the USHH HQ point person for some of
14   these doctors to neutralize.  Do you see
15   your name on that first page?
16         A.   Yes.  I'm not sure what this
17   list is.  What is this?
18         Q.   Well, let's work through it.
19         A.   Okay.
20         Q.   You're listed as the point
21   person for Roy Altman.  Who's Roy Altman?
22         A.   Roy Altman is a
23   rheumatologist in -- is a rheumatologist.
24         Q.   Okay.
page 270
1          What did you do with Roy
2    Altman?
3          A.   What did I do with him?
4          Q.   Yes.  I mean, you're the
5    point person.  Did you meet with him?
6    Did you have dinner with him?  Did you
7    talk to him about Vioxx?
8          A.   Oh, I've known Roy for a
9    long time, and one of Roy's -- so, we had
10   conversations around clinical trials --
11   around clinical trails for Vioxx.
```

[272:3] - [274:7] 5/2/2006 McKines - 4.20.06

```
page 272
3                You were the point person
4    for Len Calabrese, too, at the Cleveland
5    Clinic.  Do you see that?
6          A.   Yes.
7          Q.   What activities did you have
8    concerning Len Calabrese?  Did you visit
9    him?
10         A.   Yeah.  I can't recall
```

Handwritten annotation (right margin):

A objection: 402, 403, 802, cumulative

π response: Nonhearsay as admission of party opponent. Business record exception. Relevant to show Merck was trying to suppress truth re Vioxx CV safety by discrediting and neutralizing doctors.

*please see previous page*

```
                                          mckines.4.20.2006
11     activities I had or conversations I've
12     had with Len Calabrese.
13              Q.    Okay.
14                    Do you see the column all
15     the way to the right, it says, "National
16     Plan of Action"?
17              A.    Uh-huh.
18              Q.    What you're going to do?
19              A.    Uh-huh.
20              Q.    For Calabrese, it says he's
21     going to get a visit from Charlotte
22     McKines.  Do you know if he ever got that
23     visit?
24              A.    I can't recall visiting Dr.
page 273
1      Calabrese.
2               Q.    Okay.
3                     But that's listed under
4      "National Plan of Action," correct?
5               A.    Yes.
6               Q.    Turn over to the third page.
7      Do you see Dr. McMillen's name?
8               A.    Yes.
9               Q.    Okay.
10                    Now, the last column,
11     "National Plan of Action," please read
12     for the jury what the national plan of
13     action is for Dr. McMillen.  That's the
14     last column.
15              A.    "Strong recommendation to
16     discredit him.  Met with Leo Mendez -
17     7/20/99.  Follow-up meeting with Leo
18     Mendez - 9/13/99."
19              Q.    Leo Mendez is the same
20     person that told Susan Baumgartner to
21     clean up the problem physician language,
22     isn't he?  Get it out of there just in
23     case?
24              A.    Again, Leo sent that e-mail
page 274
1      to Susan.
2               Q.    And now you've got a strong
3      recommendation to discredit Dr. McMillen.
4      You didn't have any idea this was
5      happening right under your nose when you
6      were the executive director of marketing
7      for Vioxx?


[274:10] - [274:21] 5/2/2006 McKines - 4.20.06

page 274
10              THE WITNESS:  Again, I don't
11     think that Leo would -- anyone on
12     my team would intentionally
13     discredit anyone.
14     BY MR. KAUFMAN:
15              Q.    Okay.
16                    We've seen three documents,
17     all of which say discredit Dr. McMillen,
18     and this last document says the national
19     plan of action is a "strong
```

Page 48

Δ objection 402, 403, 802, argumentative

π response: Nonhearsay. as a party opponent admission. Business records exception. Relevant to show Merck suppressed truth re CV safety of vioxx by discrediting doctors

```
                                   mckines.4.20.2006
20   recommendation to discredit" Dr.
21   McMillen.  So, these documents are lying?
```

*[handwritten: please see previous page]*

