mckines.4.20.2006

5    "Anti-Inflammatory and Analgesic TBG."
6    Now, TBG means therapeutic business
7    group, right?
8           A.    Yes.
9           Q.    Okay.
10               What was the
11   anti-inflammatory and analgesic TBG?
12          A.    That was the Vioxx brand
13   team.  That was what we were officially
14   called.
15          Q.    Okay.
16               You were on the Vioxx brand
17   team, right?
18          A.    Right.  I was -- it was the
19   same as the -- it's the same as the TBG.
20          Q.    Okay.
21               So, you were on the A&A TBG,
22   right?
23          A.    Correct.
24          Q.    Okay.
page 309
1               Have you seen this document
2    before?
3           A.    This is the 2000 profit
4    plan.  I believe I --
5           Q.    Okay.
6           A.    -- recall seeing this.


[309:7] - [309:19] 5/2/2006 McKines - 4.20.06


page 309
7           Q.    It's a real narrow question
8    I've got about it.  You can flip through
9    it.  But it's Page 21.  I just want to
10   look at how much money Merck was going to
11   set aside for these HEL programs in 2000.
12   Do you see at the top, "HEL"?  The total
13   spend for HEL in 2000 is $42.3 million.
14   Do you see that?
15          A.    Yes.
16          Q.    Okay.
17               So, it's fair to say that
18   Merck set aside significant funds for
19   this program, correct?


[309:22] - [311:11] 5/2/2006 McKines - 4.20.06


page 309
22               THE WITNESS:  We set aside
23          money for HEL programs that was
24          commensurate with the size of the
page 310
1          market in which we were in.  If
2          you'll look down, you'll see that
3          we went to primary care
4          physicians, orthopedic surgeons,
5          rheumatologists, the hospital
6          segment, managed care customers.
7          we really had for the first time a
                    Page 61

*please see previous page*

mckines.4.20.2006

```
 8           very large target audience, and
 9           this amount of spend is
10           commensurate with that size of
11           target audience that we reached.
12   BY MR. KAUFMAN:
13           Q.    Okay.
14                 But that's not my question.
15   And if you can't answer it, you can tell
16   me you can't answer it.
17                 Is it fair to say that Merck
18   allotted significant funds for the HEL
19   program in 2000, $42.3 million?
20           A.    And given the size of the
21   market that we had to reach, we allocated
22   a large amount of funds for that, given
23   the size of the market that we had to
24   reach.
page 311
 1           Q.    So, your answer is yes,
 2   Merck allotted significant funds for the
 3   HEL program in 2000?
 4           A.    Commensurate with the size
 5   of the market that we had.
 6           Q.    But I'd like to hear a yes.
 7   I'm not asking you to justify it.  It
 8   might have been enough.  All I'm saying
 9   is, $42.3 million allocated to the HEL
10   program, that's a significant amount of
11   money, correct?
```

please see page 60

[311:14] - [311:17] 5/2/2006 McKines - 4.20.06

```
page 311
14              THE WITNESS:  That's
15           correct, that it's commensurate
16           with the size of the audience that
17           we had to reach.
```

[312:4] - [312:9] 5/2/2006 McKines - 4.20.06

```
page 312
 4              Now, what I want to look at
 5   is the other half of advocate
 6   development.  Let's look at the carrot
 7   this time instead of the stick.  Okay?
 8           MR. KAUFMAN:  Let's take a
 9           look at CM 51.
```

Δ objection: sidebar
π response: Plaintiff will
remove 312:4-7

[313:16] - [315:18] 5/2/2006 McKines - 4.20.06

```
page 313
16              Q.    Now, you got this e-mail
17   from Rebecca Higbee in January of 1999.
18   And she says, "Team."  So, you're a
19   member of the team, right?
20           A.    Yes.
21           Q.    Okay.
```

