Topol 1

Topol 1 (Multi-clip)
    25:11-25:13

    25:11        Q.    Dr. Topol, good morning.
    25:12 Nice to meet you, sir.
    25:13        A.    Good morning.

      26:6-29:2

    26: 6              I want to review very
    26: 7 briefly the highlights of your
    26: 8 background.
    26: 9              You have a curriculum vitae.
    26:10 I'm marking it as Exhibit 1 for this
    26:11 deposition.
    26:12                 -  -  -
    26:13              (Whereupon, Deposition
    26:14        Exhibit Topol-1, Curriculum Vitae
    26:15        Eric Jeffrey Topol, M.D., TOPOLE
    26:16        0000001 - TOPOLE 0000127, was
    26:17        marked for
    26:18        identification.)
    26:19                 -  -  -
    26:20 BY MR. KLINE:
    26:21        Q.    The version that I have is
    26:22 what I understand to be an abridged
    26:23 version of 127 pages.  Suffice it to say,
    26:24 you have a very substantial curriculum
    26:Confidential - Subject to Protective Order
    26:27
    27: Page 27
    27: 1 vitae outlining your background and
    27: 2 experience; correct?
    27: 3        A.    Yes.
    27: 4        Q.    You are -- what is your
    27: 5 current position, sir?
    27: 6        A.    I'm Provost of the Cleveland
    27: 7 Clinic Lerner College of Medicine, Chief
    27: 8 Academic Officer of the Cleveland Clinic,
    27: 9 and also the chairman of the Department
    27:10 of Cardiovascular Medicine of the
    27:11 Cleveland Clinic.
    27:12        Q.    Take them one at a time.
    27:13 Identify each one of those positions, and
    27:14 tell me very briefly what they entail.
    27:15        A.    The Provost of the medical
    27:16 college is providing the oversight of
    27:17 this college of medicine, which had its
    27:18 beginning just three years ago, and it's
    27:19 part of Case Western Reserve University.
    27:20              The chief academic officer
    27:21 responsibility is responsible for all
    27:22 research and education here at this
    27:23 academic medical center, and I've been
    27:24 chairman of the department of
    28: Page 28
    28: 1 cardiovascular medicine since 1991, and
    28: 2 this is a large department, one of the
    28: 3 largest departments in cardiovascular
    28: 4 medicine in the country.
    28: 5        Q.    My understanding, sir, that
    28: 6 this -- and you are a cardiologist; is

Topol 1

```
28: 7 that correct?
28: 8          A.    That's right.
28: 9          Q.    Trained as a cardiologist;
28:10 correct?
28:11          A.    That's exactly right.
28:12          Q.    You did your undergraduate
28:13 degree at the University of Virginia,
28:14 your medical school at the University of
28:15 Rochester, a residency at the University
28:16 of California, San Francisco, a
28:17 fellowship at Johns Hopkins in
28:18 cardiology, and then you became Board
28:19 Certified in internal medicine and in
28:20 cardiology.  All correct?
28:21          A.    That's all correct.
28:22          Q.    And then you practiced
28:23 medicine and eventually worked yourself
28:24 up to become the top person in the
29: Page 29
29: 1 department of cardiovascular medicine at
29: 2 the Cleveland Clinic; correct?

   29:5-31:20

29: 5            THE WITNESS:  That's
29: 6         correct, yes.  As of 1991, I came
29: 7         to Cleveland Clinic.
29: 8 BY MR. KLINE:
29: 9          Q.    And when did you become
29:10 chairman of the department of
29:11 cardiovascular medicine?
29:12          A.    On my arrival.
29:13          Q.    Oh, right on your arrival?
29:14          A.    Yes.  That was why I was
29:15 recruited here.
29:16          Q.    Where were you previously?
29:17          A.    University of Michigan,
29:18 where I directed the cardiocatherization
29:19 laboratory, and I was a professor of
29:20 medicine there.
29:21          Q.    And you've spent your entire
29:22 career as a practicing cardiologist, sir?
29:23          A.    Yes.  I continue to practice
29:24 cardiology with patients.
30: Page 30
30: 1          Q.    And how many years have you
30: 2 been a cardiologist?
30: 3          A.    20 years.
30: 4          Q.    You also -- it mentioned
30: 5 that you're the Provost of the Cleveland
30: 6 Clinic, and that involves overseeing the
30: 7 entire medical college?
30: 8          A.    The medical college, which I
30: 9 founded with Case Western Reserve
30:10 University back in 2001.
30:11          Q.    In addition -- oh, and I
30:12 might add, the Cleveland Clinic, sir,
30:13 give us a sentence or two on what is the
30:14 Cleveland Clinic, especially in heart
30:15 medicine.
30:16          A.    Well, in the field of heart
30:17 medicine, it's been ranked by the U.S.
30:18 News & World Report as the number one
```

Topol 1

30:19 center for the last 11 years
30:20 consecutively.
30:21          Q.     You have been a clinical
30:22 investigator on many clinical studies; is
30:23 that correct?
30:24          A.     That's right.
31: Page 31
31: 1          Q.     Tell us about it briefly, a
31: 2 few sentences.
31: 3          A.     Well, I've chaired a number
31: 4 of clinical trials over the past 20
31: 5 years.  The most widely known are the
31: 6 so-called GUSTO trials of heart attack.
31: 7 All these trials had something to do with
31: 8 heart attack prevention or better
31: 9 treatment.
31:10          The cumulative 200,000
31:11 patients were enrolled, the largest heart
31:12 attack trials ever performed in the
31:13 United States, coordinated.  I've been
31:14 the chair of all of those trials.
31:15 They've been multinational trials,
31:16 involving 40 different countries around
31:17 the world, and these trials have had, I
31:18 think, a substantial impact on clinical
31:19 practice in the field of cardiology and
31:20 for patients.


   31:24-33:5


31:24          Q.     You hold two patents; is
32: Page 32
32: 1 that correct, sir?
32: 2          A.     I think the patents have
32: 3 been applied for.  I'm not -- yes, yes.
32: 4          Q.     Now, in addition, you are on
32: 5 the editorial board of a number of
32: 6 peer-review journals; is that correct?
32: 7          A.     Yes.
32: 8          Q.     Would you explain them?
32: 9 Well, let me tick them off.  I think it
32:10 could be done more quickly.
32:11          Circulation, JACC, American
32:12 College -- American Journal of
32:13 Cardiology, American Journal of Medicine,
32:14 among others; is that correct?
32:15          A.     That's right.
32:16          Q.     And what does that involve,
32:17 sir, very briefly?
32:18          A.     Well, that means being a
32:19 peer reviewer for manuscripts, work,
32:20 research that's being conducted
32:21 elsewhere, and to provide reviews and
32:22 input and at times editorials, to help
32:23 advance the field insofar as biomedical
32:24 research and literature.
33: Page 33
33: 1          Q.     You have been an
33: 2 investigator, according to your vitae, on
33: 3 many NIH projects, National Institutes of
33: 4 Health.  Briefly, a few sentences, tell
33: 5 us about that.

