124:17-125:4

You looked at the VIGOR trial, and you made some determinations there; correct?
A. That's right.
Q. Okay.
What did you -- I would like you to list out sequentially. If you've covered it already, list it so we have it
Page 125
in a list.
What were your major findings as you looked independently back at the VIGOR trial?

125:7-126:6

THE WITNESS: I think the most important finding is summarized in Figure 1 of that paper, which comes right from the FDA Targum report. And basically what that figure, first time now published to the medical community, it shows that there's a divergence of the heart attack and serious event curves. The event curves is Figure 1, whereby starting at four to six weeks after the start of the medicine, Vioxx compared to naproxen, there is an over two-fold risk of serious events.
BY MR. KLINE:
Q. That Kaplan-Meier curve,
Page 126
which will be marked -- we don't have to display it right now, but I want to mark it so that it's part of an exhibit to be displayed as part of this transcript. We will put a number 9 on table -- on Figure 1 of the Topol JAMA article.

126:23-127:4

Q. That Figure 1, which is the Kaplan-Meier curve showing the time to
Page 127
cardiovascular adverse events, the line separated how many days?
A. Between four and six weeks these curves diverge.

127:8-127:10

Q. Is this, by the way, something that has been replicated in other studies?

127:13-127:18

THE WITNESS: It's been

D: 602 no personal knowledge
π: Witness had intimate knowledge of Vioxx studies
Ruling: OVERRULED

replicated in four randomized trials.

BY MR. KLINE:

Q. That it separates at an early time?

127:20-128:17

THE WITNESS: That's right.

BY MR. KLINE:

Q. Okay.

And what are those studies?

A. Study 090, which was a

Page 128

six-week trial, which had a 760 percent excess within the six weeks.

Q. Yes.

A. The VIGOR trial I just mentioned.

Q. Yes.

A. The ADVANTAGE trial, which was a 12-week trial that showed a significant excess in the 12-week time frame.

And the VICTOR trial, which has not yet been published, which is a colon cancer trial of 2,300 patients coordinated out of Oxford, which has been at least commented on by the investigators having immediate excess in heart attack risk.

Δ: 403 602 801 802 refers to "comments" by investigators in the VICTOR TRIAL, about which he has no personal knowledge

π: Same as Above

Ruling: OVERRULED

129:3-129:7

What conclusion have you reached, Dr. Topol, relating to the increased risk of cardiovascular events, heart attacks and strokes relating to short-term usage of the drug?

129:10-130:3

THE WITNESS: Well, there is -- I should also add the four randomized trials, there's the cumulative analysis by Dr. Juni published in the Lancet which shows no relationship between duration of therapy and heart attack excess.

But interestingly, all four of these trials, and the cumulative Juni analysis, was on patients without heart disease. So, the risk of it being immediate and early could actually be much more exaggerated in patients with

Page 130

heart disease.

BY MR. KLINE:

Q. Any doubt --

Δ: Non-responsive

π: Direct Response at 129:22-130:1

Ruling: No Ruling on non-responsive objection

130:8-130:13

Q. -- about it in your mind?
A. There isn't any question about this. To see it replicated across four trials in patients who don't even have heart disease is quite an important finding.

130:18-131:5

Q. In this particular Kaplan-Meier curve for the VIGOR trial, that was not published in the New England Journal of Medicine; is that correct?
A. No. As I mentioned earlier, the New England Journal of Medicine paper featured the gastrointestinal side
Page 131
effects and benefit, but it did not show in any graphic form, and there are other irregularities of this paper, but it certainly did not highlight the heart attack problems.

131:20-132:2

You mentioned already that there was an increased risk of cardiovascular events starting at the six-week period in this study; correct?
A. Yes.
Page 132
Q. Replicated by other studies we now know later?

132:5-132:22

THE WITNESS: Three other randomized trials.
BY MR. KLINE:
Q. Yes.
A. Yes.
Q. And by the way, I'm going to get to naproxen. On this naproxen theory, has there ever been a randomized clinical trial demonstrating that naproxen is cardioprotective?
A. There is no -- there are no data that I am aware of to show that naproxen in any randomized trial is cardioprotective.
Q. Do you think that if there were such a study, you would know about it?
A. I would think so.

133:1-133:4

Q. So, what do you think of this naproxen hypothesis that was put forward by Merck to justify the results in VIGOR?

133:7-133:16

THE WITNESS: It doesn't justify -- I mean, as I mentioned earlier, the problem is you have an experimental drug which is not fully defined, and you compare it to a drug that's been known for 20 years. To all of a sudden to ascribe some type of magical protective effect without any basis is not acceptable.

