## Baumgartner S DA 9-30-05 on 5-25-06

| Scene | Designation | Source | Tx Duration | Elapsed | Remains | Barcode |
|---|---|---|---|---|---|---|
| 1 | **498:2 -501:12** | Baumgartner, Susan 2005-09-30 | 00:03:15 | 00:00:00 | 00:23:40 | V2.1 |

498: 2 Q: Okay, Ms. Baumgartner, you
498: 3 are on camera. I'm George Tsougarakis.
498: 4 I think everybody in the room would agree
498: 5 it is a good thing that I'm not on
498: 6 camera, but you should address your
498: 7 remarks to the camera. I represent Merck
498: 8 & Company, and I'm going to ask you a few
498: 9 questions.

Sidebar
401, 402
Prefatory comment

498: 10 Let's begin by introducing
498: 11 yourself to the jury. Can you tell the
498: 12 jury where you were born and raised?
498: 13 A: My name is Susan Lynn
498: 14 Baumgartner. I was born in DeLand,
498: 15 Florida and raised in Gainesville,
498: 16 Florida where I went to high school at
498: 17 would Buchholz High School.
498: 18 Spent a couple of years
498: 19 doing prepharmacy work at the University
498: 20 of Florida in Tampa, Florida, and then
498: 21 did five years of work to obtain my
498: 22 Doctor of Pharmacy degree and Master of
498: 23 Business Administration degree from the
498: 24 University of Florida in Gainesville.
499: 1 Q: Can you tell the jury what
499: 2 year you graduated with your joint degree
499: 3 in pharmacy and your M.B.A.?
499: 4 A: I graduated in 1996.
499: 5 Q: In 1996, did you become
499: 6 employed?
499: 7 A: I did. In August of 1996, I
499: 8 was employed by Merck & Company.

499: 9 Q: Can you tell the jury a
499: 10 little bit about -- firstly, why did you
499: 11 choose a career in pharmacy?
499: 12 A: The main reason I chose a
499: 13 career in pharmacy is that my father is a
499: 14 pharmacist, and I wanted to follow in his
499: 15 footsteps. I wanted to be involved in
499: 16 healthcare because I believe it's an
499: 17 important part of life, and I believe
499: 18 pharmacy is a very noble profession.

401, 402

Q: Can you tell the jury in 1996 when you graduated with your degree in pharmacy and your M.B.A., how is it that you became employed by Merck?

A: I was actually recruited by an individual within Merck who was aware of the dual Doctor of Pharmacy and Master of Business Administration degree program, and asked one of my teachers at the time about -- one of the faculty members there about the program. I talked with them, I had a number of different opportunities that I was exploring and did a lot of research about the company and talked with a lot of different individuals who had experiences with the company, and I felt it was a great opportunity.

Q: Can you tell the jury when you were researching what issues were important to you in choosing a career?

A: It was important to me that I was with a company that had ethics and values that were similar to my own. I had just finished training as a pharmacist, so, it was important that the company had good products that represented medical advances and breakthroughs. It was important to me how they communicated information about the products and the use of their products to produce good outcomes in patients. And their financial information was very good. Their opportunities in terms of career were good as well. And their reputation and scientific integrity and everything they stood for was also very strong.

Q: Can you tell the jury what you learned in your research about Merck's ethics in the scientific integrity?

401, 402, 403, 602 lack of foundation improper opinion and character testimony of Merck

| 2 | 501:20 -501:23 | Baumgartner, Susan 2005-09-30 | 00:00:14 | 00:03:15 | 00:20:25 | V2.2 |
|---|---|---|---|---|---|---|

A: I learned that Merck's mission from the very beginning was to

501: 22 help patients, and their ethics were very
501: 23 strong. They did the right thing.

3 **503:12 -508:18** Baumgartner, Susan 2005-09-30 00:05:06 00:03:29 00:20:11 V2.3

503: 12 THE WITNESS: The decisions
503: 13 that were made, I felt, were
503: 14 consistent with values, scientific
503: 15 integrity, presenting information
503: 16 to allow prescribers to make
503: 17 decisions, making decisions with a
503: 18 patient in mind. Those were all
503: 19 very important to me, and I felt
503: 20 Merck exemplified that.

401, 402, 403, 602 Same as above. improper opinion of merck character

503: 21 BY MR. TSOUGARAKIS:
503: 22 Q. How was your experience at
503: 23 Merck compared to the research you did
503: 24 before you joined Merck?
504: 1 A. My experience with Merck has
504: 2 been very positive, and it has exceeded
504: 3 the expectations that I had before I came
504: 4 in to the company.

