**Issues Report [Susan Baumgartner]**

- **Merck's Counter Designations**

the tasks, but my responsibilities included identifying the location for the meeting, extending invitations to attendees, and determining who was going to attend that meeting, putting together an agenda and working with others to decide what questions we had, what feedback we wanted, and, therefore, what presentations -- what presenters we needed to invite to present information

page 507

about different topics. I extended the invitation to those presenters and brought them in. And the presenters put together the content of the slides that were presented there, and the -- I helped with the logistics, the location and the organization of the day, and actual implementation of the meeting.

Q. Who is responsible for the presentation -- the decision of what scientific data to present and the presentation of that scientific data at those meetings?

A. Each of the presenters was responsible for the data, the scientific data and information that was presented during that meeting.

Q. Did you take the time to become intimately familiar with all the data that was presented at those meetings?

A. No, I did not. The presenters were the ones responsible for content and who had access to those data

page 508

and information.

Q. Now, can you tell the jury a little bit more about the consultants meetings and the advisory board meetings that you had responsibility for? What were the purposes of those meetings?

A. The purpose of those meetings were to conduct market research, and what that means is just understanding what those physicians thought about new scientific data, about the current market, about the use of pain medicines, about our product Vioxx. So, it was really a chance for us to get insight into what these doctors thought about and what these experts in their areas thought about the product and the data and the information that was out there.

[Handwritten: see prior pg]

[Handwritten: overbroad, compound]

[Handwritten: Compound, overbroad, calls for narrative, speculation witness' response is non-responsive]

[509:6] - [515:3] 9/30/2005 Susan Baumgartner

page 509

Q. Can you tell the ladies and gentlemen of the jury what the methods of communicating -- Merck had communicating the benefits and limitations of its products to the medical community?

A. I wouldn't consider consultants meetings or advisory board meetings a vehicle for communicating information. We did have to present information to get their responses and feedback, but there were many mechanisms, many vehicles for communication that were

[Handwritten: Pl obj = Witness' response is non-responsive, overbroad, calls for narrative, 401/402 + 403- waste of time]

**Issues Report [Susan Baumgartner]**

- **Merck's Counter Designations**

see prior pg.

used to communicate with physicians, such as scientific sessions, publications, the sales representatives, the professional information requests that were physician to physician communications, educational programs. There were many vehicles that were used by Merck to communicate with

page 510

the scientific community and the medical community.

Π obj = speculation, foundation, relevance

Q. Do you know how many doctors were potential prescribers of Vioxx during the time you had responsibility for marketing Vioxx?

A. I do not know.

Q. Did you invite all the doctors who were potential prescribers of Vioxx to your consultants meetings and advisory board meetings?

A. No. They were samples of the physicians. They were smaller groups of those physicians that represented the views of the universe. So, they were small groups of physicians that were assembled to understand their perspectives.

Π obj = witness' response is non-responsive

Q. Who did you invite to the consultant meetings or advisory board meetings?

A. Our advisory board group was a set group of about 15 individuals who met with us on a quarterly basis. So,

page 511

they were a fixed group that met with us at regular times throughout the marketing of the product. The consultants meetings were more of a one-time activity where we identified a group of attendees and consulted with them on specific research questions and on specific things that we wanted feedback on.

Q. We've heard the term "thought leaders." Can you tell the ladies and gentlemen of the jury what a thought leader is?

A. A thought leader is someone who leads thought. It is a physician who is an expert in a specific area as determined by his or her peers. So, this is not Merck deciding that someone is a thought leader, but actually the medical community or scientific community determining that someone is an expert or has expertise or knowledge in a given area.

Q. Did you invite thought leaders to participate on your advisory

page 512

boards and consultants meetings?

A. Yes. We included thought leaders in both of those meetings.

overbroad, lack of foundation, calls for speculation, compound, witness non-responsive

Q. Were the participants that you invited to be on your advisory boards and to your consultants meetings, were they all supporters of Merck?

A. No. It was important for us to get feedback from all of the individuals out there. We didn't just want individuals who were supportive of our views. We wanted to hear from those

• **Merck's Counter Designations**

Cont'd from prior pg

who were not supportive as well. So, we invited physicians who had a range of levels of support for the product and the company.

