Baumgartner 2-25-05 (Multi-clip)

12:14-12:15

Q. State your full name for the record.
A. My name is Susan Lynn Baumgartner.

13:11-13:18

Q. Now, I take it today you're an employee for Merck; is that right?
A. Yes.
Q. And I want to focus probably in the time period from '99/2000/2001 for a lot of this deposition. You were an employee for Merck at that time; is that right?
A. Correct.

14:2-14:23

Q. Why don't you give us just a brief chronological history of your work background.
A. I started with Merck in the role of a cardiovascular consultant.
Q. What year was that?
A. In 1996.
Q. Then what did you do?
A. I went to our U.S. headquarters.
Q. That was in Philadelphia?
A. Correct. Outside of Philadelphia.
Q. Okay.
A. In May of 1997 and worked on a marketing team for our male pattern baldness product, Propecia.
In mid-1998 I joined the team for Vioxx and worked with our analgesic and anti-inflammatory product, Vioxx, and moved to the marketing team in May of 1999 where I worked on that team for about two-and-a-half years.
Q. I saw some documents where you were designated as marketing manager; is that right?
A. That's correct.

17:2-17:6

Q. I'm not going to go through your -- we're going to get your CV, but I just picked out your 19 or your 2001 year-end employment input form, and I guess we'll mark that as Exhibit Number 1 to this deposition.

19:20-20:14

Q. Now, the first paragraph in that document gives a description of the results of your work; is that right?
A. To which paragraph are you referring?
Q. Number I.
A. That outlines our brand goals. The

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order

year-end employee input form is the employee's opportunity to provide information about what they

D obj = 401-3, sales relevant in compensatory phase
Π response: sales info. relevant @ all phases & trial, goes to motive to sell Vioxx + conceal CV risks, credibility of the witness
Irvin II ruling: no prior ruling

achieve throughout the year. So, we have brand objectives, and we also have individual performance objectives that you see under number II.

Q. So, what is the first objective, brand objective, with regard to Vioxx listed under Paragraph Number I?

A. It was to "Achieve gross sales" -- actually, that was the result. Sorry. That was to "Achieve gross sales of $2.9 billion for Vioxx."

Q. Let's stop there. So, your number one job was to help achieve gross sales of 2.9 billion for Vioxx that year; correct?

See prior pg.

20:17-21:22

THE WITNESS: That was a result that was achieved by a number of individuals within Merck.

BY MR. ROBINSON:

Q. But that is listed as your first job duty; right?

A. The result of the work in 2001.

Q. For example, during the year, did you have a way to see how the sales were going on Vioxx

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order 21

during the year, say, 2001?

A. Yes.

Q. How did you do that?

A. We received performance data on sales.

Q. So, you knew, for example -- I don't know if you divide up 12 into 2.9 billion, but you'd know that you made 200 million or 400 million or whatever that month in sales?

A. That's correct.

Q. Were you given some sort of a bonus in working for Merck during this period?

A. Yes. Yes.

Q. How was the bonus calculated?

A. The bonus is calculated based on the company achieving certain objectives, our United States division achieving certain objectives, our marketing team achieving certain objectives, and my individual performance, which included specific objectives that were set at the beginning of the year and also factors such as leadership and compliance.

Same as above

22:5-22:19

A. (Witness nods.)

Q. Why don't you tell the jury what an advocate is.

A. An advocate is an individual who understands the information about our product, believes in that information and supports the use of the product in appropriate patients.

Q. So, an advocate is a doctor, right, a medical doctor?

A. A doctor or another healthcare professional.

Q. So, part of your job was to develop

advocates all over the country on behalf of Vioxx; right?
A. That's correct.

23:3-23:4

Q. But you'd give money to doctors who prescribe Vioxx; right?

23:7-23:10

THE WITNESS: There are a number of examples of providing physicians compensation; for example, for services provided, consulting services provided, which is part of my responsibility.

Δ obj = 401-3; argumentative
π response = proper cross examination, relevant to sales/promotional activities of Merck
Irvin II: no prior ruling

26:8-26:12

A. Yes.
Q. Let me ask another thing. Before the deposition, I take it you probably met with counsel. Is that right?
A. Yes.

28:11-28:15

Q. But you did meet with them for, what, three or four days, these lawyers?
A. More than that.
Q. How many days?
A. Eight or nine.

28:23-29:10

Q. Let's go to this Exhibit, Number 2. You were one of the authors of this memo; is that right?
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 29
A. Yes.
Q. The subject is "Advocate Development Opportunity: Physicians to Neutralize." Did I read that right?
A. Yes.
Q. This is dated July 1st, 1999; right?
A. Correct.
Q. So, you were then up and running as a marketing manager at that time?
A. Yes.

