```
                        Baumgartner 2-25-05
60:12                marked for identification.)
60:13
60:14           MR. ROBINSON: The Bates Number of
60:15    the Fries letter is MRK-AB0000250 through 253.
60:16           MR. TSOUGARAKIS: You said this is
60:17    Baumgartner Exhibit 9; is that right.
60:18           MR. ROBINSON: Right.

  61:15-63:2

61:15           MR. ROBINSON: Let me, first of all,
61:16    mark number 20 -- the next exhibit, which is number
61:17    10.
61:18           MR. TSOUGARAKIS: I thought maybe I
61:19    had passed out and missed 10 exhibits.
61:20           MR. ROBINSON: We had it marked 20.
61:21           MR. TSOUGARAKIS: This is number 10.
61:22    Thank you very much.
61:23                    -  -  -
61:24           (Whereupon, Deposition Exhibit
61:25           Baumgartner-10, Memo 10-4-00, "Gurkipal
61:ESQUIRE DEPOSITION SERVICES
62: Confidential - Subject to Protective Order   62
62: 1           Singh," MRK-ACX0005129 - MRK-ACX0005132,
62: 2           was marked for identification.)
62: 3                    -  -  -
62: 4    BY MR. ROBINSON:
62: 5      Q.     So, basically, number 10 is a
62: 6    document that you reviewed before you came here
62: 7    today; right?
62: 8      A.     Yes.
62: 9      Q.     This is a memo that you wrote to Dr.
62:10    Sherwood in October of 2000; right?
62:11      A.     Yes.
62:12      Q.     And you gave him sort of a chronology
62:13    regarding Dr. Singh; right?
62:14      A.     Correct.
62:15      Q.     Now, if we review the bidding, then
62:16    next in order, time-wise, would be the January 19
62:17    letter -- actually, there's a date on it, January
62:18    19, received by Raymond Gilmartin. Do you see this,
62:19    the Fries letter?
62:20      A.     Yes.
62:21      Q.     And then after that would have been
62:22    this Anstice memo of January 23rd, but there's a fax
62:23    date on it of 2/5, February 5th; right?
62:24      A.     Right.
62:25      Q.     Then the fourth document is Exhibit
62:ESQUIRE DEPOSITION SERVICES
63: Confidential - Subject to Protective Order   63
63: 1    8, your handwritten note, that lists these nine
63: 2    doctors; right?

  63:5-63:5

63: 5           THE WITNESS: Yes.

  63:7-63:24

63: 7      Q.     Now, just going back to the Fries
63: 8    memo, number 9, at Page 2 at the bottom, and then at
63: 9    Page 3 at the top, they list -- or Dr. Fries lists
63:10    Dr. Singh, Dr. Lipsky, Dr. Whelton, Dr. Petri, Dr.
```

Page 11

Handwritten annotations (right margin):

Δ Obj -
401, 402, 403, 801/802
Fries letter irrelevant + prejudicial

π response -
Fries letter is the subject of a motion in limine so admissibility of the document will be decided. π set forth full response re: use of this document in our Opp to MIL. However, π claims that the letter + testimony are highly relevant to Merck's national integrated policy of neutralizing doctors, ignoring risks of the drug. Further, this bears directly on notice to Merck of risks and their failure to warn.

Not hearsay because not offered for truth, but to show notice.

- hearsay exception as business record - 803(6)

T ruling - no prior ruling re: this testimony, but letter was excluded

Handwritten annotations (left margin):

