Baumgartner 2-25-05

```
182:23        Q.       Right?
182:24        A.       Those are the same physicians that
182:25   are mentioned in the letter from Dr. Fries.
```

184:5-184:22

```
184: 5        Q.       Well, I mean, is this feedback on
184: 6   doctors that are hostile to Vioxx or hostile to
184: 7   Merck in some way, competitive for Merck?
184: 8        A.       I'm not sure how they categorize
184: 9   information, but our National Service Center
184:10   receives reports coming in to the company on all
184:11   physicians and all speakers and presentations and
184:12   experiences that representatives and others have
184:13   with regard to our products.
184:14        Q.       Do you know if your department
184:15   apologized to these nine doctors that were mentioned
184:16   in the Fries letter to say, hey, look, we're sorry
184:17   for our part in, you know, getting you in trouble
184:18   with your superiors at your universities or losing
184:19   the honorarium or whatever it was you've lost, et
184:20   cetera?  Do you know if there's any letters going
184:21   out from your department apologizing to these
184:22   doctors?
```

184:24-185:1

```
184:24                THE WITNESS:  I was not aware of any
184:25   wrongdoing or any need for an apology to these
184:ESQUIRE DEPOSITION SERVICES
185: Confidential - Subject to Protective Order 185
185: 1   individuals.
```

198:14-198:14

```
198:14        Q.       Now, let's go to the next exhibit.
```

199:22-199:23

```
199:22        Q.       Let's go.  Here's Exhibit 25 that I
199:23   previously referenced.
```

202:7-203:16

```
202: 7        Q.       Why don't you do this.  Why don't you
202: 8   look at the attachment and see if it appears
202: 9   consistent with the mentioned attachment in the
202:10   front page of this exhibit?
202:11        A.       Can you clarify what you --
202:12        Q.       Yes.  In other words, just see if
202:13   this appears to be what you remember as the
202:14   attachment you sent when you sent this exhibit to
202:15   Sherrin Johnson in July of '99 where you say, here
202:16   is "the complete list of 36 physicians to neutralize
202:17   with background information and recommended tactics.
202:18   You will notice that some have already been
202:19   neutralized.  The physicians listed in my previous
202:20   e-mail represent a subset of these physicians who we
202:21   would like to get involved in Merck clinical
202:22   research.  Please let me know if you need any
202:23   additional information.  I thought you should be
202:24   aware of our most challenging (and also most vocal)
202:25   national and regional physicians."  Signed "Susan."
                          Page 21
```

Handwritten annotations:

*same as above.*

*Irvin II - No prior ruling.*
*Δ - No objection*

*Irvin II - No prior ruling*
*Δ - 401, 402, 403 testimony on the neutralize issue irrelevant*
*TT response - [struck through: portion of] relevant to show pattern of neutralizing critics and improperly influencing physicians through payment of money.*

Baumgartner 2-25-05

*Same*
*as*
*email*

202:ESQUIRE DEPOSITION SERVICES
203: Confidential – Subject to Protective Order 203
203: 1    Did I read that right?
203: 2          A.        I wasn't paying attention.
203: 3          Q.        Pardon me.
203: 4          A.        I wasn't listening.
203: 5          Q.        Okay.
203: 6                    Why don't you take a look at the
203: 7    attachment and see if it appears to be the
203: 8    attachment that you mentioned.
203: 9          A.        (Witness reviewing document.)
203:10          Q.        For the record, the attachment is
203:11    AFI0201416.
203:12          A.        (Witness reviewing document.)
203:13                    I can't remember whether this
203:14    document was the attachment that was on this e-mail.
203:15          Q.        Was it the type of attachment you're
203:16    are referring to?

    203:19-203:22

203:19                    THE WITNESS:  It contains similar
203:20    information to what's referenced in the e-mail
203:21    cover, but I don't know if that's the attachment
203:22    that was included with this.

