Baumgartner 9-30-05

```
38:18          Q.    You wrote that underneath
38:19  the heading that says "Threats."
38:20          MR. PAPANTONIO:  Could you
38:21          please underline "Threats" so we
38:22          can...
38:23  BY MR. PAPANTONIO:
38:24          Q.    Do you see this on your
39: Page 39
39: 1  screen, where it says "Threats"?  So, you
39: 2  wrote "Threats," and then underneath
39: 3  "Threats" you wrote, "VIGOR," which was a
39: 4  study that was conducted by Merck; is
39: 5  that correct?
39: 6          A.    Correct.
```

Inv II - objection overruled
Δ objection - same
π response - same

SB 4802      48:2-48:13

```
48: 2          Q.    In terms of this document,
48: 3  we want to talk about definitions here.
48: 4  "Threat" means what to Susan Baumgartner?
48: 5          A.    When I look at this document
48: 6  today?
48: 7          Q.    Yes.
48: 8          A.    I defined it as inconsistent
48: 9  with Merck's position about the product
48:10  and other products.
48:11          Q.    You would say bad for
48:12  Merck's position; right?  Bad?
48:13          A.    Different.  Not consistent.
```

Inv II - objection overruled (2)
Δ - 401, 402, 403
π - ratio of CV risk,
credibility

SB 5501      55:1-55:7

```
55: 1          You chose to write down
55: 2  underneath "Threats," Susan Baumgartner,
55: 3  not anybody else, chose to write down
55: 4  that there's an "Increased relative risk
55: 5  of developing CV events."  Correct?
55: 6  Susan Baumgartner chose to write that
55: 7  down underneath "Threats"?
```

Inv II - No prior ruling
Δ - Argumentative & sarcastic
π - This is a proper cross-
examination question. It is rebut
as to the meaning of "threats"
as it relates to CV risk

SB 5511      55:11-55:14

```
55:11          Q.    Nobody else but Susan
55:12  Baumgartner wrote that?
55:13          A.    That's what this e-mail
55:14  indicates.
```

Inv II - No prior ruling
Δ - same objection
π - same response.

SB 5701      57:1-57:8

```
57: 1          Q.    And so we're talking about
57: 2  in this document that you created, we're
57: 3  talking about increased risk, relative
57: 4  risk of developing CV events, and you're
57: 5  also talking about MI rates; correct?
57: 6  "MI" is heart attack.  They were higher
57: 7  according to what you wrote down here
57: 8  also, weren't they?
```

Inv II - No prior ruling
Δ - No objection

SB 5711      57:11-57:21

```
57:11          THE WITNESS:  It's stated
57:12          here.  As I mentioned, I believe
```

Page 3

Baumgartner 9-30-05

```
57:13          this is a summary of what the
57:14     authors in that publication
57:15     concluded, because these were
57:16     contrary to Merck's beliefs and
57:17     conclusions about the product.
57:18 BY MR. PAPANTONIO:
57:19          Q.    And that's why you wrote
57:20 down "Threats"?
57:21          A.    Right.
```

SB 7017      70:17-72:10

```
70:17          Q.    Now, take a minute and tell
70:18 me, when did you see this document, if
70:19 ever?
70:20          A.    (Witness reviewing
70:21 document.)
70:22          Q.    Ms. Baumgartner, have you
70:23 ever seen this document before today?
70:24          A.    One more quick second.
71: Page 71
71: 1               (Witness reviewing
71: 2 document.)
71: 3          Q.    Is this the first time
71: 4 you've ever seen this document?
71: 5          A.    It is.
71: 6          Q.    Now, remember, before I
71: 7 showed you this document, the question I
71: 8 was asking of you was whether or not you
71: 9 knew of any safety studies that had been
71:10 done specifically to figure out whether
71:11 or not there was a risk between CV events
71:12 and Vioxx.  Do you remember me asking
71:13 that question?
71:14          A.    Yes.
71:15          Q.    And you didn't know.  Is
71:16 that what you told me?
71:17          A.    Correct.
71:18          Q.    Now, tell the jury, please,
71:19 who is Richard A. Dybas?
71:20          A.    I don't know.
71:21          Q.    What is the MRL?  At Merck,
71:22 what would the MRL be, Merck Research
71:23 Laboratories?
71:24          A.    Correct.
72: Page 72
72: 1          Q.    Now, do you see where it
72: 2 says, let's -- this is August 27, 2004.
72: 3 Do you see that?
72: 4          A.    Yes.
72: 5          Q.    August 27, 2004.  Now,
72: 6 again, I'm asking you this question based
72: 7 on the fact that part of your job was to
72: 8 be able to relate to doctors what you
72: 9 knew about the safety of the product;
72:10 correct?
```

