UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 06-0485 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| GERALD D. BARNETT, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**OPPOSITION OF DEFENDANT MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION TO EXCLUDE ARGUMENT OR OPINION TESTIMONY THAT THE APPROVE STUDY AND PROTOCOL 203 CANNOT BE GENERALIZED TO OTHER POPULATIONS, AND TO EXCLUDE OPINIONS CONCERNING "INDIVIDUAL CONFIDENCE INTERVALS"**

Plaintiff seeks to preclude Merck from offering expert testimony that: (i) the results of APPROVe cannot be generalized to other patient populations; and (ii) the relative risk observed in APPROVe is inapplicable to him. Plaintiff's Motion lacks merit. The Court should deny it.

First, plaintiff has the burden of proving general causation – *i.e.*, that his use of Vioxx is capable of causing heart attacks. Plaintiff will rely on data from APPROVe to meet this burden of proof. Merck may then present expert testimony explaining *why* plaintiff's reliance on that

data is misplaced. Plaintiff's Motion is based on an *assumption* that the risk observed in one patient population – *i.e.*, colon polyp patients in APPROVe – is equally applicable to *different* patient populations that may react differently to treatment with NSAIDs. That assumption is wrong. Further, the available clinical data for Vioxx and Celebrex suggest that patients with colon polyps may have an increased cardiovascular risk vis-à-vis other patient populations. Merck is entitled to explain this to the jury.

Second, plaintiff has the burden of proving specific causation – *i.e.*, that his use of Vioxx caused his heart attack. Again, Merck is entitled to present expert testimony explaining why plaintiff's reliance on the APPROVe data is misplaced. Plaintiff's Motion is premised on an *assumption* that the increased risk of cardiovascular adverse events seen in APPROVe is equivalent to *his* individual risk. But that assumption is incorrect. Population-based statistics are not indicative of any individual's risk for the simple reason that different individuals have different baseline risks. Accordingly, population-based statistics alone do not provide a valid basis for inferring causation in any individual. Merck is entitled to explain this to the jury.

## I. MERCK MAY REFUTE PLAINTIFF'S CLAIM THAT THE INCREASED CARDIOVASCULAR RISK OBSERVED IN APPROVe IS APPLICABLE TO ALL PATIENT POPULATIONS.

Plaintiff bears the burden of proving general causation. *See, e.g., Livingston v. Noland Corp*, 362 S.E.2d 16, 18 (S.C. 1987); Michael J. Saks *et al.*, Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2005-2006) ("Reference Manual") at 537. If plaintiff chooses to rely on the APPROVe data in an attempt to meet his burden of proof, Merck may present expert testimony rebutting his reliance on that data. And in fact, plaintiff's reliance on APPROVe is misplaced for several reasons.

First, the APPROVe data show that in patients with a history of colorectal adenomas (*i.e.*, colon polyps), the continuous use of Vioxx at the 25 mg dose for a period of 18-36 months is associated with an increased risk of adverse cardiovascular events. (Bresalier RS et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial* (2005), 352 NEW. ENG. J. MED. 1092, 1092 & Figure 2 ("*Among patients with a history of colorectal adenomas*, the use of rofecoxib was associated with an increased cardiovascular risk" that "became apparent after 18 months of treatment." (emphasis added)).) Whether plaintiff likes it or not, that is what the data show. By contrast, the data do *not* show an increased risk associated with the use of Vioxx at a *different* dose or duration, nor do they show an increased risk associated with Vioxx use in a *different* patient population.

Further, it is insufficient merely to *assume* – as plaintiff does – that the increased risk seen in APPROVe applies to the general population. Such an approach is inconsistent with the cardinal rule of epidemiology, which requires the comparison of *similarly situated* patient populations. *See, e.g., Am. Legion v. Derwinski*, 311 U.S. App. D.C. 385, 387 n.2 (D.C. Cir. 1995) (Epidemiology is "a branch of science and medicine [that] uses studies to 'observe the effect of exposure to a single factor upon the incidence of disease in two otherwise identical populations.'") (quoting *DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 945 (3d Cir. 1990). Plaintiff's assumption amounts to nothing more than extrapolating from what is known to what is unknown, and it is scientifically unreliable under *Daubert*. *See, e.g., Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (improper to "leap[] from an accepted scientific premise to an unsupported one"); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (improper extrapolation is factor to be considered in *Daubert* analysis).

