REBUTTAL EXPERT WITNESS REPORT

For the past 25 years, I have been a Professor in the Division of Biostatistics, School of Public Health, and in the Department of Statistics, both at the University of California, Berkeley. Specifically, I have served as a Full Professor (1987 – present); Associate Professor (1983 – 1987); and Assistant Professor (1981 – 1983). Prior to that, I was an Assistant Professor in the Department of Statistics at Princeton University, Princeton, New Jersey (1979 – 1981) where I also served as Director of the Statistical Laboratories. At Berkeley, I also hold positions as the Director of the Center for Computational Biology, and Chair of the University of California Graduate Groups in (i) Biostatistics, and in (ii) Computational and Genomic Biology. From 1994 to 2000 I served as Vice Provost at the University of California, Berkeley, in the Office of the Chancellor. A true copy of my CV is attached as Exhibit A.

I have served as a member of the National Academy of Sciences Committee on National Statistics (1993 – 1996) and of the Committee on Theoretical and Applied Statistics (1994 – 1996). I received my Ph.D. in Mathematics from the University of Edinburgh, Scotland in June 1976, and was a post-doctoral Harkness Fellow at Stanford University and the University of California at Berkeley from 1976 to 1978 (funded by the Commonwealth Fund of New York). In 1978-79 I was a Research Fellow in the Medical Statistics Unit at the University of Edinburgh, Scotland. I also held a Visiting Professor appointment at Oxford University, England, in Spring 1990.

I am the author of a textbook, "Statistics for Epidemiology," (Chapman and Hall, New York 2003), as well as approximately 100 peer-reviewed articles in the field of biostatistics. I am a founding editor of the *International Journal of Biostatistics*, Senior Editor for the journal *Statistical Applications in Genetics and Molecular Biology*, and Associate Editor for the journal *Biometrika*. In 2005, I received the Snedecor Award, of the Committee of Presidents of the Statistical Societies, awarded to "an individual who was instrumental in the development of statistical theory in biometry." The award is associated with the best publication in biostatistics in the world in the previous 3 years. I also received a Distinguished Teaching Award from School of Public Health, University of California at Berkeley, in 2004.

I am or have been a member of several international statistical societies including the International Biometric Society, the Institute of Mathematical Statistics, and the American Statistical Association. I was made a Fellow of the American Statistical Association in 1991, and a Fellow of the Institute of Mathematical Statistics in 1996. I served as President of the Western North American Region of the International Biometric Society in 1991, and as Treasurer of the Institute of Mathematical Statistics from 1985-1988.

This report is submitted to respond to some issues raised by defense counsel in the deposition of Dr John Farquhar and in the Expert Witness Statement and Deposition of defense biostatistician Dr. Kim.



EXHIBIT

A

1

**High Risk and Vioxx Interaction: APPROVe**

In the deposition of Dr. Farquhar, defense counsel challenged the definition of the "high risk" group that I analyzed, as described in Dr. Farquhar's Supplemental Report of May 2006. This is my response.

In my original analysis of the joint effects of Vioxx and baseline high risk status, I defined the high risk group to include anyone classified by Merck as having "increased cardiovascular risk" (defined as a prior history of symptomatic ASCVD, or possessing two or more cardiovascular risk factors) and/or diabetics, after discussion with Dr. Farquhar. Following Dr. Farquhar's deposition, I re-analyzed the data to only include the "increased cardiovascular risk" individuals, as defined by Merck, in the high risk group . This change resulted in a shift of only two of thirty confirmed thrombotic events from the "high risk" Vioxx treatment arm to the "low risk" Vioxx treatment arm. There was no change in the number of placebo events. As would be expected with such a relatively minor change in the overall data, the results are materially very similar to those from my previous analysis. For example, in the analysis of all 72 thrombotic events, the Relative Risk for an event associated with assignment of Vioxx was 1.28 with a 95% confidence interval of (0.65—2.51) in the low-risk group (as compared to 1.15 with the previous definition of baseline risk). On the other hand, the same Relative Risk in the high-risk group remained considerably higher, namely 2.70 with a 95% confidence interval of (1.31—5.57), with an associated p-value of 0.007 (as compared to 2.87 before, with a p-value of 0.004).

Thus it is still apparent that the deleterious effect of Vioxx is more than 2 times worse in the high risk group as compared to the low-risk group. These two Relative Risks can be compared quantitatively by using a test for interaction, to address the question as to whether risk status significantly modifies the effect of Vioxx on the risk for an adverse event. This test yields a p-value of 0.137 (as compared to 0.07 before). The fact that this is not "significant" by conventional or mindless application of a 0.05 significance level has to be viewed in the context that interaction tests are well-known to have reduced power (and raising the significance level is a direct way of addressing this) and the fact that a similar interactive effect was also observed in my analysis of VIGOR. Further, it should be stressed that the interaction test used here is examining the evidence for *multiplicative* interaction which sets a much higher 'bar" than looking for *additive* interaction. Most epidemiologists consider the existence of additive interaction to suggest biological synergism between two factors (here Vioxx exposure, and "increased cardiovascular risk" at baseline)—see Rothman and Greenland (1998). The presence of multiplicative interaction, as described above in detail, always determines that there is even more striking evidence of additive interaction in the data (given that the Relative Risks of both factors are greater than one). I thus consider the evidence of an elevated Relative Risk associated with Vioxx in the high-risk group to be notable, supporting biologic synergism of the effects of Vioxx with other pre-determined cardiovascular risk factors in the APPROVE trial.

