IN RE VIOXX PRODUCTS LIABILITY )  MDL No. 1657
LITIGATION )
)

## SUPPLEMENTAL EXPERT REPORT OF JOHN W. FARQUHAR. M.D.
THIS DOCUMENT APPLIES TO ALL CASES

### A.  Introduction and Summary of Opinions

1.    This Report is submitted to supplement the opinions provided in my Report dated September 26, 2005, based on review of the additional materials referenced herein. The opinions provided herein are stated to a reasonable degree of medical and scientific probability. In summary, the Supplemental Report includes the following:

- Protocol 203: Merck's pre-specified analysis of data from three pooled studies (APPROVe, VICTOR and ViP), known as "Protocol 203," shows early and continuous excess risk of cardiac adverse events, statistically significant at 18 months and at all times thereafter, thereby refuting Merck's hypothesis that no excess risk appears until after 18 months of exposure.

- High-Risk Patients: Data from the APPROVe and VIGOR studies are analyzed, showing greater relative risks and rapid onset of excess cardiovascular events among patients at higher background risk; that is, the level of the cardiovascular (CV) risk before using Vioxx.

- Hypertension: Data from the APPROVe and VIGOR studies are displayed, showing early, continuous and statistically significant excess risk of hypertension due to Vioxx, compared to both placebo and naproxen. Also, data from the APPROVe study show



- 1 -

EXHIBIT
B

significantly greater incidence of both "Stage 2" (more severe) hypertension and thrombotic events among Vioxx patients who suffered Stage 2 hypertension. No such increase in CV event risk appeared among placebo patients who experienced Stage 2 hypertension, supporting the conclusion that there was a synergistic interaction between hypertension and Vioxx use.

• APPROVe "extension" data:  According to documents submitted to the FDA by Merck in May 2006, the excess risk of CV events, including myocardial infarction ("MI") and ischemic stroke, remains statistically significant when data from a one-year off-drug follow-up were combined with the previously published data. For the extension period alone, there was a 64% increased risk of thrombotic events in the Vioxx group.

• Biological Mechanism:  Recent publications support Cox-2 inhibition as the cause of hypertension and thrombosis.

## B. Protocol 203 Shows Early and Continuous Risk of Excess Cardiac Events Among Vioxx Patients.

2.     In 2002, following the VIGOR study, Merck prepared a plan to analyze CV adverse events in a pooled analysis of 3 large placebo controlled studies: APPROVe, VICTOR and ViP. The plan, known as "Protocol 203," was submitted to the FDA for its response. On December 19, 2002, FDA Medical Officer Lawrence Goldkind responded to Merck's proposal, indicating general acknowledgment that Protocol 203 would provide "clinically important safety information" about the risk of Vioxx. (Letter, Goldkind to Braunstein, 12/19/02, at p. 1.) Merck proceeded to implement Protocol 203.

3.     Merck's Protocol 203 Data Analysis Plan ("DAP") stated a purpose "to provide increased precision on estimates of the comparability between

- 2 -

rofecoxib and placebo on the incidence of thrombotic cardiovascular serious adverse experiences" (SAEs). (MRK-AFL0015451-484, at 454). The Protocol commented that the larger data set would be more accurate than data from any single one of the three studies. The DAP stated that the findings of Protocol 203 would allow "generalization of the results to other populations" who used Vioxx, including arthritic patients, because the study populations were of similar age and had risk factors for CV events. (Id.)

4.      The endpoints defined in the Protocol 203 included "Cardiac" (MI, Sudden Death, Unstable Angina, etc.), and "Cerebrovascular" (Ischemic Stroke, Transient Ischemic Attack) events. (MRK-AFL0015463). The DAP for Protocol 203 also called for Kaplan-Meier (KM) cumulative incidence graphs to compare the risk of Vioxx versus placebo for CV events over time. (MRK-AFL0015474-75). To the best of my knowledge, Merck has never presented these analyses for Protocol 203, but instead has claimed support for the "18-month hypothesis" based only on the KM curve for "all thrombotic events" in the APPROVe study, which was only one of the 3 studies to be included in the pre-specified analysis.

5.      Following preparation of my Report dated September 26, 2005, data produced by Merck became available to calculate the RR and prepare the KM cumulative incidence curve for Vioxx versus placebo from the Protocol 203 studies. The Protocol 203 data were analyzed and KM cumulative incidence graphs were prepared by Nicholas Jewell, Ph.D., a renowned biostatistician at the University of California at Berkeley School of Public Health, who applied generally accepted methods. Professor Jewell's report on Protocol 203 is attached as Exhibit A.

6.      Based upon this larger and statistically more reliable data set, Protocol 203 directly refutes Merck's hypothesis that no excess risk appears until after 18 months of Vioxx use. To the contrary, the RR of cardiac events (MI, Sudden Cardiac Death and Unstable Angina) in the Vioxx population was 2.68 after 30 days, and 2.37 ($p<0.001$, 95% CI 1.43-3.91) at the end of the study. There was a statistically significant

- 3 -

excess risk by 18 months, and continuously thereafter until the end of the study. As seen in **Figure 1**, below, the rate of cardiac events in the Vioxx population exceeded placebo from the first month through the end of the study. Further, statistical analysis shows that there was <u>no</u> significant difference in the RR of cardiac events over time. (Jewell Report, at pp. 1-2).



**Month**

**Figure 1:** Kaplan – Meier Estimation of cumulative cardiac events. The inset in the upper left corner of the Figure presents an expanded scale for the 0-6 month period, to better illustrate the early separation of the incidence curves.

7. The scientific method is largely based upon testing of hypotheses which are specified before a study is conducted. To prevent manipulation of the results, an essential element of this method is that the data must be analyzed according to the plan made at the outset. That was not done by Merck or its consultants in this case. The DAP did <u>not</u> call for a KM curve of CV event data over time for APPROVe alone. (MRK-I8940080858-928, at 875-876); nevertheless, Merck has promulgated the "18-month" hypothesis based on that single study, which was underpowered to detect differences in the rate of events over time. Conversely, the DAP for Protocol 203 did specify that a KM curve would be prepared from the larger data set of the 3 combined studies, but Merck

-4-

has failed to perform such an analysis. The results of that pre-specified plan show early and persistent excess risk of CV events, with the risk due to Vioxx significantly greater than placebo at 18 months and all later periods (see Figure 1, above), refuting the " no risk for 18-months" hypothesis. The scientific method does not prohibit conducting exploratory analyses that were not pre-specified, and such analyses may provide important information. However, such exploratory analyses are not an acceptable substitute for those that were planned in advance.

8.    Since all of the Protocol 203 studies were terminated on the same date (9/30/04), there was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of CV risk for all three trials, as pre-specified. Indeed, a November 12, 2004, draft version of the subsequently published APPROVe study acknowledged the pre-specified Protocol 203 plan, as follows: "Assessment of cardiovascular safety was not the primary purpose of this study [APPROVe] and there was no pre-specified hypothesis concerning this endpoint for this study alone. However, an analysis of combined cardiovascular data from this study and the data from two other studies was planned." (RBRES-001054-1079, at 1066). The authors deleted such references from later drafts (e.g., 1/26/05 Draft, MRK-AHD0075201-234, at 75209), and no reference to Protocol 203 appeared in the final draft submitted for peer review on February 6, 2005.

9.    At his deposition in November 2005, New England Journal of Medicine (NEJM) Editor Gregory Curfman testified that NEJM had not been informed of the plan to combine APPROVe with two other studies; that the existence of the related studies should have been disclosed; and that clinical trial registration is intended to prevent "bad news" from being "buried away" by the sponsor. (Depo. of Curfman, 11/21/05, at 136-141).

10.    I agree with Dr. Curfman that the related studies of Protocol 203 should have been made known to the editors of NEJM. The scientific method and the

- 5 -

interests of the medical community required disclosure of results of the pre-specified data analysis of all three pooled studies, and not only the results of APPROVe. Such disclosure is particularly important where the undisclosed, pre-specified analysis contradicts the substitute analysis offered by the sponsor, as in the case of the "18-month" hypothesis based on APPROVe alone, which is refuted by the complete Protocol 203 data.

## C. Patients in APPROVe Who Were at High Risk for CV Events at Baseline Had Higher Relative Risks of CV Events Due to Vioxx, Supporting the Synergistic and Multiplicative Effect of Vioxx and Baseline High-Risk Status.

