# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re:  VIOXX | ) | MDL NO. 1657 |
|  | ) |  |
| PRODUCTS LIABILITY LITIGATION | ) | SECTION: L |
|  | ) |  |
|  | ) | JUDGE FALLON |
| THIS DOCUMENT RELATES TO | ) |  |
|  | ) |  |
| *Calandra, et al. v. Merck & Co., Inc.*, MDL No. 05-2914 and | ) | MAG. JUDGE KNOWLES |
|  | ) |  |
|  | ) |  |
| *DeToledo, et al. v. Merck & Co., Inc.*, MDL No. 05-5083 | ) |  |
|  | ) |  |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT MERCK & CO., INC.'S MOTION TO DISMISS THE FOREIGN CLASS ACTIONS OR, IN THE ALTERNATIVE, STRIKE THE FOREIGN CLASS ALLEGATIONS

The plaintiffs in the two subject actions are Italian and French residents who were prescribed Vioxx in Italy and France by Italian and French doctors, and bought Vioxx approved for sale in Italy and France by Italian and French regulators, with warnings and packaging information prescribed by those regulators and written in Italian and French.[1]  Plaintiffs suffered their alleged injuries in Italy and France, and were treated for these injuries in Italy and France. As Merck explained in its opening brief, and as numerous courts have held in similar situations, these cases simply do not belong in the United States.  Because plaintiffs are foreign citizens who suffered injury abroad, allegedly as a result of a product regulated and approved for sale by foreign regulators, these foreign jurisdictions have an overwhelming interest in adjudicating

---

[1]    Merck's opening brief addressed the claims of the class action complaints filed on behalf of citizens of England, Australia, Italy, France, South Africa, and Canada, as well as the suits filed on behalf of citizens of "Europe" and of "the world."  Counsel for the foreign plaintiffs and Merck have agreed that the motion should be decided first as it applies to the French and Italian complaints.  Accordingly, this reply brief focuses on the Italian and French plaintiffs' claims.

these claims.  Trial here would impose an immense burden on this Court, requiring it to immerse itself in foreign law and regulation from civil, rather than common law, jurisdictions, written in Italian and French.  Trial here would also require this Court to manage discovery of documents and witnesses located outside the United States, and render the Court unable to compel testimony from potentially crucial third-party witnesses.  For all these reasons, plaintiffs' claims should be dismissed under the doctrine of *forum non conveniens*.

In their Opposition, plaintiffs assert that dismissal would be inappropriate because:  (1) Italy and France – countries with two of the most established legal systems in the world – are inadequate forums, since they do not offer American-style class actions or permit plaintiffs' lawyers to rely on contingency fees, and since they require losing parties to pay some of the prevailing party's legal costs (Pl.'s Mem. in Supp. of Their Opp'n to Def. Merck & Co., Inc.'s Mot. to Dismiss the Foreign Class Actions ("Pls.' Op.") at 8-21); and (2) the public and private interest factors favor trial in the U.S., because all decisions regarding the marketing and sale of Vioxx in Italy and France were allegedly made by Merck in New Jersey (*id.* at 24-25, 30-35). However, as set forth below, the adequate forum analysis at ***most*** tests the availability of legal ***remedies*** relevant to plaintiffs' claims – not the particular procedures or financing arrangements employed by other legal systems.  Moreover, the public and private interest analysis in these cases turns on the fact that plaintiffs are foreign residents who allege injury in foreign countries as a result of ingesting products approved by foreign regulators and sold and marketed according to foreign regulation.  The fact that foreign sales of a foreign-regulated product were directed or managed from the United States, even if true, does not alter the balance of interests in favor of the United States – least of all when pending U.S. litigation will provide any appropriate deterrence against U.S. companies.

2

Finally, plaintiffs fail even to contest Merck's argument that plaintiffs' class allegations should be stricken or dismissed because Italy will not give *res judicata* effect to a judgment in Merck's favor against members of an opt-out class.  And with respect to France, plaintiffs fail to establish with sufficient certainty that such a judgment would have preclusive effect.

## ARGUMENT

I.    **THE ITALIAN AND FRENCH PLAINTIFFS' CLAIMS SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.**

A.    **France And Italy Provide Plainly Adequate Alternative Forums For Litigation Of Plaintiffs' Claims.**

As Merck explained in its opening brief, the standards for adequacy in a *forum non conveniens* analysis are generally satisfied if the defendant is "amenable to process in the other jurisdiction."  *Piper Aircraft v. Reyno*, 454 U.S. 235, 254 n.22 (1981).  While a forum may also be inadequate if it offers "clearly unsatisfactory" remedies for a plaintiff's alleged injuries, this happens only in "rare circumstances," *id.*, such as when the alternative forum prohibits litigation of the entire "subject matter in dispute," *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 78 F.R.D. 445 (D. Del. 1978), or when a forum's court system is "in a state of virtual collapse," *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1226 (3d Cir. 1995).

Under these standards, the courts of France and Italy are plainly adequate.  There is no dispute that the relevant Merck entities are amenable to service of process in Italy and France (*see* Mem. in Supp. of Def. Merck & Co., Inc.'s Mot. to Dismiss the Foreign Class Actions ("Def. Br.") at 11), and both forums provide causes of action that would enable plaintiffs to obtain relief for the injuries asserted in their complaints (*see id.* at 10-11).  Confirming this conclusion, numerous courts across the country have dismissed cases in favor of France and Italy.[2]  Notably,

---

[2]       *See, e.g.*, *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 606-07 (10th Cir. 1998) (France an adequate alternative forum); *Miles v. Banque Paribas*, No. 94-56768, 1995 U.S. App. LEXIS 25023, at *2-3 (9th Cir. Aug. 23,

3

plaintiffs do not cite a *single* case in which a U.S. court has held a French or Italian forum to be inadequate.  In fact, the most obvious evidence that France and Italy are adequate alternative forums is that plaintiffs in both countries have already initiated Vioxx suits there against Merck.

