Arnaud RAYNOUARD

*Agrégé des Facultés de Droit*
*Professeur à l'Université*
*des Sciences sociales Toulouse 1*

5, Allées François Verdier
31000 Toulouse

Tél. 05 61 53 42 04
arnaud.raynouard@wanadoo.fr

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| **In re: VIOXX** | **MDL NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | **SECTION: L** |
|  | **JUDGE FALLON** |
| **THIS DOCUMENT RELATES TO** |  |
| *Calandra, et al. v. Merck & Co., Inc.*, **MDL** No. 05-2914 and | **MAG. JUDGE KNOWLES** |

*DeToledo, et al. v. Merck & Co., Inc.*, **MDL** No. 05-5083



EXHIBIT

A

Blumberg No. 5119

**DECLARATION EN REPONSE DU PROFESSEUR ARNAUD RAYNOUARD**

1. Je, soussigné Arnaud Raynouard, agrégé des facultés de droit, professeur à l'Université de sciences sociales de Toulouse 1 (France), a établi cette déclaration en réponse, venant au soutien des intérêts du défendeur, Merck & Co., Inc. dans le cadre des actions collectives intentées auprès de tribunaux des Etats-Unis d'Amérique (" U.S. ") par des résidents français.

2. Il m'a été demandé de rendre un avis juridique, en tant qu'expert. Je me suis donc limité à donner une consultation, sans adopter une position partiale – ce qui est le rôle d'un conseil. L'expert des demandeurs a, dans sa consultation, directement mis en doute certaines de mes positions ; je ne la suivrai pas dans cette direction. Je préfère en revanche indiquer que, le droit étant une question de rhétorique, les opinions sont discutables.

   Cette consultation complémentaire a simplement pour but de repositionner les avis que j'ai exprimés pour ce qu'ils sont : des avis sur un point de droit, et de replacer mes conclusions dans leur contexte (cf. la première consultation)

3. Dans une première partie, j'exposerais certaines observations sur l'organisation générale du système judiciaire français, en insistant notamment sur trois aspects : les honoraires de résultat (ou *contingency fees*), la charge des frais exposés en application de l'article 700 du nouveau code de procédure civile, et la durée d'une procédure.

   Dans une deuxième partie, je traiterai de la question de l'administration de la preuve ; et dans une troisième partie, j'ajouterai quelques observations concernant la reconnaissance et l'exécution de jugements étrangers de *class action*.

Enfin, je résumerai ma position, en insistant sur le fait qu'elle ne contredit pas la première consultation.

1. **Organisation générale du système judiciaire français**

   Il est historiquement indiscutable que le système juridique d'un pays de droit romano-germanique, en particulier celui de la France, est fondé sur des règles prescriptives (d'où l'accent porté sur la norme, c'est-à-dire une règle écrite de portée générale), plutôt que sur le droit créé par le juge (généralement appelé " droit jurisprudentiel "). Il est également généralement admis, par les historiens et la doctrine, que les Révolutionnaires se défiaient des juges et que, en conséquence, le système judiciaire français du dix-neuvième siècle n'accordait pas aux juges de véritable indépendance.

   Il faut avoir à l'esprit qu'il s'agit de faits historiques, et que la société a changé de manière significative au cours des deux cent dernières années ; il est difficilement concevable de présenter le système judiciaire français contemporain, malgré tous les changements qu'il subit encore et dont il a probablement besoin (mais ceci étant entendu comme pour tous les systèmes juridiques *vivants*), comme l'aboutissement direct de celui du dix-neuvième siècle.

   Parmi les raisons les plus flagrantes des ces évolutions considérables, nul ne peut ignorer l'importance des changements économiques et sociaux que la France, et de façon plus large, l'Europe, ont connu depuis la deuxième guerre mondiale. Le simple fait que la France soit un membre (fondateur) de l'Union européenne, et signataire de

la Convention européenne de sauvegarde des droits de l'Homme, a entraîné de nombreux changements dans le système juridique et dans la façon dont les juges appréhendent et remplissent leur mission.

Bien sûr, l'évolution de la société dans son ensemble, et celle du système juridique en particulier, n'ont pas coupé celui-ci de ses racines. Le juge français n'est pas un activiste, au sens, par exemple, de l'activisme judiciaire tel qu'il existe aux Etats-Unis. Ceci est dû au fait que les changements de société ne doivent pas être décidés par des professionnels non élus (les juges), mais par le Parlement. Ceci, indiscutablement, constitue une différence théorique majeure entre la France et les Etats-Unis en ce qui concerne le rôle non-écrit du juge dans la société. En pratique cependant, les choses sont plus complexes et plus subtiles : les juges français rendent des décisions sous-entendant qu'ils adoptent des positions impliquant des changements sociaux. Ainsi, les années passant, le juge français est devenu une des sources de changement dans la société (de la même façon que dans le système juridique américain, le rôle du Congrès, et du droit écrit, ont évolué).

En fin de compte, la seule question pertinente est de savoir si un demandeur ou un défendeur aura en France un procès convenable et équitable. La réponse est, indiscutablement, " oui ". Le débat qui demeure ouvert – il s'agit de questions d'opinions politiques et philosophiques – porte sur la question des types de ·changements qu'il faut encourager.

Ceci à l'esprit, plusieurs aspects de la procédure civile peuvent être détaillés, relatifs aux *contingency fees*, à l'aide juridictionnelle, à la mise à la charge des frais de justice, à la possibilité pour des demandeurs d'agir en groupe et enfin un dernier relatif à la durée d'une instance.

## 1.1 *Contingency fees*

Le professeur Kessedjian expose que " *les honoraires de résultat, c'est-à-dire des honoraires qui ne sont versés à l'avocat qu'en fonction du succès qu'il obtient pour son client* ", sont interdits en France [1].

Cependant, les éléments suivants doivent être précisés concernant l'interdiction des honoraires de résultat.

L'article 10 de la loi du 31 décembre 1971 affirme qu'un avocat ne peut être payé *exclusivement* en fonction du résultat judiciaire [2].

La même disposition prévoit également que les avocats peuvent recevoir des honoraires de résultat en fonction du résultat judiciaire, dès lors qu'ils reçoivent à titre complémentaire des honoraires indépendamment du résultat.

S'agissant de cette rémunération complémentaire, indépendante du résultat du litige, aucun montant minimum n'est imposé, de telle sorte que cette rémunération peut être quasiment symbolique, ou à tout le moins largement inférieure à celle prévue en fonction du résultat.

---

[1]     Avis juridique du professeur Kessedjian, page 4

[2]     Loi n°71-1130 du 31 décembre 1971, article 10

Aucun texte ne prévoit d'ailleurs de sanction en cas de fixation par l'avocat d'une rémunération, au titre des prestations, très basse par rapport à la rémunération fixée sur le résultat du litige.

En outre, les juges veillent à ce qu'en pratique, ce principe puisse être librement appliqué.

Ainsi, la Cour de cassation a cassé la décision d'une cour d'appel qui avait annulé un contrat dont l'effet était de donner à un honoraire de résultat un montant bien supérieur à la rémunération des prestations. La Cour de cassation a ainsi expressément indiqué que les honoraires de résultat peuvent être d'un montant bien supérieur à la rémunération des prestations, et cela sans proportionnalité [3].

Cette solution est d'ailleurs fréquemment adoptée par les avocats, qui pourront prévoir des conventions d'honoraires dont la rémunération fixée sur le résultat du litige représentera jusqu'à 90% de la rémunération totale, alors que la rémunération complémentaire au titre des prestations, indépendante du résultat, ne représentera que 10%.

Enfin, il convient de préciser que les juges apprécient souverainement, d'après les conventions des parties et les circonstances de la cause, le montant des honoraires dus à l'avocat. Ils peuvent d'ailleurs en réduire le montant tant que ce montant ainsi que son principe n'ont pas été acceptés par le client, alors même que le service a déjà été rendu [4].

En cas de différend sur la fixation du quantum et sur le recouvrement des honoraires d'avocat, une procédure spécifique a été mise en place par un décret du 27 novembre 1991 [5].

Cette procédure permet de soumettre ce type de contestations au bâtonnier de l'Ordre des avocats auquel appartient l'avocat concerné, puis en appel, au premier président de la cour d'appel [6].

Le bâtonnier saisi doit, dans un délai de trois mois, fixer le montant des honoraires qu'il estime équitables. Il peut par conséquent, dans certaines circonstances, diminuer le montant des honoraires fixés par l'avocat s'il estime ce montant déséquilibré par rapport à la prestation rendue [7].

Une fois la décision du bâtonnier rendue, il convient de la déférer au tribunal de grande instance avant de la rendre exécutoire.

---

[3]   Cass civ 1ère, 10 juillet 1995

[4]   Cass Civ 2ème, 5 juin 2003

[5]   Décret n°91-1197 du 27 novembre 1991 organisant la profession d'avocat, relatif notamment aux contestations des honoraires d'avocats, articles 174 et suivants

[6]   Décret n°91-1197, article 175

[7]   Décret n°91-1197, article 175

Ces règles s'insèrent avec cohérence dans le système judiciaire français, fondé sur un principe général d'accès à la justice, signifiant que le coût de la justice doit être limité.

Ainsi, la limitation des honoraires de résultat ou le développement de l'aide juridictionnelle sont considérés comme des éléments ayant pour but de limiter les coûts.

## 1.2 Aide juridictionnelle

Concernant l'aide juridictionnelle, le professeur Kessedjian expose que l'avocat nommé au titre de l'aide juridictionnelle est " très peu rémunéré " et qu'il " *ne pourra pas demander un complément d'honoraires par rapport à la somme qui lui est allouée par l'aide judiciaire* " [8].

Cette affirmation est cependant incomplète.

En effet, l'article 36 de la loi du 10 juillet 1991 relative à l'aide juridictionnelle prévoit que, lorsque la décision passée en force de chose jugée rendue au profit du bénéficiaire de l'aide juridictionnelle a procuré à celui-ci des ressources telles que, si elles avaient existé au jour de la demande d'aide juridictionnelle, celle-ci ne lui aurait pas été accordée, l'avocat désigné peut demander des honoraires à son client [9].

Ainsi, l'avocat désigné au titre de l'aide juridictionnelle peut parfaitement prévoir une convention d'honoraires avec son client en ce sens et percevoir ainsi, en cas d'issue favorable du litige, un complément d'honoraires, en plus de la somme qui lui a été allouée par l'aide juridictionnelle.

Par ailleurs, le professeur Kessedjian explique que le revenu des bénéficiaires de l'aide judiciaire doit être situé en dessous d'un certain seuil qui est " *extrêmement faible* " [10].

Il convient cependant de préciser qu'il existe une solution alternative, " l'aide juridictionnelle partielle ", pour les personnes dont le revenu serait situé au dessus de ce seuil, mais qui ne seraient pas pour autant en mesure d'assumer le coût que représente l'assistance d'un avocat.

Dans le cadre de cette aide juridictionnelle partielle, tant l'Etat français que le bénéficiaire contribuent à la rémunération de l'avocat désigné. Toutefois, la part contributive de l'Etat est inversement proportionnelle aux ressources du bénéficiaire [11].

---

[8]     Avis juridique du professeur Kessedjian, page 5

[9]     Loi n°91-647 du 10 juillet 1991 relative à l'aide juridique, article 36 : " *Lorsque la décision passée en force de chose jugée rendue au profit du bénéficiaire de l'aide juridictionnelle a procuré à celui-ci des ressources telles que, si elles avaient existé au jour de la demande d'aide juridictionnelle, celle-ci ne lui aurait pas été accordée, l'avocat désigné peut demander des honoraires à son client* "

[10]    Avis juridique du professeur Kessedjian, page 5

[11]    Loi n°91-647 du 10 juillet 1991 relative à l'aide juridique, article 34 : " *En cas d'aide juridictionnelle partielle, la part contributive de l'Etat au profit du bénéficiaire est, dans des conditions déterminées par*

L'Etat peut donc verser jusqu'à 85% des honoraires fixés par l'avocat.

Cette solution garantit ainsi à tout individu ayant des revenus insuffisants, mais supérieurs au seuil de l'aide juridictionnelle totale, l'assistance d'un avocat.

Selon les chiffres du Ministère de la justice, plus de 830 000 personnes ont bénéficié d'une aide juridictionnelle en France en 2004 [12].

**1.3    Application de l'article 700 du nouveau code de procédure civile**

Le professeur Kessedjian rappelle la règle imposée par l'article 700 du Nouveau Code de Procédure Civile (" NCPC ") selon laquelle " [...] *le juge condamne la partie tenue aux dépens ou, à défaut, la partie perdante à payer à l'autre partie la somme qu'il détermine, au titre des frais exposés et non compris dans les dépens. Le juge tient compte de l'équité ou de la situation économique de la partie condamnée. Il peut même d'office, pour des raisons tirées des mêmes considérations, dire qu'il n'y a pas lieu à cette condamnation. [...]* " [13].

Cependant, il convient de noter que, dans le système français, le montant auquel les tribunaux condamnent effectivement la partie perdante au profit de la partie gagnante, sur le fondement de l'article 700 du NCPC, est peu élevé en comparaison de ce qui peut exister dans d'autres systèmes juridiques.

De plus, il est important de souligner que la prise en compte par les juges de la situation économique de la partie condamnée est systématique, et ce précisément dans le cadre d'affaires opposant de simples particuliers à des entreprises.

Ceux-ci prennent en effet en considération les revenus respectifs des parties.

Par conséquent, en contentieux français, l'ensemble des frais ne suit pas, en règle générale, l'action. Force est de constater qu'en droit comme en pratique, la partie perdante est rarement condamnée au paiement d'une partie substantielle des dépens et autres frais résultant du procès, à l'autre partie (il faut conserver à l'esprit que, contrairement au système américain, une fois l'assignation délivrée, 95% des affaires sont jugées, dès lors qu'il n'existe pas de *pretrial proceedings* (procédures pré contentieuses)).

Plus particulièrement, en matière de responsabilité délictuelle dans une procédure où un particulier aurait perdu contre une entreprise, les juges ne prononcent généralement aucune condamnation à l'encontre de ce simple particulier pour les frais exposés par l'entreprise dans le cadre de la procédure [14]. Tout au plus, en pratique,

---

*un barème fixé par décret en Conseil d'Etat, inversement proportionnelle aux ressources du bénéficiaire* "

[12]    Statistiques de la justice Octobre 2005, Ministère français de la justice

[13]    Avis juridique du professeur Kessedjian, page 5

[14]    Cass civ 1ère, 27 septembre 2005, pourvoi n°03-18225 ; Cass civ 1ère, 3 mai 2006, pourvoi n°04-10994 ; Cass civ 1ère, 23 septembre 2003, pourvoi n°01-13063 ; CA Versailles, 25 novembre 2005, Arandel c. GSK ; CA Montpellier, 4 avril 2006, Boukran c. GSK ; TGI Guingamp, 20 octobre 2004, Bouteloup c. GSK ; TGI Versailles, 6 novembre 2003, Bouvart c. GSK ; CA Versailles, 22 octobre 2004, Cauvin c. GSK ; TGI Versailles, 5 juin 2003, Cimadomo c. GSK ; TGI Versailles, 27 janvier 2005, de Troyer c. GSK ; CA Versailles, 7 septembre 2005, Douaglin c. GSK ; TGI Nanterre, 27 mai 2005, Dumont c. GSK ; CA Lyon, 13 janvier 2004, Ferrero c. GSK ; TGI Dax, 6 décembre 2005, Gensous c.

peuvent-ils condamner le particulier à des sommes infimes ne dépassant pas 2 000 euros, qui ne correspondent aucunement aux frais que l'entreprise a réellement exposé [15].

De plus, il est courant que les tribunaux condamnent la partie gagnante à payer les frais de procédure de la partie perdante (frais d'expertise) dans les cas où il y aurait atteinte à l'équité si la partie perdante devait supporter la charge de tels frais (en particulier quand une grande entreprise est défenderesse face à un particulier).

Ainsi, un certain nombre de décisions ont refusé de mettre les frais à la charge de la partie perdante, surtout en présence d'une différence substantielle entre leurs capacités financières respectives.

Pour ce faire, le juge détaille sa motivation, en faisant référence au principe d'équité, comme suit : " *Compte tenu de la disparité des situations financières des parties, laisse à la charge du laboratoire les dépens qui comprendront les frais d'expertise* " [16].

Enfin, il convient d'ajouter que, si la partie perdante est bénéficiaire de l'aide juridictionnelle, elle n'a jamais à supporter les frais exposés prévus par l'article 700 du NCPC, dans la mesure où il incombe à l'Etat de supporter de tels coûts [17].

## 1.4   La possibilité pour les demandeurs d'agir en groupe

Le professeur Kessedjian indique dans sa consultation qu'elle a interrogé les autorités européennes sur l'éventualité d'un projet européen en matière de *class action*, et que " *la réponse a été très nette : il n'existe aucune volonté politique pour le moment pour lancer un tel projet au niveau européen* " [18].

De telles affirmations sont quelque peu surprenantes, dans la mesure où la Commission européenne a publié en décembre 2005 un livre vert sur les actions en dommages et intérêts pour infractions aux règles communautaires sur les ententes et les abus de position dominante, dans lequel est envisagée la mise en place d'une *class action* en faveur des consommateurs contre des entreprise [19].

En effet, la Commission européenne a précisé que l'un des objectifs de ce livre est, en particulier : " *Compte tenu des coûts d'une procédure judiciaire et de la faible valeur de leur demande individuelle, il est peu probable que des particuliers, pris individuellement, soient en pratique en mesure d'introduire des actions en dommages et intérêts contre l'auteur de l'infraction. Toutefois, il peut s'avérer avantageux de favoriser le dédommagement des pertes subies par les consommateurs. C'est*

---

[15]   GSK ; CA Versailles, 7 septembre 2005, Gandemer c. GSK ; TGI Dunkerque, 12 mai 2004, Hoffman c. GSK ; CA Toulouse, 9 mai 2005, Justou c. GSK
       CA Grenobles, 30 juillet 2003, Benoît c. GSK

[16]   TGI Nanterre, 3 février 2006, Rassinier c. GSK ; Pour d'autres décisions avec la même motivation : Cour d'appel de Versailles, 17 mars 2006, Fageolle c. GSK ; TGI Nanterre, 7 octobre 2005, Renard M.J. c. GSK ; Civile 2ème, 1 décembre 1982, Dalloz 1983

[17]   Loi n°91-647 du 10 juillet 1991 relative à l'aide juridique, article 24 ; Cass Civ 1ère, 3 octobre 1991

[18]   Avis juridique du professeur Kessedjian, page 4
[19]   Livre vert sur les actions en dommages et intérêts pour infraction aux règles communautaires sur les ententes et les abus de position dominante

*pourquoi le livre vert soumet à la discussion plusieurs solutions destinées à résoudre ce problème* " [20].

En ce qui concerne la France, le professeur Kessedjian déclare dans sa consultation que " *le système juridique français n'est pas un système favorisant les contentieux* " [21].

Cependant, les précisions suivantes doivent être apportées concernant les différentes options ouvertes aux plaideurs désireux d'intenter une action de groupe contre un professionnel.

Il convient au préalable d'indiquer que deux propositions de lois permettant l'instauration de *class actions* en France ont été récemment présentées, l'une par des membres du Sénat, le 25 avril 2006, l'autre par le député monsieur Luc Chatel le 26 avril 2006 [22].

Ces deux propositions ont pour but de permettre aux consommateurs d'intenter des *class actions* contre des professionnels, dans des domaines marchands (services financiers, télécommunications, santé…).

