Lemuel A. Moye, M.D., Ph.D.

Page 394

1    MR. PIORKOWSKI: Objection
2  to form.
3  BY MR. WACKER:
4    Q.  Would it be fair to say that
5  based upon the studies that you have
6  reviewed, looking at those drugs, that
7  Vioxx was the worst of those COX-2
8  inhibitors?
9    MR. PIORKOWSKI: Objection
10  to form.
11    THE WITNESS: I would say
12  not just based on those studies,
13  but based on my understanding of
14  the role of the -- the
15  differential role of COX-1, COX-2,
16  that Vioxx is the worst. That's
17  my understanding as I sit here
18  today.
19    MR. WACKER: Thank you.
20    MR. JOSEPHSON: I have no
21  questions of the witness at this
22  point. I'll reserve my questions
23  until his next appearance.
24    MS. SNAPKA: We're reserving

Page 395

1  ours.
2    MR. JOSEPHSON: Which I
3  think is on the 20th?
4    MS. FILIPPOV: We're
5  reserving ours also.
6    MR. JOSEPHSON: 16th. I
7  stand corrected. It is the 16th.
8    - - -
9    (Whereupon, the deposition
10  adjourned at 5:31 p.m.)
11    - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 396

1    CERTIFICATE
2
3    I, LINDA L. GOLKOW, a Notary
   Public and Certified Shorthand Reporter
4  of the State of New Jersey, do hereby
   certify that prior to the commencement of
5  the examination, LEMUEL A. MOYE, M.D. was
   duly sworn by me to testify to the truth,
6  the whole truth and nothing but the
   truth.
7
8    I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
9  testimony as taken stenographically by
   and before me at the time, place and on
10  the date hereinbefore set forth, to the
   best of my ability.
11
12    I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor
13  attorney nor counsel of any of the
   parties to this action, and that I am
14  neither a relative nor employee of such
   attorney or counsel, and that I am not
15  financially interested in the action.
16
17
18
19    _____
   LINDA L. GOLKOW, CSR
20  Notary Number: 1060147
   Notary Expiration: 1-2-08
21  CSR Number: 30XI176200
   Dated: June 9, 2006
22
23
24

Page 397

1    ACKNOWLEDGMENT OF DEPONENT
2
3
4    I,_____, do
   hereby certify that I have read the
5  foregoing pages, 1 - 399, and that the
   same is a correct transcription of the
6  answers given by me to the questions
   therein propounded, except for the
7  corrections or changes in form or
   substance, if any, noted in the attached
8  Errata Sheet.
9
10
11
12    _____
   LEMUEL A. MOYE, M.D.         DATE
13
14
15
16
17  Subscribed and sworn
   to before me this
18    Day of _____, 20___.
19  My commission expires:
20
21  Notary Public
22
23
24

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 398

```
 1        - - - - - -
           E R R A T A
 2        - - - - - -
 3   PAGE  LINE  CHANGE
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

Page 399

```
 1        LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

Golkow Litigation Technologies - 1.877.DEPS.USA

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 400

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX              :  MDL DOCKET NO.
LITIGATION PRODUCTS      :  1657
LIABILITY LITIGATION     :  SECTION L
                          :
This document relates    :  JUDGE FALLON
To                       :
GERALD BARNETT AND       :  MAGISTRATE JUDGE
CORRINE BARNETT          :  KNOWLES
        V.               :
MERCK & CO., INC.        :
                          :
Civil Action No.         :
2:06cv485                :
                          :
And Related Actions      :
                         —   —   —

June 16, 2006

—   —   —

Videotaped deposition of LEMUEL A.

MOYE, M.D., Ph.D., VOLUME 2, held in the

offices of Abraham, Watkins, Nichols,

Sorrels, Matthew & Friend, 800 Commerce,

Houston, Texas, commencing at 8:10 a.m., on

the above date, before Michael E. Miller,

Registered Merit Reporter and Certified

Realtime Reporter.    —   —   —

GOLKOW LITIGATION TECHNOLOGIES
Four Penn Center
1600 John F. Kennedy Boulevard
Suite 1210
Philadelphia, Pennsylvania 19103
877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 401

1  A P P E A R A N C E S :
2
3     ABRAHAM WATKINS NICHOLS SORRELS
      MATTHEWS & FRIEND
4     BY:  JASON C. WEBSTER, ESQUIRE
      800 Commerce Street
5     Houston, Texas 77002
      (713) 222-7211
6     jwebster@abrahamwatkins.com
      Counsel for Plaintiffs
7
8     ROBINSON, CALCAGNIE & ROBINSON
      BY:  TED P. WACKER, ESQUIRE
9     620 Newport Center Drive - 7th Floor
      Newport Beach, California 92660
10    (949) 720-1288
      Counsel for Plaintiffs
11
12    BLIZZARD MCCARTHY & NABERS, LLP
      BY:  EDWARD F. BLIZZARD, ESQUIRE
13    440 Louisiana - Suite 1710
      Houston, Texas 77024
14    (713) 844-3750
      Counsel for MDL Plaintiffs
15    Steering Committee
16
      THE GALLAGHER LAW FIRM
17    BY:  MICHAEL T. GALLAGHER, ESQUIRE
      777 Walker - Suite 2500
18    Houston, Texas 77002
      (713) 222-8080
19    mike@gld-law.com
      Counsel for State of Texas Plaintiffs
20
21         - - -
22
23
24

Page 402

1  A P P E A R A N C E S :  (CONTINUED)
2
3     THE PIORKOWSKI LAW FIRM, PC
      BY:  JOSEPH D. PIORKOWSKI, JR., ESQUIRE
4     Suite 800
      910 17th Street, N.W.
5     Washington, DC 20006
      (202) 223-5535
6     jpiorkowski@lawdocl.com
      Counsel for Merck & Co., Inc.
7
8     FULBRIGHT & JAWORSKI, LLP
      BY:  DAVID WALLACE, ESQUIRE
9     Suite 2800 - 2200 Ross Avenue
      Dallas, Texas 75201
10    (214) 855-8184
      dawallace@fulbright.com
11    Counsel for Merck & Company, Inc.
12
      FULBRIGHT & JAWORSKI, LLP
13    BY:  GERRY LOWRY, ESQUIRE
      1301 McKinney - Suite 5100
14    Houston, Texas 77010-3095
      (713) 651-5151
15    glowry@fulbright.com
      Counsel for Merck & Company, Inc.
16
17    BAKER BOTTS, LLP
      BY:  RICHARD L. JOSEPHSON, ESQUIRE
18    One Shell Plaza
      910 Louisiana Street
19    Houston, Texas 77002
      (713) 229-1460
20    richard.josephson@bakerbotts.com
      Counsel for Merck & Co., Inc.
21
22         - - -
23
24

Page 403

1  A P P E A R A N C E S :  (CONTINUED)
2
3     BARTLIT BECK HERMAN
      PALENCHAR & SCOTT, LLP
4     BY:  KEN BAUM, M.D., ESQUIRE
      Courthouse Place
5     54 West Hubbard Street
      Chicago, Illinois 60610
6     (312) 494-4451
      Counsel for Merck & Co., Inc.
7
8     CRUSE, SCOTT, HENDERSON & ALLEN, LLP
      BY:  VICTORIA A. FILIPPOV, ESQUIRE
9     7th Floor - 2777 Allen Parkway
      Houston, Texas 77019-2133
10    (713) 650-6600
      Counsel for Texas Physicians
11
12 ALSO APPEARING:
13    NATALIE EROS, Ph.D.,
      The Piorkowski Law Firm, PC
14
15 VIDEOGRAPHER:
16    BRYAN P. BIRMINGHAM, CLVS
      Esquire Deposition Services
17
         - - -
18
19
20
21
22
23
24

Page 404

1              I N D E X
2
3  EXAMINATION OF LEMUEL A. MOYE, M.D., Ph.D.:
4     BY MR. PIORKOWSKI:        411
5     BY MR. JOSEPHSON:         741
6     BY MR. WEBSTER:           759
7     BY MR. GALLAGHER:         761
8     BY MR. PIORKOWSKI:        769
9     BY MR. JOSEPHSON:         777
10
11
12
13              E X H I B I T S
14
13 NUMBER      DESCRIPTION      MARKED
14 Moye MDL 10   Testimony of      417
               Lemuel A. Moye, M.D.,
15             Ph.D.
16 Moye MDL 11   "From Test Tube to   419
               Patient: Improving
17             Health Through Human
               Drugs" D2485.1 -
18             D2485.100
19 Moye MDL 12   Division of        440
               Gastrointestinal and
20             Coagulation Drug
               Products, Medical
21             Officer's Consult
               Review, D2319.1 -
22             D2319.113
23
24

2  (Pages 401 to 404)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Moye MDL 13 | "Comparison of Cardiovascular Thrombotic Events in Patients with Osteoarthritis Treated with Rofecoxib Versus Nonselective Nonsteroidal Anti-inflammatory Drugs (Ibuprofen, Diclofenac and Nabumetone)," by Reicin, et al., D616.1 - D616.6 | 507 |
| Moye MDL 14 | "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," by Bombardier, et al., (9 pages) | 537 |
| Moye MDL 15 | "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," by Mukherjee, et al. (6 pages) | 559 |
| Moye MDL 16 | 1/24/06 Federal Register Excerpt, Pages 3922 - 3999 | 603 |

EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Moye MDL 17 | "The Effect of Pravastatin on Coronary Events After Myocardial Infarction in Patients with Average Cholesterol Levels," by Sacks, et al. (9 pages) | 656 |
| Moye MDL 18 | 10/1/01 Letter to Thomas Abrams, Director of DDMAC, from David W. Anstice, Merck, Re: NDA No. 21-042 VIOXX (Rofecoxib) tablets, MRK-AAF0007803 - MRK-AAF0007853 | 678 |
| Moye MDL 19 | 1/2/02 Fax to Thomas M. Casola, Merck, from Laura Governdale, DDMAC, Re: NDA 21-042, Vioxx (rofecoxib) tablets, MRK-ACI0013248 - MRK-ACI0013249 | 681 |
| Moye MDL 20 | "Analysis and Interpretation of Treatment Effects in Subgroups of Patients in Randomized Clinical Trials, by Yusuf, et al. (6 pages) | 686 |

EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Moye MDL 21 | APPROVe Trial Cardiovascular Safety Report, MRK-AFV0426355 - MRK-AFV0426453 | 758 |

PROCEEDINGS

(June 16, 2006, 8:10 a.m.)

