UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| **This document relates to** | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |
| | * | |
| **Gerald Barnett v. Merck & Co, Inc.** | * | **CASE NO. 02:06CV00485** |

---

## PLAINTIFF'S OPPOSITION TO MERCK'S MOTION TO EXCLUDE THE OPINION TESTIMONY OF LEMUEL MOYÉ, M.D., PH. D.

---

Plaintiff, by and through his attorneys, files this brief in opposition to Merck's Motion to Exclude the Opinion Testimony of Lemuel Moyé, M.D., Ph. D. As outlined below, Dr. Lemuel Moyé is qualified to proffer each of the opinions challenged in Merck's motion.

## I.  STATEMENT OF THE FACTS

This action for personal injuries arises from Plaintiff Gerald Barnett's use of Vioxx, which caused a heart attack on September 6, 2002, and resulting damage to his heart, necessitating coronary artery bypass surgery four days later. Mr. Barnett was approximately 56 years old when he was prescribed Vioxx by his physician in December 1999, and he had been taking the drug for approximately 32 months at the time of his heart attack. Plaintiff contends that his heart attack was caused by a clot in one of his coronary arteries which resulted from a plaque rupture as well as the acceleration of atherogenesis due to Vioxx use.

1

Mr. Barnett's treating doctors have testified that had Merck disclosed the known risks of Vioxx they would not have prescribed him Vioxx. However, because his physicians were unaware of the risks of Vioxx, and Merck failed to disclose and warn what it knew regarding the dangers of Vioxx, Mr. Barnett continued to take the drug even after his heart attack, until a few weeks before it was removed from the market.

As a result of the heart attack and 5-way bypass surgery at the early age of 58, Mr. Barnett suffers from permanent damage to his heart, which has reduced his life expectancy. In addition, he is now at a much greater risk of suffering another heart attack, and the bypass surgery has placed him at a greater risk for heart failure.

## II.     DR. MOYÉ'S QUALIFICATIONS AND SUMMARY OF HIS OPINIONS

### A.     Summary of Dr. Moyé's Qualifications

Dr. Moyé is a Professor of Biostatistics at the University of Texas School of Public Health in Houston. *See* COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D. ("Moyé Rpt.") at ¶ 2, attached hereto as Ex. A. Dr. Moyé, a medical doctor and Ph.D. in Biostatistics, practiced medicine from 1979-1992. *Id.* Dr. Moyé has been involved in the design, execution, and analysis of clinical trials for over nineteen years. *Id.* Dr. Moyé has been the Principal Investigator of numerous clinical trials including one that involved over 4159 patients who were followed for five years. *Id.* As a Principal Investigator of a trial, Dr. Moyé has been responsible for collecting and reporting adverse events to the sponsor as well as the FDA. *Id.* In his capacity as a Principal Investigator of clinical trials, Dr. Moyé has had instruction in FDA regulations.

Dr. Moyé's work has resulted in over 120 articles being published in numerous scientific journals, including *The New England Journal of Medicine* and *The Journal of the American Medical Association.* Moyé Rpt. ¶ 5. Dr. Moyé has authored six books, such as *Statistical*

*Reasoning in Medicine – The Intuitive P value Primer* (2000), *Difference Equations with Public Health Applications* (2000), *Multiple Analysis in Clinical Trials: Fundamental for Investigators* (2003), among others.  Moyé Rpt. ¶ 6.

Dr. Moyé serves as the statistician/epidemiologist on the FDA's Cardiovascular and Renal Drug Advisory Committee.  Moye Rpt. ¶ 14.  In addition, Dr. Moyé serves as a statistical consultant for the FDA, and most recently completed a two-year term on the FDA's Pharmacy Sciences Advisory Committee. *Id.*

In relation to this case, Dr. Moyé has devoted approximately 250 hours to reviewing the scientifically relevant literature on Vioxx and other NSAIDs. *See* June 2, 2006 Deposition of Lemuel A. Moyé ("Moyé Dep."), at 35:2-20, attached hereto as Ex.B.  Dr. Moyé's report includes a list of 63 of these publications, studies, reports and other documents.  Moyé Rpt., ¶¶ 106-110.  These materials include, but are not limited to, the following: (1) VIGOR (Moyé Dep., 373:4-9; *see also* Moyé Rpt., ¶¶ 101-105); (2) Protocol 090 (Moyé Dep., 373:14-374:4; *see also* Moyé Rpt., ¶¶ 29, 41); (3) ADVANTAGE (Moyé Rpt., ¶¶ 43, 58, 115); (4) meta-analysis by Dr. Deborah Shapiro (October 18, 2000) (evaluating the effect of Vioxx verses NSAIDS) (Moyé Rpt., ¶¶ 39, 52); (5) ViP study (Moyé Rpt., ¶¶ 42, 117); (6) the Ray study (Moyé Rpt., ¶ 113); (7) VICTOR (Moyé Rpt., ¶ 116); (8) Alzheimer's studies (Moyé Rpt., ¶ 118); and (9) APPROVe (Moyé Rpt., ¶¶ 119-135); and (10) the Solomon study (Moyé Rpt., ¶¶ 137-141).  Dr. Moyé's report exceeds 100 pages and provides a detailed analysis of the various studies addressing the cardiovascular effects associated with Vioxx and other NSAIDs.

