demonstrated that when patients were followed for approximately one year after the con-

clusion of the blinded component, the increased risk of serious cardiovascular adverse

events persisted. Table E1 and E2 of the APPROVe follow-up reveals that when followed

through Week 210, the relative risk of fatal/nonfatal myocardial infarction was 2.22 (95%

CI 0.67-7.36) demonstrating excessive hazard associated with rofecoxib. When the cen-

soring date was October 31, 2005, the relative risk of fatal/nonfatal myocardial infarction

was 2.04 (95% CI 0.75 – 5.52).

134.   This observation of prolonged elevated risk clearly answers the prospective question

raised by Dr. FitzGerald and persuasively confirms the fears of the 1998 Merck Scientific

Advisory Panel. Specifically, the elevated risk of cardiovascular disease seen in the AP-

PROVe follow-up more likely than not stands for the proposition that rofecoxib acceler-

ates atherosclerosis.

135.   The follow-up analysis of the APPROVe data demonstrated that when patients were fol-

lowed for approximately one year after the conclusion of the blinded component, the in-

creased risk of serious cardiovascular adverse events persisted. Table E1 and E2 of the

APPROVe follow-up report reveals that when followed through Week 210, the relative

risk of fatal/nonfatal myocardial infarction was 2.22 (95% CI 0.67-7.36) demonstrating

excessive hazard associated with rofecoxib. When the censoring date was October 31,

2005, the relative risk of fatal/nonfatal myocardial infarction was 2.04 (95% CI 0.75 –

5.52). This prolonged elevated risk explains the findings of the Merck Scientific Advi-

sory Board, which stated that COX-2 inhibitors produce increased thrombosis, as well as

accelerated atherogenesis. This, in combination with the blood pressure elevation associ-

ated with rofecoxib explains the prolonged increased risk of fatal/nonfatal myocardial infarction.

136. Epidemiologic studies are not the most persuasive evidence; however they do help to extend the context in which the effect of the study can be anticipated. Several observational studies were carried out to examine the effect of COX -2 inhibitor therapy on the occurrence of cardiovascular disease.

137. Solomon [19] carried out an observational study utilizing the Medicare beneficiaries who received prescription medications through the Pennsylvania Pharmaceutical Assistance Contract for the Elderly or the New Jersey Pharmaceutical Association Program for the Aged and Disabled during 1998, 1999, and 2000. Patients with a life threatening illness such as HIV/AIDS, malignance, or coagulopathy were excluded, as were patients with an AMI that was not the principal discharge diagnosis.

138. Cases were defined as acute myocardial infarction (AMI) if this diagnosis was listed as one of the first three top diagnoses in a hospitalization that was between three days and 180 days. To increase the stability of the estimate of cardiac events in the control group, four control patients were matched to each case. Date of hospitalization was the index date for each case. Controls had to have the same (or nearly the same) age, and have the same gender and month of the index date as the case to which they were matched.

139. Once cases and controls were identified, their antecedent exposure to COX-2 inhibitor therapy was ascertained.  Exposure was based on celecoxib or rofecoxib on the index date. Dose and duration categories were defined for each exposure. Covariates were demographic and morbidity measures. Mean age of all patients was over eighty years. Thus, any findings of this study face difficulty in generalizing to younger cohorts. In ad-

dition, even after matching, patients in the COX-2 inhibitor groups older than the control cohort, an effect who potential for effect size perturbation can be modulated through statistical adjustment.

140. Rofecoxib had slightly greater risk 1.14 (95% CI:1.00-1.31) when referent group was no current use. Patients in the rofecoxib group were more likely to have an MI when compared to celecoxib 1.24 (1.05-1.46, p =0.011). In addition, rofecoxib > 25 mg was associated with higher adjusted relative risk to AMI than rofecoxib < 25 mg (1.70, 95% CI 1.07-2.71). Risk was elevated during the first 90 days of exposure, but not thereafter. This is directionally the reverse of the finding in the APPROVe study, and is most likely attributable to the random aggregation of patients within subgroups and therefore should hold no real persuasive power. The deleterious cardiovascular effects of COX-2 inhibition are most likely seen for the duration of therapy.

141. Overall, the Solomon study confirms the concept that the Cox-2 inhibitor rofecoxib is cardiotoxic.

142. Three additional retrospective studies have been carried out that examine the relationship between rofecoxib and cardiovascular events. Bannwarth [20] reported on the safety profile of patients included in an open-label study conducted to evaluate the influence of non-pharmacological interventions on the outcomes of osteoarthritis in patients receiving rofecoxib. However, the authors acknowledge the highly selective nature of the cohort with its limited definition of cardiovascular risk, the absence of a control group, and the difficulties of comparing incidence rates of studies with different designs.

143. A second retrospective analysis examined investigator-reported cardiovascular adverse event data held within the osteoarthritis safety database. This was collected from several

pre-marketing randomized controlled trials assessing the efficacy of rofecoxib [21]. However, the authors themselves acknowledge that the combined sample size of each treatment group, together with the low number of serious thromboembolic events reduces any illumination this study might shine on the exposure-disease relationship of interest. This is the classic underpowered environment, which forces us to discount the findings of no relationship between COX-2 inhibitor use and cardio-embolic disease in this study. Its null findings are merely uninformative.

144. The third evaluation also investigated this topic, but assessed thromboembolic events across 23 randomized controlled trials in over 28,000 patients with any of osteoarthritis, rheumatoid arthritis, Alzheimer's disease, or chronic back pain. The researchers concluded that the risk of a cardiovascular thromboembolic events was similar between rofecoxib and placebo cohorts and the non-naproxen NSIAD groups, but were significantly higher when compared to the naproxen cohort. They argue that these results support the cardioprotective effect of naproxen.

145. This cohort, completed in September 2000 has been followed and a resulting manuscript appeared describing the publication of the additional adjudicated data by Weil et. al. [22]. The pooled analyses when repeated with the new data were unchanged.

146. Population based pharmacoepidemiologic studies aim to identify and quantify adverse events from the treatment experiences of the population and examine that population for characteristic features in order to learn and inform from these experiences. Such studies usually include far more patients than randomized controlled trials, but suffer from bias and confounding. They do not alter with the prescribing practice of the physician, nor do they require strict inclusion and exclusion criteria. Therefore they are more representative

of the experience of the population. They may contribute useful information about the possible relationship between any NSAID use and the risk of TE events in patients with concurrent medical problems and or using concomitant medication.

147. The strongest evidence for a relationship between cardiovascular thromboembolic events and COX-2 inhibitor therapy comes from Ray[23]. The conclusion was that high-dose (> 25 mg rofecoxib) could be associated with an increased risk of serious CHD, whereas rofecoxib <25 mg, celecoxib, naproxen, and ibuprofen were not. However, in contrast to the randomized controlled trials presented earlier, this study did not examine all serious cardiovascular thromboembolic events or report on the proportion of patients who were prescribed aspirin use

148. Another epidemiologic study that assessed the role of Cox-2 inhibitors and cardiovascular events was the study by David Graham. A nested case-control study was conducted at the Kaiser-Permanente clinic system in California. Appropriate covariate control was exerted, and the analysis was proper. The study demonstrated that rofecoxib increases the risk of acute myocardial infarction and sudden cardiac death above patients taking Celecoxib. The overall increase in risk was 1.59 (95% confidence interval 1.10 – 2.32, $p = 0.015$). The risk was greater for high dose rofecoxib (3.58 fold increase) than lower dose (1.47 fold increase) when compared to celecoxib use. In addition, this study failed to reveal any cardio-protective effect of naproxen.

149. Another observational studied was conduced using administrative healthcare data from Canada [24]. The authors determined that no significant difference was observed in acute myocardial infarction risk for new users of celecoxib, rofecoxib, naproxen, or non-naproxen NSAIDS (used continuously for more than 30 days) compared to non-users. Pa-

tients who were reported to have taken study drugs for less than 30 day were excluded. The effect of this exclusion on the relative risk of myocardial infarction in unclear.

150. Two observational studies were carried out in the United Kingdom. Users of rofecoxib, celecoxib, and melocixam were compared [25] and [26] (melocixam is less COX-2 selective than either of rofecoxib or celecoxib. After adjusting for age and gender, these two studies revealed a statistically significant higher rate of cerebrovascular thromboembolic events for both rofecoxib and celecoxib when compared with melocixam, but a statistically significant lower rate of peripheral venous thrombotic events for the rofecoxib cohort compared with melocixam, but neither revealed a difference in the rate of cardiovascular thromboembolic event group.

151. A major source of information on suspected medication exposure-disease relationships is the post marketing database held by pharmacovigilence units, including those of the regulatory community and manufacturers. There are problems of selection and confounding by indication, as well as recall bias, and information bias. Such data provides a complimentary perspective on adverse reaction frequency with randomized controlled studies and observational studies. They are derived from national populations and operate over the timeline of the drug, include drug use in the hospital as well as the general practice and ambulatory setting. They are useful for signal generation.

152. Commonly, the data that comprises these individual cases is incomplete. The source of the information is inhomogeneous and there is no accepted a priori threshold for reporting. Such voluntary reporting schemes are useful in signal generation or detection, but have important limitations in science.

153. An independent study of adverse reactions primarily adverse renal effects reported for rofecoxib (n = 2720) versus celecoxib (n=8434) reported to the WHP UMC up until the middle of 2000[27]. The SOH Uppsala Monitoring Centre in Sweden maintains a database of spontaneous reports received from the national monitoring centers worldwide. Suspected adverse reactions are coded onto the WHP database. Signal score processing uses a collection of sophisticated techniques includes Bayes procedures. Although the focus was on renal events, thromboembolic disease was examined. The strength of association between rofecoxib and thromboembolic disease was greater than that for celecoxib. However, the authors concluded that there was no association. One possible explanation for these null results was that patients with renal disease are more likely to have symptomatic cardiovascular disease. However, this was an ecologically based argument and no case-by-case examination took place.

154. In Canada, spontaneous reports are submitted to the regulatory authorities, health Canada through the Canadian Adverse Drug Reaction Monitoring Program [28]. They reported that they had received by October 2001 70 cardiovascular/cerebrovascular cases out of 528 total reports) for celecoxib, and 68 out of 348 for rofecoxib. Seven of the cases reported on celecoxib were fatal. Of these, two were cerebral hemorrhage in patients also taking warfarin. However, prevalence of the thromboembolic events was not computed from those at risk, not only from all events. This does not address the relative risk of the medications in the general public.

155. Meta Analyses: The interpretation of meta-analyses is problematic. They purport to combine studies, and through the increased sample size and number of events, identify a highly reliable estimate of effect size. However, complications quickly arise to vacate

many of their results. Meta analyses are rarely prospectively defined. Thus the definition of exposure is commonly not standardized across the combined studies. In addition, endpoints rarely have a common definition across studies. This heterogeneity reduces the persuasive ability of this style of analysis. Typically, only positive studies are included in the analysis, producing a clear bias in their interpretation. Finally, the aforementioned problems with random research also complicate the interpretation of this post hoc manner of analysis. Thus, post hoc meta-analytic results are not confirmatory.

