# EXHIBIT  B

Lemuel A. Moye, M.D., Ph.D.

Page 1

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX            :  MDL DOCKET NO.
LITIGATION PRODUCTS     :  1657
LIABILITY LITIGATION    :  SECTION L
                        :
This document relates:  JUDGE FALLON
To                      :
GERALD BARNETT AND      :  MAGISTRATE JUDGE
CORRINE BARNETT         :  KNOWLES
        V.              :
MERCK & CO., INC.       :
                        :
Civil Action No.        :
2:06cv485               :
                -  -  -

              June 2, 2006

                -  -  -

     Oral deposition of LEMUEL A. MOYE,

M.D., Ph.D., held in the offices of

Abraham, Watkins, Nichols, Sorrels,

Matthew & Friend, 800 Commerce, Houston,

Texas, commencing at 9:30 a.m., on the

above date, before Linda L. Golkow, a

Federally-Approved Registered Diplomate

Reporter and Certified Shorthand

Reporter.
                -  -  -

         GOLKOW LITIGATION TECHNOLOGIES
               Four Penn Center
         1600 John F. Kennedy Boulevard
                 Suite 1210
         Philadelphia, Pennsylvania 19103
                 877.DEPS.USA
```

a46c412c-de3e-4446-bf8d-937e4e429297

# Lemuel A. Moye, M.D., Ph.D.

## Page 2

1  A P P E A R A N C E S :
2
3  BEASLEY, ALLEN, CROW, METHVIN,
   PORTIS & MILES
   BY: J. PAUL SIZEMORE, ESQUIRE
4  218 Commerce Street
   Montgomery, Alabama 36103-4160
5  (334) 269-2343
   Counsel for Plaintiffs
6
7  ROBINSON, CALCAGNIE & ROBINSON
   BY: TED B. WACKER, ESQUIRE
8  110 Laurel Street
   San Diego, California 92101
9  (619) 338-4060
   Counsel for California Plaintiffs
10
11 BLIZZARD MCCARTHY & NABERS
   BY: EDWARD BLIZZARD, ESQUIRE
12 440 Louisiana - Suite 1710
   Houston, Texas 77024
13 (713) 844-3750
   Counsel for MDL Plaintiffs
14 Steering Committee
15
   SNAPKA TURMAN & WATERHOUSE
16 BY: KATHRYN A. SNAPKA, ESQUIRE
        and
17   RICK WATERHOUSE, JR., ESQUIRE
18 Suite 1511 - 606 North Carancahua
   Corpus Christi, Texas 78476
19 (361) 888-7676
   Counsel for Plaintiffs
20
21 FIBICH HAMPTON LEEBRON & GARTH,
   LLP
22 BY: TOMMY FIBICH, ESQUIRE
   Suite 1800, Five Houston Center
23 1401 McKinney Street
   Houston, Texas 77010-9998
24 (713) 751-0025
   Counsel for Plaintiffs

## Page 3

1  A P P E A R A N C E S : (CONTINUED)
2
3  WATTS LAW FIRM
   BY: T. CHRISTOPHER PINEDO, ESQ.
4  14th Floor, Tower II Building
   555 North Carancahua Street
5  Corpus Christi, Texas 78478
   (361) 887-0500
6  Counsel for Plaintiffs
7
   O'QUINN LAW FIRM
8  BY: JENNIFER J.J. LEACH, ESQUIRE
   2300 Lyric Centre Building
9  440 Louisiana
   Houston, Texas 77002
10 (713) 223-1000
   Counsel for Plaintiffs
11
12 WILLIAMS BAILEY
   BY: AMY M. CARTER, ESQUIRE
13 Suite 600
   8441 Gulf Freeway
14 Houston, Texas 77017
   Counsel for Plaintiffs
15
16
   JOSEPH D. PIORKOWSKI, JR., ESQUIRE
17 Suite 800
   910 17th Street, N.W.
18 Washington, DC 20006
   (202) 223-5535
19 jpiorkowski@lawdoc1.com
   Counsel for Merck & Co., Inc.
20
21
22    - - -
23
24

## Page 4

1  A P P E A R A N C E S : (CONTINUED)
2
3  FULBRIGHT & JAWORSKI LLP
   BY: DAVID WALLACE, ESQUIRE
4  Suite 2800 - 2200 Ross Avenue
   Dallas, Texas 75201
5  (214) 855-8184
   dawallace@fulbright.com
6  Counsel for Merck & Company, Inc.
7
8  BAKER BOTTS LLP
   BY: RICHARD L. JOSEPHSON, ESQUIRE
9  One Shell Plaza
   910 Louisiana Street
10 Houston, Texas 77002
   (713) 229-1460
11 richard.josephson@bakerbotts.com
   Counsel for Merck & Co., Inc.
12
13 BARTLIT BECK HERMAN
   BY: SHAYNA COOK, ESQUIRE
14 Courthouse Place
   54 West Hubbard Street
15 Chicago, Illinois 60610
   (312) 494-4451
16 Counsel for Merck & Co., Inc.
17
18
19 CRUSE, SCOTT, HENDERSON & ALLEN,
   LLP
20 BY: PEGI S. BLOCK, ESQUIRE
        and
21   VICTORIA A. FILIPPOV, ESQUIRE
   7th Floor - 2777 Allen Parkway
22 Houston, Texas 77019-2133
   (713) 650-6600
23 Counsel for Texas physicians
24    - - -

## Page 5

1    - - -
2  I N D E X
3  WITNESS          PAGE NO.
4  LEMUEL A. MOYE, M.D., Ph.D.
5
6  By Mr. Piorkowski      10
7  By Mr. Wacker         392
8
9    - - -
10 E X H I B I T S
11
   NO.    DESCRIPTION      PAGE NO.
12
13 Moye MDL 1  "COX-2 Inhibitor   38
              Report of Lemuel A.
14            Moye, M.D., Ph.D."
              5-22-06
15            (110 pages)
16
17 Moye MDL 2  "Documents Reviewed  71
              by Dr. Lemuel A.
18            Moye"
              (88 pages)
19
20 Moye MDL 3  Curriculum Vitae of 136
              Lemuel A. Moye,
21            M.D., Ph.D.
              (22 pages)
22
23 Moye MDL 4  "Testimony of      224
              Lemuel A. Moye, MD,
24            PhD"
              (2 pages)

2 (Pages 2 to 5)

a46c412c-de3e-4446-bf8d-937e4e429297

# Lemuel A. Moye, M.D., Ph.D.

## Page 6

```
1
2   Moye MDL 5   Invoices      211
        (9 pages)
3
4
5
6   Moye MDL 6   "Scientific    228
        Advisors' Meeting
        May 3-May 6, 1998
7       Programmatic Review
        Vioxx Program"
        MRK-AEI0002734 -
        MRK-AEI0002746
8
9
10  Moye MDL 7   "Final Results of  267
        an Analysis of the
11      Incidence of
        Cardiovascular SAEs
12      in the Phase
        IIb/III Vioxx
13      Osteoarthritis
        Clinical Trials"
14      2-2-98 (Watson)
        MRK-AAD0046029 -
15      MRK-AAD0046052
16
17  Moye MDL 8   Vioxx May 1999   317
        Label
18      MRK-LBL0000027 -
        MRK-LBL0000030
19
20  Moye MDL 9   Memo 4-6-05      360
        "Analysis and
21      recommendations for
        Agency action
22      regarding
        nonsteroidal and
23      anti-inflammatory
        drugs and
24      cardiovascular
        risk" (19 pages)
```

## Page 7

```
1     DEPOSITION SUPPORT INDEX
2
3
4   Direction to Witness Not To Answer
    Page Line Page Line
    (None)
5
6
7
8
9   Request For Production of Documents
    Page Line Page Line
    (None)
10
11
12
13
14  Stipulations
    Page Line Page Line
    (None)
15
16
17
18
19  Questions Marked
    Page Line Page Line
    (None)
20
21
22
23
24
```

## Page 8

```
1                 - - -
2           MR. PIORKOWSKI:  Is anybody
3   here who is in New Jersey?
4           MR. SIZEMORE:  I don't think
5   so.  Nobody in New Jersey is here.
6           MR. PIORKOWSKI:  Let me just
7   state that we received a cross
8   notice of this deposition for the
9   New Jersey litigation.  A letter
10  was filed on behalf of Merck with
11  Judge Higbee objecting to that.
12  Apparently there's no counsel from
13  New Jersey here present.  It's my
14  understanding that Dr. Moye has
15  not been designated as an expert
16  at this time in any New Jersey
17  case.
18          Paul, any other preliminary
19  stuff we need to talk about as far
20  as --
21          MR. SIZEMORE:  I can't think
22  of anything.
23          MR. JOSEPHSON:  Let me just
24  say this on the record.  Richard
```

## Page 9

