Lemuel A. Moye, M.D., Ph.D.

Page 489

1  pain reliever, in other words -- well, let me
2  back up.
3          Some pain relievers are
4  anti-inflammatories, and some pain relievers
5  are not, right?
6      A.   Right.
7      Q.   Okay.  Do you know of any
8  anti-inflammatory medication that had
9  clinical studies of longer than one-year
10  duration at the time of their initial
11  approval?
12     A.   I don't, no.
13     Q.   Okay.  Do you know of any pain
14  reliever medication that had clinical trials
15  longer than one-year duration at the time of
16  initial approval?
17     A.   No.
18     Q.   Do you know whether, at the
19  time Celebrex was approved, it had clinical
20  trials longer than one year?
21     A.   I don't know one way or the
22  other about Celebrex.
23     Q.   Okay.  Let me -- I want to just
24  ask you a question about the way Phase III

Page 490

1  testing is done and your understanding about
2  that, all right?
3      A.   Uh-huh.
4      Q.   Phase III testing is where you
5  are actually giving the drug, usually in some
6  sort of a controlled study, right?
7      A.   Yes.
8      Q.   The controlled study may be a
9  placebo-controlled study, or it may be a
10  comparator study, right?
11     A.   Right.
12     Q.   And, generally, you're looking
13  for larger numbers of patients than you would
14  have in your Phase II studies --
15     A.   Yes.
16     Q.   -- right?
17          And one of the things that
18  manufacturers are required to do is they're
19  required to demonstrate efficacy using
20  traditional tests of statistical
21  significance, right?
22     A.   Yes.
23     Q.   And they're also required to
24  evaluate safety, right?

Page 491

1      A.   Yes.
2      Q.   And the way they evaluate
3  safety is they collect all adverse events
4  during the clinical trials, right?
5      A.   Xymelatran, I think, is an
6  example of a drug that was studied for a year
7  or longer -- longer than a year.
8      Q.   I'm sorry.  What was the name
9  of it?
10     A.   Xymelatran.
11     Q.   How do you spell that?  X-Y --
12     A.   X-Y-M-E-L-A-T-R-A-N.
13     Q.   And you think that was --
14     A.   It's an antithrombotic drug,
15  yeah.
16     Q.   Okay.  And you think that was
17  studied for longer than one year?
18     A.   Right.
19     Q.   At the time of the initial
20  approval?
21     A.   Right.
22     Q.   Okay.  Do you know that for
23  fact --
24     A.   No, I believe it was longer

Page 492

1  than a year.
2      Q.   Do you know how long?
3      A.   No, I don't.
4          And if I think of any others,
5  I'll let you know as we go, if that's okay,
6  as we go through.
7      Q.   But fair to say you've been on
8  the Advisory Committee for approval of many
9  new products, right?  Let me rephrase --
10     A.   Et- -- I'm trying to say the
11  name right.  It's a tongue-twister.
12  Ebafitride, I think.  E-B-A-F-I-T-R-I-D-E, I
13  think.  That's how you pronounce it.
14     Q.   What is that?  Is that the
15  generic name for --
16     A.   That's the -- actually, that's
17  the trade name.  The generic name is even
18  worse.
19     Q.   Okay.  So that's a second drug,
20  you're saying?
21     A.   Yes.
22     Q.   Okay.  In your experience on
23  the Advisory Committee during the time you've
24  considered applications for new drug, you'd

24  (Pages 489 to 492)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 493

1  agree with me that studying the drug for
2  longer than a year is the exception to the
3  rule?
4      A.    Actually, I would disagree with
5  you for that -- over that, and it's because
6  many of the drugs that come before the
7  committee have already been approved -- are
8  studied for longer than a year, and I can
9  give you lots of examples of those; however,
10  when they first came on the market, they
11  were -- the company -- the sponsor is looking
12  for another approval.
13      Q.    Right.
14      A.    And the other approval led the
15  FDA to believe that a shorter duration of
16  therapy would be useful; for example,
17  diuretics and blood pressure.
18          Diuretics, when they first
19  appeared on the market, were studied for a
20  relatively short period of time because the
21  only indication was blood pressure control.
22          However, when they -- when the
23  scientific community is interested in and the
24  sponsor is -- is enthusiastic about

Page 494

1  developing another indication for the drug,
2  then it's studied for a much longer period of
3  time for a second approval.
4      Q.    Okay. But applying foresight,
5  one can -- one would expect that a blood
6  pressure medication could be used for longer
7  than a year, right?
8      A.    Of course.  Of course.
9      Q.    And most blood pressure
10  medications at the time of their initial --
11  at the time of their initial approval, have
12  not been studied for more than a year?
13      A.    And that is the subject of the
14  debate.
15      Q.    Okay.
16      A.    Because there is ongoing
17  vehement discussion about this deficiency --
18      Q.    Okay.
19      A.    -- in requiring short-term
20  studies.
21      Q.    But that is, in fact, the way
22  it is, whether it's the subject of debate or
23  not, right?
24      A.    As shoddy as they are, those

Page 495

1  are the guidelines.
2      Q.    All right.  Now, let's go back
3  to talking about Phase III studies.
4          The way Phase III studies work
5  in terms of safety information is that the
6  manufacturer -- or, actually, it's not the
7  manufacturer.  The clinicians who are doing
8  the clinical trials are required to collect
9  any and all --
10      A.    Excuse me.  I'm sorry.  I think
11  clopidogrel was studied for longer than a
12  year.  Its first approval was as an
13  antiplatelet agent.  And the studies that
14  were presented before the FDA were for its
15  first approval, and that study was longer
16  than a year.
17      Q.    Okay.
18      A.    I'm trying to get out of the --
19  that track.  I'm just trying to give you some
20  examples of these studies, and it's taking me
21  a while to pull them up.
22      Q.    All right.
23      A.    I'm sorry.  Let me stay focused
24  on your current question, now.

Page 496

1      Q.    Okay.  In Phase III clinical
2  trials, clinical investigators are required
3  to collect any and all adverse event
4  information throughout the duration of the
5  clinical trial, right?
6      A.    They are, yes.
7      Q.    Okay.  And whether somebody has
8  a heart attack, an ulcer, a case of
9  pneumonia, an ingrown toenail or hemorrhoids,
10  that information is required to be recorded,
11  right?
12      A.    Yes.
13      Q.    It's required to be analyzed,
14  right?
15      A.    Yes.
16      Q.    And it's required to be
17  submitted to FDA, right?
18      A.    Yes.
19      Q.    Okay.  And, in general, one of
20  the reasons that Phase III clinical studies
21  are designed that way is because we don't
22  always know and can't always anticipate what
23  the potential adverse events associated with
24  the medication are, right?

25 (Pages 493 to 496)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 497

1    A.   Yes.
2    Q.   Okay.  So the idea is if you
3  study the medication in a large population,
4  that you may see an increased risk of a
5  particular adverse event compared to the
6  comparator group, right?
7    A.    If you have a larger sample in
8  a Phase III study, the more patients you
9  have, the more likely you are to see --
10  everything else being equal.
11    Q.   Right.  Everything else
12  being --
13    A.   -- the more likely you are to
14  see adverse events which occur at lower
15  incident rates.
16    Q.   Okay.  And that's the way
17  Phase III clinical studies are usually done,
18  right?
19    A.   Yes.
20    Q.   That's the way they're always
21  done, right?
22    A.   Right.  Well, reporting, I
23  don't know.  Certainly, it's the way they're
24  done now.

Page 498

1    Q.   Okay.  And it's the way they
2  were done around the time of the Vioxx
3  approval --
4    A.   Yes.
5    Q.   -- right?
6        And, in fact, that's the way
7  the Phase III studies on Vioxx were
8  conducted, right?
9    A.   Yes.
10    Q.   Okay.  Now, are you aware of
11  any study that was done on Celebrex
12  specifically to look at cardiovascular
13  outcomes prior to the time Celebrex was
14  approved?
15    A.   No, I haven't studied that.
16    Q.   Haven't studied it, okay?
17    A.   Right.
18    Q.   Are you aware of any kind of
19  cardiovascular outcome study that was done on
20  any nonsteroidal anti-inflammatory medication
21  prior to its approval?
22    A.   No.
23        MR. PIORKOWSKI:  Okay.  Let me
24  ask you -- let me just go off for a

Page 499

1  second.  We don't need to take a
2  break, just...
3        THE VIDEOGRAPHER:  Off the
4  record at 9:47.
5        (Recess taken, 9:47 a.m. to
6  9:49 a.m.)
7        THE VIDEOGRAPHER:  Hold,
8  please.  On the record at 9:49.
9    Q    (BY MR. PIORKOWSKI)  Dr. Moye,
10  in the case of Vioxx, the FDA asked to have
11  an Advisory Committee meeting to get input
12  about the approvability of the Vioxx; is that
13  right?
14    A.   Well, there certainly was an
15  Advisory Committee meeting in 1999.
16    Q.   Right.
17    A.   I guess my understanding was
18  that since this was a new drug --
19    Q.   Right.
20    A.   -- that it was standard
21  operating procedure -- a new class of drugs,
22  sorry, a new class of compounds, it was
23  standard operating procedure for there to be
24  an Advisory Committee.

Page 500

1        So I don't know whether Merck,
2  in addition, asked for one, but I expected
3  that there would be one, anyway.
4    Q.   I actually wasn't -- yeah, I
5  wasn't asking whether Merck asked for one.  I
6  was asking whether --
7        Well, first of all, not every
8  drug that's approved by the FDA or submitted
9  for new drug application gets an Advisory
10  Committee meeting, right?
11    A.   That's right.
12    Q.   Okay.  The FDA ultimately is
13  the one that decides when an Advisory
14  Committee meeting should be held, right?
15    A.   Yes.
16        MR. PIORKOWSKI:  Okay.  Excuse
17  me a second.
18        Jason, could I ask somebody to
19  make a couple copies of this?
20        MR. WEBSTER:  Yeah.
21        MR. PIORKOWSKI:  Thanks.
22    Q    (BY MR. PIORKOWSKI)  And prior
23  to the -- its decision to approve Vioxx, the
24  FDA, in the case of Vioxx, did ask for an

26 (Pages 497 to 500)

Lemuel A. Moye, M.D., Ph.D.

