Lemuel A. Moye, M.D., Ph.D.

Page 589

1  trials?
2    A.   That's one of their goals, yes.
3    Q.   Okay.  You understand that
4  50 milligrams of Vioxx has never been
5  approved for chronic use?
6    A.   I understand that, yes.
7    Q.   You understand that?
8    A.   Yes.
9    Q.   And you understand that Merck
10 has never sought approval of 50 milligrams of
11 Vioxx for chronic use?
12   A.   I didn't know what -- they saw
13 it, but I know it's not been approved.
14   Q.   Right.  Well, I think we talked
15 last time that you had seen some
16 correspondence back and forth, although you
17 weren't sure you'd seen everything; is that
18 right?
19   A.   I'm sorry.  Say again?
20   Q.   You'd seen some correspondence
21 back and forth between Merck and the FDA,
22 although you weren't sure you'd seen
23 everything; is that right?
24   A.   Right.  That's right, uh-huh.

Page 590

1    Q.   And in the correspondence that
2  you've seen, you never saw any supplemental
3  new drug application where Merck requested
4  approval for 50 milligrams for chronic use?
5    A.   For 50 milligrams, I have never
6  seen such, right.
7         MR. PIORKOWSKI:  All right.
8  Off the record for a second.
9         THE VIDEOGRAPHER:  Off the
10 record at 11:21.
11        (Recess taken, 11:21 a.m. to
12 11:21 a.m.)
13        THE VIDEOGRAPHER:  On the
14 record at 11:21.
15   Q    (BY MR. PIORKOWSKI)  Doctor,
16 one of the -- one of the things that's
17 described in your report in various places,
18 you have a lot of places where you discuss
19 something called relative risk, right?
20   A.   Yes.
21   Q.   And I just want to talk to you
22 to make sure we're on the same page about
23 some terminology, all right?
24   A.   Okay.

Page 591

1    Q.   Relative risk, first of all, is
2  a -- it's a measurement of -- it's considered
3  a ratio of hazards, if you will, between an
4  exposed group and a control group?
5    A.    It is the ratio of -- let's say
6  it's the ratio of incidence rates.
7    Q.   Okay.
8    A.   Okay.
9    Q.   All right.  But a couple things
10 about relative risk:  First of all, relative
11 risk is often calculated in, like,
12 placebo-controlled studies, right?
13   A.   Well, in controlled studies,
14 many times placebo-controlled studies, but
15 not only placebo-controlled studies.
16   Q.   Well, it's not calculated,
17 typically.  In epidemiological observational
18 studies, there's a different term that's
19 used, typically called odds ratio, right?
20   A.   Right.  When you don't have an
21 incidence rate.
22   Q.   Right.
23   A.   When you don't have new cases,
24 you only have -- you have new and background

Page 592

1  cases --
2    Q.   Right.
3    A.   -- then you go to the odds
4  ratio.
5    Q.   Right.
6         And many studies look at odds
7  ratio as opposed to relative risk, right?
8    A.   That's true, yes.
9    Q.   Okay.  And odds ratio is
10 roughly -- it's not exactly the same thing,
11 but it's a rough estimate of relative risk?
12   A.   It depends on the background
13 rate.  If the -- the lower the background
14 rate is, the more closely the odds ratio
15 corresponds to the incidence rate.
16   Q.   Okay.
17   A.   I'm sorry.  The more -- I'm
18 sorry.  Let me say that again.
19        The lower the background rate
20 of disease, the more closely the odds ratio
21 will approximate the relative risk.
22   Q.   Okay.  So for something
23 that's -- and so you're talking about with a
24 particular disease, if the incidence in the

49 (Pages 589 to 592)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 593

1  background population is 5% --
2      A.   Right.
3      Q.   -- that the odds ratio would be
4  a better reflection of relative risk in a
5  disease that had a background rate of 1%?
6      A.   Right.
7      Q.   Okay.  The lower the background
8  rate --
9      A.   Right.  More closer --
10     Q.   -- the closer the odds ratio
11  will be?
12     A.   Yes.
13     Q.   All right.
14     A.   Again, everything else being
15  equal, that's right.
16     Q.   All right.  Now, relative
17  risk --
18     A.   I need to get a little closer
19  here.
20     Q.   Gotcha.
21         Relative risk, by definition,
22  needs to be relative to something, right?
23     A.   Yes.
24     Q.   In other words, when you do a

Page 594

1  study, you can do a relative risk compared to
2  a placebo group, right?
3      A.   Yes.
4      Q.   And you can also do a relative
5  risk compared to a comparator drug, for
6  example?
7      A.   Yes.
8      Q.   Okay.  And, in fact, you can
9  also do a relative risk comparing one dose of
10  a drug to another dose of the same drug?
11     A.   Yes, you can.
12     Q.   Okay.  So whenever we're
13  talking about relative risk, it's always
14  important for purposes of understanding to be
15  clear about relative to what?
16     A.   Yes.
17     Q.   Is that fair to say?
18     A.   Sorry.  Yes.
19     Q.   And the relative risk of a drug
20  against a comparator drug may or may not
21  correspond to the relative risk of a drug
22  against placebo?
23     A.   That's true.
24     Q.   Okay.  Now, also when we're

Page 595

1  talking about relative risk, relative risk --
2  we usually don't have that discussion in a
3  vacuum.  We usually have that discussion with
4  respect to a particular endpoint; is that
5  right?
6      A.   That's true.
7      Q.   Okay.
8      A.   Right.
9      Q.   So, in other words, if we take
10  the studies that we're looking at here, there
11  are a variety of different endpoints that
12  these studies have looked at, right?
13     A.   Yes.
14     Q.   One of the endpoints, for
15  example, is myocardial infarction, right?
16     A.   Yes.
17     Q.   One of the endpoints is cardiac
18  events, which includes myocardial infarction
19  and angina pectoris and sudden cardiac death
20  and other things, right?
21     A.   Right, a more combined
22  endpoint.
23     Q.   A combined endpoint.
24         One of the relative -- one of

Page 596

1  the end points is thromboembolic
2  cardiovascular events, right?
3      A.   Right.
4      Q.   Another combined endpoint is
5  the APTC endpoint, right?
6      A.   Yes.
7      Q.   And just so we're clear, even
8  for the same drug and the same dose and the
9  same comparator, the relative risk for one
10  endpoint may be different than the relative
11  risk for a different endpoint, right?
12     A.   Yes.
13     Q.   So, in other words, in our
14  studies, the relative risk of myocardial
15  infarction may be higher than the relative
16  risk of a combined endpoint that includes
17  myocardial infarction and other things?
18     A.   Right.  It would be different.
19     Q.   It would be different, right?
20     A.   Right.
21     Q.   All right.  Now, another thing
22  that you talk about a little bit in your
23  report is another concept called attributable
24  risk, right?

Lemuel A. Moye, M.D., Ph.D.

Page 597

1    A.   I think I talk about
2  attributable risk exposed. I think I talk
3  about attributable risk exposed.
4    Attributable risk is different than
5  attributable risk exposed, and I think I talk
6  about the ARE.
7    Q.   And what is the attributable
8  risk exposed?
9    A.   It's the -- well,
10  mathematically, it's the odds ratio minus one
11  divided by the odds ratio, or the relative
12  risk minus one divided by the relative risk.
13    Q.   And how is that different from
14  attributable risk?
15    A.   Attributable risk is just the
16  difference between the event -- between the
17  incidence rates. For example, if we were
18  dealing with relative -- with incidence rates
19  here, the relative risk, of course, is the
20  ratio, as we talked about. The attributable
21  risk is the difference between the two,
22  simply the difference.
23    Q.   Okay.
24    A.   And the attributable risk

Page 598

1  exposed is the relative risk minus one
2  divided by the relative risk.
3    Q.   Okay. And what is it that you
4  understand attributable risk exposed tells
5  you?
6    A.   It's the excess risk
7  attributable to the intervention or to the
8  exposure. The excess risk attributable to
9  the exposure.
10    Q.   All right. Let's -- let me use
11  an example to make sure we're on the same
12  page.
13    A.   Sure. Okay.
14    Q.   Let's say we've got --
15    A.   We have to talk about this
16  before lunch. After lunch, I probably can't.
17    Q.   Yeah. Okay.
18         Let's say we're dealing with a
19  relative risk of two, okay?
20    A.   Okay.
21    Q.   All right. And the two refers
22  to the risk in the exposed population
23  compared to a risk of 1.0 in the background
24  population or the --

Page 599

1    A.   Okay.
2    Q.   -- or the control group.
3    A.   Okay. So, right, uh-huh.
4    Q.   Now, the attributable risk
5  exposed would be 50%?
6    A.   Right. It would be two minus
7  one divided by two, and that would be 50%.
8    Q.   And you're saying that refers
9  to the excess risk?
10    A.   Right. It is the excess risk
11  that is the burden of the exposed.
12    Q.   And is that -- in a situation
13  where a cause-and-effect relationship has
14  been established, is that the percentage of
15  the total cases that are attributable to the
16  drug?
17    A.   Yes.
18    Q.   Okay.
19    A.   In the exposed group.
20    Q.   That's what I mean.
21    A.   Yeah, in the --
22    Q.   So if you have a relative risk
23  of two, you have an attributable risk of
24  50% --

Page 600

1    A.   Right.
2    Q.   -- and you have an established
3  cause-and-effect relationship --
4    A.   Yes.
5    Q.   -- what you're saying is that
6  50% of the cases would be due to the drug?
7    A.   Yes.
8    Q.   All right.
9    A.   Right.
10    Q.   Now, I'd just like to run
11  through a couple other numbers. If you have
12  a relative risk of one, right, that --
13    A.   Yes.
14    Q.   -- translates with -- to an
15  attributable risk exposed of zero, right?
16    A.   Yes. Right. There are no
17  excess cases. Right.
18    Q.   All right. No excess cases. A
19  relative risk of one plus or minus a couple,
20  that's essentially saying that there's no
21  increased risk, right?
22    A.   Right. There's no strength of
23  asso- -- there's no strength of association
24  between the exposure and the endpoint.

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 601

1    Q.   Okay.  Now, if we have relative
2  risk of 1.5, how does that translate to
3  attributable risk?  Is that about 33%?
4    A.   Right.  Well, that's -- right.
5  It will be .5 divided by 1.5, or a third, so
6  33%.
7    Q.   Okay.  And then, similarly, if
8  you had a relative risk of 2.5, that would
9  be --
10   A.   What is that?
11   Q.   -- 67?
12   A.   Yeah.  That's 1.5 divided by
13 2.5, right, or 15/25, or 3/5ths, or 60%.
14   Q.   Okay.  Now, by definition, any
15 relative risk that's less than two would have
16 an attributable risk of less than 50%, right?
17   A.   Yes.
18   Q.   Okay.  Now, can an attributable
19 risk also be calculated from a study that
20 uses an odds ratio?
21   A.   An attributable risk, not an
22 ARE, but attributable risk.
23   Q.   Let me -- I'm sorry.  Let me
24 rephrase the question.

