# Lemuel A. Moye, M.D., Ph.D.

1   to a set of outcomes, for example,
2   cause-specific deaths or the number of events
3   within a specific time period." Is that
4   correct? Did I read that correctly?
5       A.   Yeah, you did.
6       Q.   Do you agree with that?
7       A.   At the time, I'd say yes.
8   Now -- I mean, this was 15 years ago. So at
9   the time, yes.
10      Q.   Okay. It says, "When the
11  context is clear, the term 'subgroup' shall
12  refer to a proper subgroup."
13           He's talking for purposes of
14  the rest of his discussion in this paper,
15  right?
16      A.   Yes.
17      Q.   All right. And then he goes on
18  to talk about what's an improper subgroup,
19  right?
20      A.   Right.
21      Q.   He says, "An improper subgroup
22  is defined herein as a group of patients
23  characterized by a variable measured after
24  randomization and potentially affected by

1   treatment. Example, separate examination of
2   the prognosis of patients with a patent
3   coronary artery in the trial of a
4   thrombolytic agent when patency is determined
5   after initiating the randomized treatment,"
6   right?
7       A.   Right.
8       Q.   You agree with that example?
9       A.   Yes, I do.
10      Q.   "In such a case, a low
11  mortality rate may reflect not only the
12  effects of the therapy, but also inherent
13  favorable prognostic characteristics of the
14  patients themselves, such as spontaneous
15  recanalization, the presence of a
16  nonocclusive thrombus or the fact that the
17  infarct was small," right?
18      A.   Yes.
19      Q.   "Analysis of improper
20  subgroups, though seductive, can be extremely
21  misleading because a particular treatment
22  effect may influence classification to the
23  subgroup," right?
24      A.   Yes.

1       Q.   You agree with that too?
2       A.   Yes.
3       Q.   "Thus, an apparent subgroup
4   effect may not be a true effect of treatment,
5   but, rather, the result of inherent
6   characteristics of patients that led to a
7   particular response or to the development of
8   side-effects." Do you agree with that?
9       A.   Yes.
10      Q.   Okay. Let me ask you, first of
11  all: Is subgroups -- subgroup analysis can
12  depend not only on the subgroup of the
13  patient study, but it can also refer to a
14  subgroup of endpoints, right?
15      A.   See, that was where I think the
16  nomenclature has departed some from what
17  Salim was talking about.
18      Q.   Okay.
19      A.   I think when he was talking
20  about subgroups then, I think what he was
21  really talking about was subsets, like
22  subsets like, for example, of the APTC
23  endpoint, a subset would be fatal/nonfatal
24  myocardial infarction.

1       Q.   Right.
2       A.   We don't really talk about --
3   describe those as subgroups. Those are
4   really a subset of the combined endpoint.
5       Q.   Well, that's actually my
6   question, is: Do you view, when you -- you
7   recognize that in the studies that have been
8   done on Vioxx, whether you agree or disagree
9   with the methodology, the endpoint that was
10  studied is generally a combined endpoint of
11  several different thrombotic or cardiac
12  events, right?
13      A.   I actually would say that in
14  these clinical studies looking at Vioxx, all
15  kinds of endpoints have been used. Combined
16  end points have been used, individual
17  analyses have been used, some prespecified,
18  others not. I can't -- don't think there's a
19  rhyme or reason to any of them.
20      Q.   Well, there is a common theme
21  that runs through the Merck-funded studies.
22  There's a common endpoint that runs through
23  them all, right: Combined thromboembolic
24  serious cardiovascular events?

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 693

1    A.   Yes, but it's not the only one
2  that's used, and --
3    Q.   I'm sorry.  Go ahead.
4    A.   Not the only one that's used,
5  and the evaluations are provided for the
6  individual components as well as for the --
7  the overall combined endpoint.  P values in
8  and confidence are supplied for all of them,
9  and so it's easy to lose the rationale, and
10 it's all underpowered, anyway.
11       And so it's easy to lose the
12 rationale for the notion of prospective
13 determination when you've got all these other
14 forces.
15   Q.   Okay.  Well, let's see if we
16 can agree on a few specific points.
17   A.   Okay.
18   Q.   You agree that starting with
19 the implementation of the CVSOP prior to
20 VIGOR --
21   A.   Right.
22   Q.   -- the primary cardiovascular
23 endpoint that was specified in Merck's
24 clinical trials was a combined thromboembolic

Page 694

1  endpoint?
2    A.   Yes.
3    Q.   Okay.  And all of the studies
4  also included a secondary endpoint, which was
5  the APTC endpoint, right?
6    A.   Right.
7    Q.   At the same time -- I think
8  this is what you're alluding to -- all of the
9  individual data on the individual events
10 themselves were presented when these studies
11 were written up, right?
12   A.   Right, which is -- which is one
13 of the principles of displaying combined --
14   Q.   Right.  I mean, that's
15 appropriate, right?
16   A.   Right.  Right.  That's right.
17   Q.   All right.  And so you have --
18 you have data on the APTC endpoint, you have
19 data on the combined thromboembolic endpoint,
20 you have data on myocardial infarctions,
21 right?
22   A.   Right.
23   Q.   You have data on angina
24 pectoris?

Page 695

1    A.   Right.
2    Q.   You have data on sudden cardiac
3  death?
4    A.   Yes.  Right.
5    Q.   You have data on pulmonary
6  embolism?
7    A.   Right.
8    Q.   You have data on deep vein
9  thrombosis?
10   A.   Right.
11   Q.   You have data on stroke and
12 TIA?  I mean, all of those are within the
13 realm of the data that are displayed for all
14 these settings?
15   A.   Right.  And if I could add to
16 this cascade, we have P values for all of
17 them.
18   Q.   Right.
19   A.   We have relative risk -- I
20 mean, I'm sorry, confidence intervals for all
21 of them, and all are underpowered.
22   Q.   Right.  But the reason they're
23 underpowered is because all of these events
24 are relatively rare?

Page 696

1    A.   Yes.  Rare enough so that the
2  sizes of the sample are not able to identify
3  an effect, should there be one, of clinical
4  magnitude.
5    Q.   Okay.  So they're underpowered
6  because the incidence of these events is
7  small in the background population first,
8  right?
9    A.   Well, let's say -- I mean, it's
10 too small for the small sample to identify
11 them.
12   Q.   Okay.  But even when we have
13 thousands -- thousands of patients, because
14 of the relative rarity of the events, that's
15 why it's underpowered?
16   A.   Well, right.  But I don't
17 think -- if you're looking at -- I mean,
18 studies -- if you look at what we did in
19 CARE, we only had 4100 patients, and we
20 followed them for a long period of time, of
21 course.
22       So it's a combination of the
23 duration of the -- the duration of follow-up
24 as well as the number of patients that

75 (Pages 693 to 696)

Lemuel A. Moye, M.D., Ph.D.

Page 697

1 determines whether you can capture enough
2 events.
3    Q.    Okay.  Do you view looking at
4 one subset of the prespecified endpoint as a
5 subgroup analysis?
6    A.    I see what you're saying.  No,
7 I don't.  I mean, to me, that is not a
8 subgroup analysis.  That's the evaluation of
9 a component of a combined or composite
10 endpoint.
11    Q.    Okay.
12    A.    But, to me, I don't think of
13 that as a subgroup analysis.
14    Q.    Do you consider that an
15 appropriate epidemiological method?
16    A.    In some circumstances.  Let me
17 try to be clear about that.  If someone
18 posits that the finding for a combined
19 endpoint is clinically and statistically
20 significant for efficacy, then the question
21 arises, well, is this a finding that is seen
22 for each of the components, or is it seen for
23 just one of the components?
24         For example, if the study is

Page 698

1 in -- if the combined endpoint is unstable
2 angina and myocardial infarction and the
3 study is positive on this combined endpoint,
4 but 90% of the endpoint cases are unstable
5 angina and very few are MI, then that's a
6 much weaker finding than if you had many of
7 the case -- many more of the cases being MIs.
8    Q.    Okay.
9    A.    If the effective therapy was
10 primarily in the unstable angina --
11    Q.    I see.
12    A.    -- it's a weaker --
13    Q.    I understand what you're
14 saying.
15    A.    Right.  Right.
16    Q.    And --
17    A.    So there, it does -- it's
18 useful to look at the analysis for each of
19 the components.
20    Q.    Do you -- in your opinion, is
21 angina --
22         MR. PIORKOWSKI:  Do you want me
23 to stop, Jason?
24         MR. WEBSTER:  No.  Keep going.

Page 699

1    Q.    (BY MR. PIORKOWSKI)  In your
2 opinion, is angina a thrombotic event?
3    A.    I don't think so because we
4 think of thrombotic -- I mean, of course,
5 anything is possible, but by and large, I
6 would say no, because we think of thrombotic
7 events as being terminally occlusive, and
8 that would be -- that would produce the MI.
9    Q.    You -- you've actually had some
10 experience working on studies where the
11 endpoint of concern has been sudden cardiac
12 death, right?
13    A.    Right.
14    Q.    For example, your work on
15 Seldane, right?
16    A.    Right.  Right.
17    Q.    That was an issue where,
18 because of the effects on the liver
19 enzymes --
20    A.    Right.  Right.
21    Q.    -- a drug level became
22 elevated, which led to a cardiac arrhythmia
23 referred to as Torsade, right?
24    A.    Right.

Page 700

1    Q.    And that's potentially fatal
2 arrhythmia?
3    A.    Yes.
4    Q.    Okay.  You agree with me that
5 sudden cardiac death can occur either in the
6 context of an arrhythmia -- well, let me back
7 up.
8         Do you agree that in some
9 cases, sudden cardiac death can occur
10 secondary to an arrhythmia in the absence of
11 a myocardial infarction?
12    A.    Sure.
13    Q.    Okay.  Do you have any
14 information about whether sudden cardiac
15 death occurs more frequently in the presence
16 of a myocardial infarction or the absence of
17 a myocardial infarction?
18    A.    I don't have any information
19 about that.  I mean, it occurs in both.
20    Q.    Okay.  Would you agree with me
21 that sudden cardiac -- well, if we're talking
22 about sudden cardiac death secondary to an
23 arrhythmia, not induced by a myocardial
24 infarction, do you regard that as a

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 701

1  thrombotic event?
2      A.    Sudden cardiac death that is
3  not due to a myo- -- due to an arrhythmia,
4  not due to a myocardial infarction, my
5  understanding is it's electrical.
6      Q.    Right.
7      A.    And so it's not a thrombus.
8      Q.    Okay.  Do you regard the --
9  from your perspective, was -- well, in
10 conducting a study of potential cardiac
11 events, okay, is it fair to say that the
12 combined thrombotic event captures all of the
13 potential things that could be related to a
14 clotting problem?
15     A.    Well, it -- I think on our
16 current understanding, yes, the types of
17 events that are associated -- that are
18 generated by thrombosis are the kinds of
19 events -- are the kinds of events that are
20 included in this combined endpoint.
21     Q.    Okay.  And it would be fair to
22 say that Merck cast a wide net here with
23 respect to the cardiac endpoints that it was
24 looking at?

