# EXHIBIT  B

ROUGH DRAFT - Confidential - Subject to Protective Order

THE VIDEOTAPE TECHNICIAN:

Good afternoon.  Here begins

Videotape Number 1 in the

deposition of Dr. James Fries in

the matter of Vioxx litigation in

the United States District Court

Eastern District of Louisiana,

Case Number 1657.

Today's date is June 16th,

2006.  The time is 1:05 p.m.  This

deposition is being taken at 1000

Welch Road, Palo Alto, California.

The videographer is ^ , here

on behalf of Esquire Deposition

Services, 505 Samson, Street 502,

San Francisco, California.

Will all counsel present

please identify yourselves and

state whom you represent.

MR. RAFFERTY:  We're going

to do that after.

DR. JAMES FRIES,

after having been duly sworn, was

examined and testified as follows:

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 2

```
1              - - -
2          EXAMINATION
3              - - -
4   BY MR. RAFFERTY:
5       Q.   Could you state your name
6   for the jury, please, Doctor.
7       A.   James Franklin Fries.
8       Q.   You are a medical doctor,
9   correct?
10      A.   That's correct.
11      Q.   We're here at Stanford
12  University to take your deposition today.
13  Is this where you're currently employed?
14      A.   That's right.
15      Q.   And what is your current
16  position here?
17      A.   I'm a professor of medicine,
18  emeritus active.
19      Q.   Okay.
20           And how long have you been a
21  professor of medicine here at Stanford?
22      A.   At one grade or another, a
23  professor since 1971.
24      Q.   Okay.
```

Page 3

```
1           Do you have a particular
2   specialty?
3       A.   I'm a rheumatologist.  I
4   also do work in clinical epidemiology, in
5   aging research and health public policy
6   and in information technology.
7       Q.   Okay.
8           In terms of your specialty
9   of rheumatology, have you done particular
10  research in regards to NSAIDs?
11      A.   Yes. I should probably give
12  you a little bit of background, because
13  it will be important, probably for
14  everything that happens.
15      Q.   Sure.
16      A.   30 years ago, about 30 years
17  ago, I founded Aramis, that's
18  A-R-A-M-I-S, the Arthritis Rheumatism and
19  Aging Medical Information System.  And
20  we've tracked some 17,000 people in total
21  from when we get ahold of them until they
22  die or just say good-bye to us in another
23  way.
24           And we follow them for
```

Page 4

```
1   everything that happens to them
2   medically.  We get their clinical
3   information, we go to them with
4   questionnaires about health status, each
5   six months.  We collect information at
6   that time on the drugs that they've
7   taken, the disability level that their
8   arthritis has inflicted on them, the pain
9   they have, their use of medical care
10  services, the drugs they are taking and
11  any side effects that they have had for
12  those drugs, whether they are symptoms
13  side effects or side effects of
14  hospitalizations or the cause of death.
15           We tally these and we write
16  papers with regard to the comparative
17  toxicity of different drugs.  So, this is
18  the first chronic disease databank system
19  that has existed.  It is also the longest
20  in duration.
21           There are about 1,000 papers
22  that have emerged from it on a series of
23  different subjects.  Probably my
24  guesstimate would be around 20 on the
```

Page 5

```
1   subject that we're discussing today,
2   which are side effects of the -- side
3   effects assessment in general, and side
4   effects of the nonsteroidal
5   anti-inflammatory drugs in particular,
6   so...
7       MS. COVEY:  Doctor, I'm
8       going to stop you there and ask
9       you just to let him ask the
10      questions.
11      MR. RAFFERTY:  That's okay.
12  You're doing --
13      MS. COVEY:  I just --
14      THE WITNESS:  That's okay.
15      MR. RAFFERTY:  You're
16      shortcutting -- you're
17      shortcutting it by going through
18      all of that for me.
19      THE WITNESS:  Yes, yes.
20      MR. RAFFERTY:  I appreciate
21      it.
22      MS. COVEY:  If this is fine
23  with you, then you can let him go
24  ahead.
```

2 (Pages 2 to 5)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 6

1        MR. RAFFERTY:  No problem.
2    BY MR. RAFFERTY:
3        Q.   And Aramis, that is, in
4    part, funded by the NIH; is that correct?
5        A.   Yes.
6        Q.   Okay.
7            In fact, portions of -- in
8    terms of your dealings with Merck in the
9    past, has Merck funded research for
10   Stanford University to your knowledge in
11   the past?
12       A.   Well, I'm sure that -- not
13   to my direct knowledge.  It has never
14   funded me.  But I'm sure that it's funded
15   Stanford University probably until in a
16   number of different project ways.
17       Q.   Okay.
18           Prior to October 28, 2000,
19   had you ever met Dr. Louis Sherwood
20   before?
21       A.   I don't have any recall of
22   that, but it certainly could have
23   happened.
24       Q.   When I say Dr. Sherwood, do

Page 7

1    you know who I'm referring to?
2        A.   Yes.
3        Q.   Okay.
4            October 28, 2000, did you
5    have a conversation with Dr. Sherwood?
6        A.   Well, now, you're going to
7    have to apologize for my memory, dates
8    and sequences five years ago.  Anything
9    that's in the written record I would
10   prefer to refer to than to my memory.
11       Q.   Okay.
12       A.   I think that that was the
13   first contact that I remember having with
14   Dr. Sherwood.
15       Q.   Okay.
16           I'm going to go ahead and
17   hand you what's been marked as
18   Plaintiff's Exhibit 1.0176, which is a
19   copy of the letter on Stanford University
20   letterhead addressed to Dr. -- or, I'm
21   sorry, Mr. Ray Gilmartin, and you can
22   feel free to refer to this.
23       A.   Yeah, thank you.
24       Q.   This letter we'll be talking

Page 8

1    -- we'll be going through it and actually
2    talking about it in more detail a little
3    bit later on, but --
4        MR. RABER:  Excuse me, Troy,
5    do you have a copy for me?
6        MR. RAFFERTY:  Yes, here,
7    Steve.
8        (Handing over document.)
9        MR. RABER:  Thank you.
10   BY MR. RAFFERTY:
11       Q.   I think this may refresh
12   your recollection in terms of certain
13   dates and sequences.
14       A.   Yes.
15       Q.   So, getting back, on October
16   28, 2000, did you receive a call from Dr.
17   Sherwood?
18       A.   Yes.
19       Q.   Okay.
20           And at that time, did he
21   identify himself as being with Merck?
22       A.   Yes, I believe so.
23       Q.   And during that
24   conversation, where did you receive the

Page 9

1    phone call?
2        A.   Well, I received that call
3    at home.
4        Q.   Okay.  Had you ever received
5    a call from a pharmaceutical company like
6    that at home before?
7        A.   No.
8        Q.   Did you find that unusual?
9        A.   Yes.
10       MR. RABER:  Objection to
11   form.
12   BY MR. RAFFERTY:
13       Q.   Was it during the week or on
14   the weekend?
15       A.   It was on a Saturday.
16       Q.   On a Saturday.  Okay.
17           What was Dr. Sherwood
18   calling to discuss with you at that time?
19       A.   He was concerned that a
20   doctor, research associate on my staff,
21   Gurkipal Singh, had been giving talks in
22   public which were critical of Merck's
23   Vioxx, and in particular, had emphasized
24   the potential cardiovascular toxicity of

3 (Pages 6 to 9)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 10

1  Vioxx.
2      Q.   In particular, what was he
3  complaining about, Dr. Sherwood?
4      A.   He believed that the talks
5  in question were unbalanced and that this
6  was something that I, as his immediate
7  supervisor, should know about and take
8  some action. And he also contacted the
9  chairman of the department and the
10  chairman of our division.
11     Q.   Did he tell you that at that
12  time?
13     A.   No.
14     Q.   Okay.
15          You found that out
16  subsequent to the conversation?
17     A.   I believe one of those calls
18  was subsequent to this conversation.
19     Q.   Okay.
20          What did Dr. Sherwood say at
21  that time? Did he imply to you any
22  consequences or what did he want you to
23  do in regards to Dr. Singh?
24     A.   He --

Page 11

1          MR. RABER:  Object to form.
2  Go ahead.
3  BY MR. RAFFERTY:
4      Q.   Go ahead. You can answer.
5      A.   Yeah. He wanted Dr. Singh
6  to stop making the kinds of statements
7  that he had been making.
8      Q.   What -- go ahead.
9      A.   And he wanted, you know, me
10  to assist him in that task.
11     Q.   Okay.
12          And did he indicate to you
13  that there would be any kind of
14  consequences if you didn't or if Dr.
15  Singh did not?
16     A.   Well, he did, and I wrote up
17  when I was much closer to the time, some
18  of the things that he said, that Dr.
19  Singh would flame out if he didn't change
20  his behavior and that there would be
21  consequences for Stanford, and he implied
22  that there might be consequences for me.
23     Q.   Okay.
24          At that time did you take

Page 12

1  that to mean that Stanford or yourself
2  would not be receiving research funds if
3  that didn't stop?
4      A.   Well, that was never stated.
5      Q.   Is that what you --
6      A.   And it's always not,
7  sort of an implied thing when you say how
8  would it be bad for Stanford. I guess it
9  would be bad for Stanford if the research
10  funding dried up.
11          MR. RABER:  Objection, move
12  to strike, speculation.
13  BY MR. RAFFERTY:
14     Q.   Is that what you understood
15  Dr. Sherwood to mean, though, when he
16  said the consequences to you or to
17  Stanford?
18     A.   I thought it was Stanford,
19  because I didn't have any dealings with
20  them. I was sort of a third party to all
21  of this.
22     Q.   Okay.
23          After that conversation with
24  Dr. Sherwood, did you contact Dr. Singh?

