ROUGH DRAFT - Confidential - Subject to Protective Order

Page 94

1  faculty position at Stanford?
2      A.   No, not in a true faculty
3  position.  He was an adjunct clinical
4  professor which is someone who goes to a
5  clinic as a voluntary person.  He was a
6  researcher -- he had a title called
7  senior medical scientist, which used to
8  be called senior research associate.
9      Q.   Dr. Fries, I want to talk to
10 you a little bit about you referred to an
11 investigation that you did into things
12 that you had heard in the rumor mill.  Do
13 you remember that?
14     A.   Yes.
15     Q.   I take it that you didn't
16 have firsthand knowledge about the
17 matters that you testified about in your
18 letter.  Is that fair to say?
19        MR. RAFFERTY:  Object to
20     form.
21        THE WITNESS:  I believe
22     that's probably true.  That was
23     one reason I tried to be as
24     careful and as balanced as I

Page 95

1      could, because I was getting
2      dangerously toward what I would
3      even call hearsay if I got too
4      far.
5  BY MR. RABER:
6      Q.   And, of course, you can't be
7  expected to have firsthand knowledge of
8  all these things with the different
9  doctors that you were writing about,
10 right?
11     A.   That's right.
12     Q.   And is it fair to say that
13 certain doctors and Dr. Singh told you
14 things and then you relayed that
15 information to Merck?
16     A.   Yes.
17        - - -
18     (A discussion off the record
19     occurred.)
20        - - -
21 BY MR. RABER:
22     Q.   Did you know any of the
23 eight doctors that are referred to in
24 your letter before sending your letter to

Page 96

1  Gilmartin?
2      A.   Yes.
3      Q.   Did you know them well?
4      A.   Some of them I knew well.
5      Q.   Did you know Dr. McMillen
6  very well?
7      A.   No.
8      Q.   I take it then that you
9  relied on what you were told by Dr. Singh
10 and these other doctors?
11     A.   Yes.  Also, it wouldn't be
12 fair to say that I was not aware of these
13 issues myself, that is, the absence of
14 data which was of interest was something
15 that was commonly known to all -- well,
16 many, many rheumatologists at that time.
17     Q.   The data you're talking
18 about are edema, hypertension, the things
19 you told us about earlier, correct?
20     A.   Well, but also the heart
21 attack data not appearing in subsequent
22 manuscripts, where it clearly should have
23 been placed.
24     Q.   But the heart attack data

Page 97

1  was clearly in the public domain, wasn't
2  it, throughout 2000?
3      A.   I think that it was not.  I
4  talked with Claire ^ about it a good
5  deal, the senior investigator on that was
6  a physician that I trained here.  And
7  there were some issues with the journal
8  about putting in some things the
9  investigators wanted in.  It was part her
10 view, that they would have put more in,
11 but the journal wouldn't let you, with
12 space constraints and other things.
13     Q.   I'm not talking about the
14 New England Journal, I'm talking about
15 just it was publicly known in let's say
16 the summer of 2000 that there were
17 significantly more heart attacks in the
18 Vioxx group than in the naproxen group.
19 Would you agree with that?
20     A.   It was known by a small,
21 relatively small number of people who
22 focus on these things.  If you had asked
23 generically probably rheumatologists, I
24 would say it was not well known.  And if

ROUGH DRAFT - Confidential - Subject to Protective Order

1  you said general public, I would say it
2  wasn't known at all.
3       MR. RABER:  I want to mark
4       this as Defense Exhibit 132.
5            - - -
6       (Whereupon, Deposition
7       Exhibit Fries-132, DESCRIPTION,
8       was marked for identification.)
9            - - -
10 BY MR. RABER:
11      Q.  Dr. Fries, I've placed in
12 front of you an exhibit that's marked as
13 Defense Exhibit 132.  I'll represent to
14 you it's an article from the Wall Street
15 Journal dated May 1st, 2000.  Do you see
16 that?
17      A.  Uh-huh.
18      Q.  I'm sorry.  You need to say
19 yes or no.
20      A.  Yes.
21      MR. RAFFERTY:  I'm sorry, do
22      you have an extra copy?
23 BY MR. RABER:
24      Q.  What does the headline of

1  that article says?
2       A.  "Shares of Merck sink on
3  worries over Vioxx."
4       Q.  And I would like to have you
5  look towards the bottom half of the page
6  there.  There's a heading that says
7  "Statistically Significant."  Do you see
8  that?
9       A.  Yes.
10      Q.  Okay.
11           And what does the first
12 sentence under that say?
13      A.  "The root of the problem
14 started in late March when Merck reported
15 the preliminary results of a large test
16 of Vioxx and rheumatoid arthritis
17 patients."
18      Q.  Okay.
19           And the last sentence of
20 that paragraph says what?
21      A.  It says, "But in footnotes,"
22 not the body, but in footnotes to the
23 trial, "Merck noted that 0.5 percent of
24 those taking Vioxx had heart attack,

1  compared with 0.1 percent who took
2  naproxen, a statistically significant
3  difference."  All true.
4       Q.  So, at least as of May of
5  2000, the people at the Wall Street
6  Journal knew that there was a
7  statistically significant difference in
8  heart attacks between Vioxx and naproxen
9  in the VIGOR study; true?
10      A.  Yes.  But I don't believe
11 that that means that the general public
12 nor the general rheumatologists knew it
13 or believed it.  Part of what happened in
14 the VIGOR trial, if you look at it, and
15 you see where the --
16      Q.  Sir, I'm going to --
17      MR. LANIER:  Let him finish.
18      MR. STEIN:  Let him finish.
19      MR. LANIER:  Let him finish.
20      MR. RABER:  I'm going to
21 object, because --
22      MR. LANIER:  Do not -- you
23 can object when he's done, Steve.
24 You cannot interrupt him.

1       MR. RABER:  You interrupted
2  him and told him that you didn't
3  want the hearsay part of his
4  answer because you had a time
5  concern.
6       MR. LANIER:  But I still
7  gave him a chance to finish the
8  answer.  I'm telling you, you
9  cannot do this.  I'll get the
10 judge on the phone in a heartbeat.
11 You let him finish the answer.
12      MR. RABER:  The question was
13 whether it said --
14      MR. LANIER:  Let him finish
15 the answer.
16      MR. RABER:  If you want to
17 followup, you can.
18      MR. LANIER:  No.  Let him
19 finish the answer.  You can't
20 interrupt him.
21      Sir, please finish your
22 answer on the VIGOR study.
23      MR. RABER:  No, no.
24      MS. COVEY:  You can answer.

26 (Pages 98 to 101)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 102

1      MR. RABER:  Let me ask
2   another question.
3      THE WITNESS:  All right.
4      I believe that the case is
5   attempting to be made that, in
6   fact, because something is
7   published in some place in some
8   form, everybody knows about it.
9   And I don't believe that that's
10  true.  Although people following
11  the stock may have believed that.
12  I believe that if you look and
13  inspect the article in question,
14  which is being quoted as the root
15  for here, you'll find that those
16  statistics do not jump out at you
17  and that they are explained away
18  for reasons which, as I previously
19  discussed, are weak reasons.
20  BY MR. RABER:
21     Q.   And is that because the
22  alternative explanation that Vioxx might
23  cause heart attack is obvious in your
24  mind from that data or chance?

Page 103

1      A.   I'm not positive how
2   independent we are of things that I've
3   already said, but there were three
4   arguments that were made that could
5   have -- that were made to defend the fact
6   that it didn't cause heart attacks.
7      Q.   And you already talked about
8   that?
9      A.   I've already talked about
10  those.
11     Q.   Okay.
12        Let me go back to your
13  letter.  You've told us that you relied
14  on what you were told by doctors and Dr.
15  Singh.  Did you talk to any third parties
16  to confirm or verify what you had been
17  told by any of those doctors?
18     A.   No.
19     Q.   So, for example, if we look
20  at Exhibit P 1.0176, which is your
21  January 9, 2001 letter, on the third page
22  of that letter, towards the top, it says,
23  "Dr. McMillen believes that his VCF
24  appointment at Hershey was revoked

Page 104

1   because of these accusations."  Do you
2   see that?
3      A.   Yes.
4      Q.   Now, is that something that
5   Dr. McMillen told you?
6      A.   That's right.
7      Q.   Did you ever speak with
8   anybody at the Hershey Medical Center to
9   verify Dr. McMillen's version of the
10  events?
11     A.   No.  But Dr. McMillen who,
12  again, I did not know then and I do not
13  know now, sent me a whole packet of
14  materials which were communications
15  between he and Merck, taking him out of
16  some clinical trials, and he was the one
17  who said that these letters looked like
18  they were a pattern of intimidation to
19  me.
20        There were more than one of
21  them and they were citing specific things
22  that were cancelled, cancelled to
23  clinical trials that he couldn't
24  participate in.

Page 105

1      Q.   Sir, the question was, did
2   you speak with anybody from the Hershey
3   Medical Center to verify what Dr.
4   McMillen had told you?
5      A.   No.
6      Q.   I would like to show you a
7   document that we'll mark as defense
8   Exhibit 952.
9        MR. LANIER:  Has this been
10       produced previously in discovery?
11       MR. RABER:  Yes.
12       MR. BOEHN:  Counsel, do you
13  have a copy?
14       MR. RABER:  I do, I'm sorry.
15  BY MR. RABER:
16     Q.   Dr. Fries, you have in front
17  of you Defense Exhibit Number 952.  Does
18  this appear to be a letter from the
19  Hershey Medical Center dated February
20  1st, 2000?
21     A.   Yes.
22     Q.   From a --
23     A.   I'm familiar with this
24  letter.

