UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX LITIGATION: MDL DOCKET NO. 1657

---

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

- - -

Coordination Proceeding: CASE NO. JCCP
Special Title : JCCP NO. 4247
(Rule 1550(b)) :
:
This Document Applies :
To All :
VIOXX CASES

- - -

CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER

- - -

November 22, 2005

- - -

Videotape deposition of ERIC J. TOPOL, M.D., held in the InterContinental Hotel, 9801 Carnegie Place, Cleveland, Ohio 44106, commencing at 9:41 a.m., on the above date, before Linda L. Golkow, a Federally-Approved Registered Diplomate Reporter and Certified Shorthand Reporter.

- - -

GOLKOW LITIGATION TECHNOLOGIES
Four Penn Center - Suite 1210
1600 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
1.877.DEPS.USA

Page 2

APPEARANCES:

KLINE & SPECTER, P.C.
BY: THOMAS R. KLINE, ESQUIRE
and
LISA DAGOSTINO, M.D., J.D.
and
LEE B. BALEFSKY, ESQUIRE
(By Telephone)
19th Floor
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000
Counsel for Plaintiffs

SEEGER WEISS LLP
BY: DAVID R. BUCHANAN, ESQUIRE
Suite 920
550 Broad Street
Newark, New Jersey 07102
(973) 639-9100
Counsel for Plaintiffs

LEVIN SIMES & KAISER LLP
BY: STEVEN B. STEIN, ESQUIRE
One Bush Street - 14th Floor
San Francisco, CA 94104
(415) 646-7171
Counsel for Plaintiffs

THE BEASLEY FIRM LLC
BY: SCOTT D. LEVENSTEN, ESQUIRE
1125 Walnut Street
Philadelphia, Pennsylvania 19107
(215) 592-1000
Counsel for Plaintiffs

- - -

Page 3

APPEARANCES: (Continued)

LEVIN FISHBEIN SEDRAN & BERMAN
BY: MICHAEL M. WEINKOWITZ, ESQ.
Suite 500 - 510 Walnut Street
Philadelphia, Pennsylvania 19106
(215) 592-1500
Counsel for Plaintiffs
(By Telephone)

MINTZ, LEVIN COHN FERRIS GLOVSKY AND POPPEO P.C.
BY: H. JOSEPH HAMELINE, ESQUIRE
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000
Counsel for the Witness,
Eric J. Topol, M.D.

THE CLEVELAND CLINIC FOUNDATION
BY: VICTORIA L. VANCE, ESQUIRE
1950 Richmond Road
Lyndhurst, Ohio 44124
(216) 297-7067
Counsel for the Witness,
Eric J. Topol, M.D.

BARTLIT BECK HERMAN PALENCHAR & SCOTT, LLP
BY: ANDREW L. GOLDMAN, ESQUIRE
Courthouse Place
54 West Hubbard Street
Chicago, Illinois 60610
(312) 494-4400
Counsel for Merck & Company, Inc.

Page 4

APPEARANCES: (Continued)

JOSEPH D. PIORKOWSKI, JR., ESQUIRE
910 17th Street, N.W.
Suite 800
Washington, DC 20006
(202) 223-5535
Counsel for Merck & Company, Inc.

HUGHES HUBBARD & REED
BY: JAMES C. FITZPATRICK, ESQUIRE
One Battery Park Plaza
New York, New York, 10004
(212) 837-6000
Counsel for Merck & Company, Inc.

CRUSE, SCOTT, HENDERSON & ALLEN
BY: JAY HENDERSON, ESQUIRE
7th Floor - 2777 Allen Parkway
Houston, Texas 77019-2133
(713) 650-6600
Counsel for Texas physicians
(By Telephone)

- - -

Page 5

APPEARANCES (VIA INTERNET)

LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS
BY: JOSEPH JANE, ESQUIRE
(Via Internet)

LEVIN PAPANTONIO THOMAS MITCHELL ECHSNER & PROCTOR, P.A.
BY: TROY RAFFERTY, ESQUIRE
JASON TISDALE, ESQUIRE
(Via Internet)

SNAPKA & TURMAN, LLP
BY: KATHRYN SNAPKA, ESQUIRE
(Via Internet)

EVANS & ROWE
BY: NATHAN KETTERLING, ESQUIRE
(Via Internet)

CLARKE PERDUE ARNOLD & SCOTT
BY: D. ANDREW LIST, ESQUIRE
(Via Internet)

CRUSE SCOTT HENDERSON & ALLEN
BY: SHARON ALFORD, ESQUIRE
(Via Internet)

GIBBONS DEL DEO DOLAN GRIFFINGER & VECCHIONE
BY: VIK ADVANI, ESQUIRE
(Via Internet)

- - -

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer
Page Line Page Line
(None)

Request For Production of Documents
Page Line Page Line
(None)

Stipulations
Page Line Page Line
(None)

Questions Marked
Page Line Page Line
(None)

- - -

INDEX

| WITNESS | PAGE NO. |
|---|---|
| ERIC J. TOPOL, M.D. | |
| By Mr. Kline | 25, 555 |
| By Mr. Goldman | 316 |

- - -

EXHIBITS

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Topol-1 | Curriculum Vitae Eric Jeffrey Topol, M.D. TOPOLE 0000001 - TOPOLE 0000127 | 26 |
| Topol-2 | E-mails TOPOLE 0000450 | 45 |
| Topol-3 | "The sad story of Vioxx, and what we should learn from it," (Karha/Topol), Cleveland Clinic Journal of Medicine, Volume 71, Number 12, December 2004, 933-939 | 53 |
| Topol-4 | "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," (Mukherjee, et al), JAMA, August 22/29, 2001 Vol 286, No. 8, 954-959 | 82 |
| Topol-5 | E-mails MRK-ABA0009274 | 87 |
| Topol-6 | E-mail 4-26-01, with attachment, "Selective COX-2 Inhibitors are Associated with An Increased Risk of Cardiovascular Events," (Mukherjee, et al) draft manuscript MRK-AAZ0001561 - MRK-AAZ0001593 | 89 |
| Topol-7 | E-mails, with attachment, "Selective COX-2 Inhibitors are Associated with An Increased Risk of Cardiovascular Events," (Mukherjee, et al) draft manuscript, MRK-ABA0009661 - MRK-ABA0009693 | 106 |
| Topol-8 | Memo 2-1-01, "Consultation NDA 21-042, S-007 Review of cardiovascular safety database (Targum) (37 pages) | 115 |
| Topol-9 | Excerpt from "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," (Mukherjee, et al), JAMA, August 22/29, 2001 Vol 286, No. 8, 956 | 126 |
| Topol-10 | "Raising a Cautionary Flag about COX-2 Use in High-Risk Heart Patients," Cleveland Clinic Heart Center (2 pages) | 167 |
| Topol-11 | "Lack of Cardioprotective Effect of Naproxen," Arch Intern Med/Vol 162, Dec 9/23, 2002 2637 | 173 |

Topol-12 "Cyclooxygenase-2: Where are we in 2003? Cardiovascular risk and COX-2 inhibitors," (Mukherjee et al), Arthritis Research and Therapy 2003, Vol. 5, 8-11 181

Topol-13 "Pharmaceutical advertising versus research spending: Are profits more important than patients? (Mukherjee et al) American Heart Journal, October 2003, 563-564 187

Topol-14 "A coxib a day won't keep the doctor away," (Topol, et al), The Lancet Vol 364, August 21, 2004, 639-640 195

Topol-15 "Risk of cardiovascular events and rofecoxib: Cumulative meta-analysis," (Juni, et al) The Lancet, Vol. 364, December 4, 2004, 2021-2029 201

Topol-16 "Rofecoxib, Merck, and the FDA," (Kim et al), N Engl J Med 351;27 December 30, 2004, 2875 - 2878 226

