Page 98

1  Merck's failure to study patients, the
2  very patients in whom the drug was going
3  to be taken?
4        MR. GOLDMAN: Objection,
5     opinion testimony.
6        THE WITNESS: Well, there're
7     a couple of possible explanations,
8     but one is that they didn't want
9     to know or they didn't want to do
10    the trials that were obviously, as
11    we said, mandated. They didn't
12    want to do the trials.
13 BY MR. KLINE:
14    Q.  Did you believe that they
15 should have?
16       MR. GOLDMAN: Objection.
17       THE WITNESS: Absolutely.
18    And both, not just Merck, but also
19    Pfizer, and any manufacturer of a
20    COX-2 inhibitor. It wasn't just
21    about a Merck problem, although
22    clearly the VIGOR trial was the
23    one that was most concerning.
24 BY MR. KLINE:

Page 99

1     Q.  If you'd look at the last
2  sentence of the paper on Page 18, there's
3  more, but I don't have time to go through
4  it all. Maybe we can furnish you a copy,
5  and you can see how they were marking
6  your paper up, sir. I've provided a copy
7  to your counsel. Would you at some
8  point, after this deposition, like to see
9  how they marked up your paper internally?
10       MR. GOLDMAN: Objection to
11    the foundation.
12       THE WITNESS: No. I am just
13    reading some, and it's very
14    disturbing, but, yes.
15 BY MR. KLINE:
16    Q.  Look at Page 18.
17    A.  Yes.
18    Q.  "Until then," and this ended
19 up in your paper, "we urge caution in
20 prescribing these agents to patients at
21 risk for cardiovascular morbidity." Your
22 words?
23    A.  That's the words that's here
24 in the paper that are published, yes.

Page 100

1     Q.  The underlined words are Dr.
2  Reicin's, according to her e-mail which
3  she wrote. Did you see what she said?
4     A.  Yes.
5     Q.  "Conclusion needs to be
6  toned down."
7        MR. GOLDMAN: Objection,
8     lacks foundation.
9  BY MR. KLINE:
10    Q.  By the way, you met with Dr.
11 Reicin; correct?
12    A.  Yes.
13    Q.  She came out to see you?
14    A.  Yes. With Dr. Demopoulos.
15    Q.  I see.
16       You knew Dr. Demopoulos
17 before; correct?
18    A.  Yes.
19    Q.  Did you know Dr. Reicin?
20    A.  No, I'd never met her
21 before.
22    Q.  Did anyone introduce or did
23 you know, sir, at the time that her
24 personnel file, her actual personnel file

Page 101

1  described her as the "tenacious defender
2  of the Vioxx franchise"? Did you know
3  that fact?
4        MR. GOLDMAN: Object to the
5     form, lacks foundation.
6        THE WITNESS: Well, it has
7     become -- I didn't know that, but
8     certainly over time, that's become
9     increasingly and abundantly clear.
10 BY MR. KLINE:
11    Q.  Is she even a cardiologist,
12 sir?
13       MR. GOLDMAN: Objection,
14    lacks foundation.
15       THE WITNESS: I don't
16    believe so, no.
17 BY MR. KLINE:
18    Q.  And when she came to see
19 you, sir, did you believe that one of the
20 purposes was to neutralize you and your
21 opinion?
22       MR. GOLDMAN: Object to the
23    form, lacks foundation.
24       THE WITNESS: Well,

Page 102

1  certainly. The comments she made
2  at that meeting would go along
3  with that. I mean, she basically
4  said that -- I remember the
5  conversation. It actually was
6  supposed to be three people coming
7  to visit, which was unusual, to
8  discuss a manuscript, but because
9  of our prior relationship with
10 Merck and Dr. Demopoulos and Dr.
11 DiBattiste, I had reluctantly
12 agreed to this meeting. But Dr.
13 DiBattiste didn't show up, it was
14 supposed to be the three of them,
15 and the meeting started out with
16 that we got it wrong, that we
17 would be embarrassed.
18 BY MR. KLINE:
19     Q.    "We" meaning?
20     A.    Dr. Nissen, Dr. Mukherjee
21 and I.
22     Q.    Three physicians at the
23 Cleveland Clinic?
24     A.    Right.

Page 103

1     Q.    Got it wrong?
2     A.    Got it wrong, that we would
3  be embarrassed if we published this
4  paper.
5     Q.    Her word?
6     A.    That's the word. The word
7  is "embarrassed." And I thought that was
8  harsh. And she came across as kind of
9  arrogant, I thought. But we talked it
10 through, and I explained to her that, you
11 know, we don't feel that way at all, and
12 we will stand by our data. We only
13 wanted the input on inconsistencies of
14 data. We did not ask to them -- for Dr.
15 Reicin or colleagues to opine about our
16 perspective.
17        But the discussion ended up
18 okay. You know, she came about the
19 naproxen hypothesis, which I dismissed as
20 the explanation. She came with the
21 rheumatoid arthritis -- that patients
22 with rheumatoid arthritis, you know, Dr.
23 Topol, have much higher rates of heart
24 attack. And I said, well, that doesn't

Page 104

1  explain it, because all the patients had
2  rheumatoid arthritis. So, if there's a
3  gradient of heart attack, it can't just
4  be from that explanation.
5        She also came with the
6  notion that there were lots of data that
7  we didn't know about, Dr. Nissen, Dr.
8  Mukherjee and I, that was in the Merck
9  files that the FDA had, but we didn't
10 have access. And I said, well, we can't
11 comment on data we don't have access to,
12 and I'm sorry.
13       So, the meeting probably
14 went on about an hour-and-a-half. It
15 ended cordially. And at times she said
16 that Merck was considering doing a trial
17 in heart patients, and if we had any
18 ideas, she welcomed us to forward a
19 proposal, protocol, and that seemed to
20 be -- I got the sense it was a gesture.
21 I didn't really think that Dr. Reicin was
22 serious about it, but nonetheless, I
23 thought that we probably should at least
24 send some type of protocol sketch if they

