Page 158

1  there an insertion about the risk
2  and some of the data, but it is
3  certainly not prominently featured
4  in the new label.  It's actually
5  in a very small print and, in my
6  mind, not adequately highlighting
7  the risk for patients and for the
8  medical community.
9      MR. GOLDMAN:  Objection,
10  move to strike, nonresponsive
11  opinion testimony.
12  BY MR. KLINE:
13      Q.  So, in your opinion, the
14  label, as you now understood the data as
15  it pertained to the '99 label when you
16  learned about this in 2001 and as you
17  understand it today based on the '99 and
18  2002 labels --
19      A.  Yes.
20      Q.  -- those labels, did they
21  provide adequate warnings and information
22  relating to the real risk of patients
23  taking Vioxx?
24      MR. GOLDMAN:  Objection,

Page 159

1  opinion testimony.
2      MR. HAMELINE:  Wait for his
3  objections.
4      THE WITNESS:  I'm sorry.
5      MR. KLINE:  Yes.  For those
6  who hear the constant stream of
7  talking, it's Merck's lawyer
8  objecting the entire deposition.
9      MR. GOLDMAN:  Mr. Kline, I'm
10  whispering, as the court reporter
11  can confirm.  I'm intentionally
12  whispering into the microphone so
13  she can hear me.  I'm not trying
14  to interrupt the deposition at
15  all.  You're asking him for clear
16  opinion testimony, and that's my
17  objection.
18      MR. KLINE:  I don't know why
19  we can't simply agree that you
20  have a standing objection to form
21  and opinion, and I'm willing to do
22  it.
23      MR. GOLDMAN:  And I told you
24  before, sir, that's not --

Page 160

1      MR. KLINE:  Let's go off the
2  record.  I don't want to take any
3  time on this.
4      THE VIDEOTAPE TECHNICIAN:
5  Off the record, 11:25.
6      - - -
7      (A discussion off the record
8  occurred.)
9      - - -
10      MR. KLINE:  I, again, invite
11  counsel to make any objection to
12  form or opinion testimony, which I
13  believe 90 percent of them are,
14  and now I can't even hear the
15  objections because they're just
16  being whispered so, I don't have
17  a chance to correct anything that
18  might be to the form because I
19  haven't heard the ones that are
20  being whispered.
21      I invite them to give Mrs.
22  Golkow at the end of the
23  deposition all of the bases of the
24  objections so I don't have to hear

Page 161

1  them.  They object to everything
2  Merck says.  It's as clear as it
3  can be.  Or everything that Dr.
4  Topol says.  Let's go back.
5      MR. GOLDMAN:  Mr. Kline, to
6  be clear, I'm saying the
7  objections loud enough for you to
8  hear and if for some reason if you
9  want me to say them louder, I'm
10  happy to do that.
11      MR. KLINE:  Yes.
12      MR. GOLDMAN:  But don't say
13  later on that you did not hear my
14  objections.
15      MR. KLINE:  What you want to
16  do -- what you clearly want to do,
17  and I didn't want to get to this
18  point today, Andy, but what you
19  clearly want to do is object to
20  every single question.  I don't
21  understand how it's not preserved
22  if I say to you I agree on behalf
23  of all of the parties taking the
24  deposition in this case, the

41 (Pages 158 to 161)

Page 162

1   thousands of people who have sued
2   Merck in this litigation in the
3   MDL, that I will agree that for
4   that purpose you can go back and
5   fill it in. I'm sure if we call
6   Judge Fallon, which I don't want
7   to do, that's what he would say.
8   It's as clear as can be. You have
9   the objection.
10      MR. STEIN: I make that
11  agreement for the people in
12  California, the state cases in
13  California that I represent. You
14  can have a standing objection.
15      MR. GOLDMAN: Are there any
16  other cross notices in this
17  deposition?
18      MR. KLINE: No.
19      MR. GOLDMAN: Well, with all
20  due respect, I don't know how the
21  judge is going to rule on that
22  later, and I can't just preserve
23  my objection, Mr. Kline. I will
24  do my best to do it in a

Page 163

1   non-disruptive way. I've tried to
2   do that.
3       I don't want to hear later
4   that you couldn't hear my
5   objections, because that's not
6   true.
7       MR. KLINE: I couldn't.
8       MR. GOLDMAN: And if Dr.
9   Topol just gives me a second to
10  make the objection, then we
11  wouldn't have the problem.
12      MR. KLINE: But then we're
13  still going to end up with a
14  transcript that is this and that.
15  But you know what, some day we'll
16  play it, and I'll ask for an
17  instruction from the judge that
18  this is what Merck was doing
19  during the deposition because they
20  didn't want to hear what Dr. Topol
21  said.
22      Let's go.
23      THE COURT REPORTER: I just
24  have one quick question or

Page 164

1   suggestion. Can you just say
2   objection, period? Do you have to
3   state the basis each time?
4       MR. KLINE: I asked that,
5   too.
6       MR. GOLDMAN: You want to me
7   to say objection period, and then
8   later I can go in and put in what
9   the objection is?
10      MR. KLINE: Yes. If it is
11  to form or opinion, you can go
12  back in and Linda can fill it in.
13      MR. GOLDMAN: Fine. I will
14  do that. That is fair.
15      Just for the record, I will
16  object just by saying "objection,"
17  and after the deposition I will
18  contact Linda and tell her what
19  the basis for that objection is.
20      MR. KLINE: You have to say
21  any other objection out loud. If
22  it is form or opinion, which 99
23  percent of this is, I'm fine. If
24  it's something else, you've got to

Page 165

1   let me know.
2       MR. GOLDMAN: Like what?
3       MR. KLINE: I don't know.
4       MR. GOLDMAN: What objection
5   would you like me to make now?
6       MR. HAMELINE: Foundation is
7   the only other objection you've
8   been making, so, let's keep that
9   in the three.
10      MR. KLINE: We'll keep that
11  in the three. Foundation is in
12  the three.
13      If there's anything other
14  than those three, state it.
15      MR. GOLDMAN: Sounds good.
16      MR. KLINE: Let's go.
17      THE VIDEOTAPE TECHNICIAN:
18  Back on the record at 11:30.
19      MR. KLINE: Okay.
20      We're back on the record;
21  correct?
22      THE COURT REPORTER: Yes.
23  BY MR. KLINE:
24      Q.  We have the warning labels,

Page 166

1  and I ask you about them and there were
2  objections and I'm not sure what came
3  through or not, so, I'm going to do it
4  again to be sure.
5      The warnings on this drug,
6  were there adequate warnings on this
7  drug, sir, in the '99 and 2002 labels?
8      MR. GOLDMAN: Objection.
9  BY MR. KLINE:
10     Q.  As to cardiovascular risks?
11     THE WITNESS: In my opinion,
12     both the original label and then
13     the revision in April 2002 did not
14     show adequate safety concerns
15     about heart attacks, strokes and
16     death that could occur from the
17     medicine.  So, it wasn't present
18     at all in the first iteration in
19     1999, and it certainly was not
20     adequately flagged in the 2002
21     revision.
22     MR. GOLDMAN: Move to
23     strike, nonresponsive.
24  BY MR. KLINE:

Page 167

1      Q.  You, sir, online at the
2  Cleveland Clinic Heart Center, you
3  apparently have online for your patients;
4  correct?  There's an online service
5  called Cleveland Clinic Heart Center, and
6  there was something in the winter '01 was
7  actually posted on the website, what I
8  see, "Raising a Cautionary Flag About
9  COX-2 Use in High-Risk Heart Patients."
10     A.  Yes.
11     Q.  Do you see that, sir?
12     A.  Yes, I do.
13     Q.  I've marked it as an
14  exhibit.  I'll get you a copy, counsel
15  for Merck.  We'll mark it as the next
16  exhibit number.
17         - - -
18     (Whereupon, Deposition
19     Exhibit Topol-10, "Raising a
20     Cautionary Flag about COX-2 Use
21     in High-Risk Heart Patients,"
22     Cleveland Clinic Heart Center (2
23     pages), was marked for
24     identification.)

Page 168

1         - - -
2  BY MR. KLINE:
3      Q.  And I'm going to ask you to
4  identify it.
5      A.  Yes.  This is from the
6  Cleveland Clinic Heart Center website.
7      Q.  Right.
8      Having said what you've just
9  told us, that there weren't adequate
10  warnings on the drug, were you at least
11  going to tell your patients certain
12  things about the drug?
13     MR. GOLDMAN: Objection.
14     THE WITNESS: Yes.
15  BY MR. KLINE:
16     Q.  As you understood it?
17     MR. GOLDMAN: Objection.
18     THE WITNESS: Well, this
19     could be for patients or it could
20     be for physicians, anyone who
21     comes to the website.  It's a
22     public access website.  So, it was
23     anyone who wanted to go to the
24     Cleveland Clinic Heart Center

Page 169

1      website would see our take and our
2      further recommendations from the
3      recent JAMA paper.
4  BY MR. KLINE:
5      Q.  Is the information that's
6  contained here, including, "Both
7  researchers call for prudent use of COX-2
8  inhibitors among coronary patients until
9  the potential risk can be fully addressed
10  in prospective randomized multicenter
11  trials," was that your advice to anyone
12  who came to the website to read it?
13     MR. GOLDMAN: Objection.
14     THE WITNESS: Yes.
15  BY MR. KLINE:
16     Q.  Was that being told to
17  people by Merck in their label?
18     A.  No.
19     MR. GOLDMAN: Objection.
20  BY MR. KLINE:
21     Q.  "We'd like to see a study of
22  patients at the highest cardiovascular
23  risks in which they get either a
24  combination of one of the coxibs and

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 170

1  aspirin or aspirin alone, says Dr.
2  Topol."
3        Is that a statement that's
4  yours and fairly attributed to you?
5        MR. GOLDMAN:  Objection.
6        THE WITNESS:  Yes, it is.
7  BY MR. KLINE:
8     Q.   "We think the aspirin and
9  coxib combination would provide
10 anti-platelet protection, and it may be
11 even more protective than aspirin alone.
12 But it could be worse, and that's what we
13 need to find out."  That's what you were
14 telling people posted on the website of
15 the Cleveland Clinic?
16       MR. GOLDMAN:  Objection.
17       THE WITNESS:  That's
18    correct.
19 BY MR. KLINE:
20    Q.   Dr. Nissen, your colleague,
21 added, "It wouldn't be a hard trial to
22 do."  We can get "a study of 6,000
23 patients, and reach enrollment goals in
24 as little as six months."

