Page 258

1  is unequivocal. This is a
2  problem.
3      "MR. BRADLEY: Did you ever
4  talk to Merck officials about
5  that?
6      "DR. TOPOL: I tried. I
7  called Mr. Gilmartin, the CEO, and
8  the director of research, Dr.
9  Peter Kim, on multiple occasions
10 asking to discuss this, but the
11 calls were never returned."
12 BY MR. KLINE:
13     Q. Did you make those
14 statements on 60 Minutes as well?
15     A. I certainly did.
16     Q. Dr. Gilmartin and Dr. Kim,
17 tell me about that.
18     I'm sorry.
19     Mr. Gilmartin, the M.B.A.,
20 and Dr. Kim, the Ph.D., did you call --
21 neither are medical doctors, I might add.
22     Did you talk to -- in fact,
23 I think Dr. Kim started medical school
24 but didn't finish. A little side point.

Page 259

1  Here's the question.
2      Did Dr. --
3      Tell me about when you
4  called Dr. Kim and Mr. Gilmartin.
5      MR. GOLDMAN: Objection.
6      THE WITNESS: So, in 2001,
7  when we started to get very
8  uncomfortable about the data, I
9  started attempting to reach either
10 Mr. Gilmartin or, at the time, it
11 was Dr. Scolnick, and then later
12 he was replaced by Dr. Kim as the
13 chief scientific officer, and I
14 did not get any responses.
15     I worked with a friend at
16 Merck named Durga Bobba, who I
17 knew very well from this clinical
18 trial we had done, and also I
19 talked with other researchers like
20 Dr. Demopoulos, Dr. DiBattiste,
21 but I never could get any
22 communication established. No
23 calls were responded -- would be
24 returned from Merck.

Page 260

1  BY MR. KLINE:
2      Q. Why were you, a head person
3  at the Cleveland Clinic, not received by
4  either Mr. Gilmartin or by the top Merck
5  researcher, Dr. Kim, and do you think --
6  would the ordinary course of who you were
7  and who they were have necessitated them
8  to take your call?
9      MR. GOLDMAN: Objection.
10 BY MR. KLINE:
11     Q. Go ahead.
12     A. I don't know any
13 pharmaceutical company CEO that wouldn't
14 return my call, this was unprecedented,
15 no less the chief scientific officer. I
16 know most of the large pharma and device
17 company CEOs, they know me, and they
18 would return my calls as a courtesy.
19 Maybe not within minutes, but certainly
20 within hours or a day or two.
21     MR. KLINE: Let's play the
22 third clip, and then I have a
23 number of things to cover.
24     (Whereupon the following was

Page 261

1  played:)
2      "DR. TOPOL. I'm trying for
3  now two decades in my career to
4  try to prevent heart attacks and
5  treat heart attacks. To have a
6  medicine that's causing heart
7  attacks and strokes is something
8  that can't be tolerated. These
9  are the two biggest, most
10 important killers in our society,
11 and then it's important that we
12 never have something like this
13 happen again."
14 BY MR. KLINE:
15     Q. On all three clips that I
16 showed, Dr. Topol, for evidentiary
17 purposes, would you simply confirm and
18 authenticate that that is you, and you
19 made those statements on that day?
20     A. It's authentic.
21     Q. And it's what you believed
22 then?
23     MR. GOLDMAN: Objection.
24     THE WITNESS: I still

Page 262

1  believe today, yes.
2  BY MR. KLINE:
3      Q.  Now, there is an e-mail --
4  let's switch gears.
5          I want to talk about some
6  notes that you made, because I think it
7  provides a road map to discuss some
8  things. Topol Bates Number 0000469 and
9  504 are what I'm looking for. I'll start
10 with 469.
11         While we're getting those,
12 maybe I can talk about the study called
13 ADVANTAGE. Did you come into possession
14 of information regarding a study called
15 ADVANTAGE that was performed by Merck?
16     A.  I didn't come into anything
17 special. I just read the New York Times
18 article when it came out about that
19 trial.
20     Q.  What did you learn?
21         MR. GOLDMAN: Objection.
22         THE WITNESS: That there had
23 been misclassification of events
24 and that the FDA had records that

Page 263

1  there was, by their tally, a
2  significant excess of events, but
3  in the manuscript published by
4  Lisse and colleagues, the New York
5  Times demonstrated that it was
6  ghostwritten, that he had never
7  participated in the writing of the
8  article or the trial, and that he
9  had somehow been made the first
10 author of the paper and that the
11 events were misclassified, and
12 they had e-mails in the article
13 which showed, amazingly enough,
14 how a death, a sudden death was
15 classified as a hypertensive
16 event, which is quite
17 extraordinary.
18 BY MR. KLINE:
19     Q.  I want you to assume that
20 all of the things that you just said that
21 were reported are things that could be
22 independently established and confirmed
23 from firsthand sources. How, then, would
24 you view that type of conduct?

Page 264

1      MR. GOLDMAN: Objection.
2      THE WITNESS: The conduct is
3  totally in continuum with the
4  other concerns that I registered
5  earlier, like the suppression of
6  090, like the erroneous issues
7  about VIGOR and now with
8  misclassifications of deaths and
9  events in ADVANTAGE. These are
10 all very similar types of things.
11 BY MR. KLINE:
12     Q.  Is this serious business,
13 Dr. Topol?
14         MR. GOLDMAN: Objection.
15         THE WITNESS: This is
16 totally inadequate and highly
17 misleading clinical science.
18 BY MR. KLINE:
19     Q.  Does it amount to serious
20 scientific misconduct by Merck?
21         MR. GOLDMAN: Objection.
22         THE WITNESS: I think that
23 if this were to be adjudicated by
24 an academic medical center in an

Page 265

1  unblinded way for whether there
2  was scientific misconduct, this
3  would fulfill the definition of
4  scientific misconduct.
5  BY MR. KLINE:
6      Q.  Now, sir, I want to look at
7  your notes, which relate to -- let me
8  show you an exhibit marked Topol-22.
9              - - -
10         (Whereupon, Deposition
11 Exhibit Topol-22, Handwritten
12 notes, TOPOLE 0000469, was marked
13 for identification.)
14             - - -
15 BY MR. KLINE:
16     Q.  Topol-22 appear to be
17 handwritten notes. Are they in your
18 handwriting, sir?
19     A.  This is my handwriting.
20     Q.  And when were these notes
21 made?
22     A.  These notes were made in
23 October 2004, you know, shortly after the
24 withdrawal, my op/ed, and at the time

