Page 318

1 of heart disease in the emergency room or
2 before even getting to the hospital?
3      A.   That number may be about
4 right.  There's a lot of out of hospital
5 sudden death, yes.
6      Q.   Did you take Vioxx, Dr.
7 Topol?
8      A.   Yes, I took Vioxx.
9      Q.   You took Vioxx for years,
10 didn't you?
11      A.   I took it occasionally.  I
12 have knee arthritis.  I've had multiple
13 knee surgeries, so, I would take it on
14 demand, you know, whether it be every --
15 once, a couple, every few weeks, that
16 sort of thing.
17      Q.   The reason you took Vioxx is
18 because you had serious knee pain, and
19 traditional NSAIDs were bothering your
20 stomach.  Is that true?
21      A.   I think the medicines that I
22 had taken actually didn't bother my
23 stomach.  I haven't had any things that
24 really bothered my stomach very much, but

Page 319

1 I can't recall that so much as I thought
2 I had better relief of my arthritis than
3 by taking a Motrin or some other
4 over-the-counter preparation.
5      Q.   Vioxx helped relieve your
6 knee pain better than the traditional
7 NSAIDs.  Is that fair?
8      A.   The ones that I had tried,
9 yes.
10           - - -
11           (Whereupon, Deposition
12      Exhibit Topol-29, New York Daily
13      News Reprint (3 pages), was
14      marked for identification.)
15           - - -
16 BY MR. GOLDMAN:
17      Q.   Let me show you what I'll
18 mark as the next exhibit.  Let's see if I
19 can refresh your recollection on whether
20 you suffered any stomach problems on
21 traditional NSAIDs.  This is Exhibit 29,
22 and it is an excerpt from the New York
23 Daily News.  Directing your attention,
24 Dr. Topol, to the paragraph, do you see

Page 320

1 it highlighted there?
2      A.   No.  What page are you on?
3      Q.   Let me have it back, sir.
4      A.   (Handing over document.)
5      Q.   On the third page, I'll read
6 it to you, and you tell me if it's
7 accurate.  This is quoting you:  "Vioxx
8 and Celebrex are 'great medicines,' adds
9 the Queens born cardiologist who is 47.
10 He takes them for knees wrecked playing
11 college basketball.  'I used to have a
12 lot of stomach problems and I don't
13 challenge the stomach benefit,' says
14 Topol."
15      A.   Well, I haven't seen the
16 thing, and it'd be nice if I could see
17 it.
18           MS. DAGOSTINO:  Where is the
19 quote?  I'm sorry.
20           MR. GOLDMAN:  It's on Page
21 3, the third column to the right,
22 second full paragraph.
23           THE WITNESS:  (Witness
24 reviewing document.)

Page 321

1           Okay.
2 BY MR. GOLDMAN:
3      Q.   Is that correct or not?
4      A.   I don't remember ever saying
5 I used to have a lot of stomach problems,
6 so, I don't believe that's correct.
7      Q.   Is it true, Dr. Topol, that
8 newspapers sometimes report things that
9 aren't true?
10      A.   I would assume that not
11 everything in the newspaper is absolutely
12 correct, yes.
13           MR. HAMELINE:  Can we get a
14 copy of that?
15           MR. GOLDMAN:  Sure.
16           (Handing over document.)
17 BY MR. GOLDMAN:
18      Q.   You have pointed out on
19 several occasions on your direct
20 examination that you read newspaper
21 articles, and you formed opinions in this
22 case based on what you've read in
23 newspaper articles.  Is that true, sir?
24      A.   There are only two newspaper

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 322

1  articles that I mentioned today that were
2  not substantiated by medical literature
3  that was peer reviewed.  One was the
4  ADVANTAGE trial which was supplementary
5  to the Annals of Internal Medicine paper
6  by Lisse et al.  The other was the VALOR
7  trial which, of course, has not been
8  published, it never was done.  Otherwise,
9  all my comments were derived from the
10  literature that was published in medicine
11  in leading peer-reviewed journals.
12      Q.   Let's talk about the VIGOR
13  study.  When did you first learn about
14  the VIGOR results, Dr. Topol?
15      A.   The VIGOR trial, to my --
16  really learning about it was not until,
17  as I mentioned this morning, February
18  2001.
19      Q.   Was the VIGOR trial
20  published in the New England Journal of
21  Medicine?
22      A.   Yes.  As I mentioned, the
23  November 22nd, 2000.
24      Q.   Is the New England Journal

Page 323

1  of Medicine a top medical journal?
2      A.   It's the leading impact
3  journal in biomedicine today.
4      Q.   Do you read it regularly?
5      A.   I read articles -- it's
6  impossible to keep up with all the
7  medical literature, but I read all
8  articles that are pertinent to my
9  specialty, which is coronary artery
10  disease, which is -- with the primary
11  focus on the heart, yes.
12      Q.   Is the New England Journal
13  of Medicine a peer-reviewed journal?
14      A.   Yes.
15      Q.   That means that before the
16  New England Journal of Medicine will
17  publish an article, doctors who are
18  knowledgeable in the field that's being
19  described in the article review the
20  article for accuracy.
21      A.   "Peer review" means that the
22  data are reviewed, and certainly the
23  conclusions are -- yes, that's what peer
24  review is all about.

Page 324

1      Q.   Peer reviewed is a standard
2  process that medical journals use to
3  ensure the quality of the articles that
4  they publish; correct?
5      A.   Correct.
6      Q.   I want to talk briefly about
7  how the VIGOR trial was conducted, and
8  then we'll discuss the results.  Okay?
9      A.   Yes.
10      Q.   Do you know that VIGOR
11  tested whether Vioxx was safe at treating
12  pain suffered by patients who had
13  rheumatoid arthritis?
14      A.   Yes.  I mentioned that
15  earlier today.
16      Q.   And one of the things that
17  the VIGOR trial sought to test was
18  whether the patients who had rheumatoid
19  arthritis could have relief from their
20  pain without causing them as many stomach
21  problems as naproxen; correct?
22      A.   The primary, I think,
23  endpoint of the study was the relief of
24  gastrointestinal complications.  That

Page 325

1  was, I think, why the sample size and the
2  power of the trial was set up, to detect
3  whether or not rofecoxib/Vioxx would have
4  an advantage over naproxen in that
5  regard.
6      Q.   Are patients with rheumatoid
7  arthritis at higher risk of heart
8  attacks?
9      A.   As I mentioned this morning,
10  yes, patients with RA, rheumatoid
11  arthritis, do have higher event rates for
12  heart attacks.
13      Q.   In the VIGOR trial, patients
14  who participated either used Vioxx 50
15  milligrams once a day or naproxen, 500
16  milligrams twice per day.  Is that right?
17      A.   That's correct.
18      Q.   The dosage for Vioxx that
19  was used is actually twice the highest
20  recommended dose in the label for Vioxx,
21  correct, sir?
22      A.   That's correct, although I
23  must say it was an 8,000 patient trial,
24  so, it was a very large trial, and that's

Page 326

1  the dose that was picked by the trialist
2  and the sponsor, yes.
3      Q.   The dose that was picked was
4  also approved by the FDA; correct, sir?
5      A.   The dose approved by the FDA
6  at the time was not approved for
7  rheumatoid arthritis.  It was approved
8  for osteoarthritis, and I believe the
9  doses were 12-and-a-half milligrams to 25
10 milligrams or up to 50 milligrams.
11     Q.   I wasn't clear, sir.
12          The 50 milligram dose that
13 was used in the VIGOR trial was approved
14 by the FDA to be used in the VIGOR trial,
15 correct, sir?
16     A.   Well, that's not the way it
17 works.  You don't get doses approved by
18 the FDA to use in a trial.  There's an
19 approval mechanism for a drug now that's
20 on the market.  The VIGOR trial, I
21 believe, had started long before the drug
22 was approved.  So, what would be here
23 would be a protocol that would be
24 reviewed by the FDA.  If that's what the

Page 327

1  sponsor wants to use as a dose, then
2  certainly the FDA isn't going to take
3  issue with that.
4      Q.   Does the FDA approve
5  protocols before clinical trials can be
6  conducted, sir?
7      A.   The FDA reviews the
8  protocols, and in general, unless there's
9  something that's particularly an outlier
10 regarding the design, the FDA will go
11 along with what the sponsor's wishes are
12 as long as there's no concern regarding
13 overt safety and ethical issues.  The
14 sponsor is the one that would be
15 responsible for picking the appropriate
16 dose.
17     Q.   You're not critical, Dr.
18 Topol, of Merck's decision to use
19 naproxen as the drug to compare Vioxx to,
20 are you, sir?
21     A.   No.  I think naproxen, being
22 a widely used nonsteroidal agent for
23 arthritis, all types of arthritis, was a
24 very suitable comparator.

Page 328

1      Q.   None of the patients in the
2  VIGOR trial used placebo, did they?
3      A.   The VIGOR trial did not test
4  placebo.  It was a so-called active
5  comparison, that is, comparing one active
6  anti-inflammatory versus another.
7      Q.   A placebo is another word
8  for a sugar pill.  Is that right?
9      A.   That would be an inactive
10 drug, yes.
11     Q.   You agree, sir, that it
12 would have been unethical and
13 inappropriate to conduct a study on
14 patients with rheumatoid arthritis and
15 give half of the group Vioxx and the
16 other half a sugar pill?
17     A.   No, I don't agree with that
18 whatsoever.  That is, you could do a
19 trial, as long as you had some pain
20 medicine, anti-inflammatory, that all the
21 patients were getting to relieve their
22 symptoms.  And then on top of that, you
23 could do Vioxx versus placebo on top of
24 that.  So, no, I don't agree with that.

