Page 418

```
 1        Manuscript, TOP1PRO0000285 -
 2        TOP1PRO0000311, was marked for
 3        identification.)
 4            - - -
 5   BY MR. GOLDMAN:
 6        Q.   Let me hand you what I've
 7   marked as Exhibit 35.  This is an e-mail
 8   dated June 20 of 2001 from Pete
 9   DiBattiste to you, and it attaches your
10   manuscript for the JAMA paper, doesn't
11   it, sir?
12        A.   Yes.
13        Q.   Do you see that Dr.
14   DiBattiste is saying this to you in this
15   e-mail, "Laura and I have had a chance to
16   review the most recent version of the
17   COX-2 manuscript.  Thanks for sharing it
18   with us.  We've made a few comments,
19   embedded in the text."
20             Do you see that, sir?
21        A.   Yes.
22        Q.   Then if you flip the pages,
23   you can see that on occasion, Merck made
24   some suggestions to your paper.  Do you
```

Page 419

```
 1   see that, sir?
 2        A.   Yes.  There's just
 3   limited -- okay, I see them now, yes.
 4        Q.   And I want to just point to
 5   an example of the type of suggestion that
 6   Merck made to you.  Do you see on page --
 7   that ends --
 8             MR. HAMELINE:  Can you just
 9        establish that he received this?
10   BY MR. GOLDMAN:
11        Q.   The e-mail was written to
12   you, wasn't it, Dr. Topol?
13        A.   The e-mail's written to me,
14   but I don't recall ever having seen this
15   document or the e-mail.
16        Q.   Do you have any reason to
17   dispute that you actually received an
18   e-mail from Dr. DiBattiste on June 20 of
19   2001?
20        A.   Well, this looks unfamiliar
21   to me.  I don't remember seeing it
22   before.  So, it's certainly something
23   that I'm not familiar with.
24        Q.   My question was, do you have
```

Page 420

```
 1   any reason to dispute that you actually
 2   received it.
 3             MR. HAMELINE:  He's answered
 4        the question.
 5             THE WITNESS:  Maybe it was
 6        sent, and I never got it.  Maybe
 7        there was a problem.  I don't
 8        know.  But I don't remember seeing
 9        it previously.
10   BY MR. GOLDMAN:
11        Q.   Dr. Topol, if you'd turn to
12   the page that ends with a Bates Number at
13   the bottom TOP1PR and then several zeros,
14   294?
15        A.   294.  Yes.
16        Q.   Do you see that?
17        A.   Sure.
18        Q.   And here Merck is providing
19   some input, and you see what's underlined
20   there are their suggested comments.  Do
21   you see that?
22        A.   Where it says "These
23   results"?
24        Q.   Yes.
```

Page 421

```
 1        A.   Okay.
 2        Q.   And in the section about
 3   study 085 and 090, Merck says "These
 4   results" that you describe, "while
 5   important, are incomplete.  Would you
 6   consider" --
 7             MR. KLINE:  Page?
 8             MR. GOLDMAN:  Bates stamp
 9        that ends 294.
10   BY MR. GOLDMAN:
11        Q.   "Would you consider
12   substituting the following section to
13   provide more robust data?"  Do you see
14   that, sir?
15        A.   Yes.
16        Q.   That's a question that Merck
17   is asking you about whether you think it
18   would be a good idea to include the
19   language that follows; correct?
20             MR. HAMELINE:  Again, note
21        my objection that he doesn't
22        recall having seen this, so your
23        statement is --
24             MR. GOLDMAN:  You have that
```

Page 422

1   objection.
2          MR. KLINE: Can I have a
3   continuing objection as well?
4          MR. GOLDMAN: Sure.
5          MR. HAMELINE: Your
6   statement -- your question is
7   misleading then.
8          THE WITNESS: Well, I also
9   want to point out, we sent this
10  paper -- I sent it to Laura in
11  March, I believe, and submitted it
12  to the JAMA, and this is the 20th
13  of June. So, this is months after
14  I had sent it to them, but anyway,
15  please.
16  BY MR. GOLDMAN:
17     Q.   Does Merck write here "To
18  further evaluate the relationship of"
19  Vioxx "to adverse cardiac events, a
20  meta-analysis of all Phase II through V"
21  Vioxx "studies using either placebo or
22  NSAID comparators was performed. This
23  included over 28,000 patients in 23
24  studies in osteoarthritis, rheumatoid

Page 423

1   arthritis, chronic low back pain, and
2   Alzheimer's disease. In the" Vioxx
3   "meta-analysis (which includes VIGOR),
4   the relative risk for a cardiovascular
5   event was 1.69...when comparing" Vioxx
6   "to naproxen." That's not statistically
7   significant; correct, sir?
8       A.   That is statistically
9   significant. 1.69 --
10      Q.   That's right. I'm sorry.
11  You're right.
12      A.   By the way, this is the
13  Konstam paper. She's summarizing a paper
14  that subsequently came out in
15  Circulation. We didn't incorporate any
16  of these data in our paper.
17      Q.   Let me withdraw the question
18  for a second.
19          Dr. Topol, do you see that
20  Merck is writing here at the bottom of
21  598 or 294 to 295 that there are studies
22  of over 28,000 patients in 23 studies in
23  osteoarthritis, rheumatoid arthritis,
24  chronic low back pain and Alzheimer's

Page 424

1   disease and then describes what the
2   relative risk for cardiovascular events
3   was. Do you see that?
4       A.   I see it.
5       Q.   And do you see that when
6   comparing Vioxx to nonnaproxen NSAIDs,
7   ibuprofen, diclofenac and nabumetone that
8   the relative risk was .79. Do you see
9   that, sir?
10      A.   This is a summary of data
11  across many different trials and
12  indications, and that's what the data
13  indicate that's being supplied, you know,
14  in this paper that I don't recall ever
15  having received or seen. Yes, I see it.
16      Q.   Do you see that there's no
17  statistically significant difference
18  between Vioxx and nonnaproxen NSAIDs when
19  you look at those 23 studies?
20      A.   The 23 studies includes a
21  statistically significant difference of
22  169 percent increased risk against
23  naproxen.
24      Q.   Right.

