Page 478

1   Topol, in August of 2001, that two
2   smaller studies -- withdrawn.
3           MR. KLINE: I apologize.
4   Where are you reading from?
5           MR. GOLDMAN: First column
6   of the JAMA article on Page 958.
7           MR. KLINE: Thank you.
8   BY MR. GOLDMAN:
9       Q.   Dr. Topol, did you write in
10  August of 2001 that "Two smaller studies
11  (Study 085 and Study 090)...did not
12  demonstrate the significant increase in
13  cardiovascular event rate noted in
14  VIGOR"? Did you write that?
15      A.   That's correct.
16      Q.   Did you also say in the next
17  sentence, "However, these studies had
18  smaller sample sizes, used only 25% of
19  the dose of" Vioxx "used in VIGOR, and
20  had few events for meaningful
21  comparison." Did you write that then,
22  sir?
23      A.   That's right.
24      Q.   You didn't say that on 60

Page 479

1   Minutes?
2           MR. HAMELINE: Can I just
3   note an objection. I know you
4   want to move through these
5   quickly, but raising your voice --
6           MR. GOLDMAN: I don't mean
7   to raise my voice.
8           MR. HAMELINE: I know you
9   don't. I'm just noting that for
10  the record. I think it's late in
11  the afternoon, and we all get
12  involved in the deposition.
13          MR. GOLDMAN: I promise you
14  if I I'm raising my voice, I
15  apologize, but that's not my
16  intent at all.
17          THE WITNESS: You're also
18  not allowing me to adequately
19  respond.
20          MR. HAMELINE: That is his
21  intent. That's different.
22          THE WITNESS: And you
23  continue to drill ahead, and I
24  don't have a chance to give you

Page 480

1       the data that's objectionable. We
2       were erroneously misled. Not only
3       was the suppression of 090 never
4       published that trial --
5   BY MR. GOLDMAN:
6       Q.   You knew that --
7           MR. HAMELINE: Could you let
8       him finish?
9           THE WITNESS: The trial was
10      completed in 1999. In 2001 we
11      could give a couple of years to a
12      near thousand patient trial not
13      being published. But now we're in
14      2004, and the study is still not
15      published, and we didn't have the
16      data to go into the table of
17      Targum until 2004 to find out that
18      the events that we misclassify in
19      our JAMA paper were actually very
20      different than what we had
21      estimated and what Targum even had
22      estimated. She never spent time
23      on this, and it's not a trivial
24      matter. This is a 978 patient

Page 481

1       trial with statistically
2       significant results of excess of
3       heart attacks.
4   BY MR. GOLDMAN:
5       Q.   Dr. Topol --
6           MR. GOLDMAN: Move to strike
7       as nonresponsive.
8   BY MR. GOLDMAN:
9       Q.   Dr. Topol, did you write
10      back when you were writing to doctors in
11      your JAMA article that study 090 had
12      small sample sizes, used only 25 percent
13      of the dose and had few events for
14      meaningful comparison? Was that your
15      statement in your article?
16      A.   That was the statement based
17      on the data we had at the time, yes.
18      Q.   I want to try to keep track
19      of the numbers that you've used over time
20      for study 090, and so I'm going to give
21      you a chart and ask you to confirm that
22      this is correct.
23          In your August 2001 JAMA
24      article for study 090, you said that

121   (Pages 478 to 481)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 482

1 there were 6 cardiovascular events in the
2 Vioxx group, correct?
3      A.   Right.
4           MR. KLINE:  What page are we
5 looking at here, Mr. Goldman?
6 BY MR. GOLDMAN:
7      Q.   2 in the nabumetone group?
8           MR. GOLDMAN:  It's the JAMA
9 article.
10          MR. KLINE:  Where are you
11 pointing to?
12          MR. GOLDMAN:  I'm pointing
13 to Page 956, second column, second
14 paragraph.
15          THE WITNESS:  Last sentence
16 of that paragraph, Study 090, 6, 2
17 and 1.
18 BY MR. GOLDMAN:
19     Q.   So, when you wrote your JAMA
20 article, you wrote that there were 6
21 cardiovascular events on Vioxx, 2 on
22 nabumetone, 1 on placebo; correct, sir?
23     A.   That's what we thought at
24 the time, unfortunately.

Page 483

1      Q.   Within a month after
2 withdrawal, you started to write 60
3 Minutes various e-mails; correct?
4      A.   Well, I had interaction with
5 Michael Radutsky, the producer, yes.
6      Q.   You talked about study 090
7 in those e-mails, didn't you, sir?
8      A.   Yes, I did.
9      Q.   What you told 60 Minutes
10 about Study 090 was different from what
11 you wrote in your JAMA article.  Isn't
12 that true, sir?
13     A.   By having had a chance to
14 review these data, and I already had
15 mentioned this morning I was asked about,
16 did I get a letter from Mr. Myers and
17 Bill Moyers, and when I got that, he sent
18 me this report to look over, and I
19 started to wonder about these events that
20 we, unfortunately, had not had adequate
21 detail on Page 32 of the Targum report.
22 And it turns out, the numbers, when you
23 characterize each of these patients
24 appropriately, are different.  Less

Page 484

1 events in the Vioxx and less events in
2 the placebo as well.  It changes.  And
3 it's a very important change.
4           MR. GOLDMAN:  Move to strike
5 as nonresponsive.
6           - - -
7           (Whereupon, Deposition
8 Exhibit Topol-41, E-mails, EJT
9 000191, was marked for
10 identification.)
11          - - -
12 BY MR. GOLDMAN:
13     Q.   Dr. Topol, I'm going to hand
14 you what I've marked as Exhibit 41.  This
15 is an e-mail that came from your files
16 that has a Bates Number at the bottom,
17 EJT 191.  Do you see that?
18     A.   Yes.
19     Q.   This is an e-mail at the
20 bottom that you wrote to Marlene
21 Goormastic on October 25, 2004; correct?
22     A.   Yes.
23     Q.   Is that your statistician?
24     A.   That's the statistician,

Page 485

1 that's right.
2      Q.   And you're writing to Ms.
3 Goormastic on October 25, this is a month
4 after withdrawal, to do some statistical
5 analysis; correct?
6      A.   Yes.  There was subsequent
7 to this as well, but this is one of the
8 interactions we had.
9      Q.   You ask Marlene at the
10 bottom, "I need to do a test comparing
11 three treatment arms - Vioxx versus
12 nabumetone and then Vioxx versus the
13 other two combined," meaning nabumetone
14 and placebo.  "Here are the data.  Vioxx,
15 7 out of 390 events."
16     A.   Right.
17     Q.   "Nabumetone 1 out of 392
18 events.  Placebo, 1 out of 196 events."
19 Is that what you wrote to her?
20     A.   These are events that are
21 not death, heart attack or stroke.  These
22 are events requiring cessation of the
23 drug.  This is a different part of the
24 Targum report.  But, yes, this is one of

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 486

1  the ancillary analyses that was
2  performed.
3      Q.   This is an analysis on study
4  090; correct?
5      A.   Study 090, but not on death,
6  heart attack and stroke.
7      Q.   I'm going to write down the
8  numbers for October 25 of 2004.
9      A.   These numbers do not
10 correspond to death, heart attack and
11 stroke.
12     Q.   I understand that.
13     A.   Okay.  Well, I don't know
14 what you're writing down because you're
15 comparing apples and oranges now.
16     Q.   7 events on Vioxx.
17     A.   They're different events.
18         MR. KLINE:  Are you going to
19 making a chart that's going to be
20 displayed?
21         MR. GOLDMAN:  All I'm doing
22 is trying to keep track of the
23 numbers, that's all.
24         MR. KLINE:  But for your own

Page 487

1  benefit?
2          THE WITNESS:  You're making
3  a table of events, of different
4  types of events.  These are events
5  that are requiring cessation of
6  drug with serious
7  cardiovascular -- I'm more focused
8  on my letter in the New England
9  Journal and what I'm talking about
10 with 60 Minutes and those things
11 you're interested in on death,
12 heart attack and stroke, and
13 they're different numbers.
14 BY MR. GOLDMAN:
15     Q.   The numbers that you're
16 using here on October 25 have to do with
17 the numbers of Vioxx patients who had to
18 be discontinued in the 090 study; right?
19     A.   With serious cardiovascular
20 adverse events, different than death,
21 heart attack and stroke.  That's a
22 different table.
23     Q.   So, the numbers that you
24 have are 7, 1 and 1.

Page 488

1      A.   Okay.
2      Q.   And you ask Ms. Goormastic
3  at the bottom, "Can you or someone run
4  this and get back to me, the p values,
5  RR, 95% CI?"  Do you see that?
6      A.   Yes.
7      Q.   What you are asking her to
8  do -- a p-value is a test for statistical
9  significance; correct?
10     A.   Yes.  Yes.
11     Q.   Relative risk is RR?
12     A.   Yes.
13     Q.   And CI is confidence
14 interval, and that's another test for
15 statistical significance; correct?
16     A.   Yes.
17     Q.   Ms. Goormastic writes back
18 to you that same day above and says "The
19 chisquare," that's a type of statistical
20 test, correct, "including all 3 groups is
21 p equals .06," and then here's the answer
22 to your question:  "For Vioxx versus
23 nabumetone chisquare" p-value is ".03."
24 Do you see that, sir?

Page 489

1      A.   Yes.  I see that, but again,
2  it's not related to my principal
3  interest.
4      Q.   The .03, just so the jury
5  can understand and I can understand, if a
6  p-value is less than .05, that means that
7  it's statistically significant, the
8  result; correct?
9      A.   That's right.
10     Q.   Here, this is showing a
11 statistically significant result for
12 .03; is that right?
13     A.   That's correct, but you're
14 comparing -- you don't even know what
15 these events are.  So, you're just
16 looking at some numbers.  You don't know
17 what this analysis is about.
18         MR. GOLDMAN:  Move to strike
19 as nonresponsive.
20 BY MR. GOLDMAN:
21     Q.   The next line says --
22         MR. KLINE:  How can you
23 possibly say that?  How can you
24 possibly say his answer is

123  (Pages 486 to 489)

Page 490

1    nonresponsive?
2    BY MR. GOLDMAN:
3        Q.   -- relative risk.  Do you
4    see you wrote "Relative risk for Vioxx is
5    7" -- I'm sorry, this is what Ms.
6    Goormastic wrote -- "is 7."  And then you
7    have a confidence interval here that she
8    writes ".9 - 56.9."  Do you see that in
9    the parenthesis?
10       A.   Yes.
11       Q.   And if the confidence
12   interval that is described there includes
13   the number 1, that is, if one falls
14   within .9 to 56, that means that the
15   result is not statistically significant;
16   correct, sir?
17       A.   That's correct.
18       Q.   So, Ms. Goormastic writes:
19   "I was puzzled why this confidence
20   interval covers 1 when the p-value is
21   less than .05.  I think it's due to the
22   small number of events" used.  Do you see
23   that?
24       A.   Yes, I do.

