ORIGINAL

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

*U.S. DISTRICT COURT*
*EASTERN DISTRICT OF LA*
*2006 JUN 27  PM 12: 40*
*LORETTA G. WHYTE*
*CLERK*

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| *This document relates to* | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |
| | * | |
| **Gerald Barnett v. Merck & Co., Inc.** | * | **CASE NO. 06-0485** |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO
EXCLUDE TESTIMONY OF JOHN W. FARQUHAR, M.D., FILED ON BEHALF OF
PLAINTIFFS' STEERING COMMITTEE AND PLAINTIFF GERALD BARNETT**

**(DEFENDANT'S EXPERT CHALLENGE NO. 6)**

**I.     INTRODUCTION**

This Court, in its earlier <u>Daubert</u> decision, listed the extensive credentials of Plaintiffs'

expert, John W. Farquhar, M.D., and held that the opinions expressed by Dr. Farquhar in his

September 26, 2005 Report (Ex. 1) were based on a reliable methodology, including review and

analysis of Merck's own data and various published articles concerning Vioxx and

cardiovascular (CV) risk. <u>In re Vioxx Products Liability Litigation</u>, 401 F.Supp.2d 565, 596, 600

(E.D. La. 2005) The Court found that both sides' experts reviewed the same studies and reached

different conclusions.    "Differing conclusions are permissible under Rule 702; improper

methodology is not. . . . As evidenced by his thorough and explanatory ninety-five page report,

Dr. Farquhar is qualified and relied on proper methodology." (<u>Id.</u> at 596).

Dr. Farquhar submitted a Supplemental Expert Report on May 26, 2006, which provided

additional analyses of the APPROVe study and Merck data. (Ex. 2) Dr. Farquhar has not altered

his methodology since last September, and Defendant Merck's current motion repeats many of

- 1 -

the same arguments it made in 2005.  Defendant has failed to provide any legitimate basis for changing the Court's prior conclusion that Dr. Farquhar's opinions concerning the CV risk of Vioxx are based on a proper methodology and therefore admissible.

Defendant targets Dr. Farquhar's reliance upon the contributions of a biostatistical consultant, Professor Nicholas Jewell, Ph.D., who analyzed Merck's data according to standard statistical methods.  Similar arguments were made by Merck in 2005 with respect to Dr. Farquhar's reliance on other biostatistical experts. Dr. Farquhar candidly acknowledges that he is not a biostatistician, and he relied upon professionals with such expertise to carry out the analyses that he directed in this case, just as he has throughout his career.  The September 2005 and May 2006 reports both followed this model.  It is well recognized that experts may rely upon the work of other consultants and specialists, when the information is of a type commonly relied upon by experts in the particular field, as Dr. Farquhar has done in relying upon the analyses of Dr. Jewell.  This methodology passed muster in 2005, and it remains reliable in 2006.

Defendant has also raised numerous challenges to the validity of the data underlying the Protocol 203 analysis performed by Dr. Jewell and described in Dr. Farquhar's report. Yet the Protocol 203 analysis is based on data from three Merck-sponsored studies, and Merck itself provided all the data. Thus, if there were any real flaws in the Plaintiffs' analysis, no one would be in a better position to prove those flaws than Merck. Instead, however, Merck never asked its own experts to analyze Protocol 203, a decision which essentially concedes that it is shooting blanks in its critique of Plaintiffs' analysis. Merck claims that the Protocol 203 analysis is "premature," but this claim is refuted by Merck's own documents.

After Plaintiffs' expert reports were submitted, Merck used Dr. Farquhar's deposition as an opportunity to highlight technical biostatistical issues, and to emphasize his reliance on Dr.

- 2 -

Jewell to address such matters. Merck then employed the occasion of Plaintiffs' June 12, 2006 deposition of Merck's own expert biostatistician, Dr. Kim, to conduct a direct examination eliciting the expert's previously undisclosed opinions about a June 3, 2006 meta-analysis published in the British Medical Journal. Merck's biostatistician claimed at that time that the recent article supports the new defense theory that the excess risk of CV events in APPROVe (polyp patients) cannot be generalized to osteoarthritis patients. These maneuvers justified Plaintiffs' Counsel's need to designate Professor Jewell as a testifying expert, and to submit Dr. Jewell's rebuttal report (Ex. 3). Plaintiffs' Counsel offered Professor Jewell for a deposition on a date certain, but rather than accept that offer, Defendant now seeks to exclude his testimony, although they had previously claimed his testimony was "vital." The Federal Rules permit rebuttal experts and reports, and Plaintiffs should be allowed to respond to Defendant's attack on statistical issues. Defendant has ample time to depose the witness before trial, and no prejudice will result.

Finally, in its prior decision, the Court reserved its ruling on the admissibility of testimony concerning the state of mind issue "until it is presented at trial. At that time, the Court will have a clearer basis for making its ruling." (401 F. Supp. 2d at 600.) Plaintiffs submit that the same ruling is appropriate on the present motion.

