IN RE VIOXX PRODUCTS LIABILITY ) MDL No. 1657
LITIGATION )
 )

### SUPPLEMENTAL EXPERT REPORT OF JOHN W. FARQUHAR, M.D.
### THIS DOCUMENT APPLIES TO ALL CASES

**A.** **Introduction and Summary of Opinions**

 1. This Report is submitted to supplement the opinions provided in my Report dated September 26, 2005, based on review of the additional materials referenced herein. The opinions provided herein are stated to a reasonable degree of medical and scientific probability. In summary, the Supplemental Report includes the following:

- **Protocol 203:** Merck's pre-specified analysis of data from three pooled studies (APPROVe, VICTOR and ViP), known as "Protocol 203," shows early and continuous excess risk of cardiac adverse events, statistically significant at 18 months and at all times thereafter, thereby refuting Merck's hypothesis that no excess risk appears until after 18 months of exposure.

- **High-Risk Patients:** Data from the APPROVe and VIGOR studies are analyzed, showing greater relative risks and rapid onset of excess cardiovascular events among patients at higher background risk; that is, the level of the cardiovascular (CV) risk before using Vioxx.

- **Hypertension:** Data from the APPROVe and VIGOR studies are displayed, showing early, continuous and statistically significant excess risk of hypertension due to Vioxx, compared to both placebo and naproxen. Also, data from the APPROVe study show

538398.1



significantly greater incidence of both "Stage 2" (more severe) hypertension and thrombotic events among Vioxx patients who suffered Stage 2 hypertension.  No such increase in CV event risk appeared among placebo patients who experienced Stage 2 hypertension, supporting the conclusion that there was a synergistic interaction between hypertension and Vioxx use.

- <u>APPROVe "extension" data</u>:  According to documents submitted to the FDA by Merck in May 2006, the excess risk of CV events, including myocardial infarction ("MI") and ischemic stroke, remains statistically significant when data from a one-year off-drug follow-up were combined with the previously published data.  For the extension period alone, there was a 64% increased risk of thrombotic events in the Vioxx group.

- <u>Biological Mechanism</u>:  Recent publications support Cox-2 inhibition as the cause of hypertension and thrombosis.

**B.**  <u>**Protocol 203 Shows Early and Continuous Risk of Excess Cardiac Events Among Vioxx Patients.**</u>

2.     In 2002, following the VIGOR study, Merck prepared a plan to analyze CV adverse events in a pooled analysis of 3 large placebo controlled studies: APPROVe, VICTOR and ViP.  The plan, known as "Protocol 203," was submitted to the FDA for its response.  On December 19, 2002, FDA Medical Officer Lawrence Goldkind responded to Merck's proposal, indicating general acknowledgment that Protocol 203 would provide "clinically important safety information" about the risk of Vioxx.  (Letter, Goldkind to Braunstein, 12/19/02, at p. 1.)  Merck proceeded  to implement Protocol 203.

3.     Merck's Protocol 203 Data Analysis Plan ("DAP") stated a purpose "to provide increased precision on estimates of the comparability between

- 2 -

rofecoxib and placebo on the incidence of thrombotic cardiovascular serious adverse experiences" (SAEs). (MRK-AFL0015451-484, at 454). The Protocol commented that *the larger data set would be more accurate than data from any single one of the three* studies. The DAP stated that the findings of Protocol 203 would allow "generalization of the results to other populations" who used Vioxx, including arthritic patients, because the study populations were of similar age and had risk factors for CV events. (Id.)

4.      The endpoints defined in the Protocol 203 included "Cardiac" (MI, *Sudden Death, Unstable Angina, etc.*), and "Cerebrovascular" (Ischemic Stroke, Transient Ischemic Attack) events. (MRK-AFL0015463). The DAP for Protocol 203 also called for Kaplan-Meier (KM) cumulative incidence graphs to compare the risk of Vioxx versus placebo for CV events over time. (MRK-AFL0015474-75). To the best of my knowledge, Merck has never presented these analyses for Protocol 203, but instead has claimed support for the "18-month hypothesis" based only on the KM curve for "all thrombotic events" in the APPROVe study, which was only one of the 3 studies to be included in the pre-specified analysis.

5.      Following preparation of my Report dated September 26, 2005, data produced by Merck became available to calculate the RR and prepare the KM cumulative incidence curve for Vioxx versus placebo from the Protocol 203 studies. The Protocol 203 data were analyzed and KM cumulative incidence graphs were prepared by Nicholas Jewell, Ph.D., a renowned biostatistician at the University of California at Berkeley School of Public Health, who applied generally accepted methods. Professor *Jewell's report on Protocol 203 is attached as Exhibit A.*

6.      Based upon this larger and statistically more reliable data set, Protocol 203 directly refutes Merck's hypothesis that no excess risk appears until after 18 months of Vioxx use. To the contrary, the RR of cardiac events (MI, Sudden Cardiac Death and Unstable Angina) in the Vioxx population was 2.68 after 30 days, and 2.37 ($p < 0.001$, 95% CI 1.43-3.91) at the end of the study. There was a statistically significant

- 3 -

excess risk by 18 months, and continuously thereafter until the end of the study. As seen in **Figure 1**, below, the rate of cardiac events in the Vioxx population exceeded placebo from the first month through the end of the study. Further, statistical analysis shows that there was <u>no</u> significant difference in the RR of cardiac events over time. (Jewell Report, at pp. 1-2).



**Figure 1:** Kaplan – Meier Estimation of cumulative cardiac events. The inset in the upper left corner of the Figure presents an expanded scale for the 0-6 month period, to better illustrate the early separation of the incidence curves.

       7.      The scientific method is largely based upon testing of hypotheses which are specified before a study is conducted. To prevent manipulation of the results, an essential element of this method is that the data must be analyzed according to the plan made at the outset. That was not done by Merck or its consultants in this case. The DAP did <u>not</u> call for a KM curve of CV event data over time for APPROVe alone. (MRK-I8940080858-928, at 875-876); nevertheless, Merck has promulgated the "18-month" hypothesis based on that single study, which was underpowered to detect differences in the rate of events over time. Conversely, the DAP for Protocol 203 did specify that a KM curve would be prepared from the larger data set of the 3 combined studies, but Merck

538398.1

has failed to perform such an analysis. The results of that pre-specified plan show early and persistent excess risk of CV events, with the risk due to Vioxx significantly greater than placebo at 18 months and all later periods (see Figure 1, above), refuting the " no risk for 18-months" hypothesis. The scientific method does not prohibit conducting exploratory analyses that were not pre-specified, and such analyses may provide important information. However, such exploratory analyses are not an acceptable substitute for those that were planned in advance.

8.      Since all of the Protocol 203 studies were terminated on the same date (9/30/04), there was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of CV risk for all three trials, as pre-specified. Indeed, a November 12, 2004, draft version of the subsequently published APPROVe study acknowledged the pre-specified Protocol 203 plan, as follows: "Assessment of cardiovascular safety was not the primary purpose of this study [APPROVe] and there was no pre-specified hypothesis concerning this endpoint for this study alone. However, an analysis of combined cardiovascular data from this study and the data from two other studies was planned." (RBRES-001054-1079, at 1066). The authors deleted such references from later drafts (e.g., 1/26/05 Draft, MRK-AHD0075201-234, at 75209), and no reference to Protocol 203 appeared in the final draft submitted for peer review on February 6, 2005.

9.      At his deposition in November 2005, New England Journal of Medicine (NEJM) Editor Gregory Curfman testified that NEJM had not been informed of the plan to combine APPROVe with two other studies; that the existence of the related studies should have been disclosed; and that clinical trial registration is intended to prevent "bad news" from being "buried away" by the sponsor. (Depo. of Curfman, 11/21/05, at 136-141).

10.      I agree with Dr. Curfman that the related studies of Protocol 203 should have been made known to the editors of NEJM. The scientific method and the

- 5 -

interests of the medical community required disclosure of results of the pre-specified data analysis of all three pooled studies, and not only the results of APPROVe. Such disclosure is particularly important where the undisclosed, pre-specified analysis contradicts the substitute analysis offered by the sponsor, as in the case of the "18-month" hypothesis based on APPROVe alone, which is refuted by the complete Protocol 203 data.

**C.    Patients in APPROVe Who Were at High Risk for CV Events at Baseline Had Higher Relative Risks of CV Events Due to Vioxx, Supporting the Synergistic and Multiplicative Effect of Vioxx and Baseline High-Risk Status.**

11.    Data from Merck's APPROVe Cardiovascular Safety Report (CSR), filed with the FDA in June 2005, in conjunction with data provided by Merck in this litigation, were used by Professor Jewell to evaluate RRs of thrombotic events among patients at "high cardiovascular risk," compared to patients with lower risk status. Merck defined the "high cardiovascular risk" category to include those with "a history of symptomatic atherosclerotic cardiovascular disease [SACVD] or the presence of at least two of the following risk factors for coronary artery disease: a history of hypertension, a history of hypercholesterolemia, a history of diabetes, or current cigarette use." (Bresalier, 352 NEJM at 1097). Patients identified as diabetics were included in the "high-risk" analysis, based on well-established epidemiologic evidence that the CV adverse event risk conferred by diabetes is equivalent to the CV risk for patients with coronary heart disease (CHD). See, e.g., Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III). NIH Publication No. 02-5215, Bethesda, MD, National Institutes of Health 2002 ("ATP III"), which designated diabetes as a CHD risk equivalent.

