

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
Rockville, MD 20857

IND 46,894

Merck Research Laboratories
Attention: Ned Braunstein, M.D.
Director, Regulatory Affairs
P.O. Box 2000 RY 33-720
Rahway, NJ 07065-0900

Dear Dr. Braunstein:

Please refer to your Investigational New Drug Application (IND) submitted under section 505(i) of the Federal Food, Drug, and Cosmetic Act for Vioxx (rofecoxib) tablets, 12.5 mg, 25 mg, 50 mg.

We have completed the clinical review of your protocol entitled: "Prospective Combined Analysis of Thrombotic Cardiovascular Events in 3 Randomized, Double-Blind, Placebo-Controlled Studies of Rofecoxib in Patients at Risk of Developing Recurrent Adenomatous Colon Polyps, Recurrent Colon Cancer, or Prostate Cancer/Protocol No. 203-00". Provided below are the Division responses to the questions that were submitted regarding Protocol No. 203-00.

**SPONSOR QUESTIONS with FDA RESPONSE**

1A. Does the Agency agree that a prospective combined analysis of 3 similarly conducted, long-term studies comparing a single dose of rofecoxib (25 mg) to placebo would provide clinically important information about the effects of rofecoxib on the incidence of thrombotic events and would therefore constitute a cardiovascular outcomes study with rofecoxib?

<u>FDA Response:</u>
**A study with the proposed exposure (size and duration) would provide clinically important safety information about rofecoxib.**

1B. Does the Agency agree with MRL's plans to combine the cardiovascular data from the APPROVe, VICTOR, and Prostate Cancer Prevention studies as described in the protocol?

<u>FDA Response:</u>
**a. Conceptually a meta-analysis is reasonable.**



b. **However, the issue of homogeneity needs to be addresssed before pooling the three studies for analysis. The sponsor should do appropriate tests for "combinability".**
c. **Agency suggests evaluation of the KM curves of each study as well as careful analysis of hazard rate over time.**
d. **The sponsor is advised to add a study-by-treatment interaction term to the model.**
e. **Conceptually a safety analysis cannot be restricted to prespecified definitions of "success" or "noninferiority".**

2. The patients in the APPROVe, VICTOR AND Prostate cancer prevention studies are anticipated to represent a typical spectrum of patients at risk for thrombotic cardiovascular events and it is anticipated that 10 to 20% of patients will be taking low-dose apspirin for cardiovascular prophylaxis. Does the Agency agree that the patient populations being studied in the APPROVe, VICTOR, Prostate Cancer Prevention studies are appropriate for the study of the cardiovascular safety of rofecoxib?

**FDA Response:**
**Given the ethical constraints of studying safety compared to placebo, the use of the populations enrolled in the proposed therapeutic trials is reasonable. Although a high risk population is generally optimal to study risk, a minimum of 20% patients taking low dose ASA for CV prophylaxis appears acceptable.**

3. Does the Agency agree that the primary analysis of confirmed thrombotic cardiovascular events for non-inferiority of rofecoxib vs. placebo (primary hypothesis) should be performed in a Per-Protocol population? Rules for excluding patients from the Per-Protocol population will include lack of compliance and use of non-study NSAIDs. The complete definition will be prespecified in the DAP.

**FDA Response:**
No.
a. **The Agency does not agree with the proposal of a per-protocol analysis as the only primary analysis. Even for a non-inferiority trial, the intention-to-treat (ITT) analysis is important because it preserves randomization and avoids bias introduced by PP exclusion criteria. A modified ITT is acceptable. Both ITT and PP analyses are important.**
b. **An outline of the analysis plan should be submitted with the original protocol (only minor changes in details should be left for the final DAP with justification for changes made).**

Note: The Division of Cardio-renal products is uncomfortable with the use of a non-inferiority trial. For claims related to the CV system, direct discussion with the Division of Cardio-renal products is recommended.

4. Does the Agency agree that the primary analysis for superiority of rofecoxib versus placebo (secondary hypothesis) should be performed on the modified ITT population as defined in the protocol?

**FDA Response:**
**Yes.**

5 MRL proposes that for the non-inferiority hypothesis, the upper comparability bounds for the 95% CI of the hazard ratio should be 1.30. Assuming a true underlying HR of 1.00, approximately 611 confirmed thrombotic events need to be observed to provide 90% power to yield the upper limit of the 95% CI for HR<1.30. Satisfying this criteria would require an observed HR no larger than approximately 1.16. MRL anticipates that 611 confirmed events in the per protocol population will be accrued by 2006. Does the Agency concur with these proposed design specifications?

**FDA Response:**
**No. The Agency does not agree with the proposed non-inferiority bounds. For serious adverse events, such as CV thrombotic events, a 30% delta appears to be unacceptably wide. The agency agrees that hypotheses regarding relative risk are appropriately prespecified by the Sponsor. However, review by the agency and labeling changes relative to safety cannot be limited to prespecified hypotheses.**

**The proposed protocol with this size and duration will provide an extremely valuable and robust safety database. However, since the hazard ratio of CV-thrombotic events may not be constant (as suggested by the VIGOR study) and the timing of the occurrence of events is not known the Agency can not commit to agree on what would be "non-inferior". The sponsor may define important time intervals for which the hazard ratio should be estimated and propose a statistical analysis plan for each of these intervals. The Sponsor in this regard may propose different appropriate non-inferiority margins for different time intervals. As non-inferiority is required at each of the proposed time intervals, no correction for multiplicity would be necessary.**

MRL proposes analyzing the CV data from these protocols after approximately 611 events in the Per-Protocol population have been confirmed and submitting a CSR and labeling supplement based on this analysis. It is anticipated that 2 of the studies (VICTOR, and the Prostate Cancer Study) will be ongoing at that time. MRL proposes but does not anticipate submitting labeling supplements based on the updates unless the data supported substantive changes. Does the Agency agree that the analyses described above and based on the first approximately 611 events could be described in product labeling?

