John W. Farquhar, M.D.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re:  VIOXX
PRODUCTS LIABILITY
LITIGATION

GERALD BARNETT and CORRINE            )
BARNETT,                              )
                                      )MDL Docket No. 1657
         Plaintiffs,                  )
                                      )
vs.                                   )
                                      )
MERCK & CO., INC.,                    )
                                      )
         Defendant.                   )
                                      )
_____ )

VIDEOTAPED DEPOSITION OF JOHN W. FARQUHAR, M.D.
San Francisco, California
June 8, 2006

Reported by:
DARCY J. BROKAW
RPR, CRR, CSR No. 12584
Job No. 69492



Page 1

John W. Farquhar, M.D.

1    you know, other trials.

2         And that's what I've tried to do in my

3    supplementary report is pick a high-risk subgroup

4    that is more generally represented, representative

5    of the high-risk state in cardiovascular trials.

6    BY MR. MORTARA:

7         Q    You picked a high-risk subgroup in your

8    supplemental report that was not pre-specified in

9    the data analysis plan, correct?

10        A    That's not correct.  And I think at this

11   point, you know, I alluded to the increased

12   cardiovascular risk in Table 19, right.  I alluded

13   to that.

14        The subgroup analysis as we -- as I --

15   described it -- and "we" means Professor Jewell and

16   I -- says that diabetics were included -- but what

17   I'm saying to you now, and I have a document that

18   will clarify this, is that what is in the

19   supplemental report is, in fact, only the group

20   identified as increased cardiovascular risk.

21        Q    In the APPROVe study?

22        A    Right.

23        Q    When you did your analysis in your

24   supplemental report, you used the prespecified high

25   cardiovascular risk subgroup of the APPROVe study --

Page 62

John W. Farquhar, M.D.

1      A    Correct.

2      Q    -- as defined by Merck?

3      A.   Correct.

4      Q    Dr. Farquhar, when assessing the

5  statistical reliability of a subgroup, how does one

6  use a P for interaction?

7      A    Well, there are two -- a P for interaction

8  is looking to see if there is a synergistic

9  relationship between the attribute in question and

10  the end point that has been studied.

11          So Professor Jewell is the individual who

12  performed that analysis for me, or for us, to the

13  extent that he's part of the report.  And his --

14  would you want to know more about the level of

15  p-value that -- is that what you're looking for?

16      Q    I'll ask another question.  We'll get

17  there.  Thank you, Dr. Farquhar.

18          When you assess the statistical

19  reliability of a subgroup, you look at the P for

20  interaction to see if it's above a certain number or

21  not, correct?

22      A    That's only one thing I look for.  The

23  first thing I look for is whether or not there is a

24  significant difference in the value of -- well, two

25  things.  The value of the Vioxx group at high risk

Page 63

John W. Farquhar, M.D.

1    the inferences that I drew from my notes --

2    incidentally, it wasn't the notes themselves that

3    was guiding my writing the report.  I had documents

4    to review.  And my modus operandi is to sit at the

5    computer and try and create the, if you will, the

6    initial concepts that come from my review of the

7    materials.

8            The presence or absence of notes is not as

9    germane as my method of taking materials that I'm

10   looking at and deriving conclusions that end up in

11   the report.

12   BY MR. MORTARA:

13       Q    Dr. Farquhar, I'm going to mark as Exhibit

14   4 your Supplemental Expert Report.

15                        (Exhibit No. 4 marked for

16                        identification.)

17   BY MR. MORTARA:

18       Q    Dr. Farquhar, Exhibit 4 is your

19   Supplemental Expert Report.  Could you turn to the

20   final page, page 25.  Exhibit 4 is dated May 22nd,

21   2006, and is that your signature there, sir?

22       A    Yes.

23       Q    Dr. Farquhar, on the front page of your

24   report, there is a bullet that says, "Protocol 203:

25   Merck's prespecified analysis of data from three

Page 67

John W. Farquhar, M.D.

1    pooled studies (APPROVe, VICTOR and ViP), known as

2    'Protocol 203.'"

3              Do you see that?

4        A    Yes, I do.

5        Q    What is Protocol 203?

6        A    It's an analysis of data from those three

7    studies.

8        Q    And you say that Dr. Jewell has analyzed

9    the Protocol 203 data?

10       A    Yes, he has.

11       Q    Did Dr. Jewell follow the data analysis

12   plan for Protocol 203?

13             MR. ARBITBLIT:  Object to form.

14             THE WITNESS:  Well, he did, but you know,

15   he was using his own brain.  And in order to answer

16   whether or not he did analyses beyond what was in

17   203, I would have to look at the data analysis plan

18   for that particular point.

19   BY MR. MORTARA:

20       Q    Have you ever read the data analysis plan

21   for Protocol 203?

22       A    Yes.  Not in detail, but --

23       Q    Did Dr. Jewell, in his analysis, follow

24   the data analysis plan for Protocol 203?

25       A    Well, I'm going to stop and think a little

Page 68

John W. Farquhar, M.D.

1   bit about what has been analyzed that is likely to

2   be -- all right.  Let me take -- I'm going to try

3   and answer this piecemeal.

4           If we are considering Figures 2 and Figure

5   3 where we're dealing with the high-risk versus

6   low-risk status, that follows the data analysis

7   plan, because the data analysis plan had increased

8   cardiovascular risk as one of the categories, among

9   many, of baseline attributes.

10          So in Figures 2 and 3, the data analysis

11  plan was followed in the sense that that category of

12  increased cardiovascular risk was listed as one of

13  the attributes.

14          Now, Figure 1, which is the total analysis

15  of the 203 data, in respect to cardiac events, was

16  in the data analysis plan because cardiac events,

17  all thrombotic events and cardio -- cardiac events,

18  cardiac and cerebrovascular events and all

19  thrombotic events were all listed as part of the

20  data analysis plan.

21          And Dr. Jewell, Professor Jewell, made

22  analyses of the total population of 203, comparing

23  the Vioxx to the placebo groups, using the

24  Kaplan-Meier and other analyses, yes.

25          So I think what I'm leading up to is he

Page 69

John W. Farquhar, M.D.

1    did follow the data analysis plan entirely.

2        Q    **What was the primary end point of Protocol**

3    **203?**

4        A    Well, the primary of 203 would have been

5    all thrombotic events.

6        Q    **What was the secondary end point of**

7    **Protocol 203?**

8        A    It included cardiac and cardiac plus

9    cerebrovascular.  Secondary end points were cardiac

10   only, cardiac plus cerebrovascular, and I've

11   analyzed all three.

12       Q    **Cardiac was, in fact, an exploratory end**

13   **point of Protocol 203, wasn't it, Dr. Farquhar?**

14       A    Well, I don't agree with that.

15       Q    **Cardiac events was defined as an**

16   **exploratory end point in Protocol 203 data analysis**

17   **plan, correct?**

18       A    I consider it as secondary end point.

19       Q    **I'm not asking you what you consider it to**

20   **be.  I'm asking what "cardiac events" is defined as**

21   **in the data analysis plan for Protocol 203?**

22            **Do you know, sir?**

23       A    Well, I -- what I know is what -- my

24   assumption was, and you have some other information

25   that it was identified as a secondary end point.

Page 70

John W. Farquhar, M.D.

1       Q       You assumed that cardiac events were

2    identified as a secondary end point of Protocol 203,

3    correct?

4       A       I'm going to -- I'm going to say yes but

5    one of the reasons that this supplement shows as

6    Figure 1, cardiac events, is that Mr. Barnett, the

7    case in whom I am, for whom, with whom, by whatever,

8    that I'm involved in his case, he represents an

9    individual with cardiac events.  And so this is

10   relevant to his case.

11      Q       The end point most relevant to Mr. Barnett

12   is cardiac events, in your opinion?

13      A       Yes.

14      Q       Dr. Farquhar, could you turn to page 5 of

15   your 2006 supplemental report.  And paragraph 8,

16   first sentence reads:  "Since all of the Protocol

17   203 studies were terminated on the same date,

18   (9/30/04), there was no apparent impediment to

19   simultaneously collecting the data and presenting

20   the pooled analysis of CV risk for all three trials,

21   as prespecified."

22              Do you see that?

23      A       Yes.

24      Q       Is the VICTOR study part of the Protocol

25   203?

John W. Farquhar, M.D.

1      A    Yes.

2      Q    Who ran the VICTOR study?

3           MR. ARBITBLIT:  Object to form.

4           THE WITNESS:  Well, the investigators,

5    supported by Merck.

6    BY MR. MORTARA:

7      Q    Do you know if Merck was in control of the

8    data collection for the VICTOR study?

9           MR. ARBITBLIT:  Object to form.

10          THE WITNESS:  I'm assuming that the data

11   collected in all three studies was done

12   appropriately.

13   BY MR. MORTARA:

14     Q    That's not what I'm asking.  I'm asking:

15   Do you know if data collection for the VICTOR study

16   was done by Merck or by the University of Oxford?

17     A    Well, the data collection would be by the

18   investigators, as I said.

19     Q    Who controlled the VICTOR data, do you

20   know?

21          MR. ARBITBLIT:  Object to form.

22          THE WITNESS:  Controlled -- I don't

23   understand the word "controlled."

24   BY MR. MORTARA:

25     Q    Do you know when the VICTOR data became

Page 72

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    **final, sir?**

2            MR. ARBITBLIT:  Object to form.

3            THE WITNESS:  Well, in order -- do I know

4    when it became final?

5            Thank you very much.

6            What this sentence says is the data, at

7    the time of termination, there was no impediment to

8    simultaneously collecting that data and reporting

9    it, and that's my statement.

10   BY MR. MORTARA:

11       Q    **No impediment to whom, sir?  To Merck?**

12           MR. ARBITBLIT:  Object to form.

13           THE WITNESS:  Well, no impediment to the

14   investigators and to Merck as well, because the

15   investigators are part of a Merck-sponsored study.

16   And if they don't have a relationship that -- where

17   one party knows when the study is terminated, then

18   that's a very strange situation.

19   BY MR. MORTARA:

20       Q    **When did the VICTOR trial investigators**

21   **finalize the VICTOR trial data?**

22           MR. ARBITBLIT:  Object to form.

23           THE WITNESS:  What this sentence is

24   talking about --

25

John W. Farquhar, M.D.

1   BY MR. MORTARA:

2       Q    I'm not asking about this sentence, sir.

3            I'm asking you:  When did the VICTOR trial

4   data become final?  Do you know?

5       A    9/30/04.

6       Q    Have you asked plaintiffs' lawyers when

7   the VICTOR trial data became final?

8            MR. ARBITBLIT:  Object to form.

9            THE WITNESS:  Well, this sentence was

10  something that plaintiffs' lawyers have agreed to.

11  BY MR. MORTARA:

12      Q    Plaintiffs' lawyers told you that the

13  VICTOR trial data was final September 30th of '04;

14  is that correct?

15           MR. ARBITBLIT:  Object to form.

16           THE WITNESS:  Well, I think there's a

17  misunderstanding.  All of the trials needed -- okay.

18  They were all -- they were terminated in the sense

19  of what Protocol 203 -- getting Protocol 203

20  analyzed in a timely manner would require that all

21  three studies end at that time.

22           Now, if the investigators continued to

23  collect data as they have in APPROVe, then that's

24  supplementary data.

25

John W. Farquhar, M.D.

1    BY MR. MORTARA:

2         Q    And if a patient comes in six months after

3    September 30th, 2004 and says, "I had an event with

4    my primary physician in March of '04," that could

5    still get counted in the data analysis plan,

6    couldn't it?

7              MR. ARBITBLIT:  Object to the form.

8              THE WITNESS:  The analysis that we

9    performed, Professor Jewell and I, on 203 was the

10   data of APPROVe; it didn't include the extension

11   data of APPROVe because it wasn't available.  It

12   included the VICTOR and the ViP data, as it was --

13   as -- it included the data that was available by

14   9/30/04.

15   BY MR. MORTARA:

16        Q    Dr. Farquhar, investigators do not perform

17   their data analysis until they've frozen their

18   statistical file, correct?

19             MR. ARBITBLIT:  Object to form.

20             THE WITNESS:  Well, the ViP data that we

21   used was available.

22   BY MR. MORTARA:

23        Q    Dr. Farquhar, my question is:  When

24   investigators are reporting results of a clinical

25   study, they do not do the statistical analysis until

Page 75

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    the file is frozen, correct?

2            MR. ARBITBLIT:  Object to form.

3            THE WITNESS:  Well, it's frozen and then

4    there's -- "frozen" has a volitional element to it.

5    And if 203 is being assembled and analyzed and

6    reported in a timely manner, then data from all

7    three elements need to be included.

8    BY MR. MORTARA:

9        Q    The data from all three components of 203,

10   APPROVe, VICTOR and ViP, needs to be frozen before

11   Protocol 203 can be reported, correct?

12           MR. ARBITBLIT:  Object to form.

13           THE WITNESS:  "Frozen" is your word.  It

14   needs to be obtained.

15   BY MR. MORTARA:

16       Q    Do you understand what it means for data

17   to be frozen in a clinical trial?

18           MR. ARBITBLIT:  Object to form.

19           THE WITNESS:  Well, I just don't like the

20   word "frozen."  I think yes, I do know what that

21   means.

22   BY MR. MORTARA:

23       Q    It's a term used in randomized clinical

24   trials, correct?

25       A    Some people use that.  I don't.

Page 76

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    Q    It's a term statisticians use, isn't it?

2    A    Some of them do, yes.

3    Q    And the way statisticians use the term

4  "frozen" is to mean the data has been collected and

5  the database is locked for analysis, correct?

6    A    Frozen and locked.  I mean, APPROVe is

7  doing an extension trial that required unfreezing

8  and unlocking and continuing to accumulate, and then

9  freezing and locking, and will it continue?  In

10  other words, it's a sequential manner.

11    Q    With that understanding, Dr. Farquhar,

12  Protocol 203 could not be completed until the

13  on-treatment results were obtained for APPROVe,

14  VICTOR and ViP, and that those three trials had had

15  their databases locked, correct?

16    A    What I'm saying is the investigators in

17  VICTOR and ViP had an obligation to freeze and

18  unlock and analyze their data in order to allow a

19  timely analysis of 203.

