## ..ecial Communication

# Analysis and Interpretation of Treatment Effects in Subgroups of Patients in Randomized Clinical Trials

EXHIBIT 31
CURFman
11-21-05

Salim Yusuf, DPhil, MRCP; Janet Wittes, PhD; Jeffrey Probstfield, MD; Herman A. Tyroler, MD

A key principle for interpretation of subgroup results is that quantitative interactions (differences in degree) are much more likely than qualitative interactions (differences in kind). Quantitative interactions are likely to be truly present whether or not they are apparent, whereas apparent qualitative interactions should generally be disbelieved as they have usually not been replicated consistently. Therefore, the overall trial result is usually a better guide to the direction of effect in subgroups than the apparent effect observed within a subgroup. Failure to specify prior hypotheses, to account for multiple comparisons, or to correct P values increases the chance of finding spurious subgroup effects. Conversely, inadequate sample size, classification of patients into the wrong subgroup, and low power of tests of interaction make finding true subgroup effects difficult. We recommend examining the architecture of the entire set of subgroups within a trial, analyzing similar subgroups across independent trials, and interpreting the evidence in the context of known biologic mechanisms and patient prognosis.

(JAMA. 1991;266:93-98)

THE DILEMMA articulated by Ber-
..ard[*] in 1865 still haunts the clinician:
the response of the "average" patient to
therapy is not necessarily the response
of the patient being treated. If all pa-
tients shared identical characteristics
and equivalent risks, the overall analy-
sis of a clinical trial would be sufficient
to provide medical practitioners with an
unambiguous guide to treatment. In
practice, however, patients with a spe-
cific disease may differ greatly one from
another. No analysis of data can predict
with certainty the response of a newly
presenting patient to therapy; there-
fore, investigators often analyze data
from clinical trials by subgroups within
which the responses to treatment are
expected to be fairly similar, but be-
tween which the responses are sus-
pected to differ. Unfortunately, inter-
preting the effects of treatment in sub-
groups of patients in clinical trials is
fraught with inferential problems.[2,3] An-

ticipated differential effects of therapy
in different subgroups are often absent
or hard to establish. Conversely, unan-
ticipated differences, when found, are
difficult to interpret. We argue herein
that the chief aim of subgroup analysis
should be to identify either consistency
of, or large differences in, the magni-
tude of treatment effects among differ-
ent categories of patients. Properly per-
formed, analysis of subgroups can yield
useful insights into therapy; unfortu-
nately, many commonly used approach-
es are often uninformative or mislead-
ing. We discuss several common pitfalls
associated with analysis and interpreta-
tion of subgroups. We contrast proper
with improper subgroups and distin-
guish conclusions concerning subgroups
defined a priori to confirm a hypothe-
sized effect from conclusions concerning
subgroups defined a posteriori to gener-
ate new hypotheses. Most of our exam-
ples pertain to cardiovascular disease,
but the considerations are applicable to
clinical trials in general.

### DEFINITIONS

Randomized clinical trials measure
the efficacy of a treatment by comparing
outcomes after therapy of patients ran-
domized to one of at least two treat-
ments. One therapy is declared better
than another if the overall results of the
trial show a statistically significant dif-

ference between treatment on an out-
come variable. The effect of treatment
is then often compared within sub-
groups.

We define a *proper subgroup* as a
group of patients characterized by a
common set of "baseline" parameters.
These parameters may include inherent
patient characteristics that cannot be
affected by treatment (eg, age, sex) or
disease characteristics defined before
randomization (eg, anterior or inferior
myocardial infarction when the deter-
mination is made before randomiza-
tion). In randomized clinical trials, each
proper subgroup constitutes a smaller
randomized, controlled trial. Some-
times the term *subgroup* refers to a set
of outcomes, for example, cause-specific
deaths or the number of events within a
specific period of time. This article deals
only with subgroups defined at base-
line. Hereafter, when the context is
clear, the term *subgroup* shall refer to a
proper subgroup.

An *improper subgroup* is defined
herein as a group of patients character-
ized by a variable measured after ran-
domization *and* potentially affected by
treatment, eg, separate examination of
the prognosis of patients with a patent
coronary artery in a trial of a thrombo-
lytic agent when patency is determined
after initiating the randomized treat-
ment. (In such a case, a low mortality
rate may reflect not only the effects of
therapy, but also inherent favorable
prognostic characteristics of the pa-
tients themselves, such as spontaneous
recanalization, the presence of a nonoc-
clusive thrombus, or the fact that the
infarct was small.) Analysis of improper
subgroups, though seductive, can be ex-
tremely misleading, because a particu-
lar treatment effect may influence clas-
sification to the subgroup. Thus, an
apparent subgroup effect may not be a
true effect of treatment but rather the
result of inherent characteristics of pa-
tients that led to a particular response
or to the development of side effects.
Comparisons of responders to nonre-

From the Clinical Trials Branch, Division of Epidemiology and Clinical Applications, National Heart, Lung, and Blood Institute, Bethesda, Md (Drs Yusuf and Probstfield); New England Research Institute, Inc, Washington, DC (Dr Wittes); and Department of Epidemiology, School of Public Health, University of North Carolina, Chapel Hill (Dr Tyroler).
Reprint requests to Clinical Trials Branch, Division of Epidemiology and Clinical Applications, National Heart, Lung, and Blood Institute, Bethesda, MD 20892 (Dr Yusuf).

exh 14

sponders or compliers to noncompliers based on information collected after randomization are particularly egregious forms of improper subgroup analysis[4] because response and adherence may be markers of good prognosis, not necessarily measures of therapeutic efficacy.[5]

*Magnitude of effect* shall refer to relative risk, relative odds, or change in absolute risk. A *subgroup effect* refers to a treatment effect in a specific proper subgroup. An *interaction*, or a differential subgroup effect, refers to treatment effects that differ by subgroup. When a treatment is beneficial or harmful in all subgroups but the magnitude of effect varies among subgroups, the interaction is termed a *quantitative interaction*.[4] (For example, "Although the new treatment is beneficial in both men and women, the benefit is greater in women.") Because differences inherent among patients may influence the degree of response to treatments, expected and unexpected quantitative interactions are quite likely to be present among different subgroups.

A *qualitative interaction*[4] is one in which treatment is truly beneficial in some subgroups but truly harmful in others. (For example, "A new treatment confers a 2-year increase in median survival time in men, but a 1-year decrease in women.") Although true qualitative subgroup interactions may be present in an *unselected* group of individuals with a specific disease, they are uncommon in clinical trials, especially when analysis is confined to specific end points, partly because patients within a trial share certain important characteristics. Moreover, patients susceptible to adverse effects, for example, patients with contraindications, are excluded from most clinical trials. We regard observed qualitative interactions with considerable skepticism, for they are often shown to be spurious when the same comparison is made in similar trials. We base this judgment on our observations from a large number of randomized trials in heart disease.[7,8] As an example, the section "An Example of Subgroup Analysis in Cardiovascular Trials" presents a discussion of apparent subgroup effects in the many trials of β-blockade after myocardial infarction (MI).

### SAMPLE SIZE FOR DETECTING EFFECTS IN PROPER SUBGROUPS

The sample size of a well-designed randomized clinical trial is large enough to ensure a high probability, or *power*, of detecting a clinically important *overall* difference between two treatment groups. A large sample size gives assur-

ance that if no effect in treatment is truly present, the probability (ie, the significance level, or the "*P* value") of spuriously finding an effect is small. For example, suppose one wants to evaluate the effect on mortality of long-term use of β-blockers given after MI in a trial with significance level of 0.01 and power of 90%. Four thousand patients, divided equally between treatment and control groups, are needed to detect a 25% reduction in mortality from 10% to 7.5%. If the locations of the MIs are determined before randomization to have been half anterior and half inferior, the probability of detecting a 25% decrease in mortality for each location would be only about 50%. If treatment had a similar effect in both subgroups, and the control mortality rates were similar, demonstrating separate subgroup effects would require 4000 patients per subgroup (or 8000 patients in all). Suppose that among patients with prior anterior and inferior MI, β-blockade reduced mortality by 35% and 15%, respectively. A sample of 4000 patients would give a roughly 30% chance of detecting this differential reduction in mortality between the two subgroups. Generally, trials adequate for detecting an overall treatment effect cannot be expected to detect effects within even relatively large subgroups and are very unlikely to detect interactions. Since most currently performed clinical trials are barely large enough to detect overall effects, the numbers of patients in even the larger subgroups examined within these same trials would hardly be expected to provide reliable estimates of treatment effect. We believe the prudent stance is to rely more on the overall results to indicate the likely "true" effect in a particular subgroup, rather than on the actual observations, unless the trial was specifically designed to have sufficient power within subgroups of interest.

The following examples illustrate the importance of relying more on the overall results of a study in assessing the effect within a subgroup than on the apparent effect observed within that subgroup. The GISSI (Gruppo Italiano per lo Studio della Streptochinasi nell'Infarcto Miocardico) study[9] showed that streptokinase reduced overall mortality roughly 20%. Subgroup analyses suggested that benefit was confined to patients with anterior myocardial infarction, to those under the age of 65 years, and to those treated within 6 hours of the onset of symptoms. Although the overall results were highly significant, the power to detect benefit within each subgroup was low. Subsequent trials[10,12] and a review of subgroup effects from several trials[11] demon-

strated benefit irrespective of site of infarction, age of patient, and time from onset of symptoms to treatment. Moreover, the size of effect within each subgroup was closer to the size of overall results than to the apparent effect seen in the analogous subgroup of GISSI. The Second International Study of Infarct Survival (ISIS-2)[13] presented results by the astrological sign under which patients were born. Aspirin was clearly beneficial overall and for persons born under all signs except Libra and Gemini, for which apparent harmful effects were observed.

### MULTIPLE COMPARISONS, ORDERED SUBGROUPS, AND STRUCTURED HYPOTHESES

The more questions asked of a set of data, the more likely it will yield some statistically significant difference even if the treatments are in fact equivalent. In such situations, the significance levels usually reported bear little relationship to the true probability of finding an effect of chance alone. Consider a trial comparing a worthless treatment with a control. Dividing the subjects into 10 mutually exclusive subgroups produces a 20% chance that treatment will appear significantly ($P<.05$) better than control in at least one subgroup, as well as a 20% chance that control will appear significantly better than treatment in at least one subgroup. Partitioning the data into many small subsets will almost ensure the discovery of a suggestive, though not necessarily statistically significant, treatment effect. The following numerical example provides some flavor of the magnitude of the distortion arising from incautious analysis of subgroups. Suppose 1000 patients with a mortality rate of 10% are allocated at random to two equally efficacious treatments. If the data are then divided at random into 10 equally sized subgroups and the relative risk calculated for each, the chance is roughly 99% that, in at least one subgroup, the relative risk will be at least 2; the chance is over 80% of observing a relative risk of at least 3; the chance is 5% of observing a relative risk of at least 10. Sometimes investigators seek to demonstrate that a treatment has a uniform effect across all the subgroups. Proving uniformity is extremely difficult. Even when treatments truly have similar effects in different subgroups, the play of chance may well exaggerate, dilute, or occasionally reverse the results in a particular subgroup. Curiously, even when no large difference truly exists, the observed difference sometimes appears to be concentrated in a few subgroups.[6] Several methods are available to adjust *P* values to account for multiple compar-

isons" or to provide subgroup estimates at relate explicitly to the overall estimated treatment effect." A simple conservative approach divides the overall significance level by the number of comparisons actually made. Thus, in a study with significance level of .05 and 20 statistical tests, a $P$ value of .0025 is needed to declare significance. Correcting the $P$ value for multiple comparisons is, we believe, especially useful in a trial that has shown little overall benefit. Examination of multiple subgroups is likely to unearth one or more with apparent interesting, statistically significant results. Adjusting for multiple comparisons can help clarify whether the results are credible enough to deserve further exploration.

Simply correcting for multiplicity in a trial that shows an overall treatment effect leads to comparisons concerning individual subgroups that are often woefully lacking in power. Moreover, the conclusions may suffer from logical inconsistencies." For coherent inference about treatment effects, we believe that hypotheses concerning subgroup effects should have strong biological rationale. Hypotheses in ordered subgroups should generally reflect the natural ordering. Consider, for example, the hypothesis that thrombolytic therapy reduces mortality in patients with acute MI. Pathophysiological arguments and data from experiments in animals lead to the reasonable hypothesis that thrombolytic therapy is generally effective and that its benefit is likely to increase with earlier administration. Suppose a clinical trial with equal-size subgroups yielded the hypothetical data in Table 1. How should the observed differential subgroup effects be interpreted if one is operating at a significance level of .01? Correcting for multiplicity would denote as significant only those comparisons with $P$ values less than .01/6. A naive reading is, "Thrombolytic therapy is effective in the treatment of acute MI, but its efficacy is confined to cases treated within 2 hours of the event; if the time of administration is over 2 hours after onset of pain, the therapy is no more effective than control." Therefore, the conclusion would be that therapy, though effective overall, is not effective in any subgroup. A more coherent interpretation would be, "Thrombolytic therapy in the treatment of acute MI; on average, it reduces the risk of 14-day mortality by about 33%. Its relative efficacy is directly related to the time of administration: the earlier it is administered, the more benefit is achieved." Appropriate statistical analysis would capture this graded effect.

Table 1.—Hypothetical Example of Ordered Subgroups: Relative Risk as a Function of Time of Administration of Thrombolytic Therapy

| Hours After Pain | 14-d Mortality (%) | | Relative Risk | P |
|---|---|---|---|---|
| | Treated | Control | | |
| ≤2 | 10 | 20 | .50 | .01 |
| >2-4 | 11 | 16 | .70 | Not significant |
| >4-8 | 17 | 22 | .77 | NS |
| >8-12 | 20 | 25 | .80 | NS |
| >12 | 23 | 24 | .95 | NS |
| Overall | 14 | 21 | .67 | .001 |

## SUBGROUP EFFECTS DEFINED A PRIORI AND A POSTERIORI

Investigators initiating a trial often use physiological arguments to predict in which categories of patients the treatment is likely to be most effective. For example, interventions designed primarily to limit infarct size, such as thrombolytic therapy, may be expected to be most effective if administered in the critical early hours of infarction when ischemic myocardium progresses to necrosis." Suggestive differential subgroup effects that have emerged in previous trials may be incorporated as a priori subgroup hypotheses in the design of a new trial or be tested in other already completed studies. Strong medical reasons supporting a hypothesis that appears plausible should be explicitly stated in the protocol as well as in formal publications concerning the respective trials." Such an approach usually limits the number of subgroups, which, in turn, decreases problems arising from multiplicity and helps design valid statistical tests. Further, a possible subgroup effect can be tested by selective oversampling of certain types of patients to increase statistical power." While postulating subgroup effects a priori allows formal statistical hypothesis testing, much less credence is due to formulating hypotheses after examining the data. Such analysis smacks of betting on a horse after the race is over. Subgroups defined a posteriori are grist for formulating hypotheses, not for testing them. At the end of the trial, some subgroup may show apparent benefit and a medical "explanation" can be tailored to the observation. Most protocols omit explicit statements of subgroup hypotheses so that when a long trial ends, the investigators often cannot recall precisely which hypotheses were truly postulated in advance and which were data derived, which were considered plausible and which unlikely. Readers of completed study reports are even more in the dark, for they cannot discern whether all subgroup analyses performed or explored were reported, or even whether the same analyses were performed repeatedly dur-

ing the follow-up (eg, at 5, 7, and 10 years) but reported only when a subgroup at a particular time achieved "statistical significance."

Some subgroup hypotheses examined at the end of a trial are clearly stated to be data derived, while others may be modifications of prior hypotheses. For example, the protocol may state a particular definition of a subgroup but the results only become statistically significant when an alternative definition of the subgroup is used. Such analyses should be considered to test data-derived hypotheses rather than hypotheses stated a priori. Corrections for such complex multiplicity are only possible if a scrupulous and detailed record of all such analyses is maintained by the investigators and such information is fully divulged to the reader. Moreover, mechanical corrections for multiplicity may not be intellectually satisfying if this type of analysis simply yields a list of subgroup results lacking biological coherence. Further, analysis of individual subgroups does not test whether the effect observed in a particular subgroup is significantly different either from the average results or from the result of another specific subgroup.

One might test for statistical interaction by formally comparing the treatment effect in a subgroup of interest with the overall treatment effect." A differential subgroup effect is declared only if a subgroup effect is shown to differ significantly from the overall treatment effect. Correction for multiplicity and tests of interactions lead to stringent statistical procedures. If applied to results already published, these methods would render many reported subgroup effects in clinical trials statistically nonsignificant (Table 2[20]).

We recommend that medically interesting data-derived subgroup effects be reported clearly as post hoc analyses so that the resulting hypotheses can be tested in other studies. Estimates of effects and associated confidence limits should also be presented. A strategy sometimes used is to refrain from quoting significance levels for post hoc analyses.

Table 2.—Claims of Subgroup Effects on Mortality in the 55 Randomized Trials of β-Blockers in Acute Myocardial Infarction*

| Study | Subgroup Benefit Claimed | Prior Hypothesis | Confirmed in Other Trials | Overall P Value | Test for Heterogeneity | Correction for Multiplicity | P |
|---|---|---|---|---|---|---|---|
| | | | Early Initiation of Treatment | | | | |
| 1. Barber et al[29] | Tachycardia at entry >100 beats per min | No | No | Not significant | — | — | — |
| 2. MIAMI[19] | "High-risk" patients | No | No | NS | — | — | — |
| | | | Late Initiation of Treatment | | | | |
| 3. Anderson et al[28] | Treatment beneficial in patients <65 y and harmful in those >65 y | Unclear | No, most trials show similar reductions in relative risk among younger and older patients.[35] | NS | — | — | — |
| 4. Hjalmarson et al[8] | Benefit observed only in patients with HR >65 beats per min (never formally published) | No | No, the MIAMI trial included only this group. Overall results were not significant. The impact of HR on effect of treatment was tested in ISIS-1.[38] No differential was found. | <.03 | — | — | — |
| 5. Wilhelmsson et al[24] | Benefit only in patients with "electrical" or "mechanical" complications | No | No, although one other study[27] observed a similar result. Many other studies and the Beta-Blocker Pooling Project[20] failed to identify this subgroup as benefiting preferentially. | NS | — | — | — |
| 6. Multicenter International[29] | Benefit only in patients with anterior MI before entry | No | No | <.08 | — | — | — |
| 7. Taylor et al[26] | Benefit only among those with treatment initiated within 6 mo of MI, while those treated later appeared harmed | No | No | NS | — | — | — |
| 8. Beta-blocker Heart Attack Trial[9] | Benefit only in patients with "electrical" or "mechanical" complications prior to randomization | No | Not consistently | <.003 | — | — | + |
| 9. Yusuf et al[23] (pooled data) | β-blockers without ISA more effective than those with ISA | No | Uncertain. Three new trials appear to contradict this conclusion. A trial of metoprolol was unpromising. Two studies, one of acebutolol and one of oxprenolol, both with ISA, were favorable. | <.0001 | +(P<.02) | — | — |

*Only subgroups that are "proper" are included. HR indicates, heart rate; MI, myocardial infarction; and ISA, intrinsic sympathomimetic activity.

To minimize the number of spuriously significant subgroup results generated by examination of the data, we recommend stringent statistical procedures (eg, tests for interaction and adjustments for multiplicity) for data-derived hypotheses. Because correcting for multiplicity "protects" the significance level of statistical tests, differential effects detected by statistical methods that correct for multiplicity or that test for interactions are much more likely to be true than those suggested by a naive approach but not confirmed by more careful and sophisticated analyses. Unfortunately, because most current clinical trials are small, the very stringency of the methods implies that true differential effects are unlikely to be detected. The real lesson is that if we are seriously interested in detecting subgroup effects reliably, very large trials with high power to provide answers for the most important subgroups are required.

