APPROVe Trial Cardiovascular Safety Report



### 7.6 New Ischemic Events

A new ischemic event was not a pre-specified DAP endpoint for analysis and was included in the analysis based on a regulatory agency request. Table 16 summarizes the new ischemic events which occurred between randomization and 14 days after the last dose of study therapy by term and treatment.

There were 38 patients with new ischemic events in the rofecoxib treatment group and 28 patients with new ischemic events in the placebo treatment group.

The patient-year adjusted event rates were 1.24 and 0.85 events per 100 patient-years for the rofecoxib and placebo treatment groups, respectively.

**Table 16**
**Summary of New Ischemic Events by Class of Terms**
**(Events on Treatment through 14 Days After the Last Dose of Study Therapy)**

| Event Terms | Rofecoxib 25 mg (N=1287) 3062 Patient-Years (PY) | | Placebo (N=1299) 3308 Patient-Years | |
|---|---|---|---|---|
| | n(%)[†] | PY-Rate[‡] (95% CI) | n(%)[†] | PY-Rate[‡] (95% CI) |
| Total number of patients with events | 38 (2.95) | 1.24 (0.88, 1.70) | 28 (2.16) | 0.85 (0.56, 1.22) |
| Acute coronary syndrome | 1 (0.08) | 0.03 (0.00, 0.18) | 0 (0.00) | 0.00 (0.00, 0.11) |
| Acute myocardial infarction | 5 (0.39) | 0.16 (0.05, 0.38) | 1 (0.08) | 0.03 (0.00, 0.17) |
| Angina pectoris | 5 (0.39) | 0.16 (0.05, 0.38) | 9 (0.69) | 0.27 (0.12, 0.52) |
| Angina unstable | 1 (0.08) | 0.03 (0.00, 0.18) | 1 (0.08) | 0.03 (0.00, 0.17) |
| Cardiac arrest | 2 (0.16) | 0.07 (0.01, 0.24) | 2 (0.15) | 0.06 (0.01, 0.22) |
| Coronary artery disease | 17 (1.32) | 0.56 (0.32, 0.89) | 16 (1.23) | 0.48 (0.28, 0.79) |
| Coronary artery occlusion | 1 (0.08) | 0.03 (0.00, 0.18) | 0 (0.00) | 0.00 (0.00, 0.11) |
| Coronary artery stenosis | 1 (0.08) | 0.03 (0.00, 0.18) | 1 (0.08) | 0.03 (0.00, 0.17) |
| ECG signs of myocardial ischaemia | 1 (0.08) | 0.03 (0.00, 0.18) | 0 (0.00) | 0.00 (0.00, 0.11) |
| Myocardial infarction | 11 (0.85) | 0.36 (0.18, 0.64) | 7 (0.54) | 0.21 (0.09, 0.44) |
| Myocardial ischaemia | 3 (0.23) | 0.10 (0.02, 0.29) | 2 (0.15) | 0.06 (0.01, 0.22) |
| Sudden cardiac death | 1 (0.08) | 0.03 (0.00, 0.18) | 0 (0.00) | 0.00 (0.00, 0.11) |
| Sudden death | 1 (0.08) | 0.03 (0.00, 0.18) | 0 (0.00) | 0.00 (0.00, 0.11) |
| Ventricular fibrillation | 1 (0.08) | 0.03 (0.00, 0.18) | 0 (0.00) | 0.00 (0.00, 0.11) |

Note: Patients with multiple events may be counted more than once in different terms, but only once in each term
[†] Crude Incident(n/Nx100)
[‡] Events per 100 Patient-Years, where patient-years at risk were calculated based on the overall event
Data Source: [4.4.1]

41


EXHIBIT A

Confidential - Subject To Protective Order

MRK-S0420051272

APPROVe Trial Cardiovascular Safety Report



Figure 8 displays the Kaplan-Meier cumulative rate curves over time for new ischemic events for
both treatment groups.

**Figure 8
Kaplan-Meier Plot for New Ischemic Events
(Events on Treatment through 14 Days After the Last Dose of Study Therapy)**



| Patients at Risk | 0 | 6 | 12 | 18 | 24 | 30 | 36 |
|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1286 | 1129 | 1058 | 990 | 940 | 898 | 729 |
| Placebo | 1298 | 1190 | 1150 | 1074 | 1035 | 994 | 828 |

Data Source: [4.4.1]

Confidential - Subject To Protective
Order

MRK-S0420051273

APPROVe Trial Cardiovascular Safety Report



Figure 9 displays the hazard functions over time for both treatment groups. The rates of new ischemic events for both treatment groups and the relative risks at 6-month intervals or 18-month intervals are shown in Tables 17 and 18. Figure 9, Tables 17 and 18 show that the hazard ratio or the relative risk for new ischemic events did not appear to be a constant over time. The testing of the proportional hazard assumption for the Cox proportional hazards model also showed that the assumption did not hold (p=0.014). The relative risk calculated as an estimate of the hazard ratio from the Cox model should be interpreted as an average of the treatment effect over the time range of the study. The relative risk of rofecoxib versus placebo therapy was 1.48 with a 95% confidence interval of (0.90, 2.43). The relative risk was not significantly greater than 1 (p= 0.121) (Table 8).

**Figure 9**
**Hazard Plot for New Ischemic Events**
**(Events on Treatment through 14 Days After the Last Dose of Study Therapy)**



Data Source: [4.4.1]

Confidential - Subject To Protective Order

APPROVe Trial Cardiovascular Safety Report

Confidential - Subject To Protective Order

MRK-S0420051275

Table 17
Summary of New Ischemic Events by Time Interval (6 Months)
(Events on Treatment through 14 Days After the Last Dose of Study Therapy)

| Time Interval | Rofecoxib 25 mg (N=1287) | | | Placebo (N=1299) | | | Relative Risk(95% CI) |
|---|---|---|---|---|---|---|---|
| | Number At Risk | Events/Patient-years | Rate (95% CI)[1] | Number At Risk | Events/Patient-years | Rate (95% CI)[1] | |
| 0 - 6 Months | 1287 | 4/602 | 0.66(0.18, 1.70) | 1299 | 11/620 | 1.77(0.89, 3.17) | 0.37 (0.09, 1.26) |
| 6 - 12 Months | 1129 | 5/544 | 0.92(0.30, 2.14) | 1190 | 4/583 | 0.69(0.19, 1.76) | 1.34 (0.29, 6.75) |
| 12 - 18 Months | 1058 | 10/511 | 1.96(0.94, 3.60) | 1150 | 5/555 | 0.90(0.29, 2.10) | 2.17 (0.68, 8.10) |
| 18 - 24 Months | 990 | 6/482 | 1.25(0.46, 2.71) | 1074 | 1/528 | 0.19(0.00, 1.06) | 6.57 (0.80, 302.35) |
| 24 - 30 Months | 940 | 3/458 | 0.66(0.14, 1.92) | 1035 | 3/506 | 0.59(0.12, 1.73) | 1.11 (0.15, 8.26) |
| > 30 Months | 898 | 10/466 | 2.15(1.03, 3.95) | 994 | 4/516 | 0.78(0.21, 1.99) | 2.77 (0.80, 12.10) |

[1] Events per 100 Patient-Years (PY)
Data Source: [4.4.1]

