RR for these hypertension-related complications was **4.61, CI 1.50-18.83**, comparing rofecoxib to placebo. See Bresalier, Table 4 at 1100. These are related adverse events for the following reasons: Hypertension increases the burden on the heart because the "pump" must now work harder since it beats against increased peripheral resistance, the hallmark of hypertension. Second, hypertension increases the occurrence rate of heart attacks, further weakening the heart muscles. Third, with both types of weakening, the heart begins to fail—and when this happens, water is retained, causing ankle swelling (peripheral edema) and lung congestion (pulmonary edema), with both becoming more evident as the heart failure progresses. It is likely that blood pressure increases will be greater in those with higher baseline pressures. It is also likely that the tendency of rofecoxib to increase arterial blood clotting, (see ¶¶ 57 and 67, above) will create more clots in arteries damaged by increased blood pressure than in undamaged arteries. In this manner, the combination of rofecoxib's tendencies to increase both blood pressure and arterial clotting will increase the likelihood of both heart attacks and strokes. Therefore, patients who suffered CHF due to Vioxx are at very high risk of further events, including MI, stroke and premature mortality.

### APPROVe Data Shows Excess Risk Throughout Exposure to Vioxx.

77.     Merck has claimed since September 2004 that the APPROVe study showed no excess risk of thrombotic events until after 18 months' use. This position is contrary to generally accepted principles of science, and is also contradicted by unpublished data and analyses from Merck's own files.

78.     On January 31, 2005, two weeks before the APPROVe article was published, Merck's consultant and APPROVe co-author Dr. Konstam stated that the authors were "going out on a limb" by emphasizing the assertion of a rate difference between the 0-18 month and 19-36 month time periods. (MRK-AHD0075697.) This is a candid admission that there is no scientific support for the assertion. Yet I have seen

475846.1                                 - 28 -

Merck's former CEO, Raymond Gilmartin, testify that there was no effect on people who took Vioxx for less than 18 months. Mr. Gilmartin was going out on the same limb.

79.     The APPROVe study was not designed or "powered" to evaluate CV event rates, and instead the monitoring of CV events was incidental to the study's purpose, i.e., to detect a difference in the rate of recurrent neoplastic polyps of the large bowel for Vioxx versus placebo. "Power" refers to the ability to detect a statistically significant difference in outcomes between the treatment arms when such a difference exists. Scientific studies are designed in advance to include sufficient numbers of subjects to detect such differences, at pre-specified levels of significance, *as to the outcome for which the study was designed.* Thus, the APPROVe Data Analysis Plan (DAP) shows that the study was designed to detect recurrent polyps, not CV events (MRK-I8940080876); the study was certainly not powered to detect a difference in CV event rates for one segment versus another, and this is particularly true for the earliest time period, when there are relatively few events to be analyzed. It is a fundamental principle of science and epidemiology that, unless the study is adequately powered to detect differences in event rates over an early time period as part of the pre-study design, the same relative risk determined when the study is over is presumed to apply throughout. Merck's post-hoc "subgroup analysis" of 0-18 vs 19-36 month time periods violates this principle and lacks any scientific basis. It is axiomatic that the early phase of any RCT is subject to statistical uncertainties, and the entire field of statistics was developed to create rules of judgment on when enough evidence is present to draw sound conclusions.

80.     Despite the design limitations of the APPROVe study, it is important to note that even small studies can yield statistically significant results when the exposure causes a large difference in disease outcomes. This is true because the power of a study to detect a statistically significant effect of exposure is directly proportional to (a) the magnitude of effect, as well as (b) the size of the study population.

- 29 -

Thus, the larger the magnitude of the effect, the smaller the population size necessary to detect the effect at a statistically significant level. Conversely, even a small increased risk can be detected at a significant level with very large population sizes. These principles are directly relevant to the analysis of data from the APPROVe study, as discussed below.

81.     The largest magnitude of effect in APPROVe was seen in the patients with pre-existing conditions that placed them at exceptionally high risk for adverse cardiovascular events, including MI and stroke. Thus, the relative risk for the category of "symptomatic atherosclerotic cardiovascular disease" was **9.59**, and the relative risk for diabetics was **6.10**, and both results were statistically significant. Importantly, the Kaplan-Meier cumulative incidence curve presented in the published version of the APPROVe study displayed only the data for the population as a whole, without a separate display of the data for the high-risk subgroups. In fact, one of the reviewers for the *New England Journal of Medicine* specifically asked the authors to present the curve for high-risk patients (MRK-AHD0000075):

> "It is said that the thrombotic events do not separate out for 18 months it [sic] would be important to know if that is true for all risk groups and for the non-aspirin group. For example did the ACSD [Atherosclerotic Disease] symptomatic group not on ASA [aspirin] separate out earlier . . . did the patients with a CAD [coronary artery disease] history separate out earlier? I am trying to understand whether patients with already existing ACSD develop problem early while other patients at lower risk (the majority in the study build up risk over time." (2005 NEJM 000280) (emphasis added).

82.     Rather than provide the requested analysis showing the separation of the curves for high-risk patients, the authors responded that the small numbers of subjects would result in a "lack of statistical power." (Id.) This reply to the NEJM reviewers was incorrect. In fact, the magnitude of the effect in the high risk groups is so

- 30 -

large that early separation and statistically significant increased risk can be observed in both the early and late portions of the study, despite the small size of the sub-population of patients in these categories. Analysis of the SAS files for the APPROVe study, provided by Merck in this case, allowed identification of the patients with pre-existing heart disease and/or pre-existing diabetes and their event rates. For such patients, there were **18 confirmed thrombotic events in the Vioxx arm, versus 3 in the placebo arm, and the curve for Vioxx is above placebo throughout the entire period of the study.** Furthermore, 15 of the 18 events in the Vioxx arm were cardiac in nature, including 11 MIs (2 of which were fatal), 4 unstable angina, and 1 sudden cardiac death, whereas 2 of the events in the placebo group were peripheral venous thromboses which are of questionable relevance to the endpoint of interest. The Kaplan-Meier curve for the high risk patients appears below:



**APPROVe Study**
**Adjudicated events, high risk subgroup**

83.    Contrary to Merck's oft-repeated claim of "no effect" in the first 18 months, the data show a statistically significant increased risk for these high-risk patients in the Vioxx arm for the 0-18 month period. **RR=3.49, P=0.0406**, by the log-rank test, which is standard in this context.[3]  At 36 months, the Relative Risk was even higher, **RR=5.69 (95% CI 1.68, 19.3)**.  These statistically significant findings mean that it is highly likely the results were due to the toxic effects of Vioxx, rather than chance.

_____

[3] The 95% CI at 18 months is 0.974, 12.5.  The CI is based on the estimated standard error of the cox coefficient, and it is not as accurate nor efficient as the log rank test.  The p-value of 0.0406 is the most reliable indicator of statistical significance.

The finding of a significant effect in the 0-18 month period in high-risk patients directly refutes the false claims made by Merck that no such difference exists.

84.     As noted previously, the clearest signal for the toxicity of Vioxx appears with respect to cardiac events, that is, MI, sudden cardiac death and unstable angina, with a highly statistically significant RR of **2.80** in APPROVe, Bresalier at 1096, Table 2. The SAS files provided by Merck from the APPROVe study did not precisely match the data presented in the published article, in that the SAS files showed 29 "cardiac events" in the Vioxx arm, rather than 31 as stated in Table 2 of the article. Therefore, the RR in my calculations is slightly lower (2.62) than the RR of 2.80 from Bresalier. Nevertheless, the RR of **2.62** was significant, **p < .04, 95% CI 1.33, 5.13.** For the 0 to 18 month period, **RR = 1.81, P = 0.129, 95% CI 0.83, 3.96.** Although the result at 18 months does not reach statistical significance due to the smaller number of events, there is nevertheless only a 1 in 8 possibility that the result is due to chance. Particularly where the data at 36 months show a highly significant increased risk, it is far more likely than

not that the different at 18 months is due to the toxic effect of Vioxx. The Kaplan-Meier cumulative incidence curve, below, shows visual separation with Vioxx above placebo well before 18 months:

## APPROVe Study
### 2.a.1 MI/Sudden Death/Unstable Angina, all



85. Equally important is the fact that the investigator-reported (IR) cardiovascular events from the APPROVe study were analyzed by Merck pursuant to its pre-study plan, and the results of that analysis, which were not disclosed to the NEJM peer reviewers or the public, contradict Merck's public position on the supposed lack of early risk of Vioxx. A Cardiovascular Safety Report (CSR) prepared by Merck in January 2005 (MRK-AHD0075757, et seq.) includes a narrative description, relative risk calculation and Kaplan-Meier incidence graph for IR events, and drafts of the APPROVe

manuscript (MS) included data that were <u>deleted</u> from the MS submitted to NEJM, as described below.[4]

      86.     The CSR states that IR events constituted a "secondary endpoint" (<u>id.</u> at MRK-AHD0075767) of equivalent status as the endpoint based on the publications of the Antiplatelet Trialists Collaboration (APTC). The status of IR data as a "secondary endpoint" is confirmed by Protocol 203, which set forth Merck's plan to combine and statistically analyze data from the APPROVe, VICTOR and ViP trials (MRK-I8940077737). However, Merck published APTC statistical analyses while deleting the data for the IR events. The IR data show that Vioxx conferred clear early visual separation and therefore supports other evidence, including statistically significant differences that demonstrate increased CV risk throughout the study, contrary to Merck's claim that there was no difference until after 18 months' exposure.

      87.     There were 77 patients with IR cardiovascular events in the rofecoxib treatment group and 44 patients with the events in the placebo treatment group. The patient-year adjusted event rates were 2.54 and 1.33 events per 100-patient years for the rofecoxib and placebo treatment groups, respectively. The relative risk of IR events for Vioxx versus placebo was **1.90 with a 95% confidence interval of (1.31, 2.76)**. The relative risk was significantly greater than 1 (p=0.001). (CSR at p. 33, MRK-AHD0075789).

---

[4] The data were ultimately submitted to the FDA in an appendix to the APPROVe CSR in June 2005. To my knowledge, they have not been discussed in the media or peer-reviewed literature. It is clear from the NEJM reviewers' comments that these data are highly relevant and of great interest to the scientific and medical community.

88.     Figure 6 of the CSR (MRK-AHD0075792; MRK-AFV0426392) displayed the Kaplan-Meier cumulative rate curves over time for both treatment groups for investigator-reported cardiovascular events.  Text accompanying the figure states, **"The curve of the rofecoxib treatment group was above the curve of the placebo treatment group during the entire study."**  (Id., emphasis added.)[5]   This curve is reproduced below:

**Figure 6**
**Kaplan-Meier Plot for Investigator-Reported Cardiovascular Events**
**(Events on Treatment through 14 Days After the Last Dose of Study Therapy)**



| Patients at Risk | | | | | | | |
|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1127 | 1053 | 982 | 928 | 883 | 712 |
| Placebo | 1299 | 1194 | 1154 | 1078 | 1035 | 993 | 827 |

Data Source: [4.4.1; 4.21]

89.     Tables 12a and 12b of the CSR display the relative risk of Vioxx versus placebo over six-month time intervals and 18-month time intervals, respectively, based on IR events.  Table 12a shows that the relative risk of Vioxx versus placebo was elevated in every six month period, from "0 to 6 months" through "greater than 30

---

[5] A similar result was obtained by a Merck statistician in September 2004, before Vioxx was withdrawn.  (See MRK-AAD0357815.)

months". Table 12b shows that **the relative risk of IR cardiovascular events for Vioxx versus placebo was statistically significantly elevated during the 0-18 month interval, RR=1.67 (95% CI 1.01, 2.76) and in the 19-36 month interval, RR=2.22 (95% CI, 1.28, 3.85)** (MRK-AHD0075794). This statistically significant excess risk is not due to chance and should have been published rather than deleted. The statistical analysis is further evidence that the "18 month" hypothesis is untenable.

90.     Figure 7 of the CSR displayed the hazard functions over time for both treatment groups for investigator-reported cardiovascular events. "A test of the proportional hazard assumption for the COX proportional hazards model did not show the violation of the assumption (p=0.205)." (Id. at MRK-AHD0075793.) That is, **there was no significant difference between the relative risk of Vioxx versus placebo according to duration of exposure, and, instead, Vioxx conferred greater risk than placebo at all periods analyzed**.

91.     The data described above refute Merck's position that there was no difference in CV events until after 18 months of exposure to Vioxx in the APPROVe study. Merck failed to disclose these data in the published APPROVe study in the NEJM. It is important that a draft manuscript submitted to NEJM included a reference to the deletion of the IR event analysis from the table of CV adverse events, and that the suggestion to delete the IR data was made by Christopher Lines, an author of the article whose financial disclosure to NEJM a Merck employee and owner of more than $10,000 equity or stock options in Merck. (MRK-AHD0075698; 2005 NEJM 000008). Mr. Lines asserted that the deletion of these data "improves clarity" (MRK-AHD0075698). However, the deletion of data obscured, rather than clarified.

92.     The NEJM reviewers were very concerned about the deletion of investigator-reported event data. One reviewer stated: "The authors clearly considered including this category in the Table 2, but deleted this category. There is a note at the

top of Table 2 'suggestion is to delete investigator-reported events.' Recommendation: Restore this category in Table 2." Another reviewer stated: "There is a worrying note to delete some reports from Table 2 that the authors ought to explain – we were obviously not supposed to see that!" (MRK-AHD0000076-77.) On February 9, 2005, the NEJM (2005 NEJM 000281-282) rejected the APPROVe manuscript, with the directive, "Restore the investigator-reported events category to Table 2." 2005 NEJM 000013.

