Beverly "Kim" Tilmon v. Wyeth, Et Al

opening statement (defendant)
January 30, 2006

Page 48

```
 1                TRIAL COURT CAUSE NO. 3-39220
 2
                                      )
 3      BEVERLY "KIM" TILMON,          )  IN THE DISTRICT COURT
                                      )
 4           Plaintiff                 )
                                      )
 5      VS.                            )  ANDERSON COUNTY, TEXAS
                                      )
 6                                    )
        WYETH, ET AL,                  )  3RD JUDICIAL DISTRICT
 7                                    )
             Defendants
 8
 9
10      _____
11            DAILY COPY TRANSCRIPT OF PROCEEDINGS
12                **UNCERTIFIED ROUGH DRAFT**
13             (OPENING STATEMENT - DEFENDANT)
14                    JANUARY 30, 2006
15      _____
16          WARNING:  This unedited rough draft of the
17      proceedings is not certified and may not be cited or
18      used in any way or at any time to rebut or contradict
19      the certified transcription of the proceedings.  There
20      will be discrepancies in this form and the final form
21      because this transcript has not been finally edited or
22      proofread, corrected, finalized, bound or certified.
23      There will also be a discrepancy in page numbers
24      appearing on the unedited rough draft and the certified
25      final transcript.
```

Adams Reporting & Record Service
(903) 586-5651

EXHIBIT A

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

Page 118

1              THE COURT: Guys, you want to talk?
2              MR. LAMINACK: Your Honor, first of all,
3     Judge --
4              THE COURT: Hold on. Let me identify what
5     we've got, I know you have a motion --
6              MS. BENEITZ: You had asked us to file a
7     brief on the spoilation issue. We filed it this morning
8     and I put it in a notebook book with attachments and I've
9     given the Plaintiff their copy. I will get you some case
10    law.
11             THE COURT: Okay.
12             MR. BENEITZ: Then we filed a Broder motion
13    relating to the qualifications of Doctor Moye per the
14    Court's scheduling order. And then you heard a little
15    bit of our Havner challenge to the causation testimony,
16    and we just need to present those grounds to you within
17    our five minutes before he testified because I think
18    we're required to make them before he testifies. So Ms.
19    Hull is going to go ahead --
20             THE COURT: So we've got a Broder motion,
21    Havner issue, what have you got?
22             MR. LAMINACK: Motion for mistrial.
23             THE COURT: Overruled. What other motions
24    do you have?
25             MR. LAMINACK: Can I be heard on that?

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

Page 119

1  THE COURT: Sure.
2  MR. LAMINACK: Here's the problem, Judge.
3  I've never in my life done this. Never. We started off
4  after you made it clear to everybody we're not going to
5  insert the lawyers into this case. We started off right
6  off the bat with a violation of a motion in limine
7  talking about lawyer advertising. Then they did
8  something that neither you or I thought they were going
9  to do, they started talking about lawyers getting
10 involved in healthcare. Then to top it all of, they got
11 up here in front of the jury and accused the lawyers of
12 engaging in a plan to scare our client and scare the
13 jury.
14     My problem is without putting one of us on
15 the stand to talk about what's going on here I don't know
16 how to fix that, and so I'm in a situation where I don't
17 have any choice but to ask the Court for a mistrial.
18     THE COURT: Response?
19     MR. SHICK: Your Honor -- well, I apolgize,
20 although I believe what I did was -- you had overruled
21 the motion, I knew --
22     THE COURT: You did argue the lawyers and
23 not the issues, and I think the record will be clear on
24 that.
25     MR. SHICK: What I said was lawyers

Page 120

1  referred her to two of these doctors.
2     THE COURT: No, you carried it further.
3  You said lawyers not only referred it but the lawyers
4  weren't satisfied and kept on on the case.
5     MR. SHICK: Well, actually I said Doctor
6  Stainback was the one that did an echo --
7     THE COURT: I heard what I heard.
8     MR. SHICK: Yes, sir, I won't go any
9  further on that. I don't think a mistrial is necessary.
10 If Mr. Laminack and Mr. Pirtle have a problem, I didn't
11 show the record from Doctor Stadnyk which states that the
12 referral came from Jimmy Williamson. The name is there.
13 I didn't do that. And, you know, you're not going to
14 hear this from me any longer except when it comes time to
15 cross Stainback and Stadnyk and just the simple question
16 they were referred to you or she was referred to you --
17     THE COURT: Explain the process to me on
18 how we get this -- how we get here in these cases.
19     MR. LAMINACK: Everybody is in the class.
20 Everybody's cases are settled in the class. The
21 exception is if you have a PPH case.
22     THE COURT: But you told me it had to go
23 through the eye of a needle, right?
24     MR. LAMINACK: PPH is defined not
25 necessarily how the medical community defined it, but

Page 121

1  there are aspects of that obviously, but it's defined in
2  a long order. You have to not only prove you have PPH,
3  you have to prove that it was caused by diet drugs. So
4  there's a whole laundry list of things you have to
5  satisfy to the judge in Philadelphia before he will let
6  you have a PPH case if Wyeth chooses to challenge it. In
7  this case Wyeth challenged. So we had to go through that
8  entire process, as we often anticipate we will. In front
9  of Judge Bartle we had to give evidence, it's a whole
10 long laundary list.
11     Now, they're going to take the position
12 that that definition of PPH in the class is a lot broader
13 than the medical definition. In practice the way Judge
14 Bartle has interpreted this, it's much narrower. The
15 needle is much smaller than what the medical commuity
16 says. And dozens and dozens and dozens of PPH cases that
17 doctors swear are real PPH cases have been thrown out
18 because we didn't meet all the hypertechnical
19 definitions. Stuff that doctors would not necessarily do
20 in the course of their treatment and diagnosis.
21     So in order to meet the requirements to
22 bring this case we have to work with the doctors and say,
23 look, you got to do this, you've got to do this test,
24 you've got to do this, rule this out, and you've got to
25 do that, otherwise we're going to be out on our ear.

Page 122

1     We went through that entire process
2  because we had to. They challenged. Judge Bartle looked
3  at the stuff and said Plantiffs, you meet the challenge,
4  you go forward.
5     That's what we have to do in order to even
6  bring a case. It's not like any other case. We have to
7  go try it to Judge Bartle and win. And the requirement,
8  I mean, they're that thick. It's a hypertechnical list
9  of things -- of pressure findings you have to have and
10 all kinds of stuff that not all doctors would necessarily
11 do in the ordinary course of looking at somebody with
12 PPH. If anyone of them is missing, you're out.
13     MR. SHICK: I disagree with the last
14 characterization made. He's right that it sets it out.
15 All they've got to do is either have the cath or an echo
16 which shows "X". My point is the doctor she was going to
17 didn't do it, and so they had to find somebody who would,
18 and that's why they wind up referring her.
19     MR. LAMINACK: There's a whole lot more
20 than that. There's a whole list of rule-outs we've got
21 to go threw.
22     MR. SHICK: And I do agree with the
23 suggestion that --
24     MR. LAMINACK: And then they stood up in
25 front of this jury and said we refused to dismiss the

Adams Reporting & Record Service
(903) 586-5651

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

Page 123

1  case. Those were their words: We refused to dismiss the
2  case.
3       MR. SHICK: No, I didn't say that.
4       MR. LAMINACK: Or words to that effect.
5  That's what he said.
6       MR. SHICK: I did not say that.
7       MR. WILLIAMSON: Judge, so you get the
8  flavor of the order since I was the attorney whose name
9  appeared in these two records, you know, you have to have
10 a profusion line scan, you have to have a chest x-ray.
11 You have to have a heart cath. You have to have an
12 cardiogram showing that you don't have a disqualifying
13 valvular heart condition that precludes a PPH claim. You
14 have to have a history and physical. You have to exclude
15 congenital problems. You have to exclude some rare
16 diseases like coritribtritrum (phoenetic), or something
17 like that. And you have to get all that done with a
18 board certified doctor. So to say, oh, no, all you
19 needed was an echo and heart cath is flat wrong.
20      And the the other thing, Judge, the Court
21 heard it correctly since it was my conduct -- I listened
22 with a pretty keen ear since my conduct was the one that
23 was being questioned, and what they were saying was I was
24 fabricating --
25      THE COURT: Here's what I'm going to do.

