## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| *COORDINATION PROCEEDING* ) | DOCKET NO. 2:06-cv-00485-EEF-DEK_____ |
| ) | |
| SPECIAL TITLE [Rule 1550(b)] ) | MDL NO. 1657 |
| ) | |
| IN RE VIOXX® CASES ) | SECTION: L |
| ) | |
| _____ ) | JUDGE FALLON |
| GERALD D. BARNETT and CORINNE ) | MAG. JUDGE KNOWLES |
| BARNETT, ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| MERCK & COMPANY, INC., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |

COX-2 Inhibitor Report of
## Lemuel A. Moyé, M.D., Ph.D.

May 22, 2006



EXHIBIT
C
Blumberg No. 5119

## Table of Contents

PERSONAL VITA

    PERSONAL VITA ........................................................................................................... 5

    DEGREES ...................................................................................................................... 5

    RESEARCH EXPERIENCE .......................................................................................... 5

    CURRENT ACTIVITIES .............................................................................................. 6

    MANUSCRIPTS .......................................................................................................... 6

    BOOKS ........................................................................................................................ 6

    PRESENTATIONS ...................................................................................................... 7

    TEACHING .................................................................................................................. 7

    INVITED LECTURES .................................................................................................. 7

    CONSULTATIONS ...................................................................................................... 7

    GRANT REVIEW ........................................................................................................ 8

    MONITORING BOARDS ............................................................................................ 8

    FDA APPEARANCES FOR SPONSORS ..................................................................... 8

    FDA SERVICE ............................................................................................................ 8

    RECENT PUBLICATIONS .......................................................................................... 9

    RISK BENEFIT EXPERIENCE ................................................................................... 9

    CARDIORENAL COMMITTEE MEETINGS .............................................................. 9

    FDA SERVICE .......................................................................................................... 10

    EDUCATION ............................................................................................................. 10

    BASIS OF OPINIONS ............................................................................................... 10

    FEES .......................................................................................................................... 10

    PREVIOUS TESTIMONY ......................................................................................... 10

SUMMARY OF OPINIONS ................................................................................................ 11

RISK-BENEFIT ANALYSIS ............................................................................................... 13

ADVERSE EFFECTS .......................................................................................................... 17

    ROFECOXIB AND STROKE ..................................................................................... 20

    HYPERTENSION ...................................................................................................... 23

    BACKGROUND BIOCHEMISTRY .......................................................................... 24

    BIOCHEMISTRY OF COX-2 INHIBITION .............................................................. 24

    THE ROLE OF ENZYMES ........................................................................................ 24

    THE PROSTAGLANDIN SYSTEM ........................................................................... 25

COX-1 AND COX-2 ........................................................................................... 28

INADEQUATE TESTING ................................................................................ 32

CLINICAL STUDIES .................................................................................. 37

THE VIGOR TRIAL .................................................................................. 38

POSSIBLE PROTECTIVE EFFECT OF NAPROXEN ........................... 42

ADVANTAGE ............................................................................................. 43

VICTOR ....................................................................................................... 44

VIP ............................................................................................................... 44

ALZHEIMER STUDIES ............................................................................ 45

APPROVE .................................................................................................... 45

FAILURE TO WARN ...................................................................................... 60

FDA EXPERTISE ....................................................................................... 60

ROLE OF FDA ........................................................................................... 61

MODERIZATION ACT .............................................................................. 62

COLLABORATION .................................................................................... 62

ADVISORY COMMITTEES ..................................................................... 63

DECISION PROCESSES ............................................................................ 64

MATERIAL INFORMATION ................................................................... 64

ADVERSE EVENTS ................................................................................... 65

LABELING .................................................................................................. 65

MISLEADING THE FDA ............................................................................... 70

APPENDIX A: STATISTICAL REASONING IN MEDICINE ..................... 74

SAMPLING ERROR AND SIGNIFICANCE TESTING ........................ 75

STATISTICAL POWER .............................................................................. 77

SAMPLE SIZE COMPUTATIONS ........................................................... 78

APPENDIX B: DETERMING CAUSALITY IN MEDICINE ....................... 79

LIMITATIONS OF CASE REPORTS ....................................................... 82

APPENDIX C: DETECTING ADVERSE EVENTS ....................................... 85

DETECTING ADVERSE EVENTS: COMPLICATION IN SAFETY MONITORING .......... 85

STRATEGY 1: MONITOR WIDELY ....................................................... 88

STRATEGY 2: ASSESSING UNANTICIPATED ADVERSE EVENTS ............................... 89

APPENDIX D: SUBGROUP ANALYSES ...................................................... 93

SUBGROUPS: DEFINITIONS AND BASIC CONCEPTS ..................... 94

SUBGROUPS VERSUS SUBGROUP STRATA ..................................... 94

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                              5/22/2006

SUBGROUPS: INTERPRETATION DIFFICULTIES ............................................................. 95

RANDOM SUBGROUPS ......................................................................................................... 97

PROPER VERSUS IMPROPER SUBGROUPS ...................................................................... 98

INTENTION-TO-TREAT" VERSUS "AS TREATED" SUBGROUP ANALYSES............... 98

EFFECT DOMINATION PRINCIPLE ..................................................................................... 100

MANUSCRIPT INTERPRETATION ....................................................................................... 102

REFERENCES ........................................................................................................................... 107

# Personal Vita

1. **Personal Vita**: My name is Lemuel A. Moyé. I am over twenty-one years of age, am of sound mind, am not a party to this action, have never been convicted of a felony, and am otherwise competent to make this affidavit. I have personal knowledge of all factual statements contained herein, and all such factual statements are true and correct to the best of my knowledge.

2. **Degrees**: I have a M.D. and a Ph.D. degree in Community Sciences - Biostatistics. I am a licensed physician in the states of Texas and Indiana, and I have actively practiced medicine from 1979-1992. I am a diplomat of the National Board of Medical Examiners. My formal training has included many courses in mathematical statistics, epidemiology, and biostatistics. I am currently a Professor of Biostatistics at the University of Texas School of Public Health in Houston, where I hold a full time faculty position in biostatistics.

3. **Research Experience**: I have carried out cardiovascular research for nineteen years and continue to be involved in the design, execution and analysis of clinical trials. I have been Principal Investigator on a grant from Schering-Plough and have been Co-Principal Investigator on two grants from Bristol Myers-Squibb. In these studies, I was responsible for the design, execution, and analysis of these experiments. In one case, the experiment involved over 2000 patients who were followed for 3.5 years, and in the other case, 4159 patients were followed for five years. In each of these enterprises, an important component of my responsibility was the reporting of adverse events from physicians. In one of these trials, I supervised the collection of adverse events that were reported to both the Sponsor and to the Federal Food and Drug Administration (F.D.A.). Each of these clini-

cal trials has resulted in several articles that were published in the Journal of the Medical Association and The New England Journal of Medicine, as well as other journals in the peer reviewed medical literature.

4.   ***Current Activities***: I am currently Principle Investigator and in charge of the biostatistics group that is carrying out research on the treatment of strokes, funded by the National Institute of Neurologic Disorders and Strokes. I am also a co researcher on a federally funded grant that is examining the influence of behavioral modification of risk factors for atherosclerotic disease.

5.   ***Manuscripts***: I have published over one hundred and twenty manuscripts in peer-reviewed literature that reflect my experience in the design, execution and analysis of clinical trials. Included among these manuscripts are papers that provide the mathematical development of tools that improve both the design and the execution of large-scale clinical trials

6.   ***Books***: I am the author of six books. I am the sole author of the book *Statistical Reasoning in Medicine—The Intuitive P value Primer*, published by Springer-Verlag in 2000. Marcel-Dekker published a second book, entitled *Difference Equations with Public Health Applications*, co-authored with a colleague, in October 2000.  A third book of which I am sole author, entitled *Multiple Analysis in Clinical Trials: Fundamentals for Investigators*, was published by Springer-Verlag and appeared in the summer 2003.  A fourth book titled *Finding Your Way in Science* was published in August 2004. A fifth book entitled *Mathematical Statistics with Applications* appeared in 2005. A sixth book entitled *Statistical Monitoring of Clinical Trials: Fundamentals for Investigators*; was released in the fall, 2005. The second edition of *Statistical Reasoning in Medicine—The In-*

*tuitive P value Primer* will appear in the summer of 2006. I am currently writing a book *Elementary Bayesian Biostatistics* to be published by Taylor and Francis, to appear during the summer of 2007. In addition I have authored invited book chapters and contributed articles to scientific encyclopedias.

7.   ***Presentations:*** I have been an Investigator on four grants from the National Institutes of Health, involving the design, execution, and analysis of clinical trials and epidemiologic studies. Each of these has led to publications in the peer-reviewed literature. I have presented results of clinical research at over twenty different professional meetings, including a presentation in 2001 to the Drug Information Agency and a separate presentation at the International Joint Statistical Meetings. I have presented results at the International Joint Statistical Meetings in 2003, 2004, and 2005.

8.   ***Teaching***: I have consistently taught courses in biostatistics since my full-time appointment as a faculty member in 1987 at the University of Texas School of Public Health. In these courses, I have taught experimental design in clinical research studies, the statistical methodology that supports these design principles, the statistical analysis of clinical research programs, and the role of epidemiology in interpreting the conclusions from these clinical research programs. For 18 years, I have been a supervisory professor for students training in epidemiology, biostatistics, and other areas of public health.

9.   ***Invited Lectures***: I have given over thirty invited guest lectures on research methodology topics.

10.   ***Consultations***: I have served as a clinical trial consultant to Berlex, Proctor and Gamble, Marion Merrill Dow, Pfizer, Hoechst Roussel, Aventis, Key Pharmaceuticals, Coromed,

DuPont, Bristol Myers-Squibb, Novartis, Medtronics, Astra-Zeneca, CryoCor and Vasogen.

11. **Grant Review**: I have reviewed grants and/or data on over fifty different occasions on behalf of government research programs.

12. **Monitoring Boards**: I have served on three Data Monitoring Committees (DMC) that oversee the conduct of clinical trials, and most recently have been the chairman of a Data, Safety, and Monitoring Committee of a study sponsored by Bristol-Meyer-Squibb and Key Pharmaceuticals. I currently serve on three DMC's, one privately sponsored and two on NIH sponsored studies.

13. **FDA Appearances for Sponsors**: I have appeared before the F.D.A. on behalf of sponsors on several occasions.

14. **FDA Service**: In addition to serving as a consultant with the pharmaceutical industry for seventeen years, I have also directly and overtly supported the F.D.A. I have served as a statistician/epidemiologist for four years on the Cardiovascular and Renal Drug Advisory Committee to the Food and Drug Administration. In this capacity, I have reviewed the data provided by pharmaceutical companies and an analysis of that data by the FDA to render opinions about the safety and effectiveness of these medical interventions being considered for FDA approval.  In this capacity, I have formally reviewed over twenty clinical trial programs of private sponsors and commented in public testimony that is part of the Federal Registry. In some instances, a component of this review was direct evaluation, criticism and comment on the proposed product label by the Sponsor. I currently serve as a statistical consultant to the F.D.A., and most recently have been to a two-year term on the F.D.A. Pharmacy Sciences Advisory Committee.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                      5/22/2006

15. ***Recent Publications***:  I have published manuscripts as the sole author in each of the following journals:  *Controlled Clinical Trials*, and *Statistics in Medicine*. This work has promulgated the philosophy (while advancing the supporting mathematics) that clinical research interpretation must be disciplined and must explicitly hold the highest regard for community protection from dangerous, false, and misleading results from clinical research. I have been featured in health care articles in both *Money* magazine (December 1998) and *US News and World Report* (January 11, 1999). In 2000, an article, on which I am the sole author, appeared in *Statistics in Medicine*, and it has generated important published commentary in the peer-reviewed literature.

16. ***Risk Benefit Experience***: I have taken part in research studies that have been both observational and experimental. In each of these studies, functioning as an investigator, I have participated in discussions assessing the safety and effectiveness of the medication. This assessment has not been based on complicated economic arguments, but instead places emphasis on balancing the health advantages the therapy offers against the disadvantages its use produces. I have published an article that computed the effectiveness and safety of various strategies in the treatment of essential hypertension.

17. ***CardioRenal Committee Meetings***: During the thrice-yearly meetings of the Cardio-Renal Advisory Committee to the F.D.A., I, along with the other committee members, have been asked to weigh the advantages and disadvantages of the medications presented to us for approval. This assessment was not economic but a collective appraisal by physicians and health care researchers of the relative clinical strengths and clinical weaknesses of the intervention.

18. ***FDA Service:*** My service on the F.D.A. Advisory Committees, as well as my service to drug manufacturers, has given me specialized knowledge and experience concerning the F.D.A. policies, procedures and regulations as well as the corresponding duties of a reasonable and prudent drug manufacturer. In my service on behalf of sponsors to the F.D.A., and my service to the F.D.A. at Advisory Committee meetings, I have developed expertise, knowledge, education, training and experience in F.D.A. matters.

19. ***Education***: My education consists of the following:

| Year | Degree | School |
|------|--------|--------|
| 1987 | Ph.D. Community Sciences -Biometry | University of Texas |
| 1981 | M.S.  Statistics | Purdue University |
| 1978 | M.D. | Indiana University |
| 1974 | B.A. Mathematical Sciences | Johns Hopkins |

20. ***Basis of Opinions***: I have gained scientific, technical, and specialized knowledge of biostatistics, epidemiology, and risk/benefit assessment. The basis for my opinions is derived from my education, training, research, experience, expertise, and review of the peer-reviewed medical literature.

21. ***Fees***: My fees are $400 per hour for review of literature, documents, and $500 for depositions and trial testimonies.

22. ***Previous testimony***: A list of previous testimony is attached as Appendix E.

# Summary of Opinions

23. The Cox-2 inhibitor rofecoxib, designed to reduce pain while avoiding gastrointestinal effects, was a therapy with a foreseeable design defect, and whose risks exceeded its benefits. Several studies, carried out both before and after rofecoxib was approved by the FDA, demonstrated that rofecoxib's analgesic effect was no better than commonly used, inexpensive nonsteroidal anti-inflammatory drugs. In addition, other studies demonstrated the harmful gastrointestinal effects of rofecoxib produced more gastrointestinal disease than placebo therapy. Thus, when released, Cox-2 inhibitors were not superior to commonly used pain relievers for analgesia, nor were they free of gastrointestinal adverse effects. Thus there was minimal benefit of these agents above and beyond the available, inexpensive alternatives.

24. Rofecoxib excites the production of cardiovascular disease. It produces this disease through two mechanisms. First, rofecoxib's propensity to produce elevations in blood pressure adds to the force of atherosclerotic disease development. In addition, its mechanism of action, i.e., the selective inhibition of the Cox-2 prostanoid synthesis destabilizes the blood's delicate clotting balance, producing catastrophic thrombotic events in the heart, and other end organ vasculature. This adverse effect causes angina pectoris, nonfatal heart attacks, fatal heart attacks, and the fatal syndrome known as sudden death.

25. Rofecoxib is unsafe at any dose/duration combination in any patient regardless of their underlying risk for cardiovascular disease. The harmful cardiovascular effects of rofecoxib have been demonstrated repeated. These dangerous adverse consequences occur in patients on both low dose and high dose rofecoxib. They occur in short durations of ther-

apy, as well as in patients exposed for many months to the drug. In addition, these cardiovascular side effects occur in patients who are at low risk for cardiovascular disease, as well as in patients who are at high risk for cardiovascular disease. Rofecoxib is a defective product. In addition, based on the data, it is more reasonable than not that rofecoxib causes cerebrovascular accidents or strokes.

26.   The use of rofecoxib is unjustified in patients who suffer from the chronic pain of rheumatoid arthritis or osteoarthritis. Although each of these chronic conditions produces substantial pain, they are not deadly. The use of a medication that causes death through its combined thrombotic, hypertensive effects is unjustified in patients who suffer from the painful, chronic, but non-lethal illnesses which are the drug's indications. These patients, because of their age and high background risk of atherosclerotic cardiovascular illness are at greater risk of vessel-occlusive attack by this drug. Merck Laboratories was aware of a signal of its cardiotoxic effects of rofecoxib in 1998, a year before the drug was approved. In the presence of increased numbers of adverse cardiovascular effects, Merck allowed the FDA to approve a product that it knew was cardiotoxic. During the appearance of study after study, which confirmed pre-approval suspicions that rofecoxib would be dangerous for the cardiovascular system, Merck continued to defend the drug's use with a scientifically incredulous argument, with no additional warnings for its profound cardiovascular effects.

# Risk-Benefit Analysis

27. All medication have risks that must be 1) balanced by the benefits to the population to re-
ceive the therapy, and 2) must be promulgated to physicians, pharmacists, and patients,
so that these prescriber, dispensers, and users can exercise their independent right to de-
termine if the therapy's benefits outweigh its risks. A fair assessment of the contribution
of rofecoxib to the public health requires a fair assessment of its benefits and risks.

28. Benefits of COX inhibition: The *raison dêtre* of COX-2 inhibition is that selective block-
ing of the COX-2 pathway blocks pain generation while permitting continued gastrointes-
tinal protection. Thus, the medical community expected superior analgesia to be deliv-
ered while the safety of the stomach's protective mucosal lining was preserved.

29. However, rofecoxib-generated analgesia was quite ordinary, demonstrated to be of no
greater magnitude than medications currently on the market. A striking example was the
comparison of rofecoxib to nabumeton in Protocol 090. In this study, 12.5 mg rofecoxib
was compared to 1000 mg of nabumeton, Merck's own scientists anticipated that pain re-
lief (as measured by the Patient Global Assessment Response to Therapy (PGART) was
anticipated to be 15 percentage points greater than that of the comparator drug nabume-
ton, a well established, commonly used NSAID. However, rofecoxib did not reach this
prospectively determined goal. In fact, the difference between the two therapies was not
15 points, but 7-8 points (50.4% versus 43.3%). Thus rofecoxib was not more effective
than commonly used, already available pain medications, according to the criteria set by
Merck's own scientists.

30. In addition, rofecoxib produces clinically significant gastrointestinal distress. In the Hip-
pisley-Cox study [1] a nested case-control analysis involving almost 100,000 participants,

the relationship between gastrointestinal disease and the use of Cox-2 inhibitors was evaluated. This examination revealed that rofecoxib was associated with an elevated risk of adverse gastrointestinal event, with a relative risk of 1.56 (95% confidence interval of 1.30-1.87) for patients with recent exposure to rofecoxib. These findings reflect a 56% increase in gastrointestinal adverse events in patients exposed to rofecoxib versus placebo drug use. Rofecoxib was no more effective than standard, inexpensive NSAIDS, and itself was associated with increased gastrointestinal adverse effects when compared to placebo. However, evidence suggests that both minor symptoms of GI disease (e.g. dyspepsia) and endoscopically detected lesions are not good predictors of future, complicated GI disease. Also, in the APPROVe trial, rofecoxib at the standard 25 mg dose was associated with approximately a four-fold, statistically significant excess of gastrointestinal adverse events compared to placebo. Further, in the VIGOR trial, the authors reported that gastrointestinal mortality was "similar" for the rofecoxib and comparator NSAID, naproxen. Taken together, these studies show that rofecoxib was harmful to the GI system.

31.  Also, while it is clear that non-selected NSAIDS produce gastrointestinal disease, it is unclear which component of COX-1 inhibition (anti-aggregatory propensity or absence of GI protection) produces the serious GI complications associated with these therapies (e.g., perforations, bleedings, and obstructions). In fact, it was quite possible that the COX-1 inhibition produced by the nonselective NSAIDS was not related to gastric protection, but generated by some other mechanism, e.g., direct gastric mucosal injury. It the latter was the case, then it was unlikely that COX-2 inhibitors would provide any gastrointestinal protection. Thus, it was necessary to carry out large-scale clinical studies comparing NSAIDS with COX-2 inhibitor therapy.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    5/22/2006

32.  Balancing Benefit and Risk: All medication have risks that must be 1) balanced by the
     benefits to the population to receive the therapy, and 2) must be promulgated to physi-
     cians, pharmacists, and patients, so that these prescriber, dispensers, and users can exer-
     cise their independent right to determine if the therapy's benefits outweigh its risks.
     When a drug's benefit is large, it is reasonable to accept a larger risk for the use of the
     drug. Examples may be found in oncology, where the combined use of the cancer chemo-
     therapeutic agents, bleomycin, cisplatin, and vinblastine produced cardiac toxicity. How-
     ever, their use is tolerated because they prolong the lives of patients who would soon die
     from their cancer. The greater the benefit, the more willing is the medical community to
     accept harmful side effects.

