**Articles**

# Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study

David J Graham, David Campen, Rita Hui, Michele Spence, Craig Cheetham, Gerald Levy, Stanford Shoor, Wayne A Ray

## Summary

**Background** Controversy has surrounded the question about whether high-dose rofecoxib increases or naproxen decreases the risk of serious coronary heart disease. We sought to establish if risk was enhanced with rofecoxib at either high or standard doses compared with remote non-steroidal anti-inflammatory drug (NSAID) use or celecoxib use, because celecoxib was the most common alternative to rofecoxib.

**Methods** We used data from Kaiser Permanente in California to assemble a cohort of all patients age 18–84 years treated with a NSAID between Jan 1, 1999, and Dec 31, 2001, within which we did a nested case-control study. Cases of serious coronary heart disease (acute myocardial infarction and sudden cardiac death) were risk-set matched with four controls for age, sex, and health plan region. Current exposure to cyclo-oxygenase 2 selective and non-selective NSAIDs was compared with remote exposure to any NSAID, and rofecoxib use was compared with celecoxib.

**Findings** During 2302029 person-years of follow-up, 8143 cases of serious coronary heart disease occurred, of which 2210 (27·1%) were fatal. Multivariate adjusted odds ratios versus celecoxib were: for rofecoxib (all doses), 1·59 (95% CI 1·10–2·32, p=0·015); for rofecoxib 25 mg/day or less, 1·47 (0·99–2·17, p=0·054); and for rofecoxib greater than 25 mg/day, 3·58 (1·27–10·11, p=0·016). For naproxen versus remote NSAID use the adjusted odds ratio was 1·14 (1·00–1·30, p=0·05).

**Interpretation** Rofecoxib use increases the risk of serious coronary heart disease compared with celecoxib use. Naproxen use does not protect against serious coronary heart disease.

## Introduction

Cyclo-oxygenase 2 (COX2) selective non-steroidal anti-inflammatory drugs (NSAIDs) are prescribed for the treatment of arthritis and other musculoskeletal complaints because of the reduced occurrence of gastrointestinal toxic effects compared with non-selective NSAIDs.[1,2] Questions about cardiovascular risk with these COX2-selective drugs were raised by the finding of a five-fold difference in incidence of acute myocardial infarction between patients treated with rofecoxib 50 mg/day and naproxen 1000 mg/day in a larger randomised clinical trial (Vioxx Gastrointestinal Outcomes Research; VIGOR).[3] and by a meta-analysis of clinical trials of celecoxib and rofecoxib.[3] Because the VIGOR trial did not have a placebo group, its findings could have suggested either an adverse effect of rofecoxib, an adverse effect of coxibs in general, or a hitherto unrecognised protective effect of naproxen.[4,5] In view of the high use of COX2 drugs in the USA, even a small increase in adverse cardiovascular events would have substantial public-health effects.

Several observational studies have sought to clarify the findings of the VIGOR trial. High-dose rofecoxib (>25 mg/day) has been reported to enhance the risk of adverse cardiovascular events relative to non-users of any NSAID[6] or users of celexoxib.[7] In one study, no increased risk was noted with rofecoxib compared with other NSAIDs, but high-dose rofecoxib was not assessed separately.[8] Studies investigating the effect of naproxen on cardiovascular risk have yielded conflicting results. In three cohort studies, no reduction in risk was reported with naproxen use,[6,7,8] whereas a cardioprotective effect was noted in three other studies.[9–11] We sought to address these important questions about the cardiovascular effects of NSAIDs.

## Methods

Kaiser Permanente is a national integrated managed care organisation providing comprehensive health care to more than 6 million residents in the state of California.[11] The enrolled population varies with respect to age, educational attainment, family income, and ethnic origin. The organisation maintains computer files of eligibility for care, outpatient visits, admissions, medical procedures, emergency room visits, laboratory testing, and outpatient drug prescriptions for all its members. Mortality status, including underlying cause of death as recorded on death certificates, is periodically updated with data obtained from the California Department of Health, Center for Health Statistics. This study was approved by the institutional review boards of both the northern and southern divisions of Kaiser Permanente in California.

Lancet 2005; 365: 475–81

See Comment page 449

Published online
January 25, 2005
http://image.thelancet.com/
extras/05art1005web.pdf

Office of Drug Safety, Center
for Drug Evaluation and
Research, Food and Drug
Administration, Rockville, MD,
USA (D J Graham MD); The
Permanente Medical Group
(D Campen MD, S Shoor MD),
Pharmacy Outcomes Research
Group (R Hui PharmD,
M Spence PhD,
C Cheetham PharmD), and
Southern California
Permanente Medical Group
(G Levy MD), Kaiser
Permanente, Oakland, CA, USA;
Department of Preventive
Medicine and Center for
Education and Research on
Therapeutics, Vanderbilt
University School of Medicine,
Nashville, TN, USA
(Prof W A Ray PhD); and
Geriatric Research, Education,
and Clinical Center, Nashville
Veterans Administration
Medical Center, Nashville, TN,
USA (Prof W A Ray)

Correspondence to:
Dr David J Graham
GRAHAMD@cder.fda.gov



For personal use. Only reproduce with permission from Elsevier Ltd.

475

We assembled a cohort of NSAID-treated patients to undertake a nested case-control study. From Jan 1, 1999, to Dec 31, 2001, we identified all individuals age 18–84 years who filled at least one prescription for a COX2 selective (celecoxib or rofecoxib) or non-selective (all other) NSAID. Those with at least 12 months of health plan coverage before the date of that first NSAID prescription were entered into the cohort if they had no diagnoses of cancer, renal failure, liver failure, severe respiratory disease, organ transplantation, or HIV/AIDS during the screening interval. We followed up cohort members from this entry date until the end of the study period (December, 2001) or until occurrence of an acute myocardial infarction or death, whichever came first.

The study outcome was incident serious coronary heart disease, defined as acute myocardial infarction requiring admission or sudden cardiac death. We identified acute myocardial infarction requiring admission with the international classification of diseases, 9th revision, clinical modification (ICD-9-CM) code 410 (acute myocardial infarction) or 411·1 (intermediate coronary syndrome, as long as laboratory documentation was available of acute myocardial infarction—ie, raised creatine kinase MB fraction or troponin I). We classified outpatient deaths as sudden cardiac death if the underlying cause of death listed hypertensive heart disease, ischaemic heart disease, conduction disorders, dysrhythmias, heart failure, atherosclerotic heart disease, sudden death, or death from an unknown cause.[9] In validation studies of computerised hospital data, a principal diagnosis code for acute myocardial infarction has a positive predictive value between 92%[14] and 95%[11] and a sensitivity of 94%.[14] Furthermore, we used computerised laboratory data, from which we noted that 87·4% of patients admitted with acute myocardial infarction had cardiac enzyme concentrations that confirmed diagnosis. Although there is probably more misclassification of the out-of-hospital sudden cardiac deaths, their inclusion is important (and routine in clinical trials), because coronary artery disease frequently manifests as sudden death outside of the hospital.[15]

For every case, we randomly selected four controls from individuals under observation in the study cohort on the date of the case event (index date), and matched them for age (year of birth), sex, and health plan region (north or south).[17] A given cohort member selected as a control for a case on one date could become a control for another case occurring on a later index date, as long as he or she remained in the study cohort and was therefore also at risk of becoming a case. Thus, a control could subsequently become a case. We excluded potential cases and controls if they were not enrolled on the index date and for at least 11 of the 12 preceding months. During the study period, pharmacy benefits persisted for enrolment lapses of up to 1 calendar month.

We established the NSAID exposure status of cases and controls at the case index date. We based exposure classification on the duration, or days of drug supply, dispensed in the NSAID prescription. Patients were current users if the duration of the NSAID prescription closest to and preceding the index date overlapped with the index date. Remote users were those whose drug supply ended more than 60 days before the index date. We judged these patients unlikely to be taking the prescription NSAID on the index data and thus they were the reference category in several analyses. Recent users were individuals whose NSAID prescriptions ended between 1 and 60 days before the index date. We classified these patients separately for several reasons. The effects of NSAIDs on cardiovascular risk might persist a short time after the last dose. Because of dosing as required or incomplete compliance, some recent users might have been taking the drug after the nominal end of the dispensed supply. Thus, we created a separate category to avoid the misclassification that would arise by regarding these patients as either current or remote users.

We initially classified rofecoxib exposure as either standard (≤25 mg/day) or high (>25 mg/day) dose on the basis of the dispensed tablet strength. However, review of computerised patients' prescription histories showed inconsistencies between the instructions for use, days supply, and frequency of refills. For example, some patients dispensed the 25 mg strength were taking two tablets per day, whereas others who were dispensed the 50 mg strength were taking a half tablet per day. To address this potential misclassification, computerised printouts of all NSAID prescriptions for all rofecoxib-treated patients, covering the entire study period, were reviewed by a panel masked to case or control status (DC, RH, MS, CC). We reclassified patients with respect to rofecoxib dose status only if there was unanimous consensus among panel members.

For the 365-day period before the index date, we obtained data for potential risk factors for the occurrence of serious coronary heart disease. These included: cardiovascular admissions, as defined by diagnosis-related group coding (acute myocardial infarction, coronary revascularisation, angina, congestive heart failure, other ischaemic heart disease, cardiac arrhythmias, cerebrovascular accidents, peripheral vascular disease); emergency room visits for cardiovascular reasons and outpatient diagnoses for tobacco use, as defined by ICD 9-CM coding; and cardiovascular prescription drug use (thiazide diuretics, loop diuretics, angiotensin-converting-enzyme inhibitors or angiotensin-receptor blockers, calcium-channel blockers, β blockers, digoxin, nitrates, antiarrhythmics, 3-hydroxy-3-methyl-glutaryl coenzyme A reductase inhibitors, fibrates, nicotinic acid, antiplatelet drugs [ticlopidine, clopidogrel], anticoagulants [warfarin, low molecular weight heparin], insulin, oral hypoglycaemics). We also obtained data for non-cardiovascular admissions and emergency room visits, same-day admissions for medical procedures, outpatient diagnoses of alcohol dependence, rheumatoid arthritis,

For personal use. Only reproduce with permission from Elsevier Ltd.

and prescription use of hormone replacement therapy, oral prednisone (>1000 mg in the past year) or disease-modifying antirheumatic drugs.

To control for potential differences in cardiovascular disease between study exposure groups, we calculated a cardiovascular risk score for cases and controls.[4,9,16-19] The score was estimated from a logistic regression analysis of the effects of the above factors on the odds of serious coronary heart disease for unexposed (remote or recent use) patients. We used the coefficients from this regression to calculate every participant's predicted probability of serious coronary heart disease—the risk score. This score then was categorised into ten values, with the lowest value representing patients with no diagnosed or treated cardiovascular disease and the remaining nine representing approximate quantiles of the controls. A 12·1-fold difference in risk was present between the lowest (0) and highest (9) value of the score, with a progressive increase in risk with every increasing score value. The results thus obtained were virtually identical to those from more complex models that included the individual components of the risk score. For example, the odds ratio for recent users, the largest exposure group in our study, was 1·140 (95% CI 1·062–1·223) with the complex model and 1·109 (1·034–1·190) with the cardiovascular risk score, a difference of 0·031. Similarly, for ibuprofen users, the largest currently exposed drug group in our study, the odds ratio with the complex models was 1·074 (0·969–1·191) and with the score-based model it was 1·059 (0·956–1·174), a difference of 0·015, less than 2%. Of note, the risk score produced slightly more conservative point estimates and lower bounds for the CIs than did the complex models.

We used conditional logistic regression to compare current exposure to a specific NSAID with remote exposure to any NSAID. We obtained estimates of the odds ratio and 95% CIs from the regression. An a-priori aim of the study was to compare current exposure to either standard-dose or high-dose rofecoxib with current exposure to celecoxib. The same regression model was rerun with celecoxib as the reference to obtain odds ratio estimates for standard-dose and high-dose rofecoxib. We did all analyses with Stata version 7.0 (College Station, TX, USA).

To assess the potential for confounding from low-dose aspirin use, over-the-counter NSAID use, smoking history, and family history of acute myocardial infarction, we undertook a standardised telephone survey of a random sample of controls currently exposed to celecoxib, ibuprofen, naproxen, or rofecoxib, or controls with remote exposure to a NSAID.

### Role of the funding source

A document describing portions of this study was prepared for the US Food and Drug Administration (FDA) by the lead author (DG), and the FDA posted this on its website on Nov 2, 2004.[11] This document was preliminary, and has been a source of controversy within the FDA. With respect to the study described here, which has been revised from that previously posted to correctly apply enrolment criteria for cases and controls, Kaiser Permanente and FDA management had no role in study design, data collection, data analysis, data interpretation, or writing of the report. The corresponding author had full access to all the data in the study and had final responsibility for the decision to submit for publication.

