UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06CV00485 |

**REPLY TO MERCK OPPOSITION TO MOTION OF PLAINTIFF GERALD BARNETT FOR AN ORDER EXCLUDING CERTAIN OPINION TESTIMONY OF FOSTER CURTIS BRYAN, II, M.D.**

The defense brief does everything but truly address the issues raised concerning the testimony of Dr. Bryan. Dr. Bryan treated Mr. Barnett during a one month period almost four years ago. He last saw Gerald Barnett in October of 2002. He first saw Gerald Barnett in September of 2002. Plaintiff does not object to testimony concerning Dr. Bryan's treatment of Mr. Barnett during that period of time. However, Plaintiff does object to Dr. Bryan giving speculative testimony from the period of time in November of 2002 through June of 2006. Dr. Bryan admits that he did not treat Mr. Barnett during that time, never looked at his medical records before the deposition for that time, and really does not understand the current condition of Mr. Barnett.

In effect, what happened at the deposition was defense counsel showed Dr. Bryan a random or sporadic document or piece of a medical record and asked the doctor to speculate regarding what this might mean for Mr. Barnett. This is clear inadmissible speculative testimony without any proper foundation. The defendant cites cases regarding a hybrid treater expert. If in fact a treater is treating a patient consistently and persistently over a three-and-a-half year period but was not elected as an actual expert in the case, then that witness may still be able to give opinions as a hybrid expert. The

situation with Dr. Bryan could not be further from that type of factual setting.

What is more important is that the defense has already elicited similar testimony from Dr. Karavan who continued to treat Mr. Barnett up through December of 2005. At best, though really given without proper foundation and a true understanding of the records in this case, Dr. Bryan's testimony would be cumulative of the testimony of Dr. Karavan. Clearly in the deposition Dr. Bryan said that he would defer to the opinions of Dr. Karavan on the development of the condition and prognosis of Mr. Barnett.

It is clear that tactically the defendant is trying to create a mis-impression for the jury. Namely, the defendant is trying to create an impression that the two treating doctors disagree with Plaintiff's expert Dr. Zipes. The difference is Dr. Zipes has extensively reviewed all of the records and given his opinions whereas Dr. Bryan never reviewed Barnett's record except for his own chart before this deposition. In addition, his chart consisted of one month from September to October 2002.

Plaintiff would ask the Court to review the following testimony from Dr. Bryan in considering whether to strike everything but Dr. Bryan's testimony concerning his period of treatment during late 2002.

```
                              13
21  Now, Doctor, your exposure in
22  this case basically has been as the surgeon taking
23  care of Mr. Barnett when he had his heart attack
24  surgery, correct?
25      A.  That's correct.

                              14
 1      Q.  All right. And just preliminarily, I just
 2  want to confirm, do you intend to render any
 3  opinions as to the standards of care by Dr.
 4  Barnett's past or current treating physicians such
 5  as Dr. Mikolojcyk, Dr. Karavan or Dr. McCaffrey?
 6      A.  No.
```

7    Q. You haven't been asked to do that?
8    A. No.
9    Q. All right. And you have not reviewed any
10   of Mr. Barnett's medical records prior to your first
11   involvement; is that correct?
12   A. That's correct.
13   Q. All right. And according to my notes here
14   and records, and please correct me if I'm wrong, but
15   I believe the last time you saw Mr. Barnett was
16   sometime in October of 2002. Does that sound about
17   right?
18   A. That sounds about right. I don't recall
19   seeing him after his postop visit, which would be
20   somewhere between three and four weeks after the
21   bypass surgery.
22   Q. All right. And you -- I believe you
23   deferred his cardiac care then to Dr. Karavan.
24   Would that be accurate?
25   A. That would be accurate. We typically,

