Confidential - Subject to Protective Order

Page 122

1    Q.  That would be 360 pills, 90 times --
2    A.  That's a one-year -- one-year supply.
3    Q.  90 times four?
4    A.  That's correct.
5    Q.  Okay.
6    A.  And then -- then I had to fill in a
7  whole different form.  They made me do it all over
8  again.  That's what classic Merck Medco was at that
9  time, you fill out -- besides the prescription, you
10 had to fill out a whole other form and then send
11 that back in so it's like sending in two
12 prescriptions and putting what he had been on
13 before.  Oh, that was the Feldene prescription,
14 but --
15   Q.  All right.  Then you also filled
16 another one from -- for Vioxx as well, correct?
17   A.  That's correct.
18   Q.  And that was also 90 --
19   A.  90 Merck Medco, yes, sir.
20   Q.  That was 90 pills through three
21 refills?
22   A.  That's correct, a one-year supply.
23   Q.  So in other words, he received two --
24 two years of pills, 360, twice?
25   A.  That's correct.

Page 123

1    Q.  Okay.  And that was through Merck Medco
2  and that was prescribed by you?
3    A.  That is correct.
4    Q.  And you keep that record in your
5  computer, right?
6    A.  Yes, sir.
7    Q.  Now, do you remember Merck sales reps
8  Tim Bailey and Latrell Fowler discussing with you a
9  grant involving an institution that you were
10 associated with?
11   A.  What type of grant?
12   Q.  I'll show you the record.  I'm just
13 wondering was there any discussion that you
14 remember where Merck was going to pay for some sort
15 of a grant associated with either a hospital or
16 some institution that you --
17   A.  I'd have to see what it is.
18   Q.  -- were supporting?  I'll show you the
19 document.
20   A.  Okay.
21   Q.  Okay.  Is it true that you received a
22 total of 8,000 dollars for three programs, one on
23 March 21st, 2000, one on May 15th of 2001 and one
24 on August 15th, 2002 from Merck, do you know?
25   A.  I keep all my records at home every

Page 124

1  year on every company so that would probably be
2  correct.
3    Q.  And in addition, you received another
4  3,000 additional monies for speaker fees from
5  Merck, does that make sense?
6        MR. GOLDMAN:  Object to the form.
7        THE WITNESS:  Yes, sir.
8  BY MR. ROBINSON:
9    Q.  And that you received approximately
10 1500 dollars for -- for meals -- where you were
11 compensated for meals you had -- you've had that
12 were Merck, I guess, medication related?
13       MR. GOLDMAN:  Object to the form.
14       THE WITNESS:  Meals?
15 BY MR. ROBINSON:
16   Q.  I'll show you the document.
17       MR. GOLDMAN:  Object to the form.
18       THE WITNESS:  That might be gasoline or
19 something.
20 BY MR. ROBINSON:
21   Q.  Oh, okay, let me show you the document.
22   A.  Yeah, it was -- it was probably travel
23 fees.
24   Q.  Another -- okay.  Did you also receive
25 7 -- approximately 7,000 dollars in honoraria?

Page 125

1        MR. GOLDMAN:  Object to the form.
2        THE WITNESS:  I mean, honoraria is when
3  you give a -- a lecture, that's an honoraria.
4  BY MR. ROBINSON:
5    Q.  Okay.  Okay, let me take you through --
6        MR. ROBINSON:  What was -- is that --
7  Number 7 was the last one?
8        MS. MYER:  Um-hum.  That's correct.
9        MR. ROBINSON:  Let's -- let's go to
10 Exhibit Number 8.  Did you -- do we just -- are we
11 just writing on them?
12       MR. GOLDMAN:  Yeah.  I have stickers.
13       COURT REPORTER:  If you just put the
14 number, I'll fill them in later.
15       MR. ROBINSON:  Okay, good, good.  I'll
16 just put a number in the upper right-hand corner.
17       (PLF. EXH. 8, EasyRxform, with
18 attachments, was marked for identification.)
19 BY MR. ROBINSON:
20   Q.  Let me show you Exhibit Number 8,
21 Doctor, and I actually flagged a page for you.  And
22 Exhibit Number 8, let's see, looks like the sixth
23 page in has the Merck Medco prescriptions that we
24 just talked about for Vioxx.  Do you see that?
25   A.  On the red page?

32 (Pages 122 to 125)

Confidential - Subject to Protective Order

Page 126

1     Q.  Yes.  Yes.
2     A.  Okay.
3     Q.  Do you see up in the upper -- very --
4   the top prescription?
5     A.  Yes, sir.
6     Q.  And that would have been the first
7   prescription you issued for Vioxx on behalf of
8   Mr. Barnett, right?
9     A.  Yes, sir.
10    Q.  And if you notice down at the bottom of
11  that paragraph, it gives four filling dates, 2 --
12  January 7th of 2000, April 6th of 2000, July 10th
13  of 2000 and October 5th of 2000.  Do you see that?
14    A.  Sort of.
15    Q.  At the bottom there --
16    A.  Yeah.
17    Q.  -- where it says filled.
18    A.  Yes, sir.
19    Q.  Okay.  And then if you go down to the
20  fourth paragraph, do you see where it says,
21  Dr. McCaffrey -- once again, it shows 90 pills plus
22  three refills.  Do you see that?
23    A.  Yes, sir.
24    Q.  And then the prescription -- the fill
25  dates were December 21st, 2000?

Page 127

1     A.  Correct.
2     Q.  March 22nd, 2001?
3     A.  Correct.
4     Q.  July 2nd, 2001?
5     A.  Correct.
6     Q.  And October --
7     A.  1st.
8     Q.  -- 1st, 2001, right?
9     A.  That's correct.
10    Q.  Okay.  And that sort of conforms with
11  what you have on your computer?
12    A.  Correct.
13    Q.  Okay.  Going back to Exhibit Number
14  6 -- going back to Exhibit Number 6.
15        MR. GOLDMAN:  Which is what?
16        MR. ROBINSON:  That was the speaker
17  moderator contract with Merck.
18        MR. GOLDMAN:  Um-hum.
19  BY MR. ROBINSON:
20    Q.  How many pharmaceutical companies have
21  you signed a partnership agreement with?
22    A.  Speaker agreements?
23    Q.  Yes.
24    A.  I don't know, I'd have to go back and
25  review my files because every year there's some

Page 128

1   companies that I sign agreements with and I may
2   never speak for them for the whole year.  Like I
3   signed a contract with GlaxoSmithKline and I
4   haven't spoken for Imitrex yet this year.
5     Q.  Okay.  I don't want to know what you
6   make from your patients, but I wanted to get your
7   best estimate of how much you make from these
8   relationship agreements or speaker payments from
9   the various pharmaceutical companies on a yearly
10  basis approximately.
11    A.  Depends on the year, somewhere between
12  30 and 60,000 dollars a year.
13    Q.  And do you know each year approximately
14  how much is being paid by Merck?
15    A.  Merck is at the low end.  They -- I
16  don't do very much for them at all.  I never have.
17  I speak for other companies on a regular basis.
18  Merck has always been as I call them a bottom
19  feeder.  I spoke the least for them out of all the
20  companies.
21    Q.  Well, would you -- would it surprise
22  you that if -- at least the records Merck gave us
23  showed that you made approximately 15,000 to 20,000
24  with Merck?
25        MR. GOLDMAN:  Over what time period?

Page 129

1   Object to the form.
2         THE WITNESS:  For what -- over the past
3   six years.
4   BY MR. ROBINSON:
5     Q.  Over the past six years.
6     A.  That's 2,000 dollars a year.  That's
7   not -- that's -- that's one talk a year or two
8   talks a year.
9     Q.  Okay.  Okay.  Let's go to Exhibit
10  Number 6 and Page 1 where it says, speaker fees
11  expense reimbursement.  Would you read that
12  sentence -- first sentence into the record, please.
13    A.  Which one is this?
14    Q.  First sentence under speaker fees
15  expense reimbursement.
16    A.  Merck agrees to pay you a reasonable
17  fee, speaker fee, in return for your services.
18    Q.  Okay.  Now I'd like you to go to the
19  third page and could you read the -- do you see 9B?
20    A.  9B.
21    Q.  I'm sorry, see -- do you see 9A?
22    A.  Yes.
23    Q.  Could you read the first sentence into
24  the record, please.
25    A.  For all programs designated by Merck as

33  (Pages 126 to 129)

Confidential - Subject to Protective Order

Page 130

1  remote speaker programs, example, programs
2  conducted via teleconference or Internet, Merck
3  will provide you with a slide -- a prepared slide
4  presentation for your use in the remote
5  presentation.
6      Q.  Could you read the next sentence,
7  please.
8      A.  You agree to review the slide -- the
9  prepared slide presentation and the current package
10 circular for the Merck product in advance for each
11 remote speaker program that you conduct.
12     Q.  Then go on, you can read the next
13 sentence, please.
14     A.  You further agree to use the prepared
15 slide presentation exactly as provided by Merck.
16     Q.  So in other words, Merck is preparing
17 the slide presentation at least before '9 -- before
18 2006?
19         MR. GOLDMAN:  Object to the form.  Are
20 you talking about --
21         THE WITNESS:  That is -- that's
22 correct.
23 BY MR. ROBINSON:
24     Q.  Okay.  Let me show you --
25         MR. ROBINSON:  I guess this is -- is

Page 131

1  this going to be Exhibit Number --
2         MS. MYER:  9.
3         MR. ROBINSON:  Number 9.  Here you go.
4  Can you get that?  I'm sorry.
5         (PLF. EXH. 9, Email dated 8/3/00 to
6  Michael A. Buttala from Jill I. Wargo, with
7  attachments, was marked for identification.)
8  BY MR. ROBINSON:
9      Q.  And Exhibit Number 9 appears to be an
10 e-mail Merck document dated 8/3/2000, is that
11 correct?  Do you see that?
12     A.  Yes, sir.
13     Q.  And do you see where it says the
14 subject is FW:  Speaker top earner Vioxx?
15     A.  Yes, sir.
16         MR. GOLDMAN:  Can I have a standing
17 objection to your use of documents that
18 Dr. McCaffrey's never seen before on foundation
19 grounds?
20         MR. ROBINSON:  Well, let's -- don't
21 worry, you can have your objection all the way
22 through.
23         MR. GOLDMAN:  Yes?
24         MR. ROBINSON:  You can have an
25 objection to every question I ask.

Page 132

1  BY MR. ROBINSON:
2      Q.  The -- do you see where -- where the --
3  there's a Bates number at the bottom of these
4  pages, Doctor?
5      A.  Um-hum.
6      Q.  Okay.  If we -- if we go deep into this
7  to Bates Number 45244 --
8      A.  45?
9      Q.  45244 at the bottom there.
10     A.  45244, got it.
11     Q.  Correct.
12     A.  There's my name.
13     Q.  So you're listed as -- as one of the
14 speaker top earners for Vioxx and your rate is 750
15 dollars, is that right?
16     A.  That's correct.
17     Q.  And then if we go to 45289, you're
18 listed again in that document.  Do you see that?
19     A.  Yes, sir.
20     Q.  And your rate there is 750 dollars as
21 well, is that right?
22     A.  That's correct.
23     Q.  Okay.  Now let's go to the next
24 exhibit, which is Number 10.
25         (PLF. EXH. 10, Email dated 9/4/01, with

Page 133

1  attachments, was marked for identification.)
2  BY MR. ROBINSON:
3      Q.  Here you go, Doctor.  Now, this is
4  another e-mail from Merck, Bates Number
5  MRK ADK 0006184.
6      A.  That's the first page.
7      Q.  Yes.  And do you see where it says SE
8  executive team right there --
9         MR. GOLDMAN:  This is another example
10 of a document he hasn't seen.
11         MR. ROBINSON:  I know you're --
12         MR. GOLDMAN:  Object on foundation
13 grounds.
14         MR. ROBINSON:  You're going -- you're
15 going to object.
16         THE WITNESS:  How far -- oh, SE
17 executive team, okay.
18 BY MR. ROBINSON:
19     Q.  Yes.  And then it says:  Since there is
20 so much opportunity with Vioxx and Zocor, I asked
21 Tara deHaan -- small D-E, capital H-A-A-N -- to run
22 a report looking at all of our Vioxx and Zocor HEL
23 programs for the remainder of the year.  There is
24 one tab by HEL budget and each tab can be sorted by
25 region.

34  (Pages 130 to 133)

Confidential - Subject to Protective Order

**Page 134**

1    Did I read that right?
2    A. Yes.
3    Q. And then if we go to actually the next
4    page, do you see under Atlanta region there under
5    program type colloquia, you're listed as speaking
6    at the Collectors Cafe in Myrtle Beach?
7    A. Okay.
8    Q. So did you speak concerning Vioxx?
9    A. Don't remember speaking for Vioxx.
10   Q. Pardon me?
11   A. I don't remember speaking for Vioxx.
12       MR. GOLDMAN: What page?
13   BY MR. ROBINSON:
14   Q. Do you see on Bates Numbers
15   MRK ADK 0006185 that you -- that apparently you
16   gave a speech?
17   A. I may have. I don't remember giving
18   a -- because I had talked to the company before. I
19   always spoke for Maxalt and they said they didn't
20   need me to speak for Vioxx so I don't remember
21   speaking for them. If this says it actually
22   happened, then it happened.
23   Q. Okay. If you go -- they -- they
24   actually give a date, I think. If you go to the
25   next page, it appears to be 9/6/2001. Do you see

**Page 135**

1    at Bates Number 6186, it showed that you got 800
2    dollars?
3    A. 9/6/2001?
4    Q. Yes.
5    A. Okay.
6    Q. You just don't remember giving that
7    speech?
8    A. No, sir.
9    Q. Okay.
10       (PLF. EXH. 11, Document entitled Cust
11   Assoc Pymnt, was marked for identification.)
12   BY MR. ROBINSON:
13   Q. Okay, the next exhibit is 11. Here you
14   go, Doctor. Okay, Exhibit Number 11 is a Merck
15   customer association payment chart. Do you see
16   that?
17       MR. GOLDMAN: This is another example
18   of a document he hasn't seen. Object on foundation
19   grounds.
20   BY MR. ROBINSON:
21   Q. Okay.
22   A. Okay.
23   Q. I'd like you to go to Page 4 of 4.
24   A. Okay.
25   Q. And do you see that you're listed nine

**Page 136**

1    times as a customer association payment on this
2    document?
3        MR. GOLDMAN: Object to the form. As a
4    what?
5        MR. ROBINSON: Customer association
6    payment.
7        THE WITNESS: And so are my partners.
8    BY MR. ROBINSON:
9    Q. Which ones are your partners?
10   A. All the people on that page.
11   Q. So --
12   A. On all four pages, these are all my
13   partners. We all have to sign the same contracts.
14   Q. So all your partners signed all of
15   these contracts as well?
16   A. Yes, sir.
17   Q. And these are payment contracts, right?
18   A. Yes, sir.
19   Q. Okay.
20   A. That's how you get paid.
21   Q. I see. Now, let's go to the next
22   exhibit, Number 12.
23       (PLF. EXH. 12, Program Date Listing,
24   was marked for identification.)
25   BY MR. ROBINSON:

**Page 137**

1    Q. There you go. This is a list of
2    preceptorships, roundtables and colloquia that
3    Merck gave us that you were involved in. Do you
4    remember being involved with preceptorships,
5    roundtables, colloquia and tutorials?
6    A. Yes, sir.
7    Q. And --
8    A. This looks pretty accurate.
9    Q. This looks accurate to you?
10   A. Yes, sir.
11   Q. As I look at this, from 1999 through
12   December of 2001 when your prescription for Vioxx
13   was completed, you were involved in 18 either
14   colloquials (sic), tutorials, roundtables or
15   preceptorships with Merck, is that right?
16   A. That's correct.
17       MR. GOLDMAN: Object to the form.
18       (PLF. EXH. 13, Document entitled
19   pgm_affil, was marked for identification.)
20   BY MR. ROBINSON:
21   Q. Let me show you Exhibit Number --
22       MS. MYER: 13.
23   BY MR. ROBINSON:
24   Q. -- 14.
25       MS. MYER: 13.

