# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  VIOXX PRODUCTS LIABILITY LITIGATION | * MDL Docket No. 1657 |
| | * |
| | * SECTION L |
| This document relates to | * |
| | * JUDGE FALLON |
| ALL ACTIONS | * |
| | * MAGISTRATE JUDGE KNOWLES |
| | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## EXPERT REPORT OF RICHARD M. KAPIT, MD

### Table of Contents

I.  Background ........................................................................................... 3

    A.  Compensation ............................................................................ 4

    B.  Qualifications and Experience .................................................... 4

II.  Documents Reviewed ......................................................................... 6

III.  The FDA: What It Is and What It Does ............................................... 7

    A.  Clinical Trials Done by Companies ............................................ 7

    B.  FDA Depends on Completeness of Information and Honesty of Companies ................................................................................ 7

IV.  Pharmaceutical Companies' Duties to Warn About Adverse Drug Reactions ....... 9

    A.  Pertinent Regulations ................................................................. 9

        1.  21 CFR 201.57(e) ......................................................... 10

        2.  21 CFR 314.70 (c)(6)(iii)(A) ........................................ 10

        3.  Example of a Company Carrying Out These Obligations as Required ..................................................................... 11

V.   Labeling .............................................................................................. 11

  A.   Label Is the Primary Communication with Medical Providers. ............... 11

  B.   FDA Cannot Force Label Changes Without Drastic Measures. ............... 11

VI.   Merck's Vioxx Has a Problem .......................................................... 13

  A.   Pre-Approval Indications of a Cardiovascular Problem ........................ 13

  B.   Approval of Vioxx Without Proff of a GI Benefit .................................. 14

  C.   The VIGOR Trial Results .................................................................. 14

  D.   Merck's Assessment of VIGOR .......................................................... 15

  E.   Merck's Precautions With Doctors and Patients Involved in Its Own
       Studies .......................................................................................... 17

    1.   The Press Release of March 27, 2000 ......................................... 17

    2.   Merck Modifies Its Study Protocols. ............................................ 17

  F.   What Merck Should Have Done With Other Doctors and Patients .......... 18

    1.   Advise Doctors and Patients of the Uncertainty and Potential
         Problem ..................................................................................... 18

    2.   Recommend the Action Merck Took with Patients in Its Studies  19

  G.   Why Merck Did Not Take Such Actions with Other Doctors and
       Patients ......................................................................................... 20

VII.   What Merck Did Instead of Alerting the Medical Community About the Risks of
       Vioxx .............................................................................................. 21

  A.   Merck Orders Sales Representatives Not to Discuss the VIGOR Study. . 21

  B.   Merck Repeatedly Implicates Naproxen, Not Vioxx. ............................ 21

  C.   Merck Asserts and Advertises the Cardiovascular Safety of Vioxx. ........ 22

  D.   Merck Promotes Vioxx GI Safety While Playing Down Risks ................ 22

E.    The History of the Vioxx Label Change Negotiations............................. 23

1.    Merck Could Have Made Label Changes Immediately ............... 23

2.    Merck's Initial Label Change Proposal, June 29, 2000................ 24

3.    Merck's Submission of October 13, 2000 ................................... 24

4.    Merck's Delays Prolong the FDA Effort to Add Cardiovascular
      Safety Data to the Label.............................................................. 25

5.    FDA and the Arthritis Advisory Committee Determine that the
      Vioxx Label Sould Address the Cardiovascular Safety Issues
      Shown by the VIGOR Study........................................................ 26

6.    Merck's Label Submission of March 16, 2001 ............................ 26

7.    FDA Initiates Formal Label Discussions..................................... 27

8.    On November 8, 2001, Merck Rejects FDA's Labeling Proposal
      and Submits Its Label Response................................................... 28

9.    After Six Months of Intense Negotiations, Merck and FDA Agree
      on a Label.................................................................................... 29

10.   Why Did Merck Resist?............................................................... 29

VIII.   Recent Developments ........................................................................... 30

A.    Advisory Committee Votes Unanimously for CV Alert........................... 30

B.    FDA Memo on the Safety of NSAIDs,  April 6,  2005............................. 31

C.    Analysis of Protocol 203 Data............................................................... 33

D.    Editorial in *Circulation* May 9, 2006...................................................... 33

IX.    Conclusions ........................................................................................ 34

## I.    Background

1.    I am a medical doctor, licensed to practice medicine in Maryland.  For nearly 30 years I worked in various capacities for the Government of the United States – at the National Institute of Mental Health, the Veterans Administration, the District of Columbia, the National Institute on Drug Abuse, and the Food and Drug Administration.

For 16 years, I was a clinical reviewer at the Food and Drug Administration, where I reviewed data on clinical trials and medical use of drugs and biologicals. I made recommendations about agency actions on submissions from pharmaceutical manufacturers and academic investigators. These submissions included numerous Investigational New Drug Applications (INDs), New Drug Applications (NDAs), Biologics Licensing Applications (BLAs), and postmarketing surveillance reports.

2.     While employed at the FDA, I made recommendations about unapproved and approved pharmaceuticals, about the adequacy of INDs and NDAs supporting the approval of pharmaceuticals, about labeling, and about postmarketing surveillance reports related to pharmaceuticals. My recommendations often focused on whether the pharmaceuticals were safe for use in human beings.

3.     In a former capacity, when I worked for the District of Columbia, I testified in court more than 100 times. In these instances I was working either for the Bureau of Forensic Psychiatry of the D.C. Government or in private forensic psychiatric practice. I made recommendations to courts in the District of Columbia and Maryland (both local and federal) about the mental state of criminal defendants, specifically about competency, criminal responsibility, dangerousness, need for mental health treatment, and related matters.

### A.     Compensation

4.     I charge $250 per hour for all my time in connection with any kind of legal or forensic work, whether testimony, research and report preparation, or travel.

### B.     Qualifications and Experience

5.     The following paragraphs summarize my qualifications and experience. For completeness, I have attached copies of my curriculum vitae and resume to this document. (Exhibits A and B). Together, the C.V. and resume contain the most complete list of my publications that I can compile.

6.     2002-Present – President, MD-Writer, Inc.: Research, preparation, and composition of medical and scientific articles for newspapers, magazines, and other publishers; consulting on matters related to pharmaceuticals and their adverse effects.

Over the last four years, I have also been involved in a number of litigations. These included two criminal matters in which I gave testimony in court:

North Carolina v. Hall

South Carolina v. Pittman

In addition, I have been deposed and/or testified in several tort litigation matters:

> In re Baycol Products Litigation
>
> In re Paxil Products Litigation
>
> Witczak v. Pfizer
>
> Cartwright v. Pfizer
>
> Zikis v. Pfizer
>
> Plunkett v. Merck

7.  1991-2002 – Medical Officer, GS-15, Division of Epidemiology, Office of Biostatistics and Epidemiology, Center for Biologics Evaluation and Research, Food and Drug Administration, Rockville, MD 20852: Evaluation and analysis of adverse drug reactions of licensed biological medicines and vaccines.  Member of review teams of new Biologics Licensing Applications (BLAs and PLAs).  GS-15 is the highest rank of Civil Service employees below the Senior Executive Service.

8.  1990-1991 – Medical Officer, GS-15, Clinical Trials Branch, Medication Development Division; National Institute on Drug Abuse; Alcohol, Drug Abuse and Mental Health Administration, Rockville, MD 20857: Development of medications to treat substance abuse.

9.  1984-1989 – Medical Officer, GS-15, Division of Neuropharmacological Drug Products, Office of Drug Evaluation I, Center for Drug Evaluation and Research, Food and Drug Administration, Rockville, MD 20857: Medical review (including clinical safety review) of investigational new drug applications (INDs), new drug applications (NDAs), and postmarketing surveillance reports.  Among the new drug applications that I reviewed was one that has had an unusually large impact on pharmaceutical treatment – Prozac.

10.  1980-1984 – Forensic Psychiatrist, private practice, Washington DC and Maryland.

11.  1979-1984 – Medical Officer, GS-15, Bureau of Forensic Psychiatry, Department of Human Services, Government of the District of Columbia, Washington DC 20001.

12.  1972-1975 – National Institute of Mental Health, Overholser Division of Training and Research, St. Elizabeths Hospital, Washington, DC 20032: Resident in Psychiatry.

13.  1972 – M.D. New York University School of Medicine, New York, NY 10016.

14.    1967 – B.A. from Columbia College, Columbia University, New York, NY 10027.

15.    AWARDS:

1994 FDA Cash Award.

1994 FDA Commendable Service Award – This award was given for "superior performance and leadership in development of improved procedures for post-marketing surveillance."

1995 FDA Group Recognition Award for MedWatch – This award was given for work in analyzing and communicating adverse reaction information regarding certain therapeutic products.

16.    TRAINING IN EPIDEMIOLOGY:

Johns Hopkins University School of Hygiene and Public Health, Master of Public Health program: Courses in epidemiology, public health, and statistics.  Forty credits.

17.    CERTIFICATION:

National Board of Psychiatry and Neurology, 1978.

18.    PROFESSIONAL SOCIETIES:

American Academy of Pharmaceutical Physicians

American Association for the Advancement of Science

American College of Clinical Pharmacology

American Medical Writers Association

Crohn's and Colitis Foundation of America

D.C. Science Writers Association

FDA Alumni Association

International Society of Pharmacoepidemiology

## II.    Documents Reviewed

19.    See Appendix and Attachment C.

6

### III.    The FDA: What It Is and What It Does

20.    In the United States, the process of new drug development is regulated by the Food and Drug Administration, whose mission it is to promote and protect the health of Americans.

### A.    Clinical Trials Done by Companies

21.    At the outset, it should be understood that despite the existence of the FDA, almost all drug development work goes on without the direct participation or supervision of this agency. The work is generally carried out by pharmaceutical manufacturers, who perform research in their own laboratories and conduct human clinical trials in their own facilities or those of clinical research companies and institutions under contract.

22.    The FDA assumes regulatory authority over the process at such time as a pharmaceutical company applies to the agency for permission to develop a particular chemical entity into a new drug. This request is known as an Investigational New Drug (IND) application.

23.    Prior to filing an IND application, a pharmaceutical company engages in preparation, identification, characterization, purification, synthesis, biochemical investigation, biological activity research, and animal investigations of the compound entirely without FDA oversight. However, once the IND application is received by the agency and the company is given approval to go forward, then FDA regulations and guidelines influence the drug development process, and agency reviewers receive information and exercise oversight on the research. For this reason, a prudent company will conduct research according to agency regulations and requirements even prior to FDA involvement.

### B.    FDA Depends on Completeness of Information and Honesty of Companies

24.    The FDA's new drug review process requires submission of extensive and detailed data by the sponsor of an NDA, which is most often the pharmaceutical manufacturing company.

25.    In order to make a medically appropriate decision about the approval of new drug, the FDA expects and relies upon the completeness and accuracy of the data provided by the sponsor. This important point cannot be overstated. Since the FDA does not develop data on its own, the agency is exquisitely dependent on the forthrightness, completeness, and honesty of the sponsor. Without such behavior by the pharmaceutical company, the FDA has no sound basis upon which to perform its vital mission of promoting and protecting the public health of the country.

26.     The language of federal regulations, which have the force of law, assumes that the pharmaceutical company submits accurate and complete information in all sections of an NDA. But particularly in regard to data on safety,

> The applicant [i.e., the sponsor] shall submit an integrated summary of *all available information about the safety of the drug product*, including pertinent animal data, demonstrated *or potential adverse effects of the drug*, clinically significant drug/drug interactions, and other safety considerations, such as data from epidemiological studies of related drugs.  21 CFR § 314.50(d)(5)(vi)(*a*) [Italics added.]

27.     Moreover, as new information becomes available, the sponsor is required to update the data originally submitted.

> The applicant shall, under section 505(i) of the act, update periodically its pending application with *new safety information learned about the drug that may reasonably affect the statement of contraindications, warnings, precautions, and adverse reactions* in the draft labeling and, if applicable, any Medication Guide required under part 208 of this chapter.  These "safety update reports" are required to include the same kinds of information (from clinical studies, animal studies, and other sources) and are required to be submitted in the same format as the integrated summary in paragraph (d)(5)(vi)(a) of this section. 21 CFR § 314.50(d)(5)(vi)(*b*)

28.     The inclusive language of the CFR is intended to alert sponsors that submission of safety information is not merely a passive requirement to pass along the investigators' data to the agency.  Companies are expected to accurately analyze the data and inform the agency of the actual and potential significance and relevance of the information.  For instance, in order to report epidemiologic studies of related drugs, the company must actively survey the medical and scientific literature for potentially related information, pick out relevant articles, analyze such information, and report results of such efforts.

29.     During my many years of work at the FDA, I encountered numerous instances of companies bringing safety matters to agency's attention, when they came upon such information in the course of monitoring data related to their drugs.  It was clear that *pro-active efforts to bring safety matters forward for agency consideration constitutes the standard of practice of ethical pharmaceutical companies.*

30.     It should not be assumed that FDA reviewers will necessarily be able to discern safety problems from raw data submitted by sponsors as part of required NDA documents.  Like any human enterprise, the FDA review process may be affected by competing demands for reviewers' attention, the acumen and perspicacity of individual

8

reviewers, prior expectations about actions and effects of a particular class of drugs, and a host of factors that might impede the review process.

31.     It is quite possible that the FDA review process may occasionally miss a problem entirely. Many reviewers have described the increasing workload and time pressures at the agency. Indeed, in 2003 the Office of Inspector General of the Department of Health and Human Services issued a report that addressed this problem. The report covered the years in which Vioxx was approved. It surveyed FDA reviewers and concluded that "workload pressures increasingly challenge the effectiveness of the review process." In particular, the report noted that 58% of FDA reviewers believed that the allotted 6 month time for a priority review (such as the Vioxx review) is inadequate. Because FDA may occasionally slip up, if a sponsor knows about a problem, the company has the affirmative obligation to bring the matter before the FDA. Without such initiatives taken by ethical pharmaceutical companies, the FDA cannot properly perform its mission.

