1          REPORTER'S NOTE:  Since this
deposition has been realtimed and is in
2     rough draft form, please be aware that
there is a discrepancy regarding page and
3     line numbers when comparing the realtime
screen, the rough draft, rough ASCII, and
4     the final document.
5          Also please be aware that the
realtime screen and the unedited, rough
6     draft transcript may contain untranslated
steno, an occasional reporter's note, a
7     misspelled proper name, and/or
nonsensical English word combinations.
8     All such entries will be corrected on the
final, certified transcript.
9
          We, the party working with
10    realtime, understand that if we choose to
use the realtime rough draft screen, or
11    printout, that we are doing so with the
understanding the rough draft is an
12    uncertified copy.
13         The realtime rough draft may be
used in place of or in addition to our
14    notes taken during testimony.
15         We further agree not to share,
give, copy, scan, fax, or in any way
16    distribute this realtime rough draft in
any form (written or computerized) to any
17    party.  However, our own experts,
co-counsel, and staff may have limited
18    internal use of same with the
understanding that we agree to destroy
19    our realtime rough draft and/or any
computerized form, if any, and replace it
20    with the final transcript and/or any
computerized form, upon its completion.
21
CASE CAPTION:  In Re:  Vioxx
22    CIVIL ACTION NO.:
DEPOSITION OF:  RICHARD M. KAPIT, M.D.
23    TAKEN ON:   Monday, June 19, 2006
24

**Page 2**

Page 2 is blank (lines 1-24 numbered only).

**Page 4**

1    MR. BLACK:  Whatever your
2  memory is.  This is --
3    THE WITNESS:  I've been
4  deposed once.  Maybe I was deposed
5  twice.
6    MR. BLACK:  We'll state for
7  the record there have been two
8  depositions.  There was one in
9  September or October of last year
10  and one, I think, in February.
11 BY MR. ROTHMAN:
12    Q.   You had one deposition in
13 September of 2005 with Mr. Peter could
14 you ski.  Is that the one you remember?
15    A.   Oh, yes, I do remember being
16 disposed by him.
17    Q.   And Mr. I say mal deposed
18 you again just before the Plunkett trial
19 in February.  Do you remember that?
20    A.   Not so well.  I'll take your
21 word for it.
22    Q.   Okay.  But it's fair to say
23 in any event that you understand how a
24 deposition works?

**Page 3**

1
2         [!WITNESS],
3    after having been first duly
4    sworn, was examined and testified
5    as follows:
6
7         EXAMINATION
8
9  BY MR. ROTHMAN:
10    Q.   Good morning, Dr. Kapit.
11    A.   Good morning.
12    Q.   We haven't melt before, have
13 we, sir?
14    A.   No, we have not, I don't
15 think.
16    Q.   Okay.  My name is Seth
17 Rothman.  I'm one of the lawyers
18 representing Merck and I'm going to be
19 asking you questions here today.  Okay?
20    A.   Okay.
21    Q.   You've been deposed twice
22 before in the Vioxx litigation; is that
23 right?
24    A.   Twice?

**Page 5**

1    A.   Yes, I do.
2    Q.   Okay.  If you need a break
3  at any time, just let me know and I'm
4  happy to try to accommodate you.
5    A.   Fine.  Thank you.
6    Q.   If you don't understand any
7  of my questions or need a clarification
8  of some sort, just ask me and I'll try to
9  make the question clearer.  Okay?
10    A.   Fine.  Thank you.
11    Q.   If you answer the question,
12 I'll assume you understood it.  Fair
13 enough?
14    A.   Okay.
15    Q.   I'll ask you to answer
16 verbally as opposed to nodding your head
17 so the court reporter can take it down.
18    A.   Right.
19    Q.   If you let me finish my
20 question before you start giving an
21 answer and I'll try to do the same for
22 you, that will also make it much easier
23 for our court reporter.
24    A.   Okay.

Page 6

1    Q.   Is there any reason that you
2  can't testify to the best of your ability
3  here today?
4    A.   No. I'm fine.
5    Q.   Okay. You're not ill or on
6  any medication that would impair your
7  ability to testify?
8    A.   No.
9    Q.   First I'd like to start by
10  updating some of the information that
11  you've already given us. Okay?
12    A.   Objection fine.
13    Q.   Is your address still 10507
14  Weymouth Street, Apartment 203, Bethesda,
15  Maryland?
16    A.   That's right.
17    Q.   Is that your residence
18  address?
19    A.   That is my residence
20  address, yes.
21    Q.   Do you have any other
22  residence address?
23    A.   No, not at the moment.
24    Q.   Have you had other

Page 7

1  residences?
2    A.   Only one at a time thus far.
3    Q.   How long have you been
4  living at Weymouth Street?
5    A.   Since 2002.
6    Q.   Now, you have a business,
7  right?
8    A.   Yes.
9    Q.   And the name of your
10  business is MD Writer, Inc.?
11    A.   LLC.
12    Q.   LLC. Do you operate that
13  business out of the apartment on Weymouth
14  Street?
15    A.   Yes, I do. But it has a
16  different address.
17    Q.   What's the address of the
18  business?
19    A.   The address of the business
20  is Post Office Box 1, Garrett Park,
21  G-A-R-R-E-T-T, Park, Maryland 20896.
22    Q.   Are there any employees of
23  MD Writer, LLC?
24    A.   Me.

Page 8

1    Q.   Just you?
2    A.   Just me.
3    Q.   What's the business of MD
4  Writer, LLC?
5    A.   Medical and bioscience
6  writing and consulting.
7    Q.   Does it cover your
8  consulting for litigation?
9    A.   Yes, it does.
10    Q.   As in this case?
11    A.   You go huh.
12    Q.   How much of your income is
13  derived from MD Writer, LLC?
14    A.   I guess about 60 percent.
15  The other --
16        MR. BLACK: Objection.
17    Form. Go ahead and answer, if you
18    want to.
19        THE WITNESS: The other
20    amount is from my federal
21    retirement.
22  BY MR. ROTHMAN:
23    Q.   Okay. So other than your
24  retirement income from the federal

Page 9

1  government, a hundred percent of your
2  earned income comes from your litigation
3  consulting work?
4    A.   At the present time. I have
5  earned money writing, but at the present
6  time it's all coming from litigation,
7  yes.
8    Q.   Okay. And that hasn't
9  changed since you gave your deposition in
10  September of 2005?
11    A.   That's right, yes.
12    Q.   As of your September
13  deposition, I think you told us you had
14  spent about 90 hours on the Vioxx
15  litigation. Do you recall that?
16    A.   Yes.
17    Q.   In terms of hours, what are
18  you up to today?
19    A.   I didn't check that. And I
20  have no idea at this point. I can look
21  that up, if you want, but I don't know
22  offhand.
23    Q.   Your rate is still $250 an
24  hour?

Page 10

1     A.   250 an hour.
2     Q.   Do you charge differently
3  when you testify?
4     A.   I charge 250 an hour
5  straight for everything I do, no matter
6  what it is.
7     Q.   Including trial?
8     A.   Including trial.  Including
9  carrying boxes up to law offices.
10     Q.   So as of September 2005, I
11  think you were up to about 22 thousand or
12  $23,000?
13     A.   Right.
14     Q.   That you had made on the
15  Vioxx litigation?
16     A.   Right.
17     Q.   Do you know what you're up
18  to today?
19     A.   I would guess it's in the
20  30s.
21     Q.   Okay.  Did you bring your
22  billing records with you to today's
23  deposition?
24     A.   Yes, I did.  I didn't

Page 11

1  bring -- I believe I have my statements
2  here, but I'm not completely sure.  What
3  I do have here definitely is a time sheet
4  that shows all my hours and you can just
5  multiply it by 250 to get the total.
6     Q.   Okay.  And is that in the
7  box that's behind Mr. Black?
8         MR. BLACK:  Objection.
9         THE WITNESS:  The time sheet
10     would be on one of the CDs that
11     you are going to get.
12  BY MR. ROTHMAN:
13     Q.   Okay.  Just for the record,
14  you've brought with you some of your
15  materials on CD-ROM that your counsel is
16  going to be reviewing and then turning
17  over to us eat hard copies or electronic
18  copies; is that right?
19         MR. BLACK:  Well, I will
20     state that there are six or
21     seven -- let me count -- six CDs
22     that Dr. Kapit brought with him
23     today.  There are also hard copies
24     of other documents, but there are

Page 12

1     the six CDs.  I believe that some
2     of the CDs contain material that
3     is either not responsive to the
4     deposition notice or which
5     pursuant to agreement among
6     counsel are not the type of
7     information that we have to
8     produce.  So we have to review
9     those CDs before I can turn them
10     over to you.  We'll give them to
11     you in electronic form.
12         While we're on the subject,
13     to the extent that you want copies
14     of the materials that Dr. Kapit
15     has brought with him today, there
16     is one box where the documents
17     have been marked in a particular
18     way, and he wants to make sure
19     that that system of marking is
20     retained.  So if you want copies
21     of those, what we'd ask you to do
22     is perhaps on the first break,
23     take a look at the documents, we
24     can identify which ones they are

Page 13

1     that he feels this way about them,
2     we'll make arrangements to get
3     those copied here so he can take
4     those back with him rather than
5     send them out for copying.  The
6     rest we can get copied later.  But
7     I'll leave it to you to take care
8     of the logistics as you see fit.
9         MR. ROTHMAN:  Okay.  Thank
10     you for that explanation.
11  BY MR. ROTHMAN:
12     Q.   Doctor, when did you turn
13  your CD-ROMs over to Mr. Black?
14     A.   About ten minutes, 15
15  minutes ago.
16     Q.   Okay.
17         MR. ROTHMAN:  We might as
18     well mark this as 1.
19         (Whereupon, Deposition
20     Exhibit No. Kapit-1, DESCRIPTION,
21     was marked for identification.)
22  BY MR. ROTHMAN:
23     Q.   Doctor, I marked as
24  Exhibit 1 the Amended Notice of

Page 14

1    Deposition of Richard Kapit in this case.
2         Have you seen this notice
3    before, Exhibit 1?
4         A.   No.
5         Q.   Have you seen the prior
6    Notice of Deposition in this case for
7    your deposition?
8         A.   I probably did.
9         MR. BLACK:  I want to --
10   well, not object but state by way
11   of clarification that per your
12   request, Attachment A, Dr. Kapit
13   can confirm this, if you take a
14   look at Attachment A, was faxed to
15   Dr. Kapit as per your request.
16        THE WITNESS:  Oh, yes.  Now
17   I realize that I did see this
18   because I looked at this in terms
19   of what I had to bring.  I just
20   didn't really pay much attention
21   to the first page and that's the
22   reason I didn't recognize it.
23   BY MR. ROTHMAN:
24        Q.   But you did see Attachment

Page 15

1    A?
2         A.   I certainly did see the list
3    of attachments.
4         Q.   Okay.  And did you collect
5    documents --
6         A.   According to those lists.
7    Everything I believe I was able to judge
8    is listed on these 5 points.
9         Q.   What did you do to search
10   for those documents?
11        A.   I have two sets of files.
12   One basically is electronic files that
13   are all in a single folder on my
14   computer.  And I have all these boxes of
15   documents.  And as far as the paper
16   documents, I just brought all the boxes.
17   And as far as the contents of the files,
18   I believe I just copied everything in
19   those -- in that folder onto CDs.
20        Q.   Did you search for e-mail?
21        A.   Yes, I did.
22        Q.   With plaintiff's counsel?
23        A.   Yes.  I have a -- I'm sorry.
24   Did I interrupt you.

Page 16

1         Q.   The court reporter is
2    smiling because you tend to jump in a
3    little fast.
4         A.   I know.  And it's a bad
5    habit.  And just tell me when I'm doing
6    that and I'll try to stop.
7         Q.   Okay.  You just did it
8    again.
9         A.   You know, I realized I just
10   did it again when you said that.  So I'm
11   sorry.  It's a bad habit and I will try
12   my best.  But you will probably have to
13   remind me repeatedly and I will do my
14   best and I will not be upset if you
15   remind me a lot.  I'm aware of this
16   problem and I am sorry that it exists and
17   I will do my best not to do that.
18        MR. BLACK:  You know, before
19   we go any further, did you keep --
20   BY MR. ROTHMAN:
21        Q.   Other than drafts of your
22   expert report, are there any Vioxx
23   documents you chose not to bring with you
24   today?

Page 17

1         A.   I don't think so.
2         MR. BLACK:  Objection.
3    Form.
4    BY MR. ROTHMAN:
5         Q.   Are your billing records up
6    to date?
7         MR. BLACK:  Objection.
8    Answer, if you can.
9         THE WITNESS:  The
10   spreadsheet that you will see,
11   which includes all my time, is up
12   to date with the exception perhaps
13   of the last day or two.
14   BY MR. ROTHMAN:
15        Q.   And have you actually billed
16   the plaintiffs for the time that you've
17   accumulated?
18        A.   Up until -- I don't believe
19   I've billed for anything happening in
20   June yet.
21        Q.   So you're current up to the
22   end of May?
23        A.   Yes.
24        Q.   And have you been paid up to

Page 18

```
 1   the end of May?
 2       A.   No.
 3       Q.   Okay.  How much is
 4   outstanding?
 5       A.   At this point, about five to
 6   $6,000.  Well, that doesn't include the
 7   time for June.  But the bill that's
 8   outstanding is about five or 6,000.
 9       Q.   At your September
10   deposition, you told us you were pursuing
11   a degree in journalism at the University
12   of Maryland?
13       A.   Yes.
14       Q.   Are you still doing that?
15       A.   I certainly am.
16       Q.   And where does that stand?
17       A.   Right now I'm in the middle
18   of a very interesting course in
19   communication law actually.  I'm really
20   amazed about how fascinate I've become
21   about the problems you lawyers deal with.
22   So that's probably -- I think I have
23   about two or three courses to do before I
24   graduate.
```

Page 19

```
 1       Q.   And other than the course
 2   work that you're taking in pursuit of the
 3   journalism degree, have you taken any
 4   other courses since your September
 5   deposition?
 6       A.   Any other courses of any
 7   kind in.
 8       Q.   Of any kind.
 9       A.   I'm take going French
10   courses.
11       Q.   Okay.  Anything else?
12       A.   I think French and
13   journalism is about it.
14       Q.   And you're a licensed
15   physician; is that right, Doctor?
16       A.   Yes.
17       Q.   Are you still licensed in
18   the state of Maryland?
19       A.   Yes.
20       Q.   Are you licensed in any
21   other state?
22       A.   No.
23       Q.   Anywhere else?
24       A.   No.
```

Page 20

```
 1       Q.   Since your September 2005
 2   deposition, have you practiced medicine?
 3       A.   No.
 4       Q.   So it's still the case that
 5   you haven't actively practiced medicine
 6   since 1984; is that right?
 7       A.   Yes.
 8       Q.   And it's still the case that
 9   you've never prescribed a COX-2 inhibitor
10   or a non-selective NSAID to a patient,
11   right?
12       A.   No, I have not.
13       Q.   Just so we're clear, you've
14   never prescribed a COX-2 inhibitor to a
15   patient; is that right?
16       A.   Written out a prescription,
17   no.  I mean, I may have told friends or
18   relatives to take a COX-2.  No, not a
19   COX-2.  A non-selective.
20       Q.   Okay.  But you've never
21   prescribed a COX-2 inhibitor?
22       A.   No.
23       Q.   So your answer is yes to the
24   question?  The answer to the question is,
```

Page 21

```
 1   yes, I've never prescribed a COX-2
 2   inhibitor?
 3       A.   That's correct.
 4           MR. BLACK:  Objection.
 5   BY MR. ROTHMAN:
 6       Q.   And the same is true of
 7   non-selective NSAIDs?
 8           MR. BLACK:  Objection.
 9           THE WITNESS:  Aside from
10           recommending it occasionally, no,
11           I've never prescribed one.
12   BY MR. ROTHMAN:
13       Q.   Now, you're aware that
14   you've been designated as an expert
15   witness in the case of Barnett versus
16   Merck?
17       A.   Uh-huh.
18       Q.   That's a yes?
19       A.   Yes.
20       Q.   To your knowledge, have you
21   been designated in any other Vioxx cases?
22       A.   About --
23           MR. BLACK:  Objection.
24           THE WITNESS:  I was
```

Page 22

1    designated in the preceding one,
2    the case that was tried in
3    February.
4  BY MR. ROTHMAN:
5    Q.   Okay. Any others besides
6  those two?
7    A.   No.
8    Q.   You're not designated in the
9  upcoming cases that will take place in
10  California, are you?
11    A.   Not to my knowledge.
12    Q.   Okay. And you're not
13  planning to attend a Vioxx trial in
14  California this summer?
15    A.   I have no plans to do that.
16    Q.   And you're not planning to
17  attend any Vioxx trials in New Jersey
18  this summer or this fall?
19    A.   I have no plans to do that.
20    Q.   Okay. Have you been
21  retained in any other litigation since
22  your September deposition?
23        MR. BLACK: Objection. You
24    mean anything other than Vioxx

Page 23

1    litigation?
2        MR. ROTHMAN: Yes.
3        THE WITNESS: No.
4  BY MR. ROTHMAN:
5    Q.   You're not involved in
6  Bextra litigation, for example?
7    A.   I am involved in other
8  litigation. But I haven't received a
9  retainer in the time period you
10  specified.
11    Q.   Are you involved in any
12  litigation that you don't have listed on
13  your resume or in your report?
14    A.   Yes.
15    Q.   And what's that litigation?
16    A.   I may, and it looks like it
17  is likely, and I just found out about
18  this actually in the last day or two, be
19  involved in litigation -- should I tell
20  them the actual stuff?
21        MR. BLACK: To the extent
22    that you're not revealing any
23    confidential information, it's
24    fine to answer. If it would --

Page 24

1        THE WITNESS: I can't -- I
2  don't know whether this is
3  confidential or not at this point.
4        MR. BLACK: Well, then,
5    I'd -- only provide what you're
6    sure would not violate
7    confidentiality concerns in the
8    other litigation. So to the
9    extent you can answer within that
10    guidance, so ahead. Otherwise, I
11    think it would be inappropriate to
12    answer.
13        THE WITNESS: Okay. Well, I
14    guess the best way for me to
15    answer is that I'm not involved in
16    any litigation in any class
17    related to NSAIDs or pain
18    relievers or anything like that.
19  BY MR. ROTHMAN:
20    Q.   Is it products liability
21  litigation?
22    A.   Yes.
23    Q.   Does it relate to a
24  pharmaceutical product?

