Page 194

1   Is it confidential with regard to
2   some other drug?
3       THE WITNESS:  Interferon.
4   Alpha Interferon.  There's a very
5   dramatic example of --
6       MR. BLACK:  Stop just a
7   minute.  I think we had better
8   not -- if you believe that there's
9   something you're about to say that
10  would be divulging confidential
11  information, we ought not do it.
12      THE WITNESS:  It's probably
13  true that I'm not supposed to talk
14  about this stuff.
15  BY MR. ROTHMAN:
16      Q.   You're talking about
17  labeling negotiations, right?
18      A.   I'm talking about labeling
19  of an adverse reaction in which the focus
20  of the change -- an adverse reaction,
21  that it's known to be a major, major
22  problem with Interferon, and the
23  company's wording, they insisted on
24  making the smallest population possible

Page 195

1   in the labeling, that this -- that this
2   problem might apply to, but it really, to
3   be truthful, it should have been -- I
4   mean, we should have been talking about
5   something that happens in 20 percent
6   instead of something that happens in half
7   a percent, I mean, you know, that's the
8   kind of difference it was.
9       Q.   And how long did it take to
10  resolve that difference?
11      A.   It went on for a couple of
12  months.
13      Q.   Okay.  See if you'll agree
14  with this.  "The FDA is the expert
15  federal public health agency charged by
16  Congress with ensuring that drugs are
17  safe and effective and that their
18  labeling adequately informs users of the
19  risks and benefits of the product and
20  it's truthful and not misleading."
21      A.   I believe that's an accurate
22  statement of what Congress wants the FDA
23  to do.
24      Q.   Okay.  "The Agency makes

Page 196

1   approval decisions based not on an
2   abstract estimation of a product's safety
3   and effectiveness but rather on a
4   comprehensive scientific evaluation of
5   the product's risks and benefits under
6   the conditions of use prescribed,
7   recommended or suggested in the
8   labeling."
9       MR. BLACK:  Objection.
10  BY MR. ROTHMAN:
11      Q.   Do you agree?
12      A.   No, I don't agree.  What
13  you're -- what that language accurately
14  reflects is what should ideally be done.
15  But, in fact, the reality is that there's
16  often quite a discrepancy between the
17  ideal and reality, and often what happens
18  falls short, short specifically, for
19  example, in the use of the word
20  comprehensive.  As we see in the case of
21  Vioxx, there are many things that are
22  unknown at the time a drug is approved.
23  We also know very well that there are
24  extraordinary limitations in clinical

Page 197

1   trials.  There have been articles written
2   on the clinical -- the fact that clinical
3   trials are in some ways very poor
4   indicators of what the real problems that
5   are going to emerge.  The trials are
6   generally small, not -- even the -- all
7   the large patients in the Vioxx trials,
8   which was a large database, as I've
9   admitted, when you come to a drug that is
10  given in tens and hundreds of millions of
11  people, even large trials cannot
12  adequately tell you about all the things.
13  So the trials are small, their patient
14  populations are generally inadequate
15  because you often screen out many
16  patients or types of patients that will
17  get the drug, they are very tightly
18  controlled and very closely monitored.
19  And that does not happen in real
20  practice.  So clinical trials are
21  often -- fall far short of being able to
22  tell you what's actually going to happen.
23  So when you say the FDA approves the drug
24  on the basis of a comprehensive and

Page 198

1   scientific evaluation, that's an ideal
2   situation. And, yeah, they try to do
3   that, but there's often a great deal of
4   difference between what they're able to
5   do and the ideal.
6        Q.   Would you agree that
7   labeling reflects thorough FDA review of
8   the pertinent scientific evidence?
9             MR. BLACK: Objection.
10            THE WITNESS: Once again,
11       this is an ideal situation, and
12       the pertinent scientific review
13       can be different -- can occur to
14       different degrees. A reviewer can
15       have more than one thing on his
16       plate. The reviewers can be
17       distracted by different things
18       going on. The reviewers can have
19       limited ability to digest the data
20       because the drug may be an
21       expedited drug that has a limited
22       review clock. So, again, what
23       you're talking about is an ideal
24       situation that we would like to

Page 199

1        think the FDA does but, in fact,
2        the reality is that it often falls
3        short.
4   BY MR. ROTHMAN:
5        Q.   Okay. The labeling is meant
6   to be a summary of the available data on
7   the product?
8        A.   Yes, it is meant to be that.
9        Q.   It's not a place to debate
10  novel theories or scientific issues?
11            MR. BLACK: Objection.
12  BY MR. ROTHMAN:
13       Q.   True?
14       A.   Clearly not. I mean, but --
15  debate scientific issues, no, it's not a
16  place to debate scientific issues.
17       Q.   Can we agree that the FDA
18  carefully controls the content of
19  labeling for prescription drugs?
20            MR. BLACK: Objection.
21            THE WITNESS: I would -- I
22       would agree that the FDA tries to
23       exert careful control of the
24       scientific issues. Once again, I

Page 200

1        have to insert the limitations
2        that any human enterprise has and
3        the limitations inherent upon
4        very, very busy FDA reviewers.
5   BY MR. ROTHMAN:
6        Q.   Do you agree that there's a
7   risk in over-warning?
8             MR. BLACK: Objection.
9             THE WITNESS: I know that
10       there's been a lot of discussion
11       about the risk of over-warning. I
12       think that over-warning is not
13       the -- is not the risk that
14       people -- that some groups assert
15       that it is. It's -- it's a risk
16       in situations where, like, there's
17       only one drug on the market that
18       will treat a certain disorder and
19       where the disorder that's being
20       treated is not like rheumatoid
21       arthritis, which is a chronic
22       illness, but it's not usually
23       fatal, where it's a fatal disorder
24       or it's a disorder that has very

Page 201

1        damaging implications in the -- in
2        terms of longevity, for example,
3        and the drug is not -- there's no
4        substitute for the drug. And in
5        those situations, I think there
6        may be a risk of over-warning.
7        I'm not sure that it's much of a
8        risk in most situations. And to
9        give you a related example, I know
10       that this particular issue of
11       over-warning has come up in regard
12       to antidepressants. And people
13       have said over-warning about
14       antidepressants is a very bad
15       thing. Well, there are lots of
16       ways to treat people with
17       depression. You can treat them
18       with psychotherapy. You can treat
19       them with a whole different
20       variety of drugs. And in those
21       situations, I think this
22       over-warning issue is a read
23       herring, for example, and so I am
24       not quite prepared to buy

Page 202

1    over-warning as a major problem
2    the way some people seem to assert
3    that it is.
4        MR. ROTHMAN:  Let's this as
5    Exhibit 6.
6        (Whereupon, Deposition
7    Exhibit No. Kapit-6, DESCRIPTION,
8    was marked for identification.)
9    BY MR. ROTHMAN:
10       Q.   Doctor, do you recognize
11   Exhibit 6?
12       A.   It's a Federal Register from
13   January 24th, 2006.  And this is the
14   labeling -- the labeling issue in the
15   Federal Register, I believe.
16       Q.   You're free to look at the
17   whole thing.  The pages I'm going to ask
18   you about are the ones numbered 3934 and
19   3935.
20       A.   Okay.
21       Q.   This is written by the FDA,
22   correct?
23       A.   Yes, it is.
24       Q.   Okay.  If you look at the

Page 203

1    first column on page 3934, about halfway
2    down it says, "Under the Act and FDA
3    regulations, the Agency makes approval
4    decisions based not on an abstract
5    estimation of its safety and
6    effectiveness but rather on a
7    comprehensive scientific evaluation of
8    the product's risks and benefits under
9    the conditions of use prescribed,
10   recommended or suggested in the
11   labeling."
12       And as we've discussed, you
13   disagree with the FDA?
14       A.   Oh, no, I did not disagree.
15       MR. BLACK:  Objection.
16       THE WITNESS:  What I said is
17   that this represents an ideal
18   statement and that the reality of
19   actual FDA work falls short of
20   this.  It doesn't say that the
21   statement as a represented -- as a
22   statement of what ideally is
23   supposed to happen is falls.  I
24   don't disagree that this is

Page 204

1    supposed to be what happens.
2    BY MR. ROTHMAN:
3        Q.   Okay.  Where does it say in
4    this document that this is the ideal
5    situation?
6        A.   It doesn't have to say that.
7    I can tell you from my experience as an
8    FDA reviewer who worked for a long time
9    in the reality that this is an ideal
10   statement of what's supposed to happen.
11       Q.   Do you see where it says the
12   agency makes approval decisions?
13       A.   Yes.
14       Q.   Do you think that that's
15   referring to what's happening in real
16   life and in practice or do you think that
17   that's an ideal?
18       A.   This statement, and shall I
19   read it to you again?
20       Q.   Can you answer my question,
21   do you think --
22       A.   I believe I've answered your
23   question.  This -- this is a statement in
24   the Federal Register.

Page 205

1        Q.   Yes, sir.
2        A.   It is going to be a
3    statement about the ideal, the goal, the
4    way the FDA should operate, the way every
5    reviewer should strive to be.  And I
6    believe most reviewers do work their
7    hardest to live up to this, but the
8    reality is that that's rarely possible to
9    live completely up to this.  And in that
10   sense, this statement is not false, but
11   it's an ideal about how things ought to
12   be.
13       Q.   Okay.  Toward the bottom of
14   that column, it says "FDA carefully
15   controls the content of labeling for a
16   prescription drug because such labeling
17   is FDA's principal tool for educating
18   healthcare professionals about the risks
19   and benefits of the approved product to
20   help ensure safe and effective use."  Do
21   you agree with that statement?
22       A.   Once again, it's my same
23   answer.  Let me, for example, talk to --
24   talk to -- mention the statements by

Page 206

1    Sandy Kweder before Congress.
2        Q.   Sir, with all due respect --
3            MR. BLACK: Let him finish
4        the answer.
5    BY MR. ROTHMAN:
6        Q.   With all due respect, I
7    didn't ask you what Sandy Kweder said.
8            MR. BLACK: But he's
9        answering the question.
10   BY MR. ROTHMAN:
11       Q.   I asked you if you agreed
12   with what the FDA wrote here in the
13   Federal Register. Can you answer that
14   question?
15           MR. BLACK: Does he agree
16       that's what it says?
17           THE WITNESS: See, that's
18       exactly it. I cannot give what I
19       believe is a fair and truthful
20       answer to your question without a
21       longer explanation.
22   BY MR. ROTHMAN:
23       Q.   Well, you can just say you
24   don't agree?

Page 207

1        A.   I'm not saying that I don't
2    agree.
3        Q.   Okay. Well --
4        A.   I'm saying I agree this is a
5    statement of the ideal.
6        Q.   Okay.
7        A.   Of the goal, of the way
8    things ought to be.
9        Q.   Do you think that it often
10   doesn't happen in practice?
11       A.   Yes, it often doesn't happen
12   in practice. That's the truth. The FDA,
13   as any human enterprise, falls short.
14   And because it is such a complex and
15   intricate set of decisions, and there are
16   so many factors that go into it, it
17   rarely happens that this ideal is lived
18   up to a hundred percent. And there are
19   times when it falls -- the agency falls
20   very short, unfortunately, as much as I
21   regret to say it.
22       Q.   So you think that when the
23   FDA wrote, FDA carefully controls the
24   content of labeling, that it wasn't

Page 208

1    telling the truth?
2        A.   On the contrary. I believe
3    that this is -- it's sort of like a
4    statement of procedure. It's sort of
5    like an SOP. It says what reviewers and
6    what the agency ought to be doing and
7    what they try to do. But, unfortunately,
8    like any human enterprise, they fall
9    short at times.
10       Q.   Okay.
11       A.   And I think, even though you
12   don't want me to answer this, that
13   Kweder's testimony and Trontell's e-mail
14   are important to answering this question.
15       Q.   You'll see in the middle of
16   the third paragraph, it says, "In fact,
17   the determination whether labeling
18   revisions are necessary is, in the end,
19   squarely and solely FDA's under the act."
20           MR. BLACK: Where are you
21       reading from?
22           THE WITNESS: I'm sorry. I
23       missed that.
24           MR. ROTHMAN: In the middle

Page 209

1    of the third column in the middle
2    of the page on 3934. There's a
3    couple of citations to cases. And
4    then the sentence picks up, "In
5    fact, the determination whether
6    labeling revisions are necessary
7    is, in the end, squarely and
8    solely FDA's under the act."
9            THE WITNESS: And I'm still
10       having trouble finding it.
11           MR. BLACK: Objection.
12           MR. ROTHMAN: I haven't even
13       asked a question yet.
14           THE WITNESS: Well, I am.
15       I'm asking a question. I can't
16       find it. Tell me where it is
17       again. I gotcha.
18           MR. BLACK: I'm going to
19       object anyway.
20           THE WITNESS: In fact, the
21       determination is, in the end,
22       squarely and solely the FDA's
23       under the act.
24   BY MR. ROTHMAN:

Page 210

1    · Q.  Do you agree with that
2   statement?
3          MR. BLACK:  Objection.
4   BY MR. ROTHMAN:
5      Q.  Yes or no, if you can.
6      A.  I believe the FDA has the
7   final say about whether labeling
8   revisions are necessary.
9      Q.  Okay.  Down below -- I'm
10  sorry.  If we go to the next page, 3935,
11  at the top left-hand column, "FDA
12  interprets the act to establish both a
13  floor and a ceiling, such that additional
14  disclosures of risk information can
15  expose a manufacturer to liability under
16  the act if the additional statement is
17  unsubstantiated or otherwise false or
18  misleading."
19         MR. BLACK:  Objection.
20  BY MR. ROTHMAN:
21     Q.  Do you agree with that
22  statement by the FDA?
23     A.  You're asking pea to make a
24  statement that involves a legal

Page 211

1   assessment because it's a question about
2   exposure to liability, and since I'm not
3   a lawyer, I'm not going to express an
4   opinion about this statement.
5      Q.  Do you view the FDA labeling
6   regulations as both a floor and a
7   ceiling?
8          MR. BLACK:  Objection.
9          THE WITNESS:  This sentence,
10     I'm afraid, doesn't make sense to
11     me.  It seems to be geared toward
12     liability issues, and I'm just not
13     going to comment on this statement
14     at all because it just seems to me
15     to be unrelated to any of the
16     things that I dealt with at the
17     FDA.
18  BY MR. ROTHMAN:
19     Q.  Do you think that the FDA
20  labeling regulations are minimum
21  standards?
22         MR. BLACK:  Objection.
23         THE WITNESS:  No, they
24     should not be minimum standards.

Page 212

1      FDA labeling ideally should be
2      adequate for safe and effective
3      use of the drug.
4   BY MR. ROTHMAN:
5      Q.  And does that mean that you
6   shouldn't add additional disclosures of
7   risk information if they are
8   unsubstantiated or otherwise false or
9   misleading?
10         MR. BLACK:  Objection.
11         THE WITNESS:  The --
12  BY MR. ROTHMAN:
13     Q.  Look, you've told me that
14  you're going to give an opinion in this
15  case based on how Merck acted under the
16  regulations.  Now, if you don't want to
17  answer questions about your understanding
18  based on legal principles, that's fine.
19  But if you -- I don't know that you can
20  have it both ways.
21         MR. BLACK:  Well, counsel,
22     that is, as you know, a recitation
23     of case law in the preamble.
24         MR. ROTHMAN:  I'm not asking

Page 213

1      about case law.
2          MR. BLACK:  If you're asking
3      him to comment on case law, I
4      doubt that he's read a single one
5      of the cases.
6          MR. ROTHMAN:  I have not
7      asked him to comment on any case
8      law.
9          THE WITNESS:  I'll just
10     answer the question you just
11     asked.
12         MR. ROTHMAN:  Go ahead.
13         THE WITNESS:  It's not going
14     to be a simple yes-or-no answer.
15     So please ask it again.
16  BY MR. ROTHMAN:
17     Q.  Okay.  Do you think that
18  pharmaceutical companies should add
19  additional risk information to a label
20  that is unsubstantiated?
21         MR. BLACK:  Objection.
22         THE WITNESS:  Now, FDA
23     regulations are very clear that
24     you do not have to prove the

Page 214

1    association between an adverse
2    reaction and a drug to be
3    obligated to put it in labeling.
4    Now, if unsubstantiated means
5    there's absolutely no evidence of
6    an association, then, of course,
7    no, that should not be in
8    labeling, but unsubstantiated
9    should not include those
10    situations in which there's an
11    association that, according to FDA
12    regulations and comment,
13    scientifically qualified people
14    would agree is evidence of a
15    relationship. When scientifically
16    qualified people agree there's
17    evidence of a relationship, even
18    if there's not proof of a
19    relationship, that should go in
20    labeling. Now, I'm not sure what
21    the word unsubstantiated means in
22    this context.
23    BY MR. ROTHMAN:
24    Q.    Okay. Fair enough.

Page 215

1        So let me just make sure I
2    understand your answer. How do you
3    define reasonable association?
4    A.    That science --
5        MR. BLACK: Objection. Go
6    ahead and answer, if you can.
7        THE WITNESS: That people
8    qualified by scientific background
9    and expertise would agree that
10    there's a relationship, maybe not
11    everybody, but people who have
12    that background say that there's
13    evidence of an association between
14    the drug and the adverse reaction.
15    BY MR. ROTHMAN:
16    Q.    Well, what if some people
17    agree and some people don't, where do you
18    draw the line on what makes a reasonable
19    association?
20        MR. BLACK: Objection.
21        THE WITNESS: Well, the FDA
22    does have the -- should have the
23    say on whether it goes or doesn't.
24    So if the FDA wants to go with the

Page 216

1    people who say there is, then
2    that's what should happen. But
3    the tendency should be to err on
4    the side of going with -- with
5    putting the information in if it's
6    a significant hazard. If it's
7    something that really people ought
8    to know about because there's a
9    potential for real harm and a
10    mainstream, scientifically --
11    people qualified by science and
12    expertise say it's related then it
13    should probably go in, but the FDA
14    should have the ultimate say.
15    BY MR. ROTHMAN:
16    Q.    Do you agree that
17    exaggerating risks in labeling can
18    discourage appropriate use of beneficial
19    drugs?
20        MR. BLACK: Objection.
21        THE WITNESS: By definition,
22    exaggerating risks is not the
23    thing that labeling ought to do.
24    It should put in risks that

Page 217

1    represent real associations of
2    significant problems.
3    BY MR. ROTHMAN:
4    Q.    Okay. Take a look at
5    paragraph 122 of your report. Are you
6    there?
7    A.    Yes.
8    Q.    Okay. In paragraph 122 of
9    your expert report, which we've marked as
10    Exhibit 2, it refers to epidemiological
11    studies.
12    A.    Yes.
13    Q.    Okay. Which studies are you
14    referring to in that paragraph?
15    A.    I think the main one is
16    Graham's study.
17    Q.    Any others?
18    A.    There are others, but that's
19    the one I have mostly in mind. I don't
20    think that was the only one that
21    indicated that.
22    Q.    As you sit here today,
23    though, you can't name any of the others?
24    A.    Graham is the one that I

Page 218

1  certainly had most clearly in mind when I
2  wrote that sentence.
3       Q.   Do you see where Dr. Graham
4  came up with his figures?
5       A.   He reviewed postmarketing
6  data and he reviewed databases from -- I
7  would have to review the report -- but I
8  believe it was Kaiser. I'm not sure.
9       Q.   But you're relying on Dr.
10  Graham?
11       A.   Right.
12       Q.   You haven't done any
13  independent work to confirm --
14       A.   No.
15       Q.   -- these figures, correct?
16       A.   Right.
17       Q.   Now, in paragraph 124 of
18  your report, you say that Merck dragged
19  its collective feet about the label
20  change?
21       A.   Yes.
22       Q.   And what is the basis for
23  that opinion?
24       A.   What's the -- it's a lot of

