1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

    In re:  VIOXX               *   MDL Docket No. 1657
3                               *
    PRODUCTS LIABILITY LITIGATION *  SECTION L
4                               *
                                *   JUDGE FALLON
5   EVELYN IRVIN PLUNKETT, as   *
    Personal Representative of the *  MAGISTRATE JUDGE
6   Estate of RICHARD IRVIN, JR., *      KNOWLES
                                *
7                Plaintiff,     *   CASE NO. 2:05CV4046
                                *
8       vs.                     *
                                *
9   MERCK & CO., INC.,          *
                                *
10               Defendant.     *
11

12   VIDEOTAPED DEPOSITION OF JANET ARROWSMITH-LOWE, M.D.
                     October 28, 2005
13                        9:49 a.m.
                   Bean & Associates, Inc.
14                119 E. Marcy, Suite 110
                 Santa Fe, New Mexico  87501
15
16           PURSUANT TO THE FEDERAL RULES OF CIVIL
    PROCEDURE, this deposition was:
17
    TAKEN BY:  MR. BERT BLACK
18              Attorney for the Plaintiff
19
20
21
22   REPORTED BY:  Jan A. Williams, RPR, CCR 14
                   Bean & Associates, Inc.
23                 Professional Court Reporting Service
                   500 Marquette, Northwest, Suite 280
24                 Albuquerque, New Mexico  87102
25   (3144M)  JAW

Page 2

```
1          APPEARANCES
2  For the Plaintiff:
3      LOCKRIDGE GRINDAL NAUEN, PLLP
        100 Washington Avenue S., Suite 2200
4      Minneapolis, MN 55401-2179
        612-339-6900
5      BY: MR. BERT BLACK
           MS. ELIZABETH R. ODETTE
6
       REICH & BINSTOCK, LLP
7      4265 San Felipe, Suite 1000
        Houston, Texas 77027
8      713-622-7271
       BY: MR. DENNIS C. REICH
9
       BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
10     MILES, PC
        218 Commerce Street
11     Montgomery, Alabama 36104
        334-269-2343
12     BY: MR. J. PAUL SIZEMORE (by telephone)
13  For the Defendant:
14     HUGHES HUBBARD & REED, LLP
        One Battery Park Plaza
15     New York, New York 10004-1482
        212-837-6872
16     BY: MR. SETH D. ROTHMAN
           MS. JENNIFER E. GRAHAM
17
       MR. JOSEPH D. PIORKOWSKI, JR.
18     910 17th Street, N.W., Suite 800
        Washington, D.C. 20006
19     303-223-5535
20  Also Present:
21     DALE ALVERSON, Videographer
22
23
24
25
```

Page 4

```
1        EXHIBITS MARKED (Continued)
2  NUMBER
   22 - Article entitled Plan to Evaluate the
3       Incidence of Cardiovascular SAEs, etc.   255
   23 - Article entitled Final Results of an Analysis
4       of the Incidence of Cardiovascular SAEs, etc. 263
   24 - Medical Office Review, Vioxx (Rofecoxib)   271
5  25 - Memorandum dated 12/23/98 with attachments  272
   26 - Executive Summary                  282
6  27 - Vioxx labels                      285
   28 - FDA Talk Paper, 4/11/02             286
7  29 - FDA Webview article, 5/1/00          288
   30 - Memorandum dated 2/1/01 with attachments  294
8  31 - Synopsis of Application             298
   32 - Arthritis Advisory Committee, 2/8/01    303
9  33 - Arthritis Advisory Committee, 2/8/01    307
   34 - Article from Archives of Internal Medicine,
10      Volume 162, Dec. 9/23, 2002           309
   35 - Article entitled Risk of Cardiovascular Events
11      Associated with Selective COX-2 Inhibitors  313
   36 - Article entitled U.S. Long Range Operating
12      Plan Franchise, etc.                 314
   37 - Medical Officer Review, Vioxx (Rofecoxib)   317
13  38 - Medical Officer Review, NDA 21-042 and
        NDA 21-052                       319
14  39 - Article entitled Risk of cardiovascular events
        and rofecoxib: cumulative meta-analysis   322
15  40 - (Not marked)
   41 - Miscellaneous documents            326
16  42 - Documents contained in black binder from
        Dr. Arrowsmith-Lowe               347
17  43 - Documents contained in redwell folder from
        Dr. Arrowsmith-Lowe               347
18  44 - Documents unbound from Dr. Arrowsmith-Lowe  347
19
20
21
22
23
24
25
```

Page 3

```
1          INDEX
2                           PAGE
3  EXAMINATION OF JANET ARROWSMITH-LOWE, M.D.
4      BY MR. BERT BLACK          6, 344
       BY MR. SETH D. ROTHMAN       336
5
   CERTIFICATE OF COMPLETION OF DEPOSITION    348
6
   WITNESS SIGNATURE/CORRECTION PAGE        350
7
         EXHIBITS MARKED
8
   NUMBER
9  1 - Rule 26(a)(2)(B) Expert Report of Dr. Janet
        Arrowsmith-Lowe              9
10  2 - Notice of Videotaped Deposition      55
   3 - Article entitled Comparison of Upper
11      Gastrointestinal Toxicity, etc.      60
   4 - Letter dated 8/28/01               67
12  5 - (Withdrawn)                    81
   6 - Article entitled Cardiovascular Events
13      Associated with Rofecoxib, etc.      87
   7 - Article entitled Vioxx, Excerpts from primary
14      review of NDA 21-042-Osteoarthritis    154
   8 - Article entitled The Pink Sheet 2004/2005
15      Abramac FDA Credibility Crisis, etc.
   9 - Floor Statement of U.S. Senator Chuck Grassley 172
16  10 - Article entitled Risk of acute myocardial
        infarction and sudden cardiac death, etc.  178
17  11 - Title 21, Food and Drugs, Part 201    189
   12 - Article entitled FDA's Drug Approval Process:
18      Up to the Challenge?               192
   13 - U.S. Senate Committee on Health, Education,
19      Labor & Pensions, Witness Testimony, 3/1/05  199
   14 - Article entitled Chief Dr. Lester Crawford is
20      Criticized on Drug-safety Issues      205
   15 - Title 21, Food and Drugs, Part 314    212
21  16 - Guidance for Industry, Changes to an
        Approved NDA or ANDA            214
22  17 - Guidance for Industry, Changes to an
        Approved NDA or ANDA, Revision 1    218
23  18 - Letter dated 5/23/03 with attachments    227
   19 - Letter dated 3/8/00 with attachments    234
24  20 - Title 21, Food and Drugs, Part 314    243
   21 - Article entitled Systemic biosynthesis of
25      prostacyclin by cyclooxygenase-2, etc.    248
```

Page 5

```
1       THE VIDEOGRAPHER: We are on the record. The
2  date is October 28, 2005. The time now is
3  approximately 9:49 a.m. Mountain time.
4       This is the videotaped deposition of
5  Dr. Janet Arrowsmith-Lowe in the matter of Evelyn
6  Irvin Plunkett versus Merck & Company, Incorporated,
7  Case No. 2:05CV4046, in the United States District
8  Court for the Eastern District of Louisiana.
9       We are in the offices of Bean & Associates
10 at 119 East Marcy, Suite 110, Santa Fe, New Mexico,
11 87501. The videographer is Dale Alverson. The court
12 reporter is Jan Williams.
13       Will the attorneys please introduce
14 themselves for the record.
15       MR. BLACK: My name is Bert Black, I'm here
16 on behalf of the MDL plaintiffs and in particular
17 Ms. Plunkett.
18       MS. ODETTE: Elizabeth Odette, same as Bert,
19 Lockridge Grindal Nauen.
20       MR. REICH: Dennis Reich, MDL plaintiffs.
21       MS. GRAHAM: Jennifer Graham, Hughes Hubbard
22 & Reed, defendant.
23       MR. PIORKOWSKI: Joseph Piorkowski from
24 Washington, D.C., on behalf of Merck & Company.
25       MR. ROTHMAN: Seth Rothman, Hughes Hubbard,
```

Page 6

1  on behalf of Merck.
2      Before -- Bert, before you get started, let
3  me just note that the deposition is being taken
4  pursuant to the protective order in the case. I trust
5  that all counsel present including Paul Sizemore
6  on the phone have signed onto that order. Also before
7  I forget, let me just note that the witness does
8  reserve her right to read and sign the transcript.
9      MR. BLACK: Okay.
10     THE VIDEOGRAPHER: And will the reporter
11  please swear in the witness.
12         JANET ARROWSMITH-LOWE, M.D.,
13     after having been first duly sworn under oath,
14     was questioned and testified as follows:
15             EXAMINATION
16  BY MR. BLACK:
17     Q.  Dr. Arrowsmith-Lowe, would you please state
18  your name for the record.
19     A.  Janet Arrowsmith-Lowe.
20     Q.  And I gather, at least from one experience
21  before, that you've given your deposition on prior
22  occasions?
23     A.  Yes, that's correct.
24     Q.  So you understand that this is sworn
25  testimony?

Page 7

1      A.  Yes.
2      Q.  You understand it's just like you were at
3  court?
4      A.  Yes.
5      Q.  You understand that we're videotaping the
6  deposition today and that some or all of the videotape
7  may actually be played in front of the jury. You
8  understand that?
9      A.  Yes, I do.
10     Q.  And, to make a clear record, you have to
11  speak your answer, no nods or gestures because that
12  won't show up in the transcript. You understand that?
13     A.  Yes.
14     Q.  And we should both, I hope we can avoid doing
15  this, talking over each other. If you'll allow me to
16  finish the question before you start to answer and I
17  hope that I'll let you finish your answer before I
18  start to ask another question. Is that fair enough?
19     A.  That sounds good.
20     Q.  Okay. If you don't understand a question,
21  you'll tell me. All right?
22     A.  Yes.
23     Q.  And, if you do answer a question, I'll assume
24  you understood it. Is that fair enough?
25     A.  Yes.

Page 8

1      Q.  Now, you understand that you've been
2  designated as an expert witness in the case of Irvin
3  versus Merck & Company; is that right?
4      A.  Yes.
5      Q.  And you understand that the Irvin case
6  involves the drug Vioxx; is that correct?
7      A.  Yes.
8      Q.  And Vioxx was made by Merck?
9      A.  That's correct.
10     Q.  And the generic name for Vioxx is rofecoxib;
11  is that correct?
12     A.  That's correct.
13     MR. BLACK: Do you need a spelling on that?
14     THE REPORTER: No.
15  BY MR. BLACK:
16     Q.  And you understand that you're here because
17  you've been named in a -- that, because you're here as
18  an expert witness, that I can ask you hypothetical
19  questions?
20     A.  Yes.
21     Q.  And finally the most important rule of all,
22  you'll let me know if you need a break.
23     A.  I will.
24     Q.  And I think we have the logistics of breaks
25  finally sorted out here; although, given the

Page 9

1  logistical glitches so far, let's just hope that goes
2  right.
3      (Exhibit No. 1 was marked.)
4  BY MR. BLACK:
5      Okay. I'm handing you what has been marked
6  as Exhibit 1. Is this a copy of the expert report
7  that you submitted in the Irvin case?
8      A.  Yes, it looks as though it is.
9      Q.  Okay. Look through and confirm that. Is
10  Exhibit 1 a complete and accurate statement of the
11  opinions you have reached with regard to the Irvin
12  case?
13     MR. ROTHMAN: Go ahead and take your time to
14  look through it, if you need to.
15  BY MR. BLACK:
16     Q.  Make sure it's an accurate copy.
17     Have you had a chance to review Exhibit 1?
18     A.  Yes, I have looked through it, it appears to
19  be complete.
20     Q.  And is it a complete and accurate statement
21  of the opinions you have reached with regard to the
22  Irvin case?
23     A.  Yes.
24     Q.  Now, Exhibit A to Exhibit 1, if I can find it
25  here, that other appears to be a copy of your

Page 10

1   curriculum vitae; is that correct?
2       A.   Yes, that's correct.
3       Q.   Okay.  Is it a complete and up-to-date copy
4   of your CV?
5       A.   Essentially, yes.
6       Q.   Well, you say essentially.  In what ways is
7   it not complete or accurate?
8       A.   Well, let me see.  This appears to be
9   accurate and complete.
10      Q.   Now, on the first page of Exhibit A to your
11  CV, there are two addresses given, a home address and
12  an office address.  Are both of those addresses
13  currently correct?
14      A.   Well, they're both the same, yes, they are
15  correct.
16      Q.   Is all the other contact information in
17  Exhibit A currently correct?
18      A.   Yes.
19      Q.   From looking at your CV, it appears that you
20  were at the FDA for about ten years; is that right?
21      A.   About 11 years.
22      Q.   When I say FDA, I mean Food and Drug
23  Administration for the jury.
24           You say you were there for about 11 years,
25  not ten; is that correct?

Page 11

1       A.   Yes, that's correct.
2       Q.   What years were you at the FDA then?
3       A.   I started in 1984 and I was in ED FDA from
4   '84 to 1990.  And then again starting in 1991 I was
5   back at FDA until I left the D.C. area in 1996.
6       Q.   Okay.  There's about a two-year gap there
7   then; is that right?
8       A.   There's one year, approximately one year.
9       Q.   Okay.
10      A.   When I was at the Agency for Health Care
11  Policy and Research.
12      Q.   Okay.  In looking through your CV, it
13  appeared to me that you were at the Centers for
14  Disease Control for awhile but assigned to the FDA; is
15  that correct?
16      A.   Yes, that's correct, that's correct.
17      Q.   Okay.  So, in the '84 to '96 period, when you
18  say you were working for the FDA, that includes the
19  time that you were at the CDC and assigned to the FDA?
20      A.   That's correct.
21      Q.   And there was a one-year gap.  And where
22  again were you for that one year?
23      A.   I was at the Agency For Health Care Policy
24  and Research.
25      Q.   In your time at or working for the FDA, were

Page 12

1   you ever the medical officer in charge of reviewing a
2   new drug application?
3       A.   I participated in one.  I was not the medical
4   officer in charge.
5       Q.   What was the nature of your participation?
6       A.   I did data analysis in the ddI, didanosine
7   new drug application.
8       Q.   Did you ever work on any other new drug
9   application?
10      A.   I worked on designing the pivotal trials for
11  penciclovir.  And there may have been another one
12  during the time that I was at the Division of
13  Antiviral Drug Products.  I have to think about it.
14      Q.   But at no time were you ever the medical
15  officer in charge of reviewing a new drug application;
16  is that correct?
17      A.   Not fully in charge, that's correct.
18      Q.   Okay.  Were you ever the medical officer in
19  charge of reviewing an IND, an investigative new drug
20  application?
21      A.   Yes.
22      Q.   For how many INDs were you the medical
23  officer in charge?
24      A.   Scores, 20 or 40.  I had a lot of INDs.
25      Q.   Am I correct that there are a lot more INDs

Page 13

1   that the FDA reviews than NDAs?
2       A.   That's correct.
3       Q.   And that's primarily because you have to go
4   through the IND stage before you get to the NDA stage;
5   is that right?
6       A.   That's -- that --
7           MR. ROTHMAN:  Objection to form.
8           THE WITNESS:  I'm not sure, I don't
9   understand what you're saying.
10  BY MR. BLACK:
11      Q.   Okay.  That was a bad question, I'll strike
12  the question.
13           Is it true that most times prior to a company
14  submitting an NDA they have conducted clinical
15  research pursuant to an IND; would that be right?
16      A.   In this country, absolutely, that is correct.
17  You can't get to an NDA without an IND.
18      Q.   And, after doing that clinical research, they
19  never reach the NDA stage sometimes; isn't that right?
20      A.   Well, yes, the data are that one in 5,000
21  identified compounds progresses to an NDA.  And I
22  think it's about one in 50 INDs progresses to an NDA
23  and one of three -- yeah, I think that's correct.
24      Q.   And then one of three NDAs progresses to an
25  actual marketed drug, is that what you were about to

Page 14

1  say?
2    A.  I can't remember whether that's exactly the
3  statistic or not.  But there are more INDs than NDAs.
4    Q.  And is the one in three approximately right
5  for the number of NDAs that actually result in drugs
6  going on the market?
7    MR. ROTHMAN:  Objection to the form.
8    THE WITNESS:  Again I don't remember exactly
9  the statistics.
10  BY MR. BLACK:
11    Q.  Were you ever the medical officer primarily
12  responsible for reviewing a supplemental NDA?
13    A.  Oh, gosh.  Let me think.  No.  I participated
14  in some, but I don't believe I was the medical officer
15  in charge of an sNDA.
16    Q.  Would it be fair to say that the majority of
17  your time at the FDA was spent on AIDS related issues?
18    A.  Well, let's see.  Why don't we look at my CV.
19  From '84 to '86, I really wasn't involved in HIV.  '86
20  to '88, which is four years, I was not particularly
21  involved in HIV.  From '88 to '93 which is five years,
22  I was involved in HIV.
23    And, from '93 to '96, I was not specifically
24  involved with HIV.  So no, I don't think that would be
25  accurate.  There was about five years where I was

Page 15

1  primarily involved in either -- in either HIV-related
2  activities or antiviral activities which included some
3  HIV work.
4    Q.  Did that work on -- did that HIV-related work
5  involve reviewing new drugs for approval?
6    A.  That's correct.
7    Q.  It did?
8    A.  That's correct.
9    Q.  About how many new -- and were those HIV
10  drugs in every case?
11    A.  No.
12    MR. ROTHMAN:  The HIV-related work?
13  BY MR. BLACK:
14    Q.  Yeah.  I would assume that they were.
15    A.  No.  Well, no, not in antivirals, no, that's
16  not a valid assumption.  Most of my -- or I had a
17  number of HIV-related drugs.  I also had a -- I think
18  a larger number of drugs related to the treatment of
19  herpes, primarily varicella-zoster, but herpes
20  simplex, human papilloma virus.  Those are the ones
21  that come to mind.
22    Q.  Okay.  On page 4 of your CV, I'm just
23  curious, here you list Hoofbeats Therapeutic Riding
24  Program.  Can you tell us in one or two sentences what
25  that is?

Page 16

1    A.  Yes.  That's actually a program that uses
2  horses to help children, high-risk youth, handicapped
3  kids.  We have kids from -- have had kids from the
4  school -- New Mexico School of the Visually
5  Handicapped.  We have the special education program
6  from the Mescalero Apache school system.
7    We have a high-risk youth school in the
8  Ruidoso Municipal School Systems.  And then we have
9  some private clients who we use horses to help them
10  develop coordination, muscle control, and good self
11  confidence.  It's a very successful program.
12    Q.  Now, Exhibit B to your report is a list of
13  cases in which you have testified over the last four
14  years at deposition or at trial; is that correct?
15    A.  Yes.
16    Q.  Could you designate which items on the list
17  were trial testimony, just looking down, starting with
18  Rankin.
19    A.  I believe the Segarra.
20    Q.  Okay.  To be clear that's the second item on
21  the list, correct?
22    A.  I believe that's -- no, that's not the one
23  I'm thinking of.  The Haltom trial was, Garcia down
24  near the bottom.
25    Q.  Okay.

Page 17

1    A.  Carroll Brown.  Morgado, Concepcion Morgado,
2  the top of page 2, Lefler below that.  Hayes.
3    Q.  Okay.
4    A.  Eichmiller.
5    Q.  Okay.
6    A.  Coffey.
7    Q.  Okay.
8    A.  Nustad, the one at the bottom, Vickie Carol
9  Campbell -- Reese, et al.
10    Q.  Okay.
11    A.  Gaylene Davis.
12    Q.  Okay.
13    A.  I believe Hargrove.  That's it.
14    Q.  Okay.  Now, one point of clarification.  I
15  noticed that you mentioned Haltom and there are two
16  Haltom listings there.  Would that mean that there's a
17  separate listing for the deposition you gave in Haltom
18  and for the trial?
19    A.  That's correct.
20    Q.  So the first I take it was the deposition and
21  the second the trial?
22    A.  Yes.  Yes, that's correct.
23    Q.  Does that mean in every case where you
24  testified -- where you testified both at trial or at
25  deposition in a case that you've listed it twice here?

