Page 158

1 the detection of strokes.
2    Q.  And what about thromboembolic adverse events
3 generally, were they powered to detect that?
4    A.  I don't believe they were, no.
5    Q.  Can you name any trial that was sufficiently
6 powered to find a doubling of the myocardial
7 infarction risk in patients taking Vioxx as compared
8 with any other population?
9       MR. ROTHMAN:  Objection to the form.
10       THE WITNESS:  I'm not aware of any that were
11 a priori powered to detect any specific increase in
12 thromboembolic events, whether cardiovascular or
13 cerebrovascular.  I'm just not aware that any of them
14 were specifically powered for that.
15 BY MR. BLACK:
16    Q.  Well, you said a priori.  That leaves the
17 question about a postiori.
18    A.  The only way you can power is a priori.
19    Q.  Now, on page 4 of your report, you opine that
20 Merck adequately investigated potential risk?
21    A.  Okay.  And where are you?
22    Q.  Okay.  We're back at your report, Exhibit 1,
23 page 4.  Let's see.  It's the first full paragraph on
24 the page, it's the last sentence, "In my opinion,
25 Merck adequately investigated the potential risks of

Page 159

1 Vioxx."
2    A.  Yes.
3    Q.  Okay.  That's what you said in your report,
4 correct?
5    A.  That's correct.
6    Q.  Now, that opinion is not based on any
7 analysis of the data that you have done; is that
8 correct?
9    A.  No, that's based on my analysis of what was
10 submitted, what was reviewed.  No.  That is based on
11 my evaluation of what was submitted to FDA, what was
12 reviewed at the company, what was reviewed at FDA.
13    Q.  Okay.  Let me ask my question a little bit
14 differently, I think I asked a bad question.
15       That opinion is not based on any calculations
16 that you've done with the data, is it?
17    A.  It's not based on calculations, no.
18    Q.  It's based primarily on the fact that the FDA
19 reviewed the submissions and approved the drug; is
20 that correct?
21       MR. ROTHMAN:  Objection to the form.
22       THE WITNESS:  No, that isn't correct.  It's
23 also based on the fact that the company reviewed data
24 that came in to it.  I mean, if we're talking about
25 the cardiovascular risks, the company set up an

Page 160

1 adjudication process with three different expert
2 panels to review and to determine whether investigator
3 reported events, in fact, were cardiovascular
4 thromboembolic events or not.  I think that the
5 company did a very good job in reviewing the data that
6 was available.
7 BY MR. BLACK:
8    Q.  Now, is that opinion based on the fact that
9 the company had this process in place -- strike that.
10       That opinion is based then on the fact that
11 the company had this process in place; is that
12 correct?
13       MR. ROTHMAN:  Objection to the form.
14       THE WITNESS:  And that it had it in place, it
15 relied on its experts, it relied on its data safety
16 and monitoring boards.  These were people outside of
17 Merck.  And Merck set up the whole -- the SOPs so that
18 this could go forward, just talking about the
19 cardiovascular thromboembolic question.  I mean aside
20 from that Merck adequately investigated and reported
21 adverse events that were sent in from investigators.
22 BY MR. BLACK:
23    Q.  But your opinion about the adequacy is not
24 based -- again it is not based on any calculations
25 that you did?

Page 161

1       MR. ROTHMAN:  Objection, asked and answered.
2       THE WITNESS:  I answered that already.  And I
3 said I did not do any calculations, but I did review
4 the data.  And I reviewed the processes that were in
5 place to assure the validity of the data.
6 BY MR. BLACK:
7    Q.  So, as I understand your last answer, your
8 opinion about the validity of the data is based on
9 your review of the process through which it was
10 generated; is that correct?
11       MR. ROTHMAN:  Objection to the form.
12       THE WITNESS:  I'm sorry.  I feel -- I
13 can't -- I don't understand -- I don't understand what
14 you're asking me.  I mean I thought I gave a full
15 answer.  And I don't understand what you're asking me.
16 I'm sorry, I don't understand.
17 BY MR. BLACK:
18    Q.  You believe that the data in cardiovascular
19 adverse events that Merck developed, that Merck had or
20 acquired, that that was valid data; is that correct?
21    A.  Yes.
22    Q.  And your opinion that it's valid data is
23 based on your review of the process through which the
24 data was developed or generated; is that correct?
25       MR. ROTHMAN:  Objection.

Page 162

1      THE WITNESS: I don't know what you mean the
2  process. I don't know what -- what that encompasses
3  for you in that question.
4  BY MR. BLACK:
5      Q.  And I reviewed the processes that were in
6  place to assure the validity of the data.  Whatever
7  sense you used processes in, that's the sense I'm
8  using now.
9      A.  Okay.  You used singular, I used plural.
10     MR. ROTHMAN:  Hold on.  Let me object to the
11  form because I think you're mischaracterizing her
12  prior testimony.
13  BY MR. BLACK:
14     Q.  Do you understand the question now, Doctor?
15     A.  I will answer what I understand.  But I don't
16  know -- it is not what you asked me.  What I said is
17  there are processes in place.  Those processes include
18  the credentialing of investigators, they include
19  audits at the investigator sites, they include FDA
20  compliance audits, that includes data lock and review.
21     That includes the physician's best judgments,
22  the investigator's best judgments of what the events
23  that they're recording in terms of adverse events are.
24  It includes the adjudication of those reported events
25  by these expert panels.  It includes reporting the

Page 163

1  data to FDA.
2      It includes the CFRs for deaths and
3  withdrawals due to adverse events.  I mean it includes
4  all of the processes that are in place in the
5  regulatory framework as well as the processes that
6  Merck set up on its own, the DSMB and the expert
7  panels.
8      So those are the processes that I'm referring
9  to.  I am not referring to a single thing.  You know,
10  and you take into account the training and experience
11  of everyone involved with this.  So those are the
12  processes that I'm referring to.
13     Q.  I understand that.  Now, did you go back and
14  review the training and experience of any of the
15  people who were doing this work?
16     A.  Any of what people doing this work?  I'm
17  sorry.  What work are you talking about?
18     Q.  You take into account the training and
19  experience of everyone involved in this.  And I take
20  it by that you mean the training and experience that
21  the people who are involved in the various processes
22  that you have just listed; would that be correct?
23     A.  The physicians who are involved as
24  investigators, I know some of the people that were on,
25  for instance, the expert panel that helped design

Page 164

1  VIGOR, I'm aware of their training and experience, I
2  know the processes that go -- CVs of investigators are
3  reviewed at FDA.
4      Q.  Did you review any CVs of investigators?
5      A.  Of these investigators?  Not that I recall.
6      Q.  So you were, in effect, as part of the
7  processes that you were relying on, you were relying
8  on the fact that the FDA would review those CVs; is
9  that correct?
10     A.  The FDA would review them, compliance would
11  review them, the company reviews them; if it's a
12  contract research organization, they review them.  I
13  have some faith in the scientific processes that go
14  on.  I will absolutely admit to that.
15     I do not go back and question every premise
16  involved in the development of a drug.  And I do not
17  question all of the premises involved in the
18  ascertainment of adverse events and their evaluation
19  in drug development.  That simply is -- my experience
20  at FDA is that those people are very competent, they
21  are experienced, they're well trained.
22     Q.  And your opinion in this case then is based
23  on the fact that these well trained and experienced
24  people at the FDA went through the kinds of reviews
25  that you just outlined for us here; would that be

Page 165

1  correct?
2      MR. ROTHMAN:  Objection to the form.
3      THE WITNESS:  No.
4      MR. ROTHMAN:  This is the same problem she's
5  been having, is that you start the question with in
6  your opinion.  And it's not clear which of her
7  opinions or whether it's one opinion or several that
8  you're referring to.
9      MR. BLACK:  Well, that merited an objection
10  to form, Counsel.  And, if I had wanted to know what
11  the form was, I would have asked.  Since you've
12  outlined it for me, I appreciate that.
13     MR. ROTHMAN:  I'm just trying to -- trying to
14  help this move along.
15  BY MR. BLACK:
16     Q.  Now, let me see if I can fix that.
17     Your opinion with regard to the adequacy of
18  the processes through which -- by which Vioxx was
19  reviewed, is that opinion about the adequacy of the
20  processes based primarily on the fact that it was
21  these qualified people at the FDA doing it?
22     A.  No.  You've really misunderstood what I was
23  talking about when I talked about processes.  That
24  includes not only FDA, and frankly it's not just the
25  people at FDA, it's the regulations that they -- that

Page 166

1 they enforce and adhere to. It's the framework of the
2 regulations.
3       Also it has exact requirements on companies.
4 I know that, you know, I'm convinced of the competency
5 of many of the people whose memoranda I have read from
6 the company. I mean I'm not restricting this as I
7 said before to just what I consider the competencies
8 at FDA. I also consider the investigators, the
9 contract research organizations, the company. I
10 don't --
11    Q.  Let me see if I can ask you a question that
12 gets us --
13       MR. ROTHMAN:  Wait, wait.
14 BY MR. BLACK:
15    Q.  I mean, if you want to, I don't mean to cut
16 you off. But I think maybe I can get us to the end of
17 this a little bit quicker if you allow me to ask
18 another question.
19       MR. ROTHMAN:  Hold on. Let's let the witness
20 finish her last answer.
21       If you're finished, then you're finished; if
22 you're not, please go ahead.
23       THE WITNESS:  Well, I was just saying I feel
24 as though I've said this so many times and I don't
25 understand what's unclear about my response every

Page 167

1 other time. And I don't think I'm saying anything
2 different and I don't think any of my answers the past
3 three times have been different. So I'm having a very
4 difficult time understanding what you want me to
5 clarify.
6 BY MR. BLACK:
7    Q.  I understand that. And I'm not
8 understanding. Okay. And I'm trying to get an answer
9 that will help me understand what you mean by this.
10 And that's why I've been persisting in asking
11 questions. My questions may not -- apparently have
12 not been adequate to get the clarification that I'd
13 like.
14       Let me try this question then. Your review
15 consisted primarily of looking at the work that
16 others, be they at the FDA or Merck, wherever, but
17 consisted of primarily looking at work that others had
18 done with regard to Vioxx; is that a fair statement?
19       MR. ROTHMAN:  Objection to the form.
20       THE WITNESS:  I think that that in a very
21 general sense is a fair statement.
22 BY MR. BLACK:
23    Q.  And you accept the work that these others, be
24 they at the FDA, at Merck, or elsewhere, have done,
25 you accept that work at face value because of the

Page 168

1 confidence you have in the FDA and Merck and perhaps
2 others that did the work; would that be a fair
3 statement?
4       MR. ROTHMAN:  Objection.
5       THE WITNESS:  I wouldn't say that I accept at
6 face value. I would say that my assessment is also
7 based on my training, my experience, my knowledge
8 of -- of medicine, of drug development, of public
9 health.
10       So I really hesitate to agree that -- I mean
11 I would say that would be my explanation of what --
12 how I come to those judgments. It's not that I accept
13 just at face values work that other people do. It's
14 that I have an understanding of why work is done the
15 way it's done.
16       I understand -- I understand how
17 institutional review boards operate. I understand how
18 data safety and monitoring boards operate. So that
19 it's -- there are lots -- I understand that there are
20 lots of checks and balances in drug development, in
21 the development of the data and the analysis of the
22 data, in the presentation of the data.
23       There were three advisory committees that
24 looked at -- at the Vioxx data. So I really hesitate
25 to agree to an encapsulation that is so restrictive.

Page 169

1 And so I will not totally agree with the question as
2 you posed it. Can I get a drink of water.
3       MR. BLACK:  Shall we take a break at this
4 time.
5       MR. ROTHMAN:  Yeah, I think that's a good
6 idea.
7       MR. BLACK:  Let's go off the record.
8       THE VIDEOGRAPHER:  We are off the record.
9 The time now is 3:28 p.m. Mountain time.
10       (Recess.)
11       THE VIDEOGRAPHER:  We are back on the record.
12 The time now is 3:42 p.m. Mountain time.
13 BY MR. BLACK:
14    Q.  Doctor, would it be fair to say that the FDA
15 has been the subject of some significant criticism
16 recently?
17       MR. ROTHMAN:  Objection.
18       THE WITNESS:  I mean it's been the subject of
19 criticism recently. It's been the subject of
20 criticism as long as I've been associated with it
21 actually.
22       (Exhibit No. 8 was marked.)
23 BY MR. BLACK:
24    Q.  Okay. Well, let me hand you what's been
25 marked as Exhibit 8. And this is from a publication

Page 170

1  called The Pink Sheet Almanac; is that correct?
2      A.  That's what it says.
3      Q.  And The Pink Sheet is a publication that kind
4  of specializes in food and drug law; would that be
5  correct?
6      A.  No.  Pink Sheet I think is pretty much
7  exclusively drugs.
8      Q.  So it's a publication that specializes in
9  drug law; would that be correct?
10     A.  I don't know drug law.  It reports on things
11  going on inside and outside of FDA, companies and the
12  agency having to do in general with drug regulation.
13     Q.  I think that's a far more accurate statement
14  than I made about what it is.  In any event this
15  document, the caption is FDA Credibility Crisis:  1990
16  Generic Drug Scandal May Be Blueprint For 2005; is
17  that correct?
18     A.  That's what it says.
19     Q.  And then, if you'll read along with me, the
20  first paragraph, it says the "FDA is heading into 2005
21  facing the most difficult challenge to its credibility
22  as a regulatory agency since the generic drug scandal
23  at the end of the 1980s."  Is that correct?
24     A.  Well, that's what this says.
25     Q.  I'm just asking you to agree that's what it

Page 171

1  says.
2      A.  Yeah.  I don't think it's correct, but that
3  is what it says.
4      Q.  Okay.  You've probably already answered my
5  question, but let me discuss one more thing that it
6  said in here.
7      A.  I left my water.  Could you get my water.
8  Sorry.
9          MS. GRAHAM:  I'll get it.
10  BY MR. BLACK:
11     Q.  Shall we continue?
12     A.  Yes, uh-huh, that's fine.
13     Q.  If you go down one, two, three, four, it's
14  the fifth paragraph, nonetheless, you follow that?
15     A.  I see that.
16     Q.  Are you with me.  "Nonetheless, there is at
17  least one important common thread:  The claim that FDA
18  has tilted too far in favor of the industry in
19  response to an expanded legislative mission."  Now,
20  you would agree that's what it says in this document,
21  correct?
22     A.  That's what it says.
23     Q.  And I take it you disagree with that
24  assessment of the FDA?
25     A.  Yes, I do.

Page 172

1      Q.  Okay.
2          (Exhibit No. 9 was marked.)
3  BY MR. BLACK:
4      Q.  Let's take a look at what we'll mark as
5  Exhibit 9.  And Exhibit 9 is a Floor Statement of U.S.
6  Senator Chuck Grassley of Iowa; is that correct?
7      A.  That's what it says.
8      Q.  In the U.S. Senate Committee on Finance; is
9  that correct?
10     A.  That's what it says.
11     Q.  All right.  And, if you'll come down one,
12  two, the third paragraph, but before we do that, this
13  is dated July 18, 2005; is that correct?
14     A.  That's what it says.
15     Q.  And then three paragraphs down, "During the
16  last 18 months, this country's confidence in the FDA
17  has been shaken.  It has been shaken not because of
18  one isolated incident or one isolated whistleblower.
19  It has been shaken because multiple drug safety
20  concerns have been exposed by more than one courageous
21  whistleblower.  My oversight of the FDA leads me to
22  the conclusion that there are cultural and systemic
23  problems at the FDA."  Did I read that correctly?
24     A.  Yes, you read it correctly.
25     Q.  And then there's a sentence about

Page 173

1  Dr. Crawford.  And the following sentence after that
2  is "The evidence is overwhelming that the FDA must
3  change to better protect the American people."  Did I
4  read that correctly?
5      A.  You read that correctly.
6      Q.  Do you disagree with Senator Grassley's
7  assessment of the FDA?
8      A.  Yes, I do.
9      Q.  Okay.  Well, let me ask you another question
10  then.  This statement was made earlier this year, just
11  a couple months ago, correct?
12     A.  In July, that's what it says, yes.
13     Q.  Okay.  And you left the FDA in 1996, correct?
14     A.  I left FDA -- yes, in 1996.
15     Q.  So it's been nine years since you were there,
16  correct?
17     A.  Since I worked at FDA, that's correct.
18     Q.  So your firsthand knowledge of the FDA today
19  is not what it was in 1996, when you were there as an
20  employee; would that be correct?
21     A.  Well, I'm not employed by FDA, that's
22  correct.  But I certainly keep abreast of FDA issues
23  and I certainly know a lot of the people at FDA and
24  talk to them from time to time.
25     Q.  Who do you talk to at the FDA, Doctor?

Page 174

1    A.   I talk to David Graham, I talk to Diane
2  Kennedy.  I ran into several people at the
3  International Society for Pharmacoepidemiology
4  recently and the Drug Information Association a couple
5  of years ago.  So I stay in touch with people at FDA.
6    Q.   How often have you spoken with David Graham
7  since you left the agency in 1996?
8    A.   Three or four times.
9    Q.   When was the last time you spoke with David
10 Graham?
11   A.   A couple of months ago.
12   Q.   What did you discuss with him a couple of
13 months ago?
14   A.   How things were going, I had a protocol I
15 wanted to run past him.  Just I didn't -- I generally
16 just asked him how things were going and a few -- a
17 few scientific issues.
18   Q.   I take it you regard Dr. Graham as a very
19 competent scientist?
20   A.   I regard Dr. Graham as a friend.
21   Q.   Do you regard him as a competent scientist as
22 well?
23   A.   I think David and I have significant
24 differences in the way we approach data and data
25 interpretation.

Page 175

1    Q.   But, as I understood your testimony just a
2  minute ago, you were consulting with him about some
3  scientific issues; is that correct?
4    A.   Yes, about the feasibility of a project.
5    Q.   Who is Diane Kennedy?
6    A.   She is an MPH epidemiologist.  She was the
7  head of the MedWatch program from its inception until
8  a couple of years ago, a few years ago.  She's still
9  in the Center For Drugs.  She was in the Office of
10 Women's Health Issues.  And I -- I can't remember
11 whether she's still there or not.
12   Q.   Have you ever published anything with Diane
13 Kennedy?
14   A.   Yes, I have.
15   Q.   What would that be?
16   A.   The aspirin and Reye syndrome paper.  She
17 may -- no.  She wrote the companion chapter to the
18 book chapter that Chuck Anello and I wrote.  I may
19 have had -- I need to look at my CV.  That one stands
20 out, the aspirin and Reye syndrome.
21   Q.   Let me ask this question because this is what
22 I was really trying to get at.  And I think you just
23 answered it.  You had authored a chapter for a book
24 that was edited by Brian Strom; is that correct?
25   A.   Right, that's correct.

Page 176

1    Q.   On pharmacoepidemiology?
2    A.   That's correct.
3    Q.   And is Diane Kennedy the one who wrote that
4  chapter of the subsequent edition of the book?
5    A.   I believe she did, yes.  I believe she also
6  wrote a companion chapter when I wrote my chapter
7  initially.
8    Q.   Okay.  That addresses the question I had.  If
9  there's something you want to add based on reviewing
10 your CV, feel free.  But that's what my question about
11 Diane Kennedy was.
12   A.   That may have been the only paper she and I
13 did together.
14   Q.   Okay.  When is the last time you spoke with
15 Diane Kennedy?
16   A.   Well, we emailed back and forth in September
17 I think it was.  We were hoping to have dinner
18 together and then she got sick and couldn't make the
19 meeting.
20   Q.   Any other names other than Dr. Graham and
21 Dr. Kennedy that you can recall explicitly having --
22 strike that question.
23        Any people other than Dr. Graham or
24 Dr. Kennedy that you can recall explicitly having
25 discussions with since you left the FDA in 1996?

Page 177

1    A.   Who are still at FDA?  Well, I've talked to
2  Russ Katz who was the head of the Division of
3  Neuropharm.  I've talked to people in DDMAC.
4        There have been a couple of other people that
5  I've talked to who were in the postmarket safety group
6  with me.  And some of the reviewers, one of the
7  reviewers in the Division of Antiviral Drug Products I
8  stay in touch with.
9    Q.   About how often do you have contact with
10 people who are currently at the FDA?
11   A.   I don't know, once or twice a year.
12   Q.   And are those contacts typically at the types
13 of meetings that you described?
14   A.   They're meetings or they're phone calls or
15 emails, something along those lines.
16   Q.   About half of them at meetings and half
17 emails?
18   A.   I guess.
19   Q.   Would that be a fair --
20   A.   Sure, that's fine.
21        (Discussion off the record.)
22 BY MR. BLACK:
23   Q.   Do you know who Dr. Andrew Mosholder is?
24   A.   No, I don't think so.  It's a familiar name,
25 but I don't know who he is.

Page 178

1    Q.  Are you aware that warnings about possible
2  teen suicides on certain antidepressant drugs have
3  been added in recent years?
4    A.  Yes, I'm aware of that.
5    Q.  And it's correct, is it not, that those
6  warnings were required in Great Britain before they
7  were required in this country; is that correct?
8    A.  I believe that's true.  I think they were --
9  I think it was in the EU.  But yes, I believe that's
10  true.
11      (Exhibit No. 10 was marked.)
12  BY MR. BLACK:
13    Q.  Okay.  I'm going to hand you now what's been
14  marked as Exhibit 10.  And this is an article that
15  appeared in The Lancet earlier this year; is that
16  correct?
17    A.  Yes.
18    Q.  An article -- and the lead author for this
19  article was David Graham, correct?
20    A.  Yeah, that's correct.
21    Q.  That's the same David Graham that we were
22  talking about at the FDA earlier?
23    A.  Yes.
24    Q.  Are you familiar with this article?
25    A.  Yes.

Page 179

1    Q.  And I direct your attention to page 480,
2  towards the end, just before it starts listing the
3  contributors.  There's a paragraph that says in the
4  future.  And then if, you look up in the paragraph
5  just before that --
6    A.  Okay.
7    Q.  Page 480.
8    A.  Okay.
9    Q.  I'm sorry.  Am I going too fast for you?
10    A.  Yes.
11      MR. ROTHMAN:  Yeah, I think
12  Dr. Arrowsmith-Lowe needs a little time to look at the
13  article.
14      THE WITNESS:  So it's 480.
15  BY MR. BLACK:
16    Q.  Page 480.  And then, over in the right-hand
17  column, the penultimate paragraph towards the bottom,
18  there's a sentence that begins using the relative
19  risks from the above-mentioned randomized clinical
20  trials.  Do you see that?
21    A.  No, I don't see that.  I don't know what
22  you're -- where you are.
23      MR. ROTHMAN:  It's the middle of the
24  paragraph.
25      THE WITNESS:  The middle of the paragraph.

Page 180

1  Okay.  I'm sorry.
2      MR. ROTHMAN:  It took me awhile to find it
3  too.
4  BY MR. BLACK:
5    Q.  Using the relative risks from the
6  above-mentioned clinical trials, do you find that now?
7    A.  I see that, yes.
8    Q.  Okay.  If you read along with me please,
9  "Using the relative risks from the above-mentioned
10  randomized clinical trials and the background rates
11  seen in the NSAID risk studies, an estimated 88,000 to
12  140,000 excess cases of serious coronary heart disease
13  probably occur in the United States over the market
14  life of rofecoxib."  Have I read that correctly?
15    A.  Yes, you've read that correctly.
16    Q.  Do you agree with Dr. Graham's assessment
17  that 88,000 to 140,000 cases of excess serious
18  coronary heart disease occurred in this country in
19  connection with the marketing of rofecoxib?
20      MR. ROTHMAN:  Objection to the form.
21      THE WITNESS:  I very serious -- I very
22  seriously doubt that that's an accurate estimate.
23  BY MR. BLACK:
24    Q.  So I take that answer to be that you disagree
25  with him?

