1            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA

2                    -   -   -

IN RE:  VIOXX          :  MDL DOCKET NO.

3  LITIGATION          :  1657

4  -------------------------------------------

SUPERIOR COURT OF THE STATE OF CALIFORNIA

5            COUNTY OF LOS ANGELES
            CENTRAL CIVIL WEST

6

VIOXX CASES            :  JCCP NO. 4247

7                      :  ASSIGNED TO HON
                      :  VICTORIA CHEYNEY

8                  -   -   -

            CONFIDENTIAL

9     SUBJECT TO PROTECTIVE ORDER
                  -   -   -

10            May 9, 2006
                  -   -   -

11     Videotape deposition of DAVID J.

12  GRAHAM, M.D., M.P.H, held at The

13  Renaissance Mayflower Hotel, 1127

14  Connecticut Avenue, N.W., Washington,

15  D.C. 20036, commencing at 9:23 a.m., on

16  the above date, before Linda L. Golkow, a

17  Federally-Approved Registered Diplomate

18  Reporter and Certified Shorthand

19  Reporter.

                  -   -   -

20

21     GOLKOW LITIGATION TECHNOLOGIES
            Four Penn Center

22     1600 John F. Kennedy Boulevard
                Suite 1210

23     Philadelphia, Pennsylvania 19103
                877.DEPS.USA

24

Page 2

```
 1  A P P E A R A N C E S :
 2
 3       KLINE & SPECTER, P.C.
         BY:  THOMAS R. KLINE, ESQUIRE
 4            and
           LEE B. BALEFSKY, ESQUIRE
 5            and
           LISA DAGOSTINO, M.D., J.D.
 6            and
           MICHELLE L. TIGER, ESQUIRE
 7         (Via Telephone)
         19th Floor - 1525 Locust Street
 8       Philadelphia, Pennsylvania 19102
         (215) 772-1000
 9       Counsel for Plaintiffs
10
11       SEEGER WEISS LLP
         BY:  DAVID R. BUCHANAN, ESQUIRE
12            and
           MOSHE H. HORN, ESQUIRE
13            and
           JEFFREY GRAND, ESQUIRE
14         (Via Telephone)
         Suite 920 - 550 Broad Street
15       Newark, New Jersey 07102
         (973) 639-9100
16       Counsel for Plaintiffs
17
18       ASHCRAFT & GEREL
         BY:  CHRISTOPHER TISI, ESQUIRE
19            and
           MICHELLE A. PARFITT, ESQUIRE
20            and
           JENNIFER L. ORENDI, ESQUIRE
21       Suite 400 - 2000 L Street, N.W.
         Washington, D.C. 20036
22       (202) 783-6400
         Counsel for Plaintiffs
23
24          - - -
```

Page 3

```
 1  A P P E A R A N C E S :  (CONTINUED)
 2
 3       HERMAN, HERMAN, KATZ & COTLAR
         BY:  LEONARD A. DAVIS, ESQUIRE
 4       201 St. Charles Avenue
         Suite 4310
 5       New Orleans, Louisiana 70170
         (504) 581-4892
 6       Counsel for the Plaintiffs
 7
 8       LEVIN SIMES & KAISER & GORNICK LLP
         BY:  STEVEN B. STEIN, ESQUIRE
 9       14th Flooor
         One Bush Street
10       San Francisco, California 94104
         (415) 646-7160
11       sbs@lskg-law.com
         Counsel for California Plaintiffs
12
13
         BLIZZARD, McCARTHY & NABERS, LLP
14       BY:  J. SCOTT NABERS, ESQUIRE
         Suite 1710
15       440 Louisiana Street
         Houston, Texas 77002
16       (713) 844-3750
         Counsel for Plaintiffs
17
18
         LOPEZ, HODES, RESTAINO, MILMAN,
19       SKIKOS & POLOS
         BY:  JOHN M. RESTAINO, JR., ESQ.
20       2nd Floor
         450 Newport Center Drive
21       Newport Beach, California 92660
         (949) 640-8222
22       Counsel for Plaintiffs
23
24          - - -
```

Page 4

```
 1  A P P E A R A N C E S : (CONTINUED)
 2
 3       HAGENS BERMAN SOBOL SHAPIRO LLP
         BY:  HUGH E. MCNEELY, ESQUIRE
 4       Fourth Floor - One Main Street
         Cambridge, Massachusetts 02142
 5       (617) 482-3700
         hugh@hbsslaw.com
 6       Counsel for California
         Plaintiffs
 7
 8
         MARTIN & JONES
 9       BY:  MARTIN A. RAMEY, ESQUIRE
         Suite 200
10       410 Glenwood Avenue
         Raleigh, North Carolina 27603
11       (919) 821-0005
         mar@m-j.com
12       Counsel for New Jersey
         Plaintiffs
13
14
         AYLSTOCK, WITKIN & SASSER
15       BY:  KENNETH W. SMITH, ESQUIRE
         Suite 200
16       2121 Eisenhower Avenue
         Alexandria, Virginia 22314
17       (703) 778-5978
         ksmith@aws-law.com
18       Counsel for Plaintiffs
19
20       ALEXANDER HAWES & AUDET LLP
         BY:  SUSANNE N. SCOVERN, ESQUIRE
21       Suite 1460
         221 Main Street
22       San Francisco, California 94105
         Counsel for Plaintiffs
23
24          - - -
```

Page 5

```
 1  A P P E A R A N C E S : (CONTINUED)
 2
 3       GOFORTH LEWIS SANFORD LLP
         BY:  SHELLY A. SANFORD, ESQUIRE
 4       Suite 2200 - 1111 Bagby
         Houston, Texas 77002
 5       (713) 650-0022
         Counsel for Plaintiffs
 6       (Via Telephone)
 7
 8       THE O'QUINN LAW FIRM
         BY:  STEPHANIE SHAPIRO, ESQUIRE
 9       2300 Lyric Centre Building
         Houston, Texas 77002
10       (713) 223-1000
         Counsel for the Plaintiffs
11       (Via Telephone)
12
13       BARTLIT BECK HERMAN
         BY:  PHILIP S. BECK, ESQUIRE
14            and
           SHAYNA COOK, ESQUIRE
15            and
           KEN BAUM, M.D., ESQUIRE
16       Courthouse Place
         54 West Hubbard Street
17       Chicago, Illinois 60610
         (312) 494-4451
18       Counsel for Merck and Co., Inc.
19
20       WILLIAMS & CONNOLLY LLP
         BY:  DOUGLAS R. MARVIN, ESQUIRE
21            and
           R. HACKNEY WIEGMANN, ESQUIRE
22       725 Twelfth Street, N.W.
         Washington, D.C. 20005
23       (202) 434-5400
         Counsel for Merck & Company, Inc.
24          - - -
```

Page 6

```
1  a P P E A R A N C E S:  (CONTINUED)
2
3      STINNETT THIEBAUD & REMINGTON LLP
       BY:  RUSSELL G. THORNTON, ESQUIRE
4      Suite 2500
       1445 Ross Avenue
5      Dallas, Texas 75202
       (214) 954-2200
6      Counsel for Texas physicians
7
8      CRUSE, SCOTT, HENDERSON & ALLEN,
       LLP
9      BY:  VICTORIA A. FILIPPOV, ESQUIRE
       7th Floor
10     2777 Allen Parkway
       Houston, Texas 77019-2133
11     (713) 650-6600
       Counsel for Texas physicians
12
13         - - -
14
15 ALSO PRESENT:
16
17     GOVERNMENT ACCOUNTABILITY PROJECT
       BY:  JOANNE ROYCE, ESQUIRE
18         and
           MARK COHEN, ESQUIRE
19     Suite 1100
       1612 K Street, N.W.
20     Washington, D.C. 20006
       (202) 408-0034
21     Counsel for David Graham,
       M.D., M.P.H.
22
23
24
```

Page 7

```
1  ALSO PRESENT: (CONTINUED)
2
3      U.S. DEPARTMENT OF HEALTH AND
       HUMAN SERVICES
4      OFFICE OF THE GENERAL COUNSEL
       BY:  MARC L. CADEN, ESQUIRE
5          and
           MICHAEL LEVY, ESQUIRE
6      Office of the Chief Counsel
       Food and Drug Administration
7      5600 Fishers Lane, GCF-1
       Rockville, Maryland 20857
8      (301) 827-7141
       Counsel for the Food & Drug
9      Administration
10
11     UNITED STATES DEPARTMENT OF
       JUSTICE
12     BY:  GERALD C. KELL, ESQUIRE
       Office of Consumer Litigation
13     P.O. Box 386
       Washington, D.C. 20044
14     (202) 514-1586
       Counsel for the Food & Drug
15     Administration
16
17     KIRKE D. WEAVER, ESQUIRE
       Merck & Co., Inc.
18     351 N. Sumneytown Pike
       North Wales, PA 19454-2505
19     (267) 305-6331
20
21     KLINE & SPECTER
       ROBERT ENGLERT, Legal Assistant
22
23         - - -
24
```

Page 8

```
1          - - -
2         I N D E X
3  WITNESS              PAGE NO.
4
5  DAVID J. GRAHAM, M.D., MPH
6
7    By Mr. Kline        33, 460
8    By Mr. Beck         227
9
10         - - -
11      E X H I B I T S
12 NO.    DESCRIPTION    PAGE NO.
13
   Graham-1  Curriculum Vitae of  47
14           David Graham
15
   Graham-2  "Drug Safety in     89
16           America: A Nation
             Still at Risk,"
17           (Graham) Power
             Point Slides
18           DG000035 - DG000061
19
   Graham-3  "Rofecoxib         172
20           Diagnosis and
             Treatment: What
21           went wrong?  Can we
             avoid?" (Graham)
22           PowerPoint Slides,
             DG000014 - DG000034
23
24
```

Page 9

```
1  Graham-4  "Risk of acute      195
             myocardial
2            infarction and
             sudden cardiac
3            death in patients
             treated with
4            cyclo-oxygenase 2
             selective and
5            non-selective
             non-steroidal
6            anti-inflammatory
             drugs: nested
7            case-control study"
             (Graham, et al) The
8            Lancet 2-5-05 Vol.
             365, 475-481
9
10 Graham-5  "Review of          197
             Epidemiologic
11           Studies on
             Cardiovascular Risk
12           with Selected
             NSAIDs," (Graham)
13           PowerPoint Slides,
             2-17-05
14           DG0000107-DG0000127
15
   Graham-6  Letter 5-5-06       232
16           (1 page)
17
   Graham-7  E-mails             235
18           (2 pages)
19
   Graham-8  "COX-2 selective    253
20           non-steroidal
             anti-inflammatory
21           drugs and
             cardiovascular
22           disease," (Ray, et
             al) Pharmacology
23           and Drug Safety
             2003; 12: 67-70
24
```

Page 10

```
 1   Graham-9    "High frequency of  258
         use of rofecoxib at
 2       greater than
         recommended doses:
 3       Cause for concern,"
         (Griffin, et al)
 4       Pharmacoepidemiolog
         y and Drug Safety
 5       2004; 13: 339-343
 6
 7   Graham-10   "Cohort Analysis   279
         Myocardial
 8       Infarction Risk and
         COX2 Use in the
 9       Kaiser Large
         Observational
10       Thrombosis Study
         (KLOTS) (Levy, et
11       al) ACR Abstract
         (1 page)
12
13   Graham-11   "Risk of Acute     288
         Cardiac Events
14       Among Patients
         Treated with
15       Cycloxygenase-2
         Selective and
16       Non-Selective-
         Nonsteroidal
17       Anti-Inflammatory
         Drugs Category: 06
18       Osteoarthritis
         clinical aspects"
19       America College of
         Rheumatology
20       Abstract
         (1 pages)
21
22   Graham-12   E-mail 5-25-04    292
         KP002153
23
24
```

