Page 114

1  if you didn't.  And it's highly
2  statistically significant.  So,
3  the question is, well, are these
4  people being influenced -- you
5  know, is the financial tie causing
6  them to vote the way they vote.  I
7  can't answer that question.  But
8  what I can say is that the
9  financial ties, having that
10  financial relationship with the
11  company, is highly predictive of
12  how an individual will vote when
13  it comes to important decisions
14  such as should a drug stay on the
15  market or be removed from the
16  market.
17 BY MR. KLINE:
18     Q.   Let me move through -- you
19 believe you've covered -- I know we went
20 back to structural issues, and there are
21 many, as I think you're telling this
22 jury.
23     A.   Yes.
24     Q.   The Advisory Committee being

Page 115

1  part of it, is that correct?
2     A.   Correct.
3          MR. BECK:  Object to the
4  form.
5  BY MR. KLINE:
6     Q.   And now cultural issues,
7  sir.  Have we covered them?
8     A.   I think we've covered those
9  fairly well.
10     Q.   Is there a presumption that
11 a drug is safe until it is, as you say in
12 this public statement, proven guilty?
13     A.   Yes.  If you look at the way
14 that drug safety is evaluated in both
15 preapproval and postapproval, the --
16 what's called the null hypothesis, the
17 assumption is that the drug is safe.  And
18 then what is required is to have
19 overwhelming evidence that says, no, it's
20 not safe before you'll say that the drug
21 is not safe.  And this is done by using a
22 measure called the p-value, which is a
23 measure used by statisticians to talk
24 about how likely or unlikely something is

Page 116

1  to have occurred by chance.  And the
2  magic number is .05.  If something has a
3  5 percent or less chance of happening by
4  chance, that is, there's a 95 percent or
5  greater chance that it occurred because
6  of the study that you've done, that the
7  drug works or that it has safety, then
8  we'll believe it.  But if it's only -- if
9  you're only 90 percent sure, we're going
10 to say that the drug is safe.
11          So, for example, we can
12 have -- and we have examples of this in
13 actually the Vioxx NDA, in the new drug
14 application there, where the medical
15 officer saw evidence of increased
16 cardiovascular risk and said, but we
17 cannot be absolutely certain.  And so
18 it's because FDA insists on absolute
19 certainty about safety that it in my
20 estimation gives the companies a free
21 pass on safety.
22          Because no company -- here's
23 the situation.  If I'm going to get a
24 drug approved, well, the assumption that

Page 117

1  FDA makes is the drug doesn't work.  If
2  I'm a drug company, well, now I have an
3  incentive to do a really good study to
4  show FDA that the drug works.  So, the
5  incentives work in the right direction.
6  The company is going to try to do a
7  really good job to convince FDA to change
8  its mind about the drug because FDA
9  starts off saying the drug doesn't work.
10          On safety, it's just the
11 reverse.  The bigger and better a study
12 the company does, the more likely it's
13 going to find a problem.  And so
14 companies are actually rewarded for doing
15 small studies that aren't able to show a
16 problem because the assumption is that
17 the drug is safe.  And that is the way
18 FDA misuses statistics at FDA.
19          It could be analogized to
20 something called noninferiority trials.
21 Noninferiority trials are done in
22 situations where you have one drug and
23 what you want to do is you want to show
24 that it's no worse than another drug, but

30 (Pages 114 to 117)

Page 118

1  it can actually be a little bit worse.
2  It could be 20 percent worse than the
3  other drug, and even if it's 20 percent
4  worse, we'll call it the same.  Now, FDA
5  has recognized for a long time that the
6  incentives for such a study are in the
7  wrong direction, that is, they encourage
8  poorly done studies because they give an
9  overwhelming advantage to industry in
10  terms of getting a drug approved.  Well,
11  that's exactly what we have with safety.
12  It's a noninferiority study.  We're
13  assuming that the drug has no problem.
14  And until we can show beyond a shadow of
15  a doubt basically, you know, with 95
16  percent or greater confidence, that we're
17  going to pretend like it never happened.
18      Q.   You analogized this in front
19  of the United States Senate to bullets in
20  a gun.
21      A.   Yes.
22      Q.   Would you tell the members
23  of the jury the same thing so they have
24  the benefit.

Page 119

1      A.   Right.  I was trying to get
2  the Senators to understand the statistics
3  of the matter, and I gave the analogy of
4  a gun with 100 chambers.  And I said,
5  let's play Russian roulette.  Now, we're
6  going to put 95 bullets in the gun, so we
7  are 95 percent certain that this drug
8  causes whatever adverse reaction we're
9  talking about.  Let's just say this drug
10  causes liver failure.  This drug causes
11  heart attacks.  We're 95 percent certain.
12      Q.   That's the current test?
13      A.   Right.  So, we put 95
14  bullets in, and we play Russian roulette.
15  And at that point, the FDA says, we
16  believe you, the gun is loaded, the drug
17  isn't safe.  Let's take five bullets out
18  of the chamber.  Now we have 90 bullets
19  in the chamber.  So there's only 90
20  percent chance that when I pull the
21  trigger, a bullet is going to come out of
22  the gun.  FDA says the gun is not loaded.
23  That's the misuse of statistics.
24      Q.   How can that be?

Page 120

1      A.   It's a historical artifact,
2  but it is one that is embedded in the way
3  FDA does business.
4      Q.   How should it be, sir?
5      A.   My belief is that it is
6  possible to design studies in advance in
7  which you prespecify a level of risk that
8  you would be willing to tolerate for the
9  anticipated benefit of a drug, and then
10  you design your study large enough to
11  exclude risks greater than that maximum
12  tolerable risk.
13      Q.   I want to move on.  I want
14  to move very quickly because I have to
15  get through your Vioxx study, I have to
16  get through your Kaiser study -- your
17  Vioxx opinions and your Kaiser study.
18      MR. KLINE:  I do want to
19      show Exhibit Number 44, if I may.
20      And if we can put it up.  44 to
21      the PowerPoint.
22  BY MR. KLINE:
23      Q.   Now, I know, sir, this is a
24  cartoon, but you did this at a

Page 121

1  professional meeting, correct?
2      MR. BECK:  Excuse me a
3  second.  Is this a new exhibit?
4      MR. KLINE:  No.  It's part
5  of the same exhibit.
6      MR. BECK:  Page 44?
7      MR. KLINE:  Yes.
8      MR. BECK:  I'm sorry.
9      MR. KLINE:  Page 44.
10      MR. BECK:  I have the same
11  objection.
12      MR. KLINE:  Sure.
13  BY MR. KLINE:
14      Q.   It's a cartoon.  On the left
15  side it's side effects.  On the right
16  side it says the lifeguard is the FDA,
17  "Hey, how am I supposed to hear his
18  request for a new drug approval with all
19  your screaming?"  And the pharmaceutical
20  company is to the right.  Were you making
21  a point, sir?
22      A.   Yes, I was.
23      Q.   What was the point?  Were
24  you making a serious point?

Page 122

1      A.   I was making a very serious
2  point. This, in my view, crystallizes
3  the situation that we have in the United
4  States today and why I said that the
5  United States was defenseless against
6  another Vioxx.
7      Q.   Sir, did we cover the
8  scientific and personnel issues, or do we
9  still have to go --
10     A.   We covered the science. We
11 didn't cover personnel.
12     Q.   All right.
13          Before we get to personnel,
14 I want to show you another point that you
15 made in exhibit number 61 of the
16 PowerPoint that you showed to your
17 Hopkins medical colleagues.
18     MR. BECK:  Page 61?
19     MR. KLINE:  Page 61 of
20 Exhibit Number 2.
21     MR. BECK:  I assume that I
22 can have a continuing objection?
23 I don't need to --
24     MR. KLINE:  That was my

Page 123

1  point before we even got started,
2  that you don't even have to make
3  the objection under the rule of
4  Judge Fallon.
5  BY MR. KLINE:
6      Q.   Now, again, a cartoon, but
7  were you making a serious point to your
8  medical colleagues at that time and
9  place?
10     A.   Most definitely.
11     Q.   The cartoon shows a fox to
12 the right, and it shows the press corps
13 to the right and a lawyer, of all people,
14 apparently standing there. And the
15 cartoon says, "Those responsible for
16 putting my client in charge of the
17 henhouse should be on trial here, not my
18 client who, as a fox, was only doing his
19 job." Who is the fox in the cartoon as
20 you understood it?
21     A.   Is industry.
22     Q.   Pharmaceutical industry?
23     A.   Pharmaceutical industry.
24     Q.   What was the point, the

Page 124

1  serious point that you were making,
2  albeit in a humorous way? You apparently
3  have a good sense of humor.
4      A.   I was trying to convey the
5  message that FDA is not functioning in
6  the independent and objective interests
7  of what's best for the public, that it is
8  really functioning first and foremost for
9  a service of its primary customer and
10 client, the industry.
11     Q.   And of course the industry
12 is in the end of the day the one who is
13 promoting, manufacturing and profiting
14 from the drug, correct?
15     MR. BECK:  Object to form.
16 BY MR. KLINE:
17     Q.   Who is the one who is
18 profiting by the drug?
19     MR. BECK:  Same objection.
20     THE WITNESS:  The companies
21 who manufacture and market these
22 drugs are the ones who profit from
23 them.
24 BY MR. KLINE:

Page 125

1      Q.   Let's carry one more point
2  before we move out of this area, and
3  that's the scientific problems, I
4  believe, that you have. Scientific or
5  personnel issues?
6      A.   That's personnel.
7      Q.   What are the personnel
8  issues that lead to what you call an
9  institutional bias, sir?
10     A.   Within FDA, there have now
11 been at least four different surveys done
12 by various groups of the scientific
13 staff. There was a survey done by
14 something called the Health Research
15 Group, which is a watchdog group in 1990
16 to 1999 surveying medical officers within
17 the Center for Drug Evaluation and
18 Research. And what they learned was that
19 30 percent of the people who responded,
20 responded that they felt that they
21 couldn't express contrary scientific
22 opinions within FDA. Now, the response
23 rate for that survey was very low, so,
24 you could say, well, it's not

Page 126

1   representative.
2           The Center for Drug
3   Evaluation and Research then did its own
4   survey, and that survey also came back
5   with the figure of about 30 or 33 percent
6   saying that they feel they cannot express
7   contrary scientific opinions when
8   questions about drug approval and safety
9   *come up.*
10          Then the government
11  accountability office also did a survey
12  of medical -- well, scientific staff at
13  CDER, and it reported that 18 percent of
14  FDA scientists had reported that they had
15  been pressured by their supervisors to
16  change a recommendation from not approved
17  to approved. Now, when that became
18  public, like I think it was in 2004, a
19  public interest group called PEER brought
20  this to light, FDA's official response
21  was, we don't want to talk about the 18
22  percent that had this problem, let's talk
23  about the 82 percent that didn't have the
24  problem, that weren't suppressed.

Page 127

1           And my answer to that is, is
2   that there's lies, there's damned lies
3   and there's statistics. And this is an
4   example where I think that it's
5   manipulating statistics. Because most
6   drug approvals that FDA is faced with
7   today are for drugs that are called "me-
8   too" drugs. They're not the new
9   lifesaving drugs that everybody thinks
10  FDA is working on all the time. Most of
11  what FDA approves is routine stuff. It's
12  additional. It's saying, well, this drug
13  is already in the market, and we're going
14  to allow you now to market it for another
15  disorder. It's approved for sinus
16  infections. Now we're going to allow you
17  to market it for ear infections.
18          If you were to take out all
19  that stuff and just boil it down to the
20  new drugs where there's a safety concern,
21  that 18 percent would come up closer to
22  100 percent.
23          We then finally have --
24  recently FDA did a culture survey. They

Page 128

1   brought in an outside group to do an FDA
2   culture survey, and that survey found
3   that 30 percent of scientific staff felt
4   that they couldn't express altering
5   scientific views.
6           We also have the widely
7   publicized example of my colleague, Dr.
8   Andrew Mosholder at FDA, who was pretty
9   severely suppressed by both the Office of
10  New Drugs management and by management
11  within the Office of Drug Safety itself
12  who viewed their mission as doing what
13  Office of New Drugs told them to do. And
14  so Dr. Mosholder's report on suicidiality
15  with antidepressants in children was kept
16  from the public. He wasn't allowed to
17  speak in an open public Advisory
18  Committee meeting that was convened to
19  talk about that subject, and he was given
20  a script by my supervisors to read if
21  *anyone on the committee asked him why he*
22  wasn't presenting, a script that
23  basically tried to cover up the fact that
24  he was being suppressed.

