Page 230

1 a document subpoena on the FDA, a formal
2 document subpoena?
3     A.   I'm not aware of that.
4     Q.   Well, did you know that the
5 FDA was collecting documents from
6 people's computers and files in order to
7 turn over in response to some sort of
8 formal request from the plaintiffs'
9 lawyers?
10     A.   Right.  And I turned over
11 documents at that time.  I think it was
12 like in October.
13     Q.   Okay.
14         So, way back in October you
15 were giving documents to the FDA lawyers,
16 I suppose, who were collecting them in
17 response to the subpoena from the
18 plaintiffs; is that right?
19     A.   I give them to an office
20 manager, and what happens to them after
21 that, I don't know.
22     Q.   And then last Friday, did
23 you collect another couple hundred pages
24 of documents from your computer at the

Page 231

1 FDA offices and from your FDA files and
2 give them to your lawyers to be turned
3 over to the plaintiffs?
4     A.   My attorneys asked for
5 specific documents, and I provided them
6 to them.  I wasn't told what would happen
7 with those documents.  Also, the
8 documents that I turned over, it wasn't
9 hundreds of pages as I recall, and the
10 documents in terms of like the PowerPoint
11 presentations, those were things that I
12 had actually done on my own time as
13 outside activities with FDA, and I had
14 copies of them at work as well.
15     Q.   You didn't have copies of
16 them at home, right?
17     A.   That's correct.
18     Q.   So, you only retained copies
19 in your office at work, right?
20     A.   Correct.
21         MR. BECK:  Let me show you
22 what we'll mark as Defendant's
23 Exhibit 1.  I guess I'll just go
24 in sequence from where he left off

Page 232

1 rather than defendant's exhibits.
2         We'll call this Graham
3 Exhibit 6.
4         - - -
5         (Whereupon, Deposition
6 Exhibit Graham-6, Letter 5-5-06
7 (1 page), was marked for
8 identification.)
9         - - -
10         MR. BECK:  And we'll put
11 this up on the screen that we've
12 been using.
13 BY MR. BECK:
14     Q.   Is this stationery, is this
15 from the lawyers who are here
16 representing you today?
17     A.   Repeat that, please, sir.
18 I'm sorry.
19     Q.   This stationery where this
20 letter is written on, is this from the
21 lawyers who are here representing you
22 today?
23     A.   Yes.
24     Q.   And do you see here where

Page 233

1 your lawyers, or Mark Cohen, one of them,
2 is writing to Mr. Tisi, who is one of the
3 plaintiffs' lawyers: "Enclosed please
4 find documents responsive to your May 5,
5 2006 letter requesting certain
6 information in anticipating of the
7 deposition of Dr. Graham on May 9th.
8 Please understand that since these
9 documents were stored on Dr. Graham's FDA
10 computer or in his FDA office, Dr. Graham
11 did not consider them responsive to the
12 subpoena issued by Merck on April 3,
13 2006.  Please...make sure that these
14 documents are forwarded to counsel for
15 Merck and counsel for the FDA."
16         And is this accurate in
17 terms of you didn't consider those
18 PowerPoints and other documents to be
19 responsive to Merck's earlier subpoena
20 because they were retained in the FDA
21 files and on the FDA computer?
22     A.   I discussed this with Mike
23 Levy, who is --
24         MS. ROYCE:  Objection,

Page 234

1    attorney-client privilege.
2  BY MR. BECK:
3    Q.   I don't want to know what
4  you and your lawyers talked about.  I
5  want to know whether this is an accurate
6  statement.
7         MS. ROYCE:  Objection, lack
8  of foundation.  Has he read it?
9  BY MR. BECK:
10    Q.   You just went over it with
11  me, didn't you, sir?
12    A.   I haven't read the letter
13  yet.  You asked me to look at the
14  letterhead and the name, and I did.
15    Q.   Well, I just read the letter
16  out loud.
17    A.   You did, you did -- okay.
18  You read it out loud to me.
19    Q.   Yes, and I read it out loud,
20  and the lawyer representing you said
21  that, "Please understand that since these
22  documents were stored on Dr. Graham's FDA
23  computer or in his FDA office, Dr. Graham
24  did not consider them responsive to the

Page 235

1  subpoena issued by Merck on April 3,
2  2006."
3         My only question is whether
4  that statement is true or not?
5    A.   I was told that the subpoena
6  on April 3rd excluded specifically
7  materials that were in my FDA office or
8  on my FDA computer, and so those things
9  then weren't responsive.
10    Q.   This letter from one of your
11  lawyers says that they're sending these
12  documents in response to a May 5th, 2006
13  letter.  Do you see that?
14    A.   Uh-huh.
15    Q.   Did anybody ever show you a
16  letter, May 5th letter, 2006 requesting
17  documents?
18    A.   No.  I may have had
19  something read to me over the telephone
20  by my attorney, but I honestly don't
21  recall.
22         - - -
23         (Whereupon, Deposition
24    Exhibit Graham-7, E-mails (2

Page 236

1  pages), was marked for
2  identification.)
3         - - -
4  BY MR. BECK:
5    Q.   I'm handing you what we've
6  marked as Exhibit 7.  Please take a look
7  at that top e-mail, and to set the stage,
8  someone from our office was asking about
9  the -- Shayna Cook from my office was
10  asking plaintiffs' lawyers for a copy of
11  a letter that was sent to Dr. Graham's
12  counsel requesting documents.
13         Do you see that?
14    A.   Uh-huh.
15         MR. KLINE:  Can we read the
16  whole thing for completeness under
17  the completeness doctrine, Rule
18  160?
19         MR. BECK:  What part do you
20  want read?
21         MR. KLINE:  The bottom part
22  that starts the e-mail train.
23         MR. BECK:  Sure.
24  BY MR. BECK:

Page 237

1    Q.   Start at the bottom, and
2  we'll charge this against Mr. Kline's
3  time.
4         MR. KLINE:  No, I don't
5    think so.
6  BY MR. BECK:
7    Q.   At the bottom, Ms. Dagostino
8  of Mr. Kline's office says, "Shayna, I
9  understand you e-mailed Chris Tisi
10  earlier re:  plans for document
11  presentation during the Graham dep on
12  Tuesday.  We will likely be utilizing
13  some combo of hard copies and Sanctions.
14  I hope that answers your question.
15         "Also - attached please find
16  some documents we received late today
17  from Dr. Graham's lawyers at the
18  Government Accountability Project.  This
19  will be the first of three emails.  Mr.
20  Kline wanted to make sure that your
21  office had them before the weekend."
22         And then right above that
23  Ms. Cook says please give us a copy of
24  the letter that you sent to Dr. Graham's

Page 238

1  lawyers requesting documents.
2          And then what the
3  plaintiffs' lawyer said was that: "No
4  letter was sent, but an oral request was
5  made on Thursday to Dr. Graham's
6  counsel," et cetera.
7          Now, did you know that the
8  reason --
9          MS. ROYCE: Objection. Lack
10  of foundation. You're
11  cross-examining on something he's
12  probably never even read.
13          MR. BECK: Counsel, do you
14  consider yourself bound in any way
15  by the order from The Court about
16  what kind of objections are going
17  to be made?
18          MS. ROYCE: Yes, sir.
19          MR. BECK: Okay.
20  BY MR. BECK:
21      Q.   Now, did you have any
22  understanding of whether, in fact, a
23  request had even been put in writing or
24  whether it was just a phone call from the

Page 239

1  plaintiffs' lawyers to your lawyers
2  asking that you produce FDA documents on
3  one day's notice?
4      A.   I was asked by my attorneys
5  to --
6          MS. ROYCE: Objection,
7  attorney-client privilege. I'm
8  going to ask the witness and
9  instruct him not to answer.
10  BY MR. BECK:
11      Q.   Well, did you ever find out
12  that I then wrote a letter asking for
13  other documents related to the ones that
14  you turned over to the plaintiffs'
15  lawyers last Friday?
16      A.   I learned sometime yesterday
17  late morning that someone from Merck,
18  maybe it was you, had put in a request
19  for basically what I was told, a broad
20  range of documents that mirrored the
21  previous subpoena of my entire family's
22  e-mail history for the past seven years.
23      Q.   But they didn't show you the
24  actual letter?

Page 240

1      A.   I talked by telephone.
2      Q.   All right.
3          You turned over some
4  documents from your personnel file to the
5  plaintiffs' lawyers last Friday, didn't
6  you?
7      A.   Copies of performance
8  evaluations, yes.
9      Q.   Were you told that we asked
10  for any other documents that you had from
11  your personnel files?
12      A.   On Monday, it was mentioned,
13  among other things, that you wanted
14  everything from my personnel file, and I
15  said to my attorneys that --
16          MS. ROYCE: Objection,
17  attorney-client privilege.
18  BY MR. BECK:
19      Q.   Why did you turn over
20  documents voluntarily from your personnel
21  file to the plaintiffs' lawyers, but you
22  wouldn't turn over the other documents
23  from your personnel file to us?
24      A.   I turned them over to my

Page 241

1  attorneys, not to the plaintiffs'
2  attorneys.
3      Q.   Why did you do that in
4  response to a request by the plaintiffs'
5  attorneys, but then you wouldn't give us
6  the rest of the file when we asked for
7  it?
8          MS. ROYCE: Objection,
9  argumentative.
10          THE WITNESS:  Do I answer?
11          MS. ROYCE:  You can answer.
12          THE WITNESS:  I was
13  following the instruction of my
14  attorneys.
15          MR. BECK:  We can go off the
16  video record for a minute.
17          THE VIDEOTAPE TECHNICIAN:
18  Stand by.
19          The time is 2:18.  Off the
20  video record.
21          MR. BECK:  Let's stay on the
22  record.
23          Counsel, either you're going
24  to abide by the judge's rulings or

Page 242

1  we're going to take a break and
2  call him up now. So, tell me how
3  you want to do it.
4      MS. ROYCE: What am I doing
5  wrong?
6      MR. BECK: You're making
7  objections other than objections
8  as to form, making objections as
9  to argumentative, making
10  objections as to foundation.
11      Mr. Kline read the Judge's
12  order about what counsel was
13  supposed to do and how they're
14  supposed to comport themselves
15  during the deposition. I didn't
16  hear a single objection from you
17  this morning, and my only question
18  is, if you intend to go beyond
19  form, I can't stop you. But at
20  some point, we'll have to take a
21  break and call Judge Fallon.
22      MR. KLINE: Respectfully,
23  Mr. Beck, form and privilege.
24      MR. BECK: Yeah, that

Page 243

1  doesn't have to do with
2  argumentative or foundation, and I
3  didn't raise any question about
4  privilege.
5      MR. KLINE: He and I agree.
6  Form and privilege are things that
7  you can object to.
8      MS. ROYCE: Okay. Sorry.
9          - - -
10      (Whereupon, an
11  off-the-record discussion was
12  held.)
13          - - -
14      MR. KLINE: May we go back
15  off the record for a second? I
16  apologize, Phil. Count it against
17  me. Don't count the optional
18  completeness against me, but --
19      MR. BECK: If you're going
20  to do it, I didn't do that to you.
21  You're going to have me reading
22  documents --
23      MR. KLINE: I just wanted
24  you to know. That was my way of

Page 244

1  saying that's a two-edged sword.
2      MR. BECK: I didn't do it to
3  you, so it is a one-edge sword.
4      MR. KLINE: You did it
5  during a whole trial, so it's a
6  two-edged sword.
7      The only issue that I raise
8  with you, which is something
9  different than we have among the
10  parties, and I don't know the
11  exact history behind it, has to do
12  with I don't know how she gets to
13  preserve -- a third party gets to
14  preserve an objection. Maybe they
15  come in later and argue. I assume
16  they have the right to argue that
17  sometime later when the deposition
18  is cut or the deposition is to be
19  played. My concern being for any
20  third party how we go about
21  interpreting that. And I don't
22  want to hold you up honestly,
23  Phil, but that's my problem that I
24  have with that.

