Page 346

1          THE WITNESS:  Can I disagree
2     with that for a moment?  I think
3     that's very germane to the
4     question about what happened, and
5     I'm not trying --
6  BY MR. BECK:
7     Q.   I didn't ask you what
8  happened, sir.  I asked you a specific
9  question, and you started telling me
10  about a four-day holiday you were going
11  on.
12          MS. ROYCE:  He can't answer
13     a question unless he explains
14     things.  He needs to be able to
15     put things in context.
16          MR. BECK:  And I'm simply
17     putting everybody on notice,
18     including the witness, the
19     witness' counsel, and plaintiffs'
20     lawyers that I can't finish in
21     three-and-a-half hours because of
22     answers like this.  We'll have to
23     be going back to the judge to see
24     about more time.

Page 347

1          MR. KLINE:  Let's see if you
2     finish.  I have full faith and
3     credit like the United States of
4     America.  So, I think you'll
5     finish.  My point being, let's
6     cross that bridge when we come to
7     it, if we come to it.
8          MR. COHEN:  You're wasting
9     time.
10          MR. BECK:  I'm sorry.  What
11     did you say?  Can I know what you
12     said?
13          MR. COHEN:  I said he's just
14     wasting time.
15  BY MR. BECK:
16     Q.   Was it your view, sir, that
17  this peer review process that was
18  implemented was really some sort of smoke
19  screen by people at the FDA who were --
20  and what you think is this organized
21  campaign to smear and discredit you?
22     A.   No, no.  My concerns with
23  the clearance process that they were
24  proposing was that in a situation where

Page 348

1     there was lots of active research going
2     on and many different people wanting to
3     publish articles and we were aware of
4     several articles that were under review
5     at the time, that their specific creation
6     of this new and unprecedented review
7     process would slow down and delay our
8     ability to submit this for publication.
9          And I had talked at length
10     with them, and Dr. Trontell has a long
11     history of holding up people's
12     manuscripts in the past, and I can give
13     you examples if you would like.
14     Q.   No thanks.
15          Was it your view that FDA
16     management had come up with a strategy to
17     block your paper and that that strategy
18     was the peer review process?
19     A.   I wasn't thinking of it in
20     those terms.  I mean, I raised the
21     question that could have that
22     effect, but I didn't -- I don't think
23     that -- I don't think that I thought that
24     that was why they were doing that.

Page 349

1          - - -
2          (Whereupon, Deposition
3          Exhibit Graham-20, E-mails
4          FDACDER022789, was marked for
5          identification.)
6          - - -
7  BY MR. BECK:
8     Q.   All right.
9          I've handed you Exhibit 20.
10  Is this an e-mail from you to Richard
11  Horton, the editor of Lancet?
12     A.   Yes, it is.
13     Q.   October 29th, 2:03 p.m.?
14     A.   Yes.
15     Q.   So, that would be around the
16  time that we've got this memo from Dr.
17  Trontell; is that right?
18     A.   Correct.
19     Q.   And --
20     A.   Although it's before.  It
21  actually precedes -- it precedes it.  The
22  time on this is like 12:51, so, it's
23  about 1:00 in the afternoon.  And as I
24  mentioned before, I was actually unaware

Page 350

1  of Dr. Trontell's comments at this time.
2  What I was aware of was that they were
3  going to create a peer review process
4  involved -- and that peer review process
5  was going to involve Dr. O'Neill and
6  those people.
7      Q.   So, you were aware that they
8  were going to create a peer review
9  process, but you didn't have her
10  comments, and based on that, you told the
11  editor of Lancet -- well, let me get this
12  up on the screen here.
13          Based on the fact that they
14  were going to implement this peer review
15  process, you said, "I'm sorry to bother
16  you but is it still possible to speak
17  with you today. FDA management has come
18  up with another strategy to block our
19  paper which I need to run by you."
20          Is that what you told the
21  editor of Lancet?
22      A.   Yes.
23          MR. KLINE:  Mr. Beck, may I
24  just raise one point respectfully?

Page 351

1          And, again, I'm operating under
2  the assumption, and I'll be brief,
3  and it doesn't count against your
4  time, the record should reflect
5  that --
6          MR. BECK:  Is this an
7  objection as to form?
8          MR. KLINE:  No, it's not an
9  objection as to form, but I want
10  to --
11          MR. BECK:  Is it going to be
12  alerting the witness that he ought
13  to be testifying in a certain way?
14          MR. KLINE:  No.  It is
15  nothing to alert the witness.  You
16  know better than that.  You know I
17  wouldn't do that.
18          My sole objection, I'm happy
19  to make it outside of the presence
20  of the witness, but I want to make
21  sure we have an understanding.
22          None of these documents go
23  to the public record, and I'm not
24  standing in your way and I'm not

Page 352

1  interfering, but I just want to
2  make sure, and then I'll be
3  totally out of your way the whole
4  rest of the time, that out of an
5  abundance of caution that we are
6  not agreeing to any of this
7  examination on two bases.  One --
8          MR. BECK:  You made this
9  speech this morning.  You don't
10  have to make it again.
11          MR. KLINE:  One, they're
12  loaded with hearsay -- and then
13  I'll be done.  I appreciate your
14  indulgence.  And two, they go
15  nowhere near or about or around
16  any public statements.  I'm done.
17  Thanks for your indulgence.
18  BY MR. BECK:
19      Q.   After your paper was
20  accepted for publication by Lancet but
21  before it actually was published, did you
22  learn that Dr. Steven Galson of the FDA
23  was in communication with The Lancet
24  about your paper?

Page 353

1      A.   Yes, I did.
2      Q.   And who is Dr. Steven
3  Galson?
4      A.   He is the Center director
5  for CEDR.
6      Q.   And I think you described
7  this morning that CDER, both the Office
8  of New Drugs and the Office For Drug
9  Safety are underneath CDER, which is the
10  Center for Drug Evaluation and Research,
11  right?
12      A.   Right.
13      Q.   And is Dr. Galson one of the
14  people that you think is part of this
15  very organized and orchestrated campaign
16  to smear and discredit you?
17      A.   Yes, he was.  He may have
18  been an unwitting participant.
19          - - -
20          (Whereupon, Deposition
21      Exhibit Graham-21, E-mails
22      KP001136 - KP001138, was marked
23      for identification.)
24          - - -

Page 354

BY MR. BECK:

Q.   And let me show you Exhibit 21.

Have you seen Exhibit 21 before? And I'm particularly interested in actually whether you've seen the e-mail that's on the second page of Exhibit 21 from Dr. Galson to -- is it Dr. Horton?

A.   Yes. Dr. Horton forwarded copies of these to me after he telephoned me on November 12th to discuss the concerns that Dr. Galson had raised in his telephone conversation and in his e-mail on the same day.

Q.   And the concerns that you're referring to, those are the ones set forth in this e-mail dated November 12th from Dr. Galson to Dr. Horton?

A.   Yes. This whole thing about the different findings from the ACR abstract and our ISPE poster and paper.

Q.   Okay.

So that, again, not to

Page 355

review the whole thing in detail again, but he raises the issue with Dr. Horton about whether he's been informed of an earlier abstract from the same group, the ACR abstract that had the different conclusions, correct?

A.   Correct.

Q.   And he also raises a concern about how the number of cases attributed to high dose rofecoxib is different between the ACR abstract and the poster, as well as the article you submitted, right?

A.   That's right.

Q.   And did he go on to say that the draft manuscript that the FDA had reviewed described "a process of unanimous consensus by four Kaiser collaborators for adjudicating uncertain cases of high dose rofecoxib exposure. It is not clear how the consensus process resulted in two different published numbers of high-dose rofecoxib cases and controls in the ACR abstract and the

Page 356

draft manuscript."

A.   Yes.

Q.   You understood this as a concern that Dr. Galson was expressing?

A.   Right. It's the same concern that Dr. Trontell had raised, and it's the exact same questions that I had spoken with Dr. Trontell and Dr. Seligman with from May through August as those issues came up, and I had explained each of them to them in the past.

Q.   And then on the last page of this, you understood at the time that Dr. Galson said to the Lancet people, "We would like Dr. Graham and his colleagues to have an opportunity to address these questions through the peer-review process, and in no way wish to intrude or otherwise advise the Lancet about its scientific review and editorial policy."

You understood that that's what he said at the time, didn't you?

A.   He said that here in the e-mail. There was a prior telephone

Page 357

conversation that Dr. Galson had had with Dr. Horton, and if you read Dr. Horton's response to Dr. Galson, you can pick up threads of some of the things that Dr. Galson expressed in that telephone conversation that are probably toned down in this follow-up e-mail.

- - -

(Whereupon, Deposition Exhibit Graham-22, E-mails, FDACDER022247 - FDACDER02249, was marked for identification.)

- - -

BY MR. BECK:

Q.   Have you seen Exhibit 22 before?

A.   Yes.

Q.   Does Exhibit 22 include an e-mail from you to Dr. Galson responding to the e-mail that we just looked at?

A.   It responds, actually, to the entire process, because attached to this was a detailed response, basically comment by -- phrase by phrase, paragraph

Page 358

1  by paragraph to Dr. Trontell's October
2  29th memorandum and -- in which I address
3  each of her concerns and explain things
4  as best as I was able.
5        And explaining to Dr. Galson
6  that my managers, that Dr. Seligman and
7  then Dr. Trontell, who was not my
8  supervisor but who was involved in this
9  process, had opportunities to talk to me
10  to clarify things to improve
11  communication and didn't avail themselves
12  of that, and that I had been acting in
13  good faith. And in any event, yes, it's
14  in response to the entire process.
15        Q.   And then including, as you
16  say, in the very first line of the e-mail
17  that we just looked at, right? "Dr.
18  Horton forwarded to me your email back to
19  him last evening."
20        Is that the e-mail we were
21  just looking at?
22        A.   Well --
23        Q.   Well, that's okay.
24        A.   I honestly -- I honestly

Page 359

1  don't know.
2        Q.   Setting aside which e-mail
3  this refers to, because you said this
4  refers to the entire process, I just want
5  to focus on what you said to Dr. Galson
6  in the last paragraph of your e-mail.
7  You said, "You should know that this
8  entire episode has upset and intimidated
9  me greatly. I was supposed to spend the
10  weekend working on my Senate testimony,
11  but I accomplished virtually nothing
12  because I was so distracted and afraid by
13  what was being done to me. You can't
14  begin to imagine the toll this shameful
15  behavior has taken on my family and on
16  me. And now I face the prospect that I
17  will be unable to complete my testimony
18  and say everything that I believe needs
19  to be brought into the clear light of
20  day."
21        Is that what you told Dr.
22  Galson, that you were afraid and
23  intimidated and scared?
24        A.   Yes. My management had

Page 360

1  basically refused to communicate with me.
2  And I had gone to, I think, extraordinary
3  lengths with numerous e-mails asking them
4  to talk to me, to explain to me what the
5  rules and regulations were, what the
6  policies were, and received zero back in
7  return, just basically emptiness. I
8  never got straight answers.
9        And even in this situation,
10  where Dr. Galson could have very simply
11  gotten on the telephone and called me and
12  said Dr. Seligman and Dr. Trontell are in
13  my office and they have raised some
14  serious questions, can we talk about it,
15  and I would have been very happy to do
16  so.
17        But Dr. Galson did not do
18  that, and he had the opportunity to do
19  that. Instead, he chose to go ahead,
20  recognizing that I'd be testifying and
21  calling the editor of the Lancet. I
22  mean, at this point they knew that our
23  paper would be published online the day
24  before I appeared before the Senate

