Page 462

```
1         The time is 7:14.  We're back on
2     the record.
3         MR. KLINE:  We had a lot of
4     noise, so, I want to start again.
5     BY MR. KLINE:
6     Q.   Do you get the idea that
7  Merck still does not like your study?
8         MR. BECK:  I'll object to
9     the form.
10        THE WITNESS:  Definitely.
11    BY MR. KLINE:
12    Q.   Have you ever had any paper
13 or study that you have been involved in
14 in any capacity in the last 23 years that
15 has had more scrutiny than this paper
16 which was published in the Lancet?
17    A.   Never in life.
18    Q.   And have you ever had more
19 scrutiny brought to bear on you as a
20 scientist for your work in the last 20
21 some years at the FDA other than beyond
22 this work?
23    A.   Never in life.
24    Q.   I want to clean up a couple
```

Page 463

```
1  of little things and then move on.
2         The estimates that you have,
3  88,000 to 140,000?
4     A.   Yes.
5     Q.   First of all, are they lower
6  than some folks' estimates of the
7  number of increased cardiovascular, both
8  deaths and incidents, that have occurred
9  as a result of the drug Vioxx?
10    A.   Yes, they are.
11    Q.   Is yours a conservative
12 estimate compared to others in the
13 published medical literature?
14        MR. BECK:  Object to the
15    form.
16        THE WITNESS:  I wouldn't say
17    that it is conservative.  I would
18    say that it is realistic.
19    BY MR. KLINE:
20    Q.   And, sir, after answering
21 all of Mr. Beck's questions about how you
22 went about getting to those numbers,
23 number one, do you stick by them?
24    A.   Oh, definitely.
```

Page 464

```
1     Q.   And, number two, is there a
2  logical and sound scientific basis for
3  having done these numbers in the way you
4  did them?
5         MR. BECK:  Object to the
6     form.
7         THE WITNESS:  Yes.  There's
8     an explanation, and I tried to
9     offer that explanation.  Basically
10    in doing, coming up with this
11    estimate, we were trying to do
12    something that had never been done
13    at FDA before, which was basically
14    to put into a population context
15    what the human costs were of a
16    severe serious adverse drug
17    reaction.
18        And what we needed to do was
19    to come up with what we thought
20    would be reasonable estimates of
21    what was actually happening among
22    the patients who were going to be
23    treated with Vioxx and who
24    actually were treated with Vioxx,
```

Page 465

```
1     and that's what we did.
2     BY MR. KLINE:
3     Q.   How many people from the
4  authors of the study through the peer
5  reviewers laid eyes on and gave input and
6  commentary into the process until it was
7  finally published in the Lancet, the
8  journal from Britain, that there were
9  88,000 to 140,000 excess CV events?
10 Approximately how many people saw that?
11        MR. BECK:  Object to the
12    form.
13        THE WITNESS:  Yes.
14        I'm guessing at least 25
15    different individuals examined
16    that.
17    BY MR. KLINE:
18    Q.   25 different individuals, is
19 that what you're saying?
20    A.   Yes.  That's my estimate.
21    Q.   And at the end of the day,
22 it ended up in the published medical
23 literature, in that exact number, that
24 exact estimate; is that correct?
```

Page 466

1    MR. BECK: Object to the
2  form.
3    THE WITNESS: That is
4  correct. That is correct.
5    MR. BECK: Just off the
6  record for a second.
7    THE WITNESS: You want me to
8  pause, please?
9    MR. BECK: Yes.
10    THE WITNESS: I'm sorry. I
11  apologize for that.
12    MR. BECK: I appreciate it.
13  Thank you.
14  BY MR. KLINE:
15    Q.   And when you went to
16  Congress to testify, were you sworn in?
17    A.   Yes, I was.
18    Q.   Just as you were today?
19    A.   Actually, when I think back
20  on it, I don't think that I was sworn in,
21  which I was kind of surprised. I
22  honestly don't remember.
23    Q.   All right.
24      In any event --

Page 467

1    A.   I'm sorry.
2    Q.   In any event, you gave that
3  same testimony to the senators of the
4  finance committee of the United States
5  Senate of the United States Congress?
6    A.   That is correct.
7    MR. BECK: Object to the
8  form.
9  BY MR. KLINE:
10    Q.   Where have you presented
11  these numbers, sir, the ones that you
12  were talking to Mr. Beck about for the
13  better part of a half an hour?
14    A.   I presented them at
15  international scientific meetings. I
16  presented them at a variety of
17  universities throughout the United States
18  and at a number of other sort of
19  scientific colloquia within the United
20  States. I've also discussed them in the
21  media, in newspapers and television, and
22  there's probably other places where I've
23  discussed them as well.
24    Q.   All right.

Page 468

1    Now, let's talk just about
2  one short, small aspect of this, which
3  is, I think that the APPROVe data was in
4  a preliminary stage when you were making
5  these estimates for the Kaiser study; is
6  that correct?
7    A.   Yes, that is correct.
8    Q.   I'm just setting it up as a
9  predicate to my real question.
10    A.   Yes.
11    Q.   My real question is, would
12  the excess -- and you're familiar now
13  with the published APPROVe data?
14    A.   Correct.
15    Q.   Would the estimate of excess
16  cardiovascular incidences change in any
17  significant way based upon what you now
18  know to be the final numbers?
19    A.   Unchanged.
20    MR. BECK: I'm going to
21  object. I don't think that is
22  proper redirect.
23  BY MR. KLINE:
24    Q.   Next question.

Page 469

1    Sir, we've seen a lot of
2  e-mails today which, first of all, did
3  any of those e-mails that you spent the
4  better part of two-and-a-half hours with
5  with Mr. Beck, were any of those the
6  subject of public testimony, sir?
7    MR. BECK: Object to the
8  form.
9    THE WITNESS: No, they were
10  not.
11  BY MR. KLINE:
12    Q.   Were any of those -- any of
13  that elaborate examination that you were
14  given by Merck's counsel part of any
15  public statements or public scientific
16  meetings or testimony before Congress?
17    A.   No.
18    MR. BECK: Object to the
19  form.
20    Please wait.
21    THE WITNESS: No, they
22  weren't.
23    I really am trying. I
24  apologize.

118 (Pages 466 to 469)

Page 470

1        MR. BECK: I know you are.
2        Let me object and then you answer.
3        I object to the form.
4    BY MR. KLINE:
5        Q.    Let me try to clean it up.
6    Let me see if I can ask it in a
7    non-leading way.
8        The e-mails that you
9    discussed at length and all those
10   internal documents -- let me ask it this
11   way.
12       Were those e-mails in the
13   FDA, to your knowledge, ever made public
14   or put out in the public forum or talked
15   about by you prior to today?
16       A.    No.
17       Q.    And you saw that Mr. Beck
18   had picked some out that said things that
19   either had scientific or personal
20   criticisms in them. Do you recall those
21   questions?
22       A.    Yes, I do.
23       Q.    All right.
24       Now, let me go back to that

Page 471

1    area. First of all, sir, you are in the
2    Office of Drug Safety?
3        A.    Yes.
4        Q.    Were you ever offered the
5    top job there?
6        A.    Not the top job in the
7    Office of Drug Safety, but I was asked by
8    the commissioner of FDA --
9        Q.    Who was that?
10       A.    It was Lester Crawford at
11   the time, he was the acting commissioner.
12   On November 9th, the acting commissioner
13   invited me to his office.
14       Q.    November 9th of what year?
15       A.    Of 2004. It was the week
16   before my Senate testimony. He invited
17   me to his office and offered me a
18   position overseeing the restructuring of
19   drug safety at FDA, and what he said to
20   me at the time was that he needed someone
21   who understood drug safety, and that if
22   he left it to the Center for Drug
23   Evaluation to oversee this, that nothing
24   would happen.

Page 472

1        And I told the commissioner
2    that I wasn't a manager, didn't enjoy
3    management and enjoyed science, and that
4    I could give him the names of 10 or 12
5    people who could do this job in an
6    excellent fashion after which he could
7    make them director for a center for
8    post-marketing regulation. And so he
9    sent me an e-mail confirming our meeting
10   in which he outlined the job description
11   that he had in mind, and I sent him
12   e-mail back saying thanks very much, I'll
13   get in touch with you in a couple of days
14   and gave him a list of 10 or 12 names of
15   people who I thought would be excellent
16   for this position.
17       It's surprising, though,
18   that, you know, that here on November
19   9th, right before I go to give my Senate
20   testimony that the commissioner is
21   offering me this really high level job
22   with a lot of responsibility, and then
23   one week later, he's calling me all sorts
24   of names in an FDA public statement

Page 473

1    that's issued on the eve of my Senate
2    testimony.
3        And this ties in with what I
4    was talking about before about an
5    organized effort on the part of some
6    within FDA to intimidate me prior to my
7    Senate testimony. And the commissioner
8    was part of that. Why else would he
9    offer me this job and then turn around a
10   week later and say the things that he
11   said?
12       Q.    All right.
13       Now, I also want to ask you
14   something about how you were recognized
15   the following year. In 2005, something I
16   didn't cover, but which I'm putting out
17   as redirect in response to the
18   questioning that was asked here. You
19   were given in 2005, November of 2005 the
20   FDA outstanding service award for
21   scientific and regulatory assessment and
22   actions regarding safety of nonsteroidal
23   anti-inflammatory drugs.
24       MR. BECK: I'm going to

Page 474

1      object.  Improper redirect.  You
2      did ask him about that on direct,
3      and I didn't ask a single question
4      about his awards.
5          MR. KLINE:  We'll get an
6      ruling.  I don't think I asked him
7      about that.
8   BY MR. KLINE:
9      Q.   Did you get that award?
10     A.   I got that award.
11     Q.   You also got the American
12  Public Health Association award for
13  excellence in December 2005; is that
14  correct?
15         MR. BECK:  Objection.
16     Improper redirect.
17         THE WITNESS:  Yes.  And sir,
18     that's a very prestigious national
19     award that no one from the Food &
20     Drug Administration has ever been
21     awarded that award from the
22     American Public Health
23     Association.
24  BY MR. KLINE:

Page 475

1      Q.   Briefly, one sentence, what
2   is the American Public Health
3   Association?
4      A.   The American Public Health
5   Association is the professional
6   organization that represents public
7   health professionals within actually the
8   entire world, the United States and the
9   rest of the world.  I think it has over
10  35,000 members.
11     Q.   Sir, every year you as an
12  FDA employee are -- there's a performance
13  evaluation of you, correct?
14     A.   Yes.
15     Q.   You listened to Mr. Beck's
16  many questions about e-mails regarding
17  things that you did technically and
18  statistically and the like.  Do you
19  recall all those questions?
20     A.   Yes, I do.
21     Q.   There are categories of
22  technical competence in 2005, and I have
23  the document right here, a copy of which
24  we'll give to Mr. Beck.  We'll mark it as

