# EXHIBIT "G"

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:   VIOXX LITIGATION:   MDL DOCKET

5                          NO. 1657

6

7                     -   -   -

8                    CONFIDENTIAL

9            SUBJECT TO PROTECTIVE ORDER

10                    -   -   -

11                 November 21, 2005

12                    -   -   -

13

14           30(b)(6) Notice to Massachusetts Medical

15   Association, Videotaped deposition of Gregory D.

16   Curfman, M.D., held in the offices of Brown

17   Rudnick, One Financial Center, Boston,

18   Massachusetts, 02110, commencing at 9:18 a.m., on

19   the above date, before Deborah Roth, Notary Public,

20   Registered Professional Reporter and Certified

21   Shorthand Reporter.

22                    -   -   -

23             ESQUIRE DEPOSITION SERVICES

24                    -   -   -

1    we had all that information.

2            EXHIBIT NO. 29 MARKED

3        Q.   Doctor, Exhibit 29 appears to be a letter

4    dated February 9, 2005 at 2005 NEJM 13 and 14, to

5    which a set of suggestions for transmittal to

6    authors are attached at Pages 270 to 285, and

7    finally, a financial disclosure and authorship form

8    at 2005 NEJM 8, at the last page.

9        A.   Right.

10       Q.   With respect to the letter, is that your

11   signature on the second page?

12       A.   Yes, it is.

13       Q.   Did you write this letter and send it to

14   John Baron on February 9th?

15       A.   Yes, I did.

16       Q.   And the suggestion for transmittal to

17   authors are comments of reviewers identified as A

18   through E; is that right?

19       A.   That's right.

20       Q.   Does that consist of the four outside

21   experts, plus one of the statistical consultants

22   from within New England Journal's own staff?

23       A.   That's right.

24       Q.   Does the letter of February 9, 2005 -- back

1    up for a second.

2              How do the specific comments of the

3    reviewers and the overall letter that you wrote

4    yourself relate to each other in terms of what The

5    Journal's expectations are?

6       A.   Right.   The covering letter is really a

7    short summary of some of the really essential

8    points that need to be transmitted to the authors.

9              But the comments of the reviewers, in

10   this case, I felt were just spectacular, very

11   comprehensive; and there was duplication among the

12   reviews.

13             The only purpose of my letter was to

14   bring together some of the essential points; but in

15   making revisions to the manuscript, the authors

16   also need to go through the comments of the

17   reviewers, and that's why they spend so much time

18   writing these up, so we can transmit them to the

19   authors.

20             To summarize, the letter is not a

21   stand-alone.   The letter goes in conjunction with

22   the comments to the reviewers.

23             MR. ARBITBLIT:   Off the record for just

24   a second.

1          THE VIDEOGRAPHER:  Off the record,

2    1:37.

3          EXHIBIT NO. 30 MARKED

4          THE VIDEOGRAPHER:  Back on the record.

5    The time is 1:38.

6      Q.  Doctor, we are going to mark this as

7    Exhibit 30.

8          Looking at the Exhibit 29, the letter

9    of February 9, 2005, on Page 2, underneath the

10   Paragraph No. 8 there is a statement, "You will

11   also find editorial comments in tracking changes in

12   the version of the manuscript being returned to

13   you."

14         MR. SHAW:  One moment, please.

15     A.  Right, yes, uh-huh.

16     Q.  My question is, with respect to Exhibit 30

17   that has been handed to you, is this document the

18   tracked-changes version that was returned to the

19   authors?

20     A.  Yes.  This is the version that was returned

21   to them.

22     Q.  Did you personally make any of the tracked-

23   changes entries to this document?

24     A.  I made handwritten notes in my version of

1   the hard-copy manuscript, and those handwritten

2   notes were transcribed into tracked changes, and I

3   honestly can't remember if I actually transcribed

4   them or my assistant did.

5          One of us took my handwritten changes

6   and put them in, and they appear to be accurately

7   transcribed.

