

Jun 16 2006
7:45PM

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| This document relates to | * | JUDGE FALLON |
| Case No. 06-0485 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| GERALD D. BARNETT, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION OF MERCK & CO., INC. ("MERCK")
## FOR ORDER EXCLUDING TESTIMONY OF JERRY AVORN, M.D.

### (EXPERT CHALLENGE NO. 2)

Defendant Merck, through undersigned counsel, and pursuant to Federal Rules of Evidence 702 and 403, hereby moves to exclude the testimony of Jerry Avorn, M.D. The facts and law supporting this motion are set forth in the accompanying memorandum and exhibit, which are incorporated as if fully set forth herein.

Respectfully submitted,

_/s/ Dorothy H. Wimberly_

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:    213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Motion of Merck for Order Excluding Testimony of Jerry Avorn, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Mark Robinson by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8A, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 16th day of June, 2006.

_/s/ Dorothy H. Wimberly_

UNITED STATES DISTRICT COURT

*EASTERN DISTRICT OF LOUISIANA*

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| This document relates to | * | JUDGE FALLON |
| Case No. 06-0485 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| GERALD D. BARNETT, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR ORDER EXCLUDING TESTIMONY OF JERRY AVORN, M.D.

### (EXPERT CHALLENGE NO. 2)

Plaintiff has designated Jerry Avorn, M.D., a pharmacoepidemiologist, as an expert witness in this case. According to his expert report, Dr. Avorn has been retained "to consider the question of whether rofecoxib (Vioxx®) increases the risk of cardiovascular disease, and to assess the methods by which Merck evaluated and managed this issue throughout the development and marketing of Vioxx." (Expert Report of Jerry Avorn, M.D. ("Avorn Rpt.") at 2, attached hereto as Ex. A.) Amazingly, only one paragraph in Dr. Avorn's 25-page report addresses the risks associated with Vioxx, a subject upon which expert testimony is appropriate and which is within the realm of Dr. Avorn's expertise in pharmacoepidemiology. (*See id.* at 19, Section VI.) The rest of his report is devoted to Dr. Avorn's opinions on "the methods by which Merck evaluated and managed this issue" – including his interpretation of internal Merck documents, his evaluation of Merck's conduct, his speculation about Merck's state of mind, and

his judgment that Merck did not act responsibly.  This testimony is neither grounded in "scientific, technical, or other specialized knowledge" nor necessary, from the jury's point of view, "to understand the evidence or to determine a fact in issue." FED. R. EVID. 702.  It is nothing more than "spin" – counsel's attempt to put their arguments before the jury under the guise of expert testimony.  Under Rules 702 and 403 of the Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the testimony must be excluded.[1]

## I.      LEGAL STANDARD.

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-4 of the Motion of Defendant Merck & Co., Inc. ("Merck") for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis, filed concurrently herewith and incorporated herein by reference.

## II.     THE COURT SHOULD EXCLUDE DR. AVORN'S SPECULATIVE OPINIONS ON NON-SCIENCE ISSUES.

Rule 702 allows expert opinion testimony that will "assist the trier of fact," provided it comes from a witness with "scientific, technical, or other specialized knowledge." FED. R. EVID. 702. It does not permit "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  As courts have recognized, "the requirement of 'knowledge' guards against the admission of subjective or speculative opinions." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004); *see also Daubert*, 509 U.S. at 589-90 ("the word 'knowledge' connotes more than subjective belief or unsupported

---

[1] A number of plaintiff's other experts – including Dr. Farquhar, Dr. Moye, and Dr. Zipes – proffer similar testimony that is also inadmissible under *Daubert* and Rule 702. Merck has moved to exclude all of this testimony in separate motions, filed concurrently herewith. Merck also reserves the right to supplement this motion based on Dr. Avorn's deposition, which started on June 15th and concludes today, June 16th.

2

speculation"). Rule 702 also "ensures that expert witnesses will not testify about lay matters which a jury is capable of understanding and deciding without the expert's help." *In re Rezulin*, 309 F. Supp. 2d at 541 (citation and internal quotations omitted).

Contrary to these well-settled principles, Dr. Avorn apparently intends to proffer "expert" testimony that consists of little more than his personal views on: (i) the Vioxx "story"; (ii) what Merck knew or should have known about the risks allegedly associated with Vioxx; (iii) Merck's alleged suppression of information about Vioxx; and (iv) regulatory issues, including Merck's negotiations with the FDA over Vioxx labeling. These opinions are not based on Dr. Avorn's "scientific, technical, or other specialized knowledge." FED. R. EVID. 702. In fact, they are not *related in any way to Dr. Avorn's area of expertise, pharmacoepidemiology* – which, as noted above, only informs one paragraph in his expert report. Nor would Dr. Avorn's opinions on these non-science issues help the jury determine any issue of consequence in this case. Mr. Barnett's claims should be resolved on their merits, not based on a paid expert's subjective, *ex post facto* opinions about what Merck could or should have done differently. Merck thus moves the Court to exclude Dr. Avorn's improper opinion testimony in full.

### A.  Dr. Avorn's Recounting Of The Vioxx "Story" Is Improper Expert Testimony That Must Be Excluded.

The vast majority of Dr. Avorn's expert report is devoted to chronicling the "[a]vailable evidence prior to FDA approval of Vioxx" and "[a]dditional clinical trial evidence of risk following FDA approval of Vioxx." (*See* Avorn Rpt. at 2-21.) He summarizes this "evidence," given to him by plaintiff's counsel, and provides a timeline starting in 1996 and ending with Merck's voluntary withdrawal of Vioxx from the market in 2004. This narrative, which is

3

essentially a collection of excerpts from internal Merck documents, does not qualify as "expert" testimony.[2]   It is inadmissible on a number of grounds.

First, Dr. Avorn's description of selected events is "merely a narrative of the case which a juror is equally capable of constructing." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551 (citation and internal quotations omitted).  His "spin" on the facts, apparently intended to bolster plaintiff's case, "does no more than counsel for plaintiff will do in argument, *i.e.,* propound a particular interpretation of [Merck's] conduct." *Id.* (citation omitted).  Such advocacy on the part of a paid expert poses a host of problems, as the *In re Rezulin* court recognized:

> A practice reminiscent of wager of law has become fashionable among some well-financed litigants – the engagement of "expert" witnesses whose intended role is more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit.  These "experts" thus are loosely analogous to compurgators, also known as oath helpers, in that they lend their credentials and reputations to the party who calls them without bringing much if any relevant knowledge to bear on the facts actually at issue.

*In re Rezulin*, 309 F. Supp. 2d at 538.

Allowing Dr. Avorn to filter and feed the facts of this case to the jury would be highly improper.  This testimony does not require any "scientific, technical, or other specialized knowledge," and it would not assist the trier of fact.  Instead, it would simply give Dr. Avorn a platform to act as a paid advocate for the plaintiff. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 546 (excluding expert testimony addressing corporate state of mind because otherwise experts would "improperly . . . assume the role of advocates for the plaintiffs' case"); *see also Tanner v. Westbrook*, 174 F.3d, 542, 548 (5th Cir. 1999); *In re Propulsid Prods. Liab.*

---

[2]  The sources of Dr. Avorn's opinions are clear from a cursory review of the "Materials Considered" section of Dr. Avorn's expert report.  (Avorn Rpt., "Materials Considered," pp. 1-9.)  This list is comprised almost entirely of internal Merck documents.

*Lit.*, 261 F. Supp. 2d at 616; *cf. Sec. & Exch. Comm'n v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) (expert accountant was not "specially equip[ped] to divine what [defendant] truly believed" about reliability of financial reports; any opinions offered in that regard are "at worst, rank speculation" and at best, "credibility choices that are within the province of the jury"). It is *for counsel – not witnesses, and certainly not paid experts – to present argument at trial.* To allow Dr. Avorn to do so would inevitably confuse the jury and run afoul of Rules 403 and 702 of the *Rules of Evidence.*

Second, to the extent the underlying facts detailed in Dr. Avorn's report are admissible, his regurgitation of these facts is cumulative and would waste time. *Meadows & Walker Drilling Co. v. Phillips Petroleum Co.*, 417 F.2d 378, 382 (5th Cir. 1969) ("It is well established that evidence which is merely repetitious and cumulative of testimony already introduced may be excluded by the court.") Foundational material is properly put into evidence only through the testimony of percipient witnesses or through documentary evidence. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551 (excluding expert's "historical commentary of what happened"). And there is no evidence that Dr. Avorn has any personal knowledge of any of the facts he has included in his narrative of the case, other than knowledge acquired from his review of the documents given to him by plaintiff's counsel in anticipation of this litigation.[3] An expert such as Dr. Avorn who "lacks personal knowledge may only testify about the underlying facts if he is

---

[3] Courts should be especially cautious in dealing with expert opinions developed solely for the purpose of litigation. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office."); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001).

actually bringing to bear his scientific expertise" – which Dr. Avorn is not doing here, since his narrative does not draw upon his background in pharmacoepidemiology. *See id.* at 554 (citation and internal punctuation omitted).

**B.     The Court Should Exclude Dr. Avorn's Opinions About What Merck Knew Or Should Have Known.**

Expert witnesses are routinely prohibited from providing testimony regarding the "intent, motives or states of mind of corporations, regulatory agencies and others," because they "have no basis in any relevant body of knowledge or expertise." *In re Rezulin*, 309 F. Supp. 2d at 546. Yet Dr. Avorn's expert report is brimming with exactly this kind of impermissible testimony. He opines, *inter alia*, that:

- There is "clear evidence that Merck officials had been aware of th[e] risk [allegedly associated with Vioxx] and failed to take reasonable action to address it. (Avorn Rpt. at 2.)

- The knowledge about the dangers of selective COX inhibition "was clearly in place when Merck was developing Vioxx." (*Id.* at 3.)

- "Merck anticipated an increase of cardiovascular events in patients taking Vioxx." (*Id.*)

- "[T]he Merck officials who designed the drug's clinical trial program were aware of the drug's potential for cardiovascular harm." (*Id.* at 4.)

- "Knowing what it knew then, Merck did not respond to the [Watson] analysis as a potential important signal to guide the planning of future clinical trials . . . ." (*Id.* at 5.)

- "[A]s the VIGOR trial was being conducted, the company's scientists were aware that patients enrolled in the Vioxx arm could well have a higher rate of serious arterial embolic events." (*Id.* at 8.)

- "A year after the publication of VIGOR, . . . internal Merck correspondence revealed that senior officials were quite aware of the problem [that Vioxx allegedly caused an increase in cardiac events]." (*Id.* at 16.)

This and other similar testimony is inadmissible and must be excluded under Rule 702. As one court reasoned, in rejecting testimony from an expert on a pharmaceutical manufacturer's "state of mind":

> The witnesses are qualified in particular scientific disciplines. These disciplines do not include knowledge or even experience in the manner in which corporations and the pharmaceutical marketplace react, behave or think regarding their nonscientific goals of maintaining a profit-making organization that is subject to *rules, regulations, standards, customs and practices among competitors and influenced by shareholders or public opinion.*

*In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2000 U.S. Dist. LEXIS 9037, at *28-29 (E.D. Pa. June 20, 2000). *Dr. Avorn lacks this very knowledge and experience.* Accordingly, the Court should exclude his speculative testimony about what Merck knew and when.

