Westlaw.

Not Reported in F.Supp.2d
*Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)*
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
In re: DIET DRUGS (PHENTERMINE,
FENFLURAMINE, DEXFENFLURAMINE)
PRODUCTS LIABILITY LITIGATION
**No. MDL 1203.**

June 20, 2000.

Gregory P. Miller, Miller, Alfano & Raspanti, P.C.,
Phila.
Nina M. Gussack, Pepper, Hamilton & Scheetz,
Michael T. Scott, Reed, Smith, Shaw & MC Clay,
Arnold Levin, Levin, Fishbein, Sedran & Berman,
Edward W. Madeira, Jr., Pepper, Hamilton &
Scheetz, Philadelphia, for in re: Diet Drugs (
Entermine, Fenfluramine, Dexfenfluramine) Products
*Liability Litigation.*

MEMORANDUM AND PRETRIAL ORDER NO.
1332

BECHTLE, J.

*1 Presently before the court are American Home
Products Corporation's Motions to Limit the Expert
Testimony of Jerome L. Avorn, M.D. and to Exclude
Testimony of Lewis J. Rubin, M.D. and the responses
thereto. For the reasons set forth below, the court will
grant the motions in part and deny them in part.

## I. BACKGROUND

Plaintiffs have offered Jerome L. Avorn, M.D. and
Lewis J. Rubin, M.D. as expert witnesses in several
civil actions in this MDL No. 1203. Primarily, their
testimony will cover issues about the health risks and
benefits of the diet drugs Pondimin [FN1] and Redux.[FN2]
AHP challenges several of the opinions to be offered
by these physicians. The court will address the
background of these challenges for each physician
separately.

FN1. Pondimin is the brand name for the
diet drug fenfluramine.

FN2. Redux is the brand name for the diet
drug dexfenfluramine.

### A. *Jerome L. Avorn, M.D.*

Dr. Avorn is being offered as a generic liability
expert in these proceedings. He is a medical doctor, a
pharmacoepidemiologist [FN3] and a
pharmacoeconomist.[FN4] Dr. Avorn is highly qualified
in these areas of expertise, as borne out by his
curriculum vitae. (Pls.' Opp. to AHP Mot. re: Avorn
Ex. A.) Nonetheless, AHP argues that Dr. Avorn
lacks the qualifications and reliable methodology to
offer many of the opinions he expresses. AHP asserts
that Dr. Avorn's testimony as regards the weight of
evidence, the intent of AHP and his personal
interpretation of documents and testimony are simply
not expert testimony. AHP challenges seven areas of
testimony to be offered by Dr. Avorn.

FN3. Pharmacoepidemiology is the science
that applies epidemiologic approaches to
*studying the use, effectiveness,* value and
safety of pharmaceuticals. (AHP Mot. re:
Avorn at 2.)

FN4. Pharmacoeconomics is the study of the
relationship between a drug's benefits *and its*
risks and costs. (Pls.' Opp. to AHP Motion
re: Avorn at 2.)

1. Opinions about the Labeling of Pondimin and
Redux.

Dr. Avorn testified that between 1987 and 1996, the
Pondimin warning concerning pulmonary
hypertension was false and misleading and that it was
inadequate. (AHP Mot. re: Avorn Ex. A at 46-53.) He
also testified that he would have preferred that the
labeling for Pondimin and Redux in 1996 and 1997
had been formatted to place information about
pulmonary hypertension in a black box rather than
bolded text not in a box. *Id.* at 55-56; 97. Dr. Avorn
also endorsed the boxed format adopted by the
French government. *Id.* at 88-91.

*AHP asserts that Dr. Avorn is not an expert regarding*
FDA drug labeling regulations and that, in fact, he
has disclaimed that he is an expert concerning
regulations governing pharmaceutical labeling. (AHP
Mot. re: Avorn Ex. B at 46.) AHP further asserts that
even if Dr. Avorn were qualified, there is no
indication of any systemic review of the evidence
concerning AHP's labeling, and thus, there is no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

reliable methodology underlying Dr. Avorn's opinion.

Plaintiffs respond that Dr. Avorn is not being offered as an expert in FDA regulations. According to Plaintiffs, what is at issue in this litigation is whether AHP adequately warned physicians and patients about the risks of Pondimin and Redux, not whether AHP complied or did not comply with FDA regulations. Plaintiffs argue that even if AHP did comply with the FDA regulations, that would not be dispositive of whether it satisfied its duty under the common law. Plaintiffs assert that Dr. Avorn's *testimony goes to the issue of whether the drug labels were actually* false and misleading, and not just in the regulatory sense.[FN5] In addition, Plaintiffs argue that Dr. Avorn's opinions are all grounded in facts and evidence that will be introduced.[FN6]

> FN5. AHP objects to Dr. Avorn's testifying as to whether the Pondimin labeling regarding pulmonary hypertension was "false and misleading" because those terms *are standards under FDA regulations* for determining whether a pharmaceutical product is misbranded. 21 C.F.R. § 201.56. (AHP Mot. re: Avorn at 14.) Plaintiffs response is that Dr. Avorn is not being offered to testify as an expert in FDA regulations. Instead, his testimony on this subject refers only to the ordinary meaning of the words "false" and "misleading." (Pls.' Opp. to AHP Mot. re: Avorn at 11.)

> FN6. For example, Dr. Avorn opines that AHP should have included a black box warning about primary pulmonary hypertension ("PPH"). According to Plaintiffs, that opinion is grounded in evidence which will demonstrate that AHP knew of more cases of PPH than indicated on the original warning, that the French government required a black box warning for dexfenfluramine and that an FDA officer indicated that Redux should have a black box warning.

2. Speculation as to AHP's Motives and Intent in Marketing and Labeling Pondimin and Redux.

*2 Dr. Avorn opines that AHP's failure to change the Pondimin label concerning pulmonary hypertension and in drafting the Redux label with the FDA was driven by its desire to increase profits. (AHP Mot. re: Avorn Ex. A at 94.) AHP asserts that this amounts to improper lay opinion testimony, that Dr. Avorn lacks personal knowledge concerning AHP officials' thought processes and that his opinions of AHP's corporate intent invade the province of the jury. AHP also argues that the true purpose of Dr. Avorn's testimony is to place an expert's stamp of approval on Plaintiffs' interpretation of the evidence.

Plaintiffs respond that Dr. Avorn's testimony about the risks, benefits, patterns of use and economics of Pondimin and Redux is within the scope of his expertise as a pharmacoeconomist and pharmacoepidemiologist and is based on AHP internal documents relating to marketing and sales.

3. Speculation as to the Thoughts and Expectations of Physicians.

Dr. Avorn has given opinions regarding the thoughts and expectations of physicians with respect to their decisions to prescribe Pondimin and Redux and their interpretations of prescription drug labels and warnings. (AHP Mot. re: Avorn Ex. A at 35-39 and 85-86.) AHP asserts that these opinions are not based on any sort of survey or comparative analysis and instead appear to be an inappropriate attempt to convert Dr. Avorn's subjective views into expert opinion.

Plaintiffs respond that Dr. Avorn is qualified to provide opinions to the jury about what information physicians expect to be provided in drug labeling and their decision making process in prescribing drugs. In fact, Plaintiffs assert that *Dr. Avorn's qualifications* show that he is integrally involved in the choice of all drugs to be used for an entire teaching hospital at Harvard Medical School. (Pls.' Opp. to AHP Mot. re: Avorn Ex. A.)

4. Dr. Avorn's Recounting of Various Documents or Testimony.

Throughout his preservation deposition testimony, Dr. Avorn read into the record the content of other documents or testimony. AHP asserts that Dr. Avorn lacks personal knowledge of these matters and that Plaintiffs cannot use him as a funnel for a broad range of documents and testimony about which he has no knowledge or legitimate expert opinions. Plaintiffs respond that Dr. Avorn's testimony recounting various documents is merely laying the foundation for his opinions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 3
Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

5. Dr. Avorn's Reaction to Documents Discussing the Approval Process for Redux.

Throughout his preservation deposition testimony, *Dr. Avorn is asked to give his reaction to certain documents discussing the approval process of Redux.* AHP asserts that Dr. Avorn has no personal knowledge of these documents and that his reactions are not expert opinions as Dr. Avorn is not an expert in drug approval. AHP argues that insofar as Dr. Avorn's reaction is that he would have acted differently than AHP or the FDA, such opinion is speculation and invades the province of the jury. Plaintiffs respond that Dr. Avorn is generally qualified to testify about prescription drug policy issues.

6. Dr. Avorn's Speculation Regarding the Processing of Certain Adverse Drug Experience Reports and AHP's Intent in Processing and Investigating Adverse Drug Experience Reports.

*3 Dr. Avorn gave testimony in his preservation deposition concerning how he would have processed certain adverse drug experience reports differently than AHP and that the way AHP handled these reports was motivated by a desire to mislead the public regarding risks associated with Pondimin and Redux. (AHP Mot. re: Avorn Ex. A at 38; 127-35; 144-45.) AHP asserts that Dr. Avorn is not an expert in investigating or processing adverse drug event reports and his speculations about AHP's intent are for a jury, not an expert, to evaluate. Plaintiffs respond that, as a pharmacoepidemiologist, Dr. Avorn is qualified to testify about how post-marketing reports of adverse reactions should be evaluated.

7. Dr. Avorn's Agreement with Colin Bloor, M.D.'s Opinion Regarding Pathology Slides from an Animal Study on Dexfenfluramine.

At his preservation deposition, Dr. Avorn testified that he agreed with Colin Bloor, M.D., a pathologist who reviewed rat slides from a Les Laboratories Servier ("Servier") study and opined that the results from that study mandated further investigation into the risks involved with dexfenfluramine. (AHP Mot. re: Avorn Ex. A at 104-05.) AHP asserts that Dr. Avorn has no expertise in pathology, which is the subject matter of Dr. Bloor's opinion, and that he has not reviewed the materials cited by Dr. Bloor.

Plaintiffs respond that Dr. Avorn refers to this study only in the sense that it should have put AHP on notice that fibrotic heart conditions (such as valvular heart disease) were a potential problem with Redux.

B. *Lewis J. Rubin, M.D.*

Dr. Rubin is among a handful of internationally recognized authorities on PPH and its relationship to diet drugs. He is highly qualified in his field, as borne out by his curriculum vitae. (Pls.' Opp. to AHP Mot. re: Rubin Ex. 14.) Nonetheless, AHP argues that Dr. Rubin lacks the qualifications and reliable methodology to offer many of the opinions he expresses. AHP challenges three areas of testimony purported to be offered by Dr. Rubin.[FN7]

> FN7. AHP asserts as a fourth ground that Dr. Rubin should not be allowed to rely on data from the Surveillance of North American Pulmonary Hypertension ("SNAPH") Study (which he participated in) when the study data have not been produced. AHP is currently pursuing these documents pursuant to Hague Convention Rules. To the extent that AHP asserted this ground for exclusion in its motion, it is now moot.

1. Opinions Related to Pondimin Labeling.

Dr. Rubin opines that between 1994 and 1996, the Pondimin label relating to pulmonary hypertension incorrectly stated the number of known cases of PPH associated with fenfluramine, and fails to distinguish between pulmonary hypertension ("PH") and PPH.[FN8]

> FN8. According to Dr. Rubin, PH is not necessarily progressive and fatal and can be treated by addressing the underlying condition that caused elevation of the pulmonary artery pressures in the patient. (AHP Mot. re: Rubin Ex. A ¶ 25(d).) On the other hand, PPH is a rare and difficult condition to diagnose, and it is also a progressive and incurable condition. (AHP Mot. re: Rubin Ex. A ¶ 25(d).)

AHP asserts that Dr. Rubin is not qualified to opine on the adequacies of the Pondimin label, that he is not an expert in warnings and that he has no expertise regarding the regulatory aspects of drug warnings. AHP further asserts that even if Dr. Rubin's basis for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

his opinion is only as a practicing physician, that is not a sufficient basis to offer opinions on drug labeling.

AHP argues that Dr. Rubin's opinions about the Pondimin label amount to nothing more than personal opinion of what he thinks is AHP's ethical responsibility. AHP asserts that this opinion is not based on any type of methodology and thus does not constitute scientific, technical or other specialized knowledge. In support of its argument, AHP contends that the only document Dr. Rubin relied upon was a print out of adverse drug event reports submitted to the FDA, which was shown to him as part of an ABC News interview. AHP asserts that Dr. Rubin never reviewed the accuracy of this document, nor did he review a single adverse drug event report in formulating his opinion. AHP argues that, in fact, Dr. Rubin does not even have and did not produce a copy of the document; it was merely shown to him.

*4 AHP further argues that Dr. Rubin's opinions will mislead and confuse the jury. Dr. Rubin states that he will opine generally that more information regarding pulmonary hypertension should have been provided. AHP argues that such an opinion will not assist the trier of fact and that further confusion will stem from Dr. Rubin's lack of qualifications and failure to use any methodology regarding the labeling of Pondimin.

Dr. Rubin states that the inadequacies in labeling which he points out are the kind of information prescribing physicians rely upon. AHP, however, asserts that Dr. Rubin does not prescribe appetite suppressants and has done no research concerning what physicians who actually prescribed Pondimin would rely upon in making their decisions. Additionally, AHP argues that Dr. Rubin has no case specific information regarding what a particular prescribing physician knew. In sum, AHP contends that Dr. Rubin's opinions on labeling amount to expressions of personal feeling and are not proper expert testimony.

