Jerry Avorn, M.D.

Page 94

1   identified, that you say show a potential
2   cardiovascular problem with Vioxx prior to
3   the time it was approved?
4       A.  Well, that's a different question
5   from what you asked a minute ago, because
6   you asked a minute ago for human studies.
7       Q.  Yes.  I'm talking about -- Are you
8   aware of any other human studies, other
9   than those that you just mentioned, which
10  you say show a potential cardiovascular
11  problem with Vioxx prior to approval?
12      A.  There may be a study whose protocol
13  number I don't recognize.  But barring
14  that, no.
15      Q.  What animal studies do you say were
16  done prior to the time Vioxx was approved
17  that you believe showed an important
18  potential cardiovascular problem with
19  Vioxx?
20      A.  Okay.  There was the -- A number
21  of studies out of Dr. FitzGerald's lab.  I
22  think Dr. Catella-Lawson had such a paper.
23      Q.  About animals?
24      A.  I don't recall whether her --

Page 95

1   whether Catella-Lawson's paper was animal
2   or human.  It was the -- It was the
3   literature summarized by the Scientific
4   Advisory Board, which I can go to their
5   report, because they -- they refer to
6   animal studies, and let me just pull that
7   out.
8       Q.  Is that your source for the animal
9   studies, that you're aware of that show --
10      A.  Well, no.  I know -- I know that
11  there was also animal literature in the
12  clinical pharmacology literature.
13          I did not focus on animal studies
14  per se, except to know that they were
15  animal studies that had raised this
16  concern.
17      Q.  Have you, yourself, looked at any
18  animal studies to see whether they show
19  any potential cardiovascular problem with
20  Vioxx prior to approval?
21      A.  Yes.  And I -- my recollection is
22  that there are animal studies that showed
23  increases in Thromboxane and reductions in
24  prostacyclin.  I can't give you the

Page 96

1   citation right now, but I could come up
2   with it by tomorrow.
3       Q.  Would you do that for me?
4       A.  Sure.
5           THE WITNESS:  And you're
6   making a list of all the stuff I've got
7   to do, right?  Okay.
8           BY MR. GOLDMAN:
9       Q.  Can you tell me all of the lab
10  studies that you say show an important
11  potential cardiovascular problem with Vioxx
12  before approval?
13      A.  But I would lump lab and animal
14  together, and I would like to be able to
15  just get back to you with those specific
16  citations tomorrow.
17      Q.  Okay.  And will you agree, Dr.
18  Avorn, that if I -- if I permit you to
19  take the time to find the names of those
20  studies, that you will do that on your
21  own --
22      A.  Yes.
23      Q.  -- without the assistance of
24  counsel?

Page 97

1       A.  Yes.  Although I may ask them where
2   in this pile of many, many binders
3   something is likely to be filed.  But I --
4   It will be studies that I've read before.
5       Q.  Have you ever taken the position
6   that for a drug that's been withdrawn from
7   the market, the manufacturer warned
8   appropriately about the risks?
9       A.  For a drug that's -- has been
10  withdrawn from the market?
11          MR. TISI:  You mean in
12  litigation or in literature or personal?
13  What kind of communication are you talking
14  about?
15      A.  I don't -- I don't think that I
16  have taken such a position.
17      Q.  Have you ever taken the position
18  that a drug company acted responsibly if a
19  drug that was manufactured by that company
20  was subsequently withdrawn?
21      A.  Yes.  In the case of Lotronex made
22  by Glaxo, Alosetron, A-L-O-S-E-T-R-O-N, is
23  the trade -- is the generic name, that the
24  company behaved responsibly in withdrawing

25 (Pages 94 to 97)

Jerry Avorn, M.D.

Page 98

1   it from the market, and in its
2   reintroduction later on with a lot of
3   safeguards.
4     Q.  For any drug that has been
5   withdrawn and remains withdrawn from the
6   market, have you ever taken the position
7   that the drug company acted responsibly?
8         MR. TISI:  Objection to
9   form.
10    A.  I can't recall an example of that.
11    Q.  Are all drugs dangerous, sir?
12        MR. TISI:  Objection to
13  form.
14    A.  It all depends.
15    Q.  On what?
16    A.  On whether the risks that they have
17  are acceptable in light of the benefits
18  that they produce.
19    Q.  Do all drugs have risks?
20    A.  Yes.
21    Q.  Do you take drugs that have serious
22  risks?
23    A.  Yes.
24    Q.  Like what and what risks?

Page 99

1         MR. TISI:  Objection.  I
2   don't think you have to give your personal
3   medication.
4     A.  I take low dose aspirin, which
5   carries the risk of bleeding.  That's my
6   whole medical regimen.
7     Q.  Do you take low dose aspirin
8   because you know that it's
9   cardioprotective?
10    A.  Yes.
11    Q.  Would you agree, Dr. Avorn, that
12  you've made statements in your book called
13  Powerful Medicines that you did not make
14  when Vioxx was on the market?
15        MR. TISI:  Objection.
16    A.  I don't understand the question.
17    Q.  Would you agree, sir, that the
18  positions that you've taken with respect
19  to the Powerful Medicines book that you've
20  published are different, occasionally, than
21  the positions you took when Vioxx was on
22  the market?
23        MR. TISI:  Well, objection.
24    A.  You said the --

Page 100

1         MR. TISI:  Objection.  Let
2   me place an objection.  Vague.  Not
3   referring to a specific statement.
4         Go ahead.
5     A.  Well, your question was the
6   positions I've taken with respect to
7   Powerful Medicines.
8     Q.  Mm-hmm.
9     A.  Well, that's asking me about
10  positions I've taken about my book.  I
11  don't think that's what you mean.
12    Q.  Dr. Avorn, in your book called
13  Powerful Medicines, do you take positions
14  that you did not take when Vioxx was on
15  the market?
16        MR. TISI:  Objection, for
17  the reason stated.
18    A.  No, I don't agree with that.  In
19  fact, that book was written while Vioxx
20  was on the market.  So that's an
21  impossible situation.
22    Q.  When was the book actually written?
23    A.  It was written in '03.  It was
24  published in '04.  But most of the text was

Page 101

1   written in '03.  And it was actually out
2   in distribution by the spring and summer
3   of '04, which was before Vioxx was
4   withdrawn.
5     Q.  Is it your testimony that you wrote
6   the section about Vioxx in your Powerful
7   Medicines book while Vioxx was on the
8   market?
9     A.  Of course.  The book was published
10  before Vioxx was removed from the market.
11    Q.  Let me hand you, Dr. Avorn, your
12  report in this case.
13        MR. GOLDMAN:  I'll mark that
14  as Exhibit 2.
15        MR. TISI:  I think he has a
16  copy.  Just mark it if you want.
17        (Exhibit-2, Expert Opinion Report
18  prepared by Dr. Avorn, marked for
19  identification).
20        BY MR. GOLDMAN:
21    Q.  Is Exhibit 2 the expert report that
22  you have submitted in the MDL, federal
23  litigation, and in the New Jersey state
24  court litigation?

26 (Pages 98 to 101)

Jerry Avorn, M.D.

Page 102

1    A.  Yes.
2         MR. TISI:  And the
3    California coordinated litigation as well,
4    Counsel.
5    A.  It's the report -- It's the one and
6    only report I wrote.
7    Q.  Who wrote this report, sir?
8    A.  I wrote all of it myself.
9    Q.  When did you start drafting it?
10   A.  Oh, I would guess in early '06.
11   Q.  And did you finish drafting it on
12   March 20th, 2006, when you signed it, or
13   shortly around that time?
14   A.  It was around the 20th or -- yeah.
15   Yeah, of course.  If I signed it on the
16   20th, it was about the 20th, yes.
17   Q.  Did the plaintiffs' lawyers assist
18   you in preparing your report?
19   A.  All of the writing is my own.  I
20   created it from scratch, and did not have
21   it edited or modified by any attorneys at
22   all.  I discussed it with them, and they
23   would indicate if they thought that I had
24   a fact wrong or something like that.  But

Page 103

1    it was all my own work.
2    Q.  Did the plaintiffs' attorneys ever
3    provide you with any comments about any
4    draft reports that you generated?
5    A.  Yes.  We would -- I -- there were
6    not many drafts, but I -- there was an
7    earlier version which we talked about, and
8    they said that they found some pieces
9    unclear and so forth.  But this is
10   substantially what I wrote.
11   Q.  Is the report that you submitted in
12   this case, the 25-page report,
13   substantially the same as the first draft
14   that you wrote?
15   A.  Yes.
16   Q.  Did the plaintiffs' attorneys
17   suggest any substantive changes to your
18   report?
19   A.  Nothing substantive.
20   Q.  Did the plaintiffs' lawyers suggest
21   that you add any substantive remarks to
22   your report?
23   A.  It was more things they suggest
24   that I shouldn't have in there.

Page 104

1    Q.  What did the plaintiffs' lawyers
2    tell you you shouldn't have in your
3    report?
4    A.  Well, they pointed out that I had
5    no way of knowing individual people's
6    intentions, and they pointed out I was not
7    an expert in ethics, and that those were
8    things which would be inappropriate to
9    have in such a report.
10   Q.  Anything else?
11   A.  No.  That's -- Those are the main
12   areas.
13        MR. GOLDMAN:  Let me mark
14   two documents.  The first is Exhibit 3,
15   and it's the notice of deposition that was
16   served in the New Jersey cases.  And
17   Exhibit 4 is the amended notice of
18   deposition that was served in the federal
19   cases.
20        MR. TISI:  Do you have a
21   copy of those? Because I haven't seen the
22   New Jersey one, actually.
23        (Exhibit-3, Notice of Deposition in
24   the New Jersey cases; Exhibit-4, Amended

Page 105

1    Notice of Deposition in the Federal cases,
2    marked for identification).
3    BY MR. GOLDMAN:
4    Q.  Dr. Avorn, I'm just going to ask
5    you to start with Exhibit --
6         MR. TISI:  Can you just
7    give me a moment to look at this?
8         MR. GOLDMAN:  Sure.
9         MR. TISI:  Can I just make
10   note -- Yeah.  Can I make note for the
11   record that the New Jersey -- I'm looking
12   at the -- This is the first time I ever
13   saw it -- that this notice was served on
14   June 14th, which is yesterday.  What's
15   today, the 15th?  Do we know what time it
16   was served and uploaded yesterday?
17        MR. GOLDMAN:  I do not
18   know.  I just know that Merck's attorneys
19   in the New Jersey litigation supplied me
20   with this notice.
21        MR. TISI:  Okay.  Well, let
22   me just make for the record that we have
23   agreed for this deposition to occur.  I
24   think you and I had conversations down in

27 (Pages 102 to 105)

Jerry Avorn, M.D.

Page 106

1  New Orleans at the last status conference
2  over a month ago, we had a notice of a
3  deposition the day before the deposition
4  that I've never seen before today.
5          MR. GOLDMAN: I won't ask
6  about it.
7          MR. TISI: I'm going to
8  make an objection.
9          MR. GOLDMAN: I won't even
10  ask about the particular notice. Let's
11  talk about the notice --
12          MR. TISI: No. Let's --
13  Let me just make sure that we're clear
14  about that. The notice in the federal
15  litigation was issued on the 12th day of
16  June 2006, which is --
17          MR. GOLDMAN: That's the
18  amended notice.
19          MR. TISI: I'm sorry. We
20  never got a notice before that.
21          MR. GOLDMAN: Well, we
22  served a notice. But anyway, go ahead.
23          MR. TISI: Anyway, you know,
24  my position has been -- and you and I

Page 107

1  have e-mailed back and -- that we had very
2  short notice to compile -- we did the best
3  we could to compile the information you
4  requested.
5          I just want to make note for the
6  record that these are -- certainly the New
7  Jersey one is something I've never seen,
8  and I don't think counsel from New Jersey
9  has ever seen it.
10          BY MR. GOLDMAN:
11          Q.   Dr. Avorn, my only question is
12  going to be on the fourth page of Exhibit
13  4.
14          MR. TISI: Exhibit 4.
15  Which one are we talking about? The
16  federal one?
17          MR. GOLDMAN: Yeah, the
18  federal one.
19          A.   All right.
20          Q.   Do you see there are five
21  categories of documents, and I want to go
22  through these and ask you whether you have
23  provided me with all the documents in your
24  possession that are responsive to these

Page 108

1  requests, and if you haven't, when you
2  think you can provide me with that
3  information. So the first is --
4          A.   Before you go on, let me also point
5  out I've never seen this document before
6  just now.
7          Q.   For the record, I have had an
8  agreement with Mark Robinson, who is on
9  the plaintiffs' steering committee in the
10  MDL, that all plaintiffs' experts will
11  provide responsive documents at their
12  depositions. So that's been a long-time
13  understanding --
14          MR. TISI: I -- Let me --
15          BY MR. GOLDMAN:
16          Q.   I understand, Dr. Avorn, you
17  haven't seen it, but that's not my fault.
18          MR. TISI: And let me --
19  Well, it isn't a matter of fault. This
20  is a matter of fairness.
21          I have not been involved in Mark
22  Robinson's case, okay? Just like you were
23  unaware of what happened in New Jersey, on
24  the New Jersey notice. I did get an

Page 109

1  e-mail for you, okay, and I did go through
2  this -- this notice with the doctor. You
3  know, I didn't give him a copy of the --
4  In an effort to comply with your
5  request --
6          MR. GOLDMAN: I gotcha.
7          MR. TISI: -- I provided four
8  -- at least four banker's boxes of
9  documents today during the deposition for
10  over -- over -- they compiled four boxes.
11  I took them out of the boxes -- so that
12  you could go through them. You asked me to
13  come in early, and I did.
14          MR. GOLDMAN: Let me just
15  -- Let me just cut you off, Chris. I'm
16  not blaming you for not producing
17  everything today, okay?
18          MR. TISI: We produced
19  everything -- I can tell you the one thing
20  we did not produce that you -- if you
21  want me to help you with that.
22          MR. GOLDMAN: Let me go
23  through these items, okay?
24          MR. TISI: That's fine.

