Jerry Avorn, M.D.

| Page 214 | Page 216 |
|---|---|
| 1 class vein. | 1 Q. Why do you say usually? |
| 2 And I think that they got it wrong, | 2 A. Because there are some times in |
| 3 as I've told Dr. Temple, and I've stated | 3 which a -- an excessively rigid use of |
| 4 it in print. | 4 statistical, quote, rules, unquote, such as |
| 5 Q. What did Dr. Temple say to you when | 5 saying that any finding with a P value of |
| 6 you said that to him? | 6 less than .05 is real and meaningful, and |
| 7 A. He said that they were working with | 7 any finding with a P value of greater than |
| 8 the best data they had, and they felt that | 8 .05 is unimportant. Being too rigid about |
| 9 they wanted to be safe about it. | 9 that can lead to erroneous conclusions. |
| 10 Q. Did you take issue with the FDA's | 10 Q. Can taking results that are not |
| 11 conclusion that all COX-2 inhibitors should | 11 statistically significant -- Withdrawn. |
| 12 have a black box warning about potential | 12 Do statistical rules and the |
| 13 cardiovascular effects? | 13 concept of statistical significance help |
| 14 A. I did not take issue with that. | 14 prevent people from drawing invalid |
| 15 Q. Do you disagree with the FDA's | 15 conclusions from the data? |
| 16 desire to have a black box warning on | 16 A. When used intelligently, yes. |
| 17 Celebrex for potential cardiovascular risk? | 17 Q. And is the concept of statistical |
| 18 A. No. | 18 significance a principle that's been around |
| 19 Q. Do you think that there is no | 19 for many years? |
| 20 cardiovascular risk associated with | 20 A. Well, yeah. But so has astrology. |
| 21 traditional NSAIDs, other than by | 21 I don't know that that's a helpful |
| 22 increasing hypertension? | 22 question. |
| 23 A. I do not think that. I don't | 23 Q. It's helpful to me to ask, so -- |
| 24 know. I think we don't have enough data | 24 A. Okay. It's been around for many |

| Page 215 | Page 217 |
|---|---|
| 1 to know. | 1 years. |
| 2 MR. GOLDMAN: Now is | 2 Q. Merck didn't invent the concept of |
| 3 probably an okay time to break for lunch, | 3 statistical significance, right? |
| 4 because I'm about to switch topics. | 4 A. Correct. |
| 5 MR. TISI: Okay. | 5 Q. And when a result is statistically |
| 6 (Off the record at 12:25 p.m.) | 6 significant, doesn't that help you |
| 7 (Lunch recess). | 7 distinguish between adverse events that are |
| 8 (On the record at 1:38 p.m.) | 8 caused by a drug versus adverse events |
| 9 BY MR. GOLDMAN: | 9 that are caused by chance? |
| 10 Q. I want to switch topics, Dr. Avorn, | 10 A. That can be one helpful tool. |
| 11 and talk about statistical significance. | 11 Q. And is it true, sir, that it is |
| 12 Okay? | 12 generally inappropriate to make causal |
| 13 A. Mm-hmm. | 13 inferences if a difference is not |
| 14 Q. When you analyze and publish data, | 14 statistically significant? |
| 15 do you follow generally accepted | 15 MR. TISI: Clarification. |
| 16 statistical principles? | 16 Because this is important, and I don't |
| 17 A. Usually. | 17 want to get in the way, but are you |
| 18 Q. Is it important to follow generally | 18 talking about in the confines of one |
| 19 accepted statistical principles? | 19 study, or are you talking about looking at |
| 20 A. Usually. | 20 overall evidence of a cross-study? |
| 21 Q. Why? | 21 BY MR. GOLDMAN: |
| 22 A. To convey a sense of the likelihood | 22 Q. I'm just talking about the concept |
| 23 that a given finding is the result of | 23 of statistical significance -- |
| 24 chance or of causality. | 24 MR. TISI: But causation -- |

55 (Pages 214 to 217)

Jerry Avorn, M.D.

Page 218

1 Causation involves more than just looking
2 at one -- one set of numbers, and I want
3 to make sure that we're not creating an
4 inappropriate record.
5     MR. GOLDMAN:  Just object to
6 form, if you would.  I don't -- I'm not
7 sure what your objection is, but --
8     MR. TISI:  All right.
9 Well --
10     MR. GOLDMAN:  Let me ask it
11 a different way. Okay?
12     MR. TISI:  Sure.
13 BY MR. GOLDMAN:
14 Q.  When you are analyzing adverse
15 events for a particular study, am I right
16 that it is generally inappropriate to make
17 a causal inference if the result is not
18 statistically significant?
19 A.  I think that's an
20 oversimplification of the principle.  And
21 I can explain why, if you like.
22 Q.  Sure.
23 A.  If a study does not have the power,
24 in the statistical sense of the term, to

Page 219

1 be able to identify a, quote, significant,
2 close quote, difference, then assuming that
3 an association with a P value of greater
4 than .05 is unimportant or irrelevant can
5 be an erroneous conclusion.
6 Q.  Assuming that a study does have
7 power to detect a difference between a
8 drug and an event and a placebo and an
9 event, do you agree, sir, that it is
10 inappropriate to make causal inferences if
11 the difference is not statistically
12 significant?
13 A.  If the study had power to detect a
14 difference in that outcome, then that
15 lends credence to adhering to the P 1.05
16 standard.
17 Q.  And if -- Let me see what you
18 said.
19     (Record read).
20 Q.  In your -- The answer before the
21 last one, Dr. Avorn, you said if the study
22 does not have sufficient power to identify
23 a statistically significant difference, it
24 would be wrong to interpret a P value that

Page 220

1 is greater than .05 as unimportant or
2 irrelevant?
3 A.  Correct.
4 Q.  Do you remember that?
5 A.  Correct.
6 Q.  Wouldn't it also be wrong, Dr.
7 Avorn, even if a study didn't have the
8 power to detect a statistically significant
9 difference, to conclude from a P value
10 that is greater than .05, that there is an
11 increased risk or there really is an
12 elevated risk?
13     MR. TISI:  Clarification
14 based on that study alone.
15 A.  I think what you meant was a P
16 value of less than .05 in your question.
17 Q.  No.
18 A.  A P value of less than .05, meaning
19 that it looks significant.
20 Q.  Yeah.  I meant greater than.  So
21 let me ask again.
22 A.  All right.
23 Q.  As I understand your previous
24 statement, sir, if a study does not have

Page 221

1 the power to detect a statistically
2 significant difference, it would be wrong
3 to consider that study where a P value was
4 greater than .05 as being irrelevant or
5 unimportant, right?
6 A.  Correct.
7     MR. TISI:  Objection.
8     BY MR. GOLDMAN:
9 Q.  And my question is:  It would also
10 be wrong to consider that P value of
11 greater than .05 as inferring causation?
12     MR. TISI:  Objection.
13 Clarification on the study alone.
14 A.  I'm not understanding -- I'm not
15 understanding the question.
16 Q.  If you have a P value that is
17 greater than .05, is that statistically
18 significant or not?
19 A.  In the conventional sense, no.
20 Q.  And your point was that if a study
21 that is not powered enough to detect a
22 statistically significant difference
23 reveals a P value of greater than .05,
24 it's wrong to consider that result to be

Jerry Avorn, M.D.

Page 222

1    irrelevant or unimportant, right? --
2    A.   Right.  It can be wrong.  It --
3    Yeah.  I mean, you could be misled by
4    writing off something with a P value
5    greater than .05 if there was no power to
6    detect a significant difference --
7    Q.   You could also be misled by
8    concluding that a P value greater than
9    .05, even in a study that's not powered to
10   detect a difference --
11   A.   Yeah.
12   Q.   -- is evidence of actual causation?
13         MR. TISI:  Objection for the
14   reason stated.
15   A.   Okay.  Let me see if I understand
16   what you're saying.
17   Q.   Mm-hmm.
18   A.   I said that dismissing a P value of
19   greater than .05 in a -- for an outcome
20   for which the study was not powered can be
21   an erroneous conclusion, and you're saying
22   -- I think what you're saying is, wouldn't
23   it -- couldn't it also be erroneous to
24   assume that it also be meaningful?

Page 223

1    Q.   Correct.
2    A.   I said it can be erroneous to
3    assume it means nothing, and you're saying
4    couldn't it also be erroneous to assume
5    that it means something?
6    Q.   Yes.
7    A.   Correct.  I agree with you.
8    Q.   So let me just state it again, just
9    so the record is clear.  I think we're on
10   the same page, okay?
11   A.   Yes.
12   Q.   It could be erroneous and
13   misleading for somebody to draw the
14   conclusion that there is a meaningful
15   difference seen in a study where a P value
16   is greater than .05 when that study is not
17   powered to detect a difference.
18         MR. TISI:  Objection.
19   Assuming you're limiting it to one study.
20   Go ahead.
21   A.   Right.  In any given study it --
22   and I think what may be the simplest way
23   and clearest way to say this is, it is
24   inappropriate to read too much into the

Page 224

1    presence or absence of significance of a
2    finding for which there was no power to
3    detect a significant finding in either
4    direction.
5    Q.   Do most researchers report results
6    at 95 percent confidence intervals?
7    A.   Yes.
8    Q.   And a 95 percent confidence
9    interval is traditionally used when
10   analyzing data, right?
11   A.   Yes.
12   Q.   And if you use a 95 percent
13   confidence interval, that means that you
14   are 95 percent confident that the true
15   risk lies within the lower and upper
16   bounds of the confidence interval, true?
17   A.   Correct.
18   Q.   And if the number one appears in
19   the confidence interval, then you cannot
20   reject the no hypothesis, right?
21   A.   If one is using the P .05 standard.
22   Q.   Yes.
23   A.   I think -- I think cannot -- I'm
24   trying to avoid black and white, yes, no.

Page 225

1    But yes, it means that there is a 95 --
2    There is not a 95 percent confidence that
3    the finding is difference from one.
4    Q.   It's generally true, sir, that if
5    the number one appears in a confidence
6    interval, that means the result is not
7    statistically significant, right?
8    A.   In the conventional sense, yes.
9    Q.   You said in your report that Merck
10   knew of the risk of heart attack or stroke
11   before approval in May of 1999, yet failed
12   to take reasonable action to address it.
13   Do you remember using words to that
14   effect?
15   A.   Well, I'd like to see the exact
16   words I used, so if you want to tell me
17   where --
18   Q.   Well, if you turn to the section
19   Available Evidence Prior to Approval --
20   A.   Mm-hmm.
21   Q.   -- of Vioxx.
22   A.   (Witness viewing document).  Yes.
23   Q.   Is it your position, sir, that
24   based on your analysis in this report,

Jerry Avorn, M.D.

Page 226

1  Merck knew about the risk of heart attack
2  or stroke from Vioxx prior to approval?
3        MR. TISI:  Objection.
4  Mischaracterizes his prior testimony on
5  that.
6    A.  Well, that's -- that's why I wanted
7  to see the exact words of mine that you
8  were referring to, because a term like
9  "knew of" is both oversimplified and I
10  think misleading. .
11   Q.  Okay.
12   A.  I think a fairer statement of this
13  is that Merck was aware of the potential
14  for that to be a problem.
15   Q.  And you think that there was clear
16  evidence that Merck was aware of the
17  potential cardiovascular problem with Vioxx
18  before approval, right?
19   A.  Yes.
20   Q.  And I want to make a distinction
21  between being aware of the possibility of
22  an increased risk for cardiovascular events
23  and being aware that Vioxx actually causes
24  heart attacks, okay?

Page 227

1    A.  All right.
2    Q.  Is it your testimony, sir, that
3  Merck knew, prior to approval of Vioxx,
4  that Vioxx causes heart attacks?
5    A.  No.  I think prior to approval,
6  what -- Merck had evidence that this was
7  an important potential problem, but I
8  would not go so far as to say that --
9  Well, let me just think carefully about
10  this.
11       I'm having a problem with the
12  concept of quote, Merck knew that, because
13  Merck is a company, and companies don't
14  know or not know things.
15       I think the -- There was evidence
16  available to Merck, some of which Merck
17  generated, that raised a very worrisome
18  signal about the likelihood that Vioxx
19  could cause heart attack.  I think that
20  that's a fair and accurate depiction of
21  what I think was available to the company.
22   Q.  Do you agree, sir, that there is no
23  evidence that Merck officials, prior to
24  approval, believed that Vioxx causes heart

Page 228

1  attacks?
2    A.  I guess that's asking me to state
3  what I believe individuals' beliefs were.
4    Q.  Well, you say in your report, sir,
5  on Page .2, that the internal documents and
6  the documents in the public domain provide
7  clear evidence --
8    A.  Can you tell me where you're
9  reading from?
10   Q.  Sure.  The second to last paragraph
11  on Page .2.
12   A.  Okay.
13   Q.  "Inspection of information available
14  in the public domain and internal company
15  documents --"
16   A.  Right.
17   Q.  -- "provides clear evidence that
18  Merck officials have been aware of this
19  risk for years." And then it continues,
20  okay?
21   A.  Yeah.
22       MR. TISI:  Just for
23  completeness sake, I know it comes under
24  the heading of pre -- prior approval, but

Page 229

1  if you read the sentence before, it says,
2  "Leading up to 2004." So let's -- For
3  completeness, maybe we should read the
4  whole paragraph.
5       MR. GOLDMAN:  No.  I don't
6  need to have him read the whole paragraph.
7       MR. TISI:  Oh, okay.  Then
8  we won't be doing that at trial now, will
9  we?
10       BY MR. GOLDMAN:
11   Q.  Dr. Avorn, do you see how you talk
12  about that there was clear evidence about
13  what Merck officials were aware of, right?
14   A.  Correct.
15   Q.  Those are your words, right?
16       MR. TISI:  Prior to what
17  date, Counsel?
18       BY MR. GOLDMAN:
19   Q.  Are those your words, "prior to
20  approval," sir?
21   A.  Yes.
22   Q.  Is it your testimony that Merck
23  officials, prior to approval, were aware
24  that Vioxx causes heart attacks?

58 (Pages 226 to 229)

Jerry Avorn, M.D.

Page 230

1    A.   Okay.  The problem we have here,
2  Counsel, is that you're distorting my
3  quote, and that really is kind of --
4    Q.   I'm separating -- I'm moving from
5  the quote.
6    A.   You just read my statement.  Okay?
7  My statement is accurate and my statement
8  is what I believe.
9        So I don't understand the purpose
10  of your then recharacterizing it in words
11  that are not my own, and asking if I
12  agree with it.
13       What I agree with is what I wrote,
14  and you can read it again into the record
15  if you'd like.
16    Q.   Dr. Avorn, is it your opinion that
17  Merck officials were aware that Vioxx
18  carried an increased risk of causing heart
19  attacks?
20       MR. TISI:  When?
21       BY MR. GOLDMAN:
22    Q.   Prior to approval.
23    A.   Yes.
24    Q.   Based on what?

Page 232

1  aware of the potential that Vioxx could
2  cause cardiovascular events --
3    A.   Right.
4    Q.   -- and taking the position that
5  Merck believed and knew and was aware that
6  Vioxx causes heart attacks yet put the
7  drug on the market anyway.
8       MR. TISI:  Objection.
9       BY MR. GOLDMAN:
10    Q.   Do you understand the difference?
11    A.   Yes.
12    Q.   Is it your testimony that Merck
13  officials were aware that there was an
14  increased risk and that Vioxx caused heart
15  attacks prior to approval of Vioxx?
16       MR. TISI:  Objection.
17  Compound.
18    A.   It's -- As Mr. Tisi said, what I
19  agree with is what I said, which was they
20  were aware of the increased risk, and that
21  is different from the second piece of the
22  question which is, they knew that Vioxx
23  caused heart attacks.
24    Q.   Is it fair to say, then, Dr. Avorn,

Page 231

1    A.   Based on the observation that there
2  was an increased incidence of
3  cardiovascular events in the preapproval
4  studies that they submitted to the FDA.
5    Q.   You believe the preapproval studies
6  submitted to the FDA show an increased
7  cardiovascular risk for Vioxx?
8    A.   Okay.  What we need to do is go
9  back to my words, which was "an increased
10  risk."  Okay.  That's different from
11  saying they knew that it caused heart
12  attacks.
13       What they knew was that their drug
14  was associated with an increased risk of
15  those events in the preapproval studies.
16       Now, the reason I'm being careful
17  about that is that it's an increased risk,
18  which is the potential for a problem.  I'm
19  not saying that there was prima facie
20  evidence that they had all these heart
21  attacks that they were hiding or something
22  like that.
23    Q.   Dr. Avorn, there is a difference
24  between saying that Merck officials were

Page 233

1  that you don't know of any evidence where
2  Merck officials knew that Vioxx caused
3  heart attacks before approval?
4    A.   I am aware that Merck officials
5  stated, in documents that I could cite for
6  you, that their drug had the potential to
7  increase the risk of heart attack.
8       And the problem is when you keep
9  coming back to the word new, because new
10  implies certainty, and I'm not testifying
11  that as of the time of approval, there was
12  certainty of the cause of heart attacks.
13  But there was very compelling evidence of
14  an increased risk of heart attacks, and
15  that's an important distinction.
16    Q.   And the compelling evidence of an
17  increased risk of heart attacks from Vioxx
18  before approval was what?
19    A.   Both the -- Well, primarily --
20  Well, it was of -- of several kinds.  One
21  was the evidence from the preapproval
22  studies as reflected in the NDA in which
23  there was a succession of what I would
24  characterize as worrisome signals of

59 (Pages 230 to 233)

Jerry Avorn, M.D.

