Jerry Avorn, M.D.

Page 370

1 Archives of Internal Medicine.
2         (Witness viewing document). Yeah.
3 Here it is. That was published in May of
4 2002.
5    Q.   Mm-hmm.
6    A.   And we reported a very modest 16
7 percent reduction in the risk of heart
8 attack in users of Naproxen.  And --
9         MR. TISI:  Here's a clean
10 copy.  I mean, this is a clean copy so
11 you don't --
12        THE WITNESS:  Okay.
13        BY MR. GOLDMAN:
14    Q.  Go ahead.
15    A.  All right.  And then in the
16 discussion section of that paper, we said
17 -- in fact, we even cited the Vioxx --
18 the VIGOR study, and we pointed out that
19 in VIGOR, the rates of an AMI at that
20 point we said fourfold higher in patients
21 taking Vioxx.  And again, in the matter
22 that I described a minute ago, we stated
23 that in kind of a logical possibilities,
24 that it could have been that Naproxen

Page 371

1 lowered the risk, Vioxx increased the
2 risk, or both.
3    Q.   Mm-hmm.
4    A.   And then we go on to say, to put
5 this in context, the reductions seen with
6 Naproxen in our study was not compatible
7 with the idea that it was responsible for
8 the difference in the rates in the VIGOR
9 study, because all we found was a 15
10 percent reduction, and you need to have an
11 80 percent reduction to achieve the
12 magnitude of reduction that was seen in
13 VIGOR.
14    Q.   How much of a reduction in -- I'm
15 going to talk about the extent of
16 Naproxen's cardioprotection in a minute.
17 Okay?
18    A.   Mm-hmm.
19    Q.   While Vioxx was on the market, were
20 there reputable scientists who wrote
21 articles saying that Vioxx -- Sorry.
22 Withdrawn.
23        During the time that Vioxx was on
24 the market, sir, were there reputable

Page 372

1 scientists who wrote articles saying that
2 the VIGOR results and the difference in
3 heart attacks could be explained by
4 Naproxen?
5    A.   Yes.
6    Q.   And do you know, sir, that there
7 was actually much controversy in the
8 medical community about whether the VIGOR
9 study could be explained by Naproxen or
10 Vioxx or both, right?
11    A.   Actually, no.  By reputable
12 scientists, I'm thinking of the editorial
13 that accompanied our paper, but it was
14 editorial without actual data of its own.
15        I cannot think a single study with
16 data -- cite a real study based on data
17 that reported evidence that Naproxen was
18 cardioprotective to the extent that would
19 have explained the difference in rates in
20 VIGOR.  So if there were such a study, I
21 would like to see it.  I don't think such
22 studies ever were written.
23    Q.   Do you remember, sir, whether or
24 not reputable scientists expressed their

Page 373

1 opinion in articles, peer- reviewed
2 articles, that they believed that Naproxen
3 could explain the difference in heart
4 attacks seen in the VIGOR trial?
5        MR. TISI:  Objection.
6    A.   I recall that -- I think it was
7 Dr. Dalen, who is the editor of the
8 Archives, wrote an editorial to that
9 effect.  How peer reviewed it was, I don't
10 know, since editorials are sometimes not,
11 and he was the editor who might have peer
12 reviewed himself.
13        So I'm aware of that, and I
14 remember being struck at the time with how
15 it didn't make sense to me that he could
16 argue that.  And I'm -- I can't think of
17 other reputable authors, certainly with any
18 data, that wrote that.  But there may have
19 been such people.
20    Q.   Do you agree, sir, that there was
21 much debate and controversy in the medical
22 community about whether the VIGOR study
23 could be explained?  And what I mean --
24 Withdrawn.

Jerry Avorn, M.D.

Page 374

1    Do you remember a debate in the
2    medical community and controversy about
3    whether the difference in heart attacks
4    seen in the VIGOR study was caused by
5    Vioxx or a cardioprotective effect of
6    Naproxen?
7         MR. TISI: Objection; asked
8    and answered.
9    A.  Well, to tell you the truth, I
10   can't recall any vigorous debate.  I
11   recall most people that I spoke to saying,
12   how can you take a drug with either --
13   with both no evidence from clinical trials
14   that it is cardioprotective, that is
15   Naproxen, and with the only evidence from
16   an epidemiologic study showing a very
17   modest, around 15 percent, reduction, and
18   claim that that explains a four- or
19   fivefold difference in heart attack.
20        So I guess I don't recall that
21   there was all this so-called controversy
22   or debate.
23   Q.  Do you think it was fairly obvious
24   from the VIGOR study alone, sir, that

Page 376

1    VIGOR trial and this increase in heart
2    attacks seen in the Vioxx arm in the lay
3    press?
4    A.  Was there controversy in the lay
5    press?
6    Q.  Mm-hmm.
7    A.  I don't know.
8    Q.  Was there discussion in the lay
9    press in the 2000, 2001, 2002 time frame
10   about the VIGOR trial and whether or not
11   Vioxx causes heart attacks?
12   A.  Yes.  And I know that Merck was
13   putting out a lot of information depicting
14   it as an Naproxen effect, and to the
15   extent that there was quote, controversy,
16   unquote, that would have been the sole
17   source of the controversy, to my
18   knowledge.
19   Q.  Was there a discussion in the lay
20   press, such as the New York Times and Wall
21   Street Journal, in the 2000 and 2002 time
22   frame, about whether Vioxx causes heart
23   attacks?
24   A.  Yes.

Page 375

1    Naproxen could not account for the
2    difference in heart attacks?
3         MR. TISI: Objection to
4    form.
5    A.  I think it was fairly obvious from
6    the absence of any corroborating evidence
7    of any kind on the planet that Naproxen
8    was a majorly-cardioprotective drug.
9    Q.  So it's your testimony that it was
10   obvious, by reading the VIGOR study, that
11   Vioxx was harmful to the heart and
12   explained the difference in heart attacks
13   in that study, as opposed to Naproxen
14   being cardioprotective?
15        MR. TISI: Objection.
16   A.  No.  That is not -- That is not
17   what I said.
18        What I said was, the data in VIGOR,
19   combined with the absence of any evidence
20   that Naproxen was cardioprotective to that
21   extent, in combination, made the contention
22   that this is all about Naproxen
23   implausible.
24   Q.  Was there discussion about the

Page 377

1    Q.  Do you know that there was an
2    advisory committee meeting held in February
3    of 2001 to investigate the question about
4    what explained the difference in heart
5    attacks in the VIGOR trial?
6    A.  Yes.
7         MR. TISI: Objection.
8    Mischaracterizes the scope.
9         BY MR. GOLDMAN:
10   Q.  Did you participate in the advisory
11   committee in February of 2001?
12   A.  No.
13   Q.  Were you invited to participate?
14   A.  No.
15   Q.  Are you aware that respected
16   doctors came to advise the FDA and review
17   the literature to make a recommendation
18   about what should be said about the VIGOR
19   trial?
20   A.  To advise the FDA about what should
21   be said about the VIGOR --
22        MR. GRAND: Objection.
23        MR. TISI: Objection;
24   misstates.

95 (Pages 374 to 377)

Jerry Avorn, M.D.

Page 378

1      BY MR. GOLDMAN:
2      Q.  Do you agree there were respected
3   scientists and doctors who participated in
4   the advisory committee meeting in February
5   of 2001?
6      A.  Yes.
7      Q.  Have you reviewed the transcript
8   and the conclusion -- Withdrawn.
9          Have you reviewed the transcript
10   from the 2001 advisory committee meeting?
11      A.  Yes.  I know that I've --
12   transcript.  Yes.
13      Q.  Do you know what the advisory
14   committee suggested to the FDA about what
15   to do in response to the VIGOR trial?
16          MR. GRAND:  Objection.
17      A.  I don't recall off the top of my
18   head.
19      Q.  Do you remember what the advisory
20   committee suggested about what Merck should
21   put in the package insert for Vioxx to
22   describe the VIGOR trial?
23      A.  Yes.  I remember --
24          MR. GRAND:  Objection.

Page 379

1      A.  I remember that at the advisory
2   committee there was discussion about the
3   fact that it would be inappropriate to
4   depict the results of VIGOR as being
5   primarily a protective effect of Naproxen.
6   I remember some folks said that.  I don't
7   think Dr. Nissen was one of the people
8   that made that statement.
9      Q.  In fact, the conclusion of the
10   advisory committee was that it's unknown
11   whether Vioxx causes·heart attacks,
12   Naproxen prevents them, or a combination
13   of both, when interpreting the VIGOR
14   trial, right?
15          MR. TISI:  Objection;
16   mischaracterizes.
17      A.  If you would like me to respond to
18   that, I would need to look at the exact
19   statement.
20      Q.  There's no reason to think that the
21   advisory committee in February of 2001 was
22   biased in favor of Merck, was there, sir?
23      A.  Not to my knowledge.
24      Q.  You point out that·in 2005, an

Page 380

1   advisory committee voted that Vioxx causes
2   heart attacks.  Do you remember that?
3      A.  Yes.
4      Q.  How many members of the advisory
5   committee in 2005 voted that Vioxx could
6   potentially come back in the market?
7          MR. GRAND:  Objection.
8          MR. TISI:  Objection.
9      A.  I'd need to look at the numbers.
10   I don't have that in my head.
11          But -- But I think the important
12   point there is that virtually none of them
13   said it should come back on the market as
14   it was before, and those who said it
15   should, in general, said that it should
16   come back only with either informed
17   consent by the patient, or a big black box
18   warning, or use in restricted populations.
19   And essentially none of them said yeah,
20   just bring it back like it was.  They all
21   had major caveats.
22      Q.  You don't remember what the vote
23   was about whether or not Vioxx could be
24   brought back on the market when the

Page 381

1   advisory committee met in 2005?
2      A.  I remember that virtually none of
3   them said it should come back without
4   major precautions.
5      Q.  Back in 2001, sir, did you read an
6   article that was published by Dr.
7   Mukherjee and Dr. Topol in JAMA?
8      A.  Yes.
9      Q.  Have you cited that article in
10   several of your own?
11      A.  I don't remember.
12      Q.  Did you think that Dr. Topol and
13   Dr. Mukherjee did an acceptable analysis
14   of the data that existed back at the time
15   concerning VIGOR?
16      A.  I believe they did.
17      Q.  Isn't it true, sir, there were many
18   scientists, actually, who questioned the
19   findings of Dr. Topol and Dr. Mukherjee
20   because the rates of acute myocardial
21   infarction from the aspirin studies that
22   Dr. Topol was looking, at were
23   exceptionally low?
24          MR. GRAND:  Objection.

Jerry Avorn, M.D.

Page 382

```
1              MR. TISI:  I think there's
2   a third author, as well, just to be clear
3   on the record.
4       A.  Okay.  I don't recall that.
5       Q.  Did you ever believe that the acute
6   myocardial infarction rates that were used
7   to compare Vioxx and Celebrex in the Topol
8   article were exceptionally low?
9       A.  I can't recall what I believed in
10  2001 about that.
11      Q.  In 2002, Dr. Avorn, were there four
12  studies that were published examining
13  whether Naproxen was cardioprotective?
14      A.  Well, I know that we published one
15  and -- I mean observational studies?
16      Q.  Yes.
17      A.  I know we published one, and there
18  were several others around that time.
19      Q.  Do you remember that three of the
20  four observational studies that were
21  published in 2002 showed that Naproxen
22  decreased heart attacks by 17 to 39
23  percent versus traditional NSAIDs?
24      A.  Well, ours was -- didn't even, I
```

Page 383

```
1   don't think, reach 17 percent, so I don't
2   know where that lower bound came from.
3   Ours was 16 percent.  And I don't -- And
4   I know that there were a number of studies
5   that found a very small cardioprotective
6   effect.  I don't remember a number as high
7   as 30 something percent, but it's
8   conceivable.  I would like to see that
9   paper before commenting on it.
10      Q.  Or papers, you mean?
11      A.  Well, yeah.  You're talking about
12  the upper bound of 30 something percent.
13      Q.  But you don't remember, as you sit
14  here today, whether there was a study
15  published by Dr. Watson in 2002 reporting
16  that Naproxen has a 39 percent reduction
17  in heart attacks?
18          MR. TISI:  Objection.
19      A.  That was Dr. Watson of Merck?
20      Q.  No.
21      A.  A different Dr. Watson.
22      Q.  I believe so.
23      A.  Okay.  I would like to see such a
24  study.
```

Page 384

```
1       Q.  Okay.  Maybe we'll look at it
2   later.
3           Did you talk -- Withdrawn.
4           In your epidemiologic study where
5   you said that there was a 16 percent
6   cardioprotective effect of Naproxen, did
7   you control for the dose that was used by
8   the population you studied?
9           MR. TISI:  Dose of?
10          MR. GOLDMAN:  Naproxen.
11          MR. TISI:  Naproxen.
12      A.  As I recall, it was an exposed, not
13  exposed analysis, rather than looking at
14  doses.
15      Q.  So in your study, when you
16  concluded that Naproxen had a 16 percent
17  cardioprotective effect, you were not
18  looking at patients who took Naproxen 500
19  milligrams twice a day, true?
20      A.  We were looking at the dose as it
21  was used in the population.
22      Q.  Is my statement true?
23      A.  There were people probably on that
24  dose, and there were people on other
```

Page 385

```
1   doses, too.  I'm trying to see whether we
2   specified the dose.
3           (Witness viewing document).  We did
4   control for dose in that we looked at the
5   potential -- the percent of maximum
6   anti-inflammatory dosage in Table 2, and
7   I'm just -- in an observational study, you
8   just study the doses as they were used.
9   And there were -- there were people on all
10  kinds of doses.
11      Q.  And my only point, Dr. Avorn, is
12  that when you analyzed Naproxen in your
13  epidemiologic study, you were not focused
14  solely on Naproxen 500 milligrams twice a
15  day, which was the dose that was used in
16  the VIGOR study, correct?
17          MR. GRAND:  Objection.
18          MR. TISI:  Objection.
19      A.  We focused on all the doses that
20  were -- that were being used.  There were
21  some people on that dose and there were
22  people on other doses.  We did not
23  distinguish between doses, and we did not
24  limit it to only one dose.
```

97 (Pages 382 to 385)

Jerry Avorn, M.D.

Page 386

1   Q.  You never studied a subgroup of the
2   patients who you observed in your
3   epidemiologic study to see of those
4   patients who took 500 milligrams of
5   Naproxen twice a day how much
6   cardioprotection did they get, right?
7   A.  Correct.
8   Q.  And you've never studied 500
9   milligrams of Naproxen twice a day to
10  determine the amount of cardioprotection it
11  affords, right?
12  A.  I'm trying to recall whether in our
13  most recent work, the paper that -- Well,
14  you said never.
15  Q.  Okay.
16  A.  The paper that Dr. Solomon and I
17  published in Arthritis and Rheumatism just
18  a month or two ago, I know we looked at
19  dose, and so I'd want to look at that
20  paper before saying never.
21  Q.  While Vioxx was on the market, Dr.
22  Avorn, did you ever publish any article
23  where you studied the cardioprotective
24  effect of Naproxen 500 milligrams twice a

Page 387

1   day?
2   A.  Not specifically.
3   Q.  In your study with Dr. Solomon in
4   2002, am I right that you couldn't control
5   for whether or not the patients who you
6   were studying took Naproxen every day?
7   A.  Correct.
8   Q.  Are you familiar with a study by
9   Van Hencken?
10  A.  The name doesn't ring a bell,
11  initially.
12  Q.  How about Tuleja?  Ever read a
13  study by him?
14  A.  Also does not ring a bell.
15  Q.  Is it true, sir, that the weight of
16  the evidence and the general pattern of
17  data subjects that Naproxen is good for
18  the heart?
19         MR. TISI:  Objection.
20  A.  I think a fairer way to say it is
21  that there are a number of studies which
22  depict, in general, a very modest
23  cardioprotective effect, and then there are
24  other studies which do not demonstrate

Page 388

1   that effect, and there are some studies,
2   such as Dr. Graham's, that even indicate
3   an increased risk.  I think that's the
4   fairest way of describing the data.
5   Q.  Do you deny that the weight of the
6   evidence and the general pattern of data
7   suggests that Naproxen is good for the
8   heart?
9         MR. GRAND:  Objection.
10         MR. TISI:  Objection to the
11  phrase "good for the heart."
12  A.  I think I would -- I think I would
13  deny that, because it's a simplification
14  of the data.
15  Q.  Is Naproxen good for the heart?
16  A.  Not if by that you mean should you
17  take it to help your heart, no.  Would I
18  recommend Naproxen to somebody to help
19  their heart?  No.
20  Q.  Is it true that aspirin reduces the
21  risk of heart attacks to even a greater
22  extent in high risk patients?
23  A.  Yes.
24  Q.  Do you know, sir, is that there are

Page 389

1   multiple studies showing that aspirin can
2   be 50 to 60 percent cardioprotective in
3   high risk populations?
4   A.  That's a slightly higher number
5   than I'm aware of.  I think of more 25 to
6   45 percent.  But there could be such
7   studies.  I don't know.
8   Q.  Have you ever calculated, Dr.
9   Avorn, how much of a cardioprotective
10  effect Naproxen 500 milligrams a day
11  would need to have in order to make the
12  difference in heart attacks in the VIGOR
13  study not statistically significant?
14  A.  No.
15  Q.  During the time that Vioxx was on
16  the market, sir, were there reputable
17  scientists who said that Vioxx and COX-2
18  inhibitors in general could protect the
19  heart?
20         MR. TISI:  Objection.
21  A.  I'm not aware of that, but there
22  could have been.
23  Q.  Were you aware of any articles
24  published by reputable scientists while

98 (Pages 386 to 389)

Jerry Avorn, M.D.