```
[274:24] - [276:5] 5/2/2006 McKines - 4.20.06

page 274
24                THE WITNESS:  I do not
page 275
1       believe in any way that anyone
2       would discredit a physician.  And
3       I'm not -- I don't know --  I'm
4       assuming -- I make the assumption
5       this never happened.  I do not
6       believe that we, in fact, would
7       discredit any -- intentionally any
8       of our thought leaders or opinion
9       leaders or any physician, for that
10      matter.
11   BY MR. KAUFMAN:
12      Q.   So, look into the camera and
13   explain to the jury why again and again
14   and again in documents produced by your
15   team it says discredit Dr. McMillen.
16   Explain that, please.
17      A.   I do not know why -- again,
18   I go back to what I said previously.  I
19   do not believe in any way we set out to
20   discredit, and we would not discredit any
21   of our physicians.
22      Q.   You haven't explained why it
23   appears in the documents over and over
24   and over again.
page 276
1       A.   And I did not write these
2   documents.  I don't know why it's in the
3   documents, but I know that there's no way
4   we would intentionally discredit any of
5   our physicians.
```

*[handwritten: Δ objection: 402, 403, 803, argumentative. π response: please see previous response]*

```
[276:6] - [276:24] 5/2/2006 McKines - 4.20.06

page 276
6       Q.   Are you familiar with the
7   medical school at Johns Hopkins
8   University?
9       A.   I know of it.  I don't know
10  if I'm familiar with it.
11      Q.   Do you know its reputation?
12      A.   I would assume it has a
13  great reputation, as it is Johns Hopkins.
14      Q.   Okay.
15           You don't have to be a
16  doctor to know that Johns Hopkins has a
17  top notch medical school, correct?
18      A.   It is a very good medical
19  school.
20      Q.   You knew when you were the
21  executive director of marketing for Vioxx
22  that there was a professor at Johns
```

*[handwritten: Δ objection: 402, 403, 802. π response: Relevant to show that Merck was trying to suppress the truth regarding the CV safety of Vioxx by neutralizing physicians. Nonhearsay as an admission by a party opponent. Business record exception.]*

Page 49

```
                                      mckines.4.20.2006
23    Hopkins who thought Vioxx was dangerous,
24    right?
```

*please see previous page*

```
[277:3] - [277:19] 5/2/2006 McKines - 4.20.06


page 277
3                     THE WITNESS:  I don't recall
4           that.
5     BY MR. KAUFMAN:
6           Q.    You don't remember that?  No
7     professor at Hopkins who thought Vioxx
8     was bad?
9           A.    I'm not aware of a -- I
10    don't recall a professor there.
11          Q.    You don't recall a professor
12    making statements in the press that Vioxx
13    caused increased incidences of
14    hypertension and edema?
15          A.    I don't recall that.
16          Q.    You don't recall hearing
17    that a doctor said those things at Johns
18    Hopkins University and that he needed to
19    be neutralized?


[277:22] - [278:1] 5/2/2006 McKines - 4.20.06


page 277
22                    THE WITNESS:  Again, I don't
23          recall.
24                    MR. KAUFMAN:  Let's take a
page 278
1           look at CM 49.
```

Δ objection: 402, 403, 802 lack of foundation / mischaracterizes evidence
π response: please see previous response

```
[278:9] - [278:18] 5/2/2006 McKines - 4.20.06


page 278
9           Q.    This is two pages of
10    e-mails, most of which you personally
11    received, some of which you did not.  I
12    want to review them chronologically, so,
13    we'll start on the second page.  Okay?
14          A.    Okay.
15          Q.    The first e-mail is from
16    Patti Davis.  Who is Patti Davis?
17          A.    I believe Patti was one of
18    the specialty managers in the field.


[280:7] - [280:17] 5/2/2006 McKines - 4.20.06


page 280
7           Q.    Patti Davis writes to Leo
8     Mendez, "Subject:  Background - Dr.
9     Andrew Welton," "Importance:  High."  Do
10    you see that?
11          A.    Yes.
```

Δ objection: 402, 403
π response: Relevant to show Merck was trying to suppress the truth regarding CV safety by neutralizing doctors such as Whelton who believed Vioxx caused incidences of hypertension & edema