mckines.4.20.2006

```
22              And it says,
23  "Intelligence/NEJM."  Do you know what
24  NEJM stands for?
page 314
1          A.    I assume that's New England
2  Journal of Medicine.
3          Q.    Okay.
4                "Importance:  High."
5                "This e-mail will summarize
6  what Public Affairs has learned from a
7  series of conversations that took place
8  over" the "last few days regarding an
9  upcoming publication on COX-2s in the New
10  England Journal of Medicine."
11              Then it mentions a "Dr. M.
12  Michael Wolfe."  Do you remember Dr.
13  Wolfe?
14          A.    Vaguely.
15          Q.    Okay.
16              There's another doctor,
17  David Lichtenstein, do you remember him?
18          A.    No.
19          Q.    How about Gurkipal Singh?
20          A.    Yes.
21          Q.    Okay.
22              So, you're getting an e-mail
23  about Dr. Wolfe's article.  And is it
24  fair to say that Rebecca is trying to
page 315
1  figure out what the article is going to
2  be about?
3          A.    Yes.
4          Q.    Okay.
5                She wants to know what are
6  these docs going to say.
7              Turn over to the second
8  page.  It says, third paragraph down,
9  "Because of the prestige of New England
10  Journal of Medicine and growing media
11  attention to COX-2s, we believe the
12  article, whatever its content, will
13  naturally result in news coverage."
14              So, you want to knew if that
15  coverage is going to be bad or good,
16  right?
17          A.    We just want to know what
18  the coverage is.
```

[316:1] - [316:22] 5/2/2006 McKines - 4.20.06

```
page 316
1                "Public Affairs will keep
2  you informed of what we learn regarding
3  the content and timing of the NEJM
4  publication, as well as our plans to
5  address potential negative messages from
6  the publication."
7              So, you're getting ready to
8  respond to negative messages if they
9  appear in that publication, correct?
10          A.    We're trying to learn what
```

Page 63

mckines.4.20.2006

```
11     the response should be.
12            Q.    Well, it says, "as well as
13     our plans to address potential negative
14     messages from the publication."
15            So, you're anticipating that
16     perhaps there will be negative messages,
17     and if there are, you want to respond to
18     them quickly, correct?
19            A.    Well, I think if there are
20     going to be some negative messages, we
21     want to make sure that there's a way to
22     address any of those.
```

[316:24] - [317:6] 5/2/2006 McKines - 4.20.06

```
page 316
24            So, you've got this article,
page 317
1      it's an unknown quantity, you don't know
2      what's going to be said in the article,
3      and you've got this guy, Dr. Wolfe, the
4      lead author.  Let's see what we do with
5      Dr. Wolfe.
6            MR. KAUFMAN:  CM 52, please.
```

[321:23] - [323:13] 5/2/2006 McKines - 4.20.06

```
page 321
23            Well, we've got this article
24     with three doctors who are kind of an
page 322
1      unknown quantity at the time.  With
2      Singh, the strategy is take it slow and
3      develop trust.  And then up at the top of
4      the page, this first e-mail, it says --
5      the e-mail from Rebecca Higbee to Sherrin
6      Johnson and to you.  Do you see that?
7            A.    Yes.
8            Q.    The last line there is about
9      Dr. Wolfe, who is the lead author.  She
10     asks the two of you, "What is Marketing's
11     perception of Dr. Wolfe's position?  I
12     look forward to hearing from you."
13            Do you recall what
14     marketing's perception of Dr. Wolfe's
15     position was?
16            A.    No, I don't know.  I assume
17     she's looking for, sort of, does
18     marketing have any background around Dr.
19     Wolfe.  I'm not familiar -- I don't
20     recall Dr. Wolfe specifically.
21            Q.    What does it matter what a
22     bunch of marketers at a drug company
23     think of a doctor who is publishing in
24     the New England Journal of Medicine?
page 323
1            A.    Again, this is really not
2      our perception of Dr. Wolfe, but it
3      really is, are there concerns Dr. Wolfe
```

mckines.4.20.2006

```
4      has, are there questions he may have
5      around Vioxx.
6              Q.    So, after this article was
7      published, Dr. Wolfe's article in the
8      early part of 1999, do you recall what
9      sort of interaction Merck had with
10      Dr. Wolfe?
11             A.    No, I can't recall that.
12             MR. KAUFMAN:  Let's look at
13       1.1112.
```