Topol 1

33:8-34:4

```
33: 8              THE WITNESS:  Well, the main
33: 9         one is at a specialized center of
33:10         clinically-oriented research,
33:11         which is the flagship grant of the
33:12         NIH, which I was awarded a year
33:13         ago.  It's a five-year grant for
33:14         nearly $18 million to support our
33:15         work in genetics and genomics of
33:16         coronary artery disease and heart
33:17         attack, and that's been the main
33:18         research interest that I've had
33:19         over the past five years, has been
33:20         in the genetics and genomics of
33:21         heart attack.
33:22 BY MR. KLINE:
33:23         Q.    You've been a manuscript
33:24 reviewer for a number of journals, peer
34: Page 34
34: 1 review, including Nature, Science, the
34: 2 New England Journal of Medicine, JAMA,
34: 3 Lancet and many other prestigious
34: 4 journals; correct?
```

34:7-34:20

```
34: 7              THE WITNESS:  Yes.
34: 8 BY MR. KLINE:
34: 9         Q.    I have by count, and I'm
34:10 doing all of this, I might say, just to
34:11 save time, to get through all of this,
34:12 you have by my count, 909 original
34:13 publications in the scientific
34:14 literature.  Does that sound about right?
34:15         A.    That's about right.
34:16         Q.    You have 36 collaborative
34:17 group-authored papers, meaning papers
34:18 where a group is mentioned, not you, but
34:19 you really were a major contributor.  Is
34:20 that also correct?
```

34:23-34:24

```
34:23              THE WITNESS:  That's
34:24         correct.
```

35:2-35:7

```
35: 2         Q.    You are -- you have 39
35: 3 articles submitted for publication at the
35: 4 time that the curriculum vitae you handed
35: 5 us was.  In other words, these are not
35: 6 even yet published, they're in the mill;
35: 7 is that correct?
```

35:12-35:13

```
35:12         Q.    Again, by my count, an
35:13 author or co-author on 30 books?
```

35:16-35:19

```
                                        Topol 1
35:16               THE WITNESS:  That's
35:17         correct.
35:18 BY MR. KLINE:
35:19         Q.    164 book chapters?

   35:22-36:15

35:22               THE WITNESS:  That's
35:23         correct.
35:24 BY MR. KLINE:
36: Page 36
36: 1         Q.    And these all deal in the
36: 2 field of cardiology, sir?
36: 3         A.    Virtually all are cardiology
36: 4 pieces of work, yes.
36: 5         Q.    And there was a recent
36: 6 article, and I'd like you to tell me if
36: 7 this is correct, it sort of pulls some
36: 8 things together, on November 11th in the
36: 9 Associated Press which says, "One medical
36:10 journal index service ranked Topol as the
36:11 eighth most cited medical researcher
36:12 among its index publications in the past
36:13 ten years with his 498 papers cited by
36:14 colleagues, 21,050 times."
36:15               Is that about correct?

   36:18-37:22

36:18               THE WITNESS:  That's
36:19         correct.  The ISI ranks medical
36:20         researchers, and in the last ten
36:21         years, I'm ranked number eight of
36:22         the most widely cited medical
36:23         researchers in the world.  So,
36:24         that's correct.
37: Page 37
37: 1 BY MR. KLINE:
37: 2         Q.    Let me ask it in a different
37: 3 way just to be sure.
37: 4               How does the -- what is the
37: 5 ISI, and how does it rank you as someone
37: 6 who is cited by others in the medical
37: 7 field?
37: 8         A.    That means that if you
37: 9 publish a paper and that paper is cited
37:10 by others, that's the cumulative tally of
37:11 citations of your impact in the medical
37:12 literature, in the medical community, and
37:13 so that is the most highly regarded
37:14 authority for collating that data.  And
37:15 in the ten-year cumulative tally, as you
37:16 mentioned, somewhere around 500
37:17 manuscripts were published, and that was
37:18 the eighth leading, I believe, citation
37:19 tally in the rankings.
37:20         Q.    Are you, sir, with this
37:21 background, an expert in the field of
37:22 cardiovascular medicine?

   38:1-38:2

38: 1               THE WITNESS:  I believe I
```

                                      Topol 1
38: 2        am, yes.

  38:19-39:17

38:19        Q.    Sir, at some point in time
38:20 you became interested in the drug Vioxx;
38:21 is that correct?
38:22        A.    Yes.
38:23        Q.    And that would have been
38:24 sometime around what year?
39: Page 39
39: 1        A.    Well, it was February 2001.
39: 2        Q.    Okay.
39: 3              Now, I want to fast forward
39: 4 before going to February 2001, which I'll
39: 5 go back.
39: 6              Between February 2001 and
39: 7 today, sitting here today, which is
39: 8 November --
39: 9              MS. VANCE:  22.
39:10 BY MR. KLINE:
39:11        Q.    -- 22nd of 2005, have you
39:12 expressed certain opinions publicly and
39:13 in the academic literature, as well as
39:14 privately in e-mails and writings,
39:15 relating to your beliefs and opinions
39:16 regarding the drug Vioxx?
39:17        A.    Yes, certainly.

  44:8-44:13

44: 8        Q.    Now, you also formed
44: 9 opinions relating to the conduct of the
44:10 pharmaceutical company, Merck, and its
44:11 conduct of research and its marketing and
44:12 its making available to the public the
44:13 drug Vioxx; is that correct?

  44:16-44:17

44:16              THE WITNESS:  That's
44:17        correct.

  45:5-45:20

45: 5        Q.    Now, what I'd like to do is
45: 6 to show you a document which is from
45: 7 November 24, '04, marked as Exhibit
45: 8 Number 2.
45: 9                    -  -  -
45:10              (Whereupon, Deposition
45:11        Exhibit Topol-2, E-mails, TOPOLE
45:12        0000450, was marked for
45:13        identification.)
45:14                    -  -  -
45:15 BY MR. KLINE:
45:16        Q.    It's an e-mail from you to
45:17 David Graham.  Who is David Graham?
45:18        A.    David Graham is a safety
45:19 officer at the Food & Drug
45:20 Administration.

  46:23-47:6

Topol 1

46:23        Q.    Does this e-mail reflect
46:24 some of the opinions and conclusions that
47: Page 47
47: 1 you reached relating to Merck's conduct
47: 2 of its scientific studies and its
47: 3 marketing of the drug Vioxx over the past
47: 4 four years since you have become involved
47: 5 in the matter?
47: 6        A.    Yes.