136:5-136:11

Q. Tell me, Dr. Topol, as you wrote it in JAMA and as you believed it then and today, the significance of 090, the study 090. What was that study? When was it performed? Just tell me what it was and what its significance was to you.

136:14-138:10

THE WITNESS: To me, that study has been overlooked. It has, in many ways, extraordinary significance in the clinical development of Vioxx. And the reason is is that this study had 978 patients. And within the 978 patients, they were randomly assigned, they had the typical arthritis, osteoarthritis so-called, they were randomly

Page 137

assigned to Vioxx, a medicine called nabumetone or known as Relafen, which isn't used very much, or placebo.

And so what they had were these three arms tested with only 12-and-a-half milligrams of Vioxx. So, it's a very low dose of Vioxx relative to these other trials that we've been discussing.

BY MR. KLINE:

Q. 090 being a 12.5 milligram, as opposed to VIGOR, which was 50?

A. That's right.

Q. Okay.

A. And what is so striking about this trial is that it has, at the end of six weeks of therapy, a statistically significant 760 percent excess of heart attacks. Now, it's not quite 1,000 patient trial, but certainly that can't be minimized. And the point being is that if you see that trial in replication with the problems with VIGOR,

Page 138

you have a very serious problem.

But moreover, what is the misleading statements that have been made, is that there have been no trials ever done with Vioxx, before APPROVe, comparing the drug except for naproxen, in which there was a risk. In fact, there was study 090, which compared to placebo or nabumetone, which showed a highly significant excess risk.

138:21-138:24

Q. Was there, as you view this and as you viewed it back then in 2001, a real public health threat out there in the form of the drug Vioxx?

139:3-139:18

THE WITNESS: Yes. When we published our article in August 2001, there was an accompanying article in the Wall Street Journal, an A1 article, in which I stated just precisely that, that we're staring a public health -- I don't know if I used the word "disaster," but it was a significant word, that this is a major public health issue, yes.

BY MR. KLINE:

Q. Why did you state it in those blunt terms, sir?

A. Because it obviously was a public --

139:21-140:11

THE WITNESS: Here you have a possible five-fold increase in heart attacks in patients without heart disease; you have a drug

Page 140

that's being given to -- tens of millions of prescriptions, millions of people are taking it, and it could be much worse in patients with heart disease; we've got direct-to-consumer advertising unleashed with the most successful launch of prescription medicines in the history of pharmaceutical development; we have a major significant jeopardy, yes.

141:5-141:21

As of August 22, 2001, all you were asking Merck to do was what?

A. To do an appropriate trial, to acknowledge that there may be risks, and that didn't occur, but to also do an appropriate trial in patients with heart

D: 801 802 403 answer refers to a WSJ statement in a article
Π: Witness is referring to statements he made that reflect his views at the time; WSJ reference as to his state of mind when he wrote article
Ruling: OVERRULED

D: 611(c) Leading
Π: Not leading; Δ also fails to object to form & to give opportunity to cure
Ruling: OVERRULED

disease.
Q. You made a big point in your paper about the fact that the trials that were done, I think you already told us, weren't done in patients who were at risk for cardiovascular disease. Correct so far?
A. Yes.
Q. Those would be the real patients you'd have to really worry about; correct?

141:24-142:3

THE WITNESS: Exactly. The
Page 142
patients with heart disease had been completely excluded from these trials.

142:7-142:8

Q. You needed to study them; correct?

142:11-142:12

THE WITNESS: That's correct.

143:16-143:21

Q. Had anything that is called a prespecified cardiovascular endpoint study, has it ever been done by Merck?
A. It has never been done in my mind to this day.
Q. Did it need to be done?

143:24-144:9

THE WITNESS: Absolutely.
Page 144
And we called for it innumerable times.
BY MR. KLINE:
Q. And here's the question. Why? And why is that different than what we've heard -- we hear from Merck that, well, we studied, and we went back and we looked at the end points. Why, sir -- you can tell us, why?

144:18-145:9

A. Yeah. The main thing is that Merck was saying that they were doing trials to look at cardiovascular endpoints like APPROVe, like VICTOR and a prostate cancer trial. These were not being done for a cardiovascular endpoint. They were done in patients without heart
Page 145

disease.
These were trials being done to extend the indications for the drug to new areas, such as prevention of colon polyps or prevention of prostate cancer. They had nothing to do with assuring safety from a cardiovascular standpoint. That could only be done in trials of patients with heart disease.

145:19-145:20

Q. Did they do what they should have done here?

145:23-146:2

THE WITNESS: They did not do what was needed to be done,
Page 146
which we called for in our JAMA paper.