401, 402, 403, 602 lack of foundation

504: 5 Q. When did you first get
504: 6 responsibility for Vioxx?
504: 7 A. I joined the market
504: 8 integration team for Vioxx in the middle
504: 9 of 1998.
504: 10 Q. How many years of experience
504: 11 did you have at Merck when you joined the
504: 12 marketing team for Vioxx?
504: 13 A. Just under two years --
504: 14 well, just under two years.
504: 15 Q. During the time you had
504: 16 responsibility for marketing of Vioxx,
504: 17 who was the most junior member of that
504: 18 team?
504: 19 A. I was.

leading

504: 20 Q. How many people reported to
504: 21 you, Ms. Baumgartner, when you were on
504: 22 the marketing team for Vioxx?
504: 23 A. No individuals reported to
504: 24 me.
505: 1 Q. Can you tell the jury what
505: 2 your responsibilities were for Vioxx
505: 3 while you were on the marketing team?
505: 4 A. My responsibilities included
505: 5 interacting with physicians, and the

majority of my time was spent in coordinating advisory board meetings and consultant meetings And by that I mean setting up the logistics of those programs, putting together agendas, inviting presenters or Merck scientists or external physicians and thought leaders to present information at those meetings, and inviting physicians to those meetings and facilitating the gathering of the information and the reporting of the data within Merck. Those meetings were primarily designed to understand the perspective of physicians, understand what they thought We had a product that we were marketing and communicating information about We wanted to understand how physicians were receiving it and what they thought of it, and so we brought groups together. And my role was around the things -- the activities that I mentioned in putting together those meetings.

Q. I want to be very clear as to your role

sidebar - object prefatory

Can you tell the ladies and gentlemen of the jury, when putting together those consultant meetings and advisory board meetings, what exactly it is that you did?

A. When organizing the meetings, I usually worked with a third-party company to help with some of the tasks, but my responsibilities included identifying the location for the meeting, extending invitations to attendees, and determining who was going to attend that meeting, putting together an agenda and working with others to decide what questions we had, what feedback we wanted, and, therefore, what presentations -- what presenters we needed to invite to present information about different topics I extended the invitation to those presenters and brought them in And the presenters put

together the content of the slides that were presented there, and the -- I helped with the logistics, the location and the organization of the day, and actual implementation of the meeting.
Q. Who is responsible for the presentation -- the decision of what scientific data to present and the presentation of that scientific data at those meetings?
A. Each of the presenters was responsible for the data, the scientific data and information that was presented during that meeting.
Q. Did you take the time to become intimately familiar with all the data that was presented at those meetings?
leading
A. No, I did not. The presenters were the ones responsible for content and who had access to those data and information.
Q. Now, can you tell the jury a little bit more about the consultants meetings and the advisory board meetings that you had responsibility for? What were the purposes of those meetings?
A. The purpose of those meetings were to conduct market research, and what that means is just understanding what those physicians thought about new scientific data, about the current market, about the use of pain medicines, about our product Vioxx. So, it was really a chance for us to get insight into what these doctors thought about and what these experts in their areas thought about the product and the data and the information that was out there.

4 **509:6 -515:3** Baumgartner, Susan 2005-09-30 00:06:02 00:08.35 00:15:05 V2.4

Q. Can you tell the ladies and gentlemen of the jury what the methods of communicating -- Merck had communicating the benefits and limitations of its products to the medical community?

A. I wouldn't consider consultants meetings or advisory board meetings a vehicle for communicating information. We did have to present information to get their responses and feedback, but there were many mechanisms, many vehicles for communication that were used to communicate with physicians, such as scientific sessions, publications, the sales representatives, the professional information requests that were physician to physician communications, educational programs. There were many vehicles that were used by Merck to communicate with the scientific community and the medical community.

Non-responsive

Q. Do you know how many doctors were potential prescribers of Vioxx during the time you had responsibility for marketing Vioxx?

A. I do not know.

Q. Did you invite all the doctors who were potential prescribers of Vioxx to your consultants meetings and advisory board meetings?

A. No. They were samples of the physicians. They were smaller groups of those physicians that represented the views of the universe. So, they were small groups of physicians that were assembled to understand their perspectives.

Q. Who did you invite to the consultant meetings or advisory board meetings?

A. Our advisory board group was a set group of about 15 individuals who met with us on a quarterly basis. So, they were a fixed group that met with us at regular times throughout the marketing of the product. The consultants meetings were more of a one-time activity where we identified a group of attendees and consulted with them on specific research questions and on specific things that we wanted feedback on.

Q We've heard the term 'thought leaders.' Can you tell the ladies and gentlemen of the jury what a thought leader is?

A A thought leader is someone who leads thought. It is a physician who is an expert in a specific area as determined by his or her peers. So, this is not Merck deciding that someone is a thought leader, but actually the medical community or scientific community determining that someone is an expert or has expertise or knowledge in a given area.