Q. Did you invite to your consultants meetings and advisory boards physicians who were critical of Merck or Vioxx?

A. The -- by the nature of the meetings, we did want feedback on the product, we did include physicians who were not supportive of the product and

page 513

who were critical, but that was important because the purpose of the meeting was to understand their thoughts and views, and that to the extent that they didn't agree with the conclusions that the Merck scientists arrived at, we wanted to hear why and understand their perspectives.

Q. Was scientific data presented at these advisory board meetings and consultant meetings?

A. Yes, it was.

Q. And what was the purpose of presenting data at these meetings?

A. The purpose was to present information that the physicians in attendance could respond to or react to and to serve as a basis for the discussion that we had and the questions that we wanted to ask them.

Q. Did you solicit feedback from the attending physicians on the data presented at these meetings?

A. Yes. That was a primary purpose of the meeting, to present

page 514

scientific information and to have them respond, react, give us their thoughts, ask any questions, and also help us communicate that ultimately to others.

π obj: irrelevant, waste of time

Q. And in your experience in soliciting feedback from the physicians who attended the consultant meetings and the advisory board meetings, did those groups of physicians reach unanimity on any issue that you presented?

A. I can't remember an instance where the physicians in attendance reached unanimity, and it's probably consistent with other forums for scientific discussion and debate. There were physicians who held different views, and that was the purpose of that meeting, to express that and to discuss and debate the different views on the product and on the information in general.

Q. During the time that you had -- what was the period that you had responsibility for the marketing of Vioxx?

page 515

A. I was actually on the marketing team from mid-1999 through the third quarter of 2001.

**Issues Report [Susan Baumgartner]**

- **Merck's Counter Designations**

[516:4] - [522:3] 9/30/2005 Susan Baumgartner

page 516

BY MR. TSOUGARAKIS:
Q. And during the time you had responsibility for Vioxx, did you learn the results of the VIGOR study?
A. Yes, I did.
Q. Can you tell the ladies and gentlemen of the jury what you learned about the results of the VIGOR study?
A. The VIGOR study was designed to look at stomach problems for Vioxx compared to naproxen, and it was a landmark study of over 8,000 patients. And the results of that study were that Vioxx showed a lower number of stomach problems than naproxen.
Q. Were there also cardiovascular results of that VIGOR study?
A. Yes, there were.
Q. Can you tell the ladies and gentlemen of the jury what the

page 517

cardiovascular results of the study were?
A. In that study, there was a five-fold difference in the rate of cardiovascular events between Vioxx and naproxen.
Q. Did Merck disclose the VIGOR data?
A. Yes.
Q. Can you tell the jury how Merck disclosed the VIGOR data and what the timing of it was?
A. The VIGOR data was disclosed starting -- I'm not sure when the actual first disclosure took place, but after the results were received in March of 2000, Merck communicated that information through press release, through professional information requests that our representatives had available in the event there were questions about the product and that specific study.
There were numerous scientific sessions starting in May of 2000. There was a big gastroenterology

page 518

meeting in May of 2000 at which Merck presented the scientific data in a scientific session. There were numerous other scientific sessions at which the data was discussed and throughout the rest of 2000 as well.
There were advisory board meetings and consultant meetings at which we communicated the information to obtain physicians' views and thoughts on those data. And there were publications, support for CME programs, there were communications with investigators, and, obviously, within the company there was communication as well.
Q. Based on your experience, do you have a view as to whether or not Merck's efforts to disclose the data were successful?
A. In my view, Merck's efforts were very successful. I think it was

Π obj = asked & answered, cumulative [see Merck counter-designation @ p. 570:10, et seq.] overbroad, calls for narrative, lack of foundation, calls for expert testimony, misstates the evidence, hearsay

vague + ambiguous

Π obj. = calls for narrative, overbroad, compound

Π obj. = 401/402 - irrelevant, 403, calls for speculation, lacks foundation

- **Merck's Counter Designations**

see prior pg.

widely communicated, and I know in my research, physicians were aware of the study, aware of the results, and it

page 519

was -- there were many, many different communication vehicles and multiple communication vehicles used in order to communicate that.

Q. Were you ever provided with an explanation of the results, the cardiovascular results of the VIGOR trial?

A. Yes.

Π obj. = hearsay

Q. What was that explanation?

A. The explanation for the results of the VIGOR study was that naproxen was acting as a cardioprotective agent in the study due to its platelet effect. It was acting similar to aspirin.