Δ obj = 401-3; not relevant b/c none of Barnett's doctors are identified in the document
π response = the fact Mr. Barnett's doctors aren't specifically listed in this document doesn't make it irrelevant; document + testimony highly relevant re: Merck's national integrated sales + marketing campaign that included "neutralizing" physicians
Irvin II: no prior ruling

29:11-29:12

Q. Let me do this. I've got an Exhibit Number 3 that I want to give you.

Same as above

29:23-29:25

Q. We just went to the Merriam-Webster Dictionary, and we have the definition for the word "neutralize." Do you see that there?

Δ obj. = irrelevant, prejudicial
π response = relevant to impeach witness
Irvin II: no prior ruling

30:1-30:6

MR. TSOUGARAKIS: Exhibit 3, do you want to identify what it is, Mr. Robinson.
MR. ROBINSON: Yes. It's from the Merriam-Webster Dictionary Online, and it's a definition or the definitions of the word "neutralize."

30:9-30:14

Q. I'd like to go down the list of definitions. Do you see where it says number 1: "To make chemically neutral." Now, that wasn't what you were doing when you said "neutralize" here; right?
A. Right.

30:15-30:22

Q. Number 2 said: "To counteract the activity or effect of: make ineffective <propaganda that is difficult to neutralize> b: Kill, destroy." Is that what you were doing here?
A. No.
Q. Well, let me ask you, were you trying to counteract the activity or effect of the doctors who were speaking out against Vioxx?

Same as above - Δ = irrelevant + prejudicial
Π response = relevant to credibility and impeachment of witness
Irvin II: no prior ruling

30:25-31:3

THE WITNESS: Definitely not. The

ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 31

use of the word "neutralize" in this relates to bringing those physicians to a more neutral or balanced position.

Δ = 401-3, irrelevant b/c none of Π's doctors were on these documents
Π = relevant to Merck's integrated, national sales + marketing campaign + credibility of witness
Irvin II: no prior ruling

31:16-31:22

Q. Let ask you this. Did you happen to -- I'm sure you read the article in the New York Times that just came out about three weeks ago about this neutralization?
A. Yes, I did.
Q. Let me see if I have a copy of it here.

See next pg.

32:13-33:1

Q. I'm going to just ask you some questions about it. I'm sure -- as you said, you read it, but I want to see if certain statements that are made are true.
I want to go to the second paragraph on Page 1 of Exhibit 4 where it says, "In 1999, the company's new pain drug, Vioxx, was beaten to pharmacy shelves by a competing drug, Celebrex." Is that a true statement?
A. Yes.
Q. Then it says, "Merck apparently hoped that nationally known rheumatologists like Dr. Roy Altman could help it catch up," I guess to

ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 33

Pharmacia; right?

33:3-33:18

THE WITNESS: I can't speculate. I think that's the author's statement.
BY MR. ROBINSON:
Q. Well, let me ask you. Is it true that you wanted to get rheumatologists like Dr. Roy Altman to support Vioxx as a product?
A. Yes.
Q. Then it says, "At a dinner that year in Miami, a Merck executive asked Dr. Altman what it would take to win his support." Did that happen?
A. I don't know.
Q. Well, who was the person that was confronting Dr. Altman in Miami?
A. I don't know.
Q. You don't know that?
A. No.

34:19-35:19

Q. Then it says, "Dr. Altman said he told the executive that he wanted to run a clinical trial involving Vioxx, and, later, Merck put up 25,000 for it." Is that true?
A. I don't know.
Q. You don't know that he got 25,000?
A. It's reported in here, but I don't

know. I don't have that experience.
Q. Well, when you went through these documents, did you see the spreadsheet that showed "Show me the money" right after Dr. Altman's name?
A. I did see that.
Q. Well, did you -- that was a Merck document; correct?
A. Correct.
Q. That was a document that was given to you; correct?
A. It was information that was provided to me that I summarized.
Q. And right next to Dr. Altman's name was "Show me" -- it said "Show me the money," right, on that document?
A. I think it was in a section of the document.
Q. It says "Show me the money."
A. It does.