π further response testimony unrelated to Fries letter

π further response testimony not related to Fries letter

```
                         Baumgartner 2-25-05
63:11    Yocum, Dr. Simon, Dr. McMillen and Dr. Stillman.  Am
63:12    I right?
63:13         A.       Yes.
63:14         Q.       And then, of course, he signs the
63:15    letter himself; right?
63:16         A.       Yes.
63:17         Q.       So, those same eight doctors plus Dr.
63:18    Fries are listed in your note of February 7; right?
63:19         A.       Yes.
63:20         Q.       And after that, it says "Compilation
63:21    in one report - all reports, NSC, tomorrow end of
63:22    day for initial 5 -- end of week for rest."  Did I
63:23    read that right?
63:24         A.       Yes.

   64:9-64:19

64: 9                  Did you hear about the Fries letter
64:10    when you wrote this interlineation on February 7,
64:11    2001?
64:12         A.       I don't remember what I knew at the
64:13    time, but this is the first time I've seen that
64:14    Fries letter.
64:15         Q.       Did someone tell you that Dr. Fries
64:16    listed Dr. McMillen, Dr. Singh, Dr. Whelton, Dr.
64:17    Simon, Dr. Stillman, Dr. Yocum, Dr. Lipsky and Dr.
64:18    Petri in his letter?
64:19         A.       I don't remember.

   65:4-66:1

65: 4         Q.       If we go to the Fries exhibit, which
65: 5    is Exhibit Number 9, and go to that paragraph that I
65: 6    referred to at the bottom of page 2, it says, "Even
65: 7    worse were the allegations of Merck damage control
65: 8    by intimidation, often with a pattern of going to
65: 9    the Dean or Department Head with complaints of
65:10    anti-Merck bias and always alleging unbalanced
65:11    anti-Vioxx presentations."  Did I read that right?
65:12         A.       Yes.
65:13         Q.       And then it says, "This has happened
65:14    to at least eight investigators:  Dr. Singh; Dr.
65:15    Peter Lipsky, now research chief at the Arthritis
65:16    Institute; Dr. Andrew Whelton of Hopkins; Dr.
65:17    Michelle Petri of Hopkins; Dr. David Yocum of
65:18    Tucson, currently head of the FDA advisory panel;
65:19    Dr. Lee Simon of Harvard; Dr. James McMillen; and
65:20    Dr. Thomas Stillman.  I suppose I was mildly
65:21    threatened myself, although I have never spoken or
65:22    written on these issues."  Did I read that right?
65:23         A.       Yes.
65:24         Q.       Now, you just happened to list those
65:25    nine people in your record of daily events
65:ESQUIRE DEPOSITION SERVICES
66:      Confidential - Subject to Protective Order     66
66: 1    approximately two weeks after Dr. Fries sent this

   66:6-66:11

66: 6                  THE WITNESS:  I don't remember why
66: 7    they were listed in my planner.  If I look at this
66: 8    today, it looks like I was running a report of any
66: 9    input coming in to our national service center,
                              Page 12
```

Handwritten annotations:
- "Same, see prior pg" (next to 63:11–63:24)
- "¶ further response - this testimony is about witness' personal knowledge of her own activities at Merck" (next to 65:24–66:11)

```
                        Baumgartner 2-25-05
66:10      which is our 800 line where we collect information,
66:11      but that's all I can get from that document.

   68:13-69:4

68:13            Q.      Well, your job was to either do it
68:14      yourself or have other people do research on what
68:15      went on with regard to Vioxx with regard to Dr.
68:16      McMillen, Dr. Singh, Dr. Whelton, Dr. Simon, et
68:17      cetera?
68:18            A.      My responsibility was to conduct
68:19      market research with these individuals, to talk with
68:20      them about their perspectives on the product, what
68:21      questions they had, what concerns they had.
68:22            Q.      Well, let me ask you this.  When you
68:23      say that you're going to -- "tomorrow," we'll have
68:24      "end of day for initial 5" and "end of week for the
68:25      rest," you weren't going to talk to them and
68:ESQUIRE DEPOSITION SERVICES
69: Confidential - Subject to Protective Order   69
69:  1     interface with them, you were actually digging
69:  2     information up on them; right?
69:  3           A.      I don't remember exactly what that
69:  4     refers to.

   121:11-121:15

121:11           Q.      Bates Number AFI0193472.  It's dated
121:12     January 29, 2001.  It's a memo from Michael T.
121:13     Phelan to Susan L. Baumgartner, copies going to
121:14     Messrs. Bazmi, Coppola and Miller.  The subject is
121:15     "Medical School Grant Application."

   124:2-125:6

124: 2           Q.      Tell me what this is about.
124: 3           A.      The e-mail exchange is around a
124: 4     proposed study of Vioxx that looks like was
124: 5     submitted to our medical school grant committee for
124: 6     consideration.
124: 7           Q.      Who was the proposed medical school?
124: 8           A.      It looks like the VA Medical Center
124: 9     in Albany.
124:10           Q.      Why was it coming to you?
124:11           A.      They were checking on the status of
124:12     it.  I sat on the medical school grant committee,
124:13     and they were trying to find out when it would be
124:14     reviewed.
124:15           Q.      Who was on the medical school grant
124:16     committee with you?
124:17           A.      Primarily the scientists from MRL and
124:18     CDP, our two groups of researchers within the
124:19     company.
124:20           Q.      In your e-mail on the front page at
124:21     the bottom, do you see where you say, "Sounds like
124:22     this is important from a business perspective
124:23     relative to the VA based on the brief background
124:24     that you provided.  We have supported many similar
124:25     studies, so it is not critical from either a
124:ESQUIRE DEPOSITION SERVICES
125: Confidential - Subject to Protective Order   125
125: 1     scientific or strategic perspective that we support
125: 2     it.  However, clearly there are business reasons
                            Page 13
```