    205:7-206:1

205: 7          Q.        Yes.  And they say right here in your
205: 8    memo, your cover memo, you say, "You will notice
205: 9    that some have already been neutralized."  So, the
205:10    bottom line is, there's 36 boxes.  Would you agree
205:11    if you put Jane and Pat Box together, you get 36
205:12    doctors?  If you put those two as one, the way it's
205:13    been boxed up here.
205:14          A.        (Witness nods.)
205:15          Q.        Correct?
205:16          A.        If you count them as one individual?
205:17          Q.        Yes.
205:18          A.        Then there would be 36.
205:19          Q.        Also, some of them, like you say,
205:20    have already been neutralized.  In fact, you've got,
205:21    for example, Steven Berney is said to be
205:22    neutralized.  Right?  And all the way through it
205:23    there are some people like Condemi you say is
205:24    neutralized.  Right?
205:25          A.        That's what's included in this
205:ESQUIRE DEPOSITION SERVICES
206: Confidential – Subject to Protective Order 206
206: 1    document.

    206:23-207:2

206:23          Q.        Let me ask it this way.  Does this
206:24    appear to be, first of all, work product done by
206:25    your department at Merck, "this" being the
206:ESQUIRE DEPOSITION SERVICES
207: Confidential – Subject to Protective Order 207
207: 1    attachment?
207: 2          A.        It looks like a list that I compiled.

    207:9-207:12

Page 22

Baumgartner 2-25-05

```
207: 9          Q.        So, whether it's the 36 that were
207:10    attached to this memo of July 23rd or not, you did
207:11    compile a list that appears like this list; correct?
207:12          A.        Yes.
```

208:12-209:15

```
208:12          Q.        Going through, the first name on
208:13    there is Roy Altman.
208:14          A.        Yes.
208:15          Q.        Do you see that?  He's the one from
208:16    Miami, Florida that was mentioned in the New York
208:17    Times article that we talked about earlier this
208:18    morning; correct?
208:19          A.        Yes.
208:20          Q.        Then if you go to the third page of
208:21    this document which is AFI0201418, it says "Roy
208:22    Altman."  And then under the category called
208:23    "Recommendations (in addition to continued focus by
208:24    the specialists and HSAs)," would you read into the
208:25    record what it says in the box next to Roy Altman
208:ESQUIRE DEPOSITION SERVICES
209: Confidential - Subject to Protective Order 209
209:  1    including quotes?
209:  2          A.        It says "'Show me the money.' -
209:  3    clinical trials
209:  4                    "- funding greater than $50,000,
209:  5    Rheum Fellowship Program.
209:  6                    "- Task Force to continue to work
209:  7    with him.
209:  8                    "- Task force in place - Dr. Bruce
209:  9    Freundlich SBD (J.G.) RMD K.  Edwards, M. Halpin &
209:10    local reps."
209:11          Q.        When that "Show me the money" is in
209:12    quotes, is that something that was attributed to Dr.
209:13    Altman, or is that something that your
209:14    representative as part of the task force that
209:15    interviewed him made up?
```

209:17-209:20

```
209:17                    THE WITNESS:  I don't know.  In
209:18    compiling this information, I cut and paste
209:19    information provided in e-mails from our sales team
209:20    and our health science associates.
```

210:11-210:19

```
210:11          Q.        It says "Show me the money" and then
210:12    there's a "- clinical trials."  What does that refer
210:13    to?
210:14          A.        I don't know.
210:15          Q.        I mean, this is your document.  I'm
210:16    asking what you meant when you put that down.
210:17          A.        I have nothing further to add to what
210:18    I previously communicated about how the information
210:19    was collected.
```

213:20-214:16

```
213:20          Q.        Then under Jane and Pat Box, it says,
213:21    "Continue to support with clinical studies.  Visit
213:22    by Dr. Greg Geba, CDP."  Do you know Greg Geba?
                              Page 23
```

Same as above

Also, "show me the money" shows that Merck was willing to participate in the payment of money for a grant to Dr. Altman to keep him favorable to Vioxx. This is improperly influencing a physician prescribing habits. Merck admitted it would be improper to influence a physician with money and so also goes to credibility when Merck denies this.