SB 7213      72:13-74:1

```
72:13               THE WITNESS:  Correct.
72:14 BY MR. PAPANTONIO:
72:15          Q.    And so, it says, "Peter,
72:16 Your defense of Vioxx sounds very feeble.
```

Page 4

Irvin II - No prior ruling

A - 602 No foundation, no personal knowledge - the witness is being asked about an e-mail she has never seen before.

π response.
The witness is part of the national sales and education managers for Merck. Therefore, given her position she either knew or should have known of the CV risk of Vioxx. The document is therefore relevant as to what information Merck was providing its own sales and education managers about the CV risk of Vioxx. It is therefore relevant to notice of CV risk, credibility and impeachment with inconsistent position. Further, since the witness is an a Pharm D. she has a high degree of knowledge of this CV risk issue.

Baumgartner 9-30-05

```
72:17  Every retrospective study reported and
72:18  many clinical trials point clearly to
72:19  there being a cardiotoxic affect
72:20  associated with the drug."  Now, let me
72:21  ask you this.
72:22            From a doctorate in
72:23  pharmacy, what would you construe
72:24  cardiotoxic as being?  What does that
73: Page 73
73: 1  mean, cardiotoxic?
73: 2       A.    Toxic to the cardiovascular
73: 3  system.
73: 4       Q.    That would be something that
73: 5  was bad for the cardiovascular system,
73: 6  wouldn't it, toxic?
73: 7       A.    Yes.
73: 8       Q.    Okay.
73: 9            It says, "Nearly 2 years
73:10  ago, Scolnick promised a definitive
73:11  study from Merck to 'show the world' that
73:12  Vioxx is safe.  Where are the data??"  Do
73:13  you see that?
73:14       A.    Yes.
73:15       Q.    Now, tell me, you know who
73:16  Richard Scolnick is, don't you -- excuse
73:17  me, you know who Scolnick is?
73:18       A.    (Witness nods.)
73:19       Q.    Tell us who Scolnick is.
73:20       A.    He was the head of MRL.
73:21       Q.    And it says, "Scolnick
73:22  promised a definitive study from Merck to
73:23  'show the world' that Vioxx is safe."  Do
73:24  you see that?
74: Page 74
74: 1       A.    Uh-huh.

SB 7614   76:14-76:19

76:14       Q.    Had you ever gotten anything
76:15  directly from Scolnick where he conducted
76:16  a study about the relationship between
76:17  CVs and Vioxx?
76:18       A.    I don't remember receiving
76:19  anything from Dr. Scolnick directly.

SB 7717   77:17-77:23

77:17       Q.    I'm sure you did, Ms.
77:18  Baumgartner.  But what I'm asking you is,
77:19  did Susan Baumgartner receive information
77:20  about the relationship between CVs, CV
77:21  events, cardiovascular events and Vioxx
77:22  from Scolnick that you passed on to
77:23  doctors the whole time you were there?

SB 7804   78:4-78:7

78: 4       Q.    The whole time you were
78: 5  working on Vioxx.
78: 6       A.    I never received anything
78: 7  from Dr. Scolnick.

SB 8004   80:4-80:12
```

Page 5

*[Handwritten annotations:]*

same as above

Issue II - No prior ruling
△ objection - Attorney sidebar
π response.
This is relevant to what
information she was given
by the President of MRL
and when she knew it.
Given that the witness is
responsible for educating physicians
about Vioxx it is highly
relevant what the President of
Merck told her.