3

The fact is that different patient populations have different risk profiles and disease states. Rheumatoid arthritis patients, for example, are at an increased risk of adverse cardiovascular events compared to the general population. (Wolfe, *et al.*, *The Mortality of Rheumatoid Arthritis, Arthritis & Rheumatism* (08/19/93); Myllykangas-Luosujarvi, *et al.*, *Mortality in Rheumatoid Arthritis, Arthritis & Rheumatism* (12/95).) It is thus inappropriate to apply to one patient population the results of a study involving a different patient population. The Food and Drug Administration ("FDA") has publicly acknowledged this scientific truism. (*See e.g.*, U.S. Dep't of Health and Human Services, Food and Drug Administration, et al., *Final Guidance, Guidance for Industry, Pharmacogenomic Data Submissions*, 24 BIOTECHNOLOGY L. REP. 357, 358 (2005), *available at www.fda.gov/cder/guidance/6400fnl.pdf* ("The findings from a specific study often cannot be extrapolated . . . to different study populations . . . ."); *Smithkline Corp. v. Food & Drug Admin.*, 587 F.2d 1107, 1121, 1121 n.33 (D.C.C. 1978) (FDA argued that side-effects produced by drug in population of anxious obese patients could not be extrapolated to population of non-anxious obese patients).) In fact, it is *because* different patient populations have different risk profiles that the FDA requires drug manufactures to obtain separate approval before marketing their drugs for new indicated uses.[1] *See* 21 U.S.C. §§ 355(d), 393(b)(2)(B).

In addition, the available clinical trial data suggest that colon polyp patients – *i.e.*, the patient population at issue in APPROVe – may have a unique cardiovascular risk profile when given NSAIDs. For example, it is widely recognized that aspirin can have a cardio-protective effect. (*See, e.g.*, U.S. Preventive Services Task Force, *Aspirin for the Primary Prevention of Cardiovascular Events: Recommendation and Rationale*, ANN INTERN MED. 2002; 136:157-160,

---

[1] In that regard, the FDA required Merck to submit a separate New Drug Application before marketing Vioxx for juvenile rheumatoid arthritis patients even though Vioxx had already been
*(footnote continued next page)*

at 157.) Yet aspirin appears to *increase* the risk of cardiovascular adverse events in patients with a history of colon polyps. (*See* Expert Report of KyungMann Kim, Ph.D. at 25 ("Further, it is interesting to note that in Baron et al. (2003) in the same patient population as in the APPROVe ... stud[y], aspirin, instead of showing cardioprotection, showed an increase in adverse thrombotic cardiovascular events in terms of MI, stroke and coronary revascularization."), attached hereto as Ex. A.)

The Vioxx clinical trial data appear to confirm that colon polyp patients may be at an increased risk of cardiovascular adverse events during NSAID therapy vis-à-vis other patient populations. Indeed, whereas APPROVe found an increased risk among colon polyp patients, other clinical trials involving patients who had or were at risk of developing Alzheimer's disease found *no* increased cardiovascular risk. (Reines SA et al., *Rofecoxib, No effect on Alzheimer's disease in a 1-year, randomized, blinded, controlled study*, NEUROLOGY 2004; 62:66-71, at 69, 71; Thal et al., *A Randomized, Double Blind, Study of Rofecoxib in Patients with Mild Cognitive Impairment*, NERUOPSYCHOPHARMACOLOGY (2005), 1-12, at 8.) Similarly inconsistent findings between colon polyp patients and Alzheimer's patients are seen in the clinical trial data for Celebrex, another COX-2 inhibitor. (*Compare* Solomon et al., *Cardiovascular Risk Associated with Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention* (hereinafter the "APC" study), NEW. ENG. J. MED. (2005), 352(11):1071-1080, 1017 (finding increased risk in colon polyp patients), *with* Pfizer Inc., *A Double-Blind, Randomized Placebo-Controlled, Comparative Study of Celecoxib (SC-58635) For The Inhibition of Progression of Alzheimer's Disease* (Protocol IQ5-97-02-001) at 6, *available at www.clinicalstudyresults.org/documents/company-study_76_0.pdf#search='Double%20Randomized%20Placebo%20Study%20Celecoxib%20Inhib*

---

approved for adult rheumatoid arthritis.