Merck's challenge appears to be based on whether a particular high risk subgroup was prespecified. So it is important to note that the high-risk subgroup used in this new analysis was defined by Merck in their own Statistical DAP for Protocol 203 (on p.20). (In the DAP the symptomatic ASCVD individuals were referred to by the term "Aspirin

indicated".) Thus, in analyzing the question of synergistic effects of Vioxx and baseline risk status in this document, I have directly followed the DAP for Protocol 203, here applied to available data from APPROVe study. As stated by Merck Research Laboratories President Peter Kim, Merck itself followed the DAP for Protocol 203 in its analysis of APPROVe data. (Conference call transcript, May 30, 2006.) Finally, similar results to prior analyses are again found if other endpoints are examined (cardiac events only, or cardiac and cerebrovascular events).

Merck's challenge raises the question of whether our analysis should be regarded with skepticism as a "post hoc" analysis. However, in this regard it is important to note that the hypothesis of greater CV risk on Vioxx among patients at increased baseline risk was previously raised by Merck itself in the Bombardier (2000) article on the VIGOR trial. That article reported a statistically significant increased risk of MI among the high-risk "aspirin-indicated" subgroup, while stating that there was no significant difference in MI rates in the lower-risk, non-aspirin-indicated subgroup. The question of whether patients at increased baseline risk would be at greater risk of CV events due to Vioxx was subsequently discussed in the FDA Targum report (2/1/01). Thus, my purpose in examining high cardiovascular risk status, was to confirm—or not—the findings in the VIGOR trial regarding the joint effects of baseline risk status and exposure to Vioxx, and make relevant comparisons. In this sense, this particular subgroup analysis is confirmatory rather than exploratory. The above analysis shows that the results do not depend on the exact definition of "high risk" and my conclusions stand when using the "increased CV risk" group pre-defined by Merck. Thus, this examination clearly does not fall prey to the issues of misinterpretation arising from indiscriminate subgroup comparisons, most recently described by Lagakos (2006).

A separate issue, not addressed in Lagakos (2006), is the choice of an appropriate significance level for a single test of interaction with moderate sample sizes (although he uses an example with the "usual $P=0.05$" he does not discuss other alternatives). This is an important point because statisticians are well aware of the reduced power to detect an interaction effect in samples of moderate size (where the study is usually powered only to detect main effects). Indeed, in a similar vein, defense expert Dr. Kim stated that we (statisticians) have been "too successful" in the promulgation of the $p < 0.05$ significance level, in reference to a test of proportional hazards, a special case of a test for interaction (Kim deposition). A standard and simple way to address this in the case of a test for interaction is to use a larger nominal p-value, such as 0.2, a strategy immediately familiar to statisticians as a way to increase power, and a technique that I have previously recommended in my book (Jewell, 2004). This is particularly appropriate when the analysis is confirmatory—as it is here—rather than exploratory. I also note that Lagakos' conclusions regarding the interaction tests carried out by Bhatt at al (2006) would remain the same even if he had started with a nominal p-value of 0.2 rather than the 0.05 he considered (specifically if the Bhatt et al (2006) interaction tests been assessed with a significance level of $0.2 \div 20 = 0.01$, none would have reached statistical significance).

A higher significance level than 0.05 for examining interactions is widely used in other contexts, including drug safety analyses. In the context of Vioxx analyses, note that "Results that were statistically significant at level 0.1" are listed in a Safety Analysis (Table 4) of the Statistical Reviewer Briefing Document for the Advisory Committee (p.

3

11). In the same document, Table 3 (p. 9) lists "statistically significant subgroup by treatment interactions at level 0.10", and, for example, a claim that a "statistically significant (p-value = 0.073) treatment by baseline steroid use interaction was observed." In the Vioxx Review of NDA #21-042 transcript, Dr. Li of the FDA states that "there is (sic) a strong statistical significant study by treatment interactions. ... the P-value is (sic) .09 and .08."

Note that if a 0.2 significance level is applied to the subgroup analyses given in Table 19 of the APPROVe Trial Cardiovascular Safety Report, four of the interactions discovered can be considered "significant". All four of these subgroups refer to biologically plausible high risk categories (Symptomatic Atherosclerotic Cardiovascular Disease, History of Ischemic Heart Disease, Diabetes, and Two or More Cardiovascular Risk Factors). This further supports the conclusion that a significance level of 0.2 for interaction is a reasonable indicator of consistent elevated risk among prespecified higher risk patient groups, as compared to the circumstances of concern to Lagakos (2006), namely a chance occurrence in one of many subgroups indiscriminately defined potentially after examination of the data.