11.    Data from Merck's APPROVe Cardiovascular Safety Report (CSR), filed with the FDA in June 2005, in conjunction with data provided by Merck in this litigation, were used by Professor Jewell to evaluate RRs of thrombotic events among patients at "high cardiovascular risk," compared to patients with lower risk status. Merck defined the "high cardiovascular risk" category to include those with "a history of symptomatic atherosclerotic cardiovascular disease [SACVD] or the presence of at least two of the following risk factors for coronary artery disease: a history of hypertension, a history of hypercholesterolemia, a history of diabetes, or current cigarette use." (Bresalier, 352 NEJM at 1097). Patients identified as diabetics were included in the "high-risk" analysis, based on well-established epidemiologic evidence that the CV adverse event risk conferred by diabetes is equivalent to the CV risk for patients with coronary heart disease (CHD). See, e.g., Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III). NIH Publication No. 02-5215, Bethesda, MD, National Institutes of Health 2002 ("ATP III"), which designated diabetes as a CHD risk equivalent.

12.    The data show not only that Vioxx use caused statistically significant excess risk of CV events, but also that Vioxx interacts synergistically with

- 6 -

high baseline CV risk status to more than multiply the RR of thrombotic events in high-risk patients. Because interaction tests divide the population into subgroups for comparison, the power to detect important differences is reduced. Therefore, tests of significant interaction may be appropriately set at levels greater than the "p=0.05" level commonly established for significance testing of primary effects. See, Jewell, N., Statistics for Epidemiology (Chapman and Hall, New York 2003) at 159 (setting level of significant interaction at $\leq 0.2$ has "the desired effect of drawing attention to important variations that might be missed by inappropriately fixating on the standard 0.05 level of significance"). The results of this analysis are discussed at paragraphs 13-15, and presented graphically in **Figure 2**, below:



**Figure 2:** Summary Incidence rate of Confirmed Cardiac and Cerebrovascular Events in the APPROVe Study by Baseline Risk Status and Treatment Group.
Relative Risks (RR) and p-values based on Proportional Hazard Model

13. These data from APPROVe reveal a statistically significant increased risk of cardiac plus cerebrovascular events in the high-risk Vioxx group v. high-risk placebo group, RR = 3.83 (95% CI 1.67-8.77), p = 0.001. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.43. Comparison of the high-risk RR (3.83) to the lower-risk RR (1.43) yields a p value of 0.086, indicating significant

interaction between baseline risk and Vioxx use, that is, the higher RR is due to the synergistic effect of CV risk due to both Vioxx and to baseline risk status.

14. For a second category of outcomes, "all thrombotic" events, for the high-risk Vioxx group v. high-risk placebo group, the RR = 2.87 (95% CI 1.40-5.86), p = 0.004. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.15. An interaction p value of 0.07 for the comparison of high-risk RR (2.87) to low risk RR (1.15) provides strong evidence of the synergistic relationship between baseline risk and Vioxx use, consistent with the findings cited above (see ¶ 13).

15. This synergistic interaction is supported by consistent results when RRs are compared for "high risk" and "lower-risk" Vioxx patients. The RR for high-risk Vioxx patients is significantly higher than for low-risk Vioxx patients, RR = 4.36, 95% CI (2.38-7.99), p < 0.001 for "all thrombotic events"; RR = 4.35, 95% CI (2.32–8.14) p < 0.001 for cardiac plus cerebrovascular events. These data again support interaction between Vioxx use and baseline risk, since high-risk status plus Vioxx resulted in a significantly greater RR than lower-risk status and baseline risk.

16.    A KM cumulative incidence curve for the "high-risk" APPROVe patients shows early separation for the outcome category of cardiac plus cerebrovascular events, with the Vioxx rate above placebo, and a doubling of risk in the first 18 months; overall RR = 3.83, P < 0.001 (95% CI, 1.67-8.77), as set forth in **Figure 3**, below:



**Figure 3:** Comparison of the Kaplan-Meier Estimates of Confirmed Cardiac + Cerebrovascular Events by Treatment Group Restricted to the High Risk Subgroups of VIGOR and APPROVe Studies

### D.    VIGOR Analysis Shows Similarly Higher Relative Risk and Rapid Onset of CV Disease in Vioxx Patients v. Naproxen.

17.    In my previous Report, data from the VIGOR study were presented, showing, among other things, a greater RR of thrombotic events in the Vioxx subgroup of aspirin-indicated patients versus the naproxen subgroup of aspirin-indicated patients, RR = 4.89, p = 0.012, 95% CI (1.44-16.88) compared to the non-aspirin-indicated (lower-risk) Vioxx v. naproxen subgroup, RR = 1.88, p = 0.04, 95% CI (1.02-3.44). FDA Medical Officer Review, 3/30/01, p. 5. Professor Jewell has prepared a KM curve (**Figure 3**, above) using Merck's data, showing that the high-risk VIGOR population on Vioxx experienced very rapid onset of CV thrombotic events, immediately and continuously in excess of the naproxen group, and statistically significant after a study of only 8 months mean exposure duration.

18. These data are not explained by a "protective effect" of naproxen. If Vioxx were harmless and the VIGOR results were explained by a naproxen "protective effect," then the Vioxx cardiac event rate would have come out "even" with the rate for the harmless placebo given in APPROVe and Protocol 203. Instead, the Vioxx event rates were significantly worse than placebo, and particularly elevated for high-risk patients. Thus, the data from APPROVe and Protocol 203 confirm the refutation of the cardioprotection theory advanced by Merck to explain VIGOR's results.

19. As noted by Cox-2 researcher Garret FitzGerald in the aftermath of the removal of Vioxx from the market, "[t]he higher a patient's intrinsic risk of cardiovascular disease, the more likely it would be that such a hazard [of Cox-2 inhibition] would manifest itself rapidly in the form of a clinical event"(FitzGerald, "Coxibs and Cardiovascular Disease," NEJM 2004; 351:1709-1711). The elevated RRs of the high-risk status patients from APPROVe and VIGOR, as shown above, are consistent with FitzGerald's assessment of the increased likelihood of events in patients on Vioxx with high background risk.

E. **Vioxx Causes Significant Increased Hypertension, Including Severe "Stage 2" Hypertension That Was Strongly Associated With Thrombotic Events in APPROVe.**

20. In both APPROVe and VIGOR, Vioxx caused large and statistically significant increased incidence of hypertension. Figure 4, below, presents the KM for hypertension in VIGOR, prepared by Professor Jewell from Merck's data, along with the KM curve for hypertension in APPROVe from Merck's "Figure 9" in the "General Safety Report," (GSR), Reference P122, Appendix 2.1.1 (MRK-AFV0426229).

538398.1



**Figure 4:** Comparison of Cumulative Incidence Rates of Hypertension Adverse Events in the VIGOR and APPROVe Studies.

21.     These figures demonstrate a remarkably consistent, statistically significant, approximate doubling of hypertension in Vioxx patients, at both 25 mg. versus placebo (APPROVe) and at 50 mg. versus naproxen (VIGOR). Also, the data show a disturbing, continuously increased cumulative incidence of hypertension-related adverse events (AEs) due to Vioxx suffered by approximately 30% of the patients in the APPROVe study by the end of 3 years' use of Vioxx at the standard therapeutic dose. In APPROVe, there were 377 (29.3%) hypertension AEs in the Vioxx patients compared to 219 (16.99%) on placebo (Table 32; MRK-AFV0426227). Merck reported the "Difference in Percentage Points" (12.4%) and the 95% CI for that difference (9.2, 15.6), a highly significant result. In the VIGOR study, Professor Jewell used Merck's data to calculate the RR = 1.83, P < 0.0001, 95% CI 1.55-2.16. Of further interest, in APPROVe, Merck analyzed the hypertension-related AEs based on "Common Toxicity Criteria" of the National Cancer Institute, graded 0 (no event) through 4 (most severe). (Table 33, MRK-AFV0426228). The Vioxx group had more than double the incidence

- 11 -

of "Grade 2"[1] hypertension (8.08% v. 3.77%) and "Grade 3"[2] hypertension (5.67% v. 2.69%), and the p-value for treatment based on a logistic regression model was "0.000," i.e., a less than 1 in 1,000 possibility that the result was due to chance. (Id.)

22.    Additional unpublished APPROVe data demonstrate increased risk of more severe "Stage 2" hypertension on Vioxx versus placebo. As can be seen in Table 39 below, reproduced from the Merck GSR (MRK-AFV0426242), the Vioxx and placebo populations had essentially identical prevalence of Stage 2 hypertension at baseline (before the study). However, as seen in Table 40 from the GSR, below (MRK-AFV0426243), the Vioxx population experienced a large and highly statistically significant increased incidence of both systolic and diastolic blood pressure increases exceeding the threshold for Stage 2 hypertension. For patients who developed both Systolic Blood Pressure (SBP) $\geq$ 160 and Diastolic Blood Pressure (DBP) $\geq$ 100, the RR was 2.14 p < 0.001 (95% CI 1.57, 2.92), that is, more than double the risk that Vioxx patients would develop this severe form of hypertension.