Plaintiffs' argument that France and Italy are inadequate forums because neither country permits U.S.-style class actions has been soundly rejected by other courts.  Simply put, "the lack of a class action device is not a basis for concluding that a foreign forum in inadequate for *forum non conveniens* purposes." *Pavlov v. Bank of New York Co., Inc.*, 135 F. Supp. 2d 426, 434 (S.D.N.Y. 2001).[3]  The adequate forum inquiry focuses on "whether the remedy available in the alternative jurisdiction is satisfactory," *Van der Velde v. Phillip Morris Inc.*, 02 Civ. 783 (BSJ), 2004 U.S. Dist. LEXIS 246, at *8 (S.D.N.Y. Jan. 9, 2004), and a class action is not a "remedy." Rather, it is a 'convenient procedural device,' which most of the world's nations have chosen not to adopt," *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 540-41 (S.D.N.Y. 2001), and whose absence cannot render a foreign forum inadequate.  If it could, inadequacy would be common, rather than "rare," *Piper Aircraft*, 454 U.S. at 255 n.22, and the U.S. would become the automatic default forum for putative classes from the vast majority of countries that do not have class actions.  *Cf. Coakes v. Arabian Am. Oil Co.*, 831 F.2d 572, 576 (5th Cir. 1987) ("If the lack

1995) (same); *Kensington Int'l Ltd. v. Societe Nationale Des Petroles Du Congo*, No. 05 Civ. 5101 (LAP), 2006 WL 846351, at *7 (S.D.N.Y. March 31, 2006) (same); *Gambra v. Int'l Lease Finance Corp.*, 377 F. Supp. 2d 810, 817 (C.D. Ca. 2005) (same); *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 159 (S.D.N.Y. 2004) (same); *Dattner v. Conagra Foods, Inc.*, 01 Civ. 11297 (RCC), 2003 U.S. Dist. LEXIS 5219, at *11-12 (S.D.N.Y. April 2, 2003) (same); *Mediterranean Golf, Inc. v. Hirsh*, 783 F. Supp. 835, 841 (D.N.J. 1991) (same); *Ernst v. Ernst*, 722 F. Supp. 61, 67-68 (S.D.N.Y. 1989) (same); *King v. Cessna Aircraft Co.*, 405 F. Supp. 2d 1374, 1377-78 (S.D. Fla. 2005) (Italy an adequate alternative forum); *Delta Brands, Inc. v. Danieli Corp.*, 99 Fed. Appx. 1, at *9 (5th Cir. May 5, 2004) (unpublished) (same); *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 718 (7th Cir. 2002) (same); *Adams v. Unione Mediterranea Di Sicurta*, No. CIV.A. 94-1954, 1997 WL 253119, at *3 (E.D. La. May 14, 1997) (same); *Mamish v. Tidex Int'l, Inc.*, No. Civ. A. 91-3791, 1992 WL 161040, at *1 (E.D. La. June 24, 1992) (same); *Colantonio v. Hilton Int'l Co.*, No. CIV.A. 03-1833, 2004 WL 1810291, at *4 (E.D. Pa. Aug. 13, 2004) (same).

3        *See also, e.g., Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002) ("While the need for thousands of individual plaintiffs to authorize the action in their names is more burdensome than having them represented by a representative in a class action, it is not so burdensome as to deprive the plaintiffs of an effective alternative forum."); *In re Lloyd's American Trust Fund Litig.*, 954 F. Supp. 656, 673 (S.D.N.Y. 1997) ("The absence of a rule providing for class actions in the alternative forum does not render the forum inadequate.").

816550v.1

of a contingent-fee system were held determinative, then a case could almost never be dismissed because contingency fees are not allowed in most foreign forums.").[4]

Plaintiffs also argue that France and Italy are inadequate forums because they require the losing party to pay the legal expenses of the prevailing party in a lawsuit, and because they prohibit lawyers from working on a contingency-fee basis.  However, as with class actions, courts have repeatedly held that neither the "loser pays" rule nor the absence of contingency fees can render a forum inadequate.  *See, e.g., Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1430 (11th Cir. 1996) ("[A]s cherished as contingency fee arrangements have become to some plaintiffs and their attorneys, [plaintiff] has not cited us to any Supreme Court or court of appeals decisions giving such considerations substantial weight in *forum non conveniens* analysis.");[5] *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1353 (1st Cir. 1992) (U.K.'s cost-shifting rule does not render the U.K. an inadequate forum).[6]  And for the same reasons discussed above, these courts are clearly correct:  "complaints regarding contingency fees and the requirement that a losing party pay her opponent's fees do not concern the adequacy of available **remedies**," the

---

[4]      In any event, even if plaintiffs were correct that the lack of a class action device could render a foreign forum inadequate, both Italy and France **have** effective mechanisms short of class actions that allow groups of plaintiffs who allege similar injuries to file suit together.  In France, claimants can group together and act collectively in the same proceeding against an entity they consider liable for losses they have suffered under similar circumstances.  *See* Reply Declaration of Professor Arnaud Raynouard (June 21, 2006) ("Raynouard Reply Decl.") ¶ 1.4; *see id.* (noting that this procedure was used in a case where several groups of patients and families sued manufacturers of blood products).  Similarly, in Italy, groups of plaintiffs can file group actions.  *See* Reply Declaration of Antonio Gambaro (June 12, 2006) ¶ 5(a).  Contrary to the allegation of plaintiffs and their experts, these procedures can be used by personal injury plaintiffs who are geographically dispersed.  *Id.*  Beyond this, Italian plaintiffs' lawyers have coordinated among themselves and filed hundreds of identical lawsuits against single manufacturers (for example, tobacco companies).  *Id.*

[5]      Plaintiffs fault *Magnin* for concluding that France was an adequate alternative forum simply because the defendant consented to French jurisdiction.  (*See* Pls.' Opp. at 11.)  But that conclusion is wholly appropriate, because jurisdiction over the defendant is the principle requirement for adequacy.