De plus, bien que le droit français ne prévoie pas d'autres actions collectives que les trois mentionnées par le professeur Kessedjian dans sa consultation, il permet en toute hypothèse à des demandeurs de se regrouper et d'agir collectivement, dans le cadre d'une seule et même procédure, contre une personne physique ou morale qu'ils estimeraient responsable du préjudice dont ils auraient souffert, dans des circonstances similaires.

Pour ce faire, il convient simplement que l'ensemble des demandeurs soit représenté devant les juridictions concernées par le même avocat.

Le cas échéant, les demandeurs peuvent initier la procédure par le biais d'une seule assignation, commune à tous.

Ainsi, des groupes de patients agissant en leur nom propre ou celui de leurs conjoint ou enfants, peuvent intenter une action commune devant les tribunaux français, en particulier contre les fabricants de produits de santé.

L'exemple de nombreux groupes de patients et de leurs familles ayant poursuivi les producteurs de produits sanguins peut ainsi être cité [23].

---

[20]   Site internet de la Commission européenne, communiqué sur le livre vert sur les actions en dommages et intérêts pour infraction aux règles communautaires sur les ententes et abus de position dominante : http://europa.eu/rapid/pressReleasesAction.do?reference=MEMO/05/489&format=HTML&aged=1&language=FR&guiLanguage=fr

[21]   Avis juridique du professeur Kessedjian, page 3

[22]   Proposition du 25 avril 2006 par le sénat "sur le recours collectif" et proposition du 26 avril par l'assemblée "visant à instaurer les recours collectifs de consommateurs" dans le système procédural français

[23]   Cour d'appel de Lyon, 9 mai 1996, rendu en faveur d'un groupe de 20 patients ; TGI de Lyon, Ordonnance de référés, 26 octobre 1999, rendue en faveur d'un groupe de 29 patients

Les juridictions françaises ont, dans une telle hypothèse, choisi librement des experts impartiaux, indépendants et compétents sur la maladie concernée, auxquels elles ont confié des pouvoirs et un champ d'investigation large, y compris à l'étranger.

Dans cet exemple, les demandeurs étaient impécunieux. L'intégralité des frais des expertises diligentées dans le cadre de la procédure (qui s'élevaient à des sommes considérables), ont été pris en charge par le Trésor au titre du système de l'aide juridictionnelle (système expliqué au point 1.2).

De toute évidence, ces quelques remarques tempèrent l'affirmation selon laquelle le système français ne favorise pas les contentieux !

## 1.5    Durée de la procédure en France

Le professeur Kessedjian affirme que dans une affaire comme celle-ci, " *en première instance,* [...] *une durée de 3 ans environ ne serait pas impossible* " et rappelle que " *la France a été condamnée à plusieurs reprises pour des procédures trop longues* " [24].

Il convient néanmoins de préciser sur ce dernier point que si la France a pu faire l'objet de condamnations par la Cour européenne des droits de l'Homme, pour violation de l'article 6§1 de la Convention européenne des droits de l'Homme (" CEDH "), ces condamnations concernaient des litiges portant sur des matières totalement différentes de l'affaire en cause et bien particulières : les principales critiques en matière de durée de la procédure portent sur des affaires pénales (en procédure pénale) ou, sur des questions d'expropriation et de succession en matière civile.

De plus, d'après la jurisprudence publiée de la Cour européenne des droits de l'Homme, aucune condamnation pour violation de l'article 6§1 de la CEDH du fait d'une procédure trop longue n'a été prononcée à l'encontre de la France en matière de responsabilité délictuelle depuis 1999 [25].

Par ailleurs, il est parfaitement impossible d'estimer qu'une telle procédure durerait environ 3 ans en première instance. En effet, la longueur d'une procédure s'apprécie au regard de nombreux critères, notamment sa nature, les circonstances en cause ou encore la complexité de l'affaire.

En tout état de cause, les données du ministère français de la justice révèlent que la durée moyenne des affaires civiles devant les tribunaux de grande instance est passée de 7 mois en 2004 à 6,7 mois en 2005 [26].

Il faut en outre comprendre qu'il existe une grande différence entre les poursuites pénales (qui ont tendance à être " trop longues " à cause de la période d'instruction dont est chargé le juge d'instruction) et les contentieux civils. La durée moyenne de ces derniers ne dépasse pas celle des autres pays occidentaux.

---

[24]    Avis juridique du professeur Kessedjian, page 15

[25]    Site de la Cour européenne des droits de l'Homme : http://cmiskp.echr.coe.int/tkp197/default.htm

[26]    Site    du    ministère    français    de    la    justice : http://www.justice.gouv.fr/actualites/statistiquesciviles/statistiquesciviles.htm

Plus encore, il convient d'insister sur le fait que la procédure civile française connaît des procédures de référés, extrêmement rapides, qui sont courantes en matière de responsabilité du fait des produits défectueux, en particulier lorsque les demandeurs demandent la nomination d'un expert médical.

Par ailleurs, un décret relatif à la procédure civile tendant notamment à améliorer la célérité et la qualité de la justice est entré en vigueur le 1er mars 2006.

Ainsi, afin d'améliorer la célérité de la procédure, ce texte prévoit notamment la mise en place, par le juge de la mise en état, d'un calendrier de procédure. Les délais qui sont fixés dans ce calendrier ne peuvent être prorogés par le juge de la mise en état qu'en cas de cause grave, dûment justifiée [27].

Enfin, il convient de préciser que l'article 515 du NCPC donne au juge la possibilité de prononcer, d'office ou à la demande des parties, l'exécution provisoire d'un jugement rendu par une juridiction de première instance [28], s'il l'estime nécessaire, et compatible avec la nature de l'affaire. L'exécution provisoire signifie qu'un jugement de première instance peut être exécuté même s'il fait l'objet d'un appel.

A cet égard, le décret précité relatif à la procédure civile contient des dispositions qui ont pour effet de renforcer l'exécution provisoire des décisions de première instance, en permettant notamment au premier président de la cour d'appel de conditionner l'examen d'un appel formulé contre un jugement rendu, à l'exécution provisoire de ce jugement [29].

En matière de responsabilité civile délictuelle du fait des produits défectueux, le prononcé par les juges français de l'exécution provisoire des jugements rendus par les tribunaux de première instance est d'ailleurs fréquent [30].

## 2.    L'administration de la preuve

Le Professeur Kessedjian expose dans son avis juridique que " *Les parties à un procès en France n'ont aucune obligation de révéler spontanément les informations en leur possession qui seraient utiles à la manifestation de la vérité* " [31].

Historiquement, le système procédural civil français est de nature inquisitoire, ce qui implique que ce sont les juges qui conduisent le procès.

---

[27]   Décret n°2005-1678 du 28 décembre 2005 relatif à la procédure civile, article 23

[28]   Article 515 du NCPC : " *Hors les cas où elle est de droit, l'exécution provisoire peut être ordonnée, à la demande des parties ou d'office, chaque fois que le juge l'estime nécessaire et compatible avec la nature de l'affaire, à condition qu'elle ne soit pas interdite par la loi. Elle peut être ordonnée pour tout ou partie de la condamnation.* "

[29]   Décret n°2005-1678 du 28 décembre 2005 relatif à la procédure civile, article 175

[30]   TGI Nanterre, 9 septembre 2005, Bettayeb c. GSK ; TGI Nanterre, 5 juin 1998, Leroy c. GSK ; TGI Nanterre, 12 mai 1999, Soulier c. GSK ; TGI Nanterre, 8 octobre 2004

[31]   Avis juridique du Professeur Kessedjian, page 6

Ce principe a toutefois été atténué au fil des années, ce système civil procédural ayant été au fur et à mesure adapté aux besoins d'une société chaque jour davantage contentieuse.

En outre, il doit être souligné que le principe selon lequel le juge conduit le procès est d'application différente selon qu'il s'agit d'affaires civiles ou de poursuites pénales, le juge ayant davantage de pouvoirs dans le cadre des poursuites pénales.

## 2.1  Les dispositions du Nouveau code de procédure civile

Lors de l'adoption du Nouveau code de procédure civile (" NCPC ") en 1972, les règles procédurales ont été largement réécrites et le système procédural tel qu'existant au dix-neuvième siècle a été totalement abandonné.

Désormais, le NCPC organise spécifiquement la conduite de l'instance par les parties, le juge devant veiller au bon déroulement de l'instance [32].

La loi considère que le rôle des parties est essentiel et précise que le juge ne doit se prononcer que sur ce qui a été invoqué par les parties, tant dans leur demandes que dans leur défenses [33].

En outre, il incombe aux parties elles-mêmes de prouver les faits sur lesquels elles entendent fonder leurs prétentions (par l'apport de preuves) et le juge n'est pas supposé fonder sa décision sur des faits qui n'ont pas été prouvés par les parties lors des débats [34].

Toutefois, si le juge estime nécessaire de prendre en considération des faits supplémentaires, il doit s'assurer que les parties ont pu en discuter contradictoirement [35].

Plus précisément, le NCPC comprend des dispositions relatives à l'administration de la preuve (au regard de la loi française, une distinction, quelque peu théorique, peut être opérée entre " faits " et " preuve ", alors que le terme anglais " evidence " couvre les deux : une " preuve " est en général un élément qui lie le juge (par ex., les dispositions d'un contrat par acte authentique, signé devant notaire, ne peuvent être contestées dans la mesure où elles ont été adoptées en présence d'un tiers neutre) ; un " fait " voit son existence et sa signification librement démontrées et débattues).

Ainsi, le NCPC prévoit expressément qu'il incombe aux parties d'apporter la preuve des faits sur lesquels elles fondent leurs prétentions, que le juge a le pouvoir d'ordonner toute mesure d'instruction prévue par la loi, et le plus important, que les

---

[32] Article 2 du NCPC : " *Les parties conduisent l'instance sous les charges qui leur incombent. Il leur appartient d'accomplir les actes de la procédure dans les formes et délais requis.* "
Article 3 du NCPC : " *Le juge veille au bon déroulement de l'instance ; il a le pouvoir d'impartir les délais et d'ordonner les mesures nécessaires.* "

[33] Article 5 du NCPC : " *Le juge doit se prononcer sur tout ce qui est demandé et seulement sur ce qui est demandé.* "

[34] Article 6 du NCPC : " *A l'appui de leurs prétentions, les parties ont la charge d'alléguer les faits propres à les fonder.* "

[35] Article 16 du NCPC : " *Le juge doit, en toutes circonstances, faire observer et observer lui-même le principe de la contradiction.*
*Il ne peut retenir, dans sa décision, les moyens, les explications et les documents invoqués ou produits par les parties que si celles-ci ont été à même d'en débattre contradictoirement.*
*Il ne peut fonder sa décision sur les moyens de droit qu'il a relevés d'office sans avoir au préalable invité les parties à présenter leurs observations.* "

parties sont tenues de participer aux mesures d'instruction (découverte de preuves), le juge pouvant à cet égard prendre en compte le refus d'une partie d'y participer, ou son abstention lors du déroulement de telles mesures.

Ce dernier point est essentiel : le fait que le juge puisse prendre en compte le refus d'une partie de produire des informations en sa possession ou le refus d'une partie de produire des informations dans le cadre d'une expertise judiciaire garantit notamment le fonctionnement de système et permet au processus d'administration de la preuve de remplir son rôle.

Il existe évidemment une différence considérable avec le système américain mais on considérerait à tort que cette différence signifie que le système français en est inférieur ou moins efficace : le système français est entièrement différent et présente ses propres rationalité et efficacité, qui sont garanties par les dispositions du NCPC [36].

Il convient enfin de mentionner l'expertise judiciaire, qui est un aspect important du système procédural français. Le juge désigne les experts à partir d'une liste d'experts agréés. Ces experts ne diligentent pas l'expertise au nom des parties (bien qu'une expertise " privée " puisse également être diligentée à la demande d'une partie, la force probante légale de cette expertise étant alors différente), mais selon les termes d'une mission qui est déterminée par le juge. L'expert judiciaire est tenu d'agir en respectant certains principes, c'est à dire de façon impartiale et autonome, d'entendre les parties ou un tiers si nécessaire, et sans donner d'avis d'ordre juridique concernant l'issue du litige [37].

De telles expertise médicales sont fréquemment ordonnées par le juge dans le cadre de contentieux en matière de responsabilité du fait de produits, qui concernent des médicaments [38].

## 2.2    Conséquences relatives à l'administration de la preuve

Le Professeur Kessedjian expose dans son avis juridique que " *L'administration de la preuve est  [...] essentiellement entre les mains du juge* " [39].

---

[36]    Article 9 du NCPC : " *Il incombe à chaque partie de prouver conformément à la loi les faits nécessaires au succès de sa prétention.* ".
Article 10 du NCPC : " *Le juge a le pouvoir d'ordonner d'office toutes les mesures d'instruction légalement admissibles.* ".
Article 11 du NCPC : " *Les parties sont tenues d'apporter leur concours aux mesures d'instruction sauf au juge à tirer toute conséquence d'une abstention ou d'un refus.*
*Si une partie détient un élément de preuve, le juge peut, à la requête de l'autre partie, lui enjoindre de le produire, au besoin à peine d'astreinte. Il peut, à la requête de l'une des parties, demander ou ordonner, au besoin sous la même peine, la production de tous documents détenus par des tiers s'il n'existe pas d'empêchement légitime.* ".

[37]    Article 232 du NCPC : " *Le juge peut commettre toute personne de son choix pour l'éclairer par des constatations, par une consultation ou par une expertise sur une question de fait qui requiert les lumières d'un technicien.* "
Article 237 du NCPC : " *Le technicien commis doit accomplir sa mission avec conscience, objectivité et impartialité.* "
Article 238 du NCPC : " *Le technicien doit donner son avis sur les points pour l'examen desquels il a été commis.*
*Il ne peut répondre à d'autres questions, sauf accord écrit des parties.*
*Il ne doit jamais porter d'appréciations d'ordre juridique.* "

[38]    TGI  Toulouse, 27 août 2001, GSK / Gacem ; TGI Nanterre, 5 septembre 2003, GSK / Lopes ; TGI Ajaccio, 8 septembre 2003, GSK / Gianelli ; TGI Le Mans, 2 décembre 2003, Aventis Pasteur MSD / Beaulaton ; TGI Nanterre, 16 janvier 2004, GSK / Ganne ; TGI Nanterre, 9 janvier 2004, GSK / Natali ; TGI Nanterre, 16 janvier 2004, GSK / Ganne ; TGI Créteil, 15 juin 2005, Baxter International Inc / Rodriguez ; CA Versailles, 30 avril 2004, S.A. UCB Pharma / Mme Guirimaud.

[39]    Avis juridique du Professeur Kessedjian, page 6

Cependant, il est important de comprendre que l'administration de la preuve n'est plus " essentiellement " entre les mains du juge depuis le début des années 70. Ce changement majeur dont la loi française a fait l'objet a d'ailleurs été abondamment relevé par la doctrine [40].

Trois conséquences sur le système juridique français doivent être soulevées.

- En premier lieu, le juge français peut ordonner à une partie ou un tiers de produire les éléments de preuve en leur possession, bien qu'il ne dispose pas de pouvoir lui permettant de contraindre " physiquement " ces personnes à produire de tels éléments.

- En second lieu, le juge français dispose de pouvoirs lui permettant de contraindre une partie ou un tiers à produire les éléments de preuve en leur possession. Il peut notamment ordonner le paiement d'une amende civile. Tel qu'il a été précisé par les défendeurs, ce moyen n'est pas le plus efficace dans la mesure où le montant maximum de l'amende est limité à une certaine somme.

   Toutefois, il convient de souligner que le juge dispose d'un moyen bien plus efficace lui permettant de contraindre une partie ou un tiers à produire des informations. En effet, le juge peut enjoindre une partie ou un tiers de produire un élément de preuve sous peine d'une astreinte, qui sera déterminée selon les enjeux du litige [41].

   Par ce moyen, le juge ordonne à une partie ou un tiers de produire les éléments de preuve en leur possession sous peine d'une astreinte journalière dont il fixe librement le montant. Ainsi, le résultat peut être terriblement efficace lorsqu'une partie est enjointe de produire des documents sous peine d'une astreinte de 1 000, 5 000 euros ou plus par jour...

   En outre, le juge peut augmenter le montant de l'astreinte. Par exemple, un juge a enjoint une société de produire des documents sous peine d'une astreinte de 750 euros le premier mois puis de 1 500 euros à partir du mois suivant. [42].

- Enfin, parmi les pouvoirs dont dispose le juge français, le pouvoir le plus efficace, dont le rôle est le plus important en pratique, est celui par lequel le juge qui aurait demandé à une partie de produire des éléments de preuve, peut tirer toutes les conséquences du refus de cette partie de produire les documents demandés [43].

   Ainsi, lors de la décision par le juge concernant la solution du litige, le refus d'une partie de produire des éléments de preuve demandés par celui-ci sera retenue contre elle [44]. Ce dernier pouvoir est essentiel car il garantit l'efficacité du processus français d'administration de la preuve : une partie

---

[40]   Jean Vincent & Serge Guinchard, Procédure civile, Précis Dalloz, 24ème édition ; Gérard Cornu & Jean Foyer, Procédure civile, Hémis Droit privé, Puf ; Gérard Couchez, Procédure civile, 11ème édition, Armand Colin

[41]   Article 11 du NCPC, cité précédemment

[42]   Ordonnance de la Cour d'Appel de Versailles, 17 Octobre 1996, jurisdata n°044382

[43]   Article 11 du NCPC, cité précédemment

[44]   Cass Civ 1ère, 30 mars 2005 ; Cass com, 5 mars 1996 ; CA Reims, 14 mai 2002 ; CA Paris, 23 janvier 1987

qui refuse de produire des éléments de preuve nécessaires à la solution du litige, met en jeu cette solution et risque de ce fait de voir le juge adopter une décision en sa défaveur.

## 2.3    L'application des textes limitant la production de preuve

Le Professeur Kessedjian expose dans son avis juridique que les différents textes législatifs français applicables, sur lesquels je me fonde pour expliquer en quoi la production de documents de certaines natures pourrait présenter des difficultés " *ne sont généralement pas appliqués en matière civile, mais essentiellement dans des domaines sensibles comme le droit de la concurrence ou des domaines économiques particuliers* " [45]. Je souhaite cependant exprimer mon dissentiment sur cette affirmation.

Il est assez exact de mentionner que le juge français ne s'oppose généralement à la transmission de documents que sur le fondement d'un intérêt spécial. Toutefois, cela résulte non pas du fait que la Convention de la Haye du 18 mars 1970 n'est pas applicable en matière civile (surtout lorsque, en vertu de la loi française, le domaine économique n'est pas totalement exclu du champ d'application de la " matière civile "), mais des termes mêmes de la convention.