(The following proceedings were held off the video record.)

MR. JOSEPHSON:  Richard Josephson here for Merck.  Yesterday there was a hearing, telephonic hearing, with Judge Wilson in the Texas MDL at which time, after argument, the Court ordered that Dr. Moye's deposition in the Texas MDL have an additional day added to it so that there will be a third day; and the third day will be devoted to issues relating -- neurological issues related to stroke and other items related to stroke, and it will cover the Texas MDL and the Choctaw Indian case.

And the date of that deposition has not yet been selected, but counsel for plaintiff has offered a few dates, and one of those will hopefully be chosen.

3 (Pages 405 to 408)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 409

1    So today, the Court told us not
2  to cover those issues in this
3  deposition, but to cover issues
4  related to myocardial infarction and
5  other areas other than stroke in this
6  deposition.  Is that correct, Jason?
7    MR. WEBSTER:  That's correct.
8  That's what the Court said.
9    THE REPORTER:  Is that it?
10    MR. JOSEPHSON:  That's it.
11    Let me just say on the record
12  also, so I can say this now, that this
13  deposition has also been -- in
14  addition to the Texas MDL, has also
15  been noticed in the State of Texas v.
16  Merck, and I am here in both the Texas
17  MDL and in the State of Texas v.
18  Merck, as is Gerry Lowry, who is here
19  in the Texas MDL, but not the State of
20  Texas v. Merck.
21    Off the record.
22    (Discussion off the record.)
23    THE VIDEOGRAPHER:  Hold,
24  please.  Today's date is June 16,

Page 410

1  2006.  The time is 8:12.  We're on the
2  record.
3    Will counsel please state their
4  appearances for the record at this
5  time.
6    MR. WEBSTER:  Jason Webster for
7  the plaintiffs.
8    MR. WACKER:  Ted Wacker for
9  plaintiffs.
10    MR. LOWRY:  Gerry Lowry for
11  Merck.
12    MR. JOSEPHSON:  Richard
13  Josephson for Merck.
14    MR. WALLACE:  Ed Wallace for
15  Merck.
16    MR. PIORKOWSKI:  Joseph
17  Piorkowski for Merck.
18    MR. BAUM:  Ken Baum for Merck.
19    MR. WEBSTER:  What's your name?
20    MR. BAUM:  Ken Baum.
21    MS. EROS:  My name is Natalie
22  Eros.
23    MR. PIORKOWSKI:  She's a member
24  of my office.  She's not an attorney.

Page 411

1    MR. WEBSTER:  Okay.  I just
2  wanted to know everybody in the room.
3  No problem.
4    MR. PIORKOWSKI:  Yeah.
5    LEMUEL A. MOYE, M.D., Ph.D.,
6  having been duly sworn, testified as follows:
7    EXAMINATION
8  BY MR. PIORKOWSKI:
9    Q.   Doctor, would you state your
10  name for the record, please?
11    A.   Sure.  Lemuel, L-E-M-U-E-L,
12  Moye, M-O-Y-E.
13    Q.   Okay.  Dr. Moye, about two
14  weeks ago in this room, we conducted a day of
15  deposition on Vioxx issues.  Do you recall
16  that?
17    A.   Yes, I do.
18    Q.   Okay.  And I'm going to try not
19  to revisit things that we talked about last
20  week, and cover new matters, but there are a
21  couple of things we may need to kind of fill
22  in the gaps.
23    A.   Sure.
24    Q.   At that time, I believe you

Page 412

1  told me that the report that you filed in the
2  MDL also set forth the opinions you intended
3  to render in cases in the State of Texas; is
4  that correct?
5    A.   Yes, it is.
6    Q.   Okay.  And since -- during that
7  deposition, we talked about some additions
8  and modifications to the opinions set forth
9  in your report.  Do you recall that?
10    A.   I do.
11    Q.   Okay.  Since that deposition
12  concluded, have you made any other additions,
13  deletions, modifications or corrections to
14  your report, or do any need to be made?
15    A.   No, I have not.
16    I do need to clarify one thing
17  that we mentioned.  I believe you asked me,
18  Mr. Piorkowski, at one point, had I written
19  the affidavit, and the answer is yes.  The
20  answer is still yes.  But you asked me if I
21  had done any cut-and-pasting, and I said no.
22  I think that that was -- I misremembered.
23    There are some stock things I
24  said in there, for example, discussions of

Lemuel A. Moye, M.D., Ph.D.

Page 413

1  the FDA, general discussions of the FDA CFRs.
2  I didn't retype those. I did cut and paste
3  those.
4       Also, part of the appendices
5  which talk about some of the principles of
6  statistical reasoning in clinical trials, I
7  think I cut and pasted those as well. I had
8  written those originally, just didn't rewrite
9  those, but took them from other writings.
10      Q.    Okay. So we're clear, do you
11 have your report available to you?
12      A.    I don't have a copy here with
13 me.
14          MR. WEBSTER: I could get you a
15 copy real quick, if you want to wait
16 two seconds.
17          MR. PIORKOWSKI: Let's do it on
18 a break. Let me --
19          MR. WEBSTER: Okay.
20          MR. PIORKOWSKI: I appreciate
21 that, Jason.
22      Q    (BY MR. PIORKOWSKI) But just
23 so we're clear, what you mean is, starting
24 with Appendix A, where it says, "Statistical

Page 414

1  Reasoning in Medicine" --
2      A.    Yes.
3      Q.    -- and from there to the end,
4  those sections, you may have cut and pasted?
5      A.    Fragments of those sections, I
6  may have cut and pasted. Also, earlier in
7  the affidavit when I provide a general
8  description of the FDA, I believe I cut and
9  paste those as well.
10      Q.    Okay. What did you cut and
11 paste them from?
12      A.    The earlier -- the FDA
13 information, from my earlier affidavits from
14 fen-phen.
15      Q.    I see.
16      A.    Fen-phen litigation.
17      Q.    Okay. Now, have you read your
18 deposition transcript from June 2nd?
19      A.    No, I have not.
20      Q.    Other than those items that you
21 just mentioned, are there any other
22 corrections that you believe you need to make
23 to answers you gave at that deposition?
24      A.    As best as I can recall, the

Page 415

1  only ones I remembered and reflected on were
2  the ones I just discussed about the
3  cut-and-paste components of the affidavit.
4      Q.    Fair enough.
5          Have you looked at any
6  additional materials in the intervening two
7  weeks between the conclusion of the
8  deposition on June 2nd and today?
9      A.    If by "additional" you mean new
10 material, I have just glanced at an updated
11 report from Merck on the approved follow-up
12 data -- data analysis.
13      Q.    And by "updated," you mean
14 updated since the one you looked at that was
15 discussed in your original report?
16      A.    That's right.
17      Q.    Okay. And where did you get
18 the copy of the approved -- the updated
19 approved follow-up data?
20      A.    I was directed -- I got it on
21 the Internet.
22      Q.    At what -- I'm sorry. Are you
23 finished?
24      A.    There was a URL that I don't

Page 416

1  remember that I was able to find and access.
2      Q.    Was it a Merck website, or was
3  it an FDA website?
4      A.    I think it was a Merck website,
5  but I don't really remember.
6      Q.    And did counsel provide that to
7  you?
8      A.    Yes.
9      Q.    Okay. I was handed a copy of
10 your testimony this morning. Is that -- does
11 that contain additional testimony from what
12 we discussed last week -- or on June 2nd?
13      A.    Yes, it does.
14      Q.    It does contain additional
15 information?
16      A.    Yes.
17      Q.    And what additional information
18 does it contain?
19      A.    It includes the testimony I
20 provided in the Rezulin cases, the deposition
21 and the trial testimony from Rezulin.
22      Q.    Okay. And we -- those were not
23 on the version you had last -- a couple weeks
24 ago, right?

5  (Pages 413 to 416)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 417

1    A.    That's right, they weren't.
2    Q.    Okay.  Which ones are the
3 Rezulin ones?  Could you just identify them
4 for me?
5    A.    Sure.  Actually, they're all
6 the ones that mention Warner-Lambert, so
7 numbers 18, 19, 20, 21, 30.  Those are the
8 only ones I see.
9    Q.    Okay.
10   A.    And, of course, the Vioxx one's
11 on there as well.
12   Q.    And you added your deposition
13 from June 2nd?
14   A.    Right.
15         (Whereupon, Deposition Exhibit
16   Moye MDL 10, Testimony of Lemuel A.
17   Moye, M.D., Ph.D., was marked for
18   identification.)
19   Q    (BY MR. PIORKOWSKI)  Okay.  I'm
20 going to mark this as Moye Deposition
21 Exhibit 10.
22         MR. WEBSTER:  May I see that,
23   please?
24         MR. PIORKOWSKI:  Yeah.

Page 418

1    Q    (BY MR. PIORKOWSKI)  Dr. Moye,
2 the money that you earn in your capacity as
3 an expert witness, does that money go to you,
4 or does that money go to the University of
5 Texas?
6    A.    To me.
7    Q.    Okay.  Have you had any
8 additional bills or invoices to counsel since
9 the ones we talked about on June 2nd?
10   A.    No.
11   Q.    How much time -- well, I assume
12 that you billed counsel or will bill counsel
13 for the deposition time from June 2nd; is
14 that right?
15   A.    Yes.
16   Q.    Okay.  And how much additional
17 time since June 2nd have you spent prior to
18 today?
19   A.    I think -- I would say on
20 average, about an hour a day.
21   Q.    So 15 days have gone by --
22   A.    Yes.
23   Q.    -- so about 15 hours?
24   A.    Yes.

Page 419

1    Q.    Okay.  Now, when we started
2 last week, I think you said that some of the
3 materials that you looked at initially were
4 materials from the FDA's website; is that
5 right?
6    A.    Yes.
7         (Whereupon, Deposition Exhibit
8    Moye MDL 11, "From Test Tube to
9    Patient: Improving Health Through
10   Human Drugs" D2485.1 - D2485.100, was
11   marked for identification.)
12   Q    (BY MR. PIORKOWSKI)  Okay.  I'm
13 going to hand you what I've marked as Moye
14 Deposition Exhibit 11, and represent to you
15 that this is a document that we obtained on
16 the FDA's website.  It's entitled "From Test
17 Tube to Patient, Improving Health Through
18 Human Drugs."  Does that appear to be what it
19 is?
20   A.    Yes.
21   Q.    Okay.  And it entitled "A
22 Special Report," and it's authored by the US
23 Food & Drug Administration; is that correct?
24   A.    Yes.