**B.** **Summary of Dr. Moyé's Opinions**

Based on his education, training, research, experience and review of peer-reviewed medical literature, Dr. Moyé expects to offer the following opinions:

3

- Vioxx, designed to reduce pain while avoiding gastrointestinal effects, was a therapy with a foreseeable design defect, and whose risks exceeded its benefits. Studies, before and after approval, indicated that the drug demonstrated no better analgesic effect than commonly used, inexpensive NSAIDs and that the harmful gastrointestinal effects of Vioxx exceeded placebo. Moyé Rpt. ¶ 23.

- Vioxx produces cardiovascular disease through: 1) elevations in blood pressure adds to the force of atherosclerotic disease development; and 2) the selective inhibition of the Cox-2 prostanoid synthesis destabilizes the blood's delicate clotting balance, producing catastrophic thrombotic events in the heart, and other end organ vasculature. Moyé Rpt. ¶ 24.

- Vioxx is unsafe at any dose/duration combination in any patient regardless of the underlying risk for cardiovascular disease. Moyé Rpt. ¶ 25.

- The use of Vioxx is unjustified in patients who suffer from chronic pain of rheumatoid arthritis or osteoarthritis. The use of a medication that causes death through its combined thrombotic, hypertensive effects is unjustified in patients who suffer from painful, chronic, but non-lethal illnesses. These patients because of their age and high background risk of atherosclerotic cardiovascular illness are at greater risk of vessel-occlusive attack by this drug. During the appearance of study after study, which confirmed the pre-approval suspicions that Vioxx would be dangerous· for the cardiovascular system, Merck continued to defend the drug and market the drug with no additional warnings for its profound cardiovascular effects. Moyé Rpt. ¶ 26.

## III.   ARGUMENT

### A.   Legal Standard

The *Daubert* trilogy cases, *Daubert v. Merrell Dow Pharmaceuticals*, 113 S. Ct. 2786 (1993), *General Electric Co. v. Joiner*, 118 S. Ct. 512, 517-519 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), have made the district judge the "gatekeeper who must pass on the reliability and relevance of proffered evidence pursuant to Federal Rule of Evidence 702."[1] Rule 702 takes into account the trilogy and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form

---

[1] MANUAL FOR COMPLEX LITIGATION § 472 (4th ed. 2004).

> of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The Rule "not only requires that the testimony be relevant, but also that it be based on sufficient facts or data, that it be the product of reliable principles and methods, and that the witness applied those principles and methods reliably to the facts of the case."[2]

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Daubert*, 113 S. Ct. at 2786. In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire*, 526 U.S. at 138.

In addition to the five factors laid out in *Daubert*, a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999). Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded

---

[2] MANUAL FOR COMPLEX LITIGATION § 484 (4th ed. 2004).

conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g., id.* at 313; *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.,* 243 F.Supp.2d 672, 678 (W.D. Tex. 2002). Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert,* 113 S. Ct. at 2786. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Joiner,* 522 U.S. at 146.

**B.    Dr. Moyé Is Qualified To Offer Opinions On FDA Labeling, Ethical Violations Regarding The Publication Of VIGOR, General Causation, And Vioxx Cardiotoxicity Compared With Other COX-2 Inhibitors.**

**1.    Dr. Moyé Is Qualified to Offer Opinions That The Vioxx Label Was Misleading.**

Merck asserts in its motion that Dr. Moyé is not an expert in marketing. Dr. Moyé does not hold himself out as an expert in marketing.[3] Dr. Moyé does not intend to opine about Merck's marketing practices. Dr. Moyé does intend, however, to opine that the Vioxx label was misleading and insufficient to warn doctors of the cardiovascular risks associated with the drug.