156. Nevertheless, meta-analyses have been carried out in an attempt to assess the relationship between COX-2 inhibitor therapy and thrombotic disease. One such meta-analysis has been published with the goal of evaluating the totality of the evidence on cardiovascular thromboembolic events and the cyclooxygenase-2 inhibitor. This was conducted by Mukherjee et al. [29]. The goal of this effort was to determine if the COX-2 inhibitors as a class were associated with either a protective, or a harmful effect on the risk of cardiovascular events. They compared the adjudicated cardiovascular outcomes from major trials. The control group event rate was provided externally, as reported in the placebo group of a recent meta-analysis of four aspirin primary prevention trials.

157. The authors reported that their findings suggested a potential increase in cardiovascular event rates for users of COX-2 inhibitors as a class effect, even though only data for rofecoxib and celecoxib were examined. Criticisms include the lack of consistency in displaying each trial's results. In addition, there was no over all estimate of the magnitude of treatment difference, nor did it investigate the heterogeneity between trials or explore the robustness of the main findings with a sensitivity analyses. In addition, the contributory trials were of different designs, had different study endpoints, involved patient popula-

tions with dissimilar cardiovascular risk and they compared unequivalent doses of rofecoxib and celecoxib. The sample sizes of the studies differed widely, ensuring that VIGOR's findings would exert undue influence on the effect ascribed to the findings. Finally, a number of studies that found no relationship between rofecoxib and thrombotic events were excluded. These limitations in addition to the invocation of the random research paradigm, limit the generalizability of post hoc meta-analyses.

158. Risk-Benefit Analysis: Risk benefit analysis is the comparison of the risks of therapy to the therapy's benefits. This can be considered on the macroscopic (societal) level as well as on the microscopic (patient level). The tools used for each of these evaluations are different and thus these two perspectives must be viewed differently.

159. Risk-benefit analysis on the macroscopic scale considers the relative risks to the society when assessed against the benefits to society i.e., the population of patients taking COX-2 inhibitors. In this calculation, the benefits of COX-2 inhibitors are assessed primarily in the degree to which they reduce pain, and the degree to which these agents reduce gastrointestinal adverse effects. It is recognized that neither moderate doses of NSAIDS nor moderate doses of aspirin produce this combination of pain relieve without GI distress. Estimates are that more than 100,000 hospitalizations and 16,500 deaths each year in the United States occur as a result of NSAID use. Since is was believed that the COX-2 inhibitors avoided this extent of GI disease, it is claimed that their use provides an important societal benefit in patients with chronic pain. However, recent evidence reveals that the Cox-2 inhibitors are associated with upper gastrointestinal illnesses. In addition, the acknowledgement that they are the producing cause of cardiovascular thrombotic disease dramatically and unfavorably tilts the risk-benefit balance.

160.  This risk benefit calculus requires that one consider alternative modalities of pain re-lieve.  Specifically, Tylenol, a well-established pain reliever, is neither habit-forming nor associated with adverse gastrointestinal distress. In addition, low dose NSAID use is less damaging to the GI tract than moderate or high dose NSAIDS. Thus, the macroscopic benefits of COX-2 inhibitor therapy are less clear when compared to these latter agents and doses.

161. Furthermore, the mechanism by which COX-2 inhibitor therapy produces fewer upper GI adverse effects is speculative. Evidence suggests that both minor symptoms (e.g., dys-pepsia) and endoscopically detected lesion are not good predictors of future complicated GI disease. It is also unclear whether serious GI complications such as perforations and bleeding are a consequence of COX-1 inhibition in platelets (the supposed mechanism) or a direct interaction between the NSAID and the gastric mucosa. Thus, while the macro-scopic benefits of COX-2 inhibitors over high dose NSAID and aspirin use are clear in terms of GI relief, the benefits over low dose aspirin/NSAID are not. Similarly, the ad-vantage of COX-2 inhibitors when compared to high dose Tylenol, or a combination of high dose Tylenol and low dose NSAIDS, has not been established.

162. In addition, the risk of thromboembolic disease is greater with the use of COX-2 inhibi-tors. The occurrence of COX-2 induced MI's and strokes with the consequent production of new deaths and hospitalizations require a complete new assessment of the risk-benefit balance of this therapy. Neither Tylenol (at low doses or high doses), nor aspirin (at low doses or moderate doses) is associated with a greater risk of MI.

163. The microscopic consideration of risk-benefit is an assessment of the risk of COX-2 in-hibitor therapy versus its benefit in the individual patient. There are no reliable models to

review this; each patient-practitioner couple provides its own unique risk-benefit metric in the decision as to whether a patient should accept COX-2 inhibitor therapy. In patients with chronic arthritic pain, a combination of Tylenol (low or high dose) and low dose aspirin or NSAIDS provides substantial analgesia without GI distress. Should upper GI symptoms appear, the dosing of aspirin or NSAIDS can be reduced, or even temporarily discontinued. There is no established increased risk of thromboembolic disease with low or high dose Tylenol, or low or moderate aspirin use. Therefore the use of COX-2 inhibitor therapy confers no advantage for these patients.

164. However, the greater risk of serious thromboembolic events with COX-2 inhibitor adversely tips the risk-benefit balance. To offset this greater risk, greater benefit must be achieved when compared to therapies that 1) are not associated with thromboembolic adverse events, and 2) do not produce a significant increase in upper GI events.

165. However, implicit in the individual risk-benefit assessment that each physician-patient pair undertakes is the assumption that each of the practitioner and the patient have access to all relevant facts available on risk and benefit are available to those who must make the final decision. Patients and physicians have the right to make an independent assessment of the risk of therapy. The requisite for the discharge of this right is that they each have access to all risks and benefits of the intervention. This implies that the absence of complete disclosure of the risks of a therapy produces flawed decisions about the implementation of the therapy.

## Failure to Warn

166. **FDA Expertise**: I have attended more than 20 meetings of the Cardio-Renal Advisory Committee to the Food and Drug Administration (F.D.A.), and I have served for four years

on the Cardio-Renal Advisory Committee, served as an ad hoc member of other FDA Advisory Committees, and currently serve on the FDA Pharmacy Sciences Advisory Committee. These positions have provided me the opportunity to observe and take part in the interplay that characterizes the relationship between the F.D.A. and the drug sponsors.

167.  As an actively serving member of this advisory committee, I have published two articles on the deliberations of the Cardio-Renal Advisory Committee to the F.D.A. which have appeared in the peer reviewed, public literature (30, 31).

168.  My service on the F.D.A. advisory committees, as well as my service to drug manufacturers, has given me specialized knowledge and experience concerning the F.D.A. policies, procedures and regulations as well as the corresponding duties of a reasonable and prudent drug manufacturer.

169.  In addition, I have argued before the F.D.A. on behalf of sponsors on numerous occasions. In my service on behalf of sponsors to the F.D.A., and my service to the F.D.A. at advisory committee meetings, I have developed expertise, knowledge, training and experience in F.D.A. matters.

170.  ***Role of F.D.A.*** The Federal Food and Drug Administration (F. D. A.) is an organization charged by the public through Congress to insure the effectiveness and safety of foods and compounds produced for public consumption. Over the course of this century, the powers of the F. D. A. have expanded commensurate with their public responsibilities in a growing and increasingly complex food and drug environment.

171.  The responsibilities of the F. D. A. have often placed it in perceived opposition to the pharmaceutical industries. The F.D.A. regrets this comparison and has devoted substantial effort to overcome it. The F.D.A. has encouraged the view that the relationship between it

and the pharmaceutical industry is a collaborative one, and has suggested that the efforts of both the F.D.A. and the pharmaceutical industry be viewed as one of joint partnership.

172. ***Modernization Act***: This emphasis can been seen in the F.D.A. Modernization Act, which provided a set of streamlined procedures for the sponsor and F.D.A. to follow, helping to insure a prompt and efficient review of a new drug application (NDA). These procedures have substantially reduced the time it took the F.D.A. to complete the review of a sponsor's application for a new drug approval.  This pivotal move to streamline the administrative review process was a direct response to complaints from both the pharmaceutical industry, and, to some extent, from segments of the public that the F.D.A. was not responsive enough to the need for the swift introduction of safe and effective medications. The F.D.A. correctly recognized that the timely delivery of these new medications was essential for maintenance of the public health.

173. ***Collaboration:*** In order for the F.D.A.-pharmaceutical industry collaborative process to work, the F.D.A. and the Sponsor must work together to demonstrate the efficacy and safety of the compounds.  Contrary to public perception, the F.D.A is not a central laboratory.  It generally does not carry out independent testing of the products submitted to it by the pharmaceutical industry for approval. The F.D.A. does not independently execute clinical trials to study in an independent manner the safety and effectiveness of new compounds.  The F.D.A. instead receives the crucial information about the effects of a drug from outside sources.  The F.D.A. has developed skill in identifying relevant information for the effects of a drug.  Several of these sources include the general medical literature, and research reports from academic investigators, and research study results which are sponsored by other institutions e.g. the National Institutes of Health, (NIH). However, the

primary source of information concerning the safety and efficacy of the compound is the sponsor itself.  It is the sponsor's task to provide the F.D.A. with the majority of the information concerning the effects of its compound in animals (when appropriate) and in humans. The F.D.A. reviews, scrutinizes and reanalyzes the information it receives, but it relies on its partner, the sponsor, to provide the data on which its decision ultimately rests.

174. It is therefore essential that the sponsor and the F.D.A. have a relationship, which at its foundation is truthful, honest, open, characterized by a timely and accurate communication process.  The pharmaceutical company must provide accurate information describing the pharmacology (including the mechanism of the compound's action), the effectiveness of the compound (known as the efficacy), and the risk afforded by the compound (the safety). The F.D.A. must respond to this information in a timely manner, either approving the compound in a reasonable period of time, or disapproving the compound.  When the compound is disapproved, the reasons for the disapproval must be clear, and the procedure to appeal the decision must be available. One of the mechanisms of appeal is the convening of an advisory committee.

175. *Advisory Committees*: The collection of advisory committees to the F.D.A. is an official body with codified rules in the Code of Federal Regulations (C.F.R.).  It consists of experts in the field in which the drug is expected to be effective. It also includes experts from the disciplines of epidemiology and biostatistics, and, in some instances, consumer advocates and representatives from the pharmaceutical industry itself.   The F.D.A. and the sponsor each provide written information to the advisory committees, and each make presentations before the committee in a session that is in general open to the public. The advisory committee provides guidance to the F.D.A. by responding to specific questions posed to it by

the F.D.A. The F.D.A. considers both the content of the advisory committee's delibera-
tions and committee's answers to the F.D.A. posed questions very seriously. However, the
advisory committee can only render its most informed and effective judgments when it is
also the beneficiary of open, honest, accurate and timely reporting from both the F.D.A.
and the sponsor. To this end, the sponsor spends months preparing briefing packets for the
advisory committee, and weeks in intense practice sessions preparing for the meeting.

176. **Decision Processes:** The decision process of the F.D.A. and its external advisory com-
mittees is built on a foundation of the open, accurate and timely dissemination of scien-
tific evidence concerning the mechanism of drug action, the drug's effectiveness, and the
drug's safety profile. When this foundation is solid, the process will swiftly identify and
rapidly approve drugs that are safe, effective, and meet a medical need. During this proc-
ess, the public is protected from compounds that either have no efficacy or are unsafe,
these inferior products being removed from further consideration. The maintenance and
promotion of the public health depend on the integrity of this system. If either the sponsor
or the F.D.A. engage in dishonest or deceptive practices, the process begins to erode, and
the public suffers. This occurs either through the delay in the approval of safe and effec-
tive compounds that meet a medical need, or through the publics direct exposure to inef-
fective and dangerous compounds. The F.D.A. cannot make timely, informed decisions
when the sponsor denies them information.