```
1   Josephson for Merck in the State
2   of Texas MDL.
3           Because of a hearing we had
4   a few days ago which Paul is
5   familiar with, I did not
6   originally intend to be here since
7   it was a California case.  That's
8   the position I took.  The judge
9   has recognized some of the cross
10  notices from Texas that were filed
11  in this case, and, therefore, I'm
12  here representing Merck in this
13  case.  So, to the extent that I
14  feel the need to use our objection
15  form or objection responsiveness,
16  and Mr. Piorkowski doesn't make
17  that connection, then you may hear
18  me make that objection.  I don't
19  want to disrupt the proceedings
20  because I, frankly, didn't want to
21  be here.
22          MR. SIZEMORE:  That's fair.
23  I won't pitch a fit like everyone
24  else has done.
```

3 (Pages 6 to 9)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 10

1    MR. PIORKOWSKI: Anything
2  else preliminary?
3    (No response.)
4      - - -
5    LEMUEL A. MOYE, M.D., Ph.D.,
6  after having been duly sworn, was
7  examined and testified as follows:
8      - - -
9      EXAMINATION
10     - - -
11 BY MR. PIORKOWSKI:
12   Q.  Would you state your full
13 name, Doctor.
14   A.  Sure. Lemuel, L-E-M-U-E-L,
15 Moye, M-O-Y-E.
16   Q.  How are you today, sir?
17   A.  I'm doing fine. How are
18 you?
19   Q.  Are you prepared to give
20 your deposition? This is the first Vioxx
21 case in which you've been deposed; is
22 that right?
23   A.  That's right, yes.
24   Q.  You've been deposed a number

Page 11

1  of times in other matters, true?
2    A.  Yes, I have.
3    Q.  Okay.
4      Let's just talk real briefly
5  about the ground rules. I'm going to ask
6  a series of questions. If you don't
7  understand my question, will you ask me
8  to rephrase it?
9    A.  Yes. I understand that.
10   Q.  If you go ahead and answer
11 the question, I'll assume you understood
12 it.
13     Is that fair?
14   A.  Yes.
15   Q.  If you need a break at any
16 time, just let us know, and we can
17 accommodate you.
18     All right?
19   A.  Okay.
20   Q.  As far as objections, there
21 may be objections by counsel at any point
22 in time to a question. In the event of
23 an objection, you understand you proceed
24 to answer the question?

Page 12

1    A.  Yes.
2    Q.  I may from time to time
3  object to your answer or part of your
4  answer as nonresponsive if I feel like
5  you're not answering my question.
6      Do you understand that?
7    A.  I do.
8    Q.  That's not intended to be a
9  show of disrespect to you. It's just
10 something we're doing to preserve the
11 record.
12   A.  I appreciate that.
13   Q.  Do you understand?
14   A.  Yes.
15   Q.  Can you tell us first how
16 did you get involved in the Vioxx
17 litigation?
18   A.  I have worked with -- well,
19 a couple things. Number one, I have been
20 following, as most physicians have, I
21 think, the whole development of concerns
22 involving Vioxx and had been asked to
23 consider being part of this litigation
24 process actually by both plaintiffs and

Page 13

1  defendants and gave it careful
2  consideration, began to review the
3  literature. Again, this was now, just to
4  put a time frame on this, this was in
5  maybe 2005, and have been reviewing
6  literature during this time. And had
7  finally been decided that my beliefs
8  served the plaintiffs and offered myself
9  as an expert witness, available expert
10 witness for plaintiffs.
11   Q.  Who was the first person to
12 contact you to ask you to be an expert
13 witness on behalf of the plaintiffs?
14   A.  I think it was through
15 Scientific Evidence. I'm a consultant
16 for that company.
17   Q.  Is that still run by Dr.
18 Jean Hoepfel?
19   A.  It is, yes.
20   Q.  Is Dr. Hoepfel the person
21 that called you?
22   A.  Yes.
23   Q.  Who is the first lawyer
24 representing a plaintiff that you talked

Lemuel A. Moye, M.D., Ph.D.

Page 14

1  to in connection with the litigation?
2      A.  I don't remember.
3      Q.  You said that you were asked
4  by defendants to become involved in the
5  litigation.  Is that what I heard you
6  say?
7      A.  Yes.
8      Q.  What defense lawyer asked
9  you to become involved in the litigation?
10     A.  It's -- I don't know.  I got
11  a phone call at the University from a
12  group of lawyers who represented the
13  defendants and asked me to consider
14  working on Vioxx.  I told them that I
15  would, that I hadn't made my mind up and
16  let it go at that.  They never called
17  back.  Never any followup conversation.
18     Q.  Do you have the name of the
19  lawyer?
20     A.  I don't.
21     Q.  Did you ever meet with that
22  lawyer?
23     A.  No, sir.
24     Q.  Was there ever a phone call

Page 15

1  following up that conversation after that
2  phone call with that lawyer?
3      A.  No.
4      Q.  Do you know whether that
5  lawyer was based in Texas?
6      A.  I don't remember.
7      Q.  Was it a male or a female?
8      A.  Male, I believe.
9      Q.  Do you remember any other
10  identifying information about that
11  lawyer?
12     A.  No.
13     Q.  When was that phone call?
14     A.  Maybe late 2004, early 2005.
15     Q.  Is that the only contact you
16  had where an attorney asked you to become
17  involved on behalf of Merck?
18     A.  Yes.
19     Q.  Who's the first attorney you
20  met who represented the plaintiff in this
21  case?
22     A.  I don't know.  That is to
23  say, let me answer this way.  I don't
24  think I met with a single attorney.  I

Page 16

1  think I met with a group of attorneys.
2      Q.  Let me back up a minute.
3  And I apologize.  I'm working off of your
4  -- we've been provided for the record
5  with, what is it, 14 disks?
6          MS. COOK:  12.  Yes, 14.
7  BY MR. PIORKOWSKI:
8      Q.  There's a total of 14 disks,
9  I believe, by Mr. Sizemore.  One of them
10  is entitled Vioxx billing, I think, which
11  I'm assuming that contains your billing
12  records to date?
13     A.  Yes, sir.
14     Q.  Is that your understanding?
15     A.  Yes, it is.
16     Q.  Then there are 12 disks that
17  are marked as "Vioxx documents reviewed
18  by Dr. Moye" 1 through 12 of 12?
19     A.  Yes.
20     Q.  Right?  And then there's
21  another independent disk that's entitled
22  "Vioxx documents reviewed by Dr. Moye
23  ,"right?
24     A.  Yes.

Page 17

1      Q.  We'll come back to what
2  those are in a moment.  I apologize, I
3  don't have this in hard copy.  I'm just
4  getting it off the disk.
5          Am I correct that your
6  records reflect that the first time you
7  billed any time on Vioxx was in February
8  of 2005?
9      A.  I believe that's right, yes.
10     Q.  If your records reflect it
11  was February 26, 2005, is that consistent
12  with your recollection?
13     A.  If that's in the record,
14  then I'm willing to stand by that, yes.
15     Q.  And there's a meeting with
16  the lawyers that appears to be on March
17  4th of 2005?
18     A.  Then I accept that, yes.
19     Q.  Now, to come back to what
20  you said, you said you first met with
21  lawyers, that was your first contact with
22  several lawyers?
23     A.  Yes.
24     Q.  Where was that meeting?

Golkow Litigation Technologies - 1.877.DEPS.USA

a46c412c-de3e-4446-bf8d-937e4e429297

# Lemuel A. Moye, M.D., Ph.D.

**Page 18**

1   A.  I don't remember.
2   Q.  Was it in Texas?
3   A.  Yes, it was.
4   Q.  Do you know if it was in
5 Houston?
6   A.  I'm sorry.  It was in
7 Houston, Texas.  I don't know what
8 office.
9   Q.  Some law office in Houston,
10 Texas?
11   A.  Yes.
12   Q.  Who attended the meeting?
13   A.  I don't remember.
14   Q.  Can you remember anybody who
15 attended the meeting?
16   A.  No.
17   Q.  Are any of the attorneys who
18 are present in the room today in
19 attendance at the meeting?
20   A.  I've had subsequent meetings
21 in which they've been in attendance.  I
22 don't remember who was at the -- in
23 attendance at the March 4 meeting.
24   Q.  At the original meeting.  Do

**Page 19**

1 you know whether that would be contained
2 in your documents anywhere?
3   A.  I don't think so.
4   Q.  Do you know what law firm
5 the lawyers were with who originally
6 represented you?
7   A.  No.  At this meeting, no, I
8 don't.
9   Q.  How long was the meeting on
10 March 4?
11   A.  That's going to be in the
12 record.  I would imagine it was no more
13 than two hours, but that would be in the
14 billing record.
15   Q.  And can you tell me what
16 happened at the meeting?
17   A.  I don't have any particular
18 recollection of it.  I believe it was
19 just about the developing litigation and
20 my willingness to participate in this.
21   Q.  Had it been decided before
22 you attended the meeting that you would
23 serve as an expert on behalf of
24 plaintiffs, or was that the purpose of

**Page 20**

1 the meeting, to kind of get acquainted?
2   A.  I think the purpose of the
3 meeting was to let me know that they were
4 interested in moving forward and would be
5 interested in my participation.  At that
6 point I guess I wasn't sufficiently
7 informed about the facts of the case to
8 provide an assertion one way or the
9 other.  But I believe I did say that I
10 would begin an investigation.
11   Q.  Now, at the time that you
12 say you weren't sufficiently informed
13 about the facts of the case, what had you
14 looked at at that point in time?  Prior
15 to the meeting I'm talking about.
16   A.  I don't remember.  Let me
17 answer this way.  In the capacity as a
18 physician and a public health worker, I
19 was aware there were several manuscripts
20 out, several controversial manuscripts
21 out that were examining the relationship
22 between Vioxx and serious adverse events,
23 and I had looked at those.
24   Q.  And by "manuscripts," are

**Page 21**

1 you referring to articles in the
2 published medical literature?
3   A.  Yes.
4   Q.  Had you looked at anything
5 else other than articles in the published