Page 501

1 Advisory Committee, right?
2    A.   Yes.
3    Q.   Okay.  And just so we're clear
4 on the timing, when you mentioned that Vioxx
5 was a new class of drugs, you're referring to
6 COX-2 inhibitors, right?
7    A.   Yes.
8    Q.   And at the time that Vioxx was
9 approved, there was another COX-2 inhibitor
10 that already was on the market, right?
11    A.   Yes.
12    Q.   That was Celebrex?
13    A.   Right.
14    Q.   Okay.  So Celebrex's approval
15 predated Vioxx's approval?
16    A.   Right.
17    Q.   Okay.  The Advisory Committee
18 recommended that Vioxx be approved for
19 marketing at the -- for the indications in
20 the label and at the doses set forth in the
21 label, correct?
22    A.   Yes.
23    Q.   Okay.  And we had talked
24 last -- couple weeks ago about the fact that

Page 502

1 there are sometimes contentious issues about
2 safety and efficacy and often reasonable
3 minds on the Advisory Committee can differ,
4 right?
5    A.   Yes.
6    Q.   Okay.  In this particular
7 Advisory Committee, the vote was eight to
8 nothing in favor of approval, right?
9    A.   Yes.
10    Q.   Okay.  And then the FDA, in May
11 of 1999, determined that Vioxx -- or made a
12 decision to approve Vioxx as safe and
13 effective, correct?
14    A.   Yes.
15    Q.   Okay.  Now, do you believe that
16 the FDA was wrong in approving Vioxx as safe
17 and effective in May of 1999?
18    A.   I do.
19    Q.   And on what basis do you
20 believe they were wrong?
21    A.   Because its pain relief was no
22 better than standard available therapy, and
23 the reduction in the incidence of gastro- --
24 serious upper gastrointestinal illnesses was

Page 503

1 really unsubstantiated.  So those two reasons
2 on the efficacy side.
3         And on the risk side, there was
4 an important serious -- well, an important
5 increase in the risk of serious
6 cardiovascular disease.
7    Q.   Okay.  The FDA did not conclude
8 that the reduction of gastrointestinal
9 problems was unsubstantiated -- well, let me
10 back up.
11         We already talked about the
12 fact that endoscopic studies that were
13 performed during the Phase III clinical
14 trials demonstrated a reduction of ulcers
15 endoscopically, right --
16    A.   Right.
17    Q.   -- in Vioxx users compared to
18 comparators, right?
19    A.   I didn't mean to cut you off.
20 Right.
21    Q.   Right.
22         The only information the FDA
23 did not have was information about whether
24 that translated to hard gastrointestinal

Page 504

1 clinical endpoints, right?
2    A.   When we talk about the "only
3 information," we mean the only information
4 about this matter?
5    Q.   About the GI risks.
6    A.   Yes, that's correct.  I agree.
7    Q.   All right.  But there certainly
8 was reason to believe, based on the
9 endoscopic studies, that there was a GI
10 benefit, right?
11    A.   Well, I guess I would put it
12 this way:  If you're asking me was there
13 reason to believe, I'd say, no, not much.
14 There was the promise of this benefit.
15    Q.   Okay.
16    A.   But it hadn't been -- it had
17 not been realized and documented preapproval.
18    Q.   Okay.  You -- you're not --
19 you've never done a fellowship in
20 gastroenterology, right?
21    A.   That's true.
22    Q.   And you don't hold yourself out
23 as a gastroenterologist?
24    A.   That's correct.

27 (Pages 501 to 504)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 505

1    Q.    Okay. And you do recognize
2  that there were gastroenterologists at the
3  FDA who were involved in the review process,
4  right?
5    A.    Yes.
6    Q.    Okay. And you've not been
7  fellowship-trained in rheumatology, right?
8    A.    That's true.
9    Q.    And you are not board certified
10 in rheumatology, right?
11   A.    That's correct.
12   Q.    You don't hold yourself out as
13 an expert in rheumatology, right?
14   A.    That's right too.
15   Q.    And you recognize that there
16 were people at the FDA who were experts in
17 rheumatology who were involved with the
18 review of this --
19   A.    Yes.
20   Q.    -- drug? Okay.
21        And, in fairness, the reviewers
22 at the FDA who considered the new drug
23 application spent a lot more time, at least
24 collectively, reviewing the studies on Vioxx

Page 506

1  than you have; is that fair to say?
2        MR. WEBSTER: Objection, form.
3    A.    If you mean "collectively," you
4  sum the hours of all the reviewers, then I
5  think it's fair to say the sum of those hours
6  exceeds the sum of my hours.
7    Q    (BY MR. PIORKOWSKI) Sure.
8  Well, I mean, all of your time hasn't been
9  spent -- I mean, if we go back to the
10 roughly, whatever, 250 hours and let's
11 assume we --
12   A.    Right.
13   Q.    -- let's say with the 15 hours
14 you've spent in the last couple of weeks,
15 let's even say roughly 270 or something like
16 that.
17   A.    Sure.
18   Q.    In the 270 hours that you've
19 spent, part of -- a lot of that time has been
20 spent drafting an expert report, right?
21   A.    Yes.
22   Q.    A lot of it has been spent
23 looking at company documents, right?
24   A.    Yes.

Page 507

1    Q.    A lot of it has been spent
2  looking at medical literature that's come out
3  since the approval, right?
4    A.    Yes.
5    Q.    So in fairness to the FDA, the
6  amount of time that you actually spent
7  looking at the materials that the FDA looked
8  at when they made the reviewing decision,
9  they spent a lot more time than you did;
10 fair?
11   A.    Sure.
12        MR. WACKER: Objection, form --
13        MR. WEBSTER: Object to form.
14        MR. WACKER: -- speculation.
15   Q    (BY MR. PIORKOWSKI) Fair?
16   A.    Yes.
17   Q.    Okay. Let me --
18        MR. PIORKOWSKI: Thank you,
19 Jason, for --
20        MR. WEBSTER: You're welcome.
21        (Whereupon, Deposition Exhibit
22 Moye MDL 13, "Comparison of
23 Cardiovascular Thrombotic Events in
24 Patients with Osteoarthritis Treated

Page 508

1        with Rofecoxib Versus Nonselective
2  Nonsteroidal Anti-inflammatory Drugs
3  (Ibuprofen, Diclofenac and
4  Nabumetone)," by Reicin, et al.,
5  D616.1 - D616.6, was marked for
6  identification.)
7    Q    (BY MR. PIORKOWSKI) Let me
8  hand you what I've marked as Exhibit 13,
9  please.
10   A.    Thank you.
11   Q.    As a part of your review, did
12 you look at this article? And please take a
13 minute, if you need to review it.
14   A.    Sure. Thank you.
15        (Witness reviews document.)
16   A.    I don't think I referred to
17 this article in my affidavit, but I did look
18 at it.
19   Q    (BY MR. PIORKOWSKI) Okay. You
20 understand this is an article that sets forth
21 the -- first of all, it's based on the
22 Phase IIb and III osteoarthritis trials that
23 were performed prior to the initial approval
24 of Vioxx, right?

28  (Pages 505 to 508)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 509

```
1       A.   Yes.
2       Q.   Okay.  And it is authored by
3  Merck authors, right?
4       A.   Yes.
5       Q.   Okay.  And its focus is on
6  comparing cardiovascular thrombotic events in
7  Vioxx patients with patients in the control
8  group in the osteoarthritis trials, right?
9       A.   Yes.
10      Q.   Okay.  Now, let me ask you to
11 turn to Table 2.
12      A.   Can I have just one second?  I
13 just want to look at the "Methods" section
14 for just a moment.
15      Q.   Certainly.  Certainly.
16      A.   Thanks.
17           (Witness reviews document.)
18      A.   Okay.
19      Q.   (BY MR. PIORKOWSKI)  Okay.
20      A.   Thank you.
21      Q.   Do you see Table 2?
22      A.   I do.
23      Q.   Okay.  And Table 2 sets forth
24 rofecoxib, which is Vioxx, right?
```

Page 510

```
1       A.   Yes.
2       Q.   Versus nonselective NSAIDs, and
3  summarizes investigative reported
4  cardiovascular thrombotic events, right?
5       A.   Yes.
6       Q.   Okay.  In reviewing this, when
7  you looked at it, did you have any reason to
8  believe that the data that are set forth in
9  this paper are inaccurate or wrong?
10          MR. WEBSTER:  Objection, form.
11      A.   Well, let me put it this way:
12 I certainly would not accuse the authors of
13 misrepresenting the numbers.  So I have no
14 reason to suspect that the numbers in
15 Table 2, or any other table, for that matter,
16 are imprecise --
17      Q   (BY MR. PIORKOWSKI)  Okay.
18      A.   -- and don't reflect what they
19 saw in the database.
20      Q.   Okay.  Fair enough.
21           And what -- if we go down and
22 take a look, what it shows is that if we look
23 at cardiac events, for example, we see
24 that -- well, actually, let's look -- there's
```

Page 511

```
1  an n there at the top of the column, right?
2       A.   Right.
3       Q.   And that -- the n means that's
4  the total number of patients who were in the
5  studies that were looked at?
6       A.   Yes.
7       Q.   Okay.  And that's true for both
8  the rofecoxib group and for the nonselective
9  NSAID group, right?
10      A.   Right.
11      Q.   Okay.  And then there are
12 percentages throughout, right?
13      A.   Right.
14      Q.   And that's the percentages of
15 patients in the clinical trials -- these
16 particular clinical trials who experienced
17 those particular side-effects, right?
18      A.   Right.
19      Q.   Okay.
20      A.   Taking these drugs for what
21 period of time.
22      Q.   Right.
23           And what it shows is that
24 cardiac events collectively were .54% in
```

Page 512

```
1  Vioxx users, right?
2       A.   Right.
3       Q.   That's a little more than the
4  half of 1%, right?
5       A.   Right.
6       Q.   And in nonselective NSAID
7  users, they were .77%, right?
8       A.   Right.
9       Q.   Which is a little more than
10 three-quarters of 1%, right?
11      A.   Yes, uh-huh.
12      Q.   Okay.  And nobody would suggest
13 that difference, by the way, is
14 meaningful or statistically significant;
15 would you agree with me?
16      A.   Or even worth comparing.
17      Q.   Okay.  And you see also in
18 myocardial infarctions, that there is a .27%
19 for the rofecoxib group and .26% for the
20 nonselective NSAID group?
21      A.   Right.
22      Q.   And you'd agree with me those
23 are quite similar?
24      A.   Again, there's no question that
```

29 (Pages 509 to 512)

Lemuel A. Moye, M.D., Ph.D.