Page 602

1    A.   Okay.
2    Q.   We just did some attributable
3  risk exposed calculations, right?
4    A.   Right.
5    Q.   Can -- can an attributable risk
6  exposed calculation be done from a study that
7  uses an odds ratio as opposed to a relative
8  risk?
9    A.   Yes.
10   Q.   Okay.  And how does -- how
11 would that be done?
12   A.   The same way.  It's the odds
13 ratio minus one divided by the odds ratio.
14   Q.   Okay.  Now, in your
15 attributable risk, you have a couple of
16 attributable risk exposed calculations you
17 did?
18   A.   Yes.
19   Q.   Did you do any kind of a global
20 attributable risk calculation based on the
21 clinical studies overall, or did you -- did
22 you just limit it to -- I think VIGOR and
23 APPROVe?
24   A.   I don't know.  Let me see what

Page 603

1  I have here.
2        (Interruption by the
3    videographer.)
4    A.   I guess the most responsive
5  part of the affidavit is page 18.
6    Q    (BY MR. PIORKOWSKI)  Okay.
7    A.   And I show the relative risk of
8  myocardial infarction, so I show the overall
9  relative risk here.  If your question --
10 wait.
11   Q.   I'm sorry.
12   A.   If your question was about the
13 AR- -- did I do AREs --
14   Q.   Right.
15   A.   -- I didn't do AREs for this,
16 no.
17       MR. PIORKOWSKI:  Okay.  All
18   right.
19       (Whereupon, Deposition Exhibit
20   Moye MDL 16, 1/24/06 Federal Register
21   Excerpt, Pages 3922 - 3999, was marked
22   for identification.)
23   Q    (BY MR. PIORKOWSKI)  Let me
24 hand you what I've marked as -- as Exhibit 16

Page 604

1  and ask you if you've seen that previously.
2        MR. WEBSTER:  Lunch is being
3    served now, so if you want to take --
4    finish the five minutes and then we'll
5    take, what, 30 minutes for lunch?  Is
6    that all right?
7        MR. PIORKOWSKI:  That's fine.
8    A.   I have not seen this particular
9  rendition, no.
10   Q    (BY MR. PIORKOWSKI)  Okay.  All
11 right.  Let me actually do a few housekeeping
12 things before lunch.  We've got five minutes
13 left on the tape.
14       Is it your opinion that any
15 drug that affects -- let me start over --
16 that any drug that does not inhibit
17 thromboxane, but that does affect a decrease
18 in urinary prostacyclin levels creates a
19 proclotting state?
20   A.   I don't know.  I don't know.
21   Q.   Are you aware of any other
22 drugs that -- well, is it your view that
23 pharmacologically, when you don't inhibit
24 thromboxane but you decrease urinary

52  (Pages 601 to 604)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

| Page 605 | Page 607 |
|---|---|
| 1 prostacyclin, that there's a potential of<br>2 cardiovascular risk?<br>3      A.   Everything else being equal<br>4 here -- and one thing I keep relearning is<br>5 that everything else is not equal with these<br>6 complicated mechanisms -- yes, that's true.<br>7      Q.   Okay.  Are you aware of any<br>8 other drugs that decrease urinary<br>9 prostacyclin levels, but do not inhibit<br>10 thromboxane, other than Vioxx?<br>11      A.   No, but I haven't studied other<br>12 drugs in sufficient detail to be able to<br>13 really informatively respond.<br>14      Q.   Okay.  Let me ask you on the<br>15 document that I just handed you -- actually,<br>16 I'm going to wait and do that after lunch.<br>17           Do you know, have you<br>18 reviewed --<br>19           MR. PIORKOWSKI:  I'm sorry, one<br>20 minute.<br>21      Q.   (BY MR. PIORKOWSKI)  Have you<br>22 reviewed all of Merck's submissions with<br>23 respect to proposed label changes to the FDA<br>24 concerning Vioxx? | 1 to change the label to a label that included<br>2 the VIGOR cardiovascular data?<br>3      A.   Well, I imagine that they --<br>4           MR. WACKER:  Objection.<br>5      A.   -- would -- that they would<br>6 have to acknowledge that a label change was<br>7 necessary, but to what extent that first<br>8 overture -- to what extent they went in the<br>9 first overture, I don't know.<br>10      Q.   (BY MR. PIORKOWSKI)  Do you<br>11 know to what extent the first overture was<br>12 made by Merck as opposed to the FDA?<br>13      A.   No.<br>14           MR. PIORKOWSKI:  Okay.  All<br>15 right.  I think we're at the end of<br>16 our tape.<br>17           MR. WEBSTER:  Okay.<br>18           THE VIDEOGRAPHER:  Off the<br>19 record at 11:37.<br>20           (Recess taken, 11:37 a.m. to<br>21 12:14 p.m.)<br>22           THE VIDEOGRAPHER:  Hold,<br>23 please.  Back on the record at 12:14.<br>24      Q.   (BY MR. PIORKOWSKI)  Good |

| Page 606 | Page 608 |
|---|---|
| 1      A.   Yes.  I haven't referred to<br>2 them in my affidavit, but I have reviewed<br>3 them, yes.<br>4      Q.   You've reviewed all of their<br>5 submissions?<br>6      A.   Yes.<br>7      Q.   Okay.  Do you know how many --<br>8 on how many occasions Merck requested that<br>9 the FDA change the -- or, I'm sorry.  Let me<br>10 start over.<br>11           Do you know on how many<br>12 occasions Merck proposed a label change to<br>13 the FDA that included the VIGOR<br>14 cardiovascular data between March 2000 and<br>15 April 2002?<br>16           MR. WEBSTER:  Objection, form.<br>17      A.   I'm not sure I understand your<br>18 question.  I do know that there was an<br>19 activity and communication between the agency<br>20 and Merck about label changes, but how many<br>21 label changes were proposed by Merck in that<br>22 time, I don't know.<br>23      Q.   (BY MR. PIORKOWSKI)  Okay.  Do<br>24 you know whether Merck actually asked the FDA | 1 afternoon, Dr. Moye.<br>2      A.   Good afternoon.<br>3      Q.   I'd handed you a document that<br>4 I think we marked as Exhibit 16 before the<br>5 break.  Do you have that?<br>6      A.   Yes.<br>7      Q.   Okay.  And I'll represent to<br>8 you that this is a section of the Federal<br>9 Register that contains an update by the FDA<br>10 concerning its requirements for labeling?<br>11      A.   Yes.<br>12      Q.   Does that appear to be what it<br>13 is?<br>14      A.   Yes.<br>15      Q.   Are you familiar generally,<br>16 from your work at the Advisory Committee,<br>17 with FDA requirements for labeling?<br>18      A.   Yes.<br>19      Q.   You've been -- I think you've<br>20 testified before that in other cases, that<br>21 you've been asked to consider labeling issues<br>22 as a part of your work at the Advisory<br>23 Committee?<br>24      A.   Yes. |

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 609

1    Q.    When you've -- what labels
2  specifically have you worked on in your work
3  on the Advisory Committee?
4    A.    I don't know.  I could -- I
5  mean, what -- my recollection here is going
6  to be incomplete, but I think there's four or
7  five drugs that the Advisory Committee was
8  asked specifically questions about labels.
9    Q.    Okay.  What kinds of questions
10 were -- do you recall the Advisory Committee
11 being asked by the FDA with respect to
12 products on which you sat on the Advisory
13 Committee?
14   A.    They were -- they ranged from
15 the generic, should the -- what should the
16 label say, to specific, what dosage should be
17 included, what specifically should the
18 indications be, what should the
19 contraindications be, should there be a
20 statement in the -- should there be a
21 statement in the warning section that warns
22 of one particular adverse effect or another.
23      They were -- should there be
24 statements in the precautions section of the

Page 610

1  label.  They were actually all over the map.
2    Q.    Okay.  But those are all things
3  that, during your tenure, that the FDA,
4  solicited advice from its outside advisors on
5  those labeling questions?
6    A.    Those are the examples I just
7  provided, yes.
8    Q.    Okay.  I want to ask you to
9  look at what is page 3334.
10   A.    3934?
11   Q.    Yes.  I misspoke.  Thanks.
12   A.    Okay.
13   Q.    And it says, quote, "Under the
14 Act, FDA is the expert federal public health
15 agency charged by Congress with ensuring that
16 drugs are safe and effective, that their
17 labeling adequately informs users of the
18 risks and benefits of the product, and is
19 truthful and not misleading."  Did I read
20 that correctly?
21   A.    Yes.
22   Q.    Okay.  Is that consistent with
23 your understanding of the FDA's role with
24 respect to labeling?

Page 611

1    A.    Well, it's my understanding of
2  their charge, right.
3    Q.    Okay.  Okay.  And then it goes
4  on to say, "Under the Act" -- and by "the
5  Act," they mean the Food, Drug and Cosmetic
6  Act?
7    A.    Yes.
8    Q.    That's your understanding?
9    A.    Right.
10   Q.    -- "and FDA regulations, the
11 agency makes approval decisions based, not
12 only on an abstract estimation of its safety
13 and effectiveness, but, rather, on a
14 comprehensive scientific evaluation of the
15 product's risks and benefits under the
16 conditions of use prescribed, recommended or
17 suggested in the label -- labeling."  Did I
18 read that correctly?
19   A.    Actually, not.  You put in
20 "only."  It doesn't matter.  But you said
21 "based not only on"; it's really "based not
22 on."  But that's a small matter.
23   Q.    I'm sorry.  "Based not on an
24 abstract estimation" --

Page 612

1    A.    Right.
2    Q.    -- "of its safety and
3  effectiveness, but, rather, on a
4  comprehensive scientific evaluation of the
5  product's risks and benefits under the
6  conditions of use prescribed, recommended or
7  suggested in the labeling."
8    A.    You read it accurately.
9    Q.    Okay.  And do you agree with
10 that?  Is that your understanding of FDA's
11 charge under the Food, Drug and Cosmetic Act
12 and the FDA regulations?
13   A.    Well, this is a little
14 different.  This now says -- not so much as a
15 charge.  It says, "The agency makes approval
16 decisions based, not on" -- based not on --
17 and it goes on and does that.
18      I mean, that's their goal.  I
19 mean, they don't do that sometimes, but
20 that's their goal, to, in fact, have a
21 comprehensive scientific evaluation of a
22 product's risk and benefits.
23   Q.    Okay.  From your experience at
24 FDA -- or I should say with the FDA Advisory

Lemuel A. Moye, M.D., Ph.D.