Page 702

1      A.    Yes.
2      Q.    Okay.  Because some of them, as
3  you've already said, like angina, isn't
4  typically regarded as a thrombotic issue?
5      A.    Right.  And it's not really a
6  heart event, anyway.
7      Q.    Right.
8      A.    People can disagree about
9  whether a patient's got angina or not.
10     Q.    Okay.
11     A.    Not quite so much disagreement,
12 still some, but not quite so much with MIs.
13     Q.    And sudden death is the same
14 thing?
15     A.    Right.  That's right.  Sure.
16     Q.    It may or -- you know, it may
17 be thrombotic, may not be, but --
18     A.    Right.
19     Q.    Okay.  Do you have -- one thing
20 that using a combined endpoint allows a
21 doctor or a regulator to do is to look at the
22 data and reanalyze the data any way that
23 person wants to do that, right?
24     A.    When you say -- you mean -- if

Page 703

1  you're suggesting that they can deconstruct
2  the combined endpoint --
3      Q.    Yeah.
4      A.    -- and look at any individual
5  endpoints they like --
6      Q.    Right.
7      A.    -- then they have the original
8  data, they can do that.
9      Q.    Right.  Well, I mean, even if
10 they have the -- if the published data break
11 them down, they can do that too, right?
12     A.    If you're looking at tables --
13     Q.    Right.
14     A.    -- and the tables break out the
15 number of events -- number of component --
16 number of events for each of the component
17 endpoints, then yes.
18     Q.    Well -- and, in fact, Merck has
19 presented those data both to the FDA and
20 published papers for all the studies that
21 have come out?
22     A.    Well, that's their obligation
23 to do, yes.
24     Q.    Right.  But, I mean, they did?

Page 704

1      A.    Yes.
2      Q.    Okay.  And so if somebody else
3  came along and said, "Gee, I really think
4  that what we should be looking at here is a
5  combined endpoint of myocardial infarction
6  plus sudden cardiac death," that person could
7  go to the tables and sort of construct their
8  own analysis and see what they found, right?
9      A.    Yes.
10     Q.    Okay.  Do you -- would you
11 agree that it would be unethical to
12 intentionally expose patients to a
13 significant risk of a serious adverse event
14 without some countervailing benefit?
15     A.    I mean, to expose them in
16 a way that they would ordinarily not be
17 exposed, yes, that's right.
18     Q.    I mean, that would be unethical
19 to do that, right?
20     A.    Right.
21     Q.    Do you -- did you review any
22 documents about Protocol 203?  I mean, if you
23 need to refer to something, this isn't a
24 memory test.  You're welcome to look at your

77  (Pages 701 to 704)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 705

1  report or anything else.
2      A.   Let me look and see.  I don't
3  think so.
4          MR. WEBSTER:  Do you have
5  Protocol 203 with you?
6          MR. PIORKOWSKI:  I don't.
7      A.   No, I don't have the protocol
8  number for VICTOR, but I assume it's not...
9      Q    (BY MR. PIORKOWSKI)  Let me --
10         MR. PIORKOWSKI:  Oh.  Yeah, do
11  you have that?
12         (Conference out of the hearing
13  of the reporter.)
14         MR. PIORKOWSKI:  I'm sorry.
15     A.   I don't have the protocol
16  numbers for VIP or VICTOR in here.
17     Q    (BY MR. PIORKOWSKI)  Okay.
18     A.   I don't -- so I don't know
19  what --
20     Q.   Did any of the documents you
21  read -- do you recall what Protocol 203 was,
22  generally?
23     A.   I don't, no.
24     Q.   Okay.  Let me represent to you

Page 706

1  that Protocol 203 was intended originally to
2  be a combined analysis of the APPROVe study,
3  the VIP study and the VICTOR study.
4      A.   Okay.
5      Q.   Do you remember reading any
6  documents that discussed that protocol?
7      A.   No, I don't recall reading any
8  documents that discussed that combined
9  analysis of those three studies.
10     Q.   Do you recall reading any
11  documents that indicated that the combined
12  analysis of those three studies was ever
13  discussed with the FDA?
14     A.   No.
15     Q.   Okay.  I think we talked --
16     A.   I don't remember reading any
17  such studies, no.
18     Q.   Okay.  I think we talked
19  earlier about -- I think we went up to the --
20  we were talking about the April 2002 label
21  change.  Do you recall that?
22     A.   Yes.
23     Q.   And I asked you whether you had
24  any criticisms, and you said that you did,

Page 707

1  but then when I asked you about whether the
2  VIGOR data were adequate -- were accurately
3  set forth, I think you also told me that they
4  were, right?
5      A.   Yes.
6      Q.   Okay.  What specific criticisms
7  do you have of the April 2002 label change?
8      A.   It's the criticism I have of
9  all the labels, and that is that Vioxx cannot
10  be labeled for safe and effective use.
11         I don't think Vioxx should ever
12  have been submitted, don't think it should
13  have been approved, and I don't think any
14  label characterizes its use in a way that it
15  can be implemented safely and effectively.
16     Q.   Are you aware, as you sit here
17  today, of any studies that have compared --
18  well, that have looked at the cardiovascular
19  risk of Vioxx and compared it to the
20  cardiovascular risk with nonselective NSAIDs?
21         MR. WEBSTER:  Objection, form.
22     Q    (BY MR. PIORKOWSKI)  And found
23  no difference in risk?
24         MR. WEBSTER:  Objection, form.

Page 708

1      A.   Actually, I'm not sure I
2  understand the question.
3      Q    (BY MR. PIORKOWSKI)  Are you
4  aware of any studies -- observational
5  studies, metanalysis of clinical trials, any
6  studies -- that have looked at the
7  cardiovascular risks of Vioxx and compared it
8  with the cardiovascular risks of nonselective
9  NSAIDs and found no difference in risk?
10     A.   If you're including
11  observational studies, I need to look at my
12  report to see if I have any there.
13     Q.   That's all right.
14     A.   Okay.  Ask the question again,
15  please.  I'm sorry I have to keep asking you
16  to do that.
17     Q.   That's all right.
18         The question is:  Have you seen
19  any studies that have looked at
20  cardiovascular risks in Vioxx users compared
21  to cardiovascular risks in nonselective NSAID
22  users and concluded that the risks are
23  equivalent?
24     A.   No.

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 709

1    Q.    Is it your view that -- is it
2  your opinion that there's a dose-response
3  relationship with respect to the
4  cardiovascular risks of Vioxx?
5    A.    Yes.
6    Q.    Okay.  And by that, you mean
7  that the risk of 50 milligrams is greater
8  than the risk of 25 milligrams, is greater
9  than the risk of 12.5 milligrams?
10   A.    Yes.
11   Q.    Okay.  And what do you base
12 that on?
13   A.    Well, it's based on a few
14 things.  First of all, just my understanding
15 of how toxins work and the more that you
16 have, the more likely you are to have the
17 event.
18       If you look at -- there are
19 some data from some of the epidemiologic
20 studies, such as Ray, which shows that risks
21 with higher doses of rofecoxib are greater
22 than a risk of lower doses of rofecoxib.
23   Q.    And if we took that same study
24 as an example, like Dr. Ray's study -- you're

Page 710

1  referring to his 2002 study?
2    A.    I need to look at the
3  reference.  It'll just take me a moment.
4       (Witness reviews document.)
5    A.    Yes.
6    Q.    (BY MR. PIORKOWSKI)  Okay.
7  Dr. Ray's 2002 study found no increased risk
8  with doses of 25 milligrams or less, right?
9    A.    That's true.  Right.  Right.
10   Q.    Is -- do you know that Dr. Ray,
11 by the way, is an expert in many of the Vioxx
12 cases for the plaintiffs?
13   A.    Well, I don't know about many.
14 I did know that he was -- he has been.  I
15 don't know what he's doing now.
16   Q.    Is it your opinion that the
17 cardiovascular -- well, let me ask you:  With
18 respect to 12.5 milligrams, what data do you
19 rely on for your opinion that 12.5 milligrams
20 of Vioxx is unsafe, regardless of how it's
21 labeled?
22       (Witness reviews document.)
23   A.    I can't remember, and I can't
24 find it here.  There's one other place I need

Page 711

1  to look.
2    Q.    (BY MR. PIORKOWSKI)  Take your
3  time, because that's an important point.  If
4  you need to take a minute to do it, that's
5  all right.
6       (Witness reviews document.)
7    A.    No, I can't remember.  I don't
8  have the doses of the Vioxx in each of the
9  trials that I cite here, and I can't remember
10 what they are.
11   Q.    (BY MR. PIORKOWSKI)  Okay.  As
12 you sit here today, are you aware of any
13 placebo-controlled trial that shows an
14 increased risk of 12.5 milligrams of Vioxx?
15   A.    I think I am.  I just can't
16 find out what that is.
17   Q.    Okay.
18       MR. WEBSTER:  You mind if I --
19 I think it may help him if he looked
20 at paragraph 89 of the report, or 90.
21       MR. PIORKOWSKI:  Paragraph 90
22 is Watson's report.
23       MR. WEBSTER:  Oh.  Okay.  No,
24 of Moye, I'm sorry, of his report.