Page 13

1      A.   Yes. I took this the same
2  way that I think anybody should who hears
3  about it. You want to determine if it's
4  true or not, and so I did ask Dr. Singh,
5  and I told Dr. Sherwood that I would do
6  this, that I would ask Dr. Singh what had
7  transpired and I would check out. And if
8  there was action that was required, I
9  would take the action. And I did that.
10     Q.   When you say you did that,
11  did you actually review the -- or did you
12  talk to Dr. Singh specifically about his
13  presentation?
14     A.   I talked with him about the
15  presentation. He felt that it was a
16  balanced presentation, that's what he
17  maintained. And I said, well, can I see
18  the slides, and so I looked at the
19  PowerPoint slides that he had. There
20  were, I don't remember, maybe 30 of them.
21  I counted up the ones which were pro --
22  much of the talk was on -- much of his
23  talks were on GI NSAID safety in general,
24  not connected with a particular product.

4 (Pages 10 to 13)

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 14

1    But there was mention of
2  both the VIGOR trial and the CLASS trial,
3  and of celecoxib and of rofecoxib during
4  that talk.  And I counted the slides for
5  rofecoxib and for celecoxib, and there
6  were the same number, and they were both
7  from similar studies and were really
8  quite parallel.  I learned that he had
9  had a previous slide which had a little
10 man who was shoveling -- hiding something
11 under a rug, and I actually saw that
12 slide.
13    He explained that he had had
14 it -- it was a little Merck man shoveling
15 something under the rug.  And it was sort
16 of humorous.  And he explained that he
17 had taken out -- this out of his
18 presentation because he had gotten the
19 data that he had been trying to get from
20 Merck.
21    Q.   Did you find the
22 presentation to be balanced?
23    A.   It looked to me to be
24 reasonably balanced.  You can't tell by

Page 15

1  looking at a set of slides what someone
2  is saying when they have those slides on.
3  So, I went a little bit further and I
4  checked with three people who had been in
5  the audience of the both defending of
6  these, and none of them were particularly
7  offended or thought it particularly
8  unbalanced.
9    So, it was a funny
10 situation, because the data that were of
11 interest were on something that would
12 almost automatically unbalance a balanced
13 presentation, because there was negative
14 information on one product of different
15 degrees of certainty, and there wasn't
16 any balancing information.  So, if you
17 really were explaining things at that
18 point, one would tend to probably
19 overemphasize or emphasize more the Vioxx
20 data.
21    Q.   When you say there was more
22 data on the toxicity of one product,
23 which product are you referring to?
24    A.   Well, the Vioxx.

Page 16

1    Q.   Vioxx.
2    And when --
3    A.   And specifically the
4  cardiovascular data and specifically
5  the -- whatever the number is now, 21
6  versus 4 cardiac events.
7    Q.   In the VIGOR study?
8    A.   Yes.
9    Q.   Okay.
10    So, when you reviewed the
11 slides so that basically the -- well, let
12 me kind of skip ahead a little bit.
13    After your conversation and
14 reviewing the slides with Dr. Singh, did
15 you then have another conversation with
16 Dr. Sherwood?
17    A.   Yes.  I'm -- and again, I
18 apologize for being so hazy.  But I had a
19 couple more with him.  One was at the
20 American College of Rheumatology meeting
21 where he -- my recollection of that at
22 this point is that we met in a poster
23 area and he came up and said, can I talk
24 with you, what have you done, and I told

Page 17

1  him what I had done and I said I didn't
2  find anything that was objectionable, and
3  so we weren't going to do anything.
4    Q.   All right.
5    Did you also at that --
6  let's back up and talk for a second about
7  the ACR meeting.
8    When you say the American
9  College of Rheumatology or ACR, when was
10 that?  Was that in November of 2000,
11 approximately?
12    A.   It must have been, yes.
13    Q.   Okay.
14    And when you say "posters,"
15 what is a poster?
16    A.   There is a large hall in
17 which people put up 4 by 6 posters on a
18 particular research project.  There are
19 maybe 200 of them up at a time, and the
20 hall is refilled about every day during
21 the meetings.
22    Q.   Okay.
23    Is this a large meeting of
24 rheumatologists?

5  (Pages 14 to 17)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 18

1     A.   Yes, it's large.  Probably
2  attended by 8,000 people.
3     Q.   8,000 people?
4     A.   Yes.
5     Q.   A number of those
6  rheumatologists?
7     A.   Yes.
8     Q.   Okay.
9     A.   A number of them from
10  industry also.
11     Q.   Okay.
12        And were Merck
13  representatives there?
14     A.   Oh, yes, I'm sure.  From
15  every company.
16     Q.   And in these posters, did
17  they make presentations in regards to the
18  VIGOR data?
19     A.   Well, the posters are
20  scientific reports.  They are brief
21  scientific reports.  They have been
22  submitted for a presentation to the
23  meeting, and they have gone through a
24  judging process and those have been --

Page 19

1  they have been selected for talks from
2  the podium or for poster presentations or
3  for rejection.  About two-thirds of them
4  are accepted for at least a poster
5  presentation, which is the lowest form of
6  presentation.
7        So, there will be for all of
8  the companies that had sponsored and had
9  completed research, they -- often the
10  first announcements of a research study
11  like VIGOR or CLASS, for example,
12  although I'm not sure it is true there,
13  they would be presented first at the
14  meeting in abstract form, and people roam
15  around during designated hours during the
16  day and they look at the presentations,
17  the abstracts, which they also have in a
18  book, but they also meet with the authors
19  of the studies who are usually present at
20  their poster defending their poster.
21     Q.   In regards to the posters
22  for Vioxx, did you attend any of those
23  poster presentations?
24     A.   I looked at them all, yeah.

Page 20

1  Attending is -- sometimes I do it at a
2  brief trot.
3     Q.   And during those posters,
4  were the cardiovascular side effects
5  discussed at the ACR meeting back in
6  November of 2000?
7     A.   Well, I believe that they
8  weren't.  This was at a time when the --
9  there was additional work presented on
10  Vioxx, but it did not contain additional
11  information about the cardiovascular
12  events.  And the data that we had been
13  trying to get was a second kind of
14  cardiac effect, because there are two
15  sets of things.  One are the coronary
16  events, which are what appeared in the
17  original VIGOR trial, had been in that
18  paper.
19        But second was a group of
20  fluid retention side effects, which had
21  not, and these include weight gain,
22  edema, accelerated congestive heart
23  failure, increased hypertension.  And
24  that's a different set, which involved to

Page 21

1  a certain extent, the renal mechanisms as
2  well as others.
3     Q.   Okay.
4        And you say that you had
5  been trying to get.  Had you tried -- had
6  you tried to get that data yourself from
7  Merck?
8     A.   No.  I hadn't really tried
9  myself to get it.  But I had heard people
10  sort of muttering about the fact that
11  they had heard rumors about this data and
12  they hadn't seen it.
13     Q.   All right.
14        Did you try to get that data
15  while you were at the ACR meeting?
16     A.   No, I don't believe so.
17     Q.   Okay.
18        Just to refresh your
19  recollection, let me ask you to turn to
20  Page 2 of the letter there.
21     A.   Okay.  Uh-huh.
22     Q.   Go down to the last full
23  paragraph on that letter.  And about six
24  lines up from the bottom of that

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 22

1 paragraph, you state --
2 A. Well, I stated that it was
3 hard to judge these areas without the
4 numerical details, and you couldn't avoid
5 the conclusion that because the interest
6 in these issues, the data would have been
7 presented had they been favorable.
8 Q. And the sentence that I was
9 referring to was right before that, where
10 it says --
11 A. Oh. "I tried unsuccessfully
12 to get the data myself." Yeah, I must
13 have.
14 Q. Okay.
15 Does that refresh your
16 recollection as to whether or not you
17 tried to get that data from Merck?
18 A. Yeah. I think that I
19 asked -- I don't remember what I did. I
20 think that I asked a representative or
21 something like that, a fairly low level.
22 This was not a full court press to get
23 those data.
24 Q. But certainly you wouldn't

Page 23

1 have put in the letter had you not tried
2 at that point to get --
3 A. Yeah. No. No. I was on
4 sabbatical the year this letter was
5 written. It took me about six weeks to
6 write this letter. I tried to document
7 every single point in it exactly.
8 Q. Okay.
9 This was a very detailed
10 letter that you wrote?
11 A. Yes.
12 Q. Correct.
13 It was a letter that you
14 obviously spent a lot of time drafting,
15 rewriting and being very detailed and
16 specific in your wording, correct?
17 A. I wanted to be --
18 MS. COVEY: Objection to
19 form.
20 MR. RABER: Objection to
21 form.
22 THE WITNESS: Okay.
23 MR. RABER: Excuse me. I'm
24 sorry, Doctor, I just need to