27 (Pages 102 to 105)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 106

1     Q.   Okay.
2          This letter was among the
3     documents that Dr. McMillen gave to you?
4     A.   Probably.
5     Q.   It was in your file?
6     A.   Yes.
7     Q.   And does this letter
8     describe Dr. McMillen's status with the
9     Hershey Medical Center?
10    A.   Yes.  It purports to.
11    Q.   Okay.
12         And it says in the second
13    paragraph, "Dr. McMillen held an
14    appointment as clinical assistant
15    professor of medicine from July 1st, 1978
16    to December 31st, 1999, at the Milton S.
17    Hershey Medical Center at the
18    Pennsylvania State University College of
19    medicine," correct?
20    A.   Yes.
21    Q.   All right.
22         At the bottom of the first
23    page, it says "Dr. McMillen currently has
24    an intensive and ongoing commitment to

Page 107

1     clinical studies and a very active
2     speaking schedule," true?
3     A.   Yes.  That's what it says.
4     Q.   And that speaking schedule
5     you understood was on behalf of Pfizer?
6     A.   I have no knowledge of what
7     components of the speaking schedule are.
8     Q.   Then the letter from the
9     Hershey Medical Center states,
10    "Recognizing his past teaching
11    contributions but acknowledging that he
12    has not been actively involved in
13    teaching our students or house staff in
14    recent years, his clinical faculty
15    position has not been renewed."  Do you
16    see that?
17    A.   Yes.
18    Q.   It appears that Dr. McMillen
19    was no longer -- no longer had a faculty
20    appointment at Hershey because he had
21    stopped teaching, true?
22         MS. COVEY:  Calls for
23    speculation.
24         MR. RAFFERTY:  Object to the

Page 108

1     form.
2          MR. LANIER:  Objection.
3          THE WITNESS:  Let's go back
4     to the -- I do not believe that is
5     true in the true sense of true.
6     It's instructive that in the last
7     paragraph -- I read this the same
8     way McMillen read this.  This is a
9     kind of a letter that we use when
10    people have been terminated which
11    means that you didn't do it in any
12    way that could activate any
13    reaction from the individual
14    because you had plausible
15    deniability about why you actually
16    fired him.
17         And the key to that in this
18    letter, within this letter is the
19    word "will," which is in the very
20    last sentence.  And in that very
21    last sentence it says, "Similar
22    reviews will be under way."
23         So, in other words, he was
24    the first.  They took him out of

Page 109

1     order and they say here they are
2     going to do reviews like this of
3     everybody, but they hadn't done
4     them yet.  They had just done them
5     for him.  So, I interpret this the
6     opposite way.
7          I've seen many, many letters
8     like this.  And I see this as just
9     another one.
10    BY MR. RABER:
11    Q.   Well, make no mistake,
12    though, the letter says that his faculty
13    position was not renewed because he has
14    not been actively involved in teaching
15    students or house staff in recent years,
16    correct?
17    A.   But that's very common for
18    these kinds of appointments.
19    Q.   But that's what the letter
20    says?
21    A.   Yes.  And I pointed out
22    reasons why I don't believe that that is
23    probably the real thinking of the person
24    that wrote the letter.

28  (Pages 106 to 109)

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 110

1    Q.   Sir, do you acknowledge the
2  situation with your letter to Mr.
3  Gilmartin presented somewhat of a he said
4  she said dispute?
5           MR. RAFFERTY:  Object to the
6           form.
7           THE WITNESS:  No.  I was
8           directly present in accusatory
9           statement which is no hearsay to
10          this.  Things were said by Dr.
11          Sherwood to me.
12 BY MR. RABER:
13   Q.   Right.
14       But in terms of other
15 doctors and things like that, it's --
16   A.   Like always, if I'm going to
17 talk to the chief of the NIH clinical
18 research area in rheumatology, a friend
19 of mine for 20 years, and he tells me
20 that he's never had anything like this
21 happen, that they came and marched into
22 his room and wanted to look at all his
23 slides, made a special trip to
24 Southwestern, where he was to do this,

Page 111

1  and I believe him, yes.
2       If the chairman of the FDA
3  advisory board tells me the same thing
4  and talks about one of his appointments,
5  Harvard appointments being threatened in
6  this way, then I believe him.  Yes, I
7  believe him.
8    Q.   Sir, do you at least
9  acknowledge that in a situation like this
10 you might hear different versions
11 depending on who you talk to?
12   A.   Who else?
13   Q.   Well, first --
14   A.   Who else are we talking
15 about?
16   Q.   Well, for example, we saw
17 that the Hershey hospital stated reasons
18 for the nonrenewal of Dr. McMillen's
19 faculty appointment that are different
20 from what Dr. McMillen believed, true?
21   A.   Yes.
22   Q.   Dr. Fries, have you ever in
23 your career in doing studies dealt with
24 data that is confidential in nature?

Page 112

1    A.   Yes.
2    Q.   And it's confidential until
3  it is either published or perhaps
4  presented to the FDA?
5    A.   Yes.  We don't usually use
6  the word "confidential," but in effect
7  you are correct.
8    Q.   And you understand that
9  pharmaceutical companies sometimes have
10 in their possession data that's treated
11 as confidential until it is either
12 published or made publicly available
13 through the FDA?
14   A.   Yes.  That's fair.  Yeah.
15   Q.   Nothing unusual about that?
16   A.   No.  But I tend to -- I
17 think that my previous testimony here has
18 kind of indicated that there's sort of
19 shades of gray in all of these kinds of
20 things, and that some things are common
21 practice, and in some things we would
22 scientifically want premature data not to
23 be released, because it would be
24 confusing and misleading.

Page 113

1       And at some other time, we
2  would like to say that if a company has
3  internal data which is suggesting that
4  their drug causes heart attacks, that
5  they incur a social responsibility, which
6  is a major one, to get all of that data
7  out in the public domain just as quickly
8  and as completely as they can.
9           MR. RABER:  Move to strike,
10          nonresponsive.
11 BY MR. RABER:
12   Q.   Dr. Fries, let's go back to
13 your letter.  On Page 3 of your letter,
14 you state near the top that, "Dr. Simon
15 believes that one of his two academic
16 appointments has been jeopardized."  Do
17 you see that?
18   A.   Yes.
19   Q.   Is that something Dr. Simon
20 told you?
21   A.   Yes.
22   Q.   Did you talk with Dr.
23 Simon's boss or anybody to verify that?
24   A.   No.

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 114

1    Q.  No?
2    A.  And I tried when I wrote
3  this to be as careful as I could with
4  words.  So, it was me, not you, that said
5  Dr. Simon believes.  He did believe that.
6  I know that for sure.  But I don't know
7  that his belief was correct, and I tried
8  to indicate that.
9    Q.  Is it possible that his
10  belief was incorrect?
11    A.  Of course.  Just like it was
12  possible that Dr. McMillen's belief was
13  incorrect.
14    MR. RABER:  How am I doing
15  on time?
16    THE VIDEOTAPE TECHNICIAN:
17  You have an hour -- sorry.  You
18  have an hour -- you went for 23
19  minutes, so you have --
20    MR. RABER:  An hour and
21  30 --
22    THE VIDEOTAPE TECHNICIAN:
23  Right.  You have an hour, 40.
24  BY MR. RABER:

Page 115

1    Q.  Now, you made reference to
2  some intimidation that you heard about
3  that related to a Dr. Lipsky and a Dr.
4  Whelton?
5    A.  Uh-huh.
6    Q.  Yes?
7    A.  Yes.
8    THE VIDEOTAPE TECHNICIAN:
9  Doctor, watch your glasses.  They
10  are hitting the mike.
11    MR. RABER:  Let's mark this
12  next document as Exhibit 953.
13    - - -
14    (Whereupon, Deposition
15  Exhibit Fries-953, DESCRIPTION,
16  was marked for identification.)
17    - - -
18  BY MR. RABER:
19    Q.  Dr. Fries, we've put in
20  front of you a document marked as Defense
21  Exhibit 953, which I'll represent to you
22  is an article from the Philadelphia
23  Inquirer in 2005, specifically on June
24  5th of 2005.  I would ask you if you

Page 116

1  would, turn to the second page of this
2  exhibit.
3    A.  Yes.
4    Q.  In the far right column of
5  that page there's a paragraph that
6  begins, "He cited Singh, Simon and
7  Stillman."  Do you see that?
8    A.  Oh, yeah.
9    Q.  Okay?
10    A.  Uh-huh.
11    Q.  And this article states,
12  "Two of them, former Arthritis Institute
13  director Peter Lipsky, and Johns Hopkins
14  University director Andrew Whelton, said
15  in interviews that they had heard of
16  Merck complaints about their work, but
17  had never felt threatened nor had gotten
18  calls from Sherwood."  Do you see that?
19    A.  Yes.
20    Q.  Do you allow that it is
21  possible that neither Dr. Lipsky nor Dr.
22  Whelton ever felt threatened or
23  intimidated by Merck?
24    A.  Yes.  I think it's possible.

Page 117

1  In explanation, this to me, seems sort of
2  like hearsay, because you've got
3  something here, but I'll give you my
4  interpretation of this.
5    When I talked with Peter, he
6  was the one, he was still at
7  southwestern.  He wasn't yet at the NIH
8  at his NIH position.  And he had a slide
9  presentation which Merck had objected to.
10  And what they did was to put pressure on
11  him internally to review the slides that
12  he had shown at that time.
13    Peter is not an easily
14  intimidated guy, and I'm sure he didn't
15  feel particularly intimidated.  He did
16  feel pissed off, if I could put that in
17  the deposition, because it was using his
18  time to be back over something that he
19  shouldn't be challenged on.
20    And Andy was a little bit --
21  Andy Whelton, I've known since we were
22  fellows together at Hopkins in the renal
23  lab in '66, and he's a very good guy.
24  And he's in a different area, and his

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 118

1  complaints were he did -- I did not cite
2  him in my letter, for example, as having
3  been called by Sherwood.
4      Q.   But at least if we accept
5  these statements from these individuals,
6  they didn't feel threatened or
7  intimidated by Merck.  Do you agree with
8  that?
9         MR. RAFFERTY:  Objection to
10     the form.
11        MS. COVEY:  Objection,
12     calling for speculation.
13        THE WITNESS:  Yeah, I said
14     in my letter that I didn't really
15     feel intimidated, you know.  I
16     said maybe a little.  I mean,
17     it's -- I think there were some
18     other interesting things in just
19     scanning.  I hadn't seen this
20     document.  But as I did look
21     through it, there were some
22     fascinating things about it where
23     some of those things that I said
24     that Simon said are reinforced,

Page 119

1      you know, and so forth.
2  BY MR. RABER:
3      Q.   Let's talk about that.  If
4  you look at the second page in front of
5  you there with Dr. Simon, do you see in
6  the middle column there?
7      A.   Yeah.
8      Q.   And it says in quotes, it
9  says, "No specific action was taken
10 against me, but there was a reputational
11 issue, said Simon."  Do you see that?
12     A.   Yes.
13     Q.   Now, your letter indicated
14 that Dr. Simon believes that one of his
15 two academic appointments had been
16 jeopardized.
17     A.   Yes.
18     Q.   It appears in this that Dr.
19 Simon said no specific action was taken
20 against him.  Would you agree with that?
21     A.   Yeah.  Threatened and
22 taking -- yeah.  I see them as
23 consistent.  Yes.
24     Q.   Do you see these as

Page 120

1  consistent?
2      A.   Yeah.
3      Q.   Okay.
4         Look a little further down
5  where it says, "His boss at Harvard,
6  Steven Weinberger, now a vice president
7  at the American College of Physicians in
8  Philadelphia, confirmed getting
9  Sherwood's call but said it, 'had nothing
10 to do,' with Simon's promotion.  'Lou
11 Sherwood was not at all threatening me,'
12 Weinberger said, adding that he had
13 skipped over Simon because of unrelated
14 questions about his record running the
15 school's graduate medical education
16 program."  Do you see that?
17     A.   Yes.
18     Q.   Does that seem to be a
19 little different version of events than
20 what's laid out in your letter to
21 doctor -- to Mr. Gilmartin?
22     A.   No.  I don't believe so.  I
23 didn't say that people that I hadn't
24 talked with had said they were