Topol-17 "Good Riddance to a Bad Drug," (Topol) New York Times Reprint, October 2, 2004 (2 pages) 230

Topol-18 "Failing the Public Health - Rofecoxib, Merck, and the FDA (Topol) N Engl J Med 351;17 October 21, 2004 1707-1709 237

Topol-19 "Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs..." (Graham, et al), The Lancet, Vol. 365, February 5, 2005, 475-481 240

Topol-20 E-mails TOPOLE 0000458 245

Topol-21 E-mails TOPOLE 0000333 250

Topol-22 Handwritten notes TOPOLE 0000469 265

Topol-25 "Cardiovascular System Clinical Profile in Osteoarthritis Studies," Cardiovascular Card, MRK-ABW00000243 - MRK-ABW0000248; MRK-ADB0009039 - MRK-ADB0009042; MRK-ACW0008375; MRK-ACZ0072955 - MRK-ACZ0072956 274

Topol-23 Handwritten notes TOPOLE 0000504 277

Topol-24 Handwritten notes TOPOLE 0000463 288

Topol-26 "Preliminary Questions - 60 Minutes" TOPOLE 0000465 300

Topol-27 Letter 10-7-04 with handwritten notes TOPOLE 0000462 303

Topol-28 Memo 10-17-04 TOPOLE 0000474 305

Topol-29 New York Daily News Reprint (3 pages) 319

Topol-30 "Arthritis Advisory Committee NDA # 21-042/S007, Vioxx (Rofecoxib, Merck)" 2-8-01, 1-3; 210 351

Topol-31 E-mails MRK-AAZ0001594 367

Topol-32 "Rofecoxib in the Prevention of Ischemic Events in Patients with Acute Coronary Syndromes and Elevated Markers of Inflammation," (Bhatt, et al) MRK-ABA0003235 - MRK-ABA0003244 367

Topol-33 "Selective COX-2 Inhibition Improves Endothelial Function in Coronary Artery Disease," (Chenevard, et al) Circulation, January 28, 2003, 405-409 387

Topol-34 E-mails MRK-ABA0011062 410

Topol-35 E-mails TOP1PRO0000282 - TOP1PRO0000283 413

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Topol-36 E-mail 6-20-01, with attachment, "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," (Mukherjee, et al) Draft Manuscript, TOP1PRO0000285 - TOP1PRO0000311 417

Topol-37 E-mails TOP1PRO0000279 429

Topol-38 "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," JAMA August 22/29, 2001 Vol 286, No. 8, 954-958, MRK-ADJ0035003 - MRK-ADJ0035008 434

Topol-39 "A coxib a day won't keep the doctor away," (Topol, et al) The Lancet Vol 364 August 23, 2004, 639-640 444

Topol-39A Letter 10-16-01 EJT 000323 - EJT 000324 450



Topol-40 "Systematic adjudication of myocardial infarction end-points in an international clinical trial," (Mahaffey, et al), Current Controlled Trials in Cardiovascular Medicine August 2001 Vol. 2 No. 4, (6 pages) 455

Topol-41 E-mails EJT 000191 484

Topol-42 E-mails EJT 000192 494

Topol-43 E-mails EJT 000190 501

Topol-44 "MRL Clinical Study Report, Multicenter Study: A Randomized, Placebo-Controlled, Parallel-Group, Double-Blind Study to Evaluate the Efficacy and Safety of MK-0966 (Rofecoxib) 12.5 mg Versus Nabumetone 1000 mg in Patients with Osteoarthritis of the Knee (Protocol 090)," MRK-00420016832 - MRK-00420016849 513



Topol-44A Memo 2-1-01 "Consultation NDA 21-042, S-007 Review of cardiovascular safety database," (Targum) with handwritten notes, EJT 000211 - EJT 000248 527

Topol-45 E-mail 10-17-04 EJT 000343 533

Topol-46 E-mails FDACDER 023057 - FDACDER 023058 538

Topol-47 Letter 4-11-02, with attached label EJT 000044; EJT 000050 - EJT 000065 543

Topol-48 "Dr. Topol's Analysis CV Events in Study 090," Chart (1 page) 588

Topol-49 E-mail 3-9-00 MRK-ABH0016219 589

Topol-50 E-mails MRK-ABC0033809 592

Topol-51 E-mails TOPOLE 000149 - TOPOLE 000150 601



Topol-52 "Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib," (Konstam, et al), Circulation 2001;104:r15-r23 612

Topol-53 Letter 12-17-01 TOPOLE 0000511 619

Topol-54 Letter 1-7-02 TOPOLE 0000456 - TOPOLE 0000457 622

Topol-55 Letter 2-5-02 TOPOLE 0000452 625

Topol-56 E-mails MRK-AAC0152575 - MRK-AAC0152576 632

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer
Page Line Page Line
(None)

Request For Production of Documents
Page Line Page Line
(None)

Stipulations
Page Line Page Line
(None)

Questions Marked
Page Line Page Line
430

- - -

MR. GOLDMAN: Merck objects to the use of Dr. Topol's deposition in the upcoming Plunkett trial because, among other things, Dr. Topol has not been designated as an expert witness and has not submitted an expert report, and I expect that much of Dr. Topol's testimony today will be in the form of opinion testimony.

In Plunkett, also the deposition designations and exhibit lists have already been submitted, and the trial starts in six days.

MR. KLINE: Before we go on the video, we have a loose understanding worked out between myself and Mr. Goldman that I will examine for three hours, he will then -- we split the time four/three, four hours and three

hours of actual tape running time. We will attempt to finish sooner, if we can. Something tells me that won't happen.

There's going to be time kept on the record as to the actual running time, which will not include time taken for objections or time off of the record.

I've also advised Mr. Goldman that I'm going to reserve an hour. So, I'm going to do three hours, hopefully I'll get through everything, and then we'll do an hour -- or we'll do his examination, I'll come back and do redirect, and then he will do limited recross, if needed, to the areas that I examine. He and I have agreed that we will limit our redirect and our recross very specifically to the rules of evidence as you would do a

redirect and a recross, rather than open up new areas.

I think that's our basic understanding, and we've agreed to attempt to agree on as much as possible today.

We've also agreed that we'll go off the video record for any objections. So, if there's an objection, we'll go off the record if there's something to be added other than the word "objection." Is that fair enough?

MR. GOLDMAN: Well, if I state the basis for some of the objections, you don't expect to go off the record for those. So, for example, if I say "objection, opinion testimony" --

MR. KLINE: No.

MR. GOLDMAN: Okay.

MR. KLINE: That's fine. But if you have some longer objection, then go. It is either

Page 22

objection, two or three words or objection, off the record. And I'll do the same if there's something longer to be said.

MR. GOLDMAN: Fair enough.

MR. KLINE: Thomas R. Kline for plaintiffs. This deposition is being taken pursuant to the federal litigation pending in the MDL.

I'm here with Lisa Dagostino, M.D., J.D., and she will be assisting me.

MR. BUCHANAN: Dave Buchanan, Seeger Weiss, also for plaintiffs in the MDL litigation.

MR. STEIN: I'm Steve Stein. I'm here for the California plaintiffs in the state proceedings, state coordination proceeding, which has been cross-noticed -- which was cross-noticed for this deposition.

My understanding from Jim

Page 23

O'Callahan, liaison counsel, is that Merck also cross-noticed it in the California state proceeding. So, we're here for the California state plaintiffs in the JCCC coordination.

Steve Stein, Levin Simes & Kaiser, San Francisco, California.

MR. LEVENSTEN: Scott Levensten, The Beasley Firm, Philadelphia.

MR. GOLDMAN: My name is Andy Goldman. I represent Merck.