Page 105

1  would like to see what our ideas were for
2  pursuing this question.
3          MR. GOLDMAN: Move to strike
4      the nonresponsive testimony.
5  BY MR. KLINE:
6     Q.    Let me use a
7  characterization, and you can agree or
8  disagree.
9          Did you think that her
10 attempts were to intimidate you?
11    A.    I don't know if I would at
12 that point use the word "intimidation,"
13 but she was quite strong. In some
14 respects, I would even consider her
15 comment brazen. But she didn't say, if
16 you publish this, we're going to do such
17 and such. You know, it was nothing like
18 that.
19       I think she knew when she
20 left that we were going to publish this
21 paper without any change in the types of
22 things that she was interested in. There
23 was no quid pro quo.
24    Q.    There appears to have been

Page 106

1  -- there appears to have been some
2  revisions that were made to the draft
3  after it was submitted to JAMA; is that
4  correct?
5      A.   Well, the reviewers of the
6  paper certainly had some revisions
7  requested, but I don't believe anything
8  substantive was changed in the review
9  process.  The process was already -- had
10 started when that visit in April had
11 occurred, and that independent review was
12 something that we had to attend to, of
13 course.
14     Q.   Let me just briefly show you
15 another document.  It's a Merck document,
16 Exhibit Number 7.
17         - - -
18         (Whereupon, Deposition
19     Exhibit Topol-7, E-mails, with
20     attachment, "Selective COX-2
21     Inhibitors are Associated with An
22     Increased Risk of Cardiovascular
23     Events," (Mukherjee, et al) draft
24     manuscript, MRK-ABA0009661 -

Page 107

1      MRK-ABA0009693, was marked for
2      identification.)
3          - - -
4  BY MR. KLINE:
5      Q.   Very briefly.  And, again, I
6  don't have the time to have you sit and
7  read the whole thing, but I want you to
8  look at the front page.
9          Apparently the manuscript
10 was further worked on internally at
11 Merck.  Are you aware of that fact?
12     A.   No.
13         MR. GOLDMAN:  Objection to
14     the characterization.
15         THE WITNESS:  I had no
16     knowledge of that.
17 BY MR. KLINE:
18     Q.   And there's an e-mail from
19 Dr. Demopoulos to a number of people,
20 including Alise Reicin.  And they took a
21 crack at revising it, and if you look at
22 the last sentence of the e-mail, "We
23 recognize that the revised" transcript
24 "does not completely neutralize the

Page 108

1  potential negative impact of the
2  publication, but...it is substantially
3  removed from the original.  We" feel
4  "that revising it further to more
5  completely present a Merck perspective
6  might alienate the authors and" thus
7  "jeopardize our opportunity to contribute
8  at all."
9          Did you know that's what was
10 going on?
11         MR. GOLDMAN:  Objection, and
12     object --
13         THE WITNESS:  This is
14     remarkable.  I didn't know --
15         MR. GOLDMAN:  -- to the use
16     of the document.
17         THE WITNESS:  -- this was
18     going on at all.
19         MR. GOLDMAN:  Dr. Topol, let
20     me just insert an objection.
21         Lacks foundation, and can I
22     have a standing objection to your
23     use of documents that Dr. Topol's
24     never seen?

Page 109

1  BY MR. KLINE:
2      Q.   Dr. Topol --
3          MR. GOLDMAN:  Can I have
4      that, Mr. Kline?
5          MR. KLINE:  Yes.
6  BY MR. KLINE:
7      Q.   You've now seen it.  What do
8  you think of that kind of conduct?
9          MR. GOLDMAN:  Object to the
10     form, opinion testimony.
11         THE WITNESS:  I'm actually
12     appalled by this.  Yes, to say
13     that, you know, this was trying to
14     "neutralize the potential negative
15     impact" and "jeopardize our"
16     "ability to contribute."  We
17     didn't ask them to contribute.  We
18     asked them to reconcile the data
19     inconsistencies.
20 BY MR. KLINE:
21     Q.   Is part of the academic
22 process -- you've worked --
23         You've done studies for
24 large pharmaceutical companies, Merck?

Page 110

1  A. Yes.
2  Q. Is part of the process to
3  get the scientific facts in the medical
4  literature, or is the real objective, or
5  is part of the objective to get the,
6  quote, drug company perspective?
7      MR. GOLDMAN: Objection.
8      THE WITNESS: Well, you
9      know, I had been trying to have an
10     intellectually fulfilling and
11     collaborative relationship with
12     people at Merck, and that was
13     something that I think we enjoyed
14     up until this sort of thing, which
15     is obviously a departure from
16     that, but --
17 BY MR. KLINE:
18  Q. Is it --
19  A. -- it's unfortunate.
20  Q. Is it a departure --
21     MR. GOLDMAN: Move to strike
22     as nonresponsive.
23 BY MR. KLINE:
24  Q. -- from sound academic and

Page 111

1  scientific practice to attempt to
2  neutralize papers and try to inject a
3  particular perspective, rather than what
4  is the down the middle truth?
5      MR. GOLDMAN: Objection,
6      lacks foundation, opinion
7      testimony.
8      THE WITNESS: Yes. I mean,
9      I think that the role of academic
10     medicine is to publish a highly
11     objective independent processing
12     of data and perspective, and
13     anything to try to warp that or
14     twist it is unacceptable.
15 BY MR. KLINE:
16  Q. Is that how you view these
17 e-mails that I've just shown you --
18     MR. GOLDMAN: Move to strike
19     the nonresponsive portion.
20 BY MR. KLINE:
21  Q. -- for the first time?
22     MR. GOLDMAN: Objection,
23     lacks foundation, opinion
24     testimony.