Page 171

1        Did Merck do that study?
2     A.   No.  That trial was not
3  done.
4     Q.   Should it have been done?
5        MR. GOLDMAN:  Objection.
6        THE WITNESS:  Any trial
7     would have been helpful, but no
8     trial was done.
9  BY MR. KLINE:
10    Q.   Did you have to take it upon
11 yourself to warn patients yourself
12 without the adequate warnings that were
13 being given by Merck, sir?
14       MR. GOLDMAN:  Objection.
15       THE WITNESS:  The website
16    was one way in which we put our
17    concerns out there beyond what was
18    published in the medical
19    literature.
20 BY MR. KLINE:
21    Q.   I'd like to move in the
22 period from -- move forward into the year
23 2002/2003/2004.
24       You wrote an editorial which

Page 172

1  was published in the Archives of Internal
2  Medicine, December of '02, and apparently
3  there were three or so articles that were
4  funded by Merck -- I think you'll put
5  this in context -- that were funded by
6  Merck which were attempting to show the
7  cardioprotective effects of naproxen.
8        If I've stated that wrong,
9  I'm just trying to get through a lot with
10 one simple concept.  Is that what was
11 going on and what you were responding to?
12       MR. GOLDMAN:  Objection.
13       THE WITNESS:  I'm not sure
14    what you're referring to.  Is it
15    one of the publications that I've
16    written?
17 BY MR. KLINE:
18    Q.   Let me withdraw this and
19 I'll go back.
20       I'm looking for a document,
21 which I'll show you, which was December
22 of '02, "Lack of Cardioprotective Effect
23 of Naproxen," written by you.
24    A.   Okay.  Yes, yes.

Page 173

1     Q.   (Handing over document.)
2        Put it in context.  Now I
3  won't get an objection to the question if
4  I just say put this in context, sir.
5     A.   Yes.
6        (Witness reviewing
7     document.)
8        MR. KLINE:  I've marked it
9     as Exhibit Number 11.
10       - - -
11       (Whereupon, Deposition
12    Exhibit Topol-11, "Lack of
13    Cardioprotective Effect of
14    Naproxen," Arch Intern Med/Vol
15    162, Dec 9/23, 2002 2637, was
16    marked for identification.)
17       - - -
18 BY MR. KLINE:
19    Q.   It says, "In summary, there
20 remains currently no definitive evidence
21 that naproxen has a cardioprotective
22 effect."  What were you responding to
23 there?
24    A.   So, there were three studies

Page 174

1  in the archives that were published and
2  an editorial.  We were responding to
3  that, that still there was no adequate
4  data to show that naproxen has any
5  cardioprotective effect, and that still
6  remains the case today.
7         MR. GOLDMAN:  Objection.
8  BY MR. KLINE:
9     Q.   Sir, in the VIGOR study --
10        MR. GOLDMAN:  Move to
11  strike.
12  BY MR. KLINE:
13    Q.   One thing I have not -- I
14  haven't testified to --
15        MR. KLINE:  Mr. Goldman, if
16  you would just state your --
17        MR. GOLDMAN:  Objection.
18  Move to strike as nonresponsive.
19        MR. KLINE:  Say it out loud
20  anymore, because that way I can
21  hear it.  No sense hiding it.
22        MR. GOLDMAN:  I'm not hiding
23  it, Mr. Kline.  I really don't
24  want you to argue to the judge

Page 175

1  that you couldn't hear my
2  objections.  Okay?
3         MR. KLINE:  I'm not going to
4  argue that up until this point,
5  but now I want to hear it, because
6  I want to know what's said at this
7  point.
8         What I find disruptive,
9  honestly, is the talking, the
10  whispering.  I just find it
11  disruptive.  I'm not -- I'm just
12  saying it is.
13  BY MR. KLINE:
14    Q.   Now, let's move -- I lost my
15  train of thought, so bear with me.
16        We were talking about
17  naproxen and this whole thing, its
18  cardioprotective effect.  In VIGOR, Merck
19  had made the point, as you well know,
20  that they had no long-term randomized
21  clinical trial to show that naproxen was
22  cardioprotective.  We've covered that
23  point; correct?
24        MR. GOLDMAN:  Objection.

Page 176

1         THE WITNESS:  Yes, yes.
2  BY MR. KLINE:
3     Q.   I'm just putting it in
4  context.
5     A.   No.  There are no data to
6  support in any definitive fashion or
7  meaningful way that naproxen has a
8  cardioprotective effect.
9     Q.   And what they did in the
10  VIGOR paper was they went to comparing it
11  to a flurbiprofen article which was done
12  in some post-CABG patients, I believe, if
13  you recall.  How did you view that?
14    A.   Well, there were several
15  things that were done to try to make a
16  case for a cardioprotective effect.
17        MR. GOLDMAN:  Objection.
18  BY MR. KLINE:
19    Q.   Tell me what things Merck
20  tried to do to make a case for
21  cardioprotective effect of naproxen.
22        MR. GOLDMAN:  Objection.
23        THE WITNESS:  Quoting the
24  platelet biology effects of

Page 177

1  naproxen compared with other
2  nonsteroidal anti-inflammatory
3  drugs, other comparisons, but
4  these were not randomized trials
5  with clinical cardiovascular
6  endpoints.  So, there's no way to
7  ascertain whether there's any
8  cardioprotective effect with
9  naproxen.
10  BY MR. KLINE:
11    Q.   And, therefore, when you
12  were writing here that "lack of
13  cardioprotective effect of naproxen,"
14  were you saying that there was definitely
15  no at all cardioprotective effect, or
16  were you saying that a cardioprotective
17  effect of naproxen could not explain the
18  results in VIGOR?
19        MR. GOLDMAN:  Objection.
20  BY MR. KLINE:
21    Q.   Or something else?
22        MR. GOLDMAN:  Objection.
23        THE WITNESS:  No.  It was
24  the latter.  That if there was a

Page 178

1    cardioprotective effect, it was
2    modest at best, and it could not
3    explain the five-fold increase in
4    heart attacks in the VIGOR trial.
5    BY MR. KLINE:
6        Q.   Okay.
7             Now came the year 2003.
8    What was roughly going on?
9        A.   Well --
10            MR. GOLDMAN:  Objection.
11   I'm sorry, Dr. Topol.  Objection.
12            THE WITNESS:  By 2003, now
13   we had several of these so-called
14   epidemiologic or observational
15   studies.  These were case-control
16   studies, multiple studies in large
17   populations published in various
18   journals.  And in these studies,
19   there were, by 2003, I think
20   probably five of them, four of
21   which showed very concerning
22   evidence of -- confirming our
23   initial paper in JAMA, but not in
24   a randomized trial like VIGOR,

Page 179

1    but, rather, in these population
2    studies, twofold or greater risk
3    of Vioxx compared with other
4    agents to be used for arthritis.
5        MR. GOLDMAN:  Objection,
6    move to strike as nonresponsive.
7    BY MR. KLINE:
8        Q.   And by the fall of that
9    year, actually, you have a paper that was
10   received September '02; revisions,
11   October '03; accepted '04 and published
12   October 28, '02, so, it's late '02.
13            You actually wrote an
14   article which said, "Where are we in
15   2003?"  You actually -- it was an October
16   2002 publication that's projecting
17   forward to 2003; correct?
18            MR. GOLDMAN:  Objection.
19            THE WITNESS:  Right.
20   BY MR. KLINE:
21       Q.   Correct?
22       A.   Right.
23       Q.   So, if it would really be
24   technically described, it would be, where

Page 180

1    are we as of October 28, 2002?
2        A.   That's correct.
3        Q.   You already had New Year's
4    planned for apparently; correct?
5        A.   That's correct.
6        Q.   And I want to look at that
7    article with you so that you can tell the
8    members of the jury where you saw this
9    Vioxx situation as of that time.
10       A.   Yes.
11       Q.   And by the way, while we're
12   getting the paper out and marked, we're
13   marking it as the next exhibit number,
14   which is Number 12, were you still
15   concerned?
16            MR. GOLDMAN:  Objection.
17            THE WITNESS:  Our concern
18   never went away, so, yes, just as
19   in 2001 -- it actually got
20   reinforced over time because of
21   the other studies that I
22   mentioned.
23   BY MR. KLINE:
24       Q.   Now, what you --

Page 181

1           - - -
2            (Whereupon, Deposition
3    Exhibit Topol-12,
4    "Cyclooxygenase-2: Where are we
5    in 2003? Cardiovascular risk and
6    COX-2 inhibitors," (Mukherjee et
7    al), Arthritis Research and
8    Therapy 2003, Vol. 5, 8-11, was
9    marked for identification.)
10          - - -
11           MR. GOLDMAN:  Mr. Kline, I
12   didn't get a chance to insert my
13   objection because the document was
14   being handed to me.  So, objection
15   to the last question.
16   BY MR. KLINE:
17       Q.   What you we stated here is
18   in the second paragraph, "Given the
19   results of several large clinical trials
20   of COX-2 inhibitors, it is clear that
21   theoretical concern for a prothrombotic
22   effect is now transformed to a clinical
23   reality."
24       A.   Yes.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 182

1      MR. GOLDMAN:  Where are you?
2   BY MR. KLINE:
3      Q.   We are under "Conclusions,"
4   in the first sentence of the second
5   paragraph saying, "Given the results of
6   several large clinical trials of COX-2
7   inhibitors, it is clear that the
8   theoretical concern for a prothrombotic
9   effect is now transformed to a clinical
10  reality."
11         Indeed it was; correct?
12         MR. GOLDMAN:  Objection.
13         THE WITNESS:  There is no
14      question that we, at this point --
15      we have had adequate replication
16      through multiple studies, and so
17      this is a reality, yes.
18  BY MR. KLINE:
19      Q.   You said, "The apparent
20  hazard does not appear to be large and,
21  in absolute terms, may be a fraction of 1
22  percent excess and may be confined to
23  patients with an as yet undefined,
24  specific genetic susceptibility.  With