Page 266

1  when I was putting together the New
2  England Journal and talking to the
3  producer at 60 Minutes.
4      Q.   What do they represent in
5  terms of what you have down on this
6  paper?
7          MR. GOLDMAN: Objection,
8      and, Tom, can I have a standing
9      objection to the use of this
10     document and testimony about it?
11         MR. KLINE: You have a
12     standing objection.
13         THE WITNESS: These are the
14     salient points that I've reviewed
15     in this deposition, the data
16     safety monitoring board, the study
17     090, the Juni paper, the naproxen
18     that was untenable, and then the
19     suppression issues of what
20     appeared to be deception and
21     falsifying. All these things are
22     enumerated here.
23 BY MR. KLINE:
24     Q.   And it's being displayed or

Page 267

1  will be displayed and incorporated in a
2  final package so everyone sees it, but
3  you start off by saying, "'What,' 'when'
4  Merck knew."
5          Have you discussed with us
6  today to your satisfaction what and when
7  Merck knew things?
8          MR. GOLDMAN: Objection.
9  BY MR. KLINE:
10     Q.   If not, I want to have an
11 opportunity to expand. That's one of my
12 purposes of this line of questioning.
13         MR. GOLDMAN: Objection.
14         THE WITNESS: I did touch on
15     this earlier, that is, study 090
16     was completed in May 1999, and the
17     VIGOR trial data and safety
18     monitoring board alert was in
19     November 1999. So, already by
20     1999 there were very significant
21     issues, and this should have been
22     widely known to the senior
23     management at Merck.
24         MR. GOLDMAN: Objection,

Page 268

1      nonresponsive, move to strike.
2  BY MR. KLINE:
3      Q.   You then say, "Study 090,"
4  you've discussed that at length with us;
5  correct? The "DSMB November 18, 1999."
6  We've discussed that at length; correct?
7      A.   (Witness nods.)
8      Q.   I need an audible answer.
9      A.   Yes.
10     Q.   Thank you.
11         And for study 090, have we
12 discussed that at length to your
13 satisfaction in terms of telling what you
14 know or what you think someone should
15 know about it?
16         MR. GOLDMAN: Objection.
17         THE WITNESS: Yes.
18 BY MR. KLINE:
19     Q.   Okay.
20         I'm using this as a wrapup.
21         "Lancet," you mentioned the
22 Juni paper, and we've discussed that at
23 length; correct?
24     A.   Yes.

Page 269

1      Q.   "Position, 'naproxen,'" you
2  wrote the word in your handwriting,
3  "Untenable." You've told us about that
4  today; correct?
5      A.   Yes.
6      Q.   Now, in the middle of the
7  page, or more or less in the middle of
8  the page, you write three words,
9  "Deception/Falsifying/Suppression of
10 Data." Do they apply -- do all three of
11 those words apply to Merck?
12         MR. GOLDMAN: Objection.
13         THE WITNESS: I have
14     reviewed elements of each in this
15     deposition that fulfill those
16     terms.
17 BY MR. KLINE:
18     Q.   As they apply to Merck;
19 correct?
20     A.   As they apply to the studies
21 and the data of Vioxx.
22     Q.   Those would be words,
23 filling in the details from what you've
24 told us earlier, that would describe

Page 270

1  Merck's conduct; correct?
2          MR. GOLDMAN: Objection.
3          THE WITNESS: That's
4      correct.
5  BY MR. KLINE:
6      Q.  And then you list underneath
7  this the sort of laundry list of things
8  that fit in the category of deception,
9  falsifying and suppression of data;
10 correct?
11     A.  Yes. The only thing I
12 hadn't mentioned was the symposia that
13 would be done at each of the national
14 meetings, where they would have these
15 Merck consultants giving lectures, taking
16 apart our data, like the JAMA paper, and
17 assuring the medical community like
18 cardiologists or internists, doctors,
19 that there was nothing wrong with the
20 safety of Vioxx, that it was an illusion
21 of the Cleveland Clinic authors of the
22 JAMA paper.
23         MR. GOLDMAN: Objection,
24     move to strike as nonresponsive.

Page 271

1  BY MR. KLINE:
2      Q.  Did you believe, sir,
3  looking at your list, that no publication
4  of 090, which we've discussed, the
5  Bombardier paper, which is the VIGOR
6  paper, where there were deaths and
7  incomplete information, the multiple
8  publications by Reicin and Konstam --
9  what does that refer to?
10     A.  The Merck people, whether
11 they were Dr. Reicin or Dr. Konstam, who
12 was a consultant, published multiple
13 articles, and Dr. Konstam published an
14 article in Circulation just a few months
15 after our JAMA paper to challenge it with
16 a so-called meta-analysis of their data
17 which had considerable issues, did not
18 provide the results per trial. It did,
19 in fact, show a statistically significant
20 excess of heart attacks compared to
21 naproxen.
22         So, the Konstam paper was
23 out there. There were multiple papers
24 that Merck authored in different journals

Page 272

1  to take the data that we published on as
2  well as other case-control studies that I
3  had touched on earlier.
4          MR. GOLDMAN: Objection,
5      move to strike, nonresponsive.
6  BY MR. KLINE:
7      Q.  What you're suggesting is
8  that they would assault any publication
9  that was against the safety of the drug
10 Vioxx prior to the time that they
11 withdrew it from the market; correct?
12         MR. GOLDMAN: Objection.
13         THE WITNESS: Yes.
14 BY MR. KLINE:
15     Q.  And even today; correct?
16         MR. GOLDMAN: Objection.
17         THE WITNESS: Yes.
18 BY MR. KLINE:
19     Q.  "Marketing and sales." What
20 did you mean there?
21     A.  Well, the marketing and
22 sales has been very much demonstrated in
23 the Waxman report, the Congressional
24 report of the cardiovascular card. This