Page 329

1      Q.   Would it be ethical, Dr.
2  Topol, if half of the patients in the
3  VIGOR study who had rheumatoid arthritis
4  only took a placebo?
5      A.   If they had no other relief
6  for their rheumatoid arthritis symptoms?
7      Q.   Yes.
8      A.   No, that would not be
9  proper.
10     Q.   The VIGOR trial showed that
11 Vioxx was an effective treatment for
12 pain; correct?
13     A.   The VIGOR trial showed there
14 was no difference in pain relief between
15 naproxen and Vioxx.
16     Q.   That wasn't my question, Dr.
17 Topol.
18          I asked you whether Vioxx
19 was shown in the VIGOR trial to be an
20 effective treatment for pain.
21     A.   Effective compared with
22 what, Mr. Goldman?
23     Q.   Effective, period, sir.
24     A.   No.  You can't make --

Page 330

1  effective, you have to have a reference.
2  Here the reference was naproxen. It was
3  shown to be no more effective than
4  naproxen. So then you could say it's
5  equally effective to naproxen, then I
6  would say yes, for pain relief.
7       Q.   Do you agree then, sir, that
8  Vioxx worked to reduce pain that
9  rheumatoid arthritis patients were
10 experiencing in the VIGOR trial?
11      A.   It reduced pain, as far as I
12 understand from the data, equally, as
13 well as naproxen at the doses that were
14 administered with the 50 milligrams of
15 Vioxx, yes.
16      Q.   The results of VIGOR also
17 showed that Vioxx significantly reduced
18 the risk of stomach bleeds compared to
19 naproxen; correct?
20      A.   Yes. As reviewed earlier
21 today, the risk of reduction of stomach
22 bleeds was small, but statistically
23 significant, and it was very much in
24 keeping with the magnitude of the excess

Page 331

1  of heart attacks and strokes.
2       Q.   Dr. Topol, if you could try
3  to just answer my questions directly --
4       MR. KLINE: Objection.
5  BY MR. GOLDMAN:
6       Q.   -- and not add anything on
7  to them, that would be helpful. My only
8  question, sir --
9       MR. KLINE: Does the same
10     rule apply to Merck? Let's redact
11     Alise Reicin's deposition.
12          You should answer the
13     questions fully and completely.
14 BY MR. GOLDMAN:
15      Q.   Dr. Topol, did Vioxx
16 significantly reduce the risk of stomach
17 bleeds compared to naproxen in the VIGOR
18 trial?
19      A.   I believe I answered that
20 question to the best of my ability.
21      Q.   Is the answer yes?
22      A.   As I had previously answered
23 the question in context.
24      Q.   Is the answer yes?

Page 332

1       MR. HAMELINE: I think he's
2  already answered the question. If
3  you don't like the answer, that's
4  a different issue.
5  BY MR. GOLDMAN:
6       Q.   Dr. Topol, I'm asking you a
7  very simple question.
8       Did Vioxx in the VIGOR trial
9  substantially reduce or significantly
10 reduce the risk of stomach bleeds
11 compared to naproxen?
12      MR. KLINE: Objection, asked
13     and answered.
14     THE WITNESS: Can you read
15     my answer back, my initial answer,
16     please.
17          - - -
18     (Whereupon, the court
19     reporter read the pertinent part
20     of the record.)
21          - - -
22 BY MR. GOLDMAN:
23      Q.   Was there a 54 percent
24 reduction in the risk of perforations,

Page 333

1  ulcers and bleeds in the Vioxx group
2  compared to the naproxen group, sir?
3       A.   I had to go back to the
4  paper and put that in. I have to look at
5  the data if you'd like me to answer that.
6  I don't memorize statistics about the
7  gastrointestinal bleeding. That's not my
8  field of expertise.
9       Q.   Do you want to take a minute
10 to look at it?
11      A.   I don't have the VIGOR
12 paper. If you'd like to produce it.
13      Q.   What I'll do, Dr. Topol, is
14 show this to you at a break so that you
15 can read it for me rather than do it on
16 the record. Is that okay?
17      A.   Whatever you would like.
18     MR. HAMELINE: Let me just
19     note that Dr. Topol is here for
20     one day of deposition. And we've
21     taken this morning, and I know
22     that it's not your issue, but this
23     morning we've gone off the record
24     repeatedly and not counted that or

Page 334

1 at least the argument is not
2 counted that against his running
3 time.  If you're going to ask him
4 questions about an exhibit, why
5 don't you show it to him.  We'll
6 try to cooperate off the record if
7 we can, but I don't want this to
8 be an off-the-record issue which
9 prolongs this day unduly.
10         MR. KLINE:  I would like him
11 to look at it now, rather than at
12 some break.
13 BY MR. GOLDMAN:
14     Q.   Let's talk about the
15 cardiovascular results of VIGOR.  Okay,
16 Doctor?
17         We saw in the VIGOR trial
18 that there were more cardiovascular
19 events in the Vioxx group than in
20 naproxen; correct?
21     A.   That's correct.  And I did
22 review that this morning.  I'll be happy
23 to review it again if you'd like.
24     Q.   So, you reviewed the data

Page 335

1 about the cardiovascular events in VIGOR
2 this morning, but you didn't review the
3 data about the reduction in stomach
4 bleeds.
5     A.   No.  I did review in my
6 letter of December 30, 2004
7 correspondence in the New England
8 Journal.  I commented about the
9 gastrointestinal complications, as well
10 as, but I did not cite the particular
11 bleeding figure, percentage that you just
12 asked me about.
13     Q.   Was the difference in
14 cardiovascular events in the Vioxx group
15 mostly due to a five times difference in
16 heart attacks compared to the naproxen
17 group?
18     A.   Well, let me just be very
19 clear about that.  Okay?  There were 22
20 deaths in the Vioxx group and 15 deaths,
21 as I reviewed, in the naproxen group.
22 There were 20 heart attacks versus -- in
23 the Vioxx group versus 4.  So, there was
24 an excess of deaths.  That was a 46

Page 336

1 percent excess of deaths, which is
2 similar, if your number is right, with
3 respect to the bleeding complications.
4 If we're talking about percentages, 46
5 percent increase in death and 46 percent
6 increase in bleeding complication, if
7 that's correct.  We have a five fold, 500
8 percent increase in heart attack.  And
9 then we have also an increase in stroke,
10 11 versus 9.
11         So, according to the correct
12 data, which was not published in the New
13 England Journal paper by Bombardier in
14 November 22, 2000, there was 53 of these
15 events, death, heart attack or stroke
16 versus 28.  The largest portion of those
17 in terms of numerical were heart attack,
18 but there was a consistent excess across
19 each, death, heart attack and stroke.
20         MR. GOLDMAN:  Move to strike
21 as nonresponsive.
22 BY MR. GOLDMAN:
23     Q.   Dr. Topol, first of all, the
24 deaths that you just described, the 22

Page 337

1 versus 15, those weren't all heart attack
2 deaths or cardiovascular deaths, were
3 they, sir?
4     A.   Predominantly they were,
5 yes, as reported in the study report in
6 the FDA, yes.
7     Q.   Is it your testimony under
8 oath, Dr. Topol, that the majority of the
9 22 deaths and the majority of the 15
10 deaths reported in VIGOR were heart
11 attacks?
12     A.   Not heart attacks, but they
13 were cardiovascular deaths, and I'd be
14 happy to go to the Targum report where
15 they're enumerated in tables if you would
16 like.
17     Q.   My question actually was not
18 about the deaths, Dr. Topol.  My question
19 was about whether or not in VIGOR the
20 difference in cardiovascular events was
21 attributed mostly because there was a
22 five times more -- five times greater
23 difference in heart attacks versus
24 naproxen.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

1  MR. KLINE: Objection to the
2  introduction.
3  BY MR. GOLDMAN:
4  Q. Dr. Topol, was there a five
5  times difference in heart attacks in the
6  Vioxx group versus the naproxen group in
7  the VIGOR study?
8  MR. HAMELINE: So, can I
9  just interject a comment here.
10  You're asking him very specific
11  questions about the data in the
12  VIGOR study without putting the
13  VIGOR study in front of him. To
14  the extent that Dr. Topol has
15  memorized all of this or put it
16  into subsequent articles, that's
17  fine. I'm just trying to make
18  sure that the answers are fair and
19  complete.
20  THE WITNESS: Okay.
21  BY MR. GOLDMAN:
22  Q. Let me back up, Dr. Topol.
23  I think you said in one of your previous
24  answers that there were 20 heart attacks

1  seen in the Vioxx group and 4 heart
2  attacks seen in the naproxen group.
3  Right?
4  A. That's correct.
5  Q. That's a five times
6  difference; right?
7  A. That's correct.
8  Q. What percentage of the
9  patients in the Vioxx group had heart
10  attacks?
11  A. That would be 20 of 4,047.
12  So, that would be approximately -- I
13  don't have a calculator, but it would be
14  approximately .5 percent.
15  Q. One half of one percent?
16  A. One half of one percent.
17  Q. Do you know what the
18  percentage of heart attacks in the
19  naproxen group was?
20  A. Well, that was 4 out of
21  4,029, which is less than .1 percent.
22  Q. Or less than one-tenth of
23  one percent?
24  A. That's correct.

1  Q. Because there was no placebo
2  group in the VIGOR study. If you only
3  looked at the VIGOR study without looking
4  at any other data, you wouldn't be able
5  to tell the reason for the difference in
6  heart attacks in the Vioxx group versus
7  naproxen; is that right?
8  A. I'm not sure that I
9  understand that question.
10  Q. If you just look at the
11  VIGOR study --
12  A. Yes.
13  Q. -- at the time that it was
14  done and you don't consider any data
15  outside of the VIGOR study --
16  A. Yes.
17  Q. -- you don't know whether
18  the difference in heart attacks between
19  Vioxx and naproxen was due to Vioxx --
20  A. Oh, I see.
21  Q. -- naproxen or chance.
22  A. Now I understand your
23  question. Okay. So, first --
24  Q. Is that right?

1  A. Yes, you do know. That is,
2  I reviewed this this morning, but just to
3  recap. When you're doing clinical trials
4  with an experimental drug, in this case,
5  it's Vioxx, versus a drug that's been
6  around for 20 years, in this case,
7  naproxen, which is considered the control
8  arm, not a placebo, but a control arm,
9  and if you have an untoward event crop up
10  like occurred in the VIGOR trial, one has
11  to assume that it's the experimental drug
12  excess that's the problem rather than
13  what was introduced by Merck, which is
14  substantiated in the Targum report and
15  other places, which is that it was a
16  protective effect of naproxen which was
17  not documented. The only appropriate
18  conclusion would have been that there was
19  a problem with the experimental drug,
20  which in this case was Vioxx.
21  Q. Is it your testimony, Dr.
22  Topol, that when you reviewed the VIGOR
23  study, it was your conclusion that Vioxx
24  caused the difference in heart attacks

Page 342

1  and not naproxen and not chance?
2      A.   Yes.  That was our
3  conclusion, but we did not at that time
4  have the replication that was needed to
5  say that this drug should be taken off
6  the market or something drastic.  What we
7  did say, as we wrote in the JAMA paper,
8  as you well know and I reviewed earlier,
9  is that more data were needed, and
10  specific significant caution must be
11  exercised in using this medicine because
12  of the heart attack risk.
13      Q.   Did the Food & Drug
14  Administration hold a special Advisory
15  Committee meeting in February of 2001 to
16  discuss the question of whether COX-2
17  inhibitors cause heart problems?
18      A.   Yes.  They had, as I
19  mentioned this morning, a two-day
20  conference, one for each of the drugs,
21  Celebrex and Vioxx.
22      Q.   What is an FDA Advisory
23  Committee briefly, sir?
24      A.   Well, a panel of experts are