Page 425

1       A.   Which is exactly what we
2   were concerned about in this issue, yes.
3       Q.   I'm not talking about
4   naproxen.
5       A.   Okay.
6       Q.   I'm asking you whether the
7   results that were being reported here of
8   the 23 studies including Alzheimer's
9   showed that there was no statistically
10  significant difference in cardiovascular
11  events between Vioxx and NSAIDs other
12  than naproxen.
13      A.   I recognize this passage
14  from the Konstam paper that's published
15  subsequently in Circulation after our
16  JAMA paper. It looks almost identical to
17  that.
18      Q.   That's accurate, isn't it,
19  sir?
20      A.   I would not say the data are
21  accurate, but I recognize the passage,
22  and I also recognize that these are the
23  things that Alise Reicin told me during
24  that April 2001 visit that, for example,

Page 426

1  you don't know about the 28,000 patients
2  and Alzheimer's and all these other
3  things. You don't have the data. So,
4  she did tell me about this stuff when she
5  came to visit with Dr. Demopoulos.
6      Q.  Dr. Topol, do you have any
7  reason to dispute whether the results of
8  the 23 studies that are described here in
9  OA patients, in rheumatoid arthritis
10 patients, in Alzheimer's patients showed
11 that there was no statistically
12 significant difference between Vioxx and
13 NSAIDs other than naproxen?
14     A.  Yes, I have -- I have
15 concerns regarding how this analysis was
16 done, and I can review that with the
17 Konstam paper if you would like.
18     Q.  Have you ever said, sir,
19 that the comments -- withdrawn.
20         All that Merck is doing
21 here, by the way, is saying to you, would
22 you consider including this language;
23 correct?
24         MR. HAMELINE: Again,

Page 427

1      objection.
2          THE WITNESS: Well, yes. I
3      guess that's what they're saying
4      in this, but we certainly didn't
5      include, and I don't remember ever
6      seeing this.
7  BY MR. GOLDMAN:
8      Q.  The next comment that Merck
9  makes here is "To further evaluate the
10 risk of sustaining a cardiovascular event
11 on" Vioxx "in an elderly patient
12 population, an interim analysis was
13 performed of two ongoing large placebo
14 controlled studies in elderly patients
15 with Alzheimer's and mild cognitive
16 impairment. The relative risk of
17 sustaining a thrombotic event on" Vioxx
18 "versus placebo was .65," and that's not
19 statistically significant; correct, sir?
20     A.  That is an unacceptable
21 analysis.
22     Q.  Is that number, sir,
23 statistically significant? That's my
24 only question.

Page 428

1      A.  Interim results of trials
2  that one should not be doing interim
3  results for looking at something like
4  this and putting in a report? No.
5      Q.  Do you see that the .65 is
6  not statistically significant because
7  when you look in the parenthesis, the
8  number 1 actually falls within the range
9  .45 and 1.19?
10         MR. KLINE: Page?
11         THE WITNESS: From the
12     standpoint of confidence
13     intervals, that's not
14     statistically significant. But
15     that doesn't mean that the data
16     are authentic or meaningful.
17 BY MR. GOLDMAN:
18     Q.  If you remember, Dr. Topol,
19 you actually felt that Merck's comments
20 to you were insightful about the JAMA
21 paper?
22     A.  No. I didn't say that.
23 Okay?
24     Q.  I know that's not what you

Page 429

1  said today. Let me show you an e-mail,
2  sir, that I'll mark as the next exhibit,
3  which is 36? Sorry, 37.
4           - - -
5          (Whereupon, Deposition
6      Exhibit Topol-37, E-mails,
7      TOP1PRO0000279, was marked for
8      identification.)
9           - - -
10 BY MR. GOLDMAN:
11     Q.  This is an e-mail from you
12 back to Dr. DiBattiste, June 22nd of
13 2001. Do you see that, sir? At the top?
14     A.  Okay. Yes, I see that.
15     Q.  Do you see that you wrote to
16 Dr. DiBattiste, "Thanks - your comments
17 on the paper came back after it was
18 resubmitted and now we have final
19 acceptance and will try to weave some of
20 the insightful points into the galleys."
21 Do you see that, sir?
22     A.  Yes. It's nice to have this
23 e-mail to help remember the interaction.
24 Yes, I do remember this.

Page 430

1   Q.   So, you now remember getting
2 comments and reviewing them, correct,
3 sir?
4   A.   No. I'll tell you what I
5 remember exactly. The galleys -- the
6 paper had been accepted, the galleys had
7 already been sent back, and then after
8 the fact we got this -- you know, three
9 months after submitting it to Merck, we
10 got these comments. I had basically
11 disregarded them because the paper was
12 complete, so I really never went into it.
13   Q.   Did you say to Dr.
14 DiBattiste on June 22nd, 2001 that you
15 would try to weave in some of the
16 insightful points into the paper?
17   A.   Just like when I said to
18 Doctor --
19   Q.   Can you answer that yes or
20 no?
21   A.   It's not as simple as that.
22 Mr. Goldman --
23   Q.   I asked you what the e-mail
24 says.

Page 431

1   A.   I'm sorry, Mr. Goldman, but
2 things are not quite as simple as you're
3 trying to make them out to be. Just like
4 with the communication to Dr. Reicin
5 where I said I enjoyed the meeting, when
6 it wasn't enjoyable throughout --
7   Q.   I'm not asking you about
8 that, please, Dr. Topol. Can you please
9 focus on my question the way that you did
10 for the plaintiffs' lawyers? Can you
11 just focus on my question?
12       MR. HAMELINE: He answered
13     questions --
14       MR. KLINE: Let him finish,
15     and I object to the comment.
16       MR. HAMELINE: He answered
17     questions to the plaintiffs'
18     lawyers by trying to give his
19     understanding and comments and
20     beliefs, and that's what he's
21     trying to do here.
22 BY MR. GOLDMAN:
23   Q.   Dr. Topol, do you see that
24 on June 22 --

Page 432

1       MR. KLINE: I think he still
2     has an answer pending.
3 BY MR. GOLDMAN:
4   Q.   Dr. Topol, do you see on
5 June 22 --
6       MR. KLINE: I object. He
7     was answering a question. You cut
8     him off. You didn't let him
9     finish, and now you are going to
10     ask a question again. I insist
11     that the question be read back and
12     he be allowed to finish the answer
13     to the question.
14 BY MR. GOLDMAN:
15   Q.   Dr. Topol, I'm conducting
16 this deposition.
17       MR. STEIN: You interrupted
18     him.
19       MR. KLINE: No, you're not.
20     You're not conducting this
21     deposition with impunity. He was
22     answering the question. He told
23     you he was answering the question,
24     and you cut him off, and you won't