Page 491

1        Q.   You had talked about the
2    small number of events in your JAMA
3    article; right?
4        A.   That's correct.
5        Q.   Then she says, "When I ran a
6    logistic regression model" that's another
7    way of calculating statistical
8    significance, right, "I got very similar
9    results, a relative risk of 7.1," and
10   then the confidence interval there covers
11   1.  Correct, sir?
12       A.   That's correct.
13       Q.   Ms. Goormastic is telling
14   you that she's puzzled because she is
15   seeing with one test there's a
16   statistically significant difference and
17   with another one there's not?
18       A.   Yes, but this is really an
19   immaterial look at the data.  It's not on
20   death, heart attack and stroke.  And it's
21   not with the final review of the events,
22   as you've not allowed me to go through
23   patient by patient of study 090 from
24   Table 32 in the Targum report.  You've

Page 492

1    not allowed me to do that.
2            MR. GOLDMAN:  Move to strike
3    as nonresponsive.
4    BY MR. GOLDMAN:
5        Q.   The reason that Ms.
6    Goormastic is puzzled, Dr. Topol, is
7    because one test shows that there's no
8    statistically significant difference, and
9    another test shows that there is;
10   correct?
11       A.   But it's not on the events
12   of interest, Mr. Goldman.
13       Q.   I'm not asking about the
14   events of interest.
15           You wrote the e-mail here.
16   Sir, you wrote an e-mail to your
17   statistician in October of 2004 because
18   you thought that this answer was
19   important.  Is that true?
20       A.   No.  This is not the e-mail
21   of importance.  You've picked this
22   e-mail.  There are other e-mails that are
23   considerably more important with my
24   statistician, and you just picked this

Page 493

1    one.
2        Q.   We'll get to that one, sir.
3        A.   Okay.
4        Q.   When you received this
5    e-mail from Ms. Goormastic, it wasn't
6    clear to you, sir, whether there was a
7    statistically significant difference or
8    not as reflected in Ms. Goormastic's
9    e-mail; correct?
10       A.   That really was not my
11   focus.  I see what you're saying here,
12   but that was not my concern.  The events
13   here for death, heart attack and stroke
14   were unclear.  This is not what this
15   refers to.
16       Q.   What time did you write this
17   e-mail?  I'm sorry, what time --
18   withdrawn.
19           What time did Ms. Goormastic
20   write her e-mail to you on October 25,
21   2004?
22       A.   She wrote that at 4:42 p.m.
23           - - -
24           (Whereupon, Deposition

124  (Pages 490 to 493)

Page 494

1     Exhibit Topol-42, E-mails, EJT
2     000192, was marked for
3     identification.)
4     - - -
5  BY MR. GOLDMAN:
6     Q.   I'm going to show you an
7  e-mail that I've marked as Exhibit 42.
8  This came from your files, Dr. Topol, and
9  I want to focus on the bottom e-mail.
10  This is an e-mail from you to Michael
11  Radutsky?
12     A.   Radutsky.
13     Q.   Who is that?
14     A.   He's the producer for CBS 60
15  Minutes.
16     Q.   What time did you write this
17  e-mail to the producer of 60 Minutes?
18     A.   14 minutes or so later.
19     Q.   You wrote this e-mail to 60
20  Minutes at 4:46 in the afternoon,
21  correct?
22     A.   Right.
23     Q.   You received an e-mail from
24  Ms. Goormastic at 4:42, four minutes

Page 495

1  earlier; correct?
2     A.   That's right.
3     Q.   And you write to 60 Minutes,
4  "Michael, Great news on the Statistics
5  for Study 090.  The difference between
6  Vioxx and nabumetone is significant, P
7  equals .03."  And then you continue.  Do
8  you see that, sir?
9     A.   I see that.  That's not the
10  end of the story here, though.
11     Q.   You forwarded --
12     A.   You just have an ice pick
13  view of this interaction.
14     Q.   Dr. Topol, you forwarded --
15  do you see the forward "FW" in the
16  subject line of your e-mail to 60
17  Minutes?
18     A.   Yes.
19     Q.   You forwarded the e-mail
20  that Ms. Goormastic sent to you, correct,
21  sir?
22     A.   Yes, yes.
23     Q.   But you didn't include what
24  Ms. Goormastic said to you about being

Page 496

1  puzzled and about there being no
2  statistically significant difference with
3  respect to the confidence interval?  You
4  changed that and wrote that there was a
5  statistically significant difference?
6     A.   Where is that?
7     Q.   Do you see in your e-mail to
8  60 Minutes after you say "Great news.
9  The difference between Vioxx and
10  nabumetone is significant" and you cite
11  only the p-value.  Do you see that, sir?
12     A.   Yes.
13     Q.   You didn't tell 60 Minutes
14  in that e-mail that your statistician was
15  puzzled about these numbers, did you?
16     A.   They were not final numbers.
17  As I already indicated you, these were
18  not the final numbers for death, heart
19  attack and stroke.  And so I will take
20  the opportunity to amplify here because
21  you're trying to take this down the wrong
22  path.  On October 25th, the data were
23  inconclusive because we did not have a
24  chance to learn about these events in the

Page 497

1  Targum table, these patients on death,
2  heart attack and stroke.  They were not
3  reviewed.  I did not have the details of
4  any of those patients.  So, these events
5  that we're looking at were not the
6  interested field of cardiovascular
7  endpoints of deaths, of all cause, heart
8  attack and stroke.
9     Q.   You found it important
10  enough to write to 60 Minutes four
11  minutes after your statistician wrote to
12  you to tell them about what you thought
13  was great news, and you characterized --
14     A.   This was the beginning of
15  the analysis, only the beginning.
16     Q.   Do you see that 60
17  Minutes --
18     A.   This is a work in progress,
19  and you're just taking one part of that
20  work.
21     Q.   Do you see that 60 Minutes
22  writes back to you on the top and says
23  "Remarkable" and then continues. "So
24  then how does the company ignore numbers

Page 498

1  like that?  How does that not warrant
2  further study?"  Et cetera.  And he says
3  "How can they call the study
4  'statistically insignificant'?"  Do you
5  see that?
6      A.   I see that.
7      Q.   Did you ever write back to
8  60 Minutes and say that your statistician
9  told you that under another test there
10  was no statistically significant
11  difference for 090?
12      A.   I discussed this extensively
13  with Michael Radutsky on the phone, and I
14  told him that we needed -- before this
15  could be wrapped up and before I could
16  make any statements about study 090, I
17  needed to have all the information
18  regarding the patients with events,
19  putative events of this trial, which I
20  didn't have at this time.  So, these data
21  did not -- again, I've said it at least
22  three or four times.  These data did not
23  reflect the final categorization of
24  death, heart attack or stroke for study

Page 499

1  090.
2      Q.   Did you in your e-mail to
3  Doctor -- I'm sorry, withdrawn.
4           Did you in your e-mail to 60
5  Minutes say that your statistician was
6  puzzled?  Yes or no?
7      A.   I discussed it on the phone.
8      Q.   Your testimony is that you
9  discussed your statistician being puzzled
10  on the phone, but you told 60 Minutes
11  that there was --
12      A.   No.
13      Q.   -- there was a significant
14  difference here?
15      A.   I discussed with Michael
16  Radutsky that more work had to be done,
17  that we can't use any of these numbers
18  until we get all the details on these
19  patients of this page 32 in the Targum
20  report.  So, all this was preliminary
21  work, and we still didn't have a sense of
22  where we were with the death, heart
23  attack and stroke story.  I discussed
24  that with him.

Page 500

1      Q.   You told 60 Minutes that
2  this was great news about study 090
3  because you wanted to make Merck look
4  bad.  Isn't that true, sir?
5      A.   All I wanted was the truth
6  about this drug and the truth about study
7  090, and it was becoming increasingly
8  clear, now we're in 2004, we're now five
9  years into this whole story, and this
10  trial has never been published.  And we
11  never ran the stats in the JAMA paper.
12  We never actually did the statistics on
13  090 or 085.  We didn't spend enough time
14  going into the details of this, and then
15  it became apparent that there were
16  miscategorizations when this was
17  carefully reviewed.
18      Q.   You said in your JAMA paper
19  that the numbers were too small for
20  meaningful comparison for 090.  Isn't
21  that right, sir?
22      A.   They were not statistically
23  significant, but they were
24  mischaracterized.  So, how can one make a

Page 501

1  definite conclusion.  We were working
2  with erroneous categorization of
3  endpoints.
4           MR. GOLDMAN:  Move to strike
5  as nonresponsive.
6           Let's take a break.
7           MR. HAMELINE:  Sure.
8           THE VIDEOTAPE TECHNICIAN:
9  Off the record, 5:18.
10           - - -
11           (Whereupon, a recess was
12  taken from 5:18 until 5:28 p.m.)
13           - - -
14           THE VIDEOTAPE TECHNICIAN:
15  Back on the record at 5:28.
16           - - -
17           (Whereupon, Deposition
18  Exhibit Topol-43, E-mails, EJT
19  000190, was marked for
20  identification.)
21           - - -
22  BY MR. GOLDMAN:
23      Q.   Dr. Topol, I've handed you
24  what I've marked as Exhibit 43 --

126  (Pages 498 to 501)

Page 502

1    A.   Yes.
2    Q.   -- which is an e-mail,
3  November 12, 2004 from you to your
4  statistician again, and this is now two
5  days before you go on 60 Minutes.
6  Correct?
7    A.   That's right.
8    Q.   Now you tell Ms. Goormastic
9  to -- and you say regarding 60 Minutes
10  coming up quickly, "can you run the
11  difference between 5 out of 390 versus 1
12  out of 588 for odds ratio, 95 percent
13  confidence interval, chi square and
14  p-value."  Do you see that?
15    A.   Yes.  These are the same
16  numbers as in the New England Journal
17  paper of December 30, 2004.
18    Q.   So, these are the numbers
19  that you say are the right numbers to
20  analyze study 090; right?
21    A.   That is, before we could
22  finalize the appropriate numbers, we had
23  to have all the information for each
24  patient of whether they had an event or

Page 503

1  not from this original table, and this is
2  now where they are all properly
3  classified for death, heart attack or
4  stroke.
5    Q.   The information that you
6  looked at, sir, when you came up with
7  your numbers, 7,1,1, back in October,
8  came from Ms. Targum's report, correct,
9  sir?
10    A.   The original information,
11  and then we got all the details of each
12  patient subsequently.
13    Q.   You got the details of all
14  the patients when you wrote that the
15  numbers were 7, 1 and 1 --
16    A.   No.
17    Q.   -- in October of 2004?
18    A.   No.  We did not have the
19  details.  All I had was this table.
20  There are multiple tables in the Targum
21  report.  I did not have the appropriate
22  clinical history for each patient and how
23  the endpoint was categorized until
24  shortly before this e-mail.