## II.   DR. FARQUHAR'S ANALYSIS OF PROTOCOL 203 FOLLOWS THE STATISTICAL DATA ANALYSIS PLAN THAT MERCK HAS INACCURATELY DESCRIBED

Protocol 203 is the only Merck study that was designed for the specific purpose of testing the CV risk of Vioxx 25 mg. versus placebo. It included not only APPROVe, but also two additional studies, VICTOR and ViP, providing the largest set of CV adverse event data to evaluate this issue. Dr. Farquhar has presented analyses that follow Merck's pre-specified Data Analysis Plan (DAP) for Protocol 203, which show prompt and persistent increased risk of

- 3 -

Vioxx, and which refute Merck's assertion that there is no increased risk for 18 months of use. (Ex. 2, Figure 1 and accompanying text).[1]

Defendant incorrectly states that "The Merck Data Analysis Plan for Protocol 203 contemplated that a combined analysis of cardiac events in all three studies would be conducted only when each study had run its full pre-specified course.  Professor Jewell and Dr. Farquhar have in fact engaged in a *post-hoc* analysis, not, as they attempt to suggest, a combined analysis that was pre-specified when the studies were designed."  (Defense Memorandum at 3, fn.2; emphasis added). These assertions are contradicted by the DAP for Protocol 203.  The DAP planned for interim analyses and publication, early stopping due to excess risk, and final analysis in 2006 while the VICTOR and ViP studies were expected to continue for six more years.  As Dr. Jewell states in his Rebuttal Report, the events accumulated by mid-October 2004 had already exceeded the "Inferiority" stopping criteria, and if Protocol 203 had not been stopped due to the termination of APPROVe, the ESMB would have stopped it according to the Inferiority Early Decision rule (Ex. 3, at 12).

These points are detailed below.

### A.     Protocol 203 Was Designed For Generalization of Results, Interim Analyses And "Early Decision For Inferiority."

Defendant Merck prepared a statistical DAP for Protocol 203 dated January 9, 2004. (Exhibit 4).[2]  The DAP followed a format typical of the clinical trials of Vioxx, in that there were *statements of the objectives, hypotheses, descriptions of study participants, safety analyses,*

---

[1] In today's online edition of the New England Journal of Medicine, a correction was published, which withdrew statements from the APPROVe article claiming the absence of adverse CV effects of Vioxx for 18 months. See Ex. 25 to Decl. of Donald C. Arbitblit.

[2] This document was submitted as Exhibit 8 to the Declaration of Donald C. Arbitblit in Support of Plaintiffs' Memorandum in Opposition to Motion to Exclude Testimony of John W. Farquhar, M.D., dated November 2, 2005.  For the convenience of the Court, documents previously submitted are filed again with this Opposition Brief.

statistical technical issue descriptions and ground rules for analysis. (Id.) However, there was an important difference between Protocol 203 and all other Merck clinical trials of Vioxx: Protocol 203 was specifically designed and statistically powered to compare the cardiovascular safety of Vioxx 25 mg. to placebo, whereas no other Vioxx study had that objective or design. (Id. at p. ii, MRK-AFL0015455). Further, the DAP was designed to include a "spectrum of cardiovascular risk" among the subjects, who were similar in age to real world users of Vioxx, thereby "allowing generalization of the results of this analysis to other populations, including those with osteoarthritis or rheumatoid arthritis." (Id. at p. i, MRK-AFL0015454). In contrast, no other *Merck study was designed with the stated objective to allow generalization to other populations.*

It is important that "generalization" was built into the design of Protocol 203; it did not appear by accident. Merck's proposal of Protocol 203 to the FDA described it as a "cardiovascular outcomes study," stating that the three component clinical trials would provide "a typical spectrum of patients at risk for thrombotic cardiovascular events." (Ex. 5, p. 1.) Hopeful of a favorable outcome, Merck asked for the FDA's approval to use the results in product labeling, for the purpose of seeking removal of the statement that no "prospective studies" of Vioxx' CV risks had been conducted. (Letter, Goldkind to Merck, 12/19/02, pp. 2-4, Ex. 5.) The FDA did not commit to the sufficiency of the study to justify such a label change, but agreed that the results would provide "clinically important safety information" about CV risk of Vioxx. (Id. at 1.)

In the exchange with the FDA, Merck described the function of the ESMB that would monitor patient safety, and the FDA agreed to this aspect of Merck's plan. (Letter, December 19, 2002, ¶ 9 at p. 4; Exhibit 2). Merck thereupon included details of the ESMB role in the DAP for Protocol 203. In particular, the DAP stated the following important points:

- 5 -

• "[I]f the ESMB should decide to make an early decision due to the importance of study patients' safety, the early decision rules described below will be considered when making a decision regarding the conduct of this trial.

"Early Decision for Inferiority: An early decision/conclusion for inferiority would require the lower limit of a CI > 1.0 at overall one-sided $\acute{\alpha} = 0.025$ and an observed HR > 1.30." (DAP, at iv, MRK-AFL0015457; Exhibit 4). In fact, those criteria were surpassed by the event data accumulated as of October 2004. (Jewell Report, Ex. 3, at 12.)

• In February 2005, Merck Vice President Ned Braunstein presented the interim analysis of Protocol 203 to the FDA Advisory Committee (AC) in 'Slide 53.' The CV Outcomes Pooled Analysis at that time showed a relative risk of 1.67, 95% confidence interval 1.15, 2.43. (Exhibit 7).[3] These results demonstrate that the 'Early Decision for Inferiority' had been met, that is, the relative risk or hazard ratio exceeded 1.30, and the 95% confidence interval exceeded 1.0 at the lower bound, which is equivalent to the DAP criterion of $\acute{\alpha} = 0.025$ (one-sided). (DAP at 10, MRK-AFL0015468; Exhibit 4).