12.    The data show not only that Vioxx use caused statistically significant excess risk of CV events, but also that Vioxx interacts synergistically with

538398.1

high baseline CV risk status to more than multiply the RR of thrombotic events in high-risk patients. Because interaction tests divide the population into subgroups for comparison, the power to detect important differences is reduced. Therefore, tests of significant interaction may be appropriately set at levels greater than the "p=0.05" level commonly established for significance testing of primary effects. See, Jewell, N., Statistics for Epidemiology (Chapman and Hall, New York 2003) at 159 (setting level of significant interaction at $\leq 0.2$ has "the desired effect of drawing attention to important variations that might be missed by inappropriately fixating on the standard 0.05 level of significance"). The results of this analysis are discussed at paragraphs 13-15, and presented graphically in **Figure 2**, below:



**Figure 2:** Summary Incidence rate of Confirmed Cardiac and Cerebrovascular Events in the APPROVe Study by Baseline Risk Status and Treatment Group.
Relative Risks (RR) and p-values based on Proportional Hazard Model

13. These data from APPROVe reveal a statistically significant increased risk of cardiac plus cerebrovascular events in the high-risk Vioxx group v. high-risk placebo group, RR = 3.83 (95% CI 1.67-8.77), p = 0.001. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.43. Comparison of the high-risk RR (3.83) to the lower-risk RR (1.43) yields a p value of 0.086, indicating significant

- 7 -

interaction between baseline risk and Vioxx use, that is, the higher RR is due to the synergistic effect of CV risk due to both Vioxx and to baseline risk status.

14.    *For a second category of outcomes, "all thrombotic" events, for the high-risk Vioxx group v. high-risk placebo group, the RR = 2.87 (95% CI 1.40-5.86), p ≈ 0.004.  For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.15.*  An interaction p value of 0.07 for the comparison of high-risk RR (2.87) to low risk RR (1.15) provides strong evidence of the synergistic relationship between baseline risk and Vioxx use, consistent with the findings cited above (see ¶ 13).

15.    This synergistic interaction is supported by consistent results when RRs are compared for "high risk" and "lower-risk" Vioxx patients.  The RR for high-risk Vioxx patients is significantly higher than for low-risk Vioxx patients, RR = 4.36, 95% CI (2.38-7.99), p < 0.001 for "all thrombotic events"; *RR = 4.35, 95% CI (2.32–8.14) p < 0.001 for cardiac plus cerebrovascular events.  These data again support interaction between Vioxx use and baseline risk, since high-risk status plus Vioxx resulted in a significantly greater RR than lower-risk status and baseline risk.*

- 8 -

16.     A KM cumulative incidence curve for the "high-risk" APPROVe patients shows early separation for the outcome category of cardiac plus cerebrovascular events, with the Vioxx rate above placebo, and a doubling of risk in the first 18 months; overall RR = 3.83, P < 0.001 (95% CI, 1.67-8.77), as set forth in **Figure 3**, below:



**Figure 3:** Comparison of the Kaplan-Meier Estimates of Confirmed Cardiac + Cerebrovascular Events by Treatment Group Restricted to the High Risk Subgroups of VIGOR and APPROVe Studies

### D.     VIGOR Analysis Shows Similarly Higher Relative Risk and Rapid Onset of CV Disease in Vioxx Patients v. Naproxen.

17.     In my previous Report, data from the VIGOR study were presented, showing, among other things, a greater RR of thrombotic events in the Vioxx subgroup of aspirin-indicated patients versus the naproxen subgroup of aspirin-indicated patients, RR = 4.89, p = 0.012, 95% CI (1.44-16.88) compared to the non-aspirin-indicated (lower-risk) Vioxx v. naproxen subgroup, RR = 1.88, p = 0.04, 95% CI (1.02-3.44).  FDA Medical Officer Review, 3/30/01, p. 5.  Professor Jewell has prepared a KM curve (**Figure 3**, above) using Merck's data, showing that the high-risk VIGOR population on Vioxx experienced very rapid onset of CV thrombotic events, immediately and continuously in excess of the naproxen group, and statistically significant after a study of only 8 months mean exposure duration.

538398.1

18.     These data are not explained by a "protective effect" of naproxen. If Vioxx were harmless and the VIGOR results were explained by a naproxen "protective effect," then the Vioxx cardiac event rate would have come out "even" with the rate for the harmless placebo given in APPROVe and Protocol 203.  Instead, the Vioxx event rates were significantly worse than placebo, and particularly elevated for high-risk patients.  Thus, the data from APPROVe and Protocol 203 confirm the refutation of the cardioprotection theory advanced by Merck to explain VIGOR's results.

19.     As noted by Cox-2 researcher Garret FitzGerald in the aftermath of the removal of Vioxx from the market, "[t]he higher a patient's intrinsic risk of cardiovascular disease, the more likely it would be that such a hazard [of Cox-2 inhibition] would manifest itself rapidly in the form of a clinical event"(FitzGerald, "Coxibs and Cardiovascular Disease," NEJM 2004; 351:1709-1711).  The elevated RRs of the high-risk status patients from APPROVe and VIGOR, as shown above, are consistent with FitzGerald's assessment of the increased likelihood of events in patients on Vioxx with high background risk.

**E.     Vioxx Causes Significant Increased Hypertension, Including Severe "Stage 2" Hypertension That Was Strongly Associated With Thrombotic Events in APPROVe.**

20.     In both APPROVe and VIGOR, Vioxx caused large and statistically significant increased incidence of hypertension.  **Figure 4**, below, presents the KM for hypertension in VIGOR, prepared by Professor Jewell from Merck's data, along with the KM curve for hypertension in APPROVe from Merck's "Figure 9" in the "General Safety Report," (GSR), Reference P122, Appendix 2.1.1 (MRK-AFV0426229).

538398.1



**Figure 4**: Comparison of Cumulative Incidence Rates of Hypertension Adverse Events in the VIGOR and APPROVe Studies.

21.     These figures demonstrate a remarkably consistent, statistically significant, approximate doubling of hypertension in Vioxx patients, at both 25 mg. versus placebo (APPROVe) and at 50 mg. versus naproxen (VIGOR). Also, the data show a disturbing, continuously increased cumulative incidence of hypertension-related adverse events (AEs) due to Vioxx suffered by approximately 30% of the patients in the APPROVe study by the end of 3 years' use of Vioxx at the standard therapeutic dose. In APPROVe, there were 377 (29.3%) hypertension AEs in the Vioxx patients compared to 219 (16.99%) on placebo (Table 32; MRK-AFV0426227). Merck reported the "Difference in Percentage Points" (12.4%) and the 95% CI for that difference (9.2, 15.6), a highly significant result. In the VIGOR study, Professor Jewell used Merck's data to calculate the RR = 1.83, P < 0.0001, 95% CI 1.55-2.16. Of further interest, in APPROVe, Merck analyzed the hypertension-related AEs based on "Common Toxicity Criteria" of the National Cancer Institute, graded 0 (no event) through 4 (most severe). (Table 33, MRK-AFV0426228). The Vioxx group had more than double the incidence

- 11 -

of "Grade 2"[1] hypertension (8.08% v. 3.77%) and "Grade 3"[2] hypertension (5.67% v.
2.69%), and the p-value for treatment based on a logistic regression model was "0.000,"
i.e., a less than 1 in 1,000 possibility that the result was due to chance.  (Id.)

       22.    Additional unpublished APPROVe data demonstrate increased risk
of more severe "Stage 2" hypertension on Vioxx versus placebo.  As can be seen in
Table 39 below, reproduced from the Merck GSR (MRK-AFV0426242), the Vioxx and
placebo populations had essentially identical prevalence of Stage 2 hypertension at
baseline (before the study).  However, as seen in Table 40 from the GSR, below (MRK-
AFV0426243), the Vioxx population experienced a large and highly statistically
significant increased incidence of both systolic and diastolic blood pressure increases
exceeding the threshold for Stage 2 hypertension.  For patients who developed both
Systolic Blood Pressure (SBP) $\geq 160$ and Diastolic Blood Pressure (DBP) $\geq 100$, the RR
was 2.14 p < 0.001 (95% CI 1.57, 2.92), that is, more than double the risk that Vioxx
patients would develop this severe form of hypertension.

**Table 39**

**Summary of Baseline or Screening Stage II Hypertension**

| Blood Pressure | Rofecoxib 25 mg n/N(%) | Placebo n/N(%) |
|---|---|---|
| DBP ≥ 100 | 26 / 1287 (2.02) | 29 / 1299 (2.23) |
| DBP ≥ 100 and SBP ≥ 160 | 14 / 1287 (1.09) | 13 / 1299 (1.00) |
| DBP ≥ 100 or SBP ≥ 160 | 547 / 1287 (30.96) | 543 / 1299 (41.81) |
| SBP ≥ 160 | 132 / 1287 (10.26) | 128 / 1299 (9.85) |

Data Source: [4,2]

[1] "Grade 2":  "recurrent or persistent symptomatic increase by > 20mmHg (diastolic) or to > 150/100 if
previously within normal limits (WNL); not requiring treatment." (Id.)
[2] "Grade 3":  "requiring therapy or more intensive therapy than previously."

- 12 -

538398.1

Table 40

Analysis of Stage II Hypertension

| On-Treatment Blood Pressure (mmHg) | Rofecoxib 25 mg (N=1287) Events/Patient-Years (rate/100) | Placebo (N=1299) Events/Patient-years (rate/100) | Comparison | | |
|---|---|---|---|---|---|
| | | | Difference (95% CI) | Relative Risk (95% CI) | P-Value |
| DBP ≥ 100 | (rate/100) | (rate/100) | (CI) | (95% CI) | 0.001 |
| DBP ≥ 90 or systolic | (rate/100) | (rate/100) | (CI) | (95% CI) | 0.001 |
| DBP ≥ 90 or systolic | (rate/100) | (rate/100) | (CI) | (95% CI) | 0.001 |
| DBP ≥ 100 | (rate/100) | (rate/100) | (CI) | (95% CI) | 0.001 |

Data Source: [9.3]

23.     Several unpublished documents from Merck's files demonstrate the strong association between Stage 2 hypertension and thrombotic events in APPROVe:

a.      On February 20, 2004, APPROVe External Safety Monitoring Board (ESMB) Chair James Neaton, Ph.D., wrote an email to other members of the ESMB, which made the following points:

- The data so strongly indicated cardiac toxicity that Dr. Neaton raised the possibility of stopping the APPROVe study at that time, over 7 months before it was actually terminated. (MRK-AG00000394).

- Some of the statistical results of the study were unlikely to change before the planned termination date, and, if they remained unchanged, they would be "interpreted as very damning to the drug." (Id.).

- As one of the "alternatives" to stopping the APPROVe trial in February 2004, Dr. Neaton proposed "that treatment be discontinued if Stage 2 hypertension develops" because a disproportionately large percentage of the confirmed CV events in the Vioxx group occurred among patients who had Stage 2 hypertension.  As of that time, 20 of the 38 events (53%) in the Vioxx group had occurred among 390 patients who developed Stage 2 hypertension (30% of the Vioxx treatment population).