**FDA Response:**
**No. Since the hazard rate for cardiovascular event may increases with time, the Agency is concerned that the first 611 events may not reflect the true hazard ratio at a later timepoint. The primary analysis should be done at the end of the study although a blinded interim analysis after prespecified goal of both minimum exposure (in terms of numbers of patients and duration) and number of events exposure has been achieved may be discussed with the**

**Agency in reference to inclusion in labeling. A per-protocol analysis should be confirmatory of the primary analysis. In addition, the sponsor should do appropriate secondary analyses for evaluating time related-risk estimates for patients who are at high risk for CV events, and for regional differences.**

7. Does the Agency agree that performing the studies and analyses described in the protocol would result in the removal of the statement in the US product circular that "Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed" and that the data from this prespecified combined analysis could be described in product labeling as data from a CV Outcome Study?

   **FDA Response:**
   **See answers to questions 1 to 6.**

8. Does the Agency agree that the data from this study would be relevant to revising the Precaution, Cardiovascular Effects section of the product circular?

   **FDA Response:**
   **Yes.**

9. MRL proposes that single External Safety Monitoring Board (ESMB) will monitor all aspects of safety in the APPROVe and Prostate Cancer Prevention Studies. The VICTOR study is being conducted by Oxford and has it own Data Safety Monitoring Committee (DSMC) that will monitor safety in that study. However, to ensure that cardiovascular safety information from all 3 studies is considered when assessing patient safety, MRL has proposed that the same ESMB monitoring APPROVe and the Prostate Cancer Prevention study will also monitor the cardiovascular safety data from all three studies. This ESMB will communicated its findings at each meeting to the VICTOR DSMC. Does the Agency agree with this strategy for ensuring patient safety in these studies?

   **FDA Response:**
   **Yes.**

If you have any questions, call Barbara Gould, Project Manager, at 301 827-2090.

Sincerely,

*{See appended electronic signature page}*

Lawrence Goldkind, M.D.
Deputy Director
Division of Anti-Inflammatory, Analgesic, and
Ophthalmic Drug Products, HFD-550
Office of Drug Evaluation V
Center for Drug Evaluation and Research

---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---

/s/

--------------------

Lawrence Goldkind
12/19/02 04:59:02 PM

**REPORT OF JOHN W. FARQUHAR AS TO GERALD BARNETT**

1. This Report pertains to plaintiff Gerald Barnett. My Report of September 2005 and Supplemental Report of May 2006, are incorporated by reference. For the purpose of this Report, I have reviewed a summary of the medical history of Gerald Barnett prepared by Douglas Zipes, M.D.

2. Mr. Barnett began Vioxx use in approximately January 2000. Shortly thereafter, on January 19, 2000, Mr. Barnett had an episode of chest pain, characterized in the records by his treating physicians as "atypical." However, a nuclear imaging stress test revealed mild lateral wall ischemia, characteristic of an inadequate blood supply to that part of the heart due to atherosclerosis of at least one coronary artery, which had not been indicated in his prior records. The chest pain is best characterized as new-onset angina.

3. According to Dr. Zipes' review, Mr. Barnett had normal blood pressure from 1971-2000, except for a few mildly abnormal readings. On January 19, 2000, Mr. Barnett's records show the highest blood pressure that he had ever had, 162 systolic (SBP)/ 95 diastolic (DBP). These blood pressures are in the range defined as Stage 2 hypertension, which is more severe than lower degrees of elevated blood pressure. Between January 19, 2000 and his MI in September 2002, Mr. Barnett had additional spikes as high as 170 SBP while on Vioxx.

4. Both the new onset angina and the blood pressure spikes were probably caused by Vioxx use. As described in my prior reports, such conditions are strongly associated with Vioxx exposure, particularly among the most susceptible to cardiovascular (CV) toxicity. Mr. Barnett was at significant baseline risk for adverse CV effects of Vioxx, because of his underlying condition of atherosclerotic disease as indicated by the stress test. This degree of disease, although milder than the state to which he progressed during use of Vioxx, took a number of years to develop. Vioxx



exposure then resulted in a multiplicative and synergistic increased risk of MI, as indicated initially by the new episode of stage 2 hypertension and new-onset angina; and, subsequently, by rapidly increased atherosclerosis and MI.

5. As a result of his BP spike and angina on January 19, 2000, Mr. Barnett was in the highest risk categories of patients likely to experience a heart attack due to Vioxx. Mr. Barnett's unstable angina made his risk status comparable to the category defined in the APPROVe study as "symptomatic atherosclerotic cardiovascular disease" (SACVD). As stated in Section C of my Supplemental Report, the relative risk for cardiac events among the "high-risk" patients, including those similar to Mr. Barnett, is 3.83, compared to the analogous high-risk placebo group. Also, by virtue of his spike in blood pressure exceeding 160 systolic on January 19, 2000, and the spike of 170/92 on February 18, 2002, Mr. Barnett is comparable to the Stage 2 hypertensive category of the APPROVe study, for whom a statistically significant RR of 3.82 was reported.

6. These consistently elevated RRs due to multiple risk factors strongly support the conclusion that Mr. Barnett's risk of MI following January 19, 2000 was at least 3.8 times higher than if he had not been taking Vioxx. Based upon a standard formula for calculation of the attributable proportion of risk (APR), Mr. Barnett's APR was $\frac{3.8-1}{3.8}$ = 74%. The APR is a measure of the incidence of disease due to the risk factor in question—in this case, Vioxx—as opposed to all other possible causes. Thus, there is at least a 74% likelihood that Mr. Barnett's MI on September 6, 2002 was caused by Vioxx. It is highly likely that, but for his use of Vioxx, Mr. Barnett would not have suffered an MI on September 6, 2002.

7.      Figure 1, below, is a representation of the 74% APR applicable to individuals in Mr. Barnett's risk category, who were exposed to Vioxx. This figure graphically demonstrates the high likelihood that Mr. Barnett's MI resulted from his Vioxx exposure.

**Figure 1:** Attributable Proportion of Risk of Thrombotic Event for Gerald Barnett, based on (1) High Risk Status and/or (2) Blood Pressure Spikes > 160 SBP:



74% of Thrombotic Events
Caused by Vioxx

26% of Thrombotic Events
Attributable to Non-Vioxx causes

Figure 2, below, reproduced from my Supplemental Report, graphically shows that individuals with Mr. Barnett's baseline risk conditions who were *not* exposed to Vioxx had a significantly lower risk of MI, reinforcing the conclusion that Vioxx acted in a synergistic and multiplicative manner to cause the MI that he suffered.