20        Now, what is missing in all of this is the

21  source of the ViP data that I was provided

22  represents data that had been analyzed and therefore

23  unlocked.  I've heard indirectly, and I don't know

24  much about it, that the investigators in Oxford had

25  some lag in data analysis.

Page 77

John W. Farquhar, M.D.

1          But all I'm saying is the data that I was

2     provided on ViP was available to the plaintiffs'

3     lawyers.  And in order to find out the source of

4     that, we would need to get the MRK number and look

5     at it.

6          Q    Dr. Farquhar, you state in your

7     supplemental report that there was no apparent

8     impediment to simultaneously collecting the data and

9     presenting the pooled analysis of CV risk for all

10    three trials as prespecified --

11          (Reporter interruption.)

12    BY MR. MORTARA:

13          Q    There was no apparent impediment to

14    simultaneously collecting the data and presenting

15    the pooled analysis of CV risk for all three trials.

16          You said that in your report, didn't you?

17          A    Yes, I did.

18          Q    Now, if the VICTOR trial data wasn't

19    complete, that's an impediment, isn't it?

20          MR. ARBITBLIT:  Object to form.

21          THE WITNESS:  I'm sorry.  The APPROVe data

22    wasn't complete either.

23    BY MR. MORTARA:

24          Q    When did the VICTOR trial data become

25    final, sir?

Page 78

John W. Farquhar, M.D.

1          MR. ARBITBLIT:  Object to form.

2          THE WITNESS:  The data that I've used on

3    VICTOR was available to the plaintiffs' attorneys

4    and we would need to look at the MRK to see the date

5    that that represented.

6    BY MR. MORTARA:

7          Q    **Have any of the plaintiffs' attorneys told**

8    **you that the VICTOR data did not become final until**

9    **early May 2006?**

10         MR. ARBITBLIT:  Object to the form.

11   Mischaracterizes the record.

12   BY MR. MORTARA:

13         Q    **Have you ever heard that the VICTOR data**

14   **became final in May 2006?**

15         MR. ARBITBLIT:  Object to form.

16         THE WITNESS:  What I said earlier is that

17   I've been told that there were delays in obtaining

18   the VICTOR data, but what I said before and will say

19   again is the VICTOR data that appears in here as

20   part of 203 was obtained by the plaintiffs'

21   attorneys, and I am not aware of impediments to

22   their obtaining it, I'm not aware of the specific

23   details of what that Merck document has revealed,

24   and that would have to be explored with the

25   plaintiffs' attorneys.

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1          I cannot furnish any more information

2     other than saying, as I have already, that when

3     APPROVe was terminated, then VICTOR and ViP needed

4     to have data available up to that time analyzed and

5     included.

6          Q    Dr. Farquhar, if the VICTOR trial data

7     only became final last month, it's possible that now

8     a Protocol 203 analysis could be performed with all

9     the final trial data, correct?

10          MR. ARBITBLIT:  Object to form.

11          THE WITNESS:  Well, I've gone through this

12    about four times, that the obligation of the

13    investigators is to assemble the data available at

14    that time.

15          Now, we're stuck on VICTOR.  I mean, you

16    can't terminate VICTOR after the date of this report

17    and say that's the only data of value.  The VICTOR

18    data that was available to the plaintiffs' attorneys

19    is what appears in Protocol 203 analysis.

20    BY MR. MORTARA:

21          Q    Who's responsible for reporting the VICTOR

22    trial data?

23          MR. ARBITBLIT:  Object to form.

24          THE WITNESS:  Well, fundamentally, the

25    investigators are responsible to do the appropriate

Page 80

John W. Farquhar, M.D.

1   thing.  And if this whole 203 plan was distorted and

2   violated from its original purpose, then whoever did

3   that has made a mistake.

4   BY MR. MORTARA:

5       Q    If the VICTOR trial investigators

6   collected data for the VICTOR trial from the period

7   that the trial ended, September 30th, 2004, up until

8   early May 2006, do you blame the VICTOR trial

9   investigators for delaying in their data analysis?

10          MR. ARBITBLIT:  Object to form.

11          THE WITNESS:  Okay.  This is May 22nd,

12  2006.  Are you saying that I should have had some

13  additional data on VICTOR?

14  BY MR. MORTARA:

15      Q    Dr. Farquhar, I'm only asking you whether

16  or not you know that the VICTOR trial data was made

17  final in 2006.

18          MR. ARBITBLIT:  Object to form.

19          THE WITNESS:  Well, what I said earlier is

20  I knew there were delays, but I don't know the exact

21  date when the investigators decided it was final.

22  But I'll repeat that the VICTOR data that appears in

23  this analysis was available to the plaintiffs'

24  attorneys, and I cannot tell you the cutoff date for

25  the events that are present in the data they

Page 81

John W. Farquhar, M.D.

1   obtained.

2            In order to explore that, I would have to

3   read the Merck document that is responsible for that

4   data.

5   BY MR. MORTARA:

6       Q    Dr. Farquhar, do you think Merck delayed

7   analyzing Protocol 203 data?

8       A    Well, let me answer that by saying that

9   this is the first analysis of 203 data that has

10  appeared in a form like this, to the best of my

11  knowledge, and yes, I believe that it should have

12  been analyzed and reported much earlier.

13      Q    If the VICTOR trial investigators had

14  delays, as you described them, associated with their

15  data collection, is that Merck's fault?

16           MR. ARBITBLIT:  Object to form.

17           THE WITNESS:  Well, you know, you're

18  asking me what kind of relationship existed between

19  the investigators and Merck, and that I cannot

20  answer.  But I want to return to saying that what is

21  analyzed as VICTOR here was available to the

22  plaintiffs' attorneys prior to May 22nd of '06.

23  BY MR. MORTARA:

24      Q    You understand that --

25           MR. ARBITBLIT:  Don't interrupt him,

Page 82

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    Counsel.  Let him finish.

2    BY MR. MORTARA:

3        Q    **Are you finished?**

4        A    Not quite.  I'm saying that it had to be

5    available before May 22nd, 2006 in order for it to

6    be analyzed by Professor Jewell and, you know,

7    created jointly in the form that it appears in the

8    supplemental report.

9            So the missing ingredient here is -- first

10   of all, you're asking me to know the relationship

11   between Merck and the investigators of VICTOR.

12   That, I can't say with any important knowledge at

13   all, other than having heard there was -- there were

14   some delays.

15           So I do not know when the data cut point

16   for VICTOR was that gave the data that appears in

17   this analysis.  In order to do so, we would have to

18   have plaintiffs' attorneys provide the documents

19   that they obtained with the VICTOR data.

20       Q    **Do you know whether or not Dr. Jewell used**

21   **the final VICTOR data in his analysis?**

22       A    If it didn't become available until

23   May 26th, he obviously used what was available prior

24   to that time.

25       Q    **If it became available to plaintiffs'**

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    attorneys on May 5th, 2006, do you know if

2    Dr. Jewell used the final VICTOR data?

3            MR. ARBITBLIT:  Object to form.

4            THE WITNESS:  Well, again, you're asking

5    me a question that I have answered, I think, four or

6    five times.

7            The plaintiffs' attorneys would have to be

8    the one to tell you the cut point at the -- used in

9    the VICTOR data supplied to Jewell and to me.  And I

10   cannot give you that date.  I just can't.

11   BY MR. MORTARA:

12       Q    If it's correct that the VICTOR final data

13   was produced to plaintiffs on May 5th, 2006, you

14   don't know whether or not Dr. Jewell used that data?

15   Only Dr. Jewell knows that; is that correct?

16           MR. ARBITBLIT:  Object to form.

17           THE WITNESS:  Well --

18   BY MR. MORTARA:

19       Q    I'll ask it a different way.  Do you know

20   when Dr. Jewell performed his statistical analysis

21   of Protocol 203 for you?

22       A    Let's see what date is on his two things

23   that he's given us.

24           Here is --

25       Q    That's okay.  Dr. Farquhar, I'll just mark

Page 84

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1   them as exhibits, if you don't mind.

2        A    Okay.

3             MR. MORTARA:  I'll mark Jewell's Protocol

4   203 analysis as Exhibit 5 and you can use that one.

5                       (Exhibit No. 5 was marked for

6                         identification.)

7   BY MR. MORTARA:

8        Q    And this is -- Exhibit 5 is Dr. Jewell's

9   Protocol 203 analysis, correct?

10       A    Mm-hmm.

11       Q    Dr. Jewell didn't put his name anywhere on

12  the Protocol 203 analysis, did he?

13       A    No.

14       Q    Dr. Jewell didn't sign his Protocol 203

15  analysis, did he?

16       A    No.

17       Q    Dr. Jewell didn't date his Protocol 203

18  analysis, did he?

19       A    No.  And I'm trying to answer your

20  question when did it -- when did the analyses occur,

21  and I can't give you the exact date.  I'll put it

22  another way.  There was certainly a lot of desire to

23  finish the supplemental report, and getting it done

24  by May 22nd took a lot of hustling, and there was

25  some date prior to that when these analyses were

John W. Farquhar, M.D.

1    done.

2         Now, if the plaintiffs' attorneys had data

3    on VICTOR that they did not supply Professor Jewell

4    and me, then we need to ask them that question.  We

5    can't ask me that question because I don't have the

6    answer.

7         Q    The only person that knows what data

8    Dr. Jewell used in his Protocol 203 analysis is

9    Dr. Jewell, correct?

10        A    Yes, that's ultimately correct.

11        Q    And sitting here today, you don't know if

12   Dr. Jewell got an updated data package in May 2006

13   or not?

14        A    May 22nd.

15        Q    May 2006.

16        A    You know, I understand that.  I'm just

17   thinking of May 22nd and I'm trying to guess the

18   dates that these were produced.  I would think they

19   would likely have been in April but I can't be sure.

20        Q    I would have to ask Dr. Jewell what data

21   he used for his Protocol 203?

22        A    Correct.  And where he got it, and when he

23   received it.

24        Q    Thank you, Dr. Farquhar.

25        A    You're welcome.

Page 86

John W. Farquhar, M.D.

1    reclassification of these two patients, correct?

2            MR. ARBITBLIT:  Object to form.

3            THE WITNESS:  Well, you know, the meaning

4    of words, I have looked over the data and explored

5    its origins.  And so in that sense, I have added a

6    verification step.

7    BY MR. MORTARA:

8        Q    You didn't check Ms. Gross, the

9    plaintiff's lawyer's, work with respect to these two

10   patients on page 2 of Exhibit 7, did you?

11           MR. ARBITBLIT:  Object to form.

12           THE WITNESS:  I answered that.

13   BY MR. MORTARA:

14       Q    You didn't look at the adverse event

15   reports, did you?

16       A    I've answered the question.

17           MR. ARBITBLIT:  Object to form --

18           THE WITNESS:  -- about these data.

19   BY MR. MORTARA:

20       Q    Dr. Farquhar, turning back to your report,

21   Supplemental Report, page 7, the first full sentence

22   on page 7 reads:  "Because interaction tests divide

23   the population into subgroups for comparison, the

24   power to detect important differences is reduced."

25           Do you see that?

John W. Farquhar, M.D.

1      A    Yes.

2      Q    The next sentence reads:  "Therefore,

3   tests of significant interaction may be

4   appropriately set at levels greater than the P

5   equals 0.05 level commonly established for

6   significance testing primary effects."

7           Do you see that?

8      A    Yes.

9      Q    You cite Dr. Jewell's book for that

10  proposition, correct?

11     A    I cite his book and I cite his stated

12  reasons for having put that in the book since we

13  have discussed these issues.

14     Q    It's your opinion that when doing a

15  subgroup analysis, you can set a p for interaction

16  above 0.05 and still have it be significant,

17  correct?

18     A    You need to distinguish between tests of

19  interaction versus tests of significant differences

20  and Dr. Professor Jewell is only talking about the

21  test for interaction.

22     Q    I'm only talking about the test for

23  interaction too so I'll ask the question again.

24  It's your opinion that in a significant interaction

25  can be found with a p for interaction greater than

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    0.05 when doing a subgroup analysis, correct?

2        A    Professor Jewell's actual words are that

3    one should see p-values as high as .2 as indicative

4    of a possible relationship and that one should

5    not -- and now I'm paraphrasing -- have a slavish

6    devotion to a single p-value of .05 in judging

7    interaction terms.  This is -- now particularly

8    heightened if you're dealing with the possibility of

9    harmful effect.

10           Now, I think my conclusion is that I agree

11   with Professor Jewell and would also point out that

12   the p-values that we list are not as high as .2.

13   And later when we get to hypertension, I will draw

14   your attention to even lower p-values for

15   interaction.

16       Q    Dr. Farquhar, you rely on Dr. Jewell to

17   set the level of significant interaction to a p of

18   less than or equal to .2, approximately?

19           MR. ARBITBLIT:  Object to form.

20           THE WITNESS:  No.  I'm going to repeat and

21   then leave it at that.  I'm going to repeat that the

22   language he uses is that a p-value as high as .2

23   should be considered to point to the possibility of

24   a meaningful interaction.

25           And he doesn't say that he's going to like

John W. Farquhar, M.D.

1    .2 better than he'll like .1.  He just wants to draw

2    the line higher to indicate the importance of

3    scientists considering a p-value of greater than .05

4    when one is looking at the possibility of an

5    interaction.

6    BY MR. MORTARA:

7         Q    Scientists should consider p-values for

8    interaction above .05 still as meaningful and

9    significant, correct?

10            MR. ARBITBLIT:  Object to form.

11            THE WITNESS:  I have answered that.

12   BY MR. MORTARA:

13        Q    Dr. Farquhar, have you ever heard of Steve

14   Lagakos?

15        A    No.

16        Q    Do you read the New England Journal of

17   Medicine?

18        A    Sometimes.

19            MR. MORTARA:  Handing you what's marked as

20   Exhibit 8.

21                        (Exhibit No. 8 marked for

22                        identification.)

23   BY MR. MORTARA:

24        Q    Exhibit 8 is an essay from the New England

25   Journal of Medicine by Stephen Lagakos, published on

John W. Farquhar, M.D.