## SUBGROUPS AND THEIR RELATIONSHIP TO THE MONITORING OF TRIALS

At some time during the course of a trial, an apparent extreme treatment effect, favorable or unfavorable, often arises in one or more subgroups. If the effect within a subgroup is consistent with a prior hypothesis, one should use a statistically sound monitoring method[7,12] to assess how extreme the results are. In practice, the chance is very small that a valid statistical approach that accounts for multiplicity, interactions, and the interim nature of the analysis will identify a subgroup effect strong enough to lead to early termination. The investigator should weigh any additional extraneous evidence, the plausibility of the result, and the impact that early termination of a subgroup would have on the remaining subjects in a trial. Unexpected subgroup trends arising during the course of a study, even if fairly extreme, should be dealt with more cautiously. One prudent course of action is to use the available data to formulate a hypothesis and test it formally during the remaining part of the trial.[33]

A different kind of problem may arise during the monitoring of a "mega-trial" in which a large number of end points is expected. Sometimes measuring the effect of treatment separately within a specific subgroup is of particular interest because there may be important differences in pathophysiology. Consequently, marked differences in treatment effects are considered likely. For example, ISIS-2[30] aimed to detect an effect of treatment separately among subgroups of patients with acute MI treated with a thrombolytic agent early and late after onset of symptoms. Similarly, among patients with low ejection fraction, one might want to detect separately an effect of an angiotensin converting enzyme inhibitor in patients with and without heart failure. In very large trials designed to provide separate answers within specific subgroups, each subgroup may be monitored as a separate trial. Although an appropriate analysis at the end of the trial would report the overall results, viewing the subgroups separately during the course of the trial prevents termination of the trial if the overall trial shows clear results but no component is persuasive by itself. Such an approach is clinically sensible. It is ethically justified when practicing physicians are reluctant to extrapolate the results observed in one subgroup of patients to another. Another advantage of very large trials is that they increase the power to examine other subgroups. The large sample size of ISIS-2[30] permitted examination of the effects of thrombolytic therapy by age, site of MI, and electrocardiographic presentation.

## MISCLASSIFICATION AND MISSING DATA

Thus far, we have tacitly implied that all patients are categorized into the cor-

rect subgroup. Usually, however, many baseline data are measured with error so that the observed subgroups include misclassified persons. When the entry criteria are related to the measurements, regression toward the mean[14] will cloud classification. Even when baseline data are measured precisely, other factors may blur distinctions among subgroups. For example, changes in characteristics of patients during the course of a long-term study may render the interpretation of subgroup effects problematic. If measurement error and misclassification are independent of prognosis, the estimated subgroup effects remain unbiased, but their precision is compromised. Far more serious to valid inference is the common situation in which measurement error or missingness is in fact related to prognosis. For example, in a trial of coronary artery bypass graft surgery, patients might be classified as having normal or abnormal exercise test results to assess differential effects of an intervention on the two subgroups. Patients with severe heart failure, claudication, or severe angina, however, may be unable to perform a satisfactory exercise test. Excluding such patients from analyses because their baseline data are missing could bias the resulting estimated subgroup effects. In trials using surrogate end points, the sickest patients are often those with missing baseline and end-point data.[15]

Sensitivity analysis provides one simple approach to missing data. Suppose a subgroup analysis shows a treatment effect among patients with an ejection fraction of less than 50% that is different from the effect in patients with an ejection fraction of greater than 50%, but 5% of the baseline ejection fractions are missing. A sensitivity analysis might assign all unknown patients to each subgroup in turn and estimate effects under each assignment. If the inference concerning the differential subgroup effect remains essentially unchanged no matter to which subgroup the unknowns are assigned, the subgroup effect is likely to be real. If, however, recategorizing the unknowns erases the subgroup effect or renders it nonsignificant, the observed effect is then in doubt.

Some trials report the efficacy of treatment only among those who complete the study. Bias arises in this type of analysis because the reasons for withdrawal of treated and control patients may differ substantially from each other. Consequently, the remaining groups of patients are no longer directly comparable either to each other or to those withdrawn. For example, in a trial comparing β-blockers, patients with severe

ventricular dysfunction may be more likely to develop such side effects as fatigue and heart failure, which cause intolerance to β-blockers. These very sick patients are likely to withdraw from the treatment arm. On the other hand, patients in the control group who develop angina or hypertension may be withdrawn from placebo and given β-blockers. Since different types of patients are withdrawn from the two groups, the patients remaining are clearly not comparable to each other.

## SUBGROUP EFFECTS OBTAINED FROM SEVERAL DIFFERENT TRIALS

Suppose a study reports an effect for a particular subgroup. One approach to determining if this observation represents a true subgroup effect is to obtain data about similarly constituted subgroups from other completed trials. The statistical significance of a real subgroup effect should be enhanced by pooling data; on the other hand, a spurious result is unlikely to be replicated. Sometimes one can use published data to assess informally if the "trend" of the data is similar in all the relevant subgroups from the different trials. Alternatively, one may often pool the relevant information in a formal overview, or "meta-analysis."[38] In that case, clear definitions of the subgroups are essential. For example, subgroups defined by a specific ejection fraction for all trials, say 35%, are preferable to vague categorizations of patients, say "high risk," the definition of which may vary greatly between trials. (Indeed, at times the definitions might be influenced by which classification provides the most interesting answer.) When reasonably uniform data are pooled from many studies, the statistical power to detect a subgroup effect may be high enough to establish the likely existence of differential subgroup effects when the individual trials did not. (For example, the pooled data imply that the beneficial effect of tamoxifen citrate in women over 50 years with breast cancer is greater than in younger women; $P<.0001$.[7]) Conversely, the pooled data from many trials may refute the claim of a subgroup effect from a single trial (see the following section).

## AN EXAMPLE OF SUBGROUP ANALYSIS IN CARDIOVASCULAR TRIALS: β-BLOCKERS IN PATIENTS WITH SUSPECTED OR ESTABLISHED ACUTE MI

About 65 randomized trials have compared β-blockers with control following an acute MI. Some trials instituted treatment in the early hours of an MI; others started treatment some weeks

after the infarct. Several trials stated specific prior subgroup hypotheses, but in no instance did the results of the trial support the hypothesis. At least nine different proper subgroup effects were claimed or reported, including several "qualitative interactions" (Table 2). None of these hypotheses had been clearly stated a priori in its respective trial; none of the reported subgroup hypotheses has been consistently supported by other trials. Only one analysis used tests for interactions; most of the others used uncorrected $P$ values. Only in the subgroup analyses reported from the Beta-blocker Heart Attack Trial[17] was a $P$ value not assigned to the data-derived analyses. The Table notes the method used to relate the quoted $P$ value to the true probability of finding the result. A careful analysis should, we believe, have at least one " + " in the Table.

Even a very conservative analysis may yield subgroup effects that cannot be replicated. Example 9 in Table 2, which deals with β-blockers with and without intrinsic sympathomimetic activity (ISA),[23] represents a situation analogous to subgroups. Relevant data from all trials were used and a statistical test of interaction applied. Despite the significant $P$ value ($P<.02$) indicative of a quantitative interaction (β-blockers without ISA apparently being more effective than those with ISA), the results were not replicated in three more recent trials.

The Beta-Blocker Pooling Project,[22] which used uniform definitions to examine subgroups from several trials, showed some quantitative interactions, but none that were statistically significant. None of the subgroups showed qualitative interactions.

All these results support the general observation, stated in the "Definitions" section, that qualitative interactions are improbable in randomized clinical trials. Overviews of the trials of thrombolytic agents in acute MI[15] and antiplatelet agents in vascular disease (R. Peto, FRS, written communication, February 1990) have reported similar findings.

## RECOMMENDATIONS

This article recommends a stance regarding analysis and interpretation of data from clinical trials that encourages skepticism toward most reported subgroup effects. We believe that the overall "average" result of a randomized clinical trial is usually a more reliable estimate of treatment effect in the various subgroups examined than are the observed effects in individual subgroups. Interesting and compelling subgroup effects should be regarded seriously if they arise from appropriate

Table 3.—Key Points in Subgroup Analyses and Interpretation

**Design**
1. State clearly a few important and plausible subgroup hypotheses in advance. Include the direction of the expected effect.
2. Rank the subgroup hypotheses in order of plausibility.
3. Calculate power to detect key subgroup effects. If it is inadequate, consider building adequate power to detect key subgroup effects.
4. State whether the trial will be continued even after the overall results are convincing but the subgroup effects are not significant. Decide whether the primary method of monitoring will focus on the subgroups or on the overall trial.
5. State primary analytical methods in advance.

**Monitoring a trial**
1. Rigorous evidence of benefit or harm in subgroups postulated a priori: consider selective discontinuation of that subgroup.
2. Evidence of benefit or harm in unexpected subgroup: postulate a hypothesis to be tested in the remaining part of the study.

**Analyses and Interpretation**
1. Use statistical methods that capture the framework of the prior hypotheses.
2. Place greater emphasis on the overall result than on what may be apparent within a particular subgroup.
3. Distinguish between prior and data-derived hypotheses. Do not calculate P values for data-derived hypotheses because such P values usually bear little resemblance to what could occur if the hypothesis were tested independently in another study.
4. Use tests of "interactions" and/or correct for multiplicity of statistical comparisons. ("Nominal" P values are usually misleading.)
5. Interpret the results in the context of similar data from other trials, from the architecture of the entire set of data on all patients, and from principles of biological coherence.

**Improper subgroups and analyses**
1. Avoid analyses of subgroups based on postrandomization response, compliance, etc.
2. Avoid emphasizing nominal P values.
3. Do not emphasize data-derived analyses or analyses based on post-hoc definitions of subgroups.

analytic methods. We urge extreme caution, however, in interpreting striking results that are data derived even for the generation of hypotheses. On the other hand, if no clear subgroup effects are apparent after rigorous analysis of the data, we do not recommend that clinicians treat every patient identically. In making clinical decisions, the physician must weigh the overall evidence from clinical trials with other data. Patient prognosis, risks of side effects, and known pathophysiological mechanisms all bear on decisions concerning treatment. For example, in assessing the benefits of simple treatments such as long-term use of β-blockers, many physicians might consider that for high-risk patients a 25% reduction in risk is worthwhile, whereas they might choose not to prescribe a β-blocker in low-risk patients because a similar reduction in risk translates into a small absolute benefit that may not outweigh the risk of developing adverse effects. Conversely, a physician may decide to extrapolate the result of a trial to types of patients not studied. For example, sound clinical and pathophysiological principles suggest that patients with angina or hypertension are likely to benefit from β-blocker therapy even though such patients have usually been excluded from post-MI trials.

We urge interpreting an observed subgroup effect in the context of other available information about the disease and the pharmacologic mechanisms of the treatment. Table 3 summarizes our recommendations. Results from even properly conducted subgroup analyses should not be accepted until confirmatory evidence is available from other similar studies.

References

1. Bernard C; Green HC, trans. An Introduction to the Study of Experimental Medicine. New York, NY: Dover Publications Inc; 1957.
2. Simon R. Patient subsets and variation in therapeutic efficacy. Br J Clin Pharmacol. 1982;14:473-482.
3. Bulpitt CJ. Subgroup analysis. Lancet. 1988;2:31-34.
4. Simon R., Wittes R. Methodologic guidelines for reports of clinical trials. Cancer Treat Rep. 1985;69:1-3.
5. The Coronary Drug Project Research Group. Influence of adherence to treatment and response of cholesterol on mortality in the Coronary Drug Project. N Engl J Med. 1980;303:1038-1041.
6. Yusuf S, Held P, Teo KK, Toretsky ER. Selection of patients for randomized controlled trials: implications of wide or narrow eligibility criteria. Stat Med. 1990;9:73-86.
7. Yusuf S, Wittes J, Friedman L. Overview of results of randomized clinical trials in heart disease, I: treatments following myocardial infarction. JAMA. 1988;260:2088-2093.
8. Yusuf S, Wittes J, Friedman L. Overview of results of randomized clinical trials in heart disease, II: unstable angina, heart failure, primary prevention with aspirin, and risk factor modification. JAMA. 1988;260:2259-2263.
9. Gruppo Italiano per lo Studio della Streptochinasi nell'Infarcto Miocardico (GISSI). Effectiveness of intravenous thrombolytic treatment in acute myocardial infarction. Lancet. 1986;1:397-401.
10. ISIS-2 Collaborative Group. Randomized trial of IV streptokinase, oral aspirin, both, or neither among 17,187 cases of suspected acute myocardial infarction. Lancet. 1988;2:349-360.
11. Wilcox RG, von der Lippe G, Olsson CG, et al. Trials of tissue plasminogen activator for mortality reduction in acute myocardial infarction: Anglo-Scandinavian Study of Early Thrombolysis (ASSET). Lancet. 1988;2:525-530.
12. AIMS Trial Study Group. Effect of intravenous ASPAC on mortality after acute myocardial infarction: preliminary report of a placebo-controlled clinical trial. Lancet. 1988;1:545-549.
13. Yusuf S, Sleight P, Held P, MacMahon S. Routine medical management of acute myocardial infarction: lessons from overviews of recent randomized controlled trials. Circulation. 1990;82:117-134.
14. Miller RG Jr. Simultaneous Statistical Inference. 2nd ed. New York, NY: Springer-Verlag NY Inc; 1985.
15. Davis CE, Leffingwell DP. Empirical Bayes estimates of subgroup effects in clinical trials. Controlled Clin Trials. 1990;11:37-42.
16. Nelder JA. Discussion on papers by Wynn, Bloomfield, O'Neill, and Wetherill. J Royal Stat Soc Series B. 1971;33:244-246.
17. Systolic Hypertension in the Elderly Cooperative Research Group. Rationale and design of a randomized clinical trial on prevention of stroke in isolated systolic hypertension. J Clin Epidemiol. 1989;41:1197-1208.
18. The SOLVD Investigators. Studies of left ventricular dysfunction (SOLVD)—rationale, design, and methods: two trials that evaluate the effect of enalapril in patients with reduced ejection fraction. Am J Cardiol. 1990;66:315-322.
19. Furberg CD, Hawkins CM, Lichstein E. Effect of propranolol in post infarction patients with mechanical or electrical complications. Circulation. 1984;69:761-765.
20. Barber JM, Boyle DM, Chaturvedi NC, et al. Practolol in acute myocardial infarction. Acta Med Scand. 1976;587(suppl):213-219.
21. The MIAMI Trial Research Group. Metoprolol in acute myocardial infarction (MIAMI): a randomized placebo-controlled international trial. Eur Heart J. 1985;6:199-226.
22. Andersen MP, Bechsgaard P, Frederiksen J, et al. Effect of alprenolol on mortality among patients with definite or suspected acute myocardial infarction: preliminary results. Lancet. 1979;2:865-868.
23. Yusuf S, Peto R, Lewis J, Collins R, Sleight P. Betablockade during and after myocardial infarction: an overview of the randomized trials. Prog Cardiovasc Dis. 1985;27:335-371.
24. Hjalmarson A, Elmfeldt D, Herlitz J, et al. Effect on mortality of metoprolol in acute myocardial infarction: a double-blind randomised trial. Lancet. 1981;2:823-827.
25. ISIS-1 Collaborative Group. Randomised trial of intravenous atenolol among 16,027 cases of acute myocardial infarction: ISIS-1. Lancet. 1986;2:57-66.
26. Wilhelmsson C, Vedin JA, Wilhelmsen L, et al. Reduction of sudden deaths after myocardial infarction by treatment with alprenolol. Lancet. 1974;2:1157-1160.
27. Beta-blocker Heart Attack Trial Research Group. A randomized trial of propranolol in patients with acute myocardial infarction, II: morbidity results. JAMA. 1983;250:2814-2819.
28. The Beta-Blocker Pooling Research Group. The Beta-Blocker Pooling Project (BBPP): subgroup findings from randomized trials in post infarction patients. Eur Heart J. 1988;9:8-16.
29. Multicenter International Study. Supplementary report: reduction in mortality after myocardial infarction with long-term beta-adrenoreceptor blockade. BMJ. 1977;2:419-421.
30. Taylor SH, Silke B, Ebutt A, et al. A long-term prevention study with oxprenolol in coronary heart disease. N Engl J Med. 1982;307:1293-1301.
31. Lan KKG, Simon R, Halperin M. Stochastically curtailed tests in long-term clinical trials. Communications Stat. 1982;35:207-219.
32. Lan KKG, DeMets DL. Discrete sequential boundaries for clinical trials. Biometrika. 1983;70:659-663.
33. The Coronary Drug Project. Findings leading to further modifications of its protocol with respect to dextrothyroxine. JAMA. 1972;219:996-1008.
34. Knoke JD, Hawkins DL. Estimating baseline values of the variable of intervention in a clinical trial. Cont Clin Trials. 1985;6:136-145.
35. Wittes J, Lakatos E, Probstfield J. Surrogate endpoints in clinical trials: cardiovascular disease. Stat Med. 1989;8:415-425.
36. Collins R; Gray R, Godwin J, Peto R. Avoidance of large biases and large random errors in the assessment of moderate treatment effects: the need for systematic overviews. Stat Med. 1987;6:245-250.
37. Early Breast Cancer Trialists' Collaborative Group. Effects of adjuvant tamoxifen and of cytotoxic therapy on mortality in early breast cancer. N Engl J Med. 1988;319:1681-1692.

Treatment Effects in Patient Subgroups—Yusuf et al

**■■■** SPECIAL COMMUNICATION

# Risk of Cardiovascular Events Associated With Selective COX-2 Inhibitors

Debabrata Mukherjee, MD

Steven E. Nissen, MD

Eric J. Topol, MD

ASPIRIN AND NONSTEROIDAL anti-inflammatory agents (NSAIDs) have proven analgesic, anti-inflammatory, and antithrombotic properties but also have significant gastric toxicity. The gastrointestinal toxicity appears to be related to cyclooxygenase 1 (COX-1) inhibition.[1] In 1990, Fu et al[2] detected a novel COX protein in monocytes stimulated by interleukin, and a year later Kujubu et al[3] identified a gene with considerable homology to COX-1.

Identification of this COX-2 protein rekindled the efforts of the pharmaceutical industry to produce a safer analgesic and anti-inflammatory drug via selective inhibition of COX-2, and this class of agents was introduced in 1999. By October 2000, celecoxib and rofecoxib had sales exceeding $3 billion in the United States, and a prescription volume in excess of 100 million for the 12-month period ending in July 2000.[4]

The development of COX-2 inhibitors as anti-inflammatory agents without gastric toxicity is based on the premise that COX-1 predominates in the gastric mucosa and yields protective prostaglandins, whereas COX-2 is induced in inflammation and leads to pain, swelling, and discomfort. However, selective COX-2 inhibitors decrease vascular prostacyclin (PGI$_2$) production and may affect the balance between prothrombotic and antithrombotic eicosanoids.[5] Unlike the platelet inhibition afforded by COX-1 inhibitors, COX-2 inhibitors do not share this salutary antithrombotic property. In contrast, by decreasing vasodilatory and antiaggregatory PGI$_2$ production, COX-2 antagonists may tip the balance in favor of prothrombotic eicosanoids (eg, thromboxane A$_2$) and may

Atherosclerosis is a process with inflammatory features and selective cyclooxygenase 2 (COX-2) inhibitors may potentially have antiatherogenic effects by virtue of inhibiting inflammation. However, by decreasing vasodilatory and antiaggregatory prostacyclin production, COX-2 antagonists may lead to increased prothrombotic activity. To define the cardiovascular effects of COX-2 inhibitors when used for arthritis and musculoskeletal pain in patients without coronary artery disease, we performed a MEDLINE search to identify all English-language articles on use of COX-2 inhibitors published between 1998 and February 2001. We also reviewed relevant submissions to the US Food and Drug Administration by pharmaceutical companies.

Our search yielded 2 major randomized trials, the Vioxx Gastrointestinal Outcomes Research Study (VIGOR; 8076 patients) and the Celecoxib Long-term Arthritis Safety Study (CLASS; 8059 patients), as well as 2 smaller trials with approximately 1000 patients each. The results from VIGOR showed that the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) with rofecoxib treatment compared with naproxen was 2.38 (95% confidence interval, 1.39-4.00; $P=.002$). There was no significant difference in cardiovascular event (myocardial infarction, stroke, and death) rates between celecoxib and nonsteroidal anti-inflammatory agents in CLASS. The annualized myocardial infarction rates for COX-2 inhibitors in both VIGOR and CLASS were significantly higher than that in the placebo group of a recent meta-analysis of 23407 patients in primary prevention trials (0.52%): 0.74% with rofecoxib ($P=.04$ compared with the placebo group of the meta-analysis) and 0.80% with celecoxib ($P=.02$ compared with the placebo group of the meta-analysis).