Table 18
Summary of New Ischemic Events by Time Interval (18 Months)
(Events on Treatment through 14 Days After the Last Dose of Study Therapy)

| Time Interval | Rofecoxib 25 mg (N=1287) | | | Placebo (N=1299) | | | Comparison | |
|---|---|---|---|---|---|---|---|---|
| | Number At Risk | Events/Patient-years | Rate (95% CI)[1] | Number At Risk | Events/Patient-years | Rate (95% CI)[1] | Difference(95% CI) | Relative Risk(95% CI) |
| Months 0 - 18 | 1287 | 19/1657 | 1.15(0.69, 1.79) | 1299 | 20/1758 | 1.14(0.69, 1.76) | 0.01 (-0.71, 0.73) | 1.01 (0.53, 1.92) |
| Months 19 - 36 | 990 | 19/1405 | 1.35(0.81, 2.11) | 1074 | 8/1550 | 0.52(0.22, 1.02) | 0.84 (0.13, 1.54) | 2.62 (1.10, 6.92) |
| Ratio | | | 1.27 (0.66, 2.41) | | | 0.45 (0.17, 1.08) | | |

[1] Events per 100 Patient-Years (PY)
Data Source: [4.4.1]

44

Exhibit B - Farquhar Deposition Excerpts

• Farquhar Reply

[1:] - [1:25]          6/8/2006        Farquhar, John W., M.D.

page 1
    0001
1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF LOUISIANA
3
4        In re:  VIOXX
         PRODUCTS LIABILITY
5        LITIGATION
6
7        GERALD BARNETT and CORRINE              )
         BARNETT,                                )
8                                                )MDL Docket No. 1657
                       Plaintiffs,               )
9                                                )
         vs.                                     )
10                                               )
         MERCK & CO., INC.,                      )
11                                               )
                       Defendant.                )
12                                               )
         _____)
13
14
15
16        VIDEOTAPED DEPOSITION OF JOHN W. FARQUHAR, M.D.
17                  San Francisco, California
18                       June 8, 2006
19
20
21
22
23
24        Reported by:
          DARCY J. BROKAW
25        RPR, CRR, CSR No. 12584
          Job No. 69492


[123:20] - [133:6]          6/8/2006        Farquhar, John W., M.D.

page 123
20        Q      Turn to the next page.  The next page, Dr.
21   Farquhar, is a chart and it's titled at the top:
22   "Excerpts of Merck database showing diabetics with
23   thrombotic events had 2 or more risk factors."
24          Do you see that?
25        A      Yes.
page 124
1         Q      Who prepared this chart?
2         A      Ms. Gross.
3         Q      Ms. Gross prepared this chart, correct?
4         A      Correct.
5         Q      This chart shows a series of patients and
6    purports to show the diabetics with thrombotic
7    events in APPROVe?
8         A      Correct.
9         Q      Next to two of the patients is an
10   asterisk.  Do you see that?
11        A      Yes.
12        Q      And underneath there's an explanation of
13   the asterisk that says:  "AN numbers 91512 and 93522
14   had two or more risk factors, i.e. diabetes plus
15   hypertension, as shown in the adverse event reports
16   for these patients."
17          Do you see that?
18        A      Yes.
19        Q      Ms. Gross went and looked at the adverse
20   event reports for these patients and determined that
21   they had hypertension?



Exhibit B - Farquhar Deposition Excerpts

• Farquhar Reply

```
22    A    Yes.
23    Q    You relied on a plaintiff's lawyer looking
24  at adverse event reports to know whether or not
25  these two patients had hypertension?
page 125
1              MR. ARBITBLIT:  Object to form.
2              THE WITNESS:  Well, I relied on it and I
3  was happy to have someone who had the skill and
4  ability at the time to go over all of those.  It's
5  tedious work and I trust the results.
6  BY MR. MORTARA:
7    Q    You yourself did not go over the adverse
8  event reports for these patients, correct?
9    A    Correct.
10    Q    You relied on Ms. Gross, a plaintiff's
11  lawyer, to tell you whether or not these two
12  patients had hypertension?
13    A    Yes, I did.
14    Q    Is Ms. Gross a medical doctor?
15    A    I don't know her curriculum vitae, so I
16  don't know all her attributes.
17    Q    Have you ever heard Ms. Gross referred to
18  as "Dr. Gross"?
19              MR. ARBITBLIT:  Object to form.
20              THE WITNESS:  No, I have not.
21  BY MR. MORTARA:
22    Q    It's your understanding that Ms. Gross,
23  the plaintiff's lawyer, reclassified these two
24  patients as having two or more risk factors based on
25  adverse event reports, correct?
page 126
1              MR. ARBITBLIT:  Object to form.
2              THE WITNESS:  Well, reclassified -- I
3  think she simply discovered that they had been
4  incorrectly classified because their hypertension
5  had been missed in the database accumulation,
6  keeping in mind that those are done with people
7  punching numbers in and pressing a button on a
8  computer and it spills out and occasionally
9  something will be missed, and that's an example.
10    Q    And it's your understanding that Ms.
11  Gross, the plaintiff's lawyer, when she did this
12  work, looked at adverse event reports, correct?
13    A    Yes.
14    Q    What's an adverse event report?
15    A    You want to know specifically for APPROVe
16  or do you want to know it in general for all
17  studies?
18    Q    In general is fine.
19    A    An adverse event report is a report of --
20  sorry, it sounds weird -- a report of an adverse
21  event.  Now, what is an adverse event?  It's highly
22  variable, and it depends on what the investigators
23  and the data safety and managing board or external
24  review boards have decided is an adverse event.
25              So, you know, the compilation of adverse
page 127
1  events is something that is prespecified.
2    Q    Adverse event reports get generated after
3  treatment has begun and there's an adverse event,
4  correct?
5    A    Right.
6    Q    And an adverse event report will show
7  medical information about the patient who had the
8  adverse event, correct?
9    A    That's right.
10    Q    And that medical information in the
11  adverse event report will reflect the condition of
12  the patient at the time he had the adverse event,
13  correct?
14    A    The adverse event report may be generated
15  sometime after the event occurs, but the date of the
```

Exhibit B - Farquhar Deposition Excerpts

• Farquhar Reply

16  event is there.  So the answer is yes.
17     Q    Why would an adverse event report for a
18  patient in the APPROVe study tell you anything about
19  his baseline hypertension?
20            MR. ARBITBLIT:  Object to form.
21            THE WITNESS:  You have to have the data.
22  BY MR. MORTARA:
23     Q    Do you know if the data on baseline blood
24  pressure is present in adverse event reports in the
25  APPROVe study?
page 128
1      A    I haven't seen the adverse event reports
2  of the APPROVe study, so I don't know what is
3  included and what is excluded.  But if you're going
4  to do your job, you have an adverse event and you
5  want to follow Table 19 and look for the
6  relationship of baseline factors, the adverse event,
7  then you have to generate the baseline data, which
8  as I say, may or may not be on the adverse event
9  report.
10     Q    You don't know how Ms. Gross decided to
11  take these two patients, who are listed as not
12  having any of the risk factors in the database, and
13  decide they had an additional risk factor in
14  addition to being diabetic, correct?
15            MR. ARBITBLIT:  Object to form.
16            THE WITNESS:  I think I've already
17  answered how she did it.
18  BY MR. MORTARA:
19     Q    Do you know if she looked at baseline risk
20  factors or at risk factors that were present in the
21  adverse event report at the time the adverse event
22  occurred?
23            MR. ARBITBLIT:  Object to form.
24            THE WITNESS:  Well, what I've already said
25  I'll repeat, is she had the adverse event report
page 129
1  data and in addition, she had the baseline data.
2  And how she got those together in one form, I wasn't
3  told about that.  But yes, she had both of those
4  bits of data.
5  BY MR. MORTARA:
6      Q    That's not what it says after the
7  asterisk, does it?  It says: "AN numbers 91512 and
8  93522 had 2 or more risk factors, i.e. diabetes plus
9  hypertension, as shown in the adverse event reports
10  for these patients."
11     A    Well, that means that the adverse event
12  reports included the baseline factors.
13     Q    If the adverse event reports don't include
14  the baseline factors, then Ms. Gross did it wrong
15  and you didn't know about it, correct?
16            MR. ARBITBLIT:  Object to form.
17            THE WITNESS:  Well, correct, correct.  I
18  mean, this question is leading towards mistrust of
19  Ms. Gross's work, and I don't mistrust it.  So I'm
20  reluctant to answer your question with anything
21  other than I trust the work that she has done.
22  BY MR. MORTARA:
23     Q    You trust that the adverse event reports
24  that Ms. Gross looked at to do this risk factor
25  analysis for you had baseline risk factor
page 130
1  information in them?
2            MR. ARBITBLIT:  Object to form.
3            THE WITNESS:  I will hold to my previous
4  answer.
5  BY MR. MORTARA:
6      Q    If I show you at trial that these adverse
7  event reports do not in fact have baseline risk
8  factor information in them, that means this whole
9  chart, this whole page is incorrect, correct?