93.     Instead of simply providing the requested investigator-reported data, Merck prepared a misleading response that "the relative risk [for investigator-reported events] is similar to that for confirmed events," while failing to disclose that the IR data contradicted Merck's claim that there was no difference in event rates until after 18 months of exposure. (MRK-AHD0000077) The importance of this data is reinforced by the consistent evidence of statistically significant increased risk for the high risk patients, even when only "confirmed" events are considered. See ¶ 82, above.

94.     Merck also claimed in its responses to the NEJM reviewers that it was only appropriate to rely on the "confirmed" events rather than those reported by the investigators. However, this position is contrary to Merck's practice in the past. There is no legitimate reason to conceal investigator-reported event analysis, and, indeed, numerous Merck studies of Vioxx include statistical analysis of both confirmed and investigator-reported events. In APPROVe itself, the endpoint of CHF, pulmonary edema and cardiac failure was not adjudicated at all, yet the NEJM reviewers insisted upon including the statistical analysis showing increased relative risk of 4.6 versus placebo, and Merck complied. (MRK-AHD0000061; Bresalier, 352 NEJM at 1097.) Similarly, Merck provided statistical analysis of both confirmed and investigator-reported gastrointestinal adverse events in the VIGOR publication (Bombardier, NEJM 2000) and such data analyses were considered fit for publication by both the authors and

475846.1                                    - 38 -

the journal. Furthermore, Merck authors published a study of thrombotic events based entirely on investigator-reported data, Reicin, "Comparison of Cardiovascular Events," etc., Am J Cardiol 2002; 89:204-209, and it is improper for Merck to rely on IR data in some studies but delete such data from the APPROVe manuscript, particularly where the NEJM reviewers specifically asked to have it restored.

95.   Merck contends that the difference between Vioxx and placebo after 18 months was attributable to the "flattening" of the curve for the placebo arm of the trial, suggesting that the incidence of CV events declined drastically in the placebo group after 18 months. (Howard Report at 8). Instead, the IR data show a fairly constant event rate throughout the study, and the "flattening" resulted from disparate results of the adjudication process. In the Vioxx arm, the percentage of cases confirmed by adjudication was roughly the same in both the 0-18 and 19-36 month arms, and totaled 46 out of 77 (approximately 60%). The confirmation rate was drastically different between the 0-18 month and 19-36 month segments of the placebo arm (80% versus 32%), resulting in an artifactual difference in the relative risks for the first and second halves of the APPROVe study. There is no biologically plausible explanation for this discrepancy, which instead appears to be either a statistical anomaly or the result of excessively restrictive criteria for adjudication of events, or both.

96.   Merck has also claimed that the APPROVe data failed the test of proportional hazards, to support its position that there is a true difference between the relative risk of Vioxx versus placebo in the 19-36 month segment versus the 0-18 month segment. However, this flawed statistical analysis is based upon the difference in the rate of adjudicated confirmation, rather than the rate of reported events. Importantly, the APPROVe CSR states that, when investigator-reported events were analyzed, such events did not fail the proportional hazards test, indicating that **there was no significant**

**difference in the relative risk between the earlier and later portions of the study.**
(MRK-AHD0075793.)

97.     Extending this flawed analysis, Merck attempts to cast doubt on
the APPROVe results by arguing that the difference between the relative risks for the
later versus earlier periods are inconsistent with the proposed thrombotic mechanism of
Vioxx cardiovascular damage, which would be expected to appear more rapidly. Again,
this argument fails because it is based upon the anomaly in adjudication confirmation
rates, rather than reported event rates. Also, it fails because the high-risk patients
showed statistically significant increased risk for the 0-18 month period, with immediate
visual separation of the incidence curves, which demonstrates consistency with
mechanisms of damage acting rapidly upon the most susceptible. Therefore, the
occurrence of early and late effects in the investigator-reported data is coherent with the
prothrombotic and hypertensive mechanisms, providing additional reasons why such
data should not only have been disclosed, but are actually more credible than the
implausible comparison of early to late event rates advanced by Merck.

98.     It should also be noted that Merck's reference to the "apparent
absence of difference in the first 18 months," Bresalier, 352 NEJM at 1099, is factually
incorrect. At 18 months the Vioxx group adjudicated thrombotic events were 18%
greater than those of the placebo group (RR =1.18). An 18% difference can certainly be
certainly medically important, and it is misleading to say there is "an apparent absence
of a difference" when, in fact, such a difference exists.

### The risk of cardiac events was more than doubled with standard therapeutic doses of Vioxx.

99.     The subjects in APPROVe received standard therapeutic doses of
25 mg Vioxx per day. Thus, the excess cardiac injuries cannot be attributed to higher-
than-normal doses. This fact not only distinguishes APPROVe from the 50 mg dose
administered in VIGOR, but also distinguishes the risk of Vioxx from that of Celebrex,

since the only RCT showing higher cardiac event rates for Celebrex compared to placebo involved Celebrex doses that exceeded standard therapy for osteoarthritis by 2 to 4 times. Solomon, et al., "Cardiovascular Risk Associated with Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention," NEJM 2005; 352 (online version, 2/15/05).

**Vioxx was shown to be unsafe for both high-risk and low-risk patients.**

100.    The APPROVe population consisted of both high-risk and relatively low-risk subjects, and there was an excess risk of CV disease in the Vioxx group in both risk categories. Thus, the danger cannot be limited to high-risk populations. This fact again distinguishes APPROVe from VIGOR, in which Merck has attempted to blame the excess risk of CV disease on the predisposition of rheumatoid arthritis (RA) patients.

**Exceptionally high RRs were shown for high-risk patients.**

101.    The RRs for Vioxx in two particularly high-risk populations were exceptionally high: **9.59 (95% CI 1.36, 416)** for those with "symptomatic atherosclerotic cardiovascular disease," and **6.10 (95% CI 1.36, 56.1)** for diabetics. Bresalier, NEJM 352: 1096-97. While the confidence intervals were wide due to small numbers, the magnitude of the effect was so great that the results were nevertheless statistically significant, and it is a generally accepted principle of epidemiology that the "point estimates" within those intervals, i.e., 9.59 and 6.10, are most likely to represent the true risk of exposure.

102.    RRs of this magnitude are rare in clinical trials, and they indicate both a clear cause-and-effect relationship and an exceptionally high degree of toxicity. Indeed, the Vioxx RR of 9.59 equates to an attributable proportion of risk of approximately 90%, which is comparable to the RR for lung cancer among cigarette smokers versus nonsmokers. See, e.g., "Women and Smoking: A Report of the

Surgeon General, Executive Summary, 8/30/02, p.51 RR12:1-30. ("About 90 percent of all lung cancers among U.S. women smokers are attributable to smoking.")[6].

103.    No other NSAID has been reported to have RRs approaching those found for Vioxx and CV disease among high risk patients in APPROVe, at standard doses, again distinguishing Vioxx as the most dangerous drug in its class.

104.    Finally, a reviewer for NEJM told the APPROVe authors that it would be appropriate to include CHF endpoints in the "primary composite outcome," rather than peripheral venous endpoints. 2005 NEJM 000272. The APPROVe authors did not provide a composite, but in fact Merck had done this analysis in September 2004, which showed early visual separation of the incidence curves, and a doubling of risk within 6 months, as displayed below (MRK-AAD0357814):



Figure 4a
K-M Plot

---

**B.    The Vigor Study Showed Excessive Cardiovascular Disease Caused By Vioxx, For Both Short And Long-Term Use.**

105.    *Project Description* VIGOR was a trial in patients with rheumatoid arthritis designed to determine if rofexcoxib at 50 mg/d would result in less bleeding from the gastrointestinal tract than would use of 1000 mg/d of the commonly used "non-selective" NSAID—naproxen. See para 10, Bombardier, et al. Patients were predominantly female of mean age 59. Rofecoxib and naproxen exposures were both approximately 2700 pt-yrs. The study was of reasonably short duration—a mean of 8 months. See FDA Memorandum, of Dr. Targum, 2/1/2001, at 7.

106.    *Cardiac events, the main deleterious outcome of interest.* As compared to records submitted to the FDA, the VIGOR publication was neither complete nor accurate in its description of the impact of rofecoxib on CVD. The inaccuracy stemmed, in part, from a report of only 16 myocardial infarct (MI) events in the Bombardier, et al. article, whereas 20 such events were submitted to the FDA. See Targum memo, 2/1/2001, at 13. Incompleteness was evident from omission of data on differences between rofecoxib and naproxen in total deaths, fatal MIs, congestive heart failure (CHF) and hypertension—always in excess in the rofecoxib group. The accurate RR for rofecoxib vs naproxen for MI was **5.0, (p < 0.003)**. See Targum at 13. The RR listed by Targum is reported as Naproxen rate/Rofecoxib rate as 0.2 with a confidence interval demonstrating statistical significance. The reciprocal of 0.2 is **5.0**, which gives the more appropriate comparison of Rofecoxib rate/Naproxen rate. This RR demonstrates a very large magnitude of effect. In the broader definition of serious heart disease (adding fatal MIs and unstable angina) the number of events for rofecoxib was 28 and for naproxen 10, giving an RR for rofecoxib vs naproxen which remained high at **2.82 (p < 0.005)**.

107.    The published VIGOR study incorrectly states that ischemic cerebral vascular events occurred in 0.2% of the patients in each group, suggesting that

there was no difference in the rate of such events. However, the Targum memorandum (p. 18) shows that there were 11 confirmed ischemic cerebral vascular events for Vioxx versus 8 for placebo. Further, for investigator-reported events, there are 17 in the Vioxx arm versus 9 for placebo. When combined with data from related RA studies, there was a borderline statistically significant increased risk of stroke for Vioxx compared to naproxen. (See § V.C, below.)

108.    The VIGOR study demonstrated that Vioxx was far more toxic than the comparator NSAID, in this case naproxen, with respect to hypertension, edema and congestive heart failure. The published article fails to mention these events at all. The Targum memorandum (p. 10) reports that there were 28 discontinuations in the Vioxx group due to hypertension-related adverse events, versus only 6 in the naproxen group, for a statistically significant relative risk of **4.67 (p < 0.001 95% CI 1.93, 11.28)**. In addition, there were 19 versus 9, and 25 versus 13 discontinuations for congestive heart failure (CHF) and edema adverse events, in the Vioxx and naproxen groups, respectively, and both results were borderline significant **(CHF:  p=0.005, 95% CI 0.96, 4.67; Edema:  p=0.057, 95% CI 0.98, 3.75)**. Thus, there were a total of 72 versus 28 discontinuations for these cardiovascular-related adverse events. None of these events or elevated risks were reported in the published article.

109.    With regard to hypertension, the published VIGOR study offers only the misleading assertion that there was no association between hypertension and myocardial infarction, on the basis that "only a single patient (in the rofecoxib group) had both hypertension and a myocardial infarction as adverse events." However, the authors failed to report the findings in the Targum memo table entitled "Incidence of Confirmed Thrombotic Cardiovascular Serious Adverse Experiences in Patients With and Without Hypertension-related Adverse Experiences." (p. 23.) These data show that there was a strong relative risk of **3.96** among Vioxx patients who suffered both a

hypertension-related adverse experience and a confirmed thrombotic cardiovascular adverse event, compared to patients in the naproxen group. This tends to support a likely multiplicative, synergistic effect of hypertension and Vioxx, since naproxen patients with hypertensive adverse events had a much lower rate of thrombotic events. In addition, as discussed previously, a very similar elevated relative risk of **3.82** for thrombotic events following a "spike" in blood pressure was found in the APPROVe study (see discussion at ¶ 75), and such consistency supports the probability of a cause and effect relationship between Vioxx, hypertension and thrombotic events such as heart attack and stroke. In short, the data show that patients on Vioxx are approximately twice as likely to develop hypertension, and that those Vioxx patients with hypertension are almost four times more likely to develop serious heart disease.

110.    Additional important conclusions follow from the high rate of hypertension in the Vioxx group in VIGOR. First, the hypertensive patients are clearly at increased risk for the cardiovascular toxicity of Vioxx. Therefore, as in APPROVe, the disproportionate early withdrawal of patients from the study due to hypertensive events artificially lowers the relative risk that would have been observed if such patients had continued on Vioxx. In the real world of clinical practice, blood pressure monitoring is not as frequent as in a clinical trial, nor were physicians warned not to give Vioxx to hypertensive patients. Therefore, such patients would have continued taking the drug and would have suffered an even higher relative risk of heart attack and stroke than reported in the VIGOR study. Second, because hypertension is a serious cardiovascular condition that is strongly associated with MI, stroke, and CHF, hypertension adverse event rates should have been reported along with data for the thrombotic events in the published article. Third, as in the pre-marketing trials that compared Vioxx to other (non-naproxen) NSAIDs, the rate of hypertension was

475846.1                                      - 45 -

significantly higher for Vioxx, showing either that such events are not due to a class effect of all NSAIDs, or that Vioxx is more toxic than other members of the class.

111.     The VIGOR Kaplan-Meier curve, reproduced below, shows that early separation was apparent for thrombotic events after only 4 to 6 weeks following exposure. (Targum Memo at 17.) This is consistent with the APPROVe high-risk patient data and investigator-reported results, demonstrating that the risk of Vioxx exposure begins very early and persists throughout the period of exposure. The statistically-significant increased relative risks for MI (5.0, see ¶ 105, above), serious heart disease (**2.82**; id.), and all "confirmed thrombotic events" (**2.37**, see ¶ 111, below), were all demonstrated in a study with a mean duration of approximately 8 months, adding further strong evidence refuting Merck's contention that there is "no effect" in the first 18 months of exposure.