Page 124

1  At this time I'm overruling the motion for mistrial.
2  However, I want the Plaintiff to take excerpts of the
3  statements that they found offensive this morning for the
4  Court so they can read them, and then secondly I want a
5  proposed instruction from the Plaintiff with regard to
6  explaining the process to the jury and the attorney
7  involvement. In other words, if we're going to have it
8  in here, I want it explained to the jury on how you got
9  this far. I'll look at it then and I'll rule
10 accordingly.
11      MR. O'QUINN: Can I say something? The
12 whole thrust of tort reform as I know and as you know --
13      THE COURT: I know that.
14      MR. O'QUINN: -- Is to attack the lawyers.
15 Plaintiffs lawyers are scum bags to be suspected and all
16 that. That's the way this case is being tried all the
17 way from TV lawyers --
18      THE COURT: I understand. Let me see --
19      MR. O'QUINN: All the way to I've gone out
20 to get doctors to write reports that will scare the jury.
21 Even scare my own client.
22      THE COURT: I want to see the excerpts that
23 were stated this morning so I will be able to look at it.
24 You-all propose an instruction with regard to this. I'll
25 look at it when you've got it. Now what do you have?

Page 125

1       THE COURT: Hello, Your Honor. Robbi
2  Hull for Wyeth. I'm going to present to you two
3  exhibits, if I could to be part of the record. Court
4  Exhibit 1 is what we call our Havner motion. You have
5  heard some of those motions already when we were here
6  last week. And that motion was filed early this morning.
7  Court Exhibit 2 is specifically what we call our Broder's
8  motion that challenges the relevant qualifications,
9  reliability of the expert. So these motions, as you can
10 tell, are fairly lengthy and have a number of exhibits
11 attached. In the little bit of time if I can go through,
12 I am incorporating the law that I set forth to you in
13 those motions.
14      THE COURT: All right.
15      MS. HULL: The first objection we have to
16 Doctor Moye's testimony is on testimony of -- the
17 causation testimony. Number one, he's a biostatistician,
18 which means he --
19      THE COURT: Hold on. Here's my ruling. I
20 wan to hear it. We're going to have the doctor testify.
21 You can stand up and make your objections at the time.
22 I'm not going to pre-judge. I haven't heard anything.
23 The law doesn't require that you stand here and make all
24 these objections prior to this time, does it?
25      MS. HULL: I believe that it does, Your

Page 126

1  Honor.
2       THE COURT: Before I admit his testimony
3  you stand up and make your proper objection.
4       MS. HULL: Well, let me just kind of set it
5  up for you a little bit --
6       THE COURT: I'm not going to pretry this
7  case.
8       MS. HULL: There's one ground that he's
9  qualified to testify on, so there's six areas --
10      THE COURT: Then why don't you stand up and
11 object and say he's --
12      MR. CEDILLO: Yes, I will, Your Honor.
13      THE COURT: All rise.
14      MS. HULL: Thank you, Your Honor.
15      THE COURT: I'm not trying to cut you off,
16 but we're tied up hearing this thing. We're going to try
17 a case.
18      (Jury present at this time)
19      THE COURT: All right. Everybody have a
20 seat, please. Mr. Prewitt, I attempted to contact your
21 doctor today. I was unable to do so. I visited with the
22 lawyers. I know that your treatment is important to you
23 as this case is important to everybody else. But on the
24 other hand, the last thing we want to do is interfere
25 with your well-being. Therefore I'm releasing you from

Adams Reporting & Record Service
(903) 586-5651

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

## Page 127

1. the jury. If next alternate moves it up. You know who
2. you are. Let me have my dollar and quarter badge. I
3. believe Kathy Coleman, you're next. And Ms. Coleman, I
4. did receive your note and I familiarized your note and
5. they'll be address it during either the testimony or
6. argument. Thank you so much. All right. Call your
7. first witness.
8.     MR. O'QUINN: Yes, sir. We call Doctor Lem
9. Moye.
10.     LEM MOYE,
11. after having been first duly sworn, testified as follows:
12.     DIRECT EXAMINATION
13. BY MR. O'QUINN:
14.   Q Good afternoon.
15.   A Good afternoon, sir.
16.   Q Let's begin by telling us your name, sir ?
17.   A Sure. First name is Lem, L-E-M, last name is
18. Moye, M-O-Y-E.
19.   Q At least I got it spelled right.
20.   A Almost.
21.   Q Has an accent on the end. Thank you. Doctor
22. Moye, since you're here as a professional expert witness
23. we're going to have to develop your educational
24. experience; okay?
25.   A Yes, sir.

## Page 128

1.   Q I assume you went to the high school land
2. graduated from high school?
3.   A Yes, sir, I did. A few years ago.
4.   Q Where did that occur, sir?
5.   A That occurred in Queens, New York.
6.   Q Okay. And after you finished your education in
7. high school in Queens, New York, where did you go next
8. education?
9.   A I went to Johns Hopkins. That's in Baltimore.
10.   Q What were you basically studying at Johns
11. Hopkins?
12.   A I eventually wanted to be a physician, so I had
13. to do premed training first, and that required a college
14. degree. And so Johns Hopkins had a good pre-medical
15. program leading to a college degree, so I went there.
16. Spent four years there.
17.   Q And did you eventually complete that education
18. and obtain a degree?
19.   A Yes, sir, I finished that in 1974.
20.   Q And where did you go next for additional
21. education?
22.   A I went to a medical school.
23.   Q Which medical school did you go to?
24.   A I went to Cornel University in New York City,
25. again for two years and got married and transferred to

## Page 129

1. Indiana where I finished my MD in Indianapolis.
2.   Q And what year would that be in, sir?
3.   A That was in 1978 that I graduated from medical
4. school in Indiana.
5.   Q Almost thirty years ago -- 27 years?
6.   A I appreciate the reminder, yes. It was a long
7. time ago.
8.   Q I'm trying to get you in context, okay. You
9. have a medical degree -- lot of doctors when they get
10. their medical degree they'll do an internship to better
11. learn to be a doctor.
12.   A Yes, sir.
13.   Q Where did you get your internship training, sir?
14.   A I got my internship training at Methodist
15. Hospital Graduate Medical Center in Indianapolis. Spent
16. one year doing that.
17.   Q Sometimes after doctors finish that they go off
18. and get some additional training so they can specialize?
19.   A Yes, sir.
20.   Q What did you decide to do with your career at
21. that point?
22.   A At that point I decided I wanted a career in
23. research and in public health, so rather than take
24. speciality training like many doctors do I went to Pursue
25. University and got a master's degree in statistics.