33.  Alternatively, therapies associated with reduced benefits, must be accompanied by mini-
     mal level of adverse effects to be accepted by the medical community. However, the
     benefits of rofecoxib are no better than well-established, low-cost alternatives, and the GI
     protection offered by rofecoxib does not make it a safe drug. Therefore the adverse ef-
     fects caused by rofecoxib must be minimal for it to be acceptable to the medical commu-
     nity. However, rofecoxib's dangerous effects dramatically exceed this low threshold.

34.  Rofecoxib causes thrombotic events by mechanisms discussed by Merck in 1998, before
     the therapy was approved. The measure of the adverse effects of the drug is measured by
     an odds ratio, and the ARE.

35.  Relative risks and odds ratios measure the strength of association between an exposure
     and an illness. The computations are based on the fundamental principle that is an expo-
     sure causes a disease, and that one would naturally expect there to be greater disease in
     the exposed group than the unexposed group. Relative risks measure the occurrence of

disease in the exposed group to the control group over a period of time, and is used when one follows patients in the exposed and unexposed group forward in time to compute the occurrence of disease in each of the two groups. Odds ratios are used in circumstances when the ability to follow patients is impaired by the study design (for example, the investigator takes an epidemiologic snapshot of a cohort, measuring the extent of exposure in a collection of people, and comparing the extent of disease in the exposed and unexposed groups. A relative risk (or odds ratio) of one indicates an equal extent of disease in each group. The larger the relative risk (or odds ratio) the greater the extent of disease.

36. The attributable risk exposed (*ARE*) is the excess risk of disease produced by an exposure. Developed in the 1970's [2, 3] the *ARE* is a useful quantity that calculates the fraction of events that are attributable to one causative agent when several possible explanations may be available. It is computed as

$$ARE = \frac{OR-1}{OR}.$$

where *ARE* is the attributable risk exposed and *OR* is the odds ratio. It may also be computed as

$$ARE = \frac{RR-1}{RR}.$$

where *RR* is the relative risk.

37. Risk of Coronary Artery Disease: The concept of odds ratios and ARE can be applied to established risk factors for coronary artery disease (Table 1).

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                      5/22/2006

Table 1. Odds Ratios for Coronary Heart Disease Relative Risk[4]

| Risk Factor | Odds Ratio (Men) | Attributable Risk Exposed |
|---|---|---|
| Age | 1.05 | 4.7% |
| High Normal BP | 1.32 | 24.2% |
| Hypertension Stage 1 | 1.73 | 42.2% |
| Hypertension Stage 2 | 1.84 | 45.6% |
| Cigarette Smoking | 1.68 | 40.5% |
| Diabetes(Yes/No) | 1.50 | 33.3% |
| Severe LDL Elevation | 1.74 | 42.5% |
| Very Low HDL | 1.46 | 31.5% |

These are the odds ratio for the risk of developing coronary heart disease in ten years.

38.   The attributable risk exposed reveals the excess risk for coronary heart disease attributable to each of these risk factors. For example, cigarette smoking produces 40.5% excess risk of coronary heart disease, i.e., after all other risks are considered, the risk is 40.5% greater on top of that baseline risk in subjects who smoke cigarettes.  These risks will be compared to the rofecoxib's risk of cardiac toxicity.

# Adverse Effects

39.   ***Cardiovascular Toxicity.*** The overall risk of cardiovascular events in the VIGOR trial data (discussed later in this affidavit) as reported to the FDA, with a relative risk of 5.0, a risk that translates to an ARE of 80%. This holds for short term and long-term use. This is a greater risk of atherosclerotic disease than any of the known risk factors.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                        5/22/2006

40.   A succinct summary of cardio toxicity provided by Merck reveals the cardiovascular dan-
gers posed by rofecoxib. The report VIOXX Preliminary Cardiovascular Meta-Analysis
by Dr. Deborah Shapiro provides a crisp summary of the findings from several of
Merck's sponsored trials.  In the table entitled MI Endpoints, rofecoxib vs. NSAIDS the
following data is depicted.

Study   Relative Risk of Myocardial Infarction

Overall2.02

ViGOR          5.0

Advantage     2.95

RA              1.82

nonRA          1.68

OA-069         0.55

A similar table entitled MI endpoint- rofecoxib versus placebo shows an overall hazard
for rofecoxib as well. Since there is no credible scientific body of evidence suggesting that
NSAIDS are cardio protective, it is no surprise that the two tables convey the same clear mes-
sage.

41.   The cardiovascular damage produced by rofecoxib in low doses was clearly portrayed in
Protocol 090. Table 37 of that report demonstrates a relative risk of 3.0 and an ARE of
66%. . Thus, in this study, excess cardio toxicity was reported in the absence of efficacy,
a clear warning that the therapy could be no more effective than standard pain therapy,
but increase the cardiac disease event rate.

42.   Rofecoxib's harmful effect in short duration of therapy was demonstrated in Protocol 201
(VIP study) The average follow-up study for a median follow-up period of 4 months. The

rofecoxib dose evaluated in this study was 25 mg.  From Table 1-6 (from the P201 Clini-cal Study Report), focusing on drug related adverse events, there were 13 cardiac disor-ders (9 in the rofecoxib group, and 4 in the placebo group. There were four episodes of coronary artery occlusion, myocardial infarction, and myocardial ischemia in the rofe-coxib group and none in the placebo group. When the classification is broadened to ex-amine specific serious clinical adverse events, there were 30 seen in the rofecoxib group and 23 in the placebo group. There were 13 myocardial infarctions in VIP that met this classification, 7 in the rofecoxib group, six in the placebo group (Table 1-7).

43.  In addition, the Advantage study following patients treated with either rofecoxib (25 mg) or naproxen for osteoarthritis for only twelve weeks. The medical reviewer's report (MRK-AFV0341732) revealed that total mortality was higher in the rofecoxib group (n = 5) than in the placebo group (n=4) (Page 21). Significantly, three of the five deaths in the rofecoxib group were sudden death. There were no cardiovascular deaths in the naproxen group.  There were five myocardial infarctions, two anginal events, and three sudden deaths in the rofecoxib group and one MI and two anginal events (no sudden deaths) in the placebo group (page 10). In addition, more patients (40 versus 21) discontinued rofe-coxib than naproxen therapy for cardiovascular related adverse events (page 10).  In addi-tion, 15 versus 7 patients discontinued for hypertension related events, and 19 versus 12 patients discontinued therapy for edema related events. The increase in number of car-diovascular events is particularly striking since the study was only a twelve-week trial and 25 mg of rofecoxib (half the dose used in VIGOR) was used. The FDA Reviewer stated (page 12) "the CV findings are of concern…"

# Rofecoxib and Stroke

44. Cerebrovascular accidents (CVA's or strokes) are abrupt interruptions of blood flow to the brain. These interruptions lead to massive brain cell death, producing paralysis, loss of cognitive function, and, in extreme cases, coma and death.

45. Stroke is the number one cause of adult disability in the United States and the third leading cause of death. In the United States, stroke mortality fell by 15.1% from 1988 to 1998, but the actual number of stroke deaths rose 5.3% [5,6]. Approximately 600,000 people have a new or recurrent stroke each year in the US. Of these 500,000 are first attacks, and 100,000 are recurrent attacks. More men than women have strokes [5].

46. In many respects, strokes are similar to heart attacks. Atherosclerosis, the pathological process underling the majority of strokes, occurs throughout the arterial blood system. It can produce loss of function in the heart, peripheral vascular system, or kidneys as well as in the central nervous system.

47. Both strokes and heart attacks commonly have the same mechanism of production, i.e., the initiation and development of atherosclerotic plaques in major arteries that supply these two end organs (the brain and the heart) with nutrient and oxygen rich blood. The athermanous gruel grows over time, fed by lipid rich macrophages, aggravated by high vascular pressures, and the vasoactive affects of smoking. The creation of a fissure in the plaque can activate the intricate collection of clotting mechanisms that leads to the rapid development of a thrombus, further narrowing the lumen of the blood vessels, leading to death of the supplied tissue.

48. The risk factors for stroke (older age, hypertension, unfavorable lipid panels, smoking) are closely related to those of heart attacks. In addition, treatment is the same. The first

treatment, prevention, requires the modulation of risk factor levels. A second is the iden-

tification of major blood vessels that are at risk (carotid vessels for the brain, coronary ar-

teries for the heart) including bypassing the lesions or endarterectomy. Finally, acute

treatment for each includes the use of clot lysis therapy including tissue plasminogen ac-

tivator or tPA. In each case, the lysis therapy must begin as quickly as possible after the

onset of the heart attack or stroke. Thus, stroke and heart attacks and sister symptomatic

manifestations of the same underlying disease – atherosclerosis.

49. Thus the introduction of new risk factor for the development of thromboembolic disease

would naturally suggest the risk factor would affect not just the occurrence of heart at-

tacks, but the occurrence of strokes as well. Because of the same underlying pathophysi-

ology, the warnings received by Merck outlining the potential dangers of rofecoxib ap-

plied to the occurrence of stroke as well.

50. The relatively small number of strokes complicates the epidemiology of risk factor identi-

fication and stroke. Therefore, when the a priori warning about cardiovascular adverse

events associated with rofecoxib was sounded by Fitzgerald, Oates, and Patrono, the

search for stroke adverse events must be especially sensitive diligent since the occurrence

of strokes are themselves not common.

51. In the 1998 Watson report. Table 1 of that report reveals that cerebral infarction, and

cerebral vascular accident, were included as cardiovascular serious adverse events. In the

words of the report (Page 3; C: Cardiovascular Serious Adverse Events). The SAE's cho-

sen were felt to have a high likelihood of representing acute thrombotic events. Table 6

and 7 of that report demonstrate a greater incidence of CV SAE cases in men (relative

risk 1.28) and women (relative risk 2.16). Appendix C of that report reveals that there was at least one patient who had a CVA.

52. Preliminary rofecoxib meta-analysis by Dr. Deborah Shapiro (October 18, 2000) there were 8 cerebral accidents in the rofecoxib group and 9 in the control group (including one hemorrhagic and one lacunar stroke).  However, in that same report, an evaluation of the effect of rofecoxib versus NSAIDS, there were 23 CVA's in the rofecoxib group (11 CVA, 2 hemorrhagic strokes, 9 cerebral vascular strokes, and 1 lacunar stroke) versus only 9 in the NSAIDS group. (7 CVA, 1 hemorrhagic stroke, and 8 ischemic cerebrovascular strokes). This is a remarkably strong signal of rofecoxib-stroke hazard, given the paucity of stroke events.

53. IN VIP (Table 1.12 of the Clinical Study Synopsis), There were five strokes on treatment or within 14 days of study drug discontinuation. However, Table 1.6, which lists events, believed to be related to the drug, there was only one infarction (lacunar) in the rofecoxib group and none in the placebo group. This is unquestionably a small number of events, but it is enhanced sensitivity to these rare events that the sponsor is obligated to pay when there has been adequate *a priori* warning.

54. In the Alzheimer studies (protocol 091, 078, and 126), three fatal strokes occur, versus one in the placebo groups. (Table 2, FDA Cardiovascular data in Alzheimer's studies). This occurred in relatively short-term studies, again manifesting a small but clear increased stroke hazard in patients taking rofecoxib.

55. In the Victor protocol, as stated in the Overview of Cardiovascular Events in the VICTOR Study (Table 1 Summary of Confirmed Thrombotic Cardiovascular Serious AE's by Class of Terms Rofecoxib 25 mg vs. Placebo). There were four ischemic cardio-

vascular strokes observed, 3 in the rofecoxib, and 1 on placebo. The combined endpoint analysis including APTC events revealed the same division (3 in the rofecoxib group and 1 in the placebo group) again, an excess number of strokes attributable to rofecoxib therapy.

56. The published APPROVe study, revealed 22 cerebrovascular events (Table 2, Incidence of Adjudicated Thrombotic Adverse Events). Of these 22 CVA's 15 were in the rofecoxib group, and 7 in the placebo group (hazard ratio 2.32: 95% CI 0.89 – 6.74). The notion of statistical significance means little in this underpowered environment. The only fatal stroke occurred in the patients receiving rofecoxib.

57. While the identification of excess risk can be complex when the number of events is small, a review of the available data reveals consistent excess risk from several Merck sponsored studies. Given the similarities between the pathophysiology of stroke and CVA, a review of the data, consistent with well-established epidemiologic principles reveals that it is more reasonable than not that rofecoxib causes strokes.

# Hypertension

58. The rofecoxib group had a greater proportion of patients with hypertension-related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In the ADVANTAGE study, there were more 15 patients versus 7 patients who discontinued therapy for ischemia hypertension-related adverse events, and 19 versus 12 patients discontinued therapy for edema related events. In addition, in the APPROVe clinical trial, the rofecoxib group had a greater proportion of patients with hypertension

related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10).

# Background Biochemistry

59. ***Biochemistry of COX-2 inhibition***: COX stands for cyclooxgenase. It is an enzyme system that expedites, and accelerates a particular type of chemical reaction in the body. Many chemical actions and reactions in the body must be facilitated in order to proceed. Before we can discuss the role of COX inhibition, we must first understand what enzymes do, and specifically, the remarkable degree of control their presence gives the organism.

60. ***The Role of Enzymes***: While people and governments conduct the affairs of business using money, the body conducts its affairs of living through chemistry. Chemical reactions permit it to feed itself, to grow, to move, to defend itself, and to reproduce. This chemistry is intense and complex.

61. Just as fiscal flow, critical in societal interaction, must be carefully balanced and regulated, so too the intricate chemistry of life must be controlled and monitored. The fact is that chemical reactions, left to their own, would quickly consume all reagents and generate products in unproductive amounts at unhelpful times. Frequently, chemical reactions necessary for life would not take place at all because the chemical environment in the cell or tissue where the reaction is to take place is wrong. (e.g., too little reagent, or not enough acid). In order to bring order to this chemical chaos, the body, over tens of thousands of years, has developed reaction-facilitators. These facilitators are called enzymes.

Specifically, an enzyme is a complex molecule that expedites a chemical reaction. The enzyme is neither consumed nor produced by the reaction. The reaction is facilitated by the mere presence and interaction of the enzyme.

62.     The human body has tens of thousands (and perhaps many more) of such enzyme complexes. Many of these systems have been studied for generations, e.g., the Kreb cycle, which is the process by which glucose (sugar) is converted in the presence of oxygen to chemical energy, with water and carbon dioxide as byproducts. There are over ten different chemical reactions that must take place and each of them is facilitated by enzyme system.[*] Without it, organized energy production in living tissue would fail.

63.     ***The Prostaglandin System***: A prostaglandin is a molecule. Specifically, it is a collection of fatty acids (approximately twenty of them) attached to a five-membered ring. Their main function (as best understood at this time) is to function as messengers; their presence initiates a series of other chemical reactions. For example, one signal that prostaglandins send is the need for an inflammatory response. The injured body part notifies its constituency that a self-protective, inflammatory reaction is necessary by synthesizing prostaglandins. Inflammation is commonly and most productively a protective response of the organism, commonly producing increased blood flow to the site of inflammation, an immune response, and pain.

64.     A second function of prostaglandins is to mediate the propensity of blood to clot. The tendency of blood to clot must be carefully balanced. Blood that does not clot loses the ability to repair damaged blood vessels that are commonly injured or worn down in the

---

[*] Some of these enzymes are hexokinase, aldolase, dihydrolipoyl dehydrogenase, pyruvate kinase, and dihydrolipoyl transacetylase.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    5/22/2006

process of daily living.[*] Blood that does not clot quickly enough leads to a painfully de-

bilitating and short life, as revealed by the natural history of patients with untreated he-

mophilia. Alternatively, blood that is too likely to clot (i.e., it exists in a hypercoagulable

state) leads to blood clots forming where they are neither required nor helpful. Such clots

can break off, be carried though the blood stream, and lodge in small (and sometimes

large) vessels. The blockage of blood flow leads to death of the tissue that relies on the

blood flow, now impeded by the clot. The results of these clots are pulmonary embolisms

(if the arteries to the lungs are blocked), and heart attacks (if a coronary artery, a vessel

supplying the cardiac muscles own blood supply is blocked) or strokes (if the blood sup-

ply to the brain is blocked). Platelet aggregation is one of the precipitating mechanisms in

producing a myocardial infarction by producing a blood clot in a vessel that directly sup-

plies the heart with oxygen. This pro-clotting process can trigger the cascade of events

that produces a heart attack.

65.   The mechanism by which blood clots is one of most studied and complex biochemical

mechanisms known, and a detailed discussion of this complicated system, involving liter-

ally hundreds of reagents, enzymes, and coenzymes is beyond the scope of this report.

The relevant component here is the compound thromboxane $A_2$. One effect of pros-

taglandins are that they stimulate hemostasis through up-regulation of thromboxane $A_2$,

increasing platelet adhesion and aggregation. Thus the production of prostaglandin, ac-

cording to this theory, increases the coagulability of the blood.

66.   In addition, prostaglandins control the protection of the sensitive stomach lining from an

attack on it by the acids and caustic digestive juices produced by the stomach needed to

---

[*] The body has over 100,00 miles of blood vessels, most of them too small to see. There are frequently hourly tears
in these blood vessels that must be immediately repaired.

digest food. Prostaglandins are involved in the regulation of these systems (and most likely, many, many more).

67. Prostaglandin production is controlled in part by the cyclooxgenase, (COX) enzyme system. By stimulating COX, *ceteris paribus*[*] prostaglandin synthesis is increased. Repressing or inhibiting COX decreases prostaglandin synthesis.[†] We might then expect that a COX inhibitor, by down regulating COX and thereby reducing prostaglandin synthesis would 1) decrease pain and inflammation, 2) reduce blood coagulability (since prostaglandins up regulate thromboxane $A_2$), and 3) decrease the ability of the stomach to protect itself. This is precisely what the traditional non-steroidal inflammatory agents (NSAIDS) do.

68. These NSAIDS, (e.g. ibuprofen and naproxen) are general or nonselective COX inhibitors[‡] and have been available for approximately thirty years. They have well known clinical characteristics. While widely accepted as having generally effective analgesia, or pain control. However, since the mechanism of pain control is based on inhibiting COX, and thereby reducing prostaglandin synthesis, they reduce gastric mucosal protection. This reduction is associated with the production of gastric ulcers, gastric obstruction, and gastrointestinal bleeding, all symptoms of erosion of the gastric mucosa. It has been estimated (MK-966 Cox-2 inhibitor product development plan stage 0 review MRK-NJ0220388 page 8, Introduction and Program hypothesis ) 76,000 patients are hospital-

---

[*] This is a critical insertion. In a complicated biochemical system, any assertion about the response of a system when a component is changes assumes everything else in the system is constant.
[†] Aspirin controls pain and inflammation because it blocks prostaglandin synthesis. With a reduction in prostaglandin synthesis, the inflammation signal is not sent, and the production of pain is reduced.
[‡] We will see later that even these broad COX inhibitors have different abilities to repress different aspects of the COX system.

ized each year, and that over 7,600 patients die each year in the United States alone as a result of NSAID associated gastrointestinal events.

69.   However, there is a huge population of patients who have been exposed to the traditional NSAIDS for over thirty-five years. The number of patients with severe gastrointestinal illnesses and deaths is actually a relatively small proportion of patients taking traditional NSAIDS.

70.   **_COX-1 and COX-2_**: Continued research on the COX system led to the identification of a bifurcated system. It is now believed that there is not one but two COX systems regulating the production of prostaglandins, identified as COX-1 and COX-2.  Each metabolize arachidonic acid to prostaglandin $PGH_2$, which is the intermediate step in the synthesis of prostaglandins and related compounds known as prostanoids.

71.   It is important to understand the role of these two COX systems to appreciate the advantage and difficulties produced by differential COX inhibition. The currently accepted view is that the COX-1 system is a constitutive system, i.e., it is always active, with the enzyme present in high concentrations within tissues including platelets, vascular endothelium (the special cells that make up the inner layer of blood vessels), gastric epithelial cells, and cells in the kidney (renal parenchyma). The prostanoids produced by the COX-1 system increase stomach-lining protection, and increase the coagulability of the blood.

72.   Alternatively, the COX-2 system is not always active, but is induced by inflammation. It produces the prostaglandin that sends the inflammatory signal, thereby inducing the cycle of increase blood flow, immune response and pain. It has also been learned that COX-2 also produces prostacyclin $PGI_2$ that is an anti-aggregator and a vasodilator.