### Results

A total of 1 394 764 people contributed 2 302 029 person-years of observation time to the study cohort of NSAID users. Patients received various NSAIDs, including celecoxib (n=40 405), ibuprofen (991 261), naproxen (435 492), and rofecoxib (26 748). From this cohort, we identified 8199 cases of serious coronary heart disease and 32 796 matched controls. Of these, we excluded 56 cases and 1300 controls who did not meet the enrolment criteria, resulting in 8143 cases and 31 496 controls.

| | Cases (n=8143) | Controls (n=31 496) |
|---|---|---|
| Age (years) | 66.8 (11.6) | 67.0 (11.5) |
| Men | 5031 (62%) | 19 399 (62%) |
| Cardiovascular admission in past year* | 1153 (14%) | 962 (3%) |
| Myocardial infarction or revascularisation | 202 (2%) | 133 (<1%) |
| Angina | 230 (3%) | 271 (1%) |
| Heart failure | 287 (4%) | 306 (<1%) |
| Other ischaemic heart disease | 354 (4%) | 392 (1%) |
| Cardiac arrhythmia | 186 (2%) | 204 (1%) |
| Peripheral vascular disease | 45 (1%) | 35 (<1%) |
| Stroke | 123 (2%) | 143 (<1%) |
| Cardiovascular drug use in past year* | 6526 (80%) | 18 274 (58%) |
| Angiotensin-converting-enzyme inhibitor | 2839 (35%) | 6287 (20%) |
| Angiotensin-receptor blocker | 372 (5%) | 596 (2%) |
| Antiarrhythmic drug | 719 (3%) | 345 (1%) |
| Anticoagulant drug | 494 (6%) | 1014 (3%) |
| β blocker | 3162 (39%) | 6929 (22%) |
| Calcium-channel blocker | 2196 (27%) | 4483 (14%) |
| Digitalis glycoside | 808 (10%) | 1126 (4%) |
| Hypoglycaemic drug | 2196 (27%) | 3735 (12%) |
| Lipid-lowering drug | 2800 (34%) | 6069 (19%) |
| Loop diuretic | 1714 (21%) | 2214 (7%) |
| Nitrate | 2382 (29%) | 2658 (8%) |
| Platelet inhibitor | 432 (5%) | 434 (1%) |
| Thiazide diuretic | 2038 (25%) | 6752 (21%) |
| Other medical care in past year | | |
| Non-cardiovascular admission | 3268 (12%) | 2514 (8%) |
| Cardiovascular emergency room visit† | 337 (4%) | 276 (1%) |
| Non-cardiovascular emergency room visit† | 2778 (34%) | 6931 (22%) |
| Oestrogen use by women | 1162 (14%) | 5125 (16%) |
| Smoking-related diagnosis | 552 (7%) | 1013 (3%) |
| Alcohol dependence | 63 (1%) | 161 (1%) |
| Treated by rheumatologist | 166 (1%) | 524 (2%) |
| Diagnosis of rheumatoid arthritis | 55 (1%) | 139 (<1%) |
| Disease-modifying antirheumatic drug use | 191 (2%) | 536 (2%) |
| Prednisone use (>1000 mg) | 378 (5%) | 691 (2%) |

Data are mean (SD) or number of participants (%). *Totals lower than the sum of the constituting subcategories because patients could contribute to more than one subcategory. †Visits not resulting in admission.

Table 1: Characteristics of cases and matched controls from a base population of 1 394 764 users of COX2 selective and non-selective NSAIDs, 1999–2001

For personal use. Only reproduce with permission from Elsevier Ltd.

**Articles**

| | Celecoxib (n=491) | Ibuprofen (n=2573) | Naproxen (n=1409) | Rofecoxib (n=196) | Remote use (n=18720) |
|---|---|---|---|---|---|
| Age (years) | 73.4 (8.5) | 66.9 (11.2) | 68.4 (10.9) | 72.1 (9.5) | 66.4 (11.2) |
| Men | 245 (50%) | 1591 (62%) | 801 (57%) | 91 (46%) | 11807 (63%) |
| Cardiovascular risk score | 4.21 (3.24) | 3.11 (3.14) | 3.72 (3.15) | 3.34 (3.16) | 2.91 (3.16) |
| Cardiovascular admissions in past year | 31 (6%) | 59 (2%) | 51 (4%) | 5 (3%) | 581 (3%) |
| Cardiovascular drug use in past year | 373 (76%) | 1535 (60%) | 878 (62%) | 129 (66%) | 10388 (55%) |
| Angiotensin-converting-enzyme inhibitor | 140 (29%) | 532 (20%) | 303 (21%) | 43 (22%) | 3555 (19%) |
| Angiotensin-receptor blocker | 29 (6%) | 33 (1%) | 28 (2%) | 2 (1%) | 348 (2%) |
| Antiarrhythmic drug | 11 (2%) | 29 (1%) | 19 (1%) | 2 (1%) | 234 (1%) |
| Anticoagulant drug | 46 (9%) | 38 (1%) | 27 (2%) | 15 (8%) | 674 (4%) |
| β blocker | 159 (32%) | 589 (23%) | 318 (23%) | 50 (26%) | 3974 (21%) |
| Calcium-channel blocker | 115 (23%) | 351 (14%) | 231 (16%) | 31 (16%) | 2532 (14%) |
| Digitalis glycoside | 40 (8%) | 74 (3%) | 44 (3%) | 9 (5%) | 679 (4%) |
| Hypoglycaemic drug | 78 (16%) | 324 (13%) | 182 (13%) | 18 (9%) | 1922 (12%) |
| Lipid-lowering drug | 130 (26%) | 489 (19%) | 287 (20%) | 48 (24%) | 3505 (19%) |
| Loop diuretic | 82 (17%) | 165 (6%) | 122 (9%) | 19 (10%) | 1239 (7%) |
| Nitrate | 64 (13%) | 243 (9%) | 126 (9%) | 23 (12%) | 1463 (8%) |
| Platelet inhibitor | 9 (2%) | 27 (1%) | 19 (1%) | 1 (1%) | 278 (1%) |
| Thiazide diuretic | 127 (26%) | 605 (24%) | 352 (25%) | 56 (29%) | 3658 (20%) |
| Other medical care in past year | | | | | |
| Non-cardiovascular admission | 49 (10%) | 176 (7%) | 97 (7%) | 15 (8%) | 1524 (8%) |
| Non-cardiovascular emergency room visit* | 100 (20%) | 532 (21%) | 248 (18%) | 36 (18%) | 4162 (22%) |
| Oestrogen use by women | 107 (22%) | 434 (17%) | 322 (23%) | 52 (27%) | 2779 (15%) |
| Smoking-related diagnoses | 8 (2%) | 88 (3%) | 40 (3%) | 2 (1%) | 610 (3%) |
| Treated by rheumatologist | 18 (4%) | 39 (2%) | 39 (3%) | 17 (9%) | 239 (1%) |
| Disease-modifying antirheumatic drug use | 28 (6%) | 60 (2%) | 46 (3%) | 9 (5%) | 218 (1%) |
| Prednisone use (>1000 mg) | 22 (4%) | 56 (2%) | 39 (3%) | 12 (6%) | 368 (2%) |

Data are mean (SD) or number of controls (%). *Visits not resulting in admission.

Table 2: Characteristics of controls currently exposed to celecoxib, ibuprofen, naproxen or rofecoxib, or remotely exposed to an NSAID.

Of the 8143 cases of serious coronary heart disease, 6635 were admitted with acute myocardial infarction and 1508 had sudden cardiac death. Laboratory confirmation (raised creatine kinase MB fraction or troponin I) was present in 5799 (87%) patients admitted with acute myocardial infarction. Of all admitted cases, 702 (11%) died. As expected, the prevalence of previous cardiovascular admission, emergency room visits, and drug use was uniformly increased in cases (table 1).

To establish if risk factors for cardiovascular disease varied by NSAID use, we investigated the distribution of these factors in controls (table 2). Controls exposed to ibuprofen or naproxen, and those with remote exposure to any NSAID, were similar with respect to age, sex, and most covariates, although anticoagulant drug use was more common in the remotely exposed group than in the other groups. Rofecoxib-exposed controls were older, more likely to be women and to be treated by a rheumatologist, and more likely to have used anticoagulants or oral prednisone than controls exposed to ibuprofen, naproxen, or a remote NSAID. Celecoxib-treated controls had more cardiovascular admissions in the preceding year and had a higher frequency of use for various cardiovascular drugs than those exposed to rofecoxib. Cardiovascular risk scores were significantly greater for controls treated with celecoxib than for those from all other groups including rofecoxib (p=0.0001, rofecoxib vs celecoxib).

When all current users of rofecoxib were compared with remote users of NSAIDs, the risk of serious coronary heart disease was enhanced 1.34-fold (p=0.066; table 3). Risk fell slightly with celecoxib (odds ratio 0.84) and rose a little with standard-dose rofecoxib

| | Cases | Controls | Unadjusted odds ratio (95% CI) | Adjusted* odds ratio (95% CI) | p |
|---|---|---|---|---|---|
| Compared with remote use | | | | | |
| Remote use | 4658 | 18720 | 1.00 | 1.00 | |
| Recent use | 1720 | 6258 | 1.12 (1.05-1.20) | 1.11 (1.03-1.19) | 0.004 |
| Current use | | | | | |
| Celecoxib | 126 | 491 | 1.05 (0.86-1.28) | 0.84 (0.67-1.04) | 0.12 |
| Ibuprofen | 670 | 2573 | 1.07 (0.98-1.18) | 1.06 (0.96-1.17) | 0.27 |
| Naproxen | 367 | 1409 | 1.07 (0.95-1.21) | 1.14 (1.00-1.30) | 0.05 |
| Rofecoxib (all doses) | 68 | 196 | 1.39 (1.05-1.83) | 1.34 (0.98-1.82) | 0.066 |
| Rofecoxib ≤25 mg/day | 58 | 188 | 1.23 (0.92-1.66) | 1.23 (0.89-1.71) | 0.21 |
| Rofecoxib >25 mg/day | 10 | 8 | 5.03 (1.98-12.76) | 3.00 (1.09-8.31) | 0.03 |
| Other NSAIDs | 534 | 1849 | 1.19 (1.07-1.32) | 1.13 (1.01-1.27) | 0.03 |
| Compared with celecoxib use | | | | | |
| Celecoxib use | 126 | 491 | 1.00 | 1.00 | |
| Remote use | 4658 | 18720 | 0.95 (0.78-1.16) | 1.11 (0.96-1.48) | 0.12 |
| Recent use | 1720 | 6258 | 1.07 (0.87-1.31) | 1.32 (1.06-1.65) | 0.015 |
| Current use | | | | | |
| Ibuprofen | 670 | 2573 | 1.02 (0.82-1.27) | 1.26 (1.00-1.60) | 0.054 |
| Naproxen | 367 | 1409 | 1.02 (0.81-1.28) | 1.36 (1.06-1.75) | 0.016 |
| Rofecoxib (all doses) | 68 | 196 | 1.32 (0.94-1.85) | 1.59 (1.10-2.32) | 0.015 |
| Rofecoxib ≤25 mg/day | 58 | 188 | 1.17 (0.82-1.67) | 1.47 (0.99-2.17) | 0.054 |
| Rofecoxib >25 mg/day | 10 | 8 | 4.78 (1.85-12.38) | 3.58 (1.27-10.11) | 0.016 |
| Other NSAIDs | 534 | 1849 | 1.13 (0.91-1.41) | 1.35 (1.06-1.72) | 0.015 |

*Adjusted for age, sex, and health plan region, cardiovascular risk score, admission for non-cardiac-related disorders and same-day procedures, emergency room visits for non-cardiac reasons, hormone replacement therapy, and high-dose prednisone.

Table 3: Risk of acute myocardial infarction with use of selected NSAIDs compared with remote use of a NSAID or with current use of celecoxib.

For personal use. Only reproduce with permission from Elsevier Ltd.

Articles

| | Celecoxib use (n=169) | Ibuprofen use (n=190) | Naproxen use (n=192) | Rofecoxib use (n=81) | Remote use (n=185) | Total (n=817) | p |
|---|---|---|---|---|---|---|---|
| Aspirin use | 32 (19%) | 43 (23%) | 53 (28%) | 19 (23%) | 44 (24%) | 191 (23%) | 0.43 |
| Over-the-counter NSAID use (≥2 days a week for ≥1 year) | 26 (15%) | 18 (9%) | 23 (12%) | 11 (14%) | 24 (13%) | 102 (12%) | 0.55 |
| Smoking history | | | | | | | |
| Current | 15 (9%) | 17 (9%) | 22 (11%) | 6 (7%) | 20 (11%) | 80 (10%) | 0.80 |
| Past | 72 (43%) | 100 (53%) | 78 (41%) | 35 (43%) | 89 (48%) | 374 (46%) | 0.14 |
| Family history of acute myocardial infarction | | | | | | | |
| First-degree relative | 65 (38%) | 90 (47%) | 89 (46%) | 34 (42%) | 84 (45%) | 362 (44%) | 0.45 |
| First-degree at early age* | 27 (16%) | 34 (18%) | 34 (18%) | 13 (16%) | 29 (16%) | 137 (17%) | 0.97 |

Data are number of controls (%). *Men age <55 years, women age <65 years.