                                15
1    after we've established that they're doing fine from
2    a surgical standpoint, the cardiologist will
3    maintain the long-term cardiac care management of --
4    of their cardiac care long term.
5    Q. All right. And I -- unfortunately, we
6    don't have your original chart here. But Merck
7    and -- and Mr. Barnett, we have been able to get
8    copies of your records.
9         And I have not seen any substantial
10   records after October or November of 2002. Would
11   that be accurate, that you have not been forwarded
12   copies of any of his subsequent medical records, to
13   the best of your knowledge?
14   A. No.
15   Q. So would it be fair to say that you don't
16   have any understanding or opinions of his current
17   health status?
18        MR. GOLDMAN: Object to the form.
19        THE WITNESS: I don't know about his
20   current health status.
21   BY MS. SHERBANEE:
22   Q. All right. I think you answered this
23   question in retards -- in regards to when you last
24   examined him. It was around October 2002?
25   A. Correct.

17

20   Q. All right. Now, do you recall, Dr. Bryan,
21 ever prescribing Vioxx to Mr. Barnett?
22   A. I don't recall starting a new prescription
23 for him. I don't know if we renewed one or not.
24   Q. During the time that you cared for
25 Mr. Barnett, did you prescribe any COX-2s?

18

1   A. Not that I'm aware of.

19

5   Q. Doctor, have you read any of the recent
6 studies regarding Vioxx and it's potential
7 cardiovascular effect?
8   A. I read the colorectal study when it first
9 came out. There was -- there was concern about the
10 COX-2 inhibitor Vioxx causing increased risk of
11 stroke and -- and MI or myocardial infarction, heart
12 attack.
13   Q. All right. And that would be the approved
14 study?
15   A. I believe that's what it was. It was
16 about two or three years ago?

20

13   Q. Doctor, do you have any opinion as to
14 whether or not Vioxx is pro thrombotic?
15        MR. GOLDMAN: Object to the form. Lacks
16 foundation.
17        Go ahead. I'm sorry.
18        THE WITNESS: No.
19 BY MS. SHERBANEE:
20   Q. You have no opinion?
21   A. I -- I have no -- no opinion on that.
          . . .

66

19   Q. Doctor, in my records I don't see anything
20 that you saw him after October 10, 2002. I don't
21 know if counsel has anything. But as far as the
22 records that we have, that was the last time that
23 you saw him. Would that be an accurate --
24   A. Yes.
25   Q. -- recollection? All right. We do,

67

1 Doctor, have some records in regards to his cardiac
2 rehab. Would that have been something your office

3  would have been involved in?
4      A.  We'll often sign the cardiac rehab for
5  them so they can get started, and then every now and
6  then we'll get a report from cardiac rehab. Most
7  times we just forward it on to their cardiologists
8  since they're gonna be doing the long-term care.
9          Now, most of the cardiologists won't see
10 them until we clear them surgically. So what -- or,
11 you know, usually won't unless they're a long-term
12 patient. So we will often sign those forms to get
13 them going in their cardiac rehab so they don't have
14 to wait for the cardiologist to see it, and then
15 usually most of the time the reports are sent
16 directly to the cardiologist.
17     Q.  So these are basically courtesy copies to
18 you?
19     A.  Yes.
20     Q.  All right. So you had no interaction or
21 involvement with the rehab?
22     A.  If they call us we -- we refer them
23 directly to the cardiologist.