35 (Pages 134 to 137)

Confidential - Subject to Protective Order

Page 138

1   BY MR. ROBINSON:
2       Q.  13.  Here's 13.
3           Before I show you 13, did you know
4   Merck was keeping all these records on you?
5           MR. GOLDMAN:  Object to the form.
6           THE WITNESS:  I'm sure every company
7   does.
8   BY MR. ROBINSON:
9       Q.  Okay.  13 appears to be lectures, is
10  that right?
11      A.  Yes, sir.
12      Q.  And are your partners listed on this as
13  well?
14      A.  Yes, sir.
15      Q.  Off this sheet tell me -- please tell
16  us which ones are your partners.
17      A.  All of them.
18      Q.  So Jerry --
19      A.  Schexnayder.  Ralph Cozart was a
20  partner of mine, Julian Hayes, Barbara Sarb,
21  Frederick Hamilton, John Juliano.  Ed Michael was a
22  partner.  John Juliano was a partner, Jeff
23  Benjamin, Tom Chambers and myself.  So it looks
24  like these are people that they brought around to
25  talk to us or we went to their actual talks.

Page 139

1       Q.  And you gave six lectures for Merck, is
2   that right?
3       A.  I don't think these were lectures I
4   gave.
5           MR. GOLDMAN:  Object to the form.
6           THE WITNESS:  These aren't lectures
7   that I gave.
8   BY MR. ROBINSON:
9       Q.  These are lectures that you attended?
10      A.  Lectures I attended or they brought a
11  speaker into the office so if you match the dates
12  up, you can see -- I think they brought a speaker
13  into the office, like a visiting consultant came in
14  and talked to us, they sat and ate lunch with us so
15  somebody else got paid for that.
16      Q.  Okay.  Okay.  Let me show you Exhibit
17  Number 14.
18          (PLF. EXH. 14, Document entitled
19  pgm_expns, was marked for identification.)
20  BY MR. ROBINSON:
21      Q.  14 appears to be monies paid for meals,
22  miscellaneous, speaker expenses, speaker fees,
23  program support, et cetera, right?
24      A.  That's correct.
25      Q.  And just going through, the ones that

Page 140

1   are listed for you, you received 461 dollars on
2   August 15, 2002, right?
3           MR. GOLDMAN:  Object to the form.
4           THE WITNESS:  That was paying --
5           MR. GOLDMAN:  That was received?
6           THE WITNESS:  That's paying for lunch
7   for the office.
8   BY MR. ROBINSON:
9       Q.  Okay.
10      A.  I didn't receive any money.
11      Q.  Okay.  But this is money spent by
12  Merck --
13      A.  Right.
14      Q.  -- on your office's behalf, right?
15      A.  That's correct.
16      Q.  Okay.  And then 395 dollars 8/15 also,
17  right, speaker expenses?
18      A.  Of what year?
19      Q.  2002.  I'm just following right down
20  the first page where it says McCaffrey.
21      A.  Okay.
22      Q.  So let me -- let me strike that
23  question and start over.
24          This -- this Exhibit Number 14 has --
25      A.  Now, these fees at the end, this is

Page 141

1   somebody they brought in and they paid them 2,000
2   dollars to come and talk to me about acute pain.
3   These look like all outside fees they paid somebody
4   else to come in and talk to me.
5       Q.  Well, you're saying that you -- that
6   somebody came and spoke to you and they got 2,000
7   dollars?
8       A.  Exactly.
9       Q.  But the -- but the meals and --
10      A.  The meals are different.
11      Q.  The meals were paid by Merck for your
12  staff, right?
13      A.  Exactly.  For the office, yes.
14      Q.  What about the program support?
15      A.  Program support.  Wasn't paid to us.
16      Q.  Okay, let's just go down it.  So -- so
17  the first entry is 8/15/20002.  That's $461.15 for
18  meals and hospitality for your office, right?
19      A.  That's correct.
20      Q.  Then the third one down, 8/15/2002, so
21  the same day, speaker got 395 dollars, is that
22  right?
23          MR. GOLDMAN:  Object to the form.
24          THE WITNESS:  That's correct.
25  BY MR. ROBINSON:

Confidential - Subject to Protective Order

Page 142

1    Q.  In expenses?
2    A.  In expenses.  It might have been flying
3  in or whatever it was.
4    Q.  And then the speaker got 2,000 dollars
5  for speaking, right?
6    A.  Yeah, that's correct.
7    Q.  And then there's 461 dollars the same
8  day for meals and hospitality again?
9    A.  That's correct, that was the food in
10  the office.
11    MR. GOLDMAN:  Object to the form.
12  BY MR. ROBINSON:
13    Q.  Okay.  And the rep on that was Amanda
14  Moore?
15    A.  Amanda, that's correct.
16    Q.  Do you remember her?
17    A.  Yeah, a little bit.  She hasn't been in
18  the company for a long time.
19    Q.  Okay.  Okay.  Now, the next group of
20  numbers here, the rep was Timothy Bailey, is that
21  right?
22    A.  That's correct.
23    Q.  Do you remember him?
24    A.  I know him very well.  He just went
25  back to Camp Lajeune.  He's an instructor for the

Page 143

1  Marines.  He was in Iraq and he's worked for
2  multiple different pharmaceutical companies.
3    Q.  Okay.  And it says that meals and
4  hospitality for 5/15/2001 was 836 dollars?
5    A.  That's correct.
6    Q.  And the program support was another 836
7  dollars?
8    A.  That's correct.
9    Q.  And for the --
10    MR. GOLDMAN:  Object to the form of all
11  these questions.
12  BY MR. ROBINSON:
13    Q.  -- the same day, the speaker fees was
14  1500 dollars, is that right?
15    A.  That's correct.
16    Q.  Okay.  Now, the next date was March
17  21st, 2000 and the rep there was Latrell Fowler, is
18  that right?
19    A.  That's correct.
20    Q.  Is that a woman or is that a male?
21    A.  I can't remember.
22    Q.  Okay.  The -- in any event, you don't
23  remember Latrell Fowler?
24    A.  I think it was a female.
25    Q.  Okay.  So the meals and hospitality

Page 144

1  were $387.45 that day, right?
2    A.  That's what paid for my staff, yeah.
3    Q.  And miscellaneous is 28 dollars, right?
4    A.  That's correct.
5    Q.  Program support was $415.45?
6    A.  That's correct.
7    Q.  And the speaker would have gotten 1500
8  dollars?
9    A.  That's correct.
10    Q.  Do you remember who the speaker was?
11    A.  No, sir.
12    Q.  Okay.  Okay, let's show you Exhibit
13  Number 15.
14    (PLF. EXH. 15, Listing, was marked for
15  identification.)
16  BY MR. ROBINSON:
17    Q.  Exhibit Number 15 appears to be
18  honorariums, is that right?
19    A.  Correct.
20    Q.  And so if we track the numbers through
21  to the last page of Exhibit Number 15 and just view
22  the dates, it appears that you received 1500
23  dollars honoraria for -- on July 15th, 1999, right?
24    A.  That's correct.
25    Q.  And you received 1500 dollars on March

Page 145

1  29th, 2000 from Merck?
2    A.  That's correct.
3    Q.  You received 1500 dollars on May 30th,
4  2000 from Merck, right?
5    A.  That's correct.
6    Q.  And then on 9/12/2000 you received 300?
7    A.  That's correct.
8    Q.  And then on 3/15/2001 you received 500?
9    A.  That's correct.
10    Q.  And then on April 13th, 2001 you
11  received 250 dollars?
12    A.  That's correct.
13    Q.  And then on September 26, 2001 you
14  received 500 dollars?
15    A.  That's correct.
16    Q.  And lastly on November 30th, 2001 you
17  received another thousand dollars?
18    A.  That's correct.
19    Q.  And -- and all of those preceded the
20  end of the prescription for Mr. Barnett which ended
21  in December of 2001, correct?
22    MR. GOLDMAN:  Object -- object to the
23  form, vague.
24  BY MR. ROBINSON:
25    Q.  Correct?

37 (Pages 142 to 145)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 146

1    A.  Would you ask the question again,
2  please?
3    Q.  Yes.  All of those honorariums came
4  before the last prescription that was filled on
5  behalf of Mr. Barnett -- was completed in December
6  of 2001?
7    A.  That's correct.
8    Q.  Okay, let me go to Exhibit Number 16
9  now.
10    (PLF. EXH. 16, Document entitled
11  Call Notes, was marked for identification.)
12  BY MR. ROBINSON:
13    Q.  There you go, Doctor.  Okay, Exhibit 16
14  appears to be call notes, correct?
15    A.  That's correct.
16    Q.  So from time to time, the Merck reps
17  would come meet with you and then have discussions
18  with you and then apparently wrote a call note
19  about what they discussed with you, right?
20    A.  That's correct.
21    Q.  Okay.  If we go down to the first -- on
22  the first page of Exhibit 16, on the fourth line
23  where it says, Gerald Barnett, case name, Michael
24  McCaffrey and then the rep is Timothy Bailey, do
25  you see that?

Page 147

1    A.  Up at the top of the page?
2    Q.  Yeah, the fourth line down.
3    A.  Okay.  Okay.
4    Q.  And the call date was 3/9/2001, is that
5  right?
6    A.  Gotcha, okay.
7    Q.  And the customer is Michael McCaffrey,
8  right?
9    A.  Yes, it is.
10    Q.  And then it says accomplishments.  Did
11  I read that right?
12    A.  That's correct.
13    Q.  And then under the note text, it says:
14  Talked about a grant for his institution.
15    Does that refresh your memory now?
16    MR. GOLDMAN:  Object to the form.
17    THE WITNESS:  Well, you didn't show me
18  what it's for.
19  BY MR. ROBINSON:
20    Q.  Well, I'm asking you.
21    A.  The only thing I can think, Tim -- Tim
22  was -- like I said, he's still a good friend of
23  mine.  He went back to the Marines.  We have a
24  thing called the St. Andrew's Crusader countdown.
25  It's a hundred-dollar ticket.  Him and his wife go

Page 148

1  every year so that was probably the grant for 100
2  dollars to go to -- some companies will let the rep
3  do it through the company as a donation to the
4  Catholic school and some people would have to pay
5  out of pocket and that's probably what he's talking
6  about, a hundred-dollar ticket.  That's my best
7  guess because I don't know of anything else I would
8  have asked him for.
9    Q.  Okay, let me go to -- let's go to the
10  third page, 3 -- Page 3 of 20.  And if you go one,
11  two, three, four, five, six down, do you see where
12  it says 12/3/99?
13    A.  3/99, got it.
14    Q.  12/3 -- you got it?
15    A.  Right.
16    Q.  Did Latrell Fowler --
17    A.  Yes.
18    Q.  -- have the same connection to the same
19  charity as -- as Tim or is this a separate grant?
20    A.  It said:  Discuss roundtable and grant,
21  daily chronic -- this -- this is for -- I was
22  giving a talk.  It was actually a CME course that I
23  was giving on the -- for these pharmacists, but I
24  have no idea about a grant.
25    Q.  Did you discuss a grant with Latrell

Page 149

1  Fowler?
2    A.  She was just talking about how much
3  money she was going to pay me, discuss roundtable
4  and grant, daily clinic -- grant daily chronic
5  headaches, so what she was going to pay me.
6    Q.  So it would be a -- it would be a grant
7  regarding daily chronic headaches?
8    MR. GOLDMAN:  Object to the form.
9    THE WITNESS:  However she wanted to put
10  it in there.  I can't say what she was thinking
11  that day.
12  BY MR. ROBINSON:
13    Q.  What is -- okay.  What -- what do you
14  remember?
15    A.  I just remember talking to her about
16  doing a talk.
17    Q.  She didn't talk about giving you a
18  grant as well?
19    A.  I don't get grants.
20    Q.  Okay.  Let's go to the next exhibit.
21    A.  Done with that one?
22    Q.  Yeah, we're done with that one.  Number
23  17.
24    (PLF. EXH. 17, Listing, was marked for
25  identification.)

38  (Pages 146 to 149)

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 150

1  BY MR. ROBINSON:
2      Q.  There you go, 17 over here.  These
3  appear to be all the contacts with you regarding
4  Vioxx, is that right?
5          MR. GOLDMAN:  Object to the form, lacks
6  foundation.
7          THE WITNESS:  It would be Merck itself,
8  I guess.
9  BY MR. ROBINSON:
10     Q.  And they were -- these would
11 approximately be 374 contacts, does that make
12 sense?
13         MR. GOLDMAN:  Object to the form.
14         THE WITNESS:  Yes, sir.
15 BY MR. ROBINSON:
16     Q.  That's about you said one -- one a week
17 or something?
18     A.  One a week at least if not two a week.
19     Q.  Okay.
20         MR. ROBINSON:  Let's take a break.
21         THE WITNESS:  I've got to move on.
22 BY MR. ROBINSON:
23     Q.  Well, let's keep going.  Okay, great,
24 good.
25     A.  I've got sick people to take care of.

Page 151

1      Q.  Okay.
2          (Off-the-record conference.)
3          VIDEO TECHNICIAN:  This is the end of
4  Tape Number 2 in the deposition of Dr. Michael
5  McCaffrey.  The time is approximately 3:43 PM.  The
6  date is May 3rd, 2006.  We will now go off the
7  record.
8          (A recess transpired.)
9          (PLF. EXH. 18, Call Summary, was marked
10 for identification.)
11         VIDEO TECHNICIAN:  This is the
12 beginning of Tape Number 3 in the deposition of
13 Dr. Michael McCaffrey.  The time is approximately
14 3:44 PM.  The date is May 3rd, 2006.  We are now
15 back on the record.
16 BY MR. ROBINSON:
17     Q.  By the way, just from your experience
18 with Merck on Vioxx and their other drugs, did they
19 have sort of an integrated marketing campaign?
20         MR. GOLDMAN:  Object to the form.
21         THE WITNESS:  I don't understand the
22 question.
23 BY MR. ROBINSON:
24     Q.  Well, I mean, they had samples, they
25 had sales rep meetings, they had lectures,

Page 152

1  preceptorships, TV ads, et cetera, right?
2          MR. GOLDMAN:  Object to the form.
3          THE WITNESS:  Correct.
4  BY MR. ROBINSON:
5      Q.  And it appears that you at least had
6  some experience with all of those, correct?
7          MR. GOLDMAN:  Object to the form.  Of
8  all of -- can you repeat the question?
9  BY MR. ROBINSON:
10     Q.  Let me rephrase it.
11     A.  Okay.
12     Q.  You certainly saw over -- from 1999
13 through -- through 2002 Vioxx ads on TV.
14     A.  Yes, sir.
15     Q.  From 1999 through 2002, you -- you had
16 sales call appointments with reps coming to your
17 office for Vioxx, right?
18     A.  Yes, sir.
19     Q.  From 1999 to 2002, you had
20 preceptorships?
21     A.  That's correct.
22     Q.  And the same is true for some of the
23 other lectures that you -- that you were involved
24 in with Merck, correct?
25     A.  Yes, sir.