## IV.     Pharmaceutical Companies' Duties to Warn About Adverse Drug Reactions

32.     Pharmaceutical companies play a critical role in the American health care systems. In 2000, on average, more than 15 prescriptions per patient were filled per year, according to one study (*Fink and Byrns; 2004: Annals of Family Medicine 2: 488-93*). Because of their crucial health function, pharmaceutical companies operate in a position of confidence and trust in relation to the American people. In consequence of their position of trust, these companies incur obligations to American patients and the health care practitioners who treat them.

33.     These obligations compel pharmaceutical companies to ensure the safety of the medications they sell to the American public. To this end, the companies should make available to practitioners and patients all information needed for the safe use of the medications they sell *as soon as such information is known*. It is critical, in particular, that the companies make available all information about significant and serious adverse reactions to their drugs.

### A.     Pertinent Regulations

34.     The obligations of drug companies are codified in regulations promulgated by the Food and Drug Administration (FDA). Thus pharmaceutical companies are governed by regulatory obligations as well as ethical and medical ones.

35.     The following two regulations are specifically relevant to a pharmaceutical company's obligation to provide information about adverse drug reactions:

9

### 1.    21 CFR 201.57(e)

36.    This regulation stipulates a company's duty to warn about serious drug-related hazards.

> Warnings: The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.

37.    This regulation means that a company must issue a warning about a serious hazard as soon as there is reasonable evidence that such hazard exists. The company should not wait until there is scientific proof that its medication causes the hazard.

### 2.    21 CFR 314.70 (c)(6)(iii)(A)

38.    This regulation, known as *Changes Being Effected (CBE)*, stipulates that a company has the ability (and, therefore, the obligation) to change the product information (label) for a drug to provide such information without prior approval by the FDA. In particular, without prior approval, a company may

> add or strengthen a contraindication, warning, precaution, or adverse reaction.

39.    This regulation obligates a company to issue a warning, precaution, or adverse reaction notification as soon as it possesses reasonable evidence that a problem is related to its drug. The company should not wait until the FDA approves the information. The relevant FDA Guidance Document in effect during most of the time Vioxx was on the market affirms that a CBE "should be submitted" for a label change [Reg 1]. As an indication of the importance the FDA attaches to this regulation, a more recent version of this Guidance Document directs that a CBE "must be submitted" for such a label change [Reg 2].

40.    This regulation is intended to provide doctors and patients with important safety information as soon as possible – without any delay that could result from the time needed for the FDA to review the notification.

41.    A company should issue a warning, precaution, or notification of adverse reaction in a variety of formats. First, such information should be included in the *prescribing information* for the medication. Second, the company's *sales representatives* should discuss such information with the doctors and health care providers whom they call upon, in order to make sure that these practitioners are aware of the hazard. Third, the company should include information about significant hazards in *advertisements* to the public and the medical profession. Fourth, the company should send *letters* to doctors and other health care professionals ("Dear Health Care Professional" letters). Fifth, the company should add relevant information to the *"Information for Patients" documents.*

### 3.    Example of a Company Carrying Out These Obligations as Required

42.    On August 22, 2003, the pharmaceutical company Wyeth issued a precaution about hostility and suicidality in children and adolescents treated with its drug Effexor, an antidepressant drug.  In a letter to health care professionals, the company wrote:

> In pediatric clinical trials there were increased reports of hostility and, especially in Major Depressive Disorder, suicide related events such as suicidal ideation and self-harm.

43.    Wyeth issued this important information a year before the FDA required it. Moreover, at the time the company issued this notification, proof that Effexor causes hostility and suicidality in children and adolescents was lacking.  In 2004, the FDA reviewed numerous pediatric studies of SSRI treatment and a key FDA official stated in September 2004 that causality had been established.

## V.    Labeling

### A.    Label Is the Primary Communication with Medical Providers

44.    One of a pharmaceutical company's primary methods of communicating important safety information is through the drug label, which may also be called the package insert (PI) or product information.

45.    Drug labeling should contain adequate directions to *use a drug safely* and must not contain *false or misleading statements*.  In addition to information about the drug substance, its effects and intended use, directions are required to include information about dangers associated with the drug, specifically, contraindications, warnings, precautions, and adverse reactions.  All these terms are defined by various regulations.

46.    The FDA considers the labeling the most important and most official information about a drug, and the agency reviews all labeling carefully.  The FDA must approve final labeling before any new drug product is approved.  And the agency must also eventually approve new labeling or changes to labeling. [21 CFR 201]

47.    The FDA's power to regulate labeling derives from its power to seize a drug product and remove it from the market if the agency considers the drug mislabeled.

### B.    FDA Cannot Force Label Changes Without Drastic Measures

48.    If the FDA determines that a drug is not properly labeled, it considers the drug misbranded.  The agency will then request the company to change the label and submit new labeling for review by the agency.

11

49.     Sometimes there are significant disagreements between the pharmaceutical company and the FDA about what labeling should say about the drug. Such disagreements are almost always short-lived and quickly resolved.

50.     In my experience, which included hundreds of labeling decisions, resolutions of disagreements between the agency and the company never took more than a few days or weeks at the outside. In cases where the issue concerned human safety, such as warnings, precautions, or adverse reactions, the FDA almost always prevailed. I do not remember any substantial disagreement on safety matters, where the FDA did not have final say.

51.     Nevertheless, writing labeling always involved a negotiation with the company. Companies usually deferred to the FDA because of fears of adverse publicity, loss of reputation, or enforcement actions, if disagreements over safety issues remained unresolved.

52.     Occasionally, however, disagreements can remain unresolved. In that case, if jawboning by the FDA and deference on the company's part does not produce a resolution, as a practical matter the enforcement actions the FDA can take are limited.

53.     The FDA could request the company to recall the drug. [21 CFR 7.40]. If the company refuses, the only alternative is for the FDA to seize the drug as an "imminent hazard to public health." [21 CFR 2.5]

54.     Clearly, seizing a drug is a very drastic step. Doing so disrupts the treatment of patients who are taking the medicine. The action disturbs doctors and the medical profession generally. It places significant burdens on the health care system and on the pharmaceutical company.

55.     As a practical matter, the FDA tries to avoid declaring an imminent hazard whenever possible. Because of this reality, if a pharmaceutical company wishes to resist FDA proposals, it can refuse to implement the agency's recommendations. In effect, it dares the FDA to take action.

56.     Testifying before Congress on Vioxx, Dr. Sandra Kweder, Acting Director of the FDA's Office of New Drugs, described the limits of FDA's authority, particularly in relation to the negotiations over Vioxx.

> Dr. Kweder: We don't have the authority to tell a company, "This is how your label has to look. This is the language that needs to go into your label. Here's where it goes. End of story. We have to negotiate with the company the specific language of how things should be worded, placement, those kinds of things.

> Senator Murray: So you were talking to them.

> Dr. Kweder: Correct.

Senator Murray: Did they reject that wording?

Dr. Kweder: I would say they rejected our proposals.

## VI.   Merck's Vioxx Has a Problem

### A.   Pre-Approval Indications of a Cardiovascular Problem

57.    Even before Vioxx was approved, a clinical study of the drug pointed to a potential adverse effect of Vioxx in increasing the risk of CV/T events.  Study 023 of the effects of Vioxx on the kidney was completed in 1997 and subsequently reported in the medical literature [145].  Although it was primarily a kidney investigation, the results of Study 023 suggested that Vioxx reduces the level of an important hormone called prostacyclin, which is also present in blood vessels.  Prostacyclin reduces the clotting of blood platelets and is anti-thrombotic.  But because Vioxx is a selective COX-2 drug, it does not reduce the level of a vascular hormone called thromboxane, which is pro-thrombotic.  The study suggested that together these two effects of Vioxx might well increase the risk of cardiovascular thromboses, including myocardial infarctions. [146]

58.    A board of Merck scientific advisors that met in May 1998 was sufficiently concerned about this finding of Study 023 that it recommended the company conduct systematic examination of coronary thrombotic events in all future Vioxx trials. Specifically the scientific advisors recommended that the company develop criteria for such events, analyze the occurrence of these events as a planned endpoint, and perform a meta-analysis of these events that pooled the results of all future Vioxx studies.  Despite this recommendation by its own scientific advisors, Merck submitted the NDA for approval of Vioxx in November 1998 before completing any such studies or analyses. Moreover, Merck never performed a study designed to assess cardiovascular risk as a primary endpoint, nor did it perform the recommended meta-analysis, not even by the time of the withdrawal of Vioxx more than five years later.

59.    Merck included a report of Study 023 in NDA 21-042 for Vioxx, as required by regulations.  But although the prostacyclin issue was mentioned in the study report, little was said about it there.  Merck reported a statistically significant decrease in prostacyclin in the absence of a decrease in thromboxane on Vioxx, but the company also stated that the clinical implications of the findings were unknown.  This comment fell short of full disclosure, because Merck knew of the potential serious adverse effect that cardiovascular thrombosis might increase. [146]

60.    Moreover, Merck should have reported the findings and the serious clinical implications in other sections of the NDA, too.  An obvious place to bring up the subject would have been in Vol. 1.94, the General Safety Overview, in section 1.7, entitled "Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition."  If the possibility of increasing CV/T events as a result of specific COX-2 inhibition is not a risk deserving of mention in this section, then what is?  Yet Merck did not say a word about it here. [142]

**B.   Approval of Vioxx Without Proof of a GI Benefit**

61.   On May 20, 1999, the FDA approved Merck's new drug application for Vioxx [0.1]. The drug was approved after a rapid, priority review lasting only six months. Such reviews are intended for drugs for serious conditions that have the potential to address an unmet medical need.

62.   It was hoped that Vioxx, a specific inhibitor of the inflammatory protein COX-2, would prove advantageous compared to older analgesic/anti-inflammatory agents that inhibit COX-2 and a similar protein COX-1, which protects the lining of the GI tract. The older drugs, which include aspirin, naproxen, and other non-steroidal anti-inflammatory drugs (NSAIDs), are used for treatment of chronic pain, especially the pain of arthritis. Older NSAIDs may cause gastrointestinal (GI) pain and injury to the lining of the GI tract.

63.   The reason for the optimism was that Vioxx, by targeting the COX-2 protein that is found in sites of inflammation (such as occur in arthritis), would have less effect on the COX-1 protein that protects GI tract. It was hoped that Vioxx would be safer in terms of GI adverse reactions.

64.   However, it was not long before serious problems with Vioxx emerged.

65.   The studies Merck submitted to the FDA in support of the Vioxx New Drug Application (NDA) did not sufficiently demonstrate that Vioxx caused fewer GI adverse reactions. The FDA reviewer, Dr. Villalba, wrote that analyses of ulcerations, bleeds and perforations were "not demonstrative of clinically significant differences between rofecoxib [Vioxx], ibuprofen and diclofenac," two older NSAID drugs [2].

66.   In order to try to prove that Vioxx was less toxic to the GI tract, Merck decided to do another study comparing Vioxx to the older NSAID naproxen. The study began before Vioxx was approved, but was still underway after the drug was on the market. This study was called VIGOR for "Vioxx Gastrointestinal Outcomes Research."

**C.   The VIGOR Trial Results**

67.   In the VIGOR study, Vioxx did show less GI toxicity than the older NSAID naproxen. But the study also showed that Vioxx was associated with more serious cardiovascular adverse reactions, especially myocardial infarctions and other potentially fatal events.

68.   The first results of the VIGOR study became available March 2000. According to a timeline later prepared by FDA, in June 2000 an analysis of the cardiovascular/thrombotic (CV/T) adverse events, mostly MIs, showed that these severe reactions occurred in five times as many patients on Vioxx as on naproxen.

69.     This five-fold association with heart attacks and other potentially fatal CV/T events was a very serious problem for Vioxx.  MIs are almost always much more serious adverse reactions than ulcers or GI pain.  MIs have a greater potential to cause death.

70.     Eventually – it took four years – Merck decided to withdraw Vioxx from the market due to these cardiovascular adverse reactions.  In order to understand what happened and why it took so long, we have look at Merck's actions after VIGOR.

D.     **Merck's Assessment of VIGOR**

71.     Dr. Edward Scolnick, who was President of Merck Research Labs and, in that capacity, supervisor of the Vioxx program, had reason to worry about the cardiovascular effects of Vioxx for at least a couple of years, even before the results of VIGOR were in hand.

72.     The reason was that COX proteins stimulate the production of another protein called prostacyclin, which reduces blood clotting.  This fact can be found in the 1992 Merck Manual, a respected reference published by the company itself.

73.     In addition, as described above (*See* Section VI.A.), Merck sponsored Study 023 on the effects of selective COX-2 inhibition on kidney function.  It showed that Vioxx reduced blood levels of prostacyclin.  This study indicated that in the kidney and other organs, including blood vessels, COX-2 plays a role in prostacyclin production, and inhibition of COX-2 by Vioxx suppresses prostacyclin.  If so, Vioxx might increase blood clotting and cause MIs and other CV/T events.  The study was submitted to a medical journal of pharmacology before Merck submitted the NDA to the FDA.  In the article, the authors wrote that "Prostacyclin formation by the vasculature is of functional importance. . . . It remains to be established whether treatment with specific Cox-2 inhibitors will suppress this response."

74.     This study implied a possible role for Vioxx in causing the increased CV/T event rate in VIGOR.  In a revealing document written by Dr. Scolnick after the drug was taken off the market ("Vioxx, a Scientific Review"), he wrote that the results of this study were know to him and Merck since 1997.  Scolnick wrote that because of the findings of this study, on being told the results of VIGOR, he thought that Vioxx had caused the elevated rate of cardiovascular events.  [82]

75.     Dr. Scolnick's comment and the words of the authors of the pharmacology article (who included three Merck researchers) show that he and Merck were aware of this problem in 1997, and they still were concerned about it as late as 2000, when the results of VIGOR Became available.