Page 25

1    A.   Yes.
2    Q.   But not a COX-2 or an NSAID?
3    A.   No.
4    Q.   Let's go back to the Barnett
5  case.
6    A.   Okay.
7    Q.   You understand that the
8  Barnett indication involves the
9  prescription medicine Vioxx?
10    A.   Yes.
11    Q.   Which is also known as
12  rofecoxib?
13    A.   Yes.
14    Q.   Have you reviewed any of the
15  plaintiff's medical records?
16    A.   No.
17    Q.   Have you reviewed the
18  plaintiff's deposition in the Barnett
19  case?
20    A.   No.
21    Q.   Have you reviewed the
22  depositions of any of the plaintiff's
23  physicians?
24    A.   The witnesses or the

Page 26

1 treating physicians?
2       Q.   The treating physicians.
3       A.   No, I have not.
4       Q.   Have you reviewed any case
5 specific materials relating to the
6 Barnett case?
7            MR. BLACK: Objection.
8            THE WITNESS: Not -- no, not
9       in terms of the particular
10      situation of this man and only
11      with regard to much more general
12      questions.
13 BY MR. ROTHMAN:
14      Q.   Okay. Do you plan to review
15 any of the materials we just discussed
16 prior to the trial in this case?
17           MR. BLACK: Objection.
18           THE WITNESS: At the present
19      time, I don't see any relevance or
20      the specifics to what I'm going to
21      testify about, so I have no plans
22      to do that.
23 BY MR. ROTHMAN:
24      Q.   Okay. Do you know what Mr.

Page 27

1 Barnett is alleging with respect to his
2 Vioxx use?
3       A.   Actually, I'm not even going
4 to go into the specifics of that because
5 I don't think I should answer that unless
6 I'm absolutely certain, and I really am
7 not.
8       Q.   Okay. I didn't ask you to
9 tell me what you know. Just, do you know
10 any -- withdrawn.
11           So you're not sure -- is it
12 fair to say that you're not sure what Mr.
13 Barnett is alleging with respect to his
14 Vioxx use?
15      A.   No, I really don't know what
16 the specifics of that are other than that
17 he had a cardiovascular adverse reaction
18 to Vioxx.
19      Q.   Do you know what type of
20 reaction he claims to have had?
21      A.   Myocardial infarction.
22      Q.   Do you know that or are you
23 just assuming?
24      A.   I'm assuming.

Page 28

1       Q.   Do you know when he says he
2 began taking Vioxx?
3       A.   I'll tell you the truth, I'm
4 not familiar with the details of the
5 case, so I don't want to answer that
6 question.
7       Q.   Okay. So your answer is you
8 don't know?
9       A.   That's right.
10      Q.   Okay. Do you know which
11 dose of Vioxx is at issue in the Barnett
12 case?
13      A.   I do not know the specifics
14 of the case.
15      Q.   And I take it you're not
16 planning to give any opinions on the
17 cause of Mr. Barnett's alleged injury?
18      A.   No, I'm not.
19           MR. BLACK: Objection. Not
20      directly about his specific plans.
21 BY MR. ROTHMAN:
22      Q.   The opinions you plan to
23 give are limited to FDA and regulatory
24 issues; is that right?

Page 29

1            MR. BLACK: Objection.
2            THE WITNESS: I'm not sure
3       that's completely correct, but
4       they are in any case limited to
5       FDA and regulatory issues and
6       related issues about things like
7       pharmacology that might touch on
8       those regulatory issues.
9 BY MR. ROTHMAN:
10      Q.   Okay. Are you planning on
11 giving any medical opinions in the
12 Barnett case?
13           MR. BLACK: Objection.
14           THE WITNESS: I'm not sure
15      what you mean by medical opinions.
16      I'm a doctor and I'm an FDA -- I
17      was an FDA medical officer and I
18      certainly felt that everything I
19      did in regard to that was medical
20      in nature and many of the
21      judgments that I make about this
22      case are based on the medical --
23      my medical background and my
24      medical judgment. So, I mean, the

Page 30

1    answer to your question, am I not
2    planning to is no. I am planning
3    to use my medical background and
4    medical judgment with regard to
5    issues that come up, mostly
6    related to the regulatory
7    questions, but you cannot divorce
8    regulatory questions from certain
9    kinds of medical judgments, and
10   I'm planning to comment about
11   that.
12   BY MR. ROTHMAN:
13       Q.   As you sit here today, are
14   you planning to comment on general
15   causation?
16       MR. BLACK: Objection.
17       THE WITNESS: Some of the
18   issues that I talk about may touch
19   on general causation.
20   BY MR. ROTHMAN:
21       Q.   Which issues are those?
22       A.   Well, I can't tell you
23   what -- everything that's possible that
24   may come up. But, for example, there are

Page 31

1    issues in regard to the interpretation of
2    statistical data, graphs, things like
3    that, which I'm -- even though I'm not an
4    expert in cardiovascular medicine, I'm
5    certainly in all my work in the FDA dealt
6    with those things like graphs and
7    statistical values, and those graphs and
8    statistics and other things like that do
9    touch on general causality. So it may be
10   that I have things to do that are -- have
11   implications for general causality.
12       Q.   Are you a statistician?
13       A.   I'm not a statistician, but
14   I certainly worked with statistics
15   constantly. I took many courses in
16   statistics, both at the FDA and at Johns
17   Hopkins. I was considered competent to
18   review and make judgments about
19   statistical information during all of the
20   work that I did at the FDA. And I
21   will -- I feel qualified to give opinions
22   that are derived from the extensive work
23   with statistics that I did while I was an
24   FDA reviewer.

Page 32

1        Q.   All right. Do you have a
2    degree in statistics?
3        A.   No. But I did have many --
4    I took many credits in statistics. I
5    would say probably 20 something credits
6    in statistics courses at Hopkins and at
7    the FDA and at the Foundation For Advance
8    Education in the Sciences at the NIH,
9    those three places, the FAES, the FDA,
10   and at Hopkins, I took courses in
11   statistics. And I'm very familiar with
12   statistical concepts and use them all the
13   time in my work.
14       Q.   Have you met the Barnetts?
15       A.   No.
16       Q.   Have you communicated in any
17   way with the Barnetts?
18       A.   No.
19       Q.   Have you ever met any
20   members of the Barnett family?
21       A.   No.
22       Q.   Have you communicated in any
23   way with any members of the Barnett
24   family?

Page 33

1        A.   No.
2        Q.   Other than Mr. Black, who's
3    sitting beside you today, have you med
4    met with any of the lawyers representing
5    the plaintiffs in the Barnett case to
6    discuss the case?
7        A.   I believe Mr. Black is the
8    only lawyer -- no. Ted Wacker is
9    involved with the Barnett cases?
10       MR. BLACK: He met Mr.
11   Wacker.
12       THE WITNESS: I met Mr.
13   Wacker.
14   BY MR. ROTHMAN:
15       Q.   To discuss the Barnett case?
16   I'm not asking if you met these people
17   when you were working on the Plunkett
18   case. I understand you met these people
19   in connection with the Plunkett case.
20       A.   Oh, since I've been working
21   on the Barnett case, I've only dealt with
22   Mr. Black.
23       Q.   Okay. Thank you.
24       And if we broaden the

1   question to go beyond lawyers and include
2   other people who may be working on behalf
3   of the plaintiffs, is that same answer
4   true, that you've only met with Mr.
5   Black?
6       A.   That's true.
7       Q.   Okay.  Have you met with any
8   of the folks that the plaintiffs have
9   designated as experts in the Barnett
10  case?
11      A.   No.
12      Q.   You haven't met or
13  communicated with Dr. Gueriguian about
14  the Barnett case?
15      A.   No.
16          MR. BLACK:  I'm going to
17      object to the form of the last
18      questions, well, not the
19      Gueriguian question but the former
20      question.
21  BY MR. ROTHMAN:
22      Q.   Have you reviewed any of the
23  reports submitted by the plaintiffs'
24  experts in the Barnett case?

1       A.   Yes, I have looked at some
2   of them.
3       Q.   Which ones have you
4   reviewed?
5       A.   I cannot tell you that.
6       Q.   Did you review Dr.
7   Gueriguian's report?
8       A.   I don't believe so.
9       Q.   Did you review Dr.
10  Arrowsmith-Lowe's report?
11      A.   No.
12          MR. ROTHMAN:  I'll mark your
13      report as Exhibit 2.
14          (Whereupon, Deposition
15      Exhibit No. Kapit-2, DESCRIPTION,
16      was marked for identification.)
17          MR. BLACK:  Seth, while
18      you're taking a moment here, I
19      only got these two copies, but
20      that's the spreadsheet.
21          MR. ROTHMAN:  Thanks.
22  BY MR. ROTHMAN:
23      Q.   Doctor, do you recognize
24  Exhibit 2 as the expert report you have

1   submitted in the Barnett case?
2       A.   Yes.
3          MR. BLACK:  Objection.
4      Form.  Mischaracterizes the
5      document.
6          MR. ROTHMAN:  I didn't
7      characterize it at all.  I just
8      asked him what it was.
9          MR. BLACK:  The caption on
10     the document reads pertains to all
11     actions.
12  BY MR. ROTHMAN:
13      Q.   Doctor, is it your intention
14  that this report will apply to cases
15  other than the Barnett case?
16      A.   The document was submitted
17  to Mr. Black.  I'm not aware of
18  limitations on its use.  To my knowledge,
19  it's only relevant to this case.
20      Q.   Have you been asked to be an
21  expert witness for plaintiffs in any
22  other future cases in the MDL?
23          MR. BLACK:  Objection.
24          THE WITNESS:  There's been

1       no formal asking, no.  I've heard
2       mention that there are other cases
3       in the future and that something
4       might develop, but there's been
5       nothing formal about that.
6   BY MR. ROTHMAN:
7       Q.   Okay.  In any event, if I
8   call this report your Barnett report,
9   you'll know what I mean?
10      A.   Okay.
11      Q.   We can agree on that?
12      A.   Yes.
13      Q.   Okay.  And this report, the
14  Barnett report, appears to be a revised
15  or updated version of the prior report
16  you submitted in the Plunkett case; is
17  that fair?
18      A.   Yes, that's true.
19      Q.   Why did you review or update
20  your report?
21      A.   There were some issues that
22  needed further clarification that I
23  discussed with Mr. Black.  For example,
24  there was additional documents that I

Page 38

1  became aware of and were sent to me since
2  the Plunkett case, and some of that
3  information needed to be incorporated in
4  a report, and so that was the main
5  purpose of updating it.
6      Q.   As between you and Mr.
7  Black, who decided that the report needed
8  to be updated?
9          MR. BLACK: Objection.
10         THE WITNESS: Well, I mean,
11     Mr. Black sent me a bunch of
12     documents. I reviewed them and
13     those documents clearly meant that
14     some of the things that I had
15     written in the original report
16     needed to be revised. So I knew
17     that that had to happen and Mr.
18     Black and I also discussed those
19     things, and out of that reading of
20     the new documents and the
21     discussions with Mr. Black, we
22     arrived at some additional
23     information that should be
24     included in the report.

Page 39

1  BY MR. ROTHMAN:
2      Q.   Okay. So it was a
3  collaborative process?
4      A.   Yes.
5      Q.   Did you ask Mr. Black to
6  send you the documents that he sent to
7  you?
8          MR. BLACK: Objection.
9          THE WITNESS: With one or
10     two exceptions. I believe he made
11     me aware of these documents that I
12     should be — that I should see.
13     There were some — one or two that
14     I knew that I was missing from the
15     first.
16  BY MR. ROTHMAN:
17     Q.   Which were those?
18     A.   I think the thing that
19  stands out most in my mind and that I
20  requested Mr. Black to send me, in fact,
21  during the Plunkett case, and he didn't
22  have it at that time, was the June 29th
23  label submission from Merck, June 29th,
24  2000. And I was aware that such a

Page 40

1  document existed back in the Plunkett
2  case and that I didn't have it. So —
3  and then I asked him for it even back
4  then. So he sent that actually when it
5  became available through discovery, I
6  guess.
7      Q.   Okay. Are there any other
8  documents that you recall asking Mr.
9  Black to send you?
10     A.   There were -- there were
11  some things I told him I wanted to see.
12  There was, actually, something fairly
13  recently, a Konstam report that I asked
14  him, in fact, to send me last night. And
15  he did.
16     Q.   Are you talking about the
17  paper that appeared in circulation?
18     A.   Yes, that's right.
19     Q.   That's the paper that
20  describes Merck's pooled analysis of
21  cardiovascular events?
22         MR. BLACK: Objection.
23         THE WITNESS: That's true.
24  BY MR. ROTHMAN:

Page 41

1      Q.   And you saw that for the
2  first time last night?
3      A.   Yes. I read it for the
4  first time last night.
5      Q.   You haven't seen it before
6  in the course of your work on this
7  litigation?
8      A.   No.
9      Q.   And you hadn't seen it
10  perusing circulation?
11     A.   No.
12     Q.   And had you seen the
13  June 29th label submission before Mr.
14  Black sent it to you?
15     A.   No.
16     Q.   Okay. Any other documents
17  that you can recall?
18     A.   There were others, but, no,
19  I can't recall them.
20     Q.   That you asked Mr. Black to
21  send to you?
22     A.   Yes.
23     Q.   Okay. Did you -- in terms
24  of the documents you -- the new documents

Page 42

1    you reviewed for this report, are there
2    any that you found on your own?
3        A.   There are a number of
4    documents that came from the FDA website
5    and even the New York Times that are
6    relevant to this case that I reviewed on
7    my own.
8        Q.   You did your own independent
9    research to look for material?
10       A.   No, I wouldn't quite so far
11   as to say that. But, obviously, I was
12   always aware of things appearing relative
13   to Vioxx and the litigation in different
14   media, and I kept an eye out for them.
15   And to that extent, the stuff that was on
16   the FDA about it, the stuff that was in
17   the legitimate press and the stuff that
18   was in the medical literature, if it was
19   relevant to Vioxx, I would go to it and
20   download it. I actually have subscribe
21   to a number of list servers related to
22   pharmacology and pharmaceutics and every
23   now and then there would be something
24   about Vioxx listed and I would do that.

Page 43

1    I would get it from that.
2        Q.   When did you begin work
3    devise advising your Plunkett report?
4        A.   In May.
5        Q.   How did that come about?
6        A.   Well, after I had these
7    discussions with Mr. Black, I went to
8    work.
9        Q.   Did he tell you you would
10   need to submit a report for the Barnett
11   case?
12       A.   Yes.
13       Q.   And tell me about how you
14   worked on your report? Did you do
15   that --
16       A.   I went through the
17   documents. I went through my report.
18   And in the -- in the collaborative work
19   with Mr. Black that preceded that, we had
20   identified sections of my report that
21   needed additional work. But once that
22   was done, I did it myself, I wrote the
23   whole thing myself, without consultation
24   to him. And I didn't consult with him

Page 44

1    about it until it was done and I wanted
2    to have his input on it.
3        Q.   Okay. And did that happen?
4        A.   Yes.
5        Q.   So when you finished your
6    draft, you sent a copy to Mr. Black?
7        A.   Yes.
8        Q.   Did you send a copy to
9    anyone else?
10       A.   No.
11       Q.   Did you get comments back
12   from Mr. Black?
13       A.   Mr. Black and I discussed
14   the documents, yes.
15       Q.   Okay. And did he comment on
16   anything you had written?
17       A.   Yes.
18       Q.   Do you recall any of those
19   comments?
20       A.   Nothing specific. The
21   general -- I want to make it clear that
22   none of my opinions were changed by him,
23   nor would I have let that happen. But
24   there were -- okay. So there are always

Page 45

1    questions about wording and precision and
2    things like that and the best way to say
3    things. And so those things were
4    discussed and once again, I want to make
5    clear, though, and Mr. Black those this
6    quite well, is that I write what I think.
7    And so he did not change the substance of
8    anything that I thought. It was a matter
9    of wording and things like that.
10       Q.   Okay. The collaborative
11   process that we've discussed where you
12   and Mr. Black discussed the new
13   documents, did that happen face to face?
14       A.   Mostly over the phone.
15       Q.   Were there any face-to-face
16   meetings?
17       A.   I don't think we met face to
18   face.
19           MR. BLACK:  It's whatever
20       your recollection is.
21           THE WITNESS:  I don't think
22       we met face to face. I think it
23       was all over the phone.
24   BY MR. ROTHMAN:

Page 46

1    Q.   Can you give me a sense of
2  how often you spoke to Mr. Black about
3  these documents?
4    A.   Oh, geez. Five, ten times,
5  something like that.
6    Q.   And how long was each call?
7       MR. BLACK: Objection.
8       THE WITNESS: They varied
9    from as short as a few minutes to
10   maybe an hour and a half. And, in
11   fact, you have the exact
12   information about that on my time
13   sheet.
14  BY MR. ROTHMAN:
15   Q.   Thank you.
16      Are there any limits placed
17  on you how much time or money you can
18  spend developing new opinions or revising
19  your report?
20   A.   No.
21      MR. BLACK: Though we are
22   considering it. No, we're not.
23  BY MR. ROTHMAN:
24   Q.   Now, your Exhibit 2, which

Page 47

1  you have in front of you, does that now
2  contain all of the opinions that, as you
3  sit here today, you presently intend to
4  offer at trial?
5       MR. BLACK: Objection.
6       THE WITNESS: That's a -- I
7    mean, that's a question that
8    implies a limitation that I don't
9    want to give. I mean, I cannot
10   anticipate where the questioning
11   at trial is going to go, and --
12  BY MR. ROTHMAN:
13   Q.   I'm not asking you to
14  anticipate. I'm asking you, as you sit
15  here today, does your report now contain
16  all the opinions you presently intend to
17  give?
18      MR. BLACK: Objection.
19      THE WITNESS: I don't see
20   how I can say yes to a question
21   like that since I don't -- I don't
22   know exactly what's -- the way
23   it's going to work out. I mean,
24   these are all -- these are all the

Page 48

1    opinions that I'm offering in my
2    report, but if you want to say
3    that I can't say anything that
4    comes up in a question that
5    touches on something that I didn't
6    put in my report, and I feel that
7    in order to give a complete answer
8    I have to go beyond what's in this
9    report, it seems to me that that's
10   the way it has to be. I mean, I
11   don't understand even the
12   question. There's no way that
13   everything I can possibly opine
14   about is in this report.
15  BY MR. ROTHMAN:
16   Q.   Are there any opinions you
17  feel you need to add to your report?
18   A.   I am not aware of any
19  opinions I need to add at this time,
20  that's right.
21   Q.   Is there anything that's in
22  your report, that's Exhibit 2, that you'd
23  like to modify, correct or change in any
24  way?