Page 219

1  what happened during the period of two
2  years that, first of all, when Merck
3  submitted a label in June of 2000, this
4  was the first label submission after the
5  VIGOR study results had come out, the
6  cardiovascular information in the
7  labeling was minimal and so that, first
8  of all, it immediately put in play that
9  there would have to be a lot of
10  negotiations. At the time that Merck
11  submitted the June label to the FDA
12  following VIGOR, as I mentioned in
13  previous testimony, it could have put the
14  information in labeling right away
15  through the submission of a changes being
16  effected. Merck didn't do that. Then
17  after that, the FDA, in October of -- no,
18  first in November of 2000, the FDA asked
19  for additional information, particularly
20  the ADVANTAGE study, that would have
21  addressed the cardiovascular effects of
22  Vioxx in a lower dose of 25 milligrams
23  and against placebo in a study that might
24  shed light on the standard dose and did

Page 220

1  not suffer from the problem of a lack of
2  placebo comparator in VIGOR. And I've
3  discussed how Merck took from that point
4  on a total of about eight months to
5  finally come through with that data. And
6  then after that, when the FDA proposed a
7  label in October, which was much stronger
8  in terms of cardiovascular events,
9  cardiovascular information, Merck
10  objected vehemently to putting it in
11  there. And Dr. Scolnick wrote an e-mail
12  that said he will never accept it in
13  warnings. And I must say that,
14  certainly, the cardiovascular reviewer,
15  Dr. Targum thought it ought to be in
16  warnings and FDA's initial professional
17  should have put it in warnings, would
18  have put it in warnings, and I certainly
19  think heart attacks, the possibility of
20  heart attacks, ought to be in warnings.
21  But Merck objected a great deal. And
22  there was a back and forth of
23  negotiations that went on for another six
24  months before they finally came to a

Page 221

1  result. So all in all, it was a two-year
2  period from the time that the results of
3  VIGOR came out until the time that the
4  label finally ended up including this
5  information. And it's stuff that Merck
6  could have put in right away if they had
7  chosen to do so. And so putting that all
8  together, it seems to me it's fair to
9  call it dragging their feet. And that's
10  what I did.
11       Q.   Okay. Have you seen any
12  statements or comments by the FDA where
13  the FDA says that Merck dragged its feet?
14       A.   No, I didn't. The FDA did
15  not say that. Although, there is a very
16  interesting memo that FDA wrote. It's an
17  internal memo and I've reviewed it, and I
18  think it's the period -- it may be the
19  early months of 2002, I believe. And in
20  it they make it very clear that Merck
21  resisted. The exclusive language in this
22  FDA memo that Merck resisted label
23  changes and that this made it a very
24  difficult process. And I can pull that

Page 222

1  up, if you'd like.  And so drag its feet,
2  no, they didn't use exactly that term,
3  but they certainly wrote a memo that says
4  kind of the same thing.
5      Q.   We know you've reviewed Dr.
6  Kweder's testimony before Congress,
7  right?
8      A.   Yes.
9      Q.   Have you reviewed all of it?
10     A.   I can't remember whether I
11 reviewed the whole thing or not.  I
12 did -- I think I got the whole thing and
13 I did look through parts of it, but it's
14 not the kind of thing that I'm going to
15 say that I reviewed every word carefully,
16 no.
17     Q.   You keep pointing me to a
18 particular portion.
19     A.   Part of it, yes.
20     Q.   Is that a part that you read
21 on your own or that somebody pointed out
22 to you?
23     A.   That I read on my own.
24     Q.   Did you read the part where

Page 223

1  she said that she thought Merck acted
2  responsibly?
3      A.   It's difficult -- I'm not
4  sure what you're referring to.  In fact,
5  let me -- first of all, let me say, if
6  you're going to ask me a question about
7  that, I'm going to want to see it.  But
8  it certainly -- it's certainly difficult
9  to reconcile that with the other
10 statement that she made that I pointed
11 out.  So I would like to see the context
12 of that statement.
13     Q.   Okay.
14         MR. ROTHMAN:  Let's mark
15     this as Exhibit 7.
16         (Whereupon, Deposition
17     Exhibit No. Kapit-7, DESCRIPTION,
18     was marked for identification.)
19 BY MR. ROTHMAN:
20     Q.   If you'd look at page 73,
21 Dr. Kapit.
22     A.   What did you say?
23     Q.   73.
24         MR. BLACK:  I'm not -- okay.

Page 224

1  Never mind.  Having said that, my
2  copy doesn't seem to have numbers
3  on the pages.
4      MR. ROTHMAN:  It doesn't
5  have numbers at the bottom of the
6  pages?
7      MR. BLACK:  No.  I don't
8  know how the heck that happened,
9  counsel.  If you see the numbers,
10 point them to me.  I sure the heck
11 don't see them.  Is that the right
12 document you gave me?
13     MR. ROTHMAN:  Doctor, do you
14 have page numbers on yours?
15     THE WITNESS:  I've got the
16 page number.
17     MR. BLACK:  Okay.  What
18 exhibit number is this, by the
19 way?  7?
20     MR. ROTHMAN:  7.
21     MR. BLACK:  So what you
22 handed me that says Kweder at the
23 bottom with nothing, that is page
24 73.

Page 225

1      MR. ROTHMAN:  Yes.  The
2  first thing on the page is,
3  "Grassley:  You didn't answer his
4  question about during the process,
5  do you think Merck acted
6  responsibly?"
7      THE WITNESS:  Okay.  Shall I
8  go ahead and read these pages?
9  BY MR. ROTHMAN:
10     Q.   Well, if you need to.  I'll
11 tell you what, I'll read it into the
12 record.
13     A.   Okay.
14     Q.   Her answer, five paragraphs
15 down, Dr. Kweder said, "Yes, that's
16 right.  It was a long time.  Yes, I
17 believe that Merck acted responsibly.  I
18 will say that it did take a very long
19 time, much longer than usual, to make
20 that change to the labeling for the drug.
21 However, during the most --
22     And Senator Hatch asked,
23 "That was unusual?"
24     And Dr. Kweder answered,

57 (Pages 222 to 225)

Page 226

```
1    "Yes, that was unusual.  Normally it's
2    just several months at most.  However,
3    during that period of time, we were also
4    collecting additional data from Merck.
5    Merck was in the process of collecting
6    additional data from ongoing studies to
7    try and bring more information to try and
8    assess how to address that."
9          Senator Hatch:  "Then Merck
10   was cooperative throughout that process?"
11         Dr. Kweder:  "Yes."
12         Senator Hatch:  "Okay.
13   That's what I want to know."
14         Did I read that correctly?
15   A.    Yes, you did.
16   Q.    And do you disagree with --
17   A.    May I read the preceding --
18   I'll be with you --
19   Q.    Read the whole thing,
20   Doctor.
21   A.    -- in just a minute.
22         Okay.  Well, it seems to me
23   this is -- this discussion with Dr.
24   Kweder and Mr. Hatch is not about the
```

Page 227

```
1    time period that we're talking about.
2    Q.    Which labeling do you think
3    they're talking about there, Doctor?
4    A.    Well, let me refer to the
5    statements.  On page 72, the second
6    question from hatch, is there any
7    evidence as far as the FDA is concerned
8    and you're concerned that Merck acted
9    improperly prior to the removal, of
10   pulling the drug from the market, or they
11   acted pursuant to scientific data that
12   was accumulated?  And so that implies
13   that this answer refers to the period of
14   time after the APPROVe results were
15   available.
16   Q.    Doctor, do you think
17   we're -- do you see where Dr. -- Dr.
18   Kapit, do you see where Dr. Kweder says,
19   "I will say that it did take a very long
20   time, much longer than usual to make that
21   change to the labeling for the drug"?  Do
22   you understand that to be talking about
23   the VIGOR labeling changes?
24   A.    Up to that point, in other
```

Page 228

```
1    words, Grassley -- Grassley introduces
2    this subject about the seven or eight
3    years.  And --
4    Q.    Right.  And she says she
5    believes that Merck acted responsibly the
6    whole time?
7    A.    Yeah.  But when she -- the
8    first time she is asked about the
9    question of the responsibility of Merck
10   and what it seems to me is setting the
11   tone for the questions that come on the
12   second page is hatch is very clear and
13   he's referring, was Merck responsible
14   once the problem was established beyond
15   doubt.  And she, in fact, says, one of
16   those studies was the APPROVe study.  And
17   so in the first page, when she says
18   responsible, she is referring to once it
19   was established that the problem existed
20   in the APPROVe study that the -- that
21   Merck acted responsibly in removing it.
22   And, by the way, that's my opinion, too,
23   that once APPROVe was in --
24   Q.    We don't disagree with that?
```

Page 229

```
1    A.    -- Merck acted responsibly.
2    And I think that's what she was saying.
3    Q.    I'm not fussing that point
4    with you, sir.
5    A.    Yes.
6    Q.    But on page 73, Senator
7    Grassley changes the question.  He says,
8    you didn't answer his question about
9    during the process do you think Merck
10   acted responsibly.  I think you, meaning
11   Senator Hatch, asked about during the
12   process, as well as the final action.
13   And Senator Hatch says, well, that would
14   be fine.  I was basically asking, yes, I
15   mean the whole process.  Dr. Kweder
16   clarifies it, the whole process.  And
17   then gives an answer based on the whole
18   seven or eight years, right?
19         MR. BLACK:  Objection.
20         THE WITNESS:  It's my
21   judgment from this whole thing is
22   that the tone of this particular
23   exchange was set when Kweder --
24   Kweder used the word responsible
```

Page 230

1      or agreed Merck was responsible.
2  BY MR. ROTHMAN:
3      Q.   When she says that Merck
4  cooperated, can we agree that that's
5  talking about the VIGOR period?
6      A.   I do not think that that's
7  what this part means.  I think that
8  this -- that this -- the tone of this
9  process is about the -- what the --
10  Merck's -- the primary emphasis is that
11  once the scientific data was beyond
12  dispute that Merck did ability
13  responsibly.  And I don't dispute that
14  either.  And I think that's what set the
15  tone for that exchange.
16      Q.   Had you seen that exchange
17  before --
18      A.   No.
19      Q.   -- just now?
20      A.   I may have seen it, but I
21  didn't look closely at it.
22      Q.   Do you need a break?
23      A.   What time are we at?
24          MR. BLACK:  It's about

Page 231

1  3 o'clock.
2          THE WITNESS:  Yeah, it's
3  probably a good idea to take a
4  break.
5          MR. BLACK:  Okay.  But
6  before we go off the record on
7  this, I have provided to -- I'm
8  sorry.
9          MR. ROTHMAN:  Carl.
10          MR. BLACK:  What's your last
11  names?
12          SPEAKER NO. 4:  Mills, Carl.
13          MR. BLACK:  To Mr. Mills,
14  Dr. Kapit brought with him today,
15  in addition to the documents that
16  have already been provided to
17  counsel, he brought with him seven
18  discs, which, as I've explained
19  earlier, contains some information
20  which was either not responsive or
21  which we were not obligated to
22  provide to counsel.  I have
23  provided copies of four of those
24  discs to Mr. Mills.  I'm in the

Page 232

1  process of getting two other discs
2  copied, which I'll provide to him
3  before the break is over, and one
4  disc contained documents in a form
5  that couldn't be readily copied.
6  And I have hard copies minuted off
7  that disc and I'll look through
8  those and provide them to you
9  shortly which means that the
10  documents pursuant to Attachment A
11  are complete.
12          MR. ROTHMAN:  The discs you
13  gave to Mr. Mills, are these our
14  copies.
15          MR. BLACK:  They're your
16  copies, that's right.
17          MR. ROTHMAN:  For the
18  record, we have four CD-ROMs
19  labeled A, B, C and D.
20          MR. BLACK:  And there is a
21  label tag on the disc so that it
22  reflects exactly what was on Dr.
23  Kapit's discs.  And there will be
24  two more discs forthcoming and

Page 233

1  then some documents copied from
2  the seventh.
3          MR. ROTHMAN:  We'll go on
4  break.
5          (Recess taken from 3:10 p.m.
6  to 3:26 p.m.)
7          (Whereupon, Deposition
8  Exhibit No. Kapit-8, DESCRIPTION;
9  Exhibit No. Kapit-9, DESCRIPTION;
10  and Exhibit No. Kapit-10,
11  DESCRIPTION, were marked for
12  identification.)
13  BY MR. ROTHMAN:
14      Q.   Back on the record.  Doctor,
15  I'm handing you what we marked as Kapit
16  Exhibit 8.  I'll represent to you that
17  this is a document that I found in the
18  boxes that you brought to the deposition
19  today.  Do you recognize this document?
20      A.   Yes.
21      Q.   Is this a copy of the
22  questions that plaintiffs' counsel asked
23  you when you testified at the Plunkett
24  trial?

59 (Pages 230 to 233)

Page 234

```
1        A.  No.  There was a -- there
2   was a trial that I never ended up
3   testifying at, and it was in New
4   Orleans -- no.  It was in Houston.
5        Q.   Are you referring to the
6   first Plunkett trial?
7        A.   Yeah, right.
8            And these were pretrial
9   questions that apparently they planned to
10  use, but since I didn't go on, we never
11  actually used them.
12       Q.   Who gave you this document?
13       A.   I don't remember.  It was
14  not Mr. Black, I don't believe.  I
15  believe it was one of his colleague.
16  Maybe Mr. Sizemore.
17       Q.   Somebody from the Beasley
18  Allen firm?
19       A.   Yes.
20       Q.   And your understanding is
21  that if they had called you at trial to
22  testify, these are the questions they
23  would have asked you?
24       A.   No, I don't think that's
```

Page 236

```
1        Q.   Can you tell me what these
2   notes are from?
3        A.   This was a two-day meeting
4   that was prior to any of the actual trial
5   or deposition work in which we were
6   talking about how to deal with the issues
7   of Vioxx and VIGOR.  And I made some
8   notes on that -- on those conference --
9   on that conference, that two-day
10  conference.
11       Q.   Is this a face-to-face
12  meeting?
13       A.   This was a meeting between
14  me and, I think it was initially,
15  although some left, about half -- about
16  six or seven lawyers.
17       Q.   Do you remember which
18  lawyers?
19       A.   You were there, right?  Mr.
20  Black was there.
21           MR. BLACK:  I'm not sure
22       what meeting we're talking about
23       at this point.  Anyway, it's your
24       memory that's being tested here,
```

Page 235

```
1   exactly --
2            MR. BLACK:  I'm going to
3       object to the form of the
4       question.  Go ahead and answer, if
5       you can.
6            THE WITNESS:  I don't think
7       that's exactly what -- these were
8       kind of pretrial prep issues that
9       I was supposed to look at and
10      consider the answers to.
11  BY MR. ROTHMAN:
12       Q.   Did you get a similar bunch
13  of questions before you testified in the
14  case in New Orleans?
15       A.   No.
16       Q.   Okay.  Let me mark as
17  Exhibit 9 this next document, which
18  appears to be some handwritten notes on
19  the stationery of the Sheraton in
20  Philadelphia, Pennsylvania.  We marked a
21  copy so as not to de face the original
22  notes.  And I'll give you both the copy
23  and your originals, if that helps you.
24       A.   Yes.
```

Page 237

```
1       not mine.
2            THE WITNESS:  I think
3       it's -- I think it's -- I think
4       Mr. Wacker was there, Mr. Sizemore
5       I think was there.  But, actually,
6       I can't tell you completely who
7       was there.
8   BY MR. ROTHMAN:
9        Q.   Okay.  Do you have a
10  recollection of when this meeting took
11  place?
12       A.   No, I can't remember exactly
13  when it took place.  It was obviously in
14  that year, in 2005, and probably was like
15  June or something like that.  But I -- I
16  just -- I don't know, actually.  I can't
17  remember.
18       Q.   When did you first start
19  working on the Vioxx cases?
20       A.   Sometime -- I mean, I can
21  answer the question specifically, if you
22  want me to go back to my time record.
23       Q.   Can you give me a general
24  answer?
```

**Page 238**

1    A.   I'd rather go back to my
2  time record --
3    Q.   If you can do that, go
4  ahead.
5    A.   -- because I'm not
6  completely sure.
7        Apparently the first time
8  was -- yeah, this was -- this was --
9  September 12th and September 13th.
10  That's when this meeting took place.
11    Q.   At your first deposition,
12  you told us about a meeting that you had
13  with the plaintiffs' counsel at which Dr.
14  Egilman was present at which you talked
15  about what to put in your report.  Is
16  this the same meeting?
17    A.   Right, it is.
18        MR. BLACK:  Objection.
19        THE WITNESS:  In which I
20    told them what I was going to put
21    in my report, if you remember, if
22    you've gotten that transcript.
23  BY MR. ROTHMAN:
24    Q.   And then we have one other

**Page 239**

1  set of notes that I'm going to mark as
2  Exhibit 10.  And, again, I'll give you a
3  copy and your original document.  And I
4  will represent to you that Exhibit 10, as
5  well as Exhibit 9, was found in the boxes
6  that you brought today.
7    A.   Were these stapled together
8  as they are here?
9    Q.   I've given you back the
10  original as it was in your box.
11    A.   Okay.
12    Q.   Do you know what these notes
13  are from?
14    A.   I'm -- let me look at them.
15        (Witness reviews document.)
16        Yeah, this looks like some
17  notes from the -- from the trial
18  before -- trial in February, a meeting or
19  conference or something that took place
20  before the trial in February.
21    Q.   Okay.  Can you tell who was
22  at that meeting?
23    A.   That was Mr. Black and Mr.
24  Sizemore and -- no, maybe not.  The

**Page 240**

1  main -- the main people that I was
2  involved with at that point were Mr.
3  Black and Mr. Sizemore, but I can't say
4  that that was the entire -- there weren't
5  other people involved occasionally, too.
6    Q.   All right.  On the top of
7  page two, Mr. Rafferty's name appears.
8  Does that indicate he might have been at
9  this meeting?
10    A.   Yeah, I guess so.
11    Q.   Okay.  Are these your notes
12  from the meeting?
13    A.   Definitely my handwriting.
14    Q.   Is the front page also your
15  handwriting?
16    A.   Yes.  Yes.
17    Q.   All the handwriting on the
18  front page is yours?
19    A.   Yes.  Yes.  Rafferty was
20  involved in -- had some telephone --
21  yeah, that's right, there was a meeting
22  with Mr. Rafferty and Mr. Black in
23  January.  So he was also involved.
24    Q.   Okay.  And was this a

**Page 241**

1  meeting to -- a face-to-face meeting?
2    A.   The information I have about
3  the meetings with Mr. Black and Mr.
4  Sizemore and Mr. Black and Mr. Rafferty
5  were face-to-face meetings.  There were
6  also some telephone conferences.
7    Q.   Where did this January
8  meeting take place?
9    A.   Maybe downtown in DC.  Let
10  me see.  Probably -- probably locally
11  because there's not that much time
12  associated with it.
13    Q.   Okay.  Was this a meeting to
14  prepare for your direct examination at
15  trial?
16    A.   Probably, yeah.  No,
17  actually, I think some of it was for a
18  deposition and some of it for the trial.
19  Actually, I think these notes are more
20  related to the deposition.  They were
21  very -- it was all within a week or so,
22  or ten days, that the deposition and the
23  trial happened.  So they were all -- but
24  I think these notes are probably more

Page 242

1   connected to the deposition.
2       Q.   Okay.  Go back to the prior
3   exhibit, Exhibit 9, for a moment.  Is
4   that your handwriting on Exhibit 9?
5       A.   This?
6       Q.   The one -- the Sheraton
7   stationery.
8       A.   Yes.  This is all my
9   handwriting.
10      Q.   Okay.  I want to make sure I
11  understand your position on CBEs.  Okay?
12      A.   Yeah.
13      Q.   In paragraph 129 of your
14  expert report, which we've marked as
15  Exhibit 2 --
16      A.   Okay.
17      Q.   -- in the second sentence of
18  that paragraph, you write, "FDA
19  regulations require prior approval to
20  change a label to add a unique benefit or
21  to add results of a new investigation."
22      MR. BLACK:  Counsel, I think
23  Dr. Kapit is having the same
24  problem.  Apparently when this got