Page 18

1    A.  Right, if I provided testimony at trial, yes.
2    Q.  Are there other cases not listed in Exhibit B
3  to your report where you've testified at trial?
4    A.  At trial?  No.
5    MR. ROTHMAN:  In the last four years?
6    MR. BLACK:  No.
7    MR. ROTHMAN:  Okay.
8    MR. BLACK:  Ever.  I mean she's testified
9  this is a complete list.
10    MR. ROTHMAN:  I'm just making sure she
11  understands the question.
12  BY MR. BLACK:
13    Q.  Well, it's objection form or objection
14  privilege please, counsel.  No coaching the witness.
15    A.  What I was asked to provide was the testimony
16  I had provided in the last four years.  So that's
17  what's on here.
18    Q.  Let me explain, Doctor.  The rules require
19  that you give that with which you prepared and
20  complied.  The rules also allow me to ask if there's
21  any other testimony you've ever given, which is what
22  I'm doing now.
23    A.  Yes, there is other testimony.
24    Q.  Okay.  In how many other cases have you
25  testified at trial other than the ones listed in

Page 19

1  Exhibit B?
2    A.  Maybe four or five, I'm not really sure.
3    Q.  Do you remember the names of any of the
4  cases, any of those four or five --
5    A.  One was Trina Washington.  It was diet drug
6  litigation in Mississippi.  There was a trial in
7  Oregon, I think it was Batson, it was diet drug
8  litigation.  Those are the only ones that I remember.
9    Q.  But you think there were four or five total?
10    A.  I don't know.  Those are the only ones I
11  remember.
12    Q.  Are there other cases not listed on Exhibit B
13  where you have testified at deposition but not at
14  trial?
15    A.  Oh, there may be.  I really don't remember.
16    Q.  Are there cases in which you've been retained
17  as a consultant in connection with litigation but in
18  which you have provided no testimony at all, either at
19  trial or at deposition?  And I'm not confining myself
20  to the four-year period, this is ever.
21    A.  You're asking me are there?  Can you rephrase
22  your question.  I'm sorry.  I didn't hear the question
23  part.
24    Q.  Have there been or are there currently cases
25  in which you've been retained as a consultant in

Page 20

1  connection with litigation but in which you have not
2  provided testimony?
3    A.  Yes, there are.
4    Q.  About how many cases have there been that
5  fall into that category?
6    A.  How many individual cases?  Are you talking
7  about individual like the named people?  I'm not sure
8  I understand what you're asking me in this case.
9    Q.  Are you making a distinction then between,
10  for example, being retained as a consultant in
11  connection with Vioxx and being retained as a
12  consultant in connection with an individual case, is
13  that what you're question is, what your
14  misunderstanding --
15    A.  That's what I'm trying to understand.  Which
16  are you asking me?
17    Q.  All right.  Let me put the question
18  differently then.
19       Are there any pharmaceutical products for
20  which you've been retained as a consultant in
21  litigation and then not given testimony?
22    A.  Yes, there are.
23    Q.  What products would those be?
24    A.  I've got confidentiality -- well, actually
25  there is one that I've given a report in.  And that's

Page 21

1  Lotrinex, a GlaxoSmithKline product.
2    Q.  And about how many times have you been
3  retained in such a capacity as a consultant in
4  connection with a pharmaceutical product without
5  giving testimony?
6    A.  Oh, I don't know, five or six, maybe more.
7    Q.  When was the first time that you were
8  retained in any capacity in connection with
9  litigation?
10    A.  It was in the late spring, early summer of
11  1999.
12    Q.  Now, Exhibit C to your report is a list of
13  materials that you considered in connection with
14  preparing your report; is that correct?
15    A.  That's correct.
16    Q.  And is that a complete list?
17    A.  In terms of materials that I rely on, I
18  believe this is a complete list.  I mean I also rely
19  on my experience and training and so forth.  But, in
20  terms of written materials, yes, I believe this is the
21  complete list.
22    Q.  Okay.  By my count, Doctor, there are well
23  over a half a million pages including the documents
24  you have listed in Exhibit C; would that be a fair
25  statement?

Page 22

1    A.  It might be.  I haven't counted up the pages.
2    Q.  You would have no reason to particularly
3  disagree with me on that count, would you?
4    A.  No, no reason to disagree.
5    Q.  And, given that it's in excess of a half a
6  million pages, I assume that you did not read all half
7  million pages, did you?
8    A.  No, I didn't read in great detail.  I have
9  selected the ones that I found of greatest interest
10  and read those.
11    Q.  You never even looked at all at many of those
12  half million pages, did you, Doctor?
13    A.  I think I leafed through most of them.  There
14  were chunks of data tables that I did not go through
15  in any detail, that's correct.
16    Q.  Okay.  Would you take your report and leaf
17  through the first 20 pages of your report.
18    A.  You're asking me to do what I --
19    Q.  Yeah.
20    A.  Okay.
21    Q.  Just leaf through the way you did the
22  documents.
23    MR. PIORKOWSKI:  Her report is 12 pages.
24    MR. ROTHMAN:  Excuse me?
25    MR. BLACK:  That's right.  I just want the 12

Page 23

1  pages.
2    MR. ROTHMAN:  You said 20.
3    MR. BLACK:  All right.  The 12 pages of her
4  report.  That's fine.
5    MR. ROTHMAN:  You want her to read the 12
6  pages of her report --
7    MR. BLACK:  No.  Leaf through as she did the
8  documents, the half million documents.
9    MR. ROTHMAN:  I object.
10    THE WITNESS:  That's -- that won't -- that
11  won't work with this.
12  BY MR. BLACK:
13    Q.  Well, we've already consumed a half a minute.
14  We haven't gotten through 12 pages.  My point is,
15  Doctor, you didn't look at every one of those half
16  million pages, did you?
17    MR. ROTHMAN:  Objection to the form,
18  argumentative, asked and answered.
19  BY MR. BLACK:
20    Q.  You can object to form, Counsel.
21    A.  As I told you, there were big chunks of data
22  tables that I did not look at, that's correct.  I knew
23  what parts of the NDA I wanted.  I pulled those.  I
24  pulled the references related to those that I wanted
25  to look at.

Page 24

1    But all of the -- all of the -- all of the
2  information that I looked at was based on the entire
3  NDA.  But I knew -- I knew what I wanted to see.  And
4  I did not spend time looking through the data tables,
5  you're correct.
6    Q.  So there are portions of the NDA that you
7  knew that you didn't have to review just because of
8  your experience with NDAs; is that correct?
9    A.  I knew I wasn't going to make anything out of
10  data tables, that's correct.
11    Q.  Okay.  Did you ever actually have all the
12  documents on this list in your possession?
13    A.  No, I had access to them up at Hughes Hubbard
14  in New York.
15    Q.  And, if there were sections of the FDA that
16  you just went right past, you still included that in
17  this list; is that correct?
18    MR. ROTHMAN:  NDA.
19    THE WITNESS:  Of the FDA?
20  BY MR. BLACK:
21    Q.  If there were -- of the NDA, correct.
22    A.  Yes, I guess they are included in this list.
23    Q.  Where did you obtain the documents in the
24  list?
25    A.  The NDA I went through at Hughes Hubbard in

Page 25

1  New York.  Some of the other documents I pulled off
2  the Internet, some of them were provided just me by --
3  by counsel, some of them were in journals that I
4  receive.
5    Q.  Did you receive any of the documents on
6  disks?
7    A.  I think -- none of these, no, I don't think.
8    Q.  Did you receive any documents in connection
9  with Vioxx on disks?
10    A.  I'm trying to remember if I did or not.  I
11  may have.  I'm sorry.  I don't remember whether I did
12  or not.
13    Q.  How were the documents on the list selected?
14    A.  Well, for the NDA-related documents, the ones
15  that came out of the NDA, I selected those.  I knew
16  what parts of the NDA I wanted.  And so I selected
17  those.
18    Some documents would be documents that I -- I
19  knew about and would request, things like advisory
20  committee notes or transcripts.  I asked for -- as I
21  recall I wanted all the approval letters.  And there
22  were some of these documents I may have gotten for
23  myself or may have requested them, I don't really
24  recall.
25    Q.  Now, I think you just testified -- let me

Page 26

1 take a look at your answer here. Let's see. You
2 testified that, for the NDA-related documents, I knew
3 what parts of the NDA I wanted. So you selected
4 certain portions of the NDA that you knew that you
5 wanted to look at; is that correct?
6     A.  That's where I always start, yes, that's
7 correct.
8     Q.  But Exhibit C lists the entire NDA; is that
9 correct?
10     A.  That may list the entire NDA. As I said I
11 had access to the entire NDA.
12     Q.  Who prepared Exhibit C?
13     A.  I believe that Hughes Hubbard prepared the --
14 all of the page numbers. And I think we went over
15 these -- the public documents. But they -- they
16 physically prepared this, I didn't -- I didn't type
17 this.
18     Q.  Did you verify its accuracy?
19     A.  To the extent that I could, I certainly
20 verified the accuracy of the public documents. And I
21 assumed that these were all accurate.
22     Q.  And --
23         MR. ROTHMAN: Bert, maybe I can help you out
24 a little bit here. As you did with Dr. Kapit, a lot
25 of materials Dr. Arrowsmith-Lowe reviewed she reviewed

Page 27

1 in our offices. And so we had a lawyer try to capture
2 all of those in Exhibit C.
3         MR. BLACK: Okay. That's fair enough. Thank
4 you.
5 BY MR. BLACK:
6     Q.  Now, when you reviewed this for accuracy, you
7 didn't say, well, you've listed the whole NDA, but I
8 only reviewed portions of it. You didn't correct it
9 for that problem, did you?
10     A.  I didn't go back --
11         MR. ROTHMAN: Objection to the form.
12         THE WITNESS: I'm sorry. I didn't go back
13 and match up the numbers, that's correct.
14 BY MR. BLACK:
15     Q.  When did you first become involved in the
16 Vioxx litigation?
17     A.  I think it was about a year and a half ago.
18     Q.  Who first contacted you with regard to
19 working on Vioxx?
20     A.  Well, a lawyer named Richard Josephson first
21 contacted me. It was almost three years ago I think,
22 two years, three years, it must have been three years
23 ago.
24     Q.  Okay. So you initially answered a year and a
25 half and now on further reflection it's three years?

Page 28

1     A.  No.
2         MR. ROTHMAN: No.
3         THE WITNESS: No, that's not correct. I
4 think you asked me when I was contacted. First you
5 asked me when I worked on Vioxx and then you asked me
6 when I was contacted.
7 BY MR. BLACK:
8     Q.  I understand the difference. When
9 Mr. Josephson contacted you three years ago, what were
10 you told about the case?
11     A.  I really wasn't told much of anything. I
12 told him -- he asked me if I would be interested in
13 reviewing some documents or working on some
14 pharmaceutical-related problem. I don't remember any
15 of the details. And I told him that it wasn't
16 possible, I was busier than I wanted to be and to call
17 me back in a year. And he did call me back a year
18 later to the day I think.
19     Q.  So, after that initial contact, you didn't
20 review any documents immediately?
21     A.  Oh, no, huh-uh. It was about a year and a
22 half later I think that I really reviewed any
23 documents.
24     Q.  When he called you back, what were you told
25 about the case?

Page 29

1     A.  I don't remember, other than I think he told
2 me that it involved Vioxx and would I consider doing
3 some consulting work with lawyers for Merck. And I
4 think I tentatively -- I think I agreed at that point,
5 yeah, I would take a look at some documents.
6     Q.  Okay. Just to be clear, what year did that
7 occur, this second call?
8     A.  I think it was 2003, early in 2003.
9     Q.  And at that point did you agree to do this
10 consulting work that you've just described?
11     A.  Well, I agreed to look at some documents. I
12 mean I didn't agree to do anything one way or the
13 other. I wanted to see what the issues and the facts
14 were.
15     Q.  And what documents did you agree in 2003
16 then?
17     A.  That's when I agreed to go look at the new
18 drug application. And I'm sure I had -- I was aware
19 of Vioxx and Celebrex in terms of risks and benefits.
20 And so this was an opportunity to get more information
21 about, you know, what was going on with Vioxx and what
22 the concerns were.
23     Q.  What concerns did Mr. Josephson express to
24 you in 2003?
25         MR. ROTHMAN: Objection to the form.

Page 30

1    THE WITNESS: I'm not sure that Mr. Josephson
2 was the one who expressed concerns. But I believe
3 the -- I was meeting with Mr. Rothman. And I think at
4 that time there was discussion about whether there
5 would be litigation related to cardiovascular events
6 and their association with the use of Vioxx.
7 BY MR. BLACK:
8    Q. Okay. Your answer indicates I must have
9 asked a bad question earlier. Your initial contact
10 was with Mr. Josephson and then there was a subsequent
11 contact in 2003. And it was Mr. Josephson who called
12 you back in 2003?
13    A. That's correct.
14    Q. Okay. And then you talked to people in
15 addition to Mr. Josephson in 2003; is that correct?
16    A. Right. And Mr. Josephson actually may have
17 been at that initial meeting in New York. That I
18 don't recall. I don't remember the mechanics.
19    But Mr. Josephson called me about I guess
20 litigation he anticipated in Texas. And then -- but
21 the NDA and the confidential documents were at Hughes
22 Hubbard in New York. So, if I wanted to review them,
23 I needed to go up to Hughes Hubbard and spend a couple
24 of days up there.
25    Q. So you talked to Mr. Josephson and then you

Page 31

1 go to Hughes Hubbard, and who did you meet with at
2 Hughes Hubbard?
3    A. As I said I believe Mr. Rothman was the
4 person primarily I met with.
5    Q. Anybody else?
6    A. I don't recall. There may have been an
7 associate. It was -- it wasn't -- it was primarily a
8 time for me to review documents. I mean that was
9 essentially what happened, is I reviewed documents.
10    Q. And about when in 2003 was this?
11    A. I think it was maybe June, May, June,
12 sometime in that --
13    Q. And how long did you spend reviewing
14 documents at Hughes Hubbard in June of 2003?
15    A. I was there for a couple of days.
16    Q. And did you take any documents back home with
17 you from Hughes Hubbard?
18    A. I had some shipped home.
19    Q. Did you then continue your review at home
20 after you returned from Hughes Hubbard?
21    A. Yes.
22    Q. And about how much time did you spend
23 reviewing that initial batch of documents?
24    A. I really don't remember.
25    Q. What was the next contact you had with anyone

Page 32

1 regarding Vioxx after the meeting with Hughes Hubbard
2 in June of 2003?
3    A. Oh, I don't know. I think -- I think my time
4 frames are correct. I may have had calls or meetings
5 with Mr. Josephson or Mr. Rothman. I know we met some
6 in the fall of 2004.
7    Q. Would the fall of 2004 have been your next
8 meeting with --
9    A. That's what I'm saying, I really don't
10 remember.
11    Q. There were telephone calls in between the
12 fall of 2004 and June of 2003; would that be correct?
13    A. That's my recollection. And there may have
14 been meetings. I just don't right now really recall.
15    Q. About how much time did you spend related to
16 Vioxx between June of 2003 and the fall of 2004?
17    A. I don't -- I can't answer that. I have no
18 idea. I would have to look at my invoices.
19    Q. Did you bring those with you today?
20    A. I didn't bring them with me.
21    MR. BLACK: Are they available here today?
22    MR. ROTHMAN: I don't have them.
23    MR. BLACK: Well, the deposition notice
24 specified that they were supposed to be here.
25    MR. ROTHMAN: I don't have them here.

Page 33

1    MR. PIORKOWSKI: I have to check -- we'll
2 check on a break.
3    MR. BLACK: Okay. We'll deal with that
4 momentarily.
5 BY MR. BLACK:
6    Q. Prior to being contacted about Vioxx, had you
7 ever done any work related to anti-inflammatory
8 medications?
9    A. Well, when I was first at FDA, I -- my review
10 group in Postmarket Safety Office had to do with
11 analgesics and NSAIDs in particular. So yes.
12    Q. Any work other than the work you did
13 reviewing postmarketing reports on NSAIDs?
14    A. What do you mean by that? I mean what --
15    Q. Okay. You responded to my question that you
16 had done work in postmarketing safety that had to do
17 with analgesics. And NSAIDs would be included in
18 analgesics, correct?
19    A. Yes. And did I work on NSAIDs, yes, that's
20 correct.
21    Q. Okay. Now, have you ever done any work
22 relating to NSAIDs other than the work you did in
23 postmarketing safety at the FDA?
24    A. In post -- oh.
25    Q. And, to make my question clearer, prior to

Page 34

1 your engagement in connection with Vioxx.
2    A.  Well, NSAIDs have -- I mean they are
3 certainly a very commonly prescribed drug.  I read a
4 lot about them, I'm very interested in NSAIDs.  But
5 I'm not sure -- I mean I had responsibility for
6 monitoring postmarket reports and for doing a couple
7 of little studies on NSAIDs.  I don't recall that I've
8 done any other formal work other than what's required
9 of me as a practicing physician.
10    Q.  Would it be fair to say that you don't
11 consider yourself an expert on anti-inflammatory
12 drugs?
13       MR. ROTHMAN:  Objection to the form.
14       THE WITNESS:  No, I don't think I -- that
15 would be fair to say that.
16 BY MR. BLACK:
17    Q.  Fair to say you do not consider yourself an
18 expert in cardiology?
19       MR. ROTHMAN:  Object to the form.
20       THE WITNESS:  I'm an internist.  I have
21 certain expertise, yes, in cardiology.
22 BY MR. BLACK:
23    Q.  The expertise that an internist would have;
24 is that correct?
25    A.  That's correct.

Page 35

1    Q.  And I assume that you have the expertise that
2 an internist would have in gastroenterology?
3    A.  That's correct.
4    Q.  And that you have the expertise that an
5 internist would have in rheumatology; is that correct?
6    A.  That's correct.
7    Q.  Now, during this June 2003 to fall 2004
8 period, was one of the things that you reviewed an
9 article published in the New England Journal of
10 Medicine on a study called VIGOR, V-I-G-O-R?
11    A.  Well, I had seen it, yes.  I did review it
12 again then.  Yeah, I saw it when it came out and then
13 I reviewed it again during that time period as I
14 recall.
15    Q.  And I think you've anticipated my next
16 question, but let me clarify for sure.  And the VIGOR,
17 the article on VIGOR that appeared in the New England
18 Journal of Medicine, was that an article he coauthored
19 by someone named Bombardier and other authors?
20    A.  That may be who it is, I don't remember the
21 author, the first author.
22    Q.  But you saw that article in the New England
23 Journal of Medicine then in the course of your medical
24 practice; is that correct?
25    A.  Yes, it was in -- sometime in 2000, the fall

Page 36

1 of 2000 I believe, yes.
2    Q.  Have you prepared -- other than Exhibit 1,
3 your expert report in the Irvin case, have you
4 prepared any other reports relating to Vioxx?
5    A.  I don't believe so.  I don't recall.  I don't
6 think so.
7       MR. ROTHMAN:  Actually you've had reports in
8 other cases.
9       THE WITNESS:  Oh, okay.  There were -- he
10 tells me I have reports in other cases.  I don't -- I
11 don't remember that.
12 BY MR. BLACK:
13    Q.  I gather then that you don't know how many
14 other cases reports have been -- you've submitted
15 reports -- reports related to Vioxx?
16    A.  I don't remember.  I may have some on -- I
17 just don't remember.  And I don't -- I doubt that I
18 know -- I don't know.  I know I've been designated in
19 other cases.  But I don't remember what the report --
20 whether there was a report or not.
21    Q.  You don't recall signing reports in other
22 cases then?
23    A.  Specifically for Vioxx, I'm sorry, I don't
24 recall one way or the other.
25       MR. BLACK:  Okay.  Again the deposition

Page 37

1 notice said that she was supposed to bring all
2 documents relating to Vioxx litigation, not just this
3 case.  So we should have available to us all the
4 reports that she's prepared in connection with Vioxx.
5       And I'm going to go through the deposition
6 notice as to what -- we'll do this in a more organized
7 fashion.  But this is the second instance where
8 there's been a failure to comply with the deposition
9 notice, Counsel.
10       MR. PIORKOWSKI:  Well, first of all it's not
11 a failure to comply, Bert.  Second, there's been an
12 understanding in this litigation that drafts are not
13 being produced.  And, to the extent that her reports
14 in prior cases are essentially drafts of this, then
15 there's no obligation to produce them.  So that's my
16 understanding.  We can take it up on the break.  As is
17 usually the case, this is going to go both ways.  So,
18 you know.
19       MR. BLACK:  If there is a representation that
20 every other report she's prepared was a draft, I'll
21 want to consider whether our agreement goes to drafts
22 in this case or drafts in other cases.  And I want to
23 consult with co-counsel on that.  But is that what the
24 factual --
25       MR. PIORKOWSKI:  Okay.  That's what I'm

Page 38

1  saying. I don't know because I was not the --
2  obviously the author of the report. So, you know,
3  Mr. Rothman and I will discuss it with the witness on
4  a break. And we'll come back and make a
5  representation accordingly.
6        As to the invoices, we acknowledge that
7  you're probably entitled to those. And we're going to
8  see if we can get those produced. She didn't have a
9  copy of them.
10       MR. BLACK: Okay.
11       MR. PIORKOWSKI: Okay.
12       MR. BLACK: All right. I think we can
13 resolve those, those issues.
14 BY MR. BLACK:
15    Q.  Okay. In the fall of 2004, were you
16 contacted again about Vioxx?
17    A.  Well, I had a meeting in the fall of 2004.
18    Q.  Okay.
19    A.  And I know I had been contacted before that.
20 You know, I just don't remember whether there were
21 meetings specifically. I'm sorry. I just don't
22 remember. I do know there was a meeting in the fall
23 of 2004.
24    Q.  When in the fall of 2004, do you remember the
25 month?