Page 181

1    A.  Yes, I disagree with him.
2    Q.  Okay.  Were you aware that in June of this
3  year, June of 2005, Janet Woodcock of the FDA
4  testified before the Institute of Medicine; were you
5  aware of that?
6    A.  I remember that she had testified, yes.  I
7  don't remember the substance of it, but yes, I
8  remember.
9    Q.  And the Institute of Medicine is related to
10  the National Academy of Sciences; is that correct?
11    A.  Yes.
12    Q.  And it's a very distinguished organization;
13  would that be a fair statement?
14    A.  Yes.
15    Q.  And Dr. Woodcock is a senior official at the
16  FDA; would that be a fair statement?
17    A.  Yes.
18    Q.  Do you recall exactly what her title is?
19    A.  She's a deputy commissioner as I recall for
20  science.  I don't remember her exact title.  She used
21  to be the director of the office of -- I mean the
22  Center For Drug Evaluation and Research.  She was the
23  center director.
24    Q.  I do not have a copy of this article.  It
25  appeared in The New York Times on June 9, 2005, and it

46 (Pages 178 to 181)

Page 182

1   was reported by somebody named Gardiner,
2   G-a-r-d-i-n-e-r, Harris. But this article indicated
3   that Dr. Woodcock had testified at the Institute of
4   Medicine -- well, I'll quote the article.
5       "A top federal drug official told a medical
6   advisory board on Wednesday that the nation's drug
7   safety system had pretty much broken down and that
8   there was room for a lot of improvement in the
9   government's approach to uncovering dangers in drugs
10  already on the market." Would you disagree or agree
11  with that statement?
12      MR. ROTHMAN: Objection to the form.
13      THE WITNESS: Well, I wouldn't disagree that
14  there's room for improvement. And I would really like
15  to see the actual transcript to see what actually was
16  said.
17  BY MR. BLACK:
18      Q.  But you wouldn't disagree that there's room
19  for improvement?
20      A.  I wouldn't disagree, there's always room for
21  improvement.
22      Q.  A lot of improvement?
23      A.  There's -- science is always moving forward.
24  There's always room for improvement.  I mean ideally
25  we would love to be able to identify every problem

Page 183

1   before it happens, but that's a little unrealistic.
2       Q.  I think we can agree both on the aspiration
3   and the unrealism.
4       The quote of Dr. Woodcock was a -- room for,
5   at least as quoted in The New York Times, a lot of
6   improvement which is why I asked, when you say
7   improvement, would there be room for a lot of
8   improvement.  Do you agree with that?
9       MR. ROTHMAN: Objection to the form, asked
10  and answered.
11      THE WITNESS: I agree there's room for
12  improvement. I would really like to see the actual
13  transcript.
14  BY MR. BLACK:
15      Q.  I would too and I haven't been able to find
16  it. So why don't we move on to the next question, I
17  don't think we can do much more with that one.
18      Were you aware that former FDA Commissioner
19  David Kessler was recently interviewed on public
20  radio?
21      A.  No, I wasn't aware of that.
22      Q.  This was on October 12 on All Things
23  Considered. And again I apologize, I don't have a
24  transcript, I'm trying to acquire one. But, as
25  reported on the web, Dr. Kessler said that the FDA's

Page 184

1   credibility is at the lowest level he has ever seen.
2   He said that FDA's credibility is at its lowest level
3   among physicians and the public both.
4       Would you agree or dis -- well, would you
5   agree with that statement, that the FDA's credibility
6   is at a very low level today?
7       A.  No, I wouldn't agree with that. I don't know
8   where -- how Dr. Kessler came to that conclusion. But
9   I wouldn't agree with that.
10      Q.  So the statements from Senator Grassley and
11  Janet Woodcock and David Kessler and David Graham are
12  in contrast with your understanding of the current
13  status of the FDA; would that be a fair statement?
14      MR. ROTHMAN: Objection to the form.
15      THE WITNESS: I'm not aware of any statement
16  that you've read to me that David Graham made about
17  the credibility of the FDA, if that's what you're
18  asking me.
19  BY MR. BLACK:
20      Q.  Okay.  Strike David Graham from the question.
21  Then the other three?
22      MR. ROTHMAN: Same objection.
23      THE WITNESS: You know, I -- they have their
24  opinions. I've lived through the FDA being called the
25  federal death agency by the HIV activist committee

Page 185

1   groups. I mean there's always room for improvement.
2   FDA will never satisfy everyone.
3       And I'm sure there are people who have lesser
4   opinions of the agency than I do and people that have
5   higher opinions. I mean those people said what they
6   said and that's their opinion. And you know what, if
7   they had said anything else, it wouldn't have made the
8   pink sheet and it wouldn't have been very newsworthy
9   on NPR.
10      So I think that some of the people who are
11  selected to make these comments or the comments that
12  they make are -- you know, they're newsworthy and so
13  they're being picked up. I don't see any objective
14  information that confirms it one way or the other and
15  it's not my opinion.
16  BY MR. BLACK:
17      Q.  Janet Woodcock and David Graham still work
18  for the FDA; is that correct?
19      A.  That's correct, they do.
20      Q.  And Senator Grassley and Dr. Kessler were
21  commenting on the current state of affairs at the
22  agency as I quoted them to you; would that be correct?
23      MR. ROTHMAN: Objection.
24      THE WITNESS: Yes, I believe that is correct.
25  BY MR. BLACK:

Page 186

1    Q.  How much money has Janet Woodcock ever made
2  from testifying in litigation, Doctor?
3    A.  I don't know.
4    Q.  Would she be allowed to do that as an FDA
5  officer?
6    A.  She would have to get special dispensation.
7  It would not be routine.
8    Q.  Would she be able to collect a fee for the
9  litigation?
10    MR. ROTHMAN: Objection to the form.
11    THE WITNESS: If she got advanced approval,
12  yes, she could.
13  BY MR. BLACK:
14    Q.  To your knowledge has she ever testified in
15  litigation?
16    A.  I have no idea.
17    Q.  Do you have any idea how much Senator
18  Grassley has made testifying in litigation about
19  pharmaceutical companies?
20    MR. ROTHMAN: Objection to the form.
21    THE WITNESS: I have no idea.
22  BY MR. BLACK:
23    Q.  Could you conceive of a U.S. senator going
24  and testifying as an expert witness in pharmaceutical
25  litigation, Doctor?

Page 187

1    MR. ROTHMAN: Is that a serious question?
2  BY MR. BLACK:
3    Q.  Yes, it is a serious question.
4    A.  Who knows what Bill Frist is going to do when
5  he leaves. I have no idea.
6    Q.  While he's a sitting senator, that he would
7  go and testify in pharmaceutical litigation?
8    A.  You said ever is my recollection. I have no
9  idea whether he would do that or not.
10    MR. ROTHMAN: Are you guys planning to call
11  Senator Grassley as a witness?
12  BY MR. BLACK:
13    Q.  I will not regard that as a serious comment.
14    Do you have any knowledge that David Kessler
15  has ever been paid any money to testify as an expert
16  witness in pharmaceutical litigation?
17    A.  I have absolutely no idea.
18    Q.  What about David Graham?
19    A.  David, as far as I know, has not testified in
20  any pharmaceutical-related litigation.
21    Q.  And, as I understood your testimony, you make
22  about $500,000 a year testifying for pharmaceutical
23  companies; is that about right?
24    MR. ROTHMAN: Object.
25    THE WITNESS: I did for the first two or

Page 188

1  three years, yes.
2  BY MR. BLACK:
3    Q.  And $400,000 last year, correct, Doctor?
4    MR. ROTHMAN: Objection to the form.
5    THE WITNESS: It's an estimate. And I don't
6  know what this year.
7  BY MR. BLACK:
8    Q.  Now, on page 3 of your report, you refer
9  to -- let's see if I can find it. Yes. In the second
10  full paragraph down towards the bottom, there's a
11  sentence that reads "FDA also maintains strict control
12  over the labeling of prescription medicines and must
13  approve the format, content, and exact wording of the
14  package insert." Did I read that correctly?
15    A.  Yes, you did.
16    Q.  Now, I'd like to explore a little bit the
17  nature of that strict control. It would be true,
18  Doctor, would it not that the labeling for a drug
19  should contain a warning about serious adverse
20  reactions and potential safety hazards associated with
21  the drug; isn't that correct?
22    A.  No, that is not the regulatory language for
23  the warning.
24    Q.  Okay. Let's take a look at the regulatory
25  language and make sure we get it accurate.

Page 189

1    (Exhibit No. 11 was marked.)
2  BY MR. BLACK:
3    Q.  Okay. I'm handing you Exhibit 11. And this
4  is a copy of Title 21 CFR Part 201, labeling; is that
5  correct? And in particular it's Section 201.57 of the
6  CFR; is that correct?
7    A.  I believe that's correct.
8    Q.  And --
9    A.  Yes.
10    Q.  This particular -- the way it printed out
11  here, it's 18 pages long. I would refer you to page 4
12  of 18. And there's a caption there that says
13  warnings, it's subsection E, warnings. Do you see
14  that?
15    A.  Yes, I do.
16    Q.  Under this section heading, if you read along
17  with me, "the labeling shall describe serious adverse
18  reactions and potential safety hazards, limitations in
19  the use imposed by them, and steps that should be
20  taken if they occur." Did I read that correctly?
21    A.  Yes, you did. And I apologize. I was
22  thinking of the standard for revising the warning
23  sections of the labeling. So I apologize. Yes, you
24  were correct initially.
25    Q.  So it is correct that the labeling for a drug

Page 190

1 should contain a warning about serious adverse
2 reactions and potential safety hazards. That would be
3 a correct statement; is that right, Doctor?
4    A. Well, that's under -- that's what should
5 appear in the warning sections of the label -- section
6 of the label, that's correct.
7    Q. Now, is a heart attack a serious adverse
8 reaction?
9       MR. ROTHMAN: Objection to the form.
10       THE WITNESS: Well, it can be.
11 BY MR. BLACK:
12    Q. Is a myocardial infarction a serious adverse
13 reaction?
14       MR. ROTHMAN: Same objection.
15       THE WITNESS: Well, they're the same thing.
16 I'm not sure what you're --
17 BY MR. BLACK:
18    Q. Okay. Would a heart attack most of the time
19 be considered a serious adverse reaction, Doctor?
20       MR. ROTHMAN: Objection.
21       THE WITNESS: Yes.
22 BY MR. BLACK:
23    Q. Would a thrombotic cardiovascular event in
24 general most of the time be considered a serious
25 adverse reaction?

Page 191

1       MR. ROTHMAN: Objection.
2       THE WITNESS: I guess you're going to have to
3 be more specific than that. I mean there will be some
4 that are serious and some that are not.
5 BY MR. BLACK:
6    Q. Is a stroke a serious adverse reaction most
7 of the time?
8       MR. ROTHMAN: Objection to the form.
9       THE WITNESS: A stroke is a serious clinical
10 event in general.
11 BY MR. BLACK:
12    Q. Do you think people taking drugs should be
13 warned if there's a propensity for a drug to cause
14 strokes?
15    A. If there's reasonable evidence of an
16 association with a serious hazard, yes.
17    Q. You think the warning requires reasonable
18 evidence; is that correct?
19    A. Well, that's what the definition says.
20    Q. I take it you would also agree that the
21 labeling for a drug should be revised to include a
22 warning as soon as there is reasonable evidence of an
23 association of a serious hazard with the drug. Would
24 you agree with that?
25    A. Yes.

Page 192

1    Q. And you would agree that reasonable evidence
2 doesn't mean that a causal relationship has to be
3 proven before a warning is added to the labeling; is
4 that correct?
5    A. Yes, that's correct.
6    Q. Now, before a new drug application for a drug
7 is approved, the FDA has more authority to specify the
8 language that appears in the labeling for the drug
9 than after the NDA is approved; is that right?
10    A. I don't -- in my experience that's not
11 uniformly true, no.
12    Q. Okay. I take it that you're aware of
13 Dr. Sandra Kweder's testimony before the Senate
14 Committee on Health Education, Labor, and Pensions
15 that occurred on March 1 of this year. Were you aware
16 of that testimony?
17    A. Well, I'm aware that she testified in
18 Congress, yes.
19       (Exhibit No. 12 was marked.)
20 BY MR. BLACK:
21    Q. Okay. And this time we have a transcript so
22 we can see what she said. First of all who is
23 Dr. Kweder, do you know?
24    A. She is -- she's like a deputy director of one
25 of the offices in the Senate for drugs. I don't know

Page 193

1 what her exact title is now.
2    Q. Could that be the Deputy Director for the
3 Office of New Drugs, does that sound right?
4    A. That could be what it is, yes.
5    Q. Now, I would direct your attention first of
6 all to page 22 to see what the origin of this is.
7 Down in the middle of the page, it says prepared
8 statement of Senator Murray. And then this is a
9 statement from Senator Murray. And then it follows
10 over onto page 23, in the middle of the page, there's
11 a paragraph that begins "But, Dr. Kweder, I did want
12 to follow up on Senator Kennedy's question." Do you
13 see that?
14    A. I'm sorry. Where are you?
15    Q. Page 23.
16    A. Oh, yes. Okay.
17    Q. So I went back to page 22 just to establish
18 that this is Senator Murray asking the question.
19    A. Okay.
20    Q. So Senator Murray is asking Dr. Kweder, "But,
21 Dr. Kweder, I did want to follow up on Senator
22 Kennedy's question because I think it is important
23 that we understand what the current process is and if
24 there are problems with it and what we need to do
25 legislatively. He asked you about the FDA clinical

Page 194

1  trials that Merck shared with you, the clinical trials
2  on Vioxx. And I think it was 2002 when the larger
3  study was done on Alzheimer's patients that was given
4  to you. And you said there was a delay in getting a
5  warning on the labels after that. What caused the
6  delay." Did I read that question correctly?
7      A. I believe you read the question correctly. I
8  think the facts are incorrect. But I think that's --
9  you read the question correctly.
10      Q. Let's see what Dr. Kweder answered. Did
11  Dr. Kweder correct the facts and say no, Senator
12  Murray, you've misstated the facts, did she do that?
13      A. No, I don't see that she did. I'm just --
14      Q. Let's see what she answered. And you read
15  along with me. Dr. Kweder's answer, "Well, what
16  caused the delay is that we don't have the authority
17  to tell a company this is how your label has to look,
18  this is the language that needs to go into your label,
19  here is where it goes, end of story. We have to
20  negotiate with the company the specific language of
21  how things should be worded, placement, those kinds of
22  things." Did I read that correctly?
23      A. Yes, you did.
24      Q. Do you have any reason to disagree with
25  Dr. Kweder's statement?

Page 195

1      A. That's not my experience. That has not been
2  my experience at FDA.
3      Q. Other than your experience at the FDA, do you
4  have any reason to disagree with Dr. Kweder's
5  statement?
6      A. Well -- you know, that's what she says. You
7  know, she says what she says.
8      Q. And again your last year at the FDA was 1996,
9  correct?
10      A. That's correct.
11      Q. Now, if you'll take a look at page 18 of this
12  same transcript. And, at the top of the page, it says
13  Senator Burr. Then Senator Kennedy says "Thank you
14  very much, Mr. Chairman." And then Senator Kennedy
15  asks the question "The failure to recognize the safety
16  problems with the COX-2 drugs may have resulted in
17  tens of thousands of patients suffering heart attacks
18  or strokes and an unknown number of deaths. Can you
19  assure the committee and the American people that this
20  kind of lapse will never happen again." Did I read
21  the question correctly?
22      A. Yes, I believe you did.
23      Q. And then, without reading through
24  Dr. Kweder's entire answer, take a look at the bottom
25  just before Senator Kennedy speaks again, there's a

Page 196

1  paragraph that begins "I would say." Can you find
2  that?
3      A. I see that.
4      Q. And her answer was "I would say that the
5  lapse from my perspective was the delay that it took
6  to get that information into labeling. It took over a
7  year. As well as once it was in the labeling, the
8  failure of that information somehow to be in the
9  forefront of the consciousness of the prescribing
10  clinician." Did I read that correctly?
11      A. I believe you did.
12      Q. So she described a lapse -- strike that.
13          She described a delay of over a year to get
14  information about cardiovascular risks with Vioxx into
15  the labeling. Would you disagree -- would you agree
16  that there was a delay of over a year in getting that
17  information into the labeling?
18      A. Well, I don't know what specific information
19  she's talking about.
20      Q. Well, let me strike the question since that
21  one seems to be problematic for you to answer.
22          THE VIDEOGRAPHER: Mr. Black, I'm sorry to
23  interrupt. I do need to change the tape.
24          MR. BLACK: Well, then let's go off the
25  record.

Page 197

1          THE VIDEOGRAPHER: This ends tape No. 2 in
2  today's videotaped deposition of Dr. Janet
3  Arrowsmith-Lowe. The time now is 4:14 p.m. Mountain
4  time. We are off the record.
5          (Recess.)
6          THE VIDEOGRAPHER: This begins tape No. 3 in
7  today's videotaped deposition of Dr. Janet
8  Arrowsmith-Lowe. The time now is 4:15 p.m. Mountain
9  time. We are back on the record.
10  BY MR. BLACK:
11      Q. I don't believe there's actually a question
12  pending, Doctor, because I struck my prior question.
13  And I would like to ask you this instead without
14  referring to whatever statement Dr. Kweder had made.
15          It's true I believe that the first proposal
16  for changes in the labeling about Vioxx to incorporate
17  information from VIGOR, the first proposal came from
18  Merck on June 29, 2000; is that correct?
19      A. Yes, that's correct.
20      Q. Okay. And the label was ultimately changed I
21  believe early in April of 2002; isn't that correct?
22      A. Yes, FDA approved the labeling at that time.
23      Q. So there were -- there was well over a year
24  lapse between the first proposal for the label and
25  when the label actually was changed?

1    A. That's correct.
2    Q. That's factually correct. Okay. Now,
3  referring again to the transcript which is Exhibit 12,
4  I just want to get one other thing on the record here,
5  this again is in response to questioning from Senator
6  Murray.
7       On page 24, if you'll look at the top of page
8  24, there's a question from Senator Murray, an answer
9  from Dr. Kweder, and then a second question from
10  Senator Murray. Do you see that second question?
11    A. So what --
12    Q. "How about changing labels?"
13    A. Okay.
14    Q. Let me read the question into the record.
15  "How about changing labels? You don't have the
16  authority to change label, correct?" Did I read the
17  question correctly?
18    A. That's the question, yes.
19    Q. And Dr. Kweder answered, if you read along
20  with me, "We do not have the authority to require a
21  specific label change. Most of the time I have to say
22  the discussion with companies about changes in labels
23  doesn't take as long as it took for that particular
24  one. Usually, you know, it's just a matter of a few
25  back-and-forths and just getting the language right

1  and making sure it's clear. It usually is not a
2  problem" -- "it is usually not a problem." Have I
3  read that correctly?
4    A. Yes, you have.
5    Q. Okay. And I believe in context it's fair to
6  say that, when she says as long as it took for that
7  particular one, she's referring to the Vioxx label;
8  would that be correct?
9    A. I haven't reviewed the whole transcript. I
10  won't disagree with you, but I certainly can't
11  represent one way or the other.
12    Q. All right. Do you know who William B.
13  Schultz is?
14    A. That's another familiar name, but I'm not
15  sure that I know exactly who he is.
16       (Exhibit No. 13 was marked.)
17  BY MR. BLACK:
18    Q. I believe he's a former FDA official who
19  is -- I believe he's a lawyer now in private practice
20  in D.C. But in any event take a look at Exhibit 13.
21  And would this be a testimony from William B. Schultz
22  who apparently is now with Zuckerman Spaeder, LLP, in
23  Washington, D.C.?
24    A. Well, that's what it appears to be.
25    Q. Okay. And this was downloaded from the web

1  site for the U.S. Senate Committee on Health,
2  Education, Labor, and Pensions. And that's what
3  appears on the logo at the top of the page, correct?
4    A. It appears to be, yes.
5    Q. Now, if you turn in one, two, three, this is
6  five pages long, turn to the fourth page. And part of
7  Mr. Schultz's statement on page 4, there's a caption
8  that says, a, Authority to change -- strike that.
9  Authority to Order Changes to the Drug Label Based on
10  New Information. Have I read that caption correctly?
11    A. Yes.
12    Q. Okay. Then he goes to say in his statement,
13  "All known information about the safety of a drug is
14  supposed to be included on the drug's label. And the
15  FDA has sufficient leverage to require appropriate
16  information at the time the drug is approved." Did I
17  read that correctly?
18    A. Yes, you read that correctly.
19    Q. And I take it you agree with that statement?
20    A. Well, I don't think he's very specific when
21  he says all known information about the safety of a
22  drug is supposed to be included in the information --
23  in the label. I don't know exactly what he's talking
24  about.
25    Q. Do you disagree with that statement?

1    A. Well, I think it's very non --
2    MR. ROTHMAN: Objection to the form.
3    THE WITNESS: Very nonspecific.
4  BY MR. BLACK:
5    Q. In any event Mr. Schultz goes on, "The
6  problem comes when new information is discovered after
7  the drug is already on the market." Did I read that
8  correctly?
9    A. Yes.
10    Q. "When that occurs, there is no explicit
11  authority for the FDA to order that the label be
12  changed to include new information or new warnings."
13  Did I read that correctly?
14    A. Yes, you did.
15    Q. Do you agree with that statement from
16  Mr. Schultz, that part of the statement?
17    A. Well, I think there is authority for FDA to
18  require a label be changed when -- if they declare the
19  drug misbranded and unapproved.
20    Q. Okay. Well, let's read on and see what
21  Mr. Schultz says, because I think that's pretty much
22  what he says. "The FDA's only recourse is to withdraw
23  the drug from the market or to bring a misbranding
24  action." Did I read that correctly?
25    A. Yes, you did.

Page 202

1    Q.   And, based on the comment you just made, I
2  gather you agree with that statement?
3    A.   I agree, yes, that that is a recourse.
4    Q.   Okay.  "These options are usually
5  inappropriate and cumbersome.  Thus, the FDA is left
6  to negotiate labeling changes with the company and it
7  does not have sufficient leverage to require the
8  changes that it deems appropriate."  Did I read that
9  correctly?
10   A.   Yes, you read that correctly.
11   Q.   Would you agree with the last part of
12  Mr. Schultz's -- of the language I read from
13  Mr. Schultz?
14   A.   No, not in my experience, that is not my
15  experience at FDA.
16   Q.   And again you left the agency in 1996,
17  correct?
18   A.   That's correct.
19   Q.   Did any Congressional committee ask you to
20  testify in the wake of the Vioxx market withdrawal?
21   A.   Not Vioxx, no.
22   Q.   Did you submit a statement to any
23  Congressional committee with regard to Vioxx?
24   A.   No, not to a Congressional committee.
25   Q.   Did you offer to testify with regard to Vioxx

Page 203

1  at any Congressional committee?
2    A.   No.
3    Q.   Would you agree that the history of the
4  labeling change for Vioxx with regard to the VIGOR
5  study results went beyond the typical give-and-take
6  between the FDA and sponsors in negotiating label
7  changes when adverse events occur?
8    A.   What do you mean --
9         MR. ROTHMAN:  Objection to the form.
10        THE WITNESS:  -- went beyond, what does that
11  mean?
12  BY MR. BLACK:
13   Q.   In terms of the length of time that it took
14  to come to an end of the negotiation process.
15   A.   I think it took a long time.
16   Q.   Did it take longer -- strike that.
17        Are you aware of any other instance where the
18  negotiation of a label change with regard to adverse
19  events took as long as the negotiations took for
20  getting the VIGOR information into the Vioxx label?
21   A.   I guess I'm not clear what you mean
22  negotiation.  As far as I know, the negotiation
23  started in October of 2001 and ended with an approval
24  in April of 2002.
25        Prior to that the company had submitted

Page 204

1  several proposed label changes and basically had no
2  response back from FDA.  And I wouldn't consider that
3  negotiation.  I would consider the actual discussion
4  about the label the negotiation.
5    Q.   Isn't it correct, Doctor, that, in the
6  interim period between the submission of the first
7  proposed label change in June of 2000 and the FDA's
8  proposed language in October of 2001, isn't it true
9  that during that period the FDA on a number of
10  occasions asked Merck for additional information about
11  Vioxx?
12   A.   I think you're asking me apples and oranges.
13  Yes, they asked for additional information.  Yes,
14  Merck provided them.  But that did not appear to be
15  involved in the label negotiations which as far as I
16  could tell started in October of 2001.
17   Q.   And ended in April of 2002; is that correct?
18   A.   That's correct.
19   Q.   So that would be about six months; is that
20  right?
21   A.   About six months, yeah.
22   Q.   Are you aware of any other instance where it
23  took six months to negotiate a label change?
24   A.   That's not an inordinate length of time.
25   Q.   Okay.  Are you aware that -- well, let me

Page 205

1  give you -- this was reported on the web and I'll give
2  you the information we have on it.
3        (Exhibit No. 14 was marked.)
4  BY MR. BLACK:
5    Q.   I'm handing you what's been marked as Exhibit
6  14.  And Exhibit 14 came off of the web from a site
7  which is identified at the top, www.drug-injury.com.
8  And the headline here or the caption is FDA Chief
9  Lester Crawford is Criticized on Drug Safety Issues;
10  is that correct?
11   A.   That's what it says.
12   Q.   And then, at the bottom of the page, it
13  reports that Dr. Yaw Ford apparently several times at
14  this hearing said "The system works as it is."  And
15  then a Congressman Maurice Hinchey -- is that correct,
16  have I read that correctly?
17   A.   I guess so.
18   Q.   Okay.  And then there was a response
19  according to this report from Congressman Maurice
20  Hinchey that "It shocks me to hear you say that.  How
21  can you say the system works."  Did I read that
22  correctly?
23   A.   Yes.
24   Q.   And then Congressman Hinchey apparently also
25  said "You're not getting the job done."  Is that

Page 206

1   correct, at least as reported here?
2       A.   Apparently, yes.
3       Q.   "This prompted Steven Galson, acting director
4   of the FDA's drugs center, to reply 'We're not proud
5   of how long (the Vioxx label change) took.'"  Is that
6   correct?  Let's go off the record.
7       THE VIDEOGRAPHER:  We are off the record.
8   The time now is 4:26 p.m. Mountain time.
9       (Recess.)
10      THE VIDEOGRAPHER:  We're back on the record.
11  The time now is 4:39 p.m. Mountain time.
12  BY MR. BLACK:
13      Q.   Okay.  Doctor, before we got so rudely
14  interrupted by the telephone, I was reading you a
15  statement as reported in this blog, a statement by
16  Steven Galson, acting director of the FDA's drugs
17  center.  And that he responded "We're not proud of how
18  (long the Vioxx label change) took."  Did I read that
19  correctly from Exhibit 14?
20      A.   Yes, I believe -- I don't know what exhibit
21  it is.  But yes, you read that correctly.
22      Q.   Do you know who Dr. Galson is?
23      A.   Yes.
24      Q.   Who is he?
25      A.   He's the acting director for the Center for

Page 207

1   Drugs.
2       Q.   Is he still at the FDA?
3       A.   Yes, he is, and he's still the acting
4   director.
5       Q.   Now, as an FDA alumna, are you proud of the
6   way the labeling change for Vioxx dragged out?
7       MR. ROTHMAN:  Objection to the form.
8       THE WITNESS:  No, I thought it could have
9   been done more quickly.  I didn't understand why it
10  took so long.
11  BY MR. BLACK:
12      Q.   Are you aware of any example of where the FDA
13  forced a company post approval without negotiation to
14  adopt specific labeling language with which the
15  company disagreed and which the company refused to
16  adopt?
17      MR. ROTHMAN:  Objection to the form.
18      THE WITNESS:  I'm not aware of a company
19  refusing to adopt it.  I certainly am aware of FDA
20  dictating language to a company.
21  BY MR. BLACK:
22      Q.   Let me change the question then.  Are you
23  aware of any example of where the FDA forced a company
24  post approval and without negotiation, without
25  negotiation to adopt specific labeling language with

Page 208

1   which the company disagreed?
2       A.   Yes.
3       Q.   The FDA went in and said this is the
4   language, you're going to take it, and that's it;
5   you're aware of a situation where that occurred?
6       MR. ROTHMAN:  Objection to the form.
7       THE WITNESS:  And put it in a black box, yes,
8   I am aware of that.
9   BY MR. BLACK:
10      Q.   And what was the instance?
11      A.   It happened with the Roche drug Versed.
12      Q.   Do you know if with -- well, strike that.
13      What kind of a drug is Versed?
14      A.   Versed is a short-acting benzodiazapine, it's
15  in the same family as -- it's an anxiolytic hypnotic.
16  It's in the same family as Valium and Xanax.
17      Q.   And what was the adverse event that required
18  a black box warning?
19      A.   The black box warning had to do with dosing
20  in elderly and frequency of dosing.
21      Q.   Did the FDA threaten to bring an enforcement
22  action in order to compel the language that was added?
23      A.   No.  The -- the office director sat down and
24  dictated to the company what would go into the black
25  box.  And they put it in the black box, although they

Page 209

1   were not enthusiastic about it.
2       Q.   Did you participate in that particular
3   labeling change?
4       A.   Well, the data that the labeling change was
5   based on was data that I had developed.  And, in fact,
6   I testified in front of Congress on that data and that
7   drug.  So yes, I had a hand in developing the data for
8   that black box.
9       Q.   When the FDA asked Merck to put information
10  about the VIGOR study into the warning section of the
11  label, Merck did not similarly agree the way Roche had
12  agreed with the black box warning on Valium; is that
13  correct?
14      MR. ROTHMAN:  Objection to the form.
15      THE WITNESS:  Well, they disagreed, that's
16  correct.
17  BY MR. BLACK:
18      Q.   And Roche had disagreed on the black box
19  warning for Versed; isn't that correct?
20      A.   They were not happy about the black box.
21  They weren't happy about the extent of the label
22  change.
23      Q.   So they disagreed that the label change FDA
24  had requested was required; is that correct?  Strike
25  that, that's a bad question.