Page 11

```
 1   Graham-13   "Risk of Acute    296
         Myocardial
 2       Infarction and
         Sudden Cardiac
 3       Death with Use of
         COX-2 Selective and
 4       Non-Selective
         NSAIDs" (Graham, et
 5       al)
         KP001521 - KP001526
 6
 7   Graham-14   E-mails with      305
         attachment
 8       "Comments on ISPE
         Paper"
 9       FDACDER006048 -
         FDACDER006049
10
11   Graham-15   E-mails           313
         FDACDER011048 -
12       FDACDER011049
13
14   Graham-16   E-mails           321
         FDACDER006056 -
15       FDACDER006058
16   Graham-17   E-mails           325
         FDACDER021810 -
17       FDACDER021811
18
19   Graham-18   E-mails           328
         FDACDER010352 -
20       FDACDER010353
21
22
23
24
```

Page 12

```
 1   Graham-19   Memo 10-29-04     337
         "Review of reports
 2       of FDA/Kaiser Vioxx
         study: Questions
 3       about
         Inconsistencies and
 4       Bias,"
         FDACDER022462 -
 5       FDACDER022470
 6
 7   Graham-20   E-mails           349
         FDACDER022789
 8
 9   Graham-21   E-mails           353
         KP001136 - KP001138
10
11   Graham-22   E-mails           357
         FDACDER022247 -
12       FDACDER022249
13   Graham-23   E-mails           361
         TOPOLE0000333
14
15   Graham-24   E-mails           364
         FDACDER022681
16
17   Graham-25   Chart             374
         FDACDER005940
18
19   Graham-26   E-mail 10-23-04   392
         KP002315
20
21
22
23
24
```

Page 13

```
 1   Graham-27   Memo 9-30-04 "Risk  406
         of acute myocardial
 2       infarction and
         sudden cardiac
 3       death in patients
         treated with COX-2
 4       selective and
         non-selective
 5       NSAIDs"
         FDACDER022369 -
 6       FDACDER022388
 7
 8   Graham-28   E-mail 10-22-04    411
         FDACDER022409
 9
10   Graham-29   E-mail with        413
         attachment "Risk of
11       Acute Myocardial
         Infarction and
12       Sudden Cardiac
         Death in Patients
13       Treated with COX-2
         Selective and
14       Non-Selective
         NSAIDs" (Graham, et
15       al)
         KP001133;
16       KP001133A -
         KP001133X
17
18   Graham-30   "FDA Medical       423
         Review:
19       Cardiovascular
         analysis for
20       Vioxx," (Targum)
         2-1-01
21       MRK-ABX0002367 -
         MRK-ABX0002404
22
23
24
```

4 (Pages 10 to 13)

Page 14

1    Graham-31    "Cardiovascular    426
        Events Associated
2        with Rofecoxib in a
        Colorectal Adenoma
3        Chemoprevention
        Trial" (Bresalier,
4        et al) NEJM
        3-17-05, 352;11:
5        1092-1102
6
7    Graham-32    Memo 4-6-05    441
        "Analysis and
8        recommendations for
        Agency action
9        regarding
        non-steroidal
10        anti-inflammatory
        drugs and
11        cardiovascular
        risk"
12        (19 pages)
13    Graham-33    FDA Performance    476
        Evaluation Plan
14        (4 pages)
15
16    Graham-34    Memo 11-5-00    480
        "Consulting
17        agreement for Wayne
        A. Ray, Ph.D."
18        MRK-ABT0018298
19    Graham-35    E-mails    482
        MRK-ACV00363335
20
21    Graham-36    E-mails    490
        FDACDER011046 -
22        FDACDER011047
23
24

Page 16

1        DEPOSITION SUPPORT INDEX
2
3
    Direction to Witness Not To Answer
4    Page  Line  Page  Line
    (None)
5
6
7
8
    Request For Production of Documents
9    Page  Line  Page  Line
    (None)
10
11
12
13
    Stipulations
14    Page  Line  Page  Line
    (None)
15
16
17
18
    Questions Marked
19    Page  Line  Page  Line
    (None)
20
21
22        - - -
23
24

Page 15

1    Graham-37    E-mail 8-16-04 with    492
        attachment "ISPE
2        Poster"
        MRK-ACM0002855 -
3        MRK-ACM0002856
4
5    Graham-38    Handwritten notes    496
        MRK-GAR0016806 -
        MRK-GAR0016807
6
7    Graham-39    E-mails    548
        FDACDER023033 -
8        FDACDER023037
9
10    Graham-40    E-mail 11-14-04    553
        FDACDER022932 -
        FDACDER022933;
11        FDACDER021558 -
        FDACDER021577 with
12        attachment
13
14    Graham-41    E-mails    556
        FDACDER029127 -
        FDACDER029133
15
16
17
18
19
20
21
22
23
24

Page 17

```
1              - - -
2         MR. KLINE:  Before you go on
3    the record, a couple of things on
4    the stenographic record.
5         First of all, two things
6    that I know Mr. Beck and I will
7    agree on.
8         One, everybody turn their
9    cell phones off.  Make sure your
10   cell phones are off.
11        Number two, for those folks
12   who are on the phone, we've had
13   issues before on the phone.  If
14   there's feedback on the phone, if
15   somebody puts their phone on hold
16   or gets Muzak or some static,
17   we're going to have to cut the
18   whole line.  So, everybody should
19   know that in advance.  I'm just
20   going to ask Linda, whether it's
21   in my examination or Mr. Beck's,
22   to cut the line.
23        You have everybody on the
24   record, Linda?
```

Page 18

1       THE COURT REPORTER:  Yes.
2       MR. KLINE:  Formally for the
3   plaintiffs, I'm here with Dr.
4   Dagostino to my left, also Lee
5   Balefsky, Chris Tisi, and Lenny
6   Davis, who are the lawyers
7   responsible for the deposition.
8       MR. BECK:  Tom, I'm having a
9   hard time hearing you right now.
10   So, people are going to have to
11   lean back or you're going to have
12   to speak up.
13       MR. KLINE:  Maybe I can get
14   the room mic closer.  Does that
15   help you?
16       MR. BECK:  No.
17       MR. KLINE:  Not really.  I
18   think both of us are going have
19   the same problem all day.  I will
20   speak up.  I'll speak up, and
21   you'll try to do so also.
22       Before we go on the video, a
23   couple more things.
24       The deposition of Dr. Graham

Page 19

1   is, of course, under subpoena.  It
2   was the subject of a court order.
3   There are a couple of counsel here
4   who may not be familiar with
5   certain things, and I just want to
6   make sure we all know the ground
7   rules.
8       The deposition is governed
9   by Pretrial Order Number 9, which
10   clearly states: "All objections
11   except to those as to form and
12   privilege are reserved until trial
13   or other use of the depositions."
14   So, there's no need for anybody to
15   interrupt.  It further says -- and
16   that includes everybody.
17       It says: "Counsel shall
18   refrain from engaging in colloquy
19   during deposition.  The phrase
20   objection to form or similar
21   language shall be sufficient to
22   preserve all objections as to the
23   form until the deposition is
24   sought to be used.  And only

Page 20

1   then," Judge Fallon said, "the
2   objecting party shall provide a
3   sufficient explanation if it's
4   requested by the questioner.
5       "Counsel shall not make
6   objections or statements which may
7   suggest an answer to the witness."
8       So, nobody needs to make any
9   objections.
10       MR. BECK:  Just expanding on
11   that, the last point, Counsel
12   should not -- could you read what
13   you just said there?
14       MR. KLINE:  I sure will.
15   "Counsel shall not make objections
16   or statements which might suggest
17   an answer to the witness."
18       MR. BECK:  So that the
19   record is clear on the approach
20   that I'll be taking to objections,
21   as I understand the rules in
22   Federal Court as well as the state
23   courts where this has been
24   noticed, leading questions are

Page 21

1   objectionable as to form.  So, I
2   would ask, Doctor, to give me time
3   to interpose an objection so we're
4   not talking over one another if,
5   in fact, Mr. Kline starts asking
6   leading questions.  Because I will
7   be objecting, Tom, on form grounds
8   as to any leading questions.
9       MR. KLINE:  And I will be,
10   too, if appropriate, on
11   cross-examination.
12       MR. BECK:  Right.
13       MR. KLINE:  So we're clear,
14   Phil, the rules are clear that
15   all you need to do if you have a
16   leading question is simply to
17   state objection as to form.  It's
18   preserved.  No speeches.
19       MR. BECK:  Right.
20       MR. KLINE:  And we'll all
21   get along fine.
22       All other objections are
23   preserved for both your side and
24   the plaintiffs' side.

Page 22

1      MR. BECK:  I understand.
2      MR. KLINE:  There's no need
3  to raise those objections, and
4  there will be many, I would think.
5      MR. BECK:  I've been in
6  depositions before.
7      MR. KLINE:  I understand.
8  But I've also seen some of the
9  depositions already in this
10  litigation.  So, I just wanted to
11  make sure we all understood each
12  other.
13      MR. KELL:  Counsel, I'm
14  Gerald Kell from the Justice
15  Department.  I just want to make a
16  brief statement because I have not
17  been in one of these depositions
18  in this case before.
19      MR. KLINE:  Well, welcome.
20      MR. KELL:  The government in
21  this case does not represent Dr.
22  Graham, even though he is
23  subpoenaed as an FDA employee.  We
24  do assume that the protective

Page 23

1  order entered by The Court on July
2  20, 2005, particularly Paragraph
3  4, applies here.  I may be making
4  objections in one of those areas
5  that you mentioned, privilege.
6  There are certain governmental
7  privileges like deliberative
8  process and investigatory
9  privilege.  If the question calls
10  for that, I will make that
11  objection and simply state just
12  that simply, the basis for it.
13      I do want to say that,
14  without making a speech, every
15  time I make an objection, if I
16  make an objection on one of those
17  governmental privilege grounds,
18  it's the government's position
19  that the question should not be
20  answered.  We have no power or
21  authority to instruct the witness
22  not to answer.
23      MR. KLINE:  Understood.  And
24  I assume then that you'll take it

Page 24

1  up with Judge Fallon at some
2  point.
3      MR. BECK:  Tom, again, I do
4  this so that we can avoid
5  arguments once we start the
6  deposition.
7      MR. KLINE:  Sure.
8      MR. BECK:  The judge has
9  also entered orders when approving
10  this deposition restricting the
11  scope.
12      MR. KLINE:  Yes.
13      MR. BECK:  If, in fact,
14  either side asks questions outside
15  the scope as approved by the
16  judge, as far as I'm concerned,
17  that's an appropriate area to
18  raise an objection.
19      MR. KLINE:  Well, I would
20  think that those -- maybe we can
21  agree to agree.  I would think
22  those objections, since they do
23  not fall within Order Number 9,
24  Pretrial Order Number 9, that

Page 25

1  those would simply be preserved.
2      MR. BECK:  I feel compelled
3  to raise those.  Hopefully, we
4  won't have any, but if we do, that
5  will be one where I feel I need to
6  make a record as we go.
7      MR. KLINE:  Okay.  I
8  would --
9      MR. BECK:  The reason for
10  that is because we've done our
11  best to review Dr. Graham's public
12  statements on various issues and
13  feel like we have a decent handle
14  on them.  If he talks in an area
15  where he hasn't spoken publicly
16  before, we want to raise the
17  objection, and then if we can be
18  corrected and directed to where
19  he's raised this before, then I'll
20  want to cross-examine him on it.
21  But if not, then I won't.  So,
22  that's the reason why in that area
23  I may have an objection along the
24  way.