Page 129

1           This is the environment, the
2   personnel environment that FDA medical
3   officers and scientists operate in, is
4   that if you buck the system, if you stand
5   *in the way of a drug approval or you*
6   threaten the marketability, the viability
7   of a drug, that you are severely,
8   severely reprimanded, pressured,
9   criticized and threatened.
10          Q.   And did you find that -- I'm
11  now pressing down to about an hour and 10
12  or 15 minutes of left time with you on
13  direct examination.
14          Did you find that to be the
15  case in your experience when you had
16  something to say about Vioxx in mid to
17  late 2004?
18          A.   Yes. I experienced threats,
19  intimidation and actually what in my view
20  appears to have been a very organized and
21  orchestrated campaign to smear and
22  discredit me.
23          Q.   All right.
24          I want to go back to one

Page 130

1  quick point and then move forward.
2         When you were talking about
3  95 bullets and the gun being loaded with
4  only 90 bullets, and then the FDA says,
5  well, it's still safe, that was sort of
6  what you were saying, is that --
7  ultimately is it the pharmaceutical
8  company that is looking at it that way as
9  well?
10        MR. BECK:  Object to form.
11  BY MR. KLINE:
12     Q.   Go ahead.
13     A.   My view is that the
14  pharmaceutical companies will comply with
15  whatever rules FDA chooses to enforce,
16  so, basically tell me what hoops to jump
17  through, and I as a drug company will
18  jump through those hoops because I want
19  to get my drug approved.
20     Q.   Does industry look at the
21  safety issue that same way?
22     A.   Oh, yes.
23     Q.   That's my point.
24     A.   Yes.  It is quite frequent

Page 131

1  that you'll be in a meeting with a
2  company, and you'll have the point
3  estimate of the risk will be elevated.
4  So, we'll have a situation where the risk
5  is elevated seven times.  There was a
6  seven times increased risk of something
7  bad.  But the p-value is greater than
8  .05.  So, we don't have 95 bullets in the
9  gun.  We only have 93 or 92.  And the
10  companies will say it's not statistically
11  significant, therefore, it's not real,
12  therefore, we don't have to worry about
13  it.  And FDA will go along with it.
14        The number one reason why
15  that happens is because the study that's
16  being talked about is too small to show
17  the problem.  So, actually, it's like
18  you've stacked the deck.  If I give you a
19  small study that has no possibility of
20  showing the effect we're interested in
21  examining and then I don't find that
22  effect, well...
23     Q.   Well, you told me that the
24  FDA wasn't doing the study.  If the deck

Page 132

1  is stacked, who's stacking the deck?
2     A.   The deck is stacked --
3        MR. BECK:  Object to form.
4        THE WITNESS:  The deck is
5  stacked by the misuse of science.
6  It's the misuse of statistics.
7  It's allowing companies to benefit
8  from doing studies that are too
9  small to show the safety problem.
10  BY MR. KLINE:
11     Q.   Who is doing the studies?
12     A.   The companies are doing the
13  studies, and they know that small studies
14  have low power.
15     Q.   So, then, who is stacking
16  the deck?
17        MR. BECK:  Object to form.
18        THE WITNESS:  Well, in that
19  case, I would say the companies
20  are stacking the deck, I would
21  have to say.
22  BY MR. KLINE:
23     Q.   Now, I want to talk about a
24  concept.  I want to do it in less than

Page 133

1  three minutes of a very complicated
2  subject.
3        By the way, if you see
4  statistical significance in one of these
5  small studies, does that -- is there
6  greater significance to that?  If there's
7  a study that's not powered to show a
8  problem and then you show it anyway, is
9  there more significance to that?
10     A.   In my view --
11        MR. BECK:  Object to form.
12        THE WITNESS:  In my view,
13  that is an alarming circumstance,
14  one that demands intensive
15  scrutiny and attention.
16  BY MR. KLINE:
17     Q.   Did that happen here in the
18  Vioxx story?
19     A.   Yes, it did.
20     Q.   Did the stacked deck that
21  you mentioned earlier in your testimony
22  happen in the Vioxx story?
23        MR. BECK:  Object to form.
24        THE WITNESS:  My view of the

Page 134

1    · evidence is that that indeed
2    happened.
3    BY MR. KLINE:
4        Q.    Now, I want to do a topic,
5    efficacy versus benefit. I'd like you to
6    explain to the members of the jury in
7    brief terms why efficacy, which is what
8    we sometimes hear, a drug is efficacious,
9    is different than benefit, and how those
10    two either equate, in your opinion, or
11    don't equate and what the significance
12    is, please.
13        A.    Okay. Efficacy is, does the
14    drug have a biological effect. So, if
15    the drug is supposed to treat high blood
16    pressure, the efficacy will be, does it
17    reduce your blood pressure. So, it's
18    reducing a body measurement. That's the
19    effect. And if it does that, we say that
20    it has efficacy.
21        Effectiveness is whether or
22    not that drug taken on a regular basis
23    will actually give you a health benefit
24    long-term. If the drug lowers your blood

Page 135

1    pressure, but doesn't prevent you from
2    having heart attacks, strokes, kidney
3    failure or dying at a young age, well,
4    then, you've spent a lot of money to have
5    a lower blood pressure number, but have
6    derived no benefit from it. So, what you
7    want is, really, when you talk about
8    benefit/risk, is you want to look at what
9    is sort of the health benefits, the real
10    certifiable health benefit that you're
11    deriving from a drug versus what are the
12    real risks.
13        But what FDA frequently
14    does, almost always does, is it takes the
15    efficacy -- when it says benefits exceed
16    the risks, what it's really saying is in
17    our estimation, the FDA's estimation, the
18    efficacy should lead to a benefit, and we
19    say that benefit exceeds the risk. But
20    FDA has never done a formal benefit
21    analysis on any drug product to my
22    knowledge. It certainly did not do one
23    with Vioxx when it said that the benefits
24    exceeded the risks.

Page 136

1        Q.    Why is it important in the
2    Vioxx story to understand that the FDA
3    did no risk/benefit analysis as you've
4    just said?
5        A.    It's because I think if you
6    look at the VIGOR study, you're
7    confronted with what at least in my read
8    is a startling revelation that for every
9    complicated perforated ulcer or bleed
10    that Vioxx prevented, there were almost
11    two thrombotic cardiovascular events that
12    were caused by the drug. And so if
13    you're talking about benefits and risks,
14    here we have a ratio of almost two to one
15    where the risks exceed the benefits.
16        Now, let's look at what the
17    case fatality rates are. Nationally,
18    about five percent of people with GI
19    bleeds die. And I learned that by going
20    to the National Centers For Health
21    Statistics and looking at death
22    certificate data and then going to the
23    National Hospital Discharge Survey and
24    looking at how many hospitalizations

Page 137

1    there are for GI bleed. So, you have a
2    five percent death rate from GI bleeding.
3    In other words, you can have a GI bleed,
4    that's a pretty serious thing, you get
5    hospitalized for it, but most of the time
6    you're not going to die. With heart
7    attack, it's about a 40 percent chance
8    that you're going to die. So, if what
9    we're really interested in is sort of
10    benefit/risk, and let's take it to what's
11    the most important thing, and that's do I
12    live or do I die, in my view, the scales
13    are tilted greatly against Vioxx in terms
14    of safety versus benefit.
15        Q.    Okay.
16        That risk/benefit analysis
17    was or was not done by FDA?
18        A.    It was not done by FDA.
19        Q.    In your opinion, had it been
20    done, it would have come out the way you
21    suggested if it had been correctly and
22    diligently and honestly done?
23        A.    Yes.
24        Q.    Is the risk --

Page 138

1      MR. BECK: I have to object
2  to form on that last question.
3  BY MR. KLINE:
4      Q.  I'm reminded to ask, was
5  that risk/benefit done by the company, by
6  Merck?
7      A.  To my knowledge, it was not.
8  And I could cite as evidence of that the
9  VIGOR study.  And in the VIGOR study,
10  there's no real mention of weighing the
11  benefits and the risks in that study.
12  It's kind of implied that the benefits
13  exceed the risks, but there's no formal
14  analysis of it.
15      And it's also very curious
16  that in that paper, the most likely
17  explanation for the finding wasn't
18  addressed, which is the effect of Vioxx
19  on prostacyclin, which is the chemical
20  made by the body that causes blood
21  vessels to dilate and keeps platelets
22  from clotting.  And what Vioxx does is,
23  it blocks the production of prostacyclin
24  and makes it more likely that a heart

Page 139

1  attack can happen.  And in that VIGOR
2  study, which was published in the New
3  England Journal of Medicine and got a lot
4  of press, there's not a single word or
5  mention or reference to this
6  pharmacologic fact that was well known
7  throughout the medical community by this
8  time and was published in the literature.
9  And it was well known to the FDA medical
10  officer in her NDA review which preceded
11  the publication of the VIGOR study.
12      Q.  Was it all the more
13  significant as to Vioxx, and I know
14  you've talked about this, sir, the fact
15  that there were, I think it's in your
16  article, the fact that there were 106
17  million prescriptions of Vioxx during the
18  lifetime of Vioxx from '99 to '04?
19      A.  In the United States,
20  correct.
21      Q.  What is the significance --
22  and used by how many people to your
23  understanding?
24      A.  Estimates that I've seen

Page 140

1  range to about 20 million in the United
2  States.
3      Q.  What is the significance of
4  this story -- in this story, we're going
5  to go into this in detail in a moment.
6  What's the significance in terms of all
7  of that usage, both premarketing and then
8  after the drug was marketed, the fact
9  that it was going to be used by --
10      A.  Well --
11      Q.  -- literally over a hundred
12  million prescriptions?
13      A.  Right.  The fact that the
14  drug was going to be used widely and that
15  it was used widely means that the
16  exposure to potential harm was very large
17  at a population level.  So, at a
18  population level, if we were saying, oh,
19  only 1,000 people or 10,000 people got
20  this drug, well, the number of people who
21  could be injured as a result, that
22  absolute number, would be relatively
23  small.  But when you give a drug to 20
24  million people, you multiply the numbers

Page 141

1  of people who can be affected.  So,
2  that's -- from a public health
3  perspective, that is why I considered
4  this to be a public health catastrophe.
5      Q.  Was it indeed -- was Vioxx
6  indeed a public health catastrophe?
7      MR. BECK:  Object to form.
8      THE WITNESS:  Yes.
9  BY MR. KLINE:
10      Q.  Why, sir?
11      A.  Vioxx, in my opinion, was a
12  public health catastrophe because, A, it
13  was a toxic drug that had severe
14  cardiovascular effects raising --
15  increasing the risk of heart attack.
16      Two, heart attack is like
17  one of the leading causes of death in the
18  United States, so, the rate of it is
19  pretty high.  If I have a drug that
20  increases the rate of something that
21  already happens at a high rate, I'm
22  multiplying two high numbers by each
23  other, and that's going to mean that lots
24  of people will probably have heart

Page 142

1   attacks.
2          Three, the typical person
3   with osteoarthritis or rheumatoid
4   arthritis who was going to get Vioxx is
5   somebody who is older. And older people
6   have other risk factors for heart
7   disease. If your typical Vioxx user is
8   somebody in their 60s, well, if they are
9   male, they've got their gender is a risk
10  factor for heart attack, their age is a
11  risk factor for heart attack, and if you
12  look nationally at statistics on health
13  of Americans, they will also have at
14  least one of the following: they'll have
15  high blood pressure, high cholesterol,
16  diabetes or they'll smoke. So, right off
17  the bat, this drug is going to be
18  marketed -- your typical patient that is
19  getting this drug is going to be somebody
20  who has two or three risk factors for
21  heart disease already. So, you put all
22  these things together and then you
23  multiply it by the fact that I'm giving
24  it to 20 million people, and it's just

Page 143

1   simple mathematics that you've got a
2   formula for disaster.
3      Q.   Sir, you have actually
4   quantified what you believe to be the
5   formula in your study paper -- your
6   Kaiser study paper published in Lancet.
7   Is Lancet a highly respected journal?
8      A.   Yes.
9      Q.   Published in Britain?
10     A.   Yes.
11     Q.   The equivalent of the New
12  England Journal of Medicine here in the
13  United States?
14     A.   Yes.
15         MR. BECK:  Object to form.
16  BY MR. KLINE:
17     Q.   What is it the equivalent of
18  in the United States?
19         MR. BECK:  Objection.
20         THE WITNESS:  It's the
21  equivalent of the New England
22  Journal of Medicine or the Journal
23  of the American Medical
24  Association.