Page 245

1      MR. BECK: Well, she doesn't
2  have any interest in whether
3  there's a lack of foundation or
4  not. That's not her concern.
5      MS. ROYCE: She did.
6      MR. BECK: She's here.
7      MR. DAVIS: If I may.
8      MR. KLINE: Len knows the
9  history.
10      MR. DAVIS: If I may.
11      MR. BECK: I take it we're
12  off the clock here --
13      MR. KLINE: Totally.
14      MR. BECK: -- while we're
15  getting lectured.
16      MR. KLINE: Totally.
17      MR. DAVIS: Having been
18  involved with Judge Fallon and
19  having seen the order, I think
20  that Judge Fallon would expect
21  professionalism and courtesy
22  throughout the deposition as he
23  expects throughout this
24  litigation.

Page 246

```
 1            I would think that if you
 2    have an objection on behalf of the
 3    witness, that you should make your
 4    objection, but the intent is not
 5    to obstruct the deposition and to
 6    have colloquy, and I think you
 7    need to preserve your record and I
 8    think not waste time.
 9            I think that if there's an
10    issue, then you guys ought to call
11    Judge Fallon if you think it needs
12    that.  Other than that, I think
13    you ought to get the show on the
14    road and go forward with the
15    deposition.
16            MR. BECK:  Well, that's
17    where we were, I think, five or
18    ten minutes ago.
19            So, are we ready to go back?
20            THE VIDEOTAPE TECHNICIAN:
21    The video time is 2:22.  We're
22    back on the record.
23    BY MR. BECK:
24       Q.   Last week when you were
```

Page 247

```
 1    collecting documents that the plaintiffs
 2    asked for, did you ask anybody from the
 3    FDA whether it was okay with them to turn
 4    over documents from the FDA computers and
 5    the FDA files?
 6       A.   That didn't cross my mind,
 7    no.
 8       Q.   And when I asked for
 9    documents, did you ask anybody from the
10    FDA whether it was okay to turn them over
11    to me?
12       A.   No, I didn't.  I relied on
13    the advice of my counsel, FDA counsel and
14    personal counsel.
15       Q.   So, you did talk to the FDA
16    lawyer about --
17       A.   Well, no.  But I was told
18    that the FDA lawyer said that even --
19    that we couldn't produce those documents.
20    You're talking to a nonlawyer, so, you
21    know, it's getting translated.  That was
22    my understanding.
23       Q.   Somebody told you it was
24    okay to produce them last week to the
```

Page 248

```
 1    plaintiffs, but not this week to us?
 2       A.   Well, last week, what I
 3    produced were things that I considered to
 4    be actually in a sense my own property.
 5    My performance evaluations are my
 6    property.  The slides, the PowerPoint
 7    presentations were PowerPoint
 8    presentations for talks that I
 9    constructed on my own time in my personal
10    capacity and had copies of them at FDA.
11            The letters of
12    recommendation are letters of
13    recommendation that -- those are not
14    official FDA documents.  Those are
15    personal documents relevant to me.  So, I
16    don't really see that these are, in
17    quotes, FDA documents, but I'm a
18    nonlawyer.
19       Q.   Let's move away from this.
20            On direct examination, you
21    gave some testimony about what you said
22    you thought was the mechanism by which
23    you thought that Vioxx increased the risk
24    of cardiovascular events.  Do you
```

Page 249

```
 1    remember that?
 2       A.   Yes.
 3       Q.   And in summary, what you
 4    said is that you thought that Vioxx
 5    suppressed the body's production of
 6    prostacyclin and that's what contributed
 7    to these events; is that correct?
 8       A.   Correct.
 9       Q.   Would you agree with me,
10    sir, that determining this sort of a
11    mechanism is something that is outside of
12    your area of expertise?
13       A.   It is not outside of my area
14    of expertise to read the medical
15    literature, to attend medical meetings,
16    and to learn from other investigators who
17    are expert in the field.
18       Q.   But in terms of your area of
19    expertise, Dr. Graham, to make a
20    determination yourself as to the
21    mechanism is just outside of your area of
22    expertise, is it not?
23       A.   I am not a physiologist or a
24    biochemist.
```

Page 250

1    Q.   Or a pharmacologist, right?
2    A.   I'm a clinical
3  pharmacologist.
4    Q.   Well, can you give me a yes
5  or no answer, whether making a
6  determination of mechanism by which you
7  think --
8        MS. ROYCE:  Objection to
9    form.
10  BY MR. BECK:
11   Q.   -- is whether it is inside
12  or outside of your expertise?
13       MR. KLINE:  Objection to
14   form.
15       THE WITNESS:  I think it is
16   within my area of expertise when
17   it is based on the available
18   evidence.  And there's additional
19   evidence that we haven't talked
20   about that relates to the effects
21   of aspirin on --
22  BY MR. BECK:
23   Q.   So, you can't give me a yes
24  or no answer, I guess; is that right?

Page 251

1    A.   Well, my answer is yes, it
2  is within my area of expertise when it's
3  based on the available evidence.
4    Q.   Do you remember telling the
5  2005 Advisory Committee that "As an
6  epidemiologist first, I try to report the
7  phenomenon I observe and leave it to
8  brighter minds to figure out why what I
9  observed happens"?
10   A.   Uh-huh.  That's true.
11   Q.   And when you said that, you
12  were talking about mechanisms, right?
13   A.   Yes.
14   Q.   Another subject that you
15  discussed on direct examination is what
16  you call the naproxen myth.  Do you
17  remember that?
18   A.   Uh-huh.
19   Q.   And that's a phrase that you
20  used in a couple of these PowerPoints
21  that were dated from 2005, right?
22   A.   It's possible.  I mean, I
23  don't have them in front of me, but it's
24  certainly possible.

Page 252

1    Q.   Well, you had one of them in
2  front of you before --
3    A.   That said "alibi," not myth.
4    Q.   Oh, I'm sorry, naproxen
5  alibi.  I stand corrected there.
6        Now, when you were writing
7  scientific articles in 2003 and 2004 and
8  you discussed this hypothesis of naproxen
9  being cardioprotective, you didn't call
10  it an alibi then, did you?
11   A.   No.  It's a different
12  audience.
13   Q.   In fact, well, the audience
14  that you are writing for in scientific
15  publications are other scientists and
16  doctors, right?
17   A.   Correct.
18   Q.   And when you were writing in
19  scientific publications for other
20  scientists and doctors, what you said was
21  that the naproxen hypothesis was one of
22  the possible explanations for the
23  difference that was seen in the VIGOR
24  trial between Vioxx and naproxen

Page 253

1  patients, isn't that right, sir?
2    A.   A very low possibility.
3    Q.   Let's look at what you
4  actually said.
5            - - -
6        (Whereupon, Deposition
7    Exhibit Graham-8, "COX-2
8    selective non-steroidal
9    anti-inflammatory drugs and
10   cardiovascular disease," (Ray, et
11   al) Pharmacology and Drug Safety
12   2003; 12: 67-70, was marked for
13   identification.)
14           - - -
15  BY MR. BECK:
16   Q.   I'll hand you what we've
17  marked as Exhibit 8.
18       Is Exhibit 8 a 2003
19  publication?
20   A.   Yes, based on a talk from
21  2002.
22   Q.   And the first named author
23  on here is Wayne Ray.  Do you see that?
24   A.   Yes.

1    Q.   He, I think, was the person
2 that you said you recruited to help on
3 the Kaiser Permanente study that you
4 headed up, right?
5    A.   Yes.
6    Q.   And then also you're listed
7 as an author; is that right?
8    A.   Correct.
9    Q.   If you go over *to the second*
10 *page*, I'm going to direct you down to the
11 bottom of the left-hand column, and I've
12 blown this up and put it on the board.
13 If you want to look at it on the board,
14 it might be a little easier.
15         In this 2003 article of
16 yours and Dr. Ray's and the others, I see
17 you say that "The VIGOR trial enrolled
18 8076 patients with rheumatoid arthritis,
19 who were randomly assigned to rofecoxib"
20 -- that's Vioxx, right?
21    A.   Uh-huh.
22    Q.   -- "(50 milligrams...) or
23 naproxen, an established non-selective
24 NSAID." And then do you say, "MI" --

1 now, first of all, what does MI stand
2 for?
3    A.   That's myocardial
4 infarction.
5    Q.   Is that the same thing as a
6 heart attack in common language?
7    A.   Correct. Yes.
8    Q.   Okay.
9         So, a heart attack "occurred
10 in .4 percent of patients receiving
11 rofecoxib compared to .1 percent of
12 patients receiving naproxen. These data
13 may reflect an increased risk of" heart
14 attack "associated with rofecoxib;" being
15 Vioxx, "a decreased risk associated with
16 naproxen; or a combination of both
17 effects."
18         Do you see that?
19    A.   Uh-huh.
20    Q.   And then did you go on to
21 say that there were two recent published
22 studies that looked at "whether naproxen
23 has a protective effect on the risk of
24 coronary heart disease"?

1    A.   Uh-huh.
2    Q.   And this thing that you
3 called an alibi today, back in 2003, did
4 you report that both of those studies
5 that you referred to there actually
6 reported a reduction in the risk of heart
7 attacks for people who were using
8 naproxen?
9    A.   Well, a couple of things.
10    Q.   Did you say that or not,
11 sir?
12    A.   That is not what I said.
13 This paper represented a combined
14 distillation of, I guess it was four
15 different talks presented at a symposium.
16 And they frequently -- what they do is
17 they have one session and they condense
18 them into a single paper, and then they
19 list everybody as an author. And this
20 material was from someone other than me
21 in the section that I was presenting on.
22    Q.   Who was it from?
23    A.   I'd have to go back to the
24 topic headings of what the different

1 people, the four different speakers had,
2 what their speaking assignment was. My
3 speaking assignment at this meeting was
4 to talk about the association of
5 high-dose rofecoxib and hypertension.
6    Q.   Let me ask, when your name
7 is listed as an author on an article like
8 this, do you have a chance to review the
9 whole article and decide whether you want
10 to be associated with the comments that
11 are made in there?
12    A.   You get copies of articles
13 like this. When I got it, I only really
14 read the section that was my purview, and
15 I really didn't read the other sections.
16    Q.   Is this the first time that
17 you understood or knew that your name was
18 on a scientific article that said that
19 heart attacks may reflect a decreased
20 risk associated with naproxen?
21    A.   Well, I mean, I knew my name
22 was on the paper. I hadn't read that
23 closely. The studies that are referenced
24 are studies that I talked about during

Page 258

1    the previous part of the deposition that
2    are analyzed incorrectly and so really
3    don't show reductions in cardiovascular
4    risk with naproxen, but in any event.
5        Q.   Did you ever ask that your
6    name be removed from this article?
7        A.   No, I did not.
8        MR. BECK: Okay.
9            - - -
10           (Whereupon, Deposition
11       Exhibit Graham-9, "High frequency
12       of use of rofecoxib at greater
13       than recommended doses: Cause for
14       concern," (Griffin, et al)
15       Pharmacoepidemiology and Drug
16       Safety 2004; 13: 339-343, was
17       marked for identification.)
18           - - -
19   BY MR. BECK:
20       Q.   Please take a look at what
21   we've marked as Exhibit 9.  Is Exhibit 9
22   a copy of a scientific article that has
23   your name on it as one of the authors?
24       A.   Yes.