Page 361

1  Finance Committee, and so you would have
2  basically a paper getting published and
3  attracting international attention,
4  followed by a Senate hearing that focused
5  on the same topic.
6        And so one effect of this
7  intervention is that it could block the
8  publication of the paper. And in any
9  event, accusations of scientific
10  misconduct are very serious, and Dr.
11  Galson certainly should have spoken to me
12  about it, and he did not.
13        Q.   Despite what you claim was
14  this concerted effort to intimidate you,
15  and despite your claims to Dr. Galson
16  that you were distracted and afraid, you
17  went ahead and testified in front of the
18  Senate, right?
19        A.   Well, it was either do it
20  voluntarily or be subpoenaed. So, yes, I
21  did.
22              - - -
23        (Whereupon, Deposition
24  Exhibit Graham-23, E-mails,

Page 362

1    TOPOLE0000333, was marked for
2    identification.)
3         - - -
4    BY MR. BECK:
5    Q.    What's Exhibit 23?
6    A.    It looks like an e-mail
7    dated November 1st from me to Dr. Eric
8    Topol at the Cleveland Clinic. And it's
9    -- it looks like it's kind of like in
10   response to an e-mail that he had sent to
11   me. And there are several other e-mails
12   that went back and forth between Dr.
13   Topol and myself, dating back, I think,
14   to like the end of October when he first
15   telephoned me to ask if I knew who was in
16   FDA he could talk to about COX-2 pain
17   relievers and heart attack risk. And I
18   referred him to Shari Targum, whose
19   review I spoke about earlier.
20   Q.    You referred to Dr. Topol as
21   at the Cleveland Clinic. Is he still at
22   the Cleveland Clinic?
23   A.    My understanding is that
24   he's now at Case Western, but I'm not

Page 363

1    really -- it's basically what I read in
2    the newspaper.
3    Q.    And then did you complain to
4    Dr. Topol that "the last 2 weeks have
5    been absolute hell, and the efforts by
6    Anne Trontell and Paul Seligman to
7    intimidate and threaten me so as to block
8    the submission of our study to Lancet has
9    been intense and stressful to say the
10   least."
11   A.    Yes. Dr. Trontell scheduled
12   a meeting on September 22nd in which five
13   or six senior managers from the Office of
14   New Drugs and my own management chain
15   spent an hour criticizing me, some of
16   them calling me names, some of them
17   raising their voices, many of them
18   talking in a disrespectful tone, knowing
19   that eight days later I was supposed to
20   have completed a report to FDA that would
21   summarize our study and that would
22   represent sort of basically my report on
23   the subject. And the purpose of the
24   meeting, at least in my view, the way I

Page 364

1    interpreted it, it was a meeting to
2    criticize and a meeting to say, you know,
3    why on earth did you do this study in the
4    first place. We did a labeling change in
5    2002, and nothing more needs to be done.
6    There's no regulatory issue here. So,
7    that's the type of stuff that I was
8    referring to, and it was quite stressful.
9         - - -
10       (Whereupon, Deposition
11   Exhibit Graham-24, E-mails,
12   FDACDER022681, was marked for
13   identification.)
14       - - -
15   BY MR. BECK:
16   Q.    What's Exhibit 24?
17   A.    This is an e-mail from me to
18   Dr. Horton, the editor of the Lancet. He
19   had e-mailed me --
20   Q.    I just -- all I want is --
21   A.    Sorry.
22   Q.    -- for you to tell me that
23   that's an e-mail.
24       So, obviously you've seen it

Page 365

1    because you wrote it and sent it to Dr.
2    Horton on October 6, 2004, correct?
3    A.    Correct.
4    Q.    I'm blowing up the paragraph
5    about two-thirds of the way down. It
6    begins with, "Within FDA." Do you see
7    that?
8    A.    Uh-huh.
9    Q.    And did you tell the editor
10   of The Lancet that "Within FDA, I was
11   ostracized upon my return from France,
12   and subsequently have been subjected to
13   veiled threats and intimidation by
14   managers within new drugs and drug
15   safety, because of the conclusions I
16   reached regarding rofecoxib. They are
17   also trying to block the publication of
18   our manuscript." And what's the next
19   word there? "(it is currently undergoing
20   the 'FDA clearance') because it outlines
21   what is potentially a drug safety
22   catastrophe of enormous proportions."
23       And that's what you told the
24   editor of Lancet the FDA management was

Page 366

1   up to, right?
2       A.   I told them that that was my
3   perception of what was happening.
4       Q.   And we talked about your
5   views that there was this group within
6   the FDA that was "a very organized and
7   orchestrated campaign to smear and
8   discredit" you.  You also have a theory,
9   do you not, sir, that there was some sort
10  of a conspiracy at the FDA concerning --
11      MS. ROYCE:  Objection, form.
12  BY MR. BECK:
13      Q.   -- concerning the timing of
14  the Vioxx withdrawal?
15      A.   I never used the word
16  "conspiracy."  What I said was that I
17  thought that FDA had shared with Merck
18  the date when my final report would be
19  completed.
20      Q.   And if we just look up at
21  the paragraph right above the one that we
22  just looked at, you were writing the
23  editor of Lancet, and you were saying,
24  "In any event, the landscape has changed

Page 367

1   dramatically since my last email to you.
2   Merck's withdrawal on September 30" --
3   and that's the withdrawal of Vioxx,
4   right?
5       A.   Right.
6       Q.   And what you said was that
7   "Merck's withdrawal on September 30th was
8   not, I believe, an accident.  I had been
9   ordered by FDA management to complete a
10  study report by that date, which I told
11  them was far too short a time frame, but
12  they were not sympathetic.  I feel
13  certain that this date was communicated
14  to Merck, and that Merck's analysis of
15  its colon polyp study was precipitated by
16  the publicity" of our study -- "by the
17  publicity our study attracted at Bordeaux
18  at the end of August."
19          Now, are you saying here
20  that you thought that Merck decided to
21  withdraw Vioxx on September 30 because
22  people at FDA management gave them a
23  heads up that your article was going to
24  be published, and Merck said we'd better

Page 368

1   get Vioxx off the market before that
2   article was published?
3       A.   No.  I was just pointing to
4   the coincidence of the dates.
5       Q.   Well, you said it wasn't a
6   coincidence, didn't you?
7       A.   Well, I don't think it was a
8   coincidence, but...
9       Q.   So, that's my question.
10          Do you think that Merck's
11  withdrawal on September 30 was based
12  because people at the FDA told Merck that
13  Dr. Graham is going to publish an
14  article, and so Merck said we'd better
15  get this drug off the market?
16      MS. ROYCE:  Objection, form.
17      THE WITNESS:  No, I don't.
18  BY MR. BECK:
19      Q.   That's what you told Dr.
20  Horton --
21      A.   I know that.
22      Q.   -- though, isn't it?
23      A.   That's what I -- and at the
24  time, I think under the duress that I was

Page 369

1   under, that is what I believed.
2       Q.   That was kind of a wild and
3   crazy charge, don't you think?
4       MS. ROYCE:  Objection to
5   form.
6       Can we take a break now?
7   It's getting pretty late.
8       MR. BECK:  I want him to
9   answer the question.
10  BY MR. BECK:
11      Q.   That was kind of a wild and
12  crazy charge you made to the editor of
13  Lancet concerning --
14      A.   No.
15      Q.   -- FDA management, don't you
16  agree?
17      A.   It's not wild and crazy.  If
18  you experienced what I experienced, you
19  would understand -- you would understand
20  better.
21      MR. BECK:  Your counsel has
22  asked for a break, so, we'll take
23  one.
24      MS. ROYCE:  Thank you.

Page 370

```
 1          THE VIDEOTAPE TECHNICIAN:
 2     Stand by, please.
 3          The time is 4:39.  We're
 4     going off the record.
 5            - - -
 6          (Whereupon, a recess was
 7     taken from 4:39 p.m. until
 8     4:58 p.m.)
 9            - - -
10          THE VIDEOTAPE TECHNICIAN:
11     The video time is 4:58.  We're
12     back on the record.
13   BY MR. BECK:
14     Q.   Dr. Graham, as an
15   epidemiologist, do you deal with the
16   concept of incidence rates?
17     A.   Yes, I do.
18     Q.   And in a sentence or two,
19   can you describe what an incidence rate
20   is?
21     A.   It's the occurrence of an
22   outcome, a disease, in a defined
23   population over a specified period of
24   time.  So, you might express something as
```

Page 371

```
 1   10 per 100,000 per year would be an
 2   incidence rate.
 3     Q.   I have created a chart that
 4   I want to go over with you, and I want to
 5   look at some numbers from the Kaiser
 6   study that you did, and I understand that
 7   an adjustment was applied for a
 8   cardiovascular risk score that I'll get
 9   to later in the examination, but I want
10   to look at the kind of raw numbers about
11   incidence rates of heart attacks and
12   sudden cardiac death for Vioxx and
13   Celebrex as you saw them in your study.
14   Okay?
15          So, if you will take out
16   Exhibit 4, which is your 2005 Lancet
17   publication, and if you'll look over at
18   the third page in the right column under
19   "Results," tell me if the numbers I
20   filled in on the screen there for number
21   of users for Vioxx of something over
22   26,000, and then for Celebrex, something
23   over 40,000, are those accurate numbers
24   --
```

Page 372

```
 1     A.   Yes.
 2     Q.   -- from your study?
 3     A.   Yes.
 4     Q.   And then if you'll look at
 5   Table 3 on that same page or is -- Table
 6   3, I guess it's the next page.  If you'll
 7   look at Table 3, do I have it right that
 8   the number of heart attacks and sudden
 9   cardiac deaths, Vioxx was 68 and for
10   Celebrex was 126?
11     A.   Yes.
12     Q.   And when we're talking about
13   Vioxx here, that includes both low dose
14   and high dose, right?
15     A.   Correct.
16     Q.   And so just taking the
17   numbers that you report before the
18   adjustments are made, is this correct
19   that the incidence rate of heart attacks
20   and sudden cardiac deaths for Vioxx would
21   be about .25 percent, whereas for
22   Celebrex, it would actually be a little
23   higher, .31 percent?
24     A.   No.  That's not an incidence
```

Page 373

```
 1   rate.  That is a proportion.  An
 2   incidence rate would take into account
 3   the amount of time that each of the users
 4   was on the drug, and so then what you'd
 5   end up having is years of exposure to
 6   Vioxx in the denominator and number of
 7   cases in the numerator and the same for
 8   Celebrex.  So, these are proportions, but
 9   they are not incidence rates.
10     Q.   Okay.
11          So, proportions.
12          And the proportions of
13   Celebrex users who experienced heart
14   attacks or sudden cardiac deaths was
15   actually slightly higher than the
16   proportion of Vioxx users, correct?
17     A.   That is correct.
18     Q.   And you said that in order
19   to do an incidence rate, you'd want to
20   know how long they were using the drugs,
21   so you'd take into account patient years;
22   is that right?
23     A.   Correct.
24          MR. BECK:  Let me mark for
```

Page 374

1      you, please, Exhibit 25.
2              - - -
3          (Whereupon, Deposition
4      Exhibit Graham-25, Chart
5      FDACDER005940, was marked for
6      identification.)
7              - - -
8      BY MR. BECK:
9          Q.  And this Exhibit 25, do you
10     recognize this as a document or a page of
11     a longer document that was created as
12     part of your study?
13         A.  Yes.  I don't recall,
14     though, at what stage in the study that
15     this run was done, and so I don't know if
16     it included sort of the modifications
17     that we had to make because of
18     eligibility problems and the like.  But
19     it is from our study.  I'm not able here
20     to read the column on the right-hand side
21     because of it being smudged.
22         Q.  Yeah.  Well, this is the way
23     we got the document.
24         A.  Okay.