Page 476

1   Exhibit 33.  I want to be very quick with
2   it, sir.
3              - - -
4          (Whereupon, Deposition
5       Exhibit Graham-33, FDA
6       Performance Evaluation Plan (4
7       pages), was marked for
8       identification.)
9              - - -
10         THE WITNESS:  Right.  This
11     covers --
12  BY MR. KLINE:
13     Q.   Yes.
14     A.   This covers the year of
15  2004.
16         MR. BECK:  Let me please
17     make an objection before you do
18     this.  Twofold.  One is improper
19     redirect.  I didn't ask about any
20     performance evaluations.
21         Second, this is one of the
22     documents that was provided last
23     week by Dr. Graham's counsel, and
24     we asked for the full package and

Page 477

1   evaluation materials.  I didn't
2   make an issue of it because you
3   didn't ask him any questions on
4   direct about evaluation materials,
5   and now it's redirect, and it
6   really is objectionable when we
7   have been denied access to all the
8   materials in the evaluation file
9   for you to use the stuff that he
10  gave you last week.
11         MS. ROYCE:  You asked for it
12     yesterday.
13         MR. KLINE:  You know what,
14     we'll withdraw it.  Let's move on.
15     I would rather not --
16         THE WITNESS:  Shucks.
17         MR. KLINE:  All right.
18     You know what?  Let's keep
19     it.
20         Is your objection done?
21         MR. BECK:  Yes.
22  BY MR. KLINE:
23     Q.   Okay.
24         Let's do it and we'll

Page 478

1 eventually get a ruling on it.
2     A.   This evaluation is for --
3     Q.   Very briefly, sir.
4     A.   -- the year 2004, which
5 covers this entire period of our study.
6     Q.   That's my question.
7     A.   And I got "exceeds" in work
8 management, technical competency. And
9 throughout my entire career, I've gotten
10 "exceeds" in technical competency.
11     Q.   That's what I want to focus
12 on. Does the FDA in 2004 rate you as
13 exceeds knowledge, skills and abilities
14 on technical competency?
15     A.   Yes.
16         MR. BECK:  Object to form.
17 BY MR. KLINE:
18     Q.   Is that the highest level
19 that you could get?
20     A.   That's the highest level you
21 can get.
22     Q.   Next area to examine you on,
23 sir.
24         I would like to talk to you

Page 479

1 about that study that was done and your
2 involvement with Wayne Ray. Do you
3 recall Mr. Beck making quite a -- let me
4 put it in a less pejorative way.
5         Do you remember Mr. Beck
6 making a point about conflict of interest
7 and the fact that Wayne Ray had consulted
8 for Pfizer and for plaintiffs' attorneys,
9 too?
10     A.   Yes, I do.
11     Q.   And, of course, those are in
12 drug product litigation, even you would
13 know or a novice or anyone would know
14 that those are the two opposite ends of
15 the spectrum, the plaintiffs and the drug
16 companies, correct?
17     A.   Correct.
18     Q.   You also told us earlier or
19 maybe you didn't.
20         Who is Harry Guess?
21     A.   Harry Guess is deceased now,
22 but he was, I think, like the lead
23 epidemiologist at Merck and a long-time
24 colleague, and maybe friend is a little

Page 480

1 too strong a word, but I had much respect
2 for Harry.
3     Q.   I see.
4         And he eventually was at
5 Merck?
6     A.   He worked for Merck, yes.
7     Q.   He worked for Merck.
8         - - -
9         (Whereupon, Deposition
10 Exhibit Graham-34, Memo 11-6-00
11 "Consulting agreement for Wayne
12 A. Ray, Ph.D." MRK-ABT0018298,
13 was marked for identification.)
14         - - -
15 BY MR. KLINE:
16     Q.   I'll show you Exhibit 34.
17 With reference to Wayne Ray, the man who
18 Mr. Beck showed you was conflicted.  May
19 we put it up, please?
20         THE WITNESS:  I have never
21 seen this document.
22 BY MR. KLINE:
23     Q.   Yes.  That's fine.  Mr. Beck
24 showed you a lot of things you didn't

Page 481

1 see. It's a Merck document, by the way.
2     A.   Okay.  Yes.
3     Q.   It is right out of the Merck
4 files.
5     A.   Right.
6     Q.   And not only was Wayne Ray a
7 consultant for the plaintiffs in
8 litigation for Pfizer, but who else did
9 he have a consulting agreement with?
10     A.   With Merck.
11         MR. KLINE:  May we display
12 it, please?
13         Let's go off the video
14 record.
15         THE VIDEOTAPE TECHNICIAN:
16 Stand by, please.
17         The time is 7:29.  Off the
18 video record.
19         - - -
20         (Whereupon, a recess was
21 taken from 7:29 p.m. until
22 7:30 p.m.)
23         - - -
24         THE VIDEOTAPE TECHNICIAN:

Page 482

1    · 7:30. We're back on the record.
2  BY MR. KLINE:
3    Q.   We've marked it as Exhibit
4  Number --
5    A.   34.
6    Q.   -- 34. Exhibit Number 34 is
7  -- your co-colleague was also a
8  consultant with Merck, correct?
9    A.   Yes.
10   Q.   What's Merck's complaint?
11   A.   That he was a plaintiffs'
12 attorney for rofecoxib or that he worked
13 for Pfizer.
14   Q.   Was the man at one point one
15 of their own consultants, your co-author?
16   A.   Yes, he was.
17     MR. KLINE:  Let's mark the
18   next exhibit number.
19             - - -
20     (Whereupon, Deposition
21   Exhibit Graham-35, E-mails
22   MRK-ACV00363335, was marked for
23   identification.)
24             - - -

Page 483

1  BY MR. KLINE:
2    Q.   This is also right out of
3  the Merck files.
4      MR. BECK:  And I'm going to
5    object to the colloquy, if this is
6    intended as a question.
7      MR. KLINE:  We can strike
8    that colloquy.
9  BY MR. KLINE:
10   Q.   This is in a different
11 context back in 2000. You weren't
12 involved, you haven't seen this before,
13 correct?
14   A.   This is correct.
15   Q.   The first phrase from, it's
16 Dr. Guess, correct?
17   A.   Correct.
18   Q.   Epidemiologist?
19   A.   Senior epidemiologist at
20 Merck.
21   Q.   Senior epidemiologist at
22 Merck?
23   A.   He may have even been a vice
24 president. You can ask the Merck folks.

Page 484

1    Q.   "I have known David Graham
2  well for a long time. He has an
3  admirable concern for public health."
4      Do you see that?
5    A.   Yes, I do.
6    Q.   Did you know that that's how
7  the senior epidemiologist at Merck felt
8  about you, sir?
9    A.   No. He never conveyed that
10 to me.
11   Q.   Well, now he has.
12     Next.
13   A.   Posthumously.
14     MR. BECK:  Objection, move
15   to strike the colloquy and
16   speeches.
17 BY MR. KLINE:
18   Q.   Next. Let's talk about --
19     Let's talk just one or two
20 more things about Wayne Ray. Wayne Ray.
21 Who ran last year's ISPE conference?
22   A.   Dr. Ray did.
23   Q.   Is Dr. Ray also a consultant
24 to the FDA?

Page 485

1    A.   He most definitely is.
2    Q.   So, your co-author was a
3  consultant to the FDA, former consultant
4  to Merck in addition to the things that
5  were pointed out by Mr. Beck; is that
6  correct?
7      MR. BECK:  Object to form.
8      THE WITNESS:  That is
9    correct. The reason why we
10   asked -- why I asked Wayne to
11   participate in our study was
12   because of that FDA/Dr. Ray
13   relationship.
14 BY MR. KLINE:
15   Q.   Now, speaking of
16 relationships, that's the next place I
17 want to go.
18     There was a document that
19 was shown to you, and let me find it. It
20 was exhibit -- it was the e-mail from
21 Jenkins to Jonca. I know the Bates
22 Number. I didn't mark the number on it.
23 FDA CDER 11048. It is this document
24 here.

Page 486

1    · A.   Thank you for showing it to
2  me.
3    Q.   But if you can find it.
4       Do you recall seeing it in
5  your *direct examination?*
6    A.   Yes, I do.
7    Q.   Or I'm sorry, in your
8  cross-examination?
9    A.   Yes, I do. I recall seeing
10  it.
11       MR. KLINE: 15. Thank you
12       very much, Counsel.
13  BY MR. KLINE:
14    Q.   Now, Mr. Beck had asked you
15  about the e-mail from Jenkins to Jonca.
16  I had asked him to read for completeness
17  the first e-mail, the e-mail underneath
18  *that, from Jenkins to Jonca.*
19       And do you see the portion
20  of it that begins, "Please see Paul's
21  message below which he kindly shared."
22       That would be Paul of the
23  FDA sharing the e-mail with Merck,
24  correct?

Page 487

1    A.   I'm not sure with whom he
2  shared it.
3    Q.   Let me go further. It says,
4  "For the record, Merck will likely not be
5  happy so this could well eventuate in
6  calls to the agency. Should we involve
7  Bob Temple?"
8       Who is Bob Temple?
9    A.   Bob Temple is the director
10  of medical policy at FDA, and he's also
11  *one of the senior office directors.*
12    Q.   Senior office director?
13    A.   Yes.
14    Q.   That was where -- okay.
15       And it says, "He
16  historically has been the one of the
17  first ones they complained to."
18       "They" being who?
19    A.   "They" being Merck.
20    Q.   So, when Merck has their
21  complaints, who do they go and complain
22  to?
23    A.   According to this e-mail, to
24  *Dr. Temple.*

Page 488

1    Q.   Is this an example of what
2  you told me on direct in terms of who is
3  the real client of the FDA?
4       MR. BECK: Object to the
5       form of the question.
6       THE WITNESS: This would be
7       an example of that.
8  BY MR. KLINE:
9    Q.   Okay.
10       Let me ask it in a
11  non-leading question.
12       What is this an example of,
13  *sir?*
14       MR. BECK: I'm going to
15       object to the form having given
16       him the answer.
17  BY MR. KLINE:
18    Q.   You can answer any way you
19  want or whatever you want to say.
20    A.   This is an example of the
21  way FDA views industry as its clients and
22  tries to please industry, its client.
23    Q.   Now, sir --
24       MR. BECK: Before you leave,

Page 489

1  I would ask that the last
2  paragraph of that e-mail be read
3  for completeness.
4       MR. KLINE: I will. It was
5       read already, but we'll read it
6       *again.*
7  BY MR. KLINE:
8    Q.   "I am very concerned that
9  David Graham is lead author on this and
10  is identified as FDA staff. This clearly
11  implies agency endorsement of his
12  presentation and this is the first we
13  have seen of it. Paul's message below
14  for a presentation at a meeting coming up
15  later this month does not allow much time
16  to review or clear. Jonca."
17       Is that along the same lines
18  as Merck will not likely to be happy?
19       MR. BECK: I'm going to
20       object to the form of the
21       question.
22  BY MR. KLINE:
23    Q.   Please answer, sir.
24    A.   Yes. That's consistent with