8      Q.  Are all of the tracked changes in this

9   document entries or changes that reflected your

10  personal handwritten notes that were transcribed,

11  or were there -- any of the other editors or

12  reviewers involved in that?

13     A.  Well, these were my handwritten notes; and

14  to the best of my recollection, I probably did have

15  the comments of the reviewers with me when I made

16  these notes.

17          These were very kind of sketchy notes,

18  which I intended to have in front of me when I knew

19  I would be speaking with Dr. Baron after he had all

20  of the reviewers' comments in front of him.

21          So I wanted to have something in front

22  of me written right into the manuscript itself so

23  that he and I could go through page by page, and I

24  could answer any questions he might have about the

1   reviewers' comments, and, at the same time,

2   underscore points that I felt were particularly

3   important for him to address.

4      Q.   Is it correct that the letter of February

5   9, 2005 informed the authors that the manuscript

6   would not be accepted in its current form in which

7   it had been submitted?

8      A.   That's right.

9      Q.   Did the letter of February 9th and

10  attachments of reviewer comments constitute a set

11  of directives which the authors could attempt to

12  comply with if they sought to have the manuscript

13  published?

14     A.   Yes.

15     Q.   Between February 7, 2005 when you saw the

16  manuscript for the first time and the February 9,

17  2005 letter, do you recall having any contact with

18  any of the authors?

19     A.   I don't recall.  I might have, but I don't

20  recall.

21     Q.   Is it correct that at some point between

22  February 9 and February 15, 2005 you had some form

23  of contact with one or more of the APPROVe study

24  authors to address the directives in the February

1    9th letter and attachments?

2        A.   Yes.   There was quite a lot of back and

3    forth.   The primary communications were with

4    Dr. John Baron, who was serving, in this case, as

5    the corresponding author.

6              Toward the end of the process, I do

7    recall a telephone conversation with

8    Dr. Bressalier, and there may have even been two,

9    but I know that there was at least one toward the

10   end of the process, but predominantly with

11   Dr. Baron.

12       Q.   To the best of your knowledge, is there any

13   written documentation as to the substance of what

14   took place during any of communications you just

15   described with Drs. Baron and/or Bressalier?

16       A.   What we provided were in the Bates-stamped

17   documents is everything that we have, with the

18   exception of those sheets that identify the

19   reviewers.

20              I did not keep private files on the

21   manuscript.   That's something that I don't

22   generally do.

23       Q.   After the February 9, 2005 letter was sent,

24   how would you characterize the extent of

# EXHIBIT "H"

Kyungmann Kim, Ph.D.

```
 1
 2    In re:  VIOXX                    MDL DOCKET NO. 1657
        PRODUCTS LIABILITY
 3     LITIGATION            SECTION L
 4                     JUDGE FALLON
 5   This document relates to
 6                     MAGISTRATE JUDGE KNOWLES
 7   GERALD BARNETT,,
 8           Plaintiff,
 9      -vs-
10   MERCK & CO., INC.,
11           Defendant.
12     Civil Action No. 2:06CV485
     = = = = = = = = = = = = = = = = = = = = = = = = = = = =
13
14   CROSS NOTICED IN VARIOUS OTHER ACTIONS
              * * *
15   CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
              * * *
16
17
18                    Deposition of:
19              KYUNGMANN KIM, PH.D.
20              Madison, Wisconsin
                June 12, 2006
21
22
          Reported by:  Taunia Northouse, RDR, CRR
23
24
25
```

Kyungmann Kim, Ph.D.