The fact that Dr. Avorn even offers this testimony is incredible, given that his opinions on the same subject have been excluded by other courts. In the Phen-Phen litigation, the United States District Court for the Eastern District of Pennsylvania ruled that Dr. Avorn lacked the requisite qualifications to opine on the "corporate intent" of the defendant – and that, in any case, such testimony was unreliable and thus inadmissible. *Id.* at 30. The court further noted that "[t]he question of intent is a classic jury question and not one for experts." *Id.* at 29. The same is true here. Dr. Avorn's testimony on Merck's state of mind is improper and unnecessary, in that it "describes lay matters which a jury is capable of understanding and deciding without [an] expert's help." *In re Rezulin*, 309 F. Supp. 2d at 546 (citation and internal quotations omitted). The Court should exclude all of Dr. Avorn's proffered testimony on Merck's alleged "state of mind."

## C.   Testimony About Merck's Alleged Suppression Of Information Is Inadmissible.

For similar reasons, the Court should preclude Dr. Avorn from testifying about Merck's alleged failure to provide the medical community or the FDA with complete and accurate

7

*information on the risks associated with Vioxx.* (*E.g.,* Avorn Rpt. at 15 ("Merck did not provide a complete and accurate account of these study outcomes to FDA until after the drug had been taken off the market."); 19-21 (Section VII, "Inaccurate communication of risks to physicians"); 21-24 (Section VIII, "Negotiations with FDA over labeling and promotion").)  Dr. Avorn's testimony on this subject also has been excluded on prior occasions.  As the *In re Rezulin* court explained:

> To the extent that the challenged testimony relates, as plaintiffs contend, to the factual accuracy of [defendant's] clinical data submissions to the FDA, it constitutes lay matter that the fact-finder can understand without the assistance of experts, *regardless of [how] much experience these witnesses have with clinical trials.*  Dr. Avorn's testimony illustrates the point.  His view that [defendant] failed to disclose information to the FDA boils down to a contention that [defendant] "buried" certain lab results in an Appendix to the Rezulin NDA.  This opinion does not implicate Dr. Avorn's expertise in pharmacoepidemiology.  It is a simple inference drawn from *his review of two documents – which,* if admissible, plaintiffs' counsel may present directly to the fact-finder while arguing his or her view as to their significance.  Expert testimony interpreting [defendant's] conduct in disclosing information to the FDA therefore will not assist the fact-finder in these cases.

*In re Rezulin,* 309 F. Supp. 2d at 549-50.  For these same reasons, any testimony from Dr. Avorn about the manner in which Merck communicated information about the risks and benefits of *Vioxx* to the medical community and to the FDA should be excluded.

**D.    Dr. Avorn Is Not Qualified To Opine On Merck's Negotiations With The FDA Over Vioxx Labeling And Promotion.**

Dr. Avorn's *purported testimony on regulatory issues* – including Merck's "[n]egotiations with FDA over labeling and promotion" (*see* Avorn Rpt. at 21-24) – is also inadmissible.  By Dr. Avorn's own admission, he is not a regulatory expert. *In re Diet Drugs,* 2000 U.S. Dist. LEXIS 9037, at *36 ("Dr Avorn admits that he is not an expert in the regulatory field.").  Nor does his training as a pharmacoepidemiologist qualify him to weigh in on: (i) the process by which Merck and the FDA revised the *Vioxx* label following *VIGOR;* (ii) whether

8

the Vioxx label provided adequate information to health professionals; (iii) whether Merck was concerned "about the effect of a possible label change on increasing physician awareness of [Vioxx's] cardiovascular hazards"; (iv) whether risk information provided on a prescription drug label "can heavily influence a drug's sales"; (v) whether, "in the absence of a negotiated agreement with the FDA concerning the contents of its official label," Merck could have "notified physicians or consumers about the emerging data about the risks of Vioxx"; and (vi) whether the post-VIGOR Vioxx label was adequate. (Avorn Rpt. at 21-24.) Again, other courts have recognized that Dr. Avorn is unqualified to opine on these issues. *In re Rezulin*, 309 F. Supp. 2d at 549 (finding Dr. Avorn "not qualified to render opinions describing or interpreting FDA regulations, or commenting on [the defendant's] adherence to those regulations"); *In re Diet Drugs*, 2000 U.S. Dist. LEXIS 9037, at *36 (finding that, although Dr. Avorn is "fully qualified" in his specialty, "that does not qualify [him] to speak as experts in the field of the requirements of the federal regulations regarding labeling and warnings for FDA approved drugs"). This Court should also exclude Dr. Avorn's testimony on regulatory matters.

## III.   CONCLUSION.

For the reasons stated above, Merck respectfully requests that the Court grant its Motion for Order Excluding Testimony of Jerry Avorn, M.D.

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:    213-430-6407

Attorneys for Merck & Co., Inc.

10

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Motion of Merck for Order Excluding Testimony of Jerry Avorn, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Mark Robinson by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 16th day of June, 2006.

/s/ Dorothy H. Wimberly

11

**Expert report of Jerry Avorn, M.D.**
*March 20, 2006*

## I. Credentials

I am a Professor of Medicine at Harvard Medical School and Chief of the Division of Pharmacoepidemiology and Pharmacoeconomics in the Department of Medicine at the Brigham and Women's Hospital, one of Harvard's main teaching hospitals. I attended Columbia University as an undergraduate; my medical training was at Harvard Medical School, where I received the M.D. degree in 1974. In 1977 I completed a residency in internal medicine at the Beth Israel Hospital in Boston, another Harvard teaching hospital. I have been teaching at Harvard Medical School continuously since the 1970s, and am currently responsible for most of the teaching in pharmacoepidemiology there and at the Brigham and Women's Hospital; I also lecture on that subject at the Harvard School of Public Health. I am writing the chapter on pharmacoepidemiology for the revised edition of a textbook by faculty at our university, *Principles of Pharmacology*, the text used in the course on that topic at Harvard.

The division I founded in the Department of Medicine comprises a staff of 22, including eleven faculty members. We perform research on the benefits, side effects, and cost-effectiveness of medications; the determinants and outcomes of physician prescribing choices; and the relationship between the pharmaceutical industry, the government, and physicians in shaping medication use, with particular reference to drug marketing and the communication of risk and benefit information to physicians and patients. Our division is supported from a variety of sources, primarily peer-reviewed grants from the National Institutes of Health. We have also received research grants from various pharmaceutical companies, including Merck. My research has been published in numerous medical journals, including *The New England Journal of Medicine, the Journal of the American Medical Association,* and *Circulation,* among others. I am an author of over 200 papers in the medical literature on these topics, and have been identified as one of the most highly cited authors in the field of social sciences (including epidemiology) and medicine. In 2004, my book, *Powerful Medicines: the Benefits, Risks, and Costs of Prescription Drugs,* was published by Knopf and was well reviewed in both the lay and medical press.

In addition to pharmacoepidemiologic studies measuring medication risks, a major focus of my research has been to understand how physicians evaluate the benefits and risks of alternative medications in making their prescribing decisions, and how those decisions can be improved. We have published a number of major papers in this area, and the topic forms the basis of much of my teaching at Harvard Medical School, the Harvard School of Public Health, and other institutions nationally and internationally. One component of that work involves providing physicians and patients with evidence-based, non-commercial summaries of the medical literature to help them make more accurate drug-use decisions. We have studied this approach in several settings in multi-state randomized controlled trials and reported the results of these interventions in *The New*

1



EXHIBIT

A

*England Journal of Medicine* and several other journals. We also perform such prescribing quality-improvement activities at the Brigham and Women's hospital to educate the interns, residents, and Harvard medical students in training there, and last year my colleagues and I began a large program funded by the state of Pennsylvania to provide this kind of evidence-based medication information for practicing physicians throughout that state on an ongoing basis. In addition to my own research and educational activities in this area, I have consulted internationally on the development and evaluation of programs based on my research that are designed to provide doctors with accurate, unbiased information about drug benefits and risks in countries including Canada, Great Britain, and Australia.

Since my residency I have practiced internal medicine as well as geriatrics in the ambulatory and inpatient settings at several Harvard teaching hospitals; I presently serve as senior attending physician on the General Medicine Service at the Brigham and Women's Hospital, where I supervise and teach interns, residents, and medical students.

## II. The present assignment

*I was asked by plaintiffs' attorneys to consider the question of whether rofecoxib* (Vioxx) increases the risk of cardiovascular disease, and to assess the methods by which Merck evaluated and managed this issue throughout the development and marketing of Vioxx. In performing these tasks I relied on publications from the peer-reviewed medical literature, publicly available material from the Food and Drug Administration, and other documents (including internal Merck communications) provided by counsel. I relied on these materials as well as my education, experience, and research, and I employed standard methodologies that are generally accepted in the scientific community.

## III. Available evidence prior to FDA approval of Vioxx

Merck's withdrawal of Vioxx (rofecoxib) in September 2004 was followed by numerous statements from company officials that they were astonished at the unanticipated finding that their drug could double the risk of heart attack or stroke. But inspection of information available in the public domain and of internal company documents provides clear evidence that Merck officials had been aware of this risk for years and failed to take reasonable action to address it.

Merck consistently promoted the advantage of its selective cox-2 inhibitor as retaining the favorable effects of suppressing the "bad" cox-2 (so as to reduce pain and inflammation) without suppressing the "good" effects of cox-1 (thus maintaining the gastric mucosa). But there was evidence as early as the 1990s that this good/bad formulation was an oversimplification of reality. Early papers made it clear that a selective cox-2 inhibitor could also suppress vital functions of cox-2 (e.g., prevention of clot formation) along with the more harmful ones (pain and inflammation). Such selective suppression would leave potentially dangerous functions of cox-1 (promotion of clot formation) relatively spared, and thus imbalanced.

2

M00081974

This knowledge was clearly in place when Merck was developing Vioxx. An internal memorandum from October 1996 describes a very early clinical trial of the new drug compared to placebo (Protocol 017). Even though the trial lasted only six weeks, the committee reviewing the trial results noted that "[a]dverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina...increase in blood pressure)." A plan was described to test the drug in a study in which patients would be given low-dose aspirin to protect against these cardiovascular side effects, but to my knowledge Merck never conducted any clinical trial pro-actively designed to address the crucial topic of the cardiovascular risk and safety of Vioxx in patients taking aspirin.

In 1996, Merck began planning a large-scale gastrointestinal outcomes study (which later evolved into the VIGOR trial), comparing Vioxx to a traditional NSAID. These early documents make clear that Merck anticipated an increase of cardiovascular events in patients taking Vioxx. Internal memos during this period make it clear that Merck was attempting to design a study that would demonstrate favorable results for its drug's g.i. safety, while minimizing the potential for finding more adverse cardiovascular outcomes in the Vioxx arm — whether those events were the result of Vioxx increasing cardiac risk or because Vioxx would not provide cardioprotection (having no effect on platelet function) to a population at risk for such events. A Merck scientist, Tom Musliner, wrote candidly that the new drug was likely to increase cardiac risk compared to a traditional NSAID if patients in the proposed study were not given aspirin to protect their hearts:

> there is a substantial chance that significantly higher rates of CV [cardiovascular] AE [adverse event] events (MIs, angina, strokes, TIAs, etc.) will be observed in the selective Cox-2 inhibitor group compared to the standard NSAID group, as summarized in the preceding section.

He stated the study design option starkly: "Prohibit use of low-dose aspirin and accept the risk of observing significant differences in CV rates [i.e., more heart attacks in the Vioxx group]." In the next sentence, Musliner suggested a way to obscure this problem:

> One could attempt to minimize between-group differences [in CV event rates] by excluding patients at high risk (i.e., with prior MI, angina, stroke, TIA, atrial fibrillation, valvular heart disease, peripheral vascular disease, etc.).