Plaintiffs respond that AHP improperly characterizes Dr. Rubin's opinions as related to regulations. Plaintiffs assert that the content of a warning must be medically and scientifically accurate and that Dr. Rubin's opinions address the accuracy of AHP's warning. In fact, Plaintiffs point out that AHP retained Dr. Rubin for his expertise in PPH and to develop an algorithm in order to distinguish between PH and PPH. Moreover, Plaintiffs point out that even AHP's own regulatory witness stated that regulatory expertise does not qualify a witness to draft the content of a drug warning.

Plaintiffs also contend that Dr. Rubin relies on good grounds for his opinions. For example, Plaintiffs assert that Dr. Rubin relies on good grounds to support his view that the Pondimin label prior to 1997 was misleading. According to Plaintiffs, these good grounds include: (1) an article in 1993 which reported 15 cases of fatal and irreversible PPH; (2) an AHP line listing shown to Dr. Rubin first by ABC News but later by other attorneys in connection with this case which indicated a number of reported PH cases; and (3) the fact that in August 1996, AHP was aware of at least 62 fenfluramine associated PH cases (including 20 deaths) and 142 additional PH cases associated with dexfenfluramine (including 52 deaths) on a worldwide basis. Plaintiffs further argue that AHP relied on this very same article and AHP line listing to reach the same conclusion internally in 1994, when AHP employees suggested that the Pondimin label was wrong and should be revised.

### 2. Opinions Regarding Pharmacological Similarities Between Different Drugs Including Aminorex and Pondimin.

Dr. Rubin has referred to the drug Aminorex to support his conclusion that diet drugs cause PPH. Both aminorex fumarate ("Aminorex") and fenfluramine are anorectic agents. (AHP Mot. re: Rubin Ex. A ¶ 12, at 6.) AHP asserts that Dr. Rubin cannot compare these drugs because he is not qualified to give expert opinions in general pharmacology. AHP argues that Aminorex has a different pharmacology from fenfluramine and dexfenfluramine and, thus, cannot be used to show that fenfluramine or dexfenfluramine caused PPH. AHP has had no involvement with Aminorex and asserts that there is nothing in the record to show that any plaintiff in a case where Dr. Rubin is an expert took Aminorex. In addition, AHP contends that Aminorex-related testimony would confuse the jury by creating a mini-trial over the similarities and differences between Aminorex and AHP's products.

*5 Plaintiffs respond that Dr. Rubin does not have to be a pharmacologist to opine that the outbreak of PPH in persons who took Aminorex, an anorexigen, should have put AHP on notice that anorexigens were potentially problematic and should have been investigated thoroughly.

### 3. Opinions Regarding Corporate Conduct of AHP.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 5
Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

AHP asserts that Dr. Rubin should not be permitted to testify regarding his meetings and communications with the manufacturers of Pondimin and Redux. Similarly, AHP asserts that Dr. Rubin should be barred from offering opinions on the propriety of AHP's corporate actions. In support of its assertions, AHP argues that Dr. Rubin is not an expert on corporate conduct, has never worked for the FDA and has no understanding of the applicable FDA regulations.

Plaintiffs respond that AHP is seeking exclusion of factual evidence which is not implicated by *Daubert* at all. Plaintiffs also believe that such a blanket request is best left to the transferor courts who can consider the relevance of the proposed evidence in light of the facts of each case based on a fuller record than that which has been developed by AHP in the instant motion.

## II. *LEGAL STANDARD*

Federal Rule of Evidence 702 imposes an obligation on a trial judge to " 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." ' [FN9] *Kumho Tire Co ., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999)* (quoting *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993))*. The party offering the expert has the burden of proving admissibility under Rule 702. *See Daubert, 509 U.S. at 592 n. 10* (citing Federal Rule of Evidence 104(a)). In *Daubert*, the Court required that the subject of an expert's testimony must constitute "scientific knowledge." *Id. at 589-90*. "The adjective 'scientific' implies a grounding in the methods and procedures of science," and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id. at 590*. In addition, Rule 702 requires that expert evidence or testimony *assist the trier of fact. See id. at 591*. In other words, expert testimony must "fit" the issues in a case by having a "valid scientific connection to the pertinent inquiry" before the trier of fact. *Id. at 591-92*.

> FN9. The Rule provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702.

Faced with a proffer of expert testimony, the court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact." *Id.* at 592. In undertaking this gatekeeping function, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid" and whether "that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. In *Daubert*, the Court identified several factors to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge. These include: whether the theory or technique can be or has been tested; whether the theory has been subjected to peer review and publication; whether a technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and whether the theory or method has general acceptance in the scientific community. *See id.* at 593-94 (listing factors which may bear on inquiry, but stating that such factors did not establish definitive checklist or test). The court's role as a gatekeeper is a flexible one and these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir.1999).

*6 A court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." 4 Weinstein's Fed. Evid. § 702.06[1], at 702-52 (2000); *see Wehling v. Sandoz Pharms, Corp.,* 162 F.3d 1158 (4th Cir.1998) (available at No. 97-2212, 1998 WL 546097, at *4 (4th Cir. Aug. 20, 1998)) (stating that pharmacist/toxicologist was unqualified to testify as to adequacy of drug warning where he had "never been involved with the drafting, regulation, or approval of product labeling for any prescription medication" and that "experience as a pharmacist, reading prescription labels and dispensing drugs, [did] not qualify him to testify about the adequacy of drug warnings"); *Robertson v. Norton Co.,* 148 F.3d 905, 907 (8th Cir.1998) (stating that, while ceramics expert "was undoubtedly qualified to testify about a manufacturing defect in an exploding ceramic grinding wheel, that did not qualify him as an expert on grinding wheel warnings," because, among other things, "[h]e had never designed a warning for a ceramic product" and "[h]is knowledge of ceramics would not provide the expertise on questions of display, syntax, and emphasis that the jury would expect from a bona fide warning expert"); *Kent v. Howell Elec. Motors,* No. Civ. A. 96-7221, 1999 WL

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

517106, at *5 (E.D.Pa. July 20, 1999) (excluding engineering expert from offering opinion as to adequacy of warnings because expert admitted he was not expert in warning design); _Tyler v. Sterling Drug Co._, 19 F.Supp.2d 1239, 1245 (N.D.Okla.1998) (excluding testimony of human factors psychologist as to product warnings); _Estate of Lam v. Upjohn Co._, No. Civ. A. 94-003-H, 1995 WL 478844, at *2 (W.D.Va. April 21, 1995) (recommending exclusion of expert testimony on pharmaceutical warnings when expert had "no academic training or regulatory experience and ha[d] never participated in any FDA-related proceedings addressing what constitutes an adequate warning"). In other words, a party cannot qualify an expert generally by showing that the expert has specialized knowledge or training that would qualify him or her to opine on some other issue. _See Redman v. John D. Brush and Co._, 111 F.3d 1174, 1179 (4th Cir.1997) (holding that metallurgic expert could testify about properties and characteristics of metal safe, but was not qualified to testify about industry standards for design of safes because "he had never before analyzed a safe, engaged in the manufacture or design of safes, or received any training regarding safes," and, "[e]ven more importantly, he was not personally familiar with the standards ... used in the safe industry"); _Barrett v. Atlantic Richfield Co._, 95 F.3d 375, 382 (5th Cir.1996) (holding that ecologist with expertise in behavior patterns of rats was not qualified to opine on source of chromosomal damage exhibited by rats; _nor was he qualified to opine on whether humans faced increased health risks from exposure to chemicals_).

\*7 In addition, an expert's opinion must be based on scientific, technical or other specialized knowledge and not on "subjective belief or unsupported speculation." _Daubert_, 509 U.S. at 590; _see Textron, Inc. v. Barber-Colman Co._, 903 F.Supp. 1558, 1564 (W.D.N.C.1995) (stating that "not every opinion offered by an expert is an expert opinion ... [and that] an expert's opinion must be an 'expert' opinion (that is an opinion formed by the witness' expertise) rather than simply an opinion broached by a purported expert"). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury. _See McGowan v. Cooper Indus., Inc._, 863 F.2d 1266, 1273 (6th Cir.1987) (holding that while expert's testimony on industry custom was admissible, "once the jury heard all of the evidence on the scope of [the defendant's] duty, it was as qualified as [the expert] to determine whether [the defendant] breached that duty"); _STX, Inc. v. Brine, Inc._, 37 F.Supp.2d 740,

768 (D.Md.1999), _aff'd_, 211 F.3d 588 (Fed.Cir.2000), _aff'd_, No. 99-1540, 2000 WL 564010 (Fed.Cir. May 8, 2000) (stating that " 'an expert's opinion on the ultimate legal issue must be supported by something more than a conclusory statement' ") (quoting _In re Buchner_, 929 F.2d 660, 661 (Fed.Cir.1991)); _Securities and Exch. Comm'n v. Lipson_, 46 F.Supp.2d 758, 763 (N.D.Ill.1998) (holding that expert's training and experience as accountant did not "specially equip him to divine what [the defendant] truly believed" about reliability of financial reports and that any opinions offered in that regard were "at worst, speculation [and that] at best, they are credibility choices that are within the province of the jury").

## III. _DISCUSSION_

Initially, the court will address some practical concerns that stem from the manner and circumstances under which the instant motions were presented. Then, the court will address the four general subject areas which will encompass the scope of its ruling on these motions: (1) the introduction of documents and other testimony into the preservation depositions of witnesses; (2) the corporate intent of AHP; (3) the opinions rendered by Drs. Avorn and Rubin concerning disciplines in which they are not qualified but that are purportedly offered only to the extent that they put AHP on notice of a particular circumstance; and (4) opinions concerning FDA regulations, drug warnings, drug labels and the thoughts and considerations of physicians generally.

### A. _Practical Concerns_

From a practical standpoint, these _Daubert_ motions present this MDL transferee court with a unique situation. AHP's challenges to the expert testimony of Drs. Avorn and Rubin arose out of the statements made in response to questions addressed to them at their preservation depositions. The preservation depositions are especially important in the MDL sense, because in most trials before transferor courts, Drs. Avorn and Rubin will not appear live, but will be offered on video to a jury. This presents the court with several concerns involving judicial administration. First, the court recognizes that this testimony will be offered, presumably, at hundreds of trials in different states where the Federal Rules of Evidence will apply. However, the state substantive law applied by these transferor courts may be different (i.e., state laws about informed consent). These differences in state law may affect the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

substance of a particular civil action as it involves the content of the drug warnings and labels and other issues. The preservation deposition of an expert witness, therefore, must be handled in a materially different way than the preservation deposition of a fact witness. The mechanics of the preparation of the preservation deposition should be such that depending on transferor court rulings as to relevancy, admissibility, and Rule 403 balancing, excerpts from portions of the preservation deposition-including questions, answers and possibly even exhibits-may have to be deleted or rearranged.

*8 It is impossible to make such adjustments if many of these ideas and thoughts embodied in questions, answers and exhibits are so intertwined that redaction is either impossible, awkward or results in a confusing presentation in what remains of a preservation deposition to present to a jury after editing. Thus, aside from the content that can be a problem depending on where the case will be tried, and before which judge (who will rule on admissibility, relevancy and other factors), the actual structure of the document to be depicted on the video has to be taken into consideration at the time that it is prepared. There is no way for this MDL transferee court to go through these preservation depositions and exclude certain portions and grant AHP's motion in part, but allow other portions and deny AHP's motion in part. Chopping, cutting and pasting would be an arduous task and will probably distort the entire presentation in many portions that are to be conveyed by video.

### B. AHP's Instant Challenges

Initially, the parties agree that both Dr. Avorn and Dr. Rubin are highly qualified within their particular disciplines. Many of the opinions rendered by these witnesses then, presumably, are not being challenged. Specifically, AHP recognizes that Dr. Avorn is qualified as a pharmacoepidemiologist and pharmacoeconomist and that Dr. Avorn's preservation deposition testimony does address some issues within his expertise. Likewise, AHP recognizes that Dr. Rubin is qualified as an expert on PPH and that his preservation deposition testimony does address some issues within his expertise.

How these witnesses will be presented in the video is another matter and is not before us, but could very well be before trial judges throughout the country. Although those judges will still be governed by the Federal Rules of Evidence there could be differences among them about relevancy, admissibility and Rule 403 balancing. With these concerns in mind, the court finds that AHP's challenges to the testimony of Drs. Avorn and Rubin fall into four categories: (1) the introduction of documents and other testimony into the preservation depositions of witnesses; (2) the corporate intent of AHP; (3) the opinions rendered by *Drs. Avorn and Rubin concerning disciplines in which they are not qualified* but that are purportedly offered only to the extent that they put AHP on notice of a particular circumstance; and (4) opinions concerning FDA regulations, drug warnings, drug labels and the thoughts and considerations of physicians generally.

### 1. The Lengthy Introduction of Documents and Other Testimony into the Witness' Preservation Deposition.

Whether a particular document can be introduced through a witness as a basis for his expert opinion will, of course, be left to the trial judge in the transferor court. If the document that is being read or paraphrased to the witness is in fact admitted into evidence (i.e. it is relevant and admissible, and there is no Rule 403 balancing reason to preclude it), presumably the trial judge will allow the witness to speak to it. On the other hand, if it is inadmissible, or if it is capable of being admissible but is irrelevant, or if both admissible and relevant but, pursuant to Rule 403, its prejudice outweighs its probative value, it will not get into evidence and the witness will not be called upon to speak about it. There is no way for this MDL transferee court to predict whether a portion of the preservation deposition should be portrayed to the jury or not. Accordingly, the court cannot and will not grant AHP's motion to preclude it. The time when those issues should be decided is when the trial court, presumably at a pretrial conference, would be called upon to order redaction of certain portions of the video preservation deposition.