28 (Pages 106 to 109)

Jerry Avorn, M.D.

Page 110

```
1          BY MR. GOLDMAN:
2      Q.  Dr. Avorn, have you provided to
3  your -- the plaintiffs' lawyers in this
4  case or brought here today for me, Number
5  1, "All materials you've relied -- you've
6  reviewed prior to or since you were
7  retained as an expert in this litigation
8  that relate to Vioxx"?
9      A.  Right.  The attorneys brought all
10  the materials --
11     Q.  Okay.
12     A.  -- today.  And to the best of my
13  knowledge, they brought everything.
14     Q.  Number 2, "All materials in which
15  you rely --
16          MR. TISI:  Can I make an
17  objection -- Now that he's given his
18  answer, can I make an objection that
19  obviously he follows some literature on
20  his own which may not be included in these
21  documents.
22     A.  Right.  And newspaper accounts and
23  other -- right.  But anything that is not
24  in, sort of, public domain; medical
```

Page 111

```
1  journals, the New York Times.
2      Q.  Number 2 says, "All materials on
3  which you rely as support for your
4  opinions in the Vioxx litigation."  Have
5  those been provided to me?
6      A.  To my knowledge, yes.
7          MR. TISI:  The only -- The
8  only caveat I make, Counsel, is I notice
9  you have not asked him for information
10  related to a study that he conducted
11  before being involved in litigation.  He
12  did not produce all of those, if there are
13  such documents.
14     A.  In other words, our research back
15  in the '90s --
16          MR. TISI:  Research and
17  those kinds of things.
18          THE WITNESS:  Right.  But
19  those have been in binders that I've
20  reviewed with you, so I believe that those
21  were materials that you shared with the
22  defense.
23          MR. TISI:  Right.
24          THE WITNESS:  You know, our
```

Page 112

```
1  papers, and, you know --
2          MR. TISI:  I can explain.
3  I don't want to explain in front of you.
4  I'll explain to Counsel, and we can --
5          BY MR. GOLDMAN:
6      Q.  Okay.  Number 3 says, "All work
7  product other than draft reports that you
8  have prepared in the Vioxx litigation."
9      A.  Right.
10     Q.  Have you given those to me?
11     A.  Right.  It's just this.  Yes.
12  Just the --
13     Q.  Just your final report?
14     A.  Correct.
15     Q.  "All statements reflecting time
16  you've spent on Vioxx-related work,
17  including invoices, and all notes or other
18  memos you've prepared in the Vioxx
19  litigation."  Have those been provided to
20  me?
21     A.  There's only one invoice thus far,
22  and Mr. Tisi has a copy of it.  I could
23  try to get a copy of it, if I go back to
24  my office later today.
```

Page 113

```
1          MR. TISI:  I'll provide it
2  to you.
3          MR. GOLDMAN:  Okay.
4          BY MR. GOLDMAN:
5      Q.  And five, "All communications you
6  have had with any plaintiffs' lawyer in
7  the Vioxx litigation."  That would include
8  e-mails, sir.  Do you have -- Have you
9  provided all of your e-mails to and from
10  or other correspondence between you and
11  any plaintiffs' lawyer in the Vioxx
12  litigation?
13     A.  Yeah.  The only e-mails were can we
14  -- you know, can I call you tomorrow, can
15  we meet on a certain day.
16          And I generally just get rid of my
17  e-mails, because I have limit on my e-mail
18  storage capacity that shuts me off from
19  sending out future e-mails.  So if it's
20  something of no consequence, like can we
21  talk to you tomorrow, I delete it.  But
22  there were no substantive e-mails ever,
23  anyway.
24     Q.  So you never receive any
```

29 (Pages 110 to 113)

Jerry Avorn, M.D.

Page 114

1 substantive e-mails from any plaintiffs'
2 lawyer in the Vioxx litigation?
3    A.   Correct.  And let me explain that
4 more fully.
5        While I was traveling in Australia
6 over the last two weeks, there were one or
7 two documents that Mr. Tisi sent me --
8 that I believe he has made available to
9 you -- that had to do with the approved
10 follow-up studies that were -- that just
11 came to light in the last couple of weeks.
12 And I believe those were the only e-mails
13 that contained any substance, apart from
14 can I call you last Tuesday.
15    Q.   When were you provided with the
16 follow-up APPROVe studies, sir?
17    A.   Over the last two weeks, because I
18 remember getting them from Australia --
19    Q.   When did you --
20    A.   -- or on the way to Australia.  It
21 would have been, you know, in the last two
22 weeks in May or first week in June.
23    Q.   When did you review the APPROVe
24 follow-up data?

Page 115

1    A.   Well, there were several iterations
2 of it.  The material -- I certainly
3 reviewed what I saw in the press.
4        There was something which the
5 Associated Press reporter sent to me,
6 apart from this litigation, which she sent
7 to me I think the day that it was in the
8 media.  I looked at that then.
9        And then the additional material
10 that Mr. Tisi sent me, I would have
11 reviewed in the last week or two of May,
12 or maybe the first few days of June.
13        MR. TISI:  I can represent
14 to you what those were, if you would
15 prefer me to do that.
16    A.   And to my recollection, those are
17 the only substantive e-mails that I've
18 ever gotten from Mr. Tisi.
19        MR. TISI:  Do you want --
20 Do you want me to represent what they
21 were, or no, you don't know or you don't
22 care?
23        MR. GOLDMAN:  I don't care
24 right now.

Page 116

1        MR. TISI:  Okay.
2 BY MR. TISI:
3    Q.   Dr. Avorn, am I right that when you
4 wrote your report in this case, you did
5 not rely on any approved follow-up data?
6    A.   Correct.
7    Q.   And you're not relying on any
8 approved follow-up data for your opinions,
9 true?
10    A.   Well, now that I've seen them, I
11 have opinions about them that contribute
12 to what I believe today.
13        MR. GOLDMAN:  Okay.  We're
14 going to take the position that those are
15 -- in both New Jersey and in the MDL and
16 in California, any opinions that Dr. Avorn
17 has about the approved follow-up data have
18 not been disclosed to us, and I'm not
19 going to explore those, because I haven't
20 been given an --
21        MR. TISI:  You do so at
22 your own peril, Counsel, because -- Let me
23 just -- Let me just make absolutely clear
24 about -- about -- about this, so that you

Page 117

1 are forewarned is forearmed, as they say.
2        We have been asking for the
3 follow-up APPROVe data, as you know, in
4 the MDL for months.  We got those --
5        MR. GOLDMAN:  Let's keep
6 this short, Chris.  I don't want to limit
7 my time --
8        MR. TISI:  I'm going to
9 keep it short.  I understand.  But you
10 can take the position you want.  I don't
11 want to put you in a bad position here.
12        We got those, we turned them over
13 to Dr. Avorn immediately.  We provided you
14 with a -- with a supplemental list of
15 documents relied upon on June 8th. You had
16 those documents.  Whether you got them
17 from your people or not is not my concern.
18        MR. GOLDMAN:  You provided
19 those in the New Jersey litigation; you
20 did not provide anything like that to me
21 in the MDL.
22        MR. TISI:  Well, you take
23 what position you want.  You're here on
24 behalf of the New Jersey litigation as

Jerry Avorn, M.D.

Page 118

1 well, Counsel, correct?
2        MR. GOLDMAN:  Yes.
3        MR. TISI:  Fair enough.  Go
4 ahead.
5   BY MR. GOLDMAN:
6    Q.  The additional -- Well, let me ask
7 you, Dr. Avorn.  In your report, you've
8 got a list of materials considered, and
9 today I was given an amended supplemental
10 list of materials considered that's dated
11 June 8th of 2006.
12        MR. GOLDMAN:  If I
13 understand you, Chris, that you served
14 this on one of the attorneys in the New
15 Jersey litigation?
16        MR. TISI:  No.  That's
17 actually not true.  We served it on your
18 coord -- you have a person, as you know,
19 who coordinates the science expert stuff
20 for California, MDL and New Jersey
21 litigation.
22        MR. GOLDMAN:  What's his
23 name?
24        MR. TISI:  Charlie Cohen.

Page 119

1        MR. GOLDMAN:  Okay.
2        MR. TISI:  We served it on
3 Charlie Cohen on behalf of all the
4 litigation.
5   BY MR. GOLDMAN:
6    Q.  Dr. Avorn, I want to just make sure
7 that this now ten-page materials
8 considered --
9    A.  Mm-hmm.
10    Q.  -- which I'm going to attach as a
11 separate exhibit.
12        MR. TISI:  Would you do me
13 a favor, Counsel, and attach the cover
14 letter as well, just for completeness
15 purposes?
16        MR. GOLDMAN:  Yeah.
17        MR. TISI:  Thank you.
18 (Exhibit-5, Letter of Additional
19 Materials Numbered 178 through 188, marked
20 for identification).
21        MR. GOLDMAN:
22    Q.  Exhibit 5 is a cover letter from
23 Dave Buchanan -- it's not signed, but I
24 understand it's printed off from Mr.

Page 120

1 Tisi's computer -- to Charlie Cohen, and
2 it includes additional materials numbered
3 178 through 188.
4        MR. TISI:  Go to the second
5 page.  It refers to APPROVe follow-up as
6 well.
7   BY MR. GOLDMAN:
8    Q.  And the last item is the APPROVe
9 follow-up data.  Okay?
10    .  Is the list of materials that's
11 attached as Exhibit 5, sir, the list of
12 materials that you have considered in
13 forming your opinions?
14    A.  If there's something supplemental
15 to what I'm holding here -- okay.  Okay.
16 With the important proviso that I have no
17 way of knowing whether, you know, every
18 Bates number and every document that I've
19 reviewed is listed in this, I would defer
20 to counsel as to whether they represent
21 that it's a complete list of everything I
22 got.
23        MR. TISI:  And, Counsel, let
24 me just also be clear, because I don't

Page 121

1 want there to be any misinterpretation
2 here.
3    I also mentioned the standard
4 operating procedures at the beginning of
5 the deposition and the e-mail which you
6 questioned Dr. Avorn about earlier.
7    There are, as you know, and as you
8 asked me, a pile of documents for you to
9 take a look at, if you want to double
10 check.  But we have brought to you the
11 things that we believe Dr. Avorn has
12 relied upon.
13        BY MR. GOLDMAN:
14    Q.  The list, Dr. Avorn, that I just
15 handed you, Exhibit 5, plus the CV SOP,
16 and this one e-mail that Mr. Tisi brought
17 to my attention earlier, those are the
18 materials you've considered in forming your
19 opinions, true?
20    A.  As I said, if that represents what
21 has been in all the boxes that I've been
22 sent by counsel, then it is true.
23    Q.  Who prepared the Materials
24 Considered list?

Jerry Avorn, M.D.

Page 122

1    A.   Counsel.
2    Q.   Did you review it at all?
3    A.   I've looked at it, yes.  And I
4    said, Gee, there's a lot of documents
5    here, and many of them look like documents
6    that I've read.  But given that there's
7    hundreds of them, I can only hope that
8    they were complete in their list of
9    providing numbers on everything they sent
10   me.
11   Q.   Did you confirm that you actually
12   reviewed each of the items listed on
13   Exhibit 5, sir?
14   A.   Did I look at every one saying yes,
15   I've seen that, I've seen that, I've seen
16   that?  As I said, looking at it, they
17   look like the materials I've seen.  I have
18   not lined up every one of the several
19   hundred documents and sort of checked off
20   whether it is one that I've seen.
21        I assume that when they say they
22   sent it to me, they were being correct in
23   saying they sent it to me.
24   Q.   Have you reviewed all of the

Page 123

1    materials on Exhibit 5?
2         MR. TISI:  Objection.  Asked
3    and answered.
4    A.   If it reflects what was sent to me
5    in the boxes, yes.
6    Q.   So you've reviewed everything the
7    plaintiffs' lawyers have sent you in this
8    litigation?
9    A.   Yes.  The one caveat I mentioned
10   earlier was that the CD that arrived a few
11   days ago while I was out of the country I
12   have not yet even put in the computer.
13   Q.   The materials that were produced
14   here for me to review, which we will copy
15   tonight, include five binders that have
16   177 tabs, and they're called Materials
17   Considered by Dr. Avorn --
18   A.   Mm-hmm.
19   Q.   -- right?
20   A.   Right.
21   Q.   And then you've produced three
22   additional binders; one says Vioxx Science
23   Compendium, and there are two volumes of
24   that.  And then a third binder that says

Page 124

1    Deposition Transcripts of Dr. Scolnick, and
2    there are three depositions listed there.
3    Do you see that?
4    A.   (Witness viewing document).
5    There's many more binders than that.
6    There's this one on the floor.
7    Q.   Well, let me start with what I
8    just --
9    A.   Okay.  Well, I just --
10   Q.   Is that right?
11   A.   They are there, yes.
12   Q.   So we've got the five binders
13   through tabs 177; we've got the two
14   binders of Vioxx Science Compendium; we've
15   got the one binder of deposition
16   transcripts of Dr. Scolnick; and then we
17   have another binder that's dated February
18   14, 2006, that's called Additional
19   Documents.  Right?
20   A.   Right.
21        MR. TISI:  Just keep that
22   off the floor.
23        THE WITNESS:  Okay.
24   A.   But there are also all those other

Page 125

1    binders.
2    Q.   No.  But these --
3    A.   No.  These are mine.
4         MR. GOLDMAN:  Off the
5    record.
6         (Off the record at 10:49 a.m.)
7         (Discussion off the record).
8         (On the record at 10:49 a.m.)
9         BY MR GOLDMAN:
10   Q.   To be clear, Dr. Avorn, the
11   materials that you have relied on in
12   forming your opinions are contained in the
13   five binders that go up to Tab 177; the
14   two binders that are called Vioxx Science
15   Compendium; the binder that has three
16   deposition transcripts of Dr. Scolnick, and
17   the binder that's called Additional
18   Documents dated February of 2006, true?
19   Just start with that.
20   A.   All right.  Let me give a better
21   answer --
22   Q.   Okay.
23   A.   -- than true or false.  My
24   understanding, coming in today, was that

Golkow Litigation Technologies - 1.877.DEPS.USA

Jerry Avorn, M.D.