Page 234

1 increase in a variety of different
2 clinical trials that Merck had conducted,
3 increased rates of cardiovascular outcomes,
4 which also was accompanied by evidence
5 from the company's own Scientific Advisory
6 Board and the pharmacological literature,
7 suggesting a precise reason why selected
8 inhibition of the COX-2 receptor might
9 predispose to cardiovascular outcomes.
10      And combining the evidence from
11 pharmacology, the statements of their own
12 advisors, and the signals from their
13 premarketing studies, I would -- and their
14 own statements, as per Dr. Scolnick and
15 others, of this could be a problem, it may
16 be a class effect, this drug could raise
17 the risk of thrombotic events, et cetera,
18 et cetera -- of which there are many such
19 internal documents -- that there was an
20 awareness of the possibility that their
21 drug could increase cardiovascular risk.
22      Q.  Did you read a study by Dr. Reicin
23 that was published in 2002?
24      A.  The one in which she -- American

Page 235

1 Heart Journal or American Journal of
2 Cardiology in which she looked at all
3 their -- she claimed to have looked,
4 although I think erroneously claimed, to
5 have looked at all their osteoarthritis
6 studies.
7      Q.  Are you claiming that Dr. Reicin
8 published an article and did not include
9 an osteoarthritis study in her analysis?
10      A.  I was unable to figure out whether
11 all the studies were there.  I don't know
12 whether ADVANTAGE was in that collection
13 of studies or not, because they were
14 listed by numbers of people rather than
15 specific protocol numbers.  And so my -- I
16 -- I simply can't tell whether ADVANTAGE
17 was listed in there or not.
18      Q.  Am I right, sir, that the
19 conclusion of the study that Dr. Reicin
20 did and published was that if you look at
21 the osteoarthritis studies, there is no
22 increased risk associated with Vioxx
23 concerning heart attacks?
24      A.  That was what she concluded.

Page 236

1      Q.  And that's, in fact, what the
2 analysis of the osteoarthritis studies
3 showed?
4           MR. TISI:  Objection.
5      A.  That was not what FDA's reading of
6 the osteoarthritis study showed.
7      Q.  Have -- You're saying that the FDA
8 concluded that Vioxx's preapproval
9 osteoarthritis studies showed that there
10 was an increased risk of heart attack with
11 Vioxx?
12           MR. TISI:  Objection.
13      A.  No.  I'm concluding that FDA's
14 review of the osteoarthritis studies
15 submitted within the NDA indicated to the
16 FDA medical reviewers that there were --
17 there was evidence of the possibility of
18 increased thrombotic risk, and that there
19 was not enough information to dismiss that
20 risk, in their own words.
21      Q.  Do you agree, Dr. Avorn, that there
22 was no reasonable association of a risk of
23 stroke from Vioxx when Vioxx was on the
24 market?

Page 237

1           MR. TISI:  Objection to
2 form.
3      A.  There was no -- I want to go back
4 and look at the specific stroke outcomes
5 that were in the NDA as well as in other
6 prewithdrawal studies like ADVANTAGE and
7 VIGOR, and I -- I could do that now or
8 prior to tomorrow.
9      Q.  As you sit here today, Dr. Avorn,
10 can you identify any study, while Vioxx
11 was off the market, showing that Vioxx
12 carried an increased risk of stroke?
13      A.  Stroke was included among the
14 cardiovascular outcomes in several of those
15 studies, and so what I would need to do
16 is to see, among the studies that found
17 increased cardiovascular risk, how much of
18 that risk was explained by MI and how much
19 by stroke.
20      Q.  So will you do that by tomorrow?
21 Will you look to see whether you can
22 identify any study before Vioxx was
23 withdrawn from the market showing an
24 increased risk of strokes for Vioxx?

60 (Pages 234 to 237)

Jerry Avorn, M.D.

Page 238

1    A.  Yes.
2    Q.  Do you remember whether the VIGOR
3  study showed any signal that Vioxx causes
4  strokes?
5    A.  I don't recall that it did.
6    Q.  Do you know what the stroke results
7  were in the ADVANTAGE study?
8    A.  Not off the top of my head.
9    Q.  If the results of the ADVANTAGE
10  study showed that there were six strokes
11  on Naproxen and zero on Vioxx, would you
12  say that Vioxx prevents strokes?
13       MR. TISI:  Objection.
14  Mischaracterizes the evidence.
15    A.  Were they comparably sized groups,
16  the same number of people in both arms of
17  the study?
18    Q.  I believe so.  You can check that
19  tonight.  But I believe so.  Let's assume
20  that they were.
21    A.  Okay.  If the only information I
22  had from a study was that one drug caused
23  six strokes in a comparably sized ...
24    Q.  Okay.  In the ADVANTAGE study,

Page 239

1  2,785 patients received Vioxx, and 2,772
2  patients received Naproxen.
3    A.  Okay.  So it's about the same size.
4    Q.  Given that there were a similar
5  number of people who took Vioxx and
6  Naproxen in the ADVANTAGE study, would you
7  conclude, based on the fact there were six
8  strokes in the Naproxen arm and zero in
9  the Vioxx arm, that Vioxx prevents
10  strokes?
11       MR. TISI:  Objection.
12  Assumes facts that are incorrect.
13    A.  Okay.  The problem is the word
14  "conclude."  I think based on any single
15  study, it is -- especially if the findings
16  are of marginal significance, as I don't
17  know if those were or weren't -- I
18  wouldn't conclude anything.  What I would
19  say is that's a worrisome signal.
20       And if it was just Drug A and Drug
21  B, regardless of which drugs they were, I
22  would say this is interesting, this is of
23  concern, let's gather more information to
24  find out whether Naproxen causes strokes

Page 240

1  or whether Vioxx prevents strokes.
2       But I don't think a conclusion
3  based on one study with six events out of
4  thousands of people is likely to be a
5  conclusive conclusion.
6    Q.  Would you agree, sir, that before
7  you can draw firm conclusions about risks,
8  it's important to assess the totality of
9  the data --
10    A.  Yes.
11    Q.  -- and not just one study, right?
12    A.  Correct.  Unless there is one study
13  which has compelling evidence in and of
14  itself, as for example, VIGOR did.  But
15  usually that's not the case.
16    Q.  You think that the VIGOR study on
17  its own demonstrated that Vioxx caused
18  heart attacks?
19    A.  Yes.
20    Q.  And was that your view when you
21  read the VIGOR study in 2000-2001?
22    A.  Yes.
23    Q.  Do you know, while Vioxx was on the
24  market, sir, whether there was any

Page 241

1  reasonable association of risk between
2  Vioxx and arrhythmia?
3    A.  I do not know that there was,
4  whether there was.
5    Q.  Have you seen any evidence in your
6  review of the literature, sir, that there
7  is a reasonable association of risk
8  between Vioxx and heart attacks where
9  patients use Vioxx intermittently?
10       MR. TISI:  Objection.
11    A.  I'm sorry.  Can you repeat the
12  beginning of that question?
13    Q.  Have you seen any evidence in your
14  review of the literature, sir, that there
15  is a reasonable association of risk
16  between Vioxx and heart attacks where
17  patients use Vioxx intermittently?
18       MR. TISI:  Objection.
19    A.  Yes.
20    Q.  What's your basis for saying that
21  there's an increased risk?
22    A.  The observational studies conducted
23  by our group and by Dr. Ray, and most of
24  the other observational studies, if you

Jerry Avorn, M.D.

Page 242

1  look at drug use within those cohorts, the
2  use is frequently intermittent, as use of
3  nonsteroidals often is.
4      Q.  And we'll talk about the
5  observational studies later.  I should
6  have limited my question, okay?
7      A.  Okay.
8      Q.  Are you aware, sir, of any
9  randomized clinical trials showing that
10  there is an increased cardiovascular risk
11  associated with Vioxx where patients use
12  the medicine intermittently?
13          MR. TISI:  Objection.
14      A.  That's a faulty question because in
15  clinical trials, drugs are generally not
16  given intermittently, and so there aren't,
17  to my knowledge, no clinical trials in
18  which Vioxx is administered intermittently.
19  And so it's an impossible question to --
20  to respond to.
21      Q.  Based on the clinical trials that
22  were done for Vioxx, sir, you can't
23  conclude that Vioxx increases
24  cardiovascular risk if patients use it

Page 243

1  intermittently, right?
2          MR. TISI:  Objection.
3      A.  The clinical trials didn't speak to
4  that, because they didn't administer the
5  drug intermittently.
6      Q.  So the answer to my question is
7  yes?
8          MR. TISI:  Objection.
9      A.  I think the answer to your question
10  is no, but I know what you mean.
11      Q.  Based on the clinical trials that
12  were done for Vioxx, you cannot conclude
13  that Vioxx increases cardiovascular risk
14  for patients who use the medicine
15  intermittently, correct?
16          MR. TISI:  Objection.
17      A.  Because there was no intermittent
18  use in the clinical trials, that -- that
19  is not a conclusion one can make or refute
20  based on the clinical trials.
21      Q.  You said in your report that the
22  doubling of a cardiovascular risk that was
23  seen in the APPROVe study in September of
24  2004 was known prior to approval.  Do you

Page 244

1  remember that?
2      A.  Can you show me where I say that?
3      Q.  Okay.  Let me rephrase the
4  question.  I don't have quotes around it,
5  so maybe I misspoke.
6      A.  Can you tell me which page you're
7  reading from?
8      Q.  Yes.  Page .2, under Available
9  Evidence Prior to FDA Approval of Vioxx.
10      You see, sir, in the first sentence
11  where you think Merck officials were saying they were
12  astonished by an unanticipated finding --
13      A.  (Witness viewing document).  Yes.
14      Q.  -- that Vioxx could double the risk
15  of heart attack?
16      A.  Yes.
17      Q.  Are you aware of any evidence, sir,
18  that a doubling of a CV, cardiovascular
19  risk with Vioxx was known prior to the
20  approval of Vioxx?
21      A.  Okay.  The problem is you've,
22  again, mischaracterized what I've said.
23      Q.  I'm deviating from this to ask a

Page 245

1  question that is related to this.  Okay?
2  Are you with me?
3      A.  Let's try again.  Why don't you
4  phrase the question in a way that does not
5  misquote me.
6      Q.  Do you know, sir, of any evidence
7  showing that Vioxx doubled the
8  cardiovascular risk prior to approval?
9      A.  Prior to approval.  I'm aware of
10  evidence prior to approval that Vioxx
11  increased cardiovascular risk that --
12  What's problematic is the term "doubling,"
13  because I need to go back and look at the
14  extent to which it increased it.
15      But I -- I'm aware of the
16  preapproval studies demonstrating an
17  increase in risk.  I don't recall whether
18  it was a doubling or a 50 percent greater
19  or a tripling or whatever.
20      Q.  Will you show me any preapproval
21  study of Vioxx that shows a doubling of
22  cardiovascular risk between Vioxx and
23  placebo?  Or between Vioxx and an active
24  comparator?

62 (Pages 242 to 245)

Jerry Avorn, M.D.

<table>
<tr><td>

Page 246

```
1     A.  Okay.  There was a binder that was
2   sitting over here --
3         MR. TISI:  I moved it
4   because we were doing that.  I'm sorry.
5         THE WITNESS:  All right.
6   So where is the binder that has 174 in
7   it?
8         (Discussion off the record).
9     A.  Okay.  Looking at Table 52, in the
10.  primary review of the -- of Merck's NDA.
11    Q.  Which is tab what in your binder?
12    A.  Tab 175.  There are the following
13   numbers on -- in Table 52.  And again,
14   I'll just give some examples.
15         For placebo, there are rates of .2
16   percent, .8 percent.  But for Rofecoxib --
17   and the title of this is Thromboembolic
18   Adverse Events all OA, for osteoarthritis
19   trials.
20         So placebo .2 percent, 0.8 percent,
21   whereas for Rofecoxib the numbers -- Okay.
22   Let me just back up.
23         Six week studies which -- we do
24   these by duration.  Six week studies,
```

</td><td>

Page 248

```
1   with the increase going higher with the
2   higher doses, as compared with placebo for
3   short studies.  And if you want, we can
4   repeat the data, which are similar, for
5   the longer studies.
6     Q.  Is it your testimony that there is
7   a statistically significant increased risk
8   of thromboembolic events between Vioxx at
9   25 milligrams and placebo in the
10   osteoarthritis studies?
11    A.  The numbers were too small to
12   attain the level of statistical
13   significance, but they are still worrisome
14   and still indicate, as the FDA concluded,
15   evidence of potential increased risk.
16    Q.  It would be wrong to conclude from
17   the table that you just referred to that
18   Vioxx caused the doubling of a
19   cardiovascular risk compared to placebo
20   based on the OA studies, true?
21         MR. TISI:  Objection.
22    A.  I do not agree with that.
23    Q.  Does the -- Sorry.
24    A.  What I -- What I would say is that
```

</td></tr>
<tr><td>

Page 247

```
1   placebo 0.2 percent, Rofecoxib 12.5
2   milligrams, 0.7 percent, Rofecoxib 25
3   milligrams, the rate is 0.18 percent.
4   Rofecoxib 50 milligrams, the rate is 1.1
5   percent.  Rofecoxib 125 milligrams, the
6   rate is 1.4 percent.
7         So for the six week studies we have
8.  a dose- dependent increase in the risk of
9   thromboembolic adverse events as per the
10.  FDA's review of the data submitted by
11   Merck from its osteoarthritis trials, as
12   compared with placebo, not Naproxen --
13    Q.  Is --
14    A.  I'm sorry.  I'm answering your
15   question now.
16    Q.  Mm-hmm.  Before you go to the next
17   table --
18    A.  As I recall, I was in the middle,
19   actually, of a sentence.
20    Q.  Okay.
21    A.  So we have a rate of .2 for
22   placebo, and then rates that are
23   threefold, fourfold, up to sevenfold
24   greater for Rofecoxib in various doses
```

</td><td>

Page 249

```
1   there is clear evidence of an increased
2   risk in a dose-dependent fashion with
3   Vioxx that owing to the small numbers,
4   does not meet the test of statistical
5   significance, but is a clear pattern of
6   increased risk.
7     Q.  Can you conclude from the study
8   that your -- the analysis that the FDA did
9   of the OA studies that Vioxx causes a
10   doubling of cardiovascular risk, sir?
11    A.  The problem is "conclude," and
12   conclude would require larger numbers to
13   say with certainty that there is a
14   doubling, or in the case of the higher
15   dose, a sevenfold increase.  I don't think
16   one could, quote, conclude, close quote,
17   from these data that that is an obvious
18   and significant increase in risk.  But it
19   is a very worrisome pattern.
20    Q.  Did the FDA say that there was a
21   doubling of a cardiovascular risk seen
22   with Vioxx in the OA studies?
23    A.  (Witness viewing documents).  I was
24   looking for -- This is Dr. Pelayo's
```

</td></tr>
</table>

63 (Pages 246 to 249)

Jerry Avorn, M.D.

Page 250

1 statement. I was looking for the overview
2 statement.
3 　　　Okay. Let me read from Dr.
4 Pelayo's statement on -- It is the
5 paragraphs that appear right before page
6 -- Table 52.
7 　　Q. Doctor, I'm not asking for what he
8 said.
9 　　A. Right.
10 　　Q. I'm asking you a very simple
11 question.
12 　　A. Okay. What's the question?
13 　　Q. Did the FDA conclude, before
14 approval, that Vioxx caused a doubling of
15 a cardiovascular risk?
16 　　　　MR. TISI: Objection. What
17 the FDA concluded.
18 　　A. The FDA concluded there was a
19 higher incidence of ischemic and
20 thromboembolic events in patients taking
21 Rofecoxib compared to placebo, but it did
22 not conclude that -- it did not conclude
23 there was doublings, because the number of
24 events were underpowered to make such a

Page 251

1 conclusion rigorously.
2 　　Q. So the answer to my question is no,
3 the FDA did not conclude that there was a
4 doubling of cardiovascular risk based on
5 the OA studies submitted preapproval --
6 　　　　MR. TISI: Objection.
7 　　BY MR. GOLDMAN:
8 　　Q. -- right?
9 　　　　MR. TISI: Asked and
10 answered.
11 　　A. Except I need to point out for
12 accuracy the FDA said the data seems to
13 suggest that in six week studies
14 thromboembolic events are more frequent in
15 patients receiving Rofecoxib than placebo.
16 So they said that there is this increased
17 rate, but they did not conclude that there
18 was a doubling of risk.
19 　　Q. I'm going to ask it one more time,
20 and I'm hoping that you won't talk about
21 other things.
22 　　　　MR. TISI: No. Well, I'm
23 hoping you will accept his answer. You
24 can't keep asking the question to get an

Page 252

1 answer that you like. He's answered your
2 question fully.
3 　　　　BY MR. GOLDMAN:
4 　　Q. Do you see anywhere in the FDA's
5 analysis, Dr. Avorn, a conclusion by them
6 that Vioxx causes a doubling of
7 cardiovascular risk based on the OA
8 studies?
9 　　　　MR. TISI: Objection. Asked
10 and answered.
11 　　A. I would agree that I've answered
12 that question already.
13 　　Q. Will you answer that question yes
14 or no?
15 　　　　MR. TISI: Objection. Asked
16 and answered.
17 　　A. The FDA notes increase in risk.
18 They do not call it a doubling.
19 　　Q. Is it true, sir, that based on the
20 studies that were submitted before Vioxx
21 was approved the incidence of thrombotic
22 or thromboembolic events were similar
23 between Vioxx and comparator NSAIDs?
24 　　A. In the preapproval trials?