Page 390

1   Vioxx was on the market which said that
2   Vioxx's anti-inflammatory properties might
3   actually slow down the progression of
4   arthrosclerosis and help stabilize plaque?
5   A.  Yes.
6   Q.  And that was a theory that actually
7   scientists were suggesting during the
8   entire time Vioxx was on the market, true?
9   A.  Right.
10  Q.  Did you subscribe to that theory?
11  A.  No.
12  Q.  Is it true, sir, that through the
13  third quarter of 2004, scientists were
14  saying that the COX-2 inhibitors might
15  prevent heart attacks?
16  A.  I don't recall seeing such papers.
17  Q.  Have you ever read a study about
18  Flurbiprofen, F-L-U-R-B-I-P-R-O-F-E-N?
19  A.  Yes.  I have seen studies of
20  flurbiprofen.
21      MR. TISI:  Can we go off
22  the record?
23      (Off the record at 5:07 p.m.)
24      (Discussion off the record).

Page 391

1       (On the record at 5:07 p.m.)
2       BY MR. GOLDMAN:
3   Q.  Do you know, sir, that in the
4   clinical study for Flurbiprofen there was
5   a cardioprotective effect that was similar
6   to the difference seen in the VIGOR trial
7   for heart attacks?
8   A.  I know there has been data on the
9   cardioprotective effect of Flurbiprofen,
10  and I don't recall the magnitude of that
11  effect.
12  Q.  During the time that Vioxx was on
13  the market, sir, were you aware of any
14  article or study suggesting that Vioxx
15  could cause plaque formation?
16  A.  Could cause plaque formation.
17  Cause plaque formation, no.
18  Q.  Are you aware of any article or
19  study during the time Vioxx was on the
20  market that suggested that Vioxx could
21  accelerate arthrosclerosis?
22  A.  There was the concern about
23  destabilizing plaque, which is a
24  manifestation of arthrosclerosis.

Page 392

1   Q.  I want to talk about destabilizing
2   plaque in a minute.
3   A.  Okay.
4       MR. GRAND:  Clarify what
5   type of study you mean.
6       BY MR. GOLDMAN:
7   Q.  Were there any articles or studies
8   published during the time that Vioxx was
9   on the market suggesting that Vioxx
10  accelerates the progression of
11  arthrosclerosis?
12      MR. TISI:  Objection.
13  A.  I'm not aware of any.
14  Q.  You mentioned plaque stability.  We
15  talked a minute ago about how there were
16  articles written by scientists while Vioxx
17  was on the market saying that Vioxx's
18  anti-inflammatory properties could actually
19  help stabilize plaque, right?
20  A.  Right.
21  Q.  And you're not aware of any article
22  or study that was written at the time
23  Vioxx was on the market suggesting that
24  Vioxx could cause plaque rupture, true?

Page 393

1   A.  I should say that my expertise is
2   not about clinical pharmacology papers --
3   Q.  Mm-hmm.
4   A.  -- and so whether I know or don't
5   know about a study isn't -- a clinical
6   pharmacology study isn't terribly
7   important.
8   Q.  Well --
9   A.  But I don't -- I focus more on
10  clinical events in humans.
11  Q.  Well, were there any studies in
12  humans, that you were aware of, sir, while
13  Vioxx was on the market suggesting that
14  Vioxx causes plaque rupture?
15  A.  I just don't know.
16  Q.  You've certainly never written, in
17  any of your articles, that you think Vioxx
18  causes arthrosclerosis or accelerates it,
19  right?  True?
20  A.  Right.
21  Q.  You may have answered this before,
22  and I apologize if you did.  At what
23  point, when Vioxx was on the market, do
24  you believe it was clear that Vioxx causes

99 (Pages 390 to 393)

Jerry Avorn, M.D.

Page 394

1  heart attacks?
2       MR. TISI:  Objection.  Asked
3  and answered, several times, actually.
4    A.  But to say it again, because it's
5  important, in -- I believe it was March of
6  2000 when the -- when the first data for
7  VIGOR became available.  For me, that was
8  a point at which it became clear that it
9  -- the drug increased the risk of heart
10 attack.
11   Q.  Were there still questions about
12 whether Vioxx causes heart attacks as late
13 as December of 2003, in the medical
14 literature?
15   A.  I'm sure there were people up until
16 the day the drug was withdrawn that were
17 writing articles questioning the risks of
18 Vioxx.  I would not be surprised if -- In
19 fact, I know that scientists at Merck to
20 this day claim that Vioxx is safe in the
21 first 18 months.  So we've been hearing
22 this, and we'll continue to hear it,
23 probably until 2008.
24   Q.  Hopefully we won't be talking about

Page 395

1  it then.
2       Were there still questions about
3  whether Vioxx causes heart attacks as late
4  as December of 2003, sir?
5    A.  When you say were there questions,
6  there were -- there may have been people
7  expressing doubt in the literature, but
8  there are people who are expressing doubt
9  about whether the theory of evolution is
10 correct.  I don't think there was doubt in
11 my mind.
12   Q.  On Page .12 of your report, sir,
13 you talk about a draft -- Withdrawn.
14      On Page .12 you mention that a
15 co-author of the VIGOR study suggested in
16 a draft that the study should report that
17 GI benefits should be balanced against the
18 risk of heart attack.
19   A.  Can you show me where -- where on
20 the page?
21   Q.  Okay.  The first paragraph, the
22 last sentence.
23      MR. TISI:  Page -- I'm
24 sorry, what page?

Page 396

1       MR. GOLDMAN:  Page .12.
2    A.  (Witness viewing document).  Right.
3    Q.  Is it your testimony, sir, that
4  there was a co-author of the VIGOR study
5  who thought that the study should say that
6  the GI benefits of Vioxx should be
7  balanced against the risks of heart
8  attacks?
9    A.  That was my understanding from
10 reviewing that draft, yes.
11   Q.  Why did you reference the draft and
12 the fact that the VIGOR study ultimately
13 did not include that statement?
14   A.  Because there has been a lot of
15 concern about whether the VIGOR paper had
16 been massaged over its development to
17 depict the risks of Vioxx in a way than
18 was more favorable to the drug than would
19 be fair, and that this, along with all the
20 other instances that we can talk about,
21 such as attributing it to -- the heart
22 attack rate to the Naproxen,
23 cardioprotection, this was another example
24 of that kind of spin.

Page 397

1       And because, it turns out, that it
2  is vitally important that the drug's GI
3  benefits should have been balanced against
4  the risk of MIs, because the drug would
5  not have come out looking as well in that
6  balance.
7    Q.  But in your analysis here, sir,
8  about this issue about a draft of the
9  VIGOR article, what you're doing is
10 comparing a draft to what ultimately was
11 printed by the New England Journal of
12 Medicine, right?
13   A.  Correct.
14   Q.  That doesn't take any expertise,
15 does it, sir?
16      MR. TISI:  Objection.
17   A.  Oh, it sure does.  To be able to
18 speak about what was removed from the
19 article, from its original version, to
20 what was finally submitted, and when that
21 deals with the central issue of risk about
22 the drug, and whether this is a very
23 important omission, as it is, does require
24 expertise.

Jerry Avorn, M.D.

Page 398

1  Q.  Does it require expertise to look
2  at a draft of the VIGOR study and compare
3  it to the final study to see if a
4  sentence was deleted?
5  A.  Absolutely.  When that sentence
6  deals with the balancing of risks and
7  benefits, and that sentence is deleted in
8  a way so as to minimize the risk of the
9  drug, that is an important piece of the
10  story.
11  Q.  My question was:  Does it require
12  expertise to look at a draft of the VIGOR
13  study, compare it to the final study that
14  was published to see if a sentence was
15  deleted?
16  A.  Well, to understand the importance
17  of that deletion it does, yes.
18  Q.  You don't think a juror on their
19  own could understand the importance of
20  that deletion without your assistance?
21      MR. GRAND:  Objection.
22      MR. TISI:  Objection.  You
23  don't have to get in the mind of the
24  juror or the judge in making that

Page 399

1  decision, Dr. Avorn.
2  A.  I think that looking how a paper is
3  selectively spun from draft to draft so as
4  to maximize the depiction of benefit and
5  minimize the depiction of risk is vitally
6  important and does need to be interpreted
7  and put into context.
8  Q.  Why do you discuss the expression
9  of concern that the New England --
10  A.  Can you tell me where you're
11  referring to?
12  Q.  The third paragraph.
13  A.  Yes.
14  Q.  Why do you discuss the expression
15  of concern that was issued by the New
16  England Journal of Medicine?
17  A.  Because it dealt specifically with
18  my area of expertise, which is the
19  analysis of risk and of adverse events
20  caused by a drug, and because it was a
21  relatively extraordinary step taken by the
22  Journal which, in my memory is hardly ever
23  done, for them to indicate that the
24  depiction of risk of a drug in one of

Page 400

1  their papers was misleading.
2  Q.  Do you think that the expression of
3  concern and the response by the authors of
4  the VIGOR study and then the New England
5  Journal of Medicine's reply speak for
6  themselves?
7  A.  No.  Because a juror would not
8  understand that this is an extraordinary
9  statement unless they read the New England
10  Journal every week, which most jurors
11  don't.
12      For a journal to publicly criticize
13  authors of a paper of distorting risk
14  data, a typical juror would not understand
15  how unusual that is and how important it
16  is.
17  Q.  You don't think a juror would
18  understand the importance of allegedly
19  distorting data to the New England Journal
20  of Medicine?
21      MR. GRAND:  Objection.
22      MR. TISI:  Objection.  Asked
23  and answered.  He's given you an answer.
24  He's given you an answer.  You don't like

Page 401

1  it, but it's the answer.
2  A.  I think a typical juror would have
3  no way of knowing whether -- just like the
4  New York Times publishes corrections every
5  day, whether perhaps the New England
6  Journal publishes expressions of concern
7  every day, every week.
8  Q.  Do you know that Dr. Curfman has
9  given a deposition twice in this case?
10  A.  Yes.
11      MR. TISI:  Objection.  Asked
12  and answered.
13      BY MR. GOLDMAN:
14  Q.  Dr. Curfman knows a lot more about
15  the circumstances, as he sees them,
16  concerning the expression of concern than
17  you do, right?
18  A.  Yes.
19  Q.  And Dr. Curfman is capable of
20  explaining why the New England Journal
21  issued the expression of concern and how
22  rare or not that is, right?
23      MR. TISI:  Objection.
24  A.  Yes.

101 (Pages 398 to 401)

Jerry Avorn, M.D.

Page 402

1  Q.  Are you critical of Merck and the
2  non-Merck authors' decision not to inform
3  the New England Journal of Medicine of the
4  additional three heart attacks that
5  occurred after the prespecified cutoff?
6          MR. TISI:  Objection.
7  Assumes facts not in evidence.
8  A.  Yes, I am.
9  Q.  Did Merck inform the FDA in October
10  of 2000 about the additional three heart
11  attacks?
12  A.  Yes, they did.
13  Q.  Were the additional three heart
14  attacks, sir, included in the analysis
15  that the Food and Drug Administration did
16  in anticipation of the February 2001 Ad
17  Com?
18  A.  Yes, they were.
19  Q.  Were the Ad Com members who
20  participated in the 2001 Ad Com privy to
21  the fact that there were 20 heart attacks
22  in the Vioxx arm and four heart attacks in
23  the Naproxen arm of the VIGOR study?
24          MR. TISI:  Just for the

Page 403

1  record, Ad Com is advisory committee.  New
2  lingo for me.  Go ahead.
3  A.  They were aware of the data.  I
4  don't have the data in my memory.  But
5  that sounds right.
6  Q.  And it wasn't a secret that there
7  were 20 heart attacks in the Vioxx arm and
8  four heart attacks in the Naproxen arm,
9  because that was information that Dr.
10  Topol talked about in his article in
11  August of 2001, right?
12          MR. TISI:  Objection.
13  A.  It was a secret from the readers of
14  the New England Journal of Medicine, which
15  is the most influential medical journal in
16  the world.  So in that sense, it was a,
17  quote, secret.
18  Q.  Do you think that the authors of
19  the VIGOR study intentionally withheld
20  these three heart attacks so as to
21  downplay any potential cardiovascular risks
22  of Vioxx?
23  A.  I can't speak to the intention of
24  the authors.

Page 404

1  Q.  Do you agree, sir, that the
2  difference in heart attacks in the VIGOR
3  study was statistically significant based
4  on the 17 number that was reported to the
5  New England Journal?
6  A.  Yes.
7  Q.  And it remains statistically
8  significant when the true number was 20,
9  if you count the additional three heart
10  attacks, right?
11          MR. GRAND:  Objection;
12  misstates.
13  A.  But it was more -- It was -- It
14  was a greater difference than it was a
15  more significant difference.
16  Q.  Was the -- Is it your testimony,
17  sir, that the additional three heart
18  attacks in the VIGOR study is -- makes the
19  statistical significance of the difference
20  between Vioxx and Naproxen even greater?
21  A.  We would need to go back and look
22  at the P values for the different versions
23  of it, but the magnitude of the difference
24  was certainly greater.

Page 405

1  Q.  Well, in terms of evaluating the
2  statistical significance of 20 heart
3  attacks in Vioxx and four heart attacks in
4  Naproxen versus 17 heart attacks in Vioxx
5  and four in Naproxen, there really isn't
6  any real difference in terms of the P
7  value, right?
8          MR. GRAND:  Objection.
9          MR. TISI:  Objection.
10  A.  There are three people who had
11  heart attacks, and if you've ever known
12  anyone who had a heart attack, that's an
13  important clinical event, and the magnitude
14  of the difference was --
15  Q.  Did the relative risk change much,
16  if you look at the additional three heart
17  attacks?
18  A.  My impression was that it went up a
19  bit, yes.
20  Q.  You talk about a table that was not
21  included in the final manuscript for the
22  VIGOR article.  Do you remember that?
23  A.  Right.
24  Q.  Have you ever seen that table?

102 (Pages 402 to 405)

Jerry Avorn, M.D.

Page 406

1    A.  I believe I saw it in one of the
2   earlier -- I saw the headings for it, at
3   least, in the -- in the earlier draft.
4    Q.  Have you ever evaluated what was in
5   that table?
6    A.  I'm aware that the information from
7   it was for the most part representative of
8   the text in the later versions, but
9   there's an important difference, I think,
10  in whether something is a number in a text
11  versus numbers in a table.  I think tables
12  are much more salient.
13   Q.  Was there any substantive
14  information, sir, that was in the table in
15  -- that was not included in the VIGOR
16  publication --
17   A.  As I --
18   Q.  -- that was not in the text?
19   A.  As I understand it, nearly all of
20  the table data were in the text.  But as
21  I recall, there was maybe one or two
22  numbers -- but sitting here I can't
23  remember what they were -- that didn't
24  make it in the text.

Page 407

1    Q.  Do you know that the New England
2   Journal of Medicine limits the number of
3   tables you can include in an article?
4    A.  Yes.
5    Q.  Did you know that the peer
6   reviewers for the VIGOR publication told
7   the authors of the VIGOR publication that
8   they could only include five tables?
9         MR. TISI:  Objection.
10        MR. GRAND:  Objection.
11  Misstates the evidence.
12   A.  Usually that's not what a peer
13  reviewer would say.
14   Q.  Do you know whether a peer -- Well,
15  withdrawn.
16        Have you reviewed the comments by
17  all the peer reviewers of the VIGOR trial?
18   A.  I believe I've seen peer reviewers'
19  comments.  I can't say whether I've seen
20  every one of them.
21   Q.  Do you remember reading any
22  comments by a peer reviewer who asked
23  Merck to have only five tables in the
24  study?