[323:22] - [325:19] 5/2/2006 McKines - 4.20.06

```
page 323
22             Q.    You don't have this one yet.
23      It's a composite exhibit, two documents.
24      And that first one, all we need to do is
page 324
1      look at the top.  Do you see it says, "M
2      Michael Wolfe"?
3              A.    Yes.
4              Q.    The same Dr. Wolfe from the
5      New England Journal of Medicine
6      publication.  Do you see that?
7              A.    I assume that's the same Dr.
8      Wolfe.
9              Q.    Okay.
10              Let's take a look at the
11      other part of that top there.  Payments
12      prior to February 1, 2001, and total
13      payments.  Total payments all after his
14      article is published, $184,000.  Do you
15      have any idea what it is Dr. Wolfe did to
16      get paid $184,000?
17             A.    Well, I think here it lists
18      the activities that Dr. Wolfe
19      participated in, and Dr. Wolfe was
20      certainly compensated for the services
21      and for his time.  We compensate people
22      for their services, and he was
23      compensated for his services.
24             Q.    So, let's see.  Let's take a
page 325
1      look at these.
2              You've got a lot of airfare,
3      right, listed under expense type?  Do you
4      see airfare listed a couple of times?
5              A.    Uh-huh.
6              Q.    You've got a lot of --
7      you've got some incidental expense
8      reimbursements.  I don't know what that
9      would be.  Any idea?
10             A.    No.
11             Q.    So, you're flying them
12      around the country, I guess you're
13      putting them up in hotels, too, right?
14             A.    If there was a need for a
15      hotel stay.
16             Q.    Okay.
17              Then it says, "Colloquia."
18      What's a colloquia?  So, he pontificates
                                    Page 65
```

Δ objection : 402, 403

π response : Relevant to
show Merck's influence
over doctors and motive
to maximize sales of
the drug

mckines.4.20.2006

19    about Vioxx for a couple of minutes?

*please see previous page*

[325:22] - [326:19] 5/2/2006 McKines - 4.20.06

page 325
22                    THE WITNESS:  Yeah, I can't
23        recall specifically what colloquia
24        were.
page 326
1    BY MR. KAUFMAN:
2            Q.    Well, it looks about 1,500
3    to 2 grand a pop.  That's what colloquia
4    is.  So, you know, you get paid, but you
5    don't know what it is you do?
6            A.    No.  Again, I'm unsure what
7    specifically colloquia are, but certainly
8    for any individual who we compensate for
9    their services -- again, we compensate
10    them for their services.  The sign-offs
11    are all approved by -- the contracts are
12    all approved by legal.  Sign-offs are all
13    approved.
14            Q.    From June of 1999 until
15    February of 2004, Dr. Wolfe gets paid
16    $184,000 for some part-time work with
17    Merck.
18            Do you think that's out of
19    line from '99 to 2004?

[326:22] - [326:24] 5/2/2006 McKines - 4.20.06

page 326
22                    THE WITNESS:  I think that
23        Dr. Wolfe was compensated fairly
24        for his services.

[327:10] - [327:12] 5/2/2006 McKines - 4.20.06

page 327
10            Q.    Is that about in line with
11    what a doc can expect to make doing
12    part-time work for drug companies?

[327:16] 5/2/2006 McKines - 4.20.06

page 327
16            Q.    Almost $200,000?

[327:19] - [329:5] 5/2/2006 McKines - 4.20.06

page 327
19                    THE WITNESS:  We compensate
20        physicians for their services.  I
                    Page 66