   50:1-51:1

50: 1              Sir, I'm looking at the part
50: 2 where you say, "I am bothered."  Do you
50: 3 see where you say to David Graham -- is
50: 4 Graham a physician?
50: 5        A.    Yes.
50: 6        Q.    So, you're saying to Dr.
50: 7 Graham, "I am bothered."  Would you read
50: 8 that for us, please?
50: 9        A.    "I am bothered by the
50:10 continued outrageous lies of Merck with
50:11 their fullpage multiple ads that 'they
50:12 published everything' and that they never
50:13 had a trial which showed any harm of
50:14 Vioxx until APPROVe, when, in fact, there
50:15 were two by May 2000."
50:16        Q.    Continue.
50:17        A.    "I am also upset that the
50:18 story of their scientific misconduct for
50:19 the VIGOR paper in" the New England
50:20 Journal of Medicine, that's "NEJM, with
50:21 errors of omission (deaths), erroneous
50:22 data (MIs)," or heart attacks, "and
50:23 incomplete data (more than 1/2 of the
50:24 thrombotic events) has not received any
51: Page 51
51: 1 attention whatsoever."


   52:2-52:4

52: 2        Q.    Do you believe that there
52: 3 were, in the context of what Merck did,
52: 4 "outrageous lies" by Merck?


   52:7-52:9

52: 7              THE WITNESS:  I believe that
52: 8        the data has been seriously
52: 9        misrepresented, yes.


   52:11-52:17

52:11        Q.    You said in the next to last
52:12 sentence there, "This," the words, "This
52:13 cannot."  Do you see it in the very last
52:14 sentence?
52:15        A.    This cannot?
52:16        Q.    "This cannot stand and the
52:17 truth about Vioxx needs to come out."


   52:20-52:21

D: 403 61la 61lc

Π: Not leading;
proper follow up questions
to statements above,"
in document above,
Δ fails to object to form
And give opportunity to
cure

Page 7

Topol 1

D:
403, 611a) 611c

T: same As Above

Ruling: ~~sustained~~

52:20            THE WITNESS:  Yes, yes.
52:21         That's what I wrote.

   53:8-53:11

53: 8         Q.    And today, sir, are you
53: 9 prepared to tell what you believe to be
53:10 the truth about Vioxx?
53:11         A.    Absolutely.

   53:23-54:14

D:
801, 802, 803

T: Not Hearsay; present
sense impression;
State of mind

Ruling: OVERRULED

53:23         Q.    Let me show you an article
53:24 which was in the Cleveland Clinic Journal
54: Page 54
54: 1 in December of 2004.  December of 2004,
54: 2 there's an article which was written,
54: 3 you'll have it in your hands in a moment,
54: 4 called "The sad story of Vioxx, and what
54: 5 we should learn from it."  Did you
54: 6 co-author that article?
54: 7         A.    Yes, I did.
54: 8         Q.    What is the Cleveland Clinic
54: 9 Journal of Medicine?
54:10         A.    That's the medical journal
54:11 of this institution, which is widely
54:12 circulated, has a circulation of nearly
54:13 100,000 physicians and paraprofessional
54:14 staff.

   54:20-54:23

54:20              Is this a road map to the
54:21 saga or the story of Vioxx, as you see it
54:22 as a researcher and prominent physician
54:23 in cardiology?

   55:6-55:10

55: 6         Q.    Please, sir.
55: 7         A.    I believe it's certainly
55: 8 part of trying to get the facts straight
55: 9 about this very sad story, yes.
55:10         Q.    Okay.

   56:11-56:15

56:11         Q.    Tell us the story as you
56:12 understand it as it happened in 1999
56:13 based on what you know, and tell us how
56:14 you knew it and what you know and how the
56:15 story began.

   56:22-57:15

56:22              THE WITNESS:  -- in May, the
56:23 FDA approved Vioxx for commercial
56:24 use, so, that is an important
57: Page 57
57: 1         time, timeline.  That was also at
57: 2         the time when the FDA had a formal
57: 3         review of the medicine, where the
                        Page 8

Topol 1

57:  4          primary reviewer already had
57:  5          expressed in her document, Dr.
57:  6          Villalba, that there was a concern
57:  7          regarding clotting events with
57:  8          Vioxx even at the time of approval
57:  9          in May 1999.
57:10 BY MR. KLINE:
57:11          Q.   You write here that, "The
57:12 approval was based on data from trials
57:13 lasting 3 to 6 months and involving
57:14 patients at low risk for cardiovascular
57:15 illness."  Do you see that?

    57:18-57:21

57:18              THE WITNESS:  That's right.
57:19 BY MR. KLINE:
57:20          Q.   What is the significance of
57:21 that fact?

    57:24-58:12

57:24              THE WITNESS:  Well, this is
58: Page 58
58:  1          one of the most significant parts
58:  2          of the whole clinical development
58:  3          of the Vioxx medicine, and that is
58:  4          that patients with heart disease
58:  5          were not tested in any meaningful
58:  6          way, and we know from multiple
58:  7          databases and surveys that at
58:  8          least 40 to 50 percent of the
58:  9          patients who actually took this
58:10          medicine when it was in clinical
58:11          use actually did have known heart
58:12          disease.

    58:20-58:21

58:20          Q.   Why, as you view it, is that
58:21 an important fact?

    58:24-59:13

58:24              THE WITNESS:  Well, it's
59: Page 59
59:  1          important because if the medicine
59:  2          has a clotting risk in arteries
59:  3          such that it could induce heart
59:  4          attacks, strokes or death, the
59:  5          patients who are most liable to
59:  6          suffer as a consequence of that
59:  7          would be patients with preexisting
59:  8          or known atherosclerotic artery
59:  9          disease.
59:10 BY MR. KLINE:
59:11          Q.   And did this medicine or
59:12 does this medicine, in your opinion, have
59:13 such a risk?