150:7-150:7

Q. Why was --

150:11-150:15

Q. -- as you saw it, the incremental risk of increased risk of heart attacks and strokes so important, and how did it relate to the numbers of people who were taking it?

150:18-151:4

THE WITNESS: Well, if one thinks about the risk here, if it's -- if we use the APPROVe data in colon cancer patients without heart disease, it's 16 per thousand patients, and you can just do the math about -- if you
Page 151
have millions of people, 16 per thousand having a heart attack, that's an extraordinary risk for the population.

151:8-151:9

Q. Okay.
Merck took after you, sir?

151:12-152:10

THE WITNESS: The problems that occurred after August 22nd, 2001 were quite profound in many respects. So, not only did they have consultants that they communicated to the media, like

D: 403 611(c) - Leading
Π: Question asks whether Merck came after witness; not leading.
Ruling: OVERRULED

Topol 1

Dr. Konstam and Dr. FitzGerald, accusing us of having tortured the data and manipulated the data, but they also sent out an overnight mail to every healthcare provider in the country that was commented on -- Dr. Sherwood, he was the

Page 152

doctor who sent it, and it was in the JAMA letter correspondence about our article, that one of the doctors was complaining, having received this overnight with the five-page taking on the Mukherjee/JAMA paper, and so it certainly unleashed a very robust response from Merck and its consultants.

166:5-166:7

The warnings on this drug, were there adequate warnings on this drug, sir, in the '99 and 2002 labels?

166:10-166:21

Q. As to cardiovascular risks?

THE WITNESS: In my opinion, both the original label and then the revision in April 2002 did not show adequate safety concerns about heart attacks, strokes and death that could occur from the medicine. So, it wasn't present at all in the first iteration in 1999, and it certainly was not adequately flagged in the 2002 revision.

175:16-175:23

We were talking about naproxen and this whole thing, its cardioprotective effect. In VIGOR, Merck had made the point, as you well know, that they had no long-term randomized clinical trial to show that naproxen was cardioprotective. We've covered that point; correct?

176:1-176:8

THE WITNESS: Yes, yes.

BY MR. KLINE:

Q. I'm just putting it in context.

A. No. There are no data to support in any definitive fashion or meaningful way that naproxen has a cardioprotective effect.

177:11-177:18

D: 701 702 403 improper opinion testimony; witnesses ADMIT lack of expertise in labeling 09-15 guidelines on 542: Drug

T: See in re Diet Litigation and Product Liability medical can holding that a expert as to the scientific testimony & scientific accuracy of A LABEL & whether it accurately reflects the state of medical knowledge.

RULING: OVERRULED

Q. And, therefore, when you were writing here that "lack of cardioprotective effect of naproxen," were you saying that there was definitely no at all cardioprotective effect, or were you saying that a cardioprotective effect of naproxen could not explain the results in VIGOR?

177:21-177:21

Q. Or something else?

177:23-178:4

THE WITNESS: No. It was the latter. That if there was a

Page 178

cardioprotective effect, it was modest at best, and it could not explain the five-fold increase in heart attacks in the VIGOR trial.

197:4-197:6

Q. And you did believe at that time that the drug needed a black box warning; correct?

197:8-197:20

THE WITNESS: Yes. We're now in August of 2004 publishing this.

BY MR. KLINE:

Q. Yes, sir.

A. And the extraordinary amount of evidence, not just from VIGOR, but from various other trials and studies, was really quite excessive in my opinion, and that's why the black box warning was long overdue in August 2004.

Q. Do you have a sense of when it was due by?

197:22-198:18

THE WITNESS: It could have easily been imposed as of February 2001, or if we go back to the Juni

Page 198

analysis in the Lancet, also published in the Lancet, it could have been back in year 2000. So, somewhere between 2000 and 2001 there was more than adequate confirmation.

Essentially all you need is VIGOR and study 090 together, and I could take you through the Juni analysis in the Lancet, but that basically crosses the line for

Δ: 701 702 403; Same As Above

π: As an expert in drug development and clinical trial presentation he can testify as to black box when was published in the peer reviewed literature (Lancet); also same as above

Ruling: OVERRULED

proven hazard of heart attacks.

BY MR. KLINE:

Q. Did you observe any pattern of conduct by Merck every time or any time an investigator like yourself or Juni did a critical analysis and questioned the safety of the drug Vioxx?

198:20-199:7

THE WITNESS: Each time we published a paper or a study was also published by other investigators questioning the safety of Vioxx, there would be

Page 199

immediately a PR attack on the report. Merck would refute the findings and/or they would have consultants of theirs refute the findings. So, there was a published and then anti force that would occur without any question.