---

Q Did you invite thought leaders to participate on your advisory boards and consultants meetings?

A Yes. We included thought leaders in both of those meetings.

Q Were the participants that you invited to be on your advisory boards and to your consultants meetings, were they all supporters of Merck?

A No. It was important for us to get feedback from all of the individuals out there. We didn't just want individuals who were supportive of our views. We wanted to hear from those who were not supportive as well. So, we invited physicians who had a range of levels of support for the product and the company.

---

Q Did you invite to your consultants meetings and advisory boards physicians who were critical of Merck or Vioxx?

A The -- by the nature of the meetings, we did want feedback on the product, we did include physicians who were not supportive of the product and who were critical, but that was important because the purpose of the meeting was to understand their thoughts and views, and that to the extent that they didn't agree with the conclusions that the Merck scientists arrived at, we wanted to hear

non-responsive

why and understand their perspectives.
Q. Was scientific data presented at these advisory board meetings and consultant meetings?
A. Yes, it was.
Q. And what was the purpose of presenting data at these meetings?
A. The purpose was to present information that the physicians in attendance could respond to or react to and to serve as a basis for the discussion that we had and the questions that we wanted to ask them.
Q. Did you solicit feedback from the attending physicians on the data presented at these meetings?
A. Yes. That was a primary purpose of the meeting, to present scientific information and to have them respond, react, give us their thoughts, ask any questions, and also help us communicate that ultimately to others.
Q. And in your experience in soliciting feedback from the physicians who attended the consultant meetings and the advisory board meetings, did those groups of physicians reach unanimity on any issue that you presented?
A. I can't remember an instance where the physicians in attendance reached unanimity, and it's probably consistent with other forums for scientific discussion and debate. There were physicians who held different views, and that was the purpose of that meeting, to express that and to discuss and debate the different views on the product and on the information in general.
Q. During the time that you had -- what was the period that you had responsibility for the marketing of Vioxx?
A. I was actually on the marketing team from mid-1999 through the third quarter of 2001.

Vague + ambiguous
hearsay
801, 802

5 **516:4 -522:3** Baumgartner, Susan 2005-09-30 00:06:04 00:14:37 00:09:03 V2.5

BY MR. TSOUGARAKIS:

Q. And during the time you had responsibility for Vioxx, did you learn the results of the VIGOR study?

A. Yes, I did.

Q. Can you tell the ladies and gentlemen of the jury what you learned about the results of the VIGOR study?

A. The VIGOR study was designed to look at stomach problems for Vioxx compared to naproxen, and it was a landmark study of over 8,000 patients. And the results of that study were that Vioxx showed a lower number of stomach problems than naproxen.

Q. Were there also cardiovascular results of that VIGOR study?

A. Yes, there were.

Q. Can you tell the ladies and gentlemen of the jury what the cardiovascular results of the study were?

A. In that study, there was a five-fold difference in the rate of cardiovascular events between Vioxx and naproxen.

Q. Did Merck disclose the VIGOR data?

A. Yes.

Vague - what part of VIGOR data and where?

Q. Can you tell the jury how Merck disclosed the VIGOR data and what the timing of it was?

A. The VIGOR data was disclosed starting -- I'm not sure when the actual first disclosure took place, but after the results were received in March of 2000, Merck communicated that information through press release, through professional information requests that our representatives had available in the event there were questions about the product and that specific study. There were numerous scientific sessions starting in May of 2000. There was a big gastroenterology

602 assumes facts not in evidence.

meeting in May of 2000 at which Merck presented the scientific data in a scientific session. There were numerous other scientific sessions at which the data was discussed and throughout the rest of 2000 as well.
There were advisory board meetings and consultant meetings at which we communicated the information to obtain physicians' views and thoughts on those data. And there were publications, support for CME programs, there were communications with investigators, and, obviously, within the company there was communication as well.

Q: Based on your experience, do you have a view as to whether or not Merck's efforts to disclose the data were successful?
A: In my view, Merck's efforts were very successful. I think it was widely communicated, and I know in my research, physicians were aware of the study, aware of the results, and it was -- there were many, many different communication vehicles and multiple communication vehicles used in order to communicate that.

702, 703, 602
assumes facts not in evidence.
improper opinion testimony
speculation
vague as to "successful"

Q: Were you ever provided with an explanation of the results, the cardiovascular results of the VIGOR trial?
A: Yes.
Q: What was that explanation?
A: The explanation for the results of the VIGOR study was that naproxen was acting as a cardioprotective agent in the study due to its platelet effect. It was acting similar to aspirin.

Q: And who provided you that explanation or what group provided you with that explanation?
A: The Merck scientists arrived at that conclusion after reviewing the available data.

hearsay, 801, 802

Q: Was the VIGOR data ever the subject of any consultants meetings or advisory board meetings?