Π obj = hearsay, speculation, witness' response is non-responsive

Q. And who provided you that explanation or what group provided you with that explanation?

A. The Merck scientists arrived at that conclusion after reviewing the available data.

Q. Was the VIGOR data ever the subject of any consultants meetings or

page 520

advisory board meetings?

A. Definitely. We had many discussions with our advisors as well as at consultants meetings following the presentation of the information to get views on those data.

Q. Were the cardiovascular results of the VIGOR study presented to these groups of physicians?

A. Yes.

Π obj = lack of foundation, speculation, witness testified in Merck Counter designation @ 507:9-17 that she was not responsible for the content of data presented @ the meetings

Q. What was the purpose to provide the cardiovascular results of the VIGOR study to these physicians at the consultants meetings and the advisory board meetings?

A. The purpose of presenting the information was to, as I mentioned, understand the thoughts of the physicians, understand their interpretation of the data in light of all the other data available for the coxibs and for Vioxx and the NSAIDs and for naproxen. So, the purpose was to present that information and also to see

page 521

if external thought leaders, people outside of the company, experts and thought leaders in different specialties came to the same conclusion as the Merck scientists did, so, kind of a check for the interpretation that our own scientists had of those data.

Π obj = hearsay

Q. Did the Merck scientists who presented the data to these physicians present only data that supported Merck's conclusions?

A. No. They presented all of the data in all of the possible -- or all of the discussions that were taking place in the medical community and debate that was taking place. They tried to frame

see prior pg.

- **Merck's Counter Designations**

all of that up in order to discuss and debate all of the different angles that were being taken outside of the company on the data.

Q. Did you solicit feedback from these physicians as to their reactions to the cardiovascular results of the VIGOR study?

page 522

A. Yes.

Q. Can you tell the jury what you learned in soliciting that feedback?

Π obj = hearsay speculation, foundation

[522:8] - [522:22] 9/30/2005 Susan Baumgartner

page 522

A. The consensus from those advisory board meetings and consultant meetings were that the conclusion that Merck reached, the Merck scientists reached about naproxen being cardioprotective and that being the explanation for the results in VIGOR was the explanation for that result in light of the other data that was available on the product.

Q. Do you recall whether the physicians were unanimous in believing that the most plausible explanation was that naproxen was acting cardioprotectively?

[523:5] - [524:20] 9/30/2005 Susan Baumgartner

also - witness' response is non-responsive

page 523

A. I can't recall any meeting where there was a unanimous view on the data. There were a vast majority whose conclusion was that naproxen was acting as a cardioprotective agent in that study. Naproxen was cardioprotective in that study. And there were some who could not arrive at a conclusion based on the data that was available. And there were some who felt that it could have been caused by Vioxx.

MR. TSOUGARAKIS: Let me show you what we'll mark as Baumgartner Exhibit 1.

\- - -

(Whereupon, Deposition Exhibit Baumgartner-1, Market research report, February 2001, was marked for identification.)

\- - -

page 524

BY MR. TSOUGARAKIS:

Q. I ask you to identify that, please.

A. This is a market research report from a national rheumatology consultants meeting that took place in February of 2001.

Π obj. = hearsay

Q. If I can direct your attention to Page 6 of that report, and I would ask you to read the sentence under cardiovascular CV outcomes that begins with the word "The consensus." Can you read that into the record, please?

A. "The consensus seemed to be

• **Merck's Counter Designations**

that coxibs did not pose an increased risk for cardiovascular or cerebrovascular thromboembolic events."
Q. Is that consistent with your recollection at other meetings with consultants and advisory boards?

Π obj = hearsay, speculation, foundation

[524:24] - [525:16] 9/30/2005 Susan Baumgartner

page 524
THE WITNESS: It was
page 525
definitely consistent with what I saw in the many meetings that I attended.
BY MR. TSOUGARAKIS:
Q. Ms. Baumgartner, in your time at Merck, did you ever intimidate or threaten any physicians?
A. No, I did not.
Q. In your time at Merck, did you ever improperly influence any physicians?
A. No, I did not.
Q. During the time of your responsibility for Vioxx, did you believe that Vioxx could cause heart attacks?
A. No.

Π obj = Cumulative, asked + answered, 401/402 - irrelevant, 403 - prejudicial 704 - opinion on ultimate issue