36:1-36:3

Q. As far as you know, the money, the 25,000 went to this clinical trial that Dr. Altman wanted to run; correct?

36:5-36:22

THE WITNESS: I don't know that.
BY MR. ROBINSON:
Q. I want to skip down to -- it says,

Δ = 801/802, article is hearsay
π = not hearsay- effect on the listeners state & mind, adoptive admission, asking testifying witness about her personal knowledge

Irvin II ruling: no prior ruling

"Merck's dinner with Dr. Altman, internal company documents show, was a brief stop in a long-running campaign by Merck to enlist the support of doctors for Vioxx, or, at the least, to defuse their support for Celebrex - to 'neutralize' them as the documents put it." Did I read that right?
A. Yes.
Q. So, would you agree that's a true statement?
A. I'm not familiar with the dinner with Dr. Altman --
Q. Was the rest of it true?
A. -- but I am familiar with our efforts to gain support for Vioxx based on the provision of information.

See prior pg.

37:19-37:22

Q. Let me go to Exhibit Number 5. Is Exhibit Number 5 one of the documents that you reviewed over the last couple of months?
A. Yes.

39:12-39:16

Q. Do you see where it says, "Leo, As we discussed, attached is the list of 'problem' physicians that we must, at a minimum, neutralize." That's what you wrote; right?
A. Yes.

Δ obj = 401-3; "neutralize" issue irrelevant

Π response = relevant to show Merck's national integrated sales and marketing plan that included "neutralizing" doctors; impeachment of witness credibility

41:20-41:25

Q. Let me go to the next exhibit, which is number 6.
MR. ROBINSON: There you go. I'll give you this, 6.
(Handing over document.)
MR. TSOUGARAKIS: Thank you.

Irvin II ruling: no prior ruling

42:2-42:19

Q. Is this one of the exhibits that you reviewed before you came here today?
A. Yes.
Q. In this exhibit, once again, the subject is "Physicians to Neutralize," right?
A. Correct.
Q. And Leonardo Mendez is writing back to you, Susan Baumgartner, with this e-mail; right?
A. Right.
Q. He's saying, "Susan great Job!!! in formatting and gathering this information. Now that we have a formal document to circulate, I would recommend we remove the word 'problem' from the emails...(just in case...) we should use 'future opportunity,' etc." Did I read that right?
A. Yes.
Q. So, he was saying, this isn't smart to use the word "problem" in our e-mails; right?

Same as above

42:21-42:22

THE WITNESS: That's what he was suggesting in his communication to me.

44:3-44:11

Q. But he used the term "just in case." When you read this document, what did you take that to mean?
A. When I read it at the time, I don't remember.
Q. You didn't think that he was saying, even though these people are problems, that we don't want to put this in e-mails? Isn't that what he meant?

44:13-44:14

THE WITNESS: I don't know what he meant.

45:1-45:9

Q. Did you consider that that's what he meant, that we don't want to use words like "problem" because maybe some lawyer in a lawsuit might get a copy of it?
A. I don't know.
Q. Or was he concerned about the doctors themselves using the word "problem" when you're describing it?
A. I don't know what was meant.

46:13-47:6

Q. Maybe it would be better classified as a memo. Let me show it to you. We'll make it number 7.
MR. TSOUGARAKIS: Baumgartner-7. Thank you very much.
- - -
(Whereupon, Deposition Exhibit Baumgartner-7, Memo 1-23-01, "Academic Interactions," MRK-ABI0007170 - MRK-ABI0007173, was marked for identification.)
- - -
MR. TSOUGARAKIS: The Bates Numbers
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 47
are MRK-ABI0007170-173.
MR. ROBINSON: For the record, this was found in her file.
MR. FIBICH: In her custodial file?
MR. ROBINSON: In her custodial file, that's correct, Tom.

47:24-48:11

Q. You've seen this before; correct?
A. No, I have not.
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 48
Q. You have not seen this?

Same as above

Δ obj = 401-3 documents re Dr. Singh not relevant to Π & his doctors

Π response = use of document + testimony appropriate to impeach witness/credibility, also relevant to show Merck national, integrated strategy to attack + "neutralize" "unfavorable" doctors

Irvin II ruling: no prior ruling

Same as above

Same as above

Baumgartner 2-25-05

A. No.
Q. Let me ask you this. You prepared sort of a background history for Dr. Sherwood on Dr Singh; did you not?
A. Yes, I did.
Q. Who asked you to do that?
A. I don't remember.
Q. You don't remember who asked you to do a detailed analysis of Dr. Singh's background and give it to Dr. Sherwood?

48:14-49:5

THE WITNESS: It was a while ago. I don't want to guess.
BY MR. ROBINSON:
Q. Well, I mean -- strike that.
During the 1999 through 2001 period, did you have occasion to interact with Dr. Sherwood?
A. Yes.
Q. Did you interact with Dr. Anstice?
MR. TSOUGARAKIS: He's not a doctor.
BY MR. ROBINSON:
Q. Mr. Anstice, excuse me.
A. No. Not one on one.
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 49
Q. Well, you certainly were at meetings with him; right?
A. Yes.
Q. He was your superior; correct?
A. Yes.