Handwritten annotations:
- ↑ see prior pg
- Δ obj. = 401-3, irrelevant since these doctors didn't treat π
- π response = relevant to credibility/impeachment of witness, shows Merck's national integrated strategy of attacking doctors that might not support Vioxx
- Irwin II = no prior ruling
- Δ - No objection

```
                           Baumgartner 2-25-05
125: 3     that justify us providing funding.  I'll keep you
125: 4     posted.  Thank you."  Signed "Susan."  Did I read
125: 5     that right?
125: 6          A.     Yes.

   125:17-125:25

125:17          Q.     Well, let's see what you say.  You
125:18     said, "However, clearly there are business reasons
125:19     that justify us providing funding."  Did I read that
125:20     right?
125:21          A.     Correct.
125:22          Q.     Did you mean that when you wrote it?
125:23     Did you mean what it says when you wrote it?
125:24          A.     I think everything that I write I
125:25     mean.

   126:17-126:18

126:17          Q.     I'm just asking, were you looking at
126:18     it from the business perspective?

   126:22-126:23

126:22          Q.     Correct?
126:23          A.     Yes.

   132:18-132:21

132:18          Q.     Okay.  Let's see if I can find some
132:19     more work that will help you from a business
132:20     standpoint.  Let's go to the next exhibit, which is
132:21     going to be 14.

   133:5-134:3

133: 5          Q.     But this is a document that you got
133: 6     from Caroline Yarbrough; right?  The Bates was AFI,
133: 7     which is your Bates Number, 0043312.  Do you see
133: 8     that?
133: 9          A.     Yes.
133:10          Q.     Who is Caroline Yarbrough?
133:11          A.     She was my boss when I first started
133:12     with the marketing team.
133:13          Q.     Now, she asked you if you could
133:14     attend a meeting, right, regarding this HealthSouth
133:15     program?
133:16          A.     Let me read through very quickly.
133:17                 (Witness reviewing document.)
133:18          Q.     I want to get through this before we
133:19     break for lunch.
133:20                 So, just looking at this document, it
133:21     says, "Re:  HealthSouth programs."  Who is
133:22     HealthSouth?
133:23          A.     There is a reference in here to
133:24     HealthSouth being the "Nation's leading health care
133:25     provider of comprehensive outpatient surgery and
133: ESQUIRE DEPOSITION SERVICES
134: Confidential - Subject to Protective Order    134
134: 1     rehab."
134: 2          Q.     They're a nationwide outfit; right?
134: 3          A.     Uh-huh.

                            Page 14
```

Handwritten annotations:

Δ - No objection

Irwin II - No prior ruling
Δ - No objection

Irwin II - No prior ruling
Δ - objection 401, 402, 403 HealthSouth issues having nothing to do with mr. [Garrett?] or his doctors; lack of foundation, speculation

π response - Relevant to credibility; Merck's improper undue influence over doctors and paying money in exchange for prescriptions; violates Merck's own principles of conduct and pharmaceutical co. guidelines

Baumgartner 2-25-05

134:13-134:19

```
134:13          Q.        So, it says, "This is the group that
134:14   we partnered with," meaning HealthSouth, "they're
134:15   all over the US."  Did I read that right?
134:16          A.        Yes.
134:17          Q.        Then it says, "We're committing
134:18   $700,000 to them."  Right?
134:19          A.        Right.
```

*Same as above*

134:24-134:25

```
134:24          Q.        So, this could be a big business
134:25   connection, right, for you guys, HealthSouth?
```