Baumgartner 2-25-05

```
213:23        A.      Yes.
213:24        Q.      How do you know him?
213:25        A.      I worked with him throughout my
213:ESQUIRE DEPOSITION SERVICES
214: Confidential - Subject to Protective Order 214
214: 1   career.  He's a researcher in our clinical
214: 2   development department.
214: 3        Q.      Then it says "If continue to
214: 4   support," the Boxes, they "will be neutralized."
214: 5   Right?  That's what it appears to say.
214: 6        A.      That's what it says.
214: 7        Q.      What does that mean "If continue to
214: 8   support" -- oh, with clinical studies?
214: 9        A.      Again, this is information that I cut
214:10   and paste provided by others.
214:11        Q.      Okay.  But I mean, if you had to tell
214:12   someone that was superior to you at your company
214:13   what you meant by "If continue to support, will be
214:14   neutralized," would that mean that if you continued
214:15   to support with clinical studies, they'll be
214:16   neutralized?

  214:20-214:23

214:20        Q.      Correct?
214:21        A.      I would inform my superior that I did
214:22   not write this statement and that I'm not sure what
214:23   was meant by it.

  218:16-219:4

218:16        Q.      Let's go to William Dillin and go to
218:17   "Recommendations."  That's 1424, Bates Number 1424.
218:18   Do you see that one?  Will you read into the record
218:19   the recommendations for William Dillin?
218:20        A.      "Weekend Consultants' Meeting in an
218:21   elegant location (New York, Hawaii) or a five-day
218:22   International Meeting with the top thought leaders
218:23   on pain management.  Visit from L. Mendez or M.
218:24   Thomas to open door.  Would prefer to stay with
218:25   Specialty Senior Management."
218:ESQUIRE DEPOSITION SERVICES
219: Confidential - Subject to Protective Order 219
219: 1        Q.      Was it your practice at Merck to set
219: 2   up weekend consultant meetings in Hawaii or elegant
219: 3   places in order to convince the doctor to be
219: 4   neutral?

  219:7-219:10

219: 7                THE WITNESS:  I'm not familiar with
219: 8   any meeting in Hawaii, and the purpose of our
219: 9   consultants meetings was to conduct market research
219:10   with physicians.

  221:17-221:24

221:17        Q.      Does it meet Merck's corporate
221:18   standards regarding ethics to set up a consultant
221:19   meeting in Hawaii or in some international place to
221:20   induce or entice a doctor to change his position on
221:21   Vioxx from anti-Vioxx to neutral?
221:22        A.      It's not consistent with the
```

Page 24

Same as above.

Irvin II -
No prior ruling
A objection
401, 402, 403
weekend consultant's
meeting has nothing
to do with this
case.

TJ response -
This shows that
merck made any
and all efforts
to maintain favorable
relationships with
physicians including
elegant weekend
getaways. Again,
goes to credibility
given merck's
denial of
improper influence.

Baumgartner 2-25-05

221:23   purpose of those types of meetings, so, it does not
221:24   meet our standards.

225:14-225:20

225:14        Q.       Now, under James McMillen, under his
225:15   name it says "Discredit."  Right?
225:16        A.       Yes.
225:17        Q.       And then under the recommendation,
225:18   the recommendation says, "Strong recommendation to
225:19   discredit him."  Is that what it says?
225:20        A.       Yes.

226:7-226:9

226: 7                 Did Merck attempt to discredit Dr.
226: 8   McMillen?
226: 9        A.       I don't know.

228:15-229:2

228:15        Q.       By the way, how was the term
228:16   "neutralized" first used?  Do you know who first
228:17   used it at Merck?
228:18        A.       I don't remember.
228:19        Q.       Was that a term that was already
228:20   being used in documents when you first were hired by
228:21   Merck?
228:22        A.       I don't recall.
228:23        Q.       Well, we saw there was a document in
228:24   April of 1999 that you were listed as an author
228:25   using the term "Physicians to Neutralize."  Is that
228:ESQUIRE DEPOSITION SERVICES
229: Confidential - Subject to Protective Order 229
229: 1   the first time you used that term or had you used it
229: 2   previous to April of '99?