Baumgartner 9-30-05

```
80: 4        Q.     Okay.
80: 5               Well, then, let's start with
80: 6    that.  You wanted to identify people that
80: 7    were knowledgeable about information;
80: 8    correct?
80: 9        A.     (Witness nods.)
80:10        Q.     Who is Laurenzi Martino?
80:11        MR. PAPANTONIO:   Show her
80:12    362, please.  Laurenzi Martino.
```

SB 8109      81:9-83:5

```
81: 9        Q.     Now, why don't you take a
81:10    minute and look at that from Martino
81:11    Laurenzi.
81:12        A.     (Witness reviewing
81:13    document.)
81:14        Q.     Is it the first time you've
81:15    ever seen that document?
81:16        A.     Yes.
81:17        Q.     Tell us, please, do you see
81:18    the term -- what is naproxen?  Tell the
81:19    jury what naproxen is.
81:20        A.     Naproxen is a nonselective
81:21    NSAID used to treat pain and
81:22    inflammation.
81:23        Q.     Do you see there it says,
81:24    "The presentation of the VIGOR data must
82: Page 82
82: 1    not mislead the audience into thinking
82: 2    that the difference in CV events could be
82: 3    explained by an anti-thrombotic effect of
82: 4    naproxen, which is not demonstrated."  Do
82: 5    you see that?
82: 6        A.     Yes.
82: 7        Q.     Now, is that the first time
82: 8    you've seen that written, "The
82: 9    presentation of the VIGOR data," which
82:10    we've talked about, the VIGOR data;
82:11    right?  "Must not mislead the audience
82:12    into thinking that the difference in CV
82:13    events," which is heart events; correct?
82:14    "Could be explained by anti-thrombotic
82:15    effect of naproxen."  Do you see that?
82:16        A.     Yes.
82:17        Q.     "Which is not demonstrated."
82:18    Do you see that?
82:19        A.     Yes.
82:20        Q.     Do you see the date on that?
82:21        MR. PAPANTONIO:   Corey,
82:22    could you highlight the date,
82:23    which is 2000-06?
82:24        MR. TSOUGARAKIS:   June 20th?
83: Page 83
83: 1        MR. PAPANTONIO:
83: 2    "2000-06-20."
83: 3 BY MR. PAPANTONIO:
83: 4        Q.     Do you see that date?
83: 5        A.     Yes.
```

SB 13116      131:16-132:11

Page 6

Irvin II - objection overruled

1 objection - 602 The
witness has never seen the
e-mail before; it is also hearsay

II response -
The witness and Merck
claim that Naproxen explains
the results in VIGOR.
This document is relevant
to show either; (1) Merck
execs did not share
with this witness that it's
own consultant did not
buy the naproxen explanation; or
(2) they did share this information
and this impeaches her
testimony.
Further, given that merck
did not share this information
this is highly relevant since
the witness was charged
with educating physicians
about the risks of Vioxx.
If she was not given
this information from Merck,
then she/merck misinformed
the medical community
about the Naproxen explanation.

Baumgartner 9-30-05

```
131:16        Q.     Do you see where it's
131:17  talking about the protective effect of
131:18  naproxen in VIGOR?  Do you see that?  It
131:19  says, "The authors refer to the
131:20  hypothesis of the 'protective effect of
131:21  naproxen' in VIGOR.  This claim seems a
131:22  stretch."  Do you see that?  "The
131:23  protective effect of naproxen is not a
131:24  credible explanation for the increase in
132: Page 132
132: 1  risk associated with" -- how do you say
132: 2  that?
132: 3        A.     Rofecoxib.
132: 4        Q.     "Rofecoxib in VIGOR.
132: 5  Naproxen would have to be several times
132: 6  more effective than aspirin to eliminate
132: 7  such an elevated" attack.  Now, let me
132: 8  ask you this.
132: 9               You've never seen those
132:10  words written, have you?
132:11        A.     No.
```