*ition%20Progression%20Alzheimer%27s%20Disease* (hereinafter the "ADAPT" study) (finding no increased risk in Alzheimer's patients).)[2]

Based on these inconsistencies, Merck may challenge plaintiff's claim that the increased cardiovascular risk seen in APPROVe is applicable to the general population. Further, the opinion of a single anonymous peer reviewer, issued during the New England Journal of Medicine's review of the APPROVe article, has no bearing on Merck's right to make this argument. (Pl.'s Mot. at 2, 6.) The admissibility of expert testimony is governed by the Federal Rules of Evidence, not the personal opinion of a single peer-reviewer.[3] *See, e.g., Allison*, 184 F.3d at 1316 ("[S]crutiny by one's peers does not insure admissibility.") (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593 (1993)); *Jones v. United States*, 933 F. Supp. 894, 899 & n.8 (N.D. Cal. 1996) (rejecting expert's reliance on statistically insignificant data to prove causation notwithstanding that articles reporting such data were published in peer-reviewed journals). Moreover, "Reviewer E" was just one of several peer reviewers of the APPROVe draft and the only one to make this comment.

Finally, plaintiff's reliance on statements in the Data Analysis Plan ("DAP") for Protocol 203 is similarly misplaced. (Pl.'s Mot. at 2, 6.) Protocol 203 contemplated the collection of data

---

[2] The results of ADAPT were reported in a recent article by Caldwell. (Caldwell et al., *Risk of cardiovascular events and celecoxib: a systematic review and meta-analysis*, J. R. SOC. MED. 2006; 99:132-140, Table 2 & n.15.) A third study involving Celebrex initially found no increased cardiovascular risk in colon polyp patients, but the investigators have since announced that the study indeed shows an increased cardiovascular risk in the same patient population. (*See* http://www.pfizer.com/pfizer/are/investors_releases/2006pr/mn_2006_0403.jsp.)

[3] If, for some reason, the Court were to hold otherwise, then it should preclude plaintiff from arguing that the cardiovascular results reported in VIGOR were in any way inaccurate. After all, the results of VIGOR were published in a peer-reviewed journal. (Claire Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343 NEW. ENG. J. MED. 1520 (Nov. 30, 2000).)

6

from three patient populations in three separate clinical trials,[4] thus making generalization of the data a possibility. *Cf.* Reference Manual at 531 ("It is important that a study be replicated in different populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists."). But the data collection effort contemplated by Protocol 203 was prematurely terminated when Merck voluntarily withdrew Vioxx from the market, with the result that final data was not collected from all three studies. Moreover, the DAP for Protocol 203 was written *before* the inconsistent clinical data from APPROVe, the Alzheimer's trials, APC and ADAPT became available. Thus, while a stated objective of the DAP was to "allow[] generalization of the results of this analysis to other populations," the available data suggest that the increased cardiovascular risk seen in APPROVe is not subject to the kind of generalization proposed by plaintiff.

## II. MERCK MAY REFUTE PLAINTIFF'S CLAIM THAT THE INCREASED CARDIOVASCULAR RISK OBSERVED IN APPROVe IS APPLICABLE TO HIM.

In addition to proving general causation, plaintiff must prove specific causation. *See, e.g., Livingston*, 362 S.E.2d at 18; Reference Manual at 537. In an attempt to meet his burden of proof, plaintiff apparently will argue that the relative risk and associated confidence interval reported in APPROVe are applicable to him and indicative of *his* cardiovascular risk.[5] (Pl.'s

---

[4] The APPROVe study involved colon polyp patients. The VICTOR study involved colorectal cancer patients. And the ViP study involved prostate cancer patients.

[5] The terms "relative risk" and "confidence interval" are inter-related. "Relative risk" is the "ratio of the risk of disease or death among people exposed to an agent to the risk among the unexposed." *See* Reference Manual on Scientific Evidence at 550-51. In other words, it is a measure of the average risk observed in the exposed population as a whole. "Confidence interval" refers to a "range of values calculated from the results of a study within which the true value is likely to fall." *See id.* at 546. "The width of the confidence interval provides an indication of the of the precision of the . . . relative risk observed in the study . . . ." *Id.*

7

Mot. at 2, 8.) To that end, plaintiff seeks to exclude any testimony or argument that he had an "individual confidence interval" that differs from the statistical association reported in APPROVe. (*Id.* at 9.) Again, because plaintiff seeks to rely on data from APPROVe in an attempt to meet his burden of proof, Merck is entitled to present expert testimony explaining *why* plaintiff's reliance on that data is misplaced.