Finally, these findings regarding the potential synergistic effects of Vioxx with baseline cardiovascular risk factors are consistent with the recent meta-analyses performed by Kearney et al (2006). The authors there reported upon increased CV events among Cox 2 inhibitor users, noting the likelihood of "a smaller excess [of vascular events due to COX 2 inhibitors] among those at lower risk (such as women with rheumatoid arthritis) and a higher excess in those at above average risk (such as older patients with established atherosclerotic disease)." This expectation of higher excess in patients at above average background risk is precisely the finding that my APPROVe analysis confirmed.

### Time Interaction with Vioxx: Protocol 203

In his Report and deposition, Dr. Kim stated that there was no effect of Vioxx during the first 18 months of use in the APPROVe study, and he further stated that the assumption of the Cox proportional hazards model was properly assessed using linear time rather than log(time) in an interaction term in the model. The issue of which statistical method to use in this model was raised by Merck's recent public statement that the published APPROVe article employed the linear method, although the DAP had specified log(time) and the authors erroneously reported that log(time) had been used. The following is my response to the recent disclosures and Dr. Kim's testimony about them.

As indicated, the Statistical Data Analysis Plan for Protocol 203 suggested that the issue of variation of the Relative Risk, or Relative Hazard, over time be addressed by including an interaction term with the treatment indicator multiplied by $\log(t)$ where $t$ represents follow-up time. An alternative approach would be to use an interaction term with the treatment indicator multiplied by $t$ itself (the linear time technique noted above).

In my analysis of Protocol 203, I employed a more flexible (and conservative) approach allowing the Relative Hazard to take different values over five time intervals which covered the three years of follow-up. A subsequent test of interaction examined whether there was evidence of variation of these Relative Risks or whether the estimates were

4

compatible with a single constant value over time. As previously reported the p-value for this test of time interaction was 0.13 with cardiac events as the endpoint.

I disagree with the use of $\log(t)$ in the interaction term in a proportional hazards model since it essentially forces the Relative Risk to be 1 or very close to 1 for early follow-up periods (mathematically this follows from the fact that the logarithm of zero is negative infinity so that the constant of proportionality comparing the risks in the two groups is then the exponential of negative infinity or 1). A Relative Risk of 1, or close to 1, would contradict the findings for Protocol 203 where the data provides an estimate of RR = 3.36 over the first 2 months of follow-up, and 1.42 over the first three months. If a parametric model is to be chosen, then the use of $t$ itself in the interaction term is preferable as originally carried out by investigators in their analysis of APPROVe data. However, the analysis begins but does not end with this point.

For completeness, I tested for time-varying Relative Risks using both parametric approaches: with the $\log(t)$ approach, and using cardiac endpoints, the p-value for interaction of Vioxx and time is 0.08. Alternatively, using $t$ itself—more reasonable as I have argued above—the p-value for the test for interaction is 0.035. Note that that the existence of nonproportional hazards does not refer to the magnitude of the Relative Risk in any particular time period, but only states that they are different. So, in the Protocol 203 context, a declaration of "nonproportional hazards", based on these tests, does not say that the Relative Risk is near to 1 in early follow-up periods, only that the data suggests that the Relative Risk apparently grows with increasing exposure to Vioxx (given the sign of the coefficient of the interaction term is positive). This is compatible with my previous Protocol 203 analysis using the more non-parametric analysis (noted above). To emphasize this point clearly, the proportional hazards model with an interaction term of Vioxx and $t$ itself, yields the following (necessarily time-varying) estimates of Relative Hazard:

At $t$ = 3 months, RH= 1.48 with a 95% CI of (0.79, 2.77)
At $t$ = 6 months, RH= 2.09 with a 95% CI of (1.04, 3.10)
At $t$ = 12 months, RH= 2.67 with a 95% CI of (1.53, 4.65)
At $t$ = 18 months, RH= 3.89 with a 95% CI of (1.83, 8.27)

It is important to note here that the prescriptive description of how the Relative Hazard varies smoothly over time allows more accurate estimation of Relative Hazards at earlier follow up times than my previous Protocol 203 analysis which did not make use of this assumed parametric structure. With the Merck approach, which Dr. Kim did not carry out, the Protocol 203 data then establishes significant effects of Vioxx as early as after 6 months of exposure.

The Statistical Analysis Plan for Protocol 203 in fact, envisaged doing both the parametric and non-parametric approaches that I have briefly described above. Quoting the report "If the nonproportionality is large and real, various approaches may be explored to investigate the ... nonproportionality: ... partition of the time axis ..., adding a time-dependent covariate, or using a different model." The partitioning of the time axis is what I used in my original analysis of Protocol 203; the use of a time-dependent covariate—here the treatment term times $t$—is described above.

In summary, both the parametric and less parametric approach to time-varying Relative Hazards lead to the same conclusion, namely, a sizeable Relative Hazard—greater than 1—in the early follow-up period, which tends to only increase as exposure to Vioxx lengthens.