### Table 39

#### Summary of Baseline or Screening Stage II Hypertension

| Blood Pressure | Rofecoxib 25 mg n/N(%) | Placebo n/N(%) |
|---|---|---|
| DBP ≥100 | 26 / 1287 (2.02) | 29 / 1299 (2.23) |
| DBP ≥100 and SBP≥160 | 14 / 1287 (1.09) | 13 / 1299 (1.00) |
| DBP ≥100 or SBP≥160 | 141 / 1287 (10.96) | 143 / 1299 (11.01) |
| SBP ≥160 | 132 / 1287 (10.26) | 128 / 1299 (9.85) |

Data Source: [4.2]

---

[1] "Grade 2": "recurrent or persistent symptomatic increase by > 20mmHg (diastolic) or to > 150/100 if previously within normal limits (WNL); not requiring treatment." (Id.)
[2] "Grade 3": "requiring therapy or more intensive therapy than previously."

- 12 -

Table 40

Analysis of Stage II Hypertension

| | Rofecoxib 25 mg (N=1260) | Placebo (N=1260) | Comparison | | |
|---|---|---|---|---|---|
| On-Treatment Blood Pressure (mmHg) | Events/Patient years (rate×100) | Events/Patient years (rate×100) | Difference (95% CI) | Relative Risk (95% CI) | P-Value |
| DBP ≥ 100 | 162/2049 (6.19) | 111/2085 (3.83) | 2.29 (1.13, 3.44) | 1.58 (1.24, 1.99) | 0.000 |
| DBP ≥ 100 and SBP ≥ 160 | 112/2523 (4.18) | 62/5173 (1.92) | 2.26 (1.34, 3.15) | 2.14 (1.57, 2.92) | 0.000 |
| DBP ≥ 100 or SBP ≥ 160 | 419/2541 (17.90) | 303/2732 (11.06) | 6.82 (4.70, 8.93) | 1.57 (1.35, 1.82) | 0.000 |
| SBP ≥ 160 | 384/2396 (16.03) | 262/2825 (9.23) | 6.75 (4.79, 8.71) | 1.68 (1.43, 1.96) | 0.000 |

Data Source: [4.2]

23.    Several unpublished documents from Merck's files demonstrate
the strong association between Stage 2 hypertension and thrombotic events in APPROVe:

    a.    On February 20, 2004, APPROVe External Safety
Monitoring Board (ESMB) Chair James Neaton, Ph.D., wrote an email to other members
of the ESMB, which made the following points:

- The data so strongly indicated cardiac toxicity that Dr. Neaton
  raised the possibility of stopping the APPROVe study at that time,
  over 7 months before it was actually terminated. (MRK-
  AG00000394).

- Some of the statistical results of the study were unlikely to change
  before the planned termination date, and, if they remained
  unchanged, they would be "interpreted as very damning to the
  drug." (Id.).

- As one of the "alternatives" to stopping the APPROVe trial in
  February 2004, Dr. Neaton proposed "that treatment be
  discontinued if Stage 2 hypertension develops" because a
  disproportionately large percentage of the confirmed CV events in
  the Vioxx group occurred among patients who had Stage 2
  hypertension. As of that time, 20 of the 38 events (53%) in the
  Vioxx group had occurred among 390 patients who developed
  Stage 2 hypertension (30% of the Vioxx treatment population).

- 13 -

(Id.) Another alternative proposed by Dr. Neaton was to "[s]top the study for the subgroup of patients likely to develop Stage 2 hypertension" (Id.).

b.    On March 4, 2004, two weeks later, Dr. Neaton wrote a letter informing Merck of the ESMB's recommendation that patients with "uncontrolled hypertension" (>165mm Hg systolic or >95 mm Hg diastolic) should be removed from the APPROVe study. (MRK-AF00262446). In contrast, the Vioxx label did not include a warning to discontinue such patients from Vioxx therapy. Dr. Neaton's letter comments that it is "well-known that NSAIDs and Cox-2 inhibitors raise blood pressures" (id.), while Merck's own unpublished data showed that Vioxx caused a statistically significant doubling of the risk of hypertension exceeding predefined limits of change, compared to Celebrex (Protocol 112; see my Report, 9/26/05, ¶ 150, p. 67).[3] A letter prepared by Merck to send to APPROVe investigators perpetuated the mistaken impression that Vioxx effects on blood pressure were simply an example of a class effect, without mentioning the adverse data when Vioxx was compared to Celebrex (MRK-AF00262435).

c.    On November 11, 2004, Merck's James Bolognese prepared an "Assessment of rofecoxib TCVSAE [Total Confirmed Cardiovascular Adverse Experiences] results by Systolic BP spike occurrence," which reported as follows:

---

[3] "In 2001, Merck itself had conducted a head-to-head trial of Vioxx versus Celebrex and placebo, known as Protocol 112, which supported Whelton's conclusion that Vioxx was associated with a greater degree of hypertension. Protocol 112 was a 6-week controlled study of 1,521 patients in four treatment groups, Vioxx 12.5 mg, Vioxx 25 mg, Celebrex 200 mg., and placebo. (MRK-AIN0001240). The Merck Statistical Report showing analyses as of January 9, 2001, indicates that approximately 10% of the subjects in each of the Vioxx 12.5 mg. and 25 mg. arms of the study had increased systolic blood pressure greater than 20 mm and absolute value of over 140 mm, exceeding the pre-defined limits of change, compared to 5.3% in the Celebrex arm and 4.8% in placebo. The increased hypertension on Vioxx 25 mg. versus Celebrex 200 mg. was highly statistically significant, $p = 0.004$, and also statistically significant versus placebo ($p = 0.046$). (MRK-AIN0001608-609). Id. However, Merck did not publish the data from Protocol 112". Report of John W. Farquhar, 9/26/05 at 67.

- 14 -

- In APPROVe, "examination of the results split by systolic BP (SBP) $\geq$ 160 mmHg on at least one occasion during the study revealed a <u>striking relationship</u>" to the occurrence of confirmed thrombotic events. (MRK-AGO0074496; emphasis added).

- "The interaction between SBP spike (y/n) and treatment in TCVSAE [total confirmed cardiovascular events] was statistically significant [p =0.0471]. In the patients with no SBP spike, the RR was close to 1, but <u>in those with at least one SBP spike, the RR was close to 4. These data suggest that nearly all of the excess CV events observed on rofecoxib versus placebo were in patients with at least one SBP spike.</u> However, in the placebo group, the occurrence of SBP spike showed no increase in rate of TCVSAE's." (<u>Id.</u>; emphasis added).

- When the data were analyzed according to a new "at risk" status as of the date when the SBP spike was first recorded, "<u>the interaction . . . was highly significant</u> (p = 0.0043), <u>indicating strong dependence of the treatment effect (hazard ratio) on whether there was a previous SBP spike or not.</u>" (MRK-AGO0074497; emphasis added).

- A comparable analysis of data from the Alzheimer's trials showed a "numerically similar" relationship between SBP spikes in relation to TCVSAE's, but the interaction was not statistically significant. (<u>Id.</u>)

      d.      Between November 2004 and January 2005, drafts of the APPROVe study included references to the SBP spike data that were considered for inclusion in the manuscript to be submitted to NEJM for publication (<u>e.g.</u>, MRK-AHD0075212). However, the data were not submitted to NEJM, nor ever disclosed in

- 15 -

the scientific literature. Instead, the APPROVe authors reported increases of
approximately 3 to 4 mmHg in "mean arterial pressure" in the Vioxx group, along with
the inaccurate statement that the BP changes did not explain the excess risk of CV events
in the Vioxx population. (Bresalier, 352 NEJM at 1100).

      e.    At his deposition on November 21, 2005, Dr. Curfman of
NEJM testified that the editors were never informed that Merck had analyzed the CV
events for patients with BP spikes or Stage 2 hypertension, nor that a statistically
significant relationship existed between those conditions. Dr. Curfman testified that such
data would have been relevant to the editors and readers, because "one, of course, of the
mechanisms of concern in terms of vascular disease would be hypertension as a substrate
leading to vessel damage. So that would be — if such an analysis existed, it would be
very appropriate to include that." (Curfman Depo., 11/21/05, at 167-169).