[6]      *See also, e.g., Murray v. BBC*, 81 F.3d 287, 292-93 (2d Cir. 1996) (absence of a contingency fee system should "not be considered in determining the availability of an alternative forum"); *Van der Velde*, 2004 U.S. Dist. LEXIS 246, at *6-8 (neither loser-pays rule nor absence of contingency fees rendered U.K. an inadequate forum); *Lui Su Nai-Chao v. Boeing Co.*, 555 F. Supp. 9, 16 n.9 (N.D. Ca. 1982); *Coakes*, 831 F.2d at 576; *Rudetzky v. O'Dowd*, 660 F. Supp. 341, 346 (E.D.N.Y. 1987).

816550v.1

focus of the Supreme Court's "rare circumstances" test. *Van der Velde*, 2004 U.S. Dist. LEXIS 246, at *6-8 (emphasis added). And because "most foreign jurisdictions" prohibit contingency fees and employ loser-pays rules, these features cannot render a foreign forum inadequate without violating the Supreme Court's rule that inadequacy is "rare." *Id*. (quoting *Piper Aircraft*, 454 U.S. at 252 n.18.) Indeed, the Supreme Court itself observed that these are the very features of the U.S. system that make American courts "extremely attractive to foreign plaintiffs," and give rise to the need for *forum non conveniens* motions in the first place. *Van der Velde*, 2004 U.S. Dist. LEXIS, at *8.[7]

Moreover, even if these features could render a forum inadequate, as a practical matter, plaintiffs are wrong that they may be liable for "millions of dollars" in legal expenses if they sue abroad (Pls.' Opp. at 21) or that the cost of suing in France or Italy would make a suit "unfeasible" (*id*. at 14). Both Italy and France have strict statutory limits on the amount a losing plaintiff would have to pay to a prevailing party (especially a corporation), and both countries have mechanisms, including legal aid and partial contingency fee arrangements, to ensure that all citizens have access to the courts.[8]

---

[7]     None of plaintiffs' cases disturb this conclusion. *Lehman v. Humphrey Cayman Ltd*., 713 F.2d 339 (8th Cir. 1983), on which plaintiffs principally rely (Pls.' Opp. at 9, 14), involved a lawsuit brought by a U.S. plaintiff suing in her home forum, a situation where (in sharp contrast to this case) deference to the plaintiff's choice of forum is at its height. *Lehman*, 713 F.2d at 342. Moreover, the court there did not find the Cayman Islands to be an inadequate forum based on its lack of contingency fees; rather, it mentioned this feature of the Cayman islands system, in passing, in its discussion of the public and private interest factors weighing against dismissal. *Id*. at 345-46. In *Irish National Insurance Co. v. Aer Lingus Teoranta*, 739 F.2d 90 (2d Cir. 1984) (Pls.' Opp. at 9), the Second Circuit reversed a *forum non conveniens* dismissal, but the claims at issue in that case were brought under a pair of *treaties* that specifically gave the plaintiff permission to sue in New York, and provided that, in so doing, it should be treated as an American citizen. *Irish Nat'l Ins. Co.,* 739 F.2d at 91-92. *Manu Int'l SA v. Avon Prods., Inc*., 641 F.2d 62 (2d Cir. 1981) (Pls.' Opp. at 9), reversed a decision in which a Belgian company's lawsuit against an American company was dismissed in favor of trial in a third location, Taiwan. Here, in contrast, Merck is not seeking to send plaintiffs' claims to a remote third location, but is simply asking that they be tried in plaintiffs' home forums.

[8]     In France, judges are empowered to take into account the equity and the respective incomes of the parties in assessing costs, and where individuals in tort cases lose to a company, they are generally not ordered to pay any part of the company's costs. Even when costs are awarded, they are not based on actual expenses, but rather are set at a minimal amount that in practice does not exceed 2000 Euros. (Raynouard Reply Decl. ¶ 1.3.) In addition, although strict contingency fee arrangements are prohibited, French lawyers are able to work for partial contingency fees, so

Plaintiffs' remaining, country-specific arguments are equally unavailing.  Plaintiffs claim that France is an inadequate forum because "[t]he administration of evidence in the French courts and the power to compel production of evidence lies on the judge who rarely uses this power." (Pls.' Opp. at 12-13.)  But it is well-established that "procedural differences between forums do not bar a *forum non conveniens* dismissal in the absence of a 'complete denial of due process.'" *Broadcasting Rights Int'l Corp. v. Societe du Tour de France, S.A.R.L.*, 708 F. Supp. 83, 85 (S.D.N.Y. 1989).  The fact that France, like other civil law countries, places the judge in an inquisitorial role and gives the judge discretion to decide what evidence is necessary is patently insufficient to render France (or any other civil law country) an inadequate forum.  *Cf. Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 560-561 (1987) (dissent) (discussing "inquisitional rather than adversarial" civil-law system). Plaintiffs' concern that French judges lack the practical power to force parties to produce evidence they have ordered (*see* Pls.' Opp. at 13) is baseless.[9]

Finally, plaintiffs assert that Italy is an inadequate forum because a "medical monitoring subclass is not feasible under Italian law."  (Pls.' Opp. at 19-20.)  However, the absence of particular causes of action in a foreign forum does not render that forum inadequate.  *See, e.g., Piper Aircraft*, 454 U.S. at 255 (absence of strict liability cause of action did not render forum