Ainsi que je l'ai précisé dans mon avis juridique initial (page 15):

> " *La Convention de la Haye du 18 mars 1970 relative à l'obtention de preuves à l'étranger en matière civile et commerciale, dont la France et les Etats Unis sont signataires (ci-après " la Convention "), dispose en son article 1er qu'" en matière civile ou commerciale, l'autorité judiciaire d'un Etat contractant peut, conformément aux dispositions de sa législation, demander par commission rogatoire à l'autorité compétente d'un autre Etat contractant de faire tout acte d'instruction, ainsi que d'autres actes judiciaires* ".
>
> *La commission rogatoire, soumise à un certain formalisme (art. 3 de la Convention), permet notamment à l'autorité requérante de prendre connaissance de documents, ou d'auditionner des témoins localisés sur le territoire de l'Etat requis.*
>
> *(...)*
>
> *En vertu de ces dispositions, le juge, auquel le Ministère de la Justice transfère la demande, est en principe tenu d'exécuter la commission rogatoire et les magistrats de l'autorité requérante ont la faculté d'assister à l'exécution de la commission (art. 741 NCPC).*

---

[45]    Avis juridique du Professeur Kessedjian, page 8

*Dans certains cas toutefois, le juge français à la faculté ou l'obligation de refuser d'exécuter la commission, ainsi en est-il :*

- *lorsqu'elle est transmise irrégulièrement (art. 745 NCPC) ;*

- *lorsqu'il estime qu'elle ne rentre pas dans ses attributions (art. 743 NCPC) ;*

- *ou si la commission est de nature à porter atteinte à la souveraineté ou à la sécurité de l'Etat français (art. 743 NCPC)*

*En outre, en 1987, la France a déclaré que les commissions rogatoires qui auraient pour objet une procédure de " pre-trial discovery documents " ne peuvent être exécutées que lorsque les documents demandés sont limitativement énumérés dans la commission rogatoire et présentent un lien avec l'objet du litige (Déclaration de la France du 19 janvier 1987 afin d'émettre une réserve au sujet de l'article 23 de la Convention).*

*A cet égard, la jurisprudence française est venu préciser que les documents sont limitativement énumérés, au sens de la Déclaration précitée, " dès lors que ces derniers sont identifiés avec un degré raisonnable de spécificité en fonction d'un certain nombre de critères tels que leur date, leur nature ou leur auteur " (CA Paris, 13 septembre 2003).*

*Conformément aux dispositions de la Convention de la Haye et aux dispositions du NCPC, une autorité judiciaire américaine pourrait ainsi envisager de demander, par commission rogatoire adressée au Ministère de la Justice français qui transmettrait la demande à la juridiction compétente, l'examen de documents et l'audition de témoins localisés sur le territoire français. Au surplus, l'autorité judiciaire requérante pourrait demander à se faire transmettre les dépositions sous serment des témoins (art. 3 de la Convention). "*

S'agissant des autres textes cités, (cf. mon avis juridique initial, page 17), il a été précisé que la transmission par le juge français à une Cour américaine de certains types de documents spécifiques *pourrait* présenter des difficultés.

" *A cet égard, la Convention permet toutefois, sous certaines conditions, la communication de tels documents.*

*Il en résulte que les autorités judiciaires américaines devraient être, en principe, en mesure de demander par commission rogatoire, des documents ou renseignements d'ordre économique, commercial, industriel, financier ou technique tendant à la constitution de preuves en vue de procédures judiciaires.*

*Néanmoins, tel qu'il a été exposé précédemment, cette demande devrait être effectuée en respectant les conditions relativement contraignantes imposées tant par la Convention que par le NCPC. "*.

## 2.4   Confidentialité des dossiers médicaux

Le mémoire en défense des demandeurs expose que, le patient étant libre de lever la confidentialité dont est protégé son dossier médical, l'accès aux dossiers médicaux est

par conséquent garanti [46]. Cette affirmation est sans doute correcte, mais son champ d'application est limité, et ce pour deux raisons.

D'une part, la levée de la confidentialité par le patient concerne exclusivement ses propres données médicales, alors que la confidentialité des dossiers médicaux couvre d'autres types de données médicales.

D'autre part, la levée de la confidentialité du dossier médical ne pouvant être faite que par le patient en *personne* (ce qui implique qu'il participe à la procédure), une procédure de class action ne permettrait pas la production de dossiers médicaux de patients qui ne sont pas expressément parties à la procédure *per se*.

Enfin, je souhaiterais ajouter qu'il est inexact d'alléguer que j'ai omis " *de signaler que la règle de confidentialité n'est édictée par le droit français que pour protéger le malade* " [47], dans la mesure où ceci était précisément mentionné dans mon précédent avis.

En effet, il était expressément mentionné, à la page 17 de mon avis :

> " *Il résulte de ces dispositions que seul le patient peut, sans toutefois y être tenu, autoriser son médecin à lever le secret médical couvrant son dossier médical et que lui seul est à même de demander sa communication dans le cadre d'un procès.*
>
> *En effet, si les dispositions du NCPC obligent les parties à concourir à la manifestation de la vérité dans le cadre d'une procédure contentieuse, allant jusqu'à autoriser le juge d'enjoindre tant les parties que des tiers à produire tout document, ces dernières peuvent toutefois opposer un empêchement légitime (article 11 du NCPC). La protection du secret médical constitue précisément un empêchement légitime.*
>
> *En outre, aucune disposition en droit français ne donne pouvoir au juge pour contraindre un établissement de santé ou un médecin à lui transmettre des informations couvertes par le secret médical sans l'accord de la personne concernée.* ".

## 3. Reconnaissance et effets en France d'un jugement étranger de class action, rendu par une juridiction américaine

Le Professeur Kessedjian expose dans son avis juridique que si les " *demandeurs français [sont] acceptés dans la class action aux Etats-Unis et Merck gagne ce procès [...] Nous pouvons dire, immédiatement, que toutes les conditions sont réunies pour Merck ne puisse être à nouveau rejugé en France pour une action identique ou similaire* " [48].

Toutefois, ainsi qu'il sera exposé ci-après, le juge français, qui devra examiner si les conditions nécessaires à la reconnaissance d'un jugement étranger en France sont réunies, pourrait considérer qu'il existe des raisons de ne pas reconnaître ce jugement en France.

---

[46]    Mémoire en défense des demandeurs, page 26

[47]    Avis juridique du Professeur Kessedjian, page 9

[48]    Avis juridique du Professeur Kessedjian, page 9

**3.1     La renonciation au privilège de l'article 14 du code civil**

S'agissant de la compétence d'un juge étranger, le Professeur Kessedjian expose que des demandeurs français peuvent toujours renoncer au privilège de juridiction dont ils bénéficient en vertu de l'article 14 du code civil, leur garantissant la compétence exclusive des tribunaux français [49]. Cette affirmation est sans aucun doute exacte.

La question est alors d'établir l'existence d'une telle renonciation.

Le Professeur Kessedjian considère que puisque les ressortissants français sont demandeurs à l'action aux Etats-Unis, ils sont *ipso jure* considérés comme ayant renoncé au bénéfice de l'article 14, dans la mesure où " *la participation volontaire à une class action est considérée comme l'équivalent d'une assignation* " [50].

Je suis d'accord avec cette affirmation lorsqu'elle s'applique aux ressortissants français qui ont expressément joint la class action.

En revanche, je serais profondément en désaccord avec une telle affirmation si l'on devait considérer qu'une telle présomption de renonciation s'applique aux autres ressortissants français qui entrent dans le champ de la class action, mais qui ne l'ont pas expressément jointe.

Une nouvelle action pourrait par conséquent être intentée en France par ces derniers.

Dans pareil cas, le champ de la class action serait laissé sans contrôle dans la mesure où il est très improbable qu'un citoyen français ne participant pas expressément à la class action soit considéré par le juge français comme ayant renoncé au privilège de l'article 14.

En effet, les demandeurs doivent avoir " volontairement et librement " renoncé au privilège de l'article 14 [51].

Or, dans l'hypothèse où la class action contre Merck serait de type " opt out ", certains de ses membres pourraient parfaitement ne pas être courant de l'existence de cette class action à laquelle ils appartiennent pourtant, et ce particulièrement compte-tenu du fait que cette class action se déroule aux Etats-Unis alors que ses membres sont situés en France.

Mon analyse repose en outre sur la décision du Conseil Constitutionnel français, qui, ainsi qu'il sera rappelé ci-après au point 3.4, considère que la class action avec " opt out " est contraire aux principes fondamentaux de droit français : un juge rencontrerait par conséquent des difficultés à accepter de considérer qu'un ressortissant français a renoncé à son droit d'agir devant les juridictions françaises, simplement parce que ce dernier entre dans le champ de la class action se déroulant à l'étranger, et alors qu'il n'a pas manifesté son intention d'y participer.

**3.2     Conditions relatives à l'*exequatur***

Incidemment, il me semble nécessaire de clarifier les propos suivants du Professeur Kessedjian : " *Contrairement à ce qu'indique le Professeur Raynouard, pour vérifier la compétence du juge étranger, le juge français ne regardera absolument pas s'il existe un lien de droit entre les demandeurs et la société Merck* " [52].

---

[49]     Avis juridique du Professeur Kessedjian, page 11

[50]     Avis juridique du Professeur Kessedjian, page 11

[51]     Cass civ 1ère, 16 juin 1981 ; Cass civ 1ère, 30 juin 1992 ; CA 20 janvier 1965

[52]     Avis juridique du Professeur Kessedjian, page 11

Si j'avais écrit une telle affirmation, je serais d'accord avec la remarque du Professeur Kessedjian. Mais toute personne lisant le paragraphe concerné de mon avis juridique comprendra que me prêter de tels propos consiste à attribuer à César ce qui appartient à Brutus!

J'ai simplement précisé qu'en vue d'accorder l'*exequatur* d'un jugement, le juge français doit respecter les règles générales suivantes, qui ont été établies par la jurisprudence (cf mon avis juridique initial, page 19):

> " *L'article 509 du NCPC pose aujourd'hui le principe du caractère exécutoire en France des décisions étrangères, sous réserve du respect des règles imposées par la loi française.*
>
> *Sans être un juge du fond (l'affaire n'est évidemment pas rejugée en application du droit national), le juge national saisi d'une demande d'exequatur doit s'assurer du respect de cinq conditions (CA Paris, 12 septembre 2002 ; CA Paris, 10 mai 2001 ; Cass civ Ière, 7 janvier 1964 ; Cass civ Ière, 4 octobre 1967):*
>
> - *la compétence du juge étranger qui a rendu la décision en application des règles de conflit françaises (Cass civ Ière, 6 février 1985);*
>
> - *la régularité de la procédure suivie devant la juridiction étrangère au regard de l'Ordre Public International français et des droits de la défense (TI Paris, 24 novembre 1977 ; Cass civ Ière, 4 octobre 1967 ; CA Paris, 9 mai 1980);*
>
> - *l'application de la loi compétente d'après les règles françaises de conflit (CA Paris, 4 février 1958) ;*
>
> - *l'absence de fraude à la loi (Cass civ Ière, 22 avril 1986 ; Cass civ Ière, 2 octobre 1984 ; TGI Nanterre, 2 juillet 1974 ; TGI Paris, 6 juillet 1972 ; Cass civ, 22 janvier 1951) ;*
>
> - *la conformité de la solution de la décision étrangère à l'Ordre Public international, celui-ci étant apprécié de façon atténuée (Cass civ Ière, 7 janvier 1964).*
>
> *Ce n'est que dans l'hypothèse où le juge de l'exequatur considérerait que ces cinq conditions, ou l'une d'entre elles, n'ont pas été respectées qu'il refuserait d'ordonner l'exequatur du jugement rendu par la juridiction américaine.*
>
> *En outre, le juge français peut décider de n'accorder, au regard des circonstances, qu'une exequatur partielle du jugement (CA Paris, 28 octobre 1999).*".

J'ai ensuite fait part de mon analyse relative aux éventuelles conséquences de l'application de telles règles au cas présent.

J'ai ainsi écrit (cf mon avis juridique initial, page 20) :

> " *En l'espèce, le juge français de l'exequatur pourrait notamment considérer que la première et la quatrième condition ne sont pas remplies : la*

*compétence devait être celle d'une juridiction française et il y a une fraude à la loi française en essayant d'obtenir une décision fondée sur une class action de droit américain.*

*En effet, concernant la première condition, les plaignants sont des résidents français et les dommages qu'ils ont subis ont eu lieu sur le territoire français. Cela désigne, comme for possible, les juridictions françaises. Mais il est vrai que cette compétence n'est pas exclusive et que, dans l'hypothèse où une juridiction constaterait que le dommage a été subi en France du fait d'une société américaine, les juridictions américaines seraient également compétentes selon le droit international français.*

*Cependant, en l'espèce, une juridiction française pourrait estimer que le lien entre la société de droit américain et le dommage allégué est inexistant.*

*Renforçant cet aspect de compétence, il faut effectivement observer que la société qui fabriquait le produit litigieux est la société de droit anglais Merck Sharp & Dohme Ltd, située à Cramlington au Royaume-Uni et que celle qui a distribué et commercialisé le produit ainsi que correspondu avec les Autorités françaises compétentes est la société française Merck Sharp & Dohme-Chibret, toutes deux étant juridiquement indépendantes de la société MERCK&CO., INC.*

*Ainsi, le juge français pourrait conclure que la société MERCK&CO., INC ne présente en réalité aucun lien juridique avec les litiges impliquant des consommateurs français.*

*En conséquence, un juge français pourrait parfaitement estimer qu'elle a été mise en cause par les plaignants français afin de leur permettre, en vertu des règles de compétence internationale, de saisir les juridictions américaines pour des raisons autres que le souci d'une meilleure administration de la justice. ".*

Par cette analyse, j'ai simplement relevé que la combinaison de la première et de la quatrième condition pourrait en l'espèce, conduire le juge à refuser d'accorder l'*exequatur*. Dans l'hypothèse où l'*exequatur* du jugement de class action serait recherchée, un tel argument serait évidement soulevé par le défendeur.

### 3.3   L'examen du respect des droits du défendeur : les difficultés relatives à l'appel en garantie d'un tiers français, par le défendeur

Le Professeur Kessedjian expose dans son avis juridique qu' " *il ne fait aucun doute que le déroulement des procès civils aux Etats-Unis est conforme aux principes fondamentaux de la justice en France* "[53].

Cependant, le défendeur qui est poursuivi devant les juridictions américaines pourrait rencontrer de sérieuses difficultés pour se prévaloir d'un des droits importants dont il dispose en vertu du système français, qui est la possibilité d'appeler un tiers en garantie.

En matière de responsabilité médicale, les patients présentent généralement un dossier médical complexe, dont une étude approfondie est nécessaire.

---

[53]   Avis juridique du Professeur Kessedjian, page 13

Cette étude permet d'examiner notamment la qualité et l'adéquation des actes médicaux qui ont été pratiqués par les différents professionnels de santé ayant traité les patients, ainsi que les traitements qui leur ont été administrés (ce qui peut impliquer une personne publique).

Dans l'hypothèse où, dans le cadre de la présente affaire, l'examen des dossiers médicaux des patients révélerait des actes médicaux dont le choix et la mise en œuvre sont discutables ou encore la prise de traitements médicamenteux qui pourraient avoir concouru au dommage, Merck pourrait être amené à appeler en garantie devant les juridictions américaines, le professionnel de santé (médecin, infirmier) ayant pratiqué ces actes ou bien le laboratoire dont le produit aurait été administré à un patient.

Si les juridictions américaines devaient se déclarer compétentes, un tel appel en garantie présenterait de réelles difficultés.

En effet, les patients étant des résidents français, qui ont été traités en France, les professionnels de santé qui les ont soignés résident en France et sont à priori pour la plupart, de nationalité française.

Or l'article 15 du code civil dispose qu' " *Un Français pourra être traduit devant un tribunal de France, pour des obligations par lui contractées en pays étranger, même avec un étranger* ".

Cet article confère une compétence exclusive aux tribunaux français et prive les juridictions étrangères de toute compétence indirecte à l'égard du défendeur français.

Ce privilège de juridiction, au départ applicable exclusivement aux actions contractuelles, a ensuite été étendu par la jurisprudence à la presque totalité des actions, qu'elles qu'en soient la nature et la cause, et notamment aux actions en responsabilité délictuelle et quasi-délictuelle [54].

Seules les actions réelles immobilières, les actions en partage d'immeubles et les litiges relatifs à des voies d'exécution pratiquées à l'étranger en sont exclus, ce qui n'est aucunement le cas de la présente l'affaire [55].

Par conséquent, dans l'hypothèse d'un appel en garantie par Merck devant les juridictions américaines de professionnels de santé français, ces derniers pourraient manifester leur volonté de se prévaloir du privilège de compétence dont ils bénéficient au titre de l'article 15 et refuser de se soumettre aux juridictions américaines.

Toute décision qui pourrait être rendue par les juridictions américaines à leur encontre serait dès lors considérée comme émanant d'une juridiction incompétente au regard du droit international privé et serait par conséquent dépourvue d'efficacité en France, à moins que le professionnel de santé ait volontairement renoncé au privilège dont il dispose, ce qui est rarement le cas en pratique.

Il doit être précisé à cet égard que le privilège de juridiction prévu à l'article 15 du code civil est invocable tant par une personne physique que par une personne morale.

Aussi, dans l'hypothèse où Merck souhaiterait par exemple appeler en garantie un autre laboratoire de nationalité française (dont le produit aurait été administré à un demandeur), celui-ci pourrait également lui opposer le privilège de compétence prévu par l'article 15 du code civil, pour refuser d'exécuter, le cas échéant, toute décision rendue à son encontre.

---

[54] Cass Civ 1ère, 27 mai 1970 ; Cass Civ 1ère, 5 décembre 1972 ; CA Toulouse, 20 décembre 1976 ;

[55] Cass Civ 1ère, 1 février 1955 ; Cass Civ 1ère, 17 novembre 1981 ; Cass Civ 1ère, 18 mai 1976 ; Cass Civ 1ère, 7 juin 1962 ; CA Paris, 22 mars 1991 ; Cass Civ 1ère, 12 mai 1931 ; Cass Civ 1ère, 4 mai 1971

### 3.4    La décision du Conseil Constitutionnel français

De manière générale, dans la mesure où l'*exequatur* ne constitue pas un second jugement de l'affaire en question, le juge opère un " léger " contrôle du jugement étranger, notamment s'agissant de l'examen de la cinquième condition précédemment mentionnée, relative au respect par le jugement étranger de l'Ordre Public international.

Afin de vérifier le respect, par le jugement étranger, de cette condition, le juge français devra examiner si la procédure suivie à l'étranger (en l'espèce une *class action*) a respecté les principes fondamentaux de droit français.

C'est alors qu'intervient la décision du Conseil Constitutionnel français du 25 juillet 1989. En effet, le Conseil Constitutionnel a clairement indiqué que la class action avec " opt out " serait contraire aux principes fondamentaux français, et de ce fait, la reconnaissance d'un jugement de class action avec " opt out " pourrait présenter de sérieuses difficultés.

Apparemment, le Professeur Kessedjian ne partage pas cette lecture de la décision, dans la mesure où elle estime que *"ça n'est pas parce qu'une forme de procès ne peut avoir lieu en France qu'elle serait automatiquement considérée comme contraire à l'Ordre public international français "* [56].

J'admets éprouver quelques difficultés à comprendre son argumentation. Il est clair que le simple fait qu'une procédure est inconnue en France n'est pas suffisant pour automatiquement considérer qu'une telle procédure est contraire à l'Ordre public français.

Mais en l'espèce, la décision du Conseil Constitutionnel précise clairement qu'une action de groupe avec " opt out " est contraire aux principes fondamentaux de droit français (tels que par exemple, le droit d'être entendu par le juge).

Ainsi, il ne s'agit pas de savoir si le type de procédure en question (*opt-out class action*) est prévu par le système procédural français, mais de prendre en compte le fait qu'une telle procédure est considérée comme contraire à l'Ordre public français.

A moins bien sûr de ne porter aucun crédit aux considérations du Conseil Constitutionnel, et de croire que les juges en feront autant.