Page 420

1    Q.    Have you ever seen this
2 document before?
3    A.    I think I got a hard copy of
4 this document years ago when I was finishing
5 up my tenure on the Cardiorenal Advisory
6 Committee.
7    Q.    Okay.  I really just want to
8 ask you some specific questions about some of
9 the statements that FDA makes here.  Can you
10 turn to what is -- do you see there's numbers
11 in the top right-hand corner?
12   A.    Such as D2485.3?
13   Q.    Right.  Exactly.
14   A.    Yes.
15   Q.    Can you turn to .17?
16   A.    (Witness complied.)
17   Q.    And do you see where it says,
18 quote, "CDER's mission is to promote and
19 protect the public health by ensuring that
20 safe and effective drugs are available to
21 Americans," end quote?  Did I read that
22 correctly?
23   A.    Yes.
24   Q.    Okay.  And CDER is the division

6 (Pages 417 to 420)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 421

1 of FDA that's involved with the review and
2 approval or disapproval of new drugs; is that
3 right?
4    A.    Right, Center For Drug
5 Evaluation and Research.
6    Q.    Okay. And do you agree that
7 that is CDER's mission statement, from your
8 experience on the FDA Advisory Committee?
9    A.    I believe it's their mission
10 and their goal, yes.
11    Q.    Okay. Do you, from your
12 experience in working on the Advisory
13 Committee -- I assume when you work on the
14 Advisory Committee, that you, to some extent,
15 interact with FDA physicians and scientists;
16 is that true?
17    A.    Yes.
18    Q.    Okay. Has it been your
19 experience that the FDA is made up of
20 competent physicians and scientists?
21    A.    Well, I would say this:  I
22 mean, not knowing every scientist or
23 physician or regulator, I mean, I can't -- I
24 hesitate to be general. But many of the

Page 422

1 people I met with at the FDA are competent.
2    Q.    Okay. Well, without asking you
3 to -- for a blanket endorsement, has it been
4 your general experience that the people with
5 whom you've interacted at the FDA have been
6 competent, in your view?
7    A.    Yes. However, I will say the
8 people I interact with at the FDA primarily
9 are statisticians and detail scientists.
10 They are not regulators. They are not
11 administrators. So the scientists I've met
12 certainly appear to be competent.
13    Q.    Have you had interaction with
14 members of the FDA who are involved with, you
15 know, the regulatory review aspects?
16    A.    Yes.
17    Q.    And who are those people?
18    A.    I don't remember. I mean, it
19 depends on how you define "regulatory." Of
20 course, Ray Lipicki is a scientist, who also
21 was heavily involved in regulatory. Bob
22 Temple, again, a scientist, but heavily
23 involved in regulatory.
24    Q.    Do you have a view as -- do you

Page 423

1 view Bob Temple as a competent scientist?
2    A.    I would say this about Bob:  I
3 mean, I know Bob very well. He's a very nice
4 man. Bob is very sophisticated. Bob is a
5 good scientist. He has one of the best
6 memories that -- most complete memories of
7 any man or woman I've ever encountered. But
8 Bob also understands that politics is the
9 mother's milk at the FDA, and he also
10 navigates those waters very well.
11    Q.    All right. You have some
12 references in your report to something called
13 the Prescription Drug User Fee Act; is that
14 right?
15    A.    Yes.
16    Q.    Okay. And that's often
17 referred to by its acronym PDUFA, right?
18    A.    Yes, right.
19    Q.    All right. And if you see on
20 page 35 of the document that I handed you,
21 they make -- have a little discussion about
22 the PDUFA in the upper left-hand corner,
23 right?
24    A.    Just give me a moment here.

Page 424

1       (Witness reviews document.)
2    A.    Yes.
3    Q.    (BY MR. PIORKOWSKI) And just
4 for our understanding, the way the PDUFA Act
5 works, the -- there are user fees that are
6 charged to manufacturers who are seeking to
7 have products approved, right?
8    A.    Yes.
9    Q.    Okay. In other words, if Merck
10 or Pfizer or any other company wants to have
11 a drug approved, there's a fee that has to be
12 paid, right?
13    A.    Yes.
14    Q.    And the idea behind it is that
15 ultimately they're, at least in large part,
16 the financial beneficiaries of the drug, so
17 they should have to pay for part of the
18 regulatory review of the drug, right?
19    A.    That's the -- excuse me. That
20 was the philosophy that justified its use.
21    Q.    Okay. And so we're clear, the
22 payment of the fee, the user fee, is not tied
23 to whether or not the product is approved,
24 right?

7 (Pages 421 to 424)

Lemuel A. Moye, M.D., Ph.D.

Page 425

1    A.   I would say this: Certainly,
2  no one anticipated that it would be, and I
3  don't think anyone has ever put on paper that
4  there was any link between the user fee and
5  the understanding of the future approval of
6  the drug. That certainly is true.
7    Q.   Well, a sponsor has to pay the
8  user fee, whether the product is approved or
9  not approved, right?
10   A.   If they want the product
11 reviewed in a timely fashion.
12   Q.   Right.
13   A.   Yes.
14   Q.   Right. You don't get your
15 money back if the FDA reviews your product
16 and denies your new drug application, right?
17   A.   That's true.
18   Q.   Okay. And you see in -- on
19 page 35 where it says, quote, "The Act
20 allowed the agency to hire" --
21   A.   I'm sorry. I'm not with you.
22   Q.   I'm sorry.
23   A.   Okay. I'm with you. Okay.
24 The first paragraph. Right.

Page 426

1    Q.   Right.
2         It says "the Act," and "the
3  Act" is referring to PDUFA, right?
4    A.   Right.
5    Q.   Then it said "allowed the
6  agency"; that's referring to the FDA, right?
7    A.   Yes.
8    Q.   "To hire several hundred
9  additional reviewers and support staff and
10 expedite its move towards accepting
11 computerized NDA's," right?
12   A.   Yes.
13   Q.   Okay. Do you agree with that
14 statement?
15        MR. WEBSTER: Objection, form.
16   A.   I agree with the statement.
17 It's an incomplete description of what the
18 Act allows, but certainly the Act allowed
19 that.
20   Q    (BY MR. PIORKOWSKI) Well, in
21 fact, the FDA -- based on funding obtained
22 from the Act, the FDA did, in fact, hire
23 several hundred additional reviewers and
24 support staff, correct?

Page 427

1    A.   That's true.
2         MR. WEBSTER: Objection, form.
3         THE WITNESS: I'm sorry.
4         MR. WEBSTER: That's all right.
5    A.   Yes.
6    Q    (BY MR. PIORKOWSKI) Now, when
7  it refers to NDAs, it's talking about moving
8  towards computerized NDAs, right?
9    A.   Yes.
10   Q.   So that the jury is clear, NDAs
11 are the -- they're the materials that the
12 manufacturers submit to the FDA in connection
13 with their requests for approval, right?
14   A.   Yes.
15   Q.   Okay. And they contain all of
16 the chemistry studies, the animal studies,
17 the human data and the statistical analyses
18 of human data, right?
19   A.   Yes.
20   Q.   And it's actually a very
21 voluminous amount of material; fair?
22   A.   I think you described it in
23 Alice as a living document.
24   Q.   A living document. Okay.

Page 428

1         And fair to say we're in a --
2  we're in a medium-sized conference room here?
3    A.   Fair, yes.
4    Q.   If we were to take the hard
5  copies of a new drug application and put them
6  in boxes for your average product that the
7  FDA reviews, it would probably fill up a good
8  half of this conference room?
9    A.   Actually, I would think it
10 would fill a good deal more than that.
11   Q.   Okay. Fair enough.
12        And one of the things that the
13 FDA is trying to do is -- by moving to an
14 electronic form, is trying to reduce the
15 volume of hard-copy paper. Is that --
16   A.   Yes.
17   Q.   -- what the plan was?
18        And do you see on page 38,
19 there's a discussion of the review team?
20   A.   Yes, in the middle column
21 there.
22   Q.   Yes, in the middle column.
23        And it says, "The members of
24 the CDER review team simultaneously apply

8  (Pages 425 to 428)

Lemuel A. Moye, M.D., Ph.D.

Page 429

1 their special technical expertise to the
2 review of the NDA," and then it goes on to
3 say -- and is that your experience, first of
4 all, that when an NDA has been submitted on
5 products on which you've been a member of the
6 Advisory Committee, that there has been a
7 team of scientists and chemists and doctors
8 who reviewed the new drug application prior
9 to the time that you, as the Advisory
10 Committee member, were asked to consider
11 questions about it?
12    A.    That's true.
13    Q.    Okay.
14    A.    It's also been my experience,
15 though, that they had many other NDAs to
16 review, so I don't want to suggest that
17 they're -- the only thing that they had to do
18 was to review the one new NDA that arrived.
19    Q.    Right.  I'm not suggesting that
20 any one scientist is spending full time on
21 it, but the fact of the matter is that for
22 any given application, there are many
23 scientists and physicians that spend many
24 weeks and months reviewing that particular

Page 430

1 new drug application; is that a fair
2 statement?
3    A.    That's a fair statement.  I
4 guess we could -- depending -- how much time
5 they have to spend on it might be debatable,
6 but certainly you have many scientists who
7 spend substantial hours working on the new
8 drug applications contents.
9    Q.    Okay.  Fair enough.
10       Now, it says -- under the
11 review team, it says, "Chemists focus on how
12 the drug is made and whether manufacturing
13 controls and packaging are adequate to ensure
14 the identity, strength, quality and purity of
15 the product."  Is that consistent with your
16 understanding from your experience?
17       MR. WEBSTER:  Objection, form.
18    A.    I would disagree with this only
19 insofar as the following:  I would say it is
20 their goal to determine how the drug is made
21 and whether -- and the rest of the
22 description here of their activities and what
23 they hope to be able to do.
24       I mean, their ability to do it