Dr. Moyé's has vast experience with clinical trials, with post approval marketing safety surveillance, with data safety monitoring, with the drug approval process, and with the interpretation of adverse drug effects. His experience with determining drug risks and benefits

---

[3] Though Dr. Moyé is not an expert in pharmaceutical marketing, Dr. Moyé is familiar with drug company marketing techniques since during his time in private practice as a physician, he was detailed on numerous occasions by pharmaceutical representatives. *See* Moyé Dep., 104.

includes his work on multiple data safety monitoring boards, consulting with pharmaceutical companies, his experience as a practicing physician, and his work with the FDA's Cardiovascular Renal Advisory Committee.   As an investigator for several clinical trials, Dr. Moyé was responsible for reporting adverse events that occurred in patients taking drugs in post-marketing experiences.   During meetings of the Cardiovascular Renal Advisory Committee, Dr. Moyé, as an FDA consultant, was specifically asked questions about drug labeling.   *See* Moyé Dep., 112, 115, 157-158.

Dr. Moyé is clearly qualified to evaluate a drug label and to opine when the label misstates or is insufficient to communicate the risks associated with the drug.

### 2.   Dr. Moyé Is Qualified to Opine That the Authors of VIGOR Failure To Update Article With Safety Data Was Scientific Misconduct.

In its motion, Merck argues that Dr. Moyé should not be allowed to offer the opinion contained in paragraph 108 of his report.   Though Merck points to only a portion of the opinion, in full it reads as follows:

> Neither the VIGOR authors nor the sponsors updated the data in the article that appeared in the *New England Journal of Medicine* in November 2000 with the new safety data, a critical ethical omission.   Even if one accepts that the occurrence of the three additional heart attacks did not occur before the pre-specified data cut-off date, the three events were known in August 2000, several months before the appearance of the manuscript in the *New England Journal of Medicine* in November 23, 2000.   It would have been easy for the investigators to add a statement in this manuscript, acknowledging the three additional cardiovascular events, and in addition, providing computations for the updated risk of cardiovascular events caused by rofecoxib.   *The New England Journal of Medicine* was concerned enough about this omission that they published an Expression of Concern.

Moyé Rpt. ¶ 108.

Dr. Moyé has published over 120 articles in peer-review journals, including *The New England Journal of Medicine*.   Dr. Moyé is familiar with the standards of the *The New England*

*Journal of Medicine.*  Since 2000, Dr. Moyé has been a co-author of an article published in *The New England Journal of Medicine.*  Dr. Moyé has served as a journal reviewer for *The New England Journal of Medicine.*  In addition, Dr. Moyé has reviewed manuscripts for the following journals: *Lancet, Journal of Clinical Epidemiology, Journal of the American Statistical Association, Biometrics, Controlled Clinical Trials, Journal of Biopharmaceutical Statistics, Journal of Applied Literature, PharmacoEconomics, American Journal of Epidemiology, Statistics in Medicine, Circulation, American Family Physicians,* and *Atherosclerosis.*[4]

Based on these credentials, Dr. Moyé is more than qualified to opine that in regard to VIGOR the additional three heart attacks in question should have been included in the manuscript prior to publication, given the fact that heart attacks were known months prior to publication.

> **3.  Dr. Moyé's Opinions on Causation, Mechanism, and Risk Benefit Analysis Are Admissible Under Rule 702.**
>
> > **a.  Dr. Moyé Is Qualified to Testify That Vioxx Causes Cardiovascular Events.**

Dr. Moyé is currently a full time Professor in biostatistics and epidemiology at the University of Texas School of Public Health. Dr. Moyé's qualifications and expertise are similar to that of Dr. Wayne Ray, previously qualified by this Court in the area of epidemiology, clinical study risk analysis, and general causation.  *See Plunkett v. Merck & Co., Inc.*, 401 F. Supp. 2d 565 (E.D. La 2005).

Dr. Moyé is both an epidemiologist and a medical doctor. He received a PhD in biostatistics from the University of Texas, an M.S. in statistics from Purdue, an M.D. from Indiana University, and a B.S. in mathematical sciences from Johns Hopkins.  Moyé Rpt., ¶ 19.

---

[4] Curriculum Vitae of Lemuel A. Moyé, M.D., Ph. D. ("Moyé Curriculum Vitae"), at 2, attached hereto as Ex. C.

Dr. Moyé has some 19 years of experience in cardiovascular research. *Id.* at ¶ 3. He has extensive experience in consulting for pharmaceutical entities, the FDA and National Institute of Neurology Disorders and Strokes. *Id.* Dr. Moyé is a co-researcher on a government funded grant on atherosclerotic disease. *Id.*

Consistent with this Court's opinion regarding Dr. Wayne Ray in *Plunkett*, Dr. Moyé's career has been based around pharmacoepidemiologic and epidemiologic investigations that concern the risk of cardiovascular events, neurological events and atherosclerotic events. *See generally* Moyé Curriculum Vitae; *see also Plunkett*, 401 F.Supp. 2d at 41-44.[5] More specifically, Dr. Moyé's career has been based around investigations that concern the adverse and beneficial effects of medication. As evidenced in the analysis presented in his report and his deposition testimony, Dr. Moyé has reviewed and analyzed the scientifically relevant literature surrounding Vioxx. A general theme running throughout all these studies was that Vioxx can cause adverse cardiovascular effects. Thus, Dr. Moyé is qualified to make an analogy based upon the tests that Vioxx can cause adverse cardiovascular events.