177. **Material Information:** Embedded in this body of procedures are the channels through
which accurate, relevant, and material information describing the drugs actions is
promptly communicated to practicing physicians and through the physicians to their pa-
tients. After the F.D.A. approves the drug and the sponsor to the medical community ad-

vertises the drug, it is the sponsor's obligation to closely monitor the use of the drug for

the appearance of unanticipated adverse events.

178.   *Adverse Events*: An adverse event is an undesirable effect produced by the drug.  Many

adverse events are identified during the early testing phase of the drug.  These adverse ef-

fects are included in the drug label.  The drug label is the official description of the drug,

which appears, with all the labels of all approved drugs in the Physicians' Desk Refer-

ence (PDR). This label describes the effect of the drug, the population in which the drug

is effective, the adverse effects of the drug, and the general precautions reasonable and

prudent physicians should take in prescribing the drugs. Physicians and pharmacists rely

on these labels in making decisions involving the use of these drugs in their patients, and

they require that the information in these drug labels be accurate and up to date. The

sponsor owns the drug label. It has the responsibility for ensuring that the information in

the label is accurate and up to date.   Although there are specific regulations in the C.F.R.,

which govern the content of the label, responsibility for guaranteeing that the information

in the drug label is accurate resides with the sponsor.

179. *Labeling*. Both physicians and patients have the right to draw independent conclusions

concerning the risks and benefits of a therapy. Their best and clearest recommendations

come from these considerations. Review of the Rofecoxib labels reveals several under-

statements about the label. The federal regulations require that the labeling shall contain a

summary of the essential scientific information needed for the safe and effective use of the

drug. The essential information was lacking in the warning labels for the fenfluramines.

180. Drug labels are to be designed for the safe and effective use of the drug. There is no way to

write an adequate label about a drug that has minimal efficacy and causes serious, life

threatening side effects because such a compound cannot be used safely and effectively. By definition an adequate label cannot be written for Rofecoxib since the drug cannot be used safely and effectively. The particular defects in the Vioxx label are as follows.

181. An adequate label must contain complete statements about the effectiveness of the compound. The data for the analgesic effect of Vioxx did not state that was of the same effectiveness as standard NSAIDS.

182. 21 CFR Parts 201 and 202 states, "The Commissioner also advises that these labeling requirements do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The additional labeling and advertising of additional warnings, as well as contraindication, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., 'Dear Doctor' letters containing such information) is not prohibited by these regulations.

183. However, Merck did not provide adequate warnings. On February 25, 1996 in an email from Brian F. Daniels to Thomas Simon, et. Al, regarding GI Outcomes Trial Protocol, he states, "Would allow low dose ASA real world everyone is on it, so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill drug". With this comment, not only does Merck recognize that without COX-1inhibition, rofecoxib will increase cardiovascular thrombotic events, but also that patients should take low dose ASA while on rofecoxib. Yet, this warning never appeared in the rofecoxib label.

184. The attitude toward the FDA, whose only mission is ensure that only safe and effective compounds are used by the public was antagonistic.  On May 14, 1999, in an email form Scolnick to Blois, Goldmann regarding the Vioxx US label, he states "I think the ONLY

way to handle is to GO THERE AND INVOLVE LUMPKIN and word by word agree to the final circular by next Mon/Tue.  I DID THIS WITH TEMPLE ON VASOTEC IN 1985.

185. On March 9, 2000, email for Scolnick to Shapiro, Reicin, Nies, regarding VIGOR stated, "The CV events are clearly there. Since no obvious correlate…this is real…it is a shame, but it is a low incidence and it is mechanism based as we worried it would be." The early preapproval data demonstrated a signal of CV hazard that Merck ignored. Leadership in Merck acknowledged the hazardous effect of rofecoxib. There was no mention of a possible, scientifically unsupportable beneficial effect of naproxen as a possible explanation.

186. On March 27, 2000, Merck announced through a press release the preliminary results of GI outcome study with Vioxx (VIGOR). One day later, in an email from Alan Nies to Barry Gertz regarding Dr. Patrono on VIGOR, they state that Dr. Patrono "does not think that the CV effect that we observed can be attributed to naproxen for a couple of good reasons. Merck's consultant who correctly warned before the drug was approved that rofecoxib could produce serious cardiovascular adverse effects, also warned them that the results in VIGOR, while confirmed his own concerns, could not be explained away.

187. However, on April 28, 2000, in a press release, Merck misinforms the public by "confirming a favorable CV profile.

188. On June 20, 2000, email from Laurenzie to Daniels regarding Dr. Patrono warned, "the presentation of VIGOR data must not mislead the audience into thinking that the difference in CV events could be explained by an anti-thrombotic effect of naproxen, which is not demonstrated.

189. On June 29, 2000, the Vioxx sNDA (supplemental new drug application) with Dennis Erb's letter to Central Document Room of the FDA for submission of labeling supplement to NHDA 21-042 based on VIGOR GI results. In this document, Merck argues that VIGOIR reinforces the need for concomitant aspirin use is some patients. Merck submitted protocols 085 and 090. However did not change the label adding the warning about required aspirin use.

190. On July 5, 2000, a memo from the statistician Deborah Shapiro Alise Reicin revealed that Merck knew it was not publishing all of the myocardial infarctions that occurred in VIGOR in the *New England Journal of Medicine* that would not be published until November 2000. They had the opportunity to update the data but refused to take it.

191. On November 8, 2000, in an email from Reicin to Barr involving a hypertensive patient, Dr. Barr believes a hypertension-related death in ADVANTAGE should have been classified as an MI, stating in an email timed at 11:43AM "Common things being common, the clinical scenario is likely to be an MI." He then explained the definition of sudden death and unexplained death in an email timed at 12:58 PM. However, Dr. Reicin challenged him, saying, "I still strongly feel that this should not be an MI-..." However, she went further than that, saying the death should be classified as "unknown". Specifically, she stated, "...I would prefer unknown cause of death so that we don't raise concerns." This statement's egregious insensitivity to the importance of identifying appropriate safety monitories speaks for itself.

192. On October 18, 2000, Deborah Shapiro, Merck statistician carried out a preliminary meta-analysis that demonstrated an increased CV risk. Specifically, this report showed that Vioxx more than doubled the risk of MI related to all NSAIDS, and that this increase was sta-

tistically significant. This included a MI-only analysis of the Vioxx program. This report

was omitted in Merck's FDA submission and in the published meta-analysis of Konstam.

193. On January 31, 2001, a national thought leader summary of the VIGOR study recom-

mended that Merck not emphasize the "protective effect" of Naprosyn as an explanation."

In that same paragraph, they state that there is no supporting data to substantiate a protec-

tive effect for Naproxen.

194. On this same date, January 31, 2001, Dr. Scolnick of Merck sent an email to Mr. Anstice

and Gilmartin, it which he stated, "…there is no way to prove that in patients with rheu-

matoid arthritis that ALL of the difference between Vioxx and naproxen is due to the

benefit of naproxen. It is impossible to prove this; it is impossible to know this with cer-

tainty."

195. On February 1, 2001, Targum of the FDA wrote a memo to Cook and Villalba regarding

NDA 21-042, S-007 review of cardiovascular safety database. He stated that "Despite

lower dose, smaller sample size and aspirin use, the trend is against rofecoxib." He also

stated "The sponsor claims that the difference in MI between the two groups is primarily

due to the anti-platelet effects of naproxen. This hypothesis is not supported by any pro-

spective placebo-controlled trials with naproxen."

196. On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the

safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory

Committee in public session that there was no evidence from an examination of their Phase

IIb/III database of excess cardiovascular events. A similar statement was also made on

page 56. This was false. The Watson report on which that was based clearly demonstrated

excess cardiovascular events in women, and in most of the age ranges examined in men.

This information was withheld from both the 1999 Advisory Committee and the 2001 Advisory Committee, as well.

197. On September 17, 2001, the FDA sent a Warning letter from Abrams to Gilmartin regarding Vioxx. That letter stated that Merck's promotional activities were "false, lacking in fair balance or otherwise misleading." It also stated," your claim in the press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible."

198. Nevertheless, on November 6, 2001, in a draft letter to Jonca Bull regarding the Amendment to the Supplemental New Drug Application, Merck expressed strong disagreement with FDA's initial October 15, 2001 labeling proposal, which it argues is unprecedented. Merck argues for labeling information tempering any commentary on CV/T data from VIGOR.

## Misleading the FDA

199. Regulation Sec. 14.171: Utilization of an advisory committee on the initiative of FDA. (f) Presentation of all relevant information about the matter will be made in open session unless it relates to an IND the existence of which has not previously been disclosed to the public as defined in Sec. 20.81 or is otherwise prohibited from public disclosure under part 20 and the regulations referenced therein. Sections 314.430 and 601.51 determine whether, and the extent to which, relevant information may be made available for public disclosure, summarized and discussed in open session but not otherwise made available for public disclosure, or not in any way discussed or disclosed in open session or otherwise disclosed to the public.

200. Merck mislead the FDA at the FDA Advisory Committee Meeting. On April 20, 1999, the FDA Arthritis Advisory Committee met to discuss the consideration of whether Vioxx

should be approved for use for pain relief. During that discussion, both efficacy and safety of Vioxx were discussed. There was a section of the presentation of the thromboembolic cardiovascular adverse experience. Beginning on page 105 of the transcript, the individual presenting on behalf of Merck states "I will now review the thromboembolic cardiovascular adverse experiences. We looked at an extensive list of adverse experiences representing peripheral, myocardial, and central nervous system thromboembolic events. The data presented on this slide is a combined analysis from all of our osteoarthritis studies. This is reported in events per 100 patient years. The event rate was low and was similar between placebo, rofecoxib, and the NSAID comparators. All deaths across all osteoarthritis studies are summarized on this slide: The events are reported again, per 100 patient years. The rates for rofecoxib, as you can see, are if anything, lower than with the NSAID group.

201. However, one year before, on February 2, 1998, Watson's Final results of an analysis of the incidence of Cardiovascular SAE's in the Phase IIb/III Vioxx Osteoarthritis Clinical Trials demonstrated a CV signal. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The overall relative risk for cardiovascular SAE for men was 1.28 and for women was 2.16, demonstrating a clear signal of increased cardiovascular risk associated with rofecoxib therapy (Table 7). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's than the placebo group in protocol 010(page 1 following executive summary). This finding was not reported to the FDA advisory committee at this meeting. These relevant tables were omitted from the Merck FDA Advisory Committee Background Information Packet for this meeting. The FDA Advisory Commit-

tee was never told about the increased cardiovascular risk associated with rofecoxib at this critical juncture in the FDA's deliberations for the approval of rofecoxib.