6 medical literature at that point?
7   A.  I don't believe so, no.
8   Q.  Had you attended the 2005
9 Advisory Committee meeting?
10   A.  No.
11   Q.  Had you read newspaper
12 accounts of what was going on in the
13 Vioxx litigation?
14   A.  Well, I have to say yes, I
15 think I did.  I mean, I read the
16 newspaper, and certainly Vioxx was in the
17 newspapers.  I will say about the
18 Advisory Committee meeting, I was not in
19 attendance, but a good portion of it --
20 well, a portion of it was actually
21 televised on C-Span.  And I did watch
22 that.  Also there were, of course, other
23 hearings that were also televised that I
24 watched as well.

6 (Pages 18 to 21)

Lemuel A. Moye, M.D., Ph.D.

Page 22

1    Q.   What else did you watch?
2    A.   David Graham's testimony,
3  Dr. Gilmartin's testimony.  I recall
4  those.  They may have been before a
5  Congressional committee.  I don't
6  remember the exact forum.
7    Q.   So, you watched David Graham
8  and Dr. Gilmartin's testimony on C-Span?
9    A.   Yes.
10       MR. SIZEMORE:  Object to
11       form.
12       THE WITNESS:  Yes, I did.  I
13       didn't mean to cut you off.  Yes,
14       I did.
15  BY MR. PIORKOWSKI:
16    Q.   Anything else you remember
17  having reviewed prior to the initial
18  meeting on March 4th?
19    A.   As I sit here now, no.
20    Q.   During this meeting, did the
21  lawyers who were in attendance present
22  what they thought the facts of the case
23  showed to you?
24    A.   I don't remember in detail.

Page 23

1  I think probably just the broad strokes
2  and nothing that anybody who was
3  conversant with the information that was
4  available in the public domain wouldn't
5  already know.
6    Q.   Were you shown specific
7  documents at that meeting?
8    A.   I don't think so.  I don't
9  remember.
10    Q.   Was there anyone who was not
11  a lawyer in attendance at the meeting?
12    A.   I think there was probably a
13  representative from Scientific Evidence
14  at the meeting, but I don't remember.
15    Q.   Do you know who that was?
16    A.   No, I don't remember.
17    Q.   Do you know if it was Dr.
18  Hoepfel?
19    A.   I don't remember.
20    Q.   Who else works with you from
21  Scientific Evidence besides Dr. Hoepfel?
22    A.   Well, the only support
23  Scientific Evidence provides to me is
24  logistical support.  So, they collect

Page 24

1  information for me.  And they will
2  collect information on CDs, for example,
3  and prepare the CDs that we have today.
4  But to answer your question, April
5  Thompson has been my chief contact person
6  at Scientific Evidence, and her role for
7  me has been administrative.
8    Q.   Did you say before when we
9  were off the record that Dr. Hoepfel is
10  on some sort of a sabbatical?
11    A.   Well, I know she's traveling
12  a lot.
13    Q.   But in terms of this
14  litigation -- let me back up.
15       You've worked with Dr.
16  Hoepfel on other litigations, right?
17    A.   Yes.
18    Q.   In this litigation, have you
19  worked with her?
20    A.   No.
21    Q.   Is there anybody else at
22  Scientific Evidence besides April
23  Thompson with whom you've worked?
24    A.   No.

Page 25

1    Q.   So, if anyone attended the
2  meeting, it most likely would have been
3  April Thompson?
4    A.   I think so, yes.
5    Q.   How was it left at the end
6  of the meeting on March 4th?
7    A.   I think I left it open, that
8  I had no real opinions about Vioxx or
9  Merck's conduct one way or the other and
10  that I would begin to look into it.
11    Q.   What was the plan for you to
12  begin to look into it?
13    A.   As time would allow.  I
14  mean, I really didn't put a time schedule
15  on it, but as time would allow, I would
16  begin to evaluate the information that
17  was available to me in the public domain.
18    Q.   Did you agree at that time
19  to serve as an expert, or did you just
20  agree at that time to review the
21  material?
22    A.   I think I agreed only to
23  review the material.
24    Q.   When did you agree to serve

Lemuel A. Moye, M.D., Ph.D.

Page 26

1    as an expert witness?
2         A.   That was much later, but I
3    don't have a particular date in mind
4    where I say that I agreed to be an expert
5    witness for Vioxx.
6         Q.   It would have certainly been
7    before the 22nd of May?
8         A.   22nd of May, 2006.
9         Q.   Right.
10        A.   Yes.
11        Q.   That's when you signed your
12   report?
13        A.   That's correct.  Yes.
14        Q.   Do you know whether it was
15   within a month or two of the meeting?
16        A.   Maybe closer to earlier this
17   year.
18        Q.   Early 2006?
19        A.   Early 2006, yes.
20        Q.   When you agreed to serve as
21   an expert, did you agree to serve as an
22   expert for certain attorneys, or did you
23   agree to serve as an expert for anybody
24   who wanted to hire you?

Page 27

1         A.   Let me back up for one
2    second.  Let me amend my answer.
3         I believe I signed an
4    agreement with Scientific Evidence in the
5    fall of '05 to serve as an expert.  I
6    don't have the date specifically in mind,
7    but I think it was a few months earlier
8    than I earlier testified today.
9         Q.   Would a copy of that signed
10   agreement be included on the disks that
11   are provided?
12        A.   I don't know.
13        Q.   Are you in possession of a
14   copy of the agreement?
15        A.   I should say this.  I should
16   be. I don't know if I have it or not.
17        MR. PIORKOWSKI:  Paul, we
18   would like to receive it if it's
19   not on the CD if that's agreeable.
20        MR. SIZEMORE:  Okay.
21   BY MR. PIORKOWSKI:
22        Q.   Okay.
23        Can you tell me what's the
24   first lawyer who you can remember having

Page 28

1    had a contact with?
2         A.   I think it would have
3    been -- again, I can't be specifically
4    sure whether this is the first attorney,
5    but I certainly met with Dave Matthews
6    several times this year.
7         Q.   Who is here at this firm
8    where we're taking the deposition?
9         A.   Yes.
10        Q.   All right.
11        Any other lawyers who you
12   specifically remember meeting with
13   multiple times?
14        A.   Oh, sure.  Ted, Tom
15   Sizemore.
16        Q.   Let's just use full names
17   just since we're on the record.
18        MR. SIZEMORE:  Paul
19   Sizemore.
20        THE WITNESS: Thanks.  Paul
21   Sizemore.
22        MR. SIZEMORE:  I've been
23   called worse.  Thanks.
24        MR. WACKER:  Ted Wacker.

Page 29

1    BY MR. PIORKOWSKI:
2         Q.   Anybody else?
3         A.   Tommy Fibich.  I had
4    conversations with Mark Robinson.
5    Conversation with Ed Blizzard.  That's
6    all I remember now.
7         Q.   Have you had any contact
8    with Chris Seeger or Dave Buchanan?
9         A.   If I did, I don't remember.
10        Q.   Have you had any contact
11   with Mark Lanier?
12        A.   I don't remember.
13        Q.   Do you know as you sit here
14   today whether you've had contact with
15   anybody who represents plaintiffs in New
16   Jersey?
17        A.   Back up a minute.  I know
18   who Mark Lanier is.  I have had no
19   contact with him.  I just realized that.
20        Q.   All right.  Thanks for the
21   clarification.
22        A.   I'm sorry.  Go ahead.
23        Q.   Have you agreed to be
24   retained by any lawyers who you know to

Lemuel A. Moye, M.D., Ph.D.

Page 30

1  be representing plaintiffs who have cases
2  pending in New Jersey?
3      A.   To my knowledge, no.
4      Q.   Is the list that you just
5  gave me the list of all of the lawyers by
6  whom you've been retained to date to the
7  best of your knowledge?
8      A.   I would say I think so.  I
9  don't know, but I think so.
10      Q.   Any other lawyers that we
11  didn't mention by whom you believe you've
12  been retained?
13      A.   I don't remember any.  If I
14  do during the proceedings, I will
15  certainly mention them.
16      Q.   How about Tommy Pirtle?
17      A.   I don't think so.  No, not
18  for Vioxx, no.
19      Q.   Tommy Jackson?
20      A.   The name doesn't ring a
21  bell.
22      Q.   Okay.
23          Have you agreed to testify
24  in California as an expert witness?

Page 31

1      A.   I have.
2      Q.   Have you set aside a date to
3  go out there?
4      A.   What month is it?
5      MR. SIZEMORE:  Trial?
6      THE WITNESS:  Yes.
7      MR. SIZEMORE:  In June.
8      THE WITNESS:  Then I have.
9  BY MR. PIORKOWSKI:
10      Q.   Have you agreed to testify
11  in the MDL trial that's pending in New
12  Orleans in July?
13      A.   Yes.
14      Q.   Are there any other specific
15  trials that you've agreed to testify in?
16      A.   I guess I don't know how to
17  answer that.
18      Q.   Let me reword it.  That's a
19  bad question.
20          I understand that you've
21  been retained in a number of cases by the
22  lawyers we already reviewed.  Apart from
23  the California case and the MDL, which
24  are the cases we're primarily here taking

Page 32

1  this deposition in today, are there any
2  other cases where you have a date on your
3  calendar blocked off to go to trial and
4  testify?
5      A.   No.
6      Q.   How do you track your time
7  for purposes of expert witness work?
8      A.   I track it on -- each day I
9  track it, and I log the number of hours I
10  work and to whom it's billed and the
11  amount.
12      Q.   And do you do that on
13  computer, do you do it by hand, how do
14  you do it?
15      A.   I do it by computer.
16      Q.   Okay.
17          Is it on a computer software
18  program or how do you keep track?
19      A.   I can generate reports from
20  it using a software program.
21      Q.   To whom is your time billed?
22  Is there one primary lawyer that you bill
23  your time to for purposes of Vioxx, or is
24  it split between a number of different