Page 513

1  in the data that they evaluated, these
2  were -- I mean, I believe these were the
3  rates that they found.
4      Q.   Okay.  And on sudden cardiac
5  death, for example, there were no cases in
6  Vioxx, but there was .13% in the nonselective
7  NSAIDs; but, again, you wouldn't consider
8  that a meaningful difference, I assume,
9  right?
10     A.   Well, I don't think it's any
11 difference that -- I mean, certainly the
12 numbers are different.
13     Q.   Right.
14     A.   But would one infer that
15 there's a greater incidence in nonselective
16 NSAIDs from rofecoxib from this?  I don't
17 think so.
18     Q.   Right.  I don't -- and you
19 haven't seen anybody suggest that, have you?
20     A.   Not from this, no.
21     Q.   Right.  Okay.  And -- but you
22 understand that these data, this compilation
23 of data in Table 2, is -- this represents the
24 data that the FDA had available to it from

Page 515

1      A.   Certainly no one would suggest
2  that's a meaningful difference, but I don't
3  think anybody would suggest that this data
4  are meaningful to draw any conclusion one way
5  or the other --
6      Q.   Okay.
7      A.   -- about the risk for
8  cardiovascular disease with these drugs.
9      Q.   Okay.  But what's clear from
10 these results is that among the various
11 adverse events that were looked at in the
12 Phase III clinical trials, myocardial
13 infarctions and coronary vasospasm and sudden
14 cardiac death and coronary artery disease
15 were among the adverse events that were
16 reported and analyzed, right?
17     A.   Well, they reported these
18 results in this way, yes.
19     Q.   Okay.  And you agree with me
20 that these are the data that the FDA had
21 available at the time it made this decision
22 to approve Vioxx, even though you don't agree
23 with that decision?
24     A.   This is some of the data that

Page 514

1  the Phase IIb and III clinical trials at the
2  time that it made the decision to approve
3  Vioxx?
4      A.   I believe so, yes.
5      Q.   Okay.
6      A.   They had -- they had this
7  information from the pre-NDA evaluations.
8      Q.   Okay.  And, similarly, if we go
9  to Table 3, Table 3 reflects -- under
10 "Cardiac Events," it reflects .31% for total
11 cardiac events versus .42% for placebo,
12 right?
13     A.   Right.
14     Q.   And that's somewhere in the
15 neighborhood of 1/3 of 1% to a little less
16 than 1/2 of 1%, right?
17     A.   Yes.
18     Q.   Okay.  And for myocardial
19 infarction, for Vioxx, it's .13% and for
20 placebo, it's .28%, right?
21     A.   Yes.
22     Q.   Okay.  And, again, nobody would
23 suggest that that's -- that's a meaningful
24 difference, right?

Page 516

1  the FDA had.
2      Q.   Okay.
3      A.   It is neither comprehensive nor
4  very helpfully elaborated, but this is some
5  of the data that the FDA had, right.
6          MR. JOSEPHSON:  Object to the
7  responsiveness.
8          MR. PIORKOWSKI:  Okay.  Object
9  to responsiveness.
10     A.   I will also say that I think
11 that people at the FDA understood that data
12 presented in this way, and event rates at
13 such a low incidence rate, precluded any
14 realistic determination of a relationship
15 between cardiovascular thrombotic events and
16 rofecoxib.
17         MR. JOSEPHSON:  Objection to
18 the responsiveness.
19     Q   (BY MR. PIORKOWSKI)  All right.
20 In Table 1, one of the things that they look
21 at are baseline demographic data, right?
22     A.   Yes.  Right.
23     Q.   And just -- I want to talk for
24 a second about baseline demographic data and

30 (Pages 513 to 516)

Lemuel A. Moye, M.D., Ph.D.

Page 517

1 what that means.
2         When you do a study,
3 particularly a randomized placebo-controlled
4 study, one relies on the randomization
5 process to try to get groups that are roughly
6 equivalent; is that a fair statement?
7     A.    Yes, sir.
8     Q.    Okay.  And one of the things
9 that you need to be cognizant of is if the
10 groups are different -- in other words, if
11 one group ends up with twice as much
12 hypertension at baseline or twice as much
13 high cholesterol at baseline -- that could
14 affect the results that you see in the
15 clinical trials, right?
16     A.    It would affect, everything
17 else being equal, the attribution of the
18 effect of the therapy.
19     Q.    Okay.  So I just want to make
20 sure, actually, to clarify that point:  So
21 if, for example, as a baseline, if you had a
22 higher cholesterol level in one group, that
23 would tend to -- that would tend to
24 predispose one to thrombotic events at a

Page 518

1 greater rate than if you had a lower
2 cholesterol level?
3     A.    Again, everything else being
4 equal.
5     Q.    Everything else being equal.
6     A.    We're talking about a
7 population who's typically at risk for this
8 disorder, anyway, right?
9     Q.    All else being equal.
10    A.    Right.
11    Q.    And the same thing would be
12 true, for -- like, for example, hypertension,
13 right?
14    A.    Yes.
15    Q.    All else being equal --
16    A.    Right.
17    Q.    -- if you had high -- greater
18 hypertension in one group, that would be an
19 explanation why you might have greater
20 thrombotic events in that group, right?
21    A.    Right.
22    Q.    Okay.  Now, in Table 1, what
23 they're talking about here is the baseline
24 demographic data, right?

Page 519

1     A.    Yes.
2     Q.    And from your perspective, this
3 baseline demographic data shows that, with
4 respect to most of the variables that could
5 have confounded the analysis, they're fairly
6 evenly distributed; is that a fair
7 characterization?
8     A.    Actually, Mr. Piorkowski, it's
9 not.  And I'm a little surprised at the
10 difference in the systemic hypertension,
11 hypercholesteremia -- hypercholesterolemia a
12 little bit, I guess.
13    Q.    Okay.
14    A.    But this is not one study --
15    Q.    Right.
16    A.    -- that has recruited -- what
17 are we talking about -- almost 5,000
18 patients.
19    Q.    Right.
20    A.    This is a combination of
21 studies.
22    Q.    Right.
23    A.    And so I don't know what to
24 make of that.

Page 520

1     Q.    Okay.
2     A.    I would just tell you I am a
3 little surprised at the difference in the
4 risk factors.
5     Q.    Okay.  But, actually, if we
6 look at hypertension, the difference that I
7 guess you're alluding to is the difference
8 between 30.5% of patients in the placebo
9 group and 39.8% of patients in the Vioxx
10 group, right?
11    A.    Yes.
12    Q.    Okay.  And that actually would
13 tend to make thrombotic events in the Vioxx
14 group greater, right?
15    A.    Again, everything else being
16 equal.
17    Q.    Everything else being equal.
18    A.    But, of course, here it's not,
19 because there are more smokers in the placebo
20 group.
21    Q.    Okay.  But by 1.5%?
22    A.    Right.  And so it depends on
23 the relative risk of smoking versus -- I
24 mean, I'm just saying that things aren't

Lemuel A. Moye, M.D., Ph.D.

Page 521

1 equal here.
2 Q. Okay. Okay. One of the
3 reasons you look at this, though, is so you
4 can get some understanding of what the nature
5 of the patients were in the database, right?
6 A. Yes.
7 Q. Okay. Now, it is correct,
8 right, that if -- again, assuming that
9 these -- these data accurately reflect what
10 was seen in the clinical trials, that 11.2%
11 of patients in the Vioxx Phase IIb and III
12 clinical trials had a history of
13 atherosclerotic cardiovascular disease,
14 right?
15 A. Yes.
16 Q. Okay. And 2.5% of patients in
17 the Vioxx group had a history of myocardial
18 infarction prior to -- as a baseline before
19 entering the study, right?
20 A. Right. A small number did,
21 2.5 -- well, a small percent did, 2.5%.
22 Q. Right.
23 And 6.9% of the Vioxx users in
24 the Phase IIb and III clinical studies had a

Page 522

1 history of coronary artery disease at
2 baseline, right?
3 A. Yes.
4 Q. Okay. And then if we actually
5 go down to -- to the risk factors, 57.2% of
6 patients in the Vioxx Phase IIb and III
7 clinical studies had some cardiovascular risk
8 factor at baseline, right?
9 A. Had at least one of the four
10 that are listed below.
11 Q. Okay. And 39.8% of Vioxx users
12 at baseline had hypertension at baseline,
13 right?
14 A. Yes.
15 Q. Okay. And 17.2% of Vioxx users
16 had hypercholesterol at baseline, right?
17 A. Yes.
18 Q. Okay.
19 A. However that's defined here --
20 Q. Okay.
21 A. -- but yes.
22 Q. Prior to the time -- remember
23 we had talked last couple weeks ago about the
24 Fitzgerald hypothesis and that discussion?

Page 523

1 A. Yes.
2 Q. Okay. Prior to the time of the
3 Fitzgerald hypothesis in late 1997, there was
4 a general understanding by both Merck and the
5 FDA that because Vioxx did not inhibit COX-1,
6 that Vioxx did not inhibit thromboxane,
7 right?
8 A. Yes.
9 Q. Okay. And so to the extent
10 that there was some clinical benefit achieved
11 by inhibiting thromboxane, Vioxx would not
12 provide that benefit, right?
13 A. Yes.
14 Q. I mean, that was commonly
15 understood?
16 A. Right.
17 Q. Is that fair to say?
18 A. Right.
19 Q. Okay. What was less clear at
20 that time is what effect other nonsteroidal
21 anti-inflammatory drugs had on thromboxane
22 inhibition; is that fair?
23 A. Well, but other inflammatory --
24 other nonsteroidal anti-inflammatories are

Page 524

1 global, both COX-1, COX-2 suppressors.
2 Q. Right.
3 A. Right.
4 Q. Well, let me back up a minute.
5 We agree that aspirin has an
6 effect of irreversibly inhibiting the
7 platelet and has an inhibitory effect on
8 thromboxane, right?
9 A. Right.
10 Q. No question about that?
11 A. Right. Irreversible inhibitory
12 effect, right.
13 Q. Okay. Other NSAIDs, such as,
14 let's say, ibuprofen or diclofenac --
15 A. Right.
16 Q. -- have some COX-1 suppression,
17 right?
18 A. Yes. Right.
19 Q. Their COX-1 -- the COX-1
20 suppression of ibuprofen and diclofenac is
21 reversible, right?
22 A. Yes.
23 Q. The COX-1 suppression from
24 ibuprofen and diclofenac is also related to

32 (Pages 521 to 524)

Lemuel A. Moye, M.D., Ph.D.

Page 525

1   the dose of those medications, right?
2       A.   Yes.
3       Q.   And it's also related to the
4   duration for which those medications are
5   used?
6       A.   Yes.
7       Q.   Okay. Same is true for
8   naproxen, right?
9       A.   Yes.
10      Q.   In fact, the same is true for
11  every one of the nonsteroidal
12  anti-inflammatory drugs?
13      A.   Yes.
14      Q.   Okay. So prior to the
15  Fitzgerald hypothesis, what was understood is
16  that the effect of Vioxx on thromboxane
17  inhibition was neutral or it was the
18  effect that a placebo would have?
19      A.   Right.
20      Q.   Okay. All right. Now, there's
21  a lot of discussion in your report about the
22  VIGOR study?
23      A.   Yes.
24      Q.   Okay. I want to just go over

Page 526

1   some basic things about the VIGOR study for a
2   minute.
3           You agree with me that VIGOR
4   was primarily intended as a GI outcome
5   study --
6       A.   Yes.
7       Q.   -- right?
8           The idea was that the -- there
9   was some potential for benefit, as
10  demonstrated by the endoscopy studies in the
11  Phase III trials, the FDA wanted to see some
12  hard data on some GI endpoints, and that was
13  the backdrop of the VIGOR study being
14  conducted?
15      A.   Yes. They were hoping to see
16  clinical -- important reductions in
17  clinically significant symptomatic upper GI
18  adverse events.
19      Q.   Okay. Okay. Now, would you
20  agree with me that if you're doing a study of
21  that endpoint, that aspirin use is a
22  potential confounder?
23      A.   Yes.
24      Q.   Okay. The reason aspirin is a

Page 527

1   potential confounder is because even low-dose
2   aspirin can have a -- can have an adverse
3   gastrointestinal effect --
4       A.   Yes.
5       Q.   -- right?
6           Now, am I correct the dose of
7   Vioxx that was used in the VIGOR study was
8   50 milligrams, right?
9       A.   Yes.
10      Q.   And as it was administered in
11  the VIGOR study, it was 50 milligrams
12  essentially chronic use for a period of
13  several months, right?
14      A.   Yes.
15      Q.   That dosage of Vioxx -- in
16  other words, 50 milligrams for chronic use --
17  was not an approved dosage as marketed at
18  that time --
19      A.   Right.
20      Q.   -- is that right?
21          And the patients in the VIGOR
22  study -- the VIGOR study was conducted
23  entirely in a group of rheumatoid arthritis
24  patients; is that right?