Page 613

1  Committee, is it correct that there are
2  concerns sometimes about the potential for
3  overwarning with respect to potential safety
4  risks?
5      A.    You're asking me, in my tenure
6  at the FDA?
7      Q.    In your specific experience --
8      A.    At the Advisory --
9      Q.    -- has the FDA -- have FDA
10 officials, or has it been your understanding
11 of FDA philosophy, that there are concerns
12 about potential overwarning about safety
13 risks?
14     A.    The FDA speaks with many
15 voices, and no doubt there are some voices in
16 the agency that would warn about
17 overlabeling.
18         Now, perhaps, some of those
19 voices were -- enunciated this point of view
20 at some of the meetings I was at. I don't
21 remember. But there is concern among some
22 about overlabeling.
23     Q.    Do you see on page 3935 in the
24 left-hand column --

Page 614

1      A.    Okay.
2      Q.    -- middle of the first full
3  paragraph, it says, quote, "FDA has
4  previously found that labeling that includes
5  theoretical hazards not well grounded in
6  scientific evidence can cause meaningful risk
7  information to lose its significance.
8  Overwarning, just like underwarning, can
9  similarly have a negative effect on patient
10 safety and public health."
11         Have you heard that sentiment
12 expressed at FDA in connection with your
13 service on the Advisory Committee?
14     A.    I have heard the sentiment
15 about overwarning.
16     Q.    Okay.
17     A.    And also, this notion of FDA
18 has previously labeled -- found that labeling
19 that includes theoretical hazards, well, I
20 mean, I'm -- it could be -- anybody would be
21 hard-pressed to disagree with that. I don't
22 know what relevance that has here.
23     Q.    Okay.
24     A.    But they'd be hard-pressed to

Page 615

1  disagree with it.
2      Q.    Do you agree that overwarning
3  can have a negative effect on patient safety?
4      A.    Yeah, I agree that a carelessly
5  written label, one way or the other, is going
6  to do damage. It's going to misrepresent the
7  risk-benefit ratio.
8      Q.    You understand that one of
9  FDA's concerns, potentially, or where there are
10 unknowns is whether an effect -- a safety
11 effect is an effect of just one drug or all
12 drugs within a class?
13     A.    I'm sorry. A safe -- what do
14 you mean by "safety effect"?
15     Q.    Okay. Well, let's talk about
16 Vioxx specifically, okay?
17     A.    Okay.
18     Q.    In the wake of the VIGOR study
19 that we talked about, there was a finding of
20 increased cardiovascular events in the VIGOR
21 study --
22     A.    Yes.
23     Q.    -- in Vioxx users compared to
24 naproxen, right?

Page 616

1      A.    Right.
2      Q.    One of the comments that
3  Dr. Nissen pointed out and that Dr. Topol
4  noted in his paper that we already reviewed
5  is that the myocardial infarction event rate
6  for Celebrex was similar to the myocardial
7  infarction event rate for Vioxx in the VIGOR
8  study, right?
9      A.    That's what we went through.
10     Q.    We already went through that.
11     A.    Right, before lunch. Right.
12     Q.    One of the issues raised is if
13 there is, indeed, a cardiovascular effect of
14 Vioxx that's negative, whether that is an
15 effect only of Vioxx or whether that's also
16 an effect of Celebrex.
17     A.    Okay.
18     Q.    Is that -- do you agree with me
19 that that's a fair question?
20     A.    Yes.
21     Q.    That's a question that is one
22 of the questions that the FDA was trying to
23 deal with at the February 2001 Advisory
24 Committee meeting, right?

55 (Pages 613 to 616)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 617

1     A.    Right.
2     Q.    And part of the reason that's
3  an important consideration is because if you
4  end up warning about Vioxx and not warning
5  about Celebrex and it turns out that they all
6  have the same risk, you may have done a
7  disservice, right?
8     A.    Right.
9     Q.    All right. Also, on -- if you
10 turn back to page 3934, do you see in the far
11 left-hand column about two-thirds of the way
12 down the page, it says, quote, "The
13 centerpiece of risk management for
14 prescription drugs generally is the labeling,
15 which reflects thorough FDA review of the
16 pertinent scientific evidence and
17 communicates to healthcare practitioners the
18 agency's formal authoritative conclusions
19 regarding the conditions under which the
20 product can be used safely and effectively"?
21 Did I read that correctly?
22    A.    Yes.
23    Q.    Okay. And do you agree with
24 that statement?

Page 618

1     A.    Well, it's a little too
2  muscular for me. I mean, the FDA, that is
3  the laudable goal, but that's not what the
4  reality is, commonly.
5     Q.    Okay. Well, let's start with
6  the laudable goal part, okay?
7     A.    Okay.
8     Q.    You agree with me that the
9  FDA's goal with respect to labeling is to
10 include pertinent scientific evidence that
11 communicates to healthcare practitioners the
12 FDA's formal authoritative conclusions
13 regarding the conditions under which the
14 product can be used safely and effectively?
15    A.    Right, that's their goal.
16    Q.    That's their goal?
17    A.    Right.
18    Q.    Okay. And what you're saying
19 is sometimes they achieve their goal better
20 than other times, at least in your
21 experience?
22    A.    Right.
23    Q.    Okay. It is correct, though,
24 that when the FDA approves a product, the FDA

Page 619

1  looks very carefully at the entire labeling
2  at issue for the product, right?
3     A.    Looks very carefully at the
4  labeling?
5     Q.    At the proposed labeling as a
6  part of its approval decision?
7     A.    Oh, yes. They look at the
8  proposed labeling, yes.
9     Q.    They literally look at every
10 word in the labeling?
11    A.    Yes.
12    Q.    Look at every -- as it said,
13 every comma, every period, every semicolon;
14 fair?
15    A.    Yes, uh-huh.
16    Q.    Okay. All right. And you see
17 over on the same page on the right-hand side,
18 it says, after the -- there's a various --
19 there's various citations you see to legal
20 cases --
21    Q.    Okay. Okay.
22    Q.    -- and then it says, quote, "In
23 fact, the determination whether labeling
24 revisions are necessary is, in the end,

Page 620

1  squarely and solely FDA's under the Act." Do
2  you agree with that?
3     A.    Only insofar with the next
4  paragraph, with the next sentence, yes.
5     Q.    Okay. Well, let's read the
6  next sentence and then see if I can ask you
7  about the entirety of it, okay?
8     A.    Okay. Sure. Okay.
9     Q.    The next sentence reads, quote,
10 "A manufacturer may, under FDA regulations,
11 strengthen a labeling warning, but in
12 practice, manufacturers typically consult
13 with FDA before doing so to avoid
14 implementing labeling changes with which the
15 agency ultimately might disagree and that,
16 therefore, might subject the manufacturer to
17 enforcement action." Did I read that
18 correctly?
19    A.    Yes.
20    Q.    Okay. And do you agree with
21 that statement?
22    A.    No.
23    Q.    You don't agree with that
24 statement?

56 (Pages 617 to 620)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 621

1    A.    No, I don't.
2    Q.    Well, does the FDA, as they
3  say, in the end, have the authority,
4  ultimately, to decide whether labeling
5  revisions are or are not necessary?
6    A.    Ultimately, they do, yes.
7    Q.    Ultimately, they do?
8    A.    Right.
9    Q.    And the manufacturer can
10  propose label changes to the FDA, but that
11  doesn't necessarily mean that the FDA will
12  accept those label changes?
13    A.    Well, it depends. I think we
14  can be more precise than that.
15    Q.    Okay.
16    A.    I think if a manufacturer
17  wanted to weaken its label, let's say remove
18  a warning or weaken the -- weaken the adverse
19  events section, that would really require
20  them to enter into preliminary discussions
21  with the FDA about that.
22         However, if the manufacturer
23  makes a determination that there is a -- and
24  giving them benefit of the doubt in this

Page 622

1  hypothetical circumstance, identify a new
2  serious risk, then they are at liberty of
3  making reasonable changes to the label.
4         And, in fact, the regulations
5  say there's nothing in them that suggests
6  that the manufacturer has any less freedom
7  than that. However, this reads as though, in
8  fact, manufacturers, if they're smart, are
9  going to consult with the FDA before they
10  make changes. So I disagree with this.
11    Q.    You don't think that
12  manufacturers should consult with FDA before
13  they make changes to the label?
14    A.    No. I disagree with the
15  assertion that this statement reflects FDA
16  goals and policies. That's what I disagree
17  with.
18         In fact, the FDA goes out of
19  its way to tell manufacturers that they are
20  free to make appropriate changes, especially
21  to -- I'm talking now about strengthening
22  the -- adding to contraindications or
23  strengthening the warning or adverse events,
24  and the regulations permit them to do that,

Page 623

1  but that they also have to come to the FDA
2  later and justify the change.
3    Q.    Well, but this section isn't
4  talking about weakening a label. It's
5  talking about strengthening a label warning.
6    A.    Well, which is right. Right.
7  And so which leads to my disagreement,
8  because this statement, "in the end, might,
9  therefore, subject the manufacturer to
10  enforcement action," to me, at least, as I
11  sit here and read this -- to me, suggests
12  that manufacturers strengthen the labels at
13  their own peril, which is not the intent of
14  the FDA at all.
15    Q.    Do you know -- did you come
16  across in your review of the correspondence
17  with the FDA any occasions on which Merck
18  strengthened its label to add a safety
19  warning and was told by the FDA, "No, that's
20  not appropriate"?
21    A.    No.
22    Q.    Did you come across any
23  occasion like that?
24    A.    Excuse me.

Page 624

1         I have not.
2    Q.    Okay. Would you be surprised
3  if an event like that occurred?
4    A.    I don't know. I'd have to read
5  it to be sure. I don't know.
6    Q.    Okay. But to the extent that
7  happened, that's not something that you're
8  aware of?
9    A.    Right.
10    Q.    Okay. Do you -- have you ever
11  been -- as an Advisory Committee member,
12  you've never been asked to consider what's
13  called a changes-being-effected label change,
14  right?
15    A.    That's true.
16    Q.    Okay.
17    A.    As I sit here now, trying to
18  review the many labels we looked at, I don't
19  think we ever did that.
20    Q.    Right. Right. And just so
21  we're clear, the changes-being-effected label
22  change -- or it's sometimes referred to as
23  CBE, right?
24    A.    Uh-huh.

Lemuel A. Moye, M.D., Ph.D.