Page 712

1       MR. PIORKOWSKI:  That's what
2  I'm looking at.
3       MR. WEBSTER:  Oh.  Okay.
4       MR. PIORKOWSKI:  That's about
5  Wat- --- the Watson analysis.
6    A.    Yeah, it's Protocol 010.  I'm
7  sorry it took so long.  That's not Vioxx 125.
8  That's Vioxx 12.5.
9    Q.    (BY MR. PIORKOWSKI)  Okay.
10 Well, actually, are you sure about that?
11   A.    What?  It's not 125 milligrams?
12   Q.    Yeah.
13   A.    Yeah, I think so.  Yes.
14   Q.    Are you aware that Merck did
15 study Vioxx at 125 milligrams?
16   A.    Yeah.  I don't think they did
17 it in Protocol 010, though.
18   Q.    Are you sure?
19   A.    No, I'm not.  I can check and
20 see.  It's all based on the Watson report.
21   Q.    It's all based on what?
22   A.    The Watson report.
23   Q.    Yeah.
24   A.    So let's see.

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 713

1      (Witness reviews document.)
2      A.    No, it does say 125 milligrams.
3      Q.    (BY MR. PIORKOWSKI)  In fact,
4   are you aware, Dr. Moye, that Merck even
5   studied doses as high as 175 milligrams in
6   that --
7      A.    I don't recall any single study
8   where they did that, no.
9      Q.    Okay.  So getting back to my
10  question about 12.5 milligrams, are you able
11  to identify any study that shows an
12  increased -- statistically significant
13  increased risk for 12.5?
14     A.    Well, statistically increased
15  risk, no, but I think there is a study that
16  shows an increased risk, but I haven't found
17  it yet.
18     Q.    Okay.
19     A.    But stat increased risk, the
20  answer is no.
21     Q.    Okay.  And Study 010, by the
22  way, that was not a study that found
23  thromboembolic events, is it?  It's a study
24  that found hypertension?

Page 714

1      A.    Right.
2      Q.    Right.  And hypertension is
3   certainly a cardiovascular event, but
4   that's -- that was -- the risk of
5   hypertension was appreciated by the FDA at
6   the time of the initial approval, right?
7      A.    Yes.
8      (Witness reviews document.)
9      Q     (BY MR. PIORKOWSKI)  Okay.  I'm
10  sorry.  Were you done with your answer,
11  Dr. Moye, or were you waiting for another
12  question?
13     A.    Yeah.  No, I'm done.  I'm done.
14     Q.    Okay.  Let me ask you:  Are you
15  aware of any -- any pain reliever that had
16  a --
17     A.    I'm sorry.  Excuse me.
18  Protocol 090 used 12.5 milligrams.
19     Q.    Yes?
20     A.    Right.  So it didn't -- it did
21  not demonstrate a statistically significant
22  increase --
23     Q.    Right.
24     A.    -- right, but Protocol 090

Page 715

1   gave -- deal with 12.5.  Okay.
2      Q.    Okay.
3      A.    Now I'm ready for the next
4   question.
5      Q.    All right.  And so we're clear
6   on the answer:  Other than Protocol 090,
7   you're not aware of any other study that
8   demonstrated an increased risk of 12.5?
9      A.    I can't think of any right here
10  and now, right.
11     Q.    Okay.  And the increased risk
12  that was demonstrated in Study 090 was not a
13  statistically significant increased risk,
14  correct?
15     A.    Right.  That's correct.
16     Q.    All right.  Is it your -- is it
17  your opinion that the risk of thrombotic
18  cardiovascular events of Vioxx increase with
19  increasing duration of use?
20     A.    Yes.
21     Q.    And is there any threshold
22  period of time below which there is no risk?
23     A.    Absolutely no risk?
24     Q.    Well --

Page 716

1      A.    I'd say -- I'd say the period
2   at which there was no risk is the isolated
3   one after ingestion where you get no pain
4   relief.
5      Q.    Is -- do you have any evidence,
6   scientific evidence, that the risk associated
7   with Vioxx increases immediately after a
8   blood level is achieved?
9      A.    Oh, no.  I wouldn't expect to
10  find any.  We'd have to have a study that
11  would look at a large number of people for a
12  relatively short period of time after the
13  drug was used, and we're talking about hours.
14  I wouldn't expect there to be a study to show
15  that.
16     But my understanding of the
17  mechanism and of the epidemiology of this
18  says that the risk for -- the risk for
19  cardiovascular effects tracks the risk of
20  pain relief.
21     Q.    So --
22     A.    So on onset.  On onset.
23     Q.    So we're clear, though, your
24  opinion there is based on your understanding

Lemuel A. Moye, M.D., Ph.D.

Page 717

1  of the mechanism of action?
2      A.    Yes.
3      Q.    Okay.  It's not based on a
4  particular epidemiological or clinical study?
5      A.    That's correct.
6      Q.    Okay.  And if it were
7  demonstrated that Vioxx, in fact, does not
8  affect the prostacyclin-thromboxane balance
9  in the way that you believe it does, you'd
10  have to revisit that opinion; fair?
11      A.    Yes.
12      Q.    Okay.  Does the risk, in your
13  view, that increases over time -- is that
14  simply a function of longer exposure, exposed
15  every day for many, many days, or is it --
16  does it actually increase over time?
17      A.    I think it's both.  I think
18  it's increasing over time, just because of
19  duration of exposure, but also I think that
20  there is a -- a propagation effect that is
21  related to the atherogenic effect of Vioxx as
22  well as to the accelerant effect of elevated
23  blood pressure.
24      Q.    What -- what scientific

Page 718

1  evidence do you have of a proatherogenic
2  effect other than an effect on blood
3  pressure?
4      A.    Just what we saw in the
5  follow-up data for APPROVe.
6      Q.    Okay.  Just the APPROVe
7  follow-up data, which we acknowledged earlier
8  was not a statistically significant increase?
9      A.    Right, but we're not concerned
10  about that because it's not powered to detect
11  this with statistical significance with
12  adequate power.
13      MR. PIORKOWSKI:  Object to the
14      nonresponsive portion.
15      Q     (BY MR. PIORKOWSKI)  What --
16  you have some discussions in your report
17  about various studies that have looked at the
18  cardioprotective effects of naproxen.  Do you
19  recall that?
20      A.    Yes.
21      Q.    Okay.  Do you know which
22  studies that looked at -- well, let me
23  back up.
24      Do you know whether the

Page 719

1  platelet inhibition effect of naproxen
2  depends on the dose and the frequency of
3  administration of naproxen?
4      A.    I don't.  And, actually, I
5  don't -- I'm not sure I accept the notion of
6  a platelet -- an anti-aggregatory effect of
7  platelets.  I accept the COX-1 action, but I
8  don't think I accept this anti-aggregatory
9  effect of platelets.
10      Q.    Okay.  But we looked earlier
11  today at Dr. Topol's paper, right?
12      A.    I know what Eric wrote.  I
13  appreciate that.
14      Q.    But my point is that he
15  published that in a peer-reviewed paper,
16  right?
17      A.    Yes.  Yes.
18      Q.    And he actually cited support
19  for the specific percentage of platelet
20  inhibition from naproxen, right?
21      A.    That's true.
22      Q.    And I thought you told me, and
23  let's make sure I'm clear, you didn't have
24  any study that showed anything to the

Page 720

1  contrary?
2      A.    No, certainly that's true, but
3  that -- that, in and of itself, doesn't mean
4  I believe that Eric has persuaded me and
5  these authors have persuaded me that naproxen
6  has this anti-aggregatory effect.
7      I mean, there are dozens, if
8  not hundreds, of papers that demonstrate that
9  for aspirin.  There was one citation, and I
10  don't believe the medical community is
11  persuaded of an anti- -- an anti- -- a
12  platelet anti-aggregatory effect.
13      MR. PIORKOWSKI:  Okay.  Object
14      to the nonresponsive portion.
15      Q     (BY MR. PIORKOWSKI)  Do you --
16  when you were in practice, did you ever
17  prescribe oral contraceptives?
18      A.    Yes.
19      Q.    Okay.  Do you view -- did you
20  view -- at the time, did you view oral
21  contraceptives as a safe drug?
22      MR. WEBSTER:  Objection, form.
23      Can you specify which ones you're
24      talking about?

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 721

1     MR. PIORKOWSKI: Any.
2     A.    You don't remember my answer to
3  you in Alice. I'll answer you differently
4  this time.
5         I think that in some women --
6  in many women, not in all women, the benefit
7  exceeds the risk, but it's got to be used
8  safely.
9     Q    (BY MR. PIORKOWSKI) And do you
10 know for -- so by "used safely," I assume
11 part of what you're talking about is having a
12 patient who's not smoking, right?
13    A.    Right. Right.
14    Q.    Okay. Let's assume we're
15 talking on the same page about a patient
16 who's not smoking, okay?
17    A.    Okay.
18    Q.    Who has no other risk factors
19 for coronary disease or venous disease?
20    A.    Right. Right.
21    Q.    Age 35, no other risk factors.
22 Do you --
23    A.    And I guess is sexually active?
24    Q.    Well, I'm assuming that there

Page 722

1  wouldn't be benefits to outweigh the risks --
2     A.    Well, actually -- actually, if
3  they've got painful menses, sometimes birth
4  control pills can make a difference.
5     Q.    All right. Fair enough.
6     A.    Right.
7     Q.    So -- but in a patient like
8  that, nonsmoker, age 35 --
9     A.    Right.
10    Q.    -- do you consider oral
11 contraceptives to be safe?
12    A.    Yes, when used as directed.
13 Yes.
14    Q.    Okay. Do you know in those
15 patients, age 35, nonsmokers, what the risk
16 of death from cardiovascular problems is per
17 year?
18    A.    Do you mean -- well, I guess
19 however I ask this, I'm not sure, but do you
20 mean -- are we talking about the background
21 rate, or are we talking about the rate for
22 patients on the therapy, that's attributable
23 the therapy?
24    Q.    The rate on patients

Page 723

1  attributable to the therapy.
2     A.    No, I don't. I don't remember
3  that.
4     Q.    Okay. You've got a good
5  memory. I didn't remember asking that
6  question.
7     A.    Oh, you don't? Well, I'm not
8  going to tell you my answer. You have to
9  look it up.
10    Q.    Getting back to the naproxen
11 discussion we were having a minute ago --
12    A.    Right.
13    Q.    -- do you know from any studies
14 you've looked at whether 500 milligrams of
15 naproxen b.i.d. has a greater platelet
16 inhibitory -- platelet aggregation inhibition
17 effect than 250 b.i.d.?
18    A.    I don't know. But, again, I'm
19 just not accepting the notion that it has any
20 platelet anti-aggregatory effect. But I
21 don't know whether 500 would have more than
22 250.
23    Q.    Let me be clear on what you're
24 saying. Are you saying that on a