Page 24

1 object for the proceedings.
2 THE WITNESS: Yeah, that's
3 all right.
4 MR. RABER: And I'll try and
5 keep them to a minimum, but go
6 ahead.
7 THE WITNESS: I lost my
8 train of thought.
9 I tried to keep it as
10 balanced as I could.
11 BY MR. RAFFERTY:
12 Q. Okay. All right.
13 You also reference in these
14 or during that time of the ACR meeting,
15 did it also come to your attention that
16 other doctors had complaints of Merck
17 contacting either themselves or their
18 bosses in an effort to intimidate them?
19 MR. RABER: Objection to
20 form.
21 THE WITNESS: Yes. It was
22 kind of at that time that the
23 rumor mill was going, and once
24 people started talking about this,

Page 25

1 there were other people that had
2 similar experiences. And they
3 reported, and a number of them had
4 the same reaction that I did, that
5 this was a way of influencing
6 academic debate, which was not
7 appropriate and could not
8 continue.
9 BY MR. RAFFERTY:
10 Q. Okay.
11 And did you actually talk
12 with those different investigators or
13 researchers in regards to their
14 complaints?
15 A. Yes, yes. I'm not at all
16 positive, though, I had an exhaustive
17 list. But the people that I had names
18 on, I contacted all of them and talked
19 with all of them.
20 Q. Okay.
21 Let me focus your attention
22 on the -- well, first before, we do that,
23 Dr. Sherwood, did you see him and
24 actually confront Dr. -- confront may

7 (Pages 22 to 25)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 26

1 be not the right word.
2        Did you actually talk with
3 Dr. Sherwood about these different
4 allegations prior to writing your letter?
5      A.  Yes.  But my recollection is
6 that was a telephone call after the
7 meetings.
8      Q.  Okay.
9        Tell me about that telephone
10 call.
11      A.  We'd gone backwards and
12 forwards and got a connection, and then
13 we discussed these issues much as they
14 are laid out there.  I put some quotes in
15 that letter that were not recorded
16 quotes, but they were ones that I had
17 remembered from the discussion.
18        One ironic one was that he
19 had said that the side effects didn't
20 occur at all, they had internal data to
21 indicate that they didn't occur, but that
22 anyway it was only at high doses.  I
23 thought that that was an interesting way
24 to put an affirmation and a denial into

Page 27

1 the same sentence.
2        MR. LANIER:  Who said that,
3 sir?
4        THE WITNESS:  Sherwood.
5        MR. LANIER:  Okay.
6 BY MR. RAFFERTY:
7      Q.  Doctor, in regard to your --
8 that phone conversation took place before
9 you wrote this letter obviously?
10      A.  Yes, correct.
11      Q.  Okay.
12        So, after having the phone
13 conversation on October 28, 2000, seeing
14 Dr. Sherwood at the ACR meeting, seeing
15 the VIGOR posters at the ACR meeting,
16 talking with Dr. Sherwood again on the
17 phone, you then wrote this letter on
18 January -- or sent the letter on January
19 9, 2001, correct?
20      A.  Yes.
21      Q.  Okay.
22        And you wrote this letter to
23 Mr. Raymond Gilmartin, correct?
24      A.  Yes.

Page 28

1      Q.  Had you ever met Mr.
2 Gilmartin before?
3      A.  No.
4      Q.  He is the, or at the time
5 was the Chief Executive Officer of Merck,
6 correct?
7      A.  Yes.
8      Q.  Okay.
9        Had you ever written a
10 letter to the CEO of a pharmaceutical
11 company before?
12      A.  No.
13      Q.  Okay.
14        Had you ever written a
15 letter with these kind of allegations in
16 them to a pharmaceutical company before?
17      A.  No.
18      Q.  Okay.
19        In your -- prior to writing
20 the letter, I noticed in the documents
21 that were produced by Stanford, there
22 were a number of drafts of this letter.
23      A.  Uh-huh.
24      Q.  Approximately how long did

Page 29

1 it take you to write this letter?
2      A.  I would say six weeks.
3      Q.  Okay.
4        Did you also run the letter
5 by any of your superiors?
6      A.  No.
7      Q.  Okay.
8        This is --
9      A.  That's actually probably not
10 quite accurate.  I believed that I showed
11 it to Dr. Ulman ^ , who is a peer, and to
12 Ted Harris, who was chief of the division
13 at that time.  But I see him as a friend
14 rather than as a supervisor.
15      Q.  All right.
16        Particularly, and if I can
17 focus your attention on the letter for
18 just a moment.  There were a couple of
19 things in the letter that I noticed.  You
20 reference in here several times, I
21 counted four different types that you
22 used the word "intimidate" in this
23 letter.
24        What was your understanding

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 30

1  in terms of the intimidation that you
2  felt was going on with Merck?
3         MR. RABER:  Object to the
4      form.
5  BY MR. RAFFERTY:
6      Q.   I want your understanding.
7      A.   Well, my understanding was
8  that there is quite a common theme and
9  that the reports that I got from everyone
10 who alleged that they had been
11 intimidated, they tended to use that term
12 too.  But they were all very similar.
13        They were threatened, in
14 some instances, directly financially
15 because their speaker fees were being
16 threatened or removed, I thought.  In
17 some cases, they were not allowed to be
18 on Merck trials where they wanted to be
19 participating investigators.
20     Q.   Were they similar to the
21 situation that happened with you and Dr.
22 Singh?
23        MR. RABER:  Objection to
24     form.

Page 31

1         THE WITNESS:  Yes.  The
2  pattern seemed to be the same, and
3  Dr. Sherwood confirmed that with
4  me.  It was one of the interesting
5  parts of that last conversation,
6  is that I told him that I was
7  offended that someone would go
8  over people's heads and try and
9  punish them in some way for
10 something that Merck didn't like.
11 I had never heard or seen such a
12 thing.
13        And he said that he was a --
14 had been a chairman of a
15 department of medicine and that he
16 knew all of the people in the
17 network and that he would call
18 whoever he wanted and that that
19 was his right.  And it was partly
20 that statement of his that caused
21 me to be sure to write this
22 letter, because he made it clear
23 that he felt it was justified to
24 go over the head of the people who

Page 32

1  he was concerned with, and so I
2  felt entirely justified to go over
3  his head.
4  BY MR. RAFFERTY:
5      Q.   Okay.
6      A.   Hence, the letter to
7  Gilmartin and others.
8      Q.   And did you feel that way in
9  particular in regards to just, for
10 instance, the situation involving you,
11 where he called you in regards to Dr.
12 Singh?
13     A.   Yes.  I really wouldn't want
14 to overemphasize the degree to which I
15 felt threatened.  I really didn't think
16 about it very much because I didn't see
17 any leverage that there was.
18     Q.   Okay.
19     A.   Leverage on the institution.
20 Well, right.  They weren't paying me any
21 money.
22     Q.   Okay.
23     A.   And I didn't want to be an
24 investigator on other things.  I don't do

Page 33

1  those things.
2      Q.   Do you know how much money
3  they were paying Stanford?
4      A.   Oh, no, I don't know.  I
5  don't know.  I saw some something that
6  said that 9 percent of the research
7  coming into the department of medicine,
8  or something like that was from drug
9  companies.  So, I mean, there is drug
10 company money coming in to support
11 research at Stanford and every research
12 unit here.
13     Q.   And I think, if you look at
14 Page 3 of the letter in the top
15 paragraph -- well, I guess starting,
16 actually, I guess it would be on Page 2,
17 the last paragraph of the page.
18     A.   Uh-huh.
19     Q.   Where it indicates -- just
20 follow along with me, if you would,
21 Doctor, because I'm going to ask you some
22 questions about this, in particular this
23 section.
24     A.   Right.

9  (Pages 30 to 33)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 34

1    Q.   It states, "Even worse were
2  the allegations of Merck damage control
3  by intimidation, often with a pattern of
4  going to the dean or department head with
5  complaints of anti-Merck bias and always
6  alleging unbalanced anti-Vioxx
7  presentations."
8         Did I read that correctly?
9    A.   That's correct.
10   Q.   And is that what happened in
11 regards to Dr. Sherwood contacting you in
12 regards to Dr. Singh?
13        MR. RABER:  Object to form.
14        THE WITNESS:  Yes. He
15    clearly wanted me to exert
16    pressure on Dr. Singh.
17 BY MR. RAFFERTY:
18   Q.   Okay.  And he goes on to
19 say, "This has happened to at least eight
20 investigators, Dr. Singh; Dr. Lipsky, now
21 research chief at the Arthritis
22 Institute; Dr. Andrew Whelton of Hopkins;
23 Dr. Michelle Petri of Hopkins; Dr. David
24 Yokum of Tucson, currently head of the

Page 35

1  FDA advisory panel; Dr. Lee Simon of
2  Harvard; Dr. James McMillen; and Dr.
3  Thomas Stillman.  I suppose I was mildly
4  threatened myself, although I have never
5  spoken or written on these issues"; is
6  that correct?
7    A.   That's correct.
8    Q.   Okay.
9         And is that the way you felt
10 back in 2000 when you wrote this?
11   A.   Yes.  And that's the way I
12 feel now.
13   Q.   Okay.
14        And that's the way you feel
15 now in regards to your conversation you
16 had with Mr. Sherwood -- Dr. Sherwood?
17   A.   Yes.
18   Q.   Okay.
19        You then personally took the
20 time, after all of this and after your
21 conversations, you took the time out of
22 your personal life and on your sabbatical
23 to physically actually contact all of
24 these doctors yourself and document all