Page 121

1  threatened.  I said they had gotten
2  calls.  And I said that the chairman of
3  my department had gotten calls.  I didn't
4  say that they had been threatened.  The
5  target was Simon.  The target was really
6  not Harvard.
7      Q.   Well, would you agree with
8  me that it is possible that Dr.
9  Simon's -- none of Dr. Simon's academic
10 appointments was affected or jeopardized
11 in any way by anything Merck or Lou
12 Sherwood did?  Would you allow for that
13 possibility?
14     A.   I put the word believes in
15 the letter because I thought that I
16 couldn't state with certainty.
17     Q.   You mentioned earlier there
18 is an Edward Harris?
19     A.   Yeah.
20     Q.   Was he your boss at
21 Stanford?
22     A.   He was chairman of the
23 department of medicine before Dr. Schwane
24 ^ , and then when he left that, he became

31 (Pages 118 to 121)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

---

**Page 122**

1 a chair of our division of rheumatology
2 and immunology.  And he retired a few
3 years ago.
4     Q.   You have a good relationship
5 with Dr. Harris?
6     A.   Yes.
7     Q.   And respect him?
8     A.   Yes.
9     Q.   Okay.
10     I think you mentioned that
11 Dr. Sherwood also called Dr. Harris?
12     A.   Yes.
13     Q.   How did Dr. Harris react to
14 that, if you know?
15     A.   You know, I don't remember.
16 But I know that he shared my general
17 concerns about the academic freedom
18 issues.  And I did run some drafts
19 through him.  While we were working the
20 more inflammatory lines out of this
21 letter, he was assisting in that
22 polishing process.
23     Q.   I would like to show you, if
24 we could, a document that we will mark

---

**Page 123**

1 as -- excuse me, can I sea just see what
2 number that is?
3     A.   Uh-huh.
4     Q.   Defense Exhibit 954.
5         - - -
6     (Whereupon, Deposition
7     Exhibit Fries-954, DESCRIPTION,
8     was marked for identification.)
9         - - -
10 BY MR. RABER:
11     Q.   Dr. Fries, Exhibit 954 is a
12 string of e-mails between Edward Harris,
13 Jr. at Stanford and Lou Sherwood at
14 Merck.  Can you see that?
15     A.   Yes.  I believe I've seen
16 this before.
17     Q.   Okay.
18     A.   It seems vaguely familiar.
19     Q.   All right.
20     And if you look at the
21 bottom, it appears that Dr. Harris is
22 sending an e-mail to Dr. Sherwood on
23 November the 14th of 2000, true?
24     A.   Yes.

---

**Page 124**

1     Q.   So, that would have been a
2 couple of weeks after your -- the phone
3 call that you received from Dr. Sherwood,
4 right?
5     A.   I guess so, yes.
6     Q.   Okay.
7     And that would have been
8 after you had spoken with Dr. Sherwood at
9 the ACR meeting?
10     A.   I suspect before that.  We
11 would have to check the record.
12     Q.   Okay.
13     Let's look.  It says, the
14 e-mail says, "Lou, Congratulations on
15 getting that piece of glass in return for
16 Merck's nice contributions to the ACR."
17 Do you see that?
18     A.   I believe that Dr. Harris
19 may have been president of the ACR that
20 year.
21     Q.   Okay.
22     A.   And so this would apply.  I
23 would have to check the dates, but this
24 would imply that this was after.

---

**Page 125**

1     Q.   Okay.
2     And do you know what Merck's
3 nice contributions to the ACR are that
4 are being referred to there?
5     A.   Well, I've talked about the
6 support that Merck has given in research
7 and a lot of areas, and they've done
8 good -- I have no criticism for the good
9 things that Merck has done, and I try and
10 illustrate those thing in the letter.
11     And Ted, in his position,
12 again, you know, I believe that we've
13 probably all seen letters like this a lot
14 of times, okay, and they come and you've
15 got somebody out there who is a potential
16 donor and you stroke them a little bit,
17 and so forth so you say friendly things.
18 But I don't think I had talked with Ted
19 at this time about these issues.
20     Q.   Do you think Dr. Harris was
21 just stroking Dr. Sherwood here?
22     A.   I think that this was before
23 he was aware of some of the things in the
24 subsequent conversations that I had with

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 126

1   Dr. Harris.
2        Q.   Well, the next sentence
3   says, "I understand that you have some
4   concerns about comments made by Dr.
5   Singh." Do you see that?
6        A.   Uh-huh.
7        Q.   And you understand that
8   refers to conversations between Dr.
9   Sherwood and Dr. Harris about Dr. Singh?
10       A.   Yes.
11       Q.   Okay.
12            And what did Dr. Harris say
13  to Dr. Sherwood in this e-mail, the next
14  sentence there?
15       A.   Essentially what I said to
16  Dr. Sherwood.  He says here, "I welcome a
17  formal letter so that we can conduct an
18  inquiry."
19       Q.   It says, "I would welcome a
20  formal letter from you that could
21  generate the appropriate process for
22  inquiry and clarification, and, if
23  necessary action," true?
24       A.   That's right.

Page 127

1        Q.   And so do you interpret that
2   as -- is it a fair interpretation of that
3   that Dr. Harris was encouraging Dr.
4   Sherwood to express his concerns about
5   Dr. Singh?
6            MR. RAFFERTY:  Object to the
7        form.
8            THE WITNESS:  I believe that
9        Dr. Harris was doing the same
10       thing I did when I first heard
11       about the allegations, is to
12       investigate, conduct an inquiry to
13       determine as nearly as he could
14       where the truth lay.  And not to
15       ignore it or not to stonewall it,
16       but to actually look at it.  And I
17       think this is very appropriate.  I
18       don't think that such a letter was
19       ever received, though.
20  BY MR. RABER:
21       Q.   He says, "I would welcome a
22  formal letter," doesn't he?
23       A.   Yes, but --
24       Q.   Is a fair interpretation of

Page 128

1   that that as of November of 2000 he was
2   encouraging Dr. Sherwood to pursue this
3   matter?
4        A.   Oh, he was encouraging him
5   to pursue it to formally encourage, to
6   put in writing what he was saying
7   verbally.  That's what Dr. Harris was
8   doing.  But I don't think that there was
9   ever a formal letter lodged.  And I can
10  think of some reasons perhaps why that
11  would have not have occurred.  It was a
12  clear invitation for him to send a formal
13  letter.
14       Q.   Do you see anything
15  inappropriate in these communications
16  here between Dr. Sherwood and Dr. Harris?
17       A.   No.
18       Q.   Now, looking at the top, if
19  we could, Dr. Fries, I want to see if you
20  can help me with this.  It looks like Dr.
21  Sherwood is saying, "Ted, I also
22  understand that I am supposed to be
23  receiving a letter from Stanford
24  criticizing me for raising concerns (he

Page 129

1   said that to one of the Merck people)."
2   Do you see that?
3        A.   Yes.
4        Q.   The question is, who is the
5   he?  It says, "He said that to one of the
6   Merck people"?
7        A.   I don't have the foggiest
8   idea.
9        Q.   Were you telling people that
10  you intended to send a letter
11  criticizing --
12       A.   Dr. Sherwood?
13       Q.   -- Dr. Sherwood for raising
14  concerns?
15       A.   No.  I mean, this says that
16  he was supposed to receive a letter from
17  Stanford.  I guess that's what Sherwood
18  says, right.
19       Q.   Well, the date of this
20  communication appears to be November 20,
21  2000, right?
22       A.   Yes.
23       Q.   So, that's about six weeks
24  before you sent your letter, right?

                        33 (Pages 126 to 129)

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 130

1   A.   Yeah.
2   Q.   And it appears that Dr.
3   Sherwood already knows that he might be
4   getting a letter from you?
5   A.   But there was -- well, it
6   doesn't say it was from me.  My name
7   doesn't appear here any place.
8   Q.   Well, from Stanford.
9   A.   I'm not Stanford.
10   Q.   Okay.
11   A.   I don't know whether he --
12   what he was referring to.
13   Q.   Okay.
14   He wasn't referring --
15   A.   The letter didn't exist at
16   that point, you know, so...
17   Q.   And then Dr. Harris says,
18   "Lou, if you receive such a missile, send
19   me a copy."  Do you see that?
20   A.   Uh-huh.
21   Q.   Can you think of any reason
22   why Dr. Harris would describe a letter
23   from Stanford as a missile?
24   A.   Oh, you have to know Ted.

Page 131

1   That's just the way he talks.
2   Q.   Okay.
3   What?
4   A.   He's a little flowery about
5   things.  He puts little things in his
6   sentences.  It is quite colorful.
7   Q.   I guess can you give us any
8   insight as to who might have told people
9   at Merck that Stanford would be sending a
10   letter to Dr. Sherwood criticizing him
11   for raising concerns?
12   A.   I didn't say that to Lou and
13   I didn't do it and I don't know of
14   anybody else that wrote a letter.  To me,
15   this becomes kind of, I don't know,
16   strange.  There's not enough in it to
17   tell.  You have I think access to Dr.
18   Sherwood.  He can explain why.
19   Q.   I'm just asking about the
20   e-mail.  That's all.
21   A.   Okay.
22   I don't know about it.  I
23   wasn't party to the e-mail.
24   Q.   You had conversations,

Page 132

1   though, with Dr. Harris?
2   A.   Yes, but after this.
3   Q.   Okay.
4   A.   After.  Ted's office and
5   mine abutted downstairs one floor.
6   Q.   Now, I want to talk about
7   data, Vioxx data at your January
8   9, 2001 letter.  In the middle the page,
9   there's a reference to, "A number of
10   physicians have concerns that Vioxx may
11   have some serious and under emphasized
12   drug toxicity problems, particularly the
13   50 milligram dose approved for pain
14   control."  Do you see that?
15   A.   Yes.  I mean, I don't.  I
16   recognize what you are going to say, and
17   I can't find it exactly.
18   Q.   Next page.
19   A.   Am I on the wrong page?
20   Okay.
21   Q.   I'm sorry.  Go back one
22   page.
23   A.   Okay.
24   Q.   Right there.  Do you see

Page 133

1   that?
2   A.   Yeah, okay.
3   Q.   Okay.
4   And it says, "These concerns
5   are shared by the FDA renal reviewer."
6   Do you see that?
7   A.   Uh-huh.
8   Q.   Had you reviewed comments
9   from the renal reviewer at the FDA
10   sometime before January of 2001?
11   A.   I believe I'm very fuzzy on
12   exact, on precisely.  I think that what
13   this refers to is that the FDA advisory
14   panel on which I sometimes sit, I'm kind
15   of an ad hoc reviewer for them, presents
16   and gives its advice to the FDA as to
17   whether a drug should be approved and for
18   what indications it should be approved.
19   And in the context of that, the FDA farms
20   out a whole variety of reviews, and it
21   would be a cardiovascular reviewer, an
22   arthritis effectiveness reviewer, and a
23   renal reviewer and all of these different
24   kinds of things.