MR. PIORKOWSKI: Joseph Piorkowski, I represent Merck.

MR. FITZPATRICK: Jim Fitzpatrick, I represent Merck.

MR. HAMELINE: My name is Joseph Hameline. I'm with the law firm of Mintz Levin, and I'm here on behalf of Dr. Topol.

MS. VANCE: Vicki Vance, in-house counsel at the Cleveland Clinic Foundation, associate

Page 24

counsel.

MR. BALEFSKY: Lee Balefsky, Kline & Specter.

MR. HENDERSON: Jay Henderson, Houston, Texas, pursuant to an agreement with Merck for some Texas physicians.

MR. STEIN: Linda, I've provided you the notice that was served. Can we have that entered as part of the record, our California state notice?

THE COURT REPORTER: Yes.

THE VIDEOTAPE TECHNICIAN: We're on the video record. The time is 9:41. The date is November 22, 2005.

This is the videotape deposition of Eric Topol, M.D. in the matter of In Re: Vioxx Products Liability Litigation in the U.S. District Court, Eastern Division, District of Louisiana, MDL Number 1657.

Page 25

The court reporter, would you please swear in the witness.

\- - -

ERIC J. TOPOL, M.D., after having been duly sworn, was examined and testified as follows:

\- - -

EXAMINATION

\- - -

BY MR. KLINE:

Q. Dr. Topol, good morning. Nice to meet you, sir.

A. Good morning.

Q. I have four hours, three of which I'm going to take to do your direct examination. I have a lot of material to cover with you, so, I want to be very direct and hopefully elicit your testimony, but I want to keep moving to accomplish that.

Are you prepared to do that with me, sir?

A. Yes.

Q. Okay, good.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 26

And if you'd speak up just a little bit, I think that would be helpful.

A. Certainly.

Q. That would be good.

I want to review very briefly the highlights of your background.

You have a curriculum vitae. I'm marking it as Exhibit 1 for this deposition.

- - -

(Whereupon, Deposition Exhibit Topol-1, Curriculum Vitae Eric Jeffrey Topol, M.D., TOPOLE 0000001 - TOPOLE 0000127, was marked for identification.)

- - -

BY MR. KLINE:

Q. The version that I have is what I understand to be an abridged version of 127 pages. Suffice it to say, you have a very substantial curriculum

Page 27

vitae outlining your background and experience; correct?

A. Yes.

Q. You are -- what is your current position, sir?

A. I'm Provost of the Cleveland Clinic Lerner College of Medicine, Chief Academic Officer of the Cleveland Clinic, and also the chairman of the Department of Cardiovascular Medicine of the Cleveland Clinic.

Q. Take them one at a time. Identify each one of those positions, and tell me very briefly what they entail.

A. The Provost of the medical college is providing the oversight of this college of medicine, which had its beginning just three years ago, and it's part of Case Western Reserve University.

The chief academic officer responsibility is responsible for all research and education here at this academic medical center, and I've been chairman of the department of

Page 28

cardiovascular medicine since 1991, and this is a large department, one of the largest departments in cardiovascular medicine in the country.

Q. My understanding, sir, that this -- and you are a cardiologist; is that correct?

A. That's right.

Q. Trained as a cardiologist; correct?

A. That's exactly right.

Q. You did your undergraduate degree at the University of Virginia, your medical school at the University of Rochester, a residency at the University of California, San Francisco, a fellowship at Johns Hopkins in cardiology, and then you became Board Certified in internal medicine and in cardiology. All correct?

A. That's all correct.

Q. And then you practiced medicine and eventually worked yourself up to become the top person in the

Page 29

department of cardiovascular medicine at the Cleveland Clinic; correct?

MR. GOLDMAN: Object to form.

THE WITNESS: That's correct, yes. As of 1991, I came to Cleveland Clinic.

BY MR. KLINE:

Q. And when did you become chairman of the department of cardiovascular medicine?

A. On my arrival.

Q. Oh, right on your arrival?

A. Yes. That was why I was recruited here.

Q. Where were you previously?

A. University of Michigan, where I directed the cardiocatherization laboratory, and I was a professor of medicine there.

Q. And you've spent your entire career as a practicing cardiologist, sir?

A. Yes. I continue to practice cardiology with patients.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 30

Q. And how many years have you been a cardiologist?
A. 20 years.
Q. You also -- it mentioned that you're the Provost of the Cleveland Clinic, and that involves overseeing the entire medical college?
A. The medical college, which I founded with Case Western Reserve University back in 2001.
Q. In addition -- oh, and I might add, the Cleveland Clinic, sir, give us a sentence or two on what is the Cleveland Clinic, especially in heart medicine.
A. Well, in the field of heart medicine, it's been ranked by the U.S. News & World Report as the number one center for the last 11 years consecutively.
Q. You have been a clinical investigator on many clinical studies; is that correct?
A. That's right.

Page 31

Q. Tell us about it briefly, a few sentences.
A. Well, I've chaired a number of clinical trials over the past 20 years. The most widely known are the so-called GUSTO trials of heart attack. All these trials had something to do with heart attack prevention or better treatment.
The cumulative 200,000 patients were enrolled, the largest heart attack trials ever performed in the United States, coordinated. I've been the chair of all of those trials. They've been multinational trials, involving 40 different countries around the world, and these trials have had, I think, a substantial impact on clinical practice in the field of cardiology and for patients.
MR. GOLDMAN: Move to strike as nonresponsive.
BY MR. KLINE:
Q. You hold two patents; is

Page 32

that correct, sir?
A. I think the patents have been applied for. I'm not -- yes, yes.
Q. Now, in addition, you are on the editorial board of a number of peer-review journals; is that correct?
A. Yes.
Q. Would you explain them? Well, let me tick them off. I think it could be done more quickly.
Circulation, JACC, American College -- American Journal of Cardiology, American Journal of Medicine, among others; is that correct?
A. That's right.
Q. And what does that involve, sir, very briefly?
A. Well, that means being a peer reviewer for manuscripts, work, research that's being conducted elsewhere, and to provide reviews and input and at times editorials, to help advance the field insofar as biomedical research and literature.

Page 33

Q. You have been an investigator, according to your vitae, on many NIH projects, National Institutes of Health. Briefly, a few sentences, tell us about that.
MR. GOLDMAN: Objection to form.
THE WITNESS: Well, the main one is at a specialized center of clinically-oriented research, which is the flagship grant of the NIH, which I was awarded a year ago. It's a five-year grant for nearly $18 million to support our work in genetics and genomics of coronary artery disease and heart attack, and that's been the main research interest that I've had over the past five years, has been in the genetics and genomics of heart attack.
BY MR. KLINE:
Q. You've been a manuscript reviewer for a number of journals, peer

Page 34

review, including Nature, Science, the New England Journal of Medicine, JAMA, Lancet and many other prestigious journals; correct?

MR. GOLDMAN: Object to form.

THE WITNESS: Yes.

BY MR. KLINE:

Q. I have by count, and I'm doing all of this, I might say, just to save time, to get through all of this, you have by my count, 909 original publications in the scientific literature. Does that sound about right?

A. That's about right.

Q. You have 36 collaborative group-authored papers, meaning papers where a group is mentioned, not you, but you really were a major contributor. Is that also correct?

MR. GOLDMAN: Object to form.

THE WITNESS: That's correct.

Page 35

BY MR. KLINE:

Q. You are -- you have 39 articles submitted for publication at the time that the curriculum vitae you handed us was. In other words, these are not even yet published, they're in the mill; is that correct?

MR. GOLDMAN: Object to form.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Again, by my count, an author or co-author on 30 books?

MR. GOLDMAN: Objection to the form.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. 164 book chapters?

MR. GOLDMAN: Same objection.