Page 112

1      THE WITNESS: Yes, I'm quite
2      bothered by this.
3  BY MR. KLINE:
4   Q. Those e-mails, sir, clearly
5  do relate to you and your paper, and they
6  have attached your paper; correct?
7   A. Yes.
8   Q. And they're markups of your
9  paper; correct?
10  A. Yes.
11  Q. Which did not make their way
12 into the New England Journal; correct?
13  A. No, JAMA.
14  Q. I'm sorry.
15  A. They didn't even make their
16 way to me. I've never -- I've not seen
17 these.
18  Q. Okay.
19     Now, let's move to your JAMA
20 article itself.
21  A. Yes.
22  Q. I think we're moving along,
23 I hope.
24     I want to stop at this point

Page 113

1  and say I've now covered that pre-JAMA
2  period. Is there anything in your mind
3  significant that's been missed in the
4  story leading up to the publication of
5  the JAMA article? If so, I'd like to
6  know.
7      MR. GOLDMAN: Object to the
8      form, opinion testimony.
9      THE WITNESS: Well, I think
10     there were --
11     MR. KLINE: It can't be an
12     opinion. I just asked him to tell
13     me what he knows, please.
14     THE WITNESS:
15     Chronologically, if we were to
16     look at the VIGOR trial, there are
17     some concerning things that were
18     not incorporated in JAMA that I
19     only tuned in to later. I don't
20     know if you would like to get into
21     that now from the Targum FDA
22     report or whether you'd like to
23     get into that subsequently. But
24     it's about the VIGOR trial in

29 (Pages 110 to 113)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 114

```
 1      December and November of 1999.
 2   BY MR. KLINE:
 3      Q.   Please tell us.
 4           MR. GOLDMAN:  That's why I
 5      objected on opinion testimony
 6      grounds.  Move to strike, opinion
 7      testimony.
 8           THE WITNESS:  If I could get
 9      the Targum report.  It was in the
10      document submitted, but I have a
11      copy that I brought.
12   BY MR. KLINE:
13      Q.   You actually -- I think I've
14   seen in your file, you have the Targum
15   memo in your file produced us, and you
16   marked it up?
17      A.   Yes.  I marked it up, but I
18   have a clean copy here that I wanted to
19   refer to.  Here it is.  Because this was
20   while the VIGOR trial was being
21   conducted.  And this is an independent
22   FDA review of the data from VIGOR.  It
23   also, in this report, includes the data
24   from two other trials, VIGOR -- trial 090
```

Page 115

```
 1   and trial 085.
 2                   - - -
 3           (Whereupon, Deposition
 4      Exhibit Topol-8, Memo 2-1-01,
 5      "Consultation NDA 21-042, S-007
 6      Review of cardiovascular safety
 7      database (Targum) (37 pages), was
 8      marked for identification.)
 9                   - - -
10   BY MR. KLINE:
11      Q.   I'm marking, and those who
12   see this will be familiar with this, the
13   February 1, 2001 memo of Shari L. Targum
14   of the Division of Cardiorenal Drug
15   Products at the FDA --
16      A.   Yes --
17      Q.   -- correct?
18      A.   Yes.
19           MR. GOLDMAN:  Exhibit number
20      8?
21           MR. KLINE:  Exhibit number
22      8.
23   BY MR. KLINE:
24      Q.   You've interacted with Dr.
```

Page 116

```
 1   Targum?
 2      A.   Yes.  I know Dr. Targum.
 3      Q.   Okay.
 4           Please tell us the
 5   significance to you.
 6      A.   Well, this --
 7      Q.   You did not have this at the
 8   time that you published the JAMA article
 9   or you did?
10      A.   No.  Well, Dr. Mukherjee
11   had, I think, reviewed this online, but I
12   had not.  I only had reviewed the data
13   that he presented to Dr. Nissen and I,
14   but I went back to this report and found
15   many things that still had not even yet
16   surfaced that are quite concerning.
17      Q.   Which are?
18           MR. GOLDMAN:  Objection,
19      move to strike the opinion
20      testimony.
21   BY MR. KLINE:
22      Q.   What are the concerning
23   parts to you that were known and flagged
24   in the Targum report dated February 1,
```

Page 117

```
 1   2001?
 2           MR. GOLDMAN:  Object to
 3      form, opinion testimony.
 4           THE WITNESS:  On Page 5 it
 5      talks about the DSMB, which is the
 6      data and safety monitoring board.
 7           MR. GOLDMAN:  I'm sorry,
 8      what page?
 9           THE WITNESS:  Page 5.
10   BY MR. KLINE:
11      Q.   Yes.
12      A.   And the first thing it says
13   is during -- this is at the bottom of the
14   page, the last paragraph, "During the
15   November 18, 1999 meeting, discussion and
16   focus on the 'excess deaths and
17   cardiovascular adverse experiences in
18   group A compared to group B'...In this
19   report, there were 40 and 17 patients
20   that discontinued the study because of
21   cardiovascular adverse events," and then
22   there's a blood pressure.  And it's
23   pretty easy to tell which is group A and
24   group B.
```

Page 118

1    This is November 18, 1999.
2    This is highly concerning, that there's
3    excess deaths in a trial and the DSMB is
4    noting in the course of the VIGOR trial.
5         Q.   You said November 18, 1999?
6         MR. GOLDMAN: Object to the
7    form opinion testimony.
8         THE WITNESS: Yes. This
9    would be a time when any concerns
10   about the drug, and, of course,
11   now already the 090 trial, which I
12   presume we'll get into, that
13   already was known in May of 1999.
14   So, now we have the largest
15   trial ever of the drug, and it's
16   causing, in the midst of the
17   trial, excess deaths and serious
18   cardiovascular events. So, this
19   did not apparently lead to the
20   alert that I would have thought in
21   the course of a large scale trial
22   of 8,000 patients.
23        MR. GOLDMAN: Move to strike
24   opinion testimony, nonresponsive.