Page 183

1   such an exceptionally large patient
2   population at risk, however, it is
3   imperative to determine the precise
4   extent of the risk and the methods to
5   avoid risk."
6          That's what you were after;
7   is that correct?
8          MR. GOLDMAN:  Objection.
9          THE WITNESS:  Yeah, we --
10      this is exactly the theme for
11      multiple years.  In fact, we were
12      underestimating the risk of less
13      than 1 percent.  It turned out, of
14      course, it was more than 1
15      percent, but this is what -- we
16      were trying to come up with the
17      best way to process the data as of
18      that point in time.
19         MR. GOLDMAN:  Objection,
20      move to strike as nonresponsive.
21  BY MR. KLINE:
22      Q.   You then wrote, "The
23  importance of the public health issue
24  cannot be overstated.  The class of

Page 184

1   drugs...yet to be assessed in a single
2   trial of patients with known
3   atherosclerotic disease, who stand to be
4   at the highest risk of adverse events."
5          Is that the nub of the
6   problem?
7          MR. GOLDMAN:  Objection.
8          THE WITNESS:  That's a
9      big --
10         MR. GOLDMAN:  Dr. Topol,
11      just give me one minute.
12      Objection.
13  BY MR. KLINE:
14      Q.   Please, sir.
15      A.   I'm sorry.
16         That's a big part of it,
17  because it already is a significant risk
18  in people without heart disease.  What's
19  going to happen if you have heart
20  disease?  So, all the problems that have
21  been registered and replicated are
22  potentially magnified in a higher risk
23  population.
24      Q.   Now, you became interested

Page 185

1   in something that I'm going to get into
2   in the next article and wrote on in the
3   medical literature, which is that you
4   state here, "Ironically, the
5   manufacturers of the first generation
6   COX-2 inhibitors" -- that includes Merck;
7   correct?
8          MR. GOLDMAN:  Are you
9      looking at a particular document?
10         MR. KLINE:  I'm looking at
11      the last sentence on the bottom of
12      the first column of page -- of the
13      last page of the exhibit.
14  BY MR. KLINE:
15      Q.   "Ironically, the
16  manufacturers of the first generation
17  COX-2 inhibitors spent over $265 million
18  in 2001 for direct-to-consumer
19  advertising to promote their drugs, but
20  have failed to conduct a prospective
21  trial of COX-2 inhibitors in patients
22  with cardiovascular disease."  We have
23  not -- "We will not have advanced in any
24  meaningful way in 2003 unless such a

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 186

1 trial is undertaken."
2          MR. GOLDMAN: Objection.
3 BY MR. KLINE:
4      Q.   Couple of questions.
5          Are those words that you
6 wrote?
7          MR. GOLDMAN: Objection.
8          THE WITNESS: They're
9 absolutely words that I wrote,
10 yes.
11 BY MR. KLINE:
12     Q.   And did you take the time to
13 actually look and find out what the
14 manufacturers, including Merck, were
15 spending advertising the drug?
16         MR. GOLDMAN: Objection,
17 lacks foundation.
18         THE WITNESS: Yes, we did
19 research the data for how much the
20 direct-to-consumer advertising was
21 costing for both Celebrex and
22 Vioxx.
23 BY MR. KLINE:
24     Q.   And were you asking for the

Page 187

1 same thing, for Merck to do a
2 cardiovascular endpoint study?
3      A.   Yes, we were.
4      Q.   And was it done?
5      A.   No, it was not.
6      Q.   And should it have been
7 done?
8          MR. GOLDMAN: Objection.
9          THE WITNESS: Absolutely it
10 should have been done.
11 BY MR. KLINE:
12     Q.   Now, I want -- you actually
13 wrote later an article called,
14 "Pharmaceutical advertising versus
15 research spending: Are profits more
16 important than patients?" Did you write
17 that?
18     A.   Yes.
19     Q.   Were you becoming
20 increasingly more frustrated, Dr. Topol?
21         MR. GOLDMAN: Objection.
22            - - -
23         (Whereupon, Deposition
24 Exhibit Topol-13, "Pharmaceutical

Page 188

1 advertising versus research
2 spending: Are profits more
3 important than patients?
4 (Mukherjee et al) American Heart
5 Journal, October 2003, 563-564,
6 was marked for identification.)
7            - - -
8 BY MR. KLINE:
9      Q.   Exhibit 13.
10     A.   The frustration level was
11 clearly rising over time, yes.
12     Q.   And in this particular
13 editorial, which you published -- where
14 did you publish it, sir?
15     A.   American Heart Journal.
16     Q.   American Heart Journal.
17         Is that a major journal,
18 peer-reviewed journal?
19     A.   It's one of the four leading
20 heart journals in the United States.
21     Q.   You state here, sir, "We
22 would like to call on the leaders" -- I'm
23 in the last paragraph of the article.
24         "We would like to call on

Page 189

1 the leaders of the medical community to
2 voice their concern regarding the adverse
3 effects of direct-to-consumer
4 advertising, whose sole aim is to sell
5 drugs without other considerations."
6         Did you write that?
7         MR. GOLDMAN: Objection, and
8 lacks --
9         THE WITNESS: Yes, sir, I
10 did write that.
11 BY MR. KLINE:
12     Q.   Were you thinking of Vioxx
13 and Merck when you stated that?
14         MR. GOLDMAN: Objection.
15         THE WITNESS: There isn't
16 any question. In fact, in the
17 figure of that article, we showed
18 how Vioxx had $160 million of
19 advertising in the year compared
20 to Budweiser, 146 odd and Pepsi,
21 125 million, and Nike, 70 million.
22         So, in fact, Vioxx exceeded
23 all these consumer products in
24 that very year that we looked at.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 190

1          MR. GOLDMAN:  Objection,
2      move to strike as nonresponsive.
3  BY MR. KLINE:
4      Q.   You're referring to Figure
5  1, which will be displayed, where you
6  compare the amount of money that was
7  being spent by Vioxx -- by Merck to do
8  this.
9          You're an academic
10 cardiologist.  Let me understand this.
11 What takes you to the -- what takes you
12 to analyze something like this?  Why are
13 you doing it and why are you saying this
14 to your colleagues?
15     A.   Well --
16         MR. GOLDMAN:  Objection.
17         THE WITNESS:  -- there's
18     many reasons.  Firstly, our
19     patients come in, my patients come
20     and see me and they say, Doctor, I
21     saw the commercial on the Vioxx or
22     the Celebrex, I would like that
23     medicine.  That looks like a good
24     medicine.

Page 191

1          Or I watch television
2      sometimes, and I might see the
3      advertisement and say, that's
4      concerning, because here we have
5      registered our concerns about
6      heart attack risk, and there's
7      nothing on television to transmit
8      that.
9          And beyond all those, it's
10     the idea that we are responsible
11     for public health.  I mean, that's
12     what medical research is about, is
13     to improve public health, and here
14     we're trying to prevent heart
15     attacks and we've got this
16     countercurrent, this stream of
17     marked promotion, aggressive
18     promotion of a medicine with an
19     unsure safety profile.
20         In fact, we've moved --
21     migrated from unsure to pretty
22     darn sure that it's unsafe, at
23     least in some patients.  So, that
24     is a recipe for trouble.

Page 192

1  BY MR. KLINE:
2      Q.   Were you, sir --
3          MR. GOLDMAN:  Objection,
4      move to strike as nonresponsive.
5  BY MR. KLINE:
6      Q.   Were you, sir, back here,
7  sitting here in the position as the
8  chairman of the department of
9  cardiovascular medicine of the Cleveland
10 Clinic and the Provost of the Cleveland
11 Clinic and the chief academic officer
12 here, were you here saying to yourself or
13 worried that direct-to-consumer
14 advertising was having an effect on the
15 health and safety of patients when they
16 were taking the drug Vioxx?
17         MR. GOLDMAN:  Objection.
18         THE WITNESS:  Yes.  That
19     back in '97 was when the laws were
20     changed to allow for
21     direct-to-consumer advertising,
22     and so essentially the COX-2 era,
23     the COX-2 inhibitor era, these new
24     medicines, Celebrex and Vioxx,

Page 193

1      were really the first medicines
2      launched in the direct-to-consumer
3      advertising new era.
4          And the concern there is how
5      many millions of people could
6      rapidly take a medicine without an
7      adequately established safety
8      profile.
9  BY MR. KLINE:
10     Q.   You said here, "Editors of
11 major cardiology journals."  That at one
12 time was you; correct?  Have you been an
13 editor of a major cardiology journal?
14     A.   Not one of the top journals.
15     Q.   I see.
16         So, you were saying,
17 "Editors of major cardiology journals
18 also need to be more cognizant of the
19 effects of publishing biased literature,
20 since this may significantly influence
21 the prescribing habits of practicing
22 physicians."
23         Did you make that statement?
24         MR. GOLDMAN:  Objection.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 194

1    THE WITNESS:  Yes.
2    MR. GOLDMAN:  Objection.
3  BY MR. KLINE:
4    Q.   Was the literature
5  published, in particular, the Vioxx VIGOR
6  trial as published by Merck, biased
7  literature?
8    MR. GOLDMAN:  Objection.
9    THE WITNESS:  I believe
10    there was considerable biased
11    literature that was published with
12    authors either for Merck or
13    consultants of Merck.
14  BY MR. KLINE:
15    Q.   Finally moving ahead, there
16  is a comment that you had in the Lancet.
17  Lancet is a British journal?
18    A.   Yes.
19    Q.   And of the highest caliber;
20  correct?
21    A.   Yes.  It's one of the top
22  three medical journals, the New England
23  Journal, JAMA and the Lancet, yes.
24    Q.   Those are the three?