Page 273

1  is where it was a card that was
2  distributed by the sales team throughout
3  the country, 3,000, I believe, sales reps
4  for Merck that had a card that showed
5  that there was somehow an eight to
6  ten-fold protection of Vioxx compared to
7  other non-steroidals.
8          So, this was quite
9  extraordinary, these sorts of sales
10 tactics that were going on by the
11 specially-trained Merck sales reps.
12     Q.  Well, assuming --
13         MR. GOLDMAN: I'm sorry,
14     objection, move to strike. And,
15     again, Tom, I can go fill in, as
16     you said before, the nature of
17     these objections?
18         MR. KLINE: Yes.
19 BY MR. KLINE:
20     Q.  Assuming that the drug
21 was -- assuming what you said -- what you
22 just told us was being said about the
23 cardioprotective effects, are you with me
24 so far, that would not only be, I forget

1  the word you used, extraordinary, that
2  would just be plain false; correct?
3      MR. GOLDMAN: Objection.
4      THE WITNESS: If you look at
5  the cardiovascular card, it's very
6  clear that the data that are being
7  presented are highly misleading.
8  BY MR. KLINE:
9    Q.  You've seen it?
10      MR. GOLDMAN: Objection.
11      THE WITNESS: Yes.
12      MR. KLINE: I don't want to
13  take the time to do it.  We'll
14  simply mark it and we'll put it up
15  when we incorporate it in the
16  exhibit.  We'll reserve number 25
17  for it.
18          - - -
19      (Whereupon, Deposition
20  Exhibit Topol-25, "Cardiovascular
21  System Clinical Profile in
22  Osteoarthritis Studies,"
23  Cardiovascular Card,
24  MRK-ABW00000243 - MRK-ABW0000248

Page 275

1  MRK-ADB0009039 - MRK-ADB0009042;
2  MRK-ACW0008375; MRK-ACZ0072955 -
3  MRK-ACZ0072956, was marked for
4  identification.)
5          - - -
6  BY MR. KLINE:
7    Q.  You said, "Did not do" an
8  "appropriate trial."  We know what that
9  means.  And they made the claim of 18
10  months post and they paid consultants.
11      Tell me about this thing,
12  "paid consultants on 'Independent DSMB.'"
13  How does that fit in the deception,
14  falsifying and suppression of data
15  category?
16      MR. GOLDMAN: Objection.
17      THE WITNESS: Well, I mean,
18  Dr. Konstam, for example, who is a
19  consultant for Merck, has been for
20  many years, he is the cardiologist
21  on the APPROVe trial, DSMB, Data
22  and Safety Monitoring Board.  And
23  he's also an author of the paper.
24      So, he's an author, he's on

Page 276

1  the so-called independent data and
2  safety monitoring board, but he's
3  a consultant.  So, it's hard to be
4  independent when you're being paid
5  by the sponsor of the trial in a
6  separate way, and this is quite
7  irregular.
8      Normally to do clinical
9  trials, which I've been engaged in
10  for a couple of decades, you would
11  not have a person on your data and
12  safety monitoring committee who
13  was a consultant for the company.
14  BY MR. KLINE:
15    Q.  Kind of like having one of
16  the coaches from the sidelines put on a
17  striped shirt?
18      MR. GOLDMAN: Objection.
19  BY MR. KLINE:
20    Q.  Yes?
21    A.  I have no comment.
22    Q.  I want you to look at Number
23  504.  Let's mark it as the next exhibit
24  number.  I have about 10 or 15 minutes

Page 277

1  left.  I want to use them.
2          - - -
3      (Whereupon, Deposition
4  Exhibit Topol-23, Handwritten
5  notes, TOPOLE 0000504, was marked
6  for identification.)
7          - - -
8  BY MR. KLINE:
9    Q.  There is a document which
10  we're displaying which, again, is your
11  notes, part of your 60 Minutes notes.
12  These are also your notes.  I want
13  to go through it quickly.  I think anyone
14  who sees this now will know what you're
15  saying.  "Compelling evidence of
16  Merck/Vioxx knowledge of serious risk."
17  Was this part of the notes that you made
18  in preparation, sir?
19      MR. GOLDMAN: Objection.
20  Can I have a standing objection to
21  this document?
22      MR. KLINE: Yes.  You have a
23  standing objection to this one and
24  the next handwritten one I used as

Page 278

   well.
        THE WITNESS: These notes were later, because it was only later that I learned about the VALOR trial in February 2005, and this was -- these were notes by me, but they were done at a later point in time.
BY MR. KLINE:
   Q. You have a list of "Compelling evidence of Merck/Vioxx knowledge of serious risks." Here's the compelling evidence: 1. Study 090, seven times risk of MIs and strokes. Correct?
   A. Yes.
   Q. VIGOR: Two times to five times. What's the two times number?
   A. The two times corresponds to overall cardiovascular events, and the five-fold is the heart attack excess.
   Q. And then ADVANTAGE trial, which is mis -- you said, "ADVANTAGE trial, misclassifications of deaths,"

Page 279

that's all stuff that we've talked about; correct?
        MR. GOLDMAN: Objection.
BY MR. KLINE:
   Q. Yes?
   A. Yes.
   Q. "APPROVe trial, heart failure" in "30 days."
        Have we discussed that?
        MR. GOLDMAN: Objection.
        THE WITNESS: No. We had been discussing heart attacks in the first days, but the trials like APPROVe and others also demonstrate things like heart failure in the first 30 days, but that's not necessarily the same as a heart attack, of course.
BY MR. KLINE:
   Q. By the way, there was -- and last thing is VALOR study 2002 was cancelled.
        What was the VALOR study?
        MR. GOLDMAN: Objection,

Page 280

lacks foundation.
        THE WITNESS: I only learned about that trial through the New York Times, but Bryan Myers, the reporter, called Dr. Bhatt, who actually had authored a protocol. That was the one, remember when Dr. Reicin and Dr. Demopoulos visited in April of 2001?
BY MR. KLINE:
   Q. Yes.
   A. And she said, well, why don't you send us a protocol?
   Q. Yes.
   A. So, I spoke to my colleague, Dr. Bhatt, and just a couple of weeks later, around the 2nd of May, we submitted a protocol, actually Dr. Bhatt did, to Dr. Reicin and Dr. Demopoulos.
        That protocol was testing in patients with so-called acute coronary syndrome, unstable angina, or heart attack, who had abnormal inflammation blood protein markers to test a study of