Page 343

1  brought in, and the data are reviewed,
2  and there's recommendations by the panel
3  to give to the FDA staff, and the FDA
4  staff can either accept or reject those
5  recommendations.  But this is a panel of
6  experts.  In this particular case, it was
7  predominantly rheumatologists.  There
8  were only two cardiologists who were
9  invited to the panel to review Vioxx and
10  Celebrex.
11      Q.   One of the cardiologists who
12  was on the Advisory Committee was your
13  colleague, Dr. Steven Nissen; is that
14  right?
15      A.   Yes.
16      Q.   He is a well-respected
17  cardiologist, correct, sir?
18      A.   Yes.
19      Q.   The FDA Advisory Committee
20  meetings that are held, those are open to
21  the public, aren't they, Dr. Topol?
22      A.   Yes.
23      Q.   The transcripts from the
24  Advisory Committee meetings are available

Page 344

1  on the FDA website; right?
2      A.   Yes.  And I have even
3  reviewed the transcript of this meeting
4  in depth, yes, in the past.
5      Q.   You also know then that the
6  presentations that are made during the
7  Advisory Committee meeting are also
8  available on the FDA website; right?
9      A.   That's correct.  And I've
10  reviewed the presentations as well.
11      Q.   During the Advisory
12  Committee meeting that your colleague,
13  Dr. Nissen, attended, Merck gave a
14  presentation; right?
15      A.   Merck gave a substantial
16  presentation, that's right.
17      Q.   Pfizer gave a presentation
18  about Celebrex; correct?
19      A.   That was on a different day,
20  yes.
21      Q.   The FDA made a presentation
22  as well; correct?
23      A.   Yes.
24      Q.   The FDA also prepared

Page 345

1  background materials for the Advisory
2  Committee, analyzing the clinical trials
3  that had been done on Vioxx and Celebrex;
4  correct, sir?
5      A.   That's correct.
6      Q.   After the presentations were
7  made, the Advisory Committee discussed
8  the issues, including the risk of --
9  cardiovascular risk that was potentially
10  associated with COX-2 inhibitors; right?
11      A.   In reviewing that,
12  transcripts and the presentations and
13  also discussing this with Dr. Targum, who
14  had the most important data, that is,
15  VIGOR, 085 and 090, she was given less
16  than five minutes to present her
17  findings, which were only really
18  understood by reviewing the report in
19  depth.  Her slides are on the FDA website
20  still.  They do not adequately convey the
21  concerns that she registered, and I'll be
22  happy to review some of the statements
23  that are in her report which are highly
24  disturbing and concerning.  So, in

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 346

1  effect, Dr. Targum, who did the most
2  thorough review, cardiologist at the FDA,
3  never had her chance to express her views
4  at least as she's conveyed to me and
5  certainly as conveyed by reviewing the
6  FDA slides and her -- and the transcript
7  of that day.
8       Q.   Is it your testimony, Dr.
9  Topol, that Shari Targum of the FDA was
10 not permitted by the FDA to get up and
11 give a full presentation of what she
12 thought about the risks, if any,
13 associated with COX-2 inhibitors?
14      A.   She conveyed that to me in a
15 telephone conversation, exactly the sense
16 that she did not -- she was not able to
17 evoke enough concern among the two
18 cardiologists on the panel, even though
19 they recommended strong changes in the
20 language of the package insert and the
21 label of the drug.
22      Q.   Your colleague, Dr. Nissen,
23 was sitting through the presentation that
24 Miss Targum gave, correct, sir?

Page 347

1       A.   The brief presentation.
2  Approximately three minutes as he relayed
3  to me.
4       Q.   If Dr. Nissen wanted to hear
5  more from Shari Targum of the FDA, he
6  would have said to Ms. Targum, can you
7  tell me more, correct, sir?
8       A.   He didn't know there was
9  anything there to add.  Only later, after
10 the review of the data and the review of
11 her report on the website would it become
12 more evident that there were significant
13 concerns.
14      Q.   The Targum report that you
15 keep referring to is a report that was
16 actually presented to the Advisory
17 Committee members, correct, sir?
18      A.   She wrote it February 1st.
19 I don't know whether it was distributed
20 to the Advisory Committee before that
21 meeting.  I don't know that.  You'd have
22 to ask Dr. Nissen that.
23      Q.   Shari Targum prepared a set
24 of materials for the benefit of the

Page 348

1  Advisory Committee; right, sir?
2       A.   I believe that's what -- she
3  did it for that advisory panel, but I
4  don't know -- what you're asking is, was
5  it distributed to the panelists in
6  advance?  I don't know that.  I wasn't
7  there.  This was Dr. Nissen's first FDA
8  panel.
9       Q.   Did Dr. Nissen give a slide
10 presentation during the February 2001
11 Advisory Committee meeting?
12      A.   I'm not aware of that.
13      Q.   I thought you said a minute
14 ago you reviewed the transcript?
15      A.   I reviewed the transcripts
16 of the relevant sections.  I did not go
17 through every slide presentation, and
18 it's been quite a while.  I mean, it's
19 been probably at least a year or a year
20 and a half since I reviewed that, but I
21 don't recall seeing a presentation by Dr.
22 Nissen on VIGOR.
23      Q.   Do you remember, Dr. Topol,
24 that Dr. Nissen had actually made a

Page 349

1  presentation to the other members of the
2  Advisory Committee specifically
3  addressing VIGOR, addressing the CLASS
4  trial or the Celebrex trial and
5  addressing an analysis he did of four
6  different aspirin trials?  Do you
7  remember that?
8       A.   That -- now, okay, you're
9  talking about a whole different FDA
10 panel.  This is not February of 2001.
11 Because the aspirin comparison was an
12 idea I had after he got back.  So, you
13 have the wrong FDA panel.
14      Q.   Dr. Topol, did Dr. Nissen
15 make a presentation at the Advisory
16 Committee meeting in February of 2001
17 where he discussed VIGOR, where he
18 discussed the CLASS trial, which was
19 Celebrex's outcome trial, and a trial
20 called the Primary Prevention Project?
21          MR. HAMELINE:  So, can I
22      just interject a comment here.
23          Dr. Nissen -- Dr. Topol has said
24      several times he was not at the

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

1    meeting. He's --
2        MR. GOLDMAN: I'm asking if
3    he knows.
4        MR. HAMELINE: He's reviewed
5    the website. If it's on the
6    website, why don't you show it to
7    him. You can ask him if he knows.
8    But I think he's already testified
9    that he doesn't.
10       THE WITNESS: You just
11   changed your question.
12   BY MR. GOLDMAN:
13       Q.   Dr. Topol, are you aware one
14   way or the other whether Dr. Nissen made
15   a presentation when he talked about
16   VIGOR, CLASS and a trial called the
17   Primary Prevention Project?
18       A.   That is possible, but
19   certainly not the four trials that you
20   just asked about previously. That's not
21   possible.
22       Q.   Let me show you, sir, an
23   excerpt from the FDA Advisory Committee
24   meeting.

1        MR. GOLDMAN: We'll mark
2    this as the next exhibit, 30.
3        - - -
4        (Whereupon, Deposition
5    Exhibit Topol-30, "Arthritis
6    Advisory Committee NDA #
7    21-042/S007, Vioxx (Rofecoxib,
8    Merck)" 2-8-01, 1-3; 210, was
9    marked for identification.)
10       - - -
11   BY MR. GOLDMAN:
12       Q.   Dr. Topol, do you see on
13   page 210 of the transcript that Dr.
14   Nissen is making comments during the
15   Advisory Committee meeting on February
16   8th?
17       A.   Yes. I'm familiar with this
18   comment. I reviewed this -- I remember
19   this -- I mean, it's just the one comment
20   on this one page, 210, but I do remember
21   it, yes.
22       Q.   Do you see that Dr. Nissen
23   was being asked about the label for Vioxx
24   and what it should say about any

1    potential cardiovascular risks?
2        MR. HAMELINE: Objection. I
3    don't think he's being asked.
4        He's making a comment.
5    BY MR. GOLDMAN:
6        Q.   Dr. Topol, does Dr.
7    Nissen --
8        MR. KLINE: Objection.
9    BY MR. GOLDMAN:
10       Q.   -- make the following
11   statement to the Advisory Committee?
12   "Briefly, I think what I would say in the
13   label is that there was an excess of
14   cardiovascular events in comparison to
15   naproxen, that it remains uncertain
16   whether this was due to beneficial
17   cardioprotective effects of naproxen or
18   prothrombotic effects of the agent, and
19   leave it at that, that basically we don't
20   know the reason"?
21       MR. KLINE: Objection.
22   BY MR. GOLDMAN:
23       Q.   Do you see that, sir?
24       MR. KLINE: Objection,

1    multiple reasons I'll fill in
2    later.
3    BY MR. GOLDMAN:
4        Q.   Do you see that?
5        A.   Yeah, I see it, and I
6    understand that completely. As of
7    February 8, 2001, which I believe was the
8    date of this -- and I also understand
9    that the consensus of the panel was like
10   this, that there needed to be a change in
11   the label about the cardiovascular risk.
12   So, this is consistent with that.
13       Q.   Did you agree with Dr. Topol
14   in February -- I'm sorry, withdrawn.
15       Did you agree with Dr.
16   Nissen in February of 2001 that it
17   remains uncertain whether the excess of
18   cardiovascular events compared to
19   naproxen was due to the beneficial
20   cardioprotective effects of naproxen or
21   prothrombotic effects of Vioxx?
22       MR. KLINE: Same objection.
23       THE WITNESS: We expressed
24   the same question in our JAMA

Page 354

```
1    paper that came out later in the
2    year, and the point being is that
3    we, after much more careful review
4    of the data, it was not at all
5    apparent that this could be
6    attributed to naproxen benefit.
7       At the time in February 8th of
8    2001 before we had a chance to
9    rake over the data, there was less
10   certainty.  It was more ambiguous.
11   Over time, as we had a chance to
12   review things, and certainly as
13   more studies came out beyond ours,
14   it became increasingly clear.  And
15   that's why in the JAMA paper Dr.
16   Nissen and I and Dr. Mukherjee
17   concluded about the cautionary use
18   of this drug.
19 BY MR. GOLDMAN:
20   Q.   Dr. Topol, I didn't ask you
21 anything about your opinion.
22      MR. KLINE: Objection.
23 BY MR. GOLDMAN:
24   Q.   My question is whether --
```

Page 355

```
1       MR. KLINE: Move to strike.
2  BY MR. GOLDMAN:
3    Q.   -- in February of 2001 you
4  agreed with Dr. Nissen that it was
5  uncertain whether the difference in heart
6  attacks that was seen between Vioxx and
7  naproxen was due to Vioxx, was due to
8  naproxen or chance?
9    A.   I did not see Dr. Nissen on
10 February 8th, 2001. I saw him on
11 February 9th, 2001 when we both were back
12 in Cleveland, I was in Georgia, he was at
13 the FDA. And he came to me and said I'm
14 quite concerned. So, his concern wasn't
15 reflected by this statement.
16   Q.   I'll ask one more time, sir.
17      MR. KLINE: Objection.
18 BY MR. GOLDMAN:
19   Q.   Did you agree in February of
20 2001 with Dr. Nissen that it was
21 uncertain whether the difference in
22 cardiovascular events seen between Vioxx
23 and naproxen was due to Vioxx, was due to
24 naproxen or chance?
```