Page 433

1     let him answer. That's wrong.
2 BY MR. GOLDMAN:
3   Q.   Dr. Topol, I'm going to ask
4 you another question, and if you want to
5 explain, feel free.
6       MR. KLINE: Let him finish
7     the other answer to the question
8     that's pending.
9       MR. STEIN: Read back the
10     question --
11       MR. GOLDMAN: No.
12       MR. STEIN: Read back the
13     question and answer that was asked
14     when he was cut off in the middle.
15       MR. GOLDMAN: You know what,
16     you're not participating in this
17     deposition.
18       MR. STEIN: I am
19     participating in this deposition,
20     and you don't have a right to cut
21     off a witness in the middle of a
22     statement.
23       MR. KLINE: Please read back
24     the answer to the last question

Page 434

1  where the witness was.
2        MR. HAMELINE: Can we just
3  move forward. We'll get all this
4  on the record.
5        MR. KLINE: Would you tag
6  the question and answer, Linda?
7        MR. GOLDMAN: Fine.
8  BY MR. GOLDMAN:
9    Q.  Dr. Topol, did you write to
10 Dr. DiBattiste on June 22nd of 2001 that
11 you would try to weave some of the
12 insightful points into the galleys?
13   A.  In a polite way after it was
14 already finished, that was a
15 communication I apparently made to Dr.
16 DiBattiste, who I regarded as a long-term
17 colleague, yes.
18   Q.  Let me hand you what I'll
19 mark as Exhibit 38.
20        - - -
21        (Whereupon, Deposition
22   Exhibit Topol-38, "Risk of
23   Cardiovascular Events Associated
24   with Selective COX-2 Inhibitors,"

Page 435

1    JAMA August 22/29, 2001 Vol 286,
2    No. 8, 954-958, MRK-ADJ0035003 -
3    MRK-ADJ0035008, was marked for
4    identification.)
5        - - -
6  BY MR. GOLDMAN:
7    Q.  This is your JAMA paper.
8    A.  Uh-huh.
9    Q.  That was published in August
10 of 2001, isn't it, sir?
11   A.  Yes.
12   Q.  JAMA is a peer-reviewed
13 publication, isn't it?
14   A.  That's correct.
15   Q.  It is a top journal?
16   A.  One of the top journals.
17   Q.  It's widely reviewed by
18 doctors?
19   A.  That's correct.
20   Q.  When you wrote this article
21 in JAMA, it reflected your and Dr.
22 Nissen's best medical judgment about the
23 potential cardiovascular risks associated
24 with COX-2 inhibitors, correct, sir?

Page 436

1    A.  And Dr. Mukherjee and the
2  input of the reviewers and the editors.
3    Q.  You both had reviewed, Dr.
4  Nissen and you, lots of data concerning
5  COX-2 inhibitors before writing this
6  paper, correct, sir?
7    A.  Yes.
8    Q.  Among the materials that you
9  reviewed and Dr. Nissen reviewed are the
10 VIGOR study, the CLASS study, study 090,
11 study 085, aspirin trials; correct?
12   A.  Yes.
13   Q.  And very scientific
14 literature, right, sir?
15   A.  That's correct.
16   Q.  Isn't it true, sir, that
17 when you wrote this paper, you found that
18 the difference in cardiovascular events
19 seen in VIGOR was unexpected?
20   A.  Well, I don't know if I
21 would qualify it like that. I would say
22 that it was significantly different, and
23 that we -- there was a biologic
24 mechanism. So, I don't know that you

Page 437

1  would want to say it was unexpected. We
2  already knew that prostacyclin was
3  suppressed, a critical constituent for
4  blood clots and normal artery function,
5  and so I don't know that you can say it
6  was unexpected. It wasn't expected by
7  the trialist per se, but it wouldn't be
8  at all biologically implausible.
9    Q.  If you'd turn to the page in
10 your paper, 958.
11   A.  Yes.
12   Q.  Second column, last
13 paragraph. Do you write in your paper
14 "Our analysis has several significant
15 limitations. The increase in
16 cardiovascular events in these trials was
17 unexpected." Is that what you wrote?
18   A.  That's the statement I'm
19 trying to put in context.
20   Q.  You say --
21   A.  It says, "and evaluation of
22 these end points was not prespecified,"
23 so that's part of -- it's interdependent.
24 If you don't anticipate the endpoints and

Page 438

1  some of the issues are unexpected, it's
2  not a matter of biologic expectation,
3  it's a matter of whether the trial is
4  designed to look at this question.
5      Q.  You said on direct
6  examination that you felt there was no
7  basis for the naproxen hypothesis. Was
8  that your testimony?
9      A.  That on the course of how
10 this played out from 2001 when that
11 naproxen hypothesis was first touted by
12 Merck and put in the Targum report to the
13 present, over time it was very clear that
14 that could not be tenable.
15     Q.  You said on direct
16 examination "The only appropriate
17 conclusion...would be that there's a
18 problem with the experimental drug
19 Vioxx." Right, sir?
20         MR. KLINE: Objection.
21 BY MR. GOLDMAN:
22     Q.  Is that your testimony?
23         MR. KLINE: Objection.
24 Misstates, mischaracterizes.

Page 439

1  BY MR. GOLDMAN:
2      Q.  Do you remember testifying
3  to that?
4      A.  I remember testifying, and I
5  remember the statement is very clear,
6  comparing a well-accepted historical
7  anchor, naproxen, versus an experimental
8  new drug and making the conclusion that
9  the only reasonable conclusion as a
10 clinical trialist is to say the
11 experimental arm has a problem.
12     Q.  Well, let's see what
13 conclusion you reached when you wrote
14 this paper in August of 2001. If you'd
15 turn to Page 957, the first column, last
16 paragraph, "The results of the VIGOR
17 study can be explained by either a
18 significant prothrombotic effect from"
19 Vioxx "or an antithrombotic effect from
20 naproxen (or conceivably both)." Do you
21 see that, sir?
22     A.  Not only do I see it, but I
23 acknowledged this several times earlier
24 today, that that's a possibility. We