Page 504

1    Q.   So, the basis for your view
2  that there are five events on Vioxx, 1 on
3  nabumetone and none on placebo come from
4  your review of Dr. Targum's report;
5  correct?
6    A.   No.  No.  That's only the
7  beginning.  Then we had -- not in Dr.
8  Targum's report.  There's a detailed
9  account of each patient and how that
10  diagnosis of coronary occlusion or
11  congestive heart failure was made.  And
12  remember, the endpoint that is the
13  principal endpoint for clinical trials is
14  death, heart attack or stroke.  So, the
15  final determination of these events for
16  study 090 was based on not just the
17  Targum report, but all those details that
18  were not available to us until we got the
19  subsequent information.
20    Q.   Now, you wrote "5 out of
21  390" and then you wrote "1 out of 588."
22  Do you see that in your e-mail?
23    A.   Yes.  And that's exactly the
24  same as the New England Journal

Page 505

1  subsequent correspondence.
2    Q.   The 588, which is the
3  denominator here, that is calculated by
4  taking the number of patients in the
5  nabumetone group and adding them to the
6  number of patients in the placebo group;
7  correct?
8    A.   Those are control groups for
9  the trial, that's right.  They're not
10  experimental groups.
11    Q.   So, what you did was you
12  took 5 events on Vioxx, and you compared
13  them to 1 event in placebo and nabumetone
14  combined; correct?
15    A.   That is how this analysis
16  was performed with the appropriate
17  categorization of the endpoints and the
18  statistics.
19    Q.   When you wrote your JAMA
20  article, sir, on Page 955 --
21    A.   Yes.
22    Q.   -- you describe the events
23  that occurred with 090 as 6, 2 and 1 --
24    A.   Right.

127  (Pages 502 to 505)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 506

1    Q.   -- and you didn't group the
2  nabumetone and placebo groups, did you,
3  sir?
4    A.   And that's precisely because
5  we had misinformation.  We had atrial
6  fibrillation as an event which shouldn't
7  have been.  We had congestive heart
8  failure.  We had coronary occlusion,
9  which wasn't a heart attack, and it was
10  very clear that the more meaningful way
11  to analyze the trial, just as Juni had
12  done, would be to compare controls with
13  the experimental drug.
14    Q.   When you wrote your JAMA
15  article and the events were 6, 2 and 1,
16  you wrote that those numbers were too
17  small for meaningful comparison; correct?
18    A.   With the erroneous data,
19  they were not appropriate to make a final
20  judgment.
21    Q.   The numbers, 6, 2 and 1 were
22  so small that they couldn't be used for
23  meaningful comparison.  Correct?
24    A.   I wouldn't use the term

Page 507

1  exactly, no.  That's not the term that we
2  use.
3    Q.   Well, if we look back at
4  your JAMA article, page --
5    A.   It says, "had few events for
6  meaningful comparison."  "Few events."
7  That's right.
8    Q.   So, when the events were 6,
9  4 -- I'm sorry, withdrawn.
10       When the events were 6, 2
11  and 1 as you analyzed them in your JAMA
12  article for Vioxx, nabumetone and
13  placebo, you considered that to be few
14  events for meaningful comparison;
15  correct?
16    A.   Well, there was no
17  significant difference.  So, that means
18  there's no meaningful difference, yes.
19    Q.   So now in November of 2004,
20  when you say the numbers now are 5 for
21  Vioxx, 1 for nabumetone and 0 for
22  placebo, there's actually fewer events in
23  your analysis from November of 2004 than
24  there were in your analysis in JAMA;

Page 508

1  correct?
2    A.   Correct.  But the events are
3  correct now, and they are the appropriate
4  irrevocable endpoints of death, heart
5  attack and stroke and not admixed with
6  things like atrial fibrillation or a
7  chronic occlusion that had nothing to do
8  with a heart attack.  Now we had a
9  difference of 1.3 versus 0.2 percent.
10  And what I showed in the letter in the
11  correspondence in the New England Journal
12  with those numbers is that with the exact
13  same Vioxx incident, 1.3 percent with
14  those five events that you just cited was
15  exactly the same as in the VIGOR trial,
16  1.2 percent for death, heart attack and
17  stroke.  And there was a 7.6, that's 760
18  percent excess compared with the
19  controls, whether it be naproxen in VIGOR
20  or nabumetone and placebo in the current
21  study 090 that we're discussing.
22       MR. GOLDMAN:  Move to strike
23    everything after the answer to my
24    question.

Page 509

1  BY MR. GOLDMAN:
2    Q.   Dr. Topol --
3       MR. KLINE:  Move to include
4    as very responsive.
5  BY MR. GOLDMAN:
6    Q.   Dr. Topol, the reason you
7  asked your statistician to compare the
8  number of events on Vioxx to the number
9  of events on nabumetone and placebo
10  combined is because you know that if you
11  compare the number of events on Vioxx to
12  just the number of events on nabumetone,
13  there is no statistically significant
14  difference?
15    A.   That's not the appropriate
16  comparison.  We already went through
17  this, that is, when you have drugs that
18  are a control arm that are widely
19  accepted and have been around for 10 or
20  20 years, and you have an experimental
21  drug, it is appropriate, just as Juni did
22  in his analysis in the Lancet, and just
23  as we did here, to compare the control
24  arms with the experimental arm, which in

128  (Pages 506 to 509)

Page 510

1  this case was Vioxx.
2      Q.   You didn't do that in your
3  JAMA article, did you, sir?
4      A.   We didn't do it in the JAMA
5  article, but we didn't have the right
6  data. So, of course, we couldn't do it
7  in the JAMA paper. We had erroneous
8  categorization of endpoints.
9      Q.   The reason that you combined
10 nabumetone and placebo and compared that
11 to Vioxx is because you know that if you
12 compare the number of events on Vioxx to
13 placebo for study 090, there is no
14 statistically significant difference;
15 correct?
16     A.   That is not the reason why
17 that analysis was performed that way.
18     Q.   Am I correct, sir, that if
19 you compare 5 events on Vioxx to 0 events
20 on placebo, there's no statistically
21 significant difference?
22     A.   I don't know. We'd have to
23 run the statistics on that.
24     Q.   You never ran that, did you?

Page 511

1      A.   I don't remember that we ran
2  it. I don't have it at hand.
3      Q.   The investigators who
4  conducted study 090 did not compare Vioxx
5  against nabumetone and placebo, did they,
6  sir? They kept the three arms separate?
7      A.   Maybe you can tell me, Mr.
8  Goldman, why was this paper with this
9  extent of harm to patients, why was it
10 never published?
11     Q.   Can you answer my question,
12 sir?
13     A.   I'm just asking you, can you
14 help me to understand why the paper was
15 never published six years later on nearly
16 1,000 patients?
17         MR. GOLDMAN: I have half an
18     hour left. Can you please ask
19     your witness not to ask any
20     questions.
21         MR. KLINE: I think the
22     answer is a rhetorical question.
23     I move to include it. Simply
24     rhetorical.

Page 512

1  BY MR. GOLDMAN:
2      Q.   Dr. Topol --
3      A.   I just want to point out
4  that's what has made it so difficult for
5  us to do an analysis, because we never
6  had the paper, the manuscript written on
7  1,000 patients. So, we had to work in a
8  very difficult way, and that's what
9  you're trying to get at, is why didn't
10 you do this or why didn't do that. We
11 didn't have the data at hand because it
12 was never published.
13     Q.   Dr. Topol, the investigators
14 who conducted study 090 did not compare
15 Vioxx to placebo and nabumetone combined,
16 they compared Vioxx to just placebo or
17 nabumetone; is that right?
18     A.   How would we ever know that?
19 How did you know that? I've never seen
20 any paper. How can you say something
21 like that? Can you show me that
22 evidence?
23     Q.   Do you know, sir, that the
24 protocol for study 090 called for pair

Page 513

1  wise comparisons?
2      A.   Who has ever seen the
3  protocol?
4      Q.   Well, let me show it to you.
5      A.   Okay.
6      Q.   This is Exhibit 44.
7          MR. KLINE: See, you got
8      discovery from them.
9          THE WITNESS: This will be
10     interesting.
11             - - -
12         (Whereupon, Deposition
13     Exhibit Topol-44, "MRL Clinical
14     Study Report, Multicenter Study:
15     A Randomized, Placebo-Controlled,
16     Parallel-Group, Double-Blind
17     Study to Evaluate the Efficacy
18     and Safety of MK-0966 (Rofecoxib)
19     12.5 mg Versus Nabumetone 1000 mg
20     in Patients with Osteoarthritis
21     of the Knee (Protocol 090),"
22     MRK-00420016832 -
23     MRK-00420016849, was marked for
24     identification.)

Page 514

1           - - -
2   BY MR. GOLDMAN:
3       Q.   This is the clinical study
4   report for study 090.  Do you see that,
5   sir?
6       A.   This was not in the FDA
7   database.
8           MR. KLINE:  Objection.  It's
9   a piece of the study.  It's not
10  the whole study.
11          MR. GOLDMAN:  That's
12  correct.  This is a piece.
13          THE WITNESS:  Table of
14  contents.
15          MR. KLINE:  I'm suggesting
16  to Dr. Topol's counsel to have him
17  see the whole report.
18          MR. GOLDMAN:  That's fair,
19  Dr. Topol.
20          MR. KLINE:  Like everything
21  that was provided to you today.
22          THE WITNESS:  I've never
23  seen the report of this study.
24  BY MR. GOLDMAN:

Page 515

1       Q.   Dr. Topol, I'm showing you
2   an excerpt, that's true, an excerpt of
3   the clinical study report --
4       A.   Okay.
5       Q.   -- and if you'd turn to the
6   14th page and the 15th page, do you see
7   that the investigators kept the Vioxx
8   nabumetone and placebo groups separate in
9   the chart at the bottom of Page 14?
10          MR. HAMELINE:  Let me just
11  note the objection.  We're not
12  here on behalf of either party.
13  What Dr. Topol wants to do is give
14  a fair and complete explanation of
15  the research that he produced in
16  this field, and you're giving him
17  a document.
18          MR. GOLDMAN:  He asked for a
19  document.
20          MR. HAMELINE:  Well, he
21  asked for this document six years
22  ago.  You've given him a piece of
23  the document you're asking him to
24  read in a brief period of time.