• The study was planned with power to determine whether there was a > 1.30 hazard ratio (HR) for Vioxx versus placebo, which would have required approximately 611 confirmed thrombotic events to provide 90% power to yield the upper limit of the 95% confidence interval (CI) for this pre-specified HR. It was anticipated "that the 611 confirmed thrombotic events will be reached in early 2006, which is after study completion of APPROVe and prior to study completion of VICTOR and ViP." (Id. at 8, MRK-AFL0015466) (emphasis added). Both VICTOR and ViP were planned for study completion in the year 2012. (Id. at 2, 3, MRK-AFL0015460-61). Thus, it is clear that the DAP specified a final analysis long before VICTOR and ViP had concluded, contrary to the claims in Merck's Memorandum.

• The first interim analysis of combined data for all three studies of Protocol 203 was planned for May 2004, and additional interim analyses were planned for November 2004, May 2005, and November 2005. (Ex. 4 at p. 11).

---

[3] This document was previously submitted as Exhibit 14 to the Declaration of Donald C. Arbitblit on November 2, 2005.

- 6 -

- The DAP provided that "Kaplan-Meier plots of cumulative rates over time will be compared and non-parametric methods such as the log-rank test will be utilized to compare the survival curves." (DAP at 17, MRK-AFL0015475; Exhibit 4). It is this critical presentation that Merck has not provided for Protocol 203, because Merck knows that the results refute its dearly held and oft-repeated claim that there is no harmful effect of Vioxx for the first 18 months of use.

In summary, the Protocol 203 DAP directed both early interim analysis and a final analysis by 2006. Merck's own interim analysis of Relative Risk (RR) and confidence interval (CI) in February 2005 showed that Vioxx' inferiority had been proven, which would have required termination of Protocol 203. Merck has no legitimate excuse for its own failure to present the Kaplan-Meier cumulative incidence curves for Protocol 203, which reveal the early and persistent risks of Vioxx that Merck has denied. The Protocol 203 analysis is not premature, but in fact it is "overdue." (Jewell Report, Ex. 3 at 12.)

**B.    The "Cardiac Endpoint Was Pre-specified.**

Merck states that it "intended Protocol 203 to be a combined analysis of thrombotic cardiovascular events," (Def. Mem. at 3, n. 2). However, the DAP also prespecified an endpoint of "All Confirmed Cardiac Events" (Ex. 4, at pp. 4-5).   Since the individual plaintiffs under consideration have suffered MI, the cardiac event endpoint was presented in the Protocol 203 analysis shown in Dr. Farquhar's Supplemental Report of May 26, 2006.  (Ex. 2, pp. 3-4.)  In response to defense expert testimony that the "primary endpoint" should have been analyzed (Kim Dep., Ex. 8, at 104:5-17; 105:17-106:23), Dr. Jewell has provided the KM cumulative incidence plot for the primary endpoint of All Confirmed Thrombotic Events. (Ex. 3, at p.6, and Figures 1-8.)  The results are consistent with the cardiac events endpoint, that is, both show early, persistent statistically significant excess relative risk of adverse cardiovascular events among the Vioxx 25 mg. users compared to placebo.  (Id.)).

- 7 -

**C.     Merck Has the Means to Analyze Protocol 203, and Its Challenges to the Data Used by Plaintiffs' Expert Are Unsupported.**

Merck has offered a number of arguments, unsupported by evidence, in its effort to undermine the credibility of Plaintiffs' Protocol 203 analysis.  First, Merck claims that it is unable to challenge Dr. Farquhar's reliance on Dr. Jewell's Protocol 203 analysis, because it doesn't know what data Dr. Jewell used.  However, Merck is the sole source of data to which Dr. Jewell had access.  Merck retained an expert biostatistician (Dr. Kim), yet never asked him to conduct an analysis of Protocol 203.  (Kim Depo. at 98:24-99:9; Ex. 8.)  Remarkably, Dr. Kim states that he would like to see the Kaplan-Meier plots of  cumulative rates over time for Protocol 203, but that he doesn't plan to do the analysis himself: "When I signed up to work with [defense counsel] Mr. Mortara, data analysis is not in the picture. I have no time for that. And I trust the people who does [sic] analysis." (Ex. 8, 107:20-108:8).  But Dr. Kim's trust in the people who do the analysis is misplaced, since Merck has refused to follow its own plan to analyze its own data.

Second, Merck claims that the data from the VICTOR component of Protocol 203 were not "final" until May 2006. However, Merck's vague assertions do not explain what aspects of the data were allegedly incomplete, nor how such purported infirmities might have affected the results.  The event totals used by Dr. Jewell in the Protocol 203 analysis came from Tables of Merck's VICTOR memo, stamped "Final July 28, 2005," (Ex. 9), and those totals of 14 versus 4 events for Vioxx and placebo, respectively, are identical to those that appeared in the dataset provided to Dr. Jewell in November 2005, as well as the event totals stated in the report of defense expert Kim dated June 1, 2006. (Jewell Report, Ex. 3, 11-12).  Dr. Jewell's Report states that the VICTOR data he reviewed in May 2006 did not change the adverse event totals from those received in November 2005. Even if one additional event in the placebo arm is belatedly

- 8 -

added to the VICTOR study, it would have no substantial impact on the overall result of Protocol 203, that is, early and persistent separation of the incidence curves, with Vioxx above placebo from the first month until the end of the study.  (Ex. 3 at 12) ).  Further, even assuming that the data were not "completed" until early May 2006, Merck knows which data to use, and how to do the analysis, and its statisticians could have produced a Protocol 203 analysis in a matter of hours or days – well before the June 1 expert report deadline – if they had chosen to do so