- 13 -

(Id.)  Another alternative proposed by Dr. Neaton was to "[s]top the study for the subgroup of patients likely to develop Stage 2 hypertension" (Id.).

b.       On March 4, 2004, two weeks later, Dr. Neaton wrote a letter informing Merck of the ESMB's recommendation that patients with "uncontrolled hypertension" (>165mm Hg systolic or >95 mm Hg diastolic) should be removed from the APPROVe study.  (MRK-AF00262446).  In contrast, the Vioxx label did not include a warning to discontinue such patients from Vioxx therapy.  Dr. Neaton's letter comments that it is "well-known that NSAIDs and Cox-2 inhibitors raise blood pressures" (id.), while Merck's own unpublished data showed that Vioxx caused a statistically significant doubling of the risk of hypertension exceeding predefined limits of change, compared to Celebrex (Protocol 112; see my Report, 9/26/05, ¶ 150, p. 67).[3] A letter prepared by Merck to send to APPROVe investigators perpetuated the mistaken impression that Vioxx effects on blood pressure were simply an example of a class effect, without mentioning the adverse data when Vioxx was compared to Celebrex (MRK-AF00262435).

c.       On November 11, 2004, Merck's James Bolognese prepared an "Assessment of rofecoxib TCVSAE [Total Confirmed Cardiovascular Adverse Experiences] results by Systolic BP spike occurrence," which reported as follows:

---

[3] "In 2001, Merck itself had conducted a head-to-head trial of Vioxx versus Celebrex and placebo, known as Protocol 112, which supported Whelton's conclusion that Vioxx was associated with a greater degree of hypertension. Protocol 112 was a 6-week controlled study of 1,521 patients in four treatment groups, Vioxx 12.5 mg, Vioxx 25 mg, Celebrex 200 mg., and placebo. (MRK-AIN0001240). The Merck Statistical Report showing analyses as of January 9, 2001, indicates that approximately 10% of the subjects in each of the Vioxx 12.5 mg. and 25 mg. arms of the study had increased systolic blood pressure greater than 20 mm and absolute value of over 140 mm, exceeding the pre-defined limits of change, compared to 5.3% in the Celebrex arm and 4.8% in placebo. The increased hypertension on Vioxx 25 mg. versus Celebrex 200 mg. was highly statistically significant, p = 0.004, and also statistically significant versus placebo (p = 0.046). (MRK-AIN0001608-609). Id. However, Merck did not publish the data from Protocol 112". Report of John W. Farquhar, 9/26/05 at 67.

- 14 -

- In APPROVe, "examination of the results split by systolic BP (SBP) $\geq$ 160 mmHg on at least one occasion during the study revealed a <u>striking relationship</u>" to the occurrence of confirmed thrombotic events. (MRK-AGO0074496; emphasis added).

- "The interaction between SBP spike (y/n) and treatment in TCVSAE [*total confirmed cardiovascular events*] was statistically significant [p =0.0471]. In the patients with no SBP spike, the RR was close to 1, but <u>in those with at least one SBP spike, the RR was close to 4. These data suggest that nearly all of the excess CV events observed on rofecoxib versus placebo were in patients with at least one SBP spike.</u> However, in the placebo group, the occurrence of SBP spike showed no increase in rate of TCVSAE's." (<u>Id.</u>; emphasis added).

- When the data were analyzed according to a new "at risk" status as of the date when the SBP spike was first recorded, "<u>the interaction</u> . . . <u>was highly significant</u> (p = 0.0043), <u>indicating strong dependence of the treatment effect (hazard ratio) on whether there was a previous SBP spike or not</u>." (MRK-AGO0074497; emphasis added).

- A comparable analysis of data from the Alzheimer's trials showed a "numerically similar" relationship between SBP spikes in relation to TCVSAE's, but the interaction was not statistically significant. (<u>Id.</u>)

    d.    Between November 2004 and January 2005, drafts of the APPROVe study included references to the SBP spike data that were considered for inclusion in *the manuscript to be submitted to NEJM for publication* (<u>e.g.</u>, MRK-AHD0075212). However, the data were not submitted to NEJM, nor ever disclosed in

- 15 -

538398.1

the scientific literature. Instead, the APPROVe authors reported increases of approximately 3 to 4 mmHg in "mean arterial pressure" in the Vioxx group, along with the inaccurate statement that the BP changes did not explain the excess risk of CV events in the Vioxx population. (Bresalier, 352 NEJM at 1100).

        e.      At his deposition on November 21, 2005, Dr. Curfman of NEJM testified that the editors were never informed that Merck had analyzed the CV events for patients with BP spikes or Stage 2 hypertension, nor that a statistically significant relationship existed between those conditions. Dr. Curfman testified that such data would have been relevant to the editors and readers, because "one, of course, of the mechanisms of concern in terms of vascular disease would be hypertension as a substrate leading to vessel damage. So that would be — if such an analysis existed, it would be very appropriate to include that." (Curfman Depo., 11/21/05, at 167-169).

        24.      I agree with Dr. Curfman that the analysis of Stage 2 hypertension was highly relevant to the excess CV risk, and that it should have been included in the published article. Where the internal documents acknowledge a "striking relationship," a "highly significant interaction," and the suggestion that "nearly all of the excess CV events" on Vioxx occurred among patients with SBP spikes, it was misleading to delete references to such effects, to disclose only the mean arterial pressure changes, and to deny the clearly apparent relationship between Stage 2 hypertensive changes and thrombotic adverse events.

        25.      Abundant literature in the fields of cardiology and epidemiology supports the conclusion that blood pressure changes of the magnitude reported for Vioxx contributed substantial excess risk of CV events. See, e.g., SHEP Cooperative Research Group: Prevention of Stroke by Anti-hypertensive Drug Treatment in Patients with Isolated Systolic Hypertension: Final Results of the Systolic Hypertension in the Elderly Program (SHEP). JAMA 1991; 265:3255-3264. In numerous clinical trials of antihypertensive medications, including Merck's principal drug in this class

(Cozaar/Losartan), reductions of even a few mm of Hg resulted in significantly lower incidence of stroke and coronary heart disease (CHD).  (Dahlof, B, Cardiovascular Morbidity and Mortality in the Losartan Intervention for Endpoint Reduction in Hypertension Study (LIFE): a randomized trial against atenolol.  Lancet 2002; 359:995-1003).  Further, it is well known that the larger the increase in blood pressure, the greater the increased risk, and that each mm increase in blood pressure imposes greater risk at a higher baseline.  Merck's own internal documentation shows awareness of these principles as of December 26, 2000 (MRK-NJO281966; Memo from Rush to Dixon). The "striking" interaction between Vioxx and Stage 2 hypertension magnifies the Relative Risk of adverse CV events attributable to hypertension alone, as seen in the APPROVe data discussed above.  Thus, the high incidence of increased BP of > 20 mmHg or more, and of absolute values exceeding 160 mm probably contributed substantial excess risk of MI and stroke among the subpopulation of Vioxx users who experienced such significant worsening of hypertension.

   F.   **Recent Literature Supports the Biological Plausibility of Increased Risk of Thrombosis Due to Both High Blood Pressure and the Interaction of Cox-2 Inhibition with Increased Blood Pressure.**

   26.   As noted in my prior Report, blood pressure is known to be a cause of plaque rupture that can result in thrombus and MI. In an authoritative recent article, it was noted that the " vulnerability to rupture depends on ... blood flow characteristics, particularly the impact of flow on the proximal aspect of the plaque...."  Fuster, V., et al., "Atherothrombosis and High-Risk Plaque." J. Am. Coll. Cardiol. 2005; 46:937-54 at 945.  Chronic and acute blood pressure increases magnify the "impact of flow" that results in plaque rupture.  Increased blood pressure begins when Vioxx use begins, resulting in immediate increased risk of plaque rupture and resulting MI.

   27.   In an article published in April 2006, noted Cox-2 researcher Garret FitzGerald and colleagues reported on animal data supporting the conclusion that

- 17 -

Cox-2 inhibition is the cause of both elevated blood pressure and thrombosis.  Cheng, et al., Cyclooxygenase, Microsomal Prostaglandin E Synthase-1, and Cardiovascular Function, J. Clin. Invest., 2006; doi:10:1172/JCI27540.  This finding further supports the biological plausibility of the high relative risks of MI for Vioxx users, especially those who had both high background CV risk, or on-drug Stage 2 hypertension, or both.

28.    In a recent review article in Circulation, the peer-reviewed journal of the American Heart Association, Antmann, et al. concluded that the effects of COX-2 inhibition differ between the normal and atherosclerotic conditions. In the former, the effects of COX-2 suppression have "only a marginal effect on the net anti-thrombotic imbalance owing to the importance of COX-1 as a source of PGI2 in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of PGI2 and more TxA2 is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring TxA2 production and promoting platelet-dependent thrombosis." Antmann, Cyclooxygenase Inhibition and Cardiovascular Risk, Circulation 2005; 112:759-770, at 764. Such a differential effect of COX-2 inhibition helps to explain the greater RR among patients who have atherosclerosis and are at greater

- 18 -

baseline risk of CV events due to that condition. **Figure 4 of the Antmann article**, describing this phenomenon, is reproduced below:



Figure 4. Consequences of COX inhibition for prostacyclin and thromboxane A₂ production in normal and atherosclerotic arteries. Endothelial cells are shown as a source of prostacyclin (PGI₂) and platelets as a source of thromboxane A₂ (TxA₂) under untreated conditions (top row) or treated with low-dose aspirin (middle row) or a coxib (bottom row) in the normal (left column) and atherosclerotic artery (right column) for comparison. COX-1 is the only isoenzyme expressed in platelets; endothelial cells express both COX-1 and COX-2. In the normal artery, the balance between PGI₂ and TxA₂ production favors PGI₂ and inhibition of platelet-dependent thrombus formation. In the atherosclerotic artery, both PGI₂ and TxA₂ production is increased, owing in part to increased platelet activation with compensatory PGI₂ formation via both COX-1 and COX-2 in endothelial cells; the net effect is an imbalance favoring TxA₂ production and platelet-dependent thrombus formation. Low-dose aspirin selectively impairs COX-1-mediated TxA₂ production in platelets restoring the net antithrombotic balance. Coxib use suppresses COX-2-dependent PGI₂ production in endothelial cells, which has only a marginal effect on the net antithrombotic balance owing to the importance of COX-1 as a source of PGI₂ in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of PGI₂ and more TxA₂ is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring TxA₂ production and promoting platelet-dependent thrombosis.