**Figure 2:**

**Figure 2**: Summary incidence rate of Confirmed Cardiac and Cerebrovascular Events in the APPROVe Study by Baseline Risk Status and Treatment Group
Relative Risks (RR) and p-values based on Proportional Hazard Model

8. Mr. Barnett is similar to the APPROVe population in other relevant ways. Mr. Barnett was 58 years old when he suffered his MI, and this is essentially identical to the mean age (59) of the patients in the APPROVe study. (Bresalier, 352 NEJM at 1094). Also, 62% of the APPROVe population was male. These similarities further support the conclusion that Mr. Barnett is sufficiently comparable to the APPROVe population that the results of that study are applicable to his circumstances and fairly characterize the high likelihood that his MI was caused by Vioxx.

5/22/06
Date

John W. Farquhar, M.D.
John W. Farquhar, M.D.

# Pooled Analysis of Confirmed Thrombotic CV Events CV Outcomes Study (Interim Data Feb-2005)

Relative Risk with 95% CI
Favors Rofecoxib
Favors Placebo
PYR
Pts with Events
CV Outcomes Pooled Analysis
1.67 (1.15, 2.43)
10563
(116)
APPROVe
1.92 (1.19, 3.11)
6385
(72)
ViP*
0.87 (0.41, 1.83)
2201
(28)
VICTOR*
3.14 (1.01, 9.75)
1976
(16)
0.1 0.2 0.5 1 2 5 10
Relative Risk (Rofecoxib/Placebo)
exh 7

*Interim data as of Feb 2005.

# COX-2 FDA Advisory Committee Meeting 2005
# Rofecoxib

Speaker: Ned S. Braunstein, MD

Senior Director, Merck Research Labs

In re: VIOXX MDL DOCKET NO. 1657
PRODUCTS LIABILITY
LITIGATION SECTION L
JUDGE FALLON
This document relates to
MAGISTRATE JUDGE KNOWLES
GERALD BARNETT,,
Plaintiff,
-vs-
MERCK & CO., INC.,
Defendant.
Civil Action No. 2:06CV485

= = = = = = = = = = = = = = = = = = = = = = = = = = = = =

CROSS NOTICED IN VARIOUS OTHER ACTIONS

* * *

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

* * *

Deposition of:
KYUNGMANN KIM, PH.D.
Madison, Wisconsin
June 12, 2006

Reported by: Taunia Northouse, RDR, CRR

exh 8

ever seen the statistical analysis and power calculations for Study 203?

A I may have.

Q Do you know how many events were anticipated to be collected during Study 203 for statistical analysis?

A I cannot answer that question unless I see the original document.

Q Please take a look at page "ii" of the executive summary.

A Yes.

Q Do you see under Statistical Analysis and Power that it was anticipated that approximately 611 confirmed thrombotic cardiovascular SAEs need to be observed to provide 90 percent power to yield an upper limit of a 95 percent CI for HR less than 1.30"?

A Well, let me read through the -- yes, uh-huh.

Q Now, are you aware of any other Merck study of Vioxx that provided a statistical analysis and power calculation for thrombotic cardiovascular events?

A I don't think I have.

Q Do you intend to perform a statistical analysis of the data for Protocol 203?

A No, I have no plans.

Q Did you discuss doing that with Merck's lawyers?

A No, I have not.

Q Did they tell you that they don't want you to do it?

A No.

Q Do you have an intellectual curiosity as to what those results would show?

A Well, ultimately, yes.

Q And do you know -- I see in your report you make the statement that you believe the VICTOR study, which is one part of Protocol 203, has recently become final. That's at page 26?

A Yes.

Q Did Merck's lawyers tell you that VICTOR recently became final?

A I believe so.

Q And did the Merck lawyers tell you when they had the data on the adverse events that occurred in VICTOR?

A I don't recall.

Q Do you know what it was that happened in May 2006 that was any different from the data necessary to analyze the relative risk of thrombotic events in Protocol 203 in November 2005, for example?

the relative risk, APPROVe relative risk was 3.5.

Q **And have you ever seen the Kaplan-Meier cumulative incidence curve of the events in the VICTOR trial?**

A I may have, but I don't recall.

Q **Now, with respect to Professor Jewell's analysis of Vioxx data from the APPROVe, VICTOR, and VIP studies Protocol 203 marked as Kim Exhibit 6, do you have any knowledge as to whether Dr. Jewell used something other than the final adverse event data?**

A First of all, I find the document very difficult to comprehend, and then I noted when I was reviewing the document that this study does not provide the primary analysis result. What I see is a snippet of various risks from the stated cardiovascular endpoints of the Study 203. So I see this report as very incomplete.

MR. ARBITBLIT: I'll move to strike as nonresponsive.

Q **Do you know whether Dr. Jewell had the final adverse event data when he prepared the analysis in Exhibit 6?**

A I cannot answer that question affirmatively or negatively.

Q **Do you know whether all confirmed cardiac events**

**was a prespecified endpoint in the Study 203 data analysis plan?**

A According to the Exhibit 7 you showed me, that appears to be the primary endpoint.

MR. MORTARA: I now object to the form of the question. I think it was confusing, Don.

MR. ARBITBLIT: Keep your objection in your pocket, counsel.

MR. MORTARA: This is exactly like the APPROVe extension, so please come to me on this one. There's a confusion on the question. I just want you to get it right. I won't tell you what I think the confusion is. Just get it right.

MR. ARBITBLIT: All right, okay.

Q **Doctor, take a look at page 5 of Exhibit 7, the Protocol 203 data analysis plan. Do you see the list of other endpoints there?**

A Yes. I see a sort of laundry list of endpoints.

Q **And do you see that they all fall under the heading on page 4, Endpoints for Analysis?**

A Yes. But it states that, "The primary endpoint will be confirmed thrombotic cardiovascular adverse experience as defined by the CGO

publication SOP."

Q **And you'd like to see that analysis, wouldn't you?**

A I would like to see that.

Q **But you don't plan to do it yourself?**

A When I signed up to work with Mr. Mortara, data analysis is not in the picture. I have no time for that. And I trust the people who does analysis.

MR. MORTARA: Mr. Arbitblit, I have a delayed argumentative objection to "and you'd like to see that analysis, wouldn't you"?

Q **Now, you trust the people who do the analysis?**

A Right.

Q **But they haven't done the analysis, have they?**

A Why hasn't Dr. Jewell done the analysis? I'm curious. He appears to have access to the data.