1    April 20th, 2006; the title of which is:  "The

2    Challenge of Subgroup Analyses -- Reporting Without

3    Distorting."

4           Dr. Farquhar, have you ever seen this

5    essay on Subgroup Analyses?

6       A    No, but, you know, I've scanned it briefly

7    and this is not talking about interaction.  It's

8    talking about multiple testing.  And that warning

9    has been around for a long time.

10      Q    We'll get to that.

11           Dr. Farquhar, you've seen this before?

12      A    No, I haven't.

13      Q    Dr. Farquhar, I'll represent to you,

14   Professor Lagakos is the chairman of biostatistics

15   at Harvard University.  As you can see at the end of

16   the article, it says he's a professor, but he's also

17   the chairman.  The first sentence of the essay

18   reads:  "Subgroup analyses are an important part of

19   the analysis of a comparative clinical trial."

20           Do you see that?

21      A    Yes.  I see the whole article.

22      Q    The next sentence says:  "However, they

23   are commonly misinterpreted and can lead to further

24   research that is misguided or worse, to suboptimal

25   patient care."

John W. Farquhar, M.D.

1          **Do you see that?**

2     A     I see that.  I said I've seen it all and I

3    will then match you with Professor Jewell, who for

4    six years was Provost of the University of

5    California in Berkeley.

6          And so for the fact that Dr. Lagakos is

7    professor of biostatistics at the Harvard School of

8    Public Health doesn't mean that his opinion trumps

9    that of Professor Jewell.

10         **Q     Thank you for telling me that about**

11   **Dr. Jewell.  One difference between Dr. Jewell and**

12   **Professor Lagakos, as far as you know, is that**

13   **Dr. Jewell is being paid by plaintiffs' lawyers and**

14   **Professor Lagakos is not, correct?**

15         MR. ARBITBLIT:  Object to form.

16   Argumentative.

17         THE WITNESS:  That's really wild, you

18   know.  He wrote the book on his own.  We're citing

19   his opinions.

20   BY MR. MORTARA:

21         **Q     Yes or no, Dr. Jewell is being paid by**

22   **plaintiffs' lawyers?**

23         MR. ARBITBLIT:  Object to form.

24         THE WITNESS:  For what purpose?

25

Page 138

John W. Farquhar, M.D.

1   BY MR. MORTARA:

2       Q      For his work in this case.

3              MR. ARBITBLIT:  Object to form.

4              THE WITNESS:  Is that -- but for his work

5   in this case, yes.

6   BY MR. MORTARA:

7       Q      Professor Lagakos goes on, could you turn

8   to the second page, and the last sentence, second to

9   the last sentence of the only full paragraph in the

10  first column on the second page reads:  "For

11  example, when treatments have identical efficacy,

12  the probability of finding at least one

13  statistically significant interaction test when ten

14  independent interaction tests are undertaken is

15  40 percent.  The more subgroup analyses conducted,

16  the higher the probability of one or more chance

17  findings that may be misinterpreted as clinically

18  directive."

19             Do you see that?

20             MR. ARBITBLIT:  Object to form.

21             THE WITNESS:  Well, as I say, I see the

22  whole article.

23  BY MR. MORTARA:

24      Q      Professor Lagakos is here talking about

25  the same test for interaction that you're talking

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1  about on page 7 of your report, isn't he?

2          MR. ARBITBLIT:  Object to form.

3          THE WITNESS:  Not so far.

4  BY MR. MORTARA:

5      Q    What do you think Professor Lagakos means

6  by statistically significant interaction tests?

7      A    Yes, on that one sentence he's talking

8  about interaction, but -- fine.

9      Q    The problem Professor Lagakos is

10 identifying is that the more subgroup analyses you

11 do, the more likely it is you are to find a false

12 positive, correct?

13         MR. ARBITBLIT:  Object to form.

14         THE WITNESS:  What Professor Lagakos is

15 talking about, the danger of multiple testing, is a

16 concern of statisticians for decades.  He is

17 restating what I think is generally known.

18 BY MR. MORTARA:

19     Q    And Professor Lagakos is talking about the

20 appropriate p-value to use for interaction tests

21 when you have multiple subgroup analyses, correct?

22         MR. ARBITBLIT:  Object to form.

23         THE WITNESS:  His last sentence is:

24 "Ultimately, medical research and patients are best

25 served when subgroup analyses are well planned and

                                        Page 140

John W. Farquhar, M.D.

1    appropriately analyzed and the conclusions and

2    recommendations about clinical practice are guided

3    by the strength of the evidence."

4           So I'm assuming that you agree that -- I'm

5    not supposed to use that.  But I believe that the

6    APPROVe investigators designed the study

7    appropriately.

8    BY MR. MORTARA:

9        Q    Dr. Farquhar, I'm asking you about the

10   second page of Professor Lagakos' essay where he's

11   discussing the problem of multiple subgroup analyses

12   and the possibility of false positives.  The first

13   sentence of the last paragraph of the first column

14   of that page says:  "One way to correct for the

15   inflated false positive rate when multiple subgroup

16   analyses are conducted is to apply a stricter

17   criterion than the usual P equals 0.05 for judging

18   the significance of each interaction test."

19          Do you see that?

20       A    I see that.

21          MR. ARBITBLIT:  Objection to form.

22          THE WITNESS:  And this --

23   BY MR. MORTARA:

24       Q    Dr. Farquhar -- the question is do you see

25   that?

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1          MR. ARBITBLIT:  Don't interrupt him.

2          THE WITNESS:  I see that.  As I said, I

3    see everything that's in here.  And this entire

4    paragraph, and all the implications of it, are grist

5    for the mill of a discussion with Professor Jewell.

6    Professor Jewell has his way of looking at life and

7    he may or may not agree with this paragraph.  I

8    can't say since I am not a biostatistician.  This is

9    statistician language.

10   BY MR. MORTARA:

11       Q    You rely on Professor Jewell for

12   information of this character, correct?

13          MR. ARBITBLIT:  Object to form.

14          THE WITNESS:  I rely on Professor Jewell

15   currently as my colleague in not only this

16   consultation on Vioxx but on other issues.

17          And I also -- well, I'll just add that the

18   previous colleague, who is now no longer with us,

19   was one of the individuals who trained Professor

20   Jewell.  And so there's a long legacy of my

21   connection to Jewell and a long legacy of my trust

22   in his skill, ability and wisdom.

23          And what I am saying to you now is this

24   long paragraph on the second page here, he would

25   need to be asked how he interprets that and whether

John W. Farquhar, M.D.

1  or not it's in contradiction to what he has put in

2  his text; and if so, how would he handle what's been

3  done in the APPROVe study and in our particular

4  analyses of the 203.

5        I shouldn't have said APPROVe; I should

6  have said 203, and APPROVe as well.

7     Q    Dr. Farquhar, the plaintiffs' attorneys

8  are not going to let me ask questions of Dr. Jewell,

9  unfortunately.  You have relied on Dr. Jewell and

10  written things about significant interaction in your

11  report, and I'm asking you what your understanding

12  of Professor Lagakos' essay is with respect to what

13  the appropriate p-value for interaction is to use

14  when multiple subgroup analyses are performed.

15        Do you understand what Professor Lagakos

16  is talking about?

17        MR. ARBITBLIT:  Object to form.

18        THE WITNESS:  Well, you know, about six

19  answers ago, I said the entire topic of subgroup

20  analyses has been around for a long time, and I

21  return to this answer, and then I think I'll want to

22  say I've answered the questions regarding this topic

23  by saying I rely fully on Professor Jewell's

24  attitudes and concepts and beliefs and opinion about

25  this paragraph and how it applies to our analyses on

John W. Farquhar, M.D.

1    203 and APPROVe and of VIGOR and of any of the other

2    studies that we've analyzed.

3    BY MR. MORTARA:

4         Q    Have you ever asked Professor Jewell what

5    he thinks of Professor Lagakos' views?

6              Did you say no?

7         A    Well --

8              MR. ARBITBLIT:  Object to form.

9              THE WITNESS:  I told you that I haven't

10   seen the Lagakos article, so I can't have discussed

11   this specific article with him.  I have had

12   discussions on topics related to interaction tests.

13   BY MR. MORTARA:

14        Q    Your report says on page 7 of your

15   supplemental report:  "Tests of significant

16   interaction may be appropriately set at levels

17   greater than P equals 0.05," correct?

18        A    Well, we discussed that some time ago and

19   I said this is Professor Jewell's view and I hold to

20   his views.

21        Q    Whereas Professor Lagakos says:  "One way

22   to correct for the inflated false positive rate when

23   multiple subgroup analyses are conducted is to apply

24   a stricter criterion than the usual P equals 0.05."

25             That means Professor Lagakos thinks you

Page 144

John W. Farquhar, M.D.

1   should go lower than 0.05 but Professor Jewell

2   thinks you can be higher than 0.05, correct?

3          MR. ARBITBLIT:  Object to form.  Assumes

4   facts not in evidence.

5          THE WITNESS:  Return to the fact that

6   Jewell has his beliefs and his way of analyzing data

7   and he may or may not have a fundamental difference

8   of opinion with Lagakos.  And I submit that a single

9   article taken out of context cannot answer that

10  question of whether there is a wide disparity

11  between those two gentlemen.

12  BY MR. MORTARA:

13     Q   Dr. Farquhar, the first full sentence in

14  the second column on that same page says:  "For

15  example, if 10 tests are conducted, each one should

16  use 0.005 as the threshold for significance."

17          Do you see that?

18          MR. ARBITBLIT:  Object to form.

19          THE WITNESS:  I see the whole article and

20  I return to -- I prefer to rely on Professor Jewell

21  and any subsequent dissection of this article, my

22  answer is that I trust Professor Jewell's views on

23  all items.

24  BY MR. MORTARA:

25     Q   Do you recall earlier telling me you

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    thought at least ten subgroup analyses had been

2    performed in the APPROVe study?

3              MR. ARBITBLIT:  Object to form.

4              THE WITNESS:  Ten subgroup analyses have

5    not been performed on the 203 study.  And --

6    BY MR. MORTARA:

7         Q    Dr. Farquhar, could you turn to page 6 of

8    your report.  And the Section C is entitled:

9    "Patients in APPROVe."

10             Do you see that?

11        A    Yes.

12        Q    Section C of your supplemental report is

13   not about Protocol 203, is it?

14        A    No.

15        Q    Dr. Farquhar, over ten subgroup analyses

16   have been performed on the APPROVe data and

17   Professor Lagakos thinks that you should use at

18   least 0.005 as the threshold for significance, if

19   not something lower; isn't that right?

20             MR. ARBITBLIT:  Object to form,

21   mischaracterizes the record.  Professor Lagakos has

22   never had anything to say about APPROVe.

23             THE WITNESS:  Boy, oh boy.  You know, my

24   answer is I'm trying to get away from Lagakos and on

25   to Jewell.  So any opinion that Lagakos has

Page 146

John W. Farquhar, M.D.

1   expressed, I'll say again is not -- is out of

2   context, and Professor Jewell has his reasons for

3   picking a certain method of analysis and its

4   interpretation, and I trust his views.  And I do

5   not, at this point, have any opinions to offer about

6   Lagakos.

7   BY MR. MORTARA:

8       Q    You trust Dr. Jewell and the jury's

9   supposed to trust you when you say you trust

10  Dr. Jewell, correct?

11           MR. ARBITBLIT:  Object to form.

12  Argumentative.

13           MR. MORTARA:  Withdrawn.

14           THE WITNESS:  I'm not concerning myself

15  with juries.  I'm concerning myself with trusting

16  Professor Jewell.

17  BY MR. MORTARA:

18      Q    Dr. Farquhar, do you know if plaintiffs'

19  attorneys are going to allow Dr. Jewell to explain

20  himself and his analysis?

21      A    My belief is that they would, yes.  But I

22  haven't asked the attorneys if they have such a

23  plan.

24      Q    Do you think the plaintiffs' attorneys

25  should allow Dr. Jewell to come to trial and explain

Page 147

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1   to the jury his analysis and explain, if he can,

2   Professor Lagakos' views?

3            MR. ARBITBLIT:  Object to form.

4            THE WITNESS:  I have no informed opinion

5   on what should happen with juries.  I just don't

6   know anything about that field.  So --

7   BY MR. MORTARA:

8       Q    Dr. Farquhar, I'll withdraw the question

9   and ask you this:  You talk about tests for

10  significant interaction in your report, correct?

11      A    Yes.

12      Q    You rely on Dr. Jewell for that analysis,

13  correct?

14      A    Correct.

15           MR. ARBITBLIT:  Object to form.

16  BY MR. MORTARA:

17      Q    In explaining the tests for significant

18  interaction that you disclose in your report, do you

19  think that Dr. Jewell would do a better job

20  explaining what this means and explaining how

21  Professor Lagakos' essay affects his views?

22      A    Do I think Jewell --

23      Q    Withdrawn.

24           Dr. Farquhar, do you think it's

25  appropriate to have Dr. Jewell explain himself as to

John W. Farquhar, M.D.

1  what he meant by the appropriate P for significant

2  interaction that you're relying on?

3      A    Well, I would say if that is something

4  that you and other attorneys would like to do, then

5  fine.  He needs to speak for himself.

6      Q    Dr. Farquhar, you understand that --

7  withdrawn.

8          The last sentence of the first full

9  paragraph on the third column of the second page of

10  the Lagakos essay, says:  "Post hoc subgroup

11  analyses undertaken because of an intriguing trend

12  seen in the results or selective reporting of

13  certain subgroup analyses can be especially

14  misleading."

15          Do you see that?

16          MR. ARBITBLIT:  Object to form.

17          THE WITNESS:  I see that, but please honor

18  my previous statements that anything in the Lagakos

19  paper which is contrary to Professor Jewell's modus

20  operandi and planning for analyses needs to say that

21  Jewell trumps Lagakos.  And I really -- I'm trying

22  to avoid further discussion about Lagakos.

23  BY MR. MORTARA:

24      Q    You're trying to avoid further discussion

25  of Professor Lagakos' essay, correct?

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1        MR. ARBITBLIT:  Object to form.

2        THE WITNESS:  I'm trying to elevate the

3   respect for Professor Jewell.