The available data raise a cautionary flag about the risk of cardiovascular events with COX-2 inhibitors. Further prospective trial evaluation may characterize and determine the magnitude of the risk.

*JAMA. 2001;286:954-959*      www.jama.com

**Author Affiliations:** Department of Cardiovascular Medicine, The Cleveland Clinic Foundation, Cleveland, Ohio.
**Corresponding Author and Reprints:** Eric J. Topol, MD, Department of Cardiovascular Medicine, The Cleveland Clinic Foundation, F 25, 9500 Euclid Ave, Cleveland, OH 44195 (e-mail: topole@ccf.org).

©2001 American Medical Association. All rights reserved.



exh 15

MRK-ABS0044569

lead to increased cardiovascular thrombotic events.[6] However, atherosclerosis is a process with inflammatory features[7] and selective COX-2 inhibitors may potentially have antiatherogenic effects by virtue of inhibiting inflammation. Herein, we analyze the randomized trials that have been performed to determine whether COX-2 inhibitors are associated with a protective or hazardous effect on the risk of cardiovascular events.

## METHODS

We used MEDLINE to identify all published, English-language, randomized, double-blind trials of COX-2 inhibitors from January 1998 to February 2001. Keywords used for our search included *COX-2*, *cyclooxygenase*, *rofecoxib*, and *celecoxib*. We also searched the World Wide Web using the same keywords. A number of studies[8-17] focused only on the gastrointestinal effects of COX-2 inhibitors and did not assess cardiovascular events, most likely because investigators were unaware of any cardiovascular adverse effects at that time. These studies were not included in our analysis because there was no reporting of cardiovascular adverse effects.

COX-2 inhibitors were approved in 1998 and there have been 2 major postmarketing multicenter trials with these agents. These include the Vioxx Gastrointestinal Outcomes Research study (VIGOR)[18] and the Celecoxib Arthritis Safety Study (CLASS).[19] We also reviewed cardiovascular event rates from Study 085 and Study 090, both submitted to the US Food and Drug Administration (FDA).[20] TABLE 1 summarizes the design of these trials. We also compared the annualized myocardial infarction (MI) rates in the placebo group of a recent meta-analysis of 4 aspirin primary prevention trials with MI rates in the VIGOR and CLASS trials.

An October 12, 2000, Adverse Events Reporting System search limited to the United States was conducted for rofecoxib and celecoxib using the following MedDRA terms: *central nervous system hemorrhages and cerebral accidents*,

coronary artery occlusion, coronary artery embolism, myocardial infarction, gastrointestinal arterial occlusion and infarction, and embolism, thrombosis, and stenosis.[21]

Time-to-event analysis of cardiovascular events was performed based on Kaplan-Meier estimates of cumulative event incidences. The relative risk (RR) of rofecoxib with respect to naproxen was derived from an unstratified Cox model in which the number of events was at least 11; otherwise, RR is the ratio of rates and the P value was calculated from a discrete log-rank distribution. Event rates in the CLASS trial were expressed as percentages of patients, with end points. Frequency of MIs across the trials was compared using the Fisher exact test. Statistical analysis was performed using Statistica version 5.5 (StatSoft Inc, Tulsa, Okla).

## RESULTS

### VIGOR Trial

The VIGOR trial[18] was a double-blind, randomized, stratified, parallel group trial of 8076 patients comparing the occurrence of gastrointestinal toxicity with rofecoxib (50 mg/d) or naproxen (1000 mg/d) during long-term treatment for patients with rheumatoid arthritis. Aspirin use was not permitted in the study. Although not fully published, cardiovascular event data from the VIGOR trial sponsor was recently submitted to the FDA.[22] The baseline characteristics between the treatment groups in the VIGOR trial demonstrated no meaningful or significant differences. Patients requiring aspirin for cardiac reasons were excluded from this trial.

Based on excessive cardiovascular adverse effects in one group in an interim analysis, the data and safety monitoring board recommended blinded adjudication of cardiovascular events.[22] Ninety-eight cases (65/4047 from the rofecoxib group, 33/4029 from the naproxen group) were sent for adjudication of vascular events. Of these, 45 patients (46 events) in the rofecoxib group and 20 patients (20 events) in the naproxen group were adjudicated to have serious thrombotic cardiovascular adverse events (MI, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks). Event-free survival analysis of these 66 patients showed that the RR (95% confidence interval [CI]) of developing a cardiovascular event in the rofecoxib treatment group was 2.38 (1.39-4.00), P<.001[22] (FIGURE 1).

A subgroup analysis was performed for patients classified as either "aspirin indicated" or "aspirin not indicated." In the VIGOR trial, aspirin-indicated patients were defined as those with past medical history of stroke, transient ischemic attack, MI, unstable angina, angina pectoris, coronary artery bypass graft surgery, or percutaneous coronary interventions. Only 321 (3.9%) patients were aspirin-indicated patients (170 in the rofecoxib group; 151 in the naproxen group), because the need for aspirin was an exclusion criterion. The RR of developing serious cardiovascular events among aspirin-indicated patients between the rofecoxib group and the naproxen group was 4.89 (95% CI, 1.41-16.88), P=.01, and the RR for as-

**Table 1.** Trials of Cyclooxygenase Inhibitors*

| Study, y | No. | Treatment Groups | | |
|---|---|---|---|---|
| VIGOR,[18] 2000 | 8076 | Rofecoxib 50 mg/d (n = 4047) | Naproxen 1000 mg/d (n = 4029) | NA |
| CLASS,[19] 2000 | 7968 | Celecoxib 800 mg/d (n = 3987) | Ibuprofen 2400 mg/d (n = 1996) | Diclofenac 150 mg/d (n = 1985) |
| Study 085,[20] 2001 | 1042 | Rofecoxib 12.5 mg/d (n = 424) | Nabumetone 1000 mg/d (n = 410) | Placebo (n = 208) |
| Study 090,[20] 2001 | 978 | Rofecoxib 12.5 mg/d (n = 390) | Nabumetone 1000 mg/d (n = 392) | Placebo (n = 196) |

*VIGOR indicates Vioxx Gastrointestinal Outcomes Research; CLASS, Celecoxib Arthritis Safety Study; and NA, not applicable.

©2001 American Medical Association. All rights reserved.

MRK-ABS0044570



**Figure 1.** Time to Cardiovascular Adverse Event in the VIGOR Trial

| No. at Risk | | | | | | |
|---|---|---|---|---|---|---|
| Rofecoxib | 4047 | 3643 | 3405 | 3177 | 2806 | 1067 | 531 |
| Naproxen | 4029 | 3647 | 3395 | 3172 | 2798 | 1073 | 514 |

Relative risk (95% confidence interval)=2.38 (1.39-4.00); P<.001. VIGOR indicates Vioxx Gastrointestinal Outcomes Research.



**Figure 2.** Incidence of MI, Stroke, and Death in the CLASS Trial, Stratified by Aspirin Use

MI indicates myocardial infarction; CLASS, Celecoxib Arthritis Safety Study; and NSAIDs, nonsteroidal anti-inflammatory drugs.

pirin not indicated patients was 1.89 (95% CI, 1.03-3.45), P=.04.[22] Of note, no patient in the aspirin indicated group sustained an MI.

If all cardiovascular events from the adverse event data sets that were termed "serious" in the FDA medical reviewer's opinion were compared, there were 111 patients in the rofecoxib group and 50 patients in the naproxen group with serious cardiovascular events. Event-free survival analysis showed the risk of serious cardiovascular events in the rofecoxib group was 2.2 times higher (95% CI, 1.62-3.21; P<.001) than in the naproxen group.[22]

**CLASS Trial**

CLASS was a double-blind, randomized controlled trial in which 8059 patients were randomized to receive 400 mg of celecoxib twice per day, 800 mg of ibuprofen 3 times per day, or 75 mg of diclofenac twice per day. Aspirin use (<325 mg/d) was permitted in this study. Although not published, cardiovascular event data from the CLASS study submitted to the FDA were included in our review.[23] The CLASS trial with celecoxib demonstrated no significant difference in cardiovascular events compared with the NSAIDs. FIGURE 2 shows the thrombotic event rates in the CLASS trial. The event rates are stratified by

patients receiving aspirin and those not receiving aspirin.

**Study 085 and Study 090**

Study 085 (N=1042) was a randomized, double-blind, parallel-group, placebo-controlled trial of the efficacy and safety of rofecoxib (12.5 mg/d) vs nabumetone (1000 mg/d) vs placebo after 6 weeks of treatment for osteoarthritis of the knee. Patients were allowed to take low-dose aspirin for cardioprotection.[20] There were 3 total cardiovascular events in this trial: 1 event (0.2%) in the rofecoxib group, 2 events (0.4%) in the nabumetone group, and no events in the placebo group.

Study 090 (N=978) was a randomized, placebo-controlled, parallel-group, double-blind trial of the efficacy and safety of rofecoxib (12.5 mg/d) vs nabumetone (1000 mg/d) vs placebo in patients with osteoarthritis of the knee. Low-dose aspirin for cardioprotection was also allowed in this study. Study 090 reported a total of 9 serious cardiovascular events: 6 (1.5%) events in the rofecoxib group, 2 (0.5%) in the nabumetone group, and 1 (0.5%) in the placebo group.

**Adverse Event Reporting System**

An Adverse Event Reporting System search revealed 144 unduplicated thrombotic or embolic cases for cele-

coxib and 159 cases for rofecoxib.[21] Forty-two celecoxib cases and 60 rofecoxib cases were excluded for a lack of documented event or for hemorrhagic stroke in which the prothrombin time, partial thromboplastin time, or international normalized ratio was above the normal range; also excluded were secondhand reports with no confirmed diagnosis. Ninety-nine thrombotic or embolic events were attributed to rofecoxib and 102 cases to celecoxib. TABLE 2 summarizes the thrombotic events reported with each agent.

**Comparison With Contemporary Meta-analysis**

The meta-analysis of the US Physicians' Health Study, the UK Doctors Study, the Thrombosis Prevention Trial, and the Hypertension Optimal Treatment trials included 48540 patients, of whom 25133 were treated with aspirin and 23407 were given placebo.[24] The annualized MI rate in the placebo group in this meta-analysis was 0.52%. The annualized MI rates for both the VIGOR and the CLASS trials were higher: 0.74% with rofecoxib (P=.04, compared with the placebo group of the meta-analysis) and 0.80% with celecoxib (P=.02, compared with the placebo group of the meta-analysis) (FIGURE 3).

   ©2001 American Medical Association. All rights reserved.

MRK-ABS0044571

COX-2 INHIBITORS AND CARDIOVASCULAR RISK

## COMMENT

Aspirin and NSAIDs inhibit prostaglandin synthesis via a cyclooxygenase enzyme. This action is the key to both their therapeutic and toxic effects. The COX-1 isoform is constitutively expressed in most cells, which results in the production of homeostatic prostaglandins that maintain gastrointestinal mucosal integrity and renal blood flow. The COX-1 isoform is also expressed in platelets and mediates production of thromboxane $A_2$, a potent platelet activator and aggregator. The COX-2 isoform produces prostaglandins at inflammatory sites as well as $PGI_2$, which is a vasodilator and inhibitor of platelet aggregation. Nonselective NSAIDs inhibit the production of both thromboxane and $PGI_2$. Selective COX-2 inhibitors have no effect on thromboxane $A_2$ production, but by decreasing $PGI_2$ production may tip the natural balance between prothrombotic thromboxane $A_2$ and antithrombotic $PGI_2$, potentially leading to an increase in thrombotic cardiovascular events.[25,26]

We reviewed the cardiovascular event rates in the 2 major trials with selective COX-2 inhibitors and in 2 smaller trials. The VIGOR trial demonstrated significantly increased risk of cardiovascular event rates with use of rofecoxib although the study enrolled patients who did not require aspirin for protection from ischemic events. Patients with angina, congestive heart failure, MI, coronary artery bypass graft surgery within 1 year, stroke or transient ischemic attacks within 2 years, and uncontrolled hypertension were excluded from this trial. However, these criteria can be viewed as too stringent, given data from trials that support more liberal use of aspirin for primary prevention.

The results of the VIGOR study can be explained by either a significant prothrombotic effect from rofecoxib or an antithrombotic effect from naproxen (or conceivably both). There are differential effects of NSAIDs and COX-2 inhibitors on ex vivo platelet aggregation to 1 mM arachidonic acid. Naproxen has

significant antiplatelet effects, with mean platelet aggregation inhibition of 93% compared with platelet aggregation inhibition of 92% for those taking aspirin (81 mg).[22] Thus naproxen, but not ibuprofen (platelet aggregation of approximately 80%) or diclofenac (platelet aggregation of approximately 40%), resulted in a high level of platelet aggregation inhibition similar to that achieved with aspirin.[22] There is clinical evidence that flurbiprofen, 50 mg twice daily for 6 months, reduced the incidence of MI by 70% compared with placebo.[27] Indobufen, another NSAID, was as effective as aspirin in preventing saphenous vein graft occlusion after coronary artery bypass graft surgery.[28]

Because of the evidence for an antiplatelet effect of naproxen, it is difficult to assess whether the difference in cardiovascular event rates in VIGOR was due to a benefit from naproxen or to a prothrombotic effect from rofecoxib. Therefore, we examined results from a meta-analysis of 4 aspirin primary prevention trials[24] to evaluate whether the cardiovascular event rates observed with rofecoxib were similar in VIGOR to a placebo-treated population with similar cardiac risk factors. While acknowledging that comparison of patient populations in 2 different trials is always problematic, the results of this meta-analysis may further demonstrate the prothrombotic potential of rofecoxib and celecoxib and suggest that increased event rates with COX-2 inhibitors are possibly due to a prothrombotic effect, not merely a failure to offer the protection of aspirinlike NSAIDs. However, it is important to point out that rheumatoid arthritis increases risk of MI, making intertrial comparisons difficult.[29]

In contrast to the VIGOR study, the CLASS study with celecoxib did not show a significant increase in cardiovascular event rates compared with NSAIDs, possibly due to the use of low-dose aspirin in the CLASS trial or to pharmacological differences in the NSAID agents used as controls in the 2 studies. Diclofenac and ibuprofen have significantly less antiplatelet ef-

| Table 2. Thrombotic Adverse Events With COX-2 Inhibitors Reported in the United States* | | |
|---|---|---|
| Events | Rofecoxib (n = 99)† | Celecoxib (n = 102)† |
| Myocardial infarction | 26 | 37 |
| Pulmonary embolism/ venous thrombosis | 19 | 27 |
| Stroke | 43 | 31 |
| Miscellaneous‡ | 14 | 10 |

*COX-2 indicates cyclooxygenase 2.
†With both agents, the number of events slightly exceeded the number of cases (parentheses). For rofecoxib, 1 case reported both myocardial infarction (MI) and pulmonary embolus (PE) and 2 cases reported PE and stroke; for celecoxib, 2 cases reported both MI and stroke and 1 case reported both PE and stroke.
‡Miscellaneous thrombotic events in the rofecoxib group included arterial thrombosis (n = 1), portal vein thrombosis (n = 1), ocular vascular occlusion (n = 4), and mesenteric arterial thrombosis (n = 8). Miscellaneous thrombotic events in the celecoxib group included ocular vascular occlusion (n = 3), digital ischemia/limb embolism (n = 5), and ischemic colitis (n = 2).



**Figure 3.** Comparison of MI Rates Among Subjects Receiving Placebo vs Rofecoxib or Celecoxib

MI indicates myocardial infarction. Error bars indicate 95% confidence intervals.

fects compared with naproxen.[22] To have a vascular protective effect, near-complete inhibition of thromboxane over time is needed[30] and the degree of thromboxane inhibition with diclofenac and ibuprofen may not afford cardioprotection. Furthermore, diclofenac exhibits more effect on $PGI_2$ inhibition than does naproxen. Van Hecken et al[31] demonstrated that diclofenac causes 94% inhibition of COX-2 compared with 71% inhibition of COX-2 for naproxen. Thus, diclofenac not only has less antiplatelet effect, but may have some intrinsic prothrombotic effect among NSAIDs due

©2001 American Medical Association. All rights reserved.

MRK-ABS0044572

to inhibition of vasodilatory $PGI_2$ and this may have masked the increase in event rates with celecoxib. Furthermore, the MI rate with celecoxib (0.80%) was similar to that reported with rofecoxib (0.74%) when rates were recalculated as an annualized percentage rate to enable direct comparison.

Shinmura et al[32] recently demonstrated that up-regulation of COX-2 plays an essential role in the cardioprotection afforded by the late phase of ischemic preconditioning. Administration of selective COX-2 inhibitors 24 hours after ischemic preconditioning abolished the cardioprotective effect of late ischemic preconditioning against myocardial stunning and MI.[32] These data would further suggest potential deleterious cardiac effects of COX-2 inhibitors.

The availability of selective COX-2 inhibitors has raised several important clinical questions. These concern the prothrombotic potential of COX-2 inhibitors, differences in the antithrombotic effect of various NSAIDs, the mandatory use of aspirin with selective COX-2 inhibitors, and whether simultaneous use of aspirin negates the gastrointestinal protective effect of selective COX-2 inhibitors.

Current data would suggest that use of selective COX-2 inhibitors might lead to increased cardiovascular events. Two smaller studies (Study 085 and Study 090) of rofecoxib that both allowed the use of low-dose aspirin did not demonstrate the significant increase in cardiovascular event rate noted in VIGOR. However, these studies had smaller sample sizes, used only 25% of the dose of rofecoxib used in VIGOR, and had few events for meaningful comparison. Thus the prothrombotic effect seen with rofecoxib may potentially be dose dependent. Also, the use of low-dose aspirin in these protocols may negate some of the gastrointestinal benefits of selective COX-2 inhibition. There is evidence that gastrointestinal bleeding from aspirin is not dose related.[33]

COX-2 inhibitors also have been shown to increase blood pressure,[34] and

more patients in the VIGOR trial developed hypertension in the rofecoxib group compared with the naproxen group. For rofecoxib, the mean increase in systolic blood pressure in the VIGOR trial was 4.6 mm Hg and the mean increase in diastolic blood pressure was 1.7 mm Hg, compared with a 1.0-mm Hg increase in systolic blood pressure and a 0.1-mm Hg increase in diastolic blood pressure with naproxen. Changes in blood pressure in the CLASS trial were not reported. Previous work has shown that a 2-mm Hg reduction in diastolic blood pressure results in about a 40% reduction in the rate of stroke and a 25% reduction in the rate of MI.[35] The Heart Outcomes Prevention Evaluation study demonstrated significant reduction in cardiovascular events with a 3- to 4-mm Hg reduction in blood pressure.[36] Moreover, a recent reanalysis of 20 years of blood pressure data from the Framingham Heart Study[37] suggests that the degree of benefit expected from a decrease in blood pressure may have been underestimated. Thus, the elevation in blood pressure reported with use of COX-2 inhibitors may also play an important role in adverse cardiovascular outcomes.

Based on this review, it is useful to consider nonselective and selective COX inhibitors as possessing a spectrum of biological effects, both favorable and unfavorable. At one end of the spectrum, COX-2 inhibitors show less propensity for gastrointestinal toxicity but greater prothrombotic potential. At the other end of the spectrum, aspirin and naproxen show greater potential for gastrointestinal toxicity but have a cardioprotective effect. Other agents fall along intermediate points in this spectrum. Clinicians may want to consider these patterns of risk and benefit in selecting the most appropriate agent for individual patients.