## Exhibit B - Farquhar Deposition Excerpts

• Farquhar Reply

```
10            MR. ARBITBLIT: Object to form.
11            THE WITNESS: The material that Ms. Gross
12   had indicated that these two diabetics had
13   hypertension in addition to their state of diabetes.
14   The information she had included that information.
15   BY MR. MORTARA:
16     Q    Dr. Farquhar, you relied on Ms. Gross,
17   plaintiff's lawyer, to tell you who was in and not
18   in your increased CV risk category, correct?
19            MR. ARBITBLIT: Object to form.  Asked and
20   answered.
21            THE WITNESS: We're talking about two
22   individuals out of 30 events.  The data can be
23   recalculated without those two and would give
24   essentially the same answers.
25            My statement is that I have increased the
page 131
1   precision of the analysis by following predetermined
2   rules of inclusion of the category of increased
3   cardiovascular risk.
4   BY MR. MORTARA:
5     Q    Because of Ms. Gross's work, moving
6   patients from the just diabetic group into the two
7   or more risk factors group, you managed to add two
8   more people to the increased CV risk category,
9   didn't you?
10            MR. ARBITBLIT: Object to form.
11   Argumentative.  Misstates the record.
12            MR. MORTARA: I'll withdraw the question
13   and ask it again.
14   BY MR. MORTARA:
15     Q    Dr. Farquhar, the prespecified increased
16   CV risk category for Protocol 203 consists only of
17   items 1 and 2 on page 1 of Exhibit 7, correct?
18     A    Yes.
19     Q    It does not include diabetics, the
20   prespecified increased CV risk category?
21     A    That's correct, if they are only diabetic
22   and have no other risk factors.  Most of them, you
23   know, we start by thinking diabetics have multiple
24   risk factors in addition to the state of diabetes.
25     Q    The result of Ms. Gross's, the plaintiff's
page 132
1   lawyer's, reclassification of these two patients was
2   that you added two more patients to your increased
3   CV risk analysis, correct?
4            MR. ARBITBLIT: Object to form.  Asked and
5   answered.
6            THE WITNESS: Two out of 30 have been
7   added and that has increased the precision of the
8   resulting analysis.
9   BY MR. MORTARA:
10     Q    If they shouldn't have been added, it
11   didn't increase the precision, did it?
12            MR. ARBITBLIT: Object to form.
13            THE WITNESS: They should have been added
14   and they were and it increased the precision.
15   BY MR. MORTARA:
16     Q    The only basis you have for saying that
17   these two patients should have been added to your
18   increased CV risk group is your trust in the
19   plaintiff's lawyer, Ms. Gross, correct?
20            MR. ARBITBLIT: Object to form.
21            THE WITNESS: I've already answered the
22   query.
23   BY MR. MORTARA:
24     Q    You performed no independent check on
25   whether Ms. Gross was correct in her
page 133
1   reclassification of these two patients, correct?
2            MR. ARBITBLIT: Object to form.
3            THE WITNESS: Well, you know, the meaning
```

Exhibit B - Farquhar Deposition Excerpts

• Farquhar Reply

```
4    of words, I have looked over the data and explored
5    its origins.  And so in that sense, I have added a
6    verification step.
```

[298:1] - [298:24]          6/8/2006      Farquhar, John W., M.D.

```
page 298
1    STATE OF CALIFORNIA        )
2    : ss
3    COUNTY OF SAN FRANCISCO  )
4
5    I, the undersigned, a Certified Shorthand Reporter of the
6    State of California, do hereby certify:  That the foregoing
7    proceedings were taken before me at the time and place
8    herein set forth; that any witnesses in the foregoing
9    proceedings, prior to testifying, were placed under oath;
10   that a verbatim record of the proceedings was made by me
11   using machine shorthand which was thereafter transcribed
12   under my direction; further, that the foregoing is an
13   accurate transcription thereof.
14   I further certify that I am neither financially interested
15   in the action nor a relative or employee of any attorney of
16   any of the parties.  IN WITNESS WHEREOF, I have this date
17   subscribed my name.
18          Dated: _____
19
20          _____
21                  DARCY J. BROKAW, CSR No. 12584
22
23
24
```

IN RE VIOXX PRODUCTS LIABILITY        )     MDL No. 1657
LITIGATION                            )
                                      )

## SUPPLEMENTAL EXPERT REPORT OF JOHN W. FARQUHAR. M.D.
### THIS DOCUMENT APPLIES TO ALL CASES

### A.    Introduction and Summary of Opinions

1.    This Report is submitted to supplement the opinions provided in my Report dated September 26, 2005, based on review of the additional materials referenced herein. The opinions provided herein are stated to a reasonable degree of medical and scientific probability. In summary, the Supplemental Report includes the following:

- Protocol 203: Merck's pre-specified analysis of data from three pooled studies (APPROVe, VICTOR and ViP), known as "Protocol 203," shows early and continuous excess risk of cardiac adverse events, statistically significant at 18 months and at all times thereafter, thereby refuting Merck's hypothesis that no excess risk appears until after 18 months of exposure.

- High-Risk Patients: Data from the APPROVe and VIGOR studies are analyzed, showing greater relative risks and rapid onset of excess cardiovascular events among patients at higher background risk; that is, the level of the cardiovascular (CV) risk before using Vioxx.

- Hypertension: Data from the APPROVe and VIGOR studies are displayed, showing early, continuous and statistically significant excess risk of hypertension due to Vioxx, compared to both placebo and naproxen. Also, data from the APPROVe study show

- 1 -

EXHIBIT
C

significantly greater incidence of both "Stage 2" (more severe)
hypertension and thrombotic events among Vioxx patients who
suffered Stage 2 hypertension. No such increase in CV event risk
appeared among placebo patients who experienced Stage 2
hypertension, supporting the conclusion that there was a
synergistic interaction between hypertension and Vioxx use.

- APPROVe "extension" data: According to documents submitted
  to the FDA by Merck in May 2006, the excess risk of CV events,
  including myocardial infarction ("MI") and ischemic stroke,
  remains statistically significant when data from a one-year off-drug
  follow-up were combined with the previously published data. For
  the extension period alone, there was a 64% increased risk of
  thrombotic events in the Vioxx group.

- Biological Mechanism: Recent publications support Cox-2
  inhibition as the cause of hypertension and thrombosis.