**Figure 3**



**Thrombotic Cardiovascular Serious Adverse Experiences Referred for Adjudication in Rheumatoid Arthritis Patients in the VIGOR Study Time-to-Event Plot (All Patients Randomized) Updated Application Data**

(Source: 10/13/00 Safety Update: Figure 3: pdf. page 41)

- 47 -

112.    The data submitted to the FDA show that there was an
exceptionally high risk of thrombotic events, including serious heart disease, among
those with high underlying risk. Thus, for the "low-dose-aspirin-indicated" subgroup,
consisting of subjects with prior symptomatic atherosclerotic conditions, the **RR was
4.89 (p=0.012, 95% CI 1.44, 16.88), compared to the overall RR of 2.37 (p=0.0016,
95% CI 1.39, 4.06)**. (FDA Medical Officer Review, 3/30/01, p. 5; see also Targum
Memo at p. 21.) These data support the conclusion, also found in APPROVe, that the
likelihood of serious heart disease is greatly multiplied after exposure to Vioxx, for
those who were at higher background risk. (Id.)

113.    The published VIGOR study includes a misleading and
incomplete description of the reasons why cardiovascular events were studied. The
authors state, "Because highly selective cyclooxygenase-2 inhibitors do not inhibit
platelet aggregation, which is mediated by cyclooxygenase-1, there was a possibility
that the incidence of thrombotic cardiovascular events would be lower among patients
treated with non-selective cyclo-oxygenase inhibitors than among those treated with
cyclooxygenase-2-selective inhibitors. Therefore, cardiovascular events were also
assessed for a future meta-analysis by independent committees whose members were
unaware of the patients' treatment assignments. A separate analysis of these events,
however, was not specified in the study design." Bombardier, 343 NEJM at 1521.
However, the records I have reviewed show that CV events were studied because Merck
had been aware since 1997 that patients taking Vioxx had a decline in the levels of
prostacycline, which inhibits platelet aggregation and clotting; the same study
(Protocol 023) showed that Vioxx-exposed subjects experienced a significant increase in
the levels of serum thromboxane which promotes clotting, by Day 14. (MRK-
OS420022612.) Therefore, it was predicted that Vioxx could promote thrombotic
events, whereas Merck's VIGOR publication attempts to explain the excess events by

reference to a lack of "protective" effect of Vioxx in <u>reducing</u> heart attack risks by anti-platelet activity. (MRK-ABS0037039, Final Plan, 12/30/97.) This difference between <u>promoting</u> heart attacks, as opposed to merely not <u>protecting</u> against them, was very important and should have been disclosed. Further, the Data Safety Monitoring Board (DSMB) for the VIGOR study had directed Merck to conduct an analysis of the CV adverse event rates specific to the VIGOR study, because an excess of such events was seen in the Vioxx treatment group. (MRK-AAX0002759-760.)

114. The VIGOR article also states that significant risk of MI was limited to those with high-risk backgrounds who were not taking aspirin for cardiovascular protection. Bombardier, 343 NEJM at 1523. However, the Merck update dated October 13, 2000, 6 weeks <u>before</u> VIGOR was published, shows that the adjudicated thrombotic event rate was <u>statistically significantly higher for Vioxx than naproxen, even for the lower-risk, non-aspirin-indicated group</u>. (Targum Memo at 21.)

115. These are important inaccuracies and omissions. Practitioners expect peer-reviewed literature to provide accurate information about the risks and benefits of medications that they prescribe to their patients. The published VIGOR study deprived practitioners of the facts known to Merck concerning the excess of several categories of CV events, the statistically significant excess in both low and high risk patient groups, and the biologically plausible mechanism by which Vioxx could have caused the excess. Instead of providing such facts, Merck offered a self-serving hypothesis that the excess MIs in the Vioxx group were attributable to a cardioprotective effect of naproxen, comparable to the effects of aspirin.

116. There was no scientific support for the claim that naproxen was cardioprotective. To this day, there has never been a randomized clinical trial of naproxen compared to placebo, which would have been necessary to demonstrate a protective effect of naproxen. In contrast, the cardioprotective effects of aspirin were

demonstrated by extensive clinical trials in large populations after years of study. Even then, such studies found that aspirin offers a protective effect of only about 25-33%, or in one study, 44%. Thus, even if naproxen had a similar effect, one would reasonably expect a difference of five or six heart attacks in the Vioxx group versus four heart attacks in the naproxen group. Instead, the actual results showed a difference of twenty heart attacks in the Vioxx group versus four in the naproxen group, and a 500% increased risk of MI in the Vioxx group cannot reasonably be attributed to a hypothetical 25-44% protective effect of naproxen. As noted by reviewer for the NEJM in 2005:

> The authors refer to the hypothesis of the "protective effect of naproxen" in VIGOR (page 15). This claim seems a stretch. The protective effect of naproxen is not a credible explanation for the increase in risk associated with rofecoxib in VIGOR. Naproxen would have to be several times more effective than aspirin to eliminate such an elevated risk.

(2005 NEJM 000274.)

117.    Since the VIGOR study, a number of observational studies have been conducted to investigate the hypothesized protective effect of naproxen. I have reviewed the published literature on this subject, including the articles sponsored by Merck and the meta-analysis of Juni, et al. (Juni et al. Lancet 364; 2021-29, 2004). I agree with Juni's conclusion that there is little or no cardioprotective effect of naproxen, and that the excess in risk of heart attacks and other CV events is due to the toxic effects of Vioxx. Indeed, rather than being cardioprotective, naproxen may have a small cardiotoxic effect of its own, particularly in relation to its known effect in increasing blood pressure, albeit to a much lesser degree than Vioxx. (See also FDA Medical Officer's comments rejecting the naproxen cardioprotection theory in the context of the ADVANTAGE study, at § V.D, below.)[7]

---

[7] Of note, a reviewer for NEJM criticized Merck for reiterating the "discredited

**C.      The Rheumatoid Arthritis Supplemental Marketing Application Studies Support the Conclusion that Vioxx Caused Excess Risk of CV Disease**

118.     On February 28, 2001, Merck submitted to the FDA a supplemental marketing application (SMA) for rheumatoid arthritis (RA), which was based upon Merck studies 068, 096, 097 and 98/103. Safety updates were submitted in June and August, 2001. These studies exposed approximately 2,000 patients to Vioxx, 550 patients to naproxen, and 1,000 patients to placebo. It was Merck's initial plan to combine the CV event data from these RA studies with the VIGOR study of RA population, and that plan was changed because of the VIGOR DSMB's demand for a prompt, separate analysis of VIGOR data. (MRK-NJ0120262; MRK-AAX-0002760.) The data from the Supplemental RA studies support the conclusions of the VIGOR study. In particular, there was an excess of MI and stroke in the Vioxx group versus naproxen, as follows:

a.      MI: 14 events/1528 patient years of exposure (Vioxx) versus 2 events/503 patient years of exposure (naproxen), **RR = 2.3**. When combined with the MI data from VIGOR, the **RR = 4.29, P<0.0002, 95% CI 1.78-12.51**. The significant result is consistent with APPROVe and is due to the cardiotoxic effect of Vioxx.

b.      Stroke/TIA: 8/1528 patient years of exposure (Vioxx) versus 0/503 patient years of exposure (Naproxen). The relative risk is infinite because the naproxen arm had zero events. When the Supplemental RA data are combined with the investigator-reported data from VIGOR (17 v 9 events), the result for stroke/TIA is **RR = 2.1, p<0.057, 95 CI 0.95, 5.12**. This result is borderline statistically significant, and there is only about a 1 in 18 possibility that the result is due to chance.

---

theory" that naproxen explained the VIGOR results (2005 NEJM 000270).

c.    CHF: 8 events/1528 patient years of exposure (Vioxx)

versus 0 events/503 patient years of exposure (naproxen) when the supplemental RA data
are combined with the investigator-reported data from VIGOR (19 v. 9 events), the result
for CHF is $RR = 2.27$, $p<0.03$, 95% CI 1.04, 5.49. This result is statistically significant,
consistent with APPROVe data, and indicative of the strong cardiotoxic effects of Vioxx.

119.    As in VIGOR, the Supplemental RA database showed a
substantially greater incidence of hypertension in the Vioxx group. Hypertension-
related events were observed "two to three times more often in each of the rofecoxib
arms, as compared to the naproxen arm or placebo. A higher percentage of patients
presented important increases of blood pressure and required concomitant medication in
the rofecoxib treatment groups compared to the naproxen group. More patients
discontinued due to HTN-related events from each of the rofecoxib groups as compared
to the naproxen group." (FDA Integrated Review of Safety, Vioxx Safety in RA
Efficacy Studies, paragraph 7.3.) The reviewer commented that the difference with
naproxen regarding hypertension was "observed early, even during the three-month
placebo-controlled phase." (Id.) It is medically probable that the increase in
hypertension contributed to the excess in MI and stroke, and that the relative risk of CV
events would have been higher if the subjects with hypertension adverse events had
continued in the study.

120.    I am aware of Merck's statements that the APPROVe study,
terminated in September 2004, provided the first evidence of Vioxx CV toxicity
compared to placebo. However, the 2001 data from VIGOR combined with the
Supplemental RA data showed an increased risk of Vioxx compared to placebo, in that
there were 34 MIs in 4227 patient years in the Vioxx arm, compared to zero events in
183 patient years on placebo. Although the sample size is too small to reach statistical

475846.1                                   - 52 -

significance, the excess MI's for Vioxx constitute another worrisome signal of cardiotoxicity.

121. The Supplemental RA data also show no significant difference between the CV event rates for the naproxen group versus placebo. For MI, the placebo rate was 0 events/183 PYR, versus 2 events/503 PYR for naproxen. Thus, the MI rate for placebo was actually lower than the rate of MI for naproxen. For MI plus cerebrovascular events, the placebo rate was 1 event/183 PYR, versus 2 events/503 PYR for naproxen, an insignificant difference. These data, while based on small samples, do not support the claim that naproxen has a cardioprotective effect.

122. In summary, the safety database for the RA application in 2001 showed a high degree of CV toxicity of Vioxx; failed to support the claim of a cardioprotective effect of naproxen; and when combined with the VIGOR data, showed statistically significant increased risk of CHF and borderline significant increased stroke and TIA, and suggested an excess of MI compared to placebo.

## D. The ADVANTAGE Study Showed A Similar Excess Risk Of MI For Vioxx Compared To Naproxen, Despite The Brief 12-Week Duration Of The Study.

123. ADVANTAGE was a double blind, randomized, 12-week controlled study with a mean duration of exposure of only 69 days, which compared Vioxx 25 mg/day to naproxen 1000 mg/day in patients with osteoarthritis. Approximately 2700 patients were randomized into each treatment arm. According to the FDA Medical Officer Review dated December 20, 2001, "Rofecoxib 25 mg—the dose approved for chronic use—showed no overall safety advantage over naproxen 500 mg twice daily, as measured by the total number of deaths, serious adverse events (AE's), discontinuations due to clinical/laboratory AEs compared to naproxen. This is somewhat striking, given the theoretical assumptions of the COX-2 hypothesis and

475846.1                                          - 53 -

literature publications suggesting that COX-2 selectivity would provide superior safety than non-selective NSAIDs." (Id. at page 10.)

124.    The Medical Officer Review found, "Consistent with VIGOR, there was a trend of excess in serious cardiac thrombotic events in the rofecoxib 25 mg group, compared to the naproxen group (10 and 3 events, respectively, as per FDA review)." (Id.) The Vioxx group outnumbered naproxen by 8 to 1 with respect to myocardial infarction and sudden death (which is typically cardiac in nature). Consistent with VIGOR, twice the number of patients discontinued due to cardiovascular adverse events, including hypertension (15 versus 7) and congestive heart failure (11 versus 6) in the Vioxx group compared to naproxen. (Id.) There were 2 and 5 ischemic cerebrovascular events in the Vioxx and naproxen groups, respectively; two of the four CVAs on the naproxen were also on concomitant estrogen therapy (id.), which can increase stroke risk.

125.    The reviewers concluded, "The findings of the ADVANTAGE study are consistent with those of VIGOR and the RA efficacy databases. The CV findings are of concern because this is only a 12-week study, the dose of rofecoxib used in this study is 25 mg/day (half of the dose used in VIGOR), this was a different population of patients (OA instead of RA) and patients were allowed to use aspirin if indicated for cardiovascular prophylaxis." (Id. at 11, ¶ f.)

126.    Of note, the FDA Medical Officer Review stated, "if the cardiovascular findings in VIGOR were all explained by naproxen anti-platelet effect, a difference would not be expected between naproxen and rofecoxib in ADVANTAGE, when patients at risk in both treatment groups were already maximally protected by ASA [aspirin]." (Id. at 11.)

127.    In 2003, the Annals of Internal Medicine published a Merck-sponsored article concerning the ADVANTAGE study. In May 2005, the editors of the

journal announced that they may publish a correction to the original article to show the drug had a higher risk of heart attacks than originally stated. The original study listed 5 heart attacks, but 3 additional cardiac deaths in the Vioxx group were not mentioned, including 1 in which company officials may have pressured a researcher to change his opinion about the likely cause of death, according to a New York Times article reported on April 24, 2005. According to the New York Times article, Merck overruled a suggestion by one of its researchers that a 73-year-old woman participating in the study probably died of a heart attack, and ultimately listed the cause of death as "unknown."

128.    In summary, the ADVANTAGE RCT shows early onset of an excess risk of MI, in a study of only 2.3 months' average duration of exposure, and the patients' use of aspirin for cardioprotection during the study contradicts the notion that the results were due to "protective" qualities of naproxen.