## Page 130

1.   Q And what was the subject of your master's
2. degree?
3.   A It was in applied statistics, mathmatics.
4.   Q So by 1978 you had a medical degree, correct?
5.   A Yes, sir.
6.   Q You are a medical doctor?
7.   A Yes.
8.   Q You took the necessary tests and passed them and
9. you got certified as a medical doctor?
10.   A Yes, sir, I got licensed.
11.   Q Licensed. And then you get a a master's degree
12. from Purdue, what year di that happen in?
13.   A 1982, I think.
14.   Q I'm going to show you a document that's marked
15. as Plaintiff's KT-91. You see that at the bottom, sir?
16.   A Yes, sir.
17.   Q You recognize that document, and if so what is
18. that document?
19.   A This is my resume, my current resume.
20.   Q Okay. That sets out your professional work,
21. training and experience?
22.   A Yes, sir, it does.
23.     MR. O'QUINN: Your Honor, we offer this
24. exhibit.
25.     MR. CEDILLO: May I examine the document,

4 (Pages 127 to 130)

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

### Page 131

1  Your Honor.
2  THE COURT: Sure.
3  MR. CEDILLO: No objection, Your Honor.
4  THE COURT: Admitted.
5  Q (By Mr. O'Quinn) Did you receive further
6  education, and if so tell us where you received that?
7  A Yes, sir. I obtained a Ph.D. degree in public
8  health and vital statistics in 1987 at University of
9  Texas in Houston, the Health Science Center in Houston.
10  Q I may have written this down wrong, but I wrote
11  down you've got a Ph.D. degree in public health and
12  biostatistics?
13  A Yes, sir.
14  Q Is that right?
15  A Yes, sir, it is.
16  Q There's a long term that's got a number of
17  syllables that I've heard you use before: Epidemiology?
18  A Yes, sir.
19  Q That word mean something to you?
20  A It does indeed.
21  Q And in just plain talk, what does that word
22  mean?
23  MR. CEDILLO: Excuse me, Your Honor. I'm
24  going to object. Doctor Moye is not an epidemiologist,
25  and I don't see in his resume he has an expert

### Page 132

1  designation where he's going to define words for us.
2  MR. O'QUINN: He's been trained in
3  epidemiology, correct.
4  MR. CEDILLO: He's not — may I take him on
5  voir dire, Your Honor?
6  THE COURT: Not yet. Continue on.
7  Q (By Mr. O'Quinn) Have you ever studied
8  epidemiology?
9  A I certainly have.
10  Q Where did that happen?
11  A That happened at the University of Texas. I
12  minored in in epidemiology.
13  MR. CEDILLO: May I take him on voir dire,
14  Your Honor.
15  THE COURT: No.
16  MR. O'QUINN: Not necessary, Your Honor.
17  THE COURT: Not yet. Overruled.
18  Q (By Mr. O'Quinn) Now, does epidemiology have
19  anything to do with biostatistics?
20  A Yes, sir, certainly does.
21  Q And what is that relationship?
22  A Both of them both, both fields, epidemiology and
23  biostatictics are about the same thing. They're about
24  identifying the true nature of an exposure/disease
25  relationship. The relationship can be merely

### Page 133

1  coincidental or associative or the relationship could be
2  causative. An example would be if I were to have an M&M
3  right now and have a heart attack, did the M&M cause the
4  heart attack. They happened at the same time. I took
5  the M&M before I had the heart attack. So from one point
6  of view it suggests, well, maybe there was a
7  relationship. However, commonly relationships are just
8  coincidental. Epidemiology and biostatistics are about
9  separating that from causal relationships. A causal
10  relationship is when the exposure excites the production
11  of the disease.
12  MR. CEDILLO: Excuse me, Doctor Moye, if I
13  can lodge an objection here. Your Honor, this witness is
14  not qualified to give causation as to the PPH in this
15  case either generally are --
16  THE COURT: I don't think I've heard that
17  yet. Overruled. Continue on.
18  MR. O'QUINN: Thank you, Your Honor.
19  THE WITNESS: So causation --
20  THE COURT: But make it question and
21  answer. Tighten him up.
22  MR. O'QUINN: Sure.
23  Q (By Mr. O'Quinn) I wonder, here you are, you got
24  a medical degree, every young man has a reason why they
25  end up doing what they do. What was your interest about

### Page 134

1  public health and -- where did that come from, trying to
2  figure out what causes diseases?
3  A To protect the vulnerable people, to protect
4  vulnerable population, protect the unprotected and
5  diseased and healthcare. That's my main reason, primary
6  reason for getting in this field.
7  Q Okay. And you got your PhD degree from the
8  University of Texas Health Science Center in Houston.
9  What year was that?
10  A 1987.
11  Q Look at your resue if you need to refresh your
12  memory.
13  A Yeah, 1987.
14  Q It is 1987?
15  A Yes, sir.
16  Q And you entered the University of Texas School
17  of Public Health in what year to earn that degree?
18  A 1984.
19  Q That's roughly three years?
20  A Yes, sir.
21  Q So from '84 until the present have you lived and
22  worked in Texas?
23  A Yes, sir, I have.
24  Q Are you married?
25  A Yes, I am.

5 (Pages 131 to 134)

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

Page 135

1  Q  Do you have your family in Houston?
2  A  Yes.
3  Q  You and your wife have children?
4  A  Yes, we have two adopted children.
5  Q  Are they still quite young or are they now
6  adults?
7  A  One is 25, the other is 23.
8  Q  With regard to the work that you've done since
9  1984 with regard to learning, have you been involved in
10 scientific or medical research about what causes various
11 diseases?
12 A  Yes, sir.
13 Q  So in certain cases you've been a research
14 medical scientist?
15 A  Yes, I have.
16 Q  Have you been involved in teaching students
17 subjects like public health?
18 A  Yes, I have taught students in biostatistic
19 epidemiology since 1987.
20 Q  Okay. Are you on the faculty now?
21 A  Yes, sir.
22 Q  Are you a full professor?
23 A  I'm a full professor of biostatistics and a
24 member of the epidemiology department.
25 Q  So there's a department in the school of public

Page 136

1  health called the epidemilogy department?
2  A  Yes, sir.
3  Q  And you're a member of that department?
4  A  Yes, sir, I'm a secondary member, yes.
5  Q  Okay. Have you been involved in writing books
6  on the subject of biostatistics and/or epidemiology?
7  A  Yes, sir, I have.
8  Q  Are these at least some of the books you have
9  written?
10 A  Yes, sir.
11 Q  I'm probably not going to understand, but what's
12 the subject the first one?
13 A  This book is based on the use of a certain type
14 of mathmatics called difference equations in public
15 health. It's got a chapter in biostatistics and in
16 epidemiology. That this one book. This book is a book I
17 wrote about two years ago. It's about the need for
18 scientists to develop character and compassion as well
19 productive in their research careers and their scientific
20 endeavors. This book is about a particular kind of
21 analysi that biostaticticians and epidemiologists do. It
22 involves specifically the kinds of analyses that are
23 carried out in large clinical experiments and clinical
24 trials.
25          This book is about the ethical monitoring

Page 137

1  of clinical research, perhaps research doesn't have to be
2  carried out until the very end. There are some good
3  biostatistical and epidemiologic tools that are available
4  to be used, and I wrote about these for clinical
5  trialitss or investigators.
6          This book -- this was my first one. This
7  book is about how to teach doctors who are interested in
8  research to use the principles of epidemiology and use
9  the principles of biostatistics in being able to draw the
10 correct interpretations from clinical research.
11         And this book is a book I wrote with two
12 colleagues that talks about the theory of mathmatical
13 statistics in general. It develops the theories from the
14 very basics of probability through 21st century. This is
15 kind kid of a tough read.
16 Q  Have you since 1994 while you've been in Texas
17 been involved in taking care of patients?
18 A  Yes, sir. I took care of patients. I got my
19 license here when I moved here in '84 and --
20 Q  You've got a Texas medical license?
21 A  Yes, sir, an active Texas medical license.
22 Q  Go ahead, I'm sorry I interrupted you.
23 A  And I was in practice seeing patients in a
24 general practice setting from 1984 to 1992.
25 Q  What happened in 1992 that caused a change?