73. Thus, it was believed, that just as NSAIDS were developed to block all COX activity, that further refinement of medical therapy could produce a COX-2 inhibitor. Such a therapy, it was felt, would reduce the inflammatory response, while leaving vascular coagulability unchanged and the protective gastrointestinal lining intact.

74. Early Investigation of the COX-2 inhibitors: The true effects of a therapy emerge over time, where the speed at which knowledge is gained is related to the experience of the medical community with the therapy. Pre-approval studies of the COX-2 inhibitors revealed definite efficacy, but minimal benefit above and beyond the medications that were already available. However, when evidence of harm emerges, however inconsistently, regardless of whether it appears in either the pre-marketing or post-marketing environment, the burden of proof shifts. Specifically, the appearance of harm requires that the sponsor 1) look for definitive evidence of harm in an ethical way and 2) acknowledge that the risk-benefit balance is beginning to change as evidence of new risk emerges. This requires greater efficacy to offset the greater risk. The threshold of significance for harmful effects is much less extreme than that for determining efficacy.

75. Undoubtedly, exploratory analyses demonstrating harm may not be generalizable. However, the ethical credo of "First do no harm," requires a patient protective response to this potential new hazard. An appropriate response includes but is not limited to 1) additional analyses that can, in an ethical fashion, determine if the initial finding represents a result that can be generalized to the population at large, and 2) an immediate recalibration of the risk-benefit balance, tipping this balance in the direction of greater harm.

76.   The requirement of these ethical responses neutralizes the assertion that exploratory analyses demonstrating harm can be ignored. The need to protect populations from harmful effects must not be blocked by concerns for statistical significance.

77.   What is most convincing is the consistency of findings across the breath of studies involving rofecoxib. The repeated findings of elevations of cardiovascular thrombotic events associated with rofecoxib use, regardless of dose or duration of use, that strengthen the argument that rofecoxib causes these serious adverse events.

78.   The identification of compounds that have an increased differential inhibition of COX-2 was heralded as a major step forward in pain control, allowing the patient to obtain effective analgesia while avoiding the difficulties long known to be associated with COX-1 inhibition. However, it was also recognized early in the development of COX-2 inhibitors that, by not inhibiting the COX-1 system, a pro-aggregatory effect might be produced. Even though, early in vitro studies showed that the COX-2 inhibitor rofecoxib did not inhibit platelet aggregation or prolong bleeding time when administered to health volunteers, the 1998 Scientific Advisory Committee served notice to Merck that the effect of Cox-2 inhibitors on the cardiovascular system might be harmful. Findings supported the idea that the COX-2 inhibitors were not necessarily thrombogenic.

79.   However, although 800 mg of celecoxib (a COX-2 inhibitor), did not alter levels of either serum $TXA_2$ or its urinary metabolites, a modest reduction in serum $TXB_2$ (a metabolite of $TXA_2$) was observed, suggesting that COX-2's might engender a coagulable state (i.e., make the blood more likely to clot). The balance between $TXA2$ (a platelet aggregator promoted by COX-1) and $PGI_2$ (which counteracts platelet aggregation, modulated by COX-2) requires attention at this point. The difference can be elucidated by the effect of

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    5/22/2006

aspirin. COX-1 is selectively inhibited by low-dose aspirin in activated platelets.[*] How-
ever, since COX-2 activity is preserved in the presence of aspirin, and the produced $PGI_2$
decreases blood coagulability, the effect of aspirin is to shift the haemostatic balance to
an anti-thrombotic state.

80. Thus, inhibition of COX 2 suppresses $PGI_2$ formation, blocking the anti-aggregatory ef-
fect of $PGI_2$, making the blood more coagulable. This effect should attenuate the anti-
aggregatory effect of aspirin. In mechanistic animal studies, the beneficial effect of aspi-
rin was blocked by celecoxib. In addition, the vasodilator effect of $PGI_2$ derived from the
endothelium of the coronary vessel and vasodilatory response to application of arachi-
donic acid was reduced significantly when compared to controls [7]. Because of these re-
sults, the authors expressed concern regarding the possibility of an increased risk of acute
vascular events in patients receiving COX-2 inhibitors, especially in individuals with un-
derling inflammatory disorders, including coronary artery disease. This bolstered the
theoretical argument that COX-2 inhibitors might increase the likelihood of serious
thrombotic adverse events.

81. The scientific motivation for this prescient concern is clear. COX-2 inhibition would re-
duce the anti-thrombotic effect of PGI2. By not suppressing COX-1, the thromboxane $A_2$
activity would proceed, tipping the hemostatic balance to a procoagulation state.  How-
ever, the interaction between the COX enzyme system and hemostasis is complicated by
the different potencies that the COX-2 inhibitory agents have on COX- inhibition, i.e.,
COX-2 inhibitors can also be COX-1 inhibitors. In one study, the COX inhibitors were
directly evaluated for their differential COX-1/COX-2 inhibitory activity. The main aim

---

[*] This occurs by acetylation of the hydroxyl group of a serin residue near the COX active site. Aspirin's COX-1 in-
hibitory action persists for the lifetime of the platelet. Recovery of the effect is strictly a function of platelet turn-
over.

of this investigation was to clarify the possible effect that various COX-2 inhibitors might have on the aggregatory propensity of blood. The researchers found that the COX-2 inhibitors had widely variable selectivity for COX-1 inhibition. Rofecoxib as well as the newer agent etoricoxib (brand name Arcoxia®) have the smallest effect against COX-1. Hence they are closer to "pure COX-2 inhibitors". Alternatively, celecoxib (brand name Celebrex®) had more COX-1 inhibitory activity, and is a less pure COX-2 inhibitor.

82. In addition an effect of platelet aggregation with possible clinical significance was suggested by observations of elevated prothrombin times and bleeding episodes with concomitant use of celecoxib and warfarin in a patient with pre-exiting cardiovascular disease [8]. In addition, there were reports of patients with connective tissue disorder who developed arterial thrombosis after initiation of celecoxib therapy [9]. An FDA assessment of the pre-approval data led to their acknowledgement that there was a possibility that COX-2 inhibitors could cause thromboembolic disease. The conclusions from these pharmacological studies and other experimental evidence lent credence to the view that selective COX-2 inhibition reduces synthesis of $PGI_2$ and may promote a pro-aggregatory state before rofecoxib was approved.

## Inadequate Testing

83. The potential cardiovascular risks of Vioxx were apparent well before the drug was approved, and Merck was aware of these dangers. Their testing program was inadequate.

84. On September 12, 1996, before rofecoxib was approved, a memo from Dr. Randall to the Cox-2 Team, on page 6 stated, "Another SAE (severe adverse event) of unstable angina was reported in extension to RA (rheumatoid arthritis) study. The vascular AE's are expected since COX-1 is not inhibited". This memo demonstrates that Merck appreciated

not just that cardiovascular serious adverse events could be anticipated with rofecoxib, but that they understood the mechanism by which they would be produced. They accepted the causal link between rofecoxib and cardiothrombotic adverse events before the drug was approved.

85.   On Thursday, October 10, 1996, before rofecoxib was approved, a review of protocol 017 was described (MRK-ABC0048706). In this review the following statement appears "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure), documenting the potential for cardiovascular adverse effects caused by rofecoxib."

86.   On November 11, 1996, before rofecoxib was approved, Dr. Musliner anticipated that there would be 25% more adverse cardiovascular events with rofecoxib (Memo: Subject-Anticipated consequences of NSAID anti-platelet effects on cardiovascular events and effects of excluding low-dose aspirin use in the Cox-2 GI Outcomes Megatrial – Page 5.). Dr, Musliner also stated the rofecoxib-induced increased cardiovascular event rate might be expected "due to the absence of anti-platelet effect for the selective Cox-2 inhibitor," and "would create a negative aspect to the results and leave open the question (reasonable or unreasonable) whether the drug might in some other way be contributing to such events." The concern about an increased cardiovascular adverse event profile was well established years before the drug was approved, requiring adequate testing.

87.   However, rather than design a clinical trial that was designed to fully elaborate the risks and benefits of rofecoxib, Merck designed VIGOR to underestimate the true risk rofecoxib for increasing cardiovascular events. A concern about possibility of rofecoxib

caused an increase in CV events and  "you will get more thrombotic events and kill drug." a prescient concern that time demonstrated was the fact of the matter. Dr. Reicin in a later email that day provided an unethical solution, actively considering "the idea of excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" This was a deliberate attempt to confuse the medical community about the potential cardiovascular risk associated with rofecoxib. The only concern about this unethical thought process was not that the medical community would be mislead, but "would we be able to recruit any patients?"   A following email form Brian Daniels (February 26, 1997) stated "It is clear to me that the program will be severely hurt if a megatrial shows a win in PUB's and a loss in MI/CVA." Thus VIGOR was designed not to demonstrate the true benefits and risks of the therapy, but to understate the risks while magnifying the benefits. VIGOR's configuration was crippled, designed to deceive the medical community.

88.  On October 24, 1997, before rofecoxib was approved, Dr. Fitzgerald emailed Dr. Nies, in which Dr. Fitzgerald made specific recommendations for further cardiovascular studies based on the concerns for the effects of Cox-2 inhibitor therapy.

89.  On October 27, 1997, in a letter from Dr Oates to Dr. Nies, Dr. Oates warned of the mechanism by which Vioxx could produce adverse events and proposed additional testing. Specifically, Dr. Oates made suggestions on how to study the effects of rofecoxib on prostacyclin biosynthesis in order to determine whether an imbalance is created between prostacyclin and thromboxane-A2.

90.   On February 2, 1998, before rofecoxib was approved, Dr. Watson's final results on the analysis of cardiovascular SAE's in the Phase IIb/III Vioxx osteoarthritis clinical trials was received. This was a detailed analysis demonstrating that rofecoxib produced more cardiovascular events in the VIOXX program This analysis demonstrated that the incidence ratio of cardiovascular serious adverse events was 19.4/1000 in men and 15.5/1000 in women. The overall incidence rate for women was elevated when compared to FOSAMAX controls with a relative risk of 2.16 and a 95% confidence interval of 1.14 – 3.94. On page 2, the description of the results of protocol 023 states, "These findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events) page 2. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's than the placebo group in protocol 010 (page 1 following executive summary). The next sentence which states there is no evidence of an increased incidence of such events ignores the findings from protocol 010. This analysis revealed a signal to Merck that the thromboembolic events whose occurrence was anticipated by the understanding by which rofecoxib worked. Given the *a priori* concern about the relationship between rofecoxib and cardiovascular events, this was clear signal that Merck missed.

91.   The inappropriate interpretation of the Watson report reveals a substantial, persistent inconsistency in Merck's philosophy toward rofecoxib-induced cardiovascular events. From 1996-98, their were well documented points at which Merck receives advice about the likelihood that rofecoxib produces cardiovascular events. Clearly Merck absorbed this message because it was repeated by key Merck personnel. Merck's understanding of this

threat to rofecoxib was complete enough for them to distort the design of VIGOR, ex-
cluding patients who were at high risk of cardiovascular events. However, when the
threat becomes reality, as in the Watson report, where almost all age-gender groups mani-
fest excess cardiovascular serious adverse events in patients taking rofecoxib, revealing
the relationship that Merck has been educated to fear, its scientists turn a blind eye to the
results. It is this reaction that governs Merck's perspective on the rofecoxib-CV event re-
lationship.

92.   From May 3 – May 6, 1998, the Science Advisory Committee to Merck reviewed the Vi-
oxx program. They wrote that there were significant safety risks with Vioxx. On page 11,
they stated that the possible harmful effects of Cox-2 inhibition could be produced by a
combination of three mechanisms 1) development of lipid-rich plaques in the coronary
arteries, 2) plaque cap destabilization, making them rupture prone, and 3) thrombotic oc-
clusion of the vessel at the rupture site. They further warned Merck, before rofecoxib was
approved, that more information is needed to address these questions related to the possi-
ble influences of a COX-2 inhibitor on coronary morbidity and mortality.

93.   On May 20, 1998, before rofecoxib was approved, Dr. Watson convened a meeting of the
Cox-2 cardiovascular SAE Surveillance Task Force. During the introduction to the meet-
ing, he states, "these findings raised concern about the potential for VIOXX to predispose
to thrombotic cardiovascular (CV events).

94.   On September 9, 1998, before rofecoxib was approved, Dr. Patrono wrote a letter to Dr.
Laurenzi at Merck, in which Dr. Patrono warned of potential CV issues with rofecoxib,
suggesting that more tests are required. Specifically, he said (page 1), speaking about
Cox-2 inhibitor effect, "I would like to emphasize that this is likely to be but one of sev-

eral facets of the potential cardiovascular implications of Cox-2 expression and inhibition." In addition, he said (page 2), "Because companies making non-selective Cox-2 inhibitors are likely to emphasize the cardiovascular implications of specific Cox-2 inhibitors, I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

95. On September 29, 1998, before rofecoxib was approved, Dr. Nies penned a handwritten note in which he tells Dr. Oates and Dr. Patrono that Merck will not do the kinds of studies that the two experts have proposed to explore the cardiovascular risks of rofecoxib. He anticipated that the drugs would become available without the need for the safety testing Drs. Oates and Patrono warned were so necessary.

96. This body of information demonstrates that before rofecoxib was approved, the mechanism by which it produced harmful cardiovascular events had been elucidated, and signals of cardiovascular events had occurred. Merck's pre approval testing program was incomplete.

97. On May 20, 1999, the month Vioxx was approved, the FDA Medical Officer Review reflected concern about rofecoxib's cardiovascular risk. He noted that the cardiovascular trends and that a larger databases was needed to assess CV safety. He also commented on the relatively small number of patients that Merck exposed to Vioxx prior to approval.

## Clinical Studies

98. Clinical Studies: When considering the evidence to support or disprove a hypothesis, one must consider the quality of evidence available on the subject matter. Randomized controlled trials are generally accepted as the gold standard for assessing efficacy of medicines, a justifiable conclusion assuming that the clinical trials were well conducted and

executed according to their prospective plan However, not all hazards can be identified from these types of studies, or from studies conducted before the compound receives final regulatory approval.

99. Rofecoxib was approved by the FDA based on several pivotal, short-term studies. These short-term studies followed patients for three to six months. Furthermore, these studies did not study definitive clinical endpoints (gastric ulceration that was visualized using endoscope.) Additionally, these short-term studies made no important contribution to the understanding of the long-term hazards of these drugs. In the absence of this information, large post marketing efficacy studies have become the foundation of the assessment of the long-term hazard produced by COX-2 inhibition.

100. The concern that increased cardiovascular risk may be associated with use of COX-2 inhibitors arose from two sources; case reports of patients with connective tissue disease who developed arterial thrombi after starting celecoxib, and a small clinical study (Protocol 090) which confirmed the suspicions of the 1998 Merck Scientific Advisory Panel. The presaging comments of the Scientific Advisory Panel are critical. Presence of cardiotoxic effects that appears in subsequent clinical trials carries greater weight in the presence of the prospective statement that the risk may be present. The *a priori* concerns about the possibility of risk does not permit the researcher do discard the result as a random, non-meaningful, and non-generalizable one based only on sampling error.

101. ***The VIGOR Trial***: The VIGOR trial was designed to evaluate the effect of rofecoxib versus the competing NSAID naproxen on the event rate of serious gastrointestinal disease. In the manuscript describing its results [10], the investigators examined just over 8000 patients with rheumatoid arthritis who were assigned to either of these two agents ran-

domly. The primary endpoint for the principal analysis of the study was the combined endpoint of perforation, obstruction and severe upper gastrointestinal bleeding.

102. The evaluation of this endpoint demonstrated 121 confirmed upper gastrointestinal events in the naproxen group (3.0%) and 56 (1.4%) in the rofecoxib group, reflecting a 50% reduction, with a *p*-value < 0.001. This trial demonstrated using acceptable methodology that the COX-2 inhibitor rofecoxib could reduce the incidence of upper gastrointestinal events compared to a nonselective COX inhibitor.

103. The rate of myocardial infarction was greater in the rofecoxib group than in the naproxen group (0.4 percent to 0.1 percent, relative risk 0.2, 95 percent confidence interval 0.1 to 0.7). This bald reversal in the computation of the relative risk[*] fails to hide the fact that rofecoxib was associated with a substantially greater incidence of myocardial infarction. Additionally, thirty eight percent of these patients should have been taking aspirin based on clinical indications; this subset of patients was an increased risk of having a myocardial infarction.[†]

104. Fortunately, a separate analysis of adjudicated cardiovascular events from the VIGOR study [11] provided a detailed evaluation of the overall serious adverse events data (death, hospitalization or extension of hospitalization, and/or any life-threatening events or serious disability). This evaluation revealed that the majority of the thrombotic events

---

[*] At this juncture, it must be pointed out that the reporting of these adverse event results in VIGOR was unusually insipid. The benefit of therapy was stated in a way that was beneficial to the sponsor (i.e. relative risk for GI injury is less than 1, illustrating a benefit of rofecoxib), yet the harmful effect of rofecoxib on the myocardial infarction rate is stated not as an elevated relative risk, but again as a relative risk less than one. This is inconsistent, misleading, and produces unnecessary and predictable confusion if one tries to weigh risk vs. benefit of rofecoxib in this population. In addition, the numbers of patients with heart attacks are not reported, a frankly glaring and shocking omission in a manuscript purporting to make a contribution to the modern clinical literature. The investigators were supported by Merck as stated on page 1527 of the manuscript) and all parties must share responsibility for this singularly misleading and meretricious description of cardiovascular adverse events.
[†] Patients were permitted to take low dose aspirin when this result was revealed at the end of the study.

were myocardial infarctions (MI) (rofecoxib 20, versus naproxen 4). This produces a relative risk of 5. Of the serious vascular adverse events meeting criteria for adjudication, twice as many cases were reported for rofecoxib than for naproxen (n=65 1.6% versus 33 (0.8%).   Stratification according to aspirin (indicated or not indicated) and use of the standard APTC combined endpoint revealed a higher risk of MI in the rofecoxib group when compared to naproxen (the use of combined endpoints in clinical trials is expatiated in the Appendix). Additionally, the risk of serious thrombotic events was greater in the rofecoxib group than the naproxen group. The examination of time to event was particularly revealing, demonstrating a clear divergence of the survival curves after starting treatment (within 2 months), persisting during the remainder of the study period (log rank test result not reported).

105. The conclusion of the adjudication for the VIGOR study was that a significant difference was seen in the comparison of stroke, MI and cardiac death that was unfavorable for rofecoxib vs. naproxen. The VIGOR study was designed to illuminate the relationship between the use of rofecoxib and the incidence of gastrointestinal illness, and was not planned to be a definitive evaluation of the relationship between rofecoxib and myocardial infarction. However, the demonstration of a potential public health hazard for the millions of patients taking COX-2 inhibitor therapy cannot be lightly dismissed. Thus the findings of VIGOR confirmed the findings of Protocol 90, demonstrating and computing the magnitude of the risk associated with rofecoxib.

106. It should be noted that the drug was approved in 1999 on the basis of data submitted to the FDA, the results of VIGOR were not published until November 2000, one and a half

years after commercial approval had been granted. In addition, the cardiovascular data reported in that article were incomplete.

107. A clearer evaluation of the VIGOR cardiovascular results is provided in the Merck cardiovascular update from VIGOR from Deborah Shapiro to Drs. Alise Reicin, Eliav Barr, and Dennis Erb on July 5, 2000. In addition, Figure 1 of this document demonstrates a clear separation in the Kaplan- Meier time to event curves for confirmed thromboembolic cardiovascular serious adverse events in VIGOR demonstrating the increased risk of thromboembolic events on VIGOR when compared to Naproxen occurred early in follow-up (less than two months of follow-up time). Table 3 demonstrated 47 thrombotic events in 4047 patients takes rofecoxib (1.2%) versus 20 thrombotic events in 4029 patients (0.5%), excess risk associated with rofecoxib. A review of adjudicated cardiovascular events (Table 4, revealed 45 events in 4047 patients (1.67 per 100 patient years) in patients treated with rofecoxib, 19 in 4029 patients on naproxen (0.70 per 100 patient years. The relative risk of events in rofecoxib group to those in the naproxen group is 1/0.42 = 2.38 and 95% CI is 1/0.72 – 1/0.25. or 1.39 to 4.00, based on the Cox analysis results from Table 4.