Table 4: Aspirin use, over-the-counter NSAID use, smoking history, and family history of acute myocardial infarction in 817 randomly selected controls with remote NSAID exposure or current exposure to celecoxib, ibuprofen, naproxen, or rofecoxib

(1·23). When all current users of rofecoxib were compared with current users of celecoxib, risk was increased 1·59-fold (p=0·015, table 3). For high-dose rofecoxib, the odds ratio was 3·58 (p=0·016) and for standard-dose rofecoxib it was 1·47 (p=0·054). Compared with remote use, risk of serious coronary heart disease was amplified with recent use of any NSAID, current use of naproxen, and current use of other NSAIDs. The increased odds ratio for other NSAIDs was attributable to the effects of diclofenac (odds ratio 1·60 [95% CI 0·92–2·79]; p=0·09) and indometacin (1·30 [1·06–1·59]; p=0·01).

A random sample of 1015 controls with current exposure to celecoxib, ibuprofen, naproxen, or rofecoxib or with remote exposure to a NSAID was contacted by telephone to complete a brief questionnaire; 817 (80%) participated. Controls were generally comparable with respect to cardiovascular disease risk factors, although low-dose aspirin use was somewhat lower in celecoxib-exposed controls than in the other groups (table 4).

## Discussion

The data from the present study provide further evidence that rofecoxib increases the risk of serious coronary heart disease.

Our study has several limitations. NSAID exposure was established from records of filled prescriptions and thus would not include data for drugs obtained over the counter. A telephone survey of a random sample of controls established that use of over-the-counter NSAIDs did not differ by prescription NSAID use status. Therefore, any misclassification of exposure should be non-differential and would not account for the study findings.

Although we adjusted for a wide range of recognised and potential cardiovascular risk factors, we did not have information on important factors such as smoking, family history of myocardial infarction, and use of low-dose aspirin. However, the findings of the telephone survey showed these factors were not differentially distributed with respect to NSAID exposure and thus such confounding is unlikely to account for study findings. These survey results accord with those of other

studies, in which low-dose aspirin use[22-24] or smoking behaviour[22,24] did not differ by specific NSAID. In an analysis of data from a nationwide in-home survey of US Medicare beneficiaries, patients treated with celecoxib, rofecoxib, or non-selective NSAIDs did not differ with respect to body-mass index, smoking behaviour, aspirin use, or educational level.[7]

Although we studied serious coronary heart disease in a population of 6 million people, sample size was limited for some comparisons. Relatively few people in the study base were exposed to high-dose rofecoxib. Nevertheless, the sample size was sufficient to show a substantially higher risk for high-dose use than for either remote NSAID use or celecoxib use. Our findings accord with those of the two other published epidemiological studies that have analysed use of rofecoxib in doses greater than 25 mg.[6,7]

Because of limited power, we were unable to fully address whether the cardiovascular risk associated with rofecoxib varied by duration of use. This issue arose after interpretation of data for a study of 2586 patients randomly allocated either rofecoxib 25 mg/day or placebo, who were followed up for 3 years for the development of colon polyps (Adenomatous Polyp Prevention on Vioxx; APPROVe).[25] 25 cardiovascular events arose in the placebo group and 45 in the rofecoxib group, and the difference in incidence became significant only after 18 months on the drug.[25] An entirely plausible explanation for these results is insufficient statistical power before 18 months of study time. Indeed, inadequate sample size and low power of tests of interaction make it unlikely that true differences could be found when assessing the subgroup of events occurring early in the study.[14]

In our study, the mean duration of use before occurrence of a study event was 113 days (range 4–688) with standard-dose rofecoxib and 112 days (8–262) with high-dose use (p=0·96), consistent with the idea that risk begins early in treatment. Furthermore, analysis by the FDA of data from the VIGOR trial showed that the survival curve for acute myocardial infarction risk with high-dose rofecoxib began to diverge from the naproxen curve after 1 month of rofecoxib use.[22] The absence of divergence during the first month could be attributable to the few events in either study group, leading to inadequate

For personal use. Only reproduce with permission from Elsevier Ltd.

**Articles**

statistical power.[34] Thus, these results cannot be viewed as evidence that the first month is free of risk. Indeed, in this same FDA review, analysis of a Merck-sponsored postapproval randomised clinical trial (study 090) of very short-term use of the 12·5 mg rofecoxib dose showed substantial differences in cardiovascular risk between rofecoxib and nabumetone or placebo.[37] Moreover, findings of three reports—two large nested case-control studies[3,28] and a cumulative meta-analysis of rofecoxib clinical trials[39]—strongly suggest that cardiovascular risk begins early with both standard-dose and high-dose rofecoxib treatment.

The present study provides data relevant to several other active controversies about the cardiovascular safety of NSAIDs. In current users of celecoxib, a slightly reduced risk of serious coronary heart disease was noted; in other studies, a similar diminished risk with celecoxib was seen.[4,3] Indeed, in several studies,[30,31] potentially beneficial effects of celecoxib on endothelial function and coronary-artery blood flow have been reported, and findings of a case-control study published online in December, 2004,[38] showed that celecoxib protected against the occurrence of non-fatal myocardial infarction compared with non-use of NSAIDs or rofecoxib use. However, the US National Cancer Institute halted its Adenoma Prevention with Celebrex (APC) trial[41] after the data safety monitoring board reported a 2·5-fold greater risk of acute myocardial infarction and stroke in patients treated with celecoxib 400 mg/day and a 3·4-fold increase in risk with 800 mg/day.

Findings of other studies raise concerns about a COX2 class effect. Higher rates of acute myocardial infarction, stroke, and death have been recorded in patients treated with valdecoxib after coronary-artery bypass surgery than in those given opioid treatment for postoperative pain.[11] These increases were not significant but the study was small. The manufacturer of valdecoxib announced the results of a second study,[14] in which an increased risk of serious coronary heart disease was again noted in patients treated with the drug after bypass surgery. In a large clinical trial,[15] the rate of acute myocardial infarction was increased in individuals treated with another COX2-selective drug, lumiracoxib, compared with naproxen, especially in those not taking low-dose aspirin. This difference was not significant and was not present when compared with ibuprofen use. Additional data from clinical trials in patients with baseline cardiovascular disease would be useful.[36]

After publication of the VIGOR trial findings, considerable speculation arose that naproxen reduced the risk of coronary heart disease.[1] However, our findings, like those of some[3,9] but not all[10-12] others, suggest this drug does not have cardioprotective effects. Indeed, the present data show the possibility of a small increased risk of serious coronary heart disease, and a US National Institutes of Health trial was stopped after preliminary analysis suggested a 50% increase in risk of acute

myocardial infarction and stroke in patients treated with naproxen.[27] The lack of a protective effect of naproxen is important, because the drug frequently is a comparator in clinical trials of new coxibs.[1,35] Thus, findings from such studies showing that the new drug has an increased risk of cardiovascular disease relative to naproxen should alert doctors and patients to potential cardiotoxic effects.

While this report was in preparation, rofecoxib was withdrawn from the market by the manufacturer.[8] Many would argue that, in view of the findings of the VIGOR trial[1] and subsequent observational studies,[4,5] withdrawal or restriction of rofecoxib should have happened much earlier.[29,36]

We should assess the potential public-health effects of failure to take earlier action. From 1999 to September, 2004, an estimated 106·7 million rofecoxib prescriptions were dispensed in the USA, of which 17·6% were high-dose.[39] In two Merck-sponsored randomised clinical trials,[1,25] relative risks for acute myocardial infarction of 5 for high-dose rofecoxib and 2 for the standard dose were recorded. The background rate for acute myocardial infarction among control groups from studies of cardiovascular risk in NSAID users varied from 7·9 per 1000 person-years in CLASS[3] to 12·4 per 1000 person-years in TennCare.[6] Using the relative risks from the above-mentioned randomised clinical trials and the background rates seen in NSAID risk studies, an estimated 88000–140000 excess cases of serious coronary heart disease probably occurred in the USA over the market-life of rofecoxib.[42] The US national estimate of the case-fatality rate (fatal acute myocardial infarction plus sudden cardiac death) was 44%,[44] which suggests that many of the excess cases attributable to rofecoxib use were fatal.

In the future, when trials such as VIGOR show that a new treatment confers a greater risk of a serious adverse effect than a standard treatment, we must be much more careful about allowing its unrestrained use.

**Contributors**
D J Graham had the idea for the study, was responsible for protocol development, study supervision, statistical analysis, data interpretation, and survey design, and wrote the first draft of the manuscript. D Campen shared in study conception and contributed to protocol development, study supervision, data interpretation, and critical revision of the manuscript. R Hui and M Spence contributed to protocol development, data extraction, quality assurance, data interpretation, and critical revision of the manuscript. C Cheetham contributed to protocol development, survey design and execution, quality assurance, data interpretation, and critical revision of the manuscript. G Levy and S Shoor contributed to protocol development, data analysis, data interpretation, and critical revision of the manuscript. W A Ray contributed to protocol development, statistical analysis, data interpretation, quality assurance, and critical revision of the manuscript.

**Conflict of interest statement**
WAR served as a consultant to Pfizer and to plaintiffs' attorneys regarding rofecoxib. SS has undertaken research funded by Amgen and is on the speakers' bureau for Abbott Laboratories. All other authors declare that they have no conflict of interest.

**Acknowledgments**
We thank Prof Gurkirpal Singh for helpful suggestions relating to data analysis. This work was supported by Kaiser Permanente, CA, USA, and

For personal use. Only reproduce with permission from Elsevier Ltd.

a contract with FDA. WAR was supported by cooperative agreements from the FDA (FD-U-001641) and the Agency for Healthcare Research and Quality, Centers for Education and Research in Therapeutics (HS1–0384). The views expressed are those of the authors and do not necessarily reflect those of the FDA.

**References**

1   Silverstein FE, Faich G, Goldstein JL, et al. Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS study—a randomized controlled study. *JAMA* 2000; 284: 1247–55.

2   Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. *N Engl J Med* 2000; 343: 1520–28.

3   Mukherjee D, Nissen SE, Topol EJ. Risk of cardiovascular events associated with selective COX-2 inhibitors. *JAMA* 2001; 286: 954–59.

4   Weir MR, Sperling RS, Reicin A, Gertz BJ. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. *Am Heart J* 2003; 146: 591–604.

5   Konstam MA, Weir MR, Reicin A, et al. Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib. *Circulation* 2001; 104: 2280–88.

6   Ray WA, Stein CM, Daugherty JR, Hall K, Arbogast PG, Griffin MR. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. *Lancet* 2002; 360: 1071–73.

7   Solomon DH, Schneeweiss S, Glynn RJ, et al. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. *Circulation* 2004; 109: 2068–73.

8   Mamdani M, Rochon P, Juurlink DN, et al. Effect of selective cyclooxygenase 2 inhibitors and naproxen on short term risk of acute myocardial infarction in the elderly. *Arch Intern Med* 2003; 163: 481–86.

9   Ray WA, Stein CM, Hall K, Daugherty JR, Griffin MR. Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease: an observational study. *Lancet* 2002; 359: 118–23.

10  Solomon DH, Glynn RJ, Levin R, Avorn J. Nonsteroidal anti-inflammatory drug use and acute myocardial infarction. *Arch Intern Med* 2002; 162: 1099–104.

11  Watson DJ, Rhodes T, Cai B, Guess HA. Lower risk of thromboembolic cardiovascular events with naproxen among patients with rheumatoid arthritis. *Arch Intern Med* 2002; 162: 1105–10.

12  Rahme E, Pilote L, LeLorier J. Association between naproxen use and protection against acute myocardial infarction. *Arch Intern Med* 2002; 162: 1111–15.

13  Sidney S, Petitti DB, Soff GA, Cundiff DL, Tolan KK, Quesenberry CP. Venous thromboembolic disease in users of low-estrogen combined estrogen-progestin oral contraceptives. *Contraception* 2004; 70: 3–10.

14  Fisher ES, Whaley FS, Krushat WM, et al. The accuracy of Medicare's hospital claims data: progress has been made, but problems remain. *Am J Public Health* 1992; 82: 243–48.

15  Rawson NSB, Malcolm E. Validity of the recording of ischaemic heart disease and chronic obstructive pulmonary disease in the Saskatchewan health care datafiles. *Stat Med* 1995; 14: 2627–43.

16  Friesinger GC, Hurst JW. The natural history of atherosclerotic coronary heart disease: an historical perspective. In: Alexander RW, Schlant RC, Fuster V, O'Rourke RA, Roberts R, Sonnenblick EH, eds. Hurst's the heart, 9th edn. New York: McGraw-Hill Medical Publishing Division, 1998: 1127–38.

17  Rothman KJ, Greenland S. Case-control studies. In: Rothman KJ, Greenland S, eds. Modern epidemiology, 2nd edn. Philadelphia: Lippincott-Raven Publishers, 1998: 93–114.

18  Ray WA, Meredith S, Thapa PB, Meador KG, Hall K, Murray KT. Antipsychotics and the risk of sudden cardiac death. *Arch Gen Psychiatry* 2001; 58: 1161–67.