69

1      Q.  Doctor, at the beginning of this
2  deposition I asked you what documents you had
3  reviewed, and basically you said you had only
4  reviewed -- reviewed the approved study. And so
5  would I be correct in saying you haven't reviewed
6  any of the clinical trials? There's a lot of
7  documents in this -- in this case, Doctor.
8      A.  No. No. I mean, basically being a
9  surgeon, I haven't gone through most of the --
10 the -- let's say the COX-2 inhibitor trials and --
11 and whatnot that have all been coming out about
12 these things. So, no.
13     Q.  And you're not an expert in vascular
14 biology? You don't intend to render any opinions in
15 terms of vascular biology except what you testified
16 to today?
17     A.  Right. Correct.
18         MS. SHERBANEE: All right. That might
19 shorten things a little bit.
20 BY MS. SHERBANEE:
21     Q.  Haven't done any other comprehensive
22 research on Vioxx, correct?
23     A.  Correct.

```
                                     123
12     Q.  Have you interpreted Cardiolite stress
13  tests before in your life, sir?
14     A.  I have not actually interpreted the
15  studies themselves.  I mean, I -- I look at the
16  report that the cardiologist sends.
17     Q.  Have you reviewed reports like Exhibit 14
18  before?
19     A.  Yes.
20     Q.  So this is a Cardiolite stress test, July
21  18th, 2003.  Is that about ten months after you
22  operated on Mr. Barnett?
23     A.  Yes.
                                     168
 8     Q.  Have you seen any evidence, Dr. Bryan, in
 9  any of the observation you did of Mr. Barnett in
10  September of 2002 or the follow-up visit or any of
11  the EKGs that you've seen today that Mr. Barnett has
12  had nine to ten years taken off of his life because
13  of his heart attack?
14         MS. SHERBANEE:  Objection.  Calls for
15  speculation.
16         THE WITNESS:  I -- I don't -- I don't know
17  that -- I think that's -- that's hard to -- to -- to
18  guess.  I don't -- I have really no opinion on
19  whether he's lost a length of life.  I really don't.
```

As the court can see from the above deposition excerpts, this is clearly a situation where the defense is trying to do something that the law of evidence does not allow. Basically, Dr. Bryan says that he only reviewed his own one-month chart, that he really does not have opinions regarding Vioxx, has not extensively reviewed the literature regarding Vioxx, and does not really have an opinion as to how many years Mr. Barnett is going to lose off the back end of his life. Further, Dr. Bryan says he has not been forwarded copies of any of Mr. Barnett's subsequent medical records after October of 2002. He also says that he does not know about Mr. Barnett's current health status. That should have been the end of the story for this deposition, but defense counsel proceeded to show Dr. Bryan documents he had never seen before and got him to speculate on one or two documents without showing him all of the Barnett medical charts, all of the information on Vioxx

that Plaintiff's and defense experts have looked at in this case.

The danger is that a jury does not know the difference between a non-elected expert like Dr. Bryan who has not really reviewed anything before his deposition except for his own chart which covered one month of treatment, and an expert who has put hundreds of hours into the causation part of the case. It does not take a wizard to understand what the defense is trying to do here. Defense counsel knows that jurors have a tendency to want to listen to the testimony of a treating doctor rather than an expert. If in fact a treating doctor truly understands the medical records, then that would be appropriate. But in this case where Dr. Bryan has not looked at any records after October of 2002, to allow him to speculate on the course of Mr. Barnett's care and treatment and prognosis over the next three-and-a-half to four years is grossly unjust and misleading to the jury.

Therefore Plaintiff would respectfully request that this Court limit Dr. Bryan's testimony to the care and treatment during the period which Dr. Bryan treated Mr. Barnett.

Date: July __, 2006

Respectfully submitted,

By /s/ Mark P. Robinson, Jr.

Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160

234 Commerce Street
Montgomery, Alabama  36103-4160
Telephone:  (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Counsel for Plaintiff

**Russ M. Herman**, Esquire
Leonard A. Davis, Esquire
Stephen J. Herman, Esquire
HERMAN, HERMAN, KATZ & COTLAR
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Shelly Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, 7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Gerald E. Meunier
Gainesburgh Benjamin David Meunier & Warshauer
2800 Energy Centre
1100 Polydras Street
New Orleans, LA 70163-2800
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337) 494-7171 (telephone)
(337) 494-7218 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W., Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Russ Herman and Phillip Wittmann [with courtesy copy to Merck's trial counsel, Andrew L. Goldman] by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 4th day of July, 2006.

*Mark P. Robinson Jr.*

MARK P. ROBINSON, JR.
California State Bar No. 054426
Attorney for Plaintiff
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, 7th Floor
Newport Beach, CA 92660
Telephone: 949-720-1288
Telecopier: 949-720-1292
mrobinson@rcrlaw.net