Page 153

1      Q.  Okay.  Now, let's go to Page 88 of 116.
2      A.  Okay.  I know it's down here someplace.
3      Q.  Do you see where it says -- it starts
4  with Michael McCaffrey there?
5      A.  Doctor, right.
6      Q.  And we've counted those up and would it
7  surprise you if there were over 8400 samples given
8  to your office?
9          MR. GOLDMAN:  Object to the form.
10         THE WITNESS:  It would not surprise me.
11 Would it surprise you we threw 2,000 pills away
12 when they recalled it?
13 BY MR. ROBINSON:
14     Q.  And those are samples?
15     A.  Yes, sir.
16     Q.  Okay.  Next exhibit.  I want to go
17 quickly through your medical records.  You saw
18 Mr. Barnett four times, is that right?
19     A.  Yes, sir.
20     Q.  And if we look at Exhibit Number 1, in
21 the middle of the page it says:  He had taken
22 Feldene from 12/80 to 10/96 with significant
23 improvement of his symptoms.
24     A.  Yes, sir.
25     Q.  It says:  He stopped this medication

39 (Pages 150 to 153)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 154

1   and has been taking ibuprofen since then.
2       A.  Yes, sir.
3       Q.  And then if you go to the third page of
4   Exhibit Number 1, it says under impression: I have
5   restarted him on Feldene 20 milligrams PO Q day?
6       A.  Yes, sir.
7       Q.  And then under Number 2 it says:  Neck
8   pain.  This has been stable.  Hopefully this will
9   improve with Feldene.
10      A.  Yes, sir.
11      Q.  Okay.  And, of course, there was an
12  X-ray that showed posterior degenerative changes
13  seen at L-5/S-1 and L-4/L-5 --
14      A.  Right.
15      Q.  -- with mild to moderate loss of disc
16  space height is seen at L-5/S-1, right?
17      A.  Yes, sir.
18      Q.  And there's spurring at L-3/L-4?
19      A.  Correct.
20      Q.  Osteopenia, correct?
21      A.  Yes.
22      Q.  And there's mild to moderate
23  degenerative changes seen at the L-3/L-4 facet
24  joint as well?
25      A.  That's correct.

Page 155

1       Q.  Okay.  Number -- Exhibit Number 2.
2       A.  Yes, sir.
3       Q.  You did a nerve conduction study which
4   showed that he did have problems at the L-4/S-1
5   paraspinals, right?
6       A.  L-4/L-5/S-1.
7       Q.  L-4/L-5/S-1, correct?
8       A.  Yes, sir.
9       Q.  And you -- it says:  We will see the
10  patient on a follow-up after his MRI is completed.
11  We will --
12      A.  Yes, sir.
13      Q.  -- continue him on Feldene at 20
14  milligrams per day, right?
15      A.  Yes, sir.
16      Q.  And you say, quote:  He has had a
17  significant improvement in his pain since
18  restarting Feldene?
19      A.  Yes, sir.
20      Q.  And then if we go to Exhibit Number 3,
21  which is dated 4/6/1998.
22      A.  That's correct.
23      Q.  In the middle of the page, it says:  He
24  was started on Feldene 20 milligrams per day and
25  has been doing fine on this medication.

Page 156

1       A.  Yes, sir.
2       Q.  Did I read that right?
3       A.  Yes, sir.
4       Q.  Now, I want to show you an Exhibit
5   Number --
6           MR. ROBINSON:  I guess it's Number 19?
7           MS. MYER:  Yes.
8           (PLF. EXH. 19, Carolina Health
9   Specialists medical record, with attachments, was
10  marked for identification.)
11  BY MR. ROBINSON:
12      Q.  I want you -- I want you to go to --
13  there's Bates numbers at the bottom of this
14  exhibit.
15      A.  Okay.
16      Q.  And I want you to go to 88158022 so go
17  22 pages in.  So your last visit with Mr. Barnett
18  was 12/30/99, right?
19      A.  Yes, sir.
20      Q.  So this would have been a meeting
21  with -- with Dr. Mikolajczyk --
22      A.  Mikolajczyk.
23      Q.  -- Mikolajczyk 10/22/99, which would be
24  about two months before your last meeting with
25  Dr. -- with Mr. Barnett, correct?

Page 157

1           MR. GOLDMAN:  Object to the form.
2           THE WITNESS:  Correct.
3   BY MR. ROBINSON:
4       Q.  And I'll rephrase that.  That was bad
5   form.
6           You last saw Mr. Barnett as a patient
7   on December 30, 1999, correct?
8       A.  That's correct.
9       Q.  And according to this record, he saw
10  Dr. Mikolajczyk two months before that on October
11  22nd, 1999?
12      A.  That's correct.
13      Q.  Okay.  And if we go to Number 23, the
14  next page, could you read into the record under the
15  assessment and plan Number 2 --
16          MR. GOLDMAN:  I'm going to object --
17  can I have a standing objection --
18          MR. ROBINSON:  Yes, yes.
19          MR. GOLDMAN:  -- to documents he hasn't
20  seen before --
21          MR. ROBINSON:  Sure, sure.
22          MR. GOLDMAN:  -- on foundation?
23  BY MR. ROBINSON:
24      Q.  Go ahead, sir, please read that for the
25  record.

40  (Pages 154 to 157)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

## Page 158

1  A. Number 2, osteoarthritis. Continue
2  Feldene. He takes it fairly regularly and it seems
3  to be effective for him.
4  Q. So here two months before you saw him
5  in December of 1999, at least he was telling
6  Dr. Mikolajczyk that Feldene seems to be effective
7  for him --
8  A. Yes, sir.
9  Q. -- correct? Okay. Now, if we can go
10  to Exhibit Number 4. I mean, how many patients do
11  you see in a year?
12  A. I'm not sure.
13  Q. I mean, how many patients come in and
14  ask you about a medicine they've heard about over
15  a -- over a course of five years?
16  MR. GOLDMAN: Object to the form.
17  THE WITNESS: At least once or twice a
18  week.
19  BY MR. ROBINSON:
20  Q. Okay. I mean, is it possible that
21  Mr. Barnett came in in December of 1999 and -- and
22  said that he -- he had heard something about
23  Celebrex on TV and -- and inquired about it, is
24  that possible?
25  A. It's possible.

## Page 159

1  MR. GOLDMAN: Object to the form.
2  BY MR. ROBINSON:
3  Q. Okay. And every time a patient comes
4  in and mentions a drug, do you put it down in your
5  chart?
6  A. If we discuss something I'll write it
7  down in my handwritten notes. I might not dictate
8  it out, but that's why I always keep my handwritten
9  notes.
10  Q. Well, I mean --
11  A. I'll put discussed Celebrex and Vioxx
12  or I'll just write down real brief --
13  Q. Well, your note didn't say in this case
14  discussed Vioxx, did it?
15  A. Well, it said on there I was going to
16  put him on Vioxx.
17  Q. I understand, but it didn't say, we had
18  a discussion about Celebrex and Vioxx, right?
19  A. That's correct.
20  Q. Didn't say, we discussed Vioxx,
21  correct?
22  A. That's correct.
23  Q. Now, when you look at this note, it
24  looks -- I mean, as a person who plays some golf,
25  not very well, it looks to me like -- quote: He

## Page 160

1  has noted significant improvement in his lower back
2  since not playing golf over the last two week --
3  past two weeks.
4  Did I read that right?
5  MR. GOLDMAN: Object to the form.
6  THE WITNESS: That's correct.
7  BY MR. ROBINSON:
8  Q. And then it says: He is seen in the
9  office today for increasing pain of his left
10  shoulder and deltoid, correct?
11  A. That's correct.
12  Q. Those are -- those are parts of your
13  body that are affected by golf, correct?
14  A. That's correct.
15  Q. So Feldene could have still been fine
16  like he told Dr. Mikolajczyk two weeks -- two
17  months before, but he -- he may have just seen ads
18  about new medications, is that correct?
19  MR. GOLDMAN: Object to the form.
20  THE WITNESS: That's true.
21  BY MR. ROBINSON:
22  Q. Thank you. Exhibit Number 5, which
23  I -- I'm only asking this question because I do
24  believe that it's an improper use of the -- the
25  deposition, but do you have any reason to believe

## Page 161

1  that Mr. Barnett's lying about saying he brought up
2  Celebrex?
3  A. No.
4  Q. And the warning label that you would
5  have shown Mr. Barnett in 1999 didn't have a
6  warning or a contraindication regarding heart
7  attacks, did it?
8  A. No, sir.
9  Q. Okay. So you just provided the warning
10  label that you were given by Merck, correct?
11  A. Yes, sir.
12  Q. Okay. And Merck did not tell you
13  that -- that Vioxx was associated with heart
14  attack, correct?
15  MR. GOLDMAN: Object to the form.
16  THE WITNESS: I think if you look in
17  the package insert, you know, the original studies,
18  there was a small incidence of heart attack and
19  stroke but not -- it wasn't something that was
20  widely talked about. But I think, you know, if you
21  look in the 1 percent category or less than 1
22  percent, you might find it.
23  BY MR. ROBINSON:
24  Q. But my point is they didn't put it in
25  the warnings section --

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 162

1    A. No, sir.
2    Q. -- or the contraindications section of
3 the label, right?
4    A. No, sir.
5    Q. In fact, they never did to my
6 knowledge, right?
7        MR. GOLDMAN: Object to the form. Put
8 it where?
9 BY MR. ROBINSON:
10    Q. Put it in the -- strike that.
11       There's a warnings section and a -- and
12 a contraindication section in the label, right?
13    A. That's correct.
14    Q. And even when Merck changed the label
15 in April of 2002, they didn't put a warning or
16 contraindication regarding heart attacks for Vioxx,
17 did they?
18    A. I don't remember they did.
19    Q. And --
20       MR. GOLDMAN: Mark, when you get a
21 chance, I have to go to the bathroom.
22       MR. ROBINSON: Go to the bathroom
23 quick. Go. Sorry, Doctor, he's got to go to the
24 bathroom.
25       VIDEO TECHNICIAN: We will now go off

Page 163

1 the record. The time is approximately 3:58 PM.
2       (A recess transpired.)
3       VIDEO TECHNICIAN: We're back on the
4 record. The time is approximately 4:00 PM.
5 BY MR. ROBINSON:
6    Q. And was it your practice to -- to have
7 the patients take some samples before you actually
8 filled a prescription?
9    A. Yes, sir.
10    Q. Why?
11    A. For them to try the medication.
12 Especially with any nonsteroidal, it can cause GI
13 upset and I don't want them to buy a month or three
14 months of medication and they -- they can't take
15 the medicine.
16    Q. So if the samples work, then -- then
17 they -- then they go and fill the prescription?
18    A. That's correct.
19       MR. GOLDMAN: Object to the form.
20 BY MR. ROBINSON:
21    Q. They're told to do that?
22    A. Well, I'll give them a prescription --
23    Q. Let me just ask it -- he made an
24 objection so I'm going to just --
25    A. Okay.

Page 164

1    Q. -- ask it very carefully here.
2       Explain what you did with Mr. Barnett.
3    A. With Mr. Barnett on the last visit, I
4 gave him four sample pills, which is documented in
5 my note, and I was supposed to see him three weeks
6 later because we were going to do a nerve
7 conduction study, EMG, on his arm. He never came
8 back for -- the main reason -- the other reason I
9 have people come back three or four weeks after I
10 start of a new medication, I want to see if there's
11 any side effects, especially with Vioxx. One of
12 the side effects of Vioxx you have to watch for is
13 about 7 or 8 percent of people develop high blood
14 pressure. The high blood pressure they develop on
15 Vioxx does not improve when you put them on blood
16 pressure medications so if I start somebody on
17 Vioxx or Bextra, you can see the blood pressure go
18 up. I want to see them three or four weeks later
19 because I knew this was a possible side effect of
20 the medicine.
21    Q. Now, are you aware that -- that his
22 blood pressure did go up on January 4th and January
23 19th, 2000?
24       MR. GOLDMAN: Object to the form.
25       THE WITNESS: He never came back so I

Page 165

1 would never know because he would have been
2 immediately taken off the medicine.
3 BY MR. ROBINSON:
4    Q. If he'd come back?
5    A. Yes, sir.
6    Q. But in any event, he went to
7 Dr. Mikolajczyk?
8    A. Mikolajczyk.
9    Q. Do you know Dr. Mikolajczyk?
10    A. Very well.
11    Q. When you went to some of these Merck
12 meetings, would -- would he be there?
13    A. With his wife, who is a Merck rep.
14    Q. Okay. Did she actually detail you?
15    A. Yes, she's detailed me before.
16    Q. Okay. You know, why don't you read
17 your notes in the record that you have there from
18 12/30/99, just read it -- the ones on your
19 computer, I think.
20    A. Oh, you mean the handwritten notes?
21    Q. Yeah, if you got them, yeah.
22    A. Come on. I know you're sleeping.
23    Q. Were you able to print them out too
24 maybe?
25    A. Okay. Blood pressure that day was 134

42 (Pages 162 to 165)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

---

Page 166

1  over 76. Heart rate was 80. Low back pain acting
2  up five days a week. Low back improved if not
3  playing golf times two weeks. Increased pain left
4  shoulder and deltoid. He had a positive Phalen's
5  sign and reverse Phalen's on the left hand.
6      COURT REPORTER: Slow down. A
7  positive?
8      THE WITNESS: Phalen's,
9  P-H-A-L-E-N-'-S. And reverse Phalen's sign. He
10  also had decreased sensation over the left hand and
11  the median nerve distribution. Starting the
12  patient on Vioxx -- I just put arrow Vioxx 25
13  daily, four sample pills. Will need MRI cervical
14  spine and nerve conduction study, EMG. And it was
15  supposed to be left arm and then return to clinic
16  three weeks.
17  BY MR. ROBINSON:
18      Q. Okay. So basically -- and then you
19  gave him a package insert and told him --
20      A. Actually, he -- I think it -- I don't
21  know if there were four pills in a package. You
22  know, he would have gotten a package insert, but he
23  might have gotten two of them because they were
24  only sampling two pills at a time.
25      Q. So how many samples did you give him?

---

Page 167

1      A. Four -- either one packet or two
2  packets but a total of four pills.
3      Q. Four pills.
4      A. Four pills.
5      Q. And by giving him the package insert,
6  that was your way of -- of allowing him to
7  understand what the company was saying about the
8  medication Vioxx, right?
9      MR. GOLDMAN: Object to the form.
10      THE WITNESS: That's correct.
11  BY MR. ROBINSON:
12      Q. And so -- I mean, there was a lot of
13  potential smaller side effects mentioned in that
14  package insert, right?
15      A. That's correct.
16      Q. Like -- like there is in every package
17  insert, correct?
18      A. That's correct.
19      Q. So you didn't go over the potential
20  side effects with him, correct?
21      A. No, what I usually do with patients, I
22  tell them here's the medicine, there's a package
23  insert, read through it. If you have any side
24  effects, highlight it, bring the package insert
25  back with you whenever I see you in three weeks.