76.     Despite these findings, at the time the VIGOR results came out, the Merck project team supervised by Dr. Scolnick chose to rely on an alternative explanation for the higher rate of MIs on Vioxx.  In addition to protecting the GI tract lining, the COX-1 protein promotes blood clotting.  Since the comparator drug, naproxen, inhibits COX-1, it

15

theoretically might reduce blood clotting.  By reducing clotting, naproxen might be reducing CV/T adverse reactions.  (However, according to FDA reviewers, there is no good evidence from placebo-controlled clinical studies that naproxen actually does this – see below.)

77.    According to Dr. Scolnick, in order to resolve the dilemma of which explanation of the elevated Vioxx rate of CV/T events was correct – whether Vioxx was causing clots or naproxen was reducing them – the project team examined two ongoing studies of Vioxx in Alzheimer's disease.  In these studies, Vioxx was compared to a placebo; so if an elevated Vioxx rate of CV/T events occurred in those studies, it would show that Vioxx was causing the clots.

78.    On examining the Alzheimer's study results, they found no elevated rate of CV/T events in the Vioxx group.  From that time on, Merck chose to put forward the alternative explanation – naproxen prevented rather than Vioxx caused clots – in all the official statements from the company.  According to Merck, in the VIGOR study significantly fewer CV/T events, including MIs, occurred in the naproxen group; this was consistent with naproxen's ability to block clot formation. [76]

79.    But there were problems with this explanation from Merck.  The company itself admitted that such an effect of naproxen had never before been observed in a clinical study. [76]  Merck's own cardiovascular consultant, Dr. Patrono, e-mailed a Merck official stating that he did not believe the VIGOR results could be attributed to naproxen benefit. [60]  Moreover, when the FDA reviewers considered this explanation, they discounted it.  The NDA reviewer, Dr. Villalba, said the Alzheimer's studies were not large enough or designed to assess cardiovascular risk. [15]  The FDA consultant in the agency's cardiovascular division objected that no placebo-controlled studies had shown a naproxen benefit to be true. [6.4]

80.    Merck did support its conclusion that naproxen protects against rather than Vioxx causes heart attacks and other CV/T events with other studies besides the Alzheimer's trials.  But the bottom line was that *the truth was not known*.  Merck's research director, Dr. Scolnick, admitted this.  In an e-mail a number of months after the VIGOR study was analyzed, he wrote to Raymond Gilmartin, Merck's CEO,

> it is impossible to know that in patients with rheumatoid arthritis that ALL of the difference between Vioxx and naproxen is due to the benefit of naproxen.  IT IS IMPOSSIBLE TO PROVE THIS; IT IS IMPOSSIBLE TO KNOW THIS WITH CERTAINTY. [Caps in original] [59]

81.    Mr. Gilmartin himself, in testimony on Vioxx before Congress in 2004, said in a prepared statement that it was impossible to know from the VIGOR study whether naproxen was having a beneficial effect or Vioxx was having a negative effect. [78]

82.    The lack of an answer to this dilemma raised a serious question about how best to treat patients.  If Vioxx causes a greater a number of heart attacks, then doctors should be

informed of that fact, because they would need to decide whether to treat patients at risk for heart attacks with Vioxx. But if naproxen causes a decrease in the frequency of heart attacks because of a protective effect, then doctors would not need to worry about heart-attack prone patients taking Vioxx.

83.     To put out the claim publicly that Merck knew that difference was due to naproxen benefit was to advise doctors that *it was OK to treat patients at high cardiovascular risk with Vioxx.* We now know that the evidence shows Vioxx does cause increased rates of CV/T events, and Merck withdrew Vioxx because of that. But at that time, the answer was not known.

84.     So what did Merck do?

### E.     Merck's Precautions With Doctors and Patients Involved in Its Own Studies

#### 1.     The Press Release of March 27, 2000

85.     What Merck did was tell news reporters, doctors, financial analysts, and others that the benefit of naproxen was what reduced the frequency of heart attacks and CV/T events in the naproxen group in the VIGOR study.

86.     Merck put out a press release intended for the news media and stock analysts and investors that contained the assertion

> . . . . significantly fewer thromboembolic [CV/T] events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation [clotting]. [76]

87.     The announcement did *not* say there was any question about this or that another possibility was that Vioxx increased cardiovascular events.

88.     In an important way, this press communication from the company lies at *the heart of the questions about what Merck did and did not do about the CV toxicity of Vioxx.* I will discuss what Merck *should* and *should not* have done in Section IV.F. of this report.

#### 2.     Merck Modifies Its Study Protocols

89.     The press release also stated that Merck was notifying doctors under contract to the company who were investigators in studies of Vioxx. [76] In addition to notifying its investigators, the company also amended the protocols of all Vioxx studies to allow the addition of low-dose aspirin where appropriate. [0.1] In doing this in June 2000, shortly after the VIGOR results came out, Merck was changing its studies of Vioxx so that participating doctors could give aspirin to their patients at risk for CV/T problems.

90.     This was an important and revealing action on Merck's part, because if Vioxx was truly no hazard to high-risk patients, then there was no reason for Merck to do anything at all.

91.     Merck did take action to allow its own doctors -- those the company had hired to do investigations of Vioxx – to add aspirin to patients' regimens because the company wanted to reduce the CV/T risk to the patients participating in its own investigations. This was one of the *very first things* the company did upon learning that the Vioxx patients were having more heart attacks, and it is therefore clear that the company was worried about the elevated rate in that group of patients.

92.     But what about all the other doctors prescribing Vioxx and all the other patients who were taking Vioxx throughout the United States. *What about them?  Didn't they have reason for concern also?*

93.     If the company was concerned about the patients on Vioxx in its studies, why shouldn't physicians everywhere have been concerned about patients on Vioxx also?

**F.     What Merck Should Have Done With Other Doctors and Patients**

**1.     Advise Doctors and Patients of the Uncertainly and Potential Problem**

94.     The first thing Merck had an obligation to do – for all the doctors and patients throughout the country who were prescribing or taking Vioxx – was to inform them that there was a serious medical question about the safety of Vioxx.

95.     Even the Merck doctor who was in charge of the Vioxx program and the CEO of the company knew that it was impossible be certain that the increased heart attacks and other CV/T events in the Vioxx group were not due to Vioxx.  That is what every other doctor needed to know, too.

96.     Doctors needed to know that there was a possibility that their patients on Vioxx might be at greater of risk of CV/T events because of taking Vioxx.  This was especially true for patients who already had elevated risk of cardiovascular disease or already had the actual disease.

97.     FDA regulations make special provisions for warning the medical profession when there is a serious question about the safety of a drug, even if there is no proof that the drug causes the reaction.  An FDA regulation states:

>     Warnings.  Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur.  The labeling shall be revised to include a

warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved. [21 CFR 201.57]

98.     Another related regulation states that companies "may add or strengthen a warning, precaution, or adverse reaction" before getting FDA approval [21 CFR 314.70]. The purpose of this regulation is to allow drug companies to move forward as quickly as possible with alerting the medical profession to serious safety problems.

99.     Merck ought to have put out a public statement that made the problem clear. Because of the seriousness of the problem, a letter to all health care professionals would have been appropriate.  Such a letter should have honestly told these medical providers something like this:

- In a Merck clinical trial, patients receiving Vioxx had an increased rate of cardiovascular thrombotic events compared to patients receiving naproxen.

- At present it is unknown whether this indicates an increased risk of cardiovascular thromboses on Vioxx or a decreased risk of such events on naproxen.

- Because of the uncertainty, doctors with patients on Vioxx may wish to consider the risks and benefits of Vioxx in their patients at for cardiovascular thrombotic events.

100.    In addition to putting out public information, Merck should have changed the label of Vioxx to warn about this problem.  This was the action recommended by the FDA cardiovascular reviewer after she had reviewed the VIGOR data, i.e., that a warning be put in labeling. [5]  According to the regulation, Merck did not have to wait for the FDA to recommend this.  The company could have done it on its own, and should have done it on its own.

101.    The company should also have instructed their sales representatives to inform the doctors they visited and discuss the issues with them.  These sales people often develop familiar relationships with the doctors on their routes and can be very effective in conveying information.  If the sales people had no effect, the companies wouldn't use them.  And if a salesman told a doctor about a problem with his own company's drug, you can be sure the doctor would have listened.

## 2.     Recommend the Action Merck Took With Patients in Its Studies

102.    The next thing Merck should have done was something it also chose to do with the doctors and patients in its own studies: advice about the use of aspirin.  Merck did this in its own investigations to protect the patients.  It modified its protocols to allow the

investigators to put patients on aspirin if the patients were at cardiovascular risk, and it sent notices to all the investigators. *But again, what about all the other patients throughout the country? Didn't they need to be protected, too?*

103.    Merck did state in the March press release that it had notified its investigators of protocol modifications to allow aspirin, but that is not the same thing as directly advising doctors to consider aspirin for their patients. Moreover, the statement about notifying investigators followed sentences of the paragraph that implied that naproxen was protective and Vioxx absolved of blame.

104.    Eventually, two years later, after long negotiations with the FDA (more about this below), Merck did put a statement in Vioxx labeling that anti-clotting therapies such as aspirin should be considered for patient with cardiovascular risk. But the company did not need to wait two years. It could have put such a statement in the Precautions section immediately. Moreover Merck could have added a fourth bullet, such as the following one, to the preceding three in a letter sent to medical providers.

- Since Vioxx does not protect patients against cardiovascular thromboses and may possibly increase the risk, doctors may wish to consider the addition of aspirin to the regimens of patients taking Vioxx.

### G.    Why Merck Did Not Take Such Actions with Other Doctors and Patients

105.    It is impossible to know the hearts and minds of the Merck doctors and executives who chose not to take the actions I discussed in the preceding section, and I do not claim to be able to say why they acted as they did. But two important facts should be taken into account in considering why Merck did not inform the medical community right away that (1) it was possible that Vioxx was causing the elevated rate of CV/T events, and (2) that doctors should consider aspirin for their patients on Vioxx.

106.    The first fact is that there were many other analgesic and anti-inflammatory agents on the market. Vioxx had lots of competition. If Merck put out that Vioxx might be causing such serious problems as heart attacks, it was possible that it would lose market share or even be widely rejected.

107.    The second fact was that the main selling point of Vioxx was that it was safer on the GI tract. Aspirin, however, is known to often irritate the GI tract and cause ulcers. About a year and a half later, *The Medical Letter*, a respected newsletter on drugs commented that taking aspirin might have protected against cardiovascular thromboses, but it would also diminish the apparent advantage of gastrointestinal safety. In other words, if Merck advised doctors to consider aspirin for Vioxx patients, that would detract from the main selling point of the drug.

108.    In addition, as discussed below, financial considerations played a role in the course Merck chose to take.

### VII.    What Merck Did Instead of Alerting the Medical Community About the Risks of Vioxx

#### A.    Merck Orders Sales Representatives Not to Discuss the VIGOR Study

109.    In the previous section, I described how useful it would have been to have Merck's sales representatives discuss the VIGOR study with the physicians on their beat. In fact, Merck did the opposite of this at one point. According to a congressman, whose committee held hearings on Merck and Vioxx, in February 2001, the company issued a bulletin to its 3000 sales people. The bulletin ordered, "DO NOT INITIATE DISCUSSIONS ON ... THE RESULTS OF THE . . . VIGOR STUDY." It advised that if a physician inquired about VIGOR, the sales representative should talk about the gastrointestinal benefit of Vioxx and then say, "I cannot discuss the study with you." [18]

#### B.    Merck Repeatedly Implicates Naproxen, Not Vioxx

110.    In previous sections, I also noted that by pushing the claim that the elevated rate of CV/T events was due to the protective effect of naproxen and not harmful effects of Vioxx, Merck was distorting the truth that the cause had not been pinned down and Vioxx might well be the cause. And the company was diverting physicians from considering the risks that Vioxx might cause to some of their patients. I described how FDA reviewers and Merck's own consultant cast doubt on the company's explanation. [6.4, 15, 60]

111.    Nevertheless, Merck consistently maintained and put out statements that protection due to naproxen was the explanation.

112.    The company implied this in three press releases. [63, 76, 84] The first one, previously cited, came out shortly after the VIGOR study results came out. It declared that the results were "consistent with naproxen's ability to block platelet aggregation." Merck repeated this statement in press releases May and August 2001, even though in February, the FDA reviewers at an FDA advisory committee meeting had objected that the claim was unsubstantiated.

113.    In September 2001, the FDA division that monitors advertising issued a warning letter to the company. [7] The agency accused Merck of sponsoring six audio conferences on Vioxx for doctors that were "false or misleading in that they minimized the MI results of the VIGOR study." The letter charged that Merck was claiming:

> Vioxx does not increase the risk of MIs & that the VIGOR finding is consistent with naproxen ability to block platelet aggregation like aspirin.

21

The FDA continued:

> That is a possible explanation, but you fail to disclose that your explanation is
> hypothetical, has not been demonstrated by substantial evidence, and that there is
> another reasonable explanation, that Vioxx may have pro-thrombotic properties.

114.   Merck was also sending out the naproxen explanation in response to queries from
doctors about the issue.  A "Dear Doctor" form letter issued in May 2000 made this claim
about naproxen.  The letter was probably sent out to many physicians.

### C.   Merck Asserts and Advertises the Cardiovascular Safety of Vioxx

115.   Merck also repeatedly issued statements and sponsored advertisements claiming
that Vioxx had a safe cardiovascular profile.  The company did this so many times that it
is not possible to list here more than a small fraction of all the company's claims.