Page 49

1    A.   Not at this time.
2    Q.   Since drafting your report,
3  have you asked for any additional
4  documents to review?
5    A.   Well, I mean, we were
6  talking about that Konstam article that I
7  asked for last night.
8    Q.   Right.
9    A.   There were probably a couple
10  of -- a few documents since I finished
11  this report that I did review, either
12  that he sent me, Mr. Black sent me on his
13  own, or that I asked for.
14   Q.   Okay. What documents are
15  those?
16   A.   The best way for me to do
17  that is to look at the dates in my file,
18  see if there's a date that it was
19  entered, and I'd have to do it that way.
20      MR. BLACK: I will state for
21   the record that he has been
22   provided a copy of the January 24,
23   2006, Federal Register notice
24   about the labeling regulations and

Page 50

1      a copy of Dr. Arrowsmith-Low's
2    deposition transcript, the most
3    recent deposition, from June 7th
4    of this year.
5           MR. ROTHMAN:  Thank you.
6           MR. BLACK:  I believe that's
7    it.
8    BY MR. ROTHMAN:
9      Q.   Did you review the Konstam
10   article?
11     A.   Yes.
12     Q.   Does that change any of the
13   opinions you have in your report?
14     A.   Well, I mean, the Konstam
15   article addresses, as you mentioned, a
16   pooled analysis that Merck did that I was
17   not aware of.  And I talked about a
18   pooled analysis that was not done by
19   Merck, a pooled analysis of the results
20   of Protocol 203.  So in talking about the
21   Konstam report, it may be appropriate at
22   some point for me to say, well, there was
23   this analysis, and then to talk further
24   about that analysis in connection with

Page 51

1    the recommendation that I made in my
2    report or the discussion I had in my
3    report about that Protocol 203 was an
4    analysis that Merck should have done and
5    Konstam may come up in connection with
6    that.  And so while I'm not exactly
7    modifying something that I said in my
8    report as a result of reading the Konstam
9    report, it's -- there's a broader picture
10   I may have to go into in connection with
11   that.
12     Q.   Did you review the Federal
13   Register section that Mr. Black sent
14   you --
15     A.   Yes.
16     Q.   -- about the new labeling
17   rule?
18     A.   Yes.
19     Q.   Has that changed --
20     A.   No, that has not changed any
21   of my opinions?
22     Q.   -- changed any of your
23   opinions?  Are you waiting for any
24   documents to review that you've asked for

Page 52

1    and not yet received?
2      A.   Not at this time.
3      Q.   Are there any documents that
4    you asked Mr. Black to send you that he
5    did not send you?
6      A.   No, I don't believe so.
7      Q.   As you review documents in
8    this case, is it your practice to take
9    notes?
10     A.   I do, in fact, take notes on
11   selected documents.  You will see in my
12   spreadsheet that I have about 150
13   documents listed in which I made notes
14   about them.
15     Q.   Is the spreadsheet the only
16   place where you take notes?
17     A.   The only other place that I
18   take notes is in going through the paper
19   documents, you're going to find little
20   stickies occasionally and times they have
21   a note or two on them.
22     Q.   Okay.  And other than the
23   spreadsheet and the little stickies, is
24   that also for the notes you take?

Page 53

1      A.   No.  And then also I take
2    notes.  When there's a PDF document that
3    I'm reviewing, I will use action row
4    Bettina to add notes to a document, book
5    marks and notes.  You will have the
6    electronic versions of that, but that's
7    another place that I take notes.
8      Q.   Okay.  And by that you mean
9    when you print it out --
10     A.   No.
11     Q.   -- or --
12     A.   I put the book marks and the
13   comments are electronic on the PDFs.
14     Q.   And when you burn the PDFs
15   to the discs --
16           MR. BLACK:  Objection.
17   BY MR. ROTHMAN:
18     Q.   -- that you gave to Mr.
19   Black, you made sure to retain the notes
20   of the book marks?
21     A.   That's right.  Providing you
22   have the full Adobe acrobat that will
23   show them.
24     Q.   Now, if you take a look at

Page 54

1    Exhibit 2, Attachment A is your
2    curriculum vitae, correct.
3        A.   Yes, that's correct.
4        Q.   And you gave us a CV at the
5    time of the Plunkett case, correct?
6        A.   Uh-huh.
7        Q.   Is that a yes?
8        A.   Yes.
9        Q.   This CV that's in Exhibit 2,
10   is that the same CV or is that an updated
11   CV?
12       A.   I think I updated it.  I
13   think I added something or two to it.
14       Q.   Okay.  What did you add?
15       A.   I believe I added Plunkett
16   versus Merck as a list of -- I think that
17   may have been the only change that I
18   made.  And where is that listed?  I know
19   the cases that I've been involved in are
20   listed somewhere.  Where are they listed?
21   But I think adding the Plunkett versus
22   Merck was the only thing that I did.  I
23   don't see it in here, but I know that we
24   have it included someplace.

Page 55

1        Q.   Okay.  If you look at page
2    five of your expert report, I think
3    you'll find --
4        A.   Maybe that's where it's at.
5        Q.   -- I think you'll find it
6    there.
7        A.   That's correct.  That's
8    where it was put in.  So that's the only
9    change.
10       Q.   So the resume is not
11   otherwise updated?
12       A.   Right.
13       Q.   You didn't have any new
14   publications to add?
15       A.   No.
16       Q.   You didn't have any new
17   presentations to add?
18       A.   No.
19       Q.   Is there anything about your
20   resume that's inaccurate or that you'd
21   like to correct or update?
22       A.   I don't think so.
23       Q.   Okay.  Now, according to
24   your resume, you started at the FDA in

Page 56

1    1984; is that right?
2        A.   That's right.
3        Q.   And from 1984 to 1989 you
4    were a medical officer in the
5    neuropharmacological drug products
6    office?
7        A.   That's right, yes.
8        Q.   In that position, you
9    reviewed INDs, right?
10       A.   Yes.
11       Q.   NDAs?
12       A.   Yes.
13       Q.   And labeling?
14       A.   Adverse reactions labeling
15   and protocols and many different things.
16       Q.   In 1990 you moved to the
17   clinical trials branch, correct?
18       A.   I moved to the clinical
19   trials branch of the national institute
20   on drug abuse.  That was not in the FDA.
21       Q.   Okay.  In that position, did
22   you review INDs, NDAs or pharmaceutical
23   labeling?
24           MR. BLACK:  Objection.

Page 57

1            THE WITNESS:  I submitted an
2    IND during those years and I was
3    constantly involved in reviewing
4    pharmaceutical data of different
5    kinds.
6    BY MR. ROTHMAN:
7        Q.   But you weren't working as
8    an FDA --
9        A.   No.
10       Q.   -- reviewer at that time?
11       A.   That's correct.
12       Q.   And in 1991 you moved to the
13   division of epidemiology?
14       A.   The epidemiology division in
15   the Center For Biologics, that's correct.
16       Q.   And that's part of the FDA?
17       A.   Yes.
18           MR. BLACK:  Let him get his
19   questions out.  You're
20   anticipating here a little bit,
21   and we ought to try and stick with
22   the proper form.
23           THE WITNESS:  Okay.
24           MR. BLACK:  Anyway...

Page 58

BY MR. ROTHMAN:

1  BY MR. ROTHMAN:
2       Q.   In that position at FDA, in
3  the office of epidemiology, did you --
4  you evaluated and analyzed adverse event
5  reports; is that correct?
6       A.   That's correct.
7       Q.   Did you review INDs in that
8  position?
9       A.   Yeah.  I assumes -- that was
10  not a major part of my work, but in
11  biologics, things -- there's a team
12  approach and INDs would sometimes come
13  around to my desk for comment.  But I was
14  not the principal reviewer of INDs as I
15  was when I was working in the Center For
16  Drugs in the previous position.
17      Q.   Are you a principal reviewer
18  of NDAs in the -- when you were working
19  in the division of epidemiology?
20      A.   There aren't really any NDAs
21  in biologics.  There are biological
22  licensing applications and things like
23  that, although there are INDs.  And, once
24  again, as a member of a team, I would

Page 59

1  perhaps be more involved with the BLAs
2  and the PLAs, the product licensing
3  applications, than I would with the INDs
4  actually.  There were many, many times I
5  reviewed sections relating to adverse
6  reactions from the BLAs and the PLAs as
7  part of a team that was working on a
8  submission.
9       Q.   But you wouldn't be the
10  principal reviewer?
11      A.   Well, actually, no, I wasn't
12  the principal reviewer, but I was
13  certainly one of the two principal
14  reviewers of the adverse reaction
15  information when I was on that team.
16      Q.   Okay.  How about drug
17  labeling, did you review drug labeling
18  when you were in the division of
19  epidemiology?
20      A.   Constantly.  That was
21  modifications to labeling, labeling
22  submissions, in addition to all the
23  adverse action reports, that was the
24  bread and butter of my work when I was

Page 60

1  there.
2       Q.   Would you review the entire
3  labeling or just the adverse reactions
4  section of the label?
5           MR. BLACK:  Objection.
6           THE WITNESS:  Often -- often
7  it was the whole labeling and
8  sometimes it was just limited.  It
9  would depend upon how significant.
10  There was one or two, for example,
11  Interferon comes to mind, and some
12  of the information with
13  thrombolytics comes to mind, where
14  the FDA did a rewrite and so I was
15  involved in every aspect of
16  labeling for that.  And there were
17  broader times in certain
18  situations and many times where it
19  was just limited to adverse
20  reactions.
21  BY MR. ROTHMAN:
22      Q.   Did you have authority to
23  approve labels?
24      A.   No.  That was -- my

Page 61

1  authority was to make recommendations
2  about what should be in labels.  The
3  approval authority was in the
4  pre-licensing distribution, as it is in
5  the Center For Drugs.  So that they had
6  the actual regulatory power.  But I made
7  recommendations about labeling to them.
8       Q.   Did you review CBE
9  submissions?
10      A.   Yes, all the time.
11          MR. BLACK:  Objection.
12  Form.  And the objection is is the
13  time period I don't think was
14  clear from your question,
15  counselor.
16          MR. ROTHMAN:  Well, we're
17  talking about his job in the
18  division of epidemiology.
19          THE WITNESS:  Well,
20  actually, I reviewed CBEs all the
21  time.  Very, very frequently.  I
22  shouldn't say all the time.  But
23  just very frequently both in the
24  Center For Drugs and in the Center

Page 62

1    For Biologics. CBEs were common
2    submissions. And I reviewed them
3    frequently.
4  BY MR. ROTHMAN:
5    Q.   Okay. So if I understand
6  all this, the last time you reviewed NDAs
7  would have been 1989 or before that?
8    A.   That's correct.
9    Q.   Okay. And that's before
10 PADUFA took effect in 1992, correct?
11   A.   Yes.
12   Q.   And in the pre PADUFA days
13 when you were reviewing NDAs, was there a
14 time limit on how long you had to review
15 an NDA?
16   A.   I did -- I did the complete
17 reviews of three NDAs, the medical
18 officer review. The first two, there was
19 no time limit. I'm sorry. The first
20 one, there was no time limit. By the
21 time I did the second two, time limits
22 were in effect. In particular, one of
23 them was an expedited review, which had a
24 six-month time limit on it. And there

Page 63

1  was a similar time limit of, probably not
2  expedited, probably it was a regular
3  review, so by the time there was a time
4  limit on that one, too. So time limits
5  were in place for the last two NDAs and
6  not for the first one.
7    Q.   Okay. What's the first one
8  that you're referring to?
9    A.   Prozac.
10   Q.   And when did you review the
11 Prozac NDA?
12   A.   I think I finished that in
13 late '86.
14   Q.   And what are the other two
15 NDAs?
16   A.   Clozaril and I finished
17 that, I believe, probably in '88. And
18 estazolam was finished probably in late
19 '88 or '89.
20   Q.   And what was the time limit
21 on that one?
22   A.   That would have been a
23 standard review, probably a year. I
24 actually did that one in two or three

Page 64

1  months. So I actually don't recall
2  exactly what the time limit was with it,
3  but I did that quite quickly.
4    Q.   Okay. If you turn back to
5  Exhibit 2, you have a publication that's
6  attached to your report as -- I'm sorry,
7  attached as Exhibit B you have a resume
8  of medical and scientific writing; is
9  that correct?
10   A.   Uh-huh.
11   Q.   Is that correct, Doctor?
12   A.   Yes.
13   Q.   Is there anything on this
14 resume that needs to be updated?
15   A.   No.
16   Q.   Has this resume of medical
17 and scientific writing changed since the
18 one you submitted in the Plunkett case?
19   A.   No, it has not.
20   Q.   All right. So since you had
21 your deposition taken in September, you
22 haven't written any papers or articles on
23 COX-2s?
24   A.   No.

Page 65

1    Q.   You haven't written any
2  papers or articles on NSAIDs?
3    A.   Right, no, I haven't written
4  any papers or articles, period. I've
5  been involved with litigation and with
6  courses, and that's taken my time.
7    Q.   Okay. Did you prepare for
8  today's deposition?
9    A.   Yes.
10   Q.   What did you do?
11   A.   I reviewed my report. I
12 reviewed my spreadsheet. I reviewed some
13 other documents in full.
14   Q.   Did you meet with Mr. Black?
15   A.   Yes.
16   Q.   When did you meet with Mr.
17 Black?
18   A.   Yesterday.
19   Q.   How long did you meet for?
20   A.   Two and a half hours.
21   Q.   Is that the only time you
22 met with Mr. Black to prepare for this
23 deposition?
24   A.   In person. Yes.

Page 66

1    Q.   Did you talk with him on the
2  phone about this deposition?
3    A.   Yes.
4    Q.   How many times?
5    A.   A few times.
6    Q.   And when did you do that?
7    A.   Over the last couple of
8  weeks, few weeks.
9    Q.   How many hours altogether
10 did you spend on the phone with Mr. Black
11 preparing for the deposition?
12   A.   I can't tell you, but,
13 again, significant phone conversations
14 other than very brief context would be
15 listed in my time sheet.
16   Q.   Okay.  Did you go over any
17 documents with Mr. Black to prepare for
18 today's deposition?
19   A.   Yes.
20     MR. BLACK:  Objection.
21 BY MR. ROTHMAN:
22   Q.   Which documents?
23   A.   We went over Konstam.  We
24 went over the Federal Register that we

Page 67

1  talked about.  We may have been over some
2  other documents as well.
3    Q.   Anything else that you can
4  recall?
5    A.   Not -- not at the moment,
6  no.
7    Q.   Mr. Black told us before
8  that he sent you Dr. Janet
9  Arrowsmith-Low's deposition in this case.
10   A.   Yes.
11   Q.   Did you review that?
12   A.   I reviewed parts of that,
13 yeah.  Not the whole thing.  I'm not sure
14 I did read the whole thing.  I think I
15 did, about a month ago, something like
16 that.
17   Q.   Okay.  Did you review her
18 expert report in this case?
19   A.   Yes.  I read it.
20   Q.   Okay.  Other than Mr. Black,
21 did you meet with anyone else to prepare
22 for today's deposition?
23   A.   No.
24   Q.   What's the mission of the

Page 68

1  FDA?
2    A.   Could you be more specific
3  about that question?  It's such a broad
4  question, I am not sure how I can answer
5  that.  I mean, FDA probably has a mission
6  statement.  I don't happen to know what
7  that is.  I haven't read it.  But I can
8  give the answer to your question on many
9  different levels, at the broadest level,
10 the FDA protects public health and
11 promotes public health.  At more specific
12 levels, it regulates the licensed
13 pharmaceuticals.  It regulates certain
14 foods.  It regulates medical devices.  It
15 regulates -- does toxicology research.  I
16 mean, you have -- if you want, you really
17 need to be more specific.  There's
18 very -- as FDA likes to say, they
19 regulate 25 percent of the US economy,
20 but whether that's true or not, that's
21 what they say.  So it's very broad.
22   Q.   Okay.  Fair enough.
23     You told me that one mix of
24 the FDA is to promote and protect the

Page 69

1  health of the American public?
2    A.   That's right.
3    Q.   In your opinion, does FDA
4  succeed in that mission?
5      MR. BLACK:  Objection.
6      THE WITNESS:  Good question.
7    Like any human enterprise,
8    sometimes it succeeds and
9    sometimes it doesn't.
10 BY MR. ROTHMAN:
11   Q.   Does FDA attempt to succeed
12 in that mission?
13     MR. BLACK:  Objection.
14     THE WITNESS:  I am not going
15   to say that it does not attempt to
16   succeed in that -- in that job.  I
17   will say that it attempts to
18   succeed.  Sometimes I have some
19   questions about the wiseness and
20   the strategy of the attempt, but,
21   I mean, we could talk about
22   certain contraceptive issues that
23   have come up recently that I
24   wonder about them about.  But on

Page 70

```
1        the whole, yes, it attempts to
2    succeed.
3    BY MR. ROTHMAN:
4        Q.   Does the FDA serve the
5    pharmaceutical industry?
6            MR. BLACK: Objection.
7            THE WITNESS: You know, this
8    is a -- this is a -- I think it's
9    a matter of debate. I think that
10   there was a time when I worked for
11   the center of drugs, Center For
12   Drugs, when someone -- when people
13   at the FDA would not have looked
14   at what they do that way, that
15   they would have thought, and I
16   would have thought, that there was
17   an inherent difference between a
18   regulator and the industry that it
19   regulates. And so one cannot say
20   that the regulator serves that
21   industry. Now, I'm also aware
22   that in recent years, actually,
23   there are people at the FDA that
24   do view what they do in that way.
```

Page 71

```
1        Actually, there was a friend I had
2    for many years at the FDA, he was
3    in the division of advertising,
4    and when I knew him back in the
5    Center For Drugs, he would not
6    have thought of what he did as
7    serving the industry; he would
8    have thought of what he did as
9    serving the public. And I heard
10   him say not too long ago that his
11   view of what he does now is
12   serving the industry. So there
13   are some people that view FDA as
14   serving the industry. I think in
15   my own view is the FDA serves the
16   public and the public health. And
17   I wouldn't feel comfortable about
18   saying that it served the
19   industry.
20   BY MR. ROTHMAN:
21       Q.   Okay. The FDA generally
22   doesn't do its own drug testing, true?
23       A.   That's true.
24       Q.   FDA does have the ability to
```

Page 72

```
1    request information and data from
2    pharmaceutical companies, true?
3        A.   Yes.
4        Q.   And if the FDA believes that
5    a pharmaceutical company has withheld
6    information or data from it, it has the
7    power to bring an enforcement action
8    against that company?
9        A.   Well, yes, although we have
10   to qualify that. As a -- as a -- the
11   power to bring an enforcement action is
12   really the power to go to court. The FDA
13   can request. The FDA can demand. The
14   FDA can threaten not to approve or
15   something like that. The FDA can do all
16   that kind of stuff. But -- but the power
17   to force submission of information is
18   really the power to go to court. It's a
19   power that the FDA is reluctant to use.
20   And so, ultimately, the answer is, yes,
21   the FDA does have the power to go to
22   court and persuade the court to order.
23   So to that extent, the answer is yes.
24   But the answer, as I said, has to be
```

Page 73

```
1    qualified a great deal.
2        Q.   Okay. Well, can we agree
3    that the FDA has never brought an
4    enforcement action against Merck for
5    fraud on the FDA relating to Vioxx?
6        A.   I am not aware of any
7    enforcement action for fraud, right, yes.
8        Q.   Have you looked to see
9    whether there was one?
10       A.   I've looked at a lot of
11   documents. So I feel that the fact that
12   I haven't seen it probably means that it
13   probably hasn't happened.
14       Q.   Okay. And the FDA has never
15   threatened to bring an enforcement action
16   against Merck for fraud on the FDA with
17   respect to Vioxx?
18           MR. BLACK: Objection.
19           THE WITNESS: You're now
20   asking me for more knowledge than
21   I have. I do not know. There
22   were many, many communications
23   between the FDA and the company
24   that I am not privy to. So I
```