Page 243

1   copied, it goes from page 23 to
2   28.  And I bet that's in the
3   exhibit.  So he's got the actual
4   exhibit.  So we need to get that
5   fixed, whether you want to
6   substitute another -- however you
7   want to do that.  Anyway, the
8   exhibit is not complete.
9       THE WITNESS:  But I can pull
10  out the document, if you want.
11      MR. ROTHMAN:  That's fine,
12  if you have a copy of your own you
13  want to refer to.
14      MR. BLACK:  Take a second so
15  I can get a copy for myself.  Do
16  you have a copy that --
17      MR. ROTHMAN:  I have a copy
18  that has everything in it.
19      MR. BLACK:  And I have no
20  problem, I think what we ought to
21  do is take the document that's
22  marked as an exhibit and put in
23  the missing pages, so it's a
24  complete exhibit.  We can do that

Page 244

1   on the record.
2       MR. ROTHMAN:  That's fine.
3       MR. BLACK:  Whatever you
4   want to do, so long as the doctor
5   has some version of it is that
6   complete and I do, you can just
7   proceed with your questioning.
8       MR. ROTHMAN:  Here's the
9   page.  And if you would put that
10  in and make sure that the report
11  is now complete to your
12  satisfaction, I will proceed.
13      MR. BLACK:  Well, there's
14  more than that missing, counsel.
15      MR. ROTHMAN:  Okay.
16      MR. BLACK:  And we may have
17  to make some effort to get a copy
18  machine here because what happened
19  is in your back-to-back copying on
20  what's been marked as the exhibit,
21  it goes from page 23 on one side
22  and then to page 28, where is the
23  document you just handed me goes
24  from 23 to 24, so it isn't simply

Page 245

1   a mat of sticking that in.
2       MR. ROTHMAN:  We'll take out
3   that page and here's three pages
4   to replace it.
5       (Off the record.)
6   BY MR. ROTHMAN:
7       Q.   We have repaired Exhibit
8   Number 2 so that it now has all of the
9   proper pages.  72 you were calling Dr.
10  Kapit's attention to?  I forget exactly
11  where we were when all this started.
12      MR. ROTHMAN:  Paragraph 129
13  of the report.
14  BY MR. ROTHMAN:
15      Q.   Paragraph 129 of your
16  report, Doctor, you wrote, in the second
17  sentence, "FDA regulations require prior
18  approval to change a label, to add a
19  unique benefit or to add results of a new
20  investigation."
21      A.   Yes.
22      Q.   If I understand your
23  position on CBE, you're of the opinion
24  that Merck could not have done a CBE to

Page 246

1  add the GI results from VIGOR; is that
2  true?
3      A.   That's not what a CBE is
4  for, that's right. I mean, if they're
5  going to claim that they've got a better
6  result than standard NSAIDs, that
7  requires FDA -- prior FDA approval.
8      Q.   Okay. Could Merck have
9  submitted its June 29th, 2000 labeling
10  proposal as is as a CBE?
11      A.   No, because, for example,
12  they changed the clinical studies
13  section.
14      Q.   So if Merck had submitted
15  that label as a CBE, you think the FDA
16  would have rejected it?
17      A.   The CBE is, and specifically
18  the CBE that is not a 30 day review,
19  prior 30 day review, is for addition,
20  among other things, warnings,
21  precautions, contraindications. It
22  specifically concerns the safety
23  information that one must put in to have
24  safe and effective use of the drug. And

Page 247

1  so the kind of large supplement that was
2  involved, essentially a broad labeling
3  revision that Merck submitted on
4  June 29th, that cannot be submitted.
5  What we're talking about as a CBE is
6  relatively brief changes that affect
7  especially those particular section of
8  the labeling, contraindications,
9  warnings, precautions, adverse reaction.
10      Q.   If Merck had submitted that
11  June 29th label as a CBE, FDA would have
12  rejected it?
13      A.   Certainly, yes. I mean, it
14  was clearly -- a CBE without prior
15  approval, FDA would not have allowed
16  that, yes.
17      Q.   And if the FDA rejects a
18  CBE, that puts you at risk of having a
19  misbranded drug, true?
20      MR. BLACK: Objection.
21      THE WITNESS: No. I mean, I
22  don't think you can go to that. I
23  mean --
24  BY MR. ROTHMAN:

Page 248

1      Q.   Well, what's the effect of
2  the FDA rejecting a CBE?
3      A.   That the company has to
4  submit a new one.
5      Q.   And what happens if they
6  don't?
7      A.   What happens if they don't?
8      MR. BLACK: Objection.
9  BY MR. ROTHMAN:
10      Q.   Yes.
11      A.   You have to -- I mean --
12  wait a second. I mean, we're talking
13  about -- when we're talking about a
14  labeling change, like the June 29th
15  submission, it's not something that's
16  submitted as a CBE. Merck did not submit
17  it as a CBE, nor would a company with the
18  experience that Merck has have submitted
19  that as a CBE. In fact, one of my points
20  here is that Merck, by submitting
21  something that couldn't be a CBE and
22  putting the cardiovascular information in
23  that submission, which could not be a
24  CBE, precluded the immediate addition of

Page 249

1  that information to labeling. So I'm not
2  sure what you're asking as with regard to
3  CBEs here. I mean, when you say
4  rejecting a CBE, I have to ask you to be
5  more specific about what sort of
6  submission we're talking about here.
7      Q.   Okay. Can we talk about it
8  in general? If a company submits a CBE
9  and the FDA rejects it, what happens
10  next?
11      MR. BLACK: Objection.
12      THE WITNESS: You're talking
13      about a CBE that, as appropriate,
14      ads warnings, precautions,
15      contraindications or adverse
16      reactions? Is that what you're
17      referring to.
18  BY MR. ROTHMAN:
19      Q.   I'm talking about any CBE
20  submitted to the FDA that they --
21      A.   I'm so far, I cannot give
22  you an answer to -- if you ask me about a
23  specific situation, I can tell you what
24  would have happened, what in my opinion

Page 250

1    would have happened.  But this -- I don't
2    know what you're talking about being
3    submitted when you say a CBE.  Tell me
4    what kind of CBE you're talking about.
5             MR. ROTHMAN:  Let's mark
6    this as the next exhibit.
7             (Whereupon, Deposition
8    Exhibit No. Kapit-11, DESCRIPTION,
9    was marked for identification.)
10   BY MR. ROTHMAN:
11        Q.   All right.  Sir, I'm going
12   to basically point you to the attached
13   labeling, which starts on page number
14   926.  Do you have that?
15             MR. BLACK:  Bates page 926?
16             MR. ROTHMAN:  Yes.
17             THE WITNESS:  Okay.
18   BY MR. ROTHMAN:
19        Q.   Do you recognize this part
20   of the document as the Vioxx label
21   approved by the FDA in April of 2002?
22        A.   I would have to look through
23   it to make sure, but I'll accept your
24   statement that that's what it is.

Page 251

1        Q.   Well, go ahead and take a
2    look, if you want.
3        A.   (Witness reviews document.)
4             Yes, I believe this is that
5    document.
6        Q.   If Merck had been prescient
7    enough to sit down and draft this exact
8    label in the spring of 2000, could it
9    have submitted this label as a CBE?
10             MR. BLACK:  Objection.
11             THE WITNESS:  No, you cannot
12   submit a complete revision of
13   labeling as a CBE.  A CBE is
14   mainly for warnings, precautions,
15   or the type of CBE we're talking
16   about here in this case is for
17   contraindications, warnings,
18   precautions and adverse reactions.
19   So this is not that kind of
20   submission.  This is a whole
21   label.  A whole label has to be
22   submitted for prior approval and
23   that's exactly the point, that by
24   submitting a whole label, it just

Page 252

1    means that there has to be a much
2    longer review, and, therefore, a
3    much longer delay.
4    BY MR. ROTHMAN:
5        Q.   What should Merck have done
6    instead, according to your --
7        A.   I believe I said what it
8    should have done in this paragraph.  That
9    it should have submitted a simple --
10             MR. BLACK:  Okay.  Doctor,
11   you're referring to paragraph 129?
12             THE WITNESS:  Paragraph 129
13   on page 24.
14             Merck should have submitted
15   a simple, straightforward
16   statement that alerts the medical
17   community to this hazard.  And I
18   believe that somewhere in what I
19   wrote, I actually proposed some
20   wording.
21             MR. BLACK:  Take your time
22   and find it.
23             THE WITNESS:  That I
24   proposed, for example, that the --

Page 253

1    here, it could have said this in
2    the warnings section.
3             MR. BLACK:  Where are you
4    referring to in your report,
5    Doctor?
6             THE WITNESS:  Well, that's
7    the wrong section.  Where is it?
8    BY MR. ROTHMAN:
9        Q.   You're looking for paragraph
10   99, Doctor?
11        A.   I think you probably got it.
12   Yes, yes.  I think this, for example,
13   could have been put in warnings.  It's
14   basically three rather simple sentences.
15   And it says, in a Merck clinical trial,
16   patients receiving Vioxx had an increased
17   rate of cardiovascular thrombotic events
18   compared to patients receiving naproxen.
19   At present, it is unknown whether this
20   indicates an increased risk of
21   cardiovascular thrombose cease on Vioxx
22   or a decreased risk of such events on
23   naproxen.  Because of this uncertainty,
24   doctors with patients on Vioxx may wish

Page 254

1  to consider the risks and benefits of
2  Vioxx in their patients at risk for
3  cardiovascular thrombotic events.
4      Q.   And now your report, in
5  paragraph 99, you're talking about a Dear
6  Healthcare Provider letter, correct?
7      A.   Yes.  But that's the kind of
8  thing they could have put in warnings as
9  well.
10     Q.   You think that this language
11 here in paragraph 99 is appropriate
12 labeling also?
13         MR. BLACK:  Objection.
14         THE WITNESS:  It varied --
15     with perhaps a few modifications,
16     but that's the thrust of what
17     should have been put in warnings.
18 BY MR. ROTHMAN:
19     Q.   Well, what modifications
20 should you have made to make it
21 appropriate for a label?
22     A.   I think the most important
23 are the first and the third sentences.
24 In a Merck clinical trial, patients

Page 255

1  receiving Vioxx had an increased rate of
2  cardiovascular thrombotic events compared
3  to patients receiving naproxen.  Doctors
4  may -- doctors with patients on Vioxx may
5  wish to consider the risks and benefits
6  of Vioxx in their patients at risk for
7  cardiovascular thrombotic events.
8         Maybe something else, but, I
9  mean, I'd have to give it some
10 consideration.  But that's the kind of
11 simple, straightforward statement that
12 they could have put in warnings, and I
13 believe should have been put in warnings.
14     Q.   So you would not put the
15 second bullet point in the warning?
16     A.   I -- that's less important
17 than alerting doctors as to the
18 possibility.  I probably would not
19 have -- you're asking me to make a
20 definitive of things I would have to give
21 consideration to.  If I were in the FDA
22 actually working on this, I would, of
23 course, discuss it with other reviewers
24 and with people in -- so, I mean, whether

Page 256

1  it would exactly come out this way, but,
2  yeah, that's the basic idea.
3      Q.   Well, I just asked you how
4  you would modify this to make it
5  appropriate for labeling.  You read the
6  first and third bullets and you left out
7  the second one.
8      A.   Right.
9      Q.   Why did you leave out the
10 second bullet?
11     A.   Because warnings should
12 concentrate on the hazard, not so much on
13 explanations for the hazard.  But I've
14 seen warnings where some explanations
15 were included.  So maybe yes.  I'm not
16 sure.  I mean, it was -- I would have --
17 the most important thing in a warning is
18 to state the hazard that doctors have to
19 be concerned about.
20     Q.   Well, are you leaving out
21 the second bullet because it says that
22 it's unknown?
23         MR. BLACK:  Objection.
24         THE WITNESS:  Because it

Page 257

1      gets into explanatory mechanistic
2      considerations which may or may
3      not be appropriate in warnings.
4      The important -- to reiterate what
5      I said, the important thing is to
6      put the risk information in the
7      warning.
8  BY MR. ROTHMAN:
9      Q.   If you tell doctors that
10 Vioxx had an increased rate of
11 cardiovascular thrombotic events compared
12 to patients receiving naproxen, how do
13 they know whether that was a result of
14 Vioxx causing cardiovascular thrombotic
15 events or naproxen reducing
16 cardiovascular thrombotic events?
17         MR. BLACK:  Objection.
18         THE WITNESS:  Well, the
19     issue here for warnings is not so
20     much what the cause is because the
21     cause at that point was unknown.
22     The issue is that in patients who
23     have a risk for MIs, they should
24     be considering whether this is the

Page 258

1  · most appropriate medication for
2  them. That's the point. And if
3  that had been in warnings, a lot
4  of lives would have been saved.
5      MR. ROTHMAN: Can you please
6  read back the last question and
7  answer.
8      (Whereupon, the court
9  reporter read back from the
10  record.)
11 BY MR. ROTHMAN:
12     Q.  Do you think that your first
13 bullet point in paragraph 99 tells
14 doctors why there is an increased rate of
15 cardiovascular thrombotic events in the
16 clinical trial?
17     A.  The important point --
18     Q.  Doctor --
19     A.  No, it doesn't tell them
20 why.
21     Q.  Thank you.
22     A.  And it should not tell them
23 why. That's not what a warning is for.
24 If it's known, if they have -- if this

Page 259

1  were -- if this occurred at a time when
2  the answer was known, putting the
3  mechanism in there probably would have
4  been appropriate. But at this point,
5  since it was unknown, it would not have
6  been appropriate. It would have raised
7  questions which missed the point of the
8  warning, which is that patients at risk
9  for MIs need to be -- you need to be very
10 careful with this drug among patients who
11 are at risk for MIs. That should have
12 been the point of the warning.
13     Q.  Is that true even if the
14 reason for the disparity in VIGOR was a
15 cardioprotective effect of naproxen?
16     MR. BLACK: Objection.
17     THE WITNESS: Let's say
18     hypothetically that it turned out
19     that that was the reason, then
20     they could have taken the warning
21     out at some point. But at this
22     point, everybody knew that it was
23     unknown. Even the -- even as
24     Gilmartin and Scolnick said, it

Page 260

1  was unknown at this particular
2  time. And the risk was so serious
3  that an adverse event that people
4  could die from or could be
5  crippled in life from, that it
6  should have been communicated to
7  the medical community, it should
8  have happened that the medical
9  community considered very
10 carefully about patients with
11 cardiovascular risk, they should
12 have considered it, and if maybe,
13 as it did not turn out to be, at
14 some time it turned out that Vioxx
15 was perfectly innocent, well, so
16 they could have taken it out.
17 It's not like Vioxx was the only
18 drug on the market at the time
19 that could treat this stuff.
20 BY MR. ROTHMAN:
21     Q.  Is it your position, sir,
22 that it's acceptable to put an I don't
23 know in the warning section of the label?
24     A.  I'm saying the I don't know

Page 261

1  should have been in there. We're saying
2  what was known. What was known is what
3  I'm proposing to put in, that Vioxx had
4  an increased risk of cardiovascular
5  thrombotic events compared to patients
6  receiving naproxen. That was known.
7  Because of the uncertainty, doctors with
8  patients on Vioxx may wish to consider
9  the risks and benefits of Vioxx in their
10 patients at risk for cardiovascular
11 thrombotic events. That also is a
12 prudent conclusion from the first
13 statement. And that should have been in
14 warnings, too. And as we know, it turned
15 out that it was Vioxx.
16     Q.  Can you put an I don't know
17 in the warnings section of a label? Yes
18 or no.
19     MR. BLACK: Objection.
20     THE WITNESS: That's not
21     what it's for. And I wouldn't put
22     it there. No, I don't think it
23     should be there.
24 BY MR. ROTHMAN:

Page 262

1    Q.   Now, you say that back in
2  paragraph 129 of your report, that
3  another longer and more complex
4  supplement could have proposed new
5  wording for the clinical studies section
6  and added information on the
7  gastrointestinal benefit, right?
8    A.   Yes.
9    Q.   And are you saying that
10  Merck should submit this CBE supplement
11  and this prior approval supplement at the
12  same time to the FDA?
13      MR. BLACK: Objection.
14      THE WITNESS: That could
15  have been done.
16  BY MR. ROTHMAN:
17    Q.   Now, can you pointer me to a
18  regulation or a guidance or some
19  authority that says that you can split up
20  a study like that and submit two separate
21  supplements?
22      MR. BLACK: Objection.
23      THE WITNESS: There doesn't
24  need to be a regulation.  There's

Page 263

1  nothing prohibiting the company
2  from doing it.  Both of those
3  submissions are valid submissions
4  under the regulations, therefore
5  they can do it.
6  BY MR. ROTHMAN:
7    Q.   Is there any authority under
8  the regulations for doing that?
9      MR. BLACK: Objection.
10      THE WITNESS: It's not a
11  question there's nothing
12  prohibiting it.
13  BY MR. ROTHMAN:
14    Q.   So your answer is you can't
15  point me to anything either way?
16      MR. BLACK: Objection.
17      THE WITNESS: No.  I'm
18  sorry, that's a conclusion that's
19  not relevant in this situation.
20  If the reg -- if the submissions
21  are valid supplements that can be
22  submitted under the regulations
23  and there's no regulation
24  prohibiting the submission of

Page 264

1  supplements together, and I've
2  seen hundreds of times where more
3  than one supplement has come in,
4  then it can be done.  I mean, the
5  fact that there's nothing
6  prohibiting it -- I mean, the fact
7  that there's nothing specifically
8  authorizing it doesn't, and you
9  know this as a lawyer, that if
10  it's not prohibited, it can be
11  done.
12  BY MR. ROTHMAN:
13    Q.   Do you think that
14  prescribing physicians would want to know
15  that VIGOR was a GI outcomes study in
16  making prescribing decisions about Vioxx?
17      MR. BLACK: Objection.
18      THE WITNESS: Not -- not --
19  not necessary for them to know
20  that to be made cognizant of the
21  problem that we're talking about
22  putting in warnings.  Now, I do
23  think, actually, you do have a
24  partial point, that now that

Page 265

1  you're mentioning it, it probably
2  should have been mentioned in
3  warnings that it was at
4  50 milligrams.
5  BY MR. ROTHMAN:
6    Q.   You would want to mention
7  the dose?
8    A.   Yeah, I believe the warning
9  should state that it was in a
10  50-milligram study.
11    Q.   Would you want to mention
12  that the study was done in a rheumatoid
13  arthritis population?
14    A.   Possibly.  I'm not sure.
15  Again, this is going to -- this is
16  getting beyond what I can -- I feel I can
17  do on myself.  I feel like at a certain
18  point it would be something that -- it
19  would have to be more of a group process,
20  and I don't feel completely -- I don't
21  feel comfortable giving you all the
22  answers to what should have been warnings
23  on my own.  But warnings should have been
24  there.  It certainly would have been

Page 266

1  useful to have the dose. Perhaps
2  population might have been relevant. The
3  main point, though, is not the population
4  but that the -- the cardiovascular risk.
5  They should have put the cardiovascular
6  risk in warnings right away.
7      Q.   Is part of your discomfort
8  about whether to add the population the
9  fact that you're not sure when the
10 rheumatoid arthritis indication was
11 approved by the FDA?
12     A.   No.
13         MR. BLACK: Objection.
14         THE WITNESS: No. No. It's
15     just that I don't -- I'm not the
16     founder of all the wisdom on all
17     of this. And I feel that for
18     something important like this, it
19     would be nice to be able to toss
20     it back and forth between other
21     reviewers and supervisors. And so
22     I'm not -- I don't want to go out
23     on a limb and say I know for sure
24     the way it ought to have been

Page 267

1      worded. I mean, I just --
2  BY MR. ROTHMAN:
3      Q.   Well, let me --
4      A.   The fact that the
5  cardiovascular information should have
6  been in warnings I believe I can say, and
7  I can assert that with great confidence.
8  But the exact wording I'm not completely
9  sure about.
10     Q.   Well, let me ask you this.
11 If it was true that the rheumatoid
12 arthritis indication had not yet been
13 approved at the time of VIGOR, does that
14 then make the study population something
15 you would want to include in your CBE
16 warning?
17     A.   No. The point of the
18 warning is to put the adverse reaction,
19 the safety information in. That's the
20 most important point. If -- and there is
21 an argument for putting the population
22 in, but it's to put the warning in
23 context for the doctors reading it. It's
24 not -- it's not related to any regulatory

Page 268

1  secrets.
2      MR. ROTHMAN: Mark this as
3      Exhibit 12.
4          (Whereupon, Deposition
5      Exhibit No. Kapit-12, DESCRIPTION,
6      was marked for identification.)
7  BY MR. ROTHMAN:
8      Q.   Doctor, I've handed you
9  Exhibit 12. I will tell you that this is
10 a document that ^ Mr. Ismail showed you
11 at the Plunkett trial when you testified.
12     A.   Yes.
13     Q.   Do you recall this document?
14     A.   Yes.
15     Q.   This was a CBE that was
16 submitted by Merck?
17     A.   Yes, that's right, it was.
18     Q.   In October of 1999?
19     A.   Yes.
20     Q.   That's before the VIGOR
21 trial results were known?
22     A.   Yes.
23         MR. BLACK: Objection.
24     Withdraw the objection.