Page 39

1    A.  It was early October.
2    Q.  Where did that meeting take place?
3    A.  At Hughes Hubbard & Reed in New York.
4    Q.  Who attended the meeting?
5    A.  I know Mr. Rothman was there. I don't know,
6  Mr. Josephson may have been at that one.
7    Q.  Anyone else?
8    A.  Not that I recall.
9    Q.  How long did that meeting last?
10   A.  A day I guess.
11   Q.  Did it spill over into another day or was it
12 just a single day?
13   A.  I don't remember.
14   Q.  What was discussed at that meeting?
15   A.  Well, that was shortly after the drug had
16 been withdrawn from the market. So the approved study
17 was the subject of some of the discussion. And then
18 it was just I guess general discussion about the
19 litigation and issues --
20   Q.  What were you told about the litigation?
21   A.  Well, I knew that there was pending
22 litigation related to Vioxx. And I guess we discussed
23 some of the -- some of the issues that were
24 anticipated to come up in that litigation and my
25 opinions about some of those issues. And, you know,

Page 40

1  to a great extent, we reviewed what was available from
2  the approved study.
3    Q.  What were the issues that were discussed?
4    A.  I'm sorry, I really -- I don't remember other
5  than in general it would have been regulatory issues
6  related to particularly labeling, approvals, what was
7  known about the drug or what was published about Vioxx
8  in particular, COX-2's in general, and then
9  nonselective NSAIDs as well.
10   Q.  Was the primary focus of your consultation --
11 strike that.
12       Did the primary -- did your consultation at
13 this point focus primarily on regulatory issues such
14 as you've just described?
15   A.  That's my recollection. That and what was in
16 the literature, and data that were in the literature
17 and otherwise available I guess.
18   Q.  Okay. What happened after the early October
19 2004 meeting?
20   A.  Oh, I don't remember. I mean what do you --
21   Q.  What was the next event in terms of your work
22 on Vioxx after the October 2004 meeting?
23   A.  It probably -- I mean I don't know whether I
24 started drafting a report or -- I really don't
25 specifically remember. I'm sorry.

Page 41

1        I know there was a deposition in early summer
2  of this year. And so I'm sure, in anticipation of
3  depositions, I was reviewing documents and probably
4  having phone conversations and maybe meetings, I don't
5  remember specifically.
6    Q.  Had most of your review of the NDA, had that
7  already taken place by the fall of 2004?
8    A.  I think a great deal of it had. I mean I
9  continued -- as I -- as I would read something and it
10 would trigger a question, I would go back to the NDA,
11 to the integrated summary of safety or efficacy or
12 risk-benefit. I would go to the periodic safety
13 update reports and things of that nature.
14       So it never -- it hasn't actually ended. I
15 mean I continue to go back to the NDA if I have -- if
16 I'm not sure of a recollection or there's some --
17 something I want to clarify for myself.
18   Q.  Based on your prior answers, I gather that
19 you've been involved with perhaps -- with litigation
20 involving perhaps 20 different pharmaceutical products
21 since 1999; would that be a fair estimate?
22   A.  No, I think that's a gross overestimate.
23   Q.  Well, give me a more accurate estimate then.
24   A.  Well, I've been in involved in Rezulin,
25 Pondimin and Redux, Lotronex, Baycol, Vioxx, and PPA.

11 (Pages 38 to 41)

Page 42

1    Q.  Okay.  That's six as I count.  Does that
2  sound about right?
3    A.  Uh-huh, yes, that sounds about right.
4    Q.  And, based on your testimony in your CV, I
5  gather that you've given all of this testimony while
6  president of Arrowsmith-Lowe Consulting, Incorporated;
7  is that right?
8    A.  No, that's not correct.
9    Q.  Okay.  When was Arrowsmith-Lowe Consulting
10  formed?
11    A.  I believe it was incorporated in the fall of
12  1999.
13    Q.  And I understand that the first time that you
14  became involved as an expert on pharmaceutical matters
15  was in 1999; is that correct?
16    A.  That's correct.
17    Q.  Okay.  So there was -- well, let me ask the
18  question this way, after the formation of
19  Arrowsmith-Lowe Consulting in 1999, have you ever
20  given any testimony not as an employee of
21  Arrowsmith-Lowe Consulting?
22    A.  Actually, yes, I have.
23    Q.  Okay.  So maybe a better way to ask this is I
24  assume that you're going to send out a bill or a
25  statement for the time you spend here today; is that

Page 43

1  correct?
2    A.  Yes, that's correct.
3    Q.  And that bill will come from Arrowsmith-Lowe
4  Consulting; is that correct?
5    A.  That's correct.
6    Q.  Okay.  And so Arrowsmith-Lowe Consulting will
7  be paid for the time that you're spending here today;
8  is that correct?
9    A.  That's correct.
10    Q.  Okay.  After the formation of Arrowsmith-Lowe
11  Consulting, have you ever given any testimony for
12  which the bill did not come from Arrowsmith-Lowe
13  Consulting?
14    A.  No, I don't believe that's correct.  No, I
15  don't believe so, I don't believe so.  I think that is
16  correct, I don't believe I've ever sent out a bill for
17  testimony that didn't come from Arrowsmith-Lowe
18  Consulting, Incorporated.
19    Q.  Okay.  And, prior to the formation of
20  Arrowsmith-Lowe Consulting in 1999, had you ever given
21  testimony -- strike that.
22        Had you ever worked as a consultant in
23  connection with pharmaceutical litigation matters?
24    A.  Prior to?
25    Q.  Prior to the formation of Arrowsmith-Lowe

Page 44

1  Consulting in 1999, had you ever done any work in
2  connection with pharmaceutical litigation matters?
3    A.  Yes.
4    Q.  Okay.  Could you describe for us the work
5  that was done on pharmaceutical litigation matters
6  prior to the formation of Arrowsmith-Lowe Consulting?
7    A.  Well, that -- when I was initially contacted
8  by lawyers for American Home Products, that was in
9  April of 1999.  And my husband had a corporation
10  that -- I'm not sure -- I really don't know the formal
11  status of the corporation he was working as, under.
12  But we billed through that until we had
13  Arrowsmith-Lowe Consulting, Incorporated, incorporated
14  in the fall of 1999.
15    Q.  Okay.  So there was some other entity before
16  the formation of Arrowsmith-Lowe Consulting; is that
17  correct?
18    A.  Incorporated, that's right, before we
19  incorporated.
20    Q.  And then, after the incorporation of
21  Arrowsmith-Lowe Consulting, all of your work has been
22  done through Arrowsmith-Lowe Consulting; is that
23  correct?
24    A.  That's correct.
25    Q.  The work done prior to the formation of

Page 45

1  Arrowsmith-Lowe Consulting, I believe you said that
2  was for American Home Products; is that right?
3    A.  That's correct.
4    Q.  Was there any other company for which you
5  worked prior to the formation of Arrowsmith-Lowe
6  Consulting?
7    A.  No.
8    Q.  About how much -- what was the value of
9  billings to American Home Products prior to the
10  formation of Arrowsmith-Lowe Consulting?
11    A.  Oh, I don't know, 30 -- 25, $30,000,
12  something like that.  And I'm just guessing, I don't
13  have the numbers in front of me.
14    Q.  That's fair enough.  But would it be fair to
15  say that it was certainly less than $100,000?
16    A.  Oh, yes, yes.
17    Q.  Now, who owns Arrowsmith-Lowe Consulting?
18    A.  My husband and I do.
19    Q.  So all the profits from Arrowsmith-Lowe
20  Consulting are either retained by the company or go to
21  you and your husband; is that correct?
22    A.  That's correct.
23    Q.  How many employees does Arrowsmith-Lowe
24  Consulting have?
25    A.  It's -- full-time employees it's the two of

Page 46

1  us. · We do contract out.  But it's just the two of us
2  full time.
3      Q.  What was the total Arrowsmith-Lowe Consulting
4  income in 1999?
5      A.  In 1999?
6      Q.  Uh-huh.
7      A.  It was probably maybe $70,000, something like
8  that.
9      Q.  Okay.  2000?
10     A.  It was probably around 500,000 in 2000.
11     Q.  2001?
12     A.  Probably about the same.
13     Q.  And 2002?
14     A.  About the same.
15     Q.  2003?
16     A.  About the same.
17     Q.  Okay.  2004?
18     A.  I think it was less in 2004.
19     Q.  400,000?
20     A.  I think it was around 400,000.
21     Q.  And to date this year what has been the
22  income of Arrowsmith-Lowe Consulting?
23     A.  I really -- I don't know for sure.  I know we
24  got a notice that we were $21,000 in the red.
25     Q.  What does 21,000 in the red mean?

Page 47

1      A.  That we -- that's our loss for the year.
2      Q.  Okay.  What kind of expenses do you all incur
3  that would lead to losses like that?
4      A.  Mostly it has to do with travel and whether
5  travel has been reimbursed or not.  I don't expect it
6  to remain 21,000, having a loss -- net loss of 21,000.
7      Q.  And, in fact, that 21,000 in travel, you
8  expect it will ultimately be reimbursed; isn't that
9  correct?
10     A.  I'm assuming that it will, yes.
11     Q.  So that's just a temporary bookkeeping
12  glitch; is that fair enough?
13     A.  Well, it's a --
14     Q.  I hope it is for your sake.
15     A.  Yeah, I think it's -- it's something we
16  certainly are trying to address.
17     Q.  What percentage of the Arrowsmith-Lowe
18  Consulting income has come from litigation-related
19  work?
20     A.  Probably 80 or 90 percent all together.
21     Q.  What else does Arrowsmith-Lowe Consulting do
22  other than litigation-related work?
23     A.  Well, we consult with companies who are
24  trying to get a product on the market, whether it's a
25  device or a biological drug, pharmaceutical, or

Page 48

1  combination products.  We've done GMP audits for
2  companies.  We've done health hazard evaluations for
3  companies with a problem reported with their product.
4      My husband -- well, we've done research on a
5  510-K -- actually a PMA application that has a -- that
6  had a precursor device on the market.  And we did an
7  analysis of the medical device reporting system,
8  looking for the areas, potential problem areas for the
9  device.
10     Q.  Okay.  Just for the jury, what does PMA mean?
11     A.  It's a premarket approval.  It's for the --
12  certain types of devices, the more complex devices,
13  medical devices like defibrillators or pacemakers.
14  Things like that have a high potential to impact
15  the patient have to go through what's called a
16  premarket assessment.
17     And like an NDA, a new drug application, a
18  PMA is assembled and sent to the Office of Device
19  Evaluation for them to determine whether the device
20  should be on the market or not.  And in this case
21  there was a device advisory committee.  And the work
22  we did was in part for the PMA and in part for
23  presentation to the advisory committee.
24     Q.  Okay.  You've indicated that some of the work
25  you did was related to health hazard evaluation; is

Page 49

1  that right?
2      A.  Yes.
3      Q.  Did any of the products for which you did
4  health hazard evaluations ever become involved in
5  litigation?
6      A.  One may have.  I don't know.  I wasn't -- I
7  wasn't involved beyond that.  I know that one of them
8  there was a lot more study done on.  CDC actually went
9  in and did a study on that -- it was a device.  And
10  the other two --
11     Q.  Okay.  Doctor, I don't mean to interrupt.
12  But I would like the answers to kind of stick to what
13  I've asked.  And the question simply was had any of
14  these health hazard evaluations, any products ever
15  gotten involved in litigation.  I think the answer was
16  yes, maybe one?
17     A.  Maybe one, yes, that's correct.
18     Q.  I don't need any further explanation.
19     A.  Okay.
20     Q.  At the meeting with Hughes Hubbard & Reed in
21  October of --
22     MR. ROTHMAN:  Before you get on to another
23  topic, is this a fair time to take a break?
24     MR. BLACK:  It will be in just a minute.
25     MR. ROTHMAN:  Okay.

13 (Pages 46 to 49)

Page 50

BY MR. BLACK:

1    Q.   At the meeting you described at Hughes
2  Hubbard & Reed in October 2004, what opinions did you
3  express at that time to the lawyers with whom you were
4  meeting?
5    A.   Well, I guess one of the opinions I expressed
6  was that I didn't think it was a good idea to take the
7  drug off the market.  That was one of my opinions.
8        The other was that, based on the data that
9  was available, it was very preliminary data from the
10  approved study, it did not look to me as though
11  aspirin had much effect on the cardiovascular events
12  that had been reported in that -- I guess they were
13  adjudicated by that time.  But had been reported and
14  approved.
15        I can't recall whether there was some
16  inconsistencies in the -- in the MI angina sudden
17  death set.
18    Q.   And by MI you mean myocardial infarction?
19    A.   Yes, that's correct, as compared with the
20  data from the cerebrovascular accidents.  But those
21  were just sort of off-the-cuff opinions.  But I -- it
22  was my opinion that the data didn't necessarily
23  warrant withdrawal of the drug.
24    Q.   Has all of the testimony that you have

Page 51

1  provided been on behalf of pharmaceutical companies?
2    A.   No.
3    Q.   In what instances have you provided testimony
4  not on behalf of a pharmaceutical company?
5    A.   Well, I provided a deposition on behalf of a
6  plaintiff in a medical device-related litigation.
7    Q.   Okay.  Is that the only instance in which you
8  have testified on behalf of a plaintiff?
9    A.   In terms of testimony, yes, that's correct.
10    Q.   And the testimony you have given on behalf of
11  pharmaceutical companies, were the companies
12  defendants in every case in which you have testified?
13    A.   No.  In one case the company was a plaintiff.
14    Q.   What was the issue in that litigation?
15    A.   It had to do with insurance reimbursement
16  from the loss of a bulk shipment of a drug in a plane
17  crash.
18    Q.   Does anyone from Arrowsmith-Lowe Consulting
19  testify other than you?
20    A.   Yes.
21    Q.   What percentage of the testimony provided by
22  Arrowsmith-Lowe Consulting employees is your
23  testimony?
24    A.   Probably at this time about 80 percent, 90
25  percent.

Page 52

1        MR. BLACK:  Okay.  This is a good time to
2  take a break.
3        THE VIDEOGRAPHER:  We are off the record.
4  The time now is 10:52 a.m. Mountain time.
5        (Recess.)
6        THE VIDEOGRAPHER:  We are back on the record.
7  The time now is 11:12 a.m. Mountain time.
8  BY MR. BLACK:
9    Q.   Doctor, about how many hours have you spent
10  working on Vioxx-related issues since your first
11  contact in 2003?
12    A.   I don't know.  A couple, 300, I don't really
13  know.  That will be on the invoices.
14    Q.   We need to consult the invoices in order to
15  determine that accurately; is that correct?
16    A.   Right, yes.
17    Q.   Do you recall what the billing rate is that
18  you've been charging for your time on a per hour
19  basis?
20    A.   It's $400 an hour.
21    Q.   And that's been true for the entire time on
22  Vioxx?
23    A.   That's correct.
24    Q.   Has that been the rate that you've charged
25  for your time since the inception of Arrowsmith-Lowe

Page 53

1  Consulting in 1999?
2    A.   No.  I charged initially $350.  And then, in
3  October of 2000 I believe, I went up to $400 an hour.
4    Q.   Has anyone other than you from
5  Arrowsmith-Lowe Consulting worked on Vioxx?
6    A.   From my company, no.
7    Q.   When were you first asked to do a report in
8  this case, the Irvin case?
9    A.   Sometime either during the summer or spring,
10  I don't remember.
11    Q.   This year, 2005, though?
12    A.   Yes, I believe that's correct.
13    Q.   Have you reviewed any medical records
14  relating specifically to Mr. Irvin?
15    A.   No.
16    Q.   And, as I read your report, it includes no
17  opinions on whether Vioxx, in fact, caused or
18  contributed to Mr. Irvin's heart attack; is that
19  correct?
20    A.   That's correct.
21    Q.   Did you prepare any drafts of your report?
22  And I'm referring to the report in the Irvin matter.
23    A.   Right.  No, I do it all on the computer.  So,
24  you know, any corrections I make to the report I just
25  correct it and save that.  So I don't really have

Page 54

1 any -- any previous drafts for this report.
2 Q. Okay. Did you share any preliminary versions
3 of this report with counsel?
4 A. I believe that -- I believe I did. I believe
5 so. I don't know. I may have, yeah.
6 Q. Do you think you provided a preliminary
7 version to counsel in hard copy?
8 A. No, I think I emailed it.
9 Q. And I believe this does fall within our
10 agreement, Counsel.
11   Did counsel suggest any changes to the
12 preliminary version that you sent them?
13 A. Yes, in that I think I had not added
14 Dr. Gueriguian's report. Or maybe Dr. -- I didn't
15 actually mention it in one of these. I had
16 reviewed -- as I recall I reviewed Dr. Gueriguian's
17 report and I hadn't mentioned it in here or something.
18 I don't -- I don't recall specifically. But it's
19 something along those lines. It was just a lapse of
20 concentration that I didn't add a name or something
21 like that.
22   MR. ROTHMAN: Just so the record is clear,
23 Dr. Arrowsmith-Lowe is pointing to the first full
24 paragraph on page 3 of her report.
25   THE WITNESS: Yeah, in preparing the report,

Page 55

1 what I had reviewed.
2 BY MR. BLACK:
3 Q. Okay. Were there any other changes that
4 counsel suggested to you?
5 A. I don't think so. Not any substantive
6 changes.
7   (Exhibit No. 2 was marked.)
8 BY MR. BLACK:
9 Q. Okay. Doctor, I'm now handing you what has
10 been marked as Exhibit 2 to your deposition with a
11 copy for counsel. And this is a notice of your
12 videotaped deposition; is that correct?
13 A. That's what it says.
14 Q. Have you seen this document before?
15 A. No, I don't believe I have.
16 Q. Okay. I refer you to the last page which is
17 Exhibit A. And this comprises a list of items that we
18 were requesting be produced at your deposition. And
19 that included item 1 on the list, for example, all
20 documents relating to the Irvin matter; and item 3 was
21 "Copies of all invoices submitted to defense counsel
22 to the Irvin matter."
23   And that's one of the items I take it,
24 Counsel, that we're still looking into?
25   MR. ROTHMAN: We have brought with us today

Page 56

1 documents in her possession pertaining to the Irvin
2 matter. And we have those in these three boxes that
3 are behind Mr. Piorkowski. I did not myself look in
4 those boxes so I don't -- but I don't believe the
5 invoices are in there. So you are correct as to No.
6 3.
7   MR. BLACK: Okay. And, as to the other items
8 on the list, are there any others, Counsel, that we
9 can exclude? I take it that there's no records
10 pertaining to Mr. Irvin based on her testimony. So
11 two is not here and not relevant I take it; is that
12 correct?
13   MR. ROTHMAN: That is correct.
14   MR. BLACK: Anything else that we can
15 exclude?
16   MR. PIORKOWSKI: I'm not sure I understand
17 what you mean, Bert, by what we can exclude.
18   MR. BLACK: Well, that it's not something
19 being produced for a reason such as No. 2, that we
20 don't have to be concerned about it. And looking down
21 I don't see anything that would necessarily fall in
22 that category.
23   MR. ROTHMAN: Yeah, I don't either. What I
24 would suggest to you, Bert, is that maybe at a break
25 you can look through the boxes and look for yourself

Page 57

1 as to what's there.
2   MR. BLACK: That's what I think we'll do.
3   MR. ROTHMAN: Okay.
4   MR. BLACK: And it's your belief that in
5 doing so we will not find the billing records; is that
6 correct? That's a question to you, Counsel. I should
7 have put it that way. I'm sorry.
8   MR. ROTHMAN: Yes, correct.
9 BY MR. BLACK:
10 Q. All right. Let's put Exhibit 2 aside then
11 and return to Exhibit 1. Doctor, I understand from
12 your report that you have confined your opinions to
13 certain specific points; would that be a fair
14 statement?
15 A. Yes, I think that's a fair statement.
16 Q. Okay. And I'd like to try and clarify that a
17 little bit. Based on the first paragraph, I
18 understand that you've reached opinions relating to
19 certain specific issues. And what I want to do is
20 just try and understand what those issues are.
21   Is it correct that you first of all reached
22 an opinion regarding Merck's interactions with the FDA
23 with respect to Merck's disclosure of data about Vioxx
24 to the FDA; is that one of the areas in which you have
25 reached opinions?