Page 210

1 They disagreed with the specific label change
2 that the FDA had requested; is that correct?
3 A. My recollection is that they disagreed with
4 the extent of the information that was put in the
5 black box.
6 Q. But they ultimately went along with it; is
7 that correct?
8 A. Yes, they did.
9 Q. And there was a disagreement between Merck
10 and the FDA about where information about the
11 cardiovascular results from VIGOR should appear in the
12 label; is that correct?
13 A. Well, there were a number of disagreements.
14 But that was one of them, yes.
15 Q. And, with regard to that particular
16 disagreement about where the cardiovascular
17 information from VIGOR should be placed in the label,
18 Merck did not go along with what the FDA requested; is
19 that correct?
20 MR. ROTHMAN: Objection to the form.
21 THE WITNESS: They didn't agree with the
22 initial proposal that FDA made in October of 2001.
23 They disagreed with the placement of the
24 cardiovascular information in the warning and they
25 disagreed with other changes that FDA proposed in that

Page 211

1 initial draft that they provided to Merck.
2 BY MR. BLACK:
3 Q. And, instead of adopting the changes that the
4 FDA had proposed, Merck instead negotiated with the
5 agency to change -- to change the label from what the
6 FDA had proposed; is that correct?
7 A. Well, I guess I would look at it as that FDA
8 negotiated with Merck. In my experience, as with
9 Versed, if FDA is firm in their belief about where
10 information should go and how it should look, that
11 that's ultimately how the label looks.
12 If FDA is not firm, then negotiations ensue.
13 So that it's not a one-way -- it's not -- you know, it
14 doesn't move one way, it moves both ways. So FDA was
15 willing to negotiate with Merck based on Merck's
16 objections, some of which they agreed with and some of
17 which they didn't.
18 Q. When did the Versed label change take place?
19 A. That would have been in the eighties, in the
20 late eighties, '87, '88, something like that.
21 Q. And the Vioxx label change took place
22 essentially in 2000, 2001, and 2002; is that correct?
23 A. That's correct -- well, 2001, 2002, yes.
24 Q. Well, there was a label -- there was a label
25 change proposed in 2000 by Merck; isn't that right?

Page 212

1 A. Yes, that was the first time they proposed
2 the label change.
3 Q. Now, the regulations allow a company to
4 change the labeling for a drug by adding stronger
5 safety provisions without first obtaining FDA approval
6 for the new language; isn't that right?
7 MR. ROTHMAN: Objection to the form.
8 THE WITNESS: Yes, there are circumstances
9 that are outlined in the regulations under which a
10 company could change a label without prior approval.
11 BY MR. BLACK:
12 Q. And, in fact, the regulations explicitly
13 state that such a change can be made to add or
14 strengthen a contraindication, warning, precaution, or
15 adverse reaction without prior approval; isn't that
16 right?
17 MR. ROTHMAN: Objection to the form.
18 THE WITNESS: I believe that's true, that
19 that's the wording of it.
20 (Exhibit No. 15 was marked.)
21 BY MR. BLACK:
22 Q. Okay. I'm handing you what's been marked as
23 Exhibit 15 which is a copy of Section 314.70 of 21
24 CFR; is that correct?
25 A. Yeah, that's what it says on the front page.

Page 213

1 Q. Okay. If you take a look at page 4 of 8 of
2 this, that tells us that 314.70(c) deals with "Changes
3 requiring supplement submission at least 30 days prior
4 to distribution of the drug." Is that correct?
5 A. Now, where are you?
6 Q. We're on page 4. And just a little bit down,
7 maybe like two inches down from the top, it says (c),
8 "Changes requiring supplement submission at least 30
9 days." Do you see that?
10 A. Yes.
11 Q. Those are called moderate changes, correct?
12 A. That's what it says.
13 Q. Okay. And then, if you turn the page, on
14 page 5, we're now under (c). And we go through one
15 and two, three, and four, five, at about one-third of
16 the way down, on page 5, there is Subsection (6); is
17 that right?
18 A. Yes.
19 Q. So now we're at 314.70(c)(6), right?
20 A. 314.70, yes.
21 Q. There it says "The agency may designate a
22 category of changes for the purpose of providing that,
23 in the case of a change in such category, the holder
24 of an approved application may commence distribution
25 of the drug product involved upon receipt by the

Page 214

1   agency of a supplement for the change." Have I read
2   that correctly?
3       A.  Yes.
4       Q.  That means not even a 30-day wait, upon
5   receipt of the agency by the -- by the agency of a
6   supplement, the change can go into effect, correct?
7       A.  That's correct, always pending ultimate
8   approval.  But yes, they can initiate the change.
9       Q.  These changes include, and then if you'll go
10  down there's Roman (i), Roman (ii), Roman (iii), it
11  says "Changes in the labeling to accomplish any of the
12  following."  Have I read that correctly?
13      A.  Yes.
14      Q.  And then under that capital (A), "To add or
15  strengthen a contraindication, warning, precaution, or
16  adverse reaction."  Have I read that correctly?
17      A.  Yes, you have.
18      Q.  Now, has the FDA issued any guidance
19  documents with regard to that authority that it was
20  given in these regulations?
21      A.  I believe they have, yes.
22          (Exhibit No. 16 was marked.)
23  BY MR. BLACK:
24      Q.  Okay.  Let's take a look at what I have
25  marked as Exhibit 16.  And would Exhibit 16 be

Page 215

1   Guidance for Industry on Changes to an Approved NDA or
2   ANDA?
3       A.  Yes.
4       Q.  Okay.  And this particular version of the
5   Guidance for Industry is dated November 1999, correct?
6       A.  That's correct.
7       Q.  Okay.  Let's turn to page 25.  Well, let's
8   turn back to page 24, the caption is on page 24 here.
9   And this is Section X, Roman -- capital Roman X.  It
10  says labeling, right?
11      A.  Yes.
12      Q.  Up towards the top of page 24.  Okay.  And
13  then down at the bottom there's a Section C there for
14  moderate changes.  It says "Supplement--Changes Being
15  Effected."  Have I read that correctly?
16      A.  Yes, you have.
17      Q.  Let's turn to the next page.  If you would
18  read along with me, "A changes being effected
19  supplement should be submitted for any labeling change
20  that adds or strengthens a contraindication, warning,
21  precaution, or adverse reaction."  Have I read that
22  correctly?
23      A.  Yes.
24      Q.  So now it says a changes being effected
25  supplement should be submitted for a change that adds

Page 216

1   or strengthens a contraindication, warning,
2   precaution, or adverse reaction.  That's the guidance
3   from the FDA, correct?
4       A.  Well, that's one sentence out of a 30-page,
5   30-something page guidance.  You did read that
6   correctly.  But I think, if you read through this, you
7   will find that there are other circumstances that also
8   might apply.  So yes, you read that correctly in one
9   sentence out of this 30-odd page document.
10      Q.  All right.  Is this a document that you
11  reviewed in the course of preparing your report in the
12  Irvin case?
13      A.  I don't believe I reviewed it specifically
14  for that, no.
15      Q.  So you can't point me to any other specific
16  language in here that you think would change the
17  meaning or significance of the language that I read
18  into the record?
19      A.  Well, I suspect there is additional language
20  because FDA can itself require, request a CBE if it
21  feels that there are data available that meet that
22  criterion.  So that it's a mutual responsibility.  The
23  company can submit a CBE, the agency can request a
24  CBE.  And I would suspect it's somewhere in this
25  guidance since it's in these regulations.

Page 217

1           MR. ROTHMAN:  We can -- why don't we give the
2   witness --
3           MR. BLACK:  Counsel --
4           MR. ROTHMAN:  Why don't we give the witness a
5   chance to look at the document.  You've shown her a
6   document, you have pulled a sentence that she says
7   you've taken out of context.  Let's give her a chance
8   to take a look.
9           MR. REICH:  That's a mischaracterization of
10  the testimony.
11          MR. BLACK:  I will join Mr. Reich's
12  objection.
13  BY MR. BLACK:
14      Q.  And, if you want to add additional language
15  from this document on direct, Dr. Arrowsmith-Lowe,
16  you're free to.  But I'm going to move along with my
17  deposition.
18          MR. ROTHMAN:  Wait.  You know, it's not fair
19  to put a big document in front of her and then not let
20  her look through it.
21          MR. BLACK:  She has agreed that the document
22  says that at that particular page.  And that's all
23  that my question asked.  If there's some implication
24  on that that she wants to draw or some further insight
25  that she wants -- or some other explanation that she

55 (Pages 214 to 217)

Page 218

1   wants to provide, that's fine.  You can ask her
2   questions about it.
3       (Exhibit No. 17 was marked.)
4   BY MR. BLACK:
5       Q.  Doctor, I'm now handing you what's been
6   marked as Exhibit 17.  And that is a copy of the April
7   2004 Guidance for Industry on Changes to an Approved
8   NDA or ANDA; is that correct?
9       A.  That's what this says, yes.
10      Q.  And, if you would please, turn to page 25 of
11  this document.  By the way, is this a document that
12  you reviewed in the course of preparing your report in
13  this case?
14      A.  No, I didn't review this specific document.
15      Q.  Well, if you take a look at page 25, there's
16  a caption that says C, "Moderate Changes," and again
17  "Supplement--Changes Being Effected."  Have I read
18  that correctly?
19      A.  Yes, you have.
20      Q.  And under that it says, under Section
21  314.70(c)(6)(iii), and I believe that's the section
22  that we just read when we were looking at Exhibit 15,
23  correct?
24      A.  Yes.
25      Q.  "A changes-being-effected supplement must be

Page 219

1   submitted for any labeling change that adds or
2   strengthens a contraindication, warning, precaution,
3   or adverse reaction."  Have I read that correctly?
4       A.  Yes, you have read that correctly.
5       Q.  Now, I take it that you would agree that the
6   labeling regulations don't prohibit a drug
7   manufacturer from warning healthcare professionals
8   whenever possibly harmful adverse effects associated
9   with the drug are discovered?
10      MR. ROTHMAN:  Objection to the form.
11      THE WITNESS:  I'm sorry.  I don't -- can you
12  reread that.
13  BY MR. BLACK:
14      Q.  Sure.  The labeling regulations do not
15  prohibit a drug manufacturer from warning healthcare
16  professionals whenever possibly harmful adverse
17  effects associated with the use of a drug made by the
18  manufacturer are discovered?
19      MR. ROTHMAN:  Same objection.
20  BY MR. BLACK:
21      Q.  Would you agree with that statement, Doctor?
22      A.  Under the CBE, under some other regulatory
23  umbrella that invokes the label as well, in other
24  words, what a company communicates to the physicians
25  must be concordant with the label.  So, assuming that

Page 220

1   that is a labeling change in process, I think that's
2   accurate.
3       Under the drug advertising regs, a company
4   really can't say -- or what they say about the drug
5   must be consistent with the label.  So, if this is
6   information that is not the subject of a labeling
7   change, I'm not sure that that is an accurate
8   reflection of the labeling regulations.
9       Q.  Well, the addition to labeling and
10  advertising of additional warnings regarding the drug
11  or the issuance of letters directed to healthcare
12  professionals or the addition of precautions, that's
13  not prohibited by the FDA regulations, is it?
14      A.  I don't understand what you just asked me.
15      MR. ROTHMAN:  Objection.
16  BY MR. BLACK:
17      Q.  The addition to labeling and advertising of
18  further warnings or precautions or the issuance of
19  letters directed to healthcare professionals, none of
20  those things are prohibited by the regulations, are
21  they?
22      MR. ROTHMAN:  Objection to the form.
23      THE WITNESS:  There are allowances made in
24  the regulations for all of those things.  But they
25  also have to be consistent with the approved label.

Page 221

1   BY MR. BLACK:
2       Q.  Okay.  Would you agree that the FDA
3   regulations allow drug manufacturers to strengthen
4   warning labels in the interest of drug safety at any
5   time without FDA preapproval precisely so that the new
6   warnings can be placed into effect at the earliest
7   possible time; would you agree with that?
8       MR. ROTHMAN:  Objection to the form.
9       THE WITNESS:  I do not understand your
10  question.  I don't understand what you're asking me.
11  BY MR. BLACK:
12      Q.  Do the FDA regulations allow drug
13  manufacturers to strengthen warning labels at any time
14  without FDA approval so that new warnings can be
15  placed into effect at the earlier possible times?
16      MR. ROTHMAN:  Same objection.
17      THE WITNESS:  No, without prior FDA approval.
18  All label changes must have FDA approval or the
19  product is misbranded and an unapproved product.  So
20  no, I do not agree with that statement.
21  BY MR. BLACK:
22      Q.  Well, wouldn't you agree that the regulations
23  were intended to enable prompt adoption of changes
24  regarding safety?
25      MR. ROTHMAN:  Objection to the form.

Page 222

1    THE WITNESS: I do agree with that. But all
2  those changes must be approved. They don't need to be
3  prior approved, but they must be approved.
4  BY MR. BLACK:
5    Q.  And a CBE change, a changes being effected
6  change, would be a change that goes into effect
7  without prior approval, correct?
8    A.  It goes into the label without prior
9  approval, but it still must be approved. So you can
10  submit a CBE, you can print your new label; but, if
11  FDA disagrees with the wording, with the appearance,
12  with the location, then you have to stop shipping that
13  label.
14    So every change, whether it's -- it's done
15  through a CBE or through prior approval, must be
16  approved. And, if you make that change and issue that
17  letter, you still are subject to FDA's disapproval of
18  the change. So yes, you can -- you can make
19  statements. But the label still will have to be
20  approved.
21    Q.  You can put the changes into the label and
22  then subsequent to that they go through the approval
23  process; is that correct, Doctor?
24    A.  And they may or may not be approved, yes,
25  that's correct.

Page 223

1    Q.  Would you agree that the FDA -- strike that.
2    Would you agree that the Food, Drug, and
3  Cosmetic Act and the FDA's regulations set minimum
4  standards with which manufacturers must comply; would
5  you agree with that?
6    A.  No. I mean I don't know what you mean,
7  minimum standards. They're very high standards. A
8  company can do more and most companies do. But I
9  don't -- you need to define for me what you mean by
10  minimum standards.
11    Q.  Well, the regulations expressly do not
12  prohibit a manufacturer from adding to or
13  strengthening a warning or precaution, do they?
14    MR. ROTHMAN: Excuse me. Say that again.
15  BY MR. BLACK:
16    Q.  The regulations expressly do not prohibit a
17  manufacturer from adding to or strengthening a warning
18  or a precaution?
19    MR. ROTHMAN: Objection to the form.
20    THE WITNESS: I believe that that's what the
21  whole previous 20 minutes were about. A manufacturer
22  can through the CBE initiate a label change. That
23  labeling change always must be approved or not by FDA.
24    So yes, they can initiate the change, yes,
25  they can print the label; but, if FDA says that they

Page 224

1  do not agree with the new label, then the company has
2  to stop shipping that label. So it all -- all of the
3  labeling changes must ultimately be reviewed by FDA
4  and a decision made by FDA as to whether they're
5  approved or not.
6  BY MR. BLACK:
7    Q.  Do you understand, Doctor, that courts have
8  found the -- that this expressed lack of prohibition
9  making a change, that there's no prohibition about
10  making these changes without prior approval for safety
11  concerns. Do you understand that courts have found
12  that lack of prohibition -- of prohibition consistent
13  with Congress' primary goal in enacting the Food,
14  Drug, and Cosmetic Act which is to protect consumers
15  from dangerous products; were you aware the courts
16  have held that way?
17    MR. ROTHMAN: Objection to the form of the
18  question.
19    THE WITNESS: I really don't understand what
20  you just said. I'm sorry. I know scientifically what
21  the requirements are under the regulations. I don't
22  know what the courts have ruled one way or the other.
23  BY MR. BLACK:
24    Q.  Would you have any disagreement with the
25  statement that I just read?

Page 225

1    MR. ROTHMAN: Objection to the form.
2    THE WITNESS: I don't understand the
3  statement. I'm sorry. You can reread it to me.
4  BY MR. BLACK:
5    Q.  Well, let me try one more time. Courts have
6  found, in discussing an expressed lack of prohibition,
7  and they have mentioned an expressed lack of
8  prohibition about changing labels to add
9  preindications or warnings, and they have held that
10  this expressed lack of prohibition, and I'm quoting
11  now, is consistent with Congress' primary goal in
12  enacting the Food, Drug, and Cosmetic Act which is to
13  protect consumers from dangerous products. Would you
14  have any disagreement with that court holding?
15    MR. ROTHMAN: Same objection.
16    THE WITNESS: No, I think that that's
17  accurate. I think that is accurate. That doesn't
18  mean that the change is going to be approved. But I
19  believe that that's accurate, yes, I agree with that.
20  BY MR. BLACK:
21    Q.  Can you cite a single example of where a
22  company was sanctioned by the FDA for changing
23  labeling to provide a stronger warning under the CBE
24  provisions?
25    A.  Were sanctioned?

Page 226

1    Q.  Yes.
2    A.  What do you mean sanctioned?
3    Q.  Fined, any kind of legal action brought
4  against the company for initiating a CBE change to add
5  a stronger warning to a label?
6    A.  I'm not aware of that.  I'm aware of
7  instances where the agency did not approve CBEs and
8  the product that was shipped had to suspend shipment
9  until the label was approved.
10   Q.  Okay.  Are you aware of an example of where a
11  change to add a stronger warning was disapproved even
12  without sanctions because it was too strong?
13   A.  Because it was too strong?
14       MR. ROTHMAN:  Objection to the form.
15       THE WITNESS:  I'm aware of warnings that were
16  disapproved because of disagreements in language.  I
17  don't know whether -- I'm not -- I mean I don't really
18  know what you mean too strong.
19  BY MR. BLACK:
20   Q.  Okay.  Suppose -- this is a complete
21  hypothetical.  We've got drug X.  And the company
22  finds out that drug X tends to affect vision and
23  hearing.  And so they make a change to the label that
24  says drug X has been found in some studies to affect
25  vision.  They don't mention the hearing.

Page 227

1      So the agency says we don't approve of your
2  CBE because it wasn't strong enough, it didn't include
3  the hearing.  We want you to make it stronger.
4      Now, that would be different than if the
5  company put in both the vision and the hearing and the
6  FDA came back and said, well, we agree with you about
7  the warning about the vision, but we don't think you
8  really should have made that warning about hearing.
9  You over warned, it was too strong a warning.
10      Are you aware of any instance where the FDA
11  disapproved of a CBE change on the basis that it was
12  too strong?
13       MR. ROTHMAN:  Objection to the form.
14       THE WITNESS:  I'm not specifically aware of
15  one.  I mean --
16       MR. BLACK:  Let's take a look at what
17  happened in Vioxx with regard to CBEs.
18       (Exhibit No. 18 was marked.)
19  BY MR. BLACK:
20   Q.  I'll hand you what's been marked as Exhibit
21  18.  And this is a May 23rd, 2003, submission from
22  Merck to the Food and Drug Administration; is that
23  correct?
24   A.  Yes.
25   Q.  And I believe that this is a submission

Page 228

1  regarding the use of Vioxx for the purpose of treating
2  migraines; is that correct?
3    A.  I believe that's true, yes.
4    Q.  And you refer to that submission in your
5  report, correct?
6    A.  I think so.
7    Q.  Now, if you'll take a look, let me go past
8  the letter, and then after the letter there's a
9  statement of organization.  Do you see that?
10   A.  Yes.
11   Q.  And, if you go to the next page, it says
12  Supplements to NDA 21-042 Vioxx (rofecoxib tablets).
13  Do you see that?
14   A.  Yes.
15   Q.  Okay.  This is a Bates stamp number and
16  it's -- the last two digits on this particular page
17  are 10, correct, 10?
18   A.  Yes.
19   Q.  Okay.  And, if you'll take a look at the page
20  where the last two Bates stamp numbers are 13, that
21  would be a list of supplements to an NDA for rofecoxib
22  oral suspension, correct?
23   A.  Yes.
24   Q.  And that's the same drug, just administered a
25  different way, correct?

Page 229

1    A.  Right.
2    Q.  Okay.  Well, let's take a look --
3    A.  It's actually different dosage form.  I'm
4  sorry.  It's not the same drug administered
5  differently, it's a different dosage form.
6    Q.  Okay.  It's the same chemical entity I think
7  is what I meant.
8    A.  It's the same active drug product, yes.
9    Q.  Okay.  Now, if you'll take a look at the list
10  for the rofecoxib tablets and count down with me, take
11  a look at --
12   A.  I'm sorry.  Where are we?
13   Q.  We're back on the last digits are 10, 10.
14   A.  Okay.  Actually this is a very interesting
15  page anyway.
16   Q.  Okay.
17   A.  Back on 10.
18   Q.  Yeah.
19   A.  Okay.
20   Q.  And you can look down the list and there's
21  supplement number S-001, it provides chemistry and
22  labeling changes.  Take a look at S-003.  This
23  provides -- this CBE.  Do you see that?
24   A.  Yes.
25   Q.  So this one was a changes being effected,

Page 230

1  correct?
2      A.  Yes.
3      Q.  Okay.  And, if you continue on down, I think
4  take a look at -- on the next page, S-010.  That was
5  also a changes being effected, right?
6      A.  Yes.
7      Q.  And that's also true of S-011, correct?
8      A.  No.  Oh, oh, I'm sorry.
9      Q.  S-011, the CBE provides.
10     A.  Yes.
11     Q.  Okay.
12     A.  Yeah, for alternate location.
13     Q.  Yes.
14     A.  Yes, for stipulating testing, yes.
15     Q.  And S-013 is another CBE, correct?
16     A.  Yes.
17     Q.  S-014 is a CBE, correct?
18     A.  Yes.
19     Q.  S-015 is a CBE, correct?
20     A.  Yes.
21     Q.  And S-017 is a CBE?
22     A.  Updated copyright date, yes, that's right.
23     Q.  S-019 is a CBE, right?
24     A.  Yes, yes.
25     Q.  And 20 and 21 are both CBEs too; isn't that

Page 231

1  right?
2      A.  Yes.
3      Q.  Okay.  I count ten CBEs in this list.  I want
4  to go through and confirm; would I be right?
5      A.  I didn't count them, but I'm not going to
6  dispute your counting.
7      Q.  Okay.  And, if you go through the list for
8  oral suspension, I believe you'll find eight.  Any
9  reason to dispute me on that?
10     A.  Well, one of their CBEs, they were told that
11 the supplement was not a CBE and they needed an
12 approved supplement.
13     Q.  Okay.  We'll talk about that one in a minute.
14     A.  So you want me to count up the CBEs?
15     Q.  Yeah.
16     A.  Seven, eight, yes, I agree there are eight
17 there.
18     Q.  Okay.  And that's for the oral suspension you
19 were referring to?
20     A.  Yes.
21     Q.  Okay.  Now, if you'll take a look back
22 starting on page 10 for the rofecoxib tablets, I
23 think, if you review the 10, the changes that were
24 done, 10 supplements that involved CBEs, you'll find
25 that eight of them are related to safety.  And we can

Page 232

1  start with S-003.  That was a change made to include
2  postmarketing adverse reactions, correct?
3      A.  Yes.
4      Q.  And that would be related to safety, correct?
5      A.  Presumably, yes.
6      Q.  Okay.  And, if you take a look at S-010 --
7      MR. ROTHMAN:  Hold -- you've only read part
8  of S-003.
9      THE WITNESS:  That's true.  It says that this
10 is not -- the supplement should not be a CBE.  An
11 approved supplement is required.
12 BY MR. BLACK:
13     Q.  We're going to talk about that in a minute.
14 Okay.  If you come to S-010.
15     A.  010.  Okay.
16     Q.  That provides for changes -- patent product
17 information to include postmarketing adverse
18 reactions, correct?
19     A.  Yes.
20     Q.  So again that relates to safety, correct?
21     A.  U.S. Patient Product Information, yes.
22     Q.  Okay.  And look at S-013.  Again that relates
23 to postmarketing adverse reactions, correct?
24     A.  Yes.
25     Q.  So that relates to safety too, correct?