Page 26

1    Another area is, if you
2  intend to use documents that were
3  informally produced by Dr. Graham
4  from FDA computers and files that
5  were not pursuant to the
6  plaintiffs' subpoena to the FDA in
7  this case, where Dr. Graham's
8  lawyers for some reason were
9  willing to have him provide a
10  couple hundred pages of documents
11  for plaintiffs' lawyers based on
12  an informal request, when we made
13  a similar request, we were told it
14  was against the rules for him to
15  produce documents from the FDA
16  computer files, we'll have an
17  objection to the use of any
18  documents that were obtained in
19  that manner. But when you get
20  there, we can just divert, I can
21  state that, and we don't have to
22  have an argument. But I want to
23  state it on the record.
24    MR. KLINE: Sure. You can

Page 27

1  consider it raised right now so
2  that you don't have to raise it
3  later. I intend to work with some
4  of those documents, principally
5  the PowerPoints. Your objection
6  is noted. You don't have to
7  interrupt after that.
8    MR. BECK: Well, I just need
9  to point out which documents they
10  are as we go unless you do --
11    MR. KLINE: I can tell you
12  that the PowerPoints which were
13  produced --
14    MR. BECK: -- when he starts
15  testifying -- this isn't good
16  enough. When he starts testifying
17  and he gets to one of the
18  documents, I think you and I know
19  what the documents are, I'll
20  simply note for the record the
21  objection that I previously raised
22  concerning the use of documents
23  informally produced, and that will
24  be it.

Page 28

1    MR. KLINE: Fine. That's
2  fair enough. But we do intend to
3  use those documents, and those
4  documents, there's a good record
5  as to when they were produced to
6  us and when they were immediately
7  turned over to you. That's a
8  different issue for a different
9  day. I understand.
10    MR. BECK: Sure.
11    MR. KLINE: Let me just
12  think of a few more things.
13    On the issue of those things
14  which you just raised on the
15  things that you might raise, my
16  view of the order is a simple one,
17  which is that -- and I understand
18  there are certain things you might
19  do, but my view of the order is
20  that the order means what it says.
21  So, I will consider our objections
22  preserved as to those things, for
23  example, that are outside of the
24  scope of public statements. For

Page 29

1  example, if you cross-examine on
2  internal FDA documents, putting
3  aside the privilege issues that
4  there might be that the FDA might
5  raise, I'm just going to take
6  Judge Fallon's order at its word
7  and assume that those issues can
8  just be raised with the judge
9  later. For example, if you
10  examine on hearsay documents that
11  were not within the ambit of Dr.
12  Graham documents that he's never
13  seen before, which clearly is the
14  way Judge Fallon rules that a
15  witness should not be shown those
16  documents -- here's my only point.
17  I assume that those are preserved
18  under the rule because I, for one,
19  don't want to be interrupting you
20  all the time.
21    MR. BECK: That's fine.
22    MR. KLINE: Last point.
23    This is more directed to FDA
24  counsel and Dr. Graham's counsel,

Page 30

1    which is something that Mr. Beck
2    alluded to, which is that Judge
3    Fallon has an order, and I
4    expect to live up to it, I can
5    tell you in advance, and I would
6    expect that -- I would hope that
7    Mr. Beck would, but we'll see
8    where his cross-examination goes.
9    It says Dr. Graham can testify
10   about things that were public
11   before.  The judge specifically
12   cited to testimony before
13   Congress, on television, in print
14   and at professional meetings.  So,
15   he essentially laid out four
16   categories.  And then in his
17   opinion and in his Order, he said
18   that the deposition is "limited to
19   matters relevant to this
20   litigation and to which Dr. Graham
21   has previously addressed."  So,
22   that's where I intend to go with
23   my examination.  Unless you have
24   something else, Mr. Beck, I'm

Page 31

1    ready to start.
2        MR. BECK:  No, I'm ready.
3        MR. KLINE:  Okay.  Thank
4    you, sir.
5            - - -
6        (Whereupon, an
7    off-the-record discussion was
8    held.)
9            - - -
10       THE VIDEOTAPE TECHNICIAN:
11   We are now on the record.  My name
12   is Marck Reisbord.
13       Today's date is May 9, 2006,
14   and the video time is 9:23 a.m.
15       We are here in the matter of
16   In Re:  Vioxx litigation MDL
17   Number 1657.
18       The deponent is David
19   Graham, M.D.
20       The court reporter is Linda
21   Golkow and she will now swear in
22   the witness.
23           - - -
24       DAVID J. GRAHAM, M.D., MPH,

Page 32

1    after having been duly sworn, was
2    examined and testified as follows:
3        MR. KLINE:  Off the video
4    record.
5        THE VIDEOTAPE TECHNICIAN:
6    Stand by, 9:23.  Off the video
7    record.
8        MR. KLINE:  Last point, Mr.
9    Beck.  Last point, which is that
10   we have an agreement that we're
11   going to split the time equally,
12   seven hours of actual run time.
13   We're going to split it equally.
14   I'm going to take about
15   two-and-a-half hours and then take
16   an hour or so on redirect.  We've
17   also agreed in an e-mail exchange
18   between Mr. Mayer and Mr. Tisi
19   that pursuant to the way Judge
20   Fallon conducts things, there will
21   be no recross.  That's the
22   agreement.
23       MR. BECK:  The agreement is
24   also that that your redirect will

Page 33

1    be limited to the scope of my
2    cross-examination.
3        MR. KLINE:  Sure.  Yes.  I
4    understand.
5        MR. BECK:  There was talk
6    before about some other
7    plaintiffs' lawyers who said they
8    wanted to participate.
9        MR. KLINE:  No one else is
10   going to unless something happens
11   to me in between.
12           - - -
13       (Whereupon, an
14   off-the-record discussion was
15   held.)
16           - - -
17       THE VIDEOTAPE TECHNICIAN:
18   The time is 9:25.  We're back on
19   the record.
20           - - -
21       EXAMINATION
22           - - -
23   BY MR. KLINE:
24       Q.  Dr. Graham, good morning.

Page 34

1    A.   Good morning.
2    Q.   My name is Tom Kline. I'm
3  here to question you on behalf of
4  thousands of Vioxx claimants.
5        Are you prepared to answer
6  questions today?
7    A.   Yes, I am.
8    Q.   You're here under subpoena.
9  Do you understand that, sir?
10   A.   Yes.
11   Q.   And also under a Court Order
12 by Judge Fallon of the Eastern District
13 of Louisiana. Do you understand that?
14   A.   Yes.
15   Q.   And do you understand that
16 your testimony is limited in scope and
17 nature based on prior public statements,
18 including to Congress, the media, as well
19 as professional meetings?
20   A.   Yes.
21   Q.   I intend to examine you in
22 those areas. I'm going to take about
23 two-and-a-half hours to start, pursuant
24 to a time agreement, and I want to move

Page 35

1  very efficiently through many different
2  areas, that includes your background,
3  your knowledge and views of the FDA, your
4  involvement and knowledge of Vioxx, your
5  involvement in the Kaiser study, as well
6  as to some other things of which you have
7  knowledge and have stated previously,
8  public positions in either professional
9  meetings or before the Congress or the
10 media. You're prepared to do so?
11   A.   Yes, I am.
12   Q.   Okay.
13       I would like to know who you
14 are, sir. What is your current title and
15 position at the FDA?
16   A.   I'm a medical officer and
17 the associate director for science and
18 medicine in the Office of Drug Safety.
19   Q.   What does that job involve,
20 sir?
21   A.   I'm the senior scientific
22 adviser for the office. I mentor the
23 scientific staff. I advise the office
24 director on all scientific and medical

Page 36

1  matters. I oversee intramural and
2  extramural research programs within the
3  office and serve as a resource to the
4  center, the Center For Drug Evaluation on
5  epidemiologic matters as well.
6    Q.   You are an epidemiologist,
7  sir?
8    A.   Yes, I am.
9    Q.   And you're also a physician?
10   A.   That's correct.
11   Q.   So, you hold an M.D. degree
12 as well; is that correct?
13   A.   Yes.
14   Q.   And you're a long-time
15 employee of the FDA?
16   A.   Yes.
17   Q.   How many years, sir?
18   A.   About 22.
19   Q.   This deposition is about
20 many of your public statements.
21       One you made on November 18,
22 2004 to the United States Senate Finance
23 Committee. You said, to quote you,
24 "Vioxx is a terrible tragedy and a

Page 37

1  profound regulatory failure. I would
2  argue that the FDA as currently
3  configured is incapable of protecting
4  America against another Vioxx. We are
5  virtually defenseless." Did you make
6  that statement?
7    A.   Yes, I did.
8    Q.   You also made a statement on
9  November 18 before the United States
10 Senate where you said, "Vioxx is the
11 single greatest drug safety catastrophe
12 in the history of this country." Did you
13 make that statement, sir?
14   A.   Yes, I did.
15   Q.   Do you stick by that
16 statement, sir?
17   A.   I do.
18   Q.   You also said, "The FDA, its
19 Center for Drug Evaluation and Research,
20 are broken." Did you make that
21 statement, sir?
22   A.   Yes, I did.
23   Q.   Do you believe that and do
24 you stick to it today?

Page 38

1     A.   Yes, I do.
2     Q.   Sir, have you devoted your
3  entire professional life to drug safety?
4     A.   Yes.
5         MR. BECK:  Objection, form.
6  BY MR. KLINE:
7     Q.   What have you devoted your
8  entire --
9         MR. BECK:  Please, can we
10        have a pause so that I can
11        interpose my objection, and then,
12        even if you answer over my
13        objection, if you can answer
14        again so that --
15        THE WITNESS:  I apologize.
16        MR. BECK:  -- when we edit
17        the videotape, we won't be talking
18        over one another.
19        So, my objection was to
20        form, and would you please answer
21        now.
22        THE WITNESS:  Please repeat
23        the question.
24        MR. KLINE:  He will be

Page 39

1         saying nothing more than objection
2         to form.  I will go back to the
3         question.
4  BY MR. KLINE:
5     Q.   I'm going to rephrase the
6  question based upon his suggestion.  Mr.
7  Beck is helping me today.
8         Sir, within the FDA, to what
9  have you devoted your entire professional
10 activities and professional life?
11    A.   Post-marketing drug safety
12 and public health.
13    Q.   What is post-marketing
14 safety, sir?
15    A.   It's examining the safety of
16 drug products once they've been approved
17 for marketing.
18    Q.   Do you have any interest of
19 any kind in the Vioxx litigation, sir?
20    A.   No.
21    Q.   Do you have any financial
22 interest in any drug company or any other
23 kind of conflict that you can think of
24 that you would disclose here?

Page 40

1     A.   I have none that I can think
2  of.
3     Q.   Today, sir, are you here on
4  behalf of the FDA as an FDA
5  representative or are you expressing your
6  own opinions?
7     A.   Well, I've been -- I
8  honestly don't know the answer.  I've
9  been subpoenaed as an FDA employee, but
10 undoubtedly some of my opinions will not
11 represent those of the agency.
12    Q.   I want to talk somewhat
13 about your background.  I want to do it
14 efficiently, but I do want the jury to
15 know about you.
16        You have -- I'm going to
17 walk through it.  Hopefully, Mr. Beck
18 won't consider some of it leading.  I
19 don't think it's controversial.
20        You have a Bachelor's Degree
21 from Johns Hopkins; is that correct?
22    A.   Yes.
23    Q.   In what year, sir?
24    A.   1976.