Page 144

1   BY MR. KLINE:
2      Q.   You stated there, "88,000 to
3   140,000 excess cases of serious coronary
4   heart disease probably occurred in the
5   United States over the market life of
6   Vioxx." Did you make that statement?
7      A.   Yes, I did.
8      Q.   Is that a true statement?
9      A.   Yes, it is.
10     Q.   Tell us why "88,000 to
11  140,000 excess cases of serious coronary
12  heart disease probably occurred in the
13  United States over the market life of
14  Vioxx."
15     A.   It occurred because Vioxx is
16  unsafe at any dose. In other words, all
17  doses of Vioxx can cause increased heart
18  attack risk. Vioxx was used widely --
19     Q.   How about the timing of it?
20     A.   The timing begins with the
21  first dose, and there is lots of evidence
22  now that points to that. In fact, on the
23  APPROVe study, which we used to help
24  formulate our estimate of heart attacks,

Page 145

1   was a study performed by Merck of
2   patients with colon polyps, and they were
3   giving them the 25 milligram strength of
4   Vioxx to see if they could prevent colon
5   polyps. And the study found a roughly
6   twofold increase in heart attack risk in
7   patients who were treated with Vioxx
8   compared to people who are taking a sugar
9   pill, a placebo.
10         Now, in the paper that the
11  company published, they did what's called
12  a post hoc analysis. And this is an
13  analysis that's done after the fact. And
14  so FDA -- if this analysis had been
15  presented to FDA for an -- for some
16  statement to be put in their labeling,
17  FDA would have thrown it out because
18  they'd say it's post hoc, which means it
19  could have happened by accident. In
20  clinical trials, you're supposed to
21  prespecify before the trial starts what
22  analyses you will do. And the
23  prespecified analysis that Merck said
24  they would do showed a twofold increased

Page 146

1    risk.  And the correct interpretation of
2    that is that the risk would be increased
3    from the start of the drug for as long as
4    you took the drug.  But Merck did a post
5    hoc analysis.  And the post hoc analysis
6    showed these two curves where they said
7    that the risk didn't begin until after
8    you are on the drug for 18 months.  And
9    as a result, there was a public
10   statement, a press release from Merck
11   that said that the risk doesn't begin
12   until after 18 months.  Newspapers put it
13   up.  It's in newspapers.  There was just
14   an editorial commentary in the Washington
15   Post last week of somebody saying how on
16   earth could a jury award money to a
17   victim who had taken the drug for less
18   than 18 months because we all know that
19   Vioxx can't cause heart attacks before 18
20   months.
21          Well, two things.  One, that
22   was the approved -- that was a post hoc
23   analysis, so it can't be accepted.  What
24   it can be used for is to raise a

Page 147

1    hypothesis, a question, hmm, maybe this
2    is something -- maybe it only works after
3    18 months.  Then you have to go back to
4    do a second study to prove that.  If you
5    look -- so, that's point one.
6          Point two is, if you look at
7    those two curves and you look at how many
8    patients they had in the study, how many
9    heart attacks they had in that study at
10   the time -- let's take six months, for
11   example.  At six months, there were about
12   five or six heart attacks total in the
13   APPROVe study.  And now they don't give
14   the figures in the paper, so, you've got
15   to kind of make these extrapolations from
16   proportions that are presented in the
17   paper.  Five or six.  In order to show a
18   relative risk of 2, which is what the
19   overall study showed, they would have to
20   have had --
21   Q.    VIGOR?
22   A.    No.  We're talking APPROVe.
23   Q.    I'm sorry.
24   A.    This is the 18 month.

Page 148

1          They would have had to have
2    had 95 patients, 95 heart attacks by six
3    months, when all they had was five or
4    six.  So, the study would have had to
5    have been almost 20 times larger in order
6    to have a chance of finding the problem.
7    As it is, with the five or six cases that
8    they had at six months, all that Merck
9    could say from a statistical perspective
10   is the risk of heart attack with Vioxx
11   can be no higher than about 200.
12   Q.    This is called power?
13   A.    This is power.  And what
14   we're seeing there is the absence of
15   evidence is not evidence of absence.
16   They're saying the truth is, we don't
17   have the power.  But Merck is using that
18   argument to say, ha-ha, because we don't
19   have the power, therefore there isn't a
20   risk, therefore, anybody with a heart
21   attack before then, it's their own bad
22   luck.
23          But I give you an analogy,
24   and the analogy is, we've got those two

Page 149

1    curves, and if you have a picture of
2    APPROVe, you could put it up and then we
3    could talk from the curve.  You've got
4    these two curves that come together, and
5    there's no power there in that first 18
6    months to show a difference.  And as I
7    just discussed, the study would have to
8    be 20 times larger in order to show a
9    twofold difference.  You talk about
10   stacking the deck.  That's a stacked
11   deck.
12          Here's the analogy.  The
13   company is saying to you, to me, to the
14   jury, the moon has no craters.  And they
15   say, look at the APPROVe study in the
16   first 18 months.  I don't see a
17   difference there.  I look at the moon.  I
18   don't see any craters.  I'm saying, wait
19   a second, here's a pair of binoculars.
20   Let's make that study 20 times bigger.
21   Let me give you binoculars that raises it
22   20 times.  Now you look at the moon and
23   you see there are craters.  You look
24   here, you would see this heart attack.

1          Now, there had been 11
2  published studies, observational studies.
3  So, you'll never get a clinical trial
4  that's that large to study this question.
5  So, it has to come from observational
6  studies. The preponderance of the
7  evidence of observational studies, there
8  are now 11 published observational
9  studies. Nine of those observational
10 studies found that Vioxx increases the
11 risk of heart attack. Of those nine, all
12 nine of them, when you look at it, you
13 have to tease it out, but in the studies,
14 they make it clear that the risk of heart
15 attack that they found in that study
16 occurred within 12 months. So, we're
17 already inside 18 months. Seven of those
18 studies have the evidence present within
19 six months. Four of those studies have
20 the evidence within the first
21 prescription. So, in other words, what
22 we have is evidence that Vioxx increases
23 the risk of heart attack from the first
24 dose on. And we have no evidence to

1  suggest that the risk goes away with
2  time.
3          This follows precisely from
4  what we believed the underlying mechanism
5  is by which Vioxx and other COX-2
6  inhibitors might cause heart attack. And
7  that is, suppressing prostacyclin so that
8  there's an excess of thromboxane.
9  Thromboxane causes platelets to clot and
10 can cause heart attacks. And if you
11 disturb that balance, that disturbance in
12 balance is going to happen within the
13 first dose, and so -- the first couple
14 doses. And so what you have is the
15 expectation that the risk should begin
16 early. The only reason people don't find
17 it is because they don't have 10 million
18 patients in a clinical trial on the first
19 day that would let them see it.
20      Q.   You found it in your study?
21      A.   And we found it in our
22 study.
23      Q.   And was your study a large
24 scale observational study?

1      A.   Yes.
2      Q.   And do large term
3  observational studies provide an
4  important -- are they an important piece
5  of information in the matrix of
6  information about drug safety?
7      A.   Yes, they are. And in this
8  situation, particularly where we're
9  talking about this 18-month question, it
10 is the only information available.
11     Q.   Before we take a short
12 break, because then I'm going to have, I
13 think, about an hour left, I need to ask
14 you to wrap this part up. I had, I
15 think, interrupted you at a point, I'm
16 going to plead guilty to that, when you
17 started to talk about the drug being
18 unsafe at any dose, and then I
19 interrupted you asking you what about at
20 the time of the first dose.
21          I want to go back to the
22 general question that was on the table at
23 the time, which was, as to your statement
24 about the Kaiser study, in the Kaiser

1  study that 88 to 140,000 excess cases of
2  serious coronary heart disease probably
3  occurred in the United States over the
4  life of the drug Vioxx. And I had
5  interrupted you.
6          What is the answer to that
7  question as to why you make that
8  statement, if you haven't already
9  explained it?
10     A.   Right.
11     Q.   You started off saying it's
12 unsafe at any dose. It starts at the
13 initial dose. Are there other factors?
14     A.   Well, just that --
15          MR. BECK: Object to form.
16 BY MR. KLINE:
17     Q.   Please, sir.
18     A.   Just that it has wide use;
19 that lower doses and higher doses
20 increase the risk; that there's typical
21 patients who are going to get the drugs
22 have relatively high background rates for
23 heart disease. And you take these
24 factors together and you multiply them

Page 154

1  out, and you end up with large numbers.
2      Q.   While I don't want to do the
3  exact statistical computation in front of
4  the jury, have you done that to make that
5  kind of statement in the peer reviewed
6  medical literature?
7      A.   Yes, I have.
8      Q.   What is the construct there,
9  please, just briefly?
10     A.   Right.  Basically, what you
11 do is -- what we did was, we took the two
12 large published clinical trials that
13 Merck conducted, the VIGOR study, which
14 was at the higher doses of Vioxx, and the
15 APPROVe study, which was at the lower
16 doses of Vioxx, and we used those
17 studies, the relative risks from those
18 studies, five-fold increased risk in the
19 VIGOR study, a two-fold increased risk in
20 the APPROVe study for the lower dose, to
21 then apply that to the U.S. population in
22 terms of like about 18 percent of the
23 population got the high dose and 82
24 percent got the lower dose.  And you can

Page 155

1  do a series of calculations,
2  epidemiologic formulas that basically
3  just give you the answer, if you know how
4  long the prescriptions are, and we had
5  information that told us how long each
6  prescription was for.
7      Q.   You did that kind of
8  calculation?
9      A.   Yes.
10     Q.   That was your conclusion?
11     A.   Yes.
12     MR. KLINE:  When we come
13 back -- we're going to take a
14 five-minute break.  When we come
15 back, I am going to ask you
16 questions about the Vioxx story
17 and about your Kaiser study and
18 should be able to complete that in
19 roughly 45, 50 minutes, maybe 55
20 minutes.  That's my goal.  And I'm
21 going to ask you when you come
22 back to let's tighten up just a
23 little bit in terms of your
24 expansion of answers.  I

Page 156

1  appreciate it.
2      We'll be back in five
3  minutes.
4      THE VIDEOTAPE TECHNICIAN:
5  Stand by, please.  That concludes
6  Video Cassette Number 1.  The time
7  is 11:13.  We're going off the
8  record.
9          - - -
10     (Whereupon, a recess was
11 taken from 11:13 a.m. until
12 11:35 a.m.)
13         - - -
14     THE VIDEOTAPE TECHNICIAN:
15 This begins Video Number 2.  The
16 time is 11:35.  We're back on the
17 record.
18 BY MR. KLINE:
19     Q.   Dr. Graham, continuing your
20 deposition, I have at least three areas
21 that I need to cover, and I'd like to
22 cover them in 10, 15-minute segments.
23 So, I need your cooperation in narrowing
24 down and honing in on certain things so I