Page 259

1        Q.   Now, before we get into
2    Exhibit 9, is this one -- well, Dr. Ray
3    is on this one also, right?
4        A.   Correct.
5        Q.   So, a bunch of other authors
6    and you and Dr. Ray.  Is this one where
7    everybody just gave speeches and you
8    didn't read it closely?
9        A.   No, no.  No.  This was a
10   real study.
11       Q.   This was a real study?
12       A.   Yes.
13       Q.   Okay.
14           Well, looking down then at
15   the first page of -- I'm sorry, we'll go
16   over to the fourth page of what you
17   called the real study that you and Dr.
18   Ray were both authors on.
19           This language that I've
20   blown up here from the right-hand column
21   at the bottom, did you and Dr. Ray say,
22   "The cause of the excess of serious
23   cardiovascular events in the VIGOR trial
24   is still a matter of debate"?  Is that

Page 260

1    what you said in the scientific study in
2    2004?
3        A.   Yes.
4        Q.   And it says, "A recent
5    observational study reported a higher
6    rate of cardiovascular events in
7    high-dose rofecoxib users."  That would
8    be the 50 milligrams; is that right?
9        A.   That's what -- well, I'm
10   just looking at the reference for that,
11   and that would be, I think, any dose that
12   was over 25 milligrams.  So, there are
13   people who take 37-and-a-half milligrams.
14       Q.   Okay.
15           Are there very many people
16   who take that?
17       A.   I don't know.  I don't know
18   the number.
19       Q.   Okay.
20           Anyway, over 25.
21           It says, "A recent
22   observational study recorded a higher
23   rate of cardiovascular events in
24   high-dose rofecoxib users compared to

Page 261

1    users of other NSAIDs and users of lower
2    doses of rofecoxib."  It says "To date,
3    lower doses" -- that's talking about
4    Vioxx, right?
5        A.   Uh-huh.
6        Q.   "To date," you and Dr. Ray
7    say, "lower doses" of Vioxx "have not
8    been associated with a statistically
9    significant excess of these types of
10   serious events."
11           Is that what you said to the
12   scientific and medical community in 2004?
13       A.   It's based on the published
14   literature, yes.
15       Q.   And then you go on to say,
16   "Since the 50 milligram dose has
17   clinically significant undesirable
18   effects and has not been shown to be more
19   effective than lower doses" -- that's
20   more effective than lower doses of Vioxx,
21   right?
22       A.   Uh-huh.
23       Q.   -- "chronic use of high-dose
24   rofecoxib should be discouraged."

Page 262

1     Do you see that?
2     A.   Uh-huh.
3     Q.   Now, today what you said was
4   that back in 2004, you were clamoring
5   that 50 milligrams should be withdrawn
6   from the market.  Do you remember that?
7     A.   I don't remember using the
8   word "clamoring," but...
9     Q.   No.  That was my word.
10     You said you were urging
11   that 50 milligrams -- what you said today
12   was that back in 2004, Dr. Graham was
13   urging that 50 milligrams should be
14   withdrawn from the market, right?
15     A.   I don't think I used the
16   word "urge," but I thought that the
17   50-milligram strength should come off the
18   market, yes.
19     Q.   But in the actual scientific
20   publication that you and Dr. Ray authored
21   in 2004, what you said, all you said
22   about 50 milligrams was that chronic use
23   of high-dose Vioxx should be discouraged,
24   right?

Page 263

1     A.   Well, yes, but a couple
2   things.  One, the paper was published
3   online in July of 2003; and, two, that
4   the paper was submitted in November of
5   2002.  And basically -- and then the
6   third thing is, is I'm not the senior
7   author, and so for things like this, I
8   certainly couldn't disagree with the
9   statement that chronic use of high-dose
10   should be discouraged.  I would take it a
11   step further.
12     Back in 2002, I think that
13   the VIGOR study provided enough evidence
14   to seriously question Vioxx remaining on
15   the market.
16     Q.   But that's not what you said
17   in the article that you published two
18   years later in print and a year later
19   online, is it, sir?
20     A.   No, but I'm not the first
21   author.
22     Q.   All right.
23     And did you agree with the
24   first author on the lower dose, that the

Page 264

1   evidence that existed at the time did not
2   show a statistically significant excess
3   of adverse cardiovascular events?
4     A.   The published evidence.  But
5   the evidence available online within FDA
6   documents, Shari Targum, an FDA medical
7   officer who did a pretty nice review of
8   not only the VIGOR study, but study 085
9   and study 090, which were six-week
10   studies looking at the 12-and-a-half
11   milligram strength of Vioxx.  And if you
12   analyze those studies correctly, what you
13   see is that there is an increased risk
14   within six weeks at the 12-and-a-half
15   milligram dose of --
16     Q.   Well, you had --
17     A.   It's not a published study.
18   You can't reference it.  In the medical
19   literature, you are constrained to
20   reference pretty much what's in sort of
21   the commonly available medical
22   literature.  And the reference that they
23   cited was actually a meta-analysis that
24   was performed, I think, by a number of

Page 265

1   Merck employees.
2     Q.   You say "the reference that
3   they cited," by "they" you meant "we,"
4   right?
5     A.   Well, yes, that we cited,
6   yes.
7     Q.   Okay.
8     One of the PowerPoints that
9   you looked at today was marked as Exhibit
10   5.  I don't know if you still have that
11   in front of you or not.
12     A.   Uh-huh.
13     Q.   You do?
14     A.   Yes.
15     Q.   And you were directed to
16   this page that I put up on the screen.
17   Do you remember discussing this page of
18   your PowerPoint with Mr. Kline?
19     A.   Yes, yes, I do.  I'm just
20   sort of looking for it here.  Yes.
21     Q.   And I think I have the date
22   right.  This is one of the 2005
23   PowerPoints, right?
24     A.   This is from the Advisory

Page 266

1   Committee presentation of 2005.
2        Q.   Okay.
3             So, this is the one that you
4   used when you met with the FDA Advisory
5   Committee and gave them your views
6   concerning the safety of Vioxx and
7   including the comparison of Vioxx with
8   Celebrex, right?
9        A.   Correct.
10       Q.   Okay.
11            Now, just focusing on this
12  one area over here on the rofecoxib, and
13  then underneath that is the 25 milligrams
14  and less.  Do you see that?
15       A.   Uh-huh.
16       Q.   And then the study over
17  here, this is Ray, that's your colleague,
18  Dr. Wayne Ray, right?
19       A.   Correct.
20       Q.   And then underneath that,
21  Graham, that's you, right?
22       A.   That's right.
23       Q.   So, on that one you are the
24  first author, right?

Page 268

1        Q.   And so that's --
2        A.   Although I have one caveat,
3   which is there's a confidence interval
4   around that.  And these data are
5   consistent with a risk that could be
6   elevated to 1.37.
7        Q.   Let me just hone in on that.
8             This confidence interval is
9   the thing that is in the parenthesis
10  here, right?
11       A.   Correct.
12       Q.   And I hope that at trial
13  somebody else will describe confidence
14  interval because I'm not going to take
15  the time to do it with you today.  But
16  you say it's consistent with being as
17  high as 1.37?
18       A.   Right.
19            Or as low as .76.
20       Q.   Or as low as .76.
21            So that this confidence
22  interval says that Vioxx 25 milligram, it
23  might be better than not taking any
24  medicine at all when it comes to heart

Page 267

1        A.   Yes.
2        Q.   And on the Ray article, were
3   you an author of the Ray article as well,
4   just not the first author?
5        A.   No.  I was not a co-author
6   on that article.
7        Q.   Okay.
8             So, your colleague, Dr. Ray,
9   who you later worked with on the Kaiser
10  study, he had done an epidemiological
11  study looking at the effects of taking
12  Vioxx, right?
13       A.   Uh-huh.
14       Q.   And focusing on the 25
15  milligrams and less, basically what he
16  found, when it's 1.02, a 1 would mean
17  that's just the same as not taking any
18  medicine at all, right?
19       A.   Right.
20       Q.   And 1.02, you'd agree with
21  me that that's not, you know, 90 bullets
22  with 100 chambers, that's 0 out of 100,
23  right?
24       A.   I would agree.

Page 269

1   attacks, or it might be a little worse
2   than not taking any medicine at all.
3   But, basically, the best analysis is,
4   it's the same thing as not taking any
5   medicine at all, right?
6        A.   That's the appropriate
7   interpretation of that study for that
8   dose.
9        Q.   And then in your study, the
10  Graham study, what year was this from?
11       A.   It was published in 2005,
12  but it was completed in 2004.
13       Q.   So, this is the Kaiser
14  Permanente study?
15       A.   This is the Kaiser
16  Permanente study.
17       Q.   And here you found a
18  relative risk of 1.23, and then this
19  confidence interval of going below 1,
20  which would make it better than no
21  medicine at all, up to 1.71.  And from a
22  statistical point of view, what this says
23  is that there is not a statistically
24  significant difference between a 25

Page 270

1  milligram dose and not taking any
2  medicine at all, correct?
3      A.   Yes.  But the maximum
4  likelihood estimate, the most likely
5  value is that the risk is increased.  And
6  that's what that point -- the point
7  estimate's your maximum likelihood.
8          So, the preponderance of
9  evidence from this study would be that
10 there is -- the evidence is stronger that
11 the lower doses increase the risk of
12 heart attack, but it does not reach the
13 level of statistical significance.  So,
14 what this is basically saying is -- I
15 don't have the associated p-value on
16 this, but there may be 80 or 85 bullets
17 in the chamber, going back to the
18 previous analogy in terms of the
19 p-values.
20     Q.   85 for 1.23?
21     A.   The p-value for this could
22 be something like .15.
23     Q.   You mentioned before that
24 you wrote a chapter in a book on -- what

Page 271

1  was the subject of the book?
2      A.   Well, it's called
3  Pharmacoepidemiology.
4      Q.   Yeah.
5          And do you know that in that
6  book on pharmacoepidemiology, it is
7  stated that if you have a relative risk
8  of less than 2.0, that's a relatively
9  weak relationship?
10     A.   It's a view that I don't
11 subscribe to.
12     Q.   Do you know that that's the
13 view that's expressed in a book that you
14 wrote a chapter in?
15     A.   A, I haven't read a chapter
16 where that view is expressed; and, B,
17 that's one chapter written by one author
18 in a textbook where the editor pretty
19 much lets you write what your point of
20 view is.
21     Q.   Do you know whether your
22 colleague, Dr. Ray, has said under oath
23 that if the relative risk is less than 2,
24 then it's less likely than not for any

Page 272

1  particular person that Vioxx would have
2  contributed to a heart attack?
3      A.   I'm not aware of anything
4  that Dr. Ray has said under oath.
5      Q.   You spent a little bit of
6  time on direct examination concerning the
7  approval of Vioxx, as well as a
8  subsequent label change.  And I just
9  wanted to make sure that we were clear on
10 this.
11         Did you have any personal
12 role whatsoever in the FDA's review of
13 the application that led to the approval
14 of Vioxx?
15     A.   No.
16     Q.   And did you have any role
17 whatsoever in reviewing proposed label
18 changes for Vioxx?
19     A.   No.
20     Q.   Now, on the general question
21 of warnings and labels, am I correct,
22 sir, that your view is that warning
23 language really doesn't have any
24 significant impact on the decisions made

Page 273

1  by doctors whether to prescribe medicine?
2      A.   My view is, is that in
3  general, labeling changes don't influence
4  a physician or patient behavior.  But as
5  I pointed out before, in terms of
6  capacity to market the drug, there are
7  big differences in the eyes of FDA of
8  whether there's a boxed warning or not.
9          And with companies in
10 general, my experience has been that they
11 fight tooth and nail to keep things out
12 of the warning section because they don't
13 want to be at a competitive disadvantage
14 to other drug companies that have
15 competitor products that don't have such
16 a warning.
17     Q.   And you've added something
18 about what you think drug companies have
19 in mind.
20     A.   I shouldn't have done that.
21     Q.   Well, I appreciate that
22 statement.
23         So, just let me go back and
24 try to get a clean answer to my question.