Page 375

1          I'm just letting you know
2      that I'm not able to read that, but I'm
3      able to read everything else.
4          Q.  Okay.
5          In the right-hand column,
6      while we may have to struggle with the
7      exact numbers, it does say, does it not,
8      "incidence rate per 1,000 patient years"?
9          A.  That's what it looks like it
10     says to me, yes.
11         Q.  Okay.
12         I mean, there's no doubt it
13     says this?
14         A.  Right, no.  This table is
15     set up to calculate incidence rates, so,
16     there's no question about that.
17         Q.  Okay.
18         So, and then if we look down
19     at rofecoxib, that's Vioxx as we know,
20     correct?
21         A.  Right.
22         Q.  And then the rofecoxib
23     number is 7. something, right?
24         A.  Right.

Page 376

1          Q.  Again, we'll just blow it
2      up.  And does that look like 7.49 to you
3      once it's been blown up?
4          A.  Yes.  When I was looking at
5      this (indicating), I would have said
6      7.48, but it looks like 7.49 there
7      (indicating).
8          Q.  Okay.
9          Well, close enough for
10     government work.  It's 7.48 or 7.49,
11     right?
12         A.  Right.
13         Q.  And then if we look up at
14     Celebrex, celecoxib, it is like 7.8
15     something?
16         A.  Yes.  It looks like 7.84 to
17     me, but...
18         Q.  Okay.
19         Whatever it is, it's
20     actually the incidence rate taking into
21     account the patient years, as you said,
22     the incidence rate for heart attacks and
23     sudden cardiac death for Celebrex is
24     actually higher than the incidence rate

Page 377

1      for sudden cardiac death in heart attacks
2      for Vioxx, correct?
3          A.  It's a crude incidence rate,
4      and the number is higher.  They're
5      probably at this point with crude rates
6      not statistically different, but Celebrex
7      rate is higher than the rofecoxib or
8      Vioxx rate.
9          Q.  Yeah.  And I didn't mean to
10     suggest that there was a statistically
11     significant difference, but the Lancet
12     article, one of the conclusions is that
13     there is a statistically significant
14     difference between Vioxx and Celebrex and
15     that Vioxx has a statistically
16     significant higher risk of serious
17     coronary heart disease, right?
18         A.  Right.  And that's based on
19     odds ratios as opposed to incidence
20     rates.
21         Q.  But the incidence rates
22     would be basically the same?
23         A.  Yes.  The incidence rates
24     form the base of the data, but this is

Page 378

1  before adjustments have been done for the
2  types of patients that are given these
3  different drugs.
4      Q.   And that's what I want to
5  get to now.
6          So, you start out with
7  actual numbers of users and how long they
8  use the drug and how many of them had
9  heart attacks, and Vioxx and Celebrex
10 look basically identical.  And then in
11 your analysis, you applied adjustments to
12 the Vioxx users and Celebrex users, and
13 the end result of those adjustments was
14 that Vioxx ended up appearing to have a
15 higher risk, right?
16     A.   Yes.
17     Q.   And the person who -- first
18 of all, these adjustments, at least one,
19 a significant one is called a cardiac
20 risk score, cardiovascular risk score,
21 right?
22     A.   Right.
23     Q.   Is that the main adjustment
24 that was applied?

Page 379

1      A.   That was the main
2  adjustment, and it represented basically
3  a collapsing of 25 or 30 other variables
4  into a single measure.
5      Q.   And the cardiovascular risk
6  score, basically that says, well, people
7  who take one type of medicine might have
8  a whole bunch of other factors that make
9  them prone to have heart attacks more
10 than people who take a different
11 medicine, and we want to take that into
12 account?
13     A.   Right.  They have to be
14 differential distribution of risk
15 factors.
16     Q.   And the person who developed
17 the methodology to come up with the
18 cardiovascular risk scores for Celebrex
19 and Vioxx in your study was Dr. Wayne
20 Ray, who you mentioned before, right?
21     A.   Well, actually, we reference
22 him as having used it, but the use of
23 this -- it's basically -- it's a
24 confounder's score.  The use of a

Page 380

1  confounder's score in case control
2  studies has been well described by Jim
3  Schlesselman in his textbook on case
4  control studies and then by Norman
5  Breslow in his textbook on case control
6  studies.  And so this is a technique
7  that's been described before.  It's a
8  technique that Dr. Ray has used, but he's
9  not the person who created it, developed
10 it.
11     Q.   Well, he didn't invent the
12 idea of a cardiovascular risk score, but
13 he's the one who came up with the formula
14 to account for all of these variables,
15 and he's the one who did the statistical
16 heavy lifting in order to implement that
17 idea in this case, right?
18     A.   In this case, he taught me
19 how to do it.  I was the one who did it,
20 working with him by telecon.
21     Q.   And Dr. Ray and you ended up
22 assigning a higher cardiovascular risk
23 score to the Celebrex users to the Vioxx
24 users, correct?

Page 381

1      A.   That's correct.
2      Q.   And the result of that then
3  was that even though the incidence rate
4  was the same --
5      A.   The crude incidence rate.
6      Q.   -- when you applied the
7  cardiovascular risk score that the two of
8  you came up with, that's what accounts
9  for the difference in your paper between
10 risks of Vioxx and risks of Celebrex,
11 right?
12     A.   It's not just the
13 cardiovascular risk score.  It's
14 adjusting for these risk factors.  And in
15 our paper, we showed that using all of
16 the variables, all of the risk factors in
17 our study to adjust for cardiovascular
18 risk or using the cardiovascular risk
19 score gave us virtually identical
20 answers.  But use of this confounder's
21 score was a more efficient, statistically
22 efficient way to deal with the data.
23     Q.   And, of course, Dr. Ray was
24 involved heavily in the confounder's

96 (Pages 378 to 381)

Page 382

1  score also, right?
2      A.   He was the person who worked
3  with me in showing me how to derive that
4  score.
5      Q.   Okay.
6          And here I've put up on the
7  screen a copy of the article, the Lancet
8  article that's already been marked as an
9  exhibit.
10         When people write articles
11 in scientific journals, are they supposed
12 to disclose any financial conflicts of
13 interest that they have?
14     A.   They should, and I believe
15 that Dr. Ray did.
16     Q.   Okay.
17         Let's take a look at that.
18 If you'd go to Page 6. The person who
19 came, who taught you how to make these
20 adjustments that resulted in Vioxx
21 looking like it had a higher risk than
22 Celebrex, he had two significant
23 conflicts of interest, didn't he?
24     A.   Well, he has two potential

Page 383

1  conflicts of interest, and I was unaware
2  of these when I invited him to
3  participate in our study, and I was
4  actually unaware of them until it came
5  time to do our poster, at which time then
6  you need to put on it, you know, the
7  conflict of interest statement, and it
8  had never crossed my mind to ask people
9  about it. So, that was when I learned
10 about it. And --
11     Q.   And I want you to complete
12 this, but before you do, this "WAR," this
13 thing I have up on the screen, that's
14 Wayne A. Ray, right?
15     A.   Yes.
16     Q.   And he's a consultant to
17 Pfizer, it says in this disclosure,
18 correct?
19     A.   Yes.
20     Q.   Who is it that makes
21 Celebrex?
22     A.   Pfizer.
23     Q.   And so he's got a financial
24 interest in making Celebrex look good,

Page 384

1  right?
2      A.   You could argue that he
3  does, but that didn't operate in our
4  study.
5      Q.   And then he's also -- under
6  the conflict of interest, they say that
7  he's a consultant to plaintiffs'
8  attorneys regarding Vioxx, right?
9      A.   Yes.
10     Q.   And did you know that he's
11 actually served as an expert witness in
12 Vioxx trials?
13     A.   I learned about that only
14 like within the last month or so, but I
15 didn't know that beforehand.
16     Q.   So, anyway, here is Dr. Ray
17 teaching you how to make these
18 adjustments, and these adjustments were
19 made by the time your poster was
20 published, right?
21     A.   Yes.
22     Q.   And it wasn't until after he
23 taught you how to make the adjustments
24 and all the adjustments were made that

Page 385

1  you even found out that he was a paid
2  consultant to the maker of Celebrex and
3  was being paid by plaintiffs' lawyers who
4  were suing Merck in Vioxx cases? Is that
5  right?
6      A.   Yes. But that didn't impact
7  the methodology that was used to derive
8  this adjustment, this confounder's score.
9  This is a way of adjusting for a
10 difference in distribution of risk
11 factors across exposure groups. And so
12 he may have these associations, but that
13 doesn't --
14     Q.   "May have," what do you mean
15 "may have"?
16     A.   Well, he has those
17 associations. They don't affect the way
18 statistics work. They don't affect the
19 way, the methods of how one derives a
20 confounder's score. They don't affect
21 the way one does a regression model and
22 what happens after the computer program
23 spits out the results.
24     Q.   Is there a book you can go

Page 386

1  to or an article that says, here's the
2  formula, here's the exact way to
3  implement this idea of a confounder's
4  score in your study, or did it require
5  some judgment by Dr. Ray as to how he was
6  going to implement this idea when coming
7  up with a confounder's score and the
8  cardiovascular risk score?
9      A.   It's described in
10  Schlesselman's textbook and in Breslow's
11  textbook. I don't recall that all the
12  methods are described there, but the
13  notion of how to do this is.
14      Q.   But you know, don't you,
15  that the methods are not described there
16  and that a whole lot of judgment is
17  required by the people who are
18  applying -- coming up with the formula
19  for a specific study for how to calculate
20  a cardiovascular risk score?
21      A.   No. There's actually -- in
22  our case, there was basically almost no
23  judgment involved. We had a list of what
24  all those cardiovascular risk factors

Page 387

1  were. The ones that related to the
2  heart, we included those in the
3  regression model. And the regression
4  model then gets run with all of these
5  variables in it. It's a two-step
6  regression. The first regression gets
7  run, and what it does is it gives you
8  these things called linear predictors.
9  And linear predictors are the probability
10  that a patient will have an event. There
11  is a slight amount of judgment that
12  happens, because you've got to take the
13  predictors and sort them in ascending
14  order of probability, from like 0
15  probability to close to 100 percent
16  probability, and you have to divide them
17  into roughly equal-sized groups. And so
18  the judgment that happens is, is that
19  there just tends to be a confluence -- if
20  I have hypertension, diabetes and high
21  cholesterol, there's going to be lots of
22  people with that constellation of
23  findings. They are going to end up all
24  having the same probability score, the

Page 388

1  same predicted probability. And so what
2  will happen is, is, let's say I wanted to
3  divide this into ten equal groups or nine
4  equal groups, well, I'm going to get this
5  node that has like 75 people in it, and
6  what I really need to do is be able to
7  break it in half -- okay, I'm sorry.
8      Q.   Okay.
9      A.   What I'm trying to say is,
10  is that the types of judgments you're
11  talking about don't apply here. At least
12  when we were doing this, they didn't
13  apply here.
14      Q.   And you did say that the
15  fellow who taught you how to do it was
16  Dr. Ray, the guy with the two conflicts,
17  right?
18      A.   Yes, that is correct.
19      Q.   And I think you said this
20  morning that there are "lies, damned lies
21  and statistics," right?
22      A.   I said that, too. It
23  doesn't apply here, but I did say that.
24      Q.   Let's move to another

Page 389

1  subject.
2           We talked about how from the
3  original abstract to the poster, the
4  number of high-dose patients changed. Do
5  you remember that?
6      A.   Uh-huh.
7      Q.   So, you had a smaller number
8  of high-dose patients in the abstract
9  when you said there was no statistically
10  significant difference between high-dose
11  Vioxx and basically no use of medicine.
12  And then some people got changed, and the
13  net result was that there was a larger
14  number of high-dose patients when it came
15  time to write up the poster. Do you
16  remember that?
17      A.   Yes.
18      Q.   And we looked at Dr.
19  Trontell's memo where she expressed
20  concern about that. Do you recall that?
21      A.   Yes.
22      Q.   To try to save time, because
23  you may remember the numbers, I suspect
24  you do, in the abstract when you were