Page 490

1 that.
2      Q.   Now, next I just want to do
3 a couple of more e-mails which were not
4 shown to you by Mr. Beck.
5           First of all, there's an
6 e-mail of Jonca to Hertz. It has been
7 marked already. We're not sure if it is
8 marked. I'm going to just show it to
9 you. It is Bates Number from the FDA
10 CDER file, 11046. We'll give it another
11 number so we can move right along.
12           - - -
13      (Whereupon, Deposition
14      Exhibit Graham-36, E-mails
15      FDACDER011046 - FDACDER011047,
16      was marked for identification.)
17           - - -
18 BY MR. KLINE:
19      Q.   First sentence, sir. Do you
20 see it? It is the same folks that are
21 involved. Again, remind the jury. Who
22 is Bull Jon -- Jonca Bull her name was?
23      A.   Jonca Bull is -- was the
24 office director overseeing the reviewing

Page 491

1 division that approved and regulates
2 Vioxx.
3      Q.   And look what she says there
4 in the last sentence of the e-mail on the
5 top. Do you see where it says, "Look
6 out"?
7      A.   Yes, yes, yes.
8      Q.   Who were they interested in
9 getting feedback from? Who were they
10 worried about?
11      MR. BECK: I'm sorry. Where
12 are you?
13 BY MR. KLINE:
14      Q.   "Look out for feedback from
15 Merck in short order."
16      A.   Correct. They are concerned
17 about what Merck will have to say about
18 this.
19      Q.   Okay. Next.
20      MR. BECK: I would like the
21 -- above that, the sentence that
22 begins "Thanks" to be read for
23 completeness.
24 BY MR. KLINE:

Page 492

1      Q.   For completeness, "Thanks
2 for confirming my concerns here as to the
3 leap between the methodology and
4 conclusions reached."
5      MR. KLINE: Next e-mail.
6           - - -
7      (Whereupon, Deposition
8      Exhibit Graham-37, E-mail 8-16-04
9      with attachment "ISPE Poster,"
10      MRK-ACM0002855 - MRK-ACM0002856,
11      was marked for identification.)
12           - - -
13 BY MR. KLINE:
14      Q.   There's an e-mail between
15 Honig -- to Honig from Seligman. Those
16 are people who we've talked about. Honig
17 is where?
18      A.   Well, it depends on the date
19 of the e-mail. If it is in 2004 or so --
20      Q.   Yes, it is.
21      A.   -- then Honig is at Merck;
22 Seligman is at FDA.
23      Q.   Let me understand this. The
24 e-mail I'm going to show you is from Paul

Page 493

1 Seligman, the man we've talked about or
2 the man you talked about with Mr. Beck,
3 and Peter Honig.
4           Did you know, sir, that Mr.
5 or that Dr. Seligman was sending Dr.
6 Honig a copy of your poster so that, you
7 know, Merck had the heads up? Are you
8 aware of that fact?
9      A.   No. There was an e-mail
10 that I had seen from Dr. Trontell who had
11 said, oh, we can't let Dr. Graham present
12 this, but we need to let Merck know. So,
13 I was aware of that, but I didn't know
14 that it had been shared with Merck.
15      Q.   In this period of time, sir,
16 when your scientific integrity was being
17 called into question, who was on the
18 minds of the brass at the FDA?
19      MR. BECK: Objection to the
20 form.
21 BY MR. KLINE:
22      Q.   You may answer.
23      A.   They were concerned about
24 FDA and made that repeatedly clear.

Page 494

1  Q.  Who was on the minds of the
2  FDA?
3          MR. BECK:  Objection.
4  BY MR. KLINE:
5      Q.  You said they were concerned
6  about FDA?
7          MR. BECK:  He just answered
8      your question.  I renew my
9      objection to the form.
10         MR. KLINE:  Yes, sir.
11         THE WITNESS:  The FDA
12     managers were concerned about what
13     Merck would think and about what
14     Merck, in their estimation, needed
15     to know I guess because they were
16     serving them.
17 BY MR. KLINE:
18     Q.  Who is Dr. Braunstein?
19     A.  I've seen the name before,
20 but I don't know who Dr. Braunstein is.
21     Q.  Who is Brian Harvey, sir?
22     A.  Brian Harvey is, I think
23 he's like -- he was the division director
24 for the analgesics and anti-inflammatory

Page 495

1  drugs.  He was the person who was
2  responsible for Vioxx, so, he --
3      Q.  In Office of New Drugs?
4      A.  Right.  He's in that
5  division of anti-inflammatory drugs, and
6  he's the director of that division where
7  Vioxx sits, and Jonca Bull is his boss.
8  And he's the boss of like Lourdes
9  Villalba, who is the medical officer who
10 did the Vioxx review.
11     Q.  They are all in the Office
12 of New Drugs?
13     A.  Correct.
14     Q.  The ones that you told us
15 earlier have the vested interest in
16 keeping the drug on the market?
17         MR. BECK:  Object to the
18     form of the question.
19 BY MR. KLINE:
20     Q.  Is that correct, to put it
21 in context?
22     A.  Yes.  These are people from
23 the Office of New Drugs, and the Office
24 of New Drugs has a vested interest in

Page 496

1  seeing that its prior decisions are not
2  changed.
3      Q.  Now, I want to show you some
4  handwritten notes, sir, if we may show
5  you the next document.
6              - - -
7          (Whereupon, Deposition
8      Exhibit Graham-38, Handwritten
9      notes, MRK-GAR0016806 -
10     MRK-GAR0016807, was marked for
11     identification.)
12             - - -
13 BY MR. KLINE:
14     Q.  Exhibit 38.  And see if you
15 can tell me if in the period of time,
16 this would be 10/13 and 10/14 of '04,
17 correct?
18         MR. BECK:  Excuse me.
19         MR. KLINE:  Yes, sir.
20         MR. BECK:  I'm going to
21     object to the form.  You're giving
22     a date that I don't see anywhere
23     on the document.
24 BY MR. KLINE:

Page 497

1      Q.  I want you to assume that
2  that's the date.
3      A.  Well, one can -- you can
4  derive it very clearly.  It says October
5  13, and down below it's talking about me
6  and our study.  It's talking about Graham
7  et al.
8      Q.  Sir, I want you to look at
9  the middle of the page, and I'd like it
10 highlighted with the word that starts
11 "Brian," Brian being Brian Harvey of the
12 FDA?
13     A.  Yes.
14         MR. BECK:  Object to the
15     form.
16 BY MR. KLINE:
17     Q.  "Brian suggests an official
18 rebuttal on Graham."  Do you see that?
19     A.  Yes, I do.
20     Q.  Did you know that was going
21 on, sir?
22     A.  No, I don't.  I don't know
23 what an official rebuttal means, but I
24 was not aware that it was going on.

Page 498

1    Q.   Did you know, sir, that
2  Brian Harvey at the FDA -- look at the
3  last three lines.
4          This is an official of the
5  FDA.  Last three lines.  Brian told --
6  the author being Braunstein.  Braunstein
7  writes in his own handwriting, and we're
8  going to examine him on this in a
9  deposition.
10         "Brian - opportunity to get
11  message out on Graham et al."
12         MR. BECK:  I'm going to
13     object to the form of the
14     question.
15  BY MR. KLINE:
16     Q.   Did you know, sir, that
17  those discussions were going on between
18  the FDA and Merck, that they were looking
19  to get the message out on you?
20     A.   No, I didn't.
21     Q.   Did you know, sir, in the
22  last sentence that an FDA official was
23  suggesting to Merck that we provide
24  journalists with a copy of our critique

Page 500

1    effort on the part of FDA
2    officials working in collaboration
3    hand in glove with --
4  BY MR. KLINE:
5    Q.   With whom?
6    A.   With Merck.
7    Q.   Next.
8          And by the way, sir, are you
9  aware of a letter that was written by a
10  doctor whose name was Fries?
11    A.   No.
12    Q.   Okay.  Let me ask you this
13  question.  Are you aware of the Merck --
14         Are you aware of any Merck
15  documents where they had a policy in
16  effect to neutralize people, scientists
17  who disagreed with them?
18         MR. BECK:  I'm going to
19     object as wildly outside the scope
20     of any cross-examination.
21  BY MR. KLINE:
22    Q.   Yes, sir.
23    A.   I'm fully aware of that,
24  actually, because one of the victims of

Page 499

1  on Graham?
2          MR. BECK:  Object to the
3     form.
4  BY MR. KLINE:
5    Q.   Did you know that that was
6  going on, sir?
7          MR. BECK:  Excuse me.
8     Object to the form.
9          MR. KLINE:  Yes, sir.
10         THE WITNESS:  No, I did not.
11  BY MR. KLINE:
12    Q.   How does this all strike
13  you, having seen this for the first time?
14         MR. BECK:  Object to the
15     form.
16         THE WITNESS:  Well, I'll
17     tell you, I'm quite shocked,
18     because what this is is this
19     actually demonstrates more clearly
20     just how widespread the organized
21     campaign to discredit and smear me
22     was, that I'm not crazy and
23     psychotic, that there was a
24     widespread, widespread concerted

Page 501

1  these attempts was a colleague of mine,
2  Dr. Gurkipal Singh, who was at Stanford
3  and who described in great detail what he
4  had gone through at the hands of Merck
5  basically seeking to fire him because he
6  had questions about the safety of Vioxx.
7    Q.   For the record so it's clear
8  later on, this all flows from the e-mail
9  which was shown by Mr. Beck dated August
10  11 in which the part of that e-mail chain
11  said "For the record, Merck will likely
12  not be happy."  That's the basis for
13  having gone into all of this.
14         Next area of inquiry, sir.
15         By the way, is this -- was
16  there a practice at the FDA essentially
17  to give the sponsor of the drug, Merck,
18  in this case, both information and heads
19  up on things like this?
20         MR. BECK:  Object to the
21     form.
22         THE WITNESS:  No.  No.  This
23     would be uncommon and
24     unprecedented.