Page 90

```
 1        so I can inform my opinion as a scientist, inform
 2        myself.
 3    Q   Can you name one single particular difference
 4        between a polyp patient and an arthritic patient
 5        that would make the polyp patient more susceptible
 6        to having a heart attack on Vioxx than an
 7        arthritis patient?
 8    A   APPROVe seems to indicate that, whereas some of
 9        the other OA studies seem to indicate that they
10        don't have improved risk.  So if I had to look at
11        data, then that will be sort of the statistical
12        conclusion I will draw.
13                    MR. ARBITBLIT:  I move to strike as
14            nonresponsive.
15    Q   Can you name one single particular difference in
16        the condition of the patient, setting aside the
17        data --
18    A   Uh-huh.
19    Q   -- in the condition of an adenomatous polyp
20        patient -- and now that I've added the qualifiers
21        I'm going to start again.
22            Can you name one single difference between
23        the condition of an adenomatous polyp patient and
24        the condition of an arthritis patient that would
25        make the polyp patient more susceptible to having
```

Kyungmann Kim, Ph.D.

Page 91

1      a heart attack on Vioxx?

2   A  I guess not.

3   Q  Now, treatment of adenomatous polyps was never an

4      approved indication for Vioxx, was it?

5   A  No.

6   Q  And --

7   A  That's why they do a study to find out.

8   Q  That's why they do a study.

9   A  Yes.

10  Q  Right.  And yet Vioxx was taken off the market on

11     September 30, 2004, on the basis of a study of

12     people with adenomatous polyps, wasn't it?

13  A  That's correct.

14  Q  And no one was using Vioxx for that condition

15     except the people in the APPROVe trial as of

16     September 2004, were they?

17  A  I don't think I agree with that statement.

18     There's always off label use going on of any drug

19     at any one time.

20  Q  Merck was not promoting its use for that, was it?

21  A  Not that I know of.

22  Q  Doctor, do you agree that Vioxx was withdrawn on

23     September 30, 2004, because Merck considered the

24     results of APPROVe generalizable to the population

25     of millions of people who were using the drug?

Kyungmann Kim, Ph.D.

1      to have as part of the record.

2   A   Sure.

3   Q   We've talked some about this already, but

4      Exhibit 14 appears to be a set of invoices that

5      were copied from your file.  Can you just please

6      quickly take a look through and confirm that that

7      is a complete set of your invoices.

8   A   Yes, it is.

9   Q   Except for what you're billing for preparation

10     yesterday and today attending the deposition?

11  A   That hasn't been billed yet.

12  Q   Right.  And the next document is 13, going

13     backwards somewhat, but Exhibit 13 is a set of

14     documents copied from your file.  Are these notes

15     that you've taken during the time you were

16     retained on the Vioxx matter since January 2006?

17  A   Yes.  It's complete, yes.

18  Q   Now, with respect to one of the notes on your

19     May 31st, 2006, meeting, that's the last page of

20     Exhibit 13 --

21  A   Yes.

22  Q   There's a note about Adam there.  Could you read

23     what you wrote there.

24  A   An example of a prediction for a population versus

25     an individual.  Confidence interval.

Kyungmann Kim, Ph.D.

Page 132

1   Q   And how did that subject come up?  Did you raise
2       it or did Adam raise it?  Excuse me, is Adam
3       Mr. Mortara?
4   A   Oh, Mr. Mortara asked me about the implication of
5       a relative risk from a study, and particularly as
6       it relates to a person.
7   Q   Was that something that had not appeared in your
8       report up to May 31st, 2006?
9   A   I think you are correct.
10  Q   And so the report that you signed on June 1st has
11      a paragraph on page 6, the second paragraph under
12      relative risk.
13  A   Yes, uh-huh.
14  Q   And was this paragraph intended to address the
15      point in your May 31st, 2006 --
16  A   That's correct.
17  Q   Please wait till I finish the question.
18  A   Oh, okay.
19  Q   Was the second paragraph of your report at page 6
20      intended to address the point raised in your note
21      of May 31st, 2006, with Mr. Mortara?
22  A   That's correct.
23  Q   As of May 31st, 2006, did you have at your
24      disposal any examples of what it was you were
25      trying to provide to Mr. Mortara?