The company was still debating possible study designs in 1997 when Merck scientists commented on a draft protocol for what was then known as the "GI Outcomes Trial." Dr. Briggs Morrison of Merck argued that patients should be allowed to take low-dose aspirin in the trial, because "without COX-1 inhibition [that aspirin would provide] you will get more thrombotic events and kill the drug." Dr. Alise Reicin responded the same day:

3

MI000819475

> Low dose aspirin – I HEAR YOU! This is a no win situation!... the
> possibility of increased CV events is of great concern – (I just can't
> wait to be the one to present those results to senior management!).
> What about the idea of excluding high risk CV patients – i.e., those
> that have already had an MI, CABG, or PTCA? This may decrease the
> CV event rate so that a difference between the two groups would not
> be evident.

Basic principles of medical research, as well as sound science, make it clear that one
should not design a clinical trial with the pre-specified intention of masking negative
outcomes.

> The next day, Brian Daniels responded to the same e-mail group:

> It is clear to me that the program will be severly [sic] hurt if the
> megatrial [VIGOR] shows a win in PUBs [gastrointestinal
> perforations, ulcers, and bleeds] and a loss in MI/CVA [heart attack
> and stroke]. That is what we are setting up by not allowing ASA
> [aspirin].

These 1996 - 1997 memos indicated that the Merck officials who designed the
drug's clinical trial program were aware of the drug's potential for cardiovascular harm.
These documents suggest that Merck knew it would be putting patients at an increased
risk for cardiovascular events in the Vioxx arm of the planned study, either because of a
prothrombotic effect of Vioxx or because of the prohibition of cardioprotective use of
aspirin. Arthritis patients (both RA and OA) are generally at higher risk of heart disease,
but Merck decided to prohibit low-dose aspirin because of concern that its use could
reduce or eliminate the postulated difference in gastrointestinal bleeding rates. The final
trial design served to showcase that selling-point while putting patients in the Vioxx arm
at increased risk of cardiovascular events. When the study was published almost exactly
four years after the Musliner memo, it indeed found an increase in cardiovascular events
in the Vioxx arm as had been anticipated by its planners in 1996.

Concern about excess cardiovascular events in patients given Vioxx was not
limited to studies in which it was compared to older NSAIDs. To evaluate other study
results that suggested Vioxx may increase the risk of cardiovascular events, the company
conducted a comprehensive internal review of its clinical trial data in February 1998.
This study found a significant increase in cardiovascular events in patients enrolled in
Vioxx trials, as compared to patients in other trials who had been given placebo. This was
an admittedly crude study, because the Vioxx trials were still blinded and therefore
included *all* study arms (including any comparator drugs as well as placebo), and
compared event rates with the placebo-only arms of different trials. This is not an optimal
alternative to actual randomized trial data testing the hypothesis directly, since such a
cross-study design can produce differences that might not persist when more
appropriately designed trials were done. But in the absence at that point of adequate
information from such trials, the Watson analysis provided a comparison that the

4

company felt was appropriate to conduct in 1998, and was one important source of information available to it at that time. Knowing what it knew then, Merck did not respond to this analysis as a potentially important signal to guide the planning of future clinical trials to determine whether this risk would be refuted or borne out. In the first instance of a pattern repeated several times in later years, company officials dismissed the findings and explained away the results of the comparisons it had requested by suggesting that the higher number of cardiovascular events occurring in patients in the Vioxx studies was not caused by an increase in these problems caused by the drug, but rather by an unusually low rate of such events in the placebo comparator patients. That reaction is a telling one, which indicates the company's response at the time to bad news about its potential blockbuster, and is more important than the subsequent re-analyses of these crude data. Of course, later findings from large randomized clinical trials – even though they had not been designed to address this question – did confirm the pattern of increased cardiovascular risk of Vioxx in relation to placebo.

In May 1998, six months before the Vioxx NDA was filed, the company sought a *Programmatic Review* from a board of expert scientific advisors it brought together to review the development of the new drug. The advisors' written report warned that greater inhibition of the cox-2 enzyme "could lead to adverse effects of inhibiting COX-2 that are not predictable based on experience with current NSAIDs." They drew the company's attention to three separate mechanisms through which Vioxx could cause serious cardiac complications: fostering the development of lipid-rich plaques in the coronary arteries, destabilizing those plaques and making them "rupture-prone," and the resulting thrombotic occlusion of those arteries (the mechanism causing most heart attacks). The outside panel's report went into considerable detail on how the specific pharmacology of Vioxx could cause this problem by inhibiting the anti-thrombotic effects of cox-2 (particularly by reducing levels of prostacyclin, known to reduce clot formation) while leaving the clot-producing effects of cox-1 (primarily mediated via thromboxane) relatively unaffected.

Taking the concern beyond the level of theory, Merck's external Scientific Advisory Board told the company about specific evidence already in place that made this outcome even more likely: Vioxx was known to reduce the levels of a metabolite (by-product) of prostacyclin.

> By removing this potent inhibitor of platelet aggregation [prostacyclin], the probability that a coronary plaque rupture would lead to myocardial infarction [heart attack] or ischemic ventricular fibrillation [potentially fatal heart rhythm disorder] is enhanced. *More information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality.*

In its May 1998 report, the outside experts strongly urged Merck to evaluate these possibilities with clinical trials and other studies specifically designed to assess the

5

M00681947?

possible increased risk of Vioxx in causing heart attack, noting that such research studies should be "actively pursued."

In September 1998, two months before submission of the Vioxx NDA, a letter was sent to Dr. Martino Laurenzi of Merck from Carlo Patrono, M.D., a Professor of Pharmacology at an Italian university. He wrote to follow up on a prior discussion he had had with Dr. Laurenzi about the need for the company to do further research on the potential cardiac effects of Vioxx. He noted that there were many open questions concerning "the potential cardiovascular implications of COX-2 expression and inhibition," and said that the company needed to do studies to clarify this question: "I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

Dr. Patrono's letter was passed on to Dr. Alan Nies at Merck Research Laboratories. Later that month, on September 29, 1998, Dr. Nies sent a memo to colleagues at the company about Dr. Patrono's proposed research and to "the PGIM issue," referring to the prostacyclin metabolite. The same problem had been noted by Dr. John Oates, the respected head of Clinical Pharmacology at Vanderbilt University. Concerning Dr. Patrono's letter, Dr. Nies wrote:

> His thoughts are similar to those of John Oates who called me a
> couple of weeks ago wanting to study Vioxx in patients with
> atherosclerosis/hyperlipidemia and elevated Tx [thromboxane]
> metabolite excretion. I told John we would not be doing any clinical
> studies at this time. When these drugs are available, many
> investigators will probably do such studies with or without our
> help/consent.

I am not aware that Merck ever commissioned any clinical trials to clarify the potentially crucial issue of cox-2 inhibition increasing the risk of cardiac events, even though the company considered doing such studies (see below) and then decided not to follow through on them. A variety of study designs specifically designed to address the cardiac risk issue would have been practical as well as ethical and could have been initiated as early as 2000, or even earlier. Instead, Merck's failure to conduct such studies bolstered its ongoing claims that it was not aware of sufficient clinical trial data to demonstrate this risk, right up until the day it withdrew the drug from the market.

It is widely understood that once approval has been granted, FDA has very limited regulatory authority to compel a company to begin a new clinical trial for an existing indication. However, a responsible company would have initiated its own targeted study or studies to clarify a potential risk as important as this, even if not required to do so by the government.

The NDA [21-042] submitted by the company to the FDA in November 1998 contained data that indicated a clear increase in adverse events in the "cardiovascular system" category, whether the drug was being compared to placebo or to established non-

6

M000819478

selective NSAIDs. Most prominent were higher rates of hypertension and edema caused by Vioxx, and these were noted by the FDA reviewer:

> There is an unequivocal association between [Vioxx] administration and the occurrence of cardiovascular and renal effects...Of note, in most of the studies the identified cardiovascular and renal toxicities associated with [Vioxx], when administered at a dose ranging from 25 to 50 mg daily, occur at a higher rate than with the other tested [NSAID] comparators.

I am not aware of any evidence that Merck communicated the risks identified by its own board of scientific advisors to FDA in the agency's initial review of the Vioxx application. The FDA's evaluation of the drug's potential safety problems related to selective inhibition of cox-2 makes no mention of this evidence.

When the NDA data were reviewed by FDA in May 1999, an FDA reviewer noted that of the subjects selected by the company for enrollment in its studies of patients with osteoarthritis, only 20% were 65 or older even though this condition is primarily a disease of the elderly, making it difficult to know how common such problems would be once the drug was in actual use. The reviewers also observed that assessment of such risks was complicated by the fact that Merck excluded from its studies any patients with a recent heart attack or angina or a stroke or transient ischemic attack within the prior two years. Along with the under-representation of patients over 65 in the osteoarthritis studies, this probably served to obscure the detection of cardiovascular complications. Despite this, a substantially higher number of cardiovascular thromboembolic events had been seen in patients randomized to Vioxx vs. placebo, even in relatively brief studies.

## IV. Additional clinical trial evidence of risk following FDA approval of Vioxx

### A. The VIGOR trial

The VIGOR study was a randomized controlled trial of Vioxx compared with an older non-steroidal anti-inflammatory drug, naproxen. It was designed by Merck to produce evidence that Vioxx caused less gastrointestinal toxicity than traditional NSAIDs. In light of the biological concerns noted above, when the overall plan for analyzing data from the company's clinical cox-2 trials was first being developed in late 1998 and early 1999 Dr. Douglas Watson, a Merck statistician, proposed an "Analysis Strategy for the Incidence of Serious Thromboembolic Events in the COX-2 Inhibitor Program." His memo recommended that the company track summary statistics and incidence rates of adverse cardiovascular events in each treatment group. Yet he went on to recommend that "No formal statistical hypothesis testing will be performed." This would be an odd analytical approach given the importance of the problem being studied, because such a plan would obscure rather than clarify the drug's role in causing these side effects.

7

Watson then suggested that adverse events be divided into three plausible categories of outcomes – primary, secondary, and tertiary. The first would include fatal and non-fatal MI, unstable angina, and fatal and non-fatal ischemic stroke; this would be an appropriate set of primary outcomes in keeping with much of the clinical trial literature. The second included other reasonable categories of arterial thromboembolic events. The tertiary category was to include thrombotic events occurring in the veins, which have a different pathology from that of primary concern for the cox-2 drugs. Watson's original proposal was to study each category separately, which would have made sense in light of the different mechanisms causing arterial vs. venous thrombosis.

In the minutes of the CDOC meeting of January 6, 1999, the committee accepted his odd recommendation that no statistical testing be performed. But it rejected the idea of studying arterial and venous thrombotic events separately in the primary analysis, relegating such comparisons to a subsidiary status. Instead, it directed Dr. Watson "to exclude plans to conduct separate analyses of event types" in the main analysis. In addition to being pathologically very different from arterial thrombotic events (e.g., MI, ischemic stroke), some venous thrombotic events are quite common (e.g., deep vein thrombophlebitis), so their inclusion in the main analysis of outcomes in a drug with known potential for arterial clots would likely obscure that causal relationship.

Internal Merck documents indicate that as the VIGOR trial was being conducted, the company's scientists were aware that patients enrolled in the Vioxx arm could well have a higher rate of serious arterial embolic events. On January 9, 2000, Michael Gresser wrote a memo titled "stroke outcomes" to Elliot Ehrich, George Robertson, and Mervyn Turner. In it he warned that "if our worst fears concerning the prostacyclin business have any foundation in reality they [patients randomized to receive Vioxx] could have a higher incidence [of stroke]...." Yet despite the substantial pre-existing causes for concern about increased CV toxicity in the Vioxx arm of the study, Merck's initial plan for analysis of the trial data would have obscured rather than clarified any such relationship.