### 2. The Corporate Intent of AHP.

*9 Regarding expert opinions as to AHP's corporate intent, the court finds trouble in the qualifications of both Drs. Rubin and Avorn. The court also finds trouble with the admissibility of an opinion on this subject. Even if such an opinion was relevant, there are serious problems with the reliability of these opinions. The witnesses are qualified in particular scientific disciplines. These disciplines do not include knowledge or even experience in the manner in which corporations and the pharmaceutical

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

marketplace react, behave or think regarding their non-scientific goals of maintaining a profit-making organization that is subject to rules, regulations, standards, customs and practices among competitors and influenced by shareholders or public opinion. If the witnesses' bases for the opinions concerning improper intent come from other evidence such as letters, admissions of AHP officers or employees, or other admissible evidence, *that* is what the jury should hear and the question of AHP's intent would flow from such evidence to be determined by the jury. *See City of Tuscaloosa v. Harcos Chem. Inc.*, 158 F.3d 548, 565 (11th Cir.1998) (stating that statistician's characterizations of documentary evidence as reflective of collusion would not assist trier of fact through application of scientific, technical or other specialized knowledge to understand evidence or determine fact in issue because "the trier of fact is entirely capable of determining whether or not to draw such conclusions without any technical assistance from ... experts").

The question of intent is a classic jury question and not one for experts, and clearly not these experts. *See e.g., Voilas v. General Motors Corp.*, 73 F.Supp.2d 452, 464 (D.N.J.1999) (stating that area of assessing punitive damages, implicative of various societal policies and lacking any basis in economics "rests strictly within the province of the jury and, thus, does not necessitate the aid of expert testimony"). Thus, to the extent that AHP's motions seek to preclude Drs. Avorn and Rubin from testifying about the corporate intent of AHP, *the court will grant the motions.*

In doing so, the court specifically notes that its ruling does not preclude Plaintiffs from introducing evidence of the intent of AHP leadership or personnel. In fact, the court recognizes that such evidence could be relevant and, indeed, could be admissible. For example, in a particular civil action, punitive damage claims may bring into play the right of plaintiffs to show what conduct of AHP was in reckless indifference to the health and well-being of persons that were targeted for diet drug consumption by reason of a dominating or overriding policy to maximize profits at any cost. Evidence to that effect may or may not be relevant. A particular plaintiff may choose not to proceed to recover punitive damages for a number of strategic reasons. Other plaintiffs may feel otherwise. If they feel otherwise and make such a claim, evidence of such intent may be considered by the trial court and its admissibility may be challenged on customary grounds or on Rule 403 grounds. It is doubtful that an opinion will be received in that regard from any witness, let alone

Drs. Avorn and Rubin, whose specialties are clearly in other fields. For these reasons, the court will grant AHP's motions regarding these witnesses' opinions about AHP's corporate intent and it leaves to another day, and another courtroom, whether evidence of AHP's intent can be presented to the jury and if so to what extent.

### 3. Opinions Rendered by Drs. Avorn and Rubin Concerning Disciplines in Which They Are Not Qualified But That Are Purportedly Offered Only to the Extent That They Put AHP on Notice of a Particular Circumstance.

**\*10** Specifically, the court will address Dr. Rubin's preservation deposition testimony regarding Aminorex and Dr. Avorn's preservation deposition testimony agreeing with Colin Bloor, M.D.'s opinion regarding the Servier Rat Slides.

#### a. Dr. Rubin's Testimony Regarding Aminorex

Dr. Rubin has rendered the opinion that there is an association between anorexigens and primary pulmonary hypertension. (AHP Mot. re: Rubin Ex. A ¶ 11, at 5.) He draws into that opinion the fact that in the 1960's there was an epidemic of PPH in Switzerland, Germany and Austria in association with Aminorex. He goes on to opine that in 1981, case reports of PPH in association with the use of *fenfluramine*, another anorexigen, began to appear in the scientific literature, and he cites a number of articles. (AHP Mot. re: Rubin Ex. A ¶ 12, at 6.) Dr. Rubin concludes that studies in the 1990's established an association between the use of anorexigens and an increased risk of PPH. (AHP Mot. re: Rubin Ex. A ¶¶ 14-16, at 6-7.)

AHP contends that Dr. Rubin has referred to the drug Aminorex to support his conclusion that diet drugs cause PPH. AHP also suggests that all reference to Aminorex should be excluded because of the possibility of the real danger of unfair prejudice, confusion and misleading the jury.

There appears to be good ground to exclude an opinion, if there is one, that because Aminorex has been shown to have a close association with PPH and because fenfluramine is also an anorexigen, albeit with significant pharmacological differences,[FN10] that there is scientific support for the opinion that fenfluramine causes PPH. The court has not been presented with an opinion by Dr. Rubin that supports

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the notion that all anorexigens including Aminorex and fenfluramine can cause PPH. Indeed, Plaintiffs acknowledge that Dr. Rubin is not a pharmacologist. (Pls.' Opp. to AHP Mot. re: Rubin at 23.)

> FN10. *See* Generic Expert Witness Report of Nancy Balter, M.D.. (AHP Mot. re: Rubin Ex. G ¶ 23, at 12.)

Instead, Plaintiffs argue that Dr. Rubin should at least be able to opine about the Aminorex experience for the purpose of showing that the scientific community was on notice that anorexigens have long been associated with PPH. This poses a dilemma faced by this MDL transferee court on a *Daubert* challenge to this sort of an opinion. The trial court will have to determine whether or not notice is an issue before the jury. Notice could very well be an issue with a negligence claim, but it would not be so on a strict liability or regulatory violation claim. Indeed, in depth testimony concerning the pharmacological differences may demonstrate that the Aminorex experience of the 1960's vis a vis the fenfluramine experience of the 1990's might bring about exclusion under Rule 403.

At this stage of the litigation, this MDL transferee court concludes that there is no reliable basis for Dr. Rubin to state with a reasonable degree of medical certainty that because Aminorex was determined to have an association with PPH in the 1960's, that fenfluramine can cause PPH in the 1990's and beyond. If there was such an opinion the same should be precluded. However, the court does not understand Plaintiffs to be proffering such an opinion from Dr. Rubin. To the extent that the Aminorex experience in the 1960's may support evidence of notice to the pharmaceutical community, the court will leave that ultimate decision to the trial court.

### b. Dr. Avorn's Testimony Regarding Servier Rat Slide Studies

*11 Dr. Avorn agrees with the opinions of Colin Bloor, M.D., a pathologist who examined the Servier Rat Slides. Plaintiffs recognize that Dr. Avorn is not qualified as a pathologist. Instead, Plaintiffs argue that Dr. Avorn should be able to testify about Dr. Bloor's review of the Servier Rat Slide Studies for the purpose of showing that AHP was on notice of the potential need for further investigation of any potential dangers associated with dexfenfluramine. For the same reasons as stated above involving issues

of notice with regard to Dr. Rubin's opinions about Aminorex, the court makes the following conclusions. First, there is no reliable basis for Dr. Avorn to opine about pathological issues relating to the Servier Rat Slide Studies. Second, to the extent that the Servier Rat Slide Studies support evidence of notice to AHP of the potential need for further investigation into dexfenfluramine, the court will leave that ultimate decision to the trial court.

### 4. Opinions Concerning FDA Regulations, Drug Warnings, Drug Labels and the Thoughts and Considerations of Physicians Generally.

AHP seeks to preclude any opinions by these witnesses concerning the drug labeling experience encountered by AHP regarding the diet drugs in question. The parties agree that Drs. Avorn and Rubin are fully qualified within their disciplines and that they can testify concerning risks and benefits of the diet drugs in issue. The parties also agree that these doctors can provide the medical and scientific testimony as it relates to PPH. AHP's objections to Dr. Avorn's and Dr. Rubin's testimony go to the extent to which the labels were, from a regulatory vantage point, proper. AHP also objects to the opinions of these witnesses to the extent that they purport to predict what all doctors take into consideration when they read drug labels in determining whether to prescribe a particular drug.

Dr. Avorn admits that he is not an expert in the regulatory field. (AHP Mot. re: Avorn Ex. B at 46.) While Dr. Rubin has had some contact with labeling concerns and has been involved in the creation of labeling to some extent, it has been somewhat secondary to his primary endeavors within his discipline. Dr. Rubin also admits that he is not an expert in the regulatory field. (AHP Mot. re: Rubin Ex. B at 304-05.) On the present record, therefore, the court concludes that although Drs. Avorn and Rubin are fully qualified within their specialties, that *does not qualify them to speak as experts in the field* of the requirements of the federal regulations regarding labeling and warnings for FDA approved drugs. In addition, Dr. Rubin's and Dr. Avorn's qualifications do not qualify them to opine as experts about what all doctors generally consider in making prescription decisions.

On the other hand, Dr. Rubin and Dr. Avorn are fully qualified to opine on the medical facts and science regarding the risks and benefits of the diet drugs in question and to compare that knowledge with what

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 10
Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

was provided in the text of labeling and warnings on the diet drugs in question. In other words, Drs. Rubin and Avorn are qualified to render an opinion as to the labels' completeness, accuracy, and-it follows from that-the extent to which any inaccuracies or omissions could either deprive a reader or mislead a reader of what the risks and benefits of the diet drugs in issue are or were at the time the labeling was published. Again, whether or not such an opinion would be admissible will depend on an articulation by the trial judge of the issues to be decided and the law to be applied in that proceeding.

**\*12** The court can easily preclude, from a *Daubert* viewpoint, the rendering of opinions by either of these witnesses as to a label's compliance with federal regulatory requirements or as to what doctors in general think, because the witnesses are not qualified for that. However, the court cannot preclude their opinions comparing facts in evidence with the status of the content shown on the labeling of the diet drugs. Indeed, on this topic, state law may have some effect on the extent to which such opinions, though offered by qualified witnesses, may be limited on considerations of relevancy.

### IV. *CONCLUSION*

For the foregoing reasons the court will grant in part and deny in part AHP's *Daubert* motions concerning Drs. Avorn and Rubin.

An appropriate Pretrial Order follows.

### PRETRIAL ORDER NO. 1332

AND NOW, TO WIT, this 20th day of June, 2000, upon consideration of American Home Products Corporation's Motions to Limit the Expert Testimony of Jerome L. Avorn, M.D. and to Exclude Testimony of Lewis J. Rubin, M.D. and the responses thereto, IT IS ORDERED that said motions are GRANTED IN PART and DENIED IN PART:

1. to the extent that Drs. Avorn or Rubin are proffering opinions concerning the content of third party documents including letters that may not be received in evidence, the motions are GRANTED. To the extent that such documents are received in evidence the determination as to the admissibility of the witnesses' opinions should be determined by the trial court;

2. to the extent that Drs. Avorn and Rubin proffer opinions as to the intent of AHP as evidenced by the

words and conduct of their agents, servants or employees, the motions are GRANTED;

3. to the extent that any opinion by Dr. Rubin concerning any connection between Aminorex and the diet drugs in question seeks to support a conclusion that because Aminorex has an association with PPH that the diet drugs at issue have an association *and/or a causal connection between their* ingestion and PPH, AHP's motion seeking to preclude the expert testimony of Dr. Rubin is GRANTED. This preclusion does not affect the extent to which a trial court may consider the Aminorex experience of the 1960's and events that followed in connection with the investigation or study of Aminorex as a ground to allow an opinion concerning notice to the pharmaceutical community of any association that might have been shown by those events involving Aminorex;

4. to the extent that there is any opinion by Dr. Avorn as to the pathology of the Servier Rat Slide Studies reviewed by Colin Bloor, M.D., AHP's motion seeking to preclude the expert testimony of Dr. Avorn is GRANTED. This preclusion does not affect the extent to which a trial court may consider the Servier Rat Slide Studies as a ground to allow an opinion concerning notice to AHP of the need for further investigation concerning the potential dangers of dexfenfluramine; and

5. to the extent that opinions are proffered by Drs. Avorn or Rubin concerning the extent to which there was legal compliance with any laws or regulations governing the preparation, including the content of labeling or other warnings furnished by AHP in conjunction with the marketing of the diet drugs at issue, the motions are GRANTED.

**\*13** IT IS FURTHER ORDERED that the extent to which any matters in items 1 through 5 above permits the rendering of opinions by either Drs. Avorn or Rubin, such allowances shall be conditioned upon a determination by the trial court that such matters are relevant and that the evidence upon which any opinion stands be received into evidence at the trial.