Page 126

1  plaintiffs' counsel were bringing with them
2  copies of everything that they had sent
3  me.
4     Q.  Mm-hmm.
5     A.  And that some, but not all, were
6  represented in the five binders that
7  you've just referred to.
8        And I have no way of knowing
9  whether in addition to the binders you've
10 just described, whether the other binders
11 that they brought, which Mr. Tisi said was
12 his copies of everything, whether there is
13 material in there that they have sent me
14 that is different from what is in these
15 five.
16       MR. GOLDMAN: Chris, are the
17 materials -- are the binders I just
18 identified all the materials considered by
19 Dr. Avorn that are identified in the
20 Materials Considered --
21       MR. TISI: No.  That's --
22 I'm trying to tell you that, and you keep
23 cutting me off.
24       There's a -- There's a pile of

Page 127

1  binders -- There's a pile of information
2  here that is in addition.  Okay?  He has
3  stuff displayed out in front of him on his
4  desk.  There's stuff over there.
5        MR. GOLDMAN: Time out.
6        MR. TISI: There's a CD.
7  Well, you're asking me and I'm giving you
8  an answer.
9        MR. GOLDMAN: I'm starting
10 with the binders.
11       MR. TISI: Okay.  Let me
12 answer your question in a way to make this
13 clear.
14       There are five binders that he has,
15 okay, that consists of the documents on
16 his, quote, reliance list.  There are three
17 binders over here which you have
18 identified.  There is overlap between
19 these two --
20       MR. GOLDMAN: Fine.
21       MR. TISI: -- okay?  We
22 have produced those, and he has reviewed
23 those.
24       MR. GOLDMAN: Okay.  And

Page 128

1  there are -- There's a stack of documents
2  -- I'm not going to go through in detail
3  -- but there's an additional stack of
4  documents that we're going to copy here
5  that he has also considered, true?
6        MR. TISI: He's also -- He
7  has also considered.
8        MR. GOLDMAN: Okay.
9        MR. TISI: There's also
10 stuff over there that he's considered on
11 the table.
12       MR. GOLDMAN: That's part of
13 the pile.
14       MR. TISI: Part of the
15 pile, but I just want to make sure --
16 You're rolling your eyes, but I just want
17 to make sure you have everything.  I'm
18 trying to be fair.
19       MR. GOLDMAN: I do.  I'm
20 comfortable that I see what's in the room,
21 and I just want to make sure that what I
22 am going to copy tonight is the materials
23 that Dr. Avorn has been provided.
24       MR. TISI: That's what he's

Page 129

1  been provided.
2        MR. GOLDMAN: Fine.
3        MR. TISI: And that's also
4  a key point, because as you know, he is
5  the percipient witness in this case, so he
6  hasn't had materials that are not provided
7  for which he has.  He has documents for
8  which he is the percipient witness, which
9  he has.
10       BY MR. GOLDMAN:
11    Q.  Dr. Avorn, on the list of Materials
12 Considered, which is marked as Exhibit 5,
13 there is a reference --
14    A.  Wait.  Wait.  Let me pull it out.
15 Exhibit 5, yeah.  Okay.
16    Q.  -- on Number 9, to excerpts from
17 Alise Reicin -- October 11 --
18    A.  I'm sorry.  Page .5 did you say?
19    Q.  Exhibit 5 --
20    A.  Exhibit 5.
21    Q.  -- Number 9 on the Materials
22 Considered.
23    A.  Okay.
24    Q.  Do you see on Exhibit 5, which is

33 (Pages 126 to 129)

Jerry Avorn, M.D.

Page 130

1    the Materials Considered, a reference in
2    Number 9 to excerpts from Dr. Reicin's
3    October 11, 2005, trial transcript?
4        A.  (Witness viewing document).  I see
5    that.
6        Q.  Did you review the four pages that
7    the plaintiffs' lawyers sent to you from
8    Dr. Reicin's trial transcript in the
9    Humeston case?
10       A.  I have reviewed statements made by
11   Dr. Reicin.  I have no way of knowing
12   whether it was Pages .3522 through 3526.
13       Q.  Have you --
14       A.  But if you show me it to me, I'll
15   be happy to tell you if it looks familiar.
16       Q.  Have you reviewed Dr. Reicin's
17   deposition testimony in its entirety?
18       A.  I don't believe that I have.  I
19   don't recall.
20           MR. GOLDMAN:  Let me mark
21   Exhibit 6.
22           (Exhibit-6, Excerpt of Testimony
23   from the Humeston Trial, marked for
24   identification).

Page 131

1           BY MR. GOLDMAN:
2        Q.  This is -- These are the pages, on
3    the second page of this document, from the
4    Humeston trial.  If you look at Pages
5    .3522 to 3526.  Did you review those, sir?
6           MR. TISI:  Take your time
7    and read it, Doctor.
8           THE WITNESS:  Mm-hmm.
9        A.  (Witness viewing document).
10       Q.  Have you finished reading through
11   Pages .32 --
12           MR. TISI:  He's not
13   finished.  Clearly, he's reading, Counsel.
14           BY MR. GOLDMAN:
15       Q.  No.  Dr. Avorn, you're going beyond
16   what --
17       A.  I'm sorry.  Where do you want me
18   to stop?
19       Q.  I wanted you to look at Pages .3522
20   --
21       A.  Yes.
22       Q.  -- second page --
23       A.  Yeah.
24       Q.  -- through 3526, which is on the

Page 132

1    third page, and I saw that you read that
2    testimony.  Okay.
3           Did you read that before today,
4    sir?
5        A.  I am aware of all of the facts
6    that are described in it, about the
7    labeling and the discussions and the
8    studies and so forth.  I don't recall
9    whether I saw it from Dr. Reicin's
10   testimony or e-mails or other sources.
11       Q.  You don't know, as you sit here
12   today, whether you read the four pages of
13   Dr. Reicin's testimony that the plaintiffs'
14   lawyers sent you, right?
15       A.  Right.
16       Q.  Did the plaintiffs' lawyers send
17   you a complete copy of Dr. Reicin's either
18   trial testimony or any of her depositions
19   in the Vioxx litigation?
20       A.  I don't think I've seen Dr.
21   Reicin's trial testimony.
22       Q.  Or depositions, true?
23       A.  That's my recollection.
24       Q.  On Exhibit 5, there's also a

Page 133

1    reference to David Anstice and excerpts
2    from his deposition, Pages .2016 --
3        A.  Can you tell me what number?
4        Q.  Number 10.
5        A.  Right.
6        Q.  2016 to 2017.
7           MR. GOLDMAN:  I'm going to
8    mark that as Exhibit 7.
9           (Exhibit-7, Excerpts of David
10   Anstice's Testimony, marked for
11   identification).
12           BY MR. GOLDMAN:
13       Q.  This is -- These are excerpts from
14   the Humeston trial in New Jersey.  And if
15   you could read the two pages, sir, 2016 to
16   2017.
17       A.  Okay.
18           (Witness viewing document).
19       Q.  Please stop reading at the last
20   line of 2017.
21       A.  I will do that.  I just needed to
22   read 2015 to find out what in the world
23   2016 was about.
24       Q.  You wouldn't know what Page .2016

Jerry Avorn, M.D.

Page 134

1  was about unless the plaintiffs' lawyers
2  had sent you Page .2015, true?
3      A.  No.  In reading a document de novo,
4  it's a little unhelpful to ask me to begin
5  reading it in the middle, and then expect
6  me to understand what the context is.  So
7  I needed to read the one page before it.
8  And I will take my time in doing so, if
9  it's all right with you.
10     Q.  Sure.
11     A.  (Witness viewing document).  Okay.
12  I've read it.
13     Q.  Did you read Pages .2016 and 2017
14  of Dr. Anstice's testimony in the Humeston
15  trial before today?
16     A.  I'm familiar with everything he
17  describes, but I don't believe that I read
18  about it in his Humeston testimony.
19     Q.  Am I right, Dr. Avorn, that for you
20  to be able to understand what is described
21  on Page .2016, you needed to go to 2015
22  for context; is that true?
23     A.  Well, that's a ludicrous question,
24  because Page .2016 begins, "Yes, in her

Page 135

1  opinion," and how in the world am I
2  supposed to know what "Yes, in her
3  opinion" refers to, if I don't look at the
4  lines before it?
5      Q.  So is it fair to say, sir, that
6  without providing you Page .2015, Dr.
7  Avorn, you wouldn't know what doctor --
8  what Mr. Anstice was testifying about in
9  the beginning of Page .2016?
10     A.  Even if I had sat in the courtroom
11  and heard Dr. Anstice saying this, I would
12  not have been able to know the context,
13  months later, without looking at the
14  preceding page.
15     Q.  Do you see on Page .2017 that Mr.
16  Anstice is asked a question at Line 22:
17  "They're included in the label, you put
18  them in different sections, but there's
19  nothing in the warning section of this
20  label, correct, sir?"  Do you see that?
21     A.  (Witness viewing document).  I see
22  that.
23     Q.  And here you understand that what
24  is being asked of Mr. Anstice is whether

Page 136

1  there are cardiovascular results from the
2  VIGOR trial in the warning section of the
3  package insert for Vioxx, right?
4      A.  Right.
5          MR. TISI:  Objection.
6          BY MR. GOLDMAN:
7      Q.  Do you see that Mr. Anstice starts
8  his answer, "We did not believe, based on
9  the analysis of the --" and that's where
10  Page .2017 stops.
11     A.  Yes.
12     Q.  He continues on 2018, "VIGOR and
13  the other data that it was appropriate to
14  put it in the warning section which would
15  in effect mean that it was a known effect
16  of Vioxx, we did not believe that that was
17  the case."  Do you see that, sir?
18     A.  (Witness viewing document).  I see
19  that.
20     Q.  Would you have wanted to know, when
21  you read Mr. Anstice's excerpts of his
22  deposition testimony, the rest of his
23  answer?
24     A.  When you say the rest of his

Page 137

1  answer, what do you mean?
2      Q.  I mean his answer at the end of
3  Page .2017 was cut off; it has one line,
4  and the rest of his answer is on Page
5  .2018.  Would you have liked to have seen
6  Page .2018?
7      A.  No.  I'm aware of Merck's position
8  about this matter.  It's been said by many
9  people from Merck in many different
10  settings.  And it is the standard Merck
11  position on this.
12     Q.  Do you think that the plaintiffs'
13  lawyers should have sent to you the entire
14  deposition of Mr. Anstice, or are just a
15  few pages sufficient, from your
16  perspective?
17         MR. TISI:  Objection.
18     A.  I think if there had been new
19  information in it other than I had been --
20  I had seen in all the other materials that
21  I was sent, it would have been useful to
22  see.  But there's nothing here that was
23  new.
24     Q.  Did you read all of the deposition

35 (Pages 134 to 137)

Jerry Avorn, M.D.