Page 253

1 　　Q. Yes.
2 　　A. No. That's not true.
3 　　Q. You say, and you do, that early
4 papers made it clear that a selective
5 COX-2 inhibitor, the end of your quote,
6 could cause an imbalance.
7 　　A. Right.
8 　　Q. What papers are you referring to
9 when you say that early papers made it
10 clear that selective COX-2 inhibition could
11 disrupt the thromboxane/prostacyclin
12 balance and lead to heart attacks?
13 　　A. Okay. There were several out of
14 Dr. FitzGerald's lab. He was the senior
15 author on most of them. The Dr.
16 Catella-Lawson was the first author.
17 There were others. I think I cited one
18 or more of those in -- from preapproval
19 time frame in the editorial. I just sent
20 it in Circulation a month ago, and I can
21 get you the citations if you want. I
22 don't have them all in my head.
23 　　Q. Other than the Catella-Lawson,
24 FitzGerald urine study, are you aware off

Jerry Avorn, M.D.

Page 254

```
1    the top of your head of any other --
2    A.  Yes, I am.  They were -- And
3    again, I can't give you the citations from
4    memory -- but I remember that in his post
5    approval papers, Dr. Topol cited
6    preapproval papers that had come out
7    before the marketing of the drug also
8    consistent with this notion of an
9    increased risk.
10        So in other words, there are a
11   number of papers that we could get that
12   appeared before the drug was on the
13   market.
14   Q.  Is it your testimony, Dr. Avorn,
15   that in Dr. Topol's August 2001 JAMA
16   article, he cited multiple studies to
17   support the proposition that COX-2
18   inhibition can disrupt the
19   thromboxane/prostacyclin balance and cause
20   heart attacks?
21   A.  That's my recollection.
22   Q.  Before the FitzGerald urine study,
23   am I right, sir, that there was no
24   published article ever that suggested that
```

Page 256

```
1    suggest that.
2    Q.  Do you know, as you sit here today,
3    Dr. Avorn, whether there were any
4    scientific articles before the
5    Catella-Lawson paper which demonstrated
6    this theory that COX-2 inhibition can
7    reduce prostacyclin and potentially cause
8    heart attacks?
9        MR. TISI:  Objection.
10   Objection to your characterization.
11   A.  There -- There are a couple of
12   problems with the question.  One is,
13   you're adding "and potentially cause heart
14   attacks," because I don't know whether
15   such studies will typically go on to say
16   "and this can cause a heart attack."  So
17   -- But if you take that out and just talk
18   about the imbalance between prostacyclin
19   and thromboxane, my impression was that
20   yes, there were papers before the
21   Catella-Lawson paper.
22        MR. GRAND:  Could you
23   clarify which Catella-Lawson paper you're
24   discussing?
```

Page 255

```
1    COX-2 inhibition could cause heart
2    problems?
3        MR. TISI:  Objection.
4    A.  I don't think I can testify to
5    there was no published study ever.
6    Q.  Can you testify, Dr. Avorn, that
7    you are not aware of any published
8    article, prior to the Catella-Lawson,
9    FitzGerald urine study, suggesting that
10   COX-2 inhibition could cause heart
11   attacks --
12        MR. TISI:  Objection.
13        BY MR. GOLDMAN:
14   Q.  -- or heart problems?
15   A.  No.  There -- The paper you're
16   referring to is around '97, as I recall.
17   I'd need to --
18   Q.  Published in '99, conducted --
19        MR. GRAND:  Which FitzGerald
20   study?
21   A.  I think there was FitzGerald papers
22   that came out before '99 on this, and I
23   -- I don't think they would -- My sense
24   is they were not the very first papers to
```

Page 257

```
1        MR. GOLDMAN:  The one that
2    we all refer to as demonstrating the
3    FitzGerald hypothesis.
4        MR. GRAND:  There's one
5    prior to that, so that's why I'm asking.
6        MR. GOLDMAN:  All right.
7        BY MR. GOLDMAN:
8    Q.  Do you agree, sir, that the
9    Catella-Lawson FitzGerald urine study
10   showing a 60 to 70 percent reduction in
11   the urinary prostacyclin metabolite offered
12   an hypothesis?
13   A.  Why don't I just pull the paper,
14   because I think we have it here, and that
15   way we won't have to go on my memory.
16   Q.  Sure.
17   A.  (Witness viewing document).  Okay.
18   This is the Catella-Lawson paper that was
19   in the Journal of Pharmacology and
20   Experimental Therapeutics in May of 1999.
21   Q.  Mm-hmm.
22   A.  Okay.  What is the question?
23   Q.  The question is:  Based on the
24   study that was done by Catella-Lawson and
```

65 (Pages 254 to 257)

Jerry Avorn, M.D.

Page 258

1   FitzGerald that you're looking at, do you
2   agree that the authors were offering a
3   potential hypothesis concerning COX-2
4   inhibition and the imbalance theory?
5      A.  Tell me what you mean, were
6   offering a hypothesis.
7      Q.  Yes.  Did -- Well, let's do it
8   this way. Withdrawn.
9         Did the authors in the FitzGerald
10  Catella-Lawson study that you're looking at
11  in the Journal of Pharmacology and
12  Experimental Therapeutics conclude that
13  COX-2 inhibition causes heart attacks?
14     A.  No.  As I said, basic
15  pharmacologists working at this level don't
16  talk about heart attacks.
17     Q.  Did the authors of the
18  Catella-Lawson FitzGerald study conclude
19  that COX-2 inhibition puts patients in a
20  prothrombotic state?
21     A.  Okay.  What they conclude in their
22  conclusion is that COX-2 plays a role in
23  the biosynthesis of prostacyclin.  And it
24  is widely known that prostacyclin -- and

Page 259

1   this is not my quoting them, the quoting
2   of them ends with the word prostacyclin,
3   and now this is me saying that it has
4   been known and was known at the time and
5   was known before that prostacyclin is --
6   and I quote from their paper on Page .740,
7   "an effective antithrombotic strategy that
8   --" I'm sorry.  Let me read that more
9   fully.
10        "Pharmacologic enhancement of
11  endogenous prostacyclin is also an
12  effective antithrombotic strategy in vivo."
13  And other things in their paper refer to
14  the fact that prostacyclin is known to be
15  an antithrombotic agent, as well as having
16  other important effects of a good kind on
17  the vasculature, that act in opposition to
18  the thromboxane, which is known and was
19  known at the time to be prothrombotic.
20        So in their conclusion, they refer
21  to the fact that reducing prostacyclin
22  biosynthesis could relate to reducing
23  antithrombotic activity.
24     Q.  And that's a theory, right?

Page 260

1      A.  Sure.
2      Q.  Isn't it true that the authors of
3   the Catella- Lawson FitzGerald study
4   concluded that the implications of
5   prostacyclin suppression in vivo in living
6   beings was unclear?
7      A.  If you want to show me where they
8   say that, I'd be happy to take a look.
9      Q.  Second to the last paragraph, first
10  sentence.
11     A.  In their paper?
12     Q.  Mm-hmm.
13     A.  (Witness viewing document).
14  Correct.  However, in that same paragraph,
15  for completeness, I've got to point out
16  just a few lines below that they say --
17  we can't be selective in the quotation
18  here -- quote, "Prostacyclin formation by
19  the vasculature is of functional importance
20  in limiting the response to a thrombotic
21  insult."  And so they go on to say that
22  we do know that limiting prostacyclin
23  formation is a problem.
24     Q.  What does the next sentence say,

Page 261

1   for completeness?
2      A.  "We have shown previously that
3   urinary excretion --"
4      Q.  No.  "It remains."
5      A.  Oh, "It remains to be established
6   whether treatment with specific COX-2
7   inhibitors will suppress this response."
8         So there are two kinds of
9   statements here.  One is, there's worrying
10  about this because of the evidence from
11  previous studies, and we don't know what
12  this is going to do in humans.
13     Q.  How much of a reduction in
14  prostacyclin in the vasculature, sir, needs
15  to occur to put a patient in a
16  prothrombotic state?
17     A.  I have no idea.
18     Q.  Do you know how much reduction in
19  the urinary metabolite in the FitzGerald
20  study was seen?
21     A.  I have no idea.  I could look it
22  up.
23     Q.  Is prostacyclin present throughout
24  the body?

66 (Pages 258 to 261)

Jerry Avorn, M.D.

Page 262

1   A.  Yes.
2   Q.  Does the reduction in the urinary
3   metabolite of prostacyclin in the
4   Catella-Lawson FitzGerald study tell you
5   where in the body the prostacyclin is
6   being reduced?
7   A.  No.
8   Q.  For purposes of determining whether
9   Vioxx or any COX-2 inhibitor creates an
10  imbalance and puts patients in a
11  prothrombotic state, you would agree, sir,
12  that the reduction of the prostacyclin
13  needs to occur in the endothelium or the
14  vasculature?
15  A.  I don't know that that's the case.
16  Q.  Well, how could a reduction in
17  prostacyclin outside of the vasculature put
18  patients in a prothrombotic state?
19  A.  In theory, the prostacyclin could
20  be synthesized elsewhere and have an
21  activity on the vasculature.  It needn't
22  be its synthesis in the vasculature.  But
23  again, this is not my field.
24  Q.  Are you aware of literature, sir,

Page 263

1   that shows that COX-1 enzyme actually
2   produces prostacyclin in the vasculature
3   and not COX-2?
4   A.  They both, to my understanding,
5   produce it, and it's a matter of relative
6   balance of which produces it more in one
7   setting versus another.
8   Q.  Do you know whether more
9   prostacyclin is produced in the vasculature
10  by COX-1 compared to COX-2?
11  A.  I don't know.
12  Q.  Are you aware of studies measuring
13  the effect of Vioxx on prostacyclin in
14  coronary arteries?
15  A.  I know that animal studies were
16  done in -- in artery preparations.
17  Q.  Do you know the results of those?
18  A.  That's beyond my area of expertise.
19  But I should also point out that
20  prostacyclin has effects other than
21  prothrombotic, antithrombotic balance.
22  There may be effects on endothelium, there
23  may be effects on vascular resistance.
24  And so it's not only one effect of

Page 264

1   prostacyclin that one would be concerned
2   about.
3   Q.  Do you agree, Dr. Avorn, that the
4   theory that Catella-Lawson and FitzGerald
5   were advancing in this study was that
6   COX-2 inhibition could reduce prostacyclin
7   in the vasculature enough to put a patient
8   in a prothrombotic state?
9   A.  They raise that as a possibility.
10  Q.  And it was a big debate in the
11  medical community about whether or not
12  COX-2 produces prostacyclin in the
13  endothelium and the vasculature or whether
14  COX-1 does, right?
15  A.  That's not a debate that I was part
16  of, so I can't speak to it.
17  Q.  You talk, in your expert report,
18  about Protocol 017, and you mentioned that
19  earlier.  Do you remember that?
20  A.  Yeah.
21  Q.  Did you review the CSR for Protocol
22  017?
23  A.  I think what I had on 017 was a
24  summary of its findings rather than the

Page 265

1   protocol itself.
2   Q.  Who prepared the summary?
3   A.  It was a photocopy of material from
4   Merck.  It was a Xerox, much of which was
5   redacted out.
6   MR. TISI:  Just so you
7   know, it is right here.  I mean, he was
8   provided it.  I don't know whether that's
9   important to you.  But I know --
10  A.  Okay.  But what I remember most was
11  the heavily redacted summary produced by
12  Merck about it, because most of the pages
13  were black.
14  Q.  You didn't review the CSR for
15  Protocol 017, did you, sir?
16  A.  I don't recall reviewing it.  I may
17  have seen it.
18  Q.  What was the purpose of Study 017?
19  A.  Let me pull out the materials
20  relating to 017.
21  (Witness viewing documents).  Okay.
22  Q.  Okay.  So what was the purpose of
23  Protocol 017?
24  A.  All right.  The protocol itself,

67 (Pages 262 to 265)

Jerry Avorn, M.D.

Page 266

1 which is Bates number MRKAFL0010627, refers
2 to it as a double blind placebo controlled
3 study to assess safety and tolerability
4 and preliminarily evaluate efficacy in
5 patients with rheumatoid arthritis.
6 Q. Do you know long the study was?
7 A. It was brief, as I recall, six
8 weeks.
9 Q. Do you know what doses were used of
10 Vioxx?
11 A. 125 milligrams initially -- later,
12 but it also started at a much higher dose
13 of 175 milligrams.
14 Q. How many cardiovascular adverse
15 events occurred in the Study 017?
16 MR. GRAND: Would you
17 clarify which version? There's -- Can you
18 clarify what you're talking about, the
19 study or just the extension of the study?
20 BY MR. GOLDMAN:
21 Q. The study that you reviewed.
22 A. (Witness viewing documents). I'm
23 just going through the safety end of the
24 report.

Page 267

1 Okay. Looking at just the first
2 table, I find here is -- No. That's not
3 a good one.
4 Okay. Okay. Table 46 in the
5 Merck report of this Protocol 017,
6 indicated that 38 percent of patients on
7 what was then called MK0966, which is
8 Vioxx, 38 percent had a drug related
9 adverse experience, versus 16 percent of
10 placebo. And turning to cardiovascular
11 system --
12 Q. Which is what I asked about.
13 A. Okay. 10.1 percent of patients on
14 Vioxx compared to 2.9 percent of patients
15 on placebo. So that would be a threefold
16 difference.
17 Q. Can I see what you're looking at?
18 A. Sure. Do you want to come over
19 here, or do you want me to hand it over?
20 Q. How many heart attacks occurred in
21 Protocol 017?
22 A. Let me look that up. Since it was
23 a six week study, I would expect that of
24 all the cardiovascular outcomes, very, very

Page 268

1 few, if any, would be heart attacks per se
2 because --
3 Q. Why would you expect that?
4 A. Because six weeks is a very, very
5 short period of time to -- to expect a
6 heart attack to occur in.
7 MR. TISI: I'm sorry. In
8 what?
9 THE WITNESS: I'm sorry?
10 MR. TISI: You said in
11 something.
12 A. Yeah. Six weeks is a short period
13 of time in which a drug is likely to
14 cause a heart attack. The shorter the
15 study, the less likely you are to see an
16 event like an MI as compared to
17 hypertension.
18 Q. How many heart attacks occurred in
19 Study 017?
20 A. Okay. I see acute myocardial
21 infarction in a white 73 year old male,
22 and -- Oh, I'm sorry. Those were patients
23 who were discontinued due to clinical
24 adverse experiences as opposed to having

Page 269

1 had --
2 So there was -- There was one
3 patient who discontinued this because of a
4 heart attack, and now I'm looking for
5 total heart attacks, which ought to be
6 here.
7 (Witness viewing document). Okay.
8 Here it is. Listing of patients. This is
9 table 55 on page .135. Listing of patients
10 with cardiovascular adverse experiences.
11 Okay. And here I guess is that same 73
12 year old male, acute myocardial
13 infarctions, intensity severe. That's one.
14 And all the others were nonspecific
15 STT changes, hypertension, sinus
16 bradycardia, irregular heartbeat. So if
17 this is the complete listing, there was
18 one.
19 Q. There was one thrombotic
20 cardiovascular event in Study 017, right,
21 sir?
22 A. Right. But there were a number of
23 other cardiovascular events.
24 Q. Well, the theory that you are

68 (Pages 266 to 269)

Jerry Avorn, M.D.

Page 270

1   operating under and everybody else was
2   operating under concerning how Vioxx
3   increased the risk of heart attack, if it
4   did, was based on an imbalance between
5   prostacyclin and thromboxane, right?
6          MR. TISI:  Objection.
7   That's just not true.
8    A.  No.  I think -- I think --
9          MR. GOLDMAN:  It's not
10  testifying.
11         MR. TISI:  No, you're
12  testifying.  You're not allowed to testify
13  at all.
14   A.  All right.  Let me testify.
15         I think you're either
16  misunderstanding or mischaracterizing the
17  issue here.  The -- And you kind of made
18  a leap from discussing prostacyclin and
19  prothrombotic, antithrombotic balance to
20  jumping to heart attack.
21         There are many reasons of -- for
22  concern about potential pathways to
23  cardiovascular morbidity with the COX-2
24  drugs.  One of them is the prothrombotic

Page 271

1   effect, but another is the hypertension,
2   another is the congestive heart failure as
3   manifested also by peripheral edema.
4          And so it's not only about the
5   thrombosis.  And as I said a minute ago,
6   six weeks is a very short period of time
7   to expect an event.
8    Q.  Do you know, sir, for the patient
9   who had a heart attack, what his risk
10  factors were?
11   A.  No.
12   Q.  Do you take the position that Vioxx
13  caused that man's heart attack?
14   A.  I'm not taking that position.
15   Q.  Do you know if the investigator in
16  Study 017 believed that the man who had a
17  heart attack had it because of Vioxx?
18         MR. TISI:  Objection.
19   A.  I don't think any investigator
20  looking at a specific clinical trial
21  patient can rule out or rule in a
22  situation of that kind.
23   Q.  Is the answer no, you don't know
24  what the investigator said?