Page 408

1         MR. TISI:  Objection.
2    A.  It's interesting that you describe
3   it as "asked Merck," because ostensively
4   this was a paper written by Dr.
5   Bombardier, but we all know that it was
6   really about asking Merck, and I don't
7   recall that specific request by a peer
8   reviewer.
9         MR. GOLDMAN:  Move to strike
10  as nonresponsive.  I'm going to ask the
11  question again.
12        BY MR. GOLDMAN:
13   Q.  Do you remember whether the New
14  England Journal of Medicine asked the
15  authors of the VIGOR study to include five
16  tables for the VIGOR publication?
17   A.  I know that they will occasionally
18  say there are too many tables.  They will
19  often say limit it to X number, but leave
20  it up to the authors as to what is
21  included in the table and what isn't.
22   Q.  But you don't know the
23  circumstances about what the peer reviewer
24  said or didn't say about the number of

Page 409

1   tables that Dr. Bombardier should include
2   in his article?
3    A.  Her article.
4    Q.  Her article.
5    A.  Correct.
6    Q.  Are you aware, sir, that the New
7   England Journal of Medicine hired a public
8   relations firm to advise it on how to deal
9   with the VIGOR study?
10        MR. TISI:  Objection.  Time
11  frame.
12   A.  Do you mean recently in relation to
13  the current controversies --
14   Q.  Before --
15   A.  -- or back in 2000?
16   Q.  Before the New England Journal of
17  Medicine issued its expression of concern,
18  were you aware that they had hired a PR
19  company to advise it on how to deal with
20  the VIGOR study?
21   A.  I was aware that they have a PR
22  firm.
23   Q.  Did you know that the PR firm
24  advised the New England Journal of

103 (Pages 406 to 409)

Jerry Avorn, M.D.

Page 410

1  Medicine on when they should release the
2  expression of concern?
3    A.  I'm aware of that.
4    Q.  Do you know that the New England
5  Journal of Medicine released the expression
6  of concern the night before the jury in
7  the federal -- the first federal case
8  started deliberating?
9    A.  I'm aware of that.
10   Q.  Do you think that was appropriate,
11 sir?
12   A.  My understanding was that there was
13 concern that other information was going
14 to be released -- and again, I have not
15 followed this closely -- about this issue,
16 and they wanted to make sure that if other
17 information was released, their position
18 was out there at the same time.
19   Q.  Do you think it was appropriate for
20 the New England Journal of Medicine to
21 issue an expression of concern the night
22 before a jury started deliberating in the
23 first federal Vioxx trial?
24       MR. TISI:  Objection.

Page 411

1  Irrelevant.  But you may answer.
2    A.  It depends whether they were
3  issuing it in relation to the jury's
4  deliberation timing, or in relation to
5  other evidence coming out that they wanted
6  to get their position out about.  And I
7  can't know whether it was about the former
8  or the latter for the timing.
9    Q.  Do you know whether the ten
10 non-Merck authors on the VIGOR study
11 agreed with the New England Journal of
12 Medicine's criticisms of the VIGOR study?
13   A.  I know that in their response to
14 the expression of concern, they defended
15 what they had done.
16   Q.  Did you disagree with their
17 position?
18   A.  Yes.
19   Q.  In its entirety?
20   A.  There may have been things that
21 they said that they -- that I would not
22 disagree with.
23       What I specifically disagreed with
24 is that if adverse events come to light

Page 412

1  that an author is aware of, that there is
2  a responsibility to make sure that that is
3  included as fully as possible in the
4  paper, especially if the paper has still
5  not gone to press.
6    Q.  Did you know, prior to withdrawal,
7  that the VIGOR publication reported 17
8  heart attacks in the Vioxx arm, but that
9  there were really 20 in the VIGOR trial?
10       MR. TISI:  Objection.
11   A.  Did I know that prior to
12 withdrawal?
13   Q.  Yes.
14   A.  I don't see how I could have.  You
15 mean by virtue of going back to the FDA
16 Web site?
17   Q.  (Counsel nodded).
18   A.  No.  Most doctors are not -- or
19 even experts -- are not going to go back
20 and double-check numbers on the FDA Web
21 site that they've read in a Journal
22 article.
23   Q.  My question was whether you were
24 aware, prior to withdrawal, that there

Page 413

1  were actually 20 heart attacks in the
2  Vioxx arm and not 17.
3    A.  No.
4    Q.  Were you aware, prior to
5  withdrawal, that there was a five times
6  difference in heart attacks between the
7  Vioxx arm and the Naproxen arm?
8    A.  I think in the publication itself,
9  the relative risk of .2 would be a
10 fivefold difference.
11   Q.  You reference Dr. Scolnick's March
12 9th, 2000, e-mail --
13   A.  Yes.
14   Q.  -- on Page .12.  Why do you
15 reference that, sir?
16   A.  Because the company has taken the
17 position that it was unaware that the drug
18 imposed cardiovascular risk, and that the
19 findings from VIGOR, and later from
20 APPROVe, were surprising to them in that
21 they did not believe that their drug was
22 dangerous to the heart.
23       And it seemed relevant that Dr.
24 Scolnick, as early as March of 2000, wrote

104 (Pages 410 to 413)

Jerry Avorn, M.D.

Page 414

1  the cardiovascular events are clearly
2  there, this is real, and it is
3  mechanism-based as we worried it was,
4  which conveys a concern that the company
5  had had about the cardiovascular risk of
6  the drug even before the VIGOR study was
7  completed.
8      And then going on about Oates and
9  Allen and Barry who write about the
10 metabolite meanings, that is, indicating
11 that the prostaglandin findings were
12 important to the riskiness of the drug.
13 Q.  Is it your position, sir, that it's
14 obvious from the March 9, 2000, e-mail
15 from Dr. Scolnick, that he believed that
16 Vioxx caused heart attacks, and that he
17 and others at Merck were worried that that
18 would happen?
19 A.  Okay.
20     MR. TISI:  At that point in
21 time?  Are you asking what his state of
22 mind is now, or what his state of mind
23 was then?
24     MR. GOLDMAN:  Then.

Page 415

1  A.  Okay.  This is an important point
2  that has come up a number of times, and
3  I'll try to explain it again.
4      Whether or not Dr. Scolnick and the
5  others at Merck believed that more
6  patients given Vioxx in VIGOR would have
7  heart attacks than patients in VIGOR given
8  other drugs, does not require that they
9  have believed that their drug caused heart
10 attacks or whether they believed that the
11 reason was that other drugs prevented
12 heart attacks.
13     The important point is, that if the
14 company was going to go on and spend a
15 hundred million dollars a year to convince
16 patients to take Vioxx, and many millions
17 of dollars more to convince doctors to
18 prescribe Vioxx, instead of Naproxen or
19 other drugs, that the clear result of that
20 would be that patients who were switched
21 to Vioxx, even if they just believed that
22 Naproxen was preventing heart attacks, that
23 they knew that use of Vioxx would result
24 in a net increase in the number of heart

Page 416

1  attacks in patients taking Vioxx instead
2  of taking another drug.
3      And it does not matter as much
4  whether they attributed that to a
5  prothrombotic effect of Vioxx or even if
6  they believed there was an antithrombotic
7  effect of Naproxen.  The net result would
8  obviously be that people who were taking
9  Naproxen and were then persuaded by Merck
10 to take Vioxx or their doctors were
11 persuaded to prescribe Vioxx, would have
12 more heart attacks as a result of that
13 switch.
14 Q.  Did you just say that -- to try to
15 summarize -- that you believe Merck
16 expected there to be more heart attacks if
17 they switched or attempted to switch
18 patients from Naproxen to Vioxx?
19 A.  In clinical practice, yes.
20 Q.  Do you know that the patients who
21 are at risk of heart attacks were
22 encouraged to be on aspirin?
23 A.  By whom?
24 Q.  By their doctors.

Page 417

1      MR. TISI:  In what?  Where.
2  A.  What patients?
3  Q.  Well --
4      MR. TISI:  VIGOR clinical
5  practice?
6      BY MR. GOLDMAN:
7  Q.  Do you know that Merck never took
8  the position that Vioxx was a substitute
9  for aspirin in terms of protecting the
10 heart?
11 A.  I've -- I've seen them say that
12 after VIGOR came out.  I don't recall
13 seeing that before.
14 Q.  When you say the important point is
15 not whether Merck believed that Vioxx
16 caused heart attacks or whether Naproxen
17 prevented heart attacks, the important
18 point is that the net results would mean
19 that there would be more heart attacks in
20 people taking Naproxen --
21 A.  In people taking Vioxx.
22 Q.  Sorry.  Let me start over.
23 A.  Okay.
24 Q.  When you say that the important

Jerry Avorn, M.D.

Page 418

1  thing is not whether Merck believed that
2  Vioxx caused heart attacks or Naproxen
3  prevented them but rather there would be
4  more heart attacks when people take Vioxx,
5  who is that important to?
6      A.   The public health.  In that, as I
7  read all of the documents, even if one
8  assumes, in the most generous possible
9  way, that there was not a hint of belief
10  on the part of anyone at Merck that their
11  drug could cause heart attacks -- and I'm
12  not indicating that I think that's the
13  whole story, but even if one assumes that
14  that's all that was going on -- they would
15  still need to have embraced the fact that
16  if they're then going to go out and try
17  and market this drug, in a way that was
18  more active than most any other drug has
19  ever been marketed, that that would
20  clearly result in people stopping what
21  they perceived to be cardioprotective drugs
22  and starting their drug, which they appear
23  to have acknowledged was less
24  cardioprotective.  And as a result -- and

Page 419

1  this is not rocket science -- they would
2  need to assume that, as was seen in VIGOR,
3  more patients would have heart attacks as
4  a result of that switch.
5      Q.   So now you're testifying about what
6  Merck's employees would have had to
7  assume?
8          MR. TISI:  Objection.
9      A.   No.
10          MR. TISI:  Objection.
11  That's not what he testified to, Counsel.
12  Come on.  That's unfair and ridiculous,
13  and you know that.
14      A.   I think -- What I'm trying to say
15  is that -- And this is -- this is not
16  engaging in really extended speculation.
17  If Drug A causes more heart attacks than
18  Drug B, and there's tons of people out
19  there taking Drug B, and the company makes
20  a concerted effort to get people to take
21  Drug A instead, and the evidence is that B
22  causes more heart attacks -- I'm sorry,
23  I've lost track of the letters, but you
24  know what I mean -- that the company's new

Page 420

1  drug will result in more patients having
2  heart attacks than the old drug they were
3  on, I have a problem with that.
4      Even if they believe that it was
5  taking away a cardioprotective drug and
6  replacing it with their drug, whatever the
7  mechanism, VIGOR clearly indicated that
8  patients taking Vioxx would have more
9  heart attacks than patients taking
10  Naproxen.
11      Q.   Do you believe that the mechanism,
12  sir, that was being advanced for how Vioxx
13  might cause heart attacks was common to
14  Celebrex and Bextra?
15      A.   I believe that that was a real
16  concern and still is.
17      Q.   Do you have a problem with the way
18  Pfizer marketed Celebrex and Bextra in
19  terms of attempting to persuade doctors to
20  prescribe Celebrex and Bextra over drugs
21  like Naproxen?
22      A.   For me, clinical outcomes in a
23  randomized trial are the most important
24  kind of evidence.  And I do not believe

Page 421

1  that Pfizer had, certainly in 2000, the
2  level of compelling clinical evidence about
3  Celebrex causing heart attacks comparable
4  to the data that Merck had and was
5  published in 2000 about Vioxx and heart
6  attacks.  So mechanism is less important
7  to me than actual results from a
8  randomized clinical trial.
9      And I feel that the burden of the
10  VIGOR data that Merck had was dramatically
11  different from whatever mechanistic worries
12  one might have had about Celebrex or
13  Bextra.
14      Q.   So your personal opinion is that
15  Merck's effort to market Vioxx was more
16  problematic than Pfizer's efforts to market
17  Celebrex?
18          MR. TISI:  Objection to the
19  personal opinion part.
20      A.   I would say my expert opinion,
21  given the risk data available to both
22  companies, indicates that Merck was
23  marketing a drug with a strong burden of
24  risk evidence from clinical trials that

106 (Pages 418 to 421)

Jerry Avorn, M.D.

Page 422

1   was not the case with Celebrex, and still
2   is not, and the data on Bextra did not
3   emerge for years later.
4       Q.   You refer in your report, sir, to
5   another e-mail from Dr. Scolnick where he
6   calls the FDA --
7       A.   Bastards.
8       Q.   Yes.  Do you remember that?
9       A.   Yes.
10      Q.   Why did you refer to that in your
11  report?
12      A.   Okay.  Why don't we go to where it
13  is.  Remind me what page it's on.  It was
14  in the Negotiations about the Label
15  section.
16      Q.   Twenty-three.  It's at 23, top
17  paragraph, the last sentence.
18      A.   (Witness viewing document).  Right.
19  Yes.  Because -- I think this is very
20  relevant to an assessment of the company's
21  willingness or unwillingness to depict the
22  cardiovascular risk of its drug in a fair
23  and accurate manner in the labeling.
24      And my reading of what FDA was

Page 424

1   FDA's labeling, which in my view, fairly
2   describes the cardiovascular risk as ugly
3   and we will not accept this.
4       I think that's more relevant than
5   the bastards piece, which just indicates
6   the magnitude of his vehemence about this.
7       Q.   Do you know why Dr. Scolnick was
8   frustrated with the FDA over the label
9   negotiations?
10      A.   Part of it was that the company
11  wanted to win a label change that would
12  depict gastroprotection, and as I
13  understand it, FDA would not agree to that
14  until they were satisfied that there was a
15  more accurate depiction of the
16  cardiovascular risk.
17      And my understanding is that Merck
18  preferred to get the label changed to
19  reflect the favorable gastrointestinal
20  effects of the drug, but was not willing
21  to accept FDA's concurrent change of the
22  label to depict the cardiovascular risk
23  component.
24      Q.   What is your basis for saying that,

Page 423

1   proposing that Dr. Scolnick was responding
2   to, was that it was a fair and accurate
3   and helpful depiction of the true
4   cardiovascular risk of Vioxx, and Dr.
5   Scolnick's statement, and not just him
6   calling them bastards, but I think --
7   which is just bad manners -- but I think
8   more relevant, depicting that proposed
9   label as ugly cubed, and descriptions by
10  him and Mr. Anstice about fighting back
11  and the other materials that I cite, are
12  relevant because they depict a clear
13  pattern of resistance on the part of Merck
14  to the accurate depiction of the
15  cardiovascular risk of their drug in its
16  official FDA labeling.
17      Q.   You think that Dr. Scolnick's
18  reference to the FDA as bastards suggests
19  that he didn't want to accurately convey
20  the cardiovascular risks of Vioxx?
21      A.   As I said a minute ago, what is
22  more telling is not his bad language, but
23  the other quotations which I cite, in
24  which he and his colleagues depict the

Page 425

1   sir?
2       A.   Various e-mails within Merck that
3   counsel has presented to me, in which the
4   company wanted to move along its changing
5   of the label, which was the whole reason
6   they did the VIGOR study, to get evidence
7   of Vioxx's lower gastrointestinal toxicity,
8   and the discussions about FDA's
9   unwillingness to change that label piece
10  until the risk piece was changed also.
11      Q.   Was your testimony a minute ago
12  based on anything else?
13      A.   Well, it was Dr. Scolnick's
14  deposition, which I read and it -- And
15  there were -- there were other statements
16  by other people within the company that
17  also wrote e-mails about -- there was
18  several chains of e-mails -- about the
19  labeling that I was able to see.
20      MR. GOLDMAN:  Why don't we
21  call it a day, and resume -- How early
22  can you start so we can end by 2:00?
23      MR. TISI:  Remember you've
24  asked him to do some things tonight, too.