mckines.4.20.2006

```
21          have no idea what other drug
22          companies do, but we do compensate
23          physicians for their services.
24     BY MR. KAUFMAN:
page 328
1          Q.   I just wonder if it's at all
2     high.  I mean, do you know of any doctor
3     that makes more than that?
4          A.   I have no -- I have no basis
5     for responding to that.
6          Q.   No.  You wrote a lot of
7     checks to doctors, didn't you?  Or you
8     signed off on a lot of distribution or
9     disbursement vouchers for doctors, didn't
10    you?
11         A.   I personally did not sign
12    off on disbursement vouchers, but I'm
13    sure as we compensated physicians, again,
14    for their services, there were -- those
15    were reasonable expenses that we signed
16    off on.  And, again, fair compensation
17    for their services.
18         Q.   Ms. McKines, you didn't sign
19    off on disbursement voucher requests for
20    doctors?
21         A.   I may have signed off on
22    some, but I'm not sure very specifically
23    as I sit here I signed off on what I know
24    -- a specific disbursement voucher.
page 329
1          Q.   Do you think you signed off
2     on any disbursement voucher requests that
3     were even higher than the amount of money
4     that Dr. Wolfe made for his part-time
5     job?
```

please see p. 65

[329:8] - [329:16] 5/2/2006 McKines - 4.20.06

```
page 329
8                THE WITNESS:  Anything I
9           signed off on, again, was
10          consistent in paying physicians
11          for their services.
12    BY MR. KAUFMAN:
13         Q.   Okay.
14              Let's take a look at some.
15         A.   Okay.
16              MR. KAUFMAN:  Exhibit 71.
```

[329:24] - [333:15] 5/2/2006 McKines - 4.20.06

```
page 329
24         Q.   Let's orient ourselves to
page 330
1     these documents.  What's the title of the
2     document, the first one you see there in
3     that stack?
4          A.   "Merck Disbursement Voucher
5     Request."
```

Δ objection: 402, 403

π response: Relevant to show Merck's influence over doctors and motive to maximize sales of the drug

Page 67

mckines.4.20.2006

6        Q.    And in the second line, do
7    you see the box, "Typed Name of
8    Approver"?
9        A.    "Typed Name of Approver"?
10       Q.    Second line.
11       A.    Oh, yes.  Okay.  I'm sorry.
12       Q.    Okay.
13             What name appears in the
14   box, "Typed name of approver"?
15       A.    Charlotte McKines.
16       Q.    And is that your signature
17   above that?
18       A.    Yes.
19       Q.    And this is $450.24 to a Dr.
20   James Andrews.  Do you recall signing off
21   on this?
22       A.    I don't recall signing off
23   on these.
24       Q.    Do you know what Dr. James

page 331
1    Andrews did for this $450?  It says,
2    "Reimbursement for expenses...from the IT
3    Specialty meeting."
4             Do you know what that means?
5        A.    So, I assumed he attended a
6    meeting, and commensurate with our
7    contracts that we have with him, we
8    reimbursed him for certain expenses.
9        Q.    Okay.
10            Well, let's take -- I don't
11   want to look at every one of these.  I
12   want to flip over.  If you'll just flip
13   over with me to the second -- go six
14   pages in, please.  And the Bates ending
15   6558.
16            Do you see that?
17       A.    Yes.
18       Q.    All right.
19            Now, do you see your name at
20   the top, Charlotte O. McKines?
21       A.    Uh-huh.
22       Q.    Do you see your signature?
23       A.    Yes.  Yes.
24       Q.    Okay.

page 332
1             How much is this
2    disbursement voucher request for?
3        A.    $207,000.
4        Q.    $207,000 for Dr. James R.
5    Andrews for "consulting services to be
6    rendered between October 1999 and
7    December 2000."  Do you see that?
8        A.    Yes.
9        Q.    And this is the first
10   installment.
11       A.    Okay.
12       Q.    Okay.
13            Let's look at the second
14   page or the next page rather.  Do you see
15   another disbursement voucher request?
16       A.    Yes.
17       Q.    Signed by you?
18       A.    Uh-huh.