    59:16-59:23

59:16              THE WITNESS:  There isn't

Topol 1

```
59:17          any question about the medicine's
59:18          risk in this regard.
59:19 BY MR. KLINE:
59:20          Q.   When you say there's no
59:21 question, sir, can you give us broadly,
59:22 and then I'll get into details with you
59:23 later, broadly why you say that?
```

  60:2-60:11

```
60: 2               THE WITNESS:  Well, the
60: 3          medicine's risk, Vioxx's risk, has
60: 4          been evident since trials
60: 5          conducted in 1999 and all the way
60: 6          through the time of withdrawal in
60: 7          September 30, 2004.
60: 8 BY MR. KLINE:
60: 9          Q.   Have there been multiple
60:10 tests and multiple studies that have, in
60:11 your opinion, proven that fact?
```

   60:14-60:18

```
60:14               THE WITNESS:  There's been
60:15          replication of untoward
60:16          significant excess of events of
60:17          heart attack, death and stroke in
60:18          multiple trials.  That's right.
```

   61:5-61:13

```
61: 5          Q.   I didn't say in the
61: 6 beginning of this deposition.  You were
61: 7 subpoenaed for this deposition; is that
61: 8 correct, sir?
61: 9          A.   That's correct.
61:10          Q.   And you have not been -- you
61:11 are not serving here as an expert witness
61:12 for any party; is that correct?
61:13          A.   No, I'm not.
```

    62:3-62:22

```
62: 3          Q.   Now, there was a study
62: 4 called VIGOR; is that correct?
62: 5          A.   Yes.
62: 6          Q.   And you eventually became
62: 7 familiar with this study called VIGOR;
62: 8 correct?
62: 9          A.   Yes.
62:10          Q.   Did you participate in it?
62:11          A.   No, not at all.
62:12          Q.   Who did that study?
62:13          A.   This study was done by
62:14 rheumatologists, the doctors looking
62:15 after patients with rheumatoid arthritis.
62:16 It was a large trial by a network of
62:17 rheumatologists and patients, about 8,000
62:18 patients with rheumatoid arthritis.
62:19          Q.   Who funded the study?
62:20          A.   Merck.
62:21          Q.   Who conducted the study?
62:22          A.   Merck.
```
                                        Page 10

Topol 1

67:5-67:15

```
67: 5                    Following our broad outline
67: 6 in the article that you wrote in the
67: 7 Cleveland Clinic Journal of Medicine in
67: 8 December of 2004, you indicate that
67: 9 "VIGOR's strong evidence that rofecoxib"
67:10 -- that's the name for Vioxx?
67:11         A.    Yes.
67:12         Q.    -- "increases the risk of
67:13 MIs," and it came out of that study;
67:14 correct?
67:15         A.    That's right.
```

67:19-67:22

```
67:19         Q.    You also say that "The
67:20 incidence of MIs was higher in the
67:21 rofecoxib group than in the naproxen
67:22 group." Is that correct?
```

68:24-69:3

```
68:24         Q.    What did the VIGOR trial
69: Page 69
69: 1 say?  What did Merck say that the VIGOR
69: 2 trial showed relating to cardiovascular
69: 3 risks?
```

69:6-70:8

```
69: 6                    THE WITNESS:  Right.  Well,
69: 7 I remember it very well, because
69: 8 the day that that panel had
69: 9 reviewed all the data, and one of
69:10 the panelists was my colleague,
69:11 Dr. Steven Nissen, I read -- I was
69:12 actually at the medical college of
69:13 Georgia, I was a visiting
69:14 professor, I was reading the USA
69:15 Today that morning, and it said
69:16 that this was due to naproxen,
69:17 that the VIGOR problems of heart
69:18 attack was an issue of naproxen
69:19 being beneficial rather than Vioxx
69:20 being detrimental.
69:21               So, I was a little puzzled
69:22 by that, but I didn't think too
69:23 much of it until I got back to
69:24 Cleveland, and the next day met
70: Page 70
70: 1 with Dr. Nissen and Dr. Mukherjee
70: 2 about the FDA proceedings.  And
70: 3 Dr. Nissen explained he didn't
70: 4 think it was just so simple as the
70: 5 naproxen hypothesis, as we later
70: 6 termed it, and we started to drill
70: 7 down on the data and concluded
70: 8 that it was quite concerning.
```

70:12-72:8

Topol 1

```
70:12        Q.     Okay.
70:13               What did you find was
70:14 concerning about the VIGOR data?
70:15        A.     Yes.  Well, there were
70:16 several things that were particularly
70:17 bothersome.  Number one, that if naproxen
70:18 was protective, it had not ever been
70:19 proven, that is, it didn't -- we didn't
70:20 know for sure it had an aspirin-like
70:21 effect.  And so even if we could give --
70:22 assign naproxen the same magnitude of
70:23 protection as aspirin, that would be at
70:24 maximum a 25 percent reduction in heart
71: Page 71
71: 1 attacks, which has been very carefully
71: 2 studied for aspirin.
71: 3               So, if naproxen was as good
71: 4 as aspirin, that could be 25 percent
71: 5 reduction.  But on the other hand, in
71: 6 VIGOR, we saw a 500 percent, that is, a
71: 7 20-fold increase in heart attacks.  So,
71: 8 the order of magnitude was greatly in
71: 9 excess of anything that aspirin could do.
71:10               Furthermore, the second
71:11 point, in that if you have a randomized
71:12 trial and you have an experimental arm,
71:13 which is a new drug which hasn't been
71:14 studied extensively, still a lot of
71:15 things that need to be discovered about
71:16 it, and you have an anchor drug,
71:17 naproxen, that had been available for 20
71:18 years, and if you then do a comparison
71:19 and you say, there's more than five-fold
71:20 heart attacks and two-fold excess of
71:21 cardiovascular serious events, how could
71:22 you possibly conclude that it was the
71:23 naproxen being beneficial?  The only
71:24 appropriate conclusion from that would be
72: Page 72
72: 1 that there's a problem with the
72: 2 experimental drug Vioxx.
72: 3               And beyond those concerns
72: 4 was that this trial was done in patients
72: 5 with rheumatoid arthritis without heart
72: 6 disease, and so whatever was being seen
72: 7 in the VIGOR trial could be far worse in
72: 8 patients with heart disease.

      72:13-72:19

72:13        Q.     Now, what you've described
72:14 to us in the previous answer, is that
72:15 something that -- is that a capsule of
72:16 what you were thinking, you and your
72:17 colleagues were thinking, but you in
72:18 particular, when you saw the VIGOR trial
72:19 published in the New England Journal?

      72:22-73:16

72:22               THE WITNESS:  Well, I didn't
72:23         even take notice of the VIGOR
72:24         trial when it was in the New
```

D: 602 j calls for speculation

T: What witness and his colleagues were thinking is completely personal within witness's personal knowledge