204:5-204:14

Q. Now, this was published in the Lancet?

A. Yes, in November of 2004.

Q. So, not only could physicians see it, but Merck could see it as well; correct?

A. Yes.

Q. Okay.
Did they go about trashing Juni?

204:16-205:7

THE WITNESS: As I mentioned earlier, every time a study was published, there was a vehement response to that to try to provide an antidote or a negation of the results, whether it was our study or whether it was other reports.
This would have been -- in this case, they said that Dr. Juni

Page 205

and his colleagues didn't include the right trials, and they had all sorts of criticism that I believe was largely unfounded, and there was quite a bit of correspondence in the Lancet that followed this up subsequently.

214:7-214:14

One thing that Merck said from the APPROVe study was that there was an increased risk after 18 months. Do you recall that claim?

Δ: 1002 403 Argumentative; no foundation to answer the argumentative question "Did [Merck] go about trashing Juni?"

Π: Witness was not influenced by the question.

Ruling: OVERRULED

A. Yes.
Q. How did you see that in the context of the full picture of the articles?

214:16-216:5

THE WITNESS: This was another extremely concerning part of that dissemination on the day of withdrawal, that it took 18 months for there to be any risk, because that's not true.
In fact, as I reviewed earlier in this deposition, there were four trials that showed that

Page 215

the timeline for that was considerably quicker. In VIGOR, with four to six weeks, there was separation. In ADVANTAGE, within 12 weeks. In VICTOR, this was immediate. And in study 090, within six weeks.
And in all of these trials, there were no heart disease patients. So, it could have been much worse than -- in the days or weeks. And beyond all that, there's the issue of a problem of statistical power, that is, you have to do a very large trial if you're not expecting adequate number of events, and so none of the trials were adequately powered from a time perspective.
But, given all those things, that is, statistical power, lack of cardiovascular patients, and four randomized trials, in addition to the Juni analysis,

Page 216

there's a pretty strong case that the risk of Vioxx for heart attacks can occur at any time after the initiation of the medicine.

216:17-217:4

Q. By that time or by the time -- by today, by today there were studies done by -- let's see, there was a study done by Ray, correct, in Lancet, in '02, the Ray study?
A. Yes.
Q. I'm talking epidemiology studies.

Page 217

A. There were two Ray studies in the Lancet.
Q. Did that show an increased risk of heart attacks?

217:6-217:11

THE WITNESS: Yes.
BY MR. KLINE:
Q. There was a study by Solomon in Circulation in 2004. I'm talking just the epidemiological studies. Did that show an increased risk of heart attacks?

217:13-217:18

THE WITNESS: Yes.
BY MR. KLINE:
Q. There was a study by Graham in Lancet in 2005, which we'll get to. Did that show an increased risk of heart attacks?

217:20-218:1

THE WITNESS: Yes.
BY MR. KLINE:
Q. There was a study by Kimmel in the Annals of Internal Medicine published, I'm not sure when. Did that
Page 218
show an increased risk of heart attacks?

218:3-218:7

THE WITNESS: Yes.
BY MR. KLINE:
Q. There was a study by Levesque, L-E-V-E-S-Q-U-E. Did that show an increased risk of heart attacks?

218:9-218:9

THE WITNESS: Yes.

221:22-222:3

Q. All right.
Now, my purpose is to go through your criticisms of the VIGOR
Page 222
trial and what you think Merck did that constitutes scientific misconduct. Can you do so, sir?

222:9-223:24

THE WITNESS: Okay.
So, what I cited here in this correspondence is how the article in the New England Journal -- this goes back to what we discussed earlier today, which is when the paper was published in November 2000 as compared to the FDA documents that we have a chance to review in February of

Δ: 402 403 702
Highly prejudicial improper opinion testimony about what he views as "scientific misconduct" cumulative testimony re: NEJM publication of Dr. Curfman

π: Witness may testify on his views of Merck's misconduct; testimony not cumulative but placed in context of witness' opinions re: misconduct; highly probative as VIGOR trial and how it was conducted are central to π's case.

RULING: OVERRULED

2001, there was -- there were gross discrepancies, which is why we had contacted Merck in the first place about this manuscript.

Then, finally, we had the ability to work with the New

Page 223

England Journal of Medicine editors, Dr. Curfman, Dr. Drazen, and to figure out what was going on.

Now, as it turns out, in the VIGOR manuscript, in the New England Journal in 2000, in three times in the paper, this is first authored by Bombardier, and three times it says that the mortality was the same between naproxen and Vioxx. And that was untrue.

In fact, there was a 46 percent difference. There were 22 deaths in the Vioxx arm versus 15 deaths in the naproxen arm. And so instead of presenting the deaths as they should, the authors only used percentages, rounded them off, but moreover, they asserted strongly in three different places that the mortality was the same. So, that's issue number one.