A: Definitely. We had many discussions with our advisors as well as at consultants meetings following the presentation of the information to get views on those data.

602
Answer facts not in evidence.

Q: Were the cardiovascular results of the VIGOR study presented to these groups of physicians?

A: Yes.

Q: What was the purpose to provide the cardiovascular results of the VIGOR study to these physicians at the consultants meetings and the advisory board meetings?

A: The purpose of presenting the information was to, as I mentioned, understand the thoughts of the physicians, understand their interpretation of the data in light of all the other data available for the coxibs and for Vioxx and the NSAIDs and for naproxen. So, the purpose was to present that information and also to see if external thought leaders, people outside of the company, experts and thought leaders in different specialties came to the same conclusion as the Merck scientists did, so, kind of a check for the interpretation that our own scientists had of those data.

Q: Did the Merck scientists who presented the data to these physicians present only data that supported Merck's conclusions?

leading, 801, 802

A: No. They presented all of the data in all of the possible -- or all of the discussions that were taking place in the medical community and debate that was taking place. They tried to frame all of that up in order to discuss and debate all of the different angles that were being taken outside of the company on the data.

521:21 Q. Did you solicit feedback
521:22 from these physicians as to their
521:23 reactions to the cardiovascular results
521:24 of the VIGOR study?
522:1 A: Yes.
522:2 Q: Can you tell the jury what
522:3 you learned in soliciting that feedback?

---

6 **522:8 -522:22** Baumgartner, Susan 2005-09-30 00:00:39 00:20:41 00:02:59 V2.6

522:8 A: The consensus from those
522:9 advisory board meetings and consultant
522:10 meetings were that the conclusion that
522:11 Merck reached, the Merck scientists
522:12 reached about naproxen being
522:13 cardioprotective and that being the
522:14 explanation for the results in VIGOR was
522:15 the explanation for that result in light
522:16 of the other data that was available on
522:17 the product
522:18 Q: Do you recall whether the
522:19 physicians were unanimous in believing
522:20 that the most plausible explanation was
522:21 that naproxen was acting
522:22 cardioprotectively?

hearsay, 801, 802 Assumes facts not in evidence

---

7 **523:5 -524:20** Baumgartner, Susan 2005-09-30 00:01:40 00:21:20 00:02:20 V2.7

523:5 A: I can't recall any meeting
523:6 where there was a unanimous view on the
523:7 data. There were a vast majority whose
523:8 conclusion was that naproxen was acting
523:9 as a cardioprotective agent in that
523:10 study. Naproxen was cardioprotective in
523:11 that study. And there were some who
523:12 could not arrive at a conclusion based on
523:13 the data that was available. And there
523:14 were some who felt that it could have
523:15 been caused by Vioxx.
523:16 MR. TSOUGARAKIS: Let me
523:17 show you what we'll mark as
523:18 Baumgartner Exhibit 1.
523:19 - - -
523:20 (Whereupon, Deposition
523:21 Exhibit Baumgartner-1, Market
523:22 research report, February 2001,
523:23 was marked for identification.)
523:24 - - -
524:1 BY MR. TSOUGARAKIS:

hearsay, 801, 802 Assumes facts not in evidence.

Q: I ask you to identify that, please.
A: This is a market research report from a national rheumatology consultants meeting that took place in February of 2001.
Q: If I can direct your attention to Page 6 of that report, and I would ask you to read the sentence under cardiovascular CV outcomes that begins with the word 'The consensus.' Can you read that into the record, please?
A: 'The consensus seemed to be that coxibs did not pose an increased risk for cardiovascular or cerebrovascular thromboembolic events.'

lack of foundation

Q: Is that consistent with your recollection at other meetings with consultants and advisory boards?

| 8 | **524:24 -525:16** | Baumgartner, Susan 2005-09-30 | 00:00:39 | 00:23:00 | 00:00:40 | V2.8 |
|---|---|---|---|---|---|---|

THE WITNESS: It was definitely consistent with what I saw in the many meetings that I attended.

hearsay 801, 802, 602 assumes facts not in evidence

BY MR. TSOUGARAKIS:
Q: Ms. Baumgartner, in your time at Merck, did you ever intimidate or threaten any physicians?
A: No, I did not.

speculation – depends upon receiver of communication

Q: In your time at Merck, did you ever improperly influence any physicians?
A: No, I did not.

speculation – depends upon receiver of communication

Q: During the time of your responsibility for Vioxx, did you believe that Vioxx could cause heart attacks?
A: No.

702, 703, lay opinion, improper expert opinion

Play Time for this Script: **00:23:40**

Baumgartner S DA 9-30-05 on 5-25-06

**Total time for all Scripts in this report: 00:23:40**

Printed: 5/25/2006 11:34:08AM

Page 14 of 14