49:22-50:2

Same as above

When you prepared that document on Dr. Singh, did you call Dr. Sherwood and tell him you were going to give it to him, or how did you get this to him?
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 50
A. I don't remember. I think it was a written document -- or it was a written document.

51:2-51:3

Q. Let me show you the next exhibit, Number 8. It's Bates Number AFI-0000026.

51:11-51:21

Q. This is part of your personal daily record; right?
A. Yes.
Q. So, this is in your handwriting?
A. It is.
Q. Now, I want to go down to about the fifth line there. Do you see where it says, "Rheumatological Consulting Meeting." It says, "David Anstice will attend. Action plan for David or Doug Greene to call." Did I read that right?
A. Yes.

52:14-52:19

Q. So, this document is dated February 7, right, of 2001?
A. Correct.
Q. Exhibit Number 7, the Sherwood letter, was dated January 23rd, 2001, just two weeks before; correct?

52:21-53:10

THE WITNESS: Yes.
BY MR. ROBINSON:
Q. The subject of Exhibit Number 7 is "Academic Interactions." Right?
A. Right.
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 53
Q. And let's just do this. Let's just go to Exhibit Number 8 for a second and look at the doctors that you reference here. Do you see the first line? Will you read into the record the doctors that you reference in that note?
A. McMillen, Singh, Whelton, Lee Simon, Stillman, Yocum, Lipsky.
Q. Do you see where it says "Compilation in one report"?
A. Yes.

53:23-54:1

Q. So, you've listed the same one, two, three, four, five, six, seven, eight, nine doctors that are mentioned in Exhibit Number 7 in Exhibit
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 54
Number 8; right?

54:4-54:5

THE WITNESS: I'm going to need a minute to read through this.

54:15-54:20

Q. Okay. We have to move on here. Basically, let's just go down the two exhibits. These were the problem doctors that Dr. Sherwood was talking about in Exhibit Number 7; right? McMillen, Singh, Whelton, Lee Simon, Stillman, Yocum, Lipsky, Petri and John Fries?

54:23-54:24

THE WITNESS: Could you please repeat the question.

55:1-55:3

Q. These were the problem doctors that you referred to, the same ones you've got in your memo; right?

Δ obj = 401-3 irrelevant since Π's doctors not involved

Π response = relevant to credibility / impeachment of witness -doesn't matter that Π's doctors not specifically mentioned, this relates to the witness' / Merck's national, integrated sales / marketing plans for Vioxx

Irvin II rulings: no prior ruling

56:16-57:6

A. It looks like they're similar to some of the ones in here.
Q. Let me ask you. Let's go through Exhibit Number 8. You have some interlineation up above these doctors. Will you read that into the record.
For example, above Dr. McMillen, it says something. What's it say?
A. It says "done this week."
Q. So, he was neutralized this week?
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 57
A. I don't remember what that refers to.
Q. Well, what does "done" mean? He wasn't cooked; was he?
A. I don't know.
Q. I mean, "done" meant neutralized; right?

57:8-58:6

THE WITNESS: I don't know what it meant. These were notes in my planner. I'm not sure what discussions I had around them.
BY MR. ROBINSON:
Q. What's the next -- what's the note above Dr. Singh?
A. "Done last summer, no reports."
Q. So, the analysis on him was done back then, no reports?
A. I don't know what that refers to.
Q. What's it say about Dr. Whelton?
A. "Done 2 weeks ago."
Q. What's it say about Dr. Simon?
A. "No reports."
Q. Dr. Stillman?
A. "No reports."
Q. Do you see in Exhibit Number 7 where in the third paragraph Dr. Sherwood says to Dr.
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order 58
Anstice, your superior: "During the past three years, as the COX-2 wars have been waged, there have been several instances in which I have heard repeated messages from the field and headquarters about problem individuals." Did I read that right?
A. Yes.

60:1-60:18

Q. Did you read the Fries -- before -- strike that.
In 2000, 2001, did you read the letter from Dr. Fries at Stanford?
A. No.
Q. Let me give you a copy of Dr. Fries's letter. Here it is as the next exhibit.
- - -
(Whereupon, Deposition Exhibit Baumgartner-9, Letter, 1-9-01, MRK-ABO0000250 - MRK-ABO0000253, was

See next pg.