135:3-135:20

```
135: 3                    THE WITNESS:  I'm not sure what she
135: 4   meant by that, but it's stated in here.
135: 5   BY MR. ROBINSON:
135: 6          Q.        Then it says, "They also have over
135: 7   6500 monitors in all patient rooms and waiting rooms
135: 8   and we will be running an arthritis segment and our
135: 9   commercial when it is available."  Did I read that
135:10   right?
135:11          A.        Yes.
135:12          Q.        So, you committed 700,000 to them,
135:13   and you're going to be running your commercial and
135:14   an arthritis segment in all of their patient rooms
135:15   and waiting rooms; right?
135:16          A.        That's how this reads.
135:17          Q.        Then it says, "In order to 'lock them
135:18   in,' we had to start paying them in May."  Did I
135:19   read that right?
135:20          A.        Yes.
```

137:6-137:21

```
137: 6          Q.        And so you thought this would be a
137: 7   great opportunity to give them $700,000, and then
137: 8   they would -- you'd lock in Vioxx; right?
137: 9          A.        As I mentioned, I'm not familiar with
137:10   this situation.  I'm not familiar with the
137:11   commitment of funding or what it supported.
137:12          Q.        When you saw the words "lock them
137:13   in," what are you talking about -- strike that.
137:14                    You got this memo, right, this
137:15   e-mail?
137:16          A.        Correct.
137:17          Q.        Back in 1999; right?
137:18          A.        Yes.
137:19          Q.        When it said, "However, in order to
137:20   'lock them in,' we had to start paying them in May,"
137:21   I mean, you're locking them in to sell Vioxx?
```

137:25-138:6

```
137:25          Q.        Right?
137:ESQUIRE DEPOSITION SERVICES
138: Confidential - Subject to Protective Order 138
138: 1          A.        I can't comment on what this refers
138: 2   to, what it means.
138: 3          Q.        Well, it means what
```

Page 15

```
                           Baumgartner 2-25-05
138: 4           A.      I just don't know.
138: 5           Q.      If the 700,000 was a kickback or
138: 6    rebate, that would be wrong, we know that?

     138:9-138:9

138: 9                   THE WITNESS:   Yes.

     156:3-156:11

156: 3           Q.      Let me show you another one, Exhibit
156: 4    19.  The Bates Number is AA00000073.  Is this the
156: 5    type of profit plan you would receive from time to
156: 6    time?  This one happens to be for 2001.
156: 7           A.      (Witness reviewing document.)
156: 8                   Yes.
156: 9           Q.      Would you receive this like once a
156:10    year?
156:11           A.      Yes.

     157:5-158:2

157: 5           Q.      You would from time to time get a
157: 6    projected profit plan; correct?
157: 7           A.      Yes.
157: 8           Q.      I'm going to take you to this
157: 9    exhibit.  Is this 19?
157:10                   MS. LUKEI:   Yes.
157:11    BY MR. ROBINSON:
157:12           Q.      If you can go to Bates Number, it's
157:13    MRK-AA0000085.  Do you see that?  Just look for 85,
157:14    the last two digits.
157:15           A.      (Witness complies.)
157:16           Q.      Do you see under "Objectives" they
157:17    have, "The 2001 Objectives for Vioxx are defined
157:18    into two major categories: market performance and
157:19    strategic objectives.  The Market Performance
157:20    Objectives are focused on sales and income, while
157:21    the Strategic Objectives address the identified Key
157:22    Issues."  And then they give the "Market Performance
157:23    Objectives."  Do you see that?
157:24           A.      Yes.
157:25           Q.      And then below that they give
157:ESQUIRE DEPOSITION SERVICES
158: Confidential - Subject to Protective Order 158
158: 1    "Strategic Objectives."  Do you see that?
158: 2           A.      Yes.

     161:6-162:7

161: 6           Q.      Could you turn to number 110, Bates
161: 7    Number 110 on that document, number 19?
161: 8           A.      (Witness complies.)
161: 9           Q.      Look at the last -- at the head -- at
161:10    the top of this document it says, "The financial
161:11    impact of the above-mentioned scenarios are
161:12    indicated below and in Template P attached.
161:13    Monitoring Strategic Assumptions and Sensitivity
161:14    Analysis."  Do you see that?
161:15           A.      Yes.
161:16           Q.      Did I read that right?
161:17           A.      Yes.
161:18           Q.      Now, go to the bottom.  Do you see
                            Page 16
```