229:5-229:5

229: 5                 THE WITNESS:  I just don't remember.

245:1-245:1

245: 1        Q.       Exhibit 28, no Bates Number.

245:4-246:8

245: 4        Q.       This is "PhRMA Code on Interactions
245: 5   with Healthcare Professionals," and I'm only going
245: 6   to ask you about one portion of it, which is
245: 7   Paragraph Number 8.  You can read that to yourself,
245: 8   and then I'll ask you a couple questions.
245: 9        A.       (Witness reviewing document.)
245:10        Q.       This is the "Code of Interactions
245:11   with Healthcare Professionals" for the
245:12   Pharmaceutical Research and Manufacturers of
245:13   America, PhRMA; correct? Is that right?
245:14        A.       Yes.  I read it a long time ago.
245:15        Q.       Then Number 8, it says, "Independence
245:16   of Decision Making."  It says "No grants,
245:17   scholarships, subsidies, support, consulting
245:18   contracts, or educational or practice related items
245:19   should be provided or offered to a healthcare

Page 25

Same

Irvin II -
No prior ruling
& objection
Vol, Vo2, Vo3
"discredit" unfairly
prejudicial
π response -
Merck now claims
"neutralize" means
"educate" in litigation.
π believe neutralize
means to either
pay off w/ money or
if not to discredit.
Goes to credibility.

Irvin I - No prior ruling
& objection -
Vol, Vo2, Vo3
neutralize is unclear

π response -
Neutralize does not mean
educate as Merck claims.
It means either
pay off or discredit.
Credibility.

Irvin II - No prior
ruling
& - No objection

Baumgartner 2-25-05

*Eime*

```
245:20    professional in exchange for prescribing products or
245:21    for a commitment to continue prescribing products."
245:22    Did I read that right?
245:23          A.    Yes.
245:24          Q.    It says, "Nothing should be offered
245:25    or provided in a manner or on conditions that would
245:ESQUIRE DEPOSITION SERVICES
246: Confidential - Subject to Protective Order 246
246: 1    interfere with the independence of a healthcare
246: 2    professional's prescribing practices."  Did I read
246: 3    that right?
246: 4          A.    Yes.
246: 5          Q.    Is that your understanding of the
246: 6    internal standard followed by Merck as well?
246: 7          A.    Yes.  It's consistent.
246: 8          Q.    Thank you.

     246:16-247:7

246:16          Q.    Next document, Exhibit 29.
246:17          MR. FIBICH:  This is 29?
246:18          MR. TSOUGARAKIS:  It is.
246:19  BY MR. ROBINSON:
246:20          Q.    So, this is from your "Daily Record
246:21    of Events" of Friday, February 9, 2001.  Maybe this
246:22    will refresh your memory that the FDA Advisory
246:23    Committee meeting had just occurred on February 8th,
246:24    2001.  Do you remember that?
246:25          A.    I don't remember the exact date that
246:ESQUIRE DEPOSITION SERVICES
247: Confidential - Subject to Protective Order 247
247: 1    it occurred.
247: 2          Q.    Do you remember it being in February?
247: 3          A.    Yes.
247: 4          Q.    So, basically, this says "FDA
247: 5    Advisory Committee review" and then it says "Alise
247: 6    Reicin."  Right?
247: 7          A.    Right.

     247:19-247:21

247:19          Q.    Did you talk to Alise Reicin after
247:20    she appeared at the FDA Advisory Committee hearing?
247:21          A.    Yes.

     248:9-248:23

248: 9          Q.    Well, let's look at it.  Do you see
248:10    number 3, it says, "FDA bought that naproxen could
248:11    be cardioprotective."  Right?  That's what you
248:12    wrote?  Correct?
248:13          A.    Uh-huh.
248:14          Q.    Is that a yes?
248:15          A.    Yes.
248:16          Q.    I'll tell you, to get it down
248:17    audibly, we have to get it down.
248:18          A.    Yes.
248:19          Q.    When you say the "FDA bought that
248:20    naproxen could be cardioprotective," was that
248:21    something that Merck was trying to sell to the FDA
248:22    Advisory Committee, that naproxen could be
248:23    cardioprotective?
```