SB 23418        234:18-238:9

```
234:18        MR. PAPANTONIO:  Can you
234:19  please show her 176?
234:20               -  -  -
234:21               (Whereupon, Deposition
234:22  Exhibit P1.0176, Letter 1-9-01,
234:23  MRK-ABO0000250 - MRK-ABO0000253,
234:24  was marked for identification.)
235: Page 235
235: 1               -  -  -
235: 2  BY MR. PAPANTONIO:
235: 3        Q.     Now, 176 is a document
235: 4  you've seen before; is that right?
235: 5        A.     (Witness reviewing
235: 6  document.)
235: 7               I saw this during one of my
235: 8  depositions.
235: 9        Q.     Okay.
235:10               This document -- let's read
235:11  it.  It's 2001, January 9, 2001.  Tell us
235:12  who Dr. Fries is, please.
235:13        A.     Dr. Fries was a physician
235:14  from Stanford.
235:15        Q.     Who is Raymond Gilmartin?
235:16        A.     Mr. Gilmartin was the CEO of
235:17  Merck.
235:18        Q.     So, Dr. Fries from Stanford
235:19  is writing to Dr. Gilmartin, is that
235:20  correct, on January 9, 2001?  Do you see
235:21  that?
235:22        A.     It's shown here.
235:23        Q.     It says, "A series of
235:24  serious events involving certain
236: Page 236
236: 1  employees of, and...a policy of, Merck &
236: 2  Company has come to my attention rather
236: 3  accidentally and I wanted to relay these
236: 4  events which might have substantial
236: 5  implications and complications.  The
236: 6  result is harmful to the traditionally
```
Page 7

Invin II - No prior ruling
A objection -
602 - the witness has
never seen the document
before and cannot just
reads it into the record.

II response -
Relevant to notice of fact
Naproxen does not explain
VIGOR. Further, establishes
a pattern of Merck not
knowing relevant information to
its detric manager about
CV risk.

Invin II - objection overruled
(court did exclude Fries
letter itself)
A objection 401, 402, 403
801, 802. The Fries letter
is irrelevant and prejudicial
and is also hearsay.
Other questions regarding alleged
effort to discredit a
nonbiased doctor are
similarly irrelevant and
prejudicial

II response -
First, Dr. Fries has now been
deposed on 6/16/06 and so
document has been authenticated
from Dr. Fries.
Further, the letter establishes
a pattern of neutralizing
and discrediting critics
of Vioxx. Merck denies
these allegations. So the
letter proves that this
denial is false and supports
the position.

Baumgartner 9-30-05

Same as a

```
236: 7   very fine Merck public image and is
236: 8   counter-productive to the Vioxx sales
236: 9   effort.  My perspective is that...the
236:10   Principal Investigator of ARAMIS" -- is
236:11   that of -- excuse me.  "My perspective is
236:12   that of the Principal Investigator of
236:13   ARAMIS," and that is the "(Arthritis,
236:14   Rheumatism and Aging Medical Information
236:15   System).  This NIH-funded national data
236:16   bank first identified and quantitated the
236:17   stealth epidemic of NSAID gastropathy,
236:18   quantitated differences in toxicity among
236:19   NSAIDs, and ARAMIS investigators have
236:20   worked hard for a long time to find and
236:21   implement ways of reducing the frequency
236:22   of serious GI adverse events with
236:23   NSAIDs."
236:24             I want to ask you, first of
237: Page 237
237: 1   all, what is the NIH?  Do you know what
237: 2   the NIH is?
237: 3        A.    National Institutes of
237: 4   Health.
237: 5        Q.    Next sentence.  "My
237: 6   accidental involvement: On Saturday,
237: 7   October 28th I received a call at home
237: 8   from Dr. Louis Sherwood of Merck
237: 9   Pharmaceuticals.  Dr. Sherwood complained
237:10   that Dr. Gurkirpal Singh of our group had
237:11   an anti-Merck bias and was giving
237:12   lectures that were irresponsibly
237:13   anti-Merck and specifically anti-Vioxx."
237:14   Now, so this says Louis Sherwood of Merck
237:15   called this writer.  Now, who is Louis
237:16   Sherwood?  Did you work around Louis
237:17   Sherwood?
237:18        A.    I did.  Not in his
237:19   department, but I was aware that he was a
237:20   Merck employee, and he was in our medical
237:21   affairs department.
237:22        Q.    It says, "Dr. Singh was held
237:23   to have used a slide which depicted a
237:24   person hiding data under the covers, had
238: Page 238
238: 1   called Merck the 'Firestone of the drug
238: 2   industry,' and had requested data from
238: 3   Merck which was not appropriate for him
238: 4   to have.  Dr. Sherwood suggested that if
238: 5   this continued Dr. Singh would 'flame
238: 6   out' and there would be consequences for
238: 7   myself and for Stanford."
238: 8             Stanford University, is that
238: 9   what that is?

SB 23812      238:12-240:22

238:12   BY MR. PAPANTONIO:
238:13        Q.    It says at the top,
238:14   "Stanford University Medical Center."
238:15             Did you work directly with
238:16   any doctors at Stanford University
238:17   Medical Center?
238:18        A.    Interacted with a few of
```