Plaintiff's Motion is premised on an *assumption* that the risk observed for an entire patient population is equivalent to any individual's risk. That assumption is simply wrong, however. (Deposition of KyungMann Kim, Ph.D. at 133:23-25 ("Q: Now, is it correct that the risk for an individual is not the same as the relative risk? A: That's correct."), attached hereto as Ex. B.) Population-based statistics cannot be applied directly to any individual for the simple reason that different individuals have different risk profiles. Some individuals are at a higher risk than others for adverse cardiovascular events like heart attacks because they suffer from one or more conditions that predispose them to such events, including but not limited to severe coronary artery disease, hypertension, high cholesterol, or family history.

Indeed, it is *because* of the heterogeneity among individuals that it is never appropriate to base causal inferences solely on population-based statistics. Plaintiff relies on the Reference Manual on Scientific Evidence, but the Manual unequivocally states that statistical association is *not* equivalent to causation. *Id.* at 480 ("[I]t should be emphasized that *an association is not equivalent to causation*. An association identified in an epidemiological study may or may not be causal."); *see also Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 718 (Tex. 1997) ("[E]pidemiologcal studies only show association. There may in fact be no causal relationship even if the relative risk is high."). Instead, where an expert relies on statistics as part of the proof of specific causation, the expert must tie those statistics to the allegedly injured individual and

8

take the individual's unique medical conditions into account. As the Reference Manual on explains:

> A plaintiff may have been exposed to a dose of the agent in question that is greater or lower than that to which those in the study were exposed. A plaintiff may have individual factors, such as higher age than those in the study, that make it less likely that exposure to the agent caused the plaintiff's disease .... Pathological-mechanism evidence may be available for the plaintiff that is relevant to the cause of the plaintiff's disease. *Before any causal relative risk from an epidemiologic study can be used to estimate the probability that the agent in question caused an individual plaintiff's disease, consideration of these (and similar) factors is required.*

*Id.* at 540 (emphasis added); *see also Havner*, 953 S.W.2d at 720 ("[A] claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. A claimant must show that he or she is similar to those in the studies."). Based on the foregoing, Merck is entitled to explain to the jury why plaintiff's individual risk for cardiovascular injury is different than the population-based risk seen in APPROVe. Part of this explanation will involve showing that plaintiff is not similar to the colon polyp patients in that study.

Plaintiff argues that the Court should preclude Merck from providing this explanation because the concept of "individual confidence intervals" applies only to "continuous outcome variables," not to "binary outcome variables" such as heart attacks. (Pl.'s Mot. at 2.) Plaintiff misses the point. While heart attacks are binary outcome variables in the sense that one either has a heart attack or not, any individual's *risk* for a heart attack is a *continuous* variable to which an individual confidence interval applies. As Dr. Kim explains, "the relative risk for a particular event, such as myocardial infarction, is a continuous variable," meaning that not all individuals have the same risk. (June 22, 2006 Declaration of KyungMann Kim, Ph.D. at ¶ 2, attached hereto as Ex. C.) Merck is entitled to explain these scientific principles to the jury.

9

## III.  CONCLUSION.

For the foregoing reasons, the Court should deny in its entirety plaintiff's Motion to Exclude Argument or Opinion Testimony that the Approve Study and Protocol 203 Cannot Be Generalized to Other Populations and to Exclude Opinions Concerning "Individual Confidence Intervals."

Respectfully submitted,

/s/ Dorothy H. Wimberly
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

And

816518v.1

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

816518v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Opposition to Plaintiff's Motion to Exclude Argument or Opinion Testimony that the APPROVe Study and Protocol 203 Cannot Be Generalized to Other Populations and to Exclude Opinions Concerning "Individual Confidence Intervals" has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Mark Robinson by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 26th day of June, 2006.

*/s/ Dorothy H. Wimberly*