**Overall Cumulative Incidence Curves for All Thrombotic Events: Protocol 203**
In his report, Dr. Kim does not mention my Protocol 203 analysis, although at his deposition he said that he had read it. Dr. Kim believed that my Report should have focused on the "primary endpoint" of confirmed thrombotic cardiovascular adverse effects. The following is my response.

In my previous analysis of Protocol 203, I focused on cardiac events as the endpoint, because it was a prespecified endpoint in the statistical DAP for Protocol 203. Also, the published APPROVe study reported separately upon the results for Cardiac Events, Cerebrovascular and Peripheral events, with the highest Relative Risk in the Cardiac Endpoint (2.80).

Nevertheless, to address Dr. Kim's concern, I have since repeated my overall Protocol 203 analysis using two other endpoints: all thrombotic events (the primary endpoint in the DAP), and an endpoint that combines cardiac and cerebrovascular events. In the set of figures attached (Figures 1—8), I provide the analogous graphs of cumulative incidence of all thrombotic events that I originally provided for cardiac events in my previous analysis of Protocol 203 data. The figures reflect increasing cumulative amounts of follow-up data, starting from the first 30 days (Figure 1) to a full three years of follow-up (Figure 8). With the entire follow-up information, the estimate of the Relative Risk, associated with assignment to Vioxx, is 1.77 with a 95% confidence interval of (1.22, 2.56) with a p-value of 0.003.

The cumulative incidence plots (Figures 1—8) are very similar to those produced for cardiac events in my original Protocol 203 analyses, as they should be since the two endpoints (cardiac events only and all thrombotic events) are highly correlated. In fact, one is a major subset of the other so that we would expect similar results. For the same reason, the analysis of multiple endpoints does not suffer from the same multiplicity issue that we previously discussed for subgroups and as noted by Lagakos (2006). Finally, there is consistent evidence that the Relative Risk associated with Vioxx is elevated in the first 18 months of exposure, and then elevated yet higher after 18 months of follow-up, as seen in my original Protocol 203 analysis of cardiac events. As such, we would anticipate a significant p-value in a test for interaction of the Vioxx effects with time itself and that a significant difference between Vioxx and placebo patients in the incidence of thrombotic events would be detected early in the follow-up period if a proportional hazards model—with this time interaction term included—is used (as described above for cardiac events).

**Generalizability**

Dr. Kim's central hypothesis appears to be that the results of APPROVe cannot be generalized to other populations. However, the manner in which Dr. Kim appears to have reached this opinion is not reliable. Below is my response to Dr. Kim's claim.

Generalization Was Anticipated by the Protocol 203 DAP

Protocol 203 was designed to allow generalization of its results. The three studies comprising Protocol 203 were based on different patient eligibility criteria—adenomatous polyps, prostate cancer and colorectal cancer. The DAP noted that the patients would have a spectrum of CV risk, and stated that the results would allow generalization to other patient populations including osteoarthritis and rheumatoid arthritis patients. At his deposition, Dr. Kim claimed support for the contrary view (that the results of APPROVe cannot be generalized to other populations) from an overview paper by Kearney et al (2006). In particular, Dr. Kim relied upon Figure 2 of the Kearney article which restricts their meta-analysis to trials with scheduled duration of at least one year, effectively limiting the data for Vioxx to the long-term APPROVe and Alzheimers studies (Kim deposition, p.253). Interpreting differences in estimated Relative Risks as due to the definition of the populations, e.g. one group had polyps and the others didn't, is indefensible without a plausible scientific explanation as to why a polyp patient should anticipate a more serious deleterious effect from Vioxx. Notably, Dr. Kim admitted that he could not identify a single factor that would make a polyp patient more likely than an osteoarthritic to have a myocardial infarction while on Vioxx (Kim Deposition).

Inadequate Power of Alzheimer's Studies

At his deposition, Dr. Kim agreed with the general principle that, when a study with low power fails to show a significant effect, the results are more fairly described as inconclusive than negative; the proof is weak because the power is low. (Kim deposition, p. 206).

Dr. Kim's opinion that the APPROVe results cannot be generalized is largely based on the belief that the Vioxx Alzheimers trials, in particular 078 Thal et al, 2005), were adequately powered to detect an increase in risk due to Vioxx, and that since none was detected the results of APPROVe and Alzheimers are inconsistent and contradictory. Regarding the power of the 078 study to detect Vioxx cardiovascular effects. Dr. Kim states without attribution that "the 078 study had adequate (greater than 80%) power to detect a relative risk of 2 or greater" (Kim report, p. 23). The only information given in his report was the observed number of all thrombotic events in each group and the average follow-up which he quotes as being "approximately 4 years". When questioned about this power calculation in his deposition, Dr. Kim did not provide further detail regarding the validity of this statement, other than indicating that it was post-hoc (i.e. based on assumed rates and sample sizes as actually observed in the 078 study), and that he "did a calculation on the fly". He indicated that he neither accounted for compliance, nor for patient drop-out; he stated that he "used the patient enrollment duration and the follow-up duration", presumably the latter being assumed to be approximately 4 years as quoted above. It is well-known that compliance, loss to follow-up and duration of study all have serious impact on power calculations so that there seems to be little if any value to Dr. Kim's assertion regarding the power of the 078 study without further analysis of his assumptions.