      24.    I agree with Dr. Curfman that the analysis of Stage 2 hypertension
was highly relevant to the excess CV risk, and that it should have been included in the
published article. Where the internal documents acknowledge a "striking relationship," a
"highly significant interaction," and the suggestion that "nearly all of the excess CV
events" on Vioxx occurred among patients with SBP spikes, it was misleading to delete
references to such effects, to disclose only the mean arterial pressure changes, and to
deny the clearly apparent relationship between Stage 2 hypertensive changes and
thrombotic adverse events.

      25.    Abundant literature in the fields of cardiology and epidemiology
supports the conclusion that blood pressure changes of the magnitude reported for Vioxx
contributed substantial excess risk of CV events. See, e.g., SHEP Cooperative Research
Group: Prevention of Stroke by Anti-hypertensive Drug Treatment in Patients with
Isolated Systolic Hypertension: Final Results of the Systolic Hypertension in the Elderly
Program (SHEP). JAMA 1991; 265:3255-3264. In numerous clinical trials of
antihypertensive medications, including Merck's principal drug in this class

- 16 -

(Cozaar/Losartan), reductions of even a few mm of Hg resulted in significantly lower incidence of stroke and coronary heart disease (CHD). (Dahlof, B, Cardiovascular Morbidity and Mortality in the Losartan Intervention for Endpoint Reduction in Hypertension Study (LIFE): a randomized trial against atenolol. Lancet 2002; 359:995-1003). Further, it is well known that the larger the increase in blood pressure, the greater the increased risk, and that each mm increase in blood pressure imposes greater risk at a higher baseline. Merck's own internal documentation shows awareness of these principles as of December 26, 2000 (MRK-NJO281966; Memo from Rush to Dixon). The "striking" interaction between Vioxx and Stage 2 hypertension magnifies the Relative Risk of adverse CV events attributable to hypertension alone, as seen in the APPROVe data discussed above. Thus, the high incidence of increased BP of > 20 mmHg or more, and of absolute values exceeding 160 mm probably contributed substantial excess risk of MI and stroke among the subpopulation of Vioxx users who experienced such significant worsening of hypertension.

F.     Recent Literature Supports the Biological Plausibility of Increased
       Risk of Thrombosis Due to Both High Blood Pressure and the
       Interaction of Cox-2 Inhibition with Increased Blood Pressure.

26.    As noted in my prior Report, blood pressure is known to be a cause of plaque rupture that can result in thrombus and MI. In an authoritative recent article, it was noted that the " vulnerability to rupture depends on … blood flow characteristics, particularly the impact of flow on the proximal aspect of the plaque…." Fuster, V., et al., "Atherothrombosis and High-Risk Plaque." J. Am. Coll. Cardiol. 2005; 46:937-54 at 945. Chronic and acute blood pressure increases magnify the "impact of flow" that results in plaque rupture. Increased blood pressure begins when Vioxx use begins, resulting in immediate increased risk of plaque rupture and resulting MI.

27.    In an article published in April 2006, noted Cox-2 researcher Garret FitzGerald and colleagues reported on animal data supporting the conclusion that

- 17 -

Cox-2 inhibition is the cause of both elevated blood pressure and thrombosis. Cheng, et al., Cyclooxygenase, Microsomal Prostaglandin E Synthase-1, and Cardiovascular Function, J. Clin. Invest., 2006; doi:10:1172/JCI27540. This finding further supports the biological plausibility of the high relative risks of MI for Vioxx users, especially those who had both high background CV risk, or on-drug Stage 2 hypertension, or both.

          28.     In a recent review article in Circulation, the peer-reviewed journal of the American Heart Association, Antmann, et al. concluded that the effects of COX-2 inhibition differ between the normal and atherosclerotic conditions. In the former, the effects of COX-2 suppression have "only a marginal effect on the net anti-thrombotic imbalance owing to the importance of COX-1 as a source of PGI2 in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of PGI2 and more TxA2 is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring TxA2 production and promoting platelet-dependent thrombosis." Antmann, Cyclooxygenase Inhibition and Cardiovascular Risk, Circulation 2005; 112:759-770, at 764. Such a differential effect of COX-2 inhibition helps to explain the greater RR among patients who have atherosclerosis and are at greater

baseline risk of CV events due to that condition. **Figure 4 of the Antmann article,** describing this phenomenon, is reproduced below:

764   *Circulation*   August 2, 2005



Figure 4. Consequences of COX inhibition for prostacyclin and thromboxane A₂ production in normal and atherosclerotic arteries. Endothelial cells are shown as a source of prostacyclin (PGI₂) and platelets as a source of thromboxane A₂ (TxA₂) under untreated conditions (top row) or treated with low-dose aspirin (middle row) or a coxib (bottom row) in the normal (left column) and atherosclerotic artery (right column) for comparison. COX-1 is the only isoenzyme expressed in platelets; endothelial cells express both COX-1 and COX-2. In the normal artery, the balance between PGI₂ and TxA₂ production favors PGI₂ and inhibition of platelet-dependent thrombus formation. In the atherosclerotic artery, both PGI₂ and TxA₂ production is increased, owing in part to increased platelet activation with compensatory PGI₂ formation via both COX-1 and COX-2 in endothelial cells; the net effect is an imbalance favoring TxA₂ production and platelet-dependent thrombus formation. Low-dose aspirin selectively impairs COX-1–mediated TxA₂ production in platelets restoring the net antithrombotic balance. Coxib use suppresses COX-2-dependent PGI₂ production in endothelial cells, which has only a marginal effect on the net antithrombotic balance owing to the importance of COX-1 as a source of PGI₂ in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of PGI₂ and more TxA₂ is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring TxA₂ production and promoting platelet-dependent thrombosis.

- 19 -

## G. Merck's Recent APPROVe "Extension" Data Confirm Excess CV Risk of Vioxx

29. In a document submitted to the FDA in May 2006, Merck reported the results of the APPROVe study on an "Intention to Treat" basis, which includes adverse events that occurred both on the drug and after the discontinuation of the drug. According to Merck's summary, the overall data showed a statistically significant increase of risk of MI, 31 Vioxx events v. 15 placebo events, p=0.017. There was also a statistically significant increased risk of ischemic stroke, 17 Vioxx events v. 6 placebo events, p=0.024. These data therefore continue to support the conclusion that Vioxx causes excess risk of CV events, including MI and stroke. The data show, for the first time, that the increased incidence of stroke in the Vioxx group has now exceeded the threshold for a statistically significant effect of Vioxx.

30. The ITT analysis negates Merck's claim that there is no difference in CV thrombotic event rates between Vioxx and placebo for the first 18 months of use, in two ways. First, the KM graph of cumulative incidents of confirmed events is changed by the addition of data from the ITT analysis. Merck claimed that the original KM graph, presented as "Figure 2" of the published APPROVe article, supported the hypothesis of no effect for 18 months, because the incidence curves did not sharply diverge until after that point in time.[4]

31. However, the KM graph submitted to the FDA for the ITT analysis in May 2006 (Figure B1, reprinted below), shows that the curve for Vioxx (rofecoxib) separates from placebo at about 3 to 4 months, and remains above placebo for the rest of the study. According to Steven Nissen, M.D., interim Chairman of Cardiovascular Medicine at the Cleveland Clinic and a member of the FDA Advisory Committee on Cox-2 inhibitors, the claim of no effect for 18 months of treatment "makes the drug look

---

[4] A number of flaws in that reasoning have been described in my September 2005 report, and in the preceding portion of this Supplemental Report.

a lot safer than it was." Dr. Nissen stated, "If you wanted to construct a legal defense that says nothing happens for 18 months, this is how you would cut the data." (New York Times, "Why the Data Diverge on the Dangers of Vioxx," May 22, 2006 (p. 1 of 6). Alastair Wood, M.D., Chairman of the FDA advisory committee that reviewed Cox-2 inhibitors in February 2005, criticized the omission of off-day events, noting that "People may drop out because they had chest pain and then weeks later they had a heart attack." (Id. at p. 3 of 6).