---

long as their clients pay a minimal flat fee at first.  A lawyer can thus earn up to 90% of his or her compensation on a contingency fee basis.  (*Id.* at ¶ 1.1.)  France also has, in addition to the legal aid system mentioned by plaintiffs' expert, a "partial legal aid" system that provides assistance for persons whose income is above the threshold for legal aid.  (*Id.* at ¶ 1.2.)  In Italy, the legal fees that can be awarded to a prevailing party are set not by actual costs, but by a schedule of fees set by the Ministry of Justice that ensures that fees are never excessive for the losing side. (*See* Gambaro Reply Decl. ¶ 8.)  Moreover, judges have and often exercise the discretion to decide not to award costs to the prevailing party.  (*Id.*)  And while contingency fee arrangement are prohibited, lawyers commonly await the outcome of proceedings before announcing their fees.  (*Id.*)

[9]      Plaintiffs complain that the monetary fines French judges are permitted to impose are too small to work as effective tools to compel production.  However, plaintiffs do not dispute that a French judge has the power to **order** production of any evidence he or she considers relevant, and Merck would comply with any such order of production.  Moreover, in addition to monetary fines, French judges have the power to impose sanctions, including drawing adverse inferences from a party's failure to produce evidence.  (*See* Raynouard Reply Decl. ¶¶ 2.1-2.2.) That sanction is more than sufficient to compel production of evidence.  (*See id.* at ¶ 2.2.)

816550v.1

inadequate); *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 952 (11th Cir. 1997).  Italy thus cannot be inadequate simply because it does not provide a particular cause of action – least of all one that has been rejected by most U.S. states as well.  (*See* Merck's Mot. To Dismiss Med. Monitoring Master Compl.)[10]  Plaintiffs complain that Merck will "avoid liability for a medical monitoring subclass" (Pls.' Opp. at 20), but courts have held that even the absence of punitive damages – a potentially far greater liability than the cost of medical monitoring – cannot render a forum inadequate.  *See, e.g.*, *Miles v. Banque Paribas*, No. 94-56768, 1995 U.S. App. LEXIS 25023, at *2-3 (9th Cir. Aug. 23, 1995).[11]  In short, there is no serious dispute that Italy and France are adequate forums for litigation of plaintiffs' claims.

## B.    The Public Interest Factors Strongly Favor Dismissal.

After establishing that an adequate alternative forum is available, the doctrine of *forum non conveniens* requires courts to consider whether, in light of the relevant public and private interest factors, trial in the alternative forum would be more appropriate.[12]  Here, as Merck explained in its opening brief, both sets of factors decisively favor trial in Italy and France.

---

[10]     In any event, there are in fact Italian causes of action that could provide relief akin to medical monitoring. (*See* Gambaro Reply Decl. ¶¶ 5(c)-6.)

[11]     Plaintiffs also assert, based on *one* case, that if the Italian plaintiffs' claims were tried in Italy, they would take fifteen to twenty years, a delay that would render their remedy "meaningless."  But current statistics indicate that first instance decisions – which are immediately enforceable in Italy – are generally rendered in between 400 and 450 days (less than a year and a half).  (*See* Gambaro Reply Decl. ¶ 5(b).)  A single case is plainly an insufficient basis on which to draw conclusions about an entire legal system.  The *Seveso* case, moreover, is inapposite in multiple respects:  it was decided prior to numerous reforms intended to reduce the length of civil proceedings; was delayed awaiting the outcome of criminal proceedings; and took far longer than other mass injury cases decided around the same time.  (*See* Gambaro Reply Decl. ¶¶ 3, 4, 5(b).)

[12]     Plaintiffs assert that Merck must show that "the private and public interest factors weigh heavily on the side of dismissal."  (Pls.' Opp. at 6 (quoting *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 43-44 (3d Cir. 1988)).)  While Merck's motion should be granted even under that standard, in the Fifth Circuit, where a foreign plaintiff is seeking to sue in an American forum, a defendant need only demonstrate that "the balance of relevant private and public interest factors favor[s] dismissal."  *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003).  (*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947), which plaintiffs also cite (*see* Pls.' Opp. at 22) involved a domestic *forum non conveniens* motion.)

1.      **Plaintiffs Misstate The Applicable Legal Standards.**

As a threshold matter, plaintiffs suggest that their choice of forum should be given "strong deference." (Pls.' Opp. at 8.) That is incorrect. As plaintiffs themselves concede, a foreign plaintiff's choice of a United States forum merits less deference than would a U.S. plaintiff's choice of his or her home forum. *See Empresa Lineas Maritimas Argentinas, S.A. v. Schichau-Unterweser, A.G.*, 955 F.2d 368, 373 (5th Cir. 1992); (Def. Br. at 8-9.) Plaintiffs invoke the sliding scale of deference adopted by the Second Circuit in *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (*see* Pls.' Opp. at 8), but the Fifth Circuit has not adopted that analysis. Moreover, even if the sliding scale were applied, plaintiffs would receive little deference, because this litigation's clearest "bona fide" connection is with France and Italy, not the United States, and (as discussed below) considerations of convenience favor trial there. *Iragorri*, 274 F.3d at 72.

2.      **France And Italy Have An Overwhelming Interest In Adjudicating These Claims.**

The first public interest factor is the "local interest in having localized controversies decided at home." *Piper Aircraft*, 454 U.S. at 241 n.6; (*see* Def. Br. at 12-17). As Merck has previously explained, France and Italy have an overwhelming interest in adjudicating plaintiffs' claims because: (1) plaintiffs are foreign residents whose "alleged injuries have been treated exclusively or predominantly" abroad, *In re Rezulin Prods. Liab. Litig.,*, 214 F. Supp. 2d 396, 399 (S.D.N.Y. 2002); and (2) these claims involve a drug approved and regulated by the governments of France and Italy, and "[t]he forum whose market consumes" a regulated product has a "distinctive interest in explicating the controlling standards of behavior" related to that product – whether through regulation or through adjudication of private legal claims. *Doe v. Hyland Therapeutics Div.*, 807 F. Supp. 1117, 1129 (S.D.N.Y. 1992).