\*

\*   \*

Par conséquent, en accord avec mon avis juridique initial, je considère qu'il n'existe aucune assurance qu'un jugement de class action qui aurait été rendu par une juridiction américaine, soit reconnu en France.

Ceci est particulièrement renforcé par le fait qu'il existe peu de doutes sur le fait que la class action, qu'elle aboutisse ou pas, n'empêchera pas l'introduction de nouvelles actions en France, pour les raisons suivants :

- Le jugement de class action n'a pas obtenu l'*exequatur*;

- Le jugement de class action a obtenu l'*exequatur* partiel, exclusivement pour les membres qui ont expressément participé à la procédure aux Etats-Unis ;

---

[56]    Avis juridique du Professeur Kessedjian, page 13

- Que l'*exequatur* soit accordé ou pas, des actions pourront être intentées en France contre d'autres sociétés, qui sont des entités juridiques du groupe.

Pour chacune de ces hypothèses, les principes français qui gouvernent l'accès à la justice et les conditions d'un procès équitable prévues par la Convention Européenne des Droits de l'Homme empêcheront certainement le juge d'opposer l'autorité de la force jugée du jugement de class action à toute action qui serait initiée en France par un ressortissant français n'ayant pas expressément participé à la class action aux Etats-Unis.

Une fois encore, cela ne signifie pas que le jugement étranger sera ignoré (loin de là), mais que la mise en œuvre d'actions devant les juridictions françaises sera toujours possible.

\*

\*   \*

Ainsi que je l'ai exposé dans mon avis juridique et en raison de ce qui est précédemment exposé, je suis d'avis qu'une class action introduite par des résidents français aux Etats-Unis, si elle était accueillie par une juridiction américaine ou si elle était déboutée, rencontrerait de sérieuses difficultés d'exécution dans l'ordre juridique français, vidant ainsi, pour l'essentiel, l'intérêt pratique de la décision et n'empêchant pas que d'autres actions, identiques au fond, soient intentées en France.

*Je déclare sous peine de constituer l'infraction de parjure en droit des Etats-Unis d'Amérique, que le contenu du présent document est exact et véridique.*

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct*

Fait pour valoir ce que de droit

**Arnaud Raynouard**

Paris, le 21 juin 2006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: VIOXX | ) | **MDL NO. 1657** |
| | ) | |
| **PRODUCTS LIABILITY LITIGATION** | ) | **SECTION: L** |
| | ) | |
| | ) | **JUDGE FALLON** |
| THIS DOCUMENT RELATES TO | ) | |
| | ) | |
| *Calandra, et al. v. Merck & Co., Inc.*, MDL No. | ) | **MAG. JUDGE KNOWLES** |
| 05-2914 and | ) | |

*DeToledo, et al. v. Merck & Co., Inc.*, **MDL No.**
**05-5083**

**Marie-Paule WAGNER**
traductrice-interprète assermentée:
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email: MWa 1808280@aol.com

PA:366856 28/11

## REPLY DECLARATION OF PROFESSOR ARNAUD RAYNOUARD

1.  I, the undersigned, Professor Arnaud Raynouard, a French qualified Professor of Law (*agrégé des facultés de droit*; i.e. a Full Professor), Professor at the University of Social Sciences Toulouse 1 (France), make this reply declaration in the interests of defendant Merck & Co., Inc. within the frame of the class actions brought before Courts of the United States of America («U.S.») by French residents.

2.  Having been asked to issue a legal opinion, acting as an expert, my purpose is limited to the issuance of a legal opinion, not using a one-sided approach that is counsel's role. The plaintiffs' expert having, in her legal opinion, directly questioned some of my positions, I will not follow such a path, but prefer to point out that, law being a question of rhetoric, opinions are debatable.

    The following supplementary opinion is thus merely intended to replace the opinions that I have expressed as to what they stand for, opinions on a point of law, and to replace my findings in their context (see the initial legal opinion).

3.  In a first part, I will set forth some quick observations on the general framework of the French judicial system, focusing on three issues: contingency fees, burden of expenses of the action and duration of French civil proceedings.

    In a second part, I will address the question of the administration of evidence and in a third part, I will add some observations relating to the enforcement and recognition of a foreign jurisdiction decision founded on a class action suit.

    Lastly, I shall give a summarize position of my opinion, stressing the fact that it is not inconsistent with my initial legal opinion.

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email: mwa_18038a0@aol.com

### I.   General framework of the French judicial system

It is historically unquestionable that a civil law country, especially France, enjoys a legal system based on prescriptive rules (hence the focus on norms, that is to say a written rule, general in scope), rather than on judge made law (usually called case law regulation). It is also widely acknowledged, by historians and legal authors, that the French Revolutionaries where wary of judges and that, as a result, the French legal system of the nineteenth century did not entrust judges with much independence.

It must be born in mind though that this is a historical fact of a society that has changed significantly over the past two hundred years; it is hardly conceivable to present the French legal system of today, notwithstanding all the changes it is still undergoing and probably needed (but then as any *living* legal system), as a direct outcome of the nineteenth century.

Amongst the most obvious reasons of the tremendous changes one reckons the part played by the economical and social changes that France and, more widely, Europe, have undergone since the Second World War. The mere fact that France is a (founding) member of the European Union and a signatory party to the European Convention on Human Rights (ECHR), has led to dramatic shifts in the judicial system and the way judges understand and fulfill their mission.

Of course, the evolution of society at large, and of the judicial system in particular, has not eclipsed its historical rooting. The French judge is not an activist in the sense that there exists, for example,

a judicial activism in the United States, but that is because changes of society are not supposed to be decided by unelected professionals (the judges), but by Parliament. This, undoubtedly, is a major theoretical difference between France and the United States regarding the unwritten role of a judge in society. In practice though, things are more complex and more subtle: French judges give decisions implying that they adopt positions involving social changes. Thus, over the years, the French judge has become part of the forces that move society (much as in the American legal system, the role of Congress, and written statutes, have evolved over time).

At the end of the day, the only relevant question is whether or not a plaintiff or a defendant in France will get a decent and fair trial. The answer, unquestionably, is yes. What does remain open to a debate (and is a question of political and philosophical standings) is about what types of institutional changes we should push for.

With this in mind, several aspects of civil procedure can be more precisely exposed, relating to contingency fees, the legal aid, the burden of trial expenses, the possibility for claimants to bring a group action and the duration of a proceeding.

## 1.1 Contingency fees

Professor Kessedjian states in her legal opinion that «*Fees* [ that are paid to attorneys only by virtue of the success that they can obtain for their clients ] *have always been formally prohibited in France*» [1].

However, with regard to this French system's prohibition of contingency fees, the following points should be added.

The Law of 31 December 1971 in its article 10 states that an attorney can not be *exclusively* remunerated by a contingency fee (i.e., a performance-based payment on the sole result of the judicial action) [2].

The same provision also states that attorneys are allowed to receive contingency fees based on the result of the claim, insofar as a small part is attributed to the lawyer, independently from the result.

With regards to this supplementary remuneration which is independent from the result of the litigation, no minimum amount is imposed, so that this remuneration may be quasi symbolic, or at the very least, largely inferior to that envisaged according to the result.

It should be stressed out that no text provides for a sanction in the event of a lawyer setting a very low remuneration for services provided, in comparison to the remuneration based on the result of the litigation.

Furthermore, the judges being wary of this practice, this principle can be freely applied.

Thus, the Supreme Court has gone against the decision of a Court of Appeal which revoked an agreement the effect of which was to fix the result fee at an amount that was well above the remuneration for services provided. The Supreme Court thus expressly indicated that the result fees may be much larger than the remuneration for services, and this without proportionality [3].

This solution is frequently adopted by attorneys, who may envisage fee agreements in which the remuneration based on the result of the litigation will represent up to 90% of the total remuneration, while the supplementary remuneration for services provided, independent from the result, only represents 10%.

---

[1]   Professor Kessedjian's legal opinion, page 4

[2]   Law n° 71-1130 of 31 December 1971, article 10

[3]   Supreme Court, 1rst Chamber, 10 July 1995

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email: MWa 18032BO@aol.com

3

PA:3595E5 28/11

Professor Kessedjian also explains that the income of beneficiaries of legal aid must be below a certain threshold which is "*extremely low*" [10].

It is necessary to point out that there is an alternative solution, "partial legal aid", for persons whose income is above the threshold but who are not in a position to bear the cost of an attorney.

With regards to this partial legal aid, both the French State and the beneficiary contribute to the fees of the designated attorney. However, the contribution of the French State is inversely proportional to the resources of the beneficiary [11].

The State may therefore pay up to 85% of the fees fixed by the attorney.

This solution thus guarantees that each individual who has an income that is above the legal aid threshold but is insufficient to pay an attorney, will have the assistance of an attorney.

According to the Ministry of Justice figures, more than 830,000 people benefited from legal aid in France in 2004 [12].

## 1.3   Burden of expenses

Professor Kessedjian recalls the rule imposed by article 700 of the New Civil Procedure Code ("NCPC") according to which "*[....] the judge orders a party to bear the expenses or, in default, the losing party to pay to the other party a sum that he may determine, under the title of costs stated and not included in the expenses. The judge may take into account the equity or the economical situation of the sentenced party. He may also, for the reasons drawn from the same considerations, state that there is no place for this sentence. [....]*" [13].

However, it should be noted that, according to the French system, the amount that the Court actually orders the losing party to pay to the successful party, according to article 700 of the French new code of civil procedure, is very small in comparison to what may exist in other legal systems.

Furthermore, it is important to emphasize that the taking into account of the economical situation of the sentenced party by the judges, is systematic, and specifically in cases where an individual is involved in litigation against a company.

This takes effect in consideration of the respective incomes of the parties.

Therefore, in French litigation, as a matter of law and practice, full costs do not usually follow the action. The losing party rarely has to pay a substantial amount to the other party in regard to costs (it must also be born in mind that, contrariwise to the American system, once the initial writ has been served, some 95% of matters tend to go to full trial, as there is no such thing as a pretrial proceeding).

More specifically, in the matter of tortious liability in proceedings where a person loses against a company, the judges will not generally sentence this individual to bear the costs claimed by the company during the proceedings [14]. At the very most, in practice, it turns out that they sentence the

---

[10]   Professor Kessedjian's legal opinion, page 5

[11]   Law n°91-647 of 10 July 1991 relating to legal aid, article 34 : « *In case of partial legal aid, the contribution of the French State in favour of the beneficiary is, in conditions set out by decree in Council of State, is inversely proportional to the resources of the beneficiary* »

[12]   Justice figures October 2005, French Ministry of Justice

[13]   Professor Kessedjian's legal opinion, page 5

[14]   Supreme Court 1rst Chamber, 27 September 2005; pourvoi n° 0318225; Supreme Court, 1rst Chamber, 3 May 2006 pourvoi n° 0410994; Supreme Court, 1rst Chamber, 23 September 2003 pourvoi n° 0113063; Court of Appeal Versailles, 25 November 2005, Arandel / GSK; Court of Appeal Montpellier, 13 2006, Boukam / GSK, Large Claim

5

Marie-Paule WAGNER
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
e-mail : MWa @803260@aol.com

individual claimant to minimal sums not above 2,000 euros, expenses that do not correspond at all to the cost that the company actually claimed [15].

Moreover, it is common practice for the Courts to order the successful party to pay the losing party's procedural costs (expert fees) in a number of cases when equity would be fouled if the losing party had to carry the burden of such costs (and especially when a large corporation is defending against an individual).

Thus, a score of decisions have decided accordingly not to put the burden of expenses on the losing party, especially when there is a significant difference in their paying capacities.

In doing so, the judge explains his decision (in detail), relying on the principle of equity, as followed: «*Regarding the disparity of the financial situations of the parties, the laboratory shall pay the expenses which will include the experts costs*» [16].

Finally, it should be added that, should the losing party be beneficiary of a legal aid, it never has to bear the costs of the successful party provided by article 700 of the French code of civil procedure, as it is the State which bear such costs [17].

## 1.4   The possibility for claimants to bring a group action

Professor Kessedjian explains in her legal opinion that she has asked the European authorities about a possible European project on subject of class action and that «*the response has been abundantly clear: there is no political will at present to undertake such a project at the European level*» [18].

Such allegation is quite surprising, as the European Commission has published in December 2005 a green paper on damages actions for breach of EC Treaty anti-trust rules, in which a European class action for consumers against firms is envisaged [19].

Indeed, the European Commission has specified that the purpose of this book is notably: «*Given the costs of litigation and the low value of their individual claim, it is unlikely that individual consumers will in practice be in a position to bring a damages action against the infringer. There may, however, be value in fostering the recovery of losses suffered by consumers. Therefore, the Green Paper puts forward for debate several options designed to address this problem*» [20].

---

[15]   Court Guingamp 20 October 2004, Bouteloup / GSK; Large Claim Court Versailles, 6 November 2003, Bouvart / GSK; Court of Appeal Versailles, 22 October 2004, Cauvin / GSK; Large Claim Court Versailles, 5 June 2003, Cimadomo / GSK; Large Claim Court Versailles, 27 January 2005, De troyer / GSK; Court of Appeal Versailles, 7 September 2005, Douaglin / GSK; Large Claim Court Nanterre, 27 May 2005, Dumont / GSK; Court of Appeal Lyon, 13 January 2004, Ferrero / GSK; Large Claim Court Dax, 6 December 2005, Gensous / GSK; Court of Appeal Versailles, 7 September 2005, Gandemer / GSK; Large Claim Court Dunkerque, 12 May 2004, Hoffman / GSK; Court of Appeal Toulouse, 9 May 2005, Justou / GSK

[15]   Court of Appeal Grenoble, 30 July 2003, Benoit / GSK

[16]   Large Claim Court Nanterre, 3 February 2006, Rassinier / GSK; For other decisions with the same motivations : Court of Appeal Versailles, 17 March 2006 Fageolle / GSK; Large Claim Court Nanterre, 7 October 2005, Renard M.J / GSK; Supreme Court 2nd Chamber, 1 December 1982, Dalloz 1983

[17]   Law n°91-647 of 10 July 1991 relating to legal aid, article 24; Supreme Court, 1rst Chamber, 3 October 1991

[18]   Professor Kessedjian's legal opinion, page 4

[19]   European Commission Green Paper on damages actions for breach of EC Treaty anti-trust rules, December 2005

[20]   Website of European Commission, statement on its green paper on damages actions for breach of EC Treaty anti-trust rules :
http://europa.eu.int/rapid/pressReleasesAction.do?reference=MEMO/05/489&format=HTML&aged=1&language=EN&g uiLanguage=en

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email : MWg 19332@aol.com

6

As for France, Professor Kessedjian states in her legal opinion that *«the French legal system is not a system that favors litigants»* [21].

However, the following precisions should be added regarding the various options which.are offered to litigants who want to initiate a group action against a professional.

Firstly, it is important to note that two draft laws allowing the establishment of class actions in France have recently been presented, one by the members of the Senate, on 13 April 2006, the other by the Member of Parliament (Congressman) Mr Luc Chatel on 26 April 2006 [22].

These two drafts are aimed at allowing consumers to initiate class actions against professionals, in the commercial field (financial services, telecommunications, health…).

In addition, although the French law does not provide for further class actions besides the 3 types of group actions mentioned by Professor Kessedjian in her legal opinion, the current French procedural system allows claimants to group together and to act collectively, in one and the same proceedings, against a physical person or corporate entity that they consider to be liable for the loss that they have suffered, in similar circumstances.

In order to do this, all of the claimants must be represented before the courts concerned, by the same attorneys.

Where necessary, the claimants may initiate the process by means of one summons, common to all.

Thus, a number of groups of patients acting either in their name or in that of their partner and/or children, may initiate a joint action before the French courts, notably against the manufacturers of health products.

One may cite an example where several groups of patients and families sued manufacturers of blood products [23].

The French courts have freely chosen impartial, independent experts who had specific expertise in the illness in question, to whom they had given powers and a large scope of investigation, including abroad.

In this example, the claimants were impecunious and the total costs of the experts incurred during the proceedings (which were rising to considerable sums), were taken on by the French State under the Legal Aid system (system which we explained at point 1.2).

Obviously, these remarks mitigate the allegation that the French system does not favor litigants !

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02:44
email : MWa 1803280@aol.com

---

[21]   Professor Kessedjian's legal opinion, page 3

[22]   Bill of 13 April 2006 and Bill of 26 April 2006 providing class action for non professionals against professionals in the French system

[23]   Court of Appeal Lyon, 9 May 1996, handed down in favour of a group of 20 patients; Summary order of the Large Claim Court of Lyon, 26 October 1999, handed down in favour of a group of 29 patients

PA:3895E0 28(1)

## 1.5 Duration of French proceedings

Professor Kessedjian states that in a case such as this, "*at the first instance, [....] a duration of around 3 years is not impossible*" and recalls that "*France has been condemned on many occasions for having proceedings that are too long*"[24].

However, on this last point, one must observe that while France has been the subject of condemnations by the European Court of human rights, based on article 6 § 1 of the European Convention of human rights ("ECHR"), these decisions concerned litigation based on totally different and very specific substantive legal matters: the main criticism based upon the length of procedures are related to criminal cases (criminal procedures) or, in civil law matters, questions such as expropriation orders or inheritance law.

In addition, according the European Court of human rights published case law, no condemnation under article 6 § 1 of the ECHR for the fact of the proceedings being too long has been made against France by the European Court of human rights in the matter of tortious liability since 1999[25].

Furthermore, it is clearly impossible to estimate that such a procedure would last for around 3 years in the first instance, as the duration of a procedure depends on numerous criteria, notably, its nature, the circumstances in question, or the complexity of the case.

Nevertheless, the data from the French Ministry of Justice reveals that the average duration of civil matters before the court of first instance has decreased from 7 months in 2004 to 6.7 months in 2005[26].

One must realize that there is a major difference between criminal proceedings (that tend to be "too lengthy" because of the investigation period that the examining judge is in charge of) and civil proceedings. The latter are in average not longer than in any western world legal system.

Moreover, it must be stressed out that the French civil system enjoys summary proceedings or «fast track» proceedings that are extremely quick, which are common in matters of liability for defective products, especially when the plaintiffs claim for medical experts to be appointed.

In addition, a decree relating to civil procedure tending notably, towards improving the rapidity and the quality of justice came into force on 01 March 2006.

In order to improve the rapidity of the proceedings, this provides notably for the implementation by the judge in charge of the proceedings of a timetable of proceedings. The time limits fixed in the timetable can only be extended by the judge in charge of the proceedings in serious circumstances, duly justified[27].

Finally, it must be noted that article 515 of the Code of Civil Procedure provides the judge with the option to pronounce, in his official capacity or at the request of the parties, the provisional enforcement of a judgment given by a decision at first instance, if he considers it to be necessary and compatible with the nature of the case[28]. Provisional enforcement means that a first instance Court decision must be enforced even though it is being appealed against.

Marie-Paule WAGNER
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email HMWA 1803250@aol.com

---

[24]   Professor Kessedjian's legal opinion, page 15

[25]   Website of the European Court of human rights: http://cmiskp.echr.coe.int/tkp197/default.htm

[26]   Website of the French Ministry of Justice : http://www.justice.gouv.fr/actualites//statistiquesciviles/statistiquesciviles.htm

[27]   Decree n°2005-1678 of 28 December 2005 regarding civil procedure, article 23

[28]   Article 515 of the NCPC : « *In addition to cases where it is as of right, provisional enforcement may be ordered, at the request of the parties or sua sponte, each time the judge deems it proper and compatible with the nature of the matter if it*

PA3695E6 28(1)

Ø 007

In this regard, the aforementioned decree relating to civil procedure contains provisions which strengthen the provisional enforcement of a decision of first instance, in allowing, notably, the first President of the Court of Appeal to make the appeal conditional on provisionally enforcing the judgment previously given [29].