Page 431

1 really depends on the quality of information
2 they receive.
3    Q.    (BY MR. PIORKOWSKI)  Okay.  Is
4 it your understanding, though, that chemists
5 generally focus on those issues we just
6 described?
7    A.    Well, they focus on them to the
8 degree that the content of the NDA permit
9 them to do it, yes.
10    Q.    Okay.  And if the NDA is
11 deficient because there's insufficient
12 information for any scientist to review his
13 or her section of the NDA, one of the options
14 the FDA has is to go back to the sponsor and
15 say, "We need additional information," right?
16    A.    That is an option, yes.
17    Q.    And it's actually an option
18 that often occurs, right?
19    A.    Well, I would say it occurs
20 sometimes.
21       MR. WEBSTER:  Objection, form.
22    Q    (BY MR. PIORKOWSKI)  Okay.  And
23 is it your experience that there are
24 pharmacologists, typically, as a part of the

Page 432

1 review team, who evaluate the effects of
2 drugs on laboratory animals and short-term
3 and long-term studies?
4    A.    Yes, again to the degree that
5 the NDA allows them, yes.
6    Q.    Okay.  And is it your
7 experience that there are physicians who
8 evaluate the results of clinical tests,
9 including the drug's adverse as well as
10 therapeutic effects, and whether the proposed
11 label accurately reflects the effects of the
12 drug?
13    A.    Yes.
14    Q.    Okay.  Is it your experience
15 that pharmacokineticists evaluate the rate
16 and extent to which the drug's active
17 ingredient is made available to the body the
18 way it is distributed, metabolized and
19 eliminated?
20    A.    Again, to the degree -- same as
21 the physicians, to the degree -- to the
22 degree that the NDA allows them.
23    Q.    Okay.  And is it also your
24 experience that statisticians evaluate the

9 (Pages 429 to 432)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

1   designs for each controlled study and the
2   analysis and conclusions of safety and
3   effectiveness based on study data?
4      A.   Yes.
5      Q.   Okay. Now, in some cases where
6   the FDA thinks that a drug is very promising,
7   it has the option to perform what's referred
8   to as an expedited review; is that right?
9      A.   Yes, except it's not -- I
10  didn't think there was so much that the drug
11  was promising as though as the -- there was
12  the belief that the therapy might meet an
13  unmet medical need.
14     Q.   Fair enough.  Is that -- well,
15  any therapy that might meet an unmet medical
16  need is probably fair to call it promising?
17     A.   Except here's an example.
18  Let's say that somebody's working on the
19  fifth ace inhibitor for blood pressure
20  control. Well, the drug may be promising in
21  that it reduces blood pressure, but is it
22  really meeting an unmet medical need? I
23  think that's the distinction.
24     Q.   Okay. And that's discretionary

1   on the FDA's part, right? I mean, in other
2   words, they have the option of saying, "Yes,
3   we are going to review it in an expedited
4   fashion," or "No, we're not"?
5      A.   Yes. It's not an option they
6   exercise independently. The FDA is
7   malleable, and so the degree to which they
8   execute that option depends on the degree to
9   which they've been influenced.
10     Q.   Are you suggesting that people
11  at the FDA are paid off to be granted
12  expedited reviews?
13     A.   I'm not talking about financial
14  malleability.
15     Q.   Okay.
16     A.   But I'm talking about
17  administrative malleability.
18     Q.   Okay. Well, so we're clear,
19  you don't have any information that anybody
20  at FDA is paid off to conduct expedited
21  reviews?
22     MR. WEBSTER: Objection, form.
23     A.   I'm not -- I'm not suggesting
24  that that's true.

1      Q.   (BY MR. PIORKOWSKI) Okay. I
2   just want to make sure we're clear.
3      A.   Right.
4      Q.   And when you say
5   "administratively malleable," can you explain
6   what you mean there?
7      A.   Well, I mean that the FDA
8   engages in conversations with drug companies
9   as to whether -- gaining the company, the
10  sponsor's, perspective on whether the review
11  should be expedited. Sometimes the FDA hears
12  from Congress, and those are relatively
13  nonscientific concerns, but for the FDA they
14  are real concerns.
15     Q.   But there's nothing inherently
16  improper about the FDA being aware of the
17  manufacturer's views of its product prior to
18  deciding whether to conduct an expedited
19  review, is there?
20     A.   I would say this:  Being
21  aware -- certainly, there's no problem with
22  being aware. I mean, the more the FDA is
23  aware, presumably the better position they're
24  in to make a fair determination.

1      However, there's a difference
2   between being aware and being pushed; and in
3   my sense, that line is crossed commonly.
4      Q.   Can you give me an example of
5   when that line has been crossed, a specific
6   example that you're aware of?
7      A.   I think the line was crossed
8   with Rezulin.
9      Q.   And who at the FDA was pushed?
10     A.   I don't recall any particular
11  names. I think, perhaps, I used to know, but
12  I don't know today.
13     Q.   Okay. And is it important for
14  the FDA, whether it's scientific or not, if
15  there are groups of patients who, rightly or
16  wrongly, view a drug as potentially promising
17  or filling an unmet need -- is it good for
18  the FDA to be aware of those concerns?
19     A.   It's good for the FDA to be
20  aware of all concerns, and certainly concerns
21  of patients are -- are paramount; however,
22  not all patient concerns deal with an unmet
23  medical need.
24     Sometimes patient concerns deal

10  (Pages 433 to 436)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 437

1  with unanticipated adverse events, and those
2  types of patient concerns commonly don't rise
3  to the forefront when discussions are
4  being -- are undertaken about the
5  desirability or the utility of an expedited
6  review.
7      Q.   Okay.  Would it be fair -- can
8  we agree that it's a useful thing for the FDA
9  to be aware of all concerns, whether the
10  concerns come from the manufacturer, from
11  Congress, from patients or from physicians?
12     A.   I think the FDA's -- the FDA's
13  designed to be that way.  Are they better off
14  that way?  I don't know.
15     Q.   Okay.
16     A.   They're certainly designed to
17  be that way.
18     Q.   All right.  Fair enough.
19          Now, Vioxx was granted a
20  priority review, right?
21     A.   Yes.
22     Q.   And the reason that the FDA
23  thought Vioxx was promising, if you will, is
24  because it had the potential to reduce the

Page 438

1  risks of gastrointestinal toxicity associated
2  with nonselective nonsteroidal
3  anti-inflammatory drugs?
4          MR. WEBSTER:  Objection, form.
5     A.   Right.  That was -- that was
6  the need the FDA believed would addressed by
7  these -- this class of drugs, by Vioxx.
8          MR. PIORKOWSKI:  Okay.  I'm
9  sorry.  What's the basis of the
10  objection, Jason?
11         MR. WEBSTER:  It does not --
12         MR. GALLAGHER:  He doesn't have
13  to tell you.  All he has to say is
14  "form," and that's all he's permitted
15  to say.
16         MR. PIORKOWSKI:  No.  He has to
17  tell me under Texas Rules, sir.
18         MR. WEBSTER:  Objection, form.
19  Can you read back the question
20  again?
21         MR. PIORKOWSKI:  He does.
22  That's the rules.  Look them up.
23         (The following portion of the
24  record was read.)

Page 439

1          "QUESTION:  The reason that the
2  FDA thought Vioxx was promising, if
3  you will, is because it had the
4  potential to reduce the risks of
5  gastrointestinal toxicity associated
6  with nonselective nonsteroidal
7  anti-inflammatory drugs?"
8          MR. WEBSTER:  Assumes facts not
9  within evidence.
10         MR. PIORKOWSKI:  Okay.  Thank
11  you.
12     Q    (BY MR. PIORKOWSKI)  Part of
13  your review, you said you looked at several
14  materials, review materials, that FDA medical
15  officers reviewed; is that right?
16     A.   That -- well, I looked at
17  several reviews that medical officers wrote,
18  yes, that they authored.
19     Q.   Okay.  And, in particular, you
20  looked at reviews from the initial -- from
21  the initial review of the NDA at the time of
22  the initial approval, right?
23     A.   Yes.
24         MR. PIORKOWSKI:  Okay.

Page 440

1          (Whereupon, Deposition Exhibit
2  Moye MDL 12, Division of
3  Gastrointestinal and Coagulation Drug
4  Products, Medical Officer's Consult
5  Review, D2319.1 - D2319.113, was
6  marked for identification.)
7     Q    (BY MR. PIORKOWSKI)  Let me
8  hand you what I've marked as Exhibit 12.
9          MR. PIORKOWSKI:  Here's a copy
10  for you, Jason.
11     Q    (BY MR. PIORKOWSKI)  And ask
12  you:  Is this one of the materials -- well,
13  let me represent what it is.  Marked as
14  Exhibit 12, the "Division of Gastrointestinal
15  and Coagulation Drug Products, Medical
16  Officer's Consult Review."  And it's
17  concerning rofecoxib, and the consultant is
18  Lawrence Goldkind, M.D.?
19     A.   Yes.
20     Q.   Okay.  Is this one of the
21  materials that you reviewed in connection
22  with your review of the case?
23     A.   It is.
24     Q.   Okay.  And just so we're clear,

11 (Pages 437 to 440)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 441

1  when a drug is approved -- I'm sorry.  When a
2  drug is -- new drug application is submitted,
3  there's a particular division within the CDER
4  to which that new drug application is
5  assigned, right?
6     A.   Yes.
7     Q.   Okay.  And which division was
8  Vioxx assigned to?
9     A.   It was assigned to
10  rheumatology.
11     Q.   The arthritis --
12     A.   Right.
13     Q.   -- and so forth?  Okay.
14        And this consult is from the
15  gastroenterology division, right?
16     A.   Yes.
17     Q.   Okay.  And one of the tools
18  that the reviewing division has at its
19  disposal at FDA is the ability to obtain
20  consults with specialists in other divisions;
21  is that right?
22     A.   Yes.
23     Q.   So, for example, this division
24  that Dr. Goldkind is in has expertise in

Page 442

1  gastroenterology, right?
2     A.   Yes.
3     Q.   And so if there's a
4  gastroenterology safety issue, it might be a
5  good idea for them to consult with somebody
6  who has specialized knowledge in
7  gastroenterology?
8     A.   Yes.
9     Q.   That's fair?  Okay.
10        Now, Dr. Goldkind -- let me ask
11  you to turn to page D2319.6.  He's describing
12  the background of this application, right?
13     A.   He is.
14     Q.   And he says, quote,
15  "NSAID-induced gastrointestinal side-effects
16  are the most frequently reported adverse
17  drug-related events in the United States."
18  Did I read that correctly?
19     A.   Yes.
20     Q.   Okay.  Do you agree with that
21  at the -- or let me -- is that a correct
22  statement based on your understanding as of
23  the time that Dr. Goldkind conducted this
24  review?