Merck admits that Dr. Moyé is a Professor of Biostatistics and Epidemiology and is experienced in designing and conducting clinical trials. *See* Merck's Memorandum, Challenge No. 8, p. 1. Indeed, Merck expressly states that it "does *not* challenge Dr. Moyé's qualifications to discuss clinical study design, relative and attributable risk issues, or statistical interpretation of medical datum." *Id.* (emphasis added).

Despite these admissions and in a move that turns *Daubert* and the Rule 702 progeny of cases on their head, Merck claims Dr. Moyé is qualified to teach epidemiology and statistics but

---

[5] The only limitation in the Court's November 18, 2005, Order as to Dr. Ray was that he not opine as a medical doctor, since he was not an M.D. Indeed, Dr. Ray offered no medical opinions. The distinction here falls in favor of Dr. Moyé, who is an M.D. and was an invited member of the FDA's Cardio-Renal Advisory Committee at the time the coxibs, Celebrex and Vioxx, were applied for and approved for marketing beginning in the first half of 1999.

not to opine in this area because he does not have "any *personal experience* that would qualify him to testify that Vioxx causes cardiovascular events." *Id.* at p. 4, Sec. C. 1. (emphasis added). Not surprisingly, there are no cases to support this contention and no meaningful definition of what "personal experiences" would be necessary for a qualified epidemiologist to testify in the area of epidemiology. Rather, Merck's memorandum focuses on Dr. Moyé having left a full time medical practice prior to Vioxx being on market. Such issues are wholly irrelevant to general causation or epidemiology, and Merck offers no explanation as to why a full-time practice of medicine when Vioxx was on market is necessary to establish general causation. The argument morphs into a complaint by Merck that Dr. Moyé would offer opinions that the risks of Vioxx outweigh any potential benefit when he had no personal experience prescribing Vioxx as a physician. *Id.* at p. 5. This is a red herring.

Dr. Moyé offers an opinion that the risks of Vioxx outweigh any potential benefits from an epidemiologic perspective. As Dr. Moyé explains in paragraph 16 of his report, he has taken part in research studies that have been both observational and experimental and has acted in each of those studies as an investigator for the pharmaceutical industry. In that role, he participated in discussions assessing the safety and effectiveness of the medication at issue, with an emphasis on whether the balancing of the health advantages and disadvantages warranted its use. *See* Moyé Rpt., ¶ 16. In addition, Dr. Moyé has published in this area. In addition to that, at paragraph 17 of his Report, Dr. Moyé explains how, during his work as part of the Cardio-Renal Advisory Committee to the F.D.A., he and the members were asked to weigh the advantages and disadvantages of medications presented to the committee for approval for marketing in the United States. Dr. Moyé walked through this analysis and the attributable risk (a statistical and epidemiologic standard) as part of the Risk-Benefit Analysis portion of his opinions at

paragraphs 27 through 38.  For the reasons cited above, Dr. Moyé is qualified to offer these opinions and furthermore, brings to this epidemiologic foundation the perspective of a currently licensed physician and doctor who performs risk analysis with his colleagues in his assignments for the F.D.A.

> **b.     Dr. Moyé Has Acquired Knowledge, Training, and Education That Qualifies Him to Testify That Vioxx Causes Cardiovascular Events.**

Moreover, on the general causation issue, Merck contends Dr. Moyé lacks knowledge, training or education to qualify him to testify Vioxx causes cardiovascular events.  *Id. at* p. 6, Section C, subsection 2.  The basis for this challenge is that he is not a board certified cardiologist or pharmacologist.  Again, Merck expressly admitted Dr. Moyé is qualified as an epidemiologist to discuss clinical study design, relative and attributable risk issues, and interpretation of medical data.  The assertion that he must be a cardiologist or pharmacologist to testify that the data shows Vioxx can cause adverse cardiovascular events is without merit.  This Court has rejected any such contention in allowing Dr. Ray, and in fact, Merck's own witnesses, such as Dr. Barry Rayburn (neither a board certified cardiologist nor a pharmacologist), to testify on this very issue.