202. On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory Committee in public session that there was no evidence from an examination of their Phase IIb/III database of excess cardiovascular events. A similar statement was also made on page 56. This was false. The Watson report on which that was based clearly demonstrated excess cardiovascular events in women, and in most of the age ranges examined in men. This information was withheld from both the 1999 Advisory Committee as well. The Merck FDA Advisory Committee Background Information Packet dated February 8, 2001 was incomplete. On page 9 of that document (Section 2.2.1.1. Rationale for the Choice of Patient Population in VIGOR), no description of the rationale for only including patients who were not at high risk for cardiovascular disease. The critical information intimated in an email on November 11, 1996 by Dr. Reicin stating the plan of "excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" was not included in the Advisory Committee Packet. This critical information that altered the VIGOR study, blocking its ability to fairly assess the risk associated with rofecoxib was not shared with the FDA at this critical decision point in the FDA review process. In addition, Tables 6 and 7 of the Watson report, which demonstrated a clear signal of the cardiovascular danger of rofecoxib was omitted from this critical document on which the FDA reviewers relied.

203. In addition the emails dated April 6 and 7, 2001 between Dr. Greene and Dr. Scolnick revealed the internal attitude of Merck to the FDA, whose only desire was to ensure that safe and effective medications be available to the US public.

204. On April 6, 2005, John Jenkins, Director of the Office of New Drugs and Paul J. Seligman, Director Office of Pharmacoepidemiology and Statistical Science wrote a memorandum bearing the FDA's imprimatur whose subject was Analysis and recommendations for Agency action regarding nonsteroidal anti-inflammatory drugs and cardiovascular risk. The specific sources of the information on which the statements within this memo are based are not revealed in the document (e.g., the findings from the Alzheimer's trials for Vioxx, page 5). It is therefore unclear what the scientific basis for the statements and actions recommended in the document are. Without knowing the source of the information, it is difficult to assess the worthiness of the recommendations provided in this document. However the basis of my conclusion that Vioxx is a dangerous compound with unacceptable cardiovascular risks, regardless of dose or duration of exposure, are clearly delineated in this affidavit.

205. This affidavit draft does not discuss the results of analyses yet to be produced by Merck, nor does it discuss an evaluation of the actual APPROVe datasets that I plan to undertake. This affidavit will be amended as additional relevant information becomes available, and, if appropriate, upon completion of my evaluation of the SAS APPROVe datasets.

# Appendix A: Statistical Reasoning in Medicine

206. Statistical Reasoning in Medicine: Statistical reasoning in { XE "statistical reasoning:definition" }medicine is, at its heart, the process by which we determine if health care research results identified in one sample apply to a much larger population. The urgent question for a reviewer of the COX literature is whether results from all of the studies (or any of the studies) can be generalized from the peer reviewed manuscript to the population at large, and therefore be extended to a particular plaintiff. Is there a subset of studies that contribute more to our understanding, and can therefore be extended to the population? The type of generalization is not automatic; in fact, commonly in science this generalization is inappropriate. Thus, the reviewer must precisely identify the circumstances in which extension to the population is appropriate, and, alternatively, when the research results must be firmly circumscribed by the sample from which they are obtained.

207. A negative answer to this critical question does not imply that the veracity of the investigator's work is in question. { XE "statistical reasoning:critical question" }The authors of a published article did in fact find what they claimed to find in the sample; their probity is not in question. The relevant, question is whether the sample findings translate to the population from which the sample was obtained? Specifically, does the examination of the relationship between exposure and disease in the sample concisely and efficiently capture what they would find if they examined the entire population, or, alternatively, are the sample results merely due to the freak of chance, the vicissitudes of their inadvertent selection of the wrong, unrepresentative sample from the population. If the former is the case, then a whirlwind of scientific discussion is necessary and valid. However, if the relationship is one that is seen only in the sample, and does not adequately depict a population finding,

then any ensuring discussion is based on a fantasy. These questions are of direct relevance to the COX inhibitor literature, which is replete with studies of different designs, different sensitivities, and widely disparate results.

208. ***Sampling Error and Significance Testing*** Sample-based research is the study of a sample obtained from a population. Different samples, obtained from the same population, contain different individuals with different experiences an{ XE "p value:and sampling error" }d therefore contain different results. Sampling error is simply this sample-to-sample variability. The symbol $\alpha$, representing the type I error is the specific sample error that allows a population to generate a sample which contains a spurious relationship that is not seen in the population.

209. Clinical trial investigators recognize that there are many reasons why the positive findings of clinical experiment may be misleading. For example, they may have selected a population of patients in whom the therapy works but the inclusion and exclusion criteria of the study were too restrictive. The dose of the medication chosen may be effective, but it produces too many side effects. The blinding of the procedure may have been ineffective, leading to a more diligent search for endpoints among the subjects randomized to placebo therapy. These are all problems with the execution of the trial. They can be anticipated and the trial designed to remove them as obstacles to the trial's success. However, there is one problem that, no matter how well the clinical trial is designed, cannot be removed as the generator of false positive results — chance alone. This is a $\alpha$ error.

210. Statistical significance addresses the possibility that sampling error has produced the positive findings in the sample. If an $\alpha$ (or type I) error occurs, then there is no effect of the therapy in the population, but the population produced a sample in which, just through

chance alone, the therapy produced an effect. There is no question that the therapy worked in the sample; however, the sample results are not a reflection of the population effect, but instead were generated by the random aggregation of subjects selected for the sample.

211. The occurrence of a type I error is solely a property of the sampling process. Since sampling is necessary for the research effort, the investigators understand that they cannot remove this possible explanation of these results. They instead decide to measure the possible influence of sampling error. Investigators set the α error level at the beginning of the study, and compute a sample size based on the maximum acceptable type I error rate, as well as on other parameters. At the conclusion of the experiment, the investigators compute the $p$-value for the result of the study. The $p$-value is the measure of the type I error rate at the end of the study and is based on the actual research results. If the $p$-value is less than the α error rate that was prospectively identified (commonly set at the 0.05 level, a decision that has its sole basis in tradition), then researchers conclude that it is very unlikely that chance alone produced the findings of the study, and that the results of the study (be they clinically significant or clinically negligible) are truly reflective of what would occur in the larger population from which the sample was obtained.

212. Therefore, if (1) the systematic explanations for a spurious research finding are removed from the experiment by exceptional planning and good clinical trial execution, (2) the probability of a false finding just by chance alone is reduced to a small level (i.e., the $p$-value is less than the prospectively set α error rate), and (3) the magnitude of the findings are clinically important, then the medical and regulatory communities are assured that, to a

reasonable degree of certainty, the positive results of the trial represent a true population finding.[*]

213. **Statistical Power**: Statistical power, like $p$-values, is a phenomenon of sampling error. The circumstance in which statistical power is relevant in the interpretation of a research program involving the investigation of COX inhibition is when the trial results are not positive, but null; no treatment effect is seen.{ XE "power (statistical):definition" } Of course, there are many systematic explanations for a null finding (the wrong exposure level to the active intervention is but one of many possible circumstance). However, another possible explanation is sampling error. In this circumstance, the therapy is effective in the population. However, the population produced a sample by chance alone in which the therapy was ineffective. This is a type II or beta error. Power is defined as one minus the type II error. High statistical power translates into a low type II error rate.

214. Consideration of statistical power has important implications for the COX literature, since the occurrence of a type II error makes it impossible to assess the implications of a null finding. Specifically, if a study does not find a relationship between exposure to a COX inhibitor and cardiovascular disease, low statistical power means that it is quite likely that, even if there were a relationship between COX inhibition and cardiovascular disease, the study would not have found it. Therefore the null finding must not be treated as implying a null relationship in the population, but as a non-informative finding. This is the justification for the creed "Absence of evidence is not evidence of absence." Specifically, this means that absence of evidence (of a relationship between COX inhibition and cardiovascular disease) need not be evidence of absence (of this relationship existing in the popula-

---

[*] We will have much more to say about the interpretation of $p$-values.

tion). Thus null findings from underpowered evaluations of the relationship between COX inhibition and cardiovascular disease are uninformative.

215. Since the researcher does not know during the design phase of the study whether the results will be positive or null, she must plan for each possibility. Thus, she should design the study so that the type I error rate will be low (customarily no higher than 0.05) and that the power of the experiment will be high (typically, at least 80%). Each of these considerations is part of the sample size computation.

216. **Sample Size Computations**: Good clinical trials, regardless of their size, are characterized by careful planning, controlled execution, and disciplined analysis. An important component of the design of a clinical research effort is the sample size calculation. The sample size computation is the mathematical calculation that determines how many patients the trial should recruit. It is based on clinical concerns, epidemiologic determinations of event rates, and biostatistical considerations about the role sampling error may play in producing the trial's results. It can be said that the sample size computati{ XE "sample size computation:general concerns" \b }on is the forge upon which the clinical trial design is hammered.

217. Exploratory Analysis and Random Research: Exploratory analysis is the process by which the investigator allows the data to answer specific questions that the investigator did not plan to use the data to address. There are two problems with *exploratory research* or *hypothe {* XE "exploratory analyses:definition" *} {* XE "hypothesis generating analyses:definition" \t "*See* exploratory analyses" *}sis generating research*. The first is that commonly the sample is not an optimal one, since the investigator can only design a sample to answer questions that they knew to ask.

## Appendix B: Determining Causality in Medicine

218. Clinical investigation has been a human endeavor for over two thousand years. The most common building block in the edifice of health study is the { XE "case reports" }{ XE "case series" }case report. A case report is a summary of a single patient's findings and the communication of those findings to the medical community. A case series is a collection of case reports, linked together by a common thread (e.g., all of the patients were seen by the same doctor, or each of the patients was exposed to the same agent, e.g., quinine).

219. It is easy to understand how the growth of general medical knowledge has been propelled by the use of case reports. The delivery of healthcare has been governed by the interaction between a single, concerned, responsible provider and his patient. This relationship is private and privileged. However, it has historically been conducted in isolation, by physicians and nurses widely separated from each other. The idea of a community was well established. However, the concept of a medical community (i.e., a collection of practitioners who worked together to jointly expand their knowledge base) was one that took many generations to develop.

220. Therefore, medical care was delivered for hundreds of years by practitioners, who, working alone with incomplete knowledge, made decisions that directly affected the lives of their patients, and indirectly, their patients' families and communities. The one, natural learning tool these physicians could use was the active sharing of their experiences among themselves. This served to expand their expertise, suggest alternative approaches to healthcare, and extend their knowledge. This shared experience is at the heart of the case report.

221. The core thesis of this approach was best captured by{ XE "Celsus" } Celsus (circa A.D. 25) [32], who stated that "Careful men noted what generally answered the better, and then

began the same for their patients." For the next 1900 years, advances in clinical medicine occurred through the combined use of careful observations, clear recorded descriptions, and deductive reasoning. The discovery that gunshot wounds could be healed without the application of burning hot oil [33] demonstrated that a case report-style observation could uncover new information and overturn prior, erroneous principles in medicine. When medical journals began to appear, the primary medical information that they dispersed was that of the case report. Those physicians who had more exposure and experience with a medical issue compiled their case reports together into a case series that they would publish. This continues to this day. Examples are diet drugs and heart valve disease [34] and radiation poisoning [35].

222. However, case reports have well-established difficulties. Although they reflect very clear and honest observations, the degree to which a single case report represents a general phenomenon in the population can be subject to debate. Even though they are useful, the variability of observations across patients makes it difficult to assess whether one patient's findings summarized in a case report can be easily translated to others.