Page 33

1  lawyers?
2      A.   I can answer the first part
3  of your question.  I think I bill it to
4  something called Vioxx group or group
5  Vioxx.
6      Q.   Group Vioxx?
7      A.   Yes.
8      Q.   Do you know who the bill is
9  actually sent to?
10      A.   I do not.
11      Q.   Your billing is not done
12  through Scientific Evidence?
13      A.   It is.  I send my bill to
14  Scientific Evidence.  I don't know what
15  they do after that.
16      Q.   Okay.
17          But all of your Vioxx
18  matters have been on general Vioxx
19  matters as opposed to individual
20  plaintiff-specific things?
21      MR. SIZEMORE:  Object to
22  form.
23      MR. PIORKOWSKI:  Let me
24  rephrase it.

9 (Pages 30 to 33)

Lemuel A. Moye, M.D., Ph.D.

Page 34

1  BY MR. PIORKOWSKI:
2      Q.   Apart from group Vioxx work,
3  have you billed any matters to matters
4  involving individual plaintiffs like the
5  Barnett plaintiff, for example?
6      A.   I have not billed to
7  plaintiffs, no.  I think, though, that
8  when I started billing in 2005, I didn't
9  start with group Vioxx.  It might have
10 been for particular attorneys.
11     Q.   Is it your understanding
12 that the invoices that we have which are
13 approximately $98,800 represents all of
14 your billing in Vioxx to date?
15     A.   That sounds -- the amount
16 sounds correct.  Yes.  I don't know how
17 inclusive these are.
18     Q.   Okay.
19        You don't know when that
20 would go up through?
21     A.   That's true.
22     Q.   In terms of the month of
23 May, what work have you done since the
24 completion of your MDL report, which was

Page 35

1  dated the 22nd?
2      A.   I've reviewed -- the
3  literature -- the material is voluminous,
4  and reading this material one time just
5  hasn't been sufficient for me.  So, I've
6  spent some time reviewing material that I
7  have already read.
8      Q.   Okay.
9        Your rate for billing is how
10 much now?
11     A.   $400 an hour.
12     Q.   For reviewing materials?
13     A.   Yes.
14     Q.   Okay.
15        So, if we were going to
16 figure out how much time you spent, it
17 would be roughly 100,000 divided by 400?
18     A.   Right.
19     Q.   So, what's that, 250 hours?
20     A.   250 hours, right.
21     Q.   Your MDL report does not
22 have any specific opinions about the
23 plaintiff in that case, is that correct?
24     A.   Yes, sir.

Page 36

1      Q.   Do you know anything about
2  the plaintiff in the MDL case?
3      A.   No, sir.
4      Q.   You don't intend to offer
5  any opinions at trial about the plaintiff
6  specifically?
7      A.   I intend to offer no such
8  opinions.
9      Q.   Is the same true with
10 respect to the California cases?
11     A.   Yes, sir.
12     Q.   Is there any case in which
13 you've been designated or filed a
14 report -- let me back up.
15        Other than the MDL report,
16 have you filed any other reports in any
17 other Vioxx cases?
18     A.   No, sir.  No, sir.
19     Q.   Are you aware that you were
20 designated in a couple Texas cases as an
21 expert witness?
22     A.   I believe that, yes.  I
23 haven't seen the designation, I don't
24 think, but, yes.

Page 37

1      Q.   Are you familiar with what a
2  designation is as opposed to a report?
3      A.   I am.
4      Q.   It's a written description
5  prepared by the attorneys, right?
6        MR. SIZEMORE:  Object to
7  form.
8        THE WITNESS:  Yes.
9  BY MR. PIORKOWSKI:
10     Q.   That's your understanding?
11     A.   Yes.
12     Q.   Okay.
13        And there were actually two
14 of them prepared in Texas.  Do you
15 understand that?
16     A.   Yes.
17     Q.   Did you review those before
18 they were filed?
19     A.   I reviewed several
20 designations in May.  I don't remember to
21 which cases they applied.
22     Q.   Is there any case, as we sit
23 here today, as to which you intend to
24 offer an opinion about a specific

10 (Pages 34 to 37)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 38

1  plaintiff?
2      A.   There is no such case.
3          - - -
4          (Whereupon, Deposition
5      Exhibit Moye MDL 1, "COX-2
6      Inhibitor Report of Lemuel A.
7      Moye, M.D., Ph.D." 5-22-06 (110
8      pages) was marked for
9      identification.)
10 BY MR. PIORKOWSKI:
11     Q.   Doctor, can you identify
12 what I've marked as Exhibit 1?
13     A.   Yes.  This is my COX-2
14 inhibitor report.
15     Q.   Okay.
16         COX-2 inhibitors are a class
17 of drugs that include Vioxx and Celebrex,
18 right?
19     A.   Yes, sir.
20     Q.   Have you been retained to
21 offer any opinions regarding Celebrex?
22     A.   I have not.
23     Q.   How was this report

Page 39

1  prepared?
2      A.   I reviewed the material and
3  wrote the report.
4      Q.   Did you dictate it or did
5  you type it yourself?
6      A.   I typed it myself.
7      Q.   Did you have a template from
8  other cases that you were involved with
9  that you used?
10     A.   I had no template, but, of
11 course, I've written expert reports in
12 other litigation.  So, I used that
13 experience to write this, but I had no
14 formal template, no formal word
15 processing format to follow.
16     Q.   Okay.
17         Did you use any cut and
18 pastes from old reports in connection
19 with this report?
20     A.   No.
21     Q.   Did you review this report
22 carefully before signing it?
23     A.   I did.
24     Q.   Did you check it for

Page 40

1  accuracy?
2      A.   I did.
3      Q.   Did you check it for errors?
4      A.   As best I could.  There's
5  always the grammatical error that gets by
6  me, but yes.
7      Q.   When is the last time you
8  reviewed the report?
9      A.   Earlier this week.
10     Q.   As you sit here today, are
11 there any corrections that need to be
12 made to it?
13     A.   I don't think so, no.
14     Q.   Are there any changes that
15 need to be made to it?
16     A.   No.
17     Q.   Does the report set forth
18 the opinions that you intend to offer at
19 trial in the MDL?
20     A.   I would say this.  Based on
21 the review of the information I had done
22 at the time -- I had reviewed up to the
23 time of preparing the report, it does.  I
24 am aware that there's always new material

Page 41

1  that's available.  And I will read that
2  material as it becomes available.  I'm
3  also aware of my obligation to announce
4  that I'm looking at new material.
5      Q.   Fair enough.
6          As you sit here today, are
7  there other opinions -- today is June
8  2nd, is that right?
9      A.   Yes, sir.
10     Q.   And the report was on May
11 22nd?
12     A.   Yes.
13     Q.   Are there any opinions that
14 you've formed since May 22nd that need to
15 be added to your report or that are
16 beyond the scope of what's in your report
17 that you're aware of as you sit here
18 today?
19     A.   No, sir.
20     Q.   Are you waiting for any
21 additional information or documents at
22 this time?
23     A.   I am not waiting for any
24 particular document.  However, I am aware

11 (Pages 38 to 41)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 42

1 that, waiting or not, documents continue
2 to be produced.
3      Q.   But as we sit here today,
4 you've not asked to see certain documents
5 that you're still waiting for
6 specifically?
7      A.   That's true, yes.
8      Q.   You're referring to a
9 situation where something new may be
10 produced in the context of the litigation
11 and be forwarded to you?
12      A.   Yes, sir.
13      Q.   Okay.
14           Do the opinions that are set
15 forth in your report represent your final
16 opinions subject to additional
17 information that may become available?
18      A.   Yes, sir.
19      Q.   When you first became
20 involved in the litigation, how did you
21 approach your review?  What I'm trying to
22 understand is, were you sent certain
23 materials by the plaintiffs, did you ask
24 the plaintiffs to send you certain

Page 43

1 materials, did you start with a medical
2 literature search?  How did the process
3 start?
4      A.   Well, I began by not asking
5 anybody for information, but just
6 gathering information as best I could.
7 There's a voluminous amount of published
8 material that I have access to.  Of
9 course, the third FDA Advisory Committee
10 on Vioxx met in late winter/early spring
11 of 2005, and I reviewed that transcript
12 when it became available, as well as the
13 other transcripts which were already
14 actually available on the FDA site.  So,
15 much of my early review involved material
16 that I was able to get on my own.
17           Just to finish up here.
18 There were manuscripts that were sent to
19 me through Scientific Evidence that --
20 again, by "manuscripts," information that
21 was published in the peer-reviewed
22 literature that supplemented my review.
23      Q.   We'll talk about the details
24 of these Advisory Committee meetings

Page 44

1 later, but you're referring to there were
2 three Advisory Committee meetings that
3 dealt in part or in whole with Vioxx,
4 right?
5      A.   Yes, sir.
6      Q.   One was in 1999, one was in
7 2001, and one was in 2005?
8      A.   Yes, sir.
9      Q.   And you read the full
10 transcripts of each of those meetings?
11      A.   Yes, sir.
12      Q.   Okay.
13           The 2001 meeting was a
14 two-day meeting.  Do you recall that?
15      A.   Yes, sir.
16      Q.   First day was a day that
17 dealt with Celebrex?
18      A.   Yes.
19      Q.   Did you read the day that
20 dealt with Celebrex?
21      A.   I did not.
22      Q.   In terms of the published
23 medical literature, did you do your own
24 literature search, or did you ask

Page 45

1 Scientific Evidence to do a specific
2 literature search for you?
3      A.   No.  I'm sorry.  I did my
4 own literature searches first.
5      Q.   What was your literature
6 search that you did?
7      A.   By that you mean what
8 literature did I read based on that?