Page 528

1       A.   Yes.
2       Q.   Okay. And at the time the
3   VIGOR study was conducted, rheumatoid
4   arthritis was also not an approved indication
5   for Vioxx; is that right?
6       A.   Right.
7       Q.   Okay. The approved indications
8   originally were osteoarthritis --
9       A.   Right.
10      Q.   -- and short-term pain relief
11  and dysmenorrhea, right?
12      A.   Yes.
13      Q.   And 12.5 and 25 milligrams were
14  approved for chronic use, but 50 milligrams
15  was -- the recommendation was that it be
16  limited to a few days; is that right?
17      A.   Yes.
18      Q.   Okay. Now, the VIGOR results
19  became known to Merck sometime in March of
20  2000; is that right?
21      A.   Yes.
22      Q.   Is that your understanding?
23      A.   Yes.
24      Q.   All right. And do you have any

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 529

1  criticisms that you intend to offer about --
2  concerning the conduct of the DSMB with
3  respect to VIGOR?  Let me back up and --
4       MR. WEBSTER:  Objection to
5  form.
6       MR. PIORKOWSKI:  Let me back up
7  and lay a foundation for you.
8       Q    (BY MR. PIORKOWSKI) You
9  understand that there was a DSMB that was
10 involved in monitoring the VIGOR trial?
11      A.   Yes.
12      Q.   Okay.  And the DSMB was
13 composed of outside scientists, primarily,
14 right?
15      A.   Yes.
16      Q.   And there was one nonvoting
17 member who was a Merck person?
18      A.   Right.
19      Q.   Deborah Shapiro.
20      Do you have -- do you have any
21 criticisms of the DSMB with respect to their
22 conduct in overseeing the VIGOR study?
23      MR. WACKER:  Objection.
24      A.   Not at this time, no.

Page 530

1       Q    (BY MR. PIORKOWSKI) Okay.  Do
2  you agree -- you agree with me that when the
3  results of the VIGOR study, at least the
4  preliminary results -- well, let me back up.
5       The way these studies work,
6  just for the jury's benefit, there's a period
7  of analysis that needs to be done before the
8  data are finally reported, right?
9       A.   Yes.
10      Q.   But, oftentimes, you can get an
11 early read about what's going on, right?  I
12 mean --
13      A.   Well, if by that, you mean at
14 the period at the time of the closeout, there
15 is an early assessment that is typically
16 available from the statistical group --
17      Q.   Okay.
18      A.   -- that is based on the data
19 that have not really been -- that are not
20 pristine yet.
21      Q.   Right.  Let me rephrase the
22 question so we're not misunderstanding each
23 other.
24      Merck became aware of the

Page 531

1  results of the VIGOR study sometime in
2  March 2000, right?
3       A.   Yes.
4       Q.   But at that time, the data had
5  not been completely reviewed.  It was
6  preliminary data --
7       A.   Assessment.
8       Q.   -- points; is that fair?
9       A.   Yes.
10      Q.   Preliminary evaluation.
11      And Merck did promptly disclose
12 to the FDA the results of that preliminary
13 evaluation, right?
14      MR. WEBSTER:  Objection, form.
15      A.   I don't know what you mean
16 there.
17      Q.   (BY MR. PIORKOWSKI) Well,
18 Merck told -- Merck found out in -- Merck
19 found out in March of 2000 that the VIGOR
20 study -- it first of all found out that the
21 GI results were favorable for Vioxx, right?
22      A.   Yes.
23      Q.   And also found that there was
24 an unexpected increase in cardiovascular

Page 532

1  events, right?
2       MR. BLIZZARD:  Object to form.
3       MR. WEBSTER:  Objection, form.
4       A.   Yes.
5       Q.   (BY MR. PIORKOWSKI) Okay.  And
6  both of those facts were relayed to the FDA
7  within a matter of days, right?
8       A.   I don't know what fact -- a
9  couple things.  I don't know what day it was
10 relayed.
11      Q.   Okay.
12      A.   I don't know what fact about
13 the increased risk associated with Vioxx was
14 relayed.
15      Q.   Okay.  Do you know whether the
16 FDA knew by the end of March of 2000 that --
17 that the VIGOR study had demonstrated a
18 higher CV rate in Vioxx users compared to
19 naproxen users?
20      A.   I know the FDA was told that.
21 I don't know how much higher.
22      Q.   Okay.  Do you know whether the
23 FDA was told specifically that the rate of
24 heart attacks was higher?

34  (Pages 529 to 532)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 533

1    A.    I know they were told that.
2    Again, I don't know how much higher they
3    were.
4        Q.    Okay.  Do you know when Merck
5    first proposed a label change to the FDA that
6    included the VIGOR cardiovascular data?
7        A.    I don't know.
8        Q.    Okay.  I mean, do you know if
9    it was a month, a year, two years?
10       A.    I don't know.
11       Q.    Okay.  One of the things the
12   VIGOR study showed -- well, first of all,
13   cardiovascular events were not a primary
14   endpoint for the study; is that right?
15       A.    That's true.
16       Q.    Okay.  One of the reasons
17   cardiovascular events were collected was
18   because Merck had followed the recommendation
19   of its board of scientific advisors and
20   implemented a CVSOP procedure, right?
21       A.    That's why they collected the
22   events the way they -- yes.
23       Q.    And that's why we had
24   adjudicated data on VIGOR, right?

Page 534

1        A.    Yes.
2        Q.    Okay.  And you're not critical
3    of Merck for having followed the board of
4    scientific advisors' recommendation to
5    implement the CVSOP?
6        A.    Well, I certainly am not
7    critical of follow -- developing this
8    common nomenclature and classification
9    system.
10           I am critical of Merck's
11   implementation of this; that is to say, the
12   design of VIGOR, which led to the collection
13   of these endpoints.  I am critical of that.
14   I'm not critical of the nomenclature they
15   used.
16       Q.    You're critical of the design
17   of the study that led to the endpoints?
18       A.    Well, if I can rephrase.  I'm
19   critical of the patient selection decisions
20   that were made that ultimately produced the
21   number of cardiovascular endpoints that VIGOR
22   generated.
23           I'm not critical of Merck of --
24   at least at this point, how they classified

Page 535

1    them, or developing the nomenclature tools
2    that the scientific advisory board suggested.
3        Q.    Okay.  So we agree that
4    implementation of the CVSOP was a good thing
5    to do?
6        A.    Well, yes.  But, to me, that
7    also means that you design a trial so that
8    you will be able to produce these endpoints.
9        Q.    Okay.
10       A.    And so I am critical of Merck
11   in that aspect.
12           MR. JOSEPHSON:  Objection to
13       the responsiveness after the first
14       part.
15       Q    (BY MR. PIORKOWSKI)  Okay.  In
16   terms of -- what specific aspects of the
17   VIGOR trial design are you critical of?
18       A.    That they prohibited the
19   inclusion of patients who are at high risk of
20   cardiovascular disease.
21       Q.    And if patients are at high
22   risk for cardiovascular disease, a vast
23   majority of that group of patients would
24   probably have an indication for taking

Page 536

1    aspirin, right?
2        A.    Perhaps, yes.  Yes.
3        Q.    I mean, it's like you remember
4    in high school math the Venn diagrams?
5        A.    Venn diagram, yeah.
6        Q.    Okay.  If you drew one Venn --
7    if you drew one circle that were people who
8    had a history of coronary artery disease and
9    you drew another circle of the people for
10   whom aspirin was indicated, there would be a
11   large overlap in the middle, right?
12       A.    I'm not sure.  The
13   recommendation for -- well, I guess if we had
14   the first circle as history of coronary
15   artery disease, then the answer is yes, there
16   is a large overlap.
17       Q.    Okay.  The patients who were
18   excluded were patients who had --
19       A.    I need a copy of the -- I'm
20   sorry.  I need a copy of the manuscript, if
21   you have one.
22           MR. PIORKOWSKI:  Sure.
23           (Interruption by the
24       videographer.)

35 (Pages 533 to 536)

Lemuel A. Moye, M.D., Ph.D.

Page 537

1    (Whereupon, Deposition Exhibit
2  Moye MDL 14, "Comparison of Upper
3  Gastrointestinal Toxicity of Rofecoxib
4  and Naproxen in Patients with
5  Rheumatoid Arthritis," by Bombardier,
6  et al., (9 pages), was marked for
7  identification.)
8    THE WITNESS: Okay. Thank you.
9    MR. PIORKOWSKI: Get one for
10 Jason.
11   MR. WEBSTER: Thank you.
12   Q    (BY MR. PIORKOWSKI) On
13 page 1523 -- first of all, what I've marked
14 as Exhibit 14 is a copy of the published New
15 England Journal of Medicine VIGOR manuscript;
16 is that right?
17   A.   It is.
18   Q.   Okay. On page 1523, you see
19 under this heading of "General Safety"?
20   A.   Yes.
21   Q.   Okay. And about halfway down
22 that page, it says, quote, "4% of the study
23 subjects met the criteria of the Food & Drug
24 Administration for the use of aspirin for

Page 538

1  secondary cardiovascular prophylaxis
2  (presence of a history of myocardial
3  infarction angina, cerebrovascular accident,
4  transient ischemic attack, angioplasty or
5  coronary bypass)." Did I read that
6  correctly?
7    A.   Yes.
8    Q.   Okay. And is it your
9  understanding that those are the patients
10 that were excluded from the study?
11   A.   Well, it's my understanding
12 that there were many patients of high risk
13 who were excluded, now this says that 4% of
14 the study subjects, so essentially there were
15 really a small percent of patients had one of
16 these criteria, right, and most -- and many
17 patients who could have been --
18     (Interruption off the record.)
19     THE WITNESS: Let's let the
20 noise go away.
21     MR. PIORKOWSKI: Sure.
22   A.   -- many patients who had these
23 risk factors and would otherwise have been
24 admissible for the study were not. The