Page 625

1    Q.    Okay.  That's a situation where
2  a manufacturer can make a change in its label
3  without prior approval of the FDA --
4    A.    Right.
5    Q.    -- but it has to submit that
6  change to the FDA, and the FDA has to agree
7  with the change, right?
8    A.    Right.  Right.  Within a
9  certain time frame.
10    Q.    Right.
11    A.    I mean, it's very specific
12  about that, right.
13    Q.    Exactly.  And if the FDA
14  disagrees with the change --
15    A.    Right.
16    Q.    -- one of the things that this
17  section is saying can happen is the FDA could
18  consider the product misbranded?
19    A.    Yes.  That's true.
20    Q.    And that's true, right?
21    A.    That's right.
22    Q.    All right.  Now, in terms of --
23  have you ever consulted with a company where
24  you have interacted with the FDA with respect

Page 626

1  to the implementation of a CBE label change?
2    A.    No.
3    Q.    Okay.  And I think we
4  established last time, but you've never been
5  employed by the FDA, so you've never had --
6  never had an occasion to review a CBE label
7  change internally at the agency?
8    A.    Right.  I mean, I'm a special
9  government employee, the days of the Advisory
10  Committee meeting, but I've never been
11  employed by the FDA exclusive of that --
12    Q.    Right.
13    A.    -- and never reviewed a CBE.
14    Q.    And you never reviewed a CBE as
15  a member of the Advisory Committee?
16    A.    To my knowledge, that's right.
17    Q.    Have you -- in connection with
18  your opinions in this case, have you -- well,
19  have you ever read the FDA regulations about
20  implementing CBE label changes?
21    A.    Yes.
22    Q.    You have?
23    A.    Yes.
24    Q.    When was that?

Page 627

1    A.    I guess the last time was about
2  maybe four years ago.  Maybe even longer ago
3  than that.  This is 2006.  Maybe six years
4  ago.
5    Q.    Okay.  And what was the
6  occasion on which you read the CBE
7  regulations?
8    A.    I guess only insofar as I was
9  expected -- well, no.  Actually, it was just
10  part of a regulation review, just part of my
11  own regulation review that I read the section
12  talking about CBEs.
13    Q.    Okay.  And was that in
14  connection with what -- with a case?
15    A.    I don't remember.  I don't
16  remember.
17    Q.    Have you ever reviewed FDA
18  regulations -- well, I withdraw that
19  question.
20        Are you aware of any
21  situations -- you know what a prior approval
22  change is to the label?
23    A.    I could hazard a guess, but I
24  don't know.  I don't know.

Page 628

1    Q.    Okay.  You're aware that the
2  way most changes, regardless of what the
3  label that goes on it -- most changes to the
4  label, the way they're made, is the
5  manufacturer submits something to the FDA --
6    A.    Yes.
7    Q.    -- and then the FDA takes
8  action on it?
9    A.    Responds to it, yes.
10    Q.    Responds to it.
11        And the manufacturer's
12  submission may be prompted by an FDA phone
13  call --
14    A.    Right.
15    Q.    -- or it may be based on the
16  manufacturer's own initiative, but the
17  process starts with the manufacturer
18  submitting a change request to the FDA, and
19  then the FDA takes action, right?
20    A.    Right.
21    Q.    Okay.  Are you aware of any
22  situation for any drug where a manufacturer
23  has submitted a proposal -- a proposed label
24  change to the FDA with respect to a

58  (Pages 625 to 628)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 629

1  particular drug and a particular issue and
2  that while that request is pending, the
3  manufacturer went ahead and made a
4  changes-being-effected label change?
5      A.   No.
6      Q.   No.
7          Are you aware of any -- do you
8  know what an FDA guidance is?
9      A.   Yes.
10     Q.   What's an FDA -- can you tell
11 us what an FDA guidance is, please?
12     A.   Sure.  A guidance is
13 specifically that.  It is information that
14 is -- that counsels and advises sponsors,
15 primarily, as to how they can conduct a
16 particular activity within the confines of
17 the -- and still be -- within the confines of
18 the CFRs.
19     Q.   Okay.  So the guidances
20 themselves are not regulations; is that
21 right?
22     A.   To my knowledge, no, they are
23 not.
24     Q.   But the intent of guidances is

Page 630

1  to give the manufacturers some, literally,
2  guidance --
3      A.   Yes.
4      Q.   -- about how to best comply
5  with the regulations?
6      A.   Right.  The regulations are a
7  complex body of documents and it's easy to
8  get confused through it, and the guidances
9  are to advise sponsors who want to comply,
10 but may not know the best way to do that.
11     Q.   Okay.  Have you looked at FDA
12 guidances that were in place during the time
13 Vioxx was on the market with respect to
14 the -- with respect to making CBE label
15 changes?
16     A.   No.
17     Q.   Okay.  All right.  You're -- I
18 know you're familiar from other cases with
19 the Texas Supreme Court's decision in the
20 Havner case, right.
21     A.   Yes.
22     Q.   In fact, I think you wrote a
23 section of a book chapter on it; is that
24 right?

Page 631

1      A.   Yes.  Yes.
2      Q.   And you realize that there are
3  certain requirements for scientific evidence
4  for causation purposes?
5      A.   Yes.
6      Q.   Okay.  I want to ask you
7  several questions related to scientific
8  evidence that you're relying on here, and I
9  just sort of -- first, I'd like to kind of
10 make sure we're on the same page about a few
11 things.
12     A.   All right.
13     Q.   First of all, I'm going to ask
14 you some questions about controlled studies,
15 okay?
16     A.   Yes.
17     Q.   And I think -- is it your
18 understanding of controlled studies that a
19 controlled study is a study that has a
20 control group?
21     A.   Yes.  It has a cohort of
22 patients who simultaneously are being
23 evaluated under, perhaps, a different
24 intervention, but for the same endpoint; and

Page 632

1  the goal being compared to -- to compare the
2  experience in the exposed group to experience
3  in the group without the exposure.
4      Q.   Okay.  And that's a control
5  group that would be for a clinical trial,
6  right?
7      A.   Sure.
8      Q.   There's other kinds of control
9  groups that you could have for, let's say, an
10 epidemiological or an observational study,
11 right?
12     A.   Yes.  Right.
13     Q.   Okay.  But, in either event,
14 it's still fair to call them control groups,
15 right?
16     A.   Yes.
17     Q.   And you understand the
18 distinction I'm making is between a control
19 study and something that's, let say, a case
20 series, right?
21     A.   Yes.  Right.
22     Q.   And I'm also going to ask you
23 some questions about studies that have a
24 statistically significant increased risk,

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 633

1  okay?
2      A.    Okay.
3      Q.    Now, you -- I know you have
4  some issues with the use of "statistical
5  significance," generally, as far as showing
6  safety risks; is that right?
7      A.    Yes, that's right.
8      Q.    Okay. But for purposes of my
9  questions, you can -- you understand what I
10 mean by "statistical significance" in
11 accordance with your -- the traditional
12 understanding of that term?
13     A.    Yes.
14     Q.    Okay. All right.
15     A.    We're talking Fisherian rules
16 here?
17     Q.    Huh?
18     A.    Fisherian rules?
19     Q.    Right. Right.
20     A.    Okay.
21     Q.    All right. Are you aware of
22 any controlled clinical trial prior to
23 APPROVe that showed a statistically
24 significant increased risk of myocardial

Page 634

1  infarction in patients using Vioxx compared
2  to placebo?
3      A.    I would have to look at the
4  Watson report.
5          MR. PIORKOWSKI: Okay.
6          MR. GALLAGHER: We'll get it
7  for you.
8          THE WITNESS: Okay. Thank you.
9          (Conference out of the hearing
10 of the reporter.)
11         MR. GALLAGHER: You go ahead.
12         MR. PIORKOWSKI: Oh. Go ahead?
13 All right. Fine.
14         THE WITNESS: Okay. Thank you.
15         MR. GALLAGHER: Is that the
16 Watson report?
17         MR. PIORKOWSKI: Yeah.
18         MR. GALLAGHER: Okay.
19         MR. PIORKOWSKI: That's what I
20 thought you said, go ahead.
21         MR. GALLAGHER: Okay. No. Go
22 ahead. Let me tell him.
23         MR. PIORKOWSKI: Let's just go
24 off the record, then, since Jason

Page 635

1  left. I don't want to -- just for a
2  second.
3          THE VIDEOGRAPHER: Off the
4  record at 12:39.
5          (Recess taken, 12:39 p.m. to
6  12:40 p.m.)
7          THE VIDEOGRAPHER: Hold,
8  please. On the record at 12:40.
9      Q    (BY MR. PIORKOWSKI) Okay.
10     A.    Okay.
11     Q.    Let me -- let me make sure my
12 question is clear.
13     A.    Sure.
14     Q.    The Watson analysis is an
15 analysis -- first of all, the Watson analysis
16 is not itself a controlled clinical trial,
17 right?
18     A.    That's right.
19     Q.    Okay. The Watson analysis was
20 an analysis that compared people in an -- in
21 the Vioxx clinical trial to placebo groups of
22 other clinical trials, right?
23     A.    Right.
24     Q.    Okay. So my question is: Are

Page 636

1  you aware of any controlled clinical trial
2  before APPROVe that showed a statistically
3  significant increased risk of myocardial
4  infarction in patients using Vioxx compared
5  to placebo?
6      A.    I also have to look at
7  Study 090. Watson does not do that.
8      Q.    Okay.
9      A.    Okay.
10     Q.    All right.
11     A.    I need to look at 090 as well.
12     Q.    All right. What source do you
13 need to look at for 090?
14     A.    What source? Oh. I mean, I
15 need to look -- well, either the medical
16 review, the medical officer's review --
17     Q.    Okay. You have the Targum
18 analysis right there?
19     A.    Right.
20     Q.    Okay. And she reviews 090,
21 right?
22     A.    Right.
23         MS. LAWLER: Doctor, I have
24 another meeting I've got to go to, so

Lemuel A. Moye, M.D., Ph.D.

Page 637

1  excuse me.
2      THE WITNESS:  Okay.  As long as
3  you sat here for the ARE discussions,
4  I'm happy.  Thank you.
5      MR. JOSEPHSON:  She found out
6  they were exposed to --
7      THE REPORTER:  Do we need that
8  on the record?
9      MR. JOSEPHSON:  No.
10     MR. PIORKOWSKI:  No, we don't
11  need that.
12     (Discussion off the record.)
13     MR. WEBSTER:  We need to stay
14  on here if we're burning time here.
15     THE REPORTER:  I just can't get
16  all the conversations.
17     (Witness reviews document.)
18   A.   Well, so far I'm not finding
19  the analysis that I need to find to answer
20  the question and also to be able to include
21  090.
22   Q.   (BY MR. PIORKOWSKI)  Okay.
23  Is -- okay.
24   A.   Excepting that, my answer is

Page 638

1  no.
2   Q.   So your answer is:  With the
3  possible exception of Study 090, you're not
4  aware of any controlled clinical trial before
5  APPROVe that showed a statistically
6  significant increased risk of myocardial
7  infarction in patients using Vioxx compared
8  to placebo?
9   A.   That's right.  I mean, I do
10  have to say that I wouldn't expect to see a
11  study that only looked at myocardial
12  infarction because patients who were at high
13  risk for the disease weren't included in many
14  of the studies; and also my usual disclaimer
15  about stat significance when it comes to
16  safety issues.
17   Q.   Okay.  But the answer to my
18  question is:  With the possible exception of
19  Study 090, you're not aware of any studies,
20  right?
21   A.   That's right.
22   Q.   And the problem with 090 is
23  just that right now as we sit here, you
24  cannot determine if that was a statistically

Page 639

1  significant result or not?
2   A.   That's correct.
3   Q.   Okay.  And you do know that
4  Study 090 had a combined control group,
5  right?
6   A.   Yes.
7   Q.   That was not just placebo; it
8  was placebo and another drug called
9  nabumetone, right?
10   A.   Right.  That's right.  However,
11  the results are broken out for placebo and
12  nabumetone --
13   Q.   Fair enough.
14   A.   -- but I don't see the analysis
15  comparing rofecoxib and placebo.
16   Q.   Okay.  Let me ask you the same
17  question, but with respect to a broader
18  category of events --
19   A.   Yes.
20   Q.   -- which is a combined endpoint
21  of cardiac events, which would include
22  myocardial infarction, sudden cardiac death,
23  angina pectoris, those three.
24   A.   Yes.