Page 724

1  pharmacological basis, you don't accept that
2  it inhibits platelet aggregation, or are you
3  saying you're not sure that that has any
4  clinical correlation?
5     A.    Well, I'm just -- I'm saying
6  that -- I mean, certainly naproxen is -- has
7  an effect on thromboxane, no question about
8  that, because it's COX-1 and COX-2.
9     Q.    Right.
10    A.    Okay. To me, that's not the
11 same as platelet anti-aggregatory effect.
12 And I'm saying that I don't accept the
13 platelet anti-aggregatory effect hypothesis.
14 I don't accept the pharmacologic observation.
15         (Interruption by the
16         videographer.)
17    Q    (BY MR. PIORKOWSKI) Did you
18 review Dr. Curfman's deposition, or
19 depositions, in connection with your opinion?
20    A.    Yes. Both depositions.
21    Q.    Do you plan to offer any
22 opinions concerning what Dr. Curfman said?
23    A.    I don't think so.
24    Q.    Did you, in the course of your

82  (Pages 721 to 724)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 725

1  review, also review the response to the
2  expression of concern that was filed by
3  Dr. Bombardier and others?
4      A.   Yes.
5      Q.   Okay.  Did you review Dr. David
6  Graham's deposition?
7      A.   I don't think I read his
8  deposition, no.  I saw his testimony.  I
9  didn't read his deposition.
10     Q.   Okay.  Have you reviewed his
11 paper that was published in The Lancet?
12     A.   If it's the paper about the
13 Kaiser Permanente study --
14     Q.   Yes.
15     A.   -- yes.  Right.
16     Q.   Let me ask you:  If a scientist
17 collects and analyzes data according to a --
18 well, first of all, when you design a study,
19 regardless of whether it's a clinical trial
20 or an epidemiological study, is it important
21 to have a prespecified methodology?
22     A.   Yes.
23     Q.   Okay.  Why?
24     A.   Well, for two reasons:

Page 726

1  Number 1, I guess the one that's most easily
2  accepted is -- and most readily understood is
3  that you have to be able to have the
4  resources to carry out the work, and if the
5  study is going to be -- identify patients
6  with stroke, well, it's best to have
7  specialists available who can review stroke
8  cases.  And so the only way to have them is
9  to know what you're going to do.  So for
10 logistical reasons, it's got to be
11 prospectively specified.
12          But the other, more critical
13 reason is that without a prospective plan to
14 anchor you, you wind up -- the researcher
15 winds up being tossed about on these -- on
16 the -- the random eddies of sample-based
17 results; and many results -- most results
18 that come from samples are misleading.  And
19 without a prospective plan to weight them
20 down, they wind up being carried away by
21 these.
22     Q.   So what you mean is that all --
23 all researchers, however well intentioned, if
24 not forced to adhere to a protocol, can end

Page 727

1  up setting out trying to prove what they
2  intended to prove?
3      A.   Right.  It's -- well, it's a
4  serious risk.  I guess I wasn't thinking so
5  much about proving what you intend to prove,
6  because to me that suggests you need to have
7  a prospective plan.
8          But it's finding something you
9  don't anticipate and the reaction to that
10 which they'd be reacting just to the
11 vicissitudes of sampling error.
12          MR. PIORKOWSKI:  Okay.  I think
13 we're at the end of our tape.  Why
14 don't we go off the record.
15          THE WITNESS:  Okay.
16          THE VIDEOGRAPHER:  Off the
17 record at 2:19.
18          (Recess taken, 2:19 p.m. to
19 2:39 p.m.)
20          THE VIDEOGRAPHER:  Hold,
21 please.  Back on the record, 2:39.
22     Q   (BY MR. PIORKOWSKI)  Dr. Moye,
23 I thought I asked you this, but my trusted
24 colleagues tell me I didn't, so going back

Page 728

1  to -- we were talking about controlled
2  clinical studies.
3          Are you aware of any controlled
4  clinical trials that show a statistically
5  significant increased risk of myocardial
6  infarction with Vioxx users compared to any
7  control group for intermittent use?
8          MR. WEBSTER:  Objection, form.
9      A.   Well, I think every clinical
10 trial has intermittent use in the
11 intervention.  It's not designed to have
12 that.
13     Q   (BY MR. PIORKOWSKI)  Let me
14 rephrase my question.  That's a good point.
15     A.   Okay.
16     Q.   Let's define "intermittent use"
17 as use for more than -- for -- let's say a
18 week or less.
19     A.   Okay.
20     Q.   In other words, the way, you
21 know, you're prescribed Vioxx for knee pain
22 or for --
23     A.   Right.
24     Q.   -- you know, you twist an

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 729

1  ankle, that kind of thing.
2      A.    Uh-huh.
3      Q.    So let's say for a week time
4  frame.
5          Are you aware of any clinical
6  study that shows an increased risk of
7  myocardial infarction in Vioxx users when
8  used for intermittent use, as I've just
9  defined it?
10      A.    I'm going to answer you this
11  way:  I know of no clinical trial that
12  actually designed the intervention to be used
13  intermittently, but -- and so my answer to
14  your question is no.
15          But I don't know -- but every
16  clinical trial, patients come on and off the
17  drug.  Now, if you're asking whether it's
18  just that they've used for it a week and they
19  go off and they come on again exactly for a
20  week and go off, then there's no trial that
21  does that.
22      Q.    Most trials, though, have some
23  rules that the use has to exceed a certain
24  percentage or the patient doesn't get

Page 730

1  counted, right?
2      A.    No.
3      Q.    Well -- I'm sorry.  Go ahead.
4      A.    A patient -- an intent-to-treat
5  analysis, when you're randomized to active
6  therapy, you are in the trial and remain
7  tethered to the active therapy group in
8  analysis, regardless of what happened, what
9  your individual drug-taking habits are.
10      Q.    Are you aware of any compliance
11  guidelines for -- that patients have got to
12  comply with their pill-taking, if you will --
13      A.    Oh, yes.
14      Q.    -- a certain percentage of the
15  time?
16      A.    And, commonly, there are
17  running periods, where if the patient can't
18  take placebo --
19      Q.    Right.
20      A.    -- 80% of the time, they're
21  not -- they're not randomized to the study.
22      Q.    So that is a common practice?
23      A.    Yes.
24      Q.    And that was a practice in

Page 731

1  Merck's clinical trials?
2      A.    Yes.
3      Q.    Okay.  All right.  We talked
4  about -- at various points, I think, we
5  talked about at the time of initial approval
6  and we talked about at the time of the
7  April 2002 label change what materials --
8  what data you thought that FDA did not have
9  that Merck had.  Do you recall that?
10      A.    Well, it was that the Advisory
11  Committee didn't have that.
12      Q.    Right.
13      A.    That's what I was thinking, the
14  Advisory Committee didn't have.
15      Q.    In 2001?
16      A.    2001, yes.
17      Q.    Okay.  We already talked about
18  that, right?
19      A.    Okay.  Okay.
20      Q.    My question is:  From that
21  point on, is it your contention that Merck
22  failed to provide the FDA with any other data
23  other than what we've already discussed?
24      A.    I -- I guess I would say this:

Page 732

1  I believe that the 112 protocol, which looked
2  at the effect of rofecoxib on hypertension,
3  was not shared with the FDA.  That's the
4  only -- that's the one additional piece of
5  information I can think of that, to my
6  knowledge, it was not shared with the FDA.
7      Q.    And what's the basis for saying
8  it wasn't shared?
9      A.    Well, my review of it -- the
10  only review I have of it is a review that has
11  been -- that was produced by Merck.  I
12  haven't seen any FDA comments on it.
13          It's -- I mean, I think it's a
14  fairly important protocol in assessing the
15  relationship between hypertension and
16  rofecoxib, and my sense is it wasn't shared.
17          Now, I haven't gone through
18  every single document submitted by Merck to
19  check each one to make sure it wasn't 112,
20  but my sense is that 112 wasn't shared.
21      Q.    What document did you look at
22  to see the results of 112?
23      A.    I don't think I have it here.
24  It's -- it's a document which is a summary

84  (Pages 729 to 732)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 733

1  table and summary slides -- I mean, paper
2  copy, a hard copy of slides that demonstrate
3  the effect of rofecoxib versus celecoxib and
4  also versus placebo on increases in blood
5  pressure.
6      Q.   Do you know what the date of
7  that was?
8      A.   I don't.
9      Q.   But in fairness to Merck, as we
10 sit here today, you don't know whether that
11 was or wasn't submitted?
12     A.   That's true.  That's true.
13     Q.   Okay.  All right.  Any other
14 data that you're aware of, other than what
15 we've already discussed, that you contend
16 Merck should have submitted to the FDA but
17 failed to do?
18     A.   I can't think of any, sitting
19 here now.
20     Q.   You would agree with me that,
21 to the best of your knowledge, all of the
22 data with respect to the VIGOR study was
23 submitted to the FDA; is that right?
24     A.   I would say eventually, yes.

Page 734

1      Q.   In the APPROVe study -- we were
2  talking about subgroups earlier.
3      A.   Yes.
4      Q.   In the APPROVe study, there
5  were diabetes -- there was a diabetes
6  subgroup analysis.  Do you recall that?
7      A.   I do.
8      Q.   And would you agree -- would
9  you agree with me that under the criteria
10 that we talked about with the use of paper,
11 that diabetes was not a prespecified
12 subgroup?
13     A.   I believe that's true.
14     Q.   Okay.  And do you believe, and
15 is it correct, that the diabetes subgroup in
16 APPROVe -- that the events were very small
17 numbers of patients?
18     A.   Relatively small numbers of
19 patients, yes.
20     Q.   Do you believe that that risk
21 that comes out of that subgroup analysis is
22 the most appropriate risk, or is the most
23 appropriate risk the overall risk for
24 APPROVe?

Page 735

1      A.   Well, I think the most
2  appropriate risk is the overall risk of
3  APPROVe.  However, when it comes to patients
4  being at risk here, one can't ignore -- one
5  cannot ignore the fact that there are
6  increased events in subgroups in which you
7  would expect increased events.
8          Now, mathematically, we know
9  what to do with that.  We know to discard
10 that.  However, epidemiologically and
11 pathophysiologically, it's very difficult to
12 do that because it aligns with the
13 understanding of the underlying
14 cardiovascular event rates.
15         If these patients are at
16 greater risk of disease, then it's not
17 surprising that larger relative risks are
18 associated with VIGOR.
19         But there is -- there is,
20 admittedly, tension here between the
21 underlying mathematics which suggests one
22 interpretation, the underlying -- and the
23 epidemiology and plus safety considerations
24 which demand another interpretation.