Page 36

1  of their complaints as well, correct?
2         MR. RABER:  Object to form.
3         THE WITNESS:  That's
4     correct.
5  BY MR. RAFFERTY:
6    Q.   Okay.
7         And you did all of that
8  prior to ever writing this letter to
9  Merck?
10   A.   It was in process.  During
11 the six weeks the letter was being
12 written, I was continuing probably the
13 only investigative research of this kind
14 I had ever done.  I really wanted to make
15 sure that what I said, I had permission
16 from people to say that were involved and
17 that they would stick behind what they
18 had told me as their opinion.  That's why
19 I did all of this verification and it
20 went through all of these drafts and
21 drafts.
22   Q.   Okay.
23        Focusing your attention down
24 to the next paragraph -- actually, the

Page 37

1  second full paragraph on that page.  You
2  indicate in there the sentence, "The
3  investigators whose balance was
4  criticized are prominent and several
5  advised the FDA, a role not often given
6  to unbalanced presenters"; is that
7  correct?
8    A.   That's correct.  I think
9  there were also some that were not as
10 renowned, Dr. McMillen and Dr. Stillman,
11 Dr. Singh were not renowned.  But Andy
12 Whelton and Michelle Petri and David
13 Yocum, Lee Simon, Peter Lipsky, those are
14 widely respected rheumatologists' names.
15   Q.   Okay.
16        And the other ones you
17 mentioned, when you say they are not
18 renowned, that doesn't mean that they are
19 not good doctors?
20   A.   They had --
21        MR. RABER:  Object to form.
22        THE WITNESS:  They tended to
23    be people who were members of a
24    speakers bureau.

10  (Pages 34 to 37)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 38

1 BY MR. RAFFERTY:
2    Q.   Okay.
3    A.   And were frequently talking
4 to small groups of physicians on issues
5 of postgraduate education.
6    Q.   Okay.
7    The --
8    MS. COVEY:  Counsel, I don't
9 mean to take you off track, but do
10 you have another copy of that?
11    MR. RAFFERTY:  Oh, sure.
12 I'm sorry.
13    THE WITNESS:  Oh, the
14 letter.  Oh, you haven't seen it.
15    MS. COVEY:  Thank you.
16    MR. RAFFERTY:  I've got
17 plenty of them.
18 BY MR. RAFFERTY:
19    Q.   Going further down on Page
20 2, in regards to the letter that you
21 wrote back in January of 2001, and I
22 guess this would have been in draft even
23 dating back to the end of 2000, correct?
24    A.   Yes.

Page 39

1    Q.   Okay.
2    You state in the last
3 sentence on the second page of the last
4 full paragraph, "The publication of the
5 VIGOR trial recently in the NEJM did not
6 contain the data on edema and fluid
7 retention at all and dismissed the heart
8 attack data with weak arguments"; is that
9 correct?
10    A.   Yes.
11    Q.   And what weak arguments are
12 you referring to there?
13    A.   Well, Merck confronted these
14 data.  There were three explanations that
15 were put forward, and I'll give you a
16 long answer just because it is not all
17 listed in the letter.
18    There were three possible
19 explanations that were brought out.
20 Merck emphasized two of them.  One was
21 that the heart attacks only occurred in
22 people who were at high risk.  If you
23 looked at the people who had had the high
24 risk, had the heart attacks on Vioxx,

Page 40

1 they were high risk people for heart
2 attacks.  And this is true.  But it is
3 weak, because it is irrelevant.
4    These are randomized control
5 trials and there are just as many high
6 risk people in the control group as there
7 are in the Vioxx group.  So, just as many
8 in the naproxen group as there were in
9 the Vioxx group, yet there were a
10 difference in the number, significant
11 difference in the number of heart
12 attacks.  So, that's a non-argument.
13    It was a true observation
14 that they mostly happened in people at
15 risk.  Well, who else would it happen to,
16 of course.  So, that was a weak argument.
17    The second argument which
18 was induced was that it wasn't that Vioxx
19 was causing heart attacks, it was that
20 naproxen was preventing heart attacks.
21 So, that's why the difference existed.
22    Now, that's a weak argument
23 because there's been a lot of looking at
24 naproxen over the years, way before this,

Page 41

1 back when they were -- naproxen was made
2 by Syntex.  In our neighborhood, we dealt
3 with questions about whether, because it
4 had antiplatelet actions, it could be as
5 effective as aspirin and one could put it
6 in as a way of preventing heart attacks.
7    It turned out that it was
8 very hard to document that effect.  So,
9 that was never made an indication for it.
10 But there certainly was no indication
11 that there would be a substantial change
12 in heart attack rates, because you were
13 taking naproxen.  So, the evidence was
14 negative on that.  That made that a weak
15 argument.
16    Now, my first impression was
17 to say that this is just bad luck.  And
18 that does happen in trials.  This was a
19 secondary endpoint, not a prespecified
20 endpoint for the trial.  And you can have
21 bad luck in 5 percent of your secondary
22 endpoints, because 1 out of 20 of them
23 will be statistically significantly
24 positive even though there is no true

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 42

1  relationship between the observation and
2  the drug.
3       Now, that was my favorite
4  early hypothesis early on, and I can't
5  remember whether it was at the time I
6  wrote the letter or not. And I thought
7  it was probably a brouhaha about
8  something, because there was no
9  mechanism, you know, it didn't fit
10 together, it was an unexpected finding.
11      However, a friend of mine,
12 Garret FitzGerald, and I keep in touch on
13 these issues and did at that time, and he
14 knew about the Bextra data before I did.
15 It happened really early on. And then
16 there was a third drug which was never
17 brought to market.
18      So, it turns out that this
19 finding was found in three drugs, not
20 just one, and it was of similar
21 magnitude. And these drugs were at the
22 same point on the COX-1 sparing spectrum,
23 so that they were at the very edge of it.
24 They were at the right-hand edge, if you

Page 43

1  will, with regard to their effects.
2       So, that took bad luck out
3  of it. So, it was at that point that I
4  decided this was true and I stopped
5  prescribing Vioxx to my own patients.
6       MR. RABER: Objection, move
7  to strike, nonresponsive and
8  beyond the scope.
9  BY MR. RAFFERTY:
10      Q.   Did you ever receive data
11 from Merck indicating what they knew
12 prior to ever marketing Vioxx in regards
13 to its propensity to have cardiovascular
14 toxicity?
15      A.   They said the contrary to
16 me. They said they had -- that was
17 something they would say in -- they said
18 this a number of other places, because it
19 was picked up as well. They said we had
20 internal data, that the reason we don't
21 stress these findings in VIGOR is that we
22 have other data which doesn't show it.
23      Q.   They never showed you that
24 date, though?

Page 44

1       A.   No.
2            MR. RABER: Objection to
3  form.
4  BY MR. RAFFERTY:
5       Q.   You indicate there is one
6  particular article where you are quoted,
7  let me ask you. I am going to show you a
8  copy of what's going to be marked as
9  Fries .0025.
10      Well, I'll tell you what.
11 I'm running short on time. So, I am
12 going to try to cut to the --
13           MR. LANIER: You've got
14 three minutes.
15           MR. RAFFERTY: I've got
16 three minutes.
17 BY MR. RAFFERTY:
18      Q.   Let me just kind of try to
19 summarize a little bit. Did you feel the
20 contact that you had from Dr. Sherwood
21 and from Merck in regards to Vioxx, did
22 you feel that was at all appropriate?
23           MR. RABER: Objection to
24 form.

Page 45

1            THE WITNESS: I felt that
2  belief in the scientific
3  marketplace where you have freedom
4  of expression on all sides without
5  overt intimidation, let alone this
6  kind of thing, really was a threat
7  to academic freedom. And I saw it
8  and phrased my position in terms
9  of the academic freedom issues,
10 not in terms of is it toxic or is
11 it not toxic issues.
12      That was irrelevant to the
13 question that they would come down
14 on people that said something they
15 didn't like. And if everybody did
16 that, we would not have a
17 scientific process. So, I became
18 incensed on academic freedom
19 issues and that was my real
20 motivating factor.
21      Q.   I'm going to hand you -- the
22 videographer tells me I've got five
23 minutes. Let me just very quickly hand
24 you what I'm going to mark as Plaintiff's

12  (Pages 42 to 45)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 46

1  Exhibit 1.0299, which is an e-mail from
2  Douglas Greene to Ed Scolnick. And if I
3  could, I just want to ask you a couple of
4  questions.
5         Down at the bottom of that
6  e-mail, and the jury will have seen this
7  e-mail. Let me just basically ask you to
8  save time, it says, Doug Greene is
9  writing to Ed Scolnick, the subject line
10 is "Fries letter followup," and it is
11 dated February 10, 2001. Did I read that
12 correctly?
13     A.   Yes.
14     Q.   Have you ever seen a copy of
15 that before?
16     A.   No, I have not seen this,
17 no.
18     Q.   Okay.
19         In there, your letter is
20 discussed. Do you see that?
21     A.   Yes.
22     Q.   Okay.
23         And their response. In
24 particular, I want to draw your attention