34 (Pages 130 to 133)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 134

1       And so the renal reviewer at
2  that -- presenting to that arthritis
3  advisory board, which presumably would be
4  reflected in the minutes of that advisory
5  board meeting, which have got to exist
6  some place. I believe that's what I was
7  referring to.
8       Q.   Okay.
9       And looking at the top
10  paragraph of that page, it refers to Dr.
11  Singh's slide with the little man under
12  the covers. Do you see that?
13      A.   Yes.
14      Q.   And do you understand that a
15  perspective of a pharmaceutical company
16  might be different from the perspective
17  of the university when it comes to making
18  allegations like that in a public forum?
19      A.    I believe that was an
20  ill-advised slide. I would not have such
21  a slide in any presentation I had myself.
22  And it had been removed, I believe, prior
23  to when I investigated. I was told that.
24      Q.   And it was removed,

Page 135

1  according to your letter, because it
2  appears that Dr. Singh was able to get
3  the requested data from Merck?
4       A.   Again, and I only get close
5  to hearsay, that was what Dr. Singh told
6  me about why he had removed it.
7       Q.   Okay.
8       A.   Because when he showed me
9  the slides, I said where are the slides?
10  He said here are the slides. And as I
11  looked through them and there wasn't
12  anything like that and I said, I heard
13  something about a little man from Merck.
14  And he said, oh, I took that one out.
15  And I said why. And he said because I
16  got the information. And so they weren't
17  hiding the data from me anymore.
18      Q.   Okay.
19      And it indicates there in
20  your letter that the data that Dr. Singh
21  was able to get from Merck was actually
22  not favorable to Vioxx. Is that what
23  your letter says?
24      A.   Oh, that's right. None of

Page 136

1  these data were favorable to Vioxx.
2       Q.   And that's the data that
3  talks about the difference in heart
4  attacks between Vioxx and naproxen and
5  the edema, hypertension and congestive
6  heart failure. Is that the data you are
7  referring to?
8       A.    Those two general areas,
9  yes. The data, incidentally, as I'm sure
10  you know, but just to make sure it's
11  clear, the data on preventing GI side
12  effects with Vioxx was strongly in favor
13  of Vioxx.
14      MR. LANIER:  Objection,
15      nonresponsive.
16  BY MR. RABER:
17      Q.   And you refer to that in
18  your letter?
19      A.   Yes.
20      Q.   And you talk about in your
21  letter, it was your experience that
22  certainly your mindset in 2001 was that
23  the COX-2 inhibitors looked like
24  significant medical advance for dealing

Page 137

1  with the serious GI problems from
2  traditional pain relievers?
3       A.   Yes. I even took credit for
4  having created them.
5       Q.   And you believed in January
6  of 2001 even that on balance, these drugs
7  could be expected to save lives?
8       A.   No. That's going too far.
9  I think that an issue had been raised,
10  and the issue needed to be dealt with.
11  It was dealt with in a series of very
12  unfortunate ways. It could have been
13  dealt with, for example, by getting rid
14  of the 50 milligram dose and putting a
15  warning label on it and then none of us
16  would be here. But that could have been
17  done in the year 2000.
18      So, they dealt with it, you
19  know --
20      Q.   Sir, at the time --
21      MR. STEIN:  Can he --
22  BY MR. RABER:
23      Q.   -- though, if you look at
24  Page 3 of your letter. In the middle of

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 138

1  the page you say, "These drugs should, on
2  balance, save a substantial number of
3  lives."
4      A.   Yeah, that was actually my
5  mindset. That's fair.
6      Q.   Okay.
7          Back in 2001.
8      A.   Yes.
9      Q.   And some of what you're
10 saying today --
11     A.   Yeah.
12     Q.   Excuse me, Doctor.
13     A.   Okay, yeah.
14     Q.   Some of what you're saying
15 today, I take it, it's just hard not to
16 look back with hindsight. Would you
17 agree with that?
18     A.   Well --
19         MR. RAFFERTY:  Object to the
20     form.
21         THE WITNESS:  The reasoning
22     behind these sentences when I
23     wrote them is that it's one thing
24     to have proof and it's another

Page 139

1      thing to have a signal raised.
2  BY MR. RABER:
3      Q.   Okay.
4      A.   And so having a signal
5  raised doesn't mean that you
6  automatically reverse your thinking about
7  the drug. And that was the state we were
8  in at that particular period of time.
9      Q.   There was a lot of
10 uncertainty?
11     A.   There was some uncertainty,
12 yes.
13     Q.   And I think you mentioned
14 that at some point your thinking about
15 the meaning of the VIGOR study changed
16 when you became aware of some data
17 relating to Bextra and other drugs
18 through Dr. FitzGerald?
19     A.   That's right.
20     Q.   So, that would have been at
21 a time when there was data relating to
22 Bextra available. Is that fair to say?
23     A.   Yes. That was after this.
24     Q.   A fair amount after this,

Page 140

1  right?
2      A.   I think a year to two years,
3  yeah.
4      Q.   Okay.
5      A.   Dr. FitzGerald has access to
6  data, you know, at very early stage.
7          MR. RABER:  Are we at a
8      point where we want to take our
9      hourly five-minute break?
10         THE VIDEOTAPE TECHNICIAN:
11     We've been on the record for 47
12     minutes.
13         MR. RABER:  Okay.
14     Why don't we -- would this
15     be a good time to take a break for
16     five minutes?
17         THE WITNESS:  Sure.
18         THE VIDEOTAPE TECHNICIAN:
19     We are now going off the record.
20     The time is 3:07 p.m.
21             - - -
22         (Whereupon, a recess was
23     taken from 3:07 p.m. until
24     3:28 p.m.)

Page 141

1             - - -
2          THE VIDEOTAPE TECHNICIAN:
3      We are now back on the video
4      record. The time is 3:28 p.m.
5          MR. RABER:  Let's mark this
6      as Defense Exhibit 955, I think it
7      was.
8              - - -
9          (Whereupon, Deposition
10     Exhibit Fries-955, DESCRIPTION,
11     was marked for identification.)
12             - - -
13         THE VIDEOTAPE TECHNICIAN:
14     We are now back on the video
15     record. The time is 3:29 p.m.
16 BY MR. RABER:
17     Q.   Dr. Fries, we've put in
18 front of you a document that has been
19 marked as Defense Exhibit 955. Can you
20 tell us what that is, please?
21     A.   A letter to me from Lou
22 Sherwood dated November 9th, 2000.
23     Q.   And was this a letter that
24 you received from Dr. Sherwood at some

36 (Pages 138 to 141)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 142

1  point after the ACR meeting in
2  Philadelphia?
3      A.   It has to be, yes.
4      Q.   Okay.
5          That's all I have for that.
6          MR. RABER:  Linda, this has
7  already been marked as an exhibit.
8  Let's mark it as Defense Exhibit
9  245.
10         - - -
11         (Whereupon, Deposition
12     Exhibit Fries-245, DESCRIPTION,
13     was marked for identification.)
14         - - -
15 BY MR. RABER:
16     Q.   Dr. Fries, we've put in
17 front of you Defense Exhibit 245.  Can
18 you identify this?
19     A.   Yes.  We've spoken to this
20 before.  This is a letter from Mr.
21 Gilmartin to me.
22     Q.   Dated January 23rd, 2001?
23     A.   Yes.
24     Q.   And I think this is the

Page 143

1  letter that you've described as a
2  thoughtful and positive letter?
3      A.   Yes, it was a response to my
4  letter of January 9th.
5      Q.   Okay.
6          That's all I have for that.
7          MR. RABER:  Let's mark this,
8  Linda, as Exhibit 264.
9          - - -
10         (Whereupon, Deposition
11     Exhibit Fries-264, DESCRIPTION,
12     was marked for identification.)
13         - - -
14 BY MR. RABER:
15     Q.   Dr. Fries, I'm putting in
16 front of you a document marked as Defense
17 Exhibit 264.  Can you tell us what that
18 is?
19     A.   It's a letter to me from
20 David Anstice, the copy to Doug Greene.
21     Q.   Dated February 16th, 2001?
22     A.   February 16th, 2001.
23     Q.   And is this the letter that
24 came with the data that you received from

Page 144

1  Merck?
2      A.   Yes.  I don't remember
3  receiving any data.  There must have been
4  some.  There are attachments noted here.
5      Q.   Okay.
6      A.   I sort of indicate just to
7  repeat myself, but I didn't really,
8  looking at further data, wasn't on my
9  agenda at that time.
10     Q.   Okay.
11         And by this time, there had
12 been an Advisory Committee concerning
13 Vioxx and Celebrex.  Do you recall that
14 in February of 2001?
15     A.   Yeah.  As I say,
16 reconstructing these dates and what order
17 they are is really hard for me, but there
18 was one roughly around there.  Yeah.  So,
19 these data had already, in that interval,
20 been I guess released pretty generally.
21     Q.   And have you been on FDA
22 Advisory Committees before?
23     A.   Yes.
24     Q.   And has it been your

Page 145

1  experience that data from studies before
2  the Advisory Committee are discussed at
3  those meetings?
4      A.   The data are discussed, yes,
5  at the meeting.  I don't recall the exact
6  details.  Sometimes it's long and
7  sometimes it's short.
8      Q.   Has it been your experience
9  that members of FDA Advisory Committees
10 are respected scientists in the relevant
11 fields?
12     A.   Yes, for the most part.
13     Q.   Was that your view -- strike
14 that.
15         MR. RABER:  Linda, let's
16 mark this next one as Defense
17 Exhibit 312.
18         - - -
19         (Whereupon, Deposition
20     Exhibit Fries-312, DESCRIPTION,
21     was marked for identification.)
22         - - -
23 BY MR. RABER:
24     Q.   Dr. Fries, Defense Exhibit

37 (Pages 142 to 145)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 146

1   312 is a letter from Merck to you dated
2   March 22nd, 2001; is that right?
3       A.   Yes.
4       Q.   Okay.
5           And is this the last
6   communication, then, that you had from
7   Merck relating to the concerns you had
8   expressed in January of 2001?
9       A.   Yes, with the exception of
10  the thing I mentioned earlier, that they
11  wanted me to say that I intended to keep
12  this confidential.
13      Q.   But that's some point later?
14      A.   That's a different point.
15  Yes, exactly. I believe this was the end
16  of this, because he's heard back now from
17  Greene and Anstice after we had what I
18  considered to be satisfactory discussions
19  pending further observation.
20      MR. RABER:  Let's mark this
21      one as 956.
22          - - -
23      (Whereupon, Deposition
24      Exhibit Fries-956, DESCRIPTION,

Page 147

1       was marked for identification.)
2           - - -
3   BY MR. RABER:
4       Q.   Dr. Fries, I'm putting a
5   document in front of you that's been
6   marked as Defense Exhibit 956. I'll
7   represent to you that this is something
8   that we received from your files when you
9   produced documents to everyone. Does
10  that appear to be a message slip --
11      A.   Yes.
12      Q.   -- to you?
13      A.   Yes. He's giving me his
14  office and his home number and saying to
15  call.
16      Q.   Okay.
17          And the "he" that's referred
18  to there is Douglas Greene from Merck?
19      A.   Douglas Greene, yeah.
20      Q.   The date of this is what?
21      A.   1/29, must be 1/29/2001.
22      Q.   Okay.
23          Shortly after your letter to
24  Merck?