THE WITNESS: That's correct.

BY MR. KLINE:

Page 36

Q. And these all deal in the field of cardiology, sir?

A. Virtually all are cardiology pieces of work, yes.

Q. And there was a recent article, and I'd like you to tell me if this is correct, it sort of pulls some things together, on November 11th in the Associated Press which says, "One medical journal index service ranked Topol as the eighth most cited medical researcher among its index publications in the past ten years with his 498 papers cited by colleagues, 21,050 times."

Is that about correct?

MR. GOLDMAN: Object to form.

THE WITNESS: That's correct. The ISI ranks medical researchers, and in the last ten years, I'm ranked number eight of the most widely cited medical researchers in the world. So, that's correct.

Page 37

BY MR. KLINE:

Q. Let me ask it in a different way just to be sure.

How does the -- what is the ISI, and how does it rank you as someone who is cited by others in the medical field?

A. That means that if you publish a paper and that paper is cited by others, that's the cumulative tally of citations of your impact in the medical literature, in the medical community, and so that is the most highly regarded authority for collating that data. And in the ten-year cumulative tally, as you mentioned, somewhere around 500 manuscripts were published, and that was the eighth leading, I believe, citation tally in the rankings.

Q. Are you, sir, with this background, an expert in the field of cardiovascular medicine?

MR. GOLDMAN: Object to the form.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 38

THE WITNESS: I believe I am, yes.
BY MR. KLINE:
Q. I see here your either notepad or a prescription pad says "The Cleveland Clinic Foundation, A National Referral Center and International Health Resource."
Is that a correct description?
A. Yes, it's correct.
Q. And it says, "Eric Topol, M.D., Provost and Chief Academic Officer, Chairman, Department of Cardiovascular Medicine," listing your address. Is that a correct description of your title at this institution?
A. Yes.
Q. Sir, at some point in time you became interested in the drug Vioxx; is that correct?
A. Yes.
Q. And that would have been sometime around what year?

Page 39

A. Well, it was February 2001.
Q. Okay.
Now, I want to fast forward before going to February 2001, which I'll go back.
Between February 2001 and today, sitting here today, which is November --
MS. VANCE: 22.
BY MR. KLINE:
Q. -- 22nd of 2005, have you expressed certain opinions publicly and in the academic literature, as well as privately in e-mails and writings, relating to your beliefs and opinions regarding the drug Vioxx?
A. Yes, certainly.
MR. GOLDMAN: Objection, calls for expert testimony, and Dr. Topol has not been designated as an expert.
MR. KLINE: Let's go off the record.
THE VIDEOTAPE TECHNICIAN:

Page 40

Off the record at 9:52.
MR. KLINE: The only thing I would ask is so we can have the ground rules from the beginning, if we're going to go off the record, let's go off the record. If we're going to just state objection, a word or two, then let's do it that way per our agreement. Is that fair.
MR. GOLDMAN: Sure.
MR. KLINE: Okay. I appreciate it.
THE VIDEOTAPE TECHNICIAN: Back on the record at 9:52.
BY MR. KLINE:
Q. The opinions and conclusions which you reached, were they formed within the scope and context of your practice of cardiology, as well as your interest as a researcher and in your responsibilities to patients and to this institution?
A. Yes.

Page 41

MR. GOLDMAN: Object to the form, calls for expert testimony.
MR. KLINE: Let's go off the record again.
THE VIDEOTAPE TECHNICIAN: Off the record at 9:53.
MR. KLINE: I'm just trying to figure out a shorthand way to handle it.
MR. GOLDMAN: It was just a few words.
MR. KLINE: But if that's going to be the objection all of the time, why don't you say objection, expert testimony, and then I'll know what it is, and any judge who reads it will know what it is, and that way I don't have to constantly hear the disruption of it.
Or we can do it another way, which is, to the extent that you believe that there's expert testimony, which I think is going

to be your objection all day, Mr. Goldman, why don't we just reserve that as an objection, and then you don't have to say it all of the time. It will be one of those reserved objections.

MR. GOLDMAN: I will reserve the objection, but I also have to make it as often as I hear it, because it's unclear in many states whether or not reserving an objection is recognized as actually preserving it. So, I'm going to have to make the objection.

What I will do, though, is when it calls for expert testimony, I will say objection, opinion testimony.

MR. KLINE: As far as I'm concerned, you can say objection to any objection and state the basis at some time when it is being argued in front of a court

unless it is something that has to be off the record. That way I don't have the disruption all day. Is that agreeable?

MR. GOLDMAN: Mr. Kline, I'm just telling you what I'll do is what you said a minute ago, and that is, when you are asking for opinion testimony, I will say objection, opinion testimony.

MR. KLINE: That's the best I can do with you?

MR. GOLDMAN: Yes.

MR. KLINE: Let's go back on the record. I'm sorry for the interruption, Dr. Topol.

THE VIDEOTAPE TECHNICIAN: Back on the record at 9:55.

BY MR. KLINE:

Q. Okay.

I believe you answered the last question, which was, you have formed opinions in the scope and context of your duties and responsibilities to your

patients, your research in this institution; is that correct?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. Now, you also formed opinions relating to the conduct of the pharmaceutical company, Merck, and its conduct of research and its marketing and its making available to the public the drug Vioxx; is that correct?

MR. GOLDMAN: Objection, opinion testimony and form.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. And those opinions were expressed in many forms, and they would include places such as 60 Minutes, ranging from 60 Minutes to the New York Times, to the Journal of the American Medical Association; is that correct?

MR. GOLDMAN: Object to the form, opinion testimony.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Now, what I'd like to do is to show you a document which is from November 24, '04, marked as Exhibit Number 2.

\- - -

(Whereupon, Deposition Exhibit Topol-2, E-mails, TOPOLE 0000450, was marked for identification.)

\- - -

BY MR. KLINE:

Q. It's an e-mail from you to David Graham. Who is David Graham?

A. David Graham is a safety officer at the Food & Drug Administration.

Q. You wrote an e-mail to him on November 22nd, 2004 following what were Senate hearings relating to the drug Vioxx; is that correct?

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 46

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. When did you write this to him?

A. It's November 22nd at 10:00 p.m.

Q. And when was it in the context of? What was it after? I'm asking you in a non-leading fashion.

A. It was -- he had testified on the 18th of November at Senator Grassley's hearings on Vioxx --

Q. Does this --

A. -- and I wrote to him after that.

Q. Does this e-mail --

MR. GOLDMAN: I move to strike opinion testimony.

BY MR. KLINE:

Q. Does this e-mail reflect some of the opinions and conclusions that

Page 47

you reached relating to Merck's conduct of its scientific studies and its marketing of the drug Vioxx over the past four years since you have become involved in the matter?

A. Yes.

MR. GOLDMAN: Objection, opinion testimony.

And, Tom, we can go off the record for a second.

THE VIDEOTAPE TECHNICIAN: Off the record at 9:57.

MR. GOLDMAN: Can I have a standing objection to Exhibit 2 and any discussion about Exhibit 2 on the ground that it also is irrelevant, and it calls for opinion testimony?

MR. KLINE: Yes.

- - -

(Whereupon, an off-the-record discussion was held.)

- - -

Page 48

MR. KLINE: Before we go back on the record, let's ask, is there a reason for relevancy objections on the record? I mean, it's a discovery dep.

MR. HAMELINE: Can I just note on the record here that Dr. Topol is, as you've seen from his resume, a very busy man, he's treating patients, he has academic and professional obligations at the clinic. He's here pursuant to the deposition notice and also pursuant to The Court order which regulates these depositions.

MR. KLINE: Yes.