Page 119

1    BY MR. KLINE:
2         Q.   What are you saying to us?
3    Are you saying that in the period by the
4    year 2001 that there were a series of
5    things that were known to Merck?
6         MR. GOLDMAN: Object to the
7    form, opinion testimony, lacks
8    foundation.
9         THE WITNESS: Well, what's
10   evident here is it calls out the
11   53 versus 29 serious excess deaths
12   in cardiovascular events as early
13   as November of 1999. In the wake
14   of another trial, they had a 760
15   percent excess of heart attacks.
16   BY MR. KLINE:
17        Q.   What study was the 53
18   deaths, for instance?
19        A.   That's the VIGOR trial.
20        Q.   The VIGOR trial?
21        A.   At this juncture, at this
22   interim analysis by the safety and
23   monitoring board.
24        Q.   That's what I wanted to

Page 120

1    establish.
2         A.   And it actually then goes on
3    in this document by Dr. Targum, and it's
4    highly concerning because it says on Page
5    6, it says that, "The DSMB recommended
6    development of a separate analysis plan
7    for adjudicated events," this is in the
8    first full paragraph. "One concludes" --
9    this is the last sentence of that
10   paragraph. "One concludes from this
11   statement that the DSMB," the Data Safety
12   Monitoring Board, "received unadjudicated
13   adverse event data," and that there had
14   been -- further along, the last sentence
15   of this, "At the time," this is now the
16   next interim analysis, December of 1999,
17   "no cardiovascular analysis plan was in
18   place" for this trial, which is quite
19   concerning, to say the least.
20        MR. GOLDMAN: Move to strike
21   nonresponsive opinion testimony.
22   BY MR. KLINE:
23        Q.   Is what you're saying that
24   the Targum memo, to put it in

Page 121

1    perspective --
2         Is what you're saying is
3    that the VIGOR -- you learned from seeing
4    this document that the VIGOR data had
5    been analyzed, as you would expect, going
6    along at various stages?
7         A.   Yes.
8         Q.   And that at various stages,
9    were there red flags that you can see in
10   this data?
11        A.   Exactly.
12        MR. GOLDMAN: Object to the
13   form, opinion testimony.
14        THE WITNESS: Exactly. And
15   the point is, is that later we're
16   told that the first time they ever
17   knew about any problem was well
18   into 2000, which couldn't possibly
19   be true. Someone of the sponsor
20   had to be alerted by this DSMB
21   concern of excess deaths and
22   serious cardiovascular events.
23        MR. GOLDMAN: Move to
24   strike, nonresponsive, lacks

Page 122

```
 1       foundation.
 2  BY MR. KLINE:
 3       Q.  Now, let's talk about VIGOR,
 4  because that was some focus of what you
 5  were doing when you retrospectively
 6  looked at VIGOR and also a number of
 7  other studies including 090.
 8       A.  Yes.
 9       Q.  Okay.
10           You looked at, I think, a
11  study called 085, 090, VIGOR.  Any other?
12       A.  Those are the principal
13  ones.  I think all the studies, but those
14  are the ones that we focused on the most.
15           MR. GOLDMAN:  Can you set a
16       time frame for this, please?
17           MR. KLINE:  Yes.  For the
18       JAMA article of 2001.  That's what
19       I'm back to and referring to.
20           THE WITNESS:  Right.
21       That --
22  BY MR. KLINE:
23       Q.  I think while we've jumped
24  around a little bit, we've done a pretty
```

Page 123

```
 1  good job of keeping things straight so
 2  far.
 3       A.  Well, we tried --
 4       Q.  But the beauty will be in
 5  the eyes of beholder of somebody who sees
 6  this.
 7       A.  Right.  I was just trying
 8  to, while commenting on VIGOR, trying to
 9  incorporate that there were problems in
10  the conduct during the trial, which have
11  not really surfaced, as far as I know.
12           But regarding the JAMA
13  paper, the August 2001 --
14       Q.  You mean not surfaced to
15  this date?
16       A.  To this date.
17           MR. GOLDMAN:  Objection,
18       most to strike, nonresponsive,
19       opinion testimony, lacks
20       foundation.
21           THE WITNESS:  I'm not aware
22       that this concern regarding the
23       data and safety monitoring board
24       has been registered.  I've been
```

Page 124

```
 1       concerned about it, but I have not
 2       -- and I've discussed it with the
 3       FDA, but I've not gotten an
 4       adequate response.
 5           MR. GOLDMAN:  Same
 6       objections.
 7  BY MR. KLINE:
 8       Q.  I see.  Okay.
 9           Go ahead.
10       A.  Back to the JAMA paper,
11  though --
12       Q.  Yes.
13       A.  -- we really zoomed in on
14  three trials of Vioxx, study 085, study
15  090 and VIGOR.
16       Q.  Okay.
17           You looked at the VIGOR
18  trial, and you made some determinations
19  there; correct?
20       A.  That's right.
21       Q.  Okay.
22           What did you -- I would like
23  you to list out sequentially.  If you've
24  covered it already, list it so we have it
```

Page 125

```
 1  in a list.
 2           What were your major
 3  findings as you looked independently back
 4  at the VIGOR trial?
 5           MR. GOLDMAN:  Objection,
 6       lack of foundation.
 7           THE WITNESS:  I think the
 8       most important finding is
 9       summarized in Figure 1 of that
10       paper, which comes right from the
11       FDA Targum report.  And basically
12       what that figure, first time now
13       published to the medical
14       community, it shows that there's a
15       divergence of the heart attack and
16       serious event curves.  The event
17       curves is Figure 1, whereby
18       starting at four to six weeks
19       after the start of the medicine,
20       Vioxx compared to naproxen, there
21       is an over two-fold risk of
22       serious events.
23  BY MR. KLINE:
24       Q.  That Kaplan-Meier curve,
```

Page 126

1  which will be marked -- we don't have to
2  display it right now, but I want to mark
3  it so that it's part of an exhibit to be
4  displayed as part of this transcript. We
5  will put a number 9 on table -- on Figure
6  1 of the Topol JAMA article.
7          - - -
8          (Whereupon, Deposition
9          Exhibit Topol-9, Excerpt from
10         "Risk of Cardiovascular Events
11         Associated with Selective COX-2
12         Inhibitors," (Mukherjee, et al),
13         JAMA, August 22/29, 2001 Vol 286,
14         No. 8, 956, was marked for
15         identification.)
16         - - -
17         MR. GOLDMAN: Haven't you
18     already marked the JAMA article?
19         MR. KLINE: I did, but I
20     want to mark Figure 1 as a
21     separate exhibit.
22  BY MR. KLINE:
23     Q.   That Figure 1, which is the
24  Kaplan-Meier curve showing the time to