Page 195

1    A.   Yes.
2    Q.   And you wrote an article
3  called, "A coxib a day won't keep the
4  doctor away"?
5    A.   Yes.
6    MR. KLINE:  I marked it as
7  Exhibit Number 14.
8    - - -
9    (Whereupon, Deposition
10    Exhibit Topol-14, "A coxib a day
11    won't keep the doctor away,"
12    (Topol, et al), The Lancet Vol
13    364, August 21, 2004, 639-640,
14    was marked for identification.)
15    - - -
16    THE WITNESS:  Yes.
17  BY MR. KLINE:
18    Q.   I want to look on Page 2.
19  There's a lot here, but I want to
20  particularly talk about Page 2, all the
21  way at the bottom of the column, after
22  footnote 18 where you reach a conclusion.
23  And you say, "The continued commercial
24  availability of rofecoxib, without a

Page 196

1  black-box warning for cardiovascular
2  patients is indeed troubling.  The coxib
3  debate will not go away until safety and
4  efficacy questions are answered; if only
5  a small fraction of the
6  direct-to-consumer advertising costs or
7  revenue were appropriately channeled for
8  clinical trials, we might be able to have
9  an enhanced perspective and make sound
10  recommendations for our patients."
11    MR. GOLDMAN:  Objection.
12  BY MR. KLINE:
13    Q.   Did you write that?
14    MR. GOLDMAN:  Objection.
15    THE WITNESS:  Yes,
16    absolutely I wrote that.  I wrote
17    that with Dr. Gary Falk, who is
18    here as a colleague at Cleveland
19    Clinic.
20  BY MR. KLINE:
21    Q.   Okay.
22    Sir, when you did that, were
23  you talking about Merck and their conduct
24  in particular on the drug Vioxx?

Page 197

1    MR. GOLDMAN:  Objection.
2    THE WITNESS:  Yes.
3  BY MR. KLINE:
4    Q.   And you did believe at that
5  time that the drug needed a black box
6  warning; correct?
7    MR. GOLDMAN:  Objection.
8    THE WITNESS:  Yes.  We're
9    now in August of 2004 publishing
10    this.
11  BY MR. KLINE:
12    Q.   Yes, sir.
13    A.   And the extraordinary amount
14  of evidence, not just from VIGOR, but
15  from various other trials and studies,
16  was really quite excessive in my opinion,
17  and that's why the black box warning was
18  long overdue in August 2004.
19    Q.   Do you have a sense of when
20  it was due by?
21    MR. GOLDMAN:  Objection.
22    THE WITNESS:  It could have
23    easily been imposed as of February
24    2001, or if we go back to the Juni

Page 198

1   analysis in the Lancet, also
2   published in the Lancet, it could
3   have been back in year 2000. So,
4   somewhere between 2000 and 2001
5   there was more than adequate
6   confirmation.
7       Essentially all you need is
8   VIGOR and study 090 together, and
9   I could take you through the Juni
10  analysis in the Lancet, but that
11  basically crosses the line for
12  proven hazard of heart attacks.
13  BY MR. KLINE:
14      Q.   Did you observe any pattern
15  of conduct by Merck every time or any
16  time an investigator like yourself or
17  Juni did a critical analysis and
18  questioned the safety of the drug Vioxx?
19      MR. GOLDMAN: Objection.
20      THE WITNESS: Each time we
21  published a paper or a study was
22  also published by other
23  investigators questioning the
24  safety of Vioxx, there would be

Page 199

1   immediately a PR attack on the
2   report. Merck would refute the
3   findings and/or they would have
4   consultants of theirs refute the
5   findings. So, there was a
6   published and then anti force that
7   would occur without any question.
8   BY MR. KLINE:
9       Q.   Juni article, when it was
10  published, first of all, where was it
11  published?
12      A.   The Juni article was
13  published in November of 2004 in the
14  Lancet.
15      Q.   And who was Juni?
16      A.   Juni, I don't know him, I've
17  never met him, but he's a very highly
18  regarded investigator in Europe out of
19  Switzerland, Peter Juni and colleagues,
20  and they published, I think, quite an
21  important cumulative meta-analysis, where
22  they just looked at the data as it was
23  coming out. And I think that's a very
24  important figure to go at, to look at. I

Page 200

1   believe it's Figure 2 or Figure 3 in that
2   paper, if we can.
3       Q.   Yes. I actually was trying
4   to get it in front of us. I didn't have
5   my copy handy, but let's see if we can
6   find it.
7       MR. KLINE: Let's go off the
8   record for a minute.
9       THE VIDEOTAPE TECHNICIAN:
10  Off the record, 11:55.
11      - - -
12      (Whereupon, a recess was
13  taken from 11:55 a.m. until
14  11:58 a.m.)
15      - - -
16      THE VIDEOTAPE TECHNICIAN:
17  Back on the record, 11:58.
18  BY MR. KLINE:
19      Q.   I wanted to find out what
20  you believed was significant about the
21  Juni article. You pointed us to --
22      MR. GOLDMAN: I'm sorry, are
23  we on the record? Start over.
24      MR. KLINE: Are we back on

Page 201

1   the record?
2       THE VIDEOTAPE TECHNICIAN:
3   Yes.
4       - - -
5       (Whereupon, Deposition
6   Exhibit Topol-15, "Risk of
7   cardiovascular events and
8   rofecoxib: Cumulative
9   meta-analysis," (Juni, et al) The
10  Lancet, Vol. 364, December 4,
11  2004, 2021-2029, was marked for
12  identification.)
13      - - -
14  BY MR. KLINE:
15      Q.   I referred you to the Juni
16  article as part of our continuing
17  discussion. You mentioned that the Juni
18  article contained a figure which is
19  worthy of discussion, given the fact that
20  that's what you believe is significant or
21  part of the significant findings.
22      I assume you are referring
23  to the figure which shows the relative
24  risks of myocardial infarction based upon

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 202

1  many studies that had been done of the
2  drug, clinical trials; is that correct?
3        MR. GOLDMAN: Objection.
4        THE WITNESS: I'm referring
5  to Figure 3, which is the
6  so-called cumulative
7  meta-analysis, and what this does
8  is each study as it's done, and
9  these are all studies in patients
10 with arthritis, each study as it's
11 done is put in, and then as the
12 next one comes in, it adds to
13 that, adds to that. So, you have
14 basically the readout of all the
15 data cumulatively as it's being
16 accrued in the various randomized
17 trials of Vioxx. And what's
18 interesting here is that up until
19 2000 in the first entry, there's
20 5,193 patients, which is about
21 what was in at the time of the May
22 '99 approval.
23        Then comes the VIGOR trial,
24 which jumps from 5,193 patients to

Page 203

1  13,269 patients. And you can see
2  what happens here is that we're
3  almost at a statistically
4  significant two-fold excess of
5  heart attacks and events.
6        But what is interesting is,
7  the next addition is the 978
8  patients. That's study 090. And
9  what happens with study 090 is
10 that now we have truly
11 statistically crossed the line,
12 and now no longer are the
13 confidence limits spanning or
14 crossing the line of identity.
15       So, now, if one were to ask
16 when should the drug have not been
17 either on the market or should
18 have been a black box warning
19 because of definitive risks, the
20 Juni meta-analysis answers that,
21 because once you have VIGOR and
22 090, statistically it's proven,
23 without any question, from this
24 analysis.

Page 204

1        MR. GOLDMAN: Objection,
2  move to strike, nonresponsive
3  opinion testimony.
4  BY MR. KLINE:
5        Q.   Now, this was published in
6  the Lancet?
7        A.   Yes, in November of 2004.
8        Q.   So, not only could
9  physicians see it, but Merck could see it
10 as well; correct?
11       A.   Yes.
12       Q.   Okay.
13            Did they go about trashing
14 Juni?
15       MR. GOLDMAN: Objection.
16       THE WITNESS: As I mentioned
17 earlier, every time a study was
18 published, there was a vehement
19 response to that to try to provide
20 an antidote or a negation of the
21 results, whether it was our study
22 or whether it was other reports.
23            This would have been -- in
24 this case, they said that Dr. Juni

Page 205

1  and his colleagues didn't include
2  the right trials, and they had all
3  sorts of criticism that I believe
4  was largely unfounded, and there
5  was quite a bit of correspondence
6  in the Lancet that followed this
7  up subsequently.
8  BY MR. KLINE:
9        Q.   I guess one thing that comes
10 to mind, was Juni --
11       MR. GOLDMAN: Objection,
12 move to strike, nonresponsive.
13 BY MR. KLINE:
14       Q.   Was Juni independent of
15 Merck, from what you knew?
16       A.   Juni was, as best I know,
17 fully independent of Merck.
18       Q.   Now, the drug -- one day you
19 woke up and found that Merck took the
20 drug off the market; correct?
21       A.   Yes. I think it'd be
22 helpful to review that morning what
23 happened.
24       Q.   Tell me.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 206

1    MR. GOLDMAN:  Objection.
2  BY MR. KLINE:
3    Q.   What happened the morning
4  that you got up that Merck took the drug
5  off the market?
6    MR. GOLDMAN:  Objection.
7    THE WITNESS:  On September
8  30, 2004, just over a year ago, I
9  came into work here at the clinic
10  and, oh, somewhere about 8:30 in
11  the morning, later after being
12  here for a while, I got a call
13  from Dr. Richard Pasternak.  Dr.
14  Pasternak, who I knew as a
15  cardiologist and only recently had
16  joined Merck, in fact, I didn't
17  even know he joined Merck until
18  that morning, was calling me
19  somewhere between 8:30 and 9:00 to
20  say that Merck is going to
21  withdraw Vioxx from the market and
22  that we, that is, the Cleveland
23  Clinic team, was right.
24    And I said, well, Richard,

Page 207

1  can you tell me what were the
2  data?  What was the incidence of
3  the APPROVe trial, which I didn't
4  know much about APPROVe, the colon
5  cancer, colon polyp trial, what
6  were the data?  And he did explain
7  to me that it was 3.5 percent of
8  heart attacks in the Vioxx arm and
9  2.6 -- let's see.  I'm trying to
10  remember the numbers now.  Excuse
11  me.  It was 1.6 excess.  So, it
12  was 1.9 and 3.5.  So, 1.9 percent
13  heart attacks in the placebo arm
14  and 3.5 percent heart attacks in
15  the APPROVe Vioxx arm.
16    And he said, we decided to
17  take the drug off the market and
18  that our work had been prescient,
19  that is, work back three, four
20  years ago.
21  BY MR. KLINE:
22    Q.   This is someone from Merck?
23    A.   Yes.  I hadn't heard from
24  anyone from Merck in quite a long time.