Page 281

Vioxx versus placebo on top of the other normal medicines. So, that was a proposal. It was a mini proposal, but that was sent.
        And then what we found out later was that there was a trial called VALOR reported in the New York Times, a 70-page protocol, had extensive network development, and somewhere along the line, the trial that we initially had proposed, apparently, didn't get very far, we never heard back about that, but that trial was, indeed, being planned by Merck, and at some point the plug was pulled, and that's what that New York Times article was about.
   Q. You proposed to them to do a study in the people that were high risk patients who had cardiovascular disease who were susceptible. Do I have it right?
   A. Yes.
   Q. And your point was to try to see if these people -- look at those

Page 282

1  people with a specified endpoint to see
2  if those people were going to fall victim
3  to Vioxx; is that correct?
4       MR. GOLDMAN: Objection.
5       THE WITNESS: No. No. The
6  trial that we had proposed, and it
7  was Dr. Bhatt who wrote this and
8  sent it to Merck at their request,
9  it was a trial looking at people
10  who had abnormal artery
11  inflammation.
12       So, they had to have high
13  C-reactive protein, which is a
14  blood test. They could derive
15  benefit from Vioxx or COX-2
16  inhibitors, just as they could
17  potentially be exposed to risk.
18  So, here we were looking at
19  trade-offs, could we reduce
20  subsequent heart attacks or could
21  we potentially exacerbate the
22  course of patients?
23       So, this was a very
24  reasonable way to study the

Page 283

1  problem. And VALOR was a very
2  reasonable construct for a trial.
3       MR. GOLDMAN: Objection,
4  move to strike as nonresponsive.
5  BY MR. KLINE:
6    Q.  But it wasn't done?
7    A.  It wasn't done.
8    Q.  And it should have been
9  done?
10       MR. GOLDMAN: Objection.
11  BY MR. KLINE:
12    Q.  Should it have been done?
13    A.  Any trial to establish the
14  risk in patients with heart disease
15  should have been done.
16    Q.  Was it an adequate
17  substitute to look at cardiovascular
18  endpoints in the studies that weren't
19  designed by Merck to assess
20  cardiovascular risk?
21       MR. GOLDMAN: Objection.
22       THE WITNESS: This was
23  another part of the concern at the
24  point of the withdrawal, saying

Page 284

1  that the trials that had been done
2  for colon polyps were indeed to
3  assess heart risk. That could not
4  have been further from the truth.
5  In fact, they were to establish
6  new indications for the drug.
7  BY MR. KLINE:
8    Q.  Okay.
9       Now, was it an adequate
10  substitute to look at CV events in
11  studies to which the primary endpoint was
12  something else?
13       MR. GOLDMAN: Objection.
14       THE WITNESS: It's more the
15  population of patients. It's not
16  about patients of population who
17  had colon polyps with no heart
18  disease. It's about the
19  population of patients who have
20  one of the most common diseases of
21  American society, which is
22  coronary disease, established
23  coronary disease. That's where
24  there was a gap, that's where 40

Page 285

1  to 50 percent of patients taking
2  the drug of the 20 million
3  estimated had never been studied
4  as to what would happen, would
5  they derive a benefit, or would
6  they incur harm? Unknown.
7  BY MR. KLINE:
8    Q.  Switching gears, Dr. Topol.
9       Before we switch gears, I
10  have asked you a lot of questions today.
11       MR. GOLDMAN: I'm sorry, I
12  meant to introduce an objection to
13  the last answer as nonresponsive.
14       Start over, Tom.
15       MR. KLINE: Would you at the
16  end of the deposition -- I will
17  gladly pay Golkow Litigation
18  Technologies for this. Would you
19  at the end of the day count up and
20  put in the transcript the number
21  of times that Merck, through its
22  lawyer, objected to this testimony
23  today so that I don't have to do
24  the counting up? It's

Page 286

1  extraordinary. Astonishing.
2      THE WITNESS: I also would
3  like to say it's very hard to
4  answer the questions and have to
5  be in rhythm with the objections.
6  It's disruptive for my train of
7  thought.
8      MR. KLINE: That's a good
9  question, Doctor. Thank you for
10 suggesting it to me.
11     MR. GOLDMAN: Well --
12     MR. KLINE: Stop it.
13 BY MR. KLINE:
14     Q.  Was it disruptive for you,
15 sir, to, for almost every question that
16 was asked today, have an objection
17 interposed, and how, if at all, did that
18 affect your train of thought?
19     MR. GOLDMAN: Objection.
20     THE WITNESS: It has
21 affected my train of thought many
22 times along the way.
23     MR. GOLDMAN: Because you
24 just made that statement, Mr.

Page 287

1  Kline, I'm going to be forced to
2  ask Dr. Topol's lawyer, who spoke
3  with me at a break, to see if Dr.
4  Topol's lawyer thinks that I've
5  been intrusive and my objections
6  have been in any way an effort to
7  affect the deposition here today.
8      MR. KLINE: Okay. Let's go
9  on.
10     MR. GOLDMAN: Can you
11 represent, sir, that --
12     MR. KLINE: We're going to
13 just simply take his deposition.
14 I'll tell you what. You can --
15     MR. HAMELINE: Let me just
16 say this --
17     MR. KLINE: You can take his
18 deposition --
19     MR. HAMELINE: Let me just
20 say this. I'm not here to talk
21 for Dr. Topol and whether Dr.
22 Topol was inconvenienced. I
23 recognize that what you've done is
24 try to be as accommodating as

Page 288

1  possible in terms of the level and
2  tone of your objections. The
3  repetitiveness of them, et cetera,
4  is none of my truck in this case.
5      MR. GOLDMAN: Right.
6      MR. KLINE: That sounds like
7  a no comment to me.
8  BY MR. KLINE:
9      Q.  Now, a couple of things and
10 we'll finish up. Switch gears.
11     I don't want to switch
12 gears. I have got to cover one more
13 thing.
14         - - -
15     (Whereupon, Deposition
16 Exhibit Topol-24, Handwritten
17 notes, TOPOLE 0000463, was marked
18 for identification.)
19         - - -
20 BY MR. KLINE:
21     Q.  Here's some more notes.
22 They're now put on the screen. Tell me
23 when those notes were written, if you
24 would, sir.