Page 356

```
1    A.   I've answered that several
2  times earlier today, that it's in the
3  manuscript.  We didn't know for sure at
4  that point, and that is pointed out in
5  our JAMA paper on several, at least two,
6  if not three times in that manuscript.
7    Q.   Is the answer to my question
8  yes, Doctor?
9       MR. KLINE: Objection.
10      THE WITNESS:  With the one
11   trial of VIGOR and the very
12   staunch defense of this naproxen
13   hypothesis offered by Merck
14   without independent replication,
15   without any other studies, one
16   could not make definitive -- and
17   we said that in the JAMA paper,
18   not make definitive conclusions.
19   That's true.
20 BY MR. GOLDMAN:
21   Q.   You said on direct
22 examination, Dr. Topol, that a black box
23 warning could easily have been imposed by
24 February of 2001.  Do you remember
```

Page 357

```
1  testifying to that?
2    A.   Yes.
3    Q.   Did anybody at the Advisory
4  Committee meeting suggest that a black
5  box warning be put on the Vioxx label?
6    A.   No.  And that's because the
7  correct data for study 090 were not
8  presented.
9    Q.   We're going to talk a lot
10 about 090, Dr. Topol.
11   A.   Good.  I'll be happy to.
12 Look forward to it.
13   Q.   Dr. Topol, my question is
14 whether anybody at the Advisory Committee
15 meeting in February of 2001, including
16 your colleague, Dr. Nissen, suggested
17 that a black box warning be added to the
18 Vioxx label?
19   A.   I don't know the answer to
20 that.  I don't recall the transcript
21 enough to be able to say whether anyone
22 registered that concern.  I know there
23 are only two cardiologists there, so,
24 that's one issue.  But I don't know.
```

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 358

1    Q.   Do you see in the excerpt
2  that I provided to you that Dr. Nissen
3  doesn't say anything about a black box
4  warning?  Correct, sir?
5    A.   You provided one page of a
6  1,000 page transcript.  That's not -- I
7  mean, that's not a full disclosure here.
8  It's not very comprehensive, so, I can't
9  say.
10    Q.   Based on the excerpt that I
11  did provide you, do you see that in that
12  answer Dr. Nissen is not saying anything
13  about a black box warning on Vioxx?
14    A.   I certainly don't see that
15  in that excerpt, no.
16    Q.   You talked a lot about your
17  proposed cardiovascular outcome study;
18  correct?
19    A.   I discussed that we were
20  invited by Dr. Reicin --
21    Q.   No.
22    A.   That's what you're talking
23  about.
24    Q.   That's not what I was

Page 359

1  talking about.
2        On direct examination, Dr.
3  Topol, you were asked a bunch of
4  questions about your cardiovascular
5  outcomes study; correct?
6    A.   I addressed that earlier
7  today, yes.
8    Q.   You proposed a
9  cardiovascular outcomes study to both
10  Merck and Pfizer; true?
11    A.   I did not propose any
12  cardiovascular outcome trial to Pfizer,
13  and Dr. Bhatt is the one who picked up
14  the ball and proposed this to Merck.  And
15  I knew about it.  I told them about it,
16  but I wasn't the one that made any
17  proposal to either company.
18    Q.   Do you think, Dr. Topol,
19  back at the time that you were suggesting
20  that both Merck conduct a cardiovascular
21  outcome trial and Pfizer conduct one?
22    A.   I thought that would be
23  appropriate given the uncertainty about
24  this heart attack risk, yes.

Page 360

1    Q.   Do you agree, Dr. Topol
2  that your suggested approach, the
3  cardiovascular outcomes study, was not
4  the only way to address the question of
5  whether there was a potential
6  cardiovascular risk associated with COX-2
7  inhibitors?
8    A.   I had stated earlier today
9  that the only way to get the answer
10  definitively in patients who have heart
11  disease is to do a trial in patients with
12  heart disease.
13    Q.   You testified before that
14  the clinical trials that were done on
15  Vioxx did not involve patients who either
16  had heart disease or were at risk of
17  heart disease.  Was that your testimony?
18    A.   No.  My testimony was with
19  heart disease.
20    Q.   Dr. Topol, you do know that
21  in the clinical trials for Vioxx, there
22  were people who actually were at risk of
23  heart disease?
24        MR. HAMELINE:  Objection.

Page 361

1        Are you talking about all the
2  clinical trials?
3        THE WITNESS:  "At risk" is
4  not the same as having heart
5  disease.  The number of patients
6  with actual bona fide documented
7  heart disease is vanishingly
8  small, almost nonexistent in these
9  trials.  They were almost
10  systematically excluded.  There's
11  a different matter about whether
12  someone has risk for heart
13  disease, a number of risk factors,
14  but I'm talking about documented
15  coronary artery disease.
16  BY MR. GOLDMAN:
17    Q.   Dr. Topol, you do know that
18  there were patients who participated in
19  Vioxx's clinical trials who did have
20  documented cardiovascular disease; right?
21    A.   As I just said, the numbers
22  of those patients are vanishingly small,
23  perhaps as low as one percent and in some
24  trials, zero.

Page 362

1    Q.   Do you believe, Dr. Topol,
2  that your proposed study, your proposed
3  cardiovascular outcomes study was the
4  only way to -- withdrawn.
5        Do you believe, Dr. Topol,
6  that your proposed cardiovascular
7  outcomes study was the only reasonable
8  way to address the potential risk
9  associated with Vioxx and Celebrex
10  concerning cardiovascular disease?
11    A.   First of all, I would go
12  back to our JAMA paper.
13    Q.   I'm not asking about the
14  JAMA paper. I'm asking you --
15    A.   But you're asking about the
16  cardiovascular trial.
17    Q.   Dr. Topol, I'm asking you,
18  as you sit here today, do you believe
19  that your proposed cardiovascular outcome
20  trial was the only way to assess the
21  potential for cardiovascular risk in
22  patients who took Vioxx and Celebrex?
23    A.   I answered your question
24  earlier. In patients -- if we wanted to

Page 363

1  know about patients with coronary artery
2  disease, and as I reviewed this morning,
3  40 to 50 percent of the patients, of the
4  20 million taking Vioxx or by various
5  registries and surveys, had established
6  coronary artery disease, the only way to
7  find out about those patients and their
8  quantifiable risk is in a study, a trial
9  dedicated to only enter patients with
10  established coronary artery disease, and
11  there's no other way to do that, no.
12  That's the only way to do such a trial.
13    Q.   Do you agree, Dr. Topol,
14  that all clinical trials must offer
15  potential benefits to patients?
16    A.   One can never do a trial
17  with just testing the side effects
18  without at least a putative equal or
19  better benefit.
20    Q.   Is the answer to my question
21  yes, all clinical trials must offer
22  potential benefit to patients?
23        MR. HAMELINE: I think he
24  just answered your question. He's

Page 364

1  given you a fulsome, complete
2  response.
3        THE WITNESS: Can you read
4  back my answer, please.
5  BY MR. GOLDMAN:
6    Q.   I'm not interested in your
7  answer. I'm asking you a separate
8  question.
9    A.   I want to see if I answered
10  the question adequately because you
11  challenged that I didn't.
12    Q.   Dr. Topol, can you answer
13  this question yes or no?
14        Do all clinical trials have
15  to have some potential benefit offered to
16  patients?
17    A.   All clinical trials should
18  have a therapeutic potential, yes, a
19  benefit, yes.
20    Q.   You can't give patients
21  medicine in a clinical trial just to see
22  if they get sick; right?
23        MR. HAMELINE: Can I just
24  read what's in the order for the

Page 365

1  MDL, which is that "Once the
2  witness has fully answered a
3  question, that same or
4  substantially the same question
5  should not be asked again." I
6  think this has been violated for
7  the fourth -- I know you want to
8  get at concrete issues here, but I
9  do think that he's answering and
10  answered that question fully the
11  first time.
12  BY MR. GOLDMAN:
13    Q.   Dr. Topol --
14        MR. KLINE: Can we adopt Mr.
15  Goldman's rule for the Merck
16  witnesses as his approach to --
17        MR. GOLDMAN: I'd really not
18  have a speech on the record, Mr.
19  Kline. If you have an objection,
20  please state it.
21        MR. KLINE: We would be
22  really advanced in this
23  litigation.
24  BY MR. GOLDMAN:

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

1    Q.   Dr. Topol --
2    A.   Yes.
3    Q.   -- you can't give patients
4  medicine just to see if they have a heart
5  attack or die, correct, sir?
6    A.   I would never be involved in
7  a clinical trial or advocate doing a
8  trial where there was just testing for
9  harm.  You have to have -- you don't put
10 patients -- experiment on patients unless
11 you're looking at benefit and also, of
12 course, always assaying the risk as well.
13   Q.   You sent a copy of your
14 proposed protocol to Merck in May of
15 2001; correct?
16   A.   That's incorrect.  I did not
17 send anything to Merck.
18   Q.   Did --
19   A.   Dr. Bhatt sent a proposal to
20 Merck, and I was only relaying Merck's
21 interest to Dr. Bhatt.
22   Q.   Does Dr. Bhatt work at the
23 Cleveland Clinic, sir?
24   A.   Yes, he does.  He works in

1  my department, but I did not send this
2  protocol to Merck.
3              - - -
4        (Whereupon, Deposition
5        Exhibit Topol-31, E-mails,
6        MRK-AAZ0001594, was marked for
7        identification.)
8              - - -
9        (Whereupon, Deposition
10       Exhibit Topol-32, "Rofecoxib in
11       the Prevention of Ischemic Events
12       in Patients with Acute Coronary
13       Syndromes and Elevated Markers of
14       Inflammation," (Bhatt, et al)
15       MRK-ABA0003235 - MRK-ABA0003244
16       was marked for identification.)
17             - - -
18 BY MR. GOLDMAN:
19   Q.   I've marked as Exhibit 31
20 and 32 two documents.  The first is Bates
21 stamped -- this is 31, MRK-AAZ0001594.
22 Exhibit 32 is MRK-ABA0003235 to 3244.
23       Do you see, Dr. Topol, on
24 the first exhibit, Exhibit 31 on May 2nd,

1  2001 -- is it Dr. Bhatt?
2    A.   Dr. Bhatt, Deepak Bhatt.
3    Q.   Dr. Bhatt is sending an
4  e-mail to Dr. Reicin and says, "Hello.
5  As Dr. Topol promised, here is our
6  protocol regarding the use of Vioxx in
7  acute coronary syndromes."  Do you see
8  that?
9    A.   I see that, and I already
10 discussed that this morning.  And what I
11 said, if I can go back --
12   Q.   My question was just, do you
13 see that?
14   A.   I see that, yes.
15   Q.   The protocol that Dr. Bhatt
16 sent to Merck is Exhibit 32, isn't it?
17   A.   That's what you just gave
18 me, yes.
19   Q.   Do you see on the second
20 page, top left corner, there's a date,
21 May 2nd, 2001?  Do you see that, sir?
22   A.   Yes.  This was two weeks
23 after it was requested from Dr. Reicin
24 when she visited Cleveland Clinic.