Page 440

1  wouldn't just dismiss what Merck put
2  forth. It's certainly a possibility.
3  And we acknowledge it. I mentioned at
4  least twice if not three times in the
5  paper. I put that in the deposition --
6  in the testimony earlier today.
7      Q.  The reason that you felt
8  that naproxen and its cardioprotective
9  effects could explain the results in
10 VIGOR is that naproxen had significant
11 anticlotting effects, doesn't it, sir?
12     A.  That's what Merck was
13 advancing, that notion, but whether or
14 not that was clinically meaningful was
15 not ever determined.
16     Q.  If you look two sentences
17 down, "Naproxen has significant
18 anti-platelet effects" which mean
19 platelet -- "with mean platelet
20 aggregation inhibition of 93 percent
21 compared with platelet aggregation
22 inhibition of 92 percent for those taking
23 aspirin." Do you see that, sir?
24     A.  Yes.  We referenced where

Page 441

1  that data came from.
2      Q.  You referenced where that
3  data came from. That was an FDA
4  document, correct, sir?
5      A.  Right.
6      Q.  When you wrote this article
7  in JAMA, you believed that naproxen has
8  significant anti-platelet effects,
9  correct, sir, or you wouldn't have put it
10 in the article?
11     A.  No. Let me just put --
12 you're asking about context. Okay?
13     Q.  No, I'm not.
14     A.  Anti-platelet effects and
15 does that explain off the concerns of
16 Vioxx are different things.
17 Anti-platelet effects doesn't mean that
18 you can ascribe the problems of Vioxx to
19 naproxen's cardioprotective effect. And
20 that's why in the last sentence of the
21 paper we urge caution in prescribing
22 these agents to patients at risk for
23 cardiovascular morbidity. If we were so
24 confident about the platelet effect being

```
                                        Page 442
 1   clinically transferable, we wouldn't have
 2   come to that conclusion.
 3        Q.   Do you see in the second
 4   column of your article on Page 957 you
 5   also say that "naproxen, but not
 6   ibuprofen or diclofenac resulted in a
 7   high level of platelet aggregation
 8   inhibition similar to that achieved with
 9   aspirin."  Do you see that, sir?
10        A.   Yes.
11        Q.   Then you write about
12   flurbiprofen, which is something that the
13   plaintiffs lawyer asked you about; right?
14        A.   Yes.
15        Q.   You wrote in JAMA, "There is
16   clinical evidence that flurbiprofen, 50
17   milligrams twice daily for 6 months,
18   reduced the incidence of MI by 70 percent
19   compared with placebo."  Isn't that what
20   you wrote, sir?
21        A.   Yes.
22        Q.   Then you say "Indobufen,
23   another NSAID, was as effective as
24   aspirin in preventing" and then you
```

```
                                        Page 443
 1   continue, correct, sir?
 2        A.   Yes.
 3        Q.   Then you say, "Because of
 4   the evidence for an anti-platelet effect
 5   of naproxen, it is difficult to assess
 6   whether the difference in cardiovascular
 7   event rates in VIGOR was due to a benefit
 8   from naproxen or to a prothrombotic
 9   effect from" Vioxx.  Do you see that?
10        A.   As I said, this was
11   acknowledged at least two to three times
12   in the manuscript, yes.
13        Q.   In fact, sir, isn't it true,
14   that as late as August of 2004, you
15   believed that it was uncertain as to
16   whether the heart attacks in VIGOR were
17   caused by Vioxx or naproxen?
18        A.   I don't know how you could
19   ever come to that conclusion.
20        Q.   I want to show you an
21   article that you were asked about earlier
22   today, and this is the --
23        A.   The TARGET editorial, "A
24   coxib a day won't keep the doctor away"?
```

```
                                        Page 444
 1             - - -
 2             (Whereupon, Deposition
 3   Exhibit Topol-39, "A coxib a day
 4   won't keep the doctor away,"
 5   (Topol, et al) The Lancet Vol 364
 6   August 23, 2004, 639-640, was
 7   marked for identification.)
 8             - - -
 9   BY MR. GOLDMAN:
10        Q.   I'm going to mark 39, which
11   is a comment that you wrote --
12        A.   Right.
13        Q.   -- in the Lancet.  Do you
14   see that, sir?
15        A.   Yes, I do.
16        Q.   Directing your attention to
17   the first column, in the last sentence:
18   "It has remained unclear whether this
19   striking increase in myocardial
20   infarctions was related to" Vioxx
21   "directly, or the comparator agent,
22   naproxen, had significant anti-thrombotic
23   effects."  Do you see that, sir?
24        A.   Which paragraph are you on?
```

```
                                        Page 445
 1        Q.   The left column, first
 2   paragraph, do you see that you wrote "In
 3   particular," Vioxx "was associated with
 4   an unanticipated five-fold increase in
 5   myocardial infarctions compared with
 6   naproxen.  It has remained unclear
 7   whether this striking increase in
 8   myocardial infarctions was related to"
 9   Vioxx "directly, or the comparator agent,
10   naproxen, had significant anti-thrombotic
11   effects."  Did you write that?
12        A.   Absolutely.
13        Q.   Do you see that you wrote
14   that on August 21st, 2004?
15        A.   Yes.  But I -- you haven't
16   given me a chance to put this in context.
17   The point being is that the TARGET trial
18   is the largest trial ever done with a
19   COX-2 inhibitor --
20        Q.   Sir, I'm actually -- I just
21   asked if you wrote it.  That's all I
22   asked.
23             MR. KLINE:  You did not.
24   You absolutely did not.  Let him
```

Page 446

1  finish his answer.
2       MR. HAMELINE: So, let him
3  finish his answer.
4       THE WITNESS: Okay. You've
5  just taken the snippets that you
6  like out of this editorial, but if
7  you read the editorial carefully
8  and the TARGET paper which I was
9  asked by the Lancet to comment on,
10 which is the largest COX-2
11 inhibitor trial ever performed,
12 and it compared uniquely the
13 lumericoxib to naproxen or to
14 diclofenac. And what it showed is
15 there was a small protective
16 effect of naproxen. And what
17 you're not -- what you're
18 discounting, and that's why I
19 said, how could you possibly come
20 to this conclusion, is because in
21 the same editorial --
22 BY MR. GOLDMAN:
23    Q.   Well, you wrote it?
24    A.   -- that I conclude that "The

Page 447

1  continued commercial availability of
2  rofecoxib, without a black-box warning
3  for cardiovascular patients is indeed
4  troubling." And that's because the
5  TARGET trial was the most definitive
6  trial that's ever been performed in this
7  field to establish naproxen having a
8  mild, only mild, less than half the
9  benefit of aspirin. So, instead of a 25
10 percent reduction, we're talking about
11 maybe 10 or 12 percent reduction. So,
12 instead of the 500 percent protection
13 which would have been required for the
14 naproxen hypothesis, this blew it apart.
15 The TARGET trial and the commentary that
16 I wrote put this in perspective. It
17 completely took that premise about the
18 naproxen hypothesis and it blew it up.
19       MR. GOLDMAN: Move to
20   strike.
21       THE WITNESS: It was no
22   longer tenable at that point.
23       MR. GOLDMAN: Move to strike
24   as nonresponsive.