Page 516

1   That's my objection.
2           THE WITNESS:  This is very
3   simple.  Mr. Goldman, the problem
4   with this -- you're talking about
5   efficacy.  And it's fine if you
6   want to look at efficacy if you'd
7   like on each column, rofecoxib,
8   12-and-a-half milligrams, Vioxx a
9   low dose, and you want to look at
10  the nabumetone and placebo, where
11  is the safety, but where is the
12  heart attack data in this report.
13  And why isn't that combined?
14  That's a legitimate and a vital
15  comparison that needs to be made
16  on the data.
17  BY MR. GOLDMAN:
18      Q.   If you'd turn to Page 16, do
19  you see that the safety information, the
20  clinical adverse experiences were broken
21  down by Vioxx, nabumetone and placebo and
22  not combined?
23      A.   Are you on Page 16 or which
24  page are you on here?  16?

Page 517

1       Q.   Yes.
2       A.   Now, I don't see anything
3   with death, heart attack and stroke here.
4       Q.   Can you answer my question,
5   sir?  Do you see that the safety
6   information maintained by the
7   investigators was broken down, Vioxx,
8   nabumetone and placebo?
9           MR. KLINE:  Objection.  May
10  I have an objection to the line of
11  questioning?
12          MR. GOLDMAN:  Yes.
13          MR. KLINE:  He doesn't even
14  have the whole document.
15  BY MR. GOLDMAN:
16      Q.   Do you see that, sir?
17      A.   I see how it's displayed.  I
18  don't agree with that as being the only
19  analysis that should be done also with
20  respect to controls, nabumetone and
21  placebo as compared to the experimental
22  arm, Vioxx.  It should have been done
23  that way.  That doesn't mean -- if Merck
24  wants to present the data this way and

Page 518

1  manipulate the data that way, that's
2  their prerogative.  That doesn't mean
3  it's correct.
4          MR. GOLDMAN:  Object to the
5      form -- I'm sorry, move to strike
6      as nonresponsive.
7  BY MR. GOLDMAN:
8      Q.   Can you answer my question,
9  sir?
10     A.   I'll be happy to.
11     Q.   Does the table that you
12 looked at on Page 16 reflect that the
13 safety information was maintained in
14 three different columns, Vioxx,
15 nabumetone and placebo?
16     A.   The safety information I'm
17 interested in that I've been writing
18 about --
19     Q.   That's not my question.
20     A.   -- that I've been concerned
21 about this drug is not included in that
22 table, and just because it's displayed
23 under the little excerpt of this report
24 which has never been published for the

Page 519

1  medical community to see doesn't mean
2  that it's the only way and the proper way
3  to -- I don't accept that.
4      Q.   Dr. Topol, you have said on
5  several occasions that study 090 was not
6  published; correct?
7      A.   That's correct.
8      Q.   You knew that study 090 was
9  not published when you wrote your JAMA
10 article, didn't you, sir?
11     A.   Well, I already pointed out
12 earlier in our discourse, in our
13 discussion, it was 2001 -- well, it was
14 March of 2001 when we wrote that paper,
15 and the study, we didn't even know when
16 it was done, study 090.  So, we give some
17 allowance for when it might be published.
18 But now in 2004, something is very
19 concerning because it's now multiple
20 years later, it's nearly 1,000 patient
21 trial, it's not a trivial cohort, and it
22 still hasn't shown up in the literature.
23 So, there's a big difference between
24 March of 2001 a year or so, two years

Page 520

1  after the study was completed versus six
2  years after the study was completed.
3  That's a big gap.
4          MR. GOLDMAN:  Move to strike
5      as nonresponsive.
6  BY MR. GOLDMAN:
7      Q.   Dr. Topol, did you know in
8  August of 2001 when you wrote your JAMA
9  article that study 090 was not published?
10     A.   Well, I didn't know it was
11 published.  So, we have to assume that
12 since we couldn't cite it directly, we
13 only could cite the FDA -- we assumed it
14 was a manuscript in review, soon to be
15 published -- at the time when we
16 published that paper, we didn't know of
17 its publication.
18     Q.   You also know that Merck
19 didn't publish study 085 either; right?
20     A.   They did publish 085.  In
21 fact, there is a publication, and I can
22 get that for you if you'd like.  It was
23 published indeed.  It was 1,000 patient
24 similar, but I guess Merck was happy with

Page 521

1  the results, but it was published.
2      Q.   Well, if you can show me
3  today where Merck published study 085 but
4  not 090, I'd like to see that.
5      A.   It's published in the Juni
6  paper.
7      Q.   That's not a publication,
8  sir.
9      A.   No.  What I'm saying is it's
10 cited in the Juni paper.
11     Q.   Let's look at the Juni
12 paper.
13     A.   I believe it's cited in
14 there.  It's an osteoarthritis trial, so,
15 I don't remember the first author, but it
16 was in his analysis, and so it was 1,000
17 patients.  I'm trying to remember the
18 exact number, 085.  It was -- we have to
19 back it out.  085 had 1,042 patients, and
20 somewhere in this table of Figure 3, that
21 is, there's 1,042 patient trial that's
22 included in here and it's cited.  I just
23 don't --
24     Q.   Dr. Topol, that 1,042 that

131 (Pages 518 to 521)

Page 522

1  you're referring to in Table 1 of Juni's
2  paper which is on Page 2023 is the same
3  1,042 number that you have in your JAMA
4  article --
5      A.   Right.
6      Q.    -- when you described a
7  number of patients in 085.  Correct, sir?
8      A.   No.  But I'm trying to find
9  the reference for that now, sir, that is,
10  the publication.  There's a publication
11  based on these -- on this trial, 085.
12  Let me see if I can find it in here.
13  085, it's by Kivitz, et al, 2004.  What's
14  that number, Joe?
15          MR. HAMELINE:  22.
16          THE WITNESS:  Reference 22.
17      Okay.  Here it is.  It was
18      published in the Journal of
19      American Geriatric Society in 2000
20      and -- Reference Number 22, 2004,
21      Volume 52.  It's by Kivitz, et al.
22      "Efficacy and safety of rofecoxib
23      12-and-a-half milligrams versus
24      nabumetone 1,000 milligrams in

Page 523

1      patients with osteoarthritis of
2      the knee:  A randomized control
3      trial."  So it was indeed was
4      published --
5  BY MR. GOLDMAN:
6      Q.   Dr. Topol --
7      A.    -- unlike study 090.
8      Q.   Dr. Topol, what you are
9  looking at is a publication after
10  withdrawal; correct?
11          MR. KLINE:  Which means
12      when?
13          THE WITNESS:  No.  It was
14      published before the withdrawal.
15      That was published in early 2004
16      in the Journal of the American
17      Geriatric Society.  It's an
18      eight-page manuscript published by
19      Kivitz and Colley before the
20      withdrawal.
21  BY MR. GOLDMAN:
22      Q.   I don't have that here, Dr.
23  Topol.
24          MR. GOLDMAN:  I'm objecting,

Page 524

1      lack of foundation.
2          THE WITNESS:  It's right
3      here.  (Indicating.)
4          MR. GOLDMAN:  I don't see
5      the date.
6  BY MR. GOLDMAN:
7      Q.   But Dr. Topol, let me ask
8  you something.  Withdrawn.
9          When you wrote your article
10  in JAMA in August of 2001, you knew 090
11  was not published, and you didn't say in
12  your article that it should be, did you,
13  sir?
14      A.   We assumed every trial,
15  particularly when it gets to 1,000
16  patients, it's going to be published.
17  That's -- this is -- we're talking about
18  human experimentation.  And you don't
19  experiment on 1,000 patients and not
20  publish the results for the rest of the
21  medical community to see.  That's not
22  acceptable medical research.
23      Q.   Did you ever write the FDA
24  in August of 2001 when you knew that 090

Page 525

1  was not published and say that this study
2  should be published because it's
3  important?
4      A.   We give trials or sponsors
5  an allowance of time.
6      Q.   Did you do that, sir?
7      A.   How would we know that they
8  weren't intending to ever publish the
9  trial?
10      Q.   You knew that study 090 was
11  not published in August 2001.  Did you
12  ever write the FDA, did you ever write
13  Merck, did you ever write anybody and say
14  study 090 should be published?
15      A.   We assumed that it was going
16  to be published.  It was soon after --
17      Q.   That wasn't my question.
18          Did you ever write the FDA,
19  Merck or anybody else before this
20  medicine was withdrawn and say that study
21  090 should be published?
22      A.   I have a simple answer for
23  that question.  Why would we do that?
24      Q.   Is your answer to my

132  (Pages 522 to 525)

Page 526

1   question no, you didn't?
2       A.   Yes.  Why would we even
3   think of doing it?
4       Q.   Dr. Topol, if you thought
5   that study 090 was that important and the
6   events were so important that they should
7   be publicized, did you ever write the
8   FDA, Merck, or anybody else and say you
9   should publish Study 090?
10      A.   Now, Mr. Goldman --
11      Q.   Can you answer that yes or
12  no?
13      A.   You're confusing everything
14  now.  It was only in '04,
15  October/November '04 that we got the
16  straight data.  We couldn't get to the
17  data.  So how could we have known that it
18  was statistically significant with a 760
19  percent excess of heart attack in '02, in
20  '01.  We didn't have the data.  There was
21  no way of knowing that.
22      Q.   Dr. Topol, can you answer my
23  question yes or no or not?
24          MR. KLINE:  Objection.  He

Page 527

1       answered your question.
2   BY MR. GOLDMAN:
3       Q.   Can you answer it yes or no
4   or not?
5          MR. KLINE:  He answered your
6       question.
7          THE WITNESS:  I believe I
8       answered your question.  You could
9       play it back and listen to it.
10         MR. KLINE:  There are 14
11      minutes left.
12  BY MR. GOLDMAN:
13      Q.   Dr. Topol, I want to ask you
14  about Ms. Targum's analysis that you have
15  referred to so many times today.
16      A.   Yes.
17         MR. GOLDMAN:  And I'm going
18      to mark it for my purposes as 44.
19         THE WITNESS:  Okay.
20          - - -
21      (Whereupon, Deposition
22  Exhibit Topol-44A, Memo 2-1-01
23  "Consultation NDA 21-042, S-007
24  Review of cardiovascular safety