Third, Merck claims that it had no control over VICTOR, because the study was run by Oxford University, thus somehow beyond Merck's influence. But Merck fails to inform the Court that the principal investigator of the VICTOR trial, Michael Langman, was a long-time consultant for Merck who had assisted the company with Vioxx projects for years.  In fact, Dr. Langman accompanied the Merck delegation to the FDA Advisory Committee meeting in April 1999 to advocate Merck's application to license Vioxx for marketing.  (4/20/99 Transcript, Ex. 10.) According to a London Times article concerning Dr. Langman, Vioxx and the VICTOR study, "Langman became the new drug's champion."  (Ex. 11, London Times, August 21, 2005, accessed at briandeer.com/vioxx/vioxx-special-1.htm, last accessed June 26, 2006) (Id., at p. 3 of 4). On November 24, 1999, Langman published an article with several Merck employees entitled "Adverse Upper Gastrointestinal Effects of Rofecoxib Compared with NSAIDs," JAMA 1999; 282:1929-1933, which described Dr. Langman as a "consultant" to Merck & Company. Langman again was lead author with Merck employees in an article published in the International Journal of Clinical Pharmacological Therapy 2004; 42:260-266.  According to the London Times article, Dr. Langman withdrew from an agency meeting to license Vioxx for sale in the United Kingdom "due to a possible conflict of interest, given his links with Merck and its financial support for his research." (Ex. 11, p. 3 of 5).

- 9 -

It is not sufficient for Merck to assert without proof that the data from a study run by its long-time supporter, Dr. Langman, was somehow beyond its control. The VICTOR study ended on September 30, 2004, at the same time as APPROVe, for which the file was frozen for analysis by late December, less than 3 months later. The ViP study was submitted to the FDA in final form on August 22, 2005. *There is no evidence that Merck attempted to obtain the "completed" VICTOR dataset on a similarly timely basis.*

In summary, it was proper for Dr. Farquhar to follow his established methodology of relying upon biostatistical support. Dr. Jewell, a well-respected biostatistician, performed standard statistical tests upon the data provided by Merck itself. If any errors appear in that analysis, Merck has the data and expertise to let the Court know what flaws allegedly exist. Conversely, if Merck fails to produce its own analysis of its own data to contradict the analysis by Plaintiffs' experts, it should be estopped from attacking Plaintiffs' Protocol 203 analysis in the absence of evidentiary support for such attacks.

## III.   DR. FARQUHAR'S OPINIONS CONCERNING HYPERTENSION ARE WELL SUPPORTED BY THE RECORD, HIS REPORT AND TESTIMONY

Merck seeks to exclude Dr. Farquhar's testimony concerning hypertension by asserting that "it is irrelevant whether or not Vioxx causes more severe hypertension or causes or worsens hypertension more often than other NSAIDs." (Defense Brief at 6). This is an incorrect statement. As Dr. Farquhar's report of September 26, 2005 explained in detail, hypertension causes atherosclerosis and heart attacks, and worse hypertension causes more of these outcomes. (Farquhar Report, September 26, 2005, Ex. 1, at ¶¶ 22, 54, 109-110, 138-150; pp. 7, 16, 44-45, 60-67). Dr. Farquhar's Reports also detailed the evidence developed by Merck in the APPROVe study, showing that Vioxx significantly increased the incidence of blood pressure spikes reaching the level of Stage II hypertension (Systolic BP over 160 mmHg and/or Diastolic BP

- 10 -

over 100 mmHg) and that among those who suffered such increases there was a statistically significant almost quadrupling of the risk of thrombotic CV events. (Farquhar Report, 9/26/05, Ex. 1, at ¶ 75, p. 27; Farquhar Supp. Report, Ex. 2, 5/26/06 at pp. 13-17). In fact, Merck's internal correspondence includes an admission that spikes above 160 mm Hg systolic blood pressure "portended" thrombotic events. (Ex. 19.) This evidence is relevant to Plaintiff Gerald Barnett, who had never experienced Stage II hypertension spikes before taking Vioxx, but had several such episodes between the time he started taking Vioxx in January 2000 and the time of his MI on September 6, 2002. (Farquhar Report as to Gerald Barnett; Ex. 6).

Merck selectively cites excerpts concerning hypertension from Dr. Farquhar's deposition of June 8, 2006, while failing to include testimony in which Dr. Farquhar referred to the RCTs reviewed in his report of September 26, 2005 and testified that Vioxx was significantly worse than each of the 5 NSAIDs referenced (indomethacin, diclofenac, ibuprofen, Celebrex and naproxen; Ex. 12, Farquhar Tr., 285:18-289:20). Merck's memorandum cites a laundry list of 12 other NSAIDs that Dr. Farquhar had not compared to Vioxx; however, Merck fails to inform the Court that no one, including Merck, ever conducted head-to-head studies of Vioxx against 11 out of 12 of those drugs.[4] Dr. Farquhar has studied and written about hypertension for decades, he has reviewed extensive data on Vioxx as a cause of hypertension and thrombotic events, and he is well qualified to testify to the severe hypertensive effects of Vioxx.

Merck is correct that it is significant that Mr. Barnett took two of the prescription NSAIDs. (Defense Brief at 7). This is significant because, despite regular medical checkups and blood pressure readings, Mr. Barnett never experienced Stage II hypertensive spikes while taking

---

[4] Of the 12 NSAIDs listed by Merck (Def. Memo at 7), only nabumetone was tested against Vioxx, according to the list of all RCTs of Vioxx published with the Kearney article (Ex. 18). Vioxx was also worse than nabumetone for hypertension. See Ex. 21, Figures 3, 4 and 6.