538398.1

### G.   Merck's Recent APPROVe "Extension" Data Confirm Excess CV Risk of Vioxx

29.    In a document submitted to the FDA in May 2006, Merck reported the results of the APPROVe study on an "Intention to Treat" basis, which includes adverse events that occurred both on the drug and after the discontinuation of the drug. According to Merck's summary, the overall data showed a statistically significant increase of risk of MI, 31 Vioxx events v. 15 placebo events, p=0.017. There was also a statistically significant increased risk of ischemic stroke, 17 Vioxx events v. 6 placebo events, p=0.024. These data therefore continue to support the conclusion that Vioxx causes excess risk of CV events, including MI and stroke. The data show, for the first time, that the increased incidence of stroke in the Vioxx group has now exceeded the threshold for a statistically significant effect of Vioxx.

30.    The ITT analysis negates Merck's claim that there is no difference in CV thrombotic event rates between Vioxx and placebo for the first 18 months of use, in two ways. First, the KM graph of cumulative incidents of confirmed events is changed by the addition of data from the ITT analysis. Merck claimed that the original KM graph, presented as "Figure 2" of the published APPROVe article, supported the hypothesis of no effect for 18 months, because the incidence curves did not sharply diverge until after that point in time.[4]

31.    However, the KM graph submitted to the FDA for the ITT analysis in May 2006 (Figure B1, reprinted below), shows that the curve for Vioxx (rofecoxib) separates from placebo at about 3 to 4 months, and remains above placebo for the rest of the study. According to Steven Nissen, M.D., interim Chairman of Cardiovascular Medicine at the Cleveland Clinic and a member of the FDA Advisory Committee on Cox-2 inhibitors, the claim of no effect for 18 months of treatment "makes the drug look

---

[4] A number of flaws in that reasoning have been described in my September 2005 report, and in the preceding portion of this Supplemental Report.

a lot safer than it was." Dr. Nissen stated, "If you wanted to construct a legal defense that says nothing happens for 18 months, this is how you would cut the data." (New York Times, "Why the Data Diverge on the Dangers of Vioxx," May 22, 2006 (p. 1 of 6). Alastair Wood, M.D., Chairman of the FDA advisory committee that reviewed Cox-2 inhibitors in February 2005, criticized the omission of off-day events, noting that "People may drop out because they had chest pain and then weeks later they had a heart attack." (Id. at p. 3 of 6).

Figure B1   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring · Kaplan Meier Plot



32.     Further, Merck has submitted to the FDA a new statistical analysis for the "proportionality" test, indicating a p value of 0.748 (MRK-S0420112037; Figure B2, reproduced below). This non-significant result means that there is no evidence of variation in the rate of events over time. Thus, the ITT analysis contradicts the claim made by Merck in FDA submissions and in the published APPROVe article that there was a statistically significant difference in the rate of events between the 0 to 18 month and 18 to 36 month periods of the APPROVe study. (It is noted that the Heading above Figure B2 does not correspond to the legend below the figure. The heading refers to "Confirmed Thrombotic Events" while the legend below refers to the

"APTC Endpoint". I reserve the right to modify this opinion when the inconsistency is clarified. Whether Figure B2 refers to the thrombotic or APTC endpoint, the lack of variation in event rates over time undermines the 18-month hypothesis.)



Figure B2   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Hazard Rate

33.     Data from the off-drug period of the APPROVe extension study are also of interest.  During the off-drug period alone, Merck reported that there were 28 thrombotic events in those who had taken Vioxx, compared to 16 in the placebo group, RR=1.64.  Merck has stated that these data are "insufficient to conclude that there was an increased relative risk of confirmed thrombotic events following discontinuation of the therapy."  (Press Release, 5/11/06, p. 1).  However, three well-respected independent commentators have stated their disagreement with Merck's interpretation of the data.

(a)     Steven Nissen, M.D., mentioned in ¶ 31 above, stated "You have to look at the big picture.  The big picture is that the hazard stays the same."  (Wall Street Journal, 5/12/06, p. A16).  Dr. Nissen further stated, "Merck misrepresented the

538398.1

results of this study." (AP Press Release, 5/12/06). The 64 percent higher risk in the extension study "has rather important scientific implications, because it suggests that there was some kind of permanent or longstanding injury to the artery that makes it susceptible to these kinds of continuing events. (New York Times, May 13, 2006).

       (b)    According to <u>Curt Furberg</u>, M.D., a member of the U.S. FDA Drug Safety and Risk Management Safety Committee, "It may be that Vioxx is causing permanent damage to the cardiovascular system, accelerating atherosclerosis or a sustained increase in blood pressure." Reuters, May 18, 2006. Dr. Furberg stated, "for a while we assumed Vioxx caused temporary problems, and here it is more than that," referring to the occurrence of 7 strokes and 2 "mini-strokes" or *TIAs in the Vioxx group* after discontinuing treatment, compared with no such incidents in the placebo group during one year off-drug. (<u>Id.</u>)

       (c)    <u>Bruce Psaty</u>, M.D., a distinguished cardiologist from University of Washington who testified in Congress on COX-2's inhibitors, stated that the 64% higher overall event rate was "closer to a persistent finding than not." (New York Times, May 13, 2006).

       34.    I agree with Drs. Nissen, Furberg and Psaty that the increased RR of thrombotic events in the Vioxx group after discontinuing the drug is "closer to a persistent finding than not," and that the lack of statistical significance does not decide this issue. The off-drug period alone constitutes a subgroup that is not adequately powered to detect such differences to a statistically significant degree. Given the limitations due to the smaller number of events and the time off drug, the 64% increase is an impressive indicator that the risk of Vioxx probably does not end when exposure is discontinued.

       35.    I reserve the right to add to these comments in the event that future data becomes available.

## II.   CONCLUSION

36.     A consensus exists in the scientific community that Vioxx significantly increases the risk of adverse events, including MI, as noted by the unanimous agreement of 32 FDA Advisory Committee Members.  Protocol 203, the analysis pre-specified by Merck for precise estimation of CV effects of Vioxx, shows that this increased risk appears within the first 30 days and persists throughout exposure.  Protocol 203 refutes the "18-month" notion advanced by Merck through a "post hoc" hypothesis based on a single, underpowered study.  Patients at elevated baseline risk have a statistically significant higher RR of CV events than lower-risk patients, due to a synergistic and multiplicative interaction of Vioxx and baseline risk factors such as SACVD.  Stage 2 Hypertension while on Vioxx is also a strong risk factor for CV events.  Data from the APPROVe extension study confirm the excess risk of MI and stroke due to Vioxx, and it is likely that the risk persists after Vioxx exposure ends.

_5/16/06_
  / Date

_John W. Farquhar, M.D._
       John W. Farquhar, M.D.

538398.1

## REBUTTAL EXPERT WITNESS REPORT

For the past 25 years, I have been a Professor in the Division of Biostatistics, School of Public Health, and in the Department of Statistics, both at the University of California, Berkeley. Specifically, I have served as a Full Professor (1987 – present); Associate Professor (1983 – 1987); and Assistant Professor (1981 – 1983). Prior to that, I was an Assistant Professor in the Department of Statistics at Princeton University, Princeton, New Jersey (1979 – 1981) where I also served as Director of the Statistical Laboratories. At Berkeley, I also hold positions as the Director of the Center for Computational Biology, and Chair of the University of California Graduate Groups in (i) Biostatistics, and in (ii) Computational and Genomic Biology. From 1994 to 2000 I served as Vice Provost at the University of California, Berkeley, in the Office of the Chancellor. A true copy of my CV is attached as Exhibit A.

I have served as a member of the National Academy of Sciences Committee on National Statistics (1993 – 1996) and of the Committee on Theoretical and Applied Statistics (1994 – 1996). I received my Ph.D. in Mathematics from the University of Edinburgh, Scotland in June 1976, and was a post-doctoral Harkness Fellow at Stanford University and the University of California at Berkeley from 1976 to 1978 (funded by the Commonwealth Fund of New York). In 1978-79 I was a Research Fellow in the Medical Statistics Unit at the University of Edinburgh, Scotland. I also held a Visiting Professor appointment at Oxford University, England, in Spring 1990.

I am the author of a textbook, "Statistics for Epidemiology," (Chapman and Hall, New York 2003), as well as approximately 100 peer-reviewed articles in the field of biostatistics. I am a founding editor of the *International Journal of Biostatistics*, Senior Editor for the journal *Statistical Applications in Genetics and Molecular Biology*, and Associate Editor for the journal *Biometrika*. In 2005, I received the Snedecor Award, of the Committee of Presidents of the Statistical Societies, awarded to "an individual who was instrumental in the development of statistical theory in biometry." The award is associated with the best publication in biostatistics in the world in the previous 3 years. I also received a Distinguished Teaching Award from School of Public Health, University of California at Berkeley, in 2004.

I am or have been a member of several international statistical societies including the International Biometric Society, the Institute of Mathematical Statistics, and the American Statistical Association. I was made a Fellow of the American Statistical Association in 1991, and a Fellow of the Institute of Mathematical Statistics in 1996. I served as President of the Western North American Region of the International Biometric Society in 1991, and as Treasurer of the Institute of Mathematical Statistics from 1985-1988.

This report is submitted to respond to some issues raised by defense counsel in the deposition of Dr John Farquhar and in the Expert Witness Statement and Deposition of defense biostatistician Dr. Kim.



1

**High Risk and Vioxx Interaction: APPROVe**
In the deposition of Dr. Farquhar, defense counsel challenged the definition of the "high risk" group that I analyzed, as described in Dr. Farquhar's Supplemental Report of May 2006. This is my response.