Q **Would you like to see the analysis of the full data, Doctor?**

A Well, my question is why Dr. Jewell did not produce the entire analysis, just sort of a -- parts of the endpoints. That was my question when I looked at this report.

Q **Now, do you agree that endpoints for analysis as listed at page 4 going over to page 5 of the**

Protocol 203 data analysis plan includes all confirmed cardiac events?

A It states so.

Q And does Dr. Jewell's analysis state that it considers the cardiac events?

A Let me take a look at them. It states that it includes only cardiac events.

Q Now, do you see that the Kaplan-Meier plots of cumulative rates over time will be compared? Language appears at page 17 of the Protocol 203 analysis.

A Would you please be more specific about the clause.

Q Page 17 at the top.

A At the top.

Q Of the Protocol 203 data analysis plan states that Kaplan-Meier plots of cumulative rates over time will be compared. Do you see that?

A Yes, I do.

Q To the best of your knowledge, has Merck ever prepared Kaplan-Meier plots of cumulative rates over time for any endpoint prespecified in Study 203?

MR. MORTARA: Object to the form of the question, calculation for speculation.

Q **I asked for your knowledge, sir.**

MR. MORTARA: I'll withdraw the objection, Don.

A I haven't seen one yet. But as my report indicates -- where is that -- I read from page 26 of my report regarding VICTOR study, and "I understand that the study data has recently become final and I will update my report as necessary to reflect the final data." And I have yet to see the final data.

Q **And what do you mean by updating your report as necessary to reflect the final data?**

A My understanding is that this report to the FDA was a preliminary.

Q **Well, do you mean to say that you plan to update your report to include the Kaplan-Meier plots of cumulative rates over time for the primary endpoint of thrombotic events in Protocol 203?**

A Not specifically for Kaplan-Meier, but general information about the cardiovascular safety adverse events.

Q **Now, take a look at page "iii" of the Protocol 203 data analysis plan.**

A Yes.

Q **The third paragraph where it says, "Analytical and**

Protocol 145 (VICTOR) Memo

Protocol 145 (VICTOR) Memo

**MRL MEMO**

SUBJECT: Overview of Cardiovascular Events in the VICTOR Study (Reports Received by Merck as of 31-May-2005)

---

Attached please find a tabulation of cardiovascular events from the VICTOR study. All events reported to Merck Research Laboratories (MRL) by Oxford University as of 31-May-2005 that qualified for adjudication under the Cardiovascular Standard Operating Procedure are included in this tabulation. One additional event reported by Oxford since that time is not included in the analysis but will be included in any final analyses. It should be noted that the design of the study calls for visits at yearly intervals. Thus, there is potential for additional events to be reported for the on-drug portion of the study, as yearly follow-up for the primary endpoint of mortality is continuing.

Due to the voluntary withdrawal of VIOXX® from the market, investigators were instructed to terminate dosing in the study on 30-Sept-2004. Investigators were unblinded to treatment assignment on 1-Oct-2004.

Based on relatively few events, there was a difference in the rates of confirmed thrombotic and APTC events in favor of placebo, consistent with the summary of events based on the data available in February 2005. Because the study was unblinded in October 2004, there is potential for differential reporting of events. It is notable, in this regard, that the 4 events reported after 1-Oct-2004 occurred in patients treated with rofecoxib. It is not possible to draw scientifically meaningful conclusions based on these small amounts of data from a prematurely terminated study.

MRL MEMO

SUBJECT: Summary of Cardiovascular Events in the VICTOR Study (VIOXX Protocol 145)

**Objective:** This memo summarizes the cardiovascular (CV) safety data from the VICTOR Study (VIOXX Protocol 145) that were reported by Oxford University to Merck Research Laboratory (MRL) on or before May 31, 2005.

**Study Design:** This was an international, multicentre, Phase III, randomised, double-blind, placebo-controlled trial of VIOXX® 25 mg versus placebo. The study was designed to have patients randomized to VIOXX® 25 mg with either 2 years or 5 years treatment duration, and placebo with 2 years or 5 years treatment duration of therapy with randomization in equal proportions.

**Data and Populations:** Due to the voluntary withdrawal of VIOXX® from the market in September 2004, dosing in this study was terminated early. The study was unblinded on October 1, 2004. As confirmed by the University of Oxford, at the time of study termination, 2434 patients had been randomized into the study (1217 patients to placebo and 1217 patients to rofecoxib 25 mg) out of 7000 planned (See memo in Appendix 1). All CV events recorded by University of Oxford and received by MRL as of May 31, 2005 are reported in this memo.

**Endpoints:**

- Thrombotic Cardiovascular Serious Adverse Experience (TCVSAE)
- Antiplatelet Trialists' Collaboration (APTC) combined endpoint

**Results:**

The proportions of patients with TCVSAE and APTC events while on treatment or within 14 days after the last dose of study medication are tabulated in Table 1 and Table 2, respectively. The details of all investigator-reported potentially thrombotic CV events reported by Oxford University to MRL prior to and after the study unblinding date, October 1, 2004, and up to May 31, 2005 are listed in Table 3.

Business Confidential B use only

Table 1

*Summary of Confirmed Thrombotic Cardiovascular Serious AEs by Class of Terms*
Rofecoxib 25 mg vs. Placebo
Events on Treatment or Within 14 Days After Last Dose of Study Medication

| Category | Placebo (N=1217) n (%)[†] | Rofecoxib 25 mg (N=1217) n (%)[†] |
|---|---|---|
| **Total number of patients with TCVSAE[*] Endpoint** | **4 (0.33)** | **14 (1.15)** |
| **Cardiac Events** | 2 (0.16) | 8 (0.66) |
| Acute myocardial infarction | 0 (0.00) | 3 (0.25) |
| Fatal acute myocardial infarction | 0 (0.00) | 3 (0.25) |
| Unstable angina pectoris | 1 (0.08) | 1 (0.08) |
| Sudden cardiac death | 1 (0.08) | 1 (0.08) |
| **Peripheral Vascular Events** | 1 (0.08) | 2 (0.16) |
| Pulmonary embolism | 1 (0.08) | 1 (0.08) |
| Peripheral venous thrombosis | 0 (0.00) | 1 (0.08) |
| **Cerebrovascular Events** | 1 (0.08) | 5 (0.41) |
| Ischemic cerebrovascular stroke | 1 (0.08) | 3 (0.25) |
| Transient ischemic attack | 0 (0.00) | 2 (0.16) |