4   BY MR. MORTARA:

5        Q    Dr. Farquhar, do you agree or disagree

6   that "Post hoc subgroup analyses undertaken because

7   of an intriguing trend seen in the results or

8   selective reporting of certain subgroup analyses can

9   be especially misleading"?

10       MR. ARBITBLIT:  Object to form.

11       THE WITNESS:  I propose that that question

12  be asked for Professor Jewell and put into the

13  context of the APPROVe study and the specific

14  analyses that he and I performed.

15  BY MR. MORTARA:

16       Q    You can't answer that question, correct?

17       MR. ARBITBLIT:  Object to form.  Asked and

18  answered many times.

19  BY MR. MORTARA:

20       Q    You propose that I ask that question of

21  Professor Jewell at trial in front of the jury,

22  correct?

23       MR. ARBITBLIT:  Object to form.

24       THE WITNESS:  I don't have any proposals

25  for what happens at a jury trial.

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1  BY MR. MORTARA:

2      Q    Do you understand Professor Lagakos'

3  essay?

4          MR. ARBITBLIT:  Object to form.  Asked and

5  answered.

6          THE WITNESS:  Boy.  I've given you my

7  answers about Lagakos and Jewell.

8  BY MR. MORTARA:

9      Q    Are you qualified to read and interpret

10  what Professor Lagakos has written here about p for

11  significant interaction?

12      A    I've answered that.  Professor Jewell

13  would need to read this article in the context of

14  the APPROVe study and the analyses that he has done.

15      Q    Can you --

16      A    I don't -- I do not plan to give any more

17  opinions about Lagakos.  Lagakos is trumped by

18  Jewell.

19      Q    Do you have any basis for why Lagakos is

20  trumped by Jewell, other than your esteem for

21  Professor Jewell?

22          MR. ARBITBLIT:  Object to form.

23          THE WITNESS:  Well, I don't have the

24  details, but it was last year or the year before

25  that Jewell was given an honor by the American

John W. Farquhar, M.D.

1    Statistical Society or some similar group, and

2    whatever that honor was, it's an honor that I

3    presume that Lagakos has not had, and to answer your

4    question, I have great esteem for Jewell.

5             You know, there's competition between

6    Stanford and UC Berkeley, but occasionally we find

7    somebody at Berkeley who is held in very high

8    esteem, and that's where I hold Jewell.

9        Q    You agree, at least, that Professor Jewell

10   and Professor Lagakos appear to you to disagree on

11   the issue of the proper p-value to set for

12   interaction in subgroup analysis?

13            MR. ARBITBLIT:  Object to form.

14            THE WITNESS:  No, I really can't answer

15   that, because I've said that this article has to be

16   seen in the context of the specific analyses that

17   we've done on the APPROVe study.  And unless that is

18   done, it's just -- you can't draw any conclusions

19   about the Lagakos article in respect to what we have

20   done.

21   BY MR. MORTARA:

22       Q    Dr. Farquhar, could you go back to Exhibit

23   7.  Turn to the first page.

24       A    Mm-hmm.

25       Q    Earlier you said that you believe

John W. Farquhar, M.D.

1    **naproxen to COX-2 inhibitors?**

2              MR. ARBITBLIT:  Object to form.

3              THE WITNESS:  "Randomized control trials,

4    recent meta-analyses implying the presence of more

5    than one such randomized trial comparing naproxen to

6    all other NSAIDs or only to COX-2" --

7    BY MR. MORTARA:

8         Q    **Any COX-2 inhibitor.**

9         A    I haven't seen any recent meta-analyses of

10   that sort.

11             MR. MORTARA:  We'll take a break.

12             THE VIDEOGRAPHER:  This concludes Tape 2.

13   We're going off the record.  The time is 2:14.

14                  (A brief recess was taken.)

15             THE VIDEOGRAPHER:  Here begins Tape 3 in

16   the deposition of John W. Farquhar.  On the record,

17   the time is 2:30.

18   BY MR. MORTARA:

19        Q    **Dr. Farquhar, you've brought some**

20   **documents.  Do you have something to say?**

21        A    Yes.  During the break, we had a memory

22   jog episode, and namely, I was reminded that I have

23   in fact seen the adverse event report.  And I don't

24   know whether to have any weak excuses or just to say

25   I forgot that I had them.

Page 165

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1          In a certain sense, I guess I was thrown

2    off because this was a new creation, but

3    Mr. Arbitblit is very assiduous in showing me

4    everything that has appeared on the record, and so

5    what I've done is retrieved the two hypertensives.

6          And I also want to add that we can

7    recalculate at 28 if that's, you know, the final

8    opinion.  And we'll end up with very closely similar

9    results.

10        Q    It's now your testimony that these two

11   patients did not, in fact, have baseline

12   hypertension, correct?

13             MR. ARBITBLIT:  Object to form.

14             THE WITNESS:  No.  No.  I'm testifying

15   that one of them was aspirin-indicated, which means

16   that baseline -- that person had whatever you need

17   to become aspirin-indicated, so that could have been

18   hypertension plus something else, or it could have

19   been evidence of prior heart attack.  That, I can't

20   tell from the record.  But I take ASA-indicated to

21   mean a baseline risk factor.

22   BY MR. MORTARA:

23        Q    You testified earlier that

24   aspirin-indicated was the same, the exact same, as

25   history of symptomatic ASCVD.  Do you remember that?

Page 166

John W. Farquhar, M.D.

1          MR. ARBITBLIT:  Objection to form.

2    Mischaracterizes the testimony.  He said within the

3    APPROVe definitions, Counsel.

4    BY MR. MORTARA:

5          Q    With that clarification, you testified

6    earlier that within the APPROVe definitions, history

7    of symptomatic ASCVD is exactly the same as

8    aspirin-indicated, correct?

9          A    Yes, that's what I understand from what

10   happened in APPROVe.  They first called it

11   aspirin-indicated and then changed it to increased

12   cardiovascular risk.

13         MR. MORTARA:  I'm going to mark these two

14   adverse event reports as Exhibits 9 and 10 and ask

15   you to point out on Exhibit 9 what it is that makes

16   patient 91512 having two or more cardiovascular risk

17   factors.

18                    (Exhibit Nos. 9 and 10 were

19                    marked for identification.)

20   BY MR. MORTARA:

21         Q    Understanding the patient has diabetes,

22   please point out what other risk factor the person

23   had at baseline.

24         A    The basis for that, in reading the entire

25   record, the individual had congestive heart failure

Page 167

John W. Farquhar, M.D.

1    and he had a -- he had an age-indeterminant

2    myocardial infarction and -- well, just to pause,

3    I'm going to mention another thing.

4              Having congestive heart failure is, as the

5    Framingham study has shown, the result either of one

6    or more previous heart attacks earlier in the

7    patient's life or long-standing hypertension.

8              In fact, the most common cause of

9    congestive failure was long-standing previous

10   hypertension not found at the time that they are

11   diagnosed with congestive failure.

12             So there's another note here about blood

13   pressure being 150 over 70, and it was called

14   normal, but I don't consider that, and most people

15   don't consider 150 to be normal.  The diastolic was.

16             So I guess I will highlight the congestive

17   heart failure and the age-indeterminant myocardial

18   infarction.  So what I'm doing with this diabetic is

19   saying an age-indeterminant myocardial infarction, a

20   blood pressure reading of 150 over 70, and

21   congestive heart failure, was more than enough to

22   convince me that he has an additional risk factor

23   over and above diabetes, for the reasons that I

24   gave.

25             Congestive heart failure usually means

John W. Farquhar, M.D.

1    years of antecedent hypertension.  So that's that

2    one.

3        Q    **Nevertheless, this patient was not**

4    **recorded as having baseline hypertension in the**

5    **APPROVe study, was he?**

6        A    Well, give that back.

7            MR. ARBITBLIT:  I have a copy for you,

8    Counsel.

9            THE WITNESS:  I'm afraid that --

10           MR. MORTARA:  91512.  Can I have the other

11   one as well, please.

12           MR. ARBITBLIT:  Sure.

13           THE WITNESS:  So returning to this

14   gentleman, I do not, from this record, have evidence

15   that he had baseline hypertension, other than

16   knowing that he has congestive failure tells me that

17   he has had antecedent determinants of congestive

18   heart failure and that those take quite some time to

19   result in congestive failure.  Congestive failure is

20   in hypertensives, you know, may require 20 or 30

21   years of hypertension.

22           The second is the age-determinant

23   myocardial infarction.  Now, if it were

24   age-determined, one could exclude that the

25   myocardial infarction happened after Vioxx, but I

Page 169

John W. Farquhar, M.D.

1    BY MR. MORTARA:

2         Q    Dr. Farquhar, since your October 2005

3    deposition, have you given any testimony in trial?

4         A    I have not.

5              MR. MORTARA:  No more questions.

6

7                        EXAMINATION

8    BY MR. ARBITBLIT:

9         Q    Dr. Farquhar, I have just a couple of

10   questions for you.  With regard to Table 28 and

11   looking at the heading of Table 28 in the

12   Cardiovascular Safety Report that's been marked

13   as -- what exhibit is that?

14              MR. MORTARA:  Seventeen.

15   BY MR. ARBITBLIT:

16        Q    Exhibit 17, can you just read that title

17   into the record?

18        A    "List of Cardiovascular Adverse

19   Experiences or Deaths Eligible for Adjudication and

20   the Adjudication Outcome Events 28 Days After the

21   Last Dose of Study Therapy."

22        Q    Does the word "more than 28 days" appear

23   in that title?

24        A    No.

25        Q    When you looked at that table, did you

Page 282

John W. Farquhar, M.D.

1   understand the events you were looking at to be, to

2   have occurred less than 28 days --

3        A    Yes.

4        Q    And did you subsequently review documents

5   showing that the events had occurred more than 28

6   days after stopping the drug?

7        A    Yes.

8        Q    And is that the reason why you withdrew

9   paragraphs 32 and 33 from your report?

10       A    Yes.  What I'd said is the modified ITT

11  and the uncertainty of the duration of that was new

12  information and it was sufficient to want to have

13  those paragraphs removed.

14            And for the record, I would like that to

15  be accepted as my statement and that one is allowed

16  to remove paragraphs and have the new modified

17  supplement to be considered the important supplement

18  that represents my views.

19       Q    Now, Doctor, is it correct that an

20  intention to treat analysis does consider events

21  that happen off drug and on drug?

22       A    Yes, it does.

23       Q    And were the events listed in Table 28

24  available to Merck in February 2005?

25       A    The date of the Cardiac Safety Report is

Page 283

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    not given.

2        Q    If those data were available to Merck in

3    January 2005, is it correct that a true intention to

4    treat analysis would have included the six events

5    that you mentioned in paragraphs 32 and 33 of your

6    May 22nd report?

7        A    That should include all of these events,

8    yes.

9        Q    And would an ITT analysis, as of that

10   time, have shown four additional events that had

11   occurred less than 18 months after the study's start

12   as you stated in Paragraph 33 of your May 22nd, 2006

13   report?

14       A    Yes.

15       Q    Would those four events have contributed

16   to an earlier separation of the incidence curve for

17   Vioxx being above placebo during the first 18 months

18   if an ITT analysis had been presented in

19   February 2005 with those data?

20       A    It is likely, and that's one of the

21   reasons that the modified figure that was presented

22   as part of the -- excuse me -- as part of the

23   continuation study showed earlier separation and a

24   different -- a different result of looking for

25   proportionality.

John W. Farquhar, M.D.

1          So the whole question of events, when they

2    occurred and when they were counted, is germane and

3    this is something that still needs more inspection.

4          Q    Now, Doctor, please take a look at your

5    September 26th, 2005 report.

6          Did you testify earlier that you were not

7    familiar with randomized clinical trial evidence

8    comparing Vioxx to ibuprofen?

9          MR. MORTARA:   Objection.   Misstates his

10   prior testimony.

11   BY MR. ARBITBLIT:

12         Q    Do you recall that testimony?

13         A    If someone tells me that benazepril is

14   ibuprofen, then I'm in trouble.

15         Q    Doctor, could you please -- I'll withdraw

16   the question.

17         A    Okay.

18         Q    Looking at Paragraph 138 of your expert

19   report of September 26th, 2005, did you report on

20   Protocol 54, the ACE inhibitor study conducted by

21   Merck between July 1997 and February 1998?

22         A    Oh, yes, I did.

23         Q    And did that study -- was that a

24   randomized clinical trial?

25         A    Yes, it was.

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1      Q     Was Vioxx worse for hypertension than

2    Indomethacin in Protocol 54?

3      A     Yes.

4      Q     Now, please take a look at Paragraph 141,

5    at page 61 of your September 26th, 2005 report.  Did

6    you analyze -- did you review the data from Protocol

7    029-30/40 in your September 26th, 2005 report?

8      A     Yes, I did.

9      Q     Was that a randomized clinical trial?

10     A     Yes, it was.

11     Q     And was hypertension worse for Vioxx than

12    for diclofenac in Protocol 029-30/40?

13     A     It was.

14     Q     Please take a look at Paragraph 142 on the

15    next page.

16            Did you review the results of Protocol 045

17    in your report?

18     A     Yes, I did.

19     Q     And was --

20     A     Ibuprofen.

21     Q     Was Vioxx worse than ibuprofen for

22    hypertension in Protocol 045?

23     A     Yes.  Two to four times the rate.

24     Q     And that 25-milligram dose was the life

25    table rate for Vioxx 10.5 percent versus 3.9 percent

John W. Farquhar, M.D.

1    for ibuprofen?

2         A    Yes.  And at 50, it was higher.

3         Q    Please take a look at Paragraph 150 of

4    your report.  At page 67.  Did you review the

5    results of Protocol 112 which are referred to in

6    that paragraph?

7         A    Yes.

8         Q    And in 2001, did Merck conduct a

9    head-to-head trial of Vioxx versus celebrex and

10   placebo known as Protocol 112?

11        A    Yes.

12        Q    And did Vioxx have statistically

13   significantly worse hypertension exceeding

14   predefined limits of change than Celebrex in that

15   study?

16        A    Yes, it did.

17        Q    Were the doses used in that study 12.5

18   milligrams and 25 milligrams of Vioxx?