Our analysis has several significant limitations. The increase in cardiovascular events in these trials was unexpected and evaluation of these end points was not prespecified. There remains considerable uncertainty in any post hoc analysis. The patient popula-

tions in these trials were heterogeneous, and it has been established that patients with rheumatoid arthritis have a higher risk of MI.[29] This leads to difficulty in assessing risk in a more representative sampling of patients. Also, the trials we examined only addressed continuous use of COX-2 inhibitors. Currently, no data exist on cardiovascular safety for the sporadic, intermittent use of these agents by individuals for musculoskeletal pain, which appears to be the most frequent pattern of use.

Our findings suggest a potential increase in cardiovascular event rates for the presently available COX-2 inhibitors. It is possible that concomitant use of aspirin may not fully offset the risk of selective COX-2 inhibitors. However, definitive evidence of such an adverse effect will require a prospective randomized clinical trial. On the other hand, the inflammatory component of atherosclerosis has recently been emphasized[7,38,39] and may be suppressible by COX-2 inhibitors. Given the remarkable exposure and popularity of this new class of medications, we believe that it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of these agents. Until then, we urge caution in prescribing these agents to patients at risk for cardiovascular morbidity.

**Author Contributions:** *Study concept and design, acquisition of data, analysis and interpretation of data, and drafting of the manuscript:* Mukherjee, Nissen, Topol.
*Critical revision of the manuscript for important intellectual content, study supervision:* Nissen, Topol.
*Statistical expertise:* Mukherjee, Topol.
**Acknowledgment:** We gratefully acknowledge the expert editorial assistance of Donna Bressan, BA.

**REFERENCES**

1. Vane JR, Botting RAA. Anti-inflammatory drugs and their mechanism of action. *Inflamm Res.* 1998;47 (suppl 2):S78-S87.
2. Fu JY, Masferrer JL, Seibert K, Raz A, Needleman P. The induction and suppression of prostaglandin H2 synthase (cyclooxygenase) in human monocytes. *J Biol Chem.* 1990;265:16737-16740.
3. Kujubu DA, Fletcher BS, Varnum BC, Lim RW, Herschman HR. TIS10, a phorbol ester tumor promoter-inducible mRNA from Swiss 3T3 cells, encodes a novel prostaglandin synthase/cyclooxygenase homologue. *J Biol Chem.* 1991;266:12866-12872.
4. IMS Health. IMS Health reports Cox-2 drug sales in US surge 137% in six month period. Westport, Conn: IMS Health Inc; 2000. Available at: http://www

©2001 American Medical Association. All rights reserved.

MRK-ABS0044573

.imshealth.com. Accessibility verified July 9, 2001.

5. Schmedtje JF, Ji YS, Liu WL, DuBois RN, Runge MS. Hypoxia induces cyclooxygenase-2 via the NF-kappaB p65 transcription factor in human vascular endothelial cells. J Biol Chem. 1997;272:601-608.

6. Belton O, Byrne D, Kearney D, Leahy A, Fitzgerald DJ. Cyclooxygenase-1 and -2-dependent prostacyclin formation in patients with atherosclerosis. Circulation. 2000;102:840-845.

7. Koenig W. Inflammation and coronary heart disease: an overview. Cardiol Rev. 2001;9:31-35.

8. Kaplan-Machlis B, Klostermeyer BS. The cyclooxygenase-2 inhibitors: safety and effectiveness. Ann Pharmacother. 1999;33:979-988.

9. Watson DJ, Harper SE, Zhao PL, Quan H, Bolognese JA, Simon TJ. Gastrointestinal tolerability of the selective cyclooxygenase-2 (COX-2) inhibitor rofecoxib compared with nonselective COX-1 and COX-2 inhibitors in osteoarthritis. Arch Intern Med. 2000;160:2998-3003.

10. Ehrich EW, Davies GM, Watson DJ, Bolognese JA, Seidenberg BC, Bellamy N. Minimal perceptible clinical improvement with the Western Ontario and McMaster Universities osteoarthritis index questionnaire and global assessments in patients with osteoarthritis. J Rheumatol. 2000;27:2635-2641.

11. Lipsky PE, Isakson PC. Outcome of specific COX-2 inhibition in rheumatoid arthritis. J Rheumatol. 1997; 24(suppl 49):9-14.

12. Megerl CE, Strayer SM. Celecoxib for rheumatoid arthritis. J Fam Pract. 2000;49:108-109.

13. Bensen WG, Zhao SZ, Burke TA, et al. Upper gastrointestinal tolerability of celecoxib, a COX-2 specific inhibitor, compared to naproxen and placebo. J Rheumatol. 2000;27:1876-1883.

14. Chen BH. COX-2 inhibitors and renal function in elderly people. CMAJ. 2000;163:604.

15. Day R, Morrison B, Luza A, et al, for the Rofecoxib/Ibuprofen Comparator Study Group. A randomized trial of the efficacy and tolerability of the COX-2 inhibitor rofecoxib vs ibuprofen in patients with osteoarthritis. Arch Intern Med. 2000;160:1781-1787.

16. Goldstein JL, Silverstein FE, Agrawal NM, et al. Reduced risk of upper gastrointestinal ulcer complications with celecoxib, a novel COX-2 inhibitor. Am J Gastroenterol. 2000;95:1681-1690.

17. Langman MJ, Jensen DM, Watson DJ, et al. Adverse upper gastrointestinal effects of rofecoxib compared with NSAIDs. JAMA. 1999;282:1929-1933.

18. Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med. 2000;343:1520-1528.

19. Silverstein FE, Faich G, Goldstein JL, et al, for the Celecoxib Long-term Arthritis Safety Study. Gastrointestinal toxicity with celecoxib vs nonsteroidal antiinflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS study: a randomized controlled trial. JAMA. 2000;284:1247-1255.

20. Food and Drug Administration. Cardiovascular Safety Review. Rockville, Md: Food and Drug Administration; 2001. Available at: http://www.fda.gov /ohrms/dockets/ac/01/briefing/3677b2_06_cardio .pdf. Accessibility verified July 2, 2001.

21. Food and Drug Administration. OPDRA Postmarketing Safety Review. Rockville, Md: Food and Drug Administration/Center for Drug Evaluation and Research; 2001. Available at: http://www.fda.gov /dockets/ac/01/briefing/3677b1_11_thrombo.doc. Accessibility verified July 2, 2001.

22. FDA Advisory Committee. Cardiovascular Safety Review of Rofecoxib. Rockville, Md: Food and Drug Administration; 2001. Available at: http://www.fda .gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio .pdf. Accessibility verified July 2, 2001.

23. FDA CLASS Advisory Committee. CLASS Advisory Committee Briefing Document. Rockville, Md: Food and Drug Administration; 2001. Available at: http: //www.fda.gov/ohrms/dockets/ac/01/briefing /3677b1_01_searle.pdf. Accessibility verified July 2, 2001.

24. Sanmuganathan PS, Ghahramani P, Jackson PR, Wallis EJ, Ramsay LE. Aspirin for primary prevention of coronary heart disease: safety and absolute benefit related to coronary risk derived from meta-analysis of randomised trials. Heart. 2001;85:265-271.

25. McAdam BF, Catella-Lawson F, Mardini IA, Kapoor S, Lawson JA, FitzGerald GA. Systemic biosynthesis of prostacyclin by cyclooxygenase (COX)-2: the human pharmacology of a selective inhibitor of COX-2. Proc Natl Acad Sci U S A. 1999;96:272-277.

26. Catella-Lawson F, McAdam B, Morrison BW, et al. Effects of specific inhibition of cyclooxygenase-2 on sodium balance, hemodynamics, and vasoactive eicosanoids. J Pharmacol Exp Ther. 1999;289:735-741.

27. Brochier ML, for the Flurbiprofen French Trial. Evaluation of flurbiprofen for prevention of reinfarction and reocclusion after successful thrombolysis or angioplasty in acute myocardial infarction. Eur Heart J. 1993;14:951-957.

28. Cataldo G, Heiman F, Lavezzari M, Marubini E. Indobufen compared with aspirin and dipyridamole on graft patency after coronary artery bypass surgery: results of a combined analysis. Coron Artery Dis. 1998;9:217-222.

29. Wallberg-Jonsson S, Johansson H, Ohman ML, Rantapaa-Dahlqvist S. Extent of inflammation predicts cardiovascular disease and overall mortality in seropositive rheumatoid arthritis: a retrospective cohort study from disease onset. J Rheumatol. 1999; 26:2562-2571.

30. Reilly IA, FitzGerald GA. Inhibition of thromboxane formation in vivo and ex vivo: implications for therapy with platelet inhibitory drugs. Blood. 1987; 69:180-186.

31. Van Hecken A, Schwartz JI, Depre M, et al. Comparative inhibitory activity of rofecoxib, meloxicam, diclofenac, ibuprofen, and naproxen on COX-2 versus COX-1 in healthy volunteers. J Clin Pharmacol. 2000;40:1109-1120.

32. Shinmura K, Tang XL, Wang Y, et al. Cyclooxygenase-2 mediates the cardioprotective effects of the late phase of ischemic preconditioning in conscious rabbits. Proc Natl Acad Sci U S A. 2000;97:10197-10202.

33. Taylor DW, Barnett HJ, Haynes RB, et al, for the ASA and Carotid Endarterectomy (ACE) Trial Collaborators. Low-dose and high-dose acetylsalicylic acid for patients undergoing carotid endarterectomy: a randomized controlled trial. Lancet. 1999;353:2179-2184.

34. Muscara MN, Vergnolle N, Lovren F, et al. Selective cyclo-oxygenase-2 inhibition with celecoxib elevates blood pressure and promotes leukocyte adherence. Br J Pharmacol. 2000;129:1423-1430.

35. Collins R, Peto R, MacMahon S, et al. Blood pressure, stroke, and coronary heart disease, II: short-term reductions in blood pressure: overview of randomised drug trials in their epidemiological context. Lancet. 1990;335:827-838.

36. Yusuf S, Sleight P, Pogue J, Bosch J, Davies R, Dagenais G, for the Heart Outcomes Prevention Evaluation Study Investigators. Effects of an angiotensin-converting-enzyme inhibitor, ramipril, on cardiovascular events in high-risk patients. N Engl J Med. 2000;342: 145-153.

37. Clarke R, Shipley M, Lewington S, et al. Underestimation of risk associations due to regression dilution in long-term follow-up of prospective studies. Am J Epidemiol. 1999;150:341-353.

38. Libby P, Simon DI. Inflammation and thrombosis: the clot thickens. Circulation. 2001;103:1718-1720.

39. Jahn J, Dahoff K, Katus HA. Coronary artery disease: an inflammatory or infectious process. Basic Res Cardiol. 2000;95(suppl 1):159-164.

> The whole of science is nothing more than a refinement of everyday thinking.
> —Albert Einstein (1879-1955)

©2001 American Medical Association. All rights reserved.

MRK-ABS0044574

IN RE VIOXX PRODUCTS LIABILITY      )    MDL No. 1657
LITIGATION                     )
                                 )

### SUPPLEMENTAL/REBUTTAL EXPERT REPORT
### OF JOHN W. FARQUHAR, M.D.
### THIS DOCUMENT APPLIES TO ALL CASES

**A.**    **High Risk and Vioxx Interaction in APPROVe.**

     1.      The question arose in my deposition of 6/9/06 whether 28 rather than 30 events were correctly assigned to the Vioxx arm of the pre-specified subgroup of "high cardiovascular" risk for analysis of "all thrombotic" events. As predicted, the results using 28 rather than 30 bear out the conclusion stated in my Supplemental Report of 5/26/06 that a significant multiplicative interaction was present between Vioxx use and baseline risk (see ¶¶ 13-15).

     2.      Despite the considerable similarity of these two results, the 30 Vioxx-related events represent a better estimate of events derived from the high-risk subgroup, because (a) the two additional patients were diabetics, who are well-known to be among the highest risk population for CV events; and (2) both of the diabetics had additional risk factors for CV events that met the criteria for Merck's "increased cardiovascular risk" category, which were overlooked by the personnel who entered the data on those patients into the database used by Merck to create the risk subgroups, as follows:

         a.      As to patient 91512, the record of 2/9/01 shows a "PmHx" (Past Medical History) of "↑ BP" (High Blood Pressure), p. MRK-AHC0004347; also, the pre-study clinical exam recorded a blood pressure of 140/85, which meets the threshold of 140 systolic for high blood pressure under prevailing professional guidelines. For either or both of these reasons, Patient 91512 therefore had "two or more risk factors" on the list specified by Merck, *i.e.*, diabetes and hypertension.



b.  Patient 93522 was qualified for the "increased CV risk" category based on either "two or more risk factors" or "symptomatic atherosclerotic cardiovascular disease." This patient had diabetes diagnosed in 1991 (MRK-AHC0004743); a pre-study blood pressure reading of 154/81, which exceeds the high systolic blood pressure threshold (MRK-AHC0004722); and a "history of retinal artery infarct" (MRK-AHC0004743), suggestive of a symptomatic atherosclerotic condition. This patient was also "aspirin-indicated" due to the retinal infarct and was on low-dose aspirin as of 1999. (MRK-AHC0004714).

3.  The questioning of defense counsel at my deposition implied some impropriety in reviewing the records of these patients to determine their true medical status. There is nothing improper about performing a thorough review of the records to ascertain and correct the data entry errors that miscategorized the risk status of those patients. On the contrary, placing them in the proper category based on documentary evidence confirms that all patients included in the analysis of high-risk patients in my Supplemental Report belonged in the single subgroup of "increased CV risk" defined by Merck, and provides a more accurate estimate of the effects of high-risk status plus Vioxx.

4.  I also reaffirm that the high-risk analyses were designed to <u>confirm</u> prior evidence of such an interaction (Bombardier, *et al.*, NEJM 2000). Therefore, this analysis was confirmatory, not exploratory.

**B.  <u>Overall Cumulative Evidence Curves for All Thrombotic Events:</u> <u>Protocol 203.</u>**

5.  For completeness, at my direction Professor Jewell calculated and I now add the analysis of "all thrombotic events" to the cardiac events analysis reported in my Supplemental Report of 5/26/06 (¶¶ 2-10). Since cardiac events are a major subset of "all thrombotic" events, it is no surprise that closely analogous findings are present (<u>see</u> Figs. 1-8, attached).

- 2 -

6.      Given Mr. Barnett's cardiac diagnoses, the cardiac event analysis (¶¶ 2-10) remains as the most appropriate one to this case.

## C.      Effect of Naproxen on Cardiovascular Outcomes.

7.      In Dr. Kim's Expert Witness Report, he cited an observational study as support for his belief that his VIGOR findings were explained by naproxen's protective effect. However, a recent meta-analysis of randomized NSAID trials (Kearny, et al., 2006) revealed a Relative Risk = 0.92 (95% CI 0.67-1.26) for naproxen versus placebo. This fails to show a naproxen protective effect.

## D.      Generalizability of APPROVe and Protocol 203 Results.

8.      I disagree with Dr. Kim's assertion that APPROVe's results cannot be generalized to populations other than those with polyps. First of all, the data were intended to be generalized. Secondly, the Alzheimer's trials were underpowered, thus results were inconclusive (see Jewell @ pp. 8 & 9). Finally, the combined OA and RA population studies by Merck demonstrated a Relative Risk of Vioxx/placebo of 3.4 (95% CI 1.19-10.46, p = 0.01), and the OA trials alone also showed a significant increased risk, RR = 3.03, 95% CI 1.02-12.13, p = 0.03). (See Jewell, p. 10).

9.      Therefore, Vioxx's risk clearly extends to the OA and RA populations.

## E.      Individual Confidence Interval (CI).

10.      I agree with Professor Jewell's statement that the concept of a CI for an individual is completely inapplicable here, since a potential Vioxx-induced cardiovascular event is a binary outcome, not a continuous outcome. Dr. Kim agreed that he has never seen the "individual confidence interval" concept applied to a binary outcome in the peer-reviewed literature.

## F.      The Data Sets Used for Protocol 203.

11.      I agree with Professor Jewell that the VICTOR data he used for his

calculation of events in my Supplemental Report of 5/22/06 were appropriate.  If the
single event now postulated to be eligible were included, its effect would be
inconsequential (see Jewell, p. 12).

6/22/06
_____
Date

_____
John W. Farquhar, M.D.

**Arbitblit, Donald C.**

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Sunday, May 28, 2006 6:11 AM |
| **To:** | Arbitblit, Donald C. |
| **Cc:** | beachlawywer51@hotmail.com; amyer@rcrlaw.net |
| **Subject:** | RE: Jewel |

Don, can you please give us a few possible dates for Jewel's deposition?
Thanks.


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited.  Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.


-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Monday, May 22, 2006 7:26 PM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: Jewel



Attached is the report of Nicholas Jewell, Ph.D, referenced as Exhibit A to
the Supp. Report of Dr. Farquhar.
 <<Protocol203report.pdf>>

This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

exh
17

## Arbitblit, Donald C.

**From:**       Goldman, Andrew [andrew.goldman@bartlit-beck.com]
**Sent:**       Tuesday, May 30, 2006 9:41 PM
**To:**         Arbitblit, Donald C.
**Cc:**         beachlawywer51@hotmail.com; amyer@rcrlaw.net
**Subject:**    RE: Jewel

Don, I think you are mistaken and will tell you why in the next few days.
Andy


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Tuesday, May 30, 2006 2:24 PM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: RE: Jewel


Andy,
Professor Jewell is designated as a nontestifying expert under Rule
26(a)(4)(B). It is our understanding of the Rule and applicable decisions
that he is not subject to discovery in the absence of a "showing of
exceptional circumstances under which it is impracticable for the party
seeking discovery to obtain facts or opinions on the same subject by other
means." Professor Jewell's report is based on data from
3 Merck studies, provided by Merck during discovery in the course of the
litigation. Accordingly, Merck can obtain facts and opinions on the same
subject by the readily available means of having its own experts analyze the
same data. At the same time, Professor Jewell's report was provided as a
document "considered" by Dr. Farquhar in forming the opinions expressed in
his report, and we believe such production constitutes compliance with Rule
26 in regard to both Jewell and Farquhar.
If you believe we have misconstrued the applicable law, please explain.
Thanks, Don Arbitblit

-----Original Message-----
From: Goldman, Andrew [mailto:andrew.goldman@bartlit-beck.com] Sent: Sunday,
May 28, 2006 6:11 AM
To: Arbitblit, Donald C.
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: RE: Jewel


Don, can you please give us a few possible dates for Jewel's deposition?
Thanks.

1

Andrew L. Goldman Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300 Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com Direct: (312) 494-4464 Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited.  Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com] Sent: Monday, May
22, 2006 7:26 PM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: Jewel

Attached is the report of Nicholas Jewell, Ph.D, referenced as Exhibit A to
the Supp. Report of Dr. Farquhar.
 <<Protocol203report.pdf>>
This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

**Arbitblit, Donald C.**

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Friday, June 02, 2006 10:33 AM |
| **To:** | Arbitblit, Donald C. |
| **Cc:** | 'Adam Mortara' |
| **Subject:** | Draft Jewell Motion to Compel.doc |

Don, here is a draft brief we are about to file to compel discovery and deposition of Dr. Jewell.  Please let me know ASAP if you are willing to reconsider your decision not to produce him for deposition.

Andy

<<...>>

## Arbitblit, Donald C.

**From:**     Arbitblit, Donald C.
**Sent:**     Friday, June 02, 2006 12:55 PM
**To:**       'andrew.goldman@bartlit-beck.com'
**Cc:**       'beachlawyer51@hotmail.com'; Gross, Jennifer; 'amyer@rcrlaw.net'; 'twacker@rcrlaw.net'
**Subject:** Jewell

Andy,

I have reviewed your draft motion to compel, and this is submitted in response.

First, attached is Professor Jewell's analysis concerning high-risk patients, which Dr. Farquhar referenced in his Supplemental Report and the Barnett Report. We do not claim work product privilege as to materials reviewed and relied upon by Dr. Farquhar in preparation of his reports. We agree that you are entitled to production of documents prepared by Professor Jewell that Dr. Farquhar considered in arriving at the opinions he has expressed in his reports. We agree that the *Intermedics* case you cite is applicable to expert discovery, and that documents considered by an expert in forming his opinions are discoverable, regardless of whether they are relied upon or rejected.