## B. Protocol 203 Shows Early and Continuous Risk of Excess Cardiac Events Among Vioxx Patients.

2.    In 2002, following the VIGOR study, Merck prepared a plan to
analyze CV adverse events in a pooled analysis of 3 large placebo controlled studies:
APPROVe, VICTOR and ViP. The plan, known as "Protocol 203," was submitted to the
FDA for its response. On December 19, 2002, FDA Medical Officer Lawrence Goldkind
responded to Merck's proposal, indicating general acknowledgment that Protocol 203
would provide "clinically important safety information" about the risk of Vioxx. (Letter,
Goldkind to Braunstein, 12/19/02, at p. 1.) Merck proceeded to implement Protocol 203.

3.    Merck's Protocol 203 Data Analysis Plan ("DAP") stated a
purpose "to provide increased precision on estimates of the comparability between

rofecoxib and placebo on the incidence of thrombotic cardiovascular serious adverse experiences" (SAEs). (MRK-AFL0015451-484, at 454). The Protocol commented that the larger data set would be more accurate than data from any single one of the three studies. The DAP stated that the findings of Protocol 203 would allow "generalization of the results to other populations" who used Vioxx, including arthritic patients, because the study populations were of similar age and had risk factors for CV events. (Id.)

4.      The endpoints defined in the Protocol 203 included "Cardiac" (MI, Sudden Death, Unstable Angina, etc.), and "Cerebrovascular" (Ischemic Stroke, Transient Ischemic Attack) events. (MRK-AFL0015463). The DAP for Protocol 203 also called for Kaplan-Meier (KM) cumulative incidence graphs to compare the risk of Vioxx versus placebo for CV events over time. (MRK-AFL0015474-75). To the best of my knowledge, Merck has never presented these analyses for Protocol 203, but instead has claimed support for the "18-month hypothesis" based only on the KM curve for "all thrombotic events" in the APPROVe study, which was only one of the 3 studies to be included in the pre-specified analysis.

5.      Following preparation of my Report dated September 26, 2005, data produced by Merck became available to calculate the RR and prepare the KM cumulative incidence curve for Vioxx versus placebo from the Protocol 203 studies. The Protocol 203 data were analyzed and KM cumulative incidence graphs were prepared by Nicholas Jewell, Ph.D., a renowned biostatistician at the University of California at Berkeley School of Public Health, who applied generally accepted methods. Professor Jewell's report on Protocol 203 is attached as Exhibit A.

6.      Based upon this larger and statistically more reliable data set, Protocol 203 directly refutes Merck's hypothesis that no excess risk appears until after 18 months of Vioxx use. To the contrary, the RR of cardiac events (MI, Sudden Cardiac Death and Unstable Angina) in the Vioxx population was 2.68 after 30 days, and 2.37 ($p<0.001$, 95% CI 1.43-3.91) at the end of the study. There was a statistically significant

- 3 -

excess risk by 18 months, and continuously thereafter until the end of the study. As seen in <u>Figure 1</u>, below, the rate of cardiac events in the Vioxx population exceeded placebo from the first month through the end of the study. Further, statistical analysis shows that there was <u>no</u> significant difference in the RR of cardiac events over time. (Jewell Report, at pp. 1-2).



**Figure 1:** Kaplan – Meier Estimation of cumulative cardiac events. The inset in the upper left corner of the Figure presents an expanded scale for the 0-6 month period, to better illustrate the early separation of the incidence curves.

7.      The scientific method is largely based upon testing of hypotheses which are specified before a study is conducted. To prevent manipulation of the results, an essential element of this method is that the data must be analyzed according to the plan made at the outset. That was not done by Merck or its consultants in this case. The DAP did <u>not</u> call for a KM curve of CV event data over time for APPROVe alone. (MRK-18940080858-928, at 875-876); nevertheless, Merck has promulgated the "18-month" hypothesis based on that single study, which was underpowered to detect differences in the rate of events over time. Conversely, the DAP for Protocol 203 did specify that a KM curve would be prepared from the larger data set of the 3 combined studies, but Merck

has failed to perform such an analysis. The results of that pre-specified plan show early and persistent excess risk of CV events, with the risk due to Vioxx significantly greater than placebo at 18 months and all later periods (see Figure 1, above), refuting the " no risk for 18-months" hypothesis. The scientific method does not prohibit conducting exploratory analyses that were not pre-specified, and such analyses may provide important information. However, such exploratory analyses are not an acceptable substitute for those that were planned in advance.

       8.     Since all of the Protocol 203 studies were terminated on the same date (9/30/04), there was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of CV risk for all three trials, as pre-specified. Indeed, a November 12, 2004, draft version of the subsequently published APPROVe study acknowledged the pre-specified Protocol 203 plan, as follows: "Assessment of cardiovascular safety was not the primary purpose of this study [APPROVe] and there was no pre-specified hypothesis concerning this endpoint for this study alone. However, an analysis of combined cardiovascular data from this study and the data from two other studies was planned." (RBRES-001054-1079, at 1066). The authors deleted such references from later drafts (e.g., 1/26/05 Draft, MRK-AHD0075201-234, at 75209), and no reference to Protocol 203 appeared in the final draft submitted for peer review on February 6, 2005.

       9.     At his deposition in November 2005, New England Journal of Medicine (NEJM) Editor Gregory Curfman testified that NEJM had not been informed of the plan to combine APPROVe with two other studies; that the existence of the related studies should have been disclosed; and that clinical trial registration is intended to prevent "bad news" from being "buried away" by the sponsor. (Depo. of Curfman, 11/21/05, at 136-141).

       10.    I agree with Dr. Curfman that the related studies of Protocol 203 should have been made known to the editors of NEJM. The scientific method and the

interests of the medical community required disclosure of results of the pre-specified data analysis of all three pooled studies, and not only the results of APPROVe. Such disclosure is particularly important where the undisclosed, pre-specified analysis contradicts the substitute analysis offered by the sponsor, as in the case of the "18-month" hypothesis based on APPROVe alone, which is refuted by the complete Protocol 203 data.

      **C.**       **Patients in APPROVe Who Were at High Risk for CV Events at Baseline Had Higher Relative Risks of CV Events Due to Vioxx, Supporting the Synergistic and Multiplicative Effect of Vioxx and Baseline High-Risk Status.**

      11.     Data from Merck's APPROVe Cardiovascular Safety Report (CSR), filed with the FDA in June 2005, in conjunction with data provided by Merck in this litigation, were used by Professor Jewell to evaluate RRs of thrombotic events among patients at "high cardiovascular risk," compared to patients with lower risk status. Merck defined the "high cardiovascular risk" category to include those with "a history of symptomatic atherosclerotic cardiovascular disease [SACVD] or the presence of at least two of the following risk factors for coronary artery disease: a history of hypertension, a history of hypercholesterolemia, a history of diabetes, or current cigarette use." (Bresalier, 352 NEJM at 1097). Patients identified as diabetics were included in the "high-risk" analysis, based on well-established epidemiologic evidence that the CV adverse event risk conferred by diabetes is equivalent to the CV risk for patients with coronary heart disease (CHD). See, e.g., Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III). NIH Publication No. 02-5215, Bethesda, MD, National Institutes of Health 2002 ("ATP III"), which designated diabetes as a CHD risk equivalent.