## E.    The VICTOR Study Shows a Statistically Significant Increased Risk of Thrombotic Events, With Early Visually Evident Separation of the Incidence Curves

129.    VICTOR was an RCT of Vioxx versus placebo in another study designed to investigate Vioxx's effects on intestinal polyps and their malignant transformation. The study was terminated in 2004, after withdrawal of Vioxx from the market. The final confirmed thrombotic event data show that there were 14 thrombotic events in the Vioxx population versus 4 in the placebo group, including 8 versus 2 cardiac events. (MRK-18940096441) The difference is statistically significant. A Kaplan-Meier cumulative incidence curve shows that the event rate for Vioxx was above placebo throughout the period of the study:



Kaplan Meier Plot of Time to Confirmed Thrombotic CV Events for Protocol 145

| # Patients at Risk | | | | | |
|---|---|---|---|---|---|
| Placebo | 1172 | 759 | 411 | 218 | 62 |
| Rofecoxib 25 mg | 1169 | 724 | 386 | 185 | 57 |
| # Cumulative Events | | | | | |
| Placebo | 0 | 3 | 3 | 4 | 4 |
| Rofecoxib 25 mg | 0 | 8 | 10 | 12 | 12 |

Events Within 14 Days After Last Dose
Plots were truncated when the risk size in any arm is < 50.
No event occurred after the truncation point.

(MRK-AFK0190651.)[8]  Four thrombotic events occurred among patients exposed to Vioxx for 27 days or less, and there were seven such events among patients exposed to Vioxx for 76 days or less.  (MRK-18940096443-44.)  There were no thrombotic events whatsoever in the placebo group until the 56th day after exposure, and only three events within the first six months.  (Id.) These data support the early onset of cardiovascular risk due to Vioxx.

130.   In an undated memo concerning VICTOR reports received by Merck as of May 31, 2005, Merck suggests that "it is not possible to draw scientifically meaningful conclusions based on the small amounts of data from a prematurely terminated study." (MRK-18940096439.) However, despite the small numbers, the

_____

[8] This curve, based on 12 versus 3 events as of February, 2005, would not have changed significantly with the "final" confirmed event totals (14 versus 4).

magnitude of effect was sufficient to yield a statistically significant increased rate of thrombotic cardiovascular events. Such evidence would have been sufficient for the Data Safety Monitoring Board (DSMB) to terminate the VICTOR study early, regardless of the prior termination of the APPROVe study. The statistical significance of the data means that the result was highly unlikely to be due to chance, and was instead due to the toxic effects of Vioxx. This is a scientifically meaningful conclusion, consistent with other data.

### F.     ViP Shows Slight Increased Rate of Serious CHD

131.    A third study known as ViP comparing Vioxx to placebo was in progress when the drug was withdrawn. There were approximately 2300 patients in each arm of the trial. The purpose of the study was to determine the risk of prostate cancer over six years of treatment with Vioxx 25 mg/d compared to placebo. When the study was terminated on September 30, 2004, the average time on treatment was about five months, out of a planned 72-month blinded treatment protocol. Although there was no statistical difference between the rates of confirmed thrombotic cardiovascular events, there was a numerical increase in cardiac events (10 versus 8, $RR = 1.25$) in the Vioxx group. The APPROVe Data Analysis Plan indicates that it was Merck's intention to combine the data from APPROVe, VICTOR and ViP. (MRK-AFL0015454). When the cardiac events for those three studies are combined, the result **is $RR = 2.34$, $P =$ 0.0008, 95% CI 1.39, 4.07**. Thus, the data combined in the way that Merck intended confirm a highly statistically significant excess risk of cardiac thrombotic events, including MI.

### G.     Trials Testing Rofecoxib's Effects on Alzheimer's Disease

132.    *Project description.* Merck conducted three studies of populations of approximately 1,450 patients on Vioxx, and a similar number on placebo, with

possible or probable Alzheimer's disease (AD), Protocols 091, 078 and 126, described below:

     a.     Protocol 091 was a placebo-controlled study to evaluate the efficacy and safety of Vioxx 25 mg to slow the progression of symptoms of AD. Patients were required to be over 50 years of age and were randomized to Vioxx or placebo for 12 months, followed by an additional three months treatment phase in which 90% of the patients initially assigned to Vioxx were treated with placebo while the other patients remained on their initial treatment.

     b.     Protocol 078 was a placebo-controlled study to evaluate the effects of Vioxx 25 mg on the prevention of AD and cognitive decline in patients at least 65 years of age with mild cognitive impairment. Eligible patients were randomized to receive Vioxx 25 mg or placebo for two years or until 220 cases of clinically diagnosed probable or possible AD were observed, whichever came later.

     c.     Study 126 was similar in size and design to study 091.

     133.     *Major Trial Outcomes.* In a recent article, the Merck-sponsored authors reported that there was a statistically significant increase in diagnosis of AD in the Vioxx-exposed population versus placebo, supporting the conclusion that Vioxx promoted rather than prevented progression of AD. See Thal, "A Randomized, Double-Blind Study of Rofecoxib in Patients with Mild Cognitive Impairment," Neuropsychopharmacology, 2005; online edition, 1-12. The results that I have summarized showing that Vioxx causes vascular "damage," including increased MI and stroke, suggest that the more rapid progression of AD in Vioxx patients could be caused by analogous vascular damage to cerebral blood vessels. Other significant data from the AD trials include the following observations with respect to cardiovascular toxicity and mortality:

          a.       For the end point of CHD (MI plus Sudden Cardiac Death) there was a statistically significant increased risk for Vioxx versus placebo, **RR=2.04, p<0.025, 95% CI 1.16, 3.59.** (Report of Richard A. Kronmal, April 8, 2005, page 18, Table 2.) MI alone represented a smaller data set which was consistent in the direction of elevated RR **(1.63),** but not a large enough sample size to reach statistical significance in itself. (Id.)

          b.       For CHD mortality, there was a statistically significant increased risk for Vioxx versus placebo, **RR=4.33, p<0.005, 95% CI 1.161, 11.68.** (Id.)

          c.       For all cause mortality, there was a statistically significant increased risk for Vioxx versus placebo, **RR=2.42, p<0.001, 95% CI 1.55, 3.77.** (Id.)

          134.     I have reviewed the report of George Howard, which responded to Dr. Kronmal's April 8, 2005 report. Dr. Howard does not suggest any errors in the counts or calculations of events made by Dr. Kronmal from Merck's own database of the AD trials. This supports the reliability of Dr. Kronmal's analysis. Of note, the actual event counts in the Merck database for MI and sudden cardiac death were greater than those presented to the FDA in 2005. (Id.)

          135.     The Vioxx arm had substantially greater incidence of hypertension, edema and congestive heart failure-related adverse events, as follows:

- HTN-related: 65 (8.7%) versus 19 (2.6%).
- Edema-related: 21 (2.9%) versus 6 (0.8%).
- CHF-related: 16 (2.2%) versus 6 (0.8%).

(See Medical Officer Review for review period ending November 28, 2001, Table 24.)

          136.     It is noteworthy that there were 22 patients for whom insufficient records were available for adjudication, and that of those, 18 were receiving Vioxx and four were receiving placebo. Based upon the confirmation rates I have observed in other Vioxx studies, approximately 60% of the investigator-reported events were likely to have

475846.1

- 59 -

been confirmed if sufficient data had been available, which would have resulted in approximately an additional 12 Vioxx events versus two to three placebo events. These would have further increased the calculated relative risks of Vioxx.

137. In summary, the AD studies are consistent with the data referenced above, showing increased risk of cardiovascular toxicity for Vioxx versus placebo.

## VI. RCTs SHOW EXCESS RISK OF HYPERTENSION AND EDEMA CAUSED BY VIOXX

### A. Excess Hypertension and Edema Were Demonstrated in the Vioxx Trials Before and After Marketing Compared to Placebo and Other NSAIDs

138. *Protocol 054: The ACE Inhibitor Study.* From July 1997 to February 1998, Merck conducted Protocol 054, a study of patients with mild to moderate hypertension controlled by the antihypertensive drug benazepril (10 to 40 mg/day), an ACE inhibitor. Patients were randomized to Vioxx 25 mg, 75 mg sustained release indomethacin, or placebo, taken with benazepril for three sequential four-week treatment periods. End points were monitored on the last day (Day 28) of each four-week treatment period. Despite patients' use of an ACE inhibitor, Vioxx 25 mg raised 24-hour mean systolic blood pressure by 4.5 mm Hg over placebo (90% CI, 2.2, 6.8), substantially more than did the nonselective NSAID indomethacin, which increased 24-hour mean systolic blood pressure 2.0 mm Hg over placebo (90% CI, -0.3, 4.4). Vioxx increased mean diastolic blood pressure 1.9 mm Hg over placebo (90% CI, 0.3, 3.6 mm Hg), compared to 1.1 mm Hg for indomethacin (90% CI, -0.5, 2.8). (MRK-OS420014787-88)

139. Blood pressure changes of the shown for the Vioxx population in Protocol 054 are clinically significant and contribute to excess risk of heart attack, stroke and CHF. Merck incorrectly selected a *diastolic* blood pressure increase of 5 mm Hg as the predefined "clinically meaningful" effect, when in fact increases in *systolic* blood

pressure have been demonstrated to be more important indicators of cardiovascular risk. The systolic blood pressure increases in this study clearly result in substantial excess risk.

140. *The Six-Week Osteoarthritis Trials.* On November 23, 1998, Merck filed its initial New Drug Application (NDA) for Vioxx for treatment of osteoarthritis. Protocol 010 was Merck's first osteoarthritis study of Vioxx, a six-week dose-ranging pilot study undertaken from July 1995 to February 1996. In this study, **13.9 percent (10/72)** of patients on Vioxx 25 mg had systolic blood pressure increases of over 20 mm Hg and absolute levels over 140 mm Hg, thereby exceeding predefined limits of change. The rate of such adverse events was twice as high for Vioxx subjects as for placebo. (MRK-ABS0016466). For subjects who received the 125 mg dose, a remarkable 32.9% (24/73) exceeded the predefined limits. (*Id.*) While the 125 mg dose was never marketed, these results are relevant because they show a clear *dose-response relationship*, one of the hallmarks of cause and effect between exposure and disease.

141. The incidence of reported hypertension-related events was substantially greater in extended pre-marketing RCTs. For example, in Protocol 029-30/40, BP was measured among 211 subjects given 3 different dosages of Vioxx, or diclofenac 150 mg. Hypertension-related events were reported for 14.9%, 14.5%, 22.2%, and 8.3% of patients on Vioxx 12.5 mg, Vioxx 25 mg, Vioxx 50 mg and diclofenac 150 mg, respectively. (MRK-0ACD0111202.) Substantial percentages of Vioxx patients required addition or increased dose of antihypertensive medication (12.8%, Vioxx 12.5 mg; 12.9%, Vioxx 25 mg; and 18.5%, Vioxx 50/25 mg), compared to a single diclofenac patient who required additional medication. Only 2 Vioxx patients' increased blood pressure resolved while on study treatment (MRK-ACD0111202, Table 37), showing that patients suffered continuous effects of chronic hypertension while on Vioxx.

475846.1                                    - 61 -

142. Excess hypertension in the Vioxx population was reported in numerous pre-marketing RCTs, including the following:

a. In Protocol 045, a six-month placebo-controlled trial, Vioxx subjects had 2 to 4 times as high a rate of hypertension-related events as those on placebo or ibuprofen. The cumulative "life table" rates, based on the probability that the adverse event occurs by the 18-week time point, were 10.5% and 20.6% for Vioxx 25 mg and Vioxx 50 mg, respectively, compared to 3.9% for ibuprofen 2400 mg. *Id.* (MRK-ABS0057147, 150; Table 75).

b. In the original Vioxx NDA, Merck pooled data from six months studies of placebo and comparator drugs. Subjects on Vioxx had substantially higher incidence of hypertension adverse events than placebo, ibuprofen, or diclofenac. (MRK-NJ0018456.)

c. Merck reported that for the first six months of Protocol 034, **16.2%** (37/229) and **17%** (39/229) of patients on Vioxx 12.5 mg and Vioxx 25 mg, respectively exceeded predefined limits of change (*i.e.*, spiked more than 20 mm Hg and exceeded a total of 140 mm Hg), compared to 8.3% (19/229) of diclofenac patients. These "spikes" in BP are important indicators of excess risk of serious thrombotic events. (See § VA, above.) A significantly higher percentage of patients on Vioxx 12.5 mg and Vioxx 25 mg exceeded these limits relative to diclofenac ($p = 0.015$ and $p = 0.007$, respectively). (MRK-ABS0072950-1)

143. Pre-market clinical trials also showed increased incidence of edema due to Vioxx, including the following:

a. In the 6-week studies within the OA clinical dose range of 12.5 and 25 mg, the incidence of edema-type adverse experiences was significantly ($p = 0.042$) higher in the 25 mg, but not the 12.5 mg, MK-0966 [Vioxx] group compared with placebo." (MRK-AB50067191.

475846.1                                     - 62 -

144.    Pre-market clinical trials also showed increased incidence of edema due to Vioxx, including the following:

a.    "In the 6-week studies within the OA clinical dose range of 12.5 and 25 mg, the incidence of edema-type adverse experiences was significantly $(p = 0.042)$ higher in the 25 mg, but not the 12.5 mg, MK-0966 [Vioxx] group compared with placebo." (MRK-AB50067191.)

b.    Edema-related adverse experiences begin within days of starting Vioxx exposure. Cumulative incidence for both 12.5 and 25 mg doses of Vioxx exceeded the incidence for diclofenac, and visual separation of the incidence curves occurred after about 10 days.

145.    After Vioxx was on the market, further studies continued to show significant excess hypertension and edema compared to naproxen or placebo, including VIGOR, the Supplemental RA studies, and APPROVe, as discussed in §§ VA-C, above.