Page 138

1  A  I got too busy doing too many things. I
2  couldn't continue to do them all and do them all well,
3  and so I decided to set aside the active practice of
4  medicine and to engage full-time in my activities at the
5  university, at the Health Science Center in Houston.
6  Q  Do you like research, write books, teaching
7  students?
8  A  Yes, sir.
9  Q  Now, have you done research, sir, concerning --
10 well, concerning a drug known as Pondomin?
11 A  Yes, sir, I have.
12 Q  Pondomin is a drug that is, as you understand,
13 that was --
14      MR. CEDILLO: Your Honor, I object to any
15 leading, any further leading by Mr. O'Quinn.
16      THE COURT: Sustained.
17 Q  (By Mr. O'Quinn) Sir, what type of drug is
18 Pondomin?
19      MR. CEDILLO: Your Honor, excuse me again.
20 Judge, Doctor Moye is not qualified to give opinions on
21 Pondomin, its chemical composition. He has never
22 prescribed it. He has never done any specific studies.
23 He does not understand by his own admission pulmonary
24 hypertension, primary pulmonary hypertension or valvular
25 disease except in a very cursory role. I would object to

6 (Pages 135 to 138)

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

### Page 139

1 any testimony from this witness along those lines.
2 MR. O'QUINN: Your Honor, this doctor has
3 plenty of knowledge about the relationship of the diet
4 drug Pondomin and valvular heart disease and lung
5 disease.
6 THE COURT: Based on what?
7 MR. O'QUINN: Sir?
8 THE COURT: Based on what?
9 MR. O'QUINN: Based on his research.
10 MR. CEDILLO: All litigation-driven
11 research, Your Honor. He've never studied it. Never
12 published it. Never any peer review articles on the
13 subject. Everything he's done he's been doing while he's
14 been a paid expert on all of these areas. And under
15 Boders and Havner that does not qualify.
16 THE COURT: Ladies and gentlemen, I need to
17 have you take a break. All rise.
18 (Jury dismissed from courtroom)
19 THE COURT: Prove up what you want to prove
20 up before the jury.
21 MR. O'QUINN: Okay.
22 Q (By Mr. O'Quinn) Question: Have you done
23 research with regard to a diet drug known as Pondomin and
24 a diet drug known as Redux?
25 A Yes, sir.

### Page 140

1 Q Go ahead.
2 A I have -- in 1998 I was engaged to carry out a
3 study that examined the relationship between valvular you
4 heart disease and the use of fenfluramine. I was engaged
5 in my capacity as an epidemiologist/biostatistician and
6 research designer. In the process of designing that
7 research I researched extensively the medical literature
8 on Pondomin, its mechanism of cation, its indications,
9 its contraindications, the warnings that were published
10 at the time. In the process of designing that research
11 three manuscripts came out in the same journal, the New
12 England Journal of Medicine, that essentially answered
13 the question that the research was designed to address.
14 Therefore, that research was -- that research effort was
15 terminated. However, I continued my evaluation of
16 epidemiology and biostatistics -- I continued to carry
17 out this research effort and was retained by litigators
18 in 1991, a year later.
19 Q Okay. And how about the relationship between
20 these drug I've mentioned and the diseases -- lung
21 disease that some people have called primary pulmonary
22 hypertension and some people have called pulmonary artery
23 hypertension?
24 A Well, as a physician I learned a good deal about
25 primary pulmony hypertension well before the issues of

### Page 141

1 Pondomin were ever announced to the public. Once I began
2 my research into the relationships, the different effects
3 that Pondomin, had then I examined carefully the
4 relationship between Pondomin and primary pulmonary
5 hypertension, considering also mechanism of operatin of
6 operation, the kinds of clinical research that are most
7 revealing about this, and most importantly how to
8 interpret the research that has been published on this
9 because, frankly, some of the research is very good and
10 some of it is not very good and it takes an experienced
11 eye to recognize the difference.
12 Q Okay. Now, are you familiar -- are you
13 knowledgeable regarding -- if I wanted to, say, explain
14 to the jury what is the biomechanism, so to speak, that
15 causes the active ingredient inside these diet drugs to
16 cause PPH; will you be able to explain a subject like
17 that for the jury?
18 A I certainly understand the prevailing views
19 about the mechanism between -- the mechanism by which
20 Pondomin and Redux produce primary pulmonary
21 hypertension, and I can speak to that, yes.
22 Q And your training and your main activity
23 professionally has been to determine the causes of
24 disease, this disease?
25 A That has focus of my career, yes.

### Page 142

1 Q About how certain chemical substances once they
2 get into the body results in a certain disease?
3 A Yes, either a disease or a cure for the
4 diseases.
5 Q Okay. Could be a cure. But that would be,
6 again, how a certain chemical substance has a healthy
7 effect on what's going on in the body?
8 A That's right.
9 Q Or an unhealthy effect?
10 A Yes, sir.
11 Q Both ways?
12 A Yes.
13 Q Okay. So you could explain that to the jury
14 what I just said?
15 A Yes, sir, I could.
16 Q Now, a statement has been made to the jury by
17 Wyeth's lawyer regarding the frequencey of this diseases,
18 statements been made like 10 million people took Pondomin
19 and only a handful got down PPH. Are you able to explain
20 to the jury based on your professional training and
21 experience what is the proper way to make those kind of
22 statistical comparsions?
23 A Most certainly I am qualified to do precisely
24 that.
25 Q That would be precisely the core of your

7 (Pages 139 to 142)

Adams Reporting & Record Service
(903) 586-5651

Page 143

1 training and work, isn't it?
2   A   It is, sir.
3   Q   Statements have been made to this jury that in
4 effect Wyeth did not believe in Monday morning
5 quarterbacking, did not believe in after some bad
6 occurrence happened that you ought to go back and figure
7 out how and why it happened in hindsight. My question to
8 you as a medical researcher can you explain to the jury
9 why it is important or not important that people who make
10 drugs when it seems like bad things are happening with
11 regard to those drugs they ought to go back and figure
12 out why and what could be done to prevent it?
13   A   Yes, sir, I can speak to that. I've worked with
14 drug companies for almost twenty years. I've done
15 exactly what their responsibilities are.
16   Q   Okay. You believe that's Monday morning
17 quarterbacking?
18   A   Actually I think the entire analogy is
19 inappropriate. It has to do with protecting public
20 health. Calling it Monday morning quarterbacking is
21 anti-scientific.
22   Q   Okay. Can you explain to the jury the contents
23 of study such a study such as the IPPHS study published
24 in the summer of 1986 in the New England Journal of
25 Medicine that talked about the circumstances underwhich

Page 144

1 the active ingredient Pondomin causes or can cause PPH?
2   A   I can speak in detail about that very study and
3 the implications of the Eisenehim article in the context
4 of all the literature that had appeared up to that point,
5 yes.
6   Q   You often that do with respect to whatever may
7 have appeared in 1998 you previously mentioned about the
8 causal relationship between the active ingredients of the
9 two drugs I mentioned and a certain disease process?
10   A   Yes, sir, I can.
11      THE COURT: Give some background for that
12 study.
13      MR. O'QUINN: Sir?
14      THE COURT: Give me training and background
15 for that ability.
16      MR. O'QUINN: Yes, sir. Let me just ask
17 him because I can't answer myself.
18   Q   (By Mr. O'Quinn) The judge would like to know
19 what amongst your experience and your background, I
20 assume training as well as professional experience, that
21 gives you expertise in those types of areas?
22   A   Yes, sir. We're talking specifically about the
23 1998 issue --
24      THE COURT: No, no, I'm talking about the
25 issue of mechanism and chemical causes of PHP.