108. Neither the VIGOR authors nor the sponsors updated the data in the article that appeared in the New *England Journal of Medicine* in November 2000 with the new safety data, a critical ethical omission. Even if one accepts that the occurrence of the three additional heart attacks did not occur before a pre-specified data cut-off date, the three events were known in August 2000, several months before the appearance of the manuscript in the New England Journal of Medicine in November 23, 2000. It would have been easy for the investigators to add a statement in this manuscript, acknowledging the three addi-

tional cardiovascular adverse events, and in addition, providing additional computations for the updated risk of cardiovascular events caused by rofecoxib. *The New England Journal of Medicine* was concerned enough about this omission that they published an Expression of Concern [12].

109. Since it is unethical to deliberately expose patients to risk without a clear and overwhelming expectation of benefit, other studies have to be examined for evidence of harm. The best evidence for a harmful effect must come from reproducibility, i.e. consistency of the finding. This is particularly compelling if the mechanism of harm has been clearly elucidated, as has been clearly elaborated in the preapproval evaluations of the COX-2 inhibitors.

110. The overall conclusion from this FDA report was that there was an increased risk of thromboembolic events particularly MI in patients exposed to rofecoxib compared with naproxen. Unfortunately, the absence of a placebo group precluded an assessment of the absolute risk of rofecoxib. Although only the MI result was published in the main paper, the FDA report clearly showed a higher risk of serious thrombotic cardiovascular events for rofecoxib in both aspirin indicated and non-indicated patients when compared with naproxen [13]. It is surprising that the coded cardiovascular analysis was not published in the VIGOR main paper, especially since the coding necessary for cardiovascular adjudication was available to the sponsor before VIGOR was published [14].

111. ***Possible Protective Effect of Naproxen***: One possible explanation for the findings of the VIGOR trial was that undue attention was paid to the relationship between rofecoxib and cardiovascular disease. The proponents of this thesis argue that it is not that exposure to

rofecoxib increases the risk of cardiovascular disease, but that the control therapy naproxen decreases the risk of this class of illnesses.

112. However, this idea was not accepted before VIGOR in the many years during which this drug was on the market. Specifically, while data from randomized controlled trials have documented that aspirin is an effective anti-thrombotic agent for primary as well as secondary prevention of thromboembolic events, trials evaluating the effects of nonselective NSAIDS on the occurrence of cardiovascular disease have not affirmed there own purported benefit; the findings are inconclusive. In these trials on nonselective NSAIDS, the question of whether the degree of COX-1 selectivity (known to vary from drug to drug) translated into clinically detectable cardiovascular protection (as is achieved by aspirin with its characteristic irreversible inhibition of COX-1) has not been addressed.

113. A review of four epidemiologic studies with different designs and populations suggesting no overall effect of nonselective NSAIDS including naproxen [15]. The results of this review included prepublication material from Ray which itself was subsequently published in full [16]. The authors concluded that none of the NSAIDS included in the study should be used for cardioprotection.

114. Even though Merck argued that the cardiovascular effect in VIGOR could be explained by the beneficial effect of naproxen, and email from Dr. Reicin to Dr. Scolnick revealed that Dr. Scolnick was in "minor agony" over the issue, and that he wanted a cardiovascular study. Dr. Scolnick was not convinced that naproxen "benefits" explained the VIGOR findings. However, even after outside consultants advised Merck to do a CV study (in an email from DiBasttiste to Exposito on March 9, 2002), the study was not carried out.

115. ***ADVANTAGE***: This clinical trial compared the use of rofecoxib 25 mg to naproxen 500 mg bid in patients with osteoarthritis. This twelve week controlled study recruited 2700 patients to each arm of the trial. The study showed no safety advantage of rofecoxib over naproxen, and demonstrated a trend of excess serious cardiac thrombotic events in the rofecoxib group.   There were five myocardial infarctions, two anginal events, and three sudden deaths in the rofecoxib group and one MI and two anginal events in the naproxen group. In addition, more patients (40 versus 21) discontinued rofecoxib than naproxen therapy for cardiovascular related adverse events. Finally, 15 versus 7 patients discontinued for hypertension related events, and 19 versus 12 patients discontinued therapy for edema related events. The striking increase in number of cardiovascular events is particularly striking since the study was only a twelve-week trial and 25 mg of rofecoxib (half the dose used in VIGOR) was used. (Villalba ML. Food and Drug Administration – Division of Anti-inflammatory, Analgesic, and Ophthalmic Drug Products HFD-550. Medical Officer Review End of Review Date 11-18-2001.

116. ***VICTOR***: The VICTOR Study (Protocol 145), a study designed to determine whether rofecoxib could help prevent the recurrence of colon cancer, recruited and reported on 1217 patients in each of the placebo and rofecoxib groups. In Table 1 of the Overview of the Cardiovascular Events in the VICTOR Study (Reports Received by Merck as of 31-May-2005), there were 14 patients who had confirmed cardiovascular serious adverse events in the rofecoxib group and 4 patients in the placebo group. In Table 2 of the same report, when patients were classified by the occurrence of the APTC endpoint, there were 9 patients who reached the APTC endpoint, and 3 in the placebo group.   Most importantly,

the Kaplan-Meier curves demonstrated an early separation between the event rates of these events between the two groups.

117. **VIP**: VIP- Protocol 201 was designed to determine if rofecoxib 25 mg could help prevent prostate cancer. The study recruited 4741 patients of the anticipated 15,000-sample size. The study was approved on May 4, 2004, but was terminated prematurely due rofecoxib's withdrawal from the market. There were 13 myocardial infarctions in this study 7 in the rofecoxib group, six in the placebo group. There were 26 vascular disorders in the rofecoxib group and 10 in the placebo group, and 19 patients in the rofecoxib group and 2 in the placebo group. When the analysis is restricted to specific drug related clinical adverse experiences (incidence $\geq 0.0\%$ in one or more treatment groups, there were 9 in the rofecoxib group and 4 in the placebo group. Five cases of coronary artery occlusion/myocardial infarction/ischemia/silent myocardial infarction occurred in the rofecoxib group. There were none in the placebo group. There were nine APTC events in the placebo group and eight in the rofecoxib group, respectively

118. **Alzheimer studies**: The Alzheimer studies (Protocols 078, 091, and 126) revealed excess deaths in patients on rofecoxib when compared to placebo. In 078, there were 13 deaths in rofecoxib compared to 7 on placebo. (8 versus 2 cardiovascular deaths on/off drug). In protocol 091, there were 9 rofecoxib deaths to 2 placebo (6 versus 4 cardiovascular deaths on/off drug), and in protocol 126 there were 3 rofecoxib deaths versus 3 placebo (2 rofecoxib cardiovascular deaths, versus 2 placebo on/off drug).

119. **APPROVe**: The APPROVe study [17] must be set apart from VIGOR and CLASS in that the evaluation of COX-2 inhibitor exposure and cardiovascular disease was prospectively declared and the analysis prospectively planned. APPROVe was designed to provide a

confirmatory and therefore more definitive evaluation of COX-2 use and cardiovascular disease.

120. The principal goal of the Adenomatous Polyp Prevention on Vioxx (APPROVe - Protocol 122) Trial was to determine the effect of a 36-month course of rofecoxib therapy on the risk of recurrent Adenomatous polyps in patients at risk of colorectal adenomas. Men and women at least 40 years of age were eligible if they had one large bowel adenoma and were not anticipated to need long-term NSAID therapy including aspirin (thus patients taking aspirin were excluded from the study). However, patients recruited after VIGOR's findings were announced were permitted to take low dose aspirin for cardiovascular protection.

121. Patient with 1) hypertension, 2) history of a myocardial infarction, 3) coronary angiography, 4) recent history of congestive heart failure (CHF), 5) bypass surgery within the previous year, or 6) stroke or TIA within the previous two years were excluded, thereby excluding patients who were at higher risk of myocardial infarction or other thromboembolic phenomena. This exclusion criterion served in the long run to protect patients from the potential thrombogenic effects of COX-2 inhibitors, but it also reduced the number of events in the study, under powering any determination of the relationship between COX inhibition and thrombotic cardiovascular disease. The inclusion of a six-week run-in period permitted physicians to assess patient compliance with therapy. During the randomization period, 1287 patients were assigned to rofecoxib 25 mg/day, and 1299 assigned to placebo. The trial was terminated two months before its scheduled end.

122. The evaluation of the relationship between COX inhibitor therapy and thrombotic events was a prospectively declared evaluation of the study. Thrombotic events included fatal

and nonfatal myocardial infarction, unstable angina, sudden death from cardiac causes, fatal and nonfatal ischemic stroke, transient ischemic attack, peripheral arterial thrombosis, peripheral venous thrombosis, and pulmonary embolus were measured. However, the endpoint used was the APTC combined endpoint (i.e., death from cardiovascular, hemorrhagic, and unknown causes, nonfatal myocardial infraction, and nonfatal ischemic or hemorrhagic stroke. Monitoring and analysis were prospectively declared.

123. During the trial, there were more patients discontinued from rofecoxib than placebo due to adverse events. When the trial ended, patients in the rofecoxib group had an increase risk of confirmed thrombotic events. Specifically, there were 46 patients in the rofecoxib group that had confirmed thrombotic events, versus 26 patients in the placebo group. (RR 1.92, 95% confidence interval 1.19 – 3.11, $p$ =0.008). The risk for cardiac events (RR 2.80 95% CI 1.44-5.45) and cerebrovascular events (RR 2.80, 95% CI 1.44 – 5.45) was substantially higher. Representing substantial risk

124. Even though the increased risk was seen throughout the duration of follow-up in AP-PROVe, some have posited that the harmful thromboembolic does not emerge until after patients have been followed for longer than 18 months.

125. This conclusion is epidemiologically unsound for several reasons. First, the evaluation of the putative 18-month effect is the result of a subgroup analysis. Subgroup analyses, i.e., the process by which an effect in the overall cohort is adumbrated by effects in subsets of the patient has been shown to be unreliable. The findings in the ELITE trials demonstrate the misleading conclusion drawn from subgroup analyses (discussed in the Appendix of this report).

126. The "eighteen month analysis is based on an improper subgroup. A proper subgroup is a subgroup whose membership cannot be ascertained at baseline. These analyses have been debunked by Yusuf [62].

127. In addition, analyses based on a sub-cohort have a small number of events. The absence of cardiac events makes it difficult to identify an isolated effect with statistical regularity. Thus the absence of statistical significance is not due to the lack of an effect, only due to the inability to have enough events to identify the effect. This is the heart of the admonition "the absence of evidence is not evidence of absence."

128. Third, there is no plausible explanation in the literature to explain why an effect whose mechanism (differential effect on prostanoid synthesis), an effect that is observed within several half-lives of Cox-2 inhibitors should require eighteen months to manifest itself. It does not take eighteen months to observe the analgesic activity it is not biologically plausible that eighteen months would be required to observe the cardiovascular toxicity, and the idea is epidemiologically incoherent.

129. Finally, the suggestion that the harmful cardiovascular effect requires eighteen months of exposure is inconsistent from the Sponsor's own data. The VIP trial, a part of Protocol 203, assessing the effect of rofecoxib in patients with prostate cancer demonstrated cardiovascular toxicity that emerged in less than one month of exposure.

130. In addition, the examination of investigator reported events demonstrates early separation of the cardiac event rates at approximately three months of follow-up (MRK-AHK0075759)

131. In addition, deeper analysis of the APPROVe data demonstrates that cardiovascular toxicity emerges early in patients who are at higher risk of cardiovascular disease. The rela-

tive risk in the rofecoxib group compared to placebo was 9.59 (95% confidence interval 1.26 to 416 for patients with a history of cardiovascular disease. It was also elevated among diabetics (6.10: 95% confidence interval 1.36 to 56.1). An evaluation of the AP-PROVe cardiovascular safety data revealed that there was early separation of the event curves when investigator reported cardiovascular events were considered. Thus, the most robust conclusion from APPROVe is that cardiotoxicity is apparent, and appears early.

132. In addition, the rofecoxib group had a greater proportion of patients with hypertension related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In 1998, one of the fears voiced by the Merck Scientific Advisory Panel was that Cox-2 inhibitors could accelerate atherosclerosis. This would occur by fostering the development of lipid rich plaque or the destabilization of the plaque's fibrous cap. In 2004, Dr. FitzGerald wrote an article entitled Coxibs and Cardiovascular Disease [18]. On page 1711 of that manuscript, he stated. "Patients in the APPROVe study should continue to be followed. This will allow some estimate of how quickly the developed risk may dissipate. Give the relatively short half-lives of these compounds, such a dissipation may occur rapidly. On the other hand, if treatment has accelerated atherosclerosis, the offset of risk may be more gradual." Dr. FitzGerald stated an a priori hypothesis, recognizing that the continued follow-up of the APPROVe patients would answer the salient question he posed.

133. An initial evaluation of the follow-up analysis that Dr. FitzGerald called for became available in 2006. The follow-up analysis of the APPROVe data provided by Merck

demonstrated that when patients were followed for approximately one year after the con-
clusion of the blinded component, the increased risk of serious cardiovascular adverse
events persisted. Table E1 and E2 of the APPROVe follow-up reveals that when followed
through Week 210, the relative risk of fatal/nonfatal myocardial infarction was 2.22 (95%
CI 0.67-7.36) demonstrating excessive hazard associated with rofecoxib. When the cen-
soring date was October 31, 2005, the relative risk of fatal/nonfatal myocardial infarction
was 2.04 (95% CI 0.75 – 5.52).

134. This observation of prolonged elevated risk clearly answers the prospective question
raised by Dr. FitzGerald and persuasively confirms the fears of the 1998 Merck Scientific
Advisory Panel. Specifically, the elevated risk of cardiovascular disease seen in the AP-
PROVe follow-up more likely than not stands for the proposition that rofecoxib acceler-
ates atherosclerosis.

135. The follow-up analysis of the APPROVe data demonstrated that when patients were fol-
lowed for approximately one year after the conclusion of the blinded component, the in-
creased risk of serious cardiovascular adverse events persisted. Table E1 and E2 of the
APPROVe follow-up report reveals that when followed through Week 210, the relative
risk of fatal/nonfatal myocardial infarction was 2.22 (95% CI 0.67-7.36) demonstrating
excessive hazard associated with rofecoxib. When the censoring date was October 31,
2005, the relative risk of fatal/nonfatal myocardial infarction was 2.04 (95% CI 0.75 –
5.52). This prolonged elevated risk explains the findings of the Merck Scientific Advi-
sory Board, which stated that COX-2 inhibitors produce increased thrombosis, as well as
accelerated atherogenesis. This, in combination with the blood pressure elevation associ-

ated with rofecoxib explains the prolonged increased risk of fatal/nonfatal myocardial infarction.

136. Epidemiologic studies are not the most persuasive evidence; however they do help to extend the context in which the effect of the study can be anticipated. Several observational studies were carried out to examine the effect of COX -2 inhibitor therapy on the occurrence of cardiovascular disease.

137. Solomon [19] carried out an observational study utilizing the Medicare beneficiaries who received prescription medications through the Pennsylvania Pharmaceutical Assistance Contract for the Elderly or the New Jersey Pharmaceutical Association Program for the Aged and Disabled during 1998, 1999, and 2000. Patients with a life threatening illness such as HIV/AIDS, malignance, or coagulopathy were excluded, as were patients with an AMI that was not the principal discharge diagnosis.

138. Cases were defined as acute myocardial infarction (AMI) if this diagnosis was listed as one of the first three top diagnoses in a hospitalization that was between three days and 180 days. To increase the stability of the estimate of cardiac events in the control group, four control patients were matched to each case. Date of hospitalization was the index date for each case. Controls had to have the same (or nearly the same) age, and have the same gender and month of the index date as the case to which they were matched.

139. Once cases and controls were identified, their antecedent exposure to COX-2 inhibitor therapy was ascertained.  Exposure was based on celecoxib or rofecoxib on the index date. Dose and duration categories were defined for each exposure. Covariates were demographic and morbidity measures. Mean age of all patients was over eighty years. Thus, any findings of this study face difficulty in generalizing to younger cohorts. In ad-

dition, even after matching, patients in the COX-2 inhibitor groups older than the control cohort, an effect who potential for effect size perturbation can be modulated through statistical adjustment.

140. Rofecoxib had slightly greater risk 1.14 (95% CI:1.00-1.31) when referent group was no current use. Patients in the rofecoxib group were more likely to have an MI when compared to celecoxib 1.24 (1.05-1.46, p =0.011). In addition, rofecoxib > 25 mg was associated with higher adjusted relative risk to AMI than rofecoxib < 25 mg (1.70, 95% CI 1.07-2.71). Risk was elevated during the first 90 days of exposure, but not thereafter. This is directionally the reverse of the finding in the APPROVe study, and is most likely attributable to the random aggregation of patients within subgroups and therefore should hold no real persuasive power. The deleterious cardiovascular effects of COX-2 inhibition are most likely seen for the duration of therapy.

141. Overall, the Solomon study confirms the concept that the Cox-2 inhibitor rofecoxib is cardiotoxic.

142. Three additional retrospective studies have been carried out that examine the relationship between rofecoxib and cardiovascular events. Bannwarth [20] reported on the safety profile of patients included in an open-label study conducted to evaluate the influence of non-pharmacological interventions on the outcomes of osteoarthritis in patients receiving rofecoxib. However, the authors acknowledge the highly selective nature of the cohort with its limited definition of cardiovascular risk, the absence of a control group, and the difficulties of comparing incidence rates of studies with different designs.

143. A second retrospective analysis examined investigator-reported cardiovascular adverse event data held within the osteoarthritis safety database. This was collected from several

pre-marketing randomized controlled trials assessing the efficacy of rofecoxib [21]. However, the authors themselves acknowledge that the combined sample size of each treatment group, together with the low number of serious thromboembolic events reduces any illumination this study might shine on the exposure-disease relationship of interest. This is the classic underpowered environment, which forces us to discount the findings of no relationship between COX-2 inhibitor use and cardio-embolic disease in this study. Its null findings are merely uninformative.

144. The third evaluation also investigated this topic, but assessed thromboembolic events across 23 randomized controlled trials in over 28,000 patients with any of osteoarthritis, rheumatoid arthritis, Alzheimer's disease, or chronic back pain. The researchers concluded that the risk of a cardiovascular thromboembolic events was similar between rofecoxib and placebo cohorts and the non-naproxen NSIAD groups, but were significantly higher when compared to the naproxen cohort. They argue that these results support the cardioprotective effect of naproxen.

145. This cohort, completed in September 2000 has been followed and a resulting manuscript appeared describing the publication of the additional adjudicated data by Weil et. al. [22]. The pooled analyses when repeated with the new data were unchanged.

146. Population based pharmacoepidemiologic studies aim to identify and quantify adverse events from the treatment experiences of the population and examine that population for characteristic features in order to learn and inform from these experiences. Such studies usually include far more patients than randomized controlled trials, but suffer from bias and confounding. They do not alter with the prescribing practice of the physician, nor do they require strict inclusion and exclusion criteria. Therefore they are more representative

of the experience of the population. They may contribute useful information about the possible relationship between any NSAID use and the risk of TE events in patients with concurrent medical problems and or using concomitant medication.

147.  The strongest evidence for a relationship between cardiovascular thromboembolic events and COX-2 inhibitor therapy comes from Ray[23]. The conclusion was that high-dose (> 25 mg rofecoxib) could be associated with an increased risk of serious CHD, whereas rofecoxib <25 mg, celecoxib, naproxen, and ibuprofen were not. However, in contrast to the randomized controlled trials presented earlier, this study did not examine all serious cardiovascular thromboembolic events or report on the proportion of patients who were prescribed aspirin use

148.  Another epidemiologic study that assessed the role of Cox-2 inhibitors and cardiovascular events was the study by David Graham. A nested case-control study was conducted at the Kaiser-Permanente clinic system in California. Appropriate covariate control was exerted, and the analysis was proper. The study demonstrated that rofecoxib increases the risk of acute myocardial infarction and sudden cardiac death above patients taking Celecoxib. The overall increase in risk was 1.59 (95% confidence interval 1.10 – 2.32, $p = 0.015$). The risk was greater for high dose rofecoxib (3.58 fold increase) than lower dose (1.47 fold increase) when compared to celecoxib use. In addition, this study failed to reveal any cardio-protective effect of naproxen.