19  Ray WA, Meredith S, Thapa PB, Hall K, Murray KT. Cyclic antidepressants and risk of sudden cardiac death. *Clin Pharmacol Ther* 2004; 75: 234–41.

20  Ray WA, Murry KT, Meridith S, Narasimhulu SS, Hall K, Stein CM. Oral erythromycin and risk of sudden death from cardiac causes. *N Engl J Med* 2004; 351: 1089–96.

21  Graham DJ. Memorandum to the Acting Director of the Office of Drug Safety, Center for Drug Evaluation and Research. US Food and Drug Administration. http://www.fda.gov/cder/drug/infopage/vioxx/vioxxgraham.pdf (accessed Nov 8, 2004).

22  Griffin MR, Piper JM, Daugherty JR, Snowden M, Ray WA. Nonsteroidal anti-inflammatory drug use and increased risk for peptic ulcer disease in elderly persons. *Ann Intern Med* 1991; 114: 257–63.

23  Smalley WE, Ray WA, Daugherty J, Griffin MR. Nonsteroidal anti-inflammatory drug use and colorectal cancer incidence: a population-based study. *Arch Intern Med* 1999; 159: 161–66.

24  Griffin MR, Yared A, Ray WA. Nonsteroidal anti-inflammatory drugs and acute renal failure in elderly persons. *Am J Epidemiol* 2000; 151: 488–96.

25  American College of Rheumatology. Vioxx cardiovascular safety data from the APPROVe study. http://www.rheumatology.org/annual/press/APPROVesession_annouce.asp (accessed Nov 10, 2004).

26  Yusuf S, Wittes J, Probstfield J, Tyroler HA. Analysis and interpretation of treatment effects in subgroups of patients in randomized clinical trials. *JAMA* 1991; 266: 93–98.

27  Targum SL. Review of cardiovascular safety database for Vioxx, Feb 1, 2001. http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf (accessed Nov 10, 2004).

28  Kimmel SE, Berlin JA, Reilly M, et al. Patients exposed to rofecoxib and celecoxib have different odds of nonfatal myocardial infarction. *Ann Intern Med* 2005; 142. Published early online Dec 7, 2004. http://www.acponline.org/journals/annals/myo_infar.pdf (accessed Dec 10, 2004).

29  Juni P, Nartey L, Reichenbach S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. *Lancet* 2004; 364: 2021–29.

30  Chenevard R, Hurlimann D, Bechir M, et al. Selective COX-2 inhibition improves endothelial function in coronary artery disease. *Circulation* 2003; 107: 405–09.

31  Hermann M, Camici G, Fratton A, et al. Differential effects of selective cyclooxygenase-2 inhibitors on endothelial function in salt-induced hypertension. *Circulation* 2003; 108: 2308–11.

32  Kaufman M. Celebrex trial halted after finding of heart risk FDA chief urges patients to ask about alternatives. *Washington Post*, Dec 18, 2004; A1.

33  Ott E, Nussmeier NA, Duke PC, et al. Efficacy and safety of the cyclooxygenase-2 inhibitors parecoxib and valdecoxib in patients undergoing coronary artery bypass surgery. *J Thorac Cardiovasc Surg* 2003; 125: 1481–92.

34  Pfizer. Pfizer provides information to health care professionals about its COX-2 medicine Bextra (valdecoxib). http://www.pfizer.com/are/news_releases/2004pr/mn_2004_1015.html (accessed Oct 15, 2004).

35  Farkouh ME, Kirshner H, Harrington RA, et al. Comparison of lumiracoxib with naproxen and ibuprofen in the Therapeutic Arthritis Research and Gastrointestinal Event Trial (TARGET), cardiovascular outcomes: randomised controlled trial. *Lancet* 2004; 364: 675–84.

36  Topol EJ. Failing the public health-rofecoxib, Merck and the FDA. *N Engl J Med* 2004; 351: 1707–09.

37  Harris G. Study links a fourth painkiller to an increase in heart problems. *New York Times* Dec 21, 2004: A1.

38  Merck. Merck announces voluntary worldwide withdrawal of Vioxx. http://www.merck.com/newsroom/press_releases/product/2004_0930.html (accessed Sept 30, 2004).

39  IMS Health. National Prescription Audit *Plus* Time period 1999 to September 2004, extracted October 2004. Plymouth Meeting, PA, 2004.

40  McAlister FA, Straus SE, Guyatt GH, Haynes RB, for the Evidence-Based Medicine Working Group. Users' guide to the medical literature: XX. Integrating research evidence with the care of the individual patient. *JAMA* 2000; 283: 2829–36.

41  American Heart Association. Heart disease and stroke statistics: 2004 update. http://www.americanheart.org/downloadable/heart/1079736729696HDSStats2004UpdateREV3–19–04.pdf (accessed Oct 19, 2004).

For personal use. Only reproduce with permission from Elsevier Ltd.



Exhibit

EXHIBIT NO. 2
5-9-05
L. GOLKOW

DG 000035

# Drug Safety in America: A Nation Still at Risk

David J. Graham, MD, MPH

DG 000036

No conflicts of interest to disclose

DG 000037

# What placed drug safety on the "front page"?

- Vioxx

  20 million in US, 80 million worldwide

  High-dose – 5x increase in AMI

  Lower-dose – 2x increase in AMI

  Vietnam War: 58K killed; Vioxx: up to 60K



What underlies FDA's inability to protect Americans from unsafe drugs?

- Structural issues
- Cultural issues
- Scientific issues
- Personnel issues

→ institutionalized bias

DG 000038

DG 000039

# Structural issues contributing to FDA's failure (1)

- CDER focus: review and approve new drugs
  ~80% resources focused on NDA review

- CDER pre-approval
  Close collaboration with companies
  Sizeable intellectual investment
  Sense of ownership

- CDER post-approval
  Responsible for regulating post-marketing safety
  No expertise
  Cannot be objective
  Substantial delay; inadequate response



DG 000040

DG 000041

# Structural issues (2)

- Advisory committees

  Members selected by CDER/OND

  CDER decides if meeting needed

  CDER determines what is and is not presented

  CDER determines what is asked and how asked

  Usually same committee that recommended approval

  Lax rules governing conflict of interest

  "...have so many conflicts that they're no longer conflicted"

DG 000042

# FDA advisory committees and COI



**Financial ties**

|  | No | Yes |
|---|---|---|
| Yes | 27 | 1 |
| No | 15 | 19 |

Vote for
Withdrawal

RR=13 (95% CI 2-88)
p<0.0001

# Cultural issues contributing to FDA's failure

- Efficacy >>> (much more important) safety within CDER

- Pressure & institutional bias to approve

- Presumption that drug is safe until proven guilty

- Industry as client – PDUFA – unintended consequence

- Drug safety viewed as "consultant"

    Unequal relationship in terms of power, influence, respect

    "Does not add value"

    Has no power or authority

DG 000043

DG 000044



Scientific issues contributing to FDA's failure:

## Efficacy

- Pharmacologic effect
  - $\downarrow$ BP, serum LDL

- Established through RCTs
  - $H_0$: drug = placebo (no effect)
  - Usually based on surrogate measures

- Evidence of efficacy
  - Rejection of $H_0$
  - Show that effect is different from placebo
  - $P < 0.05$

- Presumes true health benefit
  - Problem: efficacy $\neq$ benefit

DG 000045

Scientific issues contributing to FDA's failure:

## Safety

- Absence of evidence of serious harm or injury interpreted as <u>proof</u> of absence of harm

- Established through RCTs

    $H_0$: drug is safe

- Evidence of safety

    Failure to reject $H_0$ @ p=0.05 level

- Standard guarantees approval of unsafe drugs

    RCTs underpowered to reject $H_0$

    RCTs not designed to reject $H_0$

    Incentives in wrong direction (why would any company want to "prove" that their drug is not safe)

DG 000046

# From FDA's 1999 Vioxx NDA review (1)

## ...CARDIOVASCULAR SAFETY

There is a theoretical concern that patients chronically treated with a COX-2 selective inhibitor may be at higher risk for thromboembolic cardiovascular adverse experiences than patients treated with COX-1/COX-2 inhibitors (conventional NSAIDs), due to the lack of effect of COX-1 inhibition on platelet function.

"theoretical concern"

DG 000047

# From FDA's 1999 Vioxx NDA review (2)

...ned of the cardiovascular bod

Of note, patients with a recent history of MI or unstable angina and with a TIA or CVA within 2 years prior to entry were excluded from the studies, although a significant percentage of the population had a preexisting cardiovascular condition, mostly hypertension (see Table 50 and 51). Additionally, patients taking low dose aspirin or other antiplatelet or anticoagulant medications were excluded from the studies.

## High-risk patients excluded

DG 000048

# From FDA's 1999 Vioxx NDA review (3)

...were only exposed for up to 18 weeks.  The data seem to suggest that in 6-week studies, thromboembolic events are more frequent in patients receiving rofecoxib than placebo but do not show a clear dose response relationship with rofecoxib.  There is a trend towards an increased incidence in longer trials, but it is always expected to have ...

It is difficult to reach meaningful conclusions when the number of events is relatively small and the length of the exposure and doses of rofecoxib used were different among studies. Longer studies included only the 12.5 and 25 mg rofecoxib doses; exposure to the 50 mg dose was limited to 397 patients in 6 month studies and less than 60 patients in 6-month to 86 week studies.

"trend towards increased incidence"

DG 000049

# From FDA's 1999 Vioxx NDA review (4)

<u>In summary</u>: With the available data, it is <u>impossible to answer with complete certainty</u> whether the risk of cardiovascular and thromboembolic events is increased in patients on rofecoxib. A larger database will be needed to answer this and other safety comparison questions.

<u>Patients who need aspirin for cardiovascular reasons should not stop aspirin</u> when taking rofecoxib. There is a potential concern of increasing the risk of GI bleeding events with the concomitant use of rofecoxib and aspirin but limited data are available from clinical studies with this combination.

## FDA's need for "complete certainty"

DG 000050

DG 000051

# Seeds of a disaster

- Concern and signal present before approval

- Insistence on "complete certainty"

- Failure to consider population effects
    - NDA excluded patients with CV risk
        - But who was going to be treated in the "real world"?
    - High background rate for CV events, especially in typical users
        - AMI risk in US for 65-74 wm is 2 per 100 per year
    - Anticipated "block buster" status
        - Potential for extensive harm

- Why not wait for VIGOR results?
    - FDA received data 7 months later

DG 000052

# The fruit exposed

- Pre-approval safety signal ignored by CDER
  - Vioxx proclaimed "safe and effective"
- Post-approval "proof" of harm ignored by CDER
  - 5x ↑ AMI risk
  - FDA silence for almost 2 years
  - Minimal labeling change having no effect – no further action required
  - Implicit determination that "benefits exceed risk"
- What benefit of high-dose Vioxx exceeds 5x ↑ AMI risk?
  - Vioxx not shown to save any lives
  - No better for pain relief than other medicines
  - Numerous alternatives
  - Ask CDER for its benefit-risk "analysis"  There was none



Boston Globe, Nov 19, 2004

DG 000053

DG 000054

# FDA's reaction

- Denial and *ad hominim* attacks
- Subterfuge and illusion

    Institute of Medicine review

    Drug Safety Board

    Program to "adjudicate differences" of opinion

# Institute of Medicine review

- 15 panel members with diverse backgrounds
  - 3 with drug-safety experience; 1 previously an FDA senior manager
- Extremely complex and large issue; difficult to grasp
- Process and scope determined by CDER
  - Information control
  - Enhanced CDER access
- Decisions and recommendations consensus-based
  - High potential for incomplete grasp of problem
  - Unlikely to recommend major changes from status quo
  - Unlikely to tackle core problems
  - Likely to have strong industry influence
- 4 previous IOM reviews of FDA components
  - "expensive waste of time...led to nothing useful"

Lester Crawford, Nov 9, 2004

DG 000055

DG 000056

# Drug safety board

- 11/15 (73%) report to CDER director
- 8/15 (53%) directly involved in pre-approval process
- 2 non-voting members involved in pre-approval
- 2/3 from ODS originally from New Drugs
- Super-majority (67%) needed to recommend action
- It takes only 6 votes to block any action

# Debunking FDA myths (1)

- Increased attention to safety will slow approval of "life-saving" medicines

  Most new drugs are "me too's"

  Most drugs not "life-saving" or "break-throughs"

- Increased attention to safety will frighten patients away from valuable, "life-saving" medicines

  What about fully informed consent?

- Increased attention to safety will hurt the "bottom line"

  FDA's failure contributed to enormous financial loss

DG 000057

# Debunking FDA myths (2)

- "Thousands" will die if drug approval is delayed

  Each day of delay = $\$\sim$2 million lost revenue

- All drugs have side-effects

  George Orwell: "all animals are equal, but some are more equal than others"

- Benefits exceed the risk

  FDA does not assess population benefit

  Product of institutional conflicts of interest, bias, pro-industry tilt

DG 000058

## Debunking FDA myths (3)

- Myth: FDA's ADR surveillance system is broken and this is why Vioxx and other drug safety problems occur.