---

Page 168

1      Q. Okay.
2      A. And if you're having -- even if it's a
3  little side effect, if it's intolerable --
4      Q. Yeah.
5      A. -- we have to stop the medicine. We
6  can't continue if it's an intolerable side effect
7  even if it works. We have to think about a
8  different medicine.
9      Q. Okay. Now, if, in fact, on January
10  19th, unbeknownst to Dr. Mikola and unbeknownst to
11  Mr. -- strike that.
12          On January 19th, 2000, Mr. Barnett had
13  chest pain. Are you aware of that?
14      A. I'm looking at the notes right here.
15      Q. Okay. But I'm not -- I'm not asking
16  you --
17      A. I wasn't aware of it at the time, no,
18  sir.
19      Q. Yeah, let's just stay with what you
20  were aware of at the time.
21      A. Okay.
22      Q. Okay. So let me go back a second. You
23  last saw him on December 30th, 1999, right?
24      A. That's correct.
25      Q. So whatever happened to him with --

---

Page 169

1  regarding chest pain on January 19th, 2000 until
2  today, you were not aware of that --
3      A. No, sir.
4      Q. -- is that correct? Okay. So you're
5  not aware that he had some chest pain that
6  Dr. Mikola thought might be angina, might be some
7  sort of gastroreflux problem or could be some other
8  stress kind of situation?
9      MR. GOLDMAN: Object to the form.
10      THE WITNESS: That's correct.
11  BY MR. ROBINSON:
12      Q. Now, would you fault Dr. Mikola for not
13  connecting that event on January 19th to -- to
14  Vioxx?
15      A. I don't know if I'd fault him. It
16  just -- you know, it would have been different if I
17  would -- you know, I look at things differently
18  than he does so if there were other symptoms
19  involved, like if he did have -- I was looking at
20  the notes quickly -- had upper respiratory
21  symptoms, you know, it's January and -- of the year
22  so -- you know, I'd have to be in the office with
23  him at the time to see what he thought.
24      Q. But if you have upper respiratory
25  symptoms, that could be like the flu?

---

43 (Pages 166 to 169)

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 170

1    A.   Exactly.
2    Q.   So you're -- you really have not
3  evaluated the chart like Dr. Mikola would have
4  evaluated it?
5    A.   Mikolajczyk.
6    Q.   -- Mikolajczyk would have -- would have
7  evaluated it, right?
8    A.   M-I-K-O-L-A-J-C-Z-Y-K, like Mickey
9  Mouse.
10   Q.   But you -- you have not looked at that
11 chart to evaluate or to question anything that
12 Dr. Mikolajczyk did, is that --
13   A.   No, sir.
14   Q.   Now, could -- you're saying upper
15 respiratory -- colds and possibly medication for
16 those colds could also increase blood pressure?
17   A.   Yes, sir.
18   Q.   Why is that?
19   A.   It's the -- they're vasoconstrictors.
20 They have a tendency to squeeze blood vessels
21 closed which can raise the blood pressure.  Do you
22 have the handwritten pages?  I'm printing them out
23 downstairs right now.
24       MR. GOLDMAN:  That would be great.
25       THE WITNESS:  Okay.

Page 171

1  BY MR. ROBINSON:
2    Q.   Yeah, I don't have them.
3    A.   It's two pages.
4    Q.   I'd love to.
5    A.   Okay.  Yeah.
6    Q.   You have handwritten for all four?
7    A.   I just -- I put them in the photocopy
8  machine downstairs.
9    Q.   Thank you.
10   A.   That's easy.
11   Q.   Now --
12   A.   Now they're going to look at the thing
13 downstairs and say, what do we do with this?
14 Probably throw it in the garbage by the time we get
15 down there.  Or shred it.  Shred it.
16   Q.   So -- yeah, were you aware that
17 January -- strike that -- January 4th, 2000 that
18 Mr. Barnett went to Doctor's Care for congestion,
19 cough, postnasal drip, sore throat, took Keflex and
20 his blood pressure went up?
21   A.   No, sir.
22   Q.   Okay.
23       MR. GOLDMAN:  What's the Bates stamp on
24 that because we don't have that?
25       THE WITNESS:  Let's see if it's in

Page 172

1  here.
2        MR. ROBINSON:  It's --
3        MR. GOLDMAN:  Lexi, we really have to
4  get the documents you guys have that we don't.  If
5  that's one of them, I'd like to know what it is.
6        MS. MYER:  I apologize.
7        MR. ROBINSON:  You don't have this?
8        MR. GOLDMAN:  I don't think so.  I have
9  to see what it is.
10       MR. ROBINSON:  Well, we'll get -- we'll
11 get you --
12       MR. GOLDMAN:  I can't -- I can't just
13 take individual documents during depositions of
14 doctors.  I need -- we had a deadline --
15       MR. ROBINSON:  Well, I didn't plan on
16 covering that with him.
17       MR. GOLDMAN:  Okay.  But I still need
18 the -- I need the documents that we don't have.
19       MR. ROBINSON:  I didn't know you didn't
20 have this.
21       MR. GOLDMAN:  Well, we gave you a CD --
22 we can do this off the record.
23       MR. ROBINSON:  Okay.  Well, we'll give
24 you a CD of what we have --
25       MR. GOLDMAN:  Okay.

Page 173

1        MR. ROBINSON:  -- okay?  I don't know
2  that -- it's amazing, we have something different
3  than you have?
4        MR. GOLDMAN:  Apparently.
5        MR. ROBINSON:  Okay.  No, I -- I want
6  you to have all the records, too.
7        MR. GOLDMAN:  Go ahead.
8  BY MR. ROBINSON:
9    Q.   Okay.  Well, let me go back a second.
10 Anyway, you didn't know that -- that he had a chest
11 cold --
12   A.   No, sir.
13   Q.   -- some five days after seeing you?
14   A.   No, sir.
15   Q.   Were you aware that he routinely went
16 to Doctor's Care -- I think it's called Doctor's
17 Care -- for his colds?
18   A.   I'm not sure if I realized that.  I
19 know when I first met him, we had talked if he had
20 a primary care physician.  He said no and that's
21 why I said he was self-referred, he came over on
22 his own.  And I think I talked to him before about
23 getting a doctor and I think that's when I think he
24 finally saw Dr. Huberty -- or Dr. Mikolajczyk, but
25 he didn't tell me where else he was going.

44  (Pages 170 to 173)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 174

1     Q.  Okay.  In any event, if -- if he -- if
2   he went on January 4th and had a blood pressure
3   spike while having a cold and taking Keflex and
4   that's what you knew, would you have still
5   prescribed him Vioxx?
6     A.  I had him on Vioxx at the time.
7     Q.  Right.
8     A.  Right.  It would have been nice to know
9   the information.
10    Q.  Okay.  But, I mean, given everything
11  you knew at Vioxx -- about Vioxx at that time,
12  would you have taken him off Vioxx because he had a
13  blood pressure spike while on Keflex and taking it
14  and having a chest cold?
15    A.  Well, I would have seen him back in the
16  office, taken my own blood pressure and if his
17  blood pressure was elevated, I probably would have
18  taken him off the medicine.  I would say he had no
19  history of high blood pressure so for his blood
20  pressure to go up, there would have been only one
21  thing on my mind that would have caused the
22  elevated blood pressure.
23    Q.  But he never came back to you, right?
24    A.  Never came back.
25    Q.  Okay.  And my point is he's not a

Page 175

1   doctor, right?
2     A.  Correct.
3     Q.  So he didn't know what you knew about
4   blood pressure and -- and Vioxx, right?
5     A.  That's correct.
6     MR. GOLDMAN:  Object to the form.
7   BY MR. ROBINSON:
8     Q.  So in other words, you really can't --
9   can you blame him for not connecting the Vioxx and
10  a blood pressure spike?
11    A.  Well, I mean, with the blood pressure,
12  I mean, it's something -- I mean, he was seeing
13  another doctor so somebody was looking at his blood
14  pressure and sorting it out.
15    Q.  Yes.  And that -- okay.  And that
16  doctor did not feel there was any problem with him
17  staying on Vioxx?
18    MR. GOLDMAN:  Object to the form.
19  BY MR. ROBINSON:
20    Q.  Do you understand that?
21    A.  That's correct.
22    Q.  Obviously he stayed on it for a period
23  of time, right?
24    A.  Yes, sir.
25    Q.  Okay.  Now, if you had seen him, say,

Page 176

1   on or around January 4th and his blood pressure was
2   elevated due to a cold -- or to the medication for
3   the cold, would you have continued to allow him to
4   take the Vioxx?
5     A.  I think if he would have followed up
6   with me, we wouldn't be sitting here right now.
7     Q.  What do you mean by that?
8     A.  Because he would have been telling me
9   that -- we'd have been looking at his blood
10  pressure.  I didn't look and see what his other
11  blood pressures were, but that's why I follow up
12  very soon after putting people on medication
13  because you can be doing well and you won't feel
14  your blood pressure go up.  And it would have
15  alleviated the problem that he had right now with
16  his heart problems.
17    Q.  So you do believe there is a connection
18  between Vioxx and heart problems?
19    MR. GOLDMAN:  Object to the form, lacks
20  foundation.
21    THE WITNESS:  I think there's a
22  connection between Vioxx and elevated blood
23  pressure and I always get concerned about that
24  because that can lead on to heart disease and
25  strokes in particular.  And, you know, as a

Page 177

1   neurologist, you're aware your blood pressure goes
2   up, you're going to have a stroke.  In a young man,
3   you know, I don't want him having a stroke.
4   BY MR. ROBINSON:
5     Q.  Okay.  But to be fair to him, I mean,
6   you didn't tell him, come back if you have elevated
7   blood -- blood pressure, correct?
8     A.  Right, but I did tell him to come back
9   in three weeks --
10    Q.  Okay.
11    A.  -- and he was noncompliant.
12    Q.  Okay.  But -- but my point is he didn't
13  know what -- what all the potential side effects
14  were?
15    A.  Right.  But this was the second time he
16  was noncompliant.  He was noncompliant --
17    Q.  Well, I mean --
18    A.  -- after the third visit because he was
19  supposed to show up in four weeks and he didn't
20  show up and then next time around I said, I'll see
21  you in three weeks and he didn't show up.  So, you
22  know, if he was following up with another doctor,
23  that's fine, but he didn't follow up with the --
24  the gentleman that put him on the medication.
25    Q.  Okay.  But he -- but he was following

45  (Pages 174 to 177)

65417542-bdd2-408c-b6ac-735533c8aa68

## Confidential - Subject to Protective Order

Page 178

1  up with another doctor?
2        MR. GOLDMAN: Object to the form.
3        THE WITNESS: Right, but it's -- you
4  know -- it's like we say in the medical field, it's
5  my responsibility. If I -- if I do the treatment
6  to you, it's my responsibility to either take the
7  credit or take the blame for something. And so on
8  something like this you say, you know, if he's
9  having problems with it, I want to know about it
10  and I wasn't told so...
11  BY MR. ROBINSON:
12        Q. How can the blood pressure spikes lead
13  to -- to heart problems?
14        MR. GOLDMAN: Object to the form.
15        THE WITNESS: You can get a dilated --
16  you can get hypertensive heart disease so if you
17  already have underlying problems -- people that
18  have heart attacks, if you look at -- if you break
19  down disease, disease breaks down three ways.
20  One-third is genetics, one-third is environmental
21  and one-third is unknown. He already got --
22  probably had the one-third genetics. My computer's
23  down right now so I can't check his family history
24  right now to see --
25  BY MR. ROBINSON:

Page 179

1        Q. Coronary artery disease?
2        A. Coronary artery disease.
3        Q. Okay.
4        A. So coronary artery disease runs very
5  high in my family. No matter what I do, I'm going
6  to have a heart attack. Stroke runs in my family.
7  No matter what I do, I'm going to have a stroke.
8  It's as simple as that. What can I do to prevent
9  it? Those are the environmental things. And so --
10        Q. By environmental, does that include
11  drugs?
12        A. Let me finish. If I have elevated
13  cholesterol, you go on -- you go on a statin
14  medication. If you have high blood pressure, you
15  take care of your high blood pressure. You don't
16  smoke, you got to watch your diet, all these things
17  you can do, exercise. If there's something that
18  can change the environmental factors on you, if you
19  give somebody a medication that raises their blood
20  pressure, that throws the equation the opposite
21  way, now you've given them a risk factor in -- in a
22  sense. If you raise their blood pressure with a
23  medication or any treatment that you do, you can
24  put them at a higher risk of heart attack and
25  stroke. If they already have underlying heart

Page 180

1  disease, just don't know it, then by raising their
2  blood pressure, it can create a problem.
3        Q. That could lead to a heart attack or
4  stroke?
5        MR. GOLDMAN: You have to talk about a
6  time frame. You're talking about one elevation of
7  blood pressure? You can't just --
8        MR. ROBINSON: No, I just -- no, you
9  can't -- you can't --
10        MR. GOLDMAN: If you're going to
11  inform -- if you're going to inform -- you're going
12  to ask these questions of Dr. McCaffrey --
13        MR. ROBINSON: Do me a favor.
14        MR. GOLDMAN: -- you need to tell him
15  the full story about his --
16        MR. ROBINSON: You know, you're not
17  supposed --
18        MR. GOLDMAN: -- about his blood
19  pressure.
20        MR. ROBINSON: I know we're -- I
21  know -- here's the point. We're -- we're both
22  doing speaking objections here and we can't be
23  doing this so let's stop it.
24        THE WITNESS: Okay.
25  BY MR. ROBINSON:

Page 181

1        Q. I just want to know here, okay? So --
2  okay, the one-third is genetics, right?
3        A. Yes, sir.
4        MR. GOLDMAN: Object to the form.
5  BY MR. ROBINSON:
6        Q. Okay. And one-third is environment,
7  right?
8        MR. GOLDMAN: Object to the form.
9        THE WITNESS: Yes, sir.
10  BY MR. ROBINSON:
11        Q. And one-third is unknown, right?
12        A. Yes, sir.
13        Q. Now, the environment includes
14  medications and things like that that you take,
15  right?
16        A. That's correct.
17        MR. GOLDMAN: Object to the form.
18  BY MR. ROBINSON:
19        Q. And what you're saying is that one of
20  the medications would be something like Lipitor
21  that could -- could help -- help your --
22        A. Help lower your cholesterol if you have
23  an elevated cholesterol.
24        Q. It could help lower your cholesterol?
25        A. Yes, sir.

46 (Pages 178 to 181)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 182

1      Q.  Another medication would be one that
2   might increase your blood pressure like Vioxx,
3   right?
4          MR. GOLDMAN: Object to the form.
5          THE WITNESS: All -- well, one -- the
6   whole category -- all of the nonsteroidal
7   medications can raise your blood pressure so even
8   Naprosyn or ibuprofen you have to watch.  So if you
9   start somebody on a nonsteroidal, any nonsteroidal,
10  you need to see them back in three or four weeks to
11  check their blood pressure because it can happen on
12  all of them.  And it's about the same percentage.
13  There's not really a difference in the percentage,
14  but it's something that has to be watched so even
15  somebody with over-the-counter Aleve, you have to
16  worry about their blood pressure going up.
17  BY MR. ROBINSON:
18     Q.  If we went forward through September of
19  2002 and his chart shows that while he was taking
20  Vioxx for 32 months that he had two other spikes
21  above 160 systolic, would that be significant to
22  you?
23         MR. GOLDMAN: Object to the form.
24         THE WITNESS: It would be nice to go
25  back to --

Page 183

1          MR. GOLDMAN: Show him all of it.
2          THE WITNESS: -- the time when he was
3   supposed to follow up and I'd be able to tell you a
4   lot more right now.
5   BY MR. ROBINSON:
6      Q.  Okay.  How can blood pressure work with
7   genetics such as coronary artery disease to -- to
8   lead to a heart attack?
9          MR. GOLDMAN: Mark, I'm going to object
10  to this question, calls for expert testimony.
11         MR. ROBINSON: Okay.
12         MR. GOLDMAN: It lacks foundation --
13         MR. ROBINSON: Okay.
14         MR. GOLDMAN: -- because he doesn't
15  know the chart and that applies to your previous
16  question as well.
17  BY MR. ROBINSON:
18     Q.  Go ahead.
19         MR. ROBINSON: You have a -- you have a
20  continuing objection.
21  BY MR. ROBINSON:
22     Q.  Go ahead.
23     A.  It accelerates atherosclerosis in the
24  heart and in the brain and in other blood vessels
25  in the body.