116.   The press releases of May and August 2001 were headlined, "Merck confirms the
cardiovascular safety profile of Vioxx," and "Merck stands behind the cardiovascular
safety profile of Vioxx."  Of course Merck knew that there were serious questions about
these claims, and that the hearts of many patients taking Vioxx might be at risk. [63, 84]

117.   Merck created a "Cardiovascular Card" for sales people to hand out to doctors.
The card did not discuss the VIGOR study but asserted the cardiovascular safety of
Vioxx based on earlier studies. [85]  A "Dear Doctor" letter confirming cardiovascular
safety was sent out to large numbers of physicians to counteract questions raised by an
article about Vioxx in the Journal of the American Medical Association. [71]

118.   Merck asserted the claim of cardiovascular safety at scientific meetings. [7]  One
such meeting was the FDA advisory committee meeting in February 2001 [1], where the
claims was directly questioned by FDA reviewers, after which the advisors voted
overwhelmingly to recommend that the cardiovascular information from VIGOR be
transmitted to physicians.  However, on the very next day, Merck ordered its sales force
not to discuss the advisory committee meeting. [18]

119.   The warning letter from the advertising division of the FDA in September 2001
cited the advisory committee meeting and objected that Merck was trying to minimize the
results of the VIGOR study. [7]

### D.   Merck Promotes Vioxx GI Safety While Playing Down Risks

120.   In numerous advertisements and other promotional material, as well as letters to
doctors, Merck emphasized the gastrointestinal benefits of Vioxx while down playing the
cardiovascular risks.  There is little doubt that Merck took this unbalanced approach in
hundreds and probably thousands of communications.  The company would put

information about GI benefits in the leading paragraphs of its Vioxx communications and only bring up cardiovascular safety further on.

121.    At an internal meeting in September 2001, FDA officials discussed Vioxx labeling and recommended balanced information on Vioxx that "de-emphasized the GI safety advantage in the Vioxx label". [0.1]  This occurred about the same time that the warning letter about advertising accused the company issuing advertisements that were "false, lacking in fair balance."  The letter also noted that the company was failing to present the Warning in labeling about the possibility of serious gastrointestinal toxicity in patients taking Vioxx and it was making unsubstantiated claims of superiority to other NSAID drugs [7]

### E.    The History of the Vioxx Label Change Negotiations

122.    Two years and one month passed between the time that Merck became aware of the cardiovascular results of the VIGOR study in March 2000 and the time Merck changed the product label for Vioxx in April 2002 to incorporate information about the serious risk of heart attacks.  Epidemiological studies have indicated that during those years, in all likelihood, tens of thousand of patients had heart attacks related to Vioxx.

123.    It did not have to take nearly so long.  If Merck had changed the label sooner, and warned doctors and patients earlier, it is very likely that many of those heart attacks might have been avoided.

124.    There is good evidence that suggests that Merck dragged its collective feet about the label change, concerned about the fierce competition for market share with the competitor drug Celebrex.  This section discusses the history of the two years in which Merck negotiated with the FDA about changing the Vioxx label.

### 1.    Merck Could Have Made Label Changes Immediately

125.    In a previous section of this report, I explained that one of the first things Merck should have done upon analyzing the results of the VIGOR was to inform doctors about the problem of heart attacks by changing the product label (*See* Section VI.F.).  Merck could have changed the label almost IMMEDIATELY.  Doing so would have been entirely appropriate because of the serious nature of the problem, and it would likely have prevented many serious illnesses and saved many lives.

126.    An FDA regulation called "Changes Being Effected" allows pharmaceutical companies to add important safety information even before getting FDA approval.  (*See above* Section IV.A. for statements of the applicable regulation and another that stipulates that a Warning be added to safety information in the label as soon as the evidence of a serious hazard becomes available.)  So Merck could have added information about the risk of heart attacks on Vioxx as soon as April or May 2000.

### 2.    Merck's Initial Label Change Proposal, June 29, 2000

127.    On June 29, 2000, Merck submitted the first supplement for new proposed labeling for the VIGOR study to FDA.  The supplement contained new labeling for both the gastrointestinal AND the cardiovascular results.  But almost all the changes in this proposed label concerned the gastrointestinal results of VIGOR, which demonstrated a benefit for Vioxx.

128.    It is understandable why Merck would have wanted to add both these changes to the product label at the same time.  The cardiovascular results indicated a serious hazard, and Merck would naturally have wanted a significant benefit to promote in the same label to compensate for the hazard and sustain Vioxx's market appeal.

129.    But it didn't have to be done that way.  FDA regulations require prior approval to change a label to add a unique benefit or to add results of a new investigation.  But the regulations also permit – and guidelines encourage – *immediate* addition of a new serious safety hazard.  So Merck could have submitted two labeling supplements instead of one:  One supplement, with simple and straightforward wording, could have alerted doctors right away to the high rate of heart attacks in the VIGOR study.  Another longer and more complex supplement could have proposed new wording for the *Clinical Studies* section and added information on the gastrointestinal benefit.

130.    Because Merck submitted both changes in one supplement (the gastrointestinal and cardiovascular results), a long FDA review was required, a process that involved protracted negotiations and eventually took two years to complete.  In the meantime, the medical community saw no label changes.

131.    Moreover, the cardiovascular information in the single supplement was weak.  In the safety sections of the label, there was no Warning about heart attacks or other CV/T events.  In contrast, it its first response to this supplement, the FDA proposed a strong Warning.  Merck did add information to the Precautions section but stated there *only* that patients who required aspirin for cardiovascular prophylaxis should continue on such treatment, since Vioxx has no anti-platelet effect.  Only at the end of the clinical studies section, after pages of information about the GI benefit of Vioxx – and not in any of the safety sections – did Merck propose wording that explained how patients on Vioxx had four times the number of heart attacks as patients on naproxen in the VIGOR study.

132.    Clearly, this was an inadequate label proposal from the standpoint of cardiovascular safety.  And the fact that it was proposed with such a weakness probably prolonged the label negotiating process.

### 3.    Merck's Submission of October 13, 2000

133.    On this date, Merck submitted the label document with the 6/29/00 changes again.  The company did not reconsider the changes and did not alter the proposal.  The

submission, however, is of some interest because in the cover letter, Merck informed the FDA of eleven additional cardiovascular serious adverse reactions in the VIGOR study. Three of these were myocardial infarctions on Vioxx. There were no additional myocardial infarctions on naproxen. These additional adverse reactions were not included in the initial VIGOR results submitted in the spring.

134.    These previously unreported MIs have caused controversy, because an article on the VIGOR study written with Merck's assistance (two of the authors were Merck employees) and published in the New England Journal of Medicine on November 23, 2000 – more than a month after this FDA submission – did not include these adverse reactions. Moreover, Merck never informed the journal about the missing data. On December 29, 2005, having learned of the missing MIs through documents in litigation, the journal published an editorial criticizing the omission of the information in the article. On March 16, 2006, the journal reaffirmed its expression of concern in response to letters from the authors of the article.

### 4.    Merck's Delays Prolong the FDA Effort to Add Cardiovascular Safety Data to the Label

135.    In order to develop a label that more adequately addressed cardiovascular safety issues, the FDA asked Merck to submit results of another study, completed about the same time as VIGOR. Called ADVANTAGE, the study also compared Vioxx to naproxen but used a lower dose of Vioxx (25 mg) and allowed aspirin prophylaxis for patients with cardiovascular risk factors. The agency wanted to find out if this study also showed an excess number of MIs in the Vioxx group.

136.    The FDA had to request Merck to submit the report of the ADVANTAGE study four times. The first request was made in November 2000 [54]. Following an advisory committee meeting on Vioxx in February 2001 (*See below* Section VII.E.5.), the company apparently still had not submitted the study report, and FDA repeated the request on February 14, a week after the meeting [55].

137.    The company responded by asking the FDA to explain and justify the request. The FDA answered that it was a large study of an "approved chronic dose without restrictions on aspirin." On February 28, the FDA sent the request as a letter in addition to a fax, and noted that the advisory committee remarked on the importance of the information. [56] This indicates that the FDA had been provoked by the delay and felt the need to make a more forceful request.

138.    Even after the agency provided a clear letter and obvious justification, the company took a month to submit the data. And even then it was not complete, lacking certain data sets and patient records [57]. The agency requested the missing data sets in April (*See* Section VII.E.7), a fourth request.

5.   **FDA and the Arthritis Advisory Committee Determine that the Vioxx Label Should Address the Cardiovascular Safety Issues Shown by the VIGOR Study**

139.   From the moment that Merck first reported the results of the VIGOR, FDA reviewers worked diligently to analyze the results and the health implications of the study. The agency was sufficiently concerned to call a meeting of the Arthritis Advisory Committee in February 2001 to discuss VIGOR and make recommendations about what to do about it. The meeting lasted two days, with the first day devoted to Celebrex, and the second day to Vioxx.

140.   At the meeting FDA reviewers made presentations asserting that the study raised serious questions about the cardiovascular safety of Vioxx. In contrast, Merck made presentations asserting that Vioxx was safe and that CV/T events were not caused by Vioxx but prevented by naproxen. FDA called Merck's explanation into question.

141.   The advisory committee overwhelmingly recommended the CV/T results of the VIGOR study be communicated to the medical profession [18]. Following this recommendation, FDA continued analyzing the Vioxx cardiovascular data in order to add a warning to the drug label. More than a year passed between the advisor's recommendation and the actual inclusion of the information in the label in April 2002. During that time Merck and FDA negotiated the wording of the label. As a former FDA reviewer, I do not remember any other post-approval labeling discussion that took so long to resolve.

6.   **Merck's Label Submission of March 16, 2001**

142.   One might suppose that after the advisory committee *overwhelmingly* recommended the inclusion of the Vioxx cardiovascular data in the label, that Merck would submit a proposal prominently displaying this information. If so, one would suppose wrong.

143.   In the previous label proposal of June 29, 2000, the company had devoted a long paragraph in the *Clinical Studies* section to the VIGOR data on myocardial infarctions. In the *Use with Aspirin* subsection, five sentences analyzed the rates of MIs, pointing out that overall rate of MIs on Vioxx was four times that on naproxen, while among the patients not indicated for aspirin prophylaxis, the rate of MIs on Vioxx was double that on naproxen. The company reported statistical means, differences and confidence intervals.

144.   In the label proposal of March 16, 2001 [158a, elec], Merck deleted this information from the *Clinical Studies* section altogether. Instead the company gave more prominence to the GI safety of Vioxx. The first paragraph of the VIGOR study information, which described the GI benefit of Vioxx, was doubled in length. The subsection on *Use with Aspirin* was shortened to contain only statements about the effect of aspirin used with Vioxx on GI toxicity.

145.    Merck moved the VIGOR cardiovascular information near the end of the *Precautions* section.  The *Cardiovascular Effects* subsection of *Precautions* followed four other subsections, which were probably much less important.  Moreover in the *Cardiovascular Effects* precaution, only one sentence in the second paragraph, reported the VIGOR data of a five-fold increase in the overall rate of MIs on Vioxx.  This one sentence occurred among nine other sentences that discussed – not the VIGOR data – but the use of aspirin, the effect of naproxen on platelets, and the results of other studies that showed little difference in the rate of MIs.

146.    It can be fairly said that five weeks after the advisory committee recommendation, Merck shortened the VIGOR cardiovascular information to a single sentence and buried it in information about aspirin.

### 7.    FDA Initiates Formal Label Discussions

147.    The FDA began its formal effort to add the VIGOR cardiovascular data with an *approvable letter* to the company on April 6, 2001. [58] It was called an "approvable letter," but the agency often uses such letters to set forth a list of requirements for reaching final approval.  In this case, the subject in question was the label change to incorporate the cardiovascular data in VIGOR, as the advisory committee had recommended two months earlier.

148.    In the approvable letter, FDA requested a complete safety update of Vioxx.  The agency also noted the incompleteness of Merck's response to the request for the ADVANTAGE study report, which lacked certain data sets, and again asked for a complete report.

149.    Merck finally submitted the requested information three months later in July.

150.    After reviewing all the information (including VIGOR, ADVANTAGE, and other studies), FDA proposed its first VIGOR-related labeling on October 15 2001. [0.1] It took another half a year before negotiations were completed and the FDA approved the label changes.

151.    The October 2001 FDA proposal added a lot to the Vioxx label, an indication that the agency was very concerned about the CV safety issue.  It added a long discussion of the VIGOR study to the *Clinical Studies* section.  More than a page of the additions – including two tables – presented the cardiovascular data.  The section began by asserting a "significant increased risk of development of serious cardiovascular thrombotic events in patients taking Vioxx."  It also included a statement on cardiovascular events in ADVANTAGE, in which nine cardiac events (including five MIs) occurred on Vioxx compared to three cardiac events (one MI) on naproxen.

152.    But most importantly, FDA added a strong *Warning* to the label.  It began, *"Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic*

*events . . ."* [italics added]  And the second paragraph began, "The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with Vioxx 50 mg . . ."

153.    The *Warning* was exactly what doctors and patients needed to know.  Patients at risk of cardiovascular events needed to be careful about taking Vioxx.  FDA was clear about this and attributed the risk to Vioxx in the *Warning*.  But instead of adding a clear warning, Merck still sought to bury the information.

### 8.    On November 8, 2001, Merck Rejects FDA's Labeling Proposal and Submits Its Label Response

154.    On the day after receiving the FDA labeling proposal,  an email from Merck's research director, Dr. Scolnick,  to another Merck official, David Anstice, stated, "Be assured we will not accept this label."  Anstice responded, "We will fight and see where we get."  Scolnick returned, "thye are bastards [sic]."

155.    Not surprisingly, on November 8, 2001, Merck rejected FDA's labeling proposal.

156.    In the letter, Merck stated that it "strongly disagrees with FDA with respect to many of the labeling recommendations.  And the company returned FDA's proposal with cross outs and markups to show how it wanted to change it.  It is instructive to see what Merck wanted out.  Among the cross outs were the following statements.

- In the Clinical study section: "The VIGOR study demonstrated a significant increase in the risk of development of serious CV/T events."

- In the Warnings section: "Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events . . ."