Page 74

```
1        can't -- there's no way I can
2        answer that question.
3   BY MR. ROTHMAN:
4        Q.   Okay.  So your answer is
5   that you're not aware one way or the
6   other of whether that's true?
7        A.   That's right.
8        Q.   And you're not aware of any
9   statements or comments by the FDA that
10  they contemplated bringing such an action
11  against Merck?
12       MR. BLACK:  Objection --
13  BY MR. ROTHMAN:
14       Q.   Is that also true?
15       A.   I cannot think of any at the
16  moment, no.
17       Q.   And you're aware that the
18  FDA has been criticized for the way it
19  handled Vioxx; isn't that true?
20       MR. BLACK:  Objection.
21       THE WITNESS:  Yes.  In
22  fact -- yeah.  Jerry Avorn did
23  that, I believe, in an article
24  that he published.  And there were
```

Page 75

```
1        other -- there may have been a New
2        York Times editorial which
3        questioned the FDA.  So, yeah,
4        there have been criticisms, yes.
5   BY MR. ROTHMAN:
6        Q.   And Congress has looked
7   into --
8        A.   Right.
9        Q.   -- the way the FDA handled
10  Vioxx?
11       A.   And the Waxman article,
12  probably, certainly implied some
13  criticisms.
14       Q.   And FDA has never said that
15  Merck withheld material information from
16  it, have they?
17       MR. BLACK:  Objection.
18       THE WITNESS:  Again, you're
19  asking me for more information
20  than I have.  I'm never -- I'm not
21  aware of them having said it in
22  those words.  That doesn't mean
23  that things that went back and
24  forth didn't imply that there was
```

Page 76

```
1        less -- for example, the ADVANTAGE
2        issue, where FDA, as I make it
3        clear in my report, had to request
4        the information four times.  And
5        then the -- and then even after
6        the submission came in in April,
7        it was not complete, and they had
8        to submit more case forms and
9        things like that that finally got
10       in in July.  And the FDA, if you
11       remember, as I said in my report,
12       in February of 2001 not only
13       requested as usual with a fax but
14       sent a letter.  And so they didn't
15       come out and say, hey, you're
16       withholding this stuff, but they
17       certainly implied, what is taking
18       so long?  Get this stuff in.  And
19       they certainly indicated some
20       level of frustration.  So -- so,
21       in the exact words you put it, no,
22       but that doesn't mean that there
23       wasn't a lot of feeling that Merck
24       was being less than forthcoming at
```

Page 77

```
1        times.
2   BY MR. ROTHMAN:
3        Q.   At the end of the day, the
4   FDA had all the ADVANTAGE data, correct?
5        MR. BLACK:  Objection.
6        THE WITNESS:  Yes.  But the
7        end of the day was a long time
8        after they asked for it.  I think
9        it was eight, nine months,
10       something like that.
11  BY MR. ROTHMAN:
12       Q.   Okay.  Can you answer my
13  question?  At the end of the day, the FDA
14  had all the ADVANTAGE data, true?
15       MR. BLACK:  Objection.
16  BY MR. ROTHMAN:
17       Q.   That's true, isn't it?
18       MR. BLACK:  If you
19       understand the question.
20       THE WITNESS:  After a long
21       time, Merck finally came across
22       with it, yes.
23  BY MR. ROTHMAN:
24       Q.   Before the FDA approved the
```

Page 78

1    revised label in April of 2002, correct?
2          MR. BLACK: Objection.
3          THE WITNESS: Yes. By the
4    time of the final agreement on
5    labeling, they had that data, yes.
6    BY MR. ROTHMAN:
7          Q.   And the FDA has never said
8    to your knowledge, sir, that it made a
9    material -- it made a decision on a Vioxx
10   application without having all the
11   material information it needed; isn't
12   that true?
13         MR. BLACK: Objection.
14         THE WITNESS: I have no
15   document in which the FDA said
16   that. I have seen no document in
17   which the FDA said that thing, but
18   that doesn't mean it wasn't said
19   and it doesn't mean that -- well,
20   I mean, you're -- you know, I
21   mean, you're looking aside, but
22   this is important stuff. It's
23   very important and material to the
24   case.

Page 79

1    BY MR. ROTHMAN:
2          Q.   Sir, you either know or you
3    don't.
4          MR. BLACK: Objection.
5          THE WITNESS: I have.
6          MR. BLACK: Seen no document
7    which said that. I do not know
8    about all the communications that
9    went back and forth.
10   BY MR. ROTHMAN:
11         Q.   Okay. You've never seen a
12   communication or heard of a communication
13   where the FDA said that; is that correct?
14         MR. BLACK: Objection.
15         THE WITNESS: Said what
16   again?
17   BY MR. ROTHMAN:
18         Q.   You've never seen a document
19   or heard that the FDA ever told Merck or
20   ever said that it made a decision on a
21   Vioxx application without having all of
22   the material data it needed, true?
23         MR. BLACK: Objection.
24         THE WITNESS: I have seen no

Page 80

1    document that said that, that's
2    true.
3    BY MR. ROTHMAN:
4          Q.   And you've never seen the
5    FDA say that, true?
6          MR. BLACK: Objection.
7    BY MR. ROTHMAN:
8          Q.   You never heard that?
9          A.   Not as you put it, no.
10         Q.   Now, do you have your report
11   there that's Exhibit 2?
12         A.   Yes.
13         Q.   In paragraph 31 of your
14   report, you added a discussion of a
15   report from the Office of the Inspector
16   General. Do you recall that?
17         A.   Yes.
18         Q.   How did that report come to
19   your attention?
20         A.   I've been aware of this
21   report for some time. And it probably
22   came to my attention originally in
23   connection with another -- another bit of
24   litigation with a different case.

Page 81

1          Q.   Is it something that the
2    plaintiffs' lawyers in this case sent to
3    you?
4          A.   I got this from the
5    Internet, I believe.
6          Q.   Okay. So your answer to my
7    last question would be no?
8          A.   That's right, yes.
9          Q.   Okay. Was it your idea to
10   add a discussion of this report to your
11   expert report?
12         A.   Yes. Well, again, I'm not
13   sure when it -- as I say, this particular
14   bit of information has been in reports
15   that I've written for more than one
16   litigation, so putting this report in has
17   been a decision I made with regard to
18   this litigation and other litigations.
19         Q.   Okay. And you've added this
20   in the paragraphs where you discuss the
21   obligation of the sponsor to bring
22   problems to the attention of the FDA?
23         MR. BLACK: Objection.
24   BY MR. ROTHMAN:

Page 82

1    · Q.   True?
2     A.   Which -- which -- which
3   wording are you referring to now?
4     Q.   Well, paragraph 31. This is
5   part of -- this is part of a discussion
6   of the obligations of sponsors to bring
7   problems to the attention of the FDA. Is
8   that a fair characterization?
9         MR. BLACK: Objection.
10        THE WITNESS: Well, yes. I
11        mean, I think fundamentally it's
12        accurate. What I'm saying here is
13        that there are limitations on FDA
14        reviewers' abilities to discern
15        safety problems and so that puts
16        the FDA in a position of
17        dependency on companies to bring
18        forward problems. I mean, it may
19        be, for example, that the FDA
20        might miss a problem. The fact
21        that the FDA goes through an
22        application and misses a problem
23        does not relieve a pharmaceutical
24        company of the responsibility to

Page 83

1         bring that problem forward. In
2        other words, a pharmaceutical
3        company is not in the position of
4        being able to say, gee, we got
5        away with that one, they missed
6        it, so let's not tell them. The
7        pharmaceutical company has an
8        obligation to bring safety
9        problems forward, even if the FDA
10       misses it. And it was in that --
11       in the context of saying that kind
12       of thing that I put this in, yes.
13  BY MR. ROTHMAN:
14    Q.   Are you saying that FDA
15  missed a problem when it approved Vioxx?
16    A.   No, I don't think that's --
17  that's quite what the issue is here. If
18  you -- if you don't mind, I'd like to
19  take a moment to think about my answer to
20  that question.
21    Q.   Okay.
22        MR. BLACK: Do you want to
23        take a break now? It would be the
24        perfect time --

Page 84

1         MR. ROTHMAN: Well, no, not
2   in the middle of an answer. Let's
3   get an answer on the record and
4   then we can take a break.
5         MR. BLACK: I'm fine.
6         THE WITNESS: Please ask
7         your question again.
8   BY MR. ROTHMAN:
9     Q.   Let me see if I can rephrase
10  and maybe it easier for you to answer.
11        You're not saying in
12  paragraph 31 and in this discussion in
13  this part of your report that FDA missed
14  a problem when it approved Vioxx? What
15  you're doing here is just kind of making
16  a general comment on the review process?
17  Is that what you're doing here?
18        MR. BLACK: Objection.
19        THE WITNESS: The answer to
20        your question is that it's
21        possible that FDA did miss a
22        problem, but I don't know that. I
23        don't know whether it was missed.
24        I don't know whether they knew

Page 85

1         about it or did not know about it.
2        But the issues relating to the
3        balance between PGI2 and
4        thromboxane that were so much the
5        heart of this case, it's not clear
6        to me how much they were aware of
7        that, even though there was
8        information about it in the
9        literature and other places before
10       the results of the VIGOR study.
11       And so it's possible that they
12       missed that. I don't know that
13       they did or not. But it is a
14       question that has — it's a
15       question that has come up in my
16       mind.
17  BY MR. ROTHMAN:
18    Q.   All right. Well, I'm not
19  asking you what's possible, Doctor. I'm
20  asking you what you know.
21        Do you know if FDA missed a
22  problem when it reviewed the Vioxx NDA?
23    A.   May I point out that, as I
24  understood your question, you asked me am

22 (Pages 82 to 85)

Page 86

1   I saying that FDA missed a problem. I
2   believe that's the wording.
3        Q.   All right. Well, I --
4        A.   And I gave you the best
5   answer I could to your question. Now
6   you're asking a slightly different
7   question. Do I know that they missed a
8   problem? And the answer is, no, I don't
9   know that they missed a problem, but
10  neither do I know that they didn't.
11       Q.   Okay. But you're not aware
12  of them missing a problem with respect to
13  the Vioxx NDA? True?
14            MR. BLACK: Objection.
15            THE WITNESS: I believe I've
16       answered that question.
17  BY MR. ROTHMAN:
18       Q.   And the answer to that
19  question is, true --
20       A.   I do not know that they
21  missed a problem but I do not know that
22  they did not.
23            MR. ROTHMAN: Did you need
24       to take a break now?

Page 87

1            THE WITNESS: That would be
2       nice. Thank you.
3            MR. ROTHMAN: Okay.
4            (Recess taken from
5       11:04 a.m. to 11:12 a.m.)
6   BY MR. ROTHMAN:
7        Q.   Doctor, one last question on
8   the issue we were discussing before the
9   break.
10       A.   Okay.
11       Q.   Are you offering any
12  opinions in this case on whether FDA
13  missed a problem when it reviewed the
14  Vioxx NDA?
15            MR. BLACK: Objection.
16            THE WITNESS: Conceivably
17       that could come up, but at the
18       present time, I'm not planning to
19       do that.
20  BY MR. ROTHMAN:
21       Q.   If you look at paragraph 31
22  of your report, you say that 58 percent
23  of FDA reviewers believed that the
24  allotted six-month time for a priority

Page 88

1   review ( such as the Vioxx review) is
2   inadequate, correct?
3        A.   Yes.
4        Q.   You base that figure on the
5   inspector general's report, right?
6        A.   Yes.
7        Q.   You didn't do anything on
8   your own to confirm that number, did you
9   sir?
10       A.   No.
11       Q.   You didn't conduct any of
12  your own surveys of FDA reviewers?
13       A.   No.
14       Q.   Did you speak to any FDA
15  reviewers about their feelings on the
16  six-month review?
17       A.   No.
18       Q.   Now, the comment about the
19  reviewers feeling pressured to complete a
20  six-month review, that's a general
21  comment not specific to Vioxx?
22       A.   Yes.
23       Q.   I mean, you don't know one
24  way or the other whether the Vioxx

Page 89

1   reviewers felt this way?
2        A.   No, I don't.
3        Q.   You haven't communicated
4   with any of the Vioxx reviewers?
5        A.   That's right.
6        Q.   You didn't see any comments
7   in writing or in their medical officer
8   reviews where they said they needed more
9   time to review the Vioxx NDA?
10       A.   No, I don't think so.
11       Q.   Have you looked at the
12  medical officer reviews for Vioxx?
13       A.   Yes.
14       Q.   Do you recall how many there
15  were?
16       A.   Well, there was Villalba,
17  Targum, Pelayo. I think there were two
18  by Villalba. So that would have been
19  four.
20       Q.   I'm not sure if I made the
21  question clear, but I'm talking about the
22  reviews of the original Vioxx NDA. Have
23  you reviewed those?
24       A.   That would have been

Page 90

1    Villalba and Pelayo and yes, I did.
2        Q.   Any other reviews you can
3    recall of the original Vioxx NDA?
4        A.   No.
5        Q.   Now, as far as -- as far as
6    you know, sir, the FDA has never said
7    that they made a mistake in approving
8    Vioxx, have they?
9            MR. BLACK:  Objection.
10           THE WITNESS:  No, the FDA
11       has never characterized what
12       happened as a mistake on their
13       part.
14   BY MR. ROTHMAN:
15       Q.   And they've never said in
16   sum or in substance that they shouldn't
17   have approved Vioxx, true?
18           MR. BLACK:  Objection.
19           THE WITNESS:  I'm not aware
20       of them using those words with
21       respect to Vioxx.
22   BY MR. ROTHMAN:
23       Q.   Do you have any sense of the
24   size of the Vioxx NDA?

Page 91

1        A.   Yeah, I did actually see --
2    I actually had it on disc, and there were
3    hundreds of volumes on disc.
4        Q.   Have you reviewed all of
5    those volumes?
6        A.   I reviewed ones related to
7    this case, I did review them.
8        Q.   Which ones did you review?
9        A.   I reviewed ones involved
10   with the -- ones intended for the
11   biopharmaceutics reviewer and ones
12   intended for the clinical reviewer.
13       Q.   Did you review the ISE?
14       A.   Yeah.
15       Q.   Did you review the ISS?
16       A.   Mainly the ISS, but I did
17   review parts of that, yes.  I mean, these
18   are long documents and I didn't
19   necessarily review everything word for
20   word, but I did look at those things,
21   yes.
22       Q.   Just for the record, what's
23   an ISS?
24       A.   Integrated summary of

Page 92

1    safety.
2        Q.   Okay.  And how much of the
3    ISS did you review?
4        A.   I can't tell you exactly.  I
5    reviewed parts of it.  I went through
6    parts of it.
7        Q.   And what's an ISE?
8        A.   Integrated summary of
9    efficacy.
10       Q.   How much of the ISE did you
11   review?
12       A.   Probably not a lot of that.
13       Q.   Okay.  How much -- do you
14   have a sense of how much time you spent
15   reviewing the Vioxx NDA?
16       A.   It was probably one day I
17   spent with the NDA and different
18   questions that I had, exploring them with
19   it.
20       Q.   In terms of the number of
21   patients studied, do you have any
22   opinions about the Vioxx NDA?
23       A.   It was a big NDA in terms of
24   the clinical database.

Page 93

1        Q.   It exceeded the ICH
2    standards?
3        A.   Actually, I'm not sure what
4    the ICH standard is on that.  Perhaps you
5    could tell me.
6        Q.   Are you aware that the ICH
7    has promulgated standards on --
8        A.   I don't doubt it.
9        Q.   And that the FDA has adopted
10   those standards?
11       A.   That's very likely, yes.
12       Q.   You're just -- you don't
13   know what they are?
14       A.   I don't know the numbers
15   involved, no.
16       Q.   Okay.  Let's mark as
17   Exhibit 3 the report from the Office of
18   Inspector General.
19           (Whereupon, Deposition
20       Exhibit No. Kapit-3, DESCRIPTION,
21       was marked for identification.)
22   BY MR. ROTHMAN:
23       Q.   And my question to you, sir,
24   is that the report you --

24 (Pages 90 to 93)

Page 94

1        MR. BLACK:  Do you have an
2     extra copy, counsel?
3  BY MR. ROTHMAN:
4     Q.    -- refer to in your expert
5  report?
6     A.    Yes, it is.
7     Q.    I take it you're familiar
8  with the report that we've marked as
9  Exhibit 3, correct?
10     A.    Yes.
11     Q.    Let me ask you this, Dr.
12  Kapit.  If you asked a bunch of people if
13  they had enough time to get their job
14  done, would you expect a lot of them to
15  say that they need more time?
16        MR. BLACK:  Objection.
17        THE WITNESS:  Yeah, I
18     certainly think that asking me for
19     an opinion about what the average
20     worker would say is not something
21     that I have any particular ability
22     to comment on as opposed to
23     anybody else.  I do want to say,
24     though, that the six-month time

Page 95

1     frame, I had a lot to do with
2     NDAs, and I want to say that the
3     six-month time frame that the
4     reviewers expressed problems
5     about, that I fully agree with
6     that, that my own experience at
7     the FDA supports that and I take
8     that comment from the reviewers or
9     that survey result from the
10     reviewers as expressing a real
11     problem.  It's not merely the
12     griping of employees who would
13     always like more time and that, in
14     fact, it does reflect real
15     concerns about the adequacy of
16     reviews done.
17  BY MR. ROTHMAN:
18     Q.    The inspector general's
19  office conducted a survey of medical
20  officer reviewers, correct?
21     A.    Yes.
22     Q.    It was a voluntary survey?
23     A.    Yes.
24     Q.    And it was anonymous survey,

Page 96

1  correct?
2     A.    Yes.
3     Q.    And even though it was
4  anonymous, only 47 percent of the
5  reviewers who got the survey completed it
6  and sent it back in?
7     A.    That's not bad for a survey,
8  as far as I understand surveys go, a
9  47 percent response rate.
10     Q.    You understand that there
11  was a 47 percent response rate?
12     A.    Uh-huh.
13     Q.    That's a yes?
14     A.    I'm going to have to look it
15  up if you want me to check.  I did read
16  that number.  I can't remember offhand
17  what that number is, but that sounds like
18  what I remember.
19     Q.    When I asked you if it was a
20  yes it was because you gave me a
21  nonverbal answer.
22     A.    I see.
23     Q.    But if you want to
24  confirm --

Page 97

1     A.    I don't doubt that your --
2  sorry.
3     Q.    Let's do it one at a time.
4     A.    Okay.
5     Q.    If you want to confirm it's
6  47 percent, turn to the executive summary
7  of that document, page little I, and if
8  you look down at paragraph 3 --
9     A.    Yes.
10     Q.    -- on the page, can we agree
11  that the estimated response rate was
12  47 percent?
13     A.    Yes.
14     Q.    Now, the survey was not
15  intended to review the quality of the FDA
16  review process, right?
17        MR. BLACK:  Objection.
18        THE WITNESS:  I don't agree
19     with that.  It seems to me that
20     that's part and parcel of what the
21     reason for doing such a survey
22     would be is that that would be one
23     way of assessing the quality of
24     reviews is to ask reviewers

Page 98

1    whether they felt pressured.  The
2    quality issue is an important part
3    of the rationale for a survey like
4    this.
5  BY MR. ROTHMAN:
6    Q.   Well, the inspector
7  general's office wasn't trying to assess
8  the scientific merit of the decisions
9  that FDA has made, were they?
10    MR. BLACK:  Objection.
11    THE WITNESS:  No, they
12    weren't looking at, I mean, the
13    kind of thing that you have just
14    hypothesized is that they compare
15    a specific decision and they
16    invite an outside expert panel
17    assigned to assess the scientific
18    quality, and, in fact, I was part
19    of such a survey, such a process
20    done in biologics at one point.
21    But this was not -- was not a
22    gathering of outside experts to
23    look at the scientific quality.
24    This was a survey, as it's clearly

Page 99

1    described, of whether the FDA
2    reviewers felt that there were
3    problems that might inhibit the
4    quality of their work.
5  BY MR. ROTHMAN:
6    Q.   This inquiry does not assess
7  the scientific merit of the decisions
8  that FDA has made?  Do you agree with
9  that statement or not?
10    MR. BLACK:  Objection.
11    THE WITNESS:  I believe I
12    said that.
13  BY MR. ROTHMAN:
14    Q.   You agree with that
15  statement?
16    A.   Yes.
17    Q.   And the inspect general's
18  office didn't seek to obtain evidence
19  about a public health concern, right?
20    A.   Once again --
21    MR. BLACK:  Objection.
22    THE WITNESS:  -- that
23    question is a very broad
24    characterization, and it seems to

Page 100

1    me the whole point of doing this
2    kind of survey is because of
3    concerns about public health,
4    about problems with the FDA review
5    process that might reflect on the
6    quality of those reviews and the
7    implications of that for public
8    health, that that has to be
9    considered part and parcel of this
10    kind of thing.
11  BY MR. ROTHMAN:
12    Q.   All right.  Let me try to
13  ask it again.  The inspector general's
14  office did not seek to obtain evidence of
15  a public health concern in this inquiry?
16  Do you agree or disagree with that?
17    MR. BLACK:  Objection.
18    THE WITNESS:  I disagree.  I
19    disagree with that.
20  BY MR. ROTHMAN:
21    Q.   Okay.  The inspect general's
22  office, in fact, found no evidence of a
23  public health concern in this report?
24    MR. BLACK:  Objection.