Page 269

1  BY MR. ROTHMAN:
2      Q.   And Merck tried to make --
3  through this CBE process, Merck tried to
4  make some changes to the label, primarily
5  a change to the drug interaction section
6  with Warfarin?
7      A.   Yes, that's right.
8          MR. BLACK: Objection.
9  BY MR. ROTHMAN:
10     Q.   And if you turn to the page
11 that's Bates numbered 430 as the last
12 three digits -- are you there, sir?
13     A.   Almost. Yes.
14     Q.   Okay. Merck tried to add --
15 Merck was proposing to add this sentence
16 in the double underlined regarding the
17 postmarketing experience of concurrent
18 administration of clinical doses of Vioxx
19 with Warfarin, correct?
20     A.   As I remember, there's a
21 much longer text that Merck was proposing
22 to add. Maybe this is one of the things.
23         MR. BLACK: Take your time
24     and look through the document.

Page 270

1      MR. ROTHMAN: You can take
2  your time and look through it,
3  sir. I will point out to you that
4  Merck also sought to add
5  information about the pregnancy
6  registry on page 16 and the
7  adverse events section, to add a
8  postmarketing adverse reaction on
9  page 19 of the draft.
10      MR. BLACK: Let me get
11  there, counselor, before you go
12  any further.
13      THE WITNESS: Now, are you
14  asserting that --
15      MR. BLACK: Before you
16  continue on, counsel, I'd like to
17  you've got 15 and 16 noted and
18  what was the other one? 19?
19      MR. ROTHMAN: 19. And if
20  you really want to be picky, they
21  changed the date on the label on
22  page 21 and the company address.
23  BY MR. ROTHMAN:
24      Q.   Are you with the both of us

Page 271

1  now, Dr. Kapit?
2      A.   Yes, I am. Do you want me
3  to go ahead and answer you?
4      Q.   I don't think I've asked a
5  question yet.
6      A.   I'm asking a clarification.
7      Q.   What's that?
8      A.   I'm asking for a
9  clarification.
10      Q.   What's that?
11      A.   This is a long paragraph
12  about Warfarin. And are you saying that
13  in this CBE, the only addition, the only
14  change, was the double underlining.
15      Q.   To the Warfarin paragraph,
16  correct.
17      A.   Okay. Go ahead.
18      Q.   I think you've told us
19  already that under your view of the CBE
20  procedure, this change should have been
21  one that could be done by CBE?
22      A.   Well, let me say that my
23  understanding was that the entire
24  paragraph was a change under the CBE. So

Page 272

1  that the entire paragraph is a very
2  complex paragraph and --
3      Q.   Well, let me ask you this
4  question.
5      A.   Let me answer you that --
6  let me answer this, that the addition of
7  a drug interaction is something that can
8  be submitted as a CBE.
9      Q.   When you say that, are you
10  referring to the whole paragraph or just
11  the double underlining?
12      A.   I'm making the general
13  statement that a drug interaction in
14  principle can be submitted as a CBE.
15      Q.   And what about a change to
16  add the sentence that's there in the drug
17  interaction paragraph?
18      A.   Okay. Now, as I say, it was
19  my impression that, and it may be
20  incorrect, that the entire paragraph was
21  added as a CBE. The FDA apparently
22  rejected this CBE. And the reason for
23  the objection can be seen in the changes
24  the FDA made, which was to simplify the

Page 273

1  whole paragraph. So it was my impression
2  that the whole paragraph was rejected
3  because of its complexity in favor of
4  much more simple, straightforward
5  language that communicated the problem of
6  the interaction with Warfarin much more
7  quickly and much more clearly than this
8  paragraph does.
9      Q.   Have you reviewed the letter
10  that the FDA sent Merck rejecting this
11  CBE?
12      A.   Yes, I did.
13      Q.   Do you know what the reason
14  stated in the letter is for rejecting the
15  CBE?
16      A.   It's my impression that it
17  was to simplify and make the CBE -- make
18  the drug interaction much more
19  straightforward and clearer.
20      MR. ROTHMAN: Would you mark
21  this as the next exhibit, please.
22      (Whereupon, Deposition
23  Exhibit No. Kapit-13, DESCRIPTION,
24  was marked for identification.)

Page 274

BY MR. ROTHMAN:
1. Q. Doctor, do you have
Exhibit 13 in front of you?
   A. Yes.
2. Q. This is a letter from the
FDA to Merck, correct?
   A. Yes.
3. Q. It's in response to the
October 6th, 1999 supplement that we just
looked at that was Exhibit 12?
   A. Yes, it appears -- well,
this is -- okay, it does appear to be
that, yes.
4. Q. The letter states several
paragraphs down, "We note that you have
submitted this supplement under 21 CFR
314.70C, special supplement changes being
effected. Changes of the kind you have
proposed are not the kind of changes
permitted by regulation to be put into
effect prior to approval of a supplement.
An approved supplement is required for
the proposed changes. Therefore, the
supplement is being reviewed under 21 CFR

Page 275

314.70B."
   That's what the letter says,
right?"
   A. Uh-huh.
   Q. It doesn't give any other
reason in this letter for rejecting the
CBE, does it, sir?
   A. Well, the FDA replied with a
letter that has boilerplate in it.
   Q. Sir, it doesn't say anything
else in this letter about the reason for
objecting the CBE, does it?
   A. The letter uses boilerplate.
And as you point out, it doesn't tell you
the FDA's reason for rejecting it.
   Q. The reason for rejecting it
is right in that paragraph, isn't it,
sir, changes of the kind you have
proposed is not the kind permitted to
regulation put into effect prior to
approval of a supplement?
   A. No.
   Q. You disagree with the FDA?
   MR. BLACK: Object to form.

Page 276

   THE WITNESS: No, I'm not
disagreeing with the FDA and I'd
like to finish my answer. The FDA
issued a boil let plate reason, a
reason from the boilerplate that
permits a rejection of a CBE. If
you look at the changes they made,
they simplified this paragraph and
made it much more straightforward.
Now, the changes that are in there
that the FDA proposed and the
difference of the FDA proposal
from the original labeling here
tells you why they wanted to
reject it. And they found -- they
found some boilerplate language to
use for rejecting it and that's
what they did.
BY MR. ROTHMAN:
   Q. See if you can answer this
question.
   Was the change Merck
proposed the type of change permissible
by CBE?

Page 277

   MR. BLACK: Objection to
form.
BY MR. ROTHMAN:
   Q. Yes or no?
   MR. BLACK: Objection to
form. There's three changes
proposed.
   MR. ROTHMAN: I'll re-ask
the question.
BY MR. ROTHMAN:
   Q. Are the changes Merck
proposed in its October 6th supplement
the types of changes that are permissible
by CBE?
   A. I'm going to have to review
the three kinds of changes and I'm going
to have to review the regulation. And at
this point, it may be that one of these
changes falls under this definition here.
But as Mr. Black points out, there are
three changes, and I'm going to need to
review each one of them and see the kind
that they are.
   Q. Didn't you tell Mr. Ismail

Page 278

1  at trial that those changes were the type
2  of changes that could be done by CBE?
3      A.   I may have been wrong about
4  that. I don't know. It's something that
5  has come up since that time, and it may
6  have been something that was an error in
7  my testimony the first time. I'm not
8  sure. This is something that I've looked
9  at since then. And the difference -- the
10 substantive difference between what's in
11 this labeling and what was proposed by
12 the FDA is a useful change in that it
13 makes the problem with the drug
14 interaction much clearer. And it's my
15 belief, therefore, that that was the
16 point of all this. Now, you can point
17 out to boilerplate and you can point out
18 this, that or the other thing, but if you
19 look at the results of the difference,
20 the changes that the FDA proposed, that
21 will tell you what they were interested
22 in. Now, maybe they used some
23 boilerplate regulation to give them the
24 excuse to make a change that they thought

Page 279

1  was necessary. I don't know. I would
2  have to evaluate that.
3      Q.   What was the question I just
4  asked you?
5          MR. BLACK: Object.
6          THE WITNESS: I'm sorry.
7      You're going to have to repeat it
8      to me because I've gone on such a
9      long-winded answer that I can't
10     remember.
11         MR. ROTHMAN: Yes, you did,
12     and I move to strike your
13     long-winded answer.
14 BY MR. ROTHMAN:
15     Q.   New subject. When did Merck
16 first find out about the VIGOR results?
17     A.   In March 2000.
18     Q.   And when did Merck first
19 share those results with the FDA?
20     A.   Very shortly after that. I
21 think it was before the end of the month.
22     Q.   Okay. In March of 2000, the
23 FDA had data on Celebrex that Merck did
24 not have access to, correct?

Page 280

1          MR. BLACK: Objection.
2          THE WITNESS: I don't know
3      that.
4  BY MR. ROTHMAN:
5      Q.   Do you know if FDA had data
6  from the class study?
7      A.   Yes, I believe that they
8  probably did.
9      Q.   In March of 2000?
10     A.   Yes.
11     Q.   Was that data public yet?
12     A.   I have not reviewed
13 information about that.
14     Q.   Would FDA have had data on
15 other NSAIDs that would not have been
16 available to Merck?
17     A.   My reviews of this -- of
18 this information are really limited to
19 Vioxx and I did not review information
20 with regard to other NSAIDs, so I can't
21 answer your question.
22     Q.   FDA could have asked Merck
23 to do a CBE, couldn't it?
24     A.   That's not the usual

Page 281

1  practice of the agency. I have -- I
2  don't know that I ever came -- I've been
3  involved with hundreds of CBEs, and I
4  don't know that I ever came across a time
5  when the FDA requested a CBE. And, in
6  fact, that's really -- the regulation is
7  pretty clear that it's designed to allow
8  the companies to put in important
9  information without FDA involvement. So
10 the answer to your question is, sure, the
11 FDA can do it, but that's not the way
12 things are usually done, not the way
13 things are done in my experience there.
14     Q.   The regulation specifically
15 says that the FDA can ask a company to
16 submit a CBE, correct?
17         MR. BLACK: Objection.
18         THE WITNESS: I don't doubt
19     that the FDA can do it. I just
20     testified, though, that that's not
21     the way it's done and that's not
22     really the purpose of the
23     regulation. The purpose is to
24     save time, to get adverse reaction

Page 282

```
1      in as soon as possible and to
2      allow the company to act on
3      important adverse reaction
4      information without having to
5      consult the FDA, which because the
6      FDA is a bureaucratic
7      organization, usually ends up
8      taking a long time.
9          MR. ROTHMAN: Okay. Move to
10     strike that answer.
11  BY MR. ROTHMAN:
12     Q.   Let me see if I can try it
13  one last time, sir.
14         The FDA has the authority to
15  ask a drug company to submit a CBE, true?
16     A.   Yeah.
17         MR. BLACK: Objection.
18         THE WITNESS: It has the
19     authority. It doesn't usually do
20     it.
21  BY MR. ROTHMAN:
22     Q.   It has the authority, true?
23     A.   It doesn't do it. Not in my
24  experience.
```

Page 283

```
1      Q.   The FDA never asked Merck to
2   do a CBE to put the VIGOR results in the
3   label, true?
4      A.   Yes, that's true.
5      Q.   As far as you know, the FDA
6   has never criticized Merck for not doing
7   a CBE to put the VIGOR results in the
8   label?
9      A.   That's true.
10     Q.   FDA could have, on its own,
11  issued a public health advisory once it
12  became aware of the VIGOR results, true?
13     A.   Yes.
14     Q.   FDA did not do that, did it,
15  sir?
16     A.   Yes.
17     Q.   You agree with me?
18     A.   I agree.
19     Q.   And FDA could have on its
20  own issued a press release or released a
21  questions and answers document about the
22  VIGOR study or VIGOR results, true?
23     A.   Yes.
24     Q.   And they didn't do that
```

Page 284

```
1   either?
2      A.   That's right.
3      Q.   What is a questions and
4   answers document, by the way?
5          MR. BLACK: Objection.
6          THE WITNESS: It's a
7      document that asks -- that puts
8      out questions that people might
9      have about a product and answers
10     those questions.
11  BY MR. ROTHMAN:
12     Q.   And when you say people,
13  you're talking about the public?
14     A.   Yeah, right.
15     Q.   Who's Bob DeLap? Do you
16  know who he is?
17     A.   He was -- was he -- no, I
18  can't remember for sure.
19     Q.   In June of 2000, Merck
20  submitted its first proposed label?
21     A.   That's right.
22     Q.   Did FDA ask Merck to submit
23  that label?
24     A.   No.
```

Page 285

```
1      Q.   That's something that Merck
2   did proactively?
3          MR. BLACK: Objection.
4          MR. ROTHMAN: What's the
5      objection?
6          MR. BLACK: Proactive
7      indicates -- has the implication
8      that it was a proactive submission
9      of a label related to safety.
10     That's not what it was.
11         MR. ROTHMAN: It doesn't
12     mean that at all.
13         MR. BLACK: And I don't want
14     that implication. And I would
15     object to a question that implies
16     that and seems to call for that
17     answer.
18  BY MR. ROTHMAN:
19     Q.   Did FDA require Merck to
20  submit the label in June of 2000?
21     A.   No.
22     Q.   Did Merck do that on its
23  own?
24     A.   Yes.
```

Page 286

1    Q.   This is four months from the
2  unblinding of the VIGOR data?
3    A.   Merck -- Merck certainly
4  wanted people to know as quickly as
5  possible that they had a GI benefit.
6  Whether they wanted them to know about
7  the cardiovascular problem I don't know.
8  But they put that in there. But, yeah,
9  Merck -- Merck wanted to get that GI
10  benefit out there as soon as possible.
11    Q.   Is June 4 months after
12  March?
13    A.   No. It's three months.
14    Q.   Okay. I'll take three
15  months. We can't call March 9th to June
16  29th four months? If you want to call it
17  three months --
18    A.   Call it four months. I
19  subtracted three from six and got three.
20  So I said three.
21    Q.   Now, do you have an opinion
22  about the timing of this submission?
23    MR. BLACK: Objection.
24    THE WITNESS: Do I have an

Page 287

1    opinion about the timing of the
2    submission? It seems to me that
3    Merck, for a variety of reasons,
4    wanted to preempt FDA action.
5    They wanted to get something on
6    the table as quickly as possible,
7    something which emphasized the GI
8    benefit and, in fact, minimized
9    the cardiovascular question and
10    made the statement that naproxen
11    was the reason for any difference.
12    And so they wanted to put that on
13    the table as quickly as possible
14    and preempt any other FDA action
15    that might occur. And so it was
16    important for them to get it out
17    there quickly.
18  BY MR. ROTHMAN:
19    Q.   What -- what FDA action
20  might have occurred?
21    A.   You just recited.
22    MR. BLACK: Objection.
23    THE WITNESS: You just
24    recited a whole bunch of them. A

Page 288

1    public advisory, a question and
2    answer document, a request for a
3    CBE. All the things that FDA
4    could have done that Merck got
5    this out there quick and sort of
6    preempted all that.
7  BY MR. ROTHMAN:
8    Q.   Do you know if the FDA was
9  considering any of those actions, sir?
10    A.   No, I don't. But you asked
11  for my opinion about it. You said do I
12  have any opinion about the timing, so I
13  told you what I thought it was.
14    Q.   You're right about that.
15  Mark this as the next exhibit.
16    (Whereupon, Deposition
17    Exhibit No. Kapit-14, DESCRIPTION,
18    was marked for identification.)
19  BY MR. ROTHMAN:
20    Q.   Dr. Kapit, have you seen
21  Exhibit 14 before?
22    A.   Yes.
23    Q.   Do you see in the first
24  sentence of Exhibit 14 refers to Robert

Page 289

1  DeLap?
2    A.   Yes.
3    Q.   Does this refresh your
4  recollection as to who he is?
5    A.   Yes, it does.
6    Q.   He was the director of the
7  CDER, office of drug evaluation 5?
8    A.   Yes.
9    Q.   And that was the office with
10  responsibility for Vioxx?
11    A.   Yes.
12    Q.   And he says it's premature
13  to draw conclusions from recent clinical
14  data on Merck's arthritis drug Vioxx,
15  rofecoxib, which show that patients
16  taking the drug suffered significantly
17  more heart attacks than occurred in
18  people taking the NSAID, naproxen. Did I
19  read that correctly?
20    A.   Yes.
21    Q.   Do you believe that in May
22  of 2000 it was premature to draw
23  conclusions from recent clinical data on
24  Merck's arthritis drug, Vioxx?

Page 290

1      A.   I believe that -- my
2  interpretation of this statement and --
3      Q.   I'm not asking you to
4  interpret the statement, sir.
5      A.   Well, I must.
6      Q.   I'm asking for your opinion.
7      A.   My opinion is that it was
8  premature in the following sense:  That
9  FDA had just received this information
10  and wanted more time to analyze and
11  decide what it meant.  It doesn't mean
12  that the Vioxx study by itself was not
13  sufficient to require, for example, a
14  warning in the labeling.  It means that
15  the FDA at this point, which is only a
16  little over a month, it may be a month
17  and a half from the time they got this
18  information, that they were in the
19  process of evaluating it.  That's what
20  premature means in this case, that we're
21  evaluating this and we don't want to make
22  any statements at this point.
23      Q.   In the second paragraph of
24  this article, it says, "For now, DeLap is

Page 291

1  convinced the product is labeled
2  appropriately."
3      A.   Yes.
4      Q.   Did I read that correctly?
5      A.   Yes.  And it has to say --
6  that's what the FDA had to say.  To say
7  that it's not labeled appropriately is to
8  imply that we have to change the labeling
9  right now.  And what they're saying is
10  that they're not ready to do that.  They
11  have to evaluate this.
12      Q.   And the this is --
13      A.   The VIGOR data.
14      Q.   Including the cardiac events
15  data?
16      A.   Right.
17      Q.   Okay.  By the way, can we
18  agree that the VIGOR study showed a
19  significant benefit for Vioxx in terms of
20  the GI results?
21      A.   I don't doubt that.  I did
22  not make a special effort to look at that
23  myself, or evaluate it, but that's what
24  it says, and I don't doubt that that

Page 292

1  study did show that.
2      Q.   All right.  On June 29th,
3  Merck submits its labeling proposal,
4  right?
5      A.   Okay.  Yes.
6      Q.   Along with the clinical
7  study report for VIGOR?
8      A.   I wasn't aware that it was
9  exactly the same date, but okay.
10      Q.   Have you reviewed the
11  clinical study report for VIGOR?
12      A.   Did I review the whole
13  clinical study report for VIGOR?  I'm not
14  sure that I did.
15      Q.   Are you aware that FDA
16  assigned a standard review to that
17  June 29th submission?
18      A.   I was aware of that, yes.
19      Q.   What does that mean?
20      A.   Actually, I'm not sure what
21  that means for this particular kind of
22  supplement, what the timeline for a
23  standard review is.  Do you know?  I
24  don't know, actually.