Page 58

1   A. I think that captures it, yes.
2   Q. Okay. And the data to which you refer, would
3   that be cardiovascular data?
4   A. It would be all -- all the data relating to
5   the approval, initial approval and subsequent
6   approvals as well as data relating to labeling
7   changes.
8   Q. Okay. So it would be data in addition to
9   cardiovascular data then?
10   A. Yes.
11   Q. As you've just described I take it?
12   A. That's correct.
13   Q. Okay. And second, I take it you have
14   opinions regarding Merck's interactions with the FDA
15   with respect to Merck's disclosure of data to the
16   medical community, is that correct?
17   A. Well, yes, that is correct.
18   Q. Okay.
19   A. And also opinions of Merck's interactions
20   with the medical community as far as disclosure. I
21   mean directly medical community and to the FDA.
22   Q. Okay. You've jumped a step ahead of me
23   because I think we're going to get there. But in any
24   event, coming back to this Merck's interactions with
25   the FDA about disclosure to the medical community,

Page 59

1   recognizing that that's separate from other
2   disclosures to the medical community, the data that
3   you refer to there, is that the same data that you
4   referred to with regard to your opinion about
5   interactions with the FDA about data?
6   A. I'm sorry.
7   Q. That's a bad question.
8      MR. ROTHMAN: Objection to the form.
9      MR. BLACK: I object to my own question and
10   I'm going to try and reformulate that.
11      MR. ROTHMAN: Fair enough.
12   BY MR. BLACK:
13   Q. You referred to certain data and the
14   interactions with the -- Merck's interactions with the
15   FDA about data?
16   A. Right.
17   Q. And then there's disclosure of data to the
18   medical community. Is that the same data that you're
19   talking about, the same set of data that you were
20   discussing in terms of the interactions with the FDA?
21   A. Yes. And that basically encompasses the
22   information that was available in the NDA and in the
23   label. So it's not restricted to cardiovascular data
24   in particular.
25   Q. I understand that. Okay. Now, apart from

Page 60

1   interactions with the FDA about communications with
2   the medical community, you also have opinions about
3   disclosures to the medical community, correct?
4   A. That's correct.
5   Q. Okay. So I think we've got that clarified.
6      (Exhibit No. 3 was marked.)
7   BY MR. BLACK:
8   Q. Let me have Exhibit 3. Just to kind of
9   clarify that distinction which is not the clearest in
10   the world, I'm handing you now what's been marked as
11   Exhibit 3. And Exhibit 3 is a copy of an article that
12   appeared in the New England Journal of Medicine on
13   November 23rd, 2000; is that correct?
14   A. Yes, that's correct.
15   Q. Is this the article to which you referred
16   earlier in connection with your testimony about the
17   VIGOR trial?
18   A. Yes.
19   Q. Okay. And the first author, first named
20   author is somebody named Claire Bombardier; is that
21   correct?
22   A. Yes.
23   Q. Okay. And I hope this clarifies what we were
24   talking about before. The publication of an article
25   such as this does not require approval from the FDA,

Page 61

1   does it?
2   A. No, it doesn't.
3   Q. So this would be an example of communication
4   with the medical community apart from interaction with
5   the FDA about communications with the medical
6   community; would that be correct?
7   A. That's correct.
8   Q. I hope that clarifies the distinction between
9   those two areas of your testimony.
10      Now, from what you testified here today in my
11   understanding of your report -- well, let me back up.
12      You recall that about two years ago I took
13   your deposition in the Baycol litigation?
14   A. Yes I do.
15   Q. And, if I recall correctly, at that
16   deposition you said that your opinions were confined
17   to regulatory compliance and that you did not have
18   opinions about other obligations there might be for
19   drug companies; is that a fair statement of your
20   testimony in Baycol?
21   A. You'll have to show me that. I don't have
22   any recollection of what you're talking about.
23   Q. Well, we could do that, if necessary. But
24   would that be the case here?
25   A. Can you --

Page 62

1    · MR. ROTHMAN: Objection to the form.
2      THE WITNESS: -- repeat what you said.
3   BY MR. BLACK:
4      Q. That your opinions are limited to regulatory
5   and compliance and that you're not expressing opinions
6   about other obligations there might be for
7   pharmaceutical companies?
8      MR. ROTHMAN: Objection to the form.
9      THE WITNESS: Again I don't -- I have no
10  idea -- I have no recollection of having said that.
11  I -- primarily what I focus on are regulatory issues
12  and how the regulatory interactions affect safe use of
13  a product, availability on the markets, that kind of
14  thing. So I don't -- again I would really appreciate
15  you showing me what you're I assume paraphrasing, I
16  don't know.
17  BY MR. BLACK:
18     Q. Well, I think you've answered my question for
19  now. And I'll be happy off the record to share with
20  you your prior testimony. But I think that's a
21  sufficient answer for this case.
22     Are you aware that Merck has filed a motion
23  to exclude Dr. Kapit's testimony in this case?
24     A. No, I'm not aware of that.
25     Q. Well, they have filed such a motion. And

Page 63

1   Merck has, in fact, filed such a motion. And it's
2   based in part on the assertion that his opinions
3   relate to what Merck should have done apart from
4   regulatory requirements.
5      And it's Merck's position that that's not
6   admissible testimony. So I assume that, if it's
7   Merck's position that's not admissible testimony, that
8   you're not going to be giving testimony about what
9   Merck should or should not have done apart from
10  regulatory requirements?
11     MR. ROTHMAN: Objection to the form.
12     THE WITNESS: I really don't understand
13  exactly what you're asking me.
14  BY MR. BLACK:
15     Q. Let's go back to the Bombardier article. And
16  I think you probably already answered some of this.
17  The New England Journal of Medicine would be
18  considered a prestigious medical journal, correct?
19     A. That's correct.
20     Q. Probably one of the one or two most
21  prestigious medical journals in the United States;
22  would that be fair to say?
23     A. I would say probably worldwide.
24     Q. One of maybe the four most prestigious in the
25  world?

Page 64

1      A. Yeah.
2      Q. Or five. And the others would be the British
3   Medical Journal; would that be correct?
4      A. I wouldn't put the British Medical Journal up
5   there.
6      Q. The Lancet?
7      A. The Lancet is pretty highly thought of.
8      Q. The Journal of the American Medical
9   Association?
10     A. Yes, JAMA, and Annals of Internal Medicine I
11  would consider one of the top.
12     Q. That was the other one I was going to ask you
13  about.
14     A. Medical journals, clinical medical journals.
15     Q. So that's four. And you wouldn't agree on
16  the British Medical Journal?
17     A. I don't -- I mean I read the British Medical
18  Journal. I don't think they have quite as strict
19  editorial policies as --
20     Q. The New England Journal of Medicine is a
21  peer-reviewed journal, correct?
22     A. That is correct.
23     Q. And the Bombardier article, Exhibit 2,
24  concluded that Vioxx caused fewer gastrointestinal
25  adverse events in rheumatoid arthritis patients than

Page 65

1   naproxen; is that right?
2      A. Yes, I believe that's true.
3      Q. It concluded that the relative risk for GI
4   adverse events with Vioxx was only about 0.5 compared
5   with naproxen; is that right?
6      A. About half, that's correct.
7      Q. I think, if you consult the abstract, it says
8   that, as a matter of fact, Doctor.
9      A. Okay.
10     Q. If you take a look at the abstract under
11  results.
12     MR. ROTHMAN: It doesn't say that under
13  conclusions, Counsel.
14     MR. BLACK: Huh?
15     MR. ROTHMAN: Are you pointing her to the
16  conclusions?
17  BY MR. BLACK:
18     Q. I'm pointing her to the results which
19  indicated that "gastrointestinal events per 100
20  patient-years," are you following me, Doctor?
21     A. Yes, I see that. I mean this is -- I think
22  we need to make sure we understand this is just the
23  abstract, this is not the entire article. And I don't
24  rely on abstracts if the whole article is available.
25     But that is, in fact, what the abstract says,

Page 66

1  that there's about a 50 percent reduction in serious
2  gastrointestinal or confirmed gastrointestinal events
3  in the rofecoxib group as compared to the naproxen
4  group at the doses --
5     Q.  And you don't recall that there was anything
6  in the article contrary to that?
7     A.  No.  There are more details of what that
8  means in the article.  But that -- that is a summary
9  of the results, the findings as far as the
10 gastrointestinal toxicity is concerned.
11    Q.  And the results of the VIGOR study also
12 included a relative risk for myocardial infarctions of
13 0.2 in naproxen versus Vioxx; is that right?
14    A.  A relative risk of 0.2.
15    Q.  In naproxen versus Vioxx.
16    A.  Naproxen.  That may be.  Where I would --
17 that's what it says.
18    Q.  And take it the other way around.  If we did
19 that Vioxx versus naproxen, that would be a relative
20 risk of about five, correct?
21    A.  That's -- approximates, yes, based on the
22 relative risk, I think you're correct in that.
23    Q.  Now, the gastrointestinal relative risk of
24 0.5 Vioxx versus naproxen, that was a good thing from
25 Merck's perspective, correct?

Page 67

1     MR. ROTHMAN:  Objection to the form.
2     THE WITNESS:  I'm sure Merck was happy with
3  that.  I think it was a good thing in terms of
4  additional information about COX-2's and this one in
5  particular.
6  BY MR. BLACK:
7     Q.  Because a prestigious publication about a
8  benefit of the drug like that in a journal like the
9  New England Journal of Medicine lets the medical
10 community know about the benefits of Vioxx; is that
11 right?
12    A.  It does in this population, that's correct,
13 that this does, that's correct.
14    Q.  An article like the Bombardier article is the
15 kind of thing that the company likes to distribute to
16 doctors, if it can; isn't that correct?
17    MR. ROTHMAN:  Objection to the form.
18    THE WITNESS:  I -- I mean I get -- I don't
19 know.  I have no idea whether it was.  They may want
20 to, I don't know.
21    (Exhibit No. 4 was marked.)
22 BY MR. BLACK:
23    Q.  Do you know one way or another whether Merck
24 ever provided copies of the New England Journal of
25 Medicine article to doctors?

Page 68

1     A.  I don't -- I don't know.  I know, when people
2  would call in, they would provide articles.  And this
3  may have been one of the articles that was provided.
4     Q.  I'm showing you now -- I'm handing you now
5  what's been marked as Exhibit 4.  And is that on Merck
6  letterhead, Exhibit 4?
7     A.  That's what it looks like.
8     Q.  Is it an August 28, 2001, letter addressed to
9  a Dr. David Egilman, E-g-i-l-m-a-n?
10    A.  That's what it looks like.
11    Q.  And does it say, at the second sentence,
12 "Your inquiry concerned a request for a reprint of the
13 Vioxx Gastrointestinal Outcomes Research Trial,
14 VIGOR"?
15    A.  Yes, that's what that says.
16    Q.  And, whether or not the company actually
17 provided him with a reprint, it certainly cites
18 Dr. Egilman to the New England Journal of Medicine
19 publication, does it not?
20    A.  Well, it says the enclosed reprint should be
21 reviewed for complete information.
22    Q.  Okay.  I thought -- I thought that's what it
23 said, I wasn't finding the language.  So apparently
24 Merck did send a copy of the reprint of the Bombardier
25 article to Dr. Egilman, correct?

Page 69

1     A.  Yes, a reprint, that's correct.
2     Q.  Now, if you take a look at this article, on
3  the second page --
4     A.  Of the article?
5     MR. PIORKOWSKI:  Of the article or the
6  letter, Bert?
7  BY MR. BLACK:
8     Q.  Strike article, go to letter, you're right.
9     A.  So which is it?  I'm sorry.
10    Q.  Okay.  Let me find exactly --
11    MR. ROTHMAN:  Counsel is looking at Exhibit 4
12 which is the letter.
13 BY MR. BLACK:
14    Q.  Yeah.  Okay.  It's the third page.  I
15 apologize.  Third page of the letter, where it says
16 cardiovascular at the bottom.
17    A.  Yes.
18    Q.  It says there, if you read in the second
19 line, "the rate of cardiovascular events was 0.4
20 percent among patients taking Vioxx."  Do you see
21 that?
22    A.  Yes.
23    Q.  What would you understand
24 cardiovascular events to mean in this context?  And
25 please read more of the letter, I'm not trying to

Page 70

1    confine you just to that one phrase.
2       A.  Well, it doesn't specify what the
3    cardiovascular events were in the letter.  But it does
4    refer the reader back to the article.
5       Q.  Okay.  Does the letter anywhere mention what
6    the cardiovascular event rate was in the comparative
7    population in the VIGOR trial?
8       A.  No, I don't see that the letter mentions
9    that.
10      Q.  Have you done any work related to Vioxx since
11   signing your report on September 30, 2005?
12      A.  Have I done any work?
13      Q.  Yes.
14      A.  What do you mean?
15      Q.  Well, let me phrase the question a little bit
16   differently.
17          Is there any time that you've spent working
18   on Vioxx since signing your expert report on September
19   30, 2005?
20      A.  Yes, yes.
21      Q.  Does some of that work include meeting with
22   counsel to prepare for this deposition?
23      A.  Some of it does, yes.
24      Q.  What work other than meeting with counsel to
25   prepare for this deposition have you done in

Page 71

1    connection with Vioxx since September 30, 2005?
2       A.  Well, I've gone back and reviewed regulatory
3    documents, I've reviewed submissions by Merck to the
4    FDA, I've reviewed letters from FDA and from Merck.  I
5    have -- most of it has been reading other than meeting
6    with counsel.  I have gotten on the Internet and
7    looked at some documents posted by FDA.
8       Q.  Has the review that you've just described
9    essentially been going back and refreshing your
10   recollection about documents that you relied upon for
11   your report?
12      A.  I think, yes, for the most part, that's true.
13      Q.  Have you looked at any documents that you had
14   not considered prior to September 30, 2005?
15      A.  Well, I got on the FDA web site and looked at
16   a template for NSAID labels and a letter, draft letter
17   that FDA proposes to send out to manufacturers of
18   prescription and OTC NSAIDs.
19      Q.  Anything else you can think of that falls in
20   that category of something you had not reviewed prior
21   to September 30, 2005?
22      A.  That's what stands out in my mind.
23      Q.  Now, coming back to the time you spent
24   preparing for your deposition, with whom did you meet
25   in connection with your preparation for this

Page 72

1    deposition?
2       A.  For this deposition primarily Mr. Rothman and
3    Ms. Graham.  And then yesterday I met for awhile with
4    Mr. Piorkowski.
5       Q.  How many meetings were there?
6       A.  I think there were two.
7       Q.  Were there any consultations over the
8    telephone about this deposition?
9       A.  About this deposition?
10      Q.  Yes.
11      A.  No.
12      Q.  So the only contact you've had with attorneys
13   related to this deposition was the two meetings you've
14   just described?
15      A.  Yeah, that's my recollection.
16      Q.  Okay.  And, at the first meeting, it was
17   Mr. Rothman and Ms. Graham; is that correct?
18      A.  That's correct.
19      Q.  And at a second meeting was Mr. Rothman,
20   Ms. Graham, and Mr. Piorkowski; is that correct?
21      A.  And Mr. Piorkowski and Ms. Graham.  There may
22   have been another one.  I'm not -- I don't really
23   remember.  But I know I remember two.
24      Q.  The first meeting, where did that meeting
25   take place?

Page 73

1       A.  In Santa Fe at the Hilton Hotel here.
2       Q.  When did that take place?
3       A.  A couple of weeks ago I believe.
4       Q.  About how long did that meeting last?
5       A.  Half a day and two-thirds of a second,
6    something like that.
7       Q.  Do you recall the issues that were discussed
8    at that meeting?
9       A.  Not specifically.
10      Q.  Okay.  I think that answered my question.
11      A.  Yeah.
12      Q.  Do you recall with any specificity any
13   opinions you might have expressed at that meeting?
14      A.  Other than the hand cream smelled like
15   Noxzema.
16      Q.  That would be one.  Do you believe that's
17   relevant to this case?
18      A.  No, I don't.  I don't recall that I expressed
19   any new opinions that would be relevant to the case.
20   I mean I think I -- we went over documents and sort of
21   discussed background and I refreshed my memory about
22   time frames.
23      Q.  Did either Mr. Rothman or Ms. Graham tell you
24   what questions to expect at this deposition?
25      A.  What questions to expect?  No.

Page 74

1    Q.  I assume then they didn't suggest any answers
2  to the questions?
3    A.  No.
4    Q.  Now, at the second meeting, where did that
5  take place?
6    A.  Also in Santa Fe.
7    Q.  When did that take place?
8    A.  Yesterday.
9    Q.  Where?
10   A.  At the Inn of the Anasazi, just around the
11  corner.
12   Q.  How long did that last?
13   A.  Let me think.  I guess we started around nine
14  o'clock, ten o'clock, something like that, and it
15  lasted until five or 5:30.
16   Q.  Do you recall with any specificity what
17  subjects you discussed?
18   A.  Vioxx.
19   Q.  Anything more specific than that?
20   A.  I think we reviewed the dates of labeling
21  changes and what correspondence went back and forth
22  between the company.  I reviewed some of the
23  regulations, labeling regulations.  And I think
24  that's -- that's all I remember.  I remember looking
25  at regulations yesterday.

Page 75

1    Q.  Was there any discussion at yesterday's
2  meeting about what questions to expect at today's
3  deposition?
4    A.  No.
5    Q.  Now, in your qualifications you state that
6  you're an epidemiologist; is that right?
7    A.  That's correct.
8    Q.  You don't hold a degree in epidemiology,
9  though, do you?
10   A.  No.
11   Q.  I understand from your CV that your training
12  in epidemiology was primarily at the National Centers
13  for Disease Control and Prevention from '84 to '86; is
14  that correct?
15   A.  Well, and at FDA and at Johns Hopkins, yes,
16  that's correct.
17   Q.  Was it primarily in that '84 to '86 period or
18  are you talking about something subsequent to '86
19  where you got additional training?
20   A.  Subsequent to '86 I took courses at Hopkins
21  in clinical trial design and I've taught courses.  I
22  mean I attend meetings of the International Society of
23  Pharmacoepidemiology and the American College of
24  Epidemiology.  So, you know, I continue to sort of
25  expand my knowledge base.

Page 76

1    Q.  Now, as I understand epidemiology, there are
2  different kinds of studies; that would be a fair
3  statement, wouldn't it?
4    A.  I think that's a fair statement.
5    Q.  Some studies are called cohort studies,
6  correct?
7    A.  That's correct.
8    Q.  And that means that you compare an exposed
9  group of people with a group that's not exposed to
10  something; would that be a fair statement?
11   A.  Or you follow an exposed cohort over time.
12  That would be -- you follow an exposed cohort.
13   Q.  So you follow an exposed cohort and you
14  follow an unexposed cohort then?
15   A.  That's correct.
16   Q.  And, in the context of a pharmaceutical case,
17  exposure would mean or could mean taking a drug,
18  correct?
19   A.  It could, yeah.
20   Q.  And not exposure could mean taking a placebo,
21  correct?
22   A.  Or taking some other drug or not taking any
23  drug at all.  If you're talking about a cohort study,
24  you can't really -- I mean you're not in control of
25  who does what really.  So you just -- you follow

Page 77

1  people along.  And some are exposed and some are not.
2    Q.  Now, one kind of cohort study where I believe
3  you have more control is something called a randomized
4  clinical trial; is that right?
5    A.  Yes.
6    Q.  And, in a randomized clinical trial, people
7  are randomly assigned to either receive a drug or
8  receive something else, correct?
9    A.  Receive a study drug or something else, yeah.
10   Q.  Would it be true that randomized clinical
11  trials are generally considered the gold standard of
12  epidemiology studies?
13   A.  Yes, I think that's true.
14   Q.  And, just to be clear, there are also studies
15  that are called case control studies, correct?
16   A.  That's correct.
17   Q.  And they're different from cohort studies,
18  right?
19   A.  That's correct.
20   Q.  And generally not -- and the results from
21  case control studies are generally considered not as
22  reliable as the results from cohort studies?
23   A.  It depends upon what you're studying.  But,
24  if you're studying a common exposure, yes, a case
25  control study is not a very effective way of doing

Page 78

1  that.
2      Q.  As a general rule, would you consider case
3  control studies to provide less reliable results than
4  cohort studies just as a general proposition?
5          MR. ROTHMAN:  Objection to the form.
6          THE WITNESS:  I think, if you're establishing
7  a hierarchy of studies, case controls generally fall
8  below cohort studies in randomized control trials.
9  BY MR. BLACK:
10     Q.  Okay.  I think that's a fair answer to my
11  question.
12         Now, there's also different kinds of
13  epidemiological data; I think that's a fair statement
14  too, isn't it?
15     A.  Yes.
16     Q.  So one kind would be the data that you
17  collect on patients during a randomized control trial,
18  correct?
19     A.  Yes.
20     Q.  And that's -- under those circumstances you
21  would usually have individual patient records,
22  correct?
23     A.  That's correct.
24     Q.  And oftentimes very detailed test results on
25  individual patients, correct?