Page 233

1      A.  Presumably, yes.
2      Q.  Okay.  And S-014 relates to postmarketing
3  reactions, correct?
4      A.  Yes.
5      Q.  And, if you look at S-020 and S-021, they
6  both relate to postmarketing adverse reactions,
7  correct?
8      A.  Yes, that's correct.
9      Q.  I think that's six out of the ten actually
10 relate to postmarketing adverse reactions and safety
11 concerns, correct?
12     A.  Okay.
13     Q.  Now, let's go back to S-003.  That's the one
14 where the SBA -- where the -- strike that.
15     Where the FDA, in fact, responded to Merck by
16 saying this is not a change that you should do through
17 CBE; is that correct?
18     A.  Yes.
19     Q.  Now, are you aware of any other instance with
20 Vioxx where the FDA upon receiving a changes being
21 effected said no, this should not be a CBE, are you
22 aware of any other instance of that?
23     A.  I believe this is the only -- this is the
24 only one that I'm aware of.
25     Q.  And subsequent to this -- this particular

Page 234

1  CBE, Merck, in fact, continued to use the mechanism
2  for other changes, correct?
3     A.  Oh, yes, they're perfectly well aware of the
4  mechanism of CBE.
5     (Exhibit No. 19 was marked.)
6  BY MR. BLACK:
7     Q.  I'm handing you now Exhibit 19.  I'm sorry.
8  I should pay more attention to what I'm doing there.
9        Now, this document refers to that supplement
10  S-003, right?
11     A.  Yes.
12     Q.  Okay.  And, if you'll look at -- the
13  attachment is, in fact, a copy of the label, correct,
14  with room on the side for comments and support,
15  correct?
16     A.  Well, as soon as I get there, I'm sure I can
17  agree with you.  It's just not clear what the
18  attachment is.  Okay.  Yes.
19     Q.  Okay.  And, if you would turn to page 12 of
20  the label, you can see that there have been changes
21  made in the label, certain language crossed out, and
22  then there's a notation on the side, Merck accepts.
23        So, as you look at the letter, I think you
24  can confirm this, this marked up label reflects the
25  changes that the FDA wanted to this CBE submission and

Page 235

1  Merck's reaction to the changes that the FDA
2  requested; would that be a fair characterization?
3        MR. ROTHMAN:  Objection, objection to the
4  form.
5        THE WITNESS:  I think I need a few minutes to
6  actually look at the document.
7  BY MR. BLACK:
8     Q.  I thought the same, you may want to take some
9  time to check --
10     A.  Yeah.
11     Q.  Please do.
12     A.  I think that would be a good idea.
13        MR. ROTHMAN:  Why don't we go off the record.
14        MR. BLACK:  Okay.  Let's go off the record.
15        THE VIDEOGRAPHER:  We are off the record.
16  The time now is 5:17 p.m. Mountain time.
17        (Recess.)
18        THE VIDEOGRAPHER:  We are back on the record.
19  The time now is 5:34 p.m. Mountain time.
20  BY MR. BLACK:
21     Q.  Okay.  Doctor, before we went off the record,
22  you had indicated you were going to review this
23  document to see if, in fact, the markups in the label
24  reflected Merck's proposed language, the FDA's
25  suggested language, and then comments on whether or

Page 236

1  not -- on Merck's reactions to those proposed changes.
2  Would that be a fair characterization of the document?
3     A.  My understanding is that this is Merck's
4  response to FDA's proposal.
5     Q.  Okay.  And FDA's proposal is changes to the
6  CBE language; isn't that correct, Doctor?
7     A.  To the CB -- I don't know to the CBE.
8        MR. ROTHMAN:  Objection to the form.
9  BY MR. BLACK:
10     Q.  This was originally submitted as a CBE with
11  which the FDA disagreed and came back with some
12  suggested changes.
13     A.  Okay.
14     Q.  And I believe that the suggested changes from
15  the FDA are shown in this attachment.  And then, in
16  the comment section, you have what -- whether Merck
17  accepts them or what Merck's reaction is to the
18  suggested changes from the FDA.
19     A.  Right.
20     Q.  That's a fair characterization?
21     A.  Yes, I think that is a fair characterization.
22     Q.  Okay.  Now, the safety related changes in
23  S-003 related to postmarketing adverse events
24  involving concurrent administration of Vioxx with
25  warfarin; is that correct?

Page 237

1     A.  Well, that is some of them.  I mean --
2     Q.  There were others.  But were there any safety
3  related changes that did not involve warfarin?
4     A.  I think this is in the precaution.  This is
5  in the warning section.  There's a safety related
6  change on page 12 that has to do with anaphylaxis and
7  angioedema.  This is in drug interactions.  So I think
8  this is actually in precautions, the language having
9  to do with warfarin FDA -- remained in precautions.
10  But there were some changes that FDA made.
11     Q.  You know, Doctor, I asked a bad question.  If
12  I could strike that.
13        MR. ROTHMAN:  Well, she's already answered
14  the question.
15        MR. BLACK:  Yeah, I think she's pretty much
16  already answered it.
17        MR. ROTHMAN:  Why don't you go ahead and ask
18  a new one.
19  BY MR. BLACK:
20     Q.  Okay.  Now, in any of the changes suggested
21  by the FDA, was the FDA telling Merck that Merck's
22  original language had constituted too strong a
23  warning?
24     A.  I'm going to need to read the warfarin.
25        The way I read this is FDA thought this was

Page 238

1 too detailed, too extensive, too much information. So
2 however you want to characterize that, they're —
3 they're offering a great deal of information about the
4 exact changes in the international — what is it,
5 international normalized ratio which is how you
6 measure the effect of warfarin.
7     And they have very extensive data on what
8 those changes were within what time periods. FDA
9 basically just said anticoagulant activity should be
10 monitored particularly in the first few days.
11     So I would actually say that what Merck put
12 in was much more extensive, much fuller description of
13 the exact interaction they were concerned about. FDA
14 summarized it.
15   Q.   Okay. That's your understanding of the
16 changes that you've reviewed in Exhibit 19, correct?
17   A.   That — after reading it, after you directed
18 me to read it, when it's telling you about, you know,
19 21-day multiple dose studies, they had been previously
20 stabilized, they start on rofe 25 a day and then 8
21 percent increase in their INR and blah, blah, blah, I
22 would say that that's a much more extensive
23 description of the — of the safety problem than what
24 FDA put in which is basically you've got to monitor it
25 shortly after the — particularly in the first few

Page 239

1 days.
2     So, you know, characterize it as you will.
3 But I think — I think Merck certainly included a lot
4 more detailed information about the interaction than
5 FDA ultimately wanted in there.
6   Q.   Okay. All right. But this change was made
7 to add information about adverse event reports; is
8 that correct?
9   A.   This is in precautions, it's a drug
10 interaction. No, it's not an adverse event — it's
11 not in adverse event reports. It's in precautions.
12   Q.   No, no, I understand that. But what's being
13 added to the precautions is based about information on
14 adverse event reports; isn't that correct?
15     MR. ROTHMAN: Objection to the form.
16     THE WITNESS: No, it's not talking about an
17 adverse event. It's talking about a laboratory
18 measurement. It says in postmarketing experience
19 there have been reports of increases in INR. I don't
20 see that there's an adverse event. It's a drug
21 interaction.
22 BY MR. BLACK:
23   Q.   Would you turn back to Exhibit 18, if you
24 would.
25   A.   Exhibit 18, okay.

Page 240

1   Q.   That was the previous exhibit.
2   A.   Okay.
3   Q.   The May 23rd, 2003, letter that listed the
4 CBEs.
5   A.   Okay.
6   Q.   And take a look at what it says there about
7 S-003. It says "This CBE provides for circular
8 revisions to include postmarketing adverse reactions
9 and postmarketing experience of concurrent
10 administration of clinical doses of Vioxx with
11 warfarin." Isn't that correct?
12   A.   And, if you look at the postmarketing adverse
13 reactions, they do, in fact, have additional
14 postmarket adverse reactions. But what it says is
15 postmarketing experience of concurrent administration.
16 So there are two — there are more than one change.
17     One is the postmarket experience with
18 warfarin and interaction with rofecoxib. The other
19 has to do with a number of additions to the adverse
20 reaction section, which is what the adverse reactions
21 indicate, the postmarket adverse reactions. That's a
22 specific section.
23   Q.   Okay.
24   A.   And so it's — it's both.
25   Q.   All right. Let's make it a little bit

Page 241

1 simpler. If you take a look at S-020 which is on page
2 12 of Exhibit 18.
3   A.   Page — is that —
4   Q.   Well, yeah, Merck — Merck the last two
5 digits are 12. It's not actually the 12th page of the
6 exhibit. And it says "This supplement" —
7   A.   Where are you, what number?
8   Q.   S-020, down towards the bottom. "This
9 supplement (CBE) provides to changes to the U.S.
10 Patient Product Information to include postmarketing
11 adverse reactions." Correct?
12   A.   Okay. That's what it says, yes.
13   Q.   All right. Now, Merck is using the CBE
14 mechanism to add information about adverse event
15 reports, correct?
16   A.   Yes, correct. They certainly know about the
17 CBE mechanism.
18   Q.   And the adverse event reports aren't
19 scientific data at all, are they, Doctor?
20     MR. ROTHMAN: Objection to the form.
21     THE WITNESS: We went over this earlier I
22 believe. You can't do data manipulation. They're not
23 valid measures of — of incidents. But they do
24 contain important scientific information that can be
25 used to signal a problem. And clearly they have

Page 242

1  value.
2       But you cannot do valid statistical
3  manipulations with adverse event reports, especially
4  the postmarket. I want to be clear, the postmarket
5  adverse event reports are not really valid for
6  statistical manipulation. But they can offer
7  information about the safety of a product.
8  BY MR. BLACK:
9       Q.  VIGOR was a randomized clinical trial; is
10  that correct, Doctor?
11      A.  Yes, that's correct.
12      Q.  So the information from VIGOR was not
13  postmarketing adverse event reports; is that correct,
14  Doctor?
15      A.  That's correct. It was -- it was from a -- a
16  clinical trial looking at efficacy and safety, that's
17  correct.
18      Q.  Would you agree, Doctor, that, when a sponsor
19  submits an NDA, it should include all available
20  information about demonstrated or potential adverse
21  effects?
22      A.  No, I don't think potential. You would have
23  to -- I mean I don't know what you mean by potential.
24  I don't know what your standard is for potential so I
25  guess I need to get that clarified.

Page 243

1       (Exhibit No. 20 was marked.)
2  BY MR. BLACK:
3       Q.  Let's take a look at Exhibit 20. Is Exhibit
4  20 a copy of Section 314.50 of Volume 20 of the Code
5  of Federal Regulations?
6       A.  I think it's 21 CFR.
7       Q.  Twenty-one, excuse me.
8       A.  Title 21, Volume 5. Okay.
9       Q.  So it's 21 CFR Section 314.50, correct?
10      A.  Yes.
11      Q.  Now, and this particular one is 17 pages
12  long.
13      A.  Okay.
14      Q.  And, if you look back at the first page,
15  Section 314.50 relates to the content and format of an
16  application, correct?
17      A.  Right, for approval, that's right.
18      Q.  And then, if you take a look on the 7 of 17,
19  this application is to include a summary --
20      A.  Where are you reading. Can you let me know
21  where you're reading.
22      Q.  Okay. Okay. Well, if you take a look down
23  towards the bottom of the page, Roman little vi,
24  little Roman vi, on page 7 of 17.
25      A.  Okay.

Page 244

1       Q.  The application is to include a summary and
2  updates of safety information as follows.
3       A.  I'm sorry. I thought I was in -- you'll have
4  to -- where are -- where are you again? I'm sorry.
5       Q.  Okay. It's about maybe two and a half inches
6  up from the bottom of the page, vi in parentheses.
7  There's a caption, a summary and updates of safety
8  information as follows. Do you see that?
9       A.  Yes.
10      Q.  Okay. And under that A, "The applicant shall
11  submit an integrated summary of all available
12  information about the safety of a drug product,
13  including pertinent animal data and demonstrated or
14  potential adverse effects of the drugs, clinically
15  significant drug/drug interactions, and other safety
16  considerations such as data from epidemiological
17  studies or related drugs." Did I read that correctly?
18      A.  Yes, you did.
19      Q.  So, upon reviewing Exhibit 20, would you
20  agree that a sponsor -- when a sponsor submits an NDA,
21  the sponsor should include all available information
22  about demonstrated or potential adverse effects?
23           MR. ROTHMAN: Objection to the form.
24           THE WITNESS: In this context, yes, that's
25  true.

Page 245

1  BY MR. BLACK:
2       Q.  And there's also a requirement to supplement
3  as more information becomes available; isn't that
4  right?
5       A.  Yes.
6       Q.  Now, in your report you've said that, in
7  considering the NDA --
8       A.  Okay. Can we go back to that and you can
9  tell me where you're looking in my report.
10      Q.  Okay. Let's go find your report. It's
11  buried here in other exhibits. Okay. Let's see.
12  What did I say there. Well, I can't find the exact
13  citation to your report. But let me read this and see
14  if you agree with it.
15           Would you agree that, in considering the NDA
16  for Vioxx, the Food and Drug Administration reviewed
17  the data provided by Merck, found Vioxx safe and
18  effective for its intended uses, and approved the NDA
19  for Vioxx on May 20, 1999; would you agree with that
20  statement?
21      A.  It sounds like my prose, but it would be
22  really helpful to know where it appears.
23      Q.  Okay. Well, take a look at page 4.
24      A.  Okay.
25      Q.  Take a look at the paragraph that says as of

Page 246

1  November 23rd, 1998.
2      A.  Okay.
3      Q.  And take a look down about the middle of the
4  paragraph, off to the right, there's a sentence that
5  begins "FDA reviewed the data provided by Merck, found
6  Vioxx safe and effective for its intended uses, and
7  approved the NDA for Vioxx on May 20, 1999."  Did I
8  read that correctly?
9      A.  Yes, you did.
10     Q.  Okay.  Now, in reaching its decision, did the
11 FDA have before it all studies that Merck had done
12 regarding Vioxx and the potential risk that it might
13 cause thrombotic adverse events?
14     A.  As far as I'm aware, it had all of the
15 completed studies that related to the indications for
16 which approval was being sought which would have
17 included, as far as I'm aware of the adverse events,
18 cardiovascular thromboembolic events that had been
19 reported by investigators.
20     Q.  So there's nothing relating to cardiovascular
21 thrombotic adverse events that Merck withheld when it
22 submitted the NDA; is that your understanding?
23     A.  Again what I'm saying is that they
24 submitted -- there may have been other studies ongoing
25 that had cardiovascular safety considerations as part

Page 247

1  of the protocol.
2      But what Merck submitted was the -- and it
3  had nothing to do with the indication for which they
4  were seeking approval.  But, as far as I recall, yes,
5  they submitted all of the relevant clinical trial data
6  including the information on cardiovascular adverse
7  events.
8      Q.  Is it your testimony, Doctor, that, if Merck
9  was conducting a trial for some other indication and
10 learned that there were potential cardiovascular
11 events, albeit in connection with this other
12 indication, that that would not have to be included
13 with the NDA for the indications that Merck was
14 submitting the NDA for?
15     MR. ROTHMAN:  Objection to the form.
16     THE WITNESS:  If these were ongoing blinded
17 trials, Merck would be required to submit the serious
18 adverse events, adverse events to FDA, to the IND.
19 I'm not sure -- you know, I mean this is all very
20 hypothetical.  Is there a study that you're -- that
21 you are thinking of that -- because I'm not aware of
22 any.
23 BY MR. BLACK:
24     Q.  Okay.  I apologize for talking over you
25 there.  We'll get on to a specific document here.  But

Page 248

1  I just -- I understood your testimony to mean that a
2  company is studying a drug for osteoarthritis.  And
3  then maybe it's studying the same drug to treat, I
4  don't know, blindness just as an example.
5      And, in the blindness study, people start
6  having heart attacks at a rate that surprises them.
7  They don't have to report the results from the
8  blindness studies in the application that's pending
9  for the arthritis indication?
10     A.  As I said they are obligated to report
11 serious adverse events that occur in clinical trials
12 to FDA.  No question about that.  The issue has to do
13 with whether -- whether the entire study is unblinded while
14 it's ongoing and that data submitted.
15     And I do not believe that they -- you know,
16 if it's not been stopped by a data safety and
17 monitoring board, if -- if it -- it is still -- the
18 treatment groups are still blinded, the company is not
19 obligated to stop the study unblind and send the data.
20 But they are obligated to send the serious adverse
21 events that occur in the clinical trial to FDA.
22     Q.  Okay.  I think I understand your answer.
23 Let's take a look at something else.
24     (Exhibit No. 21 was marked.)
25 BY MR. BLACK:

Page 249

1      Q.  I'm handing you what will be Exhibit 21.
2  Exhibit 21 is an article by -- the lead author is
3  somebody named McAdam; is that correct?
4      A.  That's what it says, yes.
5      Q.  Appeared in the Proceedings of the National
6  Academy of Sciences in January 1999, correct?
7      A.  Yes.
8      Q.  I've handed you this article, Doctor, and I
9  perhaps got a little bit ahead of myself.  One of
10 the -- strike that.
11     The initial concern about potential
12 cardiovascular events with a COX-2 inhibitor like
13 Vioxx had to do with something called the thromboxane
14 prostacyclin imbalance; isn't that correct?
15     A.  That was a theory that came about in the late
16 nineties, that there could be an imbalance and that
17 could have some effect on cardiovascular safety.
18     Q.  Okay.  And this particular article by McAdam
19 and his colleagues, it's titled Systematic
20 Biosynthesis of Prostacyclin By Cyclooxygenase-2:  The
21 Human Pharmacology of a Selective Inhibitor of COX-2.
22 Have I read that correctly?
23     A.  No.  It's systemic, not systematic.  Systemic
24 biosynthesis.
25     Q.  It certainly is.  With that correction have I

Page 250

1    read -- is it correct?
2        A.  Yes.
3        Q.  You're keeping up better than I am at this
4    hour, Doctor.  Okay.  Now, if you'll turn to I believe
5    it's page 276 of this article.  The article begins on
6    272.  And, if you'll turn to 276, at the end, McAdam,
7    et al., and they're talking here about a drug called
8    celecoxib.  If you'll take a look over on the
9    right-hand side, in the last paragraph, you see it
10   begins celecoxib exhibits?
11       A.  Yes, uh-huh.
12       Q.  And celecoxib is another COX-2 inhibitor.
13   And the basic theory as to why it should work is
14   pretty much the same as for Vioxx; is that correct?
15       A.  That it selectively inhibits
16   cyclooxygenase-2, yes, that's correct.
17       Q.  Yes.  Okay.  So "Celecoxib exhibits relative
18   rather than absolute biochemical selectivity for COX-2
19   ex vivo at doses tolerated in humans." Did I read
20   that correctly?
21       A.  Yes.
22       Q.  "Nonetheless, it does not modify
23   TxA2-dependent platelet aggregation." Did I read that
24   correctly?
25       A.  Yes.

Page 251

1        Q.  And TxA2 would be referring to a chemical
2    called thromboxane, correct?
3        A.  Right, an enzyme.
4        Q.  And that's "reflective of its modest
5    inhibitory effect on COX-1." Correct?
6        A.  That's what this says.
7        Q.  Okay.  Then it says "Ibuprofen and 800
8    milligram celecoxib inhibit COX-2 ex vivo and suppress
9    urinary PGI-M to a comparable degree." Correct?
10       A.  Yes.
11       Q.  And PGI-M -- strike that.  PGI would refer to
12   prostacyclin, correct?
13       A.  Right.
14       Q.  And PGI-M would be a metabolite of
15   prostacyclin, correct?
16       A.  Yes, that's correct.
17       Q.  And the theory is that, if you monitor
18   somebody's urine and you find reduced levels of the
19   metabolite, that reflects reduced levels of
20   prostacyclin itself, correct?
21       A.  That is one theory, that's correct.
22       Q.  So here is what -- he's saying that the COX-2
23   inhibitors seem to suppress the prostacyclin without
24   suppressing the thromboxane, they suppress the
25   prostacyclin about the same as other NSAID drugs.  But

Page 252

1    they don't suppress the thromboxane the same as other
2    NSAID drugs; is that correct?
3        A.  Well, I mean --
4            MR. ROTHMAN:  Objection to the form.
5            THE WITNESS:  What these are, this is ex
6    vivo, this is not in a person.  It's ex vivo, it's in
7    a -- so with that -- with that qualification, that's
8    what it says.  It says it has biochemical activity
9    selectivity for COX-2.
10           But it does not -- in comparable human doses.
11   But it does not appear to have thromboxane -- it
12   doesn't inhibit the end point of thromboxane
13   activation which is platelet aggregation.
14   BY MR. BLACK:
15       Q.  Okay.  Now, then the article goes on.  It
16   says "It remains to be determined whether this effect
17   is sustained during chronic dosing in age groups at
18   risk for cardiovascular disease." Did I read that
19   correctly?
20       A.  Yes.
21       Q.  So this is a hypothesis.  And it remains to
22   be determined whether this hypothesis is really
23   anything of concern; that's sort of what he's saying,
24   correct?
25       A.  I think it still remains to be determined

Page 253

1    whether that hypothesis is active at all, yes.
2        Q.  But here he's saying it remains to be
3    determined, whatever the current consensus is,
4    correct?
5        A.  Right.
6        Q.  Okay.  "If this is so," in other words, if
7    the hypothesis proves to be correct, "trials much
8    larger than those necessary to detect efficacy and
9    safety in arthritis will be necessary to determine
10   whether cardiovascular consequences of inhibiting
11   PGI2," which is the prostacyclin, right?
12       A.  Uh-huh.
13       Q.  "PGI2 biosynthesis will modulate the
14   anti-inflammatory benefit to be derived from chronic
15   administration of COX-2 inhibitors in humans." Did I
16   read that correctly?
17       A.  Yes, you did.
18       Q.  So here's an article in 1999 which is at
19   least discussing this theoretical concern about the
20   thromboxane prostacyclin imbalance, correct?
21       A.  Yes.  What is the date?  This is January '99.
22   This is after the NDA has been submitted, yes.
23       Q.  Okay.  And also I'd note that it indicates,
24   if you wanted to do a study to determine
25   cardiovascular consequences, it would have been to be

Page 254

1 a larger study than those done to determine efficacy
2 and safety in arthritis. Doesn't it also say that?
3     A. Yes, it does.
4     Q. Do you have any reason to disagree with that?
5     A. No.
6     Q. Now, were you aware that, in one of the
7 premarketing trials, protocol 023, there was an
8 unexpected reduction in prostacyclin in the urine of
9 patients -- strike that.
10     An unexpected reduction in prostacyclin
11 metabolite in the urine of patients taking Vioxx.
12 Were you aware of that?
13     A. I seem to remember that. I remember the
14 discussion of that. I don't believe I reviewed that
15 particular research report. But I do remember this
16 issue being raised. And the question is where is --
17 does that reflect activity in the kidney or does that
18 have any systemic implications.
19     Q. Move to strike the nonresponsive part of the
20 answer.
21     Given the concern about prostacyclin and
22 given the protocol 023 findings, was it important for
23 Merck to follow up to determine if heart attacks were
24 actually occurring more frequently in Vioxx patients
25 as compared to placebo patients?

Page 255

1     A. Well, it's my opinion that Merck did, in
2 fact, set up a standard operating procedure to review
3 those type -- to review cardiovascular end points in
4 their clinical trials starting in like the second
5 quarter of '98 to, in fact, examine this hypothesis.
6     (Exhibit No. 22 was marked.)
7 BY MR. BLACK:
8     Q. Let me hand you what's been marked as Exhibit
9 22. And now the caption on this is Plan to Evaluate
10 the Incidence of Cardiovascular Serious Adverse
11 Events, SAEs, in Phase IIb/III Vioxx Osteoarthritis
12 Clinical Trials. Have I read that pretty much
13 correctly?
14     A. Yes, you have.
15     Q. And the date is December 30, 1997, correct?
16     A. That's correct.
17     Q. Have you seen this document before?
18     A. I'm sure I have.
19     Q. Okay. You'll notice that it's a Bates
20 stamped document. And, if you'll turn to the page
21 that's Bates stamped 37039, I think that's right.
22     A. Okay.
23     Q. Okay. And if you'll look at the -- and I
24 apologize for the small print, this is the way we got
25 it. Apparently it had been shrunk in the course of

Page 256

1 copying.
2     But, if you'll look at the last paragraph, it
3 says in MK-0966 Protocol 023. And, before I go on,
4 MK-0966 was another designation for Vioxx; is that
5 correct?
6     A. Right.
7     Q. Okay. So in MK-0966 Protocol 023, and then
8 it goes on to discuss the situation with prostacyclin
9 and thromboxane; is that correct?
10     A. It goes on to discuss what the -- what the
11 intent of the study was which was to look at urinary
12 sodium excretion and examine renal function in people
13 on a restricted sodium diet taking either Indocin or
14 rofecoxib, the 50 milligram dose.
15     Q. In any event this paragraph is about protocol
16 023, correct?
17     A. That's correct.
18     Q. If you look down at the bottom, it talks
19 about "These findings" which would be the findings of
20 protocol 23, "raised concerns about the" --
21     A. Where are you with these findings?
22     Q. The very last sentence that begins at the
23 bottom of page 37039.
24     A. Okay. Okay.
25     Q. These findings. Are you with me?