Page 41

1     Q.   You graduated Phi Beta
2  Kappa?
3     A.   Correct.
4     Q.   Meaning?
5     A.   That's a scholastic honorary
6  society that's awarded to people who
7  graduate in the top of their class.
8     Q.   Then you went to medical
9  school where, sir?
10    A.   Johns Hopkins University.
11    Q.   You graduated second in your
12 class?
13    A.   That's correct.
14    Q.   Do you know what the person
15 who was first in your class is doing?
16    A.   Yes.  He's the chairman of
17 surgery now at a major university.
18    Q.   You then went on to get a
19 Master's Degree in public health, is that
20 correct?
21    A.   Yes.
22    Q.   Tell us about that.  Where
23 did you get the Master in public health,
24 and what did that involve?

Page 42

1      A.   I went to the Johns Hopkins
2  University School of Public Health and
3  spent eleven months studying
4  epidemiology, biostatistics and computer
5  science, as well as some course work in
6  general public health matters.  It was
7  part of a three-year fellowship in
8  epidemiology with the Public Health
9  Service.
10      Q.   That epidemiology fellowship
11  was actually at the Food & Drug
12  Administration?
13      A.   That's correct.
14      Q.   So, that's how you got your
15  first involvement at the FDA?
16      A.   Yes.
17      Q.   You're a career FDA person
18  then?
19      A.   Yes.
20      Q.   You did an internship and
21  residency at Yale first; is that correct?
22      A.   Yes.
23      Q.   Then you did a residency in
24  neurology?

Page 43

1      A.   Correct.
2      Q.   Which is a subspecialty of
3  medicine, of course, correct?
4      A.   Well, no.  It's independent
5  of internal medicine.  It's a separate
6  discipline.
7      Q.   Yes.  In other words, you
8  did an internship and residency in
9  internal medicine, then you did another
10  residency, correct?
11      A.   Correct.
12      Q.   A second residency?
13      A.   Yes.
14      Q.   That second residency being
15  at the University of Pennsylvania?
16      A.   Correct.
17      Q.   So, you have an internship
18  at Yale, residency at Penn in neurology
19  and then your training in epidemiology?
20      A.   Right.
21      Q.   Your epidemiology training
22  was three years?
23      A.   Three years.
24      Q.   What is the -- and if you

Page 44

1  could be precise, what is the study of
2  epidemiology?
3      A.   Epidemiology, I think, is
4  the study of the causes and distribution
5  of diseases in populations.  And in the
6  area of drug epidemiology, it is looking
7  at the distribution and causes of
8  drug-induced injuries, but you could also
9  be looking for the patterns of the way
10  drug products are used in the population.
11      Q.   Okay.
12          How have you used
13  epidemiology during your entire
14  professional life?
15      A.   It's been in the practice of
16  pharmacoepidemiology or drug safety.
17      Q.   And what is
18  pharmacoepidemiology, sir?
19      A.   It's a fancy word for drug
20  safety epidemiology, "pharmaco" referring
21  to drugs, "epidemiology," study of the
22  distribution and causes of disease.
23      Q.   Now, you've had in your
24  career at the FDA various positions; is

Page 45

1  that correct, sir?
2      A.   Yes.
3      Q.   Did those various positions,
4  as you moved from position to position,
5  involve promotions?
6      A.   Yes.  Although you have to
7  understand in the government that pay
8  promotions don't happen very often.
9  They're pretty much regimented.  But I
10  did receive my GS 15 as an expert, which
11  was a promotion based on expertise.  And
12  then I received a second promotion as a
13  master medical reviewer, which was also
14  based on performance and expertise.
15      Q.   You said a moment ago that
16  in the government, promotions aren't
17  sometimes financial?
18      A.   Correct.
19      Q.   Are you in your position and
20  do you do what you do based on financial
21  incentive largely?
22      A.   No.  There are people who
23  have the same pay scale as I do who do
24  jobs with far less responsibility.

Page 46

1    Q.   Are you motivated for any
2  reason to be in public service, sir, and
3  if so, why?
4          MR. BECK:  Object to form.
5          THE WITNESS:  I believe -- I
6    believe in public health, and I
7    believe that this is a way that I
8    can make a difference in patients'
9    lives.
10  BY MR. KLINE:
11   Q.   Do you believe you have,
12  sir, in the past 20 years, made a
13  difference in the lives of people?
14   A.   Yes.  It's my belief that
15  I've probably helped more people by
16  pursuing a public health career than I
17  would have had I gone a more traditional
18  route of being a practitioner and seeing
19  patients one at a time.
20   Q.   Tell us, how is that, sir?
21   A.   From the perspective, a
22  public health perspective, and sitting at
23  FDA where we're responsible for all drugs
24  marketed in the United States, I've come

Page 47

1  to view the U.S. population as my
2  patient.  So, essentially, I have 300
3  million patients, and I take that
4  responsibility very seriously.
5   Q.   That doesn't leave time for
6  house calls?
7   A.   No, it does not.
8   Q.   Along the way, sir, in your
9  career at the FDA, have you received many
10  different awards?
11   A.   Yes, I have.
12   Q.   As well as honors?  I think
13  it's called in your curriculum vitae
14  honors and awards; is that correct?
15   A.   Correct.
16          MR. KLINE:  I'm going to
17    mark your curriculum vitae as
18    Exhibit 1 so we have it as part of
19    this record.
20             - - -
21          (Whereupon, Deposition
22    Exhibit Graham-1, Curriculum
23    Vitae of David Graham, was marked
24    for identification.)

Page 48

1             - - -
2  BY MR. KLINE:
3   Q.   I'd like to discuss some of
4  them with you.
5   A.   Should I take this?
6   Q.   Yes.  I'm going to hand you
7  a copy.  I'm sure you're familiar with
8  it.
9          Would you confirm that
10  indeed that's your curriculum vitae?
11   A.   Yes, it is.
12   Q.   If you would turn to Page 3.
13   A.   Yes.
14   Q.   By my count, you have
15  something in the neighborhood of 25
16  different awards by the FDA.  Is that
17  approximately correct?
18   A.   Yes.  That's the
19  neighborhood.
20   Q.   And a further, sir, 18 of
21  those awards or roughly, that's my count,
22  were between the period of 1999 and 2004?
23   A.   Correct.
24   Q.   And these are -- an honor

Page 49

1  and an award is a decoration, correct?
2   A.   Yes.
3   Q.   So, you were decorated by
4  the FDA at least 18 times in the
5  five-year period before 2004 when your
6  Kaiser study was a matter of discussion
7  at the FDA?
8   A.   That's correct.
9          MR. BECK:  Objection, form.
10          THE WITNESS:  That is
11    correct.
12          MR. KLINE:  I will rephrase
13    the question.
14  BY MR. KLINE:
15   Q.   How many times, sir, in the
16  period leading up to 2004, in the
17  five-year period leading up to 2004, were
18  you decorated, namely, honors and awards
19  by the FDA?
20   A.   Numerous times.  You've used
21  the number 18, and I'll take your word
22  for it.  Otherwise, I'll waste time
23  counting them all.
24   Q.   Let me go back and discuss

Page 50

1  with you some of those awards, what they
2  were for. For example, if you look at
3  1999, starting in 1999, you got two
4  different awards, the FDA Special
5  Recognition Award. Would you read that
6  for us, sir?
7       A.   "FDA Special Recognition
8  Award for troglitazone and risk of acute
9  liver failure."
10      Q.   And the other one in 1999,
11 sir?
12      A.   "FDA Group Honor Award for
13 trovafloxacin restriction due to acute
14 liver failure."
15      Q.   What did those awards
16 involve?
17      A.   You mean what was the work
18 that was behind them?
19      Q.   Yes. And why did you get
20 the award?
21      A.   I did research with each of
22 these drugs that demonstrated that --
23 their association with acute liver
24 failure, that these drugs were

Page 51

1  responsible for causing acute liver
2  failure at rates much, much higher than
3  in the general population, rendering
4  these drugs unsafe.
5       Q.   What happened to the drugs?
6       A.   Rezulin was, or troglitazone
7  was removed from the market.
8            Trovafloxacin was removed
9  from the outpatient market. Its use was
10 limited to in-hospital use only.
11      Q.   On how many different
12 occasions, sir, has your work contributed
13 to the withdrawal of a drug from the
14 market?
15      A.   At least ten, and, you know,
16 we could debate whether my work on
17 rofecoxib contributed in any way. That
18 would be 11.
19      Q.   In 2000, you got another
20 award, the "FDA Group Commendable Service
21 Award," is that correct?
22      A.   Yes.
23      Q.   And you had a number of
24 awards in 2000 with similar titles,

Page 52

1  including Group Recognition Award, Group
2  Honor Award, Team Excellence Award; is
3  that correct?
4       A.   Yes.
5       Q.   In 2001, I see you got an
6  award by CDER. Some of them are labeled
7  CDER Team Excellence Awards, some are
8  labeled FDA Group Recognition Awards.
9       A.   Correct.
10      Q.   Maybe what we can do is
11 display Page 3 of your curriculum vitae
12 while we have a discussion about this.
13           What is CDER? We're going
14 to be talking about that at length today.
15      A.   CDER is the Center for Drug
16 Evaluation and Research. It is the area
17 within FDA that's responsible for
18 reviewing, approving and regulating
19 marketed drugs.
20      Q.   I see here on a number of
21 occasions you received awards which are
22 called "Team Excellence Awards." Do you
23 have to be a team player to get a Team
24 Excellence Award?

Page 53

1       A.   Yes, indeed.
2            MR. BECK: Object to form.
3  BY MR. KLINE:
4       Q.   How do you get a Team
5  Excellence Award, sir?
6       A.   You have to be a good team
7  player and exercise team leadership.
8       Q.   How many times at the FDA
9  were you cited before 2004 for team
10 excellence, sir?
11      A.   If I may have a moment to
12 count.
13      Q.   Yes.
14      A.   Seven.
15      Q.   How many of these awards,
16 sir, and honors, these decorations that
17 you got from the FDA involve withdrawal
18 of dangerous drugs?
19      A.   I'll have to refer back to
20 this again.
21      Q.   Tell us which ones they are.
22      A.   Okay.
23           MR. BECK: While you're
24 looking there, this is an area

Page 54

1    that I believe is outside the
2    scope of the subjects that the
3    judge said were appropriate for
4    examination.
5    BY MR. KLINE:
6        Q.   You may answer, sir.
7        A.   Temafloxacin was withdrawn
8    from the market based in large part on
9    the work that I performed.
10       Q.   Did you get an award for it
11   by the FDA?
12       A.   Yes, I did.
13           Fenfluramine and
14   dexfenfluramine, these are the drugs
15   commonly referred to as fen-phen, and
16   dexfen was sort of a related drug.
17       Q.   You did work that led to the
18   withdrawal?
19       A.   Yes.  I spearheaded FDA's
20   activities in that area.
21       Q.   Okay.
22       A.   Cisapride in cardiac
23   ventricular arrhythmias.  I contributed
24   to the withdrawal of that product.

Page 55

1            Troglitazone and risk of
2    acute liver failure, contributed to the
3    withdrawal of that product.
4            Trovafloxacin, contributed
5    to the withdrawal of that product from
6    the outpatient market.
7            Phenylpropanolamine, PPA,
8    this is the Yale Hemorrhagic Stroke
9    Project.  This work contributed to the
10   withdrawal of phenylpropanolamine or PPA
11   from the market.
12           We have this outstanding
13   award for scientific and regulatory
14   assessment of actions regarding safety of
15   nonsteroidal anti-inflammatory drugs, and
16   that covers not only my work on
17   rofecoxib, but work on other nonsteroidal
18   pain relievers, and rofecoxib was
19   withdrawn from the market by the sponsor.
20       Q.   Now, all of these drugs,
21   sir, had all of these drugs previously
22   been approved by the FDA for marketing
23   and distribution to Americans and people
24   in the world?