Page 157

1  can get everything covered.  I'd
2  appreciate your help.
3      MR. BECK:  I'm sorry, I
4  can't hear what you're saying.
5      MR. KLINE:  Yeah, I know,
6  because they're taking a break out
7  there.  I will start again.
8      I said I'm going to have two
9  or three areas of inquiry, and I
10 simply want to try to hone in on
11 those things.
12     Can I go off the record.
13     THE VIDEOTAPE TECHNICIAN:
14 Stand by, please.  11:36.  We are
15 off the record.
16         - - -
17     (Whereupon, a recess was
18 taken from 11:36 a.m. until
19 11:59 a.m.)
20         - - -
21     THE VIDEOTAPE TECHNICIAN:
22 The video time is 11:59.  We're
23 back on the record.
24 BY MR. KLINE:

Page 158

1    Q.   Dr. Graham, going into the
2  specifics of the Vioxx story, there is
3  something that you called the, quote,
4  Vioxx story, correct, generally speaking?
5    A.   Well, there is a story to
6  it, yes.
7    Q.   Would you give us your
8  overview and your understanding of the
9  Vioxx story?
10   A.   Well, Vioxx was approved in
11  1999. In November 2000, a study was
12  published in the New England Journal of
13  Medicine called VIGOR, which was a study
14  performed by Merck showing that Vioxx
15  reduced the occurrence of perforations,
16  ulcers and bleeds in the gastrointestinal
17  tract compared to naproxen therapy, but
18  also that it increased the risk of heart
19  attack by about a factor of five compared
20  to naproxen.
21        At that point then, the
22  article that got published in the New
23  England Journal of Medicine, rather than
24  talking about Vioxx increasing the risk

Page 159

1  of heart attack, it actually changed the
2  way it did the analysis. And I thought
3  that this was really a misleading aspect
4  of the way they went about things.
5        When you do a scientific
6  study --
7    Q.   "They" being?
8    A.   "They" being Merck.
9        When you do a scientific
10  study --
11       MR. BECK: Excuse me,
12       Doctor, before you continue on
13       with your answer, I'm going to
14       object to this as not being a
15       subject that Dr. Graham has
16       discussed previously.
17  BY MR. KLINE:
18   Q.   Dr. Graham, and I'm going to
19  let you continue your answer. Everything
20  you've said so far, have you said in some
21  public forum one way or the other?
22   A.   Yes. These things I've
23  discussed openly with others.
24   Q.   And to assure whatever judge

Page 160

1  is ruling on this, particularly Judge
2  Fallon in his court, would you continue
3  with your answer giving me those things
4  which you've said publicly as far as the,
5  quote, story about Vioxx. Thank you,
6  sir, continue.
7    A.   Right.
8        Whenever you do a clinical
9  trial or a study, you have what's called
10  a reference group or a control group.
11  Frequently in a clinical trial, that will
12  be a placebo, which is a sugar pill.  In
13  the VIGOR study, it was naproxen, which
14  is another pain reliever.  When you have
15  a comparator and you have an experimental
16  treatment, in this case, Vioxx was the
17  experimental treatment, when you do your
18  analysis, you are supposed to put the
19  results for the experimental treatment,
20  in this case, Vioxx, in the numerator of
21  a ratio, and your reference, naproxen, in
22  the denominator.  When the evidence was
23  presented on perforations, ulcers and
24  bleeds, that's the way the information

Page 161

1  was presented.  It was presented in the
2  classically accepted way, and it showed
3  that the risk of ulcers, et cetera, was
4  about one half, about .5, 50 percent that
5  of naproxen.
6        When it came to presenting
7  the heart attack risks, it flipped it
8  around.
9    Q.   "It" being who?
10   A.   The company, Merck.  They
11  flipped it around, and they put -- and
12  now in talking about heart attacks, they
13  put the risk of heart attack in naproxen
14  patients, which is the comparator, the
15  reference group, they put that in the
16  numerator, and they put Vioxx in the
17  denominator, and it should have been the
18  other way around.  But by doing this,
19  then the number that you get is .2. So,
20  what they could say was, oh, the heart
21  attack risk with naproxen is 20 percent
22  that of Vioxx, rather than having to say
23  the risk of heart attack with Vioxx is
24  five times higher than it was with

Page 162

1 naproxen.
2       It may seem like a minor
3 point, but it's really, I think,
4 fundamental, at least in my
5 understanding, of the study, because by
6 misrepresenting that information, it then
7 flows into what I would call the naproxen
8 hypothesis. And in the VIGOR study, what
9 Merck proposed was that naproxen
10 protected against heart attack. Even
11 though Vioxx had five times higher rate
12 of heart attack than naproxen, what they
13 said was, is here's Vioxx, here's
14 naproxen, what they said is, well, Vioxx
15 is normal, there's no increased risk
16 here, what it is is naproxen protects
17 against heart attack. And they cited one
18 reference to support that, and it was a
19 study that Merck itself had done in 22
20 patients where they had given them
21 naproxen, taken blood samples from them,
22 and then did experiments in test tubes to
23 see what effect it had on the way their
24 platelets worked.

Page 163

1       Well, this information,
2 subsequently the FDA basically said that
3 doesn't prove anything because there are
4 no controlled clinical trials to show
5 that naproxen protects against heart
6 attack. But the argument was that
7 naproxen protects against heart attack.
8 And that was the argument in VIGOR.
9       To me, what was -- when I
10 read that, there were two things that
11 really sort of struck me. One was that a
12 five-fold difference in heart attack risk
13 is something quite high and something
14 that you really have to pay attention to
15 because heart attack is such a serious
16 disorder, and it's so very common.
17       The second thing was that
18 just on the face of it, this notion of
19 naproxen being protective, I was highly
20 skeptical of it, and as a matter of fact,
21 so were my office leadership, including
22 Peter Honig, who is now at Merck, but was
23 my office director then, and Marty
24 Himmel, who is now at Merck, but was his

Page 164

1 deputy office director. We were
2 skeptical of the naproxen hypothesis. We
3 were skeptical for the following reasons
4 -- I was skeptical for the following
5 reasons:
6       1. Naproxen has been on the
7 market for over 30 years.
8       2. Naproxen had been used
9 in many, many, many clinical trials, and
10 nobody had ever reported this phenomenal
11 heart-protecting effect before.
12       3. There were -- and we
13 talk about 100 million prescriptions or
14 106 million prescriptions for Vioxx.
15 There were probably way, way more of that
16 of naproxen over the 30 years that it's
17 been on the market, so, there's
18 widespread use.
19       And then, finally, if
20 naproxen had had that kind of protective
21 effect that Merck was claiming in the
22 VIGOR study, it would have had to have
23 been about three times better than
24 aspirin at preventing heart attacks. And

Page 165

1 aspirin has been well studied in clinical
2 trials. It reduces heart attack risks
3 probably on average about 25 percent, and
4 that's viewed pretty much as sort of a
5 wonder drug. Aspirin is a wonder drug.
6       Well, here Merck comes with
7 the VIGOR study and says naproxen is
8 three times better than the wonder drug
9 aspirin. And to me it just failed the
10 straight face test and so --
11       Q.   The straight face test?
12       A.   Yes. Does it have sort of
13 face validity? Can you believe it on its
14 face. And on the face, to me as the
15 experienced drug safety scientist, I was
16 just highly skeptical of that.
17       Plus you have the underlying
18 biology of how Vioxx works that would
19 lead one to expect that it might increase
20 the risk of heart attack. And, in fact,
21 it's really funny how the VIGOR study
22 words this. You know, the argument that
23 is sort of commonly in the literature
24 talking about heart attack risk with the

Page 166

1    COX-2 inhibitors talks about prostacyclin
2    being decreased by drugs like Vioxx,
3    leaving thromboxane, which causes
4    clotting, unopposed. So, there's an
5    excess of it. There's sort of a balance,
6    and now there's too much thromboxane.
7         In VIGOR, Merck said, well,
8    we were interested in cardiovascular
9    risk, but their argument was because
10   naproxen -- because Vioxx wouldn't affect
11   platelet clotting and so -- but naproxen
12   would. And so we thought there might be
13   a difference. So, they sort of took the
14   converse of what was sort of like
15   obviously on everybody -- this was
16   something that everybody was talking
17   about, at least in the literature. And
18   subsequently it became sort of a real
19   focus of research.
20        In any event, it was based
21   on reading that study and being highly
22   skeptical of it and recognizing that if
23   the high doses caused heart attack at a
24   five-fold increase, well, this thing

Page 167

1    called dose response, well, there's a 25
2    milligram dose and a 12-and-a-half
3    milligram dose. 25 milligram dose is the
4    most commonly used dose. With dose
5    response, if you get an effect with a
6    high dose, what dose response says is,
7    well, you might also have an effect with
8    the lower dose. It won't be as big an
9    effect. So, the question is, is there a
10   heart attack risk with lower dose. And
11   that was something that wasn't even
12   addressed in the VIGOR study in the
13   discussion. In the discussion, it was
14   something that one could have brought up,
15   but it wasn't brought up. In my view,
16   the discussion was unbalanced.
17        In any event, taking all
18   those things together, I thought that it
19   was important that we try to do another
20   study to examine the heart attack risks
21   with Vioxx.
22        Q.   And that's how you got
23   involved?
24        A.   And that's how I got

Page 168

1    involved.
2         Q.   Okay.
3              Let me step back with a
4    couple of things by way of background
5    that you touched upon, but I want to make
6    sure that I understand.
7              In the PowerPoint
8    presentation which you presented to your
9    colleagues, on Page 97 you talked about
10   way back in 1999 there was a theoretical
11   concern.
12        A.   You said 97? I don't have
13   that particular --
14        Q.   I'm sorry. 47.
15             Again, I don't want to wed
16   you to these pages.
17        A.   Yes, yes.
18        Q.   I'd rather talk to you, have
19   a conversation with you, but I wanted to
20   focus you on it.
21             You said that there was a
22   theoretical concern way back in 1999.
23        A.   Right.
24        Q.   Tell us briefly what was the

Page 169

1    theoretical concern, and I want to just
2    make an imposition on you. I'd like to
3    have as brief an answer to every question
4    as possible because I have a lot of
5    territory to cover.
6         A.   I'll try.
7              MR. KELL: I'm going to
8         object to that question only to
9         this extent. If the story that
10        Dr. Graham is going to tell
11        involves internal agency
12        deliberations or discussions, it's
13        the government's position that it
14        would not be proper for him to
15        disclose those.
16   BY MR. KLINE:
17        Q.   So, you made -- you
18   presented this PowerPoint at numerous
19   professional meetings, correct --
20        A.   Right. This is from --
21        Q.   -- including the ISPE
22   conference in 2005; is that correct?
23        A.   That's correct.
24        Q.   That's the International

Page 170

1   Society of Pharmacoepidemiologists?
2      A.   Correct.
3      Q.   A worldwide organization; is
4   that correct?
5      A.   Yes.
6      Q.   And by the way, you've been
7   asked to publicly appear at conferences
8   like that in your professional capacity,
9   correct?
10      A.   Yes, I have.
11      Q.   A group of your colleagues,
12   international epidemiologists from all
13   over the world, would hear your views
14   that you're telling this jury, correct?
15      A.   Correct.
16      Q.   All right.
17         Now, the theoretical
18   concern.  What have you publicly said
19   about that before?
20      A.   The theoretical concern was
21   that Vioxx would reduce or inhibit
22   prostacyclin and lead to an excess of
23   thromboxane, which would result in a
24   tendency for blood clots and

Page 171

1   theoretically cardiovascular events such
2   as heart attack or stroke.
3      Q.   Known to Merck back in 1999?
4      A.   I would assume that it had
5   to have been.  If it's known to the
6   medical officer who did this review, it
7   most certainly would have had to have
8   been known to Merck.
9      Q.   And you looked at the
10   review, and once you got into -- you
11   looked into the history of it once you
12   got interested in the subject based on
13   naproxen, correct?
14      A.   Actually, this particular
15   slide that we're looking at -- actually,
16   I began looking at this subsequent.  At
17   the time that we were planning our study,
18   this wasn't something that I had focused
19   on.
20      Q.   In the early period, did the
21   FDA know and appreciate that there were
22   high-risk patients that were excluded
23   from the study?
24      A.   Yes, they did.