Page 274

1 And that is, is it your view
2 that warning language in labels does not
3 have a significant effect on the
4 decisions by doctors and whether to
5 prescribe the medicines that the warnings
6 accompany?
7 A. It's my view that warnings
8 as implemented by FDA have been very
9 ineffective. There are means, I believe,
10 whereby labeling could be constructed in
11 a fashion that it actually would
12 potentially influence physician behavior
13 and perhaps then find its way into
14 patient behavior.
15 Q. Would that be a different
16 way of going about labeling than the FDA
17 currently does?
18 A. It would actually just be
19 more straightforward about what the
20 problems are, using very bold and frank
21 and plain language, not sort of using
22 adjectives that kind of downplay it and
23 not burying it in tremendous amounts of
24 text so that when a physician looks at

Page 275

1 the label, they're confronted by three
2 paragraphs of warnings, and the warning
3 that really matters is kind of buried in
4 the midst of it. I think that there's a
5 lot of room for experimentation where
6 these labeling interventions might
7 actually have an effect. But as
8 practiced, the way FDA implements them,
9 they are not -- have not been, until now,
10 effective, in my view.
11 Q. Okay.
12 And I'm not asking you --
13 I'm taking a little bit different
14 approach than Mr. Kline. I'm not asking
15 you what you think is wrong with the
16 FDA's regime.
17 A. No, I understand.
18 Q. I'm asking that under the
19 labeling approach that the FDA takes, do
20 you agree, sir, that warning language
21 does not have a significant effect on the
22 decision by doctors whether to prescribe
23 the kind of medicine that's being
24 labeled?

Page 276

1 A. I agree with that, but there
2 are explanatory factors. It's such a
3 complex field. You've got the label
4 which says what the warnings are, and
5 then you have the drug representatives
6 who come to the physicians' offices and
7 tell a very different story. And so what
8 physicians end up coming away with at the
9 end of the day in terms of the message
10 about the safety of a product is anyone's
11 guess.
12 Q. Did you say in a written
13 publication in 2002, co-authored with
14 Willy, that "The findings from this study
15 are consistent with the results from
16 other studies showing that product
17 labeling may not meaningfully affect
18 physician behavior"?
19 A. Yes.
20 Q. Did you say in a 2001
21 article written by you as the lead
22 author, "This study suggests that
23 labeling changes, including black box
24 warnings, and instructions to monitor

Page 277

1 patients closely, as well as repeated
2 'Dear Healthcare Professional' letters to
3 physicians cannot be assumed to be
4 effective means of risk management"?
5 A. Yes, I said that.
6 Q. I want to move now to the
7 Kaiser study. I think you described that
8 this is an epidemiological study, not a
9 clinical trial, right?
10 A. Correct.
11 Q. And what that means is that
12 you and your colleagues examined the
13 medical records from thousands or even
14 more patients from the HMO, and you could
15 see what medicines they were prescribed
16 and you could see what problems they had
17 or didn't have in their healthcare; is
18 that right?
19 A. That's correct.
20 Q. And the outcome that you
21 were looking at was something that you
22 called serious coronary heart disease; is
23 that right?
24 A. That is correct.

Page 278

1    Q.    And serious coronary heart
2 disease was a category that you used, and
3 it combined myocardial infarctions or
4 heart attacks, right?
5    A.    Yes.
6    Q.    Plus it included another
7 category of events called sudden cardiac
8 death, right?
9    A.    Yes.  Because that's one of
10 the leading presentations of heart
11 attack, is basically sudden death.  So,
12 we combined the two.
13    Q.    And in your study at least,
14 you did not break down the analysis into
15 heart attacks on the one hand and sudden
16 cardiac death on the other hand, right?
17    A.    No, we did not.
18    Q.    Now, your deposition may be
19 used in cases involving MIs or heart
20 attacks.  Let me ask you, before you did
21 your study that combined heart attacks
22 and sudden cardiac deaths, did you know
23 that some of your co-authors, people who
24 worked with you from the Kaiser group,

Page 279

1 had done a study of the same patients
2 over the same time period, but looking
3 specifically at heart attacks?
4    A.    I was aware of a study that
5 I think they called KLOTS 1.  But I think
6 they sent me, it may have been a
7 PowerPoint description or something of
8 it.  But there were methodologic problems
9 *as I recall with it, and it didn't cover*
10 the same time period as the study that we
11 were doing, so, in any event, but I was
12 aware that they had tried to work on a
13 study like that, and the people who were
14 doing it were non-epidemiologists trying
15 to do epidemiology.
16                - - -
17            (Whereupon, Deposition
18        Exhibit Graham-10, "Cohort
19        Analysis Myocardial Infarction
20        Risk and COX2 Use in the Kaiser
21        Large Observational Thrombosis
22        Study (KLOTS) (Levy, et al) ACR
23        Abstract (1 page), was marked for
24        identification.)

Page 280

1                - - -
2 BY MR. BECK:
3    Q.    Let me hand you Exhibit 10.
4 Have you ever seen Exhibit 10 before?
5    A.    I don't believe that I have.
6    Q.    It appears to be a 2002
7 abstract from ACR; is that right?
8    A.    That's what it looks like to
9 me, yes.
10    Q.    What does ACR stand for?
11    A.    I think it's the American
12 College of Rheumatology.
13    Q.    And, in fact, you had an
14 abstract published, your study in the
15 ACR, didn't you?
16    A.    Yes.  Although FDA
17 ultimately forced me to remove my name
18 *from that abstract.*  But the abstract got
19 published before we were able to withdraw
20 it because of the data problems that I
21 described before, so -- but, yes.
22    Q.    And do you see here that
23 this is a "Cohort Analysis Myocardial
24 Infarction Risk in Cox-2 Use in the

Page 281

1 Kaiser Large Observational Thrombosis
2 Study (KLOTS)."  Is that what you were
3 referring to before?
4    A.    I would guess that it is,
5 yes.
6    Q.    And is that the same group
7 of patients that you looked at in your
8 study?
9    A.    I have to read the abstract.
10    Q.    Okay.
11    A.    (Witness reviewing
12 document.)
13    Q.    While you're reading it,
14 I'll blow it up so others can as well.
15    A.    (Witness reviewing
16 document.)
17            I don't think that this is
18 the same group of patients.  And the
19 reason why I say that is the number of
20 patients they say, "We identified 172,260
21 patients with 182" --
22    Q.    Where are you looking at?
23    A.    I'm in the first sentence of
24 the "Results" section.

Page 282

1    Q.   Okay.
2         Let me just make sure that
3    I'm with you and that anybody else
4    watching it is.
5    A.   This is 172,000 patients
6    that they're saying received -- I'm just
7    sort of reading above now in the
8    methods -- this is my first time seeing
9    this.  Is that they received naproxen,
10   ibuprofen, celecoxib or rofecoxib.
11        Now, if you look at the
12   study that -- the Kaiser study that we
13   did, we ended up having 1.4 million
14   patients in our base population.  So,
15   where they have 172,000 who had used
16   NSAIDs, we had 1.4 million who had used
17   NSAIDs.  So, it doesn't say in this
18   abstract, and quite honestly, I don't
19   remember, but my guess is, is that this
20   study was done on a subset of the Kaiser
21   population, but it's clearly not the same
22   population that we studied.  It's the
23   same HMO, but it's a small subset of
24   patients.

Page 283

1    Q.   Well, were you aware that in
2    the study that some of your co-authors
3    had done in this subset that they found
4    that when either COX-2, and that would be
5    either Celebrex or Vioxx, right?
6    A.   Yes.
7    Q.   When either one of Celebrex
8    or Vioxx was compared to either one of
9    the other NSAIDs, there was no
10   statistically significant difference in
11   heart attack risk?
12   A.   Yes.  But I do also note
13   that the comparison of rofecoxib
14   versus -- well, two things.  One, they
15   show that naproxen and ibuprofen have the
16   same risk.  And then they show that the
17   risk of rofecoxib is elevated with
18   respect to naproxen --
19   Q.   Well, wait.  You skipped
20   over something here.
21        Do you see here where I'm
22   highlighting?
23        MR. KLINE:  Let him finish,
24        please.

Page 284

1         THE WITNESS:  Oh, I'm sorry.
2    I was looking down at this piece
3    of paper.  I wasn't looking at the
4    screen.
5    BY MR. BECK:
6    Q.   No.
7    A.   I'm sorry.
8    Q.   And I said when you were
9    looking at the piece of paper, you
10   skipped over something.
11        MR. KLINE:  But he was in
12        the middle of an answer.  Please.
13   BY MR. BECK:
14   Q.   Do you see where rofecoxib,
15   Vioxx --
16        MR. KLINE:  He was in the
17        middle of an answer.  Please.
18   BY MR. BECK:
19   Q.   Do you see where Vioxx
20   versus Celebrex is --
21   A.   Uh-huh.
22   Q.   -- essentially identical,
23   right?
24   A.   Right.

Page 285

1         MR. KLINE:  The witness was
2    in the middle of an answer.
3         THE WITNESS:  In this study.
4         MR. KLINE:  Please let him
5    finish.
6    BY MR. BECK:
7    Q.   So, Vioxx and Celebrex were
8    essentially identical, and then you
9    wanted to say something else?
10   A.   Yes.
11        That rofecoxib versus
12   naproxen, and rofecoxib versus ibuprofen
13   came very close to traditional
14   statistical significance, and if we were
15   to use the gun analogy again, what we
16   would be talking about here is I'm
17   guessing is 92 to 94 bullets in the
18   chamber.
19   Q.   When you say "close to
20   statistical significance" --
21   A.   It's because the .96 --
22   Q.   Is below 1?
23   A.   It's below 1, but it's
24   pretty close to 1.  And the .97 for the

Page 286

1  next line, the rofecoxib versus
2  ibuprofen, is .97, which is almost 1 as
3  well.
4          So, if it was 1 or above, if
5  that lower bound was 1 or above, then
6  you'd say the p-value is .05 and you
7  would have 95 bullets in the chamber.
8  Here we're probably talking 94 or 93
9  bullets.
10         So, what I'm saying is, it's
11  borderline statistical significance. And
12  what it says is, is that that's pretty --
13  there's pretty reasonable evidence that
14  there's a difference between the two, but
15  it doesn't reach that level of
16  conventional statistical significance.
17      Q.   And do you see where I'm
18  underlining that they say the same thing
19  about Celebrex?
20      A.   Yes, they do.
21      Q.   Is it fair to say that this
22  study reaches conclusions that are just
23  fundamentally inconsistent with the
24  conclusions that you later reached?