Page 390

1    talking about high-dose people, am I
2    right that you had five people who had
3    experienced -- five so-called cases and
4    seven so-called controls?
5        A.   Correct.
6        Q.   And in one sentence, what is
7    a case and what's a control?
8        A.   A case is someone who had a
9    heart attack or sudden death.  And a
10   control was someone who was randomly
11   selected to compare to that person, who
12   on that date had not, as of that date,
13   had a heart attack or sudden death.
14       Q.   Okay.
15           And then sort of going
16   forward to by the time your article was
17   published in The Lancet, instead of five
18   cases with the same population group
19   after the reclassification, you now have
20   ten cases, right?
21       A.   Yes.
22       Q.   So, the number of heart
23   attacks and sudden cardiac deaths that
24   you were ascribing to the high-dose Vioxx

Page 391

1    users doubled from when you did the
2    abstract to when you did the article,
3    right?
4        A.   Correct.
5        Q.   And then you also, instead
6    of seven controls, you had eight
7    controls, right?
8        A.   Correct.
9        Q.   And was it your idea to do
10   this reclassification?
11       A.   What I noticed when we were
12   looking --
13       Q.   Before you say what you
14   noticed --
15       A.   Yes.
16       Q.   -- can you answer, was it
17   your idea to do the reclassification?
18       A.   Yes.
19       Q.   And then before -- I think
20   this is clear, but I want to make sure.
21           Before you did the
22   reclassification, even the high-dose
23   Vioxx users, the difference in risk
24   between them and people who didn't use

Page 392

1    any medicine was not statistically
2    significant, and then after you did the
3    reclassification, then it became
4    statistically significant, right?
5        A.   That's correct.
6        Q.   Now, did any of the authors,
7    your co-authors, express concern about
8    whether this reclassification was proper?
9        A.   Dr. Craig Cheetham from
10   Kaiser did express reservations about the
11   reclassification.  His concern was
12   primarily that it be adequately
13   described, and that eventually was done
14   to his satisfaction, and he was a
15   co-author on the published paper.
16           - - -
17           (Whereupon, Deposition
18   Exhibit Graham-26, E-mail
19   10-23-04 KP002315, was marked for
20   identification.)
21           - - -
22   BY MR. BECK:
23       Q.   Please take a look at
24   Exhibit 26.  Have you seen Exhibit 26

Page 393

1    before?
2        A.   Yes, I have.
3        Q.   And this is a -- is this an
4    e-mail from doctor -- how do you
5    pronounce his last name?
6        A.   Cheetham.
7        Q.   -- Cheetham to you and other
8    co-authors in the study?
9        A.   Yes, it is.
10       Q.   Does Dr. Cheetham say here
11   in the first paragraph, "I have never
12   been comfortable with the recoding of
13   Vioxx patients into the high dose
14   category.  However, it was done with the
15   full participation of five investigators.
16   The process by which this was done needs
17   to be fully disclosed in the methods
18   section.  Therefore, the methods section
19   needs to be clear on three points."  And
20   then his first point is the coding "was
21   done post hoc."  Do you see that?
22       A.   Uh-huh.
23       Q.   And that "post hoc," did you
24   understand that to mean that that was

Page 394

1  after the fact?
2      A.   The fact that I think he's
3  talking about here is, is that we hadn't
4  planned on doing this at the start of the
5  study.
6      Q.   Okay.
7          So, this was something that
8  was not part of the original study plan,
9  but then the reclassification took place
10  after -- in fact, it was after you
11  learned of the results reported in the
12  abstract of no statistically significant
13  difference, right?
14      A.   That coincidence in timing
15  is correct.
16      Q.   Okay.
17          So, you learned no
18  statistically significant difference
19  based on the planned classification, and
20  then you changed the plan and
21  reclassified, right?
22      A.   We did that, and for a good
23  reason, because we had misclassification
24  of the exposure.  And to leave that

Page 395

1  misclassification of exposure in the
2  study would be to misrepresent the study,
3  and so it became necessary -- we were
4  trying to use a computerized algorithm to
5  classify dose.  And what we discovered
6  was that just because somebody was
7  getting a 50-milligram tablet didn't mean
8  they were taking 50 milligrams a day.
9  Sometimes it was cheaper for patients to
10  take the 50 milligram tablet and break it
11  in half and actually take 25 milligrams a
12  day or to take two 25s instead of 50.
13  So, we were obligated to correct that
14  misclassification once we discovered that
15  it was present.
16      Q.   And the second point he
17  makes is, "All five investigators
18  participated."  And then he has the
19  initials of the five investigators,
20  including "DG," and that's David Graham,
21  you, right?
22      A.   That's right.  And I was
23  part of the call that this took place in,
24  but I was not a voting member whose votes

Page 396

1  would determine whether or not
2  reclassification occurred.  For
3  reclassification to occur, these other
4  four people had to agree that based on
5  the evidence that they saw about how
6  Vioxx was being used, that the patients
7  should be reclassified.
8      Q.   And then his third point
9  was, "David Graham was not blinded to
10  cases and controls when the recoding was
11  done."
12          Now, you talked about cases
13  being -- that's where somebody had a
14  heart attack and controls being somebody
15  did not have a heart attack.  And when he
16  says that you were "not blinded to cases
17  and controls," does that mean that at the
18  time that individual patients were
19  reclassified from short-term users to
20  long-term users, you had access to the
21  information that would tell you whether,
22  in fact, patient A had a heart attack or
23  did not have a heart attack?
24      A.   That's correct, and that's

Page 397

1  why I wasn't a voting member.
2      Q.   So, what Dr. Cheetham said
3  was that, fine, we made these
4  adjustments, but our article needs to set
5  forth what we did and how we did it and
6  needs to say that it was not part of the
7  original plan, that all five
8  investigators, including Dr. Graham,
9  participated, and when Dr. Graham was
10  participating, he knew which patients had
11  heart attacks and which ones didn't.
12  That's what he wanted to be put forth in
13  the article as published in Lancet,
14  right?
15      A.   That's what he says in this
16  e-mail.
17      Q.   And, you didn't do -- in
18  fact, he says at the bottom of this
19  e-mail, "From my perspective this issue
20  is not negotiable," right?
21      A.   Yes.
22      Q.   But you did not make the
23  disclosure that Dr. Cheetham felt was
24  necessary, and, in fact, not even

Page 398

1    negotiable, did you?
2        A.   We placed in the methods,
3    had a description of the process that we
4    used to reclassify these cases.  It
5    didn't meet with Dr. Cheetham's -- his
6    personal requirements, but the other
7    co-authors were quite comfortable, and
8    there's a lot of e-mail traffic about
9    that.
10       I will add that after this,
11   I had a conversation, after we submitted
12   the paper to the Lancet, with the editor
13   of the Lancet, Dr. Horton, in which I
14   described in detail all of these things.
15   And Dr. Horton had no problem with the
16   way that we had conducted this, and when
17   Dr. Cheetham learned that, his
18   reservations went away.
19       Q.   Well, when you say that it
20   wasn't done exactly the way he said it
21   should be done, the way that it was
22   actually done, the disclosures that were
23   made in the Lancet, they left you out
24   when it described who did the recoding,

Page 399

1    isn't that true?
2        A.   Because I didn't vote on the
3    recoding.  The recoding required the
4    unanimous vote to change of the four
5    people listed, and if even one of them
6    said that the case should not be recoded,
7    it wasn't recoded.  And --
8        Q.   Did the Lancet article
9    disclose that you were the one who
10   suggested the reclassification after you
11   already knew which patients had heart
12   attacks and which ones didn't?
13       A.   No.  But that wasn't -- the
14   editor didn't feel that that was
15   necessary.
16       Q.   Did the Lancet article
17   disclose that even though you say you
18   didn't have a vote, you wrote memos to
19   the other authors saying here's the
20   people I think ought to be reclassified?
21       A.   I did send a list of patient
22   IDs that I thought that there was a
23   question about the reclassification, and
24   each of the members of the study team

Page 400

1    were asked to come up with a similar
2    list.  And then that composite list was
3    what the group voted on together, and
4    there were 29 or 30 patients in that
5    group that the four participants voted
6    upon.
7        Q.   Did the Lancet article
8    disclose that even though you didn't have
9    a vote, that you, knowing who had heart
10   attacks and who didn't, came up with a
11   list of people that you wanted the others
12   to look at and you suggested should be
13   reclassified?  Did the Lancet article
14   disclose that?
15       A.   No, it didn't.  But the
16   editor was fully aware of it and believed
17   that the process, the voting process was
18   sufficient and stringent enough.
19       Q.   You testified on direct
20   examination about this estimate of excess
21   heart attacks and sudden cardiac deaths
22   that you say are attributable to Vioxx.
23   Do you remember that?
24       A.   Yes.

Page 401

1        Q.   And the number that you used
2    was approximately 88,000 to 139,000,
3    correct?
4        A.   Right.
5        Q.   And you used that article
6    not only today, but -- or not article,
7    you used that estimate not only today,
8    but also in your Lancet article and in
9    your Congressional testimony and then all
10   those times you went on television that
11   you went through with Mr. Kline, right?
12       A.   Correct.
13       Q.   So, I want to talk with you
14   about how you came up with those numbers.
15       Even though they were
16   published in the Lancet article, which
17   was about the Kaiser Permanente study
18   that you did, those numbers didn't come
19   from the Kaiser Permanente study, did
20   they?
21       A.   No, they didn't.  They came
22   from two Merck -- they were based on
23   results from two clinical trials
24   conducted by Merck.

Page 402

1    MR. BECK: I'm told that
2    they need to change the tape
3    again, so, why don't we take a few
4    minutes here.
5    THE VIDEOTAPE TECHNICIAN:
6    Stand by, please.
7    The time is 5:31. That
8    concludes Video Cassette Number 3.
9    We're off the record.
10   - - -
11   (Whereupon, a recess was
12   taken from 5:31 p.m. until
13   5:47 p.m.)
14   - - -
15   THE VIDEOTAPE TECHNICIAN:
16   This begins Video Cassette Number
17   4. The time is 5:47. We're back
18   on the record.
19   BY MR. BECK:
20   Q.   Before our break, Dr.
21   Graham, we started to discuss this
22   estimate of yours of excess heart attacks
23   and sudden cardiac deaths, your number of
24   88,000 to 139,000.