Page 502

BY MR. KLINE:

1   Q.   Now, let's move into other
2   areas.
3        MR. BECK: Doctor, can I ask
4   again if you would try to pause
5   because I don't want to be talking
6   over each other.
7        THE WITNESS: Okay. Yes.
8   And I'm not trying to dis you.
9        MR. BECK: I know. If you
10  get into a rhythm with somebody as
11  silver tongued as Mr. Kline, it is
12  hard to remember the rules.
13       MR. KLINE: My mom used to
14  say to me, beware of people who
15  compliment you.
16       THE WITNESS: Well, I
17  subscribe to that. If people
18  agree with me, then I have to
19  wonder what am I doing wrong.
20  Right?
21       MR. KLINE: Right.
22       But I appreciate it, Phil.
23  BY MR. KLINE:

Page 503

1   Q.   Next.
2        Mr. Beck talked about a
3   number of documents that were turned over
4   and processed and the lawyers -- do you
5   recall that whole first 15 or 20 minutes
6   of examination?
7   A.   Yes, I do.
8   Q.   Here's my question to you,
9   sir. In this litigation, did Merck
10  subpoena and request your personal
11  e-mails for seven years?
12  A.   They requested not only
13  those e-mails, but the e-mails of all my
14  family members.
15  Q.   Next. Next document, sir.
16  I'd like to go to a document which was
17  the very end of Mr. Beck's
18  cross-examination. Let me see if I can
19  find it. I know its number, I just don't
20  know where it is.
21       MR. BECK: Can I know what
22  we are talking about?
23       THE WITNESS: I think
24  they're talking number 32.

Page 504

1        MR. KLINE: Let's go off the
2   video record.
3        THE VIDEOTAPE TECHNICIAN:
4   Off the record at 7:48.
5            - - -
6        (Whereupon, a recess was
7   taken from 7:48 p.m. until 7:49
8   p.m.)
9            - - -
10       THE VIDEOTAPE TECHNICIAN:
11  The time is 7:49. We're back on
12  the video record.
13  BY MR. KLINE:
14  Q.   Let's put this in context,
15  sir. There's an e-mail from Jenkins, the
16  director of Office of New Drugs, and
17  Seligman who's -- is he also in the
18  Office of New Drugs, technically?
19  A.   No. He's in a separate
20  super office --
21  Q.   All right.
22  A.   -- but he's close personal
23  friends with Steven Galson, and Dr.
24  Galson brought Dr. Seligman into this

Page 505

1   position from outside.
2   Q.   Understood.
3        Now, Mr. Beck wanted to look
4   at the first five bullet points with you
5   in this document, including the no -- and
6   you had testified, to put it in context,
7   that there was -- no clinical trial had
8   yet shown the increased risk that they're
9   talking about here, but that it had been
10  shown in observational, namely,
11  epidemiology studies. Correct?
12  A.   That is correct.
13       MR. BECK: Object to the
14  form of the question.
15  BY MR. KLINE:
16  Q.   That's the predicate to the
17  question just to put it back in context
18  for a question now.
19       Sir, your study itself,
20  standing alone, did it show an increased
21  risk of Vioxx in causing cardiovascular
22  events?
23  A.   Yes, it did.
24  Q.   Was that both at the 25

Page 506

1  milligram dose as well as the 50
2  milligram dose?
3      A.   At the 50 milligram dose,
4  the evidence was statistically
5  significant.  At the 25 milligram dose,
6  it was elevated, but it didn't reach
7  statistical significance.  In comparison
8  with Celebrex, it was marginally
9  statistically significant with a lower
10 dose.
11     Q.   And in this document which
12 is April 6, 2005, let's put it in
13 context, drug is off the market September
14 30 of '04, correct so far?
15     A.   Yes.
16     Q.   And I just want to get dates
17 out, so I appreciate Mr. Beck's
18 indulgence.
19         And then there's -- your
20 article is published online in January of
21 '05, correct?
22     A.   Yes.
23     Q.   There's a hearing on
24 February 17th of '05, correct?

Page 508

1      A.   -- "revised labeling."
2      Q.   In other words, the drug
3  would have to be labeled different,
4  correct?
5      A.   Yes.
6      Q.   "The supplemental NDA would
7  require FDA review and approval prior to
8  implementation of the" -- what?
9      A.   "New labeling."
10     Q.   -- "new labeling since the
11 change would not be the type allowed
12 under FDA regulations ,"and they go on to
13 cite the regulations on labeling,
14 correct?
15     A.   Yes.
16         MR. BECK:  Will you just for
17     completeness read the rest of that
18     sentence.
19 BY MR. KLINE:
20     Q.   -- "new labeling since the
21 changes would not be the type allowed
22 under FDA regulations for a 'Changes
23 Being Effected (CBE)' labeling
24 supplement."  Did I read it correctly?

Page 507

1      A.   Yes.
2      Q.   And then this report comes
3  along as part of that process.  It
4  basically is tying up the endpoint of
5  having had an Advisory Committee hearing
6  and having had an investigation?
7      A.   Yes.
8      Q.   What I don't believe you
9  *were asked about was what was said about*
10 Vioxx in this paper.  And let's look at
11 Vioxx on Page 18.  And then that will, I
12 think, lead us to a discussion of some
13 other things.
14         On Page 18, we have Vioxx,
15 Page 18.  There's a separate section on
16 Vioxx, isn't there?
17     A.   Yes, there is.
18     Q.   Have we discussed that yet?
19     A.   No, we have not.
20     Q.   It says here, second
21 sentence, "Should the sponsor seek to
22 resume marketing for rofecoxib, a
23 supplemental NDA with" -- what kind of
24 labeling, sir?

Page 509

1      A.   Yes.
2      Q.   So, the FDA, even the FDA in
3  this report, did the FDA conclude that
4  the drug was not properly labeled as it
5  had been marketed when it was on the
6  market?
7          MR. BECK:  Object to the
8      form of the question.
9  BY MR. KLINE:
10     Q.   You may answer.
11     A.   Yes.  That's clearly what's
12 been concluded here.
13     Q.   And, sir, *the labeling, two*
14 *years* you had mentioned about the
15 labeling, and you discussed labeling at
16 length with Mr. Beck, and I want to talk
17 to you a little bit about labeling in a
18 minute.
19         The labeling, two years.  Is
20 there anyone in those two years in
21 particular who dragged their feet?
22         MR. BECK:  Object to the
23     form of the question.  It's also
24     improper redirect.

Page 510

1    MR. KLINE: Yes, sir. Go
2  ahead.
3    MR. BECK: I didn't get into
4  this subject at all.
5    THE WITNESS: The two-year
6  period for coming up with the
7  revised label for a problem as
8  serious as high risk of heart
9  attacks with Vioxx, this is an
10  extraordinary long period of time,
11  and the only explanation based on
12  my long experience at FDA is that
13  there was foot dragging by the
14  company. I've seen this countless
15  times with other companies with
16  other serious drug-related adverse
17  reactions where FDA comes in
18  saying we want to put a boxed
19  warning on a drug, and the company
20  says basically no way, Jose, and
21  then FDA sort of banters back and
22  forth with the company, and things
23  just go on for months and months
24  and months and months.

Page 511

1    At the same time, companies
2  are free to voluntarily implement
3  labeling changes such as boxed
4  warnings, and in this case, I
5  imagine FDA would have gone along
6  with it.
7  BY MR. KLINE:
8    Q.  Now, I'd like to go —
9    MR. BECK: I'm going to
10  object and move to strike and
11  renew the objection as outside the
12  scope. I didn't ask anything on
13  this subject at all.
14    MR. KLINE: You certainly
15  asked a whole ton of questions on
16  labeling, and I intend to go into
17  it.
18    MR. BECK: I asked if he was
19  involved in the labeling decisions
20  and he said no.
21    MR. KLINE: And then you
22  asked a series of opinions about
23  labeling. Do you want to strike
24  all the labeling testimony?

Page 512

1    MR. BECK: I have my
2  objection on the record.
3    MR. KLINE: But I'm willing
4  to offer a compromise.
5    I don't hear a taker.
6  BY MR. KLINE:
7    Q.  Sir, I want to go back and
8  cover one more thing in this document,
9  the Jenkins report. If you look on Page
10  18, right here, sir, where it says
11  "Second, concerns were expressed at the
12  recent advisory committee meeting" --
13    A.  Uh-huh.
14    Q.  "Second, concerns were
15  expressed at the recent advisory
16  committee meeting that Vioxx may be
17  associated with a higher risk of
18  increased blood pressure, fluid
19  retention, and congestive heart failure
20  than other COX-2 selective NSAIDs. We
21  believe that these additional potential
22  serious risks of Vioxx need to be fully
23  explored through a public process before
24  a decision is made regarding resumed

Page 513

1  marketing." Did I read it correctly?
2    A.  Yes, you did.
3    Q.  Is that, at least insofar as
4  that goes, sir, indeed was Vioxx
5  associated with all of these things that
6  are now known and shown in 2000 and are
7  now acknowledged by the FDA?
8    MR. BECK: Object to the
9  form and the scope.
10  BY MR. KLINE:
11    Q.  Did the epidemiology studies
12  show these things, sir?
13    MR. BECK: Object to the
14  form and to beyond the scope of
15  cross.
16    THE WITNESS: Other
17  epidemiology studies have shown
18  these things. Our study didn't
19  look at these things, but other
20  studies have, and it found these
21  effects with Vioxx.
22  BY MR. KLINE:
23    Q.  So, when Vioxx was on the
24  market, sir, by this own FDA document,

Page 514

1   was it a drug that was associated with
2   the things that you've mentioned,
3   increased risk of heart attacks and
4   coronary events, as well as these other
5   heart-related ailments which are
6   acknowledged here by the FDA?
7       MR. BECK:  Object as beyond
8       the scope of the cross.
9       THE WITNESS:  Yes.
10  BY MR. KLINE:
11      Q.   And I might add for the
12  record, this is the exact document that
13  was examined on by -- do you remember --
14      A.   Yes, I do.
15      Q.   Do you recall being examined
16  on this very document by Mr. Beck?
17      A.   I do.
18      Q.   Do you recall any questions
19  about the specific area, the specific
20  part of the document that dealt with
21  Vioxx?
22      A.   No.
23      Q.   But is it in this document,
24  sir?