Page 133

```
 1   A   I checked a few textbooks, and I didn't find
 2       specific examples that addresses for relative
 3       risk.  But I found an example that was general
 4       regression modeling setting, so I sent him an
 5       email with a copy of the pages from the textbook.
 6   Q   And was that a textbook by Pagano?
 7   A   Yes.
 8   Q   Do you recall that Pagano used an example of head
 9       circumference in newborns?
10   A   That's right, uh-huh.
11   Q   Is that a continuous outcome variable?
12   A   Yes.
13   Q   In the sense that the size of newborns' head
14       circumference could be somewhere on a spectrum
15       from the smaller to the larger; correct?
16   A   That's correct.
17   Q   Did you -- withdraw that.  Is myocardial
18       infarction a binary outcome variable?
19   A   Yes, it is.
20   Q   And does a binary outcome variable mean that you
21       either have it or you don't?
22   A   That's correct.
23   Q   Now, is it correct that the risk for an individual
24       is not the same as the relative risk?
25   A   That's correct.
```

Kyungmann Kim, Ph.D.

1   Q   With respect to a binary outcome such as

2       myocardial infarction, is it correct that the risk

3       is either one if you have that outcome or zero if

4       you don't?

5                   MR. MORTARA:   Object to the form of

6           the question.   It's vague as to time.

7   A   Would you please define "risk" in that setting.

8   Q   What does the word "risk" mean to you in that

9       setting?

10  A   Risk represents the risk of having specific

11      outcome, so for an individual, someone would

12      either get it or not.

13  Q   In that setting would the risk be one if the

14      individual got that outcome?

15  A   It's not the risk that if someone got the disease.

16      When we use the binary indicator, it could have

17      been one to ten.   It could have been one to .1.

18      It's just a place holder for whether a certain

19      event occurred or not.   We call that dichotomous

20      input.

21  Q   Is it correct that the relative risk is equal to

22      the incidence of the outcome in the exposed group

23      divided by the incidence of the outcome in the

24      unexposed group?

25  A   To clarify your remarks, relative risk in this

Kyungmann Kim, Ph.D.

Page 135

```
1        setting is used as a number of events divided by
2        the person year at risk of all the people who are
3        studied, divided by the same quantity for a
4        different group.
5    Q   Is the number of events divided by the person
6        years for that group a measure of the incidence
7        from that group?
8    A   We have to be very careful about the definition.
9        People typically use incidence for a subject
10       whether an event has occurred to the person or
11       not.  The quantity that you are talking about is
12       what we oftentimes refer to as incidence rate.
13   Q   Have you ever seen the term "individual confidence
14       interval" applied to a binary outcome in any
15       textbook?
16   A   Not for the binary outcome, no.
17   Q   Same question as to peer-reviewed publications.
18       Have you ever seen the term "individual confidence
19       interval" used in any peer-reviewed publication
20       with respect to a binary outcome?
21   A   No.
22   Q   Is it your understanding that the phrase
23       "individual confidence interval" is applicable to
24       continuous outcome variables rather than binary
25       outcome variables?
```

Page 136

1    A    That's correct.

2    Q    What is an attributable proportion of risk?

3    A    Attributable proportion of risk.  It's the -- let

4         me step back.  When you talk about a risk for a,

5         some defined population, the attributable risk

6         indicates the risk above and beyond the background

7         risk for that population.

8    Q    If you are talking about a study, a clinical trial

9         where you have an exposed group and an unexposed

10        group, would the attributable proportion of risk

11        represent the percentage of the exposed group who

12        probably experienced the outcome of interest as a

13        result of the exposure rather than the causes that

14        make up the background rate?

15   A    So that's why we look at the relative risk, to

16        account for the background rate in the group that

17        did not receive the treatment or intervention

18        under consideration.

19   Q    Do you then use the relative risks to determine

20        the attributable proportion of risk that tells you

21        what percentage of the exposed group suffered the

22        outcome because of their exposure?

23   A    No.  It's not the percentage of people who suffer.

24        So you have a group of people who receive

25        intervention.  And based on the number of events