Despite the concern by many in the scientific community about a possible cox-2-thrombosis risk, on January 12 Doug Watson reported to Gresser, Ehrich, Robertson, Turner, and Alise Reicin:

> It has been decided within MRL [Merck Research Laboratories] that analyses of that data [CV serious adverse events] will be confined to descriptive analyses and calculation of incidence rates for blocks of studies, but no formal comparisons among treatments will be done. None of these analyses will be done for another year yet.

Alise Reicin responds that there was a plan for CV events to be assessed in VIGOR. But the following day (January 13, 2000) Doug Watson, who had been central to the company's prior analyses of CV events with Vioxx, writes to others at Merck:

8

M008819480

See Alise's message below. I am confused by her statement "As part of the VIGOR DAP [data analysis plan], we plan to look at the CV events separately. Tom Capizzi is currently writing up the type of analyses [sic] which will be done.

Such plans have not been discussed with me previously. What exactly are you planning and is the intent to use adjudicated events?

The following day Watson wrote to Reicin to express his confusion: "I have looked at the VIGOR DAP and see that such an analysis is not listed as primary, secondary, or exploratory... I don't recall this ever be [sic] discussed with me or at any meetings where I was present. In the section on Aes [adverse events] it does not list these as a prespecified analysis." These memos were written two months before the VIGOR data were to be unblinded, astonishingly late for such a crucial question to remain unresolved.

On January 17, 2000, Capizzi sends a widely circulated memo in which he reports that the VIGOR data analysis plan is "undergoing revisions":

...we received senior management approval not to pursue a CV DAP...When the DSMB [the study's external Data Safety Monitoring Board] was notified that there was no program wide plan, the DSMB requested that we analyze the adjudicated CV data for VIGOR (their request seemed to be based on the size of VIGOR and the importance of the CV issue with respect to COX 2 agents).

Watson responds,

The idea that we would do this runs counter to the directives I had previously received from CDOC regarding analyses of adjudicated vascular events. As a result, the procedures in the SOP [standard operating procedure] are not set up in such a way as to get the events adjudicated on the kind of timeline this requires, and doing so will be difficult at this point.

On January 17, 2000, Harry Guess, head of epidemiology at Merck, sent an urgently worded memo to George Williams and others at the company, entitled "VIGOR Cardiovascular Event Adjudications: Alert on a potential problem." It read, in part:

The DSMB for VIGOR decided in December [one month earlier] that analyses should be conducted of cardiovascular events in VIGOR.... The issue about which I wanted to alert you is that we (Epidemiology) might not be able to get the cardiovascular (CV) events adjudicated in time to meet the VIGOR frozen file date of April 24. As of today, we have 58 potential CV events, of which only 5 have been adjudicated. Of the remaining 53 potential events, we have documentation in Epidemiology on 27 of them, so we will need to get the documentation sent in on the other 26. We estimate that by Feb 10 we might have a

9

M000681948T

total of about 70 CV events in both treatment groups of 088 and 09 combined. Alise has proposed Feb 10 as the cut off for this analysis. The most important problem is that it might not be feasible to get the committees to adjudicate all events by early April....We in Epidemiology are not staffed to get this volume of extra CV events processed between now and April while meting all other commitments, including keeping up with the GI PUB events [perforations, ulcers, and bleeds] on VIGOR.

On January 18, 2000, Capizzi reports on a new plan for analyzing CV events in VIGOR:

We currently have in the revised plan that the adjudicated events will be the primary assessment. I will add statement that explicitly states that no between group differences, tests or confidence intervals will be provided for the unadjudicated events in questions [sic]. This will protect us should the events not be adjudicated in time for the CSR.

Watson responds later that day that given the small number of events that will be available for analysis, "and that not all of them will be confirmed by adjudication, there will not be much precision in the analysis no matter what we do."

At the very best, the disarray and last-minute changes to the data analysis plan for such an important, expected, and potentially damaging side effect of Vioxx reflect terrible planning on the company's part for studying such a serious problem. Whether or not the company was ultimately successful in completing the adjudications on time, the plan to restrict the analysis to only those cardiac events that had been completely adjudicated, while explicitly excluding analyses of unadjudicated cases, would severely limit the number of events available for study. This in turn would curtail the analytical power of these comparisons, thus reducing the chance that a statistically significant increase in CV events could be detected in the Vioxx group. This analytic strategy was particularly problematic in light of the company's knowledge that serious difficulties were expected in getting all the cases processed in time.

The *NEJM* article describing the results of the trial, which appeared in November 2000, reported that VIGOR had achieved its main purpose. It found that while Vioxx had analgesic efficacy identical to that of naproxen, patients randomized to the Vioxx group had fewer gastrointestinal complications than those taking naproxen. Yet there was a 5-fold increase in cardiac events in the patients given Vioxx. In presenting the study results, the company took the unusual step of attributing this difference to a *reduction* of heart attacks by naproxen rather than an increase in risk caused by Vioxx. This was done despite the fact that such a supposed protective naproxen effect on the heart was primarily theoretical, and had never been demonstrated in any clinical trial. The FDA review of these data pointed out that naproxen was only a *transient* inhibitor of the clot-promoting substance thromboxane, and that the cardioprotective effect Merck claimed for it had never been demonstrated in a placebo-controlled trial. Moreover, such a dramatic effect of naproxen in preventing MIs would be far greater than that ever seen with

10

M000619482

aspirin, considered the "gold standard" agent for cardioprotection. Soon after publication of the VIGOR results my colleagues and I group conducted a very large observational study of patients taking naproxen and did not find evidence of such a huge cardioprotective effect in an enormous population of typical NSAID users; other observational studies have reached the same conclusion.

A key aspect of the company's "naproxen hypothesis" was that it was effectively replacing aspirin in the trial for patients who required it (but which the VIGOR design prohibited). Yet FDA's analysis at the time (Targum) reported an increase in CV events with Vioxx even in patients in whom aspirin was not indicated.

In fact, when one compares all serious adverse events seen in VIGOR (either gastrointestinal events or cardiovascular events), these occurred with equal frequency in both study groups. Indeed, the number of additional serious cardiac events in the Vioxx group was actually *greater* than the number of serious gastrointestinal events prevented. Clinically, this overall disadvantage of Vioxx is even more worrisome because non-fatal cardiovascular events such as MI and stroke can produce irreversible damage to the heart or brain, whereas non-fatal drug-induced gastrointestinal side effects are usually readily treated with cessation of the offending product and transfusions (if any are needed at all), and commonly do not produce lasting damage. As one FDA reviewer noted concerning the VIGOR results, in view of the overall findings "one can argue that naproxen would be the preferred drug compared to Vioxx."

My colleagues and I have conducted several studies of physicians' perception of risk vs. benefit and how these assessments shape their prescribing decisions; this has been an important theme of my unit's research work for over two decades. Fair and balanced depictions of the risk profile of Vioxx – that it is no more effective an analgesic than existing NSAIDs, and that in comparison with naproxen it will produce more serious CV events than it will prevent g.i. events – does not yield an attractive risk-benefit profile for Vioxx. Had such a balanced risk-benefit relationship been accurately presented to physicians, the drug would not have been prescribed at the blockbuster level of use which it quickly attained. Simple common sense would lead to the same conclusion. Further, the likelihood that the relative g.i. advantage of Vioxx is negated by low-dose *cardioprotective aspirin use (see below)* would remove even this reason for using the drug, had it been more widely known.

In its presentations of the VIGOR results, Merck adopted a clear strategy of emphasizing the gastrointestinal superiority of Vioxx while minimizing its cardiac risk. From the early phases of its cox-2 development program, the company had hoped that any increase in cardiovascular risk caused by these drugs would be offset by their capacity to reduce gastrointestinal risk. This was the entire *raison d'etre* for Vioxx, since there was never any evidence it had better analgesic efficacy than numerous NSAIDs already on the market. But if greater efficacy is not an issue, evaluation of any drug requires a careful comparison of *all* the adverse events it causes – those for which it may have an advantage over competing therapies, as well as those for which it may be worse. In the mid-1990s it was reasonable to consider the possibility that a selective cox-2

11

M006819483

inhibitor might be a useful drug to have available if its reduction of serious harm from gastrointestinal bleeding clearly outweighed the other side effects it might increase. But in its clinical trials, presentations to the FDA, and communications with prescribing physicians and with patients, Merck consistently distorted this crucial comparison by systematically minimizing the drug's cardiovascular risk while emphasizing its purported gastrointestinal advantage. A draft of the VIGOR paper initially described the increased rate of serious cardiac events as "unexpected," to which one of the co-authors added this comment in a working copy of the manuscript: "Is this unexpected? Not really..." A suggestion made by one of the co-authors of the article that the drug's g.i. benefits "be balanced against the risk of MI's" was not included in the draft submitted to the journal or the final, published manuscript.

As noted, the increased rate of heart attacks in the Vioxx group during the VIGOR study was more marked than was initially known: it was subsequently revealed that after the study report had been submitted to the New England Journal of Medicine, Merck learned of additional MIs that occurred during the study in the Vioxx arm of the trial. Even though Merck had this information months before the manuscript was published, it failed to provide this information to the journal. In addition, the originally submitted draft of the article discussed the potential for the drug to be prothrombotic, but this warning did not appear in the published version of the article. A table depicting cardiovascular outcomes was deleted from the final manuscript; the information was instead presented in a much more low-profile way by inserting it into the text as rounded percentages of *risk differences* rather than relative risks, which diminished its impact. Finally, in a highly unorthodox decision that deviates from usual procedures for analyzing clinical trial data, late in the study Merck officials imposed an earlier data cut-off point for adverse cardiovascular events (expected to be higher in the Vioxx arm) than they used for ascertaining gastrointestinal outcomes (expected to favor Vioxx). That is, they ordered that data collection stop earlier on the anti-Vioxx outcomes than on the pro-Vioxx outcomes.

When these facts became known to the editors of NEJM, they took the unusual step of publicly chastising the authors in an editorial "Expression of Concern" published in December, 2005. Even after receiving a response from the study authors published in March 2006, the journal's editors reiterated their concern in a second published statement that reaffirmed their belief that the study data had been handled improperly.

The first public announcement of the VIGOR results by Merck came in a press release on March 27, 2000. It attributed the elevated rate of cardiac events seen in patients given Vioxx to "naproxen's ability to block platelet aggregation," although there was no compelling evidence for such an enormous naproxen effect. In an internal memo dated March 9, 2000, Dr. Edward Scolnick wrote,

> "The CV [cardiovascular] events are clearly there....this is real....It is a shame but it is a low incidence and it is mechanism-based as we worried it was. Oates and Alan and barry were right about the metabolite

12

M000819404

meanings i.e. urine Pg [prostaglandin] data….This will limit the class somewhat…."

To clarify the cardiac risk issue, he notes that the company could conduct "the tylenol study we discussed to further assess safety….Endpoint studies tell the truth." However, no endpoint trials were ever done that were specifically designed to determine "the truth" concerning the drug's cardiac risk.

In preparing for public reaction to announcement of the results of the VIGOR study, the company prepared a Draft Standby Statement in March 2000. A section for internal company use noted,

> The implications for the arthritis & analgesia franchises are high… We should (hopefully) position this as applying only to patients with RA [rheumatoid arthritis], only with the highest dose of Vioxx, and underscore the substantial benefits of Vioxx compared to traditional NSAIDs (Langman, JAMA; VIGOR). If possible, we should position things as a 'reduction in events with naproxen vs rofecoxib,' rather than an 'increase in CVD events with Vioxx vs naproxen.'