E.D.Pa.,2000.
In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation
Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2070528 (Trial Motion, Memorandum and Affidavit) Joint Motion of Class Counsel and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Seventh Amendment Liaison Committee to Preliminarily and Permanently Enjoin the Jones Law Firm from Disseminating False and Misleading Information to Class Members and Improperly Soliciting Claimants to Opt-Out o f the 7th Amendment (Sep. 08, 2004)

• 2004 WL 2070529 (Trial Pleading) Class Counsel's Memorandum of Law in Reply to the Memorandum of AHP Settlement Trust in Response to Joint Motion by *Wyeth, Class Counsel and the Salc for Preliminary Approval of the Seventh Amendment to the Nationwide Class Action Settlement Agreemen t and for the Entry of Related Orders (Aug. 19, 2004)

• 2004 WL 2070530 (Trial Pleading) Memorandum of AHP Settlement Trust in Response to Joint Motion by Wyeth, Class Counsel and the Salc for Preliminary Approval of the Seventh Amendment to the Nationwide Class Action Settlement Agreement and for the Entry of Related Orders (Aug. 17, 2004)

• 2004 WL 1576280 (Trial Pleading) Defendant, Celltech Pharmaceuticals Inc.'s Answer and Affirmative Defenses to Plaintiff's First Amended Petition (Apr. 26, 2004)

• 2004 WL 1576281 (Trial Pleading) Defendant, Fisons Corporation's Answer and Affirmative Defenses to Plaintiff's First Amended Petition (Apr. 26, 2004)

• 2004 WL 1576272 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum in Opposition to Motion to Dismiss (Apr. 13, 2004)

• 2004 WL 3661021 () (Report or Affidavit) (Mar. 22, 2004) Original Image of this Document (PDF)

• 2004 WL 1576271 (Trial Motion, Memorandum and Affidavit) Brief in Support of Motion of Non-Party Woodlawn Medical Group, Inc. for Protective Order and to Quash Subpoena (Feb. 2004)

• 2003 WL 23653397 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Motion to Dismiss (Dec. 3, 2003)

• 2003 WL 23653410 (Trial Motion, Memorandum and Affidavit) The Drug Store's Response to Plaintiffs' Motion to Remand (Dec. 2003)

• 2003 WL 24232442 () (Report or Affidavit) (Nov. 25, 2003) Original Image of this Document (PDF)

• 2003 WL 23653412 (Trial Pleading) Answer and Affirmative Defenses of the Drug Store (Oct. 2003)

• 2001 WL 34134825 (Trial Motion, Memorandum and Affidavit) American Home Products Corporation%7Ds Motion to Enforce Pretrial Order No. 1415 Against Plaintiff Suzanne Jortner (Nov. 05, 2001)

• 2001 WL 34134824 (Trial Motion, Memorandum and Affidavit) Motion of American Home Products Corporation for Order Enforcing Pto 1415 Against *Certain Plaintiffs Asserting Settled Claims Under the

Guise of Asserting Claims Based on Primary Pulmonary Hypertension (Oct. 19, 2001)

• 2000 WL 34588083 () (Transcript) (Dec. 12, 2000) Original Image of this Document (PDF)

• 2000 WL 34016470 (Trial Motion, Memorandum and Affidavit) American Home Products Corporation%7Ds Opposition to the Dunn Objectors%7D Request for Further Discovery (Nov. 29, 2000)

• 2000 WL 34588077 () Report of Pravin M. Shah, M.D. (Nov. 29, 2000) Original Image of this Document (PDF)

• 2000 WL 34588078 () Karen L Kelly, MD. (Oct. 31, 2000) Original Image of this Document (PDF)

• 2000 WL 34588079 () (Report or Affidavit) (Oct. 31, 2000) Original Image of this Document (PDF)

• 2000 WL 34016465 (Trial Motion, Memorandum and Affidavit) Memorandum of Vinson Carithers, III in Opposition to Class Counsels%7D Motion to Impose Bond Requirement on Certain Objectors for the Filing of an Appeal (Oct. 30, 2000)

• 2000 WL 34016471 (Trial Motion, Memorandum and Affidavit) Memorandum of Vinson Carithers, III in Opposition to Class Counsels%7D Motion to Impose Bond Requirement on Certain Objectors for the Filing of an Appeal (Oct. 23, 2000)

• 2000 WL 34016462 (Trial Motion, Memorandum and Affidavit) Joint Motion for Approval of Fourth Amendment to Nationwide Class Action Settlement Agreement (Aug. 10, 2000)

• 2000 WL 34588073 () (Report or Affidavit) (Jul. 11, 2000) Original Image of this Document (PDF)

• 2000 WL 34588071 () Report of Gary A. Salzman, M.D. (Jun. 23, 2000) Original Image of this Document (PDF)

• 2000 WL 34016441 (Trial Filing) Pretrial Order No. (Jun. 20, 2000)

• 2000 WL 34016442 (Trial Filing) Cigna Healthcare%7Ds Statement of the Issues to be Presented on Appeal (Jun. 09, 2000)

• 2000 WL 34588074 () (Report or Affidavit) (May 26, 2000) Original Image of this Document (PDF)

• 2000 WL 34611051 () Litigation (May 10, 2000) Original Image of this Document (PDF)

• 2000 WL 34588069 () (Partial Testimony) (May 4, 2000) Original Image of this Document (PDF)

• 2000 WL 34588068 () (Partial Testimony) (May 2, 2000) Original Image of this Document (PDF)

• 2000 WL 34617100 () (Report or Affidavit) (Apr. 11, 2000) Original Image of this Document (PDF)

• 2000 WL 34611050 () Affidavit of Victor F. Tapson, M.D. (Apr. 7, 2000) Original Image of this Document (PDF)

• 2000 WL 34017133 (Trial Filing) Pretrial Order No. 1227 (Apr. 06, 2000)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

• 2000 WL 34593124 () (Report or Affidavit) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627887 () (Transcript) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627888 () (Transcript) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627889 () (Transcript) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627890 () (Transcript) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627891 () (Transcript) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627892 () (Transcript) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627893 () (Transcript) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627926 () Thomas Quincy Garvey III, M.D. (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627927 () Expert Report of Arthur Frank, M.D. (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627929 () Expert Report of Kerry J. Kaplan, M.D., F.A.C.C. (F.R. CIV. P. 26) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627945 () (Partial Testimony) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627946 () (Partial Testimony) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627947 () (Partial Testimony) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627948 () (Partial Testimony) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627949 () (Partial Testimony) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34627950 () (Partial Testimony) (Feb. 28, 2000) Original Image of this Document (PDF)

• 2000 WL 34016457 (Trial Motion, Memorandum and Affidavit) Plaintiffs%7D Memorandum in Response to Defendants%7D Motions to Exclude the Expert Testimny of Paul J. Wellman, Ph.D. and Timony J. Maher, Ph.D. (Feb. 25, 2000)

• 2000 WL 34588081 () (Report or Affidavit) (Feb. 25, 2000) Original Image of this Document (PDF)

• 2000 WL 34016440 (Trial Filing) Pretrial Order No. (Feb. 14, 2000)

• 2000 WL 34611045 () Report of Janet Arrowsmith-Lowe, M.D. (Feb. 3, 2000) Original Image of this Document (PDF)

• 2000 WL 34016448 (Trial Motion, Memorandum and Affidavit) Motion of American Home Products Corporation for a Preliminary Injunction Regarding False and Misleading Communications with Absent Class members Through the Internet Addresses (Jan. 19, 2000)

• 1999 WL 34000189 () Oral and Videotaped Deposition of Randall L. Tackett, Ph.D. (Dec. 13, 1999)

• 1999 WL 34000173 () (Partial Testimony) (Nov. 30, 1999)

• 1999 WL 34000170 () Deposition of: Colin M. Bloor, M.D. (Volume I) (Oct. 4, 1999)

• 1999 WL 33998261 () Rule 26 Expert Disclosure of Kenneth J. Kellar, Ph.D. (Oct. 1, 1999) Original Image of this Document (PDF)

• 1999 WL 33998263 () Rule 26 Expert Disclosure of Adaani Frost, M.D. (Oct. 1, 1999) Original Image of this Document (PDF)

• 1999 WL 33998264 () (Report or Affidavit) (Oct. 1, 1999) Original Image of this Document (PDF)

• 1999 WL 33998268 () Expert Disclosure of Robert Siegel, M.D. (Oct. 1, 1999) Original Image of this Document (PDF)

• 1999 WL 33998282 () Expert Disclosure of Richard T. Lee, M.D. (Oct. 1, 1999) Original Image of this Document (PDF)

• 1999 WL 33998253 () Generic Expert Witness Report of Selvyn B. Bleifer, M.D. (Sep. 30, 1999) Original Image of this Document (PDF)

• 1999 WL 33998274 () Report of C. Ralph Buncher, Sc.D. (Sep. 30, 1999) Original Image of this Document (PDF)

• 1999 WL 33998252 () Expert Witness Report of Robert W. Pollock (Sep. 29, 1999) Original Image of this Document (PDF)

• 1999 WL 33998275 () Expert Report of Kenneth P. Chepenik, Ph.D. (Sep. 29, 1999) Original Image of this Document (PDF)

• 1999 WL 33998277 () Report by Frank R. Fazzari (Sep. 29, 1999) Original Image of this Document (PDF)

• 1999 WL 33998271 () Report of Michael N. Rubinstein, M.D., F.A.C.C. (Sep. 28, 1999) Original Image of this Document (PDF)

• 1999 WL 33998273 () Report of Stanley J. Schneller, M.D. (Sep. 28, 1999) Original Image of this Document (PDF)

• 1999 WL 33998280 () Expert Report of Paul A. Kvale, M.D. (Sep. 27, 1999) Original Image of this Document (PDF)

• 1999 WL 33998281 () Expert Report of Kenneth L. Pinsker, M.D. (Sep. 27, 1999) Original Image of this Document (PDF)

• 1999 WL 33998276 () Report of John Concato, M.D., M.S., M.P.H. (Sep. 25, 1999) Original Image of this Document (PDF)

• 1999 WL 33998279 () Report of Ronald W. Millard, Ph.D. (Sep. 24, 1999) Original Image of this Document (PDF)

• 1999 WL 33998254 () Mark J. Reasor, Ph.D. (Sep.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 876900 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

23, 1999) Original Image of this Document (PDF)

• <u>1999 WL 33998287</u> () Expert Disclosure of Victor Tapson, M.D. (Sep. 1999) Original Image of this Document (PDF)

• <u>1999 WL 33998255</u> () Expert Report of Dr. Allan David Sniderman, M.D. (Jul. 1, 1999) Original Image of this Document (PDF)

• <u>1999 WL 33998256</u> () Expert Report of Dr. Walter O. Spitzer, M.D., M.H.A., M.P.H., F.R.C.P.C., F.A.C.E. (Jul. 1, 1999) Original Image of this Document (PDF)

• <u>1999 WL 34000171</u> () (Partial Testimony) (Jun. 10, 1999)

• <u>1999 WL 33740480</u> (Trial Motion, Memorandum and Affidavit) American Home Products Corporation's Objection to Certain Provisions of the Interneuron Settlement Agreement (Feb. 05, 1999)

• <u>1999 WL 34000174</u> () Report of James H. Oury, M.D. (Jan. 25, 1999)

• <u>1998 WL 34190446</u> (Trial Motion, Memorandum and Affidavit) Les Laboratoires Servier's Reply Memorandum of Law in Support of its Motion for Reconsideration and Clarification of PTO 373 (Dec. 16, 1998)

• <u>1998 WL 34190447</u> (Trial Motion, Memorandum and Affidavit) Les Laboratoires Servier's Memorandum of Law in Opposition to the PMC's Motion to Compel Discovery (Dec. 14, 1998)

• <u>1998 WL 34202072</u> (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Plaintiffs' Opposition to Les Laboratoires Servier's Motion for Reconsideration of Pretrial Order No. 271 (Sep. 22, 1998)

• <u>1998 WL 34202071</u> (Trial Motion, Memorandum and Affidavit) Les Laboratoires Servier's Motion for a Reconsideration of Pretrial Order No. 271 (Sep. 21, 1998)

• <u>1998 WL 34202074</u> (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Points and Authorities in Support of Their Opposition to Defendant, Les Laboratoires Servier's Motion for Protective Order and Stay of All Discovery (Sep. 18, 1998)

• <u>1998 WL 34202075</u> (Trial Motion, Memorandum and Affidavit) Les Laboratoires Servier's Motion for a Protective Order for a Temporary Stay of all Discovery Against the Sole Non-U.S. Defendant During the Pendency of its Motion to Dismiss (Aug. 31, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## Curriculum Vitae

updated: June, 2006

Name:            Jerome L. Avorn

Office Address:  Division of Pharmacoepidemiology and Pharmacoeconomics
                 Brigham and Women's Hospital
                 1620 Tremont Street, suite 3030
                 Boston, MA 02120

Home Address:    5 Circuit Road
                 Chestnut Hill, MA 02467

Place of Birth:  New York, New York

Education:

| | |
|---|---|
| 1969 A.B. | Columbia University, New York |
| 1974 M.D. | Harvard Medical School, Boston |

Postdoctoral Training:

| | |
|---|---|
| 1972-74 | Fellow in Social Studies (Medical Sociology), Harvard College |
| 1974-75 | Intern in Medicine, The Cambridge Hospital, Cambridge, Massachusetts |
| 1974-77 | Clinical Fellow in Medicine, Harvard Medical School |
| 1975-77 | Resident in Internal Medicine, Beth Israel Hospital, Boston, Massachusetts |

Licensure and Certification:

| | |
|---|---|
| 1974 | National Board of Medical Examiners |
| 1974 | Massachusetts License Registration |
| 1977 | Diplomate, American Board of Internal Medicine |
| 1988 | Certification in Geriatric Medicine, American Board of Internal Medicine |

Academic Appointments:

| | |
|---|---|
| 1977-79 | Instructor in Preventive and Social Medicine, Harvard Medical School |
| 1979-85 | Assistant Professor of Social Medicine and Health Policy, Harvard Medical School |
| 1985-90 | Associate Professor of Social Medicine, Harvard Medical School |
| 1990-2004 | Associate Professor of Medicine, Harvard Medical School |
| 2004-present | Professor of Medicine, Harvard Medical School |

Hospital Appointments:

Beth Israel Hospital

| | |
|---|---|
| 1977-84 | Assistant in Medicine, Department of Medicine |
| 1984-87 | Assistant Physician, Department of Medicine |
| 1987-89 | Associate Physician, Department of Medicine |
| 1989-94 | Physician, Department of Medicine |

Brigham and Women's Hospital

|  |  |
|---|---|
| 1986-1992 | Associate Physician, Department of Medicine |
| 1992-present | Physician, Department of Medicine |