**Page 138**

1  transcripts of Dr. Scolnick that the
2  plaintiffs' lawyers sent you?
3      A.  I've -- I received all of it, and
4  I read through it, and I read through
5  virtually all of it.
6      Q.  Did you review the deposition
7  transcript of Mr. -- Dr. Curfman?
8      A.  Yes.
9      Q.  Both transcripts?
10     A.  Only the first one.  I think the
11 second one hadn't occurred, or if it did,
12 I didn't see it as of when I put together
13 my report.
14     Q.  So when you had prepared your
15 report in this case on March 20th of 2006,
16 you had reviewed the March 22nd, 2005,
17 transcript of Dr. Curfman, but you had not
18 reviewed the January 24th, 2006, transcript
19 of Dr. Curfman; is that correct?
20     MR. TISI:  What was the
21 date for the first one, Counsel?  Because
22 I think you said March, and I think it
23 was November.
24     MR. GOLDMAN:  Let me ask it

**Page 139**

1  again.
2      BY MR. GOLDMAN:
3      Q.  Am I right, Dr. Avorn, that when
4  you prepared your report in this case in
5  March of 2006, you had reviewed Dr.
6  Curfman's first deposition from November of
7  2005, and you had not reviewed Dr.
8  deposition from January of 2006?
9      A.  That's correct.
10     Q.  Have you ever reviewed Dr.
11 Curfman's deposition from January of 2006?
12     A.  No.
13     Q.  There's also a reference in your
14 Materials Considered to the deposition of
15 Dr. Topol.  Do you see that?
16     A.  (Witness viewing document).  If you
17 tell me where it is, I can --
18     Q.  It's Number 13.
19     A.  Oh, I'm sorry.  The Materials
20 Considered.
21     Q.  Yes.
22     A.  Let me go to the Materials
23 Considered.
24     Q.  Trust me.

**Page 140**

1      A.  What's that?
2      Q.  Trust me.
3      A.  No.  But -- Okay.  Yes.
4      Q.  Did you review the deposition of
5  Dr. Topol?
6      A.  I believe I did.
7      Q.  Why?
8      A.  Why do I believe, or why did I
9  review it?
10     Q.  Why did you review it?
11     A.  Why did I review it?  Because I
12 tried to review all the materials counsel
13 sent me.
14     Q.  Are you relying on anything Dr.
15 Topol testified to in your -- forming your
16 opinion, sir?
17     A.  I don't believe so.  I'm relying on
18 materials he's written in the medical
19 literature, but not from his deposition.
20     Q.  Do you agree that Dr. Topol took
21 positions in his deposition that he did
22 not take when Vioxx was on the market?
23     MR. TISI:  Objection.
24     A.  I haven't tracked what he said at

**Page 141**

1  what point in time.
2      Q.  Have you reviewed any of Mr.
3  Anstice's complete deposition or trial
4  testimony?
5      A.  I don't recall seeing his trial
6  testimony, and I do not clearly recall
7  specifics from his deposition.
8      Q.  Well, isn't it true you weren't
9  sent Mr. Anstice's entire deposition, were
10 you, sir?
11     A.  I --
12     Q.  Any of them?
13     MR. TISI:  Answer.
14     A.  I have no way of recalling whether
15 -- the completeness of what was sent to me
16 about Mr. Anstice.
17     Q.  Do you see that your Materials
18 Considered refers to excerpts of a
19 transcript of David Anstice?
20     A.  (Witness viewing document).  Yes.
21     Q.  And there's nowhere on this
22 Materials Considered that indicates that
23 the plaintiffs' lawyers sent you Mr.
24 Anstice's complete deposition or trial

36 (Pages 138 to 141)

Jerry Avorn, M.D.

Page 142

1    testimony?
2       A.   That's correct.
3       Q.   Let's talk about Dr. Topol for a
4    minute, since you read his deposition.
5          MR. TISI:  You have a copy
6    of it there, if you want to refer to it.
7          THE WITNESS:  Okay.  Sure.
8          BY MR. GOLDMAN:
9       Q.   Were you --
10      A.   I'd like to have it in front of me
11   when we do that, so if you --
12      Q.   I'm not going to refer to any
13   pages.
14      A.   Oh, okay.  All right.
15      Q.   Were you aware, sir, that Dr. Topol
16   consulted for a hedge fund that shorted
17   Merck stock during the time that he was
18   criticizing Vioxx?
19         MR. TISI:  Objection.
20   Objection.  Calls for facts not in
21   evidence.  Go ahead.
22         BY MR. GOLDMAN:
23      Q.   Were you aware of that?
24      A.   My understanding is that that's a

Page 143

1    -- without using the legal term slanderous
2    loosely -- an unfair depiction of what Dr.
3    Topol's involvement was, because, as I
4    understand it, he was a consultant to that
5    hedge fund but was in no way involved with
6    or aware of any of their shorting of Merck
7    stock.  He was providing them with his
8    expert opinion about various drugs.
9          But the implication that he was
10   somehow doing so in order to profit
11   personally from the decline of Merck stock
12   is, I find, rather offensive.
13      Q.   How do you know that Dr. Topol was
14   not aware that the hedge fund was shorting
15   Merck stock while he was out there
16   criticizing Vioxx?
17      A.   From the Times -- the New York
18   Times accounts of his involvement -- the
19   relationship, and also from conversations
20   with colleagues.  And I think it was also
21   written up somewhere else that I don't
22   recall.
23         And what was -- What was clear from
24   my reading of those accounts was that it

Page 144

1    was a -- an unfair depiction or
2    implication that he was somehow doing this
3    for personal gain.
4       Q.   Do you blame Merck for any
5    suggestion in the media that Dr. Topol was
6    consulting for a hedge fund that was
7    shorting Merck stock while he was out
8    there criticizing Vioxx?
9       A.   No.
10         MR. TISI:  Objection.  We
11   do, however.
12         MR. GOLDMAN:
13      Q.   Do you agree, sir, that --
14         MR. GOLDMAN:  You do?
15         MR. TISI:  I do.  Go ahead.
16         MR. GOLDMAN:  Doesn't
17   surprise me.
18         BY MR. GOLDMAN:
19      Q.   The --
20         MR. TISI:  Want me to
21   produce Dr. Reicin's brother for a
22   deposition?
23         BY MR. GOLDMAN:
24      Q.   Dr. Avorn, is it important, sir --

Page 145

1          MR. TISI:  And we're still
2    talking about Dr. Topol?  Well, withdrawn.
3          BY MR. GOLDMAN:
4       Q.   Is it important, Dr. Avorn, that a
5    scientist disclose his financial or
6    consulting relationship to a journal if
7    that relationship might be perceived as a
8    conflict of interest?
9       A.   Yes.
10      Q.   Why is it important for a scientist
11   or an author to report a consulting
12   relationship or an expert witness
13   relationship to a journal when writing an
14   article?
15      A.   So that reviewers or editors or
16   readers can be aware of the possibility of
17   bias.
18      Q.   And why is that important?
19      A.   Because there is concern that
20   people who have financial relationships
21   with, let's say, a pharmaceutical company,
22   might tend to depict the properties of
23   that drug differently than if they had no
24   financial ties to the company.

37 (Pages 142 to 145)

Jerry Avorn, M.D.

Page 146

1  Q.  If Dr. Topol, sir, were consulting
2  with the plaintiffs' lawyers as a
3  consultant or an expert witness, do you
4  agree that he should have disclosed that
5  relationship to the journal that published
6  his article?
7       MR. TISI:  Objection.
8  Outside the scope of --
9    A.  What journal --
10      MR. TISI:  Let me make an
11 objection.
12      It's excluded, therefore it's
13 outside the scope of what we are here for
14 today, so let me object to that. Go ahead.
15    A.  I would need to know what article
16 and what journal.  If there was an article
17 about fishing, no.
18    Q.  If you were an expert witness in a
19 case and -- for the plaintiffs, and you
20 were writing an article about the subject
21 matter of that litigation, would you alert
22 the journal to that relationship?
23    A.  I do.
24    Q.  I want to ask you if you've read

Page 147

1  any of the following sworn testimony by
2  Merck witnesses, okay?  Are you with me?
3    A.  Yes.
4    Q.  Briggs Morrison.  Dr. Briggs
5  Morrison.
6    A.  I've read e-mails by Briggs
7  Morrison.  I don't remember reading a
8  deposition.
9    Q.  Have you ever read the deposition
10 testimony of Dr. Musliner?
11   A.  I'm aware of it, because I remember
12 discussing it with counsel.  I don't
13 remember whether my knowledge of it is
14 based on discussions with counsel or
15 having read the actual deposition.
16   Q.  What did plaintiffs' counsel tell
17 you about the deposition of Dr. Musliner?
18   A.  That it was important for me to
19 understand, in quoting Dr. Musliner's
20 correspondence and memos, that he was not
21 stating that he was convinced that Vioxx
22 itself caused cardiovascular risk, but
23 rather that his concern in writing that
24 memo was that Vioxx would look bad in

Page 148

1  comparison with a drug that was
2  cardioprotective.
3       And they wanted me to understand
4  that the Musliner statements were not
5  quite as egregious they would seem if one
6  didn't know that.
7    Q.  Did you decide to then go look at
8  Dr. Musliner's deposition testimony to
9  confirm that what you were being told by
10 the plaintiffs' lawyers was an accurate
11 reflection of what he said?
12   A.  I assumed that what they told me
13 was correct.
14   Q.  Would it be wrong, therefore, Dr.
15 Avorn, for somebody to suggest at a trial
16 that Dr. Musliner, back in the mid 1990s,
17 believed that Vioxx could cause heart
18 attacks?
19       MR. TISI:  Objection.  Calls
20 for speculation. Calls for facts not in
21 evidence.  Go ahead.
22   A.  It would have everything to do with
23 exactly how that was stated.  That is, he
24 was concerned in the mid 1990s that in

Page 149

1  various trial designs that were being
2  discussed, Vioxx patients randomized to
3  Vioxx could be expected to have more heart
4  attacks than patients randomized to the
5  other drug.
6    Q.  What's your basis for saying that?
7    A.  His memo.
8    Q.  Okay.  Is it your testimony, Dr.
9  Avorn, that Dr. Musliner, in the mid
10 1990s, believed that Vioxx was
11 prothrombotic and could cause heart
12 attacks?
13      MR. TISI:  Objection.  Asked
14 and answered.
15   A.  I cannot know what his beliefs were
16 at the time. I can only know that he said
17 in writing that he thought the patients
18 randomized with Vioxx in a given trial
19 design would have more heart attacks.
20   Q.  But based on what the plaintiffs'
21 lawyers told you Dr. Musliner testified to
22 in his deposition, do you now understand
23 that Dr. Musliner did not think that Vioxx
24 would cause heart attacks --

38 (Pages 146 to 149)

Jerry Avorn, M.D.

Page 150

1  MR. TISI: Objection.
2  BY MR. GOLDMAN:
3  Q.  -- in the mid 1990s?
4  MR. TISI: Objection.
5  A.  I understood at the time that I
6  wrote my report that he felt that the
7  Vioxx group would have more MIs, and that
8  that could either be the result of the
9  other group having fewer MIs, or a
10  prothrombotic effect of Vioxx.
11  And I cannot know what -- which of
12  those two was more prevalent in his mind.
13  But I can easily believe that if he felt
14  only that the other group would have fewer
15  MIs, that that would create the same
16  outcome.
17  Q.  When you're reading Dr. Musliner's
18  memo, as you put it, you're not applying
19  any expertise when you're interpreting the
20  memo, are you, sir?
21  MR. TISI: Which aspect of
22  it, Counsel?
23  A.  I don't understand the question.
24  Q.  Is your interpretation of Dr.

Page 151

1  Musliner's memo, sir --
2  A.  Why don't we just refer to that?
3  Q.  -- your personal opinion, or do you
4  believe that you are using expertise when
5  you are interpreting Dr. Musliner's memo?
6  A.  All right. Let me just find the
7  portion of his memo that I'm citing.
8  I don't agree with your statement.
9  I think that -- that reading a statement
10  about the design of a clinical trial in
11  relation to adverse events is exactly what
12  I have expertise in. So no, I don't
13  agree with your contention.
14  Q.  Whether or not Dr. Musliner
15  believed that Vioxx was prothrombotic and
16  could cause heart attacks is something
17  that a juror could determine based on
18  reading the document and not something
19  that you need to help them understand,
20  true?
21  MR. TISI: Objection.
22  Objection. Calls for a legal ruling by a
23  judge in the context of a deposition. Go
24  ahead.

Page 152

1  A.  I think that I'm perfectly
2  competent and have expertise to comment on
3  statements about trial design and the
4  expected results of a trial given
5  comparison Group A versus comparison Group
6  B.
7  Q.  Do you believe that you have
8  expertise, sir, in telling the jury what
9  Dr. Musliner thought would happen in these
10  clinical trials concerning any
11  cardiovascular effects of Vioxx?
12  A.  I have expertise in interpreting
13  what he read -- I'm sorry -- what he
14  wrote.
15  Q.  That wasn't my question.
16  A.  Oh.
17  MR. TISI: Well, Counsel --
18  Go ahead.
19  A.  I think to the extent that he --
20  what he wrote reflects what he thought,
21  which seems a pretty safe assumption, yes,
22  I think that I can comment on what he
23  wrote in his memorandum.
24  Q.  Do you think it's obvious from the

Page 153

1  memorandum that Dr. Musliner wrote that he
2  believed that Vioxx was either
3  prothrombotic and would cause heart attacks
4  or that a comparator would actually
5  prevent heart attacks?
6  MR. TISI: Objection.
7  A.  He clearly believed one or the
8  other of those.
9  Q.  Am I right, sir, that whether he
10  believed that Vioxx was cardioprotective or
11  that a comparator was -- Sorry.
12  Withdrawn.
13  Whether Dr. Musliner believed that
14  Vioxx was prothrombotic or a comparator
15  was cardioprotective is an interpretation
16  that a juror can make, true?
17  MR. TISI: Objection.
18  BY MR. GOLDMAN:
19  Q.  You don't have any particular
20  expertise in --
21  MR. TISI: Objection.
22  You're asking him to sit in the role of a
23  judge, Counsel.
24  MR. GOLDMAN: Just object.