Page 272

1    A.  I don't know.
2    Q.  Do you know what dose of Vioxx the
3   man took who had a heart attack?
4    A.  These were very high doses.  This
5   was 125 and 175 milligram doses.
6    Q.  Am I right, Dr. Avorn, that you
7   didn't look at the details of Protocol 017
8   before you wrote your report?  What you
9   did, was you looked at an internal Merck
10  document that commented about Protocol 017.
11   A.  Correct.
12   Q.  So rather than actually look at the
13  Protocol 017 yourself and assess it, in
14  terms of whether it increases the risk --
15  demonstrates an increased risk of
16  cardiovascular events, you relied on an
17  internal document from Merck?
18   A.  It was submitted to their research
19  management committee, and I assumed that
20  they probably got it right.
21   Q.  Do you know if anybody died in
22  Study 017?
23   A.  I don't know.
24   Q.  You quote and discuss at length,

Page 273

1   sir, e-mails from Dr. Musliner, Dr.
2   Morrison and Dr. Reicin.  Do you
3   remember --
4    A.  Yes, I do.
5    Q.  -- quoting from them?
6    A.  Yes.
7    Q.  Is it your opinion, sir, that Dr.
8   Morrison and Dr. Reicin believed that
9   Vioxx caused heart attacks back when they
10  wrote these e-mails in 1996, 1997?
11   A.  I believe that they -- I believe
12  that they believed and wrote that they
13  thought that there was a quote,
14  Substantial chance," to quote Dr. Musliner,
15  "that there would be more cardiovascular
16  adverse events in patients given Vioxx
17  than in the comparison group."
18         And I further recognize that it was
19  not clear at that point whether that would
20  be because Vioxx did not have the
21  cardioprotective effect that other NSAIDs
22  or aspirin might have, or whether it was
23  because the drug itself could be
24  prothrombotic.  And I'm aware that they

69 (Pages 270 to 273)

Jerry Avorn, M.D.

Page 274

1  considered both possibilities.
2      Q.  You believe that in the e-mails
3  between Dr. Reicin and Dr. Morrison that
4  there was a discussion about whether Vioxx
5  was prothrombotic?
6          MR. TISI:  Objection.
7  Mischaracterizes his testimony.
8      A.  No.  What I said was that they
9  stated that there was a, quote,
10  Substantial chance that significantly
11  higher rates of CV adverse events will be
12  observed in the selective COX-2 inhibitor
13  group, close quote.
14          And that I cannot tell from their
15  memos to which they thought
16  that was because of the fact that Vioxx
17  did not have the cardioprotective effect
18  of other nonsteroidals, or because of
19  their awareness of other reasons for
20  worrying about COX-2 inhibitors being
21  prothrombotic.
22          I cannot tell what -- what was in
23  their minds.  I know that they considered
24  the possibility that it may just be the

Page 275

1  absence of cardioprotection.
2      Q.  Isn't it true, sir, that when they
3  were writing their e-mails back in 1996,
4  1997, that these Merck scientists believed
5  that Vioxx would be neutral in terms of
6  cardiovascular effects?
7          MR. TISI:  Objection as to
8  what they believed.
9      A.  I cannot know what they believed.
10      Q.  Have you read the deposition --
11  We've been through that.
12          Are you accusing at all, sir, the
13  Merck scientists of knowingly selling an
14  unsafe drug when they sold Vioxx?
15      A.  When you say the Merck scientists,
16  the people -- the scientists weren't
17  selling the drug.
18      Q.  Okay.  Are you accusing anybody at
19  Merck of knowingly selling an unsafe drug,
20  when it came to Vioxx?
21      A.  I think that Merck was aggressively
22  marketing a drug for which they had safety
23  concerns that they did not fully address,
24  and that as a minimum, they were aware

Page 276

1  that people would be switching to their
2  drug from a more cardioprotective drug,
3  which is what was in those e-mails you
4  were just referring; that in the marketing
5  consequence of the worries that you were
6  just describing, that Dr. Musliner et al.,
7  expressed, was that a patient might stop
8  taking -- Let me be -- You look confused.
9      Q.  No.  I just asked one question.
10      A.  Yes.  I believe, to be clear --
11      Q.  Let me ask the question again.
12      A.  All right.  All right.
13      Q.  Can you answer this yes or no, and
14  if you can't and you need to explain,
15  that's fine.
16          Are you accusing anybody at Merck
17  of knowingly selling an unsafe drug when
18  they sold Vioxx?
19          MR. TISI:  Are you -- Any
20  particular point in time or at all
21  during --
22          MR. GOLDMAN:  At any point.
23          MR. TISI:  Okay.
24      A.  Yes.  And let me explain.  I

Page 277

1  believe that Merck was promoting use of
2  its drug at the same time that it had
3  evidence that use of its drug created
4  greater cardiovascular risk than other
5  alternatives that a patient would have
6  been taking, and knew, from their own
7  data, that that would have placed these
8  patients at increased cardiovascular risk.
9      Q.  Before accusing Merck's employees
10  of knowingly selling an unsafe drug when
11  they sold Vioxx, do you think that you
12  should have at least reviewed the
13  depositions of the individuals at Merck
14  who were involved in the Vioxx program?
15      A.  Well, there were dozen, if not
16  hundreds, of Merck employees involved in
17  Vioxx, and I could not possibly review all
18  their depositions.  But if there's a
19  statement from one of them that I should
20  consider, I'd be happy to.
21      Q.  My question is:  Before you accuse
22  Merck scientists of knowingly selling an
23  unsafe drug --
24      A.  Can we go back and not

70 (Pages 274 to 277)

Jerry Avorn, M.D.

Page 278

1  mischaracterize my quotes again? This is
2  becoming tiresome.
3     Q.  I asked you:  Are you accusing
4  anybody at Merck of knowingly selling an
5  unsafe drug when they --
6     A.  Right.
7     Q.  -- sold Vioxx, and your answer was
8  yes and let me explain.
9     A.  I am not accusing the scientists.
10  That's an important distinction.
11     Q.  So are you accusing the marketing
12  people at Merck of knowingly selling an
13  unsafe drug?
14     A.  I think the onus is more on the
15  marketing people than on the scientists,
16  and I would rather not be misquoted as
17  accusing scientists of selling unsafe
18  drugs.
19     Q.  So to be clear, you believe that
20  the scientists at Merck were not knowingly
21  selling an unsafe drug, but the marketing
22  people were knowingly selling an unsafe
23  drug when it came to Vioxx?
24     A.  Scientists don't sell drugs.

Page 279

1     Q.  When Vioxx was on the market in the
2  United States, is it your testimony, sir,
3  that the scientists at Merck believed that
4  Vioxx caused heart attacks?
5     A.  No.
6     Q.  Is it your testimony that when
7  Vioxx was on the market, the marketing
8  people believed that Vioxx causes heart
9  attacks?
10     A.  I can't indicate what people
11  believed or didn't believe. What I can
12  indicate is that there was information
13  available to Merck, because Merck generated
14  most of it, indicating a higher risk of
15  heart attacks in people taking its drug.
16     Q.  You talked about Dr. Watson's
17  analysis from February of 1999. That's on
18  Page .4 of your report, sir.
19     A.  Yes.
20     Q.  I have a copy if you want to see
21  it. Okay?
22     A.  I've seen it.
23     Q.  Do you claim, sir, that the
24  analysis that Dr. Watson did in February

Page 280

1  of 1998 showed a signal of a potential
2  cardiovascular risk with Vioxx?
3     A.  Yes.
4     Q.  You wrote that in your report, in
5  fact, right?
6     A.  Then it's a good thing I believe
7  it.
8     Q.  Is it true that Dr. Watson's
9  analysis compared blinded data from all
10  patients in Vioxx's clinical trials,
11  regardless of what drug they were on,
12  against the placebo rates for
13  cardiovascular events in the Proscar and
14  Fosamax studies?
15     A.  Correct.
16     Q.  Is that a crude study?
17     A.  Yes.
18     Q.  Why is that a crude study?
19     A.  Because ideally one would like to
20  compare rates within the same study.
21     Q.  But why wouldn't you want to
22  compare the rates of Vioxx -- Sorry.
23        Why wouldn't you want to compare
24  the rates the way that Dr. Watson compared

Page 281

1  them?
2     A.  Because one cannot be certain that
3  the rates of events in the placebo group
4  of Study A are a good comparator --
5        (Interruption).
6     A.  One cannot conclude that the event
7  rates in the placebo group of study are
8  the best comparison for the event rates in
9  the active drug group of Study B.
10     Q.  Did the blinded study results in
11  the Watson analysis show any increased
12  risk in cardiovascular events between the
13  Vioxx studies and the men in the Proscar
14  database?
15     A.  Looking together at the men in the
16  Proscar database and the women in the
17  Fosamax database pooled there was an
18  increase in risk, and I don't recall -- I
19  need to go back and look at the men alone
20  versus the women alone. I don't remember
21  that.
22     Q.  Would it surprise you to learn that
23  there was no difference in cardiovascular
24  events between the events in the Vioxx

71 (Pages 278 to 281)

Jerry Avorn, M.D.

Page 282

1  clinical trials and the Proscar placebo
2  arm?
3          MR. GRAND: Objection.
4  Misstates the evidence.
5    A.  I would want to look at the data
6  and tell you.
7    Q.  Did you ever look at any of the
8  blinded events in Dr. Watson's analysis to
9  determine how many of the cardiovascular
10  events occurred in patients who were
11  taking Ibuprofen?
12          MR. TISI: Objection.
13    A.  I read Dr. Watson's report.  I
14  don't remember asking myself that question.
15          MR. TISI: Can I ask you a
16  question, because your question said in
17  the blinded results how many people were
18  taking Ibuprofen.
19          BY MR. GOLDMAN:
20    Q.  Did you ever make any effort to
21  determine, in the analysis that Dr. Watson
22  did, how many of the cardiovascular events
23  occurred in patients who were taking
24  Ibuprofen or Vioxx or Diclofenac or

Page 283

1  placebo?
2          MR. TISI: Objection.
3    A.  Well, in his original analysis,
4  there were no such data available.
5    Q.  Subsequently there was data
6  available, right?
7    A.  Correct.
8    Q.  Did you ever go back and try to
9  determine how many of the cardiovascular
10  events that Dr. Watson included in his
11  analysis in the Vioxx clinical trials
12  occur in patients who were taking Vioxx,
13  Ibuprofen, Diclofenac and placebo?
14    A.  I'm aware that once the data could
15  be unblinded, the evidence was less
16  compelling that there was an increased
17  risk with Vioxx.
18    Q.  In fact, when the data from
19  Watson's analysis was unblinded, it showed
20  that there was no increased cardiovascular
21  risk between Vioxx and placebo, correct?
22          MR. GRAND: Objection.
23    A.  I understand that.
24    Q.  You also understand when the Watson

Page 284

1  analysis was unblinded, that there was no
2  difference in cardiovascular events between
3  Vioxx and placebo, true?
4          MR. GRAND: Objection.
5          BY MR. GOLDMAN:
6    Q.  Do you understand, Dr. Avorn, that
7  when the final results were unblinded and
8  you looked at the events that Dr. Watson
9  was talking about, that there was no
10  increase in cardiovascular events between
11  Vioxx and any of the comparators?
12          MR. GRAND: Objection.
13    A.  I understand that.  But the reason
14  that the Watson initial report is in my
15  report is not because I believed that it
16  was a methodologically impeccable study,
17  because everybody recognized that it
18  wasn't, but what's important is that it
19  was an important enough study that Merck
20  had him do it, the design was acceptable
21  enough to Merck; that even with all the
22  caveats, they had him do that analysis,
23  and that when the results came in, they
24  were not acted on.

Page 285

1          And what is important to me is what
2  was known to the company at that stage
3  through the best available information it
4  had, and what they did with it, which was
5  not much, if anything, rather than the
6  ultimate finding, which did not bear out
7  those initial suppositions, but that was
8  much later.
9    Q.  Was it a responsible thing for
10  Merck to have Dr. Watson conduct his
11  analysis?
12    A.  To have him conduct it, yes.  To
13  then ignore the findings, no.
14    Q.  You know, I'm trying to -- I don't
15  want you to --
16    A.  I'm sorry.
17    Q.  -- talk about things I'm not asking
18  about, if that's okay.
19          MR. TISI: No.  He's
20  allowed to answer the question.  Come on,
21  Counsel, we've been through many of these
22  depositions, where the shoe is on the
23  other foot.
24    A.  I just don't want to leave it this

72 (Pages 282 to 285)

Jerry Avorn, M.D.

Page 286

1  was -- this was a high point in Merck's
2  responsibility, because they found a
3  worrisome finding which they then didn't,
4  in my view, act upon.
5      Q.  Dr. Avorn, would you agree that it
6  was a responsible thing for Merck to have
7  Dr. Watson conduct his analysis?
8          MR. TISI:  Objection.  Asked
9  and answered.
10     A.  The conduct of it was a responsible
11 idea.
12     Q.  And is it your position, sir, that
13 Merck did not act on the results of the
14 Watson analysis?
15     A.  Well, it -- it did not act in a
16 way that was adequate.  And what I mean
17 by that is, if, in the early days of a
18 drug's development, one finds that there
19 seems to be a higher rate of an adverse
20 event, by whatever best study you can do
21 at the time method, you find this
22 increased risk and then you don't initiate
23 new studies to test that out while they
24 still believe the data from the Watson

Page 287

1  study as being worrisome, I don't think
2  that's an adequate response.
3      Q.  Do you believe that Merck did
4  anything in response to the results of the
5  Watson analysis?
6      A.  Oh, sure they did things.
7      Q.  What did they do?
8      A.  Well, there was this plan to look
9  at cardiovascular outcomes across all of
10 their studies, which I think was
11 problematic in ways we can talk about
12 later, if you want.  And there were some
13 animal studies, but nothing that -- Let me
14 be clear.
15         The appropriate response to the
16 Watson study and other things we've been
17 talking about, would have been to just cut
18 to the chase, a clinical trial designed to
19 get to the bottom of the cardiovascular
20 risk study; not a re-analysis of data from
21 other studies, or piggybacking new
22 analyses, but it would have been a study
23 targeting that question as aggressively and
24 effectively as they targeted the

Page 288

1  gastroprotection indication when they
2  wanted to sell product.  They never
3  commissioned that study.
4      Q.  Is that your personal opinion, sir,
5  or is that an expert opinion?
6      A.  That is an expert opinion.
7  Absolutely.
8      Q.  How could I test that assertion
9  that you just made?  How could I go and
10 test whether or not the appropriate
11 response to the Watson analysis would have
12 been to conduct a --
13     A.  And to the other data we've been
14 talking about.
15     Q.  How could I go test the assertion
16 that you just made concerning the
17 appropriate thing that you think should
18 have been done in response to the Watson
19 analysis was to conduct a clinical trial?
20     A.  Very simply.  You could ask a
21 hundred clinical trialists or
22 pharmacoepidemiologists or other experts in
23 the evaluation of drugs, and say the
24 following -- ask them the following

Page 289

1  question:  If there are numerous lines of
2  evidence indicating the possibility of an
3  increased cardiovascular risk in a given
4  drug, however flawed any single one of
5  those studies might be, is it appropriate
6  to conduct a new clinical trial designed
7  to understand that problem, or to simply
8  add analytic layers onto other already
9  ongoing studies that were designed for
10 very different purposes, and to do some
11 animal studies that may or may not deal
12 with the issue.
13         And I think that the answer, based
14 on my expertise, as somebody who knows
15 something about adverse events and about
16 the evaluation of drugs, that an
17 overwhelming majority of those hundred
18 people with expertise in drug evaluation
19 would say the responsible thing to do is
20 to do a focused randomized clinical trial
21 in humans to under -- that is designed to
22 understand this particular potential risk.
23     Q.  What numerous lines of evidence
24 were there in February of 1998 indicating

73 (Pages 286 to 289)

Jerry Avorn, M.D.

Page 290

1  the possibility of an increased
2  cardiovascular risk with Vioxx?
3  A.  Okay.  I did not preface my
4  statement with a particular point in time.
5  I think that the appropriate
6  reaction was abundantly clear by the time
7  the VIGOR data were in, which would have
8  been the spring of 2000.  I think it kind
9  of builds to a crescendo at that point.
10  In '98 it was worrisome.  In '99 it was
11  suggestive.  And by the time they had the
12  original VIGOR data in 2000, in early
13  2000, demonstrating a significant increase
14  in the risk of -- in the rate of heart
15  attacks in people given their drug, by
16  that time it was abundantly clear.
17  Q.  What was abundantly clear?
18  A.  That there was a very worrisome
19  risk of cardiovascular complications
20  associated with their drug.
21  Q.  You talked about the Board of
22  Scientific Advisors's --
23  A.  Yes.
24  Q.  -- memo on Page .5 of your report.