107 (Pages 422 to 425)

Jerry Avorn, M.D.

| | |
|---|---|
| **Page 426**<br>1       MR. GOLDMAN: Yes.<br>2       (Deposition of JERRY AVORN, M.D.<br>3  suspended at 5:44 p.m.)<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24 | **Page 428**<br>1       CERTIFICATE<br>2  COMMONWEALTH OF MASSACHUSETTS<br>3       SUFFOLK SS.<br>4    I, SUSAN A. ROMANO, Certified Shorthand<br>5  Reporter No. 119393, Registered Merit<br>6  Reporter and Notary Public in and for the<br>7  Commonwealth of Massachusetts, do hereby<br>8  certify that the witness whose deposition<br>9  is hereinbefore set forth, was duly sworn<br>10  and that such deposition is a true record<br>11  of the testimony given by the witness.<br>12    I further certify that I am neither<br>13  related to or employed by any of the<br>14  parties in or counsel to this action, nor<br>15  am I financially interested in the outcome<br>16  of this action.<br>17    In witness whereof, I have hereunto set<br>18  my hand and seal this 19TH day of June<br>19  2006.<br>20<br>21<br>22<br>23<br>24    Susan A. Romano, Notary Public |
| **Page 427**<br>1     DESCRIPTION OF EXHIBITS<br>2  Exhibit  Description<br>3    1     Curriculum Vitae of Jerry Avorn<br>4    2     Expert Report prepared by Jerry<br>5  Avorn<br>6    3     Notice of Deposition in the New<br>7  Jersey Cases<br>8    4     Amended Notice of Deposition in the<br>9  Federal Cases<br>10    5     Letter of Additional Materials<br>11  Numbered 178 through 188<br>12    6     Excerpt of Testimony from the<br>13  Humeston Trial<br>14    7     Excerpts of David Anstice's<br>15  Testimony<br>16  .8     May 1998 Board of Scientific<br>17  Advisors Meeting<br>18    9     Original Vioxx label<br>19    10    Table included in a Medical Study<br>20<br>21<br>22<br>23<br>24 | **Page 429**<br>1  My commission expires April 21, 2006<br>2       CAPTION .<br>3    The Deposition of Jerry Avorn, M.D.,<br>4  taken in the matter, on the date, and at the<br>5  time and place set out on the title page<br>6  hereof.<br>7    It was requested that the deposition<br>8  be taken by the reporter and that same be<br>9  reduced to typewritten form.<br>10    It was agreed by and between counsel<br>11  and the parties that the Deponent will read<br>12  and sign the transcript of said deposition.<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24 |

108 (Pages 426 to 429)

Jerry Avorn, M.D.

Page 430

```
1            .
2            DEPOSITION ERRATA SHEET
3    .
4    RE:         Jack Daniel Court Reporting
5    File No.    2349
6    Case Caption:   Gerald Barnett, et al. Vs.
7            Merck & Co., Inc.
8
9    Deponent:     Jerry Avorn, M.D.
10   Deposition Date: June 15, 2006
11   To the Reporter:
12   I have read the entire transcript of my
13   Deposition taken in the captioned matter or
14   the same has been read to me.  I request
15   that the following changes be entered upon
16   the record for the reasons indicated.  I
17   have signed my name to the Errata Sheet and
18   authorize you to attach to the original
19   transcript.
20        .
21   Page No.    Line No.    Change to:
22
23   Reason for change:
24   Page No.    Line No.    Change to:
```

Page 431

```
1
2         Reason for change:
3         Page No.    Line No.    Change to:
4
5         Reason for change:
6         Page No.    Line No.    Change to:
7
8         Reason for change:
9         Page No.    Line No.    Change to:
10
11        Reason for change:
12        Deposition of Jerry Avorn, M.D.
13        Page No.    Line No.    Change to:
14
15        Reason for change:
16        Page No.    Line No.    Change to:
17
18        Reason for change:
19        Page No.    Line No.    Change to:
20
21        Reason for change:
22        Page No.    Line No.    Change to:
23
24        Reason for change:
```