                              Page 68

please see previous page

mckines.4.20.2006

```
19        Q.    How much is this for?
20        A.    $203,000.
21        Q.    Also for James Andrews,
22   consulting services?
23        A.    Yes.
24        Q.    All right.
page 333
1              That's a total of $410,000
2    for 15 months of work.  Was Dr. Andrews
3    working for Merck full time between
4    October of 1999 and December of 2000?
5         A.    Dr. Andrews was not working
6    for Merck full time.
7         Q.    Okay.
8              410,000 for 15 months of
9    work is 27,300 a month.  Okay.  So, he's
10   not working full time, so, I guess by
11   process of elimination, he must be
12   working part time.  Please tell the jury
13   what Dr. Andrews' part-time job
14   responsibilities were that earned him
15   $27,300 a month.
```

[333:18] - [334:18] 5/2/2006 McKines - 4.20.06

```
page 333
18             THE WITNESS:  Well, if I
19        recall, Dr. Andrews was a very
20        well respected orthopedic surgeon.
21        I believe he was the orthopedic
22        team surgeon for like the Atlanta
23        Braves and some other teams, and I
24        think I recall the work that he
page 334
1         did for us is in developing -- for
2         orthopedic surgeons.
3              By the way, Dr. Andrews was
4         one of the individuals who we ask
5         orthopedic surgeons about, who do
6         you really respect and who do you
7         really want to hear from --
8         Q.    Right.
9         A.    -- and that was, in fact,
10   Dr. Andrews.  I believe he developed more
11   than a few training videos for us on some
12   sort of shoulder pain stuff, really
13   helped us in speaking to orthopedic
14   surgeons around how to manage pain,
15   because that was one audience that we
16   just couldn't reach, and so those are the
17   kind of things that Dr. Andrews did for
18   us.
```

[334:20] - [336:5] 5/2/2006 McKines - 4.20.06

```
page 334
20        Q.    So, Dr. Andrews, and you're
21   right, I think it was the Braves, and
22   also he was Michael Jordan's doctor.  I
                                         Page 69
```

*please see previous page*

Δ objection: beginning of
designation includes
lawyer's testimony, lack of
foundation /argumentative
π response: π will remove
334: 20 - 335: 2. Relevant to
show that Merck is exerting
influence over the medical
community and thus
maximizing sales

mckines.4.20.2006

```
23     think he was --
24     A.    Okay.
page 335
1                 I think he was a golfer's
2      doctor.
3            Q.    Monica Seles, the tennis
4      player who used to grunt, he was her
5      doctor.  So, when Dr. Andrews says
6      something to an orthopedic surgeon, they
7      listen.  So, if Dr. Andrews says, use
8      Vioxx, they're going to listen, right?
9            A.    I think they do respect Dr.
10     Andrews, what Dr. Andrews says.
11           Q.    So, you're paying $27,000 a
12     month for 15 months, and more orthopedic
13     surgeons write prescriptions for Vioxx,
14     right?
15           A.    No.  I wouldn't characterize
16     it that way.  More orthopedic surgeons
17     respect what Dr. Andrews says.
18     Orthopedic surgeons are one group that,
19     you know, they're all very knowledgeable,
20     they certainly want to hear from Dr.
21     Andrews, more importantly, around his
22     surgery than his experiences with Vioxx.
23           Q.    Did it ever come to your
24     attention that these payments that you
page 336
1      were making, when I say "you," Merck, but
2      you clearly signed off on some, that
3      these payments were perceived by doctors
4      as really little more than a bribe for
5      writing prescriptions for Vioxx?
```

please see previous page

[336:9] - [336:18] 5/2/2006 McKines - 4.20.06

```
page 336
9                 THE WITNESS:  NO.  I do not
10     believe that physicians felt that
11     us paying them was a bribe.  I
12     think, again, everyone is --
13     BY MR. KAUFMAN:
14           Q.    I don't want to know what
15     you think.
16           A.    Again, it never came to my
17     attention, and I do not believe that to
18     be the case.
```

Δ objection: lack of foundation/
argumentative

π response: proper question

[336:19] - [336:20] 5/2/2006 McKines - 4.20.06

```
page 336
19                MR. KAUFMAN:  Let's look at
20     1.0285.
```

Δ objection: 802, 402, 403
π response: Nonhearsay as
an admission by a party
opponent. Business record
exception. Relevant to show
that Merck is seeking to
maximize sales of Vioxx by
paying ~~these to~~ doctors to
critique details, etc in exchange
for prescribing Vioxx. Goes to motive
to suppress truth re CV safety from
doctors + the consumers.

[337:7] - [337:17] 5/2/2006 McKines - 4.20.06

page 337

Page 70