Ruling: OVERRULED

Page 12

Topol 1

```
73: Page 73
73: 1          England Journal.  It wasn't on my
73: 2          radar screen, and it didn't really
73: 3          catch, I believe, the cardiology
73: 4          community, because the heart
73: 5          attack part of that publication
73: 6          was not -- it was not featured, it
73: 7          was the protection from the
73: 8          gastrointestinal side effects that
73: 9          was the main conclusion, but only
73:10          looked back at that paper after
73:11          the FDA review of the VIGOR data
73:12          and also of the celecoxib data.
73:13          There were two days of FDA
73:14          reviews.  One day was devoted to
73:15          Celebrex, and one day was
73:16          dedicated to Vioxx.

     74:10-74:22

74:10          Q.   And it was after the
74:11 hearings in '01 where this, would it be
74:12 fair to say -- I hope there's not an
74:13 objection -- got on your radar screen?
74:14          A.    Yes.  It was only after the
74:15 FDA hearing and Dr. Nissen coming back
74:16 and Dr. Mukherjee going through the data,
74:17 getting it all collated and three of us
74:18 meeting, did this become something of an
74:19 area of interest.  It certainly was
74:20 nothing in medicine that I had any
74:21 interest in.  It wasn't in my field of
74:22 research up until that point in time.

     75:3-75:4

75: 3          Q.   Was it something that
75: 4 concerned you?

     75:7-75:18

75: 7                THE WITNESS:  As soon as we
75: 8          looked at -- well, as soon as I
75: 9          read about the FDA panel, as I
75:10          said, that morning, in the
75:11          newspaper, I was concerned.  But
75:12          that concern was magnified after
75:13          starting to review the data with
75:14          my colleagues at the Cleveland
75:15          Clinic.
75:16 BY MR. KLINE:
75:17          Q.   Okay.
75:18                Were you alarmed?

     75:21-75:22

75:21                THE WITNESS:  I don't
75:22          know --

     76:1-76:24

76: 1                THE WITNESS:  -- if I would
76: 2          use the word "alarmed," but I was
```

Page 13

Topol 1

76: 3          significantly concerned that there
76: 4          was a medicine that was gaining
76: 5          increased wide scale use.  There
76: 6          already was, of course, extensive
76: 7          advertisements and popularity of
76: 8          the medicine, and could something
76: 9          be wrong.  That was a concern.  I
76:10          would say it was a significant
76:11          concern.
76:12 BY MR. KLINE:
76:13          Q.    Okay.
76:14                What did you decide to do?
76:15          A.    So, we decided we would put
76:16 together a manuscript to pull all the
76:17 data that we could together, because
76:18 there had not yet been one, there had not
76:19 yet been a registration in the medical
76:20 literature to the medical community that
76:21 this was potentially a big deal.
76:22          Q.    Is that the kind of thing
76:23 that you do as an independent academic
76:24 physician and scientist?

   77:3-77:15

77: 3                THE WITNESS:  That's an
77: 4          obligation that we have, is to
77: 5          process data that's out there, try
77: 6          to make it available to our
77: 7          colleagues in the medical
77: 8          community, and in the interest of
77: 9          patients and caring for patients
77:10          in the optimal way.  This is the
77:11          sort of thing that is critical.
77:12 BY MR. KLINE:
77:13          Q.    Did you undertake what you
77:14 did with any axe to grind towards Merck
77:15 or towards the drug Vioxx?

   77:18-78:7

77:18                THE WITNESS:  I had
77:19          absolutely no axe to grind.  I had
77:20          an excellent relationship with
77:21          Merck.  I had done clinical trials
77:22          with Merck.  In fact, I had just
77:23          completed a very large trial
77:24          called TARGET of over 6,000
78: Page 78
78: 1          patients published in the New
78: 2          England Journal of Medicine.  And
78: 3          so I actually, for many years,
78: 4          enjoyed a very good relationship
78: 5          with Merck.  So, I do not believe
78: 6          there was any axe to grind
78: 7          whatsoever.

   79:11-80:9

79:11                Tell me what you did then.
79:12 I mean, what process did you follow,
79:13 briefly?
79:14          A.    Well, we culled all the data
                                    Page 14

Topol 1
79:15 together, which did appear in the JAMA.
79:16 It didn't have much in the way of changes
79:17 from our initial submission to the actual
79:18 publication in August.  But the one
79:19 concern that came up along the way was
79:20 that the data were different in the New
79:21 England Journal of Medicine paper
79:22 published in November 2000 and the FDA
79:23 database that was available in February
79:24 2001.
80: Page 80
80: 1                 So, at that point, while we
80: 2 were ready to submit and did submit the
80: 3 paper to JAMA for consideration, I sent
80: 4 the paper to Merck, my colleague, Dr.
80: 5 Laura Demopoulos, who I had worked on
80: 6 this so-called TARGET trial, to see why
80: 7 there were discrepancies in the data
80: 8 between the published paper and the FDA
80: 9 database.

  80:14-81:2

80:14             Q.    You actually went through
80:15 the process of getting the information
80:16 together and then drafting the paper; is
80:17 that correct?
80:18             A.    That's correct.
80:19             Q.    And did the papers represent
80:20 largely your findings and your
80:21 conclusions?
80:22             A.    Yes.
80:23             Q.    And were those findings and
80:24 conclusions critical of the VIGOR trial,
81: Page 81
81: 1 as well as raising some concerns relating
81: 2 to the drug Vioxx?

  81:5-82:6

81: 5             THE WITNESS:  There is no
81: 6 question they were critical of the
81: 7 concern about the safety.  But I
81: 8 think the most important statement
81: 9 that we made, which appears in the
81:10 article, was about how there's a
81:11 mandate to do the appropriate
81:12 clinical trials which had not been
81:13 done and wrote, "definitive
81:14 evidence of such an adverse effect
81:15 will require a prospective
81:16 randomized clinical trial."  "It
81:17 is mandatory to conduct a trial
81:18 specifically assessing
81:19 cardiovascular risk and benefit of
81:20 these agents.  Until then, we urge
81:21 caution in prescribing these
81:22 agents to patients at risk for
81:23 cardiovascular morbidity."
81:24 BY MR. KLINE:
82: Page 82
82: 1             Q.    Okay.
82: 2                 And I'm going to mark a copy
Page 15

Topol 1
82: 3 of your JAMA article as the next exhibit
82: 4 number.  While it's being marked, let me
82: 5 save time so we can keep the ball
82: 6 rolling.  I'll mark it.

    83:7-83:13

83: 7          Q.    Now, along the way, I want
83: 8 to go through with you a couple of steps
83: 9 along the way.  I don't want to spend a
83:10 lot of time on it, but I do want to get
83:11 the process.  Before you published it,
83:12 you said to me, and I'm just recapping,
83:13 that you talked to Dr. Demopoulos?