224:22-225:18

A. The second issue was the false data regarding heart attacks. So, instead of a five-fold increase, which we

Page 225

know is true at the bare minimum, because there wasn't the right adjudication in this trial as we learned and I reviewed earlier from the Targum report, but now we're talking about that the authors knew the correct number of heart attacks.

They could have fixed the galley proofs, and this is told to me by the editors of the New England Journal, but they decided to give the correct numbers in the published New England Journal paper. So, they had a four-fold increase in heart attacks rather than a five-fold increase in heart attacks.

And that is erroneous, and that appears to be, best I can reconstruct with the New England Journal editors, an error of commission.

Δ: same as above and 611(c) - leading; 602 lacks personal knowledge as to what VIGOR authors knew

π: same response as above; As to leading - there is no question in this designation; witness has personal knowledge & can speak to inconsistencies between authors' comment and data reported in NEJM

Ruling: OVERRULED

225:22-227:13

Q. And the third?

A. The third is, rather than report any of the other clotting events,

Page 226

see next page

Δ: 802 - witness is simply reading from A Hearsay post-withdrawal "perspective" Article

π: Witness is author of Article; witness is summarizing opinions he expressed in peer reviewed literature and testimony informs designation that follows re: risk/benefit Analysis

Ruling: OVERRULED

like strokes, like transient ischemic attacks, like unstable angina, like peripheral arterial thrombosis, like venous thrombosis, like pulmonary embolism, none of these were reported in the New England Journal of Medicine paper.

Q. You also state on the top of a column on Page 2878 of your correspondence, which is now marked as exhibit --

MR. HAMELINE: 16.

\- - -

(Whereupon, Deposition Exhibit Topol-16, "Rofecoxib, Merck, and the FDA," (Kim et al), N Engl J Med 351;27 December 30, 2004, 2875 - 2878, was marked for identification.)

\- - -

BY MR. KLINE:

Q. -- 16, thank you.

You state here, something we talked about earlier, which is, "We

Page 227

indeed" -- top of the second column, 2878.

"We indeed acknowledged that naproxen may have a cardioprotective effect, but the magnitude of the effect would be unlikely to exceed that of aspirin, at a 25 percent reduction of heart attacks. Instead, in the VIGOR trial, there was a 500 percent increase in heart attacks. This makes any 'naproxen hypothesis' of cardioprotection mathematically indefensible." Correct? Your words?

227:19-228:11

THE WITNESS: I wrote this. These are my words, absolutely.

BY MR. KLINE:

Q. And you said in this article or this correspondence, putting out there for the public, for the medical

Page 228

community, a little further down, "There were no differences in the rate of perforation (0.1 percent in...rofecoxib and naproxen groups)."

Your words, "It is hard to imagine that the small protection from gastric or duodenal ulcers in the VIGOR trial is an acceptable trade-off as compared with twice the incidence of death, heart attacks, and strokes."

Did you write those words?

228:13-228:17

THE WITNESS: Yes, I

228:14 certainly did.
228:15 BY MR. KLINE:
228:16 Q. And were you doing a
228:17 risk/benefit analysis there in your mind?

228:19-229:2

228:19 THE WITNESS: Yes.
228:20 BY MR. KLINE:
228:21 Q. And were you weighing the
228:22 risk of pain medication versus the risk
228:23 of dying from a disease that -- let me
228:24 start again.
229: Page 229
229: 1 Were you weighing the risk
229: 2 of pain relief versus death?

229:4-229:9

229: 4 THE WITNESS: We were
229: 5 weighing -- I was weighing, when I
229: 6 wrote that statement, the risk of
229: 7 heart attacks principally versus
229: 8 the small protection from
229: 9 significant stomach complications.

240:20-240:24

240:20 Q. You then cited the Graham
240:21 study. Now, I started this deposition by
240:22 some discussion that you had with David
240:23 Graham, who was at the FDA; correct?
240:24 A. Yes.

241:5-241:6

241: 5 Q. And what did Graham
241: 6 conclude?

241:8-242:3

241: 8 THE WITNESS: He concluded
241: 9 from a very large population study
241:10 done with the Kaiser Foundation
241:11 that there was a very high risk of
241:12 heart attacks with Vioxx,
241:13 especially in higher doses, but
241:14 across the board compared to the
241:15 other conventional nonsteroidal
241:16 agents.
241:17 BY MR. KLINE:
241:18 Q. Were you in contact with
241:19 Graham in the period of time in late
241:20 2004?
241:21 A. Yes. I had some phone
241:22 discussions and a couple of e-mails back
241:23 and forth in that time frame.
241:24 Q. From what you learned in
242: Page 242
242: 1 e-mails and phone discussions, was he
242: 2 under pressure not to publish his
242: 3 results?