[Handwritten annotations in right margin:]

Same as above

Irwin Δ - No prior ruling
Δ objection -
401, 402, 403 -
Profit plan not relevant and prejudicial - especially during compensatory phase

π response —
The profit plan ties in directly to witnesses performance review for year end where sales are #1 priority and not patient safety; further, establishes a pattern of neutralizing serious CV risk to increase sales; pattern of spreading misinformation to treating doctors and the public about CV risk; relevant to "motive" which is critical for compensatory phase for causes of action for fraud on medical community

```
                              Baumgartner 2-25-05
161:19     where it says "Vioxx" -- strike that.
161:20               They list assumptions, but the last
161:21     assumption is, for example, "Vioxx is unable to
161:22     neutralize safety/tolerability issues." And then on
161:23     the far right they put the "Revenue Impact" down.
161:24     Do you see what the revenue impact is to the right
161:25     there?
161:ESQUIRE DEPOSITION SERVICES
162: Confidential - Subject to Protective Order 162
162: 1          A.      Yes.
162: 2          Q.      What is that number?
162: 3          A.      437 million.
162: 4          Q.      So, at least somebody forecasted the
162: 5     effect of Merck's being unable to neutralize the
162: 6     safety and tolerability issues for Vioxx; right?
162: 7          A.      As stated in this document.

    167:10-167:13

167:10          Q.      Let's do this. Let's go to Exhibit
167:11     Number --
167:12               MR. TSOUGARAKIS: The next one is 20.
167:13               MR. ROBINSON: 20.

    167:22-168:16

167:22          Q.      The Bates Number on number 20 is
167:23     AFI0044662 through 665. This is an e-mail from you
167:24     to Bruce Freundlich; right? Who is Bruce
167:25     Freundlich?
167:ESQUIRE DEPOSITION SERVICES
168: Confidential - Subject to Protective Order 168
168: 1          A.      He's a region medical director with
168: 2     Merck.
168: 3          Q.      The subject was "Physicians to
168: 4     Neutralize." Right?
168: 5          A.      Yes.
168: 6          Q.      Under Dr. McMillen do you see down
168: 7     here about midway through, "met with" him -- "met
168: 8     with and fired a shot across the bow as Lou Sherwood
168: 9     would say - but he bashed Vioxx a few days later -
168:10     some docs have told us that he is so biased that he
168:11     has poor credibility and does not do a service to
168:12     Searle - maybe worse things could happen." Did I
168:13     read that right?
168:14          A.      Yes.
168:15          Q.      So, what was the "shot across the
168:16     bow" that Lou Sherwood would use?

    168:20-169:22

168:20          Q.      You dealt with Dr. Sherwood before;
168:21     right?
168:22          A.      I've never heard the term "shot
168:23     across the bow."
168:24          Q.      But you got this e-mail; right?
168:25          A.      Right.
168:ESQUIRE DEPOSITION SERVICES
169: Confidential - Subject to Protective Order 169
169: 1          Q.      Did you ask Mr. Freundlich what he
169: 2     meant by that?
169: 3          A.      No. I don't remember doing that at
169: 4     the time.
```

Handwritten annotations (right margin):