Page 26

Baumgartner 2-25-05

249:1-249:3

```
249: 1                    THE WITNESS:  When I look at the
249: 2    statement, the way I interpret it is that the FDA
249: 3    agreed that naproxen could be cardioprotective.
```

259:11-259:19

```
259:11            Q.       In other words, you knew that there
259:12    were doctors and experts, thought leaders out in the
259:13    medical community who were recommending that Merck
259:14    not emphasize the protective effect of Naprosyn;
259:15    correct?
259:16            A.       Correct.
259:17            Q.       So when you said the FDA bought that
259:18    Naprosyn could be cardioprotective, you were
259:19    thinking, yay, they bought it; right?
```

259:21-260:9

```
259:21                    THE WITNESS:  That statement refers
259:22    to the agreement of the FDA as a -- as
259:23    cardioprotection with naproxen being an explanation
259:24    for the VIGOR results.  That's how I read that
259:25    statement.
259:ESQUIRE DEPOSITION SERVICES
260: Confidential - Subject to Protective Order 260
260: 1    BY MR. ROBINSON:
260: 2            Q.       But you know what, but you didn't use
260: 3    the word "agree," did you?  Correct?
260: 4            A.       In that document?
260: 5            Q.       Right.
260: 6            A.       No.
260: 7            Q.       That's a litigation word, "agree,"
260: 8    it's being used in litigation for the first time to
260: 9    explain this document; right?
```

260:11-260:12

```
260:11                    THE WITNESS:  You asked for my
260:12    interpretation.
```

260:17-260:18

```
260:17                    Does the document say "bought"?
260:18            A.       It does.
```

261:8-261:11

```
261: 8            Q.       So, at least in February of 2001, you
261: 9    used the word "bought," that the FDA bought that
261:10    naproxen could be cardioprotective; right?
261:11            A.       Right.
```

262:5-262:10

```
262: 5            Q.       If you had to rewrite this, would you
262: 6    say "FDA agreed," or would you keep the word
262: 7    "bought" there?
262: 8            A.       The way that I understood it, I think
262: 9    "agree" would be the word that accurately depicted
262:10    what the conclusions were.
```

Page 27

Baumgartner 2-25-05

263:1-263:3

*Same*

263: 1             When you say "FDA bought that
263: 2     naproxen could be cardioprotective," that implies
263: 3     that it may not be cardioprotective; right?

263:5-263:6

263: 5             THE WITNESS:  Can you clarify your
263: 6     question?

263:12-263:25

263:12             THE WITNESS:  To me that statement
263:13     says that the FDA bought or agreed that naproxen
263:14     could be cardioprotective.
263:15     BY MR. ROBINSON:
263:16         Q.    So, in other words, when you use the
263:17     words "someone bought the farm," that means they
263:18     agreed?  I mean, are you using "agree" and "bought"
263:19     as synonyms?
263:20         A.    In the context of this statement,
263:21     that's what I thought.
263:22         Q.    I mean, when you wrote this, you knew
263:23     there were some people who were respected opinion
263:24     leaders who believed that naproxen was not
263:25     cardioprotective; right?

264:3-264:3

264: 3             THE WITNESS:  Yes, there were.

Total Length - 01:14:47

Page 28

Baumgartner 9-30-05

Baumgartner 9-30-05 (Multi-clip)
SB 1816      18:16-18:24

```
18:16          Q.    And was part of that your
18:17   responsibility to provide those
18:18   individuals with accurate information
18:19   about the product Vioxx?
18:20          A.    It was providing information
18:21   about Vioxx, as well as other pain
18:22   medicine that was available, and getting
18:23   thoughts on all of those areas.  But I
18:24   did present scientific data for Vioxx.
```

*Irwin II - No prior ruling*
*A - No objection*

SB 2119      21:19-22:2

```
21:19          Q.    And in order for them to
21:20   have any understanding of the scientific
21:21   data, it was important that that
21:22   information be accurate that you gave
21:23   them; is that correct?
21:24          A.    It was my hope that the
22: Page 22
22: 1   information that was communicated by the
22: 2   presenters there was accurate, yes.
```