Page 8

Baumgartner 9-30-05

```
238:19  them, but --
238:20       Q.    Who did you interact with at
238:21  Stanford University Medical Center?
238:22       A.    Dr. Singh was one that I
238:23  remember.
238:24       Q.    So, you know Dr. Singh then,
239: Page 239
239: 1  don't you?
239: 2       A.    I have met him on a few
239: 3  occasions.
239: 4       Q.    Well, the truth is you --
239: 5  well, let me go through -- I want to ask
239: 6  you some specific questions and ask you
239: 7  what involvement you had with these
239: 8  issues.  The next page, if you go to the
239: 9  next page, do you see the second
239:10  paragraph?  It says, "The much broader
239:11  issues, which surfaced at the American
239:12  College of Rheumatology meetings, were
239:13  most disturbing and involve" suspicion of
239:14  data by Merck --
239:15            MR. TSOUGARAKIS:  You said
239:16  "suspicion."
239:17  BY MR. PAPANTONIO:
239:18       Q.    Excuse me.  "...suppression
239:19  of data by Merck and a consistent pattern
239:20  of intimidation of investigators by Merck
239:21  staff, principally Dr. Sherwood but also
239:22  others on his staff.
239:23            "A number of physicians have
239:24  concerns that Vioxx may have some serious
240: Page 240
240: 1  and underemphasized drug toxicity
240: 2  problems, particularly at the 50
240: 3  milligram dose approved for pain
240: 4  control - these concerns are shared by
240: 5  the FDA renal reviewer.  Vioxx has been
240: 6  reported to have more frequent peripheral
240: 7  edema problems, more aggravated
240: 8  hypertension, more congestive heart
240: 9  failure, and more heart attacks than
240:10  other NSAIDs, especially Celebrex."  Do
240:11  you see that?
240:12       A.    (Witness nods.)
240:13       Q.    Now, you were asked, weren't
240:14  you, Doctor -- I mean Ms. Baumgartner, to
240:15  put together a program where actually it
240:16  was really a program of intimidation of
240:17  doctors that were saying these things
240:18  that Fries is saying here?  Well, you can
240:19  say yes or no to it.  But you were asked
240:20  to put together a program to intimidate
240:21  doctors that disagreed with what Merck
240:22  wanted to put forward.  Is that true?

SB 24101     241:1-242:16

241: 1            THE WITNESS:  That is
241: 2  absolutely not correct.
241: 3  BY MR. PAPANTONIO:
241: 4       Q.    Absolutely not true.  That's
241: 5  your testimony?
241: 6       A.    That's not true.
```

same as above.