To test Dr. Kim's assertion of adequate power in 078, I carried out power calculations that took into account the effects of poor compliance, loss to follow-up, and shorter study duration, based on information provided in published literature and FDA reviews. Results, sources and methods for this power calculation are described below.

In Thal et al (2005) it is stated that patients were accrued over two years from April 1998 to March 2000. It is stated that the median duration on medication was 94 weeks (about 21 months) in the Vioxx group and a little longer in the placebo group. It is inexplicable to me why Dr. Kim used "approximately four years" as the follow-up duration since Thal et al (2005) clearly state that the study was terminated 11 months earlier than the four year scheduled endpoint, particularly since he did not allow for drop-outs. Next, 36 thrombotic events were observed in 1550.97 patient years of follow-up in the placebo group, yielding a baseline incidence rate of 2.32 events per 100 patient years (12/18/04 Interim Review of thrombotic events in Alzheimer's studies 078 and 091). It is further indicated that 45% of the patients discontinued the study prematurely. No detailed indication of the timing of when these individuals terminated is given. The impact of drop-outs on power is accommodated by using the reported durations.

Crucially, Thal et al (2005) note that there is only 61% compliance to treatment in the Vioxx group, meaning that only 61% of the Vioxx patients took at least 80% of their assigned tablets, determined by counting pills (the authors' definition of compliance). It is known that "pill counts overestimate compliance" (*Encyclopedia of Biostatistics*, p. 836; Rudd et al, 1988), so that the actual compliance rate is likely lower. Dr. Kim indicates that he couldn't do any calculation of the effects of compliance since "we don't have data indicating what ... [loss of compliance] ...does to the relative risk". Yet Dr. Kim agreed with the generally accepted statement that the main impact of noncompliance is to reduce a treatment effect. This means that the risk in the Vioxx group will be lowered overall because a substantial fraction, 39%, of these individuals took less than the prescribed amount of medication (an insufficient level of compliance for this study to provide a valid estimate of a causal treatment effect). If the risk in Vioxx non-compliers is the same as in the placebo group, Dr. Kim's targeted intent-to-treat Relative Risk of 2.0 would be reduced to 1.61, given the observed low level of compliance; (throughout I assume that non-compliance in the placebo group does not affect their risk, since placebo is not expected to have any effect whether it is taken or not). Since the magnitude of the anticipated Relative Risk is thus lowered, the necessary design sample size (and thus the number of events) needed to achieve appropriate power must be substantially increased. The reduced power due to noncompliance with treatment is widely known to those planning and interpreting the results of randomized clinical trials. The 1998 *Encyclopedia of Biostatistics* (of which I was an Editor) entry on "Compliance Assessment in Clinical Trials" indicates that interpretation of insignificant results from an intention-to-treat analysis of a randomized clinical trial must necessarily be inconclusive in the presence of poor compliance since the latter causes treatment differences to be underestimated thereby reducing power to detect a treatment effect.

I next did a power calculation, with the following inputs: (i) the background (placebo) incidence rate calculated above, (ii) accrual over 24 months with subsequent follow-up for (a median of) 21 months, (iii) that 1460 patients were randomly (and equally)

assigned to either Vioxx or placebo, and (iv) the noted reduction in the intent-to-treat relative risk due to non-compliance. The software used is publicly available from the Department of Biostatistics at Harvard (Massachusetts General) at the following website http://hedwig.mgh.harvard.edu/biostatistics/software.php.

With all of these stated inputs based on reported data, the intent-to-treat power declines to 0.71. Now, considering drop-outs, Thal et al (2005) state that 368 of participants (approximately equally split between Vioxx and placebo) withdrew consent and so discontinued the study. Thal et al (2005) does not provide information as to the times when such dropouts occurred, but some reasonable assumptions can be made. If these individuals dropped out early after recruitment, they would contribute few patient months of follow-up to either treatment group, lowering the power even further to 0.58. Even if omitting such individuals increases the median follow-up duration of remaining participants to say 25 months, the power remains as low as 0.63. If we however consider a targeted Relative Risk of 1.5 instead of 2.0, the power is now 0.27 even if all drop-outs contribute some information. These power calculations illustrate that non-compliance and drop-out drastically reduces the power of the 078 study making it considerably less than 0.80. It is my view, that the low compliance rate in study 078 makes reliable estimation of the *causal* effects of Vioxx (as against the intent-to-treat effects) very uncertain; without question, the causal effects in a high-noncompliance situation are greater than those reported by an intent-to-treat analysis, since the latter deems subjects to have been drug-exposed based on their original randomization status, even though they did not meet the protocols for acceptable use of study medication.

These remarks regarding the power of the 078 study are supported by an FDA reviewer's comments concerning the Vioxx Alzheimers trials as a whole. For example, in the Arthritis Advisory Committee transcript, Dr. Villalba of the FDA asserts that the Alzheimers studies "were not powered to show any difference with placebo" in reference to the analysis of cardiovascular events.