Figure B1   All Patients -- Confirmed Thrombotic Cardiovascular Events -- Week 210 Censoring - Kaplan Meier Plot



Patients at Risk
Rofecoxib 25 mg    1287  1221  1187  1152  1131  1117  1092  1032  989
Placebo            1300  1247  1224  1189  1173  1157  1133  1071  1027

32.     According to the New York Times article, Merck says it was "simply adhering to the study's original design, and that the more recent chart reflects data that were not available to analyze in early 2005." (Id.). However, neither of these statements is correct. First, as mentioned above (¶ 7), the original design for the APPROVe Data Analysis Plan (DAP) did not include any KM curves at all, nor any analyses of potential differences in the rate of events over time. Instead, the KM curve portion of the analysis was "borrowed" from the DAP for Protocol 203, which combined the APPROVe study with two other trials, to form a substantially larger database of events for which such analyses would be more reliable. Second, to the extent that Merck

borrowed from the DAP for Protocol 203, it did so selectively. In particular, the
Protocol 203 DAP prespecified the use of a "modified intention-to-treat" ("mITT")
analysis that included all randomized patients in the trials. The DAP stated, "As a
sensitivity analysis, reports of confirmed events that occur after randomization and within
28 days of study drug discontinuation will also be examined." (MRK-AFL0015464).
The DAP further noted that "there are limitations using a per-protocol analysis in the face
of a very high dropout rate. Thus, both the per-protocol and mITT analyses will be
considered when interpreting the results. If differing conclusions arise, then further
analyses will be conducted to try to understand the reason for the difference and which
analyses are most appropriate." (Id. at MRK-AFL0015465; (emphasis added)).

   33. To the best of my knowledge, Merck did not present the mITT
analysis to the FDA in February 2005, nor to the New England Journal of Medicine
reviewers when the draft APPROVe article was submitted on February 6, 2005.
However, a Cardiovascular Safety Report ("CSR") prepared by Merck prior to February
2005 did include the mITT events up to 28 days after the last dose of study therapy
(Table 28, pgs. MRK-AHD0075823-824). There were six such events in the Vioxx
treatment group, versus three events in the placebo group. Notably, four of the events
among the Vioxx patients listed in Table 28 occurred within the first 18 months after the
study start (Patient No. 91247, event on day 86; Patient No. 92718, event on day 203;
Patient No. 90070, event on day 351; and Patient No. 90310, event on day 413).
According to the New York Times article, Merck claims that "new data" for events after
the original 14 day cutoff showed 26 events in the Vioxx group and 21 in the placebo
group in the first 18 months, compared to 22 versus 20 in the "old analysis," a difference
of four events in the Vioxx group (New York Times, Why the Data Diverge on the
Dangers of Vioxx, May 22, 2006 at p. 3). The description of Table 28, above, shows that
these four events were not new data, but were known to Merck at the time the original
analysis was presented. Thus, an ITT analysis of data known to Merck in February 2005

- 22 -

would have shown the early separation of the incidence curves during the 0 to 18 month period, which appears in Merck's May 2006 submission to the FDA.

      34.    Further, Merck has submitted to the FDA a new statistical analysis for the "proportionality" test, indicating a p value of 0.748 (MRK-S0420112037; Figure B2, reproduced below). This non-significant result means that there is no evidence of variation in the rate of events over time. Thus, the ITT analysis contradicts the claim made by Merck in FDA submissions and in the published APPROVe article that there was a statistically significant difference in the rate of events between the 0 to 18 month and 18 to 36 month periods of the APPROVe study.

Figure B2  All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Hazard Rate



      35.    Data from the off-drug period of the APPROVe extension study are also of interest. During the off-drug period alone, Merck reported that there were 28 thrombotic events in those who had taken Vioxx, compared to 16 in the placebo group, RR=1.64. Merck has stated that these data are "insufficient to conclude that there was an

increased relative risk of confirmed thrombotic events following discontinuation of the therapy." (Press Release, 5/11/06, p. 1). However, three well-respected independent commentators have stated their disagreement with Merck's interpretation of the data.

        (a)    Steven Nissen, M.D., mentioned in ¶ 31 above, stated "You have to look at the big picture. The big picture is that the hazard stays the same." (Wall Street Journal, 5/12/06, p. A16). Dr. Nissen further stated, "Merck misrepresented the results of this study." (AP Press Release, 5/12/06). The 64 percent higher risk in the extension study "has rather important scientific implications, because it suggests that there was some kind of permanent or longstanding injury to the artery that makes it susceptible to these kinds of continuing events. (New York Times, May 13, 2006).

        (b)    According to Curt Furberg, M.D., a member of the U.S. FDA Drug Safety and Risk Management Safety Committee, "It may be that Vioxx is causing permanent damage to the cardiovascular system, accelerating atherosclerosis or a sustained increase in blood pressure." Reuters, May 18, 2006. Dr. Furberg stated, "for a while we assumed Vioxx caused temporary problems, and here it is more than that," referring to the occurrence of 7 strokes and 2 "mini-strokes" or TIAs in the Vioxx group after discontinuing treatment, compared with no such incidents in the placebo group during one year off-drug. (Id.)

        (c)    Bruce Psaty, M.D., a distinguished cardiologist from University of Washington who testified in Congress on COX-2's inhibitors, stated that the 64% higher overall event rate was "closer to a persistent finding than not." (New York Times, May 13, 2006).

        36.    I agree with Drs. Nissen, Furberg and Psaty that the increased RR of thrombotic events in the Vioxx group after discontinuing the drug is "closer to a persistent finding than not," and that the lack of statistical significance does not decide this issue. The off-drug period alone constitutes a subgroup that is not adequately

powered to detect such differences to a statistically significant degree. Given the limitations due to the smaller number of events and the time off drug, the 64% increase is an impressive indicator that the risk of Vioxx probably does not end when exposure is discontinued.

37. I reserve the right to add to these comments in the event that future data becomes available.

## II. CONCLUSION

38. A consensus exists in the scientific community that Vioxx significantly increases the risk of adverse events, including MI, as noted by the unanimous agreement of 32 FDA Advisory Committee Members. Protocol 203, the analysis pre-specified by Merck for precise estimation of CV effects of Vioxx, shows that this increased risk appears within the first 30 days and persists throughout exposure. Protocol 203 refutes the "18-month" notion advanced by Merck through a "post hoc" hypothesis based on a single, underpowered study. Patients at elevated baseline risk have a statistically significant higher RR of CV events than lower-risk patients, due to a synergistic and multiplicative interaction of Vioxx and baseline risk factors such as SACVD. Stage 2 Hypertension while on Vioxx is also a strong risk factor for CV events. Data from the APPROVe extension study confirm the excess risk of MI and stroke due to Vioxx, and it is likely that the risk persists after Vioxx exposure ends.

_5/22/06_
Date

_John W. Farquhar, M.D._
John W. Farquhar, M.D.

## ANALYSIS OF VIOXX DATA FROM THE APPROVe, VICTOR & ViP STUDIES---PROTOCOL 203

The analyses here pool the data from the three studies and consider cardiac events only. There are 71 events recorded after commencement of follow-up. The pooled Kaplan-Meier estimates of the survival curves for the Vioxx and Placebo groups yield cumulative incidence proportions that are plotted against days of follow-up in Figure 9.

The apparent difference between these two curves cannot be attributed to chance variation (p-value = 0.001, using the log rank test). The estimate of the Relative Risk is 2.37 with a 95% confidence interval of (1.43, 3.91). Thus Vioxx patients were exposed to a more than doubling of the risk for a cardiac event over the observed entire time period. This estimate of the Relative Risk is essentially unchanged (RR = 2.36) if we account for different levels of risk in the three studies since there is little difference in proportions of patients on Vioxx in the three studies. As it happens there is no (statistically) significant difference in risk across the three studies, although quantitatively the ViP study shows the highest event rate, with Approve exhibiting only a very slightly smaller rate, and the VICTOR study showing only 79% of the risk as compared to ViP.

We can consider different periods of follow-up in looking at the cumulative incidence plots or Relative Risk estimates. In particular, for different periods of follow-up the estimated Relative Risks (with 95% confidence intervals) are:

From 0 to 1 month (30 days—Figure 1):  RR = 2.68 (0.71, 10.12)

From 0 to 2 months (60 days—Figure 2):  RR = 3.36 (0.92, 12.21)

From 0 to 4 months (120 days—Figure 3):  RR = 1.42 (0.63, 3.19)

From 0 to 6 months (180 days—Figure 4):  RR = 1.35 (0.64, 2.86)

From 0 to 1 year (365 days—Figure 5):  RR = 1.51 (0.82, 2.80)

From 0 to 1½ years (540 days—Figure 6):  RR = 1.76 (1.01, 3.06)

From 0 to 2 years (730 days—Figure 7):  RR = 2.08 (1.22, 3.56)

From 0 to 3 years (1095 days—Figure 8):  RR = 2.33 (1.41, 3.85)



EXHIBIT

C

1

Finally, the overall Relative Risk "averages" the Relative Risks over sub-intervals although the number of events in smaller time periods is associated with much greater variability. However, for reference, the estimated Relative Risk (with 95% confidence intervals) for different time intervals are as follows:

From 0 to 1 month (11 events): RR = 2.68 (0.71, 10.12)

From 1+ to 6 months (17 events): RR = 0.91 (0.35, 2.36)

From 6+ to 12 months (14 events): RR = 1.91 (0.64, 5.71)

From 12+ to 24 months (18 events): RR = 5.50 (1.59, 18.99)

From 24+ to 36 months (11 events): RR = 5.02 (1.08, 23.24) (No ViP data)

As can be seen and allowing for high variability, there is a reasonably consistent Relative Risk, reflecting consistently higher risk in the Vioxx patients over time. In addition, statistically the data is somewhat compatible with a constant Relative Risk over the five different time intervals (p-value = 0.13 when testing null hypothesis of constant Relative Risks against time varying Relative Risks).