816550v.1

Here, both France and Italy conducted detailed regulatory review processes, involving independent consideration of data and other information by national regulators. (*See* Gambaro Decl. ¶ 16; Decl. of Madame Le Professor Anne Laude (Dec. 16, 2005) ("Laude Decl.") ¶¶ 5-32.)[13]  Vioxx was sold in these countries according to these foreign regulations, which, among other things, determined the labels and packaging information that would accompany the drug, prohibited direct-to-consumer advertising, and heavily regulating the advertising that could be sent to healthcare professionals. (*See* Gambaro Decl. ¶ 16.1-16.2; Laude Decl. ¶¶ 39, 42-48.) France and Italy therefore have strong interests in adjudicating these claims.

In response, plaintiffs dismiss the possibility of interference with Italian and French regulatory judgments, claiming that they are not suing foreign regulatory agencies. (Pls.' Opp. at 33-34.) That argument misses the point. Although plaintiffs have not ***directly*** challenged the foreign regulatory agencies' conduct in approving Vioxx and its warnings, trying plaintiffs' claims in the United States nonetheless risks disrupting those agencies' judgments indirectly by effectively imposing a U.S. jury's view of the appropriate standards of safety and labeling on companies marketing and selling drugs in the Italy and France. As discussed above, those countries have a strong interest in having their ***own*** courts adjudicate these claims as part of their overall regulatory regime.

---

[13]     European approval of Vioxx began in the United Kingdom, the first European Union country in which Vioxx was approved. There, the United Kingdom's Medicines Control Agency ("MCA") engaged in an extensive marketing authorization process in approving Vioxx for sale, evaluating a wide variety of documents and scientific evidence to assess the drug's safety and efficacy. (*See* Decl. of David Anderson (Nov. 17, 2005) ("Anderson Decl.") ¶¶ 48-54.) After the drug was approved in the UK, the national regulatory authorities in Italy and France conducted independent reviews of this authorization before approving Vioxx for sale in those countries. (*See* Gambaro Decl. ¶ 16; Laude Decl. ¶¶ 5-32.) Although their approval was based on a principle of "mutual recognition" among European Union members, (Laude Decl. ¶ 10), "the mutual recognition procedure is not a mere administrative procedure automatically confirming the decision of the member state which granted the marketing authorization," but rather involves an independent analysis of an inquiry into the drug and the bases for approval in the other member state. (Laude Decl. ¶ 24; *see generally* Laude Decl. ¶¶ 10-25; Gambaro Decl. ¶ 16.3.)

816550v.1

Plaintiffs' further suggestion that a U.S. jury would have no difficulty in determining the adequacy of warnings because that determination "is proved through expert testimony" is baseless.  (Pls.' Opp. at 34.)  Plaintiffs themselves admit that "[t]he jury" – not an expert – "will hear the [applicable] standard . . . and then assess whether said standard was met."  (*Id.*)  Thus, a U.S. jury will be called upon to assess the sufficiency of a warning written in a ***foreign*** language for a ***foreign*** public accustomed to a ***foreign*** regulatory scheme and ***foreign*** medical practices. Such a jury would be manifestly ill-equipped to evaluate the appropriateness or sufficiency of such warnings, regardless of what standard it was instructed to apply.

Plaintiffs' principal argument is that the United States' interest in adjudicating their claims outweighs these foreign interests, because the marketing and sale of Vioxx in Italy and France was allegedly directed from the United States.  (*See* Pls.' Opp. at 32-33; 34-35.)[14]  Even assuming this were true, this argument fails for at least two reasons.  First, it is directly contrary to the weight of relevant authority.  As discussed in Merck's opening brief, numerous courts have concluded that, in cases involving foreign injury to foreign plaintiffs as a result of regulated products, the country where the product is regulated and sold, and whose citizens are allegedly injured, has a pronounced interest in adjudicating the claims of its citizens.  (*See* Def. Br. at 13-14.)  Many of these cases involved situations where the relevant products were developed and tested in the United States, marketed from the United States, or both; nonetheless, these courts concluded that the foreign jurisdiction's regulatory interest in hearing the claims decisively outweighed any interest of the jurisdiction where the corporation was located.  *See, e.g.*,

---

[14]     The reality is in fact more complicated than this, with different decisions relevant to the sale and marketing of Vioxx made both locally and in New Jersey.  However, as discussed in the text, the location of these decisions simply does not matter for purposes of this motion.  Plaintiffs also assert that Vioxx was manufactured in the United States.  In fact, the Vioxx sold in Italy and France was manufactured in a multi-stage process that took place in a variety of countries, which may or may not have included the United States.  In any event, the location of the drug's manufacture is, like the location of sale and marketing decisions, largely irrelevant to the public interest analysis in this case, as discussed in the text.