In the matter of civil tortious liability for defective products, the pronouncement by French judges of the provisional enforcement of judgments given by the court of first instance is also frequent [30].

## 2. Administration of evidence

Professor Kessedjian states in her legal opinion that «*The parties to a legal proceedings in France are not obliged to spontaneously reveal information in their possession, which might be of use in demonstrating the truth*» [31].

Historically, the French civil procedure is of inquisitorial nature, meaning that the judge leads the case.

But this principle has suffered over the years, civil procedure being gradually adapted to the needs of a more litigious society.

It must also be stressed that such a principle has a different meaning whether applied in criminal cases or civil cases, the judge having greater powers in criminal proceedings.

## 2.1 The provisions of the New French code of civil procedure

With the adoption of the New French code of civil procedure («NCPC») in 1972, the rules have been extensively rewritten, the nineteenth century system being totally discarded in the process.

It is expressly stated by the NCPC that the judicial process is "conducted" by the parties, while the judge has to ascertain that the proceedings "move swiftly" [32].

The role of the parties is essential, and the law reckons that by saying that the judge's assignment is limited to what the parties have set forward in their demand and their defense [33].

Furthermore, allegation of facts (evidence) is in the hands of the parties themselves, and the judge is not supposed to rest his case on facts that have not been set forward [34].
If a judge finds it necessary to obtain supplementary facts, he is compelled to have the parties discuss them contradictorily [35].

---

is not prohibited by law. It may be ordered for the whole or part of the judgement. In no case, may it be ordered in relation to costs»

[29]   Decree n°2005-1678 of 28 December 2005 regarding civil procedure, article 47

[30]   Large Claim Court Nanterre, 9 September 2005, Betrayeb / GSK; Large Claim Court Nanterre, 5 June 1998, Leroy / GSK; Large Claim Court Nanterre, 12 May 1999, Soulier / GSK; Large Claim Court Nanterre 8 October 2004

[31]   Professor Kessedjian's legal opinion, page 6

[32]   Article 2 of the NCPC : «*The parties conduct the proceeding under the duties incumbent upon them. They are held to carry out the pleadings according to the forms and within the required time-limit*»
Article 3 of the NCPC : «*The judge supervises the proper progress of the proceeding; he has the authority to define the time-limits and order the necessary measures*»

[33]   Article 5 of the NCPC : «*The judge must rule upon all what is claimed and only upon what is claimed*»

[34]   Article 6 of the NCPC : «*In support of their claims, the parties put forward the relevant facts supporting their claims*»

[35]   Article 16 of the NCPC : «*In all circumstances, the judge must supervise the respect of, and he must himself respect, the adversarial principle.*
*In his decision, the judge may take into consideration grounds, explanations and documents relied upon or produced by the parties only if the parties had an opportunity to discuss them in an adversarial manner.*

9

Marie-Paule WAGNER
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email : MWa 180Sp80@aol.com
PA3895E6 2041

More precisely yet, the NCPC contains some provisions on the administration of evidence (under French Law a distinction, somewhat theoretical, can be drawn between facts and proof, whereas the English term "evidence" tends to cover both: a proof (preuve) usually refers to an element that has a binding force on the judge (for ex., the provisions of a sealed contract (acte authentique, an act received by a public notary) can not be contested as to their existence, because a third party, neutral, has witnessed the consent of the parties to the said-provisions); a fact is freely proved and debated as to its existence and significance.

Having said that, the NCPC expressly states that it rests with the parties themselves to administer evidence of the facts that they rely upon, that the judge has the power to order all sorts of investigating measures that are legally accepted and, most crucial, that the parties are compelled to participate in the investigating measures (disclosure of evidence), the judge having the power to take into account the abstention or refusal of a party to do so.

This last point is essential: the fact that a judge can decide on the fact that a party has refused to discover information in his possession or has refused to do so towards the Court-appointed expert, is notably what makes the whole system work and permits the discovery process to fulfill its purpose. Obviously, there is a major difference with the American system, but one would be mistaken in believing that this difference means that it is inferior or less efficient than the American system: the system is altogether different and has its own rationale and efficacy, which is granted by the provisions of the NCPC [36].

One word should also be said of the French judicial experts' investigation system. This is an important aspect of the French judicial system: experts are designated by the judge, on a list of accredited experts. The latter does not carry on his investigation on the behalf of a party (although a privately mandated investigation is also possible, but the legal force of the investigation is then different), but according to the terms of reference set out by the judge. The judicial expert is obliged to act in a certain way, i.e. impartially and autonomously, hearing the parties or any third party if necessary, and not giving his feeling about the outcome of the legal dispute [37].

Such medical investigations are most frequently ordered by the judge in matters of product liability which concern medicines [38].

---

*He shall not base his decision on legal arguments that he has raised sua sponte without having first invited the parties to comment thereon. »*

[36] Article 9 of the NCPC : « *Each party must prove, according to the law, the facts necessary for the success of his claim ».*

Article 10 of the NCPC : « *The judge has the authority to order sua sponte any legally appropriate investigation measures ».*

Article 11 of the NCPC : « *The parties are held to cooperate for the implementation of the investigation measures, even if the judge notes the consequences of abstention or refusal to do so.*

*Where a party holds evidence material, the judge may, upon the petition of the other party, order him to produce it, where necessary under a periodic penalty payment. He may, upon the petition by one of the parties, request or order, where necessary under the same penalty, the production of all documents held by third parties where there is no legitimate impediment to doing so ».*

[37] Article 232 of the NCPC : « *The judge may commission any person of his choice to set him straight in the form of findings, consultation or an expertise on a question of fact that requires the insight of an expert ».*

Article 237 of the NCPC : « *The commissioned expert must fulfil his mission conscientiously, objectively and impartially ».*

Article 238 of the NCPC : « *The expert must give his opinion on the points he has been commissioned to examine. He may not consider other questions, except in case of a written consent of the parties. He must never express an opinion on a point of law ».*

[38] Large Claim Court of Toulouse, 27 August 2001, Smithkline Beecham / Gacem; Large Claim Court of Nanterre, 5 September 2003, GSK / Lopes; Large Claim Court of Ajaccio, 8 September 2003, GSK / Gianelli; Large Claim Court of Le Muns, 2 December 2003, Aventis Pasteur MSD / Beaulaton; Large Claim Court of Nanterre, 16 January 2004, GSK / Ganne; Large Claim Court of Nanterre, 9 January 2004, GSK / Natali; Large Claim Court of Nanterre, 16 January 2004, GSK / Ganne; Large Claim Court of Créteil, 15 June 2005, Baxter International Inc / Rodriguez; Court of Appeal of Versailles, 30 April 2004, S.A. UCB Pharma / Mme Guirimaud.

Marie-Paule WAGNER
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email - MWG@aol.com                    PA:3695E6 28/11

## 2.2  Consequences on the administration of evidence (disclosure process)

Professor Kessedjian states in her legal opinion that «*The administration of evidence* [...] *essentially lies in the hands of the judge*» [39].

However, one must then realize that the administration of evidence does not "essentially" lie in the hands of the judge since the early 1970's. This major change in the French civil law procedure has been overly stressed by legal authors [40].

Three consequences must be drawn of this system.

- First, the French judge can order a party and a third party to disclose information in their possession, even though he cannot physically compel a party or a third party to produce such evidence.

- Secondly, the French judge does have powers to force a party or a third party to produce evidence in its possession. Notably, he has the power to order a fine, although, as it has been stressed out by the defendants, this is certainly not the most efficient means towards disclosure, the fine being of a limited maximum amount.

  Although this latter statement is not incorrect, one should realize that the judge has a much more efficient mean to force a party or a third party to disclose information since he can order such disclosure under a penalty payment, which will be set according to the aim of the claim [41]. Using this mean, the judge will order a party to disclose the evidence in his possession under a daily "fine" of which he fixes freely the amount. The result can be devastatingly efficient, when a party is ordered to disclose documents under a penalty of 1000, 5000 or more euros per day ...

  Furthermore, the judge can increase the amount of the penalty payment. For instance, a judge has ordered a company to disclose some documents under a penalty payment of 750 euros per day for the first month and then 1 500 euros per day for the next month [42].

- Finally, amongst these powers, the most efficient one, and one that does play an important role in practice, is that the judge, having ordered a party to reveal information, may draw all consequences from the fact that the party has not complied with the order [43].

Thus, in deciding the case, the refusal to produce the relevant evidence will be held against that party [44]. This is the central part of the system, this is the judicial power that ensures the efficiency of the administration of evidence in the French system: a party that does not want to produce evidence necessary for deciding the case, puts the outcome at stake and risks, because of his refusal, to have the case decided against him.

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email : MWa 1803260@aol.com

---

[39]  Professor Kessedjian's legal opinion, page 6

[40]  Jean Vincent & Serge Guinchard, Procédure civile, Précis Dalloz, 24ème edition; Gérard Cornu & Jean Foyer, Procédure civile, Hémis Droit privé, Puf; Gérard Couchez, Procédure civile, 11ème edition, Armand Colin

[41]  Article 11 of the NCPC, previously quoted

[42]  Order of the Court of Appeal of Versailles, 17 October 1996, jurisdata n°044382

[43]  Article 11 of the NCPC, previously quoted

[44]  Supreme Court, 1rst civil chamber, 30 March 2005; Supreme Court, commercial chamber, 5 March 1996; Court of Appeal Reims, 14 May 2002; Court of Appeal Paris, 23 January 1987;

PA:3695EB 28/11

## 2.3    Application of texts limiting disclosure

Professor Kessedjian states in her legal opinion that the various legislative French texts on which I rely to explain how the disclosure of some evidence might present difficulties «are generally never applied in civil matters, but essentially in sensitive areas, such as competition law or special economic areas»[45]. However, I would like to add a dissent.

It is quite correct to say that the French judge usually opposes a transmission only on the grounds of a special interest. But that is not because the Hague Convention of March 18, 1970, is not applied in civil matters (especially when, under French law, economic matters are not totally outside the scope of "civil matters"), but because of the wordings of the Convention itself.

As I had written in my opinion (page 13):

*"The Hague Convention of March 18, 1970 relating to obtaining evidence abroad in civil and commercial matters, to which both France and the United States are signatories (hereafter "the Convention"), lays out in article 1 that "In civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act".*

*The Letter of request, subjected to certain formalities (Article 3 of Convention), especially allows the applicant authority to take note of documents, or to hear witnesses located on the territory of the addressed State.*

*(...)*

*Under the terms of these provisions, the judge, to whom the Minister of Justice transfers the request, is in principle obliged to implement the Letter of request and the judge of the applicant authority has the right to attend to the work of the commission (Article 741 NCPC).*

*In certain cases however, the French judge has the right or obligation to refuse the implementation of the Letter of request, namely:*

- *when the request is not appropriately transmitted (Article 745 NCPC);*

- *when he/she judges it is not within his/her remit (Article 743 NCPC);*

- *or if the Letter of request is likely to affect the sovereignty or safety of the French State (Article 743 NCPC)*

*Moreover, in 1987, France declared that the Letters of request aiming at a "pre-trial discovery documents" procedure may only be carried out when the required documents are restrictively enumerated in the Letters of request and are related to the object of dispute (Declaration of France of January 19, 1987 in order to issue a reserve about article 23 of Convention).*

*In this respect, French case law specified that the documents are restrictively enumerated, within the purpose of the above-mentioned Declaration, "when the latter are identified with a reasonable degree of specificity according to several criteria such as their date, nature or author" (CA Paris, September 13, 2003).*

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email : MWa.1803280@aol.com

PA:3695E8 20(1)

---

[45]    Professor Kessedjian's legal opinion, page 8

> In accordance with the provisions of the Hague Convention and the provisions of the French civil procedure code, a U.S. court authority could thus expect to require, by Letters of request addressed to the French Ministry of Justice which would transmit the request to the competent Court, the examination of documents and hearing of witnesses, located on French territory. Furthermore, the applicant legal authority could require for the depositions of the witnesses under oath to be communicated to the former (Article 3 of Convention)."

As for the other texts cited (see my legal opinion, page 15), it had also been said that, for some specific type of documents, there *may* be difficulties in their disclosure by a French judge to an American court.

> "In this respect, the Convention however allows, under certain conditions, the communication of such documents.
>
> Therefore, the U.S. legal authorities should be in principle entitled to ask by Letters of request for documents or information of an economic, commercial, industrialist, financial or technical nature contributing to the establishment of evidence for legal procedures.
>
> Nevertheless, as previously stated, such request should be carried out by observing the relatively constraining conditions imposed by the Convention as well as by the NCPC".

## 2.4   Confidentiality of medical records

The plaintiffs' memorandum stresses out that the patient is free to waive his rights to the confidentiality of medical records and therefore grant access to the medical records [46]. This is undoubtedly correct, but is limited in scope for two reasons.

First of all, the patient's waiver only covers his *personal* medical records, and that the medical record confidentiality covers other types of medical data.

Secondly, such a waiver can only be given personally by the patient (implying that he is in the procedure), which means that a class action procedure would not permit the disclosure of medical records for patients that are not expressly part of the procedure *per se.*

Finally, I would add that it is quite incorrect to say that I have *"failed to indicate that the confidentiality rule was enacted in French law only to protect the patient"* [47], since this was stressed out in my opinion.

It was expressly written on page 15 of my legal opinion:

> "It results from such provisions that only the patient may, without however being obligated thereof, authorize his/her doctor to disclose the medical files and he/she is the only person in a position to ask for their communication within a trial.
>
> Indeed, if the NCPC provisions forces the parties to contribute to the revelation of the truth within a litigation procedure, to the degree of authorizing the judge to order both the parties and third parties to produce a document, the latter are in all cases able to present a legitimate justification (article 11 of the NCPC). More precisely, the protection of medical confidentiality constitutes a legitimate justification.

---

[46]   Plaintiff's memorandum, page 26

[47]   Professor Kessedjian's legal opinion, page 8

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email: MWa_803280@aol.com

13

PA:3695E9  28/1)

> *Moreover, no provision in the French law gives power to a judge to force a health institution or a doctor to communicate any information covered by medical confidentiality without the agreement of the person concerned."*

**3.   Recognition and effects in France of a foreign decision of a judgment given by a U.S. Court giving right to a class action**

Professor Kessedjian states in her legal opinion that should *«the French plaintiffs [be] accepted in a class action in the United States and Merck win these proceedings [...] We can immediately say that all conditions are met so that Merck is not judged again in France in an identical or similar lawsuit»* [48].

However, as it will be explained hereunder, the French judge, who will have to examine whether the conditions to recognize the foreign judgment in France are met, might consider that it exists some reasons why he ought not to recognize the judgement in France.

**3.1   Waiver of article 14 of the Civil code**

With regard to the jurisdiction of a foreign judge, Professor Kessedjian states that the French plaintiffs can always waive the privilege which grants them an exclusive jurisdiction in France. This privilege is provided by article 14 of the French civil code [49]. This is undoubtedly correct.

The question is then to know how to ascertain such a waiver.

Professor Kessedjian deems that French citizens have waived their privilege defined at article 14 of the French civil code by suing abroad, as *"participation in a class action suit is considered to be equivalent to suing"* [50].

I agree completely with such a statement if it applies to the French citizen that has expressly joined the suit.

But I would strongly disagree if such a waiver presumption were to be applied to other French citizens that fall within the scope of the class action but have not expressly joined it. As a consequence, a new suit can be envisaged in France. This then leaves the scope of the class action suit without control because if a French citizen does not participate expressly in the class action, it is highly unlikely that he will be deemed having waived his article 14 privilege.

Indeed, the plaintiffs must have waived to their privilege provided by article 14, *«voluntarily and freely»* [51].

Should the class action against Merck be an «opt out» one, some of the members might not be aware of the existence of the class action on behalf of a class which they belong to, specially regarding the fact that the class action takes place in the United States, whereas its members are located in France.

This opinion is further founded by the decision of the French Constitutional Council, that, as it will be reminded hereunder at point **3.4**, has considered that opt-out class actions were inconsistent with fundamental principles of French law: a judge would find it very difficult to accept that a French citizen has waived his right to sue before French jurisdictions, just because he falls within the scope

---

[48]   Professor Kessedjian's legal opinion, page 9

[49]   Professor Kessedjian's legal opinion, page 11

[50]   Professor Kessedjian's legal opinion, page 11

[51]   Supreme Court, 1rst chamber, 16 June 1981; Supreme Court, 1rst chamber, 30 June 1992; Court of Appeal 20 January 1965

Marie-Paule WAGNER
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44          PA:3895E6 28(1)
email: MWa/1 803280@aol.com

of a class action taking place in a foreign jurisdiction and to which he has not expressed his will to participate.

## 3.2 *Exequatur* requirements

Incidentally, I find it necessary to clear a point that has been put forward in Professor Kessedjian' legal opinion when it states that: *"contrary to what Professor Raynouard indicates, in order to verify the jurisdiction of a foreign judge, the French judge should not at all see whether there is a legal link between the plaintiffs and Merck"* [52].

Had I written this, I would tend to agree with the remark, but if one reads the related paragraph of my legal opinion he will realize that this is giving to Cesar what belongs to Brutus!

I merely pointed out that, in order to grant an *exequatur* a French judge would have to follow the general rules set out by case law (See my legal opinion, page 17):

*"Article 509 of the NCPC today imposes the principle of the executory character of foreign decisions in France, subject to the compliance with the rules imposed by the French law.*

*Without being a trial judge (the case is obviously not judged again pursuant to the national law), the national judge who is referred a request for exequatur must ensure that five conditions are met (CA Paris, September 12, 2002; CA Paris, May 10, 2001; Cass civ 1ère, January 7, 1964; Cass civ 1ère, October 4, 1967):*

- *the competence of the foreign judge who delivered the decision pursuant to the French rules of conflict (Cass civ 1ère, February 6, 1985);*

- *the regularity of the procedure carried out before the foreign Court as regards the French International Public Law and the rights of the defense (TI Paris, November 24, 1977; Cass civ 1ère, October 4, 1967; CA Paris, May 9 1980);*

- *the application of the applicable law according to the French rules of conflict (CA Paris, February 4, 1958);*

- *the law must not have been contravened (Cass civ 1ère, April 22, 1986; Cass civ 1ère, October 2, 1984; TGI Nanterre, July 2, 1974; TGI Paris, July 6, 1972; Cass civ, January 22, 1951);*

- *the conformity of the foreign decision resolution with the international Public Order; On this criteria however, the judge will have a relatively superficial control (Cass civ 1ère, January 7, 1964).*

*Only if the judge deciding on the exequatur considered that these five conditions, or one of them, were not complied with, he/she would refuse to order the exequatur of the judgment pronounced by the U.S. Court.*

*In addition, the French judge may only decide to grant, depending on the circumstances, the partial exequatur of the judgment (CA Paris, October 28 1999)».*

I then went on to express my opinion on the possible consequences of these rules in the particular case between the plaintiffs and the defendant.