Page 443

1     A.   I can't say one way or the
2  other whether I agree with this.
3     Q.   Okay.
4     A.   I don't know how he determined
5  it's the most frequently reported ADE.
6     Q.   Okay.  Fair enough.
7        You haven't done a study to
8  determine that he's wrong.  You just don't
9  know one way or the other?
10     A.   That's right.
11     Q.   Okay.  And then he goes on to
12  say, quote, "Although most of these are
13  minor, adverse events such as symptomatic
14  ulcer, perforation and bleeding are reported
15  to occur in 2 to 4% of patients on chronic
16  therapy."  Did I read that correctly?
17     A.   Yes.
18     Q.   Okay.  Now, do you have any
19  basis to disagree with Dr. Goldkind's
20  statement about the percentage of patients on
21  chronic therapy who develop symptomatic
22  ulcers, perforations and bleeds?
23     A.   I don't -- I haven't done my
24  own study, so I can neither confirm nor deny

Page 444

1  this range of 2 to 4%.
2     Q.   Okay.  Fair enough.
3        Just so I'm clear, as a part
4  of -- in connection with your review of the
5  case, and I know you looked at a lot of
6  different things, but did you conduct a
7  separate medical literature review on the
8  subject of NSAID-induced gastrointestinal
9  problems?
10     A.   No.  I read some articles on
11  it, but I haven't conducted my own separate
12  comprehensive review.
13     Q.   And are the articles that you
14  read included in the reference list at the
15  end of your report?
16     A.   Of my affidavit, yes.
17     Q.   Okay.  Did you come to any
18  independent assessment about the absolute
19  risk of serious GI problems on patients using
20  nonselective NSAIDs, chronically?
21     A.   The only one I came to was
22  fairly -- was a qualitative one, and that is
23  that they are relatively infrequent.
24     Q.   Relatively infrequent?

12 (Pages 441 to 444)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 445

1     A.   Infrequent.
2     Q.   And what does that mean?
3     A.   That means that not only do
4 most patients who take NSAIDs not have these
5 serious problems, but very few patients have
6 these serious problems.  There's no denying
7 that some do.
8     Q.   Okay.  And by "very few," do
9 you have a percentage in mind?  I mean, are
10 you talking about less than 5%, less than 1%,
11 less than .1%?
12          MR. WEBSTER:  Objection, form.
13     A.   No.  I guess I was thinking
14 less than 3%.
15     Q    (BY MR. PIORKOWSKI)  Less than
16 3%.  Okay.
17          And from your perspective, less
18 than 3% would be a relatively infrequent
19 incidence of a side-effect for a chronic
20 drug?
21          MR. WEBSTER:  Objection, form.
22     A.   Yes.
23     Q.   (BY MR. PIORKOWSKI)  Okay.
24 Now, you see at the bottom of -- of the

Page 446

1 page 6 there, it says the, "The broad" --
2 quote -- it says, quote, "The broad-based
3 usage of NSAIDs for acute and chronic pain in
4 the general population as well as in the
5 large population of arthritis patients
6 translates into a large absolute number of
7 serious complications.  It has been estimated
8 that at least 2600 deaths and 20,000
9 hospitalizations per year in the United
10 States can be attributed to NSAID use in
11 rheumatoid arthritis patients alone."  Did I
12 read that correctly?
13     A.   Yes, you read it correctly.
14     Q.   Okay.  Do you have any basis to
15 dispute Dr. Goldkind's statement in that
16 respect?
17     A.   Well, I don't have any -- any
18 basis to dispute the second statement that
19 you read, "It's estimated that at least" --
20 that begins with, "It has been estimated that
21 at least 26,000 deaths."
22     Q.   I'm sorry.  2600 deaths.
23     A.   2600 deaths.
24     Q.   Right.

Page 447

1     A.   I'm sorry.
2          20,000 hospitalizations.  Thank
3 you.
4     Q.   Okay.  So you have no basis to
5 dispute that sentence?
6     A.   Yeah.  The first sentence
7 ending with the -- ending the second line
8 there "translates into a large absolute
9 number of serious complications," that's
10 relative.
11     Q.   Because we don't know what
12 "large" means?
13     A.   Right.
14     Q.   But we can agree that there's
15 no -- at least you don't have any basis to
16 dispute that it's been estimated that at
17 least 2600 deaths and 20,000 hospitalizations
18 per year in the United States can be
19 attributed to NSAID use in rheumatoid
20 arthritis patients alone?
21     A.   Well, I can't agree or disagree
22 with that.  I mean, he references item 7.  I
23 don't know what that is.
24     Q.   Okay.

Page 448

1     A.   But I don't -- I just can't
2 comment on that one way or the other.
3     Q.   All right.  But you don't have
4 any other study to say it's too high, it's
5 too low, anything like that?
6     A.   Well, actually, I think I did
7 refer in my affidavit to a statement that I
8 thought actually came from Merck.  I don't
9 remember what the numbers were in that
10 statement.  I guess we'd have to compare them
11 to what we've got here, 2600 deaths and
12 20,000 hospitalizations per year.
13     Q.   Right.  Well, you actually did
14 refer to that statement, and I guess my
15 question about the statement in your report
16 was:  Were you adopting Merck's statement as
17 accurate, or were you just simply saying
18 that's what Merck said?
19          MR. WEBSTER:  Objection, form.
20          MR. PIORKOWSKI:  Was my
21 question unclear?
22          THE WITNESS:  No.  I'm sorry.
23 Were you talking to me?
24          MR. PIORKOWSKI:  Yes.

13 (Pages 445 to 448)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 449

1    THE WITNESS: Okay.
2    MR. PIORKOWSKI: Let me
3  withdraw the question and rephrase it.
4    THE WITNESS: Okay. Sure.
5    Q    (BY MR. PIORKOWSKI) There is a
6  statement in your report where you reference
7  a statement made by Merck about what the GI
8  risks associated with NSAID use are.
9    A    Right.
10   Q    Okay. Are you -- were you
11 intending to adopt that statement as being
12 correct and accurate, or were you simply
13 stating as a fact that that's what Merck
14 said?
15   A    You know, probably best to look
16 in my affidavit at this point.
17   Q    I tell you what: Since we
18 don't have -- since we -- we'll get a copy on
19 the break, and we'll come back to that.
20   A    Okay. Okay.
21   Q    Now, the next sentence says,
22 "Put another way, the chance of
23 hospitalization or death from a
24 gastrointestinal adverse event is 1.3 to 1.6%

Page 450

1  per year in patients with rheumatoid
2  arthritis known to be taking NSAIDs." Did I
3  read that correctly?
4    A    Yes, you did.
5    Q    Do you have any basis to
6  dispute that statement?
7    A    Yeah, I can't comment one way
8  or another about this.
9    Q    Okay. Does that sound out of
10 line with other materials that you've read?
11   A    It does not, no.
12   Q    Is that consistent with your
13 view about relatively infrequent events being
14 less than 3%?
15   A    Yes.
16   Q    Okay. Is it -- you would agree
17 with me that that is not -- that -- well,
18 first of all, some of the materials you read
19 were trial transcripts, right?
20   A    Yes, sir.
21   Q    Okay. You'd agree with me that
22 when we're talking about symptomatic ulcers
23 and perforations and bleeds, that we are
24 talking about serious adverse events, right?

Page 451

1    A    In that --
2    MR. WEBSTER: Objection, form.
3    A    In that category of, right.
4    Q    (BY MR. PIORKOWSKI) Right.
5  And we're talking about events that in some
6  cases, are life-threatening, right?
7    A    I would say in rare cases are
8  life-threatening.
9    Q    Okay. But at least according
10 to Dr. Goldkind, there's at least 2600 deaths
11 a year in rheumatoid arthritis patients who
12 are using NSAIDs chronically as a result of
13 gastrointestinal toxicity, right?
14   A    Well, that's interesting. You
15 know, this statement, if I'm reading this
16 correctly, beginning with "The broad-based
17 use of NSAIDs," down to "can be attributed to
18 NSAID use in rheumatoid arthritis patients
19 alone," he doesn't say in here that these are
20 gastrointestinal-related deaths, right, or
21 hospitalizations?
22   Q    Well, actually, I think he
23 does.
24   A    Where? Did I miss that?

Page 452

1  Did --
2    Q    Well, the whole section
3  beginning with the second line is discussing
4  adverse events.
5    A    Well -- but there's no question
6  he's discussing adverse events, but we begin
7  talking about GI side-effects, right? The
8  first line actually kind of lays out the --
9  if you will, the topic sentence for the
10 paragraph. But, "The broad-based use of
11 NSAIDs" -- next paragraph. It's not
12 indented, but -- The broad-based use of
13 NSAIDs for acute and chronic pain based on a
14 large population of arthritis patients
15 translate into a large absolute number of
16 serious complications."
17   It doesn't say whether these
18 are GI.
19   Q    Do you know -- well, let me ask
20 you along that line, then: What other risks
21 of death are associated with NSAID use, to
22 your knowledge?
23   A    Well, I mean -- I mean,
24 anaphylaxis is one. Again, very rare. But

14 (Pages 449 to 452)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 453

1  he doesn't say what he's talking about. I'm
2  just raising the question that he's not being
3  clear about what the source of these deaths
4  and hospital- -- the cause of the deaths and
5  hospitalizations.
6      Q.    The very first sentence of the
7  very first paragraph, though, talks about
8  NSAID-induced gastrointestinal side-effects,
9  right?
10     A.    There's no question about that.
11 I mean, I certainly don't dispute that. I'm
12 just saying the second paragraph, he doesn't
13 say anything at all -- well, until the next
14 sentence about GI adverse events.
15     Q.    Right.
16     A.    So I don't know whether this
17 2600 deaths and 20,000 hospitalizations, even
18 though let's suggest that they were
19 attributed to NSAIDs and use -- and NSAID use
20 in rheumatoid arthritis patients, if you just
21 say that they're GI. This is probably all
22 dealt with very easily by looking at
23 reference 7.
24     Q.    Okay.