Dr. Moyé has some 19 years of experience in clinical trials that have dealt with cardiovascular events.  He has been an investigator in this area and responsible for the collection of adverse events and adverse event reporting in clinical trials.  He has written and lectured in the area.  He has served as a member of the FDA's Cardiovascular Renal Advisory Committee.  He is a Professor of epidemiology and biostatistics.  He has published peer reviewed papers in this area.  He has authored books that deal with clinical trial design and assessment.  Most significantly, he has consulted for and been hired by pharmaceutical companies in this area.  As

Merck points out, Dr. Moyé testified that he has extensive training and experience carrying out cardiovascular trials. *Id.* at p. 6, note 7.

**c.      Dr. Moyé's Opinion That Vioxx Causes Cardiovascular Events Has Abundant Scientific Support.**

In a third causation challenge, Merck contends Dr. Moyé admits his causation opinions lack a scientific basis. This is based upon a series of questions to Dr. Moyé about the molecular explanations of the primary mechanism of action. *Id.* at p. 8. This very argument was made and rejected by the Court with Dr. Wayne Ray.   Merck challenges Dr. Moyé's epidemiologic testimony on the Fitzgerald hypothesis, which the Court noted in its Order of November 18, 2005, to have been "supported by numerous articles as well as recognized medical journals." *Plunkett,* 401 F.Supp.2d at 586-587.   As the Court reasonably stated, "Although Merck may disagree with the conclusions reached in the Fitzgerald hypothesis and supporting literature, a disagreement does not amount to improper methodology or scientifically unreliable data." *Id.*

In a sub-point on the issue of mechanism, Merck challenges Dr. Moyé on his qualifications to testify that Vioxx accelerates atherosclerosis, as provided in part by the Fitzgerald hypothesis. The Court also rejected this argument as to Dr. Ray and said "for the same reasons cited above, Professor Ray is qualified to opine that Vioxx accelerates atherosclerosis." *Id.* This sentence immediately preceded the Court's statements on the Fitzgerald hypothesis set forth in the preceding paragraph. There is no difference here with Dr. Moyé.

The same reasons for which the Court qualified Dr. Ray are met here and in fact, are exceeded by Dr. Moyé.   Merck's contentions on causation and mechanism from an epidemiological standpoint are merely recycled from the prior challenges to Dr. Ray and should be rejected for the same reasons cited by the Court in its previous Order denying the challenges.

12

### 4.   Dr. Moyé Is Qualified To Offer Opinions About whether Vioxx Poses Increased Cardiovascular Risks as Compared To Other NSAIDs.

Merck contends that Dr. Moyé is not qualified to offer opinions about Vioxx as compared to other COX-2 inhibitors. Merck prefaces its argument in part on the FDA's memorandum wherein the FDA concluded that there is a "class effect" for all NSAIDs and there is no basis for rank ordering the various COX-2 inhibitors in terms of cardiovascular risk. Merck asserts that, "Dr. Moye acknowledges that before issuing the [April 6, 2005] Memo, the FDA conducted a comprehensive review of existing datum concerning the cardiovascular risk of all NSAIDs, including COX-2 inhibitors such as Vioxx." This is a gross mischaracterization of Dr. Moyé's testimony. Dr. Moyé actually testified as follows:

Q.   But you haven't done a scientific review of the literature on the cardiovascular effects of other NSAIDs, have you?
A.   That's true.
Q.   And the FDA says that they did that?
A.   Fair enough.

Moyé Dep., 370:2-10. Merck's implication that Dr. Moyé defers to the FDA's conclusions in the April 2005 Memorandum based on its "comprehensive review of existing data" is misleading and false.

Merck concedes, as it must, that Dr. Moyé is an expert in the area of biostatistics and epidemiology and does not challenge Dr. Moyé's testimony in these areas. *See* Merck's Memorandum, Challenge No. 8, p. 1. However, Merck argues that because Dr. Moyé is not a pharmacologist, he cannot compare Vioxx with other COX-2 inhibitors. *Id.* at p. 10. Regardless of the North Carolina court's ruling in *Smith v. Wyest-Ayerst Labs Co.*, 278 F.Supp.2d 684 (W.D.N.C. 2003), upon which Merck bases its argument, this Court has already addressed this issue in connection with expert challenges made by the plaintiff and Merck prior to the *Irvin I* trial. For example, with respect to the Plaintiff's challenge to one of Merck's experts, Dr. David

Silver, the Court stated: "[Dr. Silver] has reviewed all the relevant literature and studies.  If the Plaintiff wishes to attack Dr. Silver because he is not a cardiologist, pharmacologist, biostatistician,   neurologist,   regulatory   expert,   hematologist/clot   expert,   or pharmacoepidemiologist, she will be allowed to do so on cross-examination."  *Plunkett*, 401 F.Supp.2d at 582.   If Merck contends that Dr. Moyé does not understand or cannot compare the cardiovascular effects of Vioxx and other COX-2 inhibitors due to an alleged lack of practical experience with COX-2 inhibitors, Merck will be able to address those concerns on cross-examination.  *Plunkett*, 401 F.Supp.2d at 584 ("To the extent that Merck asserts that [Winston Gandy, Jr., M.D.] does not understand Vioxx and its alleged effects, Merck will be able to attack Dr. Gandy at cross-examination much like it did at his deposition.").