223. However, what the case report and essentially all investigative mechanisms in medicine hope to illuminate, by examining both the environment (e.g., exposure to a toxin or a potential cure) and the patient's response, is the true nature of the exposure–outcome relationship. This true nature could be simply an association, or it could be causal.

224. An { XE "association:vs causation" \t "*See* causation" }association is the coincidental occurrence of an exposure and an outcome. Its recognition (e.g., the relationship between coffee drinking and pancreatic cancer) typically does not require direct action by the medi-

cal community. A { XE "causation" }causal relationship, on the other hand, signifies that the exposure excites the production of the outcome. This more powerful, directed relationship incites the medical and regulatory communities to action. For example, the conclusion that exposure to citrus fruits reversed the symptoms of scurvy incited action by the British navy to mandate the storage of fresh fruit in the provisions of its crews for long sea voyages [36]. On the other hand, links between the use of cutting and bleedings and the remission of yellow fever were merely associative. Thus, when we as physicians examine a case report's details, we sift through the provided clinical descriptions in order to discern if the relationship between the exposure and the outcome is either causative or associative.

225. Epidemiologists are specialists who identify the determinants or causes of disease. They have developed criteria that would be useful in ascertaining whether an exposure causes (i.e., excites the production of) the disease. Elaborated by Sir Austin Bradfor{ XE "Hill, Bradford:and causality tenets" }d Hill [37], these tenets are based on a common sense approach to determining causality and are remarkably free from complicated mathematical arguments. These criteria acknowledge that more disease cases in the presence of the risk factor than in its absence raise a causal suspicion. In addition, determining that greater exposure (either by dose or duration) to the risk factor produces a greater extent of disease amplifies our sense that the exposure is controlling the disease's occurrence and/or severity. These two features are important characteristics of a cause–effect relationship.

226. Other questions posed by Hill permit us to explore the "believability" of the relationship. Is there a discernible mechanism by which the risk factor produces the disease? Have other researchers also shown this relationship? Are there other examples that help us to understand the current exposure–disease relationship? The nine precise Bradford Hill criteria

are: (1) strength of association, (2) temporality, (3) dose-response relationship, (4) biologic plausibility, (5) consistency, (6) coherency, (7) specificity, (8) experimentation, (9) analogy. These are well elaborated in the literature [38].

227. Diligent attempts to determine whether specific case reports and case series can satisfy these causality criteria continue to provide invaluable service to patients and communities. The link between methyl mercury exposure and birth defects in communities surrounding Minamata Bay, Japan, [39], and the establishment that thalidomide was the cause of the birth defects phecomelia and achondroplasia [40] are just two 20th century examples of the ability of case reports and case series to establish causal relationships that produced public health action. The identification of (1) the relationship between tick bites and Lyme disease, and (2) the link between new illnesses among postal workers and anthrax exposure in 2001 are recent examples of their continued value.

228. *Limitations of Case Reports*: Although medical knowledge has progressed through the sensitive and intelligent use of case reports and case series, there is no doubt that the illumination provided by these investigational tools are also profoundly limited. There are four major criticisms of the value of case reports and case series in determining the causal nature of an exposure–disease relationship. They are th{ XE "case reports:and limitations" }at (1) case reports and case series do not provide quantitative measures of the relationship between an exposure and a disease, (2) case reports do not always rule out other competing causes of disease, (3) case reports are subject to biases of selection (i.e., the manner in which the case report was selected may make it unreasonable to believe that its occurrence reflects an important finding in the population), and (4) measurements made in the case re-

port may be nonstandard. These limitations reduce the contribution of case reports to our understanding of the exposure–disease relationship.

229. One of the most remarkable deductive failures of case reports was their false identification of the effects of cardiac arrhythmia suppression [41]. In the 1970s, considerable attention was provided to the potential of new therapies (specifically, the drugs encainide, flecainide, or mirtazapine) for the treatment of dangerous ventricular arrhythmias. It was believed that these new drugs would be more effective and produce fewer side effects than the traditional, poorly tolerated medications. The effectiveness and safety of these newer drugs were examined in a collection of case series. At first, only the sickest patients were given the new therapy. When these patients survived, the investigational drug was credited with saving the patient's life. However, if the patient died, then the patient was commonly deemed "too sick to be saved" and the drug was not debited for the death.

230. Based on these observations, despite some opposition, a consensus developed in the cardiology community that patients with arrhythmias would benefit from the use of these new drugs. After a period of intense deliberation, the Federal Food and Drug Administration (FDA) approved the new antiarrhythmic agents. As a consequence of this approval, physicians began to prescribe the drugs not just to patients with severe rhythm disturbances, but also to patients with milder arrhythmias. This new use was consistent with the growing consensus that these drugs would be beneficial in blocking the progression of dysrhythmia from mild heart arrhythmias to more serious rhythm disturbances.

231. Only after the drugs were approved and on the market was a study carried out that incorporated a control group and the use of randomization. This trial, called CAST{ XE "The CAST Trial" } (Cardiac Arrhythmia Suppression Trial) demonstrated that, not only did the

new therapies not save lives, but also their use caused excess mortality [42]. The findings from CAST, demonstrated the lethality of medications whose safety had been "demonstrated" by case series.

# Appendix C: Detecting Adverse Events

232. ***Detecting Adverse Events: Complication in Safety Monitoring***: The ethical concern for safety introduces a new complexity into the interpretation of interim monitoring results. Essentially, the primacy of the admonition, "First, do no harm," complicates the interpretation of exploratory analyzes. Recall that confirmatory analyzes, they the product of prospectively declared plans, are most easily generalizable. They produce reliable estimates of effect sizes, effect size variability, and type I error rates. In addition, prospective consideration of the type and number of statistical hypotheses to be tested leads to tight control of the family wise error rate. On the other hand, exploratory analyzes hold none of these features. These latter analyzes that are suggested by the data rather than by prospective planning produce inaccurate estimators and must be repeate{ XE "safety:and confirmatory monitoring" }d (or confirmed) before they can be generalized.[*]

233. With this dis{ XE "estimators:efficacy versus safety" }tinction in place, the evaluation of efficacy examinations in clinical research is clear and straightforward at both the conclusion of the study and during an interim examination. Consider a hypothetical clinical trial designed to determine the effect of an intervention on patients who have suffered a stroke. The primary analysis for this clinical trial is the effect of therapy on the total mortality rate. If the study's design and execution has been (1) carefully considered with a precise, prospectively declared protocol, (2) executed in accordance with that protocol,[†] and (3) produces a type I error rate below the a priori declared threshold for a clinically significant

---

[*] The reasons for the different interpretations of exploratory versus confirmatory analyzes are discussed earlier in this report Two.

[†] This is defined as concordant execution.

level of efficacy, its results on the primary endpoint would be heralded as positive. However, assume in that same study, that the therapy was observed to produce a reduction in the myocardial infarction rate. Because the therapy's effect on the myocardial infarction rate was not prospectively declared, and its results would be seen as exploratory[*], requiring confirmation before they can be generalized.

234. However, in the reverse setting, where both the findings for mortality and the myocardial infarction rate indicate harm and not benefit, the ability to interpret the situation is complicated. Again, the prospective nature of the research design that is focused on mortality permits the investigators to conclude that the study produces a confirmatory evidence of harm. However, the identification of an early harmful effect of the intervention on the cumulative myocardial infarction rate is problematic. Clearly, the finding of an increased risk of myocardial infarction associated with the therapy is crippled by the exploratory nature of the analysis. However, the occurrence of this finding for harm in all likelihood would not, and could not, be reproduced. The ethics of protecting subjects from known and suspected dangers precludes the initiation of a new confirmatory research effort in order to demonstrate that the intervention excites the production of myocardial infarctions.[†]

235. Thus, although confirmatory findings of harm carry the same weight as those of efficacy, exploratory findings of harm commonly carry more weight than exploratory findings of efficacy. This places a greater burden on investigators, who must balance the ethical re-

---

[*] Because both the effect of therapy on the total mortality rate and the effect of therapy on the myocardial infarction rate appear to be equally reliable to the observer, both being produced from the same database, concluding that only the myocardial infarction finding be discounted may appear capricious. However, because the trial was not designed to examine the myocardial infarction issue, the ability of the study to ensure that (1) it had an appropriate sample size for the evaluation of the effect of therapy on heart attacks, and (2) the investigators collected all of the cases of heart attacks (including silent myocardial infarctions) even though they never said that they would must be questioned. Secondly, the "positive" finding of therapy on the myocardial infarction rate was based on an unplanned interrogation of the database. This inquiry rose to prominence solely because of its unanticipated and surprising finding. Allowing the data to suggest answers in this fashion introduces a new sampling error component into the analysis that undermines the traditional estimates of effect size, precision, $p$-values and power.

[†] Other information may become available that would allow the evaluation of the possibility of harm produced by the intervention. Additional concurrent studies, case control, and historical cohort studies may provide some illumination of this issue.

quirement to adequately warn about adverse events with the scientific need to avoid misdi-

rection about the risks of an intervention. This is a challenge to healthcare research in gen-

eral and interim monitoring in particular. Because, confirmatory analyzes for harm will be

the most persuasive, investigators make their strongest possible case when they execute as

many confirmatory analyzes as possible.

236. Although two strategies to address this issue of multiple safety measures are reviewed,

the best strategy begins with good a priori knowledge. During the design phase, investiga-

tors can strengthen the interim analyzes that they have in mind for the safety monitoring by

carrying out an in-depth review of the evidence of adverse effects produced by the inter-

vention that they plan to study. This will allow them to put prospective monitoring rules in

place that provide rigor in detecting the early occurrence of several different adverse

events.

237. With foreknowledge of the adverse event profile of the intervention, and some apprecia-

tion of the frequency at which these adve{ XE "safety:exploratory monitoring" }rse events

appeared, the researcher is able to place prospectively declared rules in place.

238. However, many times adverse events occur that were completely unsuspected during the

course of a clinical research effort, which catch the researcher by surprise. The occurrence

of de novo breast cancer in women exposed to lipid lowering agents during the course of a

cardiovascular clinical experiment, the occurrence of dangerous new arrhythmias gener-

ated by an intervention that suppresses other rhythm disturbances, and the production of

liver failure in medications designed to reduce insulin sensitivity are but a few examples of

unanticipated adverse effects that can be produced by a new intervention.

239. This illustration suggests that although monitoring procedures can provide clear warning that a treatment signal has been detected; the presence of this signal does not provide prima facie evidence for drawing a conclusion and terminating the research effort. That decision is more complex, requiring thoughtful consideration of both the efficacy and the safety of the compound. Ultimately, the decision to discontinue a study is not a mathematical one, but a clinical and ethical decision.

240. Statistical monitoring rules do not provide much guidance in this scenario. The absence of prospective identification, in concert with the large probability of a type I error generated by multiple interrogations of the adverse event data confound any attempt to apply statistical rigor to the evaluations executed on behalf of the patients. This is the conundrum of safety-based monitoring. The predomination of ethical considerations requires the researcher to sometimes set aside statistical precepts in order to be assured that patients are not being harmed in the research effort or in the population. This is unacceptable when one is building an argument for efficacy, but is required in the examination of safety. The asymmetry of this circumstance finds its genesis more in an oath than in science. The following are other useful tools in assessing the validity of an unanticipated adverse event finding.