9      Q.   What search terms did you
10 use, or how did you go about your search
11 for relevant medical articles?
12      A.   Oh, I don't remember.  I
13 would tell you it was primarily
14 Internet-based search, but I don't
15 remember what search terms I used.
16      Q.   You have in your report at
17 the end on Pages 106 through 110, you
18 have a list of references.  Do you see
19 that?
20      A.   Yes, sir.
21      Q.   Are all of the published
22 medical articles that you've reviewed
23 listed in these references?
24      A.   I hesitate to say that all

12 (Pages 42 to 45)

Lemuel A. Moye, M.D., Ph.D.

Page 46

1  of them are listed here. I mean, I think
2  all of them would be on the CDs that you
3  have, but I don't want to suggest that
4  every single medical reference, reference
5  in the medical literature that I based my
6  opinion on is listed in the references.
7  I mean, I wish that were the case, but
8  there may have been a couple that got
9  away.
10     Q.   Okay.
11          It's fair to say that while
12  you may have missed one or two, your
13  intent was to list all of the medical
14  articles that you reviewed or that you
15  thought were important in your
16  references?
17     A.   Yes, sir.
18     Q.   And if there's an article
19  that you looked at that's not in the
20  references, it would be on the CDs that
21  we referred to?
22     A.   I would say if there's an
23  article that I looked at and relied upon
24  and incorporated its ideas in any way,

Page 47

1  shape or form in my report, then it
2  should have been listed in the
3  references.
4      Q.   Okay.
5           Now, did you review the
6  investigational new drug application?
7      A.   Yes, sir, I did.
8      Q.   How did you get access to
9  that?
10     A.   Scientific Evidence sent
11  that to me.
12     Q.   Did you review it in its
13  entirety or did you look at certain parts
14  of it?
15     A.   Well, I only looked at
16  certain parts. It is a voluminous
17  document, of course, so, I looked at what
18  I believe were the relevant sections.
19     Q.   What did you believe were
20  the relevant sections at the time you
21  looked at them?
22     A.   The integrated review of
23  efficacy, the integrated review of
24  safety, integrated summary of safety.

Page 48

1      Q.   Are you talking about the
2  IND or the NDA?
3      A.   I'm talking about the NDA.
4      Q.   The NDA?
5      A.   The NDA. I'm sorry. Did
6  you not ask me about that?
7      Q.   I think I said IND, but I
8  shouldn't -- let's back up and start
9  over.
10     A.   Okay.
11     Q.   Did you look at the
12  investigational new drug application?
13     A.   I did not.
14     Q.   You did look at certain
15  sections of the new drug application?
16     A.   I looked at the new drug
17  application. That's right.
18     Q.   The original new drug
19  application?
20     A.   Yes, sir.
21     Q.   When you said you looked at
22  certain sections, the sections you looked
23  at were the integrated summary of
24  efficacy, the integrated summary of

Page 49

1  safety?
2      A.   Yes, sir.
3      Q.   And what else?
4      A.   If there was an overall
5  summary, I looked at that. I also looked
6  at the statistical reviewer's comments.
7  The medical reviewer's comments really
8  were part of, I thought, the ISS and ISE.
9      Q.   So, you did look at the
10  medical officer reviewer's comments?
11     A.   Yes.
12     Q.   But am I understanding you
13  to say you thought her comments were
14  already included in what was presented in
15  the integrated summary of safety?
16     A.   By and large, yes.
17     Q.   Are you familiar with the
18  summary basis of approval?
19     A.   I am.
20     Q.   Was there any summary basis
21  of approval document related to Vioxx?
22     A.   I don't remember.
23     Q.   Did you look at any of the
24  supplemental new drug applications?

13 (Pages 46 to 49)

Lemuel A. Moye, M.D., Ph.D.

Page 50

1      A.   Not in their entirety, no.
2      Q.   Is there any section of the
3   supplemental new drug applications that
4   you can remember reviewing?
5      A.   I reviewed several reviews
6   of supplemental material -- reviews by
7   the FDA of supplemental materials
8   submitted by Merck.
9      Q.   Like, for example, the
10  medical officer's review of the
11  supplemental new drug application?
12     A.   Yes, sir.
13     Q.   That's what you're talking
14  about?
15     A.   Yes.
16     Q.   Did you review -- you're
17  aware that there was a cardiorenal
18  adviser who looked at information in
19  early 2001 named Shari Targum.  Do you
20  recall that?
21     A.   Yes.
22     Q.   Did you read her review?
23     A.   Yes, sir.
24     Q.   Anything else that you can

Page 51

1   remember in terms of FDA reviews of the
2   supplemental new drug applications?
3      A.   No, sir.
4      Q.   Did you look at the periodic
5   safety updates that were submitted by
6   Merck?
7      A.   I did not.
8      Q.   Did you review any kind of
9   post-marketing analyses that were
10  conducted by FDA?
11     A.   Nothing separate and apart
12  from what was provided to Advisory
13  Committees or provided in the --
14  discussed in the supplemental new drug
15  applications.
16     Q.   Okay.
17         So, you had available to you
18  essentially the same information that was
19  available to the members of the Advisory
20  Committees in 1999 and 2001 respectively?
21     A.   I'm not sure what time frame
22  we're talking about.  I actually believe
23  as I sit here now, I've looked at much
24  more information than they've had, but

Page 52

1   maybe I'm not addressing your question.
2      Q.   Okay.
3         In terms of FDA materials,
4   in terms of materials that Merck
5   submitted to the FDA or medical officer
6   reviews of the FDA, you looked at the
7   same materials that the Advisory
8   Committee members looked at.  Is that
9   your understanding?
10     A.   Again, I think I probably
11  looked at much more than the Advisory
12  Committees would have looked at.
13     Q.   All right.
14         What other things have you
15  looked at other than what the Advisory
16  Committee looked at?
17     A.   Wait.
18         MR. SIZEMORE:  Can you
19     specify which one, Joe?
20         MR. PIORKOWSKI:  Yes.
21  BY MR. PIORKOWSKI:
22     Q.   Let's back up a minute.
23         Let's start with the 1999
24  Advisory Committee.  What materials do

Page 53

1   you believe that you've looked at that
2   were available at the time that the
3   Advisory Committee members in 1999 did
4   not look at?
5      A.   Just so I can be clear, you
6   mean materials that were provided by the
7   FDA or materials in general?
8      Q.   Well, I'm assuming -- let's
9   just say materials in general.
10     A.   Okay.
11         Reports -- excuse me.
12  Reports within Merck that suggest the
13  appearance -- suggest the possibility,
14  I'll say, of a link between Vioxx use and
15  severe cardiac events and also data
16  within Merck that demonstrates a link
17  between Vioxx and severe cardiovascular
18  embolic events.
19     Q.   Are you referring to what
20  you call in your report the "Watson
21  analysis"?
22     A.   That's one thing, yes.
23     Q.   What other materials are you
24  aware of that was available in 1999 that

14  (Pages 50 to 53)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 54

1    was not available to the FDA or the
2    Advisory Committee?
3         A.   What I list in my report,
4    and that is -- let me just look at this
5    specifically.
6         The September -- I'm on item
7    84, Paragraph 84 on Page 32.
8         Q.   Page 32?
9         A.   Yes, sir.
10        Q.   Paragraph what?
11        A.   84, the very last one on
12   that page.
13        Beginning with that
14   Paragraph 84, the September 12, 1996
15   memo; Paragraph 85, the October 10th,
16   '96; Paragraph 86, November 11, 1996.
17        Q.   Right.
18        A.   And this litany of material
19   was available, but had not been presented
20   at the Advisory Committee.  So, that's
21   the basis of my answer to the question.
22        Q.   Okay.
23        The materials you're talking
24   about in Paragraph 84, you're talking

Page 55

1    about an internal memorandum, right?
2         A.   Yes, sir.
3         Q.   And the internal memorandum
4    deals with a case of unstable angina that
5    was reported in an RA study, correct?
6         A.   Yes, sir.
7         Q.   Do you know whether that
8    case was reported to the FDA in
9    accordance with the procedures by which
10   it's supposed to be reported the FDA?
11        A.   I don't know if it was
12   reported to the FDA or not.
13        Q.   Paragraph 85 deals with also
14   an internal memorandum.  Is that right?
15        A.   Yes, sir.
16        Q.   Do you know whether the data
17   that were the subject of that memorandum
18   were or were not reported to the FDA?
19        A.   I don't know.
20        Q.   In Paragraph 86, there's a
21   discussion about a memo authored by a Dr.
22   Musliner, right?
23        A.   Yes.
24        Q.   That talks about an

Page 56

1    anticipation of greater adverse
2    cardiovascular events in rofecoxib
3    compared with comparator NSAIDs, right?
4         A.   Yes.
5         Q.   That was not a study.  That
6    was a memo, right?
7         A.   Yes.
8         Q.   Actually, further on in your
9    report on Page 71, you discuss the Watson
10   analysis, correct?  70 and 71?
11        A.   Yes.
12        Q.   In this discussion you say
13   that Merck misled the FDA, right?
14        A.   Yes.  I also discussed it in
15   90 and 91 as well.
16        Q.   90 and 91?
17        A.   Paragraph 90 and 91, top of
18   Page 35.
19        Q.   Yes.  I understand.  I'm not
20   suggesting that's the only place you talk
21   about it.  I'm just saying in your
22   discussion about misleading the FDA on
23   Page 70 and 71, the first part of your