Page 539

1  patients at risk for heart disease were
2  not -- excuse me, were excluded from the
3  study, by and large.
4    Q    (BY MR. PIORKOWSKI) Well, you
5  would agree with me that it would be
6  unethical to conduct a study that prohibited
7  patients from taking medication that they
8  needed to take to reduce their cardiovascular
9  risk?
10   A.   Right. And I'm not suggesting
11 that that should be the case at all.
12   Q.   Okay.
13   A.   I mean, these people should
14 have received the appropriate aspirin
15 prophylaxis while they were in the study.
16     MR. PIORKOWSKI: Right. I
17 think we're out of tape.
18     THE WITNESS: Sure.
19     MR. PIORKOWSKI: Is this a good
20 time for a break, Jason, or what do
21 you want to do?
22     THE VIDEOGRAPHER: Off the
23 record at 10:27.
24     (Recess taken, 10:27 a.m. to

Page 540

1    10:35 a.m.)
2      THE VIDEOGRAPHER: Hold,
3  please. On the record at 10:35.
4    Q    (BY MR. PIORKOWSKI) Doctor, is
5  it your opinion that patients with high
6  cardiovascular risk should have been
7  permitted in the study even if they needed
8  aspirin?
9    A.   Yes, and they should have been
10 given aspirin when they entered the study.
11   Q.   Okay. Well, you understand
12 that the exclusion criteria intended to
13 exclude patients for whom aspirin was
14 indicated?
15   A.   Well, I understand that, but
16 I -- but what I -- but what I disagree with
17 is the result that came from this
18 consideration, I mean, because certainly
19 inclusion and exclusion criteria are a
20 complicated calculus, and every decision has
21 implications.
22   Q.   Right.
23   A.   The decision to exclude -- to
24 deny patients the use of aspirin was not a

36 (Pages 537 to 540)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 541

1  decision that was -- that was required in
2  order to conduct the study. In fact --
3      Q.   Okay. I'm sorry. Were you
4  done?
5      A.   No, that's okay.
6      Q.   Let me make sure we're clear
7  about what the facts were.
8          First of all, the exclusion
9  criteria are what the study design says --
10 these are patients that should not be
11 participating in the study, right?
12     A.   Yes.
13     Q.   Okay.
14     A.   Right.
15     Q.   There are times where, even
16 though the exclusion criteria intend to
17 exclude certain patients for reasons of lack
18 of adherence to inclusion/exclusion criteria,
19 patients get included in a study even though
20 they should be excluded, according to the
21 protocol, right?
22     A.   Right. No execution -- no
23 clinical trial has perfect execution.
24     Q.   Okay.

Page 542

1      A.   And there are a small number of
2  patients who, for one reason or another, get
3  through the screening mechanism --
4      Q.   Right.
5      A.   -- and are admitted who should
6  not have been.
7      Q.   Right. And you understand that
8  that's what happened in VIGOR?
9      A.   For a small number of patients,
10 yes.
11     Q.   For a small number of patients,
12 they should have been excluded because they
13 had aspirin indications but, in fact, they
14 were included in the study, right?
15     A.   Right.
16     Q.   Now, you understand that
17 nobody -- nobody foreclosed them from taking
18 aspirin once they were in the study?
19     A.   I'm not suggesting that that
20 happened.
21     Q.   Okay. I just want to make sure
22 we're clear about that.
23     A.   Right. Sure. Right.
24     Q.   Okay. The fact of the matter

Page 543

1  is, though, that if the patient needs aspirin
2  because of FDA -- because of the
3  indications --
4      A.   Right.
5      Q.   -- you and I agree that it
6  would be unethical to withhold aspirin during
7  the course of the trial, assuming the patient
8  got into the trial?
9      A.   I agree, right. Sure.
10     Q.   Okay.
11     A.   Right.
12     Q.   And -- but you also agree with
13 me that if you're studying GI endpoints,
14 aspirin use is going to confound the results?
15     A.   Well, I guess I disagree with
16 that. Certainly, aspirin is going to
17 increase -- we can get specific here.
18 Aspirin is -- aspirin use is going to
19 increase the rate of GI bleeds in both
20 groups. That does not preclude demonstrating
21 a rofecoxib effect. It just means it's going
22 to be a little harder to demonstrate that.
23 It doesn't preclude it, okay?
24     Q.   Okay. But it does make the

Page 544

1  accomplishment of the primary objective of
2  the study more difficult; you agree with me
3  there?
4      A.   Well, yes and no. Yes, in --
5  yes, in that it makes the determination of
6  the effectiveness of rofecoxib in reducing
7  GI -- serious GI -- upper GI events more
8  difficult. However, it makes it easier to
9  identify the harmful effect of rofecoxib on
10 cardiovascular disorders.
11     Q.   Now, let's assume for the sake
12 of discussion that patients were included and
13 that those patients were, in fact, taking
14 aspirin.
15     A.   You mean high-risk patients.
16     Q.   High-risk patients were
17 included with those patients who were taking
18 aspirin.
19     A.   Right. Right.
20     Q.   We talked last time about the
21 fact that aspirin inhibits thromboxane,
22 right?
23     A.   Yes.
24     Q.   It inhibits thromboxane

37 (Pages 541 to 544)

Lemuel A. Moye, M.D., Ph.D.

Page 545

1  irreversibly?
2     A.   Yes.
3     Q.   And so if your theory is that
4  Vioxx causes an imbalance --
5     A.   Yes.
6     Q.   -- then a study that allowed
7  aspirin use would not give you a thorough
8  evaluation of whether or not Vioxx does or
9  does not adversely affect the
10  thromboxane-prostacyclin balance?
11     A.   I would agree that no study is
12  perfect --
13     Q.   Okay.
14     A.   -- in this complicated -- in
15  this complicated biochemical environment.
16     Q.   Okay.
17     A.   However -- however, including
18  patients who were at high risk of
19  cardiovascular disease would require them to
20  be on aspirin. It would complicate the
21  evaluation.
22        We also recognize as -- I think
23  as you pointed out, that clinical trial
24  execution is not perfect. Some of those

Page 546

1  high-risk patients would not be taking
2  aspirin, and there could be an evaluation of
3  those patients, the effect of
4  cardiovascular -- the effect of rofecoxib on
5  cardiovascular disorders in those patients.
6     Q.   Okay. But you agree with me in
7  principle that aspirin use would complicate
8  the interpretation not only of the
9  gastrointestinal endpoint, it would also
10  complicate interpretation of the
11  cardiovascular endpoint?
12     A.   No, because the cardiovascular
13  endpoint is already complicated by the fact
14  that you have patients who are at low -- you
15  have primarily patients who are at low risk,
16  and I don't accept that admitting patients
17  with high risk and including aspirin would
18  lead to a more complicated interpretation of
19  the effect of rofecoxib on
20  cardiothrombotic -- on atherosclerotic
21  disease.
22     Q.   The -- would you agree with me
23  that in the wake of the VIGOR study, that
24  there was widespread debate about what the

Page 547

1  results of the VIGOR study meant in the
2  medical community?
3     MR. WACKER:  Objection.
4     A.   Can I ask you to define for me
5  what you mean by "wake"? Specifically, are
6  we talking about after its publication?
7     Q.   (BY MR. PIORKOWSKI) Well, fair
8  question.
9        Let's talk about the period of
10  time in -- well, let me back up. Withdraw
11  that question.
12        FDA in February 2001 convened
13  an Advisory Committee meeting, right?
14     A.   Yes, they did.
15     Q.   Okay. One of the reasons the
16  FDA convened the Advisory Committee meeting
17  was because the interpretation of the VIGOR
18  study was very complicated; fair to say?
19     MR. WACKER:  Objection.
20     A.   Well, I would say that the --
21  its findings surprised many people.
22     Q.   (BY MR. PIORKOWSKI) But if the
23  findings absolutely represented a clear and
24  unequivocal cardiovascular risk, then there's

Page 548

1  no need to have an Advisory Committee to talk
2  about what it means. The FDA can just --
3  just demand that Merck modify its label to
4  add a cardiovascular risk?
5     MR. BLIZZARD:  Object to form.
6     A.   Well, I don't think it's that
7  easy at all. Maybe on paper, it is, but, in
8  fact, Merck or a sponsor in general could
9  certainly contest it and ask to have their
10  own advisor -- ask the Advisory Committee as
11  well.
12     Q.   (BY MR. PIORKOWSKI) Merck
13  didn't contest the Advisory Committee.
14     A.   No. No. I said -- no. In
15  this example you gave where the FDA could
16  summarily say you have to change the label,
17  the sponsor can come back and ask that that
18  not happen, that we first have an Advisory
19  Committee meeting.
20     Q.   But that never happened. The
21  FDA never demanded a label change. The FDA's
22  position was these study results are
23  complicated, and we want to get some input
24  from our Advisory Committee about what they

38  (Pages 545 to 548)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 549

1  mean, right?
2      A.    Okay.  I don't doubt -- the
3  only thing I'm quibbling about is the
4  "complicated."
5      Q.    Okay.
6      A.    I mean, certainly the results
7  were a surprise, they had new information
8  that had to be considered, and an Advisory
9  Committee meeting was prudent.
10     Q.    Well, one of the reasons that
11  the interpretation of the data were
12  complicated is because it was not -- VIGOR
13  was not a placebo-controlled study, right?
14         MR. WACKER:  Objection to form.
15         MR. WEBSTER:  Objection, form.
16     A.    That is one reason, yes.
17     Q     (BY MR. PIORKOWSKI)  And
18  whether you agree with it or disagree with
19  it, there were people who believed that
20  naproxen's effects may account for part of
21  the findings or that Vioxx effects may
22  account for part of the findings, or some
23  combination of those and chance, or chance
24  alone, right?  I mean, there's -- all those

Page 550

1  were possibilities?
2         MR. WACKER:  Objection,
3  compound.
4         MR. WEBSTER:  Objection, form.
5         MR. PIORKOWSKI:  Let me
6  withdraw the question.
7      Q     (BY MR. PIORKOWSKI)  Is it fair
8  to say that within the -- outside of Merck,
9  but within the medical community, there
10  were -- there were views reflected in the
11  medical literature throughout 2001 that the
12  results of the VIGOR study were unclear in
13  terms of what they meant as far as
14  cardiovascular risk?
15     A.    Yes, I agree with that.
16     Q.    Okay.  You agree with that?
17     A.    Right.
18     Q.    And you agree that there
19  were -- well, at the -- so we have an
20  understanding of what was going on at the
21  time of the Advisory Committee meeting, this
22  was not -- there was not just a study on
23  Vioxx.  There was also a study on Celebrex
24  that had been recently released, right?