Page 640

1   Q.   Is the answer the same?
2   A.   Name the three again for me,
3  please?
4   Q.   Okay.  The events I'm including
5  in this analysis are myocardial infarction --
6   A.   Yes.
7      MR. PIORKOWSKI:  I'm sorry.
8  Let me let the bus pass here one
9  second.
10     THE WITNESS:  There are a lot
11  of them, unfortunately.
12     MR. PIORKOWSKI:  Right.
13   Q.   (BY MR. PIORKOWSKI)  I'm asking
14  the same question, but I'm expanding the
15  point we're talking about from myocardial
16  infarction --
17   A.   Right.
18   Q.   -- to a broader combined
19  endpoint that includes myocardial
20  infarction --
21   A.   Okay.
22   Q.   -- sudden cardiac death --
23   A.   Right.
24   Q.   -- angina pectoris.  I think

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 641

1  that's it.
2      A.    Okay.  Prior to APPROVe, is the
3  question?
4      Q.    Prior to APPROVe, that's my
5  question.
6      A.    Against placebo?
7      Q.    That's right.
8      A.    Well, that really narrows it
9  down.  I can't think of any.
10     Q.    Okay.  Are you aware of any
11  observational study published prior to
12  withdrawal that showed an increased risk of
13  myocardial infarction with 25 milligrams of
14  Vioxx compared to nonusers?
15         MR. WEBSTER:  Objection to
16  form.
17         MR. PIORKOWSKI:  Actually, let
18  me back up and ask you a couple
19  predicate questions first.
20     Q    (BY MR. PIORKOWSKI) You gave
21  me a description of how the control group was
22  used in a clinical trial, right?
23     A.    Right.
24     Q.    Okay.  When you're looking at

Page 642

1  epidemiological observational studies of a
2  case-controlled design --
3      A.    Yes.
4      Q.    -- it's a little bit -- the
5  groups are situated a little bit differently,
6  right?
7      A.    Yes.
8      Q.    You don't actually have a
9  placebo group the way you do in a clinical
10  trial, right?
11     A.    Right.  Right.
12     Q.    But the closest -- would you
13  agree with me that the closest thing that --
14  well, there's a lot of different ways you can
15  analyze a study that's an observational
16  study, right?
17     A.    Yes.
18     Q.    You can look at the rate in one
19  drug versus the rate in another drug, right?
20     A.    Right.
21     Q.    You can look at the rate in one
22  drug versus the rate in nonusers of any drug,
23  right?
24     A.    Right.

Page 643

1      Q.    You can look at the rate of one
2  drug in current use versus the rate of that
3  drug in remote use, right?
4      A.    Right.
5      Q.    Is it fair to say that since we
6  don't have a placebo group, that the closest
7  surrogate we have for a placebo in a
8  case-controlled design is a comparison
9  between the drug and nonuse?
10     A.    Yes.
11     Q.    Okay.  All right.  With that --
12  with that background, my question is:  Is
13  there any observational study that you're
14  aware of that was published prior to
15  withdrawal that showed an increased risk of
16  myocardial infarction with 25 milligrams of
17  Vioxx use when compared with nonusers?
18     A.    I don't know when the Solomon
19  report appeared.  So, therefore, I'm not sure
20  if that meets your time constraint.
21     Q.    Okay.
22     A.    But I think that the Solomon
23  report shows an increased risk of -- well,
24  I'm sorry, "to nonusers," you mean nonusers

Page 644

1  of --
2      Q.    Of NSAIDs, generally.
3         In other words, the studies
4  that have been done have looked at -- one of
5  the categories of controls that they've
6  looked at are patients who are not using any
7  NSAID drug, right?
8      A.    Okay.  All right.  Okay.
9  Right.
10     Q.    You recognize that that's a
11  true statement, right?
12     A.    Right.  Including COX -- any
13  other COX-2s --
14     Q.    Anything, right, including any
15  COX-2s --
16         (Simultaneous discussion
17  interrupted by the reporter.)
18         THE WITNESS:  That's my fault.
19         MR. PIORKOWSKI:  I apologize.
20     Q.    (BY MR. PIORKOWSKI) Including
21  any COX-2s or any nonselective NSAIDs, right?
22     A.    I understand, right.
23     Q.    Okay.  And so that's my --
24  that's my question.

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D., Ph.D.

Page 645

1    A.    Okay. Okay.
2         No, I don't.
3    Q.    Okay.  Are you aware of any
4  controlled clinical trial that shows -- even
5  to today, that shows a statistically
6  significant increased risk of myocardial
7  infarction in 50-milligram Vioxx users
8  compared to placebo?
9    A.    Compared to placebo?  No.
10   Q.    Okay.  Are you aware of any
11 controlled clinical trial that shows a
12 statistically significant increased risk of
13 myocardial infarction in patients using Vioxx
14 for five days or less compared with placebo?
15   A.    No.
16   Q.    Are you aware of any controlled
17 clinical trial that shows a statistically
18 significant increase of myocardial infarction
19 in 12.5-milligram Vioxx users compared to
20 placebo?
21        Actually, in fairness, that --
22 to the extent that you don't know about
23 Study 090, that's probably the same answer,
24 right?

Page 646

1    A.    I don't know.  I'm wondering --
2         MR. WEBSTER:  Objection, form.
3    A.    I actually am wondering about
4  ADVANTAGE, and I'm wondering about VIP.
5    Q     (BY MR. PIORKOWSKI)  Okay.
6  ADVANTAGE and VIP were both 25 milligrams,
7  right?
8    A.    Right.  Well, your question
9  was --
10   Q.    12.5 milligrams?
11   A.    Ah.  Well -- no.  Okay.  Okay.
12   Q.    So let's just -- so the record
13 is clear:  Are you aware of any controlled
14 clinical trial that shows a statistically
15 significant increased risk of MI in
16 12.5-milligram Vioxx users compared to
17 placebo?
18   A.    No.
19   Q.    Okay.  And are you aware of any
20 controlled clinical trial that shows a
21 statistically significant increased risk of
22 MI in 12.5-milligram Vioxx users compared to
23 nonselective NSAIDs?
24   A.    No.

Page 647

1    Q.    Okay.  Are you aware of any
2  controlled clinical trial that shows a
3  statistically significant increased risk of
4  myocardial infarction in 25-milligram Vioxx
5  users for less than a month?
6    A.    No.
7    Q.    Okay.  You -- one of the -- you
8  talk in your report -- do you have your
9  report handy, still?
10   A.    Sure do.
11   Q.    You talk in your report about
12 the VIP study; is that right?
13   A.    Right.
14   Q.    Do you see on page 45,
15 paragraph 117?
16   A.    45, paragraph 117.  Yes.
17   Q.    Do you want to just take a
18 second and read that over?
19   A.    Okay.
20   Q.    I want to ask you a couple of
21 questions about it.
22        (Witness reviews document.)
23   A.    Yes.
24   Q     (BY MR. PIORKOWSKI)  Okay.

Page 648

1  Now, you mentioned in your discussion that
2  there are five cases of a combined endpoint
3  of coronary artery occlusion, myocardial
4  infarction, ischemia, silent myocardial
5  infarction in the rofecoxib group, and none
6  in the placebo group, right?
7    A.    I do, yes.
8    Q.    Is that an analysis that you
9  did --
10   A.    No.
11   Q.    -- that -- I mean, that
12 collection of the events, I mean?
13   A.    No.  That's an analysis that I
14 pulled from a table.
15   Q.    Okay.  All right.  Is the --
16 how did the MIs compare in the Vioxx group
17 and the placebo group in the VIP study?
18   A.    I think -- actually, I have a
19 statement four lines down into the paragraph.
20   Q.    Right.
21   A.    There were seven and six.
22   Q.    Okay.  And, to your
23 understanding, so we're clear, the VIP study
24 is still being analyzed, right?

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 649

1    A.   Right.
2    Q.   I assume that what you reviewed
3  was one of Merck's submissions of interim
4  data to the FDA --
5    A.   Yes.
6    Q.   -- is that right?  All right.
7        To your knowledge, it's not
8  been published yet, right?
9    A.   That's correct.
10    Q.   Okay.  Was the difference in
11  myocardial infarctions in the VIP study
12  between the Vioxx group and the placebo group
13  a statistically significant difference?
14    A.   The data I saw had
15  insignificant differences.
16    Q.   Had what?
17    A.   Insignificant differences.
18    Q.   Insignificant differences?
19    A.   Right.
20    Q.   Or not statistically
21  significant?
22    A.   Yes.
23    Q.   Yes.  Okay.  Okay.
24        One of the studies that we -- I

Page 650

1  think you told us last week that you had
2  participated as an author of a study called
3  the CARE study, right?
4    A.   Yes.
5    Q.   And you were actually involved
6  in the design of the CARE study?
7    A.   Yes.
8    Q.   Were you the designer, or were
9  you kind of a co-designer?
10    A.   Oh, no.  One -- actually,
11  there's no one designer in a study like that.
12  I was one of several different designers.  We
13  worked jointly to design, as well as to
14  execute and analyze it.
15    Q.   But you had input into the
16  study design, at a minimum, right?
17    A.   Yes, that's right.
18    Q.   Okay.  And into, you know,
19  things like how the groups were selected and
20  how the randomization occurred and that kind
21  of thing?
22    A.   Well, more to the point, I
23  guess trying to figure out what the event
24  rates would be, what kind of treatment effect

Page 651

1  we were looking for, how long would patients
2  need to be followed, something about
3  inclusion/exclusion criteria.
4    Q.   Okay.
5    A.   And also the sample size.
6    Q.   Okay.  Now, am I correct that
7  the CARE study was a placebo-controlled
8  study?
9    A.   Yes.
10    Q.   It was a randomized study,
11  right?
12    A.   Yes, that's right.
13    Q.   It was double-blinded?
14    A.   Yes.
15    Q.   It was a study that involved a
16  comparison of a drug called pravastatin,
17  which is known by the brand name Pravachol,
18  right?
19    A.   Right, uh-huh.
20    Q.   And comparing that to placebo,
21  right?
22    A.   Yes.
23    Q.   And it -- Pravachol is a
24  cholesterol-lowering drug, right?