Page 736

1      Q.   Well, at this point, there are
2  no safety considerations.  The drug's off the
3  market, right?
4      A.   Right.  Right.
5      Q.   I mean -- so it's not as if one
6  has to make a decision about whether to take
7  regulatory action on the basis of those
8  numbers at this point?
9      A.   Well, that's true today, but
10 when APPROVe was released --
11     Q.   It's true when APPROVe was
12 released.  The drug was withdrawn immediately
13 after the results of APPROVe were known.
14     A.   Okay.  Fair enough.  Fair
15 enough.  But, I mean, there was a point in
16 time when the available -- the available data
17 were available and the drug was on the
18 market, a relatively short period of time.
19 And then you have this public health concern
20 about trying to react to this as well.
21     Q.   Okay.  But, I mean, that piece
22 of information that you just alluded to, the
23 diabetes subgroup risk, there's no indication
24 that that was known to anybody, that that was

Lemuel A. Moye, M.D., Ph.D.

Page 737

1 known to Merck, that that was known to the
2 data safety monitoring board for APPROVe, at
3 the time that that study was concluded,
4 right?
5     A.    Right. And that, to me, is
6 kind of one of the original sins here.
7 Because they didn't include those types of
8 patients in VIGOR, this information wasn't
9 produced until APPROVe.
10         MR. PIORKOWSKI: All right.
11     Object to the nonresponsive portion.
12     Q    (BY MR. PIORKOWSKI) Is the
13 same thing true with respect to -- APPROVe
14 also had a subgroup analysis of patients who
15 were at increased cardiovascular risk, right?
16     A.    Right.
17     Q.    Okay. And you'd agree with me
18 that for the reasons you already stated, the
19 most appropriate relative risk value for
20 those patients is the overall APPROVe risk?
21     A.    That's true.
22     Q.    Okay.
23     A.    And that goes for all the
24 subgroup analyses in APPROVe, including the

Page 738

1 18-month evaluation.
2     Q.    Okay. All right. I wanted to
3 ask you: There's -- we talked a little bit
4 last time about some of the -- some of your
5 earnings related to your work in fen-phen.
6 Do you recall that?
7     A.    Yes.
8     Q.    Okay. Do you -- was there a
9 point in time at which you had to pay back
10 certain money to the University of Texas
11 related to your fen-phen expert work?
12     A.    Yes --
13         MR. WEBSTER: Objection, form.
14         THE WITNESS: Sorry.
15     A.    Yes. I was -- I couldn't -- I
16 could not use vacation time to work on this,
17 and so I had to pay back the money I made for
18 vacation time.
19     Q    (BY MR. PIORKOWSKI) I'm sorry.
20 You could not use vacation time meaning you
21 didn't have enough vacation time left, or you
22 could not use it meaning they didn't let
23 you --
24     A.    No. Unbeknownst to me, they

Page 739

1 changed the rule where you couldn't use your
2 vacation time to work in these kinds of
3 endeavors. And when I learned that, then I
4 paid back the university the time -- my
5 vacation money earned during that time.
6     Q.    Does that mean you took
7 vacation to undertake activities like
8 depositions and that kind of thing?
9     A.    Yes. Right.
10     Q.    You thought you were taking
11 vacation, and later learned that you weren't
12 allowed to take vacation?
13     A.    That's true.
14         MR. WEBSTER: Objection, form.
15     A.    Right.
16     Q    (BY MR. PIORKOWSKI) Okay. So
17 today, let's say, is a Friday, right? Is
18 this a normal working day for you?
19     A.    It would be, yes.
20     Q.    Are you on vacation now?
21     A.    Oh. Oh. I'm sorry. Normally,
22 I would be at the university.
23     Q.    Right.
24     A.    Today, I take leave without

Page 740

1 pay.
2     Q.    I see. Which is different from
3 vacation time?
4     A.    Exactly. Vacation time, I get
5 paid.
6     Q.    I see.
7     A.    But "leave without pay" means
8 you don't get paid.
9     Q.    I see.
10         And so at some point, the rules
11 changed so that you -- so that you had to
12 take leave without pay instead of vacation,
13 is what you're saying?
14     A.    I didn't realize that, and when
15 I learned it, I paid them pack.
16     Q.    Okay. Okay. How much money
17 did you end up having to pay back?
18     A.    About $11,000, I think.
19     Q.    Okay. Have you ever taken any
20 speed-reading courses?
21     A.    Speed-reading courses? Oh, I
22 think I was in middle school or high school,
23 I think, one summer, I read a speed-reading
24 book. Read it too fast, I guess.

86 (Pages 737 to 740)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 741

1    Q.    Okay.  Were you a speed -- do
2  you speed-read today?
3    A.    Do I speed-read today?  Yes.
4    Q.    Yes?
5    A.    I kind of -- I actually have no
6  choice.
7        MR. PIORKOWSKI:  Let's go off
8    the record.  I'm going to --
9        THE VIDEOGRAPHER:  Off the
10   record at 2:52.
11       (Recess taken, 2:52 p.m. to
12   2:53 p.m.)
13       THE VIDEOGRAPHER:  Hold,
14   please.  On the record at 2:53.
15       EXAMINATION
16 BY MR. JOSEPHSON:
17   Q.    Good afternoon, Doctor.
18   A.    Good afternoon, sir.
19   Q.    My name is Richard Josephson.
20 You and I have met before, but I haven't
21 asked you any questions today; is that
22 correct?
23   A.    Yes, sir.
24   Q.    All right.  I have some

Page 742

1  questions.  I'm not going to repeat questions
2  that have already been asked.  And if you
3  will stick with me for just a little while, I
4  think we'll be done.
5    A.    Okay.
6    Q.    First of all, let me ask you
7  this:  You are -- you have been designated as
8  an expert in a case called State of Texas
9  versus Merck.  Were you aware of that?
10   A.    Yes, sir.
11   Q.    Have you ever done any work in
12 that case, that is in addition to that which
13 is outlined in your report?
14   A.    No, sir.
15   Q.    The opinions that you've given
16 in connection to questions today and at
17 your -- at your earlier deposition by
18 Mr. Piorkowski have -- is the same work that
19 you did for the plaintiffs who are pursuing
20 product liability cases the same work that
21 you've done for the State of Texas?
22   A.    Yes, sir.
23   Q.    Okay.  So there -- have you
24 reviewed any specific documents or

Page 743

1  correspondence between Merck and the State of
2  Texas?
3    A.    No, sir.
4    Q.    Have you reviewed any -- any
5  information that you can recall that would be
6  germane only to the State of Texas case?
7    A.    No, sir.
8    Q.    The materials that you outlined
9  at your last deposition -- that is, the time
10 that you spent, the documents that you looked
11 at, that information -- did that contain
12 anything that you recall specific to the
13 State of Texas case?
14   A.    No, sir.
15   Q.    There is a reference in your
16 report, and if you've got your report in
17 front of you, let me ask you about that
18 reference.  There is a reference toward the
19 tail end of your report.  It's on page 73,
20 paragraph 205.
21   A.    Yes, sir.
22   Q.    Do you have that in front of
23 you?
24   A.    Yes, sir.

Page 744

1    Q.    Okay.  It talks about your
2  opinion that Merck's actions constitute a
3  violation of the Texas Medicaid Fraud and
4  Prevention Act.
5    A.    Yes.
6    Q.    Do you see that?
7    A.    Yes, sir.
8    Q.    Is that paragraph the only
9  section of your report that deals with the
10 Texas Medicaid Fraud Prevention Act, as far
11 as you know?
12   A.    Yes, sir, it is.
13   Q.    And have you -- have you
14 reviewed the statute?
15   A.    Just basically.  I haven't read
16 it in any great detail.
17   Q.    Okay.  Do you consider yourself
18 an expert on the Texas Medicaid Fraud
19 Prevention Act?
20   A.    No, sir.
21   Q.    Are you going to be offering
22 legal opinions about the meaning of the Texas
23 Medicaid Fraud Prevention Act?
24   A.    No, sir.

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 745

1    Q.   In terms of Merck's actions and
2 inactions being a violation of that Act, do
3 you know which sections of the Act you
4 believe were violated by Merck?
5    A.   I don't know which specific
6 sections, no.
7    Q.   Okay. When you formed the
8 opinion that Merck violated the Texas
9 Medicaid Fraud Prevention Act, did you have
10 the statute in front of you?
11    A.   I did not have the statute in
12 front of me, no.
13    Q.   Okay. How do you know what
14 sections of the statute Merck violated?
15    A.   Oh. I don't -- I'm sorry. I
16 don't know what sections.
17    Q.   Okay. Well, you say they --
18 Merck's actions constitute a violation of the
19 "Unlawful Acts" section in the Texas Medicaid
20 Fraud.
21    A.   I see.
22    Q.   And I'm asking you: Did you
23 have the statute in front of you and offer
24 opinions?

Page 746

1    A.   I see.
2         No, I did not. What I did do
3 is understand -- I believe I understand what
4 Merck did, why Merck's acts were
5 inappropriate, and, therefore, believe they
6 violate the Texas Medicaid Fraud Prevention
7 Act.
8         Now, I don't know what sections
9 they were, and it was suggested to me it was
10 the "Unlawful Acts" section.
11    Q.   Okay. And who suggested that
12 to you?
13    A.   Attorneys.
14    Q.   Okay. So attorneys told you
15 that they believed that Merck had violated
16 the "Unlawful Acts" section?
17    A.   Well, no. I believe that their
18 actions violated the Medicaid Fraud
19 Prevention Act, but I didn't -- I don't know
20 the details of the Act, and they suggested
21 the sections.
22    Q.   Okay. Who suggested the
23 sections?
24    A.   I don't know which attorneys

Page 747

1 did, but attorneys did.
2    Q.   Suggested to you the sections
3 that they believed Merck violated of the
4 Texas Medicaid Fraud Prevention Act?
5    A.   Actually, the sections that I
6 believed that Merck violated.
7    Q.   Okay. And if I showed you the
8 statute today, you told me you're not an
9 expert on the Texas Medicaid Fraud Prevention
10 Act, correct?
11    A.   Yes, sir.
12    Q.   And you're not an attorney?
13    A.   That's right.
14    Q.   And so -- and you're not going
15 to be offering opinions, I presume, about the
16 Texas Medicaid Fraud Prevention Act and its
17 effect at the trial; is that correct?
18    A.   That's correct, yes.
19    Q.   Okay. So if I understand what
20 you're going to be saying is -- and let me
21 see if I understand this -- you're really not
22 going to be talking about whether Merck's
23 actions violated a statute, correct?
24    A.   That's correct.