Page 47

1  to the line that states, "At my
2  suggestion, we will use the next Vioxx
3  marketing meeting to invite Fries, along
4  with these members of the opposition,
5  place them in a program at which we roll
6  out our data and then engage (and
7  control) them in a panel discussion to
8  followup the presentations."
9         Did I read that correctly?
10     MR. RABER:  Object to form.
11     THE WITNESS:  Yeah.
12 BY MR. RAFFERTY:
13     Q.   First of all, have you ever
14 attended any pharmaceutical marketing
15 meetings?
16     A.   Oh, yes. Yes.
17     Q.   Okay.
18         And did you ever attend a
19 Vioxx marketing meeting?
20     A.   Probably likely. I don't
21 have specific recall.
22     Q.   Okay.
23         This is dated February 10,
24 2001. Do you recall at or around that

Page 48

1  time whether this meeting ever occurred
2  where they rolled out the data and
3  controlled you in a panel discussion?
4     MR. RABER:  Object to form.
5     THE WITNESS:  They invited
6  me to come and bring their data
7  and look at the data, to come to
8  me. I don't believe that I was
9  ever invited to do it on a talk.
10 And I basically declined the
11 other. That wasn't the issue.
12     I wanted to get closure on
13 the academic freedom issue. That
14 was what I was focused on. I
15 wasn't interested in carrying it
16 further than that. I know a lot
17 of other people were.
18 BY MR. RAFFERTY:
19     Q.   Okay.
20         In regards to the closure on
21 the academic freedom issue, did you
22 receive a call from David Anstice after
23 you wrote this letter?
24     A.   Yes. I received a written

Page 49

1  letter back from Dr. Gilmartin which was
2  thoughtful, I thought, and tended to be
3  responsive. And then the followup call
4  from Dr. Anstice was to report on what
5  their internal deliberations were and a
6  point of actions that they were taking
7  internally to control the situation.
8     Q.   Okay.
9         Let me just very quickly ask
10 you one question backing up.
11         During your conversation of
12 October 28, 2000 with Dr. Sherwood, did
13 he ever tell you that the data that Dr.
14 Singh was relying upon or presented by
15 Dr. Singh was incorrect?
16     MR. RABER:  Object to form.
17     THE WITNESS:  No, I don't
18 believe so.
19 BY MR. RAFFERTY:
20     Q.   I'm going to show you a copy
21 of what's been identified or marked as
22 Fries 0008, and if you would look at the
23 third full paragraph. This appears to be
24 a confidential draft document, it says at

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 50

1  the top, November 27th?
2      A.  Yes.  Oh, all right.
3          MR. RAFFERTY:  Here you go,
4  Steve.
5          (Handing over document.)
6          MS. COVEY:  May I have one?
7          MR. RAFFERTY:  I'm sorry.
8          (Handing over document.)
9          THE WITNESS:  This is a very
10  early version of this.
11          MR. RAFFERTY:  I'm sorry.
12  There you go.
13  BY MR. RAFFERTY:
14      Q.  This is an early version of
15  what ultimately ended up being --
16      A.  Nothing ever disappears,
17  does it?
18      Q.  -- the January 2001 letter;
19  is that correct, Doctor?
20      A.  Yes, I believe so, yes.
21      Q.  All right.
22          And in that third full
23  paragraph, you state -- well, looking at
24  that third full paragraph, you state,

Page 51

1  "After the call, I pondered several
2  strange elements to the conversation.
3  The specific allegations were said to
4  have come from a Pharmacia competitor
5  closed investigator meeting in San Diego.
6  I wondered how this information had come
7  to Dr. Sherwood.  He said that Dr. Singh
8  took Vioxx himself for his back pain, and
9  this was hypocritical, and I wondered how
10  he knew this.  He did not indicate that
11  any of the data presented by Dr. Singh
12  were incorrect"; is that accurate?
13      A.  Yes.  I think I took it out
14  because it was more speculative and not
15  as solid as what I was trying to make the
16  tone of the letter.
17      Q.  Okay.
18          But do you have any
19  recollection as we sit here today that
20  Dr. Sherwood ever alleged that the data
21  being presented by Dr. Singh at those --
22  in those meetings was ever incorrect?
23          MR. RABER:  Object to form.
24          THE WITNESS:  I don't

Page 52

1  believe that's been alleged
2  against anybody.
3  BY MR. RAFFERTY:
4      Q.  Okay.
5          And when you looked at the
6  Dr. Singh presentation, did you see that
7  any of it was incorrect to your
8  knowledge?
9      A.  Well, with the caveat that I
10  didn't hear it and I wasn't in the room.
11          MR. RAFFERTY:  Okay.
12  I think I am out of time.
13  So, I'm going to give the
14  questioning over to Mr. Lanier.
15          MR. ^:  Do you want to take
16  over or do you want to take a
17  break?
18          MR. RAFFERTY:  Do you want
19  to take a break right now?
20          THE WITNESS:  Or we could go
21  a little more.
22          MR. LANIER:  I'm ready to
23  go, if you're ready.
24          THE WITNESS:  Okay.

Page 53

1          - - -
2          EXAMINATION
3          - - -
4  BY MR. LANIER:
5      Q.  I'll warn you now, a lot of
6  what I'm going to ask is repetitive of
7  what you've been asked, because I've
8  tried two of these so far and I plan on
9  trying about 100 more, and I would like
10  the jury to hear my voice with some of
11  these questions, because I plan on
12  playing this video.  So, humor me that I
13  may ask you the same questions.  Okay?
14      A.  Well, humor me if there are
15  unintentional discrepancies between my
16  responses.
17      Q.  No problem.
18          Doctor --
19          MR. RABER:  I'm just going
20  to very quickly -- and I'll take
21  this objection out of my time.
22  I'm going to lodge an objection
23  that this is not consistent with
24  the MDL order on depositions, this

14 (Pages 50 to 53)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 54

1    approach of repeating things where
2    it expressly says questioners are
3    not to repeat things.  I'm going
4    to object to any questions that
5    are repetitive.
6        MR. LANIER:  Fair enough.
7        For clarity's sake, I'm
8    taking this under a subpoena that
9    was issued in the New Jersey
10   litigation.  I'm not part of the
11   MDL.
12       MR. RABER:  This deposition
13   was noticed in the MDL --
14       MR. LANIER:  And in the New
15   Jersey litigation.
16       MR. RABER:  -- pursuant to
17   the rules of the MDL.
18       MR. LANIER:  Well, it was
19   noticed, first of all, from a
20   subpoena that I had issued and
21   served out of the New Jersey
22   litigation.  That's what I'm here
23   taking it for.  So, thank you.
24   BY MR. LANIER:

Page 55

1        Q.   Doctor, would you please
2    tell the jury your name.
3        A.   James Fries.
4        Q.   And, Dr. Fries, I have a
5    copy of a curriculum vitae of yours.  Is
6    that your CV, sir?
7        A.   As of a year ago, yes.
8        Q.   Okay.
9        As of a year ago, was that
10   pretty much correct and up-to-date?
11       A.   Yes.
12       Q.   Any big changes in the last
13   year?
14       A.   No.
15       Q.   All right.
16       Doctor, what kind of a
17   doctor are you?
18       A.   I'm a physician, M.D.
19       Q.   All right.
20       A.   Rheumatologist, internist.
21   I have boards in internal medicine and in
22   rheumatology.
23       Q.   Rheumatology, what does that
24   do?

Page 56

1        A.   It is the study of arthritis
2    and related conditions, treatment of
3    patients with those conditions.
4        Q.   Do you actually treat people
5    who have arthritis?
6        A.   Yes.
7        Q.   Have you done that for a
8    long time?
9        A.   Yes.
10       Q.   How many years?
11       A.   Since 1966.
12       Q.   40 years.
13       In addition to treating
14   people who actually have arthritis, do
15   you do research into arthritis and
16   treatment?
17       A.   Yes.
18       Q.   Are you a trained, qualified
19   researcher, what they call an
20   epidemiologist?
21       A.   I'm not a card carrying
22   epidemiologist with a Ph.D., but I'm a
23   clinical epidemiologist with some
24   national and international credit to

Page 57

1    that.
2        Q.   Fair enough.
3        Doctor, we've got a letter
4    here that's been marked in your
5    deposition as Exhibit Number 1.0176.
6    It's a letter you wrote to Merck.  Do you
7    have -- to Ray Gilmartin of Merck.  Do
8    you have that in front of you?
9        A.   I do.
10       Q.   We'll put it up for the jury
11   to see.
12       Why did you write Ray
13   Gilmartin a letter?
14       A.   I was concerned with some
15   internal practices at Merck which I felt
16   infringed on academic freedom, and I felt
17   it was not in Merck's interest to
18   continue those.  I attempted to make that
19   case to them and it concerned, in
20   particular, a lot of allegations around
21   the Vioxx drug.
22       Q.   Had you had some
23   interactions with Merck at this point?
24       A.   No.  Prior to the Sherwood

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 58

1  call, I had no interactions whatsoever
2  with Merck.
3      Q.   Now, by "Sherwood call," are
4  you talking about Louis Sherwood?
5      A.   Yes.
6      Q.   The Merck vice president?
7      A.   Yes.  He was vice president
8  for medical affairs or some such title.
9      Q.   And how did he come about to
10 call you?  Well, you wouldn't know that.
11     When did he call you?
12     A.   Well, the date is in the
13 document.  I believe it's October 28th.
14 And he called because he was upset with
15 things that an employee of mine was
16 saying.
17     Q.   Well, Doctor, is that
18 normal, for you to get -- by the way, did
19 he call you here at work?
20     A.   No.  He called me at home on
21 a Saturday.
22     Q.   Is that normal for you to
23 get a phone call?
24     A.   It is quite extraordinary