Page 148

1       A.   Yes.
2       Q.   And did you followup with
3   Dr. Greene on this?
4       A.   Yes.
5       Q.   Okay.
6           And that's what led to the
7   discussions about what data you wanted or
8   the invitation to come look at data?
9       A.   Yeah. That's right.
10      Q.   And I think I understood
11  you, you were offered to come meet with
12  Dr. Greene to go over data and you
13  decided that you didn't need to do that
14  at that point?
15      A.   That's right. That's right.
16  I wasn't in -- and I think that a whole
17  lot of stuff was happening all in the
18  same direction about this same time.
19  There was a thing at the VA where a lot
20  of data was released to the VA. Then
21  there was the arthritis advisory board
22  and there was more data released.
23          So, the questions about data
24  hiding pretty well, for the most part,

Page 149

1   subsided during this same period of weeks
2   or months. Whether this had anything to
3   do with what we're talking about, I don't
4   know. I like to claim credit for
5   anything good that happens.
6       Q.   Have you ever been provided
7   with copies any of internal documents at
8   Merck such as e-mails or memos, that sort
9   of thing?
10      A.   No.
11      Q.   I take it as we sit here
12  today, you haven't formed any opinions
13  about documents like that. Is that fair
14  to say?
15      A.   No. That's not fair to say.
16      Q.   I mean, I'm talking about
17  documents you haven't seen. Do you have
18  opinions --
19      A.   Oh, that I have not
20  personally seen?
21      Q.   Yes.
22      A.   Yeah, but that have been
23  reported in the New York Times or the
24  Wall Street Journal or something else. I

                    38  (Pages 146 to 149)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 150

1  mean, I have an opinion about those,
2  yeah.
3      Q.   Okay.
4          After Merck had dealt with
5  the concerns raised in your letter, is it
6  your understanding that Dr. Singh went on
7  to do some work for plaintiffs' lawyers
8  suing Merck over Vioxx?
9      A.   I have no idea.
10      MR. RABER:  I think that's
11  all I have for now, and I'm going
12  to, as I said, reserve 10 minutes
13  at the end of your examination.
14      MR. RAFFERTY:  Okay.
15      THE VIDEOTAPE TECHNICIAN:
16  Do you want to go off the record?
17      MR. LANIER:  We don't need
18  to.  Let's just go.  This doctor
19  has got better things to do than
20  sit around and wait for us.
21      THE WITNESS:  This is true.
22  I have to take care of my wife.
23      MR. LANIER:  That's exactly
24  right.

Page 151

1          - - -
2          EXAMINATION
3          - - -
4  BY MR. LANIER:
5      Q.   Her name is Sarah?
6      A.   Yes.
7      Q.   I have four daughters, one
8  of them named Sarah with an H.  She
9  wishes she had not had an H added to her
10  name.
11      A.   Oh.  No, we always liked the
12  H.
13      Q.   That's what I told her.
14  When she grew up, she'd appreciate the H.
15          - - -
16      (A discussion off the record
17      occurred.)
18          - - -
19  BY MR. LANIER:
20      Q.   Doctor, I'm not going to
21  take long, and then I'm even probably
22  going to walk out the door and let them
23  finish with you.  I want to make sure I'm
24  clear on a couple of things.

Page 152

1          You spoke about concerns
2  after your conversation with Dr. Louis
3  Sherwood, the Merck vice president, about
4  whether or not there had been a culture
5  shift at Merck or just an individual
6  loose canon.  Do you remember that?
7      A.   I don't believe I spoke with
8  that with him.
9      Q.   But I mean your deposition.
10      A.   Yes.  I mean, that was my
11  question.  It was in my mind.  Because
12  you had a different remedy.  If it was
13  all Dr. Sherwood who had gone over to the
14  dark side, then that was one
15  interpretation as to how you would handle
16  it.  If it was a culture and it was
17  pervasive, then there was something else
18  you had to do.
19      Q.   Okay.
20          I would assume you've never
21  done an intensive examination of the
22  Merck documents themselves and Merck as a
23  company on this.  Am I right?
24      A.   The documents?

Page 153

1      Q.   All the Vioxx documents and
2  all that mess.
3      A.   No.  No.
4      Q.   So, as we sit here, if I was
5  to ask you, do you think that there was a
6  culture shift when Dr. Vagelos stepped
7  down and Ray Gilmartin stepped in, or do
8  you think there was just a loose canon,
9  is it fair to say even though you may
10  have an opinion, you're not really
11  certain?
12      A.   I think that you could make
13  the case either way, and I would get
14  pretty conjectural, so, I prefer not to
15  come down on that.
16      Q.   All I wanted to make sure.
17          Next area.
18          You testified in response to
19  the Merck attorney's questions that you
20  were satisfied at the time with Merck's
21  reaction to your letter.  Do you remember
22  that testimony?
23      A.   Yes.
24      Q.   Now, I don't want there to

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 154

1  be a misunderstanding with the jury.  Are
2  you saying that now you believe, looking
3  back, that Merck handled all aspects
4  about the Vioxx drug properly or are you
5  merely saying at the time you thought
6  Merck handled your complaints properly?
7          MR. RABER:  Object to form.
8          THE WITNESS:  The second.
9  BY MR. LANIER:
10     Q.   All right.
11         And when we talk about the
12 second and Merck handling your complaints
13 properly, are you saying your complaints
14 were not valid or are you saying that
15 Merck responded to your complaints in a
16 way that you were satisfied with?
17     A.   Merck responded to a way
18 that if they kept to the agreement
19 essentially, that I talked with Anstice
20 about, that I was satisfied that in this
21 kind of limited thing I was trying to
22 change, I had been successful.
23     Q.   Now, one of the documents
24 that I suspect the jury has seen at the

Page 155

1  point we're playing this video for them
2  is a Merck document that has a list of
3  doctors that are targeted to be, quote,
4  neutralized, closed quote, or some of
5  them are actually noted as discredited by
6  Merck.  Have you ever seen that document?
7     A.   I have not seen that
8  document.
9          MR. RABER:  Object to form.
10 BY MR. LANIER:
11     Q.   Are you familiar just in
12 your 40 years of medicine with the idea
13 of drug companies choosing to neutralize
14 and discredit doctors?
15     A.   I was amazed earlier when we
16 saw something that said somebody was
17 going to control me as part of.  I said,
18 that's hard to do.  So, no, I've never
19 seen anything like this.  This is really
20 unprecedented in my experience.
21         MR. RABER:  Object to form.
22         Move to strike, nonresponsive.
23 BY MR. LANIER:
24     Q.   All right.

Page 156

1          Next area.
2          You testified about
3  confidential data and you certainly see
4  the reason and need for confidential data
5  at times.  Do you remember that
6  testimony?
7     A.   Uh-huh.  Uh-huh.
8     Q.   Are you suggesting to the
9  jury that you approve of Merck holding
10 back data on the Vioxx drug and its
11 implications for heart problems?
12         MR. RABER:  Objection to
13 form.
14         THE WITNESS:  No.
15 BY MR. LANIER:
16     Q.   Okay.
17         Explain to me why not.  I
18 want to make sure the jury is clear on
19 that.
20     A.   I indicated earlier, but
21 I'll try and state again, that I see
22 confidentiality as having a variety of
23 justifying reasons.  There may be
24 propriety interests that are there, it

Page 157

1  would not be good for these things to get
2  out.  There may be a lot of residual
3  uncertainty, and if things got out that
4  were wrong and then later had to be
5  retracted, that would not be a good state
6  of nature.
7          And then there are areas in
8  which you get a signal that something is
9  happening which it is in the public
10 interest to know fully about as soon as
11 possible.  And I consider the association
12 of heart attack events in a significant
13 way with the drug to be something that
14 you go back and you bring all your data
15 out to bear on it.  And if it's necessary
16 to take the drug out of the approval
17 process, you take it out of the approval
18 process or make appropriate changes.  So,
19 those data, I believe, should have been
20 fully disclosed.
21     Q.   You believe in safety first?
22     A.   No.  I believe that you have
23 a balance with pharmaceutical treatments
24 between the good and the harm that they

40 (Pages 154 to 157)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 158

1   do.  Things that do a whole lot of good,
2   they can do quite a bit of harm.  And you
3   still would say that on balance, they're
4   good drugs.  So, it's a balance issue.
5        Q.   You at least believe in full
6   disclosure of safety risks?
7        A.   That's right.  And we have
8   taken a position within Aramis that the
9   FDA has not been as attentive to safety
10  issues as they should be.  And the issue
11  that we're talking about here, which is
12  NSAID gastropathy, for example, I told
13  the FDA in the advisory open session that
14  they should not have had to wait until I
15  told them about NSAID gastropathy.
16        They have been studying
17  these drugs for a quarter of a century
18  before the traditional NSAIDs, not the
19  Vioxx ones, but the traditional ones, and
20  they didn't know that they cause 100,000
21  hospitalizations a year.
22        Q.   Okay.
23        Now, Doctor, one last area
24  and then I'm going to pass the witness, I

Page 159

1   believe.
2        You have in front of you an
3   e-mail chain that the Merck lawyer gave
4   you about the missile.  Do you remember
5   the missile one?
6        A.   Yes.  That was Ted Harris's
7   thing.  I'm not sure I have it in front
8   of me.
9        Q.   It says, "Brooks, Barbara,"
10  across the top.
11        A.   I think I may have -- here
12  it is.
13        Q.   There it is.  All right.
14        You testified that a formal
15  letter would be something you would
16  welcome, something Ted would welcome.  Do
17  you remember that testimony?
18        A.   Yeah.
19        Q.   Is that the right way to go
20  about expressing concerns about someone
21  in your school?
22        A.   I think that Ted is here
23  trying to react to a situation.  Nobody
24  is going to put something where I'm