MR. HAMELINE: He's here for the seven-hour period. I understand your concern about working these issues out off the record or at least off the videotape. However, if this goes on, we're going to count the seven hours as seven hours, and we're

Page 49

going to give you some leeway, we want to get this done in a fair and appropriate fashion, but we've been going now for about 25 minutes, 15 of which seem to have been off the record.

MR. KLINE: I agree.

MR. HAMELINE: Just so I note my concern up front.

MR. KLINE: They are off the video record. I agree fully. I would like to ask him questions. I've asked Merck's counsel if they will simply agree with me to say the word "objection," and they can say all the objections they want to any court, any time in the country.

MR. HAMELINE: Fine. Let's just go ahead.

THE VIDEOTAPE TECHNICIAN: Back on the record at 9:59.

BY MR. KLINE:

Q. Okay.

Page 50

Sir, I'm looking at the part where you say, "I am bothered." Do you see where you say to David Graham -- is Graham a physician?
A. Yes.
Q. So, you're saying to Dr. Graham, "I am bothered." Would you read that for us, please?
A. "I am bothered by the continued outrageous lies of Merck with their fullpage multiple ads that 'they published everything' and that they never had a trial which showed any harm of Vioxx until APPROVe, when, in fact, there were two by May 2000."
Q. Continue.
A. "I am also upset that the story of their scientific misconduct for the VIGOR paper in" the New England Journal of Medicine, that's "NEJM, with errors of omission (deaths), erroneous data (MIs)," or heart attacks, "and incomplete data (more than 1/2 of the thrombotic events) has not received any

Page 51

attention whatsoever."
Q. Okay. Did you believe --
MR. GOLDMAN: I'm going to object, Tom, to the form, and all of this calls for opinion testimony.
BY MR. KLINE:
Q. Did you believe what you wrote in that e-mail to Dr. Graham?
A. Yes, I did believe this.
MR. GOLDMAN: Same objection.
THE WITNESS: I was privately expressing it to Dr. Graham, but I certainly stand by that and believe it, yes.
BY MR. KLINE:
Q. Okay.
You believed it then, and do you believe it now?
MR. GOLDMAN: Same objection.
THE WITNESS: Yes, I certainly do.

Page 52

BY MR. KLINE:
Q. Do you believe that there were, in the context of what Merck did, "outrageous lies" by Merck?
MR. GOLDMAN: Objection, opinion testimony, leading.
THE WITNESS: I believe that the data has been seriously misrepresented, yes.
BY MR. KLINE:
Q. You said in the next to last sentence there, "This," the words, "This cannot." Do you see it in the very last sentence?
A. This cannot?
Q. "This cannot stand and the truth about Vioxx needs to come out."
MR. GOLDMAN: Object to the form, leading.
THE WITNESS: Yes, yes. That's what I wrote.
BY MR. KLINE:
Q. Would you read the last sentence of this, please?

Page 53

MR. GOLDMAN: Same objection, opinion testimony, form.
THE WITNESS: "This cannot stand and truth about Vioxx needs to come out."
BY MR. KLINE:
Q. And today, sir, are you prepared to tell what you believe to be the truth about Vioxx?
A. Absolutely.

\- - -

(Whereupon, Deposition Exhibit Topol-3, "The sad story of Vioxx, and what we should learn from it," (Karha/Topol), Cleveland Clinic Journal of Medicine, Volume 71, Number 12, December 2004, 933-939, was marked for identification.)

\- - -

BY MR. KLINE:
Q. Let me show you an article which was in the Cleveland Clinic Journal

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

in December of 2004. December of 2004, there's an article which was written, you'll have it in your hands in a moment, called "The sad story of Vioxx, and what we should learn from it." Did you co-author that article?

A. Yes, I did.

Q. What is the Cleveland Clinic Journal of Medicine?

A. That's the medical journal of this institution, which is widely circulated, has a circulation of nearly 100,000 physicians and paraprofessional staff.

Q. Did you -- that just goes on there, if you would please, sir. Anywhere is fine.

What I'd like you to do -- and do you consider this to be --

Is this a road map to the saga or the story of Vioxx, as you see it as a researcher and prominent physician in cardiology?

MR. GOLDMAN: Object to the

form. Can I have a standing objection on this document and testimony about it calls for opinion testimony.

BY MR. KLINE:

Q. Please, sir.

A. I believe it's certainly part of trying to get the facts straight about this very sad story, yes.

Q. Okay.

MR. GOLDMAN: Tom, I have a question. Can I have a standing objection to this document and any testimony about it on the ground that it calls for opinion testimony?

MR. KLINE: Yes. You can have a standing objection to anything that you say objection to that doesn't take my time in asking questions during this deposition. I want three hours of direct examination of this witness, and I've had around ten

minutes so far.

BY MR. KLINE:

Q. Sir, I'd like to walk this through, if you would, please. I want to look at your thing.

You said the story starts in 1999. I don't want you to read the article, but I want you to use this as a basis to tell us the story.

A. Yes.

Q. Tell us the story as you understand it as it happened in 1999 based on what you know, and tell us how you knew it and what you know and how the story began.

MR. GOLDMAN: Object to the form.

THE WITNESS: Well, in 1999 --

MR. GOLDMAN: Calls for opinion testimony.

THE WITNESS: -- in May, the FDA approved Vioxx for commercial use, so, that is an important

time, timeline. That was also at the time when the FDA had a formal review of the medicine, where the primary reviewer already had expressed in her document, Dr. Villalba, that there was a concern regarding clotting events with Vioxx even at the time of approval in May 1999.

BY MR. KLINE:

Q. You write here that, "The approval was based on data from trials lasting 3 to 6 months and involving patients at low risk for cardiovascular illness." Do you see that?

MR. GOLDMAN: Object to the form, lacks foundation.

THE WITNESS: That's right.

BY MR. KLINE:

Q. What is the significance of that fact?

MR. GOLDMAN: Object to the form.

THE WITNESS: Well, this is

Page 58

one of the most significant parts of the whole clinical development of the Vioxx medicine, and that is that patients with heart disease were not tested in any meaningful way, and we know from multiple databases and surveys that at least 40 to 50 percent of the patients who actually took this medicine when it was in clinical use actually did have known heart disease.

MR. GOLDMAN: Move to strike as nonresponsive --

BY MR. KLINE:

Q. Why --

MR. GOLDMAN: -- and calls for opinion testimony.

BY MR. KLINE:

Q. Why, as you view it, is that an important fact?

MR. GOLDMAN: Objection, calls for opinion testimony.

THE WITNESS: Well, it's

Page 59

important because if the medicine has a clotting risk in arteries such that it could induce heart attacks, strokes or death, the patients who are most liable to suffer as a consequence of that would be patients with preexisting or known atherosclerotic artery disease.

BY MR. KLINE:

Q. And did this medicine or does this medicine, in your opinion, have such a risk?

MR. GOLDMAN: Objection, calls for opinion testimony.

THE WITNESS: There isn't any question about the medicine's risk in this regard.

BY MR. KLINE:

Q. When you say there's no question, sir, can you give us broadly, and then I'll get into details with you later, broadly why you say that?

MR. GOLDMAN: Objection,

Page 60

opinion testimony.

THE WITNESS: Well, the medicine's risk, Vioxx's risk, has been evident since trials conducted in 1999 and all the way through the time of withdrawal in September 30, 2004.

BY MR. KLINE:

Q. Have there been multiple tests and multiple studies that have, in your opinion, proven that fact?

MR. GOLDMAN: Objection, calls for opinion testimony.

THE WITNESS: There's been replication of untoward significant excess of events of heart attack, death and stroke in multiple trials. That's right.

BY MR. KLINE:

Q. Okay.

Do you have any doubt about this in your mind, sir?

MR. GOLDMAN: Object to the form, calls for opinion testimony.

Page 61

THE WITNESS: There isn't any question in my mind about that.