Page 127

1  cardiovascular adverse events, the line
2  separated how many days?
3     A.   Between four and six weeks
4  these curves diverge.
5          MR. GOLDMAN: Move to strike
6     the opinion testimony.
7  BY MR. KLINE:
8     Q.   Is this, by the way,
9  something that has been replicated in
10 other studies?
11         MR. GOLDMAN: Objection,
12     move to strike.
13         THE WITNESS: It's been
14     replicated in four randomized
15     trials.
16 BY MR. KLINE:
17     Q.   That it separates at an
18 early time?
19         MR. GOLDMAN: Objection.
20         THE WITNESS: That's right.
21 BY MR. KLINE:
22     Q.   Okay.
23         And what are those studies?
24     A.   Study 090, which was a

Page 128

1  six-week trial, which had a 760 percent
2  excess within the six weeks.
3     Q.   Yes.
4     A.   The VIGOR trial I just
5  mentioned.
6     Q.   Yes.
7     A.   The ADVANTAGE trial, which
8  was a 12-week trial that showed a
9  significant excess in the 12-week time
10 frame.
11         And the VICTOR trial, which
12 has not yet been published, which is a
13 colon cancer trial of 2,300 patients
14 coordinated out of Oxford, which has been
15 at least commented on by the
16 investigators having immediate excess in
17 heart attack risk.
18     Q.   What then, sir --
19         MR. GOLDMAN: Objection,
20     move to strike nonresponsive
21     opinion testimony, lacks
22     foundation.
23 BY MR. KLINE:
24     Q.   What, then, sir, opinion and

Page 129

1  conclusion have you reached -- let me
2  strike it and start again.
3          What conclusion have you
4  reached, Dr. Topol, relating to the
5  increased risk of cardiovascular events,
6  heart attacks and strokes relating to
7  short-term usage of the drug?
8          MR. GOLDMAN: Objection,
9      opinion testimony.
10         THE WITNESS: Well, there is
11     -- I should also add the four
12     randomized trials, there's the
13     cumulative analysis by Dr. Juni
14     published in the Lancet which
15     shows no relationship between
16     duration of therapy and heart
17     attack excess.
18         But interestingly, all four
19     of these trials, and the
20     cumulative Juni analysis, was on
21     patients without heart disease.
22     So, the risk of it being immediate
23     and early could actually be much
24     more exaggerated in patients with

Page 130

1    heart disease.
2    BY MR. KLINE:
3        Q.   Any doubt --
4            MR. GOLDMAN: Objection,
5        move to strike the nonresponsive
6        testimony.
7    BY MR. KLINE:
8        Q.   -- about it in your mind?
9        A.   There isn't any question
10   about this. To see it replicated across
11   four trials in patients who don't even
12   have heart disease is quite an important
13   finding.
14           MR. GOLDMAN: Objection to
15       opinion testimony in the last
16       question.
17   BY MR. KLINE:
18       Q.   In this particular
19   Kaplan-Meier curve for the VIGOR trial,
20   that was not published in the New England
21   Journal of Medicine; is that correct?
22       A.   No. As I mentioned earlier,
23   the New England Journal of Medicine paper
24   featured the gastrointestinal side

Page 131

1    effects and benefit, but it did not show
2    in any graphic form, and there are other
3    irregularities of this paper, but it
4    certainly did not highlight the heart
5    attack problems.
6        Q.   Okay.
7             Now, I want to do findings.
8    Then I want to go to what you've
9    described as irregularities --
10           MR. GOLDMAN: Move to strike
11       as nonresponsive.
12   BY MR. KLINE:
13       Q.   -- because you have a
14   perspective on both of those issues;
15   correct?
16       A.   Yes.
17       Q.   Okay.
18            Let's talk about the
19   findings.
20            You mentioned already that
21   there was an increased risk of
22   cardiovascular events starting at the
23   six-week period in this study; correct?
24       A.   Yes.

Page 132

1        Q.   Replicated by other studies
2    we now know later?
3            MR. GOLDMAN: Objection to
4        the opinion testimony.
5            THE WITNESS: Three other
6        randomized trials.
7    BY MR. KLINE:
8        Q.   Yes.
9        A.   Yes.
10       Q.   And by the way, I'm going to
11   get to naproxen. On this naproxen
12   theory, has there ever been a randomized
13   clinical trial demonstrating that
14   naproxen is cardioprotective?
15       A.   There is no -- there are no
16   data that I am aware of to show that
17   naproxen in any randomized trial is
18   cardioprotective.
19       Q.   Do you think that if there
20   were such a study, you would know about
21   it?
22       A.   I would think so.
23           MR. GOLDMAN: Objection.
24   BY MR. KLINE:

Page 133

1        Q.   So, what do you think of
2    this naproxen hypothesis that was put
3    forward by Merck to justify the results
4    in VIGOR?
5            MR. GOLDMAN: Objection,
6        opinion testimony.
7            THE WITNESS: It doesn't
8        justify -- I mean, as I mentioned
9        earlier, the problem is you have
10       an experimental drug which is not
11       fully defined, and you compare it
12       to a drug that's been known for 20
13       years. To all of a sudden to
14       ascribe some type of magical
15       protective effect without any
16       basis is not acceptable.
17   BY MR. KLINE:
18       Q.   I don't have the document in
19   front of me, but I think I've read in the
20   many documents that I've had in front of
21   me a comment by you to the effect that if
22   Merck's view were true, it would be the
23   wonder drug of wonder drugs or something
24   like that. Did you say something like

Page 134

1  that at some point?
2          MR. GOLDMAN: Object to the
3      form, opinion testimony.
4          THE WITNESS: I don't think
5      I did, but probably some other
6      person who astutely made that
7      statement, but that wasn't me.
8  BY MR. KLINE:
9      Q.  Would that be a correct
10 statement?
11         MR. GOLDMAN: Time out.
12     Object to the form, lacks
13     foundation. You're now asking him
14     to comment about a statement that
15     somebody else might have made.
16 BY MR. KLINE:
17     Q.  Would it be a correct
18 statement that naproxen would be the
19 wonder drug of wonder drugs if the Alise
20 Reicin/Merck hypothesis were true?
21         MR. GOLDMAN: Object to the
22     form, opinion testimony, lacks
23     foundation.
24         THE WITNESS: Well, as I