Page 208

1  So, that morning I got a phone call from
2  Dr. Pasternak.
3    Q.   And did I hear your words
4  that he said to you that the Cleveland
5  Clinic was right and Merck was wrong?
6    MR. GOLDMAN:  Objection.
7    THE WITNESS:  He didn't say
8  that Merck was wrong.  He said,
9  you got it right or you were
10  right, something like that.  He
11  was being supportive.  And he had
12  been an acquaintance and friend
13  for some time, and I believe he
14  only, at that point, had only,
15  within weeks or very recently had
16  joined Merck.
17  BY MR. KLINE:
18    Q.   What was your next
19  involvement?  Tell me the story as it
20  progressed through your eyes.
21    MR. GOLDMAN:  Objection.
22    THE WITNESS:  Well, as the
23  day unfolded, in some ways it was
24  kind of like a nightmare coming

Page 209

1  true.  Who would want to be right
2  about this?  Why would we want to
3  be right that the heart attacks
4  were being engendered by a
5  medicine?  All we wanted were
6  trials to be done and get to the
7  definitive story here.  We didn't
8  want there to be -- this type of
9  thing to occur, not by any means.
10  But what then started to happen
11  was, the same type of what I
12  viewed as unacceptable publicity
13  about Vioxx was now being
14  disseminated, and this was quite
15  disconcerting, to say the least.
16  BY MR. KLINE:
17    Q.   What are you referring to,
18  sir?
19    MR. GOLDMAN:  Objection,
20  move to strike nonresponsive
21  opinion testimony.
22  BY MR. KLINE:
23    Q.   Dr. Topol, what are you
24  referring to?

Page 210

1      A.   Well, what was being done
2   here is to say, number one, that this was
3   the first time that the company was ever
4   aware of the heart attack risk.
5      Q.   You're referring to Merck's
6   press release?
7      A.   Yes.  That, in fact, that
8   the problems with this drug had never
9   been seen against placebo --
10        MR. GOLDMAN:  Objection to
11     last question.
12        THE WITNESS:  -- or other
13     non-steroidals, only naproxen,
14     which is untrue.
15   BY MR. KLINE:
16     Q.   Sir, I didn't focus, and I
17   apologize.
18        What was the second thing
19   you said?
20     A.   The second point was that
21   they made the claims on that day of
22   withdrawal and subsequently that they had
23   never seen a problem with Vioxx in any
24   trial except against naproxen.

Page 211

1         And that was not true,
2   because in study 090, which was never
3   published, as I've already reviewed,
4   there was a significant 760 percent
5   excess, which somehow or another has been
6   forgotten about.
7         Now, beyond that, they also
8   used numbers that were not being
9   communicated adequately to the public.
10   So, instead of saying 3. -- 1. -- what's
11   the number?  1.5 percent and 3. -- let's
12   see, 1.9 and 3.5 percent, that is -- I
13   can't write it down because I'm not
14   allowed to have any numbers here in front
15   of me.  But instead of saying what the
16   numbers really were in APPROVe, so that
17   the public would know there was a 1.6 per
18   100 or 16 per thousand, no, no, the
19   numbers that were communicated, like in
20   the New York Times that day, were .75 and
21   1.5 per thousand patient years.
22         And reporters, journalists,
23   could not understand those numbers and
24   thought the excess was a fraction of what

Page 212

1   it really was.
2      Q.   Did that disturb you?
3      A.   Yes, it disturbed me,
4   because I spoke to the journalist that
5   day.  Virtually all of them called of the
6   major newspapers, Gina Colata -- Barbara
7   Martinez of the Wall Street Journal, Gina
8   Colata of the New York Times and various
9   others, and they said well, there's not
10   very much difference.  I said, wait a
11   minute, I talked to Dr. Pasternak.
12   Because they said, well, where did you
13   get your information?  This morning.  And
14   the numbers I have suggest a 1.6 per
15   hundred or 16 per thousand excess of
16   heart attacks, which is very different.
17        MR. GOLDMAN:  I tried to
18     make an objection before.  I
19     object to that last answer as
20     nonresponsive.  It calls for
21     opinion testimony, and the
22     previous answer, too.
23        Okay, Tom?
24        MR. KLINE:  Yes.  Not that

Page 213

1     you -- just to the fact that you
2     have objected, and they're
3     preserved.
4   BY MR. KLINE:
5      Q.   Are you saying that the
6   effect here was to distort the data so
7   that it would be both difficult to
8   understand and it would lessen the true
9   impact and nature of the problem?
10        MR. GOLDMAN:  Objection.
11        THE WITNESS:  That's an
12     adequate summary of how I felt
13     that day, yes.
14        MR. KLINE:  All right.
15     Let's take just a brief
16     break, like two to three minutes.
17        THE VIDEOTAPE TECHNICIAN:
18     Off the record at 12:08.
19        - - -
20        (Whereupon, a recess was
21     taken from 12:08 p.m. until
22     12:18 p.m.)
23        - - -
24        THE VIDEOTAPE TECHNICIAN:

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 214

1    Back on the record at 12:18. Tape
2    Number 3.
3  BY MR. KLINE:
4    Q.   Dr. Topol, thanks for
5  hanging in there. We're now in the third
6  hour of examination on the subject.
7    One thing that Merck said
8  from the APPROVe study was that there was
9  an increased risk after 18 months. Do
10  you recall that claim?
11    A.   Yes.
12    Q.   How did you see that in the
13  context of the full picture of the
14  articles?
15    MR. GOLDMAN: Objection.
16    THE WITNESS: This was
17  another extremely concerning part
18  of that dissemination on the day
19  of withdrawal, that it took 18
20  months for there to be any risk,
21  because that's not true.
22    In fact, as I reviewed
23  earlier in this deposition, there
24  were four trials that showed that

Page 215

1  the timeline for that was
2  considerably quicker. In VIGOR,
3  with four to six weeks, there was
4  separation. In ADVANTAGE, within
5  12 weeks. In VICTOR, this was
6  immediate. And in study 090,
7  within six weeks.
8    And in all of these trials,
9  there were no heart disease
10  patients. So, it could have been
11  much worse than -- in the days or
12  weeks. And beyond all that,
13  there's the issue of a problem of
14  statistical power, that is, you
15  have to do a very large trial if
16  you're not expecting adequate
17  number of events, and so none of
18  the trials were adequately powered
19  from a time perspective.
20    But, given all those things,
21  that is, statistical power, lack
22  of cardiovascular patients, and
23  four randomized trials, in
24  addition to the Juni analysis,

Page 216

1    there's a pretty strong case that
2    the risk of Vioxx for heart
3    attacks can occur at any time
4    after the initiation of the
5    medicine.
6    MR. GOLDMAN: Objection,
7    move to strike, nonresponsive,
8    opinion.
9  BY MR. KLINE:
10    Q.   What you've stated to us is
11  your conclusion, based on your review of
12  all of the information which you cited;
13  is that correct?
14    MR. GOLDMAN: Objection.
15    THE WITNESS: Yes.
16  BY MR. KLINE:
17    Q.   By that time or by the
18  time -- by today, by today there were
19  studies done by -- let's see, there was a
20  study done by Ray, correct, in Lancet, in
21  '02, the Ray study?
22    A.   Yes.
23    Q.   I'm talking epidemiology
24  studies.

Page 217

1    A.   There were two Ray studies
2  in the Lancet.
3    Q.   Did that show an increased
4  risk of heart attacks?
5    MR. GOLDMAN: Objection.
6    THE WITNESS: Yes.
7  BY MR. KLINE:
8    Q.   There was a study by Solomon
9  in Circulation in 2004. I'm talking just
10  the epidemiological studies. Did that
11  show an increased risk of heart attacks?
12    MR. GOLDMAN: Objection.
13    THE WITNESS: Yes.
14  BY MR. KLINE:
15    Q.   There was a study by Graham
16  in Lancet in 2005, which we'll get to.
17  Did that show an increased risk of heart
18  attacks?
19    MR. GOLDMAN: Objection.
20    THE WITNESS: Yes.
21  BY MR. KLINE:
22    Q.   There was a study by Kimmel
23  in the Annals of Internal Medicine
24  published, I'm not sure when. Did that

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 218

1  show an increased risk of heart attacks?
2          MR. GOLDMAN: Objection.
3          THE WITNESS: Yes.
4  BY MR. KLINE:
5      Q.   There was a study by
6  Levesque, L-E-V-E-S-Q-U-E. Did that show
7  an increased risk of heart attacks?
8          MR. GOLDMAN: Objection.
9          THE WITNESS: Yes.
10 BY MR. KLINE:
11     Q.   Now, I'd like to go back to
12 VIGOR because I didn't cover this, and I
13 think it's essential.
14         In VIGOR, you have a series
15 of criticisms of VIGOR about the data and
16 about -- and I had that in the memo that
17 you wrote to Graham originally. You
18 cited scientific misconduct in the VIGOR
19 trial, and I think I glossed over this,
20 and I don't want to miss it.
21         You said there were errors
22 of omissions --
23         MR. GOLDMAN: Do you have a
24     document?

Page 219

1          MR. KLINE: I'm back to the
2      Graham thing, which is Exhibit 2.
3  BY MR. KLINE:
4      Q.   You said there were "errors
5  of omission (deaths)." Please explain.
6  You're talking about what Merck did that
7  constituted scientific misconduct.
8  That's the point I'm at.
9          MR. GOLDMAN: Objection, and
10     can I have the same standing
11     objection about this document that
12     I had before?
13         MR. KLINE: Yes.
14 BY MR. KLINE:
15     Q.   Scientific misconduct in
16 VIGOR by Merck. First of all, you said
17 there were "errors of omission." Please
18 explain concisely.
19         MR. GOLDMAN: Objection.
20         THE WITNESS: I summarized
21     this in the letter in the New
22     England Journal, which goes
23     through the VIGOR correct data, as
24     compared to the data that was in

Page 220

1          the manuscript from November of
2      2000.
3  BY MR. KLINE:
4      Q.   Is that a good place to go
5  to find it?
6          MR. GOLDMAN: Objection.
7          THE WITNESS: I really
8      believe you should get this
9      document to look at --
10 BY MR. KLINE:
11     Q.   Let's.
12     A.   -- because together we can
13 take you through this quickly.
14     Q.   Fine.
15         Let's look at the New
16 England Journal of Medicine editorial.
17     A.   No, letter.
18     Q.   I'm sorry, letter.
19     A.   December 30, 2004.
20     Q.   December 30, 2004.
21     A.   Right. It's a
22 correspondence based on the editorial.
23     Q.   Okay.
24         Let me get that in my hand.