Page 289

1      A.  These notes were done in
2  concert with the discussion with Michael
3  Radutsky, the producer at 60 Minutes.
4      Q.  Okay.
5      You were taking --
6      MR. GOLDMAN: Tom, this is
7  the handwritten document which you
8  said I can have a standing
9  objection to?
10     MR. KLINE: It is.
11     MR. GOLDMAN: And there's
12 testimony about?
13     MR. KLINE: Yes. We've
14 already agreed that you can have a
15 standing objection to these three
16 documents.
17 BY MR. KLINE:
18     Q.  First of all, you talk about
19 Merck suppression of 090, and you talk
20 about FDA's suppression. Correct, as to
21 both of them, sir?
22     A.  Yes.
23     Q.  And you talk about
24 deceptive, falsifying data, and we've

Page 290

1  discussed that as well; is that correct?
2      A.  Yes.
3      Q.  Okay.
4          Now, a couple of things I
5  want to switch gears on to finish up.
6          I think somewhere along the
7  way I saw in documents that you were
8  involved as an advisor to some kind of a
9  stock or bond fund.  Is that correct,
10 sir?
11     A.  It was an investment fund
12 known as Great Point Partners.
13     Q.  What did that involve, and
14 how does that affect anything that either
15 you've said here today or your views, if
16 at all?
17         MR. GOLDMAN:  Objection.
18         THE WITNESS:  I do not
19     believe it has any effect on what
20     I've said, but it has, in an
21     article in Fortune, in a contrived
22     way, been made to give a
23     perception of a conflict of
24     interest, which did not exist.

Page 291

1  BY MR. KLINE:
2      Q.  Did you ever have a conflict
3  of interest when you stated your views
4  publicly either back when you published
5  the JAMA article or up to today when you
6  testified under oath?
7          MR. GOLDMAN:  Objection.
8          THE WITNESS:  I do not
9     believe I've had any conflict of
10    interest whatsoever in all the
11    articles that we've written or
12    even the matter cited regarding
13    this investment fund serving as a
14    medical adviser.
15 BY MR. KLINE:
16     Q.  Now, a couple of additional
17 points here and there.
18         You mentioned that you
19 couldn't get ahold of Dr. Gilmartin.
20 That raised in my mind the question, did
21 Merck or anyone -- let me start it this
22 way.
23         Merck -- does Merck -- let
24 me start again.

Page 292

1          You mentioned that you had
2  done a study for Merck; correct?
3      A.  With Merck, yes, the TARGET
4  trial, yes.
5      Q.  Yes.
6          And what drug was that, by
7  the way?
8      A.  That was a drug, the
9  commercial name is known as Aggrastat,
10 tirofiban.
11     Q.  Were you actually paid by
12 Merck?
13     A.  No.  I was not paid.  I did
14 do the trial.
15     Q.  Was there funding provided
16 to the institution here, the Cleveland
17 Clinic, by Merck?
18     A.  There was funding to the
19 Cleveland Clinic and to the 60 sites that
20 participated in the trial, yes.
21     Q.  Did the Cleveland -- it
22 raises the question that, has anyone from
23 Merck, to your knowledge, either
24 contacted anyone at the Cleveland Clinic

Page 293

1  or your colleagues or anyone relating to
2  your writings or your public statements
3  relating to Vioxx in any way?  And if so,
4  what is it, if anything?
5          MR. GOLDMAN:  Objection.
6          THE WITNESS:  I was told by
7     a colleague here at the clinic on
8     October 14th, the chairman of the
9     board of trustees, Mr. Mal Mixon,
10    was contacted.
11 BY MR. KLINE:
12     Q.  His name is?
13     A.  Mal, Malachi Mixon, chairman
14 of our board of trustees.
15     Q.  Current?
16     A.  Yes, of the Cleveland
17 Clinic.  That he was contacted directly
18 by Raymond Gilmartin in October of 2004,
19 and that Mr. Gilmartin said to Mr. Mixon,
20 what has Merck ever done to the Cleveland
21 Clinic to warrant this?  And this was
22 relayed by a colleague who spoke to Mr.
23 Mixon.
24     Q.  Who was that colleague, sir,

74 (Pages 290 to 293)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 294

```
 1        MR. GOLDMAN:  Objection,
 2    move to strike as nonresponsive.
 3        THE WITNESS:  His name is
 4    Richard Rudick.
 5  BY MR. KLINE:
 6    Q.   Who is he?
 7    A.   He is the director of
 8  clinical research.
 9    Q.   Rudick was told by Mixon
10  that Mixon was contacted by Gilmartin.
11  Is that what you're telling me?
12        MR. GOLDMAN:  Objection.
13        THE WITNESS:  Yes.  That he
14    was further told that Mr.
15    Gilmartin and Mr. Mixon were
16    colleagues together at Harvard
17    M.B.A. school, they were old
18    friends, and that Mr. Mixon
19    understood that Mr. Gilmartin was
20    very upset when he called in
21    October '04.
22        This was relayed on October
23    14th to Dr. Rudick.  I don't know
24    exactly what date.  I believe it
```

Page 295

```
 1    was the day prior, October 13th,
 2    but I can't know for sure.
 3        MR. GOLDMAN:  Objection,
 4    lacks foundation.
 5  BY MR. KLINE:
 6    Q.   And where does October 14
 7  fit on our chronology?  What event does
 8  that relate to?
 9    A.   That was eight days after
10  the New England Journal paper, of my
11  editorial, and about 13 or 12 days after
12  the New York Times op/ed.
13    Q.   And from your perspective,
14  assuming we pin all of that down that
15  that, indeed, happened -- first of all,
16  you believe that if called to testify,
17  that's what Dr. Rudick would tell us?  Is
18  that what you're saying?
19        MR. GOLDMAN:  Objection.
20        THE WITNESS:  Yes.  I've
21    confirmed this with Dr. Rudick,
22    yes.
23  BY MR. KLINE:
24    Q.   And what -- how do you view
```