1    Q.   I want to talk about the
2  specifics of your proposed outcomes
3  study.  Okay?
4    A.   Dr. Bhatt authored this
5  study.  You probably should talk to him.
6    Q.   This is a study, Dr. Topol,
7  that you, on the first page, and Dr.
8  Bhatt put together; is that right?
9    A.   Well, he put it together.
10 He put my name on it.  And he sent it to
11 Merck.  But I did not go over the study.
12 This was a request by Merck.  I didn't
13 have any particular interest in doing
14 this trial, and I asked Dr. Bhatt if he
15 was interested and he followed up on it.
16   Q.   It's your testimony, Dr.
17 Topol, that you were not interested in
18 conducting the cardiovascular outcomes
19 study that you suggested be done?
20   A.   I wasn't interested in doing
21 the trial per se.  I had been outspoken
22 about the need to do a trial.  I didn't
23 think it would be appropriate if I did
24 the trial per se.

Page 370

1    Q.   Well, you -- withdrawn.
2         The protocol for your trial,
3  by "your," I mean the Cleveland Clinic --
4    A.   Right.
5    Q.   -- includes Dr. Bhatt's
6  name and your name; correct?
7    A.   He put my name on it, but
8  that doesn't mean that I was involved in
9  this.  This is a protocol sketch, and I
10 guess he was looking for feedback from
11 Merck.  But I did not go over this in
12 terms of, did I think this was the
13 appropriate design.  This was a brief
14 conversation I had with Dr. Bhatt, and I
15 don't recall all the details.  It's back
16 four years ago in May 2001, but I did not
17 author this protocol, and my name was
18 loosely attached to it.  I was not
19 interested in running a trial personally
20 on this because I didn't feel that was
21 appropriate.  I thought it should be
22 done, but I should not necessarily be
23 involved with it.
24   Q.   Dr. Topol, did the Cleveland

Page 371

1  Clinic send a protocol to Merck outlining
2  what the Cleveland Clinic believed would
3  be an appropriate cardiovascular outcomes
4  study for Vioxx?
5    A.   Dr. Bhatt did, yes.
6    Q.   How many patients did you
7  believe should participate in a
8  cardiovascular outcomes study?
9    A.   Do I believe or did Dr.
10 Bhatt put in the protocol?  I'm not sure
11 if I understand your question.
12   Q.   The question was, do you
13 believe that -- withdrawn.
14        Dr. Topol, did the Cleveland
15 Clinic, when it sent this protocol to
16 Merck, believe that it was the
17 appropriate cardiovascular outcomes study
18 to conduct?
19   A.   I don't -- I would have to
20 read the protocol now if you'd like me
21 to.
22   Q.   Sure.
23   A.   (Witness reviewing
24 document.)

Page 372

1         MR. GOLDMAN:  We can go off
2  the video while Dr. Topol is doing
3  that.
4         MR. HAMELINE:  Again, I
5  don't mean to take this out on
6  your time, but if you want to ask
7  him questions about particular
8  issues, this is going to be a very
9  long day for Dr. Topol.  And so
10 he's going to read through this
11 quickly and will try to answer
12 your questions directly.  So, I
13 don't think it's fair that we go
14 off the record and not count time.
15        MR. GOLDMAN:  We've gone off
16 the record several times for the
17 plaintiffs and not counted the
18 time --
19        MR. KLINE:  Not to review --
20        MR. GOLDMAN:  -- so, I would
21 appreciate the same courtesy.
22        MR. KLINE:  Not to review
23 documents.  Not to sit and review
24 documents.  I provided no

Page 373

1  documents where the witness was
2  then asked off the record to sit
3  and review them.
4         MR. HAMELINE:  I want to be
5  fair to both sides.  We're just
6  trying to get through this.  I
7  recognize this.  You know, if Dr.
8  Topol can review it quickly, let's
9  just move on.
10        (Witness reviewing
11 document.)
12 BY MR. GOLDMAN:
13   Q.   Did you review now, Dr.
14 Topol, the protocol that has your name on
15 it and that was sent to Merck on May 2nd
16 of 2001?
17   A.   I've had a chance to breeze
18 through this.  I would hardly call this a
19 protocol.  This is a concept sheet.
20 There's nothing about sample size.
21 There's nothing about event rates.  This
22 is as minimal as one could ever imagine.
23 I would not call this a protocol.  This
24 is a concept.  There's not even the most

94  (Pages 370 to 373)

Page 374

1 important salient features of a true
2 clinical trial in this document.
3     Q.   Do you agree with the
4 concept that's being expressed in Exhibit
5 32 which has your name on it?
6     A.   The concept of studying
7 Vioxx in patients with acute coronary
8 syndromes who have elevated C-reactive
9 protein is a concept that I discussed
10 with Dr. Reicin and Dr. Demopoulos when
11 they visited Cleveland just two weeks
12 prior to this point on April 14, I
13 believe, of the same year.
14         MR. GOLDMAN:  Objection,
15 move to strike, nonresponsive.
16 BY MR. GOLDMAN:
17     Q.   Dr. Topol, if you'd turn to
18 Page 6 of the concept that Cleveland
19 Clinic sent to Merck, do you see on the
20 top, the criteria for inclusion in this
21 proposed study was that participants be
22 male or female, 18 years or older?  Do
23 you see that?
24     A.   Uh-huh.

Page 375

1     Q.   And then point 2, "Being
2 admitted for acute coronary syndrome.
3 The patient was admitted to an inpatient
4 facility with an acute coronary syndrome
5 defined as:  Ischemic discomfort at rest
6 lasting at least five minutes."  Do you
7 see that, sir?
8     A.   Yes.
9     Q.   Can you briefly, sir,
10 describe what acute coronary syndrome is?
11     A.   It's either a threatened or
12 actual heart attack, that is,
13 inflammation in the arteries that are
14 leading to a crack in the artery wall
15 with a blood clot potentially, and these
16 are patients who could have a small or a
17 threatened heart attack.
18     Q.   So, the concept that
19 Cleveland Clinic was proposing to Merck
20 involved taking patients who were
21 threatened with a heart attack or who had
22 a heart attack to participate in this
23 study; correct?
24         MR. HAMELINE:  Could I just

Page 376

1 note a continuing objection that
2 this is not the Cleveland Clinic's
3 concept, it's Dr. Bhatt's, and I
4 think we've made that abundantly
5 clear.
6 BY MR. GOLDMAN:
7     Q.   Dr. Topol, the concept that
8 has your name and Dr. Bhatt's name on it
9 describes these criteria for inclusion,
10 and as you described acute coronary
11 syndrome, the concept was that patients
12 who either were threatened with a heart
13 attack or who had a heart attack would
14 participate in the study.  Is that right?
15     A.   That's correct.  But you're
16 leaving out one important element.  And
17 as in the title of this concept sheet,
18 "Elevated Markers of Inflammation," and
19 in the inclusion criteria on Page 6 that
20 we are now reviewing, you see Item Number
21 3, it says, "AND Item Number 3, elevated
22 high-sensitivity C-reactive protein"
23 known as CRP "greater than .2."  So, they
24 had to have arterial inflammation, and

Page 377

1 that was the whole point of the concept,
2 was that rofecoxib, as well as celecoxib,
3 have been shown to reduce inflammation.
4 So, in fact, it could be a benefit to
5 these patients to suppress subsequent
6 heart attacks.
7     Q.   I want to talk about that in
8 one minute, Dr. Topol.
9         Do you see, sir, that the
10 concept that you were proposing to Merck
11 calls for the study to last a minimum of
12 one year?
13     A.   Where is that?
14     Q.   If you look on Page 5 under
15 study design, it says, "This study is a
16 multicenter double blind randomized" and
17 it continues "comparing the effects of"
18 Vioxx "versus placebo administered in
19 conjunction with standard therapy
20 (including aspirin...) for a minimum of
21 one year to patients who have suffered an
22 episode of an acute coronary syndrome,"
23 and it goes on.
24     A.   Again, this is a concept

1  sheet.  This is not a protocol.  This
2  does not have anything about events rates
3  that are anticipated.  It doesn't have
4  anything about sample size.  It doesn't
5  have the number of triggered events to
6  stop a trial.  One year is just a very
7  loose term, that it has to have some
8  long-term followup.  So, I see it, but,
9  again, it reinforces how sketchy -- this
10 could not be called a protocol.  This is
11 a very early rudimentary design concept
12 sheet.
13      Q.   The concept that you were
14 proposing to Merck, you and Dr. Bhatt --
15      MR. HAMELINE:  Again,
16 objection.  It's Dr. Bhatt's
17 concept sheet.
18 BY MR. GOLDMAN:
19      Q.   Dr. Topol, the concept sheet
20 that has your name on it and Dr. Bhatt's
21 name on it calls for a study that would
22 last a minimum of one year; correct?
23      A.   Very loosely defined, yes.
24      Q.   The concept sheet that has

1  your name on it and Dr. Bhatt's name on
2  it also calls for patients to be followed
3  up for a minimum of one year.  Do you see
4  that, sir?
5      A.   That's what it says.
6      Q.   The concept sheet also
7  refers on Page 7, sir, to certain
8  criteria for exclusion.  Do you see that?
9      A.   Yes.
10      Q.   This is another way of
11 saying these are the type of patients who
12 will not be allowed to participate in the
13 study according to this concept sheet;
14 correct?
15      A.   That's correct.
16      Q.   If you look at Number 4, do
17 you see that the concept that Dr. Bhatt
18 was proposing to Merck says that, under
19 4, "Any need for COX-2 inhibitors."  So,
20 if a patient wanted to participate in
21 this study, they couldn't do so if they
22 actually needed COX-2 inhibitors; is that
23 right?
24      A.   You'll have to ask Dr. Bhatt

1  about this since he wrote it, but my
2  interpretation is if they didn't have any
3  other relief of their problem without a
4  COX-2 inhibitor, that they couldn't be --
5  that is, they would have to be willing to
6  be randomized.  So, yes, if they had to
7  take a COX-2 inhibitor for some reason,
8  they obviously wouldn't be a suitable
9  candidate for the trial, the way he's
10 written this up.
11      Q.   So, anybody who needed a
12 COX-2 inhibitor like Vioxx could not
13 participate in this concept study that
14 Dr. Bhatt proposed to Merck; correct?
15      MR. KLINE:  Objection.
16 Repetitive and misstates and
17 mischaracterizes.
18      MR. HAMELINE:  Again, this
19 is the same statement that I just
20 read in the MDL which is "Once the
21 witness has fully answered a
22 question, that same or
23 substantially same question --
24      MR. GOLDMAN:  He's not