Page 448

1  BY MR. GOLDMAN:
2     Q.   Directing your attention
3  back to your JAMA article, sir:
4        MR KLINE: It was responsive.
5        THE WITNESS: Yes.
6  BY MR. GOLDMAN:
7     Q.   I want to talk about Figure
8  3 for just a minute, Page 957, Figure 3.
9     A.   JAMA article?
10    Q.   Yes.
11    A.   Figure 3?
12    Q.   Do you see that?
13    A.   Yes. I'm with you, yes.
14    Q.   Let me see if I understand
15 this and your analysis here.
16       What you did in your paper
17 was to take a placebo group and the rate,
18 annualized rate of MIs or heart attacks
19 in a placebo group, and you obtain those
20 numbers from four different aspirin
21 trials. Is that right?
22    A.   No. Actually, the trials
23 were pulled together by a British heart
24 journal paper, and we took that, which is

Page 449

1  the largest data set we could find, to
2  have as an anchor or reference to the
3  COX-2 inhibitor trials, yes.
4     Q.   Then you compared the
5  annualized rate of myocardial infarctions
6  in those four trials to the MI rate in
7  VIGOR and in CLASS, the Celebrex trial,
8  correct, sir?
9     A.   Yes.
10    Q.   And according to Figure 3,
11 this shows that Celebrex has a higher
12 annualized myocardial infarction rate
13 than VIGOR. Is that right, sir?
14    A.   That's right, but they're
15 very close. They're both .80, .74, yes.
16    Q.   You agree, sir, that there
17 are significant flaws in the analysis
18 that you conducted here in your JAMA
19 article, don't you?
20    A.   There are limitations. I
21 think flaws is a little strong, but
22 absolutely we acknowledge those
23 limitations.
24    Q.   One of the limitations in

Page 450

1  your analysis is that the aspirin trials
2  where you were looking at the MI rate in
3  the placebo group did not have any
4  patients who had rheumatoid arthritis;
5  correct?
6      A.  Right.  But the CLASS trial
7  was osteoarthritis as well.  And the
8  incidence of myocardial infarction in
9  rheumatoid arthritis is not well
10 characterized.
11     Q.  The FDA called your analysis
12 invalid and plainly inappropriate,
13 haven't they, sir?
14         MR. KLINE:  Objection.
15         THE WITNESS:  That's a very
16    broad interpretation of a letter
17    that Bob Temple sent to me
18    personally.
19         MR. GOLDMAN: Let me mark the
20    next exhibit, 39.
21              - - -
22         (Whereupon, Deposition
23    Exhibit Topol-39A, Letter
24    10-16-01, EJT 000323 - EJT

Page 451

1     000324, was marked for
2     identification.)
3              - - -
4         THE WITNESS:  Yes.
5  BY MR. GOLDMAN:
6     Q.  This is the letter that the
7  Food & Drug Administration wrote to JAMA
8  addressing your article, correct?  The
9  first sentence says, "The question,
10 addressed recently in JAMA."
11     A.  I would like to --
12        MR. KLINE:  Do I have a
13    line, continuing line?
14        MR. GOLDMAN:  Yes, you do.
15        THE WITNESS:  This letter
16    was not published in JAMA.  It was
17    forwarded to me from JAMA, and it
18    was from Dr. Temple.  It was not
19    -- it's Dr. Temple writing this.
20    It is not the FDA.
21 BY MR. GOLDMAN:
22    Q.  Is Dr. Temple somebody who
23 works for the FDA?
24    A.  Yes.  And I know him very

Page 452

1  well.  Yes.
2     Q.  Does Dr. Temple write to
3  JAMA on the first page, third paragraph,
4  last sentence, "Indeed, merely examining
5  the AMI rates" that's annualized
6  myocardial infarction rates "in the
7  control groups of the studies in the
8  meta-analysis shows the invalidity of
9  this approach."  Do you see that, sir?
10    A.  Which sentence are you?
11    Q.  Last sentence in the third
12 paragraph.
13    A.  Oh, yes, I see it, yes.
14    Q.  And then Dr. Temple shows
15 that in the aspirin studies that you
16 looked at, there were varying MI rates;
17 correct?
18    A.  Yes.
19    Q.  And says that "The placebo
20 rates in the various studies vary by more
21 than a factor of 3."  Do you see that,
22 sir?
23    A.  Yes.
24    Q.  On the next page, Dr. Temple

Page 453

1  writes "These highly variable results
2  suggest that this is probably a poor case
3  for any meta analysis."  And then he
4  continues.  Do you see that?
5     A.  Yes.
6     Q.  "The weakness of this
7  comparison goes well beyond being
8  'problematic,' the authors' term; it is
9  plainly inappropriate."  Do you see that,
10 sir?
11    A.  I certainly do, and I
12 responded to him.  And I also got a
13 response from him.  If you'd like to just
14 take this out of context.  Are we going
15 to go further into this, or are we just
16 going to leave it at that?
17    Q.  In the JAMA article --
18    A.  Dr. Temple sent me a letter
19 saying --
20        MR. GOLDMAN:  Can you please
21    instruct your witness to answer my
22    question?
23        MR. KLINE:  He's answering
24    your question.