Page 528

1   database," (Targum) with
2   handwritten notes, EJT 000211 -
3   EJT 000248, was marked for
4   identification.)
5       - - -
6   BY MR. GOLDMAN:
7       Q.   This is an analysis by Ms.
8   Targum, February 1st --
9       A.   Dr. Targum.
10      Q.   I'm sorry.
11         Exhibit 44 is the analysis
12  from Dr. Targum dated February 1st of
13  2001; correct, sir?
14      A.   Correct.
15      Q.   Do you see on Page 28 of the
16  document that Dr. Targum spends seven
17  pages studying 090?
18      A.   Yes.
19      Q.   Do you see that Dr. Targum
20  also spends four pages studying 085?
21      A.   Yes.
22      Q.   Starting on pages --
23      A.   I remember that, yes.
24      Q.   The information that you

Page 529

1   obtained to come up with your numbers,
2   5,1,0 came from this document that Dr.
3   Targum prepared in February of 2001, and
4   that has been on the website ever since;
5   correct?
6       A.   That's not true.  I've
7   already stated unequivocally that we had
8   the details of each patient before we
9   could make the final determination of the
10  5, 1 and 0.
11      Q.   If you'd turn to Page 32 of
12  the document, Dr. Topol --
13      A.   That's right.
14      Q.   -- do you see that you have
15  written at the bottom 5, 1 and 0?  Do you
16  see that, sir?
17      A.   Yes, but that's not solely
18  on the basis of this table.  That's notes
19  that I wrote after having access to the
20  clinical details of all the events, the
21  6, the 2 and the 2, that is 10 events, 10
22  putative events.  I didn't have the
23  details.  So, for example, the placebo
24  patient called coronary artery occlusion

Page 530

1  which could have been a heart attack,
2  only did I find out during the details
3  was that, in fact, this was a man who had
4  had a chronically occluded artery for
5  many years.  It wasn't a heart attack.
6  So, I couldn't possibly have made a
7  determination about heart attack just on
8  the basis of this table.  That's just an
9  example.
10     Q.   Dr. Topol, do the numbers 5,
11  1 and 0 --
12        MR. GOLDMAN:  Move to strike
13     the last answer.
14  BY MR. GOLDMAN:
15     Q.   Do the numbers 5, 1 and 0
16  that you wrote down on Page 32 appear on
17  the page that Dr. Targum wrote in
18  February of 2001?
19     A.   Her numbers are 7 --
20     Q.   Her numbers -- that's
21  actually a good point.
22     A.   Cardiovascular system are 7,
23  1 and 1.
24     Q.   Well, let's actually go up

Page 531

1  to the top, Dr. Topol.  Do you see that
2  Dr. Targum, who did this analysis, says
3  at the very top, "Below is a listing of
4  serious cardiovascular adverse events.
5  In the" Vioxx "group, a total of 6
6  serious cardiovascular adverse events
7  were reported; in the nabumetone group,
8  there were 2, and in the placebo group,"
9  there were 1.  Do you see that, sir?
10     A.   Yes.
11     Q.   Those are the numbers that
12  you used in your JAMA article; correct?
13     A.   We took our JAMA straight
14  without any questions because we didn't
15  have access to the details.
16     Q.   This same table down below
17  that you referred to before where you
18  came up with 7, do you see that, sir, of
19  the 7 in the Vioxx group?
20     A.   Yes.  But they --
21     Q.   In the middle?
22     A.   The 7 doesn't correspond to
23  the table above.
24     Q.   The 7, sir, is the number

Page 532

1  that you used in October of 2004 when you
2  wrote to your statistician --
3     A.   Right.
4     Q.   -- correct?
5     A.   Right.  So, what we were
6  doing --
7     Q.   My only question was, is
8  that correct?
9     A.   We accepted Dr. Targum's
10  data in proxy for the real data.  That
11  was the whole point.  We accepted Dr.
12  Targum before we were getting the
13  details.  We accepted her data.  She
14  apparently didn't do the statistical
15  analysis, not presented here.  In fact, I
16  discussed this with Dr. Targum, and I
17  have e-mails back and forth to Dr. Targum
18  that she did not do the statistical
19  analysis that should have been done, but
20  we accepted her numbers before we got the
21  real numbers.
22        MR. GOLDMAN:  Move to strike
23     as nonresponsive.
24  BY MR. GOLDMAN:

Page 533

1     Q.   Dr. Topol, the 6, 4 and 2
2  that you wrote in your JAMA article came
3  from a document that Dr. Targum wrote in
4  February of 2001, correct, sir?
5     A.   The JAMA paper, if we can
6  get back to that, was taking that table
7  with the things that were completely
8  erroneous like atrial fibrillation, heart
9  failure, we took those en face.  We
10  didn't know the details.  We just
11  accepted her numbers.  That's why it
12  corresponds to numbers of 6, 2 and 1.
13  That's exactly how the table is laid out,
14  6, 2 and 1.  Do you follow me on that?
15        MR. GOLDMAN:  Move to strike
16     as nonresponsive.
17  BY MR. GOLDMAN:
18     Q.   Dr. Topol, you were asked a
19  question before about an exhibit, another
20  e-mail that you wrote to 60 Minutes.
21        - - -
22        (Whereupon, Deposition
23     Exhibit Topol-45, E-mail
24     10-17-04, EJT 000343, was marked

Page 534

1        for identification.)
2        - - -
3   BY MR. GOLDMAN:
4        Q.   Dr. Topol, this is an
5   exhibit I'll mark as Exhibit 45.  Mr.
6   Kline asked you -- this is another
7   e-mail, October 17, you're writing to 60
8   Minutes, 2004; correct?
9        A.   Right.
10       Q.   And you were asked about the
11  statement in the first paragraph "We can
12  now confirm that the famous study '090'
13  of Merck was NEVER published, that it was
14  part of the FDA pivotal registration
15  packet leading to the May 1999 approval,
16  and that it showed a striking risk of
17  heart attack and stroke before the drug
18  ever got commercialized."  Do you see
19  that?
20       A.   Yes.
21       Q.   The reason you told 60
22  Minutes that is because you wanted to
23  make it look like Merck had information
24  before Vioxx was approved about an

Page 535

1   increased cardiovascular risk; correct?
2        A.   That is absolutely
3   incorrect.
4        Q.   You know, Dr. Topol, that
5   it's false that the study 090 was not
6   part of the pivotal registration packet,
7   which is the NDA, because study 090
8   wasn't completed by the time Merck
9   submitted the NDA?
10       A.   There was no way of us
11  knowing that from the FDA documents.
12  There were no dates in here about when
13  the study was done, and only later did we
14  find out that 085, 090 and VIGOR were in
15  this pivotal supplement to get expanded
16  application -- expanded indication for
17  VIGOR.  So, it wasn't in the original
18  approval packet, and I only learned that
19  subsequent to this e-mail.
20       Q.   Do you see if you look at
21  Dr. Targum's report --
22       A.   Yes.
23       Q.   -- that we talked about, do
24  you see your handwriting there in the top

Page 536

1   left, "Study 090 September 1998 - May
2   1999"?  Do you see that?
3        A.   Yes.
4        MR. GOLDMAN:  Page 1.
5        MR. KLINE:  Page what?
6        MR. GOLDMAN:  1.
7   BY MR. GOLDMAN:
8        Q.   Dr. Topol, you agree with me
9   that the information that you gave to 60
10  Minutes which you confirmed that Merck
11  submitted study 090 with the NDA was not
12  true?
13       A.   It was because we didn't
14  have the information.  It was the best I
15  could do.  But just like the numbers that
16  we finally got corrected for 5, 1 and 0
17  on Page 32, I finally did get the dates
18  of the conduct of study 090, and I wrote
19  them down on this report, but I didn't
20  have it at the time and certainly in mid
21  October.  I only got that information
22  well into November.
23       Q.   You confirmed to 60 Minutes
24  without knowing whether or not Merck's

Page 537

1   090 study was part of the NDA.  You
2   confirmed that fact with 60 Minutes?
3        A.   I had no idea when the study
4   was performed.  And there's no way of
5   telling in this document when this study
6   was performed.
7        Q.   Dr. Topol, when you wrote to
8   60 Minutes, we now can confirm that study
9   090 was part of the NDA leading to the
10  May 1999 approval, you didn't know
11  whether that was true; correct?
12       A.   I thought it was true, but I
13  only found out later it was a mistake.
14  Because, again, dealing with a study
15  that's never been published, and dealing
16  with FDA documents -- and, actually, I
17  called Shari Targum, I sent e-mails to
18  her, I even sent e-mails to Maria
19  Villalba asking them, and they would not
20  release the dates to me.  So, I tried
21  very hard to do the best I could to get
22  the dates of the trial.  I finally got
23  the dates, but, again, it was extremely
24  difficult because they're not on the FDA

135 (Pages 534 to 537)

Page 538

1  website.
2      Q.   Do you know, Dr. Topol, that
3  the FDA -- withdrawn.
4          MR. GOLDMAN:  Let me show
5      you two documents, sir.  Let's go
6      off the record while I get these
7      if that's okay.
8          THE VIDEOTAPE TECHNICIAN:
9      Off the record at 5:56.
10          - - -
11      (Whereupon, a recess was
12      taken from 5:56 p.m. until
13      5:57 p.m.)
14          - - -
15          THE VIDEOTAPE TECHNICIAN:
16      Back on the record at 5:57.
17          - - -
18      (Whereupon, Deposition
19      Exhibit Topol-46, E-mails,
20      FDACDER 023057 - FDACDER 023058,
21      was marked for identification.)
22          - - -
23  BY MR. GOLDMAN:
24      Q.   Dr. Topol, I've handed you

Page 539

1  Exhibit 46, which is an e-mail exchange
2  within the FDA.  And I want to point your
3  attention to November 1st, 2004.  Do you
4  know who the author is?
5      A.   Dr. Villalba, yes, primary
6  reviewer of this application.
7      Q.   Dr. Villalba of the FDA
8  writes "Study 090 was conducted between
9  September 1998 and May 1999.  This one
10  showed more CV thrombotic events on Vioxx
11  than nabumetone or placebo.  Topol was
12  not interested in study 085 which had
13  identical design and duration (6 weeks)
14  and approximately same size, but showed,"
15  and he underlines this, "no differences
16  in CV thrombotic events."  Do you see
17  that, sir?
18      A.   I see it, and I want to
19  point out that a clinical trial is for 20
20  years.
21      Q.   Doctor --
22      A.   You look for signals and you
23  don't disregard certain trials and look
24  at certain trials.