- 11 -

either of those drugs, but did have such spikes beginning within 2 to 3 weeks of his first exposure to Vioxx, and on several occasions thereafter. (Ex. 6). Thus, this evidence only serves to support Dr. Farquhar's opinion that Vioxx is more dangerous than other NSAIDs for hypertensive effects.

**IV.   DR. FARQUHAR'S ANALYSIS OF "HIGH RISK" PATIENTS WAS "CONFIRMATORY" NOT "*POST-HOC*," BECAUSE THE EVIDENCE OF GREATER EXCESS CV EVENTS AMONG HIGH RISK PATIENTS WAS PREVIOUSLY PROPOSED BY MERCK ITSELF IN THE VIGOR PUBLICATION**

Merck argues that Dr. Farquhar should not be permitted to testify that there was a greater risk of Vioxx to patients who were at higher background risk, claiming that this is a "*post-hoc*" analysis. However, the term "*post-hoc*" does not apply to Dr. Farquhar's analysis. "Post hoc" means "after-the-fact," and in science this refers to exploratory analyses based on inspection of data after a study is over, without a pre-specified hypothesis. See, e.g., Yusuf, et al., "Analysis and Interpretation of Treatment Effects in Subgroups of Patients in Randomized Clinical Trials," JAMA 1991; 266:93-98 (Ex. 14).   In the case of Vioxx, Merck itself had generated the hypothesis that patients with a high background risk experienced a greater rate of CV events on Vioxx than patients at lower risk, in the VIGOR article published in 2000 (Bombardier, Exhibit 13).   Specifically, the Merck-sponsored VIGOR article stated that there was a statistically significant increased risk of MI on Vioxx versus naproxen among the "aspirin indicated" patients who were at high risk of CV events, while the difference was not significant for the lower risk patients. (Id.) The excess CV risk for high-risk patients was also discussed in the FDA Targum Memorandum (2/1/01, Ex. 21), and the FDA's proposed label for Vioxx included a caution for patients at increased background risk, in October 2001 (Ex. 23). Authors

- 12 -

of peer-reviewed literature also reviewed the Vioxx data and stated, "we urge caution in prescribing [Cox-2 inhibitors] to patients at risk for cardiovascular morbidity." *Mukherjee, et al.*, "Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors," JAMA 2001; 286:954-959, at 959 (Ex. 15). Merck also designed, but did not conduct, a study to evaluate the risk of Vioxx in a study of high-risk patients, hoping to show a "favorable CV event profile" to "reassure physicians." (Ex. 25). Thus, the hypothesis was generated in VIGOR, found credible by the FDA, discussed in the literature, and confirmed in APPROVe, in accordance with standard scientific methods. Dr. Farquhar did not generate the hypothesis following APPROVe; he reported on the subsequent study confirming the effect.

Defendant also inaccurately accuses Dr. Farquhar of "data dredging" when in fact the high risk subgroups were pre-specified by Merck itself in the DAP for Protocol 203. (Ex. 4 at p. 20.) At his deposition on June 8, 2006, Dr. Farquhar was asked about this subject, and the following exchange occurred:

> Q.  When you did your analysis in your supplemental report, you used the pre-specified high cardiovascular risk subgroup of the APPROVe study —
>
> A.  Correct.
>
> Q  — as defined by Merck?
>
> A.  Correct.

(Farquhar Tr. 62:23-63:3.; Ex. 12)

In response to defense counsel's criticism of the patients whose events were included in the "high risk" analysis, Dr. Farquhar stated that the analysis could be redone to include only the 38 cases identified in Merck's database as members of the "increased cardiovascular risk" category, while excluding the 2 diabetics who should have been placed in the same category, and

- 13 -

that the results would be similar. (Farquhar Tr. 165:19-166:9; Ex. 12).[6]  At Dr. Farquhar's request,, Professor Jewell has now performed that analysis, using only the Merck pre-specified "increased cardiovascular risk" category. Professor Jewell states, "the results are materially very similar to those from my previous analysis." (Jewell Report at 2; Exhibit 3). The relative risk in the high risk group was "considerably higher" than in the low risk group, namely 2.70 with a 95% confidence interval of 1.31-5.57, p = 0.007, compared to the previous analysis showing a p value of 2.87 and a p value of 0.004.  In other words, there is no material difference, and even if Merck's position is accepted the data show that patients with pre-specified high background CV risk have a far greater excess risk of CV events due to Vioxx.

It is also important that Dr. Farquhar's analysis is consistent with a large and growing body of literature confirming the biological plausibility of higher relative risks for the patients who start out at high background risk levels.  This literature, which began with VIGOR and the Mukherjee article (Exs. 13, 15) includes a recent meta-analysis of Cox-2 inhibitor trials, relied upon and introduced by Merck as a deposition exhibit on June 12, 2006, which posits "a higher excess in those at above average risk (such as older patients with established atherosclerotic disease)." (Kearney, British Medical Journal 2006; 332:1302-1308 (3 June) at 1307 (emphasis added); Exhibit 18).

In summary, it is inaccurate to charge Plaintiffs' experts with "data dredging," where (1) Merck first published the hypothesis of greater CV risk on Vioxx for patients at higher baseline risk; (2) Merck designed the Vioxx studies that defined the "increased CV risk"

---

[6] Defense counsel charge that Dr. Farquhar relied on plaintiffs' counsel to provide information about the 2 diabetics with additional risk factors.  However, Dr. Farquhar corrected the record to state that he personally reviewed the relevant documents. (Ex. 12, Tr. at 165-169).