In my original analysis of the joint effects of Vioxx and baseline high risk status, I defined the high risk group to include anyone classified by Merck as having "increased cardiovascular risk" (defined as a prior history of symptomatic ASCVD, or possessing two or more cardiovascular risk factors) and/or diabetics, after discussion with Dr. Farquhar. Following Dr. Farquhar's deposition, I re-analyzed the data to only include the "increased cardiovascular risk" individuals, as defined by Merck, in the high risk group . This change resulted in a shift of only two of thirty confirmed thrombotic events from the "high risk" Vioxx treatment arm to the "low risk" Vioxx treatment arm. There was no change in the number of placebo events. As would be expected with such a relatively minor change in the overall data, the results are materially very similar to those from my previous analysis. For example, in the analysis of all 72 thrombotic events, the Relative Risk for an event associated with assignment of Vioxx was 1.28 with a 95% confidence interval of (0.65—2.51) in the low-risk group (as compared to 1.15 with the previous definition of baseline risk). On the other hand, the same Relative Risk in the high-risk group remained considerably higher, namely 2.70 with a 95% confidence interval of (1.31—5.57), with an associated p-value of 0.007 (as compared to 2.87 before, with a p-value of 0.004).

Thus it is still apparent that the deleterious effect of Vioxx is more than 2 times worse in the high risk group as compared to the low-risk group. These two Relative Risks can be compared quantitatively by using a test for interaction, to address the question as to whether risk status significantly modifies the effect of Vioxx on the risk for an adverse event. This test yields a p-value of 0.137 (as compared to 0.07 before). The fact that this is not "significant" by conventional or mindless application of a 0.05 significance level has to be viewed in the context that interaction tests are well-known to have reduced power (and raising the significance level is a direct way of addressing this) and the fact that a similar interactive effect was also observed in my analysis of VIGOR. Further, it should be stressed that the interaction test used here is examining the evidence for *multiplicative* interaction which sets a much higher 'bar' than looking for *additive* interaction. Most epidemiologists consider the existence of additive interaction to suggest biological synergism between two factors (here Vioxx exposure, and "increased cardiovascular risk" at baseline)—see Rothman and Greenland (1998). The presence of multiplicative interaction, as described above in detail, always determines that there is even more striking evidence of additive interaction in the data (given that the Relative Risks of both factors are greater than one). I thus consider the evidence of an elevated Relative Risk associated with Vioxx in the high-risk group to be notable, supporting biologic synergism of the effects of Vioxx with other pre-determined cardiovascular risk factors in the APPROVE trial.

Merck's challenge appears to be based on whether a particular high risk subgroup was prespecified. So it is important to note that the high-risk subgroup used in this new analysis was defined by Merck in their own Statistical DAP for Protocol 203 (on p.20). (In the DAP the symptomatic ASCVD individuals were referred to by the term "Aspirin

2

indicated".) Thus, in analyzing the question of synergistic effects of Vioxx and baseline risk status in this document, I have directly followed the DAP for Protocol 203, here applied to available data from APPROVe study. As stated by Merck Research Laboratories President Peter Kim, Merck itself followed the DAP for Protocol 203 in its analysis of APPROVe data. (Conference call transcript, May 30, 2006.) Finally, similar results to prior analyses are again found if other endpoints are examined (cardiac events only, or cardiac and cerebrovascular events).

Merck's challenge raises the question of whether our analysis should be regarded with skepticism as a "post hoc" analysis. However, in this regard it is important to note that the hypothesis of greater CV risk on Vioxx among patients at increased baseline risk was previously raised by Merck itself in the Bombardier (2000) article on the VIGOR trial. That article reported a statistically significant increased risk of MI among the high-risk "aspirin-indicated" subgroup, while stating that there was no significant difference in MI rates in the lower-risk, non-aspirin-indicated subgroup. The question of whether patients at increased baseline risk would be at greater risk of CV events due to Vioxx was subsequently discussed in the FDA Targum report (2/1/01). Thus, my purpose in examining high cardiovascular risk status, was to confirm—or not—the findings in the VIGOR trial regarding the joint effects of baseline risk status and exposure to Vioxx, and make relevant comparisons. In this sense, this particular subgroup analysis is confirmatory rather than exploratory. The above analysis shows that the results do not depend on the exact definition of "high risk" and my conclusions stand when using the "increased CV risk" group pre-defined by Merck. Thus, this examination clearly does not fall prey to the issues of misinterpretation arising from indiscriminate subgroup comparisons, most recently described by Lagakos (2006).

A separate issue, not addressed in Lagakos (2006), is the choice of an appropriate significance level for a single test of interaction with moderate sample sizes (although he uses an example with the "usual P=0.05" he does not discuss other alternatives). This is an important point because statisticians are well aware of the reduced power to detect an interaction effect in samples of moderate size (where the study is usually powered only to detect main effects). Indeed, in a similar vein, defense expert Dr. Kim stated that we (statisticians) have been "too successful" in the promulgation of the $p < 0.05$ significance level, in reference to a test of proportional hazards, a special case of a test for interaction (Kim deposition). A standard and simple way to address this in the case of a test for interaction is to use a larger nominal p-value, such as 0.2, a strategy immediately familiar to statisticians as a way to increase power, and a technique that I have previously recommended in my book (Jewell, 2004). This is particularly appropriate when the analysis is confirmatory—as it is here—rather than exploratory. I also note that Lagakos' conclusions regarding the interaction tests carried out by Bhatt at al (2006) would remain the same even if he had started with a nominal p-value of 0.2 rather than the 0.05 he considered (specifically if the Bhatt et al (2006) interaction tests been assessed with a significance level of 0.2÷20 = 0.01, none would have reached statistical significance).

A higher significance level than 0.05 for examining interactions is widely used in other contexts, including drug safety analyses. In the context of Vioxx analyses, note that "Results that were statistically significant at level 0.1" are listed in a Safety Analysis (Table 4) of the Statistical Reviewer Briefing Document for the Advisory Committee (p.

3

11). In the same document, Table 3 (p. 9) lists "statistically significant subgroup by treatment interactions at level 0.10", and, for example, a claim that a "statistically significant (p-value = 0.073) treatment by baseline steroid use interaction was observed." In the Vioxx Review of NDA #21-042 transcript, Dr. Li of the FDA states that "there is (sic) a strong statistical significant study by treatment interactions. … the P-value is (sic) .09 and .08."

Note that if a 0.2 significance level is applied to the subgroup analyses given in Table 19 of the APPROVe Trial Cardiovascular Safety Report, four of the interactions discovered can be considered "significant". All four of these subgroups refer to biologically plausible high risk categories (Symptomatic Atherosclerotic Cardiovascular Disease, History of Ischemic Heart Disease, Diabetes, and Two or More Cardiovascular Risk Factors). This further supports the conclusion that a significance level of 0.2 for interaction is a reasonable indicator of consistent elevated risk among prespecified higher risk patient groups, as compared to the circumstances of concern to Lagakos (2006), namely a chance occurrence in one of many subgroups indiscriminately defined potentially after examination of the data.

Finally, these findings regarding the potential synergistic effects of Vioxx with baseline cardiovascular risk factors are consistent with the recent meta-analyses performed by Kearney et al (2006). The authors there reported upon increased CV events among Cox 2 inhibitor users, noting the likelihood of "a smaller excess [of vascular events due to COX 2 inhibitors] among those at lower risk (such as women with rheumatoid arthritis) and a higher excess in those at above average risk (such as older patients with established atherosclerotic disease)." This expectation of higher excess in patients at above average background risk is precisely the finding that my APPROVe analysis confirmed.

**Time Interaction with Vioxx: Protocol 203**
In his Report and deposition, Dr. Kim stated that there was no effect of Vioxx during the first 18 months of use in the APPROVe study, and he further stated that the assumption of the Cox proportional hazards model was properly assessed using linear time rather than log(time) in an interaction term in the model. The issue of which statistical method to use in this model was raised by Merck's recent public statement that the published APPROVe article employed the linear method, although the DAP had specified log(time) and the authors erroneously reported that log(time) had been used. The following is my response to the recent disclosures and Dr. Kim's testimony about them.

As indicated, the Statistical Data Analysis Plan for Protocol 203 suggested that the issue of variation of the Relative Risk, or Relative Hazard, over time be addressed by including an interaction term with the treatment indicator multiplied by $\log(t)$ where $t$ represents follow-up time. An alternative approach would be to use an interaction term with the treatment indicator multiplied by $t$ itself (the linear time technique noted above).

In my analysis of Protocol 203, I employed a more flexible (and conservative) approach allowing the Relative Hazard to take different values over five time intervals which covered the three years of follow-up. A subsequent test of interaction examined whether there was evidence of variation of these Relative Risks or whether the estimates were

4

compatible with a single constant value over time. As previously reported the p-value for this test of time interaction was 0.13 with cardiac events as the endpoint.

I disagree with the use of log($t$) in the interaction term in a proportional hazards model since it essentially forces the Relative Risk to be 1 or very close to 1 for early follow-up periods (mathematically this follows from the fact that the logarithm of zero is negative infinity so that the constant of proportionality comparing the risks in the two groups is then the exponential of negative infinity or 1). A Relative Risk of 1, or close to 1, would contradict the findings for Protocol 203 where the data provides an estimate of RR = 3.36 over the first 2 months of follow-up, and 1.42 over the first three months. If a parametric model is to be chosen, then the use of $t$ itself in the interaction term is preferable as originally carried out by investigators in their analysis of APPROVe data. However, the analysis begins but does not end with this point.