Note: Patients with multiple events may be counted more than once in different categories but only once within a category.
[*] TCVSAE = Confirmed Thrombotic Cardiovascular Serious Adverse Experience.
[†] Crude incidence (n/Nx100)

Business Confidential use only

Table 2

Summary of APTC by Class of Terms.
Rofecoxib 25 mg vs. Placebo
Events on Treatment or Within 14 Days After Last Dose of Study Medication

| Category | Placebo (N=1217) n (%)[†] | Rofecoxib 25 mg (N=1217) n (%)[†] |
|---|---|---|
| **Total number of patients with APTC[*] Endpoint** | 3 (0.25) | 9 (0.74) |
| **Cardiac Events** | 1 (0.08) | 7 (0.58) |
| Acute myocardial infarction | 0 (0.00) | 3 (0.25) |
| Fatal acute myocardial infarction | 0 (0.00) | 3 (0.25) |
| Sudden cardiac death | 1 (0.08) | 1 (0.08) |
| **Cerebrovascular Events** | 1 (0.08) | 3 (0.25) |
| Ischemic cerebrovascular stroke | 1 (0.08) | 3 (0.25) |
| **Other Events** | 1 (0.08) | 0 (0.00) |
| Fatal vascular rupture | 1 (0.08) | 0 (0.00) |

Note: Patients with multiple events may be counted more than once in different categories but only once within a category.
[*] APTC = Antiplatelet Trialists' Collaboration.
[†] Crude incidence (n/Nx100)


Business Confidential use only

Table 3

Listing of All Investigator-Reported Potentially Thrombotic CV Events Provided to MRL by 31-May-2005

| Case ID | AN | Treatment | Date of Randomization | Date of Event | Relday[†] of Event | Date Reported | CV Event Term | APTC Event | TCVSAE Event |
|---|---|---|---|---|---|---|---|---|---|
| Events Reported Prior to Study Unblinding, October 1, 2004 | | | | | | | | | |
| 949 | 10416 | Placebo | 01/24/2003 | 05/05/2003 | 102 | 06/09/2003 | Unstable angina pectoris | N | Y |
| 4015 | 10597 | Placebo | 04/03/2003 | 09/03/2004 | 520 | 09/10/2004 | Ischemic cerebrovascular stroke | Y | Y |
| 3642 | 11065 | Placebo | 09/17/2003 | 03/17/2004 | 183 | 03/19/2004 | Sudden cardiac death | Y | Y |
| 3969 | 11366 | Placebo | 12/15/2003 | 07/02/2004 | 201 | 07/02/2004 | Loss of consciousness, Disorientation, Vomiting, Syncope | N | N |
| 4073 | 12042 | Placebo | 06/15/2004 | 09/07/2004 | 85 | 09/30/2004 | Pulmonary embolism | N | Y |
| 3997 | 12094 | Placebo | 07/02/2004 | 08/26/2004 | 56 | 09/01/2004 | Other event | Y | N |
| 979 | 10021 | Rofecoxib 25 mg | 05/22/2002 | 11/14/2003 | 542 | 11/17/2003 | Fatal acute myocardial infarction | Y | Y |
| 902 | 10125 | Rofecoxib 25 mg | 08/19/2002 | 01/17/2003 | 152 | 01/24/2003 | Myocardial ischemia | N | N |
| 967 | 10137 | Rofecoxib 25 mg | 09/02/2002 | 08/24/2003 | 357 | 09/04/2003 | Acute myocardial infarction | Y | Y |
| 961 | 10141 | Rofecoxib 25 mg | 09/03/2002 | 08/14/2003 | 346 | 08/15/2003 | Acute myocardial infarction | Y | Y |
| 4336 | 10165 | Rofecoxib 25 mg | 09/16/2002 | 11/10/2003 | 421 | 11/18/2003 | Oesophageal carcinoma | N | N |
| 4422 | | Rofecoxib 25 mg | 09/16/2002 | 12/09/2003 | 450 | 11/18/2003 | Fatal acute myocardial infarction | Y | Y |
| 978 | 10216 | Rofecoxib 25 mg | 10/21/2002 | 10/30/2003 | 375 | 11/04/2003 | Transient ischemic attack | N | Y |
| 3971 | 10399 | Rofecoxib 25 mg | 01/21/2003 | 08/08/2004 | 566 | 08/10/2004 | Myocardial ischaemia | N | N |
| 3677 | 10560 | Rofecoxib 25 mg | 03/21/2003 | 10/16/2003 | 210 | 03/31/2004 | Alveolitis fibrosing | N | N |
| 971 | 10635 | Rofecoxib 25 mg | 04/15/2003 | 09/08/2003 | 147 | 09/30/2003 | Peripheral venous thrombosis | N | Y |
| 974 | 10904 | Rofecoxib 25 mg | 07/24/2003 | 10/07/2003 | 76 | 10/14/2003 | Pulmonary embolism | N | Y |
| 3580 | 11364 | Rofecoxib 25 mg | 12/15/2003 | 01/31/2004 | 48 | 02/19/2004 | Transient ischaemic attack | N | N |
| 991 | 11369 | Rofecoxib 25 mg | 12/16/2003 | 01/11/2004 | 27 | 01/15/2004 | Ischemic cerebrovascular stroke | Y | Y |
| 4143 | 11481 | Rofecoxib 25 mg | 01/20/2004 | 07/05/2004 | 168 | 07/26/2004 | Transient ischaemic attack | N | N |

MRK-I8940096443

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3653 | 11563 | Rofecoxib 25 mg | 02/06/2004 | 02/24/2004 | 19 | 03/23/2004 | Ischemic cerebrovascular stroke | Y | Y |
| 3654 | | Rofecoxib 25 mg | 02/06/2004 | 02/28/2004 | 23 | 03/23/2004 | Fatal acute myocardial infarction | Y* | Y* |
| 3861 | 11783 | Rofecoxib 25 mg | 04/07/2004 | 04/28/2004 | 22 | 06/28/2004 | Unstable angina pectoris | N | Y |
| 3973 | 12082 | Rofecoxib 25 mg | 06/28/2004 | 07/30/2004 | 33 | 08/17/2004 | Sudden cardiac death | Y | Y |
| Events Reported After Study Unblinding, October 1, 2004 | | | | | | | | | |
| 4605 | 10275 | Rofecoxib 25 mg | 11/20/2002 | 10/07/2004 | 688 | 05/09/2005 | Cardiac arrest | N | N |
| 4587 | 10384 | Rofecoxib 25 mg | *01/15/2003* | *05/11/2004* | *483* | *04/22/2005* | *Acute myocardial infarction* | Y | Y |
| 4183 | 11962 | Rofecoxib 25 mg | 05/27/2004 | 08/27/2004 | 93 | 11/03/2004 | Transient ischemic attack | N | Y |
| 4095 | 12049 | Rofecoxib 25 mg | 06/16/2004 | 10/04/2004 | 111 | 10/05/2004 | Ischemic cerebrovascular stroke | Y | Y |

* Both events for this patient are reflected in Tables 1 and 2.
† Relday = days on study medication since the start of study.