19        A    Correct.

20             (Reporter interruption.)

21   BY MR. ARBITBLIT:

22        Q    12.5 and 25 milligrams of Vioxx versus

23   Celebrex, 200 milligrams?

24        A    Yes.

25        Q    Look at 148 and 149 of your report at

Page 287

John W. Farquhar, M.D.

1    pages 66 and 67.  Did you review an article by

2    Sowers, S-o-w-e-r-s?

3         A    Yes, Sowers, comparing celebrex and

4    naproxen to Vioxx, yes.

5         Q    And was Vioxx worse than celebrex and

6    naproxen for hypertension in the Sowers study?

7         A    It was.

8         Q    Please take a look at Paragraph 146 of

9    your report at page 64, and underneath the figure,

10   Figure 4, could you read the statement that you

11   wrote at that time?

12        A    "Perhaps the most striking evidence of the

13   hypertension" --

14        Q    I'm sorry.  I was referring to underneath

15   the figure.

16        A    Oh, "Vioxx appears to be the most

17   hypertensive drug ever marketed for patients with

18   chronic disease, and its effects on blood pressure

19   contributed to the excess MIs and strokes that it

20   caused.  It is also plausible that the excess

21   hypertension caused damage to cerebral blood

22   vessels, which may have contributed to the

23   significant increases in Alzheimer's disease among

24   the Vioxx patients in these studies."

25             I had mentioned that earlier as far as

John W. Farquhar, M.D.

1   vascular dementia.

2       Q    With respect to the first sentence that

3   you read, you state that "Vioxx appears to be the

4   most hypertensive drug ever marketed for patients

5   with chronic disease"; is that right?

6       A    That is right.  And I stated my belief

7   that that was the case, but I was incomplete in

8   citing the evidence for it.

9       Q    Does the evidence that you've cited in

10  your September 26th, 2005 report concerning

11  Indomethacin, diclofenac, ibuprofen and Celecoxib

12  support the statement that you made here that Vioxx

13  appears to be the most hypertensive drug ever

14  marketed for patients with chronic disease?

15      A    Yes.  And it's relevant to the question of

16  the whole array of NSAIDs that have been studied or

17  might be studied and where do we stand now is that

18  the present evidence would say that Vioxx has more

19  evidence of being hypertensogenic than any of them

20  studied to date.

21          MR. ARBITBLIT:  No further questions.

22

23                    FURTHER EXAMINATION

24  BY MR. MORTARA:

25      Q    Dr. Farquhar, did you look at any clinical

The New England Journal of Medicine

# COMPARISON OF UPPER GASTROINTESTINAL TOXICITY OF ROFECOXIB AND NAPROXEN IN PATIENTS WITH RHEUMATOID ARTHRITIS

Claire Bombardier, M.D., Loren Laine, M.D., Alise Reicin, M.D., Deborah Shapiro, Dr.P.H.,
Ruben Burgos-Vargas, M.D., Barry Davis, M.D., Ph.D., Richard Day, M.D., Marcos Bosi Ferraz, M.D., Ph.D.,
Christopher J. Hawkey, M.D., Marc C. Hochberg, M.D., Tore K. Kvien, M.D.,
and Thomas J. Schnitzer, M.D., Ph.D., for the VIGOR Study Group

## ABSTRACT

*Background*   Each year, clinical upper gastrointestinal events occur in 2 to 4 percent of patients who are taking nonselective nonsteroidal antiinflammatory drugs (NSAIDs). We assessed whether rofecoxib, a selective inhibitor of cyclooxygenase-2, would be associated with a lower incidence of clinically important upper gastrointestinal events than is the nonselective NSAID naproxen among patients with rheumatoid arthritis.

*Methods*   We randomly assigned 8076 patients who were at least 50 years of age (or at least 40 years of age and receiving long-term glucocorticoid therapy) and who had rheumatoid arthritis to receive either 50 mg of rofecoxib or 500 mg of naproxen twice daily. The primary end point was confirmed clinical upper gastrointestinal events (gastroduodenal perforation or obstruction, upper gastrointestinal bleeding, and symptomatic gastroduodenal ulcers).

*Results*   Rofecoxib and naproxen had similar efficacy against rheumatoid arthritis. During a median follow-up of 9.0 months, 2.1 confirmed gastrointestinal events per 100 patient-years occurred with rofecoxib, as compared with 4.5 per 100 patient-years with naproxen (relative risk, 0.5; 95 percent confidence interval, 0.3 to 0.6; P<0.001). The respective rates of complicated confirmed events (perforation, obstruction, and severe upper gastrointestinal bleeding) were 0.6 per 100 patient-years and 1.4 per 100 patient-years (relative risk, 0.4; 95 percent confidence interval, 0.2 to 0.8; P=0.005). The incidence of myocardial infarction was lower among patients in the naproxen group than among those in the rofecoxib group (0.1 percent vs. 0.4 percent; relative risk, 0.2; 95 percent confidence interval, 0.1 to 0.7); the overall mortality rate and the rate of death from cardiovascular causes were similar in the two groups.

*Conclusions*   In patients with rheumatoid arthritis, treatment with rofecoxib, a selective inhibitor of cyclooxygenase-2, is associated with significantly fewer clinically important upper gastrointestinal events than treatment with naproxen, a nonselective inhibitor. (N Engl J Med 2000;343:1520-8.)

©2000, Massachusetts Medical Society.

NONSTEROIDAL antiinflammatory drugs (NSAIDs) are among the most commonly used medications in the world.[1] A major factor limiting their use is gastrointestinal toxicity. Although endoscopic studies reveal that gastric or duodenal ulcers develop in 15 to 30 percent of patients who regularly take NSAIDs,[2] the chief concern is clinically important gastrointestinal problems, such as bleeding. It has been estimated that more than 100,000 patients are hospitalized and 16,500 die each year in the United States as a result of NSAID-associated gastrointestinal events.[3,4]

Most NSAIDs inhibit both cyclooxygenase-1 and cyclooxygenase-2, isoenzymes involved in the synthesis of prostaglandins.[5] Cyclooxygenase-1 is constitutively expressed and generates prostanoids involved in the maintenance of the integrity of gastrointestinal mucosa and platelet aggregation,[6] whereas at sites of inflammation, cyclooxygenase-2 is induced to generate prostaglandins that mediate inflammation and pain.[7] The antiinflammatory effects of nonselective NSAIDs (those that inhibit both cyclooxygenase-1 and cyclooxygenase-2) therefore appear to be mediated through the inhibition of cyclooxygenase-2,[8] whereas their harmful effects in the gastrointestinal tract as well as their antiplatelet effects are believed to occur primarily through the inhibition of cyclooxygenase-1.[5]

Agents that selectively inhibit cyclooxygenase-2 have antiinflammatory and analgesic effects that are simi-

From the Institute for Work and Health, Mount Sinai Hospital, and the University Health Network, Toronto (C.B.); the Gastrointestinal Division, Department of Medicine, University of Southern California School of Medicine, Los Angeles (L.L.); Merck, Rahway, N.J. (A.R., D.S.); the Faculty of Medicine and Research Division, Universidad Nacional Autonoma de Mexico, and Hospital General de Mexico, Mexico City, Mexico (R.B.-V.); University of Texas–Houston School of Public Health, Houston (B.D.); the Department of Clinical Pharmacology, University of New South Wales and St. Vincent's Hospital, Sydney, Australia (R.D.); the Division of Rheumatology, Department of Medicine, Escola Paulista de Medicina, Universidade Federal de São Paulo, São Paulo, Brazil (M.B.F.); the Division of Gastroenterology, School of Medicine and Surgical Sciences, University Hospital, Nottingham, United Kingdom (C.J.H.); the Division of Rheumatology and Clinical Immunology, University of Maryland, Baltimore (M.C.H.); Oslo City Department of Rheumatology, and Diakonhjemmet Hospital, Oslo, Norway (T.K.K.); and the Office of Clinical Research and Training, Northwestern University School of Medicine, Chicago (T.J.S.). Address reprint requests to Dr. Bombardier at the Institute for Work and Health, 250 Bloor St. E., Suite 702, Toronto, ON M4W 1E6, Canada, or at claire.bombardier@utoronto.ca.

Arthur Weaver, M.D., Arthritis Center of Nebraska, Lincoln, was another author.

Downloaded from www.nejm.org by JULIETTE KRUSE on October 31, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

UPPER GASTROINTESTINAL TOXICITY OF ROFECOXIB AND NAPROXEN IN PATIENTS WITH RHEUMATOID ARTHRITIS

lar to those of nonselective NSAIDs,[9-12] but they induced significantly fewer ulcers in endoscopic trials.[12-15] Whether such a decrease in the number of ulcers translates into a similar decrease in the number of clinical gastrointestinal events is a matter of controversy. We performed a prospective, randomized, double-blind comparison of rofecoxib and naproxen in more than 8000 patients with rheumatoid arthritis.

## METHODS

### Study Population

Patients with rheumatoid arthritis who were at least 50 years old (or at least 40 years old and receiving long-term glucocorticoid therapy) and who were expected to require NSAIDs for at least one year were eligible. Patients were excluded if they had a history of another type of inflammatory arthritis, upper gastrointestinal surgery, or inflammatory bowel disease; an estimated creatinine clearance of 30 ml or less per minute; a positive test for fecal occult blood (this test was performed at base line in all patients); an unstable medical condition; a history of cancer or alcohol or drug abuse in the five years before the study; a history of cerebrovascular events in the two years before the study; or a history of myocardial infarction or coronary bypass in the year before the study. Patients with morbid obesity and those who required or who had been receiving treatment with aspirin, ticlopidine, anticoagulants, cyclosporine, misoprostol, sucralfate, or proton-pump inhibitors or treatment with histamine $H_2$–receptor antagonists in prescription-strength doses were also excluded from the study. Patients enrolled in the study were not thought to require the use of these agents by their treating physicians.

### Study Design

The study was conducted at 301 centers in 22 countries. Three to 14 days after discontinuing NSAIDs, eligible patients were randomly assigned to receive either 50 mg of rofecoxib (Vioxx, Merck, Whitehouse Station, N.J.) once daily or 500 mg of naproxen (Novopharm Biotech, Toronto) twice daily. The groups were stratified according to the presence or absence of a history of gastroduodenal ulcer, upper gastrointestinal bleeding, and gastroduodenal perforation. Blinding was achieved through the use of a matching placebo for each study medication.

Patients were permitted to take acetaminophen, non-NSAID analgesic medications, glucocorticoids, and disease-modifying drugs (e.g., methotrexate) to control their rheumatoid arthritis. Patients were also allowed to take antacids and $H_2$-receptor antagonists in the following maximal doses: ranitidine, 150 mg daily; famotidine, 20 mg daily; cimetidine, 400 mg daily; and nizatidine, 150 mg daily. Nonstudy NSAIDs were not allowed. After randomization, the patients returned to the clinic at six weeks and at four months and every four months thereafter until the end of the study. Patients were contacted by telephone at week 10 and every four months thereafter. Compliance was assessed by pill counts at clinic visits and by questioning of patients during the scheduled telephone calls. Serum was obtained from all patients for Helicobacter pylori testing (HM-CAP, Enteric Products, Stonybrook, N.Y.). Investigators were not informed of the results of these tests during the study.

The institutional review board or ethics review committee at each center approved the protocol, and all patients gave written informed consent. A steering committee oversaw the study design, conduct of the trial, analyses of data, and drafting of this report. This committee was composed of 14 members, 2 of whom were employees of the sponsoring pharmaceutical company. An independent data and safety monitoring board monitored the patients' safety. An independent, external (end-point) committee whose members were unaware of the patients' treatment assignments reviewed the data to determine which patients had reached the study end points. Because highly selective cyclooxygenase-2 inhibitors do not inhibit

platelet aggregation, which is mediated by cyclooxygenase-1, there was a possibility that the incidence of thrombotic cardiovascular events would be lower among patients treated with nonselective cyclooxygenase inhibitors than among those treated with cyclooxygenase-2–selective inhibitors. Therefore, cardiovascular events were also assessed for a future meta-analysis by independent committees whose members were unaware of the patients' treatment assignments. A separate analysis of these events, however, was not specified in the study design.

### Study End Points

Patients who had potential clinical upper gastrointestinal events were evaluated and treated according to the standard practice of the physicians who were caring for them. Patients who stopped taking the study medication before the study ended were followed until the end of the study to determine whether an upper gastrointestinal event had occurred. Only events that were confirmed by the end-point committee according to prespecified criteria (Table 1) and that occurred during treatment or within 14 days after the discontinuation of treatment were included in the primary analysis.

In addition, the protocol called for the analysis of all episodes of gastrointestinal bleeding, including confirmed and unconfirmed episodes of upper gastrointestinal bleeding, and bleeding from a site beyond the duodenum that resulted in hospitalization, discontinuation of treatment, or a decrease in the hemoglobin level of at least 2 g per deciliter.

### Assessment of Efficacy

For each patient both the investigator and the patient answered a Global Assessment of Disease Activity question at base line (after the discontinuation of prestudy NSAIDs), 6 weeks, 4 months, and 12 months and at the end of the study or when treatment was discontinued. The score can range from 0 ("very well") to 4 ("very poor"), and higher scores indicate more disease activity. The Modified Health Assessment questionnaire was administered only to patients enrolled at centers in the United States at base line, at six weeks, and at the end of the study or when treatment was discontinued. This questionnaire evaluates the extent of functional disability in eight types of tasks performed on a daily basis. The level of effort required to perform each task is assessed on a 4-point scale on which a score of 0 indicates no difficulty in performing the task and a score of 3 indicates an inability to perform the task.[16] Higher scores indicate more severe disability.

### Statistical Analysis

The primary hypothesis was that the risk of confirmed upper gastrointestinal events (gastroduodenal perforation or obstruction, upper gastrointestinal bleeding, and symptomatic gastroduodenal ulcers) would be lower among patients who were taking rofecoxib than among those who were taking naproxen. Secondary hypotheses were that the risk of confirmed complicated events (perforation, obstruction, and severe upper gastrointestinal bleeding) and the risk of both confirmed and unconfirmed upper gastrointestinal events would be lower among patients who were taking rofecoxib.