However, it remains our view of the facts and the law that exceptional circumstances do not exist to justify deposition or discovery from Professor Jewell, a nontestifying expert, where all of the data came from Merck, where the methods used to analyze the data are comparable or identical to those Merck itself has used and reported as to particular portions of the same data, and where Merck is capable of obtaining information on the same subject by other means. The *Long Term Capital Holdings* case does not stand for the open-ended proposition that a nontestifying expert who provides a report relied upon by the testifying expert is always subject to deposition and discovery. To the contrary, in that case the court relied on the facts that the assistants spent the majority of the time on the project and chose the data to input from among "hundreds of thousands of pages" of documents that they reviewed. Here, Professor Jewell used the specified data sets that Merck provided, and the statistical tests are identified in the reports. The *Dura* case states mere dicta on the issue of nontestifying experts, while the holding was addressed to the exclusion of untimely reports. We see no general support in the case law for the proposition that nontestifying experts may be deposed to see if they did their jobs "competently," and such a view would contradict Rule 26 by permitting this type of discovery without the requisite showing of exceptional circumstances.

Please let us know whether you wish to discuss this further.

Finally, you had agreed to let us know the location for the Kim depo by June 1, so we could make travel plans. Please let us know today, if at all possible.

Don Arbitblit

# ANALYSIS OF APPROVE DATA: VIOXX/PLACEBO AND HIGH RISK STATUS

The APPROVe data set consists of 2,586 individuals. In five of these the data of withdrawal is the same as the date of randomization to treatment so that these individuals play no role in subsequent data analysis. In the complete data set, 1,299 were randomized to Placebo and 1,287 to Vioxx.

A high-risk category was defined by considering whether an individual had any one (or more) of three binary conditions: being diabetic, classified as aspirin-indicated , and being classified as of high cardiac risk. Of the complete data set, 764 (approximately 30%) were classified as high-risk in this manner. As anticipated, by the randomization, about half of these high-risk individuals were assigned to Vioxx (405), and the remainder (359) to Placebo.

Using the data we then examined the risks (and, most importantly, the comparison of risks) for various adverse outcomes. The latter were considered in three related groups: (i) all events, (ii) cardiac events plus cerebrovascular events (i.e. excluding peripheral venous and arterial thrombosis events, and excluding all pulmonary embolisms), and (iii) cardiac events only (as in group (ii) but now also excluding ischemic cerebrovascular strokes, and transient ischemic attacks). In each case, we considered the Relative Risks associated with exposure to Vioxx for both the high-risk and low-risk groups separately and comparison between these two Relative Risks. The methods involved construction of *Kaplan-Meier curves and application of the Cox proportional hazards model. The results* are as follows:

### (i)     ALL EVENTS

There were a total of 72 adverse events observed. In the low-risk group, the Relative Risk for an event associated with assignment of Vioxx was 1.15 with a 95% confidence interval of (0.57—2.29). On the other hand, the same Relative Risk in the high-risk group was considerably higher, namely 2.87 with a 95% confidence interval of (1.40—5.86). The latter Relative Risk carries an associated p-value of 0.004.

Qualitatively it is apparent that the deleterious effect of Vioxx is more than 2.5 times worse in the high risk group as compared to the low-risk group. These two Relative Risks can be compared quantitatively by using a test for interaction, to address the question as to whether risk status significantly modifies the effect of Vioxx on the risk for an adverse event. This test yields a p-value of 0.07. The fact that this is not "significant" by conventional or mindless application of a 0.05 significance level has to viewed in the context that interaction tests are well-known to lack power and that type I errors here (incorrect assumption of interaction effects when none are truly present) are considered less serious than when testing for main effects of treatment, for example. For both these reasons, many statisticians recommend a significance level of 0.2 when examining

interactive effects (see Jewell (2004). We thus consider the evidence of an elevated Relative Risk associated with Vioxx in the high-risk group to be quite substantial.

As an aside, we note that designation of high-risk does in fact carry higher risk of an adverse outcome. In the placebo group, the Relative Risk arising from comparing high and low risk individuals is 1.74 with a 95% confidence interval of (0.79—3.84), reflecting a 75% increase in risk associated with having one or more of the high risk indicators. In the Vioxx group, the picture is startlingly different; here, the Relative Risk arising from comparing high and low risk individuals is 4.36 with a 95% confidence interval of (2.38—7.99), significantly different from one with an associated p-value < 0.001. This difference in effects reflects, of course, the same interaction discussed in the previous paragraph.

We now repeat these analyses on two subsets of the events which inevitably have smaller numbers of observed events and therefore less precision in the results.

### (ii)    CARDIAC + CEROBROVASCULAR EVENTS

The number of observed cardiac and cerebrovascular events was 62. In the low-risk group, the Relative Risk for an event associated with assignment of Vioxx was 1.43 with a 95% confidence interval of (0.67—3.06). On the other hand, the same Relative Risk in the high-risk group was again substantially higher, namely 3.83 with a 95% confidence interval of (1.67—8.77). The latter Relative Risk carries a p-value of 0.001. A similar p-value of 0.086 was obtained for the test of interaction comparing these two Relative Risks. Again, the evidence is very striking regarding the effect modification following the same remarks regarding conventional levels of significance.

With regard to the impact of being in the high-risk group, for these adverse events, the Relative Risk arising from comparing high and low risk individuals is 1.63 in the placebo group with a 95% confidence interval of (0.64—4.13), reflecting a 63% increase in risk associated with having one or more of the high risk indicators. In the Vioxx group, the picture is again completely different; here, the Relative Risk arising from comparing high and low risk individuals is 4.35 with a 95% confidence interval of (2.32—8.14), significantly different from one with an associated p-value < 0.001. This difference in effects again reflects the interaction effects discussed in the previous paragraph.

### (iii)    CARDIAC EVENTS ONLY

The number of observed cardiac events was 42 so that we would anticipate even lower levels of precision in our estimates of the Relative Risk here. In the low-risk group, the Relative Risk for an event associated with assignment of Vioxx was 1.82 with a 95% confidence interval of (0.60—5.57). On the other hand, the same Relative Risk in the high-risk group was yet again higher, namely 2.99 with a 95% confidence interval of (1.28—7.01). The latter Relative Risk carries a p-value of 0.012. However, in this case, the two Relative Risks are more similar and coupled with the loss of precision the test of interaction when comparing these two Relative Risks is 0.49.

The effects of being in the high-risk group are most pronounced when studying cardiac events only: the Relative Risk arising from comparing high and low risk individuals in the placebo group is 3.88 with a 95% confidence interval of (1.23—12.22), reflecting an almost quadrupling of the risk of a cardiac event associated with having one or more of the high risk indicators (and with p-value 0.021). In the Vioxx group, the picture is again qualitatively different in that the risk *associated with the high-risk factors* is even higher; here, the Relative Risk arising from comparing high and low risk individuals is 6.37 with a 95% confidence interval of (2.84—14.32), significantly different from one with an associated p-value < 0.001. This difference in effects again reflects the interaction effects discussed in the previous paragraph although the difference is not as pronounced due to the fact that the Relative Risk is already so high in the placebo group.

ADDENDUM TO VIGOR ANALYSIS OF HIGH RISK (ASPIRIN-INDICATED ANALYSIS)

In an earlier analysis, we showed that the Relative Risk for all confirmed thrombotic events events, comparing Vioxx to Naproxen, was 4.90 in the high-risk group (aspirin indicated), based on 18 events among 320 individuals (with a 95% confidence interval given by 1.42—16.93). I believe the summary figures for low-risk group (aspirin not indicated) reveals 30 events in the Vioxx group based on 2592 patient years of follow-up and 16 events in the Naproxen group based on 2596 patient years of follow up. These summary figures yield a Relative Risk associated with Vioxx of 1.88 with a 95% confidence interval of 1.02--3.44, and the p-value for testing whether this Relative Risk is 1.0 is 0.04.

A simple comparison of these two Relative Risks (the RR, 4.90, in the high-risk group is markedly higher than the RR in the low-risk group, 1.88 ) yields a p-value of 0.17. Most of the uncertainty in this comparison arises from the low numbers of individuals in the high-risk group, but again the p-value is suggestive of a strong interactive effect, given our earlier comments about power, and the similarity of what we found in the APPROVe data.

VIGOR:  Analysis of incidence of all confirmed thrombotic events in aspirin indicated group



Cox regression -- Breslow method for ties

| No. of subjects = | 320 | Number of obs = | 320 |
|---|---|---|---|

No. of failures =     18
Time at risk    =     73827

LR chi2(1)    =     8.49
Log likelihood =  -92.397558          Prob > chi2   =   0.0036

| _t | Haz. Ratio | Std. Err. | z | P>\|z\| | [95% Conf. Interval] | |
|---|---|---|---|---|---|---|
| txid ███████ | 3.099073 | 2.51 | 0.012 | 1.418004 | 16.92653 | |

```
  __  /  ___/ /  ___/
 __/ / /___/ / /___/   9.0   Copyright 1984-2005
  Statistics/Data Analysis        StataCorp
                         4905 Lakeway Drive
     Special Edition          College Station, Texas 77845 USA
                         800-STATA-PC       http://www.stata.com
                         979-696-4600      stata@stata.com
                         979-696-4601 (fax)
```

30-student Stata for Windows (network) perpetual license:
        Serial number:  81990515369
        Licensed to:  School of Public Health
                   UC Berkeley

Notes:
    1.  (/m# option or -set memory-) 10.00 MB allocated to data
    2.  (/v# option or -set maxvar-) 5000 maximum variables
    3.  New update available; type -update all-

. edit

. log
(closed)

. edit
(4 vars, 321 obs pasted into editor)

. save "C:\Documents and Settings\nick_jewell\My
Documents\VIGOR\VIGORhighriskFeb21.dta"
file C:\Documents and Settings\nick_jewell\My
Documents\VIGOR\VIGORhighriskFeb21.dta saved

. edit
- preserve

. gen txid=0

. replace txid=1 if trmt=="A"
(170 real changes made)

. summ  eventindicvasc by txid
variable by not found
r(111);

. summ  eventindicvasc, by txid
option by not allowed

r(198);

. table  eventindicvasc by  txid
variable by not found
r(111);

. table  eventindicvasc txid

```
--------------------
eventindi |   txid
cvasc     |  0    1
----------+---------
       0| 148  155
       1|   3   15
--------------------
```

. edit
- preserve

. stset  eventday, failure( eventindicvasc)

    failure event:  eventindicvasc != 0 & eventindicvasc < .
obs. time interval:  (0, eventday]
 exit on or before:  failure

```
------------------------------------------------------------
   321  total obs.
     1  obs. end on or before enter()
------------------------------------------------------------
   320  obs. remaining, representing
    18  failures in single record/single failure data
 73827  total analysis time at risk, at risk from t =      0
                  earliest observed entry t =      0
                     last observed exit t =    372
```

. stsgraph
unrecognized command: stsgraph
r(199);

. sts graph

     failure _d:  eventindicvasc
  analysis time _t:  eventday

. sts graph, by( txid)

```
      failure _d:  eventindicvasc
   analysis time _t:  eventday

. sts gen surv=survf, by( txid)
survf unknown function
r(198);


. sts gen surv = survf, by( txid)
survf unknown function
r(198);


. sts gen survf = s, by( txid)

. edit
- preserve

. gen cumf =1-survf
(1 missing value generated)

. edit
- preserve

. scatter cumf _t if txid==1

. scatter cumf _t if txid==1, c(L) msymbol(O)

. scatter cumf _t if txid==1, c(L) msymbol(o)

. scatter cumf _t if txid==1, c(L) msymbol(o) ytitle("Cumulative Incidence Proportion")
xtitle ("Days
> of Follow-up")
invalid "'Days of Follow-up'
invalid syntax
r(198);

. scatter cumf _t if txid==1, c(L) msymbol(o) ytitle("Cumulative Incidence Proportion")

. scatter cumf _t if txid==1, c(L) msymbol(o) ytitle("Cumulative Incidence Proportion")
xtitle("Days"
> )

. scatter cumf _t if txid==1, c(L) msymbol(o) ytitle("Cumulative Incidence Proportion")
xtitle("Days
> of Follow-up")
```

. scatter cumf _t if txid==1, c(L) msymbol(o) ytitle("Cumulative Incidence Proportion")
xtitle("Days
> of Follow-up") || scatter cumf _t if txid==0, c(L) msymbol(oh) legend(label(1
"Vioxx")) legend(labe
> l(2 "Naproxen"))

. stcox  txid

       failure _d:  eventindicvasc
   analysis time _t:  eventday

Iteration 0:   log likelihood = -96.640258
Iteration 1:   log likelihood = -92.498625
Iteration 2:   log likelihood = -92.398166
Iteration 3:   log likelihood = -92.397558
Iteration 4:   log likelihood = -92.397558
Refining estimates:
Iteration 0:   log likelihood = -92.397558

Cox regression -- Breslow method for ties

No. of subjects =      320              Number of obs   =     320
No. of failures =       18
Time at risk    =    73827
                              LR chi2(1)    =    8.49
Log likelihood  =  -92.397558            Prob > chi2   =   0.0036

------------------------------------------------------------------------------
     _t | Haz. Ratio   Std. Err.     z    P>|z|     [95% Conf. Interval]
--------+---------------------------------------------------------------------
   txid |  4.899172   3.099073    2.51   0.012    1.418004   16.92653
------------------------------------------------------------------------------

**Arbitblit, Donald C.**

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Friday, June 02, 2006 2:00 PM |
| **To:** | Arbitblit, Donald C. |
| **Cc:** | beachlawyer51@hotmail.com; Gross, Jennifer; amyer@rcrlaw.net; twacker@rcrlaw.net |
| **Subject:** | RE: Jewell |

Thanks Don.  We'll wait until after Farquhar's deposition before deciding whether to file our motion.

Kim's deposition will be at:

Otjen, Van Ert, & Weir S.C.
University Research Park
450 Science Drive
Ste 110
Madison, Wisconsin
(608) 238-9500

The deposition will start at 8:00 a.m.  The witness must leave by 5:00 p.m.  The dep is also noticed for the upcoming California trials.

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should be considered to be attorney work product and/or attorney-client privileged. This communication is the property of Bartlit Beck Herman Palenchar & Scott LLP and is intended only for the use of the addressee. If you are not the intended recipient, please notify the sender, delete the message, and note that any distribution or copying of this message is prohibited.  Any discussion of tax matters contained herein is not intended or written to be used, and cannot be used, for the purpose of avoiding any penalties that may be imposed under Federal tax laws.

**From:** Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
**Sent:** Friday, June 02, 2006 2:55 PM
**To:** andrew.goldman@bartlit-beck.com
**Cc:** beachlawyer51@hotmail.com; Gross, Jennifer; amyer@rcrlaw.net; twacker@rcrlaw.net
**Subject:** Jewell

Andy,

I have reviewed your draft motion to compel, and this is submitted in response.

First, attached is Professor Jewell's analysis concerning high-risk patients, which Dr. Farquhar referenced in his Supplemental Report and the Barnett Report. We do not claim work product privilege as to materials reviewed and relied upon by Dr. Farquhar in preparation of his reports. We agree that you are entitled to production of documents prepared by Professor Jewell that Dr. Farquhar considered in arriving at the opinions he has expressed in his reports. We agree that the *Intermedics* case you cite is applicable to expert discovery, and that documents considered by an expert in forming his opinions are discoverable, regardless of whether they are relied upon or rejected.

However, it remains our view of the facts and the law that exceptional circumstances do not exist to justify deposition or discovery from Professor Jewell, a nontestifying expert, where all of the data came from Merck, where the methods used to analyze the data are comparable or identical to those Merck itself has used and reported as to particular portions of the same data, and where Merck is capable of obtaining information on the same subject by other means. The *Long Term Capital Holdings* case does not stand for the open-ended proposition that a nontestifying expert who provides a report relied upon by the testifying expert is always subject to deposition and discovery. To the contrary, in that case the court relied on the facts that the assistants spent the majority of the time on the project and chose the data to input from among "hundreds of thousands of pages" of documents that they reviewed. Here, Professor Jewell used the specified data sets that Merck provided, and the statistical tests are identified in the reports. The *Dura* case states mere dicta on the issue of nontestifying experts, while the holding was addressed to the exclusion of untimely reports. We see no general support in the case law for the proposition that nontestifying experts may be deposed to see if they did their jobs "competently," and such a view would contradict Rule 26 by permitting this type of discovery without the requisite showing of exceptional circumstances.

Please let us know whether you wish to discuss this further.

Finally, you had agreed to let us know the location for the Kim depo by June 1, so we could make travel plans. Please let us know today, if at all possible.

Don Arbitblit

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to postmaster@lchb.com

6/26/2006

**Arbitblit, Donald C.**

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Tuesday, June 13, 2006 9:19 PM |
| **To:** | Arbitblit, Donald C. |
| **Subject:** | Jewell |

Don, after reviewing Dr. Farquhar's deposition, I believe it is vital that we obtain document discovery from and a deposition of Dr. Jewell. Dr. Farquhar is clearly relying on Dr. Jewell and our inability to cross-examine Dr. Jewell directly prejudices our ability to cross-examine Farquhar at trial.

(1) Dr. Farquhar repeatedly deferred to Jewell when it came to certain statistical inquiries and even suggested that Merck ask questions of Jewell. For example:

```
Q    Dr. Farquhar, I'm asking you about the
10   second page of Professor Lagakos' essay where he's
11   discussing the problem of multiple subgroup analyses
12   and the possibility of false positives. The first
13   sentence of the last paragraph of the first column
14   of that page says: "One way to correct for the
15   inflated false positive rate when multiple subgroup
16   analyses are conducted is to apply a stricter
17   criterion than the usual P equals 0.05 for judging
18   the significance of each interaction test."
19        Do you see that?
20    A    I see that.
21        MR. ARBITBLIT:  Objection to form.
22        THE WITNESS:  And this --
23   BY MR. MORTARA:
24    Q    Dr. Farquhar -- the question is do you see
25   that?
0142
1        MR. ARBITBLIT:  Don't interrupt him.
2        THE WITNESS:  I see that.  As I said, I
3    see everything that's in here.  And this entire
4    paragraph, and all the implications of it, are grist
5    for the mill of a discussion with Professor Jewell.
6    Professor Jewell has his way of looking at life and
7    he may or may not agree with this paragraph.  I
8    can't say since I am not a biostatistician.  This is
9    statistician language.
10   BY MR. MORTARA:
11    Q    You rely on Professor Jewell for
```

12   information of this character, correct?
13          MR. ARBITBLIT:  Object to form.
14          THE WITNESS:  I rely on Professor Jewell
15   currently as my colleague in not only this
16   consultation on Vioxx but on other issues.
17          And I also -- well, I'll just add that the
18   previous colleague, who is now no longer with us,
19   was one of the individuals who trained Professor
20   Jewell.  And so there's a long legacy of my
21   connection to Jewell and a long legacy of my trust
22   in his skill, ability and wisdom.
23          And what I am saying to you now is this
24   long paragraph on the second page here, he would
25   need to be asked how he interprets that and whether
0143
1   or not it's in contradiction to what he has put in
2   his text; and if so, how would he handle what's been
3   done in the APPROVe study and in our particular
4   analyses of the 203.
5          I shouldn't have said APPROVe; I should
6   have said 203, and APPROVe as well.
7      Q   Dr. Farquhar, the plaintiffs' attorneys
8   are not going to let me ask questions of Dr. Jewell,
9   unfortunately.  You have relied on Dr. Jewell and
10   written things about significant interaction in your
11   report, and I'm asking you what your understanding
12   of Professor Lagakos' essay is with respect to what
13   the appropriate p-value for interaction is to use
14   when multiple subgroup analyses are performed.
15          Do you understand what Professor Lagakos
16   is talking about?
17          MR. ARBITBLIT:  Object to form.
18          THE WITNESS:  Well, you know, about six
19   answers ago, I said the entire topic of subgroup
20   analyses has been around for a long time, and I
21   return to this answer, and then I think I'll want to
22   say I've answered the questions regarding this topic
23   by saying I rely fully on Professor Jewell's
24   attitudes and concepts and beliefs and opinion about
25   this paragraph and how it applies to our analyses on
0144
1   203 and APPROVe and of VIGOR and of any of the other
2   studies that we've analyzed.
3   BY MR. MORTARA:
4      Q   Have you ever asked Professor Jewell what

6/26/2006

5   he thinks of Professor Lagakos' views?
6        Did you say no?
7   A   Well --
8        MR. ARBITBLIT:  Object to form.
9        THE WITNESS:  I told you that I haven't
10  seen the Lagakos article, so I can't have discussed
11  this specific article with him.  I have had
12  discussions on topics related to interaction tests.
13  BY MR. MORTARA:
14    Q   Your report says on page 7 of your
15  supplemental report:  "Tests of significant
16  interaction may be appropriately set at levels
17  greater than P equals 0.05," correct?
18    A   Well, we discussed that some time ago and
19  I said this is Professor Jewell's view and I hold to
20  his views.
21    Q   Whereas Professor Lagakos says:  "One way
22  to correct for the inflated false positive rate when
23  multiple subgroup analyses are conducted is to apply
24  a stricter criterion than the usual P equals 0.05."
25        That means Professor Lagakos thinks you
0145
1   should go lower than 0.05 but Professor Jewell
2   thinks you can be higher than 0.05, correct?
3        MR. ARBITBLIT:  Object to form.  Assumes
4   facts not in evidence.
5        THE WITNESS:  Return to the fact that
6   Jewell has his beliefs and his way of analyzing data
7   and he may or may not have a fundamental difference
8   of opinion with Lagakos.  And I submit that a single
9   article taken out of context cannot answer that
10  question of whether there is a wide disparity
11  between those two gentlemen.
12  BY MR. MORTARA:
13    Q   Dr. Farquhar, the first full sentence in
14  the second column on that same page says:  "For
15  example, if 10 tests are conducted, each one should
16  use 0.005 as the threshold for significance."
17        Do you see that?
18        MR. ARBITBLIT:  Object to form.
19        THE WITNESS:  I see the whole article and
20  I return to -- I prefer to rely on Professor Jewell
21  and any subsequent dissection of this article, my
22  answer is that I trust Professor Jewell's views on
23  all items.