      12.     The data show not only that Vioxx use caused statistically significant excess risk of CV events, but also that Vioxx interacts synergistically with

- 6 -

high baseline CV risk status to more than multiply the RR of thrombotic events in high-risk patients. Because interaction tests divide the population into subgroups for comparison, the power to detect important differences is reduced. Therefore, tests of significant interaction may be appropriately set at levels greater than the "p=0.05" level commonly established for significance testing of primary effects. See, Jewell, N., Statistics for Epidemiology (Chapman and Hall, New York 2003) at 159 (setting level of significant interaction at $\leq 0.2$ has "the desired effect of drawing attention to important variations that might be missed by inappropriately fixating on the standard 0.05 level of significance"). The results of this analysis are discussed at paragraphs 13-15, and presented graphically in **Figure 2**, below:



**Figure 2:** Summary Incidence rate of Confirmed Cardiac and Cerebrovascular Events in the APPROVe Study by Baseline Risk Status and Treatment Group. Relative Risks (RR) and p-values based on Proportional Hazard Model

13.     These data from APPROVe reveal a statistically significant increased risk of cardiac plus cerebrovascular events in the high-risk Vioxx group v. high-risk placebo group, RR = 3.83 (95% CI 1.67-8.77), p = 0.001. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.43. Comparison of the high-risk RR (3.83) to the lower-risk RR (1.43) yields a p value of 0.086, indicating significant

- 7 -

interaction between baseline risk and Vioxx use, that is, the higher RR is due to the synergistic effect of CV risk due to both Vioxx and to baseline risk status.

14.     For a second category of outcomes, "all thrombotic" events, for the high-risk Vioxx group v. high-risk placebo group, the RR = 2.87 (95% CI 1.40-5.86), p = 0.004. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.15. An interaction p value of 0.07 for the comparison of high-risk RR (2.87) to low risk RR (1.15) provides strong evidence of the synergistic relationship between baseline risk and Vioxx use, consistent with the findings cited above (see ¶ 13).

15.     This synergistic interaction is supported by consistent results when RRs are compared for "high risk" and "lower-risk" Vioxx patients. The RR for high-risk Vioxx patients is significantly higher than for low-risk Vioxx patients, RR = 4.36, 95% CI (2.38-7.99), p < 0.001 for "all thrombotic events"; RR = 4.35, 95% CI (2.32–8.14) p < 0.001 for cardiac plus cerebrovascular events. These data again support interaction between Vioxx use and baseline risk, since high-risk status plus Vioxx resulted in a significantly greater RR than lower-risk status and baseline risk.

16.    A KM cumulative incidence curve for the "high-risk" APPROVe patients shows early separation for the outcome category of cardiac plus cerebrovascular events, with the Vioxx rate above placebo, and a doubling of risk in the first 18 months; overall RR = 3.83, P < 0.001 (95% CI, 1.67-8.77), as set forth in **Figure 3**, below:



**Figure 3:** Comparison of the Kaplan-Meier Estimates of Confirmed Cardiac + Cerebrovascular Events by Treatment Group Restricted to the High Risk Subgroups of VIGOR and APPROVe Studies

### D.    VIGOR Analysis Shows Similarly Higher Relative Risk and Rapid Onset of CV Disease in Vioxx Patients v. Naproxen.

17.    In my previous Report, data from the VIGOR study were presented, showing, among other things, a greater RR of thrombotic events in the Vioxx subgroup of aspirin-indicated patients versus the naproxen subgroup of aspirin-indicated patients, RR = 4.89, p = 0.012, 95% CI (1.44-16.88) compared to the non-aspirin-indicated (lower-risk) Vioxx v. naproxen subgroup, RR = 1.88, p = 0.04, 95% CI (1.02-3.44). FDA Medical Officer Review, 3/30/01, p. 5. Professor Jewell has prepared a KM curve (**Figure 3**, above) using Merck's data, showing that the high-risk VIGOR population on Vioxx experienced very rapid onset of CV thrombotic events, immediately and continuously in excess of the naproxen group, and statistically significant after a study of only 8 months mean exposure duration.

18.     These data are not explained by a "protective effect" of naproxen.
If Vioxx were harmless and the VIGOR results were explained by a naproxen "protective
effect," then the Vioxx cardiac event rate would have come out "even" with the rate for
the harmless placebo given in APPROVe and Protocol 203. Instead, the Vioxx event
rates were significantly worse than placebo, and particularly elevated for high-risk
patients. Thus, the data from APPROVe and Protocol 203 confirm the refutation of the
cardioprotection theory advanced by Merck to explain VIGOR's results.

19.     As noted by Cox-2 researcher Garret FitzGerald in the aftermath of
the removal of Vioxx from the market, "[t]he higher a patient's intrinsic risk of
cardiovascular disease, the more likely it would be that such a hazard [of Cox-2
inhibition] would manifest itself rapidly in the form of a clinical event"(FitzGerald,
"Coxibs and Cardiovascular Disease," NEJM 2004; 351:1709-1711). The elevated RRs
of the high-risk status patients from APPROVe and VIGOR, as shown above, are
consistent with FitzGerald's assessment of the increased likelihood of events in patients
on Vioxx with high background risk.

E.      Vioxx Causes Significant Increased Hypertension, Including Severe
        "Stage 2" Hypertension That Was Strongly Associated With
        Thrombotic Events in APPROVe.

20.     In both APPROVe and VIGOR, Vioxx caused large and
statistically significant increased incidence of hypertension. Figure 4, below, presents
the KM for hypertension in VIGOR, prepared by Professor Jewell from Merck's data,
along with the KM curve for hypertension in APPROVe from Merck's "Figure 9" in the
"General Safety Report," (GSR), Reference P122, Appendix 2.1.1 (MRK-AFV0426229).

- 10 -



**Figure 4:** Comparison of Cumulative Incidence Rates of Hypertension Adverse Events in the VIGOR and APPROVe Studies.

21. These figures demonstrate a remarkably consistent, statistically significant, approximate doubling of hypertension in Vioxx patients, at both 25 mg. versus placebo (APPROVe) and at 50 mg. versus naproxen (VIGOR). Also, the data show a disturbing, continuously increased cumulative incidence of hypertension-related adverse events (AEs) due to Vioxx suffered by approximately 30% of the patients in the APPROVe study by the end of 3 years' use of Vioxx at the standard therapeutic dose. In APPROVe, there were 377 (29.3%) hypertension AEs in the Vioxx patients compared to 219 (16.99%) on placebo (Table 32; MRK-AFV0426227). Merck reported the "Difference in Percentage Points" (12.4%) and the 95% CI for that difference (9.2, 15.6), a highly significant result. In the VIGOR study, Professor Jewell used Merck's data to calculate the RR = 1.83, P < 0.0001, 95% CI 1.55-2.16. Of further interest, in APPROVe, Merck analyzed the hypertension-related AEs based on "Common Toxicity Criteria" of the National Cancer Institute, graded 0 (no event) through 4 (most severe). (Table 33, MRK-AFV0426228). The Vioxx group had more than double the incidence

- 11 -

of "Grade 2"[1] hypertension (8.08% v. 3.77%) and "Grade 3"[2] hypertension (5.67% v. 2.69%), and the p-value for treatment based on a logistic regression model was "0.000," i.e., a less than 1 in 1,000 possibility that the result was due to chance. (Id.)

22.     Additional unpublished APPROVe data demonstrate increased risk of more severe "Stage 2" hypertension on Vioxx versus placebo. As can be seen in Table 39 below, reproduced from the Merck GSR (MRK-AFV0426242), the Vioxx and placebo populations had essentially identical prevalence of Stage 2 hypertension at baseline (before the study). However, as seen in Table 40 from the GSR, below (MRK-AFV0426243), the Vioxx population experienced a large and highly statistically significant increased incidence of both systolic and diastolic blood pressure increases exceeding the threshold for Stage 2 hypertension. For patients who developed both Systolic Blood Pressure (SBP) $\geq$ 160 and Diastolic Blood Pressure (DBP) $\geq$ 100, the RR was 2.14 p < 0.001 (95% CI 1.57, 2.92), that is, more than double the risk that Vioxx patients would develop this severe form of hypertension.