146. Perhaps the most striking evidence of the hypertensive effect of Vioxx is the Kaplan-Meier curve for onset of hypertension over time in the Vioxx arm of the Alzheimer's studies. As set forth below, the data show that *over 30%* of the Vioxx population suffered hypertension, the curves separated immediately, and the incidence slope continued to rise as the study period ended:

Figure 2. Kaplan Meier estimates (95% CI) of time to hypertension (On-drug population)



Kaplan-Meier Estimates (95% CI) of Time to Hypertension
On-Drug Population

| Number of Patients | | | | | | | |
|---|---|---|---|---|---|---|---|
| ------- Placebo | 1074 | 913 | 765 | 420 | 342 | 249 | 207 |
| ——— Rofecoxib 25 mg | 1069 | 822 | 612 | 329 | 236 | 160 | 120 |

Source: Figure 4, ISS, s030

Vioxx appears to be the most hypertensive drug ever marketed for patients with chronic disease, and its effects on blood pressure contributed to the excess MIs and strokes that it caused. It is also plausible that the excess hypertension caused damage to cerebral blood vessels, which may have contributed to the significant increases in AD among the Vioxx patients in the studies.

**B.**     **Head to Head RCTs of Vioxx v. Celebrex and Naproxen Demonstrate Excess Hypertension and Edema in the Vioxx Groups**

147.    Two closely similar 6-week randomized clinical trials were done in patients over the age of 65 with osteoarthritis (OA) that compared the effects on destabilized blood pressure and peripheral edema of rofecoxib (25mg/d) to celecoxib (200 mg/d). Destabilized blood pressure was defined as a rise during the trial of systolic blood pressure (SBP) of > 20 mm Hg and a SBP > 140 mm Hg, with the latter satisfying the definition of hypertension. The results of these two trials were pooled to obtain summary values for these adverse events. See Becker, et al. Clinical Therapeutics, 25 (2): 647-662, 2003. The effects showed a significantly greater development in the rofecoxib patients of the "edema–only" condition (p < 0.001); and of "destabilized blood pressure" condition (p< 0.001. Also, 3 times as many rofecoxib patients had both adverse events, and the % of patients with any of the three conditions was 21.9 for rofecoxib and 12.9 for celecoxib. See Brinker at 654.

148.    The 24-hour test of blood pressure, taken by an automatic machine worn by the patient, is generally considered to be a very reliable method of judging the presence and severity of hypertension. A published study of rofecoxib's (25 mg/d) effects on 24-hr blood pressures (BPs), based on this method, appeared in 2005 and contrasted the results with that of celecoxib (200 mg/d) and naproxen (500 mg/twice daily). See Sowers, et al., Arch Intern Med, 165: 161-168, 2005. The patients were between about 62 to 64 yrs of age, all with osteoarthritis and all with hypertension that was reasonably well-controlled on antihypertensive medications. Although the baseline 24-hr BPs were closely similar, 6 weeks later the 24 hr BPs showed that only the rofecoxib group's BPs rose, and to a significant degree (p = 0.005 for rofecoxib vs celecoxib and p = 0.005 for rofecoxib vs naproxen. See Sowers at 163. Figure 3 of Sowers demonstrates graphically that rofecoxib was the only medication of the three that increased SBP both night and day throughout the 24 hrs. See Sowers at 166. This figure is reproduced below:



Figure 3. Hourly means of ambulatory systolic blood pressures (SBPs) over 24 hours at baseline and week 6 for celecoxib, rofecoxib, and naproxen. MN indicates midnight. Ambulatory BP monitoring was initiated at approximately 9 AM±2 hours. The morning dose of study medication was administered within 5 minutes of initiating the ambulatory BP monitoring session. A consistent increase from baseline in ambulatory systolic pressure was observed only in the rofecoxib treatment group.

149.    It is generally accepted, and Sowers, et al., state, "Small increases in both clinic and ambulatory SBP in patients with hypertension and type 2 diabetes are associated with substantial increases in the risk of cardiovascular morbidity." Sowers at 166. The Sowers study showed significant mean elevations of about 5 mmHg in the Vioxx group. It is medically probable that the demonstrated hypertensive effects of

Vioxx contribute to the excess risks of MI, stroke and CHF found in the Vioxx RCTs, and among patients who used the drug.

150.    Whelton, one of the co-authors of the Sowers article referenced above, had previously published data showing similar excess hypertension in Vioxx versus Celebrex. See, e.g., Whelton, Am. J. of Ther., 8:85-95, 2001, in which hypertensive-medicated OA patients 65 years or older had a statistically significantly greater risk of increased systolic blood pressure on Vioxx compared to Celebrex (17% v. 11%, p = 0.032), and also had almost double the rate of edema (9.5% v. 4.9%, p = 0.014). In 2001, Merck itself had conducted a head-to-head trial of Vioxx versus Celebrex and placebo, known as Protocol 112, which supported Whelton's conclusion that Vioxx was associated with a greater degree of hypertension. Protocol 112 was a 6-week controlled study of 1,521 patients in four treatment groups, Vioxx 12.5 mg, Vioxx 25 mg, Celebrex 200 mg., and placebo. (MRK-AIN0001240). The Merck Statistical Report showing analyses as of January 9, 2001, indicates that approximately 10% of the subjects in each of the Vioxx 12.5 mg. and 25 mg. arms of the study had increased systolic blood pressure greater than 20 mm and absolute value of over 140 mm, exceeding the pre-defined limits of change, compared to 5.3% in the Celebrex arm and 4.8% in placebo. The increased hypertension on Vioxx 25 mg. versus Celebrex 200 mg. was highly statistically significant, p = 0.004, and also statistically significant versus placebo (p = 0.046). (MRK-AIN0001608-609). Id. However, Merck did not publish the data from Protocol 112.

## VII.    SUMMARY OF ROFECOXIB'S EFFECTS IN ALL RANDOMIZED CLINICAL TRIALS (RCTs)

### A.    Summary of Randomized Clinical Trial Results.

151.    Since the pre-marketing studies, Vioxx has demonstrated a clear danger to the cardiovascular system, which has been confirmed by repeated clinical trials. Before marketing, Vioxx displayed statistically significant increases in hypertension,

edema and chest pain compared to placebo.  Vioxx also demonstrated worse hypertensive effects than diclofenac and ibuprofen, to which it was compared during the pre-market phase.  Hypertension appeared even in studies of two weeks' duration or less, and the cumulative incidence of hypertension exceeded 20% of the population in the extensions of short-term, pre-market studies.  The evidence of prothrombotic imbalance between thromboxane and prostacycline was also demonstrated in a pre-marketing, randomized trial, Protocol 023, which involved two-week exposures.

152.   The results of the VIGOR study in March 2000 showed that Vioxx was responsible for a five times greater risk of MI, and a statistically significant increased relative risk of 2.37 for the combination of endpoints identified by Merck as "thrombotic."  VIGOR was more than a "signal"; it was a confirmation of serious cardiotoxicity.  Consistent increased cardiovascular risk was found in the supplemental RA studies.  When data from those studies were combined with the VIGOR results, as Merck intended, the statistically significant increased risk of MI was confirmed (RR = 4.39), and a statistically significant increased risk of CHF was also demonstrated.  (RR = 2.27).  The risk of stroke and TIA was more than doubled (RR = 2.10), and the result achieved borderline statistical significance ($p < 0.057$).

153.   The ADVANTAGE study further confirmed the excess risk of serious cardiac events, the category for which the evidence has been strongest, and the MI + sudden cardiac death for Vioxx outnumbered naproxen by 8 to 1.  These results were obtained despite the brief, 12-week duration of the study, using the standard therapeutic dose of 25 mg. of Vioxx.

154.   The APPROVe study, commenced in 2001 and terminated prematurely on September 30, 2004, provides clear and convincing evidence of the damage of Vioxx to the cardiovascular system, including increased risk of cardiac events (RR = 2.80) and cerebrovascular events (RR = 2.32).  Relative risks for the patients at

475846.1                                   - 68 -

highest background risk were particularly high, **9.59** for patients with pre-existing symptomatic atherosclerotic cardiovascular disease, and **6.10** for diabetics. APPROVe confirmed that the risk of Vioxx begins when the patient starts taking the drug, and this is particularly clear for the high-risk patients, where the confirmed event rate was statistically significant in both the 0-18 months and 19-36 months periods of the study, and visual separation of the incidence curves began immediately. Strong increased risk of CHF-related events also appeared early and was significant **(RR = 4.61; 95% CI, 1.50, 18.83)**. Patients on Vioxx were significantly more likely to experience hypertension, and those with spikes in hypertension were almost four times more likely to suffer thrombotic events. Relative risks would have been even higher than those reported if not for the disproportionate early drop-out of Vioxx patients who suffered precursor events such as hypertension and edema.

155.    The VICTOR study showed a statistically significant increased risk of confirmed events, and **RR = 4.0** for the subcategory of cardiac events. The ViP study showed a slight increase in cardiovascular events **(RR = 1.25)**, and when combined with APPROVe and VICTOR as Merck intended in Protocol 203, there was a highly statistically significant increased risk of cardiac events **(RR = 2.34)**.

156.    Finally, the Alzheimer's trials showed statistically significant increased risk for the endpoint of MI + sudden cardiac death **(RR = 2.04)**, and for mortality arising from such events **(RR = 4.33)**. The Alzheimer's trials also showed a continually rising incidence of hypertension in the Vioxx arm, with cumulative incidence exceeding 30% by the time the studies were terminated.

157.    These consistent results strongly demonstrate that Vioxx is cardiotoxic and has caused an excess of heart attack, stroke, CHF, and hypertension.

## VIII.   EVIDENCE FOR ROFECOXIB'S HARM DERIVED FROM OBSERVATIONAL EPIDEMIOLOGY

### A.   Introduction.

158.   Observational (also called "non-experimental") epidemiology studies contribute a large amount of the total literature on rofecoxib's harm. This group includes many case-control studies (which are done by a process of matching rofecoxib-exposed patients with controls matched for age and gender, and, when possible, matched also for risk factors such as hypertension). There are also adverse event reports (AERs) emanating from the FDA, from the World Health Organization's data, largely from Europe and one from the UK. AERs report occurrence rate comparisons, without matching, by referral to events reported and relating them to either (1) prescription data as a surrogate for patient-years of exposure, or (2) expected proportions of events. Both types of study will be categorized by their impact on the disease outcomes of interest: serious heart disease; cerebrovascular disease, that is, fatal and non-fatal stroke and transient ischemic attacks (TIA's); hypertension; congestive heart failure, pulmonary edema and peripheral edema. All these reports amplify, complement and verify the conclusions reached from the experimental epidemiology studies described above, and contribute to the consistency principle of epidemiology described under paras 9 and 12, above.

### B.   Serious Heart Disease.

159.   *Adverse Event Reporting System of the United States Food and Drug Administration (US-FDA)* The FDA's quarterly Data Extract provided the number of adverse events (AEs) from 1/1999 through 9/2004 for the two major competitors and major sellers in the COX-2 pharmaceutical field, Celebrex (celecoxib) and Vioxx (rofecoxib). Relative Reporting Rates (RRRs) were derived from the AE data, as the numerator, and from the "IMS Health NPA Plus Monthly Rx Audit" for the number of prescriptions as the denominator. RRR data were derived for four time periods, 1/1999--

3/2000, 4/2000--12/2000; 1/2001--12/2001; and 1/2002—9/2004. From close to 9 through almost 80 million prescriptions for each of these drugs were filled during each of these 4 periods, with the largest sales occurring in the third period: over 76 million for Celebrex and over 67 million for Vioxx. Serious heart disease in this calculation was restricted to those terms defined as "myocardial infarction (MI)", which included fatal and non-fatal myocardial infarction, and sudden cardiac death. RRRs for MI for Vioxx versus Celebrex were high in each period

| I. | 1/1999 – 3/2000: | RRR = 8.84 |
|---|---|---|
| II. | 4/2000 – 12/2000: | RRR = 4.72 |
| III. | 1/2001 – 12/2001: | RRR = 12.11 |
| IV. | 1/2002 – 9/2004: | RRR = 20.46 |
| | Overall: | RRR = 11.29 (p <0.001 for all periods)[9] |

The RRR for all periods combined was 11.29, indicating over than an eleven-fold greater relative reporting rate of MI for Vioxx than for Celebrex. A high degree of statistical significance for Vioxx being more dangerous than Celebrex was present in each period (p <0.0001), and for the 4 periods combined (p <0.0001). The consistently elevated relative reporting rate therefore acts to supplement the information obtained from the randomized clinical trials described above: RR of 2.80 for serious heart disease for rofecoxib vs naproxen in APPROVe: RR of 5.00 for MI comparing Vioxx to placebo in VIGOR; an RR of 4.00 for serious heart disease (MI, Sudden Death and/or Unstable Angina) for Vioxx vs placebo in the VICTOR trial; an RR of 3.33 for serious heart disease for Vioxx compared to naproxen in the ADVANTAGE trial; and an RR of 2.04 for MI and sudden

---

[9] The most reliable RRR is for the first reporting period, before any adverse publicity about Vioxx could have affected the result. This RRR of 8.84 is consistent with and supportive of excess risk of Vioxx.

cardiac death for Vioxx compared to placebo in the Alzheimer trials. Therefore, the principle of consistency valued as evidence for causality by epidemiologists is amply demonstrated by the adverse event data, which clearly supplements the RCT data.