Page 145

1      THE COURT: I'm sorry?
2      MR. O'QUINN: Talking about the 1996
3 article put out by in effect -- Your Honor, I think you
4 are, put out by IPPH study group, New England Journal of
5 Medicine, about how the active ingredients in these drugs
6 can cause PPH in people that use the drugs?
7   A   Yes, yes, I'll be glad to. First, in
8 epidemiology we are most certainly interested in
9 elucidating the biologic mechanism of the drug.
10 Sometimes the mechanism is complex and one may not know
11 about it for years. Other times the mechanisms are posed
12 that have important biochemical persuasive power and
13 which are wholly within the understanding of the effects
14 of the. In this case the pertinent molecule is serotonin,
15 and the relevant question does fenfluramine influence
16 serotonin's level at the cellular junction, at the
17 cellular membrane junction. It functions in three
18 capacities. First, fenfluramine mimics serotonin, so it
19 amplifies the effect of serotonin. Secondly, fenfluamine
20 increases the release of serotonin, further amplifying
21 the effect of serotonin. Thirdly, fenfluramine -- they
22 reduce the uptake, the re-uptake of serotonin so that you
23 have more serotonin released, you have more of it
24 available for a longer period of time, and this sustained
25 exposure of the arterial muscle to serotonin leads to a

Page 146

1 hyperbole of the muscular wall inside the pulmonary
2 arteries. The sustained increase in muscular tone of the
3 pulmonary artery increases pulmonary vascular resistance,
4 thereby increasing the blood pressure and producing
5 primary pulmonary hypertension hypertension.
6      THE COURT: Counsel.
7      MR. O'QUINN: I'm sorry, I didn't hear Your
8 Honor.
9      THE COURT: Continue your examination.
10      MR. O'QUINN: Okay.
11   Q   (By Mr. O'Quinn) Have you read and reviewed
12 records and documents of the FDA regarding these diet
13 drugs and their causal relationship to these types of
14 diseases?
15   A   Yes, sir, I have.
16   Q   Have you read and reviewed FDA documents
17 regarding the process by which these drugs got on the
18 market and got down off the market?
19   A   Yes, sir, I have.
20   Q   Have you read FDA documents regarding what
21 warnings were given and were not given regarding -- with
22 regard to these drugs and with regard to these diseases
23 prior to early March of 1997 including -- early March
24 1997?
25   A   Yes, sir, I most certainly have.

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

Page 147

1   Q   Have you reviewed documents of Wyeth itself or
2   its predecessor company which is known as American Home
3   Products and A. H. Robins regarding these two drugs
4   regarding what Wyeth knew or its predecessor companies
5   knew and when they knew it regarding the risks?
6   A   Yes, sir, I have read those documents.
7   Q   Have you read documents from the same source
8   regarding what Wyeth did and when Wyeth did it regarding
9   this subject?
10  A   Yes, sir, I have.
11  Q   Have you yourself ever been called upon by the
12  FDA to serve in a scientific capacity regarding
13  scientific issues with regard to a drug?
14  A   Yes, sir. I served for six years as a special
15  government employee workign for the FDA called to
16  meetings to render an opinion about the approvability of
17  certain drugs and compounds, yes.
18  Q   I'm looking at your resume, and I see on Page 19
19  of 25 pages -- I see an exmaple there in Number 40. Does
20  that have something to do with what you just told the
21  judge?
22  A   Yes, sir, it does.
23  Q   And how does that have something to do what you
24  just told the judge?
25  A   Yes. The cardio-renal advisory panel of which I

Page 148

1   was a board member at the time was convened to offer
2   advice to the FDA about the epidemiology of the
3   relationship between drugs known as calcium channel
4   blockers which are used to treat blood pressure
5   elevations, arterial blood pressure elevations and
6   mortality. The fear was the a calcium channel blockers
7   were producing an inordinate number of heart attacks. So
8   the complicated question was required a good deal of
9   epidemiological discussion and I was asked to render an
10  opinion to the FDA about the safety and effectiveness of
11  calcium channel blockers in treating hypertension.
12  Q   Item 44 on the same page --
13      THE COURT: Do I understand that he is not
14  going to render on opinion that Ms. Tilmon actually has
15  PHP?
16      MR. O'QUINN: True.
17      THE COURT: His is an academic background,
18  statistical analysis of this study -- this IPPHS study.
19      MR. O'QUINN: Yes, but let me add something
20  so it's fully understandable to you. In every drug case,
21  including this one, we have what we call general
22  causation: Can the drug cause in some users the disease.
23  That's called general causation. He is highly qualified
24  to testify about the general causation issue. The next
25  causation issue is what's called specific causation.

Page 149

1   Based on the evidence that's pertinent to that particular
2   plaintiff who has a disease -- and the Supreme Court has
3   said you can't even get started in a cases unless you can
4   show the general causation, in a general sense can that
5   drug cause the disease in question. After you get over
6   that hurdle the Supreme Court requires evidence that that
7   particular drug in fact caused that particular disease in
8   the plaintiff herself. That's called perfect specific
9   causation. This witness is not going to testify about
10  specific causation. The doctors who treated this woman
11  are going to testify about specific causation. He is
12  here as witness on general causation which I am required
13  to present by Supreme Court decisions that I've got to
14  establish general causation.
15      MR. PIRTLE: With the caveat if we assume
16  that the person has a diagnosis of primary pulmonary
17  hypertension from a qualified doctor which we bring
18  later. Doctor Moye gives a epidemiological model and can
19  do an estimated risk anallysis, what is the probability
20  that this drug caused primary pulmonary hypertension in
21  this person. Black letter epidemiology. In other words,
22  you take the risk developed from the epidemiology. If
23  you have a person who is diagnosed with that diseases
24  there's an elevated risk from exposusre to a drug, there
25  is a mathmatical formula thta can be done to show the

Page 150

1   probability that the drug caused the disease and it's not
2   idiopathic.
3       THECOURT: That may be just math, but
4   therein lies the case if you're going to apply it to a
5   specific plaintiff, right?
6       MR. PIRTLE: Right. Although he's a
7   medical doctor and a pulmonoligist, it is the use of
8   epidemiology from a population to an individual --
9       THE COURT: Well, I'm having a problem with
10  specific causation if he's going to testify that Ms.
11  Tilmon has this.
12      MR. PIRTLE: Oh, no, the answer is no.
13      THE COURT: Either through statistics or
14  otherwise.
15      MR. PIRTLE: I'm sorry. Maybe I didn't
16  make myself clear. Assuming that she has primary
17  pulmonary hypertension will be the question. Then taking
18  the model and the information that we have, we develop
19  what is the probability that it's caused by Pondomin is
20  what he's going to say. Somebody else will have to make
21  the diagnosis of primary pulmonary hypertension.
22      THE COURG: You've taken the position
23  before the jury this is the only way you get PHP, right?
24      MS. MOORE: I did not take that position,
25  Your Honor.