149.  Another observational studied was conduced using administrative healthcare data from Canada [24]. The authors determined that no significant difference was observed in acute myocardial infarction risk for new users of celecoxib, rofecoxib, naproxen, or non-naproxen NSAIDS (used continuously for more than 30 days) compared to non-users. Pa-

tients who were reported to have taken study drugs for less than 30 day were excluded. The effect of this exclusion on the relative risk of myocardial infarction in unclear.

150. Two observational studies were carried out in the United Kingdom. Users of rofecoxib, celecoxib, and melocixam were compared [25] and [26] (melocixam is less COX-2 selective than either of rofecoxib or celecoxib. After adjusting for age and gender, these two studies revealed a statistically significant higher rate of cerebrovascular thromboembolic events for both rofecoxib and celecoxib when compared with melocixam, but a statistically significant lower rate of peripheral venous thrombotic events for the rofecoxib cohort compared with melocixam, but neither revealed a difference in the rate of cardiovascular thromboembolic event group.

151. A major source of information on suspected medication exposure-disease relationships is the post marketing database held by pharmacovigilence units, including those of the regulatory community and manufacturers. There are problems of selection and confounding by indication, as well as recall bias, and information bias. Such data provides a complimentary perspective on adverse reaction frequency with randomized controlled studies and observational studies. They are derived from national populations and operate over the timeline of the drug, include drug use in the hospital as well as the general practice and ambulatory setting. They are useful for signal generation.

152. Commonly, the data that comprises these individual cases is incomplete. The source of the information is inhomogeneous and there is no accepted a priori threshold for reporting. Such voluntary reporting schemes are useful in signal generation or detection, but have important limitations in science.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                                5/22/2006

153. An independent study of adverse reactions primarily adverse renal effects reported for ro-
     fecoxib (n = 2720) versus celecoxib (n=8434) reported to the WHP UMC up until the
     middle of 2000[27]. The SOH Uppsala Monitoring Centre in Sweden maintains a data-
     base of spontaneous reports received from the national monitoring centers worldwide.
     Suspected adverse reactions are coded onto the WHP database. Signal score processing
     uses a collection of sophisticated techniques includes Bayes procedures. Although the fo-
     cus was on renal events, thromboembolic disease was examined. The strength of associa-
     tion between rofecoxib and thromboembolic disease was greater than that for celecoxib.
     However, the authors concluded that there was no association. One possible explanation
     for these null results was that patients with renal disease are more likely to have sympto-
     matic cardiovascular disease. However, this was an ecologically based argument and no
     case-by-case examination took place.

154. In Canada, spontaneous reports are submitted to the regulatory authorities, health Canada
     through the Canadian Adverse Drug Reaction Monitoring Program [28]. They reported
     that they had received by October 2001 70 cardiovascular/cerebrovascular cases out of
     528 total reports) for celecoxib, and 68 out of 348 for rofecoxib. Seven of the cases re-
     ported on celecoxib were fatal. Of these, two were cerebral hemorrhage in patients also
     taking warfarin. However, prevalence of the thromboembolic events was not computed
     from those at risk, not only from all events. This does not address the relative risk of the
     medications in the general public.

155. Meta Analyses: The interpretation of meta-analyses is problematic. They purport to com-
     bine studies, and through the increased sample size and number of events, identify a
     highly reliable estimate of effect size. However, complications quickly arise to vacate

many of their results. Meta analyses are rarely prospectively defined. Thus the definition of exposure is commonly not standardized across the combined studies. In addition, endpoints rarely have a common definition across studies. This heterogeneity reduces the persuasive ability of this style of analysis. Typically, only positive studies are included in the analysis, producing a clear bias in their interpretation. Finally, the aforementioned problems with random research also complicate the interpretation of this post hoc manner of analysis. Thus, post hoc meta-analytic results are not confirmatory.

156. Nevertheless, meta-analyses have been carried out in an attempt to assess the relationship between COX-2 inhibitor therapy and thrombotic disease. One such meta-analysis has been published with the goal of evaluating the totality of the evidence on cardiovascular thromboembolic events and the cyclooxygenase-2 inhibitor. This was conducted by Mukherjee et al. [29]. The goal of this effort was to determine if the COX-2 inhibitors as a class were associated with either a protective, or a harmful effect on the risk of cardio-vascular events. They compared the adjudicated cardiovascular outcomes from major trials. The control group event rate was provided externally, as reported in the placebo group of a recent meta-analysis of four aspirin primary prevention trials.

157. The authors reported that their findings suggested a potential increase in cardiovascular event rates for users of COX-2 inhibitors as a class effect, even though only data for rofe-coxib and celecoxib were examined. Criticisms include the lack of consistency in displaying each trial's results. In addition, there was no over all estimate of the magnitude of treatment difference, nor did it investigate the heterogeneity between trials or explore the robustness of the main findings with a sensitivity analyses. In addition, the contributory trials were of different designs, had different study endpoints, involved patient popula-

tions with dissimilar cardiovascular risk and they compared unequivalent doses of rofe-coxib and celecoxib. The sample sizes of the studies differed widely, ensuring that VIGOR's findings would exert undue influence on the effect ascribed to the findings. Finally, a number of studies that found no relationship between rofecoxib and thrombotic events were excluded. These limitations in addition to the invocation of the random research paradigm, limit the generalizability of post hoc meta-analyses.

158. Risk-Benefit Analysis: Risk benefit analysis is the comparison of the risks of therapy to the therapy's benefits. This can be considered on the macroscopic (societal) level as well as on the microscopic (patient level). The tools used for each of these evaluations are different and thus these two perspectives must be viewed differently.

159. Risk-benefit analysis on the macroscopic scale considers the relative risks to the society when assessed against the benefits to society i.e., the population of patients taking COX-2 inhibitors. In this calculation, the benefits of COX-2 inhibitors are assessed primarily in the degree to which they reduce pain, and the degree to which these agents reduce gastrointestinal adverse effects. It is recognized that neither moderate doses of NSAIDS nor moderate doses of aspirin produce this combination of pain relieve without GI distress. Estimates are that more than 100,000 hospitalizations and 16,500 deaths each year in the United States occur as a result of NSAID use. Since is was believed that the COX-2 inhibitors avoided this extent of GI disease, it is claimed that their use provides an important societal benefit in patients with chronic pain. However, recent evidence reveals that the Cox-2 inhibitors are associated with upper gastrointestinal illnesses. In addition, the acknowledgement that they are the producing cause of cardiovascular thrombotic disease dramatically and unfavorably tilts the risk-benefit balance.

160.  This risk benefit calculus requires that one consider alternative modalities of pain re-lieve.  Specifically, Tylenol, a well-established pain reliever, is neither habit-forming nor associated with adverse gastrointestinal distress. In addition, low dose NSAID use is less damaging to the GI tract than moderate or high dose NSAIDS. Thus, the macroscopic benefits of COX-2 inhibitor therapy are less clear when compared to these latter agents and doses.

161. Furthermore, the mechanism by which COX-2 inhibitor therapy produces fewer upper GI adverse effects is speculative. Evidence suggests that both minor symptoms (e.g., dyspepsia) and endoscopically detected lesion are not good predictors of future complicated GI disease. It is also unclear whether serious GI complications such as perforations and bleeding are a consequence of COX-1 inhibition in platelets (the supposed mechanism) or a direct interaction between the NSAID and the gastric mucosa. Thus, while the macroscopic benefits of COX-2 inhibitors over high dose NSAID and aspirin use are clear in terms of GI relief, the benefits over low dose aspirin/NSAID are not. Similarly, the advantage of COX-2 inhibitors when compared to high dose Tylenol, or a combination of high dose Tylenol and low dose NSAIDS, has not been established.

162. In addition, the risk of thromboembolic disease is greater with the use of COX-2 inhibitors. The occurrence of COX-2 induced MI's and strokes with the consequent production of new deaths and hospitalizations require a complete new assessment of the risk-benefit balance of this therapy. Neither Tylenol (at low doses or high doses), nor aspirin (at low doses or moderate doses) is associated with a greater risk of MI.

163. The microscopic consideration of risk-benefit is an assessment of the risk of COX-2 inhibitor therapy versus its benefit in the individual patient. There are no reliable models to

review this; each patient-practitioner couple provides its own unique risk-benefit metric in the decision as to whether a patient should accept COX-2 inhibitor therapy. In patients with chronic arthritic pain, a combination of Tylenol (low or high dose) and low dose aspirin or NSAIDS provides substantial analgesia without GI distress. Should upper GI symptoms appear, the dosing of aspirin or NSAIDS can be reduced, or even temporarily discontinued. There is no established increased risk of thromboembolic disease with low or high dose Tylenol, or low or moderate aspirin use. Therefore the use of COX-2 inhibitor therapy confers no advantage for these patients.

164. However, the greater risk of serious thromboembolic events with COX-2 inhibitor adversely tips the risk-benefit balance. To offset this greater risk, greater benefit must be achieved when compared to therapies that 1) are not associated with thromboembolic adverse events, and 2) do not produce a significant increase in upper GI events.

165. However, implicit in the individual risk-benefit assessment that each physician-patient pair undertakes is the assumption that each of the practitioner and the patient have access to all relevant facts available on risk and benefit are available to those who must make the final decision. Patients and physicians have the right to make an independent assessment of the risk of therapy. The requisite for the discharge of this right is that they each have access to all risks and benefits of the intervention. This implies that the absence of complete disclosure of the risks of a therapy produces flawed decisions about the implementation of the therapy.

## Failure to Warn

166. **FDA Expertise**: I have attended more than 20 meetings of the Cardio-Renal Advisory Committee to the Food and Drug Administration (F.D.A.), and I have served for four years

on the Cardio-Renal Advisory Committee, served as an ad hoc member of other FDA Advisory Committees, and currently serve on the FDA Pharmacy Sciences Advisory Committee. These positions have provided me the opportunity to observe and take part in the interplay that characterizes the relationship between the F.D.A. and the drug sponsors.

167. As an actively serving member of this advisory committee, I have published two articles on the deliberations of the Cardio-Renal Advisory Committee to the F.D.A. which have appeared in the peer reviewed, public literature (30, 31).

168. My service on the F.D.A. advisory committees, as well as my service to drug manufacturers, has given me specialized knowledge and experience concerning the F.D.A. policies, procedures and regulations as well as the corresponding duties of a reasonable and prudent drug manufacturer.

169. In addition, I have argued before the F.D.A. on behalf of sponsors on numerous occasions. In my service on behalf of sponsors to the F.D.A., and my service to the F.D.A. at advisory committee meetings, I have developed expertise, knowledge, training and experience in F.D.A. matters.

170. **Role of F.D.A.** The Federal Food and Drug Administration (F. D. A.) is an organization charged by the public through Congress to insure the effectiveness and safety of foods and compounds produced for public consumption. Over the course of this century, the powers of the F. D. A. have expanded commensurate with their public responsibilities in a growing and increasingly complex food and drug environment.

171. The responsibilities of the F. D. A. have often placed it in perceived opposition to the pharmaceutical industries. The F.D.A. regrets this comparison and has devoted substantial effort to overcome it. The F.D.A. has encouraged the view that the relationship between it

and the pharmaceutical industry is a collaborative one, and has suggested that the efforts of both the F.D.A. and the pharmaceutical industry be viewed as one of joint partnership.

172. ***Modernization Act***: This emphasis can been seen in the F.D.A. Modernization Act, which provided a set of streamlined procedures for the sponsor and F.D.A. to follow, helping to insure a prompt and efficient review of a new drug application (NDA). These procedures have substantially reduced the time it took the F.D.A. to complete the review of a sponsor's application for a new drug approval.  This pivotal move to streamline the administrative review process was a direct response to complaints from both the pharmaceutical industry, and, to some extent, from segments of the public that the F.D.A. was not responsive enough to the need for the swift introduction of safe and effective medications. The F.D.A. correctly recognized that the timely delivery of these new medications was essential for maintenance of the public health.

173. ***Collaboration:*** In order for the F.D.A.-pharmaceutical industry collaborative process to work, the F.D.A. and the Sponsor must work together to demonstrate the efficacy and safety of the compounds.  Contrary to public perception, the F.D.A is not a central laboratory.  It generally does not carry out independent testing of the products submitted to it by the pharmaceutical industry for approval. The F.D.A. does not independently execute clinical trials to study in an independent manner the safety and effectiveness of new compounds.  The F.D.A. instead receives the crucial information about the effects of a drug from outside sources.  The F.D.A. has developed skill in identifying relevant information for the effects of a drug.  Several of these sources include the general medical literature, and research reports from academic investigators, and research study results which are sponsored by other institutions e.g. the National Institutes of Health, (NIH). However, the

primary source of information concerning the safety and efficacy of the compound is the sponsor itself.  It is the sponsor's task to provide the F.D.A. with the majority of the information concerning the effects of its compound in animals (when appropriate) and in humans. The F.D.A. reviews, scrutinizes and reanalyzes the information it receives, but it relies on its partner, the sponsor, to provide the data on which its decision ultimately rests.

174.  It is therefore essential that the sponsor and the F.D.A. have a relationship, which at its foundation is truthful, honest, open, characterized by a timely and accurate communication process.  The pharmaceutical company must provide accurate information describing the pharmacology (including the mechanism of the compound's action), the effectiveness of the compound (known as the efficacy), and the risk afforded by the compound (the safety). The F.D.A. must respond to this information in a timely manner, either approving the compound in a reasonable period of time, or disapproving the compound.  When the compound is disapproved, the reasons for the disapproval must be clear, and the procedure to appeal the decision must be available. One of the mechanisms of appeal is the convening of an advisory committee.

175.  ***Advisory Committees***: The collection of advisory committees to the F.D.A. is an official body with codified rules in the Code of Federal Regulations (C.F.R.).  It consists of experts in the field in which the drug is expected to be effective. It also includes experts from the disciplines of epidemiology and biostatistics, and, in some instances, consumer advocates and representatives from the pharmaceutical industry itself.   The F.D.A. and the sponsor each provide written information to the advisory committees, and each make presentations before the committee in a session that is in general open to the public. The advisory committee provides guidance to the F.D.A. by responding to specific questions posed to it by

the F.D.A. The F.D.A. considers both the content of the advisory committee's delibera-
tions and committee's answers to the F.D.A. posed questions very seriously.  However, the
advisory committee can only render its most informed and effective judgments when it is
also the beneficiary of open, honest, accurate and timely reporting from both the F.D.A.
and the sponsor.  To this end, the sponsor spends months preparing briefing packets for the
advisory committee, and weeks in intense practice sessions preparing for the meeting.

176.  **Decision Processes:** The decision process of the F.D.A. and its external advisory com-
mittees is built on a foundation of the open, accurate and timely dissemination of scien-
tific evidence concerning the mechanism of drug action, the drug's effectiveness, and the
drug's safety profile.  When this foundation is solid, the process will swiftly identify and
rapidly approve drugs that are safe, effective, and meet a medical need. During this proc-
ess, the public is protected from compounds that either have no efficacy or are unsafe,
these inferior products being removed from further consideration.  The maintenance and
promotion of the public health depend on the integrity of this system. If either the sponsor
or the F.D.A. engage in dishonest or deceptive practices, the process begins to erode, and
the public suffers. This occurs either through the delay in the approval of safe and effec-
tive compounds that meet a medical need, or through the publics direct exposure to inef-
fective and dangerous compounds. The F.D.A. cannot make timely, informed decisions
when the sponsor denies them information.

177.  **Material Information**: Embedded in this body of procedures are the channels through
which accurate, relevant, and material information describing the drugs actions is
promptly communicated to practicing physicians and through the physicians to their pa-
tients.  After the F.D.A. approves the drug and the sponsor to the medical community ad-

vertises the drug, it is the sponsor's obligation to closely monitor the use of the drug for the appearance of unanticipated adverse events.

178.   **Adverse Events**: An adverse event is an undesirable effect produced by the drug.  Many adverse events are identified during the early testing phase of the drug.  These adverse effects are included in the drug label.  The drug label is the official description of the drug, which appears, with all the labels of all approved drugs in the Physicians' Desk Reference (PDR). This label describes the effect of the drug, the population in which the drug is effective, the adverse effects of the drug, and the general precautions reasonable and prudent physicians should take in prescribing the drugs. Physicians and pharmacists rely on these labels in making decisions involving the use of these drugs in their patients, and they require that the information in these drug labels be accurate and up to date. The sponsor owns the drug label. It has the responsibility for ensuring that the information in the label is accurate and up to date.   Although there are specific regulations in the C.F.R., which govern the content of the label, responsibility for guaranteeing that the information in the drug label is accurate resides with the sponsor.

179. **Labeling**. Both physicians and patients have the right to draw independent conclusions concerning the risks and benefits of a therapy. Their best and clearest recommendations come from these considerations. Review of the Rofecoxib labels reveals several understatements about the label. The federal regulations require that the labeling shall contain a summary of the essential scientific information needed for the safe and effective use of the drug.  The essential information was lacking in the warning labels for the fenfluramines.

180. Drug labels are to be designed for the safe and effective use of the drug. There is no way to write an adequate label about a drug that has minimal efficacy and causes serious, life

threatening side effects because such a compound cannot be used safely and effectively. By definition an adequate label cannot be written for Rofecoxib since the drug cannot be used safely and effectively. The particular defects in the Vioxx label are as follows.

181. An adequate label must contain complete statements about the effectiveness of the compound. The data for the analgesic effect of Vioxx did not state that was of the same effectiveness as standard NSAIDS.

182. 21 CFR Parts 201 and 202 states, "The Commissioner also advises that these labeling requirements do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The additional labeling and advertising of additional warnings, as well as contraindication, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., 'Dear Doctor' letters containing such information) is not prohibited by these regulations.

183. However, Merck did not provide adequate warnings. On February 25, 1996 in an email from Brian F. Daniels to Thomas Simon, et. Al, regarding GI Outcomes Trial Protocol, he states, "Would allow low dose ASA real world everyone is on it, so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill drug". With this comment, not only does Merck recognize that without COX-1inhibition, rofecoxib will increase cardiovascular thrombotic events, but also that patients should take low dose ASA while on rofecoxib. Yet, this warning never appeared in the rofecoxib label.

184. The attitude toward the FDA, whose only mission is ensure that only safe and effective compounds are used by the public was antagonistic.  On May 14, 1999, in an email form Scolnick to Blois, Goldmann regarding the Vioxx US label, he states "I think the ONLY

way to handle is to GO THERE AND INVOLVE LUMPKIN and word by word agree to the final circular by next Mon/Tue.  I DID THIS WITH TEMPLE ON VASOTEC IN 1985.

185.  On March 9, 2000, email for Scolnick to Shapiro, Reicin, Nies, regarding VIGOR stated, "The CV events are clearly there. Since no obvious correlate…this is real…it is a shame, but it is a low incidence and it is mechanism based as we worried it would be." The early preapproval data demonstrated a signal of CV hazard that Merck ignored. Leadership in Merck acknowledged the hazardous effect of rofecoxib. There was no mention of a possible, scientifically unsupportable beneficial effect of naproxen as a possible explanation.

186.  On March 27, 2000, Merck announced through a press release the preliminary results of GI outcome study with Vioxx (VIGOR). One day later, in an email from Alan Nies to Barry Gertz regarding Dr. Patrono on VIGOR, they state that Dr. Patrono "does not think that the CV effect that we observed can be attributed to naproxen for a couple of good reasons. Merck's consultant who correctly warned before the drug was approved that rofecoxib could produce serious cardiovascular adverse effects, also warned them that the results in VIGOR, while confirmed his own concerns, could not be explained away.

187. However, on April 28, 2000, in a press release, Merck misinforms the public by "confirming a favorable CV profile.

188.  On June 20, 2000, email from Laurenzie to Daniels regarding Dr. Patrono warned, "the presentation of VIGOR data must not mislead the audience into thinking that the difference in CV events could be explained by an anti-thrombotic effect of naproxen, which is not demonstrated.

189. On June 29, 2000, the Vioxx sNDA (supplemental new drug application) with Dennis Erb's letter to Central Document Room of the FDA for submission of labeling supplement to NHDA 21-042 based on VIGOR GI results. In this document, Merck argues that VIGOIR reinforces the need for concomitant aspirin use is some patients. Merck submitted protocols 085 and 090. However did not change the label adding the warning about required aspirin use.

190. On July 5, 2000, a memo from the statistician Deborah Shapiro Alise Reicin revealed that Merck knew it was not publishing all of the myocardial infarctions that occurred in VIGOR in the *New England Journal of Medicine* that would not be published until November 2000. They had the opportunity to update the data but refused to take it.