- Truth: Vioxx disaster was not due to a failure of surveillance, but of organizational decision-making and values

  CDER approved drug; felt ownership of drug; views industry as client and customer; over-values drug benefits; disregards drug risks

  Within 6 months of Vioxx approval, FDA knew it increased AMI risk by 5-fold, yet <u>did nothing</u>. Why? Because of structural and organizational conflicts of interest, cultural bias favoring industry and utter disregard for population impact of unsafe drugs

DG 000059

## The future?

Dr. Pangloss – "we live in the best of all possible worlds"

- Restructuring is critical – without it, meaningful change impossible, money wasted, more lives lost

  Independent Center-UK model

  Full post-market authority

  No PDUFA funding

  Checks and balances

- Cultural change will follow

  Separate organization

  Not dominated by CDER drivers

  Committed leadership with passion for safety

- Raise pre-approval safety standards – presume drug is not safe.  Adopt post-market standards that protect public

DG 000060

DG 000061



"Those responsible for putting my client in charge of the henhouse should be on trial here, not my client, who, as a fox, was only doing his job."



December 2004 - VOLUME 25 - NUMBER 12

INTERVIEW

# Blowing the Whistle on the FDA

### An Interview with David Graham

Dr. David Graham is the associate director for science and medicine in the U.S. Food and Drug Administration's Office of Drug Safety, and the FDA medical officer who blew the whistle on Vioxx. Graham graduated from the Johns Hopkins University School of Medicine, and trained in Internal Medicine at Yale and in adult Neurology at the University of Pennsylvania. He also has a Masters in Public Health from Johns Hopkins, with a concentration in epidemiology and biostatistics. Over a 20-year career at FDA, he has contributed to the withdrawal of a number of drugs from the U.S. market, including Abbott Laboratories' Omniflox, an antibiotic that caused hemolytic anemia; Warner-Lambert's Rezulin, a diabetes drug that caused acute liver failure; Wyeth's Fen-Phen and Redux, weight loss drugs that caused heart valve injury; and PPA (phenylpropanolamine), an over-the-counter decongestant and weight loss product that caused hemorrhagic stroke in young women.

*Very senior people from the Office of New Drugs, and my own Office of Drug Safety said to me, "Why on earth did you study Vioxx and heart attacks? We have no regulatory problem with this drug."*

**Multinational Monitor:** *Your research found that Vioxx causes heart attacks. How did the Food and Drug Administration (FDA) respond to your findings?*

**David Graham:** When I began at FDA, I had no idea of the costs that would be demanded of my family or of me personally. Had I known the cost, and the extreme difficulty of working in an environment that routinely dismisses or twists the truth about drug safety, and punishes you severely for speaking the truth, I'm certain that I would have chosen a different path.

I did a study with several other people. It was a very good study. It found that Vioxx caused heart attacks.

I wanted to get that study published in the peer review literature, and FDA reacted violently.

FDA would not have pulled Vioxx, rest assured. FDA saw no problem with 100,000 people having heart attacks.

The week before Vioxx came off the market, I was in a meeting with very senior people from the Office of New Drugs, and my own Office of Drug Safety. They said to me, "Why on earth did

FDA's standard in this case, as it applies to all drugs, was: we can't be 95 percent certain the drug won't kill you, so we'll assume that it won't, and let it on the market.

you study Vioxx and heart attacks? We have no regulatory problem with this drug." And, "Why are you studying Vioxx and heart attacks, we in the Office of New Drugs didn't approve that study, we don't want you studying that." This from my own supervisors: "You're work is scientific rumor." My Center director called the study "junk science."

The day after he made that remark, I had the lead article in the Journal of the American Medical Association (JAMA), and it was accompanied by a lead editorial, with the editors of JAMA calling for a complete restructuring of FDA. I found that rather amusing — so much for junk science.

In any event, a week before Merck pulled the drug from the market, FDA had no problem with the drug. They were perfectly willing to have it remain on the market.

**MM:** *Should FDA have known about the problems earlier?*

**Graham:** I think if one looks at the evidence, it is clear that prior to the marketing of Vioxx and Celebrex, there were strong theoretical reasons to expect that these drugs might increase the risk of heart attack. FDA was fully aware of these theoretical concerns. FDA also knew that these drugs, called Non-Steroidal Anti-Inflammatory Drugs, intended for pain relief and arthritis, would be used by tens of millions of people.

So here we have the set up: We have theoretical concerns that this drug would cause heart attacks; we know the drug is going to be given to tens of millions of Americans; and FDA does not insist that the drugs be safe, that there be clear, unequivocal evidence of safety.

Rather, FDA was willing to give a free pass on safety. FDA's standard in this case, as it applies to all drugs, was: we can't be 95 percent certain the drug will kill you, so we'll assume that it won't, and let it on the market. And then you and I, our parents and grandparents, our children — all of us — get to be the guinea pigs in that grand experiment — while drug companies continue to make profits, and FDA continues to receive its Prescription Drug User Fee Act fees for having put those drugs on the market in the first place.

**MM:** *What happened when Merck withdrew Vioxx from the market?*

**Graham:** When Merck pulled Vioxx from the market, it attracted the attention of Congress. This is a drug that is given to 20 million people, Merck is a big company, its capitalization drops $27 billion in one day — Congress says maybe something

FDA doesn't take safety as seriously as it should. They look for ways to serve industry, to enable industry to continue marketing unsafe products.

has happened, so they want to ask questions. Senator Charles Grassley was particularly concerned because he had seen the way FDA had dropped the ball with other drugs this year, involving antidepressants and the issue of suicidality in children.

When Senator Grassley's staff began to ask me questions about Vioxx, I knew my goose was cooked. Because Senator Grassley's Finance Committee was going to have a hearing, and I would be asked to testify. I was happy to tell the truth, but I wasn't so happy at the prospect of being unemployed.

**MM:** *How did your managers respond to your being asked to testify?*

**Graham:** In the few days leading up to my testimony, managers at FDA — those above me in the "food chain" — sought to intimidate me. They did this in a number of different ways. They contacted Senator Grassley's office, to try to convince Senator Grassley that I wasn't worth his support, that I was a liar, that I was a cheat, a bully, a demagogue, and untrustworthy. At the same time, they contacted the Government Accountability Project, which is providing me with legal counsel, with the same line. In the third arm of this coordinated attack, my Center director contacted the editor of the Lancet, one of the most prestigious medical journals in the world, and accused me of scientific misconduct.

Scientific misconduct is the highest crime a scientist can commit. Scientific misconduct is a betrayal of all that science stands for. Scientific misconduct, if you have committed it, is career ending.

So here I am on the weekend preceding my testimony — the weekend on which I plan to write my testimony — and I get a telephone call from the editor of the Lancet, saying there have been serious allegations and what do I have to say. So I walked him through everything. There was no scientific misconduct. We had run into problems in our study, we addressed them and moved on. I had described all of these things to the editor of the Lancet at the time I submitted our paper. So he was very relieved.

My supervisors also knew that the allegations were untrue. They had been informed of all of the problems as they cropped up during the course of the study. They had a convenient lapse of memory — that would be charitable. Maybe it wasn't a lapse of memory — that would make it intentional. We'll let others determine which of the two it was.

By the end of the weekend, the editor of the Lancet had communicated to the Center director that I had handled myself in the finest tradition of scientists and that there was no scientific

The culture at FDA views the pharmaceutical industry it is supposed to regulate as its client, over-values the benefits of the drugs it approves and seriously under-values, disregards and disrespects drug safety.

misconduct; there were no scientific problems with the paper; and that it should be published. The Center director agreed that it should be published.

It was supposed to be published online the day before the Senate hearing, so that the numbers in my testimony — the 100,000 heart attacks caused by Vioxx — would have been published in the Lancet and would have scientific credibility.

But my manager set a trap: If I allowed the study to be published, they could fire me. So I was forced to withdraw the article before publication. Fortunately, I was still able to give the testimony.

**MM: *The testimony made a huge splash, but it wasn't enough to protect you from retaliation at FDA?***

**Graham:** I had no idea that the testimony would attract the attention that it did. I had no intention of becoming a public figure, which to some extent it appears I have become.

When I finished the testimony, Tom Devine — my attorney from the Government Accountability Project, who is one of the two reasons I still have a job (the other is Senator Grassley) — said that if I did what I wanted to do, which was go back to my office and continue to do research and hope this goes away, I would be fired and be fired quickly. We needed to get into the media as quickly as possible, and I needed to make my case to the American people before FDA management had a chance to finish me off.

So it was a race. 60 Minutes came and said we really want to do your story. We asked, when will you be able to get it on the air? "Well," they said, "we'd love to accommodate you, but we can't get you there until mid-December." In Tom's estimation I would be a goner by mid-December. ABC News said we can get you on the air right before Thanksgiving, and so that is what we did.

**MM: *Is the Vioxx story an outlier, or representative of FDA failure?***

**Graham:** The way FDA approaches safety is to virtually disregard it. FDA believes there is no risk that cannot be managed in the post-marketing setting. FDA has created the concept of risk management, which enables the continued marketing of unsafe medicines. If you do a careful examination of how it has managed drugs that it has identified as being unsafe, you'll see that the techniques used to manage those risks are almost uniformly without efficacy. FDA knows this.

The case of antidepressants and suicidality is a perfect example.

How does FDA handle this? With labeling changes. FDA knows that labeling changes don't change physician behavior. Yet they act as if they are doing a great public good when they change the warning.

With the SSRIs [Selective Serotonin Re-Uptake Inhibitors, the class of antidepressants including Prozac and Paxil], I think FDA pulled a fast one on the American people. Because they said, "we are using our most powerful labeling, our most powerful medicine: we're putting a black box around it." But it doesn't change physician behavior. People are as unsafe after the labeling goes into effect as they were before.

With the SSRI labeling, people are actually more deceived. Because the labeling says that the risk of suicidal thoughts and behavior in children is 1-2 percent. But FDA's own senior managers admitted at an open public advisory committee meeting that our clinical trials don't capture suicidal thoughts and behavior. So what we know about it is what has been voluntarily reported. There are lots more out there, we just didn't measure them. They have evidence from an NIH clinical trial that the risk is more like 8 percent.

FDA doesn't take safety as seriously as it should. They look for ways to serve industry, to enable industry to continue marketing unsafe products. The way the agency uses science guarantees it. Rather than ensuring with 95 percent certainty that a drug is safe, what FDA says is: We can't be 95 percent certain this drug will kill you, therefore we will assume it doesn't — and they let it on the market. That was the case with Vioxx.

That's the dilemma we face with Celebrex now. We have this clinical trial that shows it increases the risk of heart attack. What is FDA going to do about it? It beats me what they are going to do about it. If they are concerned, I'd be very concerned. Because they weren't concerned about Vioxx, and we saw what that got us.

**MM:** *How have your colleagues responded to the controversy surrounding your testimony and statements?*

**Graham:** My colleagues have been absolutely marvelous. Management has been typically hostile.

The day after my testimony, I came into the office, I was surrounded by co-workers who hugged me, kissed me, slapped me on the back, told me what a great job I did. It turns out a bunch of them had gone down to the cafeteria to watch the hearing on C-Span, and were cheering as I was stating one truth after another, and were really energized by it.

Subsequently, I learned that seven of my co-workers signed a letter sent to Senator Grassley basically saying, "He's the heart and soul of what goes on here. Without him, we won't have effective drug safety. And so you need to make sure that he is able to stay." People who didn't sign it because they are afraid of retaliation come to my office and say things such as, "Dave, we don't know what we'll do if you leave." That has been very supportive.

Tom Devine, my attorney, tells me that the typical response to whistleblowers is that their colleagues abandon them, at least in public places, and tell them what a great job they are doing privately. But outside of that, there is no solidarity.

But that hasn't been my experience.

**MM:** *What do you recommend to reform the drug safety regulatory process?*

**Graham:** I used to think you could create a separate center for product safety, located within the FDA. I am no longer of that mind. I have come increasingly to believe that a separate agency is needed for product safety, one that is insulated from the pressures that industry is able to bring to bear. Without that, we will continue to have bad decisions from FDA and hundreds of thousands people injured.

They say that physicians bury their mistakes. That is true. But they occur one at a time. When FDA makes a mistake, it is a mass grave.

I outlined three problems in my testimony. There is actually a fourth problem.

The three problems that I identified are a structural problem, a cultural problem and a scientific problem. The fourth problem that I would add is the fear factor: scientists need to operate with freedom. They can't be subject to fear and pressure and intimidation.

The structural problem is locating the product safety center in the agency responsible for approving drugs. Big Pharma is already lobbying like crazy to prevent Congress from re-organizing FDA. The last thing on earth the drug companies want is strong, post-marketing drug safety regulation. Strong post-marketing drug safety is going to cost them money — it will cost more money to research drugs before they hit the market, and they are going to run the risk of experiencing the consequences of a drug that isn't safe being removed from the market.

The culture needs to be changed. Industry can't be the client. The culture is dominated by a worldview that believes only randomized clinical trials provide useful and actionable information and that post-marketing safety is an afterthought. This culture also views the pharmaceutical industry it is supposed to regulate as its client, over-values the benefits of the drugs it approves and seriously under-values, disregards and disrespects drug safety.