Page 184

1      Q.  How does it accelerate atherosclerosis?
2          MR. GOLDMAN: Object to the form.
3          THE WITNESS: By the -- the whole
4   process.  I mean, you know -- you know, we're
5   stepping out like we said into a world where, you
6   know, now we're talking to academic people that
7   talk about thrombogenesis and everything else with
8   the plaques and everything else in the blood
9   vessels.  So elevated blood pressure is a risk
10  factor for all this.
11         (The proceedings were interrupted.)
12         THE WITNESS: Off the record for a
13  second.
14         VIDEO TECHNICIAN: We will now go off
15  the record.  The time is approximately 4:26 PM.
16         (Off-the-record conference.)
17         VIDEO TECHNICIAN: We're back on the
18  record.  The time is approximately 4:27 PM.
19  BY MR. ROBINSON:
20     Q.  Were you aware that he had already
21  started seeing Dr. Mikola -- Mikolazyk --
22     A.  Mikolajczyk.
23     Q.  -- Mikolajczyk before he saw you on
24  December 30th, 1999?
25     A.  No, I wasn't.

Page 185

1      Q.  Okay.  And do you understand that
2   Dr. Mikolajczyk became his family doctor after --
3      A.  That's what I found out today.
4      Q.  Okay.  And so if the records show that
5   at least in January of 2000, he went to
6   Dr. Mikolajczyk for follow-up care, at least he
7   went to a doctor, correct?
8      A.  That's correct.
9      Q.  Okay.  And are you aware that he
10  continued on with Dr. Mikolajczyk in March of 2000?
11     A.  I haven't had a chance to look at the
12  notes, but I'm assuming from this stack of papers
13  that he did.
14     Q.  Okay.  So -- so you're saying with what
15  you know about Vioxx -- strike that.
16         You're saying with what you know about
17  Vioxx that had you known that there was an increase
18  in his blood pressure, you would not have
19  prescribed him Vioxx?
20     A.  If he would have followed up at three
21  weeks and had an elevated blood pressure, I would
22  have taken him off the medicine.
23     Q.  Why?
24     A.  Because my concern is heart attack and
25  stroke would -- I was seeing people with blood

47 (Pages 182 to 185)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 186

1  pressure -- when you're on Vioxx, you can be put on
2  blood pressure medication and the blood pressure
3  doesn't come down, so the easiest way to solve the
4  problem is to take them off the medicine.
5      Q.  So in other words, even -- even if he
6  took --
7      A.  That's my own personal opinion, it's
8  not from anybody.  It's just when you start getting
9  a feel from patients and they come in and they're
10  like -- they're seeing their primary care doctor
11  and blood pressure's still elevated, I'm taking
12  them off the Vioxx and blood pressure returned to
13  normal, that was easy to do before somebody had a
14  problem.
15      Q.  So in other words, you had patients
16  where they were taking medicine to regulate their
17  blood pressure, to keep the blood pressure down and
18  they were taking Vioxx and the blood pressure
19  wouldn't come down?
20      A.  No, I had patients that had no history
21  of hypertension, went on Vioxx, blood pressure went
22  up, maybe not superelevated like 160 over 90.  I'd
23  send them to their primary care doctor, put them on
24  blood pressure medicine, see them back.  Blood
25  pressure's still elevated, still 140 over 85.  It

Page 187

1  wouldn't come back down to normal.  You'd check
2  this for a couple months and just, let's stop the
3  Vioxx and see what happens.  Blood pressure come
4  right back down to normal, off the blood pressure
5  medication.  Didn't happen very often, but when it
6  did happen, we said, thank goodness I take you off
7  this medicine, now I can take you off two
8  medicines.  I'll have to put you on something else
9  for your arthritis or your pain, but I don't have
10  to keep you on a blood pressure medicine.  So this
11  was just a clinical thing that I saw with other
12  doctors here locally that this was happening, so
13  easiest thing was bring them back at three weeks.
14  Blood pressure's elevated at all, stop the
15  medicine.
16      And again -- and that's why I don't
17  have -- haven't run into any patients that followed
18  up with me routinely that had a heart attack or a
19  stroke from Vioxx.  And you see the numbers that I
20  wrote on Vioxx and I'm not having malpractice suits
21  against me for Vioxx.  I follow people very
22  closely.  I have a very large practice, but I stay
23  involved.
24      Q.  Would you say because of your
25  experience with treating people with strokes that

Page 188

1  you had probably more understanding of the blood
2  pressure consequences with Vioxx than, say, family
3  practitioners?
4      MR. GOLDMAN:  Object to the form.
5      THE WITNESS:  Probably.
6  BY MR. ROBINSON:
7      Q.  For the jury, why?  What is it about
8  what you do that would give you that understanding?
9      A.  Horry County has the highest incidence
10  of -- either first, second or third in the country
11  incidence of stroke in the United States so we see
12  people with elevated blood pressures on a daily
13  basis for stroke.  Some people come in and they'll
14  have a blood pressure of 170 over a hundred and
15  they'll have a stroke so you don't have to have
16  this superelevated blood pressure to have a stroke.
17  You don't have a blood pressure of 240 over 140 to
18  have a stroke, especially if you have underlying
19  atherosclerosis or hardening of the arteries.  So
20  it's just -- you just have a very watchful eye.
21  Anybody with high blood pressure you watch very
22  closely.
23      Q.  And a stroke is -- is a CV or
24  cardiovascular event, is that right?
25      A.  It falls in the cardio -- the blood

Page 189

1  vessels in the brain are a little bit different
2  from the heart, but they're close enough related in
3  the way they -- they interact with each other.
4      Q.  So if you have hardening of the
5  arteries --
6      A.  In the heart.
7      Q.  -- in the heart --
8      A.  Probably have them going to the brain,
9  too, yes.
10      Q.  You could -- so you're -- you're
11  susceptible if you have a medicine that increases
12  your blood pressure to either stroke or heart
13  attack, right?
14      MR. GOLDMAN:  Object to form.
15      THE WITNESS:  Yes, sir.
16  BY MR. ROBINSON:
17      Q.  Now, you've had something like
18  four-and-a-half years experience of prescribing
19  Vioxx, right?
20      A.  Yes, sir.
21      Q.  And today in 2006, you're speaking from
22  having all that experience, right?
23      A.  Yes, sir.
24      MR. GOLDMAN:  Object to the form.
25  BY MR. ROBINSON:

48  (Pages 186 to 189)

65417542-bdd2-408c-b5ac-735533c8aa68

Confidential - Subject to Protective Order

**Page 190**

1    Q.   Can you say that way back in 1999 when
2   you first prescribed this for Mr. Barnett that you
3   had all the experience and understanding that you
4   have today with your experience in 2000, 2001,
5   2002, 2003 and 2004?
6         MR. GOLDMAN: Object to the form.
7         THE WITNESS: Of course I don't.
8   BY MR. ROBINSON:
9    Q.   Okay, thank you. So some of what you
10  learned about blood pressure spikes in Vioxx and
11  your experience with personal patients has come in
12  2000, 2001, 2002, 2003, 2004, correct?
13        MR. GOLDMAN: Object to the form.
14        THE WITNESS: That's correct. That's
15  what they call the art of medicine. Most people
16  are trying to make -- call it the business or the
17  practice of medicine. It's the art of medicine.
18  You paint a different picture every day.
19  BY MR. ROBINSON:
20   Q.   Okay. So if Dr. Mikolajczyk, you know,
21  in early 2000 did not have the same experience with
22  patients using Vioxx as you did, you can't blame
23  him, can you?
24   A.   No, I can't.
25   Q.   What is it about a drug like Vioxx that

**Page 191**

1   increases blood pressure from your experience that
2   can work with coronary artery disease in a person
3   to lead to a stroke or heart attack?
4    A.   I have absolutely --
5         MR. GOLDMAN: Object to the form.
6   Calls for expert testimony.
7         THE WITNESS: Yeah, I have absolutely
8   no idea.
9   BY MR. ROBINSON:
10   Q.   But you know it to be true?
11        MR. GOLDMAN: Object to the form, calls
12  for expert testimony.
13        THE WITNESS: I know that in my
14  clinical experience, I've seen people develop
15  elevated blood pressure -- according to the package
16  insert, it was as high as 7 or 8 percent -- and I
17  was just always suspicious of those particular
18  people. So as I've said before, when I see the
19  blood pressure go up, I stop the medicine and they
20  hopefully don't have any side effects, but
21  unfortunately if the medication was working, people
22  a lot of times don't want to come off the
23  medication but -- you know, so you have an elevated
24  blood pressure, here you are taking more medicine.
25        You know, it's the old story of the

**Page 192**

1   person that puts salt in their coffee or salt in
2   their tea and they went down to one store and they
3   tried to put different things in to make it taste
4   right and the next store and the next store and
5   then finally the little old lady on the corner, she
6   said, why don't you make a new cup of coffee? Same
7   concept, blood pressure's going up, take you off,
8   let's get a new cup of coffee. Instead having
9   to try and counteract all the side effects, let's
10  stop the inciting event, which would the start --
11  first medication.
12  BY MR. ROBINSON:
13   Q.   Let me ask you this: When -- when --
14  when you got news that Vioxx was being taken off
15  the market in the end of September of 2004, did you
16  have occasion to -- to read about that APPROVe
17  study at all?
18   A.   APPROVe study, no.
19   Q.   Okay. Did you know there was some
20  study that -- that showed that -- that Vioxx,
21  certainly in long-term use of Vioxx, had an
22  increased risk for MI's --
23        MR. GOLDMAN: Object to the form.
24  BY MR. ROBINSON:
25   Q.   -- or heart attacks?

**Page 193**

1         MR. GOLDMAN: He just said he didn't
2   read the study.
3         THE WITNESS: I think I may have heard
4   it on CNN News or something like that, but I didn't
5   read the study itself.
6   BY MR. ROBINSON:
7    Q.   Okay. When you heard that, did you
8   connect it to this blood pressure issue that you're
9   talking about?
10   A.   It's always my suspicion -- I mean, I'm
11  just going from my clinical suspicion so...
12   Q.   But that was what you -- that's what
13  your belief is?
14   A.   I've always --
15        MR. GOLDMAN: Object to the form.
16        THE WITNESS: I always think it's --
17        MR. GOLDMAN: What -- what his belief
18  is. Object to the form.
19  BY MR. ROBINSON:
20   Q.   Go ahead, what is your belief on -- on
21  that subject --
22        MR. GOLDMAN: Object to the form.
23  BY MR. ROBINSON:
24   Q.   -- about blood pressure?
25        MR. GOLDMAN: Object to the form.

49 (Pages 190 to 193)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

**Page 194**

1    THE WITNESS: I think if the blood
2  pressure's raised for whatever reason — I mean, if
3  you -- if you're on another nonsteroidal medication
4  that it can lead to a progression of
5  atherosclerosis whether it be in the brain or in
6  the heart. I mean, that's a known fact. That's —
7  you raise the blood pressure, you run into
8  problems.
9    MR. ROBINSON: Thank you very much,
10  Doctor.
11    THE WITNESS: You're welcome.
12    MR. GOLDMAN: First of all, for the
13  record, Mr. Robinson, based on the examination you
14  did and I didn't agree to it before, we can't have
15  your -- your examination played first before mine
16  because if that were to happen, I would need to ask
17  just about every question that I asked before over
18  again and more. So we can take this up with Judge
19  Fallon, but -- but my position is the deposition
20  has to be played in the order it was taken.
21    MR. ROBINSON: I -- I want to -- want
22  to play the deposition -- my part first because --
23    MR. GOLDMAN: I know you do.
24    MR. ROBINSON: — otherwise I -- I'm
25  going to go with Karavan first tomorrow and we'll

**Page 195**

1  call Judge Fallon.
2    MR. GOLDMAN: No, we reached an
3  agreement --
4    MR. ROBINSON: Okay.
5    MR. GOLDMAN: — that I would go on
6  Dr. Karavan first, but we'll talk -- we'll take
7  care of that later.
8    MR. ROBINSON: Okay. Sorry, Doctor.
9    EXAMINATION
10  BY MR. GOLDMAN:
11    Q. Dr. McCaffrey, you were asked a number
12  of questions about the risk associated with Vioxx
13  concerning hypertension or high blood pressure. Do
14  you remember that?
15    A. Yes, sir.
16    Q. If I understand your testimony, had you
17  known that Mr. Barnett's high -- high blood
18  pressure increased after you put him on Vioxx, you
19  would have taken him off?
20    A. Yes, sir.
21    Q. Did Mr. Robinson show you any of the
22  blood pressure readings for Mr. Barnett at all?
23    A. No.
24    Q. Do you have any idea whether after his
25  initial spike in blood pressure, his blood pressure

**Page 196**

1  was fairly normal throughout the time that he took
2  Vioxx?
3    A. No, sir.
4    Q. When you said that you believe that
5  increasing hypertension can lead to a heart attack
6  or heart disease --
7    A. Yes, sir.
8    Q. — that was based on just your common
9  knowledge about hypertension?
10    A. That's correct.
11    Q. Not having any idea about what
12  Mr. Barnett's high blood pressure readings were
13  during the time he took Vioxx, you're not in a
14  position to assess whether or not Vioxx contributed
15  to Mr. Barnett's heart attack, are you?
16    A. That's correct.
17    Q. You would need to know a lot more
18  information in order to make an assessment of
19  whether Vioxx played any role in Mr. Barnett's
20  heart attack, true?
21    A. That's correct.
22    Q. As you sit here today, you don't know
23  what Mr. Barnett's family history was for heart
24  disease, do you?
25    A. I did ask. I don't know if he told me

**Page 197**

1  everything because we went -- the computer went
2  down. I was hoping it would come back up and it
3  did. When I asked him on family history, and I can
4  print this out -- it's acting up again. Oh, here
5  we go. Most of the family history I do is mother,
6  father, brother, sisters and children. So I
7  usually don't since I'm a neurologist -- I can't
8  read this well. Father died -- it's whited out
9  here. He did have high blood pressure.
10    MR. ROBINSON: What date are we looking
11  at?
12    THE WITNESS: This is the initial
13  visit. It's just whenever they scanned it in, I
14  don't have the technology to change the color right
15  now and it's just -- there was something big I put
16  at the beginning. It might have been heart
17  disease, but I can't tell. I just know he had --
18  his father had high blood pressure.
19  BY MR. GOLDMAN:
20    Q. Dr. McCaffrey, when you were answering
21  Mr. Robinson's questions about hypertension, you
22  didn't know what Mr. Barnett's family history was
23  for coronary artery disease, correct?
24    MR. ROBINSON: Well, I'm going to
25  object. He just said he thought it was.