- In the Warnings section: "The risk of development myocardial infarction in the VIGOR study was five-fold higher in patients treated with Vioxx. . . .  The finding was consistent in smaller and shorter studies." [52]

157.    Merck wanted to state in the clinical study section only that there was a significant *difference* (not *increase*) in the incidence of MIs between Vioxx and naproxen, and the company wanted to move the information to Precautions rather than put it in Warnings.

158.    In my opinion, information about an increased rate of so serious an event as myocardial infarction belongs in Warnings, not Precautions.  That is also what the FDA's cardiovascular reviewer recommended.  Merck response to the FDA would have watered down the impact of the label changes, and it delayed the implementation.

### 9.   After Six Months of Intense Negotiations, Merck and FDA Agree on a Label

159.   After the FDA's October 2001 label proposal, Merck and the agency exchanged numerous communications in the course of their negotiations.  Months passed by. During the exchanges, Merck protested FDA's intention to put the VIGOR data in labeling with adverse reactions broken down by body system. [4.1]  Such information would have added additional important safety information.

160.   In regard to the FDA's wish to put the cardiovascular information in the *Warning* section, an internal Merck email on November 8, 2001 from Dr. Scolnick to the Merck executives Greene and Goldman, he wrote:

> Twice in my life I have had to say to the FDA, "That label is unacceptable, we will not under any circumstances accept it."

161.   After difficult negotiations, the agency and the company finally came to agreement on April 11, 2002.  Merck had prevailed about putting the cardiovascular section in *Precautions* rather than *Warnings* as FDA had wanted.  So Dr. Scolnick had his way.  [Package Insert 2002]

### 10.   Why Did Merck Resist?

162.   It is important to bear in mind that during the long hiatus between the analysis of the VIGOR data in March 2000 and the completion of labeling negotiations in April 2002, physicians were prescribing Vioxx and their patients were taking the drug without any statements about the risk of heart attacks and cardiovascular thromboses (as demonstrated in VIGOR) in the official product information.  Moreover, the information Merck made available to the medical community through the New England Journal of Medicine was misleading in that it did not accurately communicate the number and rate of myocardial infarctions in patients taking Vioxx.

163.   During these two years, millions of patients were taking Vioxx.  It is almost certain that some Vioxx patients died before Merck put the VIGOR information in labeling.  In all probability, most patients who died had pre-existing risk factors for heart attacks and other CV/T events, and many of them might have been put on less toxic drugs if the company had cooperated and moved more expeditiously to disseminate the information.

164.   Indeed, rather than disseminate the information, there is good evidence that Merck tried to withhold it.  In his article in the New England Journal of Medicine, Congressman Henry Waxman discussed some of this evidence (*See* Section IX.).  One other relevant document is a Merck sales plan dated March 23, 2001, about a year before labeling negotiations were completed.  One page of this PowerPoint document lists

"Overall Communication Objectives" for the marketing force.  The first bullet states:

- *Do no harm;* refrain from proactively generating coverage that jeopardizes label negotiations and/or links Vioxx to CV adverse events. [Italics in original.]

165.   How cynical that the ancient Hippocratic instruction to do no harm (*Primum non nocere*) was used by Merck – not to prevent harm – but to prevent sales people from proactively alerting doctors about possible heart attacks and other CV/T events due to Vioxx.

166.   In view of the long delay in finalizing labeling, one must ask: When it was a matter of such serious illness – even life and death – for so many patients, why did Merck wait so long?  Could it have been the case that Merck's concerns about the market share of Vioxx trumped any concerns the company might have had about the health and lives of so many patients?  One cannot know for sure.  But two Merck documents show how much money the company thought to be at stake.

- A "2001 Profit Plan for Vioxx" was written in September 2000 [194], about half a year after the VIGOR analysis.  On page 38 a table shows the company's "revenue impact" projections for the coming year.  One item in the "Potential Downside(s)" section of the table is "VIOXX is unable to neutralize safety/tolerability issues."  This impact was estimated at almost half a billion dollars in sales.  That was just one year's impact.

- A "U.S. Long Range Operating Plan" [176] written around the same time as the profit plan estimated losses 2001-2006 if a cardiovascular Warning were included in the Vioxx label: $4 billion to $5 billion.  The same document estimated that the losses would still be about half that much if the cardiovascular information were put in Precautions.

## VIII.   Recent Developments

### A.   Advisory Committee Votes Unanimously for CV Alert

167.   At the present time, Vioxx remains withdrawn the market, but in February 2005 an FDA advisory committee voted narrowly (17-15) against banning Vioxx completely.  Lest it be misunderstood that this advisory opinion meant the advisors believed Vioxx is a safe drug without serious cardiovascular risks, the same committee voted unanimously (32-0) to support the conclusion that "rofecoxib significantly increases the risk of cardiovascular events."  Moreover, committee members made several comments that Vioxx is more dangerous than other COX-2 inhibitors:

- The blood pressure effects seen with [Vioxx] are clearly outside the norm and are undesirable.

- A signal for heart failure is present [for Vioxx] and other NSAIDs have not exhibited the same signal.

- The blood pressure and heart failure data is compelling indicating [Vioxx] is substantially worse than other COX-2s.

- A strong dose relationship is very apparent [for Vioxx in regard to cardiovascular events].

168.   Furthermore, at the same committee meeting, Dr. John K. Jenkins, Director of FDA's Office of New Drugs, said, "We heard the message that the committee thought Vioxx had a cardiovascular risk that was perhaps larger or better documented than the others."

169.   That the FDA agreed with the committee's view is made clear in minutes for a May 3, 2005 meeting with officials from Merck. These minutes stated, "FDA noted that while the magnitude of the cardiovascular risk may not be clearly worse for Vioxx, the evidence for that risk is stronger."

### B.   FDA Memo on the Safety of NSAIDs, April 6, 2005

170.   About a month before the Merck-FDA meeting (April 6), Dr. Jenkins, along with Dr. Paul J. Seligman, Director of the agency's Office of Pharmacoepidemiology and Statistical Science (the office handing the postmarketing surveillance program) sent a memo to their immediate superior, Dr. Steven Galson, Acting Director of the Center for Drug Evaluation and Research. The memo concerned cardiovascular risks of Vioxx, other COX-2-inhibitor NSAIDs and the nonselective NSAID drugs. In its first bullet point (in the Executive Summary) the memo stated clearly:

- The three approved COX-2 selective NSAIDs (celecoxib, rofecoxib, and valdecoxib) are associated with an increased risk of serious adverse CV events compared to placebo. The available data do not permit a rank ordering of these drugs with regard to CV risk.

171.   It is important to understand the context of this memo and of the other bullet points that followed this one. Vioxx had been withdrawn from the market about half a year previously. The FDA advisory committee had met to consider Vioxx and other COX-2s two months earlier in February. Huge press coverage and publicity had attended these events, which cast into question the safety of all the marketed NSAIDs, drugs often taken regularly by hundreds of millions of people. The world was wondering what it meant and what to do. Is it safe to continue taking these drugs? What is the FDA's position on this matter?

172.   The memo was written to FDA's director of drug regulation, Dr. Galson, from the two most senior officials responsible for the safety analyses of the drugs. As FDA's drug regulator, Galson is the official probably most often interviewed and questioned about

drug safety issues. The point of the memo was to provide an official documentary basis for Galson to respond to the public's urgent questions about using available NSAIDs.

173. The first bullet answers the question: Do COX-2 inhibitors carry CV risk. The answer was clearly yes. However, the *available evidence* does not permit a statement that one is more dangerous than another. This statement should not be taken to mean that the FDA considers Vioxx as safe as the other. Other FDA statements make clear that the agency does not think so. Rather the statement said that information is lacking, and at the present time there is not enough information to officially rank the drugs in order of dangerousness.

174. Many of the bullets in the Executive Summary make similar statements, namely, that sufficient data to address all safety questions are not available, with the implication that at some future time additional information may answer some questions. In contrast, however, one bullet (number 5) does not say that information is lacking, and indeed it asserts that some drugs are safe for certain usages. It is important to see what bullet number 5 actually means:

- Short-term use of use of NSAIDs to relieve acute pain, particularly at low-doses, does not appear to confer an increased risk of serious CV events (with the exception of valdecoxib in hospitalized patients immediately post-operative from coronary bypass (CABG) surgery).

175. This bullet does not concern Vioxx. In particular, it does not imply that Vioxx is safe in short-term use at low dose. This bullet concerns all the hundreds of millions of people taking available NSAIDs each day, and it is intended to support Galson in providing an answer to their urgent question, "Is it OK for me to continue to use these drugs when I have pain?"

176. Vioxx is not now and was not on the market at the time the memo was written. Consumer use of Vioxx is not now and was not then an issue. Not every bullet in the Executive Summary concerned Vioxx. Moreover, not every bullet concerned COX-2s. Certain bullets addressed other issues. This bullet concerned everyday use of NSAIDs by consumers, and it was intended to reassure them. The answer to their question is that it's OK to take these drugs for acute pain, at the ordinary low dose, as long as they don't take the drugs for more than several days. Under those circumstances, any increased CV risk is minimal, if it exists at all.

177. This intention of bullet number 5 is confirmed by a paragraph on page 13 where almost the same words as in the bullet are used: "low-dose, short-term use . . . for relief of acute pain." The first sentence of the paragraph reads, "Several non-selective NSAIDs are currently available to consumers without a prescription (e.g. ibuprofen, naproxen, ketoprofen)." This use was the focus of concern of the bullet.

### C.   Analysis of Protocol 203 Data

178.    In 2003, about a year before Merck withdrew Vioxx in the wake of the results of the APPROVe study, the company planned a definitive analysis of the CV risks of Vioxx. The analysis, detailed in Protocol 203 dated June 11, 2003, described a meta-analysis of three ongoing or planned studies of Vioxx: APPROVe, a colon polyp recurrence study; VICTOR, a colon cancer therapy study; and VIP, a prostate cancer prevention study.

179.    Merck did not perform the analysis. Vioxx was withdrawn and from the company's viewpoint, the analysis apparently was moot. Still, if the results had been favorable to Vioxx, the company would have had a reason to do it.

180.    However, the data on a sufficient number of patients – treated in these studies before drug withdrawal – has been made available to the plaintiffs in this litigation, and a statistician and an epidemiologist retained by the plaintiffs, both experts in their fields, have analyzed the Protocol 203 data.

181.    Graphical displays of the results of their analysis have been made available to me. The analysis spans 1095 days of Vioxx treatment and shows that excess CV risk attributable to Vioxx, in comparison to placebo, emerges at 10 days of Vioxx treatment. Throughout the rest of the treatment period, the relative hazard due to Vioxx was greater than placebo. Between 10 days and two months, the risk for Vioxx was 2-3 times placebo. At 18 months the risk difference between Vioxx and placebo became statistically significant ($p < 0.05$) and remained significant for the rest of the study.

182.    However, that concept of statistical significance refers to the probability being less than 5% that the results could be due to random chance rather than the treatment. So the absence of significance prior to 18 months does NOT mean that the excess CV risk attributable to Vioxx was absent before 18 months. Indeed, the graphical display, which shows the elevated risk of Vioxx emerging at 10 days and remaining elevated throughout the rest of the study period, implies that the onset of Vioxx risk occurs early in treatment. A recent article in the Canadian Medical Association Journal also suggests early onset of risk. [143]

183.    The FDA did not have the results of the above-described Protocol 203 analysis when the April 6, 2005 memo was written. Indeed, to this day, the agency does not have an analysis of the Protocol 203 data.

### D.   Editorial in *Circulation* May 9, 2006

184.    In May 2006, Dr. Jerry Avorn, a professor of medicine at Harvard Medical School, published an editorial in the American Heart Association journal *Circulation*. The purpose of the editorial was to contribute to what the author described as a "discussion about how to repair the drug evaluation process." Dr. Avorn commented

specifically on the Vioxx case in the editorial. What he wrote in one comment is particularly noteworthy:

> In the case of rofecoxib . . . [t]here were already ample signals in preapproval studies of possibly increased cardiovascular risk and even a documented (and statistically significant) 5-fold increase in myocardial infarctions rates in a trial published soon after marketing began. The problem was not that these risks were not detected early enough; it was that they were not acted on appropriately, by the manufacturer or by the FDA, once they were noted.

## IX.   Conclusions

185.   In June 2005, the New England Journal of Medicine published a commentary by Congressman Henry Waxman, whose committee in Congress held hearings prompted by the history of Vioxx into the occurrence of serious safety issues in association with approved medicines. [18]

186.   Mr. Waxman began by noting that in 2000 the VIGOR study had shown that Vioxx was associated with four times as many myocardial infarctions as naproxen. Yet Vioxx remained on the market for four more years with robust sales eventually exceeding 100 million prescriptions. The committee wanted to understand how this could have happened.

187.   In the commentary, Mr. Waxman focused on marketing practices of pharmaceutical companies and Merck, in particular, which directed its "sales force to provide clinicians with a distorted picture of the relevant scientific evidence."

188.   Merck told sales people not to discuss the VIGOR trial when physicians inquired about it. It created a "Cardiovascular Card" which provided a misleading picture of the evidence on Vioxx.

189.   It required sales representatives to show doctors only scientific study results that provide "solid evidence as to why [doctors] should prescribe Merck products." The company hired medical opinion leaders to speak at medical education meetings to provide favorable views of Merck products. It counseled sales people to use subliminal sales techniques on doctors.

190.   In reviewing documents for my report, I saw examples of the practices Mr. Waxman described. Repeatedly Merck's scientific presentations and press releases distorted the causation of myocardial infarctions and other cardiovascular/thrombotic events, asserting that they were reduced by naproxen rather than caused by Vioxx.