Page 101

1  BY MR. ROTHMAN:
2    Q.   Isn't that true?
3    A.   I do not agree with that,
4  that, in fact, it's because this -- the
5  reviewers' problems with the amount of
6  time available for reviews that I believe
7  that a public health concern is raised
8  and I believe that there are many people,
9  many people throughout the country, who
10  are concerned about the FDA who view this
11  as raising issues about a public health
12  concern.
13    Q.   Reviewer concerns about time
14  constraints do not necessarily mean that
15  there's a threat to public health, true?
16    MR. BLACK:  Objection.
17    THE WITNESS:  That -- if
18    you're asking whether there's an
19    absolute implication of a threat
20    to public health, no.  But it
21    certainly raises a question that
22    has public health implications.
23  BY MR. ROTHMAN:
24    Q.   As part of this report, you

Page 102

1 understand that the inspector general's
2 office conducted interviews with the
3 medical reviewers at the FDA?
4         MR. BLACK: Objection.
5         THE WITNESS: Uh-huh. Yes,
6     I do.
7 BY MR. ROTHMAN:
8     Q.   And do you know what the
9 reviewers said in those interviews about
10 the quality of their reviews?
11     A.   I believe they have a couple
12 of quotations in this report. I don't
13 remember them.
14     Q.   All right. Can you look at
15 page little 3 in the executive summary,
16 the second paragraph down from the top.
17     A.   Yes.
18     Q.   Second sentence begins, we
19 have no evidence of a public health
20 concern, nor did we seek to obtain such
21 evidence. That's what it says there,
22 right?
23     A.   That is indeed what it says.
24     Q.   And it says, reviewers

Page 103

1 commented in interviews that they did not
2 believe that they were ignoring key
3 information or data contained in the
4 applications in order to meet time goals.
5     A.   That's what it says, yes.
6     Q.   And you don't have any basis
7 to dispute the comments made here in the
8 inspector general's report, do you, sir?
9         MR. BLACK: Objection.
10        THE WITNESS: I believe
11    that -- that the question you're
12    asking is, does this report raise
13    issues -- raise issues that may be
14    a public health concern. And I
15    believe that it does.
16 BY MR. ROTHMAN:
17    Q.   So you disagree with the
18 inspector general's office?
19    A.   No, I'm not exactly
20 disagreeing.
21    Q.   Well, you disagree with them
22 when they say they have no evidence of a
23 public health concern?
24    A.   There's a slight difference

Page 104

1 between what I'm saying and what they're
2 saying here. And --
3     Q.   Okay. Sir, with all due
4 respect, I didn't ask you if there was a
5 difference.
6         MR. BLACK: Counsel, let him
7     answer the question.
8         MR. ROTHMAN: Hold on.
9 BY MR. ROTHMAN:
10    Q.   All I'm asking is whether
11 you agree or disagree with their comment
12 that they have no evidence of a public
13 health concern?
14        MR. BLACK: I think you have
15    to let him answer the question the
16    way he's answering the question.
17    I'm not sure that's amenable to a
18    yes-or-no answer.
19        MR. ROTHMAN: I didn't ask a
20    yes-or-no question.
21 BY MR. ROTHMAN:
22    Q.   Can you answer the question
23 that's pending, Doctor?
24    A.   I don't disagree with this

Page 105

1 sentence. They put it in here and I
2 don't -- I'm not saying they're putting
3 in a false statement. But I don't think
4 this sentence implies that there are no
5 public health concerns suggested by this
6 report. The fact that they -- what
7 they're saying is that they have -- they
8 did not get evidence of a specific, to
9 take an example, they did not get
10 evidence that Vioxx was a -- has a major
11 public health problem. That's not what
12 they got in this report.
13    Q.   Nor were they seeking to
14 obtain such evidence?
15    A.   That's right. And they
16 weren't seeking to obtain something like
17 Vioxx is a public health problem. But
18 they are -- they were looking for
19 evidence that, in fact, bears on exactly
20 the question, a question related to
21 Vioxx, which is, is there -- are there
22 problems in doing reviews that may make
23 Vioxx-like problems more common. That's
24 what they were assessing. And when they

1　say they have no evidence, what they mean
2　is they have no specific evidence that we
3　uncovered a Vioxx-like issue. But they
4　did uncover things that may go to perhaps
5　touching on why Vioxx issues --
6　Vioxx-type issues come up.
7　　Q.　Okay. They did not find
8　that reviewers ignored information or
9　data in applications in order to meet
10　time goals, correct?
11　　　MR. BLACK: Objection.
12　　　THE WITNESS: And, once
13　　again, they say that the reviewers
14　　told them that they were not
15　　ignoring key information.
16　　However, there's a big difference
17　　between ignoring information and
18　　doing all the things you need to
19　　do to check out that information,
20　　and that is what is affected by
21　　reviewer time. A reviewer may be
22　　aware of that information, may be
23　　consider -- may consider that
24　　information, but a reviewer may

1　not have time to check out all the
2　questions related to that
3　information that the reviewer
4　might want to check out if the
5　reviewer did have sufficient time.
6　　　MR. ROTHMAN: Can you please
7　read back my last question.
8　　　(Whereupon, the court
9　　reporter read back from the
10　　record.)
11　　　THE WITNESS: They did not
12　　find that reviewers ignored --
13　BY MR. ROTHMAN:
14　　Q.　Continue, please.
15　　A.　The reviewer ignored key
16　information in the sense that they were
17　unaware of it or that they did nothing
18　about it. Ignoring is a very low
19　standard here, and they didn't find that
20　reviewers ignored information, nor did
21　they -- nor are they saying that
22　reviewers had enough time to complete a
23　review of that information.
24　　Q.　At the top of page little 3,

1　Doctor, do you see that they're talking
2　about user fees? Maybe I'm on the wrong
3　page. I'm sorry, on page 2.
4　　A.　Yes.
5　　Q.　At the top of page 2, do you
6　see where they're discussing user fees?
7　　A.　Yes.
8　　Q.　What is a user fee?
9　　A.　It's charging a company for
10　various regulatory actions that the FDA
11　takes with regard to its submission --
12　the company's submissions, including
13　regulatory actions, on the review of an
14　application to market, an NDA or a BLA.
15　　Q.　It's like a filing fee?
16　　A.　Yes, that's right.
17　　Q.　When a company files a New
18　Drug Application, it has to pay one of
19　these fees?
20　　A.　Yes.
21　　Q.　It's paid at the time of the
22　filing?
23　　A.　I actually don't know the
24　details of how it's paid.

1　　Q.　Okay. Well, do you know if
2　it's paid at the time that the FDA makes
3　its decision on the application?
4　　A.　I actually don't know much
5　at all about the nuts and bolts of how
6　PADUFA works.
7　　Q.　Do you know if the FDA
8　refunds the money to the pharmaceutical
9　company if it rejects the application?
10　　A.　Let me explain that PADUFA
11　came into effect in the mid-'90s. At
12　that time I was in a postmarketing
13　division. Postmarketing, all during the
14　time that I worked at the FDA, was
15　excluded from PADUFA. And so I had no --
16　I had no personal contact with
17　PADUFA-related issues at all during the
18　time that it was in effect. So, I'm
19　sorry, I can't answer your questions. I
20　just know that there are fees that got
21　charged and a few other things of general
22　import about it, but I don't know
23　anything about the nuts and bolts of how
24　it actually worked.

Page 110

1      Q.   Do you know what the FDA
2  does with the fees?
3      A.   It uses it to fund
4  reviewers. I know that's one thing, that
5  it hires more reviewers with the money.
6      Q.   And also computer systems?
7      A.   Perhaps. I don't -- I don't
8  know.
9      Q.   Okay. If you look at the
10  top of page 2, it says, the FDA primarily
11  used the funds from user fees to hire
12  more staff and to implement computer
13  systems to speed up its review of NDAs.
14      A.   Okay.
15      Q.   That's what it says there?
16      A.   That's indeed what it says.
17      Q.   Okay. And you have no
18  reason to quibble with that statement?
19      A.   No.
20      Q.   Okay. Do you have an
21  opinion on whether the enactment of
22  PADUFA has affected the FDA's review of
23  drugs?
24      A.   Yes, I do.

Page 111

1      Q.   What's that opinion?
2      A.   It's my understanding that
3  the timelines that we talk about, for
4  example, in connection with this IG's
5  report are developed in negotiations with
6  the companies that are PADUFA
7  negotiations. The fees are negotiated in
8  negotiations that also include deadlines
9  and timelines and working all that out.
10  So to the extent that reviewers are
11  working under timelines, the pressures
12  that this report describes have come into
13  play. And, yes, I do believe that this
14  has sometimes had a negative effect on
15  the review process, maybe not always,
16  maybe there are some -- other situations
17  in which it's actually improved the
18  review process. But certainly the PADUFA
19  law has affected the review process,
20  positively in some respects, negatively
21  in other respects.
22      Q.   Okay. I'm not quite sure
23  what you're referring to when you say
24  there's now negotiations over timelines.

Page 112

1  Can you explain that to me?
2      A.   As I say, the fees are set
3  and the timelines are created, milestones
4  are put in place, in discussions with the
5  company, with the pharmaceutical
6  industry, not any specific companies. At
7  least that's my understanding as to how
8  it works. And that those discussions
9  occur in the context of the PADUFA law
10  and perhaps also in the context of the
11  FDAMA law, but I'm not sure about that.
12  But that's my understanding of how it
13  works.
14      Q.   Okay. You're talking about
15  the creation of the law now; you're not
16  talking about how it works?
17      A.   No. I'm talking about the
18  ongoing process that the law sets up.
19      Q.   So when a company files --
20      A.   PADUFA fees have been
21  renegotiated and the PADUFA law has been
22  modified. So there's a series of
23  negotiations that are going on pretty
24  much all -- ever since the law was

Page 113

1  originally passed. And it's my
2  understanding that these negotiations are
3  the negotiations in which things get --
4  timelines get put in place, milestones
5  get put in place, fees get set. And so
6  they're all part of the same process of
7  coming to some agreement with the
8  pharmaceutical industries about how
9  things are going to work at the FDA.
10      Q.   How many times has the
11  PADUFA law been re authorized?
12      A.   I believe I was aware of
13  three -- three -- not re -- I believe I'm
14  only aware of one PADUFA reauthorization,
15  but I'm aware of two or three
16  renegotiations of this whole bunch of
17  things. Now, I haven't been part of
18  those negotiations, so I have no
19  firsthand knowledge of what goes on, but
20  you asked me what my opinion was, and so
21  I'm giving you my opinion based on my
22  understanding.
23      Q.   All right. You understand
24  that PADUFA is an act of Congress?

Page 114

1      A.   Yes.
2      Q.   Congress is the one that's
3   re authorizing it each time?
4      A.   Yes.  And it was re
5   authorized, I'm aware of recent -- not
6   too long ago.  I think that was the first
7   PADUFA reauthorization but there have
8   been other renegotiations of the,
9   quote/unquote, contract.  I guess it is a
10  contract between the FDA and the
11  industry.
12     Q.   If you turn to page 8,
13  Doctor, in the first full section on that
14  page, where it says FDA gives
15  considerable attention to synthesizing
16  review information across review
17  disciplines, do you see that?
18     A.   Yes.
19     Q.   The first sentence.  The FDA
20  relies on multi-disciplinary teams to
21  review NDAs.  Do you agree with that?
22     A.   Yes.
23     Q.   The teams meet throughout
24  the review process to discuss the status

Page 115

1   of their reviews and to share ideas.  Is
2   that consistent with your FDA experience?
3      A.   Yes.  Although this is --
4   this happens much more often and much
5   more regularly than when I was working on
6   NDAs in the '80s, although it is much
7   more in line with what my experience was
8   at the Center For Biologics in the '90s
9   and the early years of this century.
10     Q.   Okay.  I mean, the
11  paragraphs here go on to suggest that the
12  time goals have helped to improve this
13  coordination by encouraging team members
14  to work on the same application at the
15  same time, right?
16        MR. BLACK:  Objection.
17        THE WITNESS:  That may be
18     one of the positive results.
19  BY MR. ROTHMAN:
20     Q.   Okay.  You don't disagree
21  with that comment?
22     A.   I don't, no.
23     Q.   Okay.  If you turn to page
24  9, there's a section that says, FDA

Page 116

1   relies on a core of expert scientific
2   reviewers.  Do you see that?
3      A.   Yes.
4      Q.   The first sentence reads,
5   the FDA's in-house expertise is a key as
6   set of the review process.  Did I read
7   that correctly?
8      A.   Yes.
9      Q.   Do you agree that the FDA
10  has in-house expertise?
11     A.   Yes.
12     Q.   The FDA is comprised of
13  hundreds of scientific experts, including
14  physicians, chemists, statisticians,
15  pharmacologist's and toxicologist's, most
16  of whom have advanced degrees.  Is that
17  true?
18     A.   Yes.
19     Q.   Reviewers bring scientific
20  and technical expertise and a strong
21  commitment to public health.  Is that
22  true?
23     A.   Yes.
24     Q.   Many have left positions in

Page 117

1   academia and private industry to work at
2   FDA and serve the public.  Is that true?
3      A.   Yes.
4      Q.   Okay.  If you turn back to
5   your expert report, which is Exhibit 2, I
6   think.
7        MR. BLACK:  Two.
8   BY MR. ROTHMAN:
9      Q.   I noticed in some of the
10  paragraphs you deleted the phrase medical
11  and ethical in describing obligations of
12  drug companies.  Is that something that
13  you did, Doctor?
14     A.   Yes.
15     Q.   Why did you do that?
16     A.   It was because the
17  discussion of my opinions might be
18  more -- might be complicated in an
19  unnecessary way by putting those words
20  in.
21     Q.   Are you planning to offer
22  opinions in this case about whether Merck
23  acted in accordance with medical and
24  ethical obligations?

Page 118

1    A.   I might, yes.
2    Q.   Okay.  Which medical and
3  ethical obligations might you opine on?
4    A.   Well, as I've said in the
5  report, that -- in fact, we discussed
6  this at the beginning of the deposition
7  today about the --
8        MR. BLACK:  I'm going to
9    object to the form of the
10   question, but go on, continue your
11   answer.
12       THE WITNESS:  -- about
13   the -- Merck's ability to --
14   Merck's bringing forward safety
15   problems and that, for example, if
16   an FDA reviewer missed a safety
17   problem, that that didn't relieve
18   the company from the obligation to
19   bring such a problem forward.
20   Now, that's specified in
21   regulations, so it's a regulatory
22   issue.  And I believe we took out
23   those words because it
24   unnecessarily complicates the

Page 119

1    regulatory issue involved to point
2    out that there are also medical
3    and ethical issues connected with
4    that.  So, I mean, there may be
5    things that I say that touch --
6    that have medical and ethical
7    implications.  But our focus -- we
8    wanted to focus specifically on
9    the regulatory issues.
10  BY MR. ROTHMAN:
11   Q.   Are there a set of written
12   medical and ethical standards that you're
13   relying on?
14   A.   No.
15   Q.   So when you say medical and
16   ethical obligations, what are the source
17   of those obligations?
18       MR. BLACK:  Objection.
19       THE WITNESS:  I meant to
20   answer you -- as I understood your
21   question, I meant to say that my
22   answers may have -- may touch on
23   medical and ethical issues, not
24   that I'm necessarily going to

Page 120

1    focus on them per se.  That the
2    issues I will be talking about
3    mainly are regulatory.  The whole
4    point of regulations is that they
5    have medical and ethical
6    implications.  So that's why
7    they're there.  So it's
8    unavoidable that things may touch
9    on those areas.
10  BY MR. ROTHMAN:
11   Q.   All right.  Well, I noticed
12  in paragraph 31 of your report, you refer
13  to an issue -- in the last sentence, you
14  refer to initiatives taken by ethical
15  pharmaceutical companies.
16   A.   Yes.
17   Q.   Did you mean to leave the
18  word ethical in place in that paragraph?
19   A.   Yes, I did.  And I can
20  explain why.
21   Q.   Okay.
22   A.   It's because throughout the
23  30s, 40s, '50s and '60s, there were
24  certain pharmaceutical companies, and

Page 121

1    Merck was one of them, that characterized
2    themselves as ethical pharmaceutical
3    companies, and that was deliberately used
4    by those companies at that time, to
5    differentiate themselves from snake
6    salesmen and things like that.  So there
7    was a time when the pharmaceutical
8    companies made a whole point of calling
9    themselves the ethical pharmaceutical
10   companies as differentiated from
11   pharmaceutical companies that weren't
12   ethical.  So I left it in reference to
13   that content that Merck had certainly of
14   itself at one time and I believe it
15   probably still would like to have of
16   itself today.
17   Q.   Are you opining in this
18  paragraph 31 that a company that doesn't
19  take the initiative that's referred to in
20  that last sentence that it's an unethical
21  company?
22       MR. BLACK:  Objection.
23       THE WITNESS:  What Merck and
24   other companies who call

1      themselves ethical pharmaceutical
2      companies refer to, I believe they
3      did things in a way that
4      emphasized quality control,
5      science and concern for patients
6      and public health, and that's what
7      I'm referring to here.  And so
8      companies that are concerned for
9      quality science, patient and
10     public health, that they should do
11     things for those reasons.  They
12     should -- they should follow the
13     FDA regulations for those reasons.
14     And that's part of the way they
15     think of themselves, the way the
16     public thinks of them and so
17     forth.
18   BY MR. ROTHMAN:
19     Q.    Are you planning to offer an
20   opinion that Merck is unethical?
21        MR. BLACK:  Objection.
22        THE WITNESS:  Not in that --
23     those terms, no.
24   BY MR. ROTHMAN:

1      Q.    Are you planning to -- let
2    me just close the loop on this.  Are you
3    planning to offer an opinion that Merck
4    has acted unethically with respect to
5    Vioxx?
6      A.    I probably -- well, I have
7    no plans to say it in that way, but --
8    but I'm going to be offering opinions
9    that Merck should have done things that
10   it didn't do.
11     Q.    Okay.  But you're going to
12   say that without reference to some
13   ethical code of some sort; is that right?
14     A.    Right.  Other than what's in
15   the regulations.  And the regulations, I
16   mean, to some extent they are an ethical
17   code, but it's with reference to the
18   regulations.
19     Q.    Okay.  New subject.
20     A.    Okay.
21     Q.    Let's talk about labeling.
22   The FDA has to approve all prescription
23   drug labels, true?
24     A.    Yes.