Page 293

1      Q.   Do you think it means a
2  ten-month review?
3      A.   I don't believe it does, not
4  for -- I would be surprised if they gave
5  ten months to a single study supplement,
6  but I don't know the answer.
7      Q.   Do you know when Merck
8  received the approvable letter on this
9  supplement?
10      A.   It was in April of 2001.
11      Q.   Does that, the fact that
12  it --
13      A.   All right.
14      Q.   Never mind.
15      A.   So you're saying it's a
16  ten-month review for a standard
17  supplement?
18      Q.   Don't take my word for it.
19  Let me ask you another question.
20          You're aware that Merck
21  asked for a priority review of this
22  supplement?
23          MR. BLACK:  Objection.
24          THE WITNESS:  Yes.

Page 294

1  BY MR. ROTHMAN:
2       Q.   And that would be --
3  whatever the time frame, we can assume
4  that that would be a faster review than
5  the standard review?
6       A.   Remember, the main point of
7  this supplement from Merck's point of
8  view was to highlight the
9  gastrointestinal benefit.
10      Q.   Merck asked for a quicker
11 review of this supplement?
12      A.   They wanted to debt that
13 gastrointestinal benefit out there.
14      Q.   So your answer is, yes, Mr.
15 Rothman, Merck asked for a quicker review
16 of this supplement?
17      A.   Yes.
18           MR. BLACK:  Objection.
19           THE WITNESS:  That's part of
20 my answer.
21 BY MR. ROTHMAN:
22      Q.   And the FDA refused Merck's
23 request for a quicker review, true?
24      A.   Because they had -- they

Page 295

1  felt, and they say this in certain
2  documents, that they needed to balance
3  the cardiovascular and the
4  gastrointestinal, and they had a lot of
5  questions about the whole thing.  And in
6  that sense, the FDA was asking for a
7  longer time to make this difficult
8  judgment.
9       Q.   Which documents are you
10 referring to in that last answer?
11      A.   I can't recall the specific
12 document that -- yes.  It's the -- the
13 one that I'm thinking of is the meeting
14 with the higher level FDA -- FDA
15 management in August of 2001 in which
16 they make the explicit statement that
17 they need to balance the risks.  And I
18 believe that that's the kind of concern
19 that the FDA had all during their review
20 process.
21      Q.   Okay.  Did the FDA send
22 Merck a labeling proposal in response to
23 the June 29th proposal?
24      A.   Eventually, yes.

Page 296

1       Q.   And when was that?
2       A.   Their response was in
3  October -- October 15th, 2001.
4            MR. BLACK:  I'm going to
5  object to the question -- the last
6  two questions.  Go on.  You can
7  answer.
8            THE WITNESS:  I did.
9            MR. ROTHMAN:  He's already
10 answered.
11           MR. BLACK:  Yeah.
12 BY MR. ROTHMAN:
13      Q.   You understand, sir, that
14 after the advisory committee meeting in
15 February of 2001 Merck submitted a new
16 labeling proposal?
17      A.   Yes.  In March.  Yes.
18      Q.   And once Merck does that,
19 what happens to this June 29th proposal?
20      A.   I guess it gets reset.
21      Q.   So this June 29th label then
22 is off the table, correct?
23      A.   I believe that's the way it
24 works, yes.

Page 297

1       Q.   So then the FDA's label in
2  October wouldn't be in response to this
3  June 29th label?
4       A.   No, I think you're
5  technically right, that it was in
6  response to the March label.  That
7  doesn't mean that the whole FDA response
8  for that entire prior year wasn't
9  affected by that June 29th submission,
10 which I believe it was.
11      Q.   How was that?
12      A.   Well, I mean, I think the
13 June 29th submission, which highlighted
14 the GI benefits and did not give
15 sufficient space to the cardiovascular
16 risks, became the context against which
17 the FDA's whole need to evaluate this
18 question was based.  I mean, if Merck had
19 initially, in this June 29th submission,
20 put a much more visible and put it in
21 warnings, information about the
22 cardiovascular risks, this whole problem
23 probably would have been expedited and we
24 want much more quickly.  It probably

Page 298

1   would have been handled in a couple of
2   months.
3       Q.   Let me ask you this, Doctor.
4   Once Merck submitted the prior approval
5   supplement to the FDA in June of 2000,
6   did that commit the company to working
7   with the FDA to craft new labeling?
8       A.   Yes.
9       Q.   So once they have submitted
10  their prior approval supplement, they
11  then can't go behind the FDA's back and
12  put in a CBE?
13      A.   I don't think that's true,
14  no.
15      Q.   You think they can?
16      A.   Yes.
17      Q.   You think --
18      A.   What the CBE would have
19  affected was the preexisting labeling.
20  Now, they sent in this new labeling on
21  June 29th, and that is being worked on
22  with the FDA.  But if they had submitted
23  a CBE about the same time or even after
24  the June 29th submission, that CBE would

Page 299

1   have applied to the preexisting labeling.
2       Q.   Do you think Merck should
3   have done that?
4       A.   Yes, I do.
5       Q.   You think once Merck was
6   talking to the FDA about coming up with
7   new labeling it should have just gone off
8   on its own and done a CBE?
9       A.   Well, let's put it this way.
10  I think Merck should have done it right
11  away.
12      Q.   I understand that.  I'm
13  asking you now, once we're past June 29th
14  of 2000 --
15      A.   Oh, wait.  Wait a second.
16      Q.   That's what I'm asking you
17  now.
18      A.   No, no, because the first
19  thing that CBE could have put in right
20  away.  Once that CBE was in, once the
21  risk information was communicated to the
22  medical community, then they didn't
23  necessarily have to put in a new labeling
24  submission on June 29th.  They didn't

Page 300

1   have to rush that in unless of course
2   they wanted to highlight the GI benefit,
3   which was the real reason.
4       Q.   We're not communicating
5   here.
6       A.   Are we not communicating.
7       Q.   We're not communicating.
8           MR. BLACK:  These questions
9       and answers seem to be shooting
10      past each other.
11  BY MR. ROTHMAN:
12      Q.   So let me try again.  Merck
13  did not do a CBE between March of 2000
14  and June 29th of 2000 to incorporate the
15  VIGOR results in the Vioxx label.
16      A.   Okay.
17      Q.   On June 29th of 2000, Merck
18  submitted a prior approval supplement to
19  the FDA --
20      A.   Right.
21      Q.   -- proposing to put the
22  VIGOR study into the label.
23      A.   Right.
24      Q.   Okay.  After Merck did that,

Page 301

1   I'm focusing on the period after
2   June 29th of 2000 --
3       A.   Okay.
4       Q.   -- is it your opinion that
5   Merck should have done a CBE in that
6   prior -- that subsequent period after
7   June 29th, 2000?
8           MR. BLACK:  Objection.
9           THE WITNESS:  My opinion is
10      yes.  And let me -- let me explain
11      my opinion.  That maybe it would
12      have been a somewhat unorthodox
13      thing to do, but we're talking
14      about huge risk.  Graham, et al.,
15      talked about a hundred thousand
16      heart attacks.  So even if it
17      would have been a bit unorthodox
18      to do it that way, the medical --
19      the medical necessity for getting
20      that information out there would
21      have justified even something that
22      was unorthodox to do.  And, yes, I
23      think that it -- that Merck should
24      have put that CBE out there as

Page 302

1    soon as possible.  I think it
2    should have done it before the
3    June 29th submission, but even if
4    it went in with the June 29th
5    submission, the importance of
6    getting that information out there
7    was so important that it could
8    have done that afterwards.
9  BY MR. ROTHMAN:
10    Q.   Have you ever seen a company
11 submit a prior approval supplement --
12    A.   I --
13    Q.   Hold on.  Let me finish the
14 question.
15       MR. BLACK:  Let him finish
16    the question.
17       THE WITNESS:  Got it.
18 BY MR. ROTHMAN:
19    Q.   Have you ever seen a company
20 submit a prior approval supplement and
21 then after that submit a CBE to make
22 changes about the same study?
23    A.   I don't recall any such
24 thing, but this was an unusual situation.

Page 303

1  And there's nothing in regulations that
2  would have prohibited it.
3     Q.   In February of 2001, the FDA
4  had an advisory committee meeting?
5     A.   That's right.
6     Q.   Could Merck have done a
7  VIGOR -- should Merck have done a VIGOR
8  CBE after the advisory committee?
9     A.   I certainly think it would
10 have been justified, yes, especially
11 after that advisory committee meeting.
12    Q.   How about in October
13 of 2001, after Merck received the FDA's
14 first labeling proposal, should it have
15 done a CBE for VIGOR at any time after
16 that happened?
17    A.   Well, you're going through
18 the timeline of the long protracted
19 labeling period.  And obviously the later
20 it gets and the more history behind it,
21 the more awkward it becomes to do that
22 kind of thing.  But, once again, I want
23 to reiterate that in my opinion, the
24 medical consequences were so important

Page 304

1  that any time at any point a CBE would
2  have been justified up until the
3  April 2000 completion of the -- 2002
4  completion of the negotiations.  It would
5  have been unorthodox, but the medical
6  justification of it was important and it
7  was there and the preferable way to do it
8  would have been as soon as possible, but
9  at any time during that two-year period,
10 it would have been justified on the basis
11 of medical necessity.  And it wouldn't
12 have been prohibited by regulations.
13    Q.   What was the recommendation
14 of the advisory committee that met in
15 2001?
16    A.   To put the cardio --
17       MR. BLACK:  Objection.
18       THE WITNESS:  To put the
19    cardio -- for the cardiovascular
20    stuff, it was to put it in
21    labeling communicated to doctors.
22 BY MR. ROTHMAN:
23    Q.   Now, the advisory committee
24 members didn't say where to put it, did

Page 305

1  they, sir?
2     A.   No, they did not.
3     Q.   They didn't say that Merck
4  should have done a black box warning?
5     A.   No.  They said it should
6  have been communicated.  I believe that
7  was as far as they went.
8     Q.   Okay.  They didn't recommend
9  that Merck withdraw Vioxx from the
10 market?
11    A.   No, they did not.  It was an
12 almost unanimous recommendation, and that
13 probably should have meant it should have
14 been stronger rather than a weaker
15 communication.
16    Q.   Nobody at the advisory
17 committee meeting said that Merck should
18 have done a CBE, right?
19    A.   No.  But I don't know that
20 advisory committee members are clued in
21 to that kind of thing.
22    Q.   Well, no one at the advisory
23 committee meeting criticized Merck for
24 not getting the information to doctors

Page 306

1   sooner?
2       A.   Well, they responded to the
3   question that the FDA asked, which was
4   should this be communicated, and that's
5   their charge, is to respond to the
6   specific questions the FDA asks.  And so
7   they responded and they were with -- they
8   voted almost unanimously to put -- to
9   answer the question in the affirmative,
10  that it should be put in label.
11      Q.   Nobody at the advisory
12  committee criticized Merck for not
13  getting the VIGOR information to doctors
14  sooner, did they, sir?
15      A.   I'm not aware of that, no.
16      Q.   Now, the advisory committee
17  took a vote on how to display the
18  cardiovascular information in the label,
19  right?
20          MR. BLACK:  Objection.
21  BY MR. ROTHMAN:
22      Q.   Are you aware of that?
23      A.   I am not clear on that.
24      Q.   Have you reviewed the

Page 307

1   transcript of the --
2       A.   I did review --
3       Q.   -- February 2001 meetings?
4       A.   Yes, I did look at parts of
5   it anyway.  Would you like to show me
6   what you're talking about?
7           MR. ROTHMAN:  We'll mark as
8       Exhibit 15 the transcript from the
9       Thursday, February 8, 2001 meeting
10      of the arthritis advisory
11      committee meeting.
12          (Whereupon, Deposition
13      Exhibit No. Kapit-15, DESCRIPTION,
14      was marked for identification.)
15  BY MR. ROTHMAN:
16      Q.   Let's put that aside while
17  we look for it.
18          MR. ROTHMAN:  Let's mark
19      that as Exhibit 16.
20          (Whereupon, Deposition
21      Exhibit No. Kapit-16, DESCRIPTION,
22      was marked for identification.)
23  BY MR. ROTHMAN:
24      Q.   Doctor, do you recognize

Page 308

1   Exhibit 16?
2       A.   Yes, this is the March
3   labeling proposal from Merck, I believe.
4   March --
5           MR. BLACK:  Counsel --
6           THE WITNESS:  2000.
7           MR. BLACK:  Not meaning to
8       interrupt, but the copy I have
9       appears to be two documents.  Did
10      you mean to include in Exhibit 16
11      a letter dated March 2nd, 2001,
12      from Merck?
13          MR. ROTHMAN:  Tell you what,
14      let me have that back.
15          MR. BLACK:  Yes.  Check.
16      Maybe that's what you intended to
17      do, but...
18          MR. ROTHMAN:  Let's go off
19      the record for a second.
20          (Off the record.)
21          MR. ROTHMAN:  Okay.  We'll
22      keep the exhibit the way it is.
23      Counsel is correct that it's two
24      versions of the same submission.

Page 309

1       The top document is a version that
2   has a e-mail, was sent by e-mail
3   by Robert E. Silverman of Merck.
4   And then the second one starts
5   with the March 2nd, 2001 cover
6   letter.  And the one attached --
7   just for --
8       I'm marking as Exhibit 16 a
9   document, the Bates number is --
10  starts on the first page MRK-ACD
11  0003158.  It goes to MRK-ACD
12  0003185 and then the Bates numbers
13  shift and the second half of the
14  document is MRK-NO 5006109 to the
15  end of the document, which is page
16  6163.
17  BY MR. ROTHMAN:
18      Q.   And this, I will represent
19  to you, Doctor, is the March 2nd, 2001
20  labeling proposal that Merck submitted to
21  the FDA.
22          MR. BLACK:  And for clarity
23      sake, as originally marked,
24      Exhibit 16 had another document at

Page 310

```
 1    the back of it which is not now
 2    being included as part of
 3    Exhibit 16.
 4         MR. ROTHMAN:  Correct.
 5  BY MR. ROTHMAN:
 6    Q.   Sir, in your expert report
 7  you referred to this submission as an
 8  October -- I'm sorry, as a March 16 --
 9    A.   Yes, I believe I did.
10    Q.   Can we agree it was sent on
11  March 2nd?
12    A.   Okay.  Yes.
13    Q.   Of 2001.
14         Was Merck asked by the FDA
15  to submit this label?
16    A.   I don't believe they were.
17  I believe that this was the first
18  submission after the advisory committee.
19    Q.   Was Merck required to submit
20  this label on March 2nd of 2001?
21    A.   No.
22    Q.   This is something that Merck
23  did on its own?
24    A.   Again, it was doing a
```

Page 311

```
 1  similar thing as it did the previous
 2  June, of preempting the discussion with a
 3  submission, that in fact played down the
 4  cardiovascular risks and played up the GI
 5  benefits.
 6    Q.   In this label, sir, the CV
 7  results from the VIGOR study are now
 8  described in the precautions section?
 9    A.   That's true.  But they're
10  buried in a lot of words about aspirin,
11  in the second paragraph.
12    Q.   In the final approved label
13  in April 2002, where did the CV results
14  get discussed?
15    A.   In precautions, but they
16  were much more prominent.  They weren't
17  in the fourth or fifth section of
18  precautions.  They weren't buried in a
19  second paragraph following a whole bunch
20  of information about aspirin.  And they
21  were put out there pretty close to the
22  top and with much more explicit
23  information about the CV risks.  So FDA,
24  even though it gave in on the precautions
```

Page 312

```
 1  placement, made it a lot more prominent
 2  as to what the problem was.
 3    Q.   The April of 2002 label did
 4  not have the CV discussion in the
 5  warnings section, correct?
 6    A.   That's true.
 7    Q.   And when FDA received this
 8  March 2nd, 2001 proposal from Merck, FDA
 9  didn't immediately call Merck up and say,
10  what are you doing, this needs to be in
11  the warnings section, did they, sir?
12    A.   Well, FDA proposed that it
13  be in the warnings.
14    Q.   In October?
15    A.   In October.  That the
16  cardiovascular reviewer recommended that
17  it be in warnings.
18    Q.   Prior to the advisory
19  committee?
20    A.   FDA -- I'm sorry?
21    Q.   Prior to the advisory
22  committee meeting, true?
23    A.   Yes.
24    Q.   And FDA got this label from
```

Page 313

```
 1  Merck after the advisory committee
 2  meeting, they didn't call Merck up to
 3  tell Merck that they had made a mistake
 4  by putting the data in the precautions
 5  section, did they, sir?
 6    A.   This was March 2002.
 7    Q.   One.
 8    A.   I'm sorry, March 2001.  So
 9  it was almost -- it was exactly a year
10  after the VIGOR information had come out.
11  And -- no.  My -- no.  What I meant to
12  say was that FDA agreed to language in
13  the precautions in March 2002, in
14  April 2002.  I'm sorry.  It was a long
15  time before the information was in
16  labeling.  And certainly a prominent
17  statement in precautions was a big
18  improvement, a very big improvement.
19  And, yeah, maybe they didn't go along
20  with their initial proposal.  Maybe they
21  accepted something that was less dramatic
22  than their initial proposal, but it was a
23  lot of -- it finally got out there and it
24  was really important information, and it
```

Page 314

1  took long enough.
2      Q.   New subject.
3      A.   Okay.
4      Q.   In paragraphs 133 and 134 of
5  your expert report, you added a
6  discussion of Merck's October 13, 2000
7  submission as well as referring to, in
8  paragraph 134, the controversy with the
9  New England Journal of Medicine?
10     A.   That's right, yes.
11     Q.   Okay.  Have you reviewed the
12  New England Journal of Medicine expressed
13  concern?
14     A.   Yes.
15     Q.   And have you reviewed the
16  New England Journal of Medicine's
17  affirmation?
18     A.   Affirmation of its concern,
19  yes.
20     Q.   Okay.  Where did you obtain
21  those documents?
22     A.   I think it was the web.
23     Q.   Is that something you saw on
24  your own or something that counsel

Page 315

1  directed you to?
2      A.   I think initially counsel
3  directed me to it, yes.
4      Q.   Did you review the responses
5  of the article's authors?
6      A.   Yes.
7      Q.   You reviewed both the
8  response by the Merck authors and also
9  the response by the non-Merck authors?
10     A.   That's right.
11     Q.   And are you planning to
12  offer any opinions at trial about this
13  subject?
14     A.   Well, yes.  I think there is
15  some important -- there's some important
16  information about it that there were
17  three myocardial infarctions that were at
18  issue, which Dr. Curfman, who is an
19  editor of the New England Journal, said
20  that they should have been apprised of by
21  Merck before publication and that Merck
22  had enough time to publish -- to apprise
23  them before publication.  And I want to
24  opine or I may be — may opine about the

Page 316

1  significance of three myocardial events
2  because it may seem that three events,
3  not 12 MIs versus nine MIs is not that
4  significant, so I do want to say
5  something about that.  And I am to point
6  out that in the Bombardier article in
7  which the information was first
8  published, they make the statement that
9  there was no difference between the rates
10  of myocardial infarctions, no
11  statistically significant difference
12  between the rates of myocardial
13  infarctions in the non-aspirin indicated
14  group for Vioxx versus placebo.  That
15  statement could not have been made in my
16  opinion, that very important statement
17  that Bombardier and co-authors made about
18  no difference between Vioxx and
19  placebo -- and naproxen in
20  non-aspirin-indicated patients could not
21  have been made if those three myocardial
22  infarctions had been reported.  And why
23  not?  It would have been because that the
24  difference would have been very close to

Page 317

1  statistical significance.  And so they
2  couldn't have put in a statement that
3  there was no difference because the data
4  would have showed that, although it
5  didn't quite make statistical
6  significance, it would have been close
7  enough so that that statement would not
8  have been made, and that important
9  statement in the Bombardier article would
10  not have been made and would not have
11  been justified.  So I may opine about
12  that.
13     Q.   Have you ever served on the
14  editorial board of a medical journal?
15     A.   No.  But I've read many
16  articles.
17     Q.   Have you ever been an editor
18  of a medical journal?
19     A.   I actually was asked to be
20  an editor at one point, but I didn't
21  really follow up on it.  But, no.  The
22  answer is no.
23     Q.   Have you submitted peer
24  reviewed articles to medical journals?