Page 79

1      A.  That's correct.
2      Q.  Now, another kind of data would be using
3  databases maintained by organizations like HMOs, where
4  you match drug use and billing codes; would that be
5  correct?
6      A.  Yes, that would be one type of data you could
7  get from a records link to database like an HMO.
8      Q.  Okay.  And you used the term I was going to
9  ask you about, records linked databases.  Would it be
10  correct that generally, with records linked databases,
11  you don't have the same level of detail that you would
12  have with the individual patient records in a
13  randomized clinical trial?
14     A.  Well, there are times where people go back to
15  the original medical records.  You might not have the
16  volume of information, but you might have the quality
17  of information that you want to study a particular
18  outcome.
19     Q.  But, with a randomized clinical trial, since
20  it's designed going forward, you can specify tests
21  related to the specific issue that you're studying; is
22  that correct?
23     A.  Among other tests, that's correct.
24     Q.  And you wouldn't have that opportunity if you
25  were dealing with a linked database; is that correct?

Page 80

1      A.  You wouldn't specify a priori.  But,
2  depending upon the outcome, you might have very
3  extensive data on the outcome of interest.
4      Q.  I understand that you might, in fact, have
5  it.  But you wouldn't have the opportunity to specify
6  in advance as you would with a randomized clinical
7  trial; would that be correct?
8      A.  I think that's correct, that's a fair
9  statement.
10     Q.  And then there are also adverse event reports
11  after a drug goes on the market, the kind of thing
12  that goes into the FDA's adverse event reporting
13  system; would that be correct?
14     A.  So we're moving from general epidemiology
15  into adverse event reporting, is that --
16     Q.  If you want to make that distinction, yes.
17     A.  Well, it's -- I'm sorry.  I wasn't really
18  following -- yes, that is true.
19     Q.  Let me respond to -- since you've asked for a
20  clarification, let me respond a little bit
21  differently.  We're moving on to adverse event
22  reporting now.  Whether that means a departure from
23  epidemiology or not I'll leave for another
24  determination.
25         With regard to adverse event reporting data,

Page 81

1  would it be true that you do not consider that data to
2  be scientifically valid?
3          MR. ROTHMAN:  Objection to the form.
4          THE WITNESS:  Well, it depends upon -- if
5  you're trying to manipulate the data to derive rates
6  of some type, I think that's accurate, yes.  The data
7  itself may be scientifically valid and useful in
8  determining signals or looking for new information
9  about a drug in particular.
10         (Exhibit No. 5 was marked.)
11  BY MR. BLACK:
12     Q.  Okay.  Doctor, this is the only copy I have
13  of this so you'll have to look on.  I'm going to hand
14  you Exhibit 5 which is an excerpt from your testimony
15  in the Baycol litigation.  And you can confirm this.
16  But, since it's the only copy, let me read it to you
17  first.
18         MR. ROTHMAN:  Is that her deposition or her
19  trial testimony?
20         MR. BLACK:  This is her deposition.  This is
21  deposition testimony in the Baycol MDL.
22         MR. ROTHMAN:  You would know this better than
23  I.  But let me just ask you whether that's subject to
24  any kind of confidentiality or protective order that
25  would run in favor of Bayer?

Page 82

1   MR. BLACK: There is a protective order
2   relating to this deposition. The general testimony
3   that we're talking about here will not run afoul of
4   it. And Mr. Piorkowski who represented Bayer might
5   want to take a look at this and confirm that. If we
6   have to edit something out of the exhibit, I think we
7   can do that.
8       MR. PIORKOWSKI: Okay. I'll note for the
9   record I won't stand behind Mr. Arbitblit's practice
10  of not allowing a document to be shown to a witness
11  unless there are three copies provided.
12      MR. BLACK: Let the record reflect I am not
13  Donald Arbitblit.
14      MR. ROTHMAN: Can we go off the record for
15  one second.
16      MR. BLACK: Yeah, we can go off the record.
17      THE VIDEOGRAPHER: We are off the record.
18  The time now is 11:48 a.m. Mountain time.
19      (Discussion off the record.)
20      THE VIDEOGRAPHER: We are back on the record.
21  The time now is 11:51 a.m. Mountain time.
22      MR. BLACK: Okay. While Mr. Piorkowski is
23  reviewing Exhibit 5, and we may have to redact
24  something from it before we actually put it in the
25  record, I don't believe that will be the case, but

Page 83

1   we'll see.
2   BY MR. BLACK:
3       Q. As I understood your testimony in Baycol,
4   Doctor, it was your opinion that adverse event reports
5   would be used primarily to detect possible signals;
6   would that be a fair statement?
7       A. Yes, I totally agree with that, yeah.
8       Q. And that they are not valid scientific data
9   for other purposes because they are not derived from
10  well-controlled trials or from any other level of
11  scientific certainty; would that be a fair statement?
12      A. Yes. And that's what I just said in answer
13  to your first question.
14      Q. Okay. Well, my question probably wasn't so
15  good and I don't think the answer came out that clear.
16  But I'll accept the blame for that.
17          And then you also went on to say in the
18  Baycol deposition so they are not really data. Is
19  that an opinion that you still hold today?
20      A. Yes, I do. Yes, they are not data.
21      Q. In the interest of -- since we've mentioned
22  this on the record and we've got the exhibit marked,
23  if Mr. Piorkowski will review it to make certain that
24  there's no problem with confidentiality, I think we'll
25  just leave it in the record. If there is, perhaps

Page 84

1   we'll strike it. But let's just go on here.
2           Now, just to be -- one more point on adverse
3   event reports. Is an adverse event report the same
4   thing as an adverse drug experience report?
5       A. Yes, they're just different terminology from
6   different periods of time.
7       Q. Now, as a general rule, epidemiology involves
8   comparing disease incidence in populations; would that
9   be a fair statement?
10      A. Yeah, with the idea that you're looking
11  for -- trying to identify risk factors for disease,
12  yes.
13      Q. I think we've probably already covered that.
14  But an epidemiologist might compare a population
15  taking a drug with a population taking a placebo,
16  correct?
17      A. That's — yes, in a general sense, that's
18  epidemiology.
19      Q. Or maybe compare it with the population
20  taking another drug, correct?
21      A. Right.
22      Q. And in comparing populations one of the
23  primary things an epidemiologist looks at is the ratio
24  of incidence rates; would that be a fair statement?
25      A. That's certainly one of the things that you

Page 85

1   might look at. You look at, yes, rate ratios,
2   relative risks, yes.
3       Q. If people taking the drug have a disease or a
4   condition less frequently than people not taking the
5   drug, that's an indication that the drug can be used
6   to treat the disease, correct?
7       MR. ROTHMAN: Objection to the form.
8       THE WITNESS: I'm sorry. Can you repeat that
9   question.
10  BY MR. BLACK:
11      Q. Well, you've got a drug that you hope to get
12  approved. And you give it to a population and they
13  get disease X at a rate of a tenth of a percent. And
14  you give the same drug to a population not taking the
15  drug or taking something else and they get the disease
16  at 1 percent.
17      A. I'm sorry. That —
18      Q. You're not following my example?
19      A. If you're talking about a controlled trial,
20  you have a whole population and you randomize people
21  to one treatment or the other.
22      Q. Yes.
23      A. And then you follow those two populations for
24  whatever outcome you're interested in and compare them
25  at the end of the trial.

Page 86

1    Q.   And one thing that you do for the comparison
2  would be to compare the rate of occurrence of the
3  disease of interest for the people taking the drug
4  with the rate of occurrence of people not taking the
5  drug in the trial; would that be correct?
6    A.   That would be a trial for a preventive
7  product.
8    Q.   Yes.
9    A.   Like a vaccine or something like that.
10   Q.   Yes.  That's -- that was what the question
11  was aimed at.  I'm not saying this is like Vioxx or
12  anything like that.  Just, if you were to test a drug
13  to prevent a disease and people taking the drug got
14  the disease less frequently than other people, that
15  you would say that's a good drug, that's evidence that
16  the drug works to prevent the disease, correct?
17       MR. ROTHMAN:  Objection to the form.
18       THE WITNESS:  I think that's a very simple
19  description of it.  I think, in a very simple level,
20  you could say that that's what you're doing.  I mean
21  the other thing you look for are confounding factors
22  in each population that may affect the outcome.  So --
23  BY MR. BLACK:
24   Q.   Well, if you designed a randomized clinical
25  trial, hopefully you designed it in such a way that

Page 87

1  you wouldn't have confounding factors; isn't that
2  correct?
3       MR. ROTHMAN:  Objection to the form.
4       THE WITNESS:  You never -- you can never
5  design a trial without confounding factors as far as I
6  know.  But what you hope for is that the confounding
7  factors are equally distributed between the two
8  populations.
9       And that's -- you're assuming that there's
10  equal compliance and, you know, a whole host of other
11  factors that are equal in each of the populations, the
12  treated and the untreated.
13  BY MR. BLACK:
14   Q.   Relative risk is a ratio of two incidence
15  rates; is that correct?
16   A.   I think that's correct, yes.
17   Q.   And relative risk is what was reported in the
18  Bombardier article, correct, or I should say relative
19  risks because there were several reported; would that
20  be correct?
21   A.   Yes.
22       (Exhibit No. 6 was marked.)
23  BY MR. BLACK:
24   Q.   I'm handing you what's been marked as Exhibit
25  6.  And that is a copy of another article that

Page 88

1  appeared in the New England Journal of Medicine,
2  correct?
3    A.   Yes.
4    Q.   This one coauthored by someone -- well, not
5  coauthored.  This one -- the lead author on this
6  article is someone named Robert Bresalier, correct?
7    A.   Yes.
8    Q.   B-r-e-s-a-l-i-e-r.  And this article relates
9  to the approved trial with Vioxx, correct?
10   A.   Yes.
11   Q.   I assume you've seen this article before,
12  correct?
13   A.   Yes.
14   Q.   And my only question here is this too -- this
15  article also reports results in terms of relative
16  risks, correct?
17   A.   I believe that's correct, yes.
18   Q.   So fair to say that relative risk was the
19  analytical tool that Merck was using to communicate
20  both the benefits associated with Vioxx and the risks;
21  is that correct?
22       MR. ROTHMAN:  Objection to the form.
23       THE WITNESS:  Well, I would say, in these two
24  articles, that's correct, yes.  I believe that the New
25  England Journal had some report of -- yeah, of

Page 89

1  efficacy as well, effectiveness of rofecoxib and
2  naproxen.
3  BY MR. BLACK:
4    Q.   Just to be clear for the record, Doctor,
5  since I've got a lot of exhibits in front of you,
6  which one are you referring to now?
7    A.   Oh, I'm sorry.  The VIGOR study.
8    Q.   Exhibit 2.
9        MR. ROTHMAN:  That's Exhibit 3.
10  BY MR. BLACK:
11   Q.   Exhibit 3?
12   A.   Exhibit 3 which was a co-end point as well as
13  the safety issues with -- with rofecoxib and naproxen.
14   Q.   But again those results were reported in
15  terms of relative risks, correct?
16   A.   For efficacy?  No, I don't believe efficacy
17  was reported as well as the risk.  There was a
18  change in the -- it was a least squares.
19   Q.   Which page are you referring to now?
20   A.   Page 1524.
21   Q.   Of Exhibit 3?
22   A.   Yes.
23   Q.   Well, let me clarify because I think I
24  understand your point.  In terms of the risks of
25  Vioxx, that was reported this terms of relative risks,

Page 90

1  correct?
2      A.  That's correct.
3      Q.  Okay.  Now, when you do an epidemiology
4  study, you start off with some kind of a study plan or
5  a protocol; isn't that correct?
6      A.  We start off with an hypothesis.
7      Q.  Okay.
8      A.  And then you design your study to test that
9  hypothesis.
10     Q.  Okay.  So the starting point is the
11 hypothesis.  And then the next step is some kind of a
12 study design, correct?
13     A.  Right.
14     Q.  And certainly you're supposed to have --
15 strike that question.
16         And is that study design also sometimes
17 called a study protocol?
18     A.  Well, the study protocol is generally the
19 expanded version with great detail.  But the study
20 protocol does include the study design, yes.
21     Q.  Okay.  Just to clarify your answer, the study
22 protocol is an expanded version of the study design;
23 is that correct?
24     A.  That's correct.
25     Q.  Okay.  And are you supposed to develop a

Page 91

1  protocol as well as a design before starting a study?
2      A.  That's correct.
3      Q.  And that specifies what groups you plan to
4  compare; would that be correct?
5      A.  What --
6      Q.  Among other things.  I mean that's one part
7  of it, would be what groups you could compare; would
8  that be correct?
9      A.  Well, it really depends upon your design.  If
10 you're talking about studies like this, you define a
11 group that you're going to study and then you
12 randomize that group.  You choose a group and then
13 you -- and you have the treatment arms, however many
14 treatment arms.
15         And that group of people is then distributed
16 into those treatment arms.  But you don't get a group
17 for this treatment and a group for that treatment.
18 You start with the description of the pool of patients
19 that you want to include in your study, if that's what
20 you're trying to ask me.
21     MR. ROTHMAN:  Just so the record is clear,
22 when the doctor says a study like this, she was
23 pointing --
24     MR. BLACK:  Well, that's what I was going to
25 ask.  I was going to follow up.  Counsel, Counsel, I

Page 92

1  was going to follow up.
2      MR. ROTHMAN:  She was pointing at Exhibit
3  3 which is the VIGOR --
4      MR. BLACK:  I was -- I was going to follow
5  up.
6      MR. ROTHMAN:  The VIGOR article.  Please
7  don't interrupt me.
8      MR. BLACK:  Well, please confine your
9  comments to objections that are relevant.  And I am
10 going to follow up on that with a question.  So thank
11 you for clarifying it for me.
12 BY MR. BLACK:
13     Q.  When you refer to a study like this, you were
14 referring to the VIGOR trial; is that correct, Doctor?
15     A.  Yes, yes, a randomized controlled trial,
16 that's correct.
17     Q.  And you start out with a population and then
18 you split it into two groups, one of which receives
19 the drug and the other which receives either a
20 different dose of the drug or some other drug or a
21 placebo; would that be correct?
22     A.  That wouldn't be the way I would describe it.
23 You start with a defined population.  And then the
24 individuals in that population are randomized to the
25 treatment arms.  I think it's -- you have to be very

Page 93

1  clear that the decision-maker as to who gets what
2  treatment is a random number generator, it's not an
3  individual.
4          And so I'm a little uncomfortable with the
5  way you're saying you give this group that and this
6  group that.  You start with a group of patients.  They
7  are, if enrolled, subsequently randomized to whatever
8  treatment arms you have that you're studying.  That
9  would be the way I would say it.
10     Q.  That's fair enough.  Now, some studies are
11 not randomly controlled trials, correct?
12     MR. ROTHMAN:  Objection to the form.
13     THE WITNESS:  Some epidemiologic studies are
14 not.
15 BY MR. BLACK:
16     Q.  Random clinical trials.
17     A.  I'm sorry.  Are you talking about any -- any
18 type of trial at all?
19     Q.  My question was bad.  Let's go back.  I said
20 random controlled trials and I meant random clinical
21 trials.
22         Some studies, some epidemiology studies are
23 not random clinical trials, correct?
24     A.  Randomized --
25     Q.  Randomized.

1    A. -- clinical trials, that is correct, yes.
2    Q. Okay.
3    A. Some studies are just random.
4    Q. Well, that may be true. I will get my
5  terminology down right.
6         And sometimes investigators will develop a
7  plan to go back and look at existing data, correct?
8         MR. ROTHMAN: Objection to the form.
9         THE WITNESS: I'm sorry. Investigators in
10  what will look at what type of existing data? I don't
11  understand your question.
12  BY MR. BLACK:
13    Q. Sometimes scientists have data from a number
14  of trials and they decide they want to go back and
15  reexamine this data in a certain way. And so they
16  develop a plan for doing so. Does that sort of work
17  ever take place?
18    A. That work does take place, yes.
19    Q. Okay. And, when you go back and do a
20  reexamination of data like that, according to a study
21  design, it's still important to stay within the
22  confines of the study design, is it not?
23    A. Which study design are you talking about?
24    Q. Well, we have some investigators who said
25  there's data from three different studies of a drug

1  who want to go back and look at a new hypothesis with
2  this data that we've already collected. Here is a
3  plan for doing that. And they go off and they do the
4  study based on this plan.
5    A. You mean they re-analyze the data based on
6  the plan?
7    Q. They re-analyze the data based on this plan.
8  It's important that, when they report the results,
9  they report it in accordance with that original study
10  plan, correct?
11         MR. ROTHMAN: Objection to the form.
12         THE WITNESS: I think in general that's true,
13  yes.
14  BY MR. BLACK:
15    Q. Now, when you calculate relative risk, it's
16  important to consider something called statistical
17  significance; would that be true?
18    A. Yes.
19    Q. Can you tell the jury what statistical
20  significance is?
21    A. Well, there are a number of measures way to
22  look at statistical significance. What it means is
23  that you have applied standardized procedures to the
24  data that you have to determine how likely the result
25  you got was due to chance or how likely the result you

1  got was due to a true effect. And there are a number
2  of ways to test whether your answer is more likely due
3  to effect or likely due to chance.
4         And there -- there are levels of
5  certainty. I mean that determines the certainty of
6  whether this is an effect or whether it's simply due
7  to chance. So there are a number of levels of
8  certainty that you might want. And you have to set
9  your levels of certainty before you collect your data.
10         You have to say that I want to be, for
11  instance, 95 percent certain that my data, whatever
12  the outcome is, is not due to chance. I want to be 95
13  percent certain that -- that the outcome that I have
14  identified is likely due to the test, likely an effect
15  of the, for instance, drug I'm testing. That's one
16  way to look at significance, statistical significance.
17         The other important criterion for determining
18  statistical significance which is very similar to
19  setting your level of certainty at 95 or 90, whatever
20  your -- you hope to achieve or you want to achieve,
21  depending upon the importance of the question, is that
22  you look at the answer that you get in terms of risk
23  or whatever measurement of the outcome and then
24  setting a confidence interval around that that tells
25  you that I have how -- again you set 95, 90, 85

1  percent.
2         I want to be 95 percent certain that this
3  number I came up with as the risk lies within these
4  bounds. You call it a 95 percent confidence interval.
5  So that my answer is an estimate of the truth, but I
6  want to be sure that that estimate of the truth lies
7  within these -- this interval.
8         And you generally do not want that interval
9  to include the number one because the number one means
10  you can't tell the difference between the test group
11  and the nontest group. So that there are a number of
12  ways you look at statistical significance. And they
13  all basically have to do with how certain can I be
14  that my data reflects a true effect as opposed to
15  chance variation.
16    Q. Statistical significance, let me try this a
17  different way because I think I understand your
18  answer. But I'd like to clarify it a little bit, if I
19  could. Statistical significance relates generally to
20  something called a null hypothesis, correct?
21    A. It does relate to a null hypothesis.
22    Q. And the null hypothesis, as you just
23  described, if there were no difference between two
24  groups, that would mean that the number one for
25  relative risk fell within the 95 percent confidence