Page 257

1     A. Yes.
2     Q. "These findings raised concern about the
3 potential for Vioxx to predispose to cardiovascular
4 thrombotic events; however, there has not been any
5 evidence of an increased incidence of such events in
6 clinical trials of Vioxx to date." Have I read that
7 correctly?
8     A. Yes.
9     Q. Okay. Now, we're now on page 37040. And if
10 you read along under II, "The purpose of this plan is
11 to document the rationale and methods for an analysis
12 of the incidents of thrombotic serious adverse events
13 among patients in the Vioxx Phase IIb and III
14 osteoarthritis trials and their extensions." Is that
15 correct?
16     A. That's what this says, yes.
17     Q. And there's some description about
18 stratification of the populations. But then there's a
19 sentence that says, "For purposes of comparison, the
20 incidence of the same events will be estimated with
21 patients from Fosamax and Proscar clinical trials."
22 Did I read that correctly?
23     A. Yes.
24     Q. And then, if you look at the objective, "The
25 objective of this plan is to provide information on

Page 258

1  which to base a recommendation to the Vioxx
2  team regarding the need for a more detailed assessment
3  of the risk of cardiovascular thrombotic serious
4  adverse events with Vioxx." Did I read that
5  correctly?
6    A.  Yes.
7    Q.  And you recall having seen this document
8  before?
9    A.  I believe I've seen this before, yes.
10   Q.  And am I correct that, in this particular
11 study, they had these ongoing osteoarthritis trials,
12 right?
13   A.  Right.
14   Q.  Okay.  And they weren't ready to unblind
15 those trials yet, were they?
16   A.  That's correct.
17   Q.  Okay.  So you've got this problem that you
18 can't separate the Vioxx people from the non-Vioxx
19 people because you would have to unblind the trials to
20 do that, right?
21   A.  Well, you can separate into treatment A and
22 treatment B and look to see if there is an excess of
23 any given event in treatment A versus treatment B.
24   Q.  They didn't do that here, did they?
25   A.  Not with the osteoarthritis trials, that's

Page 259

1  right.
2    Q.  What they did instead --
3    A.  Well, but this is -- what's the date of this?
4  '97.
5    Q.  Yes.
6    A.  Okay.
7    Q.  What they did instead as I understand it, and
8  correct me if I'm wrong, what they did instead is they
9  took all the women from those trials, all of them,
10 whether they were on Vioxx or anything else, and then
11 they compared the cardiovascular disease rate in all
12 the women with the placebo group from a Fosamax trial;
13 is that correct?
14       MR. ROTHMAN: Objection to the form.
15       THE WITNESS: From -- I think from the whole
16 Fosamax -- I thought it was from the whole Fosamax
17 database. One, two, three, four, five, six, seven,
18 eight, nine, there are nine trials that were included
19 that were basically donating placebo patients for
20 comparison. So there are nine -- there are one, two,
21 three, four Proscar and there are nine Fosamax
22 clinical trials.
23 BY MR. BLACK:
24   Q.  Okay.  I stand corrected.  They compared all
25 the women from the Vioxx trials unblinded so it's all

Page 260

1  the women, whether other Vioxx or not, and they
2  compared that with all the placebo patients from the
3  Fosamax trials, correct?
4    A.  I guess that was the --
5       MR. ROTHMAN: Objection to the form.
6       THE WITNESS: Duration of therapy. Okay.
7  That's what they did apparently.
8  BY MR. BLACK:
9    Q.  And they did a similar thing with all the men
10 from the Vioxx trials and they compared that to all
11 the placebo people from the Proscar trials, right?
12   A.  That's what it looks like.
13   Q.  And you use Fosamax because Fosamax is a drug
14 primarily administered to women, correct?
15       MR. ROTHMAN: Objection to the form.
16       THE WITNESS: Well, it's administered to
17 postmenopausal women.
18 BY MR. BLACK:
19   Q.  And Proscar is a drug primarily administered
20 to men, correct?
21   A.  Proscar I think is only administered to men.
22 Actually women -- I mean men do take Fosamax. But I
23 believe that these are all clinical trials in women.
24   Q.  I believe your understanding is correct.
25 Okay.  Now, was that an appropriate study design in

Page 261

1  your opinion, Doctor?
2    A.  Well, they said that there's no hypothesis
3  going into this.  So they were basically looking at --
4  at clinical trial data from the -- it's a reasonable
5  estimate of whether anything is going on in -- in a
6  clinical trial, if you compare to a placebo group that
7  you -- that may or may not actually be taking aspirin.
8  I don't know what the inclusion criteria were for --
9  for the Fosamax trials. I don't know whether women
10 could be on aspirin in this or not.
11   Q.  Let me ask --
12   A.  I don't think it's a terribly rigorous
13 comparison. But it's a comparison. And as they say
14 there's no statistical hypothesis in the analysis.
15 It's just an estimate of incidence.
16   Q.  Well, if I understand the situation right,
17 including all of the people from the Vioxx studies,
18 whether they were on Vioxx or not, would tend to
19 underestimate the relative risk for Vioxx people
20 versus placebo; isn't that correct?
21       MR. ROTHMAN: Objection to the form.
22       THE WITNESS: Well, it would -- you might
23 dilute out if there was really a lot going on. But
24 they've been monitoring these trials. I mean they're
25 not in absentia. As the trials go on, they monitor

Page 262

1  the safety in the trials.
2       So that they -- it's not as though they don't
3  know what is going on in the trials in terms of
4  adverse events. What they're trying to do is look at
5  another database to see if there's any difference in
6  the adverse events from the Fosamax database.
7       And again it's a postmenopausal group of --
8  it's postmenopausal women who are going to be at
9  higher risk for cardiovascular events anyway. And you
10  don't know whether they're going to be on aspirin or
11  not which would modify that. I mean it's just a --
12  it's just a reasonable -- I think it's a reasonable
13  best guess.
14  BY MR. BLACK:
15  Q.  Well, let me ask this question. As a native
16  Chicagoan, I want to raise a baseball example.
17  A.  I don't know baseball.
18  Q.  Well, let me see if you know this much
19  baseball. I've got a batting average of .300 which
20  means I get 300 hits out of 1,000 times at bat.
21  That's what a 300 batting average means.
22  A.  Okay.
23  Q.  And I'm the only one on this team, it's a
24  small team. And somebody else joins the team. And
25  his batting average is .200, he only gets 200 hits out

Page 263

1  of 1,000 times at bat.
2  A.  Okay.
3  Q.  Our combined batting average is going to be
4  lower than my batting average, isn't it?
5  A.  Right, it's going to be basically .250,
6  assuming you each were up at bat the same number of
7  times.
8  Q.  And, in looking at the relative risk, Vioxx
9  versus this Fosamax placebo control group, if the
10  women in that -- in that placebo control group were
11  people who were more likely to have cardiovascular
12  problems, that too would tend to lower the relative
13  risk Vioxx versus the placebo group; isn't that
14  correct?
15  A.  Well, yeah. But it's also going to be
16  similar in age to the -- I mean they're all over 40.
17  It's going to be similar in age to the Vioxx group.
18  We know, in the Vioxx group, you couldn't take
19  aspirin. In Fosamax I don't know if you could take
20  aspirin or not.
21       I mean, you know, I don't think this is a
22  rigorous study. I'm not going to defend this as a
23  rigorous scientific study. But I think, in terms of,
24  you know, looking at the available data, it's fine.
25       (Exhibit No. 23 was marked.)

Page 264

1  BY MR. BLACK:
2  Q.  Let's take a look at Exhibit 23 which reports
3  the results. And this is dated February 2nd, 1998,
4  right?
5  A.  Yes.
6  Q.  It's by somebody named Doug Watson, Ph.D.,
7  who is from the epidemiology department apparently,
8  correct?
9  A.  That's what it says, yes.
10  Q.  And it says MRL epidemiology department at
11  the top. Would MRL stand for Merck Research
12  Laboratories?
13  A.  I would assume so, yes.
14  Q.  And then the title is Final Results of an
15  Analysis of the Incidence of Cardiovascular Serious
16  Adverse Events, SAEs, in the Phase IIb/III Vioxx
17  Osteoarthritis Clinical Trials. Did I read that
18  correctly.
19  A.  Yes.
20  Q.  So this would appear to be the report of the
21  results for the study that was undertaken in
22  accordance with the plan laid out in Exhibit 22,
23  correct?
24  A.  I believe that's accurate. Let's see.
25  Q.  Let's assume that that's correct. Okay.

Page 265

1  Turn, if you would, to --
2       MR. ROTHMAN: Actually she's looking. So
3  let's not assume.
4  BY MR. BLACK:
5  Q.  Well, let's. It's my question. Let's assume
6  that's correct.
7       MR. ROTHMAN: You can't put something in
8  front of the witness and ask her a question and then,
9  when she starts to confirm what you've said is right,
10  run away and do something else. Give her a chance --
11       MR. BLACK: Well, let the record reflect she
12  hasn't confirmed I was right. We're just going to
13  assume it.
14       MR. ROTHMAN: Well, give her a chance to look
15  at the document, please. She is entitled to that.
16  Even if you don't want to ask her a question, just
17  give her a chance to look at it. I know it's late.
18       MR. BLACK: I'm trying to get us all out of
19  here.
20       MR. ROTHMAN: I know. I appreciate that.
21  But give her a chance to take a look.
22  BY MR. BLACK:
23  Q.  But anyway.
24  A.  Okay.
25  Q.  Okay. Let's assume -- well, does it appear

67 (Pages 262 to 265)

1  to you that Exhibit 23, in fact, reports the results
2  for the plan outlaid -- for the study outlined in
3  Exhibit 22?
4     A.  Yes, for the -- yes.
5     Q.  Okay.  Now, I call your attention to the
6  first page after the cover page on Exhibit 23.  And,
7  if you go down one, two, three, four paragraphs,
8  there's a paragraph that begins "The pooled incidence
9  of CV SAEs in men in the Vioxx program was 19.4."  Do
10  you see that?
11     A.  Yes.
12     Q.  Okay.  Now, go down in the third line.
13  There's a sentence that begins "The overall pooled
14  incidence rate."  Do you see that?
15     A.  Yes.
16     Q.  Okay.  And read along with me.  "The overall
17  pooled incidence rate for men in the Vioxx program was
18  not statistically significantly different from the
19  Proscar placebo controls (age and time period at risk
20  adjusted rate ratio 1.28, confidence interval 0.53 to
21  1.82."  Did I read that correctly?
22     A.  Yes.
23     Q.  "The overall incidence rate for women was
24  elevated to those of Fosamax placebo controls
25  (adjusted rate ratio 2.16, 95 percent confidence

1  interval 1.14 to 3.94."  Did I read that correctly?
2     A.  Yes.
3     Q.  Now, for the women one is not included in the
4  confidence interval, is it?
5     A.  That's correct.
6     Q.  So the results for the women were
7  statistically significant, correct?
8     MR. ROTHMAN:  Let's read the rest of the
9  paragraph, if you would.
10     THE WITNESS:  It then goes on to explain that
11  it was driven by low rates in two of the short-term it
12  looks like Fosamax placebo exposure strata.  And then
13  above that too it says after the -- it describes the
14  ratio, the incidence rates in men and women.
15     It then says "These rates are not elevated
16  compared to those of persons aged 65 and older in the
17  cardiovascular health study."  So it's more than just
18  a comparison of the Proscar and the Fosamax.  You did
19  read it correctly, you didn't read the whole
20  paragraph.
21  BY MR. BLACK:
22     Q.  All right.  But the results for the women
23  were statistically significant, correct?
24     A.  That's -- that's what this says.  Given the
25  data that it was based on, that's what it says.

1     Q.  Okay.  And was the comparison with the
2  cardiovascular health study population included --
3  well, strike that.
4     I will report to you that the cardiovascular
5  health study comparison was never included in the
6  original plan for the study, Exhibit 22.
7     A.  Okay.
8     Q.  So assume that that's, in fact, the case.
9  Was shifting the focus to use this alternative
10  population to compare the results with, was that --
11  would that constitute a post hoc comparison, Doctor?
12     MR. ROTHMAN:  Objection to the form, it
13  assumes facts not in evidence.
14     THE WITNESS:  Look, I don't know what Merck
15  did with this.  I do know they instituted SOPs.  I do
16  know they convened three expert panels.  And I do know
17  they monitored the cardiovascular SAEs.
18     I don't know what Merck did with this.  You
19  know, this is not -- just a brief what I've seen --
20  you know, this isn't going to -- it's not a
21  peer-reviewed article.
22  BY MR. BLACK:
23     Q.  Well, let's --
24     A.  It's an analysis that somebody did.  And, as
25  far as I'm concerned, you know, Merck continued on and

1  set up these -- these ways to look at serious
2  cardiovascular thromboembolic events that was
3  appropriate.
4     Q.  Were the studies that were submitted as part
5  of the NDA, were they peer-reviewed articles?
6     A.  I'm not saying that they were, although
7  certainly some articles came out of that.  What I'm
8  saying is that no matter what -- what they did or what
9  this individual did in this study, I do know what
10  Merck did.
11     And Merck I thought did a very good job in
12  setting up these expert panels, in reviewing and
13  adjudicating adverse events that were reported by
14  investigators.  They had a data safety and monitoring
15  board that was put into effect.
16     I mean this I don't know what Merck did with.
17  I don't think it's a very rigorous study.  I'm not
18  going to defend it.  But I will say I know what Merck
19  did.  And I think what Merck did was appropriate.
20     Q.  I'm not asking you questions about what Merck
21  did.  I'm asking questions about this study.  And I'd
22  like to confine both my questions and the answers to
23  this study.  Can we do that, please.  Okay.  Now, if
24  you'll take a look, back on the first page, after the
25  cover page in Exhibit 23.

Page 270

1    A.  Okay.
2    Q.  And that's the same paragraph we were reading
3  from before.  It says "These rates are not elevated
4  compared to those of persons aged 65 and older in the
5  cardiovascular health study."  Did I read that
6  correctly?
7    A.  Yes, you did.
8    Q.  And assume with me, if you would please, that
9  the average age in the cardiovascular health study was
10  73.  Just assume that.
11    A.  Fine.
12    Q.  How does that compare with the average age in
13  the Vioxx osteoarthritis studies, do you know?
14    A.  I don't remember what the average age was.
15    Q.  Why don't you turn to — it's the page of
16  Exhibit 23 that has 13 are the last two digits.  And,
17  if you take a look at that, that says table 2, right?
18    A.  Yes, demographics.
19    Q.  It says demographics, correct?
20    A.  Yes.
21    Q.  Okay.  And for -- in the men the Vioxx
22  patients had an average age of 62.4, right?
23    A.  Yes.
24    Q.  And the Proscar placebo group, that was an
25  average age of 63.8, right?

Page 271

1    A.  Yes.
2    Q.  By my reckoning 63.8 is a lot closer to 62
3  than 73 is; would that be right?
4    A.  Okay.  63.8 is closer to?
5    Q.  62.4 than 73 would be to 62.4?
6    A.  Right, I would agree with that.
7    Q.  Okay.  And, if you look over at the women,
8  the average age for the Vioxx women was 62.3; is that
9  right?
10    A.  That's what it says, yes.
11    Q.  And, for the Fosamax placebo group that they
12  compared the Vioxx people to, the Vioxx women to, the
13  average age was 65.4, correct?
14    A.  That's what it says, yes.
15    Q.  And again 65.4 is closer to 62.3 than 73
16  would be to 62.3, correct?
17    A.  Can you say that again.  I'm sorry.  I don't
18  know what your numbers were.
19    Q.  I'll strike the question.
20       To your knowledge was the report that
21  constitutes Exhibit 23 ever provided to the Food and
22  Drug Administration?
23    A.  Not that I'm aware of.
24       (Exhibit No. 24 was marked.)
25  BY MR. BLACK:

Page 272

1    Q.  And I'm now handing you Exhibit 24 which is
2  the Medical Officer Review for Vioxx; is that correct?
3       MR. ROTHMAN:  This is the document she asked
4  you for before.
5       MR. BLACK:  Okay.  Well, now she has it.
6       MR. ROTHMAN:  Gee, I didn't --
7  BY MR. BLACK:
8    Q.  And I take it that, since you asked for it
9  before, this is a document that you had reviewed prior
10  to today, correct?
11    A.  Yes, uh-huh.
12       MR. ROTHMAN:  For the record she asked for it
13  before because the last time you showed her excerpts
14  from it.  That was Exhibit 7.
15  BY MR. BLACK:
16    Q.  I don't want to spend time going through a
17  document this thick now, the day is getting late.
18  But, based on your prior review, do you recall ever
19  seeing any mention in this Medical Officer Review of
20  the Watson report, Exhibit 23?
21    A.  I don't remember seeing it.  I wouldn't have
22  sent it in.  I mean it's -- it's not a --
23    Q.  Okay.  Let me take a look at another document
24  which you may have read.
25       (Exhibit No. 25 was marked.)

Page 273

1  BY MR. BLACK:
2    Q.  Let me hand you Exhibit 25.  And is Exhibit
3  25 a copy of the review of the cardiovascular and
4  renal database that was done by the FDA in connection
5  with the Vioxx new drug application?
6    A.  Yes.
7    Q.  And that was -- the memo at least is from
8  somebody named Juan Carlos Pelayo; is that correct?
9    A.  Yes, it looks like it, yes.
10    Q.  Is this a document that you reviewed?
11    A.  Yes, I have reviewed this.
12    Q.  Okay.  And again, without taking time at this
13  point in the day to go through it in any detail, do
14  you recall seeing in this document any mention of the
15  Watson report which is Exhibit 23?
16       MR. ROTHMAN:  Objection to the form.  This
17  document is not looking at the same type of data.
18  BY MR. BLACK:
19    Q.  Okay.
20    A.  Let me see.  I'm looking at the materials
21  utilized in the safety review and the methodology.
22    Q.  Well, I asked you based on your memory.
23    A.  Well, at this late time of the day, I'm not
24  going to really rely on my memory.
25    Q.  Okay.  Well, then let's move on to another

Page 274

1  question.
2      A.  So you don't want me to answer that question?
3      Q.  If you don't feel like relying on your memory
4  now, I just won't ask you that question.
5      A.  No.
6      Q.  Let's take a look at page 74 of the document
7  we've marked as Exhibit 24 which is the Medical
8  Officer Review.
9      A.  Page 74?
10     Q.  Yes.
11         MR. ROTHMAN:  In the upper right-hand corner.
12 BY MR. BLACK:
13     Q.  In the upper right-hand corner, that's
14 correct.  And, at the very top of that page, there's a
15 heading that says General considerations.  Do you see
16 that?
17     A.  Yes, I do.
18     Q.  It says, if you'll read along with me, "The
19 aim of any NDA Safety Review is to find trends or
20 signals that suggest an increased incidence of a given
21 adverse event."  Did I read that correctly?
22     A.  Yes.
23     Q.  "For many of the observed safety end points,
24 one can assume that the available studies will be
25 under-powered."  Did I read that correctly?

Page 275

1      A.  You certainly did.
2      Q.  "To detect a" -- "To detect or rule out
3  relatively uncommon adverse events, a larger database
4  is always needed."  Did I read that correctly?
5      A.  Yes, you did.
6      Q.  Also it says that "Additionally, patients who
7  participate in clinical trials are judged to be in
8  otherwise general good health based on medical
9  history, physical examination, and routine laboratory
10 tests."  Did I read that correctly?
11     A.  I think in general that's true, yes.
12     Q.  I read it correctly, though?
13     A.  You read it correctly, yes.
14     Q.  And you would generally agree with it,
15 correct?
16     A.  Generally I will, yes.
17     Q.  "Therefore, only postmarketing surveillance
18 will allow appreciating the complete safety profile of
19 a new drug."  Did I read that correctly?
20     A.  Yes, you did.
21     Q.  Are you in agreement with this paragraph that
22 we've just read in?
23     A.  I think I've written this very same thing
24 many times before.
25     Q.  I believe you testified that the Watson

Page 276

1  report, Exhibit 23, is not the kind of thing that you
2  would have provided to the FDA.  Did I understand your
3  testimony correctly?
4      A.  I mean I don't think it's a very persuasive
5  study one way or the other.  So I mean it's -- it's
6  data FDA had.  I don't know why they would want to
7  send that to them, to FDA.
8      Q.  Do you know one way or the other if Merck
9  ever submitted the Watson report to the FDA as part of
10 the NDA?
11     A.  I don't -- I don't know.
12     Q.  Now, are you aware of any other study
13 undertaken by Merck prior to the submission of the NDA
14 or during the pendency of the FDA where comparisons
15 were made of the rate of occurrence of cardiovascular
16 adverse events in a Vioxx population with some
17 comparative population?
18         MR. ROTHMAN:  Objection to the form.
19         THE WITNESS:  What do you mean -- what do you
20 mean study?  You mean like this?  Or -- I mean --
21 BY MR. BLACK:
22     Q.  Was there ever a relative risk provided to
23 the FDA for cardiovascular events, Vioxx versus some
24 comparator, in the NDA or during the pendency of the
25 NDA?

Page 277

1          MR. ROTHMAN:  Objection to the form.
2          THE WITNESS:  I'm really not aware of seeing
3  relative risks calculated.  I mean I'm not aware of
4  that as being a calculus that's often done for an NDA.
5  I mean usually you have -- you know, you're looking at
6  end points.  And the safety data are reported.  I
7  can't -- at this point I can't think of another study.
8  BY MR. BLACK:
9      Q.  Now --
10     A.  But I do know that the safety data were
11 reported and reviewed and so forth.  But I don't know
12 of another study.
13     Q.  Move to strike the nonresponsive part of the
14 answer.
15         Now, Exhibit 23, the Watson report, did, in
16 fact, contain a relative risk estimate for the rate of
17 occurrence of cardiovascular events in people taking
18 Vioxx versus people not taking Vioxx, correct?
19     A.  I think that, yes, he reports relative risks.
20     Q.  Was there ever any better study done to
21 follow up on the Watson study?
22         MR. ROTHMAN:  Objection to the form.
23         THE WITNESS:  Well --
24 BY MR. BLACK:
25     Q.  I'll strike the question, I'll withdraw the

Page 278

1    question. Let me ask it this way.
2         As part of the NDA submission or during the
3    pendency of the NDA, did Merck ever make any other
4    calculation of the relative risk for Vioxx versus some
5    comparative drug with regard to cardiovascular adverse
6    events that you're aware of?
7    A.   Prior to the approval of the first NDA?
8    Q.   Yes.
9    A.   In that six-month time period?
10   Q.   Yes.
11   A.   I'm not aware of any study that was initiated
12   and completed in that time frame.
13   Q.   Are you aware of any study undertaken by
14   Merck prior to submitting the NDA or during the
15   pendency of the NDA that was intended to follow up on
16   the Watson study which is Exhibit 23 to your
17   deposition?
18   A.   Well, I would say that rather than follow up
19   on the Watson study, there were studies that were
20   initiated during that time frame to more closely
21   examine this hypothesis.
22   Q.   And this hypothesis, your hand is on the
23   McAdam article; is that correct?
24   A.   Yes, McAdam, Fitzgerald hypothesis. And so
25   I'm not aware that -- of any follow-up on this Watson

Page 279

1    analysis. But I am aware of the fact that Merck
2    notified the FDA -- the FDA was aware of this because
3    I know this hypothesis was discussed --
4    Q.   When you say this, you're not referring to
5    Watson, you're referring to the McAdam article; is
6    that correct?
7    A.   Yes, the McAdam and Fitzgerald.
8         MR. ROTHMAN: She said this hypothesis.
9         THE WITNESS: This hypothesis was discussed
10   in the first advisory committee meeting and that
11   this was the genesis basically of the SOPs that I've
12   mentioned before. So I'm not aware of any follow-up
13   on this article. But I am aware --
14   BY MR. BLACK:
15   Q.   And this article you mean the Watson?
16   A.   Excuse me. The Watson analysis, yes. But I
17   am aware of the fact that FDA -- this was presented to
18   FDA, FDA was aware of it, and this was the genesis --
19   basically testing that hypothesis was the genesis of
20   the -- of the cardiovascular thromboembolic SOPs.
21        MR. BLACK: Let's go off the record, please.
22        THE VIDEOGRAPHER: We are off the record.
23   The time now is 6:34 p.m. Mountain time.
24        (Discussion off the record.)
25        THE VIDEOGRAPHER: We are back on the record.

Page 280

1    The time now is 6:36 p.m. Mountain time. This ends
2    tape No. 3 in today's videotaped deposition of
3    Dr. Janet Arrowsmith-Lowe. The time now is 6:36 p.m.
4    Mountain time. We are off the record.
5         (Recess.)
6         THE VIDEOGRAPHER: This begins tape No. 4 in
7    today's videotaped deposition of Dr. Janet
8    Arrowsmith-Lowe. The time now is 6:49 p.m. Mountain
9    time. We are back on the record.
10   BY MR. BLACK:
11   Q.   Doctor, I call your attention back to Exhibit
12   3, the Bombardier article which we've already
13   discussed somewhat. And, while you're looking for it,
14   I think I can ask you a question. Bombardier reported
15   on the results from VIGOR; is that correct?
16   A.   You know what, when I look at the article, I
17   sure can answer that question. Okay.
18   Q.   Okay.
19        MR. ROTHMAN: I can't find mine either.
20        THE WITNESS: Okay. I know exactly -- no
21   that's.
22        MR. ROTHMAN: I have a copy, it's unmarked,
23   if you need one.
24        THE WITNESS: Okay. Why don't you give me
25   yours because I don't know where mine is. Yes.

Page 281

1    BY MR. BLACK:
2    Q.   Okay. Make sure you give me mine back. The
3    VIGOR results became known to Merck on March 9, 2000,
4    correct?
5    A.   What do you mean the VIGOR results?
6    Q.   Okay. Take a look at page 6 of your report.
7    It says "On March 9, 2000, Merck learned the results
8    of the VIGOR trial, a randomized, double-blinded
9    controlled clinical trial."
10   A.   Okay.
11   Q.   I stated -- read your report correctly?
12   A.   Yes, you did.
13   Q.   Okay. So, on March 9, 2002, the results of
14   the VIGOR trial became known to Merck, correct?
15   A.   Yes, that's correct.
16   Q.   And in your report you state that "Following
17   the VIGOR trial, Merck conducted an extensive review
18   of data from completed and ongoing clinical trials of
19   Vioxx." Have I read that correctly? That's from page
20   6 of your report.
21   A.   Well, that's true. I didn't follow your
22   reading. But yes, that is true.
23   Q.   Okay. What was the power of any of those
24   individual trials to detect a doubling of the risk for
25   a myocardial infarction?