Page 56

1        A.   Yes.
2        Q.   I want to turn to a couple
3    more things.
4            By the way, do you consider,
5    sir, what we've just gone over, these
6    honors and awards, as part of your
7    background and expertise in drug safety?
8        A.   There's no question that
9    they are.
10       Q.   Okay.
11           Now let's talk about some
12   other things.  You've published in the
13   medical literature, correct?
14       A.   Yes.
15       Q.   I see from your curriculum
16   vitae that you have something along the
17   order of 31 different publications in the
18   medical literature?
19       A.   Right.
20       Q.   And those would be in
21   peer-reviewed journals?
22       A.   Yes.
23       Q.   I'm sure by this time any
24   juror who hears this will know what

Page 57

1    peer-reviewed journal is, so, I'll simply
2    ask you, what journals have you peer
3    reviewed for?
4        A.   You mean what journals am I
5    a peer reviewer for?
6        Q.   Yes.  Either previously or
7    currently.
8        A.   I am a peer reviewer for the
9    Journal of the American Medical
10   Association, for The Lancet, for the Mayo
11   Clinic Proceedings, for Circulation, for
12   Pharmacoepidemiology and Drug Safety, for
13   Cardiovascular Drugs and Therapy, for
14   Clinical Practice Cardiovascular
15   Medicine.
16       Q.   Finally, at least in terms
17   of your qualifications and background,
18   sir, you've contributed to book chapters,
19   book chapters in books, in particular, a
20   textbook entitled Pharmacoepidemiology,
21   correct?
22       A.   Yes.
23       Q.   I believe there's a third
24   edition and a fourth edition; is that

Page 58

1  correct?
2      A.   Correct.
3      Q.   In particular, what has been
4  your contribution in that book?
5      A.   In the third edition, I
6  wrote a chapter with colleagues from
7  European regulatory agencies describing
8  how drug safety and drug safety
9  epidemiology is practiced from a
10 government and public health perspective.
11      In the fourth edition, I
12 wrote a book chapter with colleagues from
13 the Office of Drug Safety examining risk
14 management and what does and doesn't work
15 in terms of managing the risks of drugs.
16 This actually represents the first book
17 chapter that we're aware of tackling this
18 topic.
19      Q.   An important topic, you
20 believe, sir?
21      A.   It's a very important topic.
22 It's important because with the evolution
23 of FDA over the past 10 or 12 years with
24 the introduction of the Prescription Drug

Page 59

1  User Fee Act, there's been a slow
2  transition within FDA to taking the tack
3  that risks of drug products can be
4  managed so that drugs that have
5  particular risks can remain on the
6  market, the proviso being that -- the
7  assumption being that these risk
8  management strategies actually then
9  render a drug that is unsafe or less
10 safe, that those risk management
11 strategies make the drug safe.  What we
12 show in this book chapter is that in
13 virtually every instance where risk
14 management efforts have been examined in
15 a scientific manner, that they've been
16 shown not to result in much or any
17 improvement in the safety profile of the
18 drug or in the way that the drugs are
19 used.
20      Q.   Is that a book, obviously,
21 something that's public and could be
22 purchased and read by anybody who was
23 interested?
24      A.   Yes.

Page 60

1      Q.   Do you have anything else
2  that you would want someone who is
3  listening to this tape, especially a
4  juror, to know about your background
5  before I go on to examine you about
6  questions of your substantive testimony?
7      MR. BECK:  Object to form.
8      THE WITNESS:  No.
9  BY MR. KLINE:
10      Q.   I would ask you, sir, do you
11 consider yourself an expert in drug
12 safety?
13      A.   Yes, I do.
14      Q.   Do you consider yourself an
15 expert in the workings of the Food & Drug
16 Administration insofar as understanding
17 the structure, the culture, the
18 background, the personnel?
19      MR. BECK:  Objection to
20      form.
21      THE WITNESS:  Yes, I
22      consider myself an expert on the
23      culture, structure, organization,
24      et cetera, of FDA, having lived

Page 61

1      through it for 22 years.
2      MR. KLINE:  Since Mr. Beck
3      objected, I will rephrase the
4      question.
5  BY MR. KLINE:
6      Q.   In what areas of FDA do you
7  consider yourself expert?
8      A.   I am an expert in areas of
9  post-marketing drug safety.  I am an
10 expert in areas of interaction between
11 the reviewing divisions, the preapproval
12 side of FDA and the postapproval side of
13 FDA.  I'm an expert on the culture of
14 FDA, on the ways that science is used
15 within FDA for -- as it relates to drug
16 safety in particular, but also as it
17 relates to efficacy.  I'm an expert in
18 the personnel practices of FDA in the
19 ways that it treats its medical officers,
20 and there's probably a host of other
21 areas that relate to life working within
22 FDA that I've become expert in.
23      Q.   You're a lifer there?
24      A.   Thus far, yes.

Page 62

1      Q.   Let me -- do you have any
2   current intention of leaving the FDA?
3      A.   No, not unless I'm forced to
4   leave.  I love the work that I do.
5      Q.   Let me ask you some
6   questions about your public statements.
7          You testified before the
8   United States Senate, Senate Finance
9   Committee Hearing on drug safety and the
10  worldwide withdrawal of Merck & Company,
11  Inc. of Vioxx, November 18, '04; is that
12  correct?
13     A.   Yes.
14     Q.   You appeared on 60 Minutes
15  on February 16, '05; is that correct?
16     A.   Yes.
17     Q.   You appeared on February 17,
18  '05 before the joint meeting of the
19  Arthritis Advisory Committee of the Drug
20  Safety and Risk Management Advisory
21  Committee of the FDA; is that correct?
22     A.   Yes.
23     Q.   On the Today Show with Katie
24  Couric on December 21, '05 you were

Page 63

1   interviewed?
2      A.   Was it '05 or '04?
3      Q.   '04.  I'm sorry.  '04?
4      A.   Yes.
5      Q.   On Good Morning America with
6   Diane Sawyer on November 19, '04?
7      A.   Yes.
8      Q.   Did you appear on World News
9   Tonight with Peter Jennings on September
10  18 '04?
11     A.   I'm told that I did, but I
12  didn't see the show.
13     Q.   We have a tape.  I'm sure
14  that Merck does as well.
15         Did you also appear on ABC
16  Nightline with Ted Koppel on December 3,
17  '04?
18     A.   Yes, I did.
19     Q.   And in many other forums
20  relating to Vioxx, the withdrawal of
21  Vioxx; is that correct?
22     A.   Yes.
23     Q.   Do you believe Vioxx is an
24  unsafe drug, sir?

Page 64

1      A.   Yes I, do.
2      Q.   Do you believe that Merck
3   was correct in taking it off the market?
4      A.   Yes.
5      Q.   Should it ever have been on
6   the market in the first place?
7      A.   It is my professional
8   opinion, based on the evidence that I've
9   looked at, that Vioxx should not have
10  been approved at the time that it was
11  approved, that there were substantial
12  areas of concern relating to
13  cardiovascular safety that should have
14  been explored more fully and more
15  thoroughly prior to consideration of an
16  approval.
17         MR. BECK:  At this point I
18         would interpose an objection on
19         the ground that this is beyond
20         public statements that Dr. Graham
21         has previously made.
22  BY MR. KLINE:
23     Q.   The statements that you --
24  the statement that you just made, sir, is

Page 65

1   that something that in one way, shape or
2   form you have said in some public forum?
3      A.   Yes.
4      Q.   Is there anything new in
5   what you just expressed to the jury that
6   in your professional opinion Vioxx should
7   not have been approved at the time it was
8   approved and that there were substantial
9   areas of concern relating to
10  cardiovascular safety and should have
11  been more fully explored, anything new
12  there?
13     A.   No.
14     Q.   Okay.
15         Let's talk about the FDA
16  itself, area number two.
17         The FDA -- sir, on November
18  18, '04, before the United States
19  Congress you said, "The FDA culture uses
20  the pharmaceutical industry as its
21  client.  It overvalues the benefits of
22  the drugs it approves and seriously
23  undervalues, disregards and disrespects
24  drug safety."  Is that a view that you

Page 66

1   stated before United States Senators
2   appearing in the Senate finance room?
3       A.   Yes.
4       Q.   Is that an opinion that you
5   still hold today?
6       A.   More strongly now than then.
7       Q.   Tell the members of the jury
8   why.
9       A.   Why what?
10      Q.   Why you believe it.  What is
11  the basis -- thank you for helping me.
12           What is the basis of that
13  opinion and view?
14      A.   That --
15      Q.   That the FDA culture views
16  pharmacy -- the pharmaceutical industry
17  as its client and that it overvalues the
18  benefits of drugs it approves and
19  seriously undervalues, disregards and
20  disrespects drug safety.
21      A.   Right.
22      Q.   Why do you say that, sir?
23  What is your basis?
24      A.   In the course of my career,

Page 67

1   I have participated in countless internal
2   meetings with the portion of FDA that
3   reviews and approves new drugs where drug
4   safety questions that occurred either
5   premarketing or post-marketing were
6   brought up and many times were of a
7   serious nature.  And the virtually
8   uniform response was -- from these
9   divisions was to downplay or ignore the
10  work that we did and the statements that
11  we made.  This was confirmed quite
12  recently in a government accountability
13  office report.  The GAO issued a report
14  in which they found that the work product
15  of our office drops into, in quotes, a
16  black hole once we do our work.
17           Other evidence that I have
18  that led me to this point of view was a
19  previous office director of mine told me
20  and a colleague of mine when he was
21  trying to pressure us to change a
22  conclusion in a report that we had
23  written on another drug, not on Vioxx, he
24  told us that industry was our client.

Page 68

1   And he and I had a lively debate about
2   this.  And at the end we had to agree to
3   disagree.
4       Q.   From your observation -- do
5   you want to finish?
6       A.   I have another example that
7   I think is -- two examples that are very
8   telling.
9            One is that on September 11,
10  2003, our center director, a Dr. Steven
11  Galson, came to an all-hands meeting of
12  the Office of Drug Safety.  So, this is a
13  meeting that has about 50 members of our
14  office in attendance.  At that meeting,
15  he told us that we, our office, needed to
16  find a way to add value to the center
17  because what we were doing was not adding
18  value to the center.  So, my
19  interpretation of that was was that from
20  the point of view of center management,
21  they don't value the work that's done in
22  the Office of Drug Safety.
23           The final piece of evidence
24  was a CDER grand rounds that was held, I

Page 69

1   believe, on February 9, 2004 or 2005, but
2   I have the notes from the meeting.  And
3   they were talking about FDA and industry.
4   And we were told by a senior FDA official
5   that industry is our primary customer.
6   Of course, the American public is also
7   our customer, but the customer we really
8   have to worry about is industry.
9       Q.   Sir, from what you've
10  observed while you, from what I heard you
11  say, disagree with the concept that
12  industry should be the client, is that
13  indeed the way the FDA perceives it, that
14  industry is the client?
15      A.   Yes.  FDA perceives industry
16  as its client as customer number one.  It
17  is a point of view that I completely and
18  totally disagree with.
19           This is a very interesting
20  point to note.  Dr. Peter Honig, who is
21  now a senior vice president at Merck, was
22  formerly our office director.  He was the
23  one who promoted me to associate director
24  for science in the office.  When he was