Page 172

1      MR. BECK:  Object to form.
2   BY MR. KLINE:
3      Q.   Did Merck understand that?
4      MR. BECK:  Object to the
5   form.
6      THE WITNESS:  It is clear
7   from the way the studies are
8   described that patients at high
9   risk of experiencing
10   cardiovascular events were
11   excluded from the study, and since
12   that's written in the VIGOR study,
13   I have to assume that Merck was
14   fully aware and that it was
15   intentional.
16         - - -
17      (Whereupon, Deposition
18   Exhibit Graham-3, "Rofecoxib
19   Diagnosis and Treatment: What
20   went wrong?  Can we avoid?"
21   (Graham) PowerPoint Slides,
22   DG000014 - DG000034, was marked
23   for identification.)
24         - - -

Page 173

1   BY MR. KLINE:
2      Q.   I'm going to mark another
3   Powerpoint which you presented to the
4   International Society of
5   Pharmacoepidemiologists.  They had their
6   conference in 2005 in Nashville,
7   Tennessee, correct?
8      A.   Yes.
9      Q.   I think on occasion they've
10   had their conferences at more exotic
11   places, correct?
12      A.   It alternates, Europe and
13   North America.
14      Q.   I see.  This time it was
15   Nashville.
16         Now, I want to focus you,
17   sir, on some things that you said to the
18   international academy of -- International
19   Society of Pharmacoepidemiologists.
20      MR. BECK:  Before you do, I
21   believe this is another document
22   that was turned over by Dr.
23   Graham's personal lawyers from the
24   FDA files last Friday not in

Page 174

1   response to a subpoena, and we
2   have the same objection to the use
3   of this that we had for the Johns
4   Hopkins PowerPoint.
5   BY MR. KLINE:
6       Q.   Was everything that you
7   said, sir, at the International Society
8   of Pharmacoepidemiologists in a public
9   forum?
10      A.   Yes, it was.
11      Q.   And were Merck -- are Merck
12  representatives always at the
13  International Society of
14  Pharmacoepidemiology?
15      A.   Well, I know that at this
16  particular meeting, several people from
17  Merck were there because they're
18  professional colleagues.  So, we had
19  conversations during the meeting, and I
20  know that they attended this session.
21      Q.   And was your PowerPoint
22  available as part of it?
23      A.   The PowerPoint was
24  presented.

Page 175

1       Q.   Now, in it, and I just want
2   to focus you on the slide that's entitled
3   "VIGOR:  deja vu all over again," what
4   were you telling your fellow members of
5   the International Society of
6   Pharmacoepidemiologists?
7       A.   Which slide number are you
8   on?
9       Q.   Number 24.
10      A.   Oh, here what I was talking
11  about was trying to make a little joke
12  about Yogi Berra and deja vu, but what I
13  was trying to talk about here is the
14  evidence that was accruing on Vioxx and
15  heart attack risks and FDA's response,
16  which in my experience has been to
17  downplay or ignore those risks and to let
18  things get worse in a sense to, let the
19  problem continue unabated.  So, that's
20  basically what I was, I think, trying to
21  convey there.
22      Q.   Understood.
23          Now, if you'd go to slide
24  number 29, this is something I'd like to

Page 176

1   display.  And regardless of whether the
2   display is there or not, the fact of the
3   matter is that you have used and you've
4   given this jury an explanation of the
5   naproxen and whether it was a plausible
6   explanation for the VIGOR results.  That
7   is what you've done so far, correct?
8       A.   Correct.
9       Q.   What did you call it
10  publicly, sir, the naproxen --
11      A.   I called it an alibi.
12      Q.   What is an alibi, sir?
13      A.   Well, I'm not a lawyer, but
14  what I meant was, it's sort of an excuse
15  to explain away an uncomfortable
16  situation.
17      Q.   What did you mean when you
18  described -- and I assume you're talking
19  about Merck's explanation later published
20  in the New England Journal that naproxen
21  was cardioprotective and thereby
22  explained the results of the VIGOR trial.
23  Is that what you were talking about?
24      A.   That is correct.

Page 177

1           MR. BECK:  Object to the
2   form.
3   BY MR. KLINE:
4       Q.   That is just a predicate.
5           My question is, what in that
6   context did you mean by the "naproxen
7   alibi," sir?
8       A.   What I meant was that there
9   was -- it was much more likely based on
10  the available evidence at the time that
11  Vioxx was increasing the risk of heart
12  attack than that naproxen was protecting
13  against heart attack, but that pointing
14  to naproxen saying it protects against
15  heart attacks is an alibi.  It's
16  basically to say it's not Vioxx that's
17  causing the heart attacks, it's naproxen
18  that's protecting against heart attacks.
19          What I also said at this
20  meeting was that it resulted in a
21  two-year wild goose chase as people in
22  their research focused on addressing
23  naproxen and whether it affects the risk
24  of heart attack, rather than focusing on

Page 178

1  Vioxx and on lower-dose Vioxx, which was
2  being used by increasing numbers of
3  patients.
4      Q.   That two-year wild goose
5  chase occurred roughly in what calendar
6  year?
7      A.   2001/2002.
8      Q.   That was the years that I
9  believe you described earlier when the
10 label wasn't changed?
11     A.   Correct.
12         MR. BECK:  Object to form.
13 BY MR. KLINE:
14     Q.   What was going on with
15 labeling in that same period of time,
16 sir?
17     A.   Nothing was happening with
18 labeling, at least nothing visible.
19     Q.   Was it your words when you
20 described it, those two years, as a wild
21 goose chase?
22         MR. BECK:  Object to form.
23         THE WITNESS:  My reference
24     to wild goose chase was to the

Page 179

1      efforts by the scientific
2      community to investigate what has
3      subsequently been shown, I think,
4      unequivocally to be an untruth,
5      which is that naproxen does not
6      protect against heart attack.
7      There are now, I think, 18 or 19
8      published observational studies
9      that have looked at this.  And
10     four of them say that naproxen is
11     protective.  Four of them say it
12     increases the risk.  And the
13     others say there's no difference.
14     If you look at the four that say
15     there's a risk, two of them were
16     funded by Merck and co-authored --
17     one of them was co-authored by
18     Merck scientists.  And those two
19     actually have come to
20     inappropriate conclusions because
21     the analyses that were done were
22     scientifically inappropriate.
23         In the paper by Rahme which
24     was done in Quebec which claimed

Page 180

1  that, I think, naproxen reduced
2  the risks of heart attack by like
3  21 percent compared to other
4  NSAIDs, that got captured in the
5  press and interpreted by the
6  medical community as naproxen
7  protected against heart attacks.
8  But what you want to do is know
9  what does naproxen do versus
10 nothing at all?  That's the
11 appropriate comparison.
12     What they did in the Rahme
13 study was they took naproxen, and
14 they compared it to another pain
15 reliever.  If you rearrange the
16 Rahme data and they present all
17 the data in the paper so you can
18 rearrange it and then do an
19 analysis of the Rahme paper
20 similar to what we did in our
21 Kaiser study, they come up with a
22 conclusion -- they would come up
23 with the result that shows that
24 naproxen increases the risk of

Page 181

1  heart attack by about 28 percent.
2      Now, the second paper done
3  by Watson, that's the paper that
4  was basically authored by Merck
5  employees.  In that study, they
6  claimed that -- they concluded
7  that naproxen reduced the risk of
8  heart attack by, you know, 35 or
9  40 percent.  And they showed a
10 variety of analyses to support
11 that.  But the analysis that they
12 did, that they based their
13 conclusion on, did not adjust for
14 cardiovascular disease.  So, if
15 I'm concerned about does a drug
16 increase my risk of heart attack,
17 well, I've got to do adjustment
18 for cardiovascular risk.  And
19 Merck didn't do it.  So, the
20 analyses where they did do it, the
21 results weren't statistically
22 significant.
23     And then there's also
24 problems with case ascertainment

Page 182

1    because in this case, covering 4
2    million patients followed for 10
3    or 15 years, they only found 27
4    sudden deaths, when they should
5    have found thousands.
6  BY MR. KLINE:
7    Q.   What is the bottom line,
8  bottom, bottom line on the science of
9  whether naproxen is cardioprotective and
10  whether this was an alibi?
11    A.   Naproxen is not
12  cardioprotective, never was, and it
13  isn't.
14    Q.   And does the science show it
15  today?
16    A.   And the science shows that
17  today.
18    Q.   Did they have the science in
19  their possession when they made what you
20  call an alibi back at the time of the
21  publication of the VIGOR trial?
22    A.   The studies that I've
23  referred to hadn't been performed at that
24  time, but what was available was the

Page 183

1  knowledge about aspirin and the fact that
2  then this would have had to have been
3  three times better than aspirin in that
4  naproxen had been used in many, many
5  clinical trials, it had been used for 30
6  years, and nobody had reported this
7  before. So, that common-sense stuff was
8  known.
9    Q.   Did the --
10        What you now call the
11  naproxen alibi, is that what drew your
12  eye and your attention, that along with
13  the number of people who were using the
14  drug along with the VIGOR results showing
15  the multiple of increased relative risk?
16    A.   They were --
17        MR. BECK: Object to form.
18  BY MR. KLINE:
19    Q.   Please.
20    A.   They were all interrelated,
21  and so they were all of a concern.
22    Q.   Now, you then set about,
23  yourself, to do something about it as a
24  safety officer of the Office of Drug

Page 184

1  Safety of the Food & Drug Administration
2  of the United States of America, correct?
3        MR. BECK: Object to form.
4        THE WITNESS: Yes.
5  BY MR. KLINE:
6    Q.   What did you do?
7    A.   What we did was looked
8  around to see if there was a way that we
9  could do a study in which -- my hope was
10  to do a study where the playing field
11  would be level so that -- my biggest
12  concern was when we do a study, what if
13  we find out in our results that there is
14  -- we don't find an increased risk with
15  Vioxx. Let's say we do the study, and
16  the results come out that there's no
17  increased risk. I wanted to be sure by
18  the way we designed the study that we
19  could trust that result because you have
20  this problem of low power and the like.
21    Q.   Let me stop you for a
22  minute.
23        Would this study have some
24  usefulness as distinguished from -- as an

Page 185

1  observational study, namely an
2  epidemiology study, as distinguished from
3  the clinical trials of which Merck had
4  done?
5    A.   Yes. The advantage of the
6  observational studies is that they are
7  much larger and have far larger numbers
8  of cases of people who are exposed to the
9  drug, and that's what gives you your
10  power to see if there's a problem. What
11  I mentioned before about the APPROVe
12  study and having only like five or six
13  heart attacks in six months, they really
14  needed like 95 cases or more to be able
15  to see the risk. With an observational
16  study, we had over 8,000 heart attacks in
17  our study. Compare that to what was in
18  the VIGOR study or the APPROVe study
19  where they had 30 or 40 heart attacks or
20  50 maybe or 60 in the VIGOR study. The
21  numbers -- it's just economy of scale.
22  The bigger the study is, it's like a
23  microscope, the better you can see what
24  the problems are.