Page 287

1       A.   I would say that these
2  conclusions are at variance with the
3  conclusions that we reached in our much
4  larger study. And as I mentioned, the
5  people doing -- none of the authors on
6  this study are epidemiologists. And none
7  of them have ever conducted epidemiologic
8  studies, and so not having reviewed the
9  methods and the like, I would wonder
10  about the -- about how methodologically
11  well the study was performed.
12      Q.   I'd like to -- we started
13  out talking about your Kaiser study, and
14  I got diverted for a minute on this
15  earlier study by some of the same
16  authors. Let's go back to the Kaiser
17  study.
18          And you described this
19  morning kind of a chronology of reports
20  that you made or public disclosures of
21  the results of the study. And I want to
22  go through those same events with you, if
23  I could.
24          And I've prepared a chart,

Page 288

1  and what I want to do is talk with you
2  about different statements that you made
3  in different publications about the
4  significance of 25 milligrams or below,
5  whether that poses a statistically
6  significant increase for heart attacks,
7  whether -- and whether above 25 does.
8          Are you with me?
9      A.   Uh-huh.
10      Q.   Okay.
11          And I can go through the --
12      A.   Do you have a copy of the
13  ACR abstract that I could just refer to?
14      Q.   Sure. Yeah.
15          MR. BECK:  We'll mark that
16  as Exhibit 11.
17              - - -
18          (Whereupon, Deposition
19  Exhibit Graham-11, "Risk of Acute
20  Cardiac Events Among Patients
21  Treated with Cycloxygenase-2
22  Selective and
23  Non-Selective-Nonsteroidal
24  Anti-Inflammatory Drugs Category:

Page 289

1  06 Osteoarthritis clinical
2  aspects" American College of
3  Rheumatology Abstract (1 pages),
4  was marked for identification.)
5              - - -
6          MR. BECK:  And I'm told that
7  they are going to need to change
8  the videotape. So, while they're
9  doing that --
10          THE WITNESS:  Want to wait?
11          MR. BECK:  Yes.
12          What I'm thinking is that
13  why don't we break and let them
14  change the videotape, and while
15  they're doing it, if you could
16  just look at the abstract so
17  you'll be able to tell me what it
18  is you've said in the abstract
19  about these items that we have up
20  on the screen. Okay?
21          THE WITNESS:  Uh-huh.
22          THE VIDEOTAPE TECHNICIAN:
23  Stand by, please.
24          That concludes Video

Page 290

1   Cassette Number 2. The time is
2   3:03. We're going off the record.
3       MS. ROYCE: Can we take a
4   five-minute break?
5       MR. BECK: Sure.
6       - - -
7       (Whereupon, a recess was
8   taken from 3:03 p.m. until
9   3:17 p.m.)
10      - - -
11      THE VIDEOTAPE TECHNICIAN:
12  This begins Video Cassette Number
13  3. The time is 3:17. We're back
14  on the record.
15  BY MR. BECK:
16      Q.   Dr. Graham, what I want to
17  do now is fill in these blanks on the
18  chart I have on the screen for the
19  relative risk and confidence intervals in
20  these different categories.
21      So, with the May 2004 ACR
22  abstract, do I have that correct that the
23  relative risk that was reported was 1.02
24  for 25 milligrams or less, with the

Page 291

1   confidence intervals as I've indicated up
2   there?
3       A.   Yes, that's correct.
4       Q.   And that is not
5   statistically significant, correct?
6       A.   That's correct.
7       Q.   And then for the greater
8   than 25 milligrams, there's a high
9   relative risk of 5.04, but as a technical
10  matter on statistical significance, the
11  confidence interval is such that it would
12  not be statistically significant; is that
13  correct?
14      A.   There would be 94 bullets in
15  the chamber.
16      Q.   And I appreciate your
17  analogy, but you, yourself, recognized
18  that with these confidence intervals,
19  this would not be statistically
20  significant, correct?
21      A.   It wouldn't reach levels of
22  traditional statistical significance.
23      Q.   Okay.
24      Now, after this May 2004

Page 292

1   abstract, you went back and reclassified
2   some of the patients from the Kaiser
3   study who had been classified as low-dose
4   patients for the purposes of the analysis
5   that's shown in the abstract. I think my
6   hand just snuck across the screen.
7   Excuse me.
8       You reclassified some
9   patients who had been counted as low-dose
10  patients, and then you counted them
11  instead as high-dose patients; is that
12  right?
13      A.   Yes. And high-dose patients
14  who are reclassified as low dose.
15      - - -
16      (Whereupon, Deposition
17      Exhibit Graham-12, E-mail 5-25-04
18      KP002153, was marked for
19      identification.)
20      - - -
21  BY MR. BECK:
22      Q.   After you reclassified
23  patients, then I'm going to show you what
24  we marked as Exhibit 12. Did you write

Page 293

1   an e-mail which is -- I'm looking for the
2   date. Can you help me with the date?
3   Oh, it is also from May. Up at the top
4   you will see your e-mail is May 25th,
5   2004?
6       A.   Uh-huh.
7       Q.   And then you report new
8   relative risks and confidence intervals
9   based on the reclassifications, right?
10      A.   Yes.
11      Q.   Okay.
12      And tell me if I have it
13  right up here. The relative risk that
14  you reported after reclassifying people
15  for the 25 milligrams or less was .98,
16  correct?
17      A.   Yes.
18      Q.   With the confidence
19  intervals as I've indicated there, right?
20      A.   Yes.
21      Q.   And that is not
22  statistically significant, correct?
23      A.   Correct.
24      Q.   And we're talking here about

74 (Pages 290 to 293)

Page 294

1  Vioxx 25 milligrams or less compared to
2  people who are not taking pain
3  medication, no difference in risk, right?
4     A.   Right.
5     Q.   And in your analogy of
6  bullets in chambers, there would be zero
7  bullets in the chambers for people who
8  were using 25 milligrams of Vioxx, right?
9     A.   Yeah.  They'd be pretty
10 close to zero.  There would be five or
11 six, but yes.
12    Q.   Well, there would be --
13    A.   The P is .91.  So, what that
14 means is that 91 out of 100 chances that
15 the answer lies between those confidence
16 intervals and that that .98 -- so, it's
17 the most likely answer.
18    Q.   The most likely thing is --
19 and when we say .98, that's actually a
20 little bit lower risk than someone who's
21 not taking any medicine at all.  I mean,
22 it doesn't -- it's so little that it
23 doesn't make any difference, but we're
24 talking about Vioxx 25 milligrams is

Page 295

1  basically indistinguishable from not
2  taking any medicine at all when it comes
3  to cardiovascular risk, right?
4     A.   Yes.
5     Q.   Okay.
6         And then after this
7  reclassification, the risk that you
8  reported, the relative risk for higher
9  dose goes up substantially, and then it
10 is statistically significant, correct?
11    A.   Yes.
12    Q.   Now, after the e-mail, did
13 you -- I think you said you did something
14 called a poster, you wrote up a poster?
15    A.   Right.  That was in August.
16    Q.   August of --
17    A.   Of 2004 --
18    Q.   Of 2004?
19    A.   Correct.
20    Q.   And this poster, let me hand
21 you Exhibit 12 and ask you if that's the
22 poster you are referring to.
23         - - -
24         (Whereupon, Deposition

Page 296

1  Exhibit Graham-13, "Risk of Acute
2  Myocardial Infarction and Sudden
3  Cardiac Death with Use of COX-2
4  Selective and Non-Selective
5  NSAIDs" (Graham, et al) KP001521
6  - KP001526, was marked for
7  identification.)
8         - - -
9  BY MR. BECK:
10    Q.   And I think I got it right.
11 Is it the ISPE poster that you talked
12 about on direct examination?
13    A.   Yes.
14    Q.   And this sets forth the
15 results after you reclassified some of
16 the formerly low-dose patients as
17 high-dose patients and some of the
18 formerly high-dose patients as low-dose
19 patients, right?
20    A.   That, and in the interim had
21 discovered that the way the regression
22 analysis was done for the first two, that
23 I had done it incorrectly.  This was what
24 I talked about before, the --

Page 297

1     Q.   I --
2         MR. KLINE:  Let him finish,
3  please.
4         MR. BECK:  Okay.
5         MR. KLINE:  He was
6  answering.
7         MR. BECK:  Yeah, I know.
8  But I don't want him just to
9  repeat what he talked about
10 before.
11        MR. KLINE:  But he was
12 answering.
13        MR. BECK:  Okay.
14        Go ahead.
15        THE WITNESS:  What I was
16 saying is, is that we had done the
17 regression analyses incorrectly by
18 treating each drug separately and
19 doing a separate regression
20 analysis, when everything should
21 have been combined together into
22 one regression analysis.
23        And so the August poster
24 reflects the appropriate analysis,

Page 298

1 · along with the reclassification of
2 patients who had been
3 misclassified previously.
4 BY MR. BECK:
5 Q. And all I want you to do is
6 confirm for me, sir, after you
7 reclassified people and then changed the
8 regression analysis, is this the relative
9 risk that you recorded for 25 milligrams
10 or less?
11 A. Yes, it is.
12 Q. And that is under
13 traditional approach not statistically
14 significant, correct?
15 A. It's elevated, that's
16 correct.
17 Q. Correct that it's not
18 statistically significant?
19 A. Yes, but -- yes.
20 Q. And then the high dose
21 numbers came down somewhat, but still
22 elevated. And after the reclassification
23 and change in methodology, they remained
24 statistically significant, right?

Page 299

1 A. Yes.
2 Q. Now, finally you reported
3 these results in The Lancet article that
4 you testified about, right?
5 A. Yes.
6 Q. And that's already been
7 marked as an exhibit. I don't know if
8 you still have it in front of you, but it
9 was marked, I believe, as Exhibit 4.
10 A. Uh-huh.
11 Q. And do I have up here -- you
12 can get this by going out to Table 3 on
13 Page 4, but just to save time, do I have
14 it correct on the chart here that in The
15 Lancet article, I guess after further
16 work, reclassifying patients and changing
17 the methodology, the 25 milligrams or
18 below the relative risk is 1.23, and the
19 confidence interval is as indicated
20 there. Is that what you reported?
21 A. That's what we reported, but
22 what happened here is that we did a final
23 quality control on our patients to see
24 if -- basically we went back over all the

Page 300

1 programming that we had done throughout
2 the whole study to see if everybody in
3 the study belonged in the study. What we
4 discovered were there were about 1,300
5 patients whose eligibility there,
6 membership in Kaiser, had lapsed for more
7 than one month. And so what that meant
8 is, is we could be missing drug exposure
9 information. So, we had to remove those.
10 To not do so would have been to
11 misrepresent the data.
12 So, we weren't manipulating
13 anything and we weren't changing our
14 methods. We were doing quality control,
15 and that explains the change that you see
16 there.
17 Q. All right.
18 So, after the
19 reclassification in May and the change in
20 methodology in August, and then the
21 quality control in 2005, your final
22 result for 25 milligrams and below was a
23 relative risk of 1.23 with a confidence
24 interval from below 1 to above 1, right?

Page 301

1 A. Yes.
2 Q. And under traditional
3 approach, that is not statistically
4 significant, correct?
5 A. Correct.
6 Q. And then the final numbers
7 for the high dose that you had were 3
8 with the confidence interval as
9 indicated, right?
10 A. Yes.
11 Q. And that under this analysis
12 remains statistically significant; is
13 that right?
14 A. Yes.
15 Q. So, just sort of a summary
16 question that in all four of your reports
17 as to the outcome of your study, the 25
18 milligrams and below, the relative risk
19 at all times remained under traditional
20 views as to statistical significance; is
21 that right?
22 A. Compared to remote use, but
23 not compared to — well, compared to
24 remote use.

Page 302

1    Q.   Yeah. I'm asking about
2  comparing it to remote use, which is --
3    A.   Basically nonuse.
4    Q.   Right.
5         So, in all four at 25
6  milligrams or below, there was no
7  statistically significant difference
8  between taking that dose of Vioxx and not
9  taking any medicine at all, right?
10   A.   Yes.
11   Q.   I want to focus a bit on, a
12  little bit more on how these changes came
13  about from the abstract to the poster and
14  also what people within the FDA were
15  saying about your analysis, because I
16  think you testified about that this
17  morning. Do you remember that?
18   A.   Uh-huh.
19   Q.   The abstract itself, did you
20  have that reviewed by anybody from the
21  FDA before the abstract was published?
22   A.   What are we referring to?
23   Q.   We're referring to back up
24  on the screen, May of 2004 --

Page 303

1    A.   The ACR abstract.
2    Q.   -- ACR abstract.
3    A.   What happened with the ACR
4  abstract is that David Campen at Kaiser
5  was the first author, and I sent him the
6  quick analysis that we had done, and he
7  submitted the abstract, and I did not put
8  it through FDA clearance, and that was an
9  oversight on my part.
10   Q.   And then because there is a
11  procedure that you are supposed to follow
12  at FDA to show them studies and articles
13  and abstracts and posters that you intend
14  to have your name on, whether you're the
15  first author or second, third, fourth or
16  fifth, right?
17   A.   Yes.
18   Q.   Okay.
19        And then when it came to the
20  poster in August of 2004, after you've
21  reclassified people and changed the
22  methodology, did you submit that for
23  review by folks from the FDA?
24   A.   Yes, I did.