Page 403

1    And I think we covered this,
2    but am I correct that even though you
3    published this in your Kaiser study, the
4    numbers did not come from the work that
5    you did with the Kaiser information?
6    A.   That's correct.
7    Q.   And did you say that they
8    came from the VIGOR study and the APPROVe
9    study?
10   A.   Correct.
11   Q.   In fact, you had to take
12   some numbers from VIGOR and APPROVe and
13   then apply them to other numbers from
14   still other studies in order to come up
15   with this estimate, didn't you?
16   A.   We took the numbers from
17   VIGOR and APPROVe, which were the risks,
18   the estimates of relative risk, the five
19   for the high dose and two for the low
20   dose, and we applied that to the
21   estimates of how many people had high
22   dose or low dose. And in the formula
23   that you use, you also need background
24   rates for what is the background rate in

Page 404

1    the population that you are dealing with.
2    Q.   When you did the background
3    rates, you took background rates from
4    still other studies, some of which didn't
5    have anything to do with Vioxx, right?
6    A.   We took background rates
7    from the CLASS study, using their control
8    group because they had an unexposed
9    control group, and so what we could do
10   is, is by doing that, we could get a
11   handle on the types of patients who might
12   be prescribed a COX-2 inhibitor and look
13   to see what their experience of heart
14   attacks were.
15   We didn't have that in the
16   VIGOR study, because the VIGOR study
17   compared two active treatments.
18   We also, because people who
19   get enrolled in clinical trial are, as a
20   rule, healthier than the patients who
21   ultimately get the drugs, we also took a
22   background incidence rate from another
23   study with a somewhat sicker population,
24   and so then we had a range. And it was

Page 405

1    because of the range in those two
2    background rates that we end up with
3    ultimately the 88,000 and the 139 or the
4    140,000, that they relate to those rates.
5    Q.   At least one of the studies
6    that you picked the background rate from
7    didn't even involve Vioxx, right?
8    A.   That's correct. But it
9    involved the types of patients who we had
10   every reason to believe would be
11   prescribed Vioxx in the real world.
12   Q.   Now, we talked before about
13   the peer review process and how you
14   submitted the manuscript that ended up
15   being published in Lancet to these peer
16   reviewers within the FDA. Do you
17   remember that?
18   A.   Uh-huh.
19   Q.   Now, when you submitted your
20   article to the FDA peer reviewers, you
21   had a much different estimate of excess
22   cardiovascular events than you ended up
23   putting in the Lancet publication,
24   correct?

Page 406

1    A.   That's correct.
2        MR. BECK:  I'm going to mark
3    the draft as it was submitted to
4    the FDA reviewers.  This is
5    Exhibit 27.
6             - - -
7        (Whereupon, Deposition
8    Exhibit Graham-27, Memo 9-30-04
9    "Risk of acute myocardial
10   infarction and sudden cardiac
11   death in patients treated with
12   COX-2 selective and non-selective
13   NSAIDs," FDACDER022369 -
14   FDACDER022388, was marked for
15   identification.)
16           - - -
17   BY MR. BECK:
18       Q.   Is that a copy of the
19   article that you gave to the FDA people
20   to review before it was sent on to
21   Lancet?
22       A.   Just let me quickly look
23   through this.  No.  There were two
24   documents at the time.  There was a

Page 407

1    report for the FDA, which this is a copy
2    of that report for the FDA, and there was
3    a companion document, which was a
4    manuscript that was based on the same
5    material that's in the report.  So, we
6    can talk about the materials here, but
7    this is not what those people were given.
8        Q.   Okay.
9        So, this is a report to the
10   FDA, and the manuscript reflected the
11   same information that's in this report?
12       A.   Right.  But it had to be
13   more concise and the like.
14       Q.   Okay.
15       Well, focusing on this
16   report, which I've put up on the screen,
17   if we go over to Page 10 -- actually, I'm
18   sorry.  I want to go to -- yes, Page 10.
19       And did you say in the
20   report to the FDA, as well as the
21   manuscript that you submitted for their
22   review, that combining -- that when you
23   looked at all of the data of Vioxx versus
24   Celebrex, that you came up with the

Page 408

1    excess of adverse cardiovascular events
2    of 27,785 cases?
3        A.   That's correct.
4        Q.   And so this was, when you
5    submitted it to FDA review, you were
6    comparing Vioxx to Celebrex, correct?
7        A.   Yes.
8        Q.   And that, in fact, is what
9    you compared in, one of the things you
10   compared in the Kaiser study, right?
11       A.   That's correct.
12       Q.   And then you had the number
13   27,000.  But then by the time it gets
14   published in Lancet, you've changed the
15   comparison from Vioxx to Celebrex, and
16   now it's to Vioxx versus --
17       A.   Nonuse.
18       Q.   Nonusers?
19       A.   Right.
20       Q.   And the number goes from
21   27,000 to those two numbers you put out
22   before, 88 to 139,000, right?
23       A.   Right.  And the reason for
24   the difference has to do with mainly two

Page 409

1    factors: one, this report was based only
2    on Vioxx use through 2003, and in the
3    Lancet paper, we took it through the end
4    of marketing through September of 2004,
5    so, there is additional exposure, if you
6    will; and the second is, is that in
7    looking at -- what we decided was is
8    that -- what was more important was to
9    talk in general terms about the
10   population impact, the potential
11   population impact of the use of Vioxx in
12   the general population.  And so we
13   realized that the background rates for
14   myocardial infarction in Kaiser are much,
15   much lower than the national average,
16   that that is a much healthier population
17   than the general U.S. population, and
18   that it would be better to use background
19   rates that were more reflective of the
20   types of people who were actually going
21   to get the drug.  And so those two
22   factors account for these differences and
23   the difference in the comparison between
24   Celebrex and between nonuse.

Page 410

```
 1      Q.   You indicated before that
 2   there were two specific FDA employees
 3   that you had suggested as peer reviewers,
 4   right?
 5      A.   Correct.
 6      Q.   And I think it was Dr. Bruce
 7   Stadel and Dr. Bob O'Neill?
 8      A.   Stadel, yes.
 9      Q.   Stadel is how to pronounce
10   it?
11      A.   Yes.
12      Q.   And they, in fact, looked at
13   your manuscript, the one that had the
14   27,000 number in it, Vioxx versus
15   Celebrex, as part of their peer review,
16   right?
17      A.   Correct.
18      Q.   And they told you, as part
19   of the people that you suggested as peer
20   reviewers, they told you that they didn't
21   think you should include that comparison
22   as a matter of sound science, right?
23      A.   That's correct.  And in the
24   manuscript that we submitted to the
```

Page 411

```
 1   Lancet, that was removed.  The editors of
 2   the Lancet came back and said that they
 3   wanted us to have an estimate in the
 4   discussion.  And so it was in response to
 5   the editors of the Lancet that we put
 6   them back into the paper.
 7      Q.   Let's just stick, if we can,
 8   with my question about what the people
 9   who you said you respected their judgment
10   and wanted them to be the peer reviewers
11   and what -- let's see here.  I don't know
12   if I've identified this.  I don't think I
13   have.
14            - - -
15          (Whereupon, Deposition
16      Exhibit Graham-28, E-mail
17      10-22-04 FDACDER022409, was
18      marked for identification.)
19            - - -
20          MR. BECK:  I will mark it as
21      Exhibit 28, and I put it up on the
22      screen.
23   BY MR. BECK:
24      Q.   Is this an e-mail from you
```

Page 412

```
 1   to Dr. Seligman and Dr. Trontell of the
 2   FDA, as well as your co-authors dated
 3   October 22nd, 2004?
 4      A.   Yes, it is.
 5      Q.   And the very first thing you
 6   say is, "I reviewed the comments of Bob
 7   and Bruce" -- that's Dr. Bruce Stadel
 8   and Dr. Bob O'Neill, right?
 9      A.   Yes.
10      Q.   -- "and discussed them with
11   the co-authors.  We" -- that's you and
12   the co-authors, right?
13      A.   Right.
14      Q.   "We changed the paper to
15   exclude our estimate of the actual number
16   of excess cases of heart attacks and
17   sudden cardiac deaths, suggested by both
18   Bob and Bruce," right?
19      A.   Yes.
20      Q.   Okay.
21          So, the manuscript that you
22   submitted to the Lancet took out that
23   27,000 estimate that the two peer
24   reviewers you suggested said was
```

Page 413

```
 1   scientifically unsound, right?
 2      A.   That's correct.
 3      Q.   And then after it was
 4   submitted to the Lancet, you put in a new
 5   estimate of excess cardiovascular events,
 6   right?
 7      A.   At the request of the
 8   editors, yes.
 9      Q.   And let's take a look at
10   this.  And you used higher numbers, even
11   though you were still comparing Vioxx to
12   Celebrex, right?
13      A.   You have to show me the
14   documents because I honestly don't
15   recall.
16          MR. BECK:  Okay.
17          I put this on upside down,
18      but it is Exhibit 29.
19            - - -
20          (Whereupon, Deposition
21      Exhibit Graham-29, E-mail with
22      attachment "Risk of Acute
23      Myocardial Infarction and Sudden
24      Cardiac Death in Patients Treated
```

Page 414

1    with COX-2 Selective and
2    Non-Selective NSAIDs," (Graham,
3    et al) KP001133;  KP001133A -
4    KP001133X, was marked for
5    identification.)
6    - - -
7  BY MR. BECK:
8    Q.   Is Exhibit 29 a copy of an
9  e-mail from you to the Lancet folks
10  attaching a revised manuscript?  And all
11  of this is dated November 11, 2004.
12    A.   Yes.
13    Q.   Let me put that on the
14  screen here.
15        And so you say here on the
16  first page, "Dear Richard and Stuart,
17  Attached is our revised-revised
18  manuscript," right?
19    A.   (Witness nods.)
20    Q.   Correct?
21    A.   Yes.
22    Q.   And then if you'd turn over
23  to Page 12, this paragraph at the bottom
24  using the odds ratio?

Page 415

1    A.   Uh-huh.
2    Q.   The present study and
3  background incidence rate from U.S.
4  population?
5    A.   Right.
6    Q.   So, when Lancet says we kind
7  of like that comparison that the peer
8  reviewer said was scientifically unsound,
9  you put it back in, but this time you
10  increased it by 10,000 cases, right?
11    A.   That is -- I'm just trying
12  to look for -- oh, it's because --
13    Q.   First, before you get to the
14  reason why --
15    A.   Yes.
16    Q.   -- is it true?
17    A.   Yes.
18    Q.   Okay.
19    A.   And the reason is, is that
20  in the first one, we were using the odds
21  ratios that we got from our actual study
22  and applying those to the national drug
23  use numbers. Here we were looking for
24  other populations that might have

Page 416

1  background rates that were more
2  appropriate, but we were still using the
3  relative risk estimates from our Kaiser
4  study.
5    Q.   Now, did Dr. Stadel and
6  Dr. O'Neill, the two peer reviewers that
7  you said you trusted, and who said that
8  the 27,000 figure was scientifically
9  unsound, did they have a chance to review
10  this 37,000 figure that you came up with
11  after you submitted the manuscript to
12  Lancet?
13    A.   No.  Once a paper goes into
14  a journal and you're dealing with the
15  journal and its peer reviewers, what
16  happens is between the author and the
17  journal.  So, there was no requirement
18  to, and I didn't.
19    Q.   And then the rest of this
20  paragraph, is that where you first came
21  up for the very first time with this
22  estimate of 88,000 to 138,000 excess
23  cases when you move away from Vioxx
24  compared to Celebrex and instead do your

Page 417

1  comparison of Vioxx to nonusers?
2    A.   Yes. But the way we were
3  thinking of it is, is that we were moving
4  from relative risks that were derived
5  from observational studies to more solid
6  estimates of risk which came from
7  randomized controlled clinical trials.
8  And so that's why we chose, ended up
9  focusing on VIGOR and APPROVe and their
10  relative risks rather than the
11  observational study data from our Kaiser
12  study.  We thought that, being based on
13  clinical trials, that it had greater
14  credibility and would be more free of
15  potential biases.
16    Q.   And, of course, it's the --
17  those are the numbers that got all the
18  headlines and all the attention on 60
19  Minutes and Good Morning America and all
20  the news shows you appeared on, right?
21    A.   I suppose those numbers did
22  attract attention.
23    Q.   And did you ever give your
24  peer reviewers who told you that your

Page 418

1   27,000 number was scientifically unsound,
2   did you ever give those peer reviewers
3   whom you recommended the chance to take a
4   look at these new comparison --
5        MS. ROYCE: Objection, form.
6   BY MR. BECK:
7        Q.   -- and new numbers of 88,000
8   to 139,000?
9        A.   No.  There was no
10  requirement to.  Lancet has a very
11  extensive and exhaustive peer review
12  process.  Our paper was reviewed by five
13  peer reviewers, which is two more than
14  normally happens with the medical
15  journal.  And those peer reviewers and
16  the editors of the journal didn't happen
17  to agree with those two people from the
18  FDA.
19       Q.   Just so that we're clear,
20  nobody from the FDA during the peer
21  review process ever got a chance to look
22  at this new comparison that you did for
23  the first time and the revised-revised
24  manuscript, correct?