Page 516

1   language, not sort of using adjectives
2   that downplay it and not burying it in
3   tremendous amounts of text."  Your words.
4   Do you recall saying that to the jury
5   here today?
6       A.   Yes, I do.
7       Q.   Now, sir, can a
8   straightforward, bold, frank, plain
9   language label warning make a difference
10  in prescribing of drugs as you see and
11  know and understand it?
12      A.   It certainly can.  In the
13  case of Vioxx, I think had the warning
14  been very clear, had it been boxed, the
15  number of patients exposed to the drug
16  would have probably been much reduced,
17  and this would have resulted in a
18  substantial reduction in the number of
19  people who were injured by heart attacks
20  or killed by heart attacks.
21      Q.   Sir, in your testimony
22  before the United States Senate Finance
23  Committee before Senator Grassley and his
24  committee, you were asked the question --

Page 515

1       A.   It certainly is.
2       Q.   And does the FDA speak about
3   the fact that Vioxx can't be on the
4   market unless it had a different label?
5       MR. BECK:  Object to the
6       form and to the scope.
7       THE WITNESS:  That's
8       correct.
9   BY MR. KLINE:
10      Q.   Let's talk about your
11  testimony, sir.
12          In response to questions by
13  Mr. Beck, you said -- I want to talk
14  label for a minute, labeling in response
15  to the questions that he asked you.
16  First of all, sir, you testified earlier
17  about how labels can make a difference.
18  You said that a straightforward -- I
19  actually have from Mrs. Golkow's
20  transcription here today instant access
21  to it on real time.  And it says here,
22  "It would actually just be more
23  straightforward about what the problems
24  are, using very bold and frank and plain

Page 517

1   you were saying -- you were asked the
2   question by Senator Graham (sic):  "A
3   black box will catch everybody's
4   attention."  You said, "As I pointed out
5   before, I think the most effective thing
6   that this black box would have done is it
7   would have given prominence to the heart
8   attack risk of Vioxx and it would have
9   stopped direct-to-consumer advertising."
10          Do you recall making that
11  statement, sir, before the Congress?
12      A.   Yes, I do.
13      MR. BECK:  Object to the
14      form.
15  BY MR. KLINE:
16      Q.   My question is, do you abide
17  by and agree with that particular public
18  statement which was made then today?
19      A.   Oh, definitely.  There's no
20  question about that.
21          Could I add one other thing
22  since we're talking about labeling.
23  Shari Targum, whose review we talked
24  about earlier, in the very conclusion of

130 (Pages 514 to 517)

Page 518

1 her review, I was really stunned, I only
2 saw this recently in rereading the
3 review, she wrote basically that this --
4 that Vioxx should have warnings. And she
5 said "at least warnings." And so I think
6 reading that and looking at her review,
7 the fact that here's the expert who
8 reviewed the drug, thought that it should
9 have been in warnings, and then
10 eventually we have it came out that it's
11 sort of, you know, buried in the fine
12 print, I was actually fairly surprised
13 because I hadn't realized that Dr. Targum
14 had actually stated that.
15      Q.   As to your opinions, sir,
16 before the United States Senate, putting
17 aside Dr. Targum, when you said that the
18 black box can be effective, have you
19 stated here today now a more complete
20 view of your opinions as I've asked you
21 here on redirect examination?
22      A.   Yes, I have.
23           MR. BECK: Objection.
24      Somebody has to let me object. I

Page 519

1      object to the form of the
2 question.
3           MR. KLINE: Phil, I
4 apologize. I'm really trying to
5 rush through it here at 8:00, but
6 I appreciate it, and I will really
7 try to be more deferential.
8 BY MR. KLINE:
9      Q.   Next. Let's talk about --
10 yes. I'd like you to go to Exhibit
11 Number 8 very briefly.
12      You were asked by Mr.
13 Beck -- I'm going to like make you work
14 while you talk because we're trying to
15 wrap up.
16      You had mentioned -- there
17 was an exchange where basically you said
18 you'll leave it to brighter minds to
19 determine mechanism, et cetera, correct?
20      A.   Yes.
21      Q.   Now, I also think I heard
22 you say that you understand mechanism
23 because you're a pharmacologist?
24      A.   I'm a clinical

Page 520

1 pharmacologist, board certified.
2      Q.   And you wrote an e-mail
3 that's part of the documents that I don't
4 think we've displayed it yet to the jury.
5 But let me ask you the concept, and
6 hopefully I won't be put to the task of
7 showing it. You said, "Epidemiology
8 doesn't require or depend on a known
9 mechanism for its findings." It's your
10 e-mail to David Campen, who is your
11 co-author on this study.
12      A.   (Witness nods.)
13      Q.   "Epidemiology doesn't
14 require or depend on a known mechanism.
15 What it does is seek to describe the way
16 things are and leave it to brighter minds
17 to figure out why." Do you remember
18 that?
19      A.   Yes, I do.
20      Q.   Were you being facetious?
21      A.   I was being facetious.
22      Q.   But does it describe things
23 to put it the way you put it, the way
24 they are?

Page 521

1      A.   That's the whole purpose of
2 it.
3      Q.   Now, in your article -- in
4 the Wayne Ray article --
5      A.   Is this Number 8?
6      Q.   Yes. This is Number 8. Go
7 quickly, Number 8, Page 68.
8           I'm impressed by the work we
9 have in running this technical screen.
10 We're getting them right up here and I'm
11 rushing through a series of maybe eight,
12 ten more documents.
13           It says here -- do you
14 remember Mr. Beck got to sort of the
15 middle of the paragraph. I wish I had a
16 laser pointer. It was right there where
17 he was talking about the VIGOR trial,
18 enrolling these. Remember that's what
19 you were dealing with?
20      A.   Yes.
21      Q.   But I'd like you to go to
22 the top of the next column -- and by the
23 way, you were talking there about whether
24 naproxen was cardioprotective, and Mr.

Page 522

1  Beck in his questions was suggesting to
2  you, well, maybe you're not correct.  Do
3  you recall that?
4          MR. BECK:  I'm going to
5      object to the form.
6  BY MR. KLINE:
7      Q.   Do you recall that exchange?
8      A.   Yes, I do.
9      Q.   Is that how you interpreted
10 that exchange, sir?
11         MR. BECK:  Object to the
12     form of the question.
13 BY MR. KLINE:
14     Q.   Did you understand his
15 questions to suggest or challenge whether
16 you were correct on naproxen?
17         MR. BECK:  Same objection.
18         THE WITNESS:  Yes, I did.
19 BY MR. KLINE:
20     Q.   Here's my question to you,
21 sir.
22         In that very paragraph, not
23 in the article, not in the end, not in
24 the conclusions, in the very same

Page 523

1  paragraph at the end it says, "These
2  studies ,"referring to what studies?
3      A.   Studies above, the ones we
4  were talking about.
5      Q.   Which were what, VIGOR?
6      A.   Yes.  VIGOR and -- I guess
7  we're talking about VIGOR.  And it looks
8  like there are several other referenced
9  studies there which we'd have to go to
10 the bibliography to see what those refer
11 to.
12     Q.   These studies, including
13 VIGOR, which is what Mr. Beck was
14 focusing on with you, correct?
15     A.   Correct.
16         MR. BECK:  Object to form.
17     That's simply false,
18 BY MR. KLINE:
19     Q.   Maybe I should stand
20 corrected.  Was he referring, as you
21 understood it, to anything other than
22 VIGOR at the time when he was questioning
23 you?
24     A.   My understanding was he was

Page 524

1  referring to the entire paragraph.  VIGOR
2  is in that paragraph.  And VIGOR supplies
3  most of the data, and VIGOR is the most
4  reliable data because it is the biggest
5  study.
6      Q.   Look at what the last
7  sentence of the paragraph says.  "These
8  studies suggest that any potential
9  protective effect of naproxen does not
10 fully account for the findings in the
11 VIGOR study."  True?
12     A.   Definitely true.
13     Q.   That was published in 2003,
14 correct?
15     A.   Yes.  And it was based on a
16 symposium that occurred in August of
17 2002.
18     Q.   That's the other thing.  If
19 we can have the front of the article.
20 There was a lot of testimony about what
21 it was and what it wasn't.  It's up on
22 top, sir, IPSE commentary.  It doesn't
23 pretend to be a peer-reviewed journal
24 article, does it?

Page 525

1          MR. BECK:  Object to the
2      form of the question.
3          THE WITNESS:  Not to a
4      traditional scientific article,
5      but it does undergo some form of
6      peer review, but it's not as
7      stringent.
8  BY MR. KLINE:
9      Q.   Now, Next.
10         I'd like to put back up very
11 briefly the piece of your Advisory
12 Committee hearing, which is 114.  It's
13 the Advisory Committee document?
14         MR. BECK:  Can I see what
15     you are talking about?
16         MR. KLINE:  Yes, sure, Phil.
17     You used it.
18         THE WITNESS:  Is it number
19     5?
20 BY MR. KLINE:
21     Q.   Yes, sir.  Yes, it's the
22 PowerPoint.
23         Now, this PowerPoint was
24 given in 2005 over a year ago.  We now

Page 526

1  see in front of us what Mr. Beck had
2  highlighted for the members of the jury,
3  correct?
4      A.   Yes.
5      Q.   Is that what we had
6  highlighted or he had highlighted?
7      A.   He highlighted a lot of
8  things.
9          MR. BECK:  I object, because
10     it's not what I highlighted.
11         MR. KLINE:  Okay, then I
12     stand corrected.
13 BY MR. KLINE:
14     Q.   Now, let's look at it in
15 totality.  Your testimony with him, I
16 believe you had a long discussion about
17 the Ray numbers, 1.02 with .76 to 1.37
18 confidence intervals.  Do you see that?
19     A.   Yes.
20     Q.   But let's look down the all
21 doses.  After all, the drug is taken at
22 all doses by -- over the whole
23 population, correct?
24         MR. BECK:  Object to the

Page 527

1      form.
2          THE WITNESS:  Yes.
3  BY MR. KLINE:
4      Q.   Is the drug taken at all
5  doses?
6      A.   Yes, it is.
7      Q.   Let's look.  The Graham
8  study, 1.34.  That means for every
9  thousand not on the drug, 1,340
10 statistically have an incidence, correct?
11     A.   Yes.  It's increased.
12     Q.   By a whisker it's not
13 statistically significant, correct?
14     A.   Right.  This is an example
15 of having 94 bullets in the chamber as
16 opposed to 95.
17     Q.   The Solomon study,
18 statistically significant increased risk,
19 correct?
20     A.   Yes.
21     Q.   The Kimmel study,
22 statistically significant increased risk,
23 correct?
24     A.   Umm.

Page 528

1      Q.   I'm sorry, no.
2      A.   It's not statistically
3  significant.
4      Q.   But it's showing a trend?
5      A.   The point estimate is
6  elevated.
7          MR. BECK:  Can we have for
8      completeness the one you just
9      skipped over in there?
10         MR. KLINE:  The Mamdani
11     study.
12         THE WITNESS:  The Mamdani.
13         MR. KLINE:  1.00, neutral.
14 BY MR. KLINE:
15     Q.   Ingenix, 1.41 with
16 statistically significant confidence
17 intervals at all doses, correct?
18     A.   Yes.  And this was a
19 Merck-funded study.
20     Q.   Merck-funded study?
21     A.   Yes.  The Ingenix study was
22 funded by Merck.  I don't -- I was told
23 that the publication of this study was
24 being held up by Merck because of some

Page 529

1  sort of contractual arrangement that it
2  had with the Ingenix company.  And as a
3  result, it sort of delayed the
4  publication of those results.  That was
5  what the scuttlebutt was in the academic
6  community, and that was where I was told
7  about it.
8          MR. BECK:  I can't help but
9      I have to move to strike no matter
10     what.
11 BY MR. KLINE:
12     Q.   Does the Ingenix/Merck study
13 demonstrate a statistically significant
14 increased risk of heart attacks and
15 cardiac events with the drug Vioxx, their
16 own funded epidemiology study?
17         MR. BECK:  Object, beyond
18     the scope of cross.
19         THE WITNESS:  Now, this
20     study shows an overall increased
21     risk and an increased risk with
22     the lower doses of Vioxx as well.
23     If you were to look at this study
24     in terms of the timing of when

Page 530

1    heart attacks occurred, this is
2    one of the studies that you can
3    look at the data and see that the
4    risk is present in a time period
5    of one year or less.
6  BY MR. KLINE:
7    Q.   And, sir, that study
8  eventually was published. Was it
9  published in the peer-reviewed medical
10 literature?
11   A.   Yes, it was.
12   Q.   Does that very study funded
13 by Merck support your very conclusion
14 that the drug is unsafe?
15       MR. BECK: Object to form
16   and scope.
17 BY MR. KLINE:
18   Q.   You may.
19   A.   This study supports that
20 position.
21   Q.   When was it published, do
22 you know, the Ingenix study?
23   A.   Golly. Was it 2005? The
24 first author is, I think, the Valentgas.