The 4- to 5-fold increase in heart attacks is then re-depicted as a "2-fold decrease in the risk of certain cardiovascular events" in patients taking the comparator drug. This draft document does demonstrate, however, that Merck initially intended to disclose that Vioxx could be prothrombotic. Yet this language does not appear in the press releases discussing the VIGOR study and does not appear to have been disseminated to the public or medical community at all.

A "Q&A" section appended to the draft standby statement posed several potential questions from the press and suggested answers. In response to the boldfaced question, **"What does this mean for Vioxx? How can you promote a product that increases heart attacks and strokes?"** the proposed answer contains the following misleading and incorrect statement:

> This [increased rate of cardiovascular adverse events] has only been seen in this one study of high-dose rofecoxib in patients with RA, who may be particularly suseptable [sic] to the cardioprotective effects of naproxen or at an increased risk of thrombotic-type events when treated with a COX-2 specific inhibitor, as opposed to patients with OA or other conditions…The clinical trials and postmarketing experience with VIOXX in OA and other conditions otherwise show no evidence of any adverse effect on CV SAEs [cardiovascular serious adverse events].

Additional language in the draft statement indicating that the drug could pose particular risk to patients vulnerable to coagulation problems was never, to my knowledge,

M006691985

disseminated by Merck to physicians or patients in any labeling, press release, or promotional materials.

The Merck staff who prepared the draft Q&A provided a final, telling question that might be asked by the media: "Over a year ago, scientists at the U. of Pennsylvania (Fitzgerald et al) published a report in PNAS suggesting there might be an increased risk of cardiovascular events in patients taking coxibs, due to changes in levels of certain prostaglandins. Were they right?"

### B. Additional data of increased risk from other randomized trials

Although Merck depicted the VIGOR results as a one-of-a-kind anomaly, several other randomized controlled clinical trials conducted by the company also documented increased risk with Vioxx. Protocol 090 was conducted by Merck in 1998 and 1999, with the final study results reported internally the following year. Although the company claimed it had never observed an increase in cardiovascular events with Vioxx except in comparison with the supposedly cardio-protective naproxen, Protocol 090 enrolled 978 patients and tested Vioxx against nabumetone, a non-selective NSAID, as well as against placebo. A relatively low dose of Vioxx was used (12.5 mg), and each patient was given the drug for just 6 weeks. Yet significantly higher rates were seen with Vioxx compared to nabumetone, placebo, or both in the following categories: one or more adverse experiences; serious adverse experiences; and study discontinuation due to an adverse experience, a drug-related adverse experience, or a serious adverse experience. (Unconventionally, this calculation included events in patients in the nabumetone and placebo groups who dropped out of the study prior to randomization – an unusual way of counting that served to diminish the effect of higher event rates in the Vioxx group.)

When Merck measured side effect rates in each group among aspirin users vs. non-users, the pattern of higher adverse events with Vioxx compared to both comparison groups was found in aspirin users as well as in non-users. In all patients in Protocol 090, the rate of serious cardiovascular events was 3-fold higher in the Vioxx group as compared to either the nabumetone group or the placebo group. This included a heart attack and two strokes in the Vioxx group within the 6-week study period, and none in either of the comparison groups. To my knowledge the results of this trial have never been published.

ADVANTAGE was an even larger study of approximately 5,500 patients with osteoarthritis randomly allocated to receive either 25 mg Vioxx or 1000 mg naproxen. The initial analysis restricted the CV outcome to MI, and there is evidence of internal re-assignment by Merck employees of at least one probable cardiac death to "unknown cause." However, when FDA used a more comprehensive outcome definition of serious coronary heart disease and re-adjudicated these outcomes, it found a relative risk of 3.2 for Vioxx use. This study had lasted for only 12 weeks. Although the ADVANTAGE trial was completed at about the same time as VIGOR (early 2000), a preliminary report of its findings was not provided to FDA until December of that year, and final data was not submitted until mid-2001.

14

MRK-0891946S

On October 18, 2000, Dr. Deborah Shapiro of Merck presented a meta-analysis of all the company's existing data on cardiovascular outcomes from its collected Vioxx clinical trials. For the outcome of myocardial infarction (heart attack), her data depict substantially increased risks seen in 4 of the 5 studies reviewed, including a tripling of risk in ADVANTAGE, a near-doubling of risk in a study labeled "RA," and a quintupling of risk (5-fold increase) in VIGOR. All in all, the summary statistic revealed a doubling of risk across all 5 groups of studies that was statistically significant. I am not aware that an analysis reporting on the endpoint of myocardial infarction was ever provided to the FDA or to the medical community.

Following the release of VIGOR, Merck had put forward several explanations for why the study's findings of increased cardiovascular risk should be discounted: the study was done in rheumatoid arthritis patients, who might be unrepresentative; subjects were prohibited from using aspirin, casting Vioxx in a worse light; the comparison drug was naproxen, which was massively cardioprotective; and Vioxx was used in a higher-than-usual dose. But in 2000, other large randomized controlled trials conducted by Merck undercut each of these proposed explanations. ADVANTAGE did use naproxen as a comparator, but studied a lower dose of Vioxx (25 mg) in patients with osteoarthritis, not RA, and aspirin use was allowed. Protocol 090 used placebo as a comparator, studied OA patients, used a low dose of Vioxx (12.5 mg), and also allowed aspirin use. Both studies showed an increase in CV risk with Vioxx. (For completeness, it should be noted that Protocol 085 did not demonstrate an increased CV risk. Nevertheless, the availability in 2000 of three other large randomized studies [VIGOR, ADVANTAGE, and 090], using a variety of doses, populations, and comparator drugs, should clearly have raised an alarm within Merck that the VIGOR findings could not be dismissed so readily.)

As our research unit was conducting its own epidemiological studies of Vioxx risk, colleagues at Merck noted on several occasions that it was unlikely that the drug caused any important cardiac risk because no such problem had been seen in several studies of Vioxx used to prevent or treat Alzheimer's disease. But in the largest of these for which outcome data are available (Protocol 078), there was substantial evidence of harm, although it was obscured in the published results (Thal et al) by a variety of unconventional and inappropriate analytic approaches. The outcome of "serious thrombotic vascular events" included venous thromboses, not usually included in analyses of cardiovascular thrombotic events (which are in the arteries, not the veins). Rather than use the universally accepted intention-to-treat approach to analysis (which had been pre-specified by Merck in the study's data analysis plan), the authors instead stopped counting adverse outcomes two weeks after a patient ended use of the drug. But a subsequent analysis of data submitted to the FDA, performed after Vioxx was withdrawn, found an increase in the risk of serious coronary heart disease in the Vioxx group compared to placebo. To my knowledge, Merck did not provide a complete and accurate account of these study outcomes to FDA until after the drug had been taken off the market.

15

MRK-ABI19487

Of greatest concern, the mortality rate of subjects given Vioxx in Merck's Alzheimer's studies was double that seen in subjects randomized to placebo. Having practiced and taught geriatrics for many years, I am aware that ascertainment of causes of death in an elderly patient (as most of these study subjects were) can be very problematic. Older people are likely to have multiple co-existing illnesses, and it is well documented that MIs in the elderly often present "silently" – that is, without the typical pain or shortness of breath that are likely to accompany an MI in a middle-aged patient. It has been estimated that about a third of MIs may present in this manner in older patients. As a result, a serious MI may be mis-diagnosed as another condition, and a cardiac death may not be recognized as such as readily as in a younger patient. Death has been called "the clearest outcome in drug research" in that its existence need not be adjudicated. It is therefore of particular concern that a doubling of the death rate was seen in Merck's Alzheimer's studies of Vioxx, which it often cited as evidence of the safety of its drug. Re-analysis of serious cardiac event rates by those outside Merck did in fact indicate an increase risk in patients given Vioxx.

Event adjudication has been more problematic in Merck's studies of Vioxx than in any other drug evaluations I am aware of. In November 2001, FDA was reviewing the results of the ADVANTAGE study comparing Vioxx with naproxen. The agency found that it had to re-adjudicate the data the company presented on adverse cardiovascular outcomes; in 12 events (in a total of 21 patients) the FDA found that Merck had under-estimated the number of adverse cardiovascular events that had occurred in Vioxx patients and over-estimated the number of such events in the naproxen group. It found no instances in which the errors went in the opposite direction. The FDA review stated that the available evidence indicated that adding low-dose aspirin to Vioxx may not eliminate the excess cardiovascular risk seen in the study, but that it could eliminate the drug's relative advantage in reducing gastrointestinal side effects. If that were the case, it would negate virtually all of the drug's clinical and economic advantage over older NSAIDs.

A year after the publication of VIGOR, despite public statements discounting the likelihood that Vioxx caused an increase in cardiac events, internal Merck correspondence revealed that senior officials were quite aware of the problem. In a memo of November 21, 2001 circulated among senior company officials, Dr. Scolnick wrote,

> I think the question we should answer now is NOT whether Vioxx or any Coxib is safe for Cv outcomes. I think the question NOW is what is the best antiplatelet regimen to use with a Coxib. I think that is THE medical question and if we answer it, the problem will dissipate.

He then proposes two studies that would combine Vioxx with antiplatelet agents in order to negate its apparent clot-forming properties: "If you think it through this will answer the questions that are medically needed." To my knowledge, no such large-scale clinical trials were ever conducted by the company.

Coincidentally, in the same month (November 2001), Dr. Scolnick was among ten Merck scientists who received a memo describing the initial results of the Vioxx Low-

16

MOO6819488

Dose Aspirin Endoscopy Study (Protocol 136). This study randomized 1,200 patients to one of four groups: Vioxx plus low-dose aspirin, low-dose aspirin alone, placebo, or ibuprofen (Motrin), a non-selective NSAID. All underwent g.i. endoscopy to assess ulcer formation. After 12 weeks, the Vioxx plus low-dose aspirin group had about twice the rate of ulcer formation as the placebo or aspirin-alone groups – a rate that was virtually indistinguishable from that in the group taking the older NSAID ibuprofen (Motrin). Thus, in one large patient group in whom gastroprotection would be the most important – those who would require low-dose aspirin to prevent heart disease – the study showed Vioxx to be no better than a much older, cheaper NSAID. Despite the fact that it was negotiating revisions to the Vioxx label with FDA concerning GI safety, Merck did not disclose the results of Protocol 136 to the agency until after the revised label was approved in April 2002. This study was not published until 2003.

The APPROVe study which resulted in the eventual withdrawal of Vioxx from the Market in September 2004 had never been designed to answer the question of cardiac risk. In testing Vioxx to determine whether it slowed the progression of colonic polyps, it excluded patients with recent cardiac disease, and had a mean subject age of 59. This was far lower than the age at which cardiovascular adverse events would be most likely to be detected, and far lower than the mean age at which Vioxx was being used and heavily marketed. Nonetheless, the study did reveal a doubling of risk of heart attack or stroke even in this relatively healthy population. Even here the company's presentation of the data was distorted. Merck has consistently maintained that there was no risk evident until 18 months into the trial. (At that point, the divergence of the curves was attributed to an unusual "flattening out" of the event curve for placebo rather than to an increase in the event rate with Vioxx.)

However, inspection of event rates for all adverse cardiovascular events reveals that the curves separate much earlier, as do data for investigator-reported events. Because this was a double-blind placebo-controlled trial one would not expect such investigator-reported outcomes to be biased for or against the drug. Nevertheless, in the final editing stages of the paper a Merck representative suggested deleting mention of all investigator-reported events prior to submission of the paper to *The New England Journal of Medicine*, even though such events were specified as secondary endpoints for analysis in the study protocol. While Merck did include another secondary endpoint in the published version of the trial (APTC), it did not include the analysis of investigator-reported events which was unfavorable to the drug.