Hospital Clinical Responsibilities:

|  |  |
|---|---|
| 1977-1981 | Attending physician (General Internal Medicine), Beth Israel Hospital |
| 1981-1992 | Attending physician (Geriatrics and Internal Medicine), Beth Israel Hospital |
| 1992-1998 | Attending physician (Geriatrics and General Medicine), Brigham and Women's Hospital |
| 1998-present | Attending physician (General Medicine Service), Brigham and Women's Hospital |

Major Administrative Responsibilities:

|  |  |
|---|---|
| 1978-1980 | Director, Division of Geriatrics, Harvard School of Public Health |
| 1978-1980 | Program Director, Geriatric Curriculum Development Project, Harvard School of Public Health |
| 1982-1983 | Director, Geriatric Drug Education Program, Department of Public Health, Commonwealth of Massachusetts |
| 1982-1984 | Director, Program in Ethics and Geriatrics, a joint project of The Hastings Center and Harvard Medical School |
| 1985-1987 | Chair, Task Force on Determinants of Antibiotic Utilization, National Institutes of Health |
| 1979-1980 | Director, Harvard Medical School Long-Term Care Gerontology Center Program |
| 1986-present | Director, Program for the Analysis of Clinical Strategies |
| 1990-1995 | Harvard Geriatric Research and Training Center: Director of Epidemiology, Data Management, and Health Services Research Core |
| 1998-present | Chief, Division of Pharmacoepidemiology and Pharmacoeconomics, Department of Medicine, Brigham and Women's Hospital. |

Major Committee Assignments and Other Positions:

National and Regional

|  |  |
|---|---|
| 1978-81 | Professional Advisory Committee, Department of Elder Affairs, Commonwealth of Massachusetts |
| 1979 | Study section on long-term care gerontology centers, Administration on Aging, Department of Health, Education and Welfare |
| 1982-83 | Advisor on drug utilization studies, National Center for Health Services Research, National Institutes of Health |
| 1983-84 | Peer reviewer, Robert Wood Johnson Foundation, Program for Hospital Initiatives in Long-term Care |
| 1983-85 | Working group on "The Aging Society," The Carnegie Corporation |
| 1985-93 | Peer reviewer for Medications and Aging program, The John A. Hartford Foundation |

| 1989 | Peer reviewer, Gerontology and Geriatrics Review Group, National Institute on Aging, National Institutes of Health. |
| 1989-91 | U.S. Congress, Office of Technology Assessment: Advisory Panel on Government Policy and Pharmaceutical Research and Development |
| 1990-94 | Advisory Panel on Geriatrics, U.S. Pharmacopeia |
| 1997-99 | Advisory Panel on Outcomes and Cost-Effectiveness, U.S. Pharmacopeia |
| 2000- | Consultant in Pharmacoepidemiology, Food and Drug Administration |
| 2002-03 | Member, National Committee for Quality Assurance (NCQA) Advisory Panel on Medication Management in the Elderly |

Harvard Medical School

| 1977-80 | Committee on Geriatrics |
| 1978-80 | Teaching Committee, Department of Preventive and Social Medicine |
| 1980-88 | Executive Committee, Division on Aging |
| 1980-84 | Malpractice consultant, Harvard Risk Management Foundation |
| 1981-88 | Working Group on Health Policy and Aging, Division of Health Policy Research and Education |
| 1986-88 | Faculty Council |
| 1997-98 | Faculty Advisor, William Bosworth Castle Society |
| 1997-98 | Member, Geriatrics Interest Group, Francis Weld Peabody Society |
| 1998-2002 | Subcommittee on Teaching Evidence-Based Medicine and Therapeutics |
| 2001-02 | Committee on development of new postdoctoral course in clinical pharmacology (responsible for pharmacoepidemiology component) |
| 2003- | Search committee for a faculty appointment in pharmacoepidemiology, Harvard School of Public Health |

Beth Israel Hospital

| 1976-77 | Committee on House Officer Education, Department of Medicine |
| 1980-81 | Chair, Committee on Medical Research, Division of General Medicine |
| 1983-92 | Pharmacy and Therapeutics Committee |
| 1986-87 | Laboratory Board |
| 1986-92 | Transfusion Committee |
| 1987-92 | Chair, Pharmacy and Therapeutics Committee |

Brigham and Women's Hospital

| 1992-present | Pharmacy and Therapeutics Committee |
| 1993-98 | Chair, Medication Education and Management Committee |
| 1993-95 | Chair, Technology Assessment Committee |
| 1994-95 | Chair, Drug Therapy Cost Reduction Committee, Partners Healthcare System |
| 1996-97 | Clinical Practice Standards Committee |
| 1996-2000 | Order Entry Clinical Advisory Group / Clinical Software Oversight Committee |
| 1998-2000 | Clinical Executive Committee |
| 1998-2002 | Advisory Committee, Department of Medicine |
| 1999-present | Education Council |
| 2002-present | Faculty Standing Committee on Resident Research |
| 2002-present | Executive Committee, Department of Medicine |

Professional Society Involvement:

| | |
|---|---|
| 1978-94 | Gerontological Society of America (clinical medicine section) |
| 1979-81 | Research Group on Ethics and Health Policy of the Institute of Society, Ethics, and the Life Sciences (The Hastings Center) |
| 1981-82 | Public Policy Committee, The Gerontological Society of America |
| 1981-82 | Task Force on Ethical Issues and Medical Technology, The Hastings Center |
| 1982- | American Geriatrics Society |
| 1984-89 | Fellow, The Hastings Center |
| 1988-89 | Institute of Medicine, Forum on Drug Development and Regulation: Working Group on Geriatric Pharmacology |
| 1988-90 | Institute of Medicine, Committee on Health Promotion and Disability Prevention in Aging |
| 1990-91 | Chair, panel on *Drug Utilization Review Interventions, American Society for Clinical Pharmacology and Therapeutics* |
| 1994-98 | Board of Advisors, Center for the Study of Drug Development, Tufts University |
| 1998 | Advisory Panel on Methodology in Pharmacoeconomics, International Society for Pharmacoeconomics and Outcomes Research |
| 2002 | Invited opening plenary presentation, International Society for Pharmacoeconomics and Outcomes Research |

International Society for Pharmaco-Epidemiology:

| | |
|---|---|
| 1995-98 | Board of Directors |
| 1995-97 | Task Force on Standards for Research Methods in the Epidemiologic Evaluation of Drugs |
| 1995-97 | Program Chair, XIII International Conference on Pharmaco-Epidemiology |
| 1996-99 | Ad Hoc Committee on Privacy and Epidemiologic Research |
| 1997-98 | President of the Society |
| 1998-99 | Chair, Nominating Committee |
| 2002- | Fellow of the Society |
| 2002 | Invited opening plenary presentation |

Other National and International Contributions:

| | |
|---|---|
| 1981-85 | Board of Directors, The Harvard Public Interest Health Foundation |
| 1982-83 | Director, Curriculum Development Project in social medicine, The Aga Khan Medical College, Karachi, Pakistan |
| 1982-88 | Consultant in geriatric medicine and epidemiology, The Greater New York Blood Program |
| 1983-91 | Physician advisor and program evaluator (geriatric pharmacology and policy), American Association of Retired Persons |
| 1985-86 | Expert Panel on Prescription Drug Use, Blue Cross of Massachusetts |
| 1988-89 | Member, Massachusetts Drug Formulary Commission |

| | |
|---|---|
| 1988-90 | Advisor to the Inspector General, U.S. Department of Health and Human Services, on drug coverage and quality assurance in federal programs |
| 1989-1994 | Clinical Director, Optimal Therapeutics Program, Blue Cross-Blue Shield of Massachusetts |
| 1992 | Advisor to President Clinton's transition team on prescription medication policy |
| 1997-1998 | Chair, National Collaborative on Improving Prescribing Practices, Institute for Healthcare Improvement |
| 1997-2000 | Co-Founder and Board of Directors member, The Ad Hoc Committee to Defend Health Care [Massachusetts] |
| 1999-2000 | Steering committee, Massachusetts Citizens' Initiative Petition to Reform Health Care |
| 2000-2001 | Expert Advisor on antibiotic prescribing and bacterial resistance, World Health Organization (WHO) Global Strategy for Containment of Antimicrobial Resistance |
| 2001-present | Member, Technical Advisory Group, State of Pennsylvania Department of Aging, Pharmaceutical Assistance Contract for the Elderly |

Editorial Boards and Editorships:

| | |
|---|---|
| 1981-84 | Journal of Gerontology (Editorial Board) |
| 1990-99 | UPDATE, A Quarterly Review of Geriatric Pharmacology (Editor) |
| 1992-1996 | Journal of Gerontology (Associate Editor, Clinical Medicine) |

Journal Reviewer:

| | |
|---|---|
| 1985-present | New England Journal of Medicine (ad hoc reviewer) |
| 1987-present | Journal of the American Medical Association (ad hoc reviewer) |

Awards and Honors:

| | |
|---|---|
| 2002: | Highly Cited Researcher: Identified by Institute for Scientific Information based on Medline citations as one of the most frequently cited investigators within the category of Social Science and Medicine during the period 1981 – 1999 (top one-half of 1% of all published researchers). |

## TEACHING, CLINICAL, AND RESEARCH CONTRIBUTIONS

With accelerating progress in new drug development and rising pressures to contain the costs of health care, educating physicians about appropriate prescribing decisions has become increasingly important. The focus of my work has been on defining patterns of medication use by physicians and patients; quantifying the benefits, risks, and costs of specific drugs to help build an evidence-base for rational prescribing; and developing, implementing, and rigorously testing innovative educational approaches to improve prescribing practices.

I have addressed these problems in several complementary ways, including: (1.) creating new approaches to teaching physicians about optimal drug use, and then testing these approaches in randomized controlled multi-site studies; (2.) developing new methods for computer-assisted analysis of large population databases to measure patterns and predictors of physician prescribing practices, as well as to study adverse drug events and patient non-compliance; (3.) measuring the effect of changes in reimbursement policies on physician prescribing and patient outcomes; and (4.) conducting cost-effectiveness analyses of specific medications. Together, these studies have resulted in new ways to improve drug use and clinical outcomes. Programs based on this work have been implemented locally, nationally, and internationally.

One method I developed, known as "academic detailing," uses medical-school-based educational outreach to improve physician prescribing and reduce drug use that is not pharmacologically optimal or cost-effective. This intervention merges evidence-based analysis of appropriate drug use with the effective adult-learning and behavior-change strategies that have been used by pharmaceutical companies to change physicians' prescribing practices. My colleagues and I have evaluated its effectiveness in several randomized controlled trials involving physicians in primary care practice in four states, doctors and other caregivers in nursing homes, general practitioners in Europe, and house officers at the BWH. These studies have shown that the approach is effective in educating clinicians about rational prescribing and improving medication use. My work in this area has been a synthesis of teaching and research. It has now been widely replicated and adopted by large health care systems, drug benefit managers, governmental health services in Great Britain, Canada, and Australia, and in the developing world.

Teaching has been a central focus of my career since my first year as a student at HMS, when I developed a student-initiated course in some of these areas, described below. In the more than 30 years since I have worked in several domains to develop teaching programs at HMS and its affiliated institutions. I created new courses on health care delivery at Harvard College (medical sociology; aging and society), the Harvard School of Public Health (geriatrics and health policy), and HMS (forerunners to the "Patient-Doctor" and "Clinical Commons" courses). I continue to teach at HMS (pharmacology, geriatrics), HSPH (epidemiology), the Harvard Program in Clinical Effectiveness (health policy, pharmaco-epidemiology), and BWH (while serving as Attending Physician on the General Medicine Service and as described further below).

In 1998 my teaching, clinical, and research activities came together when I was asked to establish a Division of Pharmacoepidemiology and Pharmacoeconomics within the Department

6

of Medicine at BWH. In this role, I developed several new programs to teach physicians and medical students about appropriate and cost-effective prescribing, including: (1.) implementing a new curriculum of lectures and monthly teaching rounds for interns and residents on proper medication use and drug cost-effectiveness analysis; (2.) using the hospital's automated order-entry system to produce interactive computer guidelines that improve drug use decisions at the time they are being made; (3.) establishing and editing a new series of publications to teach house officers and medical students about evidence-based medication choices; (4.) developing a program that supports fellows in Infectious Diseases to serve as "academic detailers" who are deployed to provide "just-in-time" education when problematic antibiotic orders are written; (5.) creating a new system for evaluating the benefits, risks, and costs of drugs proposed for hospital formulary inclusion; (6.) conducting *epidemiologically rigorous* assessment of current in-patient drug use practices and identifying areas in need of educational intervention. The Division is coming to be viewed as a model for integrating evidence-based medication use and cost-effective prescribing into the teaching programs and clinical activities of academic departments of medicine.