39 (Pages 150 to 153)

Jerry Avorn, M.D.

Page 154

1  Please object to the form.
2      MR. TISI:  That's a totally
3  inappropriate question.
4      BY MR. GOLDMAN:
5  Q.  Dr. Avorn, do you believe you have
6  expertise in determining Dr. Musliner's
7  state of mind and what he thought about
8  the potential of Vioxx to cause heart
9  attacks in the mid 1990s?
10     MR. TISI:  Different
11 question.  You may answer.
12 A.  I have expertise in interpreting
13 what he wrote.  I do not have expertise
14 about his state of mind.
15 Q.  Let me ask you if you've read any
16 of the depositions of the following
17 witnesses:  Brian Daniels?
18 A.  Doesn't ring a bell.
19 Q.  Doug Watson?
20 A.  I've read a lot of material by Dr.
21 Watson.  I've heard him make
22 presentations.  I can't recall having read
23 a deposition from Dr. Watson.
24 Q.  Did the plaintiffs' lawyer send you

Page 155

1  the deposition of Dr. Nies?
2  A.  I don't -- Again, I remember
3  reading what Dr. Nies has written -- had
4  written at the time.  I don't recall a
5  deposition.
6  Q.  Do you remember reading the
7  deposition of any of the following people:
8  Elliot Ehrich, E-H-R-I-C-H, Mervin Turner,
9  Harry Guess, Debra Shapiro, Ray Gilmartin
10 or Peter Kim?
11 A.  No.
12 Q.  Am I right, sir, all of the
13 materials that are identified in your
14 Materials Considered list were selected by
15 the plaintiffs' lawyers and sent to you by
16 the plaintiffs' lawyers, true?
17 A.  With the exception or the proviso
18 that I asked them to also send me evidence
19 that the other side would find helpful so
20 that I could see it from them rather than
21 -- or before today rather than at today.
22 Q.  Do you think the plaintiffs'
23 lawyers sent you information that you
24 would find helpful in understanding Merck's

Page 156

1  position in this case?
2  A.  Yes.
3  Q.  You have published research in
4  Circulation, right?
5  A.  Yes.
6  Q.  Is that a prestigious journal?
7  A.  Yes.
8  Q.  Peer reviewed?
9  A.  Yes.
10 Q.  They are fairly selective at
11 Circulation in the articles that they
12 decide to publish, right?
13 A.  Yes.
14 Q.  When you submit articles to
15 journals, and peer reviewers have suggested
16 changes, do you consider their suggestions?
17 A.  You have to, if you want the paper
18 to be published.
19 Q.  If you don't agree to make the
20 changes that a journal asks you to make,
21 then the journal can just decide not to
22 publish your paper, right?
23 A.  Right, although you also can
24 explain why you don't want to make those

Page 157

1  changes, and that will often suffice.
2  Q.  But ultimately, if a journal like
3  the New England Journal of Medicine or
4  Circulation decides they're not happy with
5  the content of a publication or they want
6  the authors to describe data in a certain
7  way, they can decide not to publish the
8  document, true?
9  A.  Correct.
10     MR. TISI:  Objection.
11     BY MR. GOLDMAN:
12 Q.  You've done research concerning the
13 communication of risk and benefit
14 information to physicians and patients,
15 right, Dr. Avorn?
16 A.  Yes.
17 Q.  Have you done any specific research
18 on Vioxx, other than as an expert witness
19 in this case?
20 A.  Do you mean the communication of
21 risk and benefit?
22 Q.  Yes.
23 A.  Well, we've -- I've been
24 responsible for a program that

40 (Pages 154 to 157)

Jerry Avorn, M.D.

Page 158

1 operationally does provide risk and benefit
2 information to patients and doctors in our
3 Pennsylvania work about Vioxx, and --
4 Well, not Vioxx specifically, but about
5 COX-2s.
6   Q.  Have you done any research or
7 published any study where you analyze
8 Merck's communications about cardiovascular
9 risks of Vioxx?
10   A.  Research about Merck's
11 communications?
12   Q.  Mm-hmm.
13   A.  Well, I have published an editorial
14 in Circulation in which I talked about the
15 presentation of data about risks and
16 benefits of Vioxx that came out just about
17 a month or so ago.  So in a sense, that
18 was an article in a peer review journal
19 about the communication of risk of Vioxx.
20      There was also a segment of a paper
21 that Dr. Solomon and I published about the
22 use of COX-2s before Vioxx was withdrawn,
23 in which we looked at the influence of
24 physician practice, and wrote about the

Page 159

1 fact that the heavy promotion of Vioxx by
2 its manufacturer may have or probably did
3 influence the patterns of use of Vioxx in
4 explaining our findings.  So in that
5 sense, yes.
6   Q.  So as I understand it, you've
7 analyzed Merck's promotional efforts and
8 concluded that they may have or probably
9 did influence prescribing habits; is that
10 your testimony?
11   A.  Yes.
12   Q.  While Vioxx was on the market, did
13 you do any research or publish any
14 articles talking about the way Merck
15 communicated potential cardiovascular risks
16 of Vioxx?
17      MR. TISI:  Objection.
18   A.  I don't believe that we did
19 research on Merck's communication at that
20 time.
21   Q.  Have you ever spoken with a doctor
22 from South Carolina named Dr. Mikola about
23 Vioxx?
24   A.  How do you spell that name?

Page 160

1   Q.  M-I-K-O-L-A.
2   A.  No.
3   Q.  Have you ever spoken with Dr.
4 McCaffrey about Vioxx?
5   A.  No.
6   Q.  Have you ever spoken with any
7 doctors to your knowledge who prescribed
8 Vioxx to plaintiffs in the Vioxx
9 litigation?
10   A.  Not to my knowledge, no.
11   Q.  Have you ever spoken with a doctor
12 named Dr. Jose Caceres, C-A-C-E-R-E-S, in
13 California?
14   A.  No.
15   Q.  Have you ever spoken with Dr.
16 Richard Shaw, who is a doctor in
17 California?
18   A.  No.
19   Q.  Have you ever spoken with any
20 doctor who took care of patients in the
21 state of New Jersey about their decision
22 to prescribe Vioxx to any of the
23 plaintiffs in this litigation?
24   A.  No.

Page 161

1   Q.  Is the same true for doctors in
2 Texas, California and every other state in
3 the United States?
4   A.  Yes.
5   Q.  Is it fair to say, Dr. Avorn, that
6 you do not know what the doctors in a
7 particular Vioxx case knew about the
8 cardiovascular risks, if any, of Vioxx?
9   A.  Well, I know what doctors in
10 general knew and -- in the sense that I'm
11 aware of what doctors in general knew.
12 It's a safe bet that specific doctors were
13 likely to have known the same thing.
14   Q.  How are you aware of what doctors
15 generally knew about the cardiovascular
16 risk, if any, of Vioxx?
17   A.  Because I'm aware of all of the
18 sources of information that they could
19 have conceivably seen, whether it was the
20 labeling or information in the media or
21 promotional materials or marketing
22 campaigns or direct consumer advertising
23 they would have seen.  And that's -- and
24 articles in the literature.

41 (Pages 158 to 161)

Jerry Avorn, M.D.

Page 162

1   So because I am aware of everything
2   that they would have seen, I have a pretty
3   good idea of what they did or didn't know.
4   Q.   So you have a pretty good idea of
5   what doctors in general knew about any
6   potential cardiovascular risks of Vioxx,
7   even though you haven't spoken with any
8   doctors who prescribe Vioxx?
9        MR. TISI:  That's not what
10  the question was, Counsel.  In litigation
11  is the question you said.  That's not
12  fair.
13  A.   Yeah.  I never said I -- I never
14  said I have not spoken to any doctors who
15  have ever prescribed Vioxx.
16       What I've said was that I have not
17  spoken to individual doctors involved in
18  the cases that are in trial.
19  Q.   Is it fair to say, then, Dr. Avorn,
20  that you don't know what any of the
21  specific doctors in the Vioxx cases knew
22  about potential cardiovascular risks
23  associated with Vioxx?
24       MR. TISI:  Objection.

Page 163

1   A.   That's not fair to say.
2   Q.   You believe, that even though
3   you've never spoken with them, you know
4   what particular doctors knew about the
5   potential cardiovascular effects of Vioxx?
6   A.   No.  What I said was that I'm
7   aware of the information that was
8   available to any doctor in America, and
9   because -- because what is known to any
10  doctor is only going to come from what's
11  in the label, what's in the marketing
12  campaign, what's in the promotion, what's
13  in the literature and what's in the direct
14  consumer advertising, as well as perhaps
15  their own clinical experience.
16       There's no way that people can know
17  things apart from those channels.  And
18  I've done research on the influence of
19  different channels of communication to
20  doctors, whether it's promotional or
21  scientific, in shaping their knowledge and
22  their prescribing.
23       And so in the sense that I know
24  what Merck was saying about Vioxx or

Page 164

1   wasn't saying and I know what was in the
2   literature the doctors might have read, I
3   can have a pretty good impression of what
4   doctors in general were aware of in
5   relation to Vioxx.
6   Q.   What did Dr. McCaffrey or Dr.
7   Mikola know about the potential risks of
8   cardiovascular -- Sorry. Withdrawn.
9        What did Dr. Mikola or Dr.
10  McCaffrey know about the potential
11  cardiovascular risks of Vioxx?
12       MR. TISI:  Objection.
13  A.   Only what was in the label or the
14  promotional materials or the literature.
15  That I can say with certainty.
16  Q.   Do you know whether Dr. Mikola or
17  Dr. McCaffrey read any of the promotional
18  materials for Vioxx?
19  A.   No.
20  Q.   Can you say, sir, under oath, that
21  you are aware of what the doctors who are
22  treating -- were treating the patients in
23  the Vioxx litigation knew, actually knew,
24  about the potential cardiovascular effects

Page 165

1   of Vioxx?
2        MR. TISI:  Objection.
3   A.   Of course I can't get into the head
4   of a given doctor that I've never met.
5   Q.   So the answer is no?
6        MR. TISI:  Objection.
7   A.   But I can know what doctors in
8   general knew.
9   Q.   I didn't ask about doctors in
10  general.
11  A.   But given that these specific
12  doctors are a subset of doctors in
13  general, that's a relevant answer.
14  Q.   Do you plan, in your trial
15  testimony, sir, to tell the jurors what
16  you believe the doctors in any particular
17  case knew about the cardiovascular risks
18  of Vioxx?
19       MR. TISI:  Objection.
20  A.   I will be able to comment with some
21  authority on what information was available
22  to physicians and presented to physicians,
23  and that is a very strong and accurate
24  predictor of what any given doctor had

42 (Pages 162 to 165)

Jerry Avorn, M.D.

Page 166

1   available to him.
2     Q.   You work on providing
3   evidence-based noncommercial summaries of
4   medical literature to doctors to help them
5   make accurate drug use decisions, right?
6     A.   Correct.
7     Q.   And when you provide evidence-based
8   noncommercial summaries of medical
9   literature, do you make it a point to
10  provide unbiased and objective views?
11    A.   That's what we try to do.
12    Q.   Why is it important to provide
13  objective unbiased views when it comes to
14  the medical literature about a particular
15  drug or class of drugs?
16    A.   So that a doctor can get
17  information that's not driven by the need
18  to sell a particular product.
19    Q.   Do you feel that your expert report
20  here, sir, contains an objective unbiased
21  review of the medical literature concerning
22  Vioxx?
23    A.   I feel that it does.
24    Q.   Do you agree, sir, that Celebrex,

Page 167

1   Ibuprofen, Feldene and over the counter
2   Advil are all essentially the same drug? .
3     A.   No.
4     Q.   Do you believe that COX-2
5   inhibitors were underused by doctors?
6     A.   No.
7     Q.   Do you believe that Vioxx was
8   underused by doctors?
9     A.   No.
10    Q.   Do you believe, sir, that for
11  patients who had serious risk of cardio --
12  Withdrawn.
13        Do you believe that for patients
14  who had serious risk of gastrointestinal
15  problems, that those patients didn't use
16  COX-2 inhibitors enough?
17        MR. TISI:  Objection.
18        BY MR. GOLDMAN:
19    Q.   Let me ask it a different way.
20    A.   Okay.
21    Q.   Dr. Avorn, do you agree, sir, that
22  for patients who had risk factors for GI
23  problems, Vioxx and COX-2 inhibitors in
24  general were underused?