Page 291

1  Do you remember that?
2  A.  Yes.
3  Q.  Do you think it was a responsible
4  thing for Merck to meet with its advisors
5  to discuss the FitzGerald hypothesis?
6  A.  It would have been if they had
7  followed their advice.
8  Q.  That's hindsight, right, that
9  you're applying?
10  MR. TISI:  Objection.
11  A.  No.  These were recommendations
12  made at the time in May of 1998.
13  Q.  I'm not talking about the
14  recommendations.  We'll talk about that in
15  a minute, okay?
16  A.  Was it responsible for them to have
17  a meeting?
18  Q.  Was it responsible for Merck to
19  consult with its scientific advisors,
20  independent scientific advisors to discuss
21  the FitzGerald hypothesis?
22  A.  Yes.
23  Q.  And of the studies that the Board
24  of Scientific Advisors had mentioned in

Page 292

1  that meeting, do you have any idea which
2  ones Merck did and which ones Merck didn't
3  do?
4  A.  I know what they didn't do.  And I
5  know that they also did some animal
6  studies to try to follow up on -- on
7  these worries.
8  Q.  Do you know whether the Board of
9  Scientific Advisors ever said to Merck,
10  you're not doing the studies that we
11  suggested, and you really ought to do
12  them, or was the Board of Scientific
13  Advisors satisfied that Merck was acting
14  responsibly in response to their comments?
15  MR. GRAND:  Objection.
16  MR. TISI:  Objection.
17  A.  I have no way of knowing the level
18  of satisfaction.  I do know that the
19  meeting was in May of '98, and in
20  September of '98, there had -- they had --
21  Merck had already been contacted by Dr.
22  Oates, Dr. Patrono, and perhaps others,
23  asking them to please move forward on the
24  prostaglandin -- on the prostacyclin issue,

Page 293

1  and Dr. Nies indicated that they were not
2  going to.
3  Q.  Did I ask about Dr. Patrono or Dr.
4  Oates?
5  MR. TISI:  Well, yes.  You
6  actually did.
7  MR. GOLDMAN:  Indirectly.
8  BY MR. GOLDMAN:
9  Q.  Are they on Merck's Board of
10  Scientific Advisors?
11  A.  I -- You were talking about whether
12  Merck responsibly followed up on the
13  studies that the Scientific Advisory Board
14  performed.
15  Q.  Let me be clear.  Do you know
16  whether the Board of Scientific Advisors
17  ever took the position that Merck did not
18  act responsibly in response to their
19  suggestions?
20  A.  I do not know of such a document.
21  MR. TISI:  Asked and
22  answered.
23  BY MR. GOLDMAN:
24  Q.  Do you think the Board of

74 (Pages 290 to 293)

Jerry Avorn, M.D.

Page 294

1    Scientific Advisors, in May of '98,
2    conducted an unbiased and objective review
3    of the state of the science concerning
4    Vioxx and any potential cardiovascular
5    effects?
6        A.   That's my impression.
7        Q.   It's also your impression, as you
8    said before, that the Board of Scientific
9    Advisors raised theoretical benefits that
10   Vioxx could have on the heart and
11   theoretical adverse effects that Vioxx
12   could have on the heart, right?
13       A.   Right.
14       Q.   Did the Board of Scientific
15   Advisors, sir, think that more information
16   was needed before any conclusions could be
17   made about the potential for cardiovascular
18   adverse effects from Vioxx?
19       A.   I would expect that they said that.
20   I don't think that they're exact words,
21   but it was -- that would have been a
22   plausible statement.
23       Q.   Do you criticize the Board of
24   Scientific Advisors's suggestion that Merck

Page 295

1    move forward and attempt to put Vioxx on
2    the market?
3        A.   I don't --
4        MR. TISI:   I'm sorry.
5    Could you reread the question?  I just
6    stepped away to get a drink.  I'm sorry.
7        MR. GOLDMAN:   You can read
8    it back.
9        (Record read).
10       MR. TISI:   Objection....
11       A.   I guess I don't -- I don't -- If
12   you can refer me to where they said that,
13   that would be helpful.
14       I don't recall seeing an
15   exhortation to Merck to market the drug in
16   their report.
17       MR. GOLDMAN:   I'll mark this
18   as Exhibit 8.
19       (Exhibit-8, May 1998 Board of
20   Scientific Advisors Meeting, marked for
21   identification).
22       BY MR. GOLDMAN:
23       Q.   This is the Board of Scientific
24   Advisors's meeting from --

Page 296

1        A.   Right.
2        Q.   -- May of 1998.  If you turn to
3    the page that ends with the Bates stamp
4    2742.
5        A.   (Witness complied).
6        Q.   Do you see in the last sentence
7    there's a statement by the board, "Thus,
8    there is a strong mandate for introduction
9    of Vioxx into medical practice as soon as
10   it's feasible."  Do you see that?
11       A.   (Witness viewing document).  Yes.
12       Q.   Do you disagree with that?
13       A.   Let me read what comes before the
14   thus.
15       Q.   Mm-hmm.
16       A.   (Witness viewing document).  Yes.
17   I see that.
18       Q.   Do you disagree with that advice?
19       A.   No.  I think in May of '98 that
20   was a -- that was a plausible conclusion.
21       Q.   Did the Board of Scientific
22   Advisors advise Merck to set up a
23   procedure to monitor potential
24   cardiovascular events in their clinical

Page 297

1    trials?
2        A.   As I recall they did.
3        Q.   Were you also aware, sir, when you
4    read the document that the board wanted
5    Merck to set up this procedure so that
6    Merck could conduct a meta-analysis of all
7    of the cardiovascular adverse events that
8    were seen in the trials?
9        A.   Yes.
10       Q.   And Merck complied with the Board
11   of Scientific Advisors's request, right?
12       A.   Wrong.
13       Q.   Merck did not set up a
14   cardiovascular standard operating
15   procedure?
16       A.   They set one up on paper, but they
17   implemented it in such a flawed manner as
18   to not be considered a compliance with
19   that recommendation.
20       Q.   How did Merck, as you say,
21   implement the cardiovascular operating
22   procedure in a flawed manner?
23       A.   Well, as -- as I describe in my
24   report, when it came to implementing it to

75 (Pages 294 to 297)

Jerry Avorn, M.D.

Page 298

1 the -- before approving the single most
2 important study about cardiovascular
3 outcomes, their implementation of the
4 cardiac standard operating procedure was
5 really -- it would be a comedy of errors
6 except there was nothing funny about it.
7        The disarray and incoherence of
8 their evaluation of the cardiac outcomes.
9 And the VIGOR study was appalling, and
10 reflects either ineptitude or willful
11 neglect, and I can't tell which, but the
12 quotations from within Merck, from Dr.
13 Guess and Dr. Capizzi and Dr. Watson,
14 about what are we doing, what are we
15 counting, how can we do this, there's no
16 time, what are we supposed to measure,
17 reflects the most inept tracking of a
18 potentially lethal outcome that I've ever
19 experienced in my career. So no, I can't
20 say they complied with that recommendation.
21   Q.  Is the way you just described
22 Merck's implementation of the CV SOP and
23 VIGOR the basis for your statement that
24 Merck implemented the CV SOP in a flawed

Page 299

1 manner?
2   A.  Yes.
3   Q.  What about with respect to other
4 studies other than VIGOR?
5   A.  There are problems there, too.  Any
6 standard operating procedure for the
7 ascertainment of cardiovascular outcomes
8 needs to have some systematic means of
9 identifying which cases are going to be
10 brought forward for analysis, and there
11 needs to be a fair and rigorous
12 adjudication process.  And it appears
13 that, at least in some instances, the
14 adjudication step was skipped because some
15 cases didn't even get put into the file of
16 cases that would be adjudicated.
17        There was one memorable case in
18 which -- I think it was Dr. Barr
19 identified a woman who died of what
20 appeared clinically to be a cardiovascular
21 death that Dr. Reicin urged him to
22 describe as an unknown cause.
23        And that kind of process -- I can't
24 tell how widespread it was, but it

Page 300

1 shouldn't have happened even once, that a
2 cardiac death gets not adjudicated because
3 -- or gets urged to be ignored by a Merck
4 official and recharacterized incorrectly as
5 an unknown cause, that is not exactly an
6 effective standard operating procedure.
7        There were other problems with, as
8 we know, the reporting of data to the New
9 England Journal about cardiovascular
10 outcomes in the VIGOR study, which again,
11 does not seem to reflect a standard
12 operating procedure.
13        The variation in the date of cutoff
14 for cardiac adverse events being earlier
15 than the date of cutoff for favorable
16 gastrointestinal effects in VIGOR was
17 contrary to all standard medical practice
18 in evaluating clinical trial design, and
19 there are other examples as well.
20        If there was a standard operating
21 procedure, it was a major embarrassment.
22   Q.  Are you done?
23   A.  For now.
24   Q.  Did you learn about this incident

Page 301

1 with Dr. Reicin and Dr. Barr when you read
2 it in the newspaper?
3   A.  No.  It was in the materials that
4 was -- that were provided to me by
5 counsel.
6   Q.  Is that the first time you learned
7 about it, or did you learn about it in
8 the newspaper?
9   A.  Well, I think it was also in the
10 newspaper but a much more abbreviated -- I
11 think just a snippet.  I was able to look
12 at the whole interchange before and after
13 that snippet.
14   Q.  Before you accused Dr. Reicin of
15 doing anything improper concerning that one
16 event, do you think that it would be fair
17 to review her deposition to see what she
18 says about that?
19   A.  I'd be interested in seeing it, but
20 I think that the -- her e-mails speak for
21 themselves as they occurred at the time
22 rather than her post hoc justifications.
23 But if there's something that she's said
24 since then that you wanted me to look at,

76 (Pages 298 to 301)

Jerry Avorn, M.D.

Page 302

1    I could review that.
2        Q.  Well, you reached that conclusion
3    about that incident without bothering to
4    go look at what Dr. Reicin said, right?
5        A.  It's not a matter of bothering.
6    It's a matter of the trail of e-mail
7    correspondence at the time is more
8    reliable than a subsequent, perhaps
9    coached, redescription of what she was
10   really thinking.
11       Q.  Are you suggesting that Dr.
12   Reicin's deposition testimony was coached?
13       A.  Well, I think that whenever there's
14   something as embarrassing as that appears
15   in the media and there's litigation, I'm
16   sure there were conversations about putting
17   the best face on it.  That's
18   understandable.
19       Q.  Do you know whether Dr. Reicin knew
20   whether that particular event that you
21   described occurred in a patient taking
22   Vioxx, or in a patient taking a
23   comparator?
24       A.  I have no way of knowing what she

Page 303

1    knew.  But I do know that the data was
2    already published in the New England
3    Journal, or data were -- not published,
4    but data were already -- There was already
5    a pre-existing worry that -- and knowledge
6    that a cardiovascular event in a Vioxx
7    trial was more likely to be in a Vioxx
8    patient than in a controlled patient, just
9    because that was the way the data were --
10   had -- had sorted out from other studies.
11       Q.  Do you take the position, sir, that
12   Dr. Reicin knowingly changed the nature of
13   that particular event so that it would not
14   be characterized as a sudden cardiac death
15   that would be countered against Vioxx?
16       A.  No, I do not.
17       Q.  Do you know the circumstances, sir,
18   surrounding the data analysis plan that
19   the DSMB suggested be followed for the
20   VIGOR trial?
21            MR. TISI:  Objection.
22   Vague.
23       A.  I know some things, but not all
24   things, about it.

Page 304

1        Q.  Do you understand that all the
2    documents you refer to in your expert
3    report about the -- what you called an
4    embarrassing implementation of the CV SOP
5    actually related to a data analysis plan
6    for VIGOR as opposed to the CV SOP?
7        A.  You mean a specific analysis?
8        Q.  (Counsel nodded).
9        A.  But my understanding was that the
10   CV SOP was supposed to cover all Merck
11   trials.
12       Q.  Did you also understand or did the
13   plaintiffs' lawyers provide you with
14   documentation explaining that for the VIGOR
15   trial, the DSMB wanted a particular
16   procedure followed?
17       A.  I understand that.  But that that
18   would not preclude other analyses from
19   going forward as well.
20       Q.  Back in 1998 and 1999, sir, was it
21   a responsible thing for Merck to plan to
22   adjudicate all different types of
23   thrombotic events that were reported in
24   clinical trials?

Page 305

1        A.  I would need to review the
2    statement in which they put forward that
3    methodology before I could comment on how
4    responsible it was.
5        Q.  Do you know that the CV SOP was a
6    plan to have adjudicated by independent
7    people whether events were considered
8    thrombotic events or not?
9        A.  Right.
10       Q.  Okay.  And that was a responsible
11   thing to do, to have these independent
12   people evaluate these particular events and
13   make a determination about whether or not
14   they were a confirmed cardiovascular event
15   or not, true?
16       A.  You're responsible only if there
17   was a piece of the plan that included how
18   those cases would be identified in the
19   first place --
20       Q.  You don't --
21       A.  -- to be put forward.
22       Q.  You don't know whether the CV SOP
23   had a prespecified --
24            MR. TISI:  Ascertain.

77 (Pages 302 to 305)

Jerry Avorn, M.D.

Page 306

1 Trying to help you.
2     MR. GOLDMAN: Yeah. I'm
3 trying to think of my word.
4   A. A prespecified list of diagnoses
5 which would warrant bringing forward for
6 adjudication.
7   Q. Yes.
8   A. There was such a prespecified list
9 which contained some very egregious
10 omissions that were put in place in late
11 '99. I cannot understand why that
12 actually removed from adjudication some
13 very important events. So I guess I would
14 not characterize that as responsible.
15   Q. What was removed?
16   A. There were -- There were diagnoses
17 such as some arrhythmias, which could well
18 have been a manifestation of an acute MI.
19 Congestive heart failure, which could have
20 been a manifestation of an acute MI, and
21 others, which I could pull out the
22 document and look at with you, that having
23 been struck out in the document that Merck
24 provided with a date in late '99, made me

Page 307

1 wonder why they would want to start
2 excluding cardiac events if the whole
3 point was to get to the bottom of whether
4 their drug was causing cardiac risk.
5   Q. Wasn't the theory, sir, that the
6 Board of Scientific Advisors was
7 considering as a mechanism for Vioxx being
8 prothrombotic the fact that Vioxx might
9 lower prostacyclin and disrupt its balance
10 and put patients in a prothrombotic state?
11     MR. TISI: Objection.
12 Misstates the record.
13   A. That is only one very narrow
14 depiction of the potential cardiovascular
15 risks of the drug. The others include the
16 retention of sodium, the precipitation of
17 congestive heart failure, the increase in
18 hypertension, all of which were known,
19 even for older nonsteroidals, so it was
20 not a particularly exotic idea. And
21 elimination of all but a very, very narrow
22 kind of cardiovascular complication from
23 ascertainment was not only not responsible,
24 it was irresponsible.

Page 308

1     And just to be clear about this, it
2 is also well known that the first
3 presentation of myocardial infarction in a
4 patient can easily be acute congestive
5 heart failure, pulmonary edema, arrhythmia,
6 all of which were struck out in the list
7 of ascertainment in the cardiovascular SOP.
8 So I would not characterize that as
9 responsible.
10   Q. Are the events you've just
11 mentioned thrombotic in nature?
12   A. Let me explain it a little bit
13 clearer. An acute MI may often present as
14 its first presentation --
15   Q. Okay.
16   A. -- as pulmonary edema, congestive
17 heart failure, arrhythmia, and as such,
18 it's a reflection of an acute MI, which is
19 a thrombotic event.
20   Q. Is it your opinion, sir, that
21 Merck --
22     MR. TISI: I don't know if
23 he was finished, was he?
24     THE WITNESS: Yeah. That's

Page 309

1 fine.
2 BY MR. GOLDMAN:
3   Q. Is it your opinion, sir, that Merck
4 intentionally changed the criteria for
5 those cases that would be adjudicated in
6 order to cover up the potential of a
7 cardiovascular risk?
8     MR. TISI: Objection.
9   A. All I can report is that Merck
10 intentionally changed the criteria after
11 they had been established, and I cannot
12 speak to who did it or what they were
13 thinking.
14   Q. Do you know that the CV SOP
15 contemplated that events would be analyzed
16 during the course of the trial and up to
17 14 days after a patient stopped treatment?
18   A. Right.
19     MR. GRAND: Objection.
20 Misstates the testimony.
21 BY MR. GOLDMAN:
22   Q. And the plan, sir, to --
23   A. If you stipulate that that's the
24 case, that sounds familiar. But I -- I

Jerry Avorn, M.D.