Page 432

```
1    Page No.    Line No.    Change to:
2
3    Reason for change:
4         No changes made to the Errata Sheet
5         I am returning this signed Errata
6    Sheet with changes noted.
7    Under penalties of perjury, I declare that I
8    have read the foregoing transcript and that
9    the facts stated in it are true.
10   SIGNATURE:          DATE:
11        Jerry Avorn, M.D.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

109 (Pages 430 to 432)

Jerry Avorn, M.D.

Page 433

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2                    MDL DOCKET NUMBER:   1657
                            SECTION L
3
    In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4   GERALD BARNETT AND CORRINE BARNETT,

5           Plaintiffs,

6        VS                          CIVIL ACTION NUMBER:
                                     2:06cv485
7   MERCK & CO., INC.,

8           Defendant.
    ----------------------------------
9
                    CONTINUING DEPOSITION OF
10
                       JERRY AVORN, M.D.
11
                         VOLUME II
12
                       June 16, 2006
13                       8:38 a.m.

14                  Sheraton Boston Hotel
                       39 Dalton Street
15                  Boston, Massachusetts

16   Laurie J. Driggers, Notary Public, Certified Shorthand Reporter, Realtime
    Professional Reporter
17   and Certified Realtime Reporter within and for the Commonwealth of
    Massachusetts

18

19

20

21

22

23

24

Jerry Avorn, M.D.

Page 434

1      APPEARANCES:.
2      .
3      ON BEHALF OF PLAINTIFFS:
4      CHRISTOPHER V. TISI, ESQUIRE
5      JENNIFER L. ORENDI, ESQUIRE
6       Ashcraft & Gerel
7       2000 L Street, N.W., Suite 400
8       Washington, District of Columbia 20036
9       202.783.6400
10      cvtisi@aol.com
11      jorendi@dc.ashcraftlaw.com
12      .
13      ON BEHALF OF DEFENDANT:
14      ANDREW L. GOLDMAN, ESQUIRE
15       Bartlit Beck Herman Palenchar & Scott LLP
16       54 West Hubbard Street, Suite 300
17       Chicago, Illinois 60610
18       312.494.4400
19       andrew.goldman@bartlit-beck.com
20      .
21      .         . .    .
22      .
23      .
24      .

Page 435

1      CONTINUING DEPOSITION OF JERRY AVORN, M.D.
2                VOLUME II
3             JUNE 16, 2006
4             PROCEEDINGS:
5       JERRY AVORN, M.D., the deponent,
6      having been satisfactorily identified and
7      duly sworn by the Notary Public, was
8      examined and testified as follows:
9             EXAMINATION
10       BY-MR.GOLDMAN:
11      Q.  Good morning, Dr. Avorn.
12      A.  Good morning.
13      Q.  Yesterday I asked you to try to get
14      me some answers on a few questions.  Did
15      you attempt to do that last night?
16      A.  Yes, I did.  Whoops.
17      Q.  Can you tell me the list of animal
18      studies that you think show a potential
19      cardiovascular problem with Vioxx that were
20      published before Vioxx was approved?
21      A.  Yes.  I have them written down
22      here.  I can give you the citation and
23      then pull out the document.
24         One is Murata, M-U-R-A-T-A, et al.,

Page 436

1      from Nature 1997.  Another is Adderly,
2      A-D-D-E-R-L-Y, et al., from the Journal of
3      Biological Chemistry in 1999.  And the
4      third is Shinmura, S-H-I-N-M-U-R-A, et al.,
5      and that was in the proceedings of the
6      National Academy of Sciences.
7         The paper came out in 2000, but I
8      believe there was an abstract presented in
9      1999.
10      Q.  Is that the universe of animal
11      studies you're aware of, sir, that you
12      believe show an increase or a potential
13      cardiovascular risk with Vioxx preapproval?
14      A.  That's the universe that I was able
15      to identify between last night and this
16      morning.
17      Q.  Can you tell me all of the studies
18      that you believe show an increased risk of
19      stroke from Vioxx that existed while Vioxx
20      was on the market?
21      A.  I'm sorry.  I thought the question
22      was preapproval.  Maybe I got the question
23      wrong.
24      Q.  I -- Withdrawn.

Page 437

1         My question yesterday, actually,
2      Dr. Avorn, was whether you were aware of
3      any clinical trials showing an increased
4      risk of stroke with Vioxx at any point
5      while Vioxx was on the market?
6      A.  Okay.  I erroneously looked for
7      preapproval evidence of stroke, and found
8      that in all -- in the data that was
9      reviewed by FDA, stroke -- in Pelayo's
10      report, stroke had been folded into
11      cardiovascular outcomes, and -- and was
12      not separated out uniquely.
13         I'm sorry if I misunderstood the
14      question about prior to withdrawal as
15      opposed to prior to approval.  I can go
16      back and try to get that information for
17      you.
18      Q.  As you sit here today, Dr. Avorn,
19      are you aware of any clinical trials that
20      show an increased risk of stroke with
21      Vioxx at any point while Vioxx was on the
22      market?
23      A.  I would want to go back and look
24      at the ADVANTAGE trial and the Alzheimer's

2 (Pages 434 to 437)

Jerry Avorn, M.D.

Page 438

1   studies and others of the osteoarthritis
2   and RA studies.  And I apologize for not
3   having done so, because I misunderstood
4   the question.
5       Q.   What I'm going to do is mark as
6   the next exhibit, then, 11, a blank
7   document.
8       A.   Mm-hmm.
9       Q.   And if you could, after this
10  deposition, find any studies that you
11  think show an increased risk of stroke --
12      A.   Okay.
13      Q.   -- while Vioxx was on the market,
14  and then if you could just please let Mr.
15  Tisi know --
16      A.   Right.
17      Q.   -- and then we will make sure that
18  your list --
19          MR. TISI:  I've never seen
20  this quite done this way, but I will --
21  Let's -- That's fine.
22          MR. GOLDMAN:  -- put it on
23  Exhibit 11.
24          THE WITNESS:  That's fine.

Page 439

1           MR. TISI:  I'll take Exhibit
2   11 and we'll --
3           And were we successful in getting
4   all those materials that were photocopied
5   back?
6           MR. GOLDMAN:  Yes.
7           MR. TISI:  Okay.  Good.  So
8   I'll be able to take those back or get
9   them back to you.
10          (Exhibit-11, Studies That
11  Show An Increased Risk of Stroke,
12  Published During The Time Vioxx Was On The
13  Market, marked for identification).
14          MR. GOLDMAN:  I'm going to
15  label Exhibit 11 Studies That Show An
16  Increased Cardio -- sorry -- An Increased
17  Risk of Stroke Published During the Time
18  Vioxx Was on the Market.
19          MR. TISI:  And just to be
20  clear, I'm not -- I am not agreeing to
21  produce an exhibit this way.  I will think
22  about it, because I've never seen it done
23  this way, whether I would just provide it
24  as a supplement or have an exhibit made

Page 440

1   like this.  But I -- I accept that you
2   can mark any exhibit you want.
3           BY MR. GOLDMAN:
4       Q.   And to be clear, Dr. Avorn, I don't
5   want the plaintiffs' lawyers to go search
6   the planet to try to find --
7       A.   Of course.
8       Q.   -- a study.  I want it based on
9   the work you've done in formulating your
10  opinions and testifying that you believe
11  there's an increased risk of stroke.  I
12  would appreciate if you could do that,
13  okay?
14          MR. TISI:  And I will agree
15  that that's the way it's to be done.
16          BY MR. GOLDMAN:
17      Q.   Do you know of any clinical trial
18  that showed a doubling of the risk of
19  cardiovascular events from Vioxx before the
20  APPROVe study?
21      A.   Yes.  And that is derived also from
22  Dr. Pelayo's, P-E-L-A-Y-O, 1999 review of
23  the new drug application for Vioxx.  There
24  is a table in it which I can pull right

Page 441

1   now.
2           (Witness viewing documents).
3           MR. TISI:  And would that
4   have been the preapproval or post?  I
5   don't remember what your question was.
6   I'm sorry.
7           MR. GOLDMAN:  At any point
8   Vioxx was on the market.
9           MR. TISI:  Any point Vioxx
10  was on the market.
11      A.   Okay.  Then was I, because it was
12  a long day, just mishearing that as at any
13  time prior to approval as well, and I
14  misheard it?  Because you apparently
15  didn't say that yesterday.  Is that --
16      Q.   Okay.  Let me ask it both ways.
17      A.   Maybe we can just go back and look
18  at what the wording was.
19          MR. TISI:  I think you
20  testified, Jerry.  I mean, I don't want --
21          BY MR. GOLDMAN:
22      Q.   Let's start with preapproval
23  then --
24      A.   Right.

3 (Pages 438 to 441)

Jerry Avorn, M.D.

Page 442

1    Q.  -- and we can go to the next
2  question.
3    A.  And we can review what the question
4  was, if we've got the transcript from
5  yesterday, just to see if I misheard that.
6    Q.  Before Vioxx was approved for use
7  in the United States, sir, can you point
8  to any study that showed an increased
9  cardiovascular risk with Vioxx?  And I
10  believe you said a doubling of the risk.
11    MR. TISI:  I'm just going
12  to object, because I think we covered this
13  yesterday.  But go ahead.
14    A.  Okay.  To be accurate about my
15  recollection of it, the doubling --
16    Q.  Mm-hmm.
17    A.  -- was a description of the finding
18  from APPROVe.  And I believe that it was
19  you who put the doubling concept into the
20  question, rather than me.  But that's
21  fine.  Because there was a substantial
22  increase and in some cases a doubling.
23    And I think we talked about this
24  yesterday when we were going over table --

Page 443

1  I believe it was 52, in -- yes, in Dr. --
2  No.  This is Dr. Villalba's -- I'm sorry,
3  it's Dr. Villalba's report,
4  V-I-L-L-A-L-B-A, review of the new drug
5  application.
6    MR. TISI:  And since there
7  were numerous Villalba reports, can you
8  give the date of that?
9    THE WITNESS:  Yes.
10    MR. TISI:  Because there
11  were numerous ones.
12    THE WITNESS:  Let me just
13  go to the beginning of it.
14    MR. TISI:  I'm sorry.
15    THE WITNESS:  It's all
16  right.
17    MR. TISI:  Actually, just
18  for the record, it's Tab 175 in your
19  binder.
20    THE WITNESS:  Right.  And I
21  can -- It was 1999.  I can get the
22  exact --
23    MR. TISI:  That's okay.
24    A.  Okay.  It is -- The review date

Page 444

1  says December '98 through May of '99.
2    Q.  Okay.
3    A.  Okay.  And it is Table 52.  And as
4  I believe we covered yesterday, it
5  describes thromboembolic adverse events.
6    Q.  Yes.  You did describe it
7  yesterday.
8    Do you have anything to add other
9  than what you talked about yesterday
10  concerning the preapproval studies and
11  whether they show an increased
12  cardiovascular risk with Vioxx?
13    A.  No.  Concerning preapproval, that's
14  what I have.
15    Q.  Okay.  Now, let's go to the broader
16  question, and if there was a
17  misunderstanding, then I apologize.
18    A.  Okay.
19    Q.  So let me just ask you:  Based on
20  your review of the materials before you
21  issued your expert report, okay?
22    A.  Yes.
23    Q.  What clinical trials do you believe
24  show an increased cardiovascular risk with

Page 445

1  Vioxx before the APPROVe study?
2    A.  Okay.  And that would include
3  VIGOR, ADVANTAGE, and there were others
4  whose protocol numbers I don't have in
5  mind.  I think 090 sticks in my mind as a
6  protocol number.  But since I haven't
7  memorized all the protocol numbers, that's
8  something that I would go back and provide
9  specific protocol numbers for you.
10    I was looking and thinking that the
11  question was about pre -- I think the
12  confusion was, you may have said pre
13  APPROVe, and I may have heard that as
14  preapproval.
15    So I can give you other protocol
16  numbers besides VIGOR, ADVANTAGE and O90,
17  if you want, subsequent to today.
18    Q.  Sure.  In fact, what we'll do, on
19  Exhibit 11, is just have another part that
20  says Clinical Trials Before APPROVe --
21    A.  Why don't you say "The APPROVe
22  study," just to keep us from getting
23  confused again.
24    Q.  Okay.  So on Exhibit 11, I added,

4 (Pages 442 to 445)

Jerry Avorn, M.D.

Page 446

1    "These are your opinions now of clinical
2    trials before the APPROVe study that show
3    an increased cardiovascular risk from
4    Vioxx," okay?
5        A.  Good.
6        Q.  And you said VIGOR, ADVANTAGE, 090
7    and whatever else you want to add after
8    the deposition, okay?
9        A.  Correct.
10           MR. TISI:  And again, the
11   same qualified objection.  Go ahead.
12           BY MR. GOLDMAN:
13       Q.  The ADVANTAGE study, sir, did that
14   show an increased risk with Vioxx for
15   strokes?
16       A.  Let me pull the ADVANTAGE study and
17   take a look.  I -- If you have it there
18   and want to present it to me --
19       Q.  Sure.
20       A.  -- that would speed things up.
21   Thank you.
22           MR. TISI:  You're handing
23   him the published study, right?
24   ///

Page 447

1            BY MR. GOLDMAN:
2        Q.  I'm handing you the published study
3    of ADVANTAGE.
4            MR. TISI:  I want to make
5    sure what you're handing him.
6            MR. GOLDMAN:  Okay.
7            MR. TISI:  I mean, we're
8    not handing him the CSR, we're not handing
9    him the medical records to review or
10   anything -- nothing.
11           BY MR. GOLDMAN:
12       Q.  I'm handing you the peer-reviewed
13   published article on the ADVANTAGE study.
14       A.  (Witness viewing document).  Okay.
15   And the question was, is there evidence of
16   an increased risk of stroke in the
17   ADVANTAGE study?
18       Q.  Yes.
19       A.  I cannot see any --
20           MR. TISI:  No.  I think it
21   was -- I think he asked stroke.  You had
22   asked cardiovascular.
23           MR. GOLDMAN:  No.  We're on
24   the same page.

Page 448

1            MR. TISI:  Okay.  Objection.
2            BY MR. GOLDMAN:
3        Q.  Dr. Avorn, when you look at the
4    risk of thrombotic events in the ADVANTAGE
5    study, do you agree, sir, that there is no
6    statistically significant increased risk
7    associated with Vioxx?
8        A.  One problem I have with working
9    from the published version that I know was
10   that there were issues about adjudication
11   of endpoints in a number of the trials
12   that FDA received --
13       Q.  Mm-hmm.
14       A.  -- from -- from Merck.  And I
15   recall clearly that when -- that FDA felt
16   that it had to readjudicate outcomes in a
17   number of the trials.
18       Q.  Mm-hmm.
19       A.  And as I recall, in nearly all of
20   those instances FDA staff readjudicated
21   outcomes and found outcomes that were
22   cardiovascular adverse events in the Vioxx
23   group that Merck scientists had not found
24   to be cardiovascular events.  And I

Page 449

1    believe I recall that the differences also
2    went in the other direction.
3            And so I would like to first look
4    at my report where I discuss that, and
5    secondly, I would want to go back to
6    another version, because there has been
7    this persistent issue of FDA finding, when
8    its scientists looked at outcomes, more
9    events in Vioxx than Merck reported there
10   to be.
11       Q.  Dr. Avorn, in your study -- I'm
12   sorry -- in your report on Page .14, you
13   talk about the ADVANTAGE study --
14       A.  Yes.
15       Q.  -- at the bottom --
16       A.  Yes.
17       Q.  -- right?
18       A.  Right.
19       Q.  And then you continue on Page .15
20   to talk about it, right?
21       A.  Right.
22       Q.  Do you indicate, sir, anywhere in
23   your report that the ADVANTAGE study
24   reflects an increased risk of thrombotic

5 (Pages 446 to 449)

Jerry Avorn, M.D.

Page 450

1  events from Vioxx?
2     A.  That's what I want to review.
3        (Witness viewing document).  Yes.
4  This is exactly the point that I was going
5  to make.
6     Q.  Mm-hmm.
7     A.  In my report I indicate that there
8  was the question that we discussed
9  yesterday of at least one instance of
10  reassignment by Merck of one probable
11  cardiac death to unknown cause, and to
12  read from my report:  When FDA used a
13  more comprehensive outcome definition of
14  serious coronary heart disease and
15  readjudicated these outcomes, it found a
16  relative risk of 3.2 for Vioxx use.
17     Q.  My question, Dr. Avorn, was about
18  thrombotic events, not about a new
19  category of serious coronary heart disease,
20  okay?  You understand the difference?
21     A.  Well, thrombotic event would be a
22  subset of serious thrombotic -- serious
23  cardiac heart disease.
24     Q.  Do you say in your report, sir,

Page 451

1  that there is an increased risk seen for
2  thrombotic events in the ADVANTAGE study?
3     A.  I would need to look at the report
4  that FDA produced and to look at its
5  definition of serious coronary artery
6  disease which would of course include
7  thrombotic cardiovascular events.
8     Q.  Did you -- I'll ask one more time
9  -- indicate in your report that there was
10  an increased risk in thrombotic events
11  seen in the ADVANTAGE study?
12     A.  All right.  We only -- I will need
13  to repeat that one can play games in a
14  counterproductive manner by using terms
15  such as thrombotic events versus serious
16  coronary heart disease versus myocardial
17  infarction, all of which are intersecting
18  circles which describe similar but related
19  events.
20        If you want, we can stop and I can
21  go back to the FDA's adjudication and see
22  what they considered a serious coronary
23  heart disease event.  But I can assure you
24  that clinically, a thrombotic

Page 452

1  cardiovascular event is going to have
2  heavy overlap with a serious coronary
3  heart disease event.
4     Q.  Are there other events that would
5  be considered part of coronary heart
6  disease events that are not thrombotic in
7  nature?
8     A.  I would need to look at what FDA
9  meant when it used its term "serious
10  coronary heart disease," because many of
11  these are terms that can vary with exactly
12  what one includes.
13        But frankly, in any kind of
14  realistic terms, heart attack, serious
15  coronary heart disease, major thrombotic
16  coronary event all describe pretty much
17  the same thing, although there may be some
18  small differences in the definitions.
19     Q.  At a break maybe we can look at
20  the FDA analysis, because I have to move
21  forward.
22        MR. TISI:  Actually, I have
23  it if you want to --
24        MR. GOLDMAN:  Okay.

Page 453

1        MR. TISI:  I have it right
2  here if you want to --
3        MR. GOLDMAN:  Let's do it
4  at a break.
5        MR. TISI:  Sure.
6        THE WITNESS:  You mean off
7  the record?
8        MR. TISI:  No.  We can do
9  it on break.  I had it.  I was trying to
10  speed things along.
11     A.  All right.
12     Q.  Dr. Avorn, you remember yesterday
13  we were talking about a number of
14  documents written by Dr. Scolnick or Dr.
15  Musliner or Dr. Reicin, internal Merck
16  documents that you're relying on for your
17  opinions, right?
18     A.  Yes.
19     Q.  Am I right, sir, that you don't
20  have any personal knowledge of the facts
21  described in those documents; you're just
22  relying on those documents, true?
23     A.  Correct.
24     Q.  Okay.  In the Materials Considered,

6 (Pages 450 to 453)

Jerry Avorn, M.D.

Page 454

1  which is Exhibit 5, sir --
2  A.  Mm-hmm.
3  Q.  -- if you wouldn't mind looking at
4  that.
5  A.  Got it.
6  (Witness viewing document).
7  Q.  Am I right that you don't indicate
8  anywhere in there that you're relying on
9  Dr. Ray's expert report?
10  A.  I have, indeed, read Dr. Ray's
11  report --
12  Q.  Mm-hmm.
13  A.  -- and been impressed by it.  And
14  I believe that my awareness of Dr.
15  Kronmal's analysis of the Alzheimer's data
16  was as it was reported in Dr. Ray's
17  report, as well as -- I think that was my
18  primary awareness of Dr. Kronmal's data.
19  So, yes, I did read it.  I did
20  take it seriously, and it did inform me
21  about the Kronmal evaluation of the
22  Alzheimer data.