    83:16-85:6

83:16              THE WITNESS:  Yes.
83:17 BY MR. KLINE:
83:18          Q.    You actually -- and I have a
83:19 copy of this.  You actually sent to her
83:20 the manuscript; correct?
83:21          A.    Yes.
83:22          Q.    In advance?
83:23          A.    Yes.
83:24          Q.    And what was the purpose of
84: Page 84
84: 1 sending her the manuscript, as you viewed
84: 2 it?
84: 3          A.    The main purpose was to
84: 4 reconcile the differences in data that
84: 5 had been published in the New England
84: 6 Journal of Medicine and what was
84: 7 appearing in the FDA database.  There
84: 8 were some significant discrepancies.
84: 9          Q.    The FDA database was made
84:10 available after the February 2001 hearing
84:11 to the public; is that correct?
84:12          A.    That's right.
84:13          Q.    Posted on the website?
84:14          A.    Posted on their website.
84:15          Q.    Available to anyone to see?
84:16          A.    Absolutely.
84:17          Q.    And Merck, did you have
84:18 access to their internal data?
84:19          A.    No, we did not.
84:20          Q.    Did you want to get it?
84:21          A.    Well, that's one of the
84:22 reasons that I tried to reach out to Dr.
84:23 Demopoulos.  Since I had worked with her,
84:24 we had a very good relationship in our
85: Page 85
85: 1 other trial that we had done, I know she
85: 2 did not do research in this area of COX-2
85: 3 inhibitors, but I thought she could be
85: 4 helpful to get these concerns about data
85: 5 inconsistencies straightened out.
85: 6          Q.    Was the data forthcoming?

    85:11-85:17

85:11              THE WITNESS:  We never
85:12              received any revisions from anyone
                                    Page 16

```
                                 Topol 1
85:13           from Merck.  That was never sent
85:14           to us, any suggestions, changes of
85:15           data.  There was never anything
85:16           sent back to me or to my
85:17           colleagues.

  87:6-87:11

87: 6           Q.    I'm going to show you an
87: 7  e-mail.  I will mark it as the next
87: 8  exhibit number.  I'm going to put it in
87: 9  the record, it's brief, to save some --
87:10  you know what, I can put it right in
87:11  front of you.  Exhibit Number 5.

  90:5-90:11

90: 5           Q.    Now, it's a copy of -- I
90: 6  would like you to identify it, the front
90: 7  page of it.  There's an e-mail that says
90: 8  it's from Alise Reicin to Laura
90: 9  Demopoulos.  It says, "Did this in the
90:10  middle of the night -- not sure it makes
90:11  sense."

  90:21-90:24

90:21           And it says here, it
90:22  basically transmits back Alise Reicin's
90:23  markup, electronic markup of your
90:24  document.  Are you familiar with it?

  91:3-91:14

91: 3           THE WITNESS:  I've never
91: 4      seen this.
91: 5  BY MR. KLINE:
91: 6           Q.    Okay.
91: 7           I want you to turn to Page
91: 8  8, sir.  I want to find out if this is
91: 9  something that was ever suggested to you.
91:10           If you'd look at the front
91:11  page, please, first.  Front page.
91:12           A.    Oh, yes.
91:13           Q.    Sorry.
91:14           A.    Yes.

  91:21-91:23

91:21           "Selective COX-2 Inhibitors
91:22  Are Associated With an Increased Risk of
91:23  Cardiovascular Events."

  92:10-92:12

92:10           Q.    Do you see it?
92:11           A.    Yes.
92:12           Q.    Okay.

  92:18-92:24

92:18           Q.    This is your paper; correct?
92:19           A.    Yes.  Well, I mean, this was
                            Page 17
```

D: 403/602 No. 89:7-12 is
foundation; at lines 89:7-12 He is
Questioner makes clear the
using internal Merck document
witness has never seen used
This document is then
for the following

T: This is relevant
testimony of defendant's
State of mind concerning
the publication of a
Pivotal scientific article
and his manuscript

Ruling: OVERRULED

Topol 1
```
92:20 the one that apparently was worked over.
92:21          Q.    Correct.
92:22          A.    This is not our paper.
92:23          Q.    Were you aware of the fact
92:24 that Merck was working over your paper?
```

```
  93:3-93:23
```

```
93: 3              THE WITNESS:  I had no idea
93: 4          until this very moment.
93: 5 BY MR. KLINE:
93: 6          Q.    Look under "Results" on Page
93: 7 8.  Do you see -- I'd like you to look at
93: 8 the -- don't look at the underlined
93: 9 sentence yet.  Look at the last -- the
93:10 sentence that begins, "The results of the
93:11 event-free survival analysis on the 66
93:12 cases showed that the relative risk of
93:13 developing a cardiovascular event in
93:14 rofecoxib treatment arm was 2.37"
93:15 percent.
93:16              That's something you
93:17 eventually told people in your JAMA
93:18 paper; correct?
93:19          A.    Yes.
93:20          Q.    Did you know or did they
93:21 suggest it directly to you that according
93:22 to Dr. Reicin, "we prefer to flip the
93:23 data and say it was reduced on naproxen"?
```

```
  94:2-94:5
```

```
94: 2              THE WITNESS:  It's amazing.
94: 3          Yes, I see it here, but it's
94: 4          amazing.  It certainly didn't
94: 5          appear in our manuscript.
```

SAME
as
ABOVE

```
  95:15-97:2
```

```
95:15          Q.    Sir, your JAMA article, I
95:16 think you read to me that your conclusion
95:17 was to call for a full large-scale study;
95:18 correct?
95:19          A.    That's right.
95:20          Q.    Did you want a primary
95:21 cardiovascular endpoint study performed?
95:22          A.    Not only did it need to have
95:23 cardiovascular endpoints, but it had to
95:24 have cardiovascular patients.  Patients
96: Page 96
96: 1 had been excluded essentially from all of
96: 2 these studies, and so that was a patient
96: 3 group that we were most worried about,
96: 4 because they would have the highest
96: 5 predisposition to life-threatening
96: 6 events.
96: 7          Q.    Why was it important to
96: 8 study patients who were at high risk for
96: 9 cardiovascular events when taking the
96:10 drug Vioxx and COX-2s generally?
96:11          A.    Well, we already knew that a
96:12 large proportion of patients who have
96:13 heart disease have concomitant arthritis.
```

Page 18

Topol 1

96:14 And, in fact, in my practice, the vast
96:15 majority of patients who have come to see
96:16 me with heart disease, they also have
96:17 arthritis.  But there was the Ray paper
96:18 in Lancet, the Tennessee Medicaid
96:19 database, there was the other papers that
96:20 I have referred to where 45, 50 percent
96:21 or higher percent of patients taking
96:22 Vioxx or other medicines in this class
96:23 had established known coronary heart
96:24 disease.  So, these patients were
97: Page 97
97: 1 essentially the highest risk for having a
97: 2 life-threatening event.


97:7-97:17

97: 7        Q.    So, did your study, what you
97: 8 were proposing, was it to study the drug
97: 9 in those people who were the logical
97:10 people who were going to take the drug?
97:11        A.    Yes.  The only way we could
97:12 get to the answer here, was it safe for
97:13 people with heart disease who have
97:14 arthritis to take the medicine, was to do
97:15 a trial in these particular patients who
97:16 had been completely neglected in the
97:17 development of Vioxx.