Δ obj = 802/403

Π response = Communication with FDA relevant for notice + pattern/practice by Merck of suppressing scientific information

Not hearsay - not being offered for truth, but for notice to Merck, also 803(6), 803(18) - business record + learned treatise exceptions

Ruling = Sustained from 241:18 → end of section, on other grounds (in part)

242:5-242:8

THE WITNESS: He conveyed
that to me aptly.
BY MR. KLINE:
Q. What did you learn, sir?

See prior pg.

242:10-243:1

THE WITNESS: I learned that
the FDA, his superiors, did not
want him to publish that
particular paper, which eventually
appeared in Lancet, and according
to him and according to the
reports about this, and according
to the editor at Lancet, FDA tried
to suppress that publication.
BY MR. KLINE:
Q. It was published by Lancet?
Was it published by Lancet?
A. Yes.
Q. And was it one more piece of
evidence that you were -- that was now in
Page 243
your knowledge bank?

243:3-243:10

THE WITNESS: It was one of
seven epidemiologic studies
published to this point in time,
and all but one of them showing a
very significant excess of heart
attacks with Vioxx.
BY MR. KLINE:
Q. Was everyone --

243:14-243:16

Q. And was every one of those
seven studies done by someone who was not
affiliated with Merck?

Δ obj = 802/403, 602

π = Not hearsay - offered to show notice of risks & known/knowable risk of Vioxx, business record/learned treatise exceptions, witness has personal knowledge

Ruling: Sustained

243:19-244:7

Q. Those epidemiological
studies?
A. Well, some of the authors
could have been affiliated with Merck.
Like, for example, the Solomon paper,
there had been a Merck statistician,
Page 244
epidemiologist, Carolyn Cannuscio, who
was involved, but then she was deleted at
the request of Merck, and I spoke about
that with Carolyn, but she had to have
her name taken off the paper in
Circulation, which was one of the
epidemiologic studies.

244:11-244:12

Q. What did she tell you, if anything, about why her name was removed?

244:14-246:3

THE WITNESS: She told me in a phone conversation in October of '04 that she was very distraught about the fact that she had done extensive work with the team in Boston, at Harvard, and that at the last minute, after having been on the paper, manuscript submission, she had to have her name taken off at the request of Merck, because they did not agree with the conclusions of the study.

BY MR. KLINE:

Q. Okay.

I want to show you an e-mail that you had between yourself and David Graham. We covered this way earlier, but I want to make sure that whoever hears this knows who Graham was. Please. Who is Graham?

A. David Graham is a safety officer at the FDA.

- - -

(Whereupon, Deposition Exhibit Topol-20, E-mails, TOPOLE 0000458, was marked for identification.)

- - -

BY MR. KLINE:

Q. I'm marking this as Exhibit Number 20. It's an e-mail between yourself and Graham, and you say in yours on the bottom, it's an e-mail dated November 15, 2004, you say, "David, I attach my analysis of the 2 trials submitted to FDA as part of Supplement 007."

What are you referring to?

246:5-246:18

THE WITNESS: That's the FDA supplement of the three trials, 090, 085 and VIGOR.

BY MR. KLINE:

Q. One never published, that referring to 090?

A. 090 never published.

Q. "I'd be interested in your thoughts as I think this, along with the Juni paper, nails this down as to when there was confirmatory evidence that rofecoxib was," to use your words, "a dangerous drug."

Did you write that?

Δ: 802, 403, 602

π = testimony relates to witness' personal knowledge re: conversations he had with Merck employee, non-hearsay as admission by party opponent relevant to show Merck's pattern / practice of silencing critics + distancing itself from unfavorable data to Vioxx

e-mail b/w Topol + Graham not hearsay b/c not offered for the truth, present sense impression + notice

Ruling = Sustained

247:4-247:19

Q. "A dangerous drug," you say. It nails down "when there was confirmatory evidence." So, I have to ask you, what is that date that you can nail down, your private words to David Graham, safety officer of the FDA, when can you nail down when there was confirmatory evidence that Vioxx was a dangerous drug?
A. The paper that I reviewed earlier, the Juni paper that shows that time cumulative analysis, shows in 2000, when VIGOR and 090 are put together, that's when you cross the line of statistical significance, and that's the definition of a dangerous drug.

Δ = 802, 403, 602

Π = Same responses as above

248:1-248:17

Q. If you look at David Graham's response, he says to you in the second paragraph, "Each day the issue gets more and more complicated and fishy smelling. Apparently, Merck was heavily lobbying the members of the Finance Committee to cancel the hearing today, and our acting center director, Dr. Galson, has reportedly refused to appear before the Committee."
Skipping down a little bit. Anyone who wants to fill in later, may.
"But it does make you wonder, why is everyone afraid and what are they trying to hide?"
That was his response to you.