- Same as above (bracketing 161:19–162:7)
- Ins II -
- No prior ruling
- △ objection -
- 401, 402, 403 -
- testimony on the neutralize issue is irrelevant here
- π response -
- relevant to pattern of neutralizing physicians critical of Vioxx; thereby downplaying significance of cv risk; also, credibility since Merck denies "intimidating" physicians with a negative view of Vioxx.

```
                          Baumgartner 2-25-05
169: 5      Q.     Let's look down below.  Your e-mail
169: 6   to him says -- actually, to him and others says, "I
169: 7   thought you should be aware of our most challenging
169: 8   (and also some of the most vocal and influential)
169: 9   national and regional physicians for Vioxx.  The
169:10   attached document lists 36 physicians who the
169:11   National HSAs and A&A Specialty Representatives have
169:12   identified as being:
169:13          "1) Important from a business
169:14   perspective in terms of influence and/or
169:15   prescribing, and
169:16          "2) Not as supportive of Merck and/or
169:17   Vioxx as we would like."
169:18          Did I read that right?
169:19      A.     Yes.
169:20      Q.     So, the first group includes people
169:21   that were actually influential, but also people who
169:22   were potential prescribers of Vioxx; right?

   169:24-170:15

169:24                    THE WITNESS:  It could be either/or
169:25   or both.
169:ESQUIRE DEPOSITION SERVICES
170: Confidential - Subject to Protective Order 170
170: 1   BY MR. ROBINSON:
170: 2      Q.     So, you were looking at these 36
170: 3   physicians as possible people who could be
170: 4   prescribing Vioxx?
170: 5      A.     They were either using pain medicine
170: 6   or they were influencing.  Based on their reputation
170: 7   or their knowledge or their position, they were
170: 8   communicating information about pain medicine to
170: 9   others.
170:10      Q.     Let's go on here.  It says number 2,
170:11   "Not as supportive of Merck and/or Vioxx as we would
170:12   like."  So, this list, and we'll go to the list, but
170:13   these 36 included people that weren't supportive of
170:14   Vioxx; right?
170:15      A.     Correct.

   171:14-172:5

171:14      Q.     This is Exhibit 21.  It's AFI0044563.
171:15   It's an e-mail at the top from Susan Baumgartner to
171:16   Sherrin Johnson, another e-mail from Susan to
171:17   Carolyn Yarbrough, one back from Carolyn to Susan.
171:18   It's dated 7/23/99.
171:19          Your first e-mail at the top says,
171:20   "As you move forward with the clinical development
171:21   program for MK-0663, please consider including the
171:22   following physicians as investigators for your
171:23   clinical trials.  These 'physicians to neutralize'
171:24   are important from an A&A business perspective in
171:25   terms of influence and/or prescribing and have not
171:ESQUIRE DEPOSITION SERVICES
172: Confidential - Subject to Protective Order 172
172: 1   been as supportive of Merck and/or Vioxx as we would
172: 2   like.  I will also send you a complete list of the
172: 3   'physicians to neutralize' to give you some
172: 4   background on each of them."  Did I read that right?
172: 5      A.     Yes.
```

Handwritten annotations:
- Same as usual
- Irwin II - No prior ruling
  A - 401, 402, 403 testimony on the neutralize issue is irrelevant
  π response - relevant to pattern of neutralizing critics of Vioxx

Baumgartner 2-25-05

178:3-178:6

```
178: 3           Q.      Let's go back to this.  Your specific
178: 4      job duties in number 1, I'm going to take you
178: 5      through it, "Achieve gross sales of 2.9 billion for
178: 6      Vioxx."  Is the word "pain" in there?
```

178:8-179:5

```
178: 8                   THE WITNESS:  No.
178: 9      BY MR. ROBINSON:
178:10           Q.      Is the word "sales" in there?
178:11           A.      Yes.
178:12           Q.      Is there a dollar sign in there?  In
178:13      that one?
178:14           A.      Yes.
178:15           Q.      Next one, "Achieve controllable
178:16      income of 2.2 billion for Vioxx."  Is the word
178:17      "pain" in there?
178:18           A.      No.
178:19           Q.      Is the word "income" in there?
178:20           A.      Yes.
178:21           Q.      Is there a dollar sign in there with
178:22      a "billion" after it?
178:23           A.      Yes.
178:24           Q.      Next one.  "Achieve monthly NRx exit
178:25      share," I guess those are prescriptions, "exit share
178:ESQUIRE DEPOSITION SERVICES
179: Confidential - Subject to Protective Order 179
179: 1      of 22% in the A&A market."  Is the word "pain" in
179: 2      there?
179: 3           A.      No.
179: 4           Q.      Is a share of the prescriptions in
179: 5      that A&A market in there?
```

179:8-179:24

```
179: 8                   THE WITNESS:  What was the question?
179: 9      BY MR. ROBINSON:
179:10           Q.      What is the "22% of the prescriptions
179:11      in the A&A market"?  What does that refer to?
179:12           A.      It refers to the new prescriptions in
179:13      the analgesic and anti-inflammatory market.
179:14           Q.      Next one:  "Achieve monthly new
179:15      prescription exit share of 54% in the coxib market."
179:16      Did I read that right?
179:17           A.      Yes.
179:18           Q.      What does that 54 percent refer to?
179:19      What's the difference between the 22 percent and the
179:20      54 percent?
179:21           A.      The 22 percent is the market share in
179:22      the NSAID, the nonselective NSAID and coxib market,
179:23      and the 54 percent is the market share in the coxib
179:24      market.
```