*Irwin II - No prior ruling*
*A - No objection*

SB 2224      22:24-23:3

```
22:24          Q.    Tell me why that's important
23: Page 23
23: 1   that a doctor that might be prescribing
23: 2   Vioxx have accurate information.  Why is
23: 3   that important?
```

*Irwin II - objection overruled*
*A - No objection*

SB 2306      23:6-23:23

```
23: 6               THE WITNESS:  We want
23: 7   physicians to be fully informed
23: 8   about the products.
23: 9   BY MR. PAPANTONIO:
23:10          Q.    And why is it important that
23:11   they be fully informed about the
23:12   products?
23:13          A.    So they can use the products
23:14   appropriately.  The --
23:15          Q.    Is part -- excuse me.  I
23:16   don't mean to cut you off.  Were you
23:17   finished there?
23:18          A.    And make the right decisions
23:19   about use of the product.
23:20          Q.    So, in other words, it's
23:21   important that you give the doctor the
23:22   correct information so they can use it
23:23   properly; is that correct?
```

SB 2402      24:2-24:4

```
24: 2               THE WITNESS:  It is
24: 3   important that we give accurate
24: 4   information.
```

SB 3015      30:15-30:19

Page 1

```
                                    Baumgartner 9-30-05
    30:15           Q.     Well, let me just show you
    30:16     what I'm talking about.
    30:17                 MR. PAPANTONIO:   Let's show
    30:18     Dr. Baumgartner 1259, please.  Not
    30:19     Dr. Baumgartner, Mrs. Baumgartner.


SB 3111        31:11-31:20

    31:11           Q.     Well, do you see where it
    31:12     says, Ms. Baumgartner, it says "From:
    31:13     Baumgartner, Susan L."  That's you, isn't
    31:14     it?
    31:15           A.     It is.
    31:16           Q.     And underneath it it says,
    31:17     "Subject:  JAMA Review."  Do you see
    31:18     that?  "Subject:  JAMA Review."  Do you
    31:19     see that?
    31:20           A.     Yes.


SB 3301        33:1-33:17

    33: 1           Q.     So, before I had asked you,
    33: 2     remember, before I showed you this
    33: 3     document, whether one of the things that
    33: 4     you did was to review medical literature
    33: 5     and give your impressions about that
    33: 6     literature.  Do you remember me asking
    33: 7     you that question?
    33: 8           A.     Correct.
    33: 9           Q.     So, this document, obviously
    33:10     that's what you did in this document, you
    33:11     reviewed a piece of medical literature in
    33:12     the JAMA.  Tell the jury what that is.
    33:13           A.     The Journal of the American
    33:14     Medical Association.
    33:15           Q.     And you gave your
    33:16     impressions; is that correct?
    33:17           A.     Of this publication.


SB 3412        34:12-35:6

    34:12           Q.     Well, do you see where it
    34:13     says "Threats" there, Ms. Baumgartner?
    34:14           A.     Yes.
    34:15           Q.     Let's read.  It says,
    34:16     "'Available data raise a cautionary flag
    34:17     about the risk of cardiovascular events
    34:18     with COX-2 inhibitors...Our findings
    34:19     suggest a potential increase in CV event
    34:20     rates for the presently available COX-2
    34:21     inhibitors...We believe that it is
    34:22     mandatory to conduct a trial specifically
    34:23     assessing CV risk and benefit of these
    34:24     agents.'"
    35: Page 35
    35: 1                 Now, I want to ask you some
    35: 2     questions since this is the beginning of
    35: 3     this deposition.  What is a "CV risk"?
    35: 4     What does that mean?
    35: 5           A.     It typically refers to
    35: 6     cardiovascular risk.


SB 3818        38:18-39:6

                        Page 2
```

Irvin II - objection overruled
A - No objection

Irvin II - objection overruled
A - 801, 802 - hearsay

π response -
The objection was overruled
already. Relevant to
credibility, notice of CV risk