Page 9

Baumgartner 9-30-05

*Same as above*

```
241: 7          Q.    Well, let's read something
241: 8   then.  Look at the last paragraph.  It
241: 9   says, "Even worse were the allegations of
241:10   Merck damage control by intimidation,
241:11   often with a" growing "pattern of" the
241:12   "Dean or Department Head with complaints
241:13   of anti-Merck bias and always alleging
241:14   unbalanced anti-Vioxx presentations.
241:15   This has happened to at least eight
241:16   investigators:  Dr. Singh" you know who
241:17   that is; right?
241:18          A.    Yes.
241:19          Q.    Dr. Lipsky, you know who
241:20   "Dr. Peter Lipsky" is, don't you?
241:21          A.    Yes.  I know of him.
241:22          Q.    He's now research chief at
241:23   the Arthritis Institute.
241:24                "Dr. Andrew Whelton," you
242: Page 242
242: 1   know who that is at Hopkins; correct?
242: 2          A.    Yes, I do.
242: 3          Q.    "Dr. Michelle Petri"; true?
242: 4   You know who that is, Michelle Petri?
242: 5          A.    I know of her.
242: 6          Q.    Hopkins?
242: 7          A.    I don't know her.
242: 8          Q.    Dr. Yocum, you know "Dr.
242: 9   David Yocum" of Tucson?
242:10          A.    I do not know him.
242:11          Q.    Do you know "Dr. Lee Simon"
242:12   of Harvard?
242:13          A.    I know of him.
242:14          Q.    "Dr. James McMillen," you
242:15   know Dr. James McMillen?
242:16          A.    I know of him as well.


SB 24301      243:1-243:4

243: 1          Q.    It's directed to Dr. Raymond
243: 2   Gilmartin, Chief Executive Officer;
243: 3   correct?
243: 4          A.    Correct.


SB 24308      243:8-249:2

243: 8          Q.    Truth is, two years before
243: 9   this document ever came out from Dr.
243:10   Fries, Susan Baumgartner, along with
243:11   other employees at Merck, had already
243:12   been asked to start a program of
243:13   discrediting the very doctors that he has
243:14   in here, specifically Dr. Singh, Dr.
243:15   Lipsky, Dr. Petri, Dr. Stillman, Dr.
243:16   McMillen, and Dr. Simon?
243:17          A.    That is definitely not
243:18   correct.  I was never asked to put
243:19   together a program of discrediting or
243:20   intimidation, and I don't think that's
243:21   something the company would do.  It's
243:22   definitely not something I would be
243:23   involved in.
243:24          Q.    I'm not asking what the
244: Page 244
```

Page 10

*Irvin II - objections that were made were overruled (appears objections only made to portions)*
*A - same objection; also designation is full of argumentative, sarcastic questions and lawyer speeches (see 243:24; 244:12)*

*R - response - objections previously overruled. Relevant to credibility on Merck's denial of neutralizing and discrediting critics of Vioxx.*

Baumgartner 9-30-05

Same as above.

244: 1  company would do.
244: 2        Susan Baumgartner, as early
244: 3  as 1999, had already decided before this
244: 4  letter was ever written -- this letter
244: 5  was written again in 2001.  But in 1999,
244: 6  Dr. Baumgartner -- excuse me, Mrs.
244: 7  Baumgartner had already decided in
244: 8  cooperation with Dr. Sherwood to create a
244: 9  program to discredit doctors that
244:10  disagreed with the dangers of -- that
244:11  said Vioxx was dangerous.  You're saying
244:12  that did not happen?
244:13        A.    That is not correct the way
244:14  you characterized it at all.
244:15        Q.    Well, let's see.  Let's
244:16  start with 1260.
244:17        MR. PAPANTONIO:  Show her
244:18        document 1260.
244:19                  -  -
244:20        (Whereupon, Deposition
244:21        Exhibit P1.1260, E-mails,
244:22        MRK-AFI0045078, was marked for
244:23        identification.)
244:24                  -  -  -
245: Page 245
245: 1  BY MR. PAPANTONIO:
245: 2        Q.    Now, I believe you've seen
245: 3  this document.  Take a minute, but it
245: 4  says, "To:  Baumgartner, Susan L."
245: 5  That's you, correct?
245: 6        A.    Yes.
245: 7        Q.    From Charlotte McKines?  Is
245: 8  it McKines?
245: 9        A.    McKines.
245:10        Q.    McKines.  Okay.  From
245:11  Charlotte McKines.  Tell us who Charlotte
245:12  McKines is.
245:13        A.    She was the head of our
245:14  marketing team.
245:15        Q.    Do you see the date on that
245:16  letter, that memo, was it 1999, 8-23-99;
245:17  correct?
245:18        A.    Correct.
245:19        Q.    Then it says, "Background -
245:20  Dr. Andrew Welton."  Do you see that?
245:21        A.    Yes, I do.
245:22        Q.    Isn't Dr. Whelton one of the
245:23  people that were just mentioned in Dr.
245:24  Fries' letter?  Dr. Whelton, we just saw
246: Page 246
246: 1  Dr. Whelton's name.
246: 2        MR. PAPANTONIO:  Could you
246: 3        throw that back up there, that
246: 4        paragraph that shows Dr. Whelton's
246: 5        name?  It's on the second page,
246: 6        the very bottom.  Corey, can you
246: 7        show it?  It's document number
246: 8        176.  Just that one paragraph.
246: 9        No, no, this paragraph right here,
246:10        second page, last paragraph.
246:11        Now take everything else off
246:12        the screen.
246:13        THE VIDEOTAPE TECHNICIAN:  I
                        Page 11