Consistency of Increased Risk after 18 Months
While Dr. Kim maintains that the APPROVe and Alzheimers studies are inconsistent, in one relevant respect they are strikingly consistent. As shown above (in the section on time interaction with Vioxx effects), the Protocol 203 data analysis shows that the deleterious effects of Vioxx are greater with longer-term exposure, for example, at least 18 months of exposure than with shorter exposure. This appears to also be true in the combined data for studies 078 and 091 submitted by Merck to the FDA. In the 12/18/04 FDA Interim Review of thrombotic events in Alzheimer's studies 078 and 091, Table 6 indicates that there were 26 thrombotic events after 18 months of exposure (in 538 patient years of follow-up) in the Vioxx group, and 16 thrombotic events (in 665 patient years) in the analogous time period for the placebo group. Comparison of these numbers yields a Relative Risk of 2.01 with an exact 95% confidence interval of (1.03, 4.01), with a p-value of 0.027. Thus, just as in APPROVe specifically, and Protocol 203 more generally, studies 078 and 091 show a consistent and significant elevation of risk of thrombotic events in patients with 18 months or more exposure to Vioxx.

In addition, Dr. Kim's Report does not address the issue of unadjudicated CV thrombotic events that have not been included in the statements regarding the Alzheimers studies

078, 091 and 126. According to the Medical Officer Memo to file (3/12/02) 22 patients had potential cardiovascular thrombotic events with insufficient information to adjudicate. Of these 22 patients, 18 were on Vioxx and only 4 on placebo. Given the small number of observed events, inclusion of these events in the calculations would increase the Relative Risk associated with Vioxx, bringing the estimate substantially closer to what has been observed in other trials.

## The Kearney Article Does Not Support Kim's Claim of Inconsistency between Polyp Patients and other Populations

In Dr. Kim's deposition, he states that the Kearney et al (2006) meta-analysis supports his assertion about inconsistency between polyp data, (as illustrated in APPROVe) and Alzheimer's disease data. However, these two groups of trials do not cover the universe of trial populations assessed by Kearney et al.. Using the data from Kearney's article, we can see that in trials of Vioxx on other patient populations other than the Alzheimer's and polyp patients described in their Figure 2, there is an estimated Relative Risk of 1.45 with a 95% confidence interval of (0.58, 4.07), almost identical to the overall estimated Relative Risk of 1.49 reported for all trials they considered. Thus, these data are consistent with the conclusion that the non-polyp, non-Alzheimer's populations had increased risk of vascular events of the same magnitude as the population as a whole.

## Merck's Trials against Placebo Show Increased Risk for OA and RA Populations

At the deposition of Dr. Farquhar, defense counsel introduced a table of Merck clinical trial data for thrombotic events in Vioxx patients versus placebo, for the apparent purpose of showing no difference in the rate of thrombotic events in the Alzheimer's trials (Table 13 of the Information Amendment – Clinical (IND 46,894: Vioxx (rofecoxib), provided to the FDA by Merck on March 22, 2004). For the reasons stated above, the Alzheimer's studies presented in Table 13 were underpowered to detect a difference. At the same time, Table 13 presents summary information on trials containing rheumatoid arthritis (RA) and osteoarthritis (OA) patients. Combining the OA and RA trials in a similar fashion to Kearney et al (2006) yields an estimated Relative Risk of 3.14 with a 95% confidence interval of (1.19, 10.46) with associated p-value of 0.01 (TCVSAE endpoint). In fact, the analysis of solely the OA trials in Table 13 yields a Relative Risk of 3.03 with a 95% confidence interval of (1.02, 12.13), and p-value of 0.03 (using the grouped data provided). Thus, this clearly suggests that the elevated risk associated with Vioxx is not restricted to "polyp" patients, but appears, for example, in combined studies of OA patients.

As to the OA trials, I note that Kearney included the 010 trial, which does not appear in Merck's Table 13. Merck's documentations of Protocol 010 (MRK-OS420045791-92) shows that there were two events (both TIAs) under Vioxx, and approximately 15.5 and 7.3 patient-years of exposure to Vioxx and placebo, respectively. Thus the Relative Risk for the primary endpoint of TCVSAE among the Merck OA trial populations is now 3.30 [23/765.0 vs. 4/439.6], with 95% confidence interval (1.13, 13.14), and p-value 0.016. It is noteworthy that the mean duration of exposure to Vioxx or placebo in the OA trials was only 76 days. The appearance of a statistically significant tripling of risk of thrombotic events in the OA trials in such a short duration contradicts the hypothesis that there is no effect for the first 18 months of use of Vioxx. (note that the Relative Risk for

the combined OA and RA trials, including 010, yields a Relative Risk of 3.27 with a 95% confidence interval of (1.25, 10.86) and p-value 0.007.)