Focusing on the first 18 months, the Relative Risk 1.76, significantly greater than 1.0, as noted above, indicating strong evidence of a considerably higher risk in the Vioxx patients. Carrying out a similar test of constant Relative Risk over four time intervals over the first 18 months (0--1 month, 1—6 months, 6—12 months, and 12—18 months) gives a p-value of 0.36. Thus the data shows significantly higher risk in the first 18 months, associated with exposure to Vioxx, and supports the fact that this elevated risk is consistently higher over this entire time period.

**FIGURE 1**

**Protocol 203 Cardiac Events: 0—30 days of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 2.68 (0.71, 10.12)

**FIGURE 2**

**Protocol 203 Cardiac Events: 0—60 days of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 3.36 (0.71, 10.12)

4

FIGURE 3

**Protocol 203 Cardiac Events: 0—120 days of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 1.42 (0.63, 3.19)

## FIGURE 4

### Protocol 203 Cardiac Events: 0—6 months of Follow-up



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 1.35 (0.64, 2.86)

6

**FIGURE 5**

**Protocol 203 Cardiac Events: 0—1 year of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 1.51 (0.82, 2.80)

7

## FIGURE 6

### Protocol 203 Cardiac Events: 0—18 months of Follow-up



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 1.76 (1.01, 3.06)
(p-value = 0.04)

8

FIGURE 7

Protocol 203 Cardiac Events: 0—2 years of Follow-up



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 2.08 (1.22, 3.56)
(p-value = 0.007)

9

## FIGURE 8

### Protocol 203 Cardiac Events: 0—3 years of Follow-up



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 2.33 (1.41, 3.85)
(p=value = 0.001)

**FIGURE 9**

## Protocol 203 Cardiac Events—All Follow-up Data



Relative Risk, comparing Vioxx to Placebo patients (95% CI ) = 2.37 (1.43, 3.91)
(p-value = 0.001)

**REDACTED**

From: Goldman, Andrew [mailto:andrew.goldman@bartlit-beck.com]
Sent: Tuesday, May 30, 2006 11:41 PM
To: 'Arbitblit, Donald C.'
Cc: 'beachlawywer51@hotmail.com'; 'amyer@rcrlaw.net'
Subject: RE: Jewel

Don, I think you are mistaken and will tell you why in the next few days.
Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Tuesday, May 30, 2006 2:24 PM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: RE: Jewel

Andy,
Professor Jewell is designated as a nontestifying expert under Rule
26(a)(4)(B). It is our understanding of the Rule and applicable decisions
that he is not subject to discovery in the absence of a "showing of
exceptional circumstances under which it is impracticable for the party
seeking discovery to obtain facts or opinions on the same subject by other
means." Professor Jewell's report is based on data from
3 Merck studies, provided by Merck during discovery in the course of the
litigation. Accordingly, Merck can obtain facts and opinions on the same
subject by the readily available means of having its own experts analyze the
same data. At the same time, Professor Jewell's report was provided as a
document "considered" by Dr. Farquhar in forming the opinions expressed in
his report, and we believe such production constitutes compliance with Rule
26 in regard to both Jewell and Farquhar.
If you believe we have misconstrued the applicable law, please explain.
Thanks, Don Arbitblit

-----Original Message-----
From: Goldman, Andrew [mailto:andrew.goldman@bartlit-beck.com] Sent: Sunday,
May 28, 2006 6:11 AM
To: Arbitblit, Donald C.
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: RE: Jewel

Don, can you please give us a few possible dates for Jewel's deposition?
Thanks.

1


EXHIBIT
D

Andrew L. Goldman Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300 Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com Direct: (312) 494-4464 Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited.  Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com] Sent: Monday, May
22, 2006 7:26 PM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: Jewel

Attached is the report of Nicholas Jewell, Ph.D, referenced as Exhibit A to
the Supp. Report of Dr. Farquhar.
 <<Protocol203report.pdf>>
This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

**REDACTED**

**From:** Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
**Sent:** Friday, June 02, 2006 2:55 PM
**To:** andrew.goldman@bartlit-beck.com
**Cc:** beachlawyer51@hotmail.com; Gross, Jennifer; amyer@rcrlaw.net; twacker@rcrlaw.net
**Subject:** Jewell

Andy,

I have reviewed your draft motion to compel, and this is submitted in response.

First, attached is Professor Jewell's analysis concerning high-risk patients, which Dr. Farquhar referenced in his Supplemental Report and the Barnett Report. We do not claim work product privilege as to materials reviewed and relied upon by Dr. Farquhar in preparation of his reports. We agree that you are entitled to production of documents prepared by Professor Jewell that Dr. Farquhar considered in arriving at the opinions he has expressed in his reports. We agree that the *Intermedics* case you cite is applicable to expert discovery, and that documents considered by an expert in forming his opinions are discoverable, regardless of whether they are relied upon or rejected.

However, it remains our view of the facts and the law that exceptional circumstances do not exist to justify deposition or discovery from Professor Jewell, a nontestifying expert, where all of the data came from Merck, where the methods used to analyze the data are comparable or identical to those Merck itself has used and reported as to particular portions of the same data, and where Merck is capable of obtaining information on the same subject by other means. The *Long Term Capital Holdings* case does not stand for the open-ended proposition that a nontestifying expert who provides a report relied upon by the testifying expert is always subject to deposition and discovery. To the contrary, in that case the court relied on the facts that the assistants spent the majority of the time on the project and chose the data to input from among "hundreds of thousands of pages" of documents that they reviewed. Here, Professor Jewell used the specified data sets that Merck provided, and the statistical tests are identified in the reports. The *Dura* case states mere dicta on the issue of nontestifying experts, while the holding was addressed to the exclusion of untimely reports. We see no general support in the case law for the proposition that nontestifying experts may be deposed to see if they did their jobs "competently," and such a view would contradict Rule 26 by permitting this type of discovery without the requisite showing of exceptional circumstances.

Please let us know whether you wish to discuss this further.

Finally, you had agreed to let us know the location for the Kim depo by June 1, so we could make travel plans. Please let us know today, if at all possible.

Don Arbitblit

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to postmaster@lchb.com

6/26/2006


EXHIBIT
E

**REDACTED**

**From:** Goldman, Andrew [mailto:andrew.goldman@bartlit-beck.com]
**Sent:** Tuesday, June 13, 2006 11:19 PM
**To:** 'Arbitblit, Donald C.'
**Subject:** Jewell

Don, after reviewing Dr. Farquhar's deposition, I believe it is vital that we obtain document discovery from and a deposition of Dr. Jewell. Dr. Farquhar is clearly relying on Dr. Jewell and our inability to cross-examine Dr. Jewell directly prejudices our ability to cross-examine Farquhar at trial.