*Harrison v. Wyeth Labs. Div. of Am. Home Prods. Corp.*, 510 F. Supp. 1, 4 (E.D. Pa. 1980) (holding that the U.K.'s interest outweighed Pennsylvania's "[e]ven assuming arguendo that all production and marketing decisions were made by defendant in Pennsylvania"); *In re Richardson-Merrell, Inc. Bendectin Prods. Liab. Litig.*, 545 F. Supp. 1130, 1135 (S.D. Ohio 1982) (Ohio's interest "minimal" and U.K.'s "overwhelmingly apparent" even though "development or testing occurred in this country").[15]

Second, as Merck has also explained, any interest the United States may otherwise have had in deterring misconduct by its corporate residents is not implicated here, because Merck is already facing thousands of lawsuits in this forum.  There can thus be no concern that if foreign plaintiffs are not permitted to sue, Merck will face too little potential deterrence.  *See In re Rezulin*, 214 F. Supp. 2d at 399 ("the United States has little interest in adjudicating" claims brought by a Canadian plaintiff allegedly injured in Canada, because "the enormous volume of Rezulin litigation brought on behalf of United States plaintiffs . . . ensures that appropriate standards of care are applied"); *Van der Velde v. Philip Morris, Inc.*, 02 Civ. 783 (BSJ) 2004 U.S. Dist. LEXIS 246, at *19 (S.D.N.Y. Jan. 9, 2004).  Plaintiffs urge this Court to discount the deterrent effect of already-pending litigation brought by U.S. plaintiffs, because, having distributed Vioxx to foreign citizens, "Defendant should be subjected to justice under the very system that allows them to reap billions of dollars of rewards."  (Pls.' Opp. at 32.)  In fact, this argument favors Merck's position, as any profit it earned from selling Vioxx in Italy and France

---

[15]      *See also, e.g., Doe*, 807 F. Supp. at 1120; *Abdullah v. Pfizer, Inc.*, 01 Civ. 8118, 2002 U.S. Dist. LEXIS 17436, at *34 (S.D.N.Y. Sept. 16, 2002) (dismissing plaintiffs claim in favor of Nigerian forum even though defendant "developed, produced, and performed preliminary testing" of pharmaceutical product and also designed the treatment protocol "within the United States"); *Wesnowski v. Johnson & Johnson*, No. L-9819-01, slip op. at 9 (N.J. Super. Ct. Law Div. June 10, 2004) (dismissing pharmaceutical claim in favor of Canada despite plaintiff's allegations that decision to market drug despite known health risks "emanated from the [company's] New Jersey headquarters"); *id.* at 17 (plaintiff "mistakenly assumes that, because defendants have a corporate presence in New Jersey, any and all personal injury litigation allegedly arising from use of its products should be filed in New Jersey").

12

was earned under the pharmaceutical regulatory system in *those* countries, not the United States. Thus, under plaintiffs' own logic, these claims should be tried in Italy and France, not here.[16]

> ### 3.   Permitting Plaintiffs' Suits To Proceed Would Require This Court To Analyze And Apply Unfamiliar Foreign Law And Regulations.

In their opposition brief, plaintiffs also argue that permitting their claims to proceed would not force the Court to apply unfamiliar law because New Jersey law would apply to their claims. (*See* Pls.' Opp. at 35-38.) Once again, however, plaintiffs misinterpret applicable law. Illinois, where plaintiffs' suit was originally filed,[17] applies the local law of the place of injury, unless another state has a more significant relationship with the occurrence and the parties. (*See* Def. Br. at 17 n.8.) In applying this test, Illinois courts consider the place of injury, the place where the conduct occurred, the domicile, nationality, and place of incorporation and business of the parties, and the place where the relationship of the parties is centered. (*See* Pls.' Opp. at 36.)

Plaintiffs assert that, under this test, New Jersey law would govern, because "it is where the tortious conduct occurred and where the Defendant is incorporated." (*See* Pls.' Opp. at 36.) This analysis patently misapplies the test. Initially, because plaintiffs were concededly injured abroad, there is a *presumption* that French and Italian law will apply. *See, e.g., Ferguson v.*

---

[16]      In their brief, plaintiffs cite *Carlenstolpe v. Merck & Co., Inc.*, 638 F. Supp. 901 (S.D.N.Y. 1986) (Pls.' Opp. at 33-34), where the court concluded that a pharmaceutical manufacturer's home forum had a greater interest in hearing a foreign claim than the foreign forum where the drug was approved and sold. This case is inapposite in numerous respects. To begin, the court in *Carlenstolpe* decided – wrongly, in Merck's view – that because the "role of the Swedish government agencies in approving defendant's" drug was "essentially ministerial," and it had essentially rubber-stamped the FDA's approval, "trial in this forum would [not] seriously impinge on Swedish interests." 638 F. Supp. at 906, 909. The situation here is markedly different, where Italy and France engaged in an active, independent review of documents and data pursuant to European Union law. In addition, *Carlenstolpe* involved a single plaintiff who had received a vaccine in Sweden. It was thus not a case where, as here, any interest the home forum may have had in deterrence was accounted for by pending domestic lawsuits. Finally, and in any event, *Carlenstolpe* is "contrary to the weight of authority." *Doe*, 807 F. Supp. at 1129 n.15. As other courts have concluded, *Carlenstolpe* is "uncompelling," because it "does not assess fully the balance of competing public interests at stake," and "underestimates the foreign forum's interest in this type of pharmaceutical products liability action." *Doe*, 807 F. Supp. at 1129.

[17]      *See, e.g., Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) (stating that in cases transferred pursuant to 28 U.S.C. § 1407, the transferee court must apply the substantive state law, including the choice-of-law rules, that would have applied in the transferor court).

816550v.1

*Kasbohm*, 131 Ill. App. 3d 424, 426 (1st Dist. 1985).  And, under the remaining factors, New

Jersey does not have a relationship with plaintiffs or their claims that outweighs this presumption.

First, even assuming that decisions affecting the marketing and sale of Vioxx were made from

the United States, much of the relevant conduct – such as the actual marketing and sale of the

drug – occurred abroad.  Second, while Merck is located in New Jersey, plaintiffs live abroad,

and the subsidiaries that actually marketed and sold Vioxx to plaintiffs are similarly domiciled

and incorporated abroad.  Third, the relationship between plaintiffs and the defendant is

indisputably centered in France and Italy.  Accordingly, under Illinois law, New Jersey's

relationship with plaintiffs' claims fails to outweigh the presumption that French and Italian law

will apply.