---

[52] Professor Kessedjian's legal opinion, page 11

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email : MWa.f1303280@aol.com

15

I thus wrote that (See my legal opinion, page 18):

> *"In this case, the French judge deciding on the exequatur could in particular consider that the first and the fourth conditions are not met: the adequate jurisdiction should have been that of a French Court and the French law would have been contravened while trying to obtain a decision based on the American law class action.*
>
> *Indeed, concerning the first condition, the plaintiffs are French residents and the damages they sustained occurred on French territory. That indicates French Courts as competent. But it is true that such competence is not exclusive and that, if a French Court concluded that damage was sustained in France because of an U.S. company, the U.S. Courts would also be qualified according to the French international law.*
>
> *In this case, however, a French Court might conclude that the relation between the U.S. law company and the claimed damage was non-existent.*
>
> *In support of this aspect of competence, we should indeed note that the company which manufactured the product of the dispute is the English law company Merck Sharp & Dohme Ltd, located at Cramlington in the United Kingdom, and that the company which distributed, marketed and corresponded with the competent French Authorities is the French company Merck Sharp & Dohme-Chibret, both being legally independent of MERCK&CO., Inc company.*
>
> *It would thus be possible for a French Court to conclude that MERCK&CO., Inc company does not bear any actual legal relation to dispute involving French consumers.*
>
> *Consequently, a French judge could very well assess that the former was made a party thereto by the French plaintiffs in order to allow them, under the terms of international competence, to refer to the U.S. Courts for reasons other than the purpose of a better administration of justice".*

In expressing my opinion, I merely pointed out that the combination of the first and fourth requirements set by French case law could lead a judge to refuse to grant *exequatur*; obviously, this is an argument that the defendant, would an *exequatur* of the class action be sought, would set forward.

### 3.3 Upholding "rights of defense": difficulties in relation to the defendant bringing a French third party to the case

Professor Kessedjian states in her legal opinion that *«there is no doubt whatsoever that the pursuit of civil lawsuits in the United States complies with the fundamental principles of justice in France»* [53].

However, the defendant, by being sued before the American jurisdictions, may face strong difficulties in invoking one of its important rights provided by the French legal system, which is the possibility to bring a third party into a case.

In the matter of pharmaceutical medical liability, patients generally submit a complex medical file, of which a detailed analysis is necessary.

This study allows the examination, notably, of the quality, and the adequacy of the medical acts that have been practised by various health professionals having treated the patients, as well as the treatments that were administered to them.

---

[53] Professor Kessedjian's legal opinion, page 13

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.84/Fax 02.32.32.02.44
email : MW 1803280@aol.com

In the hypothetical situation where, in this present case, the examination of the medical files revealed medical acts whose choice and implementation were questionable or the taking of current medical treatments that may have contributed to the injuries, Merck could bring before the American courts, the health professionals (doctor, nurse) having carried out these acts or even the manufacturer whose product had been administered to the patient.

Should the American Court retain jurisdiction, such action would present real difficulties.

Indeed, the French resident patients were treated in France, the health professionals who cared for them reside in France and are *a priori* in the most part, of French nationality.

Article 15 of the Civil Code provides that " *A French person may be sued before a French court, for the obligations contracted by him in a foreign country, even with a foreigner.*"

This article confers an exclusive competence on the French courts and deprives foreign jurisdictions of any indirect competence with regard to a French defendant.

This jurisdictional privilege, initially applicable exclusively to contractual claims, has been extended by case law to cover nearly all actions, whatever their nature or cause, and notably to actions in tortious and quasi-tortious liability [54].

Only real actions in real estate, actions regarding jointly owned property and litigation relating to methods of enforcement carried out abroad are excluded from it. Neither of these exclusions would apply in the present case [55].

As a result, in the hypothetical situation that Merck should bring French health professionals before an American Court, such defendant could manifest their willingness to take advantage of the competence from which they benefit under article 15 and refuse to submit to the American courts.

Any decision which may be given by the American courts against them would from then be considered as emanating from an incompetent jurisdiction with regards to private international law and would, therefore, not be effective in France, unless the health professional had voluntarily renounced his privilege. This is rarely the case in practice.

It must be stated, in this regard, that the privilege of jurisdiction provided in article 15 of the Civil Code can be invoked as an argument both by a physical person and a corporate entity [56].

Therefore, in the hypothetical situation where Merck would wish, for example, to bring another laboratory of French nationality, (whose product had been administered to a claimant) before the American Court, the defendant may oppose Merck by using this privilege of jurisdiction provided by article 15, to refuse to enforce, if necessary, any decision made against them.

## 3.4    The French Constitutional Council decision

Generally speaking, since an exequatur decision is not a second judgment of the case, the judge undergoes a «light» control of the foreign decision, and this is quite clearly the case with the fifth requirement previously mentioned, e.g. that the foreign decision does not violate or contradict the international public order.

---

[54]  Supreme Court, 1rst Chamber, 27 May 1970; Supreme Court, 1rst Chamber, 5 December 1972; Court of Appeal Toulouse, 20 December 1976

[55]  Supreme Court, 1rst Chamber, 1 February 1955; Supreme Court, 1rst Chamber, 17 November 1981; Supreme Court, 1rst Chamber, 18 May 1976; Supreme Court, 1rst Chamber, 7 June 1962; Court of Appeal Paris, 22 March 1991; Supreme Court, 1rst Chamber, 12 May 1931; Supreme Court, 1rst Chamber, 4 May 1971

[56]  L.Cadiet, op cit., n°567 – P.Mayer and V.Heuzé, op cit., n°291

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email : MWa 180a260@aol.com

In order to assess this point, the French judge will examine whether the procedure followed abroad (in this case, a class action) has met French fundamental principles of law.

This is where the Constitutional Council's decision of 1989 (July, 25) comes into the game. Indeed, the Constitutional Council has clearly decided that an "opt out" class action would be contrary to the French fundamental principles, and therefore its recognition under the French legal system may raise a serious difficulty.

Apparently, Professor Kessedjian does not share this reading of the decision since she is of the opinion that *"it is not because a certain form of court proceeding is unknown in France, that it would be automatically considered as contrary to French procedural public policy"* [57].

I admit having some difficulties in following her argument. It is clear that the mere fact that a procedure is unknown in France is not sufficient grounds to decide automatically that that specific procedure violates the French public order.

But in this case, the decision of the Constitutional Council clearly found that an opt-out class action is not consistent with fundamental principles of French law (as, for ex., the right to be heard by a judge).

Thus, it is not a question of not knowing whether the type of proceeding involved (class action) is provided by the French procedural system, but a question of such a procedure being considered incompatible with the French legal order.

Unless of course, one grants no credit to the Constitutional Council's findings and believes that trial judges will ignore it.

*

* *

Therefore, consistently with my legal opinion, I am of the opinion that there is no clear path to the recognition in France of a class action granted by an American court.

This is especially reinforced by the fact that there is little doubt that the class action, whether or not it succeeds, will not prevent the commencement of new actions in France because:

- It has not been granted *exequatur*;

- It has been granted a limited *exequatur* only for the parties expressly members of the proceedings in the United States;

- Whether or not it is granted *exequatur*, the action is commenced in France against other companies (legal persons) of the group.

In all of these scenarios, the French principles governing access to justice and the requirements of a fair trial of the European Convention on Human Rights will certainly prevent a judge from using the authority of the final judgement of a class action against an action commenced by a French national resident in France who has not expressly been a part of the class action in the United States.

Once again, this does not mean that the foreign decision will be ignored (far from it) but that the commencement of court actions in France will always be possible.

*

---

[57]    Professor Kessedjian's legal opinion, page 13

18

**Marie-Paule WAGNER**
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email: MWa 1803280@aol.com
P. Wagner

\*   \*

As I previously wrote, and for the reasons set out above and in my initial legal opinion, I am of the opinion that a class action introduced by French residents in the United States, whether it was welcomed by an American court or whether it was nonsuited, would encounter serious enforcement problems in the French legal system, depriving in essence the decision of practical interest and not preventing other substantively identical actions being brought in France.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Arnaud Raynouard

Paris, on 21 June 2006

Marie-Paule WAGNER
traductrice-interprète assermentée
Tél. 06.10.44.54.64/Fax 02.32.32.02.44
email MWa 150 3280@aol.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION: L |
| | JUDGE FALLON |
| THIS DOCUMENT RELATES TO | |
| *Calandra, et al. v. Merck & Co., Inc.*, MDL | MAG. JUDGE KNOWLES |
| No. 05-2914 and | |

*DeToledo, et al. v. Merck & Co., Inc.*, MDL
No. 05-5083

## REPLY DECLARATION OF ANTONIO GAMBARO

1°- Il sottoscritto Antonio Gambaro, professore presso la Facoltà di Giurisprudenza dell'Università di Milano ed Avvocato iscritto al Foro di Milano, rende la presente dichiarazione ad ulteriore conforto della istanza della convenuta Merck &Co di declinare la Foreign Class Action.

Sono professore di diritto privato comparato presso la Facoltà di Giurisprudenza dell'Università di Milano e Direttore dell' Istituto di Diritto Civile della medesima Facoltà.

Nel corso della mia carriera accademica iniziata nel 1975 ho insegnato anche la materia: Istituzioni di diritto privato, sia presso la medesima Facoltà giuridica di Milano, sia presso altre Facoltà. Dirigo ed ho diretto diverse riviste giuridiche ed opere giuridiche enciclopediche.

Sono anche avvocato iscritto presso l'Albo degli avvocati del Foro di Milano dal 1971. Sono stato partner di un importante studio legale milanese e sono attualmente of counsel.

Come avvocato la mia specializzazione è rivolta alla vertenze civili.

Sono stato altresì delegato italiano alla XV Conferenza dell'Aia, e per conto del governo italiano, ho seguito come esperto designato i lavori relativi a varie convenzioni internazionali.

Una copia del mio C.V. è allegata sub documento n. 1. .

2° Sono stato richiesto da Lovells di commentare ed eventualmente correggere il documento datato 15 maggio 2006 scritto dal prof. Claudio Consolo in riferimento al procedimento iniziato in the United States District Court for the Northen District of Illinois da un gruppo di attori residenti in



EXHIBIT
*B*

Italia per ottenere il risarcimento dei danni allegatamente sofferti per aver assunto il farmaco Vioxx prodotto dalla Merck & Co.

Nel suo documento il prof. Claudio Consolo fa riferimento ad una mia precedente declaration datata 13 dicembre 2005 e riferita al medesimo tema, ossia: ai rimedi che potrebbero assistere gli attori italiani ove essi svolgessero la loro azione in Italia, nonché agli effetti che una eventuale sentenza USA potrebbe avere in Italia.

Nel suo documento il prof. Consolo sottolinea come sebbene gli attori italiani potrebbero ben svolgere la loro azione in Italia, tuttavia essi non potrebbero godere della medesima efficace tutela che è assicurata dalla class action intentata negli USA. Più specificatamente il prof. Consolo dubita che agendo avanti un Tribunale italiano potrebbero ottenere efficacia tutela i membri della Medical Monitoring Subclass composta da persone che non hanno sofferto danni fisici alla salute, ma che chiedono il risarcimento per doversi sottoporre a continui esami medici al fine di prevenire il possibile insorgere della malattia.

Al riguardo osservo come non sia dubbio che nel sistema giuridico italiano non esiste un esatto equivalente della class action americana. Del resto le class actions in forma strettamente analoga al modello americano non esistono in alcun ordinamento europeo[1].
Tuttavia ciò non significa che i danneggiati non abbiano protezione.
Osservo anche che nel suo documento il prof. Consolo fa ampio riferimento al cosiddetto caso Seveso.

3° Ritengo che sia utile puntualizzare come la vicenda Seveso difficilmente può costituire un precedente significativo.
Ciò non solo e non tanto perché hard cases made bad law, ma per due ulteriori ragioni.
In primo luogo il caso Severo è stato uno dei peggiori mass disaster avvenuti in Italia negli ultimi 60 anni e perciò ha dato origine ad interventi che hanno utilizzato tutti gli strumenti del legal process: procedimenti penali in cui le vittime hanno potuto svolgere le loro azioni civili; speciali programmi di intervento pubblico; transazioni fuori dalle corti; svolgimento di una speciale commissione parlamentare di inchiesta ( Legge 16 giugno 1977 n. 357). Concentrare l'attenzione solo su ciò che avvenuto nelle corti civili può essere fuorviante, specie per osservatore esterno.
In secondo luogo, anche considerando il solo sistema della procedura civile e del risarcimento del danno alle vittime degli incidenti collettivi, l'ordinamento italiano, proprio a partire dal caso Seveso, si è in una certa misura evoluto in almeno tre direzioni:
ci si è abituati ad affrontare meglio le azioni di gruppo;
si sono introdotte una serie di riforme per accelerare lo svolgimento dei processi;
ci si è abituati a considerare meglio i danni non collegati con lesioni al corpo o alla proprietà.

4°- Per quanto riguarda la vicenda Seveso nel suo complesso è da ricordare che:
I primi interventi nella zona di Seveso furono svolti dal Ministero della Sanità ( DPCM 4.8.1976) e dalla Regione Lombardia, la quale avviò programmi di accertamento e controllo sanitario sulla popolazione colpita nonché una serie di altri interventi di sostegno ai singoli[2], impegnando la

---

[1] Cfr. C. Consolo, *Class Actions fuori dagli USA ?*, in Rivista di diritto civile, 1993, I, 609, in particolare vedi pag. 614

[2] Cfr. R. Compiani, *La regione Lombardia, le istituzioni locali e Seveso*, in *Seveso trent'anni dopo: la gestione del rischio industriale*, a cura di A, Cutrera, G. Pastorelli, B. Pozzo, Milano, Giuffré, 2006, p. 22

somma di 38 miliardi di lire ( del 1976[3]). In particolare, per quanto riguarda la salute delle popolazioni vennero istituiti programmi di controllo sanitario sistematico mediante apposite convenzioni con istituti universitari; sorveglianza epidemiologica su tutte le patologie e le variazioni di eventi rari; ricerche di laboratorio sugli effetti della TCDD.

La Givaudan - La Roche, società svizzera che controllava l'Icmesa da cui uscì la nube tossica, aprì un ufficio in Milano nell'autunno del 1976 per risarcire i danni causati alle persone. Al 10 giugno 1978, 5 miliardi di lire erano stati pagati alle vittime di Seveso mediante transazioni fuori dalle corti, tutte le famiglie tranne due si avvalsero di tale meccanismo transattivo[4]. Successivamente nel 1980 la Givaudan raggiunse una transazione con la Regione Lombardia che prevedeva il pagamento di 7,5 miliardi di lire a favore dello Stato; 40,5 miliardi alla Regione Lombardia per le spese sostenute; mentre la Givaudan si impegnava al pagamento di ulteriori 47 miliardi per spese di bonifica ambientale. Successivamente ancora nel 1983 Givaudan stipulò una transazione con i Comuni di Desio, Cesano Maderno e Seveso. La transazione con il Comune di Seveso venne animatamente discussa in consiglio Comunale e venne firmata il 13 settembre 1983. Il Comune di Seveso ottenne un risarcimento di 15 milioni di Franchi Svizzeri.

Quando il 9 luglio 1986 novanta abitanti di Seveso e Meda iniziarono la causa civile, per la quale attesero la sentenza penale, 7000 pratiche con privati erano già state chiuse con transazioni e gli enti pubblici. In totale la Givaudan aveva pagato prima dell'inizio del processo oltre 200 miliardi di lire[5].

La vertenza civile cui fa riferimento la dichiarazione del prof. Consolo riguardava quindi solo coloro che non erano riusciti o non avevano inteso pervenire ad una transazione con il danneggiante e che costituivano una evidente minoranza,inoltre essi fondavano la loro pretesa su una tesi, allora, innovativa.

5°- Per quanto riguarda l'evoluzione intervenuta nel sistema giuridico italiano considero qui di seguito i tre aspetti anzidetti relativi: (a) alle azioni di gruppo; (b) alle riforme tendenti ad accelerare i processi; (c) alla evoluzione diritto giurisprudenziale in materia di danni non collegati ad una lesione al corpo ed alla proprietà.

(a) Circa il primo aspetto, nel documento del prof. Consolo si riconosce che il codice di procedura civile italiano, all'art. 103, ammette che una pluralità di persone può agire nello stesso processo quando la decisione dipende anche parzialmente dalla soluzione di identiche questione, oppure quando tra le vertenze esiste connessione per l'oggetto o per il titolo da cui dipendono. Tuttavia egli ritiene che questa possibilità sia di dubbia utilità per gli attori italiani nel caso Vioxx, i quali non essendo concentrati nella stessa area geografica, come nel caso Seveso, avrebbero molta difficoltà a cooperare tra loro senza il meccanismo della class action ( Consolo, § 13).

In realtà oltre al caso Seveso, vi sono non pochi esempi di azioni collettive intentate in Italia per il risarcimento di danni alla salute discendenti dalla medesima causa. Ad esempio nella causa intentata da persone affette da emoderivati, centinaia di attori, per la precisione 388, hanno agito assieme contro un unico soggetto convenuto, nel caso il Ministero Italiano della Sanità, per ottenere il risarcimento dei danni sofferti. Nella causa conclusa con sentenza del Tribunale di Brescia 21 aprile 2006, n. 1167 ( Cattalini et al. C. Immuno/Baxter) 25 attori hanno agito congiuntamente contro il produttore di un emoderivato, asserendo di aver contratto il virus dell'HCV, dell'HBV o dell'HIV come conseguenza dell'uso del prodotto.

---

[3] Nel 1976 il cambio lira/dollaro USA è stato in media di lire 831,62 per 1 dollaro ( fonte Ufficio Italiano cambi), pertanto 38 miliardi di lire corrispondono a circa dollari USA 45. 728. 038, sempre del 1976.

[4] Cfr. L. Centimeri, *Ritorno a Seveso*, Milano, Bruno Mondatori editore 2006, p. 53

[5] Cfr. L. Centimeri, *Ritorno a Seveso*, op. cit. p. 56.

In quel caso anche gli avvocati hanno dimostrato di aver appreso la lezione ed hanno evitato di costituirsi parte civile nel procedimento penale che pure era iniziato, ed hanno invece svolto la loro azione direttamente avanti il giudice civile, come il sistema italiano permette di fare. Il risultato è stato che la durata del procedimento, pur molto complesso come è facile immaginare e che ha richiesto lo svolgimento di una altrettanta complessa consulenza tecnica, non è stata paragonabile alla durata del caso Seveso. In effetti la vertenza relativa al danno da emoderivati è iniziata avanti il Tribunale di Roma nel dicembre 1993 e venne decisa da detto Tribunale nel novembre 1998. Il procedimento di appello è terminato nell'ottobre 2000[6]  e la Corte di Cassazione lo ha definitivamente chiuso nel 2005[7] quando ormai i danneggiati erano stati da tempo risarciti.

Va infatti ricordato che, come ho sottolineato della mia precedente dichiarazione, in Italia la sentenza di primo grado è immediatamente esecutiva.

Voglio anche sottolineare che nella vertenza relativa al danno da emoderivati i 388 attori non provenivano dalla medesima area geografica, ma da ogni parte d'Italia e non ostante ciò sono stati in grado di coordinare con successo la loro azione.

Sempre in tema di azioni di gruppo, o a tutela di interessi collettivi, vorrei anche ricordare come dal 1998 le associazioni dei consumatori inserite nell'elenco tenuto dal Ministero delle Attività Produttive possono agire a tutela degli interessi dei consumatori come previsto dalla legge 30 giugno 1998 n. 281, le cui disposizioni sono ora trasfuse negli articoli 139 segg. Codice dei consumatori ( D.Lgs. 6 settembre 2005, n. 206).