Page 454

1      A.    That's where this comes from.
2      Q.    But putting aside the 2600
3  deaths and the 20,000 hospitalizations, it's
4  clear that his estimate of 1.3 to 1.6% per
5  year hospitalization or death rate is due to
6  gastrointestinal side-effects of NSAIDs?
7      A.    Yes.
8      Q.    Okay.
9      A.    That's clear, right.
10     Q.    Okay. And presumably, to your
11 knowledge, this is -- this was not -- this
12 was not a secret back in 1999, right? This
13 was common knowledge among physicians, that
14 chronic use of nonsteroidal anti-inflammatory
15 drugs had as a potential side-effect of
16 serious gastrointestinal problems, right?
17     A.    Right. In the uncommon
18 occurrence of serious gastrointestinal
19 problems, that's right.
20     Q.    Right.
21          And, in fact, you prescribed
22 NSAIDs, and one of the reasons that you did
23 not prescribe NSAIDs chronically is because
24 you were concerned about not giving a patient

Page 455

1  a risk for one of -- for this very
2  side-effect, right?
3      A.    Well, that's one reason, right.
4  That's one reason, yes.
5      Q.    Okay. All right. And I assume
6  that doctors would have to have a pretty good
7  reason for prescribing a drug. In other
8  words, they'd have to have an expectation
9  that this drug was working or would improve
10 function to accept a risk of 1.3 to 1.6% of
11 hospitalizations or death per year?
12     A.    I would say there is a
13 risk-benefit calculation that doctors do
14 based on what whatever information that they
15 have available; and physicians believe that
16 for these NSAIDs, if used carefully and
17 wisely and taken wisely, that, in fact, they
18 might be able to keep this risk small.
19     Q.    Do you know whether -- whether
20 patients who have serious bleeds, meaning
21 resulting in hospitalization or death,
22 whether they have warning signs consistently
23 prior to their bleeding episode?
24     A.    Well, anything I would have to

Page 456

1  say would have to be prefaced by the comment
2  that every patient presents differently,
3  okay?
4      Q.    Okay.
5      A.    Having said that, though, it is
6  the rare patient who has absolutely no
7  history of gastrointestinal symptoms and then
8  can't be aroused the next day because they're
9  bleeding acutely into the GI tract. That's
10 the rare patient.
11     Q.    Do you know whether the
12 literature does describe such patients?
13     A.    Oh, I believe it probably does,
14 yes.
15     Q.    Okay. Do you know whether --
16 is it fair to say that all patients using
17 chronic NSAIDs are potentially at risk of
18 gastrointestinal side-effects?
19     A.    Well, not knowing anything else
20 about the patient --
21     Q.    Right.
22     A.    -- you have to believe, I mean,
23 just from a safety perspective, that patients
24 who are placed on these therapies are being

Lemuel A. Moye, M.D., Ph.D.

Page 457

1   placed at risk for these kinds of serious
2   gastrointestinal problems.
3       Q.    When we're talking about these
4   things like bleeding ulcers and perforations
5   and so forth, you'd agree with me that it
6   would be somewhat callous of somebody to
7   characterize those as being tummy aches?
8           MR. WEBSTER:  Objection, form.
9           MR. WACKER:  Objection.
10      A.    Well, if we're talking about
11  obstructions -- upper GI obstructions, acute
12  perforations and bleeds, we have to be very
13  careful.  I mean, patients will -- sometimes
14  will come in and just absolutely minimize
15  their symptoms.  So somebody can have a
16  massive heart attack and say they have a
17  little bit of chest discomfort, I mean.  So I
18  don't know that I would say one way or the
19  other about tummy aches.  I would say this:
20  That is not how I personally would
21  characterize it.
22      Q.    (BY MR. PIORKOWSKI)  And that's
23  not how a doctor would fairly characterize a
24  peptic ulcer or a bleed, right?

Page 458

1           MR. WEBSTER:  Objection, form.
2       A.    Again, it depends.  You have to
3   try to use every possible way to get through
4   to a patient and have them understand.  And
5   sometimes, I suppose, you might make -- a
6   physician might make better headway with a
7   patient who doesn't understand the nuances of
8   this and rather than say "perforated ulcer,"
9   may say, "You have a severe tummy ache that
10  needs attention."
11      Q     (BY MR. PIORKOWSKI)  Okay.
12      A.    I don't know.
13      Q.    Fair enough.
14          And if you're talking to a
15  patient, you need to put it in the patient's
16  language?
17      A.    Right.
18      Q.    That's what you're saying,
19  right?
20      A.    Yes.
21      Q.    But if a lawyer were to stand
22  up in court and say the only side-effects
23  associated with NSAID use chronically are a
24  few tummy aches, you agree with me that would

Page 459

1   not be a fair characterization?
2           MR. WEBSTER:  Object to form.
3           MR. BLIZZARD:  Objection.
4       A.    Well, I would just say -- I
5   mean -- I can talk about what's appropriate
6   for doctors to say, a little less competent
7   about what's appropriate for lawyers to
8   say --
9       Q     (BY MR. PIORKOWSKI)  Okay.
10      A.    -- in a given circumstance.
11      Q.    Fair enough.
12      A.    But it certainly is not a term
13  I would use.
14      Q.    Certainly.  Okay.  Thank you.
15          Now, at the time that the Vioxx
16  new drug application was submitted, the FDA
17  understood that Vioxx was not completely free
18  from GI side-effects, right?
19      A.    Yes, that's right.
20      Q.    In other words, Merck never
21  represented Vioxx as being free of
22  gastrointestinal toxicity, right?
23      A.    That's true.
24      Q.    Vioxx still had more

Page 460

1   side-effects, for example, than placebo?
2       A.    Yes.
3       Q.    And that would be sort of the
4   benchmark.  If you're trying to evaluate your
5   product and say, "Does my product have any
6   effects," you really have to have a
7   comparison to placebo to say that?
8       A.    Yes.  And just so we can be
9   clear, we're talking about gastrointestinal
10  side-effects now.
11      Q.    Well, really, that's true with
12  any side-effects, right?  I mean, in other
13  words, in order to tell what your product --
14  how your product compares to no product --
15  that's really a placebo-controlled trial
16  that's going to tell you that?
17      A.    A couple of things.  Certainly
18  that's true a placebo-controlled trial tells
19  you that, but I thought your question was
20  about what did Merck represent to the FDA
21  about the occurrence of gastrointestinal
22  side-effects.
23      Q.    That was my original question.
24  I thought you answered that.

16 (Pages 457 to 460)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 461

1    A.    Okay.  All right.
2    Q.    Okay.  And then my next
3  question was that the type of -- that if you
4  compared -- when you compared the cases of
5  Vioxx in the clinical trials between Vioxx
6  use and placebo use, you still had an
7  increase in Vioxx use in terms of GI events?
8    A.    Yes.
9    Q.    Right?
10    A.    Right.
11    Q.    All right.  And then my next
12  question was that a placebo-controlled trial
13  is really the type of trial that would give
14  you the best information on that --
15    A.    Yes.
16    Q.    -- question, right?
17    A.    Yes.
18    Q.    Okay.  Now -- but the reason
19  Vioxx was viewed to be promising was because
20  it had the potential for greatly reduced GI
21  side-effects compared to nonselective NSAIDs;
22  fair?
23          MR. BLIZZARD:  Object to form.
24          MR. WEBSTER:  Object to form.

Page 462

1    A.    Well, certainly it had the
2  potential for reduced GI side-effects.
3    Q    (BY MR. PIORKOWSKI)  Okay.
4  Well, at the time of the new drug
5  application, the studies that had been
6  performed and were submitted and were
7  reviewed by the FDA showed endoscopically
8  that there were less ulcers in Vioxx users
9  compared to nonselective NSAID users, right?
10    A.    Yes.
11    Q.    Okay.  And so we're clear on
12  what an endoscopy is -- I assume we are, but
13  just for the purposes of making sure we're on
14  the same page --
15    A.    Uh-huh.
16    Q.    -- endoscopy is where they take
17  a fiberoptic scope or a tube, right --
18    A.    Yes.
19    Q.    -- and they insert it down
20  through the esophagus, and they look directly
21  at the lining of the stomach?
22    A.    Yes.
23    Q.    And they can see whether there
24  are erosions or not, right?

Page 463

1    A.    Yes.
2    Q.    And when they did that in the
3  clinical studies, there were significantly
4  less erosions in Vioxx patients than there
5  were in nonselective NSAID patients, right?
6    A.    Yes.  Right.
7          The question that they had was
8  whether in sort of in a longer-term
9  situation, that would actually translate into
10  lower bleeds and ulcers and perforations.
11          MR. BLIZZARD:  Object to form.
12    A.    Yes, the concern was that the
13  endoscopy -- endoscopic findings were
14  surrogates.
15    Q    (BY MR. PIORKOWSKI)  Right.
16    A.    And surrogates are not always
17  reliable.
18    Q.    Might be; might not be, right?
19    A.    Right.
20    Q.    But at least you'd agree with
21  me that, based on the endoscopic findings,
22  there was certainly a good-faith scientific
23  basis to believe that Vioxx offered promise
24  in terms of lower GI side-effects?

Page 464

1    A.    But this is not faith here, and
2  surrogate endpoints are notoriously
3  unreliable.  And so there -- I would say -- I
4  would say this:  There was hope that there
5  would be, but there was suspicion that there
6  would not be.
7    Q.    Well, and, in fact, the FDA did
8  not allow Merck on the basis -- even though
9  they had demonstrated improved risk from
10  endoscopic studies, the FDA didn't allow
11  Merck to change the label to make it
12  different from the other nonselective NSAIDs,
13  did it?
14          MR. WEBSTER:  Objection, form.
15    A.    In regarding the reduced GI
16  serious side-effects, that's correct.
17    Q    (BY MR. PIORKOWSKI)  Right,
18  back in May of 1999, so we're clear on the
19  time frame.
20    A.    Yes.
21    Q.    And that's the reason that the
22  VIGOR study was undertaken eventually, right?
23    A.    Yes.
24    Q.    Okay.  Now, so I'm clear on

17  (Pages 461 to 464)

Lemuel A. Moye, M.D., Ph.D.