Dr. Moyé has devoted approximately 250 hours to reviewing the scientifically relevant literature on Vioxx and other NSAIDs.  (Moyé Dep., 35:2-20).  Dr. Moyé's report includes a list of 63 of these publications, studies, reports and other documents.  (Moyé Rpt., pp. 106-110).  Dr. Moyé's report exceeds 100 pages and provides a detailed analysis of the various studies addressing the cardiovascular effects associated with Vioxx and other NSAIDs.  He specifically describes the data that supports his conclusions and provides a detailed analysis of the COX system, demonstrating his clear understanding of COX-2 inhibitors.  (Moyé Rpt., ¶¶ 70-82).

Furthermore, in formulating his opinion that Vioxx poses a greater cardiovascular risk as compared to other COX-2 inhibitors, Dr. Moyé relied upon his own training, knowledge, and experience in the areas of biostatistics and epidemiology.  There is no question that Dr. Moyé possesses the qualifications to testify as an expert in these areas.  Furthermore, Dr. Moyé's vast experience with clinical trials qualifies him to testify regarding the various trials which have

14

addressed the adverse and beneficial effects of NSAIDs.[6]  This experience includes post approval marketing safety surveillance, data safety monitoring, the drug approval process, and interpretation of adverse drug effects.  His experience with determining drug risks and benefits includes his work on multiple DSMBs (data safety monitoring boards), consulting with pharmaceutical companies, his experience as a practicing physician, his work with the FDA Cardiovascular Renal Advisory Committee,[7] and epidemiologic lectures at the University of Texas School of Public Health.  As noted earlier, Dr. Moyé is also a prolific author of scientific literature and books,[8] and he has served as a reviewer for several renowned publications.  (Moyé Curriculum Vitae, p. 2).

Merck contends that Dr. Moyé's opinion that Vioxx is the worst of the COX-2 inhibitors lacks foundation because he has not read the scientific literature focusing specifically on other COX-2 inhibitors such as Bextra and Celebrex.  Consequently, Merck argues that Dr. Moyé should be precluded from testifying that the FDA's conclusion in its April 2005 Memorandum that COX 2 inhibitors cannot be ranked is incorrect.  Dr. Moyé has neither challenged the FDA's conclusion that COX-2 inhibitors cannot be "ranked" in terms of cardiovascular risk based on the presently available data, nor attempted to "rank" the COX-2 inhibitors.  Rather, Dr. Moyé has opined that Vioxx poses a greater cardiovascular risk as compared to the other NSAIDs as a whole.  *See* Moyé Dep., 368:22-369:9; 371:22-372:2; 372:17-373:3; 394:4-18; *see also* Moyé Rpt., *passim*.  This Court has recognized that although the existing studies were not all designed

---

[6] Dr. Moyé has acted as an investigator in large clinical trials in which one of his primary responsibilities was collecting adverse events that occurred in patients who were taking drugs in post marketing studies (the SAVE study, 1987-1992, and the CARE study, 1989-1996).  Moyé Curriculum Vitae, p. 22.
[7] Dr. Moyé's service on the Cardiovascular Renal Advisory Committee involved discussion and voting on whether the contemplated drugs were safe and effective.  This necessarily involved risk-benefit assessment.
[8] Some publications in this regard include the following: (1) Moyé LA and Roberts SD, *Modeling the Pharmacologic Treatment of Hypertension,* MANAGEMENT SCIENCE, 28:781-797 (1982); (2) Moyé LA, *Statistical Reasoning in Medicine – The Intuitive P-value Primer* (2000, 2006); and (3) Moyé LA, *Multiple Analysis in Clinical Trials – Fundamentals for Investigators* (2003).  Moyé Curriculum Vitae, pp. 3-25.

to specifically compare the cardiovascular effects of the various NSAIDs, the general theme of these studies is that Vioxx can cause adverse cardiovascular effects as compared to other NSAIDs. *Plunkett*, 401 F.Supp.2d at 586. The existing studies were not designed to specifically compare the cardiovascular effects of the various COX-2 inhibitors. This should not preclude Dr. Moyé from opining that Vioxx causes adverse cardiovascular effects as compared to the other COX-2 inhibitors based on his experience and review of the existing scientific literature from which Dr. Moyé has drawn proper and supported conclusions.