241. *Strategy 1: Monitor Widely*: Researchers m { XE "adverse events:need to monitor widely" }ust lead diligent adverse event report evaluations. Just as physicians cannot diagnose diseases of which they have never heard, researchers cannot ethically weigh the implications of serious adverse events that they are not measuring. Thus, the researchers must cast a wide net in order to capture the occurrence of all adverse events. The investigators in post marketing clinical trials were able to successfully carry out this strategy.

242. **Strategy 2: Assessing Unanticipated Adverse Events**: Clinical trials have been executed for only sixty years. This is a relatively short period of time in the history of clinical investigation. However, the assessment of whether the occurrence of the event is related to a treatment has been a cerebral process that has evolved for hundreds of years. Useful skills have been amassed by scientists in the implementation of no statistical evaluations of the relationship between an event (be it either adverse or salubrious) and an exposure. In the setting of exploratory endpoint analyzes, where statistical assessments are not quite so reliable, these other no statistical assessments rise to new prominence.

243. The occurrence of an exposure and an adverse event occurring in the same patient (or group of patients) begs the question of whether the relationship between the two is associative or causal. An associative relationship is merely that the exposure and the disease occurred coincidentally in the same patients, for example, the occurrence of breast cancer in women taking HMG-Coal reductase inhibitor (i.e., statin) therapy for elevated lipid levels. It is a passive relationship. On the other hand, a causal relationship, as discussed earlier, is active. An exposure causes a event if the exposure excites the production of the event. It is an active relationship, a relationship with directionality. An example is the causal relationship between liver hepatotoxicity and thiazolidinedione therapy for diabetes mellitus.

244. When statistical tools are less useful, other tools of observation become more valuable. In 1965, Hill [43] described the nine criteria for causality arguments in healthcare. These nine rules or tenets are remarkably and refreshingly devoid of complex mathematical arguments, relying instead on natural honest intuition and common sense for the inquiry into the true nature of a risk factor–disease relationship. The questions Dr. Hill suggested

should be posed by the investigators in their assessment of the true nature of the exposure–disease relationship.

245. The evaluation begins with a simple assessment of numbers. Are there many more adverse event cases when the intervention is present, and fewer disease cases when the intervention is absent? If this question has been affirmatively answered, other questions follow. Does a greater exposure to the risk factor produce a greater extent of disease? Other questions asked by Hill explore the "believability" of the relationship. Some of these are: is there a discernible mechanism by which the risk factor produces the disease? Have other researchers also shown this relationship? Are there other such relationships whose demonstration helps us to understand the current risk factor– disease relationship?

246. Consistency requires that the findings of one study be replicated in other studies. The persuasive argument for causality is much more clearly built on a collection of studies involving different patients and different protocols, each of which identifies the same relationship between exposure to the risk factor and its consequent effect. There are numerous examples of collections of studies with different designs and patient populations, but that nevertheless successfully identify the same hazardous relationship between an exposure and disease. Identification of case series involving different series of patients in different countries and different cultures—yet each series producing the disease after the exposure would satisfy these criteria. Because research findings become more convincing when they are replicated in different populations, different studies that examine the same exposure–disease relationship and find similar results add to the weight of causal inference.

247. The specificity of a disease is directly related to the number of known causes of the disease. The greater the number of causes of a disease, the more nonspecific the disease is,

and the more difficult it is to demonstrate a new causal agent is involved in the production of the disease. The presence of specificity is considered supportive but not necessary, and researchers no longer require that the effect of exposure to an agent such as a drug be specific for a single disease.

248. Exposure must occur before the disease develops for it to cause that disease. A temporal relationship must exist in order to convincingly demonstrate causation.* This criterion can be clearly satisfied by a case report that accurately documents that the exposure occurred before the disease.

249. An evaluation of a relationship between occurrences of the adverse events and either the dose or duration of the intervention is also useful. The observation that a more intense exposure produces a greater frequency or severity of adverse events adds new strength to the notion that the relationship between the intervention and the adverse event is a causal one. In addition there should be some b{ XE "Hill, Bradford:causality and safety" }asis in the scientific theory that supports the relationship between the supposed "cause" and the effect. However, observations have been made in epidemiological studies that were not considered biologically plausible at the time but subsequently were shown to be correct.

250. It is important to note in the application of these tenets that satisfaction of all nine is not required to establish to the satisfaction of the medical community that a causative relationship exists between the exposure and the disease. Hill himself stated [43]:

251. None of my nine viewpoints can bring indisputable evidence for or against the cause–and–effect hypothesis, and none can be required as a *sine qua non.*

---

* Protopathic bias, or the result of drawing a conclusion about causation when the disease process precedes the risk factor in occurrence can result without appropriate attention to the condition.

252. However, these tenets are invaluable in the assessment of intervention-adverse event rela-

tionships.

# Appendix D. Subgroup Analyses

253. A subgroup analyses in a clinical research effort is the evaluation of the effect of the randomly allocated intervention within a fraction of the recruited subjects. The analysis of subgroups is a popular, necessary, and controversial component of the complete evaluation of a controlled clinical trial. Indeed, it is difficult to find a manuscript that reports the results of a clinical trial that does not report findings within selected subgroups.

254. Subgroup analyses as currently utilized in clinical trials are tantalizing and controversial. There may be no better maxim for guiding the interpretation of subgroup analyses in this setting than "Look, but don't touch," The results from subgroup assessments have traditionally been used to augment the persuasive power of a clinical trial's overall results by demonstrating the uniform effect of the therapy in patients with different demographic and risk factor profiles. This uniformity leads to the development of easily understood and implemented rules to guide the use of therapy[*]. Some clinical trials report these results both in the manuscript announcing the trial's overall results  [44, 45, 46,47] and separately [48, 49, 50]. Such subgroup analyses potentially provide new information about an unanticipated benefit (or hazard) of the clinical trial's randomly allocated intervention.

255. However useful and provocative these results can be, it is well established that subgroup analyses are often misleading [51, 52, 53, 54]. Assmann et al. [55] has demonstrated how commonly subgroup analyses are misused, while others point out the dangers of accepting subgroup analyses as confirmatory [56]. For example, the Amlodipine controversy in the PRAISE trials discussed earlier in this report were based on a subgroup analysis. Neverthe-

---

[*] The finding that a particular lipid lowering drug works better in women than in men can complicate the already complex decisions that practitioners must make as the number of available compounds increase.

less, the medical community continues to be tantalized by spectacular subgroup findings from clinical trials. A recent example is the subgroup analysis-based suggestion that medication efficacy is a function of race; this has appeared in both peer-reviewed journals [57, 58] and the lay press  [59]. In this section, we will review the definitions, concepts, and limitations of subgroup utilization in clinical trials.

256. ***Subgroups: Definitions and Basic Concepts*** While the concept of subgroup analyses is straightforward, the terminology can sometimes be confusing. This report will therefore devote some attention to defining nine and classifying subgroup analyses.

257. ***Subgroups Versus Subgroup Strata***: A subgroup is the description of{ XE "subgroups:definition" } patient based characteristic, e.g., gender that can be subdivided into categories. These different categories are described as strata, one stratum level for each category. For example, if an investigator is interested in creating a gender subgroup, patients are classified according to their sexual characteristics; the resultant gender subgroup consists of two strata—male and female.

258. The classic subgroup analysis itself is an evaluation of the effect of therapy within each of the subgroup strata. In this example of a gender-based subgroup, the subgroup analysis consists of an evaluation of the effect of therapy for males and an evaluation of the effect of therapy for females. Thus each stratum analysis produces an effect size with its standard error, a confidence interval, and a $p$-value.

259. The investigators choose the characteristics that form the basis of these subsets. However, over time, a commonly evaluated set of subgroup evaluations has emerged. Although there are differences from one medical subspecialty to another, the most common of these subgroups are based on demographic criteria e.g., gender, ethnicity, and age. Frequently used

sociologic determinants are marital status, education, and acculturation.[*] In addition, there are subgroups that are based on lifestyle choices. Some examples of these are alcohol use, tobacco use, dietary intake, and exercise. Of course findings from medical histories (e.g., history of cancer, history of CHF, history of endocrine disorders) and physical examination (e.g., body mass index or DBP) are among commonly appearing subgroups in clinical trials as well.

260. The definition of a subgroup can be more complicated than a first glance would suggest. Consider the marriage status subgroup. One might think that this is easy to define. Is the patient married or not? Phrased this way, this suggests that the marriage subgroup should have two strata. However, the choices can be much more complex than this. The patient could be married now, or have been married in the past and is single now. The patient could be separated, divorced, or remarried. These alternative classifications can either be useful, or merely distractions depending on the purpose for which the evaluation will take place. For example, in some research, which is not primarily sociologic, these additional classifications may be unnecessary. However, in other research efforts, the intricate differentiation of marriage history details is very important. Thus, one must know how the subgroup analysis will be used so that the most useful strata membership criteria can be developed. Once each of the subgroup strata have been identified, the clinical trial workers will know what data to collect that will be the most useful.[†]

261. *Subgroups: Interpretation Difficulties*: The illustrations of the previous sections have demonstrated that there are many possible ways to subgroup patients. However, we must keep in mind that, in a collection of subgroup analyses, it is the same patien{ XE "sub-

_____

[*] Acculturation is the degree to which a community composed primarily of immigrants accepts with approval and is involved in the activities of the surrounding society.
[†] Another subgroup that has grown in complexity is that for race/ethnicity.

groups:interpretation difficulties" }ts that are being stratified in different ways. This observation can complicate the interpretation of a subgroup evaluation.

262. For example, consider a randomized, controlled clinical trial, which is in its analysis phase. At this time, all of its patients are classified by gender, grouping patients into male and female sub-cohorts. Once the stratum membership assignment is finished, the effect of the randomly allocated intervention is assessed in each of the two gender strata. It is seen that the effect of therapy appears to depend on gender, with males experiencing a different effect than females.

263. When completed, these same patients are then re-aggregated based not on gender, but on age. Subjects are placed into one of the following three age strata: (1) less than 40 years of age, (2) between 40 and 60 years of age, and (3) greater than 60 years of age. When the subgroup analysis is carried out for the age strata, it appears that the effect of therapy is the same in each of the age groups.

264. The results from these two subgroup analyses essentially demonstrate that the same patients when characterized one way (by gender) provide a different result than when characterized another way (by age). Was it really gender that modified the effect of therapy or was it the chance collection of patients that made it appear that gender was an influence? Since we can expect that the effect of treatment within a subgroup stratum depends on the patients within that stratum, then the value of the subgroup analysis must be tightly linked to the ability to demonstrate that it is the stratum characteristic that is producing the interesting effect and not just the random aggregation and re-aggregation of patients.

265. ***Random Subgroups***. Investigators work to identify subgroup classifications that are meaningful. When examination of the therapy effect within a subgroup appears, it is only

natural for the investigator to believe the rationale for the choice of the subgroup was justified. Furthermore, the scientist may think that the stratum specific therapy effect is due to some effect-mediation ability produced by the subgroup trait. However, the very fact that patients are classified and divided can induce a subgroup effect.