24   discussion starts with the proposition

Page 57

1    that Merck misled the FDA and the FDA
2    Advisory Committee because at the time of
3    the original Advisory Committee meeting,
4    they did not disclose the Watson
5    analysis.  Right?
6         A.   Yes, sir.
7         Q.   And it's your understanding
8    that the Watson analysis showed a clear
9    signal of an increased cardiovascular
10   risk associated with rofecoxib therapy?
11        A.   Yes, sir.
12        Q.   To your understanding, were
13   the data upon which the Watson analysis
14   was based disclosed to the FDA?
15        A.   I don't know whether the
16   data in any way, shape or form was
17   disclosed to the FDA in the IND or any
18   supplemental information, but it was not
19   disclosed to the Advisory Committee.
20        Q.   You know that because you've
21   reviewed the Advisory Committee
22   transcript?
23        A.   The transcript and also the
24   background dossier provided by Merck for

15  (Pages 54 to 57)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 58

1  the Advisory Committee to review.
2      Q.   Prior to the original 1999
3  Advisory Committee meeting?
4      A.   Yes, sir.
5      Q.   Now, is there any other data
6  besides the data contained in the Watson
7  analysis that you believe that Merck did
8  not disclose to the FDA or to the FDA
9  Advisory Committee prior to the 1999
10 meeting?
11     A.   No.  That's the only data I
12 believe I point out in my affidavit for
13 the 1999 Advisory Committee.
14     Q.   Did you look at a file that
15 contained -- well, let me back up.
16          You just alluded to the
17 documents that Merck provided to the
18 Advisory Committee members.  There're
19 referred to as briefing documents?
20     A.   Yes, sir.
21     Q.   Right?
22          Did you look at those on
23 line?
24     A.   I don't think I looked at

Page 59

1  those on line, no.
2      Q.   Those are --
3      A.   I'm sorry.
4      Q.   Were they provided by
5  Scientific Evidence?
6      A.   Yes.
7      Q.   Did you look at all of
8  Merck's briefing documents before all of
9  the Advisory Committees?
10     A.   Yes.
11     Q.   Including the 2005?
12     A.   Yes.
13     Q.   Did you review as a part of
14 your review a correspondence file between
15 Merck and the FDA concerning Vioxx?
16     A.   I reviewed some
17 correspondence between the FDA and Merck.
18 I can't say I reviewed one large complete
19 correspondence file.
20     Q.   How was the correspondence
21 that you reviewed selected?
22          MR. SIZEMORE:  Object to
23 form.
24 BY MR. PIORKOWSKI:

Page 60

1      Q.   Let me withdraw the
2  question.
3          If you reviewed some letters
4  but not all the letters, there had to be
5  some selection process in deciding what
6  you saw?
7      A.   Yes.
8      Q.   Fair?
9          Were you involved in that
10 selection process, was that a decision
11 made by Scientific Evidence, or was that
12 a decision made by the lawyers with whom
13 you were working?
14     A.   No.  I would say it was a
15 joint decision.  At this point in my
16 review, you're talking now about April or
17 May of this year, and I would meet with
18 attorneys, some of whom I mentioned
19 earlier, and we would talk about what
20 information would be most useful, and I
21 would ask for material, as well as have
22 material supplied unvolunteered --
23 supplied, volunteered by others, not by
24 me.

Page 61

1      Q.   Did you give the lawyers
2  directions about what you wanted to see
3  in terms of correspondence?
4      A.   Well, yes.  Not just
5  correspondence, but other documents as
6  well, yes.
7      Q.   Let's talk first about
8  correspondence.  What directions or
9  guidance did you give them about what you
10 wanted to see?
11     A.   Well, it depended on the
12 topic we were talking about.  For
13 example, when we're talking about
14 preparations for Advisory Committee
15 meetings, then any material that
16 corresponded between FDA and the --
17 excuse me -- between FDA and Merck
18 involving the Advisory Committee, I
19 wanted to see.  And that included, but
20 wasn't limited to, background documents.
21     Q.   Okay.  Anything else?
22     A.   That's the clearest example
23 I can think of as I sit here now.
24     Q.   Have you reviewed all of the

16  (Pages 58 to 61)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 62

1  correspondence dealing with label changes
2  or proposed label changes between Merck
3  and the FDA?
4       A.   I have not, no.
5       Q.   Have you reviewed any of the
6  correspondence concerning label changes
7  or proposed label changes between Merck
8  and the FDA?
9       A.   I don't think so, no.
10       Q.   Have you reviewed
11  correspondence between Merck and the FDA
12  with respect to warning letters?
13       A.   Warning letters? Yes, I
14  have.
15       Q.   Your report makes reference
16  to a warning letter in September of 2001,
17  correct?
18       A.   Yes, sir.
19       Q.   Is that the only letter
20  concerning any DDMAC-related issues that
21  you saw?
22       A.   No, it's not.
23       Q.   Were you provided with
24  Merck's response to that warning letter?

Page 63

1       A.   I believe so, yes.
2       Q.   Were you provided with the
3  FDA's response to Merck's response?
4       A.   That I don't remember.
5       Q.   You said you gave the
6  lawyers guidance not only with respect to
7  correspondence, but with respect to
8  documents generally that you wanted to
9  see?
10       A.   Yes.
11       Q.   What guidance did you give
12  them?
13       A.   Any correspondence relating
14  to communication -- any correspondence
15  involving or centered on the VIGOR
16  manuscript and the -- actually, any and
17  all published manuscripts. So,
18  correspondence between editors and
19  authors involving reviewers,
20  correspondence involving reviewers. I
21  wanted to see all of that material in
22  addition to whatever internal
23  documentation that they had -- I'm sorry,
24  documentation internal to Merck involving

Page 64

1  these studies, as well as the studies
2  themselves.
3       Q.   So, first of all, you wanted
4  to see any correspondence between Merck
5  employees and editors of journals?
6       A.   Let me rephrase. No.
7       Q.   Okay.
8       A.   Between the authors of
9  Merck's -- Merck-funded manuscripts and
10  editors.
11       Q.   Okay.
12       A.   Including reviews,
13  summaries, cover letters and so on.
14       Q.   Do you believe you were
15  provided with that?
16       A.   Yes.
17       Q.   Is that included in the
18  materials in the disk?
19       A.   Yes.
20       Q.   Any other -- let me back up.
21       I'm sure you did review
22  internal company documents, right?
23       A.   Yes, sir.
24       Q.   How were the internal

Page 65

1  documents selected that you reviewed?
2       A.   They were -- during
3  conversations, face-to-face
4  conversations, there were discussions,
5  and they would say that there were -- the
6  statement would be made that there is an
7  e-mail that is responsive to this issue.
8  Let's just say -- I'll give you a
9  specific example. The evaluation of the
10  design of VIGOR. And then my response
11  was, I'd like to see that and all related
12  material involving the design of VIGOR
13  that was available that they had.
14       Q.   So your understanding is
15  that you received that, all materials
16  relating, let's say, to the design of
17  VIGOR?
18       A.   That they had, yes.
19       Q.   That the lawyers had?
20       A.   Yes.
21       Q.   Okay.
22       Anything else besides the
23  design of VIGOR specifically as it
24  applies to internal company documents?

17 (Pages 62 to 65)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 66

1      A.  Well, I actually -- the
2  tenor of the conversation was precisely
3  that.  So, it was about the design of
4  VIGOR, about concern, early concerns
5  about the possibility of a relationship
6  between Vioxx and cardiothrombolic
7  agents.  If there was any correspondence
8  about that, I wanted to see, not just the
9  correspondence that was in hand, but any
10  and all correspondence related to that.
11      Q.  Including the followup?
12      A.  Yes.
13      Q.  And to your understanding,
14  you've seen that?
15      A.  Yes, sir.
16      Q.  Okay.
17          Anything else that you asked
18  to see?
19      A.  Actually, that's quite a
20  bit.
21      Q.  And I want to focus on
22  internal company documents for this line
23  of discussion.  Any other internal
24  company documents that you specifically

Page 67

1  asked to see?
2      A.  Let me go through my
3  affidavit to see because I think there's
4  probably some others.
5      Q.  Sure.
6      MR. SIZEMORE:  Can we take a
7  break?
8      MR. PIORKOWSKI:  Sure.
9      (Witness reviewing
10  document.)
11          - - -
12      (Whereupon, a recess was
13  taken from 10:30 until 10:44 a.m.)
14          - - -
15      THE WITNESS:  Two other
16  areas.  One was the notion of the
17  naproxen protective effect, and
18  the second broad area was any
19  information that was available
20  about study protocols.  I'll give
21  you an example, the Alzheimer
22  studies.  Another example would be
23  VIP.  Another example would be
24  VICTOR.  I'm not trying to be

Page 68

1  exhaustive here, but that's
2  examples.  If there was a little
3  bit of material I was exposed to,
4  I wanted to see all of the
5  material that was available.
6  BY MR. PIORKOWSKI:
7      Q.  With respect to study
8  protocols?
9      A.  Yes.
10      Q.  For the clinical trials?
11      A.  Yes.
12      Q.  Well, let me ask you, when
13  you looked at the new drug application,
14  did you look at any of the study
15  protocols for the osteoarthritis trials
16  that were submitted as a part of the
17  Phase III studies?
18      A.  Yes.
19      Q.  You looked at that as part
20  of the new drug application?