Page 551

1      A.    Yes.
2      Q.    A study called the CLASS study?
3      A.    Yes.
4      Q.    The CLASS study was a study
5  that was in some ways similar to the VIGOR
6  study in that it was looking at
7  gastrointestinal endpoints, right?
8      A.    Yes.
9      Q.    Okay.  There's some differences
10  with the CLASS study, right?
11     A.    Well, I don't know the CLASS
12  study very well.
13     Q.    Okay.
14     A.    I didn't study it.
15     Q.    All right.  But you do know
16  from having read the Advisory Committee
17  transcript that there was one day of the
18  Advisory Committee in February 2001 that was
19  devoted to looking at Celebrex --
20     A.    Yes.
21     Q.    -- and there was a separate day
22  devoted to looking at Vioxx?
23     A.    That's right.
24     Q.    And one of the issues that they

Page 552

1  talked about in both meetings is whether, if
2  there is -- whether, if the VIGOR results do
3  mean there's an increased risk, whether that
4  is an increased risk just for Vioxx or
5  whether it's an increased risk for COX-2s
6  generally or whether it's an increased risk
7  across the board?
8      A.    That's right.
9      Q.    That was one of the questions,
10  right?
11     A.    Sorry.
12         Yes.  Right.
13     Q.    Okay.  And although I
14  understand, you know, you don't know the
15  details of the CLASS study, you do understand
16  that the CLASS study was not a naproxen
17  comparison, right?
18     A.    That's true.
19     Q.    Okay.  It was a study of
20  Celebrex versus ibuprofen and diclofenac,
21  right?
22     A.    Yes.
23     Q.    Okay.  The 2001 Advisory
24  Committee, in part, included members who were

39 (Pages 549 to 552)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 553

1  trained in cardiology, right?
2      A.    Yes.
3      Q.    And which isn't really typical
4  for an arthritis advisory committee, right?
5      A.    That's right.
6      Q.    The reason that cardiologists
7  were invited to participate is because there
8  were issues with the interpretation of
9  potential cardiac risks, right?
10     A.    Yes.
11     Q.    One of the cardiologists who
12 participated on that panel was a fellow named
13 Dr. Steve Nissen, right?
14     A.    Yes.
15     Q.    Do you know Dr. Nissen?
16     A.    Not personally, no.
17     Q.    Have you served on an Advisory
18 Committee with him?
19     A.    I don't think so. I don't
20 think so.
21     Q.    Dr. Nissen is at the Cleveland
22 Clinic; is that your understanding?
23     A.    Right.
24     Q.    Is he viewed as a prominent

Page 554

1  cardiologist, from your understanding?
2      A.    Yes.
3      Q.    Okay. And Dr. Nissen at the
4  Advisory Committee made comments along the
5  lines of "I suppose people want to hear from
6  me, since I'm the cardiologist who's here,"
7  right?
8      A.    Yes.
9      Q.    And he expressed the view
10 that -- or the question as to whether what
11 was seen in the VIGOR trial was or wasn't
12 different for Vioxx and for Celebrex, right?
13     A.    Yes.
14     Q.    Okay. And at the end of the
15 day, Dr. Nissen's bottom line, if you will,
16 was that he thought the information from the
17 VIGOR label -- or from the VIGOR study should
18 be included in the product label, right?
19     A.    Yes.
20     Q.    But he didn't -- he didn't
21 believe that it was clear that that
22 represented an increased cardiovascular risk;
23 is that fair to say?
24         MR. WACKER: Objection.

Page 555

1      A.    That's a characterization of
2  his opinion.
3      Q     (BY MR. PIORKOWSKI) Yes, it
4  is.
5      A.    Yes.
6      Q.    I'm asking you: Is that a fair
7  characterization of his opinion?
8      A.    Yes.
9      Q.    Because you read this
10 transcript. Actually, it was one of the
11 first things you read when you got involved
12 in the litigation, right?
13     A.    That's true, right.
14     Q.    Okay. And nobody on the 2001
15 Advisory Committee recommended that Vioxx be
16 withdrawn from the market, right?
17     A.    Well, that's certainly true,
18 but it -- we have to view that decision
19 through the lens of what they were shown.
20 What they were shown was misleading.
21     Q.    Okay.
22     A.    But given they've -- the view
23 that they had, then that was the conclusion
24 they reached.

Page 556

1      Q.    Let's come back and --
2         MR. JOSEPHSON: Objection to
3  the responsiveness.
4         MR. PIORKOWSKI: Okay.
5      Q     (BY MR. PIORKOWSKI) Let's come
6  back and talk about what they were shown in a
7  minute. Let me be sure we're on the same
8  page with respect to what their conclusions
9  were.
10     A.    Sure.
11     Q.    And then we'll talk about what
12 they may or may not have seen.
13         Their conclusion -- nobody on
14 the Advisory Committee concluded or suggested
15 or recommended that Vioxx should be withdrawn
16 from the market, correct?
17     A.    That's right.
18     Q.    Okay. And nobody suggested
19 that Vioxx have a black box warning for
20 cardiovascular risk, right?
21     A.    That's right.
22     Q.    Okay. What they suggested is
23 that the information from the VIGOR study be
24 included in the product label so that doctors

40  (Pages 553 to 556)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 557

1 had that information available to make their
2 own determination about what it meant?
3    A.   Yes.
4    Q.   Is that fair?  Okay.
5    A.   Yes.
6    Q.   And, in fact, that's the
7 recommendation that was ultimately adopted
8 and integrated into the label in April of
9 2002, right?
10   A.   Yes.
11   Q.   Okay.  Now, you said in
12 response to an earlier question that the FDA
13 Advisory Committee is essentially only as
14 good as the information it's given or
15 something like that?
16   A.   Yes.
17   Q.   Okay.  What specific
18 information is it that you contend that the
19 February 2001 FDA Advisory Committee did not
20 have?
21   A.   Two things:  They didn't have
22 the relevant tables from the Watson report,
23 nor did they have the mortality data from the
24 Alzheimer's studies.

Page 558

1    Q.   Okay.  Anything else?
2    A.   No.  Those are the two things I
3 can -- I believe they should have had and did
4 not have.
5    Q.   Other than those two things,
6 there's nothing else at trial that we're
7 going to hear you say that Merck failed to
8 give to either the FDA or the Advisory
9 Committee in 2001; is that right?
10   A.   I would say this:  If I learn
11 anything else, I will certainly let you know
12 well before trial.
13   Q.   But, as we sit here today,
14 there's nothing other than those two pieces
15 of information?
16   A.   That's true.
17   Q.   Okay.  All right.  One of the
18 articles that you referenced in your -- in
19 your report is an article written by
20 Drs. Mukherjee, Nissen and Topol, right?
21   A.   Yes.
22   Q.   And that was published in the
23 Journal of the American Medical Association
24 in August of 2001, right?

Page 559

1    A.   Yes.
2         (Whereupon, Deposition Exhibit
3    Moye MDL 15, "Risk of Cardiovascular
4    Events Associated with Selective COX-2
5    Inhibitors," by Mukherjee, et al. (6
6    pages), was marked for
7    identification.)
8    Q    (BY MR. PIORKOWSKI)  And
9 I've --
10   A.   Thank you.
11   Q.   Is the article that I've marked
12 as Exhibit 15 the article to which you
13 referred?
14   A.   Yes.
15   Q.   Okay.  And in this article,
16 Dr. Topol and Nissen, the authors, review the
17 results of a number of different studies,
18 right?
19   A.   Yes, they do.
20   Q.   Including -- they review the
21 VIGOR study first, right?
22   A.   Yes.
23   Q.   They review the CLASS study
24 that we just talked about on Celebrex, right?

Page 560

1    A.   Yes.
2    Q.   They reviewed study 085 and
3 090, right?
4    A.   Yes.
5    Q.   Which you also allude to?
6    A.   Right.
7    Q.   And they also comment about
8 adverse event reporting, right?
9    A.   Yes.
10   Q.   And then they conduct kind of a
11 review, and they do a comparison of the
12 annualized myocardial infarction rates from
13 the VIGOR and the CLASS study with a placebo
14 metanalysis, right?
15   A.   Yes.
16   Q.   Okay.  Let's break down what
17 that means.  Okay.
18        First of all, there's a lot of
19 different ways that you can report risk data;
20 fair to say?
21   A.   Yes.
22   Q.   Okay.  And one of the ways that
23 you can report it is in something called
24 patient-years, right?

41 (Pages 557 to 560)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 561

1    A.   Right.
2    Q.   And patient-years actually
3  takes account of -- of the time elements of a
4  drug in addition to just sort of the rate?
5    A.   Well, let's put it this way:
6  It takes into account the duration of
7  follow-up in addition to the number of
8  patients that are in the study.  That's one
9  way to do that.  Not the only way, but that's
10  one way.
11    Q.   Okay.  But, for example, if we
12  have -- let's see what he used here.  Like,
13  for example, he used -- they used .52 per --
14  is it thousand patient-years? -- hundred
15  patient-years on the table for the --
16  Table 3, for the annualized myocardial
17  infarction rate.  You see on page 957?
18    A.   I see Figure 3.
19    Q.   Figure -- I'm sorry.  Figure 3.
20    A.   Yeah, Figure 3.  Right.
21    Q.   I'm sorry.
22    A.   Looks like the arrow bar goes
23  right through it.  That first -- the height
24  of that first point is 0.52.

Page 562

1    Q.   Yes.  Okay.  Yeah, but it is
2  .52, right?
3    A.   Right.  Right.
4    Q.   Okay.  And is that -- is
5  that -- that's .52 per hundred patient-years;
6  is that right?
7    A.   Let's see.
8    Q.   Let's take a second to be sure,
9  because I want to make sure we got it right.
10    A.   Right.
11    (Witness reviews document.)
12    A.   Well, all I can find -- I can
13  only find a reference to the figure at the
14  top of page 958.
15    Q.   (BY MR. PIORKOWSKI)  Okay.  Let
16  me see if I can --
17    A.   Yeah, it's the first column --
18    Q.   All right.
19    A.   -- first complete sentence.
20    Q.   I tell you what:  We'll come
21  back and make sure we get clarified on that.
22    A.   Okay.
23    Q.   You know, one of the sources of
24  information that Dr. Topol and his authors

Page 563

1  refer to in the end notes is the Targum memo
2  that we talked about last time.  Do you
3  remember that?
4    A.   Yes, I remember.  Yes.
5    Q.   Okay.  And we actually, I
6  think, marked that as an exhibit on our first
7  day, right?
8    A.   Yes.
9    Q.   I believe.
10    And that is one of the
11  reference materials that Dr. Topol and
12  Mukherjee used in presenting their data,
13  right?
14    A.   Yes.
15    Q.   Okay.  Let me show you --
16    MR. PIORKOWSKI:  And, Jason, I
17  only have -- we marked this last time.
18  I only have this copy.  You're welcome
19  to take a look at it.
20    Q.   (BY MR. PIORKOWSKI)  But what I
21  want to show you, Doctor, is on page 14 of 38
22  of Dr. Targum's memo.  And there's a
23  category -- there's a table that's entitled
24  "Analyses Of Cardiovascular Events in the

Page 564

1  VIGOR Study Using Endpoint Definitions
2  Standard and Large Antiplatelet Trials."
3    Why don't you just take a look
4  at that for a second.
5    A.   Sure.
6    MR. GALLAGHER:  Which exhibit
7  is it?
8    MR. PIORKOWSKI:  I don't
9  remember which exhibit number it is.
10  I'll see if I got -- do you have
11  another copy?  Here you go.  I've got
12  another copy for you.
13    MR. GALLAGHER:  Thanks.
14    Q.   (BY MR. PIORKOWSKI)  You see
15  what I'm talking about?
16    A.   Yes, sure do.
17    Q.   Okay.  Now, do you see on there
18  that there's a -- hold onto it a second.
19    A.   Okay.
20    Q.   Do you see on there there's a
21  myocardial infarction rate?
22    A.   Yes.
23    Q.   Okay.  And can you read what
24  the myocardial infarction rate is for

Lemuel A. Moye, M.D., Ph.D.