Page 652

1    A.   Yes, right.
2    Q.   And what was -- it would --
3  under normal circumstances, it would be
4  unethical to withhold a cholesterol-lowering
5  drug from patients who you knew in advance
6  needed cholesterol-lowering, right?
7    A.   Right.
8    Q.   Okay.  So what you were doing
9  in Pravachol was a little bit different
10  was giving it to patients in the wake of
11  myocardial infarctions who did not
12  necessarily have elevated cholesterol?
13    A.   Right, who had, quote/unquote,
14  "normal LDL cholesterols, normal" -- circa
15  1989.
16    Q.   Right.  Or what they refer to
17  in the title as "average cholesterol levels"?
18    A.   Yes.
19    Q.   Okay.  Although those averages
20  have now come down, right?
21    A.   Yes.
22    Q.   All right.
23    A.   Well, we hope they have.
24    Q.   All right.  Now, the study was

64  (Pages 649 to 652)

Lemuel A. Moye, M.D., Ph.D.

Page 653

1  a study that was five years in duration,
2  right?
3      A.    The follow-up was five years,
4  that's right.
5      Q.    Okay.
6      A.    It took longer to do it, but
7  the follow-up was five years.
8      Q.    The patients were -- the period
9  of time for which the patients were enrolled
10 was five years?
11     A.    Yeah; but, actually, I think
12 the minimum follow-up period was --
13 '95, '91 -- well, the average follow-up was
14 five years, I think.  Right, a little over
15 five years.
16     Q.    Okay.  And you consider this to
17 have been a scientifically rigorous study,
18 right?
19     A.    Yes.
20     Q.    It was ultimately published in
21 the New England Journal of Medicine?
22     A.    Yes, they were.
23     Q.    Okay.  You were a co-author,
24 right?

Page 654

1      A.    Yes.
2      Q.    In fact, you were the third
3  author, right?
4      A.    Yes.
5      Q.    And you personally have
6  responsibility for the contents of the
7  article?
8      A.    Yes.
9      Q.    Okay.  The study was sponsored
10 by Bristol-Myers Squibb; is that right?
11     A.    That's right.
12     Q.    They funded the study?
13     A.    Yes.
14     Q.    And were you paid by
15 Bristol-Myers Squibb in connection with your
16 work?
17     A.    Through the university, yes.
18     Q.    Through the university.  All
19 right.
20          Now, do you agree -- would you
21 agree with me that breast cancer is a serious
22 risk?
23     A.    Yes.
24          MR. WEBSTER:  Objection, form.

Page 655

1      Q.    (BY MR. PIORKOWSKI)  It is?
2  Yes?
3      A.    It is.
4      Q.    It's potentially fatal, right?
5      A.    Right.
6      Q.    And one of the findings in the
7  CARE study was that there were 12 cases of
8  breast cancer in the Pravachol users, right?
9      A.    Right.
10     Q.    And there was one case of
11 breast cancer in the placebo group, right?
12     A.    That's right.
13     Q.    And if we were to calculate the
14 relative risk of breast cancer in the
15 Pravachol group, it would be a relative risk
16 of 12.0, right?
17     A.    Approximately right, assuming
18 the denominators are equal, right.
19     Q.    Okay.  Now, if we were to
20 calculate what the increase over -- assuming
21 we're dealing with a relative risk of 12 --
22 have you heard -- have you read in any of the
23 transcripts you've read where the relative
24 risk of myocardial infarctions in the VIGOR

Page 656

1  study compared to naproxen was five, right?
2      A.    Right.
3      Q.    Okay.  And have you heard
4  people characterize that as a 400% increase
5  risk?
6      A.    I've heard it characterized
7  lots of different ways, yeah.
8      Q.    Okay.  Do you think that's a
9  fair characterization, to call a relative
10 risk of five, a 400% increased risk?
11     A.    No.  I mean, it's five times
12 the rate of the naproxen group.
13     Q.    Okay.
14     A.    So I would just say it's five
15 times.
16     Q.    Okay.  And let me -- I don't
17 want to ask you too many more questions
18 without giving you the benefit of your study
19 here.
20          (Whereupon, Deposition Exhibit
21 Moye MDL 17, "The Effect of
22 Pravastatin on Coronary Events After
23 Myocardial Infarction in Patients with
24 Average Cholesterol Levels," by Sacks,

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 657

1    et al. (9 pages), was marked for
2    identification.)
3        Q    (BY MR. PIORKOWSKI)  What I've
4    marked as Exhibit 17 --
5        A.    Thank you.
6        Q.    -- would you agree with me that
7    that's a copy of the published CARE study
8    from the New England Journal of Medicine?
9        A.    Yes.
10       Q.    Okay.  Now, you discuss in the
11   results of this section on page 1006,
12   starting at the very bottom of the left-hand
13   side and then going to the top of the page --
14       A.    Yes.
15       Q.    -- you discuss the breast
16   cancer results, right?
17       A.    That's right.
18       Q.    Okay.  And you actually give a
19   P value to the difference between the breast
20   cancer cases in the placebo group and the
21   breast cancer cases in the pravastatin group,
22   right?
23       A.    Right.
24       Q.    P value is .002, right?

Page 658

1        A.    Yes.
2        Q.    And what that means, at least
3    in statistical terms, is that the likelihood
4    that that result is due to chance is about
5    one in 500, right?
6        A.    Well, yeah, if it's -- there
7    are a lot of caveats, but in a perfect world,
8    that's what that means.
9        Q.    Okay.  All right.  Now, prior
10   to the time the study was undertaken, there
11   had been animal studies that showed cancer
12   risks in pravastatin users, right?
13       A.    There certainly were.
14       Q.    Okay.  And you were -- when you
15   discuss the results here -- and you also
16   actually discuss the results on the next --
17   on page 1007, right?
18       A.    Right.
19       Q.    Starting at about that first
20   paragraph on the right-hand side, right?
21       A.    Right.
22       Q.    Now, you would agree with me
23   that when you wrote the article, that breast
24   cancer is not mentioned anywhere in the title

Page 659

1    of the article, right?
2        A.    That's true.
3        Q.    Okay.  And, in fact, if you
4    read the abstract of the article, breast
5    cancer is not mentioned in the abstract,
6    right?
7        A.    That's true too.
8        Q.    Okay.  And, in fact, I asked
9    you about a relative risk of 12, but there's
10   nowhere in the article where it
11   actually says there's a relative risk of 12,
12   right?
13       A.    No.  Right.  It gives the
14   numbers and the P value, but it doesn't give
15   the relative risk.
16       Q.    Right.  Okay.
17            Now, there's nothing in here
18   where the authors -- or you or any of the
19   other authors call for a study of the breast
20   cancer -- of breast cancer in pravastatin,
21   right?
22       A.    Well, we didn't have to, but to
23   answer your question, we didn't do that.
24       Q.    You didn't ask for further

Page 660

1    study?
2        A.    That's true.  That's right.
3        Q.    Okay.  And nobody suggested a
4    black box warning for breast cancer, right?
5        A.    For pravastatin.
6        Q.    For pravastatin?
7        A.    That's correct.
8        Q.    Okay.  And nobody suggested any
9    kind of a label change, right?
10       A.    That's true.  Right.
11       Q.    All right.  And what -- what
12   the authors, among yourself, did -- one of
13   the things that you did was you looked at
14   other information that was available to see
15   whether the findings in this study fit with
16   other information that was known to the
17   scientific community about the relationship,
18   if any, between pravastatin and breast
19   cancer?
20       A.    Well, we went to a sister study
21   to see if they had identified a similar
22   relationship.
23       Q.    Okay.  And what was that study?
24       A.    LIPID.

66  (Pages 657 to 660)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 661

1    Q.    Okay.  So you had a study that
2  had a relative risk of 12 with a P value
3  of .002?
4    A.    Right.
5    Q.    You looked at another study to
6  see whether they had an increased risk --
7    A.    Right.  And they had many more
8  patients than we did, had a good deal more
9  power to detect it.  So if this signal was
10  real, we believe they would have found it.
11    Q.    Okay.  And what's the name of
12  the study, again?
13    A.    Actually, it's in the
14  manuscript.  It's called LIPID.  It's on
15  page 1007.
16    Q.    Okay.
17    A.    The first -- I'm sorry, second
18  column, first full paragraph, about ten lines
19  up, "Long-Term Intervention with Pravastatin
20  in Ischemic Disease."
21    Q.    Okay.  All right.  Fair enough.
22        So what you did, so we're
23  clear, is you looked at the results of
24  another -- you looked at interim results of

Page 662

1  another study?
2    A.    Yes.
3    Q.    Okay.  Interim results -- was
4  the study actually unblinded specifically to
5  look at this issue?
6    A.    It was toward the end of that
7  study, and we had communication with the
8  DSM -- the data monitoring committee chair,
9  to actually ask him to -- ask him or her to
10  unblind this and look specifically at this
11  issue.
12    Q.    Okay.  And is it your testimony
13  that the LIPID study actually had greater
14  numbers than your study?
15    A.    They had larger number of
16  patients, yes.
17    Q.    Okay.  The manuscript says four
18  years of treatment of 1508 women, right?
19    A.    Right.
20    Q.    That's not as many patients as
21  you have?
22    A.    No, but that's women.  Women.
23  We had 4,159 patients.
24    Q.    I see.