Page 748

1    Q.   You're really just going to be
2 sitting up there and answering questions, if
3 an attorney asks you about Merck's conduct
4 related to the previous sections, 1 to 204?
5    A.   Yes.
6    Q.   And, factually, you're going to
7 be talking about those sections?
8    A.   Yes, sir.
9    Q.   Okay. So you're not going to
10 get up, just so we can clear this up, and
11 say, "I think Merck violated Section 32.8 of
12 the Texas Medicaid Fraud Statute"?
13    A.   I would say this: At this
14 time, I don't have any intention of doing
15 that. That's correct.
16    Q.   Okay. Have you been paid --
17 have you been compensated in connection with
18 the State of Texas case by -- separate and
19 apart from the compensation that you told us
20 about already?
21    A.   I don't think so. But just so
22 I can be clear, when I bill, I bill to
23 something called the Vioxx Litigation Group;
24 and I must tell you, I don't know whether

88 (Pages 745 to 748)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 749

1  attorneys who will be representing plaintiffs
2  in the State of Texas case are part of that
3  or not. I don't know.
4      Q.   All right. Right now, do you
5  know any attorneys who are part of the State
6  of Texas case?
7      A.   Other than Mr. Gallagher, no.
8      Q.   Okay. So have you met -- what
9  I guess I'm asking you is: Have you met with
10 Mr. Gallagher to discuss this case?
11     A.   No, sir.
12     Q.   Did you meet with someone from
13 his office to discuss the case?
14     A.   No.
15     Q.   Who did you meet with who
16 represents the State of Texas to discuss this
17 case?
18     A.   Well, I've had just the very
19 briefest of conversations with Mr. Gallagher
20 about -- about the intent to go forward with
21 this case.
22     Q.   Okay.
23     A.   But it's not been a
24 conversation in any detail.

Page 750

1      Q.   Well, what I'm -- are your
2  thoughts on the State of Texas case in terms
3  of -- are they preliminary, or are they --
4  have you concluded your work on the State of
5  Texas case, as far as you're concerned --
6      A.   Well, I --
7      Q.   -- to the extent you've
8  concluded it on the --
9      A.   Sure.
10     Q.   -- Texas products liability
11 cases in the MDL and are submitting yourself
12 for deposition?
13     A.   I was presuming that my work
14 represented in this affidavit would be
15 sufficient to cover my involvement in the
16 Texas case.
17     Q.   Okay.
18     A.   And so I wasn't planning to do
19 anything specific for that.
20     Q.   Okay. So -- and that's what I
21 want to try to get at. You've not really
22 specifically gone and done an analysis of the
23 Medicaid Fraud Prevention Act?
24     A.   That's right.

Page 751

1      Q.   You are simply relying upon
2  whatever you concluded for the -- for the
3  cases in California or the cases in the
4  federal MDL or the cases in the Texas MDL?
5      A.   Yes.
6      Q.   And if that turns out to be
7  relevant to the State of Texas case, then
8  you'll be offering those types of opinions in
9  the State of Texas case?
10     A.   Yes, sir.
11     Q.   And if it turns out not to be
12 relevant, then you won't?
13     A.   Then I'll stay home.
14     Q.   All right. So if I looked
15 through your billings, to your knowledge,
16 would I find any specific time that you spent
17 with Mr. Gallagher?
18     A.   You would not.
19     Q.   If I looked through your
20 billings, is it correct I wouldn't find any
21 specific time that you spent with any other
22 attorney purporting to represent the State of
23 Texas?
24     A.   That also is true, you would

Page 752

1  not find such time.
2      Q.   Okay. When you bill, you say
3  you bill to something called the Vioxx
4  Litigation Group?
5      A.   Yes, sir.
6      Q.   And the Vioxx Litigation Group,
7  the bill goes to that group?
8      A.   It goes to Scientific Evidence,
9  and then Scientific Evidence presumably
10 collects from that group.
11     Q.   Okay. Now, the Scientific
12 Evidence -- what I didn't understand from
13 your earlier testimony, you say you charge
14 $400 an hour?
15     A.   Yes, sir.
16     Q.   And of that $400 an hour, does
17 Scientific Evidence get a cut of that?
18     A.   I think they get -- they add to
19 that.
20     Q.   Okay.
21     A.   So on top of that.
22     Q.   Okay. So you keep the $400 an
23 hour, but Scientific Evidence gets something
24 on top of that?

89 (Pages 749 to 752)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 753

1    A.    Yes, sir.
2    Q.    Okay.  And, to date, have
3  you -- do you know how much -- well, strike
4  that.
5        Do you know how much you've
6  been paid to date under this arrangement that
7  you've had with Scientific Evidence,
8  regardless of the litigation?
9    A.    Total amount, I don't know.
10   Q.    Several million?
11   A.    No.  I would -- I mean, I would
12  estimate less than 2 million.
13   Q.    Okay.  All right.  And that --
14  and that's principally for the fen-phen
15  litigation?
16   A.    Yes, sir.
17   Q.    The Rezulin litigation?
18   A.    Yes, sir.
19   Q.    Was there anything else, other
20  than the Vioxx litigation?
21   A.    Some small things that didn't
22  go to trial.  Lotronex, I gave a deposition
23  for.  I may have done a little bit of work on
24  Sulzer hip, but I didn't go to deposition or

Page 754

1  trial.  So, principally, it's been fen-phen
2  and Rezulin.
3    Q.    And --
4    A.    And then now Vioxx, of course.
5    Q.    All right.  And you've given
6  approximately 55 to 60 depositions?
7    A.    Oh, I hope not that many.  I
8  don't know how many.
9    Q.    I think you gave us a new list
10  today that had the --
11   A.    Well, between depositions and
12  trials, appearances, total appearances, it
13  may be that many.  I don't know.
14   Q.    Okay.  And --
15       MR. GALLAGHER:  That would
16    include, probably, Daubert hearings.
17   Q    (BY MR. JOSEPHSON)  And you
18  have -- your first time -- your first
19  involvement in the litigation was -- in the
20  pharmaceutical litigation was back in 1999?
21   A.    Yes.
22   Q.    So all of this has occurred in
23  the last six or seven years?
24   A.    Yes, sir.

Page 755

1    Q.    Okay.  Now, have you ever been
2  prohibited by a Court from expressing an
3  opinion about the adequacy of labeling?
4    A.    I think, perhaps, there was one
5  court in Santa Fe.  As I sit here now, that's
6  the only one I can remember.  I mean, there
7  may have been others, but I don't remember.
8    Q.    Do you recall being in
9  Palestine, Texas, earlier this year?
10   A.    Yes.
11   Q.    In a fen-phen case?
12   A.    It was a mistrial.  Yes, I
13  remember that, yes.
14   Q.    Right.
15       Before the mistrial, do you
16  recall in any way being limited in the
17  opinions you could offer about the adequacy
18  of the labeling?
19       MR. WEBSTER:  Objection, form.
20       MR. GALLAGHER:  May I just
21    state for the record, too, that those
22    cases involved -- Richard, weren't
23    they all stipulated liability?
24       MR. JOSEPHSON:  I don't know.

Page 756

1    I'm asking.  I wasn't in them.
2        MR. GALLAGHER:  All the cases
3    were stipulated liability.
4        MR. JOSEPHSON:  Well, I
5    wasn't -- no, they were --
6    Q    (BY MR. JOSEPHSON)  Do you
7  know, Doctor, if you were prohibited from
8  offering opinions on the labeling?
9    A.    I don't remember.
10   Q.    You remember being at a trial
11  in Palestine?
12   A.    Well, I remember starting a
13  trial.  I remember --
14   Q.    And then a mistrial at some
15  point being declared?
16   A.    Yeah, I think I had a day of
17  testimony, was taken on voir dire, and the
18  next day there was a mistrial, a mistrial
19  ruling.  So I don't recall what the judge's
20  rulings were.
21   Q.    Okay.  Now, in the State of
22  Texas case, just to make it absolutely clear,
23  you don't know what Merck told the State of
24  Texas about Vioxx or its safety?

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 757

1     A.    That's true.
2     Q.    And you don't know what the
3  State knew or didn't know on its own about
4  Vioxx or its safety?
5     A.    I -- that's correct.  I simply
6  know what I have testified to so far.
7     Q.    Okay.  Which has nothing to do
8  with what either Merck told the State of
9  Texas about the safety of Vioxx or about what
10  the State of Texas may have known about the
11  safety of Vioxx?
12     A.    What other arrangements there
13  may or may not have been, I don't know about.
14     Q.    Okay.  And do you know anything
15  about the approval process by which a drug is
16  approved to be on the state Medicaid
17  formulary?
18     A.    I do not.
19     Q.    And you've not reviewed any of
20  the communications between Merck and the
21  State of Texas regarding that?
22     A.    That's true.
23     Q.    Okay.  And, therefore, you
24  won't be offering any opinions about

Page 758

1  whether -- what Merck said or what the State
2  said and whether what Merck said was adequate
3  or not, because you haven't even seen any of
4  the material?
5     A.    Right.  I cannot offer any
6  opinions now.  I think if I do have opinions,
7  then we'll reconvene.
8     Q.    Okay.  But right now, you have
9  no opinions?
10     A.    That's right.
11        MR. JOSEPHSON:  All right.
12  That's all I have.  Thank you, Jason.
13        MR. PIORKOWSKI:  Jason, do you
14  want to ask questions?
15        MR. WEBSTER:  I've got a
16  couple.  Mine are just real quick.  Do
17  you have the exhibit stickers, please?
18        (Whereupon, Deposition Exhibit
19  Moye MDL 21, APPROVe Trial
20  Cardiovascular Safety Report,
21  MRK-AFV0426355 - MRK-AFV0426453, was
22  marked for identification.)
23
24

Page 759

1              EXAMINATION
2  BY MR. WEBSTER:
3     Q.    Doctor, I'm going to show you
4  what we've marked as Exhibit No. 21 to your
5  deposition.
6        MR. WEBSTER:  There's a copy
7  for you.
8     Q.    (BY MR. WEBSTER)  Could you
9  please identify that for the record, please?
10     A.    It's the APPROVe trial on
11  cardiovascular safety report appendix.
12     Q.    Have you reviewed that in
13  preparation for your testimony?
14     A.    Yes.
15     Q.    And do you rely on that
16  document for the basis of your opinions?
17     A.    Yes, I do.
18     Q.    Specifically, have you reviewed
19  Table 13, which is located in that document?
20     A.    Yes, I have.
21     Q.    And have you relied upon that
22  table also in the basis of your opinions that
23  you've stated here today?
24     A.    Yes, I have.