Page 59

1  probably for any of us.
2      Q.   I mean, is he an old time
3  friend where he had your home number or
4  something like that?
5      A.   No.
6      Q.   Are you listed in the book?
7      A.   Yes.
8      Q.   Okay.
9          So, I guess he could have
10 looked it up in the phone book maybe?
11     A.   Could have.
12     Q.   He calls you at home on a
13 Saturday, and what did he tell you?
14     A.   He said that my research
15 associate in a series of talks was giving
16 an anti-Merck message.
17     Q.   What's the name of this
18 research associate?
19     A.   Gurkipal Singh.
20     Q.   Singh?
21     A.   Singh.
22     Q.   S-I-N-G-H?
23     A.   Yes.
24     Q.   Is he from India?  It sounds

Page 60

1  like an Indian name.
2      A.   Yes.
3      Q.   Okay.
4          Good doctor?
5      A.   Yes.
6          MS. COVEY:  Objection,
7  vague.
8          MR. LANIER:  I'm sorry?
9          MS. COVEY:  Objection,
10 vague, ambiguous.
11 BY MR. LANIER:
12     Q.   Okay.
13     Well, does he work here at
14 Stanford still?
15     A.   No.
16     Q.   Okay.
17     This is a doctor that worked
18 for you?
19     A.   Yes.
20     Q.   You mentioned in your letter
21 that the vice president from Merck, Mr.
22 Sherwood, or Dr. Sherwood, said that if
23 this continued, someone would flame out
24 and there would be consequences for

Page 61

1  Stanford.  What was said?
2      A.   Just that.  I didn't know
3  exactly what flame out meant myself.  I
4  only reported it to give the flavor of
5  the kind of conversation that was
6  occurring.
7      Q.   Consequences for Stanford.
8  Are you the complaining department for
9  Stanford if someone has got a complaint?
10         MR. RABER:  Objection to
11 form.
12         THE WITNESS:  No.
13 BY MR. LANIER:
14     Q.   Are you listed down as the
15 public relations man for Stanford
16 somewhere?
17     A.   No.
18         MR. RABER:  Objection, asked
19 and answered.
20         THE WITNESS:  No.  I believe
21 the reference was to calling
22 people higher in the food chain
23 than I at Stanford, in addition to
24 his contact with me.

16  (Pages 58 to 61)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 62

BY MR. LANIER:
1  BY MR. LANIER:
2      Q.   Well, you used the word
3  intimidation four times in that letter.
4  Why did you choose the word
5  "intimidation"?
6      A.   It seemed like the right
7  word.
8      Q.   Did you believe you were
9  being intimidated -- that Merck was
10 exercising intimidation on you and
11 others?
12     A.   I felt myself fairly immune
13 from it.  I was a tenured professor
14 without any research support from Merck,
15 as I didn't really know what they could
16 do.
17     Q.   You said that in the
18 letter that -- well, let me ask it this
19 way.
20         Do you feel like the phone
21 call to you was an intimidation of the
22 doctor that worked for you, Dr. Singh?
23     A.   I thought it was an attempt
24 to influence and bring additional

Page 63

1  pressure to bear on Dr. Singh.
2      Q.   Is that right?  Should
3  people be doing that?
4          MR. RABER:  Objection.
5  BY MR. LANIER:
6      Q.   Let me ask it this way.
7  That's probably objectionable.
8          Is that typical in the
9  medical community?
10         MR. RABER:  Objection to
11 form.
12         THE WITNESS:  I've never
13         seen this particular form of
14         intimidation by any drug company
15         of physicians who are involved in
16         doing research and are speaking
17         things that should be protected
18         speech and shouldn't draw adverse
19         actions.
20 BY MR. LANIER:
21     Q.   Do you believe that this
22 type of intimidation is healthy for the
23 medical research environment academia
24 that you work in?

Page 64

1          MR. RABER:  Object to form.
2          THE WITNESS:  No.  I think
3          that vigorous debate is very
4          healthy, and debate on all sides
5          of the issue.  Open mikes.  I
6          believe those things are very
7          constructive.
8  BY MR. LANIER:
9      Q.   After you got this phone
10 call from Dr. Sherwood at Merck, did you
11 do an investigation to see whether or not
12 Dr. Singh was out of line or if this had
13 been going on other places?
14     A.   Well, I reacted to the
15 initial conversation with Dr. Sherwood by
16 asking -- conducting an investigation of
17 whether the anti-Merck bias that was
18 alleged could be substantiated.  Because
19 if it could, I was going to say we've got
20 to shut that down.
21         And so in that context, I
22 asked Dr. Singh if it was unbalanced.  He
23 said no.  I asked to see his slides.  And
24 he showed me the slides.  I found them

Page 65

1  fairly unobjectionable.
2          There had been an earlier
3  slide in his standard presentation that
4  was perhaps objectionable, because it
5  showed a little Merck man sweeping
6  something under a rug.
7      Q.   Okay.
8      A.   And suggested that data was
9  being hidden.  That I was told had been
10 removed.
11         I asked people that had
12 attended Dr. Singh's presentation whether
13 they thought it had been unbalanced,
14 three people I asked.  And they said that
15 they thought that it was balanced.  One
16 of them thought that it took a little --
17 it had some humorous aspects of Merck, it
18 poked a little fun.
19     Q.   All right.
20         I'm going to need to
21 interrupt you for a minute, because what
22 those people said is probably going to be
23 hearsay and I won't be able to play the
24 rest of your answer.  I am going to have

17 (Pages 62 to 65)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 66

1  to cut it off with what you've already
2  said.  So, let me ask you this.
3          Just in general, in addition
4  to talking to Dr. Singh and looking at
5  his slide presentation, did you do some
6  other investigation of people who
7  attended the lectures to see if they
8  thought Dr. Singh was out of line?
9      A.   I did investigate by asking
10  three people.
11      Q.   By the time you were through
12  with your investigation, was it your
13  belief Dr. Singh was out of line and
14  needed to be reprimanded or something?
15          MR. RABER:  Object to form.
16          THE WITNESS:  I did not
17      believe that he needed to be
18      reprimanded, but I did believe
19      that a concern I have over this
20      particular method of distributing
21      information was buttressed a
22      little bit.  By that, I mean these
23      evening meetings in which usually
24      a dinner at a very nice

Page 67

1      restaurant, a small group of -- as
2      close to opinion leading doctors
3      as you can get at the restaurants
4      and a presentation by someone, all
5      of this sponsored by a
6      pharmaceutical company.
7  BY MR. LANIER:
8      Q.   You don't approve of those?
9      A.   I don't approve of those.  I
10  don't do them myself.  People who are on
11  the Stanford -- really on the Stanford
12  faculty, I don't think very many, if any,
13  do those.  They are not -- they are
14  always, from the drug company's
15  standpoint, an attempt to influence
16  opinion in its favor.  I mean that not
17  just Merck, but anyone else who is doing
18  the same thing.
19          So, they are always -- there
20  is always the likelihood or the suspicion
21  that there is a little spin.  Not that
22  the presentation is unbalanced, not that
23  anything is said which is scientifically
24  untrue, but that is just being tweaked a

Page 68

1  little bit now and again during the
2  lecture.  And I have this nasty suspicion
3  about any time I hear sponsor talks on
4  anything by anybody.
5      Q.   So, I gather as we look
6  through the Merck documents of the
7  millions of dollars they've spent to pay
8  doctors to come give those kinds of
9  lectures at dinner meetings, are we going
10  to find your name on the list of people
11  they've hired?
12      A.   No, no.
13          MR. RABER:  Objection to
14      form.
15  BY MR. LANIER:
16      Q.   All right.
17          Sir, after you mailed the
18  letter to -- and by the way, is your
19  letter accurate?
20          MR. RABER:  Objection to
21      form.
22          THE WITNESS:  Yes.
23  BY MR. LANIER:
24      Q.   Did you go to a lot of care

Page 69

1  to make sure it was accurate?
2      A.   Yes.
3      Q.   Did you write it and rewrite
4  it and rewrite it?
5      A.   Yes.
6      Q.   How long did it take you to
7  finally get that in final form?
8      A.   Well, we saw a draft of it a
9  little while ago which was back in
10  November I think, and then it came out on
11  January 9.
12      Q.   About six weeks?
13      A.   So, I'd say six weeks or so,
14  yes.
15      Q.   In your letter you spoke
16  about a number of other people by name
17  that you thought had also expressed some
18  concerns of intimidation by Merck.  Do
19  you remember that?
20      A.   Yes.
21      Q.   I want you to focus on that
22  for a minute because I want to ask you,
23  did you get a followup phone call or two
24  from people at Merck after you sent your

18  (Pages 66 to 69)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 70

```
 1  letter?
 2      A.  Yes.
 3      Q.  Do you remember anything at
 4  all about those conversations and what
 5  was said?
 6      A.  Yes, a little bit.  One was
 7  from a vice president who offered to show
 8  me any data that I wanted to see.  That
 9  wasn't my major thing.  I knew the data
10  would come out, so, I had other things to
11  do, so I declined that.
12          A second one was from Dr.
13  Anstice, and he told the four-part plan
14  that Merck had to remedy the problem and
15  that they were taking action in terms of
16  changing their internal operations in
17  response to the letter.
18      Q.  Now, first of all, there is
19  a David Anstice who is the head at the
20  time of Merck health, the whole Merck
21  health end.
22      A.  Yes.
23      Q.  He's not actually a doctor,
24  though, so when you say Dr. Anstice, you
```