Page 160

1   conjecturing about what I think Ted was
2   thinking about when he wrote the letter.
3        But I think that what he was
4   saying, wait a minute, there's something
5   here, and I'm not getting the full story.
6   So, put it in writing for me and let's
7   sit and we'll make a trail on this.
8        Q.   And that's what I'm driving
9   at.  Regardless of the reasons for Dr.
10  Harris saying this, there is a right and
11  a wrong way to go about questioning
12  activities, right?
13        A.   Yes.  Uh-huh.
14        Q.   One way I guess would be to
15  call someone's supervisor on a Saturday
16  at their home and try to get some result.
17  And another way is to write a letter and
18  just plainly say, here are concerns we've
19  got, would you please look into it.
20  Would you agree with me there are those
21  two ways?
22        A.   Yes, yes.  There's no -- the
23  second way doesn't have the same
24  intimidation potential, because no one is

Page 161

1   going to respond in that letter by saying
2   if you don't do this, we're going to jerk
3   the funding of your research projects.
4   So, they are constrained in a sense.  So,
5   I would find it much more appropriate.
6        Q.   So, there's an appropriate
7   way and then there's a way that seems a
8   bit more intimidating.  Would you agree?
9        A.   That's right.
10        Q.   And did Dr. Sherwood ever do
11  it with the appropriate formal letter
12  way, to your knowledge?
13        MR. RABER:  Objection to
14  form.
15        THE WITNESS:  All I know
16  about letters was -- is in this
17  e-mail chain.  I don't know
18  anything more.
19  BY MR. LANIER:
20        Q.   You never saw a formal
21  letter?
22        A.   No.
23        Q.   And certainly he didn't send
24  you a formal letter?

41 (Pages 158 to 161)

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 162

1    A.   No.
2    Q.   But he did make the phone
3  call?
4    A.   I didn't request a formal
5  letter from him either, though.  Probably
6  was remiss in that.
7    Q.   But he did make the phone
8  call?
9    A.   Yes.
10       MR. LANIER:  All right.
11       I'm going pass the witness,
12   and if you've got redirect on the
13   New Jersey, I'd ask that you do
14   that now because I don't think you
15   get redirect on the Federal Court,
16   and we can do the New Jersey part
17   and get it done.  And then Troy
18   can finish his without worrying
19   about your redirect.
20       MR. RAFFERTY:  That's fine.
21       MR. RABER:  Well, but then
22   if you are telling me you're not
23   going to use any --
24       MR. LANIER:  I'm done.

Page 163

1        MR. RABER:  If New Jersey is
2   not going to use anything that
3   Troy does, then I might think
4   about agreeing with it.  But if
5   you're going to use it, then --
6        MR. LANIER:  I do not
7   anticipate using anything Troy
8   does at this point.  I don't care.
9   Troy can handle that.
10       MR. RABER:  It is not going
11   to be much.
12       MR. LANIER:  I'm leaving.
13   I'm going to leave Troy with the
14   responsibility of New Jersey of
15   doing the recross, if there is
16   any.  Fair enough?
17       MR. RABER:  That's fair
18   enough.
19       MR. LANIER:  Okay.
20       Doctor, it is an honor to
21   shake your hand and to get to know
22   you.  Thank you very much for
23   today, and I keep your wife in my
24   prayers.

Page 164

1        - - -
2       EXAMINATION
3        - - -
4  BY MR. RAFFERTY:
5    Q.   Doctor, I'm going to show
6  you a copy of a document that is going to
7  be labeled -- give me one second while I
8  get organized here.
9        You indicated earlier that
10 you got the response and that you
11 understood that Merck was going to do
12 certain things in response to the letter
13 that you had written, correct?
14   A.   Yes.
15   Q.   I'm going to show you a copy
16 of a document that's labeled Plaintiff's
17 Exhibit Fries 0013, which is some
18 handwritten notes.
19   A.   Yes.  It is not very
20 explanatory.
21   Q.   Pardon me?
22   A.   It is not very explanatory,
23 it was just my telephone notes.
24   Q.   Okay.

Page 165

1    A.   And I added the words "Phone
2  call" later on to make it a little bit
3  clearer.
4    Q.   Okay.  All right.
5        And these are dated February
6  1st, 2001; is that correct?
7    A.   Yes.
8    Q.   And this is notes of a
9  conversation that you had at the top it
10 says "David Anstice," correct?
11   A.   Yes.
12   Q.   That's the same David
13 Anstice we've been talking about?
14   A.   Yes.
15   Q.   Number 4 it says down here,
16 "Personal approach with apologies to
17 individuals to those contacted over --
18 and to those contacted over the
19 individuals."  Do you see that?
20   A.   Yes.
21   Q.   Okay.
22       Are you aware of whether or
23 not that ever happened?
24   A.   No, I'm not.  I --

42  (Pages 162 to 165)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 166

1    Q.   Is that --
2    A.   Excuse me. I do know that
3 it happened, that such a contact was made
4 with Lee Simon, and I think with Peter
5 Lipsky. So, I think that it was at least
6 sometimes done. I'm not sure that
7 systematically everybody who was called
8 was -- got the personal apologies.
9    Q.   Do you know who contacted
10 Lee Simon and Peter Lipsky?
11    A.   No. No. And I'm not
12 absolutely positive of what I just told
13 you, but I think that's the case.
14    Q.   You are not absolutely
15 positive about whether Mr. Anstice called
16 them and apologized for the contacts that
17 they had with --
18    A.   Yes, yes.
19    Q.   Okay. All right.
20       In regards to your contact
21 with Mr. Sherwood, I want to show you a
22 copy of a document that's going to be
23 identified as Plaintiff's Exhibit 1.0184.
24       You were asked questions by

Page 167

1 Mr. Raber about your conversations with
2 him, Dr. Sherwood, I apologize. Have you
3 ever seen a copy of this e-mail?
4    A.   I don't think so.
5    Q.   I want to direct your
6 attention to the middle section which
7 starts, "From Louis Sherwood."
8    A.   Okay.
9    Q.   Dated November 7, 2000. Do
10 you see that?
11    A.   Yes.
12    Q.   And that's right around the
13 time that you had your first conversation
14 with Dr. Sherwood?
15    A.   Yes, yes.
16    Q.   And it says, "Re:  Visit."
17 And then it says, "I have placed a call
18 to Jim Fries to followup with him and I
19 hope he will call me on Wednesday. I
20 would like to hear Fries's comments
21 before you speak with Singh. Fries and I
22 discussed his, Jim's, getting Singh to
23 stop making the outrageous comments he
24 has in the past few months (which Singh

Page 168

1 doesn't really deny and says he felt
2 justified because Merck wouldn't give him
3 info). I am sure Fries will tell me that
4 Singh denies a lot of this, but I will
5 reinforce with Fries that there are too
6 many sources of concern for Singh to be
7 accurate. I will keep the pressure on
8 and get others at Stanford to help
9 Schwane" --
10    A.   He means Holman.
11    Q.   "Holman." Okay. "Harris,
12 et cetera.
13    A.   I mean, my name is
14 misspelled also.
15    Q.   Okay.
16       "Let me get Fries's input
17 first, but I would suggest to you that
18 you be direct with Singh and indicate
19 that we have received a number of reports
20 of his continuing to bash Merck and
21 Vioxx, that I have expressed my concern
22 directly to Fries and that we expect
23 Singh to stop. Should it continue,
24 further action will be necessary (don't

Page 169

1 define it). I will be pleased to speak
2 with Singh after you do if he wants to.
3 Lou."
4       Did I read that accurately,
5 first of all?
6    A.   Yes.
7    Q.   Okay.
8       Is that basically -- I want
9 to focus really quite candidly on two
10 statements. Number one, "I will keep the
11 pressure on and get others at Stanford to
12 help." Schwane, Holman, tell me who
13 Schwane, Holman and Harris are?
14    A.   Well, Harris we've talked
15 about.
16    Q.   We've talked about Harris.
17    A.   And Holman is an emeritus
18 professor of well esteemed. He received
19 the biggest award that ACR gives last
20 year, and has got an office on the floor
21 below us. And --
22    Q.   I'm sorry.
23    A.   Who else was --
24    Q.   Schwane.

43  (Pages 166 to 169)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 170

1      A.   She was chairman of medicine
2   at that time, chair of medicine.
3      Q.   Okay.
4          So would that have been
5   Harris's boss, Dr. Harris's boss or the
6   other way around?
7      A.   At that point.
8      Q.   Okay.
9          At that point.
10     A.   He had had that point, she
11  succeeded me, actually.
12     Q.   Okay.
13         But at that point, Schwane
14  would have even been Harris's boss?
15     A.   Yes.
16     Q.   Okay.
17         And is that basically what
18  you felt when Dr. Sherwood called you,
19  was that he was putting pressure on you?
20     A.   Yes.  I think this is, you
21  know, out of his own mouth.  This is what
22  we've been talking about.
23     Q.   Okay.
24         Now, he also says down at

Page 171

1   the bottom there, "Should it continue,
2   further actions will be necessary (don't
3   define it)."
4      A.   Sounds intimidating to me.
5      Q.   And is that basically --
6      MR. RABER:  Objection to
7      form, move to strike.
8   BY MR. RAFFERTY:
9      Q.   And is that basically how he
10  handled the conversation with you when he
11  called you at home on Saturday, implying
12  that there would be consequences, but not
13  defining what those are?
14      MR. RABER:  Objection to
15      form.
16      THE WITNESS:  That's right.
17      I think anybody would know you
18      wouldn't want to say exactly what
19      the consequences might be.  That
20      would be unwise.
21  BY MR. RAFFERTY:
22     Q.   Okay.
23         You were asked questions
24  about certain of the individuals you

Page 172

1   referenced in your letter by Mr. Raber,
2   including Dr. Simon.  Let me hand you a
3   copy of a document that's labeled, and I
4   apologize, Steve, I've only got one copy.
5   It is a document produced by Merck.
6          It is attached to the
7   Charlotte McKines deposition, and it is
8   identified as CM 007.  I'll put it up on
9   the screen.  I apologize for that.  But
10  it was a document that was produced by
11  Merck to us.  And the front cover says
12  "Physician Action Plans.  Action plans
13  deliver Vioxx oriented Celebrex, Adverse
14  targeted and experts."
15         And if you go to the third
16  page of that document, it says, "The top
17  rheumatologists, the Yankees of the
18  management of arthritis."  And if you
19  would look at the second name there, over
20  on the left-hand column, is that Lee
21  Simon?
22     A.   Yes.
23     Q.   Okay.
24         I also notice, just for your