BY MR. KLINE:

Q. I didn't say in the beginning of this deposition. You were subpoenaed for this deposition; is that correct, sir?

A. That's correct.

Q. And you have not been -- you are not serving here as an expert witness for any party; is that correct?

A. No, I'm not.

Q. And I'm going to continue to ask you all day long about things that are in your writings.

The things that you're telling us today, tell me if there's something that hasn't been said in your writings, because I'm going to ask you about things at least that I found in your writings. Okay?

MR. GOLDMAN: Objection to form.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

THE WITNESS: Yes.
BY MR. KLINE:
Q. Now, there was a study called VIGOR; is that correct?
A. Yes.
Q. And you eventually became familiar with this study called VIGOR; correct?
A. Yes.
Q. Did you participate in it?
A. No, not at all.
Q. Who did that study?
A. This study was done by rheumatologists, the doctors looking after patients with rheumatoid arthritis. It was a large trial by a network of rheumatologists and patients, about 8,000 patients with rheumatoid arthritis.
Q. Who funded the study?
A. Merck.
Q. Who conducted the study?
A. Merck.
Q. By the way, back to 1999 for a moment. Before the drug was even

studied clinically in patients, were there, to your knowledge, signals and issues relating to the drug from a pharmacological perspective that would indicate that the drug had any significant cardiovascular risks of any kind? Yes or no?
MR. GOLDMAN: Objection, opinion testimony and form.
THE WITNESS: There have been published papers, for example, by Dr. Garret FitzGerald, antedating the trials, which raised a concern regarding suppression of prostacyclin, which, of course, could be linked to the risk of heart attack, but it had not been demonstrated in a definitive way in clinical trials at the time of the approval in May 1999.
But what was interesting is that in May 1999, there already was the VIGOR trial, the very

largest -- the largest trial of Vioxx that was ongoing and heading towards completion, but nonetheless, the drug had been approved in May 1999, knowing that this trial would be forthcoming in a matter of months.
BY MR. KLINE:
Q. Let me jump ahead for a moment.
There came a point in time -- did there come a point in time where you published a study in the Journal of the American Medical Association?
A. Yes.
Q. Okay.
And what did that study involve briefly? I'm going to explore it a lot later, but I want to put it in context right now.
A. Well, the JAMA paper was the first published work to call out that there was indeed a significant risk of heart attack in the VIGOR trial and that

this needed a whole reset of our thinking of the safety of not just Vioxx, but also this whole class of COX-2 medicines. We also had the data for Celebrex to analyze from their so-called CLASS trial and all the studies that had been recently completed.
And so the main conclusion was that we were concerned about risk and that patients with heart disease needed to be appropriately studied.
Q. In order to --
MR. GOLDMAN: Objection, calls for opinion testimony.
BY MR. KLINE:
Q. In order to look at -- in order to write that article -- and you were a co-author; correct?
A. Yes.
Q. -- did you need at that point in time in 2001, which would obviously be true today, to learn and understand the mechanism of action of the drug as well as the clinical trials, as

Page 66

well as the animal and in vivo studies that were done?

MR. GOLDMAN: Object to form, opinion testimony.

THE WITNESS: Well, in order to write the article, and I was a senior author, so, I was the person held responsible for the article, I had to be familiar with all those points, that is, the experimental animal data, the pharmacokinetics, the pharmacology of the drug, the background of the drug and, of course, what clinical data were available. It mostly, of course, centered around the VIGOR trial.

BY MR. KLINE:

Q. And how did you educate yourself on that, sir?

A. Well, Dr. Mukherjee, who was our fellow at the time, was pulling all the studies together. I was also reviewing the literature, as well as Dr.

Page 67

Nissen. So, the three of us worked together to put this analysis and then subsequently the paper together.

Q. Okay.

Following our broad outline in the article that you wrote in the Cleveland Clinic Journal of Medicine in December of 2004, you indicate that "VIGOR's strong evidence that rofecoxib" -- that's the name for Vioxx?

A. Yes.

Q. -- "increases the risk of MIs," and it came out of that study; correct?

A. That's right.

MR. GOLDMAN: Object to the form.

BY MR. KLINE:

Q. You also say that "The incidence of MIs was higher in the rofecoxib group than in the naproxen group." Is that correct?

MR. GOLDMAN: Object to the form.

Page 68

THE WITNESS: That's correct.

BY MR. KLINE:

Q. All right.

Now, also -- well, let's look at the -- let's talk some more. Let's talk about VIGOR now.

A. Yes.

Q. VIGOR was, I think you described, I don't think it's as controversial, is the first -- let me step back.

VIGOR, the study, when did you become familiar with it?

A. Well, I only became aware of it, not when it was published in November of 2000, although going back, I reviewed that publication. But I only became aware of it in February 2001 at the time of the FDA special Advisory Committee to review the data from the VIGOR trial with respect to concerns on cardiovascular risk.

Q. What did the VIGOR trial

Page 69

say? What did Merck say that the VIGOR trial showed relating to cardiovascular risks?

MR. GOLDMAN: Object to the form.

THE WITNESS: Right. Well, I remember it very well, because the day that that panel had reviewed all the data, and one of the panelists was my colleague, Dr. Steven Nissen, I read -- I was actually at the medical college of Georgia, I was a visiting professor, I was reading the USA Today that morning, and it said that this was due to naproxen, that the VIGOR problems of heart attack was an issue of naproxen being beneficial rather than Vioxx being detrimental.

So, I was a little puzzled by that, but I didn't think too much of it until I got back to Cleveland, and the next day met

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 70

with Dr. Nissen and Dr. Mukherjee about the FDA proceedings. And Dr. Nissen explained he didn't think it was just so simple as the naproxen hypothesis, as we later termed it, and we started to drill down on the data and concluded that it was quite concerning.

MR. GOLDMAN: Objection. Move to strike, nonresponsive.

BY MR. KLINE:

Q. Okay.

What did you find was concerning about the VIGOR data?

A. Yes. Well, there were several things that were particularly bothersome. Number one, that if naproxen was protective, it had not ever been proven, that is, it didn't -- we didn't know for sure it had an aspirin-like effect. And so even if we could give -- assign naproxen the same magnitude of protection as aspirin, that would be at maximum a 25 percent reduction in heart

Page 71

attacks, which has been very carefully studied for aspirin.

So, if naproxen was as good as aspirin, that could be 25 percent reduction. But on the other hand, in VIGOR, we saw a 500 percent, that is, a 20-fold increase in heart attacks. So, the order of magnitude was greatly in excess of anything that aspirin could do.

Furthermore, the second point, in that if you have a randomized trial and you have an experimental arm, which is a new drug which hasn't been studied extensively, still a lot of things that need to be discovered about it, and you have an anchor drug, naproxen, that had been available for 20 years, and if you then do a comparison and you say, there's more than five-fold heart attacks and two-fold excess of cardiovascular serious events, how could you possibly conclude that it was the naproxen being beneficial? The only appropriate conclusion from that would be

Page 72

that there's a problem with the experimental drug Vioxx.

And beyond those concerns was that this trial was done in patients with rheumatoid arthritis without heart disease, and so whatever was being seen in the VIGOR trial could be far worse in patients with heart disease.

MR. GOLDMAN: Move to strike as nonresponsive, opinion testimony.

BY MR. KLINE:

Q. Now, what you've described to us in the previous answer, is that something that -- is that a capsule of what you were thinking, you and your colleagues were thinking, but you in particular, when you saw the VIGOR trial published in the New England Journal?

MR. GOLDMAN: Object to the form.