Page 135

1  mentioned earlier, to have a
2  20-fold benefit over aspirin,
3  which is a very important part of
4  our armamentarium for preventing
5  heart attacks, to be 20-fold
6  better than that, that would be
7  quite remarkable.
8         MR. GOLDMAN: Move to
9      strike, nonresponsive.
10 BY MR. KLINE:
11     Q.  Okay.
12         So, your opinion formed in
13 the context of reviewing this Merck data
14 and Merck study in VIGOR, was that the
15 naproxen hypothesis was tenable or
16 untenable?
17         MR. GOLDMAN: Objection,
18     opinion testimony.
19         THE WITNESS: Well, in the
20     manuscript, back in 2001, we tried
21     to present that that's a possible
22     explanation. We actually pointed
23     that out in a couple of points in
24     the paper. But at the end, our

Page 136

1  cautionary statement was because
2  we didn't believe that this was an
3  acceptable explanation.
4  BY MR. KLINE:
5      Q.  Tell me, Dr. Topol, as you
6  wrote it in JAMA and as you believed it
7  then and today, the significance of 090,
8  the study 090. What was that study?
9  When was it performed? Just tell me what
10 it was and what its significance was to
11 you.
12         MR. GOLDMAN: Objection,
13     opinion testimony.
14         THE WITNESS: To me, that
15     study has been overlooked. It
16     has, in many ways, extraordinary
17     significance in the clinical
18     development of Vioxx. And the
19     reason is is that this study had
20     978 patients. And within the 978
21     patients, they were randomly
22     assigned, they had the typical
23     arthritis, osteoarthritis
24     so-called, they were randomly

Page 137

1  assigned to Vioxx, a medicine
2  called nabumetone or known as
3  Relafen, which isn't used very
4  much, or placebo.
5         And so what they had were
6  these three arms tested with only
7  12-and-a-half milligrams of Vioxx.
8  So, it's a very low dose of Vioxx
9  relative to these other trials
10 that we've been discussing.
11 BY MR. KLINE:
12     Q.  090 being a 12.5 milligram,
13 as opposed to VIGOR, which was 50?
14     A.  That's right.
15     Q.  Okay.
16     A.  And what is so striking
17 about this trial is that it has, at the
18 end of six weeks of therapy, a
19 statistically significant 760 percent
20 excess of heart attacks. Now, it's not
21 quite 1,000 patient trial, but certainly
22 that can't be minimized. And the point
23 being is that if you see that trial in
24 replication with the problems with VIGOR,

Page 138

1  you have a very serious problem.
2       But moreover, what is the
3  misleading statements that have been
4  made, is that there have been no trials
5  ever done with Vioxx, before APPROVe,
6  comparing the drug except for naproxen,
7  in which there was a risk. In fact,
8  there was study 090, which compared to
9  placebo or nabumetone, which showed a
10 highly significant excess risk.
11      MR. GOLDMAN: Move to strike
12   nonresponsive opinion testimony.
13 BY MR. KLINE:
14   Q.  Was there a public -- the
15 Merck lawyer keeps objecting as
16 nonresponsive. He just simply doesn't
17 like what he hears.
18      MR. GOLDMAN: Object to the
19   sidebar.
20 BY MR. KLINE:
21   Q.  Was there, as you view this
22 and as you viewed it back then in 2001, a
23 real public health threat out there in
24 the form of the drug Vioxx?

Page 139

1       MR. GOLDMAN: Objection,
2    opinion testimony.
3       THE WITNESS: Yes. When we
4    published our article in August
5    2001, there was an accompanying
6    article in the Wall Street
7    Journal, an A1 article, in which I
8    stated just precisely that, that
9    we're staring a public health -- I
10   don't know if I used the word
11   "disaster," but it was a
12   significant word, that this is a
13   major public health issue, yes.
14 BY MR. KLINE:
15   Q.  Why did you state it in
16 those blunt terms, sir?
17   A.  Because it obviously was a
18 public --
19      MR. GOLDMAN: Objection,
20   opinion testimony.
21      THE WITNESS: Here you have
22   a possible five-fold increase in
23   heart attacks in patients without
24   heart disease; you have a drug

Page 140

1    that's being given to -- tens of
2    millions of prescriptions,
3    millions of people are taking it,
4    and it could be much worse in
5    patients with heart disease; we've
6    got direct-to-consumer advertising
7    unleashed with the most successful
8    launch of prescription medicines
9    in the history of pharmaceutical
10   development; we have a major
11   significant jeopardy, yes.
12 BY MR. KLINE:
13   Q.  And at that point in time --
14      MR. GOLDMAN: Move to strike
15   as nonresponsive.
16 BY MR. KLINE:
17   Q.  At that point in time, all
18 you're asking Merck to do was what?
19   A.  All --
20      MR. GOLDMAN: At what point
21   in time?
22      MR. KLINE: 2001.
23      THE WITNESS: All we
24   wanted --

Page 141

1  BY MR. KLINE:
2    Q.  I'll rephrase the question.
3  As of -- give me the date of your article
4  again. It would be August 22, 2001.
5       As of August 22, 2001, all
6  you were asking Merck to do was what?
7    A.  To do an appropriate trial,
8  to acknowledge that there may be risks,
9  and that didn't occur, but to also do an
10 appropriate trial in patients with heart
11 disease.
12   Q.  You made a big point in your
13 paper about the fact that the trials that
14 were done, I think you already told us,
15 weren't done in patients who were at risk
16 for cardiovascular disease. Correct so
17 far?
18   A.  Yes.
19   Q.  Those would be the real
20 patients you'd have to really worry
21 about; correct?
22      MR. GOLDMAN: Object to the
23   form.
24      THE WITNESS: Exactly. The

Page 142

```
 1    patients with heart disease had
 2    been completely excluded from
 3    these trials.
 4         MR. GOLDMAN: Opinion
 5    testimony.
 6  BY MR. KLINE:
 7    Q.  You needed to study them;
 8  correct?
 9         MR. GOLDMAN: Object to the
10    form.
11         THE WITNESS: That's
12    correct.
13  BY MR. KLINE:
14    Q.  And you also say in your
15  paper that you needed to do an evaluation
16  of endpoints which were specific. We
17  have two minutes left on this video
18  before we go to the second video.
19         Tell me why that was so
20  important, to do specific cardiovascular
21  endpoints. First of all, had that study
22  ever been done by Merck?
23         MR. GOLDMAN: Objection,
24    opinion testimony, lacks
```