Page 221

1  We have it.
2      A.   Good.
3      Q.   How many articles and
4  editorials have you published in the
5  medical literature, Dr. Topol, relating
6  to the Vioxx and the COX-2s?
7      A.   There have been 16 articles
8  and editorials published.
9      Q.   And what you've done in
10 those is to put your views out in front
11 of the medical world at large to let them
12 know what you're thinking?
13         MR. GOLDMAN: Objection.
14         THE WITNESS: Yes. And a
15     few of those were actually
16     directed to the lay public.
17 BY MR. KLINE:
18     Q.   Okay.
19         Do you have the reply in
20 front of you?
21     A.   Yes.
22     Q.   All right.
23         Now, my purpose is to go
24 through your criticisms of the VIGOR

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 222

1  trial and what you think Merck did that
2  constitutes scientific misconduct.  Can
3  you do so, sir?
4        MR. GOLDMAN:  Objection.
5        THE WITNESS:  Yes.
6  BY MR. KLINE:
7     Q.   Please.
8        MR. GOLDMAN:  Objection.
9        THE WITNESS:  Okay.
10       So, what I cited here in
11   this correspondence is how the
12   article in the New England
13   Journal -- this goes back to what
14   we discussed earlier today, which
15   is when the paper was published in
16   November 2000 as compared to the
17   FDA documents that we have a
18   chance to review in February of
19   2001, there was -- there were
20   gross discrepancies, which is why
21   we had contacted Merck in the
22   first place about this manuscript.
23       Then, finally, we had the
24   ability to work with the New

Page 223

1  England Journal of Medicine
2  editors, Dr. Curfman, Dr. Drazen,
3  and to figure out what was going
4  on.
5        Now, as it turns out, in the
6  VIGOR manuscript, in the New
7  England Journal in 2000, in three
8  times in the paper, this is first
9  authored by Bombardier, and three
10  times it says that the mortality
11  was the same between naproxen and
12  Vioxx.  And that was untrue.
13       In fact, there was a 46
14  percent difference.  There were 22
15  deaths in the Vioxx arm versus 15
16  deaths in the naproxen arm.  And
17  so instead of presenting the
18  deaths as they should, the authors
19  only used percentages, rounded
20  them off, but moreover, they
21  asserted strongly in three
22  different places that the
23  mortality was the same.  So,
24  that's issue number one.

Page 224

1        Issue number two with that
2  manuscript --
3  BY MR. KLINE:
4     Q.   Before you get to issue
5  number two, if you remember, how do you
6  view that conduct?  What word would you
7  use to describe it?
8        MR. GOLDMAN:  Objection.
9        THE WITNESS:  We're talking
10   about deaths, and we're talking
11   about false assurances that the
12   mortality was the same in three
13   prominent places in the
14   manuscript.
15  BY MR. KLINE:
16    Q.   Outrageous?
17       MR. GOLDMAN:  Objection.
18       THE WITNESS:  I believe it's
19   highly misleading.
20  BY MR. KLINE:
21    Q.   Go ahead.
22    A.   The second issue was the
23   false data regarding heart attacks.  So,
24   instead of a five-fold increase, which we

Page 225

1  know is true at the bare minimum, because
2  there wasn't the right adjudication in
3  this trial as we learned and I reviewed
4  earlier from the Targum report, but now
5  we're talking about that the authors knew
6  the correct number of heart attacks.
7        They could have fixed the
8  galley proofs, and this is told to me by
9  the editors of the New England Journal,
10  but they decided to give the correct
11  numbers in the published New England
12  Journal paper.  So, they had a four-fold
13  increase in heart attacks rather than a
14  five-fold increase in heart attacks.
15       And that is erroneous, and
16  that appears to be, best I can
17  reconstruct with the New England Journal
18  editors, an error of commission.
19       MR. GOLDMAN:  Objection,
20  move to strike as nonresponsive.
21  BY MR. KLINE:
22    Q.   And the third?
23    A.   The third is, rather than
24  report any of the other clotting events,

Page 226

1  like strokes, like transient ischemic
2  attacks, like unstable angina, like
3  peripheral arterial thrombosis, like
4  venous thrombosis, like pulmonary
5  embolism, none of these were reported in
6  the New England Journal of Medicine
7  paper.
8      Q.   You also state on the top of
9  a column on Page 2878 of your
10 correspondence, which is now marked as
11 exhibit --
12          MR. HAMELINE:  16.
13              - - -
14          (Whereupon, Deposition
15      Exhibit Topol-16, "Rofecoxib,
16      Merck, and the FDA," (Kim et al),
17      N Engl J Med 351;27 December 30,
18      2004, 2875 - 2878, was marked for
19      identification.)
20              - - -
21 BY MR. KLINE:
22     Q.    -- 16, thank you.
23          You state here, something we
24 talked about earlier, which is, "We

Page 227

1  indeed" -- top of the second column,
2  2878.
3          "We indeed acknowledged that
4  naproxen may have a cardioprotective
5  effect, but the magnitude of the effect
6  would be unlikely to exceed that of
7  aspirin, at a 25 percent reduction of
8  heart attacks.  Instead, in the VIGOR
9  trial, there was a 500 percent increase
10 in heart attacks.  This makes any
11 'naproxen hypothesis' of cardioprotection
12 mathematically indefensible."  Correct?
13 Your words?
14          MR. GOLDMAN:  Objection and,
15      Tom, I didn't get the chance to
16      object to the previous answer.
17          MR. KLINE:  You have the
18      objection.
19          THE WITNESS:  I wrote this.
20      These are my words, absolutely.
21 BY MR. KLINE:
22     Q.    And you said in this article
23 or this correspondence, putting out there
24 for the public, for the medical

Page 228

1  community, a little further down, "There
2  were no differences in the rate of
3  perforation (0.1 percent in...rofecoxib
4  and naproxen groups)."
5          Your words, "It is hard to
6  imagine that the small protection from
7  gastric or duodenal ulcers in the VIGOR
8  trial is an acceptable trade-off as
9  compared with twice the incidence of
10 death, heart attacks, and strokes."
11          Did you write those words?
12          MR. GOLDMAN:  Objection.
13          THE WITNESS:  Yes, I
14      certainly did.
15 BY MR. KLINE:
16     Q.    And were you doing a
17 risk/benefit analysis there in your mind?
18          MR. GOLDMAN:  Objection.
19          THE WITNESS:  Yes.
20 BY MR. KLINE:
21     Q.    And were you weighing the
22 risk of pain medication versus the risk
23 of dying from a disease that -- let me
24 start again.

Page 229

1          Were you weighing the risk
2  of pain relief versus death?
3          MR. GOLDMAN:  Objection.
4          THE WITNESS:  We were
5      weighing -- I was weighing, when I
6      wrote that statement, the risk of
7      heart attacks principally versus
8      the small protection from
9      significant stomach complications.
10 BY MR. KLINE:
11     Q.    Okay.
12          Let me move on.  So much to
13 cover.
14          The drug is withdrawn
15 September 30th of 2004.  You told me what
16 happened when you knew then.  You put
17 paper to pen and you did an op/ed piece
18 for the New York Times; correct?
19     A.    That's correct.
20     Q.    Couple of sentences.  Why?
21          MR. GOLDMAN:  Objection.
22 BY MR. KLINE:
23     Q.    Why did you do that?
24     A.    I was extremely upset by the

Page 230

1  way this was being handled and the
2  misinformation that was in the first 24
3  hours of the Vioxx withdrawal.
4      Q.   Was it a reaction to Merck's
5  public statements, which you've described
6  and critiqued for the jury already?
7      A.   Yes.
8      MR. GOLDMAN:  Objection.
9      THE WITNESS:  Yes, that, in
10  fact, the word that this was the
11  first time they had ever known
12  that this was a problem and that
13  the incidence not be reported in a
14  responsible -- for the public
15  fashion that they could understand
16  and all the other things that we
17  had already reviewed.
18          -  -  -
19      (Whereupon, Deposition
20  Exhibit Topol-17, "Good Riddance
21  to a Bad Drug," (Topol) New York
22  Times Reprint, October 2, 2004,
23  (2 pages), was marked for
24  identification.)