Page 296

```
 1  all of this?
 2        MR. GOLDMAN:  Objection.
 3  BY MR. KLINE:
 4    Q.   How do you view this event
 5  that you've just described for me?
 6        MR. GOLDMAN:  Same
 7    objection.
 8        THE WITNESS:  I find it
 9    entirely repulsive.
10  BY MR. KLINE:
11    Q.   Do you know what was said by
12  -- is it Dr. Mixon?
13    A.   No, Mr. Mixon.
14    Q.   No.  He's an M.B.A. like
15  Gilmartin?
16    A.   That's correct.
17    Q.   Have you talked to Dr. --
18  Mr. Mixon about it?
19    A.   He's never told me about it
20  directly, and I've not questioned him
21  about it.
22        MR. KLINE:  Let's take a
23    very brief break.
24        THE VIDEOTAPE TECHNICIAN:
```

Page 297

```
 1    Off the record at 1:22.
 2        - - -
 3        (Whereupon, there was a
 4    luncheon recess from 1:22 p.m.
 5    until 2:18 p.m.)
 6        - - -
 7        THE VIDEOTAPE TECHNICIAN:
 8    Back on the record at 2:18.  Tape
 9    Number 4.
10  BY MR. KLINE:
11    Q.   Dr. Topol, a few more
12  questions from me, and I'll conclude my
13  examination.
14        In the VIGOR trial, we had
15  mentioned the DSMB earlier.  Do you know
16  if there was any cardiologist on the
17  DSMB?
18    A.   I'm not aware --
19        MR. GOLDMAN:  Objection,
20    lacks foundation.
21        THE WITNESS:  I'm not aware
22    of any -- who the members of that
23    safety monitoring board were, so,
24    I don't know.
```

Page 298

1  BY MR. KLINE:
2      Q.   Would it make a difference
3  in your mind if you knew that there was
4  no cardiologist on the DSMB that was
5  addressing any cardiovascular safety
6  issues and what would you have expected?
7          MR. GOLDMAN:  Objection.
8          THE WITNESS:  It's much
9      easier to see you.
10         Yes, I would be concerned if
11     no cardiologist was on the
12     committee and they were
13     adjudicating -- remember that
14     point I made earlier about
15     November 19, 1999 when they had
16     excess deaths and serious
17     cardiovascular events, and that
18     does need a cardiologist trained
19     in clinical trials to help
20     interpret that signal.
21 BY MR. KLINE:
22     Q.   And when Dr. Reicin came to
23 visit you, did she identify herself as an
24 internist who was actually an infectious

Page 299

1  disease doctor, rather than a
2  cardiologist?
3          MR. GOLDMAN:  Objection.
4          THE WITNESS:  Dr. Reicin
5      didn't describe her background.
6      She just told us or told me when
7      she came that she was the director
8      of the Vioxx and the COX-2
9      inhibitor program.  That's all I
10     knew.
11 BY MR. KLINE:
12     Q.   Did you know that the
13 director of the COX-2 program at Merck
14 was an infectious disease doctor who had
15 limited experience prior to coming to
16 Merck just a few years earlier?
17         MR. GOLDMAN:  Objection.
18         THE WITNESS:  I did not know
19     that.
20 BY MR. KLINE:
21     Q.   Does that surprise you
22 hearing that today?
23         MR. GOLDMAN:  Objection.
24         THE WITNESS:  I would have

Page 300

1      thought rheumatologists would have
2      worked in that space, but, you
3      know, I can't really comment
4      beyond that.
5  BY MR. KLINE:
6      Q.   The next thing I'd like to
7  show you is an exhibit which was Bates
8  stamped 462, and I'd like to have it
9  marked and handed to you, if I can.
10         Instead of going to 462
11 because it doesn't matter the order, I'm
12 going to go to 465, which was -- which
13 will be the next exhibit, the next
14 exhibit number being --
15         MR. KLINE:  Are we at 26?
16         THE COURT REPORTER:  Yes.
17         MR. KLINE:  That's what it
18     says, 26.
19             - - -
20         (Whereupon, Deposition
21     Exhibit Topol-26, "Preliminary
22     Questions - 60 Minutes," TOPOLE
23     0000465 and EJT 000334, was
24     marked for identification.)