1  answering the question --
2      MR. HAMELINE:  -- shall not
3  be asked again."  That is exactly
4  the same question.
5      MR. GOLDMAN:  He's not
6  answering --
7      THE WITNESS:  If this was a
8  real protocol, you would define
9  what is a need for a COX-2
10 inhibitor particularly since the
11 whole issue about this was we
12 don't know if it's safe and we
13 don't know if it's beneficial.
14 That's why this is so rudimentary.
15 It doesn't define these things
16 adequately.  Any need for a COX-2
17 inhibitor has to have objective
18 criteria laid out, and they're not
19 there.
20 BY MR. GOLDMAN:
21      Q.   Does the rudimentary concept
22 that Dr. Bhatt sent to Merck say that
23 patients who need COX-2 inhibitors would
24 need to be excluded from the proposed

Page 382

1  study?
2      A.   It says that in the very,
3  what I would consider, loose language
4  without adequate definition.  Because
5  it's a circular reasoning in a sense.
6  That is, the trial is trying to
7  understand this safety and need, and then
8  you're putting it in as exclusion
9  criteria.  It wouldn't be suitable unless
10 it was much more rigidly defined.
11     Q.   On the first page of this
12 concept, Dr. Topol --
13     A.   It only has seven pages.
14 The rest is references.  So, it isn't
15 particularly -- there's not a whole lot
16 here.
17     Q.   On Page 2 of this
18 rudimentary concept, do you see the first
19 sentence under the introduction
20 "Inflammatory cells play a significant
21 role in atherosclerosis"?
22     A.   I agree with that.  I see
23 it, and I agree with it.
24     Q.   In the next paragraph, the

Page 383

1  concept sheet says, "Aspirin, by virtue
2  of its preferential COX-1 inhibitory
3  effect, provides minimal
4  anti-inflammatory action."  Do you see
5  that?
6      A.   I see that.
7      Q.   And then further down in
8  that second paragraph -- in that second
9  paragraph, the concept sheet says, "The
10 administration of" Vioxx "may provide a
11 direct approach to reduce coronary
12 inflammation resulting in fewer
13 cardiovascular recurrent ischemic events
14 in patients presenting with acute
15 coronary syndromes."  Do you see that?
16     A.   Yes.
17          MR. KLINE:  What page are
18 you on?
19          MR. GOLDMAN:  2.
20          MR. KLINE:  Thank you.
21 BY MR. GOLDMAN:
22     Q.   Can you explain how it is
23 that Vioxx could actually prevent
24 recurrent ischemic events?

Page 384

1      A.   Right.  So, there have been
2  several studies now with the different
3  COX-2 inhibitors in patients to look at
4  whether C-reactive protein is reduced,
5  whether endothelial function, which is
6  the lining of the artery cells, that
7  whether or not that critical layer of the
8  artery wall functions better and whether
9  the inflammation is reduced.  And indeed
10 these mechanistic studies have supported
11 the concept that there could be an
12 improvement in this process by
13 suppressing inflammation with COX-2
14 inhibitors.
15     Q.   So, the theory that you had,
16 Dr. Topol, when you were suggesting a
17 cardiovascular outcomes study was that if
18 Vioxx was given to patients, it might
19 actually help their heart?
20     A.   It could, and that's put in
21 the JAMA paper.  In all the papers -- I
22 can go through my publications, but that
23 concept is laced throughout, that there's
24 a possible -- there's a putative benefit

Page 385

1  here that can't be summarily dismissed
2  whatsoever.
3      Q.   In May of 2001 you believed
4  that Vioxx could actually help prevent
5  heart attacks; correct?
6      A.   I felt that that was an
7  important mechanism, inflammation of the
8  artery wall, and this is a potent class
9  of anti-inflammatories, and certainly
10 there was that possibility.  And other
11 studies suggested that potential.
12     Q.   You would never have
13 suggested a cardiovascular outcomes study
14 for patients at high risk of
15 cardiovascular disease if you thought
16 that Vioxx would actually cause them
17 heart attacks or worse, cause them to
18 die, correct, sir?
19     A.   You just asked about high
20 risk.  I assume you're not talking about
21 patients with coronary artery disease
22 proven.  Is that correct?
23     Q.   Dr. Topol, the study that
24 you were suggesting in May of 2001 to

Page 386

1  Merck was suggested because you thought
2  Vioxx might provide a benefit to patients
3  at risk of heart failure -- withdrawn.
4       Am I right, Dr. Topol, that
5  in the concept sheet that Dr. Bhatt sent
6  to Merck in May of 2001, anticipated that
7  Vioxx would actually prevent heart
8  attacks and not cause them?
9       A.   In patients who had active
10  inflammatory coronary disease.
11       Q.   Did you agree with Dr. Bhatt
12  that in May of 2001, patients who had
13  active inflammatory coronary disease
14  might be benefited by taking Vioxx
15  because it could help their heart?
16       A.   I already answered that
17  question affirmatively.
18       Q.   Other scientists shared that
19  view, Dr. Topol, that COX-2 inhibitors
20  could be beneficial to patients who have
21  cardiovascular disease; is that right?
22       MR. KLINE:  Objection,
23  misstatement.
24       THE WITNESS:  I already

Page 387

1       mentioned that there were several
2       studies published, and I've cited
3       them in my work, that that indeed
4       was a potential benefit of COX-2
5       inhibitors in patients with
6       arterial disease.
7  BY MR. GOLDMAN:
8       Q.   And those were the patients
9  you were suggesting be studied; correct?
10       A.   Patients with inflammatory
11  proven artery disease, yes.
12            - - -
13       (Whereupon, Deposition
14       Exhibit Topol-33, "Selective
15       COX-2 Inhibition Improves
16       Endothelial Function in Coronary
17       Artery Disease," (Chenevard, et
18       al) Circulation, January 28,
19       2003, 405-409, was marked for
20       identification.)
21            - - -
22  BY MR. GOLDMAN:
23       Q.   I've handed you Exhibit 33,
24  which is an article titled "Selective

Page 388

1  COX-2 Inhibition Improves Endothelial
2  Function in Coronary Artery Disease."
3  And it was published in Circulation in
4  2003.  Do you see that, sir?
5       A.   Yes.
6       Q.   The author is Remy
7  Chenevard?
8       A.   Chenevard.  I'm familiar
9  with this study.  I've cited it many
10  times in my work.
11       Q.   Do you see in the conclusion
12  of the abstract, Dr. Topol, that the
13  paper says, "This is the first study to
14  demonstrate that selective COX-2
15  inhibition improves endothelium-dependent
16  vasodilation and reduces low-grade
17  chronic inflammation and oxidative stress
18  in coronary artery disease."  Do you see
19  that?
20       A.   Yes, I do.
21       Q.   The next sentence I think is
22  even clearer when it says, "Thus,
23  selective COX-2 inhibition holds the
24  potential to beneficially impact outcome

Page 389

1  in patients with cardiovascular disease."
2  Do you see that?
3       A.   Yes.  And to put it in
4  context, this is a very small study of 26
5  total patients, and it's with celecoxib
6  versus placebo.  But I believe that their
7  findings and the way they made their
8  conclusions based on that data is very
9  reasonable.
10       Q.   Because you've actually
11  cited this article?
12       A.   Yes, and others like it.
13  They're small studies, they're with both
14  of the coxibs, and there is evidence of
15  some salutary effect.
16       Q.   From May of 2001 through the
17  time that Vioxx was withdrawn in
18  September of 2004, you continued to
19  suggest that Merck or Pfizer conduct a
20  cardiovascular outcomes study; right?
21       A.   That's right.
22       Q.   During that entire time
23  period --
24       MR. HAMELINE:  Can you allow

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 390

1    him to answer the question in the
2    way that he feels is appropriate
3    and complete?
4        THE WITNESS:  I would like
5    to make a comment.
6  BY MR. GOLDMAN:
7        Q.   Sure.
8        A.   Because there are other
9    reasons besides just this to continue to
10   advance that notion.
11       Q.   Dr. Topol --
12       A.   If you'd allow me to make
13   the comment.
14       Q.   I'll allow you to make the
15   comment in one minute.  If you could just
16   answer my questions, and then you can
17   certainly comment.  Okay?
18       A.   Okay.
19       Q.   From May of 2001 through the
20   time that Vioxx was withdrawn in
21   September 2004, you continue to suggest
22   that Merck and/or Pfizer conduct your
23   cardiovascular outcomes study; correct?
24       A.   Not ours, but a.  And I do

Page 391

1    have it in the public statements and
2    newspapers that it didn't matter who did
3    the trial, it just should be done.  It
4    wasn't our trial.  And this is a concept
5    sheet.  It isn't a trial.  I would never
6    try to pass this thing off that you've
7    been reviewing as a trial.
8        MR. KLINE:  You now told him
9    you were going to let him finish
10   the last concept.
11       MR. GOLDMAN:  Let me finish
12   --
13       MR. KLINE:  Are you going to
14   ask him a question and then let
15   him finish?  Now you're telling
16   him he can't do it.
17       MR. GOLDMAN:  Move to strike
18   the last answer as nonresponsive.
19       MR. KLINE:  You said you
20   would give him a chance to finish.
21   BY MR. GOLDMAN:
22       Q.   Dr. Topol, I'm not asking
23   whether it was your cardiovascular study
24   or some other person's.  Okay?