Page 454

1  MR. GOLDMAN: It's not a
2  time to go on with a speech. If
3  plaintiffs' lawyers want to ask
4  questions, that's fine. I'm
5  asking questions here.
6  MR. HAMELINE: He has
7  answered your questions. You're
8  asking him questions. He's here
9  as a third-party witness.
10  MR. GOLDMAN: Fine.
11  MR. HAMELINE: You're asking
12  him what somebody else said,
13  wasting his time, unless you are
14  going to ask him more detail about
15  it in his personal testimony. If
16  you want to just show this to
17  somebody and authenticate it by
18  Dr. Temple, you can do that. If
19  you want to ask Dr. Topol what he
20  thinks about it or his concerns or
21  his response, that's appropriate
22  deposition testimony. But for you
23  to cut him off without allowing
24  him to testify about is the

Page 455

1  inappropriate step here, just to
2  put it in total context.
3  MR. STEIN: So, can he
4  finish what he's trying to say?
5  MR. GOLDMAN: No, he cannot.
6  - - -
7  (Whereupon, Deposition
8  Exhibit Topol-40, "Systematic
9  adjudication of myocardial
10  infarction end-points in an
11  international clinical trial,"
12  (Mahaffey, et al), Current
13  Controlled Trials in
14  Cardiovascular Medicine August
15  2001 Vol. 2 No. 4, (6 pages), was
16  marked for identification.)
17  - - -
18  BY MR. GOLDMAN:
19  Q.  I'm handing you an exhibit
20  that I marked as 40, and this is an
21  article, Dr. Topol, that I think you're a
22  co-author of. Do you recognize this,
23  sir?
24  A.  Yes.

Page 456

1  Q.  It's called "Systematic
2  adjudication of myocardial infarction
3  endpoints in an international clinical
4  trial." Do you see that?
5  A.  Yes.
6  Q.  And you published it in
7  August of 2001; right?
8  A.  Yes.
9  Q.  This is about the
10  adjudication process or the evaluation by
11  an independent committee of adverse
12  events that are reported by investigators
13  in clinical trials; correct? Yes?
14  A.  Yes.
15  Q.  Do you see that in your
16  conclusion here, Dr. Topol? You say
17  "End-point adjudication by a CEC" -- what
18  is that?
19  A.  That's a clinical event
20  committee.
21  Q.  -- "is important, to provide
22  standardised, systematic, independent,
23  and unbiased assessment of end-points
24  particularly in trials that span

Page 457

1  geographic regions and clinical practice
2  settings." Do you see that, sir?
3  A.  Yes, I do.
4  Q.  Do you agree that the
5  process that is used to adjudicate or
6  evaluate cardiovascular events is an
7  important one?
8  A.  I agree with that
9  completely, and there's also other issues
10  regarding CEC, clinical event committees,
11  that that statement doesn't encompass.
12  Q.  The JAMA article that you
13  published prompted debate in the
14  scientific community. Is that fair?
15  A.  I don't know about
16  scientific debate. There was debate in
17  the media with Merck consultants. There
18  wasn't much scientific debate that I'm
19  aware of. I guess there was some, but
20  most of the studies, as we reviewed this
21  morning, came out, the case control
22  studies, six out of seven, came out with
23  a significant adverse profile of Vioxx in
24  these large epidemiologic studies.

Page 458

1        MR. GOLDMAN: Move to strike
2    as nonresponsive.
3  BY MR. GOLDMAN:
4    Q.  Did you issue a press
5  release after you published your JAMA
6  article?
7    A.  You mean with the article?
8    Q.  Yes.
9    A.  Possibly with the article.
10   Q.  Did you hold a press
11 conference after you published the
12 article?
13   A.  We did not hold any press
14 conference.
15   Q.  Was your article picked up
16 by various newspapers including the Los
17 Angeles Times, the New York Times, the
18 New York Daily News, Newsweek and others?
19   A.  I don't remember all the
20 places it was picked up, but it was
21 certainly covered.  And I've already
22 mentioned the Wall Street Journal article
23 that came out that day.
24   Q.  Did you appear on television

Page 459

1  on NBC Nightly News and the Today Show to
2  talk about your JAMA article?
3    A.  I certainly remember the
4  Today Show, possibly the other one, but I
5  do remember the Today Show interview.
6    Q.  You said on direct
7  examination, sir, that "Vioxx's risk has
8  been evident since trials in 1999 and all
9  the way through the time of withdrawal"
10 in September of 2004.  Do you remember
11 saying that?
12   A.  Yes.
13   Q.  Then you said -- you said
14 that "There's been replication of
15 untoward significant excess of events of
16 heart attack, death and stroke."  Do you
17 remember testifying to that, sir?
18   A.  Yes, I do.
19   Q.  And you said that based on
20 that -- let me ask you this.
21       The studies that you're
22 referring to are VIGOR and 090.  Is that
23 right, sir?
24   A.  No.  I'm referring to the

Page 460

1  Juni cumulative meta analysis in which on
2  all of those randomized trials, I believe
3  there were something like 18 of them, it
4  was after VIGOR and 090 that had crossed
5  the line statistically where the drug was
6  proven to be hazardous for heart attack
7  excess, and that's when Juni and his
8  colleagues concluded that the drug should
9  have been withdrawn.
10       MR. GOLDMAN: Move to strike
11   as nonresponsive.
12 BY MR. GOLDMAN:
13   Q.  Did you at any point --
14       MR. HAMELINE: He can move
15   to strike anything that he wants
16   to.  It doesn't mean it's going to
17   be stricken.  It's his comment.
18 BY MR. GOLDMAN:
19   Q.  Did you at any point, Dr.
20 Topol, write an article before Vioxx was
21 withdrawn saying that it should be
22 withdrawn?
23   A.  The article that I cited
24 about the August 2004 black box warning

Page 461

1  was as far as I got in terms of the
2  recommendation.
3    Q.  You never recommended that
4  Merck withdraw Vioxx at any point while
5  it was on the market, correct, sir?
6    A.  I did not recommend its
7  withdrawal.
8    Q.  Let's talk about study 090.
9  I believe you said on direct, "All you
10 need to know is VIGOR and 090 for a
11 proven hazard of heart attack."  Was that
12 your testimony?
13   A.  As I pointed out just a
14 moment ago, that was in the context of
15 not only the two trials together which I
16 reviewed in that letter to the New
17 England Journal, but also the Juni
18 analysis, as I cited, where those two
19 studies on top of every other randomized
20 trial crossed the line in 2000 for
21 recommending that the drug had a
22 significant excess of heart attacks.
23   Q.  The Juni article that you
24 keep referring to is an article that was

Page 462

1  written after withdrawal, correct, sir?
2      A.   It was written before -- I
3  think the data was done before the
4  withdrawal.
5      Q.   The article was published
6  after withdrawal?
7      A.   The article was published
8  shortly after withdrawal, yes.
9      Q.   Is it your position, sir,
10 that -- withdrawn.
11          You were shown a clip from
12 60 Minutes where you said the following:
13 "Whenever you find a problem and you're
14 thinking maybe it's not a problem, you
15 want to see if there's independent
16 replication.  So, if you have study 090
17 and you want to discount that somehow,
18 then you have VIGOR.  You've got two
19 trials now, you have essentially
20 lightning striking twice.  That's
21 independent replication.  That's really
22 serious confirmation.  This is
23 unequivocal.  This is a problem."  Is
24 that what you said on national TV?