Page 540

1          MR. GOLDMAN:  Move to strike
2      as not nonresponsive.
3  BY MR. GOLDMAN:
4      Q.   In the next e-mail on
5  November 8 of 2004, Doctor --
6          MR. HAMELINE:  Let me note
7      my objection here.  Again, you are
8      putting in front of him documents
9      that someone else has authored to
10      another third party.  You're
11      asking him to agree or disagree
12      with statements that they are
13      making and not allowing him to
14      concern.  If you have a question
15      for Dr. Topol about these
16      documents, ask him.  But he's not
17      here to simply be a parrot about
18      what other people have said.
19          THE WITNESS:  Yes, I mean --
20          MR. GOLDMAN:  Dr. Topol, I'm
21      not going to use up my time
22      getting into arguments.  I have a
23      few more questions.  Let me ask
24      them.

Page 541

1          THE WITNESS:  Well, it's
2      funny how you don't have the
3      statements about what they said
4      about why Merck should have
5      submitted these data earlier,
6      attributing it to me, but --
7  BY MR. GOLDMAN:
8      Q.   Dr. Topol, you see that Dr.
9  Villalba of the FDA writes on November 8
10  of 2004, "Merck might have submitted
11  study 090 results to the Agency sometime
12  earlier than June 2000, but I do not
13  think we would have done anything with
14  it, since the number of events was small
15  and there was a twin study (085) with
16  identical size and duration, conducted at
17  approximately the same time, that showed
18  no difference in CV thrombotic events as
19  compared to placebo and nabumetone."  Do
20  you see that, sir?
21      A.   I see that.
22      Q.   This was written after the
23  drug was withdrawn; correct?
24      A.   Yes.  And still I was not

136  (Pages 538 to 541)

Page 542

1    informed of these dates.
2        Q.   Dr. Topol, I have a few more
3    questions.
4        A.   And the other issues as
5    well.
6        Q.   Dr. Topol, you talked about
7    the warning label for Vioxx; correct?
8        A.   Yes.
9        Q.   You're not an expert in
10   warnings and labeling under the Food &
11   Drug Administration guidelines, are you,
12   sir?
13       A.   Well, I'm certainly familiar
14   with them.  I wouldn't call myself an
15   expert, no.
16       Q.   You said that the warning
17   label that was approved by the FDA in
18   April of 2002 was inadequate.  Is that
19   your testimony?
20       A.   I not only said it was
21   inadequate, but I also wrote in my New
22   England Journal of Medicine invited
23   editorial that it was unacceptable about
24   the delay from the time the committee

Page 543

1    met, FDA, in February 2001 with the
2    consensus recommendation that the label
3    be changed until April of 2002, a delay
4    unacceptable of 14 months for the label
5    to have a minimal change.
6        Q.   Merck sent you the label
7    that was approved by the FDA in April of
8    2002, didn't they, sir?
9        A.   Yes.
10               - - -
11           (Whereupon, Deposition
12           Exhibit Topol-47, Letter 4-11-02,
13           with attached label, EJT 000044;
14           EJT 000050 - EJT 000065, was
15           marked for identification.)
16               - - -
17   BY MR. GOLDMAN:
18       Q.   I'm marking Exhibit 47 for
19   identification, and this is a letter from
20   Tracy Mills of Merck to you, April 11,
21   2002.  "Dear Dr. Topol:  As an advisor
22   and consultant to Merck we wanted to
23   bring to your attention the revised
24   Prescribing Information for Vioxx" and

Page 544

1    then encloses the revised label.
2    Correct, sir?
3        A.   Yes.
4        Q.   Did you ever write back to
5    Merck and say you thought this label was
6    inadequate back in April of 2002?
7        A.   Well, the first point I just
8    made is the time delay was not
9    appropriate, and it's too late at that
10   point.
11           Secondly --
12       Q.   Did you --
13           MR. STEIN:  Let him finish.
14           THE WITNESS:  We're talking
15       about the package insert?
16   BY MR. GOLDMAN:
17       Q.   My question, Dr. Topol, was
18   very simple.  It was, did you ever call
19   Merck in April of 2002 to tell them that
20   you thought the label was inadequate?
21   Yes or no?
22           MR. KLINE:  Please finish
23       the answer that you are being cut
24       off from, sir.

Page 545

1    BY MR. GOLDMAN:
2        Q.   Can you answer that
3    question?
4        A.   Are we talking about the
5    package insert or this?
6        Q.   The package insert.  Did you
7    ever write to Merck --
8        A.   I did not write to Merck.
9        Q.   Did you ever write to the
10   FDA and say, I think that the package
11   insert that you just approved for Vioxx
12   was inadequate in April of 2002?
13       A.   I discussed it with the FDA,
14   and I believe it's in some of my writings
15   as well.  And it may be even in
16   correspondence to the FDA, yes.
17       Q.   I would like you to find,
18   Dr. Topol, because you just said that you
19   wrote to the FDA, I'd like you to find
20   for me where you wrote them in April of
21   2002 or any time in 2002 or any time in
22   2003 or any time in 2004 before the
23   withdrawal where you told the FDA they
24   thought that the warning label that they

137 (Pages 542 to 545)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 546

1  approved was inadequate?
2      A.   I said -- firstly, I would
3  go back to my statement. I discussed
4  this with the FDA. I don't recall for
5  sure whether I sent correspondence.
6  Certainly I didn't send a separate
7  letter, but I did discuss it with them
8  that I thought that by not -- the
9  gastrointestinal benefits were
10 highlighted in the new package insert.
11 But the cardiovascular toxicity, although
12 in the package insert, was way down, it
13 was in small print, it wasn't
14 highlighted, not in bold face. It was
15 certainly not a flag for the consumer and
16 for the physician.
17      MR. GOLDMAN:  Move to strike
18      as nonresponsive.
19 BY MR. GOLDMAN:
20     Q.   Did you ever write any
21 article, Dr. Topol, in any journal in
22 April of 2002 after you saw the
23 FDA-approved label to say, I think this
24 label is inadequate and should be

Page 547

1  changed?
2      A.   I wrote about the timing
3  being adequate in the peer-reviewed
4  literature. I did not write -- I do not
5  recall writing in any medical literature
6  that the package insert was inadequate.
7      MR. GOLDMAN:  Two more
8      questions, and I'll reserve
9      whatever time I have, if I have
10     any.
11     MR. KLINE:  You have none.
12 BY MR. GOLDMAN:
13     Q.   Dr. Topol, you referenced
14 the Juni article. Do you remember that?
15     A.   Yes, certainly.
16     Q.   The Juni article shows that
17 there's no increased risk associated with
18 Vioxx at the 25 milligram dose, correct,
19 sir?
20     A.   No. No. That's not at all
21 an appropriate interpretation of that
22 study.
23     Q.   Do you want to look at the
24 table with me?

Page 548

1      A.   Yes. I'm happy to, because
2  that's a subgroup analysis, which is
3  unacceptable if you're trying to make
4  that. What they show is lack of
5  differences between the doses. It
6  doesn't mean that one dose is not
7  significant. Here it is right here. And
8  for you to be able to interpret that
9  is --
10     MR. HAMELINE:  Identify the
11     table.
12     THE WITNESS:  -- is absurd.
13 Table 2 in the Juni paper in the
14 Lancet. What it says is that the
15 risk of 12 and a half milligrams
16 was 271 percent. And that wasn't
17 quite statistically significant,
18 although close. The 50 milligrams
19 was indeed statistically
20 significant at 2.83 or 283 percent
21 increase. And then what you're
22 trying to say is that 25
23 milligrams was not statistically
24 significant because it was 1.37.

Page 549

1  Well, you can't make those
2  conclusions. The analysis is done
3  on the drug. There's no --
4  BY MR. GOLDMAN:
5      Q.   Dr. Topol --
6      A.   There's no interaction. The
7  p-value for the interaction of the dose
8  is not significant.
9      Q.   Dr. Topol, does Table 2 of
10 the Juni article show that there's no
11 increased risk associated with Vioxx at
12 25 milligrams versus placebo?
13     A.   It absolutely does not
14 convey that.
15     Q.   Can I see the article for a
16 second?
17     A.   Yes, certainly.
18     (Handing over document.)
19     Q.   Do you see, Dr. Topol, that
20 in Table 2, under "Daily dose ,"25
21 milligrams has a relative risk of 1.37
22 and a confidence interval of .52 to 3.61,
23 so the number 1 falls within the
24 confidence interval, and there's no

138  (Pages 546 to 549)

Page 550

1  statistically significant difference in
2  cardiovascular risk associated with the
3  25 milligram dose.
4      A.   You missed on the most
5  important next part of that same --
6      Q.   Can you say whether that's
7  true or false and then you can --
8          MR. HAMELINE:  Well, you
9      have the table.
10         THE WITNESS:  The p-value
11     for the interaction, that is, is
12     .69.  So, you can't say anything
13     about statistical significance
14     about any of the doses.  You can't
15     say anything about it.
16  BY MR. GOLDMAN:
17     Q.   Doctor --
18     A.   It's an overall conclusion.
19     Q.   Dr. Topol --
20     A.   You're making an
21  illegitimate subgroup, and you can't look
22  at the confidence interval and interpret
23  that.
24     Q.   Dr. Topol, when you look at

Page 551

1  the 25 milligram dose for Vioxx in Table
2  2, do you see the confidence interval
3  covers 1, which means that the 25
4  milligram dose, there's no statistically
5  significant difference in -- withdrawn.
6          Do you see, Dr. Topol, that
7  in Table 2 of Juni's article with the 25
8  milligram dose that the difference in
9  cardiovascular events -- I'm tired.  I'm
10  sorry.
11     A.   If you read the paper, it
12  will --
13     Q.   I don't want to read the
14  paper.  I want to look at the data.
15         Dr. Topol --
16     A.   I'm with you, Mr. Goldman.
17     Q.   Dr. Topol, if you look at
18  table 2 at the 25 milligram dose, do you
19  agree that because the confidence
20  interval covers 1, there's no
21  statistically significant difference in
22  cardiovascular risk between Vioxx and
23  placebo?
24     A.   If there was a significant

Page 552

1  interaction on dose, you could make that
2  assertion, but with a p-value that's
3  insignificant for interaction, you cannot
4  make that conclusion.
5      Q.   Do you also see, Dr. Topol,
6  that in trial duration, do you see that
7  in less than six months there's no
8  statistically significant difference in
9  increased cardiovascular risk in the Juni
10  study?
11     A.   I'm afraid the problem is
12  that you're not interpreting these data
13  properly because the concept -- and I can
14  explain it if you'd like, about
15  heterogeneity and interaction.  What this
16  table shows, and the most important
17  aspect of the table is this column for P
18  for interaction.  And what this shows is
19  that the duration, there's no difference.
20  217 percent excess for less than six
21  months.  233 percent excess for heart
22  attack for greater than six months.  The
23  same thing for dose.  Only if there's a
24  p-value for interaction.  And the only

Page 553

1  one there was, interestingly, was on the
2  external endpoint committee, which is a
3  topic I would have loved to address with
4  you.  But that is the only one that was
5  significant.  And that's the only thing
6  you can say about this table.
7      Q.   Let me ask one more time.
8      A.   Yes.
9      Q.   Without looking at the
10  p-value that you just looked at, do you
11  agree that Table 2 of the Juni study
12  shows that there's no statistically
13  significant difference in cardiovascular
14  risk associated with the Vioxx 25
15  milligram dose?
16     A.   It does not show that there
17  is no statistically significant
18  difference, that there's no statistically
19  significant -- there's nothing you can
20  say about any of the doses higher or
21  lower based on this analysis and the
22  data.
23         MR. GOLDMAN:  I don't have
24     any more questions right now, Dr.