- 14 -

category to test that hypothesis; and (3) the results reported by Merck actually support an inference that the increased risk is real.

## V.   DR. FARQUHAR'S TESTIMONY CONCERNING THE ALZHEIMER'S TRIALS IS BASED ON NUMEROUS SOURCES AND IS ADMISSIBLE

Merck argues that Dr. Farquhar relies "solely" on Dr. Kronmal's analysis of the results of the Alzheimer's trials of Vioxx, and argues from that incorrect premise that Dr. Farquhar should not be permitted to testify about the Alzheimer's trials.  In his Report of September 26, 2005 (Ex. 1), at ¶¶ 132-137, and again at ¶ 147, Dr. Farquhar reviewed information concerning the Alzheimer's trials from several sources, including FDA reports and published literature, as well as the report of Dr. Kronmal.  Dr. Farquhar also reviewed a defense expert's report that "does not suggest any errors in the counts or calculations of events made by Dr. Kronmal from Merck's own database of the AD trials.  This supports the reliability of Dr. Kronmal's analysis.  Of note, the actual event counts in the Merck database for MI and sudden cardiac death were greater than those presented to the FDA in 2005." (September 26, 2005 Report, at ¶ 134; Exhibit 1).

Dr. Farquhar's Report also addressed the related cardiovascular outcomes of hypertension, edema and congestive heart failure (CHF) in the Alzheimer's trials, citing the FDA Medical Officer Review for the period ending November 28, 2001, and his report included a reproduction of the Kaplan-Meier cumulative incidence of hypertension in the Alzheimer's trials, which appeared in Merck's submissions and FDA files, but not in the Kronmal Report. Therefore, it is clear from the record that Dr. Farquhar relied upon a variety of sources for his opinions on the Alzheimer's trials, and that Merck's selective reference to the deposition of June 8, 2006 is an inadequate basis to exclude Dr. Farquhar's testimony on the Alzheimer's trials.

Dr. Farquhar has extensively reviewed and reported upon the Vioxx literature, and he is entitled to rely, in part, upon the report of another consultant such as Dr. Kronmal as part of the

- 15 -

totality of evidence upon which his opinions are based.  As noted above, this Court found Dr. Farquhar's methodology to be proper in November 2005, and Dr. Farquhar's opinions at that time included his partial reliance on Dr. Kronmal as to the Alzheimer's data.

## VI.  MERCK'S OMISSIONS OF IMPORTANT DATA FROM PUBLISHED LITERATURE ARE RELEVANT

The peer-reviewed literature concerning CV risks of Vioxx is important to the litigation. In particular, the VIGOR and APPROVe studies, written by Merck consultants and employees, and the interpretation of these studies, go to the heart of all experts' testimony on causation.  Yet Merck itself generated the data, prepared the analyses, and decided which data and analyses it would permit the peer reviewers to see and comment upon.  In the case of the VIGOR article, the failure to disclose information about known risks has resulted in the rare statement of an Expression of Concern by the reviewing journal.  Now, the APPROVe article has also required a correction of the central claim of absence of risk for the first 18 months of use.  (Ex. 19).  The reliability of an expert's methodology in citing peer-reviewed literature depends, in part, on whether the authors fully disclosed what they knew about the risks.  Similarly, the legitimacy of the APPROVe study can only be fairly considered if the experts are permitted to testify, not only as to the information disclosed to the peer reviewers, but also the information that was withheld, which both the reviewers and plaintiffs' experts believe was relevant.  In this context, the record at trial should reflect that certain information was not provided to the peer reviewers; otherwise, a jury could incorrectly conclude that the peer-reviewed publication was based upon a full disclosure and a decision by the reviewers to include only the information that actually appeared in the article.  Thus, a jury should be informed of at least the following omissions from Merck's disclosures to the peer reviewers of the APPROVe study:

- The authors did not disclose the existence of Protocol 203 in the plan to combine the APPROVe data with 2 other studies for analysis. Therefore, the peer reviewers were deprived of the analysis presented by Dr. Farquhar showing early and persistent excess risk of Vioxx, refuting the '18 month hypothesis.' (Ex. 2, at ¶ 9).

- Merck deleted the investigator reported cardiovascular event data showing the statistically significant increased risk of Vioxx in both the first 18 months and the later period of the study, and failed to provide the Kaplan-Meier cumulative incidence plot showing Vioxx above placebo throughout the study. This pre-specified secondary endpoint information contradicted the authors' claim of 'no difference' for 18 months. (Ex. 1, at ¶¶ 85-97).

- The peer reviewers requested a composite Kaplan-Meier plot for the thrombotic + APTC + CHF endpoints, which Merck did not approve, although it had done that analysis in September 2004. (Ex. 1, at ¶ 104).

- Contemporaneous with the publication of APPROVe, a Merck-employee author of the article wrote an internal email stating that blood pressure spikes "portended" thrombotic events (Ex. 20), while the draft submitted to the peer-reviewers claimed no relationship between blood pressure and thrombotic events, and failed to disclose the blood pressure spike data.