For completeness, I tested for time-varying Relative Risks using both parametric approaches: with the log($t$) approach, and using cardiac endpoints, the p-value for interaction of Vioxx and time is 0.08. Alternatively, using $t$ itself—more reasonable as I have argued above—the p-value for the test for interaction is 0.035. Note that that the existence of nonproportional hazards does not refer to the magnitude of the Relative Risk in any particular time period, but only states that they are different. So, in the Protocol 203 context, a declaration of "nonproportional hazards", based on these tests, does not say that the Relative Risk is near to 1 in early follow-up periods, only that the data suggests that the Relative Risk apparently grows with increasing exposure to Vioxx (given the sign of the coefficient of the interaction term is positive). This is compatible with my previous Protocol 203 analysis using the more non-parametric analysis (noted above). To emphasize this point clearly, the proportional hazards model with an interaction term of Vioxx and $t$ itself, yields the following (necessarily time-varying) estimates of Relative Hazard:

At $t$ = 3 months, RH= 1.48 with a 95% CI of (0.79, 2.77)
At $t$ = 6 months, RH= 2.09 with a 95% CI of (1.04, 3.10)
At $t$ = 12 months, RH= 2.67 with a 95% CI of (1.53, 4.65)
At $t$ = 18 months, RH= 3.89 with a 95% CI of (1.83, 8.27)

It is important to note here that the prescriptive description of how the Relative Hazard varies smoothly over time allows more accurate estimation of Relative Hazards at earlier follow up times than my previous Protocol 203 analysis which did not make use of this assumed parametric structure. With the Merck approach, which Dr. Kim did not carry out, the Protocol 203 data then establishes significant effects of Vioxx as early as after 6 months of exposure.

The Statistical Analysis Plan for Protocol 203 in fact, envisaged doing both the parametric and non-parametric approaches that I have briefly described above. Quoting the report "If the nonproportionality is large and real, various approaches may be explored to investigate the ... nonproportionality: ... partition of the time axis ..., adding a time-dependent covariate, or using a different model." The partitioning of the time axis is what I used in my original analysis of Protocol 203; the use of a time-dependent covariate—here the treatment term times $t$—is described above.

5

In summary, both the parametric and less parametric approach to time-varying Relative Hazards lead to the same conclusion, namely, a sizeable Relative Hazard—greater than 1—in the early follow-up period, which tends to only increase as exposure to Vioxx lengthens.

**Overall Cumulative Incidence Curves for All Thrombotic Events: Protocol 203**
In his report, Dr. Kim does not mention my Protocol 203 analysis, although at his deposition he said that he had read it. Dr. Kim believed that my Report should have focused on the "primary endpoint" of confirmed thrombotic cardiovascular adverse effects. The following is my response.

In my previous analysis of Protocol 203, I focused on cardiac events as the endpoint, because it was a prespecified endpoint in the statistical DAP for Protocol 203. Also, the published APPROVe study reported separately upon the results for Cardiac Events, Cerebrovascular and Peripheral events, with the highest Relative Risk in the Cardiac Endpoint (2.80).

Nevertheless, to address Dr. Kim's concern, I have since repeated my overall Protocol 203 analysis using two other endpoints: all thrombotic events (the primary endpoint in the DAP), and an endpoint that combines cardiac and cerebrovascular events. In the set of figures attached (Figures 1—8), I provide the analogous graphs of cumulative incidence of all thrombotic events that I originally provided for cardiac events in my previous analysis of Protocol 203 data. The figures reflect increasing cumulative amounts of follow-up data, starting from the first 30 days (Figure 1) to a full three years of follow-up (Figure 8). With the entire follow-up information, the estimate of the Relative Risk, associated with assignment to Vioxx, is 1.77 with a 95% confidence interval of (1.22, 2.56) with a p-value of 0.003.

The cumulative incidence plots (Figures 1—8) are very similar to those produced for cardiac events in my original Protocol 203 analyses, as they should be since the two endpoints (cardiac events only and all thrombotic events) are highly correlated. In fact, one is a major subset of the other so that we would expect similar results. For the same reason, the analysis of multiple endpoints does not suffer from the same multiplicity issue that we previously discussed for subgroups and as noted by Lagakos (2006). Finally, there is consistent evidence that the Relative Risk associated with Vioxx is elevated in the first 18 months of exposure, and then elevated yet higher after 18 months of follow-up, as seen in my original Protocol 203 analysis of cardiac events. As such, we would anticipate a significant p-value in a test for interaction of the Vioxx effects with time itself and that a significant difference between Vioxx and placebo patients in the incidence of thrombotic events would be detected early in the follow-up period if a proportional hazards model—with this time interaction term included—is used (as described above for cardiac events).

**Generalizability**

Dr. Kim's central hypothesis appears to be that the results of APPROVe cannot be generalized to other populations. However, the manner in which Dr. Kim appears to have reached this opinion is not reliable. Below is my response to Dr. Kim's claim.

Generalization Was Anticipated by the Protocol 203 DAP

Protocol 203 was designed to allow generalization of its results. The three studies comprising Protocol 203 were based on different patient eligibility criteria—adenomatous polyps, prostate cancer and colorectal cancer. The DAP noted that the patients would have a spectrum of CV risk, and stated that the results would allow generalization to other patient populations including osteoarthritis and rheumatoid arthritis patients. At his deposition, Dr. Kim claimed support for the contrary view (that the results of APPROVe cannot be generalized to other populations) from an overview paper by Kearney et al (2006). In particular, Dr. Kim relied upon Figure 2 of the Kearney article which restricts their meta-analysis to trials with scheduled duration of at least one year, effectively limiting the data for Vioxx to the long-term APPROVe and Alzheimers studies (Kim deposition, p.253). Interpreting differences in estimated Relative Risks as due to the definition of the populations, e.g. one group had polyps and the others didn't, is indefensible without a plausible scientific explanation as to why a polyp patient should anticipate a more serious deleterious effect from Vioxx. Notably, Dr. Kim admitted that he could not identify a single factor that would make a polyp patient more likely than an osteoarthritic to have a myocardial infarction while on Vioxx (Kim Deposition).

Inadequate Power of Alzheimer's Studies

At his deposition, Dr. Kim agreed with the general principle that, when a study with low power fails to show a significant effect, the results are more fairly described as inconclusive than negative; the proof is weak because the power is low. (Kim deposition, p. 206).

Dr. Kim's opinion that the APPROVe results cannot be generalized is largely based on the belief that the Vioxx Alzheimers trials, in particular 078 Thal et al, 2005), were adequately powered to detect an increase in risk due to Vioxx, and that since none was detected the results of APPROVe and Alzheimers are inconsistent and contradictory. Regarding the power of the 078 study to detect Vioxx cardiovascular effects. Dr. Kim states without attribution that "the 078 study had adequate (greater than 80%) power to detect a relative risk of 2 or greater" (Kim report, p. 23). The only information given in his report was the observed number of all thrombotic events in each group and the average follow-up which he quotes as being "approximately 4 years". When questioned about this power calculation in his deposition, Dr. Kim did not provide further detail regarding the validity of this statement, other than indicating that it was post-hoc (i.e. based on assumed rates and sample sizes as actually observed in the 078 study), and that he "did a calculation on the fly". He indicated that he neither accounted for compliance, nor for patient drop-out; he stated that he "used the patient enrollment duration and the follow-up duration", presumably the latter being assumed to be approximately 4 years as quoted above. It is well-known that compliance, loss to follow-up and duration of study all have serious impact on power calculations so that there seems to be little if any value to Dr. Kim's assertion regarding the power of the 078 study without further analysis of his assumptions.

To test Dr. Kim's assertion of adequate power in 078, I carried out power calculations that took into account the effects of poor compliance, loss to follow-up, and shorter study duration, based on information provided in published literature and FDA reviews. Results, sources and methods for this power calculation are described below.

In Thal et al (2005) it is stated that patients were accrued over two years from April 1998 to March 2000. It is stated that the median duration on medication was 94 weeks (about 21 months) in the Vioxx group and a little longer in the placebo group. It is inexplicable to me why Dr. Kim used "approximately four years" as the follow-up duration since Thal et al (2005) clearly state that the study was terminated 11 months earlier than the four year scheduled endpoint, particularly since he did not allow for drop-outs. Next, 36 thrombotic events were observed in 1550.97 patient years of follow-up in the placebo group, yielding a baseline incidence rate of 2.32 events per 100 patient years (12/18/04 Interim Review of thrombotic events in Alzheimer's studies 078 and 091). It is further indicated that 45% of the patients discontinued the study prematurely. No detailed indication of the timing of when these individuals terminated is given. The impact of drop-outs on power is accommodated by using the reported durations.

Crucially, Thal et al (2005) note that there is only 61% compliance to treatment in the Vioxx group, meaning that only 61% of the Vioxx patients took at least 80% of their assigned tablets, determined by counting pills (the authors' definition of compliance). It is known that "pill counts overestimate compliance" (Encyclopedia of Biostatistics, p. 836; Rudd et al, 1988), so that the actual compliance rate is likely lower. Dr. Kim indicates that he couldn't do any calculation of the effects of compliance since "we don't have data indicating what ... [loss of compliance] ...does to the relative risk". Yet Dr. Kim agreed with the generally accepted statement that the main impact of noncompliance is to reduce a treatment effect. This means that the risk in the Vioxx group will be lowered overall because a substantial fraction, 39%, of these individuals took less than the prescribed amount of medication (an insufficient level of compliance for this study to provide a valid estimate of a causal treatment effect). If the risk in Vioxx non-compliers is the same as in the placebo group, Dr. Kim's targeted intent-to-treat Relative Risk of 2.0 would be reduced to 1.61, given the observed low level of compliance; (throughout I assume that non-compliance in the placebo group does not affect their risk, since placebo is not expected to have any effect whether it is taken or not). Since the magnitude of the anticipated Relative Risk is thus lowered, the necessary design sample size (and thus the number of events) needed to achieve appropriate power must be substantially increased. The reduced power due to noncompliance with treatment is widely known to those planning and interpreting the results of randomized clinical trials. The 1998 Encyclopedia of Biostatistics (of which I was an Editor) entry on "Compliance Assessment in Clinical Trials" indicates that interpretation of insignificant results from an intention-to-treat analysis of a randomized clinical trial must necessarily be inconclusive in the presence of poor compliance since the latter causes treatment differences to be underestimated thereby reducing power to detect a treatment effect.

I next did a power calculation, with the following inputs: (i) the background (placebo) incidence rate calculated above, (ii) accrual over 24 months with subsequent follow-up for (a median of) 21 months, (iii) that 1460 patients were randomly (and equally)

8

assigned to either Vioxx or placebo, and (iv) the noted reduction in the intent-to-treat relative risk due to non-compliance. The software used is publicly available from the Department of Biostatistics at Harvard (Massachusetts General) at the following website http://hedwig.mgh.harvard.edu/biostatistics/software.php.