Business Confidential
B use only

MRK-I8940096444

Appendix

octo
Oncology Clinical Trials Office

# Memorandum

To: Maureen Kashuba

From: Francesca Duchesne

Date: 27-Apr-2005

Dear Maureen,

Please accept this memo as confirmation that the total number of patients randomised to the VICTOR Trial is 2434. There were 1217 patients randomised into the placebo arm, and 1217 Patients randomised into the Rofecoxib/Vioxx arm.

Kind regards,

Francesca Duchesne

(Clinical Trials Administrator)

B Business Confidential use only

MRK-I8940096445

UNITED STATES OF AMERICA

\+ + + + +

DEPARTMENT OF HEALTH AND HUMAN SERVICES

\+ + + + +

FOOD AND DRUG ADMINISTRATION

CENTER FOR DRUG EVALUATION AND RESEARCH

ARTHRITIS ADVISORY COMMITTEE

\+ + + + +

REVIEW OF NDA #21-042

*VIOXX™ (ROFECOXIB) MERCK RESEARCH LABORATORIES*

\+ + + + +

TUESDAY

APRIL 20, 1999

The meeting was held in the Whetstone Room at the Holiday Inn Gaithersburg, 2 Montgomery Village Avenue, Gaithersburg, Maryland, at 8:00 a.m., Dr. Steven Abramson, Chair of the Committee, presiding.

PRESENT:

| | |
|---|---|
| STEVEN B. ABRAMSON, M.D. | Chair |
| DANIEL J. LOVELL, M.D.,Ph.D. | Member |
| JANET D. ELASHOFF, Ph.D. | Member |
| LEONA M. MALONE | Member |
| FRANK PUCINO, Jr., Pharm.D. | Member |



DR. JOHNSON: Yes, and there were at least six non-steroidals discussed at that point. And this data came from pooled analyses of NDA trials. They only had 3-month on placebo, and they had up to six to 12 months on whatever non-steroidal it was.

And they were typically people who fulfilled a -- there was not a heavy-duty use of *endoscopy at that point in time. These were clinical* diagnoses, in general. And there were confidence intervals for the cumulative risks at six months and 12 months and there was a substantial amount of overlap, which is what led to the writing of the label in the first place. Unfortunately, I think it's a different era.

CHAIRMAN ABRAMSON: All right.

DR. LANGMAN: Michael Langman, Birmingham, England. I think the importance of this analysis is that without doing it and without the combination, you get no data. Secondly, an effort was made to exclude surveyance ulcers -- deliberate effort was made to get rid of them.

Now, it may not have been successful or it may have been successful, but that was pre-specified. And an attempt was then made to concentrate on those who had symptomatic ulcer and complications because of

awareness that there were problems through a series of
sensitivity analyses; which happened to come up with
the same answer.

Why does one concentrate on this?  Well,
in my country there are hundreds of deaths a year, in
you all's there are thousands, from NSAIDs
complication.  It is the critical issue and if we have
information that bears upon it, I have a feeling as of
somebody with an interest in public health, it's our
duty to make it known by some appropriate means.

If we don't believe the information is any
good that's different.  I happen to believe it is.

DR. GOLDMAN:  Dr. Abramson, just for
clarification, NSAID -- I think the agency said this,
but -- the NSAID warning has to do with ulcers, not
obstructions.  So what was always on the label in the
template is perforations, ulcers, or bleeds.

Only recently has it been requested that
you also look at obstructions which are very difficult
to, obviously because they're so rare -- as defined as
complications.  So the template and the numbers you
see are all reference to PUBs, not POBs.

CHAIRMAN ABRAMSON:  I'll need some help
from Dr. Delap, but as I recall when last we discussed
this, both in an advisory meeting not over a drug, and

# VICTIMS OF DRUG THAT TOOK A HIDDEN TOLL Page 1

**The Sunday Times (London) August 21 2005**

**SPECIAL INVESTIGATION BY BRIAN DEER**

WHEN Kenneth Wood died of a heart attack two years ago, on the day he was supposed to go on holiday to America, his wife Margaret blamed herself.

Should she have given him an aspirin, she wondered, to thin his blood as he lay complaining of chest pains? The ambulance crew had done that straight away. Could she have done more to galvanise the hospital? The doctors, she felt, had looked confused.

"The shock was that he was so active," said Margaret, 64. "He used to go bowling six nights a week, right up until the day before he died."

Last September she got another shock when Vioxx, a painkilling "wonder drug", was taken off the market after a clinical trial in America had shown a link to heart attacks.

Wood, 71, a retired laboratory technician from Madeley, Shropshire, had been taking part in British trials of Vioxx when he died. The research was designed to establish whether the drug could be extended from its main purpose, relieving arthritis, to the prevention of colon cancer.

In doing so, Wood became one of numerous victims of a medical cataclysm highlighted this weekend by a court case in Texas, which saw the drug's manufacturer, Merck Inc of New Jersey, ordered to pay £141.1m in damages to the widow of another Vioxx patient.

Dozens of British lawyers are now soliciting clients, while some experts calculate the global toll linked to Vioxx at up to 60,000 deaths. "This," Dr David Graham, a senior US Food and Drug Administration (FDA) official, told a stunned Senate committee last November, "would be the rough equivalent of 500 to 900 aircraft dropping from the sky." He described it as "what may be the single greatest drug safety catastrophe".

Although Margaret Wood has no plans to sue anyone, some lawyers believe she could have grounds. A Sunday Times investigation into the British



connection to the Vioxx project has established that her husband was never told of all the possible risks when he was recruited for the trial.