Cox proportional-hazards analysis was used to compare the effect of treatment; the presence or absence of a history of gastrointestinal events was a stratification factor in the analysis.[17,18] The scores for the Global Assessment of Disease Activity question and Modified Health Assessment questionnaire were analyzed in terms of the mean change from base line during the treatment period. The primary population for analysis comprised all randomized patients. Subgroup analyses were conducted with use of Cox regression analysis.[17,18] Interactions between treatments and subgroups were assessed to determine whether the effect of rofecoxib as compared with that of naproxen was consistent in the subgroups. We assessed data on general safety by evaluating 95 percent confidence intervals of the differences in the proportions of the treatment groups with each adverse event.[19] All statistical tests were two-sided.

Downloaded from www.nejm.org by JULIETTE KRUSE on October 31, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

The New England Journal of Medicine

TABLE 1. CRITERIA FOR GASTROINTESTINAL EVENTS.

| EVENT | CRITERIA REQUIRED FOR CONFIRMATION OF EVENT |
|---|---|
| Perforation due to nonmalignant gastric or duodenal ulcer | Evidence of perforation on endoscopy, at surgery, on radiography (evidence of free intraabdominal air or extravasation of contrast medium), or at autopsy |
| Obstruction due to gastric or duodenal ulcer | Occurrence of nausea and vomiting ≥24 hours postprandially and evidence of narrowing of distal portion of stomach or duodenum as a result of a nonmalignant ulcer on endoscopy, at surgery, on radiography, or at autopsy |
| Upper gastrointestinal bleeding | Episode of hematemesis or aspiration of bloody gastric fluid witnessed by health care provider; episode of melena witnessed by health care provider; evidence of active bleeding on endoscopy, at surgery, or on angiography; positive test for fecal occult blood with documented upper gastrointestinal lesion judged to be the source and associated with either clinically significant bleeding or decrease in volume* or evidence of visible vessel, clot, or pigmented spot on ulcer at endoscopy; or episode of hematemesis or melena reported by patient with upper gastrointestinal lesion judged to be the source and associated with either clinically significant bleeding or decrease in volume* or evidence of visible vessel, clot, or pigmented spot on ulcer at endoscopy |
| Gastric or duodenal ulcer | Evidence of gastric or duodenal ulcer on endoscopy, at surgery, on contrast-enhanced radiography of the upper gastrointestinal tract, or at autopsy |

*A decrease in volume was defined by the finding of a decrease in hemoglobin of at least 2 g per deciliter; by the finding of an orthostatically induced change in pulse of more than 20, change in systolic blood pressure of more than 20 mm Hg, or change in diastolic blood pressure of more than 10 mm Hg; by the finding of other evidence of a clinically significant reduction in circulatory volume (e.g., clinically significant hypotension that is corrected by volume replacement); or by the need for blood transfusion.

## RESULTS

### Characteristics of the Patients

Between January 1999 and July 1999, we screened 9539 patients and enrolled 8076; 4047 were randomly assigned to receive rofecoxib, and 4029 to receive naproxen. The major reasons for exclusion were a contraindication to prolonged NSAID therapy (in the case of 246 patients), a positive test for fecal occult blood (203 patients), and a failure to meet inclusion criteria (355 patients). The median follow-up was 9.0 months in both treatment groups (range, 0.5 to 13). A total of 5742 patients (71.1 percent) continued to take their assigned medication until the end of the study. Rates of discontinuation were similar in the two groups: 29.3 percent in the rofecoxib group (16.4 percent because of adverse events, 6.3 percent because of a lack of efficacy, and 6.6 percent for other reasons) and 28.5 percent in the naproxen group (16.1 percent because of adverse events, 6.5 percent because of a lack of efficacy, and 5.9 percent for other reasons). Ninety-nine percent of the patients in both groups took their medication on at least 75 percent of the study days. The base-line characteristics were similar in the two groups (Table 2).

### Efficacy

Rofecoxib and naproxen had similar efficacy against rheumatoid arthritis (Table 3). In addition, the rates of discontinuation of treatment owing to a lack of efficacy were low in both groups (6.3 percent in the rofecoxib group and 6.5 percent in the naproxen group).

### Adverse Gastrointestinal Events

Confirmed upper gastrointestinal events occurred in 177 patients. In 53 of these patients the event was complicated. An additional 13 patients had events that were reported by investigators but that were judged by the end-point committee to be unconfirmed.

The time to the development of a confirmed upper gastrointestinal event is shown in Figure 1. The rates per 100 patient-years and incidences of the prespecified clinical events are shown in Tables 4 and 5, respectively. The relative risk of confirmed upper gastrointestinal events for patients in the rofecoxib group as compared with those in the naproxen group was 0.5 (95 percent confidence interval, 0.3 to 0.6; P<0.001), whereas the relative risk of complicated confirmed upper gastrointestinal events was 0.4 (95 percent confidence interval, 0.2 to 0.8; P=0.005). The relative risk of complicated upper gastrointestinal bleeding for patients in the rofecoxib group as compared with those in the naproxen group was 0.4 (95 percent confidence interval, 0.2 to 0.7; P= 0.004), whereas the relative risk of bleeding beyond the duodenum was 0.5 (95 percent confidence interval, 0.2 to 0.9; P=0.03).

A per-protocol analysis of the 7925 patients without substantial protocol violations demonstrated relative risks of confirmed upper gastrointestinal events and complicated confirmed events of 0.4 (95 percent confidence interval, 0.3 to 0.6; P<0.001) and 0.4 (95 percent confidence interval, 0.2 to 0.7; P= 0.003), respectively. The results of an intention-to-treat analysis of all confirmed upper gastrointestinal

**1522** · November 23, 2000

Downloaded from www.nejm.org by JULIETTE KRUSE on October 31, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

UPPER GASTROINTESTINAL TOXICITY OF ROFECOXIB AND NAPROXEN IN PATIENTS WITH RHEUMATOID ARTHRITIS

TABLE 2. BASE-LINE CHARACTERISTICS OF THE PATIENTS.*

| CHARACTERISTIC | ROFECOXIB GROUP (N=4047) | NAPROXEN GROUP (N=4029) |
|---|---|---|
| Age — yr | 58±9 | 58±10 |
| Female sex — no. (%) | 3223 (79.6) | 3215 (79.8) |
| Race or ethnic group — no. (%) | | |
| White | 2761 (68.2) | 2750 (68.3) |
| Black | 207 (5.1) | 202 (5.0) |
| Asian | 101 (2.5) | 85 (2.1) |
| Hispanic | 501 (12.4) | 516 (12.8) |
| Other | 477 (11.8) | 476 (11.8) |
| Duration of disease — no. (%) | | |
| Unknown | 3 (0.1) | 6 (0.1) |
| <2 yr | 430 (10.6) | 455 (11.3) |
| 2–10 yr | 1991 (49.2) | 1996 (49.5) |
| >10 yr | 1623 (40.1) | 1572 (39.0) |
| Positive test for rheumatoid factor — no. (%) | 2946 (72.8) | 2967 (73.6) |
| Prior use of NSAIDs — no. (%) | 3321 (82.1) | 3331 (82.7) |
| Treatment for rheumatoid arthritis — no. (%) | | |
| Glucocorticoids | 2260 (55.8) | 2263 (56.2) |
| Methotrexate | 2263 (55.9) | 2269 (56.3) |
| Other disease-modifying drugs | 1847 (45.6) | 1826 (45.3) |
| Low-dose H₂-receptor antagonists — no. (%)† | 365 (9.0) | 335 (8.3) |
| History of clinical gastrointestinal events | 314 (7.7) | 316 (7.8) |
| Global Disease Activity score‡ | | |
| Patient's assessment | 2.0±0.9 | 2.0±0.9 |
| Investigator's assessment | 1.9±0.8 | 1.9±0.8 |
| American College of Rheumatology functional class — no. (%)§ | | |
| I | 881 (21.8) | 830 (20.6) |
| II | 2160 (53.4) | 2199 (54.6) |
| III | 928 (22.9) | 932 (23.1) |
| IV | 78 (1.9) | 68 (1.7) |

*Plus–minus values are means ±SD. NSAIDs denotes nonselective nonsteroidal antiinflammatory drugs.

†A low dose was defined as a maximal daily dose of 150 mg of ranitidine, 20 mg of famotidine, 400 mg of cimetidine, and 150 mg of nizatidine.

‡Scores can range from 0 ("very well") to 4 ("very poor"). Higher scores indicate more disease activity.

§According to the American College of Rheumatology's system of classification, functional class I indicates complete ability to perform usual activities of daily living, and class IV indicates limited ability to perform usual activities of daily living.

events throughout the study, including those that occurred at any time after the discontinuation of treatment, were similar and remained statistically significant (data not shown).

Subgroup analyses showed the following relative risks of clinical gastrointestinal events among the patients in the rofecoxib group as compared with those in the naproxen group: patients with no prior gastrointestinal events (relative risk, 0.5; 95 percent confidence interval, 0.3 to 0.7), patients with prior gastrointestinal events (relative risk, 0.4; 95 percent confidence interval, 0.2 to 0.8), patients with no glucocorticoid therapy at base line (relative risk, 0.7; 95 percent confidence interval, 0.4 to 1.2), and pa-

tients with glucocorticoid therapy at base line (relative risk, 0.4; 95 percent confidence interval, 0.2 to 0.6). The relative risks in these subgroups and the other prespecified subgroups (defined according to sex, race or ethnic group, and location of study center) were not significantly different, indicating that there was no significant interaction between the treatments and the subgroups.

Treatment with rofecoxib was associated with a significantly lower incidence of clinical gastrointestinal events regardless of the results of serologic tests for H. pylori. However, the relative risks of clinical events among H. pylori–negative patients and H. pylori–positive patients were significantly different (P=0.04, data not shown). Finally, the relative risk of gastrointestinal events remained significantly lower (0.1; 95 percent confidence interval, 0.02 to 1.0) in the rofecoxib group than in the naproxen group even in a subgroup at very low risk (i.e., patients who were younger than 65 years, who were negative for H. pylori, who had no history of a clinical gastrointestinal event, and who were not taking glucocorticoids at base line).

**General Safety**

The safety of both rofecoxib and naproxen was similar to that reported in previous studies.[20,21] The mortality rate was 0.5 percent in the rofecoxib group and 0.4 percent in the naproxen group. The rate of death from cardiovascular causes was 0.2 percent in both groups. Ischemic cerebrovascular events occurred in 0.2 percent of the patients in each group. Myocardial infarctions were less common in the rofecoxib group than in the naproxen group (0.1 percent vs. 0.4 percent; 95 percent confidence interval for the difference, 0.1 to 0.6 percent; relative risk, 0.2; 95 percent confidence interval, 0.1 to 0.7). Four percent of the study subjects met the criteria of the Food and Drug Administration (FDA) for the use of aspirin for secondary cardiovascular prophylaxis (presence of a history of myocardial infarction, angina, cerebrovascular accident, transient ischemic attack, angioplasty, or coronary bypass)[22] but were not taking low-dose aspirin therapy. These patients accounted for 38 percent of the patients in the study who had myocardial infarctions. In the other patients the difference in the rate of myocardial infarction between groups was not significant (0.2 percent in the rofecoxib group and 0.1 percent in the naproxen group). When the data showing a reduction in the rate of myocardial infarction in the naproxen group became available after the completion of this trial, Merck, the manufacturer of rofecoxib, notified all investigators in ongoing studies of a change in the exclusion criteria to allow patients to use low-dose aspirin. There was no association between hypertension and myocardial infarction; only a single patient (in the rofecoxib group) had both hypertension and a myocardial infarction as adverse events.

Downloaded from www.nejm.org by JULIETTE KRUSE on October 31, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

The New England Journal of Medicine

TABLE 3. EFFECTIVENESS OF ROFECOXIB AND NAPROXEN FOR RHEUMATOID ARTHRITIS.*

| VARIABLE | BASE-LINE SCORE | | CHANGE IN SCORE DURING TREATMENT | | |
|---|---|---|---|---|---|
| | ROFECOXIB GROUP | NAPROXEN GROUP | ROFECOXIB GROUP | NAPROXEN GROUP | LEAST-SQUARES MEAN DIFFERENCE BETWEEN GROUPS (95% CI)† |
| Global Disease Activity score‡ | | | | | |
| Patient's assessment | 1.96±0.93 | 1.99±0.94 | −0.51±0.93 | −0.53±0.94 | 0.00 (−0.03 to 0.03) |
| Investigator's assessment | 1.85±0.80 | 1.87±0.78 | −0.49±0.84 | −0.52±0.85 | 0.01 (−0.02 to 0.04) |
| Modified Health Assessment score§ | 0.59±0.49 | 0.59±0.49 | −0.11±0.37 | −0.12±0.36 | 0.01 (−0.01 to 0.04) |

*Plus–minus values are means ±SD.

†The values were calculated by analysis of variance in a model that included treatment assignment and presence or absence of a history of gastrointestinal events, and the base-line value as covariates. CI denotes confidence interval.

‡Scores can range from 0 ("very well") to 4 ("very poor"). Higher scores indicate more disease activity.

§Scores can range from 0 (no difficulty in performing a task) to 3 (unable to perform the task). Higher scores indicate more severe disability. The questionnaire was administered only to patients enrolled at centers in the United States (1735 in the rofecoxib group and 1732 in the naproxen group).



No. at Risk

| | | | | | | |
|---|---|---|---|---|---|---|
| Rofecoxib | 4047 | 3641 | 3402 | 3180 | 2806 | 1073 | 533 |
| Naproxen | 4029 | 3644 | 3389 | 3163 | 2798 | 1071 | 513 |

**Figure 1.** Cumulative Incidence of the Primary End Point of a Confirmed Upper Gastrointestinal Event among All Randomized Patients.