24  BY MR. MORTARA:
25     Q    Do you recall earlier telling me you
0146
1  thought at least ten subgroup analyses had been
2  performed in the APPROVe study?
3              MR. ARBITBLIT:  Object to form.
4              THE WITNESS:  Ten subgroup analyses have
5  not been performed on the 203 study.  And --
6  BY MR. MORTARA:
7     Q    Dr. Farquhar, could you turn to page 6 of
8  your report.  And the Section C is entitled:
9  "Patients in APPROVe."
10           Do you see that?
11     A    Yes.
12     Q    Section C of your supplemental report is
13  not about Protocol 203, is it?
14     A    No.
15     Q    Dr. Farquhar, over ten subgroup analyses
16  have been performed on the APPROVe data and
17  Professor Lagakos thinks that you should use at
18  least 0.005 as the threshold for significance, if
19  not something lower; isn't that right?
20              MR. ARBITBLIT:  Object to form,
21  mischaracterizes the record.  Professor Lagakos has
22  never had anything to say about APPROVe.
23              THE WITNESS:  Boy, oh boy.  You know, my
24  answer is I'm trying to get away from Lagakos and on
25  to Jewell.  So any opinion that Lagakos has
0147
1  expressed, I'll say again is not -- is out of
2  context, and Professor Jewell has his reasons for
3  picking a certain method of analysis and its
4  interpretation, and I trust his views.  And I do
5  not, at this point, have any opinions to offer about
6  Lagakos.
7  BY MR. MORTARA:
8     Q    You trust Dr. Jewell and the jury's
9  supposed to trust you when you say you trust
10  Dr. Jewell, correct?
11              MR. ARBITBLIT:  Object to form.
12  Argumentative.
13              MR. MORTARA:  Withdrawn.
14              THE WITNESS:  I'm not concerning myself
15  with juries.  I'm concerning myself with trusting
16  Professor Jewell.

17  BY MR. MORTARA:
18      Q    Dr. Farquhar, do you know if plaintiffs'
19  attorneys are going to allow Dr. Jewell to explain
20  himself and his analysis?
21      A    My belief is that they would, yes.  But I
22  haven't asked the attorneys if they have such a
23  plan.
24      Q    Do you think the plaintiffs' attorneys
25  should allow Dr. Jewell to come to trial and explain
0148
1  to the jury his analysis and explain, if he can,
2  Professor Lagakos' views?
3          MR. ARBITBLIT:  Object to form.
4          THE WITNESS:  I have no informed opinion
5  on what should happen with juries.  I just don't
6  know anything about that field.  So --
7  BY MR. MORTARA:
8      Q    Dr. Farquhar, I'll withdraw the question
9  and ask you this:  You talk about tests for
10  significant interaction in your report, correct?
11      A    Yes.
12      Q    You rely on Dr. Jewell for that analysis,
13  correct?
14      A    Correct.
15          MR. ARBITBLIT:  Object to form.
16  BY MR. MORTARA:
17      Q    In explaining the tests for significant
18  interaction that you disclose in your report, do you
19  think that Dr. Jewell would do a better job
20  explaining what this means and explaining how
21  Professor Lagakos' essay affects his views?
22      A    Do I think Jewell --
23      Q    Withdrawn.
24          Dr. Farquhar, do you think it's
25  appropriate to have Dr. Jewell explain himself as to
0149
1  what he meant by the appropriate P for significant
2  interaction that you're relying on?
3      A    Well, I would say if that is something
4  that you and other attorneys would like to do, then
5  fine.  He needs to speak for himself.
6      Q    Dr. Farquhar, you understand that --
7  withdrawn.
8          The last sentence of the first full
9  paragraph on the third column of the second page of

10   the Lagakos essay, says:  "Post hoc subgroup
11   analyses undertaken because of an intriguing trend
12   seen in the results or selective reporting of
13   certain subgroup analyses can be especially
14   misleading."
15            Do you see that?
16            MR. ARBITBLIT:  Object to form.
17            THE WITNESS:  I see that, but please honor
18   my previous statements that anything in the Lagakos
19   paper which is contrary to Professor Jewell's modus
20   operandi and planning for analyses needs to say that
21   Jewell trumps Lagakos.  And I really -- I'm trying
22   to avoid further discussion about Lagakos.
23   BY MR. MORTARA:
24       Q   You're trying to avoid further discussion
25   of Professor Lagakos' essay, correct?
0150
1            MR. ARBITBLIT:  Object to form.
2            THE WITNESS:  I'm trying to elevate the
3    respect for Professor Jewell.
4    BY MR. MORTARA:
5        Q   Dr. Farquhar, do you agree or disagree
6    that "Post hoc subgroup analyses undertaken because
7    of an intriguing trend seen in the results or
8    selective reporting of certain subgroup analyses can
9    be especially misleading"?
10            MR. ARBITBLIT:  Object to form.
11            THE WITNESS:  I propose that that question
12   be asked for Professor Jewell and put into the
13   context of the APPROVe study and the specific
14   analyses that he and I performed.


(2) Furthermore, Farquhar did not know what data Jewell used in the protocol 203
analysis Dr. Farquhar relies on.  Farquhar also didn't know whether that data
included the VICTOR final data produced to plaintiffs at the beginning of May:

7        Q   The only person that knows what data
8    Dr. Jewell used in his Protocol 203 analysis is
9    Dr. Jewell, correct?
10       A   Yes, that's ultimately correct.

***

   Q   I would have to ask Dr. Jewell what data

21  he used for his Protocol 203?
22      A   Correct.  And where he got it, and when he
23  received it.

Please let me know if you will produce Dr. Jewell for deposition as well as the
standard documents that both sides experts' are producing.

Thanks,

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

**Arbitblit, Donald C.**

**From:**          Goldman, Andrew [andrew.goldman@bartlit-beck.com]
**Sent:**          Tuesday, June 13, 2006 9:36 PM
**To:**            Arbitblit, Donald C.
**Subject:**       RE: Jewell


Thanks

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Tuesday, June 13, 2006 11:31 PM
To: andrew.goldman@bartlit-beck.com
Subject: Re: Jewell


Andy,
I will discuss with Mark Robinson and get back to you tomorrow.
Don

-----Original Message-----
From: Goldman, Andrew <andrew.goldman@bartlit-beck.com>
To: Arbitblit, Donald C. <DARBITBLIT@lchb.com>
Sent: Tue Jun 13 21:19:11 2006
Subject: Jewell

Don, after reviewing Dr. Farquhar's deposition, I believe it is vital that
we obtain document discovery from and a deposition of Dr. Jewell. Dr.
Farquhar is clearly relying on Dr. Jewell and our inability to cross-examine
Dr. Jewell directly prejudices our ability to cross-examine Farquhar at
trial.

(1) Dr. Farquhar repeatedly deferred to Jewell when it came to certain
statistical inquiries and even suggested that Merck ask questions of Jewell.
For example:

```
Q    Dr. Farquhar, I'm asking you about the
10    second page of Professor Lagakos' essay where he's
11    discussing the problem of multiple subgroup analyses
12    and the possibility of false positives.  The first
13    sentence of the last paragraph of the first column
14    of that page says:  "One way to correct for the
15    inflated false positive rate when multiple subgroup
16    analyses are conducted is to apply a stricter
17    criterion than the usual P equals 0.05 for judging
18    the significance of each interaction test."
19              Do you see that?
20       A    I see that.
21            MR. ARBITBLIT:  Objection to form.
22            THE WITNESS:  And this --
23    BY MR. MORTARA:
24       Q    Dr. Farquhar -- the question is do you see
25    that?
0142
1            MR. ARBITBLIT:  Don't interrupt him.
2            THE WITNESS:  I see that.  As I said, I
3    see everything that's in here.  And this entire
```

1

```
 4  paragraph, and all the implications of it, are grist
 5  for the mill of a discussion with Professor Jewell.
 6  Professor Jewell has his way of looking at life and
 7  he may or may not agree with this paragraph.  I
 8  can't say since I am not a biostatistician.  This is
 9  statistician language.
10  BY MR. MORTARA:
11       Q    You rely on Professor Jewell for
12  information of this character, correct?
13            MR. ARBITBLIT:  Object to form.
14            THE WITNESS:  I rely on Professor Jewell
15  currently as my colleague in not only this
16  consultation on Vioxx but on other issues.
17            And I also -- well, I'll just add that the
18  previous colleague, who is now no longer with us,
19  was one of the individuals who trained Professor
20  Jewell.  And so there's a long legacy of my
21  connection to Jewell and a long legacy of my trust
22  in his skill, ability and wisdom.
23            And what I am saying to you now is this
24  long paragraph on the second page here, he would
25  need to be asked how he interprets that and whether
0143
 1  or not it's in contradiction to what he has put in
 2  his text; and if so, how would he handle what's been
 3  done in the APPROVe study and in our particular
 4  analyses of the 203.
 5            I shouldn't have said APPROVe; I should
 6  have said 203, and APPROVe as well.
 7       Q    Dr. Farquhar, the plaintiffs' attorneys
 8  are not going to let me ask questions of Dr. Jewell,
 9  unfortunately.  You have relied on Dr. Jewell and
10  written things about significant interaction in your
11  report, and I'm asking you what your understanding
12  of Professor Lagakos' essay is with respect to what
13  the appropriate p-value for interaction is to use
14  when multiple subgroup analyses are performed.
15            Do you understand what Professor Lagakos
16  is talking about?
17            MR. ARBITBLIT:  Object to form.
18            THE WITNESS:  Well, you know, about six
19  answers ago, I said the entire topic of subgroup
20  analyses has been around for a long time, and I
21  return to this answer, and then I think I'll want to
22  say I've answered the questions regarding this topic
23  by saying I rely fully on Professor Jewell's
24  attitudes and concepts and beliefs and opinion about
25  this paragraph and how it applies to our analyses on
0144
 1  203 and APPROVe and of VIGOR and of any of the other
 2  studies that we've analyzed.
 3  BY MR. MORTARA:
 4       Q    Have you ever asked Professor Jewell what
 5  he thinks of Professor Lagakos' views?
 6            Did you say no?
 7       A    Well --
 8            MR. ARBITBLIT:  Object to form.
 9            THE WITNESS:  I told you that I haven't
10  seen the Lagakos article, so I can't have discussed
11  this specific article with him.  I have had
```

2

12  discussions on topics related to interaction tests.
13  BY MR. MORTARA:
14      Q    Your report says on page 7 of your
15  supplemental report: "Tests of significant
16  interaction may be appropriately set at levels
17  greater than P equals 0.05," correct?
18      A    Well, we discussed that some time ago and
19  I said this is Professor Jewell's view and I hold to
20  his views.
21      Q    Whereas Professor Lagakos says:  "One way
22  to correct for the inflated false positive rate when
23  multiple subgroup analyses are conducted is to apply
24  a stricter criterion than the usual P equals 0.05."
25          That means Professor Lagakos thinks you
0145
1  should go lower than 0.05 but Professor Jewell
2  thinks you can be higher than 0.05, correct?
3          MR. ARBITBLIT:  Object to form.  Assumes
4  facts not in evidence.
5          THE WITNESS:  Return to the fact that
6  Jewell has his beliefs and his way of analyzing data
7  and he may or may not have a fundamental difference
8  of opinion with Lagakos.  And I submit that a single
9  article taken out of context cannot answer that
10  question of whether there is a wide disparity
11  between those two gentlemen.
12  BY MR. MORTARA:
13      Q    Dr. Farquhar, the first full sentence in
14  the second column on that same page says:  "For
15  example, if 10 tests are conducted, each one should
16  use 0.005 as the threshold for significance."
17          Do you see that?
18          MR. ARBITBLIT:  Object to form.
19          THE WITNESS:  I see the whole article and
20  I return to -- I prefer to rely on Professor Jewell
21  and any subsequent dissection of this article, my
22  answer is that I trust Professor Jewell's views on
23  all items.
24  BY MR. MORTARA:
25      Q    Do you recall earlier telling me you
0146
1  thought at least ten subgroup analyses had been
2  performed in the APPROVe study?
3          MR. ARBITBLIT:  Object to form.
4          THE WITNESS:  Ten subgroup analyses have
5  not been performed on the 203 study.  And --
6  BY MR. MORTARA:
7      Q    Dr. Farquhar, could you turn to page 6 of
8  your report.  And the Section C is entitled:
9  "Patients in APPROVe."
10          Do you see that?
11      A    Yes.
12      Q    Section C of your supplemental report is
13  not about Protocol 203, is it?
14      A    No.
15      Q    Dr. Farquhar, over ten subgroup analyses
16  have been performed on the APPROVe data and
17  Professor Lagakos thinks that you should use at
18  least 0.005 as the threshold for significance, if
19  not something lower; isn't that right?

                        3

```
20              MR. ARBITBLIT:  Object to form,
21  mischaracterizes the record.  Professor Lagakos has
22  never had anything to say about APPROVe.
23              THE WITNESS:  Boy, oh boy.  You know, my
24  answer is I'm trying to get away from Lagakos and on
25  to Jewell.  So any opinion that Lagakos has
0147
1   expressed, I'll say again is not -- is out of
2   context, and Professor Jewell has his reasons for
3   picking a certain method of analysis and its
4   interpretation, and I trust his views.  And I do
5   not, at this point, have any opinions to offer about
6   Lagakos.
7   BY MR. MORTARA:
8        Q    You trust Dr. Jewell and the jury's
9   supposed to trust you when you say you trust
10  Dr. Jewell, correct?
11              MR. ARBITBLIT:  Object to form.
12  Argumentative.
13              MR. MORTARA:  Withdrawn.
14              THE WITNESS:  I'm not concerning myself
15  with juries.  I'm concerning myself with trusting
16  Professor Jewell.
17  BY MR. MORTARA:
18       Q    Dr. Farquhar, do you know if plaintiffs'
19  attorneys are going to allow Dr. Jewell to explain
20  himself and his analysis?
21       A    My belief is that they would, yes.  But I
22  haven't asked the attorneys if they have such a
23  plan.
24       Q    Do you think the plaintiffs' attorneys
25  should allow Dr. Jewell to come to trial and explain
0148
1   to the jury his analysis and explain, if he can,
2   Professor Lagakos' views?
3              MR. ARBITBLIT:  Object to form.
4              THE WITNESS:  I have no informed opinion
5   on what should happen with juries.  I just don't
6   know anything about that field.  So --
7   BY MR. MORTARA:
8        Q    Dr. Farquhar, I'll withdraw the question
9   and ask you this:  You talk about tests for
10  significant interaction in your report, correct?
11       A    Yes.
12       Q    You rely on Dr. Jewell for that analysis,
13  correct?
14       A    Correct.
15              MR. ARBITBLIT:  Object to form.
16  BY MR. MORTARA:
17       Q    In explaining the tests for significant
18  interaction that you disclose in your report, do you
19  think that Dr. Jewell would do a better job
20  explaining what this means and explaining how
21  Professor Lagakos' essay affects his views?
22       A    Do I think Jewell --
23       Q    Withdrawn.
24              Dr. Farquhar, do you think it's
25  appropriate to have Dr. Jewell explain himself as to
0149
1   what he meant by the appropriate P for significant
```

4

2    interaction that you're relying on?
3         A    Well, I would say if that is something
4    that you and other attorneys would like to do, then
5    fine.  He needs to speak for himself.
6         Q    Dr. Farquhar, you understand that --
7    withdrawn.
8              The last sentence of the first full
9    paragraph on the third column of the second page of
10   the Lagakos essay, says:  "Post hoc subgroup
11   analyses undertaken because of an intriguing trend
12   seen in the results or selective reporting of
13   certain subgroup analyses can be especially
14   misleading."
15             Do you see that?
16             MR. ARBITBLIT:  Object to form.
17             THE WITNESS:  I see that, but please honor
18   my previous statements that anything in the Lagakos
19   paper which is contrary to Professor Jewell's modus
20   operandi and planning for analyses needs to say that
21   Jewell trumps Lagakos.  And I really -- I'm trying
22   to avoid further discussion about Lagakos.
23   BY MR. MORTARA:
24        Q    You're trying to avoid further discussion
25   of Professor Lagakos' essay, correct?
0150
1              MR. ARBITBLIT:  Object to form.
2              THE WITNESS:  I'm trying to elevate the
3    respect for Professor Jewell.
4    BY MR. MORTARA:
5         Q    Dr. Farquhar, do you agree or disagree
6    that "Post hoc subgroup analyses undertaken because
7    of an intriguing trend seen in the results or
8    selective reporting of certain subgroup analyses can
9    be especially misleading"?
10             MR. ARBITBLIT:  Object to form.
11             THE WITNESS:  I propose that that question
12   be asked for Professor Jewell and put into the
13   context of the APPROVe study and the specific
14   analyses that he and I performed.


(2) Furthermore, Farquhar did not know what data Jewell used in the protocol
203 analysis Dr. Farquhar relies on.  Farquhar also didn't know whether that
data included the VICTOR final data produced to plaintiffs at the beginning
of May:

7         Q    The only person that knows what data
8    Dr. Jewell used in his Protocol 203 analysis is
9    Dr. Jewell, correct?
10        A    Yes, that's ultimately correct.

***

  Q    I would have to ask Dr. Jewell what data
21   he used for his Protocol 203?
22        A    Correct.  And where he got it, and when he
23   received it.

Please let me know if you will produce Dr. Jewell for deposition as well as
the standard documents that both sides experts' are producing.

5

Thanks,

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to postmaster@lchb.com

**Arbitblit, Donald C.**

**From:** Goldman, Andrew [andrew_goldman@bartlit-beck.com]
**Sent:** Thursday, June 15, 2006 3:07 AM
**To:** Arbitblit, Donald C.
**Cc:** beachlawyer51@hotmail.com
**Subject:** RE: Any word from Mark on Jewell?


You are trying to take advantage of our request to depose Dr. Jewell.  We
will object to any effort to produce a rebuttal expert report as they it is
prohibited by the scheduling order (which supersedes any federal rule).