**Table 39**

**Summary of Baseline or Screening Stage II Hypertension**

| Blood Pressure | Rofecoxib 25 mg n/N(%) | Placebo n/N(%) |
|---|---|---|
| DBP $\geq$100 | 26 / 1287 (2.02) | 29 / 1299 (2.23) |
| DBP $\geq$100 and SBP$\geq$160 | 14 / 1287 (1.09) | 13 / 1299 (1.00) |
| DBP $\geq$100 or SBP$\geq$160 | 141 / 1287 (10.96) | 143 / 1299 (11.01) |
| SBP $\geq$160 | 132 / 1287 (10.26) | 128 / 1299 (9.85) |

Data Source: [4.2]

---

[1] "Grade 2": "recurrent or persistent symptomatic increase by > 20mmHg (diastolic) or to > 150/100 if previously within normal limits (WNL); not requiring treatment." (Id.)
[2] "Grade 3": "requiring therapy or more intensive therapy than previously."

Table 40

Analysis of Stage II Hypertension

| On-Treatment Blood Pressure (mm Hg) | Rofecoxib 25 mg (N=1262) Events/Patient-years (rates/100) | Placebo (N=1264) Events/Patient-years (rates/100) | Comparison | | |
|---|---|---|---|---|---|
| | | | Difference (95% CI) | Relative Risk (95% CI) | P-Value |
| DBP ≥ 100 | 160/2744 (6.10) | 111/3685 (3.83) | 2.29 (1.13, 3.44) | 1.58 (1.24, 1.99) | 0.000 |
| DBP ≥ 100 and SBP≥160 | 118/2823 (4.18) | 61/3173 (1.92) | 2.26 (1.34, 3.15) | 2.14 (1.57, 2.92) | 0.000 |
| DBP ≥ 100 or SBP≥145 | 419/2541 (17.50) | 303/2752 (11.06) | 6.32 (4.70, 8.83) | 1.57 (1.35, 1.82) | 0.000 |
| SBP ≥ 160 | 384/2394 (16.07) | 262/2823 (9.31) | 6.75 (4.79, 8.71) | 1.61 (1.43, 1.94) | 0.000 |

Data Source: [4.2]

23.    Several unpublished documents from Merck's files demonstrate
the strong association between Stage 2 hypertension and thrombotic events in APPROVe:

a.    On February 20, 2004, APPROVe External Safety
Monitoring Board (ESMB) Chair James Neaton, Ph.D., wrote an email to other members
of the ESMB, which made the following points:

- The data so strongly indicated cardiac toxicity that Dr. Neaton
  raised the possibility of stopping the APPROVe study at that time,
  over 7 months before it was actually terminated. (MRK-
  AG00000394).

- Some of the statistical results of the study were unlikely to change
  before the planned termination date, and, if they remained
  unchanged, they would be "interpreted as very damning to the
  drug." (Id.).

- As one of the "alternatives" to stopping the APPROVe trial in
  February 2004, Dr. Neaton proposed "that treatment be
  discontinued if Stage 2 hypertension develops" because a
  disproportionately large percentage of the confirmed CV events in
  the Vioxx group occurred among patients who had Stage 2
  hypertension. As of that time, 20 of the 38 events (53%) in the
  Vioxx group had occurred among 390 patients who developed
  Stage 2 hypertension (30% of the Vioxx treatment population).

- 13 -

(Id.) Another alternative proposed by Dr. Neaton was to "[s]top the study for the subgroup of patients likely to develop Stage 2 hypertension" (Id.).

b. On March 4, 2004, two weeks later, Dr. Neaton wrote a letter informing Merck of the ESMB's recommendation that patients with "uncontrolled hypertension" (>165mm Hg systolic or >95 mm Hg diastolic) should be removed from the APPROVe study. (MRK-AF00262446). In contrast, the Vioxx label did not include a warning to discontinue such patients from Vioxx therapy. Dr. Neaton's letter comments that it is "well-known that NSAIDs and Cox-2 inhibitors raise blood pressures" (id.), while Merck's own unpublished data showed that Vioxx caused a statistically significant doubling of the risk of hypertension exceeding predefined limits of change, compared to Celebrex (Protocol 112; see my Report, 9/26/05, ¶ 150, p. 67).[3] A letter prepared by Merck to send to APPROVe investigators perpetuated the mistaken impression that Vioxx effects on blood pressure were simply an example of a class effect, without mentioning the adverse data when Vioxx was compared to Celebrex (MRK-AF00262435).

c. On November 11, 2004, Merck's James Bolognese prepared an "Assessment of rofecoxib TCVSAE [Total Confirmed Cardiovascular Adverse Experiences] results by Systolic BP spike occurrence," which reported as follows:

---

[3] "In 2001, Merck itself had conducted a head-to-head trial of Vioxx versus Celebrex and placebo, known as Protocol 112, which supported Whelton's conclusion that Vioxx was associated with a greater degree of hypertension. Protocol 112 was a 6-week controlled study of 1,521 patients in four treatment groups, Vioxx 12.5 mg, Vioxx 25 mg, Celebrex 200 mg., and placebo. (MRK-AIN0001240). The Merck Statistical Report showing analyses as of January 9, 2001, indicates that approximately 10% of the subjects in each of the Vioxx 12.5 mg. and 25 mg. arms of the study had increased systolic blood pressure greater than 20 mm and absolute value of over 140 mm, exceeding the pre-defined limits of change, compared to 5.3% in the Celebrex arm and 4.8% in placebo. The increased hypertension on Vioxx 25 mg. versus Celebrex 200 mg. was highly statistically significant, $p = 0.004$, and also statistically significant versus placebo ($p = 0.046$). (MRK-AIN0001608-609). Id. However, Merck did not publish the data from Protocol 112". Report of John W. Farquhar, 9/26/05 at 67.

- 14 -

538398.1

- In APPROVe, "examination of the results split by systolic BP (SBP) ≥ 160 mmHg on at least one occasion during the study revealed a <u>striking relationship</u>" to the occurrence of confirmed thrombotic events. (MRK-AGO0074496; emphasis added).

- "The interaction between SBP spike (y/n) and treatment in TCVSAE [total confirmed cardiovascular events] was statistically significant [p =0.0471]. In the patients with no SBP spike, the RR was close to 1, but <u>in those with at least one SBP spike, the RR was close to 4. These data suggest that nearly all of the excess CV events observed on rofecoxib versus placebo were in patients with at least one SBP spike</u>. However, in the placebo group, the occurrence of SBP spike showed no increase in rate of TCVSAE's." (<u>Id.</u>; emphasis added)."

- When the data were analyzed according to a new "at risk" status as of the date when the SBP spike was first recorded, "<u>the interaction . . . was highly significant</u> (p = 0.0043), <u>indicating strong dependence of the treatment effect (hazard ratio) on whether there was a previous SBP spike or not</u>." (MRK-AGO0074497; emphasis added).

- A comparable analysis of data from the Alzheimer's trials showed a "numerically similar" relationship between SBP spikes in relation to TCVSAE's, but the interaction was not statistically significant. (<u>Id.</u>)

      d.      Between November 2004 and January 2005, drafts of the APPROVe study included references to the SBP spike data that were considered for inclusion in the manuscript to be submitted to NEJM for publication (e.g., MRK-AHD0075212). However, the data were not submitted to NEJM, nor ever disclosed in

- 15 -

the scientific literature. Instead, the APPROVe authors reported increases of
approximately 3 to 4 mmHg in "mean arterial pressure" in the Vioxx group, along with
the inaccurate statement that the BP changes did not explain the excess risk of CV events
in the Vioxx population. (Bresalier, 352 NEJM at 1100).

     e.    At his deposition on November 21, 2005, Dr. Curfman of
NEJM testified that the editors were never informed that Merck had analyzed the CV
events for patients with BP spikes or Stage 2 hypertension, nor that a statistically
significant relationship existed between those conditions. Dr. Curfman testified that such
data would have been relevant to the editors and readers, because "one, of course, of the
mechanisms of concern in terms of vascular disease would be hypertension as a substrate
leading to vessel damage. So that would be — if such an analysis existed, it would be
very appropriate to include that." (Curfman Depo., 11/21/05, at 167-169).