160. *Case-Control Studies*. The case-control study with the largest database is that described by Graham and co-authors (Graham et al Lancet, 2005; 365:475-481). These publications reported on the occurrence of acute myocardial infarction (AMI), both fatal and non-fatal, and sudden death (SD). The latter represented deaths assumed to be the consequence of heart attacks, both outside the hospital and during hospitalizations. The data were obtained from a retrospective analysis of about 12 months of data derived from approximately 6 million Californians enrolled in the Kaiser Permanente Health Plan. This produced the extraordinary number of 2,302,029 person-years of exposure to NSAIDs, including rofecoxib, celebrex and others. See Graham at 477). The analysis revealed a significantly greater degree of harm from all doses of rofecoxib versus celecoxib (odds ratio = 1.59, $p < 0.015$). For rofecoxib doses $> 25$ mg/d, the odds ratio versus celecoxib was 3.58 ($p < 0.0.16$). For rofecoxib doses of 25 mg or less the odds ratio versus celebrex was 1.47 and of borderline significance ($p = 0.054$). See Graham at 475. The Merck claim (from the VIGOR trial) that the five fold greater risk for MI for rofecoxib vs naproxen was due to a protective effect of naproxen was contradicted by Graham and co-authors since they found a slight increase of heart disease risk with naproxen vs the group with previous exposure to NSAIDS (odds ratio = 1.14, $p = 0.05$). See Graham at 475.

161. A second case-control study was done on a large database derived from a cohort of an elderly population (mean age of about 80) who were enrolled in a pharmacy benefit program. See Solomon et al. Circulation 109: 2068-2073. The records were examined for hospitalizations for acute myocardial infarction (AMI) for patients taking rofecoxib, celecoxib, non-selective NSAIDS or non-users of NSAIDS. They

475846.1                                    - 72 -

found a significantly higher AMI rate for two dosage levels of rofecoxib (25 mg/d or less, and > 25 mg/d) vs celicoxib at two doses (200 mg/d or less, and > 200mg). Adjusted relative risks (expressed as odds ratios) were as follows: rofecoxib 25 mg/d or less, vs celecoxib 200 mg or less (odds ratio = 1.21, p < 0.036): rofecoxib at the higher dose vs celecoxib at its higher dose of > 200 mg/d, odds ratio = 1.70, p < 0.026. Rofecoxib at all doses vs no NSAIDS was also higher, but of borderline significance—odds ratio = 1.14, p < 0.054. Celecoxib was not associated with higher risk as compared to the two groups of non-selective NSAID use and non-users of NSAIDS. See Solomon at 2068. A further finding of relevance to the duration of use needed to cause harm was that the rofecoxib vs celecoxib comparison showed significance for both the 1 to 30 day period (odds ratio 1.40, p = 0.05) and the 31 to 90 day period (odds ratio 1.38, p < 0.003). The authors state, "The findings of our study suggest that the first 30 days of use may include a period of elevated risk." *Id.*, at 2072. The period later than 90 days was not significantly different for rofecoxib vs celecoxib.

162.    Ray and co-workers did a case-control study of users of selective and non-selective NSAIDs in those enrolled in Tennessee's Medicaid program. See Ray et al. Lancet, 360: 1071-1073, 2002. Rofecoxib at doses > 25 mg/d was found to increase the reported number of cases of hospital admission for acute myocardial infarction or death from coronary heart disease when compared to non-users of NSAIDs. This increase was present for this dose either in comparing comparatively long-term rofecoxib users (risk ratio 1.7, p = 0.058) or those newly started on rofecoxib (risk ratio 1.93, p = 0.024). No other comparisons were significant, including the use of naproxen vs non-NSAID use or other NSAID use. A related study found no protective effect of naproxen. See Ray, et al., Lancet 2002; 359:118-23.

163.    A recent case-control study on the topic of serious heart disease and use of rofecoxib, celecoxib and certain non-selective NSAIDS was done using health

insurance records of elderly residents of the province of Quebec. See Levesque, et al. Annals of Int Med, 142:481-489 (2005). They reported a significant increase in myocardial infarction (MI) for current users of rofecoxib vs non-users of NSAIDs. They analyzed the data by use of regression techniques to yield a "rate ratio" which they termed an RR. The values were: rofecoxib vs non-users of NSAIDs, RR = 1.24 (95% CI 1.05-1.46). Celecoxib, meloxicam (a non-selective NSAID), naproxen and "other NSAIDs" did not differ significantly from the non-NSAID users. This finding contradicts a claim of cardioprotection by naproxen, while at the same time supporting the view that Vioxx caused more damage than other NSAIDs. See Levesque at 481 . The relatively high prevalence of use of celecoxib and rofexcoxib allowed low and high doses of each of these NSAIDs to be compared to non-users of NSAIDs, and rofecoxib caused significantly more MI's for each dose. The values were: low-dose rofecoxib (25 mg/d or less), RR = 1.21 (CI 1.02-1.43); high dose rofecoxib (> 25 mg/d), RR 1.73 (CI 1.09-2.76). Neither the low dose (200 mg/d or less) nor the high dose (> 200mg/d) of celecoxib were significantly different from the non-NSAID users. See Levesque at 484-85.

164.     Mamdani and co-workers reported a case-control study of patients over the age of 66 who were enrolled in the province of Ontario's health care system. In brief, they found no difference in the "adjusted rate ratios" for celecoxib, rofecoxib and naproxen of myocardial infarction hospitalizations compared to a control of non-NSAID users. See Mamdani, et al. Arch Int Med 163:481-486, 2003. Of interest is that the unadjusted rate ratio for rofecoxib (1.5) was significantly greater than that of the control group (CI 1.1-1.9). The unadjusted rate for the non-selective NSAIDs was also 1.5 and it too was significantly greater than that of the control group. The ability to generalize these results is limited, not only due to the known weaknesses of cohort studies, which require many adjustments to attempt to bring the groups into closer alignment without

475846.1                                          - 74 -

biasing the results, but also due to exclusions of data inherent in the study design. For example, the Mamdani study excluded all patients who died, which was not done in the other studies, and could have biased the results. Also, Mamdani excluded all patients who used the drugs for less than 30 days, and this exclusion has been criticized because of the potential for missing excess risk. See Solomon, et al., Circulation 109:2068-2073 at 2072 (2004).

## C.    Hypertension, Peripheral Edema and Congestive Heart Failure—Three Interrelated Complications

165.    In a retrospective analysis of patient records, Cho and co-workers studied blood pressure changes in a group of older patients newly started on either rofecoxib (57 patients, mean dose 25.2 mg/d) and celecoxib (52 patients, mean dose 219.2 mg/d). See Cho, et al. Am J of Therapeutics, 10 (5): 311-317, 2003. Despite the rather small size of the groups, Cho and co-workers found a significant rise in blood pressure in the rofecoxib group, as compared to the celecoxib group. An even larger increase was noted in those patients over the age of 65, which change was also significant. See Cho at 311. Of note is that slightly over half of all the patients were already hypertensive, and on blood pressure-lowering medications at the start of the study. See Cho at 313.

166.    Nietert and colleagues reported a comparison of effects of newly prescribed rofecoxib vs celecoxib in stable hypertensives over the age of 55, using a retrospective, case-control design. (See Nietert, et al. Pharmacotherapy 23 (11): 1416-1423, 2003). Data were obtained from electronic medical records of 31 ambulatory care practices. The records were examined for patients newly prescribed either of these COX-2 inhibitor drugs. The usual doses were: rofecoxib 25 mg/day, and celecoxib 200 mg/day, and the results were unchanged if the few patients taking different doses were excluded from the analyses. Blood pressures taken after the new drugs began were not different, but the rofecoxib group had significantly more patients who required increases

in the doses of their blood pressure control medications (odds ratio = 1.68, 95% CI 1.09-2.60). Additionally those started on rofecoxib required the increased doses of blood pressure control medications to begin sooner than those requiring such changes in the celecoxib group ($p < 0.05$). (See Nietert at 1416).

167. In contrast to the two previously described studies, Solomon and co-workers wished to find if hypertension was induced in normotensive individuals (mean age, about 80 for each group) when started on either the two most commonly used COX-2 drugs (celecoxib and rofecoxib), when compared to non-selective NSAIDS or non-NSAID users during the years of 1998-2000. See Solomon, et al. Hypertension, 44:140-145, 2004. In this retrospective case-control study, they found that rofecoxib did create significantly more new cases when compared to either celecoxib, non-specific NSAIDS or to non-NSAID users. See Solomon at 140.

168. A fourth study was done using questionnaire responses of patients with either rheumatoid or osteoarthritis. See Wolfe et al. Jr Rheumatology, 31: 1143-1151, 2004. The goal was to determine prevalence of new hypertension, increased difficulty in blood pressure control or appearance of or worsening of edema, based on information provided to patients by their physicians as well as self-observation. Comparisons were made of those using rofecoxib, celecoxib or non-specific NSAIDS— with data restricted to self-report over the prior 6 months. All comparisons showed significant increases in all of the outcomes studied for rofecoxib over the other two treatment conditions, including greater than doubling of the risk of increased blood pressure and edema. Patients reporting increased edema also had a 4 times greater risk of developing CHF. See Wolfe at 1148.

169. A fifth study used FDA files of spontaneous reports of hypertension leading to hospitalization in association with rofecoxib, celecoxib, and two non-selective NSAIDS. See Brinker et al., Drugs Aging, 21 (7): 479-484, 2004. The

475846.1                                    - 76 -

study covered the period from 1/2/92 through 4/02 that encompassed the first 3 years of marketing of these four drugs. Again only rofecoxib was responsible for an appreciable number of hospitalized cases. There were no cases from the two non-selective NSAIDS, and 3.8 times as many for rofecoxib as for celecoxib . See Brinker at 481. Of relevance to the dose required for produce adverse events, 13 of 17 rofecoxib cases were derived from those taking the 25 mg dose and only 4 at the 50 mg dose. The authors stated that the 50 mg dose "did not seem to be over-represented among the cases". See Brinker at 482. Of great relevance to the duration of rofecoxib use required for adverse events to occur is this observation—"the time to hospitalization was 4 weeks on average, but there were reports of acute illness and hospitalization following a single dose." See Brinker at 482. (Emphasis added). The rapid onset of extreme hypertension is a contributing factor to the early appearance of increased risk of MI, stroke and/or CHF due to Vioxx. Of antecedent diseases and risk factors, only pre-existing hypertension was listed as being common (80% of celecoxib cases and 60% of rofecoxib cases). See Brinker at 482. The methodology used by Brinker is identical to the methodology that I used to prepare the adverse event analyses of serious heart disease, stroke/TIA and CHF, that is, Medwatch adverse event reports in the numerator and IMS prescription data as a surrogate for patient years of exposure in the denominator.

170.    The World Health Organization/Uppsala Monitoring Centre (WHO/UMC) of Uppsala Sweden collects adverse drug reactions (ADRs) from 57 countries that belong to the WHO program for international drug monitoring. This center collects about 35,000 new reports quarterly. See Zhao, et al. Clinical Therapeutics, 23:1478-1491, 2001. Zhao and colleagues reported on comparisons of ADRs from celecoxib vs rofecoxib through the second quarter of 2000. The topics they explored in the database were as follows: water retention (which is comprised largely of peripheral edema); abnormal renal function; acute renal failure, nephritis, cardiac failure and

475846.1                                         - 77 -

hypertension. They defined the group of ADRs as all being related to renal safety, including in their definition the three topics encompassed in this section: hypertension, peripheral edema and congestive heart failure (CHF), the latter a synonym for cardiac failure. They were stimulated to investigate these particular adverse events because of prior studies that had shown rofecoxib to cause more deleterious effects in these categories. (See Zhao at 1480, and this article's references #s 16-20). Their analytic method seeks evidence for disproportionality (referred to as "IC") in reporting of ADRs among different drugs. These IC comparisons were converted into "actual/expected ratios" of rofecoxib/celecoxib. These ratios were: 1.75 for water retention ($p < 0.0001$); 3.94 for cardiac failure ($p < 0.001$); and 1.84 for hypertension ($p < 0.001$). See Zhao at 1484. Comparisons also showed rofecoxib's IC values to be greater than those of two "traditional NSAIDS"--(diclofenac and ibuprofen) ($p < 0.05$), whereas celecoxib was similar to these two other NSAIDs. See Zhao at 1483.

171.     Hospitalizations for congestive heart failure (CHF) during the years 2000 and 2001 were studied in residents of the Canadian province of Ontario and comparisons were made among the following groups (all over 65 years in age): new users of rofecoxib, celecoxib, non-selective NSAIDS, and non-users of NSAIDs. See Mamdani, et al. Lancet 363:1751-1756, 2004. The findings showed the lowest rate of admissions were for celecoxib and non-users. Non-selective NSAID users had an intermediate rate and rofecoxib the highest rate. Additionally, rofecoxib users with no prior history of admissions for CHF had a higher readmission rate after their first admission than did either of the other two groups. See Mamdani at 1755. The CHF study by Mamdani had almost three times as many events than his study of MI. Also, the former study did not exclude subjects who took the drug for less than 30 days. These factors tend to make the CHF study more reliable.

172.     The third article on CHF was that of a single case report of a 42

year-old woman who was diagnosed with this problem after two weeks of use of 25 mg/d of rofecoxib followed by one week at 50 mg/day. See Campbell and Sneed, JABFP 17(2): 131-135, 2004. This case was reported to the FDA. See Campbell at 132. Although single case reports taken in isolation are of limited value in assigning causality, this case report is consistent with other data, including the rapid onset of CHF in the Vioxx arm of the APPROVe RCT. Therefore, this case provides supportive evidence of the brief duration of Vioxx exposure needed to produce a serious adverse event.