9 (Pages 147 to 150)

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

Page 151

1   THE COURT: Somebody did.
2   MR. CEDILLO: Mr. O'Quinn did.
3   MR. O'QUINN: Mr. O'Quinn said to his
4   knowledge that dexfenfluramine, which was the active
5   chemical in this drug, was the only known cause of PPH.
6   Now, they say -- their comeback was that may be true but
7   there are some idiocratic diseases, whichmeans nobody
8   knows what causes it. All I said was the only known
9   cause, and I think I spoke truthfully.
10   THE COURT: Okay. They to participate in
11   this, too.
12   MR. PIRTLE: THE other area we seek to
13   qualify him on so that you know, and I have no problem
14   asking the questions to do it, he has a great deal of
15   experience in front of the FDA on advisory panels looking
16   at the safety and effectiveness of drugs. We'll talk to
17   him about that process with Pondomin and Redux. In
18   addition we want to talk to him about warnings --
19   THE COURT: He hadn't testified anything
20   about warnings.
21   MR. PIRTLE: We need to talk to him about
22   kthat.
23   THE COURT: Don't you think we ought to do
24   that.
25   MR. O'QUINN: You want me ask him a

Page 152

1   question about it?
2   THE COURT: Yeah.
3   Q   (By Mr. O'Quinn) Item 44 on Page 290, Your
4   Honor. Would you look at that item, sir.
5   A   Yes, sir.
6   Q   That item has the word labeling in it, does it
7   not?
8   A   Yes, sir.
9   Q   I'm just making an assmption -- you tell me if
10   it's true or not -- that at this point you're doing some
11   work for the FDA in at least a subject of the word
12   labeling?
13   A   Yes, sir, I would say that in all of the
14   meetings I met with the FDA we were asked questions
15   specifically about labeling. That is to say, what is the
16   appropriate label for this drug. Are the indications
17   appropriate. Are the contraindications appropriate. Are
18   the adverse effects appropriate. Are the warnings
19   appropriate. We were asked specifically questions about
20   that.
21   Q   By the FDA people?
22   A   By FDA people, yes, sir.
23   Q   You being an independent expert they called in
24   to comment on that?
25   A   Yes, sir.

Page 153

1   Q   And I may be able to go through and find some
2   other areas but in a few second I just caught those two
3   with my eye.
4   A   Yes, I was asked by a drug company to consult
5   with them specifically on a label that they were writing.
6   They had received feedback from the FDA about the content
7   of the label they wrote, and I was -- sat a room with
8   them and we worked out a response that would meet the
9   FDA's requirement. We worked specifically on,
10   exclusively on developing a label.
11   Q   Did that label concern giving a warning or
12   information to prescribing doctors because of the risk of
13   the drug?
14   A   That label included statements about warnings,
15   adverse events, precautions, yes, sir.
16   Q   You've had experience doing that type of work in
17   the industry, they hired you to do it, you've had that
18   kind of experience being hired by the FDA to do it?
19   A   That's correct.
20   THE COURT: Counsel. Arguments, or what do
21   you want to do.
22   MR. CEDILLO: How would the Court like me
23   to do it, I can argue, I can ask voir dire questions.
24   THE COURT: You can take him on cross.
25   EXAMINATION

Page 154

1   BY MR. CEDILLO:
2   Q   By the way, Doctor Moye, how do you do, sir, my
3   name if Ricardo Cedillo and I'll ask you a few questions.
4   A   Nice to see you, Mr. Cedillo.
5   Q   First of all, are you Erick Moye's brother?
6   A   I am indeed, yes.
7   Q   I went to law school with him for three years.
8   Tells him hey for me, will you?
9   A   I most certainly will.
10   Q   All right. Doctor Moye, what is pharmacology?
11   A   Pharmacology is a process by which drugs through
12   mechanisms known and unknown produce their effects.
13   Q   Are you a pharmacologist?
14   A   No, sir, I'm not.
15   Q   Have you ever done a pharmacological study on
16   Pondomin?
17   A   I have never conducted a pharmacologic study on
18   Pondomin, that's correct.
19   Q   Would it be true, sir, that all the information
20   that you have about Pondomin you have learned while you
21   were being paid as an expert witness for plaintiffs in
22   these kind of cases?
23   A   No, I would disagree with that in the following
24   line: I was paid to be an expert witness by plaintiffs
25   beginning in 1999. In 1998 was when I began to design

10 (Pages 151 to 154)

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

Page 155

1  studies looking at Pondomin and valvular heart disease
2  and I was not being paid as an expert witness then.
3  Q  Ius it true, sir, that on primarily pulmonary
4  hypertension, any information that you have other than
5  whatever cursory knowledge you had and any kind of
6  general medical training, you obtained that as part of
7  your duties as a paid consulttant?
8  A  That's true, yes.
9  Q  And can you name any study that describes the
10 process that you described about the pharmacology or the
11 connection between the specific ingredients in Pondomin
12 and PPH?
13 A  I think the best description comes from an
14 article written by Fischman, and that was written I
15 believe in 1998.
16 Q  Sir, I didn't ask you for a description. I
17 asked for a study that has gone and proven the theories
18 that you were talking about?
19 A  Oh, certainly not. I mean, that's exactly why
20 it's theory, because there has been no such thing.
21 Q  And that's the point, sir, I don't want this
22 Court to come away with the impression that what you were
23 saying was scientific fact. What you done is you read
24 about certain theories, but there's been in
25 pharmacological study that established that, correct?

Page 156

1  A  That's correct, it is not proven, that's
2  correct.
3  Q  So what you would be coming here to do is talk
4  about theories that you have read about because even then
5  you have haven't actually conducted the actual work,
6  you've just become familiar with it by reading about it?
7  A  Well, I would say that nobody has conducted the
8  actual work to elucidate the theory.
9  A  And that would include you, sir.
10 A  Well, that's certainly true.
11 Q  And you're the only one I'm cross-examining..
12 A  Yes.
13 Q  Okay. So you and the rest of the world, nobody
14 can come and take that witness stand and be a qualified
15 expert that can talk about something other than pure
16 theory?
17     MR. O'QUINN: I object, Your Honor. That's
18 shear speculation. How does he know what's in the mind
19 of everyone else in the world.
20     THE COURT: Overruled.
21     MR. CEDILLO: And I didn't object to his
22 questions --
23     THE COURT: Overruled.
24 Q  (By Mr. Cedillo) Okay. Now, Doctor, you covered
25 a whole lot of ground. You are a biostatistician, are

Page 157

1  you not, sir?
2  A  Yes, sir.
3  Q  And biostatistics is the application of math to
4  biological process, is that correct?
5  A  Yes, sir.
6  Q  You told us that you teach at the Texas School
7  of Public Health, correct?
8  A  University of Texas School of Public Health in
9  Houston, yes.
10 Q  And there's an academic discipline at that
11 school called epidemiology, correct?
12 A  There's a division called epidemiology, yes,
13 sir.
14 Q  And you're not a faculty member in the
15 epidemiology discipline, are you, sir?
16 A  Yes, I am. I'm a secondary member in the
17 academic division of epidemiology, yes.
18 Q  Secondary member?
19 A  Yes.
20 Q  What do you call one that's ahead of you?
21 A  Well, there are --
22 Q  There are primary members, yes?
23 Q  And a primary member actually teaches
24 epidemiology and is an epidemiologist, correct?
25 A  Primary and secondary members teach epidemiology