191. On November 8, 2000, in an email from Reicin to Barr involving a hypertensive patient, Dr. Barr believes a hypertension-related death in ADVANTAGE should have been classified as an MI, stating in an email timed at 11:43AM "Common things being common, the clinical scenario is likely to be an MI." He then explained the definition of sudden death and unexplained death in an email timed at 12:58 PM.  However, Dr. Reicin challenged him, saying, "I still strongly feel that this should not be an MI-…" However, she went further than that, saying the death should be classified as "unknown". Specifically, she stated, "…I would prefer unknown cause of death so that we don't raise concerns." This statement's egregious insensitivity to the importance of identifying appropriate safety monitories speaks for itself.

192. On October 18, 2000, Deborah Shapiro, Merck statistician carried out a preliminary meta-analysis that demonstrated an increased CV risk. Specifically, this report showed that Vioxx more than doubled the risk of MI related to all NSAIDS, and that this increase was sta-

tistically significant. This included a MI-only analysis of the Vioxx program. This report was omitted in Merck's FDA submission and in the published meta-analysis of Konstam.

193. On January 31, 2001, a national thought leader summary of the VIGOR study recommended that Merck not emphasize the "protective effect" of Naprosyn as an explanation." In that same paragraph, they state that there is no supporting data to substantiate a protective effect for Naproxen.

194. On this same date, January 31, 2001, Dr. Scolnick of Merck sent an email to Mr. Anstice and Gilmartin, it which he stated, "…there is no way to prove that in patients with rheumatoid arthritis that ALL of the difference between Vioxx and naproxen is due to the benefit of naproxen. It is impossible to prove this; it is impossible to know this with certainty."

195. On February 1, 2001, Targum of the FDA wrote a memo to Cook and Villalba regarding NDA 21-042, S-007 review of cardiovascular safety database. He stated that "Despite lower dose, smaller sample size and aspirin use, the trend is against rofecoxib." He also stated "The sponsor claims that the difference in MI between the two groups is primarily due to the anti-platelet effects of naproxen. This hypothesis is not supported by any prospective placebo-controlled trials with naproxen."

196. On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory Committee in public session that there was no evidence from an examination of their Phase IIb/III database of excess cardiovascular events. A similar statement was also made on page 56. This was false. The Watson report on which that was based clearly demonstrated excess cardiovascular events in women, and in most of the age ranges examined in men.

This information was withheld from both the 1999 Advisory Committee and the 2001 Advisory Committee, as well.

197. On September 17, 2001, the FDA sent a Warning letter from Abrams to Gilmartin regarding Vioxx. That letter stated that Merck's promotional activities were "false, lacking in fair balance or otherwise misleading." It also stated," your claim in the press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible."

198. Nevertheless, on November 6, 2001, in a draft letter to Jonca Bull regarding the Amendment to the Supplemental New Drug Application, Merck expressed strong disagreement with FDA's initial October 15, 2001 labeling proposal, which it argues is unprecedented. Merck argues for labeling information tempering any commentary on CV/T data from VIGOR.

## Misleading the FDA

199. Regulation Sec. 14.171: Utilization of an advisory committee on the initiative of FDA. (f) Presentation of all relevant information about the matter will be made in open session unless it relates to an IND the existence of which has not previously been disclosed to the public as defined in Sec. 20.81 or is otherwise prohibited from public disclosure under part 20 and the regulations referenced therein. Sections 314.430 and 601.51 determine whether, and the extent to which, relevant information may be made available for public disclosure, summarized and discussed in open session but not otherwise made available for public disclosure, or not in any way discussed or disclosed in open session or otherwise disclosed to the public.

200. Merck mislead the FDA at the FDA Advisory Committee Meeting. On April 20, 1999, the FDA Arthritis Advisory Committee met to discuss the consideration of whether Vioxx

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                   5/22/2006

should be approved for use for pain relief. During that discussion, both efficacy and safety of Vioxx were discussed. There was a section of the presentation of the thromboembolic cardiovascular adverse experience. Beginning on page 105 of the transcript, the individual presenting on behalf of Merck states "I will now review the thromboembolic cardiovascular adverse experiences. We looked at an extensive list of adverse experiences representing peripheral, myocardial, and central nervous system thromboembolic events. The data presented on this slide is a combined analysis from all of our osteoarthritis studies. This is reported in events per 100 patient years. The event rate was low and was similar between placebo, rofecoxib, and the NSAID comparators. All deaths across all osteoarthritis studies are summarized on this slide: The events are reported again, per 100 patient years. The rates for rofecoxib, as you can see, are if anything, lower than with the NSAID group.

201. However, one year before, on February 2, 1998, Watson's Final results of an analysis of the incidence of Cardiovascular SAE's in the Phase IIb/III Vioxx Osteoarthritis Clinical Trials demonstrated a CV signal. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The overall relative risk for cardiovascular SAE for men was 1.28 and for women was 2.16, demonstrating a clear signal of increased cardiovascular risk associated with rofecoxib therapy (Table 7). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's than the placebo group in protocol 010(page 1 following executive summary). This finding was not reported to the FDA advisory committee at this meeting. These relevant tables were omitted from the Merck FDA Advisory Committee Background Information Packet for this meeting. The FDA Advisory Commit-

tee was never told about the increased cardiovascular risk associated with rofecoxib at this critical juncture in the FDA's deliberations for the approval of rofecoxib.

202. On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory Committee in public session that there was no evidence from an examination of their Phase IIb/III database of excess cardiovascular events. A similar statement was also made on page 56. This was false. The Watson report on which that was based clearly demonstrated excess cardiovascular events in women, and in most of the age ranges examined in men. This information was withheld from both the 1999 Advisory Committee as well. The Merck FDA Advisory Committee Background Information Packet dated February 8, 2001 was incomplete. On page 9 of that document (Section 2.2.1.1. Rationale for the Choice of Patient Population in VIGOR), no description of the rationale for only including patients who were not at high risk for cardiovascular disease. The critical information intimated in an email on November 11, 1996 by Dr. Reicin stating the plan of "excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" was not included in the Advisory Committee Packet. This critical information that altered the VIGOR study, blocking its ability to fairly assess the risk associated with rofecoxib was not shared with the FDA at this critical decision point in the FDA review process. In addition, Tables 6 and 7 of the Watson report, which demonstrated a clear signal of the cardiovascular danger of rofecoxib was omitted from this critical document on which the FDA reviewers relied.

203. In addition the emails dated April 6 and 7, 2001 between Dr. Greene and Dr. Scolnick revealed the internal attitude of Merck to the FDA, whose only desire was to ensure that safe and effective medications be available to the US public.

204. On April 6, 2005, John Jenkins, Director of the Office of New Drugs and Paul J. Seligman, Director Office of Pharmacoepidemiology and Statistical Science wrote a memorandum bearing the FDA's imprimatur whose subject was Analysis and recommendations for Agency action regarding nonsteroidal anti-inflammatory drugs and cardiovascular risk. The specific sources of the information on which the statements within this memo are based are not revealed in the document (e.g., the findings from the Alzheimer's trials for Vioxx, page 5). It is therefore unclear what the scientific basis for the statements and actions recommended in the document are. Without knowing the source of the information, it is difficult to assess the worthiness of the recommendations provided in this document. However the basis of my conclusion that Vioxx is a dangerous compound with unacceptable cardiovascular risks, regardless of dose or duration of exposure, are clearly delineated in this affidavit.

205. This affidavit draft does not discuss the results of analyses yet to be produced by Merck, nor does it discuss an evaluation of the actual APPROVe datasets that I plan to undertake. This affidavit will be amended as additional relevant information becomes available, and, if appropriate, upon completion of my evaluation of the SAS APPROVe datasets.

# Appendix A: Statistical Reasoning in Medicine

206. Statistical Reasoning in Medicine: Statistical reasoning in { XE "statistical reason-ing:definition" }medicine is, at its heart, the process by which we determine if health care research results identified in one sample apply to a much larger population. The urgent question for a reviewer of the COX literature is whether results from all of the studies (or any of the studies) can be generalized from the peer reviewed manuscript to the population at large, and therefore be extended to a particular plaintiff. Is there a subset of studies that contribute more to our understanding, and can therefore be extended to the population? The type of generalization is not automatic; in fact, commonly in science this generaliza-tion is inappropriate. Thus, the reviewer must precisely identify the circumstances in which extension to the population is appropriate, and, alternatively, when the research results must be firmly circumscribed by the sample from which they are obtained.

207. A negative answer to this critical question does not imply that the veracity of the investi-gator's work is in question. { XE "statistical reasoning:critical question" }The authors of a published article did in fact find what they claimed to find in the sample; their probity is not in question. The relevant, question is whether the sample findings translate to the popu-lation from which the sample was obtained?  Specifically, does the examination of the rela-tionship between exposure and disease in the sample concisely and efficiently capture what they would find if they examined the entire population, or, alternatively, are the sample re-sults merely due to the freak of chance, the vicissitudes of their inadvertent selection of the wrong, unrepresentative sample from the population. If the former is the case, then a whirlwind of scientific discussion is necessary and valid. However, if the relationship is one that is seen only in the sample, and does not adequately depict a population finding,

then any ensuring discussion is based on a fantasy. These questions are of direct relevance to the COX inhibitor literature, which is replete with studies of different designs, different sensitivities, and widely disparate results.

208. ***Sampling Error and Significance Testing*** Sample-based research is the study of a sample obtained from a population. Different samples, obtained from the same population, contain different individuals with different experiences an{ XE "p value:and sampling error" }d therefore contain different results. Sampling error is simply this sample-to-sample variability. The symbol $\alpha$, representing the type I error is the specific sample error that allows a population to generate a sample which contains a spurious relationship that is not seen in the population.

209. Clinical trial investigators recognize that there are many reasons why the positive findings of clinical experiment may be misleading. For example, they may have selected a population of patients in whom the therapy works but the inclusion and exclusion criteria of the study were too restrictive. The dose of the medication chosen may be effective, but it produces too many side effects. The blinding of the procedure may have been ineffective, leading to a more diligent search for endpoints among the subjects randomized to placebo therapy. These are all problems with the execution of the trial. They can be anticipated and the trial designed to remove them as obstacles to the trial's success. However, there is one problem that, no matter how well the clinical trial is designed, cannot be removed as the generator of false positive results ─ chance alone. This is a $\alpha$ error.

210. Statistical significance addresses the possibility that sampling error has produced the positive findings in the sample. If an $\alpha$ (or type I) error occurs, then there is no effect of the therapy in the population, but the population produced a sample in which, just through

chance alone, the therapy produced an effect. There is no question that the therapy worked in the sample; however, the sample results are not a reflection of the population effect, but instead were generated by the random aggregation of subjects selected for the sample.

211. The occurrence of a type I error is solely a property of the sampling process. Since sampling is necessary for the research effort, the investigators understand that they cannot remove this possible explanation of these results. They instead decide to measure the possible influence of sampling error. Investigators set the α error level at the beginning of the study, and compute a sample size based on the maximum acceptable type I error rate, as well as on other parameters. At the conclusion of the experiment, the investigators compute the *p*-value for the result of the study. The *p*-value is the measure of the type I error rate at the end of the study and is based on the actual research results. If the *p*-value is less than the α error rate that was prospectively identified (commonly set at the 0.05 level, a decision that has its sole basis in tradition), then researchers conclude that it is very unlikely that chance alone produced the findings of the study, and that the results of the study (be they clinically significant or clinically negligible) are truly reflective of what would occur in the larger population from which the sample was obtained.

212. Therefore, if (1) the systematic explanations for a spurious research finding are removed from the experiment by exceptional planning and good clinical trial execution, (2) the probability of a false finding just by chance alone is reduced to a small level (i.e., the *p*-value is less than the prospectively set α error rate), and (3) the magnitude of the findings are clinically important, then the medical and regulatory communities are assured that, to a

reasonable degree of certainty, the positive results of the trial represent a true population finding.[*]

213. ***Statistical Power***: Statistical power, like *p*-values, is a phenomenon of sampling error. The circumstance in which statistical power is relevant in the interpretation of a research program involving the investigation of COX inhibition is when the trial results are not positive, but null; no treatment effect is seen.{ XE "power (statistical):definition" } Of course, there are many systematic explanations for a null finding (the wrong exposure level to the active intervention is but one of many possible circumstance). However, another possible explanation is sampling error. In this circumstance, the therapy is effective in the population. However, the population produced a sample by chance alone in which the therapy was ineffective. This is a type II or beta error. Power is defined as one minus the type II error. High statistical power translates into a low type II error rate.

214. Consideration of statistical power has important implications for the COX literature, since the occurrence of a type II error makes it impossible to assess the implications of a null finding. Specifically, if a study does not find a relationship between exposure to a COX inhibitor and cardiovascular disease, low statistical power means that it is quite likely that, even if there were a relationship between COX inhibition and cardiovascular disease, the study would not have found it. Therefore the null finding must not be treated as implying a null relationship in the population, but as a non-informative finding. This is the justification for the creed "Absence of evidence is not evidence of absence." Specifically, this means that absence of evidence (of a relationship between COX inhibition and cardiovascular disease) need not be evidence of absence (of this relationship existing in the popula-

---

[*] We will have much more to say about the interpretation of *p*-values.

tion). Thus null findings from underpowered evaluations of the relationship between COX inhibition and cardiovascular disease are uninformative.

215. Since the researcher does not know during the design phase of the study whether the results will be positive or null, she must plan for each possibility. Thus, she should design the study so that the type I error rate will be low (customarily no higher than 0.05) and that the power of the experiment will be high (typically, at least 80%). Each of these considerations is part of the sample size computation.

216. **Sample Size Computations**: Good clinical trials, regardless of their size, are characterized by careful planning, controlled execution, and disciplined analysis. An important component of the design of a clinical research effort is the sample size calculation. The sample size computation is the mathematical calculation that determines how many patients the trial should recruit. It is based on clinical concerns, epidemiologic determinations of event rates, and biostatistical considerations about the role sampling error may play in producing the trial's results. It can be said that the sample size computati{ XE "sample size computation:general concerns" \b }on is the forge upon which the clinical trial design is hammered.

217. Exploratory Analysis and Random Research: Exploratory analysis is the process by which the investigator allows the data to answer specific questions that the investigator did not plan to use the data to address. There are two problems with *exploratory research* or *hypothe{* XE "exploratory analyses:definition" *}{* XE "hypothesis generating analyses:definition" \t "*See* exploratory analyses" *}sis generating research*. The first is that commonly the sample is not an optimal one, since the investigator can only design a sample to answer questions that they knew to ask.

# Appendix B: Determining Causality in Medicine

218. Clinical investigation has been a human endeavor for over two thousand years. The most common building block in the edifice of health study is the { XE "case reports" }{ XE "case series" }case report. A case report is a summary of a single patient's findings and the communication of those findings to the medical community. A case series is a collection of case reports, linked together by a common thread (e.g., all of the patients were seen by the same doctor, or each of the patients was exposed to the same agent, e.g., quinine).

219. It is easy to understand how the growth of general medical knowledge has been propelled by the use of case reports. The delivery of healthcare has been governed by the interaction between a single, concerned, responsible provider and his patient. This relationship is private and privileged. However, it has historically been conducted in isolation, by physicians and nurses widely separated from each other. The idea of a community was well established. However, the concept of a medical community (i.e., a collection of practitioners who worked together to jointly expand their knowledge base) was one that took many generations to develop.

220. Therefore, medical care was delivered for hundreds of years by practitioners, who, working alone with incomplete knowledge, made decisions that directly affected the lives of their patients, and indirectly, their patients' families and communities. The one, natural learning tool these physicians could use was the active sharing of their experiences among themselves. This served to expand their expertise, suggest alternative approaches to healthcare, and extend their knowledge. This shared experience is at the heart of the case report.

221. The core thesis of this approach was best captured by{ XE "Celsus" } Celsus (circa A.D. 25) [32], who stated that "Careful men noted what generally answered the better, and then

began the same for their patients." For the next 1900 years, advances in clinical medicine occurred through the combined use of careful observations, clear recorded descriptions, and deductive reasoning. The discovery that gunshot wounds could be healed without the application of burning hot oil [33] demonstrated that a case report-style observation could uncover new information and overturn prior, erroneous principles in medicine. When medical journals began to appear, the primary medical information that they dispersed was that of the case report. Those physicians who had more exposure and experience with a medical issue compiled their case reports together into a case series that they would publish. This continues to this day. Examples are diet drugs and heart valve disease [34] and radiation poisoning [35].

222. However, case reports have well-established difficulties. Although they reflect very clear and honest observations, the degree to which a single case report represents a general phenomenon in the population can be subject to debate. Even though they are useful, the variability of observations across patients makes it difficult to assess whether one patient's findings summarized in a case report can be easily translated to others.

223. However, what the case report and essentially all investigative mechanisms in medicine hope to illuminate, by examining both the environment (e.g., exposure to a toxin or a potential cure) and the patient's response, is the true nature of the exposure–outcome relationship. This true nature could be simply an association, or it could be causal.

224. An { XE "association:vs causation" \t "*See* causation" }association is the coincidental occurrence of an exposure and an outcome. Its recognition (e.g., the relationship between coffee drinking and pancreatic cancer) typically does not require direct action by the medi-

cal community. A { XE "causation" }causal relationship, on the other hand, signifies that the exposure excites the production of the outcome. This more powerful, directed relationship incites the medical and regulatory communities to action. For example, the conclusion that exposure to citrus fruits reversed the symptoms of scurvy incited action by the British navy to mandate the storage of fresh fruit in the provisions of its crews for long sea voyages [36]. On the other hand, links between the use of cutting and bleedings and the remission of yellow fever were merely associative. Thus, when we as physicians examine a case report's details, we sift through the provided clinical descriptions in order to discern if the relationship between the exposure and the outcome is either causative or associative.

225. Epidemiologists are specialists who identify the determinants or causes of disease. They have developed criteria that would be useful in ascertaining whether an exposure causes (i.e., excites the production of) the disease. Elaborated by Sir Austin Bradfor{ XE "Hill, Bradford:and causality tenets" }d Hill [37], these tenets are based on a common sense approach to determining causality and are remarkably free from complicated mathematical arguments. These criteria acknowledge that more disease cases in the presence of the risk factor than in its absence raise a causal suspicion. In addition, determining that greater exposure (either by dose or duration) to the risk factor produces a greater extent of disease amplifies our sense that the exposure is controlling the disease's occurrence and/or severity. These two features are important characteristics of a cause–effect relationship.

226. Other questions posed by Hill permit us to explore the "believability" of the relationship. Is there a discernible mechanism by which the risk factor produces the disease? Have other researchers also shown this relationship? Are there other examples that help us to understand the current exposure–disease relationship? The nine precise Bradford Hill criteria

are: (1) strength of association, (2) temporality, (3) dose-response relationship, (4) biologic plausibility, (5) consistency, (6) coherency, (7) specificity, (8) experimentation, (9) analogy. These are well elaborated in the literature [38].

227. Diligent attempts to determine whether specific case reports and case series can satisfy these causality criteria continue to provide invaluable service to patients and communities. The link between methyl mercury exposure and birth defects in communities surrounding Minamata Bay, Japan, [39], and the establishment that thalidomide was the cause of the birth defects phecomelia and achondroplasia [40] are just two 20th century examples of the ability of case reports and case series to establish causal relationships that produced public health action. The identification of (1) the relationship between tick bites and Lyme disease, and (2) the link between new illnesses among postal workers and anthrax exposure in 2001 are recent examples of their continued value.

228. ***Limitations of Case Reports***: Although medical knowledge has progressed through the sensitive and intelligent use of case reports and case series, there is no doubt that the illumination provided by these investigational tools are also profoundly limited. There are four major criticisms of the value of case reports and case series in determining the causal nature of an exposure–disease relationship. They are th{ XE "case reports:and limitations" }at (1) case reports and case series do not provide quantitative measures of the relationship between an exposure and a disease, (2) case reports do not always rule out other competing causes of disease, (3) case reports are subject to biases of selection (i.e., the manner in which the case report was selected may make it unreasonable to believe that its occurrence reflects an important finding in the population), and (4) measurements made in the case re-

port may be nonstandard. These limitations reduce the contribution of case reports to our understanding of the exposure–disease relationship.