The third problem is a scientific one. Take Vioxx, Celebrex and Bextra as an example. Before they come to market, we know that there are good theoretical reasons that these drugs will probably increase the risk of heart disease. You can design a study that would allow you to say with confidence that the drug is safe to a certain level. You can pre-specify: how many extra heart attacks are we willing to accept, for the benefit of this drug. You can design a clinical trial, that will show yes, the drug does not increase the risk of heart attack more than 5 percent or whatever level you specify, and yes it is saves this many lives from gastrointestinal bleeding.

Those studies would have to be much larger and take much longer than current trials. And that means industry wouldn't be able to get these blockbusters to market as quickly. If you are making $3 billion a year selling a drug, every day of clinical trials is another day you are not making $10 million.

From a public policy perspective, if we wanted drugs that are safe, we could have it tomorrow. It is easy to design those studies. But FDA is not interested in that.

Fourth, there has to be whistleblower protection. That is a start. But there also has to be strict enforcement of rules to protect scientists, so that they are not faced with losing their jobs if they arrive at conclusions that put FDA in a bad light.

FDA just had a survey done. Two-thirds of FDA scientists are not confident that products approved by FDA are safe. Eighteen percent say that they have been pressured to change their conclusions. Those are horrible statistics for an agency that is supposed to be evidence based and science based.

Table of Contents

# EXHIBIT "25"

**NewsTarget.com printable article**

Originally published August 30 2005

### The FDA Exposed: An Interview With Dr. David Graham, the Vioxx Whistleblower

The following interview with Dr. David Graham (senior drug safety researcher at the FDA) was conducted by Manette Loudon, the lead investigator for Dr. Gary Null. This interview contains jaw-dropping insights about the corruption and crimes that take place every day inside the Food and Drug Administration. This is no outside critic, either: these are the words from a top FDA employee who has worked at the agency for two decades. If you've ever wondered how the drug industry could pull off the greatest con of our time -- and turn the human body into a profit-generating machine -- you're about to learn the shocking answers in this interview.

This interview is reprinted here with permission from Dr. Gary Null. Parts of this interview also appear in Dr. Gary Null's *Prescription For Disaster* video documentary, which is available at the Gary Null website and is a must-see video for anyone who wants to know the truth about the pharmaceutical industry and the FDA.

**MANETTE:** Dr. Graham, it's truly a pleasure to have the opportunity to interview you. Let me begin by asking you how long you've been with the FDA and what your current position is?

**DR. GRAHAM:** I've been with the FDA for 20 years. I'm currently the Associate Director for Science and Medicine in the Office of Drug Safety. That's my official job. But when I'm here today I'm speaking in my private capacity on my own time, and I do not represent the FDA. We can be pretty certain that the FDA would not agree with most of what I have to say. So with those disclaimers you know everything is okay.

**MANETTE:** On November 23, 2004 PBS Online News Hour Program you were quoted as making the following statement. "I would argue that the FDA as currently configured is incapable of protecting America against another Vioxx. Simply put, the FDA and the Center for Drug Evaluation Research (CDER) are broken." Since you've made that statement, has anything changed within the FDA to fix what's broken and, if not, how serious is the problem that we're dealing with here?

**DR. GRAHAM:** Since November, when I appeared before the Senate Finance Committee and announced to the world that the FDA was incapable of protecting America from unsafe drugs or from another Vioxx, very little has changed on the surface and substantively nothing has changed. The structural problems that exist within the FDA, where the people who approve the drugs are also the ones who oversee the post marketing regulation of the drug, remain unchanged. The people who approve a drug when they see that there is a safety problem with it are very reluctant to do anything about it because it will reflect badly on them. They continue to let the damage occur. America is just as at risk now, as it was in November, as it was two years ago, and as it was five years ago.

**MANETTE:** In that same PBS program, you were also quoted saying, "The organizational structure within the CDER is currently geared towards the review and approval of new drugs. When a serious safety issue arises at post marketing, the immediate reaction is almost always one of denial, rejection and heat. They approved the drugs, so there can't possibly be anything wrong with it. This is an inherent conflict of interest." Based on what you're saying it appears that the FDA is responsible for protecting the interests of pharmaceutical companies and not the American people. Do you believe the FDA can protect the public from dangerous drugs?

**DR. GRAHAM:** As currently configured, the FDA is not able to adequately protect the American public. It's more interested in protecting the interests of industry. It views industry as its client,

and the client is someone whose interest you represent. Unfortunately, that is the way the FDA is currently structured. Within the Center for Drug Evaluation and Research about 80 percent of the resources are geared towards the approval of new drugs and 20 percent is for everything else. Drug safety is about five percent. The "gorilla in the living room" is new drugs and approval. Congress has not only created that structure, they have also worsened that structure through the PDUFA, the Prescription Drug User Fee Act, by which drug companies pay money to the FDA so they will review and approve its drug. So you have that conflict as well.

**MANETTE:** When did that go into effect?

**DR. GRAHAM:** The Prescription Drug User Fee Act came into play in 1992. It was passed by Congress as a way of providing the FDA with more funds so that it could hire more physicians and other scientists to review drug applications so that drugs would be approved more quickly. For industry, every day a drug is held up from being marketed, represents a loss of one to two million dollars of profit. The incentive is to review and approve the drugs as quickly as possible, and not stand in the way of profit-making. The FDA cooperates with that mandate.

**MANETTE:** And what about those new drugs? Are they any better than what already exists on the market?

**DR. GRAHAM:** It's a myth that is promulgated not only by industry but also by the FDA itself. It's a misperception that our lawmakers in Congress have as well and they've been fed this line by industry. Industry is saying there are all these lifesaving drugs that the FDA is slow to approve and people are dying in the streets because of it. The fact is that probably about two-thirds to three-quarters of the drugs that the FDA reviews are already on the market and are being reviewed for another indication. So, for example, if I've got a drug that can treat bronchitis and now it's going to be used to treat a urinary tract infection well, that's a new indication. But it's the same drug and we already know about the safety of the drug. There is nothing lifesaving there. There is nothing new. There is nothing innovative. A very small proportion of drugs represent a new drug that hasn't been marketed before. Most of those drugs are no better than the ones that exist. If you want to talk about breakthrough drugs – the ones that really make a difference in patients' lives and represent a revolution in pharmacology – we're talking about maybe one or two drugs a year. Most of them aren't breakthroughs and most of them aren't lifesaving, but they get treated as if they were.

**MANETTE:** Are you at liberty to discuss some of the problems your colleagues are finding with other drugs and if so, how widespread is the problem?

**DR. GRAHAM:** I'm really not at liberty to talk about things that pertain to my official duties at the FDA. I can talk in my private capacity, but I can't talk about material that would be confidential. What I can say is that there are a number of other scientists within the FDA who have also worked with drugs that they know are not safe, even though the FDA has approved or allowed them to remain on the market. They face some of the same difficulties that I do. The difference is that either the problem isn't as serious in terms of the numbers of people that were injured or that it's a fatal reaction – they're not willing to expose themselves to retaliation by the FDA - and retaliation would surely follow.

**MANETTE:** Do you think we should have any confidence in the FDA and if so, can you elaborate on what they do that you feel benefits the American people?

**DR. GRAHAM:** In terms of confidence in what the FDA does, there are two things that the FDA determines when it looks at a drug: it determines whether or not a drug is safe and it determines whether or not it's effective. Regarding the determination of drug effectiveness, I think the FDA does a pretty good job. If the FDA says that the drug will have a particular effect, probably for

many of the patients who take the drug it will actually have that effect. If the FDA says a given drug will lower blood pressure and you're somebody who has high blood pressure, there's a good chance that the drug will have an effect that lowers your blood pressure. That has to do with the rigor with which they force the drug companies to establish that the drug actually has an effect.

On the safety side, I think that the American public can't be very confident. They can have some confidence because it turns out that most drugs are remarkably safe. But, when there are unsafe drugs, the FDA is very likely to err on the side of industry. Rarely will they keep a drug from being marketed or pull a drug off the market. A lot of this has to do with the standards that the FDA uses for safety. When they look at efficacy, they assume that the drug doesn't work and the company has to prove that the drug does work. When they look at safety it's entirely the opposite. The FDA assumes the drug is safe and now it's up to the company to prove that the drug isn't safe. Well, that's a no-brainer. What company on earth is going to try to prove that the drug isn't safe? There's no incentive for the companies to do things right. The clinical trials that are done are too small, and as a result it's very unusual to find a serious safety problem in these clinical trials. Safety flaws are discovered after the drug gets on the market.

**MANETTE:** I read somewhere that a drug only has to be better than a sugar pill

**DR. GRAHAM:** Right. The standard that the FDA uses to approve a drug is primarily "does the drug work?" That's what they call efficacy. Most often, they'll compare the drug against something called a placebo or a sugar pill. It's basically something that doesn't have a medical effect. The assumption is that the drug will be no different than the sugar pill. The FDA puts the onus on the drug company to conduct a clinical trial to show that the drug is different from a sugar pill. The way the FDA's approval standards are, the drug does not necessarily have to have a very great effect in order to be approved. The drug might lower your blood pressure by just a few millimeters of mercury, but the FDA will say we can approve it because it does lower your blood pressure.

Now, would that be a benefit or are there other drugs out there – many other drugs – that patients could take instead that would lower their blood pressure by 10 or 15 or 20 millimeters? The FDA doesn't really care about that. What happens is the drug gets marketed. You've got two drugs that are out there – one drug that effectively lowers your blood pressure a substantial degree and another drug that barely lowers your blood pressure at all. The company that has that second drug markets it like it's this breakthrough medicine. It lowers your blood pressure and they have all these glitzy ads, direct-to-consumer advertising. Lots of patients and lots of doctors will use that medication. What happens in the process is these patients are actually in a sense being denied a more effective treatment because the FDA doesn't require that drugs that come on to market be at least equivalent to, or better than, the drugs that are already there. All they have to do is be better than a sugar pill.

**MANETTE:** When you consider the financial impact your whistle blowing has had on the pharmaceutical industry do you have any fears that your life may be in jeopardy?

**DR. GRAHAM:** I have tried not to think about that. In the work that I've done I've never really thought about what the financial impact would be on any particular company. I put that out of my mind because my primary concern is whether or not the drug is safe. If it's not safe, how unsafe is it and how many people are being hurt by it? In terms of when I identify an unsafe drug, to me it doesn't really matter what drug company it is. I've helped to get ten different drugs off the market, and they're from ten different drug companies. It's not a vendetta against any particular drug company. I have to hope that the drug companies don't take it personally. I'm just a scientist doing my job and I have to leave the rest to God to protect me.

**MANETTE:** Has anyone tried to silence you and stop you from becoming a whistleblower?

**DR. GRAHAM:** Prior to my Senate testimony in mid-November of 2004, there was an orchestrated campaign by senior level FDA managers to intimidate me so that I would not testify before Congress. This intimidation took several forms. One attack came from our acting Center Director who contacted the editor of the Lancet, the prestigious medical journal in the United Kingdom, and intimated to the editor that I had committed scientific misconduct and that they shouldn't publish a paper that I had written showing that Vioxx increases the risks of heart attack. This high-level FDA official never talked to me about this allegation. He just went directly to the Lancet.

The second attack was from other high level FDA officials who contacted Senator Grassley's office and attempted to prevent Senator Grassley and his staff from supporting me and calling me as a witness. They knew that if they could disarm Senator Grassley that would neutralize me.

The third attack came from senior FDA officials who contacted Tom Devine, my attorney at the Government Accountability Project, and attempted to convince him that he should not represent me because I was guilty of scientific misconduct; I was a bully; a demigod; and a terrible person that couldn't be trusted. These people were posing as whistleblowers themselves ratting on another whistleblower. Some of these senior level FDA officials were in my supervisory chain and are people I work for. They were involved in a coordinated attempt to discredit me and to smear my name and to prevent me from giving testimony.

There's one other thing that happened the week before I testified. The Acting Commissioner of the FDA invited me to his office and offered me a job in the Commissioner's Office to oversee the revitalization of drug safety for the FDA if I would just leave the Office of Drug Safety and come to the Commissioner's Office. Obviously he had been tipped off by people in the Senate Finance Committee who are sympathetic to the FDA's status quo that I was going to be called as a witness. To preempt that, he offers me this job, which basically would have been exile to a fancy title with no real ability to have an impact. This was a conspiracy and it was coordinated and there was collaboration among senior level FDA officials. What a mess!

**MANETTE:** All of these attacks backfired on them. Tell us a little bit about that.

**DR. GRAHAM:** Well, Senator Grassley and his staff quickly realized that what they were saying about me was fabricated. The editor of The Lancet also realized that what the high level FDA officials were saying to him was a pack of lies. He sent emails to them saying it looked to him as if they were trying to interfere with his editorial process. He was very savvy to what these people were doing. Tom Devine, as he said publicly, was very interested in doing the right thing. He said, "We don't want to protect somebody who's a lawbreaker and who really isn't representing the truth so produce your evidence." They had no evidence because there is no evidence. But I produced my evidence. I showed him all the documentation, all the emails, and the reports that I've written. They flunked every test and I passed every test.