50 (Pages 194 to 197)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 198

1          MR. GOLDMAN: He wasn't looking at the
2   notes when you were asking him the question.
3          THE WITNESS: No, sir.
4   BY MR. GOLDMAN:
5      Q. Can you answer my question, please.
6      A. No, I was not looking at the notes.
7      Q. When Mr. Robinson was asking you
8   questions about Mr. Barnett's hypertension and
9   whether that played any role in his heart attack,
10  you didn't know what Mr. Barnett's family history
11  was for coronary artery disease, did you?
12     A. That's correct.
13     Q. You don't know whether Mr. Barnett's
14  father had one heart attack or two heart attacks,
15  do you?
16     A. I do not know.
17     Q. You don't know whether Mr. Barnett's
18  sister had a history of TIA's, or strokes, when you
19  were answering those questions?
20     A. When I read this earlier today, I saw
21  that his sister did have a history of TIA's, but I
22  didn't at the time I was talking to him because my
23  computer was off.
24     Q. You didn't know when you were answering
25  Mr. Robinson's questions whether Mr. Barnett had a

Page 199

1   long history of high cholesterol, did you?
2      A. No, sir.
3      Q. When Mr. Barnett was asking you
4   questions, you didn't know about Mr. Barnett's
5   triglyceride levels or HDL, the other type of
6   cholesterol, did you?
7      A. No, sir.
8      Q. When you were answering questions about
9   whether Vioxx could contribute to increased
10  hypertension which you said is a risk factor for
11  heart disease, were you suggesting that Vioxx
12  caused Mr. Barnett's heart attack?
13     A. No, I was suggesting the possibility
14  that had Vioxx elevated the blood pressure and it
15  stayed elevated that it could contribute from that
16  angle or just -- anything that raises your blood
17  pressure can contribute to premature
18  atherosclerosis of the heart vessels or the vessels
19  going to the brain.
20     Q. Before you could reach a judgment --
21  the medical judgment on whether Vioxx played a role
22  in Mr. Barnett's hypertension, you would need to
23  know all of Mr. Barnett's hypertension readings?
24     A. That's correct.
25     Q. Was the risk of hypertension in Vioxx's

Page 200

1   label from day one?
2      A. Yes, it was.
3      Q. Do all COX-2 inhibitors have a risk of
4   increasing hypertension?
5      A. Yes, they do.
6      Q. Do all traditional NSAIDs have a risk
7   of increasing hypertension?
8      A. Yes, they do.
9      Q. Are the warning labels for all NSAIDs
10  and all COX-2 inhibitors -- withdrawn.
11         Do the warning labels for Vioxx and
12  Celebrex and Bextra and Motrin and ibuprofen and
13  all the traditional NSAIDs warn about the
14  possibility of increased blood pressure or
15  hypertension?
16     A. Yes, they do.
17     Q. When you were asked questions about
18  whether Vioxx could contribute to Mr. Barnett's
19  heart attack, did you have any idea what the extent
20  of Mr. Barnett's coronary artery disease was?
21     A. No, sir.
22     Q. Do you know whether he had any blockage
23  in his left main artery?
24     A. No, sir.
25     Q. Do you know whether he had blockage in

Page 201

1   his LAD or various other arteries?
2      A. No, sir.
3      Q. Do you know whether Mr. Barnett has
4   collaterals that were compensating for some of the
5   blockage in his arteries?
6      A. No, sir.
7      Q. Do you know what Mr. Barnett's cardiac
8   catheterization showed when he had it done in
9   September of 2002?
10     A. No, sir.
11     Q. Have you ever spoken with Dr. Karavan
12  who treated Mr. Barnett for heart disease and his
13  heart attack?
14     A. No, sir.
15     Q. Have you ever spoken with Dr. Bryan who
16  conducted the bypass surgery that Mr. Barnett had?
17     A. No, sir.
18     Q. Am I right, Dr. McCaffrey, that you
19  can't say with any degree of certainty based on the
20  limited amount of information that Mr. Robinson
21  showed you whether Vioxx played any role in
22  Mr. Barnett's heart attack?
23     A. That's correct.
24     Q. You were asked questions about your
25  interactions with sales representatives from Merck.

51 (Pages 198 to 201)

65417542-bdd2-408c-b6ac-735533c8aa68

## Confidential - Subject to Protective Order

### Page 202

1  Do you remember that?
2      A.  Yes, sir.
3      Q.  I think Mr. Robinson asked whether you
4  had received 374 visits from sales representatives?
5      A.  That's correct.
6      Q.  So that the jury understands, were
7  those visits visits where you sat down and spoke
8  with sales representatives?
9      A.  No, it's visits where I might talk to
10 the sales rep for 30 to 60 seconds.  I'm -- I'm
11 what they call an approachable doctor.  If you come
12 into the office, I'm going to see you even if it's
13 for one minute.  I don't send -- I don't send any
14 representatives away.
15     Q.  The representatives who came on those
16 374 occasions sometimes just dropped off samples of
17 Vioxx without talking to you, true?
18     A.  They might come in, say, hi, how you
19 doing, I know you're busy, sign, back out the door.
20     Q.  Do you find it helpful to have samples
21 of medicine that you prescribe to your patients?
22     A.  Extremely helpful.
23     Q.  Why?
24     A.  Because I don't want -- I feel bad if
25 somebody gets a medication, has a side effect and

### Page 203

1  just bought a month or three months of the
2  medication.  Also, it's -- patients like the whole
3  idea that they can take a test ride before they're
4  going to have to buy something.
5      Q.  Is it sometimes helpful for patients
6  who can't afford medication to have samples?
7      A.  Yes, it is.  And a lot of the sample
8  medications we got were supplying people for the
9  month or two months or three months they're on the
10 medication that we got from the sales reps.
11     Q.  Do sales representatives from other
12 pharmaceutical companies come to visit you
13 concerning medications that they sell?
14     A.  They do.
15     Q.  Is it common in the pharmaceutical
16 history for sales representatives to make calls on
17 doctors?
18     A.  Yes, it is.
19     Q.  Do you see anything wrong with that,
20 sir?
21     A.  No, sir.
22     Q.  Did the sales calls that you received
23 by sales reps influence your decision to prescribe
24 Vioxx to Mr. Barnett?
25     A.  No, sir.

### Page 204

1      Q.  Why did you describe -- decide to
2  prescribe Vioxx to Mr. Barnett on December 30th of
3  1999?
4      A.  I thought it was a very good and safe
5  medication.
6      Q.  Mr. Robinson was asking you questions
7  about whether Feldene was adequately treating
8  Mr. Barnett's back and neck pain.  Do you remember
9  that?
10     A.  Yes, sir.
11     Q.  Did you get the impression Mr. Robinson
12 was trying to suggest that Feldene was doing just
13 fine with treating Mr. Barnett's neck pain when you
14 saw him in December of 1999?
15     A.  Yes.
16     Q.  You were the doctor and you were
17 treating Mr. Barnett, right?
18     A.  That's correct.
19     Q.  Mr. Robinson wasn't there, was he?
20     A.  No, he wasn't.
21         MR. ROBINSON:  I'm going to object.
22 Come on.  Strike.  Please.
23 BY MR. GOLDMAN:
24     Q.  As the doctor who visited with
25 Mr. Barnett, what was your assessment of how

### Page 205

1  Feldene was doing on that occasion for managing
2  Mr. Barnett's neck and back and shoulder pain?
3      A.  It wasn't doing an adequate job.
4      Q.  Is that why you switched --
5      A.  Yes, sir.
6      Q.  -- to Vioxx?
7      A.  Yes, sir.
8      Q.  I'm going to show you --
9          MR. GOLDMAN:  Oh, let's go off the
10 record because of the tape.
11         THE WITNESS:  Okay.
12         MR. GOLDMAN:  Not too much longer.
13         VIDEO TECHNICIAN:  This is the end of
14 Tape Number 3 in the deposition of Dr. Michael
15 McCaffrey.  The time is approximately 4:50 PM.  We
16 will now go off the record.
17         (A recess transpired.)
18         VIDEO TECHNICIAN:  This is the
19 beginning of Tape Number 4 in the deposition of
20 Dr. Michael McCaffrey.  The time is approximately
21 4:51 PM and the date is May 3rd, 2006.  We are now
22 back on the record.
23 BY MR. GOLDMAN:
24     Q.  Dr. McCaffrey, when you were answering
25 questions earlier about your compensation by Merck

52 (Pages 202 to 205)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

## Page 206

1  and other pharmaceutical companies, do you remember
2  that?
3      A.  Yes, sir.
4      Q.  You were shown documents where you
5  received payments from Merck before you prescribed
6  Vioxx to Mr. Barnett and after you prescribed Vioxx
7  to Mr. Barnett, true?
8      A.  Yes, sir.
9      Q.  Did any of the speaking engagements
10  that you participated in or money that you received
11  from Merck influence you in deciding to prescribe
12  Vioxx to Mr. Barnett?
13      A.  No, sir.
14      Q.  If there's a suggestion made at trial
15  that you prescribed Vioxx to Mr. Barnett because
16  you were paid by Merck, what is your response to
17  that?
18      A.  The company did not influence me with
19  their speaking engagements.
20      Q.  Did you prescribe Vioxx to Mr. Barnett
21  because in your medical judgment, that was the best
22  medication for him?
23      A.  Yes, sir.
24      Q.  You were also asked questions about
25  whether you saw any advertisements on television

## Page 207

1  for Vioxx or other drugs. Do you remember that?
2      MR. ROBINSON:  No, Vioxx.  I asked
3  Vioxx.
4      THE WITNESS:  Yes, sir.
5  BY MR. GOLDMAN:
6      Q.  Do you remember being asked by
7  Mr. Robinson whether you saw advertisements on
8  television about Vioxx?
9      A.  Yes, sir.
10      Q.  Did the advertisements about Vioxx on
11  television influence your decision to prescribe
12  Vioxx to Mr. Barnett?
13      A.  No, sir.
14      Q.  Do you rely on commercials on
15  television about drugs in deciding what medicine to
16  prescribe to your patients?
17      A.  No, sir.
18      Q.  Why not?
19      A.  Most of it's just promotional.  If
20  you -- I mean, on certain stations you see it all
21  the time.  If you turn on Home and Garden station,
22  it's on there constantly.  If you turn on ESPN, the
23  only thing you're going to see is Viagra or Cialis
24  or Levitra.  Depending on what station you watch
25  will be what pharmaceutical companies advertise.

## Page 208

1  It's just a -- just a paid-for advertisement.  It
2  doesn't give you any nuts and bolts on what's
3  happening with the medication.
4      Q.  From your perspective as a doctor, do
5  you rely on the package insert that's approved by
6  the FDA in deciding what the risks and benefits are
7  with medicine you prescribe?
8      A.  Yes, sir.
9      Q.  Do you rely on commercials that you see
10  on television?
11      A.  No, sir.
12      Q.  You were asked a number of questions
13  about lunches that you had with sales
14  representatives.  Do you remember that?
15      A.  Yes, sir.
16      Q.  Tell me about that.  What kinds of
17  lunches were these and why would you go on the
18  lunches?
19      A.  The lunches are usually brought right
20  into the office so -- we don't have time to leave
21  the office.  A lot of times food will be bought for
22  the staff.  There's certain amounts of money that
23  can be spent quarterly and at that time, the
24  amounts might have been larger that the companies
25  could spend.  Most companies can spend 50 dollars

## Page 209

1  per doctor so if we have ten doctors in the office
2  and there's so many there, they can spend so much
3  money per quarter for lunch.  And things have
4  tightened down with HIPAA.  Back then things were
5  fairly loose on what you could do, but it was
6  routine back then when they would bring in -- and
7  some of these people they were paying were famous
8  speakers.  These weren't just Joe Schmo from
9  some -- this is somebody from an academic
10  institution that's coming in talk to you.  They'd
11  sit down and talk to you for 10 or 15 minutes, tell
12  you what's going on with what they're doing, if
13  they're doing any research on the particular
14  medication or that disease state.  And then you can
15  ask them anything you want so it's somebody you can
16  rely on.
17      Q.  Did you find that the times that you
18  went and had lunch with Merck sales representatives
19  or Pfizer sales representatives that you would
20  learn information during that?
21      A.  No, I wouldn't.
22      Q.  So would you rely at all on these
23  sessions with sales representatives in making your
24  decision about what medicine to prescribe?
25      A.  No, sir.

53 (Pages 206 to 209)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

### Page 210

1     Q. When you would go to lunch and there
2 would be a speaker who would talk to you about a
3 particular disease or a treatment, was that helpful
4 on occasion to you?
5     A. Yes, it was.
6     Q. Is that one reason why you go to these
7 lunches?
8     A. Yes -- I mean, yes and no. I mean,
9 they're happening right here at the office. So if
10 somebody's coming in, I go and it's more being
11 courteous. A lot of these companies are doing
12 stuff like this for you and probably once a month
13 you have a famous person coming through from a
14 different company. So it's courtesy, number one,
15 number two, to learn or just pick that person's
16 brain.
17     Q. Did the lunches that you went on for
18 Merck have anything to do with why you prescribed
19 Vioxx to Mr. Barnett?
20     A. No, sir.
21     Q. I believe you were talking about
22 atherosclerosis when you were answering
23 Mr. Robinson's questions. Do you remember that?
24     A. That's correct.
25     Q. You're not a cardiologist, are you?

### Page 211

1     A. No, sir.
2     Q. Have you ever studied the way that
3 atherosclerosis works in the human body?
4     A. A long time ago.
5     Q. Have you ever focused on what exactly
6 causes plaque rupture and what doesn't?
7     A. No, sir.
8     Q. Do you feel like you're an expert in
9 the field of cardiology to be able to express an
10 opinion on whether Vioxx contributes to
11 atherosclerosis in some way?
12     A. No, sir.
13     Q. I'm glad Mr. Robinson pointed out that
14 you actually saw Mr. Barnett on four occasions,
15 right?
16     A. Yes, sir.
17     Q. And the last time you saw Mr. Barnett
18 was December 30th of 1999?
19     A. That's correct.
20     Q. And then you filled a -- you wrote
21 another prescription a year later?
22     A. That's correct.
23     Q. You didn't see Mr. Barnett on that
24 occasion, did you?
25     A. No, it's something that came -- I think

### Page 212

1 he dropped it off because there was a sticker so he
2 physically had to come to the office or it was sent
3 by Merck to me -- or from, you know, Merck Medco.
4 It was physically sent to me, I reviewed the chart,
5 saw who it was and wrote the prescription for him.
6     Q. Did you have any discussions at all
7 with Mr. Barnett when you wrote the second
8 prescription for Vioxx in December of 2000?
9     A. No, sir. No, sir.
10     Q. Did Mr. Barnett come in and talk to you
11 about whether he was experiencing any side effects
12 before he asked you to write the prescription for
13 Vioxx in December of 2000?
14     A. No, sir.
15     Q. When you made the medical judgment that
16 Vioxx was the appropriate medication for
17 Mr. Barnett, was that judgment made in December of
18 1999 based on his medical condition at that time?
19     A. Yes, sir.
20     Q. And was your decision in prescribing
21 Vioxx to Mr. Barnett in December of 1999 based on
22 the information that was then available to you
23 about the benefits and risks of the medicine?
24     A. That's correct.
25     Q. You could not have -- withdrawn.