191.   In the end, Merck withdrew Vioxx from the market. A second clinical trial was halted before completion because the data showed an increased risk of serious cardiovascular events, including heart attacks and strokes, in patients taking Vioxx." [17]

192.     Prior to the withdrawal, Vioxx's huge sales numbers had shown that the Merck sales force had been successful.  The company's effort to convince doctors that Vioxx was safe succeeded.  In consequence, it is certain that many patients suffered severe cardiovascular thromboses unnecessarily, and many of those patients died. [16, 0.1, 86]

The opinions herein are expressed to a reasonable degree of certainty, based on generally accepted principles of drug safety, evaluation, and review.  As further information becomes available to me, I will revise and add to my opinions as appropriate.

_____

Richard M. Kapit, M.D.

# APPENDIX -- ENDNOTE REFERENCES

## APPENDIX- ENDNOTE REFERENCES

| End Note No. | Document | Author/Source | Date |
|---|---|---|---|
| 0.1 | Timeline: Sequence of events with Vioxx since opening of IND | FDA for Adv Cmte. 2005 | |
| 1.0 | Summary of Benefits and Risks | Merck | 3/26/99 |
| 2.0 | NDA 21-042 Vioxx Osteoarthritis Medical Officers Review EXCERPTS ONLY | M. Villalba, MD, FDA | 5/30/99 |
| 4.1 | Merck to J Bull, Act. Dir, DAAODP | Merck | |
| 5.0 | Cardio-Renal (HFD-110) consult on rofecoxib | S. Targum, MD, HFD-110 | 2/01/01 |
| 6.4 | Cardio-Renal review for package | FDA- S. Targum, MD, HFD-110 | 2/08/01 |
| 7.0 | Warning Letter from FDA to Merck re advertising | FDA- T. W. Abrams, Director, DDMAC | 9/17/01 |
| 15.0 | Interim Review of NDA 21-042 re Alzheimer studies | L. Villalba, MD, FDA | 12/18/04 |
| 16.0 | Article: Risk of acute myocardial infarction and sudden cardiac death wth Use of Cox-2 selective and nonselective NSAIDS | Graham et al. Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study. | 2/5/05 |
| 17.0 | Public Health Advisory on W/D of Vioxx | FDA | 9/30/04 |
| 18.0 | The Lessons of Vioxx - Drug Safety and Sales | Henry A Waxman, JD, D.-Calif., in NEJM | 6/23/05 |
| 52.0 | Merck's rejection of FDA label changes | | 11/06/01 |
| 54 | FDA information request re: NDA 21-042/S-007 | NDA 21-042/S-007 VIGOR (Amendment for Labeling) | 11/27/00 |
| 55.0 | FDA information request re: NDA 21-042/S-007 | | 2/14/01 |
| 56.0 | FDA information request re: NDA 21-042/S-007 | | 2/28/01 |
| 57.0 | FDA information request re: NDA 21-042/S-007 | | 3/30/01 |
| 58.0 | Approvable letter for S-007 | | 4/06/01 |
| 59.0 | Email Scolnick->Gilmartin (Merck) | | 1/31/01 |
| 60.0 | Email Reicin -> Nies (Merck) | | 3/28/00 |
| 63.0 | Press Release - Favorable cardiovascular safety profile of | | 5/22/01 |

# APPENDIX- ENDNOTE REFERENCES

| End Note No. | Document | Author/Source | Date |
|---|---|---|---|
| | Vioxx | | |
| 71.0 | Tab 78 - Red # 71 on disk | | 8/30/01 |
| 76.0 | Press release of preliminary results of VIGOR | | 3/27/00 |
| 78.0 | Prepared statement of Gilmartin to Senate Cmte on Finance | | 11/18/04 |
| 82.0 | Vioxx: A Scientific Review | E. Scolnick, Vioxx project director at Merck | 1/01/05 |
| 84.0 | Press Release - Merck stands behind the cardiovascular safety profile of Vioxx. | | 8/21/01 |
| Reg 1 | Guidance: Changes to an Approved NDA | FDA CDER | 11/1/99 |
| Reg 2 | Guidance: Changes to an Approved NDA | FDA CDER | 4/1/04 |
| 142.0 | NDA Vol. 1.94 Clinical Sections | Merck | 11/23/98 |
| 145.0 | Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids | Catella-Lawson, F, et al. | 5/1/99 |
| 146.0 | Study 023 CSR, of urinary sodium excretion and other renal parameters. NDA vol 1.115 | Merck | 11/23/98 |
| 158a | Label Proposal | Merck | 3/16/01 |
| 176 | U.S. Long Range Operating Plan | Merck | 7/12/01 |
| 194 | 2001 Profit Plan for Vioxx | Merck | 9/1/00 |

# ATTACHMENT A -- CURRICULUM VITAE

# CURRICULUM VITAE

*Name:* **Richard M. Kapit, M. D**.
Company:   **MD-Writer®, LLC**
*Address:*   **P.O. Box 1, Garrett Park, MD 20896**

## CHRONOLOGY OF PROFESSIONAL EXPERIENCE AND EDUCATION

2002-Present    President, MD-Writer, LLC:  Research, preparation, and composition of medical and scientific articles for newspapers, magazines, and other publishers; consulting on matters related to pharmaceuticals and their adverse effects.

Consultation on pharmaceutical-associated risks and adverse drug reactions to physicians, lawyers, and companies. Forensic testimony. Consultation and deposition in Baycol litigation, Paxil litigation, Zoloft litigation, and consultation and testimony in South Carolina v. Pittman, North Carolina v. Hall.

1991-2002    Division of Epidemiology, Office of Biostatistics and Epidemiology, Center for Biologics Evaluation and Research, Food and Drug Administration, Rockville, MD 20852

*Medical Officer, GS-15, Therapeutics and Blood Safety Branch: Evaluation and analysis of adverse drug reactions of licensed biological medicines and vaccines.*

Adverse events are received through the MedWatch program and the Vaccine Adverse Event Reporting System (VAERS), the Center's Office of Compliance, the Center's product and clinical reviewers, and the scientific literature. I have reviewed adverse reactions related to interferons, thrombolytics, immunoglobulins, and monoclonal antibodies. For several years, I supervised the work of three adverse event reviewers who analyzed several thousand non-vaccine adverse event reports each year. My work related to vaccines included analysis of adverse events associated with DTP, DTPH, and lot-specific reporting patterns.

Major initiatives:
- Developed system for monitoring and reviewing non-vaccine adverse events, and created and led for three years a team of reviewers for these adverse events.
- Developed system for monitoring lot-specific reporting rates for vaccines.
- Developed methods for comparing adverse event reporting rates among vaccines and completed comparison of DTP and DTPH vaccines.
- Developed vaccine-related tables and procedures for estimating lot consumption.
- Initiated program to develop reference tables describing the Vaccine Adverse Event Reporting System.

- Developed Quarterly Reports to keep clinical reviewers aware of adverse events reporting in association with their products.
- CBER representative (1995-96) to the International Conference on Harmonization of Requirements for Registration of Pharmaceuticals for Human Use, topic E2. Negotiated with representatives of the European Union and Japan on harmonizing postmarketing surveillance of adverse events related to drugs and biologics.
- Member of CBER's Fraud Policy Working Group (1991-92), I participated in investigations of problematic biologic licensing applications.

<u>1990-1991</u>     Medication Development Division; National Institute on Drug Abuse; Alcohol, Drug Abuse and Mental Health Administration, Rockville, MD 20857.

*Medical Officer, GS-15, Clinical Trials Branch: Development of medications to treat substance abuse.*

- Project officer for the development of buprenorphine, a new opiate-agonist substitution treatment for opiate addiction. Planned buprenorphine development program, designed two clinical trials, including a 400-subject multicenter potentially pivotal dose-comparison efficacy and safety study. Coordinated the work of pharmaceutical manufacturers, investigators, and NIDA staff in executing this project.
- Initiated plans to study a bupropion as a new treatment for cocaine abuse, including allocation of clinical trial resources, and development of clinical trial design.
- Negotiations with several pharmaceutical manufacturers to study proprietary compounds for cocaine abuse.
- Project officer on other contracts and interagency agreements for executing clinical trials of pharmacological agents intended to treat patients with substance abuse disorders.
- Participated in design and initiation of drug abuse research units at the Washington VA Medical Center and at other VA medical facilities.
- Established relationship with Polish medical authorities as part of initiative to establish cooperative research relationships in the drug abuse field with governments of Eastern Europe and the Soviet Union.
- Project officer on survey of U.S. pharmaceutical manufacturers to ascertain nature and amount of research into drugs to treat mental illnesses.

<u>1984-1989</u>     Division of Neuropharmacological Drug Products, Office of Drug Evaluation I, Center for Drug Evaluation and Research, Food and Drug Administration, Rockville, MD 20857.

*Clinical Reviewer, GS-15, Psychopharmacology Group: Medical review of new drug applications.*

Reviewed applications to FDA for new antidepressants, antimanics, neuroleptics, antianxiety

agents, and hypnotics.  Work included review of new drug applications (NDAs), investigational new drug applications (INDs), and adverse drug experiences.

Reviewed more than 100 IND applications, and regulated the investigational development and/or post-marketing experience of about 50 drugs.
- Medical reviewer  of Prozac, first of a new class of antidepressants, the serotonin selective re-uptake blockers.
- Medical reviewer of Clozaril, the first antischizophrenic neuroleptic drug considered uniquely superior in the treatment of chronic schizophrenia.
- Medical reviewer of estazolam, a hypnotic agent.  This NDA review was used as a model for new reviewers in the Center for Drug Evaluation and Research.

<u>1980-1984</u>      Forensic psychiatry, private practice, Washington DC  and Maryland.

<u>1979-1984</u>      Bureau of forensic psychiatry, Department of Human Services, Government of the District of Columbia, Washington DC 20001.
*Staff Psychiatrist, GS-15:  Forensic evaluation and psychiatric treatment.* Performed psychiatric evaluation and treatment of persons involved in the federal and local criminal courts in the District of Columbia.
- Evaluated competency and criminal responsibility of defendants in local and federal criminal trials.
- Evaluated and treated defendants, prisoners, parolees, and probationers.
- Consultation to local board of parole.
- Testified in federal and local courts more than 100 times.

<u>1977-1980</u>      Psychiatrist, in private practice in Northern Virginia.
- Inpatient treatment of psychiatric patients at Fairfax Hospital, Arlington Hospital, and the Dominion Psychiatric Treatment Center.
- Outpatient office in McLean, VA.

<u>1975-1977</u>      Psychiatry Service, Washington Veterans Administration Medical Center, Washington, DC 20457.
*Staff Psychiatrist, GS-15.* Medical officer in charge of inpatient psychiatric unit. Work included charge of an inpatient psychiatric unit, and teaching of residents and medical students from Georgetown, Howard and George Washington Universities.

<u>1975-1977</u>      Department of Psychiatry, Georgetown University School of Medicine, and Department of Psychiatry, George Washington University Medical School Department of Psychiatry.
*Clinical Instructor.*  Supervised and taught residents and medical students rotating throught the VA Hospital.

<u>1972-1975</u>      National Institute of Mental Health, Overholser Division of Training and Research, St. Elizabeths Hospital, Washington, DC 20032.
*Resident in Psychiatry.*  Training for 3 years in inpatient and outpatient psychiatry, child psychiatry,

4

and community mental health.  As senior resident, I was in charge of an acute admissions psychiatric service, and supervised 3 first year residents.

| 1972-1973 | National Institute of Mental Health, Overholser Division of Training and Research, St. Elizabeths Hospital, Washington, DC 20032 *Intern.* Medicine, neurology and psychiatry. |

1972-1973   National Institute of Mental Health, Overholser Division of Training and Research, St. Elizabeths Hospital, Washington, DC 20032 *Intern.* Medicine, neurology and psychiatry.

1967-1972   New York University School of Medicine, New York, NY 10016. MD degree.

1963-1967   Columbia College, Columbia University, New York, NY 10027. B.A. degree. Major and minor subjects were chemistry and mathematics.

AWARDS
1994 FDA Cash Award
1994 FDA Commendable Service Award
1995 FDA Group Recognition Award for MedWatch

EPIDEMIOLOGY
1994-1996   Johns Hopkins University School of Hygiene and Public Health, Master of Public Health program: Courses in epidemiology, public health, and statistics.  40 credits.

OTHER EDUCATION
2003-2004   University of Maryland, communications major (journalism).
1984-1989   George Washington and American Universities and the Foundation for Advanced Education in the Sciences. Biology, mathematics, statistics and physics.
1977-1979   Washington Psychoanalytic Institute. Psychoanalysis and training analysis.

LICENSE:   Maryland, licensed to practice medicine current and in good standing.

CERTIFICATION:   National Board of Psychiatry and Neurology, 1978.

PROFESSIONAL SOCIETIES:
American Academy of Pharmaceutical Physicians
American College of Clinical Pharmacology
International Society of Pharmacovigilance
International Society of Pharmacoepidemiolgy
Crohn's and Colitis Foundation of America
American Medical Writers Association
D.C. Science Writers Association
FDA Alumni Association

COMMUNITY ORGANIZATIONS:
Past President, Garrett Park Citizens Association;  member, Garrett Park Oral History Project; referee, Montgomery County Swim League; member, The Writer's Center, Bethesda, MD.