1      Q.    If a company puts a label on
2    a product without obtaining FDA approval,
3    the FDA can declare the product
4    misbranded?
5        MR. BLACK:  Objection.
6    BY MR. ROTHMAN:
7      Q.    Is that true?
8      A.    Actually -- yeah, I believe
9    that's correct, yes.
10     Q.    The FDA can ask the company
11   to take the drug off the market, true?
12     A.    Yes.
13     Q.    The FDA can seize the
14   product as an imminent hazard to public
15   health?
16     A.    I believe they have to go to
17   court to get that permission.
18     Q.    But they can take that step
19   if they want to?
20     A.    They can go to court to get
21   an order to seize the product, I believe.
22     Q.    And in paragraph 55 of your
23   expert report, you say, "As a practical
24   matter, the FDA tries to avoid declaring

1    an imminent hazard whenever possible."
2      A.    Yes.
3      Q.    What is the basis for that
4    statement?
5      A.    It causes an enormous
6    disruption to the whole medical system
7    when they do that.  Patients who are
8    relying on the drug all of a sudden don't
9    have the drug available to them.  And
10   that's probably one of the biggest issues
11   with declaring an imminent hazard and
12   seizing the drug is that patients who are
13   taking it all of a sudden don't have
14   their drug.  And it's also expense,
15   pharmaceutical company expense and
16   expense for the pharmacies and
17   distributors and the doctors get all
18   upset about not being able to prescribe
19   the drug.  So, I mean, it has a -- it has
20   very negative consequences for the
21   medical system in this country.  And if
22   it's possible to resolve whatever issue
23   is pending without declaring an imminent
24   hazard, the FDA would certainly do it

Page 126

1   that way.
2       Q.   Okay.  Do you have any
3   written documents where the FDA says that
4   they try to avoid declaring an imminent
5   hazard?
6       A.   Well, I mean, I think that
7   the documents -- the testimony by Sandy
8   Kweder in front of Congress and on a note
9   from Anne Trontell to her superiors don't
10  say it in those words, but they do imply
11  that, yeah, this is something that the
12  FDA would rather not do.
13      Q.   Okay.  Any other written
14  documents?
15      A.   Those are the two that come
16  to mind.
17      Q.   You go on to say in that
18  paragraph, "If a pharmaceutical company
19  wishes to resist FDA proposals, they can
20  refuse to implement the Agency's
21  recommendations, in effect, it dares the
22  FDA to take action."
23      A.   Yes.
24      Q.   Can you point me to an

Page 127

1   example where that's happened?
2       A.   I have to think about this
3   answer.
4           MR. BLACK:  Take your time.
5           THE WITNESS:  I think that's
6       what happened in November of 2001
7       in -- when FDA had come across
8       with its proposal for labeling in
9       October, and Merck responded very
10      negatively and we have some
11      e-mails from, I'm blocking -- you
12      can't help me out.
13          MR. BLACK:  It's your
14      memory, not mine.
15          THE WITNESS:  That's right.
16          MR. BLACK:  Would it help to
17      consult some document?
18          MR. ROTHMAN:  Let's not
19      coach the witness.
20          MR. BLACK:  Well...
21          THE WITNESS:  The e-mail is
22      from the Merck vice president,
23      whose name I'm blocking on at the
24      moment, in which he said he would

Page 128

1       never accept this.  And I think
2       it's my judgment that that's --
3       that this was a point at which the
4       company was just stone
5       stonewalling the FDA and, in
6       effect, daring it to force the
7       issue.
8   BY MR. ROTHMAN:
9       Q.   Do you think at that point
10  the company was daring the FDA to declare
11  an imminent hazard?
12      A.   I mean, the -- you -- I
13  think that there was -- that was in the
14  background, that they were putting up a
15  lot of resistance to the FDA at that
16  point knowing that the FDA didn't have a
17  whole lot of options.  Going to declaring
18  an imminent hazard was not something FDA
19  wanted to do.  In fact, Sandy Kweder said
20  that in front of Congress.  She said,
21  look, we can't tell them do it this way,
22  and that's the end of story.  And I think
23  that was what was going on at this time.
24      Q.   Have you seen any evidence

Page 129

1   that the FDA was contemplating declaring
2   an imminent hazard in November of 2001?
3       A.   No.  But I don't believe
4   that's the question you asked.  I think
5   that kind of issue was in the background,
6   that the FDA had limited actions and that
7   knowledge of that was one of the things
8   that motivated Merck at this -- at this
9   time.
10      Q.   Okay.  Well, we can agree --
11  well, first, before we move on.
12      A.   I'm going to check this
13  guy's name.
14      Q.   Well, let me help you.  Is
15  it Dr. Scolnick?
16      A.   Yes.
17      Q.   Okay.  We started off on
18  this.  I asked you for an example of a
19  situation in which a company refused to
20  implement the agency's recommendation and
21  dared the FDA to declare an imminent
22  hazard and you gave me the Vioxx example.
23      A.   Yes.
24      Q.   Do you have any other

Page 130

1    examples?
2         A.   I don't think I know of any
3    other examples of this.
4              There is -- there is --
5    actually, yeah, I do know of -- I do know
6    of another one.  It's going to be
7    difficult for me to recall the exact
8    specifics, but there was an issue with
9    immunoglobulins that I was involved in at
10   biologics in which there was a problem
11   with the formulation of one of them.  I
12   believe it had to do with sucrose and I
13   believe that there was a similar
14   resistance put up with that.  Actually,
15   there were a number of issues -- let
16   me -- now -- now that this is coming back
17   to me.  Yes.
18             This was actually not that
19   uncommon in biologics because the issue
20   in biologics was that the things like
21   immunoglobulins and biologic products are
22   not -- they're not -- there's not a lot
23   of reserve product.  And there were a
24   number of discussions, I remember, in the

Page 131

1    FDA that if we go declare an imminent
2    hazard to get the company to do what we
3    want, we're going to have to pull stuff
4    off the market and there's nothing to
5    replace them.  And I do remember that
6    kind of issue coming up in biologics on a
7    number of occasions.  I can't tell you
8    how often.  But now that you forced my
9    memory, I can recall that there were
10   imminent hazard -- the discussion of the
11   feasibility of imminent hazard was
12   brought up in a number of cases where we
13   had a biologic product and there was a
14   problem with it and whether we could
15   force the issue with the company.  And
16   one of the -- and one of the major
17   problems was that if we declared an
18   imminent hazard and seized it, we didn't
19   have anything else on the market to
20   replace it.  So, yeah, that was a big
21   issue.  Actually, it came up quite -- a
22   number of different times in biologics on
23   things I worked on.
24        Q.   Were those labeling issues?

Page 132

1         A.   No.  Those were usually
2    issues of public health hazard, like the
3    sucrose issue, I think, it was causing
4    kidney damage and there was a bacterial
5    contamination issue at another time.  And
6    I can't be specific, but I remember this
7    being an issue on a number of different
8    occasions in biologics, yes.
9         Q.   And in this example you're
10   giving, did the FDA declare an imminent
11   hazard?
12        A.   No.
13        Q.   In the Vioxx example you
14   gave, the FDA did not declare an imminent
15   hazard?
16        A.   That's right.  The FDA is
17   very reluctant to declare an imminent
18   hazard.  It really tries not to do it.
19        Q.   Isn't it true that, in
20   practice, the FDA usually doesn't get to
21   the point of declaring an imminent hazard
22   because the drug company does what the
23   FDA is asking?
24        A.   That's certainly the

Page 133

1    experience I had.  I was really surprised
2    in this Vioxx case at how much resistance
3    the company put up and how successful it
4    was in resisting because my experience is
5    just what you said, that the company
6    usually goes along pretty quickly.
7         Q.   The FDA, after the -- I'm
8    sorry.  Back up.
9              The FDA asked Pfizer to
10   withdraw Bextra from the market, right?
11        A.   Yes.
12        Q.   Do you know whether Pfizer
13   believes that Bextra should still be on
14   the market?
15        A.   I don't know for sure, but
16   I'm sure they do.
17             MR. BLACK:  Objection.
18   Form.
19   BY MR. ROTHMAN:
20        Q.   Now, the advisory committee
21   in 2005 voted to keep Bextra on the
22   market.
23        A.   I see.
24        Q.   Do you agree?

Page 134

1    A.   I didn't look into that.
2    Q.   And the FDA told Pfizer to
3  take it off, right?
4         MR. BLACK: Objection.
5         THE WITNESS: I know it -- I
6    know that's what happened.
7  BY MR. ROTHMAN:
8    Q.   And what did Pfizer do?
9         MR. BLACK: Objection.
10        THE WITNESS: I'm sorry, I
11   didn't -- I'm not familiar with
12   that.
13 BY MR. ROTHMAN:
14   Q.   Is Bextra on the market
15 today?
16   A.   No.
17   Q.   In your prior report for the
18 Plunkett case, you didn't address Merck's
19 preapproval testing of Vioxx, correct?
20   A.   Yes.
21   Q.   So when you first formulated
22 your opinions in this case, you hadn't
23 yet reviewed the IND for Vioxx, true?
24        MR. BLACK: Objection.

Page 135

1         THE WITNESS: I can't say
2    that I -- if you're implying that
3    I have reviewed the IND now,
4    that's -- I reviewed some
5    premarketing documents. I have
6    not reviewed the IND at this
7    point.
8  BY MR. ROTHMAN:
9    Q.   Okay. And you have now
10 reviewed portions of the NDA, right?
11   A.   Yes.
12        MR. BLACK: Objection.
13 BY MR. ROTHMAN:
14   Q.   When you first formulated
15 your opinions in this case, had you
16 reviewed the protocols from the Merck
17 studies?
18        MR. BLACK: Objection.
19        THE WITNESS: I can't
20   remember whether I reviewed any
21   protocols back then or not.
22 BY MR. ROTHMAN:
23   Q.   Have you done that now?
24   A.   I reviewed some protocols.

Page 136

1    Q.   Which ones?
2    A.   I cannot tell you at this
3  point. I'm sorry, I can't.
4    Q.   Did you review all of them?
5    A.   No, not all of them.
6    Q.   How many do you think you
7  reviewed?
8    A.   I probably wouldn't have
9  reviewed more than a few.
10   Q.   Have you reviewed clinical
11 study reports from the Merck studies?
12        MR. BLACK: Objection.
13        THE WITNESS: Yes, in the
14   portions of the NDA, I reviewed
15   some clinical study reports.
16 BY MR. ROTHMAN:
17   Q.   How many of those have you
18 reviewed?
19   A.   I just can't tell you. I
20 didn't keep track of things quite that
21 way.
22   Q.   Was it a few?
23   A.   Yes, it was a few.
24   Q.   And was that -- when did you

Page 137

1  do that work?
2    A.   Since May.
3    Q.   And was that the first time
4  you had reviewed those clinical study
5  reports?
6    A.   I did not have the NDA until
7  May.
8    Q.   So that was the first time
9  you reviewed those clinical study
10 reports?
11   A.   Clinical study reports,
12 right. It's possible I got them as
13 separate documents at some point before
14 then, but that's the best answer I can
15 give.
16   Q.   Okay. As far as you know,
17 you didn't review them before May?
18        MR. BLACK: Objection.
19        THE WITNESS: I'm not sure
20   whether I reviewed any clinical
21   study reports or not before May.
22   I'd have to go back. If you want
23   me to look back, I'll see if
24   there's anything in there from --

1  BY MR. ROTHMAN:
2      Q.   If you'd like to do that on
3  a break, you're free to do so.
4      A.   Okay.
5      Q.   Have you reviewed the
6  pharmacological data on Vioxx?
7          MR. BLACK: Objection.
8          THE WITNESS: Yes, pretty
9      much. I mean, in terms of the
10     COX-1, COX-2 stuff, I've seen a
11     number of articles and papers and
12     documents that talk about that.
13 BY MR. ROTHMAN:
14     Q.   And when did you do that
15 work?
16         MR. BLACK: Objection.
17         THE WITNESS: That was
18     before the first case. I did some
19     of it before the first case and
20     some of it since then.
21 BY MR. ROTHMAN:
22     Q.   Okay. How much have you
23 done since then?
24     A.   I don't divide it that way.

1          MR. BLACK: Objection.
2          THE WITNESS: Not
3      specifically beyond what I've read
4      in regard to the pharmacology of
5      Vioxx and perhaps some background
6      that goes back a long way, back
7      into medical school and stuff like
8      that. But I am not an expert in
9      prostaglandin biology New York
10     City.
11 BY MR. ROTHMAN:
12     Q.   Okay. So you had some
13 exposure to it in medical school?
14     A.   Yes. Actually, they were
15 talking about prostaglandins as far back
16 as medical school. Now, of course, I
17 don't think they had any idea how much
18 they would -- how important they would
19 become, but they were mentioning it back
20 then.
21     Q.   When you were at the FDA,
22 did any of your work involve
23 prostaglandin biology?
24     A.   I can't -- I don't recall

1  I can't tell you. Obviously this has
2  been -- pharmacology of COX-1 and COX-2
3  was part of what I looked at right from
4  the beginning. And so there was quite a
5  bit before and quite a bit since.
6      Q.   Are you a pharmacologist?
7      A.   No. But, obviously, as a
8  physician, I know a lot about
9  pharmacology. I certainly am competent
10 to read documents concerning pharmacology
11 and understands what they mean, and as a
12 physician, I can take that information
13 into account in making judgments. And
14 also, I might say, that not only am I a
15 physician, but I'm an experienced -- I
16 was an experienced FDA employee, and
17 taking pharmacological information into
18 account in making -- drawing conclusions
19 and making judgments based on that
20 information was part and parcel of the
21 work that I did for many years.
22     Q.   Okay. Do you consider
23 yourself knowledgeable about
24 prostaglandin biology?

1  anything specifically, but when I -- when
2  I was an adverse event reviewer in
3  biologics, reviewing adverse events
4  really requires acquaintance with many,
5  many, many different areas of
6  pharmacology and pharmacology-related
7  issues. So it's possible it came up in
8  different contexts, but I don't recall
9  anything specific.
10     Q.   Did you review adverse
11 events on NSAIDs?
12     A.   No. Well, I mean, only in
13 the extent that evaluating adverse events
14 in biologics might have involved patients
15 who were taking NSAIDs.
16     Q.   As a concomitant drug?
17     A.   As a concomitant drug,
18 that's right.
19     Q.   Thank you.
20         So is it fair to say you
21 re-immersed yourself in prostaglandin
22 biology for this case?
23     A.   Certainly I became
24 reacquainted with it in a big way at this

Page 142

1  time, yes, that's fair.
2      Q.   And your knowledge of
3  prostaglandin biology and the Vioxx
4  pharmacology comes from reading the
5  literature and seeing what other people
6  have said? You haven't done any
7  independent analysis of that data?
8      A.   Correct.
9          MR. BLACK: Objection.
10  BY MR. ROTHMAN:
11     Q.   Are you prepared to offer
12  opinions on Merck's preapproval testing
13  of Vioxx?
14         MR. BLACK: Objection.
15         THE WITNESS: There are
16     issues with regard to preapproval
17     testing that may come up, yes.
18  BY MR. ROTHMAN:
19     Q.   Which issues?
20     A.   Well, there are a number of
21  documents that I have reviewed in regard
22  to things that Merck was looking into in
23  regard to COX-1 and COX-2 that go back to
24  1997 and perhaps even to '96. And all of

Page 143

1  those touch on Merck's knowledge of the
2  possible ramifications of suppressing
3  PGI2 without suppressing thromboxane, and
4  it may come up that I opine about the
5  fact that Merck had this knowledge even
6  before the NDA.
7      Q.   Okay. Any other opinions
8  relating to Merck's preapproval testing
9  of Vioxx?
10     A.   I don't want to rule out
11  some others. I mean, that's all that I
12  have in mind at the present time as
13  standing out. I mean, there may be other
14  issues in those documents that might come
15  up.
16     Q.   Okay. And your opinions
17  with respect to the first issue that you
18  mentioned, the prostacyclin/thromboxane
19  balance, those are expressed now in your
20  report, correct?
21     A.   I believe I did touch upon
22  them now. I don't want to say that my
23  report completely expresses everything
24  that I -- the best way to talk about that

Page 144

1  would be to see the list of documents I
2  have from that period and what I'm
3  relying on. Issues in those documents
4  would be what I would be prepared or
5  perhaps be involved in talking about.
6      Q.   Okay. And putting aside
7  that issue, that thromboxane/
8  prostacyclin issue, you're not, as of
9  today, planning to offer any other
10  opinions about the sufficiency or
11  adequacy of Merck's preapproval testing
12  of Vioxx? And, again, I'm not asking you
13  that a question might -- an unanticipated
14  question might --
15     A.   There is an issue that it
16  may come up. It's been something that
17  I've noticed and has been a question for
18  me that the advisory committee that
19  examined in issue for Merck in '98 and
20  made a number of recommendations
21  including the recommendation about a
22  pooled analysis that Merck would have
23  done -- should have done, I'm sorry. And
24  I may opine that, in fact, they went

Page 145

1  ahead and submitted the NDA before that
2  analysis was done.
3      Q.   Okay. You're talking now
4  about Merck's board of scientific advises
5  sores?
6      A.   That's right, yes.
7      Q.   Not an FDA advisory
8  committee?
9      A.   That's correct.
10     Q.   Any other issues about the
11  preapproval testing that you can think of
12  as you sit here today?
13     A.   That -- another issue that's
14  related to that is that there's a
15  question of whether the issue of
16  cardiovascular toxicity should have
17  been -- a study should have been
18  specifically designed to look at that
19  question, whether that should have been
20  done prior to approval. And I may opine
21  about that question.
22     Q.   Okay. Any other opinions
23  that you might give relating to Merck's
24  preapproval testing?