1    A.   Yes.
2    Q.   Are you familiar with the
3 editorial policies in the New England
4 Journal of Medicine?
5    A.   I haven't specifically
6 looked them up, no.
7    Q.   You understand that the New
8 England Journal of Medicine article on
9 VIGOR published by the lead author
10 Bombardier was based on a pre-specified
11 data cutoff?
12   A.   Yes, I do understand that.
13   Q.   And is it common to have
14 pre-specified data cutoffs for clinical
15 studies?
16   A.   Not the kind that was in
17 that article.  That had a very peculiar
18 cutoff, which was different for
19 gastrointestinal events and for MIs, for
20 cardiovascular thrombotic events.
21   Q.   Do you know why that was?
22   A.   No, but it's unusual.  I've
23 never seen anything like that anywhere
24 else.

1    Q.   Do you plan to offer any
2 other opinions about the New England
3 Journal of Medicine article or expression
4 of concern?
5    A.   I think -- I think that -- I
6 mean, I think that -- I think basically
7 it would be related to the -- Merck's --
8 because two of the authors for the
9 Bombardier article were from Merck.  I
10 believe it was two or three.  That
11 Merck's participation in that calls into
12 question the degree to which Merck was
13 willing to be forthcoming completely
14 about the information on myocardial
15 infarctions.
16   Q.   Okay.  Now, you're not --
17 can we agree that the FDA had the
18 information about these three additional
19 heart attacks in October of 2000?
20   A.   In October, yes, they did.
21   Q.   That was before the advisory
22 committee meeting?
23   A.   That's right.
24   Q.   And those three additional

1 heart attacks were presented with the
2 data at the 2001 advisory committee
3 meeting, right?
4    A.   Right.  Although, there's
5 obviously a difference between telling
6 the medical community in the New England
7 Journal and telling an advisory committee
8 at the FDA.
9    Q.   And the advisory mit tea
10 meeting is a public meeting, right?
11   A.   It's a public meeting, but
12 it doesn't have the visibility of the New
13 England Journal.
14   Q.   Do you know if the 2001
15 advisory committee meeting was covered in
16 the press?
17       MR. BLACK:  Objection.
18       THE WITNESS:  The press
19       often covers meetings.  I don't
20       know specifically whether it was,
21       but, I mean, press coverage of
22       advisory committee meetings is
23       common, the rule in many cases.
24 BY MR. ROTHMAN:

1    Q.   FDA, we've talked about
2 this, FDA sent its first labeling
3 proposal to Merck in October of 2001?
4    A.   Yes.
5    Q.   This wasn't an ultimatum
6 from the FDA, was it, sir?
7       MR. BLACK:  Objection.
8       THE WITNESS:  I certainly
9       wouldn't characterize it as an
10       ultimatum.  It was a strong
11       statement of the FDA's position on
12       what they thought ought to be in
13       label.
14 BY MR. ROTHMAN:
15   Q.   But it was a draft meant for
16 discussion; isn't that true?
17   A.   Yes.
18   Q.   FDA didn't expect Merck to
19 agree to its October 15th --
20       MR. BLACK:  Objection.
21 BY MR. ROTHMAN:
22   Q.   -- labeling proposal, did
23 it?
24       MR. BLACK:  Objection.

Page 322

1       THE WITNESS:  Well, I mean,
2   I think that they made a statement
3   in this memo that I referred to
4   earlier about the difficulties.
5   So if they didn't expect Merck to
6   agree, we don't know that that --
7   I mean, I don't want to answer yes
8   implying that Merck's objections
9   were viewed by the FDA as a matter
10  of routine course.  FDA said it
11  took a long time.  It was
12  difficult negotiations.  And so --
13  but not expecting Merck to agree
14  on FDA part was expecting them to
15  be difficult and protracted
16  negotiations.
17  BY MR. ROTHMAN:
18      Q.    Before FDA sent the
19  October 2001 draft to Merck, it knew that
20  Merck was not going to be happy with that
21  draft?
22      A.    Yeah, it probably did.
23          MR. BLACK:  Objection.
24          THE WITNESS:  I don't know

Page 323

1   that for sure, but they probably
2   knew that Merck wasn't going to
3   like it.  And, of course,
4   Scolnick's e-mail about not
5   accepting it and calling the FDA
6   bastards certainly -- certainly
7   reinforces that Merck didn't like
8   it.
9   BY MR. ROTHMAN:
10      Q.    So this label is not -- this
11  labeling draft is not an example of the
12  FDA giving in to Merck, is it, sir?
13      A.    That's right.
14          MR. BLACK:  Objection.
15          MR. ROTHMAN:  Do you need a
16  break or are you okay?
17          THE WITNESS:  Yes.
18          (Recess taken from 5:14 p.m.
19  to 5:44 p.m.)
20  BY MR. ROTHMAN:
21      Q.    Doctor, do you have
22  Exhibit 11 in front of you?
23      A.    Yes, I do.
24      Q.    Do you recognize Exhibit 11

Page 324

1   as the Vioxx label approved by the FDA in
2   April of 2002?
3       A.    Yes.
4       Q.    Are you planning to offer
5   any opinions about the sufficiency or
6   adequacy of this label?
7       A.    Well, as I said, the
8   precautions, although they are in
9   precautions and I think that the problem
10  merits the warning, the precautions of
11  cardiovascular effects are much more
12  prominent and get the information out in
13  the product information and also the
14  tables that are in the clinical studies
15  section comparing VIGOR serious
16  cardiovascular thrombotic events are
17  there and show the difference between
18  Vioxx and naproxen.  And so this is not
19  the way I would do it if it were entirely
20  up to me.  I would have put it in
21  warnings and so forth.  But, I mean,
22  basically, I think that the FDA has
23  succeeded in getting the information out
24  in labeling in this document after a very

Page 325

1   long and protracted period.
2       Q.    Okay.  When you say the
3   information, you're talking about the
4   cardiovascular risk information?
5       A.    Right, yes.
6       Q.    Okay.  And do you have any
7   issues with any other part of this
8   April 2002 label?
9       A.    I haven't specifically
10  reviewed it for other issues, but I'm not
11  aware of any other issues.
12      Q.    New subject.  You added a
13  section to your report on recent
14  developments?
15      A.    Yes.
16      Q.    And the first subsection is
17  on the February 2005 advisory committee
18  vote, correct?  Doctor, did you answer
19  the last question?
20      A.    I'm sorry, repeat the
21  question.
22      Q.    You added a section in your
23  report on the February 2005 advisory
24  committee meeting vote, correct?

Page 326

1    A.   Yes.
2    Q.   Did you attend those
3 meetings?
4    A.   No, I did not.
5    Q.   Have you read the
6 transcripts of those meetings?
7    A.   I looked at information
8 related to those meetings. I can't
9 remember exactly what I reviewed with
10 regard to -- whether I reviewed the whole
11 transcript or not.
12    Q.   Have you read the background
13 materials from the minutes?
14    A.   What paragraph is that in
15 your report? Can you just refer me to
16 that, please.
17    Q.   It's on paragraphs 167, 168
18 and 169 --
19    A.   I reviewed portions of the
20 transcript.
21    Q.   How did you select which
22 portions to read?
23    A.   They were the portions that
24 concerned the votes that I was looking

Page 327

1 for.
2    Q.   Did you read Dr.
3 Braunstein's presentation on Vioxx?
4    A.   No, I did not.
5    Q.   Did you look at any of the
6 background materials submitted before the
7 meeting?
8    A.   No, I did not. I looked at
9 it for the votes, the section on the
10 votes.
11    Q.   You looked at the summary
12 minutes?
13    A.   I may have. I can't recall
14 at this point.
15    Q.   Okay.
16    MR. BLACK:   When you refer
17 to summary minutes, is that the
18 April 5 document?
19    MR. ROTHMAN:   No. There's
20 actual summary minutes of the
21 advisory committee meeting.
22    MR. BLACK:   No, I
23 understand. I just wanted to make
24 sure --

Page 328

1    MR. ROTHMAN:   Which are
2 where the votes are recorded.
3    MR. BLACK:   Yes.
4 BY MR. ROTHMAN:
5    Q.   Doctor, in your report you
6 quote some comments from the advisory
7 committee members, correct?
8    A.   Yes.
9    Q.   My only question for you,
10 Doctor, is whether you've done any of
11 your own analysis or research to
12 determine if those comments are supported
13 by the data?
14    A.   No. I've just taken the
15 comments from the advisory committee at
16 face value.
17    Q.   In paragraph 168 of your
18 report you quote Dr. Jenkins from the
19 same committee meeting?
20    A.   Yes.
21    Q.   And where did that quote
22 come from?
23    A.   I presume it comes from the
24 transcript. I did not make a note of

Page 329

1 where it came from, but I -- since it was
2 from the same committee meeting, I assume
3 it's from the transcript.
4    Q.   If I told you that I found
5 that quote in a New York Times article --
6    A.   Is that true?
7    Q.   -- would that change your
8 mind?
9    A.   Maybe. Would you show me
10 the article.
11    MR. ROTHMAN:   Let's mark
12 this as the next exhibit, please.
13    (Whereupon, Deposition
14 Exhibit No. Kapit-17, DESCRIPTION,
15 was marked for identification.)
16 BY MR. ROTHMAN:
17    Q.   Exhibit 17 is a November 19,
18 2005, New York Times article entitled
19 "FDA is Advised to Let Pain Pills Stay on
20 the Market." This is, I'll represent to
21 you, Doctor, something we downloaded
22 ourselves.
23    A.   Okay.
24    Q.   From the Internet. And if

Page 330

1  you look at the middle of page 204, I
2  think you'll find the Dr. Jenkins quote
3  that you have in paragraph 168 of your
4  expert report --
5      A.   Yes.
6      Q.   -- Exhibit 2.  Do you think
7  you --
8      A.   You're asking me if I got it
9  from there.  I read the New York Times
10  regularly, so it is possible that it came
11  from there.
12      Q.   Okay.  And then the rest of
13  the quote in this article, at least, is
14  that if Merck officials want to
15  reintroduce Vioxx "we'll welcome them to
16  come talk to us about the various paths
17  forward."
18      A.   Yes.
19      Q.   And you understood that to
20  be a reference to talking about the
21  possible reintroduction of Vioxx to the
22  market, correct?
23      A.   I am not -- I mean, I take
24  this as being an opening to talk, and

Page 331

1  more than that I don't really interpret
2  anything more.
3      Q.   Okay.  So he was inviting
4  Merck to come in to the FDA just to
5  discuss the possibilities of going
6  forward?
7      A.   Right.
8      Q.   You also added a section of
9  your report on the April 6th, 2005 FDA
10  memo on safety of NSAIDs.
11      A.   Yes.
12      Q.   Now, the advisory committee
13  that met in February of 2005 --
14      A.   Yes.
15      Q.   -- made certain
16  recommendations to the FDA, correct?
17      A.   Yes.
18      Q.   And those are not binding on
19  the FDA?
20      A.   That's correct.
21      Q.   Okay.
22      A.   You said that they met in
23  April 2005, the advisory?
24      Q.   No.  February.

Page 332

1      A.   Right.
2      Q.   And the memo was issued --
3      A.   In April, right.
4      Q.   -- in April?
5          MR. ROTHMAN:  Let's mark the
6  memo as Exhibit 18.
7          (Whereupon, Deposition
8  Exhibit No. Kapit-18, DESCRIPTION,
9  was marked for identification.)
10  BY MR. ROTHMAN:
11      Q.   The memo you have in front
12  of you that's Exhibit 18 is the FDA memo
13  on safety events that you refer to in
14  your report?
15      A.   Yes, it is.
16      Q.   It's dated April 6th of
17  2005?
18      A.   Yes.
19      Q.   And it's from John Jenkins
20  and Paul Seligman?
21      A.   Yes.
22      Q.   Through Steve Galson?
23      A.   Yes.
24      Q.   To the NDA files?

Page 333

1      A.   Yes.
2      Q.   And the subject of the memo
3  is analysis and recommendations for
4  agency action regarding non-steroidal
5  anti-inflammatory drugs and
6  cardiovascular risk?
7      A.   Yes.
8      Q.   And this memorandum was
9  prepared following the February 2005
10  advisory committee meetings, correct?
11      A.   Yes.
12      Q.   And what happened was that
13  following those advisory committee
14  meetings, CDER conducted a thorough
15  internal review of the available data
16  regarding cardiovascular safety issues
17  for COX-2 selective and non-selective
18  non-steroidal anti-inflammatory drugs.
19  Is that your understanding?
20          MR. BLACK:  Where are you
21  reading?
22          THE WITNESS:  Is that the
23  first paragraph here?
24          MR. ROTHMAN:  I'm reading

Page 334

1      · page three, the second paragraph
2      from the bottom.
3          THE WITNESS: Yes. Go
4      ahead.
5  BY MR. ROTHMAN:
6      Q.   Okay.  We can agree that
7  what happened was that following the 2005
8  advisory committee, CDER conducted an
9  internal review of the available data
10  regarding cardiovascular safety issues
11  for COX-2 selective and non-selective
12  anti-inflammatory drugs?
13      A.   We can certainly agree
14  that's what it says they did.
15      Q.   You have no reason to doubt
16  that that is what they did, do you, sir?
17      A.   No.
18      Q.   And the next sentence
19  indicates that the memorandum summarizes
20  the major issues considered in that
21  review.  Our conclusions regarding the
22  interpretation of the available data and
23  our recommendations for regulatory
24  actions necessary to further improve the

Page 335

1  safe and effective use of these drugs by
2  prescribers, patients and consumers?
3      A.   Yes.
4      Q.   And is that a fair statement
5  of what the memorandum summarizes?
6          MR. BLACK: Objection.
7          THE WITNESS: It certainly
8      refers to much of the thrust of
9      this memorandum, yes.
10  BY MR. ROTHMAN:
11      Q.   Okay.  And we can agree that
12  the participants in the CDER review
13  included staff from a number of FDA
14  divisions and offices?
15      A.   Yes.
16      Q.   Okay.  And the review --
17  they reviewed materials, including the
18  regulatory histories and the NDA and
19  postmarketing databases of the various
20  NSAIDs?
21      A.   Yes, they did.
22      Q.   Now, in your report you say
23  that the point of the memo was to provide
24  an official documentary basis for Galson

Page 336

1  to respond to the publications urgent
2  question about using available NSAIDs.
3  Is that right?
4      A.   Okay.  Which paragraph is
5  that?
6      Q.   The end of paragraph 172.
7      A.   Let me clarify this
8  statement of mine, that when I say the
9  point of the memo, I certainly mean one
10  of the main points of the memo.  I don't
11  necessarily mean to exclude other
12  possible purposes, but I want -- but
13  that's certainly one of the main points
14  of the memo.
15      Q.   Okay.  What's the basis for
16  your statement that this is one of the
17  points of the memo?
18      A.   Well, I read the whole memo,
19  and --
20      Q.   Right.  So it's based on
21  your reading of the memo?
22      A.   Yes.
23      Q.   Is it based on anything
24  else?

Page 337

1      A.   No.  It's based on reading
2  of the memo.
3      Q.   Okay.  You haven't seen an
4  FDA statement saying that the purpose of
5  the memo is to provide on official
6  documentary basis for Galson to
7  respond --
8      A.   I'm not quoting.  I'm making
9  a judgment on the basis of having read
10  the memo.
11      Q.   Okay.  Now, the -- if you
12  turn to bullet 5 in the executive
13  summary, it says, "Short-term use of
14  NSAIDs relieve acute pain, particularly
15  at low doses.  It does not appear to
16  confer an increased risk of serious
17  adverse CV events (with the exception of
18  now the coxib in hospitalized patients
19  immediately postoperative from coronary
20  artery bypass (CABG) surgery).  Did I
21  read that correctly?"
22      A.   Yes, you did.
23      Q.   And valdecoxib is Bextra?
24      A.   Yes.

Page 338

1     Q.   And that's one of the COX-2
2   drugs, correct?
3     A.   Yes.
4     Q.   And when they say short-term
5   use of NSAIDs in that paragraph, they're
6   referring to both the non-selective
7   NSAIDs and to the COX-2 group, aren't
8   they?
9     A.   Yes. Well, wait a second.
10  No. The answer is no to that question.
11  They're not referring to COX-2s except to
12  make this comment with respect to
13  valdecoxib, Bextra.
14    Q.   Well, they're excepting
15  Bextra from the rest of the paragraph,
16  correct?
17    A.   Right. It's because of this
18  particular short-term use that they need
19  to point out as an exception. And so
20  they're specifically mentioning
21  valdecoxib in this context. But the
22  paragraph itself does not refer to COX-2,
23  nor, in my opinion, as I've explained, is
24  it focused on COX-2s. It's focused on

Page 339

1   other NSAIDs, I believe.
2     Q.   Okay. Well, if you weren't
3   referring to COX-2s when you referred to
4   short-term use of NSAIDs, why would you
5   have to make an exception for one of the
6   COX-2s?
7     A.   Because there's this
8   particular study that shows that in
9   short-term use this drug, in the context
10  of CABG patients, is dangerous. And so
11  they have to, for the point of -- for the
12  purpose of clarity, declare this
13  exception, in case there is
14  misunderstanding.
15    Q.   I just want to make sure I
16  understand. Your opinion is one that
17  says short-term use of NSAIDs and in that
18  fourth bullet it's not referring to COX-2
19  inhibitors?
20    A.   No. That's not the main
21  thrust of this bullet. But they include
22  this exception because there is a very
23  glaring exception of COX -- of valdecoxib
24  causing cardiac problems in CABG patients

Page 340

1   in short-term use. It was a particularly
2   striking exception to the whole clinical
3   trial database of all the NSAIDs, and so
4   they put this in here because it was an
5   important piece of information. It made
6   sure that nobody was making this
7   confusion. But that was not the point of
8   this bullet.
9     Q.   Is there any data reviewed
10  in this memorandum that suggests a
11  short-term risk with Celebrex?
12    A.   No.
13    Q.   Is there any data reviewed
14  in this memorandum that suggests a
15  short-term risk for Vioxx?
16    A.   No. And that's why they had
17  to put valdecoxib in because valdecoxib
18  is an exception. There is data
19  suggesting a short-term risk with
20  valdecoxib. And so they wanted to make
21  sure nobody makes that confusion, that
22  there's no possibility of confusion about
23  that. And it's because valdecoxib is
24  different from Celebrex and Vioxx that

Page 341

1   they put that specific exception in.
2     Q.   Where did you obtain your
3   copy of the April 6th, 2005 memorandum?
4     A.   It may have been on the web
5   or it may have been from Mr. Black. I'm
6   not sure. One or the other.
7     Q.   The FDA posted this on its
8   website?
9     A.   I don't know. I can't
10  remember where I -- I did obtain a copy
11  of it. I don't remember where it came
12  from.
13    Q.   This is -- you recognize
14  Exhibit 18 as an official position of the
15  FDA?
16    A.   Yes. And that was one that
17  I reviewed word by word.
18    Q.   Okay. The next section of
19  your report refers to an analysis of
20  Protocol 203 D, correct?
21    A.   What paragraph are we at
22  now? Paragraph 178?
23    Q.   It starts at paragraphs 178
24  through 183.

Page 342

1    A.   Yes.
2    Q.   And you're referring here to
3  an analysis that was done by a
4  statistician and epidemiologist retained
5  by the plaintiffs?
6    A.   Yes.
7    Q.   And you -- were you planning
8  to offer opinions at trial about this
9  analysis?
10        MR. BLACK:  Objection.
11        THE WITNESS:  I'm planning
12        to offer the opinions that are
13        stated in this report, that this
14        analysis confirms that the effect
15        begins early.  And I may also
16        mention the recent admission by
17        Merck that was publicized that the
18        analysis -- the 18 month analysis
19        was a statistical error.
20  BY MR. ROTHMAN:
21    Q.   Okay.  You're referring to
22  the description of a statistical test --
23    A.   Yes.
24    Q.   -- in a published article?