Page 98

1  interval, correct?
2     A.  Right.  And one means there's -- no, you
3  can't tell the difference between the two groups.
4     Q.  You would not reject the null hypothesis then
5  that the groups were the same?
6     A.  That's correct, that's correct.
7     Q.  Okay.  Now, another way of dealing that is to
8  ask the probability of observing an event of a certain
9  magnitude if, in fact, the populations were the same,
10  correct?
11     A.  The probability of observing an effect?
12     Q.  Yes, if, in fact, the populations were the
13  same.
14     A.  Okay.  Yes.
15     Q.  And that's called the significance level,
16  correct?
17     A.  That -- yes.  And that refers to wanting to
18  know that you've only got a 5 percent chance that this
19  was a random -- that these were random events that
20  you're looking at.
21     Q.  And that 5 percent is the other side of the
22  95 percent that you referred to, correct?
23     A.  That's correct.
24     Q.  If you've got the 95 percent confidence
25  interval, if you're outside the 95 percent confidence

Page 99

1  interval, there will be a less than 5 percent chance
2  that the event occurred -- was observed even though
3  the populations were the same, correct?
4     A.  That's correct, if you set it at .05, that's
5  correct.
6     THE VIDEOGRAPHER:  Pardon me, Mr. Black.  We
7  have just one minute of the video left.
8     MR. BLACK:  Okay.  Let's go off the record
9  and let you change then.
10     THE VIDEOGRAPHER:  This ends tape No. 1 in
11  today's videotaped deposition of Janet
12  Arrowsmith-Lowe.  The time now is 12:10 p.m. Mountain
13  time.  We are off the record.
14     (Discussion off the record.)
15     MR. BLACK:  Mr. Piorkowski, you have a
16  statement to make.
17     MR. PIORKOWSKI:  Yeah.  I've had a chance to
18  review what Mr. Black has marked as Exhibit 5 which is
19  the cover sheet of Dr. Arrowsmith-Lowe's deposition in
20  the Baycol MDL and including the exhibits and then
21  excerpts from page 141 to 161.
22     I'm concerned that the excerpts that have
23  been marked do, in fact, violate the confidentiality
24  order that's in place in the Baycol MDL that was
25  agreed to by all of us.  Specifically, if I could make

Page 100

1  it clearer, the document that I understand was the
2  primary subject of the confidentiality order was
3  marked as Arrowsmith-Lowe Exhibit 1 in the Baycol
4  litigation.  It's described in this as documents
5  presented to plaintiff steering committee.
6     When I reviewed this transcript on page 146,
7  from lines 10 to 14, there's a comment from Mr. Black
8  that says, okay, lets us mark as Exhibit 11 the
9  package of information -- strike that.  It's Exhibit 1
10  already, we don't have to do that.  And then there's a
11  question that presumably asks her to turn to Exhibit
12  1.
13     Then on page 147 there's a question at lines
14  11 to 17, it's a question and answer that talks about
15  a specific number of prescriptions during specific
16  years which I understand to be IMS data which is --
17     MR. BLACK:  Joe, I don't mean to interrupt
18  you because you've gone far enough to convince me that
19  there's a problem with it.  And I had not recognized
20  that problem when I reviewed the excerpt before.  And
21  I'm glad that it's come out before this becomes an
22  official part of the record.
23     What I would propose at this time is that we
24  strike Exhibit 5 from this deposition and that we just
25  make a note that there is no Exhibit 5 for purposes of

Page 101

1  this deposition.  And that copy will be destroyed and
2  we move on.  Is that acceptable?
3     MR. PIORKOWSKI:  Fair enough.
4     (Recess.)
5     THE VIDEOGRAPHER:  This begins tape No. 2 in
6  today's videotaped deposition of Dr. Janet
7  Arrowsmith-Lowe.  The time now is 12:20 p.m. Mountain
8  time.  We are back on the record.
9     MR. BLACK:  Mr. Piorkowski and I discussed
10  Exhibit 5 during the break.  And we have concluded
11  that there are, in fact, some questions relating to
12  Exhibit 5 with regard to confidentiality in the Baycol
13  matter.
14     And we also have concluded that, rather than
15  try and redact Exhibit 5, that we will exclude it in
16  its entirety, that it's not necessary in this
17  litigation.  And so the record will reflect a place
18  for Exhibit 5 so we don't mess up our numbering
19  system, but it will have Exhibit 5 withdrawn.
20     Is that a fair statement, Mr. Piorkowski?
21     MR. PIORKOWSKI:  Great, thanks.
22  BY MR. BLACK:
23     Q.  Doctor, what statistic do you use when you
24  calculate the statistical significance of a relative
25  risk?

26 (Pages 98 to 101)

Page 102

1    A.  Well, you calculate the -- you can calculate
2  the confidence interval.  I mean please don't ask me
3  to write down the formula because I won't be able to
4  do that anymore.
5    Q.  Okay.
6    A.  But you base it on the -- it has to do with
7  how many -- how many observations you have, what your
8  range of observations is, what the observed magnitude
9  of the observations is.  And I can't write for you
10  anymore the formula for deriving either the
11  confidence -- the confidence interval in particular.
12    Q.  My question did not seek a formula.  The
13  question was what statistic do you use when
14  determining the statistical significance of a relative
15  risk.  And, to give you an example of what I mean,
16  would you use, for example, the chi-square statistic?
17    A.  Yes, you use the chi-squares if -- depending
18  upon what -- how you're testing, yes, you can use a
19  chi-square statistic and then go to a table that will
20  tell you based on how many degrees of freedom and so
21  forth you have in your study or in your data.  What
22  the statistical level that chi-square corresponds to,
23  whether --
24    Q.  And would you agree that a chi-square
25  statistic of about 3.84 would correspond to a 5

Page 103

1  percent level of statistical significance?
2    A.  I don't know, you know, you have to specify
3  your degrees of freedom and so forth.  It could, I'm
4  not going to argue with you.
5    Q.  You don't know one way or the other without
6  more information?
7    A.  No, right, and without a chi-square table in
8  front of me.
9    Q.  Okay.  If I told you it was one degree of
10  freedom, you would still need the chi-square table,
11  correct?
12    A.  I would need the chi-square table, yes.
13    Q.  Fair enough.  Any other statistics that you
14  might use when calculating the statistical
15  significance of a relative risk?
16    A.  Well, again you can use the confidence
17  interval.  And that has to do with the number of
18  observations, the variation in the observations.
19    Q.  Excuse me for interrupting, Doctor.  But to
20  say the confidence interval is not a statistic in the
21  same sense that chi-square is a statistic, is it?
22    A.  I'm sorry.  You asked me if there are other
23  ways you can determine -- repeat your question because
24  I think I heard something different from what you're
25  asking me now.

Page 104

1    Q.  I believe you did, you may have misunderstood
2  the question.  I had asked if there are any other
3  statistics that you could use in calculating the
4  statistical significance of a relative risk other than
5  chi-square.  So I specifically asked the other
6  statistics that you could use.
7    A.  But you need to understand that statistical
8  significance can be determined also by the confidence
9  interval.  So that, if we want to use a common
10  language, you're talking about probability, is that
11  correct, and I'm talking about confidence interval,
12  both of which are a means of determining the
13  significance of whatever risk you're calculating.
14      So I think I am answering your question --
15  the question you asked.  If you have a different
16  question you want to ask me, why don't you ask me a
17  different question.
18    Q.  Let me ask a follow-up question then.  Is
19  your understanding that there is no statistic that you
20  need to calculate when determining a confidence
21  interval?
22      MR. ROTHMAN:  Objection to the form.
23      THE WITNESS:  I just said yes, there are --
24  you have to have -- you have to know what your
25  variance is, you have to -- you have to have the

Page 105

1  number of observations.
2      And I don't remember everything that goes
3  into the calculation of a confidence interval.  I can
4  tell you what it is, but I just don't remember it
5  anymore.
6  BY MR. BLACK:
7    Q.  Okay.  Variance is, in fact, a statistic.  Is
8  there any other statistic that you can think of that
9  you would need to determine a confidence interval?
10      MR. ROTHMAN:  Objection to the form.
11      THE WITNESS:  I really don't remember.  I'm
12  sorry.  I wasn't prepared to teach statistics.  I
13  thought we were talking about Vioxx.
14  BY MR. BLACK:
15    Q.  Do you think there are no statistical issues
16  relating to Vioxx?
17      MR. ROTHMAN:  Objection to the form.
18      THE WITNESS:  No.
19  BY MR. BLACK:
20    Q.  I'll strike the question.
21      When a study does not find a statistically
22  significant difference between two populations, that
23  does not necessarily mean there is no difference;
24  isn't that correct?
25    A.  Yes, that is correct.

27 (Pages 102 to 105)

Page 106

1    Q.   And perhaps there weren't enough subjects in
2  the study, that might be one reason, correct?
3    A.   That could be a reason.
4    Q.   Or the study just missed the difference
5  because of random variability in samples, correct?
6    A.   That's correct.
7    Q.   When a study finds no difference between
8  populations being compared, one issue that you have to
9  consider then is the power of the study to detect a
10  difference; would that be correct?
11    A.   If a study finds no difference?
12    Q.   Yes.
13    A.   Yes, that would be one of the issues you
14  would -- you would wonder about power.
15    Q.   Could you tell the jury what statistical
16  power is?
17    A.   Well, I believe I addressed that earlier when
18  you asked me about calculations of statistical
19  significance.  Power means are there enough -- do you
20  have enough observations in your database to be able
21  to clearly tell whether there is a difference between
22  two groups.
23          It has -- the power calculation basically in
24  a clinical trial, you say I would like to have 95
25  percent -- or 90 percent -- like to have 95 percent

Page 107

1  confidence that if I -- that I can detect a difference
2  of a certain percent between the two populations,
3  because I believe that that level of difference in the
4  outcome has some clinical meaning.
5          So the power calculation in a clinical trial
6  has to do with making sure that you have -- you're
7  going to have enough observations given all of the
8  difficulties in keeping people in a clinical trial,
9  measuring the outcome of interest, being sure that you
10  have a sufficient magnitude of measurement capability;
11  in other words, can you find a difference, if there is
12  one there, by the test that you're using, your
13  clinical test.
14          And then -- and those factors are all taken
15  into account when you -- when you calculate how large
16  a population you need to start with to be able to have
17  some certainty that, at the end of the day, when the
18  trial is over, that you truly have -- that the trial
19  has been robust enough to tell you if there is a
20  difference, it's real, if there's not a difference,
21  there's real -- it's real.
22    Q.   Let me try and simplify it a little bit for
23  the jury, if we could.  Would it be fair to say that
24  power is the probability of detecting a difference of
25  specified magnitude at a specified level of

Page 108

1  significance; would that be a fair statement?
2    A.   That does relate to -- yes.  And that's
3  all -- exactly -- pretty much what I just said.
4    Q.   That's why I was trying to simplify it for
5  the jury a little bit.  I'm glad we could agree.
6          MR. ROTHMAN:  The jury will understand that
7  one.
8          THE WITNESS:  I don't know.  But the whole
9  point is the power calculation is to tell you how many
10  observations you need to have.
11  BY MR. BLACK:
12    Q.   Okay.  I understand that.
13    A.   And, if it's a clinical trial, that means how
14  many people do you have to have enrolled.
15    Q.   Doctor, my question was what it was.  So I'd
16  like to move on.
17    A.   Right.
18    Q.   The explanation of what you use it for is not
19  really responsive to my question.
20    A.   Okay.
21    Q.   Since we've agreed that it's the probability
22  of detecting a difference of specified magnitude at a
23  specified level of significance, what power level is
24  generally accepted by scientists as adequate when
25  designing a study?

Page 109

1    A.   I mean it can be anywhere from 85 to 95
2  percent.  It depends upon the importance of the
3  question.  But it has to be well above -- above
4  chance, well above the 50 percent level.
5    Q.   Okay.  Would you agree that an 80 percent
6  power is considered acceptable in some studies?
7          MR. ROTHMAN:  Objection to the form.
8          THE WITNESS:  In some studies, yes, it can be
9  acceptable.
10  BY MR. BLACK:
11    Q.   Okay.  If I told you that I wanted to detect
12  a doubling of the risk, a relative risk of two?
13    A.   Okay.
14    Q.   A relative risk of two, I wanted that
15  relative risk to be statistically significant at the 5
16  percent level.
17    A.   Okay.
18    Q.   A relative risk of two statistically
19  significant at the 5 percent level.  I want the power
20  to be 80 percent.  And the disease of interest occurs
21  in one out of 1,000 people in the control population.
22  Is there anything else that you would need to
23  determine the size of the study?
24          MR. ROTHMAN:  Objection to the form.
25  BY MR. BLACK:

1    Q.  That would be required to detect that
2  relative risk with an 80 percent chance of detecting?
3    A.  You've specified the magnitude of difference
4  between the two groups that you want to be able to
5  see; is that correct?
6    Q.  A relative risk of two.
7    A.  And you've specified the power that you want
8  to detect that.
9    Q.  Eighty percent.
10    A.  The background rate.
11    Q.  One in 1,000.
12    A.  I think you have to also take into
13  consideration what -- if you're looking at a trial
14  between one or more products, what you consider the
15  likely magnitude of the treatment, the treatment
16  effect I guess.
17    Q.  We'll assume that we're looking at a
18  magnitude that would give a relative risk of two.
19    A.  Right.  But I think you have to have an
20  estimate of a response rate to be able to -- the
21  response rate you would like to see to be able to
22  determine how large a population that you need.  In
23  other words, if you expect that -- that your treatment
24  will have -- be effective in 90 percent or 85 percent
25  or whatever of the population treated -- that's my

1  recollection.  I think that's true.
2    Q.  Well, let's take it outside the context of
3  people treated with a drug and let's just make it a
4  little bit simpler.  We're trying to determine if
5  there are a difference in people exposed to something
6  and not exposed to something.  And we're not looking
7  for a therapeutic effect.  Our expectation is that the
8  people exposed at some kind of a toxin, that they're
9  going to have an adverse effect so it will occur more
10  frequently in the exposed people than the unexposed
11  people.
12    A.  Okay.
13    Q.  If we simplify the assumptions that way and
14  we're expecting a relative risk of two or more, is
15  there anything else that you would need in order to
16  determine the number of people to include in the
17  study?
18    A.  Not if you don't have to consider dropout and
19  things like that.
20    Q.  Would you also have to consider the ratio of
21  the number of controls for each subject exposed to the
22  substance, is that something else you would have to
23  consider?
24    A.  Because we're now talking about a case
25  control study?

1    Q.  No.
2    A.  Is that what you're talking about?
3    Q.  No, no.  No, this is not a case control
4  study, in fact.  It's a cohort study.
5    A.  Okay.  But you already know what your
6  background rate is and you know what the relative risk
7  is that you're looking for.
8    Q.  Yes.  And I'm looking for the number of
9  people I need to include in the study to have this 80
10  percent probability of detecting the relative risk.
11    A.  But you're not talking about a case control
12  study and you're not talking about a randomized study?
13    Q.  No, no.
14    A.  Well, the number of -- of people exposed with
15  the disease -- if you have a two-by-two table -- well,
16  you know, I mean you have to take into account true
17  positives, false -- false positives, true negatives,
18  false negatives.
19        You have to take into account the sensitivity
20  of the measurement that you're -- that you're -- that
21  you're using.  In other words, how sensitive and
22  specific is the measurement of the outcome.
23    Q.  I think you're wandering away from answering
24  my question a little bit.
25    A.  No, I'm not, I'm not.

1        MR. ROTHMAN:  I think she's answering your
2  question to the best of her ability.
3  BY MR. BLACK:
4    Q.  That I believe.
5    A.  You might not like what I'm saying, but I
6  believe that I'm answering your question.
7    Q.  Let me see if I can cut to the chase here a
8  little bit.  If I were to give you for a cohort study
9  the significance level 5 percent, the power 80
10  percent, the incidence of the disease in the control
11  population one in 1,000, the magnitude of the relative
12  risk to be detected two, and the number of controls
13  for each subject exposed, let's say one.
14    A.  But you just told me it's a cohort.
15    Q.  No, one.
16    A.  You just told me it was a cohort.
17        MR. ROTHMAN:  Okay.  One -- one at
18  a -- one --
19        MR. BLACK:  Please let me ask the question,
20  Doctor.
21        MR. ROTHMAN:  Excuse me.  One at a time.
22        THE WITNESS:  I'm sorry, I'm sorry.
23  BY MR. BLACK:
24    Q.  You've got -- and you're looking for the size
25  of the cohort, that's what we're looking for, Doctor.

Page 114

1  That's exactly what we're looking for, is the size of
2  the cohort. And I'm telling you that the two cohorts
3  are going to be the same size, one for one. I give
4  you that information.
5      Is it your testimony with that information
6  that you would need more in order to determine the
7  number of subjects required?
8      MR. ROTHMAN: Objection to the form of the
9  question.
10     THE WITNESS: I'm sorry. I don't understand
11  two cohorts and then controls. I'm sorry. I don't
12  understand your hypothetical. I don't understand.
13  BY MR. BLACK:
14     Q. Okay. Let's move on, let's move on. And I
15  think we've established that you don't understand how
16  to answer the question I've just posed; would that be
17  a fair statement?
18     A. I would -- I don't understand your question.
19     MR. ROTHMAN: Objection to the form. She
20  said she doesn't understand the question.
21  BY MR. BLACK:
22     Q. Thank you. Randomized clinical trials
23  generally involve fewer than 5,000 people, correct?
24     MR. ROTHMAN: Objection to the form.
25     THE WITNESS: No, no, that is not true. I

Page 115

1  mean they don't -- there are huge --
2  BY MR. BLACK:
3     Q. I said generally, Doctor.
4     A. Generally. In what context generally?
5     Q. In the context of the kinds of work that's
6  done for submission for an NDA. You generally don't
7  see clinical trials involving more than 5,000 people,
8  do you, Doctor?
9     A. A single trial involving more than 5,000?
10     Q. Yes, a single trial, Doctor.
11     A. Generally I -- probably not, although there
12  certainly are very -- there are prominent exceptions
13  to that rule.
14     Q. And randomized clinical trials involving
15  5,000 people or less are not powered adequately to
16  detect rare adverse events, are they, Doctor?
17     MR. ROTHMAN: Objection to the form.
18     THE WITNESS: Why don't you define rare for
19  me as you understand it.
20  BY MR. BLACK:
21     Q. One in 5,000.
22     A. That's correct, it would not detect one in
23  5,000.
24     Q. Okay. Let's make this a little bit simpler.
25  If I had a randomized clinical trial involving 3,000

Page 116

1  people, would that be adequately powered to detect an
2  adverse event that occurred in one in 1,000 people?
3     A. In general that's an accepted ratio.
4     Q. Would that 3,000 people be 3,000 people
5  taking the drug or 3,000 people total in the study?
6     A. It would be 3,000 people exposed to whatever
7  treatment of interest that you're looking at.
8     Q. And so, if the cohort of compare -- cohort
9  from the comparative population was of similar size,
10  that would mean a study involving 6,000 people,
11  correct, Doctor?
12     A. Yes, that would be correct.
13     Q. And how big would that study need to be to
14  detect a relative risk of two?
15     MR. ROTHMAN: Objection to the form.
16     THE WITNESS: You would be looking at a
17  doubling of the risk. You're looking at an event that
18  only occurs presumably with the exposure.
19  BY MR. BLACK:
20     Q. Yes.
21     A. And you're looking at a doubling? Well, that
22  doesn't make sense. It would depend upon how
23  frequently the event also occurs in the other
24  population, in the population exposed to the other
25  treatment, if you're looking for a doubling of the

Page 117

1  risk.
2     Q. Now, in order to obtain meaningful data,
3  randomized clinical trials generally study populations
4  that are narrower and less diverse, and I'm now
5  referring to randomized clinical trials done on
6  pharmaceutical products, such randomized clinical
7  trials generally study populations that are narrower
8  and less diverse than the population of people who
9  will ultimately take the drug when it goes on the
10  market; isn't that true, Doctor?
11     A. I think in general that's true, yes.
12     Q. So, for example, very young people are not
13  included in clinical trials usually, correct?
14     A. Depending upon the drug.
15     Q. And likewise very old people are generally
16  not included in clinical trials, correct?
17     A. Again it depends upon the drug.
18     Q. And sometimes people are excluded because
19  they have certain diseases or conditions and you don't
20  want to complicate the data with comorbidities; isn't
21  that correct?
22     A. With confounding, that's correct.
23     Q. And with Vioxx, in the randomized clinical
24  trials for Vioxx, as with many randomized clinical
25  trials, people with hypertension were sometimes

Page 118

1  excluded; isn't that correct?
2      A.  I think that's correct, yes.
3      Q.  And I'm not trying to suggest that there's
4  anything nefarious about that, that's just what you
5  have to do with randomized clinical trials, correct?
6      A.  Well, it really depends upon what you're
7  studying.  But certainly there are conditions that are
8  excluded.  And, in many trials and in the case of
9  Vioxx, I believe that hypertension was -- sustained
10  hypertension was one of the exclusion criteria.
11      Q.  And, in at least one of the randomized
12  clinical trials, people with prior heart attacks were
13  excluded, correct?
14      A.  Are we talking about Vioxx?
15      Q.  Yes, we're talking about Vioxx.
16      A.  Yes, I believe that -- yes, within a certain
17  period of time, yes, that's correct.
18      Q.  And, in some of the randomized clinical
19  trials done in connection with Vioxx, people with
20  other factors that might predispose them to heart
21  attacks were excluded; isn't that correct?
22      A.  I believe that is correct, yes.
23      Q.  Now, exclusions like that are the normal part
24  of doing randomized clinical trials; would that be a
25  fair statement?