Page 282

1     A. Power calculations really are appropriate
2  before you start. I don't know what the power was of
3  those studies. I don't know what the power of the --
4  of the meta analyses were.
5       (Exhibit No. 26 was marked.)
6  BY MR. BLACK:
7     Q. Let's take a look at Exhibit 26 which is the
8  Executive Summary of something called CV Outcomes Data
9  Analysis Plan; is that correct?
10    A. That's what this says.
11    Q. Okay. Now, have you seen this document
12  before?
13    A. I don't remember it. I may have.
14       MR. ROTHMAN: I'll note for the record it's
15  an excerpt from a document.
16  BY MR. BLACK:
17    Q. Now, on pages 4 and 5 of your report, you
18  refer to prospectively designed CV safety studies; is
19  that correct? Take a look at page 4 and 5 of your
20  report. "Following the VIGOR trial" --
21    A. Right, that's right.
22    Q. "Following the VIGOR trial, Merck conducted
23  prospectively designed cardiovascular safety studies
24  of Vioxx. This took the form of a planned
25  cardiovascular analysis of data from three long-term

Page 283

1  appropriately powered placebo-controlled studies in
2  patients with or at risk for colon or prostate
3  cancer." Correct?
4     A. That's correct.
5     Q. Okay. Now, if you'll take a look at
6  exhibit -- what's the last one that I gave you? This
7  is 26.
8       MR. ROTHMAN: Twenty-six.
9  BY MR. BLACK:
10    Q. Twenty-six. If you'll take a look at 26
11  which is this executive summary, does this study --
12  does this executive summary address the combination of
13  results from the kinds of studies that you have
14  described on pages 4 and 5 of your report?
15    A. What -- I'm sorry. Is this -- does this
16  address the three --
17    Q. Let me withdraw the question.
18       "This Data" -- read along with me. "This
19  Data Analysis Plan addresses issues and provides
20  details pertaining to the statistical methods that
21  will be used to address the objectives stated in Vioxx
22  Protocol 203 for the combined analysis of thrombotic
23  cardiovascular events in three placebo-controlled
24  trials of Vioxx." And then it lists the three
25  studies.

Page 284

1       So my question is does this document, Exhibit
2  26, refer to the combined study that you have included
3  or mentioned in your report at pages 4 and 5?
4     A. The three studies that -- with the combined
5  data analysis, that's correct.
6     Q. Okay. Now, was this combined analysis ever
7  done?
8     A. Well, the studies were never completed
9  because of the approved study being halted and the --
10  and the other studies -- the drug withdrawn and the
11  other studies terminated. I believe that there have
12  been analyses. But it would not be the planned
13  analysis because the -- the protocols never went to
14  completion.
15    Q. Go on. I'm sorry.
16    A. But I believe that there would be -- that
17  there was an analysis, there were analyses done.
18    Q. Was it necessary to combine the results of
19  these three studies in order to achieve adequate power
20  to examine the question of whether or not Vioxx was
21  causing an elevated rate for cardiovascular adverse
22  events?
23    A. Was it necessary to combine the three
24  studies?
25    Q. Yes.

Page 285

1     A. In terms of power?
2     Q. Yes.
3     A. I don't know.
4       MR. BLACK: Okay. Our copy company is going
5  to be in trouble. We're just going to have to use
6  this. And some of the stuff is highlighted for you
7  already, but that's all right. This is going to
8  become Exhibit 27.
9       (Exhibit No. 27 was marked.)
10      MR. ROTHMAN: Bert, is that a label?
11      MR. BLACK: It is a label.
12      MR. ROTHMAN: Which one is it?
13      MR. BLACK: It is the 2002 label.
14      MS. ODETTE: April 2002.
15      MR. BLACK: April 2002 label.
16      MR. ROTHMAN: We may have copies of it in the
17  materials.
18  BY MR. BLACK:
19    Q. I've got two copies of it. Let's proceed
20  with this because I'd like -- take a look at Exhibit
21  27. That's two copies of the 2002 label. Does that
22  appear to be correct? And one -- one version is just
23  in a more readable form than the other.
24    A. Okay.
25    Q. And confirm that they're both April 2002.

Page 286

1    A.  Issued April 2002.  Yes, they're both 2002.
2    Q.  And, if I understand correctly, this label,
3  you have two copies of it which you ought to keep
4  together because that together comprises Exhibit 27,
5  in that label the myo — strike that.
6       The cardiovascular results from VIGOR were
7  included in the precaution section of the label; is
8  that correct?
9    A.  Yes, that's correct.
10    MR. ROTHMAN:  Objection to the form.
11    THE WITNESS:  They were also referred to --
12  they were referenced back and forth in adverse events.
13    MR. BLACK:  We don't have this either.
14    MS. ODETTE:  Yeah, we do.
15    MR. BLACK:  Okay.
16    THE WITNESS:  But the data was located in
17  precautions.
18    (Exhibit No. 28 was marked.)
19  BY MR. BLACK:
20    Q.  Okay.  Let me hand you what I'm marking as
21  Exhibit 28.  And is Exhibit 28 an FDA Talk Paper
22  related to the new indication in label changes for the
23  arthritis drug Vioxx; is that correct?
24    A.  I don't know.  Where is it?  I don't have it.
25    Q.  I just handed it to you.  Yeah, it's there.

Page 287

1  Okay.  I guess I didn't do a good job of handing it to
2  you.  Would that be an FDA Talk Paper; is that
3  correct?
4    A.  That's what it says, is an FDA Talk Paper.
5    Q.  Dated April 11, 2002?
6    A.  That's what it says.
7    Q.  Announcing that the FDA approves new
8  indication in label changes for the arthritis drug
9  Vioxx, correct?
10    A.  That's correct.
11    Q.  Now, if you'll turn to the second page, 2 of
12  2, the second full paragraph down, there's a paragraph
13  that begins "The committee also advised."  Do you see
14  that?
15    A.  Yes.
16    Q.  Okay.  And the committee would be the FDA
17  advisory committee; is that correct?
18    A.  Yes.
19    Q.  The committee that met on February 8, 2001?
20    A.  Yes.
21    Q.  "The committee also advised that the CV
22  findings should be included in the Vioxx label to
23  provide doctors and patients with the available data
24  on the potential risks and benefits of Vioxx compared
25  to naproxen."  Did I read that correctly?

Page 288

1    A.  Yes.
2    Q.  "The new labeling information approved by FDA
3  will advise doctors to use caution in prescribing
4  Vioxx for patients with ischemic heart disease and
5  notes that Vioxx 50 milligrams is not recommended for
6  chronic use."  Did I read that correctly?
7    A.  Yes.
8    (Exhibit No. 29 was marked.)
9  BY MR. BLACK:
10    Q.  Okay.  All right.  Now, let me hand you
11  what's been marked as Exhibit 29.  And that's from
12  something called FDA Webview, correct?
13    A.  Yes.
14    Q.  Dated May 1, 2000, correct?
15    A.  Yes.
16    Q.  Okay.  And this reports on comments made by
17  somebody named Robert Delap, correct?
18    A.  Yes.
19    Q.  And, in your report on page 7, you refer to a
20  statement from Mr. Delap saying that the Vioxx -- that
21  Vioxx was labeled appropriately; is that correct?
22    A.  Let's see.  Yes, labeled appropriately.
23    Q.  If you'll look at the second paragraph, it
24  says Delap told FDA Webview.  Do you see that?
25    A.  On 5/1?

Page 289

1    Q.  Yes.
2    A.  Okay.
3    Q.  Then it says for now, do you see that
4  sentence that begins for now?
5    A.  Yes.
6    Q.  Okay.  It says "For now Delap is convinced
7  the product is labeled appropriately."  Did I read
8  that correctly?
9    A.  Yes, you did.
10    Q.  And that's the statement to which you refer
11  in your report, correct?
12    A.  Yes.
13    Q.  And this is the document you were referring
14  to as the reference for that statement, correct?
15    A.  That's correct.
16    Q.  Okay.  Now, if you'll take a look at the
17  beginning of Exhibit 29, it also says "Robert Delap
18  says it is 'premature' to draw conclusions from recent
19  clinical data on America's arthritis drug Vioxx."
20  Correct?
21    A.  That's what it says, yes.
22    Q.  Does -- okay.  Now, the Delap statement came
23  less than two months after the VIGOR results became
24  known, correct?
25    A.  Right.

Page 290

1    Q.  Now, what did the New England Journal of
2  Medicine article -- strike that.
3       Let's take a look back at -- have you found
4  your copy of the Bombardier article?  And, if so,
5  could you give me mine.
6    A.  Bombardier.
7    Q.  Yeah, Bombardier.  Is that how he pronounces
8  his name?
9    A.  I don't know.  That's -- if you're
10 pronouncing it in French, it would be Bombardier I
11 believe.
12   Q.  You believe.  You probably believe correctly.
13   A.  Now, you wanted this back; is that right?
14   Q.  No, no, no.  I wanted my copy of Exhibit 3
15 back.  Have you found your copy of Exhibit 3?
16      MR. ROTHMAN: I think you did want the VIGOR
17 label back at some point.
18      THE WITNESS:  Yeah.
19      MR. ROTHMAN:  You asked --
20 BY MR. BLACK:
21   Q.  No, that's the only copy I have.  That's
22 going to be an exhibit.  And that's the only copy I
23 have.
24   A.  Okay.  So you do want it back?
25   Q.  No, I do not.  It is the exhibit so it has to

Page 291

1  stay in the exhibits.  I will say one more time, it is
2  the exhibit, it needs to stay.
3    A.  Okay.
4    Q.  You have found the Bombardier article?
5    A.  Yes.
6    Q.  Okay.  And if you will turn to the -- to page
7  1526 of that article.  And one, two, three paragraphs
8  up from the bottom, there's a paragraph that begins
9  "The overall mortality rate was similar."
10   A.  Which -- which side are we talking about?
11   Q.  Page 1526 and it's on the right side.
12   A.  Right side.  Okay.  And it's the third from
13 the bottom?  Overall mortality rate.  Okay.
14   Q.  Okay.  And then it reports on the rate of
15 myocardial infarction being significantly lower in the
16 naproxen group than the rofecoxib group, correct?
17   A.  That's correct.
18   Q.  And then it says "This difference was
19 primarily accounted for by the high rate of myocardial
20 infarction among the 4 percent of the study population
21 with the highest risk of a myocardial infarction for
22 whom low dose aspirin is indicated."  Correct?
23   A.  That's what it says, yes.
24   Q.  "The difference in the rates of myocardial
25 infarction between the rofecoxib and naproxen groups

Page 292

1  was not significant among the patients without
2  indications for aspirin therapy as secondary
3  prophylaxis."  Did I read that correctly?
4    A.  Yes, I believe -- yes.
5    Q.  So that means the significance level for the
6  relative risk was greater than .05, correct?  It
7  wasn't statistically significant, the significance
8  level must have been greater than .05, correct?
9    A.  Right.  And/or the confidence interval
10 included one.
11   Q.  Now, reading down further, the article also
12 says -- let's see where that is.  Okay.  Okay.  If you
13 take a look at the bottom, the very last thing on page
14 1526, "Thus, our results."  Do you see that?
15   A.  Yes.
16   Q.  It says "Thus" -- or the article says "Thus,
17 our results are consistent with the theory that
18 naproxen has a coronary protective effect and
19 highlight the fact that rofecoxib does not provide" --
20 protection, it talks about "this type of protection
21 owing to its selective inhibition of cyclooxygenase-2
22 at its therapeutic dose and at higher doses."  Did I
23 read that correctly?
24   A.  Yes.
25   Q.  Okay.  So the message in this New England

Page 293

1  Journal of Medicine article is essentially that it's
2  the goodness of naproxen and not the badness of Vioxx
3  that accounts for the relative risk of five for MIs in
4  Vioxx people versus naproxen people; is that correct?
5       MR. ROTHMAN: Objection to the form.
6       THE WITNESS: Well, it wasn't just based on
7  this article.  It was also based on analyses of 7,500
8  patients.
9  BY MR. BLACK:
10   Q.  Doctor, that's the message of the article,
11 though?  Forgetting what it's based on --
12   A.  Excuse me.
13   Q.  Forgetting what it's based on, that is the
14 message of the article; isn't that correct?
15      MR. ROTHMAN: Same objection.
16      THE WITNESS: Well, I want to just make sure
17 I understand that the results of that analysis were
18 included in the article.  And yes, and then the
19 authors go on to make that conclusion.
20 BY MR. BLACK:
21   Q.  Doctor, that's the message of the article,
22 correct, you agree with that statement?
23      MR. ROTHMAN: Objection to the form.
24      THE WITNESS: No, the message of the --
25 that's one of the conclusions in the article.  There

Page 294

1   are several conclusions. That is one of the
2   conclusions that the authors have voiced, that's
3   correct.
4   BY MR. BLACK:
5      Q.  Okay. What was the relative risk for
6   cardiovascular events in the nonaspirin group Vioxx
7   versus naproxen?
8      A.  I don't remember. If you're talking about
9   cardiovascular events rather than cardiovascular --
10     Q.  Rather than MIs, cardiovascular events rather
11  than MIs.
12     A.  Cardiovascular events can include edema,
13  hypertension, heart failure as well as thromboembolic
14  events. So can you clarify for me what type of
15  cardiovascular events you're talking about?
16     Q.  Let's take a look at the next exhibit.
17        (Exhibit No. 30 was marked.)
18  BY MR. BLACK:
19     Q.  I'm handing you Exhibit 30 which is the --
20  this is a February 1, 2001, document, correct?
21     A.  Yes.
22     Q.  Okay. And it was from Shari Targum, a
23  medical officer at the FDA; is that correct?
24     A.  Yes, that's correct.
25     Q.  Okay. And putting aside the -- my prior

Page 295

1   question, I'll come back to that in a minute, if
2   you'll turn to page 34 and 35 of this document, take a
3   look at the bottom of page 34, Dr. Targum says, if you
4   read along with me, "The sponsor claims that the
5   difference." Do you see that?
6      A.  Yes.
7      Q.  "The sponsor claims that the difference in
8   myocardial infarctions between the two groups is
9   primarily due to the antiplatelet effects of naproxen.
10  This hypothesis is not supported by any prospective
11  placebo-controlled trials with naproxen. One can
12  further argue that, no matter what the attribution,
13  the results from a cardiovascular standpoint are
14  favorable for naproxen." Did I read that correctly?
15     A.  Yes.
16     Q.  Okay. And, if you'll take a look a little
17  bit below that, there's another sponsor claim. "The
18  sponsor claims that the majority of cardiovascular
19  events in the VIGOR study occurred in those patients
20  who should have been on aspirin for cardioprotection."
21  Did I read that right?
22     A.  Yes.
23     Q.  And then read, if you read with me beyond
24  that, "This claim has not convinced this medical
25  reviewer. The VIGOR data are consistent (i.e.,

Page 296

1   increased events in the rofecoxib group) even in
2   patients who did not fall into the 'aspirin-indicated'
3   subgroup." Did I read that correctly?
4      A.  Yes.
5      Q.  Did you review any of the drafts of the
6   Bombardier article?
7      A.  No, I didn't.
8      Q.  Okay. So you have no way of saying one way
9   or another whether there was full disclosure to the
10  New England Journal of Medicine regarding myocardial
11  infarction findings in the VIGOR study; is that
12  correct?
13        MR. ROTHMAN:  Objection to the form.
14        THE WITNESS:  I mean I know -- I see what's
15  in the article. I'm not sure what you're referring
16  to.
17  BY MR. BLACK:
18     Q.  Okay. Let me withdraw that question.
19        With regard to the labeling after VIGOR, your
20  opinion -- your report says that the label always
21  adequately described cardiovascular information. Is
22  that correct, is that your opinion?
23     A.  Will you refer me to where you're reading.
24     Q.  Well, without where I'm reading from, is it
25  your opinion that the label for Vioxx always

Page 297

1   adequately described cardiovascular information about
2   the drug?
3      A.  Yes, the cardiovascular -- the information
4   that was known at the time, yes.
5      Q.  And just to clarify you're not saying that
6   instantaneously, upon Merck learning something, that
7   it appeared in the label, are you?
8      A.  No. I'm not saying that. But I'm saying,
9   based on the data that was available during the time
10  the label was in existence, yes, I believe that it
11  adequately disclosed cardiovascular information.
12     Q.  Let me follow up this way. What you're
13  saying is -- what I think what you're saying is that,
14  whatever delay there was from learning about some
15  information on cardiovascular events to getting that
16  into the label, whatever delay there was fell within
17  the parameters anticipated by the FDA regulations;
18  would that be a proper statement of your opinion?
19        MR. ROTHMAN:  Objection to the form.
20        THE WITNESS:  I would say -- I mean I'm not
21  saying that that length of time was -- I think it took
22  that long to sort through it. Obviously it took that
23  long to sort through with FDA and the company, to sort
24  through what the -- what the implications of the VIGOR
25  data in particular were. And, even when it went into

Page 298

1   the label, it said the clinical implications are
2   unknown or something like that. So yeah, I --
3   BY MR. BLACK:
4       Q.  Go ahead, finish.
5       A.  I would say that the company adequately
6   disclosed information that was available.
7           (Exhibit No. 31 was marked.)
8   BY MR. BLACK:
9       Q.  I'm handing you Exhibit 31. And I believe
10  this is Merck's proposed labeling changes that were
11  submitted on June 29, 2000; would that be correct?
12      A.  Well, I don't see a date anywhere on here
13  that really gives that information, that allows me to
14  say yes or no.
15      Q.  Let's see if we can find a date anywhere.
16  Okay. If you'll take a look on the last page of the
17  document, at the bottom, there's a line that says
18  MK-0966/WMA, so on and so forth, approved, and then it
19  says 8 June 2000. Do you see that?
20      A.  I do see that, yes.
21      Q.  Which indicates I believe that this was
22  approved by Merck on June 8, 2000.
23      A.  I don't know. That refers to the commercial
24  marketing history section. Maybe it is.
25      Q.  Okay.

Page 299

1       A.  Maybe it's later. But certainly that section
2   appears to have been approved on June 8.
3       Q.  Now, the submission on June 29, 2000, the
4   proposed labeling change from June 29, 2000, you
5   stated in your report that Merck sought priority
6   review for this supplemental NDA; is that correct?
7       A.  Yes.
8       Q.  Okay. The reason that Merck sought priority
9   review was to get the good word out about the lower
10  rate of GI problems; isn't that right?
11      A.  I guess that's your opinion.
12          MR. ROTHMAN: Objection to the form.
13          THE WITNESS: The labeling change included
14  both GI and the cardiovascular information.
15  BY MR. BLACK:
16      Q.  Can you cite any document where Merck said to
17  the FDA please do this on a priority basis because we
18  want to get out the word about the myocardial
19  infarction findings in VIGOR. Do you know of any
20  document like that?
21      A.  I know that they requested that the labeling
22  change be reviewed as a priority application. I
23  mean --
24      Q.  And it's true, is it not, that there was no
25  mention of the myocardial infarction findings in VIGOR

Page 300

1   in the contraindication section of the proposed
2   labeling; is that correct?
3       A.  Contraindications are not -- you don't put
4   hypotheticals in the contraindications. I don't know
5   of any data -- excuse me, excuse me. I don't know --
6       Q.  Doctor, it did not appear in the --
7       A.  I was answering your question.
8       Q.  No, you were answering the other question.
9   The answer is no, there was no -- and I don't need to
10  know the reason why. There was no mention of the
11  myocardial infarction findings from VIGOR in the
12  contraindication section of the proposed label; is
13  that correct?
14          MR. ROTHMAN: Counsel, let the witness finish
15  her answer. If you find it to be nonresponsive, you
16  know how to deal with it. Please don't cut her off,
17  though.
18          MR. BLACK: Well, that was nonresponsive.
19  And that was I think filibustering of which there's
20  been a significant amount going on. And I'm not going
21  to allow it to go any further.
22          MR. ROTHMAN: Please do not interrupt the
23  witness when she's answering a question.
24          MR. BLACK: And you're filibustering too
25  right now, Mr. Rothman.

Page 301

1   BY MR. BLACK:
2       Q.  Was there any mention of the myocardial
3   infarction findings from the VIGOR trial in the
4   precaution section of the label proposed on June 29,
5   2000?
6       A.  I think it was in the clinical study section.
7   I don't believe it was in the precaution section.
8       Q.  And not in the warning section either; is
9   that correct?
10      A.  That's right, it was not in the warning
11  section.
12      Q.  Now, if Merck had proposed adding information
13  about the VIGOR CV findings in the precautions or
14  warning section, such a change could have been done
15  through a changes being effected, correct?
16          MR. ROTHMAN: Objection to the form.
17          THE WITNESS: If they had believed that it
18  was appropriate, yes. And, if FDA had wanted it that
19  way, they could have requested a CBE for those
20  changes.
21  BY MR. BLACK:
22      Q.  The FDA did not accept the label proposed by
23  Merck on June 29, 2000, did it?
24          MR. ROTHMAN: Objection to the form.
25          THE WITNESS: Well, they -- they didn't --

Page 302

1  the response was that there was -- it was going to be
2  given a standard review. I believe the first sort of
3  real response to the label proposed was the October
4  2001. But they did say that they were not going to
5  give it a priority review.
6  BY MR. BLACK:
7      Q. Would you take a look please at Exhibit 30.
8  And if you'll turn to page 37. At the top it says "As
9  discussed with Dr. Villalba." You recall this is a
10  document authored by Dr. Targum, correct?
11     A. Right.
12     Q. "As discussed with Dr. Villalba, we will be
13  glad to discuss labeling with your division. It would
14  be difficult to imagine inclusion of VIGOR results in
15  the rofecoxib labeling without mentioning
16  cardiovascular safety results in the study description
17  as well as the warnings section." Is that correct,
18  have I read that correctly?
19     A. You read that correctly, yes.
20     Q. So there's apparently at least one and
21  perhaps two FDA medical officers who are suggesting
22  that the MI information from VIGOR appear in the
23  warning section of the Vioxx label, correct?
24         MR. ROTHMAN: Objection to the form.
25         THE WITNESS: I don't see two. I see

Page 303

1  Dr. Targum recommending that, when she said she
2  discussed -- would be willing to discuss labeling with
3  the division.
4  BY MR. BLACK:
5      Q. Okay. Now, subsequent to the submission of
6  this proposed labeling, there was an advisory
7  committee meeting that addressed COX-2 inhibitors; is
8  that correct?
9      A. That's correct.
10     Q. And that occurred on February 7 and February
11  8, 2001, I believe; is that correct?
12     A. Yes, that's correct.
13     Q. And on February 8 the day was devoted mostly
14  to Vioxx; is that correct?
15     A. Yes, that's correct.
16     Q. And February 7 was devoted mostly to
17  Celebrex; is that correct?
18     A. Yes.
19         (Exhibit No. 32 was marked.)
20  BY MR. BLACK:
21     Q. Okay. I'm handing you Exhibit 32 which is an
22  excerpt from the February 8, 2001, meeting. Would
23  that be correct?
24     A. It's kind of hard to tell.
25     Q. Okay. I assume that it is, in fact, an

Page 304

1  excerpt from the transcript of the February 8, 2001,
2  advisory committee meeting. And, if you would please,
3  look at the -- it's page 2, it's the first page after
4  the cover. And it indicates that someone by the name
5  of Nigel Harris was the acting chairperson; is that
6  correct?
7      A. That's what it says, yes.
8      Q. Okay. And, if you leave out the executive
9  secretary, there are 12 participants at the meeting;
10  does that look about right?
11     A. Eleven it looks like to me.
12     Q. Okay. Eleven then. Is that 11 in addition
13  to Dr. Harris or --
14     A. Excluding, you said excluding Dr. Harris.
15     Q. Okay. I said exclude the executive
16  secretary.
17     A. Okay. Excuse me. Then with Dr. Harris, the
18  acting chairperson, yes, there are 12.
19     Q. Okay. Now, if you turn to page 208 in
20  Exhibit 32, down at the bottom says Dr. Harris. Do
21  you see that?
22     A. Yes.
23     Q. And Dr. Harris says "Thank you. I am going
24  to raise the cardiovascular question. I am going to
25  do this this time around." Okay. Strike that.

Page 305

1         "Thank you. Now I'm going to raise the
2  cardiovascular question." Did I read that correctly?
3      A. Yes.
4      Q. "What I am going to do this time around,
5  Dr. Pina, if you could give your opinion and then
6  maybe I'll ask for one or two other comments. And
7  then we could probably, if necessary, have a show of
8  hands as to whether or not they accept some of what
9  you say." Did I read that correctly?
10     A. Yes.
11     Q. And then, if you turn to page 210, somebody
12  by the name of Dr. Nissen says, right after
13  Dr. Harris -- Dr. Harris says "Yes, Dr. Nissen." Do
14  you see that?
15     A. Yes, I see that.
16     Q. And then Dr. Nissen says "Briefly, I think
17  what I would say in the label is that there was an
18  excess of cardiovascular events in comparison to
19  naproxen, that it remains uncertain whether this was
20  due to beneficial cardioprotective effects of naproxen
21  or prothrombotic effects of the agent and leave it at
22  that, that basically we don't know the reason. We do
23  know there's a difference. That awareness should be
24  made available to the prescriber and to the consumer
25  but without necessarily a final judgment as to the

1   reasons for that difference." Did I read that
2   correctly?
3       A.   Yes.
4       Q.   And then, if you take a look at page 211,
5   this is Dr. Harris talking again at the top of the
6   page. It says "So I am going to ask yes or no,
7   whether there needs to be additional language perhaps
8   crafted along the lines that Dr. Nissen suggested or
9   no, there doesn't need to be any additional language.
10  So let me ask for those feeling yes, that there needs
11  to be something, some additional language perhaps
12  along the lines of Dr. Nissen in terms of the label.
13  I will ask for a show of hands." Did I read that
14  correctly?
15      A.   Yes.
16      Q.   There's a show of hands.  And then he says
17  "Is there anybody against." Did I read that
18  correctly?
19      A.   Yes.
20      Q.   And then it says "One hand raised." Correct?
21      A.   That's what it says, yes.
22      Q.   So one against, correct?
23      A.   That's what it says.
24      Q.   And presumably the rest for; is that correct?
25      A.   Presumably, yes.