Page 70

1  leaving to go to Merck, when he was
2  leaving FDA to go to Merck, we had a
3  farewell luncheon.  At the farewell
4  luncheon, he mentioned to us that it was
5  so refreshing to work with people in the
6  Office of Drug Safety who actually
7  believed in their mission of helping the
8  public and that this was so very
9  different from what he had experienced in
10  the Office of New Drugs.
11     Q.   Is it your mission, sir, to
12  help the public?  Is that your view of
13  it?
14     A.   Yes.
15     Q.   Pure and simple?
16     A.   Pure and simple.
17     Q.   Straight up?
18     A.   We have no other reason for
19  existence.
20        MR. BECK:  Objection to
21  form.
22  BY MR. KLINE:
23     Q.   Okay.
24        Now, let me discuss a number

Page 71

1  of things.  Let's step back before we
2  move forward.
3        Some folks who watch this
4  videotape will be initiated, some will
5  not be, as to the structure of the FDA.
6  I want to keep it simple.
7        First of all, there is
8  something that you've referred to already
9  as CDER.  I'm going to do some very
10  basics, but I'm going to try to do it
11  efficiently and quickly so we don't take
12  up a lot of time.  CDER.  What does CDER
13  stand for?
14     A.   Center for Drug Evaluation
15  and Research.
16     Q.   Now, the Center for Drug
17  Evaluation and Research, do you work,
18  broadly speaking, under that umbrella in
19  CDER?
20     A.   Yes, I do.
21     Q.   Does CDER have various
22  divisions and compartmentalizations?
23     A.   Yes, it does.
24     Q.   Is there an elaborate

Page 72

1  organizational chart for CEDR and for the
2  FDA as a whole?
3     A.   Yes.  And it's available on
4  the web.
5     Q.   Now, CDER, is one division
6  of CDER the Office of New Drugs, OND?
7     A.   Yes.
8     Q.   And tell the listener, the
9  member of the jury, what OND stands for.
10     A.   OND stands for the Office of
11  New Drugs.
12     Q.   Now, is the Office of New
13  Drugs -- what is the job of the Office of
14  New Drugs?
15     A.   The Office of New Drugs
16  reviews drug applications when a drug
17  company wants to have a drug approved.
18  The Office of New Drugs reviews those
19  applications, decides whether or not the
20  drug should be approved in the United
21  States, and once a drug is approved,
22  continues to regulate that drug after
23  it's on the market.
24     Q.   In terms of how the FDA and

Page 73

1  CDER values OND, tell the members of the
2  jury how OND is valued.
3     A.   OND is highly valued within
4  the Center for Drug Evaluation and
5  Research.  OND has traditionally had far
6  larger budgets for travel and training of
7  its scientific staff and for the purchase
8  of office equipment and supplies.
9     Q.   OND, sir, is that the group
10  that approves drugs in terms of their
11  efficacy, we'll get to benefit, in terms
12  of whether they are effective?
13     A.   Yes.
14     Q.   Can Americans be confident
15  that drugs that are on the market by and
16  large are effective in terms of the way
17  that they're approved?  For example, if a
18  drug is a blood pressure drug, can we be
19  confident that that drug will lower your
20  blood pressure?
21     A.   I think, in general, we can
22  be.
23     Q.   Is there an emphasis on that
24  aspect of approval by office of new drug?

19 (Pages 70 to 73)

Page 74

1      A.  Yes.  Clinical trials are
2   designed primarily to show the efficacy
3   of a drug.  They're not designed to show
4   the safety of a drug.  And when FDA does
5   its reviews, it spends most of its time
6   reviewing the efficacy.  And that's where
7   the largest teams of individuals are
8   gathered to examine the new drug
9   application.
10     Q.  Budgeting, sir.  Before we
11  get to budgeting, let's look at the other
12  side.
13         Is there this group called
14  Office of Drug Safety?
15     A.  Yes.
16     Q.  Is it -- in any way, shape
17  or form is it the size of, the shape of
18  or funded like the Office of New Drugs?
19     A.  No, in terms of funding for
20  the individual staff.  It has funding for
21  sort of obligatory FDA operations such as
22  its adverse event reporting system.  And
23  so if you were to look at budgetary
24  allocations for our office, you'll see

Page 75

1   large chunks of money going to these
2   various operations, but they are FDA
3   operations that FDA is obligated to
4   maintain.  They happen to be housed in
5   the Office of Drug Safety.  The actual
6   budget for the Office of Drug Safety for,
7   say, travel and training, its operating
8   budget, is small.
9      Q.  And in terms of overall,
10  what is the emphasis in the FDA and in
11  CDER, as you've described it, in terms of
12  development and approval of drugs versus
13  drug safety?
14     A.  The primary function of CDER
15  is to move the freight, that is, to
16  review and approve new drugs as quickly
17  as possible and to as large a number as
18  possible.
19     Q.  Is the Office of Drug
20  Safety, in your view, either under -- I
21  was going to say undermanned, but it
22  would be underpersoned or understaffed or
23  underfunded in terms of being able to
24  adequately assess drug safety?

Page 76

1          MR. BECK:  Objection to
2      form.
3   BY MR. KLINE:
4      Q.  You may answer.
5      A.  It is my opinion that the
6   Office of Drug Safety is tremendously
7   understaffed and underfunded.
8      Q.  Does the Office of Drug
9   Safety even come into play with a drug
10  until a drug is actually marketed and on
11  the market and already approved?
12     A.  In general, no, but there is
13  a recent development of asking drug --
14     Q.  How about -- if I may
15  interrupt you.
16         How about at the time in
17  2004?
18     A.  In 2004, what I was about to
19  say was still in play.  Companies are
20  being increasingly asked to develop what
21  are called risk management plans at the
22  time of approval that might relate to
23  areas of concern that the reviewing
24  divisions have, the OND has, about a drug

Page 77

1   product.  And the Office of Drug Safety
2   is asked to comment on those risk
3   management plans because they will be, in
4   effect, post-marketing.
5      Q.  Was that true in 1999, when
6   Vioxx was approved?
7      A.  No, it was not.
8      Q.  Was that a deficiency, sir?
9          MR. BECK:  Object to form.
10         THE WITNESS:  That's a
11     difficult question for me to
12     answer.  If you believe that risk
13     management plans have efficacy,
14     that they work, then, yes, it's a
15     deficiency.  It is my own view,
16     however, that risk management as
17     practiced by FDA has been a
18     mechanism to keep unsafe drugs on
19     the market, rather than dealing
20     with them head on.
21  BY MR. KLINE:
22     Q.  Let me ask you, have we
23  given --
24         From what you've heard, my

20 (Pages 74 to 77)

Page 78

1  questions and your answers, would a
2  layperson have an understanding of the
3  overall mechanism of the FDA, CDER and
4  then the Office of New Drugs and Office
5  of Drug Safety and where they fit in?
6  Would there be something to add here so
7  that we understood it any better in broad
8  brush terms?
9         MR. BECK: Object to form.
10        THE WITNESS: I think --
11  BY MR. KLINE:
12     Q.   Go ahead, sir.
13     A.   I think it would be
14  important for people to understand that
15  in addition to the Office of New Drugs,
16  there are a number of other offices
17  within CDER whose purpose is to actually
18  assist in the review and approval of new
19  drugs. So, you have the Office of New
20  Drugs, and that may have 7 or 800 people,
21  but you have these other offices, as
22  well, whose primary function is to work
23  on the premarketing, the preapproval side
24  of FDA's house, and without them, the

Page 79

1  drug couldn't be approved. And when you
2  take those all together, you end up with
3  like about 13 or 1400 people whose focus
4  is getting drugs on the market; if you
5  compare that to the Office of Drug
6  Safety, where we have maybe in the
7  neighborhood of 100 or 110 people
8  responsible for the safety and monitoring
9  of the safety of all drug products in the
10  country.
11     Q.   What you're saying it's
12  lopsided?
13     A.   Yes.
14        MR. BECK: I'm sorry, I
15     couldn't hear the question.
16  BY MR. KLINE:
17     Q.   I said, what you're saying
18  is that it is lopsided?
19        MR. BECK: I object to the
20     form.
21  BY MR. KLINE:
22     Q.   Is it lopsided, sir?
23        MR. BECK: I object to the
24     form.

Page 80

1  BY MR. KLINE:
2     Q.   Please.
3     A.   Yes, it is lopsided.
4     Q.   Now, in addition, sir, and
5  I'm going to mark -- let me ask you this.
6        You've given a number of
7  public --
8        How many drugs is the FDA
9  responsible for, sir, which would
10  translate into this staff of 110 safety
11  officers?
12     A.   I think there's somewhere --
13  I'm not an expert on this, but I have
14  read and heard numbers such as 6,000
15  marketed drug products, 10,000 marketed
16  drug products. There's thousands of
17  drugs out there. Not all of them are,
18  you know, widely used.
19     Q.   I've seen in a public
20  statement of yours that roughly says that
21  only five percent of the FDA's funding
22  goes into the Office of Drug Safety. Is
23  that what you've said?
24     A.   Yes.

Page 81

1     Q.   And is that correct?
2     A.   That's what it has been in
3  the past based on numbers that were
4  obtained from the web.
5     Q.   And that would also include
6  all of the funding for adverse reaction
7  reports as well?
8     A.   There you've got me. I
9  don't recall.
10     Q.   Let me ask you some more
11  questions about the FDA.
12        A common perception is that
13  the FDA has laboratories and test tubes,
14  and there are scientists there who test
15  the various drugs before they go on the
16  market. Is that correct?
17        MR. BECK: Object to form.
18  BY MR. KLINE:
19     Q.   Answer the question and then
20  I'll do a rephrased question to make sure
21  I have a correct record.
22     A.   FDA has a very small
23  laboratory research capacity and does not
24  test new drugs in patients, will

Page 82

1  occasionally do some animal testing, but
2  it is for very selective drugs, for very
3  selective issues. So, in general, I
4  think that would be a misperception on
5  the part of the public.
6      Q.  Is animal testing and other
7  kind of pharmacologic testing the
8  exception or the rule for drugs in OND?
9      A.  It is -- well, within OND,
10  it doesn't happen at all because the
11  Office of New Drugs' sole purpose is
12  relating to the development and review of
13  new drug applications. Where any sort of
14  laboratory testing might occur would be
15  in some of these other components within
16  CDER. And in that case there, it would
17  be the exception and not the rule.
18      Q.  What does OND largely rely
19  upon in approval of drugs?
20      A.  It relies on documents
21  supplied to it by a drug company seeking
22  approval of its drug.
23      Q.  Only as good as the
24  information provided?

Page 83

1          MR. BECK: Object to form.
2          THE WITNESS: Correct.
3  BY MR. KLINE:
4      Q.  Is the information
5  largely --
6          In fact, is the information
7  exclusively by and large and as the rule,
8  not the exception, information that comes
9  from the drug company?
10          MR. BECK: Object to form.
11  BY MR. KLINE:
12      Q.  You can answer.
13      A.  Yes. The information that
14  FDA scientists base their reviews and
15  decisions about approval on are based on
16  information supplied to it by the
17  pharmaceutical industry in an official
18  submission. FDA scientists do not
19  themselves do independent studies or
20  independent work relating to the approval
21  of those drugs.
22      Q.  What has been the problems,
23  if any, with that kind of system and
24  situation?

Page 84

1      A.  You're dependent on the
2  honesty, integrity and truthfulness of
3  the drug company, that it will provide
4  you with all information, that
5  information which helps their cause in
6  getting their drug approved, information
7  that may call into question the
8  effectiveness, the efficacy or the safety
9  of their drug. But it's based on trust
10  and -- it's based on trust.
11      Q.  Is that trust on some
12  occasions violated?
13      A.  That's an area that I'm
14  probably not really competent to talk
15  about in sort of anything in any direct
16  detail because my experience is really
17  post-marketing. I have heard examples
18  and rumors and the like, but it's not
19  something that I'm really expert in.
20      Q.  You have said publicly in
21  statements that there is an institutional
22  bias in the FDA which prevents the FDA
23  from protecting Americans against unsafe
24  drugs. Do you recall saying that?