Page 186

1    Q.   Now, did you get -- by the
2  way, in 2000, I think the 2002 report,
3  there's an FDA report -- I don't want to
4  have to dig out the document. I hope
5  I'll be indulged here.
6           There's a report in which
7  Vioxx was -- there was a suspect drug
8  list in 2001 reported in 2002?
9    A.   Yes.
10   Q.   What drug was on the top of
11 the suspect drug list?
12   A.   Vioxx.
13   Q.   And was your study conceived
14 by you?
15   A.   Yes.
16   Q.   And was it conceived to
17 study this number one top suspect drug?
18        MR. BECK: Object to form.
19 BY MR. KLINE:
20   Q.   Please.
21   A.   I wasn't aware at the time
22 that it was the number one drug. In my
23 mind, it was the leading public health
24 safety question that needed to be focused

Page 187

1  on. When we went to -- when we decided
2  to do the study, we had a teleconference,
3  videoconference with Merck that was
4  attended by myself, my office director,
5  Dr. Honig, his deputy, Dr. Himmel, both
6  of whom are now at Merck, and then people
7  from Kaiser. And we had a list of five
8  or six drug safety questions that we were
9  going to discuss which of these we
10 thought was the most important one that
11 needed to be studied. And the consensus,
12 hands down, of that group was that Vioxx
13 needed to be studied because that issue
14 affected more lives and the impact of
15 that was potentially greater than any of
16 the other drug safety questions we talked
17 about.
18   Q.   A side point. Do many
19 people move from the FDA into the drug
20 companies?
21   A.   There's a fair number.
22 There's a fair number who do, yes.
23   Q.   Now, the study. It was --
24 tell us what you did, what you went about

Page 188

1  doing. It was funded by the FDA,
2  correct?
3    A.   It was funded -- this study,
4  I've been told various estimates, that
5  this study cost -- should have cost -- if
6  it was being done today, it would have
7  cost over $1 million. That's what I was
8  told by people at the DSaRM committee in
9  February 2005. FDA contributed a total
10 of $60,000, which was basically good
11 faith money, and Kaiser underwrote all
12 the other expenses associated with the
13 study.
14   Q.   For the uninitiated, who is
15 Kaiser? They're going to hear about
16 Kaiser Permanente.
17   A.   It's Kaiser Permanente,
18 California. It's a managed care
19 organization in California. I believe
20 it's a not-for-profit organization, but I
21 could be wrong about that. This study --
22   Q.   Is it a healthcare plan?
23   A.   It's a healthcare plan like
24 an HMO.

Page 189

1    Q.   Do they have large
2  numbers -- a big population database
3  which you're able to mine?
4    A.   Yes. They have like 6
5  million patients.
6    Q.   Are they affiliated with
7  industry when they're involved in these
8  studies?
9    A.   There are some studies that
10 they can do with industry. This study
11 was done without industry input.
12   Q.   You got approval, and you
13 got funding from the FDA, correct?
14   A.   Correct.
15        MR. BECK: Object to form.
16 BY MR. KLINE:
17   Q.   Did you get approval?
18   A.   Yes.
19   Q.   From the FDA?
20   A.   Yes.
21   Q.   Did you get funding?
22   A.   Yes.
23   Q.   Did you go about your
24 business of conducting this study?

48 (Pages 186 to 189)

Page 190

1    A.   Yes.
2    Q.   Did you do it with the kind
3  of scientific rigor that you would expect
4  from yourself and from others like you?
5    A.   Yes.
6        MR. BECK:  Object to form.
7  BY MR. KLINE:
8    Q.   Did you do it with
9  scientific rigor?
10       MR. BECK:  Object to form.
11       THE WITNESS:  Yes.
12 BY MR. KLINE:
13   Q.   How did you conduct it?
14   A.   Well, we assembled a study
15 team, and so we had a group of
16 investigators from Kaiser who were well
17 experienced with their database and
18 understood what different files were
19 needed to do the study that we were going
20 to do.  We had people from FDA who
21 participated as well, had a statistician,
22 someone from the medical review division.
23 Eventually those people dropped off the
24 study because they just never showed up

Page 191

1  at the study meetings.  So, there was no
2  point in carrying them on.
3        And then I recruited the
4  assistance of Dr. Wayne Ray from
5  Vanderbilt, because he -- well, two
6  reasons:  one, we had a cooperative
7  agreement program where we funded him to
8  do research in a collaborative fashion
9  with FDA drug safety scientists, so, we
10 already had a relationship with him; and
11 two, he was very experienced in studying
12 these nonsteroidal pain relievers.  And
13 so the first thing was to assemble a
14 study team.
15       The second thing was to work
16 on a study protocol which -- we came up
17 with a rough protocol, but it went under
18 frequent modifications as we encountered
19 problems during the course of the study
20 where the way we thought the files would
21 work and the data would be available
22 turned out not to be the case, and so we
23 had to come up with workarounds.
24       But all that said, by August

Page 192

1  of 2000, we had our data set and did our
2  analysis and went to -- wanted to present
3  them at the international conference on
4  pharmacoepidemiology in Bordeaux, France.
5    Q.   When was that?
6    A.   That was in August of 2004.
7    Q.   The study took a number of
8  years, obviously?
9    A.   Yes.  It took about three
10 years.
11   Q.   Is that unusual?
12   A.   The study probably could
13 have been more quickly if FDA had been
14 able to devote its -- my full time to it
15 and if Kaiser had been able to devote its
16 full time to it.  But Kaiser basically
17 had their patients to take care of, and
18 they were sort of adding this on to their
19 normal workload, and I had many other
20 assignments during this time.  So, I
21 think if we were trying to do the study
22 today, maybe we could have done it in a
23 year-and-a-half.
24   Q.   Now, you were the lead of

Page 193

1  the study?
2    A.   Yes.
3    Q.   And it was your baby; is
4  that correct?
5    A.   Correct.
6    Q.   Was that known by your
7  bosses at the FDA?
8    A.   Oh, yes.
9    Q.   And did they know that you
10 were studying in particular Vioxx?
11   A.   Yes.
12   Q.   And were you studying other
13 COX-2s as well?
14   A.   We looked at Celebrex.  We
15 were not able to look at Bextra because
16 it wasn't used in Kaiser at the time of
17 our study.  And we looked at other pain
18 relievers as well, most particularly,
19 naproxen, because we also, in addition to
20 wanting to study whether or not Vioxx
21 increased the risk of heart attack, we
22 wanted to know whether naproxen protected
23 against heart attack.  And so we were
24 going to test both of those questions.

Page 194

1    Q.   Now, there's a story in
2  between, but at the end of the day, was
3  this study published in The Lancet?
4    A.   Yes, it was.
5    Q.   It was first on line January
6  25th of '05?
7    A.   Correct.
8    Q.   Was it peer reviewed by --
9  did it go through a peer review process
10  and was it peer reviewed?
11    A.   It went through peer review
12  twice.  A total of ten different peer
13  reviewers from The Lancet looked at this
14  paper, five on each of two occasions.  On
15  each occasion, the paper was accepted for
16  publication.
17    Q.   Was that unusual, that it
18  was peer reviewed twice and by that many
19  people?
20    A.   It was unusual, but it was
21  necessitated by efforts by the FDA to
22  suppress publication of the paper.
23    Q.   Yes, I'm going to have you
24  tell that story in a minute in your own

Page 195

1  words.
2    At the end of the day when
3  you published the article, the article
4  was entitled "Risk of acute myocardial
5  infarction and sudden cardiac death in
6  patients treated with..."  Is that
7  correct?  That's the study?
8    A.   Yes.
9    MR. KLINE:  And we have it
10  here.  We'll mark it as the next
11  Exhibit Number, 4.
12    - - -
13    (Whereupon, Deposition
14  Exhibit Graham-4, "Risk of acute
15  myocardial infarction and sudden
16  cardiac death in patients treated
17  with cyclo-oxygenase 2 selective
18  and non-selective non-steroidal
19  anti-inflammatory drugs: nested
20  case-control study," (Graham, et
21  al) The Lancet 2-5-05 Vol. 365,
22  475-481, was marked for
23  identification.)
24    - - -

Page 196

1  BY MR. KLINE:
2    Q.   This was the result, the
3  fruits of your four-year labor; is that
4  correct?
5    A.   Correct.
6    Q.   What was your bottom line of
7  your findings, sir?
8    A.   The bottom line was that
9  Vioxx at high dose increased the risk of
10  heart attack compared to basically nonuse
11  of the drug; that, compared to Celebrex,
12  which was the other leading COX-2 pain
13  reliever on the market, that Vioxx at
14  high dose and low dose increased the risk
15  of heart attack.  With low dose, it was
16  just a borderline statistical
17  significance, but the point estimate was
18  clearly there; and that naproxen did not
19  protect against heart attack, if
20  anything, it increased the risk
21  slightly.
22    MR. KLINE:  And if I may,
23  and let me find it, if I can mark
24  yet another exhibit, Lisa, the

Page 197

1  PowerPoint that he presented to
2  the FDA Advisory Committee,
3  please.
4    We'll mark it as Exhibit
5  Number 5.
6    - - -
7    (Whereupon, Deposition
8  Exhibit Graham-5, "Review of
9  Epidemiologic Studies on
10  Cardiovascular Risk with Selected
11  NSAIDs," (Graham) PowerPoint
12  Slides, 2-17-05 DG0000107 -
13  DG0000127 , was marked for
14  identification.)
15    - - -
16    MR. KLINE:  And we have them
17  numbered?  We do have them
18  numbered.
19  BY MR. KLINE:
20    Q.   You presented at the FDA
21  Advisory Committee on February 17, 2005?
22    A.   Correct.
23    Q.   And the purpose of this
24  Advisory Committee very briefly, sir, was

Page 198

1 what?
2    A.   To review the evidence for
3 heart attack risk with the various
4 nonsteroidal pain relievers, so, both the
5 COX-2 type, the Vioxx-type drugs and the
6 traditional pain relievers like naproxen.
7    Q.   Vioxx was off the market as
8 of September 30, 2004?
9    A.   Correct.
10    Q.   So, this postdates the
11 withdrawal of the drug?
12    A.   Yes.
13    Q.   Did you have any doubt as to
14 your opinions which you had already --
15 which you had just published in the
16 Lancet and presented in many other
17 forums, sir?
18    A.   No.
19    Q.   Now, when you presented --
20 let me show the results.
21    MR. KLINE:  Do we have his
22 PowerPoint in front of him?
23    THE WITNESS:  Uh-huh.
24 BY MR. KLINE:

Page 199

1    Q.   If you look at the last two
2 pages, your conclusions. I believe they
3 -- I want to ask you, do the conclusions
4 here mirror only in a PowerPoint form the
5 conclusions that you reached and stated
6 to the medical world at large in your
7 peer-reviewed Lancet journal article,
8 sir?
9    MR. BECK:  Before you
10 answer, please, same objection.
11 This is another document that Dr.
12 Graham's lawyers took from the FDA
13 files and turned over to the
14 plaintiffs' lawyers outside the
15 normal scope.
16    THE WITNESS:  It's also
17 available on the web.
18    MR. KLINE:  Yes. We hear
19 your objection, Mr. Beck. It's
20 also available on the web, it's
21 also available in Merck's files
22 where we first, I think, found it.
23 BY MR. KLINE:
24    Q.   Having said that, Exhibit

Page 200

1 Number -- Page 126 of Exhibit Number --
2    THE COURT REPORTER:  5.
3 BY MR. KLINE:
4    Q.   -- 5 --
5    MR. KLINE:  Thank you.
6 You're keeping track. You're good
7 with numbers. Better than me.
8 BY MR. KLINE:
9    Q.   -- is the conclusions you
10 reach regarding risk of MI, COX-2
11 selective NSAIDs, and I'd like to go to
12 rofecoxib, namely, Vioxx.
13    A.   Right. The --
14    Q.   That's it. Thank you, sir.
15    A.   The conclusions from our
16 study, this would mirror the conclusions.
17 The risk beginning early in therapy,
18 apparent during days 1-30 of use. In our
19 study, we were only able to get at that
20 time event indirectly by looking at the
21 distribution of time of use of Vioxx.
22 And what we saw was that over 50 percent
23 of our patients used the drug for less
24 than four months. And so that result