Page 304

1    Q.   And I think you indicated
2  that your supervisor reviewed that
3  poster; is that right?
4    A.   Yes.
5    Q.   And what was his name?
6    A.   Paul Seligman.
7    Q.   And at the time, was he the
8  acting head of the Office of the Drug
9  Safety?
10   A.   I think so, yes.
11   Q.   And you said something about
12  how he suggested a change in the
13  conclusion. Was your -- did your initial
14  draft of the poster have a conclusion
15  that the high dose of Vioxx, the 50
16  milligram dose should not be prescribed
17  or used?
18   A.   Let me see what this one
19  says and then I can answer you.
20        (Witness reviewing
21  document.)
22        Yes.
23   Q.   Okay.
24        And then I think you said

Page 305

1  that Dr. Seligman did not agree with that
2  conclusion and said that you should take
3  out the conclusion that high dose 50
4  milligrams should not be prescribed or
5  used; is that right?
6    A.   Correct.
7    Q.   Let me hand you what I'm
8  going to mark as Exhibit 14.
9         - - -
10        (Whereupon, Deposition
11   Exhibit Graham-14, E-mails with
12   attachment "Comments on ISPE
13   Paper" FDACDER006048 -
14   FDACDER006049, was marked for
15   identification.)
16        - - -
17        MR. BECK: Let's put this up
18  on the screen.
19  BY MR. BECK:
20   Q.   Do you recognize Exhibit 14?
21   A.   Yes, I do.
22   Q.   What is Exhibit 14?
23   A.   It's an e-mail from Dr.
24  Seligman to me with his comments on the

Page 306

1  poster.
2      Q.   All right.
3          And then the next page are
4  his comments, right?
5      A.   Right.
6      Q.   Was Mr. -- is it Dr.
7  Seligman?
8      A.   Dr. Seligman.
9      Q.   Dr. Seligman, is he one of
10  the people that you think was out to get
11  you at the FDA?
12          MS. ROYCE:  Objection to
13      form.
14          THE WITNESS:  Let's put it
15      this way.  Dr. Seligman ordered an
16      illegal criminal investigation in
17      early 2004 to identify the person
18      or persons who spoke to the media
19      about the fact that Dr. Andrew
20      Mossholder, an FDA medical officer
21      who had done a study looking at
22      SSRI antidepressants and
23      suicidality in children, that that
24      had been suppressed.

Page 307

1          Dr. Seligman, under oath
2      before the House subcommittee on
3      investigations and oversight for
4      FDA, admitted under oath that he
5      had ordered that illegal criminal
6      investigation to identify the
7      source of the leak and that he had
8      named me as a suspect, although he
9      had no grounds to do so, except
10      that he thought that this is the
11      kind of thing that I would do.
12      And so there is that past history
13      with Dr. Seligman to keep in mind.
14          At this point, I wasn't
15      interpreting his comments in that
16      regard except that the reason why
17      I hadn't said in the original
18      version was that high dose
19      rofecoxib should be removed from
20      the market was because I knew the
21      type of reaction it would get, and
22      toning it down a little bit still
23      elicited pretty much the same
24      response, and that's expressed

Page 308

1          here.
2  BY MR. BECK:
3      Q.   Well, this morning, didn't
4  you testify, in effect, that there were
5  several people at the FDA who were out to
6  get you?
7          MR. KLINE:  Objection to the
8      form.  I don't think those terms
9      were ever used.
10          THE WITNESS:  No, I never
11      used those, but I can --
12  BY MR. BECK:
13      Q.   No.  The terms you used were
14  that there was an "organized and
15  orchestrated campaign to smear and
16  discredit me."  Do you remember that
17  phrase?
18      A.   Yes.
19          MR. KLINE:  My objection is
20      only to form.
21          THE WITNESS:  And we can
22      talk about that in detail if you
23      would like.
24  BY MR. BECK:

Page 309

1      Q.   Okay.
2          My question right now is a
3  narrow one.  Is Dr. Seligman one of the
4  people that you were referring to this
5  morning as part of this organized and
6  orchestrated campaign that you thought
7  existed to smear and discredit you?
8      A.   Yes.  He would be part of
9  that group.
10      Q.   Okay.
11          So, let's look at what Dr.
12  Seligman said when you submitted the
13  poster to him.  He said, "In general a
14  excellent study and analysis of a complex
15  topic."
16          Do you see that?
17      A.   Yes.
18      Q.   And then he says, "As you
19  might expect, my only comment has to do
20  with the conclusion that 'higher-dose
21  rofecoxib should not be prescribed or
22  used.'"
23          That's the conclusion that
24  you and I were talking about a few

Page 310

1  minutes ago, right?
2      A.  Right.
3      Q.  Then he went on to explain
4  why he was concerned with having a
5  conclusion like that, didn't he?
6      A.  Yes.
7      Q.  And then he said, "My
8  concern is based both on the small number
9  of cases (10) and the lack of information
10  inherent in such a study regarding the
11  'time-to-event.'"
12      Now, small number of cases
13  being ten, does that mean that there were
14  only ten cases in your study of thousands
15  and thousands of patients where somebody
16  taking high-dose Vioxx had either a heart
17  attack or sudden cardiac death?
18      A.  We had ten patients who were
19  currently exposed to high-dose rofecoxib
20  Vioxx at the time of their heart attack
21  or sudden death.
22      Q.  And the concern expressed by
23  Dr. Seligman, whether you believe him
24  today or not, was that that number is

Page 311

1  just too small to draw a meaningful
2  conclusion from, correct?
3      A.  That's what I think he's
4  driving at here, but that's what a
5  confidence interval is for.
6      Q.  Do you remember this morning
7  when you were saying that epidemiological
8  studies are better in many ways than
9  clinical trials, because in a clinical
10  trial like the ones that Merck performed,
11  I think you said in one of the clinical
12  trials, there were only 40 or 50 heart
13  attacks, and that's just not enough to
14  draw any meaningful conclusions from?  Do
15  you remember that testimony this morning?
16      A.  But you have to — it's not
17  enough to draw a conclusion in the
18  specific area between 0 and 18 months
19  where there was insufficient power, so,
20  you had very wide confidence intervals.
21  That didn't apply here.
22      The confidence intervals
23  here were narrow enough that even though
24  the numbers are small, one can

Page 312

1  legitimately draw a conclusion.
2      Q.  But in any event, Dr.
3  Seligman disagreed and said the number of
4  cases is just so small that you cannot
5  legitimately draw such a conclusion,
6  correct?
7      A.  Yes.  But he's not referring
8  to the confidence intervals, and, you
9  know, if you ask him the same questions
10  you're asking me, he'd have to say that
11  the confidence intervals permit it.
12      Q.  Well, did others in the FDA
13  express similar concerns that Dr.
14  Seligman expressed about whether you
15  could draw conclusions from such a small
16  number --
17      A.  Yes, they did.
18      Q.  -- of people who used the
19  high-dose Vioxx?
20      A.  Yes, they did.
21      Q.  Who is Dr. John Jenkins?
22      A.  He's the director of the
23  Office of New Drugs.
24      Q.  And is Dr. Jenkins another

Page 313

1  one of the FDA people that you think was
2  out to get you?
3      A.  No.
4          - - -
5      (Whereupon, Deposition
6  Exhibit Graham-15, E-mails
7  FDACDER011048 - FDACDER011049,
8  was marked for identification.)
9          - - -
10  BY MR. BECK:
11      Q.  Let me show you Exhibit 15.
12      A.  (Witness reviewing
13  document.)
14      Q.  Exhibit 15 is an e-mail
15  string.  The last one appears to be dated
16  August 11, 2004.  They're all around that
17  time frame.
18      Do you see that the middle
19  e-mail on Page 1 is from Dr. Jenkins?
20      A.  Yes, I see it.  I've never
21  seen this e-mail before, the best I can
22  recollect.
23      Q.  Let's go through what Dr.
24  Jenkins said, focusing on the second

Page 314

1  paragraph of his e-mail of August 11,
2  2004.
3       MR. KLINE:  Objection.  Only
4  to the extent that I would like
5  the witness to be able to identify
6  whether he has seen the document
7  before.
8       MR. BECK:  He just
9  testified.
10      THE WITNESS:  No.  I've
11  never seen this.
12      MR. KLINE:  I didn't hear
13  him say that.  I apologize.
14      MR. BECK:  He said that as
15  best he could recall, he didn't
16  remember seeing it.
17      MR. KLINE:  Okay.
18  Thank you.
19      THE WITNESS:  Not on the --
20      MR. KLINE:  I would just
21  like to create a record as to
22  whether he has seen it or not for
23  ruling purposes later.  That's my
24  only reason.

Page 315

1       Thank you.
2       MR. BECK:  Okay.
3  BY MR. BECK:
4       Q.   So, Dr. Jenkins here, he
5  says -- I put the little red marker where
6  I'm going to begin reading.  Second
7  paragraph, "I would also note that I find
8  the conclusions reached in the poster to
9  be far in excess of the available data.
10  For example, 'Rofecoxib use at a dose
11  over 25 milligrams increases the risk of
12  AMI or SCD' is the primary conclusion of
13  the poster.  This is a far too definitive
14  conclusion based on the data.  Similar
15  language appears in other parts of the
16  poster and implies that a causal
17  relationship has been confirmed."
18      Now, just stopping there.
19  Did you know back in 2004 that Dr.
20  Jenkins was of the same view that Dr.
21  Seligman expressed to you?
22      A.   There was one e-mail from
23  sometime after this date, but in the
24  teens of August, it was like a two-line

Page 316

1  e-mail in which Dr. Jenkins suggested
2  what he thought different wording for our
3  conclusions would be acceptable to him
4  were, and that's pretty much the extent
5  of what my knowledge of what Dr. Jenkins
6  thought.
7       Q.   Do you see where he goes on
8  to say:  "This is misleading at best and
9  deceptive at worst, since what has been
10  demonstrated as an association between
11  the use of the drug and the events in
12  question.  Yes, we have some priors and
13  randomized controlled clinical trials
14  that suggest rofecoxib may be associated
15  with an increased risk of MI, but those
16  priors do not support reaching such a
17  definitive conclusion about the findings
18  in the study"?
19      Were you aware that Dr.
20  Jenkins was expressing the view that the
21  conclusion that you had in your draft
22  poster was misleading at best and
23  deceptive at worst?
24      A.   Nope.  No idea.