Page 419

1        A.   That's correct, and it
2   wasn't required.
3        Q.   Now, when you finally
4   published the paper in Lancet, did you
5   include the 37,000 number?
6        A.   No.  The numbers here --
7   actually, this all happens in November.
8        Q.   Can you just tell me whether
9   you included the 37,000 number in the
10  Lancet article?
11       A.   No.
12       Q.   And, in fact, by the time we
13  finally get to the published article in
14  Lancet, the only numbers that you include
15  were these 88 to 139,000 numbers that you
16  first came up with in the revised-revised
17  manuscript, right?
18       A.   That's correct.
19       Q.   Now, I want to see if we can
20  understand a little better how you came
21  up with them.  I think you said that you
22  used the relative risks from the VIGOR
23  study and the APPROVe study, right?
24       A.   That is correct.

Page 420

1        Q.   And the relative risk for
2   VIGOR was 5, right?
3        A.   Correct.
4        MR. BECK:  Somebody on the
5   phone is either going to have to
6   stop making noise or we're going
7   to hang up on you here.
8        MR. KLINE:  And I support
9   Mr. Beck.
10  BY MR. BECK:
11       Q.   And the relative risk from
12  APPROVe was 2.0, right?
13       A.   Correct.
14       Q.   And then you took those
15  relative risks and applied them to
16  background rates that you got from other
17  studies, right?
18       A.   Yes.  Actually, if we refer
19  to the document in my report, the method
20  is described there.  The numbers are
21  different because we used different
22  background rates, but the method is
23  described there.
24       Q.   Well, it is a completely

Page 421

1   different comparison, too.  It's --
2        A.   No.  But the underlying
3   method is described, so that I can tell
4   you accurately what it is that we did.
5        Q.   Well, in your article, you
6   state that "The background rate for acute
7   myocardial infarction among control
8   groups from studies of cardiovascular
9   risk and NSAID users varied from 7.9 per
10  1,000 person years in CLASS," one of the
11  studies you referred to, to 12.4 per
12  1,000 person years in what was called the
13  TennCare study, right?
14       A.   Correct.
15       Q.   So, the background rate that
16  you used when doing your calculation was
17  this range of 7.9 to 12.4, right?
18       A.   Correct.
19       Q.   And by "background rate,"
20  what we mean is people who aren't taking
21  any medicine at all.  For every 1,000
22  person years of people not taking
23  medicine, 7.9 to 12.4 people are going to
24  have an adverse cardiovascular event,

Page 422

1  right?
2      A.   Right.  Within the age
3  groups that those populations came from,
4  right.
5      Q.   So, that's sort of what
6  you'd expect from someone taking no
7  medicine at all, is somewhere between 8
8  to 12 or so people per thousand are going
9  to have heart attacks just because that's
10  what happens in life, right?
11      A.   That's what happens.  Right.
12      Q.   What was the heart attack,
13  the CV rate for the Vioxx 50 milligrams
14  in the VIGOR study?
15      A.   Golly, we'd have to look at
16  it, because I didn't view things in terms
17  of incidence rates.  I focused on
18  relative risks.  So, I'm sure you have
19  the paper there and we can look at it and
20  we can figure it out.
21      Q.   You referred earlier in your
22  testimony to the Targum memorandum?
23      A.   Shari Targum, yes.
24      Q.   And that was a memorandum

Page 423

1  written in early --
2      A.   I think 2001.
3      Q.   -- 2001?
4      A.   It's available on the FDA
5  website.
6          MR. BECK:  We'll mark that
7  as Exhibit 30.
8              - - -
9          (Whereupon, Deposition
10      Exhibit Graham-30, "FDA Medical
11      Review: Cardiovascular analysis
12      for Vioxx," (Targum) 2-1-01
13      MRK-ABX0002367 - MRK-ABX0002404,
14      was marked for identification.)
15              - - -
16  BY MR. BECK:
17      Q.   And if you would go to, it
18  looks like Page 13, if I'm reading that
19  right.  13 of 37.
20      A.   Uh-huh.
21      Q.   In this FDA report, and this
22  is a memorandum about the VIGOR analysis,
23  right, about the VIGOR study?
24      A.   I believe it is.  Yes, it

Page 424

1  is.
2      Q.   Okay.
3          And does it say on this page
4  that the MI rate for Vioxx was .74?
5      A.   Yes, but I don't know what
6  the units are.
7      Q.   Okay.
8          If you go to the next page,
9  you'll see under the second footnote,
10  under the --
11      A.   Okay.
12          "Per 100 person years."
13      Q.   Okay.
14          And --
15      A.   So, that would be equivalent
16  to 7.4 per thousand person years.
17      Q.   So, the rate for myocardial
18  infarctions, heart attacks --
19      A.   Uh-huh.
20      Q.   -- for people who were
21  taking the high-dose Vioxx in the VIGOR
22  study was 7.4 per hundred -- per thousand
23  person years, right?
24      A.   Yes.

Page 425

1      Q.   And what you said before is
2  the normal population not taking any
3  medicine at all, the background rate that
4  you used was 7.9 heart attacks per
5  thousand person years, right?
6      A.   Yes.  And the patients
7  enrolled in the VIGOR study were selected
8  to be patients who were unlikely to have
9  cardiovascular disease.  So, there were a
10  number of exclusions that would exclude
11  patients who were at higher risk of
12  having myocardial infarction.  Those
13  patients weren't excluded from the CLASS
14  study.
15      Q.   So, I just want to make sure
16  that I understand the numbers, though.  I
17  put up something on the screen here.
18          You talked about the
19  background rate, people who aren't taking
20  any medicine at all, 7.9 to 12.4.  And in
21  VIGOR, unless you start making
22  adjustments, the actual real life rate of
23  people who had heart attacks taking the
24  50 milligram dose was actually lower than

Page 426

1  what you said the background rate is,
2  right?
3      A.   That would be true if what
4  we were dealing with were patients who
5  had been screened for preexisting
6  cardiovascular disease. But the typical
7  patient who received Vioxx on the open
8  market post-marketing was not screened
9  for preexisting cardiovascular disease,
10  and the labeling never said that they
11  should be.
12      Q.   Let's now talk about
13  APPROVe.
14          What's the equivalent number
15  here for the APPROVe study which involved
16  a 25 milligram dose of Vioxx?
17      A.   You'll have to show me the
18  paper and we can derive that number.
19                - - -
20          (Whereupon, Deposition
21      Exhibit Graham-31,
22      "Cardiovascular Events Associated
23      with Rofecoxib in a Colorectal
24      Adenoma Chemoprevention Trial,"

Page 427

1      (Bresalier, et al) NEJM 3-17-05,
2      352;11: 1092-1102, was marked for
3      identification.)
4              - - -
5  BY MR. BECK:
6      Q.   Have you seen Exhibit 31
7  before?
8      A.   Yes, I have read this paper
9  before.
10      Q.   And I'll put it on the
11  screen. Well, let's just you and I go to
12  Table 2 over on the fourth page.
13          Is this a paper that deals
14  with the APPROVe study?
15      A.   Yes.
16      Q.   Okay.
17          And in looking at Table 2,
18  can you see there that there were 21
19  heart attacks out of 3,059 person years?
20      A.   I don't see where you are
21  getting the person years from, but I --
22      Q.   Look in the little footnote
23  underneath the table.
24      A.   Oh, okay. Yes. Uh-huh.

Page 428

1      Q.   And if you -- in order to
2  come up with an equivalent number that
3  we've been talking about here for event
4  rates, you would divide 21 by that 3,000
5  -- or 3.059, right?
6      A.   Right. The 3,059 multiplied
7  by a thousand or the 3.0, yes.
8      Q.   And when you did it the
9  right way, you would come up with an
10  event rate in APPROVe of 6.9; is that
11  right?
12      A.   I'll trust your arithmetic.
13      Q.   And, again, the real life
14  heart attack rate in both VIGOR and
15  APPROVe was lower than what you say is
16  the normal background rate for people who
17  are not taking any medicine at all,
18  right?
19      A.   That's correct. But
20  background rates vary from study to
21  study. We could go, though, to --
22      Q.   Is it an important thing
23  then to the legitimacy --
24          MR. KLINE:  He was finishing

Page 429

1      his answer.
2  BY MR. BECK:
3      Q.   Is it an important thing
4  then to the legitimacy of a statistical
5  study to focus on what kind of background
6  rate somebody picked?
7      A.   We picked what we thought
8  were representative background rates for
9  the types of patients who were likely to
10  be prescribed the drug. And those
11  background rates actually are the
12  national background rate for heart
13  attack. If you were to look at what's
14  the risk of heart attack in people who
15  are like 50 and older in the United
16  States, that background rate will fall in
17  the range of what our NSAID background
18  rate was. And you can do that in
19  numbers, just going to the American Heart
20  Association documents in the census and
21  just getting the number of heart attacks
22  and the number of people, and that will
23  come up with the background rate.
24          But background rates are

Page 430

1 important because at the end of the day,
2 the background rate is what drives what
3 that actual estimate of numbers is.
4 Regardless of what background rate you
5 use, however, you still end up with a lot
6 of affected bodies. And we put a number
7 in our paper, and what we were more
8 concerned with was the public health
9 impact of Vioxx exposure than we were
10 with what were the particular numbers,
11 recognizing that the particular numbers
12 could be different than the range that we
13 gave, but that was our best estimate at
14 what we thought was likely to be the
15 case.
16      Q.   Now, the patients involved
17 in the VIGOR study, these were rheumatoid
18 arthritis patients, right?
19      A.   Yes.
20      Q.   And rheumatoid arthritis
21 patients have a higher risk of heart
22 attack, all other things being equal,
23 than people who don't have rheumatoid
24 arthritis, right?

Page 431

1      A.   Some studies have found
2 that, and other studies have found that
3 there's no increase in risk.
4      Q.   Now, you mentioned that
5 CLASS was one of the studies that you
6 used to come up with your range. Those
7 people had osteoarthritis, right?
8      A.   That's correct.
9      Q.   And that is not associated
10 with a higher heart attack risk, right?
11      A.   Not that we're aware of.
12      Q.   And the other study that you
13 used for the background rate was
14 TennCare?
15      A.   Yes.
16      Q.   And that's short for
17 Tennessee Care, right?
18      A.   Right. It's a Medicaid
19 program.
20      Q.   And that's anybody who used
21 a prescription NSAID, regardless of what
22 their condition was, right?
23      A.   Right, but these were the
24 nonusers.

Page 432

1      Q.   So, these were nonusers in
2 Tenn Care, but they didn't have
3 rheumatoid arthritis or anything like
4 that?
5      A.   Some of them did, but most
6 of them didn't.
7      Q.   And VIGOR, people were not
8 -- they didn't include people who were
9 using low-dose aspirin, right?
10      A.   That is correct.
11      Q.   And people who were using
12 low-dose aspirin, that's generally going
13 to be cardioprotective and they'd have an
14 even lower rate if they had people with
15 low-dose aspirin?
16      A.   Well, the fear is it hadn't
17 been studied, and so you know that those
18 patients have underlying cardiovascular
19 disease, and so those patients are
20 theoretically at increased risk of having
21 a heart attack.
22      Q.   But even with all of that,
23 VIGOR and APPROVe both had lower rates
24 than your background rates, correct?