Page 531

1    Q.   Next, the Medi-Cal study,
2  sir, were you involved in that study?
3    A.   Yes.
4    Q.   We haven't even touched that
5  study today.
6        MR. BECK: Therefore, I
7    object as being beyond the scope
8    of cross.
9        MR. KLINE: You put that
10   document in front and selected
11   from it. How could it possibly be
12   beyond the scope?
13 BY MR. KLINE:
14   Q.   Here's my question. From
15 the very document that Mr. Beck wanted to
16 examine you on partially, and in the
17 spirit of optional completeness, a
18 doctrine under Federal Rule 106 and
19 actually the Texas civil -- the Texas
20 criminal code, under that code in the
21 spirit of getting it all out in front of
22 everyone, I ask you the next question.
23 Here it goes.
24       The Medi-Cal study --

Page 532

1        MR. BECK: Are you proposing
2    that that is part of anything that
3    gets played to the jury?
4        MR. KLINE: No. Of course
5    not. I was just trying not to go
6    off the record and make my
7    argument in case I needed to
8    remember it. Thanks for being
9    patient with me, everyone. It's
10   late. It is 8:00 at night.
11 BY MR. KLINE:
12   Q.   The Medi-Cal study, 1.32
13 relative risk with a 1.22 to 1.42
14 confidence interval, statistically
15 significant, sir?
16   A.   Yes, very much so.
17   Q.   Increased relative risk of
18 heart attacks and other coronary events
19 when you take the drug Vioxx?
20   A.   Yes.
21       MR. BECK: Object to the
22   form and scope.
23       THE WITNESS: One other
24   point on this study is we showed a

Page 533

1    dose response of increased risk
2    going from the 12-and-a-half
3    milligram dose, which is the
4    lowest dose, up through doses of
5    50 milligrams per day.
6        MR. BECK: Now I'm going to
7    state something for the record.
8    That one of the reasons why this
9    is objectionable on scope grounds
10   is I'm hearing volunteer testimony
11   about scuttlebutt in addition to
12   little details that if you had
13   asked on direct, I could have
14   crossed him on. And I can't cross
15   him because he's volunteering this
16   to questions that are beyond the
17   scope of the cross.
18 BY MR. KLINE:
19   Q.   Dr. Graham, as to anything
20 that you would be trying to say that
21 would be something that someone said or
22 scuttlebutt or something like that,
23 please just refrain. I just want to get
24 these questions out, just like Mr. Beck

Page 534

1    did, frankly.
2        A.   Okay.
3        Q.   On these particular
4    questions, I'm going to have no problem
5    in this area to try to extract that
6    testimony to get to the core of what
7    you're saying.
8            My purpose is to examine
9    this entire document, which Mr. Beck had
10   examined you on.
11           Now, taking the totality of
12   the studies, not just the Ray figures for
13   1.02 for 25 milligram dose that you were
14   examined on, but taking the totality of
15   the studies, first of all, are many of
16   these studies in any event underpowered?
17           MR. BECK:  Object to the
18       form.
19           THE WITNESS:  These studies
20       are -- have much more power than
21       clinical trials do.  Some of these
22       studies have more power than
23       others.
24   BY MR. KLINE:

Page 535

1        Q.   Taking the totality of the
2    data, do you as epidemiologists take,
3    rather than just looking at the Ray
4    statistic for picking one thing off of
5    the chart, taking the totality of the
6    data at all doses, what does it tell you
7    about the drug Vioxx?
8        A.   Vioxx increases the risk of
9    heart attack.
10       Q.   And, sir, in the Ingenix
11   study, to pick that study, 1.41, compare
12   it in thousands.  If there were 1,000
13   people who were not on Vioxx, how many
14   incidents would there be of someone on
15   Vioxx per thousand?
16           MR. BECK:  I'm going to
17       object.
18   BY MR. KLINE:
19       Q.   Please, sir.
20           MR. BECK:  Same grounds as
21       before.
22           THE WITNESS:  The way to
23       describe it is if you had 1,000
24       people who had a heart attack not

Page 536

1        taking Vioxx, not taking any drug,
2        there would be 1410, roughly, who
3        had heart attacks on Vioxx.  It
4        would be an additional 410 heart
5        attacks for every 1,000 heart
6        attacks.
7    BY MR. KLINE:
8        Q.   Moving to the next area that
9    was opened up by Mr. Beck.
10           MR. BECK:  I just move to
11       strike.  I mean, I'm sorry, I
12       can't let you give speeches
13       between each one.  I object and
14       move to strike the colloquy.
15   BY MR. KLINE:
16       Q.   Next question, next area of
17   examination, sir.
18       A.   Different document?
19       Q.   Yes.  Different document.
20           I want to go to your
21   article -- actually, I want you to get
22   your article out in the context, that's
23   Graham Exhibit Number 4.  I want you to
24   get it out in the context -- in front of

Page 537

1    us in the context of Mr. Beck's
2    questioning about -- he put up a chart,
3    he didn't mark it, and I don't have
4    access to it, but it was the less than 25
5    versus remote use, less than 25 or
6    greater than 25 remote use.  Do you
7    remember the questioning in that area?
8        A.   Yes, I do.
9        Q.   He was asking you questions
10   about whether the Kaiser study showed
11   statistically significant increases of
12   relative risks.  And he broke it down
13   into a chart which he then examined you
14   on, and there was the technological
15   capacity.  I kind of liked it, actually,
16   where he would flash up the different
17   numbers as you went along?
18       A.   Yes, I remember.
19       Q.   Here's what I'd like to do.
20   Eventually there were actual published
21   numbers in the Kaiser report, correct?
22       A.   Correct.
23       Q.   And I'd like to turn to the
24   table, sir.  It's Table Number 3 on Page

Page 538

1  478.
2       And I'd like to, following
3  the line of questioning that I had opened
4  up, talk to you about rofecoxib at all
5  doses. Do you see it there, sir?
6  Rofecoxib, all doses.
7       A.   Yes, I do.
8       Q.   When you looked at all
9  doses -- and did Mr. Beck discuss with
10 you rofecoxib at all doses in your Kaiser
11 study?
12      A.   I don't recall that he did.
13      MR. BECK: I'm going to
14      object as beyond the scope of
15      cross-examination.
16      MR. KLINE: That's the
17      point. That's the point.
18 BY MR. KLINE:
19      Q.   Let's look at the rofecoxib
20 on all doses rather than selecting out,
21 and I'll ask you a question.
22      Sir, when you look at
23 rofecoxib all doses --
24      A.   Are we talking about the top

Page 539

1  against remote use or the bottom --
2       Q.   I'm going to do both. First
3  again, remote use, rofecoxib, all doses,
4  has a 1.39 relative risk with
5  statistically significant confidence
6  intervals. I'm going to show the
7  operator where to go.
8       A.   Well, when I read that, it's
9  just on the cusp of statistical
10 significance.
11      Q.   Yes. It's 1.39, with 1.05
12 to 1.83.
13      A.   Those are the unadjusted
14 numbers.
15      Q.   Please explain.
16      A.   That's the crude odds ratio.
17 We had to take into account the
18 distribution of risk factors for heart
19 disease and do what's called adjustment,
20 and so the column on -- the one to the
21 right of that where it says adjusted odds
22 ratios, that's sort of the final answer.
23 And there it's 1.34, and the lower bound
24 of the confidence interval is below 1,

Page 540

1  so, technically it's not statistically
2  significant. But there's a p-value next
3  to it. And what that p-value says is
4  that there's a 6.6 percent chance that
5  this result could have occurred by
6  chance, a 93.4 percent chance that it
7  didn't. So, in other words, we go back
8  to my analogy. We have 93 bullets in the
9  gun.
10      Q.   Let's go down below, sir,
11 again, following the same examination
12 that Mr. Beck did, only using your table
13 itself. Rofecoxib greater than 25
14 milligrams. Let's just roll out the
15 whole thing. It is two down. Rofecoxib
16 greater than 25 milligrams, 5.03 relative
17 risk, correct?
18      A.   Okay. This is, again, an
19 unadjusted --
20      Q.   Yes. Then we go to the
21 adjusted, 3.0.
22      A.   Correct.
23      Q.   Statistically significant?
24      A.   Yes.

Page 541

1       Q.   Does that mean, sir, for
2  every thousand heart attacks that occur
3  without Vioxx, 3,000 occur on Vioxx at
4  over 50 milligrams?
5       A.   That's what that would mean.
6       Q.   I'm sorry. Over 25
7  milligrams.
8       A.   Yes. That's what that would
9  mean.
10      Q.   Let's go down to the all
11 doses compared to Celebrex. And if,
12 again, you can point him to it,
13 "rofecoxib, all doses." Again, I'm just
14 following the same format that he
15 followed in his presentation on cross.
16      MR. BECK: I object. I
17      didn't do this comparison at all.
18 BY MR. KLINE:
19      Q.   Here's the question, sir.
20 1.59 when you adjust it, 1.59 relative
21 risk with statistically significant
22 confidence intervals. Do you see it?
23      A.   Yes, I do.
24      Q.   That would mean for every

Page 542

1 1,000 heart attacks on Celebrex, there
2 would be 1,590 on Vioxx, correct?
3     MR. BECK: Object to the
4 form.
5     THE WITNESS: That's what
6 that would mean.
7 BY MR. KLINE:
8     Q.  And for rofecoxib over 25,
9 to complete the four corners, 3.58,
10 meaning for every 1,000, and it's
11 statistically significant, correct?
12     A.  Yes, it is.
13     Q.  And by the way, that would
14 mean that for every 1,000 heart attacks
15 on Celebrex, somebody that was on
16 Celebrex, 3,580 heart attacks and
17 cardiovascular events on Vioxx, correct?
18     MR. BECK: Object to the
19 form.
20     THE WITNESS: That is
21 correct.
22 BY MR. KLINE:
23     Q.  Staggering, correct?
24     MR. BECK: Object to the

Page 543

1 form.
2     THE WITNESS: It was
3 staggering to me.
4 BY MR. KLINE:
5     Q.  Sir, when you look at these
6 kinds of numbers, these were your bottom
7 line conclusions, correct?
8     MR. BECK: Object to the
9 form.
10 BY MR. KLINE:
11     Q.  Were these your bottom line
12 conclusions?
13     MR. BECK: Same objection.
14     THE WITNESS: These were my
15 bottom line conclusions.
16 BY MR. KLINE:
17     Q.  Not only yours, they were
18 those of you, Campen, Hui. Who is Hui?
19     A.  Rita Hui was one of our
20 computer programmers from Kaiser.
21     Q.  Michael -- Michelle Spence?
22     A.  She's another computer
23 programmer from Kaiser.
24     Q.  Craig Cheetham?