## V. VALOR: an aborted clinical trial

By 2001, Merck was in possession of a substantial number of warning signals about the cardiovascular risk of Vioxx. These included the biological evidence that the drug could inhibit a key cardioprotective substance (prostacyclin) while not inhibiting its clot-inducing counterpart (thromboxane); the data reporting increased occurrence of heart disease events in its early randomized trials; the recommendations of its own scientific advisors about the need to look into this likely complication; and the striking 5-fold increase in MI seen in VIGOR. In response to these issues, the company began to plan a

17

study designed to address this central problem: The Vioxx Cardiovascular Outcomes Study, known as VALOR.

Senior Merck officials began considering such a study almost immediately after the problematic VIGOR MI data were unblinded. On April 12, 2000, Dr. Scolnick sent the following e-mail to Dr. Reicin:

> We are all online too late. I will tell you my worry quotient is high. I actually am in minor agony. What I really want to do is a 10,000 vs 10,000 patient study in mild-moderate OA Tylenol vs Vioxx with prn [as-needed] low dose asa [aspirin] for those judged to need it. Safety first primary endpoint and efficacy secondary or co primary. WE WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY. PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC MEETING. Thanks / Ed   [emphasis in original]

Plans were developed for a study designed specifically to clarify the Vioxx-CV relationship, and by February 2002 a protocol had been developed that would have enrolled 10,000 patients to be given Vioxx and 10,000 to receive placebo, and compare rates of cardiovascular ischemic events between the two groups. Study documents considered the possibility that "a 3 mmHg increase in systolic BP results in small resultant increase in CV events" in the Vioxx arm. In a Merck presentation dated February 27, 2002, the logic behind the study hypothesis was listed as follows:

> **Issues Associated with current Design and Hypothesis:**
> **Several mechanisms by which VIOXX could hypothetically be**
> **associated with elevated risk vs. placebo:**
>     **-- increase in blood pressure**
>     **-- reduction in prostacyclin to a greater degree than ASA**
>     **[aspirin] alone**
>     **-- loss of ischemic preconditioning**
>     **-- increase in plaque burden**
>     **-- non-COX-2 mediated mechanisms**

VALOR would have reflected typical clinical practice much better than VIGOR had, in that all patients would be given low-dose aspirin for cardioprotection, as well as a gastric acid inhibitor (omeprazole) to protect against g.i. toxicity. Merck scientists presented sound justifications for studying the drug compared to placebo: "placebo comparison provides clear assessment of CV profile of rofecoxib; answers most important clinical question; most efficient use of resources; most timely result." The company identified study centers throughout the world and brought them on-line to plan for subject recruitment. The first patients were scheduled to begin participation in June 2002, and enrollment of each subject would be for 13 months.

But the study was never begun. In March 2002 Merck announced that it "has decided to defer the VALOR Trial at the current time" and suspended further recruitment

M006810490

of outside researchers to enroll subjects. To my knowledge, no study designed to test the cardiovascular risks of Vioxx was ever conducted.

## VI. Observational studies of Vioxx and risk

A total of eight observational studies have appeared in the literature addressing the relationship between Vioxx and cardiovascular events, including one from our group on which I was senior author (Solomon, 2004). Ours was the one of the largest of the studies, and included over 10,000 MI outcomes. Seven of the eight published observational studies found a statistically significant increase in the risk of serious coronary heart disease events for Vioxx, ranging from a 25% increase to a 272% increase when all doses were considered. (The eighth study [Mamdani, 2002] was substantially smaller that the others and had important methodological limitations which my colleagues and I discussed at the time of its publication, including exclusion of all cox-2 or NSAID patients who did not fill two successive prescriptions, exclusion of all users who were on a study drug for less than 30 days, and inappropriate adjustment for cardiovascular disease markers that may have actually been caused by one of the study drugs.) Of the four studies which assessed risk as a function of dose, all four found a greater level of risk at a higher dose.

## VII. Inaccurate communication of risks to physicians

Despite the fact that the five-fold increase in MI risk had been found in the VIGOR study soon after the drug was marketed, the official Vioxx labeling contained no adequate warning of cardiovascular risk in for the first several years the drug was on the market. Even after the label was changed, it still did not accurately portray the risks compared to the benefits of Vioxx in a manner that would have permitted physicians or others to make an informed assessment of whether to use the drug.

Instead of providing accurate risk-benefit information to guide physicians, Merck prepared several training tools to arm its sales force against the difficult questions doctors might ask about the product. One interesting example, called "Dodgeball," taught Merck sales representatives how to overcome physician concerns about the drug's side effects. The strategy the company recommended for handling questions about heart attack seems to emphasize distraction rather than education:

> *Question: If the physician is concerned about a potential increase in the risk of MI, how would you respond?*
> *Response: Doctor, once daily VIOXX has no effect on platelet aggregation. Once daily VIOXX (R) is therefore is [sic] not a substitute for aspirin for cardiovascular prophylaxis. However, once daily VIOXX 50 mg had no effect on the anti-platelet activity of low dose (81 mg daily) aspirin.*

There is no way in which this can be construed to be a fair and helpful response to a doctor's simple question about the risk of a potentially life-threatening side effect.

19

MRK0081949?

As late as September 2000, months after presenting data on elevated cardiac risk to FDA (but not to NEJM), the company was still using the lower figure of 0.4% in its official communications to physicians who inquired about this issue. This pattern of deceptive presentation of risk data to physicians is also illustrated in the "Cardiovascular Card," a sales tool prepared for Merck representatives to use with physicians concerned about the risk of cardiac events caused by Vioxx. Used from May 2000 until April 2002, the card presents known cardiac risks in a misleading manner. It presents a cardiovascular safety profile for Vioxx that appears to be similar to other NSAIDs and to placebo. However, while this "teaching aid" purported to include cardiovascular safety data from Merck's osteoarthritis (OA) trials, it apparently did not include information from other completed OA trials that contradicted this favorable profile (e.g., ADVANTAGE, 085, and 090). Further, the card suggested that the incidence of mortality with Vioxx was more favorable than for placebo, even though other studies had demonstrated a statistically significant increased risk of mortality associated with Vioxx compared to placebo.

Finally, by excluding safety data from other studies, the card fails to present or even consider critical information from the VIGOR study. Assessments of a drug's safety are best done by considering all randomized trial data available, regardless of the underlying purpose of a given study. It is inappropriate to provide only selected, most favorable study results in response to doctor's questions about cardiovascular safety and mortality. The most complete and current information on these topics should have been provided to physicians in any "teaching tool" with this purpose. At a minimum, the Cardiovascular Card should have been recalled by Merck because it contained an incomplete and misleading safety profile. Instead, as late as August 2001, by which time considerable additional information about the drug's risk had become available, the Cardiovascular Card was formally "re-validated" by the company for continuing use in promoting Vioxx, and steps were taken by Merck to make it easier for its sales staff to order large supplies of the cards to reassure physicians about the drug's safety. In doing so, the company undercut a key component of the safe use of drugs in medical practice – the doctor's ability to fairly balance benefit and risk in making prescribing decisions.

By May 2001, in response to a New York Times article on the cardiac risk of Vioxx, Merck issued a bulletin to its sales force in which it instructed them: "*DO NOT INITIATE DISCUSSIONS ON THE RESULTS OF THE [VIGOR] STUDY, OR ANY OF THE RECENT ARTICLES IN THE PRESS ON VIOXX.*" The bulletin goes on to advise the sales force to state that the incidence of MI with Vioxx is less than 0.1%, and that cardiovascular mortality caused by other NSAIDs is 8 times greater than that seen with Vioxx. It instructs Merck representatives to present the data in the "Cardiovascular Card" to physicians concerned about Vioxx risks (see above), even though it contained a highly selected and distorted depiction of the totality of that risk.

A response to a paper published in August 2001 in *The Journal of the American Medical Association* provided another opportunity for Merck to deny that there was any

20

increased cardiovascular risk with Vioxx. In a widely circulated press release, the company stated,

> The relative risks of serious cardiovascular events were similar with Vioxx and placebo, and with Vioxx and the widely prescribed NSAIDs ibuprofen, diclofenac, and nabumetone.

Merck made this statement even though it had completed clinical trials which provided very different evidence. After noting that "Patient safety is of paramount importance to Merck," the statement goes on to dismiss the increased rate of heart attack seen with Vioxx in VIGOR by noting, "This is the first time this result has been observed" -- even though by mid-2001 the company had seen the results of several of its own trials which pointed in exactly this direction.

## VIII. Negotiations with FDA over labeling and promotion

Beginning soon after the results of VIGOR were presented to the FDA, the agency had attempted to get Merck to change the company's official labeling of the drug to more accurately reflect the growing body of data about its cardiac risk. In fact in an early review of the VIGOR data one FDA reviewer noted, *"It would be difficult to imagine inclusion of the VIGOR results in the rofecoxib labeling without mentioning cardiovascular safety results in the study descriptions as well as the Warnings sections."* Instead of proactively revising its product label to accurately and prominently reflect this problem, as concern increased about the cardiac risks of Vioxx in March 2001 the company prepared a "Public Affairs Plan" discussing the best way to frame the problem. At first glance, one slide about the campaign seems compatible with the core values of medicine, with the following precept presented first: "Do no harm." However, the rest of that bullet-point provides a very different meaning for that concept: "refrain from proactively generating coverage that jeopardizes label negotiations and/or that links Vioxx to CV adverse events." The slide continues: "Vigilantly defend the brand." This does not seem compatible with the full and open discussion of risks and benefits that physicians and patients require in order to make appropriate drug choices.

As label negotiations were proceeding with the FDA, the company appears to have had a great deal of concern about the effect of a possible label change on increasing physician awareness of the product's cardiovascular hazards. The level of risk depicted in a product's official labeling can heavily influence a drug's sales. An internal marketing graph prepared by Merck dated July 12, 2001 labeled "Upside/Downside Sales Forecast" presented company staff with three estimates of potential annual sales, in billions of dollars, depending on the outcome of negotiations with FDA about the Vioxx label. The "upside" scenario predicts a 25% increase in sales by 2006 if "CV Labeling Milder; No Prothrombotic language." However, a reduction in sales of 50% is projected by 2006 if the FDA were to require a "black box warning" about cardiovascular risk rather than a milder "precaution." The difference between the two projections on the graph is approximately $1.2 billion in annual sales. If such calculations had influenced the

21

M000819463

company's position in its discussions with FDA about the proper warnings to appear on the drug's labeling, that would have been inappropriate.

Merck's mis-communications to physicians about Vioxx had become so egregious that in September 2001 the company's CEO, Mr. Gilmartin, received an unusually strongly worded Warning Letter from the FDA. It read, in part:

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed *in the* [VIGOR] study, and this, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)...
>
> Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile... Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen.

Throughout 2001, Merck continued its intense and protracted negotiations with FDA over proposed changes to the drug's labeling. There was controversy within Merck about making the data from the ADVANTAGE study available to FDA, and it appears to have taken the company a year and a half after it obtained the study results (and multiple requests by the agency) before complete safety data from that trial were actually transmitted to FDA. In April 2001, Dr. Scolnick had expressed concern about FDA's requests for more safety data:

> The open ended request for safety updates [from FDA] is a filibuster...I have never seen being nice to the FDA – except on rare occasions – pay off....This division is devious and antagonistic. One cannot deal with them *in a rational way...I think giving them* [the data from] Advantage was not wise. The alzheimer's data vs placebo is helpful. Advantage is not....we will end up with bad labeling....I realize I can be paranoid and I sometimes overreact but I am not trusting of this [FDA] group.