7

**SELECTED FUNDING INFORMATION:**

**National Institutes of Health:**

| | | |
|---|---|---|
| 1979-1981 | NIH / NCHSR / R01 | PI |

Demarketing and administrative strategies in drug prescribing.

| | | |
|---|---|---|
| 1983-1985 | NIH / AHCPR / R01 | PI |

Analysis of a successful strategy to improve prescribing.

| | | |
|---|---|---|
| 1985-1990 | NIH / AHCPR / R01 | PI |

Improving the accuracy of transfusion decisionmaking.

| | | |
|---|---|---|
| 1986-1988 | NIH / NIA / R01 | PI |

Medication use as a risk factor for falls in the elderly.

| | | |
|---|---|---|
| 1986-1988 | NIH / AHCPR / R01 | Co-Investigator |

Impact of payment restrictions on physician decisions.

| | | |
|---|---|---|
| 1986-1988 | NIH / NIMH / R01 | PI |

Staff expectation as a mediator of functional status in nursing homes.

| | | |
|---|---|---|
| 1988-1991 | NIH / FDA / R01 | PI |

Population-based surveillance of adverse drug reactions.

| | | |
|---|---|---|
| 1988-1991 | NIH / AHCPR / R01 | Co-Investigator |

Unintended outcomes of health care cost containment.

| | | |
|---|---|---|
| 1989-1991 | NIH / NEI / R01 | PI |

Epidemiology of topical beta-blocker side effects in elderly.

| | | |
|---|---|---|
| 1990-1995 | NIH / NIA / P01 | Project Director |

Geriatric Research and Training Center: Data Management and
Epidemiology Core.

| | | |
|---|---|---|
| 1992-1993 | NIH / NIA / RO1 | PI |

Drug-induced parkinsonian symptoms.

| | | |
|---|---|---|
| 1994-1995 | NIH / NIA / PO1 | Co-Investigator |

Geriatric Research and Training Center-Research & Development Core:
Effects of benzodiazepine and other CNS-active drugs on hospitalized
patients.

8

| 1993-1997 | NIH / NIA / R01 | Co-Investigator |
|---|---|---|

Missing and mismeasured data in studies of the elderly.

| 1994-1998 | NIH / NIA / K08 | Sponsor |
|---|---|---|

Clinical Investigator Award; Antihypertensives and the elderly.
(M. Monane, M.D., M.P.H.)

| 1995-1996 | NIH / NIA / PO1 | Co-Investigator |
|---|---|---|

Older Americans Independence Center-Research & Development Core:
Clinical trial of outcomes of anti-hypertensive medication reduction.

| 1995-1999 | NIH / NIA / T32 | Co-Program Director |
|---|---|---|

Training program in epidemiologic research on aging.

| 1996-1998 | NIH / AHCPR / R01 | Co-PI |
|---|---|---|

Prevention of adverse drug effects in the nursing home setting.

| 1996-1999 | NIH / NIDA / R01 | PI |
|---|---|---|

Risky geriatric benzodiazepine use: Predictors and trends.

| 1996-1999 | NIH / AHCPR / R01 | PI |
|---|---|---|

Nephrologist care and outcomes in renal insufficiency.

| 1991-1996 | NIH / NIA / K08 | Sponsor |
|---|---|---|

Clinical Investigator Award; Drug-induced illness in the elderly: NSAIDs
as a model. (J. Gurwitz, M.D.)

| 1999-2004 | NIH / NIMH / KO1 | Sponsor |
|---|---|---|

Clinical Investigator Award: Appropriateness and compliance in
depression treatment (P. Wang, M.D., Dr.P.H.).

| 2000-2004 | NIH / NIA / T32 | Program co-Director |
|---|---|---|

Training Program in Epidemiologic Research on Aging.

| 2000-2002 | NIH / AHRQ / RO1 | co-Investigator |
|---|---|---|

Consequences of drug cost-sharing in the elderly.

| 2000-2001 | NIH / NIA / RO3 | PI |
|---|---|---|

Drugs and aging: Demographic, clinical, and cost data.

| 2000-2001 | NIH / NIA / RO1 | co-PI |
|---|---|---|

Evaluating drug benefit policy changes in geriatric practice.

| 2002-2006 | NIH / NIMH / R01 | PI |
|---|---|---|

Outreach and treatment for depression in the labor force (subcontract)

| 2002-2005 | NIH / NIA / R01 | co-PI |
|---|---|---|
| | Medication use, comorbidity, and outcomes in older people. | |

| 2002-2007 | NIH / NIAMS / K 23 | sponsor |
|---|---|---|
| | A randomized, controlled trial of an intervention to improve the management of osteoporosis. (Dan Solomon, M.D., M.P.H.) | |

| 2002-2005 | NIH / NIDA / R01 | co-PI |
|---|---|---|
| | Pain medication use and risk factors for opioid dependency | |

| 2002 – 2004 | NIH / NIAMS / R55 | co-PI |
|---|---|---|
| | Why is cardiac risk increased in rheumatoid arthritis? | |

| 2003 - 2007 | NIH / NIA / RO1 | co-PI |
|---|---|---|
| | Effects of income-based drug charges on older patients | |

| 2003 – 2007 | NIH / AHRQ / RO1 | co-PI |
|---|---|---|
| | Consequences of drug cost sharing: A new randomized trial | |

**Other Federal Support:**

| 1978-1980 | Administration on Aging | Program Director |
|---|---|---|
| | Curriculum development in aging and public health | |

| 1984-1985 | HCFA | Co-Investigator |
|---|---|---|
| | Economic and clinical consequences of three drug cost containment strategies in Medicaid. | |

| 1985-1987 | Veterans Administration | Co-Investigator |
|---|---|---|
| | Central nervous system effects of beta-blockade in the elderly. | |

| 1988-1991 | Veterans Administration | Co-Investigator |
|---|---|---|
| | Systemic effects of beta-blocking medications used for glaucoma. | |

**Foundation Support:**

| 1982 | Robert Wood Johnson Foundation | PI |
|---|---|---|
| | Medication-induced disability: Its nature, extent and prevention. | |

| 1982-1984 | Blue Cross of Massachusetts Foundation | PI |
|---|---|---|
| | Preventing inappropriate medication use in hospitals: A demonstration. | |

10

1983-1984    AARP-Andrus Foundation                PI
             Clinical effects of medication use in the elderly.

1983-1986    The Commonwealth Fund                 Project Director
             Diagnosis and drug treatment of incontinence in the elderly: Epidemiology
             and health services research.

1985-1988    John A. Hartford Foundation           PI
             Clinical and economic consequences of improving the use of medications
             in nursing homes.

1988-1991    John A. Hartford Foundation           PI
             Medications and aging: Research and education in geriatric pharmacology.

1988-1995    American Federation for Aging Research    Program Director
             Fellowship program in geriatric clinical pharmacology.

1992-1993    John A. Hartford Foundation           PI
             Improving medication use in the nation's elderly.

1998-2000    The Medical Foundation                Sponsor
             Faculty development award in clinical epidemiology
             (E. Knight, M.D., M.P.H.).

2002 – 2007  The Arthritis Foundation              co-PI
             Improving osteoporosis care: Development and randomized controlled
             testing of patient and physician educational interventions

2003 – 2007  The Arthritis Foundation              co-PI
             Biologic therapies and DMARDs in rheumatoid arthritis:  Ensuring their
             safe and appropriate use

**Other Support:**

1989-1991    Alcon Laboratories                    PI
             Population-based study of adverse systemic effects in patients treated for
             glaucoma.

1989-1992    Ocean Spray Cranberries               PI
             Prevention of urinary tract infections in nursing home residents.

1992-1993    Johnson & Johnson - Merck             PI
             Clinical and policy analysis of over-the-counter use of histamine
             antagonists.

11

| 1993 | Kabi Pharmacia | PI |
| | Cost-effectiveness of thrombolytic therapy in acute myocardial infarction. | |

| 1993 | Armour Pharmaceuticals | PI |
| | Cost-effectiveness analysis of prophylactic treatment for hemophilia. | |

| 1995 | Dupont | Co-Investigator |
| | Risk management issues in medication use in the elderly. | |

| 1993-1997 | Ocean Spray Cranberries | PI |
| | Preventing recurrent urinary tract infections. | |

| 1994-1997 | American Heart Association | Preceptor |
| | Patterns and outcomes of antihypertensive therapy in the elderly. | |

| 1996-1997 | Searle | PI |
| | Health care utilization among NSAID users. | |

| 1996-1999 | Bristol-Myers Squibb | PI |
| | Hypertension and medication use: Defining the patient's perspective. | |

| 1996-1999 | Baxter International | PI |
| | Cost of inhibitor development in hemophilia. | |

| 1997-1999 | Eli Lilly | PI |
| | Racial differences in antidepressant use. | |

| 1997-2000 | Bristol-Meyers Squibb | PI |
| | Cardiac functional status and health care utilization following thrombolysis for acute myocardial infarction. | |

| 1997-2003 | Bristol-Meyers Squibb | PI |
| | Pravastatin as primary prevention in elderly subjects: cost-effectiveness analysis and outcomes research. | |

| 1999-2000 | Speywood Pharmaceuticals | PI |
| | A pharmacoeconomic analysis of the treatment of patients with inhibitors to factor VIII. | |

| 1999-2000 | Pharmacia | PI |
| | Adverse cardiac and CNS effects of anticholinergic drugs used for incontinence in the elderly. | |

| 2000-2001 | Pharmacia | PI |
| | Excessive sedation and accidents in patients with Parkinson's Disease. | |

| 2001-2002 | Pfizer | co-PI |
|---|---|---|

Epidemiology of COX-2 inhibitor use and hypertension

| 2001-2002 | Novo-Nordisk | PI |
|---|---|---|

Cost-effectiveness analysis of recombinant factor VII in the treatment of bleeding disorders.

| 2001-2002 | Pfizer | PI |
|---|---|---|

Adverse events in hospitalized patients receiving systemic anti-fungal medication.

| 2002-2004 | Merck | co-PI |
|---|---|---|

Risk of acute myocardial infarction in patients taking COX-2 inhibitors and conventional NSAIDs.

| 2003 – 2006 | GlaxoSmithKline | PI |
|---|---|---|

Post-marketing surveillance and risk management of alosetron in older patients.

**REPORT OF TEACHING:**

**Harvard College**

       1972-1974     Tutor in Medical Sociology (Social Relations)

       In collaboration with Paul Starr (then a graduate student in sociology at Harvard), developed a new offering for Harvard college students in the Social Relations Program. Topics covered included the social and political organization of the health care delivery system, the sick role, and the aging patient.

       *8 undergraduates; 3 hours/week preparation, 3 contact hours/week*

       1979-1980     Our Future Selves: Aging in Society

       While director of the Division of Geriatrics at the Harvard School of Public Health (see below), developed and taught a new course for Harvard and Radcliffe undergraduates dealing with the social, cultural, and political aspects of aging in western societies.

       *15-20 undergraduates; 2 hours/week preparation, 2 contact hours/week*

**Harvard Medical School**

    1969-1971    Course director, student-initiated Curriculum in Social Medicine

       As an HMS I student, developed a first-year course to introduce students to aspects of medicine which were not at that time covered in the HMS curriculum. Topics covered included health economics and policy, epidemiology, medical ethics, and legal medicine. Lectures by visiting faculty were coordinated with the biomedical content of the curriculum; course became integrated into the standard HMS I "core" curriculum.

      *175 medical students; 2 hours/week preparation, 1 contact hour/week*

       A second course, offered in the HMS II year in conjunction with the introduction to clinical medicine course, covered aspects of patient care and the doctor-patient relationship that were not part of the standard ICM curriculum. These included lectures by visiting faculty on physician-patient communication, alcoholism and drug abuse, human sexuality, and death and dying.

      *30 medical students; 2 hours/week preparation, 1☐ contact hours/week*

    1977-1980    Preventive and Social Medicine 724a.0: Social Theory, Human Values, and their Relation to Medical Care

Designed and taught this introductory course, which for several years was the main introductory course in the Department of Preventive and Social Medicine at HMS. Topics covered included: health policy, culture and disease, history of medicine, and societal aspects of medication use.

*25 medical students; 4 hours/week preparation, 2 contact hours/week*

1983-1984    Member, New Pathway Life Cycle Curriculum Design Group

1983-1984    Member, New Pathway Educational Methods Committee

1985-present  Annual teaching in the Division on Aging Continuing Medical Education course in geriatric medicine (pharmacotherapy in the elderly)

*200-300 practicing physicians; 1 hour preparation, 1 contact hour annually*

1996- 2001   Core lecture to HMS I on Geriatric Medicine

*100-150 medical students; 1 hour preparation, 1.5 contact hours annually*

1996- 2002   Core lecture to HMS III on Appropriate Prescribing (Patient-Doctor III)

*100-150 medical students; 1 hour presentation; 1.5 contact hours annually*

1998- 2002   Member, Subcommittee on Evidence-Based Medicine and Therapeutics

1998-present  Lecture on Geriatric Pharmacology in HMS I Principles of Pharmacology course

*100-150 medical students; 3 hours preparation, 1 contact hour [nominated as best lecture in course]*

2002-        Day-long module on pharmaco-epidemiology and pharmacoeconomics in new course, "Pharmacology for the Clinical Investigator."

*40 clinical and research fellows; 8 hours preparation, 7 contact hours*

**Harvard School of Public Health**

1979-1981    Health Policy and Management 213a, Issues in Geriatric Health Care

In developing the Division of Geriatrics at HSPH, established a curriculum on health care for the elderly for the Department of Health Policy and Management. This course provided an

15

overview of the impact of changing demography on the age distribution and health care needs of the population, and an introduction to aspects of health policy most relevant to care of the elderly (Medicaid, Medicare, long-term care, etc.).

*10-25 graduate students; 4 hours/week preparation, 2 contact hours/week*

1979-1980    Health Policy and Management 214b, Ethics and Geriatric Policy

Developed and taught this course with Professor Norman Daniels of the Philosophy Department at Tufts University. It addressed the ethical issues surrounding care of the elderly, including: determination of competency to refuse care, the "right to die," informed consent in a demented patient, ethical aspects of benefit-cost analysis and cost-containment, and intergenerational distribution of health care resources.