Page 168

1        MR. TISI:  Objection.
2     A.   All right.  Let me try to answer
3   that.
4        When it appeared, as it did when
5   the drugs were first marketed, that they
6   had a meaningful gastroprotective effect,
7   and there was less evidence available
8   about their cardiac risk, the impression
9   that I, and many of my colleagues had and
10  that we actually wrote in a paper, was
11  that if there were patients who had
12  important gastrointestinal risk and that
13  they were not on a gastroprotective drug,
14  that that was a problem.
15        I now believe that that was not the
16  case, because we now understand that the
17  cardiovascular risk of those drugs exceeded
18  whatever gastroprotective benefit they
19  offered.  But that was not clear when they
20  first were marketed.
21    Q.   Well, there was no evidence to
22  suggest that the cardiovascular risks, if
23  any, of Vioxx outweighed the benefits that
24  it offered for patients who had the

Page 169

1   potential for gastrointestinal problems
2   when Vioxx came to the market, true?
3     A.   Well, actually, I should modify my
4   last sentence.  That was not clear to me at
5   the time the drugs were marketed.
6        I do believe that there was
7   evidence already in place at the time that
8   Vioxx was marketed, of which I was
9   unaware, since it was within the NDA
10  materials that FDA had, that even at the
11  moment of marketing, the cardiovascular
12  risks provided a harm that outweighed the
13  gastrointestinal benefit.
14    Q.   Did the FDA have all the clinical
15  and animal studies that were done on Vioxx
16  before it approved Vioxx?
17    A.   I think there were studies that
18  were not available to FDA in a timely
19  manner, and I would need to go back and
20  look at what they had when.  But ADVANTAGE
21  came to them late.  The mortality data
22  from the Alzheimer studies --
23    Q.   I'm talking about approval.
24    A.   Right.

Jerry Avorn, M.D.

Page 170

1   Q.   Let me ask my question again.
2   A.   Okay.
3   Q.   When the FDA approved Vioxx for
4   marketing in the United States, sir, in
5   May of 1999, did they have all of the
6   clinical studies and animal studies on
7   Vioxx?
8          MR. TISI:  Objection.
9   A.   I know that there were studies that
10  FDA received later than they should, and I
11  cannot comment on whether that was pre or
12  post approval.  I simply don't recall.
13  Such as ADVANTAGE.  And I don't remember
14  the dates that ADVANTAGE was completed in
15  relation to the dates of approval.  But
16  for now, I'm willing to say I cannot
17  identify a specific study that FDA did not
18  have.
19  Q.   As you sit here today, Dr. Avorn,
20  you're unaware of any study that Merck
21  withheld from the FDA or they did not have
22  when they decided to approve Vioxx for use
23  in the United States, right?
24  A.   Right.  I think that was a problem

Page 171

1   later, but not at the time of approval, to
2   my knowledge.
3   Q.   And we'll talk about what you
4   thought later.
5   A.   But not at the time of approval, to
6   my knowledge.
7   Q.   I really want to ask you to stick
8   to my question --
9   A.   Okay.
10  Q.   -- and not insert these things
11  about what happened later.  Okay?
12  A.   Okay.
13  Q.   Dr. Avorn, at the time Vioxx was
14  approved in the United States by the FDA,
15  are you aware of any clinical study or
16  animal study that Merck withheld from the
17  FDA?
18  A.   I cannot name such a study.
19  Q.   The FDA, you understand, has
20  experienced scientists who work there,
21  right?
22  A.   Yes.
23  Q.   And the FDA is very experienced in
24  evaluating the risks and benefits of

Page 172

1   medicine, right?
2          MR. TISI:  Objection.
3   A.   Experienced, but I would say not
4   always competent.
5   Q.   Do you believe the people who
6   evaluated the risks and benefits of Vioxx
7   when they approved Vioxx for use were
8   competent?
9   A.   I believe there was a competent
10  evaluation.
11  Q.   Did the FDA conclude, when Vioxx
12  was brought to the market, that the
13  benefits outweighed the risks?
14  A.   Yes.
15  Q.   Did the FDA continue to approve
16  Vioxx as safe and effective and believed
17  the benefits outweighed the risks all the
18  way till the time Vioxx was withdrawn?
19  A.   I can't --
20         MR. TISI:  Objection to the
21  phrase -- what the FDA believed.  Go
22  ahead.
23  A.   I can't comment on FDA's beliefs,
24  but you're right that that was their

Page 173

1   formal position.
2   Q.   Are you aware of an informal
3   position that the FDA felt --
4   A.   No, but you are asking me to say
5   what a federal agency believes, and I
6   don't think federal agencies can believe
7   things.
8   Q.   Based on your observations of the
9   behavior of the Food and Drug
10  Administration, do you agree, sir, that
11  the FDA repeatedly approved Vioxx as safe
12  and effective while it was on the market?
13  A.   Based on my observation of the
14  behavior of FDA, as reflected in memos by
15  FDA personnel who were reviewing Vioxx, I
16  get the clear impression of ongoing
17  worries about cardiovascular safety, from
18  the moment the drug was approved, until
19  the moment that it was withdrawn.
20         MR. GOLDMAN:  Can you repeat
21  my question?
22         (Record read).
23         BY MR. GOLDMAN:
24  Q.   Can you answer that question, sir?

44 (Pages 170 to 173)

Jerry Avorn, M.D.

Page 174

1    A.  Yes.
2         MR. TISI:  Objection.  I
3    think he answered it.  Go ahead.
4    A.  There's -- There's no such -- a
5    concept as repeated approval.
6    Q.  Did the FDA approve Vioxx as safe
7    and effective on multiple occasions while
8    it was on the market?
9    A.  It only approved it once.  Drugs
10   don't get approved over and over.
11   Q.  Did the FDA approve Vioxx for use
12   for different indications while Vioxx was
13   on the market?
14   A.  Yes.
15   Q.  You did a study, I think, in
16   2002-2004 time frame, where you received a
17   grant from the NIH, concerning cardiac risk
18   in rheumatoid arthritis patients.  Do you
19   remember that?
20   A.  There was -- The paper was Dr.
21   Solomon.  It was the first health -- in
22   the Circulation.  Is that the one you
23   mean?
24   Q.  This is -- I can't remember if he

Page 175

1    was on it or not.  But let me ask it a
2    different way.
3         MR. TISI:  Do you want a
4    copy of his CV so you can identify it?
5         BY MR. GOLDMAN:
6    Q.  Do you remember doing any research,
7    Dr. Avorn, about cardiac risk in patients
8    who had rheumatoid arthritis?
9    A.  Well, I know that Dr. Solomon did a
10   paper on that topic, but he did it with
11   another group, and I'm not even sure that
12   I was a co-author of it.
13   Q.  Are you aware that patients with
14   rheumatoid arthritis have an increased risk
15   of heart attacks?
16   A.  Yes.
17   Q.  Just by having the disease
18   rheumatoid arthritis patients are,
19   unfortunately, at higher risk of
20   experiencing heart attacks, right?
21   A.  Correct.
22   Q.  Do you know what the magnitude of
23   the risk is that the patients who have
24   rheumatoid arthritis face compared to

Page 176

1    somebody who doesn't have rheumatoid
2    arthritis with respect to heart attacks?
3    A.  Not off the top of my head.
4    Q.  Are people with osteoarthritis
5    generally at higher risk of heart disease
6    than those that don't have osteoarthritis?
7    A.  Yes.
8    Q.  Do you know what the magnitude of
9    the increased risk is of the patients with
10   osteoarthritis for having heart disease
11   than patients who don't have
12   osteoarthritis?
13   A.  Not off the top of my head.
14        MR. GOLDMAN:  Let's take a
15   break.
16        (Off the record at 11:37 a.m.)
17        (Recess taken.)
18        (On the record at 11:47 a.m.)
19        BY MR. GOLDMAN:
20   Q.  Were you asked to answer two
21   principle questions by the plaintiffs'
22   lawyers when you were retained as an
23   expert?
24   A.  Yes.  But on re-reading my report,

Page 177

1    I realized that there were a couple of
2    subtasks within that evaluated and managed
3    issue having to do with how they managed
4    the risk benefit issue and communicated
5    it, and I kind of compressed it into
6    manage.  But yes.
7    Q.  The first question that you were
8    asked to answer was whether Vioxx
9    increased the risk of -- you wrote
10   cardiovascular disease?
11   A.  Right.
12   Q.  What do you mean by increase the
13   risk of cardiovascular disease?
14   A.  Well, broadly, cardiovascular
15   disease would include myocardial
16   infarction, cerebral vascular disease,
17   including stroke, but also hypertension,
18   congestive heart failure.
19   Q.  Anything else?
20   A.  Those are the main components.
21   Q.  So as I understand what you're
22   going to do in your trial deposition, Dr.
23   Avorn, you're going to testify about
24   general causation; that you believe Vioxx

45 (Pages 174 to 177)

Jerry Avorn, M.D.

Page 178

1 increases the risk of heart attacks and
2 strokes, right?
3    A.   And other cardiovascular disease,
4 right.
5    Q.   Do you know a plaintiff named Mr.
6 Gerald Barnett?
7    A.   No.
8    Q.   Have you ever reviewed Mr.
9 Barnett's medical records?
10    A.   No.
11    Q.   Do you know Stephen Hatch?
12    A.   No.
13    Q.   Did you know Stephen Hatch before
14 he passed away?
15    A.   No.  We can maybe save time by
16 saying I don't know or get involved with
17 any specific plaintiffs.
18    Q.   Okay.
19        MR. TISI:  And you've
20 actually said -- tried to say that a
21 couple times.
22        THE WITNESS:  Right.
23        BY MR. GOLDMAN:
24    Q.   And you haven't reviewed the

Page 179

1 medical records of any of the plaintiffs
2 in the Vioxx litigation, right?
3    A.   Correct.
4        MR. TISI:  Would it help
5 you if I made a global representation?
6 Supposedly that will cut down some of your
7 time.
8        MR. GOLDMAN:  No.  I'm not
9 going to go through the specific -- If
10 you're going to say general stuff?
11        MR. TISI:  No.  I'm going
12 -- What I'm going to say is he has not
13 reviewed any medical records or any
14 particular plaintiff.  He will not be
15 offered as an expert on behalf of any
16 individual plaintiff other than on -- in
17 court.
18        MR. GOLDMAN:  Okay.
19        MR. TISI:  Hopefully they
20 won't say, did you speak to the doctors?
21 Did you look at the plaintiffs? We've
22 avoided all that.
23        BY MR. GOLDMAN:
24    Q.   When you say you were asked the

Page 180

1 question about -- Withdrawn.
2        When you say that you were asked to
3 assess the methods by which Merck
4 evaluated and managed the cardiovascular
5 issue during the time that Vioxx was
6 developed and while it was on the market,
7 are you basically offering your opinion
8 about what Merck knew about any potential
9 cardiovascular risks, what Merck did or
10 didn't do in response to what you believe
11 they knew, and whether you believe that
12 Merck's actions or inactions were
13 reasonable?
14    A.   Correct.
15    Q.   What does assess methods mean?
16    A.   Can you show me where you're
17 referring?
18    Q.   The second question you were asked
19 was to assess the methods.  It's on --
20    A.   Correct.  Assess what Merck did.
21    Q.   Can you be a little more specific?
22    A.   Sure.  Evaluate and manage are two
23 different pieces.  Evaluate it is how
24 Merck worked up the question of

Page 181

1 cardiovascular risk, in term of studies
2 that it did or did not do.  And manage
3 would include how it dealt with the risk
4 in terms of how it communicated to doctors
5 and to patients.
6    Q.   Do you believe you know all of the
7 studies that Merck did to assess the
8 question of whether Vioxx increases the
9 risk of cardiovascular disease?
10    A.   There could well be studies that
11 I'm not aware of.
12    Q.   You don't know what Merck did in
13 response to the FitzGerald urine study
14 about prostacyclin and Thromboxane, right?
15    A.   I know that animal studies were
16 conducted, but I don't know that I am
17 aware of all of them.  I do believe I
18 have a clear handle on the human studies
19 that were done.
20    Q.   But you don't know any of the
21 pharmacologic studies or any of the animal
22 studies that Merck did to try to test the
23 FitzGerald hypothesis, if you will?
24    A.   I'm sure I don't know all of them.

46 (Pages 178 to 181)

Jerry Avorn, M.D.

Page 182

1   Q.   When you say that you are going to
2   assess how Merck managed the question of
3   cardiovascular risk, you said that that
4   would include how Merck dealt with the
5   risk in terms of how it communicated to
6   doctors and to patients, right?
7   A.   Correct.
8   Q.   How do you know how Merck
9   communicated to doctors and to patients
10  the potential cardiovascular risks
11  associated with Vioxx?
12  A.   Because everything the company is
13  legally permitted to say to doctors and to
14  patients needs to be a reflection of what
15  is approved by the FDA.  And also we have
16  copies of their ads, copies of their
17  statements, copies of their internal
18  documents about their plans for
19  communication.  And the materials that
20  they sent out to patients are obviously in
21  the public domain.
22  Q.   Well, is it your testimony, Dr.
23  Avorn, that you've reviewed all of the
24  advertisements about Vioxx, the statements

Page 183

1   that Merck has made about Vioxx, all the
2   relevant internal documents at Merck that
3   you believe reflect the communications that
4   Merck had concerning any potential
5   cardiovascular risk of Vioxx?
6   A.   Well, I've seen many, many of the
7   ads, and many, many of the statements.
8   I'm sure there may be some ads or -- and
9   I'm sure there are internal statements
10  that I haven't seen.
11  Q.   What scientific methodology are you
12  using when you are assessing the methods
13  of Merck's managing of the cardiovascular
14  problem, as you put it?
15  A.   Okay.  Again, there's the -- the
16  generating of new data and the
17  communication, which are really two -- two
18  separate pieces.
19      There's a growing understanding
20  that a big piece of -- of rational drug
21  use and drug stewardship is about managing
22  risk.  And so there are expectations about
23  what -- in the -- in the medical
24  community, particularly in the pharmacoepi

Page 184

1   community, about what's inappropriate
2   action to take in relation to signals in
3   terms of further studies that need to be
4   done.
5       And there's also general consensus
6   about fairness and accuracy and depiction
7   of information to patients and doctors.
8   Q.   Are you saying there's a standard
9   that you're actually applying when you are
10  assessing Merck's methods of dealing with
11  the cardiovascular risks?
12  A.   There's not a written down standard
13  that one can Xerox, but there is a
14  consensus, I think, within the medical
15  community about what's reasonable behavior.
16  Q.   What source can you point me to
17  that would show that there's a consensus
18  in the medical community about what would
19  constitute reasonable behavior by a drug
20  company?
21  A.   Well, in -- there is a document
22  called -- that I helped to write the first
23  version of.  Something like Guidelines for
24  Appropriate Pharmacoepidemiologic Practice.