Page 310

1  could review that part of the CV SOP.  I
2  recall having seen that.
3  Q.  Do you remember that the plan to
4  review adverse events, sir, that Merck had
5  before VIGOR came out was to monitor those
6  events that occurred during the course of
7  its clinical trials and 14 days
8  thereafter?
9  A.  That's my recollection.
10  Q.  And that's a responsible plan,
11  isn't it?
12  MR. TISI:  Objection.
13  BY MR. GOLDMAN:
14  Q.  Give me something --
15  MR. TISI:  No, no, no.
16  Seriously.  He's -- I know you want to
17  give --
18  A.  No, no.  We're talking about life
19  and death here. So I think it's worth more
20  than a yes-no answer.
21  It's plausible as a first
22  assumption, but when there's an increase
23  in mortality in a given study, it becomes
24  not so appropriate to ignore all the

Page 311

1  people after they've stopped drugs, because
2  people can have problems that occur more
3  than 14 days after they've stop the drug.
4  Q.  You're talking there about the
5  Alzheimer's trial?
6  A.  Among others, yes.
7  Q.  What others?
8  A.  Well, any -- once -- all right.  I
9  will grant that initially it was plausible
10  to say that an analysis would look at
11  adverse events that occur on drug and 14
12  days afterwards.
13  I think when there becomes evidence
14  that there is an increase incidence of,
15  let's say, MI, that it then becomes more
16  responsible, or it -- what is responsible
17  then becomes going to an intention to
18  create analysis.
19  Even if there was a prespecified
20  prior analysis, I think one needs to do
21  both, because of the emergence of
22  additional information that comes over
23  time.
24  Q.  We'll talk about intention and

Page 312

1  treat analyses later, okay?
2  A.  Okay.
3  (Off the record at 3:27 p.m.)
4  (Brief break).
5  (On the record at 3:35 p.m.)
6  BY MR. GOLDMAN:
7  Q.  Sir, if the imbalance theory were
8  accurate, would you expect to see an
9  increase in strokes because of Vioxx?
10  A.  Probably.
11  Q.  Would you expect to see an increase
12  in unstable angina and sudden cardiac
13  death if the imbalance theory were
14  accurate?
15  A.  Perhaps.
16  Q.  You agree, sir, that it was
17  reasonable for Merck to analyze thrombotic
18  events as a combined end point, given the
19  nature of the imbalance theory?
20  MR. TISI:  Objection.
21  A.  It depends on whether -- on what
22  thrombotic events were included.  For
23  example, I would not include venous
24  thrombotic events in that category.

Page 313

1  Q.  Other than venous thrombotic
2  events, do you agree that it was
3  reasonable for Merck to include the other
4  thrombotic events that were part of a
5  combined end point?
6  MR. TISI:  Again, is your
7  question presuming that the imbalance was
8  the theory --
9  MR. GOLDMAN:  Mm-hmm.
10  MR. TISI:  -- was the only
11  theory?  Okay.
12  A.  Right.  What I would say is that
13  yes, that's plausible, but given the major
14  magnitude of the health problems we're
15  talking about, it was also reasonable to
16  do additional analyses of just MI or just
17  cardiovascular thrombotic -- just cardiac
18  thrombotic events as well.
19  Q.  You're not critical of Merck's
20  decision to analyze a combined end point
21  that included unstable angina, heart attack
22  and strokes, right?
23  A.  Correct.
24  Q.  As to the -- And you wouldn't say

79 (Pages 310 to 313)

Jerry Avorn, M.D.

Page 314

1  that analyzing heart attacks and sudden
2  cardiac death alone is a better end point
3  to analyze than all thrombotic events,
4  true?
5      A.  It's better and -- It's worse and
6  it's better. It's worse in that you'll get
7  a smaller end. It's better if for some
8  reason the drug is causing heart attacks
9  and sudden cardiac deaths but for some
10  reason not causing the others.
11      Q.  Do you agree it was reasonable for
12  Merck to use the APTC endpoint in
13  analyzing cardiac events --
14          MR. TISI:  Objection.
15      BY MR. GOLDMAN:
16      Q.  -- in its trials?
17          MR. TISI:  It's vague.
18      A.  Okay.  That would have everything
19  to do with what exactly we mean by the
20  APTC endpoint.
21      Q.  Do you know what APTC endpoint was
22  used in the Vioxx trials?
23      A.  It seems to me that I recall seeing
24  various definitions of that, so we could

Page 315

1  look at the specifics definitions, and I
2  could indicate whether I think that was
3  acceptable or not.
4      Q.  You haven't criticized the --
5  Merck's analysis of the APTC endpoint,
6  have you, sir, in your report?
7      A.  Have I -- In other words, have I
8  specifically --
9      Q.  Mm-hmm.
10      A.  In the report, no.  But I do have
11  a problem with using venous outcomes.
12      Q.  How would the venous outcomes
13  affect the analysis of whether Vioxx
14  causes cardiovascular events?
15      A.  Well, in principle, it could dilute
16  an effect if the principle problem is
17  arterial thrombosis and not venous
18  thrombosis.
19      Q.  And it is your understanding that
20  the principle theory of it was being
21  advanced about why Vioxx could be
22  prothrombotic involve arterial thrombosis
23  not venous, correct?
24          MR. TISI:  Objection.

Page 316

1  Assumes facts not in evidence.
2      A.  Well, that was the main assumption.
3      Q.  How many venous events occurred on
4  Vioxx in the clinical trials?
5      A.  I can't answer that question off
6  the top of my head.
7      Q.  How many venous events occurred on
8  non-Naproxen NSAIDs?
9      A.  I can't answer that off the top of
10  my head.
11      Q.  Do you know if Merck had excluded
12  the venous events, how that would affect
13  the analysis of whether Vioxx increases
14  cardiovascular risk?
15      A.  I know that in one table I looked
16  at there actually were more venous events
17  in the placebo group than the Vioxx group.
18  So it's not about how the numbers would
19  have come out, it's about what's the most
20  plausible way to do it.
21      Q.  So you criticize Merck for
22  including venous events in the analysis,
23  but you recognize that by including it
24  that didn't dilute the results when it

Page 317

1  came to analyzing cardiovascular effects,
2  true?
3      A.  Correct.
4      Q.  Do you know how many -- Well,
5  withdrawn.
6          Under the imbalance theory, Dr.
7  Avorn, if patients take aspirin and Vioxx
8  together, you would agree that there
9  wouldn't be an imbalance?
10      A.  I have two problems with the
11  question.  One is that it kind of presumes
12  that everything is guided by the imbalance
13  theory, and I, as a scientist, would say
14  that while that's an important hypothesis,
15  it should not be the only foundation for
16  all clinical trials.
17          And secondly, I don't think that
18  anyone -- and even Garret FitzGerald --
19  understands all the ins and outs of COX-1,
20  COX-2, thromboxane, prostacyclin, to be
21  able to predict with certainty how aspirin
22  yes, aspirin no would play itself out.
23      Q.  In theory, Dr. Avorn, because
24  aspirin is primarily a COX-1 inhibitor, if

80 (Pages 314 to 317)

Jerry Avorn, M.D.

Page 318

1  patients take low dose aspirin and Vioxx,
2  which is a selective COX-2 inhibitor, at
3  the same time, then you would expect that
4  there would be a balance between
5  prostacyclin and thromboxane, right?
6      MR. GRAND:  Objection.
7      MR. TISI:  Objection.
8      A.  No.  I think that runs counter to
9  what I just said, which is, I certainly
10  don't claim to understand enough about
11  COX-1 and COX-2 to be able to make
12  predictions about that.
13     Q.  Do you know enough about the
14  imbalance theory to know that if that were
15  the mechanism that caused increased
16  cardiovascular events, then you would not
17  see increased cardiovascular events after
18  patients stopped using Vioxx?
19     A.  Again, I think the problem here is
20  assuming that everything is kind of
21  reduced to this balance.  And it also
22  assumes that the whole
23  thromboxane/prostacyclin relationship is
24  about clot, but there is also evidence

Page 319

1  about the beneficial effects of
2  prostacyclin in relation to endothelial
3  function, plaque stability, blood pressure,
4  and other things which I am not an expert
5  in, that it's not just about clotting.
6      Q.  I'm talking about the imbalance
7  theory, okay?
8      A.  Yes.  No.  What I'm saying is,
9  that even within the imbalance theory,
10  it's not just about clotting.
11     Q.  Do you know of any evidence, sir,
12  that any imbalance that might occur
13  because of COX-2 inhibition persists after
14  patients stop taking Vioxx?
15     A.  Just repeat that question one more
16  time.
17     Q.  Are you aware of any evidence
18  suggesting that whatever imbalance might
19  exist because of COX-2 inhibition goes
20  away when patients stop using Vioxx?
21     A.  Okay.  There is reason to be
22  concerned that problems which occur as a
23  result of the imbalance while one is
24  taking Vioxx, which may or may not only be

Page 320

1  about the coagulation story, may affect
2  endothelial function and plaque and other
3  aspects of cardiovascular system that could
4  well persist after the drug itself is
5  stopped.
6      So that, for example, if there were
7  more endothelial damage or more disruption
8  of plaque, that would persist even after
9  the drug stops.
10     Q.  Do you have any evidence that that
11  happens?
12     A.  Well, there -- there -- To jump
13  ahead to the APPROVe follow-up study,
14  there was worrisome evidence of a
15  statistically significant increase in the
16  rate of stroke in people post Vioxx
17  compared to post placebo.
18     Q.  Is there a statistically
19  significant increase in the follow-up
20  period for APPROVe for heart attacks?
21     A.  I don't think there is.
22     Q.  Is there an increased
23  cardiovascular risk after patients stopped
24  using Vioxx in the APPROVe study for

Page 321

1  thrombotic cardiovascular events when
2  looked at as a whole?
3      A.  I don't think there is.
4      Q.  Is there an increased
5  cardiovascular risk in the follow-up period
6  after APPROVe for cardiac events?
7      A.  I'd want to look at the data to be
8  certain, but I don't recall that there
9  was.
10     Q.  Is there an increased risk for
11  death, all cause or cardiovascular death,
12  in the follow-up period after APPROVe --
13     MR. TISI:  Why don't we --
14     BY MR. GOLDMAN:
15     Q.  -- between Vioxx and placebo?
16     MR. TISI:  If you're going
17  to ask him a lot of questions about it,
18  why don't we look at the --
19     A.  If we could pull out the numbers,
20  it would be much easier.
21     Q.  You don't remember?
22     A.  I don't -- I don't recall all of
23  those things that you just said --
24     Q.  We'll get to that in a minute.

81 (Pages 318 to 321)

Jerry Avorn, M.D.

Page 322

1   Are you aware of any scientific
2   evidence, sir, that the imbalance that
3   people say -- Withdrawn.
4   Are you aware of any scientific
5   evidence, sir, that suggests that the
6   imbalance theory that the plaintiffs use
7   in these cases --
8   MR. TISI: Objection. That
9   totally mischaracterizes what plaintiffs --
10   plaintiffs are using at any particular
11   theory. Why don't you just ask him a
12   question, Counsel?
13   BY MR. GOLDMAN:
14   Q. Under the balance theory, sir,
15   focusing on prostacyclin and thromboxane
16   alone, do you know of any scientific
17   evidence suggesting that an imbalance
18   exists after patients stop using Vioxx?
19   A. No.
20   Q. On Page .7 of your report, you make
21   a statement that you are not aware that
22   Merck communicated the risks identified by
23   the Board of Scientific Advisors to the
24   FDA before approval.

Page 323

1   A. Correct.
2   Q. Do you remember --
3   A. Correct.
4   Q. -- saying that?
5   What's your basis for that
6   statement?
7   A. I see no reflection of that in the
8   FDA's analysis of the NDA data that would
9   indicate they have been made aware of
10   that. If there was communication to FDA
11   that I haven't seen, I'd be happy to take
12   a look.
13   Q. Have you read the integrated
14   summary of safety for the NDA for Vioxx?
15   A. I believe I have.
16   Q. Do you think that Merck withheld
17   from the FDA the theory that Vioxx could
18   potentially be prothrombotic?
19   A. Most of the safety discussions that
20   I remember reading in the FDA's summary
21   were about platelet function, I think,
22   rather than about the other issues that
23   the Scientific Board raised.
24   Q. Before you were to conclude that

Page 324

1   Merck withheld information about potential
2   thrombotic effects of Vioxx, would you
3   want to review the material that Merck
4   submitted to the FDA?
5   MR. GRAND: Objection.
6   Misstates his testimony.
7   A. Right. I want to be clear that
8   I'm not accusing Merck of withholding
9   information. I'm saying I'm not aware
10   that the issues that were raised very
11   clearly in the Scientific Advisory Board
12   report were communicated, because I did
13   not see them reflected in the FDA's
14   statement.
15   Q. You are not aware, Dr. Avorn, one
16   way or the other, whether Merck informed
17   the FDA about the theory that Vioxx and
18   COX-2 inhibition could potentially lead to
19   increased risk of heart attack, true?
20   A. That's what my statement says.
21   Q. Do you know whether the FDA was
22   aware of the FitzGerald and Catella-Lawson
23   urine study before Vioxx was approved?
24   A. I don't know.

Page 325

1   Q. Do you know whether Merck gave the
2   FDA a copy of the Catella-Lawson
3   FitzGerald urine study?
4   A. I don't know.
5   Q. If Merck gave a copy of the
6   FitzGerald urine study and referenced it
7   in its integrated summary of safety, would
8   you agree that that would be a responsible
9   thing to do? I have to repeat that
10   because, it didn't make sense. Withdrawn.
11   If Merck gave the FDA a copy of
12   the FitzGerald urine study and referenced
13   it in its integrated summary of safety,
14   would you agree that that would be a
15   responsible thing for Merck to have done?
16   A. That would have been responsible,
17   but I come back to my statement in the
18   report that I am not aware that the issues
19   raised by the scientific advisory committee
20   were communicated to Merck -- to FDA
21   fully.
22   Q. Well, did Merck communicate to the
23   FDA that the Board of Scientific Advisors
24   felt that Vioxx could potentially help the

82 (Pages 322 to 325)

Jerry Avorn, M.D.

Page 326

1  heart?
2  A.  I don't know that they communicated
3  either the positive or the negative fully.
4  I think FDA would have -- I can
5  tell you that FDA would have had no
6  interest in theoretical benefits that were
7  apart from the indication being reviewed,
8  but they would have had great interest in
9  theoretical harms as something for them to
10  at least be aware of.
11  Q.  My question was:  Did Merck
12  communicate to the FDA that the Board of
13  Scientific Advisors felt that Vioxx could
14  potentially help the heart?
15  A.  Right.  And my answer was that FDA
16  does not and should not consider
17  theoretical statements of potential benefit
18  for an indication other than the
19  indication being considered, but that it's
20  not symmetrical.  FDA would be concerned
21  with theoretical reasons for potential
22  harms.
23  Q.  Have you ever worked for the FDA as
24  an employee?

Page 327

1  A.  I've been on advisory committees,
2  but I've not been an employee.
3  Q.  I'm not asking about what the FDA
4  would consider important or what they
5  should or should not consider, okay?
6  A.  Okay.
7  Q.  Did Merck communicate to the FDA
8  the Board of Scientific Advisors's theory
9  that Vioxx could potentially help the
10  heart?
11  A.  I don't believe they did.
12  Q.  Do you know whether the FDA was
13  aware of the theoretical risk of
14  thrombotic events from Vioxx before it
15  approved Vioxx?
16  A.  I know that there were statements
17  about the theoretical concern about
18  selective inhibition of COX-2, yes.
19  Q.  How do you define hypertension?
20  A.  It changes every month these days,
21  but...
22  Q.  How was it defined while Vioxx was
23  on the market?
24  A.  I think in those years, 140 over

Page 328

1  90.
2  Q.  Do you agree, sir, that if a
3  patient has one elevation of blood
4  pressure to 140 over 90, that doesn't mean
5  that he or she has hypertension?
6  A.  You mean on one occasion?
7  Q.  Mm-hmm.
8  A.  And it's normal on other occasions?
9  Q.  Mm-hmm.
10  A.  Correct.
11  Q.  And even if a patient has
12  intermittent spikes in blood pressure above
13  140 over 90, that doesn't necessarily mean
14  the patient has hypertension, true?
15  A.  It depends how frequent.
16  Q.  In order to know whether a patient
17  has hypertension, you would want to look
18  at the average blood pressure during a
19  particular period, rather than just
20  selecting certain intermittent spikes,
21  true?
22  MR. TISI:  Objection.
23  A.  No.  The clinical definition is
24  that if on three readings they have levels

Page 329

1  above that, then that would be considered
2  grounds for treatment, either with diet or
3  drugs.  In other words, it's not as if
4  one would average in the low blood
5  pressures as well.
6  Q.  Three readings in a row, or don't
7  you know?
8  A.  On three occasions.
9  MR. TISI:  Can I ask a
10  clarification question?  This is not a --
11  Are you talking about people who are not
12  being treated for hypertension?  In other
13  words, people who are not on drugs for
14  hypertension?
15  MR. GOLDMAN:  I'm talking
16  about just the diagnosis of hypertension,
17  yes, without being on blood pressure meds.
18  MR. TISI:  All right.
19  BY MR. GOLDMAN:
20  Q.  Is it your testimony that you would
21  diagnose a patient with hypertension if
22  they had three elevated blood pressure
23  readings over the course of two years?
24  A.  If those were the only -- If they

Jerry Avorn, M.D.