23  Q.  As I understand your testimony, Dr.
24  Avorn, you are relying on a portion of Dr.

Page 455

1  Ray's expert report where he describes an
2  analysis that was conducted by another
3  plaintiff's expert witness, Dr. Kronmal?
4  A.  That's correct.
5  Q.  I'm right, though, sir, that you
6  don't identify and the plaintiffs' lawyers
7  in this case didn't identify either Dr.
8  Ray's report or Dr. Kronmal's report on
9  the list of materials you considered in
10  forming your opinions?
11  A.  Okay.  The list was prepared by
12  plaintiffs' counsel, and --
13  Q.  I can represent to you I've looked
14  at it, and there's no reference to Dr. Ray
15  or Dr. Kronmal.
16  A.  No, I understand that.  But I'm
17  saying having not prepared this list, I'm
18  telling you that I did read and believe
19  Dr. Ray's expert testimony.  And if it was
20  not listed as a report transmitted to me,
21  I think that was an omission by counsel.
22  Q.  Because there's no reference in Dr.
23  Avorn's report to Dr. Ray's analysis or
24  Dr. Kronmal's analysis of the Alzheimer's

Page 456

1  data, and that was not disclosed in any of
2  the materials considered, we're going to
3  object to any testimony in your trial
4  deposition about either of those subjects,
5  okay?
6  A.  That's a legal issue.
7  MR. TISI:  That's between
8  you and me.  You can't ask him.
9  MR. GOLDMAN:  Okay.  And
10  let me also note for the record that I've
11  spoken with Chris -- I'm sorry -- Charlie
12  Cohen, and he doesn't have any record of
13  receiving a letter dated June 8th from the
14  Seeger Weiss firm indicating some
15  additional materials that were sent to Dr.
16  Avorn.  I understand, Chris, that you
17  all --
18  MR. TISI:  We have a
19  signed --
20  MR. GOLDMAN:  -- have a
21  signed copy, and you believe it was sent.
22  I'm just telling you that for the record,
23  I wasn't provided with it, and Charlie
24  doesn't have a record of receiving it.  So

Page 457

1  I think that's going to be sorted out
2  afterwards.
3  MR. TISI:  Yeah.  We'll
4  probably have to just sort it out.  I
5  mean, I just -- It is what it is.  There
6  are a handful of documents, they're not
7  complicated, so I think you'll have an
8  adequate opportunity to take -- to take a
9  look at them.  They're not documents
10  you've not seen before.  Go ahead.
11  THE WITNESS:  I'm listening.
12  I'm just getting a cup of coffee.
13  BY MR. GOLDMAN:
14  Q.  Okay.  You didn't review any of the
15  expert reports that have been submitted by
16  Merck expert witnesses, did you, sir?
17  A.  I don't believe I have.
18  Q.  If you look on the first page of
19  Exhibit 5, you see that there's a number
20  of items there that were not included on
21  your original Materials Considered?
22  A.  (Witness viewing document).  Yes.
23  Q.  I just want to establish that those
24  are materials that you didn't review

Jerry Avorn, M.D.

Page 458

1 before that you wrote your report but that
2 you are relying on because you've reviewed
3 them since?  Is that the situation?
4    A.  I have no way of knowing whether
5 these were added by counsel because they
6 were omitted in error from what was sent
7 originally, or whether this implies that
8 they were sent subsequently.
9    Q.  Can I look at the list for one
10 second?
11    A.  (Witness complied).  Sure.
12         MR. TISI:  I can make a
13 representation, if you wish.
14         MR. GOLDMAN:  Well, let me
15 just ask Dr. Avorn first.
16         MR. TISI:  Go ahead.
17         BY MR. GOLDMAN:
18    Q.  Prior to issuing your report, Dr.
19 Avorn, did you read the FDA's medical
20 officer review --
21    A.  Yes.
22    Q.  -- of Vioxx?
23    A.  Yes.
24    Q.  Prior to issuing your report, did

Page 459

1 you read the New England Journal of
2 Medicine's "Expression of Concern" and
3 reaffirmance?
4    A.  Yes.
5    Q.  Prior to issuing your report, did
6 you read the section from the Federal Code
7 of Regulations, 21 CFR Section 201.57(e)?
8    A.  Is that the one about duty to warn?
9    Q.  Do you know?
10    A.  Well, I know that I've read the
11 duty to warn section.
12         MR. TISI:  I have that
13 right in front of me if you want me to
14 show you the --
15         MR. GOLDMAN:  Well, he may
16 not know the number.
17    A.  Yeah, I've read the duty to warn
18 section of 21 CFR many times over the
19 years, and if that's that particular
20 number, then, yes, I have read it before
21 my report.
22    Q.  Did you read the transcript of the
23 Arthritis Advisory Committee meeting from
24 February 8th of 2001, before you issued

Page 460

1 your report?
2    A.  Yes.
3    Q.  Okay.
4    A.  So it looks as if this was not
5 materials sent to me after my report but
6 material they had failed to list earlier.
7         MR. TISI:  And I can
8 represent, just so that there's clarity of
9 the record, all of these were provided to
10 him before.  It was our initial omission,
11 which we caught when we were preparing.
12         The only documents that were not
13 were obviously the supplemental APPROVe
14 data, which wasn't available at the time
15 of his report.
16         MR. GOLDMAN:  I'm just going
17 to mark for the record the expert report
18 of Dr. Ray that you had in your file,
19 sir.  It's dated January 11th of 2006, and
20 was submitted in the Plunkett case.
21         (Exhibit-12, Expert Report
22 of Dr. Ray dated January 11, 2006, marked
23 for identification).
24 ///

Page 461

1         BY MR. GOLDMAN:
2    Q.  My only question about this, sir,
3 has to do with a reference on one of Dr.
4 Ray's references.  It really has nothing
5 to do with his report, okay?
6    A.  Okay.
7    Q.  You wrote the word zodiac?
8    A.  I wrote?  Oh, okay.  You mean my
9 notes -- My notes, right.
10    Q.  There's an indication on the last
11 page of the report where you're just
12 listing references, and you wrote the
13 reference to zodiac next to Reference 83,
14 which is an article in JAMA from 1991
15 called Analysis and Interpretation of
16 Treatment Effects in Subgroups of Patients
17 in Randomized Clinical Trials.
18    A.  Yes.
19    Q.  Can you tell me, number one, what
20 that issue is about, and number two, why
21 you wrote zodiac?
22    A.  Sure.  Let me take a look.
23         (Witness viewing document).  Sure.
24 That's a very interesting paper that I

8 (Pages 458 to 461)

eefff

Jerry Avorn, M.D.

Page 462

1  think I flagged just because it's one of
2  my favorite papers and I wanted to make a
3  note of its relevance to this case.
4      As I recall that paper, it looked
5  at the use of subgroup analysis, and
6  pointed out that in one very big clinical
7  trial, if one were to do a post hoc
8  subgroup analysis -- if this is the
9  correct paper I'm thinking of -- if one
10 were to do a subgroup post hoc analysis,
11 you could demonstrate that the given
12 treatment was very much more effective in
13 some patient groups and very much less
14 effective in other patient groups, and
15 that that group -- that grouping turned
16 out to be their zodiac sign, like Aquarius
17 or Capricorn.
18      And again, if this is the paper I'm
19 thinking of, the authors pointed out that
20 that was a limitation of post hoc subgroup
21 analyses, because clearly a patient's
22 zodiac sign was not going to be
23 meaningfully predictive of outcome.
24 Q.  Is it your opinion, then, that post

Page 463

1  hoc analyses are limited in what they can
2  establish, or is it your view that post
3  hoc analyses are compelling?
4  A.  Given that this is a topic that
5  people have written long papers about, let
6  me try to give a very brief answer.
7      Post hoc subgroup analyses can be
8  -- Well, subgroup analyses can be
9  meaningful if they have been predetermined
10 as subgroups and are not come up with --
11 are not designated after the fact.  And we
12 do that all the time.  We -- The research
13 community.
14      They can also be informative if
15 after a study is completed it turns out
16 that there may be a patient group that is
17 particularly either susceptible to a side
18 effect or likely to benefit or unlikely to
19 benefit.
20 Q.  Mm-hmm.
21 A.  And often that kind of analysis can
22 be very informative if it has -- Well, if
23 it has the following properties:  A, it is
24 not data dredging, either by an academic

Page 464

1  trying to get a paper or by somebody with
2  an axe to grind otherwise, and if there's
3  a likely biologically meaningful
4  explanation for it, such as diabetics do
5  worse or elderly people do worse.
6  Q.  Mm-hmm.
7  A.  And so in that sense it can be
8  very useful and informative and real.  But
9  it can be noninformative and even
10 counterproductive if it fits into that
11 data dredging or attempting to justify a
12 particular position by looking at --
13 looking for groups in which one can make a
14 case.
15      I'm sorry it's a complicated
16 answer, but it's not a good or bad thing
17 in itself.
18 Q.  Is it fair to say that there are
19 serious limitations when you do a post hoc
20 analyses of data?
21      MR. TISI:  Objection to
22 limitations.
23 A.  I don't think -- I don't think
24 that's what I said.  I think it depends

Page 465

1  on the instance.  Sometimes they can be
2  helpful, sometimes they can be
3  counterproductive.
4  Q.  There's a letter that was in your
5  materials that I reviewed last night.  Let
6  me represent to you it's dated March 13th
7  of 2003 -- sorry -- 2006.  Okay?
8  A.  (Witness nods head).
9  Q.  And it was from the plaintiffs'
10 lawyers to you enclosing some material.
11 A.  Okay.
12 Q.  And the letter is dated March 13th,
13 2006, and it referred to the following
14 information:  CSRs for Study 010, 017, 085
15 and 090.  Okay?
16 A.  (Witness nods head).
17 Q.  Early versions of the Ingenix
18 study?
19 A.  Ingenix.
20 Q.  Ingenix study.  And a May 22nd,
21 2001, New York Times article.  Okay?
22 A.  Okay.
23 Q.  That was sent to you a week before
24 your report was signed, right?

9 (Pages 462 to 465)

Jerry Avorn, M.D.

Page 466

1  A.  Right.
2  Q.  Did you review those materials,
3  sir, and factor them in to your analysis
4  when you wrote your report?
5  A.  I'm pausing, because I'm having a
6  hard time remembering which materials were
7  received when and what impact they did or
8  didn't have on my report.
9       I recall having seen them, and I
10  just can't tell you how any one of those
11  did or didn't relate to the report.
12  Q.  Okay.  In your expert report, sir,
13  you refer to a draft standby statement
14  dated March of 2000.
15  A.  Please help me to know where you're
16  referring to.
17  Q.  Yes.  It's on Page .13.  You quote
18  from it in the indented paragraph that
19  starts "The implications."
20  A.  (Witness viewing document).  Yes.
21  Q.  Here you're quoting from a standby
22  statement that was a draft and was
23  prepared internally at Merck, right?
24  A.  Correct.

Page 467

1  Q.  You don't have any personal
2  knowledge of the facts here, right?
3       MR. TISI:  Objection, other
4  than it was written and that's the
5  document that it says..
6       MR. GOLDMAN:  Okay.
7  A.  I -- I have knowledge that it was
8  a document Merck prepared.
9  Q.  The underlying facts and what Merck
10  did with this draft standby statement you
11  don't have any personal knowledge of,
12  true?
13  A.  My understanding is that they
14  didn't actually implement the -- this --
15  this draft standby statement in that form.
16  Q.  And what's your understanding based
17  on?
18  A.  I believe I asked counsel whether
19  this was ever -- you know, could I see a
20  document that was the final version, and
21  they said they didn't have one.  So that
22  leaves me not knowing its ultimate fate.
23       But I refer to it as evidence of
24  what officials at the company were saying

Page 468

1  and doing at the time, whatever the
2  subsequent use of that was.
3  Q.  Which you don't know?
4  A.  Right.  The absence of seeing a
5  final makes me suspect that there may not
6  have been a final.  In other words, if
7  there had been a final, I would have
8  expected that counsel would have gotten it
9  in the discovery process.  And the fact
10  that when I asked for the final they said
11  they did not have one to produce makes me
12  suspect that perhaps there was not a
13  final.  But I can't know that for sure.
14  Q.  Do you think that simple common
15  sense, sir, would lead to the conclusion
16  that if, as you say, the risk benefit
17  relationship of Vioxx were accurately
18  presented to doctors, that Merck would not
19  have sold as much Vioxx?
20       MR. TISI:  Objection.
21  A.  I don't know what simple common
22  sense would -- would indicate in that
23  because how much a company can sell of a
24  given product is a pretty complicated

Page 469

1  issue, and I -- I just can't tell you
2  what -- I don't have simple common sense.
3  I think of these things as someone who
4  spent his life studying the issue.  So I
5  can't answer that.
6  Q.  Let's talk about Study 090.  Do you
7  remember what that study was about?
8  A.  It was an osteoarthritis study.
9  And we can look to where I refer to it in
10  my report.  It would have been in a
11  section of pre -- I think pre -- If you
12  have a specific page of my report you want
13  to refer me to, that would save me some
14  time.
15  Q.  Fourteen.
16  A.  (Witness viewing document).  Okay.
17  Got it.
18  Q.  So is your understanding about
19  Study 090 described here in Page .14 of
20  your report, sir?
21  A.  Yes.  That it was Vioxx twelve and
22  a half milligrams compared to Nabumetone
23  or placebo in patients with osteoarthritis.
24  Q.  How many thrombotic cardiovascular

10 (Pages 466 to 469)

Jerry Avorn, M.D.

Page 470

1    events occurred in the 090 study?
2      A.   I'd need to go back to the -- the
3    actual report.  I can't keep all those
4    numbers in my head.  But if you have --
5    If you want to show me, I would be happy
6    to look at it.
7      Q.   Well, you refer, in the second full
8    paragraph, when you're describing protocol
9    090 in the second to the last sentence,
10   you say, "This included a heart attack and
11   two strokes in the Vioxx --"
12     A.   I'm sorry.  The second to the last
13   sentence where?
14     Q.   In the second paragraph when you're
15   describing protocol 090 --
16     A.   Okay.
17     Q.   -- the second to the last
18   paragraph --
19     A.   Right.
20     Q.   -- second to the last sentence you
21   say, "This included a heart attack and two
22   strokes in the Vioxx group within the
23   six-week study period in none or either of
24   the comparison groups."  Is that your

Page 471

1    understanding, sir?
2      A.   (Witness viewing document).  Yes.
3      Q.   While Vioxx was on the market, did
4    you ever write any articles about Study
5    090?
6      A.   No, I did not.  I don't believe
7    that I was aware of Study 090 while Vioxx
8    was on the market.
9      Q.   Did you ever write anything about
10   ADVANTAGE while Vioxx was on the market?
11     A.   No.
12     Q.   It's not your testimony, is it,
13   sir, that Merck hid the results of the
14   Study 090, is it?
15          MR. TISI:  From -- From
16   whom?
17          BY MR. GOLDMAN:
18     Q.   From anybody.
19     A.   First, to answer your question
20   about ADVANTAGE, I just want to see when
21   -- and I think you just handed me the
22   ADVANTAGE paper -- when it was -- There,
23   is that -- no.  I just want to see when
24   it -- It's over here.  Thank you.  Okay.

Page 472

1          MR. TISI:  Can we mark it
2    since you've --
3          THE WITNESS:  Yeah, it is.
4          MR. TISI:  It's not marked.
5          MR. GOLDMAN:  I'll mark it
6    as Exhibit 13.
7          (Exhibit-13, Article Entitled
8    "Gastrointestinal Tolerability and
9    Effectiveness of Rofecoxib Versus Naproxen
10   in the Treatment of Osteoarthritis," marked
11   for identification).
12          MR. TISI:  Okay.
13          BY MR. GOLDMAN:
14     Q.   Exhibit 13 is the peer reviewed
15   publication of the ADVANTAGE study.
16          MR. TISI:  Don't -- Don't
17   bait me.
18     A.   (Witness viewing document).  This
19   is the one with the outcomes as
20   readjudicated by FDA or with Merck's
21   adjudication, or don't we know?
22     Q.   Are you --
23     A.   I know that FDA readjudicated the
24   ADVANTAGE findings.  I just don't know

Page 473

1    which --
2      Q.   Dr. Avorn, you asked to see that
3    article, not to talk about whether the FDA
4    adjudicated events.  You asked to see that
5    article to see whether it was completed to
6    decide whether or not you ever talked
7    about it in any of your articles.
8      A.   Right.
9      Q.   So can we stick to that topic?
10     A.   Right.  Okay.  So it was published
11   in October of '03, and I -- I did not
12   write about it.
13     Q.   Okay.  Is it your position, sir,
14   that Merck hid the results of the Study
15   090?
16          MR. TISI:  Objection.
17     A.   Can you define what you mean by
18   hid?
19     Q.   How would you define hid?
20     A.   Well, if -- if results -- and maybe
21   to define it, I could use ADVANTAGE as an
22   example.  If results are presented in a
23   paper or to FDA with outcomes that are
24   judged by the FDA to be incorrect and

11 (Pages 470 to 473)

Jerry Avorn, M.D.

Page 474

1  misleading, the provision of those outcome
2  data to the FDA does not in my view
3  constitute a full disclosure of the
4  results of that study.
5      So, for example, would I say that
6  the true results of ADVANTAGE were hidden?
7  I would say, as originally presented to
8  FDA, given that FDA felt that the results
9  were incorrect and favored Vioxx by
10 adjudicating outcomes in a way that ended
11 up favoring the drug, I would say that's a
12 kind of hiding.
13     Q.  Is your testimony that the
14 individuals who were involved in the
15 adjudication process in the ADVANTAGE study
16 intentionally adjudicated certain events so
17 that they would favor Vioxx?
18     A.  I can't speak to the intentions of
19 individuals or their motivations.
20     Q.  Well --
21     A.  I can only look at the outcome of
22 those adjudicate -- of those decisions.
23     Q.  Do you think Merck, as a company,
24 or the individuals at Merck played any

Page 475

1  role in how the adjudicators decided what
2  they would call certain events in the
3  ADVANTAGE study?
4      A.  Yes, in that the company did have a
5  procedure for bringing cases forward to
6  adjudication, and that is often one of the
7  most important components of adjudication,
8  which is -- which cases even get
9  adjudicated.
10     And so if there are company
11 policies or procedures that cause cases to
12 not even get adjudicated, that's a very
13 meaningful way of distorting adjudication.
14     Q.  Tell me every case, sir, that you
15 say Merck caused not to get adjudicated --
16         MR. TISI:  Objection.
17     BY MR. GOLDMAN:
18     Q.  -- in the ADVANTAGE study or any
19 other study that has ever been done on
20 Vioxx.
21         MR. TISI:  Objection;
22 improper question.
23     A.  Okay.  Given that I obviously
24 cannot know of every case of the tens of

Page 476

1  thousands of people in the various
2  studies, what I can tell you is the
3  cardiovascular SOP, as we discussed
4  yesterday, specifically -- no.
5      Don't shake your head in the middle
6  of my answer.  I'm responding to your
7  question, Counsel.
8      Q.  No.  You're actually not.
9      A.  You asked me to identify Merck
10 activities that caused adjudications to go
11 wrong.
12     Q.  Un-un.  Then there was a
13 miscommunication.
14     My question is:  Tell me every case
15 where Merck caused a particular event not
16 to be adjudicated in any Vioxx clinical
17 trial.
18     A.  Okay.  All cases after the cardiac
19 SOP was modified in which patients
20 experienced pulmonary edema, congestive
21 heart failure, certain arrhythmias -- and
22 if you want, we can go through the cardiac
23 SOP and look at what diagnoses were
24 systematically struck through by Merck so

Page 477

1  as to prevent those cases from being
2  adjudicated.
3      Now, I can't tell you the case
4  numbers or the gender or the age of those
5  people.  But I can tell you that if you
6  throw out anybody who had pulmonary edema
7  or congestive heart failure from