99:16- 100:6

99:16        Q.    Look at Page 18.
99:17        A.    Yes.
99:18        Q.    "Until then," and this ended
99:19 up in your paper, "we urge caution in
99:20 prescribing these agents to patients at
99:21 risk for cardiovascular morbidity."  Your
99:22 words?
99:23        A.    That's the words that's here
99:24 in the paper that are published, yes.
100: 1        Q.    The underlined words are Dr.
100: 2 Reicin's, according to her e-mail which
100: 3 she wrote.  Did you see what she said?
100: 4        A.    Yes.
100: 5        Q.    "Conclusion needs to be
100: 6 toned down."


101:18-101:21

101:18        Q.    And when she came to see
101:19 you, sir, did you believe that one of the
101:20 purposes was to neutralize you and your
101:21 opinion?


101:24-105:2

101:24            THE WITNESS:  Well,
102: Page 102
102: 1        certainly.  The comments she made
102: 2        at that meeting would go along
102: 3        with that.  I mean, she basically
102: 4        said that -- I remember the

Page 19

*[Handwritten annotations:]*

D - same as above
P - same as above
Ruling: OVERRULED

D: 403/602
P: Question asks for witness's personal opinion re: D's intentions - witness's perception w/in witness' personal knowledge
Ruling: sustained

see next page

Topol 1

```
102: 5           conversation.  It actually was
102: 6           supposed to be three people coming
102: 7           to visit, which was unusual, to
102: 8           discuss a manuscript, but because
102: 9           of our prior relationship with
102:10           Merck and Dr. Demopoulos and Dr.
102:11           DiBattiste, I had reluctantly
102:12           agreed to this meeting.  But Dr.
102:13           DiBattiste didn't show up, it was
102:14           supposed to be the three of them,
102:15           and the meeting started out with
102:16           that we got it wrong, that we
102:17           would be embarrassed.
102:18 BY MR. KLINE:
102:19      Q.   "We" meaning?
102:20      A.   Dr. Nissen, Dr. Mukherjee
102:21 and I.
102:22      Q.   Three physicians at the
102:23 Cleveland Clinic?
102:24      A.   Right.
103: Page 103
103: 1      Q.   Got it wrong?
103: 2      A.   Got it wrong, that we would
103: 3 be embarrassed if we published this
103: 4 paper.
103: 5      Q.   Her word?
103: 6      A.   That's the word.  The word
103: 7 is "embarrassed."  And I thought that was
103: 8 harsh.  And she came across as kind of
103: 9 arrogant, I thought.  But we talked it
103:10 through, and I explained to her that, you
103:11 know, we don't feel that way at all, and
103:12 we will stand by our data.  We only
103:13 wanted the input on inconsistencies of
103:14 data.  We did not ask to them -- for Dr.
103:15 Reicin or colleagues to opine about our
103:16 perspective.
103:17           But the discussion ended up
103:18 okay.  You know, she came about the
103:19 naproxen hypothesis, which I dismissed as
103:20 the explanation.  She came with the
103:21 rheumatoid arthritis -- that patients
103:22 with rheumatoid arthritis, you know, Dr.
103:23 Topol, have much higher rates of heart
103:24 attack.  And I said, well, that doesn't
104: Page 104
104: 1 explain it, because all the patients had
104: 2 rheumatoid arthritis.  So, if there's a
104: 3 gradient of heart attack, it can't just
104: 4 be from that explanation.
104: 5           She also came with the
104: 6 notion that there were lots of data that
104: 7 we didn't know about, Dr. Nissen, Dr.
104: 8 Mukherjee and I, that was in the Merck
104: 9 files that the FDA had, but we didn't
104:10 have access.  And I said, well, we can't
104:11 comment on data we don't have access to,
104:12 and I'm sorry.
104:13           So, the meeting probably
104:14 went on about an hour-and-a-half.  It
104:15 ended cordially.  And at times she said
104:16 that Merck was considering doing a trial
104:17 in heart patients, and if we had any
```

Page 20

Δ: 403/602

P: These contacts and communications are relevant and highly probative to the central issues of the cases including attempts to suppress unfavorable evidence and intimidate scientists from making any statements that would inform others of risk. What occurred at the meeting is intimately win witness's personal knowledge.

Ruling: 101:24 - 102:2 - Sustained
102:4 - 105:2 - OVERRULED

```
                              Topol 1
104:18 ideas, she welcomed us to forward a
104:19 proposal, protocol, and that seemed to
104:20 be -- I got the sense it was a gesture.
104:21 I didn't really think that Dr. Reicin was
104:22 serious about it, but nonetheless, I
104:23 thought that we probably should at least
104:24 send some type of protocol sketch if they
105: Page 105
105: 1 would like to see what our ideas were for
105: 2 pursuing this question.
```

```
   106:14-107:12
```

```
106:14         Q.    Let me just briefly show you
106:15 another document.  It's a Merck document,
106:16 Exhibit Number 7.
106:17            -   -   -
106:18           (Whereupon, Deposition
106:19      Exhibit Topol-7, E-mails, with
106:20      attachment, "Selective COX-2
106:21      Inhibitors are Associated with An
106:22      Increased Risk of Cardiovascular
106:23      Events," (Mukherjee, et al) draft
106:24      manuscript, MRK-ABA0009661 -
107: Page 107
107: 1      MRK-ABA0009693, was marked for
107: 2      identification.)
107: 3            -   -   -
107: 4 BY MR. KLINE:
107: 5         Q.    Very briefly.  And, again, I
107: 6 don't have the time to have you sit and
107: 7 read the whole thing, but I want you to
107: 8 look at the front page.
107: 9            Apparently the manuscript
107:10 was further worked on internally at
107:11 Merck.  Are you aware of that fact?
107:12      A.    No.
```

```
   107:15-108:10
```

```
107:15            THE WITNESS:  I had no
107:16      knowledge of that.
107:17 BY MR. KLINE:
107:18         Q.    And there's an e-mail from
107:19 Dr. Demopoulos to a number of people,
107:20 including Alise Reicin.  And they took a
107:21 crack at revising it, and if you look at
107:22 the last sentence of the e-mail, "We
107:23 recognize that the revised" transcript
107:24 "does not completely neutralize the
108: Page 108
108: 1 potential negative impact of the
108: 2 publication, but...it is substantially
108: 3 removed from the original.  We" feel
108: 4 "that revising it further to more
108: 5 completely present a Merck perspective
108: 6 might alienate the authors and" thus
108: 7 "jeopardize our opportunity to contribute
108: 8 at all."
108: 9            Did you know that's what was
108:10 going on?
```

```
   108:13-108:14
```

D: 107:5-12; 602, 703, 403
admittedly lacks personal
knowledge of internal Merck
document; improper opinion
testimony

P: Dr. Topol is reacting to
comments which were
attempts to suppress
unfavorable information
about Vioxx in his original
research; he has personal
knowledge of manuscript
and his reactions to
Merck's comments on the
data is both relevant and
highly probative.