Ruling = sustained

248:20-249:2

Q. Did you receive that response?
A. Yes.
Q. And did you recognize that it was coming from a safety officer at
Page 249
the FDA?
A. Certainly.

249:7-249:10

Q. Did you share his sentiments?
A. I shared Dr. Graham's sentiments in this regard.

265:6-266:6

Q. Now, sir, I want to look at your notes, which relate to -- let me show you an exhibit marked Topol-22.
- - -

See next pg.

(Whereupon, Deposition Exhibit Topol-22, Handwritten notes, TOPOLE 0000469, was marked for identification.)

\- - -

BY MR. KLINE:

Q. Topol-22 appear to be handwritten notes. Are they in your handwriting, sir?

A. This is my handwriting.

Q. And when were these notes made?

A. These notes were made in October 2004, you know, shortly after the withdrawal, my op/ed, and at the time

Page 266

when I was putting together the New England Journal and talking to the producer at 60 Minutes.

Q. What do they represent in terms of what you have down on this paper?

D: 403/702/801/802

Π: Dr. Topol is extremely well qualified as a expert; not hearsay - state of mind; 803(1) - present sense impression not prejudicial

Ruling: Sustained as to 265:16-266:6; in part on other grounds

266:13-266:22

THE WITNESS: These are the salient points that I've reviewed in this deposition, the data safety monitoring board, the study 090, the Juni paper, the naproxen that was untenable, and then the suppression issues of what appeared to be deception and falsifying. All these things are enumerated here.

Same objections and responses as above

Prior Ruling: Sustained - partially on other grounds that do not apply here (i.e. court order barring testimony)

272:19-273:12

Q. "Marketing and sales." What did you mean there?

A. Well, the marketing and sales has been very much demonstrated in the Waxman report, the Congressional report of the cardiovascular card. This

Page 273

is where it was a card that was distributed by the sales team throughout the country, 3,000, I believe, sales reps for Merck that had a card that showed that there was somehow an eight to ten-fold protection of Vioxx compared to other non-steroidals.

So, this was quite extraordinary, these sorts of sales tactics that were going on by the specially-trained Merck sales reps.

Q. Well, assuming --

273:20-274:2

Q. Assuming that the drug was -- assuming what you said -- what you just told us was being said about the

cardioprotective effects, are you with me so far, that would not only be, I forget
Page 274
the word you used, extraordinary, that would just be plain false; correct?

274:4-274:7

THE WITNESS: If you look at the cardiovascular card, it's very clear that the data that are being presented are highly misleading.

see prior pg.

279:23-279:23

What was the VALOR study?

280:2-281:22

THE WITNESS: I only learned about that trial through the New York Times, but Bryan Myers, the reporter, called Dr. Bhatt, who actually had authored a protocol. That was the one, remember when Dr. Reicin and Dr. Demopoulos visited in April of 2001?
BY MR. KLINE:
Q. Yes.
A. And she said, well, why don't you send us a protocol?
Q. Yes.
A. So, I spoke to my colleague, Dr. Bhatt, and just a couple of weeks later, around the 2nd of May, we submitted a protocol, actually Dr. Bhatt did, to Dr. Reicin and Dr. Demopoulos.
That protocol was testing in patients with so-called acute coronary syndrome, unstable angina, or heart attack, who had abnormal inflammation blood protein markers to test a study of
Page 281
Vioxx versus placebo on top of the other normal medicines. So, that was a proposal. It was a mini proposal, but that was sent.
And then what we found out later was that there was a trial called VALOR reported in the New York Times, a 70-page protocol, had extensive network development, and somewhere along the line, the trial that we initially had proposed, apparently, didn't get very far, we never heard back about that, but that trial was, indeed, being planned by Merck, and at some point the plug was pulled, and that's what that New York Times article was about.
Q. You proposed to them to do a study in the people that were high risk patients who had cardiovascular disease who were susceptible. Do I have it

Δ obj = 403/702/801/802

Π = Same as above, Dr. Topol is well qualified as an expert in this area, can rely on hearsay; not hearsay, effect on the listener, relevant to show state of mind; Merck not interested in studying Vioxx in patients w/ CV risk

Ruling = Sustained, in part on other grounds that do not apply here

right?
A. Yes.

283:6-283:9

Q. But it wasn't done?
A. It wasn't done.
Q. And it should have been done?

283:12-283:15

Q. Should it have been done?
A. Any trial to establish the risk in patients with heart disease should have been done.

284:9-284:12

Now, was it an adequate substitute to look at CV events in studies to which the primary endpoint was something else?