180:9-181:12

```
180: 9           Q.      Here's Exhibit 22, Bates Number
180:10      ABI0007205.  It's a memo to Sandra Reiss and Susan
180:11      Baumgartner from Richard Parfrey and Su Iwicki dated
180:12      2/9/2001.  Is that correct, that date?
180:13           A.      Yes.
180:14           Q.      The subject of this document is
```

Page 19

---

Handwritten margin notes:

Irwin II –
No prior ruling
∆ objection –
401, 402, 403
focusing on amount
of Vioxx sales
irrelevant and
unfairly prejudicial,
especially in compensatory
phase

¶ response –
Relevant to witness
credibility since she
claims [illeg] safety
comes first of
Merck yet #1
goal is sales and
increasing income.
Clearly the sales
objectives were the
primary motivator
for Merck and
not patient safety
and reducing patient
pain as claimed

Irwin II –
No prior ruling
∆ objection –
401, 402, 403 –
This letter is irrelevant
and prejudicial

```
                              Baumgartner 2-25-05
180:15      "Competitive Feedback for Vioxx."  Correct?
180:16          A.      Yes.
180:17          Q.      Just to put this in sequence with
180:18   some of the other documents and what's going on,
180:19   2/9/2001 was a day after the FDA Advisory Committee
180:20   met; right?  They met on February 8th, 2001?
180:21          A.      I --
180:22          Q.      We know that from your -- you don't
180:23   know that from your calendar?
180:24          A.      It's been a while since that time.
180:25          Q.      Okay.  Okay.  Well, we know it was
180:ESQUIRE DEPOSITION SERVICES
181: Confidential - Subject to Protective Order 181
181: 1   about -- it was two days after you put that
181: 2   information in Exhibit Number 8, was it?  Do we have
181: 3   Number 8?  That's your -- so, this document,
181: 4   exhibit -- what's this?
181: 5                  MS. LUKEI:  22.
181: 6   BY MR. ROBINSON:
181: 7          Q.      Exhibit 22 is dated two days after
181: 8   Exhibit Number 8.  Do you see Number 8 there?
181: 9          A.      (Witness nods.)
181:10          Q.      Now, Exhibit Number 8 was that memo
181:11   where you're listing the same doctors as Dr. Fries
181:12   mentioned in his letter to Gilmartin; correct?

    181:16-182:16

181:16          Q.      Remember we went through all of that
181:17   this morning.  Is that true?
181:18          A.      Those are the same physicians that
181:19   were listed in the document that you showed me.
181:20          Q.      Thank you.
181:21                  Now, let's go to Exhibit 22, its
181:22   subject:  "Competitive Feedback for Vioxx
181:23   (rofecoxib)."  Is this part of the response that you
181:24   talked about from the National Service Center this
181:25   morning that you got two days later?
181:ESQUIRE DEPOSITION SERVICES
182: Confidential - Subject to Protective Order 182
182: 1          A.      It's a report from the National
182: 2   Service Center.
182: 3          Q.      Let's go to page 2 and see if any of
182: 4   the doctors on Exhibit Number 8 are mentioned.  Do
182: 5   you see it says "Attachment I.  Competitive Feedback
182: 6   for Vioxx associated with promotional programs and
182: 7   the requested associated speakers.
182: 8                  "MSNC Contacts Regarding:"  Dr.
182: 9   Fries, Dr. Lipsky, James McMillen, Dr. Petri, Dr.
182:10   Simon, Dr. Singh, Dr. Stillman, Dr. Whelton, Dr.
182:11   Yocum.  That's all nine of them; right?  That's the
182:12   same nine that you have in Exhibit Number 8; right?
182:13          A.      Yes.
182:14          Q.      That's the same nine that Dr. Fries
182:15   mentioned being intimidated in his letter to
182:16   Gilmartin; correct?

    182:19-182:19

182:19          Q.      That we covered this morning?

    182:23-182:25
```

Handwritten margin note:

> Pl response —
> First, Dr. Fries has now been deposed and so letter admissible. Second, again this shows a pattern of retaliation wh[enever] and intimidation of critics all of which Merck denies — so also relevant to credibility.