Baumgartner 9-30-05

*Same as above*

```
246:14        can't.
246:15             MR. PAPANTONIO:  If you can.
246:16   BY MR. PAPANTONIO:
246:17        Q.   It says, "Even worse were
246:18   the allegations of Merck damage control
246:19   by intimidation, often with a pattern of
246:20   going to the Dean" of the department
246:21   "with complaints of anti-Merck bias and
246:22   always alleging unbalanced anti-Vioxx
246:23   presentations.  This happened to at least
246:24   eight investigators: Dr. Singh, Dr.
247: Page 247
247: 1   ...Lipsky, now research chief at the
247: 2   Arthritis" --
247: 3             MR. PAPANTONIO:  And go to
247: 4        the very top of the next page, put
247: 5        it right up underneath there,
247: 6        please, put it under that same
247: 7        thing, if you can.
247: 8             Stand by, we'll get it.
247: 9   BY MR. PAPANTONIO:
247:10        Q.   It says, "Dr. Andrew Whelton
247:11   of Hopkins," do you see that?
247:12        A.   Yes.
247:13        Q.   Do you see the letter that
247:14   you're looking at right -- this e-mail
247:15   you're looking at right now?
247:16        A.   Yes.
247:17        Q.   It says, "Dr. Andrew
247:18   Whelton."  Do you see that?
247:19        A.   Correct.
247:20        Q.   Okay.
247:21             Now, so we can review these
247:22   names one more time, Dr. Singh, Dr.
247:23   Lipsky and Doctor -- what else do we have
247:24   up there, Dr. Whelton, Dr. Petri, Dr.
248: Page 248
248: 1   Yocum, Dr. Simon, Dr. McMillen, and Dr.
248: 2   Stillman.  So, in Dr. Fries's letter,
248: 3   those are names that he's using; correct?
248: 4        A.   Correct.
248: 5        Q.   The document I want to go to
248: 6   now is, please take that down, is 1260
248: 7   that you have in front of you, and that's
248: 8   to Susan Baumgartner, that's you, and it
248: 9   says, "Background - Dr. Andrew Welton."
248:10   Do you see that?  And it says, "for bad
248:11   guys list."  What's the "bad guys list"?
248:12   Are you putting Dr. Whelton on a bad guys
248:13   list in 1999?
248:14        A.   The list that we were
248:15   probably referring to is the list of
248:16   physicians that did not have complete
248:17   information.
248:18        Q.   Well --
248:19        A.   That we're collecting
248:20   background information about.  So, it's
248:21
248:22        Q.   Why do you call them "bad
248:23   guys"?  They don't have complete
248:24   information, so you put them on a bad
249: Page 249
249: 1   guys list?  What does "bad guys" mean to
```

Page 12