To determine further consistency of the OA trials data with Protocol 203 results I prepared a Kaplan-Meier cumulative incidence plot of the risk of thrombotic events for Vioxx versus placebo participants, as shown in Figure 9 below. These calculations were based upon the data in Table 13, supplemented by the 010 data (both referenced above), as well as exact event day information from the "Listing of All CV Events in Rofecoxib" (MRK-I8940080121-133, p. 56-68). The log-rank test comparing these cumulative incidence curves yields a p-value of 0.023. The estimated Relative Risk is 5.42 with a 95% confidence interval of (1.26, 23.29). Thus, the OA trials again show a significant separation of the risk of a thrombotic event for Vioxx patients above that for the placebo group, even within the first 60 days of exposure. The consistency of the results displayed in Figures 2 (attached) and 9 (below) demonstrates that the Protocol 203 DAP was correct in its assertion that Protocol 203 results allow generalization to other populations at risk, including osteoarthritis patients.

**FIGURE 9**
OA Trials All Thrombotic Events: 0—60 days of Follow-up



**Data sets used**
In constructing a pooled data set for Protocol 203 from SAS data files provided by Merck I checked to confirm counts of particular events by treatment assignment to compare with published and unpublished reports of these counts. It was my understanding that these data files for APPROVe and ViP were considered complete when provided, and that there was delay in finalizing the VICTOR data set. In the VICTOR information I

received in November 2005, there was information on exposure periods, treatment assignment, and adverse event outcomes, in sufficient detail to combine with the other trials. Specifically, in addition to data files on a hard drive, I reviewed copies of Tables 1 and 3 from a MRL memo stamped "Final, July 28, 2005" that showed 14 (Vioxx) versus 4 (placebo) confirmed thrombotic events. These totals exactly matched the counts in the VICTOR data records I received. In addition, the event counts correspond exactly with what is described in Dr. Kim's Expert Witness report of June 1, 2006. In May 2006, I received a CD with files containing apparent update data on VICTOR. I did not find any additional information on adverse events on these files, nor data on identification numbers etc. I therefore did not make any changes to the pooled data set based on this update. In Dr. Kim's deposition, there is reference to one possible additional placebo event for VICTOR (subject #10385). If confirmed, an addition of a single event would make very little difference to my reported analyses of Protocol 203.

In a Merck memorandum regarding the testimony of Dr. Farquhar, the defense counsel argues that analysis of Protocol 203 data is premature, claiming that "The Merck Data Analysis Plan for Protocol 203 contemplated that a combined analysis of cardiac events in all three studies would be conducted only when each study had run its full pre-specified course". This statement is incorrect. The ESMB for Protocol 203 was empowered and directed to perform interim analyses during the course of Protocol 203, and to terminate the trials due to "inferiority" applied to the primary endpoint, confirmed thrombotic cardiovascular events. Here, "inferiority" refers to the occurrence of a sufficiently greater number of adverse thrombotic events in patients assigned to Vioxx as compared to placebo. Specifically, according to the DAP, the "Early Decision for Inferiority" stopping rule required "the lower limit of a CI for HR> 1.0 ... and observed HR >1.30". (Here "CI" refers to a confidence interval and "HR" to the term Hazard Ratio, often referred to as Relative Risk.) My analysis of Protocol 203, based on data accumulated by mid-October 2004, indicates that the combined study would have been terminated early on the basis of this stopping rule, even if it had not been stopped because of the termination of the APPROVe study: the event data accumulated through mid-October 2004 data provides an estimated Hazard Ratio of 1.77 (far greater than 1.30), with the lower limit of the appropriate CI as 1.22, again far higher than 1.0. If all three trials had not been terminated due to the finding of excess toxicity in APPROVe by itself, it would have been the obligation of the ESMB to review the same pooled data that I analyzed, which would have required early termination of Protocol 203 based on the inferiority stopping rule.

In addition, the defense counsel statement contradicts what is stated in the Merck Data Analysis Plan. This plan specifically indicates that the ESMB for Protocol 203 would conduct "numerous (approximately twice yearly) interim analyses to monitor safety, which afford potential for consideration of early decision to report scientific conclusions, i.e. publish results" (p. 9). Even more directly, the DAP stated unequivocally that "The combined analysis for formal primary assessment of the primary hypothesis will be performed when the total number of confirmed thrombotic cardiovascular events ... reaches 611 in the three trials combined. It is anticipated that the 611 confirmed thrombotic events will be reached in early 2006, which is after completion of APPROVe and prior to study completion of VICTOR and ViP." Thus, Merck's own plan anticipated publication of results from Protocol 203 in early 2006. Of more importance, the plan

anticipated analysis of Protocol 203 data *prior to completion of VICTOR and ViP*. In all regards, these statements indicate that the analysis of Protocol 203 data is overdue rather than premature.

## Effect of Naproxen on Cardiovascular Outcomes

In Dr. Kim's Expert Witness report, he relies on an observational study to establish the protective effect of Naproxen on the rate of thrombotic events, with the assumption that this explains the findings (the deleterious effects of Vioxx) of VIGOR. However, in Kearney et al. (2006), their meta-analysis of NSAID randomized clinical trials show a Relative Risk of 0.92 for a comparison of Naproxen to placebo with a 95% confidence interval of (0.67, 1.26). This fails to exhibit a protective effect for Naproxen.