(1) Dr. Farquhar repeatedly deferred to Jewell when it came to certain statistical inquiries and even suggested that Merck ask questions of Jewell. For example:

```
Q   Dr. Farquhar, I'm asking you about the
10  second page of Professor Lagakos' essay where he's
11  discussing the problem of multiple subgroup analyses
12  and the possibility of false positives. The first
13  sentence of the last paragraph of the first column
14  of that page says: "One way to correct for the
15  inflated false positive rate when multiple subgroup
16  analyses are conducted is to apply a stricter
17  criterion than the usual P equals 0.05 for judging
18  the significance of each interaction test."
19       Do you see that?
20  A   I see that.
21       MR. ARBITBLIT:  Objection to form.
22       THE WITNESS:  And this --
23  BY MR. MORTARA:
24  Q   Dr. Farquhar -- the question is do you see
25  that?
0142
1        MR. ARBITBLIT:  Don't interrupt him.
2        THE WITNESS:  I see that. As I said, I
3  see everything that's in here. And this entire
4  paragraph, and all the implications of it, are grist
5  for the mill of a discussion with Professor Jewell.
6  Professor Jewell has his way of looking at life and
7  he may or may not agree with this paragraph.  I
```

6/26/2006



8   can't say since I am not a biostatistician.  This is
9   statistician language.
10  BY MR. MORTARA:
11      Q    You rely on Professor Jewell for
12  information of this character, correct?
13           MR. ARBITBLIT:  Object to form.
14           THE WITNESS:  I rely on Professor Jewell
15  currently as my colleague in not only this
16  consultation on Vioxx but on other issues.
17           And I also -- well, I'll just add that the
18  previous colleague, who is now no longer with us,
19  was one of the individuals who trained Professor
20  Jewell.  And so there's a long legacy of my
21  connection to Jewell and a long legacy of my trust
22  in his skill, ability and wisdom.
23           And what I am saying to you now is this
24  long paragraph on the second page here, he would
25  need to be asked how he interprets that and whether
0143
1   or not it's in contradiction to what he has put in
2   his text; and if so, how would he handle what's been
3   done in the APPROVe study and in our particular
4   analyses of the 203.
5           I shouldn't have said APPROVe; I should
6   have said 203, and APPROVe as well.
7       Q    Dr. Farquhar, the plaintiffs' attorneys
8   are not going to let me ask questions of Dr. Jewell,
9   unfortunately.  You have relied on Dr. Jewell and
10  written things about significant interaction in your
11  report, and I'm asking you what your understanding
12  of Professor Lagakos' essay is with respect to what
13  the appropriate p-value for interaction is to use
14  when multiple subgroup analyses are performed.
15           Do you understand what Professor Lagakos
16  is talking about?
17           MR. ARBITBLIT:  Object to form.
18           THE WITNESS:  Well, you know, about six
19  answers ago, I said the entire topic of subgroup
20  analyses has been around for a long time, and I
21  return to this answer, and then I think I'll want to
22  say I've answered the questions regarding this topic
23  by saying I rely fully on Professor Jewell's
24  attitudes and concepts and beliefs and opinion about
25  this paragraph and how it applies to our analyses on
0144
1   203 and APPROVe and of VIGOR and of any of the other

2  studies that we've analyzed.
3  BY MR. MORTARA:
4      Q   Have you ever asked Professor Jewell what
5  he thinks of Professor Lagakos' views?
6          Did you say no?
7      A   Well --
8          MR. ARBITBLIT:  Object to form.
9          THE WITNESS:  I told you that I haven't
10  seen the Lagakos article, so I can't have discussed
11  this specific article with him.  I have had
12  discussions on topics related to interaction tests.
13  BY MR. MORTARA:
14      Q   Your report says on page 7 of your
15  supplemental report: "Tests of significant
16  interaction may be appropriately set at levels
17  greater than P equals 0.05," correct?
18      A   Well, we discussed that some time ago and
19  I said this is Professor Jewell's view and I hold to
20  his views.
21      Q   Whereas Professor Lagakos says: "One way
22  to correct for the inflated false positive rate when
23  multiple subgroup analyses are conducted is to apply
24  a stricter criterion than the usual P equals 0.05."
25          That means Professor Lagakos thinks you
0145
1  should go lower than 0.05 but Professor Jewell
2  thinks you can be higher than 0.05, correct?
3          MR. ARBITBLIT:  Object to form.  Assumes
4  facts not in evidence.
5          THE WITNESS:  Return to the fact that
6  Jewell has his beliefs and his way of analyzing data
7  and he may or may not have a fundamental difference
8  of opinion with Lagakos.  And I submit that a single
9  article taken out of context cannot answer that
10  question of whether there is a wide disparity
11  between those two gentlemen.
12  BY MR. MORTARA:
13      Q   Dr. Farquhar, the first full sentence in
14  the second column on that same page says: "For
15  example, if 10 tests are conducted, each one should
16  use 0.005 as the threshold for significance."
17          Do you see that?
18          MR. ARBITBLIT:  Object to form.
19          THE WITNESS:  I see the whole article and
20  I return to -- I prefer to rely on Professor Jewell
21  and any subsequent dissection of this article, my

6/26/2006

22  answer is that I trust Professor Jewell's views on
23  all items.
24  BY MR. MORTARA:
25      Q   Do you recall earlier telling me you
0146
1  thought at least ten subgroup analyses had been
2  performed in the APPROVe study?
3          MR. ARBITBLIT:  Object to form.
4          THE WITNESS:  Ten subgroup analyses have
5  not been performed on the 203 study.  And --
6  BY MR. MORTARA:
7      Q   Dr. Farquhar, could you turn to page 6 of
8  your report.  And the Section C is entitled:
9  "Patients in APPROVe."
10         Do you see that?
11     A   Yes.
12     Q   Section C of your supplemental report is
13  not about Protocol 203, is it?
14     A   No.
15     Q   Dr. Farquhar, over ten subgroup analyses
16  have been performed on the APPROVe data and
17  Professor Lagakos thinks that you should use at
18  least 0.005 as the threshold for significance, if
19  not something lower; isn't that right?
20         MR. ARBITBLIT:  Object to form,
21  mischaracterizes the record.  Professor Lagakos has
22  never had anything to say about APPROVe.
23         THE WITNESS:  Boy, oh boy.  You know, my
24  answer is I'm trying to get away from Lagakos and on
25  to Jewell.  So any opinion that Lagakos has
0147
1  expressed, I'll say again is not -- is out of
2  context, and Professor Jewell has his reasons for
3  picking a certain method of analysis and its
4  interpretation, and I trust his views.  And I do
5  not, at this point, have any opinions to offer about
6  Lagakos.
7  BY MR. MORTARA:
8      Q   You trust Dr. Jewell and the jury's
9  supposed to trust you when you say you trust
10  Dr. Jewell, correct?
11         MR. ARBITBLIT:  Object to form.
12  Argumentative.
13         MR. MORTARA:  Withdrawn.
14         THE WITNESS:  I'm not concerning myself
15  with juries.  I'm concerning myself with trusting

6/26/2006

16  Professor Jewell.
17  BY MR. MORTARA:
18    Q   Dr. Farquhar, do you know if plaintiffs'
19  attorneys are going to allow Dr. Jewell to explain
20  himself and his analysis?
21    A   My belief is that they would, yes.  But I
22  haven't asked the attorneys if they have such a
23  plan.
24    Q   Do you think the plaintiffs' attorneys
25  should allow Dr. Jewell to come to trial and explain
0148
1  to the jury his analysis and explain, if he can,
2  Professor Lagakos' views?
3        MR. ARBITBLIT:  Object to form.
4        THE WITNESS:  I have no informed opinion
5  on what should happen with juries.  I just don't
6  know anything about that field.  So --
7  BY MR. MORTARA:
8    Q   Dr. Farquhar, I'll withdraw the question
9  and ask you this:  You talk about tests for
10  significant interaction in your report, correct?
11    A   Yes.
12    Q   You rely on Dr. Jewell for that analysis,
13  correct?
14    A   Correct.
15        MR. ARBITBLIT:  Object to form.
16  BY MR. MORTARA:
17    Q   In explaining the tests for significant
18  interaction that you disclose in your report, do you
19  think that Dr. Jewell would do a better job
20  explaining what this means and explaining how
21  Professor Lagakos' essay affects his views?
22    A   Do I think Jewell --
23    Q   Withdrawn.
24        Dr. Farquhar, do you think it's
25  appropriate to have Dr. Jewell explain himself as to
0149
1  what he meant by the appropriate P for significant
2  interaction that you're relying on?
3    A   Well, I would say if that is something
4  that you and other attorneys would like to do, then
5  fine.  He needs to speak for himself.
6    Q   Dr. Farquhar, you understand that --
7  withdrawn.
8        The last sentence of the first full
9  paragraph on the third column of the second page of

6/26/2006

10  the Lagakos essay, says: "Post hoc subgroup
11  analyses undertaken because of an intriguing trend
12  seen in the results or selective reporting of
13  certain subgroup analyses can be especially
14  misleading."
15        Do you see that?
16        MR. ARBITBLIT: Object to form.
17        THE WITNESS: I see that, but please honor
18  my previous statements that anything in the Lagakos
19  paper which is contrary to Professor Jewell's modus
20  operandi and planning for analyses needs to say that
21  Jewell trumps Lagakos. And I really -- I'm trying
22  to avoid further discussion about Lagakos.
23  BY MR. MORTARA:
24     Q   You're trying to avoid further discussion
25  of Professor Lagakos' essay, correct?
0150
1       . MR. ARBITBLIT: Object to form.
2        THE WITNESS: I'm trying to elevate the
3   respect for Professor Jewell.
4   BY MR. MORTARA:
5      Q   Dr. Farquhar, do you agree or disagree
6   that "Post hoc subgroup analyses undertaken because
7   of an intriguing trend seen in the results or
8   selective reporting of certain subgroup analyses can
9   be especially misleading"?
10        MR. ARBITBLIT: Object to form.
11        THE WITNESS: I propose that that question
12  be asked for Professor Jewell and put into the
13  context of the APPROVe study and the specific
14  analyses that he and I performed.