Moreover, while plaintiffs are doubtless correct that this Court would be capable of

applying foreign law (*see* Pls.' Opp. at 38-39), the relevant *forum non conveniens* factor favors

trial in a forum at **home** with the governing law.  Both Italy and France employ unfamiliar civil

law systems, and also incorporate by reference European Union law that is highly complex and

unsettled.  (*See* Def. Br. at 18-20.)  Italian and French courts would thus be more at home with

the governing law – and (unlike this court) could refer unsettled questions of E.U. law to the

European Court of Justice for common European resolution.

4.     **Permitting Plaintiffs To Pursue Their Claims Here Will Increase Court Congestion And Impose Unreasonable Burdens On This Court.**

Plaintiffs also assert that since only a "limited number of foreign residents" are bringing

claims in the MDL, these cases will not congest the MDL proceeding.  (Pls.' Opp. at 30.)  This

argument too misses the point.  There were many ***thousands*** of Vioxx users in other countries

around the world.  As other courts have recognized, the danger of congestion occurs because

permitting foreign plaintiffs to sue "creates precedent" for these thousands of foreign plaintiffs to

14

"bring . . . suits in United States courts." *Van der Velde*, 2004 U.S. Dist. LEXIS 246, at *17. The fact that those plaintiffs have not yet retained Mr. Moll or other U.S. counsel to represent them does nothing to undercut the likelihood that if this Court permits foreign plaintiffs to sue here, they will.

Plaintiffs also suggest that their suits will not burden this Court because "[t]he issues of liability that will arise with the Italian and French Plaintiffs . . . are the same issues that arise with United States plaintiffs." (Pls.' Opp. at 30-31.) This argument rests on a basic misunderstanding of the foreign plaintiffs' claims. ***Plaintiffs' cases are not simply additional U.S. Vioxx claims***. Rather, they are fundamentally different cases, governed by different law and regulation, involving different warnings and labels written in foreign languages, a different regulatory body, a different health care system, and a different pharmaceutical advertising regime. Adding plaintiffs' claims to these proceedings is thus in no way analogous to adding additional U.S. plaintiffs. Rather, it would represent a wholly new, and immensely burdensome, undertaking for this Court.

C.      **The Private Interest Factors Also Favor Dismissal.**

With regard to the private interest factors, plaintiffs assert that "[a]ll critical evidence is located in the United States," and that depositions would be available to obtain the testimony of third party witnesses outside the Court's reach. (Pls.' Opp. at 24-30.) Once again, both of these arguments fail.

1.      **Most Of The Relevant Documents And Witnesses Are Located Abroad.**

Plaintiffs assert that the "most critical evidence" in their cases – "documents relating to the development, testing, manufacture, and the decision to recall Vioxx" – are located in the United States. (Pls.' Opp. at 24-25.) In fact, however, courts have recognized that the most

816550v.1

critical evidence in pharmaceutical products liability cases is evidence related to the plaintiffs'

own experiences with the drug.  In *Doe v. Hyland Therapeutics Div.*, for example, the court held

that a U.S. forum was not appropriate for Irish plaintiffs' claims in part because "[a]ll the

evidence relating to the patients' medical history and treatment is located in Ireland," as well as

prescribing, "treating[,] and consulting physicians, medical personnel, other health care providers

such as hospitals and clinics, and experts who can testify as to local medical community

practices."  807 F. Supp. at 1125; *see also Wesnowski*, No. L-9819-01, slip op. at 24 (calling

causation evidence related to plaintiffs' medical histories and alleged injuries "the most critical

evidence").

Here, there is little question that the relevant sources of proof would be more easily

obtained abroad.  Plaintiffs do not dispute that evidence regarding their prescription, purchase,

and ingestion of Vioxx is located abroad.  Evidence related to the treatment of their alleged

injuries, their medical history, and their quality of life before and after their alleged injuries is

also, as is any evidence in the possession of the companies that actually marketed and sold Vioxx

in Italy and France.  And while evidence related to Merck & Co., Inc.'s conduct and knowledge

is located in the United States, the relevant documents have already been collected and produced

electronically in this proceeding.  Thus, while this production should not simply be made

available to foreign plaintiffs, whatever documents a foreign court determined were relevant

under applicable foreign procedures could be produced in short order, in electronic format.

Plaintiffs' claim that they are unaware of and would be unable to identify the nature of relevant

documents with sufficient specificity to obtain them under French evidentiary laws (*see* Pls.'

Opp. at 25-26) is simply not credible.[18]

---

[18]     Plaintiffs' reliance on *In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*, 190 F. Supp. 2d 1125 (S.D. Ind. 2002) (Pls.' Opp. at 25) is thus misplaced.  The court in *Bridgestone* focused its inquiry on "the relative

Plaintiffs also suggest that if these cases were tried in France and Italy, "millions of pages of Defendant's documents would have to be translated into French and Italian and then transported to both France and Italy." (Pls.' Opp. at 25.) In fact, the only documents that would have to be translated are those the French or Italian courts deemed relevant and admissible – not the 10 million pages plaintiffs allege are in the Document Depository. (*See id.* at 3 n.2.) Moreover, if plaintiffs' cases were tried in this jurisdiction, all the evidence related to plaintiffs' medical histories and treatment would have to be translated into English, together with documents concerning the regulatory approval process in France and Italy, and the specific labeling and warnings. Accordingly, the burden of translation does not favor trial in the United States. *See, e.g.*, *Vazquez*, 325 F.3d at 672-73 (need to translate documents related to manufacture of allegedly defective tires into Spanish balanced and outweighed by other private interest factors, including need to translate "numerous [medical] reports and witness testimony [into English]" if trial were held in United States).