Infine è da considerare che sebbene si faccia ricorso a forme processuale molto diverse dalle class actions americane, in Italia da anni si conoscono casi di contenzioso di massa in cui numerosi consumatori agiscono per identici motivi contro un medesimo convenuto, semplicemente appoggiandosi ad un medesimo gruppo di avvocati i quali hanno messo a punto una serie di atti processuali rigorosamente eguali, salvo il nome dell'attore. Simile strategia è usata ad esempio nelle vertenze che hanno per oggetto l'asserito danno esistenziale causato dall'aver creduto che il fumo di sigarette light fosse meno nocivo del fumo di sigarette normali. Si contano circa un migliaio i vertenze in questo settore, tutte rigorosamente eguali. Eguale strategia è stata impiegata per gli asseriti danni sofferti in seguito ad un prolungato black-out di energia elettrica. Anche in questa ipotesi le vertenze sono qualche centinaia. In realtà in tutte queste ipotesi gli attori, o, meglio, i loro avvocati, non fanno altro che produrre atti in serie, rivolgendosi mediante l'espediente della domiciliazione, ai medesimi giudici, così come sono di serie i prodotti asseritamene dannosi; con l'esito, tipico della produzione industriale di massa di ridurre fortemente i costi della produzione della liti.

(b) Sotto il secondo profilo ricordo che a partire dal caso Seveso, estese riforme della procedura civile italiana sono entrate in vigore, nel 1990 ( legge 26 novembre 1990, n. 353), nel 1997 ( Legge 22 luglio 1997 n. 276) e, recentemente, con la novella al codice di procedura civile entrata in vigore il 2 Marzo 2006.

In tutti i casi lo scopo perseguito è quello della accelerazione dei processi.

In base agli ultimi dati diffusi dal Ministero della Giustizia la durata media dei procedimenti è la seguente: anno 2003: per i procedimenti di primo grado: 411 giorni; per i procedimenti di appello: 826 giorni; per il procedimento di Cassazione 965 giorni; anno 2004 per i procedimenti di primo grado: 401 giorni; per i procedimenti di appello: 860 giorni; per il procedimento di Cassazione 918 giorni. Naturalmente la durata di procedimenti complessi che richiedono consulenze tecniche è normalmente più lunga della media. Si tenga sempre presente tuttavia che come ho precedentemente sottolineato la sentenza di primo grado è immediatamente esecutiva e quindi la vittima di un danno se ha diritto al risarcimento lo ottiene al termine del procedimento di

---

[6] Cfr. App. Roma 23 ottobre 2000 che si legge in Danno e Resp. 2001, p. 1067.

[7] Cfr. Cass., sez. III, 31 maggio 2005, n. 11609, in causa Accardo c. Min. salute.

4

primo grado e non già al termine del procedimento di appello o di cassazione, che sono in media assai più lunghi.

(c) Sotto il terzo profilo va considerato che, come conseguenza della sentenza 31 maggio 2003, n. 8828 della Corte di Cassazione, il risarcimento del danno non patrimoniale non è più limitato alle ipotesi di danni derivanti da reato. In effetti quella antica regola, pur inserita nel codice civile all'art. 2059, era da tempo erosa dal diritto giurisprudenziale che era sempre più incline a risarcire danno costituenti lesione della sfera dei diritti della persona piuttosto che lesioni ai beni costituenti patrimonio. Anche il prof. Consolo ricorda detta pronunzia nella nota 2 del suo documento.

Con detta pronunzia, che costituisce un autentico leading case, la Corte di Cassazione ha affermato chiaramente che deve escludersi che il risarcimento del danno non patrimoniale soggiaccia al limite di cui agli art. 2059 c.c. e 185 c.p. allorché vengano lesi valori della persona costituzionalmente garantiti.

Pertanto grazie alla nuova lettura dell'art. 2059 c.c. il danno non patrimoniale risarcibile ai sensi dell'art. 2059 c.c., alla luce di una lettura costituzionalmente orientata di tale norma, comprende sia il danno morale soggettivo (c.d. pretium doloris), sia il danno biologico (lesione della integrità psico-fisica suscettibile di accertamento medico-legale), sia il danno esistenziale (alterazione della qualità della vita che si estrinseca nella lesione della personalità del soggetto nel suo modo di essere sia personale che sociale) derivante dalla lesione di interessi di rango costituzionale inerenti alla persona[8].

Più specificatamente si deve osservare che ormai la giurisprudenza italiana è solita risarcire il danno costituito dalla compromissione non temporanea delle relazioni interpersonali, affettive, lavorative (per la componente non reddituale di socializzazione), nello sconvolgimento dell'esistenza e del menage familiare e, più in generale, nel pregiudizio patito dalle attività realizzatrici della persona umana, elementi tutti che trovano il loro fondamento nell'art. 2 cost.[9].

Certamente rientrano nella categoria del danno esistenziale anche lesioni alla vita di relazione che sono piuttosto modeste[10] ed in questi casi il risarcimento del danno è effettivamente limitato nell'ammontare pecuniario; ma ciò dipende dal tipo di danno lamentato, mentre non vi è alcuna specifica raccomandazione della giurisprudenza a limitare il risarcimento dei danni ad un livello minimale. L'asserzione che leggo al § 2 del documento del prof. Consolo è per me una sorpresa.

6° - Consegue da quanto ho appena descritto che anche i membri della Medical Monitoring Subclass potrebbero disporre di efficaci rimedi qualora decidessero di intentare azione in Italia. Al riguardo specifico che mi sono concentrato su questo segmento del gruppo, perché mi sembra di capire che rispetto agli altri sottogruppi vi sono meno problemi a riconoscere che l'ordinamento italiano appresti per essi un conveniente insieme di rimedi. Tuttavia a me pare che sotto tale profilo non vi sono rilevanti differenze tra i diversi interessi che essi esprimono.

Infatti per quanto riguarda coloro che hanno già sofferto danni alla salute dalla assunzione del farmaco, si deve ribadire che vi sono pochi dubbi circa il dato giuridico per cui il diritto alla salute

---

[8] Cfr. App. Milano,11 novembre 2003, in causa Andreoli c. Crepella.

[9] Cfr. Trib.. Genova, 12 ottobre 2003, in causa Vitello c. De Salvo; Trib. Napoli, 10 febbraio 2004, in causa Nocera c. Assicuraz. Generali; Trib. Lecce, 2 marzo 2004, in re Turco

[10] Cfr. ad esempio: Giudice di pace Roma, 11 luglio 2003, in causa X. c. Soc. Wind telecomunicaz., che si legge in Danno e resp., 2004, 85: riconoscimento del danno esistenziale per ritardata attivazione del servizio telefonico

è tutelato nel sistema giuridico italiano, anzi la giurisprudenza ne ha fatto la bandiera dei suoi orientamenti più recenti[11]. Ho già illustrato questo aspetto nella mia precedente dichiarazione.

Nemmeno, mi sembra, esistano problemi per quanto attiene al rimborso del prezzo dei farmaci.

Le questioni sollevate attengono al fatto che mediante una class action sarebbe più agevole organizzare il gruppo dei co-attori e che il trattamento impersonale del danno allevierebbe di molto l'onere della prova; ed infine che coloro i quali non hanno ancora sofferto danni fisici non avrebbero un rimedio adeguato nell'ordinamento italiano.

Osservo che la prima difficoltà, ossia quella di organizzare il gruppo è già stata superata con successo in non poche circostanze e quindi sembra essere un ostacolo di minore rilievo.

La seconda è insussistente per quanto concerne il primo sottogruppo.

La terza dipende del configurazione del danno lamentato. Ciò nel senso che ove gli attori si limitassero a chiedere il risarcimento di un danno futuro, come mi sembra postularsi nello scritto del prof. Consolo, certamente avrebbero severe difficoltà. Ma in realtà essi possono chiedere il risarcimento del danno attuale derivante dalla lesione della perturbazione della loro esistenza che discende dalla necessità di sottoporsi a continui controlli medici, oltre al danno che discende dalle spese derivanti dal dover affrontare tale necessità.

Non vedo motivo per cui tale danno, se esistente, non possa essere riconosciuto in Italia.

La giurisprudenza che ho richiamato riconosce apertamente la risarcibilità di tale danno e poiché la sua valutazione in termini di risarcimento del danno è quasi sempre equitativa, ossia rimessa alla discrezionalità giudiziale, anche il trattamento impersonale del danno che le class actions consentono, non istituisce una differenza rilevante. Sarebbe invero sorprendente se un giudice proprio in sede di valutazione equitativa del danno non considerasse rigorosamente in modo eguale tutti i casi analoghi.

7°- Merita uno specifico commento quanto leggo nel documento del prof. Consolo ai § 8-11, relativamente alla prova del danno. Anche a questo riguardo il diritto giurisprudenziale italiano ha avuto una significativa evoluzione in seguito alla quale la sentenza della Corte d'Appello di Milano nel caso Seveso può considerarsi di interesse storico, ma non un precedente attualmente orientativo.

Al riguardo debbo riferirmi al fatto, già richiamato nella mia precedente dichiarazione, che nel sistema italiano, al contrario di quanto avviene nel sistema americano, l'accertamento di fatti che richiedono conoscenze tecniche è affidato ad un Consulente Tecnico d'Ufficio, il quale è un organo ausiliario del giudice, da lui scelto.

In tema di valutazione del danno è normalissimo che il giudice ricorra ad un CTU.

La presenza di un CTU modifica e non di poco, l'onere della prova posto a carico delle parti.

In particolare la Corte di Cassazione pronunziandosi a Sezioni Unite ha chiarito che: "Il giudice può affidare al consulente tecnico non solo l'incarico di valutare i fatti da lui stesso accertati o dati per esistenti (consulente deducente), ma anche quello di accertare i fatti stessi (consulente percipiente); nel primo caso la consulenza presuppone l'avvenuto espletamento dei mezzi di prova e ha per oggetto la valutazione di fatti i cui elementi sono già stati completamente provati dalle parti; nel secondo caso la consulenza può costituire essa stessa fonte oggettiva di prova, senza che questo significhi che le parti possono sottrarsi all'onere probatorio e rimettere l'accertamento dei propri diritti all'attività del consulente; in questo secondo caso è necessario, infatti, che la parte quanto meno deduca il fatto che pone a fondamento del proprio diritto e che il giudice ritenga che il suo

---

[11] Per una rassegna cfr. *Il diritto alla salute alle soglie del terzo millennio - Profili di ordine etico, giuridico ed economico*, a cura di L. Chieffi., Giappichelli, Torino, 2003; M. Rossetti, *Il danno alla salute si moltiplica nell'evoluzione giurisprudenziale - Gli «aggiornamenti» al sistema della responsabilità civile*, in Dir. e giustizia, 2002, fasc. 1, 28; D. Morana, *La salute nella costituzione italiana - Profili sistematici*, Giuffrè, Milano, 2002.

accertamento richieda cognizioni tecniche che egli non possiede o che vi siano altri motivi che impediscano o sconsiglino di procedere direttamente all'accertamento."[12].

In realtà colui che lamenti un danno alla salute consistente nel peggioramento del suo stato ha solo l'onere di indicare i fatti da cui tale peggioramento discende, essendo il nesso causale tra tali fatti e l'allegato peggioramento demandato al CTU, mentre la liquidazione del quantum può avvenire anche in via equitativa. Ciò è frequente nel caso di danni a carattere non patrimoniale, poiché come ha indicato la Corte di cassazione: "la lesione di valori della persona umana protetti dalla costituzione, o da leggi speciali, o da norme imperative sui diritti umani, conseguente a fatto illecito, costituisce danno diretto non patrimoniale, risarcibile a norma dell'art. 2059 c.c. con valutazione equitativa (art. 1226 e 2056 c.c.)"[13]

Giova anche rilevare come nel caso di danni morali, la corte di cassazione abbia tratto le fila della più recente evoluzione che incide appunto sul livello dell'onere della prova richiesto al danneggiato che chieda il risarcimento osservando che: "Il danno morale subito dai prossimi congiunti di un minore colpito da una grave menomazione alla nascita (nel caso di specie, trattavasi di un bambino nato con una lesione irreversibile all'estetica e alla funzionalità del braccio sinistro, provocata da una errata manovra di disimpegno e di estrazione del feto alla nascita), individuabile nel vedere quotidianamente il proprio figlio «diverso dagli altri» per la menomazione che lo affligge e di vederlo a propria volta soffrire per la propria «diversità», è in re ipsa e non necessita di specifici elementi probatori."[14]. Formula che richiama  quella della res ipsa loquitur, e che al pari di quest'ultima rovescia la distribuzione dell'onere della prova.

E' certamente vero che il panorama del diritto giurisprudenziale italiano attuale è complesso, e non è facile tentare di  riassumerlo  mediante descrizioni semplici; tuttavia  le soluzioni relative alla distribuzione dell'onere della prova  non si attengono a  principi rigidi  che sono più consoni alla law in books che alla law in action.


8°- Un ulteriore breve accenno merita l'asserzione del prof. Consolo riguardante il fatto che  nel sistema italiano non si concepisce un ruolo imprenditoriale dell'avvocato, che invece sarebbe centrale  ai fini dello svolgimento di una class action, ed inoltre gli accordi di contingent fees sono proibiti. Entrambe le asserzioni sono teoricamente corrette.

Tuttavia la prima riguarda un problema di prassi e di mentalità; la seconda riguarda una regola di etica professionale. A quest'ultimo proposito si deve allora precisare che è prassi  comune che l'avvocato attenda di conoscere l'esito della controversia prima di esporre le sue competenze, salva una somma minima per fondo spese, che però in  alcune circostanze può venire omessa e non è per nulla in contrasto con l'etica professionale omettere la richiesta di un fondo spese. Circa la mancanza di imprenditorialità dell'avvocatura italiana occorre ricordare che se  ciò è vero in linea di massima, tuttavia  nulla vieta ad uno studio legale di attrezzarsi per coordinare litigi complessi e, di fatto,  gli studi associati nei quali sono presenti molti professionisti hanno esattamente questa funzione. Ed è fatto notorio che gli studi associati si stanno diffondendo anche se il loro settore preferito di attività è più quello del  diritto commerciale. Peraltro è da osservarsi che nelle vertenze italiane la ricerca e la documentazione di fatti materiali è spesso assai meno intensa che nelle prassi americane, sicché il ruolo di coordinamento imprenditoriale è molto meno gravoso[15], così come i costi di una vertenza sono assai più contenuti. Al riguardo voglio aggiungere  che benché la regola generale italiana sia quella per cui la parte soccombente è tenuta a rifondere le spese della lite alla parte vittoriosa, tuttavia nella sua dimensione pratica questa regola è ben lontana dalla regola inglese. Ciò a cagione di due fattori: in primo luogo il giudice può compensare in tutto o in parte le

---

[12] Cfr. Cass., sez. un., 4 novembre 1996, n. 9522, in causa Usl 17, Carbonia c. Polo.

[13] Cfr. Cass., sez. III, 7 novembre 2003, n. 16716, in causa Gobbo c. Milano assicuraz..

[14] Cfr. Cass., sez. III, 22 luglio 2004, n. 13634, in causa  Gatti c. Az. osp. Circolo Busto Arsizio.

[15] Cfr. V. Varano, *Verso la globalizzazione della professione di avvocato - Tendenze e problemi*, in Riv. dir. civ., 1999, I, 127

spese del giudizio. Al riguardo la Corte di Cassazione ha costantemente deciso che il giudice può disporre la compensazione delle spese "anche senza fornire alcuna motivazione, e senza che - per questo - la statuizione diventi sindacabile in sede di impugnazione e di legittimità, atteso che la valutazione dell'opportunità della compensazione, totale o parziale, delle stesse rientra nei poteri discrezionali del giudice di merito, sia nell'ipotesi di soccombenza reciproca, sia in quella della ricorrenza di giusti motivi[16] e ciò avviene spesso; in secondo luogo le spese vengono addossate alla parte soccombente non sono le spese effettivamente sostenute dalla parte vittoriosa, ma quelle liquidate dal giudice sulla base delle tariffe  stabilite dal Ministero della Giustizia, le quali peraltro sono interpretate in modo da non addossare alla parte soccombente spese eccessive.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Milano lì 12 giugno 2006.

Prof. Avv. Antonio Gambaro

---

[16] Cfr. Cass., sez. lav., 22 aprile 2005, n. 8540,  in causa Bonofiglio c. Polizia municip. Cosenza; Cass., sez. I, 26 aprile 2005, n. 8623, in causa Selgi c. Pref. Messina.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

In re: VIOXX                                    )
                                                ) MDL NO. 1657
PRODUCTS LIABILITY LITIGATION                   ) SECTION: L
                                                )
                                                ) JUDGE FALLON
DOCUMENT RELATES TO                             )
                                                )
*Calandra, et al. v. Merck & Co., Inc.*, MDL    ) MAG. JUDGE KNOWLES
No. 05-2914 and                                 )

*DeToledo, et al. v. Merck & Co., Inc.*, MDL
No. 05-5083

## REPLY DECLARATION OF ANTONIO GAMBARO

1ST – The undersigned Antonio Gambaro, professor at the School of Law of the University of Milan and attorney in and for the Court of Milan, makes this declaration in further support of the motion by plaintiff Merck & Co. to dismiss the Foreign Class Action.

I am a professor of comparative private law at the School of Law of the University of Milan and director of the same school's Civil Law Institute.

During the course of my academic career, which began in 1975, I have taught a course entitled "Institutions of Private Law" at the University of Milan School of Law as well as at other law schools. I am currently, and have been in the past, the editor-in-chief of several law periodicals and encyclopedic legal works.

I have also been a member of the Milan bar association since 1971. I was a partner in an important Milanese law firm and am currently of counsel.

My area of specialization as an attorney has been civil law.

I was also the Italian delegate to the XV Conference of The Hague and, on behalf of the Italian government, I served as an expert appointed for the development of various international agreements.

A copy of my C.V. is attached hereto as Exhibit 1.

2nd – I have been asked by Lovells to comment upon and possibly make corrections to the document written by Prof. Claudio Consolo, dated May 15, 2006, regarding an action filed in the United States District Court for the Northern District of Illinois by a group of plaintiffs residing in Italy,

1

for damages allegedly arising from having used the drug Vioxx, manufactured by Merck & Co.

Claudio Consolo makes reference in his document to a prior declaration of mine dated December 13, 2005 regarding the same matter, i.e., legal remedies available to the plaintiffs should they decide to pursue their action in Italy, as well as the repercussions a potential United States judgment might have in Italy.

Prof. Consolo emphasizes in his document how even though the Italian plaintiffs might very well file legal action in Italy, they nevertheless might not enjoy the same effective protection that a class action filed in the United States would ensure. More specifically, Prof. Consolo doubts whether bringing the matter before an Italian judge would provide protection for the members of the Medical Monitoring Subclass, which is composed of individuals who did not suffer any physical harm to their health but are seeking compensation for having to be subjected to continual medical examinations in order to prevent the potential onset of disease.

I note in this regard that there is no doubt that the Italian legal system does not possess an exact equivalent of the American class action. Indeed, there is no counterpart that strictly adheres to the American class action model in any European legal system.[1]
However, this does not mean that the injured parties are without protection.
I also note that Prof. Consolo makes ample reference in his document to the so-called "Seveso Case."