Page 465

1  your report, you're not suggesting that if a
2  drug can reduce gastrointestinal toxicity by
3  half, that's not -- that that is not very --
4  well, bad question. Let me start over.
5         You would agree that if a
6  drug -- even if a drug has some degree of
7  gastrointestinal toxicity, if it's capable of
8  reducing the incidence of ulcerations, bleeds
9  and perforations by 50%, that that's -- that
10 would be an important benefit?
11        MR. BLIZZARD: Objection, form.
12        MR. WEBSTER: Objection, form.
13     A.   As you've stated the question,
14 I must disagree with it for two reasons:
15 Number 1, I can't presume it's doing this
16 safely. Number 2, it depends on what the
17 underlying rate of serious gastro- -- serious
18 upper gastrointestinal side-effects are. By
19 that -- if we could have an agreement that
20 we're talking about bleeds, ulcers and -- I
21 mean, bleeds, perforations and obstructions,
22 that's what I mean with "serious upper
23 gastrointestinal events."
24        If we're talking about a 50%

Page 466

1  reduction from, let's say, one in 1,000, then
2  I'd say, "Well, maybe it's not worth it." If
3  we're talking about a serious reduction from
4  a higher number, then, perhaps, it is. So
5  those are the two reasons I would disagree
6  with you.
7      Q    (BY MR. PIORKOWSKI) Okay.
8  Well, let's see if we can reach agreement on
9  a couple of things.
10        If we're not dealing with a
11 number like one in 1,000, if we're dealing
12 with a number like what Dr. Goldkind cites,
13 which is one to three -- I'm sorry, 1.3 to
14 1.6% per year of patients who are
15 hospitalized or die from gastrointestinal
16 events, would you agree with me that
17 all, that reducing that by half would be a
18 valuable and important public health benefit?
19        MR. WEBSTER: Objection, form.
20     A.   No, I would not.
21     Q    (BY MR. PIORKOWSKI) It would
22 not be?
23     A.   Because, again, we're not
24 saying --

Page 467

1      Q.   Well --
2      A.   -- safe reduction.
3      Q.   -- I'm coming back to that.
4      A.   Okay.
5      Q.   I didn't ask you using Vioxx.
6  I said, would you -- my only question is:
7  Would you agree that reducing a 1.3 to 1.6%
8  rate of hospitalization or death is a
9  laudable public health goal, if it can be
10 done safely?
11        MR. BLIZZARD: Objection, form.
12        MR. WEBSTER: Objection, form.
13     A.   Ah. If it can be done safely,
14 I would say yes.
15     Q    (BY MR. PIORKOWSKI) Okay.
16 Okay. But so I'm clear, you're not saying
17 that it doesn't matter what the rate of
18 gastrointestinal -- of serious
19 gastrointestinal events is because it's so
20 small that it's inconsequential. You would
21 recognize a reduction from 1% to 1/2% as a
22 valuable public health goal, if it could be
23 achieved with no greater risk?
24        MR. BLIZZARD: Object to form.

Page 468

1      A.   If achieved safely, yes.
2      Q    (BY MR. PIORKOWSKI) Okay. All
3  right. Now, the FDA did, in fact, review the
4  Vioxx new drug application, right?
5      A.   Yes, they did.
6      Q.   And based on your review, they
7  had the same kind of team of scientists that
8  we talked about before review the new drug
9  application, right?
10     A.   Yes.
11     Q.   So, in other words, there were
12 physicians, chemists, pharmacologists,
13 pharmacokineticists and statisticians that
14 reviewed and had input on the Vioxx new drug
15 application, right?
16     A.   Yes.
17     Q.   And would you agree with me
18 that they conducted a careful review?
19        MR. WEBSTER: Objection, form.
20     A.   I would agree that they
21 conducted as careful a review as they could,
22 but I think that these review teams are
23 chronically overworked and, therefore, are
24 not able to review the complete NDA in all

18 (Pages 465 to 468)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 469

1  detail.
2         MR. JOSEPHSON:  Objection to
3     the responsiveness.
4     Q    (BY MR. PIORKOWSKI) Do you
5  have any personal knowledge that any --
6  anyone involved in the review process for the
7  Vioxx new drug application did not have
8  sufficient time to perform their duties?
9     A    I have no specific information
10 about any one reviewer reviewing this NDA.
11 My comment was a general comment about the
12 workload and constraints within the FDA.
13    Q    Generally speaking?
14    A    Generally speaking, yes.
15    Q    And certainly there's nothing
16 in any of the materials that you reviewed
17 that -- where an FDA reviewer said, "I had
18 insufficient time to conduct this review, I
19 wish I had more time," anything of that
20 nature?
21    A    I have nothing like that.
22    Q    Okay.  I'd ask you to turn to
23 page -- you remember the first FDA document
24 we looked at?

Page 470

1     A    Yes.
2     Q    Yes.
3     A    Exhibit 11?
4     Q    Exhibit 11.  Could you turn to
5  page 33 for me, please.
6     A    (Witness complies.)
7     Q    And do you see the initial
8  language there where it says, quote, "Under
9  current law, all new drugs need proof that
10 they are effective and safe before they can
11 be approved for marketing"?
12    A    I do.
13    Q    Did I read that correctly?
14    A    You did, yes.
15    Q    Okay.  Is that your
16 understanding of the current law with respect
17 to the standards that the FDA needs to employ
18 in approving a drug for marketing?
19    A    Yes.
20    Q    Okay.  And then the second
21 sentence says, quote, "No drug is absolutely
22 safe.  There is always some risk of an
23 adverse reaction."  Did I read that
24 correctly?

Page 471

1     A    Yes.
2     Q    And do you agree with that?
3     A    Yes.
4     Q    Okay.  And when it says,
5  "However, when a proposed drug's benefits
6  outweigh known risks, the FDA's Center For
7  Drug Evaluation and Research, CDER, considers
8  it safe enough to approve" -- now, do you
9  agree that that is the FDA's position about
10 approval?
11    A    Well, that's what they say --
12    Q    Okay.
13    A    -- so I guess I do.
14    Q    Okay.  Do you -- I guess I'm
15 asking because, you know, I want to make sure
16 that you're not going to, you know, come into
17 court and say, "I have a different
18 understanding, you know.  That's not really
19 right."
20    A    Well, it is their goal.
21    Q    Okay.
22    A    But what undermines this all is
23 that the FDA doesn't -- is not able to
24 determine level of safety, commonly.

Page 472

1         MR. JOSEPHSON:  Objection,
2     responsiveness.
3     Q    (BY MR. PIORKOWSKI) Okay.  You
4  see on page 34 in the third column on the
5  right, the second full paragraph?
6     A    Second full paragraph.  Okay.
7  However -- "Whenever an NDA"?
8     Q    Right.  Right.
9         It says, "Whenever an NDA is
10 submitted to CDER, the center lists in a
11 computer database that is monitored by FDA's
12 division of scientific investigations, the
13 division assigns field reviewers to make
14 on-site inspections to verify that the work
15 cited in the NDA is valid."
16        Is that consistent with your
17 experience on the FDA Advisory Committee?
18    A    If the suggestion here is that
19 field reviewers audit the majority of the
20 components of the NDA, then I would disagree
21 with that.  I mean, I certainly -- my
22 understanding is that sometimes there are
23 on-site inspections and audits.
24    Q    Is it your understanding that

19  (Pages 469 to 472)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 473

1  for any given new drug application, that the
2  FDA conducts some audits, at a minimum, of
3  the clinical trial sites on a random basis to
4  ensure that the manner in which the data were
5  gathered were accurate?
6      A.   No.  No.
7      Q.   Your understanding is that they
8  usually do not conduct --
9      A.   I can't say "usually."  I can
10 say that many times, they do not.
11     Q.   And what -- how do you know
12 that?
13     A.   Well, because I was involved in
14 clinical trials that led to NDAs and sNDAs,
15 and there were no FDA audits.
16     Q.   Maybe you misunderstood my
17 question.  I'm not asking you whether FDA
18 audits every single clinical trial in every
19 single new drug application.
20     A.   Right.
21     Q.   Okay.
22     A.   Right.
23     Q.   What I'm asking you is:  For
24 any given new drug application --

Page 474

1      A.   Okay.
2      Q.   -- the FDA conducts some audits
3  of some of the clinical trials to ensure that
4  the data collection was done in an
5  appropriate way; is that true?
6          MR. GALLAGHER:  Object to form.
7      Again, I have to disagree with
8  that.  They certainly have the option to do
9  that and I believe they do it sometimes, but
10 there are NDAs in which there have been no
11 audits of clinical -- no FDA audits of
12 clinical trials.  Now, there have been other
13 audits, but not FDA audits.
14     Q    (BY MR. PIORKOWSKI)  Do you
15 know of any products for which there have
16 been no audits at the time of the NDA that
17 you can cite?
18     A.   Well, at the time of the sNDA.
19     Q.   Well, now, my question was the
20 original NDA, an original NDA, not an sNDA.
21     A.   Okay.
22     Q.   If I asked the question just
23 limited to a new drug application, would you
24 agree with me that the FDA routinely conducts

Page 475

1  at least some audits of the clinical trial
2  sites as a part of its review of the new drug
3  application?
4      A.   I guess I'd have to disagree
5  with that, and -- just to say that they can
6  do it, how frequently they do it, I don't
7  know.  Whether every NDA has at least some
8  FDA audit presence, I don't know.
9      Q.   Okay.  You just -- it's
10 something that's -- you haven't had
11 involvement with directly?
12     A.   With NDAs, right.  That's
13 right.
14     Q.   Or with audits, particularly?
15     A.   With FDA audits.
16     Q.   Right.
17     A.   That's correct.
18     Q.   All right.  On page -- still on
19 page 34, the next paragraph, it says, "If
20 CDER's evaluation of studies reveals major
21 deficiencies, substantially more work by the
22 sponsor may be needed, ranging from further
23 analyses to the conduct of new studies --
24 either case extends the evaluation time and

Page 476

1  delays approval."
2          Is that consistent with your
3  experience in terms of the way the process
4  works?
5      A.   Well, it's a very soft
6  statement, so I guess I would just say that
7  certainly the FDA, if they -- has the power
8  to declare that studies are deficient, and
9  that puts the onus on the sponsor to make up
10 the deficiency, and that can take more time.
11 They certainly have the power to do that.
12         MR. PIORKOWSKI:  Fair enough.
13 I'm advised that we have -- we're out
14 of tape, so we need to change tapes,
15 so probably a good time for a break,
16 Jason?
17         MR. WEBSTER:  Sure.
18         THE VIDEOGRAPHER:  Off the
19 record at 9:12.
20         (Recess taken, 9:12 a.m. to
21 9:26 a.m.)
22         THE VIDEOGRAPHER:  On the
23 record at 9:26.
24     Q    (BY MR. PIORKOWSKI)  Doctor,

20  (Pages 473 to 476)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 477

1  during our first session, we -- you alluded
2  to something in your report about the risks
3  of GI hospitalizations and deaths.  Do you
4  remember that?
5      A.   I do.
6      Q.   We didn't have a copy of your
7  report at our fingertips.
8      A.   Right.
9      Q.   Can you turn to page 58 of your
10  report, paragraph 159, tell me if that's what
11  you're referring to?
12      A.   Actually, no.
13      Q.   Okay.  Well, let me just ask
14  you a specific question.
15      A.   Sure.  Okay.
16      Q.   In your report on page 58, in
17  paragraph 159, about seven lines down --
18      A.   Yes.
19      Q.   -- there's a statement that
20  says, quote, "Estimates are that more than
21  100,000 hospitalizations and 16,500 deaths
22  each year in the United States occur as a
23  result of NSAID use," end quote.  Now, did I
24  read that correctly?