Merck's effort to prevent Dr. Moyé from disagreeing with the FDA's 2005 Memorandum is improper and without legal basis.[9] Dr. Moyé has reviewed the same materials as Merck's experts but has simply reached a different conclusion. As this Court has repeatedly emphasized, although Merck may disagree with Dr. Moyé's conclusions, a disagreement in-and-of-itself does not render Dr. Moyé's methodology unreliable. *Plunkett*, 401 F.Supp.2d at 587 ("Merck may disagree with the conclusions reached in the Fitzgerald hypothesis and supporting literature, a disagreement does not amount to improper methodology or scientifically unreliable data.").

Dr. Moyé's curriculum vitae, report and deposition testimony demonstrate his qualifications and proper methodology. Merck has failed to show otherwise. Consequently, Dr. Moyé should be allowed to offer opinions about Vioxx as compared to other COX-2 inhibitors.

C.   **Dr. Moyé's Testimony Regarding Merck's Knowledge Of The Cardiovascular Risks Posed By Vioxx Is Admissible As It Addresses Issues Of Notice, Not Corporate Intent Or State Of Mind.**

---

[9] As the Court is aware, it is the Plaintiff's contention that the FDA Memorandum lacks scientific reliability due in part to the significant analytical gap between the data relied on by the FDA and the FDA's conclusions. *Joiner*, 522 U.S. at 146. The FDA acknowledges in its Memorandum that it lacks data to draw final conclusions regarding the cardiovascular risks of NSAIDs. The reasoning and methodology underlying the conclusions in the Memorandum have not been tested, peer-reviewed, published, or generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-95. Plaintiff refers the Court also to his Motion in Limine on this issue. *See* Plaintiff's Motion in Limine No. 5.

Merck seeks an order from the Court precluding the introduction of "motive and intent" testimony through Dr. Moyé.  Plaintiff does not intend to solicit testimony from Dr. Moyé regarding the motive and intent behind Merck's actions or inactions.  However, in preparing his report, Dr. Moyé was provided with numerous documents produced by Merck during discovery, including internal studies, reports, e-mails and other communications which address the cardiovascular effects of Vioxx.  Dr. Moyé's extensive knowledge and expertise of FDA procedures, regulations, and regulatory guidelines, as well as his first hand knowledge of a pharmaceutical company's obligations regarding disclosure regarding their drugs, qualify him to explain to the jury what Merck knew or should have known about the risks associated with Vioxx based on these documents.  To the extent Merck seeks to exclude such testimony, the request should be denied.

The Court previously ruled that experts can testify regarding "what information was available, what studies were available, what was known in the medical community, what Merck knew, studies they conducted, reports they prepared, e-mails indicating what they knew about this situation may be germane, what Merck did, whether it was consistent with the pharmaceutical and medical community, what was given to the FDA, what should have been given to the FDA."  (Transcript of November 16, 2005 Hearing, pp. 29-30).  Furthermore, the Court ruled that Dr. Richard M. Kapit and Dr. Janet Arrowsmith-Lowe could offer guidance to the jury regarding the meaning and significance of the voluminous materials, including Merck's internal communications, which demonstrate Merck's knowledge of the cardiovascular risks associated with Vioxx. *Plunkett*, 401 F.Supp.2d at 578, 595.  Given his undeniable qualifications and extensive review of the relevant documents, Dr. Moyé is entitled to do the same.  The sheer

17

complexity and volume of these materials necessitates the testimony of Dr. Moyé, whose specialized knowledge and expertise will undoubtedly assist the jury in understanding the issues.

In addition to Dr. Moye being qualified to render opinion testimony regarding what was known and knowable by Merck during the time that Vioxx was being developed and marketed, such testimony is crucial to assist the jury on this critical issue. Not only is this testimony relevant and material to Plaintiff's claim, but also is valid impeachment testimony. Without the assistance of a qualified expert it would be difficult for a jury to sift through the enormous technical, scientific literature and documentary evidence and seine out what was known and knowable at the relevant time. Therefore, such testimony is valid to impeach Merck's claim that the cardiovascular risk of Vioxx was unknown and unknowable, and Dr. Moye is qualified to provide this testimony.

Merck's objections to Dr. Moyé's testimony are also premature. In order to judge the appropriateness of Dr. Moyé's testimony regarding Merck's knowledge, the testimony needs to be placed in the proper context. The Court previously deferred its ruling on Merck's challenge to Professor Wayne Ray's qualifications to testify as to what Merck should have done or as to Merck's state of mind. *Plunkett*, 401 F.Supp.2d at 587. At a minimum, the Court should do the same with respect to Dr. Moyé's opinions regarding what Merck knew or should have known about the cardiovascular risks associated with Vioxx.