266. Consider the following simple experiment. A courtroom chosen at random has a capacity of seating 60 observers. A central aisle divides these 60 seats, with 30 seats on each of the left-hand and right-hand side of the courtroom. Sixty people seat themselves as they choose, distributing themselves in an unrestricted manner among the seats on each side of the courtroom. When all are seated, we measure the height of each person, finding that the average height is exactly 67 inches. Does that mean that the average height of those seated on the left-hand side of the courtroom will be 67 inches? No. The average height of those seated on the left-hand side of the courtroom will be either less than 67 inches or greater than 67 inches, but it will not be exactly 67 inches (because the average is based on only thirty of the sixty people). If the average height on the left-hand side of the courtroom is less than 67 inches, than those seated on the right-hand side will have an average height greater than 67 inches[*]. Is it fair to conclude that those who sit on the right- hand side of the courtroom are in general taller than those who sit on the left-hand side?

267. The simple, random aggregation and sub-aggregation of the observations has induced a subgroup effect that is based only on the play of chance. This random subgroup effect appears in all subgroup analyses, and we will have to integrate it into our interpretation of any subgroup effect that we see. Some interesting findings of random subgroup analyses

---

[*] If the average height of all in the courtroom is 67 inches, and the average height on the left side is less than 67 inches, then the average height on the right hand side must be greater than 67 inches

are available [60]. These occurrences help to justify the admonition that the best descriptor of the effect in a subgroup is the finding that is observed in the overall cohort.

268. ***Proper Versus Improper Subgroups***: A critical preliminary task that clearly must be completed before a subgroup analysis proceeds is the classification of each patient into a subgroup stratum. This is the process by which the subgroup membership f{ XE "sub-groups:proper vs improper" }or each patient in the study is determined. Although membership determination may appear to be a trivial task, there are circumstances in which this classification is problematic. These concerns revolve around the timing of the subgroup membership determination.

269. There are two important possibilities for determination of the timing of subgroup membership. The first is the classification of patients into the correct subgroup stratum when the patients are randomized. The second choice is to classify patients into subgroup strata at some time during the execution of the trial. While each has advantages, the determination of subgroup membership at the beginning of the study is preferred.

270. Determining subgroup membership at the beginning of the trial requires that, not only must the subgroup be defined at the beginning of the study, but also subgroup strata membership should be defined prospectively as well. This is a straightforward procedure to apply to the gender subgroup with its two strata. However, for other subgroups of clinical interest, the process can be complex.

271. ***Intention-to-Treat" Versus "As Treated" Subgroup Analyses***: Consider a clinical trial in which patients are randomized to receive an intervention to reduce the total mortality rate from chronic cirrhosis of the liver. At the inception of the study, patients are randomized to receive either control group therapy or the intervention. At the conclusion of the

study, the investigators will compare the cumulative mortality rates of patients in each of the two { XE "intention to treat:vs. \"as treated\"" }treatment groups. However, at the end of the study, how will the investigators decide what patients should be considered active group patients and which patients should be counted as in the control group? The commonly used approach is to assign treatment group membership simply as the group to which the patient was randomized. This is the "intention to treat" principle.

272. The "intention-to-treat" principle of analysis is the standard analysis procedure for the evaluation of clinical trial results. Undoubtedly, this analysis tends to be a conservative one, since not every patient is treated as they were "intended." For example, some patients randomized to the active group may not take their medication. These patients, although randomized to the active group, will have the control group experience and produce endpoints at rates similar to that of the control group. However, they would be included in the active group since they were randomized to and "intended to be treated" like active group patients. The inclusion of these patients in the active group for analysis purposes tends to make the active group experience look more like the control group experience, increasing the overall active group event rate.[*]

273. Similarly, patients who are randomized to the control group may nevertheless be exposed to active group medication (e.g., from their personal physician who is not an investigator in the study). These patients will experience event rates similar to the rates of the active group, but since they are considered as part of the control group, the inclusion of these patients will produce an event rate for the control group that is closer to that of the active

---

[*] There are occasional complications in an "intention-to-treat" analysis. In some cases, a patient is tested and randomized, but then, subsequent to the randomization the test result reveals that the patient is not eligible for the trial for a prospectively stated reason. In this case, there was no "intent" to randomize this patient when the test result was known, and the patient is removed from the study.

group. Thus the control group rate will approach that of the active group, while the cumulative event rate in the active group will be closer to that of the control group (described in the previous paragraph). This effect of these combined rate alterations reduces the magnitude of the treatment effect, thereby diminishing the power of the clinical trial.[*]

274. An alternative analysis to the "intent to treat" principle is one that analyzes the endpoint results using an "as-treated" analysis. In this case, although patients are still randomized to receive either placebo or active therapy, they are classified for analysis purposes based on whether they actually took their medication or not. Since this is determined after the patient was randomized to the medication, and the effect (both perceived beneficial effects, and adverse effects) of the medication may determine whether the patient takes the medication, the "as-treated" evaluation is a confounded analysis. A clearly detailed examination of this issue is available [61].

275. **_Effect Domination Principle_**: I have stated previously that, in the absence of confirmatory subgroup evaluations, the best estimate of the effect of randomly allocated therapy within subgroup strata is the effect of that therapy on the overall cohort. We will call this the principle of _effect domination_— the effect of therapy averaged over all randomized patients dominates the effect seen in the individual subgroup strata.

276. The effect domination principle was the basis { XE "subgroups:effect domination prinicple" } of our decision to overturn the results of several of the subgroup evaluations that were provided previously. Although there are many clinical trials designed to provide confirmatory evaluations of their primary analyses, there are far fewer confirmatory evaluations that occur in the assessments of subgroups. Therefore, the effect domination

---

[*] The effect of the magnitude of the treatment effect on the power of a study for fixed sample size is discussed in Appendix D.

principle is much more frequently required in the interpretation of the results of clinical tri-

als.

277. Since subgroup analyses have and will, in all likelihood, continue to engender the interest

of the medical community, it is logical to ask why there aren't more confirmatory analyses

involving subgroup evaluations. This is an especially interesting question since there are

clear circumstances in which subgroup evaluations can produce confirmatory results of the

therapy effect within (or across) subgroup strata. When executed, these confirmatory re-

sults stand on their own, separate and apart from the result of the effect of therapy in the

overall cohort. The criteria for these evaluations were clearly characterized by Yusuf et al.

[62] and are coincident with our development of confirmatory analyses in this text.

278. The first of these criteria for the development of confirmatory analyses in clinical trials is

that the subgroup analysis must be prospectively designed and proper. This structure is re-

quired so that (1) the therapy effect size estimators that the subgroup analysis produces are

trustworthy; and (2) that the effect of therapy to be evaluated in a subgroup is not con-

founded by (i.e., bound up with) post-randomization events as discussed previously. In

general, there has been no difficulty with meeting this requirement of confirmatory sub-

group analyses. Many clinical trials make statements in their protocols describing the plans

of investigators to evaluate the effect of therapy within their subgroups of interest. These

subgroups are, by and large, proper subgroups, e.g., demographic traits, or the presence of

risk characteristics at baseline.

279. However, the final requirement for a confirmatory subgroup analysis is the prospective

allocation of type I and type II error rates. This last criterion has proved to be especially

vexing because of the severe sample size constraints this places on subgroup analyses. As

we have pointed out earlier, the allocation of type I error rates for confirmatory testing must be such that the FWER, $\xi$, is conserved. This requires that statistical testing at the level of subgroup analyses will be governed by test-specific $\alpha$ error rates that are generally less than 0.05.

280. The difficulty of executing subgroup analyses in the presence of type I error rate control and adequate statistical power is not difficult to understand. In fact, resources are generally strained to the breaking point for the analysis of the effect of therapy in the overall cohort. This overall analysis is typically carried out with the minimum acceptable power (80%) because of either financial constraints or patient recruitment difficulties. By definition, subgroup analyses (and certainly within-stratum subgroup analyses) will involve a smaller number of patients; it is a daunting task to prospectively allocate type I and type II error rates at acceptable levels in a smaller number of patients, although the methodology for the accurate computation of sample size is available [63]. Thus, the growth of the use of sub-groups as confirmatory tools has, to some extent, been stunted by the difficulty of con-structing a prospective clinical trial with an embedded, prospectively defined proper sub-group for which tight statistical control is provided for type I and type II statistical errors.

281. ***Manuscript Interpretation*** The purpose of a published manuscript is to identify the con-tribution the research effort has made. Specifically, this general evaluation reduces to three questions that should be answered. (1) What was the purpose of the research? (2) Do the methods used allow the researcher to answer the question? and, (3) If so, then what is the answer?

282. The motivation for the research is determined from a careful study of the introductory section of the manuscript. Commonly replete with citations, this section should clearly de-

lineates the research question that was raised by the investigators. Whether the investigators are able to answer the research question they asked is determined in the methods section. Your review of this section of the manuscript should be careful and thorough. Was the instrumentation sufficient to provide the measures with the precision that the authors require? If laboratory samples are involved were they preserved using the appropriate environmental conditions?

283. If the research involves subjects, other questions must be adequately addressed in this critical section of the manuscript that describes the methodology used by the authors. Was there an adequate number of subjects? Is the analysis carried our prospectively delineated, leading to trustworthy estimates of effect sizes, standard errors, confidence intervals, and p-values, or were the analyses exploratory, requiring an additional, confirmatory study to sustain the findings.

284. If the methodology empowers the investigators to answer their prospectively asked question, then proceed to read the results section, fully planning to integrate the main findings of the research into your fund of knowledge. However, if the methods reveal that the findings from the study are exploratory and not generalizable, then the results are not generalizable, and cannot really be accepted as reflective of the population. However, considerable care must be given if the manuscript has identified a harmful effect,

285. The reviewer must avoid the temptation to "study count". "Study counting" is the process of simply counting the number of studies that address an issue and deciding if there "are enough" studies to support the result of interest. Some who are involved in study counting argue that there must be more than one study. Others say that the number of "positive" studies must outnumber the number of "negative" studies. Instead, the scientific reasoning

process assesses in detail each of the available studies, carefully dissecting the methodol-
ogy, sifting through the methodology, and carefully considering the conclusions. Study
counting represents the wholesale abandonment of the intellectual principles of careful re-
view.

286. The specific problem with "study counting" is the implicit ceteris paribus (all other things
being equal) assumption, i.e. that all of the studies that are being included in the count are
equal in methodology, equal in the thoroughness of their design, equal in the rigor of their
execution, and equal in the discipline of their analyses and interpretation. This fallacious
assumption is far from the truth of scientific discovery. Studies have different strengths
and different weaknesses. Different investigators with their own non-uniform standards of
discipline execute the research efforts. Some studies give precise results, while others are
rife with imprecision. The panoply of studies is known not for its homogeneity, but for the
heterogeneity of designs and interpretations.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                                          5/22/2006

I certify that the foregoing statements made by me are true and correct.  Executed this

*22nd* day of _May_ 2006 at Houston, Texas


Lemuel Moyé, M.D., Ph.D.


STATE OF TEXAS        )

                                     )  ss.