21      A.  Yes.
22      Q.  But then the later studies
23  that came down the pike like VIP and
24  APPROVe and VICTOR, you asked to see

Page 69

1  those protocols?
2      A.  Yes.  Actually, any and all
3  internal documents related to, be it
4  protocols, internal analyses or
5  meta-analyses or interim reviews, I asked
6  to see.
7      Q.  Okay.
8      A.  And I need to add one other
9  thing.  Kathy Snapka is an attorney who
10  designated me.  I didn't mention that
11  before.  That was my fault.  I want to
12  correct that.
13      Q.  Fair enough.
14          We'll add her to the list.
15  Let me follow up on that.
16      A.  Sure.
17      Q.  Have you met with Kathy
18  separate from the other lawyers?
19      A.  No, I have not.
20      Q.  Has Kathy participated in
21  meetings you've had with other lawyers?
22      A.  Yes.
23      Q.  Are you specifically
24  designated in a case that Kathy has set

18 (Pages 66 to 69)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

1  for trial?
2      A.   I believe so.
3      Q.   Have you set aside a date on
4  your calendar for a case Kathy has set
5  for trial?
6      A.   I don't think so.
7      Q.   Any other corrections we
8  need to make from round one?
9      A.   As I sit here now, no.  If I
10  get some more, I'll let you know.
11      Q.   While we're cleaning up some
12  things, I asked you about whether the
13  opinions you intended to render in the
14  MDL trial in New Orleans were set forth
15  in your report.  My colleague reminded me
16  that I need to ask the same question with
17  respect to California.  Are the opinions
18  you intend to render at trial in
19  California also set forth in your report
20  subject to new information becoming
21  available?
22      A.   Yes, sir.
23      Q.   As a part of your review,
24  did you review the various labels that

1  were in force with respect to Vioxx?
2      A.   Yes, sir.
3      Q.   Did you review all of them?
4      A.   Yes, I did.
5      Q.   Did you review all of the
6  draft labels?
7      A.   I don't think so, no.
8          - - -
9      (Whereupon, Deposition
10  Exhibit Moye MDL 2, "Documents
11  Reviewed by Dr. Lemuel A. Moye,"
12  (88 pages), was marked for
13  identification.)
14          - - -
15  BY MR. PIORKOWSKI:
16      Q.   We were provided with a
17  document which I've marked as Exhibit 2.
18      MR. PIORKOWSKI:  I think I
19  gave you a copy there, Paul.
20  BY MR. PIORKOWSKI:
21      Q.   I ask you to identify what
22  Exhibit 2 is.
23      A.   (Witness reviewing
24  document.)

1          It is a compendium of the
2  material that I have been provided to
3  review related to the Vioxx litigation.
4      Q.   Is it your understanding
5  that all of the material that's contained
6  in Exhibit 2 is on the CDs that we've
7  been provided?
8      A.   Yes, sir.
9      Q.   Now, you haven't read all of
10  this stuff; is that right?
11      A.   I think in fairness I can
12  say, yes, I have, but I don't remember
13  all of it.
14      Q.   To the best of your
15  knowledge, you've read everything that's
16  listed on this document?
17      A.   Yes, sir.
18      Q.   For example, on Page 2 of
19  88, second -- third line from the bottom,
20  it has, "Carol Ernst...versus Merck -
21  hearing regarding Dr. Araneta's
22  testimony."  Do you see that?
23      MR. SIZEMORE:  Where is it?
24  BY MR. PIORKOWSKI:

1      Q.   Page 2 of 8, third entry
2  from the bottom.
3      A.   Oh.  Third entry from the
4  bottom.  Yes.
5      Q.   Do you know why that was
6  provided to you?
7      A.   No, I don't.
8      Q.   Do you remember reading it?
9      A.   No, I don't remember the
10  details of it.
11      Q.   You remember anything about
12  it?
13      A.   No.
14      Q.   Or, for example, the one,
15  the entry right above it, "Hearing on
16  Exhibits"?
17      A.   Yes.
18      Q.   That's a transcript of a
19  court trial?
20      A.   That's right.  That's right.
21      Q.   Do you know why that would
22  have been of interest to you?
23      A.   No.  For that, what I did
24  was look at it to see first, cursorily,

Lemuel A. Moye, M.D., Ph.D.

Page 74

1  to see if it was going to be directly
2  relevant.  And if it wasn't going to be
3  relevant to my opinions, then I put it
4  down and moved on to something else.
5      Q.  How much of the roughly 250
6  hours that you've spent were spent
7  reviewing documents versus preparing your
8  report versus meetings with lawyers?
9      A.  I'll answer the easy part
10  first.  A small amount of time, I'd say
11  less than one percent, less than a half
12  of one percent, was spent meeting with
13  attorneys.  Maybe 70 percent of the time
14  was spent reviewing documents, and 30
15  percent of the time was preparing an
16  affidavit.  It's just a rough ballpark.
17      Q.  On Page 4, for example, of
18  this document, it appears the entire
19  trial transcript from the Ernst trial,
20  which was four weeks long, was sent to
21  you?
22      A.  Yes.
23      Q.  Did you read all of that?
24      A.  I went through it all, yes.

Page 75

1  I confess to you, I did not spend hours
2  on parts that I thought were irrelevant
3  for me --
4      Q.  Right.
5      A.  -- but I did go through it
6  all.
7      Q.  Do you remember reading the
8  deposition of Alan Nies?
9      A.  No.  I don't remember
10  anything particularly relevant from that.
11      Q.  Or do you remember reading
12  his trial testimony?
13      A.  I remember looking at it,
14  yes.
15      Q.  How about depositions or
16  trial testimony of Dr. Alise Reicin?
17      A.  Yes.
18      Q.  You read that?
19      A.  Yes.
20      Q.  How about Briggs Morrison?
21      A.  I don't remember.
22      Q.  Deposition testimony of Dr.
23  Ed Scolnick?
24      A.  Yes.

Page 76

1      Q.  David Anstice?
2      A.  I don't remember that one.
3      Q.  Deborah Shapiro?
4      A.  Yes.
5      Q.  Did you read the depositions
6  of any of the regulatory affairs
7  individuals at Merck?
8      A.  I don't remember who they
9  were.
10      Q.  Do you remember reading the
11  deposition of any sales and marketing
12  personnel other than Dr. Anstice?
13      A.  I've gone through them, but
14  I don't recall any of the details.
15      MR. BLIZZARD:  Object to
16  form.  Sorry, a little late.
17  BY MR. PIORKOWSKI:
18      Q.  Who prepared Exhibit 2?
19      A.  Scientific Evidence did.
20      Q.  Okay.
21      When was it prepared?
22      A.  I don't know.  I think
23  recently, but I don't when.
24      Q.  Was it prepared in

Page 77

1  anticipation of filing your report?
2      A.  Well, I think they knew they
3  had to have that when I filed my report,
4  but that's all I know.
5      Q.  Did you look at any Merck
6  standard operating procedures?
7      A.  No, sir.
8      Q.  You know from your own
9  clinical trial experience what a SAS file
10  is?
11      A.  Yes, sir.
12      Q.  Did you look at any of the
13  original SAS files on any of the data
14  from the Vioxx clinical trials?
15      A.  I answer your question as I
16  have begun to do that.  I am nowhere
17  near -- I'm only in the introductory
18  phase of it.
19      Q.  When did you begin to do
20  that?
21      A.  Last weekend.  Actually,
22  about a week ago.
23      Q.  Since you filed your report?
24      A.  Yes.

20  (Pages 74 to 77)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 78

1    Q.   What was the purpose of
2  looking at the SAS files from your
3  perspective?
4    A.   This file -- excuse me.
5  These files were files that were made
6  available, I believe, of the APPROVe
7  followup -- the followup component of the
8  APPROVe clinical trial.
9    Q.   And you have no opinions on
10 that at this point?
11   A.   I have no opinions on the
12 SAS data set content.
13   Q.   How long do you anticipate
14 that's going to take you to complete that
15 review?
16   A.   I don't know.  I believe
17 it's going to be a long process to get it
18 right.  So, at this point I can't even
19 reasonably estimate the number of hours.
20   Q.   Let me ask you, in coming to
21 your opinions in this case, did you look
22 at the new drug application -- any part
23 of the new drug application for Celebrex
24 or Bextra?

Page 79

1    A.   No, sir.
2    Q.   Did you took at any part of
3  the new drug application for any other
4  nonsteroidal anti-inflammatory drug?
5    A.   No, sir.
6    Q.   Did you look at the medical
7  officer review or summary basis of
8  approval for Celebrex or Bextra?
9    A.   No, sir.
10   Q.   Did you look at the medical
11 officer review or summary basis of
12 approval for any other nonsteroidal
13 anti-inflammatory drug?
14   A.   No.
15   Q.   Did you review the labeling
16 for Celebrex or Bextra in connection with
17 your opinions?
18   A.   No.
19   Q.   Did you review the labeling
20 for naproxen?
21   A.   No.
22   Q.   Did you review the labeling
23 for any other nonsteroidal
24 anti-inflammatory drug?

Page 80

1    A.   No, sir.
2    Q.   Did you do any specific
3  medical literature review concerning
4  Celebrex as a part of your review of this
5  case?
6    A.   No, sir.
7    Q.   How about with respect to
8  Bextra?
9    A.   No, sir.
10   Q.   Did you do a medical
11 literature review on the issue of
12 naproxen?
13   A.   I think I have to say yes
14 insofar as it was related to the
15 possibility of an anticardiothrombotic
16 effect associated with Naprosyn.
17   Q.   Okay.
18        What specific literature
19 search did you do?
20   A.   Well, it's the literature
21 that's in my affidavit.
22   Q.   Just for keeping the record
23 straight, when you are referring to your
24 affidavit, you're referring to Exhibit 1,

Page 81

1  your report?
2    A.   Yes, that's right.
3    Q.   That's fine.  Call it what
4  you want.  I just want to make sure we're
5  clear.
6        So, to the extent that
7  you've reviewed literature on naproxen,
8  that would be listed in your references?