Page 565

1  rofecoxib from the VIGOR study?
2      A.    0.74.
3      Q.    Okay.
4      A.    And this is using the ATPC
5  endpoint, I presume.
6      Q.    Right.  But the myocardial
7  infarctions are broken out separately, right?
8      A.    Right.  Sure.  Right.
9      Q.    Okay.  And so the .74 refers
10  specifically to myocardial infarctions, not
11  to APTC, right?
12      A.    Right.  Right.
13      Q.    Okay.  And can you tell from
14  Dr. Targum's write-up whether that .74
15  represents .74 per hundred patient-years?
16      A.    What's that?  Well, not from
17  the table.  Let's -- maybe there's a
18  statement at the end --
19      Q.    Are the numbers on there?  Can
20  you --
21      A.    Oh.  You want to just compute
22  it from the numbers?
23      Q.    Right.
24          (Witness reviews document.)

Page 566

1      A.    I think so.  If you look at
2  the -- page 15 --
3      Q.    (BY MR. PIORKOWSKI)  Yeah.
4      A.    -- it says "per 100 patient
5  year," right.
6      Q.    Yeah, that's what I was going
7  to say.  Okay.
8      A.    Right.  Right.  Right.  That's
9  right.  Okay.
10      Q.    So does that appear --
11      A.    Right.
12      Q.    -- right, sort of if you're
13  doing the N and the --
14      A.    Right.
15      Q.    I mean, basically, the math
16  that we would be doing here would be dividing
17  20 --
18      A.    20.
19      Q.    -- which is the number of
20  MIs --
21      A.    Right.
22      Q.    -- into 2699, which is the
23  patient-years, right?
24      A.    Right.  It's the ratio of 20

Page 567

1  over 2699, right.  Right.
2      Q.    Yeah.  Right.  Okay.  And that
3  would be .74 per hundred --
4      A.    4, right, per hundred per --
5      Q.    Per hundred per year, right?
6      A.    Right.
7      Q.    And -- or another way of saying
8  that would be 7.4 per thousand --
9      A.    Thousand.
10      Q.    -- per year, right?
11      A.    Right.
12      Q.    And to sort of make that
13  understandable, what that means is if you had
14  1,000 patients who were of this same, you
15  know, usage and baseline demographics and so
16  forth, that at least based on VIGOR, you
17  would expect 7.4 myocardial infarctions per
18  thousand.  You wouldn't actually have a
19  fraction --
20      A.    Right.
21      Q.    -- but per thousand people
22  using it for a year, right?
23      A.    Right.  I would think if you
24  had 10,000 VIGOR patients taking rofecoxib,

Page 568

1  74 would have had heart attacks.
2      Q.    Okay.  In a year?
3      A.    In a year, right.
4      Q.    Okay.  Now, the same table
5  actually gives you the number for naproxen,
6  right, the same table on page 14?
7      A.    14?  Yes.
8      Q.    Okay.  And the number for
9  naproxen is .15 per hundred patient-years,
10  right?
11      A.    Right.
12      Q.    Or to put it in your 10,000
13  range, that means if 10,000 patients used
14  naproxen for a year, 15 would have MIs?
15      A.    Right.  Right.
16      Q.    Is that right?
17      A.    Yes.
18      Q.    Okay.  Now, I want you to turn
19  back now to Figure 3 of the Topol paper, if
20  you would.
21      A.    Let's see.  Oh.  Okay.
22      Q.    Okay?
23      A.    Yeah.  Okay.
24      Q.    In Figure 3 of the Topol paper,

Lemuel A. Moye, M.D., Ph.D.

Page 569

1  you see under "VIGOR Rofecoxib," there's
2  that .74 again?
3      A.    Right.
4      Q.    Okay.  That .74 is the same .74
5  that we just saw in the Targum paper, right?
6      A.    Right.
7      Q.    They correspond to each other,
8  they're both talking about the same trial,
9  right?
10     A.    Right.
11     Q.    And they're both sort of using
12 the same units, if we will.  They're both
13 using patient year units, right?
14     A.    Yes.  Percent, right.
15     Q.    Now, let's back up for just a
16 second and talk about what Dr. Topol did
17 here.  Basically, what he did, we said he did
18 a metanalysis, right?
19     A.    Yes.
20     Q.    And what he did is he looked at
21 four different studies, placebo groups,
22 right?
23     A.    Right.
24     Q.    And he said, "What I would like

Page 570

1  to do here is kind of get a rough comparison
2  of how the rates that we're seeing for the
3  COX-2s from the VIGOR study and the CLASS
4  study -- how that compares with what we would
5  expect to see in the placebo groups from
6  studies in the general population," right?
7      A.    Right.
8      Q.    And he's just -- it's
9  essentially a rough comparison or a
10 historical --
11     A.    Yes.
12     Q.    -- historical control group,
13 you call it?
14     A.    Yes.
15     Q.    Okay.  Now, do you think that
16 this sort of approach to a question is a
17 reasonable scientific approach, what he's
18 doing here?
19     A.    Well, based on what information
20 was available, I think what Eric's doing is
21 certainly appropriate.  Of course, what he'd
22 like to have and does not have is a
23 head-to-head comparison of rofecoxib versus
24 placebo.

Page 571

1      Q.    Right.
2      A.    But without having that, this
3  is the next best thing he can do, and it's
4  accepted methodology.
5      Q.    Okay.  And what he's seeing
6  here is that he's seeing that there's a
7  higher rate in -- in effect, if we look at
8  the -- if we look at the CLASS study, what he
9  has down here for Celebrex, it's actually an
10 even higher rate than with VIGOR -- with
11 Vioxx in VIGOR, right?
12     A.    Well, .80 to .74.
13     Q.    Right.  And so .80 would
14 translate to -- if you looked at 10,000
15 patients for a year, 80 would be expected to
16 have an MI if they were similar to the
17 patients in the study, right?
18     A.    Right.  Right.
19     Q.    All right.  Now, do you know --
20 in any of the information you've reviewed, do
21 you know what the range of the myocardial
22 infarction rates were in the individual
23 studies that Dr. Topol looked at in this
24 analysis?

Page 572

1      A.    I have to just -- presumably,
2  he has a table here where he shows what the
3  rates are.  I don't know what they are.
4      Q.    Did you -- I think we asked
5  about this.  Did you review a letter from
6  Dr. Temple to JAMA that was kind of
7  critiquing this study?
8      A.    I don't recall that.
9      Q.    Don't recall?
10     A.    No.
11     Q.    Okay.  Are you aware that the
12 individual study rates in the studies that
13 Dr. Topol used ranged from .38 per hundred
14 patient-years to 1.33 per hundred
15 patient-years?
16     A.    I didn't know that.
17     Q.    Okay.  Did -- what the bars are
18 demonstrating on here is the bars are
19 indicating the confidence intervals, right?
20     A.    Yes.
21     Q.    The vertical bars?
22     A.    Right.  Yes.
23     Q.    Okay.  And what they show is
24 that the --

44  (Pages 569 to 572)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 573

1    A.    Well, the vertical lines, I
2  guess, that go through the bars, right.
3    Q.    Sure.  I'm sorry.
4    A.    Okay.  Right.
5    Q.    Yeah, that's a better way to
6  say it.
7          The vertical lines that go
8  through the bars indicate the confidence
9  intervals, right?
10   A.    Yes.
11   Q.    And what they show is that the
12 confidence intervals, really, for all three
13 of these groups overlap, right?
14   A.    Yes.
15   Q.    So -- okay.  All right.
16         And that means you really can't
17 draw any absolute conclusions one way or the
18 other about one being statistically higher or
19 lower than another one?
20   A.    Well, certainly you can't draw
21 any conclusions between VIGOR and class --
22 between the event rates of rofecoxib and
23 celecoxib.
24   Q.    Uh-huh.

Page 574

1    A.    If I'm looking at this right,
2  though, it appears that they are saying that
3  the rate for -- the MI rates for rofecoxib is
4  greater than the MI rate in the placebo
5  analysis, right?
6    Q.    Right.
7    A.    It's .04.  And, similarly,
8  between celecoxib and placebo.
9    Q.    And -- okay.  So for -- you're
10 saying that your interpretation of this is
11 for both Vioxx and for Celebrex, that it
12 shows an increased rate?
13   A.    That's my interpretation of the
14 P values as they've denoted them here, yes.
15   Q.    All right.  Now, we don't have
16 on here the naproxen rate, right?
17   A.    That's true.
18   Q.    Okay.  And if we were to put
19 the naproxen rate on this chart, basically
20 what we would be charting is -- to keep it in
21 the same units, we would be -- based on what
22 you just looked at in the Targum paper, we
23 would put 0.15; is that right?
24   A.    Right.

Page 575

1    Q.    Okay.  And 0.15 would be a
2  little less than a third of what they're
3  expect -- they're seeing in the placebo
4  group, right?
5    A.    Right.  However, we have to
6  point out, though, that we don't have -- do
7  we -- oh, we do have 95% confidence interval
8  for it, don't we?  .07 to .58, so it's got a
9  fairly wide confidence interval.
10   Q.    Which one are you looking at?
11   A.    I'm looking at -- you were
12 pointing out -- if we put -- I think -- if I
13 understood you correctly, if we had -- if we
14 were to have another bar --
15   Q.    Right.
16   A.    -- on Figure 3 --
17   Q.    Right.
18   A.    -- and it would be the naproxen
19 bar --
20   Q.    Right.
21   A.    -- the rate -- and, again, this
22 is percent per -- percent per year --
23   Q.    Right.
24   A.    -- would be 0.15.

Page 576

1    Q.    Right.
2    A.    And you had pointed out that
3  that is a fraction -- I think you were saying
4  it's a fraction of the 0.52.
5    Q.    Okay.  Well, I mean, let me
6  actually ask you that.
7    A.    Okay.
8    Q.    It is, in fact, a fraction
9  of --
10   A.    Right.
11   Q.    -- right?
12         It's about -- it's less than a
13 third, right?
14   A.    Right.  Right.  That's what you
15 said.  And I just pointed out that we also
16 had the error bars that would go around
17 that .15 --
18   Q.    Okay.
19   A.    -- and it extends as high as
20 .58, which is greater than the --
21   Q.    Placebo group?
22   A.    -- placebo, 0.52.
23   Q.    Okay.  So you're saying the
24 confidence intervals appear to overlap?