Page 663

1    A.    Actually, the study will tell
2  us how many women we had.  I think it was on
3  the order of 400, but if you look at the --
4  Table 1 should tell us, right?  The baseline
5  characteristics.
6    Q.    Right.
7    A.    Well, all we do is give
8  percent, so it's 14% of 4159, so I think we
9  had like 486 women.
10    Q.    Okay.
11    A.    And the LIPID study had 1500
12  women, so that's why I say the sample was
13  larger.
14    Q.    Okay.  Now, if we were to -- in
15  terms of the total number of patients, are
16  the total number of patients who are included
17  in the pravastatin group -- it's 2081; is
18  that right?
19    A.    That's right.
20    Q.    Okay.  And 14% of them --
21    A.    Right.
22    Q.    -- were women?
23    A.    Right.
24    Q.    So if we were to do the math

Page 664

1  here, so that means 291 --
2    A.    Yes.
3    Q.    -- were women; is that right?
4  Well, I guess it couldn't be 291.3.
5    A.    Approximately.
6        Yeah.  Right.
7    Q.    But in the vicinity of 291 were
8  women; is that right?
9    A.    Right.  Right.
10    Q.    Okay.  And were all the cases
11  of breast cancer in women?
12    A.    Yes.
13    Q.    I mean, you can have breast
14  cancer in a man?
15    A.    I understand.  I remember the
16  discussions back in '95 as well, right.  They
17  were all women.
18    Q.    But, I mean, just so I'm
19  right --
20    A.    Sure.
21    Q.    -- you can have breast cancer
22  in a man?
23    A.    In a male, of course, right.
24    Q.    So -- but if we were to figure

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 665

1  out how many -- what the percentage of
2  patients in the pravastatin group were who
3  had breast cancer, what we would -- well, I'm
4  sorry. Let me rephrase the question.
5        If we were to figure out the
6  percentage of women in the pravastatin group
7  who had breast cancer, the way we would do
8  that calculation is to say 12 over --
9     A.   Right.
10    Q.   -- 291, right?
11    A.   Right. That's right.
12    Q.   Which is about 4%, right?
13    A.   Right.
14    Q.   All right. So from your
15 perspective, it was reasonable to look at
16 another, larger placebo-controlled database
17 to see whether that database supported any
18 kind of increased risk?
19    A.   Well, another contemporary,
20 large, well-controlled, well-executed
21 clinical trial, looking at the same dose of
22 medication in the same patients who had a --
23 three times as many women, so more power, to
24 see if there was a signal there.

Page 666

1     Q.   Okay. And you didn't see a
2  signal?
3     A.   That's correct.
4     Q.   So based on not seeing a signal
5  in that database, you were comfortable
6  assuming that this was not something that
7  really represented harm to patients?
8     A.   Comfortable with that
9  conclusion, but also most comfortable with
10 making sure that we got this message out
11 clearly.
12    Q.   Okay. And what message -- what
13 message were you trying to get out clearly?
14    A.   Well, the same thing that you
15 pointed out, that there was an increased
16 number of patients with breast cancer in the
17 pravastatin group in CARE. I mean, we wanted
18 to be very clear that we found that.
19    Q.   Do you know whether that fact
20 was ever put into the product label?
21    A.   I don't think it was.
22    Q.   Do you --
23    A.   I must say I haven't read the
24 product label in a long time. I don't know

Page 667

1  if it has been or not.
2     Q.   Did you ever recommend that
3  that fact be put in the product label?
4     A.   I don't think so, no.
5     Q.   Okay. One of the other things
6  that you did here, really for perspective, is
7  that you looked at, again, a rough estimate
8  of what would be expected in the background
9  population, right?
10    A.   Right.
11    Q.   And of women of similar race
12 and age, right --
13    A.   Right.
14    Q.   -- to the women who were in the
15 placebo -- in the pravastatin group, right?
16    A.   Right.
17    Q.   And based on what you would
18 expect to see in the background population,
19 which you determined that there were five
20 cases that you would expect to see,
21 typically, in the background population, just
22 sort of based on other data, right?
23    A.   Right. Yeah. I mean, that's
24 kind of a throwaway line. Right. I mean,

Page 668

1  you know, that -- it means nothing. What you
2  see is what counts --
3     Q.   Right.
4     A.   -- you know. But you're right.
5  We have that discussion in there about what
6  we might expect to see and -- but --
7     Q.   Well, you didn't object to
8  putting that in there?
9     A.   Sure, I did.
10    Q.   Okay.
11    A.   Sure, I did.
12    Q.   You did object to putting it in
13 there?
14    A.   Yeah, I mean, because it
15 doesn't -- all it does is distract. What --
16 it suggests that, well, what's really going
17 on is we didn't see enough patients in the
18 placebo group that had breast cancer. Well,
19 who cared? The fact is, any way you sliced
20 it, we had an increased risk of --
21 pravastatin in CARE was associated with
22 breast cancer. That's what mattered.
23        Whether we have an increased
24 risk in the active group or a decreased risk

68  (Pages 665 to 668)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 669

1  with the placebo group, the risk is there and
2  the question became: Is this real?
3        One way to address that
4  question is to go to another independent
5  source of data, and we had an independent
6  source of data. These other issues are
7  fluff.
8      Q.   Okay. But based on the other
9  independent source of data, you were assured
10 that this was not a real risk to patients?
11     A.   Right.
12     Q.   Okay.
13     A.   Right. That it was -- let me
14 put it this way: That it was not a -- that
15 the finding in CARE was a fluke of chance and
16 would not characterize the response of women
17 to pravastatin in the general population.
18     Q.   But the fact -- the fact of the
19 matter is you can have a finding like a
20 relative risk of 12 with a P value of .002 --
21     A.   Right. Right.
22     Q.   -- that's due to chance. That
23 can happen in a study, right?
24     A.   That's true. That's true.

Page 670

1      Q.   All right.
2      A.   However, that does not mean
3  that even -- even if we believe it's likely
4  to be due to chance, it doesn't excuse us
5  from the obligation to report it as soon as
6  possible in its entirety.
7      Q.   But even a 4% rate of breast
8  cancer in women in pravastatin didn't
9  warrant, in your view, withdrawal of the
10 product from the market or even a black box
11 warning, right?
12     A.   Because we had much more
13 information than that, right.
14     Q.   Right. Fair enough.
15     A.   Now, I would say this: If, in
16 fact, we did not have LIPID, that would have
17 been precisely the result because that was
18 the result the investigators wanted to see
19 happen.
20     Q.   What was the result?
21     A.   I mean, that is to say if we --
22 if we did not have LIPID to fall back on and
23 we had this risk that we -- that we
24 identified in CARE, then we are really

Page 671

1  looking at the destruction of the product.
2  That's precisely what we're looking at.
3      Q.   Was -- to your knowledge, are
4  there any subsequent Pravachol studies that
5  have shown an increased risk of breast
6  cancer?
7      A.   To my knowledge, no.
8      Q.   Are you familiar with a study
9  called PROSPER?
10     A.   I just recently saw a -- saw it
11 used, but I haven't read anything about it.
12 I saw the -- I'm sorry, the acronym.
13     Q.   Are you continuing to serve as
14 a consultant to Bristol-Myers Squibb today?
15     A.   No.
16     Q.   When did you stop serving as a
17 consultant to Bristol-Myers Squibb?
18     A.   Well, their CARE funding was
19 discontinued in -- in, I think, 1999 or 2000.
20 About six years ago.
21     Q.   So you continued after the
22 publication of the paper -- you continued to
23 serve as a consultant for Bristol-Myers
24 Squibbs for another -- Squibb for another two

Page 672

1  or three -- for another three or four years?
2      A.   Four years, yes. Right.
3          MR. PIORKOWSKI: All right.
4  All right. We're out of tape again,
5  so we need to --
6          THE WITNESS: Ah. Okay.
7          THE VIDEOGRAPHER: Off the
8  record at 1:13.
9          (Recess taken, 1:13 p.m. to
10 1:21 p.m.)
11         THE VIDEOGRAPHER: Hold,
12 please. Back on the record at 1:21.
13     Q    (BY MR. PIORKOWSKI) Doctor, in
14 your report on page 50, you have a discussion
15 of the APPROVe follow-up data, right?
16     A.   Yes.
17     Q.   Okay. And you say in your
18 report that the relative risk of
19 fatal/nonfatal myocardial infarction was
20 2.22?
21     A.   Yes.
22     Q.   And then you have 95%
23 confidence intervals, and then you say
24 "demonstrating excess hazard associated with

69 (Pages 669 to 672)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 673

1  rofecoxib," right?
2      A.   Yes.
3      Q.   Okay.  According to traditional
4  principles of interpreting statistical
5  significance, the confidence interval there
6  includes the number 1, right?
7      A.   It does.  That's right, yes.
8      Q.   Okay.  And that would be
9  considered a not statistically significant
10 result; is that right?
11     A.   Right.  That's right.
12     Q.   Okay.  One of the things you
13 address in your report is -- you have some
14 discussion about a warning letter.  Do you
15 remember that?
16     A.   A warning letter?  Actually, I
17 don't remember.
18     Q.   Okay.  Do you have any opinions
19 that you intend to offer at trial with
20 respect to DDMAC or any -- any warning
21 letters that were received by Merck?
22         MR. WEBSTER:  Objection.  Can
23     you clarify which letters you're
24     talking about, please?

Page 674

1          MR. PIORKOWSKI:  I'm sorry.
2      I'm not --
3          MR. GALLAGHER:  Is it the
4      Gilmartin letter?
5          MR. PIORKOWSKI:  There's --
6      there's only one warning letter in the
7      case.
8          MR. WEBSTER:  Okay.
9          MR. PIORKOWSKI:  It was in
10     September of 2002.
11         MR. GALLAGHER:  September 22nd
12     or something?
13         MR. PIORKOWSKI:  Yeah,
14     September 17th, I think.  I mean,
15     that's fine.  If he doesn't have any
16     opinions, I'm not going to -- that
17     saves me a whole bunch of questions.
18     A.   Oh, actually.  I'm sorry.  I
19 have -- in paragraph 197, I talk about a
20 letter of September 17th, 2001.
21     Q    (BY MR. PIORKOWSKI)  Right.
22 Yes.  Right.
23     A.   Right.
24     Q.   Do you intend to offer any

Page 675

1  opinions about that at trial?
2      A.   Only that -- I think I do, but
3  it's confined to the four lines here.  And,
4  for me, the operative part is the claim in
5  the press release that Vioxx had a favorable
6  cardiovascular safety profile.
7      Q.   Okay.  Which line are you on in
8  your report, again?
9      A.   I'm sorry.  I beg your pardon.
10 I'm on paragraph -- I'm on
11 page 70, paragraph 197.
12     Q.   Right.  Okay.
13     A.   And the last -- the end of the
14 third line to the end of the paragraph.
15     Q.   In paragraph 197?
16     A.   Yeah.  Right.
17     Q.   Okay.  All right.  Now -- so
18 the thrust of the opinion is that FDA sent a
19 letter to Merck on September 17th; and,
20 actually, it was not FDA.  It was the DDMAC
21 division of FDA, right?
22     A.   Right.  Right.
23     Q.   And that's the division that
24 deals with advertising, right?

Page 676

1      A.   Yes.
2      Q.   They tend to be the pharmacists
3  as opposed to the doctors and scientists,
4  right?
5      A.   Yes.
6      Q.   Okay.  And the part of that
7  letter that you plan to address was -- well,
8  let me back up.
9          There were three issues that
10 were addressed in that letter.  Do you recall
11 that?
12     A.   Right.
13     Q.   Okay.  One had to do with some
14 audio conferences by a doctor, right?
15     A.   Right.
16     Q.   One had to do with some
17 representations made by a sales rep?
18     A.   Right.
19     Q.   And one had to do with a press
20 release?
21     A.   Right.
22     Q.   Those were the three subjects,
23 right?
24     A.   Yes.