Page 760

1     Q.    Counsel for Merck asked you a
2  couple of questions about 12-1/2 milligrams'
3  worth of use, and could you please explain
4  your opinions to us as to why that drug --
5  why you would consider it, 12-1/2 milligrams
6  of Vioxx, not safe on the market?
7     A.    Well, a couple of reasons.
8  One, of course, is I finally found that
9  Protocol 090, which uses 12.5 milligrams.
10  The other reason is the -- I guess an
11  understanding for how pain -- how people use
12  pain medications.
13        Patients tend to take the
14  medicine at a level that they think -- many
15  patients tend to take medications at a level
16  that they think is going to provide relief.
17  And patients will, therefore, tend to
18  increase medication doses, sometimes
19  encouraged by physicians, sometimes not, so
20  that 12.5-milligram dose, in fact, may not be
21  12.5 milligrams in reality.  It may be bumped
22  up to 25 milligrams or even 50 milligrams.
23        So regardless of the safety or
24  lack of safety of 12.5-milligram dose, the

Lemuel A. Moye, M.D., Ph.D.

Page 761

1  fact that it is a stepping stone to higher
2  doses, which are much less safe, is a reason
3  to stay away from the 12.5-milligram.
4       Q.    Does that mean, basically, in
5  layman's terms, that if you're a person
6  having pain, one helps you, but two might
7  even help more?
8       A.    Right. Actually, I thought I
9  said that.
10      MR. WEBSTER: I think that's
11  all the questions I have.
12           EXAMINATION
13  BY MR. GALLAGHER:
14      Q.    Dr. Moye, Mike Gallagher.
15  We've met before.
16      A.    You bet, Mike.
17      Q.    And, as you know, I'm one of
18  the lawyers representing the State of Texas,
19  and it was I that asked if you could become
20  involved on behalf of the State of Texas --
21      A.    Yes.
22      Q.    -- do you recall that?
23           I have just a couple of
24  questions here. You were asked a question a

Page 762

1  little bit earlier about Study 090, and the
2  question related to whether or not Study --
3  the results of Study -- of Study 090 were
4  statistically significant.
5       A.    Right.
6       Q.    And you said that they did not
7  reach the level of statistical significance
8  from an epidemiological standpoint?
9       A.    I didn't think so, right. I
10  mean, my answer was that they were clinically
11  significant and demonstrated a signal, but I
12  didn't think that the findings for myocardial
13  infarction were statistically significant.
14      Q.    But was Study 090 an important
15  part of the data that you reviewed in
16  preparing to give the opinions that you've
17  given relative to the drug Vioxx?
18      A.    Yes.
19      Q.    All right, sir. Were you ever
20  shown a Protocol 112? Have you ever --
21      A.    Yes, I have.
22      Q.    -- been --
23           When did you first receive that
24  Protocol 112?

Page 763

1       A.    Oh, actually -- well, I don't
2  know when I first received it. I think I
3  looked at it this week. I don't know when I
4  first received it, though.
5       Q.    Do you know whether or not
6  Protocol 112 was ever provided to the FDA?
7       A.    My sense is, from what I've
8  read, is that it was not provided to the FDA.
9       Q.    Have you had an opportunity to
10  review it sufficiently to make a
11  determination as to whether or not it
12  contains within it information that should
13  have been communicated to the FDA relative to
14  the risk of Vioxx?
15      A.    Yes.
16      Q.    And what is your opinion?
17      A.    My opinion is the information
18  is certainly germane and should have been
19  communicated not just to the FDA, but to
20  physicians and to pharmacists and,
21  ultimately, patients.
22      Q.    I wanted to ask you another
23  question relative to the warning letter that
24  I think is dated September 17th, and it's to

Page 764

1  Mr. Gilmartin. It's from the DDMAC division
2  of the FDA division of drug marketing,
3  advertising and communication. You're
4  familiar with them?
5       A.    Yes.
6       Q.    And you've seen publications
7  from them to various drug manufacturers in
8  other cases?
9       A.    Yes.
10      Q.    Do the publications that are
11  emanated from that division normally deal
12  with the accuracy of the information that the
13  drug company is communicating to the general
14  public?
15           MR. PIORKOWSKI: Objection,
16  lack of foundation.
17      A.    Yes.
18      Q    (BY MR. GALLAGHER) And to the
19  medical community.
20      A.    Yes.
21           MR. PIORKOWSKI: Same
22  objection.
23      Q    (BY MR. GALLAGHER) In response
24  to a question that you were asked a moment

92 (Pages 761 to 764)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 765

1  ago, you indicated that you would probably
2  address only the press release and not deal
3  with the promotional audio conferences given
4  by Peter Holt, who I think was a
5  representative -- he's a private M.D., but a
6  representative of Merck on some audio
7  conferences, or he conducted them; and that
8  you wouldn't deal with the oral
9  representations made by Merck's sales
10  representatives. Do you recall saying
11  something to that effect?
12      A.   Yes.
13      Q.   Well, what I wanted to ask you
14  was if -- and I'll give you the letter to
15  review, if you feel the need to do so. You
16  are going to give testimony at the trial that
17  relates to the obligations of a drug company
18  to communicate fairly and accurately to the
19  general public and to the medical community;
20  is that correct?
21      A.   I am, yes.
22      Q.   All right, sir. And any
23  activity that's conducted by the drug
24  company, whether it be by way of press

Page 766

1  conference, by way of their marketing
2  department, their detail people or doctors
3  who are retained by them to promote their
4  drug, if the promotion of the drug is false
5  and misleading, that will be something that
6  you intend to address in your testimony
7  during the course of the trial, is it not?
8          MR. PIORKOWSKI: Objection,
9      leading. And, Mike, that's outside
10      the scope of his report and his
11      testimony, so -- you can answer.
12      Q    (BY MR. GALLAGHER)
13  Misrepresentations?
14      A.   Yes.
15      Q.   Okay. And you addressed
16  misrepresentations in your report, didn't
17  you?
18      A.   Yes.
19      Q.   All right, sir. And you intend
20  to address those misrepresentations
21  regardless of the format in which they're
22  made, if they were made to the general public
23  and misrepresent the characteristics of the
24  drug?

Page 767

1      A.   Yes.
2          MR. PIORKOWSKI: Same
3      objection.
4      Q    (BY MR. GALLAGHER) This has
5  probably been asked, but I'll run the risk of
6  asking it again only once: Have you
7  formulated an opinion with regard to whether
8  or not, based upon the statistical data and
9  the literature that you've reviewed, Vioxx
10  increases the risk of cardiovascular events?
11      A.   Yes, sir, I have an opinion.
12      Q.   And what is that opinion?
13      A.   Vioxx causes an increase in
14  cardiovascular events.
15      Q.   In arriving at that opinion,
16  did you employ the same methodology that you
17  normally employ in -- as an epidemiologist in
18  drawing associations between different drugs
19  and certain conditions?
20      A.   Yes, sir.
21          MR. PIORKOWSKI: Objection to
22      form.
23          THE WITNESS: Sorry.
24      A.   Yes.

Page 768

1      Q    (BY MR. GALLAGHER) And you
2  have been -- have you been published with
3  regard to both the methodology that you
4  employed and the results of your methodology?
5      A.   Yes, sir, I have.
6      Q.   And have you been employed -- I
7  mean, have you been published in
8  peer-reviewed journals with regard to the
9  subject of epidemiology?
10      A.   Yes, sir.
11      Q.   All right. Do you feel that
12  the data that you have that you have had an
13  opportunity to review and which was provided
14  through discovery from Merck and from other
15  sources as well, has provided you with a
16  sufficient basis upon which to predicate your
17  opinions?
18      A.   Yes.
19          MR. GALLAGHER: All right, sir.
20      It's been so long since I've gotten to
21      ask a question, I'm sort of beginning
22      to like it again. But I'll shut up.
23          MR. PIORKOWSKI: Pass the
24      witness?

93 (Pages 765 to 768)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 769

1     MR. GALLAGHER: Yeah.
2     MR. PIORKOWSKI: All right.
3  Doctor, I have a couple of follow-up
4  questions.
5        EXAMINATION
6  BY MR. PIORKOWSKI:
7     Q.   First of all, Study 090 --
8  well, let me back up.
9        As I understand what your
10 opinion is in response to counsel's
11 questions, your opinion about the safety of
12 the 12.5-milligram dose is based on Study 090
13 and on the possibility that -- of what they
14 call dose creep?
15    A.   Well, it's based on three
16 things. Those are two of them, yes. The
17 third is just my understanding of how -- of
18 how toxins work, and that is the more that
19 you take, the worse it is. Now, it doesn't
20 mean that a low dose is a safe dose.
21    Q.   Okay. It doesn't mean that
22 it's not, either, does it?
23    A.   That's true. But in order to
24 study that, you have to carry out a fairly

Page 770

1  large clinical trial for patients on low-dose
2  therapy, follow them for a long period of
3  time, and we don't have that.
4        And I'm not willing to accept
5  the proposition in the absence of evidence
6  that 12.5 milligrams is safe in the presence
7  of 090.
8     Q.   You want to see at least some
9  patient study for like at least a year,
10 right?
11    A.   For -- yes. I mean, I'd like
12 to see -- to be sure of its safety, yes, an
13 adequate number of patients studied for a
14 sufficient period of time.
15    Q.   Okay. Do you have the Targum
16 paper in front of you?
17    A.   I did. I think I still do.
18       (Witness reviews document.)
19       MR. GALLAGHER: Here it is.
20    A.   Yes, I have it, right here.
21    Q    (BY MR. PIORKOWSKI) Okay. Can
22 you turn to page 29?
23    A.   29?
24    Q.   Okay. Am I correct that the

Page 771

1  Targum -- the Targum memo -- well, let's just
2  back up to make sure the record is clear.
3        Shari Targum was -- we talked
4  earlier about reviewers, right --
5     A.   Right.
6     Q.   -- who were not within the same
7  division as the arthritis doctors, right?
8     A.   Right.
9     Q.   And she's one of those
10 reviewers. She was from the cardiac
11 division, right?
12    A.   Right.
13    Q.   And prior to the 2001 Advisory
14 Committee, she did a whole review of the
15 cardiovascular safety of Vioxx, right?
16    A.   Right.
17    Q.   Okay. And one of the studies
18 that she looked at was Study 090, right?
19    A.   Right.
20    Q.   And, in fact, there are one,
21 two, three, four, five -- six pages of
22 analysis, basically -- five and a half --
23 dedicated to Study 090 in her report back in
24 2001, right?