Page 71

```
 1  may have assumed he was a doctor --
 2      A.  I may have assumed that he
 3  was a doctor.
 4      Q.  All right.
 5          That's the same David
 6  Anstice?
 7      A.  It is the same person.
 8      Q.  Okay.
 9          Now, David Anstice has
10  testified in this case, and David Anstice
11  has said that he was charged with
12  investigating your letter by Ray
13  Gilmartin.
14      A.  Yes.
15      Q.  Are you aware of that?
16      A.  Well, Dr. Gilmartin said
17  that he was going to do that in his
18  letter to me.
19      Q.  I don't mean to interrupt
20  you, but when you call him Dr. Gilmartin,
21  and I know he's the head of all of Merck,
22  but he wasn't a doctor, either, he's an
23  M.B.A. from Harvard in the business --
24          MR. RABER:  Objection to
```

Page 72

```
 1  form.
 2          THE WITNESS:  Yes, I am
 3  positive you are correct.
 4  BY MR. LANIER:
 5      Q.  All right.
 6          So, we've got the head --
 7  Mr. Anstice calls.  You understand he's
 8  investigating.  Mr. Anstice has also said
 9  that Mr. Anstice never felt like he
10  needed to contact any of the individuals
11  you documented, because you had indicated
12  to David Anstice on the phone, don't
13  worry, you'll take care of them.
14          Did you volunteer to contact
15  all of these people and make sure that
16  their situations were ironed out okay?
17          MR. RABER:  Object to form.
18          THE WITNESS:  Only
19  informally.  I didn't do any
20  systematic thing.  But I ran into
21  most of these people at some
22  subsequent period.  I had thank
23  you notes from a couple of them.
24  BY MR. LANIER:
```

Page 73

```
 1      Q.  Okay.
 2          Did you --
 3      A.  I will elaborate on
 4  something else that came into my mind, is
 5  that I told him that I was glad that they
 6  were making these internal reforms and
 7  that if -- because this was sufficiently
 8  notorious, I knew that if they did this
 9  again, I was going to hear about it right
10  away.  No matter who or where in
11  rheumatology they did it.
12          And that was my insurance
13  that they would, in fact, carry out
14  things and there would be no more
15  intimidating phone calls to people who
16  were superiors of the people who were
17  saying the things.  They didn't want to
18  be upset.
19      Q.  What about outside of
20  rheumatology, would you hear it if it
21  were done in, say, in the cardiology
22  area?
23      A.  Oh, undoubtedly not.
24      Q.  Okay.
```

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 74

1        So, for example, if Dr.
2   Topol has testified about intimidation he
3   got that continued, you're not in a
4   position to say yes, no or the other?
5        MR. RABER:  Object to form.
6        THE WITNESS:  There is an
7   overlap of Dr. Topol's attendance
8   in a variety of forums that I've
9   been at.  So, he's almost the same
10   sort of thing.  But I think he's
11   pretty good at getting his own
12   word out.
13   BY MR. LANIER:
14   Q.   All right.  Fair enough.
15        Now, you expressed -- I want
16   to set aside the intimidation concern
17   from the letter, and I want to talk about
18   a second.  You expressed a concern about
19   suppression of data, hidden data.  Do you
20   remember that concern?
21   A.   Yes.
22   Q.   Why is it important that
23   drug companies not hide data?
24        MR. RABER:  Object to form.

Page 75

1        THE WITNESS:  It's important
2   that at any scientific endeavor
3   you report the good and the bad,
4   and you report it in an
5   evenhanded, honest, direct way and
6   you let people figure out what it
7   is.
8        You're permitted little
9   leeway in the discussion section
10   of your papers, how you interpret
11   the data.  Other people may
12   disagree with that interpretation
13   that you put on it, but they can't
14   disagree with the data and they
15   can't say you had these data and
16   you deliberately took them out of
17   the paper.
18   BY MR. LANIER:
19   Q.   Okay.
20        Did Louis Sherwood
21   specifically tell you that Merck had some
22   data that -- about these side effects,
23   some internal data?
24   A.   Yes, he did.

Page 76

1   Q.   What did he say?
2   A.   He said the internal data
3   don't support it and words to the effect,
4   and we don't think that it's our problem.
5   Q.   Did he mention to you the
6   090 study?
7        MR. RABER:  Object to form.
8        THE WITNESS:  Not by any
9   numbers.  I didn't know the
10   specific study.
11   BY MR. LANIER:
12   Q.   Did he give you the
13   information about Merck studies that did
14   show, internal Merck studies that did
15   show the connection even before --
16   A.   No.
17   Q.   Okay.
18        Merck put out an explanation
19   to many, probably including this jury as
20   I play this tape, that any possible
21   negative finding from the VIGOR study is
22   because of naproxen's cardioprotective
23   nature.  Have you had a chance to do
24   research into naproxen?

Page 77

1        MR. RABER:  Object to form.
2        THE WITNESS:  Yes.
3   BY MR. LANIER:
4   Q.   You've done that for
5   decades, haven't you?
6   A.   Yes.
7   Q.   Didn't naproxen originally
8   get made out here somewhere?
9   A.   That's right.  Over on
10   Hillview.
11   Q.   Well, by the way, are you
12   the Dr. Fries who is behind the longest
13   running, largest arthritis study there
14   is, the Aramis study?
15   A.   Yes.
16   Q.   How many people in that
17   study?
18   A.   In the very state of angst
19   ^ , about 17,000.
20   Q.   17,000?
21   A.   Yes.
22   Q.   How long has that been going
23   on?
24   A.   30 years.

20  (Pages 74 to 77)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 78

1      Q.   30 years.  A lot of those
2  people take naproxen?
3      A.   Yes.
4      Q.   Have you written up any
5  papers or anybody else written up any
6  papers from the largest, longest running
7  study that says naproxen is five times
8  better than aspirin at stopping heart
9  attacks?
10       MR. RABER:  Object to form.
11       THE WITNESS:  Our research
12    is not -- the data banks aren't
13    set to answer that specific
14    question.  But we have studied the
15    general overall toxicities and
16    certainly nothing jumped out with
17    regard to cardiovascular events
18    being protective.  Internally at
19    what was then Syntex, who had
20    developed naproxen --
21  BY MR. LANIER:
22      Q.   Syntex is a company?
23      A.   Syntex was a company which
24  is now, if I'm correct, it has, in a

Page 79

1  series of big fish eating littler fish,
2  arrived as a part of Pfizer.
3      Q.   Oh, okay.  All right.
4       So, the company that started
5  naproxen, go ahead.
6      A.   Yes, yes.
7      Q.   What happened with them and
8  naproxen?
9      A.   Well, Syntex.  Well, they
10  were looking for indications of it and
11  one obvious indication was that you could
12  prevent heart attacks, because the then
13  theory of how aspirin prevented heart
14  attacks, which was known, was that it was
15  an action of the platelets.  And the
16  action of the platelets by aspirin is
17  irreversible so that for the entire life
18  of the platelet, it --
19      Q.   Will never clump.
20      A.   -- will never clump.  Okay.
21  And naproxen has a similar effect on the
22  platelet, but it lasts only while the
23  drug is still circulating in the blood
24  stream, not for the life of the platelet.

Page 80

1  So, it is called reversal inhibition of
2  cyclooxygenase in the platelets.  Okay.
3       But nevertheless, because it
4  is longer acting, one could make the case
5  that it would prevent heart attacks, and
6  so they did a lot of internal speculation
7  because it would be a big market if they
8  could make the case that it prevented
9  heart attacks, and they never could make
10  that case.  And the studies both before
11  and after, if you take them in the
12  aggregate, indicate that this is not the
13  case.
14      Q.   Naproxen is not the --
15      A.   It does not prevent heart
16  attacks to any degree which is measurable
17  in any studies.
18       MR. RABER:  Objection, move
19    to strike.
20       MR. LANIER:  Okay.
21       Sir, thank you so much.  I'm
22    going to take the rest of my time
23    and seed it back to Troy, because
24    he may have some more detailed

Page 81

1  questions that he didn't have time
2  for.
3       Thank you, Troy.
4       MR. RAFFERTY:  Thank you.
5       MR. LANIER:  Thank you, sir.
6  Appreciate it.
7       THE VIDEOTAPE TECHNICIAN:
8  Just to let you know, it's 20
9  minutes.
10       MR. RABER:  20 minutes left?
11       MR. LANIER:  I only used 20
12  minutes?
13       THE VIDEOTAPE TECHNICIAN:
14  Actually, 21 minutes.
15       MR. LANIER:  Do you want to
16  take a break or keep going?
17       THE WITNESS:  Perhaps we
18  could take a break.  Let me just
19  check and make sure Sarah is okay.
20       THE VIDEOTAPE TECHNICIAN:
21  We are now going off the record.
22  The time is 2:04 p.m.
23          - - -
24       (Whereupon, a recess was