Page 173

1   own reference, that on the bottom right
2   corner is James Fries.  Do you see that?
3      A.   Yes.
4      Q.   Okay.
5          And there is also Gurkipal
6   Singh, two names above that, and Peter
7   Lipsky up at the top right column as
8   well.
9          Now, in regards to Lee
10  Simon, I mean, would you agree with that,
11  first of all, that he is one of the top
12  rheumatologists, Dr. Simon?
13     A.   Yes.  This is a heroes list.
14     Q.   Okay.  A heroes list.  Okay.
15     A.   Well, not entirely.
16     Q.   Okay.
17         Well, let me show you a copy
18  now of Plaintiff's Exhibit CM.0049 very
19  quickly.
20      MR. RAFFERTY:  I do have a
21      copy of that for you, Steve.
22  BY MR. RAFFERTY:
23     Q.   I want to direct your
24  attention to the middle.  This is an

44 (Pages 170 to 173)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 174

1  e-mail string produced to us from Merck.
2  And it is -- I want to focus on the one
3  from Leonardo Mendez dated August 30,
4  1999. And it says "Re: Background, Dr.
5  Andrew Whelton."
6      A.   Uh-huh.
7      Q.   It says, "I suggest that we
8  get Dr. Lou Sherwood involved ASAP. This
9  is a top priority at this time. He needs
10 to have a strong message delivered to him
11 by Dr. Sherwood like the one sent to Lee
12 Simon. Thanks, Leo."
13     A.   Never write e-mails.
14     Q.   Now, let me ask you this.
15         Is this similar to the
16 complaints you heard from Dr. Simon --
17         MR. RAFFERTY: Objection, form.
18 BY MR. RAFFERTY:
19     Q.   -- when you talked to him in
20 terms of someone calling and leaving
21 messages?
22     A.   You just have to infer from
23 this. It is way to short to make any
24 real judgments about it.

Page 175

1      Q.   But is that basically
2  consistent with what Dr. Simon had told
3  you?
4          MR. RABER: Object to form.
5          THE WITNESS: Yes. It sound
6      like a break his kneecaps kind of
7      a suggestion, a strong message
8      delivered to him like the one sent
9      to Lee Simon. It doesn't say what
10     that strong message was or how it
11     was delivered or what it
12     contained.
13 BY MR. RAFFERTY:
14     Q.   I also want to show you a
15 copy now of document 1.1485, Plaintiff's
16 Exhibit 1.1485. It is from Susan
17 Baumgartner, who the jury has heard from
18 in this case. I'm sorry, it is from
19 Charlotte McKines to Susan Baumgartner,
20 who the jury has heard from in this case,
21 dated August 23rd, 1999. And it is
22 "Background-Dr. Andrew Whelton."
23         And on the middle paragraph
24 there, it says, in the middle e-mail, it

Page 176

1  says, "I recommend we use Dr. Sherwood
2  with Dr. Whelton. I think he is
3  concerned about his reputation and
4  credibility." And then it says,
5  Charlotte McKines forwards it to Susan
6  Baumgartner and says, "For the bad guys
7  list." Did I read that correctly?
8      A.   I don't see the bad guys.
9      Q.   Up at the top.
10     A.   Oh, okay, yeah.
11     Q.   Have you ever seen a copy of
12 this bad guys list?
13     A.   No.
14     Q.   Had you ever heard of a
15 pharmaceutical company keeping a bad guys
16 list of doctors, such as Dr. Whelton?
17         MR. RABER: Objection to
18     form.
19 BY MR. RAFFERTY:
20     Q.   Have you ever heard of a
21 pharmaceutical company keeping a bad guys
22 list such as Dr. Whelton?
23         MR. RABER: Objection to
24     form.

Page 177

1          THE WITNESS: No. But
2      nothing surprises me.
3  BY MR. RAFFERTY:
4      Q.   Okay.
5          Do you think that's an
6  appropriate thing, as an academician and
7  a researcher and an investigator --
8          MR. RABER: Objection.
9  BY MR. RAFFERTY:
10     Q.   -- do you think that's
11 appropriate for a pharmaceutical company
12 to do?
13         MR. RABER: Objection to
14     form. Calls for speculation.
15         THE WITNESS: It is an issue
16     if there really were bad guys, you
17     know, who were putting poison in
18     the drinking water at Merck or
19     something, you could have a bad
20     guys list. But it is just that
21     for people that speak and say
22     something that you don't like what
23     they are saying, I don't think you
24     can have a bad guys list on that.

45 (Pages 174 to 177)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 178

1  BY MR. RAFFERTY:
2      Q.   Are you familiar with Dr.
3  Whelton's work in regards to NSAIDs?
4      A.   Yes.  As I indicated, I
5  worked with him at Hopkins in '66.
6      Q.   Did you consider him a bad
7  guy?
8      A.   No.  He was a good guy
9  actually.  He was very nice, low key,
10 maybe a little bit overpowered by some of
11 these forces that are moving around
12 there.
13     Q.   You said that --
14         MR. RABER:  Objection, move
15 to strike, nonresponsive.
16 BY MR. RAFFERTY:
17     Q.   I think in response to Mr.
18 Raber's question, you indicated that you
19 were fellows together at Hopkins; is that
20 correct?
21     A.   Yes.  Well, he was a renal
22 fellow and I was a student actually at
23 that time working in the renal lab.  And
24 I knew his brother, too.  I was an intern

Page 179

1  with one of his brothers.
2      Q.   In either of your
3  conversations with Dr. Sherwood that you
4  had, I believe you had -- well, I believe
5  you had three, two on the phone and one
6  in person, correct?
7      A.   Yes.
8      Q.   Okay.
9          That you personally had with
10 him, did he ever tell you, did he ever
11 specifically say in regards to the data,
12 we would give you that data but we can't
13 because it's confidential?
14         MR. RABER:  Object to form.
15         THE WITNESS:  No.
16 BY MR. RAFFERTY:
17     Q.   Okay.
18         Did Dr. Sherwood -- strike
19 that.
20         In your letter, January 9th
21 letter, you state -- give me one second
22 while I pull it out.  Which is
23 Plaintiff's 1.0176, on Page 2, the second
24 full paragraph from the bottom.  Mr.

Page 180

1  Raber talked with you about portions of
2  this involving the FDA renal reviewer.
3      A.   Yes.
4      Q.   It says, "A number of
5  physicians have concerns that Vioxx may
6  have some serious and under emphasized
7  drug toxicity problems."  Did I read that
8  correctly?
9      A.   Yes.
10     Q.   Now, at that time -- well,
11 at that time, you were involved with the
12 Aramis database, correct?
13     A.   Yes.
14     Q.   Okay.
15         And were you one of those
16 doctors that had those serious and under
17 -- the serious concerns about Vioxx?
18     A.   Yes.  In a similar place in
19 this letter I say including myself.
20     Q.   Okay.  All right.
21         And that was in January of
22 2001 that you wrote this letter to Mr.
23 Gilmartin?
24     A.   Yes.

Page 181

1          MR. RAFFERTY:  How much time
2  do I have?  You don't know?
3          THE VIDEOTAPE TECHNICIAN:  I
4  don't.
5          MR. RAFFERTY:  Okay.
6          THE VIDEOTAPE TECHNICIAN:  I
7  know you had 40 minutes in the
8  beginning.
9          MR. RAFFERTY:  Okay.
10         We're pretty -- I think I've
11 got plenty of time.
12 BY MR. RAFFERTY:
13     Q.   Do you still currently treat
14 patients, Doctor?
15     A.   Yes.
16     Q.   Did Merck actually at one
17 point in time purchase from you or
18 Stanford the questionnaire off of the
19 Aramis database?
20     A.   Oh, I don't know
21 specifically.  Could well be.  But we
22 don't -- we give permission to use.  We
23 don't sell questionnaires.
24         MR. RAFFERTY:  Okay.  All

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 182

1   right.
2        That's all the questions I
3   have, Doctor.
4        MR. RABER:  I just have my
5   quick followup.  So, why don't we
6   switch and I think we'll be out of
7   here.
8        THE WITNESS:  I like that.
9            - - -
10           EXAMINATION
11           - - -
12  BY MR. RABER:
13       Q.   Okay.
14       Dr. Fries, I think we're in
15  the home stretch here.  Okay.
16       A.   (Indicating.)
17       Q.   In response to questions
18  from Mr. Lanier, you used a term called
19  "NSAID gastropathy"?
20       A.   Yes.
21       Q.   Can you tell us what that
22  means?
23       A.   Okay.
24           NSAID is nonsteroidal

Page 183

1   anti-inflammatory drug.  Gastropathy.
2   And completely, it is NSAID-associated
3   gastropathy, and it refers to
4   gastrointestinal complications from the
5   NSAID.  And Vioxx and Celebrex are a
6   subclass of NSAIDs which has come on more
7   recently.
8        Q.   How serious a health problem
9   is NSAID-related gastropathy?
10       MR. RAFFERTY:  I want to
11  state an objection.  I think
12  that's outside the scope of
13  recross, and I'm going to have to
14  followup, depending on where we
15  go.  I'm going to have to followup
16  with this particular line of
17  questioning.
18       MR. RABER:  He testified
19  that there were 100,000
20  hospitalizations, in response to
21  Mr. Lanier's questions, so I think
22  it's well related to that, and I
23  just want to get a...
24  BY MR. RABER:

Page 184

1        Q.   Let me ask it this way.
2        When you refer to NSAID
3   gastropathy, what kind of ailments, what
4   kind of physical manifestations are you
5   talking about?
6        A.   The main one is
7   gastrointestinal hemorrhage, major
8   serious one.  The NSAIDs cause nausea,
9   vomiting, diarrhea sometimes, symptoms,
10  which are no real problem.  You just stop
11  the drug or change the dose.
12       But then they cause silent
13  ulceration, most frequently in the bottom
14  portion of the stomach.  And that results
15  in bleeds, and the GI bleed is a major
16  event where a lot of blood is lost
17  through the stool or vomited up or both,
18  and results almost always in
19  hospitalization.  And about 10 percent of
20  the time it results in death.
21       My original numbers, just to
22  clarify the 100,000 number, were
23  projections which said I think 76,000
24  hospitalizations a year and 7,500, 7,600

Page 185

1   deaths per year from this association.
2        And Dr. Singh had created
3   some larger numbers at a later point,
4   which were the 100,000, over 100,000
5   hospitalizations, and I think he had
6   16,500 deaths.  I always thought those
7   were over estimates and that our original
8   75,000 deaths was much closer to the
9   reality of it.  But the FDA and others
10  have actually used that 16,500 deaths a
11  lot.  It has been bandied about a lot.  I
12  didn't think it was well founded.
13       Q.   Are you familiar with a
14  doctor named Robin Dore down at UCLA?
15       A.   No.
16       Q.   Do you have any knowledge of
17  interactions between Dr. Singh and Dr.
18  Robin Dore?
19       A.   No.
20       Q.   You were shown a series of
21  documents by Mr. Rafferty.  Let me see if
22  I have them here.  The first one was,
23  there was that was that was CM 077.  I
24  don't think I got a copy of that one.