THE WITNESS: Well, I didn't even take notice of the VIGOR trial when it was in the New

Page 73

England Journal. It wasn't on my radar screen, and it didn't really catch, I believe, the cardiology community, because the heart attack part of that publication was not -- it was not featured, it was the protection from the gastrointestinal side effects that was the main conclusion, but only looked back at that paper after the FDA review of the VIGOR data and also of the celecoxib data. There were two days of FDA reviews. One day was devoted to Celebrex, and one day was dedicated to Vioxx.

BY MR. KLINE:

Q. To put it in context, the VIGOR trial was published sometime in the year 2000; correct?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: VIGOR was published November, I believe,

November 22nd, 2000.

BY MR. KLINE:

Q. And then the FDA hearings were early next year in February of '01?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: February 8, 2001.

BY MR. KLINE:

Q. And it was after the hearings in '01 where this, would it be fair to say -- I hope there's not an objection -- got on your radar screen?

A. Yes. It was only after the FDA hearing and Dr. Nissen coming back and Dr. Mukherjee going through the data, getting it all collated and three of us meeting, did this become something of an area of interest. It certainly was nothing in medicine that I had any interest in. It wasn't in my field of research up until that point in time.

Q. Was it an area of concern?

MR. GOLDMAN: Objection to

form.

BY MR. KLINE:

Q. Was it something that concerned you?

MR. GOLDMAN: Objection to form.

THE WITNESS: As soon as we looked at -- well, as soon as I read about the FDA panel, as I said, that morning, in the newspaper, I was concerned. But that concern was magnified after starting to review the data with my colleagues at the Cleveland Clinic.

BY MR. KLINE:

Q. Okay.

Were you alarmed?

MR. GOLDMAN: Object to form.

THE WITNESS: I don't know --

MR. GOLDMAN: Opinion testimony.

THE WITNESS: -- if I would use the word "alarmed," but I was significantly concerned that there was a medicine that was gaining increased wide scale use. There already was, of course, extensive advertisements and popularity of the medicine, and could something be wrong. That was a concern. I would say it was a significant concern.

BY MR. KLINE:

Q. Okay.

What did you decide to do?

A. So, we decided we would put together a manuscript to pull all the data that we could together, because there had not yet been one, there had not yet been a registration in the medical literature to the medical community that this was potentially a big deal.

Q. Is that the kind of thing that you do as an independent academic physician and scientist?

MR. GOLDMAN: Object to the form.

THE WITNESS: That's an obligation that we have, is to process data that's out there, try to make it available to our colleagues in the medical community, and in the interest of patients and caring for patients in the optimal way. This is the sort of thing that is critical.

BY MR. KLINE:

Q. Did you undertake what you did with any axe to grind towards Merck or towards the drug Vioxx?

MR. GOLDMAN: Object to the form.

THE WITNESS: I had absolutely no axe to grind. I had an excellent relationship with Merck. I had done clinical trials with Merck. In fact, I had just completed a very large trial called TARGET of over 6,000

patients published in the New England Journal of Medicine. And so I actually, for many years, enjoyed a very good relationship with Merck. So, I do not believe there was any axe to grind whatsoever.

BY MR. KLINE:

Q. Do I hear you correctly that you actually were a clinical researcher who had done a major clinical trial for Merck?

A. Yes. We had collaborated with Merck to do a trial in patients with coronary intervention, that is, getting stents or balloon angioplasty, and we were testing a medicine that they made called Aggrastat and comparing it with another medicine called Abciximab, and it was a very large trial.

Q. So, you and your colleagues went about the project that you've just described to me, which is collecting essentially everything you could find

about the drug Vioxx that was in clinical trials?

MR. GOLDMAN: Object to form.

THE WITNESS: Yes. All that we could find, which was in the FDA database, as well as whatever publications were available.

BY MR. KLINE:

Q. All right.

Tell me what you did then. I mean, what process did you follow, briefly?

A. Well, we culled all the data together, which did appear in the JAMA. It didn't have much in the way of changes from our initial submission to the actual publication in August. But the one concern that came up along the way was that the data were different in the New England Journal of Medicine paper published in November 2000 and the FDA database that was available in February 2001.

So, at that point, while we were ready to submit and did submit the paper to JAMA for consideration, I sent the paper to Merck, my colleague, Dr. Laura Demopoulos, who I had worked on this so-called TARGET trial, to see why there were discrepancies in the data between the published paper and the FDA database.

Q. Now, it appears --

MR. GOLDMAN: Move to strike, opinion testimony.

BY MR. KLINE:

Q. You actually went through the process of getting the information together and then drafting the paper; is that correct?

A. That's correct.

Q. And did the papers represent largely your findings and your conclusions?

A. Yes.

Q. And were those findings and conclusions critical of the VIGOR trial,

as well as raising some concerns relating to the drug Vioxx?

MR. GOLDMAN: Object to the form, opinion testimony.

THE WITNESS: There is no question they were critical of the concern about the safety. But I think the most important statement that we made, which appears in the article, was about how there's a mandate to do the appropriate clinical trials which had not been done and wrote, "definitive evidence of such an adverse effect will require a prospective randomized clinical trial." "It is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of these agents. Until then, we urge caution in prescribing these agents to patients at risk for cardiovascular morbidity."

BY MR. KLINE:

Q. Okay.
And I'm going to mark a copy of your JAMA article as the next exhibit number. While it's being marked, let me save time so we can keep the ball rolling. I'll mark it.
- - -
(Whereupon, Deposition Exhibit Topol-4,"Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," (Mukherjee, et al), JAMA, August 22/29, 2001 Vol 286, No. 8, 954-959, was marked for identification.)
- - -
BY MR. KLINE:
Q. Before it -- you've read to me from your published article; correct?
A. Yes.
Q. It was published in the Journal of the American Medical Association; correct?
A. Yes.

Q. It underwent peer review?
A. Absolutely.
Q. And it was published and then out there for the world to see; is that correct?
A. Yes, yes.
Q. Now, along the way, I want to go through with you a couple of steps along the way. I don't want to spend a lot of time on it, but I do want to get the process. Before you published it, you said to me, and I'm just recapping, that you talked to Dr. Demopoulos?
MR. GOLDMAN: Object to form.
THE WITNESS: Yes.
BY MR. KLINE:
Q. You actually -- and I have a copy of this. You actually sent to her the manuscript; correct?
A. Yes.
Q. In advance?
A. Yes.
Q. And what was the purpose of

sending her the manuscript, as you viewed it?
A. The main purpose was to reconcile the differences in data that had been published in the New England Journal of Medicine and what was appearing in the FDA database. There were some significant discrepancies.
Q. The FDA database was made available after the February 2001 hearing to the public; is that correct?
A. That's right.
Q. Posted on the website?
A. Posted on their website.
Q. Available to anyone to see?
A. Absolutely.
Q. And Merck, did you have access to their internal data?
A. No, we did not.
Q. Did you want to get it?
A. Well, that's one of the reasons that I tried to reach out to Dr. Demopoulos. Since I had worked with her, we had a very good relationship in our

other trial that we had done, I know she did not do research in this area of COX-2 inhibitors, but I thought she could be helpful to get these concerns about data inconsistencies straightened out.
Q. Was the data forthcoming?
A. We --
MR. GOLDMAN: I'm sorry. Objection, move to strike as nonresponsive.
THE WITNESS: We never received any revisions from anyone from Merck. That was never sent to us, any suggestions, changes of data. There was never anything sent back to me or to my colleagues.
BY MR. KLINE:
Q. Was there any suggestions of the changes in the -- to be made in the manuscript?
A. No, there were no changes. The only thing was that there was a visit of the Merck researchers to Cleveland

Page 86

Clinic, but there was nothing sent.
Q. I want to talk to you about that. You say they came and saw you at the Cleveland Clinic?
A. Yes. On April 14, 2001.
Q. Let me hold that. April 14, 2001?
A. That's right.
Q. The JAMA article was published when?
A. August 22nd, 2001.
Q. And did they come to see you after you sent them the draft transcript?
A. Yes. It was a manuscript. We don't call it a transcript, but yes.
Q. I'm sorry. I live in the world of transcripts.
A. That's okay.
Q. We actually occasionally have a manuscript. There's probably a couple of them on the Vioxx story being written right now.
What I'd like to ask you is, at some point in time did someone from

Page 87

Merck ask you for an electronic copy of the -- of your document?
A. I don't recall if I sent an electronic copy. It's possible, but I just don't recall.
Q. I'm going to show you an e-mail. I will mark it as the next exhibit number. I'm going to put it in the record, it's brief, to save some -- you know what, I can put it right in front of you. Exhibit Number 5.