Page 143

```
 1    foundation.
 2  BY MR. KLINE:
 3    Q.  Had that study ever been
 4  done by Merck up until this point?
 5         MR. GOLDMAN: Same
 6    objection.
 7         THE WITNESS: As far as I
 8    know, there had not been a
 9    trial -- as I reviewed from the
10    Targum report, there had not been
11    a trial with a cardiovascular
12    analysis plan with an external
13    review, adjudication of the
14    events. No, it had not been done.
15  BY MR. KLINE:
16    Q.  Had anything that is called
17  a prespecified cardiovascular endpoint
18  study, has it ever been done by Merck?
19    A.  It has never been done in my
20  mind to this day.
21    Q.  Did it need to be done?
22         MR. GOLDMAN: Objection,
23    opinion testimony.
24         THE WITNESS: Absolutely.
```

Page 144

```
 1    And we called for it innumerable
 2    times.
 3  BY MR. KLINE:
 4    Q.  And here's the question.
 5  Why? And why is that different than what
 6  we've heard -- we hear from Merck that,
 7  well, we studied, and we went back and we
 8  looked at the end points. Why, sir --
 9  you can tell us, why?
10         MR. GOLDMAN: Objection to
11    form.
12         THE WITNESS: Well, as I put
13    you to the letter in the New
14    England Journal, which responded
15    to that point.
16  BY MR. KLINE:
17    Q.  Or just tell us, if you can.
18    A.  Yeah. The main thing is
19  that Merck was saying that they were
20  doing trials to look at cardiovascular
21  endpoints like APPROVe, like VICTOR and a
22  prostate cancer trial. These were not
23  being done for a cardiovascular endpoint.
24  They were done in patients without heart
```

Page 145

```
 1  disease.
 2         These were trials being done
 3  to extend the indications for the drug to
 4  new areas, such as prevention of colon
 5  polyps or prevention of prostate cancer.
 6  They had nothing to do with assuring
 7  safety from a cardiovascular standpoint.
 8  That could only be done in trials of
 9  patients with heart disease.
10    Q.  Any doubt about that, sir?
11         MR. GOLDMAN: Move to strike
12    as nonresponsive.
13         THE WITNESS: There is no
14    doubt whatsoever about that
15    statement.
16         MR. GOLDMAN: Objection,
17    opinion testimony.
18  BY MR. KLINE:
19    Q.  Did they do what they should
20  have done here?
21         MR. GOLDMAN: Objection,
22    opinion testimony.
23         THE WITNESS: They did not
24  do what was needed to be done,
```

Page 146

1  which we called for in our JAMA
2  paper.
3      MR. KLINE: Okay.
4      We'll move to the next
5  videotape, and we will take a
6  two-minute break to do it.
7      THE VIDEOTAPE TECHNICIAN:
8  Off the record, 11:05.
9      - - -
10     (Whereupon, a recess was
11  taken from 11:05 a.m. until
12  11:17 a.m.)
13     - - -
14     THE VIDEOTAPE TECHNICIAN:
15  Back on the record, 11:17 a.m.
16  Tape Number 2.
17 BY MR. KLINE:
18     Q.  Dr. Topol, in the believe it
19 or not category, I want to pick up speed.
20 I want to try to go through a lot of
21 things that you've said and done, and
22 we're using time up quickly.
23     You mentioned -- first of
24 all, what you've told us so far are the

Page 147

1  various conclusions that you reached,
2  those which you formed during the process
3  of gathering information, learning about
4  this drug and researching this matter.
5      MR. GOLDMAN: Object to the
6  form.
7      THE WITNESS: Yes.
8 BY MR. KLINE:
9      Q.  Okay.
10     Now, let me go.
11     After your study came out in
12 JAMA, did it raise a public health
13 concern in the lay press?
14     MR. GOLDMAN: Object to the
15 form.
16     THE WITNESS: I believe
17 there was a concern that was
18 brought out by the paper and then
19 many subsequent studies as well.
20     MR. GOLDMAN: Move to
21 strike, nonresponsive.
22 BY MR. KLINE:
23     Q.  Okay.
24     First of all, in The Wall

Page 148

1  Street Journal there's a quotation
2  attributed to you. You said, "Either
3  they are moving at glacial speed,"
4  referring to Merck or, "they are waiting
5  to see what the fallout will be from this
6  and other reports. We're staring at a
7  major public health issue."
8      A.  Yes.
9      Q.  Is that a quote that could
10 be attributed to you?
11     MR. GOLDMAN: Object to
12 form, opinion testimony.
13     THE WITNESS: That certainly
14 was, and that was the one I was
15 referring to a little earlier
16 about this public health concern,
17 yes.
18 BY MR. KLINE:
19     Q.  It says that "Merck sought
20 to downplay the cardiac issue." Is that
21 true?
22     A.  That's what the reporter
23 said.
24     MR. GOLDMAN: Object to the

Page 149

1  form.
2      THE WITNESS: But I do
3  believe that's true, because that
4  was, I think, the ulterior purpose
5  of the visit in April.
6 BY MR. KLINE:
7      Q.  Apparently at some point,
8 Merck, according to the published report
9 here says, that they asked Dr. DeAngelis
10 at JAMA -- who is he?
11     A.  It's a woman.
12     Q.  I'm sorry, I apologize.
13     A.  Cathy DeAngelis, and she's
14 the editor-in-chief of JAMA.
15     Q.  And that they wanted to have
16 a rebuttal right to your article when it
17 was published?
18     MR. GOLDMAN: Object to the
19 form.
20     THE WITNESS: Yeah, this was
21 quite extraordinary. I had not
22 heard of something like this
23 before. This was because we had
24 been, I think, decent and