Page 231

1          -  -  -
2  BY MR. KLINE:
3      Q.   While you're testifying,
4  we'll show this to the jury.  It's a
5  document which is entitled, "Good
6  Riddance to a Bad Drug."
7      Let me start with this, sir,
8  because I've seen this in your writings.
9      Was Vioxx and is Vioxx a
10  dangerous drug?
11      MR. GOLDMAN:  Objection.
12      THE WITNESS:  Let me first
13  start off by saying I didn't title
14  this, New York Times op/ed.  I
15  learned, since this was the first
16  op/ed I had in the New York Times,
17  that you don't get a right to pick
18  your title.
19      My title was "Vioxx
20  Vanquished," but the editor of the
21  New York Times of the op/ed picked
22  this one, and I didn't know it
23  until it was actually published.
24  BY MR. KLINE:

Page 232

1      Q.   Did you approve it?
2      MR. GOLDMAN:  Objection.
3  I'm sorry.  Objection,
4  nonresponsive.
5      THE WITNESS:  It was
6  probably different than what I was
7  trying to convey, because what I'm
8  trying to convey in this op/ed is
9  that Vioxx had a risk that had
10  never been adequately defined,
11  that overall it was unacceptable,
12  that the whole class of COX-2
13  inhibitors was suspect, and that
14  we can't tolerate this sort of
15  situation where a medicine is
16  being mass marketed, and it could
17  induce tens of thousands of heart
18  attacks and without the
19  appropriate studies.  So, the FDA
20  is involved in this as well, in
21  this op/ed.
22      So, there are many things,
23  but alerting the public who read
24  the New York Times about that it

Page 233

1  is not safe necessarily for any
2  COX-2 inhibitor, which is in here,
3  about naproxen and Aleve, Motrin,
4  all these other possible
5  alternatives, and some of the
6  lessons that we need to learn from
7  this, and most importantly was the
8  statement that our two most common
9  deadly diseases should not be
10  caused by a drug.
11      MR. GOLDMAN:  Objection,
12  move to strike as nonresponsive.
13  BY MR. KLINE:
14      Q.   Is that what you were trying
15  to convey, what you just said?
16      A.   Yes.
17      Q.   And when you conveyed it, on
18  the second page you listed two points and
19  you say, "Second, and what may be more
20  alarming, is that despite studies showing
21  the magnitude of the public health
22  problem, for several years Merck did
23  nothing to investigate."
24      Is that the message you

Page 234

1  wanted to convey as well?
2          MR. GOLDMAN:  Objection.
3          THE WITNESS:  That was a
4      critical message that probably was
5      conveyed innumerable times over
6      these last five years.
7  BY MR. KLINE:
8      Q.   You stated, "This surely
9  represents a conflict between the
10  interests of the public and the interests
11  of a company with a blockbuster drug that
12  had sales of 2.5 billion in 2003."
13          Did you write that in the --
14  for the New York Times?
15          MR. GOLDMAN:  Objection.
16          THE WITNESS:  Yes.
17  BY MR. KLINE:
18      Q.   You stated, "At the same
19  time, Merck spent at least $100 million a
20  year for direct-to-consumer Vioxx
21  advertising, while the company's
22  employees and their consultants published
23  several papers in medical journals
24  rebutting studies reporting Vioxx's heart

Page 236

1  of Medicine; correct?
2      A.   Yes.
3      Q.   Now, you've stated what you
4  believe for the lay consumption.  Now
5  you're stating it in the medical
6  literature; correct?
7          MR. GOLDMAN:  Objection.
8          THE WITNESS:  Yes.  The New
9      England Journal editors read my
10      op/ed in the New York Times and
11      called me that weekend on that
12      Saturday.
13  BY MR. KLINE:
14      Q.   They called you?
15      A.   They called me at home and
16  said, would you be kind enough to write
17  an editorial for the medical community
18  now that you've written one for the
19  public?  And I said I'd be happy to do
20  that.
21          MR. GOLDMAN:  I'll try to
22      insert an objection to the last
23      question.
24          MR. KLINE:  Preserved.

Page 235

1  attack risk."
2          Did I read that correctly?
3          MR. GOLDMAN:  Objection.
4          THE WITNESS:  Yes, you did.
5  BY MR. KLINE:
6      Q.   And you describe this as
7  "the Vioxx debacle."  Were those your
8  words?
9          MR. GOLDMAN:  Objection.
10          THE WITNESS:  That is my
11      phrase, "As the Vioxx debacle
12      shows," yes.
13  BY MR. KLINE:
14      Q.   You, later in 2004 in that
15  Cleveland Clinic article, and I'm trying
16  to put it in front of me, described this
17  whole thing as the rofecoxib debacle,
18  same language; correct?
19          MR. GOLDMAN:  Objection.
20          THE WITNESS:  Yes.
21  BY MR. KLINE:
22      Q.   Now, let's move on.
23          You then move to publishing
24  an editorial in the New England Journal

Page 237

1  BY MR. KLINE:
2      Q.   Continue.
3          Do you have anything else on
4  that?
5      A.   So, by the invitation of the
6  New England Journal, I wrote this
7  editorial that was posted on their
8  website in early October, just days after
9  the op/ed.
10          -  -  -
11          (Whereupon, Deposition
12      Exhibit Topol-18, "Failing the
13      Public Health - Rofecoxib, Merck,
14      and the FDA (Topol) N Engl J Med
15      351;17 October 21, 2004,
16      1707-1709, was marked for
17      identification.)
18          -  -  -
19  BY MR. KLINE:
20      Q.   I want to run through a
21  number of things.  Let's try to tick them
22  off as points.  I just have to cover so
23  much.
24          You talked about the fact

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 238

1   that a trial was never done; correct?
2           MR. GOLDMAN: Objection.
3           THE WITNESS: Yes.
4           MR. GOLDMAN: Doctor, if you
5   would please.
6           THE WITNESS: I'm sorry.
7   BY MR. KLINE:
8       Q.   Meaning a large scale
9   randomized study; correct?
10          MR. GOLDMAN: Objection.
11          THE WITNESS: Yes.
12  BY MR. KLINE:
13      Q.   Just wait for him, he'll
14  undoubtedly object, you'll then get to
15  give your answer.
16          You then got to talk about
17  the Merck message and how Merck conveyed
18  a message that the drug was safe;
19  correct?
20          MR. GOLDMAN: Objection.
21          THE WITNESS: Yes.
22  BY MR. KLINE:
23      Q.   And you disapproved of that;
24  correct?

Page 239

1           MR. GOLDMAN: Objection.
2           THE WITNESS: Yes.
3   BY MR. KLINE:
4       Q.   On Page 1708 of the article,
5   in the first full paragraph, you say, and
6   we've covered this in a different form,
7   you actually say it in print here, "Each
8   time a study was presented or published,
9   there was a predictable and repetitive
10  response" by "Merck, which claimed that
11  the study was flawed and that only
12  randomized, controlled trials were
13  suitable for determining whether there
14  was any risk. But if Merck would not
15  initiate an appropriate trial and the FDA
16  did not ask them to do so, how would the
17  truth ever be known?"
18          Was that your --
19          MR. GOLDMAN: Objection.
20  BY MR. KLINE:
21      Q.   Was that your thinking at
22  that point in time?
23      A.   Yes.
24          MR. GOLDMAN: Objection.

Page 240

1   BY MR. KLINE:
2       Q.   Is that still your thinking
3   today?
4           MR. GOLDMAN: Objection.
5           THE WITNESS:
6   Unquestionably.
7           - - -
8           (Whereupon, Deposition
9   Exhibit Topol-19, "Risk of acute
10  myocardial infarction and sudden
11  cardiac death in patients treated
12  with cyclo-oxygenase 2 selective
13  and non-selective non-steroidal
14  anti-inflammatory drugs..."
15  (Graham, et al), The Lancet, Vol.
16  365, February 5, 2005, 475-481,
17  was marked for identification.)
18          - - -
19  BY MR. KLINE:
20      Q.   You then cited the Graham
21  study. Now, I started this deposition by
22  some discussion that you had with David
23  Graham, who was at the FDA; correct?
24      A.   Yes.

Page 241

1           MR. KLINE: Whoa, we had a
2   question without an objection.
3   Hallelujah.
4   BY MR. KLINE:
5       Q.   And what did Graham
6   conclude?
7           MR. GOLDMAN: Objection.
8           THE WITNESS: He concluded
9   from a very large population study
10  done with the Kaiser Foundation
11  that there was a very high risk of
12  heart attacks with Vioxx,
13  especially in higher doses, but
14  across the board compared to the
15  other conventional nonsteroidal
16  agents.
17  BY MR. KLINE:
18      Q.   Were you in contact with
19  Graham in the period of time in late
20  2004?
21      A.   Yes. I had some phone
22  discussions and a couple of e-mails back
23  and forth in that time frame.
24      Q.   From what you learned in

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 242

1  e-mails and phone discussions, was he
2  under pressure not to publish his
3  results?
4       MR. GOLDMAN: Objection.
5       THE WITNESS: He conveyed
6  that to me aptly.
7  BY MR. KLINE:
8     Q.   What did you learn, sir?
9       MR. GOLDMAN: Objection.
10      THE WITNESS: I learned that
11  the FDA, his superiors, did not
12  want him to publish that
13  particular paper, which eventually
14  appeared in Lancet, and according
15  to him and according to the
16  reports about this, and according
17  to the editor at Lancet, FDA tried
18  to suppress that publication.
19  BY MR. KLINE:
20    Q.   It was published by Lancet?
21      Was it published by Lancet?
22    A.   Yes.
23    Q.   And was it one more piece of
24  evidence that you were -- that was now in

Page 243

1  your knowledge bank?
2       MR. GOLDMAN: Objection.
3       THE WITNESS: It was one of
4  seven epidemiologic studies
5  published to this point in time,
6  and all but one of them showing a
7  very significant excess of heart
8  attacks with Vioxx.
9  BY MR. KLINE:
10    Q.   Was everyone --
11      MR. GOLDMAN: Objection,
12  move to strike as nonresponsive.
13  BY MR. KLINE:
14    Q.   And was every one of those
15  seven studies done by someone who was not
16  affiliated with Merck?
17      MR. GOLDMAN: Objection.
18  BY MR. KLINE:
19    Q.   Those epidemiological
20  studies?
21    A.   Well, some of the authors
22  could have been affiliated with Merck.
23  Like, for example, the Solomon paper,
24  there had been a Merck statistician,

Page 244

1  epidemiologist, Carolyn Cannuscio, who
2  was involved, but then she was deleted at
3  the request of Merck, and I spoke about
4  that with Carolyn, but she had to have
5  her name taken off the paper in
6  Circulation, which was one of the
7  epidemiologic studies.
8       MR. GOLDMAN: Objection,
9  move to strike, nonresponsive.
10  BY MR. KLINE:
11    Q.   What did she tell you, if
12  anything, about why her name was removed?
13      MR. GOLDMAN: Objection.
14      THE WITNESS: She told me in
15  a phone conversation in October of
16  '04 that she was very distraught
17  about the fact that she had done
18  extensive work with the team in
19  Boston, at Harvard, and that at
20  the last minute, after having been
21  on the paper, manuscript
22  submission, she had to have her
23  name taken off at the request of
24  Merck, because they did not agree

Page 245

1  with the conclusions of the study.
2  BY MR. KLINE:
3     Q.   Okay.
4       I want to show you an e-mail
5  that you had between yourself and David
6  Graham.  We covered this way earlier, but
7  I want to make sure that whoever hears
8  this knows who Graham was.  Please.  Who
9  is Graham?
10    A.   David Graham is a safety
11  officer at the FDA.
12       - - -
13      (Whereupon, Deposition
14  Exhibit Topol-20, E-mails, TOPOLE
15  0000458, was marked for
16  identification.)
17       - - -
18  BY MR. KLINE:
19    Q.   I'm marking this as Exhibit
20  Number 20.  It's an e-mail between
21  yourself and Graham, and you say in yours
22  on the bottom, it's an e-mail dated
23  November 15, 2004, you say, "David, I
24  attach my analysis of the 2 trials

Page 246

1   submitted to FDA as part of Supplement
2   007."
3          What are you referring to?
4          MR. GOLDMAN:  Objection.
5          THE WITNESS:  That's the FDA
6   supplement of the three trials,
7   090, 085 and VIGOR.
8   BY MR. KLINE:
9       Q.   One never published, that
10  referring to 090?
11      A.   090 never published.
12      Q.   "I'd be interested in your
13  thoughts as I think this, along with the
14  Juni paper, nails this down as to when
15  there was confirmatory evidence that
16  rofecoxib was," to use your words, "a
17  dangerous drug."
18          Did you write that?
19          MR. GOLDMAN:  Objection.
20  Can I have a standing objection to
21  the use of this document and the
22  testimony about it?
23          MR. KLINE:  Yes.  You can
24  have a standing objection.