Page 301

1             - - -
2  BY MR. KLINE:
3      Q.   Let me hand it to you, your
4  counsel, Merck's counsel.
5          Apparently there were
6  preliminary questions from 60 Minutes.
7  Would you tell me how this document came
8  about very briefly?
9          MR. GOLDMAN:  Objection.
10     Can I have a standing objection to
11     this document and any testimony
12     about it?
13         MR. KLINE:  Yes.  For those
14     who are viewing this, there's a
15     little bit different configuration
16     in the room.  That's why Dr. Topol
17     now may be looking over to me
18     while we finish this examination.
19         THE WITNESS:  So, this was a
20     list of questions that Michael
21     Radutsky, the producer of CBS 60
22     Minutes, was providing me.  He
23     basically gave me these questions
24     over the phone, and then my

```
                                    Page 302
 1    assistant typed them up.
 2    BY MR. KLINE:
 3        Q.   You only wrote in your
 4    handwriting one word on that document;
 5    correct?
 6        A.   Yes.
 7        Q.   What is the one word that
 8    you wrote on the document?
 9        A.   The word is "deception."
10        Q.   What did you mean, sir?
11            MR. GOLDMAN: Objection.
12            THE WITNESS: I think that
13        this was about the conversation I
14        had with Michael Radutsky at CBS
15        and what he was particularly cued
16        into regarding concern about
17        deception of Merck.
18    BY MR. KLINE:
19        Q.   Did you, sir, believe there
20    was deception?
21            MR. GOLDMAN: Objection.
22            THE WITNESS: As I reviewed
23        throughout this deposition, I
24        thought there were many points of
```

```
                                    Page 303
 1        highly misleading errors of
 2        omission and what could be
 3        considered the false conveyance of
 4        data and findings.
 5    BY MR. KLINE:
 6        Q.   And would those things that
 7    you just described fall under the
 8    category of deception?
 9            MR. GOLDMAN: Objection.
10            THE WITNESS: I think that
11        that's certainly a term that could
12        be used to apply to this pattern,
13        yes.
14                - - -
15            (Whereupon, Deposition
16        Exhibit Topol-27, Letter 10-7-04
17        with handwritten notes, TOPOLE
18        0000462, was marked for
19        identification.)
20                - - -
21    BY MR. KLINE:
22        Q.   All right. I'm showing you
23    Exhibit 27, hand it to you, your counsel
24    and Merck's counsel.
```

```
                                    Page 304
 1        I'm only concerned with the
 2        handwriting on the document. It happens
 3        to be made on a note of -- with the Bill
 4        Moyers show. It's dated October 7, 2004.
 5        Sir, you have key points. Are these the
 6        points that you were raising regarding
 7        the November 18 findings of the
 8        preliminary data that was coming out on
 9        the VIGOR trial?
10            MR. GOLDMAN: Objection.
11            THE WITNESS: This is the
12        points that I put after -- this
13        fellow, Bryan Myers and Bill
14        Moyers forwarded me the Targum
15        report, which I had never
16        reviewed. Once I reviewed it,
17        these were the summary points that
18        I made because then I was asked to
19        contact Mr. Myers and Bill Moyers
20        to convey what I thought were the
21        principal findings.
22    BY MR. KLINE:
23        Q.   The principal findings from
24    what?
```

```
                                    Page 305
 1        A.   The VIGOR and -- well, that
 2    whole supplement. I forgot the number of
 3    it, but it's the combination of VIGOR,
 4    090 and 085, which I've been calling the
 5    Targum report.
 6        Q.   I understand. If you can
 7    summarize in two or three words, what was
 8    your bottom line from all this data that
 9    you have handwritten there?
10            MR. GOLDMAN: Object to
11        form.
12    BY MR. KLINE:
13        Q.   Please.
14        A.   The more I reviewed this
15    particular supplement or Targum report,
16    the more disturbing it became. I had not
17    ever delved into it as I did at that
18    point in time, and this is, of course,
19    after the drug withdrawal.
20                - - -
21            (Whereupon, Deposition
22        Exhibit Topol-28, Memo 10-17-04,
23        TOPOLE 0000474, was marked for
24        identification.)
```

Page 306

1            - - -
2  BY MR. KLINE:
3       Q.   Sir, I previously marked an
4  exhibit -- I believe I marked this.
5            MS. DAGOSTINO: You did not
6       mark it yet.
7            MR. KLINE: I did not?
8  BY MR. KLINE:
9       Q.   I'm showing you -- I guess I
10 did not -- 474, Bates Number 474, which I
11 will mark as Exhibit Number 28 which
12 covers a lot of territory. It's an
13 e-mail from you to Mike Radutsky from 60
14 Minutes. I would like to ask you to
15 confirm for me that some of these things
16 were said.
17           You say, "I was asked to
18 review a paper for the Lancet written by
19 well regarded, independent researchers
20 from Europe." Did I read it correctly?
21      A.   Yes.
22      Q.   Indeed, was it important to
23 you that these folks were independent?
24           MR. GOLDMAN: Objection.

Page 307

1            THE WITNESS: Yes.
2  BY MR. KLINE:
3       Q.   "Their study proves," and
4  you used the word "unequivocally that the
5  data on Vioxx had 'crossed the line' by
6  2001 for heart attack risk." What I've
7  read to you, is that a correct
8  statement --
9            MR. GOLDMAN: Objection.
10 BY MR. KLINE
11      Q.   -- that you made in this
12 e-mail?
13      A.   Yes, and I reviewed what
14 that line meant earlier today, yes.
15      Q.   That's what I wanted to know
16 as well.
17           Finally you go on to say in
18 the middle of this paragraph, "We can now
19 confirm that the famous study '090'" --
20 you used the word "famous," but would you
21 tell me in other correspondence you
22 actually refer to it as "infamous."
23      A.   Yes. What I'm referring to
24 is, it's buried, that is, "famous" was

Page 308

1  being somewhat sarcastic. It never got
2  to the light of day. It only could be
3  found in the Targum report. It was never
4  published, and the only abstract about
5  it, it was presented by Dr. Geba at a
6  geriatrics meeting, and it only presented
7  the -- he only presented the efficacy
8  side on arthritis. He did not present
9  the cardiovascular events.
10      Q.   You say that -- let me just
11 find it here with my eyes.
12           "We now can confirm that the
13 famous...'090' of Merck was NEVER
14 published, that it was part of the FDA
15 pivotal registration packet leading to
16 the May 1999 approval."
17           Do you see that?
18      A.   Yes.
19      Q.   You then say "and" -- that's
20 not what I want to ask you about.
21           I want to ask you about
22 this: "And that it showed a striking
23 risk of heart attack and stroke before
24 the drug ever got commercialized."

Page 309

1            Is that a correct statement?
2       A.   Well, as it turns out, the
3  dates were wrong because they were not
4  provided in the Targum report. As it
5  turned out, that data, I guess, was --
6  May 1999 was when it was finalized, and
7  so already the drug had been approved.
8  So, I was mistaken that study 090 was
9  available before approval. That data
10 must have been available coincident,
11 right around the time of approval.
12 BY MR. KLINE:
13      Q.   I see.
14      A.   But I can't say for sure
15 because I don't have all the 090
16 documents to back that up.
17      Q.   You say, "The cumulative
18 meta-analysis of 21,432 patients also
19 proves that the heart toxicity was not at
20 all dose or duration related." Correct?
21           MR. GOLDMAN: Objection.
22 BY MR. KLINE:
23      Q.   That's what you said.
24      A.   That's citing the Juni

Page 310

1  paper, which was a systematic cumulative
2  meta-analysis.
3      Q.  If you look at 3, you say
4  "One more angle," number 3, your writing,
5  "the former CEO of Merck, Dr. Roy
6  Vagelos, an honorable, capable man. He
7  hates Gilmartin and thinks he is an idiot
8  (may be accurate). He would be a good
9  person for you to call - Gilmartin
10 replaced him. Vagelos is incredibly well
11 respected in the medical and business
12 community, of the highest integrity and
13 ethical standards. I think he might open
14 up and say - 'Merck should have done the
15 right thing immediately in 1998 when
16 study 090 showed a more than 6-fold heart
17 attack risk at low dose (12.5 milligrams)
18 of Vioxx."
19         Did you make that statement
20 in that document back in October 17 of
21 2004?
22         MR. GOLDMAN:  Objection.
23         THE WITNESS:  I made that
24 statement. By happenstance, I