Page 392

1        A.   A cardiovascular.
2        Q.   Am I right, Dr. Topol --
3        MR. KLINE:  Now, does he get
4    a chance to finish the answer?
5    You said you were going to ask one
6    question and let him finish and
7    now you've asked two.
8        MR. GOLDMAN:  Tom, I'll let
9    him finish in a minute.
10   BY MR. GOLDMAN:
11       Q.   Dr. Topol, am I right that
12   from May of 2001 through the time that
13   Vioxx was withdrawn in September of 2004,
14   you were suggesting that either Merck or
15   Pfizer conduct a cardiovascular outcomes
16   study; correct?
17       A.   Yes.
18       Q.   During that entire time
19   period, you believed that Vioxx or
20   Celebrex might actually prevent heart
21   attacks or other cardiovascular events.
22   Is that right?
23       A.   That's one issue that was
24   pertinent, yes.  But there's another one

Page 393

1    I would like to get into if you give me
2    an opportunity.
3        Q.   Why don't you go ahead and
4    tell me what you want to tell me.
5        A.   Well, this goes along with
6    an e-mail exchange with Alastair Wood
7    that's in the documents that you have.  I
8    can retrieve it if you'd like.
9        Alastair Wood is probably
10   one of the most highly regarded
11   pharmacologists and physicians.  He's at
12   the Vanderbilt University, and he's
13   frequently chairing the FDA advisory
14   panels.  So one of the things that we
15   exchanged our views on was the fact that
16   if you have half the people in the United
17   States with established coronary disease
18   taking rofecoxib or celecoxib, that means
19   that there's a lot of people out there
20   that is a complete random exposure to a
21   drug, millions and millions of people
22   taking a drug without knowledge of
23   whether it's providing a harm, no less a
24   benefit.  So, the point being I'm trying

Page 394

1   to get to is this issue of equipoise.
2   That is, if you have a drug that's so
3   widely used in the population in half the
4   people, and we don't know -- that is, you
5   can justify a cardiovascular trial even
6   without the putative mechanism of
7   benefit, and I'd be happy to draw -- Dr.
8   Wood.
9       Q.   Dr. Topol, I've let you
10  answer now for some time.  Are you
11  finished now?
12      A.   Well, if I've gotten my
13  point across.
14      Q.   Okay.
15           From May of 2001 through the
16  time that Vioxx was withdrawn in
17  September of 2004, you believed that if a
18  cardiovascular outcomes study were done,
19  it could show that Vioxx and Celebrex
20  actually helped protect the heart;
21  correct?
22      A.   That's one possibility, yes.
23      Q.   Do you know Dr. Lucchesi?
24      A.   Yes, I do I was at the

Page 395

1   University of Michigan previous to coming
2   to Cleveland Clinic, and he was on the
3   faculty there.
4       Q.   Are you aware that Dr.
5   Lucchesi has been retained as an expert
6   witness for the plaintiffs in some of the
7   Vioxx cases?
8       A.   I saw that in the newspaper.
9   I've not spoken to him, but I saw that,
10  yes.
11      Q.   I'll mark as -- actually,
12  I'm not going to mark this as an exhibit,
13  but I'm going to show you a portion of
14  Dr. Lucchesi's deposition testimony and
15  ask you a question about it.  Okay?
16      MR. KLINE:  Objection, off
17  the record.
18      THE VIDEOTAPE TECHNICIAN:
19  Off the record at 3:44.
20      MR. GOLDMAN:  I --
21      MR. KLINE:  How long are we
22  on the record on cross?
23      THE VIDEOTAPE TECHNICIAN:
24  An hour and five minutes.

Page 396

1       MR. KLINE:  You are on the
2   record an hour and five minutes on
3   cross.  I haven't --
4       MR. GOLDMAN:  Go ahead.
5       MR. KLINE:  Now I'm asking
6   off the video record.
7       What the witness is being
8   asked to do now is comment --
9       MR. GOLDMAN:  I do not want
10  you talking in front of the
11  witness.
12      MR. KLINE:  Then have him go
13  out of the room.  I'm just going
14  to state an objection, which is, I
15  object to the witness being shown
16  another expert's -- let me start
17  again.
18      He's not designated as an
19  expert.  Merck has said he's not
20  an expert.  And even if he were an
21  expert, under the federal rules he
22  would not be allowed to be shown
23  one person's opinion testimony and
24  be asked to comment on it.  So,

Page 397

1   it's all objectionable.  Having
2   said that, it may be withdrawn
3   after Dr. Topol looks at it and
4   answers.
5       You can go back on the video
6   record.
7       THE VIDEOTAPE TECHNICIAN:
8   Back on the record at 3:45, Tape
9   Number 5.
10  BY MR. GOLDMAN:
11      Q.   This is an excerpt from
12  testimony that Dr. Lucchesi gave in a
13  trial in New Jersey.  Directing your
14  attention to Page 909, line 23, do you
15  see that he's being asked questions about
16  your proposed study concerning acute
17  coronary syndrome?
18      MR. HAMELINE:  Again, feel
19  free to read as much as you need
20  for context, and while you're
21  doing that, let me just note that
22  Dr. Topol, again, here is coming
23  to this deposition as a very busy
24  academic, as a very busy person in

Page 398

1    the institution and with patients
2    that he has to treat. It's fine
3    to ask him any opinions that he
4    has about what he put in his
5    record in his own documents, et
6    cetera. I think it's
7    inappropriate to ask him about
8    third-party experts.
9  BY MR. GOLDMAN:
10    Q.   Dr. Topol, do you see that
11  --
12         MR. KLINE: And I would also
13    object. You are asking a witness
14    to comment on the comments that
15    somebody else made about what he
16    did.
17  BY MR. GOLDMAN:
18    Q.   Do you see that Dr. Lucchesi
19  in his testimony thought that the study
20  that you were proposing for acute
21  coronary syndrome would be a bad idea?
22    A.   I see that, and I have a
23  couple of comments I can offer here --
24    Q.   Do you see that --

Page 399

1    A.   -- if you'll allow me to.
2    Q.   Do you see that Dr. Lucchesi
3  actually compliments Merck on its
4  decision not to do the study you were
5  suggesting?
6    A.   I saw that. Can I make my
7  further remark about that?
8    Q.   Actually, I'd rather you do
9  that when Mr. Kline asks you questions.
10         MR. HAMELINE: Let me note
11    very vehemently my objection to
12    putting a document in front of Dr.
13    Topol, showing it to him, reading
14    it to him about someone who is not
15    present. Dr. Topol is not here as
16    an expert. He's not trying to
17    take sides in the litigation, and
18    you're showing this to him and not
19    asking a question about it.
20    That's just inappropriate.
21         THE WITNESS: Well, it's
22    also extraordinary that Dr.
23    Lucchesi is not a clinical
24    trialist. He's a pharmacologist,

Page 400

1    and he hasn't worked on patients
2    in probably the last 20 or 30
3    years. He also doesn't know that
4    the protocol that was never
5    written up that talks about a
6    concept sheet, and it was about
7    inflammatory arterial markers.
8    None of that is in that -- so,
9    you're about -- you're asking Dr.
10    Lucchesi in this deposition about
11    things that are just completely
12    foreign to him to make comment.
13    It's quite remarkable, actually.
14  BY MR. GOLDMAN:
15    Q.   Do you think that Dr.
16  Lucchesi is not competent to be
17  testifying about cardiovascular disease
18  associated with Vioxx, sir?
19         MR. KLINE: Objection.
20         MR. HAMELINE: Again, coming
21    very close to --
22         MR. GOLDMAN: Withdrawn.
23    I'll ask another question.
24  BY MR. GOLDMAN:

Page 401

1    Q.   Are you familiar with the
2  drug Reopro?
3    A.   Yes, I am familiar with
4  Reopro, abciximab, yes.
5    Q.   Did Dr. Lucchesi play a role
6  with you in the development of Reopro?
7    A.   He did some experiments with
8  a colleague of mine, Dr. Bates, when I
9  was at University of Michigan in dogs.
10  Most of his work has been experimental
11  models in dogs.
12    Q.   Would you credit Dr.
13  Lucchesi with the development of Reopro?
14    A.   No. I would not credit him.
15  He did some contributory work. No, there
16  were many people, and he was just one of
17  the investigators that worked in this
18  field.
19    Q.   I want to talk to you, Dr.
20  Topol, about your JAMA article that you
21  published in August of 2001. Okay.
22    A.   Sure.
23    Q.   You said on direct
24  examination that you sent the manuscript

Page 402

1  or the draft of the JAMA article to Merck
2  to see where there were discrepancies in
3  the data between the published paper that
4  you were publishing and the FDA database.
5  Do you remember that?
6      A.   That's correct.  I sent the
7  paper to Dr. Demopoulos, and we already
8  went through about, whether it was a
9  paper version, and then Dr. Reicin
10 requested an electronic version.  We went
11 through that this morning.
12         MR. HAMELINE:  Can I just
13     note, I think you said that this
14     discrepancy is between the
15     published version, which is not
16     Dr. Topol's article, but the
17     published version and the FDA.
18     You're talking about three
19     different articles here.
20         THE WITNESS:  The New
21     England Journal --
22 BY MR. GOLDMAN:
23     Q.   Dr. Topol, you met with
24 Merck employees in April of 2001;

Page 403

1  correct?
2      A.   That was a meeting I
3  referred to when they came to Cleveland.
4      Q.   Is that the meeting where
5  you said Dr. Reicin came on quite strong,
6  and that you would consider her comments
7  to be brazen?
8      A.   I considered her remarks
9  about how we would be embarrassed if we
10 published it to be inappropriate, yes.
11     Q.   Did Dr. Reicin or Dr.
12 Demopoulos ever exert any pressure or
13 influence on you during that meeting?
14     A.   Well, it's Dr. Demopoulos,
15 and as I conveyed -- I mean, we
16 summarized this morning, that there were
17 some definite difficult issues that were
18 confronted, and there was no quid pro quo
19 in terms of intimidation.  They didn't
20 say, if you don't pull this paper out and
21 not take it out of its submission phase,
22 such and such would happen.  But it was
23 not what I would consider a pleasant
24 discussion.

Page 404

1      Q.   Actually, isn't it true, Dr.
2  Topol, that you enjoyed meeting with Dr.
3  Reicin and Dr. Demopoulos?
4      A.   Dr. Demopoulos and I are
5  colleagues, and we worked on a trial
6  together, and I had no problem with Dr.
7  Demopoulos.
8          I did have a problem with
9  Dr. Reicin, who I had not met before, who
10 used Dr. Demopoulos as an access point,
11 who came to visit, and as I said, told me
12 that we would regret publishing the paper
13 because we did not have the data that
14 Merck had, that we didn't understand that
15 rheumatoid arthritis patients had more
16 heart attacks, and that we would -- we
17 were making a mistake.  Those were
18 comments that I did not find enjoyable
19 whatsoever.
20     Q.   Do you have Exhibit 5 in
21 front of you that the plaintiffs used?
22         MR. HAMELINE:  We will.
23 BY MR. GOLDMAN:
24     Q.   Do you see Exhibit 5, sir?