Page 463

1      A.   I said that, and I stand by
2  that, and that is, when you have two
3  trials --
4      Q.   I just asked you if you said
5  it on TV.
6      A.   Okay.
7          MR. HAMELINE:  Again, if all
8      you're going to do is ask him
9      whether he said something which is
10     already in the record from this
11     morning and not allow him to
12     follow up or you're not going to
13     ask him a question about this,
14     this is a complete waste of time.
15 BY MR. GOLDMAN:
16     Q.   Did you say --
17         MR. HAMELINE:  If it's a
18     foundation or an introductory
19     question, that's fine.
20         MR. STEIN:  It is rude to
21     this witness who is not a party to
22     the case.  He doesn't have to be
23     cut off.  It's just not the right
24     thing to do.

Page 464

1  BY MR. GOLDMAN:
2      Q.   Did you say, Dr. Topol, on
3  national TV that you believe that study
4  090 and VIGOR was essentially lightning
5  striking twice?
6      A.   That was independent
7  replication, and I made the analogy to
8  lightning striking twice as far as a
9  signal and as far as how important that
10 would be, yes.
11     Q.   Did you also say on national
12 TV that study 090 and VIGOR was
13 independent replication, serious
14 confirmation and an unequivocal problem?
15     A.   All that has to do with
16 replication, which is absolute -- yes.
17     Q.   Look at your JAMA article
18 for me, sir.
19     A.   Yes.  And I know exactly
20 what's going to be your line of
21 questioning here.
22     Q.   If you'd turn to Page 956 --
23     A.   Yes.
24     Q.   -- do you see in the middle

Page 465

1  column you devote a whole section to
2  study 085 and study 090?  Do you see
3  that, sir?
4      A.   That's right.
5      Q.   Yes?
6      A.   Yes.
7      Q.   And you talk about study 090
8  and 085 in this article, don't you, in
9  August of 2001?
10     A.   Yes.
11     Q.   You obtained information
12 about study 090 from the FDA's website,
13 correct, sir?
14     A.   Yes, but not thoroughly
15 enough at this time.
16     Q.   Did you say anything in your
17 JAMA article about study 090 being a
18 lightning strike?
19     A.   The only -- after more
20 careful review of 090 with the
21 misclassifications that Merck had in the
22 FDA document, it was obvious that the
23 data were wrong and that the correct data
24 are published in the New England Journal

Page 466

1  December 2004 correspondence that I put.
2      Q.  Did you say anything in
3  August of 2001 when you were writing your
4  article that study 090 was a lightning
5  strike?
6      A.  The data in this
7  paragraph --
8      Q.  I'm just asking if you said
9  it in the article.
10     A.     -- are using incorrectly
11 classified data from Merck.
12     Q.  I don't know what you're
13 relying on for that, but I'm not asking
14 you about that right now.
15     A.  Okay.
16     Q.  My question to you is
17 whether anywhere in this article you said
18 that study 090 was a lightning strike?
19     A.  No.  Because we didn't have
20 the right data at that time.
21     Q.  Did you say anywhere in this
22 article that study 090 and VIGOR were
23 independent replication?
24     A.  Again, we didn't have the

Page 467

1  correct 090 data at that time, and,
2  again, the study was finished a long time
3  before that and still has not yet been
4  published five years later -- six years
5  later now, I should say.
6      Q.  Did you say anywhere in your
7  JAMA --
8          MR. GOLDMAN:  Move to strike
9      as nonresponsive.
10 BY MR. GOLDMAN:
11     Q.  Did you say anywhere in your
12 JAMA article that study 090 and VIGOR was
13 serious confirmation of an unequivocal
14 problem?
15     A.  Again, the --
16     Q.  Did you say that in your
17 article?
18     A.  It would not be possible
19 without having access to the correct
20 data.
21     Q.  Did you say that in your
22 article?
23     A.  It couldn't be said in the
24 article.

Page 468

1      Q.  Dr. Topol, it's a very
2  simple question.
3          Did you say in JAMA anywhere
4  whether or not study 090 and VIGOR
5  represented a serious confirmation,
6  unequivocal problem?
7      A.  As I said, we could not have
8  possibly said it at that time --
9      Q.  Is that a no?
10     A.     -- with the data that we
11 had.  That's right, no.
12     Q.  You said the things that you
13 said about lightning striking twice,
14 serious confirmation, unequivocal problem
15 about 090 because you wanted to make
16 Merck look bad on TV.  Isn't that true,
17 sir?
18     A.  That is completely untrue.
19     Q.  Do you see in your JAMA
20 article when you were writing to doctors,
21 you wrote about study 085 and study 090
22 together; right?
23     A.  Yes.
24     Q.  You did that, sir, in JAMA

Page 469

1  because study 085 was a twin study, an
2  identical study to study 090; correct?
3      A.  It is not a twin study when
4  one turns out to come out differently
5  than the other.
6      Q.  I'm talking about the
7  design, not the result.  It was a twin
8  study, wasn't it, sir?
9      A.  No.  There were significant
10 differences in the design as well.  They
11 were both in osteoarthritis, but study
12 085 and 090 had differences, for example,
13 in the dose, and there was aspirin used.
14 There were different -- I don't remember
15 all the details, but 085 and 090 were not
16 identical.
17     Q.  Let's look at what you wrote
18 back at the time in JAMA.  Do you see
19 that study 085, you say, was "a
20 randomized, double-blind
21 placebo-controlled trial" versus -- and
22 that's the 12.5 milligram dose.  Do you
23 see that?
24     A.  Yes.