139  (Pages 550 to 553)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 554

1  Topol.
2      Can we take a break?
3      MR. HAMELINE: We can. Off
4  the record.
5      THE VIDEOTAPE TECHNICIAN:
6  Off the record at 6:07.
7      - - -
8      (Whereupon, a recess was
9  taken from 6:07 p.m. until 6:24
10 p.m.)
11     - - -
12     THE VIDEOTAPE TECHNICIAN:
13 Back on the record at 6:24.
14     MR. GOLDMAN: Tom, to be
15 clear for the record, when I just
16 say objection, I can work out
17 exactly what the basis for the
18 objection is and tell Linda, the
19 court reporter, after the
20 deposition?
21     MR. KLINE: Yes. With the
22 presumption that it's a few words,
23 not a paragraph, which I assume it
24 will be.

Page 555

1      MR. GOLDMAN: It is not
2  going to be a paragraph. It's
3  going to be either lack of
4  foundation or opinion --
5      MR. KLINE: You --
6      MR. GOLDMAN: -- testimony or
7  form.
8      MR. KLINE: You and I are
9  together. Say objection, say it
10 loud and clear so we hear it.
11     - - -
12     E X A M I N A T I O N
13     - - -
14 BY MR. KLINE:
15     Q.   Dr. Topol, nice to see you
16 again.
17     A.   Yes.
18     Q.   And I want to ask you a
19 couple of questions that the Merck lawyer
20 may not have -- in fact, I know didn't
21 ask you.
22     First of all, I didn't know
23 that he was making a chart of the CV
24 event analysis. Apparently he was

Page 556

1  writing numbers. Do you recall when he
2  was writing numbers and you were
3  disagreeing that those numbers were
4  comparing apples and apples?
5      MR. GOLDMAN: Objection.
6      THE WITNESS: Yes.
7  BY MR. KLINE:
8      Q.   Well, no, he was
9  disagreeing, that it was comparing apples
10 and apples. You are saying it was like
11 comparing two different fruits?
12     MR. GOLDMAN: Objection.
13     THE WITNESS: Yes.
14 BY MR. KLINE:
15     Q.   All right.
16     I see here that he prepared
17 and marked something called Exhibit 48,
18 and what he says here, I'll put it in
19 front of us, that in August of '01, JAMA,
20 he says Vioxx -- help me with that.
21     A.   Nabumetone.
22     Q.   -- nabumetone, placebo.
23     A.   Right.
24     Q.   And he has August, '91,

Page 557

1  JAMA, 6, 2, 1?
2      A.   Right.
3      Q.   Vioxx, nabumetone, placebo
4  for October 25th, 7, 1, 1?
5      A.   Those are Dr. Targum's
6  numbers, but the basis of them was
7  uncertain. So, that's what we were going
8  on, until we could zoom in on each and
9  every patient and figure out whether they
10 had a heart attack, a death or a stroke.
11     Q.   Understood.
12     And then in November 12,
13 it's 5, 1, 0?
14     A.   That was after the final
15 review of each patient's detailed
16 clinical history.
17     Q.   This is 090; correct?
18     A.   That's 090.
19     Q.   That study for Merck was
20 bad; correct?
21     MR. GOLDMAN: Objection.
22     THE WITNESS: Well, let's
23 put it this way. I only learned,
24 you know, back in November of '04

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 558

```
1       that it was finished in 1999.  So,
2       now it's 2005, it's six years
3       later, it hasn't been published,
4       and as far as I know, it's the
5       only significant large trial in
6       nearly 1,000 patients that has not
7       been published in the Vioxx trial.
8  BY MR. KLINE:
9       Q.   Do you recall the
10  questioning when the Merck lawyer showed
11  you an e-mail, and he suggested to you
12  that somebody suggested, so, therefore,
13  he, the Merck lawyer, was suggesting that
14  you weren't interested in 085?
15       MR. GOLDMAN:  Objection.
16       THE WITNESS:  Right, yeah.
17       And that is a really important
18       point, because when you are
19       reviewing a profile of a drug or a
20       device or a biotechnology product,
21       you can't ignore a signal from any
22       given trial.  Each trial in itself
23       is a compartment.  So, if you have
24       a significant excess of events,
```

Page 559

```
1       serious events, we're talking here
2       about death, heart attack and
3       stroke, and you see it in two
4       independent compartments, that's
5       the whole story.  It's right
6       there.
7            It doesn't mean that you had
8       another trial that was very
9       similar, in this case, 085, it
10       doesn't mean that that trial is
11       wrong or right or -- the important
12       point here, and this is a critical
13       thing for interpretation of
14       clinical trials in a field, is
15       signals.  And once you have
16       replication in two compartments,
17       two independent trials, that's the
18       story.  That's basically what I
19       was communicating at the time of
20       the 60 Minutes interview.
21       MR. GOLDMAN:  Objection,
22       move to strike, nonresponsive.
23  BY MR. KLINE:
24       Q.   If there were one of the two
```

Page 560

```
1       studies -- Merck published 085; correct?
2       A.   Yes.
3       Q.   Good for them; correct?
4       MR. GOLDMAN:  Objection.
5       THE WITNESS:  Well, it --
6  BY MR. KLINE:
7       Q.   Good, at least it appeared
8  to be good as far as cardiovascular risks
9  were concerned; correct?
10       MR. GOLDMAN:  Objection.
11       THE WITNESS:  It didn't
12       have, as best I can tell, any
13       heart attack and death and stroke,
14       but it took a long time.  It got
15       published in 2004 by Kivitz and
16       colleagues, as we saw, but that's
17       a very long time lag.  I don't
18       know when that trial was
19       completed, but I assume it was
20       sometime in '99, and that's still
21       a very long time lag.
22  BY MR. KLINE:
23       Q.   Putting aside the time lag,
24  they published 085, which has some good
```

Page 561

```
1       data in them, and they did not publish
2       090, which is bad for them; correct?
3       MR. GOLDMAN:  Objection.
4       THE WITNESS:  That was why
5       090 became a source of increasing
6       concern over time, the fact that
7       it didn't show up, the fact that
8       when Dr. Juni and his colleagues
9       did their analysis, as I reviewed
10       with you, Mr. Kline, this morning.
11  BY MR. KLINE:
12       Q.   Yes, sir.
13       A.   It was that 090 that took
14  VIGOR across the line and made it what
15  they considered a drug that was suitable
16  for withdrawal.  So, this study 090
17  becomes much more important, the fact
18  that it wasn't published, but also the
19  fact that it was a replication of VIGOR.
20       Q.   Is that why you were
21  interested --
22       MR. GOLDMAN:  Objection,
23       move to strike, nonresponsive.
24  BY MR. KLINE:
```

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 562

1    Q.   Do you consider yourself to
2  be in this whole Vioxx affair a -- strike
3  that, I'm going to start again.
4          Do you consider in looking
5  at the Vioxx safety, do you consider
6  yourself to be independent, sir?
7          MR. GOLDMAN:  Objection.
8          THE WITNESS:  I don't know
9    how I could be more independent.
10   I certainly wasn't involved in the
11   trials, but on the other hand, I'm
12   looking at it as a seasoned
13   clinical trialist, so, yes, I
14   believe I'm an independent viewer.
15 BY MR. KLINE:
16   Q.   Which of the two studies, if
17 they had to pick one, should have been
18 published, and why?
19         MR. GOLDMAN:  Objection.
20         THE WITNESS:  Well, study
21   090 should have been published as
22   soon as possible, and that was the
23   concern that I registered.  And,
24   of course, that was that Mr.

Page 563

1    Goldman's e-mail that I first saw,
2    internal FDA, they talked about,
3    should they have done something
4    with that data much earlier.  But
5    that one was the one of concern.
6    And just because there's another
7    trial of similar size and design
8    that doesn't show the problem,
9    doesn't negate, it doesn't make
10   you in any way not seriously
11   concerned about 090.
12 BY MR. KLINE:
13   Q.   These data, even looking at
14 them the way he compares them, 6 Vioxx to
15 3 when you combined nabumetone and
16 placebo, or 7 versus 2 or 5 versus 1, are
17 any of those numbers, sir, reassuring
18 that Vioxx is safe?
19         MR. GOLDMAN:  Objection.
20         THE WITNESS:  They're not at
21   all reassuring.  We're running on
22   a relatively low event, but they
23   are an imbalance of events no
24   matter how you look at study 090.