These examples from VIGOR and APPROVe demonstrate that failure to make full disclosure to a peer-reviewed publication is not merely a "state of mind" issue. Because the reliability of an opinion is inherently based on the quality of the data relied upon, the authors' omission of material data undermines the opinions of those who would rely upon such publications, affecting the weight to be given to experts' views, unless the undisclosed data are considered by the expert. The omission of material data from peer-reviewed publications is also relevant to credibility, which is always at issue. The Court and jury should be permitted to hear Dr. Farquhar's testimony about the excluded data, how such data enter into the analysis, and the reliability (or lack of it) of the Merck-sponsored publications, with and without the unpublished, undisclosed data. As an author of over 200 peer-reviewed articles, Dr. Farquhar is well qualified

- 17 -

to review the record of what was and was not disclosed to the peer reviewers and to determine what additional disclosures would be relevant to understand the studies.

## VII.   DR. FARQUHAR'S SPECIFIC CAUSATION OPINION IS NOT CUMULATIVE BECAUSE IT IS BASED UPON HIS PARTICULAR EXPERTISE IN CARDIOVASCULAR EPIDEMIOLOGY

Merck alleges that Dr. Farquhar's opinions concerning specific causation of Mr. Barnett's MI are cumulative with those of Dr. Zipes and should be excluded. However, these two experts with different subspecialties provide opinions that are complementary rather than cumulative. Dr. Farquhar is one of the leaders in the field of cardiovascular epidemiology and brings special expertise to these issues. The Reference Manual on Scientific Evidence states that epidemiologic analyses are important to showing specific causation. (Id., at 381-386.) In particular, the analyses of higher relative risk of adverse CV events for patients at higher baseline risk, and for patients who suffered blood pressure spikes, are epidemiologic analyses that Dr. Farquhar is particularly well qualified to present. Such analyses are directly relevant to Plaintiff Gerald Barnett, both because he was at "increased cardiovascular risk" and because of blood pressure spikes on Vioxx that had not appeared before.

At the same time, Dr. Zipes' experience provides expertise to review and comment upon the causation issues from a mechanistic perspective. Thus, Dr. Zipes' and Dr. Farquhar's opinions are compatible and complementary, rather than cumulative, and both experts should be permitted to testify as to their opinions based on their particular areas of expertise. Further, Merck has challenged Dr. Zipes' credentials as an epidemiologist, while at the same time attacking Dr. Farquhar as insufficiently familiar with the mechanisms of Vioxx injury. Thus, Merck's own attack demonstrates the need for both experts to testify.

Plaintiffs seek to introduce complementary rather than cumulative testimony, and the Court will of course exercise its traditional role to preclude cumulative evidence at trial. Such

- 18 -

judicial control constitutes the appropriate remedy, and the pre-trial exclusion of opinions of experts from different disciplines is unwarranted.

## VIII. DEFENDANT INVITED DR. JEWELL'S TESTIMONY

Defendant's Motion presents an incomplete and imbalanced history of the interactions of counsel concerning Dr. Jewell, claiming that Plaintiffs' counsel refused to provide discovery, *which is incorrect. Based on all the circumstances, it is appropriate for Plaintiffs to have Dr. Jewell's testimony at trial.*

At the outset, it should be noted that Dr. Farquhar had relied on a biostatistician who conducted analyses of Merck data for his September 2005 Report. Then, as now, *Plaintiffs did not designate the biostatistician as a testifying expert.* Merck did not seek to depose the non-testifying biostatistician in 2005, and Plaintiffs reasonably expected that Dr. Jewell would similarly not be a target of Merck's discovery plan. However, unlike the sequence of events in 2005, Merck sought to depose the biostatistician, Dr. Jewell in 2006. Plaintiffs' counsel did not refuse discovery, but instead provided defense counsel with Dr. Jewell's "high-risk analysis" on June 2, 2006, almost a week before the deposition of Dr. Farquhar, to allow defense counsel an *opportunity to cross-examine, while advising that Dr. Jewell was a non-testifying expert.* Defense counsel then replied that he would "revisit" the issue after the deposition of Dr. Farquhar. (Ex. 17). Up until this point, the correspondence shows a cooperative relationship between counsel.

However, it is clear from the subsequent sequence of events that defense counsel planned their course to compel Dr. Jewell's deposition, by focusing the deposition of Dr. Farquhar on technical biostatistical issues and alleged insufficiencies in the data and analyses, as to which Dr. Jewell would be required to respond. When defense counsel then renewed their request to depose

- 19 -

Dr. Jewell, Plaintiffs' counsel did *not* refuse that request, but instead advised that Dr. Jewell would provide a rebuttal report and would appear for deposition. Plaintiffs' counsel then served the report and offered a deposition date, without waiver of either side's position as to permissibility of rebuttal reports. Thus far, Defendant has shown no interest in taking the discovery it claimed to need, but has instead attempted to exclude testimony from Dr. Jewell after claiming that his testimony was essential to its trial preparation. No doubt Merck hopes to have its cake and eat it too, by asking the Court to deny a right to rebuttal, then renewing its effort to take Dr. Jewell's deposition anyway.

To fairly consider this issue, Plaintiffs submit that the Court should be informed of some of the specific questions asked of Dr. Farquhar at his deposition on June 8. With respect to the issue of interactions and statistical tests, Merck introduced a highly technical article by the chairman of the Department of Biostatistics at Harvard, Steven Lagakos, as an exhibit at Dr. Farquhar's deposition on June 8, 2006.  This article was *not mentioned in Dr. Farquhar's* report, nor was he familiar with it.  Defense counsel specifically used the article to draw out Dr. Farquhar's reliance on Dr. Jewell for interpretation of biostatistical concepts, including p-values for interactions, as well as the overall meaning of the Lagakos article, over the course of 19 pages of the deposition transcript (Ex. 12, p. 133:20-152:20).  Defense counsel appeared to use this deposition inquiry as a set up for a motion to compel Dr. Jewell's deposition, *including* such questions as:

> Q.  Dr. Farquhar, do you know if plaintiffs' attorneys are going to allow Dr. Jewell to explain himself?  . . .
>
> Q.  Do you think the plaintiffs' attorneys should allow Dr. Jewell to come to trial and explain to the jury his analysis and explain, if he can, professor Lagakos' views? . . .