With all of these stated inputs based on reported data, the intent-to-treat power declines to 0.71. Now, considering drop-outs, Thal et al (2005) state that 368 of participants (approximately equally split between Vioxx and placebo) withdrew consent and so discontinued the study. Thal et al (2005) does not provide information as to the times when such dropouts occurred, but some reasonable assumptions can be made. If these individuals dropped out early after recruitment, they would contribute few patient months of follow-up to either treatment group, lowering the power even further to 0.58. Even if omitting such individuals increases the median follow-up duration of remaining participants to say 25 months, the power remains as low as 0.63. If we however consider a targeted Relative Risk of 1.5 instead of 2.0, the power is now 0.27 even if all drop-outs contribute some information. These power calculations illustrate that non-compliance and drop-out drastically reduces the power of the 078 study making it considerably less than 0.80. It is my view, that the low compliance rate in study 078 makes reliable estimation of the *causal* effects of Vioxx (as against the intent-to-treat effects) very uncertain; without question, the causal effects in a high-noncompliance situation are greater than those reported by an intent-to-treat analysis, since the latter deems subjects to have been drug-exposed based on their original randomization status, even though they did not meet the protocols for acceptable use of study medication.

These remarks regarding the power of the 078 study are supported by an FDA reviewer's comments concerning the Vioxx Alzheimers trials as a whole. For example, in the *Arthritis Advisory Committee* transcript, Dr. Villalba of the FDA asserts that the Alzheimers studies "were not powered to show any difference with placebo" in reference to the analysis of cardiovascular events.

Consistency of Increased Risk after 18 Months
While Dr. Kim maintains that the APPROVe and Alzheimers studies are inconsistent, in one relevant respect they are strikingly consistent. As shown above (in the section on time interaction with Vioxx effects), the Protocol 203 data analysis shows that the deleterious effects of Vioxx are greater with longer-term exposure, for example, at least 18 months of exposure than with shorter exposure. This appears to also be true in the combined data for studies 078 and 091 submitted by Merck to the FDA. In the 12/18/04 FDA Interim Review of thrombotic events in Alzheimer's studies 078 and 091, Table 6 indicates that there were 26 thrombotic events after 18 months of exposure (in 538 patient years of follow-up) in the Vioxx group, and 16 thrombotic events (in 665 patient years) in the analogous time period for the placebo group. Comparison of these numbers yields a Relative Risk of 2.01 with an exact 95% confidence interval of (1.03, 4.01), with a p-value of 0.027. Thus, just as in APPROVe specifically, and Protocol 203 more generally, studies 078 and 091 show a consistent and significant elevation of risk of thrombotic events in patients with 18 months or more exposure to Vioxx.

In addition, Dr. Kim's Report does not address the issue of unadjudicated CV thrombotic events that have not been included in the statements regarding the Alzheimers studies

078, 091 and 126. According to the Medical Officer Memo to file (3/12/02) 22 patients had potential cardiovascular thrombotic events with insufficient information to adjudicate. Of these 22 patients, 18 were on Vioxx and only 4 on placebo. Given the small number of observed events, inclusion of these events in the calculations would increase the Relative Risk associated with Vioxx, bringing the estimate substantially closer to what has been observed in other trials.

### The Kearney Article Does Not Support Kim's Claim of Inconsistency between Polyp Patients and other Populations

In Dr. Kim's deposition, he states that the Kearney et al (2006) meta-analysis supports his assertion about inconsistency between polyp data, (as illustrated in APPROVe) and Alzheimer's disease data. However, these two groups of trials do not cover the universe of trial populations assessed by Kearney et al.. Using the data from Kearney's article, we can see that in trials of Vioxx on other patient populations other than the Alzheimer's and polyp patients described in their Figure 2, there is an estimated Relative Risk of 1.45 with a 95% confidence interval of (0.58, 4.07), almost identical to the overall estimated Relative Risk of 1.49 reported for all trials they considered. Thus, these data are consistent with the conclusion that the non-polyp, non-Alzheimer's populations had increased risk of vascular events of the same magnitude as the population as a whole.

### Merck's Trials against Placebo Show Increased Risk for OA and RA Populations

At the deposition of Dr. Farquhar, defense counsel introduced a table of Merck clinical trial data for thrombotic events in Vioxx patients versus placebo, for the apparent purpose of showing no difference in the rate of thrombotic events in the Alzheimer's trials (Table 13 of the Information Amendment – Clinical (IND 46,894: Vioxx (rofecoxib), provided to the FDA by Merck on March 22, 2004). For the reasons stated above, the Alzheimer's studies presented in Table 13 were underpowered to detect a difference. At the same time, Table 13 presents summary information on trials containing rheumatoid arthritis (RA) and osteoarthritis (OA) patients. Combining the OA and RA trials in a similar fashion to Kearney et al (2006) yields an estimated Relative Risk of 3.14 with a 95% confidence interval of (1.19, 10.46) with associated p-value of 0.01 (TCVSAE endpoint). In fact, the analysis of solely the OA trials in Table 13 yields a Relative Risk of 3.03 with a 95% confidence interval of (1.02, 12.13), and p-value of 0.03 (using the grouped data provided). Thus, this clearly suggests that the elevated risk associated with Vioxx is not restricted to "polyp" patients, but appears, for example, in combined studies of OA patients.

As to the OA trials, I note that Kearney included the 010 trial, which does not appear in Merck's Table 13. Merck's documentations of Protocol 010 (MRK-OS420045791-92) shows that there were two events (both TIAs) under Vioxx, and approximately 15.5 and 7.3 patient-years of exposure to Vioxx and placebo, respectively. Thus the Relative Risk for the primary endpoint of TCVSAE among the Merck OA trial populations is now 3.30 [23/765.0 vs. 4/439.6], with 95% confidence interval (1.13, 13.14), and p-value 0.016. It is noteworthy that the mean duration of exposure to Vioxx or placebo in the OA trials was only 76 days. The appearance of a statistically significant tripling of risk of thrombotic events in the OA trials in such a short duration contradicts the hypothesis that there is no effect for the first 18 months of use of Vioxx. (note that the Relative Risk for

10

the combined OA and RA trials, including 010, yields a Relative Risk of 3.27 with a 95% confidence interval of (1.25, 10.86) and p-value 0.007.)

To determine further consistency of the OA trials data with Protocol 203 results I prepared a Kaplan-Meier cumulative incidence plot of the risk of thrombotic events for Vioxx versus placebo participants, as shown in Figure 9 below. These calculations were based upon the data in Table 13, supplemented by the 010 data (both referenced above), as well as exact event day information from the "Listing of All CV Events in Rofecoxib" (MRK-I8940080121-133, p. 56-68). The log-rank test comparing these cumulative incidence curves yields a p-value of 0.023. The estimated Relative Risk is 5.42 with a 95% confidence interval of (1.26, 23.29). Thus, the OA trials again show a significant separation of the risk of a thrombotic event for Vioxx patients above that for the placebo group, even within the first 60 days of exposure. The consistency of the results displayed in Figures 2 (attached) and 9 (below) demonstrates that the Protocol 203 DAP was correct in its assertion that Protocol 203 results allow generalization to other populations at risk, including osteoarthritis patients.

**FIGURE 9**
OA Trials All Thrombotic Events: 0—60 days of Follow-up



**Data sets used**
In constructing a pooled data set for Protocol 203 from SAS data files provided by Merck I checked to confirm counts of particular events by treatment assignment to compare with published and unpublished reports of these counts. It was my understanding that these data files for APPROVe and ViP were considered complete when provided, and that there was delay in finalizing the VICTOR data set. In the VICTOR information I

11

received in November 2005, there was information on exposure periods, treatment assignment, and adverse event outcomes, in sufficient detail to combine with the other trials. Specifically, in addition to data files on a hard drive, I reviewed copies of Tables 1 and 3 from a MRL memo stamped "Final, July 28, 2005" that showed 14 (Vioxx) versus 4 (placebo) confirmed thrombotic events. These totals exactly matched the counts in the VICTOR data records I received. In addition, the event counts correspond exactly with what is described in Dr. Kim's Expert Witness report of June 1, 2006. In May 2006, I received a CD with files containing apparent update data on VICTOR. I did not find any additional information on adverse events on these files, nor data on identification numbers etc. I therefore did not make any changes to the pooled data set based on this update. In Dr. Kim's deposition, there is reference to one possible additional placebo event for VICTOR (subject #10385). If confirmed, an addition of a single event would make very little difference to my reported analyses of Protocol 203.

In a Merck memorandum regarding the testimony of Dr. Farquhar, the defense counsel argues that analysis of Protocol 203 data is premature, claiming that "The Merck Data Analysis Plan for Protocol 203 contemplated that a combined analysis of cardiac events in all three studies would be conducted only when each study had run its full pre-specified course". This statement is incorrect. The ESMB for Protocol 203 was empowered and directed to perform interim analyses during the course of Protocol 203, and to terminate the trials due to "inferiority" applied to the primary endpoint, confirmed thrombotic cardiovascular events. Here, "inferiority" refers to the occurrence of a sufficiently greater number of adverse thrombotic events in patients assigned to Vioxx as compared to placebo. Specifically, according to the DAP, the "Early Decision for Inferiority" stopping rule required "the lower limit of a CI for HR> 1.0 ... and observed HR >1.30". (Here "CI" refers to a confidence interval and "HR" to the term Hazard Ratio, often referred to as Relative Risk.) My analysis of Protocol 203, based on data accumulated by mid-October 2004, indicates that the combined study would have been terminated early on the basis of this stopping rule, even if it had not been stopped because of the termination of the APPROVe study: the event data accumulated through mid-October 2004 data provides an estimated Hazard Ratio of 1.77 (far greater than 1.30), with the lower limit of the appropriate CI as 1.22, again far higher than 1.0. If all three trials had not been terminated due to the finding of excess toxicity in APPROVe by itself, it would have been the obligation of the ESMB to review the same pooled data that I analyzed, which would have required early termination of Protocol 203 based on the inferiority stopping rule.