This is the essence of what emerged from the court near Houston — that Merck did not disclose to patients all it knew about problems with the drug.

Margaret did not know, for example, that a doctor working on the trial had reported to Merck that the drug trial was "probably" to blame for Wood's heart attack. "I'm very, very angry," said Margaret when I showed her confidential documents last month. "I wasn't aware that there were any risks at all."

Her husband died in November 2003, 18 months after volunteering for the research. The trial, called project "Victor", was financed by Merck.

Nor did Margaret know that evidence of Vioxx's potential dangers had first been noted four years earlier. Even after this, the drug was backed by much of the medical establishment in America and Britain.

Just six months before Wood's death, Britain's leading authority on painkillers had dismissed rising fears over heart attack deaths connected to Vioxx as "speculation".

The Wood case is part of a far bigger scandal now threatening to engulf Merck. When Vioxx was withdrawn, 20m people around the world, including 400,000 in Britain, were using the drug. Doctors have formally reported the deaths of 103 people in Britain, but the real figure may be as high as 2,000 according to some experts.

Why was such a potentially dangerous drug allowed to be prescribed so widely in Britain? Why was it backed so enthusiastically by experts such as Professor Michael Langman, one of the leaders of the Victor trial and an expert on painkillers? The answers are both complex and distressing. They begin with a paradox that Langman had been struggling with for more than 20 years.

LANGMAN, a former dean of Birmingham University's medical school, became a figure of great influence in 1987 as one of the 36 members of the government's drugs watchdog, the Committee on Safety of Medicines (CSM).

Painkillers have long been Langman's specialist interest, particularly aspirin and similar drugs such as naproxen and ibuprofen, known collectively as "non-steroidal anti-inflammatories" or NSAIDs. Although they are effective, particularly in osteoarthritis, they can also cause fatal stomach ulcers and perforations.

When Merck announced in 1999 that it had developed a similar drug without these side effects, Langman was understandably impressed. The new drug was based on Nobel prizewinning research by Sir John Vane, a British

pharmacologist who had found that aspirin blocked two chemical messengers. One triggered the heat and pain of inflammation, while the other protected the stomach from ulcers. By blocking one but not the other, it ought to be possible to give relief without the usual risks.

Few new medicines are truly "miracle drugs" but this was how Merck sold Vioxx. To advance this image it recruited an army of consultants, Langman being among the most distinguished.

In April 1999 he sat with the Merck delegation when FDA advisers assembled at the Gaithersburg Holiday Inn in Maryland to consider the company's application for a marketing licence.

"In my country there are hundreds of deaths a year — in all there are thousands — from NSAIDs complications," he told the meeting. "It is the critical issue and if we have information that bears upon it I have a feeling, as somebody with an interest in public health, it's our duty to make it known."

Nine days later the CSM approved the drug for marketing in Britain. A leaflet aimed at British doctors stated: "In eight pooled studies of up to one year, Vioxx (average dose 25mg) reduced the risk of developing upper GI (gastro-intestinal) perforations, ulcers and bleeds by more than half compared to NSAIDs."

Although FDA staff registered "serious concerns" about the analysis, Langman became the new drug's champion. In one journal he declared that Vioxx-type drugs "are almost certainly associated with lower risks of ulcer and its complications, and probably no risk at all". In another he later denounced rising fears over heart attacks as "a flurry of unjustifiable speculation and controversy".

In 2001, at the peak of the Vioxx hype, Merck reportedly spent $160m advertising the drug. In Britain, where direct advertising is banned, the promotion was almost wholly through doctors.

"The world of relief is about to change," screamed promotions issued for Vioxx's British launch (including a coupon offering doctors a free clock). "True once-daily dosing for osteoarthritis patients . . . Selective, strong, *simple.*"

Merck also sought ways of broadening the market for the drug by demonstrating that, like aspirin, Vioxx was effective for more than just arthritis. Doctors prescribed it to reduce the inflammation caused by sports injuries, and in particular it seemed to have potential for inhibiting tumours, *for example in colon cancer.*

So while an American Merck trial code-named "Vigor" compared Vioxx — known generically as rofecoxib — with the painkiller naproxen for the treatment of rheumatoid arthritis, another trial — "Approve" — tested

whether colon cancer could be stayed.

In November 1999 the safety committee monitoring Vigor met to discuss increased blood pressure, "excess deaths and cardiovascular experiences".

| 1 | 2 | >>> Next page >>>
Brian Deer investigates Vioxx

| brian deer |

BRIAN DEER

# VICTIMS OF DRUG THAT TOOK A HIDDEN TOLL Page 2

In October 2000 Merck supplied the FDA with a string of death reports involving heart attacks and strokes. In response, Dr Shari Targum, the FDA analyst, wrote in a report dated January 2001: "It would be difficult to imagine inclusion of Vigor results in the rofecoxib labelling without mentioning cardiovascular safety results in the study description, as well as the Warnings section."

This advice was dispatched to other regulators around the world. Yet none of this was notified to patients such as Wood when a colon cancer trial in Britain was set up by Langman in partnership with David Kerr, who headed the Cancer Research Campaign Institute. The trial was established under the auspices of the main British ethics, research and regulatory bodies.

Kerr, now a professor at Oxford, was a rising star in the new Labour medical firmament — close to Alan Milburn, who was health secretary, and his expertise repeatedly acknowledged by Tony Blair.

The Victor trial was approved by a West Midlands medical ethics committee in November 2000 and aimed to recruit 7,000 volunteers at 168 British hospitals, plus more in Australia and New Zealand. Half would get Vioxx and the rest a placebo. They had all received "potentially curative" surgery for colon cancer.

Victor was trumpeted throughout the medical profession. "The idea of maintaining all the beneficial possibilities of aspirin but without the side effects was clearly very attractive," said Desmond Laurence, emeritus professor of pharmacology at University College London, who was invited to join Victor but refused.

Wood was among the first volunteers for Victor. The "informed consent sheet" that the Royal Shrewsbury hospital gave him in May 2002 itemised only these possible side effects: "tummy pain, dizziness, fluid retention leading to ankle swelling, increase in blood pressure, indigestion and heartburn, mild headache, itching". There was nothing about heart attacks or anything too serious.

Informed consent documents obtained by The Sunday Times show that even by the time the project was abandoned in November 2004 the full range of hazards was not revealed.