The most common adverse events leading to discontinuation of treatment, excluding the gastrointestinal end points, were dyspepsia, abdominal pain, epigastric discomfort, nausea, and heartburn. In the rofecoxib group, significantly fewer patients discontinued treatment as a result of any one of these five upper gastrointestinal symptoms than in the naproxen group (3.5 percent vs. 4.9 percent). The rates of discontinuation for any gastrointestinal events, including gastrointestinal end points, were also significantly lower in the rofecoxib group than in the naproxen group (7.8 percent vs. 10.6 percent). The incidence of adverse effects related to renal function was low and was similar in the two groups (1.2 percent in the ro-

Downloaded from www.nejm.org by JULIETTE KRUSE on October 31, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

UPPER GASTROINTESTINAL TOXICITY OF ROFECOXIB AND NAPROXEN IN PATIENTS WITH RHEUMATOID ARTHRITIS

TABLE 4. INCIDENCE OF GASTROINTESTINAL EVENTS IN THE TREATMENT GROUPS.

| TYPE OF EVENT | ROFECOXIB GROUP (N=4047) | NAPROXEN GROUP (N=4029) | ROFECOXIB GROUP (N=4047) | NAPROXEN GROUP (N=4029) | RELATIVE RISK (95% CI)* | P VALUE |
|---|---|---|---|---|---|---|
| | no. with event | | rate/100 patient-yr | | | |
| Confirmed upper gastrointestinal events | 56 | 121 | 2.1 | 4.5 | 0.5 (0.3–0.6) | <0.001 |
| Complicated confirmed upper gastrointestinal events | 16 | 37 | 0.6 | 1.4 | 0.4 (0.2–0.8) | 0.005 |
| Confirmed and unconfirmed upper gastrointestinal events† | 58 | 132 | 2.2 | 4.9 | 0.4 (0.3–0.6) | <0.001 |
| Complicated confirmed and unconfirmed upper gastrointestinal events‡ | 17 | 42 | 0.6 | 1.6 | 0.4 (0.2–0.7) | 0.002 |
| All episodes of gastrointestinal bleeding | 31 | 82 | 1.1 | 3.0 | 0.4 (0.3–0.6) | <0.001 |

*CI denotes confidence interval.

†The analysis includes 13 events that were reported by investigators but were considered to be unconfirmed by the end-point committee.

‡The analysis includes six events that were reported by investigators but that were considered to be unconfirmed by the end-point committee.

TABLE 5. INCIDENCE OF CONFIRMED UPPER GASTROINTESTINAL EVENTS.*

| TYPE OF UPPER GASTROINTESTINAL EVENT | ALL CONFIRMED UPPER GASTROINTESTINAL EVENTS | | ALL COMPLICATED CONFIRMED UPPER GASTROINTESTINAL EVENTS | |
|---|---|---|---|---|
| | ROFECOXIB GROUP (N=4047) | NAPROXEN GROUP (N=4029) | ROFECOXIB GROUP (N=4047) | NAPROXEN GROUP (N=4029) |
| | number (percent) | | | |
| Perforations† | 3 (0.1)‡ | 4 (0.1) | 3 (0.1) | 4 (0.1) |
| Gastric ulcer | 28 (0.7) | 81 (2.0) | 1 (<0.1) | 6 (0.1) |
| Duodenal ulcer | 27 (0.7) | 39 (1.0) | 3 (0.1) | 5 (0.1) |
| Obstruction† | 1 (<0.1) | 0 | 1 (<0.1) | 0 |
| Bleeding | 14 (0.3) | 35 (0.9) | 12 (0.3)§ | 32 (0.8)¶ |
| Total | 56 (1.4) | 121 (3.0) | 16 (0.4) | 37 (0.9) |

*Patients may have been included in more than one column, but each is counted only once in the total.

†Perforations and obstructions are complicated events by definition.

‡Two confirmed upper gastrointestinal events occurred after only one dose of rofecoxib and most likely resulted from prior use of nonselective nonsteroidal antiinflammatory drugs.

§The cause or source of bleeding was gastric ulcers in five patients, duodenal ulcers in five, and other upper gastrointestinal source in three. One patient in the rofecoxib group had both a gastric and a duodenal ulcer.

¶The cause or source of bleeding was gastric ulcers in 16 patients, duodenal ulcers in 9, and other upper gastrointestinal sources in 7.

fecoxib group and 0.9 percent in the naproxen group); only 0.2 percent of patients in each group discontinued treatment because of these adverse effects.

## DISCUSSION

We found that, in patients with rheumatoid arthritis, treatment with rofecoxib at twice the maximal dose approved by the FDA for long-term use resulted in sig-

nificantly lower rates of clinically important upper gastrointestinal events and complicated upper gastrointestinal events than did treatment with a standard dose (1000 mg per day) of naproxen. We also found that the incidence of complicated upper gastrointestinal bleeding and bleeding from beyond the duodenum was significantly lower among patients who received rofecoxib. Only 41 patients would need to be treated

Downloaded from www.nejm.org by JULIETTE KRUSE on October 31, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

The New England Journal of Medicine

with rofecoxib rather than naproxen to avert one clinical upper gastrointestinal event in a one-year period. Although the optimal dose of rofecoxib for the treatment of rheumatoid arthritis has yet to be determined, data from a prior study indicate that maximal efficacy is achieved at a daily dose of 25 mg.[23]

A prospective study that compared NSAIDs alone with NSAIDs plus misoprostol reported that 0.95 percent of patients with rheumatoid arthritis who were taking an NSAID alone had upper gastrointestinal complications over a period of six months,[24] with a relative reduction in the risk of such complications with combination treatment of 40 percent during this period. These results are similar to our finding of a cumulative incidence of serious upper gastrointestinal events over a six-month period of 0.75 percent in the naproxen group and a relative reduction in risk of 67 percent in the rofecoxib group (data not shown). A 50 percent reduction in the incidence of clinically important upper gastrointestinal events with rofecoxib as compared with a nonselective NSAID was also found in a prespecified combined analysis of eight double-blind studies that included 4921 patients with osteoarthritis, some of whom received glucocorticoids.[25] Patients with rheumatoid arthritis have a higher risk of upper gastrointestinal events than do patients with osteoarthritis.[4] Thus, the results of our study extend the results of the combined analysis to a group of patients at higher risk of bleeding.

The results of a randomized, double-blind comparison of the cyclooxygenase-2–selective inhibitor celecoxib and the nonselective NSAIDs ibuprofen and diclofenac were recently published.[26] In this trial of 7968 patients, 73 percent of whom had osteoarthritis and 27 percent of whom had rheumatoid arthritis, data were reported from the first 6 months of a study period that extended for up to 13 months. Treatment with celecoxib was associated with a nonsignificant (P=0.09) trend toward a decrease in the incidence of the primary end point (complicated ulcers and erosions) and a significant decrease (P=0.02) in the incidence of the secondary end point (complicated and symptomatic ulcers).

The incidence of clinically important gastrointestinal events was lower in the rofecoxib group than in the naproxen group in all subgroups we examined. Concomitant glucocorticoid and NSAID therapy has been reported to be associated with a higher risk of a clinical gastrointestinal event than is NSAID therapy alone.[4] Therefore, a larger reduction in the incidence of events might have been expected in the subgroup that received both an NSAID and glucocorticoids. There was a greater reduction in the relative risk of events in the subgroup of patients who were taking glucocorticoids at base line than in the subgroup of patients who were not taking glucocorticoids at base line, but the difference between the groups was not significant.

Whether ulcers identified by endoscopic examination are markers of a clinical gastrointestinal event has been a matter of controversy. The relative reduction in the risk of such ulcers in two identical studies that compared 50 mg of rofecoxib daily with 800 mg of ibuprofen three times a day was 71 percent at six months.[13,14] Thus, our findings support the concept that the results of endoscopic studies of ulcers can be extrapolated to clinical gastrointestinal events.

In prior endoscopic studies, the frequency of ulcers was similar in patients taking rofecoxib and those taking placebo.[13,14] We could not include a placebo group, and no studies have yet assessed whether a cyclooxygenase-2–selective inhibitor or the combination of nonselective NSAIDs plus gastroprotective drugs (such as misoprostol and proton-pump inhibitors) will achieve similar results.

Gastrointestinal symptoms are extremely common with NSAID therapy, as demonstrated by the fact that, in our study, the five most common adverse events leading to the discontinuation of treatment were upper gastrointestinal symptoms. Although gastrointestinal symptoms are poorly correlated with endoscopic findings of ulcers or clinical gastrointestinal events,[27] significantly fewer patients in the rofecoxib group than in the naproxen group discontinued treatment because of gastrointestinal symptoms.

The overall mortality rate was similar in the two groups, as were the rates of death from gastrointestinal events and from cardiovascular causes. The rate of myocardial infarction was significantly lower in the naproxen group than in the rofecoxib group (0.1 percent vs. 0.4 percent). This difference was primarily accounted for by the high rate of myocardial infarction among the 4 percent of the study population with the highest risk of a myocardial infarction, for whom low-dose aspirin is indicated.[22] The difference in the rates of myocardial infarction between the rofecoxib and naproxen groups was not significant among the patients without indications for aspirin therapy as secondary prophylaxis.

Naproxen inhibits the production of thromboxane by 95 percent and inhibits platelet aggregation by 88 percent, and this effect is maintained throughout the dosing interval[28]; therefore, the effects of regular use of naproxen may be similar to those of aspirin. Flurbiprofen, another NSAID that is a potent inhibitor of platelet-derived thromboxane, led to a 70 percent reduction in the rate of reinfarction as compared with placebo among patients in whom acute myocardial infarction was successfully treated with thrombolysis, angioplasty, or both.[29]

Analyses of 7535 patients in double-blind trials comparing rofecoxib with placebo and other NSAIDs (diclofenac, ibuprofen, and nabumetone) that do not produce sustained, maximal inhibition of platelet aggregation revealed similar rates of myocardial infarction in all groups[30] (and unpublished data). Thus, our

Downloaded from www.nejm.org by JULIETTE KRUSE on October 31, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

UPPER GASTROINTESTINAL TOXICITY OF ROFECOXIB AND NAPROXEN IN PATIENTS WITH RHEUMATOID ARTHRITIS

results are consistent with the theory that naproxen has a coronary protective effect and highlight the fact that rofecoxib does not provide this type of protection owing to its selective inhibition of cyclooxygenase-2 at its therapeutic dose and at higher doses. The finding that naproxen therapy was associated with a lower rate of myocardial infarction needs further confirmation in larger studies.

In summary, the use of the cyclooxygenase-2-selective inhibitor rofecoxib resulted in significantly fewer clinically important upper gastrointestinal events than did treatment with naproxen, a nonselective NSAID. The two drugs had similar rates of clinical effectiveness.

Supported by a grant from Merck.

Dr. Bombardier has received clinical research support from Aventis Pharma, Merck Research Laboratories, and Merck Frosst Canada. She has served as a consultant to Knoll Pharmaceutical, Aventis Canada, Schering Canada, Merck Research Laboratories, and Wyeth–Ayerst.

Dr. Laine has received clinical research support from Merck, Wyeth–Ayerst, and AstraZeneca. He has served as a consultant to Merck, Searle, Johnson & Johnson, AstraZeneca, Wyeth–Ayerst, and Tap Pharmaceuticals.

Dr. Burgos-Vargas has received clinical research support from Merck Sharp & Dohme, Pfizer, and Boehringer Ingelheim. He has served as a consultant to Merck and has been a member of a speakers' bureau sponsored by Merck Sharp & Dohme.

Dr. Davis has served as a consultant to Mirvant, Merck Research Laboratories, Parke-Davis, and SmithKline Beecham.

Dr. Day has received clinical research support from Merck, Searle, Pfizer, Roche, and Amgen. He has served as a consultant to Merck, Searle, and Pfizer. He has been a member of speakers' bureaus sponsored by Merck Sharp & Dohme, Searle, Pfizer, and SmithKline Beecham.

Dr. Ferraz has received clinical research support from Bristol-Myers Squibb, Merck Sharp & Dohme, and Aventis Pharma. He has served as a consultant to Aventis Pharma.

Dr. Hawkey has received clinical research support from AstraZeneca, Asta Medica, Boehringer Ingelheim, Boots Healthcare International, Cell Tech, Eisai, Elan, Merck Research Laboratories, NicOx, and Novartis. He has served as a consultant to AstraZeneca, Abbott, Cell Tech, Eisai, Merck Research Laboratories, NicOx, Novartis, Parke-Davis, and Smithklein Pharmacie. He has been a member of speakers' bureaus sponsored by AstraZeneca, Boehringer Ingelheim, Boots Healthcare International, Takeda, Wyeth Lederle, and Merck Research Laboratories.

Dr. Hochberg has received clinical research support from Merck and Quintiles (Aventis Pharma). He has served as a consultant to Aventis Pharma, Biomatrix, Merck, Negma Laboratories, Procter & Gamble, Roche, and Wyeth–Ayerst. He owns stock in Johnson & Johnson, Eli Lilly, Merck, Procter & Gamble, and Schering-Plough.

Dr. Kvien has received clinical research support from Merck, Searle, Aventis Pharma, and Schering-Plough. He has served as a consultant to Merck, Searle, Aventis Pharma, and Schering-Plough. He has been a member of a speakers' bureau sponsored by Merck and Aventis Pharma.

Dr. Schnitzer has received clinical research support from Abbott, Boehringer Ingelheim, Johnson & Johnson, McNeil Consumer Products, Merck, Novartis, Ortho-McNeil, Parke-Davis, Searle, and Wyeth–Ayerst. He has served as a consultant to Boehringer Ingelheim, Merck, Novartis, Ortho-McNeil, and SmithKline Beecham. He has been a member of speakers' bureaus sponsored by Boehringer Ingelheim, Merck, Ortho-McNeil, Wyeth–Ayerst, and Searle.

Dr. Weaver has received clinical research support from Merck, Searle, Immunex, Wyeth–Ayerst, Aventis Pharma, Pharmacia–Upjohn, Eli Lilly, Connetics, Parke-Davis, Procter & Gamble, Pfizer, Hoffmann–LaRoche, Centocor, Amgen, Cyprus Bioscience, Helsinn, Novartis, and Boehringer Ingelheim. He has served as a consultant to Merck, Searle, Immunex, Wyeth–Ayerst, Aventis Pharma, Pharmacia–Upjohn, Eli Lilly, Connetics, Parke-Davis, Procter & Gamble, Pfizer, Hoffmann–LaRoche, Amgen, Cyprus Bioscience, Helsinn, Novartis, and Boehringer Ingelheim. He has been a member of speakers' bureaus sponsored by Merck, Searle, Immunex, Wyeth–Ayerst, Aventis Pharma, Pharmacia–Upjohn, Eli Lilly, Connetics, Parke-Davis, Procter & Gamble, Pfizer, Hoffmann–LaRoche, Centocor, Amgen, Cyprus Bioscience, Helsinn, Novartis, and Boehringer Ingelheim. He is on the board of directors of MGI Pharma.