It is far too late to be giving us expert reports.

Let's discuss this after Avorn's deposition, which I am about to take.

Andy


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited.  Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.


-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Thursday, June 15, 2006 12:09 AM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawyer51@hotmail.com
Subject: Re: Any word from Mark on Jewell?


I spoke to Mark this afternoon about your email. Our intention is to serve a
rebuttal expert report prepared by Dr. Jewell, and to provide him for
deposition on the subjects as to which Dr. Farquhar referred to or relied
upon Dr. Jewell, as well as any additional issues raised by the rebuttal
report. By rule, we would have 30 days from June 1 to serve a rebuttal
report, but we are willing to work with you on scheduling. We suggest
getting a report to you by June 21, to give Dr. Jewell  time to review the
transcript of Dr. Kim (not yet received) and to otherwise prepare his
report, followed by a deposition in SF on June 28. I will be available to

1

discuss this proposal tomorrow, if you like, or send me an email.

-----Original Message-----
From: Goldman, Andrew <andrew.goldman@bartlit-beck.com>
To: Arbitblit, Donald C. <DARBITBLIT@lchb.com>
Sent: Wed Jun 14 21:10:47 2006
Subject: Any word from Mark on Jewell?


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited.  Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.



This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

## Arbitblit, Donald C.

**From:**       Arbitblit, Donald C.
**Sent:**       Wednesday, June 21, 2006 9:55 PM
**To:**       'Andrew.Goldman@bartlit-beck.com'
**Cc:**       'beachlawyer51@hotmail.com'
**Subject:**       FW: Jewell Rebuttal Report



Document1.pdf (5
MB)

Andy,
As mentioned in my previous email, attached is the rebuttal expert report of Dr. Jewell. We understand
that you have stated objections to the submission of rebuttal reports, which were the subject of discussion
with Judge Fallon on Monday. As noted at that time, we believe that we have the right to submit rebuttal
reports under the Federal Rules. A rebuttal from Professor Jewell is particularly appropriate in light of the
issues raised by defendant in the deposition of Dr. Farquhar, as well as the report and deposition of
defense expert Dr. Kim.
Please let us know whether you intend to take Professor Jewell's deposition. We had previously offered to
make him available on June 28, and this offer still holds. He is also available on June 29. It is our intention
to permit deposition of Professor Jewell without either side waiving its position as to the submission of
rebuttal reports.
Don

Downloaded from bmj.com on 5 June 2006



**Do selective cyclo-oxygenase-2 inhibitors and traditional non-steroidal anti-inflammatory drugs increase the risk of atherothrombosis? Meta-analysis of randomised trials**

Patricia M Kearney, Colin Baigent, Jon Godwin, Heather Halls, Jonathan R Emberson and Carlo Patrono

BMJ 2006;332;1302-1308
doi:10.1136/bmj.332.7553.1302

---

Updated information and services can be found at:
http://bmj.com/cgi/content/full/332/7553/1302

---

These include:

| | |
|---|---|
| **Data supplement** | *"Further details"*<br>http://bmj.com/cgi/content/full/332/7553/1302/DC1 |
| **References** | This article cites 14 articles, 12 of which can be accessed free at:<br>http://bmj.com/cgi/content/full/332/7553/1302#BIBL |
| | 1 online articles that cite this article can be accessed at:<br>http://bmj.com/cgi/content/full/332/7553/1302#otherarticles |
| **Rapid responses** | 3 rapid responses have been posted to this article, which you can access for free at:<br>http://bmj.com/cgi/content/full/332/7553/1302#responses |
| | You can respond to this article at:<br>http://bmj.com/cgi/eletter-submit/332/7553/1302 |
| **Email alerting service** | Receive free email alerts when new articles cite this article - sign up in the box at the top right corner of the article |

---

**Topic collections**   Articles on similar topics can be found in the following collections

Systematic reviews (incl meta-analyses): examples (324 articles)
Other Cardiovascular Medicine (1947 articles)
Drugs: musculoskeletal and joint diseases (336 articles)
Adverse drug reactions (521 articles)

---

**Notes**

---

To order reprints of this article go to:
http://www.bmjjournals.com/cgi/reprintform

To subscribe to *BMJ* go to:
http://bmj.bmjjournals.com/subscriptions/subscribe.shtml



Downloaded from bmj.com on 5 June 2006

# Research

**BMJ**

# Do selective cyclo-oxygenase-2 inhibitors and traditional non-steroidal anti-inflammatory drugs increase the risk of atherothrombosis? Meta-analysis of randomised trials

Patricia M Kearney, Colin Baigent, Jon Godwin, Heather Halls, Jonathan R Emberson, Carlo Patrono

## Abstract

**Objective** To assess the effects of selective cyclo-oxygenase-2 (COX 2) inhibitors and traditional non-steroidal anti-inflammatory drugs (NSAIDs) on the risk of vascular events.

**Design** Meta-analysis of published and unpublished tabular data from randomised trials, with indirect estimation of the effects of traditional NSAIDs.

**Data sources** Medline and Embase (January 1966 to April 2005); Food and Drug Administration records; and data on file from Novartis, Pfizer, and Merck.

**Review methods** Eligible studies were randomised trials that included a comparison of a selective COX 2 inhibitor versus placebo or a selective COX 2 inhibitor versus a traditional NSAID, of at least four weeks' duration, with information on serious vascular events (defined as myocardial infarction, stroke, or vascular death). Individual investigators and manufacturers provided information on the number of patients randomised, numbers of vascular events, and the person time of follow-up for each randomised group.

**Results** In placebo comparisons, allocation to a selective COX 2 inhibitor was associated with a 42% relative increase in the incidence of serious vascular events (1.2%/year v 0.9%/year; rate ratio 1.42, 95% confidence interval 1.13 to 1.78; P = 0.003), with no significant heterogeneity among the different selective COX 2 inhibitors. This was chiefly attributable to an increased risk of myocardial infarction (0.6%/year v 0.3%/year; 1.86, 1.33 to 2.59; P = 0.0003), with little apparent difference in other vascular outcomes. Among trials of at least one year's duration (mean 2.7 years), the rate ratio for vascular events was 1.45 (1.12 to 1.89; P = 0.005). Overall, the incidence of serious vascular events was similar between a selective COX 2 inhibitor and any traditional NSAID (1.0%/year v 0.9%/year; 1.16, 0.97 to 1.38; P = 0.1). However, statistical heterogeneity (P = 0.001) was found between trials of a selective COX 2 inhibitor versus naproxen (1.57, 1.21 to 2.03) and of a selective COX 2 inhibitor versus non-naproxen NSAIDs (0.88, 0.69 to 1.12). The summary rate ratio for vascular events, compared with placebo, was 0.92 (0.67 to 1.26) for naproxen, 1.51 (0.96 to 2.37) for ibuprofen, and 1.63 (1.12 to 2.37) for diclofenac.

**Conclusions** Selective COX 2 inhibitors are associated with a moderate increase in the risk of vascular events, as are high dose regimens of ibuprofen and diclofenac, but high dose naproxen is not associated with such an excess.

## Introduction

Traditional non-steroidal anti-inflammatory drugs (NSAIDs) are widely used to treat pain, but their long term use is limited by serious gastrointestinal side effects. Whereas NSAIDs inhibit the two recognised forms of prostaglandin G/H synthase (also referred to as cyclo-oxygenase), selective cyclo-oxygenase-2 (COX 2) inhibitors are selective inhibitors of the COX 2 isozyme.[1] As the anti-inflammatory effects of NSAIDs were believed to be mediated by inhibition of COX 2, and their gastrointestinal side effects by inhibition of COX 1, people hypothesised that selective COX 2 inhibitors would provide a safer alternative to traditional NSAIDs. However, although some studies have reported a lower incidence of upper gastrointestinal complications with selective COX 2 inhibitors than with traditional NSAIDs,[2 3] recent concerns about the cardiovascular safety of selective COX 2 inhibitors have limited their use.

Although the Vioxx gastrointestinal outcomes research (VIGOR) trial reported a fivefold increase in myocardial infarction among participants allocated to rofecoxib (20 rofecoxib v 4 naproxen; P < 0.001),[3] this difference might have occurred, at least in part, because high dose naproxen inhibits platelet aggregation throughout the dosing interval. However, the results of the adenomatous polyp prevention on Vioxx (APPROVe) trial, which was the first relatively large trial comparing a selective COX 2 inhibitor with placebo, indicated that rofecoxib increased the risk of vascular events by about twofold.[4] Soon afterwards, the adenoma prevention with celecoxib (APC) trial, comparing celecoxib with placebo, reported a similar excess.[5]

The accumulating evidence suggests that selective COX 2 inhibitors are associated with an increased risk of vascular events, but several important questions remain unanswered. Firstly, what is the magnitude of any excess risk of myocardial infarction, stroke, and vascular mortality? Secondly, is the excess risk of vascular events dose related, and is the size of this risk different in people who are also taking aspirin (which chiefly inhibits COX 1 at low doses)? Thirdly, are traditional NSAIDs (which also inhibit COX 2) associated with an increased risk of vascular events? We did a meta-analysis of randomised trials that compared a selective COX 2 inhibitor with placebo or a selective COX 2 inhibitor with a traditional NSAID in an attempt to answer these questions.

---

 A table, two extra figures, a statistical appendix, and extra references are on bmj.com

Downloaded from bmj.com on 5 June 2006

Research

## Methods

We used three steps to identify prospective randomised controlled trials of a selective COX 2 inhibitor versus placebo, a selective COX 2 inhibitor versus a traditional NSAID, or both. First we approached the manufacturers of each of the selective COX 2 inhibitors—Merck (rofecoxib, etoricoxib), Novartis (lumiracoxib), and Pfizer (celecoxib, valdecoxib). Then we searched the Food and Drug Administration website for data presented at the Cardiorenal Advisory Committee meeting in February 2005. Finally, we used the modified Cochrane strategy[7] combined with the generic names of each of the individual selective COX 2 inhibitors as keywords to search Medline and Embase from January 1966 to April 2005.

Randomised trials involving at least four weeks' scheduled treatment were eligible if they included at least one comparison of a selective COX 2 inhibitor versus placebo or a selective COX 2 inhibitor versus a traditional NSAID and had recorded serious (that is, admitted to hospital or fatal) cardiovascular events. The pre-specified outcomes were "serious vascular events," as defined by the Antiplatelet Trialists' Collaboration (that is, non-fatal myocardial infarction, non-fatal stroke, or vascular death)[8]; fatal or non-fatal myocardial infarction; fatal or non-fatal stroke; and vascular death (including death from myocardial infarction or stroke). The manufacturers and individual investigators provided summary design details for each trial and information on the process (if any) by which vascular events were adjudicated. All of the manufacturers provided written confirmation that the data provided were complete. Pfizer had locked their data at 31 October 2004, whereas Merck and Novartis had locked their databases at the end of January 2005. We requested numbers of events and person time at risk for each trial, where available, but in a few cases we estimated data from published results or the Food and Drug Administration website.[9]

On the basis of the known pharmacokinetic and pharmacodynamic properties of the NSAIDs studied (which raised the hypothesis that naproxen might have aspirin-like antiplatelet effects), we prospectively specified that analyses of a selective COX 2 inhibitor versus NSAID were to be subdivided into those involving naproxen and those concerning other (non-naproxen) NSAIDs.

We derived rate ratios and their confidence intervals for each of the pre-specified comparisons by using the Peto "one step" approximation (see statistical appendix on bmj.com).[10] In figures and in the text, we have used 99% confidence intervals for individual comparisons to allow for the multiplicity of analyses, reserving 95% confidence intervals for subtotals.

## Results

### Study population

Tabular data were available from 138 randomised trials involving a comparison of a selective COX 2 inhibitor versus placebo or versus a traditional NSAID (or both), in which there were a total of 145 373 participants (see table on bmj.com).[w1-w66]

### Comparisons of selective COX 2 inhibitor versus placebo

Figure 1 shows meta-analyses of a selective COX 2 inhibitor versus placebo, subdivided by individual selective COX 2 inhibitor, for each of the primary outcomes. Overall, among 121 placebo controlled trials, 216 vascular events occurred during 18 490 person years of exposure to a selective COX 2 inhibitor (1.2%/year) compared with 112 during 12 639 person years of placebo (0.9%/year), corresponding to a 42% proportional increase in the incidence of a first serious vascular event (rate

ratio 1.42, 95% confidence interval 1.13 to 1.78; P=0.003). We found no evidence that the proportional excess incidence of vascular events varied among the different selective COX 2 inhibitors (heterogeneity $\chi^2 = 0.5$, df = 4; P = 1.0). However, as only two selective COX 2 inhibitors (rofecoxib and celecoxib) had recorded appreciable numbers of such outcomes, the power to identify any real differences that might exist between selective COX 2 inhibitors was limited. In the group of trials analysed, this proportional difference corresponded to an excess of 3 (95% confidence interval 1 to 5) people with a vascular event per 1000 allocated to a selective COX 2 inhibitor per year.

We found an almost twofold proportional increase in myocardial infarction (rate ratio 1.86, 1.33 to 2.59; P=0.0003) (fig 1), corresponding to an excess of 3 (1 to 4) people with myocardial infarction per 1000 allocated to a selective COX 2 inhibitor per year. We found no significant heterogeneity in the rate ratios for myocardial infarction among individual selective COX 2 inhibitors (heterogeneity $\chi^2 = 1.0$, df = 4; P = 0.9). We found no difference in the incidence of stroke (rate ratio 1.02, 0.71 to 1.47; P = 0.9), corresponding to an absolute difference of 0 (−2 to 1)/1000/year, and the summary rate ratio for vascular death (1.49, 0.97 to 2.29; P = 0.07), although it did not reach statistical significance, corresponded to an absolute excess of 1 (0 to 2)/1000/year.

#### Duration

Of the 121 placebo controlled trials, nine were long term trials with one year or longer of scheduled treatment (mean 139 weeks) and 112 were shorter trials (mean 11 weeks). Around two thirds of the vascular events had occurred in the nine long term trials. In these long term trials, allocation to a selective COX 2 inhibitor was associated with a 45% increase in the incidence of vascular events (rate ratio 1.45, 1.12 to 1.89; P=0.005) (fig 2), with no significant heterogeneity between the event rate ratios in the trials (heterogeneity $\chi^2 = 13.4$, df = 8; P = 0.1).

#### Dose

Too few vascular events were available to allow us to assess dose-response in placebo controlled trials of etoricoxib, lumiracoxib, or valdecoxib. For rofecoxib, 85% of vascular events among patients allocated to a selective COX 2 inhibitor occurred at a dose of 25 mg daily, with few events at lower or higher daily doses, so we could not evaluate dose dependence. For celecoxib, we found a significant trend towards an increased incidence of serious vascular events with higher daily doses (trend P=0.03) (fig A on bmj.com).

#### Aspirin

Among the 84 placebo controlled trials that allowed concomitant use of aspirin for which data were available, we found no significant heterogeneity of the summary rate ratios for vascular events among aspirin users and non-users (heterogeneity $\chi^2 = 0.0$, df = 1; P = 0.9) (fig B on bmj.com). We found a similar lack of heterogeneity for myocardial infarction, stroke, and vascular death (data not shown).

### Comparisons of selective COX 2 inhibitor versus traditional NSAID

Overall, we found no significant difference in the incidence of a serious vascular event between participants allocated to a selective COX 2 inhibitor and those allocated to a traditional NSAID—340 vascular events during 33 260 person years of exposure to a selective COX 2 inhibitor (1.0%/year) versus 211 vascular events during 23 325 person years with a traditional

Downloaded from bmj.com on 5 June 2006

Research

NSAID (0.9%/year) (rate ratio 1.16, 0.97 to 1.38; $P = 0.1$) (fig 3). However, we found marked heterogeneity between the rate ratios for vascular events in trials comparing a selective COX 2 inhibitor with naproxen and those comparing a selective COX 2 inhibitor with a non-naproxen NSAID ($\chi^2 = 10.2$, df $= 1$; $P = 0.001$). We found similar heterogeneity for myocardial infarction ($\chi^2 = 4.3$, df $= 1$; $P = 0.04$), stroke ($\chi^2 = 3.6$, df $= 1$; $P = 0.06$), and vascular death ($\chi^2 = 5.3$, df $= 1$ $P = 0.02$).

### Any selective COX 2 inhibitor versus naproxen

Overall, compared with naproxen, allocation to a selective COX 2 inhibitor was associated with a highly significant increase in the incidence of a vascular event (rate ratio 1.57, 1.21 to 2.03; $P = 0.0006$) and a twofold increased risk of a myocardial

infarction (2.04, 1.41 to 2.96; $P = 0.0002$) (fig 3). We found no significant difference in the incidence of stroke (rate ratio 1.10, 0.73 to 1.65; $P = 0.7$) or of vascular death (1.47, 0.90 to 2.40; $P = 0.1$).

### Any selective COX 2 inhibitor versus a non-naproxen NSAID

Overall, we found no significant difference in the incidence of a vascular event (rate ratio 0.88, 0.69 to 1.12; $P = 0.3$), myocardial infarction (1.20, 0.85 to 1.68; $P = 0.3$), or vascular death (0.67, 0.43 to 1.06; $P = 0.09$), but a selective COX 2 inhibitor was associated with a significantly lower incidence of stroke than any non-naproxen traditional NSAID (rate ratio 0.62, 0.41 to 0.95; $P = 0.03$) (fig 3). Comparisons of a selective COX 2 inhibitor with ibuprofen (rate ratio 0.85, 99% confidence interval 0.49 to 1.46; $P = 0.4$), a selective COX 2 inhibitor versus diclofenac (0.85, 0.56

| COX 2 inhibitor | No of trials | Events/person years | | Rate ratio COX 2 inhibitor: placebo |
|---|---|---|---|---|
| | | Allocated COX 2 inhibitor | Allocated placebo | |
| **Vascular events** | | | | |
| Rofecoxib | 37 | 98/6638 | 72/6415 | |
| Celecoxib | 41 | 84/8976 | 29/4953 | |
| Etoricoxib | 17 | 7/753 | 2/414 | |
| Lumiracoxib | 12 | 14/1375 | 6/584 | |
| Valdecoxib | 14 | 13/748 | 3/273 | |
| Subtotal | 121 | 216/18 490 | 112/12 639 | |
| | | (1.2%/year) | (0.9%/year) | |
| Heterogeneity between five drugs: $\chi^2 = 0.5$, df $= 4$, P $= 1.0$ | | | | |
| **Myocardial infarction** | | | | |
| Rofecoxib | 37 | 54/6638 | 30/6415 | |
| Celecoxib | 41 | 44/8976 | 9/4953 | |
| Etoricoxib | 17 | 2/753 | 0/414 | |
| Lumiracoxib | 12 | 5/1375 | 2/584 | |
| Valdecoxib | 14 | 8/748 | 1/273 | |
| Subtotal | 121 | 113/18 490 | 42/12 639 | |
| | | (0.6%/year) | (0.3%/year) | |
| Heterogeneity between five drugs: $\chi^2 = 1.0$, df $= 4$, P $= 0.9$ | | | | |
| **Stroke** | | | | |
| Rofecoxib | 37 | 34/6638 | 34/6415 | |
| Celecoxib | 41 | 26/8976 | 13/4953 | |
| Etoricoxib | 17 | 4/753 | 2/414 | |
| Lumiracoxib | 12 | 4/1375 | 3/584 | |
| Valdecoxib | 14 | 2/748 | 1/273 | |
| Subtotal | 121 | 70/18 490 | 53/12 639 | |
| | | (0.4%/year) | (0.4%/year) | |
| Heterogeneity between five drugs: $\chi^2 = 1.0$, df $= 4$, P $= 1.0$ | | | | |
| **Vascular death** | | | | |
| Rofecoxib | 37 | 22/6638 | 19/6415 | |
| Celecoxib | 41 | 23/8976 | 9/4953 | |
| Etoricoxib | 17 | 3/753 | 0/414 | |
| Lumiracoxib | 12 | 6/1375 | 1/584 | |
| Valdecoxib | 14 | 6/748 | 1/273 | |
| Subtotal | 121 | 60/18 490 | 30/12 639 | |
| | | (0.3%/year) | (0.2%/year) | |
| Heterogeneity between five drugs: $\chi^2 = 2.0$, df $= 4$, P $= 0.7$ | | | | |

0.1  0.25  0.5 · 1.0    2.5  5.0  10
Favours                        Favours
COX 2 inhibitor              placebo

Fig 1   Comparison of effects of different selective COX 2 inhibitors versus placebo on vascular events, myocardial infarction, stroke, and vascular death. Event numbers and person years of exposure, with corresponding mean annual event rates in parenthesis, are presented for patients allocated to selective COX 2 inhibitor and placebo. Event rate ratios for subtotals, with 95% confidence intervals, are indicated by a diamond; rate ratios for individual selective COX 2 inhibitors, with 99% confidence intervals, are indicated by a square and horizontal line. Diamonds to the right of the solid line indicate hazard with a selective COX 2 inhibitor compared with placebo, but this is conventionally significant only if the diamond does not overlap the solid line

Downloaded from bmj.com on 5 June 2006

Research

to 1.27; P = 0.3), and a selective COX 2 inhibitor versus any other non-naproxen NSAID (2.21, 0.49 to 10.03; P = 0.2) yielded similar rate ratios for vascular events (test for heterogeneity $\chi^2 = 2.6$, df = 2; P = 0.3) (fig 3).