     24.    I agree with Dr. Curfman that the analysis of Stage 2 hypertension
was highly relevant to the excess CV risk, and that it should have been included in the
published article. Where the internal documents acknowledge a "striking relationship," a
"highly significant interaction," and the suggestion that "nearly all of the excess CV
events" on Vioxx occurred among patients with SBP spikes, it was misleading to delete
references to such effects, to disclose only the mean arterial pressure changes, and to
deny the clearly apparent relationship between Stage 2 hypertensive changes and
thrombotic adverse events.

     25.    Abundant literature in the fields of cardiology and epidemiology
supports the conclusion that blood pressure changes of the magnitude reported for Vioxx
contributed substantial excess risk of CV events. See, e.g., SHEP Cooperative Research
Group: Prevention of Stroke by Anti-hypertensive Drug Treatment in Patients with
Isolated Systolic Hypertension: Final Results of the Systolic Hypertension in the Elderly
Program (SHEP). JAMA 1991; 265:3255-3264. In numerous clinical trials of
antihypertensive medications, including Merck's principal drug in this class

- 16 -

(Cozaar/Losartan), reductions of even a few mm of Hg resulted in significantly lower incidence of stroke and coronary heart disease (CHD). (Dahlof, B, Cardiovascular Morbidity and Mortality in the Losartan Intervention for Endpoint Reduction in Hypertension Study (LIFE): a randomized trial against atenolol. Lancet 2002; 359:995- 1003). Further, it is well known that the larger the increase in blood pressure, the greater the increased risk, and that each mm increase in blood pressure imposes greater risk at a higher baseline. Merck's own internal documentation shows awareness of these principles as of December 26, 2000 (MRK-NJO281966; Memo from Rush to Dixon). The "striking" interaction between Vioxx and Stage 2 hypertension magnifies the Relative Risk of adverse CV events attributable to hypertension alone, as seen in the APPROVe data discussed above. Thus, the high incidence of increased BP of > 20 mmHg or more, and of absolute values exceeding 160 mm probably contributed substantial excess risk of MI and stroke among the subpopulation of Vioxx users who experienced such significant worsening of hypertension.

F.    Recent Literature Supports the Biological Plausibility of Increased Risk of Thrombosis Due to Both High Blood Pressure and the Interaction of Cox-2 Inhibition with Increased Blood Pressure.

26.    As noted in my prior Report, blood pressure is known to be a cause of plaque rupture that can result in thrombus and MI. In an authoritative recent article, it was noted that the " vulnerability to rupture depends on ... blood flow characteristics, particularly the impact of flow on the proximal aspect of the plaque...." Fuster, V., et al., "Atherothrombosis and High-Risk Plaque." J. Am. Coll. Cardiol. 2005; 46:937-54 at 945. Chronic and acute blood pressure increases magnify the "impact of flow" that results in plaque rupture. Increased blood pressure begins when Vioxx use begins, resulting in immediate increased risk of plaque rupture and resulting MI.

27.    In an article published in April 2006, noted Cox-2 researcher Garret FitzGerald and colleagues reported on animal data supporting the conclusion that

- 17 -

Cox-2 inhibition is the cause of both elevated blood pressure and thrombosis.  Cheng, et al., Cyclooxygenase, Microsomal Prostaglandin E Synthase-1, and Cardiovascular Function, J. Clin. Invest., 2006; doi:10:1172/JCI27540.  This finding further supports the biological plausibility of the high relative risks of MI for Vioxx users, especially those who had both high background CV risk, or on-drug Stage 2 hypertension, or both.

      28.    In a recent review article in Circulation, the peer-reviewed journal of the American Heart Association, Antmann, et al. concluded that the effects of COX-2 inhibition differ between the normal and atherosclerotic conditions. In the former, the effects of COX-2 suppression have "only a marginal effect on the net anti-thrombotic imbalance owing to the importance of COX-1 as a source of PGI2 in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of PGI2 and more TxA2 is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring TxA2 production and promoting platelet-dependent thrombosis." Antmann, Cyclooxygenase Inhibition and Cardiovascular Risk, Circulation 2005; 112:759-770, at 764. Such a differential effect of COX-2 inhibition helps to explain the greater RR among patients who have atherosclerosis and are at greater

- 18 -

baseline risk of CV events due to that condition. <u>Figure 4 of the Antmann article,</u>

describing this phenomenon, is reproduced below:

764    *Circulation*    August 2, 2005



Figure 4. Consequences of COX inhibition for prostacyclin and thromboxane A₂ production in normal and atherosclerotic arteries. Endothelial cells are shown as a source of prostacyclin (PGI₂) and platelets as a source of thromboxane A₂ (TxA₂) under untreated conditions (top row) or treated with low-dose aspirin (middle row) or a coxib (bottom row) in the normal (left column) and atherosclerotic artery (right column) for comparison. COX-1 is the only isoenzyme expressed in platelets; endothelial cells express both COX-1 and COX-2. In the normal artery, the balance between PGI₂ and TxA₂ production favors PGI₂ and inhibition of platelet-dependent thrombus formation. In the atherosclerotic artery, both PGI₂ and TxA₂ production is increased, owing in part to increased platelet activation with compensatory PGI₂ formation via both COX-1 and COX-2 in endothelial cells; the net effect is an imbalance favoring TxA₂ production and platelet-dependent thrombus formation. Low-dose aspirin selectively impairs COX-1–mediated TxA₂ production in platelets restoring the net antithrombotic balance. Coxib use suppresses COX-2-dependent PGI₂ production in endothelial cells, which has only a marginal effect on the net antithrombotic balance owing to the importance of COX-1 as a source of PGI₂ in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of PGI₂ and more TxA₂ is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring TxA₂ production and promoting platelet-dependent thrombosis.

- 19 -

538398.1

### G.      Merck's Recent APPROVe "Extension" Data Confirm Excess CV Risk of Vioxx

29.      In a document submitted to the FDA in May 2006, Merck reported the results of the APPROVe study on an "Intention to Treat" basis, which includes adverse events that occurred both on the drug and after the discontinuation of the drug. According to Merck's summary, the overall data showed a statistically significant increase of risk of MI, 31 Vioxx events v. 15 placebo events, p=0.017. There was also a statistically significant increased risk of ischemic stroke, 17 Vioxx events v. 6 placebo events, p=0.024. These data therefore continue to support the conclusion that Vioxx causes excess risk of CV events, including MI and stroke. The data show, for the first time, that the increased incidence of stroke in the Vioxx group has now exceeded the threshold for a statistically significant effect of Vioxx.