**D.     Cerebrovascular Disease (Stroke and TIA)**

173.    *Adverse Event Reporting System of the United States Food and Drug Administration (US-FDA)*. The FDA's quarterly Data Extract provided the number of adverse events (AEs) from 1/1999 through 9/2004 for the two major competitors and major sellers in the COX-2 pharmaceutical field, celebrex and vioxx. The methods used for the calculation of serious heart disease (see Discussion at ¶ X.B, above) were also used for stroke and TIA. RRR data were derived for four time periods, 1/1999 – 3/2000, 4/2000 – 12/2000; 1/2001–12/2001; and 1/2002 – 9/2004. In para __, I reported on the large and consistent increases in myocardial infarction rates for Vioxx/Celebrex from this data set, with the overall RRR being 11.29 (p < 0.001). Similarly, for stroke and TIA separately and combined, the RRRs for Vioxx/Celebrex were also large and statistically significant for each period and for all periods combined. The RRR and significance data for stroke and TIA combined are:

| | |
|---|---|
| I. | 17.72, (p < 0.001); |
| II. | 6.45, (p <0.001); |
| III. | 11.27, (p < 0.001); |
| IV. | 24.16, (p <0.001); |
| Overall: | 13.44, (p < 0.001) (all 4 periods combined) |

Thus, it is quite remarkable to note the very large excess and comparability of the toxic burden of Vioxx over Celebrex both for MI and stroke plus TIA (11.29 and 13.44, respectively). (Similar findings were present for strokes alone and TIAs alone).

475846.1                                         - 79 -

174.   Many comparisons of Vioxx vs Celebrex have been reported, due to their similar dates of initial marketing as well as their classification as COX 2 inhibitors. A different NSAID also classified as having COX 2 properties, (meloxicam) was compared to rofecoxib by means of a prescription-monitoring program and questionnaires sent to general practitioners in England. See Layton et al. Rheumatology, 42: 1342-1353, 2003. Prescription data were obtained from a confidential registry and the prescribing practitioners were sent questionnaires requesting information on adverse events that occurred within 9 months after the time of the prescription. Four months of prescriptions were assessed: (12/96 to 3/97 for meloxicam and 7/99 to 11//99 for rofecoxib). See Layton at 1342. Cerebrovascular disease events were derived from a long list of 23 terms that fit the diagnostic categories used by the practitioners, of which 6 were termed as "non-specific and of the "lowest level" of "relevance". See Layton at 1344. These cerebrovascular disease events, which contained at least the terminology for "stroke" and "TIA" more commonly used in the US, revealed an excess of these events for rofecoxib/meloxicam, with an RR of 1.68 (95% CI 1.15-2.46). See Layton at 1342. Cardiovascular disease events were derived from a short list of accepted terms (cardiac arrest, myocardial infarction and the vague term "CVS not specified", with CVS likely meaning "cardiovascular system"). See Layton at 1344. Despite the uncertainty of the diagnostic criteria, there was an excess of cardiovascular events for rofecoxib/meloxicam, with an RR of 1.38. This difference was not statistically significant (95% CI 0.71-2.67). See Layton at 1342.

E.     **Summary of the Observational Epidemiology Studies**

175.   These studies provide ancillary support for the findings of increased risk report randomized clinical trials, including: serious heart disease, stroke and TIA, congestive heart failure, increased blood pressure and peripheral edema. No evidence was found for an increase in peripheral venous thromboses or for their

complications, such as pulmonary embolism, tending to support the view that such peripheral venous events are of doubtful relevance to the endpoints of damage caused by Vioxx. They also support the concept that increased risk starts when exposure begins, and significant increases in serious heart disease were found in less than 30 days (Solomon; Ingenix). Consistency in outcome is therefore present. Consistency was demonstrated as well for disease outcomes discerned through different types of studies, including retrospective case-control studies, adverse event reports collected by the FDA or WHO, and self-report obtained through mailed questionnaires. The case-control studies were carried out in groups that varied considerably in age, including one in which the mean age was about 80. The onset of hypertension occurred very early after beginning Vioxx, and this hypertensive change persisted throughout the duration of use of Vioxx. One study done on 24-hour measurements revealed that the increase in blood pressure occurred throughout the 24 hours, including measures taken while patients were sleeping. This tends to support a continuous and chronic increased risk due to hypertension.

## IX. THE CARDIOVASCULAR RISK OF VIOXX BEGINS WHEN THE PATIENT STARTS TO TAKE THE DRUG AND PERSISTS THROUGHOUT EXPOSURE.

176.    David Graham, M.D., is an FDA official who has studied the effects of Vioxx and published peer-reviewed literature on this subject. Dr. Graham was invited to testify at the Advisory Committee hearings held by the FDA earlier this year. During his testimony, Dr. Graham stated to the Panel that "the risk of myocardial infarction with rofecoxib begins when rofecoxib use begins." (Transcript, FDA Advisory Committee Hearings, 2/17/05 at 64). I consider Dr. Graham's opinion to be reliable, and I agree with his statement.

A.  **APPROVe, ADVANTAGE, VICTOR and VIGOR Data Show Excess Risk Throughout Exposure to Vioxx, or Promptly after Exposure Begins.**

177.    As described previously, the APPROVe study investigator-reported data showed a statistically significant increased risk of CV events, including MI and stroke, in both the 0-18 month and 19-36 month periods of the study. The Kaplan-Meier cumulative incidence curve showed that the rate for Vioxx was above placebo throughout the entire period of the study. (See Figure at ¶ 88, above.) The Cox proportional hazards test showed no significant difference in the rate during the first and second halves of the study. These results show early and continued excess of risk. They cannot be dismissed by suppressing them, as Merck did by failing to disclose them to the New England Journal of Medicine. Nor can they be explained away by referring to different endpoints that exclude some of the damage attributable to the drug.[10] Instead, this randomized clinical trial provides reliable evidence of increased risk throughout the period of exposure. The Kaplan-Meier curve for the APPROVe high-risk patient subgroup provides consistent findings:  statistically significant increased risk in the 0-18 month period, and immediately, visually apparent separation of the incidence curves. (See Figure at ¶ 82, above.)  As discussed above, similar findings of early visual apparent separation of the incidence curves were made in ADVANTAGE, VICTOR and VIGOR.

B.  **Early Excess Risk Is Biologically Plausible.**

178.    The rapid appearance of increased risk is biologically plausible and consistent with other evidence. There is general agreement in the scientific

---

[10] See NEJM reviewer comment: "'Thrombotic cardiovascular serious events' contains a long list of heterogeneous events, including venous thrombosis and pulmonary embolism. . . . The use of a composite endpoint that includes 'noise' will reduce power. Based on known biologic mechanisms of COX2 inhibitors, heart failure might have been a better choice as an element of the primary composite outcome than venous thrombosis." (2005 NEJM 000272.)

literature that at least part of the explanation for the excess risk of Vioxx is the reduction of prostacycline without a corresponding reduction of thromboxane, which promotes platelet aggregation, thrombosis and plaque rupture. Protocol 023, the clinical trial that first informed Merck of this effect in 1997, involved Vioxx exposures of only two weeks, and showed that the prothrombotic imbalance of prostacycline and thromboxane occurred within that brief period after exposure began. This evidence supports early onset of increased risk.

179.    As is the case with all cardiovascular risk factors, the chief determinants of both the extent and rapidity of onset of adverse events are the individual "host factors" of the exposed patients. These include, primarily, the underlying state of cardiovascular risk. Thus, as noted above, there was immediate visual separation of the incidence curves for high-risk patients, with Vioxx above placebo throughout the APPROVe study, and a statistically significant excess risk in both the 0-18 month and 19-36 month periods.

180.    Early increased risk of CV events due to COX-2 inhibition is strongly supported by a study of Bextra (valdecoxib) and Dynastat (parecoxib), two other COX-2 inhibitors among patients who had recently undergone coronary artery bypass grafting (CABG). In that RCT the authors found that "short-term COX-2 inhibition is associated with a significant risk of thromboembolic events in patients at high risk for such events." Nussmeier, et al., "Complications of the COX-2 Inhibitors Parecoxib and Valdecoxib After Cardiac Surgery," New England Journal of Medicine, 2005; 352:1081-91 at 1086. The patients were exposed to such drugs for only 10 days, with a 30-day follow-up period, yet despite this relatively brief exposure, a statistically significant increased risk was demonstrated for the occurrence of "cardiovascular events" including MI, sudden cardiac death, stroke, and TIA. Nussmeier at 1087, Table 3 ($RR = 3.7$, $p = 0.03$, 95% CI 1.0, 13.5). These results strongly support the

475846.1                                                                                                         - 83 -

conclusion that the risk of COX-2 inhibitors, including Vioxx, can and does appear within the first days after exposure among high-risk populations. Just as important, the presence of underlying high risk is not known until MI or stroke occurs, leading to post-event diagnostic tests that show atherosclerotic narrowing of the artery where the thrombosis is found.

### C. Hypertension Effects Begin Early and Increase Risk of Cardiovascular Events.

181. As discussed previously, increased rates of hypertension adverse events have been reported in almost all studies of Vioxx of which I am aware. These events begin very early. For example, in APPROVe, the authors reported that the Vioxx group's increase in blood pressure had occurred within 4 weeks after the start of the study. (Bresalier, 352 NEJM at 1098.) As also noted above, adverse hypertensive events are significantly correlated with thrombotic events in APPROVe **(RR = 3.82)**, and a similar trend was reported in VIGOR **(RR = 3.96)**. Also, as cited in ¶ 75 above, not only does Vioxx cause hypertension occur more often, but when it does occur, the CV disease risks are magnified. Rapid onset of hypertension probably accelerates the risk of an adverse thrombotic event by multiplying the shear stress, which can disrupt plaque and result in emboli and/or clots. The formation of the clot would be facilitated by the effects of Vioxx in reducing the amount of prostacycline available to combat the clotting effects of thromboxane. Chronic hypertension causes ongoing damage to the arteries, increasing the risk of CV events ever further over time.

### D. Observational Studies Show Early Onset of Excess Risk

182. A published study by Solomon, et al. (See Hypertension, 44: 140-145, 2004) reported that there was an increased risk of MI during the first 30 days of exposure to Vioxx, and in the 31-90 day period. The difference between Vioxx and comparator drugs after 91 days was not significant. (See § X.B, above.)

183.    Similarly, in the Merck-sponsored Ingenix study, the authors reported in a 2003 draft that there was a statistically significant increased incidence of MI among Vioxx users compared to diclofenac or ibuprofen users in the United Health Group database of prescriptions and adverse event records, for the 0-30 day exposure period (**Adjusted Rate Ratio = 1.86, 95% CI 1.14, 3.04**). (MRK-ADC0032557.) This study has not been published.

## X.    THE SIGNAL OF VIOXX CARDIOVASCULAR TOXICITY APPEARED BEFORE VIOXX WAS MARKETED

### A.    Vioxx Caused a Significant Increase in "Chest Pain," Hypertension and Edema in Pre-Market Clinical Trials

184.    Protocol 045 was a randomized controlled, pre-marketing study of Vioxx in an osteoarthritic population, consisting of 775 patients between the approximate ages of 50 and 80 years, given Vioxx 25 mg, Vioxx 50 mg, placebo or ibuprofen 2400 per day. (MRK-OS420085325-326). The study was conducted in 1997-1998, prior to marketing of Vioxx , and data were presented in the New Drug Application submitted in November 1998. Patients participated in an initial 12-week period and a 12-week continuation. For Vioxx 50 mg patients compared to placebo, there was a significantly higher incidence of both "chest pain" (**3.6% v. 0% by week 18, p = 0.012**). (MRK-OS420085536); MRK-OS420085469, Table 44). Merck did not include "chest pain" as a term that triggered adjudication for confirmed thrombotic events. (MRK-ACV0020385). Chest pain is the signature symptom for MI, angina, myocardial ischemia, and other illnesses attributable to narrowing and/or blockage of coronary arteries. This significant difference from placebo was not the result of chance, but rather was likely due to the cardiotoxic effects of Vioxx, including hypertension (also significantly elevated in Protocol 045 for both the 25 mg and 50 mg doses,*s ee* MRK-OS420085537, 557, Table 59). The significant excess of chest pain and hypertension in Protocol 045 was a strong signal of the danger of Vioxx to the heart and

475846.1                                     - 85 -

CV system. Edema was also elevated by 2 to 3 times versus placebo, although not statistically significant due to the relatively small number of patients. See MRK-OS420085604.

**B.     Merck Knew of an Excess of CV Events in the Vioxx Pre-Marketing Clinical Trials, Compared to the Placebo Group It Chose for Such a Comparison**

185.    In December 1997, a year and a half before Vioxx was marketed, Merck appointed a Task Force to investigate the incidence of cardiovascular serious adverse events (SAEs) in the ongoing Vioxx clinical trials (Minutes, 12/3/97; MRK-ABY0199809). The included trials were 029, 029-10/20/30, 033, 034, 035, 040, 044 and 045, which comprised 5236 patients and 1488 patient-years of exposure to Vioxx, comparator drugs and placebo as of December 15, 1997(MRK-NJ0066815, 819). The stated reason for this investigation was the unexpected result of Protocol 023, which showed a decline in the levels of PGI-2, the "most potent of all inhibitors of platelet aggregation," but no inhibition of systemic thromboxane, in the urinalysis of patients on Vioxx. (Final Plan, 12/30/97, at MRK-ABS0037039). This imbalance triggered a concern over the potential for thrombotic events. (Id.) The Task Force held its first meeting on December 3, 1997. ("Updates: PTM (December, 1997), MRK-ABS0329466 – MRK-ABS0329473, at 9473).

186.    To investigate the concern over thrombotic events, Merck decided to analyze SAEs from the ongoing osteoarthritis (OA) trials listed in the preceding paragraph. Because the trials were still blinded as to treatment groups, it could not be determined whether SAEs in the database had occurred in the Vioxx, placebo, or comparator drug arms. Therefore, the Task Force designed a study in which CV SAEs from all arms of the OA trials would be added together, and the combined groups' SAEs incidence rate would be compared to incidence rates of placebo patients from trials of other Merck drugs. In particular, the incidence among females in the

Vioxx trials would be compared to the placebo groups from trials of Fosamax (an osteoporosis drug), and males from the Vioxx trials would be compared to the placebo groups from trials of Proscar (a treatment for benign prostate hyperplasia). The Task Force agreed to interpret the results according to "specific rules which set numerical cutoffs for when the incidence of a CV condition is greater than expected" for the Vioxx OA trial population. ("Minutes for December's Vioxx (MK-0966) Project Team Meeting," 1/9/98, at MRK-GUE0051409).