Page 158

1  and are epidemiologists. My primary division in
2  biostatistics.
3  Q  That's right, sir. As a matter of fact, you
4  teach classes at the School of Public Health in biology
5  discipline, not in the epidemiology discipline, correct?
6  A  That's not true, I do teach epidemiology.
7  Q  Oh, yeah, you did. You taught maybe one-third
8  of one class in epidemiology in your entire career.
9  A  Sir, not only do I teach epidemiology regularly,
10 I advise epidemiology students. I work with them on
11 their theses and dissertations. So I work regularly,
12 frequently, continually with epidemiology students.
13 Q  And you taught actually one-third of one class?
14 A  No, I have co-taught a class in epidemiology
15 for, I would say, maybe fifteen years now.
16 Q  And your portion of it is about a third of that
17 class, right?
18 A  That's correct.
19 Q  Thank you, sir?
20 A  As a secondary member, so I don't take the lead,
21 that's right.
22 Q  And some epidemiologists, sir, including the
23 epidemiologists at the School of Public Health where you
24 teach would not consider you an epidemiologist, correct?
25 A  Well, to answer your question directly, I

11 (Pages 155 to 158)

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

### Page 159

1  suppose that may be true. But in fact in epidemiology
2  many people do consider me an epidemiologist, and that's
3  why I was admitted as a secondary appointment.
4  Q  And the answer to my question was yes, there are
5  people at your school who are epidemiologists wouldn't
6  consider you one?
7  A  No, my answer is there may be. I don't know if
8  they do or not. I frankly having asked them.
9  Q  Well, sir, are you a member of my national
10 epidemiology socities?
11 A  No, sir.
12 Q  Are you a member of the American College
13 Epidemiology?
14 A  I am not, sir.
15 Q  Now, as a biostatistician you testified in part
16 regarding your interpretation of statistical data from
17 studies, correct?
18 A  Yes, sir.
19 Q  And the interpretation of statistical data from
20 a study or from a set of studies or multiple studies,
21 Doctor Moye, that is a very subjective process, isn't it?
22 A  I wouldn't disagree with you, no.
23 Q  You would. Did you disagree in the auto
24 litigation when you were asked that very question, the
25 interpretation of statistical data from the study or from

### Page 160

1  multiple studies that it's a subjective process; you
2  remember saying yes to that question?
3  A  I guess I didn't think your question was the
4  same as that.
5  Q  Exactly the same, sir. I'm not smart enough to
6  know how to ask you without reading it identically?
7  A  I guess I'm not smart enough to keep the two
8  questions straight.
9  Q  Let me try again, okay, and English is my second
10 language. Maybe I do mess it up sometimes. The
11 interpretation of statistical data from a study or
12 multiple studies is a subjective process; yes or no,
13 Doctor?
14 A  I would say it can be a subjective process, yes.
15 Q  You said before just simply a question without
16 the "can be", correct?
17 A  Well, I'm saying today it can be. That's my
18 answer today.
19 Q  And before you said just plain ol' yes, correct?
20 A  Well, if it's in the transcript, that's what I
21 said. My answer is it can be.
22 Q  Okay. Now --
23    MR. O'QUINN: Your Honor, I object to in
24 this. It's gotten beyond voir dire to find out this
25 qualifications. Just pure and simple cross-examination.

### Page 161

1  Not about something he answered one way in one situation
2  and another way in another. We're not here for a
3  crediblity argument, Your Honor, we're trying to find out
4  if this man --
5    THE COURT: I agree with that. I think we
6  need to test his predicated for him to --
7    MR. CEDILLO: I think I needed to do it
8  that way, Judge, in testing the predicate because he's
9  given different answers to try to testify here when in
10 fact I think I'm entitled to rely on what he has said
11 under oath before.
12   THE COURT: That's fine, but move on with
13 your quesitons.
14   MR. CEDILLO: Thank you, Your Honor.
15 Q  (By Mr. Cedillo) As a matter of fact, sir, you
16 have admitted in the past under oath that you were not an
17 expert in primary pulmonary hypertension, correct?
18 A  I would say I certainly am not a pulmonologist,
19 that's correct.
20 Q  You are not an expert on PPH, are you?
21 A  I'm not a pulmonologist.
22 Q  You are not an expert on PPH, the disease?
23 A  I will tell you, sir, that I am not a
24 pulmonologist.
25 Q  Okay. You've got no experience diagnosing PPH,

### Page 162

1  do you, sir?
2  A  Not since medical school.
3  Q  You've never diagnosed PPH, have you, sir?
4  A  Not since medical school.
5  Q  You're telling this Court that you diagnosed PPH
6  in medical school?
7  A  Well, I was on pulmonary service. I worked with
8  pulmonologists who diagnosed it, yes.
9  Q  You were working for somebody else who was do it
10 when you were a student. Have you as a medical doctor
11 ever performed one single diagnosis of PPH?
12 A  Let me answer this way: I have never working on
13 my own identified and diagnosed and a patient with PPH.
14 Q  Thank you, sir. And you've never treated
15 someone with PPH, have you sir?
16 A  Again, not on my own, that's correct.
17 Q  And the study of PPH that you had, sir, is at
18 best limited to an understanding of the basics of PPH
19 prior to you becoming involve in litigation, correct?
20 A  I'm not sure I understood your question.
21 Q  Any understanding you had about PPH were basics,
22 you got to learn a lot more about it after you started
23 consulting in this litigation; true?
24 A  That's a fair statement, yes.
25 Q  Thank you, sir. And I guess you also told us

12 (Pages 159 to 162)

Adams Reporting & Record Service
(903) 586-5651

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

## Page 163

1. that you haven't treated a patient since 1992, correct?
2. A  With the exception of the Katrina catastrophe
3. this year that's right.
4. Q  And not having treated patients since 1992 it's
5. fair to conclude that you certainly a specialist in any
6. medical field?
7. A  That's a fair statement, yes.
8. Q  And you're certainly not a specialist in the
9. treatment of obesity, correct?
10. A  That's correct.
11. Q  And you've never used a diet medication to treat
12. an obese patient, correct?
13. A  That's certainly true, yes.
14. Q  All right, sir. Now, you also, sir, have never
15. had any formal training on the FDA regulations governing
16. post-marketing surveillance and the reporting of adverse
17. drug events; correct?
18. A  I have had a first of all, that's incorrect.
19. I have had training as a post-marking -- in charge of a
20. post-marketing clinical trial where we received specific
21. training about adverse event reporting.
22. Q  Who gave you formal training on FDA regulations
23. governing post-marketing surveillance?
24. A  Well, formal training on -- we didn't have a
25. formal course --

## Page 164

1. Q  Listen to my question, sir.
2. A  I'm trying.
3. Q  The only thing I asked you was whether you have
4. ever had any formal training on FDA regulations governing
5. post-marketing surveillance or formal training on the FDA
6. regulations governing the reporting of adverse drug
7. events?
8. A  Excuse me, I'm confused. I've heard you say
9. training in one sentence and course in another, so I am
10. confused.
11. Q  I didn't say it that time. I'll try again. I
12. apologize if I'm the cause of any of your confusion. It
13. is true, is it not, sir, that you have never had any
14. formal training on FDA regulations governing
15. post-marketing surveillance?
16. A  I have had training on FDA regulatiosn involving
17. post-marketing surveillance that was in -- while I was
18. running a clinical trial for Bristol-Myers-Squibb. I
19. think II've had that before.
20. Q  Who gave you formal training on FDA regulations
21. governing post-marketing surveillance?
22. A  The regulatory department of
23. Bristol-Myers-Squibb.
24. Q  That you were working for?
25. A  Yes.