229. One of the most remarkable deductive failures of case reports was their false identification of the effects of cardiac arrhythmia suppression [41]. In the 1970s, considerable attention was provided to the potential of new therapies (specifically, the drugs encainide, flecainide, or mirtazapine) for the treatment of dangerous ventricular arrhythmias. It was believed that these new drugs would be more effective and produce fewer side effects than the traditional, poorly tolerated medications. The effectiveness and safety of these newer drugs were examined in a collection of case series. At first, only the sickest patients were given the new therapy. When these patients survived, the investigational drug was credited with saving the patient's life. However, if the patient died, then the patient was commonly deemed "too sick to be saved" and the drug was not debited for the death.

230. Based on these observations, despite some opposition, a consensus developed in the cardiology community that patients with arrhythmias would benefit from the use of these new drugs. After a period of intense deliberation, the Federal Food and Drug Administration (FDA) approved the new antiarrhythmic agents. As a consequence of this approval, physicians began to prescribe the drugs not just to patients with severe rhythm disturbances, but also to patients with milder arrhythmias. This new use was consistent with the growing consensus that these drugs would be beneficial in blocking the progression of dysrhythmia from mild heart arrhythmias to more serious rhythm disturbances.

231. Only after the drugs were approved and on the market was a study carried out that incorporated a control group and the use of randomization. This trial, called CAST{ XE "The CAST Trial" } (Cardiac Arrhythmia Suppression Trial) demonstrated that, not only did the

new therapies not save lives, but also their use caused excess mortality [42]. The findings from CAST, demonstrated the lethality of medications whose safety had been "demonstrated" by case series.

# Appendix C: Detecting Adverse Events

232. ***Detecting Adverse Events: Complication in Safety Monitoring***: The ethical concern for safety introduces a new complexity into the interpretation of interim monitoring results. Essentially, the primacy of the admonition, "First, do no harm," complicates the interpretation of exploratory analyzes. Recall that confirmatory analyzes, they the product of prospectively declared plans, are most easily generalizable. They produce reliable estimates of effect sizes, effect size variability, and type I error rates. In addition, prospective consideration of the type and number of statistical hypotheses to be tested leads to tight control of the family wise error rate. On the other hand, exploratory analyzes hold none of these features. These latter analyzes that are suggested by the data rather than by prospective planning produce inaccurate estimators and must be repeate{ XE "safety:and confirmatory monitoring" }d (or confirmed) before they can be generalized.[*]

233. With this dis{ XE "estimators:efficacy versus safety" }tinction in place, the evaluation of efficacy examinations in clinical research is clear and straightforward at both the conclusion of the study and during an interim examination. Consider a hypothetical clinical trial designed to determine the effect of an intervention on patients who have suffered a stroke. The primary analysis for this clinical trial is the effect of therapy on the total mortality rate. If the study's design and execution has been (1) carefully considered with a precise, prospectively declared protocol, (2) executed in accordance with that protocol,[†] and (3) produces a type I error rate below the a priori declared threshold for a clinically significant

---

[*] The reasons for the different interpretations of exploratory versus confirmatory analyzes are discussed eariler in this report Two.
[†] This is defined as concordant execution.

level of efficacy, its results on the primary endpoint would be heralded as positive. How-ever, assume in that same study, that the therapy was observed to produce a reduction in the myocardial infarction rate. Because the therapy's effect on the myocardial infarction rate was not prospectively declared, and its results would be seen as exploratory[*], requiring confirmation before they can be generalized.

234. However, in the reverse setting, where both the findings for mortality and the myocardial infarction rate indicate harm and not benefit, the ability to interpret the situation is compli-cated. Again, the prospective nature of the research design that is focused on mortality permits the investigators to conclude that the study produces a confirmatory evidence of harm. However, the identification of an early harmful effect of the intervention on the cu-mulative myocardial infarction rate is problematic. Clearly, the finding of an increased risk of myocardial infarction associated with the therapy is crippled by the exploratory nature of the analysis. However, the occurrence of this finding for harm in all likelihood would not, and could not, be reproduced. The ethics of protecting subjects from known and sus-pected dangers precludes the initiation of a new confirmatory research effort in order to demonstrate that the intervention excites the production of myocardial infarctions.[†]

235. Thus, although confirmatory findings of harm carry the same weight as those of efficacy, exploratory findings of harm commonly carry more weight than exploratory findings of ef-ficacy. This places a greater burden on investigators, who must balance the ethical re-

---

[*] Because both the effect of therapy on the total mortality rate and the effect of therapy on the myocardial infarction rate appear to be equally reliable to the observer, both being produced from the same database, concluding that only the myocardial infarc-tion finding be discounted may appear capricious. However, because the trial was not designed to examine the myocardial infarc-tion issue, the ability of the study to ensure that (1) it had an appropriate sample size for the evaluation of the effect of therapy on heart attacks, and (2) the investigators collected all of the cases of heart attacks (including silent myocardial infarctions) even though they never said that they would must be questioned. Secondly, the "positive" finding of therapy on the myocardial infarc-tion rate was based on an unplanned interrogation of the database. This inquiry rose to prominence solely because of its unantici-pated and surprising finding. Allowing the data to suggest answers in this fashion introduces a new sampling error component into the analysis that undermines the traditional estimates of effect size, precision, $p$-values and power.

[†] Other information may become available that would allow the evaluation of the possibility of harm produced by the interven-tion. Additional concurrent studies, case control, and historical cohort studies may provide some illumination of this issue.

quirement to adequately warn about adverse events with the scientific need to avoid misdirection about the risks of an intervention. This is a challenge to healthcare research in general and interim monitoring in particular. Because, confirmatory analyzes for harm will be the most persuasive, investigators make their strongest possible case when they execute as many confirmatory analyzes as possible.

236. Although two strategies to address this issue of multiple safety measures are reviewed, the best strategy begins with good a priori knowledge. During the design phase, investigators can strengthen the interim analyzes that they have in mind for the safety monitoring by carrying out an in-depth review of the evidence of adverse effects produced by the intervention that they plan to study. This will allow them to put prospective monitoring rules in place that provide rigor in detecting the early occurrence of several different adverse events.

237. With foreknowledge of the adverse event profile of the intervention, and some appreciation of the frequency at which these adve{ XE "safety:exploratory monitoring" }rse events appeared, the researcher is able to place prospectively declared rules in place.

238. However, many times adverse events occur that were completely unsuspected during the course of a clinical research effort, which catch the researcher by surprise. The occurrence of de novo breast cancer in women exposed to lipid lowering agents during the course of a cardiovascular clinical experiment, the occurrence of dangerous new arrhythmias generated by an intervention that suppresses other rhythm disturbances, and the production of liver failure in medications designed to reduce insulin sensitivity are but a few examples of unanticipated adverse effects that can be produced by a new intervention.

239. This illustration suggests that although monitoring procedures can provide clear warning that a treatment signal has been detected; the presence of this signal does not provide prima facie evidence for drawing a conclusion and terminating the research effort. That decision is more complex, requiring thoughtful consideration of both the efficacy and the safety of the compound. Ultimately, the decision to discontinue a study is not a mathematical one, but a clinical and ethical decision.

240. Statistical monitoring rules do not provide much guidance in this scenario. The absence of prospective identification, in concert with the large probability of a type I error generated by multiple interrogations of the adverse event data confound any attempt to apply statistical rigor to the evaluations executed on behalf of the patients. This is the conundrum of safety-based monitoring. The predomination of ethical considerations requires the researcher to sometimes set aside statistical precepts in order to be assured that patients are not being harmed in the research effort or in the population. This is unacceptable when one is building an argument for efficacy, but is required in the examination of safety. The asymmetry of this circumstance finds its genesis more in an oath than in science. The following are other useful tools in assessing the validity of an unanticipated adverse event finding.

241. ***Strategy 1: Monitor Widely***: Researchers m { XE "adverse events:need to monitor widely" }ust lead diligent adverse event report evaluations. Just as physicians cannot diagnose diseases of which they have never heard, researchers cannot ethically weigh the implications of serious adverse events that they are not measuring. Thus, the researchers must cast a wide net in order to capture the occurrence of all adverse events. The investigators in post marketing clinical trials were able to successfully carry out this strategy.

242. ***Strategy 2: Assessing Unanticipated Adverse Events***: Clinical trials have been executed for only sixty years. This is a relatively short period of time in the history of clinical investigation. However, the assessment of whether the occurrence of the event is related to a treatment has been a cerebral process that has evolved for hundreds of years. Useful skills have been amassed by scientists in the implementation of no statistical evaluations of the relationship between an event (be it either adverse or salubrious) and an exposure. In the setting of exploratory endpoint analyzes, where statistical assessments are not quite so reliable, these other no statistical assessments rise to new prominence.

243. The occurrence of an exposure and an adverse event occurring in the same patient (or group of patients) begs the question of whether the relationship between the two is associative or causal. An associative relationship is merely that the exposure and the disease occurred coincidentally in the same patients, for example, the occurrence of breast cancer in women taking HMG-Coal reductase inhibitor (i.e., statin) therapy for elevated lipid levels. It is a passive relationship. On the other hand, a causal relationship, as discussed earlier, is active. An exposure causes a event if the exposure excites the production of the event. It is an active relationship, a relationship with directionality. An example is the causal relationship between liver hepatotoxicity and thiazolidinedione therapy for diabetes mellitus.

244. When statistical tools are less useful, other tools of observation become more valuable. In 1965, Hill [43] described the nine criteria for causality arguments in healthcare. These nine rules or tenets are remarkably and refreshingly devoid of complex mathematical arguments, relying instead on natural honest intuition and common sense for the inquiry into the true nature of a risk factor–disease relationship. The questions Dr. Hill suggested

should be posed by the investigators in their assessment of the true nature of the exposure–disease relationship.

245. The evaluation begins with a simple assessment of numbers. Are there many more adverse event cases when the intervention is present, and fewer disease cases when the intervention is absent? If this question has been affirmatively answered, other questions follow. Does a greater exposure to the risk factor produce a greater extent of disease? Other questions asked by Hill explore the "believability" of the relationship. Some of these are: is there a discernible mechanism by which the risk factor produces the disease? Have other researchers also shown this relationship? Are there other such relationships whose demonstration helps us to understand the current risk factor– disease relationship?

246. Consistency requires that the findings of one study be replicated in other studies. The persuasive argument for causality is much more clearly built on a collection of studies involving different patients and different protocols, each of which identifies the same relationship between exposure to the risk factor and its consequent effect. There are numerous examples of collections of studies with different designs and patient populations, but that nevertheless successfully identify the same hazardous relationship between an exposure and disease. Identification of case series involving different series of patients in different countries and different cultures—yet each series producing the disease after the exposure would satisfy these criteria. Because research findings become more convincing when they are replicated in different populations, different studies that examine the same exposure–disease relationship and find similar results add to the weight of causal inference.

247. The specificity of a disease is directly related to the number of known causes of the disease. The greater the number of causes of a disease, the more nonspecific the disease is,

and the more difficult it is to demonstrate a new causal agent is involved in the production of the disease. The presence of specificity is considered supportive but not necessary, and researchers no longer require that the effect of exposure to an agent such as a drug be specific for a single disease.

248. Exposure must occur before the disease develops for it to cause that disease. A temporal relationship must exist in order to convincingly demonstrate causation.[*] This criterion can be clearly satisfied by a case report that accurately documents that the exposure occurred before the disease.

249. An evaluation of a relationship between occurrences of the adverse events and either the dose or duration of the intervention is also useful. The observation that a more intense exposure produces a greater frequency or severity of adverse events adds new strength to the notion that the relationship between the intervention and the adverse event is a causal one. In addition there should be some b{ XE "Hill, Bradford:causality and safety" }asis in the scientific theory that supports the relationship between the supposed "cause" and the effect. However, observations have been made in epidemiological studies that were not considered biologically plausible at the time but subsequently were shown to be correct.

250. It is important to note in the application of these tenets that satisfaction of all nine is not required to establish to the satisfaction of the medical community that a causative relationship exists between the exposure and the disease. Hill himself stated [43]:

251. None of my nine viewpoints can bring indisputable evidence for or against the cause–and–effect hypothesis, and none can be required as a *sine qua non*.

---

[*] Protopathic bias, or the result of drawing a conclusion about causation when the disease process precedes the risk factor in occurrence can result without appropriate attention to the condition.

252. However, these tenets are invaluable in the assessment of intervention-adverse event rela-

tionships.

# Appendix D. Subgroup Analyses

253. A subgroup analyses in a clinical research effort is the evaluation of the effect of the randomly allocated intervention within a fraction of the recruited subjects. The analysis of subgroups is a popular, necessary, and controversial component of the complete evaluation of a controlled clinical trial. Indeed, it is difficult to find a manuscript that reports the results of a clinical trial that does not report findings within selected subgroups.

254. Subgroup analyses as currently utilized in clinical trials are tantalizing and controversial. There may be no better maxim for guiding the interpretation of subgroup analyses in this setting than "Look, but don't touch," The results from subgroup assessments have traditionally been used to augment the persuasive power of a clinical trial's overall results by demonstrating the uniform effect of the therapy in patients with different demographic and risk factor profiles. This uniformity leads to the development of easily understood and implemented rules to guide the use of therapy[*]. Some clinical trials report these results both in the manuscript announcing the trial's overall results  [44, 45, 46,47] and separately [48, 49, 50]. Such subgroup analyses potentially provide new information about an unanticipated benefit (or hazard) of the clinical trial's randomly allocated intervention.

255. However useful and provocative these results can be, it is well established that subgroup analyses are often misleading [51, 52, 53, 54]. Assmann et al. [55] has demonstrated how commonly subgroup analyses are misused, while others point out the dangers of accepting subgroup analyses as confirmatory [56]. For example, the Amlodipine controversy in the PRAISE trials discussed earlier in this report were based on a subgroup analysis. Neverthe-

---

[*] The finding that a particular lipid lowering drug works better in women than in men can complicate the already complex decisions that practitioners must make as the number of available compounds increase.

less, the medical community continues to be tantalized by spectacular subgroup findings from clinical trials. A recent example is the subgroup analysis-based suggestion that medication efficacy is a function of race; this has appeared in both peer-reviewed journals [57, 58] and the lay press  [59]. In this section, we will review the definitions, concepts, and limitations of subgroup utilization in clinical trials.

256. **Subgroups: Definitions and Basic Concepts** While the concept of subgroup analyses is straightforward, the terminology can sometimes be confusing. This report will therefore devote some attention to defining nine and classifying subgroup analyses.

257. **Subgroups Versus Subgroup Strata**: A subgroup is the description of{ XE "subgroups:definition" } patient based characteristic, e.g., gender that can be subdivided into categories. These different categories are described as strata, one stratum level for each category. For example, if an investigator is interested in creating a gender subgroup, patients are classified according to their sexual characteristics; the resultant gender subgroup consists of two strata—male and female.

258. The classic subgroup analysis itself is an evaluation of the effect of therapy within each of the subgroup strata. In this example of a gender-based subgroup, the subgroup analysis consists of an evaluation of the effect of therapy for males and an evaluation of the effect of therapy for females. Thus each stratum analysis produces an effect size with its standard error, a confidence interval, and a *p*-value.

259. The investigators choose the characteristics that form the basis of these subsets. However, over time, a commonly evaluated set of subgroup evaluations has emerged. Although there are differences from one medical subspecialty to another, the most common of these subgroups are based on demographic criteria e.g., gender, ethnicity, and age. Frequently used

sociologic determinants are marital status, education, and acculturation.[*] In addition, there are subgroups that are based on lifestyle choices. Some examples of these are alcohol use, tobacco use, dietary intake, and exercise. Of course findings from medical histories (e.g., history of cancer, history of CHF, history of endocrine disorders) and physical examination (e.g., body mass index or DBP) are among commonly appearing subgroups in clinical trials as well.

260.  The definition of a subgroup can be more complicated than a first glance would suggest. Consider the marriage status subgroup. One might think that this is easy to define. Is the patient married or not? Phrased this way, this suggests that the marriage subgroup should have two strata. However, the choices can be much more complex than this. The patient could be married now, or have been married in the past and is single now. The patient could be separated, divorced, or remarried. These alternative classifications can either be useful, or merely distractions depending on the purpose for which the evaluation will take place. For example, in some research, which is not primarily sociologic, these additional classifications may be unnecessary. However, in other research efforts, the intricate differentiation of marriage history details is very important. Thus, one must know how the subgroup analysis will be used so that the most useful strata membership criteria can be developed. Once each of the subgroup strata have been identified, the clinical trial workers will know what data to collect that will be the most useful.[†]

261.  ***Subgroups: Interpretation Difficulties***: The illustrations of the previous sections have demonstrated that there are many possible ways to subgroup patients. However, we must keep in mind that, in a collection of subgroup analyses, it is the same patien{ XE "sub-

---

[*] Acculturation is the degree to which a community composed primarily of immigrants accepts with approval and is involved in the activities of the surrounding society.
[†] Another subgroup that has grown in complexity is that for race/ethnicity.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                                   5/22/2006

groups:interpretation difficulties" }ts that are being stratified in different ways. This obser-

vation can complicate the interpretation of a subgroup evaluation.

262. For example, consider a randomized, controlled clinical trial, which is in its analysis
phase. At this time, all of its patients are classified by gender, grouping patients into male
and female sub-cohorts. Once the stratum membership assignment is finished, the effect of
the randomly allocated intervention is assessed in each of the two gender strata. It is seen
that the effect of therapy appears to depend on gender, with males experiencing a different
effect than females.

263. When completed, these same patients are then re-aggregated based not on gender, but on
age. Subjects are placed into one of the following three age strata: (1) less than 40 years of
age, (2) between 40 and 60 years of age, and (3) greater than 60 years of age. When the
subgroup analysis is carried out for the age strata, it appears that the effect of therapy is the
same in each of the age groups.

264. The results from these two subgroup analyses essentially demonstrate that the same pa-
tients when characterized one way (by gender) provide a different result than when charac-
terized another way (by age). Was it really gender that modified the effect of therapy or
was it the chance collection of patients that made it appear that gender was an influence?
Since we can expect that the effect of treatment within a subgroup stratum depends on the
patients within that stratum, then the value of the subgroup analysis must be tightly linked
to the ability to demonstrate that it is the stratum characteristic that is producing the inter-
esting effect and not just the random aggregation and re-aggregation of patients.

265. ***Random Subgroups***. Investigators work to identify subgroup classifications that are
meaningful. When examination of the therapy effect within a subgroup appears, it is only

natural for the investigator to believe the rationale for the choice of the subgroup was justi-fied. Furthermore, the scientist may think that the stratum specific therapy effect is due to some effect-mediation ability produced by the subgroup trait. However, the very fact that patients are classified and divided can induce a subgroup effect.

266. Consider the following simple experiment. A courtroom chosen at random has a capacity of seating 60 observers. A central aisle divides these 60 seats, with 30 seats on each of the left-hand and right-hand side of the courtroom. Sixty people seat themselves as they choose, distributing themselves in an unrestricted manner among the seats on each side of the courtroom. When all are seated, we measure the height of each person, finding that the average height is exactly 67 inches. Does that mean that the average height of those seated on the left-hand side of the courtroom will be 67 inches? No. The average height of those seated on the left-hand side of the courtroom will be either less than 67 inches or greater than 67 inches, but it will not be exactly 67 inches (because the average is based on only thirty of the sixty people). If the average height on the left-hand side of the courtroom is less than 67 inches, than those seated on the right-hand side will have an average height greater than 67 inches[*]. Is it fair to conclude that those who sit on the right- hand side of the courtroom are in general taller than those who sit on the left-hand side?

267. The simple, random aggregation and sub-aggregation of the observations has induced a subgroup effect that is based only on the play of chance. This random subgroup effect ap-pears in all subgroup analyses, and we will have to integrate it into our interpretation of any subgroup effect that we see. Some interesting findings of random subgroup analyses

---

[*] If the average height of all in the courtroom is 67 inches, and the average height on the left side is less than 67 inches, then the average height on the right hand side must be greater than 67 inches

are available [60]. These occurrences help to justify the admonition that the best descriptor of the effect in a subgroup is the finding that is observed in the overall cohort.

268. ***Proper Versus Improper Subgroups***: A critical preliminary task that clearly must be completed before a subgroup analysis proceeds is the classification of each patient into a subgroup stratum. This is the process by which the subgroup membership f{ XE "sub-groups:proper vs improper" }or each patient in the study is determined. Although membership determination may appear to be a trivial task, there are circumstances in which this classification is problematic. These concerns revolve around the timing of the subgroup membership determination.