In all of the criticism I have received relating to Vioxx and drug safety, they've never attacked the work or the science that I've done or the results that I've come to. What they've done is call me names. The ad hominem attack is the last refuge of the indefensible. They don't have an argument that's substantial. They know that they're vulnerable. They know that they've disserved the American people. The FDA is responsible for 140,000 heart attacks and 60,000 dead Americans. That's as many people as were killed in the Vietnam War. Yet the FDA points the finger at me and says, "Well, this guy's a rat, you can't trust him," but nobody is calling them to account. Congress isn't calling them to account. For the American people, it's dropped off the radar screen. They should be screaming because this can happen again.

**MANETTE:** On CNN with Lou Dobbs you said that there was a certain "culture" that exists at the FDA. Can you explain what you meant by that?

**DR. GRAHAM:** The FDA has a very peculiar culture. It runs like the army so it's very hierarchal. You have to go through the chain of command and if somebody up above you says that they want things done in a particular way well, they want it done in a particular way. The culture also views industry as the client.

They're serving industry rather than the public. In fact, when a former office director for the Office of Drug Safety criticized me and tried to get me to change a report I'd written on another drug – Arava – he said to me and to a colleague who was a coauthor on this report that "industry is our client." I begged to differ with him. I said, "No, industry is not the client, it's the American people, the people who pay our taxes. That's who we're here to serve." He said, "No! Industry is our client." I ended the conversation by saying, "Well, industry may be your client, but it will never be my client."

Another aspect to the culture at the FDA is that it overvalues the benefits of drugs and undervalues the risks of drugs. And so the FDA will always say to you, "Well, we're leaving this drug on the market because the benefits exceed the risks." Well, the FDA has never assessed the benefit of any drug that it's ever approved. It works on what's called efficacy. Does the drug work or not? Does it lower your blood pressure or does it lower your blood sugar? Not: Does it prolong your life? Does it prevent you from having a heart attack? Those are benefits. All they focus on is efficacy.

For example, ask the FDA why on earth they didn't ban high dose Vioxx after the VIGOR Study showed in early 2000 that it increased the risk of heart attack by 500 percent? High dose Vioxx was approved for the short-term treatment of acute pain. What earthly benefit was there that exceeds a 500 percent increase in heart attack risk? Ask the FDA to produce its benefit analysis that shows that the benefits exceed the risks. It doesn't exist. The FDA has never looked at benefit. The FDA just says to the American people, "The benefits exceed the risks. Trust me. Believe me." If you held the FDA to its proof the American people would see how badly served they've been by the FDA and its culture that belittles safety in the drug companies' interest.

If the FDA were to pull a drug due to safety issues, it would hurt the marketing of the drug. It might also call into question why they approved the drug in the first place. Therefore, you get this culture of cover-up, this culture of suppression, this culture of denial, and this culture that demonstrates above all else that industry is the client and not the American people.

**MANETTE:** Have your peers turned against you?

**DR. GRAHAM:** No. I've been very fortunate. Tom Devine at GAP has told me that the experience of a typical whistleblower is that they'll have the support of their peers but the peers will be so afraid of retaliation that they won't express that support in public. I've had a very different experience. I've been basically embraced by my peers as someone who has said what they want to say and what they wished they had been able to say and that they recognize as the truth. They're really proud of the fact that I've said it and they're not afraid to be seen with me. They're not afraid to work with me. I've been pretty fortunate in that way.

Now with management it's been another story. Upper management avoids me and doesn't talk to me. I could be walking down the hall and I'll say hello, and they'll act like I'm not there. They don't give me interesting work assignments. They don't call me in to consult on things that I should be consulted on even though I am the senior epidemiologist in the Office of Drug Safety with more experience than any of the other people there. I'm looked up to by the scientific staff because of that expertise. Basically, I feel like I'm in the Gulag.

**MANETTE:** How do you cope with that going to work each day?

**DR. GRAHAM:** It's difficult. It's a mind game. They're hoping that I'll just become very frustrated

and disillusioned and leave or that I'll slip up in some way so that they can take some sort of action against me. As Tom Devine at GAP has said, I have to be Saint David. I can't afford to make any mistakes. That's very difficult and it is a little bit discouraging. But I've been a target of retaliation in the past. You take ten drugs off the market well, no good deed goes unpunished at the FDA. I've experienced retaliation with many of those other episodes but not as severe as what I've experienced with Vioxx. This is the first time that my job was actually in jeopardy and where the FDA actually intended to fire me. That was stopped only because Senator Grassley intervened. He put the heat on the FDA and told them, "Lay off. This guy has told the truth. He's helped America. Whose side are you on?"

**MANETTE:** Were there any warnings that Vioxx was a problem? Did you see the disaster coming?

**DR. GRAHAM:** I think that I was afraid that there would be a disaster, but I only became aware of this with the publication of the VIGOR Study, which was this large clinical trial that was done that showed that Vioxx increased the risk of heart attack five fold. That study was published in November of 2000. It was written, performed, and paid for by industry. What industry concluded was not that Vioxx increases the risks of heart attack, but that the drug they were comparing it against – Naproxen – decreased the risk of heart attack. I knew that was not a sustainable argument. There was no way that Naproxen was that protective against heart attacks. Clearly Vioxx was the problem. I knew that Vioxx was on the road to becoming a blockbuster drug (20 million users). All the ingredients were there for a disaster.

The FDA is responsible in so far as it could have prevented much of the damage, heart attacks, and deaths simply by banning the high dose Vioxx back in mid 2000 when they knew the results of the VIGOR Study. But the FDA did nothing for almost two years. They were "negotiating" with the company over a label. What did the label accomplish? Nothing! Before the label 17 or 18 percent of people who took Vioxx took the high dose. After the label change 17 or 18 percent were still taking the high dose. High dose use didn't change at all. People didn't read the label, and if they read the label they wouldn't know what to do anyway because it was very confusing. The right thing to do would have been to pull the high dose off the market because there is no benefit for short-term relief of acute pain that exceeds this risk. The FDA made bad decisions based on its culture and its institutionalized biases that favor industry, and as a result thousands of Americans died. Americans and Congress should be screaming bloody murder. They should be beating on the doors of the FDA demanding change.

**MANETTE:** It's estimated that over 200,000 people a year die from prescription drugs. Do you see this as a serious problem and do you think many of these treatments are more dangerous than the disease itself?

**DR. GRAHAM:** Death from adverse drug reactions is one of the leading causes of death in the United States. It turns out that most of these adverse reactions are actually what are expected in the sense that they are an extension of the drug's action. For example, we know that drugs for diabetes can lower your blood sugar. If you're more sensitive to the drug than the normal person and it lowers your blood sugar too much, causing you to have a seizure while driving your car and you get killed, well, you died from an adverse drug reaction, but it wasn't something unexpected.

The blood thinner Coumadin is another example. That drug provides a benefit, but it is also responsible for probably more deaths than any single drug currently marketed. But it has a recognized benefit and there aren't other drugs to do what it does or to do what it does well. So physicians accept that there are patients who are in a serious situation and who might die without the drug, so they take it.

Yes, drugs cause a lot of harm. Unfortunately, we haven't quantified the benefits. For most of these drugs it's more belief. It's faith. We have faith that they'll confer a benefit, but the FDA hasn't demonstrated that they confer a benefit. We're getting much better at quantitating the risks. In the

future what we need to do is just take the risks and look hard and dispassionately at what the real benefits are. If the benefits aren't there we shouldn't be having discussions about labeling the drug. You need to weed the garden patch of drugs that aren't doing what they're supposed to do. The FDA has not been very good about that; it likes to cultivate all these weeds.

**MANETTE:** In a perfect world what role do you see the FDA playing in our nation's health?

**DR. GRAHAM:** In a perfect world, I think the FDA would need to be restructured. If it were restructured properly, I think that it could actually provide a great benefit to the public health. I would recommend several changes. First, I would separate safety and post-marketing from the pre-marketing. I would create a separate center for product safety. Actually, Senator Grassley and Dodd have recently introduced legislation to create an independent center for post-marketing safety that would serve to protect the American people from unsafe drugs. This isn't happening now.

On the pre-marketing side, the FDA needs to pay greater attention to safety. They need to have larger clinical trials. They need to compare drug products against other drugs that treat the same indication rather than comparing a drug against a sugar pill. What we want in the end are drugs that actually have better benefit.

The FDA also needs to determine the post-marketing benefits of a drug. I've done that for several drugs. How many people are actually benefiting? How many people are living longer versus those who are having their lives shortened? Only when you have that kind of information can you make rational decisions about a medication. The times when I've done the benefit analysis, I've been chastised, criticized and suppressed by the FDA. These benefit analyses should be done as a matter of routine.

There is a lot that the FDA could do to improve, but the changes aren't going to happen on their own. Congress is going to have to make them happen. There's an expression, "the zebra doesn't change its stripes nor the leopard its spots." The FDA isn't going to change the way it does business; changes will have to be imposed from outside.

**MANETTE:** How you do feel about direct-to-consumer advertising?

**DR. GRAHAM:** Direct-to-consumer advertising in general is a great disservice to the American people. We see wonderful ads of people demonstrating their health, whether they're skating across the ice or doing their Tai chi. Madison Avenue knows that a picture is worth a thousand words, so they convey an image, a message, and it makes an impression on patients and on physicians. It creates needs or desires where there really isn't a need or a desire.

There was a recent study in The Journal of The American Medical Association that showed that if patients mentioned a drug that they've seen on television to their physician they were much more likely to be prescribed that drug by the doctor. Drug companies know this. That's why they do it. Would the Vioxx disaster have been as great and as large in the absence of direct-to-consumer advertising? I submit that the numbers would have been far lower than what they were. Direct-to-consumer advertising is part of what made Vioxx a blockbuster drug. It helped to rev the market up to get people to want to use the drug.

Clearly, direct-to-consumer advertising does not serve the American people well. Madison Avenue is smarter than the most intelligent American. That's why they make so much money and that's why the drug companies go to them to sell their products. We're not living in a neutral world where the information we're getting is objective and unbiased. It might be that the average American, given all the data, all the facts, and all the information in an objective way could make an intelligent, rational decision. But we don't live in that kind of world. We live in a world where what

we're seeing is a visual image of these people being vital and healthy and cured of their illnesses. And it's all because of this little pill that they're taking. A patient with that condition says, "I want to be just like that person." So they go to the doctor and say, "I want that pill." Are their lives changed? Maybe some people's lives are changed, but I think most aren't.

**MANETTE:** What do you think people hear when they're watching the ad and after the ad they list all the possible side effects?

**DR. GRAHAM:** I don't think it registers. You have the visual image that conveys one message. Then you have the voice that's speaking over this pictorial being shown telling you what this drug is good for. Then at the end the auctioneer gets on and says, "You know this drug could cause...," and they rattle off 25 different things in three seconds. You're lucky if you hear anything. I don't think that people come away with it and they certainly don't come away with any sense of how likely it is to happen because the visual image overpowers anything that gets said.

It's the same with the ads that appear in magazines. Companies are required to put some of the labeling in the ad. You have the ad on the one side – that's the picture. It shows this person being healthy because they take this pill. The fine print is all on the next page. People aren't going to read the fine print. It's the same thing with labeling for physicians. Physicians don't read product labels. Where do they learn about drugs? They learn about drugs from the detail person from the drug company or from other colleagues who have used the drug. They're not learning it from the labeling.

**MANETTE:** Do you think there is a criminal cover-up going on between the FDA and Big Pharma to approve dangerous drugs that sicken and kill Americans?

**DR. GRAHAM:** I have no knowledge of criminal activity and I'm sure there are legal standards for what's criminal and what's not. I do think that there is an institutional bias at the FDA that says we will look for a way to say "yes" to the approval of any drug that comes down the pipe. If a drug is so bad that they can't find a reason to approve it, they won't. But, if there is any way that they can approve the drug, they will. The way this is done is by what's called the "indication." Why is it that you're going to take the drug? Maybe you're going to take it because you have high blood pressure. Maybe you'll take it because you have high cholesterol. That's the indication. A company may come in with a drug and want to get it approved for five different indications. One of them is a really insignificant indication that affects a very small number of people. The main indication might affect millions of people. The drug doesn't show efficacy for that major indication, but they're able to somehow or another approve the small indication.

So the drug gets approved for this narrow indication, but the FDA and the drug company both know that it's going to be used for that other indication. It's going to be used "off-label." Then, the FDA turns around and says that they don't regulate the "off- label" use of drugs. No. But, they aid and abet it. They allow it to happen and in many instances "off-label" use of a drug product is a public health threat. The FDA has a responsibility to protect the public health. The FDA should be intervening, but they don't. In my own experience I have seen multiple examples where I've heard people say, "We can't ask a company to put that in the labeling because the company will say no." Or, "We can't do that because that will decrease their marketing. We've got to try to approve this drug. Let's see if we can give them this small indication. At least it's giving them something. You've got to find a way to say yes."