### Page 213

1     Could you have taken into account
2 information about cardiovascular risks that became
3 known after December of 1999 when you decided to
4 prescribe Vioxx to Mr. Barnett?
5     A. No, sir.
6     Q. And as time went on, as Vioxx was on
7 the market, there was more and more discussion
8 about cardiovascular effects of COX-2 inhibitors,
9 true?
10     MR. ROBINSON: I'm -- I'm going to
11 object. Which year?
12     THE WITNESS: That's true.
13 BY MR. GOLDMAN:
14     Q. Were you aware, sir, that the
15 information about cardiovascular effects of Vioxx
16 and other COX-2 inhibitors changed over time?
17     A. That's correct.
18     Q. I'm going to hand you what I'll mark
19 as --
20     MR. GOLDMAN: The next exhibit is?
21     COURT REPORTER: 20, I believe.
22     MR. GOLDMAN: 20 what?
23     COURT REPORTER: 20.
24     (DFT. EXH. 20, Merck Important
25 Prescribing Information, was marked for

54 (Pages 210 to 213)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 214

1  identification.)
2  BY MR. GOLDMAN:
3      Q.  This is a dear healthcare professional
4  letter that Merck sent out in April of 2002 when
5  the label for Vioxx was changed to include
6  information about the VIGOR study, okay?
7      A.  Yes, sir.
8      Q.  Do you see how on the front page
9  there's a reference to important prescribing
10 information?
11     A.  Yes, sir.
12     Q.  On the second page there's a box at the
13 top that says, important prescribing information?
14     A.  Yes, sir.
15     Q.  And then it says, April 2002, dear
16 healthcare professional, okay?
17     A.  Yes, sir.
18     Q.  I can represent to you that your name
19 is one on a number of -- withdrawn.
20         I can represent to you that your name
21 is on a mailing list showing that Merck sent you
22 this letter, okay?
23     A.  I think I received five or six copies
24 of this, so not just one.  I remember receiving
25 this.

Page 215

1      Q.  And why do you remember receiving five
2  or six copies of the --
3      A.  Well, I've got four different offices
4  so a copy is going to go to each office.  So every
5  office it would show up, there would be another
6  copy there for me.
7      Q.  In April of 2002, did you see from this
8  letter, sir, that there's a discussion about the
9  VIGOR study?
10     A.  Yes, sir.
11     Q.  Do you see how on the first page of
12 this letter there's a discussion at the second
13 paragraph that says:  The prescribing information
14 has been revised to reflect the results of the
15 Vioxx Gastrointestinal Outcomes research study and
16 the FDA approval of Vioxx for the relief of the
17 signs and symptoms of rheumatoid arthritis in
18 adults?
19     A.  Correct.
20     Q.  And then do you see how the letter
21 continues to talk about clinical studies and the
22 VIGOR study, you see that?
23     A.  Right.
24     Q.  And then the rest of this letter is
25 verbatim from the package insert from April of

Page 216

1  2002?
2      A.  Yes, sir.  On the back, yeah.
3      Q.  Were you aware of what was in the
4  package insert in April of 2002?
5      A.  Yes, I was.
6      Q.  Do you see on the second page of the
7  dear healthcare professional letter there is a
8  Table 1 that talks about the gastrointestinal
9  safety events compared to naproxen?
10     A.  Yes, I do.
11     Q.  And then on the next page, do you see
12 that there's a discussion of summary of patients
13 with serious cardiovascular thrombotic adverse
14 events over time compared to naproxen?
15     A.  Yes, sir.
16     Q.  And then there's another table
17 concerning serious cardiovascular thrombotic
18 adverse events in Table 3, see that?
19     A.  Right here, yes.
20     Q.  And you were aware of that information
21 in April of 2002?
22     A.  That's correct.
23     Q.  On the next page, there's a discussion
24 in the precautions section.  Do you see that?
25     A.  Yes, sir.

Page 217

1      Q.  Mr. Robinson asked you whether Merck
2  ever put information about cardiovascular risks in
3  the contraindication or the warning section of the
4  label.  Do you remember that?
5      A.  Yes, sir.
6      Q.  Do you know that a third section of the
7  label has to do with precautions?
8      A.  Yes, sir.
9      Q.  You read the precautions section, true?
10     A.  Yes, sir.
11     Q.  The precautions section in April of
12 2002 includes a discussion of cardiovascular
13 effects, do you see?
14     A.  Yes, sir.
15     Q.  And it includes a discussion of the
16 number of patients in the VIGOR study, do you see
17 that, 8,076?
18     A.  How far down?
19     Q.  It's the second paragraph in VIGOR.
20     A.  VIGOR.
21     Q.  Actually, let me -- let me --
22     A.  Okay, yeah, add the two numbers up.
23 Okay, 8,076, got it.
24     Q.  Let me back up.
25     A.  Vioxx and Naprosyn, okay.

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 218

1    Q.  Do you see under cardiovascular effects
2  there's a statement first:  The information below
3  should be taken into consideration and caution
4  should be exercised when Vioxx is used in patients
5  with a medical history of ischemic heart disease?
6    A.  I see that.
7    Q.  That statement was not in the original
8  label when you first prescribed Vioxx to
9  Mr. Barnett, true?
10   A.  That's correct.
11   Q.  And Mr. Barnett hadn't even had
12  ischemic heart disease when you prescribed Vioxx to
13  him in December of '99, right?
14   A.  To my knowledge, he did not have
15  ischemic heart disease.
16   Q.  Did Mr. Barnett ever tell you that he
17  had ischemic heart disease?
18   A.  No, sir.
19   Q.  Did he ever tell you about the result
20  from his January 19th or January 24th, 2000
21  Cardiolite stress test?
22   A.  No, sir.
23   Q.  By the way, angina, what is angina?
24   A.  Chest pain.
25   Q.  Is that --

Page 219

1    A.  Or pain -- it means pain.
2    Q.  Is that similar to ischemia?
3    A.  No, angina means pain so you can have
4  angina of your face, angina of your chest, angina
5  of your leg.
6    Q.  Is it a symptom of ischemia?
7    A.  No, just a Latin word for pain.
8    Q.  I see.  Okay.  Chest pain?
9    A.  No, angina -- that's cardiac angina.
10   Q.  Okay.
11   A.  You can have ischemic angina, you can
12  have -- I mean cerebral angina, you can have --
13   Q.  In the context of cardiovascular
14  effects when somebody talks about angina, does that
15  mean to you heart pain?
16   A.  Commonly in the United States when you
17  hear angina you think heart pain.
18   Q.  And when you hear angina, you also
19  think ischemia, true, reduced blood flow?
20   A.  Reduced blood flow.
21   Q.  Yes?
22   A.  Correct.
23   Q.  In the second paragraph under
24  precautions, do you see that in the first sentence
25  it states, in VIGOR, and then it tells you the

Page 220

1  number of months, nine months, the risk of
2  developing a serious cardiovascular thrombotic
3  event was significantly higher in patients treated
4  with Vioxx 50 milligrams once daily?
5    That wasn't what Mr. Barnett was on,
6  was it?
7    A.  No, he was on 25.
8    Q.  As compared to patients treated with
9  naproxen 500 milligrams twice daily.
10   You see that?
11   A.  Yes, sir.
12   Q.  You knew in April -- did you know in
13  April of 2002 that there was this increased risk of
14  cardiovascular thrombotic effects seen in the VIGOR
15  study?
16   A.  Yes, sir.
17   Q.  Then further down there's a discussion
18  about -- these are actually Alzheimer's studies
19  where it says:  In a placebo-controlled database
20  derived from two studies with a total of 2,142
21  elderly patients with a median duration of exposure
22  of approximately 14 months, the number of patients
23  with serious cardiovascular thrombotic events was
24  21 versus 35 for patients treated with Vioxx 25
25  milligrams once daily versus placebo respectively.

Page 221

1    Do you see that?
2    A.  The placebo was higher.
3    Q.  Can you explain that?
4    A.  I can't explain that.
5    Q.  No, can you explain why you said
6  placebo is higher?
7    A.  Placebo is higher than the actual Vioxx
8  so it's trying to say -- it says from the study
9  that -- that the -- Vioxx doesn't cause
10  cardiovascular thrombotic events.  It's higher when
11  giving somebody a sugar pill.
12   Q.  And then if you look further down, you
13  see where the label says, the significance of the
14  cardiovascular findings from these three studies,
15  VIGOR and two placebo-controlled studies, is
16  unknown, do you see that?
17   A.  Yes, sir.
18   Q.  Was it your understanding from reading
19  this label, sir, that one possible interpretation
20  of the VIGOR study was that naproxen could be
21  cardioprotective and be the reason why there were
22  more heart attacks in the Vioxx arm versus the
23  naproxen arm of the VIGOR study?
24   A.  I remember looking at this at the time.
25  I remember the rep I was sitting with and when we

56 (Pages 218 to 221)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 222

1 were talking about it, but at the time, we didn't
2 know.
3     Q.  You didn't know whether it was Vioxx
4 that was causing --
5     A.  We had no idea.
6     Q.  At the time that you were speaking with
7 the rep about the VIGOR study, was it your
8 understanding that there were several different
9 possible explanations for the increase in
10 cardiovascular events seen in the VIGOR study?
11     A.  Yes, sir.
12     Q.  Was one of the possible interpretations
13 of the VIGOR study that naproxen was
14 cardioprotective and explained the reason for the
15 difference?  Is that one possible interpretation?
16     A.  That's one possible interpretation.
17     Q.  Was another possible interpretation
18 that Vioxx was prothrombotic or could cause heart
19 attacks?
20     A.  That's another option.
21     Q.  And was a third possibility chance?
22     A.  That's correct.
23     MR. ROBINSON:  You've just done another
24 20 minutes, come on, 25 minutes.
25 BY MR. GOLDMAN:

Page 223

1     Q.  Mr. Robinson was asking you about
2 compensation for being at the deposition here
3 today.
4     A.  Yes, sir.
5     Q.  So that the jury doesn't misunderstand,
6 neither Mr. Robinson nor I are paying you for your
7 testimony, true?  In other words, we're not paying
8 you to say anything in particular.
9     A.  No.  No, sir.
10     Q.  Why is it that you are charging
11 Mr. Robinson and me 750 dollars or whatever your
12 hourly rate is to be here today?
13     A.  For the time lost in the office.  And
14 that's a set rate with the company.  All the
15 depositions for any doctor in the group, same rate.
16     Q.  When you were making decisions about
17 what medicine to prescribe to your patients, sir,
18 are you making that decision based on information
19 that is known and knowable at the time that you
20 prescribe the medicine?
21     A.  Yes, sir.
22     Q.  Are you able as a doctor when you're
23 prescribing medicine in December of 1999 and then
24 in December of 2000 to Mr. Barnett to know what
25 exactly is going to happen in the future concerning

Page 224

1 the risk of cardiovascular events?
2     A.  No, sir.
3     Q.  Do you do your best to make a
4 risk-benefit assessment concerning Vioxx or any
5 other medicine based on the information that's in
6 the package insert and that's available to you at
7 the time?
8     A.  Yes, sir.
9     MR. GOLDMAN:  That's all I have.  Thank
10 you very much.
11     EXAMINATION
12 BY MR. ROBINSON:
13     Q.  Very quickly, I'm sorry.
14     A.  That's okay.
15     Q.  He just asked you about this exhibit,
16 which is the package insert and the warning that
17 came out in April of 2002.  It's Exhibit Number 20.
18     A.  Yes, sir.
19     Q.  Can you open up to that page that he
20 talked to you about under precautions, right?
21     A.  Yes, sir.
22     Q.  Okay.  First of all, there's nothing in
23 that letter or the attached package insert under
24 the cardio -- under the contraindication or warning
25 section, right?

Page 225

1     MR. GOLDMAN:  About what?  Objection.
2 BY MR. ROBINSON:
3     Q.  About the cardiovascular risks of
4 Vioxx.
5     A.  You mean under the new package insert?
6     Q.  Right.  There's nothing in there in the
7 warnings or contraindications section?
8     A.  No.
9     Q.  Okay.  The section he was talking to
10 you about was in the precautions section, right?
11     A.  Yes, sir.
12     Q.  And as a doctor, the more serious risks
13 are put in the contraindications section, right?
14     MR. GOLDMAN:  Object to the form.
15     THE WITNESS:  Well, if it's
16 contraindicated where you can't use it for that
17 disease, then it's put in there.
18 BY MR. ROBINSON:
19     Q.  And then the next level of -- of sort
20 of red flag --
21     A.  Right.
22     Q.  -- would be the warnings section,
23 right?
24     A.  Right, for known definite side effects.
25     Q.  Okay.  And then the caution -- the

57 (Pages 222 to 225)

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

## Confidential - Subject to Protective Order

Page 226

1  precautions are like caution -- is a caution
2  section, right?
3      A.  Right.
4      Q.  Now, you -- you pointed out something.
5  Could you read the section that you said appears to
6  show that there's -- there's increased
7  cardiovascular events for Vioxx versus the placebo.
8  Could you read that into the record.
9      A.  I said there was -- that there was
10 higher with placebo.
11     Q.  So in other words, it says the number
12 of patients with serious cardiovascular thrombotic
13 events was 21 for Vioxx and 35 for placebo at -- at
14 a dose of 25 milligrams, right?
15     A.  That's correct.
16     Q.  Okay.  So as a doctor reading that, at
17 25 milligrams, it appears to be actually safer than
18 placebo, right?
19     A.  For that study.
20     Q.  Okay.  And who is the rep you said that
21 discussed naproxen being cardio --
22     A.  Do I have to use his name?
23         MR. GOLDMAN:  That's not what he said.
24         MR. ROBINSON:  Yeah.
25         MR. GOLDMAN:  That -- that -- that

Page 227

1  mischaracterizes his testimony.
2          MR. ROBINSON:  Hold on.  Hold on.  Let
3  me --
4          THE WITNESS:  Well, no, no, when the
5  letter came out, I just happened to see him that
6  day.  He goes to the same church with me.
7  BY MR. ROBINSON:
8      Q.  What's his name?
9      A.  Steve Pelagrino (ph).  His name's
10 listed in here.
11     Q.  Okay.  And let me ask you this:  Is it
12 true that one of the things he -- he said was a
13 possible explanation was the naproxen being
14 cardioprotective, right?
15         MR. GOLDMAN:  Object to the form.
16         THE WITNESS:  I don't think he -- I
17 don't think he said that at that time because we
18 didn't -- we didn't know.  He said, here's what
19 I -- he says, I don't how to make heads or tails
20 out of this, let's look through this.
21 BY MR. ROBINSON:
22     Q.  Okay.  And, I mean -- but if you look
23 at the numbers you just gave, 21 versus 35, that
24 would give you confidence that at least versus
25 placebo, the numbers appear Vioxx is actually safer

Page 228

1  than placebo, correct?
2      A.  Not safer, it's just I don't see any
3  evidence saying that Vioxx is causing heart
4  attacks.
5      Q.  Okay.  And in the prior label, the one
6  in 1999 that was in effect when you prescribed Vioxx
7  for Mr. Barnett, you weren't told in the label that
8  Vioxx was causing heart attacks, right?
9      A.  That's correct.
10     Q.  So at least during the two years that
11 you prescribed Vioxx for Mr. Barnett, you were not
12 given a warning that Vioxx causes heart attacks,
13 correct?
14     A.  That's correct.
15         MR. GOLDMAN:  Object to the form on
16 that.  You can ask him again.  Did you hear my
17 belated objection?
18 BY MR. ROBINSON:
19     Q.  During the two years that you
20 prescribed Vioxx for Mr. Barnett, were you ever
21 given a warning by Merck that Vioxx caused heart
22 attacks?
23     A.  No, sir.
24     Q.  Now, Mr. Goldman asked you questions
25 about cardio -- or coronary artery disease of