PUBLICATIONS AND PRESENTATIONS

1       Joh TH, Kapit R, Goldstein M.  A kinetic study of bovine adrenal tyrosine hydroxylase, *Biochim. Biophys. Acta*, 171:378-80, 11 Feb 1969, Cit. no. 3523766

2       Kapit RM.  Schizophrenia and Tardive Dyskinesia: Is schizophrenia also a denervation hypersensitivity?, *Medical Hypotheses*, 3:207-210, Sep-Oct, 1977

3       Shapiro T, Kapit R.  Linguistic Negation in Autistic and Normal Children, *J. Psycholing. Research*, 7:337-51, Sep 1978

4       Kapit R.  Corporal Punishment and the Court, *Am. J. Orthopsychiatry*, 48:185-86, Jan 1978

5       Prandoni JR, James GC, Kapit RM, Jones JM, Ridley BA.  The use of an Interagency Team Approach and Mental Health Referral Criteria to Improve the Effectiveness of Pre-Parole Mental Health Evaluations, *J. Offender Counseling, Services, and Rehabilitation*, 9:5-18, 1985

6       Scribner CL, Kapit RM, Phillips ET, Rickels NM, Aseptic Meningitis and Intravenous Immunoglobulin Therapy, *Annals of Internal Medicine*, 121(4): 305-306 (15 August 1994)

7       Gaines A, Varricchio F, Kapit R, Pierce L. Renal Insufficiency and Failure Associated with Immune Globulin Intravenous Therapy -- United States, 1985-1998, *MMWR Weekly*, 48(24):518-521 (June 25, 1999)

8       Epstein JS, Gaines A, Kapit R, Pierce R, Potter R, Varricchio F. Important Drug Information: Immune Globulin Intravenous (Human), *International Journal of Trauma Nursing*, 5:139-40 (October-December 1999)

Presentations

Phase I Trials: Is It Better to Use Patients or Normal Volunteers?  Presented at Joint Meeting, Society for Clinical Trials and International Society for Clinical Biostatistics, Brussels, Belgium, July 8-12, 1991

Association of Thrombolytic Agents and Adverse Embolic Events: A review and evaluation of adverse biologic experience reports.  Presented at Annual Meeting, FDA Chapter Sigma Xi, Bethesda, MD, May 21-22, 1992

Components of FDA Monitoring of Adverse Events Reported to the Vaccine Adverse Event Reporting System (VAERS): Quantitative assessment of lot-specific reporting rates at weekly meetings, and monthly scientific meetings. Presented at the Vaccine and Related Biologic Products Advisory Committee, meeting at Rockville, MD, August 24, 1994; and at the Advisory Committee on Childhood Vaccines Meeting at Rockville, MD on September 28, 1994.

Tracking and Evaluating Post-Marketing Adverse Biologic Event Reports at CBER.  Presented at PhRMA Education and Research Institute Meeting at Bethesda, MD, October 18, 1994.

Biologic Adverse Event Reporting Programs.  Presented at Regulatory Affairs Professionals Society Meeting at Washington, DC, October 24, 1994.

New Developments in Vaccine Safety Monitoring.  Presented at the 29th National Immunization Conference, Los Angeles, May 18, 1995.
CBERꞨs New Regulations for Postmarketing Adverse Event Reports.  Presented at the PhRMA Education and Research Institute, Washington, DC, June 13, 1995
CBERꞨs Final Rule for Adverse Experience Reporting.  A satellite video teleconference sponsored by The Food and Drug Law Institute, Washington, DC, June 15, 1995.

Procedures and Plans for Non-Vaccine Adverse Event Review at CBER, at the FDA Epidemiology Workshop: Surveillance Systems & Strategies at FDA, January 23 and 24, 1996, Rockville, MD.

International Conference on Harmonisation (ICH) Initiatives in Postmarketing Surveillance, at the FDA Epidemiology Workshop: Surveillance Systems & Strategies at FDA, January 23 and 24, 1996, Rockville, MD.

International Conference on Harmonisation (ICH) Initiatives in Postmarketing Surveillance, presented at World Health Organization, Annual Meeting of National Pharmacovigilance Centres, September 15-18, 1996, Lisbon, Portugal.

# ATTACHMENT B -- RESUME

# RESUME OF MEDICAL AND SCIENTIFIC WRITING

Richard M. Kapit, M. D.
MD-Writer®, LLC
P.O. Box 1, Garrett Park, MD 20896
(301) 530-3602
(301) 530-3603 (fax)
kapit@md-writer.com

MD-Writer:

Freelance medical/science writing since 1997: Research, preparation, and composition of medical and scientific articles for newspapers, magazines, and other publishers; consulting on matters related to pharmaceuticals and their adverse effects.

Remunerated writing (> 20 articles published):

• More than a dozen news articles on medical developments in the U.S. published in *Australian Doctor*, a newspaper for Australian physicians.

• *Best Practice of Medicine Report* on treatment of acute psychosis, for Praxis Press.

• Articles on individual scientists at the National Institute of Arthritis, Muscle, and Skin (NIH), done for the NIAMS website.

• Articles for the Gale Encyclopedia of Mental Disorders, and the Gale reference Drugs and Controlled Substances: Information for Students.

Clinical reviewer at the U.S. Food and Drug Administration, 1984-2002:

Author of numerous reports on medical subjects, including analyses of adverse effects of licensed drugs and biological agents. In the late 1980s, I reviewed the New Drug Applications for Prozac, Clozaril, and Prosom, and I authored the Safety Reviews of these drugs.

University of Maryland University College, Communications Major (Journalism), 2003-2005

Memberships in writing organizations:

American Medical Writers Association
D.C. Science Writer's Association
The Writer's Center

# ATTACHMENT C –
# LIST OF DOCUMENTS REVIEWED

## List of Documents Reviewed

| |
|---|
| MRK-ABS0029247 |
| MRK-ABI0003291-ABI0003293 |
| MRK-AAF0002787-AAF0002788 & ACD0085388 -ACD0085390 |
| MRK-ABA0004148-BA0004184 |
| MRK-ABT0003727; ABT0003730-ABT0003865 |
| MRK-ABI0003139 – ABI0003147 |
| MRK-ABW0008822 |
| MRK-AAB0082114 |
| MRK-AAB0082120 |
| MRK-AAX0006209-AAX0006210 |
| MRK-NJ0235253-NJ0235254 |
| MRK-ACV0042342 |
| MRK-NJ0066804-NJ0066827 |
| MRK-ACD011895-ACD011896 |
| MRK-ACD0107518-ACD0107520 |
| MRK-ACD0107514-ACD017517 |
| MRK-ACD006834 |
| MRK-ABX0002309-ABX0002332 |
| MRK-ABW0018150-ABW0018165 |
| MRK-ABS0386009-ABS0386010 |
| MRK-ABI0002269-ABI0002309 |
| MRK-02420000398-02420000403 |
| MRK-ACM0000585-ACM0000593 |
| MRK-AAX0008561-AAX0008581 |
| MRK-GUE0056973-GUE0056981 |
| MRK-GUE0008582-GUE0008583 |
| MRK-ACT0018064 |
| MRK-ACR0009297 |
| MRK-AFJ0001537 |
| MRK-GUE0055263 |
| MRK-ABH0017814 |
| MRK-GUE0003399 |
| MRK-GUE0056507 |
| MRK-ABW0004799 |
| MRK-AAB0082113-AAB0082114 |
| MRK-AAB0082116-AAB0082117 |
| MRK-AAB0082119-AAB0082121 |
| MRK-ABW0001267-ABW0001269 |
| MRK-ABI0003228-ABI0003230 |
| MRK-ABW0000270-ABW0000273 |
| MRK-ABW0001202-ABW0001244 |
| MRK-ABW0001245-ABW0001248 |
| MRK-ABW0001249-ABW0001250 |
| MRK-AFI0000028, AFI0000090, AFI0000099, AFI0000104, AFI0000106, AFI0000112, AFI0000113, AFI0000115, AFI0000130, AFI0000140, AFI0000144, AFI0000145, AFI0000152, AFI0000153, AFI0000154, AFI0000157, AFI0000162, AFI0000170, AFI0000173, AFI0000175, AFI0000176, AFI0000181, AFI0000183, AFI0000184 |
| MRK-ABA0003277-ABA0003284 |

## List of Documents Reviewed

| |
|---|
| MRK-NJ0189508-NJ0189509 |
| MRK-ABI0005912-ABI0005915 |
| MRK-AAR0021110 |
| MRK-NJ0209457-NJ0209478 |
| MRK-ABH0015570 |
| MRK-AFJ0001537 |
| MRK-ABG0001226-ABG0001243 |
| MRK-NJ0265620-NJ0265656 |
| MRK-ABI0003479-ABI0003481 |
| MRK-AAR0009943-AAR0009963 |
| MRK-NJ0267715-NJ0267777 |
| MRK-ABH0019975 |
| MRK-ABH0019999-ABH0020020 |
| MRK-ACD0078494-ACD0078517 |
| MRK-ABO0000441-ABO0000445 |
| MRK-ACT0009918 |
| MRK-AAD0041209-AAD0041324 |
| MRK-ABT0015886 |
| MRK-ADB0009726-ADB0009728 |
| MRK-ABH0002230-AABH0002231 |
| MRK-ABH0002262-ABH0002266 |
| MRK-AAD0111414 |
| MRK-01420145847-01420145961 |
| MRK-I8940078840-I8940078932 |
| MRK-00420027870-00420027981 |
| MRK-ABS0027177-ABS0027179 |
| MRK-AAF0003685-AAF0003686 |
| MRK-AAF0003723-AAF0003726 |
| MRK-AAF0003831-AAF0003832 |
| MRK-0142099056-01420099059 |
| MRK-ACR0008985 |
| MRK-AFI0020394 |
| MRK-AGZ20672955-AGZ20672956 (hard to read bates numbers, may be wrong) |
| MRK-ABO0001807 |
| MRK-AGZ0026032-AGZ0026038 |
| MRK-ADH0013038 |
| MRK-ABW0003236-ABW0003344 |
| MRK-AAF0004367-AAF0004388 |
| MRK-AFV0041602-AFV0041623 |
| MRK-AFO0048433 |
| MRK-AAF0004103-AAF0004104 |
| The Vioxx Chronicles by J. Paul Sizemore/Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
| Vioxx (rofecoxib tablets and oral suspension) Label<br>NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014<br>NDA 21-052/S-004, S-005, S-006, S007, S-008, S-009 |
| VIOXX - Excerpts from primary review of NDA 21-042 – Osteoarthritis<br>Vioxx NDA 21-042/21-052 |
| FDA correspondence to Merck (4/11/2002) |
| FDA Standards – Good Enough for Government Work? by Jerry Avorn, M.D.; N Eng J Med 353;10 |

## List of Documents Reviewed

| |
|---|
| U.S. Senate Health and Education Committee Video; http://help.senate.gov/bills/hlh_66_bill.html |
| Review of NDA 21042/s030 (Update of Cardiovascular thrombotic events in Alzheimer's studies 078 and 091) |
| FDA Issues Public Health Advisory on Vioxx as its Manufacturer Voluntarily Withdraws the Product (9/30/04) (www.fda.gov/cder/drug/infopage/vioxx/defau:t.htm) |
| The Lessons of Vioxx – Drug Safety and Sales;  The New England Journal of Medicine, Vol. 352:2576, June 23, 2005, Number 25 |
| Title 21-Food and Drugs Chapter 1-Food and Drug Administration Department of Health and Human Services Subchapter C – Drugs: General |
| Depo Cut 10-22-02; 165: 1-15 |
| FDA Issues Public Health Advisory on Vioxx as its Manufacturer Voluntarily Withdraws the Product; 9-30-04 (2pgs) |
| The Merck Manual Excerpts, Sixteenth Edition |
| The Merck Manual Excerpts, Seventeenth Edition |
| Summary of Prepared Testimony Raymond V. Gilmartinl November 18, 2004 Before the United States Senate Committee on Finance |
| Merck VIOXX Timeline 1993-2011; Key dates for VIGOR and Long-term, Placebo-conrolled Studies Implemented to Provide Cardiovascular Safety Data; prepared by Merck. |
| Merck Timeline of Epidemiological Studies Involving VIOXX or NSAIDs Jan 2002-August 2004; prepared by Merck |
| Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX; Jan Weiner; Mary Elizabeth Basaman; Laura Jordan |
| Medical Officer Review; Division of Anti-inflammatory Analgesic and Ophthalmic Drug; VIOXX (5/19/99) |
| Package Insert 1999; VIOXX (rofecoxib tablets and oral suspension) |
| Package Insert 2002; VIOXX (rofecoxib tablets and oral suspension) |
| Videotaped Confidential Deposition of Edward M. Scolnick (1/30/2003) (hard copy); Circuit Court for Montgomery County, Alabama, Case No. CV 022842-MC |
| Videotaped Deposition of Edward M. Scolnick, M.D. (3/22/05) (hard copy); Carol Ernst, et al v. Merck Co., Inc., et al; Brazoria County, Texas |
| Videotaped Deposition of Edward M. Scolnick, M.D. (4/29/05) (hard copy); Superior Court of New Jersey, Atlantic County, In Re: VIOXX Litigation: Case No. 619, Philip & Cynthia Dipietro, v. Merck & Co., Inc., et al. |
| Continued Videotaped Deposition of Edward M. Scolnick, M.D. (5/17/05) (hard copy); Superior Court of New Jersey, Atlantic County, In Re: VIOXX Litigation: Case No. 619, Philip & Cynthia Dipietro, v. Merck & Co., Inc., et al. |
| Continued Videotaped Deposition of Edward M. Scolnick, M.D. (6/1/05) (hard copy); Superior Court of New Jersey, Atlantic County, In Re: VIOXX Litigation: Case No. 619, Philip & Cynthia Dipietro, v. Merck & Co., Inc., et al. |
| Evaluation for flurbiprofen for prevention of reinfarction and reocclusion after successful thrombolysis or angioplasty in acute myocardial infarction; European Heart Journal (1993) 14, 951-957 |
| Medical Officer Review; Re: Complete Response to Approvable letter for 21-042/S 007 and 21-052/S 004; (End of review date 11/28/01) |
| Sequence of Events with Vioxx, since opening of IND; 12/20/94 – 9/30/04 |
| Warning Letter; 6/27/00; correspondence to Benard J. Kelly/Merck |
| Correspondence to Ellen R. Westrick/Merck; 7/16/99 |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Safety Update report VIOXX Gastrontestinal Outcomes Research Study (VIGOR) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Amendment to Supplemental New Drug Application; 10/6/00 (1 pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for |