Page 146

1      A.   I can't think of any other
2   at the moment.
3      Q.   Okay.  Now, you added -- if
4   you take a look at your expert report,
5   which is Exhibit 2, you added paragraphs
6   57 and 58, 59 and 60.
7      A.   Yes.
8      Q.   To your Plunkett report,
9   right?
10      A.   Uh-huh.
11         MR. BLACK:  Objection.
12   BY MR. ROTHMAN:
13      Q.   Was it your idea to add
14   those paragraphs?
15         MR. BLACK:  Objection.
16         THE WITNESS:  Well, the
17      information was sent to me and in
18      the act of sending it to me, the
19      whole issue of preapproval
20      questions was raised.  And, I
21      mean, to the extent that they
22      wanted some consultation on this,
23      I reviewed the documents they
24      sent.

Page 147

1   BY MR. ROTHMAN:
2      Q.   Did you ask them to send
3   those documents to you?
4         MR. BLACK:  Objection.
5         THE WITNESS:  I don't
6      believe so.
7   BY MR. ROTHMAN:
8      Q.   Okay.  And Mr. Black is the
9   one who sent those documents to you?
10      A.   Yes.
11      Q.   When did he send you those
12   documents?
13      A.   They would have been in the
14   last month or two.  I don't remember
15   exactly when.
16      Q.   Do you have correspondence
17   from Mr. Black that might indicate when
18   he sent you those documents?
19      A.   No.  The best way of --
20   would be the dates attached to it, to the
21   computer files.
22      Q.   You received these documents
23   electronically?
24      A.   Most of them did come

Page 148

1   electronically.  I'm not a hundred
2   percent.  But in the last month or two,
3   most documents came electronically, yeah.
4      Q.   Okay.  In paragraph 57 of
5   your report you discuss study 023.
6   Correct?
7      A.   Yes.
8      Q.   That's a study that was
9   conducted by Merck, right?
10      A.   Yes.
11      Q.   It was part of the Vioxx
12   element program?
13      A.   Yes.
14         MR. BLACK:  Objection.
15   BY MR. ROTHMAN:
16      Q.   And the people conducting
17   the study included some Merck scientists,
18   right?
19      A.   Yes.
20      Q.   And also some outside
21   researchers, like Dr. Garret FitzGerald
22   from the University of Pennsylvania?
23      A.   Actually, I didn't -- I
24   didn't note particularly who was doing

Page 149

1   it.
2      Q.   Okay.  Well, is it unusual
3   for a drug company to invite outside
4   researchers to help conduct clinical
5   studies?
6      A.   No.
7      Q.   Is that a good thing for
8   drug companies to do?
9         MR. BLACK:  Objection.
10         THE WITNESS:  Is that a good
11      thing for drug companies -- it's
12      not a bad thing.  Whether it's a
13      good thing depends upon how they
14      do it, but it's not a bad thing.
15   BY MR. ROTHMAN:
16      Q.   What was Merck testing in
17   study 023?
18      A.   Kidney -- affect on kidney
19   function.
20      Q.   Okay.  Do you know how many
21   arms there were in this study?
22      A.   I would have to look it up.
23   I don't remember.
24      Q.   If I tell you that the study

Page 150

1  had three arms, a Vioxx arm, a placebo
2  arm and an indomethacin arm, does that --
3      A.   It sounds about right, yes.
4      Q.   What's in indomethacin?
5      A.   An NSAID.
6      Q.   A non-selective?
7      A.   A non-selective NSAID.
8      Q.   So unlike Vioxx, it inhibits
9  both COX-1 and COX-2, right?
10     A.   Yes.
11     Q.   It's the researchers
12  measured the urinary secretions of the
13  people in this study?
14     A.   Yes.
15     Q.   And did they take blood
16  samples from the people in the study?
17     A.   They probably did.
18     Q.   You don't know for sure?
19     A.   If you want me to look it up
20  and read the information about the study,
21  I would.  I mean, those details are
22  difficult to keep in one's head
23  without -- basically that's what I have
24  documents for, so I can look them up.

Page 151

1      Q.   Okay.  What did they find in
2  the study regarding the excretion of a
3  metabolite of prostacyclin?
4      A.   It was reduced.
5          MR. BLACK:  Objection.
6  BY MR. ROTHMAN:
7      Q.   In which arm of the study?
8      A.   In both the Vioxx arm, the
9  rofecoxib arm, and the indomethacin arm.
10     Q.   What is prostacyclin?
11     A.   Prostacyclin is a blood
12  hormone released by endothelium in the
13  artery and it has the effect -- in this
14  case, one of the effects that is of most
15  importance is that it inhibits platelet
16  aggregation.
17     Q.   Okay.  And do you know where
18  prostacyclin is present in the body?
19     A.   Well, it's -- it's actually
20  in the kidneys certainly but it's also in
21  the vasculature.
22     Q.   Anywhere else in the body?
23     A.   I believe it's actually
24  widely present, but those are the two

Page 152

1  that stick out in my mind.
2      Q.   And what the researchers
3  measured in this study was not
4  prostacyclin itself --
5      A.   PGIM, the metabolite.
6          MR. BLACK:  Be careful,
7      you're talking over each other.
8          THE WITNESS:  Okay.
9  BY MR. ROTHMAN:
10     Q.   What's a met light?
11     A.   The body, when it degrades
12  this hormone, changes it into another
13  inactive form and that form gets excreted
14  in the urine.  So it's a metabolite
15  excreted in the urine.
16     Q.   And we can agree the PGIM
17  met light is the not same thing as
18  prostacyclin itself?
19     A.   That's correct.
20     Q.   And can we also agree that
21  Vioxx didn't completely reduce or inhibit
22  this metabolite?
23     A.   No.  But it reduced it.
24     Q.   Was this an expected

Page 153

1  finding?
2      A.   No, it was not.  They did
3  not expect that it would be reduced in --
4  and certainly in the end dough -- by the
5  PG secreted in the endothelium in the
6  vasculature was not an expected finding
7  because they did not expect that COX-2
8  had much of a role in synthesizing it,
9  but it turned out apparently that it did,
10  and so it was a surprise.
11     Q.   So nothing before this had
12  suggested that Vioxx might reduce
13  prostacyclin in the blood?
14         MR. BLACK:  Objection.
15         THE WITNESS:  I don't know
16     whether anything before that
17     suggested it or not.  I mean, I
18     know that it was -- they did not
19     realize that was -- actually,
20     some of the things that have been
21     said by some -- in some of the
22     documents suggest that there may
23     have been some question existing
24     before that, and so some people

Page 154

1     may have wondered, but this study,
2     in fact, confirmed that it
3     occurred elsewhere and that it was
4     important in the vasculature in
5     particular.
6  BY MR. ROTHMAN:
7     Q.   Now, at the same time as
8  study 023, the researchers looked at the
9  effect that Vioxx had on the metabolite
10 of thromboxane, right?
11    A.   Yes.
12    Q.   And what was that effect?
13    A.   It was -- it was decreased
14 by the indomethacin but not by the Vioxx.
15    Q.   Okay.  And putting these --
16 and what is the -- do you have the
17 medical background to draw any
18 conclusions from those two findings?
19    A.   Well, I understand what the
20 conclusion was because I've reviewed
21 that, and as a doctor, I'm able to
22 understand what that means.  I've
23 reviewed that information.
24    Q.   Okay.  And what's your

Page 156

1     Q.   Okay.  Now, in study 023
2  they measured the metabolites in the
3  urine, right?
4     A.   Yes.
5     Q.   And they couldn't tell where
6  in the body those metabolites were coming
7  from, true?
8     A.   True.  But it was clear from
9  that study that much of it was not coming
10 from the kidney.
11    Q.   But they couldn't tell where
12 in the body it was coming from, true?
13    A.   Well, I believe that in some
14 of the discussion, certainly the
15 vasculature was the primary likely
16 source.
17    Q.   Okay.  But that was a
18 hypothesis, not a proven fact, agreed?
19       MR. BLACK:  Objection.
20       THE WITNESS:  No.  I mean, I
21 wouldn't -- I wouldn't -- I
22 wouldn't characterize it as a pure
23 guess.  I mean, they had good
24 reason to believe that the rest

Page 155

1  conclusion?
2     A.   Well, thromboxane is
3  prothrombotic and prostacyclin is
4  antithrombotic.  Thromboxane promotes
5  blood clotting and prostacyclin is
6  something that prevents blood clotting.
7  It's also apparently true that this
8  particular induction of COX-2 in the
9  vasculature and the production of
10 prostacyclin in the vasculature is
11 enhanced in conditions in which -- in
12 areas of atherosclerosis in conditions
13 where there's inflammation, in
14 conditions -- in areas where there might
15 be an especial tendency to produce blood
16 clotting.  And so it's in those areas
17 that are at risk risk of blood clotting
18 where the induction of COX-2 occurs and
19 the increased production of prostacyclin
20 occurs, and that is necessary.  It's the
21 body needs to do that in order to prevent
22 blood clotting where it should not occur.
23 And that's at the heart of this whole
24 case.

Page 157

1  of -- that the majority of it came
2  from the vasculature.  It was a
3  high index of suspicion about
4  that.  So, yeah, it wasn't proved,
5  but let's put it this way, the
6  medical people and certainly the
7  company should have been aware
8  that the implication of this was
9  that there was a lot of
10 prostacyclin being produced in the
11 vasculature and it was that that
12 was being reduced by Vioxx.
13 BY MR. ROTHMAN:
14    Q.   Well, how would you tell
15 whether the prostacyclin was coming from
16 the bloodstream?
17       MR. BLACK:  Objection.
18       THE WITNESS:  I believe it's
19 the form of the metabolite,
20 although actually I'm a little
21 hazy on that point.  There may be
22 a difference in the metabolite.
23 There is a way to tell.  Actually,
24 I can't remember.  I think it may

Page 158

1  be different -- slightly
2  different -- slight differences in
3  the metabolite, but there is a
4  way, and I'd have to go back and
5  read the report again, of being
6  able to tell whether it's coming
7  mainly from the kidney -- no, I
8  think actually what it was, they
9  had estimates on the amount that
10  the kidney produced and there was
11  a lot more of it. I think there
12  was a lot more of it than could be
13  explained by the kidney
14  production, but I would have to go
15  back and read the report to know
16  for sure. But for whatever
17  reason, the study -- the
18  information concluded that there
19  was a lot of prostacyclin that had
20  to be coming from other places.
21  BY MR. ROTHMAN:
22      Q.   And the bloodstream would be
23  one of those other places?
24      A.   And the bloodstream was the

Page 159

1  prime candidate to suspect.
2      Q.   It could also be the lungs?
3      A.   Once again, the bloodstream
4  was the prime candidate. That was
5  certainly something that needed to be
6  high on the list of sources. And that's
7  the main point here, not whether there
8  was proof, but just that there was good
9  reason to think that the bloodstream was
10  a major source.
11      Q.   Well, do you think there was
12  proof or not?
13      MR. BLACK: Objection.
14      THE WITNESS: No, there
15  wasn't proof, but there was good
16  reason to think. And that's what
17  the prime impetus for future
18  action has to be. There's a high
19  index of suspicion that this
20  probably came from the
21  bloodstream.
22  BY MR. ROTHMAN:
23      Q.   Okay. Doctor, is there some
24  way to check the levels of prostacyclin

Page 160

1  in the human bloodstream?
2      A.   Yeah, I suppose there is.
3      Q.   How would you do that?
4      A.   Take a blood test.
5      Q.   Do you know if Merck ever
6  did that?
7      A.   I don't know. I mean, I
8  don't know the answer. At some point I'm
9  going to have to say that we're going to
10  have to stop talking to me because I am
11  not the expert. I am a medical doctor
12  interpreting information that I've read
13  and I'm going to have to refer to that
14  and tell you, go to -- go to the
15  plaintiffs' experts. They can talk about
16  this a lot better than me.
17      Q.   Okay. That's fair.
18
19      MR. BLACK: Not meaning to
20  imply that Dr. Kapit is not also a
21  plaintiffs' expert.
22      MR. ROTHMAN: Just not in
23  this area. Let's mark this as the
24  next exhibit.

Page 161

1      (Whereupon, Deposition
2  Exhibit No. Kapit-4, DESCRIPTION,
3  was marked for identification.)
4  BY MR. ROTHMAN:
5      Q.   Doctor, do you recognize
6  Exhibit 4? And go ahead and take
7  whatever time you need to look at it.
8      A.   I have not seen this before.
9      Q.   Well, do you want to take a
10  look at it now?
11      A.   Okay. It takes me a while
12  to do this. Are you sure you want me to
13  do that? How do you do to do it?
14      Q.   I'm willing to try and walk
15  through it with you, if you'll bear with
16  me, or you can read it over.
17      MR. BLACK: Why don't you
18  take a look at it and... while
19  he's doing that, Mr. Rothman, do
20  you have any anticipation of
21  taking a break for lunch at some
22  point?
23      SPEAKER NO. 2: I do. Lunch
24  is one of my three favorite meals

Page 162

1    of the day.
2         MR. BLACK:  So, I mean --
3         MR. ROTHMAN:  I think after
4    this topic we'll take a break.
5         MR. BLACK:  It depends on
6    Dr. Kapit's stamina in terms of
7    how long we go.  Or I guess the
8    minimum standard of anybody here
9    who wants to eat lunch.
10        MR. ROTHMAN:  We'll take a
11   break after this exhibit.
12        MR. BLACK:  We will endeavor
13   at lunch to get this disc sorted
14   out so you'll have a reasonable
15   opportunity to look at this thing.
16        MR. ROTHMAN:  By this thing,
17   you mean the documents.
18        MR. BLACK:  I mean the
19   documents on the disc.  The other
20   documents you're welcome to look
21   at any time you want.
22        THE WITNESS:  Well, I've
23   read the abstract, so...
24   BY MR. ROTHMAN:

Page 163

1         Q.   All right.  Well, let's see
2    if that's, in the interest of getting to
3    lunch, let's see if we can do it.
4         MR. BLACK:  Since lunch has
5         been raised.
6    BY MR. ROTHMAN:
7         Q.   This is a double-blind
8    study, right?
9         A.   Yes.
10        Q.   And it involves Vioxx,
11   right?
12        A.   Yes, it does.
13        Q.   And it involves the
14   50-milligram dose of Vioxx?
15        A.   That's right.
16        Q.   And there's other people in
17   the study who took naproxen, right?
18        A.   Yes.
19        Q.   And then there's an aspirin
20   group?
21        A.   Yes.
22        Q.   And a diclofenac group?
23        A.   Right.
24        Q.   And what's diclofenac?

Page 164

1         A.   Another nonspecific NSAID.
2         Q.   And what they did in this
3    study was to measure the levels of
4    prostacyclin they found in the
5    bloodstream?
6         A.   Right.
7         Q.   And not the urine?
8         A.   Right.
9         Q.   And they found that aspirin
10   increased bleeding time, right?
11        A.   Yup.
12        Q.   No surprise there, is there?
13        A.   Uh-huh.  No, there's not.
14        Q.   They found that naproxen
15   also increased bleeding time, right?
16        A.   They don't -- I don't think
17   they say that in the abstract.
18        Q.   You may be right.
19        If you look at the results
20   section on page 1112, the first sentence,
21   it starts off, aspirin, naproxen and
22   diclofenac caused a significant increase
23   in bleeding time.
24        A.   Okay.

Page 165

1         Q.   And no surprise that
2    naproxen also increased bleeding time, is
3    there, Doctor?
4         A.   No, I guess not, there
5    isn't.
6         Q.   Okay.  They found that Vioxx
7    had no effect on bleeding time, right?
8         A.   Uh-huh.
9         Q.   And that's also no surprise,
10   right?
11        MR. BLACK:  Objection.
12        THE WITNESS:  Show me the
13   sentence where it says Vioxx had
14   no effect.
15   BY MR. ROTHMAN:
16        Q.   If you read down to the
17   bottom of that paragraph we just looked
18   at, rofecoxib had no effect on bleeding
19   time, volume of blood or platelet
20   aggregation.
21        A.   Okay.  Okay.  Good.
22        Q.   And that's not a surprise
23   either, right?
24        MR. BLACK:  Objection.

Page 166

1        THE WITNESS:  No.
2  BY MR. ROTHMAN:
3      Q.   So in this study, Vioxx
4  didn't cause the blood platelets to clump
5  together or clot, right?
6        MR. BLACK:  Objection.
7        THE WITNESS:  This was a
8      study -- can I -- should I
9      elaborate on --
10 BY MR. ROTHMAN:
11     Q.   Can you answer the question
12 I asked?
13     A.   I'm sorry.  What was the
14 question?
15     Q.   In this study, Vioxx didn't
16 cause the blood platelets to clump
17 together or clot?  That's what it means
18 when it says Vioxx had no effect on
19 platelet aggregation?
20     A.   I think that I'm going to
21 need to read the whole paper.  I think
22 we're getting into issues that I can
23 already see there are problems in the
24 paper that I would certainly consider

Page 167

1  issues with regard to the conclusions.
2  These were healthy men, so perhaps
3  unlikely to have the -- a lot of the
4  inflammatory areas in the arteries that
5  might be the sites of blood clot
6  formation.  So if you want me to go and
7  read this during -- carefully during the
8  break, I will.  I'm not going to proceed
9  with you to draw conclusions about it
10 without a more careful look and, of
11 course, without the qualification that I
12 may not have the expertise to completely
13 comment on this paper.
14     Q.   Okay.
15     A.   But I certainly would be
16 able to comment to the extent that I
17 understand it if you give me the time to
18 read it.
19     Q.   Okay.  Can we just agree in
20 this particular study they found that
21 Vioxx had no effect on prostacyclin in
22 the bloodstream?
23        MR. BLACK:  Object.
24        THE WITNESS:  I can't -- I

Page 168

1      don't have the expertise to
2      respond to that question.
3  BY MR. ROTHMAN:
4      Q.   This is the first time
5  you've seen this study?
6      A.   Yes, it is.
7      Q.   Are you aware of any other
8  studies where researchers tried to assess
9  the effect by measuring -- people tried
10 to assess the effect of Vioxx on
11 prostacyclin by measuring the blood?
12     A.   No, I'm not.
13        MR. BLACK:  Objection.
14        THE WITNESS:  I'm not sure
15     of other studies, any other
16     studies.
17        MR. ROTHMAN:  Okay.  Why
18     don't we take a break for lunch.
19        THE WITNESS:  Should I read
20     this during lunch?
21        MR. ROTHMAN:  I'm not going
22     to ask any more questions about
23     it, but you're free to read it, if
24     you'd like.  You can keep it and

Page 169

1      take it home.
2        MR. BLACK:  Actually, that
3      would be wrong.  He needs to leave
4      the exhibit here.
5        MR. ROTHMAN:  Or I can give
6      him a copy.
7        (Recess taken from
8      12:39 p.m. to 1:59 p.m.)
9        MR. ROTHMAN:  Let's mark
10     this as the next exhibit, please.
11        (Whereupon, Deposition
12     Exhibit No. Kapit-5, DESCRIPTION,
13     was marked for identification.)
14 BY MR. ROTHMAN:
15     Q.   Dr. Kapit, do you recognize
16 what we've just marked as Exhibit 5?
17     A.   Yes.  It's a cover letter
18 and a label, a label that's dated
19 May 20th, so it looks like it was the
20 label agreed upon by Merck and FDA for
21 the approval.
22     Q.   Do you recognize the cover
23 letter as the letter by which the FDA
24 informed Merck that the Vioxx NDA was