Page 343

1    A.   Yes, right.
2    Q.   I would disagree with your
3  characterization of what Merck has said
4  about it.  That's not in your report,
5  though, is it, sir?
6    A.   No, it's not.
7    Q.   And if you were going to
8  opine on that, are you planning to amend
9  your report to include that?
10    A.   I was planning on looking
11  further into that issue.
12    Q.   And if you decide, after
13  looking further, that you're going to
14  opine on it, you'll amend your report and
15  send it to us?
16    A.   Is that the way it's done?
17    Q.   Usually.  But you can talk
18  to Mr. Black about that.
19    A.   I will talk to Mr. Black
20  about it, yes.
21    Q.   You refer to, in paragraph
22  178, you refer to Protocol 203 dated
23  June 11, 2003, correct?
24    A.   Yes.

Page 344

1    Q.   And that was a prospective
2  combined analysis?
3    A.   Yes.
4    Q.   Of thrombotic cardiovascular
5  events in the three studies that you list
6  there?
7    A.   Yes, the three studies of --
8  placebo-controlled studies of large
9  numbers of patients for long-term use of
10  both placebo and Vioxx.  And so these
11  would have been the most appropriate
12  studies to analyze to address the
13  cardiovascular question.
14    Q.   Okay.  Do you know if Merck
15  acquired -- sorry.  Do you know if FDA
16  required Merck to plan the definitive
17  analysis of the CV risks of Vioxx that
18  you refer to in paragraph 178 of your
19  report?
20    A.   Actually, I don't know
21  whether they made -- they required Merck
22  to do that or not.
23    Q.   I mean, do you know if FDA
24  asked Merck to do this analysis?

Page 345

1    A.   I don't know.  I know it was
2  the -- it was the -- it was an
3  appropriate thing for Merck to do, but I
4  don't know whether FDA asked for it or
5  not.
6    Q.   And Merck sent Protocol 203
7  to the FDA?
8    A.   Yes, they did.
9    Q.   And FDA concurred on the
10  final design of Protocol 203?
11    A.   I don't know that actually
12  for sure, but it certainly was an
13  appropriate -- in my opinion, it
14  certainly was an appropriate study to do.
15    Q.   Okay.  And of the three
16  studies that form this Protocol 203, the
17  first start was APPROVe, correct?
18    A.   Yes.
19    Q.   Do you know when APPROVe
20  started?
21    A.   I think it was pretty early
22  on.  I don't remember exactly when it
23  started.  I'd have to look that up.  But
24  it was going for a while.  Maybe around

Page 346

1  the time that VIGOR was approved -- VIGOR
2  was finished, it might have been around
3  that time. I would have to check that.
4      Q.   And APPROVe is also, of
5  course, the first of the studies to
6  finish?
7      A.   Yes, right.
8          MR. BLACK: Objection.
9  BY MR. ROTHMAN:
10     Q.   And in paragraph 179 you
11 mention that Vioxx was withdrawn from the
12 market. Can we agree that that was a
13 voluntary withdrawal and not a recall?
14     A.   Well, yes, it was in this
15 case. I think that's a fair statement,
16 that Merck -- that Merck did this
17 voluntarily.
18     Q.   Now, you say that Merck did
19 not perform the analysis. What do you
20 mean by that?
21     A.   The analysis of these three
22 studies. There was -- there were
23 populations accumulated in all three
24 studies by the term Merck -- by the time

Page 347

1  Vioxx was withdrawn, and so it could have
2  performed the analysis on the patients
3  who had gotten the drug by that time.
4      Q.   And you say that the data on
5  a sufficient number of patients treated
6  in these studies before drug withdrawal
7  has been made available to the plaintiffs
8  in this litigation.
9      A.   Yes.
10     Q.   Have you seen that data?
11     A.   I've seen the plaintiffs'
12 analysis.
13     Q.   Right. I'm asking if you've
14 seen the underlying data?
15     A.   I don't believe I've seen
16 the underlying data. Just the
17 plaintiffs' analysis of it.
18     Q.   Okay. Do you know how many
19 plaintiffs were included in that dataset?
20     A.   It may be that in their
21 analysis I could obtain that information,
22 but I don't have that number in my head
23 at the moment.
24     Q.   Okay. Who's the

Page 348

1  statistician?
2      A.   The statistician is a
3  professor of epidemiology -- professor
4  emeritus of epidemiology at Stanford
5  named John Farquhar and a statistician
6  from Berkeley named Keith -- I can't
7  remember the last name.
8      Q.   Jule?
9      A.   Jule.
10     Q.   Have you communicated with
11 either Dr. Farquhar or -- is it Mr. Jule
12 or Dr. Jule?
13     A.   I'm not sure.
14     Q.   Okay. Have you communicated
15 with either of those gentlemen?
16     A.   I haven't communicated with
17 them about it, but I know certainly of
18 Dr. Farquhar's reputation. And I assume
19 that as a statistician at Berkeley, Mr.
20 July is quite qualified as well.
21     Q.   Okay. But you haven't
22 spoken to either one of them about this
23 analysis?
24     A.   No, I have not.

Page 349

1      Q.   Have you spoken to either
2  one of them about Vioxx?
3      A.   No. Although, it's pretty
4  clear that, on this question of when the
5  problem starts, how early in treatment,
6  their data is pretty clear on that issue.
7      Q.   Okay. Do you know what
8  endpoint they used in their analysis?
9      A.   CVT events? I mean, I'm
10 going to have to actually get the
11 analysis up if I'm going to answer these
12 specific questions because I don't
13 remember for sure.
14         MR. ROTHMAN: Let me see if
15 I have the right one.
16         THE WITNESS: Okay.
17         MR. BLACK: Well --
18         MR. ROTHMAN: Let's mark
19 this as Exhibit 19.
20         (Whereupon, Deposition
21 Exhibit No. Kapit-19, DESCRIPTION,
22 was marked for identification.)
23         MR. BLACK: Doctor, do you
24 have a copy of this?

Page 350

1     THE WITNESS:  Yes.
2     MR. BLACK:  Compare it
3  Exhibit 19 to make sure it's the
4  one you reviewed.
5     MR. ROTHMAN:  I'm going to
6  ask him if it is.
7     THE WITNESS:  Let me get
8  what I actually reviewed, if you
9  don't mind.
10     MR. ROTHMAN:  I don't mind
11  at all.
12  BY MR. ROTHMAN:
13     Q.   I just want to know, is
14  Exhibit 19 the analysis that you
15  reviewed?
16     A.   I think I have that in hard
17  copy. Let me just make sure that --
18     Q.   I'll tell you what, Doctor.
19  If you want to, at the end of the
20  deposition, substitute your hard copy
21  version as the exhibit, we can do that.
22     A.   Okay. All right. Go ahead.
23     MR. BLACK:  You're referring
24  to Exhibit 19 now?

Page 351

1     MR. ROTHMAN:  Yes. Why
2  don't we just move on so as not to
3  take the time.
4     THE WITNESS:  Okay.
5  BY MR. ROTHMAN:
6     Q.   But let me ask you this,
7  have you done any work to independently
8  analyze or confirm the analysis that you
9  received to which we've been referring?
10     A.   No. I'm relying on the
11  expertise and the results of these two
12  men.
13     Q.   Okay. And are you a
14  statistician?
15     A.   No, I'm not. But I can
16  certainly -- I can't do statistical
17  tests, or I should not do statistical
18  tests myself. I wouldn't presume to do
19  it. But I certainly understand what they
20  mean when they're done. And to that
21  extent, I feel qualified to rely on their
22  opinion.
23     Q.   Are you an epidemiologist?
24     A.   Actually, I have many

Page 352

1  credits in epidemiology, but I'm not an
2  actual epidemiologist. But I've taken
3  over 40 credits in epidemiology at Johns
4  Hopkins.
5     Q.   What makes you an actual
6  epidemiologist? Do you need to get some
7  degree?
8     A.   To get an M.Ph. Degree, you
9  have to take about 80 degrees at Johns
10  Hopkins. I took half that much. I have
11  enough familiarity with epidemiology and
12  statistics to certainly understand what
13  they're saying and use that -- use the
14  results of their work in my report.
15     Q.   You have an MD degree?
16     A.   Yes.
17     Q.   Do you have any other
18  degrees?
19     A.   No.
20     Q.   You don't have an M.Ph.?
21     A.   No.
22     Q.   Or you don't have an MBA?
23     A.   An MBA, no.
24     (Whereupon, Deposition

Page 353

1     Exhibit No. Kapit-20, DESCRIPTION,
2     was marked for identification.)
3  BY MR. ROTHMAN:
4     Q.   In paragraph 182 of your
5  report you refer to a recent article in
6  the Canadian research journal. I'm going
7  to show you what we marked as Exhibit 20,
8  which is a report -- it's a study
9  called -- well --
10     A.   Which paragraph are you
11  referring to? Say that again.
12     Q.   I'm referring to paragraph
13  182 of your expert report. Let me show
14  you Exhibit 20, which is a study entitled
15  "Time Variations and the Risk of
16  Myocardial Infarction in Elderly Users of
17  COX-2 Inhibitors." The lead author is
18  Linda Lee Levesque. You'll see that this
19  article appeared in May of 2006.
20     A.   Yes. This is the article
21  that I was referring to.
22     Q.   And what kind of study is
23  this study?
24     MR. BLACK:  Objection.

Page 354

1    THE WITNESS:  This is an
2   epidemiologic -- this is an
3   epidemiologic review of a
4   database, a nested case-controlled
5   study.
6   BY MR. ROTHMAN:
7    Q.   If we call it an
8   observational study, is that --
9    A.   Yes, it is an observational
10   study.
11    Q.   And do you recognize there
12   is a hierarchy of scientific evidence in
13   terms of its reliability?
14    A.   Observational studies are
15   considered more prone to bias errors than
16   prospective, controlled studies, that's
17   true.
18    Q.   Randomized
19   placebo-controlled trials are the gold
20   standard, right?
21    A.   I would agree with you that
22   there's a hierarchy and that
23   observational studies are considered not
24   as reliable as prospective,

Page 355

1   placebo-controlled clinical trials.
2    Q.   Would you agree that
3   observational studies are valuable for
4   generating hypothesis, but, generally
5   speaking, they aren't considered reliable
6   enough to support firm conclusions?
7    A.   It's true that most experts
8   agree that if you have an observational
9   study that it would be a good idea to
10   follow it up with a prospective
11   controlled study to confirm it.
12    Q.   When the FDA reviewed the
13   COX-2 data in its April 6th, 2005 memo,
14   it relied on the clinical trial data and
15   not the observational studies, correct?
16    A.   Right.  But that doesn't
17   mean that this study is not correct in
18   its conclusions.  It provides support, as
19   all studies, even -- even the best
20   clinical trials provide support for
21   conclusions.  And, of course, earlier in
22   my testimony today, I mentioned to you
23   how flawed clinical trials are thought to
24   be in many different ways in terms of

Page 356

1   size, duration, representativeness,
2   excluding problems from the trials.  So
3   that clinical trials have their problems,
4   too.  And this is supportive of one
5   conclusion that the effect is early and
6   clinical trials support conclusions as
7   well.  I mean, it's all a matter of
8   accumulating sufficient evidence.  And
9   this is one important piece of evidence
10   that the effect is early.
11    Q.   Okay.  But let's talk about
12   the results of the study.  The authors
13   found a risk of myocardial infarction
14   following first time use of Vioxx with
15   events occurring in a median of nine days
16   after therapy was started?
17    A.   Right.
18    Q.   With repeated use of Vioxx,
19   the risk of myocardial infarction was not
20   statistically significant?
21    A.   Right.
22    Q.   And the risk of an acute MI
23   did not increase with increasing exposure
24   to Vioxx?

Page 357

1    A.   That's true.  Now, she gives
2   an explanation for that.  And she
3   proposes that patients with
4   cardiovascular risk are dropped out of
5   treatment.  And so the effect does not
6   show up later on.  Now, that's her
7   proposal for that particular finding,
8   which may be true or may not be true.
9   Maybe she has other evidence supporting
10   that.  But she proposes a reasonable
11   reason to suspect namely, and this does
12   happen in prospective clinical trials as
13   well, that people at risk for problems
14   and who start developing symptoms, like
15   chest pain or other things like that, are
16   dropped out.  And so you don't get the
17   long-term effects in that case.  And that
18   may have been the reason that it didn't
19   show up here.
20    Q.   Now, you also added a
21   section of your report that discusses an
22   editorial circulation by Dr. Jerry Avorn?
23    A.   Yes.
24    Q.   How did that editorial come

Page 358

1   to your attention?
2       A.   Again, I'm not completely
3   sure whether it came from the journal
4   itself or was provided by Mr. Black.
5       Q.   Have you ever met Dr. Avorn?
6       A.   Not specially, no.
7       Q.   Have you communicated with
8   him?
9       A.   No.
10      Q.   Did you know that he's a
11  plaintiffs' expert in the Vioxx
12  litigation?
13      A.   I was aware of his having
14  some participation in the -- I wasn't
15  specifically aware of what he was doing,
16  but that there was -- he wasn't
17  necessarily without interest in this
18  question.
19      Q.   Have you read any of Dr. --
20  have you read Dr. Avorn's expert report?
21      A.   No, I have not.
22      Q.   Did Dr. Avorn ever work at
23  the FDA as far as you know?
24      A.   Not so far as I know, no.

Page 359

1       Q.   And you're citing to an
2   editorial that he wrote, correct?
3       A.   Correct, yes.
4       Q.   It's not a peer-reviewed
5   article?
6           MR. BLACK:   Objection.
7           THE WITNESS:   Well, I mean,
8       it's not peer reviewed in the
9       usual sense, but certainly the
10      editors of the journal are
11      considering what he wrote and the
12      importance of what he wrote and
13      the validity of what he wrote, I
14      mean.  So it's not peer reviewed
15      via the same method that a regular
16      medical article in the journal
17      would have been reviewed, but I'm
18      sure the editors of the journal
19      exercised supervision and
20      assessment and evaluation of his
21      editorial before publishing it.
22  BY MR. ROTHMAN:
23      Q.   Are you relying on Dr.
24  Avorn's editorial to support any of your

Page 360

1   own opinions?
2       A.   No.  To support -- to
3   support, yeah.  I mean, I think that they
4   are supportive of the opinions.  Let me
5   just read this paragraph again to make
6   sure I'm -- I know what I'm saying here.
7       Q.   What I'm wondering, Dr.
8   Kapit, if you added this as sort of a
9   flavor point or whether it's actually
10  being used by you to support your
11  opinions?
12          MR. BLACK:   Objection.
13          THE WITNESS:   I've added it
14      as something that I believe
15      confirms my opinions.
16  BY MR. ROTHMAN:
17      Q.   Okay.  In what way?
18      A.   Let me read it again,
19  please.
20          (Witness reviews document.)
21          Basically that the whole
22  issue could have been handled much more
23  quickly and much more expeditiously in
24  that Merck was at fault.  And he also

Page 361

1   suggests that the FDA may have been at
2   fault.  And I haven't made any specific
3   statements about the FDA.  But insofar as
4   he cites the manufacturer as being at
5   fault for not getting the information out
6   there earlier, I believe that supports
7   what I've said.
8       Q.   Which information are you
9   referring to?
10      A.   The cardiovascular
11  information, the myocardial infarction
12  information.
13      Q.   From VIGOR?
14      A.   Yes.
15      Q.   Any other reliance on Dr.
16  Avorn's editorial?
17      A.   No.
18          MR. ROTHMAN:   All right.
19      Can we take a very quick one
20      minute break with a view toward
21      wrapping up?
22          MR. BLACK:   Sounds good to
23      me.  And, actually, I should be
24      pretty close to giving you the

Page 362

1 last of these documents.
2 (Recess taken from 6:28 p.m.
3 to 6:33 p.m.)
4 MR. ROTHMAN: Mark this as
5 Exhibit 21.
6 (Whereupon, Deposition
7 Exhibit No. Kapit-21, DESCRIPTION,
8 was marked for identification.)
9 BY MR. ROTHMAN:
10 Q. Sir, have you ever seen
11 Exhibit 21 before?
12 A. Yes.
13 Q. This is a May 19 -- the
14 minutes of a May -- I'm sorry, a review
15 of a May 1998 meeting of Merck's board of
16 scientific advisors?
17 A. Yes.
18 Q. And just to put that into
19 some time context, the NDA for Vioxx was
20 submitted to FDA in November of 1998,
21 correct?
22 A. Right.
23 Q. And the document actually
24 starts on page nine.

Page 363

1 A. Yes.
2 Q. And if you start at the
3 beginning, in the first -- toward the end
4 of the first paragraph, the board notes,
5 "The prospect of an effective drug for
6 osteoarthritis that does not produce the
7 severe and fatal complications of peptic
8 ulcers is an attractive one." Do you see
9 that statement?
10 A. That's in the first
11 paragraph?
12 Q. Yes.
13 A. Prospect of an -- the
14 prospect of an -- yeah. Okay. Go ahead.
15 Q. Okay. And do you agree with
16 that statement?
17 A. Yes.
18 Q. Now, page 11, at the top of
19 the page, the first sentence, "The board
20 addressed the potential for either
21 benefits or adverse consequences of
22 selection inhibition of COX-2 on coronary
23 heart disease." Do you see that, sir?
24 A. Yes.