Page 119

1      A.  Well, let me back up.  There were people
2  enrolled in the Vioxx trials that were permitted to
3  use drugs that indicated a -- particularly aspirin, a
4  risk for a cardiovascular event.  So I'm sorry.  With
5  that clarification can you repeat your question you
6  just asked.
7      Q.  Well, let's see.  Based on your further
8  response, I'm going to strike the prior question and
9  ask a different follow-up question.
10          In the VIGOR trial, the people on the VIGOR
11  trial were not supposed to be taking aspirin as they
12  participated in that trial; is that correct?
13      A.  That's correct.
14      Q.  Now, there were some aspirin indicated people
15  who did wind up in the trial; is that correct?
16      A.  Apparently so.
17      Q.  Was that in accord with the study design?
18      A.  No.  The intent of the study design was to
19  exclude people who had risk factors that would -- that
20  would recommend them for low dose aspirin.
21      Q.  And is it fair to say that, without that
22  exclusion criteria, there would have been a higher
23  percentage of people in the VIGOR trial who were, in
24  fact, indicated for low dose aspirin?
25          MR. ROTHMAN:  Objection to the form.

Page 120

1          THE WITNESS:  Well, I think that is true
2  in -- that is true.  I think we also have to
3  acknowledge that the rheumatoid arthritis patient
4  population that was the population in VIGOR is
5  considered in general to be a little higher, have a
6  higher risk of cardiovascular events due to the
7  ongoing inflammatory process.
8          But that being said, the intent of the study
9  was to limit as much as possible people who had
10  clearly defined risk for cardiovascular events outside
11  of the risk that's accepted for the RA population.
12  BY MR. BLACK:
13      Q.  I have to ask you to refresh my recollection
14  here.  I think you testified earlier that you had once
15  upon a time designed an epidemiology study; did I
16  recall that correctly?
17      A.  I've designed epi studies, yes.
18      Q.  Okay.  About how many have you designed?
19      A.  I don't know, four, five, six.  I don't
20  remember.  I've participated in designs, I've designed
21  them.
22      Q.  Have you ever designed a randomized clinical
23  trial?
24      A.  That went for -- well, I didn't draft the
25  original study.  But I certainly have participated in

Page 121

1  the refining of a design of a clinical trial, scores
2  of clinical trials.
3      Q.  And, in your participation in the design of
4  randomized clinical trials, would it be fair to say
5  that, on issues like determining power and the size of
6  the population required, that you deferred to
7  biostatisticians to do that work and that you were
8  reviewing other portions of the design?
9      A.  I would certainly defer the calculations to
10  the biostatistics group, yes, that's true.
11      Q.  So I take it that it's fair to say that
12  you've never determined the power of a randomized
13  clinical trial?
14      A.  Well, I've had -- actually I have.  I have
15  run the numbers.  But it was on a program that -- that
16  was given to me by one of the professors at Johns
17  Hopkins.  So I didn't sit down and do the calculations
18  by hand, that's for sure.
19      Q.  I know from recent experience that you can
20  get on the Internet and you can find a chi-square
21  calculator, where you just put the numbers in and you
22  get your result.  Was that the kind of calculation
23  that you did for determining the power in randomized
24  clinical trials, did you put numbers into an existing
25  program?

Page 122

1     A.  Right, correct, yes, from the professor that
2  I took clinical trial design from at Hopkins.
3     Q.  And I take it you would agree that, if any
4  study, no matter what the power initially, if any
5  study finds a statistically significant association,
6  then by definition that study had a sufficient sample
7  size to detect the association?
8     A.  Yeah, assuming chance didn't play into it and
9  assuming it didn't fall into the 5 percent, yes.
10    Q.  Well, what do you mean it didn't fall in the
11 5 percent?  You've conducted a study.
12    A.  Right.
13    Q.  Who knows what the power of the study was
14 going forward, it wasn't calculated.  You later
15 determine that it was -- had a power of 60 percent
16 which is a low powered study.  But it comes up with a
17 statistically significant association.  That doesn't
18 change the validity of the statistically significant
19 association, does it?
20    A.  Numerically, numerically, that's correct.
21 Numerically it does not.  In terms of how it applies
22 in the clinical world, that's a totally different
23 issue, because you can get statistically significant
24 associations by chance alone.
25    Q.  That would be true no matter what the power

Page 123

1  of the study was; isn't that right, Doctor?
2     A.  That's correct.
3        MR. BLACK:  It's almost one o'clock.  Let's
4  go off the record for a minute.
5        THE VIDEOGRAPHER:  We are off the record.
6  The time now is 12:49 p.m. Mountain time.
7        (Recess taken from 12:49 p.m. to 2:29 p.m.)
8        THE VIDEOGRAPHER:  We are back on the record.
9  The time now is 2:29 p.m. Mountain time.
10       MR. BLACK:  Okay.  During our break for
11 lunch, I've had an opportunity at least briefly to
12 review the three boxes of documents that were produced
13 as those documents that were in Dr. Arrowsmith-Lowe's
14 possession.  We've made copies of a few of the
15 documents.  And we'll introduce them later in the
16 deposition.
17       There were three groups of documents which I
18 have identified to Ms. Graham and Mr. Rothman.  And
19 they have agreed to provide us copies of everything
20 that's in those three groups of documents.  Is there
21 any question about what it is that we've requested?  I
22 think they've been adequately identified.  Isn't that
23 right, Counsel?
24       MR. ROTHMAN:  Yes.
25       MR. BLACK:  Okay.  And what I would like is

Page 124

1  if -- counsel has agreed to take these documents back
2  to New York, copy them, and send copies to me at
3  Lockridge Grindal Nauen.  And could that be done first
4  thing next week?
5        MR. ROTHMAN:  Yes.
6        MR. BLACK:  Okay.
7        THE WITNESS:  Can I -- I had I'd like to --
8  when you were asking me earlier about power
9  calculations and what all you need, the other thing
10 that you have to take into account in designing a
11 clinical trial is the duration of the observations and
12 whether -- and you can look at it in person-years and
13 so forth.
14       But usually you have to take into
15 consideration a duration for a treatment effect to
16 be -- become obvious, a duration of time.
17 BY MR. BLACK:
18    Q.  Is the clarification that you've just
19 provided something that you discussed with counsel
20 over lunch?
21    A.  No, it's something -- well, I told them that
22 I believe that that's something that I needed to
23 clarify.  But I didn't -- I thought of it.
24    Q.  Did you discuss any other aspects of the
25 deposition over lunch?

Page 125

1     A.  No, we didn't.  Nothing substantive.
2     Q.  Now, at page 2 of your report which is
3  Exhibit 1 to this deposition, you state that you have
4  expertise in the regulations which govern the
5  approval, labeling, advertising, and marketing of
6  pharmaceutical products in the United States; is that
7  correct?
8     A.  Yes, that's correct.
9     Q.  And those regulations are the -- are
10 essentially the Food and Drug Administration
11 regulations; would that be correct?
12    A.  Right.
13    Q.  While you were at the FDA, did you ever have
14 occasion to draft proposed labeling language?
15    A.  Yes, I did.
16    Q.  About how many times did you do that?
17    A.  Well, I -- several times I proposed changes
18 to labels of currently marketed drugs.  I did propose
19 specific labeling wording for aspirin and for the
20 vaginal products that are oil based.
21    Q.  Any other experience with labeling while you
22 were at the FDA?
23    A.  Well, some of the studies that I did resulted
24 in labeling changes.  And the changes were derived
25 from the studies.  I certainly reviewed labeling to

Page 126

1   see if -- well, in terms of writing labeling changes.
2   I believe there were some of the adverse events that
3   we detected that also entered into labeling.
4       Q.  But, in the case of adverse events that you
5   detected that entered into labeling, were you directly
6   involved in drafting the labeling language to reflect
7   those adverse events?
8       A.  Well, since it was a clinical diagnosis,
9   there was not a lot of drafting to be done.  It would
10  be the addition of a clinical diagnosis to an adverse
11  event.
12      Q.  Were you involved directly even in that
13  limited drafting?
14      A.  Yes.
15      Q.  While you were at the FDA, did you ever
16  engage in negotiations about labeling with a drug
17  sponsor?
18      A.  I'm not sure that I was ever the primary
19  person involved in negotiating a labeling change.  I
20  certainly was involved in it and involved in
21  investigative brochures which are sort of the
22  premarket label for a product.  But for drugs I think
23  that I was not at a level where I was involved in the
24  direct negotiation.
25      Q.  While you were at the FDA, did you ever draft

Page 127

1   a -- what's called a DDMAC letter?
2       A.  I didn't draft one, no.
3       Q.  And I guess we should clarify, what does
4   DDMAC stand for?
5       A.  Division of Drug Advertising, Marketing --
6   let me write it out.  And commercialization.
7       Q.  Well, I'm asking you from memory.  Let me ask
8   you if this conforms with your memory rather than
9   making it a guessing game here.  Would it be Division
10  of Drug Marketing, Advertising, and Communication;
11  does that sound right?
12      A.  Yes, that sounds right.
13      Q.  At page 3 of your report, you state that the
14  "FDA is the United States Government Agency
15  responsible for assuring that prescription medicines
16  marketed in the United States are safe and effective
17  for use as labeled."  Is that a correct statement of
18  what you've written?
19      A.  Yes.
20      Q.  Now, just to clarify FDA approval does not
21  necessarily assure that a drug is going to be safe and
22  effective once it gets on the market, does it?
23          MR. ROTHMAN:  Objection to the form.
24          THE WITNESS:  In a public health sense,
25  that's the whole purpose of FDA review and approval,

Page 128

1   is to assure that in a public health sense that the
2   product is safe and effective when used in accordance
3   with the label.
4           Now, that doesn't mean that a drug or any
5   other product will be effective for an individual nor
6   does it mean that a drug or any other product is
7   100 percent safe for any one individual.  But, as a
8   public health service agency, the intent is that in
9   general, in terms of the greater good of the public
10  health of the U.S., a drug is safe and effective, it's
11  approved because it is found to be safe and effective
12  when used in accordance with the label.
13  BY MR. BLACK:
14      Q.  Well, let me ask my question a slightly
15  different way.  I am assuming that, based on the
16  information available to it at the time that the FDA
17  approves a drug, that the FDA has good reason to
18  believe that whatever the balance of benefit and risk
19  is, that the drug is going to be safe and effective;
20  that would be a fair statement, wouldn't it?
21      A.  I'm pretty sure that's exactly what this
22  says.
23      Q.  I think it is what you said.  But, because of
24  things like the limitations of randomized clinical
25  trials, once a drug goes on the market, sometimes

Page 129

1   adverse events will appear that had not been
2   anticipated based on the premarketing testing; is that
3   true?
4       A.  Well, it's not only because of limitations,
5   potential limitations of clinical trials, it's also
6   the way people prescribe it, people take it, and that
7   kind of thing.  But yes, it is an accepted principle
8   that, when a drug goes on the market, we never know
9   all of the adverse events and conversantly we don't
10  always know all of the benefits.  So not everything is
11  known about a drug when it first goes onto the market,
12  that's correct.
13      Q.  And, in fact, I think Viagra is an example of
14  a drug where a benefit was discovered after the drug
15  was on the market; isn't that right?
16      A.  And a very serious adverse event as well.
17  Multiple serious adverse events.
18      Q.  So it's fair to say that, for a variety of
19  reasons, adverse events associated with a drug will
20  not become known until after the drug is on the
21  market?
22      A.  Many will not become known, that's correct.
23  And they may be of greater or lesser importance.
24      Q.  And, in fact, there have been in recent years
25  a number of drugs withdrawn from the market because of

Page 130

1 safety concerns; would that be a fair statement?
2    A. There have been a number of drugs throughout
3 the history of regulation that have been withdrawn for
4 safety reasons.
5    Q. A drug called Rezulin was withdrawn because
6 of safety concerns; is that correct?
7    A. That's correct.
8    Q. A drug called Propulsid; is that correct?
9    A. Well, you get into semantics with Propulsid
10 in particular because it was appropriately labeled.
11 But physicians were unable to -- to effectively change
12 their prescribing habits.
13    Q. Have you ever given testimony with regard to
14 Propulsid?
15    A. I don't believe I have.
16    Q. What about a drug called Posicor,
17 P-o-s-i-c-o-r? Was that withdrawn from the market
18 because of safety concerns?
19    A. I think Posicor was also withdrawn because of
20 drug interactions like Seldane. Seldane in addition
21 was withdrawn for -- because of drug interactions,
22 drug and food interactions.
23    Q. But again drug and food interactions that had
24 not been detected during the premarketing testing of
25 the drug; would that be correct?

Page 131

1    A. That's correct.
2    Q. Baycol was withdrawn because of safety
3 concerns; is that correct?
4    A. Very similarly along the lines of the others,
5 yes.
6    Q. A drug called Raxar, R-a-x-a-r; would that be
7 right?
8    A. Raxar, I don't -- I'm not familiar with
9 Raxar.
10    Q. Have you heard of a drug recalled Redux,
11 R-e-d-u-x?
12    A. I think I've heard of that drug, yeah.
13    Q. Was that withdrawn from the market because of
14 safety concerns?
15    A. It was withdrawn from the market because it
16 was unclear what the risk-benefit ratio was, yes.
17    Q. Was that lack of clarity about the
18 risk-benefit ratio because additional risks
19 materialized after it was on the market or because the
20 beneficial effect was found to be less than
21 anticipated once it went on the market?
22    A. There were new previously undocumented,
23 unexpected adverse events associated with the drug.
24    Q. Have you ever heard of a drug called Duract,
25 D-u-r-a-c-t?

Page 132

1    A. Yes, I have.
2    Q. Was that withdrawn from the market because of
3 safety concerns?
4    A. Yes.
5    Q. Was a drug called Omniflox, O-m-n-i-f-l-o-x,
6 withdrawn from the market because of safety concerns?
7    A. Yes.
8    Q. I believe we've already mentioned Seldane.
9 What about a drug called Raplon, R-a-p-l-o-n?
10    A. I don't know that one.
11    Q. Those that you do know of the ones that I've
12 just gone through, were they all drugs withdrawn
13 within the last few years?
14       MR. ROTHMAN: Objection to the form.
15       THE WITNESS: I don't remember when Duract
16 was withdrawn. Seldane the last few years, within the
17 past ten years or so, yeah.
18 BY MR. BLACK:
19    Q. And before that there were others that were
20 withdrawn; isn't that correct?
21    A. There have been drugs as I said throughout
22 the history of drug regulation -- regulation that are
23 withdrawn. Some of them come back onto the market.
24 But yes, there have been drugs throughout the history
25 of FDA regulation and I'm sure in other countries as

Page 133

1 well that have been withdrawn.
2    Q. Now, the FDA depends on sources outside the
3 agency for the data and information it evaluates; is
4 that correct?
5    A. Well, I'm not sure. FDA has its own
6 databases that it goes to. It has access to Medline
7 searches and the library. So I'm not sure what
8 you're -- what do you mean by that question? What
9 kind of data are you talking about?
10    Q. The safety and efficacy data that goes into a
11 new drug application comes almost exclusively from the
12 sponsor of the drug; would that be correct?
13    A. Well, the clinical trials data, yeah, that's
14 true. I mean the references and oftentimes the
15 references in an NDA are quite extensive and they're
16 from the published literature.
17    Q. But that isn't published literature that was
18 published by the FDA, is it?
19    A. No, it's published by investigators all over
20 the world.
21    Q. So it's information that came from the
22 sponsor or published information, but both of those
23 would be sources outside of the FDA; would that be
24 correct?
25    A. Well, that's what I was trying to get to. I

1   wasn't really sure what you were asking me, if you
2   were asking me about trade secret confidential
3   information or are you asking me about the whole range
4   of data that FDA uses when it's determining safety,
5   efficacy, marketability, and so forth.
6          So -- and is there -- do you consider there's
7   a difference between publicly available information
8   which I can get off the Internet as opposed to, oh,
9   information in an IND that never went forward but
10  maybe is in the same class as a new drug application,
11  which FDA and the sponsoring company are the only
12  people who have access to that information.  Your
13  question is not entirely clear to me.
14     Q.  The FDA is going to look at a file associated
15  with an NDA determine whether or not to approve the
16  NDA?
17     A.  What do you mean a file?  They look at an
18  NDA.  It's a huge --
19     Q.  Okay.  They're going to look at an NDA.  I
20  will -- I didn't mean to imply that there was a file
21  that was different from the NDA.  They're going to
22  look at the NDA?
23     A.  Uh-huh.
24     Q.  And the NDA is going to contain information
25  that came from the company, correct, the sponsor?

1      A.  Well, I mean the information comes from
2   investigators.
3      Q.  But the investigators don't send the
4   information directly to the FDA.  They send it to the
5   company which puts it together into the NDA format
6   which is then forwarded to the FDA, correct?
7      A.  In general that is true.  But there are
8   exceptions to that.
9      Q.  Okay.  And in general there may also be
10  included references to literature?
11     A.  Well, the actual -- the actual articles are
12  included in the NDA.
13     Q.  But the information that comes either from
14  investigators or from the sponsor, that isn't
15  information that was produced by work done by the FDA,
16  is it?
17     A.  The raw data, is that what you're talking
18  about?
19     Q.  Yes.
20     A.  The raw data are not produced in general by
21  FDA.
22     Q.  And much of the analysis of the raw data, in
23  fact, is not done by the FDA; is that correct?
24     A.  Well, the company submits their analysis.
25  But they also admit the SAS files.  And FDA often

1   reruns analyses with different data cutoffs, different
2   inclusion/exclusion, drop the last observation carried
3   forward and re-analyze it.
4          So the company does present their analysis,
5   but the company is also required to ship to FDA SAS
6   files which FDA can then go back into and in my
7   experience always does rerun analyses, do their own or
8   repeat the ones that the company did.
9      Q.  Okay.  Could you tell the jury what a SAS
10  file -- that's S-A-S I believe, correct?
11     A.  Yes.  It's a statistical software company
12  that is basically the only statistical software
13  company that is used in data analysis for the purposes
14  of FDA.  And a company is required to submit all of
15  their clinical trials data, everything that's gathered
16  in the data tables is submitted in these disks on --
17  which are in the SAS language, in the SAS software.
18         So that FDA can then plug those data sets in.
19  And it may be an ASCII file.  But FDA can then plug
20  those data sets into their computer and using their
21  SAS software rerun any analysis they want.  So it's --
22  the analyses of the company are not the only analyses
23  that are performed on the data that comes from the
24  company.
25     Q.  Okay.  One final question on SAS.  I think I

1   understood your answer to be that the SAS data is in a
2   format that can be used with SAS software; would that
3   be correct?
4      A.  Right, the CDs, that's correct.
5      Q.  So the SAS data that's submitted is not SAS
6   software, it's information that's compatible with SAS
7   software; would that be correct?
8      A.  Right, that's correct.
9      Q.  Now, is it your understanding that the FDA
10  reruns every calculation done by the company?
11     A.  No.  And that's not what I said.  They do --
12     Q.  I didn't mean to imply that it was.  I'm just
13  asking to clarify.  And I think the answer is no?
14     A.  Yes, no.
15     Q.  The FDA does no drug development on its own,
16  does it?
17     A.  No, they don't -- they don't really do drug
18  development on their own.
19     Q.  The FDA does no drug testing on its own, does
20  it?
21     A.  Yes, FDA does do drug testing.
22     Q.  Did the FDA do any drug testing in connection
23  with Vioxx?
24     A.  Not that I'm aware of.
25     Q.  Are clinical studies that are used in NDA