1       Q.   No abstentions, correct?
2       A.   That's what it says.
3            (Exhibit No. 33 was marked.)
4   BY MR. BLACK:
5       Q.   Okay. Now, let me hand you Exhibit 33 which
6   is another excerpt from the same hearing.  And, as we
7   just read, the suggestion that got voted on came from
8   Dr. Nissen, correct?
9       A.   I'll need to go back.  Yes, that there needed
10  to be additional language along the lines that
11  Dr. Nissen suggested.
12      Q.   Now, earlier in the hearing, if you'll turn
13  to page 155 of Exhibit 33, and assume that this is
14  Dr. Nissen talking, I believe the document reflects
15  that.  Make that assumption.  He says on line 15,
16  "What did we see here." Do you see that?
17      A.   Well, you know what, to be able to say that I
18  understand what he's talking about, do you have the
19  slide? It's referring to a slide.  Do you have that
20  slide in.
21      Q.   Well, I don't have the slide.  But let's see
22  if we can proceed without the slide.
23      A.   Well, then let me read some more of this
24  because I want some context.  Rather than referring to
25  a slide that I don't have and then asking whether --

1   you know, I really need to read some of this.
2       Q.   Well, the only sentence -- and you're welcome
3   to read more, if you feel it necessary.  But the only
4   sentence I want you to focus on is where he says
5   "Well, it is a bit reassuring that the naproxen event
6   rates in VIGOR and the aspirin event rates in PPE are
7   very, very similar."
8            MR. ROTHMAN: PPP.
9   BY MR. BLACK:
10      Q.   PPP, correct.
11      A.   And can you -- what is PPP, the PPP patients?
12      Q.   That was another trial that had been done.
13      A.   Well, yes, I understand that.  But there were
14  more diabetics in the PPP, the VIGOR patients were
15  more likely to be smokers.  Primary prevention project
16  published in Lancet which was an aspirin versus no
17  aspirin trial and about 4,500 low-risk Italian
18  individuals who had at least one cardiovascular risk
19  factor.  Included were -- were A, in those risk
20  factors was age greater than 65.  Okay.
21           So it's "reassuring that the naproxen event
22  rates in VIGOR and the aspirin event rates in PPP were
23  very, very similar," suggesting to me that naproxen
24  and aspirin have very similar cardioprotective
25  activities if you look at what the PPP trial actually

1   was, this brief description.
2       Q.   Okay. If you take a look at page 156, he
3   goes on and also says, if you take a look at line 8.
4       A.   Line 8 which is referring to yet another
5   slide that you don't have.
6       Q.   Let's read what it says, Doctor.  "I think it
7   is important to point out what was not discussed here
8   and I think should be discussed here that I also
9   looked at the MI rate in the class trial." The class
10  trial was a study done on Celebrex; is that correct?
11      A.   That's correct.
12      Q.   "And noted that these rates were quite
13  similar in rofecoxib and in the class trial.  I think
14  that is perhaps an important point for discussion."
15  Did I read that correctly?
16      A.   Yes, you did.
17           MR. ROTHMAN: I object to the -- I mean I'm
18  not quite sure I understand the point of having her
19  confirm that you're reading documents correctly when
20  she said she can't draw conclusions about the
21  documents without seeing the slides.
22           (Exhibit No. 34 was marked.)
23  BY MR. BLACK:
24      Q.   Let's do this then.
25           MR. ROTHMAN: So I object.

Page 310

1   BY MR. BLACK:
2      Q.  Would it be fair to say, Doctor, that, to the
3   extent you can't understand those excerpts that I just
4   had you read, that Dr. Nissen is indicating some
5   favorable view of the idea that naproxen -- that the
6   benefits of naproxen were what explained the results
7   of VIGOR?
8      A.  Okay.  I want to clarify.  I didn't read
9   them, you read them.
10     Q.  Yes.
11     A.  Okay.  And he is look -- he is comparing
12  event rates in a primary prevention trial in Italians
13  who --
14     Q.  I'm going to withdraw the question, I'm going
15  to withdraw the question.  Let's do it this way.
16  Let's assume that Dr. Nissen had -- made some
17  statements on February 8 indicating that he thought
18  maybe it was the goodness of the naproxen that
19  explained VIGOR rather than the badness of Vioxx.
20  Let's make that assumption.  I would now like you to
21  take a look at Exhibit 34.
22          MR. ROTHMAN:  Objection to the form.
23          THE WITNESS:  But I don't think these
24  documents support that.
25  BY MR. BLACK:

Page 311

1      Q.  Okay.  Let's just make that assumption,
2   though.  We're making an assumption.  Okay.  Now take
3   a look at Exhibit 34.  Exhibit 34 is a letter to the
4   editor that appeared in the December 9/23, 2002, issue
5   of Archives of Internal Medicine; is that correct?
6      A.  Yes.
7      Q.  Okay.  And if you'll look, there's two
8   letters on the page, one that begins at the bottom.
9   But the one I would like you to focus your attention
10  on is the one that says Lack of Cardioprotective
11  Effect of Naproxen.  Do you see that letter, that
12  caption?
13     A.  I see that.
14     Q.  Okay.  And the authors of that letter were a
15  doctor named Mukherjee, correct?
16     A.  That's correct.
17     Q.  Dr. Nissen, correct?
18     A.  Yes.
19     Q.  And a doctor by the name of Topol, correct?
20     A.  Yes.
21     Q.  And I'd like to call your attention to -- if
22  you look at the left-hand column, second paragraph,
23  down near the bottom, there's a sentence that begins
24  "Thus, the data on the effect of naproxen."  Do you
25  see that?

Page 312

1      A.  The second sentence of -- I'm sorry.
2      Q.  The second paragraph.
3      A.  Second paragraph.
4      Q.  In the first column, the left-hand column.
5      A.  Okay.
6      Q.  Down towards the bottom of that paragraph
7   there's a sentence that reads "Thus, the data on the
8   effect of naproxen."  Do you see that?
9      A.  Okay.  No, I don't see that -- there it is,
10  yes.  I see that.
11     Q.  Read along with me.  "Thus, the data on the
12  effect of naproxen on cardiovascular events appear
13  discordant at best with no concrete evidence of a
14  protective effect.  Indeed the study by Ray, et al.,
15  which is considerably larger and more rigorous than
16  the other three case control studies combined strongly
17  argues against a meaningful protective effect."  Did I
18  read that correctly?
19          MR. ROTHMAN:  Objection to the form.
20          THE WITNESS:  You read that correctly.  What
21  three case control studies are they referring to, do
22  you know?
23  BY MR. BLACK:
24     Q.  Did I read that correctly, Doctor?
25     A.  You read that correctly.

Page 313

1      Q.  I'm a good reader.
2      A.  Yeah, you did.
3          (Exhibit No. 35 was marked.)
4   BY MR. BLACK:
5      Q.  Take a look at Exhibit 35.  Exhibit 35
6   is an article from the Journal of the American Medical
7   Association; is that correct?  And you may have to
8   take a look at the second page to see that it comes
9   from JAMA.
10     A.  Yes, I see that.
11     Q.  Okay.  August 22nd/29, 2001, correct?
12     A.  Yes.
13     Q.  Okay.
14     A.  22/29, yes.
15     Q.  If you take a look at the abstract which
16  appears on the first page down at the bottom which
17  somebody other than I has very helpfully put a little
18  mark around.
19     A.  The abstract?  The abstract --
20     Q.  Just bear with me.  Read along.  "The
21  available data raise a cautionary flag about the risk
22  of cardiovascular events with COX-2 inhibitors."
23     A.  Yes.
24     Q.  "Further prospective trial evaluation may
25  characterize and determine the magnitude of the risk."

Page 314

1   Did I read that correctly?
2       A.   I think you did, yes.
3       Q.   Okay.  And the authors of this article were
4   Mukherjee, correct?
5       A.   Yes.
6       Q.   Nissen again, correct?
7       A.   Yes.
8       Q.   And Topol, correct?
9       A.   Yes.
10          MR. BLACK:  Let's go off the record for a
11  minute.
12          THE VIDEOGRAPHER:  We are off the record.
13  The time now is 7:32 p.m. Mountain time.
14          (Recess.)
15          THE VIDEOGRAPHER:  We are back on the record.
16  The time now is 7:50 p.m. Mountain time.
17          (Exhibit No. 36 was marked.)
18  BY MR. BLACK:
19      Q.   Okay.  Doctor, I am handing you what's been
20  marked as Exhibit 36 which is a copy of the U.S.
21  Long Range Operating Plan Franchise: Analgesic &
22  Anti-Inflammatory Products: Vioxx, Etoricoxib, July
23  2001.  Is that what this document says in the front?
24      A.   That's what it says.
25      Q.   Okay.  I would call your attention, Doctor,

Page 315

1   to page 17 of the document.  And there's a graph on
2   page 17 that gives sales in dollars for Vioxx based on
3   three different assumptions; is that correct?
4       A.   Okay.
5       Q.   And the top curve which is the highest sales
6   numbers, that's called the upside.  And that says CV
7   Labeling Milder; No Prothrombotic language.  Did I
8   read that correct?
9       A.   Yes, you did.
10      Q.   And the base is a Class CV Label Precaution.
11  Did I read that correctly?
12      A.   That's what it says, yes.
13      Q.   And the downside is CV Label is Warning/Not
14  Precaution.  Did I read that correctly?
15      A.   Yes, you did.
16      Q.   So this is the projections of what the sales
17  are going to be for Vioxx depending on what the Vioxx
18  label says; is that a fair characterization of the
19  document?
20      A.   I think that's what it's supposed to be,
21  yeah.
22      Q.   Okay.  And, if you'll take a look over in
23  2006, it looks like the difference in sales is about a
24  billion dollars; would that be about right?
25      A.   Let's see.  In millions.

Page 316

1       Q.   It looks like it's about 1,000 million
2   difference to me, if you take a look at the scale.
3       A.   I think that's about right, yes.
4       Q.   And that would be true in 2005 as well, about
5   a billion dollars difference, the upside and from the
6   downside?
7       A.   Yes, I think that's what they're -- that they
8   forecast, yeah.
9       Q.   Okay.  And the same would be true in 2004,
10  about a billion dollars difference, right?
11      A.   Well, I don't know.  I think it looks a
12  little narrower in 2004.
13      Q.   Okay.  But there's also some difference in
14  the prior years too, correct, not quite the same
15  magnitude.  But also some difference for the years
16  going back all the way to 2001, correct?
17      A.   In 2001 is when it starts.  But 2002, 2003,
18  yes, there are differences in each of those.
19      Q.   Fair to say that based on --
20      A.   In each of those upside, downside, base
21  estimates, that's correct.
22      Q.   Fair to say that, over the period covered by
23  the graph, that the difference in sales from the top
24  side to the bottom side would probably sum to more
25  than $3 billion; is that correct?

Page 317

1       A.   What are you talking about?  I'm sorry.
2   What?
3       Q.   If you took a look at the total difference in
4   sales for the period covered by the graph, it would
5   come to more than $3 billion; isn't that right,
6   Doctor?
7       A.   I mean these are -- it looks to me as though
8   they're expecting the total revenue to go down over
9   time from 2000 -- in mid 2001 down to 2006.  I mean I
10  don't know how to add those up.  Maybe that's correct.
11  I don't know.
12          (Exhibit No. 37 was marked.)
13  BY MR. BLACK:
14      Q.   Okay.  All right.  I'm handing you now -- I
15  only have one copy of this.  So I guess there's going
16  to have to be one copy of this exhibit.  Exhibit 37.
17  And, since I'm not going to have it in front of me, I
18  want to call your attention to page 5 of Exhibit 37
19  which is a Medical Officer Review document.  Would
20  that be correct, Doctor?
21      A.   Well, I think I need to look at it first.
22      Q.   Yeah.
23      A.   Yes, this is the review.
24      Q.   Okay.  If you'll take a look at page 5 of
25  that document --

Page 318

1      MR. ROTHMAN: I don't have it in front of me,
2  but it looks like it's an excerpt from the review.
3  BY MR. BLACK:
4      Q.  Yes.
5      A.  Yes, it's an excerpt.
6      Q.  If you take a look at page 5.
7      A.  Okay.
8      Q.  There are two questions there relating to
9  whether it's the beneficial effect of naproxen or some
10 adverse effect of Vioxx; is that correct?
11     A.  I don't see any questions here on page 5.
12     Q.  Okay.  If you hand me the document back.  I
13 apologize for this.  Okay.  It has two items there.
14 One says "The sponsor has suggested a possible
15 cardioprotective effect of naproxen as the sole
16 explanation for the cardiovascular findings in this
17 study."  And then it lists several issues raised by
18 this suggestion.
19     And then it has another item below that, "The
20 sponsor recommends that patients with known
21 cardiovascular risk should be on prophylactic low dose
22 aspirin.  However, outstanding issues are," and it
23 lists some issues.  And then it also says, if you read
24 along with me, "There are no adequate data available
25 to answer these questions."  Would that be a correct

Page 319

1  description of the document?
2      MR. ROTHMAN: Objection to form.
3      THE WITNESS: I mean that's what this says.
4  I still don't see -- I don't see any questions.
5      (Exhibit No. 38 was marked.)
6  BY MR. BLACK:
7      Q.  Okay.  Let's take a look at Exhibit 38 then.
8  Let's move on.
9      A.  Okay.
10     Q.  Exhibit 38, this is a document that
11 apparently was signed by three individuals, somebody
12 named Schiffenbauer, Villalba, and Goldkind; is that
13 correct?
14     A.  Yes, that's correct.
15     Q.  And these would be three FDA medical
16 officers, correct?
17     A.  Yes.
18     Q.  And it's dated July 12, 2001?
19     A.  It's dated 12/20/01.
20     Q.  Yes.  Excuse -- excuse me, excuse me.  It's
21 dated December 21, 2001; is that correct?
22     A.  It says December 20, 2001, in the first two.
23 Goldkind is 21.  Okay.
24     Q.  Okay.  So it's either the 21st or the 20th of
25 December.  Goldkind apparently just signed on the 21st

Page 320

1  and the other two signed on the 20th, correct?
2      A.  It appears that way, yes.
3      Q.  Okay.  And -- okay.  If you'll take a look at
4  page 5.
5      A.  Okay.
6      Q.  Okay.  Take a look back at page 4.  It says
7  Brief Overview of the Submission.  And then it says --
8  do you see that on page 4, Brief Overview of the
9  Submission, under Summary of Clinical Findings?
10     A.  Yes.
11     Q.  Okay.  It says "The complete response to the
12 approvable letter issued to NDA 21-042 supplement 007
13 in April 7, 2001, includes the report of the Advantage
14 study (a three-month study of rofecoxib 25 milligrams
15 per day and naproxen 500 milligrams a day twice daily
16 in approximately 5,600 patients with osteoarthritis."
17 Did I read that correctly?
18     A.  Yes.
19     Q.  Okay.  And it also refers to a safety update
20 report, correct?
21     A.  Right, "long-term follow-up of patients in
22 the original osteoarthritis program."
23     Q.  And then it says, turning to page 5, where it
24 talks about the RA efficacy, near the top, "The RA
25 efficacy supplement evaluated rofecoxib 25 and 50

Page 321

1  milligram doses."  Did I read that correctly?
2      A.  That's what it says, yes.
3      Q.  "The active comparator was naproxen 500
4  milligrams twice daily."  Did I read that correctly?
5      A.  I believe you did, yes.
6      Q.  Okay.  Now, my question is was the Advantage
7  study another study in which patients were put on
8  naproxen as the comparator and other patients were put
9  on Vioxx; is that correct?
10     A.  I believe that's correct.  That's what it
11 says.
12     Q.  Okay.  And at least some of the patients in
13 Advantage were on 25 milligram Vioxx; is that correct?
14     A.  No.  The rheumatoid arthritis efficacy
15 supplement evaluated rofe 25 and 50 milligram doses.
16 It looks to me as though it's -- Advantage is a
17 three-month study of rofecoxib 25 versus naproxen 500
18 twice a day.
19     Q.  Okay.  So all the Vioxx patients in Advantage
20 are on 25 milligrams; is that correct?
21     A.  That's my understanding, yes.
22     Q.  Okay.  And they were also allowed to take
23 aspirin; is that correct?
24     A.  Well, from March of 2000, everyone was
25 allowed to take aspirin, yes, that is correct.

Page 322

1    Q.  And the result from Advantage showed that
2  there was an elevated rate for myocardial infarctions
3  in the Vioxx people as opposed to the naproxen people;
4  is that correct?
5    A.  I believe there was an -- yes, I believe that
6  is correct.
7    (Exhibit No. 39 was marked.)
8  BY MR. BLACK:
9    Q.  Let's take a look at Exhibit 39.  And 39 --
10  well, first of all is that an article that appeared in
11  the November 5, 2004, Lancet?
12    MR. ROTHMAN:  She doesn't have it yet.
13    THE WITNESS:  I haven't even been able to
14  pick it up and look at it.
15    MR. BLACK:  Oh, okay.  Okay.  Well, I'm
16  trying to cook along here.
17    MR. ROTHMAN:  That's right.  Take your time.
18  BY MR. BLACK:
19    Q.  Okay.  Are you waiting for a question?  All
20  right.  Let me point out to you that -- well, this is
21  an article, a copy of an article that appeared in The
22  Lancet on November 5, 2004; is that correct?
23    A.  Well, it's published on the web.  I don't
24  know whether it appeared in print.
25    Q.  Okay.  In any event it's by somebody named

Page 323

1  Peter Juni, J-u-n-i, and others; is that correct?
2    A.  Yes.
3    Q.  And the title is Risk of cardiovascular
4  events and rofecoxib:  cumulative meta-analysis; is
5  that correct?
6    A.  That is correct.
7    Q.  Okay.  And, in the abstract or the summary,
8  at the bottom it says "In observational studies," you
9  follow that down at the bottom?
10    A.  No, I don't know where you are.
11    Q.  In the summary.
12    A.  Okay.
13    Q.  There's paragraph that says interpretation.
14  Do you see that?
15    A.  Okay.
16    Q.  And right above that there's another
17  paragraph.  And the last sentence of that paragraph
18  starts "In observational studies."  Do you see that?
19    A.  I see that.
20    Q.  Okay.  In observational studies the
21  cardioprotective effect of naproxen was small
22  (combined estimate 0.86 and the 95 confidence inter --
23  percent confidence interval was .75 to .99) and could
24  not have explained the findings of the VIGOR trial."
25  Did I read that correctly?

Page 324

1    A.  Yes, you did.
2    Q.  Okay.  At the back of Exhibit 39 is a
3  response to letters to the editor that Dr. Juni
4  authored and -- Dr. Juni and one of his coauthors
5  authored.
6    A.  I'm sorry.  Where are you?
7    Q.  Okay.  It's the last two pages of Exhibit 39.
8  Over in the far right-hand column, it says Authors'
9  reply.
10    MR. ROTHMAN:  This is not a complete exhibit.
11  It looks like it's the article.  And then the
12  correspondence that I have starts on page --
13    MR. BLACK:  Twenty-six.
14    MR. ROTHMAN:  Twenty-six of the printed
15  Lancet.  But, at the top of the page, it says
16  middle --
17    MR. BLACK:  The middle --
18    MR. ROTHMAN:  It's in the -- yeah.  But the
19  text begins in the middle of a letter.
20    MR. BLACK:  No.  The authors' reply is
21  complete in here, Counsel.  And that's all --
22    MR. ROTHMAN:  Yes.  But the authors are
23  replying to a letter that's not complete.
24    MR. BLACK:  Okay.  You've made your record.
25  BY MR. BLACK:

Page 325

1    Q.  Let's take a look at the --
2    MR. ROTHMAN:  And it's a letter from --
3  there's a letter from Merck I believe in here.
4  BY MR. BLACK:
5    Q.  That's correct.  Would you take a look at
6  the --
7    MR. ROTHMAN:  That you have excluded.
8    MR. BLACK:  Counsel, you have made your
9  objection.
10  BY MR. BLACK:
11    Q.  Would you take a look please at the
12  right-hand column of page 26 of this correspondence.
13  Okay.  And this is under Authors' reply.  And, if you
14  come down, it says "In their critique."  Then it says
15  "In our analysis."  Do you see that?
16    A.  No, I don't.  Where are you?
17    Q.  Do you see authors' reply?
18    A.  Yes.
19    Q.  Okay.  Do you see the second paragraph there
20  that starts "In our analysis"?
21    A.  Yes.
22    Q.  Okay.  If you come down about the middle of
23  that paragraph, there's a sentence that begins
24  "Furthermore, the results."  Do you see that?
25    A.  I see that, I see that.

Page 326

1    Q.  And it says "Furthermore, the results of the
2  observational studies not funded by Merck indicated no
3  cardioprotective effect of naproxen (combined estimate
4  of relative risk .95, 95 percent confidence interval
5  .85 to 1.06." Did I read that correctly?
6    A.  Yes, you did.
7        MR. BLACK:  Let's go off the record for a
8  minute.
9        THE VIDEOGRAPHER:  We are off the record.
10  The time now is 8:04 p.m. Mountain time.
11        (Recess.)
12        THE VIDEOGRAPHER:  We are back on the record.
13  The time now is 8:13 p.m. Mountain time.
14        (Exhibit No. 41 was marked.)
15  BY MR. BLACK:
16    Q.  Okay.  Doctor, I'm handing you a collection
17  of documents which have collectively been marked as
18  Exhibit 41.  And I would just like to real quickly go
19  through those with you just to identify the nature of
20  the document, I'm not going to ask you any other
21  questions about them.
22        Is the first document in that stack something
23  to Robert Silverman at Merck from the Food and Drug
24  Administration, from Sandra Folkendt at the Food and
25  Drug Administration?

Page 327

1    A.  That's what it says.
2    Q.  And it's dated 11/27/2000; is that correct?
3    A.  Yes, that's on page 3, yes.
4    Q.  Well, it also says 11/27/00 as the date on
5  the cover page, does it not?
6    A.  Well, that's page 3.  But yes, it does say
7  that.
8    Q.  Okay.  And the next item in the stack, this
9  is an incomplete document, but it's the first page of
10  a letter that's dated December 21, 2000; is that
11  correct?
12    A.  Yes, it is.
13    Q.  On Merck letterhead to the Central Document
14  Room at the Food and Drug Administration; is that
15  right?
16    A.  Yes, it is.
17    Q.  Okay.  And the next item in the stack is a
18  January 19, 2001, document on Merck letterhead; is
19  that correct?
20    A.  That's what it appears to be.
21    Q.  To the Central Document Room at the Food and
22  Drug Administration, correct?
23    A.  Yes.
24    Q.  Signed by Robert Silverman, if you look at
25  the last page?

Page 328

1    A.  Well, it's not signed by him, it's signed for
2  him.  But --
3    Q.  Okay.  And the next is a single page fax
4  dated February 14, 2001; is that correct?
5    A.  Yes.
6    Q.  From Sandra Folkendt at the FDA to Robert
7  Silverman at Merck; is that correct?
8    A.  Yes.
9    Q.  Okay.  And the next item in the stack is a
10  February 16, 2001, letter addressed to the Central
11  Document Room at the Food and Drug Administration,
12  correct?
13    A.  Yes.
14    Q.  And look at the second page signed by Robert
15  Silverman, correct?
16    A.  Yes.
17    Q.  The next document in the stack is a March 30,
18  2001, letter to Jonca Bull -- Jonca Bull, excuse me,
19  J-o-n-c-a B-u-l-l, care of the Central Document Room?
20    A.  No.
21    Q.  Care of -- yes, I believe it says care of
22  Central Document Room.
23    A.  That's not what's the next one on mine.  I'm
24  sorry.  This is the next one on my stack.
25    Q.  Let me take a look and see what that is.

Page 329

1  What comes after that in your stack?
2    A.  March 30, 2001.
3    Q.  Okay.  Let's put this one aside for a minute.
4  And we'll address that one in a second.
5        The next item after the one that you just
6  handed me is a March 30, 2001, letter from Jonca Bull;
7  is that correct?  Excuse me.  To Jonca Bull?
8    A.  To Jonca Bull, yes, that's correct.
9    Q.  From Robert Silverman, correct?
10    A.  Yes, it says -- yes.
11    Q.  And the next thing I believe should be -- it
12  says Record of Tele-Cons; is that correct?
13    A.  That's what this is, yes.
14    Q.  Date April 5, 2001, correct?
15    A.  That's the first one, yes.
16    Q.  Okay.  And that one has participants Dr. Bull
17  and Ms. Walling, correct?
18    A.  And Silverman and Simon, yes.
19    Q.  And there's also a reference to an April 6,
20  2001, call; is that correct?
21    A.  Yes, it looks like it's notes of a
22  teleconference.
23    Q.  Is the next document in the stack a letter to
24  Merck & Company, attention Robert Silverman?
25    A.  Yes.

Page 330

1  Q.  Okay.  And, if you look at the last page, the
2  date that -- it indicates it's from Jonca Bull,
3  correct?
4  A.  As far as I can get there.  Yes.
5  Q.  Dated April 6, 2001, correct?
6  A.  Yes.
7  Q.  Okay.  And the next is something that's
8  called an information request letter; is that right?
9  A.  No.
10  Q.  Okay.  What do you have as the next one?
11  That's the missing one.  Okay.  Okay.  The next one in
12  your stack then would be an email to Douglas Greene
13  from Edward Scolnick dated April 7, 2001; is that
14  correct?
15  A.  The one -- you're asking me about this one
16  you just handed me to?
17  Q.  Yes.
18  A.  Handed to me.  It says -- yes, it's to
19  Douglas Greene from Edward Scolnick.
20  Q.  Okay.  And what's the next one in your stack?
21  Is that one that says information request letter?
22  A.  No.  It's from -- it's to Dr. Bull from
23  Merck, from Robert Silverman.
24  Q.  Okay.  And that's dated April 16, 2001; is
25  that right?