Page 85

1      A.  Yes, I do.
2      Q.  Is that a correct statement?
3      A.  Yes.
4      Q.  Tell the members of the jury
5  what the basis is for that statement.
6      A.  Well, all you have to do
7  sort of to see it crystal clear is to
8  look at the drugs that have come off the
9  market. These are drugs where FDA
10  approved them, and by approving them said
11  the drugs were safe and effective, and
12  then at some later date they come off the
13  market because, a-ha, they're not safe or
14  they are not as safe as we thought they
15  were. If we examine how long it takes
16  from when the signal of the problem
17  emerges to when the drug comes off the
18  market, you will see that that is
19  measured in years, sometimes in decades.
20          With phenylpropanolamine,
21  PPA, a drug product present in virtually
22  every cough/cold preparation in the
23  country, it was in over-the-counter diet
24  aids to help people lose weight, was

Page 86

1  associated with hemorrhagic stroke
2  primarily in young women, and this was
3  known since 1984. However, it wasn't
4  until about 2000 or 2001 that FDA finally
5  removed that product from the market. In
6  the meantime, the company that made PPA
7  or the companies that made PPA continued
8  to make profits, and patients continued
9  to be harmed.
10     Q.   I want to just provide a
11  schematic of the FDA insofar as where the
12  Office of Drug Safety fits in that you
13  actually presented in a PowerPoint
14  presentation. There was a PowerPoint
15  presentation that you apparently gave.
16  You gave many public PowerPoint
17  presentations, correct?
18     A.   Yes.
19         MR. KLINE:  Don't put it up
20  yet.
21  BY MR. KLINE:
22     Q.   One of the PowerPoint
23  presentations that you gave was at Johns
24  Hopkins, your alma mater?

Page 87

1     A.   Correct.
2     Q.   And I have in your
3  curriculum vitae June 4, 2005.
4     A.   Yes.
5     Q.   What was the occasion
6  briefly?
7     A.   It was -- there's a
8  biannual, so, every other year, meeting
9  of the medical school alumni, and they
10  celebrate the reunions of particular
11  classes that sort of end in fives or
12  zeros. And this was the 25th reunion for
13  my medical school class, and I was one of
14  four invited speakers to speak that day
15  in scientific session.
16     Q.   What you told them from what
17  I've seen from other PowerPoints was
18  essentially a compilation of things that
19  you had previously told others in other
20  places and other times? You used some of
21  the same slides?
22         MR. BECK:  Object to form.
23         THE WITNESS:  Yes. That is
24  correct.

Page 88

1  BY MR. KLINE:
2     Q.   I'll rephrase the question.
3         Was the PowerPoint you
4  presented similar or different from
5  PowerPoints that you had presented to
6  other professional organizations, Dr.
7  Graham?
8     A.   Very similar.
9     Q.   And the one thing that you
10  did, and I'll provide a copy of it --
11         MR. KLINE:  Do you need
12  these, Mr. Beck?  Do you want one
13  from me?  I know I provided them
14  to you.
15         MR. BECK:  Could you please
16  give me a copy.
17         MR. KLINE:  If I do, I'll
18  tell you in advance. I have them
19  numbered on the bottom with our
20  Bates Numbers so you'll be able to
21  follow along easier.
22         MR. BECK:  If you can supply
23  me a copy of these as the
24  numbers --

Page 89

1         MR. KLINE:  I'll be pleased
2  to supply a copy of everything
3  that I do so that it makes it easy
4  for you.
5         Here it goes.  We're giving
6  you Exhibit Number 2 which I'm
7  going to ask the doctor to
8  identify, but I assume he's going
9  to tell me this is the PowerPoint
10  that he gave at Hopkins.
11              - - -
12         (Whereupon, Deposition
13  Exhibit Graham-2, "Drug Safety in
14  America: A Nation Still at Risk,"
15  (Graham) Power Point Slides,
16  DG000035 - DG000061, was marked
17  for identification.)
18              - - -
19  BY MR. KLINE:
20     Q.   Can we identify Exhibit 2,
21  please, sir?
22     A.   Yes. This is a copy of my
23  PowerPoint presentation.
24     Q.   And for Mr. Beck's help, the

23 (Pages 86 to 89)

Page 90

1  bottom right-hand corner has numbers, and
2  that's what I'll refer to when I put up
3  any one of the slides.
4       MR. KLINE: I hope that will
5  help you, Phil.
6       MR. BECK: And this is a
7  document that, as I understand it,
8  was not produced pursuant to
9  plaintiffs' subpoena, but was
10 turned over by Dr. Graham's
11 private lawyers last week in
12 response to an oral request for
13 further documents by plaintiffs.
14 I understand that the numbers that
15 you're referring to on the bottom
16 right are numbers that were put on
17 there by plaintiffs' lawyers.
18 This is one of the documents that
19 I've previously indicated we would
20 object to any questions about
21 since they weren't produced to us
22 in a timely way.
23       MR. KLINE: There are a
24 series of these documents. We

Page 91

1  intend to use them today. They
2  were not covered by the subpoena.
3  We can argue about that at some
4  later date. We asked for
5  documents late last week. We
6  turned them over immediately when
7  we got them. Merck has had them
8  as long as we've had them, and I
9  intend to examine on them. Here
10 goes.
11 BY MR. KLINE:
12      Q.   This was definitely -- I
13 want to meet Judge Fallon's order.
14      This was definitely a public
15 forum in which you presented this,
16 correct?
17      A.   That is correct.
18      Q.   Now, all I want to do for
19 now is to focus everyone where we are.
20 We are on the structure of the FDA and
21 the problems within the structure. Are
22 you with me?
23      A.   Uh-huh.
24      Q.   And I want to go to the

Page 92

1  chart which we've labeled -- we've taken
2  the liberty of putting some numbers on
3  the bottom to help. And number 40 is an
4  organizational chart. And if we can
5  highlight in the middle, there's an
6  island in the middle. That's the Office
7  of Drug Safety, correct?
8       A.   Correct.
9       Q.   What was the point that you
10 were making to your fellow physicians and
11 colleagues on that day that you would
12 make here upon my request?
13      A.   Everything else that is
14 circled on that organizational chart
15 plays some role in the preapproval
16 activities of the Center For Drug
17 Evaluation. And what I was trying to
18 show is that the Office of Drug Safety is
19 this tiny little group that's being
20 swallowed by an amoeba, and so it's kind
21 of a medical joke that this big sprawling
22 mass is engulfing the Office of Drug
23 Safety, eating it up.
24      Q.   When you call it a, quote,

Page 93

1  medical joke, were you trying to make a
2  point?
3       A.   Yes.
4       Q.   And the point was?
5       A.   And the point is that the
6  Office of Drug Safety has little in the
7  way of resources, little in the -- no
8  authority and really no weight or respect
9  within the Center For Drug Evaluation,
10 that in essence, drug safety is
11 dominated -- the Center For Drug
12 Evaluation for research is dominated by
13 the mindset of review and approve new
14 drugs. Safety is an afterthought.
15      Q.   How long have you observed
16 that? How long has that been your
17 observation?
18      A.   Well, I observed it even
19 during my fellowship training, but it has
20 accelerated in terms of how forcefully
21 it's pursued and enforced by OND
22 management, CDER management, since the
23 introduction of the Prescription Drug
24 User Fee Act in 1992, and that is

24 (Pages 90 to 93)

Page 94

1  referred to as PDUFA. And it's by that
2  means -- Congress passed a law that was
3  specifically designed to speed up the
4  review times of drugs that FDA was asked
5  to look at by drug companies. In return,
6  drug companies would pay money to FDA so
7  that FDA could hire more staff. And so
8  we now have a situation where more than
9  50 percent of the Center For Drug
10 Evaluation's budget comes from monies
11 paid to it by regulated industry.
12      Q.   What you're saying is that
13 the FDA -- are you saying that the FDA is
14 not funded by the citizens of the United
15 States of America?
16      A.   I'm saying --
17      MR. BECK: Objection to
18 form.
19      THE WITNESS: I am saying
20      that the majority of funding for
21      the Center for Drug Evaluation and
22      Research comes from industry, not
23      from tax dollars.
24 BY MR. KLINE:

Page 95

1      Q.   Is that, to your
2  understanding, a well-known fact, sir,
3  outside of the pharmaceutical industry?
4      MR. BECK: Object to form.
5      THE WITNESS: I suspect that
6      the public doesn't appreciate
7      who's paying the bills at FDA.
8  BY MR. KLINE:
9      Q.   What is the impact on that,
10 sir? What is the impact of 50 percent of
11 the budget coming under this PDUFA act,
12 which is the physician user --
13      A.   Prescription Drug User Fee
14 Act.
15      Q.   Prescription Drug User Fee
16 Act. 199 --
17      A.   2.
18      Q.   1992?
19      A.   It's been renewed, I think
20 we're on our third renewal, and they're
21 feverishly working to get the fourth
22 renewal. The impact of this in my own
23 experience has been that the preapproval
24 people look for reasons to say yes to a

Page 96

1  drug. So, I've been in internal meetings
2  where a drug company wanted an approval
3  for a drug maybe for six different
4  indications. So, those would be things
5  that the drug could be officially
6  promoted for to treat conditions for.
7  And the reviewing division medical
8  officers say this drug shouldn't be
9  approved at all, and then the pressure
10 will be put on the medical officer to
11 say, well, can't we approve it for just
12 one indication, just one indication, a
13 narrow indication. Because all they want
14 to do is to be able to say yes.
15      I've been at other meetings
16 where when safety concerns were expressed
17 and people from our office raised the
18 question of having things put into the
19 label that the FDA people in the Office
20 of New Drugs who have the final
21 authority, they approve the drug and they
22 have the authority to say what happens
23 after the drug is on the market, that
24 they have said we can't do that because

Page 97

1  the drug companies won't go along with it
2  or that will hurt the drug company's
3  profits.
4      These are remarks that have
5  been passed in internal meetings that I
6  have been present at. And other
7  colleagues of mine have had similar
8  experiences. And since I have gone
9  public with my Senate testimony, I have
10 been approached now by probably 10 or 15
11 medical reviewers from different
12 components of CDER with stories of being
13 pressured to change their reviews where
14 they thought a drug should not be
15 approved, but where management was
16 telling them you must now say yes to that
17 drug.
18      There was actually in The
19 Wall Street Journal just last week or the
20 week before an example of this with an
21 antibiotic called Ketek. And in that
22 article, it describes a situation where a
23 clinical trial that FDA knew was
24 fraudulent and that the company knew was

Page 98

```
1    fraudulent, FDA, it appears, based on
2    that newspaper article, accepted that
3    clinical trial and based its approval on
4    that trial and even cited it in a public
5    health announcement when recently three
6    cases of liver failure with this drug
7    were published in the medical literature,
8    and FDA issued a public health
9    announcement to say to the public, don't
10   worry, the drug is safe, look, we have
11   this clinical trial that shows us it's
12   safe even though FDA knew that that study
13   was fraudulent.
14       Q.   An example is what you've
15   just given us?
16       A.   Yes.
17       MR. KLINE:  For those folks
18   who are on the phone, we're going
19   to have to cut you off unless you
20   put your phones on mute.  I
21   repeat.  We're going to cut you
22   off unless you put your phones on
23   mute, period.
24       Can we go off the record for
```