Page 201

1 would say that the risk with Vioxx begins
2 early in therapy. And so with that sort
3 of explanation, I would say that these
4 conclusions here for rofecoxib are
5 similar to the ones in our paper. Our
6 paper did not address valdecoxib, which
7 is Bextra. And with celecoxib, in that
8 study, we didn't have a lot of high dose
9 use, and we found no risk with the low
10 dose.
11    Q.   You said as to Vioxx that
12 equal to or less than 25 milligrams, your
13 words were "probable increased risk"
14 correct?
15    A.   Correct.
16    Q.   And greater than 25
17 milligrams "definite increased risk"?
18    A.   Correct.
19    Q.   When you presented this
20 paper at the Advisory Committee meeting,
21 did you speak to anyone from Merck?
22    A.   I think I did. I think I
23 spoke to Peter Honig, but it was
24 basically -- he just said hello, how are

Page 202

1  you doing. I said, hi Peter, how are you
2  doing. And then the conversation kind of
3  shifted. And I said to him, Peter, you
4  just need to understand one thing, that
5  everything I have been doing here with
6  these drugs has nothing to do with Merck.
7  So, in my mind I'm not making a target of
8  Merck. It has to do with the safety of a
9  drug. That's all I'm interested in. His
10 response back to me was that I'm glad to
11 hear that.
12     Q.  I want to go to Page 127,
13 because on Page 127 of your PowerPoint to
14 the Food & Drug Administration Advisory
15 Committee, you told them after your study
16 that naproxen, in your view, if we can
17 highlight this, you said, "not" cardio
18 "protective," correct?
19     A.  Correct.
20     Q.  In fact, you said the exact
21 opposite?
22     A.  No. I said there's a
23 possibility.
24     Q.  Or a gradation of the exact

Page 203

1  opposite?
2      A.  Correct.
3      Q.  Namely, sir?
4      A.  That the evidence supported
5  the possibility that naproxen increased
6  the risk. Subsequently, I've done a
7  meta-analysis of this that hasn't been
8  published yet where the risk of naproxen
9  is slightly increased. It confers about
10 a ten percent increase in heart attack
11 risk.
12     Q.  Not a decrease?
13     A.  Not a decrease.
14     Q.  And -- okay, now. If you
15 look at the Advisory Committee meeting,
16 your PowerPoint number 1 -- let's see,
17 it's 114, Page 114. We'll put it up very
18 briefly and try to work through this
19 stuff in our waning moments.
20         I see here, "Risk of AMI
21 with Celecoxib Or Rofecoxib." I want to
22 focus on Vioxx, rofecoxib. Okay?
23     A.  Uh-huh.
24     Q.  What you did here was to

Page 204

1  collect the data from the various
2  studies, correct?
3      A.  Correct.
4      Q.  At all doses, just focusing
5  on the "all doses," your study showed an
6  increased risk of -- what are you showing
7  increased risks of here to be clear?
8  What are you characterizing it?
9      A.  We showed an increased risk
10 of heart attack and sudden cardiac death
11 as a -- sort of considering those
12 together.
13     Q.  By the way, sir, and I hate
14 to do it this way, but I forgot earlier.
15 When you gave me your figures of 88,000
16 to 140,000 excess cases of serious
17 coronary heart disease in the life of
18 Vioxx in the United States, how many of
19 those -- did you do a calculation of how
20 many of those were deaths?
21     A.  Yes. It's about 40 percent.
22 So, if you multiply .4 by each of the
23 numbers, you come up with a range that's
24 somewhere in the neighborhood of 40,000

Page 205

1  to 60,000.
2      Q.  40,000 to 60,000 excess
3  deaths over those that would have been
4  if --
5      A.  Patients had not used
6  rofecoxib, had not used Vioxx.
7      Q.  Back to the relative risks.
8  If we can just focus in on all doses of
9  Vioxx, we have relative risks which are
10 above 1 in the Graham study, is that
11 correct?
12     A.  Yes.
13     Q.  The Solomon study?
14     A.  Yes.
15     Q.  The Kimmel study?
16     A.  Yes.
17     Q.  The Ingenix study?
18     A.  Yes.
19     Q.  And the Medi-Cal study?
20     A.  Yes.
21     Q.  And you were involved in the
22 Medi-Cal study as well, correct?
23     A.  Correct.
24     Q.  Very briefly. I'm going to

Page 206

1  sort of bang at a couple points here.
2       50 milligram dosage, you
3  wrote a paper on it, correct, sir?
4       A.   Yes.  It hasn't been
5  published yet.
6       Q.   I thought you wrote an early
7  paper on 50 milligrams and its usage.
8       A.   Yes, we did.
9       Q.   What was your point?  You
10 can probably tell me in a sentence or
11 two.
12      A.   One, that the higher doses
13 are more toxic, there's a dose response,
14 so, the highest doses have the highest
15 toxicity; and that they're used
16 extensively, 18 percent of the
17 population; and people use them for long
18 periods of time, not for the short
19 periods of time that people at FDA say
20 it's only approved for five days of use.
21 But if you read the label closely, it
22 says it hasn't been studied for more than
23 five days of use, and then it says
24 "chronic use is discouraged."  It doesn't

Page 207

1  say that it can't be used.  So, what we
2  found is it's used much longer than what
3  people customarily thought, it's used
4  much more frequently than you would have
5  imagined, and that it has higher toxicity
6  than the other drugs.
7       Q.   What is the relative -- what
8  is the increased risk for a patient using
9  Vioxx at 50 milligrams according to your
10 epidemiological studies, sir?
11      A.   Okay.  Well, if you were --
12 let's say you're a 65 to 70-year-old --
13 74-year-old white male, which might be a
14 typical Vioxx user.  Your background risk
15 for heart attack in the next year is 2
16 percent, 1 in 50, 2 in 100.  That's from
17 the American Heart Association.  If I
18 were to increase your risk of heart
19 attack by a factor of 5 as occurred, say,
20 in the VIGOR study, you would go from a
21 risk of heart attack of 2 per 100 to 10
22 to 100.  So, that would be going from 1
23 in 50 to 1 in 10 if you used the drug
24 over a year.

Page 208

1       Q.   Now, when we see a relative
2  risk like in your study of 1.34, let me
3  understand something.  If there were
4  1,000 nonusers, that would be -- there
5  would be 1,340 who had an incident; is
6  that correct?
7       A.   Basically, what it's saying
8  is if the natural occurrence in some
9  population was 1,000 cases --
10      Q.   Yes.  That's how I wanted to
11 put it.
12      A.   -- that using Vioxx, you
13 would get another extra 340 over and
14 above the thousand that would have
15 occurred anyway.
16      Q.   Why did I know you'd say it
17 better than me.
18           Now, that was the point I
19 wanted to try to ask you.
20           Now, what I want to do in
21 the remaining direct examination is to
22 ask you about how this study came about
23 in the period in 2004 when you were ready
24 to present the study and its results.

Page 209

1  Tell us the background, the atmosphere,
2  and what occurred with your attempt to
3  present this as a paper, your attempt to
4  present it as a poster at the American
5  College of Rheumatology, your attempt to
6  present it at the International Society
7  of Pharmacoepidemiologists.
8           First of all, is there a
9  story here, sir?
10      A.   Yes, there's a story.
11      Q.   And what is -- would you
12 please tell the members of the jury the
13 story.
14      A.   Well, there's a couple of
15 stories.  One story relates to two
16 different abstracts, one for the American
17 College of Rheumatology or ACR and one
18 for ISPE.  The data in the two abstracts
19 are different.  This was a cause for
20 concern, but basically the way it came
21 about was, my making mistakes along the
22 way.
23           The ACR abstract reflected
24 an inaccurate, an incorrect analysis of

Page 210

```
 1    the data.  We had misclassified patients,
 2    and we discovered it after we put that
 3    abstract in for -- submitted it to the
 4    meeting, that required that we correct
 5    it.  Because to not correct it, that
 6    would be scientific misconduct, because
 7    we had a problem, we saw it, and we
 8    couldn't allow it to go uncorrected.
 9          The second problem that I
10    was actually much more concerned about
11    was that I had done the analysis
12    incorrectly.  In the ACR abstract, we
13    talked about a number of different drugs,
14    and I don't remember it right offhand
15    now, I'd need it in front of me, but
16    let's say there were like five different
17    drugs that we looked at.  That's probably
18    more or less what it is.  In that study,
19    I did what's called a regression analysis
20    for each drug separately, and then I came
21    up with an answer.  Well, that's the
22    wrong way to do the study because if I
23    focus on one drug, I'm leaving the data
24    for the other four drugs out of the
```

Page 211

```
 1    regression.  What you need to do is do a
 2    single analysis that includes all five
 3    drugs together at the same time in one
 4    place.  And when we learned about that
 5    mistake, I was embarrassed, but I was
 6    also kind of happy.  I was happy because,
 7    well, A, we'd caught the mistake; and B,
 8    because I learned something that I hadn't
 9    known before, and so we corrected the
10    mistakes.  And so the corrected data, if
11    you will, the corrected analyses were
12    present in the ISPE poster.  So, now, the
13    ISPE poster --
14          Q.  Okay.  So, you had some
15    issues.  Is this uncommon, by the way,
16    sir?
17          A.  No, it's not uncommon.
18          Q.  Dr. Graham, did you deal
19    with this with openness and transparency?
20              MR. BECK:  Object to the
21          form.
22              THE WITNESS:  Yes.
23    BY MR. KLINE:
24          Q.  How did you deal with this?
```

Page 212

```
 1          A.  We dealt with it with
 2    openness and transparency.
 3              MR. BECK:  Move to strike.
 4    BY MR. KLINE:
 5          Q.  How did you deal with it?
 6          A.  Well, let's see.  We had a
 7    blinded group that had to vote in a
 8    unanimous way to change the way we had
 9    classified a drug.  So, if any one person
10    in the group said no, I think this drug
11    should stay classified the way it was
12    before, we wouldn't change it.  When we
13    went about the analyses and I discovered
14    the analyses, I checked it with a number
15    of different statisticians around the
16    country, people at Stanford, people
17    within FDA.  I contacted Norm Breslow,
18    who is a statistician, I think he's at
19    the University of Washington and has
20    written sort of like the definitive
21    textbook on the analysis of case-control
22    studies because I wanted to make sure
23    that the way I'd done it was wrong and
24    that I needed to change it.  And then --
```

Page 213

```
 1          Q.  You got it changed?
 2          A.  We got it changed.
 3              And when we went to publish
 4    the paper, one of the first things that I
 5    did was I sent an e-mail to the editor of
 6    The Lancet and asked for the opportunity
 7    to speak with him before they reviewed
 8    our paper.  And he called me and we spoke
 9    for about 45 minutes.  The purpose of it
10    was to explain the ACR abstract and what
11    our paper was, why the differences
12    occurred, where they occurred, how we
13    handled them.  And his response back to
14    me was twofold.  He said, thank you for
15    your candor and your honesty and your
16    openness.  This happens all the time, and
17    I'm not concerned at all.  This is the
18    scientific method.
19          Q.  Now, did you face — I want
20    to get to this.  I'm going to try to do
21    it literally in about five minutes or ten
22    minutes.  I'm going to go a little bit
23    over.
24              Would you tell the members
```

Page 214

1  of the jury who hear this tape what
2  barriers and obstacles you faced in the
3  publication -- the presentation of this
4  information and explain the background.
5       A.   Right.
6       Q.   Are you able to capsulize it
7  like you did in front of the United
8  States Senate?
9       A.   I can try.
10          When I presented my results
11  of the study for clearance for the
12  abstract for ISPE, the reaction from my
13  supervisor was, oh, this is an
14  excellently done study, I only have one
15  problem, that's with your conclusion.
16  And he wanted me to change my conclusion.
17  And my conclusion was that Vioxx at high
18  doses increases the risk of heart attack,
19  and it shouldn't be prescribed by
20  physicians or used by patients.  So,
21  basically, I'm saying that the high dose
22  should come off the market.  That's what
23  I'm saying.  But I can't say that
24  outright, because the way FDA is, if I

Page 215

1  had said that, they would have buried me.
2  As it is, they spent three days harassing
3  me to force me to change the abstract.
4  In the process, they said, well, we're
5  not going to let you go to ISPE, oh, we
6  want you to present our view of the truth
7  so you can present what you believe and
8  what you don't believe.  Oh, we have to
9  let Merck know.  That came from Dr. Anne
10  Trontell, who is deputy office director
11  and a close personal friend of Peter
12  Honig.  And I only mention that --
13       Q.   From Merck?
14       A.   From Merck.  And I only
15  mention that because when Peter Honig was
16  a division director and then an office
17  director in our office, he's the person
18  that brought Dr. Trontell in to work with
19  us, and so she felt a great sense of
20  loyalty.  And so she was talking about,
21  we have to -- it's all right.  I can't
22  present it at ISPE, but we have to let
23  Merck know about it.  And that was the
24  FDA response.