Page 317

1       Q.   And then he goes on to say,
2  "These types of overstated conclusions
3  are typical of David's writing" -- David
4  is you, correct?
5       A.   Correct.
6       Q.   -- "and only serve to
7  undermine his credibility as an objective
8  evaluator of the data at hand."
9       And then he says, "It is
10  even more ridiculous for him to make
11  broad recommendations about not using the
12  drug based on the data from this study,
13  and such sweeping clinical/regulatory
14  conclusions represent the primary reason
15  for difficulties in the interactions
16  between David and staff in OND."
17      That would be Office of New
18  Drugs, right?
19      A.   Correct.
20      Q.   Then before I get to the
21  last couple of sentences, when you write
22  articles like you talked about this
23  morning and including this poster, do you
24  typically have a disclaimer on there that

Page 318

```
 1   says these are not necessarily the views
 2   of the FDA, they're just the views of the
 3   author, David Graham?
 4       A.   Oh, we're pretty much
 5   required to have that disclaimer.
 6       Q.   And do you see here where
 7   Dr. Jenkins says, "Perhaps the disclaimer
 8   should read that 'The views expressed are
 9   those of the author and DO NOT reflect
10   the views of the FDA.'" And "Also,
11   perhaps, the COI statement" -- what's a
12   COI statement?
13       A.   I think that's probably
14   conflict of interest.
15       Q.   Okay.
16            And I think this morning you
17   said in response to questions from
18   counsel that you didn't have any
19   conflicts of interest.
20            Do you see where Dr. Jenkins
21   says that "perhaps the conflict of
22   interest statement should say 'Dr. Graham
23   has no FINANCIAL conflicts of interest,
24   but" systemic "bias in his viewpoints
```

Page 319

```
 1   cannot be excluded."
 2            Were you aware that that was
 3   Dr. Jenkins' views as to the merits of
 4   the poster conclusion?
 5       A.   Dr. Jenkins is entitled to
 6   his opinions. I wasn't aware of them.
 7   The same could be said of the FDA.
 8       Q.   The same could be said of
 9   the FDA. I don't know --
10       A.   The same systemic --
11   systematic bias and viewpoints at FDA can
12   not be excluded. FDA has systematic
13   biases. Dr. Jenkins has systematic
14   biases. So, he's entitled to his
15   opinion. I wasn't aware of them. But I
16   probably could have surmised them.
17            MR. KLINE:  Can you read the
18       last e-mail right before just the
19       first paragraph for completeness,
20       please.
21            MR. BECK:  Sure.
22            MR. KLINE:  "Please see
23       Paul's message below."
24   BY MR. BECK:
```

Page 320

```
 1       Q.   "Please see Paul's message
 2   below which he kindly shared. For the
 3   record, Merck will likely not be happy so
 4   this could well eventuate in calls to the
 5   agency. Should we involve...Temple? He
 6   historically has been one of the first
 7   ones they complain to."
 8            MR. KLINE:  That's fine.
 9   BY MR. BECK:
10       Q.   "I am very concerned that
11   David Graham is lead author on this and
12   is identified as FDA staff. This clearly
13   implies agency endorsement of his
14   presentation and this is the first we
15   have seen of it. Paul's message below
16   for a presentation at a meeting coming up
17   later this month does not allow much time
18   to review or clear." And that's from
19   Jonca Bull, correct?
20       A.   Correct.
21            MR. KLINE:  Thank you.
22   BY MR. BECK:
23       Q.   Who is Sharon Hertz?
24       A.   I think she's a deputy
```

Page 321

```
 1   division director for the analgesic and
 2   anti-inflammatory reviewing division, and
 3   that would be the reviewing division
 4   responsible for NSAID drugs, both
 5   naproxen and drugs like Vioxx.
 6            - - -
 7            (Whereupon, Deposition
 8       Exhibit Graham-16, E-mails
 9       FDACDER006056 - FDACDER006058,
10       was marked for identification.)
11            - - -
12   BY MR. BECK:
13       Q.   I'm handing you what we've
14   marked as Exhibit 16, which I will put up
15   on the screen. This is a document that
16   you've seen before, correct?
17       A.   That is correct.
18       Q.   And it's from Sharon Hertz.
19   Is it Dr. Hertz?
20       A.   Yes, it is.
21       Q.   And Dr. Hertz, and it's to
22   you and your boss, Dr. Seligman, right?
23       A.   Correct.
24       Q.   And it copies Dr. Bull, who
```

Page 322

1  we just read an e-mail from, as well as
2  Dr. Jenkins and some others, right?
3      A.   Yes.
4      Q.   Did Dr. Hertz say to you
5  that "There is information to suggest
6  that use of aspirin may mitigate possible
7  CV risk associated with COX-2
8  inhibitors," and go on to ask "why would
9  you choose to study CV risk from a
10  database that does not collect
11  information on something as relevant as
12  aspirin use"?
13      A.   She said it, but she didn't
14  understand the study, the methods, or why
15  her question actually is not pertinent to
16  the analysis that we did because we
17  showed that aspirin is not a confounder
18  of any association between NSAID use and
19  heart attack risk. And because she
20  doesn't understand epidemiology, she
21  wrote this, but this is a statement
22  that's coming from her lack of
23  understanding of epidemiology.
24      Q.   And she also referred to

Page 323

1  your conclusion concerning high-dose
2  Vioxx and the fact that that represented
3  "a very small subgroup of a large
4  population," correct?
5      A.   She says that, but high-dose
6  Vioxx represented 18 percent of all the
7  Vioxx use in the country. So, it has
8  public health importance.
9      Q.   And did she tell you that
10  drawing conclusions about this subgroup
11  at all is inappropriate because of the
12  small size of it?
13      A.   She says that, but her
14  statement is incorrect, because the
15  confidence intervals permit that. And it
16  was stated a priori at the beginning of
17  our study that we would do that analysis,
18  that we would take a look as best we
19  could at the effect of dose of rofecoxib,
20  of Vioxx, on heart attack risk. So, she
21  can use words like it's inappropriate for
22  us to do that but the fact is that, she's
23  mistaken. There's nothing inappropriate
24  about it.

Page 324

1      Q.   And you'll see at the bottom
2  of the paragraph she said, "This is
3  simply bad science."
4      A.   She's entitled to her
5  opinion.
6      Q.   I forgot to ask you. Is
7  Dr. Hertz one of the people at the FDA
8  that you think was out to get you?
9      A.   I didn't use those terms,
10  but, no, she is not one of those people.
11      Q.   Is she one of the people,
12  who, to use your terms, was part of the
13  very organized and orchestrated campaign
14  to smear and discredit you?
15      A.   She is not a member of that
16  group.
17      Q.   She just disagreed with you
18  and thought you were using bad science,
19  right?
20      A.   That's what she says here.
21  But she's not an epidemiologist, and I'm
22  not sure that she would recognize good
23  epidemiology if she saw it.
24      Q.   And Dr. Jenkins, who we

Page 325

1  talked about a minute ago, who commented
2  on what he thought was the invalidity of
3  your analysis, do you think he knows what
4  he's talking about when it comes to
5  epidemiology?
6      A.   I think that Dr. Jenkins is
7  not an epidemiologist. He's a
8  pulmonologist. I think that he has broad
9  responsibilities for the approval of
10  drugs, and that it's his office, Office
11  of New Drugs, that approved Vioxx, and
12  that going back to the conflict of
13  interest that we talked about before,
14  that FDA has a vested interest in
15  maintaining the decisions that it's made
16  previously. And that their biggest
17  concern here was that they had, in
18  quotes, done a labeling change in 2002,
19  and that solved the problem. But I
20  contend that it didn't really accomplish
21  very much at all.
22          - - -
23          (Whereupon, Deposition
24  Exhibit Graham-17, E-mails

Page 326

1    · FDACDER021810 - FDACDER021811,
2    was marked for identification.)
3        - - -
4    BY MR. BECK:
5        Q.   I'm going to hand you what
6    we've marked as Exhibit 17. Have you
7    seen Exhibit 17 before?
8        A.   No. I have never seen this
9    before.
10       Q.   Who is -- I'm going to -- I
11   may mispronounce both halves of the name.
12   Lourdes -- you tell me how to pronounce
13   it.
14       A.   Lourdes Villalba. I've done
15   it too. No offense to Lourdes.
16   Villalba.
17       Q.   Lourdes Villalba. Who is
18   Lourdes Villalba?
19       A.   She was the medical officer
20   who was responsible for Vioxx. She may
21   have been the medical officer who
22   reviewed the original Vioxx NDA, but that
23   I'm not absolutely certain about, but she
24   had responsibility for it as the primary

Page 327

1    medical officer in the reviewing division
2    of the Office of New Drugs at this time.
3        So, she's the one who would
4    review -- well, actually, she did the
5    original review that we showed on the
6    slide. So, any supplements or any
7    submissions from Merck regarding Vioxx,
8    they would come to her desk.
9        Q.   Was she one of the people
10   that was part of the organized and
11   orchestrated campaign to smear and
12   discredit you that you think existed at
13   the FDA?
14       A.   No, she was not.
15       Q.   At the bottom of this e-mail
16   string, Lourdes writes, "I learned of
17   this study a couple of weeks ago when
18   Jonca requested my opinion about the
19   abstract that was going to be presented
20   *in France.* This study is not a good
21   study to address the cardiovascular
22   question. The conclusions are not well
23   supported by the data."
24       Did you learn back in 2004

Page 328

1    that Lourdes Villalba felt that your
2    conclusions were not supported?
3        A.   No. I was never told that,
4    but I'm not surprised. This is the
5    typical response of people in the Office
6    of New Drugs to studies that are done in
7    the Office of Drug Safety that we talked
8    about earlier where -- and that would
9    lead Dr. Galson to say that our office
10   doesn't add value to the center.
11       Q.   Who is Anne Trontell?
12       A.   Dr. Trontell is the deputy
13   director for the Office of Drug Safety.
14       Q.   And is Dr. Trontell one of
15   the people that you were referring to
16   this morning when you said that within
17   the FDA there was a very organized and
18   orchestrated campaign to smear and
19   discredit you?
20       A.   Yes.
21       - - -
22       (Whereupon, Deposition
23   Exhibit Graham-18, E-mails
24   FDACDER010352 - FDACDER010353,

Page 329

1        was marked for identification.)
2        - - -
3    BY MR. BECK:
4        Q.   Please take a look at
5    Exhibit 18.
6        A.   (Witness reviewing
7    document.)
8        Q.   Incidentally, how long has
9    Dr. Trontell been at the FDA?
10       A.   Gee, I don't exactly know.
11   She's been with the Office of Drug Safety
12   for maybe five years. She came from the
13   Office of New Drugs before that.
14       MR. KLINE: Can we just
15   establish whether he's seen the
16   document or not? That would help
17   me later with the record. That's
18   all I ask.
19       MR. BECK: Sure.
20       MR. KLINE: On all of these?
21       MR. BECK: Yes.
22       MR. KLINE: Thanks.
23   BY MR. BECK:
24       Q.   Do you remember whether

Page 330

1  you've seen this document before?
2      A.   No, I don't think that I
3  have seen this document before.
4      Q.   Do you see that Dr. Trontell
5  is writing to Dr. Seligman in the e-mail
6  on the top?
7      A.   Yes.
8      Q.   Starting with the second
9  paragraph, she says, "I understand John's
10  consternation, but let us all acknowledge
11  the problem arose when David Graham
12  overstepped the bounds of what anyone can
13  conclude from a brief poster of a complex
14  study.  He ignored advice from multiple
15  FDA sources by making a strong conclusion
16  without giving enough information or time
17  to others in FDA to evaluate it
18  rigorously."
19          Did Dr. Trontell communicate
20  those views to you even though you didn't
21  see this particular e-mail?
22      A.   She communicated views
23  similar to this.  She never said that I
24  overstepped my bounds, and she didn't use

Page 331

1  words like I ignored advice.  And at the
2  end of the day, the poster was cleared by
3  FDA, so that they can complain all they
4  want, but I didn't -- I stuck to what I
5  believed based on the data, and they
6  cleared it at the end of the day.  So, we
7  had honest disagreements about the data
8  and how to interpret it.
9      Q.   And as part of that
10  disagreement, do you see here where she
11  says that you "subverted FDA review as
12  well as the normal standards of peer
13  review by stating an
14  inadequately-supported conclusion based
15  upon the limited data" you "made
16  available for review"?  Again, did she
17  express those views to you in substance?
18      A.   No.  And that statement
19  actually makes absolutely no sense to me
20  as it's stated.  If she's talking about
21  the differences between the ACR abstract
22  and the ISPE abstract, those things I
23  described to both Dr. Seligman and Dr.
24  Trontell between the end of May and