Page 433

1      A.   Yes.
2      Q.   I want to move on then to
3 the relative risks that you used. They
4 came, as you said, from VIGOR and from
5 APPROVe.
6           Did you look at the event
7 rates of the people who took naproxen in
8 the VIGOR study?
9      A.   What I did was, is I looked
10 at the relative risk that was published
11 in the VIGOR study for the way it was
12 presented, was the ratio of Vioxx over
13 naproxen, and that ratio was given as .2.
14      Q.   No, no, I'm not asking about
15 relative risk now. I'm asking about the
16 event rates for the naproxen patients.
17      A.   No. And the reason why is,
18 is we wanted people who were unexposed,
19 and the VIGOR study didn't provide us
20 with an unexposed group to get a
21 background rate from.
22      Q.   Do you agree, sir, that if
23 you looked at the data from the Targum
24 memo where they've got the actual heart

Page 434

1  attack rate for the people who use
2  naproxen in the VIGOR study, they were at
3  a super low rate of only 1.5?
4      A.   That shows you the wonders
5  of selection bias.  That if you pick
6  healthy patients into a study, you are
7  going to get low incidence rates, and the
8  VIGOR study selected relatively healthy
9  patients into it.  So, I'm not surprised
10  that the rates were lower.
11      Q.   Do you know that Dr. Graham
12  has estimated the United States
13  background rate to be approximately 6 per
14  thousand?
15      A.   And that is in people who
16  are 15 and older.  And one-third of the
17  *population is between the ages of 15 and*
18  40, and the occurrence of myocardial
19  infarction in that group is almost zero.
20  So, if you were to truncate those people
21  out and then calculate what the actual
22  rate is among the people who are most
23  likely to get the Vioxx, the number ends
24  up smack in the middle of that range.

Page 435

1      Q.   And I've referred to you in
2  the third person.  I'm sorry.  I'm trying
3  to get through.
4      A.   I took no offense.
5      Q.   I did not intend any.  I was
6  actually thinking of Dr. Topol when I
7  referred to Dr. Graham.
8          *Dr. Topol, are you*
9  acquainted with his publication where he
10  uses a placebo rate of 5.2?
11      A.   Yes.  And that was from
12  randomized clinical trials.  And
13  randomized clinical trials, no matter
14  what they are, they select patients who
15  are healthier than the real world
16  patients that get the drugs after they go
17  on the market.
18      Q.   And in APPROVe, as I just
19  put up there, the people who took
20  placebos in the APPROVe study, their rate
21  was only 2.7, right?
22      A.   Yes.  And they were younger
23  patients without cardiovascular disease,
24  but yes.

Page 436

1      Q.   And so when you have these
2  relative risks that come from VIGOR and
3  APPROVe, and you are taking the VIGOR
4  heart attacks number of 7.4 and you're
5  comparing it with this super low number
6  of naproxen, 1.5, and that's how you come
7  up with the -- that's how that high
8  number of relative risk of 5 is derived,
9  correct?
10      A.   Those are the results from
11  the VIGOR study.
12      Q.   And the same thing with
13  APPROVe.  The relative risk is 2, but it
14  is not because a lot of people had heart
15  attacks on Vioxx, it is because not very
16  many people had them on the placebo,
17  right?
18      A.   That I don't know the -- I
19  don't know the answer to that question.
20  If you have an odd placebo group that's
21  been selected that has an unusually low
22  background rate, that's a possibility.  I
23  can't answer that question.  I don't know
24  the answer to that question.

Page 437

1      Q.   You never looked into that
2  when doing your estimate?
3      A.   No.  Realize at the time
4  that we did our estimate, what we had to
5  work on were press announcements, because
6  none of these data --
7      Q.   If the answer is no, that's
8  fine.  I only have about ten minutes
9  left.
10      A.   Okay.
11          I'm sorry.
12          MR. KLINE:  Actually, you
13  are over.
14          MR. BECK:  Let's not use any
15  time on this.
16          MR. KLINE:  I agree.  You're
17  over.  But I'm not arguing with
18  you.  I've gotten four e-mails
19  about it and I haven't said a
20  word.  Go ahead.  Go.
21          THE WITNESS:  He's now said
22  ten words.
23          MR. KLINE:  Go.  He and I
24  are a model today of getting

Page 438

1    along. Go.
2           MR. BECK: Ready?
3           MR. KLINE: We're waiting
4    for the next question.
5           MR. BECK: Okay.
6    BY MR. BECK:
7       Q.   When you wrote the Lancet
8    article, the revised-revised article, and
9    put in this estimate for excess
10   cardiovascular events that you said were
11   caused by Vioxx, did you do a similar
12   analysis for Celebrex to see how many
13   excess cardiovascular events were caused
14   by using your methodology, people who use
15   Celebrex instead of no medication at all?
16      A.   If we had done -- we did not
17   do that. If we had done that, we would
18   have shown that Celebrex actually
19   prevented heart attacks, because the
20   point estimate was below 1. And none of
21   the randomized clinical trials that we
22   had available showed an increased risk
23   with Vioxx. If it would have come up, it
24   would have been a wash.

Page 439

1       Q.   How about traditional
2    NSAIDs, did you do that kind of analysis
3    to say how many excess cardiovascular
4    events are caused by traditional NSAIDs?
5       A.   We did not because there was
6    no available randomized controlled,
7    placebo controlled data that would give
8    us incidence rates and real relative
9    risks for traditional NSAIDs. No such
10   studies had been done.
11      Q.   Are you familiar with the
12   APC study concerning Celebrex?
13      A.   I think so. I think at the
14   time that we did our study, that also was
15   unpublished.
16      Q.   Does it show that, in fact,
17   Celebrex would have an increased risk?
18      A.   I don't believe the study
19   has ever been published. If it has been
20   published, I would love to see the
21   publication because I don't recall seeing
22   it. But my recollection from that study
23   is, is that it found that I think at the
24   higher doses of Celebrex, it was like 3.4

Page 440

1    or so relative risk, and maybe 2.5 for
2    the standard dose if I'm thinking of the
3    right -- am I thinking about the study
4    that you're thinking about?
5       Q.   Yes.
6           MS. ROYCE: Can we have the
7    document?
8           MR. BECK: I don't have it
9    handy. I mean, I was surprised at
10   his answer claiming that
11   Celebrex --
12          THE WITNESS: Well, no, no.
13   Understand. When we wrote our
14   paper, this wasn't out there, and
15   all there was was this one study,
16   and we don't know what it means.
17   BY MR. BECK:
18      Q.   Let's move on to my last
19   subject and I'll wind up.
20          You talked about how you
21   made a presentation in February of 2005
22   to the FDA Advisory Committee. Do you
23   remember that?
24      A.   Yes, I do.

Page 441

1       Q.   And that was one of the
2    exhibits that you went over with Mr.
3    Kline with some of the pages from the
4    presentation that you made to the
5    Advisory Committee, right?
6       A.   Correct.
7       Q.   Then the Advisory Committee
8    made recommendations to the FDA, and the
9    FDA, in turn, reached some conclusions
10   concerning the safety of COX-2
11   inhibitors; is that correct?
12      A.   I believe it is.
13          MR. BECK: We'll mark as
14   Exhibit 32 the April 6, 2005
15   memorandum.
16          - - -
17          (Whereupon, Deposition
18   Exhibit Graham-32, Memo 4-6-05
19   "Analysis and recommendations for
20   Agency action regarding
21   non-steroidal anti-inflammatory
22   drugs and cardiovascular risk,"
23   (19 pages), was marked for
24   identification.)

Page 442

1        - - -
2    BY MR. BECK:
3        Q.   Do you recognize that
4    document, sir?
5        A.   Yes, I do.
6        Q.   Will you turn to the bottom
7    of the third page?  Do you see that
8    there's a listing of the entities from
9    the FDA, the different offices that
10   participated in the review that led to
11   this memorandum?
12       A.   Yes.
13       Q.   And here, I finally have it
14   up on the screen.
15            Is this the memorandum we've
16   been talking about?
17       A.   Yes, it is.
18       Q.   Okay.
19            And then on the bottom of
20   Page 3 where it lists the different
21   offices, did the division of
22   anti-inflammatories participate in this
23   review?
24       A.   Yes, it did.

Page 443

1        Q.   Did the --
2        A.   They were probably the major
3    participant, because they are the ones
4    who ultimately regulate these products.
5        Q.   Anti-inflammatories includes
6    NSAIDs and COX-2 inhibitors, right?
7        A.   Correct.
8        Q.   And the Division of
9    Over-the-Counter Drug Products also
10   participated, correct?
11       A.   Yes, because they're
12   over-the-counter NSAIDs.
13       Q.   And the Office of Drug
14   Evaluation II and V participated, right?
15       A.   Right.  Those are the parent
16   organizations of these other divisions.
17       Q.   And the Office of New Drugs
18   participated?
19       A.   Right.  That's the super
20   office over them.
21       Q.   Office of Drug Safety,
22   that's your office, right?
23       A.   Correct.
24       Q.   Office of Biostatistics.

Page 444

1    Does that include epidemiologists?
2        A.   No.  Epidemiologists are in
3    the Office of Drug Safety.  The Office of
4    Biostatistics is exclusively
5    statisticians.
6        Q.   And the Office of
7    Pharmacoepidemiology and Statistical
8    Science participated, right?
9        A.   Right.  That's the office
10   that contains both drug safety and
11   statistics.
12       Q.   The Office of Medical Policy
13   participated?
14       A.   Right, yes.
15       Q.   And the Office of Regulatory
16   Policy?
17       A.   Yes.
18       Q.   And the Office of the Center
19   Director, right?
20       A.   Correct.
21       Q.   And they looked at all kinds
22   of materials, including your PowerPoint
23   and your, I don't know if it's testimony
24   or remarks that were delivered to the

Page 445

1    Advisory Committee, correct?
2        A.   Presumably.  I wasn't part
3    of the internal decision-making, but
4    presumably that was part of what they
5    considered.
6        Q.   Then focusing on the first
7    page here, in terms of who authored this
8    memorandum from the FDA, I think you've
9    already identified John Jenkins, Dr. John
10   Jenkins, of the Office of New Drugs,
11   right?
12       A.   Correct.
13       Q.   And then also you've
14   identified your boss, Paul Seligman,
15   right?
16       A.   Correct.
17       Q.   And then it says "Through:
18   Steven Galson."  What does it mean when
19   it is from Drs. Jenkins and Seligman
20   through Dr. Galson?
21       A.   What it typically means is,
22   is the "froms" have written the report.
23   It goes to the "through" person, who can
24   edit it and ask for modifications and the

Page 446

1  like. And then after they've signed off
2  on it, it is sent off to whomever the
3  "to" is.
4      Q.   All right.
5          And the "to" is the NDA
6  files and has all these numbers, right?
7      A.   Correct.
8      Q.   So, if I understand it
9  correctly, they got input from all these
10  different groups, and then the head of
11  the Office of New Drugs and the director
12  of the Office of Pharmacoepidemiology and
13  Statistical Science got together and
14  wrote a draft that then was approved by
15  the director of the entire Center for
16  Drug Evaluation and Research, right?
17      A.   Correct.
18      Q.   Then I just want to go
19  through with you the first five bullet
20  points, and then I'll be done.
21          In the executive summary
22  here, do you see where the FDA says that
23  "Following a thorough review of the
24  available data we have reached the