Page 544

1     A.  He's a clinical pharmacist
2 from Kaiser.
3     Q.  Gerald Levy?
4     A.  He's a board certified
5 rheumatologist from Kaiser.
6     Q.  Stanford Shoor?
7     A.  He's a board certified
8 rheumatologist from Stanford.
9     Q.  And Wayne Ray?
10     A.  From Kaiser, I mean.
11     Q.  And Wayne Ray, the former
12 Merck consultant, correct?
13     MR. BECK: Object to the
14 form.
15     THE WITNESS: Yes. And also
16 from Vanderbilt University.
17 BY MR. KLINE:
18     Q.  A prestigious school?
19     A.  Yes, very.
20     Q.  In this field?
21     A.  Very.
22     Q.  Next.
23     That's why you had to go to
24 Nashville for the ISPE conference.

Page 545

1     A.  I enjoyed Nashville.
2     Q.  Next.
3     You must be a country music
4 fan.
5     MR. BECK: You could
6 actually get a room here. What's
7 going on?
8     MR. KLINE: What did you
9 say?
10     MR. BECK: Let's move along.
11     MR. KLINE: We are.
12 BY MR. KLINE:
13     Q.  Next issue.
14     Sir, I do want to focus on
15 something that Seligman said. Do you
16 recall Seligman called your study an
17 excellent study and analysis of a complex
18 topic?
19     A.  I do.
20     Q.  Is that a fair way to
21 describe the study, an excellent study
22 and analysis of a complex topic?
23     MR. BECK: Object to the
24 form.

137 (Pages 542 to 545)

Page 546

1      THE WITNESS:  I thought that
2   it was a fair and accurate
3   assessment.
4   BY MR. KLINE:
5      Q.   Now, do you recall Mr. Beck
6   showing you various internal criticisms
7   as the study progressed internally in the
8   FDA?  Do you recall those line of
9   e-mails?
10     A.   Yes, I do.
11     Q.   Well, sir, you also had
12  e-mails which were between you and Dr.
13  Horton, the editor-in-chief of Lancet,
14  correct?
15     A.   That's correct.
16     Q.   Do you know who Elliot
17  Curfman is?
18     A.   I believe he's like a deputy
19  editor for the New England Journal of
20  Medicine.
21     Q.   I thought he's the
22  editor-in-chief.  Gregory Curfman?
23     A.   Greg Curfman.  I think he's
24  the deputy editor.  I thought that --

Page 547

1      Q.   All right.  Let's move on.
2      Horton, sir.
3   Editor-in-Chief of Lancet, correct?
4      A.   Yes.
5      Q.   Now, I just want to -- while
6   this was all going on, eventually there's
7   an endpoint.  The endpoint is that the
8   study is published, correct?
9      A.   Correct.
10     Q.   And by the way, the endpoint
11  for Vioxx is the drug is removed from the
12  market, correct?
13     A.   Correct.
14     Q.   So, who was right about this
15  whole thing, sir?
16         MR. BECK:  Object to the
17     form of the question.
18  BY MR. KLINE:
19     Q.   At the end of the day, who
20  was right?
21         MR. BECK:  Object to the
22     form of the question.
23  BY MR. KLINE:
24     Q.   Please, sir.

Page 548

1      A.   At the end of the day, I was
2   right.
3         One other thing to add, and
4   you can decide whether to strike it or
5   not.  In those e-mails, Dr. Galson
6   actually said to Dr. Horton that he
7   looked forward to reading our paper in
8   the peer-reviewed literature.
9      Q.   All right.
10         Now, next point, sir.
11         As far as Dr. Horton was
12  concerned --
13         You were correct for 12
14  other drugs, as well, weren't you?
15     A.   Yes.  It depends how you
16  want to count Bextra and Vioxx, but
17  correct.
18         - - -
19         (Whereupon, Deposition
20     Exhibit Graham-39, E-mails
21     FDACDER023033 - FDACDER023037,
22     was marked for identification.)
23         - - -
24  BY MR. KLINE:

Page 549

1      Q.   Now, Dr. Horton, sir, he
2   sent you an e-mail dated December 6,
3   2004 -- I'm sorry, November 15, 2004.
4         November 15, 2004.
5      A.   Does that have a number?
6      Q.   We're going to give it a
7   number.  It's an FDA CDER document, and I
8   want to ask you a couple of questions
9   about it very quickly.
10         Now, Mr. Beck had a
11  discussion with you of how -- Dr. Galson
12  was having discussions with Dr. Horton,
13  Galson from the FDA, Horton from the
14  Lancet, correct?
15     A.   Correct.
16     Q.   I would like the jury to see
17  what Dr. Horton thought of you and your
18  paper, which would be in the top e-mail
19  saying "David - This email from SG seems
20  to suggest that he has been misled by
21  others about your so-called refusal to
22  respond to AT's review."
23         What is "AT's review"?
24     A.   Anne Trontell.

Page 550

1      Q.   "I think your e-mail
2  corrects the record clearly.  I think
3  also that the FDA is backing away from a
4  full scale public confrontation with
5  you."  Do you see that?
6      A.   Yes, I do.
7      Q.   You've seen this e-mail
8  before because you received it, correct?
9      A.   Correct.
10      Q.   It says -- do we not display
11  it?
12          MR. KLINE:  We are having
13      technical problems.
14  BY MR. KLINE:
15      Q.   It says here, "They know you
16  are a serious scientist, that we have
17  carefully reviewed your work, and that
18  they have to, in the end" -- "and that
19  they have to, in the end, follow the
20  science and not bend to their internal
21  politics."  Did I read that e-mail which
22  you received correctly?  Did I read it
23  correctly?
24      A.   Yes, you did.

Page 551

1      Q.   I see a smile on your face.
2  Why, sir?
3      A.   Because it's true.  And
4  because it addresses directly what I was
5  saying before about an organized campaign
6  by FDA officials to smear and discredit
7  me that began with my direct supervisors
8  and went as high as the commissioner of
9  FDA offering me a promotion to his office
10  all in the one-week period of time
11  preceding my Senate testimony.
12      Q.   Now, sir, when Dr. Horton
13  said to you "they," meaning the FDA,
14  "know you are a serious scientist," that
15  "we," the Lancet, "have carefully
16  reviewed your work, and that they have
17  to, in the end, follow the science and
18  not bend to their internal politics," at
19  the end of the day when your article was
20  published, indeed did that all come true?
21      A.   Yes and no.  I mean, you
22  have some of the end products of what
23  happened, but then you get memoranda such
24  as the one that Dr. Jenkins and Dr.

Page 552

1  Seligman wrote, which you can look at it
2  from the point of view of it being an
3  apologia that gives -- basically says all
4  the drugs have the same risk, so,
5  therefore, we don't offend any drug
6  company because basically we say they're
7  all the same, so then nobody has a
8  particular way to complain.  So, this
9  sets some of the record straight, but
10  then you have these other things that
11  persist despite that.
12      Q.   Now, sir, next area that was
13  discussed.
14          MR. BECK:  How much longer
15      do you have?
16          MR. KLINE:  I would say 15
17      minutes.
18  BY MR. KLINE:
19      Q.   Next issue is, you were
20  shown the memorandum from Seligman and
21  Trontell dated October 29.  It had an
22  executive summary.  Mr. Beck pointed out
23  some things that were critical.  Do you
24  recall that e-mail?

Page 553

1      A.   Yes, I do.
2      Q.   Now, was there a point by
3  point response by you?
4      A.   Yes, there was.  I mentioned
5  it before.  It's not among these
6  documents.
7      Q.   The point by point wasn't
8  shown to the jury, correct?
9      A.   As far as I'm aware.
10      Q.   Was the point by point
11  refutation of the scientific criticisms
12  that were made internally at the FDA, was
13  that shown to the Lancet, sir?
14      A.   Oh, it certainly was.
15      Q.   And it's a quite lengthy
16  document, isn't it?
17      A.   Yes.  It took me eight hours
18  to write.
19          MR. BECK:  Can I have a copy
20      of this?
21          MR. KLINE:  Yes, sure.
22          - - -
23          (Whereupon, Deposition
24      Exhibit Graham-40, E-mail

139 (Pages 550 to 553)

Page 554

1    11-14-04, FDACDER022932 -
2    FDACDER022933; FDACDER021558 -
3    FDACDER021577 with attachment,
4    was marked for identification.)
5       - - -
6    BY MR. KLINE:
7       Q.   And my only point here,
8    because it certainly would take a long
9    time to go through it, if one were to go
10   through the document in bold type, for
11   every technical concern and consideration
12   that was raised, including what Mr. Beck
13   had referred to as inconsistencies and
14   data issues, did you address each and
15   every single one of them?
16      A.   Each and every one was
17   carefully and exhaustively explained.
18      Q.   Sir, did you also write an
19   extensive and exhaustive e-mail to Steve
20   Galson copying Seligman and Trontell
21   explaining in detail -- in fact, you talk
22   about eight solid hours completing your
23   response to each one of them?
24      A.   Yes, I did.

Page 555

1       Q.   Did your response, sir, to
2    all of the criticisms of Seligman and
3    Trontell satisfy the Lancet peer
4    reviewers and the editor-in-chief of
5    Lancet who published your study?
6       MR. BECK:  Object to the
7       form.
8       THE WITNESS:  Oh, it more
9       than satisfied them.
10   BY MR. KLINE:
11      Q.   But did it satisfy Merck?
12      MR. BECK:  Object to the
13      form of the question.
14      THE WITNESS:  I don't know
15      about that.  It must have
16      eventually satisfied FDA, as well,
17      because they eventually allowed
18      the study to be published without
19      fear of being fired.
20   BY MR. KLINE:
21      Q.   Now, there was another FDA
22   internal --
23      MR. BECK:  I'm going to
24      object.  We're now way past time

Page 556

1    and --
2       MR. KLINE:  I have about
3    three or four more areas to cover,
4    Phil.  I would appreciate the same
5    courtesy.
6       MR. BECK:  I went over by
7    about 15 minutes.  I think you are
8    about 40 minutes over.
9       MR. KLINE:  I don't think we
10   are that far over, otherwise, I'd
11   be hungrier.
12      MR. BECK:  Well, it is 8:30.
13      MR. KLINE:  I'm going to be
14   done in 10 minutes.  I promise
15   you.
16      - - -
17      (Whereupon, Deposition
18   Exhibit Graham-41, E-mails
19   FDACDER029127 - FDACDER029133,
20   was marked for identification.)
21      - - -
22   BY MR. KLINE:
23      Q.   Here we go.  The next
24   document I'd like to talk about.  There

Page 557

1    was another internal review of your paper
2    which was not discussed by Mr. Beck,
3    correct?  The -- how do you pronounce his
4    name?
5       A.   Stadel.
6       Q.   Who is Bruce Stadel?
7       A.   Bruce Stadel was, in my
8    opinion, the leading, most experienced
9    epidemiologist in all of FDA.  He was the
10   person who -- I'm sort of a very senior
11   epidemiologist at FDA.  I'm now the most
12   senior epidemiologist at FDA.  This is
13   the guy I went to when I had questions
14   about I'm not being sure about how to
15   analyze something or -- I hold him in
16   high esteem.
17      Q.   At the end of the day, sir,
18   marking this as Graham Exhibit Number
19   42 --
20      A.   This says 41.
21      MS. DAGOSTINO:  We already
22      marked it.
23      MR. KLINE:  We already
24      marked it.

Page 558

```
 1   BY MR. KLINE:
 2       Q.   Exhibit Number 41 and on
 3   Page 4 under recommendations.
 4       A.   Yes.
 5       Q.   The most senior
 6   epidemiologist at the FDA, not Anne
 7   Trontell, not Paul Seligman, not Dr.
 8   Galson, but the senior, most senior
 9   epidemiologist at the FDA says -- what
10   did he say about your study, sir?
11           MR. BECK:  I'm going to
12       object to the form, long colloquy
13       introducing the question.
14           THE WITNESS:  Dr. Stadel
15       said, "I think this is a very good
16       and important study and that the
17       results should be submitted for
18       publication."
19           Should I continue to read?
20   BY MR. KLINE:
21       Q.   No.  I mean, I'm fine with
22   it unless there's some reason to complete
23   it.
24           And that's what was done,
```

Page 559

```
 1   correct?
 2       A.   Ultimately, yes.
 3       Q.   Sir, back to Exhibit 27.
 4   We're preciously close to being done.
 5           MR. BECK:  What's Exhibit
 6       27?
 7           MR. KLINE:  Exhibit 27,
 8       Phil, is the memorandum from
 9       Graham to Seligman, September 30,
10       '04.  You used it briefly.
11           MR. BECK:  Yes.
12   BY MR. KLINE:
13       Q.   Mr. Beck had asked you
14   questions about combining this with data.
15   Remember, you had a long discussion about
16   whether at the time there were only
17   27,785 cases as distinguished from the
18   larger number which you got later on in
19   your estimates.  That was the context of
20   the questioning.  Do you recall?
21       A.   Yes, I do.
22       Q.   Now, the question that I
23   have for you, sir, is what do you say in
24   the very last paragraph in your
```

Page 560

```
 1   conclusions on Page 13, your bottom,
 2   bottom line?
 3       A.   The very last paragraph or
 4   sentence?
 5       Q.   Well, paragraph.
 6       A.   Beginning with "Prior"?
 7       Q.   Yes, sir.  Bates Number
 8   22381.  Give us one minute to get it up
 9   on screen.  Take your time to review it.
10           MR. KLINE:  We had to go to
11       a different presentation by way of
12       an Elmo here to get this document
13       to you.
14   BY MR. KLINE:
15       Q.   But your bottom line, would
16   you read it to the jury, sir, the report
17   that Mr. Beck had put in front of you.
18       A.   "Prior to today, my
19   conclusions regarding rofecoxib were that
20   high-dose use of the drug should be ended
21   and that lower-dose rofecoxib should not
22   be used by physicians or patients.  If
23   lower-dose rofecoxib remained on the
24   market, physicians and patients needed to
```

Page 561

```
 1   understand that the risk of AMI and SCD"
 2   that's acute myocardial infarction and
 3   sudden cardiac death, "was substantially
 4   increased and that there were safer
 5   alternatives."
 6   BY MR. KLINE:
 7       Q.   And that's, sir, the way you
 8   can tell people if there's an increased
 9   risk and safer alternatives, is to put
10   what on to the label?
11       A.   Put a huge warning on it
12   that says exactly that.
13       Q.   Last thing, sir.
14           Music to counsel's ears.
15           MR. BECK:  But I've heard
16       that song several times before.
17           MR. KLINE:  But I never said
18       it exactly that way.  I said
19       preciously close.
20           Here we go.
21           I just have a video clip to
22       show to you.
23           MR. BECK:  I'm going to
24       object to showing a video clip,
```

Page 562

1    especially when I don't have any
2    idea what it is.
3          MR. KLINE: I think you will
4    know what it is.
5          THE WITNESS: So, look at
6    the screen?
7          MR. BECK: This is sand
8    bagging of the rankest order to
9    end a redirect examination with a
10   video clip.
11         MR. KLINE: It is a video
12   clip from the Senate hearings
13   exactly in conformance with Judge
14   Fallon's order. I'm going to play
15   a video clip, and I'm going to ask
16   you a question that relates to
17   your questions that you answered
18   to Mr. Beck.
19         MR. BECK: And I'm going to
20   object.
21         MR. KLINE: Exactly relating
22   to the questions.
23         There's an objection. I've
24   stated my purpose, I've stated my

Page 563

1    basis. Here it goes.
2          (Whereupon the following was
3    played:
4          "Vioxx is a terrible tragedy
5    and a profound regulatory failure.
6    I would argue that the FDA as
7    currently configured is incapable
8    of protecting America against
9    another Vioxx. We are virtually
10   defenseless."
11   BY MR. KLINE:
12   Q.   Was that you, sir?
13   A.   It certainly was.
14   Q.   Was that Mr. Raymond
15   Gilmartin, former CEO, in the background
16   over your right shoulder?
17         MR. BECK: I'm going to
18   object. This has nothing to do
19   with anything done on
20   cross-examination.
21         THE WITNESS: Yes, it was.
22   I introduced myself to him before
23   my testimony.
24   BY MR. KLINE:

Page 564

1    Q.   Sir, having had an
2    opportunity to testify here today on
3    direct and cross-examination, is there
4    anything that you answered on
5    cross-examination to Mr. Beck which
6    changes that very opinion that you gave
7    to the United States Congress?
8          MR. BECK: Object to form
9    and to scope.
10         THE WITNESS: Nothing
11   whatsoever.
12         MR. KLINE: Last clip, sir.
13         (Whereupon the following was
14   played:
15         "Today in 2004 we're faced
16   with what may be the single
17   greatest drug safety catastrophe
18   in the history of this country."
19   BY MR. KLINE:
20   Q.   Is there anything, sir,
21   having been subjected to lawyers'
22   questions here, sir, for over seven,
23   pushing eight hours that changes the
24   opinion that you gave publicly to the

Page 565

1    senators in that hearing?
2          MR. BECK: Object to the
3    form and also beyond the scope of
4    cross-examination.
5          THE WITNESS: Nothing
6    whatsoever.
7          MR. KLINE: Thank you, sir.
8    You've been patient with us.
9    Thank you very much. No further
10   questions. We're finished.
11         THE WITNESS: Thank you and
12   good riddance.
13         THE VIDEOTAPE TECHNICIAN:
14   Stand by, please. The time is
15   8:40. We're off the record.
16         - - -
17         (Whereupon, the deposition
18   concluded at 8:40 p.m.)
19         - - -
20
21
22
23
24

142 (Pages 562 to 565)

Page 566

```
 1        C E R T I F I C A T E
 2
 3      I, LINDA L. GOLKOW, a Notary
       Public and Certified Shorthand Reporter
 4     of the State of New Jersey, do hereby
       certify that prior to the commencement of
 5     the examination, DAVID J. GRAHAM, M.D.,
       MPH was duly sworn by me to testify to
 6     the truth, the whole truth and nothing
       but the truth.
 7
 8      I DO FURTHER CERTIFY that the
       foregoing is a verbatim transcript of the
 9     testimony as taken stenographically by
       and before me at the time, place and on
10     the date hereinbefore set forth, to the
       best of my ability.
11
12      I DO FURTHER CERTIFY that I am
       neither a relative nor employee nor
13     attorney nor counsel of any of the
       parties to this action, and that I am
14     neither a relative nor employee of such
       attorney or counsel, and that I am not
15     financially interested in the action.
16
17
18
19     _____
       LINDA L. GOLKOW, CSR
20     Notary Number: 1060147
       Notary Expiration: 1-2-08
21     CSR Number: 30XI176200
       Dated: May 16, 2006
22
23
24
```

Page 568

```
 1        - - - - - -
          E R R A T A
 2        - - - - - -
 3     PAGE  LINE  CHANGE
 4     ____  ____  _____
 5     ____  ____  _____
 6     ____  ____  _____
 7     ____  ____  _____
 8     ____  ____  _____
 9     ____  ____  _____
10     ____  ____  _____
11     ____  ____  _____
12     ____  ____  _____
13     ____  ____  _____
14     ____  ____  _____
15     ____  ____  _____
16     ____  ____  _____
17     ____  ____  _____
18     ____  ____  _____
19     ____  ____  _____
20     ____  ____  _____
21     ____  ____  _____
22     ____  ____  _____
23     ____  ____  _____
24     ____  ____  _____
```

Page 567

```
 1     ACKNOWLEDGMENT OF DEPONENT
 2
 3        I,_____, do
       hereby certify that I have read the
 4     foregoing pages, 1 -569, and that the
       same is a correct transcription of the
 5     answers given by me to the questions
       therein propounded, except for the
 6     corrections or changes in form or
       substance, if any, noted in the attached
 7     Errata Sheet.
 8
 9
10
11     _____
       DAVID J. GRAHAM, M.D., MPH      DATE
12
13
14
15
16     Subscribed and sworn
       to before me this
17       day of      , 20  .
18     My commission expires:
19
20     Notary Public
21
22
23
24
```

Page 569

```
 1        LAWYER'S NOTES
 2     PAGE  LINE
 3     ____  ____  _____
 4     ____  ____  _____
 5     ____  ____  _____
 6     ____  ____  _____
 7     ____  ____  _____
 8     ____  ____  _____
 9     ____  ____  _____
10     ____  ____  _____
11     ____  ____  _____
12     ____  ____  _____
13     ____  ____  _____
14     ____  ____  _____
15     ____  ____  _____
16     ____  ____  _____
17     ____  ____  _____
18     ____  ____  _____
19     ____  ____  _____
20     ____  ____  _____
21     ____  ____  _____
22     ____  ____  _____
23     ____  ____  _____
24     ____  ____  _____
```