By October 2001, FDA requested the company to add a warning that would more accurately depict the cardiac risks found in the VIGOR and ADVANTAGE studies over 18 months earlier. In my view, the warning language FDA proposed was a fair representation of the risk information that had been provided to the FDA at the time, and would have helped alert physicians to the CV risks that had become apparent.

M008819494

(Importantly, the FDA was not yet fully aware of the significant and persisting increase in mortality risk with Vioxx vs. placebo that occurred in Merck's Alzheimer's Disease trials, *if results were calculated in the usual intention-to-treat method of analysis*.) However, the company resolutely and repeatedly resisted having such a warning appear prominently on the Vioxx label. In a memo on October 15, 2001, reacting to the latest FDA proposal for such a label change, Dr. Scolnick wrote to David Anstice, "David Be assured we will not accept this label." Anstice responds, "We knew it would be UGLY and it is. We'll fight back, and see where we get."  Around midnight, Scolnick answers: "it is ugly cubed thye [they] are bastards"

Two weeks later Scolnick writes that he will not sign off on the new label until it is acceptable to him: "we need a statement now that will be a substitute for what the fda will not relent on i.e. the unknown about CV risks." The Merck team comes up with an alternative to FDA's proposal.  In it, instead of a prominent warning the information about elevated cardiovascular risk would be placed deep in the lengthy official wording much less visibly and would read: "The basis for the difference in cardiovascular event rates with VIOXX vs. naproxen observed in VIGOR, and the lack of such a difference between VIOXX and placebo or other NSAID comparators in other studies, is not understood." Scolnick declared that this alternative language was "a good start."

As discussions about the label proceeded within the company in the fall of 2001, Scolnick wrote to Douglas Greene, Bonnie Goldmann, and Peter Kim:

> twice in my life I have had to say to the FDA 'That label is
> unacceptable, we will not under any circumstances accept it.'…You
> WILL have to do that on the cardiac warning for Vioxx. I assure you
> that you will. And I assure you I will NOT sign off on any lable [sic]
> that had a cardiac warning.

This provides a strikingly clear statement of Merck's intention at the highest levels of the company to block a change in the product description that would have presented physicians with an accurate depiction of the drug's risk. The company's position was in clear opposition to the decisions expressed in the February 2001 meeting and formal vote of the FDA Advisory Committee, whose members had voiced strong concerns that the cardiovascular risk of Vioxx be more accurately reflected in its labeling. Even in the absence of a negotiated agreement with FDA concerning the contents of its official label, there is no reason Merck could not have notified physicians or consumers about the emerging data about the risks of Vioxx. Companies are permitted to provide updated information about risk in materials for to doctors and patients without obtaining prior FDA approval, but Merck did not do so. To the contrary, it continued to use misleading depictions of risk (through the "Cardiovascular Card" and other *communications noted above*) to minimize a very real problem with their product.

The revised cardiac risk labeling which FDA proposed to Merck was quite fair and reasonable in light of a comprehensive review of the data available at that time, and would have provided reasonable guidance to physicians attempting to balance the drug's

23

M008819485

benefits and risks. By contrast, the revised label that Merck eventually produced in April 2002 continued to de-emphasize the importance of the cardiovascular risk of Vioxx in a manner that would have been misleading to a physician trying to make a reasoned prescribing decision about Vioxx vs. a traditional NSAID or other alternative. Merck's intense struggle with the FDA over this issue does not appear compatible with its public statements that the company was committed to making the most accurate information on Vioxx available to physicians and the public.

### IX. Additional material

I will also present evidence concerning the experience of my research team *in its* work on our Merck-funded epidemiological study of the relationship between Vioxx and heart attack that was ultimately published in the cardiology journal *Circulation* in 2004.

### X. Post-withdrawal developments

Four months after Vioxx was taken off the market, the FDA convened an Advisory Committee meeting in February 2005 to consider all the evidence it then had available concerning the cardiac risk of the cox-2 drugs and traditional NSAIDs. After lengthy discussion and review of that extensive collection of materials, committee members were asked whether they believed that Vioxx was a cause of cardiovascular disease events. Without exception, all panel members answered "Yes." The committee members were then asked whether Vioxx should be made available for use, and if so, under what circumstances. Based on their review of all the data, about half of the reviewers said it should never be used in any patients. Nearly all the others said that such use should be permitted only under restricted circumstances. Restrictions proposed by these Advisory Committee members included limiting its use to children only (who would be at reduced risk of cardiac complications), allowing only the lowest dose (12.5 mg) on the market, strengthening the warnings on the drug's label to include a "black box" highlighting its cardiovascular risk, allowing its use only as a second- or third-choice drug after safer agents had been tried, limiting its duration of use, recommending close monitoring of patients for cardiovascular complications such as elevation in blood pressure, and having patients give explicit "informed consent" before taking the drug, acknowledging their awareness of its capacity to induce cardiovascular harm. Only 2 FDA Advisory Committee members voted to allow Vioxx back onto the market with no additional restrictions. These determinations are a comprehensive reflection of the evaluation of a large number of medical experts convened by FDA to review all the information then available to the agency and to the general public.

### XI. Summary and conclusions

Taken together, the available scientific evidence makes it clear that Vioxx is an independent risk factor that increases the risk of cardiovascular disease at all commonly used doses and durations. The risk begins early after drug use starts, is higher with greater doses, and persists over time. Evidence of this risk was available prior to the initial marketing of Vioxx, and was reinforced by repeated clinical trial findings and

24

highly consistent epidemiological data. The doubling of the rate of cardiovascular events that emerges from numerous clinical trials of Vioxx -- whether compared to other NSAIDs or to placebo -- places the drug in the category of a major risk factor for these events. Despite the evidence, Merck consistently ignored or dismissed the clear signals of cardiac risks attributable to Vioxx. This strategy began early in the drug's clinical development and continued until the day the drug was removed from the market. In the face of ample evidence of potential hazard that continued to accumulate throughout the late 1990s and up until the moment the drug was recalled, the company failed to aggressively mount the studies that could have clarified such risk. It presented the data that did emerge in a distorted manner to the public, to the FDA, and to physicians.

The opinions expressed above are based upon my education, training, research, and expertise, as well as my review of peer reviewed medical scientific and regulatory literature and relevant documents and testimony produced during the discovery process. I may supplement this report if necessary based upon receipt of additional information received during the course of the litigation. My usual consulting fee is $750 per hour for review and consultation, but I am accepting no personal compensation for my work on this case.

Jerry Avorn, M.D.

March 20, 2006

25

MO0681497

**Materials Considered**:

1. Amendment to NDA 21-042 - MRK-01420163696 - MRK-01420163721
2. (Draft) Comparison of the Effects of Rofecoxib, a Highly Selective-Inhibitor of COX 2, and Naproxen (a dual COX-1/COX-2 inhibitor) on the Incidence of Clinically Important Upper Gastrointestinal Events: Results from the VIGOR Trial by Claire Bombardier, et al., - MRK-AAB0109412 - MRK-AAB0109447
3. Letter from Claire Bombardier to NEJM attaching the manuscript entitled "Comparison of the Effects of Rofecoxib, a Highly Selective-Inhibitor of COX 2, and Naproxen (a dual COX-1/COX-2 inhibitor) on the Incidence of Clinically Important Upper Gastrointestinal Events: Results from the VIGOR Trial," dated 5/18/00 - MRK-NJ0245555 - MRK-NJ0245604.
4. Draft GI Outcomes Study Protocol - MRK-NJ0315784 - - MRK-NJ0315837
5. Email from D. Blois, dated 10/15/00 - MRK-AAX0008560 - MRK-AAX0008581
6. Email from E. Russo to A. Schechter, et al., dated 12/21/01 - MRK-AAX0009235 - MRK-AAX0009257
7. Email from J. Bull to J. Jenkins, et al., dated 4/11/02 - FDACDER007813 - FDACDER007844
8. Email from L. Villalba to D. Throckmorton, dated 9/30/01 - FDACDER010143 - FDACDER010149
9. Excerpts from Alise Reicin 10/11/05 Transcript, pages 3522-3526
10. Excerpts from David Anstice 9/26/05 Transcript, pages 2016-2017
11. Deposition transcripts of Edward Scolnick, dated 3/22/05, 3/19/05, 4/29/05, 5/17/05, 6/1/05, & 8/16/05
12. Deposition transcripts of Gregory Curfman, dated 11/21/05 & 1/24/06
13. Deposition transcript of Eric Topol, dated 11/22/05
14. Fax from B. Gould to N. Braunstein, dated 6/7/02 - MRK-AAF0008508 - MRK-AAF0008512
15. Fax from B. Gould to R. Silverman, dated 6/22/01 - MRK-AAF0004045
16. Fax from B. Gould to R. Silverman, dated 9/28/01 - MRK-AAF0004250
17. Fax from B. Gould to R. Silverman, dated 9/26/01 - MRK-AAF0004251
18. Fax from B. Gould to R. Silverman, dated 9/7/01 - MRK-ABW0008489
19. Fax from the FDA to R. Silverman, dated 7/13/01 - MRK-ACD0075472 - MRK-ACD0075473
20. FDA Teleconference Minutes for 3/20/02 - MRK-AAF0008519 - MRK-AAF0008529
21. Folkendt Report, dated 11/27/00 - MRK-NJ0069724- MRK-NJ0069726
22. GI Label Change for Vioxx Public Affairs Plan, dated 3/23/01 - MRK-ADJ0020162 - MRK-ADJ0020183
23. Highlights of Vioxx Labeling Changes Proposed by HFD-550 - FDACDER034122 - HFD-550 - FDACDER034128
24. Letter from L. Goldkind to Silverman, dated 2/28/01 - MRK-01420031266 - MRK-01420031268
25. Letter from M. Griffin to D. Watson, dated 10/16/01 - MRK-NJ0185865 - MRK-NJ0185867

M000819490

26. Letter from R. Silverman to Bull, dated 3/15/01 - MRK-AAF0003775 - MRK-AAF0003776

27. Letter from R. Silverman to Bull, dated 8/30/01 - MRK-AAF0003926 - MRK-AAF0003927

28. Letter from R. Silverman to Bull, dated 5/25/01 - MRK-AAF0003986 - MRK-AAF0003988

29. Letter from R. Silverman to Bull, dated 6/14/01 - MRK-AAF0004013 - MRK-AAF0004014

30. Letter from R. Silverman to Bull, dated 7/26/01 - MRK-AAF0004126 - MRK-AAF0004129

31. Letter from R. Silverman to Bull, dated 3/16/01 - MRK-NJ0265338 - MRK-NJ0265362

32. Fax from S. Folkendt to R. Silverman, dated 6/6/01 - MRK-AAF0003997 - MRK-AAF0003998

33. Memo from D. Watson, dated 10/24/01 - MRK-NJ0185864

34. Memo from E. Wong to D. Riendeau, dated 3/16/99 - MRK-AEG0023306

35. Memo from G. Block to Scolnick, dated 3/21/01 - MRK-NJ0333225 - MRK-NJ0333235

36. *Doubts are Raised on the Safety of 2 Popular Arthritis Drugs* by Melody Petersen, The New York Times, dated 5/22/01 – MRK-ABH0003185 – MRK-ABH0003188

37. Ingenix Epidemiology's Draft Manuscript on Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 2/27/04 – MRK-ABY0153857 – MRK-ABY0153880

38. Ingenix Epidemiology's Draft Manuscript on Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 9/27/04 - MRK-ABY0164090 - MRK-ABY0164115

39. Effects of Cyclooxygenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site f Microvascular Injury in Healthy Men by Ewa Tuleja, et al., Arterioscler Thromb Vasc Biol., dated June '03 - MRK-ADY0005464 – MRK-ADY0005468

40. Comparative Inhibitory Activity of Rofecoxib, Meloxican, Diclofenac, Ibuprofen, and Naproxen on COX-2 versus COX-1 in Healthy Volunteers by Anne Van Hecken, et al., Journal of Clinical Pharmacology, '00 - MRK-AAD0305229 - MRK-AAD0305240

41. Vioxx Project Team Agenda & Minutes, dated 11/10/00 - MRK-ABF0004419 - MRK-ABF0004442

42. Excerpts from Vioxx Preliminary CV Meta-Analysis – MRK-NJ0070364 - MRK-NJ0070397

43. Excerpts from Long Range Operating Plan: 2002-2007, dated 7/15/02 MRK-ABI0011027 - MRK-ABI0011081

44. Excerpts from NDA - MRK-ABS0066396 - MRK ABS0067019

45. Excerpts from FDA Medical Officer Review of NDA - MRK-ADI0005375

46. Excerpts from Draft Manuscript entitled "Cardiovascular Events Associated with Rofecoxib in a 3-Year Randomized Colorectal Adenoma Chemorprevention Trial" – MRK-AGO0076955 - MRK-AGO0076990

2

M0068194869

47. Excerpts from APPROVe CSR - MRK-S0420051001 - MRK-S0420053185 (P1.1034)
48. Excerpts from APPROVe Trial CV Safety Report – MRK-S0420051232 - MRK-S0420051330 (P1.1117)
49. Excerpts from VIGOR sNDA – MRK-00420008087 - MRK-00420008117 (P1.1132)
50. Excerpts from U.S. Long Range Operating Plan, dated 7/12/01 – MRK-ABI0008659 - MRK-ABI0008683 (P1.1135)
51. Excerpts from Protocol 090. – MRK-NJ0170152 - MRK-NJ0170511 (P1.1186)
52. Excerpts from COX-2 FDA Advisory Committee Meeting – MRK-AFK0232972 - MRK-AFK0233029 (P1.1238)
53. Excerpts from FDA review of NDA 21-042 and NDA 21-052 – MRK-AFV0341732 - MRK-AFV0341794 (P1.1245)
54. Excerpts from VIGOR Reviews – MRK-AFV0341795 - MRK-AFV0341881 (P1.1246)
55. Email from Edward Scolnick to David Anstice, dated 10/18/01 – MRK-ABW0004799 - MRK-ABW0004799 (P1.0002)
56. Email from Brian F. Daniels to Thomas Simon, et al., dated 2/26/97 – MRK-NJ0315892 - MRK-NJ0315894 (P1.0004)
57. Warning letter from Thomas Abrams to Raymond Gilmartin, dated 9/17/01 – MRK-ABA0003277- MRK-ABA0003284 (P1.0006)
58. Vioxx Dodgeball – MRK-AAR0019773 - MRK-AAR0019786 (P1.0007)
59. CV Card – MRK-AAR0019055 - MRK-AAR0019060 (P1.0008)
60. VICTOR KM Plot--Confirmed Thrombotic CV events, dated 2/1/05 – MRK-AFK0190651 - MRK-AFK0190651 (P1.0015)
61. VICTOR KM Plot--APTC event, dated 2/1/05 MRK-AFK0190652 - MRK-AFK0190652 (P1.0016)
62. Vioxx Preliminary Cardiovascular Meta-Analysis Slide Set by Deborah Shapiro, dated 10/18/00 – MRK-NJ0070364 - MRK-NJ0070397 (P1.0017)
63. FDA-MRL Meeting NDA 21-042/S-007: VIGOR Re: Protocol 069 Minutes, dated 4/11/01 - MRK-01420099060 - MRK-01420099061 (P1.0021)
64. Analyses of Unadjudicated and Adjudicated Thromboembolic Adverse Experiences – MRK-AAB0108912 - MRK-AAB0108932 (P1.0029)
65. Bulletin for Vioxx Action Required: Response to New York Times Article, dated 5/23/01 – MRK-AAR0007240 - MRK-AAR0007248 (P1.0061)
66. Obstacle Jeopardy – MRK-AAR0010111 - MRK-AAR0010126 (P1.0064)
67. Bulletin for Vioxx: Action Required: Response to JAMA, "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors", dated 8/21/2001 - MRK-AAR0021103 - MRK-AAR0021108 (P1.0068)
68. Deaths in MK-0966 Studies 078, 091, 126 – MRK-AAX0000696 - MRK-AAX0000705 (P1.0076)
69. Memo from G. Block and S. Reines to Edward Scolnick, dated 4/8/01 – MRK-AAX0000752 - MRK-AAX0000776 (P1.0079)
70. Memo from Thomas Musliner to B. Friedman, A. Nies and R. Spector, dated 11/21/06 – MRK-AAX0002413 - MRK-AAX0002420 (P1.0082)

3

M006819500

71. Letter from Carlos Patrono to Martino Laurenzi, dated 9/9/98 – MRK-ABC0002199 - MRK-ABC0002200 (P1.0108)

72. Email from Douglas Greene to Alan Nies, dated 12/3/01 – MRK-ABC0034124 - MRK-ABC0034124 (P1.0119)

73. Memo on protocol 136 results, dated 11/20/01 – MRK-ABC0035654 - MRK-ABC0035657 (P1.0120)

74. A. Nies email to Stone, dated 11/20/01 – MRK-ABC0035680 (P1.0121)

75. Research Management Committee No. 96-10 – Blue Bell, dated 10/10/96 – MRK-ABC0048699 - MRK-ABC0048706 (P1.0122)

76. *Email from Edward Scolnick to Deborah Shapiro et al., dated 3/9/00 – MRK-ABH0016219 (P1.0132)*

77. Letter from David Anstice to Thomas Abrams, dated 10/1/01 – MRK-ABI0003148 - MRK-ABI0003155 (P1.0151)

78. Press Release - Merck confirms favorable CV safety profile of Vioxx, dated 5/22/01 – MRK-ABI0003228 - MRK-ABI0003230 (P1.0152)

79. Nies Handwritten Memo Re: Carlo Patrono, dated 9/29/98 – MRK-ABK0311068 (P1.0167)

80. Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Clinical Trials, dated 9/30/97 – MRK-ABS0037036 - MRK-ABS0037048 (P1.0198)

81. Email from Lawson to Reines, dated 3/1/02 – MRK-ABS0344100 P1.0211

82. Email from Douglas Watson to Thomas Capizzi, et al., dated 1/18/00 – MRK-ABT0022650 - MRK-ABT0022657 (P1.0221)

83. Dear Doctor letter from John Yates, dated 10/30/03 – MRK-ABX0071232 - MRK-ABX0071233 (P1.0243)

84. Email from R. Bain to Ramey, dated 9/29/01 – MRK-ABY0019451 - MRK-ABY0019452 (P1.0246)

85. Ingenix paper 2-17 version, dated 9/3/04 – MRK-ABY0164039 - MRK-ABY0164060 (P1.0263)

86. Email from Deborah Shapiro to Eliav Barr, et al., dated 1/29/02 – MRK-ACF0004015 - MRK-ACF0004016 (P1.0278)

87. Attachments to Casola to Abrams letter, dated 11/19/01 – MRK-ACI0013241 - MRK-ACI0013246 (P1.0288)

88. Email from Edward Scolnick to Douglas Greene, dated 4/9/01 – MRK-ACR0009151 - MRK-ACR0009152 (P1.0300)

89. Email from Edward Scolnick to Douglas Greene, dated 3/22/01 – MRK-ACR0014502 - MRK-ACR0014503 (P1.0309)

90. Bulletin for Vioxx / Background and obstacle responses on retrospective observational analysis - / Solomon article No. COX 04-023, dated 4/21/04 – MRK-ADB0046424 - MRK-ADB0046427 (P1.0340)

91. D. Watson email re: Solomon Cox2 and MI Manuscript Accepted to Circ, dated 2/10/04 – MRK-ADC0003100 - MRK-ADC0003104 (P1.0344)

92. Ingenix Draft Final Report "Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 12/15/03 – MRK-ADC0032522 - MRK-ADC0032573 (P1.0346)

4

93.  Email from Adam Schechter to Thomas Cannell, et al., dated 11/22/01 – MRK-ADG0035340 (P1.0352)
94.  PIR - Use of Vioxx with Low Dose Aspirin, dated 5/17/02 – MRK-ADZ0017722 - MRK-ADZ0017729 (P1.0369)
95.  Scientific Advisors' Meeting May 3 - May 6, 1998 Programmatic Review Vioxx Program, dated 5/6/98 – MRK-AEI0002734 - MRK-AEI0002746 (P1.0386)
96.  Email from Barry J. Gertz to Peter S. Kim, et al., dated 4/30/03 – MRK-AFJ0003506 - MRK-AFJ0003510 (P1.0425)
97.  PIR - Vioxx 50 mg, dated 5/14/01 – MRK-BDN0000081 - MRK-BDN0000098 (P1.0452)
98.  PIR - Results of VIGOR trial, dated 9/2/00 – MRK-HND0000189 - MRK-HND0000193 (P1.0456)
99.  Vioxx Label Nov. '99, dated 11/1/99 – MRK-LBL0000035 - MRK-LBL0000038 (P1.0463)
100. Vioxx Final Label April 2002, dated 4/19/02 – MRK-NJ0094478 - MRK-NJ0094493  (P1.0484)
101. Email from Douglas Watson to Alise Reicin, et al., dated 1/18/00 – MRK-NJ0120249 - MRK-NJ0120250 (P1.0490)
102. Email from Alise Reicin to Eliave barr and Deborah Shapiro, dated 3/14/00 – MRK-NJ0121088 - MRK-NJ0121089 (P1.0494)
103. Email from E. Barr to D. Shapiro, dated 9/19/00 – MRK-NJ0123880 - MRK-NJ0123882 (P1.0501)
104. A. Reicin email to E. Barr, dated 11/8/00 – MRK-NJ0124427 - MRK-NJ0124428 (P1.0502)
105. MRL Clinical Study Report: Protocol 90, dated 6/15/00 – MRK-NJ0170152 - MRK-NJ0170274 (P1.0513)
106. MRL Epidemiology Department Technical Report No. EP07006.005.98 Final Results of an Analysis of the Incidence of Cardiovascular SAEs in the Phase IIb/III VIOXX Osteoarthritis Clinical Trials, dated 2/2/98 – MRK-NJ0272249 - MRK-NJ0272272 (P1.0532)
107. Press Release - Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with Vioxx, dated 3/27/00 – MRK-PRL0000114 - MRK-PRL0000115 (P1.0581)
108. Email from Edward Scolnick to Karen Grosser, dated 11/1/01 – MRK-AFO0128716 (P1.0729)
109. MRL Clinical Study Report, Multicenter Study: A Double-Blind, Placebo Controlled Study to Evaluate Safety and Tolerability and Preliminarily Assess Clinical Efficacy of MK-0966 in Patients With Osteoarthritis of the Knee (Protocol 010) – MRK-OS420045657 - MRK-OS0420046186 (P1.0967)
110. MRL Clinical Study Report, Multicenter Study: A Double-Blind, Placebo Controlled Study to Assess Safety and Tolerability and Preliminarily Evaluate Efficacy of L-748,731 in Patients with Rheumatoid Arthritis (Protocol 017) – MRK-AFL0010627 - MRK-AFL0010817 (P1.0968)
111. Memo from Eric Maller to Michelle Johnson, dated 5/14/02 – MRK-ABS0415817 (P1.1074)

M006819502