*8-12 graduate students; 3 hours/week preparation, 2 contact hours/week*

1978-80    Director, Geriatric Curriculum Development Project, Harvard School of Public Health

Was responsible for the conceptualization, development and dissemination of a series of free-standing case studies to bring concepts in geriatric care into the curricula of schools of public health and medicine in the U.S. Working with faculty and staff at HSPH, prepared case studies on issues including hospice care, quality-based reimbursement incentives, epidemiologic and economic aspects of screening for disease in the elderly, geriatric foster care programs, the role of the courts in maintaining quality standards in nursing homes, use of nurse-practitioners in geriatric delivery systems, mental health coverage under Medicare, and quality assurance in prescribing for the elderly.

1994-1996    Health Policy and Management 267c: Health and Medical Care in an Aging Population

Overview of geriatrics and health care delivery (developed and taught with Drs. John Delfs and Mark Moriane) covering policy issues in Medicare and Medicaid, nursing home regulation, capitation, demographic changes, and pharmaco-epidemiology. Course received a "perfect" evaluation by students in 1995-96 academic year.

*7-22 graduate students; 1 hour/week preparation, 2 contact hours/week*

2000-present  Epidemiology of Aging

Quantitative analysis of patterns of medication use, effectiveness, and adverse events in the elderly.

*14 – 20 graduate students; 1 hour preparation, 2 contact hours*

2001-present   Epidemiology 235d. Health Services Epidemiology

> Application of epidemiologic methods to health services research and to intervention trials designed to improve the quality of physician prescribing practices.

> *14-20 graduate students; 1 hour preparation, 2 contact hours. [Lecture received highest student evaluation in course]*

## Beth Israel Hospital

1978-1982    Preventive and Social Medicine 724b.0: The Doctor-Patient Relationship

> An extension of the earlier student-initiated course designed to supplement the HMS Introduction to Clinical Medicine curriculum, this course became a required component of ICM for all students taking this rotation at the Beth Israel Hospital. Prepared and delivered lectures on topics including compliance, confidentiality, the clinical interview, care of the elderly patient, and functioning as part of a health care team. The course was consistently one of the highest-rated components of Beth Israel ICM course. Many aspects of this course were later integrated into the New Pathway curriculum at HMS.

> *20-30 medical students; 3 hours/week preparation, 1 hour/week contact time*

1982-1992    Director, Beth Israel Hospital Drug Information Program

> Established and led a program for assembling and disseminating current information on selected topics in drug therapy. Brief monographs were prepared with BI faculty covering the indications for and rationale use of clindamycin, histamine antagonists, vancomycin, cefazolin, triazolam, metronidazole, and other drugs. Also developed a new structured antibiotic order form to improve the prescribing of parenteral antibiotic therapy throughout the hospital. The effect of this intervention was tested in a time-series analysis (see reference 19 in bibliography); form has been replicated in numerous institutions throughout the country.

## Brigham and Women's Hospital

1992-present   Director, Medication Education and Management Program (1992-1997) / Director of educational activities of the Division of Pharmacoepidemiology and Pharmacoeconomics (1998 – present)

> On coming to BWH I established a program to educate house officers, fellows, and attending physicians on evidence-based and cost-effective pharmacotherapy. Through work with local clinical experts, the program assesses new drugs proposed for formulary inclusion, develops guidelines for medication use, and prepares educational materials to explain the

pharmacology, pathophysiology, and clinical trial evidence behind these recommendations. Since 1998, this work has continued through the Division of Pharmacoepidemiology and Pharmacoeconomics. Monographs have been produced on: diltiazam for tachyarrhythmia; indications for histamine$_2$ receptor antagonists; ketorolac in post-operative analgesia; neuromuscular blocking agents in intensive care; and proper use of second and third generation cephalosporins. I also developed and edit a series of original eduational materials for house officers and staff on current topics in pharmacotherapy; a complete list of the 20 titles developed so far appears at the end of the bibliography. These are distributed to house officers and faculty throughout the hospital and are also disseminated electronically on the Partners Handbook.

In addition, my Division is helps develop the content and implementation of drug-related order entry components in the hospital's on-line order entry system.  Computer-based drug interventions have included guidelines on:  human growth hormone use in surgical or burn patients; third generation cephalosporins; age-specific dosing for psychoactive medications; intravenous proton-pump inhibitors;  COX-2 nonsteroidal anti-inflammatory drugs; fluoroquinolone antibiotics; granulocyte colonoy-stimulating factor; and activated protein C (drotrecogin alfa). Other order-entry work has developed, implemented, and evaluated a set of algorithms to convert intravenous medications to oral use when clinically appropriate for drugs with high bioavailability.

With the Infectious Diseases Division, we developed and periodically update new guidelines for antibiotic use which are disseminated hospital-wide and are also electronically. In 2003, a new program was begun with the BWH Hospitalist Service in which my Division takes responsibility once each month for the combined attending rounds of the four General Medicine Service teams and provides case-specific teaching about a selected topic on appropriate medication use.

1993-present    Annual lectures to house officers on topics in pharmacology

*25-35 house officers per year, 1.0 hour preparation, 1 contact hour annually*

1995-present    Faculty, Evidence-Based Medicine Journal Club

*20-25 house officers, 6 hours preparation, 2-3 contact hours annually*

1996-present    Approach to the Geriatric Patient, Introduction to Clinical Medicine course

*30-40 medical students; 1 hour preparation, 1-2 contact hours annually*

1996-2000    Core faculty, Epidemiology course, Clinical Effectiveness Program

*30-40 fellows and junior faculty per year; 2-3 hours preparation, 16 contact hours/year*

18

1996-present     Lectures on pharmacoepidemiology, and on health policy and drug use, Clinical
                 Effectiveness Program

*70-90 fellows and junior faculty per year, 3 hours preparation, 4 contact hours annually*

1998-present     Developed lecture series for house officers on rational prescribing and
                 cost-effectiveness analysis.

1999-present     Oversaw design, implementation, and evaluation of academic detailing program
                 to reduce excessive use of broad-spectrum antibiotics in Department of Medicine; the
                 effectiveness of this new program was documented in radomized controlled trial
                 published in *Archives of Internal Medicine* in 2001 (see bibliography). The program has
                 now been implemented on an ongoing, operational basis as an innovative peer-education
                 program. It employs senior residents trained by our Division with input from Infectious
                 Disease consultants, using case-based educational outreach to target inappropriate
                 antibiotic orders as soon as they are written.

## Advisory and supervisory responsibilities

1977-1992 Clinical supervision of medical students, house officers, and fellows in general
          internal medicine and geriatrics, Beth Israel Hospital

*3-5 medical students, 4-6 house officers, 0-1 fellow per year*

1977-1997 Annual precepting of HMS Introduction to Clinical Medicine students on history and
          physical examination, with emphasis on the geriatric patient

*3-5 medical students; 2 contact hours per year*

1980-present   Dissertation supervision for Harvard doctoral students:

          Health Policy and Management Department, HSPH: 5 *doctoral students*

          Epidemiology Department, HSPH: *2 doctoral students, 4 post-doctoral students*

          Harvard University joint M.D.-Ph.D. program: *2 doctoral students*

1983-1998     Harvard Fellowship Program in Geriatric Medicine

*served as primary research mentor for 8 fellows*

1988-1989     Preceptor for Patient-Doctor component of New Pathway curriculum

*6 medical students; 2 hours/week preparation, 2 contact hours/week*

19

1992-present   Supervision of medical students, house officers, and fellows as attending
               physician on general medicine service, Brigham and Women's Hospital

   *1-2 medical students and 3-5 house officers, one month per year*

1992-1997   Supervision of fellows on geriatric consultation service, BWH

   *1 fellow, 1-3 months per year*

1993-present   Brigham and Women's Hospital, medical residency program:
               direct one-on-one research supervision of senior medical residents during 4-6
               month research rotation

   *2 residents each year for 4-6 months each; 3-6 contact hours per week throughout year*

1996-1998   Faculty preceptor, General Medicine Division, Brigham and Women's Hospital

   *Supervised 3-4 house officers per session once a week, 2-3 months/year*

1997-1998   Faculty advisor, Castle Society, Harvard Medical School

## ADVISEES AND TRAINEES (partial list):

| Trainee name, years | Research topic | Current position |
|---|---|---|
| Stephen Soumerai, Sc.D. Predoctoral/Postdoctoral 1979-92 | Improving prescribing practices; pharmaceutical health policy | Professor of Ambulatory Care and Prevention, HMS |
| Daniel Everitt, M.D. Postdoctoral 1983-86 | Geriatric pharmacology | Director, Clinical Research, SmithKline Beecham Pharmaceuticals |
| May Reed, M.D. Predoctoral 1983-86 | Geriatrics; health services research | Associate Professor of Medicine, University of Washington, Seattle |
| Lee Learman, M.D., Ph.D. Predoctoral 1983-87 | The effect of expectations on clinical outcomes | Assistant Professor of Obstetrics, Gynecology and Reproductive Sciences, UCSF |
| Lawrence Cohen, M.D., Ph.D. Predoctoral 1984-88 | Cross-cultural definitions of dementia | Professor of Medical Anthropology, University of California, Berkeley |
| Mark Beers, M.D. Postdoctoral 1985-87 | Geriatric pharmacology | Executive Director of Geriatrics, Merck & Co.; Editor-in-Chief, The Merck Manuals |
| Susanne Salem-Schatz, Sc.D. Predoctoral/Postdoctoral 1985-90 | Health services research; clinical decisionmaking | Assistant Professor of Medicine, HMS, CHMC |
| Roselie Bright, Sc.D. Predoctoral/Postdoctoral 1986-89 | Pharmacoepidemiology | Epidemiologist, Center for Devices, Food and Drug Administration |
| Jerry Gurwitz, M.D. Postdoctoral 1986-96 | Adverse drug effects in the elderly | Professor of Medicine, U. Mass. Medical School; Director, Meyers Primary Care Research Institute |
| Paul Campbell, Sc.D. Predoctoral 1986-87 | The role of hospital management in altering physician practice patterns | Lecturer on Management, Department of Health Policy & Management, Harvard School of Public Health |
| Tom McLaughlin, Sc.D. Predoctoral 1986-88 | Diffusion of innovation in new drug technologies | Assistant Professor, Ambulatory Care and Prevention, HMS |
| Mark Monane. M.D., M.S. Postdoctoral 1989-96 | Adverse drug effects and compliance | Director of Geriatric Medication Management, Merck-Medco |

21

| | | |
|---|---|---|
| Susan Kalish, M.D., M.P.H.<br>Postdoctoral<br>1992-95 | Cost-effectiveness analysis of medications | Assistant Professor of Medicine, Boston University Medical School |
| Rhonda Bohn, Sc.D.<br>Predoctoral<br>1991-2000 | Pharmacoepidemiology, cost-effectiveness analysis | Instructor in Medicine, BWH/HMS |
| Daniel Solomon, M.D., M.P.H.<br>Postdoctoral<br>1994-present | Health care technology assessment | Assistant Professor of Medicine, BWH/HMS |
| Carole Flamm, M.D.<br>Postdoctoral<br>1994-96 | Cost-effectiveness of neuro-imaging studies in dementia and stroke | Senior Consultant, Technology Evaluation Center, Blue Cross-Blue Shield Association |
| Philip Wang, M.D., Dr.P.H.<br>Postdoctoral<br>1994-present | Utilization and side effects of psychoactive medications | Assistant Professor of Medicine, BWH/HMS |
| Johanne Monette, M.D., M.S.<br>Postdoctoral<br>1994-96 | Cross-national comparisons of drug utilization and outcomes | Assistant Professor of Medicine, McGill University |
| Cynthia X. Pan, M.D.<br>Postdoctoral<br>1996-97 | Racial differences in medication use and outcomes | Assistant Professor of Medicine, Mount Sinai Medical School |
| Eric Knight, M.D., M.P.H.<br>Postdoctoral<br>1997-99 | Epidemiology and outcomes of cardiovascular drug use in the elderly | Instructor in Medicine, Harvard Medical School |
| Minalkumar Patel, M.D.<br>Postdoctoral<br>1997-2001 | Cost-effectiveness analysis of medications | Chief Medical Director for Quality Management, Blue Cross and Blue Shield of New Jersey |
| Anick Bûrard, Ph.D.<br>Postdoctoral<br>1998-2000 | Use and outcomes of drugs in rheumatology | Assistant Professor of Epidemiology, University of Montreal |
| David Ganz<br>Predoctoral<br>1998-2001 | Decision analytic studies of therapeutic choices in cardiovascular disease | Fellow in Geriatric Medicine, UCLA (graduated HMS with honors based on research with JA) |
| Joshua Benner, Pharm.D., Sc.D.<br>Postdoctoral<br>1999-2002 | Cost-effectiveness of and compliance with medications | Director of Health Economics, ValueMedics Research, Inc. |
| Wolfgang Winkelmayer, M.D.,Sc.D.<br>Postdoctoral<br>2000-present | Clinical outcomes in patients with end-stage renal disease | Instructor in Medicine, BWH / HMS |

22

| | | |
|---|---|---|
| Michael Fischer, M.D.<br>Postdoctoral<br>1999-present | Improving house officer prescribing;<br>adverse effects of antihypertensives | Instructor in Medicine, BWH / HMS |
| Sebastian Schneeweiss, M.D.,<br>Sc.D.<br>Postdoctoral<br>2000-present | Health service utilization and clinical<br>effects of changes in drug<br>reimbursement policies | Assistant Professor of Medicine,<br>BWH / HMS |
| Charles Morris, M..D.<br>Postdoctoral<br>2001-present | Exclusion of elderly from clinical<br>trials; education for appropriate<br>prescribing | Instructor in Medicine, BWH / HMS |
| Yuka Kiyota, M.D., M.P.H.<br>Postdoctoral<br>2001-2002 | Adverse effects of antifungal agents<br>and of antiparkinsonian medications | House officer and clinical fellow,<br>Yale Medical School |

## BRIEF DESCRIPTION OF SELECTED REFERENCES

**Avorn J, Soumerai SB.  Improving drug-therapy decisions through educational outreach:  A randomized controlled trial of academically based "detailing."  N Engl J Med 1983; 308:1457-1463.**

This paper represents the first publication of the approach I developed that used a new kind of educational outreach to teach physicians how to improve their drug-use decisions. It was based on the observation that advocates of data-driven, appropriate medication use generally did not communicate proactively or compellingly with typical practitioners.  By contrast, pharmaceutical manufacturers were very effective in changing physicians' behavior, but did so primarily to promote particular products.  I hypothesized that prescribing could be improved by adapting the effective behavior-change approach of the private sector and using it instead to disseminate instruction about evidence-based therapeutics.  Shortly after completion of my residency, I formulated this approach in my first RO1 application and submitted it to what was then the National Center for Health Services Research (later AHCPR/AHRQ).  The grant was funded, and as the project grew I hired Stephen Soumerai, then a master's degree student at HSPH, to work with me on the project.

The intervention was tested in a randomized trial involving 435 physicians in four states, and sought to reduce mis-use of three drug groups: antibiotics used for viral infections, ineffective cerebral and peripheral "vasodilators," and propoxyphene (Darvon)-containing analgesics. Physicians randomized to the experimental intervention were visited in their offices by pharmacists whom we trained in the pharmacology of the target drug groups as well as in behavior-change strategies, adult learning theory, and social marketing concepts. Actual prescribing practices were tracked through analysis of each state's Medicaid paid claims tapes for the prescriptions written by each physician in the experimental and control groups.

The trial demonstrated significant reductions in inappropriate prescribing by the doctors randomized to the experimental group, using an intention-to-treat analysis. It has often been cited as one of the first studies to use a rigorous trial design to measure the impact of a medical education intervention on so large a scale. In a formal benefit-cost analysis (ref. 9) we further showed that the approach saved twice as much as it cost to implement. The intervention, which I named "academic detailing," is now in widespread use in the U.S., Europe, and the developing world.  It has spawned a substantial literature of its own which demonstrated its effectiveness in many clinical situations in a wide variety of health care systems. The Cochrane Collaborative now maintains an ongoing evidence-based review of the literature describing such programs, which it terms "educational outreach visits."

**Avorn J, Soumerai SB, Taylor W, Wessels M, Janousek J, Weiner M.  Reduction of incorrect antibiotic use through a structured antibiotic order form.  Arch Int Med 1988; 148:1720-1724.**

In the mid-1980s, I established an educational program at the Beth Israel Hospital to improve medication use there. This paper reports on the component of that work aimed at teaching physicians to prescribe antibiotics more appropriately. The goal was to provide physicians with real-time feedback to guide prescribing decisions *before* a problematic drug order had been entered, a precursor to today's computerized order-entry systems.  I developed a quasi-"interactive" paper-based structured order form for antibiotics. When a drug was chosen, the form provided the ordering physician with prompts concerning pharmacokinetics and dosages, as well as educational messages about appropriate use.  These were modified periodically to reflect changing resistance patterns and new areas of problematic antibiotic utilization at the hospital.  Using interrupted time-series analysis, we demonstrated that the introduction of the form significantly improved use of targeted antibiotics, and also resulted in substantial cost savings. A follow-up study documented that the improved antibiotic prescribing that resulted was not associated with any adverse clinical outcomes.  This approach has since been adopted in a number of other hospitals throughout the country.

25

Avorn J, Dreyer P, Connelly K, Soumerai SB.  Use of psychoactive medication and the quality of care in rest homes:  Findings and policy implications of a state-wide study.  N Engl J Med 1989; 320:227-32.

Effective approaches to improve medication use require rigorous definition of how drugs are used in a given setting. The problem of suboptimal drug use in elderly patients has been a central theme of my research and educational activities. Throughout the 1980s, board-and-care facilities in Massachusetts ("rest homes") increasingly came to care for two particularly vulnerable populations: frail elderly affected by the shortage of nursing home beds, and de-institutionalized patients with chronic mental illness who lacked community-based alternatives for care. More and more of these people were being housed in board-and-care facilities that had not been designed and were not being reimbursed to care for such complex residents. Little was known about the quality of medication use or the training needs of staff in these homes. To define this problem more clearly and lay the groundwork for policy changes, I developed a state-wide educational assessment that was implemented with the help of the Massachusetts Department of Public Health. We performed a population-based evaluation of the knowledge of staff concerning the medications they were administering. Our study documented that psychoactive drugs were being dispensed, and patients evaluated, by caretakers who had minimal understanding of safe or appropriate drug use.  The findings of this survey helped bring about changes in state policies that mandated higher educational and regulatory standards in facilities caring for these vulnerable residents.

**Soumerai SB, Ross-Degnan D, Avorn J, McLaughlin TJ.  Effects of Medicaid drug-payment limits on admission to hospitals and nursing homes.  N Engl J Med 1991; 325:1072-1077.**

In an attempt to contain costs, for an 11-month period the New Hampshire Medicaid program limited all Medicaid recipients to a maximum of three prescriptions per month. The program was carried out solely through quotas and rationing, with no education about cost-effectiveness or other evidence-driven guides to prescribing. Assessment of this policy was taken on by Dr. Soumerai and other faculty in my research unit; in an earlier NEJM paper (ref. 17) we had demonstrated the negative impact of this "cap" on physicians' ability to prescribe appropriately for their chronically ill indigent patients.

In this paper, we documented the consequences of such rationing on physician prescribing, by measuring the health care outcomes of the affected Medicaid patients in New Hampshire. We compared them with a comparable group of chronically ill patients we identified in the New Jersey Medicaid program, whose medication use was not subjected to any such cap. Using survival analysis, we showed that the New Hampshire cohort had a significantly greater rate of nursing-home institutionalization, hospital care, or death in compared to the New Jersey cohort.  This pattern of differential survival ended when the cap policy was abandoned, although its effects persisted for the excess patients who reached one of these adverse endpoints in New Hampshire. The additional costs required by such institutional care offset any savings in drug expenditures that the policy generated. This paper has become one of the most often-cited studies of the adverse impact of economic constraints on drug use, and their effects on clinical status, health care utilization, and expenditures.

27

Avorn J, Soumerai SB, Everitt DE, Ross-Degnan D, Beers MH, Sherman D, Salem-Schatz SR, Fields D.  A randomized trial of a program to reduce the use of psychoactive drugs in nursing homes.  N Engl J Med 1992; 327:168-173.

Of all health care settings in which drugs are used, the nursing home has been one of the most problematic. This paper reports on my application of the "academic detailing" approach to the problem of excessive psychoactive drug use in long-term care settings. The study was designed as a randomized controlled trial; it was carried out in 12 Massachusetts nursing homes caring for 850 patients. In the institutions we randomized to the intervention group, doctors, nurses, and aides received a series of interactive educational visits, curriculum materials, lectures, and "un-advertisements" we designed. The program taught clinicians about appropriate use of sedating medications in frail elderly patients, and presented data on side effects, preferred agents if any were used, and geriatric dosing guidelines. We also provided information on alternatives to inappropriate use of benzodiazepines, neuroleptics, and hypnotics in such patients.

After we collected detailed information on all drugs prescribed in all facilities, we trained a research assistant (blinded to study design and group assignment) to assess patients in all facilities before and after the intervention period.  We showed that the intervention succeeded in significantly reducing the burden of excessive psychoactive drug use in the experimental homes compared with controls, without deterioration in the behavior of residents.  In addition, patients who had previously been taking neuroleptics performed significantly better on a detailed test of memory in the experimental homes as compared with comparable patients in the control homes.

28

**Avorn J, Gurwitz JH, Bohn RL, Mogun H, Monane M, Walker A. Increased incidence of levodopa therapy following metoclopramide use. JAMA 1995; 274:1780-1782.**

One of the most difficult problems in educating physicians about the use of drugs in older patients is to help them distinguish between drug side effects and the onset of a new disease process, which may then be unnecessarily treated with still other medications. I hypothesized that this might occur if the extra-pyramidal side effects of a drug such as metoclopramide (Reglan) were mistakenly attributed to new-onset idiopathic Parkinson's disease. Little previous work had been done on this question other than a clinical study we had published previously (ref. 59), and a companion study published in *The American Journal of Medicine* which quantified this problem in relation to haloperidol (ref. 65).

In the present study, I employed the relational pharmacoepidemiology database we developed to identify all patients over age 65 who began treatment with dopaminergic antiparkinsonian agents such as Sinemet (L-dopa/carbidopa). We then measured whether such treatment was initiated more frequently in metoclopramide users. Because metoclopramide (and related neuroleptics) block dopaminergic receptors in the brain, this is not an appropriate initial strategy for management of these symptoms, and strongly suggests that a misdiagnosis of idiopathic Parkinson's disease had been made. The hypothesis was confirmed with the documentation of a three-fold increase in the initiation of use of L-dopa in patients taking metoclopramide, even after controlling for potential confounders using multivariable regression techniques. The availability of detailed information on dose and duration of therapy on all prescriptions in the database also made it possible to describe a dose-response curve in this population-based study, as well as to identify specific patient risk factors associated with this form of preventable iatrogenic problem. These findings, as well as the related papers cited, were then integrated into teaching programs in geriatric pharmacology both in our own unit as well as nationally.

Avorn J, Monette J, Lacour A, Monane M, Mogun H, Bohn RL, LeLorier J.
**Persistence of use of lipid-lowering medications: a cross-national study. JAMA
1998;279:1458-1462.**

Optimal prescribing requires an understanding of how well patients are adhering
to the prescribed regimen, and development of methods to assess and ultimately improve
such use. In earlier work (refs. 17, 34), we had demonstrated the adverse outcomes of
economic restriction of such coverage. However, physicians still remain unaware of the
magnitude of non-compliance among their patients even when economic constraints are
absent. In this paper, we documented that even in the presence of adequate medication
coverage, patients still often failed to take prescribed medications as directed. Using the
case of lipid-lowering drugs, we studied the persistence of medication use among patients
in three different health care contexts, each of which provided comprehensive pharmacy
benefits coverage: a province-wide program in Quebec that covered all medication costs
for all residents over 65, the Medicaid program of New Jersey, and that state's Pharmacy
Assistance for the Aged and Disabled program, which covers drug costs for non-indigent
elderly.

We found that despite marked differences in the health care financing systems of
the United States and Canada, patterns of compliance were similar and equally low in
both countries. Within the 12-month period studied, patients prescribed lipid-lowering
drugs filled only enough medication to have drug available to them for 60% of the year
on average. Compliance was significantly worse for the bile acid resins and niacin than
for the HMG-CoA reductase inhibitors. When we extended followup for five years
beyond the original study period, only 52% of the surviving patients who had been
prescribed a lipid-lowering drug were still on therapy. In comparing the two U.S.
populations, we found that even in the face of complete coverage for all prescription
costs, poorer patients (those in Medicaid) were significantly more likely to have
compliance problems that than less poor patients (those in the PAAD program), even
after controlling for other differences in demographic and clinical characteristics between
the two groups.

This work has had important implications for physician education about
prescribing, as well as for health policy. First, it documented the very high level of non-
compliance across multiple populations, and identified predictors of which patients are
more likely to stop taking recommended therapies. This work has also become part of the
current debate on medication reimbursement policy for the elderly, since it demonstrates
that as important as adequate drug coverage is, other aspects of the health care delivery
system must also work well (e.g., the physician-patient relationship, education programs,
compliance surveillance systems) to ensure optimal medication use.

**Solomon DH, van Houten L, Glynn RJ, Baden L, Curtis K, Schrager H, Avorn J. Academic detailing to improve use of broad-spectrum antibiotics at an academic medical center. Arch Intern Med 2001; 161:1897-1902.**

Antibiotic use has long been an area in need of physician education, but suboptimal use continues to be a problem. In hospital settings, a particularly important issue is the overuse of broad-spectrum agents, which can encourage the development of bacterial resistance. With the creation of the Division of Pharmacoepidemiology and Pharmacoeconomics at BWH, I had the opportunity to further develop the educational outreach approach described above, and to apply it to a new prescribing area (inpatient antibiotic use) in a different clinical setting (the teaching hospital). With other faculty and staff in my division, we developed an algorithm that used the hospital's clinical information system that began with identification of all orders for two often-overused broad-spectrum antibiotics (ceftazidime and levofloxacin) as soon as they were written. We then developed a set of decision rules with colleagues from the Infectious Diseases Division to define situations in which such use might be inappropriate. Information on the order was then sent to an ID physician or specially trained clinical pharmacist for review of the primary medical record. If the order still appeared unnecessary, the responsible house officer was contacted for an on-the-spot interactive educational session on rational antibiotic use, usually within 24 hours of the original order. The program was modeled on my earlier "academic detailing" work (NEJM 1983 and NEJM 1992), modified for use in an academic in-patient setting.

To evaluate the effect of the intervention, we randomly allocated 17 teams on the medical services at BWH to receive the new intervention or to serve as controls. We used the hospital's computer system to track all use of the two broad-spectrum antibiotics on each service. We showed that over an 18-week study period, the services randomized to the intervention group had 41% fewer days of unnecessary antibiotic use than did the control teams ($P < .001$). No adverse clinical events were found. As a result of this study, this approach has been adopted for use as an ongoing quality-improvement program at BWH.