Page 185

1   I -- I can't remember.  It's in my CV.
2   That was published by the International
3   Society for Pharmacoepidemiology, of which
4   I was president at one point, that sets
5   forth kind of good pharmacoepidemiologic
6   practice in working up and evaluating
7   risks.  So that's -- that's one piece.
8   And I believe it was -- it was revised in
9   the last year or two.
10      There are a variety of -- of
11  standards for appropriate -- Well, there
12  are standards that are not necessarily
13  written down, but they have to do with
14  fair and accurate communication.
15      There is actually legislation --
16  and I don't claim to be a regulatory
17  authority -- but there is legislation,
18  regulatory language in place about duty to
19  warn and so forth that is in FDA's
20  regulatory mandate as well.  So those
21  would be two kinds of examples of
22  standards.
23  Q.   Are drug companies subject to
24  strict FDA regulatory requirements?

47 (Pages 182 to 185)

Jerry Avorn, M.D.

Page 186

1    MR. TISI: Objection.
2    A.   Not strict enough, in my view.
3    Q.   Does the FDA regulate the conduct
4  of pharmaceutical companies in terms of
5  drug approval and post marketing?
6    A.   Post marketing? Just post
7  marketing --
8    Q.   Post marketing.
9    A.   -- behavior? To the latter, no.
10  I think there's -- there's clear evidence
11  that FDA does not have much of a
12  regulatory handle on post marketing,
13  certainly post marketing research.
14    Q.   So when you're talking about
15  assessing the methods of Merck's management
16  and evaluation of the cardiovascular issue,
17  you are talking about describing Merck's
18  conduct, and then why you believe that
19  conduct constitutes unreasonable behavior?
20    A.   Correct.
21    Q.   Is there any objective standard,
22  sir, that you can point me to, that would
23  show how a pharmaceutical company is
24  supposed to evaluate and manage a safety

Page 187

1  issue?
2    A.   Well, I just mentioned the
3  Guidelines for Good Pharmacoepidemiologic
4  Practice. What --
5    Q.   Let me stop you there.
6    MR. TISI: Are you going to
7  come back and let him finish his answer?
8  Go ahead.
9    BY MR. GOLDMAN:
10    Q.   Finish the answer. Tell me, Dr.
11  Avorn, all the places where I can find an
12  objective standard about how a
13  pharmaceutical company should evaluate and
14  manage a safety issue.
15    MR. TISI: Objection. Asked
16  and answered.
17    A.   Okay. For the third time, I will
18  cite the recommendations or the guidelines
19  published by the International Society for
20  Pharmacoepidemiology called Guidelines for
21  Appropriate -- for Good
22  Pharmacoepidemiologic Practice. That's my
23  recollection of the title. As I said, I
24  helped to write initially.

Page 188

1    There -- So in terms of -- There
2  also are various papers that have been
3  written by people like Professor Ray. He
4  had a good paper that was in the New
5  England Journal earlier this year, I
6  believe, on evaluating drug safety.
7    I had a paper that I wrote with
8  him in the New England Journal back in
9  1993, I believe -- it's in my CV -- about
10  evaluating drugs once they are on the
11  market or some title like that. Alasdair
12  Wood has also written about appropriate
13  safety evaluation of drugs.
14    So there are many papers in the
15  literature in which experts in the field
16  have laid out -- including myself, have
17  laid out what is appropriate assessment of
18  risk for marketed drugs.
19    Q.   Do any of the sources that you just
20  described indicate how a drug company
21  should respond to a particular safety
22  issue?
23    A.   Yes.
24    Q.   When you referenced the Guidelines

Page 189

1  for Good Pharmacoepidemiologic Practice --
2    A.   Right.
3    Q.   -- can you briefly tell me what
4  that is about?
5    A.   Sure. The goal, back when we wrote
6  it, was to provide a companion to the
7  guidelines that exist for good clinical
8  trial practice, good manufacturing
9  practice, so that there would be something
10  written down in which a company or other
11  interested party could find recommendations
12  about what's the right way to deal with
13  post marketing surveillance, workup of
14  safety signals and so forth.
15    Q.   And you believe that the Guidelines
16  for Good Pharmacoepidemiologic Practice,
17  Dr. Ray's article in the New England
18  Journal of medicine, your article with Dr.
19  Ray in 1993, and articles that Alasdair
20  Wood has written demonstrate that there's
21  a consensus in the medical community about
22  how pharmaceutical companies should act?
23    MR. TISI: I think you're
24  missing one that he mentioned, but I

48 (Pages 186 to 189)

Jerry Avorn, M.D.

Page 190

1   won't...
2         MR. GOLDMAN:  Okay.
3     A.  Yeah.  That -- There -- Dr. Strom
4   has written about this.  Dr. Sady.  Yeah.
5   I think if you take all of those together,
6   there is a general picture that emerges.
7   There's always going to be differences.
8     Q.  Have you identified any of those
9   sources, sir, that you mentioned in your
10  Materials Considered?
11        MR. TISI:  Counsel,
12  objection.
13    A.  Well, my -- my CV has the
14  Guidelines for Good Epidemiological
15  Practices in it.  But no, that -- that
16  would be just in the rubric of -- of
17  general medical behavior.
18    Q.  Have you evaluated the conduct of
19  pharmaceutical companies other than Merck?
20    A.  Yes.
21    Q.  Was that in the context of being an
22  expert witness?
23    A.  And other contexts as well.
24    Q.  Have you ever -- Withdrawn.

Page 191

1         Are you applying any statistical
2   methods, sir, when you're evaluating
3   Merck's conduct in this case?
4         MR. TISI:  Objection.
5     A.  Certainly statistics play a role in
6   looking at data, yes.
7     Q.  What statistics have you applied to
8   demonstrate that Merck's conduct concerning
9   Vioxx was unreasonable?
10    A.  Well, it's not like there's a
11  statistical test for reasonable behavior.
12  But what I mean is that there -- in
13  looking at study results, one needs to
14  know enough statistics to be able to
15  interpret the importance of the findings.
16    Q.  What is the test for reasonable
17  behavior by a drug company?
18    A.  Like I just said, there is no test
19  that you can apply a Chi-square to and see
20  if it passes or fails.
21    Q.  I'm not talking about a statistical
22  test.
23    A.  Okay.
24    Q.  Any test -- Withdrawn.

Page 192

1         MR. TISI:  He identified
2   reasonable behavior; isn't that correct?
3         BY MR. GOLDMAN:
4     Q.  Is there a test, sir, that you're
5   applying to determine whether Merck's
6   conduct concerning Vioxx was reasonable?
7     A.  Okay.  There is no one test the
8   way you would do a Chi-square on a
9   clinical trial.  "The test," in quotes, is
10  whether that behavior meets reasonable
11  standards of experts in the field.
12        And there's also a common sense
13  test of, I think, whether any individual
14  layperson or a juror would expect that a
15  reasonable company would do X, Y, Z given
16  a given piece of data.
17    Q.  Do you believe that jurors are
18  capable of evaluating Merck's conduct in
19  coming to a conclusion about whether
20  Merck's conduct was reasonable or
21  unreasonable?
22    A.  In some ways yes and in some ways
23  no, and let me explain.  They would not
24  be able to understand what acceptable

Page 193

1   standards of behavior in the medical
2   community are because they're not doctors,
3   or about interpreting the meaning of
4   certain findings because they're not
5   pharmacoepidemiologists.  So there are some
6   important technical things which a juror,
7   on his or her own, could not be able to
8   interpret.
9         And then there are other things
10  which any person with common sense can
11  interpret, as in if you saw a particular
12  signal of a problem that would a
13  reasonable company do.  So there's --
14  There's the two kinds.
15        And the latter I think a juror
16  could handle on their own.  The former, I
17  think, requires some expert interpretation.
18    Q.  So as I understand it, you believe
19  that expertise is required to be able to
20  explain the standards that you believe are
21  acceptable for a pharmaceutical company's
22  conduct, but whether or not Merck violated
23  those standards a juror could determine on
24  its own?

49 (Pages 190 to 193)

Jerry Avorn, M.D.

Page 194

1    A.   That's a total distortion of what I
2    said.
3              MR. TISI:  I would also
4    add, Counsel, you know, that is clearly a
5    ruling that a judge has to make.
6              Asking an expert witness to sit in
7    the -- to put judicial robes on and decide
8    where his appropriate expert testimony was
9    not appropriate expert testimony is
10   absolutely inappropriate.
11             And I will abide by Judge Fallon's
12   ruling about not, you know, stating
13   speaking objections; however, those kinds
14   of things are so ridiculous that if you
15   really feel like you're compelled to ask
16   this witness to sit as a judge, I will
17   feel that perhaps maybe we should call
18   Judge Fallon on that.
19             MR. GOLDMAN:  Fine.
20             MR. TISI:  So let's --
21   let's -- let's -- let's stick to medical
22   opinions, and not judicial opinions.
23             BY MR. GOLDMAN:
24        Q.   Are you an expert, Dr. Avorn, in

Page 195

1    FDA regulations?
2         A.   To the extent that my expertise
3    about drug risks and benefits relate very
4    closely to FDA decisions, yes. Am I a
5    regulatory attorney?  No.
6         Q.   But you believe you are an expert
7    in FDA guidelines concerning drug labeling?
8         A.   We -- We have written on that
9    topic, and I, again, to the extent a great
10   deal of that is about pharmacoepidemiology
11   and data on risks and benefits, yes.
12        Q.   We'll talk more about the FDA in a
13   minute.
14             When did you form your opinion that
15   Vioxx increased cardiovascular risk?
16        A.   I think it began to form when the
17   VIGOR study was published in November of
18   2000.
19        Q.   When did you form your opinion that
20   Merck's conduct in responding to the
21   potential cardiovascular risks of Vioxx was
22   unreasonable?
23        A.   It took form over time. I think
24   it began, actually, in early 2001, in a

Page 196

1    conversation with Dr. Lou Sherwood of
2    Merck, whom I had invited to give grand
3    rounds at our hospital. And I asked him
4    about the VIGOR findings, and he said --
5    he dismissed it out of hand and said, "Oh,
6    that's nothing to think about.  It's all
7    because Naproxen prevent MIs."
8              And that was the first time that I
9    began to feel, or believe, that Merck's
10   response to the cardiovascular risk of
11   Vioxx was not a reasonable response,
12   because that seemed to me to be a -- a
13   rather quick dismissal of a potentially
14   very worrisome problem.
15        Q.   What did you say to Lou Sherwood
16   when he told you that?
17        A.   I don't recall what I said to him
18   at the time. I remember thinking to
19   myself, "Gee, that seems like a pretty
20   glib answer." But since he was the vice
21   president of the company that made the
22   drug and knew the data more intimately
23   than I, I don't know that I -- I think I
24   may have indicated that that would make

Page 197

1    Naproxen the most cardioprotective drug
2    ever discovered. I know that that's what
3    many of us were saying at the time. I
4    would expect that I would have said that
5    to Lou.
6         Q.   But you don't remember?
7         A.   It was six years ago -- or five
8    years ago.
9         Q.   Where was the discussion with -- I
10   can't remember. He's a doctor.
11        A.   Sherwood is a doctor.
12        Q.   Dr. Sherwood.
13             MR. TISI:  He actually
14   is --
15             THE WITNESS:  He's the head
16   of endocrine at Beth Israel.
17             MR. GOLDMAN:  This is off.
18             (Off the record at 12:09 p.m.)
19             (Discussion off the record).
20             (On the record at 12:09 p.m.)
21             BY MR. GOLDMAN:
22        Q.   When was your discussion --
23        A.   It would have been about --
24        Q.   Let me finish. When was your

Jerry Avorn, M.D.

Page 198

1   discussion with Dr. Sherwood?
2   A.   It would have been about January of
3   '01, at the Brigham and Women's Hospital,
4   when I had had him come up to give grand
5   rounds.
6   Q.   Was anyone else present during your
7   discussion?
8   A.   That particular discussion, as I
9   recall, was in the hallway walking
10  somewhere, I think.  Although I remember
11  Dr. -- We had a lunch with him after
12  grand rounds, and I remember Dr. Solomon
13  was at -- It was a small lunch, mostly
14  for my division with Dr. Sherwood, and I
15  know Dr. Solomon was there.  But I don't
16  remember all the people that were there.
17  Q.   Have you had dealings with Dr.
18  Sherwood in the past?
19  A.   Over time, as I was just saying, he
20  was, I think, the head of endocrinology
21  around the time that I was at the Beth
22  Israel Hospital in the '70s or early '80s.
23  And I think he had invited -- he and I
24  were both on a panel or two over time of

Page 199

1   -- I remember there was a meeting at the
2   University of Pennsylvania we were both
3   at.  So I've seen him on and off like
4   every few years.  Rarely.
5   Q.   And has Dr. Sherwood ever done
6   anything to you that you viewed was
7   inappropriate?
8   A.   Not to my knowledge.
9   Q.   Was he ever combative or
10  threatening toward you in any way?
11  A.   Not to me.  To others.
12       MR. GOLDMAN:  Move to strike
13  as nonresponsive.
14       BY MR. GOLDMAN:
15  Q.   I'm asking about you.  Did you find
16  that Dr. Sherwood -- Let me back up for a
17  second.
18       Have you read a letter about Dr.
19  Sherwood that was written by Dr. Fries?
20  A.   I'm aware of a concern that Dr.
21  Fries had about Dr. Sherwood's behavior.
22  Q.   Is that based on a conversation you
23  had with Dr. Fries?
24  A.   No.  It was reading about it.

Page 200

1   Q.   In a letter?
2   A.   I don't remember if it was a letter
3   or an account of their interchange.
4   Q.   What type of account did you
5   read --
6   A.   Well, basically --
7   Q.   -- about the interchange between
8   Dr. Fries and Dr. Sherwood?
9   A.   Well, basically -- And this has
10  been, I think, widely reported in the
11  media -- that allegedly Dr. Sherwood
12  phoned or wrote -- I think phoned Dr.
13  Fries at Stanford to complain about the
14  statements made by Dr. Gupta -- no, I'm
15  sorry.  Dr. Singh.  His first name is
16  Gurkirpal Singh, S-I-N-G-H.  Who was a
17  junior faculty at Stanford who had been
18  making statements, based on his reading of
19  the literature and his own research, about
20  Vioxx and its cardiovascular risk, and Dr.
21  Sherwood allegedly called Dr. Fries to
22  warn him to -- as the account goes, to
23  have Dr. Singh stop saying bad things
24  about Vioxx.

Page 201

1   Q.   Do you know how Merck responded to
2   the complaint that Dr. Singh registered
3   with Merck?
4        MR. TISI:  Dr. Fries.
5        BY MR. GOLDMAN:
6   Q.   I'm sorry.  Dr. Fries.
7   A.   I know that there was a statement
8   within Merck that this looked very bad and
9   there was concern.  I don't know that I
10  remember what they did about it.
11  Q.   Do you have an opinion about
12  whether Merck acted responsibly in response
13  to Dr. Fries's letter about Dr. Sherwood?
14       MR. TISI:  A separate report
15  from Dr. Sherwood's conduct?  You're
16  talking about as an institution?  Is that
17  what you're asking?
18       BY MR. GOLDMAN:
19  Q.   Do you understand the question?
20       MR. TISI:  I don't, and I'm
21  going to object.
22  A.   No.  I -- I don't.
23  Q.   Your knowledge about the
24  interaction between Dr. Sherwood and others

51 (Pages 198 to 201)

Jerry Avorn, M.D.

**Page 202**

1   and what Dr. Fries had to say about that
2   comes from your reading the newspaper,
3   right?
4        A.  Correct.  But I can tell you it
5   created quite a stir in the academic
6   community, that a company would sort of
7   threaten a faculty member for saying bad
8   things about their drug.
9            MR. GOLDMAN:  Move to strike
10  as nonresponsive.
11           BY MR. GOLDMAN:
12       Q.  And you've said, allegedly, in
13  several of your --
14       A.  Right.
15       Q.  -- answers, right?
16       A.  Correct.
17       Q.  You don't know whether the
18  statements by Dr. Fries are accurate about
19  Dr. Sherwood, correct?
20       A.  I cannot rule out the possibility
21  that he was lying.
22       Q.  You just don't have any personal
23  knowledge at all about Dr. Sherwood or his
24  interactions with any other doctor, right?

**Page 203**

1        A.  It's from what I've read.
2        Q.  Okay.  You identify the sources of
3   information that you're relying on for
4   your opinion, sir, and you said that you
5   reach your opinions based on peer-reviewed
6   medical literature, right?
7        A.  Right.
8        Q.  Did you reach your opinions based
9   on publicly available material from the
10  FDA?
11       A.  Right.
12       Q.  And did you reach your opinion
13  about what Merck knew about the
14  cardiovascular risks and how it managed
15  those risks from the internal documents
16  that plaintiffs' lawyers sent you?
17       A.  Yes.  There -- There are other
18  sources, too.  That was not an exhaustive
19  list.
20       Q.  What are the other sources?
21       A.  Well, there was not publicly
22  available information.  I believe that it
23  was within FDA.  I think that I saw FDA
24  documents that I would not have been able

**Page 204**

1   to get outside of the discovery process.
2   I'm not sure.
3            And other communication to Merck by
4   its -- I guess I got that via Merck
5   internal documents such as correspondence
6   that was sent to Merck by its scientific
7   advisors.  And then, again, the media
8   reports, which were a smaller piece of it,
9   but they were part of that as well.
10       Q.  You're relying on media reports in
11  forming your opinion, in part?
12       A.  In small part.
13       Q.  Were there good public health
14  reasons for Merck to develop Vioxx?
15       A.  Yes.
16       Q.  What were they?
17       A.  The fact that gastrointestinal
18  toxicity, particularly GI bleeds, from
19  traditional nonsteroidals was and is a
20  clinical problem.
21       Q.  Would you agree that
22  gastrointestinal toxicity from traditional
23  NSAIDs is a substantial problem?
24           MR. TISI:  Objection.

**Page 205**

1        A.  Yeah.  Substantial is a subjective
2   word, but it's -- it's -- it's a problem.
3   I -- I -- I just don't know what
4   substantial means in this context.  But
5   yes, it's -- it's an important problem.
6        Q.  Are you aware of epidemiological
7   studies that have suggested there are
8   approximately 107,000 hospitalizations each
9   year because of GI complications from
10  traditional NSAIDs?
11       A.  Yes.
12       Q.  You have no reason to dispute the
13  integrity or accuracy of those studies,
14  right?
15       A.  Right.
16       Q.  Would you agree, sir, that Vioxx
17  worked to reduce pain and inflammation for
18  the vast majority of patients who used it
19  without causing them side effects?
20       A.  Yes.
21       Q.  And you would never say, sir, that
22  Vioxx is unsafe for any patient with any
23  dose for any duration, would you?
24       A.  Sure, I would.  In fact, that's

52 (Pages 202 to 205)

Jerry Avorn, M.D.

Page 206

1  what the FDA has said.  That's what Merck
2  has said.  Yes.  Of course I would.
3     Q.   Did you ever say, while Vioxx was
4  on the market, that it was unsafe for any
5  patient at any dose for any duration?
6     A.   I recommended to our P and T
7  committee we not have it on our formulary.
8  That's about as clear I could have been
9  about it.
10     Q.   Did you recommend to the medical
11  community, in terms of writing an article,
12  that you believed while Vioxx was on the
13  market that it was unsafe for any patient
14  at any dose for any duration?
15     A.   I wrote in my book, while the drug
16  was on the market, that it was no more
17  effective than older nonsteroidals and that
18  it raised the risk of heart attack.
19     Q.   Before Vioxx was withdrawn from the
20  market, sir, did you ever write any
21  peer-reviewed article that said that Vioxx
22  was unsafe for any patient at any dose for
23  any duration?
24     A.   I wrote peer-reviewed articles,

Page 207

1  while the drug was on the market,
2  indicating that there was a worrisome risk
3  of cardiovascular side effects from the
4  drug.
5        I did not go on to call for its
6  being banned, because that's not what the
7  articles are about.  But we had papers in
8  the literature well before the drug was
9  withdrawn saying this drug carries
10  important cardiovascular risk.
11        I think the papers also indicated
12  that it had no analgesic advantage.
13     Q.   I wasn't asking about other
14  articles.  I was asking about yours, okay?
15     A.   No.  I'm saying, that's -- I'm
16  talking about mine.  Articles that I have
17  written.
18     Q.   Did you ever write in any article
19  that was peer- reviewed while Vioxx was on
20  the market, that Vioxx was unsafe for any
21  patient at any dose for any duration?
22     A.   If you can strain the question by
23  using those particular words, no.  But to
24  complete my answer, I did say that

Page 208

1  Vioxx --
2     Q.   Why do you have to complete your
3  answer?
4     A.   Because you're asking --
5     Q.   It's complete.
6     A.   It's really a pretty absurd
7  question.
8     Q.   It's a yes or no question.
9        MR. TISI:  No, it isn't.
10     A.   You're asking if I used a specific
11  set of words that you chose that are
12  extraordinarily extreme.  And what I'm
13  saying is, while I did not use those
14  extreme words, that essentially no one
15  ever uses in an article, what I did say
16  very clearly for many years well before
17  the drug was withdrawn is that it had no
18  analgesic advantage and that it had an
19  increased cardiovascular risk.
20        That is tantamount to saying why in
21  the world would you use this drug?  So
22  technically I did not use the words that
23  were in your question, but I certainly
24  made a statement very much like that in

Page 209

1  writing in peer-reviewed articles over the
2  years.
3     Q.   Did you ever say, while Vioxx was
4  on the market in any peer-reviewed
5  article, that you believed it should be
6  withdrawn from the market?
7     A.   No.
8     Q.   Did you ever say in any
9  peer-reviewed article that you wrote while
10  Vioxx was on the market that it should
11  have a black box warning about potential
12  cardiovascular risks?
13     A.   No.
14     Q.   Did you ever write in any article
15  while Vioxx was on the market that you
16  believed that Merck's warning about
17  potential cardiovascular risks was
18  inadequate?
19     A.   I never wrote any papers in which
20  that would have come up.
21     Q.   Is the answer no?
22     A.   Right.
23     Q.   You, I think won a --
24        MR. TISI:  Could you just

53 (Pages 206 to 209)

Jerry Avorn, M.D.

Page 210

1  read back that last question, if you don't
2  mind? I'm sorry. Let me ask you, was
3  that while he was on the market, while the
4  drug was on the market?
5       MR. GOLDMAN: Yes.
6       MR. TISI: That's fine.
7       BY MR. GOLDMAN:
8       Q. Were you the recipient of a
9  clinical investigator award concerning the
10 issue of drug induced illness in the
11 elderly? Do you remember that?
12      A. I don't know that it was a clinical
13 investigator award. That --
14      Q. Okay.
15      A. Tell me what you -- From whom?
16      Q. Did you receive a grant --
17      A. From whom?
18      Q. -- from the NIH in the early '90s
19 to assess drug induced illness in the
20 elderly, and did you use NSAIDs as a
21 model?
22      A. Yes.
23      Q. Briefly, can you tell us what your
24 study was about and what were the

Page 211

1  conclusions about NSAIDs?
2       A. Okay. It was, as I recall -- And
3  this would have been many years ago --
4  looking at patterns of use of NSAIDs and
5  complications, and it -- it led into the
6  work that I did with Dr. Solomon.
7       I think -- If we're talking about
8  the same grant, that was a small grant
9  pilot award from the National Institute on
10 Aging to develop data sets for studying a
11 variety of problems.
12      MR. TISI: To the extent
13 you refer to stuff like that, because I
14 think it's helpful, if you want to -- he
15 has his CV, so I know --
16      MR. GOLDMAN: I --
17      MR. TISI: Okay. So I
18 mean, it would help me to follow what
19 you're doing. If you can't do that,
20 that's fine. I understand.
21      BY MR. GOLDMAN:
22      Q. Did you discuss, when you were
23 doing this research for the NIH, the
24 gastrointestinal complications from NSAIDs?

Page 212

1  Do you remember?
2       A. Well, yeah. I remember that that
3  research led to a number of papers that
4  Dr. Solomon and I wrote that dealt with
5  that, yeah.
6       Q. Have you ever prescribed Vioxx?
7       A. I have recommended that -- I'm
8  trying to remember whether I've -- Given
9  that it came out after I was no longer
10 doing a lot of direct primary care, I'm
11 trying to recall whether I've recommended
12 that interns or residents prescribe it.
13      I would expect that when it was new
14 to the market, I would have probably had
15 supervised interns who prescribed it.
16      Q. At what point in time do you
17 believe you told the residents and interns
18 at your hospital that Vioxx carried an
19 increased cardiovascular risk that they
20 should consider when they prescribe Vioxx?
21      MR. TISI: Objection. Asked
22 and answered.
23      A. I think it would have been shortly
24 after the publication of VIGOR in November

Page 213

1  of 2000.
2       Q. Have you ever prescribed Celebrex?
3       A. Yes. As above, that is, supervise
4  interns and residents who prescribed it.
5       Q. Do you know that the FDA has
6  concluded that all NSAIDs carry
7  cardiovascular risk?
8       MR. TISI: Objection.
9       A. I know they --
10      MR. TISI: It misstates the
11 record.
12      A. I know that they have concluded
13 that. I think that they have concluded
14 that sloppily.
15      Q. Why?
16      A. Because, as I've discussed with Dr.
17 Temple of FDA, they really did not have
18 clinical trial or data or compelling
19 observational data about drugs other than
20 the COX-2s, but that for reasons that are
21 beyond me, they chose to put the same --
22 to recommend the same warning for all
23 nonsteroidals, really on the basis of not
24 having enough data, but just assuming a

54 (Pages 210 to 213)