Page 330

1    came in only every eight months, and every
2    time you saw them, it was, you know, 160
3    over 95, yeah.
4        Q.   What if a patient actually had
5    mostly normal readings of blood pressure
6    during the period of time that he was on
7    Vioxx, but had some elevated blood
8    pressure spikes?  Would you consider that
9    to be hypertension?
10       A.   No.
11       Q.   Is it true, sir, that the medical
12   community knew long before Vioxx came to
13   the market that all NSAIDs could increase
14   hypertension?
15           MR. TISI:  Objection.  Are
16   you talking about magnitude?  Frequency?
17   Severity?  What are you talking about?
18       A.   It was known -- What the medical
19   community knew is harder to state.  We did
20   some of those original studies
21   demonstrating it with Ibuprofen.  So it
22   was known, yes.
23       Q.   Is it also well known in the
24   medical community that hypertension can

Page 331

1    increase the risk of heart attack and
2    stroke?
3            MR. TISI:  Objection.
4    Vague.
5        A.   That I would say is well known.
6        Q.   Do you know that the FDA was aware,
7    before it approved Vioxx and thereafter,
8    that Vioxx could potentially cause
9    hypertension?
10           MR. TISI:  Objection.
11           MR. GRAND:  Objection.
12       A.   I would think that any nonsteroidal
13   would be expected to cause hypertension --
14       Q.   So the answer is yes?
15       A.   -- although the question is whether
16   it does more than comparable drugs.  But
17   that would seem to me to be a relevant
18   question for FDA to be concerned with.
19       Q.   Based on your review of the
20   materials, Dr. Avorn, isn't it true that
21   the FDA was fully aware that Vioxx could
22   cause hypertension?
23       A.   Yes.
24       Q.   And the FDA was also fully aware,

Page 332

1    prior to approval and thereafter, that
2    Vioxx, in some studies, increased blood
3    pressure and hypertension more than
4    comparator NSAIDs, right?
5        A.   I believe they were aware of that.
6        Q.   Are you aware of studies, sir,
7    showing that there's actually no difference
8    in risk of hypertension between Vioxx and
9    comparator NSAIDs?
10       A.   I'm aware of studies that come to
11   the opposite conclusion.
12       Q.   Mm-hmm.  I'm sure you are.
13       A.   I would be happy to look at a
14   study that found no difference.
15       Q.   Are you aware, one way or the
16   other, of whether there are studies that
17   indicate that Vioxx does not increase
18   hypertension more than comparator NSAIDs?
19       A.   I know that the literature is
20   mixed.  My sense of the literature is that
21   more studies show an increase compared to
22   other drugs than not, but that there are
23   some studies, though fewer, that come to
24   another conclusion.

Page 333

1        Q.   Isn't it true, sir, that Vioxx's
2    label from day one indicated that Vioxx
3    could increase hypertension?
4            MR. TISI:  Objection.
5        A.   I could look at the label and
6    confirm that, but if you stipulate that
7    that's the case, I am not surprised.
8        Q.   Let me see if I can find it.
9            Why wouldn't you be surprised if
10   Vioxx's label indicated that Vioxx could
11   increase the risk of the hypertension?
12       A.   Because all nonsteroidals increase
13   the risk of hypertension.
14       Q.   Do you know also that --
15           MR. GOLDMAN:  I'll mark the
16   original label for Vioxx, albeit a poor
17   copy, as Exhibit 9.
18           (Exhibit-9, Original Vioxx Label,
19   marked for identification).
20           BY MR. GOLDMAN:
21       Q.   And I want to direct your
22   attention, Dr. Avorn, to a table on the
23   last page.
24       A.   Mm-hmm.

84 (Pages 330 to 333)

Jerry Avorn, M.D.

Page 334

1    Q.  Do you see, sir, that there is a
2    table that indicates clinical adverse
3    experiences occurring in greater than or
4    equal to two percent of patients treated
5    with Vioxx?
6    A.  (Witness viewing document).  Yes.
7    Q.  And do you see that there's an
8    entry there for cardiovascular system?
9    A.  (Witness viewing document).  Yes.
10   Q.  What does it reference?
11   A.  Hypertension.
12   Q.  And do you see how there is an
13   indication here that 1.3 percent of
14   patients in the placebo arm in the
15   clinical trials that predated this label,
16   and 3.5 percent of patients in the Vioxx
17   arm had hypertension, 3 percent in the
18   Ibuprofen arm, and 1.6 percent in the
19   Diclofenac arm.
20   A.  Right.
21   Q.  Do you agree, sir, that the Vioxx
22   label, on its face, indicates that Vioxx
23   increased hypertension more than Ibuprofen,
24   Diclofenac and placebo?

Page 335

1    A.  I don't think I could conclude from
2    the data in this table that it is
3    meaningfully more than Ibuprofen, because
4    it may just be the play of chance that
5    it's 3.5 versus 3.0.
6    Q.  You don't have any reason to doubt
7    the accuracy of the percentages in this
8    table, do you, sir?
9    A.  No.
10   Q.  So just based on the numbers
11   themselves, putting aside the question of
12   statistical significance, the numbers
13   themselves indicate that Vioxx increases
14   hypertension more than placebo, Diclofenac
15   and Ibuprofen, right?
16   A.  No.  As I said, I don't think that
17   it would be a plausible conclusion, and
18   specifically within relation to Ibuprofen,
19   to say that 3.5 is meaningfully more or
20   less than 3.0 or 4.0.
21       And the other important point is
22   that they characterize hypertension as
23   yes-no, which is one way to do it.  But
24   of greater importance is, you know, what

Page 336

1    if the people with hypertension from one
2    of the drugs had a mean blood pressure of
3    180 over 110, and the others with
4    hypertension had a mean blood pressure of
5    150 over 92.  It's -- Hypertension is not a
6    yes-no disease.
7        So while this is interesting, it's
8    very limited as to what it tells you about
9    the magnitude of the hypertension and the
10   meaningfulness of those differences.
11   Q.  Do you know of any other package
12   insert for any NSAID or COX-2 inhibitor
13   that actually describes the magnitude of
14   the increase in blood pressure for that
15   particular drug versus comparator drugs?
16   A.  I know I've seen it -- I can't
17   recall if it was in clinical trials or in
18   package inserts -- something like the mean
19   blood pressure in people in a given drug
20   group versus placebo as opposed to just
21   hypertension, yes, no.  That -- That I
22   would find to be more helpful.
23   Q.  Putting aside what you would find
24   to be more helpful, Dr. Avorn, do you

Page 337

1    agree, sir, that the table in the first
2    package insert for Vioxx indicates that
3    Vioxx can cause hypertension?
4    A.  Yes.
5    Q.  And do you also see, on the
6    previous page, under Precautions down by
7    fluid retention and edema --
8    A.  Is that Column 1 or Column 2?
9    Q.  Column 1, third to the top, it says
10   that --
11   A.  Column 1, third to the top.
12   Q.  I'm sorry.  Third from the bottom.
13   "Fluid retention and edema have been
14   observed in some patients taking Vioxx.
15   Vioxx should be used with caution and
16   should be introduced at the lowest
17   recommended dose in patients with fluid
18   retention, hypertension, or heart failure."
19   Do you see that, sir?
20   A.  (Witness viewing document).  Yes.
21   Q.  So Merck and the FDA wasn't keeping
22   it a secret that Vioxx might cause
23   hypertension and that patients might want
24   to be careful if they have it and they

85 (Pages 334 to 337)

Jerry Avorn, M.D.

Page 338

1  take Vioxx?
2   A.  Well, it does -- doesn't speak to
3  what the patients may or may not want,
4  because this is written for physicians.
5   Q.  You agree, Dr. Avorn, that Merck
6  and the FDA didn't keep it a secret that
7  Vioxx could potentially increase
8  hypertension and that doctors ought to be
9  careful in prescribing Vioxx to patients
10  who have hypertension?
11        MR. TISI:  Objection to the
12  state of Merck and the FDA.  You can
13  answer.
14   A.  Actually, I wouldn't agree, because
15  I think your wording was Vioxx can
16  increase hypertension.  Is that --
17   Q.  Cause.
18   A.  Cause.  Could you read back --
19   Q.  I'll ask it again.
20        Do you agree, sir, that Merck and
21  the FDA-approved package insert for Vioxx
22  made it clear to doctors that Vioxx ought
23  to be used with caution in patients who
24  have hypertension?

Page 339

1   A.  That's what it says.
2   Q.  And you've never criticized that
3  label before, have you, sir?
4        MR. TISI:  On that basis?
5        MR. GOLDMAN:  Yeah.
6   A.  I've criticized labels in general,
7  most recently in the New England Journal
8  about a week ago, for being so packed with
9  tiny print words as to be irrelevant to
10  most physicians.
11        So in the sense that having
12  something in four point type in a multi
13  thousand word document constitutes a fair
14  warning, I've gone on record as saying I
15  don't believe that that's generally the
16  case.
17   Q.  You've never, during the time Vioxx
18  was on the market, said that Vioxx does
19  not contain an adequate warning for
20  hypertension, right?
21   A.  I've never said that.
22   Q.  And it's true, sir, that you
23  actually think very few doctors pay
24  attention to package inserts, right?

Page 340

1   A.  Correct.  And it's not just what I
2  think.  It's what the literature shows.
3   Q.  So from your perspective, most
4  doctors don't read the package inserts,
5  and it really doesn't matter what's in
6  them?
7        MR. TISI:  Objection;
8  mischaracterizes.
9   A.  I think the first part of the
10  sentence is true.  The second part is not.
11        It is true that most doctors don't
12  read them.  I don't think that means it
13  doesn't matter what's in them.  But the
14  relevance here is that whether or not
15  words appear in the package insert does
16  not necessarily constitute appropriate
17  warning.
18   Q.  And that's your personal opinion,
19  right?
20        MR. TISI:  Objection.
21   A.  No.  That's based on the
22  literature, which we cited a couple of
23  those papers in the June 8th New England
24  Journal, documenting that warnings, and

Page 341

1  even black box warnings that appear in the
2  labels do not influence physicians'
3  behavior.  So that's not just my personal
4  opinion.
5   Q.  Is it your testimony, sir, that you
6  have held the opinion and you've expressed
7  the opinion that black box warnings in
8  package inserts do not affect prescribing
9  behavior?
10        MR. TISI:  Objection;
11  mischaracterizes.
12   A.  In last week's New England Journal,
13  I published a piece with Dr. Shrank
14  indicating that, and citing a paper by Dr.
15  Lasser, L-A-S-S-E-R, that appeared I
16  believe in JAMA, in the last year or two,
17  looking at the effect of black box
18  warnings on physician prescribing, and in
19  which she reported, based on data and not
20  based on my opinion, that even black box
21  warnings are an inadequate driver of
22  physicians' prescribing practices.
23   Q.  Have you also said, sir, that less
24  than one percent of physicians, in your

86 (Pages 338 to 341)

Jerry Avorn, M.D.

Page 342

1   view, have seen a label in the last year?
2   A.   If you can show me where I said
3   that.
4   Q.   Okay.  I won't ask you that.  I
5   won't show you it, because I don't have
6   it.
7   A.   Okay.
8   Q.   Do you believe, sir, that less than
9   one percent of doctors have even seen a
10   label for a pharmaceutical drug in the
11   last year?
12   A.   I don't think I would have put that
13   number to it, because doctors do
14   frequently use the PDR, which is
15   essentially a collection of labels.  So
16   that seems like something I would not have
17   said, that number.
18   Q.   Do you believe that a low
19   percentage of doctors are aware of the --
20   of package inserts in the PDR?
21   A.   I think -- Well, I'm not sure what
22   you mean by "aware of."  They know they're
23   there.
24   Q.   You testified a minute ago that you

Page 343

1   recently published something saying that
2   even black box warnings in package inserts
3   don't change prescribing behavior, right?
4        MR. TISI:  Objection.
5   A.   Have a limited effect on
6   prescribing behavior.  What I said was that
7   even black box warnings have a limited
8   effect on physician prescribing behavior.
9   Q.   Have you also expressed the opinion
10   that printed warnings in package inserts
11   in the PDR -- Withdrawn.
12        Have you also said, sir, that
13   physicians frequently prescribe drugs,
14   despite important contraindications in
15   black box warnings?
16   A.   Yes.
17   Q.   And that is true whether or not the
18   label is handed to the doctor or whether
19   or not it's in the PDR?
20   A.   Correct.
21   Q.   Now, you don't know, sir --
22   Withdrawn.
23        Did you ever say at any point while
24   Vioxx was on the market that a black box

Page 344

1   warning should be added for cardiovascular
2   risk?
3   A.   No.
4   Q.   Did you ever say at any point when
5   Vioxx was on the market that the statement
6   about cardiovascular risk should be in the
7   warning section and not in the precaution
8   section?
9   A.   No.
10   Q.   I'm going to hand you, sir, a
11   document --
12        MR. TISI:  Would you please
13   read that last question back again?  I'm
14   sorry.
15        (Record partially read).
16        MR. TISI:  That's all I
17   need.
18        (Exhibit-10, Table included in a
19   Medical Study, marked for identification).
20        BY MR. GOLDMAN:
21   Q.   Let me hand you, sir, what I've
22   marked as Exhibit 10.
23        MR. TISI:  I've haven't seen
24   this exhibit before, and I'm going to

Page 345

1   object to its use if you don't identify
2   where it is.
3        BY MR. GOLDMAN:
4   Q.   I'm going to represent to you, sir,
5   that this exhibit is a table from a study
6   that's published in a reputable journal.
7   And I'm going to represent to you that the
8   data that's reflected in this study has
9   not been changed and is reported in a peer
10   review journal.  Okay?
11   A.   Okay.
12   Q.   And this is a table that compared
13   various adverse effects for placebo and
14   two different doses of the same NSAID.
15   Are you with me?
16   A.   Mm-hmm.
17   Q.   Yes?
18   A.   Yes.  Is Dose 2 higher than Dose
19   1?
20   Q.   Yes.
21   A.   Okay.
22   Q.   The study involved patients who had
23   colorectal adenomas.  Okay?  Are you with
24   me?

Jerry Avorn, M.D.

Page 346

1    A.  Yes.
2    Q.  Do you see, sir, how in this
3    study --
4         MR. TISI:  Let me just
5    place an objection to the use of the
6    document when you've clearly not identified
7    the comparators, and you have not
8    identified the study and all the
9    circumstances surrounding it.  So I will
10   ask for a continuing objection to this.
11        MR. GOLDMAN:  You have it.
12        MR. TISI:  Thank you.
13   BY MR. GOLDMAN:
14   Q.  Dr. Avorn, do you see that if you
15   look at MI, myocardial infarction, and you
16   look at the placebo arm, there was one MI
17   in this study.  Do you see that, sir?
18   A.  (Witness viewing document).  Yes.
19   Q.  And then there were two MIs in the
20   low dose of this particular NSAID, and
21   five MIs in the high dose.  Okay?
22   A.  Right.
23   Q.  Would you be concerned if you saw
24   this table and saw a 7 to 1 difference in

Page 347

1    heart attacks between the NSAID and
2    placebo?
3         MR. TISI:  And let me ask
4    you, is this in the abstract, or is there
5    other information, other studies, biologic
6    mechanisms, et cetera, et cetera?
7         MR. GOLDMAN:  Can you just
8    object in a legitimate fashion?
9         MR. TISI:  Well, I am
10   objecting -- Well, that is a legitimate
11   fashion.  That's an incomplete
12   hypothetical.  You don't --
13        MR. GOLDMAN:  Chris, then
14   just object that way.
15        MR. TISI:  Okay.  Incomplete
16   hypothetical.  Objection.
17   A.  First of all, you're totally
18   incorrect in calling that a 7 to 1.  You
19   can't just add the 5 and the 2 and get 7.
20   Q.  Okay.
21   A.  The only appropriate way to do that
22   would be to get the average of the 5 and
23   2, which would be 3 and a half.
24   Q.  Mm-hmm.

Page 348

1    A.  So even if this was a ratio that
2    we would take seriously, it's a 3 and a
3    half to one, rather than a 7 to 1
4    difference.
5    Q.  Mm-hmm.
6    A.  And what I would say about that is
7    that these are very, very, very small
8    numbers.  It's interesting.  And I
9    wouldn't know what to make of it if this
10   was the only information that I had about
11   this unnamed drug.
12   Q.  What is the importance of the small
13   numbers here when you're looking at five
14   heart attacks in the high dose NSAID and
15   two in the low dose versus one placebo?
16   A.  Well, taken in isolation, one study
17   out of context of any other studies or any
18   known biology or pharmacology, which, of
19   course, is never the case.  In the real
20   world, you never look at one table with
21   the drug names obscured and say what do
22   you think of it.
23   Q.  Mm-hmm.
24   A.  But in this exercise, I would say

Page 349

1    that knowing nothing else about the drug
2    and having no other information about it,
3    I would say that's interesting, somebody
4    should look into this further.
5    Q.  Do you agree that based on this
6    table alone, that if you look at strokes
7    and you take the average, now you have 3
8    and a half to zero in the placebo arm,
9    right?
10   A.  Right.
11   Q.  And if you just look at the high
12   dose for the NSAID, it's 5 to zero right?
13   A.  Right.
14   Q.  Do you view it as a signal of a
15   potential cardiovascular problem with the
16   NSAID?
17        MR. TISI:  Objection.
18   A.  In isolation, I would say that's
19   interesting, somebody should look into this
20   further and see if this is a pattern that
21   is replicated.
22   Q.  If you combine heart attack and
23   stroke, do you see that then you have, for
24   any dose, 14 events to 1 on placebo, and

88 (Pages 346 to 349)

Jerry Avorn, M.D.

Page 350

1  if you take the average, then you would
2  have 7 thrombotic events, compared to 1
3  for placebo. Do you see that?
4      A.  (Witness viewing document). Yes.
5      Q.  Would that generate a potential
6  signal to you that this NSAID was
7  potentially harmful to the heart?
8      A.  I would say, as before, that's very
9  interesting, let's look at other studies,
10  pharmacology of the drug, what is the
11  drug, what else is known about it, and it
12  would certainly make me want to learn
13  more. But I would -- it's not prima
14  facie evidence of -- of a problem in
15  isolation.
16      Q.  Would you be worried, sir, if you
17  saw this in isolation, and you saw that
18  there was a 7 to 1 difference in
19  thrombotic events, if you take the average
20  of the two different doses of NSAIDs?
21      A.  Isn't that what we just said?
22      Q.  I had a slightly different
23  question.
24      A.  Okay. I think it's what I answered

Page 351

1  before, but I would give the same answer,
2  saying this is interesting, it should be
3  looked into further.
4      Q.  If you look at heart attack, stroke
5  and death, then you have 21 to 4, if you
6  look at the NSAIDs combined, the doses,
7  versus placebo, right?
8      A.  No. You can't --
9      Q.  Okay. You can't combine them?
10      A.  -- combine them for that reason.
11      Q.  If you take the average of the two
12  NSAIDs, you would have 10 and a half,
13  round up to 11, to 4 when you look at MI,
14  stroke and death, right?
15      A.  Right.
16      Q.  And would you also find that to be
17  an interesting finding that you think
18  ought to be looked into further because
19  there's the potential that this NSAID
20  could cause heart attacks?
21      A.  Well, when I say look into further,
22  I'd want to see the rest of the experience
23  in relation to this drug.
24      Q.  Mm-hmm.

Page 352

1      A.  I -- Yes.
2      Q.  Okay. Dr. Kronmal, sir, testified
3  that he would actually be worried if he
4  saw results like this. Would you?
5          MR. TISI:  Objection.
6      BY MR. GOLDMAN:
7      Q.  Let me ask a --
8          MR. TISI:  Please show him
9  the testimony.
10      BY MR. GOLDMAN:
11      Q.  Would you be worried, sir, if you
12  saw results like this about the potential
13  for this NSAID to cause heart attacks?
14          MR. TISI:  Objection. Asked
15  and answered several times now. Go ahead.
16      A.  I think "worried" is not a helpful
17  word here. I think -- I mean, that
18  speaks to my emotional state.
19          I think the answer is the same I
20  gave before. I would say this is
21  interesting. It may or may not be
22  important. Let's look at other available
23  information about this drug.
24      Q.  Could it be the case that this

Page 353

1  particular drug shows an increased
2  incidence of cardiac events or death in
3  the particular population that was studied
4  here in this study and it wouldn't show an
5  increased risk in another population?
6      A.  Given that I don't know what this
7  population is, that's very hard to answer.
8  But yes, drugs show different effects and,
9  you know, could show different effects in
10  a different population.
11          (Off the record at 4:17 p.m.)
12          (Recess taken).
13          (On the record at 4:29 p.m.)
14      BY MR. GOLDMAN:
15      Q.  In the portion of your expert
16  report starting on Page .7, sir, through
17  Page .14, you talk about the VIGOR trial.
18      A.  Right.
19      Q.  Okay? So I want to talk about
20  that.
21          The vast majority of your analysis
22  here concerning VIGOR appears to be based
23  on your interpretation of Merck's internal
24  documents; is that true?

89 (Pages 350 to 353)

Jerry Avorn, M.D.

Page 354

1    A.   My reading of them, yes.
2    Q.   And you're basically trying to put
3  together here a chronology, based on the
4  documents the plaintiffs' lawyers gave you,
5  of Merck's internal documents to try to
6  show what they knew about the VIGOR trial,
7  right?
8    A.   Right.
9    Q.   The VIGOR trial involved Vioxx and
10  Naproxen, right?
11    A.   Right.
12    Q.   Placebo was not involved in that
13  study, was it?
14    A.   Correct.
15    Q.   And what's the significance of not
16  having placebo arm in a study like VIGOR?
17    A.   I'm not sure what you mean.
18    Q.   Is it easier to interpret the
19  significance of a particular result in a
20  study when you have a drug versus placebo
21  versus -- as opposed to a drug versus
22  another drug?
23    A.   I think that depends on whether
24  you're looking at efficacy, where it is

Page 355

1  more challenging to demonstrate equivalence
2  than it is to demonstrate that a drug is
3  better than a sugar pill.
4        The problems are less difficult in
5  an adverse event if the comparator drug is
6  not expected to cause the adverse event.
7    Q.   If there's evidence that the
8  comparator drug in a study could prevent a
9  particular event, do you agree that that
10  type of a study is harder to interpret
11  than a study involving a drug and a
12  placebo?
13    A.   It depends on the magnitude of that
14  protection.
15    Q.   The dose involved in the VIGOR
16  trial was 50 milligrams?
17    A.   Correct.
18    Q.   That was twice the maximum dose
19  that was approved by the FDA at the time,
20  true?
21    A.   Correct.
22    Q.   And it was twice --
23        MR. TISI:  Well, wait a
24  second.  Can you read that back again?

Page 356

1  Twice the maximum dose or twice the
2  standard dose?
3        MR. GOLDMAN:  I'll get to
4  the standard in a minute.
5        MR. TISI:  Well, can we
6  read the question back?  Are you telling
7  me 50 milligrams was not approved by the
8  FDA?
9        MR. GOLDMAN:  No.  That's
10  not what I'm telling you.
11        MR. TISI:  Then I
12  misunderstood the question.
13        BY MR. GOLDMAN:
14    Q.   Was the 50 milligram dose of Vioxx
15  twice the recommended dose for treatment
16  of OA?
17    A.   That's my recollection.
18    Q.   And was the average duration of use
19  in the VIGOR study nine months?
20    A.   That's correct.
21    Q.   And that was not an approved period
22  of time for chronic use of 50 milligrams,
23  right?
24    A.   That's my recollection, too.

Page 357

1    Q.   In the VIGOR trial, was there a
2  finding that Vioxx significantly reduced
3  the incidence of perforations, ulcers and
4  bleeds?
5    A.   Yes.
6    Q.   Was there also a significant
7  reduction in serious complicated
8  gastrointestinal problems in the Vioxx arm
9  versus Naproxen?
10    A.   Yes.
11    Q.   You agree, sir, that even using
12  twice the chronic dose of Vioxx, there's
13  no doubt that the VIGOR trial showed that
14  from a GI perspective, Vioxx was superior
15  to Naproxen?
16        MR. TISI:  Objection.
17    A.   In patients not taking aspirin,
18  yes.
19    Q.   In your report on Page .10, you
20  indicate that -- in the last paragraph,
21  third sentence, "There was a fivefold
22  increase in cardiac events in the patients
23  given Vioxx."  Do you see that?
24    A.   (Witness viewing document).  I

90 (Pages 354 to 357)

Jerry Avorn, M.D.

Page 358

1   probably should. If I didn't have so much
2   jet lag I would find it. Okay.
3   Q.   Do you see that, sir?
4   A.   (Witness viewing document). Yes.
5   Q.   What cardiac events are you talking
6   about there?
7   A.   All right. Let me just pull the
8   VIGOR paper, so we can have it.
9        MR. TISI: I've got an easy
10  -- If you don't mind me giving it to him.
11       MR. GOLDMAN: No. Please.
12  A.   Okay. They were myocardial
13  infarctions, as I recall.
14  Q.   So the reference that you're
15  referring to here as a five times increase
16  was actually nonfatal heart attacks, right?
17       MR. TISI: Well, actually
18  within a fourfold increase as reported in
19  the arm --
20  A.   Right, which then turned out to be
21  a later -- to be a --
22       MR. GOLDMAN: I'm talking
23  about his report. Stop coaching the
24  witness.

Page 359

1        MR. TISI: No. You're now
2   talking referring to the article, which is
3   different, as you know.
4   A.   In VIGOR, there was a fivefold
5   increase. In the paper, it was a fourfold
6   increase. And they were myocardial
7   infarctions, and I'm just trying to see
8   whether they were characterized as nonfatal
9   or fatal plus nonfatal. But we could
10  speed things up if you want to remind me
11  whether it was fatal alone or not -- I
12  mean, not fatal alone.
13  Q.   That's actually not that important.
14  A.   Okay.
15  Q.   Do you know that there was no
16  difference in sudden cardiac death in the
17  VIGOR trial between Vioxx and Naproxen?
18       MR. GRAND: Objection.
19  A.   That sounds reasonable.
20  Q.   In the abstract of the VIGOR trial,
21  do you see that the relative risk is
22  reported as .2 --
23  A.   Yes.
24  Q.   -- for heart attacks --

Page 360

1   A.   Yes.
2   Q.   -- right? And you understood that
3   .2 is the same thing as one fifth,
4   correct?
5   A.   Yes.
6   Q.   And you understood, from reading
7   the abstract, sir, that therefore there
8   were five times the number of heart
9   attacks in the Naproxen arm -- Withdrawn.
10       You understood, from reading the
11  results here in the abstract, that there
12  were five times the number of heart
13  attacks in the Vioxx arm than in the
14  Naproxen arm, right?
15       MR. TISI: Objection.
16  A.   Right.
17  Q.   During the time that Vioxx was on
18  the market, sir, you never criticized the
19  way that Merck or the non-Merck authors
20  described the data of the VIGOR trial, did
21  you?
22  A.   No. That's not true. In
23  discussing it with residents, other faculty
24  members, medical students before the drug

Page 361

1   was withdrawn, a number of us commented on
2   the unusual way that it was presented as a
3   reduction in the Naproxen arm compared to
4   the -- to an increase in the Vioxx arm.
5   I never wrote a paper saying that, but I
6   certainly made comments about it.
7   Q.   Back at the time that the VIGOR
8   study was published, did you ever, in any
9   of your subsequent articles, say that you
10  felt that the way the data was presented
11  was misleading in the VIGOR trial?
12  A.   Right. No. We commented on the
13  cardiovascular risk of Vioxx in papers,
14  but we never specifically talked about how
15  that was conveyed in the paper.
16  Q.   Did the VIGOR study have a DSMB?
17  A.   Yes.
18  Q.   Do you know what the DSMB believed
19  was causing the difference that they saw
20  in the VIGOR trial?
21  A.   I can't speak to what they
22  believed.
23  Q.   Do you know from reading the
24  documents that the DSMB observed that one

91 (Pages 358 to 361)

Jerry Avorn, M.D.

Page 362

1  drug in Group B was likely
2  cardioprotective as opposed to concluding
3  that Group A drug was harmful to the
4  heart?
5    A.  I can't recall seeing a statement
6  by the DSMB about that.
7    Q.  That wouldn't surprise you if they
8  reached that conclusion, would it, sir?
9        MR. TISI:  Objection.
10   A.  Since I don't know what they wrote,
11  I can't say whether it would or would not
12  have surprised me.
13   Q.  Back in 2000-2001 time frame, sir,
14  did you agree that there were several
15  plausible explanations for the difference
16  in heart attacks seen in the VIGOR trial?
17       MR. TISI:  Objection.
18   A.  In 2000-2001, as I said before, I
19  recall saying to Dr. Sherwood that it
20  seemed implausible to conclude that the
21  obvious explanation was that Naproxen was
22  responsible for the difference in rates.
23   Q.  Did you ever write an article in
24  2000 and 2001 or 2002, where you said that

Page 363

1  it would be an implausible interpretation
2  of the VIGOR trial for one to say that
3  the difference in heart attacks was due to
4  Naproxen?
5    A.  Yes.  I remember writing something,
6  and I can't tell you precisely what year,
7  but it was definitely while Vioxx was
8  still on the market, that said that the
9  rate of cardioprotection that would be
10  required for Naproxen to explain this
11  difference would be so high as to -- I
12  don't remember whether I used the word
13  implausible -- but I remember saying that
14  this is far more than anyone have ever
15  demonstrated, even for aspirin, and that
16  seemed an implausible explanation.
17   I could try to find that citation.
18  But I know I said that in writing during
19  the time the drug was on the market.
20   Q.  Back in 2002, Dr. Avorn, did you
21  believe that the MI difference in the
22  VIGOR trial could have resulted from a
23  protective effect of Naproxen?
24   A.  No.

Page 364

1    Q.  Did you believe that there were
2  three different interpretations of the
3  VIGOR study, if you just look at the VIGOR
4  study alone?  One was that Naproxen was
5  cardioprotective, two was that Vioxx caused
6  heart attacks, and three was both?
7    A.  I think you're referring to a paper
8  that I wrote with Dr. Graham and Dr. Ray
9  and Dr. McDonald and some others that was
10  a symposium that we had of the pharmacoepi
11  meetings.  And in that symposium, we kind
12  of laid out all the possible alternatives.
13   But I would think it would be
14  mischaracterizing it to say that we gave
15  them all equivalent weight.  It was more a
16  matter of saying what could have caused
17  this.  It could have been lower rates with
18  Naproxen, it could have been higher rates
19  with Vioxx, it could have been both.
20   But we then go on to say -- and we
21  can look at the document together if you
22  want -- that to believe that it was the
23  result of Naproxen would require assuming
24  that Naproxen had a cardioprotective effect

Page 365

1  that was unreasonably high and way better
2  than aspirin, which was implausible.
3    Q.  And your testimony is that you've
4  actually taken the position you just
5  stated, that it was implausible to think
6  that Naproxen explained the difference in
7  MIs in the VIGOR study, because for that
8  to be true, Naproxen would have to have a
9  cardioprotective effect that was
10  unreasonably high?
11   A.  Right.  And I think what's
12  important is to understand that in laying
13  out the possible explanations of the data,
14  as I did in that ISPE, I-S-P-E, symposium,
15  and I think on Science Friday on NPR, I
16  stated that there was the possibility that
17  Naproxen was the cause, and that that
18  might have been plausible except for the
19  fact that it would require a rate of
20  cardioprotection for Naproxen that was
21  higher than was seen.
22   Q.  When did you say that in the
23  Science Friday?  And what is Science
24  Friday?

92 (Pages 362 to 365)

Jerry Avorn, M.D.

Page 366

1   A.  It was some radio show.  And so I
2   think --
3   Q.  What station?
4   A.  BUR, here.  And I think a number
5   of us have said, as you just outlined, it
6   might have been the Naproxen, it might
7   have been the Vioxx, it could have been
8   both, but usually that was in the context
9   of -- but that would require assuming --
10  and the second piece is very important --
11  that Naproxen was this wonder drug that
12  prevents heart attacks.
13  Q.  Was it your view, sir, even in
14  2004, that looking at the VIGOR study
15  alone, you could not discern the extent to
16  which the difference in acute myocardial
17  infarctions could be explained by a
18  protective effect of Naproxen or an
19  increased risk with Vioxx?
20  A.  And just help me with -- What was
21  the beginning of the question?  In 2000 --
22  Q.  Mm-hmm.  Four.
23  A.  I'm sorry.  In 2004 did I say --
24  Q.  In 2004, sir, did you believe that

Page 367

1   if you look at the VIGOR study, you could
2   not discern the extent to which the
3   difference in heart attacks could be
4   explained by the protective effect of
5   Naproxen or an increased cardiovascular
6   risk with Vioxx?
7   A.  I don't recall saying that, because
8   in 2003 and in 2002, I had said that
9   Vioxx increases the risk of MI.
10  So I -- If you have a place where
11  I said that, I would love to see it.
12  Q.  Do you recall what paper in 2002
13  you wrote that Vioxx increases the risk of
14  MI?
15  A.  There was that pharmacoepi
16  symposium with Dr. Ray and Dr. Graham, and
17  I could try to dig that out.
18  There was also a paper that I wrote
19  Dr. Solomon, in which I remember we
20  referred to Dr. Ray's Lancet paper.  I
21  think it was -- It was -- There was one
22  in the Archives of Internal Medicine, and
23  we can try to dig that out -- or perhaps
24  you might even have that there -- in which

Page 368

1   I made that statement.
2   Q.  Did you ever conduct an
3   epidemiologic study NSAIDs, including
4   Naproxen, and conclude that the data that
5   you saw was consistent with a possible
6   protective effect of Naproxen?
7   A.  Yes.  A very modest protective
8   effect of about 15 percent.
9   Q.  And did you indicate that you felt
10  that the Naproxen cardioprotection was not
11  enough to explain the difference in heart
12  attacks in VIGOR?
13  A.  Correct.
14  Q.  Did you think, sir, back in the
15  2002 time frame, that Naproxen was
16  associated with a reduced rate of heart
17  attack which was suggested by the VIGOR
18  study?
19  A.  I don't believe --
20  MR. TISI:  Let me just
21  state an objection.  I don't understand
22  the question.  But go ahead, if you can.
23  A.  I don't believe that I ever cited
24  the VIGOR study as evidence for the

Page 369

1   cardioprotective effect of Naproxen.
2   Q.  Did you find, in your epidemiologic
3   study of NSAIDs, that Naproxen was
4   cardioprotective but other NSAIDs were not?
5   A.  Correct.
6   Q.  And what was your conclusion, as
7   best you can recall, sir, after conducting
8   that epidemiologic study concerning the
9   potential cardiovascular effects of Vioxx?
10  MR. TISI:  I have a copy of
11  the study.  Do you want to put it in
12  front of him, or do you want him to do it
13  from memory?
14  MR. GOLDMAN:  Feel free.
15  A.  There were really two studies,
16  while he's looking.
17  Q.  Mm-hmm.
18  A.  The first one was actually related
19  directly to the Vioxx -- the VIGOR
20  findings in that it was an attempt to see
21  whether patients taking Naproxen had a
22  dramatically lower rate of cardiovascular
23  effects, and Dr. Solomon was the first
24  author.  I think that was the one in the