8  adjudication, you are going to definitely
9  underestimate cardiac events.
10     Q.  And is it your view, sir, that by
11 not including the category of pulmonary
12 edema events in the adjudication process
13 that that ended up creating a misleading
14 or incorrect result in the Vioxx clinical
15 trials?
16     A.  I can say that doing so will
17 clearly and systematically reduce
18 ascertainment of myocardial infarctions and
19 other important cardiac events.
20     Q.  Did you ever look to see which
21 particular cases in the Vioxx clinical
22 trials involved pulmonary edema in the
23 Vioxx arm to see whether or not there were
24 more cases of pulmonary edema in the Vioxx

12 (Pages 474 to 477)

Jerry Avorn, M.D.

**Page 478**

1  arm than in comparator arms in the Vioxx
2  clinical trials?
3  A.  No.  It's too big.  I would have
4  had to have looked at the case histories
5  of thousands of patients, and I did not do
6  that.  But I think it does speak to a way
7  of analyzing data that caused me concern.
8  Q.  Did the FDA, in any of the
9  documents you reviewed, say that Merck
10  misled them about the ADVANTAGE study?
11  A.  The FDA did indicate that it
12  readjudicated cases and -- excuse me.
13  Counsel, it will help us a great
14  deal if you don't shake your head while
15  I'm trying to -- I'm trying to be
16  responsive to your answer.
17  Q.  That's not what I'm asking.
18  A.  I think it is.
19  (Reporter interruption).
20  A.  The FDA does not -- as you well
21  know -- does not use terms like "The
22  company tried to mislead us."
23  Q.  Did any -- I'm sorry.  Go ahead.
24  A.  That is not what a government

**Page 479**

1  bureaucrat writes down in a report.
2  What the FDA does state is that it
3  readjudicated outcomes in a given case,
4  and it will describe the original
5  presentation of the outcome, and then its
6  readjudication of that outcome.
7  And my observation, from the FDA
8  report that we're talking about, was that
9  as it turned out, it just so happened that
10  in nearly all cases, the FDA's
11  readjudication found more cardiac events
12  than Merck did in those very same cases.
13  Q.  I've heard you on that answer,
14  okay?
15  A.  Okay.  Okay.
16  Q.  Did you see any reference in any of
17  the FDA materials you reviewed where the
18  FDA said that they believed Merck was
19  misleading them with the results of the
20  ADVANTAGE study?
21  A.  (Witness viewing document).  As I
22  said, the FDA does not use terms that --
23  such as "You have misled us."
24  Q.  Is the answer no?

**Page 480**

1  A.  Right.
2  Q.  In fact, you haven't seen a single
3  instance in any of the FDA materials for
4  any of the clinical trials where the FDA
5  said they felt Merck mislead them in how
6  Merck presented the data to the FDA, true?
7  A.  (Witness viewing document).
8  Quoting the FDA in a letter to Merck,
9  "Your misrepresentation of the safety
10  profile for Vioxx is particularly
11  troublesome because we have previously, in
12  an untitled letter, objected to promotional
13  materials for Vioxx."
14  And so, yes, FDA has notified Merck
15  that it felt, in as many words, that Merck
16  was misrepresenting the safety profile of
17  Vioxx.
18  Now, in that case they were
19  referring to Merck's promotion.  But, yes,
20  FDA has accused Merck in writing of
21  misrepresenting the safety of its drug.
22  Q.  So the FDA does use words like
23  misleading if they believe an act is
24  misleading, right?

**Page 481**

1  A.  Yes.
2  Q.  Did you see, in any of the FDA
3  materials that you reviewed, any statement
4  by the FDA that they felt the way Merck
5  presented the data from the Vioxx clinical
6  trials was misleading?
7  MR. TISI:  Data from --
8  MR. GOLDMAN:  To them.  To
9  the FDA.
10  MR. TISI:  Okay.
11  A.  Can you just read back -- Did I
12  see any evidence?
13  Q.  Did you see any reference in any of
14  the FDA materials, sir, where the FDA said
15  that they felt Merck was misleading them,
16  the FDA, in the way that Merck presented
17  data from clinical trials?
18  A.  Okay.  If you want, we can pull
19  out the FDA report of the ADVANTAGE
20  outcomes.
21  What that report says, as you know,
22  was that the outcomes presented by Merck
23  were considered erroneous by the FDA's
24  medical officer as having underestimated

13 (Pages 478 to 481)

Jerry Avorn, M.D.

Page 482

1  the number of cases.  That is there in
2  the FDA's report.
3      Q.  Okay.
4      A.  Did they use the word misleading in
5  their report?  No.  But frankly, it seems
6  pretty obvious to me that if they say,
7  here are the number of cardiac events that
8  Merck reported with patients on Vioxx, we
9  found that many more people had cardiac
10 events on Vioxx, and we corrected the
11 numbers upward because we think Merck got
12 it wrong.  And to me, that -- that sure
13 looks like the FDA's perception or the
14 FDA's judgment that Merck had
15 underestimated the cardiovascular outcomes
16 of its drug.
17     Q.  I want to go back to my original
18 question.
19     A.  Did they send a letter saying that?
20 Not to my knowledge.
21     Q.  Did Merck hide the results of Study
22 090?
23     A.  Now we're not talking about
24 ADVANTAGE; we're talking about 090?

Page 483

1      Q.  Well, because you decided to talk
2  about ADVANTAGE --
3      A.  Okay.  090 then.
4      Q.  -- in response to my question about
5  090.  So let's start over.
6      A.  Okay.  Okay.
7      Q.  Did Merck hide the results of Study
8  090?
9      A.  All right.
10         MR. TISI:  Objection.
11     A.  In that -- as I -- and I just want
12 to refer to my report about the
13 cardiovascular card, because I think that's
14 -- that's exactly the response to your
15 question that I need to give.
16     Q.  The CV Card you're now talking
17 about?
18     A.  Yes.  I'd like a minute to read
19 this, please.
20     Q.  Sure.
21     A.  (Witness viewing document).  Okay.
22 I can answer your question in the
23 affirmative.  I do believe that Merck hid
24 the results of Study 090 in the following

Page 484

1  way, and this is a problem that has come
2  up a number of times.
3      If the main means of communicating
4  results is via, quote, educational
5  materials, unquote, that are actively
6  disseminated to physicians, or a paper, as
7  in the case of VIGOR, that was published
8  in the most widely read medical journal in
9  the country, and if those materials fail
10 to include, or hide, to use your term, .
11 important information about risk, it does
12 not relieve the company of responsibility
13 for them to say, as they did with Study
14 090, and as they did with the additional
15 heart attacks in the case of the VIGOR
16 study, "Oh, well, we told FDA about it."
17 Because most doctors do not go to the FDA
18 Web site to understand the risks of drugs.
19 They read journals.  They talk to sales
20 reps.  They look at advertisements.  And
21 that is where their opinion comes from.
22     In my view, failing to include
23 important risk information in papers or in
24 teaching materials, including the

Page 485

1  cardiovascular card, in the case of Study
2  090, is a very important way of hiding
3  data and saying, "Well, it was put in some
4  FDA report," does not in any way undo that
5  hiding.
6      Q.  Do doctors obtain information from
7  medical journals?
8      A.  Yes.
9      Q.  Did Merck hide the results of Study
10 090 from the FDA?
11     A.  Probably not.
12     Q.  Why do you say probably?
13     A.  Well, I -- I would need to go back
14 and see if there was a problem of their
15 misadjudicating outcomes, as they did with
16 ADVANTAGE, which is, as I said a few
17 minutes ago, a form of hiding.
18     Q.  Is it true, sir, that the numbers
19 of events in the Study 090 were too small
20 for meaningful comparison?
21         MR. TISI:  Objection to the
22 word "meaningful."
23     A.  This deals with an issue that came
24 up yesterday and will come up again today,

14 (Pages 482 to 485)

Jerry Avorn, M.D.

Page 486

1   and we can perhaps dispense with it with a
2   quick response.
3        It is always possible to look at
4   one specific result from one study and say
5   it did not meet the significance test of
6   people in '05, and therefore it was
7   somehow not real or not meaningful or not
8   important.
9        What matters is the totality of all
10  of those results, several of which taken
11  in isolation may not meet the test of
12  significance, but when looked in the
13  totality -- which often can be done only
14  by the company if the results are not all
15  in the public domain -- that it becomes an
16  important finding.
17       And so if you look at any one
18  study with one particular outcome and you
19  say, well, the numbers were small, yes, if
20  that's all there was, that would be not a
21  big deal. But it's the totality where it
22  does become a big deal.
23       Q. Is it your view that when you look
24  at Study 090 and also consider the VIGOR

Page 487

1   study, that the number of events in Study
2   090 are then large enough to be meaningful
3   for comparison?
4        MR. TISI:  Objection.
5        A. For comparison of what?
6        Q. Well, when you're evaluating the --
7   the potential cardiovascular risk
8   associated with Vioxx, have you written
9   that you believe Study 090 shows an
10  increased cardiovascular risk associated
11  with Vioxx, right?
12       A. Right.
13       Q. And you believe that Study 090
14  replicates the VIGOR study, and that both
15  demonstrate an increased cardiovascular
16  risk associated with Vioxx, right?
17       A. I think that's a bit of a
18  distortion in that, if all that existed in
19  the world were Study 090, I would not
20  conclude from that that this is
21  incontrovertible evidence of the
22  cardiovascular risk of Vioxx.
23       Q. And my question -- I just want to
24  focus on Study 090 and VIGOR. That's all

Page 488

1   I want to talk about.  Okay?
2        A. Okay.
3        Q. Is it your view that Study 090
4   replicates the results found in VIGOR?
5        A. I think replicates is not the
6   correct word. But are completely
7   compatible with and -- and further, I
8   guess, demonstrate the results.
9        Q. Do you remember Study 085?
10       A. Yes.
11       Q. I think you mentioned that in your
12  report, right?
13       A. Yes.
14       Q. Did Study 085 demonstrate any
15  increased cardiovascular risk from Vioxx?
16       A. Not to my knowledge.
17       Q. Do you agree, when you look at
18  Study 085 and 090 together you would not
19  conclude that there was an increased
20  cardiovascular risk from Vioxx?
21       A. If one were to pool those two
22  findings, the -- there would not be an
23  impressive signal.
24       Q. Is it true that doctors are

Page 489

1   interested in the tolerability of
2   medications they provide?
3        A. Yes.
4        Q. I said provide.
5        Is it true that doctors are
6   interested in the tolerability of
7   medications that they prescribe?
8        A. Yes.
9        Q. Is it important that patients be
10  able to tolerate medications?
11       A. Yes.
12       Q. If patients can't tolerate
13  medications, then some of them won't be
14  able to treat their disease state, right?
15       A. Correct.
16       Q. You said in your report, and I
17  believe you indicated yesterday, that you
18  think Merck did not provide the results of
19  ADVANTAGE in a timely fashion to the FDA.
20  Is that a fair description?
21       A. If you're quoting my report, please
22  show me where in my report I said it.
23       Q. I'm not quoting. I'm interpreting
24  your report, and tell me if this is fair,

15 (Pages 486 to 489)

Jerry Avorn, M.D.

Page 490

1    okay?
2        A.   Well, I'd like to read my own words
3    before I confirm what I said.
4        Q.   Well, let me ask you:  Do you
5    believe, sir, that Merck did not submit
6    the results of the ADVANTAGE study to the
7    FDA in a timely fashion?
8        A.   Yes.
9        Q.   Do you know when Merck obtained the
10   final results of the ADVANTAGE study?
11       A.   Well, when a company obtains the
12   final results, it's a function of when the
13   company makes it its business to obtain
14   the final results, in that the company was
15   conducting the study, which was in a time
16   frame similar to that of VIGOR, which
17   somehow had its results finalized much
18   quicker than ADVANTAGE.
19       Q.   Is it your position, sir, that
20   Merck stalled on attempting to get the
21   results of the ADVANTAGE study?
22       A.   I -- I can't know that, but I
23   think it's very important to point out
24   that if a company is conducting a study,

Page 491

1    when it is -- when, quote, the final
2    results come in, closed quote, has a great
3    deal to do with how expeditiously the
4    company does its work.
5        Q.   Did the FDA, in any of the
6    materials you reviewed, indicate that they
7    believed Merck did not submit the
8    ADVANTAGE study in a timely fashion?
9        A.   I know that FDA wanted the results
10   of the ADVANTAGE study before finalizing
11   its label, and I know that FDA was
12   concerned that it was not getting the
13   results of the ADVANTAGE study when it
14   wanted them.  So I guess I believe that
15   that's the case.
16       Q.   Do you know, sir, that the FDA had
17   the results of the ADVANTAGE study before
18   approving the language of the April 2002
19   Vioxx label?
20       A.   I believe that they eventually got
21   it before April of 2002.  But it was
22   completed well, well before that.
23           (Off the record at 9:36
24   a.m.)

Page 492

1        (Recess taken).
2        (Back on the record at 9:38
3    a.m.)
4        BY MR. GOLDMAN:
5        Q.   My question, Dr. Avorn, was whether
6    the FDA had the results of the ADVANTAGE
7    study before they approved the language of
8    the April 2002 Vioxx label.
9        A.   I believe they did.
10       Q.   What is the test for heterogeneity?
11       A.   That is a statistical test in which
12   different studies or different groups
13   within a study or the results in different
14   groups are compared with one another to
15   determine if they are significantly
16   different from one another.
17       Q.   Is it important that a study
18   satisfy the test for heterogeneity to be
19   able to make meaningful conclusions from
20   it?
21       A.   That's also not a quick yes-no.  It
22   helps and it's reassuring if there is
23   hetero -- if there is not heterogeneity.
24       Q.   Mm-hmm.

Page 493

1        A.   But it does not blow away any
2    conclusions if there is.
3        Q.   Is the concept of heterogeneity
4    sort of like making sure that you're
5    comparing apples to apples and not apples
6    to bananas?
7        A.   Yes.
8        Q.   You, I believe, indicate in your
9    report that Merck never told the FDA or
10   the medical community about how Vioxx
11   compared to placebo or other comparators
12   on the endpoint of heart attack or MI.
13   Is that your view?
14       A.   Never told who?
15       Q.   The FDA or the medical community.
16       A.   Well, in the sense that the company
17   eventually gave all of its clinical trial
18   data to FDA and that the FDA eventually
19   readjudicated it as needed and got the
20   data, eventually the FDA received that
21   information.
22           But in terms of its communication
23   to physicians, I think there was selective
24   communication of -- of findings by Merck.

16 (Pages 490 to 493)

Jerry Avorn, M.D.

Page 494

1   Q.  Did Merck tell the medical
2   community in any way how Vioxx compared to
3   placebo or other active comparators on the
4   endpoint of MI or heart attack?
5   A.  Inaccurately, in my view.  And I
6   can explain why.
7        In terms of active comparators,
8   we've discussed the fact that in the main
9   publication, which is probably the single
10  most commonly read paper about Vioxx, the
11  VIGOR study, the company failed to reveal
12  cases of MI that were known to it before
13  the paper was published.
14       In terms of the main tool that the
15  company used to educate, in quotes,
16  physicians about the cardiovascular effects
17  of Vioxx, it selectively presented some
18  studies but not all studies concerning
19  cardiovascular outcomes in its teaching
20  materials.
21       And in its training materials for
22  its sales reps, the famous dodge ball
23  training materials, it presented what seems
24  clearly to be a recipe for minimizing and

Page 495

1   distorting the cardiovascular outcomes of
2   Vioxx.
3        And in relation to its memos to its
4   sales staff about how to discuss various
5   articles that appeared in the literature,
6   whether it was the one from our group or
7   papers that others had produced, those
8   materials also struck me as essentially
9   providing guidance for how to minimize the
10  problem rather than for how to communicate
11  it.
12       So, yes, I would say that Merck
13  failed to provide the medical community
14  with a -- an adequate description of MIs
15  and other cardiovascular outcomes of their
16  drug.
17  Q.  Do you remember my question?
18  A.  I thought I was responsive, but you
19  can read it back.
20  Q.  My question was:  Is it your
21  position that Merck never told the medical
22  community about how Vioxx compared to
23  placebo or other comparators on the
24  endpoint of MI?  You can answer that yes

Page 496

1   or no.
2   A.  I think my answer was responsive
3   exactly to that question.  And when you
4   say never told, that's kind of an odd
5   phrase.  I think their telling was
6   inaccurate and distorted.
7   Q.  Why is the dodge ball training
8   materials considered famous to you?
9   A.  Because it has received a great
10  deal of attention in the circles that I
11  move in in medical school and in
12  pharmacopeia.  It also has received a
13  certain amount of notoriety I think
14  publicly.
15  Q.  Do you know, sir, how the dodge
16  ball training game actually worked?
17  A.  I know that sales reps were to be
18  awarded points for certain answers, and
19  that the answers -- and if I can just
20  refer to my report -- the answers often
21  were written in a way that seemed designed
22  to obscure the relationship with --
23  between Vioxx and cardiovascular outcomes.
24  Q.  Mm-hmm.  Am I right, sir, that when

Page 497

1   you are giving that answer, you're
2   providing your personal opinion about what
3   the dodge ball training materials
4   describe --
5        MR. TISI:  Objection.
6        BY MR. GOLDMAN:
7   Q.  -- right?
8        MR. TISI:  Objection.
9   A.  No.  I'm quoting from Merck's own
10  materials.
11  Q.  Have you ever spoken with any sales
12  representative or any individuals at Merck
13  about how the dodge ball training exercise
14  worked?
15  A.  No.
16  Q.  Did you read any depositions at
17  all, sir, on that topic?
18  A.  No.  But frankly, the fact that
19  anyone could even have prepared a
20  so-called training program of this kind I
21  found appalling.
22  Q.  Is it your position, sir, you're
23  going to tell the jury that the dodge ball
24  materials are being discussed in medical

17 (Pages 494 to 497)

Jerry Avorn, M.D.

Page 498

1  schools and they're being discussed in the
2  medical community?
3  A.  No.  The -- Yes.  The fact that
4  Merck prepared a training game for its
5  sales reps called dodge ball, which
6  contained material of the kind that I
7  quoted in my report, in conversations with
8  colleagues with an interest in clinical
9  decision making and physician education,
10  many of us were absolutely struck with the
11  -- from reading from the accounts that had
12  made it into the media, that this was a
13  very strange way to educate physicians.
14  Q.  Did the meta-analysis that was
15  prepared by Dr. Shapiro pass the test for
16  heterogeneity?
17  A.  Now, by that do you mean the slide
18  sets that she showed to colleagues at
19  Merck?
20  Q.  What I mean is the materials that
21  you reviewed on the meta-analysis.  And I
22  can show it to you if you want.
23      MR. TISI:  I think that
24  would be helpful.  Thank you.

Page 499

1      BY MR. GOLDMAN:
2  Q.  While we're looking for it, did you
3  review the --
4  A.  I reviewed Dr. Shapiro's analyses,
5  and we can maybe make things go quicker to
6  say that I would not be surprised if there
7  was heterogeneity across the studies that
8  she looked at.
9      MR. GOLDMAN:  I didn't bring
10  it.
11      MR. TISI:  I have it.  I
12  have it here.  Do you want me to pull it?
13  A.  But if we want to agree that there
14  was probably heterogeneity, we can agree
15  on that.
16      MR. TISI:  I mean, do you
17  want me to pull it?
18      BY MR. GOLDMAN:
19  Q.  I just wanted to know whether or
20  not your view is that the study passed the
21  test for heterogeneity.
22  A.  And my understanding was that there
23  was heterogeneity.
24  Q.  Okay.  Let's talk about the

Page 500

1  Alzheimer's trials, okay?
2  A.  Okay.
3  Q.  Do you agree that there was no
4  statistically significant difference in
5  heart attacks in the Alzheimer's trials
6  between Vioxx and placebo?
7  A.  (Witness viewing document).  No.
8  Q.  What's your basis for that?
9  A.  That the ascertainment, as I
10  indicated in my report, of heart attack in
11  elderly people, particularly elderly people
12  with dementia, is very difficult.
13      Even in elderly people without
14  dementia, we know that about a quarter of
15  heart attacks are not symptomatic.  So any
16  conclusions about the rate of heart
17  attacks that is not based on a fairly
18  active surveillance mechanism, but rely on
19  kind of spontaneous report of heart
20  attacks but do not have a component of the
21  study designed to determine who had a
22  heart attack and who didn't proactively,
23  is of minimal reliability.
24  Q.  Have you described your bases for

Page 501

1  saying that there is a statistically
2  significant difference in heart attacks in
3  the Alzheimer's trials between Vioxx and
4  placebo?
5  A.  I didn't say that there was.
6  Q.  Yes, you did.
7  A.  Can you read back the question?
8  Q.  My question was:  Do you agree that
9  there was no statistically significant
10  difference in heart attacks in the
11  Alzheimer's trials been Vioxx and placebo?
12  A.  Right.  And the reason that I said
13  I didn't agree is that I don't know from
14  the data available whether there was or
15  wasn't a difference in heart attack rates.
16  Q.  Do you know that the peer reviewed
17  published article on the Alzheimer's trial
18  -- let's start with 078 -- demonstrated no
19  statistically significant difference in
20  heart attacks?
21  A.  As I was recall, there was some
22  very major methodological problems with
23  that article.  And the fact that something
24  makes it into a peer review journal is not

18 (Pages 498 to 501)

Jerry Avorn, M.D.

Page 502

1   in and of itself a guarantee that they got
2   it right.
3       There was problems, as I recall,
4   with the analysis in terms of whether it
5   was intentioned to treat or not in the
6   follow-up of patients. And we could go
7   over that paper in particular.
8       So they did not -- and as I also
9   recalled, there was a paper that was
10  written either mostly or predominantly by
11  Merck scientists, and it did not seem to
12  me to be a compelling representation of
13  the findings in that study.
14      Q.  Do you think because there were
15  Merck scientists on a paper about
16  Alzheimer's that that calls into question,
17  in your mind, the reliability of the study
18  and the way it's presented?
19      A.  Not in and of itself.
20      Q.  Okay. Did you see, sir, in the
21  materials that the FDA believed that there
22  was no statistically significant difference
23  in heart attacks in the Alzheimer's
24  trials?

Page 503

1       A.  Yes.
2       Q.  And you take issue with the FDA's
3   judgment on that?
4       A.  Well, I think FDA -- saying that a
5   study failed to find a difference does not
6   mean to -- does not mean the same thing
7   as there was no -- there was no
8   difference.
9       Q.  Do you dispute the FDA's conclusion
10  that there was no difference in -- in
11  heart attacks in the Alzheimer's trials
12  between Vioxx and placebo?
13      A.  Yes, I do, for the following
14  reason.
15      Q.  Actually, just say yes, you do.
16  Okay?
17      A.  Yes, I do.
18      Q.  Do you believe that there was a
19  statistically significant difference for
20  heart attacks and strokes combined in the
21  Alzheimer's trials between Vioxx and
22  placebo?
23      A.  What I believe is that there was a
24  doubling of mortality and that that raises

Page 504

1   the likelihood that there was an important
2   risk in one group and not in the other.
3       I can't speak to what that risk
4   was, whether it was stroke or heart attack
5   or both.
6       Q.  Before you were retained as an
7   expert witness, sir, did you ever say
8   anywhere that you thought that the
9   mortality question in Alzheimer's raised a
10  question about whether Vioxx caused
11  cardiovascular events in the Alzheimer's
12  trials?
13      A.  I'd never seen data on mortality.
14      Q.  And the data that you're relying on
15  is data from Dr. Ray, who is quoting Dr.
16  Kronmal?
17      A.  No. I believe that there also are
18  other sources of data on the eventually
19  reported mortality difference in that --
20  in those studies.
21      Q.  What are you relying on for your
22  opinion that there was an increase in
23  mortality between Vioxx and placebo in the
24  Alzheimer's trials, sir?

Page 505

1       A.  I honestly can't remember what the
2   source was, but I believe that they were
3   sources apart from Dr. Ray and Dr. Kronmal
4   in the reporting of the mortality data
5   from the Alzheimer's studies. And I
6   simply can't remember where I got that
7   from.
8       Q.  And you don't refer to that in your
9   report anywhere, do you, sir?
10          MR. TISI:  Objection.
11      A.  I thought I did. Let me take a
12  look.
13          MR. TISI:  Yeah.
14      A.  (Witness viewing document).
15          MR. TISI:  What page do we
16  have that discussion on? I'm sorry. Oh,
17  here it is.
18          MR. GOLDMAN:  Fifteen.
19          MR. TISI:  Sixteen,
20  actually.
21          MR. GOLDMAN:  Yeah, top.
22          MR. TISI:  I think it's
23  Page .16. Can I help -- I can find where
24  he's -- It goes 15 to 16.

19 (Pages 502 to 505)

Jerry Avorn, M.D.

Page 506

1    A.  (Witness viewing document).  Okay.
2  Sure.  Thank you.  Yes.  Here it is.
3  Yeah.  It definitely is here.  On the top
4  of Page .16.
5    Q.  Mm-hmm.
6    A.  "Of greatest concern, the mortality
7  rate of subjects given Vioxx in Merck's
8  Alzheimer's studies was double that seen
9  in subjects randomized to placebo.  Having
10  practiced and taught geriatrics for many
11  years, I'm aware that ascertainment of and
12  causes of death in an elderly
13  patient's --"
14         (Reporter interruption).
15         MR. TISI:  Actually, I think
16  he's got a different question.  He just
17  wants to know what you rely on.
18    A.  I got it.  Right.  Okay.
19    Q.  My question -- My question --
20    A.  Yeah.
21    Q.  -- Dr. Avorn, is whether in your
22  report you cite the actual source of the
23  data that you're relying on for the
24  proposition that there was an increase in

Page 507

1  mortality in the Alzheimer's trials between
2  Vioxx and placebo?
3    A.  Okay.  Let me refer to the tabs
4  that I have indicated here to see, because
5  I'm fairly certain that it was not
6  exclusively via Dr. Ray's report.
7    Q.  Okay.
8    A.  And I'll just take a moment to do
9  that.
10         MR. TISI:  I have a portion
11  of the binders here, if you need.
12         THE WITNESS:  Okay.
13         MR. TISI:  Which ones do
14  you need?
15         THE WITNESS:  Okay.  Now,
16  this -- this one doesn't have -- okay.
17  That's old 110 and 109.  Okay.
18         MR. TISI:  That's --
19         MR. GOLDMAN:  Just let him
20  find it.
21         MR. TISI:  I'm sorry?
22         MR. GOLDMAN:  I said just
23  let him find it.
24         (Off the record at 9:55

Page 508

1  a.m.)
2         (Recess taken).
3         (Back on the record at 9:56
4  a.m.)
5         BY MR. GOLDMAN:
6    Q.  In your report, sir, you have
7  handwritten some tab numbers that you say
8  you're now looking for.
9         What are the tab numbers in your
10  binders that you are looking at to find
11  the support for the mortality information?
12    A.  Okay.  The first one is Tab 35 --
13    Q.  Okay.
14    A.  -- which is a memo to Dr. Scolnick
15  from Dr. Block.
16    Q.  Okay.
17    A.  And the second one is Tab 68, which
18  is a Merck document called Deaths in
19  Studies 078, 091 and 126.
20         The third is a -- is Tab 69, a
21  memo from Joshua Chen to Dr. Bain called
22  Mortality Analysis for Protocol 091 and
23  078.
24    Q.  You can just tell me the tab

Page 509

1  numbers.
2    A.  Well, before I tell you them, I
3  want to make sure that they are what I'm
4  thinking of.  And to do that I've got to
5  -- It's not that one.
6         THE WITNESS:  Do we have
7  more binders?
8         MR. TISI:  I have one right
9  here.  That's why I was --
10         THE WITNESS:  Okay.
11         MR. TISI:  It's right here,
12  Doctor.
13         THE WITNESS:  Okay.
14    A.  Okay.  Another is Tab 133.
15    Q.  Mm-hmm.
16    A.  A memo to Ray Bain from Josh Chen.
17    Q.  Mm-hmm.
18    A.  That is called Summary of the
19  Mortality Analysis.  Another is Tab 147
20  from Dr. Chen to Dr. Bain; similar title.
21  And the last is Tab 146, which is the
22  12/18/04 Interim Review on Cardiovascular
23  Thrombotic Events in Alzheimer's Studies.
24  This looks like an FDA document.

20 (Pages 506 to 509)

Jerry Avorn, M.D.

Page 510

1    Q.  Is that the list of numbers that
2  you've indicated on your --
3    A.  Yes.
4    Q.  -- report?
5       I also want to mark as the next
6  exhibit, Doctor, the expert report you're
7  looking at with the tabs written next to
8  it.  Okay?
9    A.  Sure.  Sure.
10       MR. GOLDMAN:  Let me mark
11  that as 14.
12       MR. TISI:  The only thing
13  is I would like to make a copy, so he can
14  leave with it.
15       MR. GOLDMAN:  That's fine.
16       MR. TISI:  Then you can
17  mark the original report if you'd like.
18       MR. GOLDMAN:  Okay.
19       MR. TISI:  Doctor, can I
20  have your report --
21       THE WITNESS:  Sure.
22       MR. TISI:  -- so I can put
23  a sticker on it, please?
24       (Exhibit-14, Expert Report

Page 511

1  of Jerry Avorn, M.D., dated March 20,
2  2006, marked for identification).
3       BY MR. GOLDMAN:
4    Q.  Dr. Avorn, is it your testimony
5  that you reviewed all of the information
6  that was behind the tabs that you just
7  referred to?
8    A.  Absolutely.
9    Q.  The -- We're going to talk about
10  all-cause mortality in a minute --
11       MR. TISI:  Could we go off
12  the record for one second?
13       MR. GOLDMAN:  Sure.
14       (Off the record at 9:59
15  a.m.)
16       (Recess taken).
17       (Back on the record at 10:00
18  a.m.)
19       BY MR. GOLDMAN:
20    Q.  What's your definition of an ITT
21  analysis, sir?
22    A.  Intention-to-treat, which means that
23  all patients in a study are followed up on
24  regardless of whether they drop out of a

Page 512

1  given treatment group.
2    Q.  Is data better and more reliable
3  the longer you follow people in a
4  particular study?
5    A.  It depends.
6    Q.  Sometimes the data is more
7  reliable, sometimes it's less reliable,
8  depending on how long you study the
9  patients, right?
10    A.  Correct.
11       MR. TISI:  Objection.
12       MR. GOLDMAN:  Mm-hmm.
13       MR. TISI:  Go ahead.
14       BY MR. GOLDMAN:
15    Q.  Do you agree, sir, that on-therapy
16  experience may be more appropriate when
17  analyzing data on the side effects of
18  therapy?
19    A.  Not necessarily.
20    Q.  Well, when is on-therapy experience
21  more appropriate when analyzing side
22  effects of drug therapy?
23    A.  Well, if the side effect is
24  instantaneous, like anaphylaxis, then an

Page 513

1  on-therapy design would be plausible.
2       If the side effect is one that may
3  occur with some delay, even after a drug
4  is stopped, particularly if it might occur
5  more than 14 days after the drug is
6  stopped, then one could definitely miss
7  important adverse events if you stopped
8  considering patients within 14 days of
9  stopping.
10       And there's another important
11  point, and that is that an on-therapy
12  analysis drops out patients who stop
13  therapy, and if they stop therapy because
14  of a side effect, which perhaps may not be
15  documented or detected within 14 days, you
16  lose ascertainment of that side effect if
17  you stop considering that patient once
18  they're off therapy.
19    Q.  Is it your opinion, sir, in Merck's
20  analysis of the Alzheimer's data that
21  Merck did not count patients who stopped
22  the study because of a side effect?
23       MR. TISI:  What analysis,
24  Counsel?

21 (Pages 510 to 513)

Jerry Avorn, M.D.

Page 514

1   A.  In --
2   Q.  Do you know what I'm talking about?
3   A.  I do.  And I know that Merck did
4   it several different ways, so they were
5   intention-to-treat analyses, and there were
6   on-therapy analyses, both.
7   Q.  Is it your testimony that Merck did
8   not include, in the analyses that were
9   done on the Alzheimer's trials, adverse
10  events that occurred when people stopped
11  using Vioxx in the clinical trials?
12  A.  All right.
13       MR. TISI:  Objection.
14  A.  Let me answer that again.  Merck
15  performed analyses on an intention-to-treat
16  basis as well as on an on-therapy basis.
17  Q.  Fine.
18  A.  If your question is about did they
19  miss side effects in their on-therapy or
20  on-treatment analysis, the important point
21  here, which is a subtle one, but very,
22  very important, is that if a patient has
23  an adverse event, let's say, on March 1st,
24  and perhaps is not identified as a heart

Page 516

1   A.  And the -- the first part of the
2   question is, is it important?
3   Q.  You would agree, sir, that before
4   concluding that Merck should have analyzed
5   all of the data and planned to do that in
6   advance of the trials through 210 weeks,
7   let's say, after a particular study ended,
8   it would be important to think about
9   whether there was a biologic mechanism
10  that might cause patients to suffer side
11  effects after they're done taking Vioxx,
12  right?
13  A.  Would it be important -- I'm trying
14  to get back to the beginning of the
15  sentence.
16  Q.  To you.  To you.
17  A.  Would it be important to consider
18  whether there is a mechanism in place?
19  Q.  Yes.
20  A.  That would be an important thing to
21  take into account.
22  Q.  And the mechanism that everybody is
23  talking about, about how Vioxx could
24  potentially cause heart attacks, involved

Page 515

1   attack or -- or anything, but simply feels
2   sick, doesn't show up anymore for the
3   study, doesn't take the drug, and then you
4   stop counting any events in that patient
5   two weeks later after they've dropped out
6   of the study, if the adverse event is not
7   ascertained accurately in those two weeks,
8   that adverse event will not be counted.
9   Q.  Is it important when you are
10  determining, not after the fact, but when
11  you're planning a study, is it important
12  to think about what are the possible
13  biologic mechanisms that could lead to
14  side effects down the road with a
15  particular medicine?
16  A.  That is one important step.
17  Q.  It's important -- Before you just
18  say that everybody should be looking at
19  all the data through the year after a
20  particular study, that there be some
21  mechanism that somebody -- not after the
22  fact -- but at the time -- anticipates
23  might cause heart attacks or strokes after
24  people stop using Vioxx, true?

Page 517

1   this imbalance between prostacyclin and
2   thromboxane, true?
3       MR. TISI:  Objection.
4   A.  I think that your continuously
5   referring back to that is a kind of
6   reductionist approach that oversimplifies
7   the issues.
8   Q.  Have you ever, in any of your
9   articles, sir, said that Vioxx can cause
10  heart attacks by a mechanism other than by
11  reducing prostacyclin and create an
12  imbalance?
13  A.  I've not -- I don't write about
14  mechanisms.
15  Q.  So the answer is no?
16  A.  Right.
17  Q.  Okay.  If Merck didn't have a
18  reason to think that these patients in
19  their studies would suffer a side effect
20  more than 14 days after stopping the
21  medicine, would you agree that it would be
22  appropriate to stop analyzing the data at
23  14 days after the study?  Just -- Let's
24  assume that my premise is correct.

22 (Pages 514 to 517)

Jerry Avorn, M.D.

Page 518

1   A.   Mm-hmm.
2   Q.   Is my conclusion accurate?
3   A.   In a population of elderly people,
4   I believe that the issues are different,
5   because we know that problems may be
6   underascertained, and their consequences
7   may become clearer or evident more than
8   two weeks after a drug is stopped.
9        So I would say that both an
10  on-treatment and an intention-to-treatment
11  analysis would be appropriate in that
12  setting, particularly in demented elderly
13  patients in whom ascertainment of side
14  effects may not be evident within two
15  weeks.
16       So I'm not saying it's
17  inappropriate to have considered an
18  on-treatment analysis, but I would also
19  have said that if one does that, one
20  should also consider an intention-to-treat
21  analysis.
22  Q.   Did the FDA know what the plan was
23  before the Alzheimer's trials in terms of
24  analyzing the side effects?

Page 519

1   A.   I believe they did.
2   Q.   The FDA was aware that the plan
3   going into the Alzheimer's trials was to
4   look at adverse events that occurred on
5   therapy through 14 days after the study
6   ended, right?
7   A.   Right.
8        MR. TISI:  Objection as to
9   incomplete.
10       BY MR. GOLDMAN:
11  Q.   Do you know, Dr. Avorn, whether in
12  any of the other NSAIDs that are on the
13  market, there have been clinical trials
14  where adverse events have been studied for
15  a year after a particular study ends?
16  A.   I believe that in the Celebrex
17  colon polyps studies, there are ongoing
18  studies, as there was with APPROVe.
19  Q.   Anything else?
20  A.   Not to my knowledge.
21  Q.   Do you know in the Alzheimer's
22  trials whether Vioxx patients were followed
23  for a longer period of time after they
24  stopped using the medicine than the

Page 520

1   patients in the placebo arm were followed?
2   A.   I don't know.
3   Q.   Do you know whether there was a
4   difference in the number of Vioxx patients
5   who were followed after the Alzheimer's
6   trials ended compared to the placebo
7   patients?
8   A.   There should not have been, because
9   they were supposed to be double-blind
10  studies.
11  Q.   Do you agree, sir, that during the
12  off-drug period in the Alzheimer's trial
13  there was no statistically significant
14  difference in heart attacks or thrombotic
15  cardiovascular events between Vioxx and
16  placebo?
17       MR. TISI:  Objection,
18  misstates.
19  A.   I believe that's the case, but for
20  -- my concern is what I stated earlier,
21  which is ascertainment of a heart attack
22  in a demented elderly patient is very
23  problematic.
24  Q.   Well, you would agree, sir, there's

Page 521

1   no reason to think that demented elderly
2   patients would be more likely to miss a
3   heart attack in the Vioxx arm than they
4   would be in the placebo arm, true?
5   A.   That's an incorrect question,
6   because --
7   Q.   I'm not asking you to correct my
8   question.  Can you just say whether or not
9   that's true, or not?
10  A.   Only if I get to explain why that's
11  an incorrect question.  It is -- There
12  would be no reason to think that, except
13  that under-ascertainment of outcomes will
14  always drive the results toward the known.
15  Q.   Is it true that during the off-drug
16  period in the Alzheimer's trials there was
17  no statistically significant difference in
18  heart attacks or thrombotic cardiovascular
19  events?
20  A.   I think we just answered that.
21  Q.   Yes; that's true?
22  A.   I've lost track of who's asking and
23  who's answering.  I believe that that's
24  the case.

23 (Pages 518 to 521)