Ruling: OVERRULED

Page 21

Topol 1

*Same as above*
*Ruling: OVERRULED*

108:13                THE WITNESS:  This is
108:14        remarkable.  I didn't know --

   108:17-108:18

108:17                THE WITNESS:  -- this was
108:18        going on at all.

   109:21-110:6

109:21        Q.    Is part of the academic
109:22 process -- you've worked --
109:23                You've done studies for
109:24 large pharmaceutical companies, Merck?
110: Page 110
110: 1        A.    Yes.
110: 2        Q.    Is part of the process to
110: 3 get the scientific facts in the medical
110: 4 literature, or is the real objective, or
110: 5 is part of the objective to get the,
110: 6 quote, drug company perspective?

   110:8-110:20

110: 8                THE WITNESS:  Well, you
110: 9        know, I had been trying to have an
110:10        intellectually fulfilling and
110:11        collaborative relationship with
110:12        people at Merck, and that was
110:13        something that I think we enjoyed
110:14        up until this sort of thing, which
110:15        is obviously a departure from
110:16        that, but --
110:17 BY MR. KLINE:
110:18        Q.    Is it --
110:19        A.    -- it's unfortunate.
110:20        Q.    Is it a departure --

   110:24-111:4

110:24        Q.    -- from sound academic and
111: Page 111
111: 1 scientific practice to attempt to
111: 2 neutralize papers and try to inject a
111: 3 particular perspective, rather than what
111: 4 is the down the middle truth?

   111:8-111:14

111: 8                THE WITNESS:  Yes.  I mean,
111: 9        I think that the role of academic
111:10        medicine is to publish a highly
111:11        objective independent processing
111:12        of data and perspective, and
111:13        anything to try to warp that or
111:14        twist it is unacceptable.

   115:11-115:18

115:11        Q.    I'm marking, and those who
115:12 see this will be familiar with this, the
115:13 February 1, 2001 memo of Shari L. Targum

```
                                   Topol 1
115:14 of the Division of Cardiorenal Drug
115:15 Products at the FDA --
115:16       A.     Yes --
115:17       Q.     -- correct?
115:18       A.     Yes.

    116:22-117:1

116:22          Q.     What are the concerning
116:23 parts to you that were known and flagged
116:24 in the Targum report dated February 1,
117: Page 117
117:  1 2001?

    117:4-117:6

117:  4                THE WITNESS:  On Page 5 it
117:  5           talks about the DSMB, which is the
117:  6           data and safety monitoring board.

    117:11-118:5

117:11          Q.     Yes.
117:12          A.     And the first thing it says
117:13 is during -- this is at the bottom of the
117:14 page, the last paragraph, "During the
117:15 November 18, 1999 meeting, discussion and
117:16 focus on the 'excess deaths and
117:17 cardiovascular adverse experiences in
117:18 group A compared to group B'...In this
117:19 report, there were 40 and 17 patients
117:20 that discontinued the study because of
117:21 cardiovascular adverse events," and then
117:22 there's a blood pressure.  And it's
117:23 pretty easy to tell which is group A and
117:24 group B.
118: Page 118
118:  1                This is November 18, 1999.
118:  2 This is highly concerning, that there's
118:  3 excess deaths in a trial and the DSMB is
118:  4 noting in the course of the VIGOR trial.
118:  5          Q.     You said November 18, 1999?

    118:8-118:22

118:  8                THE WITNESS:  Yes.  This
118:  9           would be a time when any concerns
118:10           about the drug, and, of course,
118:11           now already the 090 trial, which I
118:12           presume we'll get into, that
118:13           already was known in May of 1999.
118:14                So, now we have the largest
118:15           trial ever of the drug, and it's
118:16           causing, in the midst of the
118:17           trial, excess deaths and serious
118:18           cardiovascular events.  So, this
118:19           did not apparently lead to the
118:20           alert that I would have thought in
118:21           the course of a large scale trial
118:22           of 8,000 patients.

    119:2-119:5
```

D: 702/602 Witness does nothing more than express his current opinion about events for which has no personal knowledge

P: Dr. Topol has studied Vioxx extensively and has intimate knowledge of this data/VIGOR trial; can attest to information known by Merck & what should have been done w/ that information

Ruling: OVERRULED

Topol 1

```
119: 2          Q.    What are you saying to us?
119: 3  Are you saying that in the period by the
119: 4  year 2001 that there were a series of
119: 5  things that were known to Merck?
```

119:9-119:19

```
119: 9               THE WITNESS:  Well, what's
119:10          evident here is it calls out the
119:11          53 versus 29 serious excess deaths
119:12          in cardiovascular events as early
119:13          as November of 1999.  In the wake
119:14          of another trial, they had a 760
119:15          percent excess of heart attacks.
119:16  BY MR. KLINE:
119:17          Q.    What study was the 53
119:18  deaths, for instance?
119:19          A.    That's the VIGOR trial.
```

120:23-121:11

```
120:23          Q.    Is what you're saying that
120:24  the Targum memo, to put it in
121: Page 121
121: 1  perspective --
121: 2               Is what you're saying is
121: 3  that the VIGOR -- you learned from seeing
121: 4  this document that the VIGOR data had
121: 5  been analyzed, as you would expect, going
121: 6  along at various stages?
121: 7          A.    Yes.
121: 8          Q.    And that at various stages,
121: 9  were there red flags that you can see in
121:10  this data?
121:11          A.    Exactly.
```

121:14-121:22

```
121:14               THE WITNESS:  Exactly.  And
121:15          the point is, is that later we're
121:16          told that the first time they ever
121:17          knew about any problem was well
121:18          into 2000, which couldn't possibly
121:19          be true.  Someone of the sponsor
121:20          had to be alerted by this DSMB
121:21          concern of excess deaths and
121:22          serious cardiovascular events.
```

122:3-122:14

```
122: 3          Q.    Now, let's talk about VIGOR,
122: 4  because that was some focus of what you
122: 5  were doing when you retrospectively
122: 6  looked at VIGOR and also a number of
122: 7  other studies including 090.
122: 8          A.    Yes.
122: 9          Q.    Okay.
122:10               You looked at, I think, a
122:11  study called 085, 090, VIGOR.  Any other?
122:12          A.    Those are the principal
122:13  ones.  I think all the studies, but those
122:14  are the ones that we focused on the most.
```

Page 24

D'' 702/602
Same as
above; leading;
witness lacks
personal knowledge
about "what was known
to Merck"

T's SAME AS ABOVE

Ruling: OVERRULED