284:14-285:6

THE WITNESS: It's more the population of patients. It's not about patients of population who had colon polyps with no heart disease. It's about the population of patients who have one of the most common diseases of American society, which is coronary disease, established coronary disease. That's where there was a gap, that's where 40
Page 285
to 50 percent of patients taking the drug of the 20 million estimated had never been studied as to what would happen, would they derive a benefit, or would they incur harm? Unknown.

292:1-292:20

You mentioned that you had done a study for Merck; correct?
A. With Merck, yes, the TARGET trial, yes.
Q. Yes.
And what drug was that, by the way?
A. That was a drug, the commercial name is known as Aggrastat, tirofiban.
Q. Were you actually paid by Merck?
A. No. I was not paid. I did do the trial.
Q. Was there funding provided to the institution here, the Cleveland

See prior pg.

Pl further responds: not hearsay calling for witness' personal knowledge based upon the fact that he is a well-respected, world-renowned cardiology expert

292:17 Clinic, by Merck?
292:18 A. There was funding to the
292:19 Cleveland Clinic and to the 60 sites that
292:20 participated in the trial, yes.

Total Length - 01:16:33

Topol 2 (Multi-clip)
329:10-330:6

Q. The VIGOR trial showed that Vioxx was an effective treatment for pain; correct?
A. The VIGOR trial showed there was no difference in pain relief between naproxen and Vioxx.
Q. That wasn't my question, Dr. Topol.
I asked you whether Vioxx was shown in the VIGOR trial to be an effective treatment for pain.
A. Effective compared with what, Mr. Goldman?
Q. Effective, period, sir.
A. No. You can't make --
Page 330
effective, you have to have a reference. Here the reference was naproxen. It was shown to be no more effective than naproxen. So then you could say it's equally effective to naproxen, then I would say yes, for pain relief.

334:14-334:23

Q. Let's talk about the cardiovascular results of VIGOR. Okay, Doctor?
We saw in the VIGOR trial that there were more cardiovascular events in the Vioxx group than in naproxen; correct?
A. That's correct. And I did review that this morning. I'll be happy to review it again if you'd like.

335:13-336:19

Q. Was the difference in cardiovascular events in the Vioxx group mostly due to a five times difference in heart attacks compared to the naproxen group?
A. Well, let me just be very clear about that. Okay? There were 22 deaths in the Vioxx group and 15 deaths, as I reviewed, in the naproxen group. There were 20 heart attacks versus -- in the Vioxx group versus 4. So, there was an excess of deaths. That was a 46
Page 336
percent excess of deaths, which is similar, if your number is right, with respect to the bleeding complications. If we're talking about percentages, 46 percent increase in death and 46 percent increase in bleeding complication, if that's correct. We have a five fold, 500 percent increase in heart attack. And

then we have also an increase in stroke, 11 versus 9.

So, according to the correct data, which was not published in the New England Journal paper by Bombardier in November 22, 2000, there was 53 of these events, death, heart attack or stroke versus 28. The largest portion of those in terms of numerical were heart attack, but there was a consistent excess across each, death, heart attack and stroke.

340:1-342:12

Q. Because there was no placebo group in the VIGOR study. If you only looked at the VIGOR study without looking at any other data, you wouldn't be able to tell the reason for the difference in heart attacks in the Vioxx group versus naproxen; is that right?

A. I'm not sure that I understand that question.

Q. If you just look at the VIGOR study --

A. Yes.

Q. -- at the time that it was done and you don't consider any data outside of the VIGOR study --

A. Yes.

Q. -- you don't know whether the difference in heart attacks between Vioxx and naproxen was due to Vioxx --

A. Oh, I see.

Q. -- naproxen or chance.

A. Now I understand your question. Okay. So, first --

Q. Is that right?

Page 341

A. Yes, you do know. That is, I reviewed this this morning, but just to recap. When you're doing clinical trials with an experimental drug, in this case, it's Vioxx, versus a drug that's been around for 20 years, in this case, naproxen, which is considered the control arm, not a placebo, but a control arm, and if you have an untoward event crop up like occurred in the VIGOR trial, one has to assume that it's the experimental drug excess that's the problem rather than what was introduced by Merck, which is substantiated in the Targum report and other places, which is that it was a protective effect of naproxen which was not documented. The only appropriate conclusion would have been that there was a problem with the experimental drug, which in this case was Vioxx.

Q. Is it your testimony, Dr. Topol, that when you reviewed the VIGOR study, it was your conclusion that Vioxx caused the difference in heart attacks