## Individual Confidence Interval

Dr. Kim's Expert Witness report refers to a confidence interval for the Relative Risk for an *individual*. Defense counsel brought up this subject at the deposition of Dr. Farquhar with reference to the book by Pagano & Gauvreau (2000). This concept is completely inappropriate in a discussion of an increased risk of a cardiovascular event associated with Vioxx. In more detail, Pagano & Gauvreau (2000) are referring to the prediction of a *continuous* outcome for a single individual where it is well known that the confidence interval for a predicted single value is wider than the confidence interval for the population mean. These ideas are not applicable to prediction of a binary outcome such as experiencing a cardiac event or not in a specified window of time. In fact, a binary outcome is either "Yes" or "No" and any prediction would either be "Yes" or "No" depending on the estimated underlying risk of the event for an individual. In most studies such as this where the outcomes are rare (certainly less than 50%) any prediction would have to be "No" whether the individual was exposed to Vioxx or placebo. And there is no such concept then available for the Relative Risk for an individual based on these predicted outcomes. Such a discussion is all beside the point anyway: what we would like to know for a random individual from an appropriate population is: what is the ratio of their estimated risk (of the endpoint of interest) under Vioxx to their estimated risk under placebo. This is, of course, nothing more than the Relative Risk for the population and there is no "widening" of the confidence interval for an estimate of this. It is just this number that been reported by investigators studying Vioxx in their description of risk comparisons.

The generally accepted concept associated with ascertaining how much an individual's risk increases due to exposure to Vioxx is provided by the Attributable Risk. The Attributable Risk quantifies the fraction of cardiovascular outcomes that are *attributable* to exposure to Vioxx in an exposed population. Mathematically the Attributable Risk (AR), among exposed individuals, is related to the cumulative population Relative Risk as follows:

$$AR = \frac{RR-1}{RR}.$$

A confidence interval for *AR* therefore follows directly from a confidence interval for *RR*.

**Confidence Intervals Interpretation**

In his Expert Witness Report, Dr. Kim makes the erroneous statement that a "95% confidence interval of 1.19-3.11 (as for all thrombotic events in APPROVe) tells us only that the true relative risk could be as small as 1.19 or as large as 3.11 and does not enable us to assign a probability to either of these two probabilities." (Kim Expert Witness Report, p.6). This error is picked up by defense counsel's questioning of Dr. Farquhar where he asks a question regarding confidence intervals that contains the same misinterpretation. A correct understanding of a 95% confidence interval for the Relative Risk is as follows: with probability 0.95, the reported confidence interval contains the true unknown Relative Risk. The true value of the Relative Risk is much more likely to fall near the center of the confidence interval than near either endpoint. In fact, the likelihood of the data is more than six times greater at the point estimate of the Relative Risk as compared to the likelihood of the data at either endpoint. In the example used by Dr. Kim, the point estimate of the Relative Risk, 1.92, is *much* more plausible than the estimate 1.2, for example, near the edge of the confidence interval. Similarly, in my analysis of Protocol 203 data, where I estimated the Relative Risk of 2.37 for cardiac events, associated with exposure to Vioxx, with a 95% confidence interval of (1.43, 3.91), the value 2.4 is again *much* more plausible as an estimate of the true Relative Risk than the estimate 1.5, for example.

**Book reviews**

My book, *Statistics for Epidemiology*, was published in 2004 before I had any contact with data relating to Vioxx. It has been extremely successful and is used as text in many graduate programs across the world. Reviews were extremely positive. The longest of these (Bellocco, 2005) states that "the book reaches an almost perfect balance between including very advanced concepts, and keeping the discussion at a (sic) acceptable level for intermediate graduate students. I consider it to set a new standard for texts on statistics in epidemiology, especially in its treatment of causation and bias". Professor Sander Greenland, of the University of California, Los Angeles, an international leader in the application of statistics to problems in the health sciences, and a very tough critic, states on the web that this "book is excellent; a real breakthrough in texts on statistics in epidemiology, especially in its attention to causation and bias." My book has now received several citations in medical and epidemiological peer-reviewed journals.

My hourly rate for consulting is $310. I have testified once in the last four years at a deposition in the blood product litigation.

Nicholas P. Jewell, Ph.D.

June 21, 2006
Date

14

**FIGURE 1**

Protocol 203 All Thrombotic Events: 0—30 days of Follow-up



**FIGURE 2**

Protocol 203 All Thrombotic Events: 0—60 days of Follow-up



**FIGURE 3**

Protocol 203 All Thrombotic Events: 0—120 days of Follow-up



**FIGURE 4**

Protocol 203 All Thrombotic Events: 0—6 months of Follow-up



# FIGURE 5



Protocol 203 All Thrombotic Events: 0—1 year of Follow-up

## FIGURE 6

Protocol 203 All Thrombotic Events: 0—18 months of Follow-up



**FIGURE 7**

Protocol 203 All Thrombotic Events: 0—2 years of Follow-up



**FIGURE 8**

Protocol 203 All Thrombotic Events: 0—3 years of Follow-up