(2) Furthermore, Farquhar did not know what data Jewell used in the protocol 203 analysis Dr.
Farquhar relies on. Farquhar also didn't know whether that data included the VICTOR final data
produced to plaintiffs at the beginning of May:

7      Q   The only person that knows what data
8   Dr. Jewell used in his Protocol 203 analysis is
9   Dr. Jewell, correct?
10     A   Yes, that's ultimately correct.

***

   Q   I would have to ask Dr. Jewell what data
21  he used for his Protocol 203?
22     A   Correct. And where he got it, and when he
6/26/2006

23   received it.

Please let me know if you will produce Dr. Jewell for deposition as well as the standard
documents that both sides experts' are producing.

Thanks,

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

**REDACTED**

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Thursday, June 15, 2006 12:09 AM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawyer51@hotmail.com
Subject: Re: Any word from Mark on Jewell?


I spoke to Mark this afternoon about your email. Our intention is to serve a
rebuttal expert report prepared by Dr. Jewell, and to provide him for
deposition on the subjects as to which Dr. Farquhar referred to or relied
upon Dr. Jewell, as well as any additional issues raised by the rebuttal
report. By rule, we would have 30 days from June 1 to serve a rebuttal
report, but we are willing to work with you on scheduling. We suggest
getting a report to you by June 21, to give Dr. Jewell  time to review the
transcript of Dr. Kim (not yet received) and to otherwise prepare his
report, followed by a deposition in SF on June 28. I will be available to
discuss this proposal tomorrow, if you like, or send me an email.

-----Original Message-----
From: Goldman, Andrew <andrew.goldman@bartlit-beck.com>
To: Arbitblit, Donald C. <DARBITBLIT@lchb.com>
Sent: Wed Jun 14 21:10:47 2006
Subject: Any word from Mark on Jewell?


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited.  Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.


This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

1



EXHIBIT

G

Exhibit H - Farquhar Deposition Excerpts

• Jewell

[1:] - [1:25]          6/8/2006      Farquhar, John W., M.D.

page 1
     0001
    1                    UNITED STATES DISTRICT COURT
    2                    EASTERN DISTRICT OF LOUISIANA
    3
    4        In re:  VIOXX
             PRODUCTS LIABILITY
    5        LITIGATION
    6
    7        GERALD BARNETT and CORRINE          )
             BARNETT,                            )
    8                                            )MDL Docket No. 1657
                        Plaintiffs,              )
    9                                            )
             vs.                                 )
   10                                            )
             MERCK & CO., INC.,                  )
   11                                            )
                        Defendant.               )
   12                                            )
             _____  )
   13
   14
   15
   16        VIDEOTAPED DEPOSITION OF JOHN W. FARQUHAR, M.D.
   17               San Francisco, California
   18                     June 8, 2006
   19
   20
   21
   22
   23
   24        Reported by:
             DARCY J. BROKAW
   25        RPR, CRR, CSR No. 12584
             Job No. 69492

[150:5] - [150:14]     6/8/2006      Farquhar, John W., M.D.

page 150
    5        Q      Dr. Farquhar, do you agree or disagree
    6    that "Post hoc subgroup analyses undertaken because
    7    of an intriguing trend seen in the results or
    8    selective reporting of certain subgroup analyses can
    9    be especially misleading"?
   10           MR. ARBITBLIT:  Object to form.
   11           THE WITNESS:  I propose that that question
   12    be asked for Professor Jewell and put into the
   13    context of the APPROVe study and the specific
   14    analyses that he and I performed.

[298:1] - [298:21]     6/8/2006      Farquhar, John W., M.D.

page 298
    1    STATE OF CALIFORNIA        )
    2    : ss
    3    COUNTY OF SAN FRANCISCO  )
    4
    5    I, the undersigned, a Certified Shorthand Reporter of the
    6    State of California, do hereby certify:  That the foregoing
    7    proceedings were taken before me at the time and place
    8    herein set forth; that any witnesses in the foregoing
    9    proceedings, prior to testifying, were placed under oath;
   10    that a verbatim record of the proceedings was made by me
   11    using machine shorthand which was thereafter transcribed
   12    under my direction; further, that the foregoing is an
   13    accurate transcription thereof.



EXHIBIT
H

## Exhibit H - Farquhar Deposition Excerpts

• Jewell



```
14  I further certify that I am neither financially interested
15  in the action nor a relative or employee of any attorney of
16  any of the parties.  IN WITNESS WHEREOF, I have this date
17  subscribed my name.
18          Dated: _____
19
20         _____
21              DARCY J. BROKAW, CSR No. 12584
```

Exhibit I - Kim Deposition Excerpts

• Jewell

[1:] - [1:25]          6/12/2006    Kim, Kyungmann (Barnett)

```
page 1
    0001
1
2      In re:  VIOXX                    MDL DOCKET NO. 1657
       PRODUCTS LIABILITY
3      LITIGATION            SECTION L
4                    JUDGE FALLON
5      This document relates to
6                    MAGISTRATE JUDGE KNOWLES
7      GERALD BARNETT,,
8           Plaintiff,
9        -vs-
10     MERCK & CO., INC.,
11          Defendant.
12      Civil Action No. 2:06CV485
       - - - - - - - - - - - - - - - - - - - - - - - - - -
13
14      CROSS NOTICED IN VARIOUS OTHER ACTIONS
               * * *
15      CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
               * * *
16
17
18                     Deposition of:
19                  KYUNGMANN KIM, PH.D.
20                   Madison, Wisconsin
                      June 12, 2006
21
22
                  Reported by:  Taunia Northouse, RDR, CRR
23
24
25
```

[109:5] - [110:6]          6/12/2006    Kim, Kyungmann (Barnett)

```
page 109
5   Q   Read that next sentence, please.
6   A   "The primary method for testing the proportional
7       hazards assumption will be by including the
8       factors treatment times log time in the model.
9       Nonsignificance (P greater than .050) of this
10      factor implies proportionality, namely, constancy
11      of treatment effect over time."
12  Q   Thank you.  Is that another analysis that you plan
13      to include in your updated report as referenced at
14      page 26?
15  A   Not specifically.  As you'll note throughout my
16      report, I was summarizing the main findings from
17      the study.  So when I look at the report,
18      certainly I will pay attention to those aspects.
19      And when I felt that it was critical to the
20      understanding and interpretation of the data, I
21      will make comment.  But as you've noticed, I
22      haven't made hardly any comments on the
23      proportionality of the hazard, excepting I believe
24      one or two occasions.
25  Q   Where in your report do you refer to the
page 110
1       proportionality of hazard?
2   A   Not specifically in terms of the proportionality
3       of the hazard, but I believe I mention my
4       observation from APPROVe trials about the
5       divergence of the Kaplan-Meier curves when I was
6       reviewing the Bresalier publication.
```


EXHIBIT
I

1

## Exhibit I - Kim Deposition Excerpts

• Jewell
[259:2] - [259:25]

6/12/2006    Kim, Kyungmann (Barnett)

page 259
2    STATE OF WISCONSIN )
                        ) Ss.
3    COUNTY OF DANE      )
4        I, TAINIA NORTHOUSE, a Registered Diplomate Reporter
5    and Notary Public in and for the State of Wisconsin, do
6    hereby certify that the foregoing deposition was taken
7    before me at the offices of Otjen, Van Ert, Lieb & Weir,
8    S.C., Attorneys at Law, 450 Science Drive, City of
9    Madison, County of Dane, and State of Wisconsin, on the
10   12th day of June 2006; that it was taken at the request
11   of the Plaintiffs, upon verbal interrogatories; that it
12   was taken in shorthand by me, a competent court reporter
13   and disinterested person, approved by all parties in
14   interest and thereafter converted to typewriting using
15   computer-aided transcription; that said deposition is a
16   true record of the deponent's testimony; that the
17   appearances were as shown on Page 3 of the deposition;
18   that the deposition was taken pursuant to notice; that
19   said KYUNGMANN KIM, PH.D. before examination was sworn
20   by me to testify the truth, the whole truth, and nothing
21   but the truth relative to said cause.
22            Dated June 15, 2006.
23
24                       Registered Diplomate Reporter
                         Notary Public, State of Wisconsin
25