> **2.    Compulsory Process Is Not Available To Secure The Attendance of Unwilling Foreign Witnesses At Trial.**

Finally, dismissal of plaintiffs' claims is also warranted because if trial is held in the United States, the parties will be unable to compel the attendance of witnesses outside the United States, such as treating physicians or spouses. (*See* Def. Br. at 24-25.) In their brief, plaintiffs argue that there are various mechanisms, such as the Hague Convention, through which it is ***possible*** for Merck to obtain witness testimony from Italy and France. (*See* Pls.' Opp. at 27-30.) But these procedures are no substitute for actual compulsory process, for at least two reasons.

---

importance of evidence available in the possible forums" and concluded that "crucial" evidence "probably could not be made available in Colombian courts." *Id.* at 1138, 1140. Here, in contrast, whatever evidence is ordered produced by a French or Italian court can easily be made available there. *See also Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 672 n.8 (5th Cir. 2003) (distinguishing the Indiana district court's decision in *In re Bridgestone* and dismissing a similar products liability suit more conveniently brought in Mexico).

First, even if Merck asked a U.S. court to enlist the aid of French and Italian courts in securing testimony from witnesses, it could not be sure of the results, because in every international request for testimony, the home country has discretion.  (*See* Gambaro Decl. ¶ 14; Raynouard Decl. ¶¶ 5-6.)  Second, even if these procedures were reliable, the private interest factors require the Court to consider the "***relative ease*** of access to sources of proof."  *Gulf Oil*, 330 U.S. at 508 (emphasis added).  If plaintiffs' cases are tried in France and Italy, those courts will be able to order the relevant witnesses to testify, or the relevant custodians to produce evidence.  In the United States, in contrast, Merck would have to ask a U.S. court to ask the French and Italian courts, through a cumbersome process, to order the evidence turned over to Merck.  The number of extra steps, the costs associated with those steps, and the interposition of the discretionary authority of a foreign court speak for themselves.  It is thus far easier to obtain the crucial causation evidence in France and Italy. [19]  And because Merck would comply with the orders of an Italian or French judge, plaintiffs would have no analogous problems obtaining relevant non-causation evidence from Merck in France and Italy.  For this reason too, the private interest factors favor dismissal.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD STRIKE OR DISMISS THE ITALIAN AND FRENCH CLASS ALLEGATIONS.

Finally, as set forth in Merck's opening brief, even if dismissal of the Italian and French class actions were not appropriate under the doctrine of *forum non conveniens*, these actions

---

[19]    Plaintiffs' cases are not to the contrary:  although both suggest that letters rogatory may in some circumstances be acceptable means of acquiring testimony, both involved circumstances sharply different from those in this case.  *Traver v. Officine Meccaniche Toschi Spa*, 233 F. Supp. 2d 404 (N.D.N.Y. 2002) (Pls.' Opp. at 28), involved a New York plaintiff who was injured and sued in his home forum, resulting in a "strong presumption" in favor of his choice of forum.  *Id*. at 415.  Moreover, in *Traver*, unlike here, there was no reason to believe that the testimony of third-party witnesses would be critical to the outcome of the case.  *See id*. at 416-17.  *In re: Assicurazioni Generali Holocaust S.P.A.  Ins. Litig.*, 228 F. Supp. 2d 348, 362 (S.D.N.Y. 2002) (Pls.' Opp. at 28), similarly involved a group of plaintiffs all but one of whom were U.S. residents suing in their home forums.  The court thus gave their choice of forum "great deference."  *Assicurazioni Generali*  at 353.  The court also specifically observed that "the need for live testimony is less compelling in this case."  *Id*. at 362.

816550v.1

should not proceed on a class action basis because it is "unfair to certify a class" if the class members "would not be precluded from litigating abroad in their home countries should they lose in" the United States. *In re Assicurazioni Generali,* 228 F. Supp. 2d at 364.

Plaintiffs do not deny this legal principle. Nor do they claim that an Italian court would recognize a U.S. judgment in favor of defendants as binding on Italian opt-out class members – thus apparently conceding that the Italian class allegations should be stricken or dismissed. Plaintiffs do assert that a U.S. judgment denying relief to plaintiffs would be recognized in France. However, courts have previously recognized that France would be unlikely to recognize a judgment against a member of an opt-out class. *See In re Telectronics Pacing Sys.*, Case No. MDL-1057, 1996 U.S. Dist. LEXIS 11088, at *3-4 (S.D. Ohio Feb. 23, 1996). And although plaintiffs' expert disagrees, Merck's expert has explained that her assertions are highly controversial, and likely incorrect. (*See* Raynouard Reply Decl. ¶¶ 3.1, 3.4.) To dismiss or strike the French class allegations, this Court need not find that French courts would ***definitely*** fail to give *res judicata* effect, but simply that there is significant uncertainty about the matter. *See Del Fierro v. Pepsico Int'l*, 897 F. Supp. 59, 64 (E.D.N.Y. 1995); *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996-97 (2d Cir. 1975); *Assicurazioni Generali*, 228 F. Supp. 2d at 364. Given prior precedent and the testimony of Merck's expert, there is ample doubt that a French court would recognize a judgment as binding on an opt-out class member. Thus, at the very least, plaintiffs' class allegations should be stricken or dismissed.

## CONCLUSION

For the reason set forth above, as well as in Merck's opening brief, this Court should dismiss the putative class actions brought by the French and Italian plaintiffs on the grounds of *forum non conveniens*, or, in the alternative, strike or dismiss their class allegations.

Respectfully submitted,


/s/ Dorothy H. Wimberly
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendant's Liaison Counsel


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Reply Memorandum in Support of Defendant Merck & Co., Inc.'s Motion to Dismiss the Foreign Class Actions or, in the Alternative, Strike the Foreign Class Allegations has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon Kenneth Moll by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 26th day of June, 2006.


/s/ Dorothy H. Wimberly

816550v.1