3rd – I believe it worthwhile to point out how it would be difficult to use the Seveso incident as a meaningful precedent.
My reasoning is not based solely upon the idea that hard cases make bad law, but on two further points.
In the first place, the Seveso case was one of the worst mass disasters ever to occur in Italy during the last 60 years and therefore gave rise to initiatives that made use of all the instruments of the legal process: criminal proceedings in which the victims were able to file their own civil actions, special public intervention programs, out-of-court settlements and the formulation of a special parliamentary investigative committee (Law 357 of June 16, 1977). Concentrating attention solely upon what transpired in the civil arena can be misleading, especially to an outside observer.
In the second place, even if we confine ourselves to the system of civil procedure and to the awarding of damages to multiple victims of accidents, the Italian legal system, precisely as a result of Seveso, has evolved to a certain extent in at least three directions:
we have become accustomed to responding in a better way to lawsuits filed by groups;
a series of reforms has been introduced to speed up the trial process;
we have become accustomed to considering more efficiently damages that are not linked to bodily harm or property loss.

4th – With regard to the entire Seveso incident, we must remember that:
The first initiatives in the Seveso area were conducted by the Ministry of Health (DPCM [Order of the President of the Council of Ministers] dated August 4, 1976) and by the Region of Lombardy, which set up health control and assessment programs for the population affected as well as a series of support efforts aimed at individuals,[2] committing the amount of 38 billion lire (at the 1976 exchange

---

[1] See C. Consolo, *Class Actions fuori dagli USA?* ["Class Actions outside the USA?"], in *Rivista di diritto civile* [*Civil Law Review*], 1993, I, 609, specifically p. 614
[2] See R. Compiani, *La regione Lombardia, le istituzioni locali e Seveso* ["The Region of Lombardy, Local Institutions and Seveso"], in *Seveso trent'anni dopo: la gestione del rischio industriale* [*Seveso Thirty Years Later: Industrial Risk Management*] edited by A. Cutrera, G. Pastorelli, B. Pozzo. Milan, Giuffré, 2006, p. 22.

2

rate[3]). With specific regard to the health of those affected, systematic health control programs were instituted through agreements with universities; epidemiological surveillance over all pathologies and the variations of unusual events; laboratory research on the effects of TCDD [tetrachlordibenzo-p-dioxin].

Givaudan – La Roche, a Swiss company that controlled Icmesa, from which the toxic cloud emanated, opened an office in Milan in the fall of 1976 to compensate for the injuries caused to individuals. As of June 10, 1978, 5 billion lire had been paid to Seveso victims in out-of-court settlements: all but two of the affected families availed themselves of this settlement process.[4] Subsequently, in 1980, Givaudan reached an agreement with the Region of Lombardy that provided for the payment of 7.5 billion lire to the national government and 40.5 billion to the Region of Lombardy to cover the costs it sustained, while promising to pay an additional 47 billion toward environmental improvement. In 1983 Givaudan reached a settlement with the municipalities of Desio, Cesano Maderno and Seveso. The agreement with Seveso was the subject of heated discussion in the city council and was signed on September 13, 1983. The City of Seveso received compensation in the amount of 15 million Swiss francs.

When, on July 9, 1986, ninety inhabitants of Seveso and Meda filed a civil action, for which they awaited the outcome of the criminal proceeding, 7,000 negotiations with private individuals [and public agencies] had already been brought to a close with settlements. In all, Givaudan had paid more than 200 billion lire before the trial began.[5]

Hence, the civil dispute to which Prof. Consolo's declaration refers concerned solely those who had not succeeded in or had no intention of arriving at a settlement with the injuring party, and these constituted an obvious minority. Moreover, their claim was founded upon an argument that, at the time, was innovative.

5th – As for the intervening evolution of the Italian legal system, I shall consider the following three aforementioned aspects regarding (a) group actions; (b) reforms that tend to produce speedier trials; (c) the evolution of case law regarding damages not arising from bodily harm or property loss.

(a) Regarding the first aspect, Prof. Consolo's document acknowledges that Art. 103 of the Italian Code of Civil Procedure admits that a plurality of individuals may bring action simultaneously in the same proceeding when the judgment in that proceeding depends even in part upon the resolution of identical issues, or even when there is a connection between the subject matter or title of the disputes. He also believes, however, that this possibility is of doubtful use to the Italian plaintiffs in the Vioxx matter, who, not being concentrated in the same geographic area as in the Seveso case, would find mutual cooperation extremely difficult without the help of a class action (Consolo, § 13).

Actually, there are more than a few examples in Italy, besides the Seveso case, of collective actions for damages arising from injury to health resulting from the same cause. For instance, in the action brought by individuals affected by blood products, hundreds of plaintiffs—388, to be exact—filed suit together against the same defendant, in this case the Italian Ministry of Health, for damages arising from the injury they suffered. In the case that led to Court of Brescia Judgment No. 1167 of April 21, 2006 (Cattalini et al. *v.* Immuno/Baxter) 25 plaintiffs brought action together against the manufacturer of a blood product, claiming that they contracted the HCV, HBV or HIV virus as a result of using the product.

---

[3] The 1976 ITL/USD exchange rate averaged ITL 831.62 per USD 1.00 (according to the Italian Foreign Exchange Office), therefore ITL 38 billion was equal to about USD 45,728,038 at that time.

[4] See L. Centimeri, *Ritorno a Seveso [Return to Seveso]*, Milan, Bruno Mondadori publishing, 2006, p. 53.

[5] See L. Centimeri, *Ritorno a Seveso*, op. cit., p. 56.

3

In that case, even the attorneys showed that they had learned a lesson and avoided including the aggrieved parties in the criminal proceeding that had also been filed, choosing instead to bring their action directly before the civil judge, as is allowed by Italian law. The result was that the duration of the proceeding, although extremely complex, as one could imagine, and which required the unfolding of equally complex expert witness testimony, was not comparable to that of the Seveso case. In fact, the dispute revolving around the injury suffered from hemoderivatives was initiated before the Court of Rome in December 1993 and was decided by that Court in November 1998. The appeal was concluded in October 2000[6] and the Court of Cassation issued a final judgment in 2005,[7] well after the injured parties had been compensated.

Indeed, it behooves us to remember that in Italy, as I stressed in my previous declaration, the decision of the lower court is immediately enforceable.

I also wish to stress that in the matter of the injury caused by hemoderivatives, the 388 plaintiffs did not come from the same geographic area, but rather from all over Italy and, this notwithstanding, they were able to coordinate their action successfully.

Also with regard to group actions, or the protection of collective interests, I would like to point out how since 1998 consumer advocate associations listed with the Ministry of Production have been able to act on behalf of consumer interests pursuant to Law 281 of June 30, 1998, whose provisions have been incorporated into Articles 139 et seq. of the Consumer Code (Legislative Order 206, September 6, 2005).

Finally, it must be considered that although the procedure may be very different from the American class action, mass adversarial proceedings have existed for years in Italy in which numerous consumers have acted as plaintiffs bringing identical causes of action against a single defendant simply by relying upon the same group of attorneys, who have initiated a series of court actions that are exactly the same except for the name of the plaintiff. A similar strategy is employed, for example, in disputes revolving around the alleged hedonic damage caused by the belief that smoke from light cigarettes was less harmful than that from ordinary cigarettes. There are approximately a thousand disputes of this nature, all of which are exactly the same as each other. The same strategy was used for the alleged injury suffered as a result of prolonged electrical power failures. Here as well there are several hundred cases. In reality, in all these cases the plaintiffs, or rather their attorneys, are simply mass-producing actions, directed on the basis of domicile at the same judges, just as the allegedly harmful products are mass-produced – with greatly reduced "production" costs for the litigation that are typical of industrial mass production.

(b) Regarding the second point, I recall that since the Seveso incident, there has been extensive reform of the Italian Code of Civil Procedure: in 1990 (Law 353, November 26, 1990), 1997 (Law 276, July 22, 1997) and recently, with the new amendment to the code that went into effect on March 2, 2006.

The goal in each of these instances was to speed up proceedings.

According to the latest data from the Ministry of Justice, the average length of proceedings is as follows: in 2003, 411 days for trial court proceedings; 826 days for lower appellate court proceedings; 965 days for Court of Cassation proceedings; in 2004, 401 days for trial court proceedings; 860 days for lower appellate court proceedings; 918 days for Court of Cassation proceedings. Naturally, the duration of complex trials that require expert testimony is usually lengthier than the average. One must take into account, however, that, as I pointed out earlier, lower court decisions are immediately enforceable, thus the victim entitled to compensation receives it at the close of that proceeding and does not have to

---

[6] See Rome Court of Appeals, October 23, 2000, in *Danno e Resp[onsabilità]* [Damage and Liability], 2001, p. 1067.

[7] See. Cassation, Section III, No. 11609, May 31, 2005, in the matter of Accardo *v.* Min[istry of] Health

4

wait for the judgment issued by the appeals court or the Court of Cassation, which normally takes a lot longer.

(c) As for the third point, it must be considered that, as a result of Court of Cassation Judgment 8828 of May 31, 2003, compensation for non-economic loss is no longer limited to damages arising from unlawful acts. In fact, that ancient rule, although inserted into the Civil Code as Article 2059, had for some time been eroded from case law, which was always more inclined to compensate damages relating to personal injury rather than economic loss. Prof. Consolo also refers to that decision in Note 2 of his document.

With that decision, which constitutes an authentic leading case, the Court of Cassation clearly affirmed that compensation for non-economic loss must not be subjected to the limits imposed by Articles 2059, Civil Code, and 185, Penal Code, in cases where constitutionally guaranteed personal rights have been violated.

Therefore, thanks to a new reading of Article 2059, CC, non-economic loss subject to compensation in accordance with that article, in light of a constitutionally-oriented reading of the law, includes pain and suffering (so-called *pretium doloris*) as well as bodily harm (medically and legally verifiable damage to psycho-physical integrity) and hedonic damage (alteration of quality of life, manifested as damage to one's personhood insofar as his behavior, both personally and socially, is affected) arising from damage to the consititutionally guaranteed interests inherent in all individuals.[8]

More specifically, one must observe that it is now customary for Italian case law to award damages for the non-temporary compromising of interpersonal, affective and workplace relationships (for the non-income producing component of socialization), for the upheaval of one's existence or family life and, more generally, for prejudice to one's self-realization as a human being, all of which are elements founded in Article 2 of the Constitution.[9]

Certainly included in the category of hedonic damage is injury to one's relationships that is comparatively modest[10]—in these cases damages are effectively limited in amount, but depend upon the type of injury claimed, while there is no specific recommendation in case law that would limit compensation of damages to a minimal level. The assertion made in § 2 of Prof. Consolo's document is a surprise to me.

6th – It follows from the foregoing that the members of the Medical Monitoring Subclass could also avail themselves of effective remedies should they decide to bring actions in Italy. I specifically concentrated on this segment of the group because it appears that with respect to the other subgroups, there are fewer problems recognizing that the Italian legal system is better equipped to handle them with a convenient set of remedies. Nevertheless, I feel that with regard to this subgroup there are no important differences among the various interests expressed by them.

In fact, for those who have already suffered damage to their health as a result of using the drug, it is worth repeating that there is little doubt concerning the legal provision through which the right to good health is

---

[8] See Milan Court of Appeals, November 11, 2003, in the matter of Andreoli *v.* Crepella.

[9] See Court of Genoa, October 12, 2003, in the matter of Vitello *v.* De Salvo; Court of Naples, February 10, 2004, in the matter of Nocera *v.* Assicuraz[ioni] Generali; Court of Lecce, March 2, 2004, in re Turco.

[10] See, for example, Rome Justice of the Peace, July 11, 2003, in the matter of X. *v.* Wind Telecommunica[tions], in *Danno e Resp[onsabilità]*, 2004, 85: acknowledgement of hedonic damage arising from delayed activation of telephone service.

protected within the Italian system—indeed, case law has led the way with the most recent direction it has taken.[11] I have already illustrated this point in my previous declaration.

Neither does it appear to me that there are any problems concerning reimbursement of the price of the medicines.

The issues raised [by Professor Consolo] pertain to the fact that it would be easier with a class action to organize the group of co-plaintiffs and that the impersonal treatment of the damage would greatly alleviate the burden of proof, and finally that those who have not yet suffered any physical harm would not find adequate remedy within the Italian legal system.

I note that the first difficulty, that of organizing the group, has already been overcome successfully in more than a few circumstances and therefore appears to be a minor obstacle.

The second is non-existent as far as the first subgroup is concerned.

The third depends upon the configuration of the injury being claimed, insofar as in the event the plaintiffs confine themselves to seeking compensation for a future injury, as would seem to be suggested by Prof. Consolo, they would most certainly encounter great difficulty. But in reality, they can claim compensation for the actual damage arising from the upheaval in their lives resulting from the necessity to subject themselves to continual medical examinations, in addition to the loss arising from the expense that these entail.

I see no reason for which such damage, if it does exist, could not be recognized in Italy.

The case law that I have cited openly recognizes the compensability of such damage and, since its valuation in terms of pecuniary damages is almost always equitable, or at the discretion of the judge, even the impersonal treatment of the damage afforded by class action does not institute any important difference. It would be indeed surprising if a judge, in the midst of an equitable valuation of the damage, did not consider rigorously and in an equal manner all similar cases.

7th – Paragraphs 8-11 of Prof. Consolo's document, concerning proof of injury, deserve specific comment. In this regard as well, Italian jurisprudence has undergone a significant evolution, according to which the judgment of the Milan Court of Appeals in the Seveso case may be considered of historic interest, but not an actual guiding precedent.

Concerning this, I must refer to the fact, already mentioned in my previous declaration, that under the Italian system, contrary to what takes place under the American [system], verification of facts that require special technical knowledge is entrusted to an Official Expert Witness, who is an auxiliary to the judge and is appointed by the latter.

In matters regarding assessment of the damage, it is extremely normal for the judge to resort to the testimony of an Official Expert Witness.

The presence of an expert witness alters in no small measure the burden of proof placed upon the parties. Specifically, the Court of Cassation, ruling in the Joint Sections, has declared that "The judge may assign to the expert witness not only the task of evaluating the facts the latter himself has verified or presented as fact (deducing expert), but also of verifying the facts themselves (perceiving expert). In the first instance, the expert testimony assumes that the evidence has already been completed and is aimed at evaluating the facts, whose elements have already been completely proven by the parties. In the second instance, the expert testimony may constitute in and of itself an objective source of evidence, without releasing the parties from the burden of proof and allowing them to relinquish verification of their own rights to the activity of the expert witness—indeed, in this second instance, it is imperative that the party at least deduce the facts upon which it is basing its own right and that the judge recognize that its

---

[11] For a survey of this, see *Il diritto alla salute alle soglie del terzo millennio – Profili di ordine etico, giuridico ed economico* [*The Right to Good Health on the Threshold of the Third Millennium – Ethical, Legal and Economic Aspects*], edited by L. Chieffi. Giappichelli, Turin, 2003; M. Rossetti, *Il danno alla salute si moltiplica nell'evoluzione giurisprudenziale – Gli «aggiornamenti» al sistema della responsabilità civile* ["Damage to Health is Multiplied in the Evolution of Case Law – The 'Updating' of the System of Civil Liability"], in *Dir[itto] e giustizia* [*Law and Justice*], 2002, Folio 1, 28; D. Morana, *La salute nella costituzione italiana – Profili sistematici* [*Health in the Italian Constitution – Systematic Aspects*], Giuffrè, Milan, 2002.

verification may require technical understanding that he does not possess, or that there may be other reasons that prevent or make it inadvisable to proceed directly to verification."[12]

Actually, anyone who claims damage to health consisting of a decline in the state of his health need only indicate the facts from which this decline derives, with the causal nexus between these facts and the alleged decline being delegated to the expert witness while liquidation of the amount may come about equitably. This is frequent in cases of non-economic loss, given that, as indicated by the Court of Cassation, "any violation of human rights that are protected by the constitution or special legislation, or by imperative human rights laws, and which arises from an unlawful act, constitutes a direct non-economic loss, which is compensable pursuant to Article 2059 of the Civil Code with equitable valuation (Articles 1226 and 2056, CC)."[13]

It is also useful to demonstrate how, in the case of pain and suffering, the Court of Cassation has picked up the thread of the most recent changes that precisely affect the level of burden of proof required of the injured party seeking compensation by observing that "The pain and suffering undergone by the close relatives of a minor who suffers a serious impairment at birth (in this case, a child who was born with an irreversible disfigurement and damage to the functioning of his left arm, caused by a mistaken maneuver in the delivery of the fetus), identifiable by the daily witnessing of their own child as 'different from the rest' because of his impairment and seeing him, in turn, suffer because of his 'difference,' is obvious in and of itself and requires no further specific evidence"[14]—a formula which recalls that of the *res ipsa loquitur*, and which, in this case, overturns the distribution of the burden of proof.

It is certainly true that the panorama of current Italian case law is complex, and it is no easy task to summarize it by means of simple descriptions. However, decisions regarding the distribution of the burden of proof are not dependent upon rigid principles that adhere more to the law in books than the law in action.

8th – Deserving of one further nod is the assertion of Prof. Consolo regarding the fact that the Italian legal system does not conceive of an entrepreneurial role on the part of the attorney, which would be central to the development of a class action and, moreover, that contingent fee agreements are prohibited. Both these assertions are theoretically correct.

However, the first concerns an issue of practice and mentality, while the second has to do with a rule of professional ethics. As for the latter, it should be pointed out that it is common practice for lawyers to await the outcome of a dispute before announcing their fees, with the exception of a minimum amount for expenses, which, however, may be omitted in certain circumstances, which omission in no way goes against professional ethics. As for the lack of an entrepreneurial role for Italian attorneys, we must recall that if this is true as a general rule, there is nothing that prevents a law firm from equipping itself to coordinate complex litigations and, in fact, partnership firms consisting of many professionals have precisely this function. It is also well known that partnerships are becoming more widespread even though their preferred area of specialization is corporate law. Moreover, it should be noted that in Italian litigation research and documentation of material evidence is often much less intense than it is in American practice, so that the role of entrepreneurial coordination is much less burdensome,[15] and the costs of litigation are much more contained. In this regard, I would like to add that although the general rule in Italy is for the losing party to reimburse the costs of litigation to the winning side, in practice this rule is considerably far from the English rule. This is due to two factors: in the first place, the judge

---

[12] See Cassation, Joint Sections, No. 9522, November 4, 1996, in the matter of Usl 17, Carbonia v.Polo.

[13] See Cassation, Section III, No. 16716, November 7, 2003, in the matter of Gobbo v. Milano Assicuraz[ioni].

[14] See Cassation, Section III, No. 13634, July 22, 2004, in the matter of Gatti v. Circolo Busto Arsizio Hospital.

[15] See V. Varano, *Verso la globalizzazione della professione di avvocato – Tendenze e Problemi* ["Toward Globalization of the Legal Profession – Trends and Issues"] in *Riv[ista del] dir[itto] civ[ile]*, 1999, I, 127.

may compensate all or a portion of the costs of the proceeding. In this regard, the Court of Cassation has consistently ruled that the judge may dispose of the expenses "even without furnishing any reason, and therefore without the order becoming subject to challenge on appeal or on grounds of legitimacy, provided that the evaluation of the appropriateness of the payment, be it total or partial, lies within the discretionary powers of the lower court judge, whether in the case of reciprocal loss or recurrence of just motive,[16] which happens often. In the second place, the costs that are transferred to the losing party are not those that were actually sustained by the winning side, but those liquidated by the judge on the basis of the fees established by the Ministry of Justice, which moreover are interpreted in such a manner as not to be excessive for the losing side.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Milan, June 12, 2006

Antonio Gambaro, Esq.
[signature]

---

[16] See Cassation, Labor Section, No. 8540, April 22, 2005, in the matter of Bonofigio *v.* Municipal Police of Cosenza; Cassation, Section I, No. 8623, April 26, 2005, in the matter of Selgi *v.* Prefecture of Messina.

8