Page 478

1      A.   Yes, you did.
2      Q.   Okay.  Do you accept that
3  statement as true?
4      A.   No.  Actually, I think that's
5  an overstatement.  That's why I said that
6  wasn't the statement I was talking about.
7      Q.   But why --
8      A.   But it's an overstatement.
9      Q.   Okay.  Why did you put it in
10  your report, if it's an overstatement?
11      A.   Because it was the first
12  original estimate I had, but I found an
13  estimate that I thought was much more
14  realistic; and it's that that I'm looking for
15  and that that I can't find.
16      Q.   Okay.  On what basis did you
17  determine that this was unrealistic or
18  overstated?
19      A.   Well, no.  I had another
20  reference.  I don't think it was the
21  reference that was referenced in the medical
22  review.  I had another reference.  But this
23  reference was -- certainly appeared in the
24  literature, but it's obsolete.

Page 479

1      Q.   Okay.  Well, when I -- okay.
2          And why -- why would you
3  include it in your report if it was obsolete?
4      A.   Well, actually, I thought I had
5  taken it out.
6      Q.   Okay.
7      A.   Yeah.  I mean, and -- well, I
8  believed I had, but this is still there,
9  so...
10          But there or not, it's
11  obsolete.
12      Q.   And "obsolete," you mean the
13  data are old; is that what you're saying?
14      A.   Yeah, and -- yeah, the data are
15  old, and the methodology that was used
16  wasn't -- wasn't as reliable as a newer
17  estimate that was produced that showed that
18  there were 16 -- primarily, the 16,500 deaths
19  per year, that's an overestimate.
20      Q.   Okay.  Do you know what the
21  actual number of deaths per year is?
22      A.   Actually, I can get it for you,
23  but I don't have it for -- I don't remember
24  right now.  That's why I wanted to look here

Page 480

1  and see.
2      Q.   Okay.  All right.  Maybe you
3  can find it over our lunch break or
4  something, all right?
5      A.   Sure.
6      Q.   Okay.  Can we go back to
7  Exhibit 11, please?
8      A.   Exhibit 11, yes.
9      Q.   And turn to the page that ends
10  with 35, please.  And do you see on the
11  right-hand side of the page, there's a
12  section called "Final Actions"?
13      A.   Yes.
14      Q.   And then it says, quote,
15  "In the final analysis, CDER's decision
16  whether to approve a new drug for marketing
17  boils down to two questions:  One, do the
18  results of well-controlled studies provide
19  substantial evidence of effectiveness?  Two,
20  do the results show the product is safe under
21  the condition of use in the proposed label?
22  'Safe' in this context means that the benefit
23  of the drug -- the benefits of the drug
24  appear to outweigh its risks."  Okay.

21 (Pages 477 to 480)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 481

1      Did I read that correctly?
2      A.   Yes.
3      Q.   Okay.  Do you agree that that
4   is the analysis that the FDA undertakes when
5   it makes a decision as to whether or not to
6   approve a product?
7      A.   It's their goal to make those
8   determinations.
9      Q.   Okay.  Their definition of
10  "safety," where they say, "'Safe' in this
11  context means that the benefits of the drug
12  appear to outweigh its risks," is that the
13  same definition of "safety" that you use, or
14  do you have a different definition?
15     A.   Well, this is the definition
16  that's used commonly in -- by FDA, public
17  health physicians, so I have no -- I have no
18  different definition.
19     Q.   You have no different
20  definition?
21     A.   That's right.
22     Q.   Okay.  And then in the next --
23  it goes on to say, "When the review is
24  complete, CDER writes the applicant to say

Page 482

1   the drug is approved for marketing; it is
2   approvable, provided minor changes are made;
3   or is not approvable because of major
4   problems."  Did I read that correctly?
5      A.   You did.
6      Q.   And is it your understanding
7   that those are the options that are available
8   to CDER when a new drug application is
9   presented?
10     A.   Yes.
11     Q.   Okay.  You would agree with me
12  that just simply because the manufacturer
13  pays user fees does not mean that the drug
14  automatically gets approved if it doesn't
15  meet CDER's standards?
16     A.   There is no sine qua non.
17  There is no firm link between the two.  But
18  there -- but when you have human interactions
19  and money, things do not always go as
20  originally intended by the law.
21     Q.   So is that a way of saying,
22  yes, I'm correct that the fact that you pay
23  user fees does not automatically mean that
24  the drug gets approved?

Page 483

1      A.   It does not automatically mean
2   it, that's right.
3      Q.   Okay.  Let me -- when the FDA
4   looks at a new drug application, the
5   studies -- there are some studies that are
6   referred to as pivotal studies, right?
7      A.   Yes.
8      Q.   They're generally -- the
9   studies are conducted in Phase III of the new
10  drug application process -- of the drug
11  development process?
12     A.   Yes.
13     Q.   Okay.  And in paragraph 99 of
14  your report, you say, quote, "Rofecoxib was
15  approved by FDA based on several pivotal
16  short-term studies.  These short-term studies
17  followed patients for three to six months."
18  Did I read that correctly?
19     A.   Yes.
20     Q.   Okay.  Is that your
21  understanding of the studies that formed the
22  basis for FDA's approval?
23     A.   It's my understanding of the
24  pivotal studies, yes, that the -- that they

Page 484

1   were short-term studies.
2      Q.   Okay.  And you go on later in
3   that paragraph and you say, "These short-term
4   studies made no important contribution to the
5   understanding of the long-term hazards of
6   this drug," right?
7      A.   "Of these drugs," yes.
8      Q.   "Of these drugs."
9          And "long-term," what are you
10  referring to as "long-term"?
11     A.   Well, I'm referring to the use
12  of -- the use for drugs for months or years
13  beyond the duration of follow-up in the
14  pivotal studies here.
15     Q.   Okay.  And is it your
16  understanding, after your review of the new
17  drug application when you prepared your
18  report, that the longest studies that were
19  included in the new drug application for
20  Vioxx were six months?
21     A.   I guess I would say no.  I
22  think -- I would say -- I would say this:
23  Perhaps, there was one or two that lasted
24  longer than that.  However, there were not

22  (Pages 481 to 484)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 485

1   studies that followed patients for years.
2           And if the drug was going to be
3   used for the long term, then we need to have
4   some assurance in studies of the long-term
5   record of safety.
6       Q.   Okay.  The FDA actually has
7   standard guidelines for how long a drug has
8   to be tested in clinical trials prior to the
9   time it can be approved, right?
10      A.   Yes, but as long as we're
11  clear, those are not iron-clad rules.  Those
12  are simply guidelines, and the sponsor is
13  free to exceed those guidelines, should they
14  choose.
15      Q.   Okay.  And are you familiar
16  with the ICH guidelines?
17      A.   I know about the ICH
18  guidelines, yes.
19      Q.   Okay.  The ICH stands for
20  International Conference on Harmonization?
21      A.   Yes.
22      Q.   Okay.  And the FDA has adopted,
23  or at the time that Vioxx was under
24  consideration, the FDA had adopted ICH

Page 486

1   guidelines; is that right?
2       A.   Yes.
3       Q.   Okay.  And do you know what ICH
4   guidelines require in terms of the length of
5   testing?
6       A.   I think it depends on the drug
7   being tested.  I would be surprised to see if
8   they required long-term studies for
9   pain-relief drug therapy.
10      Q.   Do you know whether they
11  require testing for a period of a year for
12  any patients?
13      A.   You mean any patients at all
14  or --
15      Q.   Yeah.
16      A.   -- pain patients?
17      Q.   I mean, is -- well, let me back
18  up.
19          Do you know whether the ICH
20  guidelines that have been adopted by FDA
21  include a requirement, whether it's a hard
22  requirement or not --
23      A.   Yeah, uh-huh.
24      Q.   -- to study patients, any

Page 487

1   number of patients, for a period of up to a
2   year?
3       A.   I guess what I'm unsure of is
4   the kind of patient.  If we're talking about
5   heart failure patients, or are we talking
6   about any patients at all?
7       Q.   We're talking about any
8   patients, yeah.
9       A.   I don't know what the ICH
10  guidelines are.
11      Q.   Do you know whether Merck
12  studied any patients using Vioxx for a period
13  of a year prior to the submission of the
14  original new drug application?
15      A.   Perhaps, they did.  I don't
16  know if those studies were pivotal, but,
17  perhaps, they did.
18          But, again, my thesis is that
19  even a year is too short if you're looking
20  for -- if patients are potentially going to
21  use this for longer than a year.
22      Q.   Do you know any -- can you name
23  me any drug product that you're familiar with
24  where, at the time of initial approval,

Page 488

1   studies had been done for longer -- clinical
2   trials had been done for longer than one
3   year?
4       A.   In any field?
5       Q.   Yes.
6       A.   On heart failure.
7       Q.   At the time of initial
8   approval.  Do you understand my question?
9       A.   Yeah, I understand.  I
10  understand.
11          I mean, before it was ever
12  allowed to be on the market, you mean?
13      Q.   Yes.
14      A.   I'll need to continue to think
15  about that.  I don't have an answer for you
16  right now, but I'm still thinking about it.
17      Q.   Okay.  All right.  Well, why
18  don't we leave it at that, and if you think
19  of one later, you can --
20      A.   Okay.
21      Q.   -- I'll give you an opportunity
22  to amend your answer, all right?
23      A.   Thank you.  Okay.
24      Q.   Okay.  Do you know of any other

23 (Pages 485 to 488)

165470b8-f920-4da9-843f-90cc143762f6