**D.      Dr. Moyé's Opinions That Merck Misled The FDA Are Not Preempted.**

Merck argues that any testimony that Merck misled the FDA is preempted by *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).[10] This Court has already addressed this issue and ruled that *Buckman* is not applicable under these circumstances.  *Plunkett*, 401 F.Supp.2d at 587, 595 ("*Buckman* is not applicable to this case . . . at all.").   During the November 15, 2005 *Daubert* hearing in *Irvin*, the Court stated as follows:  "I see *Buckman* as a different case, frankly.  That was a direct fraud on the FDA.  I don't get any help from *Buckman* in this particular case." (Transcript of November 15, 2005 Hearing, p. 34).   As in *Irvin*, there is not a claim of fraud on the FDA in the present case.  The Court's prior ruling on this issue is applicable.

Merck also argues that any suggestion that Merck acted improperly by failing to provide the Watson analysis to the FDA should be excluded because the analysis was internal.   Merck further contends that Dr. Moyé's testimony that Merck misled the FDA is improper because he concedes that data analyzed by Dr. Watson was submitted to the FDA.  Merck does not provide any legal basis for these arguments.  Merck does not suggest that Dr. Moyé lacks the requisite qualifications to provide such testimony, that Dr. Moyé utilized improper methodology in formulating his opinions, or that his testimony will not assist the jury.  Merck simply does not want Dr. Moyé to tell the jury that it withheld information from the FDA.  However, based on his review of the relevant material, Dr. Moyé is entitled to reach just such a conclusion.  *See* Moyé Rpt., ¶¶ 90-91.  Merck's disagreement with that conclusion does not provide a basis for excluding Dr. Moyé's opinion testimony.

---

[10] As the Court is aware, in *Buckman* the Supreme Court found that state law fraud-on-the-FDA claims were preempted by federal law.  Other courts which have addressed *Buckman* have concluded that evidence relating to a defendant's conduct or representations in the course of FDA proceedings is admissible in support of a plaintiff's state law product liability or tort causes of action.  *See e.g.*, *Globetti v. Sandoz Pham. Corp.*, 2001 WL 419160 (N.D. Ala. 2001); *Eve v. Sandoz Pharm. Corp.*, 2002 WL 181972 (S.D. Ind. 2002).

Moreover, whether or not the data analyzed in Watson's analysis was provided to the FDA is irrelevant.  What is significant (and notably absent from Merck's argument) is whether Dr. Watson's *findings or analysis*, which clearly revealed a higher incidence of thrombotic cardiovascular serious adverse events among patients on Vioxx, were provided to the FDA.  *See* Moyé Dep., 269:6-271:10.  Whether or not Merck acted improperly by failing to provide the FDA with the Watson analysis and/or Dr. Watson's findings is clearly an issue for the jury to decide.  Dr. Moyé's testimony will assist the jury in this regard.

## IV.    CONCLUSION

For these reasons, Plaintiff urges the Court to deny Merck's motion for an order excluding the testimony of Lemuel A. Moyé, M.D., Ph. D.

Respectfully submitted,

By _____
        Andy D. Birchfield, Jr.
        P. Leigh O'Dell
        BEASLEY, ALLEN, CROW,
        METHVIN, PORTIS & MILES, P.C.
        P.O. Box 4160
        234 Commerce Street
        Montgomery, Alabama  36103-4160
        Telephone:  (334) 269-2343
        Facsimile: (334) 954-7555

        Mark P. Robinson, Jr.
        Kevin F. Calcagnie
        Carlos A. Prietto, III
        Ted B. Wacker
        Lexi W. Myer
        ROBINSON, CALCAGNIE & ROBINSON
        620 Newport Center Dr., 7th Floor
        Newport Beach, California  92660
        Telephone:  (949) 720-1288
        Facsimile: (949) 720-1292

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Counsel for Plaintiff

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana  70013
Telephone:  (504) 581-4892
Facsimile:  (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York  10004
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799
**Co-Lead Counsel**

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER
& WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants'
Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs'
Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically
uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No.
8A, and that the foregoing was electronically filed with the Clerk of the Court of the United
States District Court for the Eastern District of Louisiana by using the CM/ECF system which
will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657
on this _26th_ day of June, 2006.


                                         _C. Leigh O'Dell_____
                                         P. Leigh O'Dell
                                         Attorney for Plaintiff
                                         Beasley, Allen, Crow,
                                         Methvin, Portis & Miles, P.C.