COUNTY OF HARRIS

Subscribed and sworn to me

Before this *22nd* day of *May* 2006

Signature of Notary Public

My Commission Expires *9/30/09*

APRIL K THOMSON
My Commission Expires
September 30, 2009

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                           5/22/2006

# References

1 .  Hippisley-Cox  JC, et al.  Risk of myocardial infarction in patients taking cyclo-oxygenase-2 inhibitors or conventional non-steroidal anti-inflammatory drugs: population based nested case-control analysis.  BMJ VOLUME 330 11 JUNE 2005

2 . Cole P, MacMahon B. Attributable risk percent in case-control studies. Br J Prev Soc Med. 1971 Nov;25(4):242-4.

3 .  Miettinen OS.  Proportion of disease caused or prevented by a given exposure, trait or intervention. Am J Epidemiol. 1974 May;99(5):325-32.

4 .  Wilson PW.  Prediction of coronary heart disease using risk factor categories. Circulation. 1998 May 12;97(18):1837-47.

5 American Heart Association Stroke Statistics. In: 2001 *Heart and Stroke Statistical Update*. Dallas: American Heart Association, 2000.

6 American Heart Association *2001 Heart and Stroke Facts*, Dallas: American Heart Association, 2000.

7 Hennan JK. Effects of selective cyclooxygenase-2 inhibition on vascular responses and thrombosis in canine coronary arteries. Circulation. 2001 Aug 14;104(7):820-5.

8. Linder JD. Cyclooxygenase-2 inhibitor celecoxib: a possible cause of gastropathy and hypoprothrombinemia. South Med J. 2000 Sep;93(9):930-2.

9 Crofford LJ. Thrombosis in patients with connective tissue diseases treated with specific cyclooxygenase 2 inhibitors. A report of four cases. Arthritis Rheum. 2000 Aug;43(8):1891-6.

10 Bombadier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med. 2000;343:1520-1528.

11  Food  and  Drug  Administration  Advisory  Committee.  Cardiovascular  safety  review  of  rofecoxib. Available from URL: http://www.fda.gove/ohrms/dockets/ac/01/briefing/3677b2_06-cardio.pdf.

12 . Curfman GD, Morissey S, Drazen JM (2005). Expression of concern; Bombardier et al., "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis *N Engl J Med* 2000;353:1520-8. *New England Journal of Medicine* 353:2813-2814.

13. Juni P, Rutjes AW, Dieppe PA. Are selective COX-2 inhibitors superior to traditional non-steroidal anti-inflammatory drugs? BMJ 2002.324:1287-8.

14. Konstam MA, Weir MR, Reicin A, et al. Cardiovascular thrombotic events in controlled clinical trials of rofecoxib. Circulation 2001. 104:2280-8.

15 Garcia Rodriguez LA. The effect of nonsteroidal anti-inflammatory drugs (NSAIDS) on the risk of coronary heart disease: fusion of clinical pharmacology and pharmacoepidemiologic data. Clin Exp Rheumatol 2001:19 (6 Suppl. 25):S41-4.

16  Ray WA, Stein CM, Hall K, et al. Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease; an observational cohort study. Lancet 2002:359 118-23.

17  Breaslier RS. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med 2005: 352:

18. FitzGerald GA. Coxibs and Cardiovascular Disease. New England Journal of Medicine.351: 1709-1711.

19. Solomon DH. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. *Circulation* 2004:109:2068-2073.

20  Bannwarth B, et al. Adverse events associated with rofecoxib therapy. Drug Safety 2003;26(1): 49-54.

21 Reicin A, et al. Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (Ibuprofen, diclofenac, and nabumetone). Am J Cardiol 2002;89: 204-9.

22 Weir MR. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J. 2003 Oct;146(4):591-604. Review.

23  Ray W, et al. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. The Lancet 2002;360: 1071-3.

24 Mamdani M, et al. Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-term risk of acute myocardial infarction in the elderly. Arch Intern Med 2003;163: 481-6.

25  Layton D, et al. Comparison of the incidence rates of thromboembolic events reported for patients prescribed rofecoxib and meloxicam in general practice in England using prescription-events monitoring (PEM) data. Rheumatology 2003;42:1342-53.

26  Layton D, et al. Comparison of the incidence rates of thromboembolic events reported for patients prescribed rofecoxib and meloxicam in general practice in England using prescription-events monitoring (PEM) data. Rheumatology 2003;42:1354-65.

27 Zhao SZ, Reynold NW, Lejkowth J, et al. A comparison of renal-related adverse drug reactions between rofecoxib and celecoxib based on the World Health Organization/Uppsala Monitoring Centre safety database. Clin Ther 2001; 23:1478-91.

28 Vu D, Murty M, McMorran M, Selective COX-2 inhibitors: suspected cardiovascular/cerebrovascular adverse reactions. Can Adv Reaction News 2002:12:1-3.

29 Mukherjee D, et al. Risk of cardiovascular events associated with selective COX-2 inhibitors. JAMA 2001;286: 954-9.

30. Fisher LD, Moyé LA. Carvedilol and the Food and Drug Administration approval process: an introduction.. Controlled Clin Trials 1999,20:1-15.

31. Moyé LA. P-Value Interpretation in Clinical Trials. The Case for Discipline. Controlled Clin Trials 1999;20:40-49.

32. Bull  JP. (1959) Historical development of clinical therapeutic trials. *Journal of Chronic Disease* **10**:218–248.

33. Malgaigne LF. (1947) *Weuvres Completes d'Ambrosise Paré*, vol. 2. Paris, p. 127.

34. Connolly HM, Crary JL, McGoon MD, et al. (1997) Valvular heart disease associated with fenflura-mine-phentermine. *New England Journal of Medicine* **337**:581–588.

35. Clark C. (1997) *Radium Girls: Women and Industrial Health Reform, 1910–1935* Chapel Hill, University of North Carolina Press.

36. Gehan EA, Lemak NA. (1994) *Statistics in Medical Research: Developments in Clinical Trials*. New York, Plenum Medical Book Company.

37. Hill B. (1953) Observation and experiment. *New England Journal of Medicine* **248**:995–1001.

38. Kleinbaum DG, Kupper LL, Morgenstern H. (1982) *Epidemiologic Research: Principles and Quantitative Methods*. New York, Van Nostrand Reinhold Company.

39. Pepall J. (1997) *Methyl Mercury Poisoning: The Minamata Bay Disaster*. Copyright © International Development Research Centre, Ottawa, Canada.

40. Lenz W. (1962) Thalidomide and congenital abnormalities. *Lancet* **1**:45.

41.  Moore T{ XE "*Thomas Moore*" }{ XE "Moore, Thomas" }. (1995) *Deadly Medicine*. New York, Simon and Schuster.

42. Preliminary report: effect of encainide and flecainide on mortality in a randomized trial of arrhythmia suppression after myocardial infarction. The Cardiac Arrhythmia Suppression Trial (CAST) Investigators. N Engl J Med. 1989 Aug 10;321(6):406-12.

43. Hill B. (1953) Observation and experiment. *New England Journal of Medicine* **248**:995–1001.

44. Pfeffer, M.A., Braunwald, E., Moyé, L.A. et al. (1992). Effect of captopril on mortality and morbidity in patients with left ventricular dysfunction after myocardial infarction–results of the Survival and Ventricular Enlargement Trial. *New England Journal of Medicine* **327**:669–677.

45. Sacks F.M. Pfeffer M.A., Moyé, L.A. (1996). The effect of pravastatin on coronary events after myocardial infarction in patients with average cholesterol levels. *New England Journal of Medicine* **335**:1001–1009.

46 The SHEP Cooperative Research Group (1991) Prevention of stroke by antihypertensive drug therapy in older persons with isolated systolic hypertension: final results of the systolic hypertension in the elderly program (SHEP). *Journal of the American Medical Association* **265**:3255–3264

47. The Long-Term Intervention with Pravastatin in Ischemic Disease (LIPID) Study Group. (1998). Prevention of cardiovascular events and death with pravastatin in patients with CAD and a broad range of initial cholesterol levels. *New England Journal of Medicine* **339**:1349–1357.

48. Moyé, L.A., Pfeffer, M.A., Wun, C.C., et. al (1994). Uniformity of captopril benefit in the post infarction population:  Subgroup analysis in SAVE. *European Heart Journal.***15**: Supplement B:2–8.

49. Lewis, S.J., Moyé, L.A., Sacks, F.M., et. al (1998). Effect of pravastatin on cardiovascular events in older patients with myocardial infarction and cholesterol levels in the average range. Results of the Cholesterol and Recurrent Events (CARE) trial. *Annals of Internal Medicine* **129**:681–689.

50. Lewis, S.J., Sacks, F.M., Mitchell, J.S., et. al (1998). Effect of pravastatin on cardiovascular events in women after myocardial infarction: the cholesterol and recurrent events (CARE) trial. *Journal of the American College of Cardiology* **32**:140–146.

51. Peto, R., Collins, R., Gray, R. (1995). Large-scale randomized evidence: Large, simple trials and overviews of trials. *Journal of Clinical Epidemiology* **48**:23–40.

52. MRFIT Investigators. (1982). Multiple risk factor intervention trial. *Journal of the American Medical Association* **248**:1465–77.

53. ISIS-1 Collaborative Group (1986) Randomized trial of intravenous atenolol among 16027 cases of suspected acute myocardial infarction–ISIS–1. *Lancet* **ii**;57–66.

54. Lee, K.L., McNeer, F., Starmer, C.F., Harris, P.J., Rosari, R.A. (1980). Clinical judgment and statistics. Lessons from a simulated randomized trial in coronary artery disease. Circulation **61**:508–515.

55. Assmann SF, Pocock SJ, Enos LE, Kasten LE. (2000), Subgroup analysis and other (mis)uses of baseline data in clinical trials. Lancet. 2000 Mar 25;355(9209):1064-9.

56. Bulpitt, C. (1988). Subgroup Analysis. *Lancet*: 31–34 .

57. Exner, D.V., Dreis, D.L., Domanski, M.J., Cohn, J.N. (2001), Lesser response to angiotensin– converting enzyme inhibitor therapy in black as compared to white patients with left ventricular dysfunction. *New England Journal of Medicine* 334:1351–7

58. Yancy, C.W., Fowler, M.B., Colucci, W.S., Gilber, E.M., Brsitow, M.R., Cohn, J.N., Luka, M.A., Young, S.T., Packer, M. for the US Carvedilol Heart Failure Study Group. 2001.Race and response to adrenergic blockade with carvedilol in patients with chronic heart failure. *New England Journal of Medicine* **334**:1358–65.

59. Stolberg S.G. Should a pill be colorblind? *New York Times*. Week in Review. May 13, 2001.p 1.

60. Moyé, L. (2000) *Statistical Reasoning in Medicine: The Intuitive P-Value Primer*. New York. Springer.

61. Peduzzi, P.,Wittes, J., Deter, K., Holford, T. Analysis as-randomized and the problem of nonadherence; an example from the veterans affairs randomized trial of coronary artery bypass surgery. (1993). *Statistics in Medicine* **12**:1185–1195.

62. Yusuf, S, Wittes J., Probstfield, J., Tyroler, H.A. (1991). Analysis and interpretation of treatment effects in subgroups of patients in randomized clinical trials. *Journal of the American Medical Association* **266**:93–8.

63. Peterson, B., George, S.L. (1993). Sample size requirements and length of study for testing interaction in a 1 x $k$ factorial design when time-to-failure is the outcome. *Controlled Clinical Trials* **14**:511–522.