9    A.   Yes, sir.
10   Q.   Okay.
11        Did you do a medical
12 literature review on any other
13 non-selective NSAID other than naproxen?
14   A.   I need to add one thing.  In
15 the literature and also what's on this
16 index because I perhaps didn't include
17 everything in my references.
18   Q.   That was with respect to
19 naproxen?
20   A.   Yes.
21   Q.   Okay.
22        Did you do a specific
23 medical literature review for any other
24 nonselective NSAID?

21 (Pages 78 to 81)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 82

1    A.   No, sir.
2    Q.   Did you review the
3  deposition testimony of Dr. Eric Topol?
4    A.   No, I did not review that.
5    Q.   Did you review the
6  deposition testimony of Dr. Curfman?
7    A.   Yes.
8    Q.   What was the purpose of
9  reviewing his testimony?
10    A.   The Dr. Curfman I'm thinking
11  of is the editor-in-chief of the New
12  England Journal.
13    Q.   Actually, he's not the
14  editor-in-chief, but he's an editor.
15    A.   Actually, you're right.
16    Q.   Same question.
17    A.   That's right, an editor of
18  the New England Journal.  I reviewed that
19  because I thought it was related to the
20  reporting of the VIGOR results.  So, I
21  thought it was relevant to VIGOR.
22    Q.   Okay.
23         Did you read both of his
24  depositions?

Page 83

1    A.   Yes, sir.
2    Q.   Did you look at the
3  exhibits?
4    A.   Yes.
5    Q.   Did you review the
6  deposition of Dr. David Graham?
7    A.   No, I did not.
8    Q.   In connection with your
9  opinions in California and the MDL, do
10  you intend to offer any opinions about
11  Merck's motives or intent with respect to
12  Vioxx?
13         MR. WACKER:  Object to form.
14         MR. SIZEMORE:  Object to
15  form.
16         THE WITNESS:  I'm not sure I
17  know how to answer that.  As I
18  read the internal documents and
19  tried to put together in my mind
20  what was going on here, I think it
21  became clear to me what they
22  weren't doing, so, I suppose I am
23  going to speak to some degree
24  about the motives.

Page 84

1  BY MR. PIORKOWSKI:
2    Q.   Let me rephrase it like
3  this:  You understand that there are
4  things that one believes should be done
5  and they don't get done, that that can
6  either be the result of a deliberate
7  process or it can be the result of lack
8  of awareness or negligence or a variety
9  of other reasons.  Fair enough?
10    A.   Yes, I understand that.
11         MR. WACKER:  I'm sorry.  Let
12  me just object to form.
13  BY MR. PIORKOWSKI:
14    Q.   My question is, you're
15  looking at the records, and in a variety
16  of respects you're saying, I think
17  certain things should have been done and
18  I don't think Merck did them.  Fair
19  enough?
20    A.   Yes.
21    Q.   Okay.
22         Are you offering any
23  opinions that Merck intended to hurt
24  patients or intended to mislead the FDA?

Page 85

1         MR. SIZEMORE:  Object to
2  form.
3         THE WITNESS:  I think I am.
4  BY MR. PIORKOWSKI:
5    Q.   What expertise do you have
6  in determining corporate intent?
7    A.   My expertise with working
8  with the drug companies in the past and
9  my expertise in designing, executing and
10  analyzing clinical trials.
11    Q.   Okay.
12         What specific -- I'd like to
13  have you just tell me as far as specific
14  issues are concerned, what specific
15  issues are you intending to offer
16  opinions about with respect to either
17  Merck's intent or Merck's motives?
18    A.   I think I can probably speak
19  most clearly about Merck's intent.  And I
20  believe Merck's intent was not to provide
21  a fair, clear assessment of the
22  relationship between Vioxx and
23  cardiovascular events -- cardiovascular
24  serious adverse events.

22 (Pages 82 to 85)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 86

1   Q.   At a particular point in
2 time?
3   A.   I have examples at
4 particular points in time, yes.
5   Q.   Well, let's break it down
6 like this. Are you offering any opinions
7 along that line about an intent not to
8 provide a fair and clear assessment
9 between Vioxx and cardiovascular events
10 prior to the initial approval?
11       MR. SIZEMORE:  Object to
12   form.
13       THE WITNESS:  Yes.
14 BY MR. PIORKOWSKI:
15   Q.   Are you offering opinions
16 between the time of the initial approval
17 and the April 2002 label change?
18   A.   Yes.
19   Q.   And are you offering
20 opinions about Merck's intent following
21 the April 2002 label change?
22   A.   I think not so much.
23   Q.   Not so much as in no?
24   A.   I mean no, sorry. No.

Page 87

1   Q.   All right.
2       Any other aspects of Merck's
3 motives or intent that you plan to offer
4 opinions about?
5       MR. SIZEMORE:  Object to
6   form.
7       THE WITNESS:  As I sit here
8   now, I think my answer is no.
9 BY MR. PIORKOWSKI:
10   Q.   In terms of your background,
11 Dr. Moye, you've completed a medical
12 internship; is that right?
13   A.   That's right.
14   Q.   But you've never completed
15 residency training, right?
16   A.   Never entered residency
17 training. That's right.
18   Q.   You are not fellowship
19 trained in cardiology, correct?
20   A.   That's true. I'm not
21 fellowship trained.
22   Q.   You're not board certified
23 in cardiology?
24   A.   I'm not board certified.

Page 88

1   Q.   You don't hold yourself out
2 as a cardiologist, right?
3   A.   That's right.
4   Q.   You're not fellowship
5 trained in hematology; is that right?
6   A.   That's right.
7   Q.   You're not board certified
8 in hematology?
9   A.   That's correct.
10   Q.   You don't hold yourself out
11 as a hematologist?
12   A.   That's right.
13   Q.   You're not fellowship
14 trained in rheumatology, right?
15   A.   Right.
16   Q.   You are not board certified
17 in rheumatology?
18   A.   Right.
19   Q.   You don't hold yourself out
20 as an expert in rheumatology, correct?
21   A.   That's correct.
22   Q.   You don't hold yourself out
23 as an expert in pharmacology, either,
24 right?

Page 89

1   A.   That's correct.
2   Q.   Am I correct you've not seen
3 a patient since March of 1992?
4   A.   That's not true. Certainly,
5 I have not been in practice since March
6 of 1992, but I've seen patients, and the
7 biggest -- I saw many patients during the
8 Katrina debacle, but I've certainly not
9 been in practice since March 1992.
10   Q.   By "not in practice," that
11 means you didn't have regular office
12 hours?
13   A.   That's true.
14   Q.   Is that what that means?
15   A.   That's right.
16   Q.   All right.
17       In what capacity have you
18 seen patients since March of 1992?
19   A.   Actually, more as courtesy
20 than anything else. And also the
21 emergency care that first responders
22 provided at the Astro Arena last
23 September.
24   Q.   Do you currently keep a

23 (Pages 86 to 89)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 90

1  valid medical license?
2      A.  I do.
3      Q.  In Texas?
4      A.  Yes.
5      Q.  Anywhere else?
6      A.  No.
7      Q.  What was your involvement in
8  the medical arena in Katrina?
9      A.  Providing emergency care and
10  then family practice general medicine
11  responder to the myriad difficulties that
12  the Katrina survivors had.
13      Q.  Did you take off from work
14  to do that, or what were the
15  circumstances?
16      A.  Well, it was off of work,
17  off of weekends.  It was --
18      Q.  Is that something that the
19  University of Texas sort of allows you
20  time off to go do, or did you have to
21  take vacation time to do that?
22      A.  No.  Actually, they made an
23  allowance for us to do that.  They made
24  an administrative time allowance for us

Page 91

1  to do that.
2      Q.  To sort of contribute to the
3  effort?
4      A.  Yes, sir.
5      Q.  Have you ever prescribed
6  Vioxx?
7      A.  No.
8      Q.  Have you ever counseled a
9  patient about Vioxx?
10      A.  No.
11      Q.  Did you ever read the
12  product label for Vioxx while Vioxx was
13  on the market?
14      A.  No.
15      Q.  Have you ever prescribed any
16  COX-2 inhibitor drug?
17      A.  No.
18      Q.  Do you have any personal
19  experience with Vioxx?
20      A.  No.
21      Q.  Are there any physicians
22  that you know who prescribed Vioxx with
23  whom you've discussed their experience?
24      A.  No.

Page 92

1      Q.  Are there any patients you
2  know who've used Vioxx with whom you've
3  discussed their experience?
4      A.  No.
5      Q.  When you were practicing
6  medicine regularly, did you prescribe
7  nonselective nonsteroidal
8  anti-inflammatory drugs?
9      A.  Frequently, yes.
10      Q.  Frequently?
11      A.  Yes.
12      Q.  For what types of problems?
13      A.  Acute injuries, some chronic
14  problems, but primarily acute injuries.
15      Q.  Which nonsteroidal
16  anti-inflammatory drugs did you use?
17      A.  Primarily ibuprofen, also
18  naproxen.
19      Q.  Any others?
20      A.  Those are the only ones that
21  come to mind now.  I'm sorry.  Parafon
22  Forte.  But I'm not sure if that's an
23  NSAID.
24      Q.  I don't think that's an

Page 93

1  NSAID.
2      A.  Okay.
3      Q.  In any event, you prescribed
4  Parafon Forte --
5      A.  Yes.
6      Q.  -- for musculoskeletal pain?
7      A.  Yes.
8      Q.  Was it your practice when
9  you were involved in active regular
10  medical practice to inform patients of
11  the potential risks of medications you
12  prescribed?
13      A.  Yes.
14      Q.  Did you inform patients when
15  you prescribed nonsteroidal
16  anti-inflammatory medications to them
17  that there were potentially serious
18  gastrointestinal risks?
19      A.  Yes.
20      Q.  Did you consider at the time
21  nonsteroidal anti-inflammatory drugs to
22  be unsafe because they had
23  gastrointestinal risks?
24      A.  Not when used as directed.

24  (Pages 90 to 93)

a46c412c-de3e-4446-bf8d-937e4e429297