45  (Pages 573 to 576)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 577

1    A.    Right.
2    Q.    Okay.  But we don't have a P
3  value for that difference between naproxen
4  and --
5    A.    No, we don't.
6    Q.    Okay.
7    A.    It probably would be
8  meaningless, anyway --
9    Q.    Okay.
10   A.    -- in this kind of coarse
11 analysis, but we don't have one.
12   Q.    Okay.  And by "coarse
13 analysis" -- what do you mean by "coarse
14 analysis"?
15   A.    Well, I mean -- you know, I
16 mean, even though it's an accepted
17 methodology, we have to understand that
18 implications and generalizations from this
19 study have to be more tightly circumscribed
20 than the kinds of generalizations you make
21 from controlled clinical studies that have
22 each of these patients randomized to each of
23 these groups follow the same duration of time
24 and so on.

Page 578

1    Q.    Okay.  Now, let me ask you in
2  Dr. Topol's paper if you could turn to
3  page 9 -- well, if you look at the bottom of
4  page 957, in the bottom left where we're back
5  to the text --
6    A.    Okay.
7    Q.    Okay.
8          -- it says, quote, "There are
9  differential effects of NSAIDs and COX-2
10 inhibitors on ex vivo platelet aggregation to
11 arachidonic acid."
12   A.    Yeah, 1 millimole -- is that
13 what that is -- of arachidonic acid?
14   Q.    Right.  Right.
15   A.    Okay.
16   Q.    Did I read that correctly?
17   A.    Yes.
18   Q.    And then it goes on to say,
19 "Naproxen has significant antiplatelet
20 effects, with mean platelet aggregation
21 inhibition of 93% compared with platelet
22 aggregation inhibition of 92% for those
23 taking aspirin (81 milligrams)," right?
24   A.    Yes.

Page 579

1    Q.    Okay.  Now, my question is:
2  Are you aware of any studies or any data that
3  shows that that statement is incorrect, that
4  naproxen does not have a platelet inhibition
5  that's equal to or greater than aspirin?
6          MR. WEBSTER:  Objection, form.
7    A.    I mean, no.  Naproxen is a
8  COX-1 COX-2 inhibitor, and so it's got
9  COX-1 -- I mean, COX-1 inhibitory effects as
10 well as COX-2 inhibitory.
11   Q.    (BY MR. PIORKOWSKI)  Okay.
12 But, I mean, they're not just talking about
13 that basic fact.  They're also talking about
14 the percent inhibition, right?
15   A.    Right.
16   Q.    Okay.  Because when you
17 actually measure the potential for a clinical
18 effect, you need a certain threshold amount
19 of platelet inhibition, right?
20   A.    Yes.
21   Q.    What's the generally accepted
22 amount of platelet inhibition that you need
23 to correspond to a clinical effect?
24   A.    Actually, it's substantial.  I

Page 580

1  don't know exactly how much.  It may be 90%
2  or more, but it's substantial.
3    Q.    Okay.  All right.  But the 92%
4  that they cite for aspirin is certainly
5  accepted as having a clinical effect, right?
6    A.    Well, let me put it this way:
7  First of all, I am not a platelet scientist,
8  so while it certainly appears that there is a
9  lot of inhibitory capacity for naproxen, you
10 know, it's been -- that, in and of itself,
11 isn't reason for us to presume that it's
12 going to have a clinically beneficial effect.
13         MR. PIORKOWSKI:  Okay.  I'm
14 going to just object to the
15 nonresponsive portion of that.
16   Q.    (BY MR. PIORKOWSKI)  Even if --
17 my only question has to do with the
18 pharmacological property, okay?
19   A.    Okay.
20   Q.    The pharmacological -- you're
21 not aware of any evidence to dispute that,
22 pharmacologically, that naproxen's inhibition
23 of platelet aggregation is equal to or --
24 equal to aspirin?

46  (Pages 577 to 580)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 581

1     A.    I don't know what the basis of
2  the statement is, and so I can't comment one
3  way or the other about...
4     Q.    Okay.  We're not going to hear
5  any dispute from you, though, as you sit here
6  today --
7     A.    Right.
8     Q.    -- about that fact?
9     A.    That's correct.
10    Q.    All right.  And then you see
11 the next sentence where it says, "Thus,
12 naproxen, but not ibuprofen," and it says,
13 "(platelet aggregation of approximately 80%)
14 or diclofenac (platelet aggregation of
15 approximately 40%) resulted in a high level
16 of platelet aggregation inhibition similar to
17 that achieved with aspirin."  Did I read that
18 correctly?
19    A.    You did.
20    Q.    Okay.  Let's see if we can
21 understand what that's saying.  It's a
22 complicated sentence.
23    A.    Sure.  Okay.
24    Q.    What they're saying is that

Page 582

1  naproxen is different from ibuprofen and
2  diclofenac with respect to its effect on
3  platelet aggregation; is that right?
4     A.    Yes.
5     Q.    Okay.  They're saying --
6     A.    In the magnitude of its effect.
7     Q.    In the magnitude of its effect,
8  because as you said earlier, all of these
9  medications in some way, shape or form, all
10 of the nonselective NSAIDs, all inhibit
11 COX-1, right?
12    A.    Right.
13    Q.    And because they all inhibit
14 COX-1, they all have some degree of platelet
15 aggregation inhibition, right?
16    A.    Right.
17    Q.    But it varies depending on the
18 dosage of the medication and the duration of
19 the medication, particularly for drugs that
20 have a fairly short half-life, right?
21    A.    Right.
22    Q.    Okay.  And so what this
23 sentence is saying is that while naproxen
24 gives you 93% platelet inhibition, ibuprofen

Page 583

1  gives you 80% and diclofenac gives you 40%,
2  right?
3     A.    Yes, that's what he says.
4     Q.    Okay.  All right.  And if -- if
5  it's correct that it's approximately 90%
6  that's needed for a pharmacologic effect,
7  ibuprofen and diclofenac would not have that
8  effect?
9     A.    Right, which is, of course, a
10 separate issue entirely from clinical effect.
11    Q.    Okay.  But at least
12 pharmacologically we agree, right?
13    A.    Right.
14    Q.    And then he goes on to
15 talk about the fact that flurbiprofen --
16 which is another nonsteroidal
17 anti-inflammatory, right?
18    A.    Right.
19    Q.    Okay.
20          -- that it actually has been
21 demonstrated to reduce the incidence of
22 myocardial infarction by 70% compared with
23 placebo, right?
24    A.    Right.

Page 584

1     Q.    Okay.
2     A.    That's what he says.
3     Q.    Okay.  And do you have any
4  basis to disagree with that?
5     A.    I don't know.  I haven't looked
6  at -- this is a 1993 study out of the
7  European Heart Journal.  I haven't looked at
8  that, so I can't comment one way or the other
9  about it.
10    Q.    Okay.  All right.  Now, can you
11 turn to page 958?
12    A.    Sure.
13    Q.    You see the middle column, the
14 first full paragraph?
15    A.    Okay.
16    Q.    Okay.  They say, quote, "Based
17 on this review, it is useful to consider
18 nonselective and selective COX inhibitors as
19 possessing a spectrum of biological effects,
20 both favorable and unfavorable.  At one end
21 of the spectrum, COX-2 inhibitors show less
22 propensity for gastrointestinal toxicity, but
23 greater thrombo-" --
24    A.    Prothrombo --

Lemuel A. Moye, M.D., Ph.D.

Page 585

1    Q.    -- "prothrombotic potential,"
2  right? "At the other end of the spectrum,
3  aspirin and naproxen show greater potential
4  for gastrointestinal toxicity, but have a
5  cardioprotective effect." Did I read that
6  correctly?
7    A.    That's what he says, right.
8    Q.    Okay. Do you have any reason
9  to disagree with the general assessment that
10 there may be a range of risks and benefits
11 between the aspirin and naproxen-type NSAIDs
12 on one hand and the COX-2 inhibitors on the
13 other hand?
14   A.    Well, to answer your question:
15 I have no reason to disagree with that. I do
16 have reason to disagree with what Eric and
17 his group have said here.
18   Q.    Okay.
19   A.    But the answer to your question
20 is: Of course there's a range of risks and
21 benefits.
22   Q.    Okay. And what is it that you
23 disagree with about what Dr. Topol said?
24   A.    "At the other end of the

Page 586

1  spectrum, aspirin and naproxen show greater
2  potential for gastrointestinal toxicity, but
3  have a cardioprotective effect."
4        It's well established the
5  cardioprotective effect of aspirin. It's
6  well established what the -- the hazard to
7  upper GI -- the increase in upper GI serious
8  AEs with aspirin and naproxen. It's not well
9  accepted that naproxen has a significant
10 cardioprotective effect.
11   Q.    So you disagree with
12 Dr. Topol -- the portion of Dr. Topol's
13 statement where he refers to naproxen having
14 a cardioprotective effect?
15   A.    Yes.
16   Q.    Okay. Do you know -- this,
17 Dr. Topol's paper, was published in the
18 Journal of the American Medical Association,
19 right?
20   A.    Yes.
21   Q.    Okay. Which is a prominent
22 journal, right?
23   A.    Well, yeah. But let's not
24 suggest that they published it because of

Page 587

1  just one statement.
2    Q.    No, I'm not suggesting they
3  published it because of one statement, but
4  the editors -- one of the jobs of the
5  editors, when they review scientific work, is
6  to identify statements that may not be
7  substantiated and to sometimes request
8  further information or rewording or something
9  along those lines, right?
10   A.    But isn't that one of the sad
11 results of all of this, that we reveal that
12 that does not happen? It doesn't happen. It
13 should happen, we want it to happen, but it
14 doesn't happen.
15   Q.    You don't know that it didn't
16 happen, do you?
17   A.    Well, I know they let that
18 statement in that shouldn't have gotten in.
19   Q.    All right. That's your view,
20 anyway?
21   A.    Well, yes, that is my view.
22   Q.    Okay. We talked about the fact
23 that in April of 2002, the FDA did approve a
24 label change that included, among other

Page 588

1  things, an inclusion of the VIGOR data,
2  correct?
3        MR. WACKER: Objection.
4    A.    We did.
5    Q     (BY MR. PIORKOWSKI) We did?
6    A.    Yes, we did.
7    Q.    Okay. All right. Do you have
8  criticisms of the contents of the April 2002
9  label?
10   A.    Yes.
11   Q.    Okay. Let me ask you some
12 specific questions.
13       Did the April 2002 label
14 accurately set forth the results of the VIGOR
15 study with respect to cardiovascular risk?
16       MR. WEBSTER: Objection, form.
17       MR. WACKER: Objection.
18   A.    Yes.
19   Q     (BY MR. PIORKOWSKI) Okay.
20 You'd agree with me that one of the FDA's
21 goals in reviewing labeling -- proposed
22 labeling changes is to ensure that the data
23 that are in the label are accurate
24 reflections of what happened in the clinical

48 (Pages 585 to 588)

165470b8-f920-4da9-843f-90cc143762f6