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 677

1    Q.   Okay.  And I'm assuming from
2  your answer that the audio conference and the
3  sales rep representatives are issues you're
4  not addressing?
5    A.   I am not addressing those.
6    Q.   Okay.  The issue you are
7  addressing is the press release?
8    A.   Yes.
9    Q.   Okay.  And did you review as
10 part of your opinions Merck's response to the
11 FDA's warning letter with respect to the
12 issue of the press release?
13   A.   Yes.
14   Q.   Okay.  And what's your
15 understanding of what Merck's response was to
16 the FDA's concern?
17   A.   Well, I think the -- I think
18 Merck -- I mean, rather than withdraw it, I
19 think Merck defended it.
20   Q.   Merck defended their press
21 release, right?
22   A.   Right.
23   Q.   And basically indicated that it
24 was in response to, essentially, something

Page 678

1  someone else had said in the way of another
2  manufacturer?
3    A.   Right.
4    Q.   Is that right?
5    A.   Yes.
6    Q.   Okay.  And do you know whether
7  the FDA accepted Merck's explanation as
8  satisfactory or whether they insisted that
9  Merck take some corrective action?
10   A.   I don't know what the FDA's
11 final determination was.
12        MR. PIORKOWSKI:  Okay.
13        (Whereupon, Deposition Exhibit
14   Moye MDL 18, 10/1/01 Letter to Thomas
15   Abrams, Director of DDMAC, from
16   David W. Anstice, Merck, Re: NDA
17   No. 21-042 VIOXX (Rofecoxib) tablets,
18   MRK-AAF0007803 - MRK-AAF0007853, was
19   marked for identification.)
20   Q    (BY MR. PIORKOWSKI)  I'm
21 handing you what I've marked as Exhibit 18.
22 That's a copy of Merck's response, right?
23   A.   Okay.
24   Q.   Okay.  And that's the letter

Page 679

1  that you've reviewed that we talked about
2  that on page 4, 5, 6 and 7 --
3    A.   Yes.
4    Q.   -- it has Merck's response to
5  the issue of the press release, right?
6    A.   Yes.
7    Q.   And Merck's response is that,
8  quote, "Merck strongly disagrees with DDMAC's
9  comments regarding the May 22nd, 2001 press
10 release for several reasons," right?
11   A.   Yes.
12   Q.   And the first reason is that,
13 "DDMAC's letter does not acknowledge the fact
14 that Merck's press release was issued in
15 response to media and analyst activity and
16 was not proactively issued to promote the
17 cardiovascular safety profile of Vioxx,"
18 right?
19   A.   Yes.
20   Q.   Okay.  Do you know whether the
21 FDA ever challenged that view?
22   A.   I don't know.
23   Q.   Okay.  It says, "Second, the
24 letter appears to create an affirmative

Page 680

1  obligation to disclose alternative
2  explanations for data in a communication
3  whose very purpose is to respond to and
4  debate those same alternative explanations."
5        Do you know whether FDA ever
6  took issue with that?
7    A.   I don't know if they did or
8  not.
9        MR. WEBSTER:  Objection, form.
10   Q    (BY MR. PIORKOWSKI)  It says,
11 "Third, the letter does not acknowledge the
12 fact that substantial balance, including the
13 existence of alternative hypotheses, was
14 included in that press release."
15        Do you know whether the FDA
16 took issue with that?
17   A.   I don't.
18   Q.   Did you actually go back and
19 look at the press release that was the
20 subject of the warning letter, the press
21 release itself?
22   A.   Yes.
23   Q.   Okay.  Where did you get that?
24   A.   I don't remember where I got

71 (Pages 677 to 680)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 681

1  it. I -- I don't remember.
2      Q.   Okay. It says, "Finally, we
3  note that while DDMAC criticizes the press
4  release for reasons 'similar' to the audio
5  conference, many of the reasons do not apply
6  to the press release."
7         Do you know whether the FDA
8  ever took issue with that?
9      A.   I don't know.
10         MR. PIORKOWSKI:  Okay.
11         (Whereupon, Deposition Exhibit
12    Moye MDL 19, 1/2/02 Fax to Thomas M.
13    Casola, Merck, from Laura Governdale,
14    DDMAC, Re: NDA 21-042, Vioxx
15    (rofecoxib) tablets, MRK-ACI0013248 -
16    MRK-ACI0013249, was marked for
17    identification.)
18      Q    (BY MR. PIORKOWSKI)  Now, on
19  the other two issues that you're not offering
20  opinions on, the FDA -- or, I'm sorry, Merck
21  told the FDA that it planned to take
22  corrective action on those issues, right?
23      A.   Right.
24         MR. WEBSTER:  Objection to

Page 682

1      form.
2      Q    (BY MR. PIORKOWSKI)  All right.
3  But have you seen a letter that says, "DDMAC
4  has reviewed your corrective actions based on
5  the information provided and concludes that
6  this matter has been satisfactorily resolved
7  and is considered closed"?
8      A.   I didn't see that letter.
9      Q.   Okay. Are you -- are you
10  familiar with the way the DDMAC process
11  works?
12      A.   I never worked with them, so I
13  don't have firsthand information about it.
14      Q.   Okay.
15      A.   I have no firsthand experience
16  with it, no.
17      Q.   Okay. Do you have any other
18  opinions that you plan to offer on any other
19  letters that came from the DDMAC division --
20      A.   No.
21      Q.   -- as a part of this case?
22      A.   No.
23      Q.   Okay. Thanks.
24         Let's talk for a couple of

Page 683

1  minutes about subgroups.
2      A.   Yes.
3      Q.   Okay. A subject near and dear
4  to your heart, right?
5      A.   Yes.
6         MR. PIORKOWSKI:  Okay.
7         MR. WEBSTER:  Objection to the
8      sidebar.
9      Q    (BY MR. PIORKOWSKI)  Is -- are
10  subgroup's analysis a subject near and dear
11  to your heart?
12      A.   I write about them, written
13  articles about them, and I've written
14  chapters in my textbooks about them.
15      Q.   In fact, when I cross-examined
16  you at a trial before, part of our dialogue
17  dealt with your views about subgroup
18  analysis?
19      A.   That's right.
20      Q.   Right?
21      A.   That's right.
22      Q.   All right. And your opinions
23  about subgroup analysis are that if the
24  subgroup is not specified in advance --

Page 684

1      A.   Yes.
2      Q.   -- that the subgroup analysis
3  may be interesting to look at, but not
4  something in which you can put scientific
5  stock; is that a fair characterization?
6      A.   Yes. However, I have to add a
7  couple of things. I mean, there are several
8  problems with subgroups. One that you just
9  mentioned is the lack of prospective
10  identification.
11         But we also have to remember --
12  and the reasons for those concerns are
13  primarily mathematical.
14      Q.   Okay.
15      A.   However, when it comes to
16  safety, mathematics has to -- is overshadowed
17  by safety concerns. So those kinds of
18  arguments I've made and as well as Salim
19  Yusuf has made and others have made, really
20  apply more to efficacy findings than they
21  apply to hazard findings.
22         But with that caveat,
23  everything you said is true.
24      Q.   Well, when we talked back in

72 (Pages 681 to 684)

Lemuel A. Moye, M.D., Ph.D.

Page 685

1  Alice, Texas, about the IPPHS study, that
2  involved a hazard finding, right?
3      A.    Well, yes, but it was in a
4  study that was designed specifically to look
5  at hazard as opposed to a study that is
6  designed to look at something else and
7  happens to develop hazard.
8      Q.    But you had told me in Alice,
9  Texas, that the subgroup analysis that was
10  used to come up with a relative risk of 23 --
11      A.    Right.
12      Q.    -- in the IPPHS study was not
13  significantly reliable?
14      A.    Right.  The most reliable --
15      Q.    Right.
16      A.    The most reliable -- I guess we
17  were talking about odds ratios then --
18      Q.    That's right.
19      A.    -- was the 6.8.
20      Q.    Yes.  That's right.
21      A.    I think that came from the
22  overall result.  That's right.
23      Q.    Right.  And that was in the
24  context of a hazard study?

Page 686

1      A.    Right.  And a study designed to
2  examine -- to look for hazards, that's right.
3      Q.    Who was Salim Yusuf?
4      A.    Oh, he's an epidemiologist out
5  of McMaster University -- McMaster's
6  University in Canada.
7      Q.    Okay.  And is he someone whose
8  opinions you respect as a biostatistician?
9      A.    Yes, sure.
10      Q.    Okay.  Is he -- has he
11  published on the subject of analysis and
12  interpretation of subgroups?
13      A.    Yes, he has.
14      Q.    Okay.  Have you reviewed his
15  literature -- in fact, you cited his
16  literature in your report?
17      A.    Yeah, he has a -- I think it
18  was a 1991 article out of JAMA.
19          (Whereupon, Deposition Exhibit
20      Moye MDL 20, "Analysis and
21      Interpretation of Treatment Effects in
22      Subgroups of Patients in Randomized
23      Clinical Trials, by Yusuf, et al.
24      (6 pages), was marked for

Page 687

1          identification.)
2      Q.    (BY MR. PIORKOWSKI)  Which is
3  in this, right?
4      A.    Yes, sure is.
5          Thank you.
6          MR. PIORKOWSKI:  You want one
7  too, Mike?
8          MR. GALLAGHER:  Yeah, please.
9  Thank you.
10          MR. PIORKOWSKI:  Yes, sir.
11      Q.    (BY MR. PIORKOWSKI)  Do you see
12  in this study -- this is a special
13  communication, right?
14      A.    Yes.
15      Q.    That's -- what kind of -- what
16  kind of document is a special communication?
17      A.    Well, it's a peer-reviewed
18  manuscript, but it is separate and apart from
19  many of the others in that it does not have
20  primary research data on which it's -- on
21  which it's reporting.
22      Q.    Okay.
23      A.    This is a description of
24  methodology.

Page 688

1      Q.    All right.  And do you see on
2  the first page, page 93, on the right-hand
3  side, he says, "We define a proper subgroup
4  as a group of patients characterized by a
5  common set of 'baseline' parameters.  These
6  parameters may include inherent patient
7  characteristics that cannot be affected by
8  treatment" --
9      A.    Yes.
10      Q.    -- example, age or sex, "or
11  disease characteristics, defined before
12  randomization (anterior or inferior
13  myocardial infarction when the determination
14  is made before randomization)."
15          He defines those as proper
16  subgroups, right?
17      A.    Yes.  Right.
18      Q.    And it says, "In randomized
19  clinical trials, each proper subgroup
20  constitutes a smaller randomized controlled
21  trial."  Do you agree with that?
22      A.    Basically, yes.
23      Q.    Okay.  He goes on to say,
24  quote, "Sometimes the term 'subgroup' refers

73  (Pages 685 to 688)

165470b8-f920-4da9-843f-90cc143762f6