Page 772

1     A.   Yes.
2     Q.   Okay. So this information
3  about Study 090 -- let me ask you: Is there
4  anything about Study 090 that you're relying
5  on that's not in Shari Targum's report?
6     A.   No.
7     Q.   Okay. So fair to say that all
8  the information in Shari Targum's report was
9  known to the FDA back in February of 2001?
10    A.   Yes.
11    Q.   Okay. And it's fair to say
12 that all the information in Shari Targum's
13 report about Study 090 was also known to the
14 FDA Advisory Committee in February of 2001?
15    A.   I don't know if I accept that.
16 I certainly -- it was known by the FDA.
17    Q.   Okay.
18    A.   I don't know if it was known by
19 the Advisory Committee in 2001. I just don't
20 remember the transcripts of -- and the --
21 whether there was any discussion of 090.
22    Q.   Okay.
23    A.   There may very well have been.
24    Q.   Do you know whether the Targum

94 (Pages 769 to 772)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 773

1  memo was prepared in advance of the FDA
2  Advisory Committee?
3      A.   Well, the Advisory Committee
4  meeting was 2001 --
5      Q.   Right.
6      A.   -- February of 2001.  This is
7  dated December 8th, 2000.
8      Q.   Right.
9      A.   So the answer is yes.
10     Q.   Right.
11     A.   Right.  It's three months
12 earlier.
13     Q.   Okay.  Right.
14          I mean, I guess my question is:
15 Are you aware of whether -- if you look on
16 the FDA's website --
17     A.   Right.
18     Q.   -- under briefing documents for
19 the 2001 Advisory Committee, her memo is on
20 the website?
21     A.   Okay.
22     Q.   So that would mean --
23     A.   Okay.
24     Q.   -- that it's a briefing

Page 774

1  document for the Advisory Committee --
2      A.   Right.
3      Q.   -- for the 2001 meeting, right?
4      A.   Yes.  Right.
5      Q.   And, similarly, in -- do you
6  have Eric Topol and Mukherjee's paper?
7      A.   Right.
8      Q.   Okay.
9      A.   Right.
10     Q.   On page 956, there's also a
11 discussion of Study 090 --
12     A.   Yes.
13     Q.   -- in that paper, right?
14     A.   Yes, there is.
15     Q.   Which was published in JAMA
16 back in 2001, right?
17     A.   Yes.
18     Q.   Okay.  So there's no new data
19 that you're aware of about Study 090 other
20 than what's reflected in the Targum memo and
21 in the Mukherjee paper?
22     A.   That's true.
23     Q.   Okay.  All right.  Now, when a
24 drug is approved, one of the conditions of

Page 775

1  approval is that it's approved for a certain
2  dose for certain indications, right?
3      A.   Yes.
4      Q.   And that doesn't mean that it's
5  not possible that somebody could take it at a
6  higher dose, right?
7      A.   That's true.
8      Q.   I mean, somebody can always --
9  50 milligrams was not approved for chronic
10 use, right?
11     A.   Right.
12     Q.   But that doesn't mean somebody
13 couldn't have used it for a longer period of
14 time --
15     A.   That's right.
16     Q.   -- if they felt it appropriate,
17 or even a patient taking it that way, right?
18     A.   That's right.
19     Q.   Okay.  But that doesn't mean --
20 the fact that somebody could take
21 12.5 milligrams could take more than that
22 doesn't mean that there's scientific evidence
23 that 12.5 milligrams itself is unsafe, right?
24     A.   That, in and of itself, doesn't

Page 776

1  mean that 12.5 milligrams isn't safe, okay?
2      Q.   Okay.
3      A.   It does suggest that the drug
4  may not be used as directed, but it doesn't
5  suggest that -- it doesn't denote that
6  12.5 milligrams would be safe --
7      Q.   Okay.
8      A.   -- would be unsafe.
9      Q.   Now, Mr. Gallagher asked you
10 about Protocol 112.  Do you recall that?
11     A.   Sure do.
12     Q.   There's nothing in your report
13 anywhere about Protocol 112?
14     A.   Right.  I just read that this
15 week.
16     Q.   Okay.
17     A.   That's why I wanted to talk
18 about it today.
19     Q.   Okay.  Who gave that to you?
20     A.   I don't know.  I probably got
21 it from several different sources.
22     Q.   Okay.
23     A.   But I just read it this week.
24     Q.   Okay.  Do you know why it was

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D., Ph.D.

Page 777

1  given to you?
2      A.    Why?  Because it -- well,
3  because it deals with cardiac events, cardiac
4  adverse events from Vioxx.  But these are --
5  this is primarily a hypertension-induced -- a
6  study of the hypertension -- blood
7  pressure-raising potential for Vioxx.
8      Q.    Okay.  And when you say -- I
9  think you said, quote, "My sense is it wasn't
10 given to the FDA."  Just so the record is
11 clear, you don't know one way or the other,
12 right?
13     A.    I don't.  That's right.  I
14 don't.
15         MR. PIORKOWSKI:  Okay.  All
16 right.  Okay.  I have no further
17 questions.
18         We done, Richard?
19         MR. JOSEPHSON:  I just have a
20 couple of follow-ups from
21 Mr. Gallagher.
22         EXAMINATION
23 BY MR. JOSEPHSON:
24     Q.    Doctor, and this may just be

Page 778

1  that I want to just make sure, because we
2  haven't asked you a lot of questions because
3  of your answers at the first deposition about
4  a particular area, and I want to make sure
5  we're not going into that area.
6      A.    Okay.
7      Q.    Is it correct that you are not
8  going to be commenting upon Merck advertising
9  that may have gone to physicians?
10     A.    The best answer I can give you
11 is this:  I am not going to review in
12 painstaking detail the words used in Merck
13 advertising, nor am I going to compare them
14 to, again, in painstaking detail, any
15 standard.
16         However, it is the -- in my
17 opinion, it is the obligation of a drug
18 company to provide a -- an accurate portrayal
19 of the drug's risks and benefits, and the
20 degree that they don't do that is the degree
21 to which I'll comment.  So it will be general
22 comments, but I don't think it will be
23 specific comments.
24     Q.    Well, let me ask you this,

Page 779

1  Doctor:  The last time you actively practiced
2  medicine was early '90s?
3      A.    March 1992.
4      Q.    Okay.  So you have not
5  practiced medicine in about, what, 14 years?
6      A.    Right.
7      Q.    And never prescribed nor were
8  detailed --
9      A.    Actually, 16 years.
10     Q.    16 years.
11     A.    Right.
12     Q.    I'm sorry.  Your math is --
13         You never prescribed or were
14 detailed on Vioxx, correct?
15     A.    That's right.
16     Q.    Or Celebrex or any of the COX-2
17 drugs?
18     A.    That's correct, yes.
19     Q.    In fact, detail man to promote
20 a medicine to you to prescribe, the last time
21 that happened was back in the early 1990s,
22 correct?
23     A.    That's right.
24     Q.    Okay.  And you've not -- have

Page 780

1  you kept up with the regula- -- the DDMAC
2  regulations on advertising?
3      A.    No.
4      Q.    And so you're not in a position
5  to comment on whether Merck violated DDMAC
6  regulations that may have been attached to
7  certain advertising -- advertisements that
8  were approved by the FDA, correct?
9      A.    Today, I'm certainly in no
10 position to point to one CFR or one
11 regulation and say, "This was violated."
12 That's right.
13         MR. JOSEPHSON:  Okay.  That's
14 all I have.  Thank you.
15         MR. PIORKOWSKI:  I think you're
16 done, Doctor.
17         MR. GALLAGHER:  You're done.
18         MR. PIORKOWSKI:  Thank you very
19 much.
20         THE VIDEOGRAPHER:  Off the
21 record at 3:28.
22         - - -
23         (Deposition concluded at
24 3:28 p.m.)

96 (Pages 777 to 780)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 781

```
 1        CERTIFICATE
 2
 3         I, MICHAEL E. MILLER, a Notary
    Public, Registered Merit Reporter and
 4  Certified Realtime Reporter, do hereby
    certify that prior to the commencement of the
 5  examination, LEMUEL A. MOYE, M.D., Ph.D. was
    duly sworn by me to testify to the truth, the
 6  whole truth and nothing but the truth.
 7         I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability.
10
           I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.
14
15
16
    _____
    MICHAEL E. MILLER, RMR, CRR
17  Notary Public in and for
    The State of Texas
18  My Commission Expires:  7/9/2008
    Dated:  June 19, 2006
19
20
21
22
23
24
```

Page 782

```
 1         ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4         I,_____, do
    hereby certify that I have read the foregoing
 5  pages, 400 - 784, and that the same is a
    correct transcription of the answers given by
 6  me to the questions therein propounded,
    except for the corrections or changes in form
 7  or substance, if any, noted in the attached
    Errata Sheet.
 8
 9
10
11
12
    _____
13  LEMUEL A. MOYE, M.D., Ph.D.    DATE
14
15  Subscribed and sworn
    to before me this
16  _____ day of _____, 20 ____.
17  My commission expires: _____
18
19  Notary Public
20
21
22
23
24
```

Page 783

```
 1              E R R A T A
 2  PAGE  LINE  CHANGE
 3  ____  ____  _____
 4  ____  ____  _____
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

Page 784

```
 1          LAWYER'S NOTES
 2  PAGE  LINE
 3  ____  ____  _____
 4  ____  ____  _____
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

97 (Pages 781 to 784)

165470b8-f920-4da9-843f-90cc143762f6