21 (Pages 78 to 81)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 82

1  taken from 2:04 p.m. until
2  2:13 p.m.)
3      - - -
4      THE VIDEOTAPE TECHNICIAN:
5  We are now back on the video
6  record.  The time is 2:13 p.m.
7      - - -
8      EXAMINATION
9      - - -
10 BY MR. RAFFERTY:
11     Q.   Dr. Fries, I've got just a
12 couple more questions and I'm going to --
13 I need a microphone here.
14     I have got just a couple
15 more questions and I'm going to save the
16 rest of my time for the redirect.
17     So, first, I want to make
18 sure I'm clear.  When you talked with Dr.
19 Sherwood back on November 22nd and you
20 told him about your feelings in regards
21 to the intimidation, as you phrased it,
22 and the other -- the hiding of the data,
23 did he specifically deny making those
24 phone calls or Merck making those phone

Page 83

1  calls to those investigators that you
2  talked to?
3      MR. RABER:  Object to form.
4      THE WITNESS:  No.
5  BY MR. RAFFERTY:
6      Q.   In fact, when he said --
7  when you specifically told him -- or did
8  you specifically tell him that you had
9  never heard of harassment of
10 investigators through their institutions
11 before this, what was his response to
12 you?
13     A.   Well, it was clear that his
14 response was that he believed this to be
15 an appropriate action.  And at the
16 closing sentence of that telephone
17 conversation, I said, "Lou, you ought to
18 be ashamed of yourself," and then hung
19 up.
20     Q.   And what was his response to
21 that?
22     A.   That was the end of the
23 conversation.
24     Q.   That was the end of the

Page 84

1  conversation.
2      Let me ask you just very
3  quickly.
4      Do you know a Karen
5  Levinson?
6      A.   I know the name, but...
7      Q.   Do you recall ever meeting
8  with somebody named Karen Levensen who
9  worked for Merck on September 30, 2004,
10 which would have been after the recall of
11 Vioxx?
12     MR. RABER:  Objection to
13 form.
14     THE WITNESS:  Well, I
15 assumed that I must have.  I just
16 had a couple of contacts after
17 these things we've been talking
18 about.  One was from a lawyer from
19 Merck called and said that people
20 are trying to get your letter into
21 court documents and so forth and
22 get access to it.  And we'd like
23 to say that it was not your
24 intention that it be publicly

Page 85

1  disseminated.  And I said, well,
2  that's right, it wasn't my
3  intention that it be publicly --
4  all my efforts were to try to keep
5  this in a civilized way between
6  people that should have similar
7  interests and not to do it
8  publicly, and so we were trying to
9  keep the publicity and so forth
10 down.
11     So I told him, yes, I did
12 intend that it be held -- again, I
13 told him I would give copies to
14 the people I named and a few other
15 people, but I had not gone to any
16 effort to disseminate it.  And he
17 said, well, would you sign an
18 affidavit to that effect and I
19 said yes, I would.
20     And then I heard probably a
21 year went by, nothing, and then
22 somebody came in with an affidavit
23 which I signed with words to that
24 effect.

22  (Pages 82 to 85)

Golkow Litigation Technologies - 877.DEPS.USA

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 86

1  BY MR. RAFFERTY:
2      Q.   Did you have any other
3  conversations with Merck lawyers after
4  that?
5      A.   I don't believe so.  Is
6  Karen Levinson a lawyer?
7      Q.   I've just got some documents
8  that were produced from Merck indicating
9  that a sales rep named Karen Levinson
10  called on you on September 30, 2004.
11      A.   I would not remember that.
12      Q.   I'm just curious what that
13  was about.  Saying she was talking to you
14  about Vioxx.
15      MR. RAFFERTY:  Okay.
16      I'm going to save the rest
17  of my time for the redirect and
18  turn the questioning now over to
19  Mr. Raber.
20      MR. RABER:  Okay.
21      We need to break for a few
22  minutes here so that we can move
23  everybody around.
24      THE VIDEOTAPE TECHNICIAN:

Page 87

1      We're now going off the video
2  record.  The time is 2:16 p.m.
3      - - -
4      (Whereupon, a recess was
5  taken from 2:16 p.m. until
6  2:21 p.m.)
7      - - -
8      THE VIDEOTAPE TECHNICIAN:
9  This is the beginning of Videotape
10  Number 2.  We are now back on the
11  video record.  The time is
12  2:21 p.m.
13      - - -
14      EXAMINATION
15      - - -
16  BY MR. RABER:
17      Q.   Good afternoon, Dr. Fries.
18  My name is Steve Raber and I'm an
19  attorney for Merck, and I have some
20  questions for you.  And hopefully we'll
21  be able to get you out of here pretty
22  quickly this afternoon.
23      I want to followup on
24  questions about your reasons for writing

Page 88

1  the letter to Mr. Gilmartin.  I think you
2  said that you wanted to deal with some
3  things in a private way?
4      A.   That's right.  I started and
5  I tried to indicate in the letter my
6  great approval of Merck as a company, and
7  I followed it over the years with top
8  five respected companies in the United
9  States and so forth.  And I respected a
10  lot of the things that they did,
11  respected their previous chairman
12  immensely, who I now know a little bit,
13  Roy Vagelos, who did extraordinary things
14  for Merck from the scientific side.
15      Q.   Is it fair to say that one
16  of your concerns was whether what you had
17  heard about reflected a culture change at
18  Merck or whether it was an aberration?
19      A.   That's right.  It was a
20  question of whether there was a single
21  loose canon involved or a small group of
22  people who were behaving irresponsibly
23  from the standpoint of the company, and
24  the company might not be aware of that

Page 89

1  and the company might not like that.  And
2  so that occurred to me.
3      And then the other was a
4  possibility that the entire corporate
5  culture had shifted so that this was the
6  kind of thing that they were doing.
7      Q.   You received a letter from
8  Mr. Gilmartin in response to your letter?
9      A.   Yes.
10      Q.   What was your reaction to
11  receiving that letter?
12      A.   Well, I think any of us, I
13  was pleased that rather promptly a
14  response had come which had taken the
15  letter seriously and which had promised
16  some action.  I recognized that it was --
17  that I was going to be running into
18  damage control types of activities, so, I
19  interpreted that and subsequent
20  conversations as having in part some
21  degree of damage control.  People wanted
22  me to be happy with the actions that were
23  being taken.
24      Q.   I take it was there some

23 (Pages 86 to 89)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

---

Page 90

1  thought of going public with this matter
2  when you were raising these concerns?
3      A.   Not initiated by me, but
4  there was a lot of media interest, and
5  I'm not sure exactly how that came about
6  or who it came about from.  Just about
7  the time that the letter went in, USA
8  Today wanted to run a piece on it.  I
9  told them some things off the record, but
10  I told them that they couldn't use it,
11  and encouraged them not to.
12      Q.   As a result of the way Merck
13  responded to the concerns you expressed,
14  did you speak with USA Today?
15      A.   No.
16      Q.   Why not?
17      A.   I think I told them before I
18  even had the response, I don't think
19  those two things were connected.  I
20  basically wanted to try and handle this
21  internally, because I thought that I
22  could get Merck to see that this was not
23  a really good thing to be doing.  I've
24  since learned what everybody has learned

---

Page 91

1  from the paper, but I'll talk about what
2  I knew then.
3      Q.   Well, let's talk about what
4  you knew then.
5          Were you satisfied with
6  Merck's response to your concerns?
7      A.   Yes.  And I thought about --
8  I mean, they didn't say specifically what
9  they were going to do with Dr. Sherwood,
10  but they said that something was going to
11  happen.
12      Q.   After you raised your
13  concerns with Mr. Gilmartin at Merck, did
14  you hear reports of any other activities
15  by Merck that you would construe as
16  intimidation or impinging on academic
17  freedom?
18      A.   No.  In the narrow sense of
19  that question, I don't think so.
20      Q.   Well, did you hear any
21  additional instances of the nature that
22  you complained about in your letter after
23  you raised those concerns with Mr.
24  Gilmartin?

---

Page 92

1      A.   No, but I do think there was
2  some structural problems with what I know
3  now as opposed to what I knew then, that
4  some of the other -- some of the
5  activities in which data were kept or
6  people were instructed not to answer
7  questions on the subject or so forth,
8  that they did reflect the corporate
9  culture.  That wasn't the issue I had
10  with it.
11          MR. RABER:  I'm going to
12  object and move to strike as
13  nonresponsive.
14  BY MR. RABER:
15      Q.   Sir, did you receive the
16  data relating to Vioxx that you had
17  requested?
18      A.   I didn't request data per se
19  for me.  I requested the data be made
20  available to others.  I wasn't
21  specifically studying --
22      Q.   Were you satisfied that
23  Merck made that data available to others?
24      A.   I believe so, yes.

---

Page 93

1      Q.   Is it fair to say then that
2  as of about March of 2001, as far as you
3  were concerned, the matter was closed?
4      A.   My job here was done.
5      Q.   Dr. Fries, I take it that
6  Merck chose not to rebut the points in
7  your letter, but, rather, to address your
8  concerns.  Is that a fair assessment?
9      A.   That's true.
10          MR. RAFFERTY:  Object to
11  form.
12  BY MR. RABER:
13      Q.   Yes?
14      A.   Yes.
15      Q.   You mentioned this morning
16  that Dr. Singh is no longer employed at
17  Stanford; is that correct?
18      A.   Yes.
19      Q.   That's correct?
20      A.   Yes.
21      Q.   When did he leave Stanford?
22      A.   A year ago.  I'm not
23  actually positive.
24      Q.   Did Dr. Singh ever hold a

---

24  (Pages 90 to 93)

22ebf3d7-e389-4696-ba87-e2975078da5f