47  (Pages 182 to 185)

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 186

1    Let me ask you this.
2    You were shown a series of
3  e-mails, internal Merck e-mails. You
4  were shown something called a physician
5  action plan within Merck. Do you recall
6  those documents?
7    A.   Yes.
8    Q.   Before today, had you ever
9  seen those documents?
10    A.   No.
11    Q.   Have you --
12    A.   I had heard about those
13  documents in other media.
14    Q.   Okay.
15    Have you seen any other
16  documents that would put them into
17  context, for example?
18    A.   No.
19    Q.   Have you reviewed or seen
20  any testimony from people who have
21  personal knowledge of those documents?
22    A.   No.
23    Q.   Now, there was a reference
24  in Exhibit 1.1485, which I've put in

Page 187

1  front you there, to a bad guys list. Do
2  you see that?
3    A.   Yes. Uh-huh.
4    Q.   Has it been your experience,
5  Dr. Fries, that sometimes people use
6  flowery language hyperbole in e-mails. I
7  think, for example, we saw Dr. Harris use
8  missile to describe your letter.
9    MR. RAFFERTY:  Object to the
10  form.
11  BY MR. RABER:
12    Q.   Sorry?
13    A.   Yes.
14    Q.   People do that?
15    A.   Yes.
16    Q.   And you can't read too much
17  into that, can you?
18    MR. RAFFERTY:  Object to
19  form.
20    THE WITNESS:  I would limit
21  the interpretation, when I don't
22  know how Susan Baumgartner says
23  things. I think it is a very poor
24  strategic choice of words for an

Page 188

1  e-mail.
2  BY MR. RABER:
3    Q.   Poor choice of words, but
4  hard to reach too much into it. Fair to
5  say?
6    MR. RAFFERTY:  Object to
7  form.
8    THE WITNESS:  Well, we do
9  have some data on these other
10  documents I am being shown which
11  indicates a pretty strong
12  harassment of these people, and
13  these are the same people that are
14  on the enemies list. So, I don't
15  think it's like there's no
16  information to think that this
17  really is an out of the ordinary
18  bad guys list. But can I infer
19  that for certain? No.
20  BY MR. RABER:
21    Q.   You're just speculating?
22    MR. RAFFERTY:  Object to the
23  form.
24    THE WITNESS:  No.

Page 189

1  BY MR. RABER:
2    Q.   Right?
3    A.   Well, no. I told you it was
4  not speculating when we see things about
5  what we're going to do to Whelton like
6  what we did to Simon, and we're going to
7  deliver him a message. And these are the
8  same guys that are on the bad guys list.
9    Q.   Sir, but you've never seen
10  these documents before today, true?
11    A.   Yes.
12    Q.   That's true?
13    A.   Yes.
14    Q.   And you haven't heard what
15  people have personal knowledge of the
16  documents have to say?
17    A.   That's right.
18    Q.   Okay.
19    And the documents that
20  you've seen today were selected by
21  lawyers for the plaintiffs, right?
22    A.   Well, I've seen documents
23  that you've selected and documents that
24  they've selected, yes.

48  (Pages 186 to 189)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 190

1    Q.   This last round of internal
2  e-mails, some of them were documents
3  selected by lawyers for the plaintiffs?
4        MR. RAFFERTY:  Object to the
5        form.
6        THE WITNESS:  Well, yes.
7        MR. RABER:  That's all I
8        have.
9        MR. RAFFERTY:  Just on the
10       NSAID gastropathy, I've got like
11       two questions.
12       MR. RABER:  Okay.
13       MR. RAFFERTY:  In fact, I
14       don't even have to sit down.
15       MR. RABER:  It's open mike
16       night.
17              - - -
18       EXAMINATION
19              - - -
20  BY MR. RAFFERTY:
21    Q.   Doctor, I'm going to show a
22  copy of something identified and what
23  will be marked as Exhibit Fries .0022 to
24  the deposition, which is an article

Page 191

1  titled "Hard Sell:  How Marketing Drives
2  the Pharmaceutical Industry."  If you
3  would turn to Page 4 of 6 on that.
4        Under the heading
5  "Misleading Claims," approximately four
6  paragraphs down.  It says, "Fries said
7  both Pfizer and Merck are still getting
8  away with a 'marketing ploy,' by
9  positioning their drugs as gentler on the
10 gastrointestinal tract than other
11 painkillers.  Although Vioxx trial data
12 show somewhat lower gastrointestinal
13 impact than some of the older, cheaper
14 painkillers, it is no better than several
15 others, Fries said."  Do you recall
16 giving this interview?
17    A.   Yes.
18    Q.   Is that a statement that you
19 made at the time?
20    A.   Yes.
21    Q.   And is that correct that
22 Vioxx is, in fact, not gentler on the
23 gastrointestinal tract than other -- than
24 some of the traditional NSAIDs?

Page 192

1    A.   Well, I included both Pfizer
2  and Merck.  This was not in any way a
3  partisan statement.  I said that the
4  entire series of mythology that was
5  developed was really a case study in how
6  you would introduce marketing concepts,
7  and that both Pfizer and Merck played a
8  role in that.
9        They started off by calling
10 these drugs COX-2 inhibitors.  They are
11 not COX-2 inhibitors.  They are COX-1
12 sparing drugs.  But they want to be able
13 to imply that they are actually better in
14 certain kinds of ways.  In the actual
15 studies, both in the VIGOR trial and in
16 the CLASS trial, which are the definitive
17 ones that have some signs of toxicity,
18 they look like they reduce the relative
19 risk of GI hemorrhage by a factor of
20 about two.
21       Now, without getting too
22 complicated, you can look at studies that
23 we've published, if you took the old
24 drugs prior to Vioxx and Celebrex, they

Page 193

1  ran from a relative risk of about two to
2  a relative risk of about 12, with the
3  most toxic ones being Feldene and
4  Tolectin and some drugs like that.  And
5  the least toxic once being like low-dose
6  ibuprofen, which had a relative risk of
7  about two.
8        Now, what happened with the
9  VIGOR -- of the three trials.  The mucosa
10 trial of Arthrotec, of an anti -- of a
11 prostaglandin, and the VIGOR and CLASS
12 trials, which were of the COX-1 sparing
13 drugs, they did decrease the number of
14 serious events.  They did decrease the
15 number of serious events, like they were
16 supposed to.
17       But if you looked at the
18 endoscopic studies, they got rid of
19 almost every ulcer.  And if you looked at
20 the field trials, they only reduced the
21 number by about half, which was to say
22 that they got down to the range of the
23 lower traditional NSAIDs.
24       So, at the present time, we

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 194

1  have a drug called salsalate. We have
2  another one called Mobic. We have one
3  called Lodine. We have low-dose
4  ibuprofen, 1,200 milligrams or less. And
5  each of these gets you to a relative risk
6  of two. Probably if you add a proton
7  pump inhibitor to any of these, you can
8  reduce the number further down below two
9  even.
10       But the hype has been, of
11 course, with these drugs, it was part of
12 what the case study is, is that you would
13 like to compare with the average
14 traditional NSAID, real easy target. And
15 so you do show better than that. But if
16 you said, okay, the real comparator
17 should have been the safest of the
18 previously available drugs, then you are
19 in trouble, because the study couldn't be
20 large enough to show that you are safer
21 than them, because they are all pretty
22 much at the same level.
23       MR. RABER:  Objection, move
24 to strike, nonresponsive, beyond

Page 195

1  the scope of the deposition.
2       THE WITNESS:  Little
3  instructive there.
4  BY MR. RABER:
5       Q.   Let me just see if I can,
6  just very quickly.
7       So was that an accurate
8  statement that I read earlier, and the
9  one that you are quoted on in here is
10 that an accurate --
11      A.   It was as wisely chosen I
12 think as I should have been at that time,
13 but it is still accurate, yes.
14      Q.   It's still accurate?
15      A.   Yes.
16      MR. RAFFERTY:  Okay.
17      That's all the questions I
18 have.
19      MR. RABER:  I just will note
20 for the record that I'm going to
21 object to what I consider to be
22 expert opinions about labeling,
23 naproxen and some other topics, on
24 the grounds that this deposition

Page 196

1  was noticed of Dr. Fries as a fact
2  witness. There have been no
3  expert reports served. And
4  because of unique circumstances,
5  there are time limits that are
6  hard time limits that would
7  preclude sufficient examination of
8  expert opinions and some of the
9  opinions expressed today.
10      So, I'm going to just note
11 that objection for the record, and
12 we don't need to fight about it.
13 It is what it is.
14      MR. RAFFERTY:  Obviously
15 I've got responses. I don't think
16 there's a reason to get involved
17 in it here.
18      MR. RABER:  And I would just
19 also note that the subpoena for
20 documents also related to factual
21 matters, not expert opinions.
22      That's it.
23      THE VIDEOTAPE TECHNICIAN:
24 Is that it?  Concluded?

Page 197

1       Okay.
2       This concludes today's
3  proceedings. The number of
4  videotapes used is two. We are
5  now going off the video record.
6  The time is 4:14 p.m.
7       - - -
8       (A discussion off the record
9  occurred.)
10      - - -
11      MR. STEIN:  Steve Stein
12 representing the California state
13 plaintiffs in the coordinated
14 action, and certain California and
15 New Jersey plaintiffs represented
16 by our firm.
17
18      MS. COVEY:  Susan Covey
19 representing ^ New Jersey.
20      MR. RAFFERTY:  Troy Rafferty
21 on behalf of the Vioxx MDL
22 Plaintiffs' Steering Committee,
23 and I guess for recross purposes
24 at the request of Mr. Lanier, the

50 (Pages 194 to 197)

22ebf3d7-e389-4696-ba87-e2975078da5f

ROUGH DRAFT - Confidential - Subject to Protective Order

Page 198

1   New Jersey.
2       MR. RABER:  Steve Raber from
3   Williams & Connolly for Merck.
4       MR. BOEHN:  Paul Boehn,
5   Williams & Connolly for Merck.
6       Mr. LOENBERG ^ :  Mike
7   Loenberg for certain plaintiffs in
8   New Jersey, Texas and MDL.
9       MS. TOLER ^ :  Lauren Jane
10  Toler from Stanford University for
11  Stanford and Dr. Fries, and Anne
12  Jolene Covey ^ from Gordon and
13  Reese also representing Stanford
14  University and Dr. Fries.
15      MR. BLANCHARD:  Robert
16  Blanchard, MDL plaintiffs.
17
18
19
20
21
22
23
24

Golkow Litigation Technologies - 877.DEPS.USA

22ebf3d7-e389-4696-ba87-e2975078da5f