\- - -

(Whereupon, Deposition Exhibit Topol-5, E-mails, MRK-ABA0009274, was marked for identification.)

\- - -

BY MR. KLINE:
Q. You'll see here it says, "It was great to have the opportunity to meet you in person." This was after you met with them. "We appreciate the time you took," and it is a request from a woman by the name of Alise Reicin. Do you know

Page 88

who Alise Reicin was?
A. She was one of the people who visited me. I had not met her previous to this.
Q. Did you know that her brother was an investment fellow at Morgan Stanley?
MR. GOLDMAN: Object to the form. Lacks foundation.
THE WITNESS: No, I had no idea of that.
BY MR. KLINE:
Q. Have you ever heard that?
A. No.
MR. GOLDMAN: Same objection.
BY MR. KLINE:
Q. Okay.
The story is, or what happens here is she says -- she wants you to send an electronic copy of the paper. It appears from documents that I have that that was done. Do you recall doing it?

Page 89

A. After reading this e-mail, I now think, yes, I must have sent a paper copy to Dr. Demopoulos, which prompted their visit, but then subsequently I probably complied and sent an electronic version.
Q. I just have a few questions about the electronic version. I'm going to mark an exhibit. It's an internal Merck document. I don't think you're familiar, would be familiar with it, but I want to ask you just a couple of questions about it.
MR. GOLDMAN: You can ask, but I'll object, lacks foundation.
MR. KLINE: Go ahead.

\- - -

(Whereupon, Deposition Exhibit Topol-6, E-mail 4-26-01, with attachment, "Selective COX-2 Inhibitors are Associated with An Increased Risk of Cardiovascular Events," (Mukherjee, et al) draft manuscript, MRK-AAZ0001561 -

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

MRK-AAZ0001593, was marked for identification.)

\- - -

BY MR. KLINE:

Q. Now, it's a copy of -- I would like you to identify it, the front page of it. There's an e-mail that says it's from Alise Reicin to Laura Demopoulos. It says, "Did this in the middle of the night -- not sure it makes sense."

By the way, are you aware of the fact, Dr. Topol, that the Merck higher-ups did a lot of work at night on Vioxx?

MR. GOLDMAN: Object to form, lacks foundation.

THE WITNESS: No.

BY MR. KLINE:

Q. Oh, okay. Well, they did.

And it says here, it basically transmits back Alise Reicin's markup, electronic markup of your document. Are you familiar with it?

MR. GOLDMAN: Objection, lacks foundation.

THE WITNESS: I've never seen this.

BY MR. KLINE:

Q. Okay.

I want you to turn to Page 8, sir. I want to find out if this is something that was ever suggested to you.

If you'd look at the front page, please, first. Front page.

A. Oh, yes.

Q. Sorry.

A. Yes.

Q. If anyone who listens to this or sees this some day feels that I'm rushing, it's because I have a lot to cover in a short time under a time frame. I want to try to get as much as I can out.

"Selective COX-2 Inhibitors Are Associated With an Increased Risk of Cardiovascular Events."

MR. GOLDMAN: Where are you

reading from?

MR. KLINE: I'm reading from the cover page.

MR. HAMELINE: Second page.

MR. KLINE: The first page of the document, underneath the Reicin to Demopoulos markup. It is Merck -- MRK AAZ0001562.

BY MR. KLINE:

Q. Do you see it?

A. Yes.

Q. Okay.

Wait till you see this one.

Under "Results" --

MR. GOLDMAN: Object to the form, sidebar.

BY MR. KLINE:

Q. This is your paper; correct?

A. Yes. Well, I mean, this was the one that apparently was worked over.

Q. Correct.

A. This is not our paper.

Q. Were you aware of the fact that Merck was working over your paper?

MR. GOLDMAN: Object to the form, lacks foundation.

THE WITNESS: I had no idea until this very moment.

BY MR. KLINE:

Q. Look under "Results" on Page 8. Do you see -- I'd like you to look at the -- don't look at the underlined sentence yet. Look at the last -- the sentence that begins, "The results of the event-free survival analysis on the 66 cases showed that the relative risk of developing a cardiovascular event in rofecoxib treatment arm was 2.37" percent.

That's something you eventually told people in your JAMA paper; correct?

A. Yes.

Q. Did you know or did they suggest it directly to you that according to Dr. Reicin, "we prefer to flip the data and say it was reduced on naproxen"?

MR. GOLDMAN: Object to the

Page 94

form.

THE WITNESS: It's amazing. Yes, I see it here, but it's amazing. It certainly didn't appear in our manuscript.

BY MR. KLINE:

Q. Are you, sir -- have you ever heard of a medical researcher flipping data?

MR. GOLDMAN: Object to the form.

THE WITNESS: No. I mean, you don't -- research and flipping data, that doesn't -- no.

BY MR. KLINE:

Q. But the naproxen hypothesis, sir --

A. Yes.

Q. -- wasn't that really a way that Merck, the way Dr. Reicin says here, flipped the data?

MR. GOLDMAN: Object to form.

THE WITNESS: Well, I do

Page 95

believe there was no basis for the naproxen hypothesis, and that was one of the really significant problems in what happened from VIGOR, all the way through from, you know, 2000, when that paper was published, all the way through to the drug's withdrawal.

BY MR. KLINE:

Q. Sir, your JAMA article --

MR. GOLDMAN: Move to strike as nonresponsive, opinion testimony.

BY MR. KLINE:

Q. Sir, your JAMA article, I think you read to me that your conclusion was to call for a full large-scale study; correct?

A. That's right.

Q. Did you want a primary cardiovascular endpoint study performed?

A. Not only did it need to have cardiovascular endpoints, but it had to have cardiovascular patients. Patients

Page 96

had been excluded essentially from all of these studies, and so that was a patient group that we were most worried about, because they would have the highest predisposition to life-threatening events.

Q. Why was it important to study patients who were at high risk for cardiovascular events when taking the drug Vioxx and COX-2s generally?

A. Well, we already knew that a large proportion of patients who have heart disease have concomitant arthritis. And, in fact, in my practice, the vast majority of patients who have come to see me with heart disease, they also have arthritis. But there was the Ray paper in Lancet, the Tennessee Medicaid database, there was the other papers that I have referred to where 45, 50 percent or higher percent of patients taking Vioxx or other medicines in this class had established known coronary heart disease. So, these patients were

Page 97

essentially the highest risk for having a life-threatening event.

MR. GOLDMAN: Move to strike as nonresponsive, opinion testimony.

BY MR. KLINE:

Q. So, did your study, what you were proposing, was it to study the drug in those people who were the logical people who were going to take the drug?

A. Yes. The only way we could get to the answer here, was it safe for people with heart disease who have arthritis to take the medicine, was to do a trial in these particular patients who had been completely neglected in the development of Vioxx.

Q. What did you think --

MR. GOLDMAN: Object to the form. Move to strike the nonresponsive opinion testimony.

BY MR. KLINE:

Q. -- when you got into this sir, in 2001, what did you think of