Page 150

1  collegial to let Merck know about
2  the paper, now they wanted to
3  publish their own paper at the
4  same time and an editorial as a
5  simultaneous publication in JAMA.
6  BY MR. KLINE:
7      Q.   Why was --
8          MR. GOLDMAN: Move to
9  strike, nonresponsive.
10 BY MR. KLINE:
11     Q.   -- as you saw it, the
12 incremental risk of increased risk of
13 heart attacks and strokes so important,
14 and how did it relate to the numbers of
15 people who were taking it?
16         MR. GOLDMAN: Object to the
17 form, opinion testimony.
18         THE WITNESS: Well, if one
19 thinks about the risk here, if
20 it's -- if we use the APPROVe data
21 in colon cancer patients without
22 heart disease, it's 16 per
23 thousand patients, and you can
24 just do the math about -- if you

Page 151

1  have millions of people, 16 per
2  thousand having a heart attack,
3  that's an extraordinary risk for
4  the population.
5          MR. GOLDMAN: Move to strike
6  as nonresponsive.
7  BY MR. KLINE:
8      Q.   Okay.
9          Merck took after you, sir?
10         MR. GOLDMAN: Object to the
11 form, leading.
12         THE WITNESS: The problems
13 that occurred after August 22nd,
14 2001 were quite profound in many
15 respects. So, not only did they
16 have consultants that they
17 communicated to the media, like
18 Dr. Konstam and Dr. FitzGerald,
19 accusing us of having tortured the
20 data and manipulated the data, but
21 they also sent out an overnight
22 mail to every healthcare provider
23 in the country that was commented
24 on -- Dr. Sherwood, he was the

Page 152

1  doctor who sent it, and it was in
2  the JAMA letter correspondence
3  about our article, that one of the
4  doctors was complaining, having
5  received this overnight with the
6  five-page taking on the
7  Mukherjee/JAMA paper, and so it
8  certainly unleashed a very robust
9  response from Merck and its
10 consultants.
11         MR. GOLDMAN: Objection,
12 move to strike as nonresponsive.
13 BY MR. KLINE:
14     Q.   Did you ever hear of them
15 refer to Dr. Sherwood as the enforcer?
16     A.   I hadn't heard that, but he
17 certainly --
18         MR. GOLDMAN: Object to the
19 form --
20         THE WITNESS: -- was the
21 person --
22         MR. GOLDMAN: -- lack of
23 foundation.
24         THE WITNESS: -- whose

Page 153

1  signature is attached to the
2  letter that went out to, I don't
3  know how many, apparently tens of
4  thousands of doctors following our
5  article.
6  BY MR. KLINE:
7      Q.   Okay.
8          Did you believe the attacks
9  were ad hominem?
10         MR. GOLDMAN: Object to
11 form, lacks foundation --
12         THE WITNESS: I don't
13 believe --
14         MR. GOLDMAN: -- opinion
15 testimony.
16         THE WITNESS: -- that they
17 were directed personally. I don't
18 think that Merck wanted to accept
19 that there was a cardiovascular
20 risk. They also said there was no
21 need to do any trial because there
22 was no cardiovascular risk.
23         That, to us, was
24 unthinkable, but I don't believe

Page 154

1    it was a personal directed --
2    anyone who wrote the paper would
3    have probably had the same type of
4    response, I imagine.
5         MR. GOLDMAN: Move to strike
6    as nonresponsive.
7    BY MR. KLINE:
8         Q.  Did you keep your scientific
9    focus, sir?
10        A.  Without any question, we
11   stayed on point regarding the need to
12   press on the clinical science and the
13   research.
14        Q.  In a reply to a series of
15   letters written by folks associated with
16   Merck, did you say, "Since publication of
17   our meta-analysis" -- was your study a
18   meta-analysis?
19        MR. GOLDMAN: Object to
20   form.
21        THE WITNESS: Well, it's one
22   form of meta-analysis. That's a
23   term that's very loose. Any time
24   you're pooling data and looking at

Page 155

1    multiple trials, you can term it a
2    meta-analysis. But yes, that was
3    basically the best we could do
4    with the data that were available
5    at that time.
6    BY MR. KLINE:
7         Q.  You said, "Several basic
8    research studies have supported the
9    potential thrombotic effect of COX-2
10   inhibitors," and you cited various
11   studies; correct?
12        MR. GOLDMAN: Object to the
13   form, lacks foundation, opinion
14   testimony.
15        THE WITNESS: Yes.
16   BY MR. KLINE:
17        Q.  And you were speaking there
18   not only of COX-2s generally, but a
19   thinking of -- were you thinking of Vioxx
20   in particular, sir?
21        MR. GOLDMAN: Same
22   objection.
23        THE WITNESS: Vioxx appeared
24   in the continuum to be the one

Page 156

1    associated with the highest risk
2    as an outlier.
3         MR. GOLDMAN: Same objection
4    as before.
5         THE WITNESS: But it
6    certainly, as we raised in the
7    JAMA paper, could have easily been
8    ascribed as a concern with
9    Celebrex as well.
10   BY MR. KLINE:
11        Q.  Now, there was a label --
12        MR. GOLDMAN: Objection,
13   move to strike as nonresponsive.
14   BY MR. KLINE:
15        Q.  -- on Vioxx at the time;
16   correct?
17        A.  Yes, there was a package
18   insert, yes, and a label.
19        Q.  Right.
20        And the label which would be
21   in the PDR as well as in the package
22   insert, did it in any way warn of the
23   cardiovascular risks which were, as I
24   think your testimony could be fairly

Page 157

1    described, obvious to you?
2         MR. GOLDMAN: Objection to
3    the opinion testimony.
4         MR. HAMELINE: Again, if you
5    need to look at the document, let
6    us know. If you have memorized
7    it...
8    BY MR. KLINE:
9         Q.  You know generally the
10   label?
11        MR. GOLDMAN: Object to
12   form.
13        THE WITNESS: Yeah, I'm
14   familiar with the two different --
15   the initial and then the April
16   2002, I'm familiar with them. At
17   least I couldn't recite it, but
18   I've reviewed them in the past.
19        The initial label, package
20   insert, did not mention any
21   cardiovascular risk. And only in
22   April 2002, which is considerably
23   long after the FDA panel requested
24   that there be a label change, was