Page 247

1          Whether it be successful is
2   another story.
3   BY MR. KLINE:
4       Q.   "A dangerous drug," you say.
5   It nails down "when there was
6   confirmatory evidence."  So, I have to
7   ask you, what is that date that you can
8   nail down, your private words to David
9   Graham, safety officer of the FDA, when
10  can you nail down when there was
11  confirmatory evidence that Vioxx was a
12  dangerous drug?
13      A.   The paper that I reviewed
14  earlier, the Juni paper that shows that
15  time cumulative analysis, shows in 2000,
16  when VIGOR and 090 are put together,
17  that's when you cross the line of
18  statistical significance, and that's the
19  definition of a dangerous drug.
20      Q.   Now --
21          MR. GOLDMAN:  I'm sorry.
22  Objection, move to strike as
23  nonresponsive.
24  BY MR. KLINE:

Page 248

1       Q.   If you look at David
2   Graham's response, he says to you in the
3   second paragraph, "Each day the issue
4   gets more and more complicated and fishy
5   smelling.  Apparently, Merck was heavily
6   lobbying the members of the Finance
7   Committee to cancel the hearing today,
8   and our acting center director, Dr.
9   Galson, has reportedly refused to appear
10  before the Committee."
11          Skipping down a little bit.
12  Anyone who wants to fill in later, may.
13          "But it does make you
14  wonder, why is everyone afraid and what
15  are they trying to hide?"
16          That was his response to
17  you.
18          MR. GOLDMAN:  Objection.
19  BY MR. KLINE:
20      Q.   Did you receive that
21  response?
22      A.   Yes.
23      Q.   And did you recognize that
24  it was coming from a safety officer at

Page 249

1   the FDA?
2       A.   Certainly.
3       Q.   And did you essentially have
4   those same sentiments?
5          MR. GOLDMAN:  Objection.
6   BY MR. KLINE:
7       Q.   Did you share his
8   sentiments?
9       A.   I shared Dr. Graham's
10  sentiments in this regard.
11      Q.   David Graham had written to
12  you that -- and I'm showing you another
13  document, which is marked 000333,
14  which I will mark, but it's a sentence or
15  two, so, I'll read to keep this thing
16  going.
17          He says -- there was some
18  thought that he would go on 60 Minutes,
19  and you were aware of that fact; correct?
20      A.   Yes.
21      Q.   You ended up -- did you end
22  up publicly speaking on 60 Minutes?
23      A.   Yes.
24      Q.   Did you consider it was

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 250

1   important to participate in public
2   information to the general public
3   regarding the drug Vioxx?
4        MR. GOLDMAN:  Objection.
5        THE WITNESS:  Yes.  Just as
6   in writing the New York Times
7   op/ed, it was the same thing about
8   getting the public fully informed,
9   appropriately informed.
10       MR. KLINE:  Can I have 0333?
11       MS. DAGOSTINO:  I just gave
12   it to you.
13            - - -
14       (Whereupon, Deposition
15   Exhibit Topol-21, E-mails, TOPOLE
16   0000333, was marked for
17   identification.)
18            - - -
19   BY MR. KLINE:
20       Q.   That's marked now as Exhibit
21   Number 21.
22       He writes to you, "Eric, My
23   perspective and resolve are unchanged.
24   If I went public on 60 Minutes, I think

Page 251

1   the retaliation I would experience would
2   be blistering."
3        Skipping down below.
4   "Internally, the last 2 weeks have been
5   absolute hell."
6        By the way, sir, if I can
7   pause for a minute.  Has Merck made life
8   absolute hell for people who criticize
9   them?
10       MR. GOLDMAN:  Objection, and
11   can I have a standing objection to
12   the use of this document?
13       MR. KLINE:  Yes.
14       THE WITNESS:  I believe that
15   is the case, that is, there have
16   been retaliation and actions taken
17   to make life extremely difficult
18   for people who have objected to
19   their work, to their studies or to
20   the lack of studies.
21   BY MR. KLINE:
22       Q.   Now, let me switch gears and
23   talk to you about what you did in
24   connection with 60 Minutes.

Page 252

1        MR. KLINE:  Can someone tell
2   me about how much time is left?
3   About a half an hour?
4        THE VIDEOTAPE TECHNICIAN:
5   About half an hour.
6        MR. KLINE:  Okay, good.
7   BY MR. KLINE:
8        Q.   Now, let me move ahead.
9        There were Senate hearings;
10   correct?
11       MR. GOLDMAN:  Objection.
12       THE WITNESS:  The 60 Minutes
13   was before the Senate hearings.
14   BY MR. KLINE:
15       Q.   60 minutes was before --
16       A.   It was a Sunday --
17       MR. KLINE:  So, that only
18   goes to show you, the objection
19   was to being a leading question,
20   and I had the leading question
21   wrong.
22       MR. GOLDMAN:  There were
23   several bases for the objection.
24   BY MR. KLINE:

Page 253

1        Q.   Go ahead.
2        A.   Sunday, the 14th, was the 60
3   Minutes segment, and Thursday, the 18th,
4   it was coordinated between the Senator
5   Grassley staffers and the 60 Minutes.
6        Q.   I see.
7        And you appeared on 60
8   Minutes, as we know; correct?
9        A.   Yes.
10       MR. KLINE:  I'm asking Lisa,
11   how difficult is it to show the
12   clip?
13       MS. DAGOSTINO:  Not
14   difficult.  Can we switch over?
15   Give me a second, please.
16       MR. KLINE:  We're going to
17   need to do a little bit of a
18   switch, and then I want to talk to
19   you about what you said.
20       Do you want to pause the
21   tape until we get set up?
22       THE VIDEOTAPE TECHNICIAN:
23   Off the record at 12:47.
24            - - -

64  (Pages 250 to 253)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 254

1    (Whereupon, a recess was
2  taken from 12:47 p.m. until
3  12:48 p.m.)
4         - - -
5         THE VIDEOTAPE TECHNICIAN:
6  Back on the record at 12:48.
7  BY MR. KLINE:
8    Q.   Okay.
9         You were both filmed in your
10 duties at the Cleveland Clinic.  I
11 believe there's some footage of you
12 actually in the capacity of doing
13 clinical work, and then you were
14 interviewed in New York; is that correct?
15   A.   That's right.
16   Q.   Okay.
17        Let me show you clip number
18 1.
19        (Whereupon the following was
20 played:
21        "MR. BRADLEY: Dr. Eric
22 Topol, chief of cardiovascular
23 medicine of the Cleveland Clinic
24 was Merck's first and most

Page 255

1  persistent critic.  In 2001, he
2  conducted a statistical analysis
3  of all the available data about
4  Vioxx.  His study was published in
5  the Journal of the American
6  Medical Association.
7         "And specifically, your
8  study that came out after the
9  VIGOR study found what?
10        "DR. TOPOL:  That study
11 which looked at all the data
12 available for both the medicines
13 of these COX-2 inhibitors and all
14 other medicines, including
15 aspirin, that were available,
16 showed a very substantial worry
17 risk of heart attacks and strokes
18 across the board from the VIGOR
19 trial and about Vioxx."
20 BY MR. KLINE:
21   Q.   Confirm for me that you made
22 those statements and that that appears --
23 and that that is an accurate
24 representation of what you said to

Page 256

1  millions of people.  Is that correct?
2         MR. GOLDMAN:  Can I have a
3  standing objection to the use of
4  the 60 Minutes --
5         MR. KLINE:  Yes.  I'll
6  rephrase the question.
7         MR. GOLDMAN:  -- and any
8  questions about it?
9  BY MR. KLINE:
10   Q.   Is that what you said on 60
11 Minutes, sir?
12   A.   It certainly was.
13   Q.   And did you mean it then?
14        MR. GOLDMAN:  Objection.
15        THE WITNESS:  I stand by the
16 statement.
17 BY MR. KLINE:
18   Q.   And did you feel it
19 necessary to be on that show and to tell
20 the public what you thought?
21        MR. GOLDMAN:  Objection.
22        THE WITNESS:  Without any
23 question.
24        MR. KLINE:  Next clip.

Page 257

1         (Whereupon the following was
2  played:
3         "DR. TOPOL.  Merck took on
4  any study that questioned the
5  safety of Vioxx with respect to
6  the heart attacks and strokes, any
7  study.
8         "MR. BRADLEY:  But can't
9  they say, on the other hand, okay,
10 there are always dissenters, we've
11 got these other studies that say
12 the drug is fine?
13        "DR. TOPOL:  Whenever you
14 find a problem and you're thinking
15 maybe it's not a problem, you want
16 to see if there's independent
17 replication.  So, if you have
18 study 090 and you want to discount
19 that somehow, then you have VIGOR,
20 you've got two trials now, you
21 have essentially lightning
22 striking twice.  That's
23 independent replication.  That's
24 really serious confirmation.  This

405d92cd-4d0a-489f-87d2-231e3a1c3f6f