Page 311

1  happened to have had dinner with
2  Dr. Vagelos just a couple of days
3  before the Vioxx withdrawal, and I
4  actually -- we spoke, it was such
5  a coincidence, about the whole
6  Vioxx issue, about his
7  relationship with Ray Gilmartin,
8  and it was actually quite an
9  extraordinary coincidence just a
10 couple of days later to have this
11 whole drug withdrawal and that
12 dinner discussion that evening
13 come back.
14         MR. GOLDMAN:  Objection,
15 move to strike as nonresponsive.
16 BY MR. KLINE:
17     Q.  Couple more points.
18         In your editorial, your
19 op/ed piece, you wrote, there's only a
20 sentence, I won't put it in front of you,
21 "Vioxx has repeatedly carried a far
22 greater risk of heart attack and stroke,"
23 you're saying, I'm reading through it,
24 "than the other COX-2 inhibitors?"

Page 312

1      A.  (Witness nods.)
2      Q.  Do I have your opinion or
3  your views, your conclusions basically
4  correct when I state that?
5         MR. GOLDMAN:  Objection.
6         THE WITNESS:  The point here
7  is that all the COX inhibitors
8  have to be implicated, the class,
9  but within that class there
10 appears to be a gradient where
11 Vioxx appears to be worse,
12 consistently worse than Celebrex,
13 and somewhere in between perhaps
14 or perhaps closer to Vioxx is
15 Bextra, and there are other agents
16 in this class as well.
17 BY MR. KLINE:
18     Q.  That's what I wanted to --
19         MR. GOLDMAN:  Move to strike
20 the nonresponsive portion.
21 BY MR. KLINE:
22     Q.  That's what I wanted to
23 know. That's what I wanted to find out.
24         MR. KLINE:  Dr. Topol, thank

Page 313

1  you for answering my questions. I
2  may have more questions after
3  Merck counsel examines you.
4         THE VIDEOTAPE TECHNICIAN:
5  Off the record at 2:31.
6         MR. LEVENSTEN:  I'm here on
7  behalf of the Pennsylvania cases.
8  Our Discovery Order Number 1
9  permits me to examine the witness
10 today. I've informed Mr. Goldman
11 that I intend to conduct an
12 examination of the witness today.
13 I've offered to do it at the
14 conclusion of Mr. Kline's direct
15 examination. Mr. Goldman's
16 position is that I cannot go
17 forward with -- well, I'll allow
18 him to state his. I don't want to
19 misstate his position. Go ahead.
20         MR. GOLDMAN:  I'm not taking
21 any position at all, Mr.
22 Levensten, on whether you can ask
23 questions. I understand that the
24 MDL plaintiffs' lawyers think that

Page 314

1 the seven-hour rule applies in the
2 MDL and that we should be
3 splitting our time. So, if you
4 want to coordinate with the
5 plaintiffs' lawyers, that's fine.
6 But I don't take a position one
7 way or the other.
8     MR. LEVENSTEN: Well, then,
9 can I go forward now?
10     MR. GOLDMAN: Let's go off
11 the record for a second.
12         - - -
13     (A discussion off the record
14 occurred.)
15         - - -
16     MR. WEINKOWITZ: While we're
17 on a break, can I enter my
18 appearance?
19     Mike Weinkowitz,
20 W-E-I-N-K-O-W-I-T-Z, from Levin
21 Fishbein Sedran & Berman here in
22 Philadelphia.
23     MR. GOLDMAN: Mr. Levensten
24 has spoken with Mr. Kline, and

Page 315

1 they're going to talk about what
2 questions they might want to ask.
3 I do want to make clear that I
4 don't know whether this deposition
5 has been cross-noticed in New
6 Jersey, and so the record will
7 speak -- or Pennsylvania. The
8 record will speak for itself on
9 that.
10     MR. LEVENSTEN: Just so I'm
11 clear on that record, we have a
12 discovery order entered that says
13 that this deposition is deemed
14 taken in Pennsylvania. The order
15 also talks about how we're allowed
16 to ask questions that aren't
17 duplicative at depositions, and I
18 just need to protect my record
19 today. Whether or not it's
20 cross-noticed, I don't even know
21 that it's relevant considering the
22 discovery order.
23     THE VIDEOTAPE TECHNICIAN:
24 On the record at 2:39.

Page 316

1         - - -
2     EXAMINATION
3         - - -
4 BY MR. GOLDMAN:
5     Q. Good afternoon, Dr. Topol.
6     A. Good afternoon.
7     Q. I want to talk for a few
8 seconds about cardiovascular disease. Is
9 it the leading cause of death in the
10 United States?
11     A. Yes, it is.
12     Q. Is cardiovascular disease
13 the leading cause of death by far?
14     A. Well, it's significantly
15 greater than the second leading cause of
16 cancer, so, yes.
17     Q. Is cardiovascular disease
18 the number one killer in the United
19 States and has it been since 1900?
20     A. Yes.
21     Q. Do you know that
22 approximately every 34 seconds somebody
23 dies of heart disease in this country?
24     A. That's, I think, from the

Page 317

1 American Heart Association, and I can't
2 vouch for the calculation, but that's out
3 there, yes.
4     Q. You also note, Dr. Topol,
5 that every 45 seconds somebody dies of a
6 stroke in the United States?
7     A. Again, I think that's an AHA
8 fact, but I can't -- I was not involved
9 at all with the calculation, but I've
10 seen that written, yes.
11     Q. Have you also seen that
12 700,000 Americans will die of a stroke in
13 2005?
14     A. That number would correspond
15 to heart attacks, 700,000. Stroke number
16 is not that high.
17     Q. Do you know that
18 approximately 700,000 Americans will have
19 a stroke in 2005?
20     A. That may well be the case,
21 but they wouldn't die from the stroke.
22 The number would be too high.
23     Q. Is it true, Dr. Topol, that
24 every year 400,000 -- 460,000 people die