Page 405

1      A.   Yes.
2      Q.   This is an exhibit that the
3  plaintiffs used and didn't ask you about
4  the e-mail dated April 20 of 2001 from
5  you to Dr. Reicin.  Do you see that in
6  the middle of the page?
7      A.   Yes, I do.
8      Q.   Do you tell Dr. Reicin on
9  April 20: "I enjoyed the meeting with you
10 and Laura and will have my assistant,
11 Donna Bressan, forward you an electronic
12 copy of the JAMA paper."
13     A.   Yes.  I certainly said that,
14 and I was trying to be politically
15 correct and smooth over the difficulties
16 we had during the meeting.
17     Q.   Was it true what you wrote,
18 Dr. Topol, that you enjoyed the meeting
19 with Laura and Dr. Demopoulos?
20         MR. KLINE:  Objection,
21     violation of Judge Fallon's order.
22         THE WITNESS:  To be exact, I
23     did not enjoy some of the
24     interactions, but I tried to be

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 406

1    correct about keeping things on an
2    upbeat -- when I wrote that, it
3    was definitely to convey a sense
4    of, let's not have any bad
5    feelings, and I tried to convey an
6    upbeat sense.  That's what that
7    is.
8    BY MR. GOLDMAN:
9        Q.   On direct examination, Mr.
10   Kline read to you a quote from a Wall
11   Street Journal article that came out when
12   you published your article in JAMA.  Do
13   you remember that, sir?
14       A.   Yes, I do, August 22nd.
15       Q.   And the quote that Mr. Kline
16   read to you was the following:
17           "Merck sought to downplay
18   the cardiac issue."
19           Do you remember that?
20       A.   Yes.  That's what the
21   reporter wrote, Tom Burton and Gardiner
22   Harris.  The reporters wrote "Merck
23   sought to downplay."
24       Q.   You said in response to Mr.

Page 407

1    Kline's question that "I do believe
2    that's true because" of the "ulterior
3    purpose of the visit."  Do you remember
4    testifying to that on direct examination?
5        A.   Let me be perfectly clear,
6    Mr. Goldman.  It is unquestionable in my
7    mind that the reason why Dr. Reicin came
8    to Cleveland was to downplay the cardiac
9    risks of Vioxx and try to get this
10   manuscript to be toned down.  There isn't
11   any question about that.
12           MR. GOLDMAN:  Move to strike
13       as nonresponsive.
14   BY MR. GOLDMAN:
15       Q.   Dr. Topol --
16           MR. HAMELINE:  He can move
17       to strike.  It doesn't mean it's
18       going to be stricken.
19   BY MR. GOLDMAN:
20       Q.   Dr. Topol, what the Wall
21   Street Journal said about Merck trying to
22   downplay the cardiac issue was not
23   accurate, correct, sir?
24       A.   It was entirely accurate in

Page 408

1    my view.  In fact, Mr. Goldman, Thomas
2    Burton, who interviewed me for that
3    article, asked me what was going on that
4    day in April 2001 when Dr. Reicin and Dr.
5    Demopoulos visited me.  And he asked me,
6    were there any quid pro quos,
7    intimidations.  And I said, well, it was
8    obvious why she came to Cleveland.  I
9    never had met her before.  I had
10   forwarded the manuscript in advance, and
11   it was obvious what the purpose of that
12   trip was.  And it's obvious that the
13   reporter, Thomas Burton, accurately
14   reported what I told him.
15       Q.   It's your testimony, sir,
16   that Merck actually pressured you or
17   tried to influence you about your JAMA
18   article?
19       A.   I wouldn't call it pressure.
20   I would call it, you don't know about the
21   other data, you don't know about the
22   Alzheimer trial patients, you're going to
23   be embarrassed if you publish it.  You
24   know, I can deal with all of these

Page 409

1    things.  I don't consider that -- the
2    word you used was what?
3        Q.   Did either Dr. Reicin or Dr.
4    Demopoulos --
5        A.   Demopoulos.
6        Q.   Yes.  I'm sorry.
7            -- ever put any pressure or
8    influence on you when they met with you
9    in April of 2001?
10           MR. HAMELINE:  Again, it's
11       the same question you keep coming
12       back with.  Is there some
13       different take that you've given
14       here?  He's already answered the
15       question.
16           THE WITNESS:  I believe that
17       -- pressure -- you know, it's an
18       ambiguous term, but it was very
19       obvious why they met with me, and
20       they subsequently met with Dr.
21       Nissen for the same purpose, which
22       is to reduce the claims that we
23       had, the worries that we had
24       regarding the cardiac risk of

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 410

1  Vioxx.
2      MR. GOLDMAN:  I want to mark
3  the next exhibit.
4      - - -
5      (Whereupon, Deposition
6  Exhibit Topol-34, E-mails,
7  MRK-ABA0011062, was marked for
8  identification.)
9      - - -
10 BY MR. GOLDMAN:
11     Q.   Dr. Topol, do you see that
12 Exhibit 34 is an e-mail on the top from
13 you to, is it Peter DiBattiste?
14     A.   Yes, Dr. DiBattiste.
15     Q.   Of Merck?
16     A.   Yes.
17     Q.   And this is August 30 of
18 2001; right?
19     A.   Yes.  So, it's after these
20 articles have come out, yes, the JAMA and
21 the Wall Street Journal, yes.
22     Q.   So, you're writing to Merck
23 after the Wall Street Journal comes out,
24 the one that said that Merck tried to

Page 411

1  downplay the cardiac issue; correct?
2      A.   That's right.  I'm writing
3  to Peter DiBattiste.  I'm not writing to
4  Merck in general, yes.
5      Q.   You wrote, sir, "I'd like to
6  talk to you about the COX-2 post-mortem
7  to straighten out any issues.  I hope you
8  know that I never mentioned your name,
9  Laura's or anyone else and never felt a
10 sense of pressure or influence."  Do you
11 see that, sir?
12     A.   Yes, I do.
13     Q.   Was that true?
14     A.   Well, as we just discussed,
15 there was no overt pressure and
16 intimidation, but there certainly was an
17 obvious motive of this trip to come to
18 Cleveland, yes.  There's a difference
19 here, and it's a matter of semantics.
20     Q.   Is the statement that you
21 wrote to Dr. DiBattiste true?
22     A.   I think -- well, I wrote it
23 to Peter, who I viewed as a colleague
24 like Laura Demopoulos, and I certainly

Page 412

1  felt -- we had a relationship that
2  extended over years doing clinical trials
3  together, and I was trying to be
4  appropriate and accurate.  Yes, I believe
5  that I'm conveying what I felt at that
6  time.
7      Q.   If you skip down to the
8  sentence that starts, "Unfortunately, a
9  co-author of the paper had a different
10 perspective and used names and painted a
11 very different picture.  I pleaded with
12 Burton, the reporter, that this wasn't
13 the case but you can see how much that
14 influenced his story."  Do you see that,
15 sir?
16     A.   Yes.  I see that.  I also
17 remember having a phone discussion with
18 Dr. Demopoulos in advance of this, and I
19 knew that both she and he were very
20 upset.  I also know that they were very
21 upset about the COX-2 inhibitor program
22 at Merck, as they conveyed to me, but,
23 yes, I certainly see this.
24     MR. GOLDMAN:  Move to strike

Page 413

1  as nonresponsive after yes.
2  BY MR. GOLDMAN:
3      Q.   Dr. Topol, you actually
4  thought that it would be great to get
5  Merck's input on the JAMA article;
6  correct?
7      A.   I didn't think it would be
8  great.  I thought it would be -- because
9  of being colleagues with Merck, because
10 of having a relationship with Drs.
11 DiBattiste and Demopoulos in another
12 trial, I thought it was appropriate that
13 we give them an opportunity to review the
14 manuscript and the data.
15     MR. HAMELINE:  So, we're
16 done with Exhibit 34?
17     MR. GOLDMAN:  Yes.
18     MR. HAMELINE:  Can we go off
19 the record and take a short break.
20     MR. GOLDMAN:  After we
21 finish this document, yes.
22     - - -
23     (Whereupon, Deposition
24 Exhibit Topol-35, E-mails,

Page 414

1    TOP1PRO0000282 - TOP1PRO0000283,
2    was marked for identification.)
3        - - -
4  BY MR. GOLDMAN:
5      Q.   Dr. Topol, I've handed you
6  Exhibit 35, which is a series of e-mails
7  starting at the bottom. It's Laura
8  Demopoulos is writing to you, Dr. Topol,
9  on April 28, 2001. Do you see that, sir?
10     A.   Yes.
11     Q.   She writes to you "Hi, just
12 wanted to let you know that Pete and I"
13 -- that's Pete DiBattiste -- "will be
14 working with Alise to try to incorporate
15 some of the data we discussed during our
16 visit into the JAMA manuscript." Do you
17 see that, sir?
18     A.   Yes. I see it. I can read
19 it very well, yes.
20     Q.   You wrote back to Laura on
21 April 28 and you said, "Hi, Laura. That
22 will be great to get your input." Do you
23 see that, sir?
24     A.   Yes. But don't cut off the

Page 415

1  sentence, "we haven't heard from JAMA
2  yet." That is, the paper was already
3  under review at JAMA. Okay? So, the
4  input was, and I told this to Laura on
5  the phone, and it's not conveyed in the
6  e-mail, the input was about data on the
7  manuscript and the discrepancies that
8  we're concerned about. And I want to be,
9  again, perfectly clear. We never
10 received any manuscript recommendations,
11 data changes from Merck, from Dr.
12 Demopoulos, Dr. DiBattiste or Dr. Reicin.
13     Q.   We'll talk about that issue
14 in a minute.
15     A.   Yes.
16     Q.   Dr. Topol, was it true what
17 you wrote to Laura Demopoulos, that you
18 thought it would be great to get her
19 input on your manuscript?
20     A.   I was the one who offered
21 the manuscript to get the input, of
22 course.
23     Q.   You actually found some of
24 Merck's comments to be insightful, and

Page 416

1  you wanted to incorporate them. Isn't
2  that right, sir?
3      A.   No. I didn't get any
4  comments. We never got any comments.
5      MR. HAMELINE:  So --
6      THE WITNESS:  The
7  manuscript --
8      MR. GOLDMAN:  We can take a
9  break now.
10     MR. HAMELINE:  That's fine.
11     THE VIDEOTAPE TECHNICIAN:
12 Off the record at 4:02.
13        - - -
14     (Whereupon, a recess was
15 taken from 4:02 p.m. until
16 4:15 p.m.)
17        - - -
18     THE VIDEOTAPE TECHNICIAN:
19 Back on the record at 4:15.
20 BY MR. GOLDMAN:
21     Q.   Dr. Topol, did Merck ever
22 provide comments to you on your JAMA
23 paper that you subsequently published in
24 August of 2001?

Page 417

1      A.   I'm not aware of any
2  comments.
3      Q.   You actually said on direct
4  examination that Merck "never sent...us
5  any suggestions, changes of data. There
6  was never anything sent back to me
7  or...my colleagues. Was that your
8  testimony?
9      A.   I referred to the documents
10 that were presented to me this morning
11 when I never saw those before. These
12 revised manuscripts from internal --
13 I've never seen those before.
14     Q.   Did Merck send you any
15 revised comments about your manuscript?
16     A.   I don't recall ever getting
17 any revised comments.
18        - - -
19     (Whereupon, Deposition
20 Exhibit Topol-36, E-mail 6-20-01,
21 with attachment, "Risk of
22 Cardiovascular Events Associated
23 with Selective COX-2 Inhibitors,"
24 (Mukherjee, et al) Draft