Page 470

1  Q. "Versus nabumetone," the
2  thousand milligram dose. Do you see
3  that, sir?
4  A. Yes.
5  Q. That's the identical dose of
6  Vioxx and nabumetone that was used in
7  study 090; correct?
8  A. Yes. But as it turns out,
9  there are differences, and I have to go
10 to the Targum report.
11 Q. Is this what you wrote in
12 your article, sir?
13 A. That is what's in the
14 article. But you're asking about whether
15 they are twin studies and the same, and
16 they're not all the same, no.
17 Q. Do you see that study 085
18 involved an evaluation of the treatment
19 of Vioxx in osteoarthritis patients who
20 had knee problems? Do you see that?
21 A. Yes.
22 Q. That's the same with 090,
23 correct?
24 A. Yes. The patient complaint

Page 471

1  of knee arthritis is the same.
2  Q. The duration of the trials
3  085 and 090 were also the same, six
4  weeks; correct?
5  A. That's what it says here.
6  I'd like to go back to the Targum report
7  to verify that.
8  Q. Do you see that in your
9  article that you wrote, patients in 085
10 were allowed to take low dose aspirin for
11 cardioprotection, and for 090, aspirin
12 for cardioprotection was also allowed.
13 Do you see that, sir?
14 A. That's what it says in the
15 article. Again, we had limited access to
16 090.
17 Q. Well, the access you had to
18 090, sir, is referenced on the last page
19 of your article in footnote 22; correct?
20 A. Which is the FDA website.
21 Q. You went to the FDA website
22 to find information from the FDA about
23 study 085 and 090, correct?
24 A. That's right, but that's not

Page 472

1  complete information. That's the
2  problem.
3  Q. Let me point out, sir, that
4  when you wrote your article at the time,
5  do you see that you wrote for study 085
6  that there were three total
7  cardiovascular events in the trial, one
8  for Vioxx, two for nabumetone, and none
9  for the placebo group? Is that what you
10 wrote in your JAMA article?
11 A. For study 085.
12 Q. Did you write for study 090
13 that there were 9 cardiovascular events,
14 6 for Vioxx, 2 for nabumetone and 1 for
15 placebo?
16 A. That's what it says in the
17 article.
18 Q. It was important to provide
19 information about 085 and 090 because you
20 wanted to give the people who read this
21 article information about both studies;
22 correct?
23 A. Well, we concentrated mainly
24 on VIGOR, so we gave the other two

Page 473

1  studies, 085 and 090, which at that time
2  we weren't as concerned, we didn't make
3  much of these two studies. That's true.
4      MR. HAMELINE: Do you
5      need -- you were looking for a
6      letter.
7      THE WITNESS: Yes. The
8      letter -- the letter in the New
9      England Journal that I am
10     referring to -- I just have to --
11     it's number 11 in the packet.
12 BY MR. GOLDMAN:
13 Q. Go ahead and look for it,
14 Dr. Topol. I'm going to keep asking you
15 questions because I have a time limit
16 here.
17 A. Go ahead.
18 Q. You never mentioned the
19 results of study 085 when you were on 60
20 Minutes, did you, sir?
21 A. No. Because all I'm talking
22 about is replication. I'm not talking
23 about other trials. There are many other
24 trials of Vioxx, of course.

Page 474

1  Q. You never mentioned the
2 results of study 085 when the plaintiffs'
3 lawyers were asking you questions, did
4 you, sir?
5  A. I wasn't asked about 085.
6  Q. The truth is, when you wrote
7 your JAMA article, you wrote that study
8 090 did not demonstrate the significant
9 increase in cardiovascular event rates
10 that you saw in VIGOR?
11  A. Only on more careful review
12 of that data, data that was not
13 accessible to us at that time, was I able
14 to find out, to drill down on these
15 events in 090. And let me just be
16 perfectly clear that when these data were
17 reviewed, and we can go back to the
18 Targum report and I can take you through
19 patient by patient why this
20 misclassification had led us astray. If
21 we had -- if this data were properly
22 classified by Merck in what was
23 transmitted to the FDA report, we would
24 have had much more definitive

Page 475

1 conclusions, but we weren't able to get
2 there. So, if I can go to the Targum
3 report and go right to the table, which
4 is really a critical table, and we can go
5 over that data.
6  Q. We will do that, Dr. Topol.
7 We're not going to do that right now, but
8 we will do that, I promise you.
9    Dr. Topol, when you did your
10 analysis before Vioxx was withdrawn in
11 August of 2001, you found that study 090
12 did not demonstrate the significant
13 increase in CV event rates,
14 cardiovascular event rates that were seen
15 in VIGOR; correct?
16  A. When we had incomplete
17 access to the data, yes. I've already
18 reviewed that.
19    MR. GOLDMAN: Move to strike
20    as nonresponsive.
21 BY MR. GOLDMAN:
22  Q. Dr. Topol, I'm going to show
23 you at Page 958 in the first column,
24 second full paragraph, you say, second

Page 476

1 sentence, "Two smaller studies (Study 085
2 and Study 090) of" Vioxx "that both
3 allowed the use of low-dose aspirin did
4 not demonstrate the significant increase
5 in cardiovascular event rate noted in
6 VIGOR." Did you write that, sir?
7  A. That was in our paper,
8 again, from the wrong data that we did
9 not have access to.
10  Q. I want to know what data you
11 had access to after this point that you
12 didn't have access to in --
13  A. I'll be happy to go over
14 that if you give me an opportunity.
15  Q. -- JAMA?
16  A. Page 32 of the Targum
17 report.
18  Q. The Targum report you saw
19 back in February 2001, sir?
20  A. Right, but then we had the
21 details of these patients, for example,
22 placebo, coronary occlusion, and we could
23 say had nothing to do with a heart
24 attack.

Page 477

1  Q. Dr. Topol, the Targum report
2 that you are relying on now for your
3 review that study 090 was a signal --
4  A. Yes.
5  Q. -- for cardiovascular risk
6 is the same report that you cite in your
7 JAMA article and that you relied on in
8 your JAMA article. Is that true?
9  A. And we had the details of
10 each of the patients.
11  Q. You had that also in
12 February 2001?
13  A. I did not have access to it.
14  Q. Well --
15  A. That is, how these events
16 were characterized, coronary occlusion,
17 there was one called atrial fibrillation,
18 there was one called congestive heart
19 failure. When we looked and went through
20 each -- when I looked and others looked
21 going through each of these events, then
22 the numbers changed.
23  Q. We'll talk about numbers
24 changing in a minute. Did you write, Dr.

120 (Pages 474 to 477)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f