Page 564

1          And then in the wake of VIGOR, or,
2    actually, it preceded VIGOR by
3    many months, but when you put the
4    two together, you have a large
5    trial of 8,000 patients, you have
6    a trial of 1,000 patients, which
7    is a respectable number, it's not
8    so small, you see the same problem
9    in both trials, that's when you
10   have to make a conclusion that
11   there's a significant problem.
12         MR. GOLDMAN:  Objection,
13   move to strike, nonresponsive.
14 BY MR. KLINE:
15   Q.   Now, when you were running
16 the statistical significance and you were
17 going to your statistician, was that a
18 statistician at Cleveland Clinic?
19   A.   Yes.
20   Q.   Okay.
21         Were you trying to be
22 accurate and correct, sir?
23   A.   Yes.  I mean, I've been
24 doing this for a long time, and I don't

Page 565

1    ever want to put my name associated with
2    data -- with the wrong data.  And I
3    regret that we could not, back in 2001,
4    get to the right data for 090, because we
5    could have found -- we could have
6    identified this problem a lot earlier.
7    Q.   Now, let's go to that point,
8    if I may.
9          MR. GOLDMAN:  Objection,
10   move to strike, nonresponsive.
11 BY MR. KLINE:
12   Q.   Bear with me.  I've got to
13 find some notes that I had, which I've
14 got here.
15         Okay.  Let's move to that
16 data.
17         You looked to the Targum
18 memo from the FDA to find out information
19 that you couldn't find publicly.  Is that
20 the gist of what you were telling us?
21   A.   Yes.
22         MR. GOLDMAN:  Objection.
23 BY MR. KLINE:
24   Q.   And the fact of the matter

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 566

```
 1   is, when you looked at that information,
 2   did you find things that were troubling?
 3   Is that the nub of it?
 4          MR. GOLDMAN:  Objection,
 5   foundation.
 6          THE WITNESS:  Without any
 7   question, yes.
 8   BY MR. KLINE:
 9      Q.   And I think you said maybe
10   three times, four times, five times, that
11   you wanted to look at Page 32 and give an
12   explanation.  Is that correct?
13      A.   Yes, I did.
14      Q.   Okay.
15      A.   Because 32 is the beginning
16   of where the problem lies.  Because on
17   Page 32, there's --
18      Q.   Let me just put it in
19   context, because the jury and whoever is
20   looking at this now, juries in
21   particular, are going to be looking at --
22   let me start again.
23          Jurors will be looking at
24   this for quite a while at this point in
```

Page 568

```
 1   yourself, what does this show me against
 2   this problem that was in VIGOR, which now
 3   has a lot of attention in the medical
 4   community; correct?
 5          MR. GOLDMAN:  Objection.
 6          THE WITNESS:  That's
 7   correct.  And moreover, there's
 8   APPROVe in colon polyp patients,
 9   not heart patients.  There's also
10   ADVANTAGE in osteoarthritis for 12
11   weeks.  There's other trials now
12   that we have access to and you
13   say, well, wait a minute, where
14   was the signal really there?
15   That's what this is about.  Where
16   was the first signal really there?
17   Why didn't we get the right data,
18   the drilled down data on the study
19   090?
20          MR. GOLDMAN:  Objection,
21   move to strike, nonresponsive.
22   BY MR. KLINE:
23      Q.   Now, recognizing -- I'll put
24   it in a different form to make sure we
```

Page 567

```
 1   the day.
 2          This is the Targum memo by
 3   an FDA reviewer, and the memorandum is
 4   dated February 1, 2001; correct?
 5      A.   Yes.
 6      Q.   But the information is about
 7   a study that was done two years earlier;
 8   correct?
 9      A.   That's correct.
10      Q.   And you now, two years
11   later, are looking at that data as an
12   independent eye and saying, what was
13   really in that study; correct?
14          MR. GOLDMAN:  Objection.
15          THE WITNESS:  Right.  Three
16   years later.
17   BY MR. KLINE:
18      Q.   Three years later.
19          And that study hadn't been
20   published yet?
21          MR. GOLDMAN:  Objection.
22          THE WITNESS:  That's right.
23   BY MR. KLINE:
24      Q.   And you're saying to
```

Page 569

```
 1   get it.
 2          Were you looking for the
 3   drilled down data, what you call drilled
 4   down data?
 5      A.   Yes.
 6      Q.   What is -- I've heard that
 7   term today.
 8          What is drilled down data?
 9      A.   Well, basically this table
10   is the bare bones.  It says coronary
11   artery conclusion for the placebo patient
12   on Page 32.
13      Q.   Look at the table.
14      A.   Yes.
15      Q.   Recognize that I have 20
16   other areas I want to cover in less than
17   40 minutes.
18      A.   Okay.
19      Q.   Would you tell the members
20   of the jury with this displayed in front
21   of them what it is that you wanted to
22   communicate to them when you were
23   answering questions by Merck's counsel
24   when he was challenging you, like Merck
```

143  (Pages  566 to 569)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 570

1  challenges everyone, please?
2           MR. GOLDMAN:  Objection.
3           THE WITNESS:  The point
4      being, I gave this example, but
5      the coronary artery occlusion,
6      without having any details, the
7      table just says placebo, coronary
8      artery occlusion.  Dr. Targum
9      concluded that was a heart attack
10     when, in fact, it wasn't a heart
11     attack when we reviewed the
12     details of this 48-year-old
13     gentleman.  He didn't have any
14     heart attack.
15  BY MR. KLINE:
16     Q.    You adjudicated the
17  individuals yourselves?
18          MR. GOLDMAN:  Objection.
19          THE WITNESS:  We had all the
20     information, we had the
21     electrocardiogram, we had the
22     angiogram.  We had all the
23     information that isn't displayed
24     in this report, and then we knew

Page 571

1      that it was never -- this patient
2      never had a heart attack.  So, he
3      was miscategorized.  And that's
4      just one example.
5  BY MR. KLINE:
6      Q.    But if you look at it no
7  matter which way it comes out displaying
8  48, does this study demonstrate anything
9  different in terms of a signal when it's
10 combined with the VIGOR study?
11         MR. GOLDMAN:  Objection.
12         THE WITNESS:  The point
13     about this is, if one is looking
14     at this with an open mind and
15     wanting the best for patients,
16     looking at the data and trying to
17     look at, is there a signal here of
18     worry, you would be worried if you
19     were the manufacturer of this drug
20     or you were the clinical trialist
21     doing this drug.  You would be
22     worried.  And that's data that's
23     available in mid-'99.
24         And you would be even more

Page 572

1      worried later in 1999 when you
2      have a trial where you have an
3      excess of deaths and serious
4      cardiovascular events.
5           And, finally, when the VIGOR
6      trial is cracked in March 2000, if
7      you looked at these data
8      objectively, you would say, we've
9      got two trials, one 1,000
10     patients, one 8,000 patients, we
11     don't need any more trials, we
12     have a problem, we need to have
13     restriction of the use of this
14     drug, particularly in patients
15     with known heart disease, and we
16     need to do the right trials to get
17     this drug, which works well for
18     arthritis, but it's got this
19     noxious side effect problem, and
20     we've got to do something about
21     it.
22          MR. GOLDMAN:  Objection,
23     move to strike, nonresponsive.
24  BY MR. KLINE:

Page 573

1      Q.    So, what we're displaying to
2  this jury in terms of this exhibit, Page
3  32 of the Targum memo, what that really
4  is is, you're showing us that there were
5  a series of patients, for example,
6  patient 2695, a 63-year-old with
7  myocardial infarction, you then looked at
8  each individual --
9      A.    Yes.
10     Q.    -- made your own
11 determination and then calculated the
12 numbers yourself?
13         MR. GOLDMAN:  Objection.
14         THE WITNESS:  This was a
15     bona fide heart attack, but the
16     patient that was listed for 2683
17     with atrial fibrillation.  That
18     was not a thrombotic event.  So,
19     each one of them required a very
20     careful review, which we only were
21     able to get that data, you know,
22     of course, late October/early
23     November of '04.
24  BY MR. KLINE:

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 574

1     Q.   Now, I want to ask you a
2  question because it was suggested three
3  times in the testimony.
4         Were you doing this or any
5  of your other activities to get Merck?
6         MR. GOLDMAN: Objection.
7  BY MR. KLINE:
8     Q.   That's what they suggested
9  to you.
10        MR. GOLDMAN: Objection.
11        THE WITNESS: I find that
12  highly objectionable, because I
13  worked very closely with Merck. I
14  did the courtesy of sending the
15  manuscript to Merck for input,
16  meeting with Merck, which I didn't
17  have to do, with Dr. Reicin and
18  Dr. Demopoulos. I did everything
19  I could, bent over backwards to be
20  collaborative, and it's really
21  extraordinary to suggest that I
22  was trying to have an objective to
23  come at Merck in any way.
24        I was just trying to do the

Page 575

1  best, what we can with this data
2  and for patients, and I think our
3  work was ultimately validated
4  exceptionally well.
5         MR. GOLDMAN: Objection,
6  move to strike the nonresponsive
7  portion.
8  BY MR. KLINE:
9     Q.   What was your work a piece
10  of in this process? What ultimately was
11  the result here of down the road of what
12  you started, sir?
13        MR. GOLDMAN: Objection.
14        THE WITNESS: When we
15  published that first paper in JAMA
16  in August of 2001, we certainly --
17  that was the first demonstration
18  in man, in patients, that there
19  was a significant problem that was
20  requiring further study. So, that
21  started the concern.
22        But, unfortunately, it was
23  met with deaf ears at Merck and
24  with Pfizer with respect to their

Page 576

1  unwillingness to do the right
2  trials, and although their data
3  weren't as worrisome, there
4  certainly were some data that were
5  concerning.
6         But the manufacturers of
7  these drugs, and particularly
8  Merck, where the data was most
9  concerning, did not do the right
10  thing for patients, and that's the
11  concern.
12        MR. GOLDMAN: Objection,
13  move to strike, nonresponsive.
14        MR. KLINE: I think it was
15  exactly responsive.
16  BY MR. KLINE:
17     Q.   Next question. Got a bunch
18  of stuff I've got to get through with
19  you.
20        In the Juni article you went
21  back and forth. First of all, Juni, you
22  pointed out to the Merck lawyer, the Juni
23  article cited the 085 study; correct?
24        MR. GOLDMAN: Objection.

Page 577

1         THE WITNESS: Yes, it did.
2  BY MR. KLINE:
3     Q.   It didn't cite the 090 study
4  because it wasn't published?
5     A.   Interestingly, and this was
6  --
7         MR. GOLDMAN: Objection.
8         THE WITNESS: We didn't
9  mention this before, but the study
10  090 was cited in the FDA report
11  and the Geba abstract, the one
12  where he only presented the
13  efficacy with no safety data at an
14  American Geriatrics Society. So,
15  there was no paper to reference.
16  So, he referenced the Targum
17  report and the abstract.
18  BY MR. KLINE:
19     Q.   Now, remember when you were
20  back and forth with the Merck lawyer
21  about when you were telling him that you
22  couldn't show that there was no dose
23  relation?
24     A.   Yes.

145  (Pages 574 to 577)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f