- 20 -

Q.   You rely on Dr. Jewell for that analysis [of significant interactions], correct? . . .

Q.   Dr. Farquhar, do you think its appropriate to have Dr. Jewell explain himself as to what he meant by the appropriate P for significant interaction that you are relying on?

A.   Well I would say if that is something that you and other attorneys would like to do, then fine.   He needs to speak for himself.

(Ex. 12, Farquhar Depo. at 147:18-149:5).   See also e-mail from Andrew Goldman to Donald Arbitblit, 6/13/06 (Ex. 17), which included Q & A from the deposition of Dr. Farquhar and described Dr. Jewell's testimony as "vita."

Similarly, defense counsel invited Dr. Jewell's opinions on the data relied upon for Protocol 203 (Ex. 10, pp. 67:18-86:23), and in particular such questions as:

Q.   Do you know whether or not Dr. Jewell used the final VICTOR in his analysis . . .

Q.   The only person that knows what data Dr. Jewell used in his Protocol 203 analysis is Dr. Jewell, correct? . . .

Q:.   I would have to ask Dr. Jewell what data he used for his protocol 203?

(Ex. 12, Farquhar Transcript at 83:20-86:23).   Defense counsel would not accept Dr. Farquhar's testimony that Dr. Jewell "did follow the data analysis plan entirely" for Protocol 203 (Ex. 12 at 69:25-70:1), nor do they have any evidence to the contrary.   They asked specific questions inviting Dr. Jewell's responses and preparing for their motion to compel his deposition. Dr. Jewell is ready, willing and able to respond and should be permitted to do so.

Because Defendant has objected to the submission of Dr. Jewell's Report, Plaintiffs intend to file a Motion for Leave of Court to supplement their witness list, if the Court deems such a motion to be appropriate.   In this regard, Plaintiffs refer the Court to Murphy v. Magnolia Electric Power Association, 639 F.2d 232 (5th Cir. 1981), which held that it was reversible error

- 21 -

to refuse to allow an expert to testify as a rebuttal witness, where no prejudice would have resulted to the opposing side, and in view of the importance of the testimony. (Id. at 235). In this case, Defendant described the testimony of Dr. Jewell as "vita," and has not shown any prejudice. Also, in Corus U.K., Ltd. v. Forest Lines, 2005 WL 1037999 (April 28, 2005, E.D. La.), Judge Engelhardt held that plaintiffs were permitted to designate an additional expert, where a rebuttal report was served after expiration of a scheduling order deadline, opposing counsel objected, and plaintiffs filed a motion for leave to designate an additional expert. The Court held that the expert would be permitted, where the testimony was important, opposing counsel could depose the expert between the time of the Court's order and the trial, and no prejudice would result by the addition of the expert as a witness. (Id. at 3-4). Plaintiffs submit that the same factors would justify adding Dr. Jewell as an expert in this case.

Thus, in addition to the issues discussed above concerning the data and analyses of Dr. Jewell, Merck's counsel made specific efforts to secure Dr. Jewell for deposition, and Merck should not now be heard to say that Dr. Jewell cannot provide a report stating the opinions and facts that Merck has claimed it needs.

## IX.   CONCLUSION

For all of the reasons set forth above, Dr. Farquhar's testimony should be permitted. He followed the same methodology that the Court found reliable in November 2005. He relied on peer reviewed literature and Merck's own data, which have been reviewed by Merck experts who reached different conclusions. As in November 2005, Dr. Farquhar appropriately relied upon assistance from a biostatistician to conduct statistical analysis, in a manner similar to his practice throughout his career, including abundant peer review publications. Merck has

- 22 -

introduced no evidence whatsoever to challenge the accuracy of Dr. Jewell's analysis, but instead merely raises questions inviting Dr. Jewell's testimony on these issues.

Dated: June 24, 2006

Respectfully submitted,

By _____

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Co-Counsel for Plaintiff

Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Counsel for Plaintiff

- 23 -

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana  70013
Telephone:  (504) 581-4892
Facsimile:  (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York  10004
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799
**Co-Lead Counsel**

## PLAINTIFFS' LIAISON COUNSEL

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana  71301-1190
Telephone:  (318) 487-9874
Facsimile:  (318) 561-2591

Carlene Rhodes Lewis
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas  77002
Telephone:  (713) 650-0022
Facsimile:  (713) 650-1669

Elizabeth Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Drew Rapier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana  70601
Telephone:  (337) 494-7171
Facsimile:  (337) 494-7218

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania  19102
Telephone:  (215) 772-1000
Facsimile:  (215) 772-1371

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl.
Newport Beach, California  92660
Telephone:  (949) 720-1288
Facsimile:  (949) 720-1292

Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania  19106-3875
Telephone:  (215) 592-1500
Facsimile:  (215) 592-4663

Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC  20036-4914
Telephone:  (202) 783-6400
Facsimile:  (307) 733-0028

## PLAINTIFFS' STEERING COMMITTEE

546543.1