In addition, the defense counsel statement contradicts what is stated in the Merck Data Analysis Plan. This plan specifically indicates that the ESMB for Protocol 203 would conduct "numerous (approximately twice yearly) interim analyses to monitor safety, which afford potential for consideration of early decision to report scientific conclusions, i.e. publish results" (p. 9). Even more directly, the DAP stated unequivocally that "The combined analysis for formal primary assessment of the primary hypothesis will be performed when the total number of confirmed thrombotic cardiovascular events ... reaches 611 in the three trials combined. It is anticipated that the 611 confirmed thrombotic events will be reached in early 2006, which is after completion of APPROVe and prior to study completion of VICTOR and ViP." Thus, Merck's own plan anticipated publication of results from Protocol 203 in early 2006. Of more importance, the plan

12

anticipated analysis of Protocol 203 data *prior to completion of VICTOR and ViP*. In all regards, these statements indicate that the analysis of Protocol 203 data is overdue rather than premature.

**Effect of Naproxen on Cardiovascular Outcomes**

In Dr. Kim's Expert Witness report, he relies on an observational study to establish the protective effect of Naproxen on the rate of thrombotic events, with the assumption that this explains the findings (the deleterious effects of Vioxx) of VIGOR. However, in Kearney et al. (2006), their meta-analysis of NSAID randomized clinical trials show a Relative Risk of 0.92 for a comparison of Naproxen to placebo with a 95% confidence interval of (0.67, 1.26). This fails to exhibit a protective effect for Naproxen.

**Individual Confidence Interval**

Dr. Kim's Expert Witness report refers to a confidence interval for the Relative Risk for an *individual*. Defense counsel brought up this subject at the deposition of Dr. Farquhar with reference to the book by Pagano & Gauvreau (2000). This concept is completely inappropriate in a discussion of an increased risk of a cardiovascular event associated with Vioxx. In more detail, Pagano & Gauvreau (2000) are referring to the prediction of a *continuous* outcome for a single individual where it is well known that the confidence interval for a predicted single value is wider than the confidence interval for the population mean. These ideas are not applicable to prediction of a binary outcome such as experiencing a cardiac event or not in a specified window of time. In fact, a binary outcome is either "Yes" or "No" and any prediction would either be "Yes" or "No" depending on the estimated underlying risk of the event for an individual. In most studies such as this where the outcomes are rare (certainly less than 50%) any prediction would have to be "No" whether the individual was exposed to Vioxx or placebo. And there is no such concept then available for the Relative Risk for an individual based on these predicted outcomes. Such a discussion is all beside the point anyway: what we would like to know for a random individual from an appropriate population is: what is the ratio of their estimated risk (of the endpoint of interest) under Vioxx to their estimated risk under placebo. This is, of course, nothing more than the Relative Risk for the population and there is no "widening" of the confidence interval for an estimate of this. It is just this number that been reported by investigators studying Vioxx in their description of risk comparisons.

The generally accepted concept associated with ascertaining how much an individual's risk increases due to exposure to Vioxx is provided by the Attributable Risk. The Attributable Risk quantifies the fraction of cardiovascular outcomes that are *attributable* to exposure to Vioxx in an exposed population. Mathematically the Attributable Risk (AR), among exposed individuals, is related to the cumulative population Relative Risk as follows:

$$AR = \frac{RR - 1}{RR}.$$

A confidence interval for *AR* therefore follows directly from a confidence interval for *RR*.

13

**Confidence Intervals Interpretation**

In his Expert Witness Report, Dr. Kim makes the erroneous statement that a "95% confidence interval of 1.19-3.11 (as for all thrombotic events in APPROVe) tells us only that the true relative risk could be as small as 1.19 or as large as 3.11 and does not enable us to assign a probability to either of these two probabilities." (Kim Expert Witness Report, p.6). This error is picked up by defense counsel's questioning of Dr. Farquhar where he asks a question regarding confidence intervals that contains the same misinterpretation. A correct understanding of a 95% confidence interval for the Relative Risk is as follows: with probability 0.95, the reported confidence interval contains the true unknown Relative Risk. The true value of the Relative Risk is much more likely to fall near the center of the confidence interval than near either endpoint. In fact, the likelihood of the data is more than six times greater at the point estimate of the Relative Risk as compared to the likelihood of the data at either endpoint. In the example used by Dr. Kim, the point estimate of the Relative Risk, 1.92, is *much* more plausible than the estimate 1.2, for example, near the edge of the confidence interval. Similarly, in my analysis of Protocol 203 data, where I estimated the Relative Risk of 2.37 for cardiac events, associated with exposure to Vioxx, with a 95% confidence interval of (1.43, 3.91), the value 2.4 is again *much* more plausible as an estimate of the true Relative Risk than the estimate 1.5, for example.

**Book reviews**

My book, *Statistics for Epidemiology*, was published in 2004 before I had any contact with data relating to Vioxx. It has been extremely successful and is used as text in many graduate programs across the world. Reviews were extremely positive. The longest of these (Bellocco, 2005) states that "the book reaches an almost perfect balance between including very advanced concepts, and keeping the discussion at a (sic) acceptable level for intermediate graduate students. I consider it to set a new standard for texts on statistics in epidemiology, especially in its treatment of causation and bias". Professor Sander Greenland, of the University of California, Los Angeles, an international leader in the application of statistics to problems in the health sciences, and a very tough critic, states on the web that this "book is excellent; a real breakthrough in texts on statistics in epidemiology, especially in its attention to causation and bias." My book has now received several citations in medical and epidemiological peer-reviewed journals.

My hourly rate for consulting is $310. I have testified once in the last four years at a deposition in the blood product litigation.


Nicholas P. Jewell, Ph.D.

June 21, 2006
Date

14

## FIGURE 1

Protocol 203 All Thrombotic Events: 0—30 days of Follow-up



**FIGURE 2**

Protocol 203 All Thrombotic Events: 0—60 days of Follow-up



**FIGURE 3**

Protocol 203 All Thrombotic Events: 0—120 days of Follow-up



## FIGURE 4

Protocol 203 All Thrombotic Events: 0—6 months of Follow-up



## FIGURE 5

Protocol 203 All Thrombotic Events: 0—1 year of Follow-up



19

**FIGURE 6**

Protocol 203 All Thrombotic Events: 0—18 months of Follow-up



**FIGURE 7**

Protocol 203 All Thrombotic Events: 0—2 years of Follow-up



**FIGURE 8**

Protocol 203 All Thrombotic Events: 0—3 years of Follow-up



MK-0966 CV Outcomes Data Analysis Plan

# Statistical Data Analysis Plan

## A Combined Analysis of Thrombotic Cardiovascular Events in 3 Placebo-Controlled Studies of Rofecoxib

### (Study 203)

### Prepared by

### Jennifer Ng - Clinical Biostatistics

### Jim Bolognese - Clinical Biostatistics

## CONFIDENTIAL, PROPRIETARY PROPERTY OF MERCK & CO., INC.



RA404.DOC  VERSION 10.1 APPROVED                                               09-Jan-2004
Restricted ⊕ Confidential – Limited Access

Confidential - Subject To Protective Order

MK-0966 CV Outcomes Data Analysis Plan

# Data Analysis Plan

## A Combined Analysis of Thrombotic Cardiovascular Events in 3 Placebo-Controlled Studies of Rofecoxib

### (Study 203)

## TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ................................................................................ 1
     A. Objective of the Data Analysis Plan ...................................... 1
     B. Description of the Studies and Objectives/Hypotheses ............ 1
        1. *Study Summaries* ........................................................... 1
        2. Objective of the Combined Analysis ............................... 3
        3. Hypotheses for the Combined Analysis ........................... 3
II.  STUDY PARTICIPANTS CHARACTERISTICS ............................ 4
III. SAFETY ANALYSES ...................................................................... 4
     A. Endpoints for Analysis ............................................................ 4
     B. Populations for Analysis ......................................................... 5
        1. Per-Protocol ................................................................... 6
        2. Modified Intention-to-Treat (mITT) .............................. 6
     C. Approaches to Safety Analysis ............................................... 6
        1. Approach to the Analysis of Non-Inferiority of Rofecoxib
           to Placebo (Primary Hypothesis) .................................... 6
        2. Approach to the Analysis of Superiority of Rofecoxib to
           Placebo *(Secondary Hypothesis)* ................................... 7
     D. Definition of Compliance Measure .......................................... 7
IV.  STATISTICAL TECHNICAL ISSUES ........................................... 8
     A. Planned Statistical Power and Sample Size ............................. 8
     B. Planned Analyses and Early Decisions .................................... 9
        1. Early Decision for Inferiority ........................................ 10
        2. Early Decision for Noninferiority .................................. 11
        3. Early Decision for Superiority ....................................... 12
        4. Roles and Responsibilities of the ESMB ....................... 14
     C. Blinding/Unblinding ............................................................... 14
     D. Statistical Methods .................................................................. 16
        1. General Approaches ....................................................... 16
        2. Check of Model Assumptions ........................................ 17
        3. *Sensitivity and Dropout Analyses* ................................ 18
           a. Sensitivity Analyses ................................................ 18

Restricted ✪ Confidential – Limited Access

Confidential - Subject To Protective
Order

MRK-AFL0015452

MK-0966 CV Outcomes Data Analysis Plan

# TABLE OF CONTENTS

PAGE

   b. Dropouts..................................................................19
   4. *Dissemination of Results* ...................................19
  E. Multiplicity .................................................................19
  F. Subgroup Analysis.......................................................20
V. GROUND RULES FOR ANALYSIS ........................................21
  A. Time of Censoring for Patients Without Events...................22
  B. Definition of Baseline Value and Treatment Period..............22
  C. Description of Data Handling Procedures Prior to Analysis ...22
VI. PRESENTATION AND FORMAT OF RESULTS.......................23
  A. Data Format ...............................................................23
  B. Sample CSR Tables and Graphs......................................23
VII. DATASETS/PROGRAMS/VARIABLES .................................23
  A. Naming and Storage Conventions of Datasets, Programs, and
   Variables ...................................................................23
  B. Documentation/Validation of Programs .............................24
VIII. REFERENCES .............................................................25
IX. APPENDICES ...............................................................27

Confidential - Subject To Protective
Order
                         MRK-AFL0015453