Wood's death certificate read: "1 (a) Myocardial rupture, (b) Acute myocardial infarction, (c) Coronary artery atheroma (furring of the arteries)." Decoded, Wood died of a heart attack so massive that it would have resembled a gunshot wound.

What the certificate did not say was whether Vioxx was involved, so it came as a shock to Margaret when I read her a confidential report from Merck giving the opinion of a Shrewsbury hospital doctor.

"The investigator felt that the myocardial infarction was not related to disease/other illness," said the report. "The investigator felt that the myocardial infarction and myocardial rupture were probably related to study therapy, and that the coronary atheroma was possibly related to study therapy." In other words, the doctor, reporting privately to other doctors, said that in his view it was probably the Vioxx that had killed Wood.

THE $250m verdict in Texas, after a five-week hearing, followed claims that Merck had lied about the drug's risks, an allegation that it strongly denied. The company has said that it will appeal. The dispute could cost Merck $20 billion, according to Wall Street analysts, one third of its total value.

The core question is why the firm took so long to act. In papers disclosed for the litigation, company e-mail chatter discussing fears of cardiovascular risks dates back to 1997. In that year researchers from London's Royal Brompton hospital warned that Vioxx-type drugs could trigger heart attacks.

According to Merck there was no reliable evidence until its Approve project, testing Vioxx's use against colon cancer, spat out preliminary numbers last September. "New and unexpected data emerged showing an increased risk," a spokesman for its British subsidiary said. "Within one week of learning those results, Merck acted in what it believed was the best interest of patients and voluntarily withdrew Vioxx from the market."

However, confidential documents obtained in the investigation raise questions over whether what the company has said publicly reflected what it knew about possible hazards. In Britain the first heart attack deaths were flagged up at the Medicines and Healthcare products Regulatory Agency (MHRA) within nine months of the product's launch.

No less disturbing were reports of fatal gut damage, the problem Vioxx was intended to solve. "There have been a number of spontaneous reports of GI perforations, ulcerations and bleeds associated with rofecoxib," MHRA staff reported confidentially to the CSM in July 2000. "While in some instances these may be related to concomitant medication, or use in patients with known high risk of GI complications, the event rate is considered significant."

The CSM considered the matter in December 2001. The minutes show that Langman was asked to stay in the room "to answer questions" even though at the meeting to license Vioxx he had withdrawn due to a possible conflict

of interest, given his links with Merck and its financial support for his research. He was deemed to be needed in the room as the authority on painkillers.

After Langman left the room, the regulators limply concluded that "sufficient concern (about heart attacks) now exists from different data sources that it would be prudent to advise prescribers and patients by updating product information". Yet five months later Wood joined the Victor trial without receiving any warning of serious heart risks. Some documents point to Langman's apparent reluctance to accept the evidence against Vioxx.

On September 30, 2004, Vioxx was withdrawn. After five years of intense marketing, Merck acknowledged the implications of research, including its own, which linked its product to possibly tens of thousands of deaths.

"We are taking this action because we believe it serves the best interests of patients," *the company announced, pulling what had become the quickest* selling new drug in history. "We concluded that a voluntary withdrawal is the responsible course to take."

LANGMAN, who had championed the drug for so long, was effectively left in the lurch. Declining to be interviewed for this article, he told me: "I don't think I've done anything other than express what I regarded as an honest opinion."

After contacting the Medical Protection Society, he later issued a one-page statement saying he had followed the rules for CSM members and that although the company had sponsored Victor and other research projects, he had had no personal financial interest for seven years.

*The Victor trial, he said, was approved or monitored* by the West Midlands ethics committee, Cancer Research UK, an independent data safety committee specially supervising the project, and, at the start, the MHRA. "I believe strongly in the need for research to improve the quality of patient care," Langman said, "and have dedicated much of my professional life to this goal while striving to bring a balanced and objective viewpoint to my work."

The criticism is not that Langman lacked dedication. It is that he was taken in, like countless others. Industry figures suggest that a new product such as Vioxx may consume £500m in investment; and once giant clinical trials such as Victor are under way, the corporate imperatives to see the drug profitably marketed can shoulder aside appropriate caution.

"I'm sure he believed the data," said Professor Kim Rainsford, editor of the journal Inflammopharmacology. "I hold Mike (Langman) in very, very high regard and so I was a little concerned to see him come out so strongly in support of this drug. But whether he's done the right or wrong thing here, I think you're right. There was so much hype that everyone had to jump on

the bandwagon."

Others believe there are wider implications for the supervision of medical research. Dr Evan Harris, Liberal Democrat MP for Oxford West and Abingdon and the party's science spokesman, said it was "unacceptable for patients in a trial to have withheld from them information about the risks of serious side effects".

He added: "Clinical trials are critical to the development of medicine and science, and that is why the apparent failure of the research ethics system to act on emerging concerns about the risks in this case suggests that reform is needed."

Nobody has yet got in touch with Margaret Wood to explain what role Vioxx may have played in her husband's death. Nor has anyone told her about the compensation scheme in place for the Victor trial. "They've never told us anything," she said. "The only contact I've had is when I rang the hospital to ask what to do with his tablets. They said, 'Take them to a chemist'. And that was that."

* * * * *

**The history**

Vioxx is an anti-inflammatory painkiller made by Merck, based in New Jersey, America. It was launched in Britain in 1999 Merck believed Vioxx would revolutionise pain relief, offering the benefits of aspirin without the older drug's risk of stomach ulcers

Elderly people suffering from arthritis were the main patients, but doctors also prescribed it for other kinds of pain, such as that caused by sports injuries

Concerns were raised after research linked the drug to heart attacks and *bleeding in the gut At the time of its withdrawal in* 2004, 20m people around the world, including 400,000 in Britain, used Vioxx

More than 4,200 claims have been lodged against Merck with courts in America - including one by Carol Ernst, left, who was awarded more than $250m this weekend

| 1 | 2 | >>> Page 1 news >>>
Brian Deer investigates Vioxx

| brian deer |

**Copyright, Brian Deer. All rights reserved. No portion of this article on Vioxx (rofecoxib) may be copied, retransmitted, reposted, duplicated or otherwise used without the express written approval of the author. Responses, information and other**

**feedback are appreciated - via the briandeer.com homepage.**

BRIAN DEER