We are indebted to Christopher T. Brett, Dayna Carroll, Russell Cender, Edward Chafatz, Laurine Connors, Gary Gartenberg, Nicole Gillies, Richard Holmes, Paige Reagan, Douglas J. Watson, Debora P.L. Weiss, and Qinfen Yu for their substantial contributions.

## APPENDIX

The following persons participated in the study: International Steering Committee: C. Bombardier (chair), L. Laine (cochair), A. Reicin, M. Hochberg, R. Day, T. Capizzi, P. Brooks, R. Burgos-Vargas, B. Davis, M. Ferraz, C. Hawkey, T.K. Kvien, T. Schnitzer, A. Weaver; Data Safety Board: M. Weinblatt (chair); D. Bjorkman, J. Neaton, A. Silman, R. Sturrock; End-Point Adjudication Committee: M. Griffin (chair), D. Jensen, M. Langman; Investigators: Argentina: E. DiGiorgio, H. Laborde, O. Messina, A. Strusberg; Australia: J. Bertouch, R. Day, G. McColl, P. Ryan, S. Sharma; Brazil: R. Bonfiglioli, C. Borges, J. Brenol, N. da Silva, M. Ferraz, F. Lima, C. Moreira, G. Novaes, A. Pessoa, F. Petean, S. Radominski, A. Samara, B. Souza; Canada: T. Anastassiades, M. Atkinson, A. Beaulieu, M. Bell, M. Camerlain, J. Canvin, M. Cohen, J. Hanly, J. Karsh, T. McCarthy, W. Olszynski, P. Patel, Y. Pesant, W. Pruzanski, K. Siminovitch, J. Thorne, V. Verdejo-Aguilar; Chile: L. Barria, C. Fuentealba, L. Massardo, P. Riedemann, L. Roca, H. Rossi; China (Hong Kong): C. Lau; Colombia: M. Abello, P. Chalem, M. Lammlein, J. Molina; Costa Rica: R. Alpizar, H. Garcia-Sancho; Czech Republic: L. Koncova, K. Pavelka, M. Sedlackova, J. Vitova, R. Ahtera; Ecuador: R. Villacis; Finland: M. Hakala, P. Hannonen, T. Helve, M. Nissila; Germany: R. Alten, M. Gaubitz, E. Gromnica-Ihle, H. Hantzschel, G. Hein, M. Keysser, R. Kurthen, B. Lang, F. Mielke, U. Muller-Ladner, C. Richter, M. Schattenkirchner, M. Schneider, H. Sorenson, E. Waldorf-Bolten, H. Watnatz, S. Wassenberg; Guatemala: E. Julian, R. Palomo; Israel: D. Buskila, A. Nahir, I. Rosner; Malaysia: S. Yeap; Mexico: R. Burgos, I. Garcia de la Torre, F. Irazoque, J. Arozco Alcala; New Zealand: P. Jones, L. McLean, C. Rajapakse; Norway: H. Gulseth, K. Helgetveit, A. Johannessen, C. Kaufmann, O. Knudsrod, T. Kvien, K. Mikkelsen, B. Rossebo, G. Sidenwall; Peru: A. Calvo Quioz, M. Gustavo, A. Hilgado, L. Portocarrero, E. Vera Bejar; Poland: J. Badurski, J. Brzezicki, M. Bykowska, L. Fiedorowicz-Fabrycy, J. Gaweda, P. Gluszki, B. Konieczna, S. Mackiewicz, J. Pazdur, E. Szczepanski, J. Szechinski; South Africa: I. Anderson, D. Gotlieb, A. Jacovides, A. Lubbe, G. Mody, M. Tikly; United States: Alabama: G. Divititorio, S. Fallahi, D. McLaine, W. Shergy, M.S. Touger, G. Williams; Arizona: B. Harris, P. Howard, D. Michel, L. Taber, J. Tesser, M. Maricic; California: E. Boiling, M. Brandon, G. Dolan, R. Dore, M. Greenwald, D. Hasselwood, M. Keller, K. Kolba, G. Multz, R. Reid, D. Stanton, G. Weidmann, S. Weiner, J. Higashida; Colorado: S. Kassan, R. Lapidus, D. Scott, J. Thompson, C. Van Kerchov; Connecticut: E. Feinglass, J. Green, R. Schoen; Florida: M. Belfian, C. Chappel, J. Forstot, P. Freeman, N. Gaylis, B. Germain, M. Guttierrez, M. Heier, T. Johnson, M. Kaufman, R. Levin, M. Lowenstein, A. Marcadis, M. Mass, S. Matthews, H. McIlwain, J. Miller, M. Nunez, H. Offenberg, J. Popp, A. Reddy, W. Riskin, A. Rosen, Y. Sherrer, K. Stark, A. Torres; Georgia: J. Lieberman; Iowa: M. Brooks; Idaho: F. Dega, C. Scoville, C. Wiesenhutter; Illinois: F. Dietz, I. Fenton, M. Pick, R. Trapp, J. Zuzga, M. Ellman, G. Liang; Indiana: C. Arsever, R. Khairi, M. Stack, R. Fife; Kansas: N. Becker, P. Ginder, R. Lies; Louisiana: W. Eversmeyer, P. Sedrish, L. Serebro; Maine: L. Anderson, S. Block; Maryland: R. Marcus, D. McGinnis, N. Wei, T. Zizic, M. Hochberg; Massachusetts: C. Birbara, A. Dahdul, S. Helfgott, J. Hosey, S. Miller, R. Rapoport; Michigan: P. Coleman, R. Roschmann, H. Uhl, J. Taborn; Missouri: T. Weiss; Montana: S. English; Nebraska: W. Palmer, A. Weaver; Nevada: S. Miller; New Hampshire: B. Samuels, J. Trice; New Jersey: S. Golombek, H. Hassman, R. Hymowitz, C. Knee, D. Macpeek, R. Marcus, G. Rihacek, J. Rohlf, D. Worth; New Mexico: K. Bordenave; New York: P. Chapae, M. Farber, A. Kaell, A. Porges, P. Riccardi, C. Ritzlin; North Carolina: G. Arnold, W. Chmelewski, G. Collins, W. Harperm, R. Harrell, T. Littlejohn, G. Schimizzi, R. Senter, A. Kashif; Ohio: T. Isakov, B. Long, D. Mandel, B. Rothschild, D. Schumacher, R. Sievers, S. Wolfe, K. Hackshaw, M. Hooper, R. Rothenberg; Oklahoma: C. Codding, R. Hynd, J. McKay, L. Jacob; Pennsylvania: R. Kimelheim, A. Kivitz, W. Makarowski, G. McLaughlin, J. McMillen, R. Reese, J. Weisberg; Rhode Island: J. Scott; South Carolina: C. Barfield, M. Brabham, K. Flint; Tennessee: C. Arkin, R. Gupta, R. Krause, H. Marker, T. Namey, L. Robinson, P. Wheeler, B. Tanner; Texas: A. Brodsky, F. Burch, W. Chase, A. Chubick, D. Halter, J. Rutstein; Utah: J. Booth; Virginia: C. Fisher, A. Goldstein; Washington: W. Eider, R. Ettlinger, R. Levy; Wisconsin: M. Pearson, G. Fiocco.

## REFERENCES

1. Misoprostol for co-prescription with NSAIDs. Drug Ther Bull 1990; 28:25-6.

Downloaded from www.nejm.org by JULIETTE KRUSE on October 31, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

The New England Journal of Medicine

**2.** Laine L. Nonsteroidal anti-inflammatory drug gastropathy. Gastrointest Endosc Clin North Am 1996;6:489-504.

**3.** Wolfe MM, Lichtenstein DR, Singh G. Gastrointestinal toxicity of nonsteroidal antiinflammatory drugs. N Engl J Med 1999;340:1888-99. [Erratum, N Engl J Med 1999;341:548.]

**4.** Singh G, Rosen Ramey D. NSAID induced gastrointestinal complications: the ARAMIS perspective — 1997. J Rheumatol Suppl 1998;51:8-16.

**5.** Cryer B. Nonsteroidal anti-inflammatory drugs and gastrointestinal disease. In: Feldman M, Scharschmidt BF, Sleisenger MH, eds. Sleisenger and Fordtran's gastrointestinal and liver disease: pathophysiology/diagnosis/management. 6th ed. Vol. 1. Philadelphia: W.B. Saunders, 1998:343-57.

**6.** Meade EA, Smith WL, DeWitt DL. Differential inhibition of prostaglandin endoperoxide synthase (cyclooxygenase) isoenzymes by aspirin and other non-steroidal anti-inflammatory drugs. J Biol Chem 1993;268:6610-4.

**7.** Fosslein E. Adverse effects of nonsteroidal anti-inflammatory drugs on the gastrointestinal system. Ann Clin Lab Sci 1998;28:67-81.

**8.** Mitchell JA, Akarasereenont P, Thiemermann C, Flower RJ, Vane JR. Selectivity of nonsteroidal antiinflammatory drugs as inhibitors of constitutive and inducible cyclooxygenase. Proc Natl Acad Sci U S A 1993;90:11693-7.

**9.** Day R, Morrison B, Luza A, et al. A randomized trial of the efficacy and tolerability of the COX-2 inhibitor rofecoxib vs ibuprofen in patients with osteoarthritis. Arch Intern Med 2000;160:1781-7.

**10.** Cannon GW, Caldwell JR, Holt P, et al. Rofecoxib, a specific inhibitor of cyclooxygenase 2, with clinical efficacy comparable with that of diclofenac sodium: results of a one-year, randomized, clinical trial in patients with osteoarthritis of the knee and hip. Arthritis Rheum 2000;43:978-87.

**11.** Ehrich EW, Schnitzer TJ, McIlwain H, et al. Effect of specific COX-2 inhibition in osteoarthritis of the knee: a 6 week double blind, placebo controlled pilot study of rofecoxib. J Rheumatol 1999;26:2438-47.

**12.** Simon LS, Weaver AL, Graham DY, et al. Anti-inflammatory and upper gastrointestinal effects of celecoxib in rheumatoid arthritis: a randomized controlled trial. JAMA 1999;282:1921-8.

**13.** Laine L, Harper S, Simon T, et al. A randomized trial comparing the effect of rofecoxib, a cyclooxygenase 2-specific inhibitor, with that of ibuprofen on the gastroduodenal mucosa of patients with osteoarthritis. Gastroenterology 1999;117:776-83.

**14.** Hawkey C, Laine L, Simon T, et al. Comparison of the effect of rofecoxib (a cyclooxygenase 2 inhibitor), ibuprofen, and placebo on the gastroduodenal mucosa of patients with osteoarthritis: a randomized, double-blind, placebo-controlled trial. Arthritis Rheum 2000;43:370-7.

**15.** Emery P, Zeidler H, Kvien KT, et al. Celecoxib versus diclofenac in long-term management of rheumatoid arthritis: randomised double-blind comparison. Lancet 1999;354:2106-11.

**16.** Pincus T, Summey JA, Soraci SA Jr, Wallston KA, Hummon NP. Assessment of patient satisfaction in activities of daily living using a modified Stanford Health Assessment Questionnaire. Arthritis Rheum 1983;26:1346-53.

**17.** Cox DR. Regression models and life-tables. J Stat Soc [B] 1972;34:187-220.

**18.** *Idem.* Partial likelihood. Biometrika 1975;62:269-76.

**19.** Fleiss JL. Statistical methods for rates and proportions. 2nd ed. New York: John Wiley, 1981.

**20.** Vioxx (rofecoxib tablets and oral suspension). Whitehouse Station, N.J.: Merck, 1999 (package insert).

**21.** Naproxen. Nutley, N.J.: Roche Laboratories, 1999 (package insert).

**22.** Genuine Bayer aspirin. Morristown, N.J.: Bayer Consumer Care Division, 1999 (package insert).

**23.** Schnitzer TJ, Truitt K, Fleischmann R, et al. The safety profile, tolerability, and effective dose range of rofecoxib in the treatment of rheumatoid arthritis. Clin Ther 1999;21:1688-702.

**24.** Silverstein FE, Graham DY, Senior JR, et al. Misoprostol reduces serious gastrointestinal complications in patients with rheumatoid arthritis receiving nonsteroidal anti-inflammatory drugs: a randomized, double-blind, placebo-controlled trial. Ann Intern Med 1995;123:241-9.

**25.** Langman MJ, Jensen DM, Watson DJ, et al. Adverse upper gastrointestinal effects of rofecoxib compared with NSAIDs. JAMA 1999;282:1929-33.

**26.** Silverstein FE, Faich G, Goldstein JL, et al. Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS Study: a randomized controlled trial. JAMA 2000;284:1247-55.

**27.** Singh G, Ramey DR, Morfeld D, Shi H, Hatoum HT, Fries JR. Gastrointestinal tract complications of nonsteroidal anti-inflammatory drug treatment in rheumatoid arthritis: a prospective observational cohort study. Arch Intern Med 1996;156:1530-6.

**28.** VanHecken A, Schwartz JI, Depré M, et al. Comparative inhibitory activity of rofecoxib, meloxicam, diclofenac, ibuprofen, and naproxen on COX-2 versus COX-1 in healthy volunteers. J Clin Pharmacol 2000;40:1109-20.

**29.** Brochier ML. Evaluation of flurbiprofen for prevention of reinfarction and reocclusion after successful thrombolysis or angioplasty in acute myocardial infarction: the Flurbiprofen French Trial. Eur Heart J 1993;14:951-7.

**30.** Daniels B, Seidenberg B. Cardiovascular safety profile of rofecoxib in controlled clinical trials. Arthritis Rheum 1999;42:Suppl:S143. abstract.

Downloaded from www.nejm.org by JULIETTE KRUSE on October 31, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.