### Comparisons of traditional NSAID versus placebo
We combined direct estimates of treatment effect (from trials involving a comparison of an NSAID versus placebo) with indirect information (from a comparison of trials of a selective COX 2 inhibitor versus placebo and a selective COX 2 inhibitor versus NSAID) (see statistical appendix on bmj.com). The summary rate ratio for vascular events, in comparison with placebo, was 0.92 (95% confidence interval 0.67 to 1.26) for naproxen, 1.51 (0.96 to 2.37) for ibuprofen, and 1.63 (1.12 to 2.37) for diclofenac.

## Discussion

When we considered all the randomised trial data, selective COX 2 inhibitors were associated with a highly significant 1.4-fold increased risk of serious vascular events, largely due to a twofold increased risk of myocardial infarction. Although we found no significant excesses in the incidence of stroke or vascular death, the confidence intervals for each were wide, so we could not exclude a clinically important excess. If, as some people have suggested (on the basis of the delayed divergence of survival curves), the hazard emerges only after a year or 18 months,[4 5] then combining short term and long term trials might underestimate the effects of long term exposure to a selective COX 2 inhibitor. We were not able to assess time dependent variation in the rate ratio because we sought numbers of events and person time only for the whole period of follow-up in each trial. However, as figure 2 clearly shows, when all the long term trials

are considered, the summary rate ratio is similar to that from short term and long term trials combined and somewhat smaller than the twofold to threefold excess suggested by the combined results of the APC and APPROVe studies.[4 5]

Not all of the trials had independent adjudication of vascular events, so a bias towards the null is possible owing to non-differential misclassification of vascular outcomes in those trials without independent adjudication. As more than 70% of the vascular events occurred in trials that were adjudicated, the potential for misclassification is limited. Indeed, the summary rate ratio for vascular events among adjudicated trials was 1.45 (95% confidence interval 1.12 to 1.89), which is very similar to the estimate among all trials of 1.42 (1.13 to 1.78). A further potential source of bias was our prospective decision to limit eligibility to trials of at least four weeks' duration, because this resulted in the exclusion of two small short term randomised trials of parecoxib (the intravenously administered pro-drug of valdecoxib) and valdecoxib versus placebo among patients having coronary artery bypass grafting,[11 12] in which the risk of vascular events was increased threefold.[13] If these two trials had been included, the summary rate ratio for a selective COX 2 inhibitor versus placebo would have been 1.49 (1.20 to 1.85). Hence, although we cannot exclude the possibility that, at least in the context of vascular surgery, the proportional increase in risk of a vascular event is higher with parecoxib or valdecoxib than with other selective COX 2 inhibitors, the exclusion of these trials had a small effect on the overall summary rate ratio for a selective COX 2 inhibitor versus placebo.

The available data from placebo controlled trials were inadequate to allow assessment of whether the cardiovascular risks of selective COX 2 inhibitors are dose dependent (fig A on

| | Events/person years | | Rate ratio |
|---|---|---|---|
| Study | Allocated COX 2 inhibitor | Allocated placebo | COX 2 inhibitor : placebo |
| **Alzheimer's** | | | |
| 078 | 29/1369 | 29/1563 | |
| 091 | 4/300 | 11/367 | |
| 126 | 6/186 | 5/192 | |
| Aisen | 6/122 | 2/111 | |
| 001 | 13/250 | 2/120 | |
| 002 | 1/24 | 2/13 | |
| Subtotal | 59/2251 | 51/2366 | |
| | (2.6%/year) | (2.2%/year) | |
| Heterogeneity between six trials: $\chi^2 = 7.7$, df=5, P=0.2 | | | |
| | | | |
| **Polyps** | | | |
| APPROVe | 34/3070 | 18/3334 | |
| APC | 35/4089 | 6/2063 | |
| PreSAP | 19/2794 | 12/1875 | |
| Subtotal | 88/9953 | 36/7272 | |
| | (0.9%/year) | (0.5%/year) | |
| Heterogeneity between three trials: $\chi^2 = 2.9$, df=2, P=0.2 | | | |
| | | | |
| Total | 147/12 204 | 87/9638 | |
| | (1.2%/year) | (0.9%/year) | |

Difference between treatment effects in two subtotals: $\chi^2 = 2.9$, df=1, P=0.09
Heterogeneity within subtotals: $\chi^2 = 10.5$, df=7, P=0.2
Heterogeneity between nine trials: $\chi^2 = 13.4$, df=8, P=0.1

0.1  0.25  0.5  1  2.5  5.0  10
Favours COX 2 inhibitor        Favours placebo
Treatment effect P=0.005

**Fig 2** Comparison of effects of selective COX 2 inhibitors versus placebo among trials with scheduled duration of at least one year. Symbols and conventions are as in fig 1

Downloaded from bmj.com on 5 June 2006

Research

bmj.com). Although we found a weak trend towards larger risks with higher daily doses of celecoxib, this result was driven by the results of one trial.[3] We were also unable to determine reliably whether the cardiovascular effects of selective COX 2 inhibitors might differ among aspirin users and non-users (fig B on bmj.com).



| COX 2 inhibitor versus: | No of trials | Events/person years | | Rate ratio COX 2 inhibitor: NSAID |
|---|---|---|---|---|
| | | Allocated COX 2 inhibitor | Allocated NSAID | |
| **Vascular events** | | | | |
| (a) Naproxen | 42 | 185/16 360 | 81/10 978 | |
| | | (1.1%/year) | (0.7%/year) | |
| Ibuprofen | 24 | 46/5848 | 47/5160 | |
| Diclofenac | 26 | 101/10 886 | 79/6913 | |
| Other non-naproxen | 7 | 8/166 | 4/274 | |
| (b) Any non-naproxen | 51 | 155/16 900 | 130/12 347 | |
| | | (0.9%/year) | (1.1%/year) | |
| Any NSAID | 91 | 340/33 260 | 211/23 325 | |
| | | (1.0%/year) | (0.9%/year) | |

Heterogeneity between (a) and (b): $\chi^2$=10.2, df=1, P=0.001
Between non-naproxen NSAIDs: $\chi^2$=2.5, P=0.3

| | | | | |
|---|---|---|---|---|
| **Myocardial infarction** | | | | |
| (a) Naproxen | 42 | 99/16 360 | 30/10 978 | |
| | | (0.6%/year) | (0.3%/year) | |
| Ibuprofen | 24 | 21/5848 | 21/5160 | |
| Diclofenac | 26 | 61/10 886 | 32/6913 | |
| Other non-naproxen | 7 | 5/165 | 2/274 | |
| (b) Any non-naproxen | 51 | 87/16 900 | 55/12 347 | |
| | | (0.5%/year) | (0.4%/year) | |
| Any NSAID | 91 | 186/33 260 | 85/23 325 | |
| | | (0.6%/year) | (0.4%/year) | |

Heterogeneity between (a) and (b): $\chi^2$=4.3, df=1, P=0.04
Between non-naproxen NSAIDs: $\chi^2$=2.6, df=2, P=0.3

| | | | | |
|---|---|---|---|---|
| **Stroke** | | | | |
| (a) Naproxen | 42 | 63/16 360 | 40/10 978 | |
| | | (0.4%/year) | (0.4%/year) | |
| Ibuprofen | 24 | 17/5848 | 16/5160 | |
| Diclofenac | 26 | 23/10 886 | 31/6913 | |
| Other non-naproxen | 7 | 2/166 | 2/274 | |
| (b) Any non-naproxen | 51 | 42/16 900 | 49/12 347 | |
| | | (0.2%/year) | (0.4%/year) | |
| Any NSAID | 91 | 105/33 260 | 89/23 325 | |
| | | (0.3%/year) | (0.4%/year) | |

Heterogeneity between (a) and (b): $\chi^2$=3.6, df=1, P=0.06
Between non-naproxen NSAIDs: $\chi^2$=2.0, df=2, P=0.4

| | | | | |
|---|---|---|---|---|
| **Vascular death** | | | | |
| (a) Naproxen | 42 | 46/16 360 | 23/10 978 | |
| | | (0.3%/year) | (0.2%/year) | |
| Ibuprofen | 24 | 13/5848 | 16/5160 | |
| Diclofenac | 26 | 24/10 886 | 25/6913 | |
| Other non-naproxen | 7 | 1/166 | 1/274 | |
| (b) Any non-naproxen | 51 | 38/16 900 | 42/12 347 | |
| | | (0.2%/year) | (0.3%/year) | |
| Any NSAID | 91 | 84/33 260 | 65/23 325 | |
| | | (0.3%/year) | (0.3%/year) | |

Heterogeneity between (a) and (b): $\chi^2$=5.3, df=1, P=0.02
Between non-naproxen NSAIDs: $\chi^2$=0.6, df=2, P=0.8

0.1   0.25  0.5  1.0      2.5   5.0   10
Favours                         Favours
COX 2 inhibitor                 NSAID

Fig 3   Comparison of effects of selective COX 2 inhibitors versus traditional NSAIDs on vascular events, myocardial infarction, stroke, and vascular death. Symbols and conventions are as in fig 1. Some trials involved more than one NSAID comparator, so numbers of trials in subtotals are not a strict sum of numbers for each NSAID

Downloaded from bmj.com on 5 June 2006

Research

**Cardiovascular effects of traditional NSAIDs**

As traditional NSAIDs inhibit the COX 2 enzyme, these drugs might also be associated with an increased risk of vascular events.[14] As NSAIDs were originally developed for the relief of pain, long term placebo controlled trials have not been done. A few traditional NSAIDs with prominent effects on the COX 1 isozyme, such as indobufen and flurbiprofen, have been tested as potential antiplatelet agents in small studies,[15 16] but no adequately powered long term randomised trials have assessed drugs without such antiplatelet effects. As the plasma half life of naproxen is around 14 hours, a regimen of 500 mg twice daily results in sustained inhibition of COX 1 dependent thromboxane biosynthesis, whereas both ibuprofen and diclofenac have much shorter half lives (one to two hours), and standard twice or three times daily regimens have only transient effects. We therefore hypothesised that the cardiovascular effects of naproxen would differ from those of non-naproxen NSAIDs. Our results indicated that high dose ibuprofen (800 mg three times daily) and high dose diclofenac (75 mg twice daily) were each associated with an increased risk of vascular events, but that the risks of high dose naproxen (500 mg twice daily) were substantially smaller. We had insufficient information to determine whether naproxen was protective. Uncertainty remains, however, as to whether the cardiovascular effects of standard (that is, lower) daily doses of these drugs would differ from those identified in this meta-analysis, and this is an important topic for future research.

**Estimating absolute risk**

In this particular group of trials, allocation to a selective COX 2 inhibitor was associated with around three extra people having a vascular event per 1000 per year, with most of this excess attributable to myocardial infarction. The annual excess incidence associated with full compliance with a selective COX 2 inhibitor would be expected to be larger than this, however. In the APPROVe study, for example, approximately one third of randomised patients discontinued study treatment before the end of the study.[1] If this discontinuation rate was typical, the absolute excess incidence of vascular events produced by full compliance with a selective COX 2 inhibitor might be four or five additional patients having a vascular event per 1000 treated per year overall, with a smaller excess among those at lower than average risk (such as young women with rheumatoid arthritis) and a higher excess in those at above average risk (such as older patients with established atherosclerotic disease).

**Study limitations**

The chief limitation of this study is the relatively small number of events available for analysis, which limits assessment of the hazards of the various different selective COX 2 inhibitors and traditional NSAIDs in particular clinical circumstances. We were also limited to analysing tabular summaries of data, which prevented us from assessing the timing of the hazard or variation in the rate ratio among particular subgroups of patients. Moreover, we limited attention to cardiovascular hazards, whereas the choice between different anti-inflammatory regimens also needs to take account of differences in their gastrointestinal effects. Some of these outstanding uncertainties may be resolved by a planned meta-analysis of data on individual patients from these trials.

**Conclusions**

This meta-analysis has shown that selective COX 2 inhibitors are associated with a moderate increase in the risk of vascular events, as are high dose regimens of ibuprofen and diclofenac, but that



high dose naproxen is not associated with such an excess. As differences between anti-inflammatory regimens are likely to be small, very large randomised trials will be needed if we are to identify which anti-inflammatory drug regimens minimise the overall burden of adverse gastrointestinal and cardiovascular outcomes.

We acknowledge the help of Novartis (Patrice Matchaba, Xavier Gitton, Elena Ehrsam, Melvin Olson, Bernd Mellein, and Godehard Hoexter), Merck (Sean P Curtis and Judith Boice), and Pfizer (Simon Lowry, George Sands, Rebecca Rosenstein, and Sharon Pan). We thank P S Aisen (Georgetown University), T Higuchi and K Sugihara (Tokyo Medical and Dental University), S Razzi (University of Siena), F K L Chan (Chinese University of Hong Kong), R K S Dionne (National Institutes of Health), G L Bakris (Rush Medical Centre), R S Philipson (GlaxoSmithKline), R K Phillips (St Mark's Hospital) and the APC investigators for providing data from their trials.

Contributors: PMK, CB, and CP contributed to the idea for and design of the study, analysis and interpretation of data, and drafting and critical revision of the report. HH contributed to the assembly of the data and drafting and critical revision of the report. JG and JRE contributed to the analysis of the data. CB is the guarantor.

Funding: The Clinical Trial Service Unit is supported by a core grant from the UK Medical Research Council, by the British Heart Foundation, and by Cancer Research UK. CB is supported by the UK MRC. CP is supported by grants from the Italian Ministry of University and Research to the Center of Excellence on Aging of the "G d'Annunzio" University Foundation and from the Commission of the European Communities (EICOSANOX Project 005033). The authors retained full editorial control of the content of this paper.

Competing interests: The Clinical Trial Service Unit has a staff policy of not accepting honorariums or other payments from the drug industry, except for the reimbursement of costs to participate in scientific or advisory committee meetings. CB has had such costs reimbursed for attending meetings arranged by Bayer, Merck, Novartis, GlaxoSmithKline, and Astra-Zeneca. He is the lead investigator of the study of heart and renal protection, a study of cholesterol lowering in chronic kidney disease, which is sponsored by the University of Oxford and supported by an unrestricted grant from Merck. CP has received grant support from Bayer, Merck, and Pfizer. In addition, he has received honorariums for lecturing and consulting from Bayer and NiCox. PMK, JG, HH, and JRE have no competing interests. No funding was provided by any drug company for this project. None of the authors has any stockholdings in pharmaceutical companies, and none is involved in advising any organisation or individual on issues related to litigation.

1   FitzGerald GA, Patrono C. The coxibs, selective inhibitors of cyclooxygenase-2. N Engl J Med 2001;345:433-42.

Downloaded from bmj.com on 5 June 2006

Research

2 Bombardier C, Laine L, Reicin A, Shapiro D, Burgos-Vargas R, Davis B, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. *N Engl J Med* 2000;343:1520-8.
3 Schnitzer TJ, Burmester GR, Mysler E, Hochberg MC, Doherty M, Ehrsam E, et al. Comparison of lumiracoxib with naproxen and ibuprofen in the therapeutic arthritis research and gastrointestinal event trial (TARGET), reduction in ulcer complications: randomised controlled trial. *Lancet* 2004;364:665-74.
4 Bresalier RS, Sandler RS, Quan H, Bolognese JA, Oxenius B, Horgan K, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. *N Engl J Med* 2005;352:1092-102.
5 Solomon SD, McMurray JJ, Pfeffer MA, Wittes J, Fowler R, Finn P, et al. Cardiovascular risk associated with celecoxib in a clinical trial for colorectal adenoma prevention. *N Engl J Med* 2005;352:1071-80.
6 Patrono C, García Rodríguez LA, Landolfi R, Baigent C. Low-dose aspirin for the prevention of atherothrombosis. *N Engl J Med* 2005;353:2373-83.
7 Robinson KA, Dickersin K. Development of a highly sensitive search strategy for the retrieval of reports of controlled trials using Pubmed. *Int J Epidemiol* 2002;31:150-3.
8 Antiplatelet Trialists' Collaboration. Collaborative overview of randomised trials of antiplatelet therapy—I: Prevention of death, myocardial infarction, and stroke by prolonged antiplatelet therapy in various categories of patients. *BMJ* 1994;308:81-106.
9 Levin B. Celecoxib in adenoma prevention—the PreSAP trial. Slide presentation at Meeting of the FDA Advisory Committee on COX-2 Inhibitors and NSAIDS, 16-18 February 2005, Gaithersburg, MD. Available at www.fda.gov/ohrms/dockets/ac/05/slides/2005-4090S1_09_FDA-Levin.ppt (accessed 2 Dec 2005).
10 Early Breast Cancer Trialists' Collaborative Group. *Treatment of early breast cancer: worldwide evidence 1985-1990.* Oxford: Oxford University Press, 1990.
11 Ott E, Nussmeier NA, Duke PG, Feneck RO, Alston RP, Snabes MC, et al. Efficacy and safety of the cyclooxygenase 2 inhibitors parecoxib and valdecoxib in patients undergoing coronary artery bypass surgery. *J Thorac Cardiovasc Surg* 2003;125:1481-92.
12 Nussmeier NA, Whelton AA, Brown MT, Langford RM, Hoeft A, Parlow JL, et al. Complications of the COX-2 inhibitors parecoxib and valdecoxib after cardiac surgery. *N Engl J Med* 2005;352:1081-91.
13 Furberg CD, Psaty BM, FitzGerald GA. Parecoxib, valdecoxib, and cardiovascular risk. *Circulation* 2005;111:249.
14 Baigent C, Patrono C. Selective cyclooxygenase 2 inhibitors, aspirin, and cardiovascular disease: a reappraisal. *Arthritis Rheum* 2003;48:12-20.
15 Brochier ML. Evaluation of flurbiprofen for prevention of reinfarction and reocclusion after successful thrombolysis or angioplasty in acute myocardial infarction: the flurbiprofen French trial. *Eur Heart J* 1993;14:951-7.
16 Fornaro G, Rossi P, Mantica PG, Caccia ME, Aralda D, Lavezzari M, et al. Indobufen in the prevention of thromboembolic complications in patients with heart disease: a randomized, placebo-controlled, double-blind study. *Circulation* 1993;87:162-4.

*(Accepted 19 April 2006)*

bmj.com 2006;332:1302

Clinical Trial Service Unit and Epidemiological Studies Unit, University of Oxford, Oxford OX3 7LF
Patricia M Kearney *clinical research fellow*
Colin Baigent *reader in clinical epidemiology*
Jon Godwin *research fellow*
Heather Halls *research assistant*
Jonathan R Emberson *senior statistician*

Department of Pharmacology, University of Rome "La Sapienza," Rome, Italy
Carlo Patrono *professor of pharmacology*

Correspondence to: C Baigent colin.baigent@ctsu.ox.ac.uk