30.      The ITT analysis negates Merck's claim that there is no difference in CV thrombotic event rates between Vioxx and placebo for the first 18 months of use, in two ways. First, the KM graph of cumulative incidents of confirmed events is changed by the addition of data from the ITT analysis. Merck claimed that the original KM graph, presented as "Figure 2" of the published APPROVe article, supported the hypothesis of no effect for 18 months, because the incidence curves did not sharply diverge until after that point in time.[4]

31.      However, the KM graph submitted to the FDA for the ITT analysis in May 2006 (Figure B1, reprinted below), shows that the curve for Vioxx (rofecoxib) separates from placebo at about 3 to 4 months, and remains above placebo for the rest of the study. According to Steven Nissen, M.D., interim Chairman of Cardiovascular Medicine at the Cleveland Clinic and a member of the FDA Advisory Committee on Cox-2 inhibitors, the claim of no effect for 18 months of treatment "makes the drug look

---

[4] A number of flaws in that reasoning have been described in my September 2005 report, and in the preceding portion of this Supplemental Report.

a lot safer than it was." Dr. Nissen stated, "If you wanted to construct a legal defense that says nothing happens for 18 months, this is how you would cut the data." (New York Times, "Why the Data Diverge on the Dangers of Vioxx," May 22, 2006 (p. 1 of 6). Alastair Wood, M.D., Chairman of the FDA advisory committee that reviewed Cox-2 inhibitors in February 2005, criticized the omission of off-day events, noting that "People may drop out because they had chest pain and then weeks later they had a heart attack." (Id. at p. 3 of 6).


Figure B1   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Kaplan Meier Plot



Patients at Risk
Rofecoxib 25 mg   1287  1221  1187  1152  1131  1117  1092  1032  989
Placebo            1300  1247  1224  1189  1173  1157  1133  1071  1027

32.   According to the New York Times article, Merck says it was "simply adhering to the study's original design, and that the more recent chart reflects data that were not available to analyze in early 2005." (Id.). However, neither of these statements is correct. First, as mentioned above (¶ 7), the original design for the APPROVe Data Analysis Plan (DAP) did not include any KM curves at all, nor any analyses of potential differences in the rate of events over time. Instead, the KM curve portion of the analysis was "borrowed" from the DAP for Protocol 203, which combined the APPROVe study with two other trials, to form a substantially larger database of events for which such analyses would be more reliable. Second, to the extent that Merck

- 21 -

borrowed from the DAP for Protocol 203, it did so selectively. In particular, the
Protocol 203 DAP prespecified the use of a "modified intention-to-treat" ("mITT")
analysis that included all randomized patients in the trials. The DAP stated, "As a
sensitivity analysis, reports of confirmed events that occur after randomization and within
28 days of study drug discontinuation will also be examined." (MRK-AFL0015464).
The DAP further noted that "there are limitations using a per-protocol analysis in the face
of a very high dropout rate. Thus, both the per-protocol and mITT analyses will be
considered when interpreting the results. If differing conclusions arise, then further
analyses will be conducted to try to understand the reason for the difference and which
analyses are most appropriate." (Id. at MRK-AFL0015465; (emphasis added)).

     33.    To the best of my knowledge, Merck did not present the mITT
analysis to the FDA in February 2005, nor to the New England Journal of Medicine
reviewers when the draft APPROVe article was submitted on February 6, 2005.
However, a Cardiovascular Safety Report ("CSR") prepared by Merck prior to February
2005 did include the mITT events up to 28 days after the last dose of study therapy
(Table 28, pgs. MRK-AHD0075823-824). There were six such events in the Vioxx
treatment group, versus three events in the placebo group. Notably, four of the events
among the Vioxx patients listed in Table 28 occurred within the first 18 months after the
study start (Patient No. 91247, event on day 86; Patient No. 92718, event on day 203;
Patient No. 90070, event on day 351; and Patient No. 90310, event on day 413).
According to the New York Times article, Merck claims that "new data" for events after
the original 14 day cutoff showed 26 events in the Vioxx group and 21 in the placebo
group in the first 18 months, compared to 22 versus 20 in the "old analysis," a difference
of four events in the Vioxx group (New York Times, Why the Data Diverge on the
Dangers of Vioxx, May 22, 2006 at p. 3). The description of Table 28, above, shows that
these four events were not new data, but were known to Merck at the time the original
analysis was presented. Thus, an ITT analysis of data known to Merck in February 2005

- 22 -

would have shown the early separation of the incidence curves during the 0 to 18 month period, which appears in Merck's May 2006 submission to the FDA.

34.     Further, Merck has submitted to the FDA a new statistical analysis for the "proportionality" test, indicating a p value of 0.748 (MRK-S0420112037; Figure B2, reproduced below). This non-significant result means that there is no evidence of variation in the rate of events over time. Thus, the ITT analysis contradicts the claim made by Merck in FDA submissions and in the published APPROVe article that there was a statistically significant difference in the rate of events between the 0 to 18 month and 18 to 36 month periods of the APPROVe study.

Figure B2   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Hazard Rate



35.     Data from the off-drug period of the APPROVe extension study are also of interest. During the off-drug period alone, Merck reported that there were 28 thrombotic events in those who had taken Vioxx, compared to 16 in the placebo group, RR=1.64. Merck has stated that these data are "insufficient to conclude that there was an

increased relative risk of confirmed thrombotic events following discontinuation of the therapy." (Press Release, 5/11/06, p. 1). However, three well-respected independent commentators have stated their disagreement with Merck's interpretation of the data.

      (a)    Steven Nissen, M.D., mentioned in ¶ 31 above, stated "You have to look at the big picture. The big picture is that the hazard stays the same." (Wall Street Journal, 5/12/06, p. A16). Dr. Nissen further stated, "Merck misrepresented the results of this study." (AP Press Release, 5/12/06). The 64 percent higher risk in the extension study "has rather important scientific implications, because it suggests that there was some kind of permanent or longstanding injury to the artery that makes it susceptible to these kinds of continuing events. (New York Times, May 13, 2006).

      (b)    According to Curt Furberg, M.D., a member of the U.S. FDA Drug Safety and Risk Management Safety Committee, "It may be that Vioxx is causing permanent damage to the cardiovascular system, accelerating atherosclerosis or a sustained increase in blood pressure." Reuters, May 18, 2006. Dr. Furberg stated, "for a while we assumed Vioxx caused temporary problems, and here it is more than that," referring to the occurrence of 7 strokes and 2 "mini-strokes" or TIAs in the Vioxx group after discontinuing treatment, compared with no such incidents in the placebo group during one year off-drug. (Id.)

      (c)    Bruce Psaty, M.D., a distinguished cardiologist from University of Washington who testified in Congress on COX-2's inhibitors, stated that the 64% higher overall event rate was "closer to a persistent finding than not." (New York Times, May 13, 2006).

      36.    I agree with Drs. Nissen, Furberg and Psaty that the increased RR of thrombotic events in the Vioxx group after discontinuing the drug is "closer to a persistent finding than not," and that the lack of statistical significance does not decide this issue. The off-drug period alone constitutes a subgroup that is not adequately

- 24 -

powered to detect such differences to a statistically significant degree. Given the limitations due to the smaller number of events and the time off drug, the 64% increase is an impressive indicator that the risk of Vioxx probably does not end when exposure is discontinued.

37.   I reserve the right to add to these comments in the event that future data becomes available.

## II.   CONCLUSION

38.   A consensus exists in the scientific community that Vioxx significantly increases the risk of adverse events, including MI, as noted by the unanimous agreement of 32 FDA Advisory Committee Members. Protocol 203, the analysis pre-specified by Merck for precise estimation of CV effects of Vioxx, shows that this increased risk appears within the first 30 days and persists throughout exposure. Protocol 203 refutes the "18-month" notion advanced by Merck through a "post hoc" hypothesis based on a single, underpowered study. Patients at elevated baseline risk have a statistically significant higher RR of CV events than lower-risk patients, due to a synergistic and multiplicative interaction of Vioxx and baseline risk factors such as SACVD. Stage 2 Hypertension while on Vioxx is also a strong risk factor for CV events. Data from the APPROVe extension study confirm the excess risk of MI and stroke due to Vioxx, and it is likely that the risk persists after Vioxx exposure ends.

_5/22/06_
'Date

_John W. Farquhar, M.D._
John W. Farquhar, M.D.