187.    An expedited timeframe was established for completion of the analysis. Douglas Watson, Ph.D., a Merck epidemiologist with training in cardiovascular studies, authored a Final Plan dated December 30, 1997. (MRK-ABS0037036-046). Results were to be presented at the January 7, 1998 meeting of the Merck Clinical Development Oversight Committee (CDOC). (Minutes, 12/4/97, MRK-ABY0199805).

188.    On average, women in the Fosamax placebo group were about 3 years older than their counterparts in the Vioxx trials (65.4 v. 62.3 years), which would confer greater risk on the Fosamax group. Women in the Vioxx group had higher prevalence of hypertension, overweight and high cholesterol, while the Fosamax group had a higher prevalence of prior stroke and TIA. Considering the constellation of risk factors, it was reasonable for Merck to conclude, as it did, that it would be useful to compare cardiovascular event rates between the females in the Vioxx trials and females in the Fosamax trials. (See MRK-ABT0014783, 785).

189.    Results calculated by Merck demonstrated a statistically significant increased relative risk (RR) of 2.16 (95% CI 1.14, 3.94) for the Vioxx females compared to the Fosamax placebo group, and a non-significant elevated RR of 1.28 for Vioxx males compared to the Proscar placebo group. The results report did not mention the "specific rules which set numerical cutoffs" for excessive CV SAEs, nor

whether such cutoffs were violated by a statistically significant doubling of the rate for the Vioxx trials compared to the Fosamax group. (Report, 2/2/98 MRK-NJ0066804-827). These results provided another signal of the cardiovascular toxicity of Vioxx.

### C.   Merck inappropriately dismissed the importance of the signal.

190.   At the January 7, 1998 CDOC meeting, Watson gave a presentation that dismissed any concern over the results of the CV SAE analysis on the grounds that (1) the Fosamax placebo group "may" have had an atypically low incidence rate of CV events, so that the doubling of SAEs in the Vioxx group was not unexpectedly high, and (2) the Vioxx groups' incidence rates were not as high as the incidence rates in a so-called "background population." (1/7/98 Watson presentation; MRK-ABP0002685-686). Merck adopted Watson's view and declared that the results showing a doubling of risk were not felt to be of concern. On February 9, 1998, the Project Team Minutes Executive Summary stated that the "results show no evidence of unexpected rates compared to the general population or to the Fosamax and PROSCAR databases," despite the statistically significant doubling compared to Fosamax. (Memo from Pemrick, 2/9/98, at MRK-ABC0009947).

191.   With regard to Merck's dismissing the appropriateness of the Fosamax placebo subjects as a substitute for a control group, Merck's explanation fails for two reasons. First, Merck's own in-house cardiovascular and epidemiology experts selected the Fosamax subjects as appropriate for comparison to the Vioxx group. The documents that I have reviewed which claim an "atypically low" incidence of CV events in the Fosamax placebo group were written after Merck learned the adverse results of the comparison (e.g., Watson 1/7/98 presentation, Watson 2/2/98 Report.) The scientific method requires adherence to the pre-specified plan for analysis of the data, and does not allow that plan to be disregarded in favor of a different plan after the results are known. Furthermore, the 12/3/97 Agenda shows that the Task Force

explicitly addressed the question: "Are FOSAMAX and PROSCAR placebo patients appropriate as controls?" An annotated version of the Agenda bearing placed a handwritten checkmark next to that agenda item, without further comment, supporting the conclusion that Merck's Task Force did not find any reason to consider the Fosamax placebo comparison to be inappropriate until after adverse results were calculated. (MRK-ABY0199809).

192.    Merck's second rationale for dismissing the results of the SAE analysis was an indefensible comparison of the incidence of cardiovascular events in the Vioxx trials to a purported "background" rate from an elderly community population. It is important that the "Final Plan" of December 30, 1997, did not state an intent to compare the Vioxx group's CV SAE rate to any "background" general population groups, but instead indicated that the analysis of risk would be based on the study design to compare Vioxx trial CV SAE rates to the Merck-chosen placebo group rates. Nevertheless, after learning that the Vioxx trial rate was more than double the rate for the Fosamax placebo group, Merck altered the study design by deciding to compare the Vioxx group SAE incidence rates to event rates from a general population group, that is, the Cardiovascular Health Study (CHS; Ives, 1995).

193.    On general scientific principles, it was inappropriate to reach outside the study design comparing rates to a clinical trial placebo group, because the Vioxx clinical trial protocols involved selection of subjects who were at lower risk of CV events than the general population. The CHS was a particularly inappropriate comparison group, because the CHS population was, on average, 11 years older than the Vioxx clinical trial population (73 versus 62 years) and the CHS population also included a far greater number of high risk patients with previous MIs, strokes, angina, hypertension, and other preexisting conditions. In addition, the CHS incidence rates included endpoints that Watson had excluded from the search terms for the Vioxx

groups, particularly congestive heart failure, which contributed 30% of the events used to calculate the CHS overall incidence rates.

194.    Watson was aware that the background rate of CV events varied "greatly" based upon the age, gender and risk factors of the population selected, as he had written in a memorandum in 1996. That memorandum referenced 15 published articles as the data sources for such highly variable rates. Some of those sources would have provided background rates that were lower than those calculated by Merck for the Vioxx OA trials in 1997, while others, like the CHS, provided higher rates. This variability highlights the impropriety of selecting a "background rate" that would support a claim that Vioxx was not toxic, when other "background" data sources would readily have supported the opposite conclusion. It was wrong to change the study design, wrong to dismiss the results of the statistical analysis v. Fosamax placebo, and wrong to ignore the signal of Vioxx's toxic effects on the heart.

195.    In October 1998, after the OA trials had been unblinded, Merck submitted the New Drug Application (NDA), which included data relating to adverse events. In that document, Merck stated that there was no statistically significant difference between Vioxx and placebo, or between Vioxx and other NSAIDs, with respect to thrombotic event rates. However, the data did not establish the cardiovascular safety of Vioxx, because the comparison to placebo was based on a very small data set, and because the comparisons to other active drugs are inherently capable of establishing only relative, rather than absolute safety.

196.    The Vioxx OA trials involved only 363 patient years of exposure to Vioxx and 127 patient years for placebo. There were only three events classified as "thrombotic" under Merck's classifications, including a single MI, in the placebo group. (MRK-ABS0027726- 728). This is such a small sample size as to be meaningless from a statistical standpoint. By comparison, there were 3327 years of patient exposure to

placebo in the APPROVe study, about 26 times more than in the OA trials. Dr. Watson, Merck's cardiovascular epidemiologist, wrote in a published article concerning gastrointestinal effects of Vioxx versus other NSAIDs that he did not analyze data for a study in which there were only 194 patient years of exposure and 3 adverse events, because "the total person-time on the drug (194 person-years) and number of events (3 total) were *too low to provide meaningful analysis.*." (Watson, et al., *The upper gastrointestinal safety of rofecoxib vs. NSAIDs: an updated combined analysis,* " Curr Med Res and Opin 2004; 20:1539-1548; emphasis added). I agree with that assessment, which applied with even greater force to the even smaller person-time placebo data in the Merck NDA for Vioxx. Nevertheless, Merck's NDA asserted that the primary safety analysis should be based on a comparison of Vioxx to placebo, and Merck further stated that such a comparison did not demonstrate a statistically significant difference in the rate of thrombotic events. (MRK-ABS0067017-019). This analysis was scientifically unjustifiable in light of the small amount of data available for the comparison.

      197.   It was equally inappropriate for the Merck NDA to rely upon the comparisons to other NSAIDs in the OA trials to prove the safety of Vioxx. The sample size was not large — only 1657 patient-years on Vioxx, and 706 years on NSAIDs. Further, as acknowledged by Thomas Bold, M.D., the Merck physician assigned to evaluate post-marketing adverse event data, such comparisons only establish the profile of Vioxx in relation to the drugs to which it was compared. (Deposition of Bold, 7/29/05, at 454:24-455:10). Merck had no basis to conclude that the comparator NSAIDs were safe, and, in fact, recent data tends to support an elevated risk of myocardial infarction associated with diclofenac, which accounted for 69% of the exposure to which Vioxx was compared in the OA trials. (See, e.g., Graham, *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-*

475846.1           - 91 -

*oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study,* Lancet 2005; online edition, 1/25/05, at 5; OR for diclofenac 1.60 versus no NSAID use, 95% CI 0.92-2.79, p=0.09; Merck submission to FDA Advisory Committee, 2/8/01, at 83). Thus, the similarity in adverse event rates between Vioxx and diclofenac would only establish that both impose risk.

198.     For the reasons stated above, the NDA data had relatively little to offer concerning CV safety of Vioxx , and instead the best available comparison groups for the Vioxx OA trials were the large data sets of placebo event rates that Merck compiled among similar populations (Fosamax and Proscar placebo groups), and which were chosen for the Watson 1997 analysis. The Fosamax placebo group was particularly large, since it included 4,471 patients followed for over 14,500 patient-years (MRK-NJ0066815, 819, Tables 4 and 7), thus providing sufficient data to allow for stable comparisons.

199.     Merck's failure to acknowledge the signal is attributable to its inappropriate rejection of the data analysis set forth in the Final Plan of 12/30/97, and the indefensible after-the-fact comparison to an inappropriate "background" population of older, sicker subjects. This early error is consistent with other events in the history of this case. At each juncture where evidence of cardiotoxicity of Vioxx appeared, Merck chose to disregard it, and instead to adopt a highly dubious hypothesis that incorrectly absolved Vioxx of blame for the excess cardiovascular illnesses that it caused.

## XI.     SUMMARY AND CONCLUSIONS

200.     Based on my review of the documents and scientific literature, and my experience in the fields of cardiology and epidemiology, it is clear that patients who used Vioxx were exposed to an unacceptably high excess risk of cardiovascular disease. Multiple lines of evidence support this conclusion. Most important are the randomized clinical trials described in this Report, which consistently identified statistically

significant increased risk of Vioxx compared to both placebo and naproxen. These findings are supported by the weight of the evidence from observational epidemiology studies, which found significant increased risk of MI, stroke and TIA, CHF and hypertension among patients who used Vioxx in comparison to other NSAIDs or non-use. Consistent and supportive evidence appears in the literature concerning plausible mechanisms of disease, including Vioxx' effect in causing an imbalance of thromboxane versus prostacycline which favors plaque rupture and thrombus formation, as well as the effects of Vioxx in causing severe hypertension, which contributed to increased risk of MI, stroke and CHF. All Vioxx users were exposed to excess risk, and the magnitude of risk of cardiovascular events was particularly high for patients who were especially susceptible to adverse effects of a prothrombotic, hypertensive drug. The data support the conclusion that the risk of Vioxx begins when the patient begins taking the drug.

201.    Evidence of the toxicity of Vioxx appeared early and repeatedly. The prothrombotic imbalance of thromboxane was known as a result of Protocol 023, conducted between April and August, 1997. The Watson analysis in December 1997 showed a statistically significant increased risk of 2.16 for cardiovascular events (including MI, unstable angina and stroke, and TIA) in the blinded osteoarthritis (OA) trials, for the combined "Vioxx + other NSAIDs + placebo" population versus the Fosamax placebo group that Merck selected as an appropriate comparison group. Merck dismissed the importance of the signal on the basis of an inappropriate comparison of the adverse event rate in the Vioxx OA trials to the rate in an older, sicker community population. Protocol 045, completed before the New Drug Application (NDA) was submitted in November 1998, showed a statistically significant increased risk of "chest pain" for Vioxx versus placebo, and multiple clinical trials during the same pre-market time frame showed significant increased hypertension for Vioxx versus placebo and/or

other NSAIDs. The combination of excess hypertension accompanied by excess chest pain, the hallmark of serious heart disease, was a strong signal of cardiovascular toxicity.

202.    The NDA itself gave no assurance of cardiovascular safety, because the rates of thrombotic events and the patient-years of exposure were too small to provide for meaningful analysis of Vioxx versus the placebo group, and because the comparison to active NSAIDs, primarily diclofenac, was only capable of providing information about the relative danger of Vioxx in relation to such other drugs. Instead, the excess risk compared to the large statistical sample of the Fosamax group provided a strong signal of toxicity that was reinforced by the excess of hypertension and chest pain in the Vioxx arms of the pre-marketing clinical trials.

203.    The VIGOR randomized clinical trial showed clear evidence of Vioxx cardiotoxicity in March 2000, including a statistically significant, five times greater risk of MI, and more than doubling of risk of combined thrombotic events, as well as CHF, edema and hypertension. There was no scientific support for Merck's rationalization that the excess was due to a protective effect of naproxen. The ADVANTAGE study and the Supplemental RA studies showed consistent increased risk of MI, CHF , hypertension and edema, in 2001.

204.    In 2004, the APPROVe study demonstrated a statistically significant increased risk of 2.80 as to cardiac events, including MI, sudden cardiac death and unstable angina, for Vioxx versus placebo. As in VIGOR, the relative risk was elevated for those who were at higher background risk. The results of the APPROVe study are consistent with the earlier indicators of excess toxicity described above. At the same time, by making the unfounded claim that there is "no effect" for Vioxx exposures less than 18 months, Merck's position is consistent with its earlier efforts to absolve Vioxx from blame in causing the excess occurrence of serious and fatal cardiovascular disease.

September $\underline{26}$, 2005

_John W. Farquhar, M.D._
John W. Farquhar, M.D.