## Page 165

1. Q  Who gave you formal training on the FDA
2. regulations governing the reporting of FDA adverse drug
3. events?
4. A  It was the same training period.
5. Q  Have you ever taken any courses in formal
6. education programs about the FDA regulations?
7. A  No, sir, I have not.
8. Q  You've never even completed an adverse event
9. form for a drug company except in a clinical trial, isn't
10. that true?
11. A  Well, completing adverse event form in a
12. clinical trial is completing an adverse event form.
13. Q  Have you ever completed adverse event form for a
14. drug company outside of a clinical trial?
15. A  No, it's all about clinical trial.
16. Q  And you've never been involved in maintaining
17. adverse reports outside the clinical trial, correct?
18. A  That's correct, yes.
19. Q  And you've never even filled out a
20. post-marketeing spontaneous ADE, have you, sir?
21. A  Again, outside of the clinical trial I have not.
22. Inside I have.
23. Q  And by the way, I heard you say that you worked
24. for the FDA?
25. A  I said I was a special government employee for

## Page 166

1. the FDA. That's what I said.
2. Q  Okay. Have you ever been paid as an employee by
3. the FDA?
4. A  Only as a special government employee.
5. Q  You were paid to be a special government
6. employee?
7. A  Yes.
8. Q  And was that for your role in the advisory
9. committee?
10. A  Yes, sir.
11. Q  Where you're role was to be there as a
12. biostatistician?
13. A  And epidemiologist.
14. Q  All right. This subcommittee was the what,
15. cardio-vascular and renal drug advise committee?
16. A  There were two. That was a four year stint,
17. yes, sir.
18. Q  There were two stints with that --
19. A  There were two committees. A four year stint
20. with cardio-renal advisory committee and followed by a
21. two-year service on pharmacy scientists.
22. Q  All right, sir. Let's take the first stint,
23. then. You were invited to join that advisory committee,
24. correct?
25. A  Yes, sir, I was.

13 (Pages 163 to 166)

Beverly "Kim" Tilmon v. Wyeth, Et Al

direct exam lem moye(1)
January 30, 2006

Page 167

1  Q You were invited to join that advisory committee
2  because of your expertise in biostatistics, correct?
3  A Biostatistics and epidemiology.
4  Q Okay. Were you invited to be there because of
5  your knowledge and expertise on FDA regulations,
6  policies, procedures, drug labeling, or post-marketing
7  surveillance?
8  A I don't think so. I don't think so.
9  Q Can you give me a no because you're the only one
10 that was there. You either know that they got you for
11 that area of speciality or you know, Doctor Moye, that
12 you got there because they wanted your imput as a
13 biostatistician; which was it?
14 A They wanted my imput because of my global
15 experience, and that global experience included
16 biostatistics, epidemiology, clinical trial monitoring,
17 and design and execution including reporting of adverse
18 events.
19 Q Even though you've never reported one outside of
20 clinical trial?
21 A Again, the experience of reporting adverse
22 events through a clinical are very relevant.
23 Q Let me ask you this: When you started
24 testifying as an expert the only thing you were really
25 familiar with with respect to the regulations of the FDA

Page 168

1  were the regulations relating to the conduct of clinical
2  trials that are conducted by researchers and perhaps the
3  the reporting of the data collected from those trials;
4  isn't that a fair statement?
5  A Yes, if we have the understanding that that
6  includes reporting adverse events also.
7  Q And I'll spot that within clinical trials.
8  A Yes, sir.
9  Q Prior to you testifying as an expert in these
10 kind of cases, sir, that was the extent of your
11 familiarity with FDA regs, correct?
12 A Yes, sir.
13 Q Now, are you telling this Court that part of
14 your work with the advisory committee, Doctor Moye, was
15 it your responsiblity as an advisory committee member to
16 become familiar with the FDA regs?
17 A Well, I would have to say yes, it was insofar as
18 we were asked specific questiosn about how to craft
19 warnings, adverse events, indications and
20 contraindications, provide labeling advise for the FDA.
21 Q Do you remember conceding to us, sir, that you
22 were not brought onto that committee because of any
23 expertise in FDA labeling regs?
24 A I think that's consistent with my testimony
25 today, yes.

Page 169

1  Q So that's true' that's a true statement?
2  A Yes.
3     THE COURT: Counsel, I think that's
4  sufficient.
5     MR. CEDILLO: All right, Your Honor.
6     THE COURT: Here's the ruling of the Court:
7  He will testify with regard to the statistical frequency
8  of the disease, the statistical comparsions allowed to be
9  made. He will testify only has to the statistical
10 analysis of the IPPHS study but not as to any causal
11 chemical causal relationship to that study. In other
12 words, the statistical, only his up-take on that. He
13 will not testify as to diet drugs and any causal relation
14 of PHP. He will not testify as to specific causation of
15 the Plaintiff Tilmon. He may testify as to general
16 causation assuming the existence of PHP if it's
17 stastically proven. I'm not sure I'm saying that
18 correct. He will not testify on FDA procedures. And he
19 will not testify with regard to the warnings or the
20 efficacy of warnings or the lack thereof. So ordered.
21 All right. I'll be back in a minute.

Adams Reporting & Record Service
(903) 586-5651

Exhibit B - Moye June 16, 2006 Deposition Excerpts

• Moye Reply

[400:1] - [400:24]    6/16/2006   Moye, Lemuel (Barnett)

```
page 400
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
         IN RE: VIOXX            :  MDL DOCKET NO.
 3       LITIGATION PRODUCTS     :  1657
         LIABILITY LITIGATION    :  SECTION L
 4                               :
         This document relates   :  JUDGE FALLON
 5       To                      :
         GERALD BARNETT AND      :  MAGISTRATE JUDGE
 6       CORRINE BARNETT         :  KNOWLES
              V.                 :
 7       MERCK & CO., INC.       :
                                 :
 8       Civil Action No.        :
         2:06cv485               :
 9                               :
         And Related Actions     :
10                       - - -
11                   June 16, 2006
12                       - - -
13          Videotaped deposition of LEMUEL A.
14     MOYE, M.D., Ph.D., VOLUME 2, held in the
15     offices of Abraham, Watkins, Nichols,
16     Sorrels, Matthew & Friend, 800 Commerce,
17     Houston, Texas, commencing at 8:10 a.m., on
18     the above date, before Michael E. Miller,
19     Registered Merit Reporter and Certified
20     Realtime Reporter.
                         - - -
21
                GOLKOW LITIGATION TECHNOLOGIES
22                    Four Penn Center
                1600 John F. Kennedy Boulevard
23                      Suite 1210
                Philadelphia, Pennsylvania 19103
24                    877.DEPS.USA
```

[755:1] - [755:7]    6/16/2006   Moye, Lemuel (Barnett)

```
page 755
 1       Q.    Okay.  Now, have you ever been
 2  prohibited by a Court from expressing an
 3  opinion about the adequacy of labeling?
 4       A.    I think, perhaps, there was one
 5  court in Santa Fe.  As I sit here now, that's
 6  the only one I can remember.  I mean, there
 7  may have been others, but I don't remember.
```

[781:1] - [781:18]    6/16/2006   Moye, Lemuel (Barnett)

```
page 781
 1           C E R T I F I C A T E
 2
 3            I, MICHAEL E. MILLER, a Notary
    Public, Registered Merit Reporter and
 4  Certified Realtime Reporter, do hereby
    certify that prior to the commencement of the
 5  examination, LEMUEL A. MOYE, M.D., Ph.D. was
    duly sworn by me to testify to the truth, the
 6  whole truth and nothing but the truth.
 7            I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
```



```
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability.
10
            I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.
14
15
16          _____
            MICHAEL E. MILLER, RMR, CRR
17          Notary Public in and for
            The State of Texas
18          My Commission Expires:  7/9/2008
            Dated:  June 19, 2006
```