269. There are two important possibilities for determination of the timing of subgroup membership. The first is the classification of patients into the correct subgroup stratum when the patients are randomized. The second choice is to classify patients into subgroup strata at some time during the execution of the trial. While each has advantages, the determination of subgroup membership at the beginning of the study is preferred.

270. Determining subgroup membership at the beginning of the trial requires that, not only must the subgroup be defined at the beginning of the study, but also subgroup strata membership should be defined prospectively as well. This is a straightforward procedure to apply to the gender subgroup with its two strata. However, for other subgroups of clinical interest, the process can be complex.

271. ***Intention-to-Treat" Versus "As Treated"  Subgroup Analyses***: Consider a clinical trial in which patients are randomized to receive an intervention to reduce the total mortality rate from chronic cirrhosis of the liver. At the inception of the study, patients are randomized to receive either control group therapy or the intervention. At the conclusion of the

study, the investigators will compare the cumulative mortality rates of patients in each of the two { XE "intention to treat:vs. \"as treated\"" }treatment groups. However, at the end of the study, how will the investigators decide what patients should be considered active group patients and which patients should be counted as in the control group? The commonly used approach is to assign treatment group membership simply as the group to which the patient was randomized. This is the "intention to treat" principle.

272. The "intention-to-treat" principle of analysis is the standard analysis procedure for the evaluation of clinical trial results. Undoubtedly, this analysis tends to be a conservative one, since not every patient is treated as they were "intended." For example, some patients randomized to the active group may not take their medication. These patients, although randomized to the active group, will have the control group experience and produce endpoints at rates similar to that of the control group. However, they would be included in the active group since they were randomized to and "intended to be treated" like active group patients. The inclusion of these patients in the active group for analysis purposes tends to make the active group experience look more like the control group experience, increasing the overall active group event rate.[*]

273. Similarly, patients who are randomized to the control group may nevertheless be exposed to active group medication (e.g., from their personal physician who is not an investigator in the study). These patients will experience event rates similar to the rates of the active group, but since they are considered as part of the control group, the inclusion of these patients will produce an event rate for the control group that is closer to that of the active

---

[*] There are occasional complications in an "intention-to-treat" analysis. In some cases, a patient is tested and randomized, but then, subsequent to the randomization the test result reveals that the patient is not eligible for the trial for a prospectively stated reason. In this case, there was no "intent" to randomize this patient when the test result was known, and the patient is removed from the study.

group. Thus the control group rate will approach that of the active group, while the cumulative event rate in the active group will be closer to that of the control group (described in the previous paragraph). This effect of these combined rate alterations reduces the magnitude of the treatment effect, thereby diminishing the power of the clinical trial.[*]

274. An alternative analysis to the "intent to treat" principle is one that analyzes the endpoint results using an "as-treated" analysis. In this case, although patients are still randomized to receive either placebo or active therapy, they are classified for analysis purposes based on whether they actually took their medication or not. Since this is determined after the patient was randomized to the medication, and the effect (both perceived beneficial effects, and adverse effects) of the medication may determine whether the patient takes the medication, the "as-treated" evaluation is a confounded analysis. A clearly detailed examination of this issue is available [61].

275. ***Effect Domination Principle***: I have stated previously that, in the absence of confirmatory subgroup evaluations, the best estimate of the effect of randomly allocated therapy within subgroup strata is the effect of that therapy on the overall cohort. We will call this the principle of *effect domination*— the effect of therapy averaged over all randomized patients dominates the effect seen in the individual subgroup strata.

276. The effect domination principle was the basis { XE "subgroups:effect domination prinicple" } of our decision to overturn the results of several of the subgroup evaluations that were provided previously. Although there are many clinical trials designed to provide confirmatory evaluations of their primary analyses, there are far fewer confirmatory evaluations that occur in the assessments of subgroups. Therefore, the effect domination

---

[*] The effect of the magnitude of the treatment effect on the power of a study for fixed sample size is discussed in Appendix D.

principle is much more frequently required in the interpretation of the results of clinical trials.

277. Since subgroup analyses have and will, in all likelihood, continue to engender the interest of the medical community, it is logical to ask why there aren't more confirmatory analyses involving subgroup evaluations. This is an especially interesting question since there are clear circumstances in which subgroup evaluations can produce confirmatory results of the therapy effect within (or across) subgroup strata. When executed, these confirmatory results stand on their own, separate and apart from the result of the effect of therapy in the overall cohort. The criteria for these evaluations were clearly characterized by Yusuf et al. [62] and are coincident with our development of confirmatory analyses in this text.

278. The first of these criteria for the development of confirmatory analyses in clinical trials is that the subgroup analysis must be prospectively designed and proper. This structure is required so that (1) the therapy effect size estimators that the subgroup analysis produces are trustworthy; and (2) that the effect of therapy to be evaluated in a subgroup is not confounded by (i.e., bound up with) post-randomization events as discussed previously. In general, there has been no difficulty with meeting this requirement of confirmatory subgroup analyses. Many clinical trials make statements in their protocols describing the plans of investigators to evaluate the effect of therapy within their subgroups of interest. These subgroups are, by and large, proper subgroups, e.g., demographic traits, or the presence of risk characteristics at baseline.

279. However, the final requirement for a confirmatory subgroup analysis is the prospective allocation of type I and type II error rates. This last criterion has proved to be especially vexing because of the severe sample size constraints this places on subgroup analyses. As

we have pointed out earlier, the allocation of type I error rates for confirmatory testing must be such that the FWER, $\xi$, is conserved. This requires that statistical testing at the level of subgroup analyses will be governed by test-specific $\alpha$ error rates that are generally less than 0.05.

280. The difficulty of executing subgroup analyses in the presence of type I error rate control and adequate statistical power is not difficult to understand. In fact, resources are generally strained to the breaking point for the analysis of the effect of therapy in the overall cohort. This overall analysis is typically carried out with the minimum acceptable power (80%) because of either financial constraints or patient recruitment difficulties. By definition, subgroup analyses (and certainly within-stratum subgroup analyses) will involve a smaller number of patients; it is a daunting task to prospectively allocate type I and type II error rates at acceptable levels in a smaller number of patients, although the methodology for the accurate computation of sample size is available [63]. Thus, the growth of the use of subgroups as confirmatory tools has, to some extent, been stunted by the difficulty of constructing a prospective clinical trial with an embedded, prospectively defined proper subgroup for which tight statistical control is provided for type I and type II statistical errors.

281. ***Manuscript Interpretation*** The purpose of a published manuscript is to identify the contribution the research effort has made. Specifically, this general evaluation reduces to three questions that should be answered. (1) What was the purpose of the research? (2) Do the methods used allow the researcher to answer the question? and, (3) If so, then what is the answer?

282. The motivation for the research is determined from a careful study of the introductory section of the manuscript. Commonly replete with citations, this section should clearly de-

lineates the research question that was raised by the investigators. Whether the investigators are able to answer the research question they asked is determined in the methods section. Your review of this section of the manuscript should be careful and thorough. Was the instrumentation sufficient to provide the measures with the precision that the authors require? If laboratory samples are involved were they preserved using the appropriate environmental conditions?

283. If the research involves subjects, other questions must be adequately addressed in this critical section of the manuscript that describes the methodology used by the authors. Was there an adequate number of subjects? Is the analysis carried our prospectively delineated, leading to trustworthy estimates of effect sizes, standard errors, confidence intervals, and p-values, or were the analyses exploratory, requiring an additional, confirmatory study to sustain the findings.

284. If the methodology empowers the investigators to answer their prospectively asked question, then proceed to read the results section, fully planning to integrate the main findings of the research into your fund of knowledge. However, if the methods reveal that the findings from the study are exploratory and not generalizable, then the results are not generalizable, and cannot really be accepted as reflective of the population. However, considerable care must be given if the manuscript has identified a harmful effect,

285. The reviewer must avoid the temptation to "study count". "Study counting" is the process of simply counting the number of studies that address an issue and deciding if there "are enough" studies to support the result of interest. Some who are involved in study counting argue that there must be more than one study. Others say that the number of "positive" studies must outnumber the number of "negative" studies. Instead, the scientific reasoning

process assesses in detail each of the available studies, carefully dissecting the methodol-ogy, sifting through the methodology, and carefully considering the conclusions. Study counting represents the wholesale abandonment of the intellectual principles of careful re-view.

286. The specific problem with "study counting" is the implicit ceteris paribus (all other things being equal) assumption, i.e. that all of the studies that are being included in the count are equal in methodology, equal in the thoroughness of their design, equal in the rigor of their execution, and equal in the discipline of their analyses and interpretation. This fallacious assumption is far from the truth of scientific discovery. Studies have different strengths and different weaknesses. Different investigators with their own non-uniform standards of discipline execute the research efforts. Some studies give precise results, while others are rife with imprecision. The panoply of studies is known not for its homogeneity, but for the heterogeneity of designs and interpretations.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.

5/22/2006

I certify that the foregoing statements made by me are true and correct. Executed this

_22nd_ day of _May_____ 2006 at Houston, Texas

_____

Lemuel Moyé, M.D., Ph.D.

STATE OF TEXAS    )

                 ) ss.

COUNTY OF HARRIS

Subscribed and sworn to me

Before this _22nd_ day of _May_____ 2006

_____

Signature of Notary Public

My Commission Expires _9/30/09_____

APRIL K THOMSON
My Commission Expires
September 30, 2009

# References

1 .  Hippisley-Cox  JC, et al.  Risk of myocardial infarction in patients taking cyclo-oxygenase-2 inhibitors or conventional non-steroidal anti-inflammatory drugs: population based nested case-control analysis.  BMJ VOLUME 330 11 JUNE 2005

2 . Cole P, MacMahon B. Attributable risk percent in case-control studies. Br J Prev Soc Med. 1971 Nov;25(4):242-4.

3 .  Miettinen OS.  Proportion of disease caused or prevented by a given exposure, trait or intervention. Am J Epidemiol. 1974 May;99(5):325-32.

4 .  Wilson PW.  Prediction of coronary heart disease using risk factor categories. Circulation. 1998 May 12;97(18):1837-47.

5 American Heart Association Stroke Statistics. In: 2001 *Heart and Stroke Statistical Update*. Dallas: American Heart Association, 2000.

6 American Heart Association *2001 Heart and Stroke Facts*, Dallas: American Heart Association, 2000.

7 Hennan JK. Effects of selective cyclooxygenase-2 inhibition on vascular responses and thrombosis in canine coronary arteries. Circulation. 2001 Aug 14;104(7):820-5.

8. Linder JD. Cyclooxygenase-2 inhibitor celecoxib: a possible cause of gastropathy and hypoprothrombinemia. South Med J. 2000 Sep;93(9):930-2.

9 Crofford LJ. Thrombosis in patients with connective tissue diseases treated with specific cyclooxygenase 2 inhibitors. A report of four cases. Arthritis Rheum. 2000 Aug;43(8):1891-6.

10 Bombadier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med. 2000;343:1520-1528.

11  Food and Drug Administration Advisory Committee. Cardiovascular safety review of rofecoxib. Available from URL: http://www.fda.gove/ohrms/dockets/ac/01/briefing/3677b2_06-cardio.pdf.

12 . Curfman GD, Morissey S, Drazen JM (2005). Expression of concern; Bombardier et al., "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis *N Engl J Med* 2000;353:1520-8. *New England Journal of Medicine* 353:2813-2814.

13. Juni P, Rutjes AW, Dieppe PA. Are selective COX-2 inhibitors superior to traditional non-steroidal anti-inflammatory drugs? BMJ 2002.324:1287-8.

14. Konstam MA, Weir MR, Reicin A, et al. Cardiovascular thrombotic events in controlled clinical trials of rofecoxib. Circulation 2001. 104:2280-8.

15 Garcia Rodriguez LA. The effect of nonsteroidal anti-inflammatory drugs (NSAIDS) on the risk of coronary heart disease: fusion of clinical pharmacology and pharmacoepidemiologic data. Clin Exp Rheumatol 2001:19 (6 Suppl. 25):S41-4.

16  Ray WA, Stein CM, Hall K, et al. Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease; an observational cohort study. Lancet 2002:359 118-23.

17  Breaslier RS. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med 2005: 352:

18.  FitzGerald GA. Coxibs and Cardiovascular Disease. New England Journal of Medicine.351: 1709-1711.

19.  Solomon DH. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. *Circulation* 2004:109:2068-2073.

20  Bannwarth B, et al. Adverse events associated with rofecoxib therapy. Drug Safety 2003;26(1): 49-54.

21  Reicin A, et al. Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (Ibuprofen, diclofenac, and nabumetone). Am J Cardiol 2002;89: 204-9.

22  Weir MR. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J. 2003 Oct;146(4):591-604. Review.

23  Ray W, et al. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. The Lancet 2002;360: 1071-3.

24  Mamdani M, et al. Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-term risk of acute myocardial infarction in the elderly. Arch Intern Med 2003;163: 481-6.

25  Layton D, et al. Comparison of the incidence rates of thromboembolic events reported for patients prescribed rofecoxib and meloxicam in general practice in England using prescription-events monitoring (PEM) data. Rheumatology 2003;42:1342-53.

26  Layton D, et al. Comparison of the incidence rates of thromboembolic events reported for patients prescribed rofecoxib and meloxicam in general practice in England using prescription-events monitoring (PEM) data. Rheumatology 2003;42:1354-65.

27  Zhao SZ, Reynold NW, Lejkowth J, et al. A comparison of renal-related adverse drug reactions between rofecoxib and celecoxib based on the World Health Organization/Uppsala Monitoring Centre safety database. Clin Ther 2001; 23:1478-91.

28  Vu D, Murty M, McMorran M, Selective COX-2 inhibitors: suspected cardiovascular/cerebrovascular adverse reactions. Can Adv Reaction News 2002:12:1-3.

29  Mukherjee D, et al. Risk of cardiovascular events associated with selective COX-2 inhibitors. JAMA 2001;286: 954-9.

30.  Fisher LD, Moyé  LA.  Carvedilol and the Food and Drug Administration approval process: an introduction..  Controlled Clin Trials 1999,20:1-15.

31.  Moyé  LA.  P-Value Interpretation in Clinical Trials. The Case for Discipline. Controlled Clin Trials 1999;20:40-49.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                          5/22/2006

32. Bull  JP. (1959) Historical development of clinical therapeutic trials. *Journal of Chronic Disease* **10**:218–248.

33. Malgaigne LF. (1947) *Weuvres Completes d'Ambrosie Paré*, vol. 2. Paris, p. 127.

34. Connolly HM, Crary JL, McGoon MD, et al. (1997) Valvular heart disease associated with fenflura-mine-phentermine. *New England Journal of Medicine* **337**:581–588.

35. Clark C. (1997) *Radium Girls: Women and Industrial Health Reform, 1910–1935* Chapel Hill, University of North Carolina Press.

36. Gehan EA, Lemak NA. (1994) *Statistics in Medical Research: Developments in Clinical Trials*. New York, Plenum Medical Book Company.

37. Hill B. (1953) Observation and experiment. *New England Journal of Medicine* **248**:995–1001.

38.  Kleinbaum DG, Kupper LL, Morgenstern H. (1982) *Epidemiologic Research: Principles and Quantitative Methods*. New York, Van Nostrand Reinhold Company.

39. Pepall J. (1997) *Methyl Mercury Poisoning: The Minamata Bay Disaster*. Copyright © International Development Research Centre, Ottawa, Canada.

40. Lenz W. (1962) Thalidomide and congenital abnormalities. *Lancet* **1**:45.

41.  Moore T{ XE "*Thomas Moore*" }{ XE "Moore, Thomas" }. (1995) *Deadly Medicine*. New York, Simon and Schuster.

42. Preliminary report: effect of encainide and flecainide on mortality in a randomized trial of arrhythmia suppression after myocardial infarction. The Cardiac Arrhythmia Suppression Trial (CAST) Investigators. N Engl J Med. 1989 Aug 10;321(6):406-12.

43. Hill B. (1953) Observation and experiment. *New England Journal of Medicine* **248**:995–1001.

44. Pfeffer, M.A., Braunwald, E., Moyé, L.A. et al. (1992). Effect of captopril on mortality and morbidity in patients with left ventricular dysfunction after myocardial infarction–results of the Survival and Ventricular Enlargement Trial.  *New England Journal of Medicine* **327**:669–677.

45.Sacks F.M. Pfeffer M.A., Moyé, L.A. (1996). The effect of pravastatin on coronary events after myocardial infarction in patients with average cholesterol levels. *New England Journal of Medicine* **335**:1001–1009.

46  The SHEP Cooperative Research Group (1991) Prevention of stroke by antihypertensive drug therapy in older persons with isolated systolic hypertension: final results of the systolic hypertension in the elderly program (SHEP). *Journal of the American Medical Association* **265**:3255–3264

47. The Long-Term Intervention with Pravastatin in Ischemic Disease (LIPID) Study Group. (1998). Prevention of cardiovascular events and death with pravastatin in patients with CAD and a broad range of initial cholesterol levels. *New England Journal of Medicine* **339**:1349–1357.

48. Moyé, L.A., Pfeffer, M.A., Wun, C.C., et. al (1994). Uniformity of captopril benefit in the post in-farction population:  Subgroup analysis in SAVE.  *European Heart Journal.* **15**: Supplement B:2–8.

49. Lewis, S.J., Moyé, L.A., Sacks, F.M., et. al (1998). Effect of pravastatin on cardiovascular events in older patients with myocardial infarction and cholesterol levels in the average range. Results of the Cholesterol and Recurrent Events (CARE) trial. *Annals of Internal Medicine* **129**:681–689.

50. Lewis, S.J., Sacks, F.M., Mitchell, J.S., et. al (1998). Effect of pravastatin on cardiovascular events in women after myocardial infarction: the cholesterol and recurrent events (CARE) trial. *Journal of the American College of Cardiology* **32**:140–146.

51. Peto, R., Collins, R., Gray, R. (1995). Large-scale randomized evidence: Large, simple trials and overviews of trials. *Journal of Clinical Epidemiology* **48**:23–40.

52. MRFIT Investigators. (1982). Multiple risk factor intervention trial. *Journal of the American Medical Association* **248**:1465–77.

53. ISIS-1 Collaborative Group (1986) Randomized trial of intravenous atenolol among 16027 cases of suspected acute myocardial infarction–ISIS–1. *Lancet* **ii**;57–66.

54. Lee, K.L., McNeer, F., Starmer, C.F., Harris, P.J., Rosari, R.A. (1980). Clinical judgment and statis-tics. Lessons from a simulated randomized trial in coronary artery disease. Circulation **61**:508–515.

55. Assmann SF, Pocock SJ, Enos LE, Kasten LE. (2000), Subgroup analysis and other (mis)uses of baseline data in clinical trials. Lancet. 2000 Mar 25;355(9209):1064-9.

56. Bulpitt, C. (1988). Subgroup Analysis. *Lancet*: 31–34 .

57. Exner, D.V., Dreis, D.L., Domanski, M.J., Cohn, J.N. (2001), Lesser response to angiotensin–converting enzyme inhibitor therapy in black as compared to white patients with left ventricular dys-function. *New England Journal of Medicine* 334:1351–7

58. Yancy, C.W., Fowler, M.B., Colucci, W.S., Gilber, E.M., Brsitow, M.R., Cohn, J.N., Luka, M.A., Young, S.T., Packer, M. for the US Carvedilol Heart Failure Study Group. 2001.Race and response to adrenergic blockade with carvedilol in patients with chronic heart failure. *New England Journal of Medicine* **334**:1358–65.

59. Stolberg S.G. Should a pill be colorblind? *New York Times*. Week in Review. May 13, 2001.p 1.

60. Moyé, L. (2000) *Statistical Reasoning in Medicine: The Intuitive P-Value Primer*. New York. Springer.

61. Peduzzi, P.,Wittes, J., Deter, K., Holford, T. Analysis as-randomized and the problem of non-adherence; an example from the veterans affairs randomized trial of coronary artery bypass surgery. (1993). *Statistics in Medicine* **12**:1185–1195.

62. Yusuf, S, Wittes J., Probstfield, J., Tyroler, H.A. (1991). Analysis and interpretation of treatment ef-fects in subgroups of patients in randomized clinical trials. *Journal of the American Medical Associa-tion* **266**:93–8.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                      5/22/2006

63. Peterson, B., George, S.L. (1993). Sample size requirements and length of study for testing interaction in a 1 x *k* factorial design when time-to-failure is the outcome. *Controlled Clinical Trials* **14**:511–522.