That is the typical attitude of the FDA culture. I think Congress is partially responsible for that because when they issued the PDUFA, the Prescription Drug User Fee Act, what they were really saying was, "We want you to review these drug applications more quickly because you're keeping lifesaving medicines from the American people." That's the line they were fed by Big Pharma. So they pressure the FDA and the FDA gets the message. It's a really pernicious system. I think it's unfortunate. There are many people from the FDA who have examples that they unfortunately

can't talk about. They'd lose their job and maybe get thrown in prison because you can't discuss confidential and trade secret information. But the fact is these things happen at the FDA and there have been multiple examples in the past where one could see evidence of that.

**MANETTE:** Did your faith as a devout Roman Catholic play any role in the decisions you made to put your career on the line to report the truth?

**DR. GRAHAM:** It did in so far as my faith forms my conscience. It's sort of my sense of what's right and what's wrong and what I am and am not responsible for. I was in a situation here with Vioxx where I was invited by Senator Grassley's office to testify. I could have told them no, but then they would have subpoenaed me. So of course I went peaceably. I was faced with this dilemma. Should I lay it on the line and tell them the way it really is or do I kind of downplay it? There are ways of doing that.

What I concluded was that I'm now being given the opportunity to tell the truth to the people who are in a position to actually make a difference. I can't make a difference. I can't change the FDA, but Congress can. If I don't tell them the truth, then I'm now responsible, in part, for future deaths. I don't want to become a co-conspirator with the FDA in what happens with Vioxx because tens of thousands of people were injured or killed because of the FDA's disregard for safety. If I keep quiet about that, now I'm part of the problem. I'm one of them, and at that point then my conscience asks me, "You know what the truth is, are you going to speak it or aren't you?"

So I went ahead and did that and prayed that it all works out well for me personally. That I have a job and I'll be able to support my family, that I'm protected from retaliation, that maybe some good will come out of that. My faith plays a role, but it wasn't a direct teaching of the church. You have to do x, y and z, but it's the faith as I've internalized it. My conscience is formed by the voice of Christ speaking internally to me. That's what the conscience is; it's the voice of God speaking to each and every one of us about what's right and what's wrong. I knew what was right. If I walked away from that nobody else would have to do anything. I'd be beating myself up because my conscience would condemn me. So yes, faith plays a part in every thing that I do. It's not saying I'm a saint, because I'm not. But I can't separate who I am from my religious faith. It's all part of the same person.

**MANETTE:** Do you think Congress genuinely wants to fix the problems at the FDA or are too many politicians influenced by the pharmaceutical industry?

**DR. GRAHAM:** I don't know what Congress will do in the end. My hope is that they will act decisively to reform the FDA and make the American people safer by having strong post-marketing. Will that happen or not? I don't know. I think there are many people in Congress who see this as a serious problem and who very much want to see a change. I think at the same time there are other people who don't think it's such a bad problem, and many of those people honestly believe that. For those people I'd say they haven't seen the evidence so they don't really understand how bad the problem is. There are undoubtedly some people who are influenced by industry. Does that influence their judgment in the end? I don't know. They'd probably say no, it doesn't. Maybe at a conscious level it doesn't. But we have the same phenomenon in the scientific world where we look at research studies that are funded by industry and studies that are funded by government, by National Institutes of Health or the Medical Research Council in the United Kingdom. Multiple studies have been done that have shown that if your study is funded by industry you are much likelier – about five times more likely – to come up with the result that's favorable to the drug company than if your study on the same subject is funded by an independent body unrelated to the company.

Now, are the researchers who did this study biased? Are they consciously cheating and manipulating the data and everything else? No. I don't think that's happening at all, but the fact is if the study is funded by industry it's much more likely to be favorable to industry. Without

attributing bad motivations to the scientists doing those studies all I can do is point to a strong correlation.

With Congress I would be concerned that there could be a strong correlation there because Pharma is very bright. They fund as many politicians as they can. They get to the Republicans and the Democrats. Look at the funding on the major committees, the Health, Education, Labor and Pension Committee in the Senate or the Oversight and Investigations Subcommittee in the House. The Wall Street Journal reported recently that many people on these committees are funded by industry to a substantial degree. Industry knows how to exercise influence. What we have to do is overcome that influence with evidence, and then rely on the fact that at the end of the day the Congress will do what's best for the American people.

Will that happen? I don't know because then it gets embroiled in politics. You know, Republicans versus Democrats, the left versus the right, conservatives versus liberals. Yet, what we're talking about is public health and public health is nonpartisan. I can say this with certainty. For every member of the House of Representatives somebody in their district died because of Vioxx. Somebody in their district had a heart attack because of Vioxx. For every Senator in the Senate, many more people in their state died because of Vioxx or had a heart attack because of Vioxx. It doesn't matter whether it's a red state or a blue state. Those are human beings and what we're talking about is public health. What I'm hoping is that Congress will respond. There is a problem and the evidence is overwhelming, but we'll just have to wait and see.

**MANETTE:** What are you thoughts on President Bush's attempt to pass tort reform, which would protect most pharmaceutical companies from lawsuits except in the most egregious cases?

**DR. GRAHAM:** I think it's dangerous and wrong for the following reasons. We already have an FDA that's been neutralized by industry and sees industry as its client. The Center for Drug Evaluation and The Office of New Drugs dominates drug safety so that the drug safety is not independent. Drug safety can't protect the American people. So government now isn't going to protect the average citizen from the consequences of unsafe drugs. The only alternative they have left is the legal system – the tort system. It's not a wonderful system. It would be much better if we had effective post-marketing regulation so that we could get bad drugs off the market before they hurt more people, but that's been neutralized. All that's left to people now is the courts. That's the only way we have of getting companies to change their behavior.

What tort reform will do is remove that threat as well. It's basically giving companies immunity because now the people who are injured by the drugs can't recover damages that might actually mean something to industry. I mean $250,000 for damages; they blow that in one ad campaign. To them that's nothing. But a lawsuit for multiple millions of dollars has more of an impact. Now, is that optimal? No. But the fact is that since we have a regulatory agency that doesn't regulate and we have a public health agency that doesn't protect the public, we have thousands of people who are being injured by products that the FDA knows are unsafe. The FDA knew there was a problem with Vioxx. They knew it was a big problem back in mid 2000 yet did nothing about it.

There has to be a system in place that reins companies in. If the FDA isn't going to exercise control over companies, then who will? How will it happen? I don't think that working through the courts and lawsuits is a particularly effective way of doing it; but it's the only recourse we have now, and that will be removed as well. You can demonize the trial lawyers but I think that there are patients who are severely injured by drugs. The defense is, "It's on the labels so we're protected." The problem is that nobody reads the labels so how do they protect anyone? The FDA should be making those decisions.

**MANETTE:** What can you tell us about all the antidepressants on the market that millions of children are taking?

**DR. GRAHAM:** In early 2004, SSRI antidepressants and suicidal behavior was a big safety issue. The FDA had suppressed a report written by a colleague of mine in drug safety and had prevented him from presenting this information in an advisory committee meeting. That information leaked to the media, embarrassing the FDA because it had been caught suppressing very important information – that most of the antidepressants don't work for treating children. Someone in my supervisory chain initiated a criminal investigation to identify the person who had leaked this information to the media. It turns out that the investigation ordered by these FDA officials was illegal. They broke federal laws – at least two or three federal laws – in ordering this investigation.

I think it's well established that depression is very common in adolescence. With the antidepressants that we have on the market right now only one of them has been shown to work in children and that's Fluoxetine or Prozac. All the other SSRI antidepressants are no better than sugar pills. However, if you were to read the labeling for these drugs it doesn't point that fact out so patients think one SSRI is as good as another. This is another way that the FDA has betrayed the American public and has betrayed the public health.

With the SSRI and antidepressants what the FDA should have insisted on was a signed informed consent at the time a child was going to be treated. That informed consent would say three things. One, these are the antidepressants that are available. Only Fluoxetine has been shown to work for depression in children. All the other drugs are no better than placebo. That's point two. No better than placebos. No better than sugar pills. Third, all of these drugs appear to have the ability to increase the risk of suicidal behavior. As a parent, if I see that in writing and the psychiatrist or GP is going to write the prescription and put my child on some drug other than Fluoxetine, I can say, "Doc, why are you putting my child on a drug that doesn't work in kids."

The FDA didn't want patients to have that information so they refused to have signed informed consent. The companies didn't want the patients to have that information because all of a sudden the "off-label" use of these drugs would dry up. So whose interest was being served there?

**MANETTE:** How do you feel about taking the approval process out of the hands of the FDA?

**DR. GRAHAM:** Well, where would you put it? If you put it somewhere else they're going to eventually become co-opted the way the FDA has been co-opted. I think the most that we could probably hope for is to try to disassociate the industry pressures from the approval decision. You have to change the culture of the organization, and you have to change the incentives in the organization. The culture and the incentives that the FDA operates by would have to be changed, and Congress can do that through legislation and by establishing different standards for how a drug gets approved. Not only do you have to show that the drug is effective, but you've got to show that it works as well or better than other drugs that treat that indication. You've got to prove to me that the drug is safe, not that the drug is harmful because you're never going to prove to me that the drug is harmful. You set up stringent standards of evidence that might lead to the approval of safe drugs that actually have benefits to the population.

Then pair that up with an independent post marketing regulation. Currently, the pre-market people who approve the drug decide what happens after it's on the market. If the drug needs to come off the market, they're the ones who have to say yes at the end of the day. The people at the FDA who approved the drug, the Office of New Drugs, they are the single greatest obstacle when it comes to removing unsafe drugs from the market. I can vouch for that from personal experience. What you have to do is you have to take that responsibility and power away from them and put it with the group who sees their mission as serving the public and protecting the public health from unsafe drugs. I think if you do those two things you'd be a long way towards getting the FDA on the right footing.

Also, it would probably be beneficial not to have the FDA's funding come from industry. He who pays the piper calls the tune, and we now have a captured agency. Industry underwrites more than

50 percent of the Center for Drug Evaluation's budget. When industry yanks the chain whose neck is going to get tugged? The Center for Drug Evaluation! If industry isn't happy with them and the funding dries up what are we going to do? We're going to have to let half our people go. The program is going to shrink. Congress is going to be jumping up and down on our back. So it's a captured agency and America is not well served when industry is calling all the shots. Yes, industry has a right to make a legitimate profit from marketing products that help the American people. But you shouldn't have a situation that just basically leaves the American public defenseless. And that's what we have right now. We're virtually defenseless.

**MANETTE:** Are there other Vioxx's out there? Do you think this will repeat itself at this high profile level?

**DR. GRAHAM:** At this current moment I don't think there are other drugs out there that are as bad as Vioxx in terms of the enormous numbers of people that were hurt. During my Senate testimony I did mention that there were five other drugs that I thought the FDA really needed to reevaluate because in my estimation the benefit to risk was misjudged. After I named those five drugs the FDA was in the media saying that I did junk science and that these drugs were safe and effective and that I was a crackpot. However, recently the FDA announced that they were going to take Bextra off the market. Well, Bextra was one of the five I mentioned. They announced that with Acutane they were going to impose a restricted distribution system. Well, I had recommended a restricted distribution system 15 years ago. The major problem with Acutane is that it's just so widely overused that it causes an enormous amount of potential harm to pregnancy exposure. If we restricted the use of the drug to the small number of women who really need it each year, the problem would be pretty much resolved. But the FDA didn't want to do that because it would interfere with company profits. If you restrict the distribution and only one-tenth of the people who are getting it now are getting it tomorrow, profit will drop 90 percent. Of course companies aren't going to go along with that and the FDA isn't going to do anything that's going to harm corporate profit.

After my Senate testimony the FDA announced that they can look at other drugs – not only the other three of the five that I mentioned. There are other drugs on the market that I prefer not to talk about that the FDA knows are killing people. Ten or 100 people a year are dying because of the use of a particular drug or being hospitalized. Hundreds or maybe thousands of people are being hospitalized each year. For some of those drugs the benefits do exceed the risks. For others, it's clear that more could and should be done and maybe that means restricting the distribution of the drug's use or maybe it means banning an indication for the drug saying the drug should not be used for particular indications. Maybe it would be something like with the SSRI's where I believe there should be signed informed consent so that parents will know that the drug the doctor is prescribing for their son or daughter actually doesn't work in children.

I think that there are many things that can be done that haven't been done. There are other unsafe drugs out there, and the nature of our business is that a drug could be approved tomorrow that turns out to be the next Vioxx and we won't know until it happens. Then the question is, how quickly do we identify the problem and how quickly do we take effective action against it? We're pretty good at identifying these problems quickly. Where the FDA falls flat on its face is that there is a long period of time in which it does nothing. Then what it normally does is woefully inadequate and ineffective and as a result the body count mounts and that needs to be changed. Maybe Congress will change that.

**MANETTE:** Let's talk about incentives. When you say incentives what do you mean? For example, working at the FDA, is their pay somehow based on how many drugs they approve?

**DR. GRAHAM:** Currently, the performance evaluations for managers at the FDA are built around the drug review. How many reviews did they get done? Did they meet their PDUFA deadlines? It looks bad if you miss your PDUFA deadlines. The unspoken mores – what's the expected – is that