Page 229

1  Mr. Barnett.  If -- if a person has coronary artery
2  disease in their family such as family histories of
3  heart attacks and TIA's --
4      A.  Yes, sir.
5      Q.  -- would -- would that be the type of
6  person that might be at risk for having
7  hypertension as a reaction to Vioxx?
8          MR. GOLDMAN:  Object to the form.
9          THE WITNESS:  Not necessarily.  I mean,
10 you can have people -- I mean, there's all the
11 different medications you can be put on, but if you
12 have multiple brothers and sisters like in my
13 family, every one of my brothers has high blood
14 pressure, I'm the only one that doesn't.  I have
15 five brothers -- four brothers and one sister --
16 and one sister.  But it doesn't -- doesn't really
17 help me to say who's going to develop high blood
18 pressure on the medication.
19 BY MR. ROBINSON:
20     Q.  But do you think that the combination
21 of high blood pressure plus some preexisting plaque
22 in your body might work together to -- to lead to a
23 stroke or a heart attack?
24     A.  Always a possibility.
25     Q.  Thank you.  And when you last

58  (Pages 226 to 229)

Confidential - Subject to Protective Order

Page 230

1  prescribed Vioxx for Mr. Barnett in December of
2  2000, did you have any information at that time
3  that Vioxx was causing heart attacks?
4       MR. GOLDMAN: Objection --
5       THE WITNESS: No, sir.
6       MR. GOLDMAN: -- to the form. Form.
7       MR. ROBINSON: Okay, go ahead, Andy.
8           EXAMINATION
9  BY MR. GOLDMAN:
10      Q.  A few more follow-ups.  If Mr. Barnett
11  in December of 2000 didn't tell you that he had had
12  ischemia and you had seen this label --
13      MR. ROBINSON:  Which label, the label
14  that came out after -- I'm going to -- I'm going to
15  object to this.
16  BY MR. GOLDMAN:
17      Q.  Dr. McCaffrey, if you were treating
18  Mr. Barnett in December of 2000 -- and let me get
19  this straight.  Withdrawn.
20          In December of 2000, you didn't even
21  talk to Mr.
22      A.  I had something come across my desk I
23  needed to refill his medication, saw who it was,
24  said reasonable guy, took care of the medication.
25  I should have told him, you need to come in, I

Page 231

1  haven't seen you in a year, but I hadn't gotten any
2  phone calls of any problems, anything like that at
3  all during that one-year time period.
4       Q.  And at that point in time in December
5  of 1999 or December of 2000 even, you didn't know
6  whether Mr. Barnett was at risk of heart disease
7  because you didn't know everything about his family
8  history or his cholesterol levels, correct?
9       A.  That's correct.
10      Q.  In your dealings with Merck sales
11  representatives, sir, did you find that they were
12  trying to push you into prescribing Vioxx?
13      A.  No, sir.
14      Q.  Did you find that Merck sales
15  representatives were just telling you that in the
16  VIGOR study, the explanation was because of
17  naproxen?
18      A.  No.
19      Q.  Did you feel that the sales
20  representatives were leaving it up to you to decide
21  what the appropriate interpretation of the VIGOR
22  study was?
23      A.  Yes, sir.
24      Q.  Had any Merck sales representatives who
25  called on you ever refused to answer any questions

Page 232

1  or avoided any questions you had about Vioxx?
2       A.  No, sir.
3       Q.  Did you feel that if you had a question
4  to ask a particular sales representative that they
5  would get you the answer or if they couldn't get
6  it, they would have somebody else at Merck send you
7  a letter giving you the answer?
8       A.  Yes, they would.
9       Q.  Mr. Robinson said on a number of
10  occasions that there was never -- withdrawn.
11      MR. ROBINSON:  Good.
12  BY MR. GOLDMAN:
13      Q.  Mr. Robinson has said on a number of
14  occasions that Merck never had a warning in the
15  package insert for Vioxx concerning cardiovascular
16  risks?
17      A.  That's correct.
18      Q.  If you look at the first page of the
19  April 2002 label, which is attached to the dear
20  healthcare professional letter --
21      A.  Yes, sir.
22      Q.  -- do you see on the first page of the
23  package insert in the bottom when they're talking
24  about the VIGOR study, there is a whole section
25  called cardiovascular safety with Table 2 talking

Page 233

1  about --
2       A.  Yes, sir.
3       Q.  -- serious cardiovascular thrombotic
4  adverse events?
5       A.  Yes, sir.
6       Q.  Now, if that's not in the warnings
7  section, is that something that you notice when
8  you're reading a package insert, sir?
9       A.  Yes, sir.  So it actually made it to
10  the first page.
11      Q.  And Mr. -- I'm sorry, Dr. McCaffrey,
12  you mentioned in response to Mr. Robinson's
13  question that warnings are supposed to include
14  definite risks, is that what you said?
15      A.  Yeah, when you get the warnings, it's a
16  definite risk.  It's something that does happen,
17  it's -- it's not imaginary.
18      Q.  So if there is an open question about
19  whether a drug causes a particular side effect or
20  the science is not fully developed where there's a
21  definitive answer, is it your understanding that
22  that is what is in the precautions section?
23      A.  That's correct.
24      Q.  And you as a physician take seriously
25  what's in the precautions section, true?

59 (Pages 230 to 233)

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

## Confidential - Subject to Protective Order

### Page 234

1      A.  That's true.
2      Q.  It's not as though you ignore what's in
3  the precautions section when you're making
4  treatment decisions, that information is one of the
5  things you consider in your risk-benefit
6  assessment?
7      A.  That's correct.
8          MR. GOLDMAN:  I think that's it.
9              EXAMINATION
10  BY MR. ROBINSON:
11     Q.  If -- if the -- so if, in fact, they
12  had given you a warning or contraindication, you
13  would have heeded that more than looking at a
14  precaution as he just said?
15         MR. GOLDMAN:  Object to the form.
16         THE WITNESS:  Well, contraindication is
17  something you definitely are not going to
18  prescribe, I mean, for that particular patient and
19  a warning is saying there is a much higher
20  suspicion, this actually happens.
21  BY MR. ROBINSON:
22     Q.  So it means it actually happens?
23     A.  It's a precaution.  It actually
24  happens.
25     Q.  So really when you -- when they put it

### Page 235

1  in the precautions section, they say -- they're
2  saying that it's up in the air?
3          MR. GOLDMAN:  Object to the form.
4          THE WITNESS:  Well, the data's not a
5  hundred percent there saying it definitely causes
6  this problem.
7  BY MR. ROBINSON:
8      Q.  I mean, they say in one sentence that
9  it's -- in one -- in two studies it was -- there
10  was more cardiovascular events on placebo than
11  there was for Vioxx, right?
12         MR. GOLDMAN:  Object to the form.
13  BY MR. ROBINSON:
14     Q.  The one we just read.
15         MR. GOLDMAN:  Read the rest of it.
16         THE WITNESS:  Yes.
17  BY MR. GOLDMAN:
18     Q.  And -- and you were -- you were -- you
19  were a Merck top earner for Vioxx, right?
20     A.  That's what I'm told.
21     Q.  And -- and why?  Why do you think you
22  were?  Are you --
23     A.  Looking at the top earner, it looks
24  like I wasn't a top earner because I was only a
25  750-dollar-a-lecture guy.  There are a lot of

### Page 236

1  people ahead of me so I don't know where the top
2  earner comes from because --
3      Q.  Could it be the regional top guy?
4      A.  No, I'm a bottom earner according to
5  those numbers.  They're not paying me enough.
6          MR. ROBINSON:  Okay.  I think I'll quit
7  with that.  I'm going to have to pay you more.
8          MR. GOLDMAN:  I move to strike as
9  nonresponsive.
10         MR. ROBINSON:  No, I'm not -- no, no,
11  no, I like that answer.
12         MR. GOLDMAN:  I move to strike as
13  nonresponsive.
14         MR. ROBINSON:  That -- with that --
15  BY MR. ROBINSON:
16     Q.  Well, let me ask it this way --
17         MR. ROBINSON:  If you're going to move
18  to strike it, I'm going to say this --
19  BY MR. ROBINSON:
20     Q.  What you're saying is they were paying
21  some of the other -- when you said they're not
22  paying me enough, they're paying these other top
23  earners more than you?  They're paying them more
24  than 750, right?
25     A.  If you look at what -- the top earners

### Page 237

1  list, they have people that, you know, they're only
2  paying them 250 dollars and there's people being
3  paid 500 dollars, 750, a thousand.  So according
4  to -- with different companies, how important am I
5  to them to go talk about a particular disease
6  state -- and there's certain companies I work
7  with -- there are certain -- certain companies that
8  don't want to pay me.  I don't work for them.  So
9  my time costs something, especially doing a
10  lunchtime talk.  I have to take lunchtime plus an
11  extra hour so it's a two-hour block that I have to
12  take out of my time to go to this person's office.
13  How much did it cost me to be out of the office for
14  the hour?  What is the lost income?  A lot of times
15  it doesn't even match up.  I'm looking at I lost
16  the income, they're paying some of it.  I'm looking
17  at the referral base from the other people in town.
18  That's what I'm really there for.  Yes, I do get
19  paid, but it's lost income I have to pick up
20  somehow.
21  BY MR. ROBINSON:
22     Q.  But it does appear from that chart that
23  you -- actually, you're getting paid more than the
24  other people from Myrtle Beach, is that correct?
25     A.  There isn't anybody else from Myrtle

60 (Pages 234 to 237)

## Confidential - Subject to Protective Order

Page 238

1 Beach.
2     Q.  You're the man?
3     A.  I'm the man.
4         MR. ROBINSON: Okay.  We'll quit with
5 that.
6         EXAMINATION
7 BY MR. GOLDMAN:
8     Q.  Dr. McCaffrey, so the jury doesn't get
9 the wrong impression here, when you're receiving
10 payments from Merck and other pharmaceutical
11 companies and you're saying that 750 dollars an
12 hour -- 700 dollar -- withdrawn.
13         When you're accepting compensation for
14 your time from pharmaceutical companies, do you
15 ever jeopardize the interest of your patients
16 because of your compensation?
17     A.  No, sir.
18     Q.  If a suggestion is made at trial that
19 you prescribed Vioxx to Mr. Barnett because you
20 were a paid speaker for Merck, what do you want
21 this jury to know about that?
22         MR. ROBINSON:  I'm going to object to
23 the form of that question.
24         THE WITNESS: Yeah, ask the question
25 again.

Page 239

1         MR. ROBINSON:  Just ask the question
2 without --
3 BY MR. GOLDMAN:
4     Q.  To what extent does your role as a
5 speaker for Merck play -- withdrawn.
6         How, if at all, does your role as a
7 speaker for Merck factor into your decision to
8 prescribe Vioxx?
9     A.  Zero.
10        MR. GOLDMAN: I'll end with that.
11        MR. ROBINSON: You quit with that?
12        MR. GOLDMAN: Yeah.
13        MR. ROBINSON: Okay.  We're going to
14 quit then.
15        VIDEO TECHNICIAN: The deposition is
16 then concluded.  The time is approximately 5:23 PM.
17 We are now off the record.
18        (WHEREUPON, the proceedings concluded
19 at 5:23 PM.)
20        (JOINT EXH. 21, Document entitled
21 Office Visits, was marked for identification.)
22
23
24
25

Page 240

1         SIGNATURE OF DEPONENT
2     I, the undersigned, MICHAEL McCAFFREY, MD,
3 do hereby certify that I have read the foregoing
4 deposition and find it to be a true and accurate
5 transcription of my testimony, with the following
6 corrections, if any:
7
8 PAGE  LINE     CHANGE          REASON
9
10
11
12
13
14
15
16
17
18
19
       _____
       MICHAEL McCAFFREY, MD      Date
20
21
22
23
24
25

Page 241

1         CERTIFICATE OF REPORTER
2     I, Terri L. Brusseau, Registered
3 Professional Reporter and Notary Public for the
4 State of South Carolina at Large, do hereby certify
5 that the foregoing transcript is a true, accurate,
6 and complete record.
7     I further certify that I am neither related
8 to nor counsel for any party to the cause pending
9 or interested in the events thereof.
10    Witness my hand, I have hereunto affixed my
11 official seal this 5th day of May, 2006 at
12 Charleston, Charleston County, South Carolina.
13
14
15
16
       _____
17     Terri L. Brusseau,
       Registered Professional
       Reporter, CP, CRR
18     My Commission expires
       May 7, 2006.
19
20
21
22
23
24
25

61  (Pages 238 to 241)

65417542-bdd2-408c-b6ac-735533c8aa68

## Confidential - Subject to Protective Order

**Page 242**

```
              I N D E X
 1
 2   MICHAEL McCAFFREY, MD          3
     EXAMINATION             3
 3   BY MR. GOLDMAN
     EXAMINATION             112
 4   BY MR. ROBINSON
     EXAMINATION             195
 5   BY MR. GOLDMAN
     EXAMINATION             224
 6   BY MR. ROBINSON
     EXAMINATION             230
 7   BY MR. GOLDMAN
     EXAMINATION             234
 8   BY MR. ROBINSON
     EXAMINATION             238
 9   BY MR GOLDMAN
10           E X H I B I T S
11   DFT EXH. 1, Strand Regional Specialty   34
     medical record
12   DFT EXH. 2, Strand Regional Specialty   39
     medical record
13   DFT EXH. 3, Strand Regional Specialty   41
     medical record
14   DFT EXH. 4, Strand Regional Specialty   43
     medical record
15   DFT EXH. 5, Excerpt testimony of        53
     Gerald D. Barrott taken on 4/26/06
16   DFT EXH. 6, Speaker/Moderator           77
     Agreement Letter
17   DFT EXH. 7, Article entitled            103
     Comparison Of Upper Gastrointestinal
18   Toxicity Of Rofecoxib And Naproxen In
     Patients With Rheumatoid Arthritis
19   PLF EXH. 8, EasyRxform, with            125
     attachments
20   PLF EXH. 9, Email dated 8/3/00 to       131
     Michael A. Sumida from Jill J Wergo,
21   with attachments
     PLF EXH. 10, Email dated 9/4/01, with   132
22   attachments
     PLF EXH. 11, Document entitled Cust.    135
23   Assoc Pymtx
     PLF EXH. 12, Program Date Listing       136
24   PLF EXH. 13, Document entitled          137
     pgm_affil
25   PLF EXH. 14, Document entitled          139
     pgm_cntrs
```

**Page 243**

```
 1   PLF. EXH. 15, Listing              144
     PLF. EXH. 16, Document entitled    146
 2   Call_Notes
     PLF. EXH. 17, Listing              149
 3   PLF. EXH. 18, Call Summary         151
     PLF. EXH. 19, Carolina Health      156
 4   Specialists medical record, with
     attachments
 5   DFT. EXH. 20, Merck Important      213
     Prescribing Information
 6   JOINT EXH. 21, Document entitled Office   239
     Visits
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Golkow Litigation Technologies - 877.DEPS.USA**

65417542-bdd2-408c-b6ac-735533c8aa68