 List of Documents Reviewed

| |
|---|
| Information; 12/20/00 (1 pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 12/21/00 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/12/01 (1pg); (Patient Accounting Table) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/12/01; providing Interim Cardiovascular Meta-Analysis that was submitted 1/8/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/12/01; Number  (%) of Patients with Serum Creatinine Increase > 25% above baseline (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/12/01; Analysis of LFT Values Exceeding the Limits of Change (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck ; Response to FDA Request for Information; 1/15/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/17/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; Request for Teleconference; 1/19/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/19/01 (1pg); Final response to the agency's request for information from November 27, 2000 |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/19/01 (1pg) (provide cause of protocol deviation for each patient) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/19/01 (1pg) (providing narratives for patients in the ADVANTAGE study who had APTC events) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/23/01 (1pg); (Summary of Pre-Study Glucocorticoid Use in VIGOR) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/25/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; VIOXX Gastrointestinal Outcomes Research Study (VIGOR); Advisory Committee Background Package; Available for Public Disclosure without Redaction; 1/25/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/30/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 1/29/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; VIOXX Gastrointestinal Outcomes Research Study (VIGOR); Advisory Committee Background Package; MRL's Main Presentation Slides; 1/30/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; VIOXX Gastrointestinal Outcomes Research Study (VIGOR); Response to FDA Request for Information; 2/1/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; VIOXX Gastrointestinal Outcomes Research Study (VIGOR); Response to FDA Request for Information; 2/2/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 2/1/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; VIOXX Gastrointestinal Outcomes Research Study (VIGOR); Response to FDA Request for Information; 2/5/01 (1pg) |
| Correspondence to FDA from Robert E. Silverman, M.D., Ph.D./Merck; Response to FDA Request for Information; 2/6/01 (1pg) |
| MK-0966 CIB; E-37; E. Effects in Humans; 28-Sep-1994; R 09-Dec-1999 |
| Correspondence to physicians; 5/24/00 (4 pgs) |
| Correspondence to David Egilman, M.D.; 8/28/01 (4 pgs) |

List of Documents Reviewed

| |
|---|
| Cardiovascular Events Associated with Rofecoxib in a Colorectal Chemoprevention Trial (The New England Journal of Medicine 2005; 352) |
| VIOXX: A Scientific Review by Merck (35pgs) |
| Memorandum; April 6, 2005; Subject: Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk |
| FDA Advisory Committee Briefing Document (February 8, 2001) (NDA 21-042, s007 Vioxx Gastrointestinal Safety) |
| Fink and Byrns; 2004: Annals of Family Medicine, 2: 488-93 |
| |
| Deposition and Exhibits of Janet Arrowsmith-Lowe |
| February 16, 17 & 18, 2005 transcripts of the FDA Advisory Committee |
| |
| FDA Advisory Committee background information for February 16, 17 & 18, 2005.  Dated January 13, 2005 and January 21, 2005 |
| |
| Protocol 203 |
| |
| Dr. John Farquhar's report in the Plunkett case |
| April 6, 2005 Memorandum and the FDA Advisory Committee Background Information |
| FDACDER 034122- FDACDER034128 |
| MRK-NJ0000862 - MRK-NJ0000869 |
| MRK-ABC0048699 -- MRK-ABC0048706 |
| MRK-AAX0002413 - MRK-AAX0002420 |
| MRK-NJ0315892 - MRK-NJ0315892 |
| MRK-AHR0009546 |
| MRK-NJ0051533 - MRK-NJ0051534 |
| MRK-NJ0152620 -- MRK-NJ0152623 |
| MRK-ABC0002150 |
| MRK-AE10002734 - MRK-AE10002746 |
| MRK-ABS0113930 -- MRK-ABS0113930 |
| MRK-ABC0002199 - MRK-ABC0002200 |
| MRK-ABK0311068 |
| MRK-ABS0066396 - MRK-ABS0067019 |
| MRK-00420000725 - MRK-00420000767 |
| MRK-ANK0031333 -- MRK-ANK0031334 |
| MRK-I2690002707 to MRK-I2690002759 |
| MRK-AH00126891 |
| MRK-AKC0019753 -- MRK-AKC0019752 |
| MRK-AAO0000073 - MRK-AAO0000118 |
| MRK-ADL0060602 -- MRK-ADL0060607 |
| MRK-NJ0070364 to 0070416 |
| MRK-ACW0002234 --MRK-ACW0002243 |
| MRK-NJ0281966 -- MRK-NJ0281968 |
| MRK-ACD0089129 |
| MRK-AHY0263588 -- MRK-AHY0263615 |
| MRK-AHY0263622 -- MRK-AHY0263624 |
| MRK-AHY0263616 |
| MRK-AGV0113870 --MRK-AGV0113880 |
| MRK-ADG0014840 -- MRK-ADG0014842 |

List of Documents Reviewed

| |
|---|
| MRK-AF10148946 -- MRK-AF10148947 |
| FDACDER 001257 - FDACDER 001267 |
| MRK-ADW0043438 |
| MRK-ADW0043439 -- MRK-ADW0043441 |
| MRK-AF10276232 -- MRK-AF10278250 |
| MRK-01420031266--MRK-01420031268 |
| MRK-AGV0057297 - MRK-AGV0057311 |
| MRK-ACC0011057 -- MRK-ACC0011058 |
| MRK-AF10276232 |
| MRK-AAF0003775 -- MRK-AAF0003776 |
| MRK-NJ0265337 -- MRK-NJ0265337 |
| MRK-ADJ0020162- MRK-ADJ0020183 |
| MRK-AH00167042 --MRK-AH00167044 |
| MRK-AFV0341796 - MRK-AFV0341881 |
| MRK-AAX0000725 to 0000751 |
| MRK-AAX0000752 to 0000776 |
| MRK-AAX0000710 to MRK-AAX0000724 |
| MRK-ACR0009151 - MRK-ACR0009152 |
| MRK-01420099060-MRK-01420099061 |
| MRK-ADB0019480 -- MRK-ADB0019532 |
| MRK-ADO0040848 |
| MRK-ACZ0087205 -- MRK-ACZ0087206 |
| MRK-ABY0030000 to 0030030 |
| MRK-AFI0136847 -- MRK-AFI10136831 |
| MRK-AFI0134945 -- MRK-AFI0134948 |
| MRK-AAF0003986 - MRK-AAF0003988 |
| MRK-NJ0194681-MRKNJ0194682 |
| MRK-AAF0003997 - MRK-AAF0003998 |
| MRK-AAF0004013-  MRK-AAF0004014 |
| MRK-AAF0004045 |
| MRK-AJAO152274 --MRK-AJA0152275 |
| MRK-ACD0075472 -MRK-ACD0075473 |
| MRK-NJ0199449 -- MRK-NJ0199450 |
| MRK-NJ0199459 -- MRK-NJ0199460 |
| MRK-AAF0004126- MRK-AAF0004129 |
| MRK-AGU0006035 -- MRK-AGU0006086 |
| MRK-AAF0004134 -- MRK-AAF0004135 |
| MRK-ADW0003691- MRK-ADW0003703 |
| MRK-AFI0177179 -- MRK-AFI0177237 |
| MRK-ABW0008489 |
| MRK-AAF0004250 |
| MRK-AAF0004251 |
| FDAWEB000637 |
| MRK-AFV0341732 -- MRK-AFV0341732 |
| MRK-AFV0341576 - MRK-AFV0341576 |
| MRK-AAX0009235 - MRK-AAX0009257 |
| MRK-ABW0005449 - MRK-ABW0005475 |
| MRK-01420159561- MRK-01420159658 |
| MRK-ABW0008657 |

## List of Documents Reviewed

| |
|---|
| FDACDER 002364 - FDACDER 002385 |
| MRK-ABW0003742 |
| MRK-ABK0493629-MRK-ABK0493649 |
| MRK-AAF0008508 - MRK-AAF0008529 |
| MRK-ADF0048420 - MRK-ADF0048423 |
| MRK-ADY0004501 - MRK-ADY0004513 |
| MRK-ADY0004514 - MRK-ADY0004522 |
| MRK-ADY0004523 - MRK-ADY0004536 |
| MRK-I2690006161 to 0006223 |
| MRK-ABY0121832 - MRK-ABY0121833 |
| MRK-ADM0167791 -- MRK-ADM0167797 |
| MRK-AAD0268576 |
| MRK-AGI0000395 |
| MRK-AF00262446 |
| MRK-ADY0006737, MRK-ANK0001606 |
| MRK-AO0262422 - MRK-AFO0262423 |
| MRK-AF00262435 |
| MRK-ANR0011510 - MRK-ANR0011514 |
| FDACDER 023000 |
| MRK-AJA0097087 - MRK-AJA0097094 |
| MRK-S0420111978 -- MRK-SO420111985 |
| MRK-AFK04246360 |
| MRK-S0420112006 -- MRK-S0420112013 |
| 6 page Merck marketing document "Cardiovascular system : Clinical profile in Osteoarthritis Studies." |
| Appendix A to Defendant's Answers to Interrogatories -- Relates to Interrogatory Nos. 40 (a), et al |
| Selected excerpts from Vols. 1.1, 1.3, 1.53, 1.93, 1.94, 1.115, 1.116 and 1.120 of Vioxx NDA |
| Catella-Lawson et al, Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids, 289 JPET 735 (1999) |
| Whelton, Nephrotoxicity of Nonsteroidal Anti-inflammatory Drugs: Physiologic Foundations and Clinical Implications, 106 Am. J. Med. 13S-24S (1999) |
| Whelton, Renal and Related Cardiovascular Effects of Conventional and COX-2 Specific NSAIDs and Non-NSAID Analgesics, 7 Am J. Therap 63 (2000) |
| Curfman et al, Expression of Concern regarding VIGOR article |
| Responses to Expression of Concern Regarding VIGOR study |
| Eular: Osteoarthritis Drug Celebrex (Celecoxib) Less likely to cause increased Pressure than Vioxx (Rofecoxib) -- Article from pslgroup.com |
| June 29, 2000 letter from Dennis Erb to FDA with Attachment |
| ACR: Differentiating Between COX-2 Specific Inhibitors -- Article from pslgroup.com |
| Whelton, Cyclooxygenase-2-Specific Inhibitors and Cardiorenal Function: A Randomized, Controlled Trial of Celecoxib and Rofecoxib in Older Hypertensive Osteoarthritis Patients, 8 Am. J. Therap. 85 |
| White et al, Loss of Blood Pressure Control and Rates of Edema in Older Treated Hypertensive Patients following Administration of the COX-2 Specific Inhibitors Celecoxib vs. Rofecoxib, Poster Session Published in Feb. 2001 J. Am. Coll. Cardiol. |
| Merck Briefing Document for Feb. 2001 Advisory Comm. Mtg. |
| FDA Advisory Committee Background information Presented to Arthritis Advisory Committee (VIGOR Study) in Feb. 2001 |
| MRK AGV0096271 to MRK AGV0096274 |
| Gertz et al, A Comparison of Adverse Renovascular Experiences Among Osteoarthritis Patients Treated with Rofecoxib and Comparator Non-Selective Non-steroidal Anti-inflammatory Agents, 18 Current Med. Res. and |

## List of Documents Reviewed

| |
|---|
| Opinions 82 (2002) |
| Geba et al, Efficacy of Rofecoxib, Celecoxib, and Acetaminophen in Osteoarthritis of the Knee - A Randomized Trial, 287 JAMA 64 (2002) |
| White et al, Effects of Celecoxib on Ambulatory Blood pressure in Hypertensive Patients on ACE inhibitors, 39 Hypertension 929 (2002) |
| Frishman et al, Effects of Nonsteriodal Anti-Inflammatory Drug Therapy on Blood Pressure and Peripheral Edema 89 (supp) Am J. Cardiol 18D (2002) |
| Schwartz et al, Comparison of rofecoxib, celecoxib, and naproxen on renal function in elderly subjects receiving a normal-salt diet, 72 Clin. Pharmacol Ther 50 (2002) |
| Qi et al, Opposite effects of cyclooxygenase-1 and -2 activity on the pressor response to angiotensin II, 110 J. Clin. Invest. 61 (2002) |
| Whelton, Effects of Celecoxib and Rofecoxib on Blood Pressure and Edema in Patients > or = 65 years of Age with Systematic Hypertention and Osteoarthritis, 90 Am J. Cardiol. 959 (2002) |
| Jan. 31, 2003 Operations Review for Vioxx |
| Department of Health and Human Services regarding "FDA's Review Process for New Drug Applications: A Management Review" |
| November 19, 2004 Deposition Transcript of Dr. Robert E. Silverman |
| Fuster et al, Atherothrombosis and Coronary Artery Disease-2nd Edition (Excerpt) |
| FDA summary minutes for February 16, 17, 18 2005 |
| Background Package for FDA Meeting on the Potential Reintroduction of VIOXX to the US Market -- March 15, 2005 |
| Response of Defendant Merck & Co., Inc. to Plaintiff's Steering Committees First Set of Interrogatories to Defendant Merck & Co., Inc. |
| Excerpt from Anstice Testimony in Humeston trial --Transcript Pages: 1987, 2016, 2017 |
| Excerpt from Reicin Testimony in Humeston trial -- Transcript Pages 3366; 3522-3526 |
| Highlights of Drug Safety: Improvement Needed in FDA's Postmarket Decision-making and Oversight Process Report; www.gao.gov/cgi-bin/getrpt?GAO-06-402 |
| GAO report to Congressional Requesters: Improvement Needed in FDA's Postmarket Decision-making and Oversight Process |
| Curfman et al, Expression of Concern Reaffirmed |
| Trial Testimony of Dr. Alise Reicin in Cona case |
| Lurie et al, Financial Conflict of Interest Disclosure and Voting Patterns at Food and Drug Administration Drug Advisory Committee Meetings, 295 JAMA 1921 (2006). |
| Levesque et al, Time variations in the risk of myocardial infarction among elderly users of COX-2 inhibitors, 174 CMAJ -- On Line |
| Avorn, Editorial: Evaluating Drug Effects in the Post-Vioxx World : There must be a better Way, 113 Circulation 2173 (2006) |