Page 170

1  approved?
2      A.   Okay.  Yes, it is.
3      Q.   And you see the fourth
4  paragraph down says, "We have completed
5  the review of this application as amended
6  and have concluded that adequate
7  information has been presented to
8  demonstrate that the drug product is safe
9  and effective for use as recommended in
10  the enclosed labeling text.  Accordingly,
11  the application is approved effective on
12  the date of this letter."
13      A.   Yes, it does say that.
14      Q.   And attached to the cover
15  letter is the enclosed labeling text from
16  the FDA, right?
17      A.   That's right.
18      Q.   And they tell Merck that the
19  final printed labeling for Vioxx needs to
20  be identical to that enclosed labeling?
21      A.   Yes, it does.
22      Q.   And if Merck markets Vioxx
23  with final printed labeling that's not
24  identical to the approved labeling text,

Page 171

1  that may render the product misbranded
2  and lead to a no approval of new drug?
3      A.   Yes.
4      Q.   Now, are you offering --
5  strike that.  Let me ask you this first.
6      The label text that's
7  attached to this letter is based on the
8  data that was available as of May 20th,
9  1999?
10      A.   Yes.
11      Q.   Are you offering any
12  opinions about the adequacy of this
13  labeling text?
14      A.   I may offer opinions about
15  the adequacy of the labeling text insofar
16  as having to give opinions about the
17  limitations of the FDA review process.
18  In other words, I'm not so -- it would
19  not be in the context of challenging the
20  regulatory decision to approve the drug
21  in connection with this labeling, but if
22  it came up -- if issues came up about the
23  possibility that this label were not
24  adequate, because there are inherent

Page 172

1  limitations in any approval process and
2  because there are especially inherent
3  limitations in what the FDA can know and
4  its ability to review, that it may be
5  that at some point I'm going to have to
6  opine that this label might have missed
7  certain problems, something like that.
8      Q.   Okay.  Now, you say at some
9  point you may have to opine.
10      A.   Right.
11      Q.   As you sit here today, do
12  you hold any opinions about the
13  sufficiency or adequacy of this initial
14  label?
15      A.   The label clearly doesn't
16  address the issue that eventually became
17  so important about the thromboxane and
18  prostacyclin imbalance and the incidence
19  of heart attacks.  Now, FDA did not have
20  specific information about the clinical
21  effects at the time this label was
22  prepared, but I've already made clear in
23  this deposition that information was
24  available in this -- in the literature

Page 173

1  that this might possibly be a problem.
2  And so it would have been better if this
3  label had included some reference to the
4  possibility of a problem, or it might
5  have been better.  I can't -- I mean,
6  you're asking me a question that I
7  actually haven't made up my mind about at
8  this point and it may be at some point I
9  may want to opine about it.  But that's
10  the area in which there is a question
11  about this labeling.  There's no
12  reference to that issue in this labeling.
13  Otherwise, I don't see a problem with the
14  labeling.
15      Q.   Okay.  Are you familiar with
16  the VIGOR study?
17      A.   Yes.
18      Q.   Do you understand that the
19  VIGOR study was a postmarketing study?
20      A.   Yes, it was.
21      Q.   It was a large study?
22      A.   Yes.
23      Q.   Do you remember how many
24  patients?

Page 174

1     A.   4,000 per group.
2     Q.   What was the population
3 studied?
4     A.   It was patients who were
5 taking it for rheumatoid arthritis and
6 for OST -- I'm not sure what the
7 indications were, but it was pain relief,
8 rheumatoid arthritis patients and other
9 pain patients.
10    Q.   If I tell you the patients
11 studied in the VIGOR study had rheumatoid
12 arthritis, would you accept that?
13    A.   Yes.  I wasn't sure if there
14 were others as well, but it was
15 definitely that group.
16    Q.   And do you remember when the
17 FDA approved rheumatoid arthritis as an
18 indication for Vioxx?
19    A.   You know, that's something
20 that I looked at carefully, and it's
21 somewhat unclear.  I've never actually --
22 looking at the documents, I've never been
23 able to identify the precise point at
24 which -- sometimes it seems like it was

Page 175

1 approved at the same time as the
2 osteoarthritis indication.  At some point
3 it seems like it was a year later or
4 something like that.  But, actually, I've
5 never been completely clear on the
6 sequence of that.
7     Q.   At the time -- well, let me
8 ask you this way.  At the time the VIGOR
9 study was done, had it already been
10 approved as an indication for Vioxx?
11    A.   Had rheumatoid arthritis
12 been approved as an indication for Vioxx?
13 Yes, I believe it had.
14    Q.   Can we agree that people
15 with rheumatoid arthritis have a higher
16 baseline risk for heart attack?
17    A.   That is true, yes.
18    Q.   That in the VIGOR study,
19 Merck tested the 50-milligram dose of
20 Vioxx?
21    A.   Yes.
22    Q.   And the patients in that
23 study took that dose chronically,
24 correct?

Page 176

1     A.   Yes.
2         MR. BLACK:  Objection.
3     Answer, if you --
4         THE WITNESS:  Yes, there was
5     long-term use of the drug.
6 BY MR. ROTHMAN:
7     Q.   Okay.  And at the time the
8 study was done, was the 50-milligram dose
9 approved for long-term use?
10    A.   No, I don't believe it was.
11    Q.   The highest dose approved
12 for long-term use was --
13    A.   Was 25, yes.
14    Q.   So VIGOR was a study using
15 double the highest dose recommended for
16 long-term or chronic use, right?
17    A.   Yes.
18    Q.   What was the comparator drug
19 in the VIGOR study?
20    A.   Naproxen.
21    Q.   Do you remember what the
22 dose of naproxen was?
23    A.   500 milligrams b.i.d., I
24 believe.

Page 177

1     Q.   That means a thousand
2 milligrams per day?
3     A.   Yes.
4     Q.   And is that a normal
5 therapeutic dose of naproxen?
6     A.   I believe so.
7     Q.   Was there a placebo group in
8 the VIGOR study?
9     A.   No.
10    Q.   And would you agree that
11 that makes the results more difficult to
12 interpret?
13    A.   Yes, it does.
14    Q.   And what kind of a study was
15 VIGOR?
16    A.   It was a study to -- you
17 mean --
18        MR. BLACK:  Objection.
19    Form.  Answer, if you can.
20        THE WITNESS:  Yeah, when you
21    say what kind of a study, can you
22    be more specific about -- there's
23    lots of ways to describe a study.
24 BY MR. ROTHMAN:

Page 178

1    Q.   Fair.  Fair point.  VIGOR
2  was a GI outcome study?
3    A.   Right, risk.
4    Q.   And the primary endpoint of
5  the study, do you remember what that was?
6    A.   PUBs, perforations, ulcers
7  and --
8    Q.   Bleeds?
9    A.   Bleeds, yes.
10    Q.   Okay.  When we say that
11  something is the primary endpoint, that
12  doesn't mean that the company isn't also
13  collecting other kinds of data, right?
14    A.   Yes, that's true.
15    Q.   The company is also
16  collecting safety data, right?
17    A.   That's right.
18    Q.   And every -- any kind of
19  adverse event that comes up in the study,
20  the company is going to collect and
21  review, right?
22        MR. BLACK:  Objection.
23        THE WITNESS:  It should,
24    yes.

Page 179

1  BY MR. ROTHMAN:
2    Q.   And that includes things
3  like heart attacks and strokes?
4    A.   Yes.
5    Q.   And Merck did that in the
6  VIGOR study, right?
7    A.   Yes.
8        MR. BLACK:  Objection.
9  BY MR. ROTHMAN:
10    Q.   And the study showed a
11  disparity in the number of thrombotic
12  events between the Vioxx and the naproxen
13  groups, right?
14    A.   Yes, it did.
15    Q.   And when Merck first
16  received the VIGOR results, its
17  scientists tried to determine the reason
18  for that disparity, right?
19        MR. BLACK:  Objection.
20        THE WITNESS:  No, I don't
21    believe you can characterize it
22    that way, as to what happened.  It
23    seems to me that Merck scientists
24    tried to explain the disparity as

Page 180

1  the result of naproxen's supposed
2  antithrombotic effect, that that's
3  a different effort from trying
4  objectively to determine what the
5  result was.  And, in fact, I do
6  not think that you can fairly say
7  that that they tried to determine
8  the actual cause, because if they
9  had done that, if they had wanted
10  to determine the actual cause,
11  they would have initiated a study
12  against placebo adequately powered
13  to compare Vioxx to placebo, and
14  they did not do that.  And that
15  would have been the way to
16  scientifically determine the
17  answer to that question.  Instead,
18  they prepared a pooled analysis of
19  studies which the FDA
20  characterized as inadequate to
21  answer that question.  And so, no,
22  I don't think they did try to
23  determine the answer to that
24  question.  I think what they did

Page 181

1    was try to prove that their drug
2    wasn't to blame, that naproxen was
3    the reason, and, in retrospect, we
4    know that that was untrue, that
5    Vioxx is the cause.
6  BY MR. ROTHMAN:
7    Q.   Okay.  Let's talk about this
8  a little bit.  You say that the Merck
9  scientists prepared a pooled analysis?
10    A.   Yes, they did.
11    Q.   Did they do anything else to
12  try to understand the VIGOR results?
13    A.   Well, that's the main thing
14  that they did, I believe, was to look at
15  their previous studies in which Vioxx was
16  compared to placebo and see whether
17  they -- whether there was -- whether
18  there was a difference between Vioxx and
19  placebo and the rate of various
20  cardiovascular thrombotic events.  And I
21  don't know of anything else that they did
22  besides that.  I think that was the main
23  thing they did.  There may have been one
24  or -- one other thing or two other

Page 182

1    things, but that was certainly the most
2    important effort they made was to look
3    retrospectively at some of the studies
4    against placebo that they had already
5    done.
6        Q.    When did they undertake this
7    effort?
8        A.    When the Vioxx --
9            MR. BLACK: Objection.
10           THE WITNESS:   -- results
11       came out.
12   BY MR. ROTHMAN:
13       Q.    Did they share the results
14   of this effort with the FDA?
15           MR. BLACK: Objection.
16           THE WITNESS: Yes, I believe
17       they did.
18   BY MR. ROTHMAN:
19       Q.    When was that?
20       A.    I can't tell you exactly
21   when they did that, but I know they made
22   that point to the FDA on a number of
23   occasions, looking retrospectively.  And
24   in that point which they made to the FDA

Page 183

1    was in fact addressed by Villalba, the
2    osteoarthritis reviewer, and also by
3    Targum, the cardiovascular reviewer, and
4    both of them, both of those reviewers,
5    discounted this effort on Merck's part to
6    attribute the results, differential
7    myocardial infarction rate, to naproxen.
8    They both discounted that.
9        Q.    You say that Merck did not
10   do a study comparing Vioxx to placebo.
11   Is that what you told me before?
12           MR. BLACK: Objection.
13           THE WITNESS: No.  I said
14       that it was -- they didn't do a
15       study that was adequately powered
16       to answer that question.  They did
17       write a protocol, Protocol 203,
18       which would have been the study
19       adequately powered in Vioxx
20       against placebo to answer that
21       question, but they never -- never
22       performed such a study.
23   BY MR. ROTHMAN:
24       Q.    Why didn't they perform such

Page 184

1    a study?
2            MR. BLACK: Objection.
3            THE WITNESS:  Why did they
4        not perform such a study?
5    BY MR. ROTHMAN:
6        Q.    Yes.  Do you have an opinion
7    on that?
8        A.    I suspect that they were --
9            MR. BLACK: Objection.  Go
10       ahead and answer, if you can.
11           THE WITNESS: I'm sorry,
12       Bert?
13           MR. BLACK:  Just an
14       objection to the form of the
15       question.  Go ahead and answer it,
16       if you can.
17           THE WITNESS:  It was an
18       extremely competitive market for
19       pain relievers, for NSAIDs.  Merck
20       was in competition, intense
21       competition, with Pfizer's
22       Celebrex, and it's clear that a --
23       that if Vioxx had been associated
24       with an elevated risk of heart

Page 185

1        attacks, that it would have --
2        that Vioxx's market share for
3        COX-2s would have suffered.  And
4        the explanation that they gave,
5        they ended up giving as a result
6        of this inadequate, quote, pooling
7        of prior studies, which supposedly
8        justified the naproxen
9        explanation, basically declared
10       that their drug was innocent and
11       not causing the excess heart
12       attacks.  We now know that that's
13       not true.  But at the time it made
14       it a lot easier for Merck to try
15       to maintain the market share of
16       Vioxx vis-a-vis Celebrex.  And I
17       certainly think that that must
18       have been a factor in why they
19       didn't do an adequate study.
20   BY MR. ROTHMAN:
21       Q.    Have you seen any written
22   documents that support that opinion, that
23   Merck considered the market share versus
24   Celebrex as a factor?

Page 186

1      A.   Yes. I've reviewed certain
2  internal projections Merck made about the
3  decrement in sales that would result from
4  labeling, that attributed the excess
5  heart attacks to Vioxx, and over one
6  document -- that's very dramatic
7  projected that over a period of several
8  years Merck would lose four, $5 billion
9  in sales. So that certainly supports
10 that opinion, I believe.
11      Q.   Does it say anywhere in that
12 document that you're referring to not to
13 do a placebo-controlled study along the
14 lines of the one you've described?
15      MR. BLACK: Objection.
16      THE WITNESS: Well,
17 there's -- there's -- I mean --
18 I'm sorry. I don't mean to laugh.
19 But you're asking whether a
20 document that says we're going to
21 lose $5 billion in sales should in
22 the same document say we therefore
23 should not do the study to find
24 out the answer. The company is

Page 187

1  not going to prepare a document to
2  that effect. But it's not
3  difficult to draw the conclusion
4  that a company that's going to
5  lose billions of dollars by what
6  the document says is a label
7  change that attributes the problem
8  to Vioxx, that that has some
9  effect on the company's behavior.
10 BY MR. ROTHMAN:
11      Q.   What is it about your FDA
12 expertise that enables you to draw that
13 conclusion?
14      A.   Well, I mean, we --
15      MR. BLACK: Objection.
16      THE WITNESS: We dealt with
17 companies all the time, and we
18 always consider -- I mean, it's
19 just a very -- you learn about the
20 industry. You learn about how the
21 industry operates and thinks and
22 what its concerns about. Industry
23 representatives are coming in and
24 meeting with you all the time.

Page 188

1  You see how the industry operates.
2  You become familiar with what the
3  industry is concerned about and
4  what it thinks about and how it
5  construes information and the
6  implications of that information
7  for marketing. You get a lot of
8  marketing information from the
9  company that's proprietary; nobody
10 else is allowed to see it. And so
11 there's probably no one better,
12 outside people who work for the
13 pharmaceutical industry itself, in
14 being able to interpret a
15 company's behavior than people who
16 have worked for the FDA.
17 BY MR. ROTHMAN:
18      Q.   When you were at the FDA,
19 did you review financial forecasts?
20      MR. BLACK: Objection.
21      THE WITNESS: No, I don't
22 believe I did.
23 BY MR. ROTHMAN:
24      Q.   When you were at the FDA,

Page 189

1  did you review profit plans prepared by a
2  pharmaceutical company?
3      MR. BLACK: Objection.
4      THE WITNESS: It's not
5  difficult to see one and know what
6  it means.
7  BY MR. ROTHMAN:
8      Q.   Can you answer my question
9  now?
10     A.   Well, that was -- those were
11 not the type of documents that came
12 across my desk, that's true, but -- but,
13 you know, in -- in the label negotiations
14 that did go on with the companies, in the
15 approval negotiations that did go on with
16 the companies, the companies would
17 suggest some language, the FDA would
18 suggest another language. This happened
19 hundreds and hundreds and hundreds of
20 time in the interactions I had. And it
21 was clear that the language that the
22 company wanted to put in labeling was
23 always, always, almost a hundred percent
24 of the time, it was -- it was motivated

Page 190

1  by marketing considerations. And you
2  became very familiar, because this
3  happened in hundreds of situations, where
4  the companies' labeling proposals were
5  geared toward the market and what they
6  were worried about with the market. So I
7  reviewed all that stuff all the time. So
8  it's just a little baby step looking at
9  actual marketing projections and seeing
10  that it really does influence these
11  things. I mean, we knew it in advance.
12  All the documents that show marketing
13  projections do is lay it out in numbers
14  what we knew was going on all the time.
15      Q.   Does the FDA require
16  pharmaceutical companies to submit
17  financial plans and financial forecasts
18  as part of proposed labeling
19  applications?
20      A.   No. And as I've already
21  said, I never reviewed any such things.
22  But I did review and I did participate in
23  language negotiations and it's clear all
24  the time that in the wording of these

Page 191

1  documents, the labeling and advertising
2  and other documents that the company
3  prepares and that the back and forth that
4  goes back and forth between the FDA and
5  the company, it's clear that marketing is
6  the issue that drives those negotiations
7  and market share is the issue.
8      Q.   Can you give me an example
9  of a labeling negotiation you were
10  involved with at FDA where you felt that
11  this was the case?
12      MR. BLACK: Objection.
13      THE WITNESS: There were --
14  without talking about any specific
15  things, there were many times
16  where the issue that was a bone of
17  contention was very much the same
18  as the issue with Vioxx because it
19  concerned whether you put
20  something in black box warnings,
21  warnings, precautions, indications
22  or adverse reactions. And so that
23  many times these negotiations
24  centered upon where in the

Page 192

1  labeling this information would
2  go. It's very similar to Vioxx.
3  And it was always clear that the
4  company was interested in reducing
5  the noticeability, in reducing the
6  effect that the labeling change
7  would have on doctors who would
8  read the labeling. And so without
9  talking about any specific
10  negotiations I was involved in,
11  that is prohibited actually, I can
12  say for certain that there were
13  hundreds of negotiations in which
14  this particular issue of whether
15  it's in warnings or precautions or
16  contraindications or adverse
17  reactions were bones of
18  contention. The company always
19  sought to minimize the
20  noticeability of the problem. And
21  the reason is for marketing
22  purposes, of course.
23  BY MR. ROTHMAN:
24      Q.   Did the companies tell you

Page 193

1  it was for marketing purposes?
2      A.   No, but...
3      MR. BLACK: Objection.
4      THE WITNESS: They didn't
5  say that, but it -- I mean, it was
6  clear from the -- from all the
7  experience. Everybody knew what
8  was going on.
9  BY MR. ROTHMAN:
10      Q.   And you're not going to name
11  a single example for me?
12      A.   Well, let's see. I mean,
13  the thing is that these were long and
14  complex negotiations, and there are many,
15  many drugs, so it's difficult for me to
16  recall chapter and verse for you. I
17  mentioned to you, for example, the
18  Interferon, the long Interferon
19  negotiation we had, and how -- I'm not
20  sure wet this is confidential or not, but
21  I'm going to say it anyway. But there
22  was --
23      MR. BLACK: Wait a minute.
24  Confidential within Vioxx is fine.