Page 364

1 Q. Are you aware that there was
2 a theory at this time that Vioxx might be
3 helpful for the heart?
4 A. Yeah, I believe that there
5 was a period of time in which that was
6 entertained as a possibility, yes.
7 Q. And do you understand the
8 mechanism for that theory?
9 A. I did -- I did actually
10 review that, but I don't remember it at
11 this point. If you want to repeat it --
12 do you want to cite it for me?
13 Q. Let's move on to page 13 of
14 the document. In the middle two
15 paragraphs on that page, can we agree
16 that they are talking there about the
17 prostacyclin thromboxane balance that we
18 discussed earlier?
19 A. Yes.
20 Q. And have you ever -- have
21 you heard that referred to as the
22 FitzGerald hypothesis?
23 A. Actually, no.
24 Q. Okay. Is there some

Page 365

1 shorthand way that you refer to this
2 prostacyclin thromboxane balance theory?
3 A. Once again, I come -- my
4 knowledge of this is from reading the
5 information in this -- relative to this
6 case. I'm not an expert in this area,
7 and I have -- I didn't -- I've never
8 developed my own terminology for it or
9 anything.
10 Q. Okay. Well, you see where
11 the board says, "This is important data,
12 but it is not a basis for any conclusion,
13 rather, it should be taken as a basis for
14 hypotheses that should be actively
15 pursued"?
16 A. Yes, I do see that.
17 Q. Do you think any issue with
18 that statement?
19 A. No. I think that says it
20 fairly, that this is a hypothesis. The
21 statement that it should be actively
22 pursued indicates that the board feels
23 that this is an important hypothesis that
24 should be investigated. So I agree with

Page 366

1  that statement.
2      Q.   Okay.  And then on page 14,
3  the board gives its recommendations.  The
4  first recommendation is systematic
5  examination of coronary ischemic events
6  in the clinical trials with Vioxx and
7  other MRL COX-2 inhibitors.
8      A.   Yes.
9      Q.   Do you know whether Merck
10 followed that advice?
11     A.   They did a study that
12 actually is -- does not follow this
13 advice, but I believe that they intended
14 it to be the study that did follow this
15 advice.
16     Q.   Do you know whether Merck
17 set up a system to assess cardiovascular
18 endpoints by a uniform set of criteria?
19     A.   Yes, they did.
20     Q.   Isn't that what the board of
21 advisors recommended?
22     A.   Well, they recommended a
23 systematic examination of clinical trial
24 with Vioxx and other MRL COX-2

Page 367

1  inhibitors.  The -- a necessary part of
2  doing that was to set up a method of
3  systematically classifying those events.
4  So this was one step, doing that was one
5  step in doing what they recommended.
6      Q.   Right.  And then the next
7  paragraph, it goes on to say, it is
8  therefore proposed that coronary events
9  be predetermined endpoints in all future
10 controlled trials with Vioxx and the
11 backup COX-2 inhibitors.  Furthermore, it
12 is proposed that these endpoints be
13 assessed by a uniform set of criteria so
14 that meta-analysis of coronary and
15 cerebrovascular events from all of these
16 trials can be performed?
17     A.   Yes, that's what it does
18 say.
19     Q.   Okay.  Now, they don't
20 recommend that Merck halt the development
21 program of Vioxx in order to do this, do
22 they, sir?
23         MR. BLACK:  Objection.
24         THE WITNESS:  They make no

Page 368

1  statement about that.  They just
2  say this ought to be done.  They
3  don't make any statement about the
4  extent to which the program ought
5  to be gone forward without --
6  without having done this.  I mean,
7  they considered this an important
8  thing to study.  And it's possible
9  that they could have felt,
10 although we don't know whether
11 they did or not, that this should
12 have been the first priority in
13 Merck's future development
14 program.  I certainly think that
15 the issue is important enough that
16 it should have been the first
17 priority in Merck's future
18 development program.  Well, we
19 don't know what they say.  They
20 just simply say that it should be
21 done.
22         MR. BLACK:  Counsel, I don't
23 mean -- I apologize to interrupt.
24 I do have to go get the car taken

Page 369

1  care of before it gets locked up.
2  Let me rush and get that taken
3  care of as soon as I can.  And
4  I'll be back momentarily.
5         (Recess taken from 6:43 p.m.
6  to 7:11 p.m.)
7         (Whereupon, the court
8  reporter read back from the
9  record.)
10         MR. ROTHMAN:  Dr. --
11         THE WITNESS:  My usual
12 verbose self, so...
13 BY MR. ROTHMAN:
14     Q.   Doctor, the board of
15 advisors did not recommend that Merck
16 conduct a CV outcome study, did they?
17     A.   A CV outcome study.  Let me
18 take time to read exactly what they say
19 here.  Well, no, I guess you're
20 technically correct.  They didn't
21 specifically recommend that, but they
22 certainly considered it very important
23 and a CV outcome study probably would
24 have fit in with their recommendations,

Page 370

1 even though they didn't specifically
2 recommend it, no.
3    Q.   They considered what to be
4 important?
5    A.   Assessing CV outcomes.
6    Q.   And they recommended that
7 Merck do that through an adjudication
8 process, correct?
9       MR. BLACK: Objection.
10       THE WITNESS: Well, they
11    say, it is therefore proposed that
12    coronary events be predetermined
13    endpoints in all future controlled
14    trials with Vioxx.
15       Now, so they're not saying
16    that you devote a specific study
17    to that, although, if you did,
18    that would fit in with this
19    recommendation. And so, I mean,
20    repeat your question.
21 BY MR. ROTHMAN:
22    Q.   The board of advisors did
23 not recommend that the Merck conduct a CV
24 outcome study, true?

Page 371

1       MR. BLACK: Objection.
2       THE WITNESS: It's very
3    close to that recommendation.
4    Yeah. Technically they didn't --
5    they didn't recommend that you do
6    a specific study on that, but they
7    did recommend that CV outcomes be
8    assessed in all future trials. I
9    mean, that seems very close to me.
10 BY MR. ROTHMAN:
11    Q.   That's not a CV outcomes
12 study, is it, sir?
13    A.   It is proposed predetermined
14 endpoint. A predetermined endpoint is an
15 outcome. So you could replace
16 predetermined endpoint by the word
17 outcome. It is therefore proposed that
18 coronary events be outcomes in all future
19 controlled trials with Vioxx. I think
20 that's what it says. So predetermined
21 endpoint is an outcome.
22    Q.   You read this to be a
23 recommendation that Merck needs to do a
24 CV outcomes study?

Page 372

1    A.   No.  I read it to be a
2 recommendation that CV outcomes need to
3 be studied.  What they're saying is that
4 you could -- is they're recommending they
5 do this as an outcome in all future
6 trials.  And those future trials may also
7 be assessing other outcomes as well.  So
8 what I've said is that they don't
9 recommend that a trial be done with CVs
10 as being the primary outcome, but they
11 are very clear in recommending that CV
12 outcomes be studied in all future trials.
13    Q.   In response to this
14 recommendation, do you know what Merck
15 did?
16    A.   Well, there is the Konstam
17 report that they did, which is a post --
18 which is a looking-back study.  I do not
19 know of any future outcome studies that
20 they did other than the Protocol 203,
21 which they ended up not doing.  I mean,
22 they did CV outcomes according to this in
23 APPROVe and VIP and VICTOR.  So to that
24 extent, they followed these

Page 373

1 recommendations.  But then they didn't go
2 ahead and analyze it.  APPROVe --
3 APPROVe, VICTOR and VIP do follow these
4 recommendations.
5    Q.   Sir, are you aware of the
6 fact that Merck established a standard
7 operating procedure for surveillance
8 monitoring and adjudication of potential
9 acute thromboembolic vascular events
10 among patients in COX-2 inhibitor trials
11 and their extensions?
12    A.   I've already told you.  You
13 asked me that before and I said yes, they
14 did.  But that's not what it says here.
15 What it says here is that they should
16 be -- that cardiovascular events or
17 coronary events should be predetermined
18 endpoints.  A predetermined endpoint is a
19 synonym for the word outcome.
20    Q.   Sir, do you see the next --
21 in response to this recommendation, Dr.
22 Kapit, Merck set up the CV SOP.  Do you
23 think that that's not what this is
24 telling them to do?

Page 374

1     MR. BLACK: Objection.
2     THE WITNESS: That's -- no,
3  by -- no. That's only one part of
4  that is -- that SOP is a step
5  required to do what it says to do
6  here. You can't do what it says
7  here, which is to study CV
8  outcomes. It says very clearly in
9  my opinion that Merck is supposed
10 to study CV outcomes here. You
11 can't do that unless you establish
12 the way you're going to assess
13 whether you've got a CV outcome.
14 So they go ahead and they put in
15 this SOP which is how they assess
16 whether they got a CV outcome.
17 And then that permits them to go
18 forward. But just simply putting
19 in that SOP is not the response
20 that is sufficient -- that by
21 itself does not do what it says
22 here to do.
23 BY MR. ROTHMAN:
24    Q.   Okay. But you know that

Page 375

1  Merck not only set up the CV SOP but then
2  implemented and collected and adjudicated
3  data in its clinical trial, correct?
4     A.   And I said that. In VICTOR,
5  in VIP and in APPROVe they did, yes.
6     Q.   And in earlier trials as
7  well?
8     A.   I'm not aware of them doing
9  it in any other trials aside from VICTOR,
10 VIP -- they look back.
11    Q.   Do you know that the events
12 in VICTOR were adjudicated pursuant to
13 the CV SOP?
14    A.   That's quite possible that
15 VICTOR, also.
16    Q.   VIGOR?
17    A.   VIGOR also was done
18 according to this SOP. I don't doubt
19 that, yes. So in VIGOR, VICTOR, APPROVe
20 and --
21    Q.   And other clinical trials?
22 Are you aware of any other clinical
23 trials?
24    A.   No, I'm not. Those four I

Page 376

1  will agree are probably done according to
2  this SOP.
3     Q.   In fact, all future
4  controlled trials with Vioxx had the CV
5  SOP in place, didn't they, Doctor?
6     A.   What other ones are there
7  besides those four that are capable of
8  assessing cardiovascular outcomes. Those
9  are the only four trials that I know of
10 that are capable of assessing
11 cardiovascular outcomes.
12    Q.   Do you see what the board of
13 advisors says on page 14, coronary events
14 be predetermined endpoints in all future
15 controlled trials with Vioxx?
16    A.   Yes. But, I mean, if you do
17 that in studies that aren't
18 placebo-controlled or that aren't --
19 don't expose patients long enough, then
20 it's not that significant. I mean, I'm
21 not sure what the point of disagreement
22 is here. I'm agreeing they did it in
23 VICTOR and the other three trials. They
24 should have analyzed it as well in the

Page 377

1  other three trials.
2     MR. ROTHMAN: Let's mark
3  this as Exhibit 22.
4     (Whereupon, Deposition
5  Exhibit No. Kapit-22, DESCRIPTION,
6  was marked for identification.)
7  BY MR. ROTHMAN:
8     Q.   Have you ever seen
9  Exhibit 22 before, Dr. Kapit?
10    A.   Yes, I have.
11    Q.   This is a cardiovascular
12 meta-analysis that Merck performed?
13    A.   Yes.
14    Q.   It was later published by
15 Dr. Konstam?
16    A.   Yes.
17    Q.   Do you know if Merck ever
18 updated this meta-analysis?
19    A.   No, I don't.
20    Q.   You haven't seen any of the
21 updates?
22    A.   Well, I've seen the Konstam
23 article. Does this include the updates?
24 I mean, I assume that the Konstam article

Page 378

1  is their definitive word on this.
2       MR. ROTHMAN: Mark this as
3  Exhibit 23.
4       (Whereupon, Deposition
5  Exhibit No. Kapit-23, DESCRIPTION,
6  was marked for identification.)
7  BY MR. ROTHMAN:
8       Q. Have you ever seen
9  Exhibit 23, Dr. Kapit?
10      A. No. I believe this is the
11 first time I've seen it.
12      Q. Okay. It's an updated
13 cardiovascular pooled analysis, correct?
14      A. Okay.
15      Q. It's submitted to the FDA
16 March 22nd of 2004?
17      A. Yes.
18      Q. And it says, in the first
19 paragraph, that this is the third
20 update --
21      A. Okay.
22      Q. -- to that original
23 meta-analysis that we just looked at.
24 Have you seen any of the prior updates?

Page 379

1       A. No, I have not.
2       Q. Do you see the second
3  sentence of the first paragraph, "Such a
4  pooled analysis was specified in the
5  vascular events adjudication standard
6  operating procedure."
7       A. Okay.
8       Q. That's referring to the CV
9  SOP that Merck set up?
10      A. Okay.
11      Q. And this is the pooled
12 analysis they did as a result of that?
13      A. Okay.
14      Q. You haven't seen this
15 before?
16      A. No, I have not.
17      Q. Turn to page 3. There are
18 three principle findings of this
19 analysis. First, the pooled analysis of
20 all placebo-controlled trials with
21 rofecoxib demonstrated similar
22 cardiovascular event rates for
23 rofecoxib --
24      A. I'm sorry. I'm on the wrong

Page 380

1  page.
2       Q. I'm sorry. I'm on page 3 of
3  the document.
4       A. Which paragraph, the three
5  principle findings at the top.
6       Q. Yes, the very top. The
7  three principle findings in this
8  analysis, fishes the pooled analysis of
9  all placebo-controlled trials with
10 rofecoxib demonstrated similar
11 cardiovascular event rates for rofecoxib
12 and placebo. These data from about 7300
13 patients on rofecoxib and representing
14 over 3,000 patient years of experience
15 suggest that rofecoxib does not have a
16 prothrombotic effect relative to the
17 placebo.
18      A. Yes. And let me go on.
19 This, in fact, is very similar to the
20 discussions section of the Konstam paper.
21 In fact, some of the words are the very
22 same. So let's look at the very next
23 sentence then. It says, of note, of the
24 place controlled patients are from the

Page 381

1  Alzheimer disease program.
2       Q. And included elderly
3  patients at increased risk for
4  cardiovascular disease.
5       A. So they're --
6       Q. That's what it says, right?
7       A. Yes.
8       Q. So their placebo compare?
9       A. So their placebo comparison
10 is designed from the Alzheimer's program.
11 Dr. Villalba of the FDA makes a very
12 clear point, that that program was
13 inadequate to assess cardiovascular
14 events. So what they're saying is that
15 their placebo comparison was done in a
16 dataset that was inadequate to assess
17 this issue.
18      Q. How many patients were in
19 the Alzheimer trials?
20      A. I do not know, but...
21      Q. Was it 7,300 patients?
22      A. I know that Dr. Villalba
23 says these trials were not powered or
24 designed to assess this question.

96 (Pages 378 to 381)

Page 382

1    Q.   Doctor, you've never seen
2  this document before.  How could you give
3  an opinion about it?
4       A.   I just explained.  And I'll
5  tell you once again how I'm giving this
6  opinion.  I have seen this language
7  before.  I read the Konstam paper.  This
8  is the same language that is in the
9  discussion of the Konstam paper.  It says
10  that the placebo comparison is designed
11  from the Alzheimer disease program.  Dr.
12  Villalba assessed that program and
13  concluded that that program was not
14  powered or designed to assess this
15  question.  So essentially Dr. Villalba is
16  saying this analysis that we're pointing
17  to here is not a valid analysis.
18      Q.   Sir, will you agree with me
19  that Merck did the meta-analysis called
20  for by the board of scientific advisors?
21      A.   No.  If you analyze the
22  placebo comparison in a dataset in which
23  it's an invalid analysis, it is not doing
24  what was called for.

Page 384

1  in safety achieved by the elimination of
2  serious and fatal gastrointestinal
3  toxicity will free patients from one of
4  the most serious adverse effects in
5  current drug therapy.  Thus, there is a
6  strong mandate for introduction of Vioxx
7  into medical practice as soon as is
8  feasible.
9       Did I read that correctly?
10      A.   Yes, you did.
11      Q.   And do you understand this
12  to be the scientific advisors telling
13  Merck to conduct and follow their
14  recommendations in parallel with the
15  ongoing development program?
16      A.   Yes, I do.  But I also
17  understand that this was written before
18  the results of VIGOR were available and
19  that serious gastrointestinal toxicity,
20  in comparison with serious cardiac
21  toxicity, that one has to say that the
22  latter is much more dangerous and much
23  more significant.  So that they made this
24  statement without knowing what would

Page 383

1       Q.   Turn to page 17 of the
2  programmatic review.
3       A.   I'm sorry, programmatic
4  review.
5       Q.   Exhibit --
6       MR. BLACK:  Which exhibit
7  are we talking about?
8       THE WITNESS:  Exhibit 21.
9       MR. ROTHMAN:  21.
10  BY MR. ROTHMAN:
11      Q.   Do you have page 17 there?
12      A.   Yes.
13      Q.   At the bottom, the advisors
14  note, the above considerations regarding
15  hypothetical adverse effects and
16  potential unexpected therapeutic benefits
17  of Vioxx are part of the scientific
18  intelligence gathering appropriate to the
19  development of any truly novel
20  pharmacological entity and should be
21  addressed in parallel with the conclusion
22  of the process of acquisition and
23  analysis of the data that will place this
24  drug in the hands of patients.  The gain

Page 385

1  happen insofar as cardiovascular toxicity
2  in the future.
3       Q.   My only point, sir, a few
4  minutes ago you told me that the board
5  didn't say anything about whether to stop
6  the program or keep the program going.
7  We now agree that they were to follow the
8  recommendations in parallel with the
9  programmatic --
10      A.   That's not exactly what I
11  said.
12      MR. BLACK:  Objection.
13      THE WITNESS:  That's not
14  exactly what I said.  Let me read
15  precisely what I said here.
16      MR. BLACK:  You're going to
17  answer this question and I think
18  we're shutting down.
19      MR. ROTHMAN:  Don't even
20  bother.  The record will speak for
21  itself as to what your --
22      THE WITNESS:  I'd like to
23  answer this question.
24      MR. BLACK:  Let him answer

Page 386

1    the question and we're shutting it
2    down.
3        MR. ROTHMAN:  Go ahead.
4        THE WITNESS:  What I've said
5    is that it may be that they felt
6    that assessing cardiovascular
7    toxicity is the first thing --
8    certainly the first thing that
9    Merck should do perhaps in concert
10   with doing other things.  There's
11   nothing in this paragraph that
12   says that they think that that
13   should not be the first thing that
14   Merck should do.  It says that it
15   should introduce Vioxx into
16   medical practice because of the
17   possible improvement in
18   gastrointestinal toxicity.  But it
19   certainly does not say that the
20   cardiovascular issue is less than
21   important -- less important or
22   that it should not be done first
23   along with this perhaps.
24   BY MR. ROTHMAN:

Page 387

1        Q.   Introduce Vioxx --
2        MR. BLACK:  That's it.
3        MR. ROTHMAN:  Hold on.  I
4    have to follow up, Bert.
5        MR. BLACK:  You do not get
6    to follow up.
7        MR. ROTHMAN:  I get to
8    follow up on that speech.
9        MR. BLACK:  You people have
10   been shutting us down on the
11   second.  We have not been extended
12   one second of courtesy in any
13   deposition.  You're not going to
14   get any comparable courtesy from
15   us.
16       MR. ROTHMAN:  I'm going to
17   ask one further question.
18       MR. BLACK:  If you put your
19   question on the record.  We're one
20   minute over the time.
21       MR. ROTHMAN:  I'm going to
22   ask one final question.
23       MR. BLACK:  Put your
24   question on the record.  There's

Page 388

1    not going to be an answer.
2    BY MR. ROTHMAN:
3        Q.   Doctor, it says
4    "Introduction of Vioxx into medical
5    practice as soon as is feasible,"
6    correct?
7        MR. BLACK:  Don't answer the
8    question.  The deposition is over.
9        We'll reserve the right to
10   review and sign.
11       THE WITNESS:  I have to
12   follow my counsel.
13       MR. BLACK:  Anything else we
14   need to put on the record?
15   Anything else we need to put on
16   the record?
17       MR. ROTHMAN:  Well, I'm
18   going to put on the record that we
19   received a whole bunch of CD-ROMs
20   at this deposition for the first
21   time that we've been unable to
22   access in any sort of meaningful
23   way, and so we're going to go
24   review those documents, and if we

Page 389

1    find anything in there that's
2    significant that we feel we need
3    to follow up on, then we're going
4    to take appropriate steps.
5        MR. BLACK:  Let me state for
6    the record that the CDs were
7    produced about midway during the
8    deposition, the first of them.
9    You had ample opportunity to
10   review them along with any of the
11   other documents.  They were
12   produced just as the other
13   documents were or a few hours
14   after the other documents were
15   produced.  You had as much
16   opportunity to review the CDs as
17   you did the hard copies that were
18   produced.  There's no distinction.
19   I will also state for the record,
20   having said that, that there was
21   one of the CDs that contained
22   images of e-mails and some of
23   these e-mails -- some of them
24   don't relate to this case at all.

Page 390

1    They're things that Dr. Kapit
2    stored in the wrong place.  And
3    I'm not capable of sorting them
4    out and providing them to you, and
5    those we'll follow up.  I'll get
6    them to you as soon as possible.
7    Most of them, based on my
8    additional review, most of them
9    are repetitive of documents that
10   show up on the other CD.  So
11   you've had, gosh, you got the
12   first of the CDs around 1:30.
13   It's now 7:30.  You had six hours
14   to review the first of them if you
15   wanted to.  You could have taken a
16   break in the deposition, counsel,
17   and done your review.  I mean,
18   you've used up your time, you
19   could take a break now left and we
20   could come back and do the final
21   five minutes.  You had the
22   opportunity to look at it, you
23   didn't avail yourself of it and
24   that's what our position will be.

Page 391

1         MR. ROTHMAN:  Your position
2    will be what it is.  Our position
3    is we did not have an ample
4    opportunity to review these
5    electronic documents.  We didn't
6    get some of the CDs until after
7    3 o'clock.  We still haven't got
8    all the e-mails by your own
9    admission.  So we're going to take
10   a look at them, and if we decide
11   we need to follow up, we'll let
12   you know.
13        MR. BLACK:  I will only
14   state that I'm not clear that you
15   don't have all the e-mails.  What
16   you have not been provided might
17   only be duplicates of what you
18   have.  I have nothing further to
19   say, unless you've got something
20   further to say.
21        MR. ROTHMAN:  No.
22        (Witness excused.)
23        (Whereupon, at 7:34 p.m. the
24   proceedings concluded.)