Page 138

1  submissions, new drug application submissions, are
2  they designed primarily to establish efficacy or to
3  find safety problems?
4      MR. ROTHMAN: Objection to the form.
5      THE WITNESS: Well, the intent -- always the
6  primary concern is safety throughout drug development.
7  So safety is -- data on safety is gathered for all
8  clinical trials, data relating to safety.
9      There are some trials that are --
10  particularly the pivotal trials that are powered
11  specifically and conducted, designed specifically to
12  test whether the drug is efficacious against some
13  other -- some control, whether it's a placebo -- a
14  placebo or some other active drug.
15      But throughout drug development including
16  postmarket, I mean safety is the major concern.
17  BY MR. BLACK:
18      Q.  Let me come at my question a little bit
19  differently then.  On page 4 of your report, you state
20  that the NDA submissions for Vioxx included results
21  from --
22      A.  Can I ask you where you are?  I don't know
23  where you are on page 4.
24      Q.  Okay.  That's a good question.  Why don't you
25  find it on page 4 of your report.  In that first

Page 139

1  paragraph, as of November 23rd, 1998, the date of
2  submission.
3      A.  Okay.
4      Q.  "Merck had completed more than 58 clinical
5  trials involving more than 10,000 patients and
6  collected and analyzed the cardiovascular data from
7  every Vioxx clinical trial."  Have I read that
8  correctly?
9      A.  Yes, you have.
10      Q.  Okay.  How many more than 58 clinical trials
11  was it?
12      A.  I don't know.  It may -- you know, those are
13  the ones that I actually went through the NDA file and
14  counted.  I think there were others that were
15  short-term that I really didn't pay that much
16  attention to.
17      Q.  You looked --
18      A.  Or were for other -- under other INDs.
19      Q.  You think that these 58 are the 58 most
20  important clinical trials relating to Vioxx then?
21      A.  These are the 50 -- these 58 relate to the
22  indications that were being proposed in this initial
23  NDA.  There were other indications that were being
24  studied as I recall at this time.
25      Q.  And the approximation of 10,000 patients, do

Page 140

1  you think it was as many as 15,000 patients or is
2  10,000 pretty close?
3      A.  I think it was around 10,000, ten, 12,000, I
4  don't remember now.  I thought this was a good
5  estimation when I wrote it.
6      Q.  And I'm not disputing that.  I'm just trying
7  to get some idea of how precise the estimate is which
8  I think you have given us.
9      Let's say it's 10,000, that's the estimate
10  you've given.  How many of those patients were taking
11  Vioxx during the clinical trials?
12      A.  Gosh, I would have to go back and look.  Some
13  of them were controlled, some of them were not
14  controlled, some of them were simply dose ranging
15  studies.  I'd have to -- I'd have to go back and count
16  how many were exposed.
17      Q.  But the 10,000 includes also patients who
18  were in the comparative groups for some of the trials;
19  is that correct?
20      A.  I think that's true, I think that's right.
21      Q.  What was the biggest number of patients in
22  any of the clinical -- of any of the 58 clinical
23  trials that you mention on page 4 of your report?
24      A.  You know, I'm -- I can't tell you precisely.
25  I think several hundred in the OA trials.  I don't

Page 141

1  remember whether -- I know there were more in other
2  longer-term trials.  But as I recall it was several
3  hundred.
4      Q.  Did any trial have as many as 1,000 patients?
5      A.  I don't remember.
6      Q.  What would the myocardial infarct, MI,
7  incident be in a placebo control population?
8      MR. ROTHMAN: Objection to the form.
9      THE WITNESS: Age, gender, underlying
10  illness.
11  BY MR. BLACK:
12      Q.  Okay.  That was a bad question.  Let me
13  strike the question.
14      A.  Okay.
15      Q.  Do you know what the MI incidence was in any
16  of the control populations used in the 58 clinical
17  trials that you have mentioned on page 4 of your
18  report?
19      A.  Right off the bat, no, no.
20      Q.  At page 5 of your report, you -- you quote
21  the Vioxx package insert.  You say, "The initial
22  package insert for Vioxx stated that cardiovascular
23  events have been reported rarely (less than 0.1
24  percent) in patients taking Vioxx regardless of
25  causality."  Have I read that correctly?

1    A.   You've read it correctly. I think I should
2  better define that. That was MI in particular. And
3  there were some other -- I think cerebral vascular
4  accident would have been in there. Cardiovascular
5  events is not -- is not -- is not defined in this.
6  And what that refers to is the MIs, stroke, I don't
7  remember the others that are in it. But those events
8  more thrombotic --
9    Q.   That would be the upper limit then on
10  whatever the number was for MIs; would that be
11  correct?
12   A.   In the patient population studied, yes,
13  that's correct.
14   Q.   That's one in 1,000, right?
15   A.   That's for the entire population, yes.
16   Q.   Now, if the MI rate in a control population
17  were one in 1,000 and if you had an equal number of
18  people taking Vioxx and on whatever the control
19  substance was, how many total patients would be
20  required for a study with an 80 percent chance of
21  finding a doubling of the relative risk at the 5
22  percent significance level?
23       MR. ROTHMAN:  Objection to the form.
24       THE WITNESS:  One study would require 3,000
25  patients in each -- a doubling of the risk?

1  BY MR. BLACK:
2    Q.   Yes.
3    A.   That would be two per thousand, one per --
4  1,500. Wait, no, no. Three times 1,500 which would
5  be 4,500; is that right? Yeah, 4,500.
6    Q.   Three times 1,500 would be 4,500. And that
7  would be 4,500 people taking Vioxx or 4,500 people
8  total of the study?
9    A.   If you're looking for a doubling of a risk of
10  0.1, then the population you need to look in would be
11  4,500.
12   Q.   Total?
13   A.   Yes, I believe that's correct.
14   Q.   Doctor, do you understand the origin --
15   A.   Five -- wait a minute. Let me rethink this.
16  1,500 -- no, it's actually 1,500. I should not have
17  multiplied by three. It's 1,500.
18   Q.   1,500 in the whole study to detect --
19   A.   1,500 if -- in the population that you're
20  looking for a rate of one per 500.
21   Q.   Okay. That's a rule of thumb, that you
22  multiply by three. If it's one in 1,000, that would
23  be 3,000 people, correct?
24   A.   Correct.
25   Q.   If it was one in 500, it would be 1,500

1  people, correct?
2    A.   Right.
3    Q.   Because you multiply by three. If it's one
4  in 100, it would be 300 people, correct, Doctor?
5    A.   In general, yes.
6    Q.   If it was one in ten, it would be 30 people;
7  is that correct, Doctor?
8    A.   I think you're -- yes, you're correct.
9    Q.   I caught on.
10   A.   Yes.
11   Q.   Do you know the origin of that rule, Doctor?
12   A.   It's -- it's handed down in epidemiology. I
13  don't really remember where it comes from. But it's
14  certainly one that -- that I've heard my career and,
15  in fact, Bob Temple used in the most recent COX-2
16  advisory committee meeting in February.
17   Q.   Okay. Would that be a rule of thumb for
18  having a 5 percent -- only a 5 percent chance of
19  missing a single event in a population if you assume
20  that the event occurred at a certain frequency? Does
21  that sound like what the rule comes from?
22   A.   You know what, it is just a rule of thumb. I
23  think, when you start applying power and statistical
24  significance and making it anything other than a
25  general rule of thumb, then I think you're stretching

1  it way beyond its capability.
2    Q.   Well, I'd like to talk about this rule of
3  thumb a little bit more, Doctor.
4    A.   Okay.
5    Q.   If you assume that you've got an event that
6  occurs in one out of ten people?
7    A.   Okay.
8    Q.   Your rule of thumb says I need 30 people for
9  some purpose. And I'm suggesting to you that that 30
10  people is what you need to have only a 5 percent
11  chance of missing the event entirely. And let's do a
12  little calculation to see if I'm right.
13       If you take one person out of a big
14  population and the chance is one in ten that that
15  person has the disease, has the effect, the chance
16  that the person will not have it is nine in ten,
17  correct? You don't understand that?
18   A.   No, I don't understand. I mean you're taking
19  a sort of a population calculation and trying to say
20  that's a predictive -- it's going to be predictive of
21  an event in an individual. And it really does not
22  work that way.
23       What you're looking at, the one in three is
24  you have to -- you about have to triple the number of
25  people to be certain that, if you find an event, it's

Page 146

1   likely to be a true -- a true association.
2        So -- and I've never heard anybody say, well,
3   it's .05 or it's .01 or .005, it's just a rule of
4   thumb that says that that's in general the size of
5   population you need to be able to reliably say that --
6   or to be -- to have a good chance of detecting an
7   association if it's real.
8        Q.  Let's forget population and people.
9        A.  But that's what it's all about.
10       Q.  Doctor, I want to talk some statistics here.
11  I've got a great big basket that's got millions of
12  balls in the basket.
13       A.  Uh-huh.
14       Q.  And I have reason to believe that one in ten
15  of those balls is black.  So there's more than one in
16  there, there's lots of them.  But one in ten is black
17  and all the rest are white.  Do you understand the
18  hypothetical up to this point?
19       A.  So you're saying 10 percent are black and 90
20  are white.
21       Q.  That's what I'm saying.
22       A.  Okay.
23       Q.  Now, I draw one ball out of the basket.
24  What's the chance the ball is going to be black?
25       A.  Well, you have basically, all things --

Page 147

1   assuming that it's a fair draw, you have a one in ten
2   chance.
3        Q.  Okay.  And when we shake this up and we make
4   it as random as possible.  So what is the chance it's
5   going to be not black?
6        A.  Clearly it's nine in ten.
7        Q.  All right.  Now, I draw a second ball out.
8   This is a big population so the distribution didn't
9   change in any appreciable way by taking one ball out.
10  I draw a second ball out.  What's the chance it's not
11  going to be black?
12       A.  That it's going to be white?  It's the same,
13  it hasn't changed.
14       Q.  Nine in ten, right?  So what's the
15  probability that I draw two consecutive balls that are
16  not black?  That's beyond your understanding?
17       A.  Each one -- each -- you know, you don't
18  really have to be rude.
19       Q.  Well, I'm not trying to be rude, Doctor.
20       A.  I think you are trying to be rude.  It's the
21  gambler's -- it's the -- what is it.  It's like the
22  gambler's conundrum.  Chance does not have a memory.
23  So every one has the same chance.
24       Q.  Okay.  But my question was different.  Every
25  one has the same chance, it's nine in ten and then

Page 148

1   nine in ten for the individual ball.  But my question
2   was a little bit different.  What's the chance of
3   drawing two consecutive that are white?
4        A.  That's a factorial as I recall.  And I -- I
5   don't remember how to do that calculation.
6        Q.  Well, would you accept it's possible that you
7   multiply .9 by .9 and come up with .81?  Does that
8   sound reasonable?
9        A.  Well, that would be a factorial.
10       MR. ROTHMAN:  Objection to the form.
11       THE WITNESS:  That's a factorial.
12  BY MR. BLACK:
13       Q.  All right.  And then, if I drew three, I
14  would multiply by .9 again to see what my probability
15  is of not getting black, right?
16       A.  It is a factorial, that's true.
17       Q.  And you might want to do this when you have
18  access to a calculator.  If you go find a calculator
19  and you do -- .9 squared would give you .81, .9 to the
20  third gives you .72, whatever it is, by the time you
21  get down to about a 5 percent probability of not
22  seeing any black balls, you've drawn about 28 or 29
23  balls.  And I would suggest to you, Doctor --
24       A.  Of not drawing -- I don't understand.
25       MR. ROTHMAN:  Okay.  Well, hold on a second

Page 149

1   because he hasn't even asked a question yet.
2   BY MR. BLACK:
3        Q.  And I would suggest to you, Doctor, that that
4   is the origin of the rule of three.  Do you have any
5   reason to disagree with that analysis?
6        MR. ROTHMAN:  Objection to the form.
7        THE WITNESS:  No.
8   BY MR. BLACK:
9        Q.  So I come back to my question then -- or
10  strike that.  Let me ask another question.
11       How many people would you have to have
12  then -- that would -- strike that.
13       That one in five chance, the rule of three
14  gives you a 5 percent chance of not missing the
15  effect.  Would that give you -- that's one case, one
16  case.  How many would you need in order to calculate a
17  relative risk?
18       MR. ROTHMAN:  Objection to the form.
19       THE WITNESS:  What is this population size?
20  BY MR. BLACK:
21       Q.  That's the question, is what is the
22  population size, exactly, Doctor.  What is the
23  population size you would need?
24       A.  I'm sorry.  Give me what you're stating as
25  the facts to work with.

Page 150

1    Q.  Okay.  Back up.  I think it should be the
2  sample size that you need.
3        MR. ROTHMAN:  We're not offering her as an
4  expert in statistics.  So we're getting a little far
5  afield which may be why you're running into some
6  difficulty here.
7  BY MR. BLACK:
8    Q.  Do you think it's possible, Doctor, that that
9  rule of three is not the rule that you use to
10  determine how many people you need in a study to
11  determine what a doubling of the relative risk is, a
12  doubling of the risk is?
13        MR. ROTHMAN:  Objection to the form.
14        THE WITNESS:  I'll go back to what I said
15  initially, that that is a rule of thumb, that I would
16  not say that -- that it is a -- it's a way to
17  determine sample size, it's not a way to estimate
18  power calculation, it's simply a rule of thumb.
19        And, you know, I understand how you believe
20  it was derived.  That's fine.  My -- I'm just saying
21  that it's one of those -- one of those pieces of
22  conventional wisdom that's handed down.  And I am not
23  trying to apply that strictly to a clinical trial or
24  even to an epidemiologic study.  It is just a
25  guideline.

Page 151

1  BY MR. BLACK:
2    Q.  Coming back to my question, if the MI rate in
3  the control population were one in 1,000, equal number
4  of subjects taking Vioxx in the comparator, 80 percent
5  chance is what you want, 80 percent power, and you
6  want to detect a doubling of the relative risk at the
7  5 percent significance level, do you have any reason
8  to disagree that it would take about 47,000 patients
9  total in the study in order to have that power, that
10  probability of detecting a relative risk of two?
11        MR. ROTHMAN:  Objection to the form.
12        THE WITNESS:  I have no way to answer that.
13  I'm not doing a power calculation, I don't have the
14  capability of doing it here.  And I'm not -- I didn't
15  come prepared to do power calculations.  And so, you
16  know, I'm not going to agree or disagree.  There's no
17  way for me to answer that question right now.
18  BY MR. BLACK:
19    Q.  And you didn't do any power calculations then
20  with regard to any of the studies done on Vioxx; is
21  that correct?
22    A.  That is correct.
23    Q.  Did you review power calculations done by
24  others with regard to any of the studies done on
25  Vioxx?

Page 152

1    A.  I reviewed the research reports which include
2  the power calculations.  And I have no reason to
3  disagree with the research report and its outline of
4  the power calculation knowing that particularly for
5  the pivotal trials those power calculations have been
6  reviewed by the statistical group at FDA.  I have no
7  reason to -- you know, I would not second-guess the
8  power calculations.
9    Q.  So your opinion is based on the fact that the
10  FDA looked at that work and you saw no complaints
11  about the power calculations from the FDA; is that
12  correct?
13        MR. ROTHMAN:  Objection to the form.
14        THE WITNESS:  No, no, that isn't what I said.
15  I am saying that, as far as I'm concerned, with the
16  power calculations, both the statistical group at the
17  company and the statistical group at FDA are learned
18  intermediaries.  And I trust that their judgments are
19  appropriate.
20  BY MR. BLACK:
21    Q.  And, when you say learned intermediary, what
22  do you mean by that term in this context?
23    A.  I mean these are people whose -- that's their
24  profession, is to evaluate a whole host of statistical
25  parameters.  And they're far better equipped to do

Page 153

1  that than I am, you know, in the absence of, you know,
2  appropriate data and appropriate computer programs.
3        So I'm not going to argue with the power
4  calculations that were made for those -- for those
5  studies.  I assumed that what they said they could
6  find with the numbers that they proposed was, in fact,
7  what they were likely to find with the numbers
8  proposed.
9    Q.  Was any Vioxx study conducted prior to
10  approval powered adequately to detect risk doubling
11  for myocardial infarctions?
12    A.  I don't know that that was part of the
13  calculus in developing the power calculations.  I'm
14  not aware that that was part of the calculus.
15    Q.  Do I understand your answer to mean you don't
16  know one way or the other?
17    A.  That's exactly correct.
18    Q.  Was any Vioxx study ever done at any time
19  adequately powered to detect risk doubling for
20  myocardial infarctions?
21        MR. ROTHMAN:  Objection to the form.
22        THE WITNESS:  Again I don't know whether that
23  was part of the -- I didn't see that as part of a
24  power calculation.
25  BY MR. BLACK:

Page 154

1    Q.   And I assume your answer would be the same
2  for strokes, if I were to ask the question about
3  strokes?
4    A.   Yes, that would be correct.
5    Q.   And I assume the answer would be the same if
6  I asked for thromboembolic adverse events generally?
7    A.   Again I don't know.  I didn't see that as a
8  consideration of power calculations.
9      (Exhibit No. 7 was marked.)
10 BY MR. BLACK:
11   Q.   I'm handing you now -- handing you now what
12 has been marked as Exhibit 7.  And Exhibit 7 is
13 excerpts from the primary review of NDA 21-042; is
14 that correct?
15   A.   That's what this says.
16   Q.   Would that be the NDA for Vioxx?
17   A.   That would be the initial NDA for Vioxx.
18   Q.   It says drug name Vioxx, rofecoxib, doesn't
19 it?
20   A.   I'm not -- all I'm saying is that would be
21 for the initial NDA.
22   Q.   I understand.  I just want to make clear that
23 this is, in fact, Vioxx.  If you look down about four
24 lines from the top, it says drug name and it says
25 Vioxx, correct?

Page 155

1    A.   Correct.
2    Q.   Okay.  If you will turn -- goodness, these
3  are not numbered.
4    A.   But this isn't the whole -- this isn't the
5  whole MOR.
6    Q.   No.  It is titled excerpts from, if you'll
7  take a look.
8    A.   I would really like to see the whole MOR if
9  you're going to ask me questions about -- I mean I'm
10 sorry, but I --
11   Q.   All right.  Well, if you have it available to
12 you here, I assume it's among the documents you
13 reviewed.
14   A.   It should be among the documents, yes.
15   Q.   And if you'd like to find it on a break and
16 if there's some reason to add to what your answers are
17 here.  But let's see if you can answer the question
18 that I want to ask based on this document.
19     MR. ROTHMAN:  Hold it.
20 BY MR. BLACK:
21   Q.   Let's just see if we can answer the question
22 that I want to ask here.  If you will come back seven
23 pages from the rear, this document for whatever reason
24 the pages are not numbered.  And there is a page at
25 the bottom of which appears table 52.  Are you finding

Page 156

1  that?
2    A.   Yes, I see that.
3    Q.   Okay.  And just above paragraph -- table 52,
4  excuse me, just above table 52, there's two
5  paragraphs.  And one says in summary.  Do you see
6  that?
7    A.   Yes, I see that.
8    Q.   Okay.  And then it says "In summary:  With
9  the available data, it is impossible to answer with
10 complete certainty whether the risk of cardiovascular
11 and thromboembolic events is increased in patients on
12 rofecoxib."  Did I read that correctly?
13   A.   Yes, you read that correctly.
14   Q.   "A larger database will be needed to answer
15 this and other safety comparison questions."  Did I
16 read that correctly?
17   A.   Yes, you did.
18   Q.   Do you have any reason to disagree with that
19 statement?
20   A.   No, I don't.
21     MR. ROTHMAN:  Do you want to see the
22 complete --
23     THE WITNESS:  If he's going to ask me more
24 questions, yes, I would like --
25     MR. BLACK:  I don't think I'm going to ask

Page 157

1  any more questions about that.
2      MR. ROTHMAN:  Okay.
3  BY MR. BLACK:
4    Q.   So, coming back to my question about what
5  clinical trials are capable of finding in general, can
6  we agree that for Vioxx at least the clinical trials
7  reported in the NDA were not adequately powered to
8  reach any conclusion about whether the drug causes
9  myocardial infarctions; would that be a fair
10 statement?
11     MR. ROTHMAN:  I'm sorry.  Could you read that
12 back.
13 BY MR. BLACK:
14   Q.   Would it be -- would it be correct to say
15 that, at least for the clinical trials reported in the
16 NDA for Vioxx, none of those clinical trials was
17 adequately powered to reach any conclusions about
18 whether the drug caused myocardial infarctions; would
19 that be fair enough, a fair statement?
20   A.   Well, I would say they were not powered for
21 that, that's correct.
22   Q.   And you have no knowledge one way or the
23 other about their power to detect strokes; is that
24 right?
25   A.   As far as I know, they were not powered for