Page 331

1  A.  Yes, that's correct.
2  Q.  Okay.  And what's the next one you have in
3  your pile there?
4  A.  A May 16, 2001, letter to Dr. Bull from
5  Dr. Silverman.
6  Q.  Okay.  And what's the next one you have in
7  your stack.
8  A.  A June 22nd, 2001, letter to Dr. Bull from
9  Dr. Silverman.
10  Q.  Okay.  And what's the next item you have in
11  your stack?
12  A.  A fax from Anti-inflammatory, Analgesic, and
13  Ophthalmic Drug Products to Dr. Silverman from Barbara
14  Gould.
15  Q.  Is the date June 22nd, 2001?
16  A.  Yes.
17  Q.  Is the next item in your stack a June 29,
18  2001, letter to Jonca Bull?
19  A.  Yes.
20  Q.  And from Robert Silverman again?
21  A.  Yes.
22  Q.  Okay.  Is the next item in your stack an
23  August 8, 2001, fax to Robert Silverman?
24  A.  Yes.
25  Q.  Okay.  And that's from the FDA Division of

Page 332

1  Anti-inflammatory, Analgesic, and Ophthalmic Drug
2  Products?
3  A.  Ophthalmic, yes, from Barbara Gould.
4  Q.  And is the next item in your stack a November
5  6, 2001, letter to Jonca Bull?
6  A.  No.
7  Q.  What's the next thing that you have?
8  A.  It's an email printed from David Anstice or
9  Anstice.
10  Q.  Okay.  From Edward Scolnick to David Anstice;
11  is that correct?
12  A.  Yes, I believe that's correct.
13  Q.  And dated October 16, 2001; is that right?
14  A.  That's correct.
15  Q.  And what's the next item in your stack?
16  A.  A letter November 6, 2001, to Dr. Bull from I
17  guess Dr. Silverman.
18  Q.  Okay.  That's a relatively thick document?
19  A.  That's correct.
20  Q.  Okay.  And what's the next item you have in
21  your stack?
22  A.  Medical Officer Review, complete response to
23  approvable letter.  It's dated November 28, 2001.
24  Q.  Okay.  And what's the next item you have in
25  your stack?

Page 333

1  A.  That's it.
2  Q.  That's it.  Okay.  Let's add then, just add
3  these to the same exhibit this document which, if you
4  confirm for me, appears to be an April 6, 2001, letter
5  to Silverman from Jonca Bull.  Would you confirm that,
6  please.
7  A.  Yes.
8  Q.  Okay.  And the next item to add to the
9  exhibit is an April 7, 2001, email to Douglas Greene
10  from Edward Scolnick; is that correct?
11  A.  Yes, it's April 7.
12  Q.  Okay.  And then the next item would be an
13  April 30, 2001, letter to Jonca Bull again from Robert
14  Silverman; is that correct?
15  A.  Yes.
16  Q.  Okay.  And this may be a second copy of
17  something you've already seen, but let's put it in.
18  This appears to be an April 6, 2001, letter from Jonca
19  Bull to Robert Silverman; would that be correct?
20  A.  I believe this is the same that you just gave
21  me.
22  Q.  I think it may be.  But let's just put it
23  on -- put it on the pile there.
24  A.  Okay.  They're both here together.
25  Q.  Okay.  And we'll have to take some step

Page 334

1   immediately after terminating the deposition to make
2   sure that those documents are all included together in
3   one exhibit in some kind of a folder or something.
4   And we can arrange to do that.
5        And let's go off the record for a minute.
6        THE VIDEOGRAPHER: We are off the record.
7   The time now is 8:23 p.m. Mountain time.
8        (Recess.)
9        THE VIDEOGRAPHER: We are back on the record.
10  The time now is 8:29 p.m. Mountain time.
11       MR. BLACK: Okay. My time, my allotted seven
12  hours in this deposition is about to expire. We will
13  pass the witness with -- but I do want to make a
14  statement for the record, that I believe the witness
15  at some times has been uncooperative and has
16  filibustered and counsel has interfered on occasions.
17       And that, if upon review of the transcript we
18  feel that some questions require further exploration,
19  we may take that up with the court. But with that
20  caveat I pass the witness.
21       MR. ROTHMAN: I completely dispute that
22  mischaracterization of the events today. And I note
23  that we were delayed this morning for more than a half
24  an hour while we tried to get the video feed to work
25  which was something that the plaintiffs had asked for

Page 335

1   for the deposition.
2        MR. BLACK: And I would note for the record
3   that the witness and counsel came back from lunch a
4   half an hour later than they had said they were going
5   to.
6        MR. ROTHMAN: Well, we were also waiting
7   for --
8        MR. BLACK: I would hope -- I would hope that
9   the same courtesy that we extend to you on that would
10  be extended to us in understanding the technical
11  difficulties.
12       MR. ROTHMAN: We did not count lunch against
13  the seven hours. So you had a full seven hours to
14  take the deposition.
15       MR. BLACK: The delay at lunch, Counsel, was
16  about as relevant as the day -- the delay at the
17  beginning of the day.
18       MR. ROTHMAN: Counsel, you had a full seven
19  hours to ask your questions. And the record will
20  reflect that.
21       MR. BLACK: I had six hours and 56 minutes.
22       MR. ROTHMAN: If you want to continue and use
23  your last four minutes, you're welcome to.
24       MR. BLACK: Pass the witness.
25       MR. ROTHMAN: Thank you.

Page 336

1                EXAMINATION
2   BY MR. ROTHMAN:
3        Q. Dr. Arrowsmith-Lowe, I'd like to ask you a
4   few questions about the changes being effected
5   procedure. Is that okay?
6        A. Yes.
7        Q. Would you turn to Exhibit 16. It should
8   still be in the stack in front of you.
9        A. Yes. Yes, Exhibit 16.
10       Q. Okay. If you turn to page 24 -- I'm sorry.
11  Before we get to page 24, what is Exhibit 16?
12       A. This is a Guidance for Industry from 1999
13  basically reflecting sort of FDA's interpretation of
14  their regulations.
15       Q. Okay.
16       A. And specifically the labeling regs.
17       Q. If you turn to page 24, you see at the very
18  bottom the letter C, "Moderate Changes," and then in
19  parentheses "Supplement—Changes Being Effected."
20       A. Yes.
21       Q. You recall that Mr. Black directed your
22  attention to that Section C, correct?
23       A. Yes, he did.
24       Q. Did he direct your attention to Section B?
25       A. No.

Page 337

1        Q. Would you tell the jury what the title is of
2   Section B?
3        A. Well, Section B under the labeling section of
4   this guidance refers to major changes in a label that
5   require prior approval.
6        Q. And would you read for us the paragraph under
7   Section B.
8        A. "Any proposed change in the labeling except
9   those that are designated as moderate or minor changes
10  by regulation or guidance should be submitted as a
11  prior approval supplement. The following list
12  contains some examples of changes that are currently
13  considered by CDER, Center for Drug Evaluation and
14  Research, to fall into this reporting category."
15       Q. And can you read No. 1 for us.
16       A. Number one is "Changes based on postmarketing
17  study results including, but not limited to, labeling
18  changes associated with new indications and usage."
19       Q. Thank you, Doctor. Would you turn to Exhibit
20  17. And would you tell us what Exhibit 17 is?
21       A. This is basically the same guidance, but its
22  date for release is April 2004. It's entitled
23  Revision 1.
24       Q. Okay. And once again let me direct your
25  attention to page 24. Did Mr. Black direct your

Page 338

1   attention to Subsection B of Roman numeral X?
2      A.  No.
3      Q.  And would you once again read for us
4   Subsection B, the title and the first paragraph.
5      A.  It says Major Changes, in parentheses Prior
6   Approval Supplement.
7      Q.  Would you read the paragraph underneath that
8   for us, at least the first sentence.
9      A.  "Any proposed change in the labeling, except
10  changes designated as moderate or minor by regulation
11  or guidance, must be submitted as a prior approval
12  supplement."  And then gives the regulations that
13  address that.
14     Q.  And would you read No. 1 under B.
15     A.  Number one, "Changes based on postmarketing
16  study results including, but not limited to, labeling
17  changes associated with new indications and usage."
18     Q.  Okay.  Let me ask you a few questions about
19  the VIGOR study.  What was the patient population in
20  the VIGOR study?
21     A.  It was rheumatoid -- patients with rheumatoid
22  arthritis.
23     Q.  In the year 2000, was that an approved
24  indication for Vioxx?
25     A.  Rheumatoid arthritis, no.

Page 339

1      Q.  And what was the dose of Vioxx used in the
2   VIGOR study?
3      A.  It was 50 milligram -- a 50 milligram daily
4   dose versus naproxen.
5      Q.  And how -- for what duration was that 50
6   milligram dose given to patients?
7      A.  It was over -- I don't remember the exact
8   duration at this point.  But it was long-term use.
9      Q.  And in 2000 -- actually strike that.
10         Was the 50 milligram dose approved for
11  long-term use?
12     A.  It was not approved for chronic use, no.
13     Q.  What was the comparator in the Vioxx trial?
14     A.  In the VIGOR trial?
15     Q.  In the VIGOR trial.  Thank you.
16        MR. BLACK:  It was a Vioxx trial, Counsel.
17  BY MR. BLACK:
18     Q.  It's late.
19     A.  It was Naproxen.
20     Q.  Was there a placebo arm in the VIGOR trial?
21     A.  No, there was not.
22     Q.  In terms of interpreting the VIGOR results,
23  what is the significance of not having a placebo arm?
24     A.  Well, it makes it more difficult to assess
25  especially safety issues.  I mean it wasn't -- it

Page 340

1   wasn't appropriate to use a placebo in a rheumatoid
2   arthritis population.  But it did complicate the
3   interpretation particularly of the -- on the
4   cardiovascular safety data.
5      Q.  Do you recall, Doctor, how many patients
6   there were in the VIGOR study?
7      A.  I think -- I don't remember right off.  There
8   were I think 3,000 total.  But I'm sorry, at this
9   point I don't remember the exact numbers.
10     Q.  Does approximately 8,000 refresh your
11  recollection?
12     A.  That would probably be correct.  I just don't
13  remember.
14     Q.  Let me ask you to take a look at Exhibit 27.
15     A.  Okay.
16        MR. BLACK:  I don't have my copy handy,
17  Counsel.  What is Exhibit 27?
18        MR. ROTHMAN:  It is the post-VIGOR label.
19        MR. BLACK:  Okay.  And that would be the
20  April 2002 label?
21        MR. ROTHMAN:  Correct.
22        MR. BLACK:  Okay.
23  BY MR. ROTHMAN:
24     Q.  Doctor, I direct your attention to the
25  precaution section, under cardiovascular effects.

Page 341

1      A.  Okay.
2      Q.  And the section there lays out the data from
3   the VIGOR study as well as from two studies of 2,142
4   elderly patients in a placebo-control database,
5   correct?
6      A.  Yes.
7      Q.  And what does the labeling say about the
8   clinical significance of those results?
9      A.  "The significance of the cardiovascular
10  findings from these three studies is unknown."
11     Q.  Okay.  Now, in your opinion could Merck have
12  incorporated the cardiovascular results of VIGOR into
13  labeling for Vioxx without FDA's prior approval?
14     A.  I don't think so.  I don't think that the
15  VIGOR data fell into a CB -- a changes being effected.
16  It was complex data, it was an unapproved population,
17  it was a dose which had not been approved for chronic
18  use.  And to my mind, as I said in my report, I don't
19  think -- I don't think it was appropriate for a CBE.
20     Q.  And what about the fact that the FDA approved
21  labeling included the statement that the significance
22  of the VIGOR results was unknown, is that the sort of
23  information that it is appropriate to add by a CBE?
24     A.  No.  I mean I -- I mean FDA didn't even want
25  to do a priority review on these data.  No, I don't

Page 342

1 believe that -- I don't believe that the VIGOR data
2 was the type of data that were appropriate for a CBE
3 in terms of a label change.
4 Q. And do you have any view on whether the FDA
5 believed the VIGOR results were appropriate for a CBE?
6 A. Well, I think I answered that in a question
7 earlier, that, if FDA had wanted the VIGOR results in
8 a CBE, they could have requested them. And they did
9 not do that.
10 Q. And Mr. Black showed you the FDA Webview
11 article that quoted Bob Delap, that's Exhibit 29 to
12 the deposition. Does Dr. Delap's statements in that
13 Webview article affect your opinion one way or the
14 other on whether the FDA believed a CBE would have
15 been appropriate?
16 A. Well, I think what this says is that at the
17 time FDA felt as though the labeling was -- for Vioxx
18 was appropriate as it was. This was after the VIGOR
19 results had been produced to FDA.
20 And at this point the office director in
21 charge of that division says that he thinks the label
22 is -- I don't remember the exact wording. Label is --
23 product is labeled appropriately.
24 Q. Mr. Black showed you an example where Merck
25 had done a CBE regarding the warfarin interaction. Do

Page 343

1 you recall that?
2 A. Yes.
3 Q. And what was the FDA's reaction to that CBE?
4 A. Well, they basically told Merck it was not
5 appropriate for a CBE, that that data was not
6 appropriate as a CBE.
7 Q. And which section of the label was Merck
8 attempting to change in that circumstance?
9 A. I believe it was the precautions section.
10 Q. Now, are there types of changes that can be
11 done by CBE?
12 A. Yes. And the -- both the guidance and the
13 regulations define those.
14 Q. And those are defined as minor changes,
15 correct?
16 A. Right, correct.
17 Q. In your view are the VIGOR results minor
18 changes of the sort that can be done by CBE?
19 A. I don't think so. No, I don't believe they
20 were.
21 MR. ROTHMAN: Thank you, Doctor. I have no
22 further questions. Pass the witness.
23 MR. BLACK: Okay. I would like, contrary to
24 what I had said earlier, just to make sure we have a
25 clean record of the deposition, the three stacks of

Page 344

1 documents that I had identified, the notebook and the
2 two other documents that you were going to get copies
3 of. Let's mark them as Exhibits 42, 43, and 44 and
4 let's give them to the court reporter and let's have
5 them copied by the court reporter so that it's a part
6 of this deposition record. That would be a better way
7 to proceed I believe.
8 FURTHER EXAMINATION
9 BY MR. BLACK:
10 Q. Doctor, the CBE regulations, that refers to
11 moderate changes, not minor changes; isn't that
12 correct.
13 A. It does in -- let me pull the -- sorry. It's
14 very late in the day and I need to go back and look at
15 the guidance or the regulations. Do you remember what
16 number -- here we are.
17 MR. ROTHMAN: I showed you 16 and 17.
18 You're correct, I misspoke.
19 MR. BLACK: Okay. If counsel is willing to
20 so state on the record.
21 MR. ROTHMAN: You're correct, I misspoke. It
22 says moderate change.
23 BY MR. BLACK:
24 Q. Okay. I have one or two other questions.
25 Doctor, the change regarding warfarin that was -- the

Page 345

1 CBE that was put in the precautions and then the FDA
2 wanted to change the language from what Merck had
3 proposed, where did that change ultimately wind up,
4 didn't it stay in precautions?
5 A. It remained in precautions, that's correct.
6 MR. BLACK: I have no further questions. Is
7 it clear that -- shall we identify on the record what
8 each of those stacks is with an exhibit number? You
9 probably ought to do that.
10 MR. ROTHMAN: If you would like to.
11 MR. BLACK: Yeah, let's do that.
12 MR. ROTHMAN: Shall we go off the videotape?
13 MR. BLACK: Yeah, we can go off the videotape
14 to do this.
15 THE VIDEOGRAPHER: We are off the record.
16 The time now is 8:45 p.m. Mountain time.
17 MR. BLACK: Okay. I am now -- you want to
18 hand those over. There is a notebook, a black
19 notebook that appears to be -- let's go off the
20 record.
21 (Discussion off the record.)
22 MR. BLACK: I am going to mark the black
23 notebook on the front as exhibit -- I am marking a
24 black notebook that appears to be about perhaps three
25 to four inches thick. It's got folders that divide

Page 346

1  some of the documents. And I'm marking that as
2  Exhibit 42. And it was among the documents that
3  Dr. Arrowsmith-Lowe brought with her today, documents
4  that were in her possession.
5      And I understand from counsel that a two-page
6  document was removed from the notebook at one point
7  during our proceedings today. And counsel is going to
8  make every good faith effort to find those two pages
9  and restore them to Exhibit 42 before it's turned over
10  to the court reporter.
11      Is that a fair statement, Counsel?
12      MR. ROTHMAN: That is a fair statement. And
13  we'll keep it here all night, Bert, if we have to.
14      (Discussion off the record.)
15      MR. BLACK: And then Exhibit 43, we are now
16  marking Exhibit 43 which is a collection of documents
17  that were in a redwell folder that Dr. Arrowsmith-Lowe
18  had in her possession prior to the deposition. And we
19  need to keep these separate somehow.
20      Exhibit 44 is an unbound stack of documents
21  about an inch or an inch and a quarter thick that are
22  documents that were in Dr. Arrowsmith-Lowe's
23  possession prior to the deposition. The first page of
24  this is a March 27, 2000, letter from Merck to
25  somebody named Karen Midthun.

Page 347

1      And the court reporting service will take
2  along with everything else Exhibits 42, 43, and 44,
3  including them in the record and provide copies to
4  counsel.
5      (Exhibit Nos. 42 through 44 were marked.)
6      THE VIDEOGRAPHER: We are back on the record.
7  The time now is 8:53 p.m. Mountain time. This
8  concludes today's videotaped deposition of Dr. Janet
9  Arrowsmith-Lowe. The time now is 8:53 p.m. Mountain
10  time. We are off the record.
11      (At 8:53 p.m. the deposition was concluded.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 348

1          UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2
   In re: VIOXX      * MDL Docket No. 1657
3                    *
   PRODUCTS LIABILITY LITIGATION * SECTION L
4                    *
                     * JUDGE FALLON
5  EVELYN IRVIN PLUNKETT, as *
   Personal Representative of the * MAGISTRATE JUDGE
6  Estate of RICHARD IRVIN, JR. , *   KNOWLES
                     *
7        Plaintiff, * CASE NO. 2:05CV4046
                     *
8        vs.         *
                     *
9  MERCK & CO., INC., *
                     *
10       Defendant. *
11      CERTIFICATE OF COMPLETION OF DEPOSITION
       I, JAN A. WILLIAMS, New Mexico CCR #14, DO
12  HEREBY CERTIFY that on October 28, 2005, the
    deposition of JANET ARROWSMITH-LOWE, M.D., was taken
13  before me as the request of, and sealed original
    retained by:
14
       For the Plaintiff
15     LOCKRIDGE GRINDAL NAUEN, PLLP
       100 Washington Avenue S., Suite 2200
16     Minneapolis, MN 55401-2179
       MR. BERT BLACK
17     and
       BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
18     MILES, PC
       218 Commerce Street
19     Montgomery, Alabama 36104
       MR. J. PAUL SIZEMORE
20
       I FURTHER CERTIFY that copies of this
21  certificate have been mailed or delivered on _____
    with changes, if any, by the witness appended, to the
22  following counsel of record and parties not
    represented by Counsel:
23
24
25

Page 349

1      For the Defendant:
       HUGHES HUBBARD & REED, LLP
2      One Battery Park Plaza
       New York, New York 10004-1482
3      MR. SETH D. ROTHMAN
4      I FURTHER CERTIFY that examination of this
    transcript and signature of the witness was requested
5  by the witness and all parties present.
6      On _____, a letter was mailed or
    delivered to MR. SETH D. ROTHMAN regarding obtaining
7  signature of the witness.
8      I FURTHER CERTIFY that the recoverable cost
    of the original and one copy of the deposition,
9  including exhibits, to MR. BERT BLACK is
    $_____.
10
       I FURTHER CERTIFY that I did administer the
11  oath to the witness herein prior to the taking of this
    deposition; that I did thereafter report in
12  stenographic shorthand the questions and answers set
    forth herein, and the foregoing is a true and correct
13  transcript of the proceeding had upon the taking of
    this deposition to the best of my ability.
14
       I FURTHER CERTIFY that I am neither employed
15  by nor related to nor contracted with (unless excepted
    by the rules) any of the parties or attorneys in this
16  case, and that I have no interest whatsoever in the
    final disposition of this case in any court.
17
18
19
20
21          _____
            JAN A. WILLIAMS
            Certified Court Reporter #14
22          License Expires: 12/31/05
23
24  (3144M) JAW
    Date taken:  October 28, 2005
25  Proofread by: JB

Page 350

```
 1   In re: Vioxx
 2          WITNESS SIGNATURE/CORRECTION PAGE
 3          If there are any typographical errors to your
     deposition, indicate them below:
 4
 5   PAGE  LINE
 6   _____ Change to _____
 7   _____ Change to _____
 8   _____ Change to _____
 9   _____ Change to _____
10          Any other changes to your deposition are to
     be listed below with a statement as to the reason for
11   such change.
12   PAGE  LINE  CORRECTION        REASON FOR CHANGE
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19          I, JANET ARROWSMITH-LOWE, M.D., do hereby
     certify that I have read the foregoing pages of my
20   testimony as transcribed and that the same is a true
     and correct transcript of the testimony given by me in
21   this deposition on October 28, 2005, except for the
     changes made.
22
23   _____    _____
     DATE SIGNED        JANET ARROWSMITH-LOWE, M.D.
24
     (3144M) JAW
25   Proofed by: JB
```

Page 352

```
 1   DATE DELIVERED:
 2   MR. SETH D. ROTHMAN
     HUGHES HUBBARD & REED, LLP
 3   One Battery Park Plaza
     New York, New York 10004-1482
 4
     RE: In re: Vioxx
 5   DEPOSITION OF: JANET ARROWSMITH-LOWE, M.D.
     DATE TAKEN: October 28, 2005
 6
 7   Dear MR. SETH D. ROTHMAN:
 8          At the time of the above deposition/sworn statement,
     it was requested that the witness read and sign
     his/her transcript.
 9
     _____ Enclosed is your copy of the transcript with the
10   original signature page.  Please ask the witness to
     read the transcript, make any corrections on the
11   signature page, and return the original signature page
     to our Albuquerque office.
12
     _____ Enclosed is your copy of the transcript.  Please
13   read it, note any corrections on the signature
     page, and return the original signature page to
14   our Albuquerque office.  You may keep the
     transcript for your files.
15
     _____ The transcript is now ready to review.  Please
16   contact our Albuquerque office, 505-843-9494, to
     make arrangements to have the transcript read and
17   signed.  If you live outside the Albuquerque area,
     please call 1-800-669-9492.
18
     _____ The transcript is now ready for review.  Please
19   remit payment in the amount of $_____ to our
     Albuquerque office.  As soon as payment is received,
20   your transcript will be delivered.  If you choose not
     to pay, please contact our Albuquerque office,
21   505-843-9494, to make arrangements for signature.
22   _____ Trial in this matter is set for _____.  If
     the transcript has not been read and signed before
23   that date, the original will be filed without a
     signature.
24
25
```

Page 351

```
 1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
 2
     In re: VIOXX       * MDL Docket No. 1657
 3                      *
     PRODUCTS LIABILITY LITIGATION * SECTION L
 4                      *
                        * JUDGE FALLON
 5   EVELYN IRVIN PLUNKETT, as  *
     Personal Representative of the * MAGISTRATE JUDGE
 6   Estate of RICHARD IRVIN, JR., *   KNOWLES
                        *
 7          Plaintiff,  * CASE NO. 2:05CV4046
                        *
 8      vs.             *
                        *
 9   MERCK & CO., INC.,    *
                        *
10          Defendant.  *
11          AFFIDAVIT
12   Deposition of: JANET ARROWSMITH-LOWE, M.D.
13   Date taken: October 28, 2005
14          The witness in this case was notified of the
15   need for signature on _____
16          Failure of the witness to timely sign this
     deposition has resulted in the filing of this
17   deposition on _____.
18
19
20   _____BEAN & ASSOCIATES, INC.
21
22
23
24
25   (3144M) JAW
```

Page 353

```
 1   _____ Other: _____
     _____
 2   _____
 3   The Federal Rules of Civil Procedure provide the
     witness 30 days in most instances from the receipt of
 4   this letter to read and sign his/her transcript.  If
     he/she has not read and signed the transcript in that
 5   time, we will file the original transcript without the
     signature page.
 6
     Sincerely,
 7
 8
 9
     BEAN & ASSOCIATES, INC.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   (3144M) JAW
```

Page 354

```
 1              RECEIPT
 2   DATE:  October 28, 2005
 3   JOB NUMBER:  (3144M) JAW
 4   WITNESS NAME: JANET ARROWSMITH-LOWE, M.D.
 5   CASE CAPTION:  In re:  Vioxx
 6        *************************
 7   ATTORNEY:  MR. J. PAUL SIZEMORE
 8   DOCUMENT:  Transcript / Exhibits / Disks / Other _____
 9   DATE DELIVERED: _____ DEL'D BY: _____
10   REC'D BY: _____ TIME: _____
11        ***************************
12   ATTORNEY:  SETH D. ROTHMAN
13   DOCUMENT:  Transcript / Exhibits / Disks / Other _____
14   DATE DELIVERED: _____ DEL'D BY: _____
15   REC'D BY: _____ TIME: _____
16        **************************
17   ATTORNEY:
18   DOCUMENT:  Transcript / Exhibits / Disks / Other _____
19   DATE DELIVERED: _____ DEL'D BY: _____
20   REC'D BY: _____ TIME: _____
21        ***************************
22   ATTORNEY:
23   DOCUMENT:  Transcript / Exhibits / Disks / Other _____
24   DATE DELIVERED: _____ DEL'D BY: _____
25   REC'D BY: _____ TIME: _____
```