Page 99

```
1    one minute.
2        THE VIDEOTAPE TECHNICIAN:
3    Stand by, please, 10:22.  Off the
4    record.
5            - - -
6        (Whereupon, a recess was
7    taken from 10:22 a.m. until 10:24
8    a.m.)
9            - - -
10       THE VIDEOTAPE TECHNICIAN:
11   Video time is 10:24.  We're back
12   on the record.
13   BY MR. KLINE:
14       Q.   All right.  Now, I want to
15   talk about -- I want to talk a minute
16   about industry's role, sir, the
17   pharmaceutical industry's role.
18       You mentioned one particular
19   fraudulent study.  When that kind of
20   thing occurs or when data is not provided
21   by a particular sponsor of a drug or
22   those kinds of things occur, are you
23   suggesting -- you're not suggesting that
24   that exonerates the pharmaceutical
```

Page 100

```
1    company itself who is furnishing the
2    data, are you?
3        A.   No.
4        MR. BECK:  Objection to the
5    form.
6    BY MR. KLINE:
7        Q.   Let me rephrase.
8        The kinds of problems that
9    you've identified, sir, what is the
10   pharmaceutical company, the sponsor's
11   responsibility under that particular
12   circumstance?
13       A.   They have -- the company has
14   a responsibility to supply all data in a
15   truthful manner, accurate and full, and
16   if they're aware of fraud or they're
17   aware of problems within their studies,
18   to fully disclose those.
19       Q.   Now, I'd like to move into a
20   couple of more FDA issues and cover FDA
21   in more detail.
22       You have said in public that
23   that there is an institutionalized bias
24   in the FDA.  Would you please -- and
```

Page 101

```
1    you've gone further to say in many forums
2    that there are structural, cultural,
3    scientific and personnel issues.  Would
4    you please -- and in particular, that
5    happens to be one of many places, on Page
6    38 of the PowerPoint you presented at
7    Hopkins.
8        A.   Right.
9        MR. KLINE:  I do not need it
10   up.
11       THE WITNESS:  Okay.  The --
12   BY MR. KLINE:
13       Q.   Would you explain to the
14   members of the jury what you mean when
15   you say there's an institutional bias at
16   the FDA?
17       MR. KELL:  Objection.  Any
18   specifics that the doctor might
19   give that would identify persons,
20   products, discussions within FDA
21   would violate his duty, in our
22   view, to maintain such information
23   on a confidential basis and the
24   deliberative process privilege.
```

Page 102

1      · That's my objection.
2    BY MR. KLINE:
3      Q.   My goal, sir, is to have you
4    in some broad --
5      A.   I can talk in general terms.
6      Q.   -- overarching terms
7    explain to us the structural, cultural,
8    scientific and personnel issues which
9    lead to an institutional bias at the FDA,
10   please, sir.
11     A.   Right. The structural
12   issues are to some extent illustrated by
13   that amoeba graph that I showed where you
14   have this inequality of resources within
15   the center. You also have sort of this
16   conflict of interest that the Office of
17   New Drugs that is responsible for
18   approving the drug also subsequently has
19   responsibility for, in a sense,
20   correcting its past mistakes, if you
21   will. That a drug safety emerges
22   post-marketing, a drug is found to be
23   unsafe, and the people who approve the
24   drug are the ones who have to make the

Page 103

1    decision to do something about that. And
2    that is a conflict of interest I maintain
3    that explains much of the structural
4    bias. Because when a drug gets approved,
5    it's not just that an FDA medical officer
6    sees this pile of data that a drug
7    company gives it for the first time.
8    Usually a medical officer and a reviewing
9    division has worked with a drug company
10   for a number of years helping the company
11   to design the clinical trials that FDA
12   will subsequently come to review. And so
13   by the time a drug gets to the approval
14   stage, the FDA people who have been
15   involved in the Office of New Drugs have
16   invested a fair amount of intellectual
17   capital in it, and it's not uncommon to
18   have medical officers refer to drugs that
19   are approved as their drugs. They take
20   pride in the work that they've done in
21   bringing a drug to the public. They're
22   not making profit from it the way a drug
23   company is, but they consider it their
24   drug because of the work that they've put

Page 104

1    into it.
2           Now a problem crops up with
3    their drug. They've signed their name on
4    the line, this drug is safe and
5    effective. It's gone to the division
6    director. It's gone to the office
7    director. It's gone to the super office
8    director. It's gone to the Center
9    director. They all have signed on it
10   saying this drug is safe and effective.
11   And now you come up with this problem
12   that says, no, it isn't.
13          And then what happens? What
14   happens is delay. Delay, delay, delay.
15   And as a result -- you can see it. You
16   can see it with rofecoxib, with Vioxx,
17   that we have the results of the VIGOR
18   study showing a five-fold increased risk
19   of heart attack with Vioxx compared to
20   naproxen at the high dose, and it takes
21   almost two years for FDA to come up with
22   the label, a label, by the way, that in
23   my estimation, accomplished nothing of
24   utility to the public health.

Page 105

1           Why a two-year delay? The
2    FDA was able to come up with a public
3    health announcement within a week of the
4    article appearing in the Annals of
5    Internal Medicine about liver failure
6    with Ketek. So, if FDA can act that fast
7    on three cases of liver failure, why do
8    they have to take two years in reacting
9    to something as important as heart attack
10   with Vioxx. And my answer is, it comes
11   down to this conflict of interest in
12   structural issues.
13          There's also the cultural
14   issues.
15     Q.   Before you go to the
16   cultural issue, let's stick with the
17   structural issue. I'm going to do all
18   four.
19          On the structural issue,
20   let's pick up a couple points and move on
21   to others. We've got a lot of things to
22   cover now in about an hour and a quarter,
23   and I want to do the Vioxx story and the
24   Kaiser story as well, so, we've got to

Page 106

1  move quickly.
2         But on this, you mentioned
3  that the label didn't make a difference.
4  My question about the label is, is the
5  label something that the FDA tells the
6  drug company to do or is it something
7  else?
8     A.   Well, the FDA press office
9  recently made a statement that they have
10 the authority to force label changes, but
11 they prefer to negotiate with the
12 company.  My experience has been that, at
13 least since PDUFA, FDA does not impose
14 label changes on the company.
15 Basically -- well, let's give a typical
16 example.  We have a drug, we know it
17 causes a problem.  We have a meeting, a
18 premeeting of the OND people, the drug
19 safety people, we're talking about a
20 post-marketing safety issue, and we've
21 decided we're going to insist that this
22 problem belongs in the warnings on the
23 label.  We go in then, we have a meeting
24 with the company, and you come out with

Page 107

1  it's not in the warnings, it might not be
2  in the precautions.  It gets worked down
3  because the FDA capitulates.
4     Q.   Why is it important to the
5  drug companies not to warn about risks?
6  You'd think they would want to warn about
7  risks if there was any chance that there
8  was a risk?
9     A.   Well --
10       MR. BECK:  Object to form.
11 BY MR. KLINE:
12    Q.   Why do they not warn about
13 the risks?
14    A.   Companies, I believe,
15 have -- resist having safety issues
16 highlighted in the warnings because it
17 raises them to sort of a level of
18 significance in terms of importance in
19 the minds of physicians and patients.  It
20 could be used for -- as a competitive
21 advantage from a competitor marketing the
22 same product.  And if it has a box around
23 the warning, my understanding is that
24 that imposes then additional restraints

Page 108

1  on the company as to how they can go
2  about marketing the drug product to
3  consumers and also how it gets marketed
4  and detailed to physicians.  So, the
5  boxed warning sort of has the -- I think
6  the greatest potential impact on a drug
7  product in terms of how a company can go
8  about marketing it.
9     Q.   Is that something -- are you
10 saying that that's something that the
11 drug company would want to avoid for
12 financial reasons?
13    A.   Yes.
14       MR. BECK:  Object to form.
15 BY MR. KLINE:
16    Q.   Why would a drug company
17 want to avoid that kind of thing?
18    A.   A company would want to
19 avoid a boxed warning because it will
20 make it more difficult to market the
21 drug, it could interfere with the
22 profitability of the product.  It could
23 give their competitors a marketing
24 advantage, and it could call into

Page 109

1  question the safety of their product and
2  then perhaps give physicians or patients
3  pause to reconsider whether they want to
4  take that particular drug if there are
5  others available that don't have such a
6  warning.
7     Q.   I want to pick up in more
8  capsuled form.  You've covered the
9  structural issues of the FDA to your
10 satisfaction; is that correct?
11    A.   Yes.
12    Q.   And, by the way, if there's
13 something simply as a precaution on a
14 drug, is that different in terms of how
15 you understand the financial impact on a
16 potential drug or a marketed drug than,
17 say, a black box warning?
18    A.   Very different.
19       MR. BECK:  Object to form.
20 BY MR. KLINE:
21    Q.   How is that?  Either a
22 regular warning or a plain warning or a
23 precaution rather than a black box
24 warning?

1    · A.   The others have no -- the
2  simple warning or precautions have no
3  consequence in terms of how a company can
4  go about marketing a product.
5    Q.   Is a precaution a lesser
6  thing than a warning?
7    A.   It was, but I believe FDA is
8  restructuring the label to have a section
9  now that will be called "warnings" and
10  "precautions."
11    Q.   Put aside the restructuring
12  and the new regulations.  How about back
13  in 2002?
14    A.   Precautions is a lower
15  level, a degree of information, of
16  warning than what was in the warning
17  statement.
18    Q.   Understood.
19      All right.  Now, cultural
20  issues, briefly.  A paragraph, not a
21  chapter.
22    A.   We've talked about it
23  before.  FDA views industry as its
24  primary customer, as its client.  And

1  this gets transmitted to the management.
2  That's how management gets selected, by
3  how well they get along with industry.
4  And it filters downhill.  And so as a
5  result, you have this organization that
6  seeks to work, in quotes, collegially,
7  with industry, we're going to partner
8  with industry.  These are phrases that
9  are frequently used within FDA to
10  describe the relationship that is desired
11  between the regulator and the regulated.
12    Q.   By the way, back to
13  structural issues.
14      Are there not these
15  independent Advisory Committees?  We know
16  you testified in front of an Advisory
17  Committee.  Are these truly independent
18  Advisory Committees?
19    A.   In my opinion, no.  These
20  Advisory Committees are part of the
21  structural problem.  They are selected
22  by -- the members of those committees are
23  generally selected by the division
24  directors within the Office of New Drugs,

1  whose drugs that committee will talk
2  about.  And so they pick people who they
3  know from the field and frequently can
4  talk with those people, will talk with
5  those people about upcoming Advisory
6  Committee meetings and the type of
7  direction that they wish that advisory
8  meeting to go in.
9      If you look at the Advisory
10  Committees in terms of their financial
11  attachments to industry, it's been in the
12  newspapers quite a bit that a third of
13  FDA committee members have financial ties
14  to industry, some large number.  And if
15  you were to look at the Advisory
16  Committee meeting from February of 2005
17  where we were talking about the
18  nonsteroidal pain relievers and the COX-2
19  drugs including Vioxx and Celebrex and
20  Bextra and the like --
21    Q.   Yes.
22    A.   -- the committee was asked
23  two questions.  It was asked one
24  question, should Vioxx be kept off the

1  market or allowed to remain on the
2  market?
3      And it was asked a second
4  question, should Bextra be allowed to
5  stay on the market or should it be
6  withdrawn from the market.
7      And I believe in this
8  handout, I have a slide that combines the
9  votes, it's number 42, that combines the
10  votes --
11    MR. KLINE:  We can put it
12  up.
13    THE WITNESS:  -- from these
14  committees based on whether the
15  members of the committee had a
16  financial tie with companies that
17  make COX-2 selective NSAIDs or
18  were working to develop COX-2
19  selective NSAIDs.
20      And what you find is that if
21  you're a committee member who had
22  such a financial tie, you were 13
23  times more likely to vote to keep
24  Vioxx or Bextra on the market than