Page 216

1          And then from the director
2  of the Office of New Drugs, this
3  contradicts our policy because our policy
4  says that the high dose is safe and
5  effective so how can he say it's not.
6          So, those are basically the
7  obstacles I had to face just to present
8  it in France.
9       Q.   Did you have an original
10  poster presentation which you ran up the
11  line at the FDA?
12       A.   Yes.
13       Q.   And did you say in that what
14  you told this jury, that 50 milligrams
15  should be off the market?
16       A.   I didn't phrase it that way,
17  but that was the clear implication, and
18  that was my intent.  And obviously that
19  was, I think, the interpretation that my
20  superiors at FDA took about it as well.
21       Q.   Did you accept some
22  editorialization by them and changes by
23  them by the time you did the final
24  presentation?

Page 217

1       A.   The final presentation was,
2  the conclusions were changed slightly,
3  and I wasn't happy with having had to
4  change them.  But if I hadn't changed
5  them, I would not have been allowed to
6  present the paper, and I thought it was
7  more important to get the information out
8  than to get it out with the conclusion
9  that I completely --
10       Q.   Which you did, correct?
11       A.   -- trusted.  Which I did.
12       Q.   And you presented the paper?
13       A.   Yes.
14       Q.   Now, what was the next step
15  along the way?  Was it putting this
16  into -- did you then get any more flack
17  at the FDA?
18          MR. BECK:  Object to form.
19          THE WITNESS:  When I
20  returned --
21  BY MR. KLINE:
22       Q.   I'll rephrase the question.
23  I don't want to have a word that might be
24  a problem.

Page 218

1        Did you run into any more
2   difficulties at the FDA as your process
3   went forward towards turning the poster
4   and the abstract into a paper?
5        MR. BECK:  Object to the
6        form.
7        THE WITNESS:  Yes.  I ran
8        into many obstacles.  The first
9        was almost as soon as I returned
10       from France, so, it was at the
11       very end of August or the very
12       beginning of September, that I was
13       verbally scolded by my supervisor.
14       Basically, he accused me of having
15       orchestrated a media campaign to
16       publicize my poster at ISPE.  It
17       was just a ridiculous accusation,
18       but he was quite heated and quite
19       angry at me, even though Dr.
20       Trontell had said in one of her
21       e-mails this is going to attract a
22       lot of media attention.
23   BY MR. KLINE:
24       Q.   Who is she?  Those that are

Page 219

1   listening might be uninitiated.
2       A.   Dr. Trontell is the deputy
3   office director and the person --
4       Q.   Is she your immediate boss?
5       A.   No.  She's not my supervisor
6   at all.
7       Q.   Where is she from?
8       A.   She's in the Office of Drug
9   Safety.  She originally came from the
10  Office of New Drugs and was brought to
11  drug safety by Dr. Peter Honig.
12      Q.   Is this an example in your
13  mind of the problems in the FDA more
14  generally?
15      A.   Yes.
16      MR. BECK:  Object to form.
17  BY MR. KLINE:
18      Q.   Tell us why.
19      A.   It's an example of FDA
20  suppressing its scientists, not allowing
21  for the free exchange of scientific
22  information or free expression of
23  scientific information.  It's an Office
24  of Drug Safety that doesn't act

Page 220

1   independently of what the Office of New
2   Drugs says it wants to have happen.
3       Q.   Is that what was happening
4   here?
5       A.   And that was what was
6   happening here.
7       MR. BECK:  Object to form.
8   BY MR. KLINE:
9       Q.   In what way specifically?
10      MR. BECK:  Same objection.
11      THE WITNESS:  Well, it's
12      coming specifically because they
13      don't want anything publicized
14      that would contradict FDA policy
15      or that would call into question
16      the legitimacy or the rationale
17      for that policy.  Remember, when
18      FDA made the -- eventually made a
19      labeling change on Vioxx with
20      Merck in April of 2002, what FDA
21      was saying at that point is by
22      doing this labeling change, we
23      have now altered the benefit/risk
24      equation for this drug into an

Page 221

1       acceptable range.  Before the
2       labeling change, it was
3       unacceptable.  Now it's
4       acceptable.
5   BY MR. KLINE:
6       Q.   Was it, in your view,
7   acceptable?
8       A.   Oh, clearly, no.
9           And what this poster's
10  conclusion was saying was that FDA's
11  policy should be more closely examined.
12          And you mentioned before
13  that I had appeared on Nightline and I
14  had the opportunity to debate Dr. Janet
15  Woodcock, who is now an associate
16  commissioner at FDA, and she had been the
17  center director at one time.  And I asked
18  her --
19      Q.   CDER director?
20      A.   CDER.  I asked her directly
21  on national television, tell America what
22  the benefit/risk analysis from FDA was on
23  Vioxx.  Tell them.  Because I haven't
24  seen one, and as far as I'm aware, none

56 (Pages 218 to 221)

Page 222

```
1   exists.  And the truth is none exists.
2   And Ted Koppel got all over her case
3   because when he saw that it hadn't been
4   done, he was pretty upset, too, because
5   FDA said the benefits exceed the risks.
6        Q.   Couple more things.
7            In your view, the benefits
8   clearly did not exceed the risks?
9            MR. BECK:  Object to form.
10           THE WITNESS:  No.
11  BY MR. KLINE:
12       Q.   In your view, did the
13  benefits clearly exceed the risk or
14  exceed them at all?
15           MR. BECK:  Object to form.
16           THE WITNESS:  No.  The
17  benefits did not exceed the risks.
18  BY MR. KLINE:
19       Q.   In fact, was it the
20  opposite?
21           MR. BECK:  Object to form.
22           THE WITNESS:  This drug was
23  risky.  And the benefits that one
24  gained at a population level for
```

Page 223

```
1   the risks just weren't worth it.
2   The juice wasn't worth the
3   squeeze, and in my view, as I said
4   before, I think that Vioxx was
5   approved prematurely, and clearly
6   if more work had been done,
7   certainly the high dose shouldn't
8   have been approved.  And if it had
9   been approved, it should have been
10  withdrawn with the VIGOR study.
11  And at that point, intensive study
12  at the lower doses should have
13  been enacted with a very large
14  clinical trial done in a very
15  short space of time to nail down
16  the question.  And I'm not talking
17  about an APPROVe-like study that
18  takes four or five years to do and
19  has only five or six heart attacks
20  in six months.  I'm talking about
21  a really huge study that gives you
22  the opportunity, the power, to
23  answer the question definitively.
24  And that was not done.
```

Page 224

```
1   BY MR. KLINE:
2        Q.   Everything of what you just
3   said, sir, was it within the resources
4   and capability of Merck & Company?
5        A.   Yes, it was.
6            MR. BECK:  Object to form.
7            MR. KLINE:  Let's go off the
8   video record.
9            THE VIDEOTAPE TECHNICIAN:
10  Stand by, please.  The time is
11  12:53.  We're going off the video
12  record.
13             - - -
14          (Whereupon, a recess was
15  taken from 12:53 p.m. until 12:55
16  p.m.)
17             - - -
18          MR. KLINE:  Dr. Graham, I
19  have no additional questions at
20  this time.  I'm sure I'll have
21  questions for you after your
22  cross-examination.  Thank you,
23  sir.
24          THE WITNESS:  You're
```

Page 225

```
1   welcome.
2            THE VIDEOTAPE TECHNICIAN:
3   Stand by, please.  The time is
4   12:55.  We're going off the
5   record.
6             - - -
7          (Whereupon, a recess was
8   taken from 12:55 p.m. until
9   2:03 p.m.)
10             - - -
11         MS. ROYCE:  This is Joanne
12  Royce representing Dr. Graham, and
13  I just wanted to address an issue
14  that was raised a couple of times
15  by Mr. Beck regarding a document
16  production.
17         Last week we got a request
18  from the plaintiffs' documents for
19  a number -- from the plaintiffs'
20  attorneys for a number of
21  documents which were very
22  specific.  They were all public
23  documents or documents that we had
24  no reason to believe that the FDA
```

Page 226

1    would have any confidentiality
2    issues with.  They were
3    post-subpoena documents, and we
4    did turn them over, and we
5    requested that they be immediately
6    turned over to the defendants as
7    well.  And so I understand that
8    you got the documents at the same
9    time that the plaintiffs did, and
10   we certainly had no intention to
11   slight the defendants.
12       We got your request for
13   documents one day before the
14   deposition when we were all
15   preparing for it yesterday.  It
16   was extremely broad.  We
17   considered that most of it was
18   covered by the subpoena that had
19   already gone to the FDA, and so we
20   contacted the FDA, and they
21   instructed us that we could not
22   release them -- should not release
23   them yet.
24       Thank you.

Page 227

1         THE VIDEOTAPE TECHNICIAN:
2    The video time is 2:04.  We are
3    back on the record.
4              - - -
5         CROSS-EXAMINATION
6              - - -
7    BY MR. BECK:
8        Q.   Dr. Graham, you talked a
9    little bit on direct examination about
10   your medical training as well as your
11   training as an epidemiologist.  Do you
12   practice medicine now?
13       A.   No, I do not.
14       Q.   Have you ever actively
15   practiced medicine?
16       A.   Yes, I did, if you count
17   residency training and then professional
18   development after I finished doing my
19   residency, during my fellowship, and then
20   while I was in my early years as a
21   medical officer at FDA.  So, during those
22   times I practiced, but I did that at
23   Walter Reed Army Medical Center.
24       Q.   How long ago would this have

Page 228

1    been?
2        A.   The last time that I saw
3    patients in active patient care was in
4    the realm of neurology.
5        Q.   How long, sir?
6        A.   15 years.
7        Q.   Okay.
8             And I'm going to make the
9    same request that Mr. Kline did, and that
10   is, that you keep your answers short.
11   For example, when I ask you how long, if
12   you could just tell me how long rather
13   than what hospital it was at and what
14   department you were in.  Okay?
15       A.   Sure.
16       Q.   So, for the last 15 years,
17   you have been focusing pretty much
18   exclusively on epidemiology and drug
19   safety rather than practicing medicine;
20   is that correct?
21       A.   Correct.
22       Q.   On direct examination, you
23   were asked whether you were subpoenaed to
24   appear here, and you said yes.  But do

Page 229

1    you understand that that's simply the FDA
2    rules, that an FDA employee cannot appear
3    to testify unless there's a subpoena
4    issued?
5        A.   I'm not a lawyer, so, I do
6    what I'm told.  I was served with a
7    subpoena, and I gave it to the FDA
8    lawyers.
9        Q.   Well, didn't you also tell
10   newspaper reporters or news reporters
11   that you welcomed the opportunity to give
12   deposition testimony?
13       A.   I don't recall what I said
14   to the press.
15       Q.   We spent a few minutes here
16   before I started, your lawyer made a
17   statement about the circumstances under
18   which you provided the plaintiffs with
19   some documents late last week.  You were
20   here when your lawyer made those
21   statements, correct?
22       A.   Yes.
23       Q.   Do you remember that a few
24   months ago the plaintiffs' lawyers served