Page 332

1  August, as we came upon each of the
2  problems and had to deal with them.  And
3  she doesn't recall that.
4          We had many, many
5  conversations.  And I had them with Dr.
6  Seligman as well.  And so looking at
7  this, that's the only thing that I can
8  guess she is -- she's saying from that,
9  but that's just a guess.
10      Q.   She says here, "To publicize
11  findings that have not been fully vetted
12  is irresponsible and professionally
13  suspect."
14      A.   Where are you?
15      Q.   If you look up on the
16  screen, I'm in the middle of the next
17  paragraph.
18      A.   Uh-huh.
19      Q.   Did she communicate those
20  views to you?
21      A.   No.  But the fact is, is
22  that I didn't communicate anything to the
23  public that hadn't been cleared by FDA.
24  So, this statement really, in my mind, is

Page 333

1  inaccurate and, you know, she's using a
2  lot of pejorative terms towards me, so,
3  she can be very critical of me, but the
4  fact is, is that the document was
5  cleared, and I have the signed clearance
6  form, and so she can have her opinion.
7      Q.   She refers in here to an
8  internal peer review process at the FDA.
9      A.   Where are you now?
10      Q.   Up in the first paragraph
11  right after she says you "subverted FDA
12  review."  It says, "as well as the normal
13  standards of peer review."
14      A.   There are no established
15  peer review standards within FDA, and, in
16  fact, for this poster -- actually, for
17  this poster they didn't do it, but for
18  our paper, they created a unique
19  once-only peer review process that had
20  never been used before within our office
21  and has not been used within our office
22  subsequently.
23          So, there's no MAP, which is
24  a manual of -- what is it -- manual of

Page 334

1 policy and procedures. There's no
2 standard operating procedure to describe
3 what she's saying. This is something
4 that she made up, and they implemented it
5 for this paper and had never done it in
6 the 20 -- almost 20 years I'd been at FDA
7 before this, and they haven't done it
8 with any work that I've done or anyone
9 else in our office has done subsequently.
10     Q.   Let's focus on the peer
11 review process that was followed in this
12 case.
13          Again, I'm going to ask you
14 to keep your answers short. Was your --
15          MR. KLINE: I would ask him
16     to answer fully and completely as
17     he needs to.
18          MR. BECK: Well, back
19     when --
20          THE WITNESS: I'll try to
21     accommodate both requests.
22     Seriously.
23          MR. BECK: I'm just making
24     exactly the same request that Mr.

Page 335

1     Kline did this morning.
2          MR. KLINE: All I'm asking
3     is that he be responsive and
4     complete.
5 BY MR. BECK:
6     Q.   The peer review process that
7 you and I were just talking about, did
8 that -- or that you were describing as
9 this new process that had never been
10 implemented before, was that a peer
11 review process that was conducted for the
12 article that eventually was published in
13 The Lancet?
14     A.   Correct.
15     Q.   Okay.
16          And did Dr. Trontell review
17 your paper and give comments?
18     A.   Yes, she did.
19     Q.   And did the folks at the FDA
20 ask you for suggestions as to people who
21 could serve as good peer reviewers,
22 people that you would respect and trust?
23     A.   Yes. And they were the same
24 names that they would have come up with

Page 336

1 as well.
2     Q.   And what were those names?
3     A.   Robert O'Neill, who is the
4 director of the office of biostatistics
5 at FDA. Bruce Stadel, Dr. Bruce Stadel
6 who's, in my view, the best
7 epidemiologist at FDA and who is retired
8 now. And then, I believe I had mentioned
9 the possibility of Dr. Curt Furberg from
10 Wake Forest and Dr. Brian Strom from the
11 University of Pennsylvania as a couple,
12 because they said they wanted to send it
13 not only to internal FDA people, but in a
14 complete breach of FDA policy and
15 protocol --
16     Q.   Now we're sort of getting
17 beyond the names of the other people that
18 I've asked you for.
19     A.   Well, they're sending it to
20 these people. They were contemplating
21 sending this paper to people outside of
22 FDA, as well, for peer review.
23     Q.   My question is then, who did
24 you suggest --

Page 337

1     A.   Well, I gave those four
2 names.
3     Q.   Okay. Good.
4          MR. BECK: Mark this as
5     Exhibit 19.
6          - - -
7          (Whereupon, Deposition
8     Exhibit Graham-19, Memo 10-29-04
9     "Review of reports of FDA/Kaiser
10     Vioxx study: Questions about
11     Inconsistencies and Bias,"
12     FDACDER022462 - FDACDER022470,
13     was marked for identification.)
14          - - -
15 BY MR. BECK:
16     Q.   I'm going to hand you
17 Exhibit 19 here, which is a memorandum
18 from Dr. Trontell to Dr. Seligman. Have
19 you seen this document before?
20     A.   Yes, I have.
21     Q.   Is this document --
22     A.   This isn't the complete
23 document. The one that I recall
24 seeing -- well, maybe it's just different

Page 338

1   typeface.  I thought it was much longer
2   than this, but in any event.
3        Q.   But you recall seeing this?
4   It may be part of a larger package --
5        A.   Right.
6        Q.   -- but you recall this
7   memorandum?
8        A.   Yes.  It was sent to me
9   after 5:00 on a Friday afternoon when I
10  was scheduled to go on a week's vacation,
11  the first vacation that I had in like
12  eight months.  So, I was coming to work
13  at 7:00 in the morning, and 5:00 is way
14  past quitting time, especially when
15  you're headed for a vacation, and so I
16  saw this, read through the first couple
17  of pages of this and said, I have talked
18  to Anne, Dr. Trontell and Dr. Seligman
19  about these things on numerous occasions
20  in the past, and so concluded this could
21  wait until I got back from vacation,
22  because I didn't see anything new here
23  that I hadn't talked with them about
24  previously.

Page 339

1        Q.   And, sir, my question was,
2   do you recall seeing this piece of paper?
3        A.   Yes, I do.
4        Q.   Does Dr. Trontell in this
5   memorandum raise concerns with the
6   methodology used in the study that you
7   had done?
8        A.   She raises a number of
9   questions which we've actually discussed
10  and have the answers to, yes.
11       Q.   Over on Page 2 in the last
12  paragraph of the executive summary, did
13  Dr. Trontell state:  "My review notes
14  several unexplained inconsistencies in
15  the conduct of the study and the
16  reporting of results.  Before the
17  findings and conclusions of the study
18  report can be accepted, the authors must
19  address all inconsistencies with adequate
20  documentation that clearly explains how
21  they occurred, in order to address the
22  potential appearance of data manipulation
23  and post hoc analyses."
24            Now, post hoc analysis, for

Page 340

1   the benefit of the jury, what that refers
2   to is somebody coming in after the fact
3   and kind of changing the rules of the
4   study --
5        A.   It's the same thing that
6   Merck did with the APPROVe study and its
7   18-month argument.  It is a post hoc
8   analysis.
9        Q.   So, now I'm starting to get
10  speeches before I've even asked the
11  question.
12            MR. KLINE:  Objection.
13            THE WITNESS:  I apologize.
14  BY MR. BECK:
15       Q.   Is a post hoc analysis where
16  somebody, after a study is conducted,
17  goes back and changes the rules of the
18  study, and the concern then is that the
19  results are invalid?  I'm not asking
20  whether you did it.  I'm asking whether
21  that's what the post hoc analysis is.
22       A.   When people talk about a
23  post hoc analysis, what they mean is
24  they're referring to an analysis that

Page 341

1   wasn't prespecified before the study
2   began or before the analysis began.
3            So, for example, in our
4   study, I know that Dr. Trontell kept
5   insisting that our comparison of Vioxx to
6   Celebrex was a post hoc analysis.  But it
7   was there from the beginning of our
8   protocol.  And so -- and I had explained
9   that to her multiple times.  But that's
10  what a post hoc analysis is.
11       Q.   And data manipulation,
12  again, not focusing on her concerns about
13  you, but what data manipulation is
14  generally is basically rigging the
15  numbers to come out the way you want
16  them?
17       A.   It's scientific misconduct.
18       Q.   And please turn over two
19  more pages.  Under, at the bottom,
20  "Recommendations," do you see where Dr.
21  Trontell says, "The authors should
22  document their methods in detail and
23  respond to questions raised in this
24  review in particular the noted

Page 342

1   inconsistencies in the study objectives,
2   results and statistical findings of
3   significance of their published ACR
4   abstract and the August 2004 ISPE
5   poster." So, do you see there where
6   she's expressing concern that you've come
7   up with different conclusions and
8   different methodologies between that
9   original ACR abstract, and then your
10  later poster, like we saw in the chart
11  that I showed on the screen? Is that the
12  subject that's being addressed here?
13      A.   Uh-huh.  Yes.
14      Q.   And, in particular, what
15  she's saying is that before you submit
16  this article for publication, that you
17  should address these issues and explain
18  them, right?
19      A.   Dr. Trontell is saying that,
20  but Dr. Trontell is not my supervisor.
21  She wrote this to Dr. Seligman.  Dr.
22  Seligman, I believe, e-mailed it to me
23  with basically no instructions.  And so
24  Dr. Trontell can have her opinions about

Page 343

1   what it is I should do, but she's not my
2   supervisor, and, in fact, has never been
3   someone who reviews any of the work that
4   I do.
5       Q.   In any event, you submitted
6   the article to the Lancet without making
7   the responses that Dr. Trontell said you
8   should make, right?
9       A.   The responses were actually
10  included in the manuscript, A; B, we
11  submitted the manuscript with the
12  approval of my supervisors.  Because I
13  sent multiple e-mails to Dr. Seligman and
14  to Dr. Trontell giving them my
15  interpretation of FDA's clearance
16  policies and asking them to instruct me
17  if I had misinterpreted them in any way,
18  because I was anxious to -- I wanted to
19  be sure that I followed all of FDA's
20  rules and procedures.  And that if they
21  didn't get back to me, then I would
22  assume that I had interpreted them
23  correctly and that it is all right for me
24  to submit it.

Page 344

1       Dr. Trontell consulted with
2   the head lawyer for the Center for Drug
3   Evaluation and Research, Jane Axelrod,
4   who basically said to Dr. Trontell by way
5   of e-mail that it was fine, that I could
6   submit it.  And so Anne did not have a
7   written response to these questions, but
8   I had -- my understanding was I had the
9   permission of FDA to submit the paper.
10  And it was never my understanding, quite
11  honestly, that I was required to give
12  written responses to these questions, and
13  I tried to express that in an e-mail to
14  Dr. Paul Seligman somewhere around
15  November 10th or 9th or somewhere in that
16  neighborhood, because I was about to go
17  on a four-day weekend, because Veterans'
18  Day, which is November 11th, is a Federal
19  holiday, and I was going to take off the
20  12th and then I would have a four-day
21  weekend.
22      And on the 9th, Dr. Seligman
23  said that I could take leave on Friday,
24  but before I left, he needed written

Page 345

1   responses to these questions.  And I
2   e-mailed back that I hadn't understood
3   that that's what he wanted.  And he never
4   came back.  He had an entire day,
5   November 10th, Wednesday, the entire day
6   he had to disabuse me of my understanding
7   if he wanted to, and he never said to me
8   that, no, I misunderstood, I really do
9   want you to give a written response.  And
10  so I think that I acted reasonably and
11  tried to get management to communicate
12  with me, and management, in this case,
13  did not answer my e-mails, did not come
14  back to me to communicate with me in
15  clear, unambiguous instructions about
16  what it is that they wanted me to do.
17      MR. BECK:  For everyone's
18      benefit, yours as well as
19      plaintiffs' counsel, if I run out
20      of time on my cross-examination, I
21      may be going back to the judge,
22      because I'm getting long,
23      nonresponsive answers that I can't
24      cut off.