Page 448

1  of absence. They're basing --
2      Q.   Well, you would disagree
3  with them, I guess, right?
4          MR. KLINE: Objection. Let
5  him finish this answer.
6          THE WITNESS: What they're
7  saying is, is they're basing this
8  on clinical trials data only. At
9  FDA, they do not accept
10  epidemiologic data as having any
11  meaning or any relevance. And so
12  then they go back to clinical
13  trials, and if the clinical trials
14  are too small and don't answer the
15  question, then you come up with a
16  situation where you say, we don't
17  have the evidence to allow us to
18  do a difference in the rank
19  ordering. So, you end up, this
20  statement as it reads, is correct.
21  But the underlying reason -- it's
22  misleading because the reason why
23  you can't distinguish them from
24  the clinical trials is because the

Page 447

1  following conclusions regarding currently
2  approved COX-2 selective and
3  non-selective non-steroidal
4  anti-inflammatory drugs and the risk of
5  adverse cardiovascular events." So
6  that's their setup.
7          Then the first point they
8  make is: "The three approved COX-2
9  selective NSAIDS (i.e. celebrex," Vioxx,
10  and what's the third one, "valdecoxib"?
11      A.   That would be Bextra.
12      Q.   So, they say that three
13  COX-2 selective NSAIDs "are associated
14  with an increased risk of serious adverse
15  CV events compared to placebo. The
16  available data do not permit a rank
17  ordering of these drugs with regard to CV
18  risk." Now, what they're saying here is
19  that any one of these COX-2 inhibitors
20  can increase CV risk, but there's no
21  basis on which to say that one is riskier
22  than another, right?
23      A.   What they're saying is, is
24  that the absence of evidence is evidence

Page 449

1  appropriate clinical trials were
2  never done. They weren't large
3  enough and you didn't have
4  head-to-head comparisons, say, of
5  Celebrex to Vioxx to Bextra, where
6  that would have been the single
7  best way to answer that question
8  definitively. So --
9  BY MR. BECK:
10      Q.   I wasn't asking you whether
11  you agreed. I was asking what this means
12  to somebody who understands an FDA
13  memorandum.
14          Does it mean that the people
15  who wrote this memo and the person who
16  approved it, whether you agree with them
17  or not, what they're saying is that you
18  cannot draw a distinction between the
19  cardiovascular risks of Vioxx versus
20  Celebrex versus Bextra?
21      A.   That's what they are saying.
22      Q.   And they, it's probably
23  clear from your prior answer, but
24  basically they disagree with one of the

Page 450

1  core conclusions that you set forth in
2  your Lancet article, correct?
3       MS. ROYCE: Objection to
4  form.
5       THE WITNESS: No. Actually,
6  in internal meetings --
7  BY MR. BECK:
8       Q. No. I'm talking about what
9  they say in this memorandum.
10      A. Well, they're not saying
11 anything in here about how many people
12 died or were injured as a result of using
13 Vioxx.
14      Q. I'm sorry.
15      A. They sidestepped that issue.
16      Q. Your article, one of its
17 core conclusions, is that there is a
18 difference, statistically significant
19 difference between the risk of using
20 Vioxx versus Celebrex, correct?
21      A. Correct.
22      Q. And they disagree with you,
23 right?
24      A. They're saying there are no

Page 452

1  and so if you have low power, you're not
2  going to be able to show things. That's
3  why observational data is needed to
4  complement what is inadequate about
5  controlled clinical trials.
6       Q. And then on the next page,
7  do they say on this first bullet,
8  "Long-term placebo controlled clinical
9  trial data are not available to
10 adequately assess the potential for the
11 non-selective NSAIDs to increase the risk
12 of serious adverse CV events." Is that
13 the point you just made?
14      A. Yes.
15      Q. So, they recognized that,
16 didn't they?
17      A. Yes, they did.
18      Q. The next point they say,
19 "Pending the availability of the
20 additional long-term controlled clinical
21 trial data, the available data are best
22 interpreted as being consistent with a
23 class effect of an increased risk of
24 serious...cardiovascular events for COX-2

Page 451

1  clinical trials to show that, and so they
2  disagree.
3       Q. Then the next point says,
4  "Data from large long-term controlled
5  clinical trials that have included a
6  comparison of COX-2 selective and
7  non-selective NSAIDs do not clearly
8  demonstrate that the COX-2 selective
9  agents confer a greater risk of serious
10 adverse...events than non-selective
11 NSAIDs."
12      Now, again, whether you
13 disagree or agree with them, are they
14 saying here that according to the
15 long-term controlled clinical trials, we
16 cannot say that COX-2 inhibitors have any
17 different risk than traditional NSAIDs?
18      A. They're saying based on the
19 evidence they have from clinical trials
20 that they can't distinguish the two.
21 What one should recognize, however, is
22 that there's virtual absence of real
23 long-term data. There's relatively very
24 small numbers for any of these things,

Page 453

1  selective and non- selective NSAIDs."
2       Now, does that mean that,
3  again, whether you agree or disagree,
4  that they're saying that the best
5  conclusion you can draw based on the data
6  that's available now is that all of these
7  medications, whether it's Vioxx, Celebrex
8  or the nonselective NSAIDs, all have the
9  same basic cardiovascular risk?
10      A. They're saying that, and
11 they're also saying that observational
12 data is not something they're -- that
13 they're willing to consider.
14      Q. Where do they say that?
15      A. Because there is a plethora
16 of existing observational data that
17 show --
18      Q. I'm sorry, do they say that
19 or are you just saying that they refuse
20 to look at it?
21      A. Well, by not mentioning it,
22 then they are in essence discounting it.
23 There are, by last count, at least nine
24 published observational studies that

Page 454

1  show, for example, an increased risk with
2  rofecoxib compared to nonuse. And most
3  of those studies looking at celecoxib did
4  not find a difference in risk. So,
5  there's a discordance, if you will,
6  between the evidence of observational
7  studies and the evidence of controlled
8  clinical trials. The problem with the
9  controlled clinical trials is that
10 they're not designed to show safety
11 problems. They're designed to show
12 efficacy.
13         So, as a result, we're back
14 to the analogy of does the moon have
15 craters or not. And what FDA is saying
16 is that we don't have binoculars, we
17 don't have a telescope, and we don't want
18 binoculars or a telescope. We're not
19 interested. Based with our naked eye,
20 what we have available, we don't see a
21 difference.
22         Q.   You're aware, aren't you,
23 that there are six published
24 epidemiological studies that find no

Page 455

1  difference between Celebrex and Vioxx?
2         A.   No. I mean, you could show
3  me the articles and I'm sure I'm familiar
4  with the articles, but I have not thought
5  about them in that way.
6         Q.   Well, let's just move to the
7  last point, and then Mr. Kline can ask
8  you anything he wants to about that
9  subject.
10        MR. KLINE: Anything that is
11        within the scope of your direct,
12        which is about anything in the
13        world.
14        MR. BECK: Last point.
15 BY MR. BECK:
16        Q.   "Short-term use of NSAIDs to
17 relieve acute pain, particularly at low
18 doses, does not appear to confer an
19 increased risk of serious adverse CV
20 events (with the exception of" -- what
21 was that one again?
22        A.   That's "valdecoxib," that's
23 Bextra.
24        Q.   -- Bextra.

Page 456

1         So, what the authors of this
2  paper and the reviewer concluded was that
3  "Short-term use of NSAIDs" including
4  Vioxx "particularly at low doses, does
5  not appear to confer an increased risk of
6  serious adverse CV events." Isn't that
7  correct?
8         A.   That's what they're saying.
9  But once again, they have zero
10 statistical power to actually make this
11 statement. What they really have is, is
12 uncertainty, because they haven't
13 adequately studied it.
14        Q.   I think you said that these
15 senior people from the FDA who wrote and
16 reviewed this consulted with lots and
17 lots of people from the FDA, but they
18 didn't consult with you, right?
19        A.   No. That's not what I'm --
20 I wasn't part of the discussions that
21 happened internally. What I would note
22 is, is that people from the Office of New
23 Drugs approved these drug products. And
24 that if you look at the organizations

Page 457

1  that you have represented here, most of
2  them fall into the amoeba that I
3  described earlier and that are part of
4  the review and approval process and that
5  our own management in drug safety answers
6  to the people in the Center for Drug
7  Evaluation who have the controlling
8  power. So, the Office of New Drugs is
9  the gorilla in the room. So, in any
10 event, I'm not saying that at all. I'm
11 not saying that I wasn't hurt. What I'm
12 saying is that in constructing this
13 report, what FDA has done is, has said
14 that because we don't have data from
15 control trials, we can't be forced to say
16 that the drugs are different, even though
17 there's observational data that would
18 suggest that there are some differences
19 that can be made.
20        Q.   My question was, the senior
21 people at the FDA --
22        MS. ROYCE: Objection, form.
23        It's over time. We've given you
24        enough time. You've asked him

115 (Pages 454 to 457)

Page 458

1   already. He gave you an answer.
2        MR. KLINE: Let him ask one
3   more time. I'm all for it.
4        THE WITNESS: Repeat the
5   question, please.
6        MR. KLINE: Senior people
7   versus bench scientists.
8        THE WITNESS: Repeat the
9   question.
10       MR. KLINE: Something like
11   that. Like the real people versus
12   management.
13       THE WITNESS: I don't know
14   what your question is, so, if you
15   would repeat it for me, please.
16   BY MR. BECK:
17       Q.   My question is the senior
18   people at the FDA, when they asked for
19   input from all of those groups that we
20   saw on Page 3, including drug safety
21   people, right, one person they didn't ask
22   for input from was Dr. David Graham. Is
23   that true or false?
24       A.   They're listing offices

Page 459

1   here. I can't tell you who the
2   individuals are that they asked for input
3   in this. I was a participant in an open
4   public Advisory Committee meeting, and so
5   presumably that material is part of the
6   record. I wrote an FDA report that I'm
7   sure is part of the record. So, I would
8   imagine that the work that I did was
9   under consideration there. But in the
10   actual writing of this memorandum, I
11   can't tell you who actually was consulted
12   to write it except John Jenkins and Paul
13   Seligman because they're the only -- oh,
14   and Steven Galson, because those are the
15   only names that appear.
16       Q.   Lastly, I just can't
17   remember, are all three of those
18   individuals included in the group that
19   you think was conspiring to smear your
20   name?
21       A.   No. Dr. Jenkins was not
22   part of that group.
23       MR. BECK: That's all that I
24   have.

Page 460

1        THE VIDEOTAPE TECHNICIAN:
2   Stand by, please.
3        The time is 6:45. We're
4   going off the record.
5        - - -
6        (Whereupon, a recess was
7   taken from 6:45 p.m. until
8   7:07 p.m.
9        - - -
10       THE VIDEOTAPE TECHNICIAN:
11   The video time is 7:07. We're
12   back on the record.
13       - - -
14       REDIRECT EXAMINATION
15       - - -
16   BY MR. KLINE:
17       Q.   Okay.
18       We're ready for a
19   redirect-examination.
20       Dr. Graham, do you get the
21   idea that Merck does not like your study?
22       MR. BECK: Object to the
23   form of the question.
24       THE WITNESS: Yes, I do.

Page 461

1   BY MR. KLINE:
2        Q.   And your study, sir, did it
3   pass peer review at the Lancet?
4        A.   It passed peer review at the
5   Lancet twice. So, on two different
6   occasions, five independent peer
7   reviewers, and it passed.
8        Q.   Have you ever had any of
9   your publications or presentations
10   subjected to more scrutiny than this
11   particular presentation, article, study?
12       A.   Never in life.
13       MR. KLINE: Let's go off the
14   video record.
15       THE VIDEOTAPE TECHNICIAN:
16   Stand by, please.
17       The time is 7:08. Off the
18   video record.
19       - - -
20       (Whereupon, a recess was
21   taken from 7:08 p.m. until
22   7:14 p.m.)
23       - - -
24       THE VIDEOTAPE TECHNICIAN: