Jerry Avorn, M.D.

Page 522

1    Q.  You made a statement in the last
2    sentence on Page .15 that Merck did not
3    provide a complete and accurate account of
4    study outcomes to the FDA --
5        MR. TISI:  I'm sorry.  What
6    page?
7        BY MR. GOLDMAN:
8    Q.  -- concerning the Alzheimer's
9    trials --
10       THE WITNESS:  Fifteen.
11       BY MR. GOLDMAN:
12   Q.  -- until Vioxx was off the market.
13   Do you see the last sentence?
14   A.  (Witness viewing document).  Yes.
15   Q.  "To my knowledge, Merck did not
16   provide a complete and accurate account of
17   these study outcomes to the FDA until
18   after the drug had been taken off the
19   market."  Is that your testimony?
20   A.  That is my understanding.  And if
21   there is such an account, I would be
22   pleased to review it.
23   Q.  What is the primary analysis that
24   was prespecified in the Alzheimer's trials

Page 523

1    concerning the time period when -- when
2    patients would be studied?
3    A.  On-treatment, up to 14 days after
4    they stopped treatment.
5    Q.  Did Merck provide that analysis to
6    the FDA before the drug was withdrawn?
7    A.  I believe they did.
8    Q.  Did Merck give the FDA all of the
9    information that would allow the FDA to
10   perform any intention-to-treat analysis
11   they wanted for the Alzheimer's trials?
12   A.  I don't know whether FDA provided
13   them with the raw data needed for that.
14       MR. TISI:  You meant Merck,
15   I assume?  Merck provided FDA?
16   A.  Right.  That's what I meant.
17   Q.  You say that, "Mortality is of
18   greatest concern when analyzing the
19   Alzheimer's trials."  Is that your view?
20   A.  Yes.
21   Q.  Now, the mortality that you are
22   referring to includes deaths that occurred
23   off drug, right?
24   A.  Any mortality, on or off.

Page 524

1    Q.  And did you make any effort at all
2    to determine the cause of the deaths that
3    occurred in patients who had stopped using
4    Vioxx?
5    A.  This is an important -- Yeah.  Yes.
6    Q.  Okay.  That's all I want to know.
7    A.  Yes.
8    Q.  Of the deaths, sir, that occurred
9    in the -- let's say the 078 study, how
10   many occurred more than 48 weeks or 300 --
11   after 300 days after patients stopped
12   using Vioxx?
13   A.  I don't recall that number.
14   Q.  Do you know what the number is for
15   placebo?
16   A.  No.
17   Q.  Do you think it would be important
18   before you blame Vioxx for all of the
19   deaths that occurred in its Vioxx arm
20   after the end of the Alzheimer's trial to
21   take a look to see what the nature of
22   those deaths were?
23       MR. TISI:  Objection to
24   after the end of the study.  Intention to

Page 525

1    treat is while the study is ongoing.  But
2    go ahead.
3    A.  The correct answer is yes, I know.
4    And I need to explain why.
5    Q.  Okay.
6    A.  And this -- this relates to my work
7    in geriatric pharmacology and geriatrics.
8    Q.  Mm-hmm.
9    A.  The cause of death in an older
10   patient, as I indicate in my report, is
11   often very tough to determine.  If an
12   older person has a stroke, perhaps, in
13   their sleep, they may aspirate their
14   stomach contents as a result of the
15   stroke.  It goes into the lungs, and the
16   next day they are discovered to have
17   pneumonia.  That will then be diagnosed as
18   pneumonia, and there may or may not be --
19   or if they have a heart attack and have a
20   transient period of unconsciousness or low
21   blood pressure, they may aspirate and
22   develop a pneumonia.
23       We've reported on -- on this kind
24   of issue in a paper in the New England

24 (Pages 522 to 525)

Jerry Avorn, M.D.

Page 526

1    Journal in December of last year in which
2    we looked at deaths related to a different
3    class of drugs. The important point, if I
4    may finish --
5    Q. Mm-hmm.
6    A. -- is that because heart attacks
7    and strokes may occur unobserved in an
8    elderly patient and do -- we know they do
9    not present typically as they do in middle
10   aged patients, the so-called terminal event
11   may be recorded as a pneumonia or sudden
12   death or any number of things.
13   Q. Mm-hmm.
14   A. So that death is a very, very
15   important outcome, even if the supposed
16   cause of death is gotten wrong. Because
17   one thing you tend to not get wrong in
18   these patients is whether they're dead or
19   not.
20   Q. Is there a statistically
21   significant difference in all-cause
22   mortality in the Alzheimer's trials if you
23   look at just the on-drug period when
24   patients were taking the medicine?

Page 528

1    Alzheimer's trials that was analyzed under
2    this ITT analysis, are you aware of any
3    other Vioxx clinical trial where there was
4    an increase in all-cause mortality in the
5    Vioxx arm?
6    A. Okay. Let me just continue to look
7    through these, because I obviously don't
8    keep all these in my head.
9        (Witness viewing document).
10   Q. Why don't I do this, Dr. Avorn --
11   A. Yes.
12   Q. Because it's going to take too long
13   for you to look through all of them.
14   A. Okay.
15   Q. Do you, in your expert report,
16   indicate, sir, the names or descriptions
17   of any other Vioxx clinical trial that
18   showed an increase in all-cause mortality
19   in the Vioxx arm?
20   A. I think that's quite different from
21   what you just asked me.
22   Q. It is different. Can you answer
23   the question I just asked?
24   A. Okay. Do I indicate study numbers

Page 527

1    A. I believe there is not.
2    Q. Are you aware of any other Vioxx
3    clinical trial, sir, other than the 078
4    Alzheimer's trial, that showed a
5    statistically significant difference in
6    all-cause mortality?
7    A. Okay.
8        (Witness viewing documents).
9    There's protocol 091 --
10   Q. Mm-hmm.
11   A. -- as per Tab 35, in which Drs.
12   Block and Reines, R-E-I-N-E-S, report a
13   statistically significant, almost fivefold
14   increase in the death rate in patients in
15   that Alzheimer's study using an
16   intention-to-treat analysis. And that's
17   from a Merck internal document dated March
18   21st, 2001.
19   Q. Other than Study 078 and 091 in the
20   Alzheimer's trials, do you know, sir,
21   whether or not there was an increased
22   statistically significant difference --
23   Withdrawn.
24       Other than Study 078 and 091 in the

Page 529

1    in my report?
2    Q. Do you indicate anywhere in your
3    expert report any studies, other than the
4    Alzheimer's studies, where you claim there
5    was an increase in mortality between Vioxx
6    and a comparator?
7    A. Where do I make that claim? I'm
8    asking for information about what your
9    question relates to.
10   Q. Sir --
11   A. You said I claim all-cause
12   mortality --
13       MR. TISI: I think you're
14   just not --
15       BY MR. GOLDMAN:
16   Q. Do you indicate anywhere in your
17   report --
18   A. Right.
19   Q. -- whether or not a study other
20   than Alzheimer's --
21   A. Right.
22   Q. -- for the Vioxx drug reflects an
23   increased risk of mortality between Vioxx
24   and a comparator?

25 (Pages 526 to 529)

Jerry Avorn, M.D.

Page 530

1    A.  No.
2    Q.  Was there a statistically
3  significant increase in all-cause mortality
4  across all the Vioxx studies when you look
5  at them together?
6    A.  I've never done so.  I've never
7  looked at all Vioxx studies together.
8  Again --
9        MR. TISI:  Can I just ask a
10  clarification?  Are you talking about on
11  drug or ITT or both?  Because I just get
12  the impression that perhaps you and he may
13  be thinking of something different, but...
14    A.  I've never had occasion to
15  amalgamate all Vioxx studies and look at
16  all-cause mortality in all studies.
17        MR. TISI:  Okay.
18        BY MR. GOLDMAN:
19    Q.  Do you know what the relative risk
20  of all-cause mortality was in the APPROVe
21  study when you look through 14 days after
22  the study ended?
23    A.  Not off the top of my head.  But I
24  do recall it as having been elevated.

Page 531

1    Q.  In fact, you're aware, sir, that
2  there was no increase in mortality in the
3  APPROVe study between Vioxx and placebo,
4  true?
5    A.  That's my understanding.
6    Q.  Are you aware of any peer-reviewed
7  literature that analyzes the Alzheimer's
8  trials by looking at all-cause mortality?
9    A.  I'm aware of the reports of the
10  Alzheimer's studies as they appeared in
11  the literature, but I'm not aware that the
12  people who wrote them up presented
13  all-cause mortality in any papers.
14    Q.  So it's true that you're not aware
15  of any peer review article that analyzes
16  the Vioxx Alzheimer's trials by looking at
17  all-cause mortality?
18    A.  Right.
19    Q.  Before the withdrawal of Vioxx,
20  sir, wasn't the FDA aware of the deaths
21  that occurred in the Alzheimer's trials?
22        MR. TISI:  Objection;
23  misleading.
24    A.  I cannot speak to what FDA was or

Page 532

1  wasn't aware of.
2    Q.  Did you ever read the FDA's
3  analysis of the Alzheimer's data in
4  December of 2004?
5    A.  I was -- I had just in front of me
6  a minute ago what appeared to be an FDA
7  analysis of that.
8    Q.  I just want to know if you read
9  it.
10    A.  I just want to make sure we're
11  talking about the same thing.
12    Q.  Okay.
13    A.  There's a December of '04, Dr.
14  Villalba, December 18th interim review.
15  Is that what you're referring to?
16    Q.  Yes.  Did you review that?
17    A.  Yes.
18    Q.  Okay.  You were sent the APPROVe
19  extension data, were you not?
20    A.  Yes.
21    Q.  When did you review that, sir?
22    A.  Oh, very recently.  It only became
23  available, I think, in May, just last
24  month, and I reviewed it when it was sent

Page 533

1  in just the last few weeks.
2    Q.  How much time have you spent
3  reviewing the extension data in the
4  APPROVe study?
5    A.  Not very much, because I think it
6  arrived while I was in Australia.  And I
7  looked at it when I was on vacation, but
8  not for hours and hours.
9    Q.  Did you spend more than an hour
10  looking at the extension data from the
11  APPROVe study?
12    A.  I believe I did, because I had been
13  previously sent it by a reporter who
14  wanted my -- my impressions of it as well.
15  So I looked at it before I left town as
16  well as from abroad.
17    Q.  What did the reporter send you?
18    A.  It was information that I think
19  Merck had issued about -- about the
20  APPROVe extension study and its press
21  release, and then there was a concern
22  about whether the press release was
23  accurate.
24        And I think there -- And I can't

Jerry Avorn, M.D.

Page 534

1    remember which source I saw this from, but
2    there was also some backup data, which I
3    -- Yeah, I think Merck issued, actually.
4    Merck had a press release, but also issued
5    -- also made available some data as well.
6        Q.   Did you review the data that Merck
7    made available about the extension for the
8    APPROVe study before the plaintiffs'
9    lawyers sent you the extension data?
10       A.   I think I did, at the request of
11   the reporter, yes.
12       Q.   You don't know what you reviewed
13   that the reporter sent you, true?
14       A.   Well, no.  I recall pretty clearly
15   that it was what Merck had put out on its
16   Web site.
17       Q.   Okay.  Where is that?  Do you
18   still have the information that the
19   reporter sent you?
20       A.   I actually looked at it on line.
21   But I can tell you that it was that which
22   was on the Merck Web site.
23       Q.   Okay.
24       A.   Which, actually I would have

Page 535

1    probably looked at anyway, because it was
2    of interest.
3        Q.   Did you analyze the data in the
4    APPROVe study past 210 weeks?
5        A.   Was there such -- I'm trying -- I
6    don't recall whether there was any data
7    past 210 weeks.
8        Q.   If there was, you didn't review it
9    and analyze it, right?
10       A.   I can't --
11           MR. TISI:  Can we put the
12   document in front of him?  That's the best
13   thing to do.
14       A.   Yeah.  I -- I can't say yes or no
15   to which week's worth of data I reviewed.
16   I remember there were several cut points.
17   I remember 210 was one of them.  If there
18   was data beyond 210, we can look at it
19   and I can tell you --
20           MR. TISI:  I mean, if
21   you're going to ask him a question, I'm
22   going to insist that you put it in front
23   of him.
24       ///

Page 536

1        BY MR. GOLDMAN:
2        Q.   Do you agree, sir, that there's no
3    evidence of an elevated cardiovascular risk
4    after patients stop taking Vioxx in the
5    APPROVe study?
6            MR. TISI:  I'm going to
7    insist that you give him the document,
8    Counsel.  I really am.
9            BY MR. GOLDMAN:
10       Q.   If you need to look at the
11   document, go ahead.
12       A.   I can tell you --
13           MR. TISI:  No, no, no.
14   He's not going to.  I've allowed you to
15   do this a lot, and I know we're --
16           (Whereupon, all parties
17   speaking at the same time).
18           BY MR. GOLDMAN:
19       Q.   Dr. Avorn, if you need to look at
20   the document, fine.
21       A.   I will look at it, but without
22   looking at it, having reviewed it
23   previously, I can tell you that there was
24   a statistically significant P.01 or P.02

Page 537

1    increase in stroke post-cessation of Vioxx,
2    and that that is a kind of cardiovascular
3    morbidity.
4        Q.   If you look at strokes and heart
5    attacks together, sir, you remember that
6    there was no evidence of an elevated
7    cardiovascular risk in patients who had
8    stopped taking Vioxx in the APPROVe study,
9    right?
10       A.   I recall that it was not
11   statistically significant, but I'd want to
12   look at the numbers before going beyond
13   that.
14       Q.   Do you know, sir, whether there was
15   any increased risk of Vioxx for heart
16   attacks and sudden cardiac death in the
17   APPROVe study when you look at patients
18   off drug?
19           MR. TISI:  Again, I object
20   without the document in front of him.
21           BY MR. GOLDMAN:
22       Q.   Do you know?
23       A.   I recall that the significant
24   findings dealt with stroke, and I don't

Jerry Avorn, M.D.

Page 538

1  recall other significant findings off drug.
2      Q.  Do you remember, sir, that when you
3  look at the off-drug data for the APPROVe
4  study in connection with the on-drug data
5  in the APPROVe study, that the relative
6  risk for heart attacks actually goes down?
7      A.  As I recall, that was one of the
8  more deceptive ways that the Merck press
9  release presented -- that if you combine
10  the not taking the drug with the taking
11  the drug, there is less of a risk, if you
12  add the off-drug experience.  But that's
13  not surprising or important.
14      Q.  You can just tell me, sir, whether,
15  based on your analysis, you're aware that
16  the relative risk for heart attacks goes
17  down when you combine the on-drug data in
18  the APPROVe with the off-drug data?
19      A.  That's my recollection.
20      Q.  You've seen the KM curve in the
21  APPROVe study, haven't you?
22      A.  Yes.
23      Q.  What does the KM curve in the
24  APPROVe study reflect about when the

Page 539

1  difference in cardiovascular events -- I
2  should say confirmed APTC events --
3  becomes statistically significant?
4      A.  That's been very controversial.
5      Q.  I'm only talking right now about
6  the KM curve.
7      A.  Right.  Merck contended, I think
8  erroneously, that there's no risk until 18
9  months.  And I think that's an incorrect
10  assessment, as do most other people whose
11  opinions I respect.
12          There's been some controversy
13  recently as to whether Merck performed the
14  statistics correctly in terms of the log
15  of time versus the actual time as a
16  variable.
17          But I do not believe that the
18  contention that there is no risk prior to
19  18 months is substantiated by that data.
20      Q.  If you just look at the APPROVe KM
21  curve, do you agree that looking at just
22  the curve --
23          MR. TISI:  The -- Which
24  curve --

Page 540

1      BY MR. GOLDMAN:
2      Q.  -- the difference in --
3          MR. TISI:  Which curve are
4  you talking about?
5      BY MR. GOLDMAN:
6      Q.  -- confirmed APTC events?
7          MR. TISI:  Okay.  No other
8  curves.
9      BY MR. GOLDMAN:
10      Q.  You agree that the difference in
11  those events does not become statistically
12  significant until 36 months?
13      A.  That's an impossible question
14  because you can't determine statistical
15  significance by looking at a curve.
16      Q.  Okay.  You haven't done any
17  research to determine whether or not using
18  a statistical method involving log of time
19  versus the actual time as a variable was
20  appropriate, right?
21      A.  Right.
22      Q.  And you don't know because you're
23  not a statistician -- Well, withdrawn.
24          I need to be more specific, because

Page 541

1  I wasn't referring to studies.  Okay?
2      A.  Okay.
3      Q.  You haven't done any research, Dr.
4  Avorn, to determine whether or not the
5  statistical method that was used in the
6  APPROVe study concerning log of time
7  versus actual time as a variable was
8  appropriate, right?
9      A.  That's correct.
10      Q.  And when you said before that
11  there's a controversy about whether or not
12  Merck used the appropriate variable, you're
13  basing that on what you read in the
14  newspaper and heard in the media --
15          MR. TISI:  Objection.
16      BY MR. GOLDMAN:
17      Q.  -- true?
18      A.  No.  In conversation with
19  colleagues, including biostatisticians and
20  epidemiologists.
21      Q.  Okay.  The -- Let me just briefly
22  ask you, sir, about Study 136, which you
23  refer to in your report.
24      A.  Can you show me where I refer to

28 (Pages 538 to 541)

Jerry Avorn, M.D.

| | Page 542 |
|---|---|
| 1 | it? |
| 2 | Q. Yes. Page .17 at the top. |
| 3 | A. (Witness viewing document). Yes. |
| 4 | Q. Was there a statistically |
| 5 | significant difference in thrombotic events |
| 6 | between Vioxx and placebo in Study 136? |
| 7 | A. Let me just pull it out here. |
| 8 | (Witness viewing documents). |
| 9 | MR. TISI: Would you repeat |
| 10 | the question? |
| 11 | MR. GOLDMAN: Yes. |
| 12 | BY MR. GOLDMAN: |
| 13 | Q. Do you know, sir, that there was no |
| 14 | statistically significant difference in |
| 15 | thrombotic events between Vioxx and placebo |
| 16 | in Study 136? |
| 17 | A. (Witness viewing document). |
| 18 | MR. TISI: While he's |
| 19 | looking at that, I hate to do this, I've |
| 20 | got to make a quick phone call about my |
| 21 | flight. |
| 22 | (Off the record at 10:30 |
| 23 | a.m.) |
| 24 | (Discussion off the record). |

| | Page 543 |
|---|---|
| 1 | (Back on the record at 10:35 |
| 2 | a.m.) |
| 3 | A. That was a twelve-week study that |
| 4 | was designed to ask a totally different |
| 5 | question about the rate of ulcer |
| 6 | development, and so I would not even have |
| 7 | looked for that outcome. |
| 8 | Q. Do you know, sir, one way or the |
| 9 | other, whether there was a statistically |
| 10 | significant difference in thrombotic events |
| 11 | between Vioxx and placebo in Study 136? |
| 12 | A. I didn't even know that they looked |
| 13 | at that outcome. And if they had, I |
| 14 | would not have been interested, because it |
| 15 | was a different question being asked. |
| 16 | Q. So the answer is you don't know? |
| 17 | A. Right. I -- I would not expect |
| 18 | that there would be. I don't know. |
| 19 | Q. Do you take the position that Merck |
| 20 | delayed submitting the results of Study |
| 21 | 136 to the FDA? |
| 22 | A. (Witness viewing document). My |
| 23 | understanding -- and I'm pleased to be |
| 24 | corrected if I got this wrong -- that the |

| | Page 544 |
|---|---|
| 1 | results of that study were not submitted |
| 2 | to the FDA until after the label was |
| 3 | revised. |
| 4 | Q. What's the basis for that |
| 5 | understanding? |
| 6 | A. I'm trying to recall whether it was |
| 7 | a date on the document in which it was |
| 8 | submitted or some other source. But I |
| 9 | can't recall the origin of that knowledge. |
| 10 | Q. Do you know whether the plaintiffs' |
| 11 | lawyers told you that fact and you relied |
| 12 | on it? |
| 13 | A. Well, I know the plaintiffs' |
| 14 | lawyers concurred with that, and I |
| 15 | honestly can't recall whether I saw it on |
| 16 | a document or heard it from them. |
| 17 | Q. Did you discover on your own the |
| 18 | fact that you say Merck did not disclose |
| 19 | Study 136 to the FDA in a timely fashion? |
| 20 | A. Well, when I saw that it wasn't |
| 21 | published until 2003, I believe I asked |
| 22 | when it was submitted to FDA, and either |
| 23 | -- and in response to that question, I |
| 24 | either was shown a document or was told |

| | Page 545 |
|---|---|
| 1 | that it was not submitted until after the |
| 2 | label was revised. |
| 3 | Q. Do you know when the final results |
| 4 | of Study 136 came to Merck's attention? |
| 5 | A. There are two very big problems |
| 6 | with your question. One is -- |
| 7 | Q. It calls for a yes or no -- |
| 8 | A. No, it does not, Counsel. I have |
| 9 | to answer in a -- in an honest way. |
| 10 | Phrasing it as "came to Merck's |
| 11 | attention," Merck conducted the study. |
| 12 | And as I said a minute ago, final results |
| 13 | are a function of how quickly one moves |
| 14 | the process along. But this is a study |
| 15 | conducted by Merck. So the results did |
| 16 | not come to their attention until they |
| 17 | completed them. |
| 18 | Q. Did -- |
| 19 | A. So if it was a late point in time, |
| 20 | what I see here on this memo on -- at Tab |
| 21 | 73 was that the preliminary results of |
| 22 | that study were internally circulated |
| 23 | within Merck in November of 2001, |
| 24 | revealing that there was no advantage in |

29 (Pages 542 to 545)

Jerry Avorn, M.D.

Page 546

1 gastrointestinal toxicity between Vioxx
2 with low dose aspirin compared to the
3 comparator.
4         And so what I'm saying to you,
5 Counsel, is that they had their initial
6 results in November of 2001, when the,
7 quote, final, unquote, results, quote, came
8 to their attention, unquote, is completely
9 a function of when they made them come to
10 their attention.
11   Q.   Well, aren't there independent
12 investigators who conduct the study?
13   A.   I am aware that studies progress at
14 a pace that has a great deal to do with
15 the speed with which the sponsor wants
16 those studies to progress.
17   Q.   What was my question, Dr. Avorn?  I
18 didn't ask anything about that.
19   A.   Your question had two very
20 problematic phrases.  One was final
21 results --
22   Q.   Doctor --
23   A.   I'm speaking now.  One was "final
24 results" and one was "came to their

Page 547

1 attention."  Both of those are deceptive
2 aspects of the question.
3         MR. GOLDMAN:  If this
4 continues, I'm going to call Judge Fallon.
5         MR. TISI:  Fine.
6         BY MR. GOLDMAN:
7   Q.   My question, Dr. Avorn, was --
8   A.   When did the final results of Study
9 136 come to Merck's attention?  And I was
10 refusing to answer on the basis that
11 "final" and "come to their attention" are
12 both deceptive aspects of the question.
13   Q.   My question was:  Aren't there
14 independent investigators who conduct
15 studies like Study 136?
16   A.   Studies like 136 or Study 136?
17   Q.   Were there independent investigators
18 who were involved in Study 136?
19   A.   I expect that there were.
20   Q.   Is it your position that the
21 cardiovascular risks that you believe are
22 associated with Vioxx occur in the short
23 term when patients use Vioxx?
24   A.   I think there is evidence of early

Page 548

1 cardiovascular risk with Vioxx.
2   Q.   Is it therefore your position that
3 the cardiovascular risks that you believe
4 are associated with Vioxx occur in the
5 short term?
6   A.   You'd need to define short term.
7   Q.   Less than six months.
8   A.   Yes.
9   Q.   Less than two months?
10   A.   Probably.
11   Q.   Less than one month?
12   A.   As the number approaches zero, the
13 data points are fewer, and if we believe
14 that this is a platelet effect, it could
15 be immediate.
16   Q.   Well, there were several
17 hypothetical statements in what you just
18 said, right?
19   A.   I believe that it is a platelet
20 effect, at least in part, and therefore
21 that provides grounds for expecting that
22 the results could be very early, almost
23 immediate.
24   Q.   What is your basis, sir, for your

Page 549

1 opinion that the cardiovascular risks
2 associated with Vioxx increase immediately
3 after patients start using Vioxx?
4   A.   The curves in VIGOR diverge very
5 early on in the trial.
6   Q.   Immediately?
7   A.   Again, this is a statistical
8 concept in that if you look at the
9 Kaplan-Meyer curves in VIGOR, the curves
10 begin to diverge nearly at the start of
11 the study.
12         Our own observational studies, and
13 those of others, have found an increase in
14 risk within the first several months of
15 use, within -- within 90 days, as a matter
16 of fact.  And so combining that with the
17 expectation that the drug's mechanism of
18 harm may be prothrombotic leads to the --
19         I'm sorry.  I've got a frog in my
20 throat.
21   Q.   Mm-hmm.
22   A.   Let me just get some more water.
23         -- leads to the expectation that
24 the effect could well be immediate.

30 (Pages 546 to 549)

Jerry Avorn, M.D.

Page 550

1  Q.  So it's your testimony that the
2  combination of the curve, KM curves in
3  VIGOR with the possible mechanism of harm
4  being the imbalance theory, that that
5  leads to the expectation that the
6  cardiovascular effect could be immediate?
7  A.  No.  I said, "And also the
8  observational studies, including our own --
9  Q.  Okay.
10  A.  -- which detected a difference very
11  early on.
12  Q.  So based on the KM curve in VIGOR,
13  the observational studies that you did,
14  which you say showed an increased
15  cardiovascular risk within 90 days, and
16  the theory that Vioxx might be
17  prothrombotic, it's your opinion that Vioxx
18  could increase the cardiovascular risk
19  immediately?
20  A.  When you restate my responses, you
21  somehow contract them so that they do not
22  adequately represent what I said.  I said
23  "our observational studies and those of
24  others."

Page 551

1  Q.  Okay.
2  A.  There have been other groups.  And
3  if we're trying to get a comprehensive
4  listing here -- which was not what I
5  recall being asked -- there also is
6  clinical trial data indicating a rise in
7  hypertension that occurs -- or a rise in
8  blood pressure that occurs also early on
9  in the course of use of Vioxx as well.
10  Q.  Have you done any analysis, sir, to
11  determine whether or not the cardiovascular
12  risk with Vioxx occurs immediately?
13  A.  Well, I just said that we performed
14  an observational study in which we found
15  an effect that occurred within 90 days.
16  Q.  And what did that study show about
17  the cardiovascular risks of Vioxx after 90
18  days?
19  A.  We did not see the effect
20  persisting after 90 days.
21       MR. TISI:  I'm going to ask
22  him to take a look at the study if you're
23  going to ask him questions about it.
24  ///

Page 552

1       BY MR. GOLDMAN:
2  Q.  Sir, other than the study that you
3  performed, which was an observational study
4  that you say showed an increase in
5  cardiovascular risk with Vioxx within 90
6  days, am I right that you haven't done any
7  other analysis to determine whether or not
8  the cardiovascular risk associated with
9  Vioxx is immediate?
10  A.  Well, are you asking about the
11  studies I've performed myself, or my
12  review of the literature, the work that
13  other people have done?
14  Q.  Let's start with studies that
15  you've performed yourself.
16  A.  Our studies -- in addition to the
17  study that was in Circulation in 2004, Dr.
18  Solomon and I, and others in our group,
19  had a paper that appeared in Arthritis and
20  Rheumatism in the last month or so.  And
21  if you want, we can refer to that as well
22  and discuss these -- the time course of
23  the -- of the findings.
24  Q.  Is that what your -- one of the

Page 553

1  things that you did to try to show that
2  there was an increased risk immediately
3  with Vioxx?
4  A.  We weren't trying to show anything.
5  We were trying to get the truth.
6  Q.  Okay.  So it's your testimony, Dr.
7  Avorn, that the day that a patient uses
8  Vioxx, their cardiovascular risk --
9  Withdrawn.
10       It's your testimony, Dr. Avorn,
11  that the day that a patient uses Vioxx,
12  they are then at increased risk of having
13  a cardiovascular event?
14  A.  Right, with the risk increasing
15  over time.
16  Q.  How much does the risk increase
17  over time?
18       (Interruption).
19       MR. TISI:  I'm sorry.  Is
20  that mine?
21       THE WITNESS:  Oh, that's me.
22  Excuse me for one second.
23       (Off the record at 10:47
24  a.m.)

31 (Pages 550 to 553)

Jerry Avorn, M.D.

Page 554

1  (Recess taken).
2  (Back on the record at 10:47
3  a.m.)
4  BY MR. GOLDMAN:
5  Q.  The question was:  How much does
6  the risk occur over time?
7  A.  Increase over time?
8  Q.  Yeah.  Yeah.  Let me ask the
9  question again.
10  A.  Yeah.
11  Q.  It's your testimony that patients
12  who use Vioxx for one day are at an
13  increased cardiovascular risk because of
14  Vioxx.
15  A.  I believe that the risk begins with
16  the first use of the drug and grows over
17  time, and I cannot put a number to the
18  rate of increase of risk.
19  Q.  Can you cite to me any study or
20  article that concludes that the risks --
21  the cardiovascular risks associated with
22  Vioxx occur the first day that a patient
23  uses it?
24  A.  The statistics involved makes that

Page 555

1  virtually impossible to demonstrate.
2  Q.  So you cannot, sir, cite me any
3  study or any article that says that the
4  cardiovascular risks associated with Vioxx
5  begin the first day that a patient uses
6  the medicine, true?
7  A.  I think that's not a -- fair
8  question, in that we know that the risk is
9  seen immediately.  Whether one can
10  document that on day one there is that
11  risk from published studies is an almost
12  impossible demand.
13  Q.  I'm going to ask one more time.
14  See if you can answer yes or no.
15  Am I right, Dr. Avorn, that you are
16  not aware of a single study or article
17  that says that Vioxx increases the
18  cardiovascular risk in a patient who uses
19  the medicine for one day?
20  A.  That's correct.
21  Q.  In fact, you can't point me to a
22  study or article that says that Vioxx
23  increases the cardiovascular risk in
24  patients who use Vioxx for one month?

Page 556

1  A.  I disagree.  I think that the
2  studies looking at risk increasing from
3  the moment of starting therapy and
4  progressing upward to a
5  pharmacoepidemiologist indicate that the
6  risk does begin at inception and increases
7  thereafter.  I think our study in
8  Circulation demonstrates that.
9  Q.  Your study in Circulation also
10  demonstrated that there is no increased
11  cardiovascular risk after 90 days, true?
12  MR. TISI:  I'm going to --
13  I'm going to have to put his article in
14  front of him.  I'm tired of --
15  MR. GOLDMAN:  Go ahead.  He
16  did the study, so ...
17  MR. TISI:  Well, no.  I
18  understand that.  But you keep doing that.
19  You keep running -- I mean, I understand
20  we're trying to get out of here --
21  MR. GOLDMAN:  Stop.  You
22  know, it's --
23  MR. TISI:  Well, no.  Don't
24  tell me to stop.  I want him to see his

Page 557

1  study.
2  MR. GOLDMAN:  Chris, it's
3  not up to you what documents he looks at.
4  If he wants to look at a document --
5  MR. TISI:  No.  It is up to
6  you, if you're going to ask questions, to
7  refer the witness to a document.
8  BY MR. GOLDMAN:
9  Q.  Dr. Avorn, did you conduct a study
10  in 2004 that you said on several occasions
11  showed an increased cardiovascular risk
12  within 90 days?
13  A.  Well, it was conducted in 2003.  It
14  was published in 2004.
15  Q.  And did that study also show that
16  there was no difference in cardiovascular
17  risk between Vioxx and a comparator after
18  90 days?
19  A.  That's incorrect.
20  Q.  Okay.  Did your study in
21  Circulation in 2004 show that there was no
22  statistically significant increased risk of
23  cardiovascular events after 90 days of
24  use?

32 (Pages 554 to 557)

Jerry Avorn, M.D.

Page 558

1   A.   Correct.
2   Q.   Can you cite me a study or article
3   that specifically says, sir, that the risk
4   of Vioxx -- Withdrawn.
5       Can you cite me a study that shows
6   that the increased risk of Vioxx, if any,
7   occurs after two months of use of Vioxx?
8   A.   Do you mean as early as two months?
9   Q.   Yes.
10  A.   I think any reasonable person in
11  the field would look at a study that finds
12  an increase in the first three months and
13  expect that what that means is that there
14  is a risk at two months.
15  Q.   What is the study that you're
16  relying on that shows a statistically
17  significant increased cardiovascular risk
18  with Vioxx at three months?
19  A.   Ours.
20  Q.   Anything else?  And by yours, you
21  mean your observational study --
22  A.   Yes.
23  Q.   -- in Circulation in 2004, right?
24  A.   Correct.

Page 559

1   Q.   Are you relying on anything else?
2   A.   I think the VIGOR -- the fact that
3   the VIGOR curves diverged as early as they
4   did, and that that whole exposure was only
5   for nine months, indicates to a person
6   experienced in looking at such data that
7   the risk is -- begins right away.
8       And I think the problem with your
9   line of questioning is that when there is
10  a modest number of events in Group A
11  versus Group B, the statistical
12  significance may not be achieved until
13  there's enough events to demonstrate that.
14  But that is quite different to say
15  therefore there's no risk before that
16  happens.
17  Q.   Was there a statistically
18  significant difference in cardiovascular
19  events between Vioxx and Naproxen in the
20  VIGOR study at three months?
21  A.   I don't believe that question was
22  even asked in the VIGOR study.
23  Q.   Based on your observations, sir,
24  and your reading of the VIGOR study, are

Page 560

1   you able to say that the cardiovascular
2   risk associated with Vioxx begin at three
3   months or earlier?
4   A.   Yes.  I think that in the absence
5   of -- Yes.  That's a yes.
6   Q.   Okay.  Then your answer is yes.  I
7   don't need the whole explanation.
8   A.   Well, I think you do.
9   Q.   No, I don't.  I really don't.
10      MR. TISI:  I know you
11  don't, but he does, and he's entitled to.
12      BY MR. GOLDMAN:
13  Q.   If you can answer my question yes
14  or no and then if you want to explain,
15  you can ask me, and if I think we have
16  time, I'll let you, okay?
17      MR. TISI:  No, not --
18      BY MR. GOLDMAN:
19  Q.   If not, then your lawyer can
20  object.
21      MR. TISI:  Absolutely --
22  Absolutely not.  He's entitled to give an
23  answer.
24  ///

Page 561

1   BY MR. GOLDMAN:
2   Q.   Did you notice, Dr. Avorn, whether
3   there was a significantly --
4       MR. TISI:  Were you finished
5   with that answer?  For the record, were
6   you finished with your answer?
7       THE WITNESS:  I think his
8   next question will give me the opportunity
9   to give a more complete answer.
10      BY MR. GOLDMAN:
11  Q.   Can you answer this question yes or
12  no:  When you --
13      MR. TISI:  Apparently not.
14      BY MR. GOLDMAN:
15  Q.   -- look at the VIGOR study, does it
16  show a statistically significant increase
17  in cardiovascular risk with Vioxx at three
18  months of use?
19  A.   That analysis was not performed.
20  Q.   In the APPROVe study, you say that
21  the study showed a doubling of the risk of
22  thrombotic events for Vioxx, right?
23  A.   Right.
24  Q.   And that was in colon polyp

Jerry Avorn, M.D.

Page 562

1  patients, right?
2  A.  Right.
3  Q.  Are you aware of any
4  placebo-controlled study, prior to APPROVe,
5  that showed a statistically significant
6  increased risk for cardiac events with
7  Vioxx?
8           MR. TISI:  Objection.  Asked
9  and answered.  That's what this deposition
10  has been about.
11  A.  Haven't we talked about the
12  ADVANTAGE study before?
13  Q.  Is that a placebo-controlled study?
14           MR. TISI:  You didn't say
15  placebo-controlled study in your trial --
16           MR. GOLDMAN:  Yes, I did.
17  Yes, I did.  I'll restate and say it
18  again.
19           (Reporter interruption).
20           MR. GOLDMAN:  Stop objecting
21  and giving speeches.
22           MR. TISI:  Let me put it
23  this way, I've been very patient.  If
24  you're -- if your question did not specify

Page 563

1  placebo-controlled, then I apologize.  But
2  if it did — I mean, if it did, I
3  apologize; if it didn't, we've been doing
4  this for a day and a half, which is more
5  than you've gotten for most of these
6  depositions.
7           BY MR. GOLDMAN:
8  Q.  Dr. Avorn, can you identify a
9  placebo-controlled study that demonstrated
10  a statistically significant increase in
11  cardiovascular risk with Vioxx prior to
12  APPROVe?
13  A.  (Witness viewing documents).  I'm
14  looking for a Study 090 to be able to
15  refer to that.  It may take a minute.
16  Q.  Mm-hmm.
17  A.  Okay.  Protocol 090, in comparison
18  with placebo and Nabumetone, or Nabumetone,
19  found significantly higher rates with Vioxx
20  in a variety of categories, including
21  serious adverse experiences, study
22  discontinuation for an adverse experience.
23           If your question was, did it reveal
24  -- When you only look at the placebo

Page 564

1  comparator, and if you limit it to
2  cardiovascular thrombotic events, was there
3  a significant difference, the answer is
4  no.
5  Q.  Am I right, Dr. Avorn, that you're
6  not aware of any placebo-controlled study
7  for Vioxx that showed an increased
8  cardiovascular risk compared to placebo
9  prior to APPROVe?
10  A.  Why don't you ask that question
11  again, because -- Get to the point.
12  Q.  Am I right, Dr. Avorn, that you
13  don't know of any placebo-controlled study,
14  prior to APPROVe, that showed a
15  statistically significant increased risk of
16  thrombotic cardiovascular events with
17  Vioxx?
18  A.  Let me just take a moment before I
19  answer.
20  Q.  Mm-hmm.
21  A.  (Witness viewing document).  If you
22  restrict the question to placebo comparison
23  studies and to outcomes that are
24  cardiovascular thrombotic events, and the

Page 565

1  conventional P.05 level of significance, I
2  don't, at the moment, recall such studies.
3           But I need to add that there were
4  many other pieces of information in which
5  other comparator drugs were used or other
6  cardiovascular outcomes were looked at,
7  which did reveal significant risks.
8  Q.  I've heard the explanation, okay?
9  A.  Okay.
10  Q.  Am I right, sir, that you don't
11  know of any placebo-controlled study, prior
12  to APPROVe, that showed a statistically
13  significant increased risk of thrombotic
14  cardiovascular events with Vioxx?
15           MR. TISI:  Objection.  He
16  just answered that.  Go ahead.
17  A.  Yes.
18  Q.  And you said, sir, that -- When you
19  said yes, you agreed with me, correct?
20  A.  Correct.
21           MR. TISI:  The beginning of
22  that question, and you said, sir, that.
23  Okay.
24  ///

34 (Pages 562 to 565)

Jerry Avorn, M.D.

Page 566

BY MR. GOLDMAN:
1 Q. Dr. Avorn, let me ask you this
2 question on Study 090, okay?
3 A. 090, yes.
4 Q. Isn't it true, sir, that there was
5 no statistically significant difference
6 between cardiovascular events on Vioxx and
7 cardiovascular events on Nabumetone?
8 A. I'd need to go back and look at
9 that. But if -- if there were two
10 reference groups or two comparison groups,
11 and you ignore one of them, that could
12 make the significance go away.
13 Q. Would you agree, sir, that
14 assessment of a drug's safety is best done
15 by considering all randomized clinical
16 trial data available, regardless of the
17 underlying purpose of the study?
18 A. Yes, so long as you don't restrict
19 it to only controlled trial data. I think
20 observational studies play an important
21 role, too.
22 Q. And do you agree that pooling of
23 trial data and doing meta-analyses are

Page 568

1 A. It was another observational study
2 similar to ours that was funded by Merck
3 to look at the rate of cardiovascular
4 adverse events in Vioxx. And it somehow
5 was not submitted for publication until
6 the drug was withdrawn from the market.
7 Q. So your criticism of Merck
8 concerning the Ingenix study concerns your
9 opinion about when Merck submitted the
10 Ingenix study for publication?
11 A. I didn't say that.
12 Q. Do you criticize Merck for not
13 submitting the Ingenix study earlier for
14 publication?
15 A. I think that when there's a
16 potentially life threatening side effect of
17 a drug, a responsible company will do
18 everything it can to speed up the
19 publication of a study, and I don't think
20 that was done in that case.
21 Q. Do you know the circumstances
22 around when and why the Ingenix study was
23 not published earlier?
24 A. The circumstances?

Page 567

1 also a pillar of post-marketing
2 surveillance?
3    MR. TISI: Objection to the
4 form.
5 A. Only if they're done appropriately.
6 Q. Do you agree that if they're done
7 appropriately, meta-analyses of clinical
8 trials can provide meaningful information
9 about the risks of drugs?
10 A. If they're well done.
11 Q. You attach in your report -- I'm
12 sorry. Withdrawn.
13    You refer in Materials Considered
14 to the Ingenix study?
15 A. Yes.
16 Q. What do you want to say about that,
17 in your trial deposition?
18    MR. TISI: Objection. He
19 has no way of knowing what I'm going to
20 ask him.
21    BY MR. GOLDMAN:
22 Q. What is the significance to you,
23 Dr. Avorn, of the Ingenix study to your
24 opinions?

Page 569

1 Q. Mm-hmm.
2 A. I know that there was a great deal
3 of back and forth with the company. But
4 other circumstances, I don't know what
5 you're talking about.
6 Q. You don't have any personal
7 knowledge about the circumstances behind
8 when Merck had the Ingenix study
9 published, correct?
10 A. The circumstances? No.
11 Q. Your only knowledge about the
12 publication of the Ingenix study is based
13 on your review of the documents that the
14 plaintiffs' lawyers gave you, true?
15 A. And other -- just awareness of the
16 peer review process that -- that the drug
17 -- that the paper was associated with.
18 Q. In terms of your knowledge of the
19 timing of the publication of the Ingenix
20 study, that is based on your review of the
21 internal Merck documents that the
22 plaintiffs' lawyers gave you, right?
23    MR. TISI: Objection. Asked
24 and answered. He said it was other

35 (Pages 566 to 569)

Jerry Avorn, M.D.

Page 570

1   things. Go ahead.
2       A.  I'm also aware of its being --
3   apart from anything related to this case
4   -- I'm aware of when it was submitted for
5   peer review through other channels.
6       Q.  What other channels?
7       A.  Colleagues to whom it was sent for
8   peer review.
9       Q.  Have you spoken with colleagues
10  about the Ingenix study?
11      A.  Yes.
12      Q.  And that was for the purpose of
13  determining when Merck submitted the
14  Ingenix study?
15      A.  No. It was in the course of my
16  normal work.
17      Q.  Okay. You're not applying any
18  expertise in coming to your opinion that
19  Merck did not publish the Ingenix study
20  early enough, are you, sir?
21          MR. TISI:  Objection.
22      A.  Yes, I am. And let me explain.
23      Q.  No. All you have to do is say
24  yes.

Page 571

1       A.  Yes, I am.
2          MR. TISI:  That's fine.
3          BY MR. GOLDMAN:
4       Q.  The VALOR study, can we talk about
5   that?
6       A.  Sure.
7       Q.  Actually, let's go back to Ingenix
8   for a minute, okay?
9       A.  Yes.
10      Q.  You were sent two documents, three
11  documents about Ingenix, and I read
12  through these last night. They were in
13  your binders. Actually, they were in the
14  loose material.
15          MR. GOLDMAN:  I'll mark
16  these as Exhibit 15, 16 and 17.
17          (Exhibit-15, Ingenix
18  Epidemiology, Cardiovascular Risk of COX-2
19  Inhibitors and Other NANSAIDs, Draft
20  Manuscript dated February 27, 2004;
21  Exhibit-16, Draft Manuscript; Exhibit-17,
22  Ingenix Epidemiology, Cardiovascular Risk
23  of COX-2 Inhibitors and Other NANSAIDs,
24  Draft Manuscript dated September 27, 2004,

Page 572

1   marked for identification).
2          BY MR. GOLDMAN:
3       Q.  They are draft manuscripts and
4   revisions to the Ingenix publication, okay?
5       A.  Okay.
6       Q.  Have you reviewed those documents,
7   sir?
8       A.  (Witness viewing exhibits). Yes.
9       Q.  How are they significant in your
10  opinion here in the case --
11      A.  Let me just arrange them in --
12      Q.  -- because you don't address them
13  in your report?
14      A.  Right. February, September. Okay.
15  Okay.
16          The most important -- one of the
17  most important aspects of it was that
18  their conclusion about the risk of Vioxx
19  was very similar to our own conclusion --
20      Q.  Mm-hmm.
21      A.  -- of an increase of -- an odds
22  ratio of -- a relative risk of 1.35 for
23  Rofecoxib compared to other drugs --
24      Q.  Mm-hmm.

Page 573

1       A.  -- specifically Ibuprofen and
2   Diclofenac, D-I-C-L-O-F-E-N-A-C, and the
3   risk was not associated with timing or
4   dose. I think the most important aspect
5   of the paper is that finding.
6       Q.  Mm-hmm.
7       A.  Another interesting aspect of it
8   was that, as far as I can tell, this
9   paper was funded by Merck at about the
10  same time as our own study was, and yet
11  did not make it into the literature until
12  substantially later, even though the work
13  appears to have begun at the same time
14  ours did, and Ingenix has an impressive
15  capacity for generating results quickly.
16      Q.  Any other testimony you intend to
17  give about the drafts of the Ingenix
18  study?
19          MR. TISI:  Objection to the
20  testimony he's going to give. His
21  testimony is a function of what I'll ask
22  him, Counsel.
23      A.  I -- I may be asked to comment on
24  -- on changes that were made in the

36 (Pages 570 to 573)

Jerry Avorn, M.D.

Page 574

1  editing process.
2      Q.  Did -- Okay.
3          Am I right, Dr. Avorn, that you
4  didn't identify any changes that were made
5  in the editing process of Ingenix your
6  study -- I'm sorry -- in your expert
7  report?
8              MR. TISI:  Actually,
9  objection.  It's inaccurate, but go ahead.
10             MR. GOLDMAN:  Don't listen
11  to the -- Please don't listen --
12             MR. TISI:  It's
13  inaccurate --
14             MR. GOLDMAN:  -- to your
15  counsel coaching you.
16             MR. TISI:  There's no
17  coaching, Counsel.
18         BY MR. GOLDMAN:
19      Q.  Doctor --
20             MR. TISI:  You're making a
21  statement -- You're making a statement
22  that is factually incorrect.
23         BY MR. GOLDMAN:
24      Q.  Dr. Avorn?

Page 575

1      A.  Yes.
2      Q.  Am I right, sir, that in your
3  expert report you do not analyze the
4  different versions of the Ingenix study?
5              MR. TISI:  That's a
6  different question.  You may answer.
7      A.  I do not analyze the different
8  versions of the Ingenix study in my
9  report.
10     Q.  Nor do you give an opinion on
11  whether or not -- whatever changes were
12  made in the Ingenix study were appropriate
13  or inappropriate, true?
14     A.  That's right.  Not in the report.
15     Q.  In the VALOR study -- You talk
16  about that in your report, right?
17     A.  Yes.
18     Q.  Are you critical of Merck for not
19  conducting a VALOR study?
20     A.  Yes, I am.
21     Q.  Is it true that you cannot conduct
22  a clinical trial if it does not offer a
23  potential benefit to patients?
24     A.  Yes.

Page 576

1      Q.  You can't just conduct a clinical
2  study to see whether or not a drug causes
3  heart attacks, right?
4      A.  If that -- You -- Right.
5      Q.  And you understood that the VALOR
6  study contemplated the use of a placebo as
7  well as Vioxx, right?
8      A.  Right.
9      Q.  Do you remember that the population
10  that was considered for the VALOR study
11  was a population at high risk of
12  cardiovascular events?
13     A.  (Witness viewing documents).
14     Q.  Do you know without looking at your
15  report?
16     A.  Yes.  No.  That's my recollection.
17     Q.  Okay.  You have no personal
18  knowledge about the reasons why Merck
19  decided not to pursue the VALOR study,
20  right, Doctor?
21     A.  That's right.
22     Q.  And your understanding of the VALOR
23  study and why Merck decided not to go
24  forward with it is based on your review of

Page 577

1  the documents the plaintiffs' lawyers gave
2  you, right?
3      A.  I have no specific reasons that I
4  have seen in writing about why they
5  decided not to go forward.
6      Q.  The fact that Merck decided not to
7  go forward with the VALOR study and the
8  discussions internally at Merck about that,
9  you know of based on the documents that
10  plaintiffs' lawyers gave you, true?
11     A.  That's my only access to internal
12  Merck documents.
13     Q.  What patient population do you
14  think should have been used in a
15  cardiovascular outcome study to test the
16  cardiovascular safety of Vioxx?
17     A.  I think that it would have been
18  appropriate to do a study of patients who
19  required a nonsteroidal anti-inflammatory
20  drug --
21     Q.  Mm-hmm.
22     A.  -- for relief of pain, probably
23  arthritis pain, and who were at
24  particularly high risk of gastrointestinal

37 (Pages 574 to 577)

Jerry Avorn, M.D.

Page 578

1  bleeding.
2  Q. Mm-hmm.
3  A. So that ethically one could have
4  said that the potential for harm that may
5  have been there for -- for cardiovascular
6  harm -- which at the time Merck was
7  denying existed -- would have been
8  balanced by a potential benefit to those
9  patients, because they would have been
10 patients who required the extra degree of
11 gastroprotection that the company said the
12 drug provided.
13 Q. So in your proposed cardiovascular
14 outcome study, the patients who participate
15 would need to be on an NSAID to relieve
16 their pain, right?
17 A. Right.
18 Q. So it would be unethical to conduct
19 that study and use a placebo, true?
20 A. It would have also been unpragmatic
21 in that patients would have probably
22 dropped out.
23 Q. So your contemplated cardiovascular
24 outcome study would involve the use of

Page 579

1  Vioxx and the use of a comparator NSAID in
2  a population of people that would need to
3  take an NSAID, right?
4  A. Or as Dr. Scolnick proposed,
5  Tylenol.
6  Q. You agree, sir, that it would be
7  unethical to just put patients on placebo
8  if they needed to use a pain reliever for
9  their pain, true?
10 A. Right.
11 Q. Do you consider Protocol 203 to be
12 an outcome study?
13 A. What is Protocol 203?
14 Q. Protocol 203 is the combination of
15 cancer studies that Merck analyzed to
16 assess cardiovascular risk, among other
17 things?
18 A. Do you mean including APPROVe?
19 Q. Yes.
20 A. Okay.
21 Q. So Protocol 203 involved three
22 different studies involving cancer
23 patients, okay?
24 A. Yes.

Page 580

1  Q. Do you consider Protocol 203 to be
2  a cardiovascular outcome study?
3  A. No. In -- Well, yes. I need to
4  say yes and no.
5  Q. Okay. Why yes?
6  A. Yes in that it was -- Well, it was
7  not a study. I think we should be clear
8  on the fact that it was a means of
9  analyzing data from other studies designed
10 for a different purpose.
11 Q. Mm-hmm.
12 A. And I'll need to give you both the
13 yes and the no. The yes was that it was
14 designed to look at cardiovascular
15 outcomes; no in that it was not -- these
16 studies were not designed to study
17 cardiovascular outcomes.
18 Q. Was it a responsible thing for
19 Merck to attempt to develop a protocol to
20 analyze whether there was an increased
21 risk -- a cardiovascular risk associated
22 with Vioxx that -- that -- Withdrawn.
23     Do you agree, sir, that it was
24 responsible for Merck to develop a

Page 581

1  Protocol 203 to assess the cardiovascular
2  safety of Vioxx?
3  A. Not if that's all that they did,
4  no.
5  Q. Let's assume that's not all they
6  did, okay? Can you possibly assume that
7  with me?
8  A. We can stipulate -- If they had
9  done that, along with other targeted
10 clinical trials, then this would have been
11 a useful thing to do as well.
12 Q. Do you agree, sir, that it was
13 responsible for Merck to develop Protocol
14 203 to assess the cardiovascular safety of
15 Vioxx?
16 A. No.
17 Q. Why not?
18 A. Because it was attempting to look
19 at a cardiovascular outcome in a group of
20 patients who were preselected to not have
21 cardiac disease.
22 Q. You think that the patients in the
23 Alzheimer's -- sorry. Withdrawn.
24     Do you think the patients in the

38 (Pages 578 to 581)

Jerry Avorn, M.D.

Page 582

1  cancer trials for Vioxx did not have high
2  risk for cardiac disease?
3     A.  The patients in APPROVe were of an
4  age -- and I believe the mean age was 59
5  -- that was much lower than one would have
6  recruited if the real goal was to find out
7  about cardiovascular outcomes.
8     Q.  Mm-hmm.
9     A.  And there was an exclusion for
10  patients with active cardiac ischemia or
11  recent cardiovascular disease that also, in
12  addition to the age selection, served to
13  reduce the likelihood of cardiac events
14  being discerned.
15     Q.  What percentage of patients in the
16  Protocol 203 had hypertension?
17     A.  I don't know that number off the
18  top of my head.
19     Q.  What percentage of patients in
20  Protocol 203 had diabetes?
21     A.  The same answer.
22     Q.  What percentage of patients in
23  Protocol 203 had risk factors for heart
24  attacks?

Page 583

1     A.  Same answer.  I don't know in my
2  head.
3     Q.  You answered my previous question
4  by referring to APPROVe, and I was talking
5  about Protocol 203 in its entirety, okay?
6     A.  Right.
7     Q.  Do you agree, sir, that -- putting
8  aside everything else you think about
9  Merck in this case -- that it was a
10  responsible thing for Merck to develop
11  Protocol 203 to assess the cardiovascular
12  safety of Vioxx?
13     A.  No.  And I'll explain why again.
14     Q.  You don't need to.
15     A.  Okay.  That's fine.
16     Q.  Do you know that the FDA approved
17  Protocol 203?
18     A.  I expect that they did.
19     Q.  Do you think it was a responsible
20  thing for the FDA to approve Protocol 203
21  to assess the cardiovascular safety of
22  Vioxx?
23         MR. TISI:  Objection.
24  Mischaracterizes.  Go ahead.

Page 584

1     A.  I think it's understandable they
2  would not have said, "Don't do it."
3     Q.  Was it responsible conduct by the
4  FDA to approve Protocol 203 to assess the
5  cardiovascular safety of Vioxx?
6         MR. TISI:  Objection.
7  Misstates.
8     A.  No.  Because it was an inadequate
9  assessment.
10     Q.  Did the results of Protocol 203
11  ultimately lead to the withdrawal of
12  Vioxx?
13     A.  With the results of APPROVe study
14  it did.
15     Q.  You don't design clinical trials
16  for a living, do you, sir?
17     A.  Not for a living.  No.
18     Q.  Do you ever design clinical trials?
19     A.  I've -- No.  But I -- I review
20  clinical trials for journals.
21     Q.  Do you ever design clinical trials?
22     A.  No.
23     Q.  What are the, would you say, three
24  leading textbooks in the field of

Page 585

1  pharmacoepidemiology?
2     A.  I would say Brian Strom's.  There
3  is another text for which Hugh Tilson is a
4  co-editor.  And there's another one, which
5  may be the same as Tilson, for which Bram
6  Hartzema is an editor.  And there's a --
7  I think those would be the ones, the main
8  ones.
9     Q.  Can you just tell me the names
10  rather than just the authors?
11     A.  Yes.  Strom's is called
12  Pharmacoepidemiology, and the others have
13  similar titles that involve words like
14  that, like Study of Adverse Events or
15  Risks and Benefits or something like that.
16     Q.  How many paragraphs in your expert
17  report talk about observational studies?
18     A.  I believe it was just one.  Let me
19  take a look.  I believe you're right.
20         (Witness viewing document).  Yup.
21  One.
22     Q.  Do you agree, sir, that
23  observational studies are generally
24  inferior to clinical trials?

39 (Pages 582 to 585)

Jerry Avorn, M.D.

Page 586

1  A.  No.
2  Q.  Do you think observational studies
3  are as meaningful in determining causation
4  as clinical trials that are well
5  controlled?
6  A.  They can be more or less
7  meaningful, depending upon what is being
8  studied and how.  And I could explain that
9  further if you want.
10  Q.  Is it true that observational
11  studies are generally inferior to clinical
12  trials for purposes of determining
13  causation?
14  A.  Do you mean --
15        MR. TISI:  Objection.
16  A.  -- the causation of efficacy, or
17  causation of adverse events?
18  Q.  Adverse events.
19  A.  I do not agree with that statement.
20  Q.  How about efficacy?
21  A.  They are inferior for demonstrating
22  efficacy.
23  Q.  Have you ever written anywhere that
24  you think observational studies are -- I'm

Page 587

1  sorry.  Withdrawn.
2        Are observational studies subject
3  to uncontrolled and uncontrollable biases
4  that reduce the reliability of their
5  results?
6  A.  They can be.
7  Q.  Do you agree that when you're doing
8  an observational study, the users and the
9  nonusers who are studied -- of a
10  particular drug -- may have substantially
11  different risk factors?
12  A.  They might.
13  Q.  Is it true that the use of pain
14  medications -- Withdrawn.
15        Is it true that patients who are
16  studied in observational studies who use
17  pain medications are generally in worse
18  health than those who do not use pain
19  medications?
20  A.  That's not correct.
21  Q.  Is it true that users of NSAIDs
22  have generally been found to have
23  increased arthrosclerosis relative to
24  nonusers of NSAIDs?

Page 588

1  A.  I'd want to review what you believe
2  indicates that.
3  Q.  So you don't think that's true?
4  A.  Not necessarily.  No.
5  Q.  Do medical claims databases often
6  not contain important information about
7  risk factors for cardiovascular disease?
8        MR. TISI:  Objection.
9  A.  That is possible.
10  Q.  It's also possible that medical
11  claims-based studies do not contain
12  important information about tobacco use or
13  family history, true?
14  A.  That's correct.
15  Q.  And the lack of information like
16  that can be important when determining the
17  significance of an observational study,
18  right?
19  A.  Wrong.  Shall I explain?
20  Q.  Let me ask you a follow-up
21  question, because I think I know why you
22  answered that the way you did.
23        Before you can draw conclusions
24  about causation, based on an observational

Page 589

1  study, do you agree that one needs to
2  consider the variables that observational
3  studies are unable to control?
4  A.  Yes.
5  Q.  Is there a minimum relative risk
6  that you think you need to see in an
7  observational study before determining that
8  an association is strong between the drug
9  and an effect?
10        MR. TISI:  Objection to the
11  word strong.
12  A.  There's no magic number.
13  Q.  Do you have a number in mind?
14  A.  It has everything to do with both
15  the confidence interval and the importance
16  of the outcome.
17  Q.  Is it true that the smaller the
18  relative risk and the narrower the
19  confidence interval the less meaningful an
20  observational study is for purposes of
21  determining causation?
22  A.  No.
23  Q.  Have you heard, sir, that there are
24  people who think that a relative risk of

40 (Pages 586 to 589)

Jerry Avorn, M.D.

Page 590

1 less than two in an observational study is
2 considered a very weak association?
3 MR. TISI: Objection.
4 A. I have -- I have heard that.
5 Q. Do you agree with it?
6 A. I do not.
7 Q. Why not?
8 A. Because, for example, if a study
9 showed a clear-cut -- If a well-designed
10 study showed a clear-cut increase, let's
11 say, of 80 percent in the risk of a given
12 outcome, with very tight confidence
13 intervals around that --
14 Q. Mm-hmm.
15 A. -- and no reason to worry about
16 confounding or other methodological
17 problems, I would say that increasing the
18 risk of a serious outcome by 80 percent is
19 an important finding, and that if it's a
20 well done study, that's very meaningful.
21 Q. Is it true, Dr. Avorn, that if you
22 have a relative risk of less than two that
23 people ought to be hesitant about drawing
24 conclusions about causation?

Page 591

1 A. No.
2 Q. Have you heard respected scientists
3 say that if a relative risk in an
4 observational study isn't at least three,
5 then the observational study really doesn't
6 have much meaning in terms of determining
7 causation?
8 A. I've not heard that stated or
9 written. I bet there are people who
10 believe it, but I think they're wrong.
11 Q. What would you say about a study,
12 sir, that showed a relative risk of, let's
13 say, 1.14 and a confidence interval of
14 1.01 to 1.29?
15 A. I would want to look at it in
16 context. I'd want to know what was it a
17 risk of.
18 Q. Let's say cardiovascular events.
19 A. Yeah. I would say that that could
20 be important.
21 Q. Would you say that a relative risk
22 of 1.14 with a confidence interval of 1.02
23 to 1.28 establishes causation between the
24 drug and the cardiovascular event that was

Page 592

1 studied?
2 A. In isolation, no one study is
3 likely to be able to do that.
4 Q. So it's your testimony that a
5 relative risk of less than two in an
6 observational study -- Withdrawn.
7 Am I right, Dr. Avorn, then, that
8 you are disputing the notion that a
9 relative risk of less than two in an
10 observational study is a weak association?
11 A. You are correct.
12 Q. Do you think that observational
13 studies are most helpful when they show a
14 consistent relative risk of at least two
15 or three?
16 A. Well, that's more compelling than a
17 lower relative risk would be.
18 Q. And do you at least agree that
19 observational studies with relative risks
20 under two, even if they're statistically
21 significant, are difficult to interpret
22 because of confounding bias?
23 A. No.
24 Q. Do you think --

Page 593

1 A. It depends on the study.
2 Q. Do you think that observational
3 studies are primarily for the purpose of
4 developing and generating hypotheses?
5 A. No.
6 Q. Do you think that observational
7 studies are important to try to develop
8 hypotheses to later test?
9 A. Yes.
10 Q. Would you agree that observational
11 studies provide clues as to whether
12 randomized clinical trials should be done
13 but they never establish causation?
14 MR. TISI: Objection.
15 A. The only evidence that we have, and
16 have had for decades, that smoking causes
17 lung cancer comes from observational
18 studies. And I think everyone agrees that
19 that's a true causal relationship.
20 Q. Okay. Well, let me ask it
21 differently. Okay?
22 A. Yes.
23 MR. TISI: You can ask what
24 you want. You don't need his permission.

41 (Pages 590 to 593)

Jerry Avorn, M.D.

Page 594

1    BY MR. GOLDMAN:
2      Q.  Is it true, Dr. Avorn, that
3    observational studies generally provide
4    clues as to what randomized clinical
5    trials should be done, but they never
6    establish causation?
7      A.  I don't agree with that.
8      Q.  Do you know whether the FDA has
9    conclude -- Well, withdrawn.
10       Do you agree, sir, that during the
11   time Vioxx was on the market observational
12   studies about Vioxx and any potential
13   cardiovascular risk provided conflicting
14   data about whether the risk existed?
15     A.  I would not characterize it that
16   way.  No.
17     Q.  Would you agree that -- Well, how
18   would you characterize it?
19     A.  I would characterize the main
20   impression from the observational studies
21   as overall a fairly consistent depiction
22   of increased risk with Vioxx.
23     Q.  For all doses?
24     A.  That the risk -- Let me finish,

Page 595

1    please.
2      Q.  I'm sorry.
3      A.  That the risk is higher at higher
4    doses, and that within that broad
5    overview, there have been differences in
6    -- from one study to another about the
7    details of that increased risk.
8      Q.  Okay.  Would you at least agree,
9    Dr. Avorn, that the vast majority of
10   observational studies that were done on
11   Vioxx did not show an increased
12   cardiovascular risk with the 25 milligram
13   dose of Vioxx?
14     A.  I -- I would not agree with that.
15     Q.  Would you agree that observational
16   studies that were done when Vioxx was on
17   the market provided conflicting information
18   about whether there was an increased
19   cardiovascular risk associated with the 25
20   milligram dose of Vioxx?
21     A.  My overview of the literature is
22   that it generally depicted an increased
23   risk, although some studies do not find
24   that increased risk.

Page 596

1        And so it depends how -- whether
2    you would characterize that as conflicting
3    or not.
4      Q.  Is it true that some observational
5    studies that were done during the time
6    Vioxx was on the market show that there
7    was no increased cardiovascular risk
8    associated with the 25 milligram dose of
9    Vioxx?
10     A.  There were some studies that did
11   not find that.
12     Q.  There were some studies that found
13   no increased cardiovascular risk associated
14   with the 25 milligram dose of Vioxx,
15   right?
16     A.  Right.
17     Q.  Your report mentions eight
18   observational studies.  They don't -- It
19   doesn't mention the study by name, but you
20   refer to eight observational studies that
21   were done on Vioxx.
22     A.  Right.
23     Q.  I know about your 2004 study in
24   Circulation.  Can just tell me the names

Page 597

1    of the other seven?
2      A.  Sure.  There was Mamdani.  Wayne
3    Ray had one and -- Let me just pull them
4    for you, so we don't have to --
5      Q.  Let me ask you -- I'll throw out
6    the names, and I think I'm missing one or
7    two.
8      A.  That's fine.  That's fine.
9      Q.  When you say there are eight
10   observation --
11         MR. TISI:  Can I maybe help
12   you?  There is an index to the
13   observational studies on Vioxx that we've
14   provided you, actually.
15         MR. GOLDMAN:  Okay.  That
16   might help, but I'm not going to go over
17   it right now.  Thank you.
18         MR. TISI:  Okay.
19         BY MR. GOLDMAN:
20     Q.  As to the eight studies that you
21   mentioned and are relying on your report,
22   sir --
23     A.  Yes.
24     Q.  -- do they include the Ray study?

42 (Pages 594 to 597)

Jerry Avorn, M.D.

Page 598

1   A.  Yes.  Lancet --
2   Q.  Mamdani?
3   A.  -- 2002.  Mamdani 2002.
4   Q.  Or 2003.  Solomon 2004?
5   A.  That's ours.
6   Q.  Graham 2005?
7   A.  David's, yes.
8   Q.  Levesque 2005?
9   A.  The Canadian one, yes.
10  Q.  Kimmel 2004?
11  A.  Pennsylvania, right.
12  Q.  And there are two others.  What are
13  they?
14  A.  Okay.  Let's see.
15  Q.  If you remember.
16      MR. TISI:  Let me help you.
17  A.  (Witness viewing documents).
18  Q.  Are you talking about Ingenix in
19  this --
20  A.  I believe I'm not, because we were
21  talking about published ones.
22  Q.  Okay.  Go ahead.
23  A.  Okay.  You may have considered --
24  may not have considered the Juni

Page 599

1   meta-analysis in your list.  And that was
2   the one that was in the Lancet in 2004.
3       MR. TISI:  I have seven
4   here.
5       BY MR. GOLDMAN:
6   Q.  Mm-hmm.
7   A.  But let's just -- okay.  So that
8   doesn't --
9       MR. TISI:  And it does
10  include Ingenix.
11      BY MR. GOLDMAN:
12  Q.  Okay.  I think we've got them
13  covered.
14  A.  Okay.  So we've got Juni.
15  Q.  So Juni is not on the list?
16  A.  Right.
17  Q.  Juni was not an observational
18  study?
19  A.  No.  It's a meta-analysis of
20  observational studies.
21  Q.  It's a meta-analysis of --
22  A.  Of --
23  Q.  Let me just finish the question,
24  okay, Doctor?

Page 600

1   A.  Okay.  I'm sorry.
2   Q.  The Juni article is not an
3   observational study.
4   A.  You're right.
5   Q.  That is not one of the eight
6   observational studies that you're relying
7   on in your report, right?
8   A.  (Witness viewing document).  Right.
9   Q.  And you don't discuss Juni at all
10  in your report?
11  A.  Right.  No.  No.  I agree.
12  Q.  And you don't discuss Juni because,
13  frankly, you don't think meta-analyses are
14  very compelling evidence, true?
15  A.  I never said that.
16      MR. TISI:  Objection.  Nice
17  try.
18      BY MR. GOLDMAN:
19  Q.  I have to be clearer.  My question
20  was poor.  Withdrawn.
21      Dr. Avorn, am I right that you're
22  not relying on the Juni meta-analysis?
23      MR. TISI:  Objection.  It's
24  on his reliance list.

Page 601

1   A.  Not as an observational study, but
2   as a meta-analysis.
3   Q.  Do you discuss anywhere -- and I
4   think you've already said no -- the Juni
5   analysis in your report?
6   A.  Not as a meta-analysis, but I --
7   but I discuss the component studies, which
8   went into the Juni analysis.  But do I
9   discuss the Juni meta-analysis per se?
10  No.
11  Q.  Do you rely on Dr. Konstam's
12  meta-analysis in 2002?
13  A.  The one in Circulation?
14  Q.  Yes.
15  A.  No.
16  Q.  Why do you rely on Dr. Juni's
17  meta-analysis but not Dr. Konstam's?
18  A.  I think Dr. Juni's was more recent.
19  I think it was 2004 versus 2002.
20  Q.  In terms of meta-analyses that were
21  done while Vioxx was on the market, do you
22  agree that Dr. Konstam's analysis was
23  meaningful?
24  A.  I can't characterize that as yes or

43 (Pages 598 to 601)

Jerry Avorn, M.D.

Page 602

1   no in terms meaningful.
2       Q.   How would you describe the
3   significance of Dr. Konstam's meta-analysis
4   to your opinion, sir?
5       A.   My concern is that it dealt with
6   outcomes which may not have been
7   completely available to him at the time,
8   in terms of adjudication and in terms of
9   information that was available.
10      Q.   How do you know that?
11      A.   Well, my -- my belief is that it
12  was based on studies for which there were
13  -- through no fault of his -- questions
14  later about whether a given outcome was --
15      For example, in -- in I believe
16  ADVANTAGE was -- was in one of his -- was
17  one of the studies that he analyzed, and
18  we've discussed previously that there were
19  some concerns about the adjudication of
20  outcomes in ADVANTAGE.
21      Q.   Putting aside the questions you
22  have about the integrity of the data in
23  the ADVANTAGE study, do you agree that Dr.
24  Konstam's analysis was reliable and

Page 603

1   meaningful?
2       A.   I think there were problems with
3   completeness in it.
4       Q.   So the answer to my question is no,
5   you don't think it was reliable and
6   meaningful?
7       A.   Right.
8           MR. TISI:  That question
9   doesn't make sense.
10          BY MR. GOLDMAN:
11      Q.   Is it true, sir, that you don't
12  consider Dr. Konstam's meta-analysis to be
13  reliable and meaningful?
14      A.   Didn't we just answer that?
15      Q.   My question referred to "it," so it
16  was not clear --
17      A.   Okay.
18      Q.   -- so let me ask the question
19  again.
20      A.   That is -- That is correct.
21      Q.   Isn't it true, sir, that Dr.
22  Konstam's meta-analysis, in your view, was
23  not reliable and not meaningful?
24      A.   It was problematic.  I think not

Page 604

1   meaningful is -- is dismissive of -- of it
2   in a harsh way.  I would say that there
3   were problems with it.
4       Q.   You know Dr. Konstam, don't you?
5       A.   I do not.
6       Q.   Any reason to think that he's not a
7   reputable, honest scientist?
8       A.   No such reason.
9       Q.   There's no reason to think that Dr.
10  Konstam would author a meta-analysis that
11  wasn't accurate, right?
12      A.   Not intentionally.
13      Q.   Just briefly, I want to go through
14  the observational studies on Vioxx.  If
15  you need to see any, please ask, and I'm
16  happy to give them to you.
17          MR. TISI:  They're all in
18  one place.
19      A.   Yeah.  I got them here.
20      Q.   But I have a feeling you know the
21  questions and the answers.
22      A.   Okay.
23      Q.   Dr. Ray's Study 2002.
24      A.   Right.

Page 605

1       Q.   Isn't it true that in that
2   observational study there was no evidence
3   of an increased cardiovascular risk with
4   the 25 milligram dose of Vioxx?
5       A.   Right.
6           And I'm going to want to refer to
7   them as we speak.
8           MR. TISI:  And I think they
9   start --
10          THE WITNESS:  They start
11  right around here.  Ray's passed.  I got
12  it.  I got it.  I got it.
13          BY MR. GOLDMAN:
14      Q.   Isn't it true, Dr. Avorn, that
15  Ray's study in 2002 indicated that there
16  was no evidence of an increased
17  cardiovascular risk associated with Vioxx
18  at the 25 milligram dose?
19      A.   All right.  And just give me a
20  moment to review the tables before
21  answering.
22          (Witness viewing documents).
23          MR. TISI:  We've been going
24  about an hour.  While he's doing that, can

44 (Pages 602 to 605)

Jerry Avorn, M.D.

Page 606

1 we take a quick one?
2 A. I can -- Just to resolve this --
3 MR. TISI: Oh, I know he's
4 in mid question. Go ahead.
5 A. No. I can answer that by saying I
6 agree.
7 Q. I have to ask it again, because
8 there's a lot of disruption.
9 MR. TISI: I'm sorry. You
10 can take out the disruption out of there.
11 BY MR. GOLDMAN:
12 Q. Do you agree, Dr. Avorn, that Ray's
13 2002 study showed no evidence of an
14 increased cardiovascular risk for the 25
15 milligram dose of Vioxx?
16 A. I agree.
17 Q. And isn't it true that, as of the
18 end of 2002, there was no observational
19 study showing that there was an increased
20 risk for patients who used 25 milligrams
21 of Vioxx?
22 A. That is probably true.
23 Q. The only conclusion that Dr. Ray
24 came to, based on his observational study,

Page 607

1 was that chronic use of 50 milligrams of
2 Vioxx probably should be avoided, right?
3 A. (Witness viewing document). Yes.
4 Q. And you understand that Merck's and
5 the FDA's package insert for Vioxx always
6 limited 50 milligram dose to five days,
7 true?
8 A. If you indicate that, I can -- We
9 can go back and look at the label, but
10 I'm willing to agree if you say that
11 that's the case.
12 Q. Mamdani?
13 A. Yes.
14 Q. Is it true, sir, that Mamdani's
15 study in 2003 showed no increased risk of
16 heart attack for Vioxx against the control
17 group?
18 A. All right. Let me just pull that.
19 (Witness viewing document) Okay.
20 Here it is. Archives 2003.
21 MR. TISI: It's a lot
22 easier the way that I've organized it. It
23 may be easier.
24 THE WITNESS: No. That's

Page 608

1 okay. I'm doing fine here.
2 MR. TISI: Okay.
3 A. As I indicate in my report, we had
4 a big problem with that study because it
5 excluded people who were not using the
6 drug for, as I recall, more than one month
7 or two months. And because of that, a
8 lot of the risk period was deleted from
9 the study.
10 And so while you are correct that
11 that's what he concluded, it's my opinion
12 that that study had a big methodological
13 problem.
14 Q. You're not suggesting that Merck or
15 anybody intentionally deleted data from
16 Mamdani's study, are you, sir?
17 A. Definitely not.
18 Q. Okay. That study wasn't set up to
19 do what you just said it should do, right?
20 A. Correct.
21 Q. Okay.
22 A. These -- Yeah. These are hard
23 studies to get.
24 Q. Am I right, sir, that the Mamdani

Page 609

1 study in 2003 showed no increased risk of
2 heart attack for Vioxx against the control
3 group?
4 A. Correct.
5 Q. And whatever criticisms you now
6 have about the Mamdani study, you didn't
7 articulate back when Vioxx was on the
8 market, did you?
9 A. Definitely we discussed those
10 within a week of the publication in the
11 Archives of Internal Medicine, and we
12 considered writing a letter to the editor
13 expressing concern about the methodological
14 issue.
15 And I don't recall that we did.
16 But this was not a -- a recent insight
17 that we had.
18 Q. You didn't write a letter to the
19 editor criticizing Mamdani's study in 2003,
20 did you, sir?
21 A. Correct.
22 Q. Nor did you write an article say
23 that the Mamdani study is unreliable
24 because it excluded certain patients,

45 (Pages 606 to 609)

Jerry Avorn, M.D.

Page 610

1    right?
2       A.  I don't know whether Dr. Solomon
3    and I may or maintained have written
4    something about that in passing in our
5    various writings about this.
6       Q.  Who is Laurie LaRusso?
7       A.  I don't know.
8       Q.  In April of 2003, Dr. Avorn, do you
9    remember that you had a view about what
10   patients should use COX-2 inhibitors and
11   what patients should not?
12      A.  In April of 20 -- Can you remind
13   me what you're describing?
14      Q.  It's this article.
15      A.  (Witness viewing document).  Okay.
16   Oh, that you -- Wait a minute.  Hold it
17   just out of my reach.
18      Q.  Is this --
19      A.  Okay.  This is the document that we
20   had talked about --
21          MR. TISI:  Can you mark it?
22      A.  -- our providing you with
23   yesterday.  This is the educational piece
24   that we put together for --

Page 611

1       Q.  Oh.
2          MR. TISI:  I was going to
3    ask you whether he ever provided that.
4    This is the --
5       A.  No.  This is my --
6          MR. TISI:  -- the one you
7    have already?
8          MR. GOLDMAN:  Let me mark
9    it just for the record.  Good.  That
10   saves you the trip.  Hold on.
11         BY MR. GOLDMAN:
12      Q.  I'm marking as Exhibit 18 what is
13   the educational pamphlet --
14      A.  Right.
15      Q.  -- that you provided to your
16   residents and interns concerning what
17   patients should use COX-2 inhibitors?
18      A.  Right.  And I should point out that
19   if it's dated 2003, there was an earlier
20   version that we had prepared that I'm
21   still meaning to get to you that was --
22   that was at the time that the drugs were
23   introduced.
24      Q.  I do need you to get me that.

Page 612

1       A.  Okay.
2          (Exhibit-18, Pamphlet
3    entitled "COX-2 Inhibitors:  Who Really
4    Needs Them," marked for identification).
5          BY MR. GOLDMAN:
6       Q.  Am I right, Dr. Avorn, that your
7    view, in April of 2003, was that there
8    were certain patients who should use COX-2
9    inhibitors and certain who shouldn't?
10      A.  Why don't you hand me the exhibit?
11      Q.  Sure.
12      A.  (Witness viewing document).  Right.
13      Q.  Okay.  And in that article, or
14   educational pamphlet, you're not just
15   talking about Vioxx, you're also talking
16   about Celebrex, right?
17      A.  Right.
18      Q.  You had the same advice for your
19   interns and residents in that educational
20   piece for Celebrex as you did for Vioxx,
21   true?
22      A.  No.  What we say on the first page
23   here is, "The VIGOR trial found a fourfold
24   higher rate of MI in patients randomized

Page 613

1    for Rofecoxib," et cetera, et cetera.
2          So let me read what we say about
3    choosing between the two drugs before I
4    respond to your question.
5       Q.  Sure.  You should read it to
6    yourself, because it's long.
7       A.  Yeah.  I will read it to myself.
8          (Witness viewing document).  Okay.
9    It is not the case that we made the same
10   recommendation for the two drugs.
11      Q.  Okay.  Can I see it for a second?
12      A.  (Witness complied).  Yeah.
13      Q.  In terms of the criteria for use
14   that you were suggesting to your residents
15   and interns in this educational document,
16   am I right that when you're talking about
17   the criteria for use, you were talking
18   about all COX-2 inhibitors?
19      A.  (Witness viewing document).  Right.
20   Those bullet points that you're referring
21   to describe patients at high risk of GI
22   bleeds.
23      Q.  Mm-hmm.
24      A.  Yes.

Jerry Avorn, M.D.

Page 614

1  Q. And the criteria that you're
2  suggesting be used for COX-2 inhibitor use
3  applied to all COX-2 inhibitors, right?
4  A. The criteria for who is at risk of
5  GI bleed is the same for both COX-2
6  inhibitors.
7  Q. So the answer to my question is
8  yes?
9  A. Yes.
10      MR. TISI: Let me see it,
11  please. Are you done? Are you going to
12  ask more questions about this, because I
13  haven't read this. Let's go off the
14  record.
15      MR. GOLDMAN: Yeah. Let's
16  take a break.
17      (Off the record at 11:50
18  a.m.)
19      (Recess taken).
20      (Back on the record at 11:56
21  a.m.)
22      (Exhibit-19, Drs. Avorn and
23  Solomon Study entitled "Relationship
24  Between Selective Cyclooxygenase-2

Page 615

1  Inhibitors and Acute Myocardial Infarction
2  in Older Adults," marked for
3  identification).
4  BY MR. GOLDMAN:
5  Q. I'm marking as Exhibit 19, Dr.
6  Avorn, the study you published in 2004
7  with Dr. Solomon, called Relationship
8  Between Selective COX-2 Inhibitors and
9  Acute Myocardial Infarction in older
10  adults, okay?
11  A. Right.
12  Q. Was the population in this study
13  primarily 81-year-old females?
14  A. That was the mean age.
15  Q. Okay.
16  A. It was people over 65, in general.
17  Q. Did your study find that there was
18  no statistically significant increased
19  cardiovascular risk when it came to Vioxx
20  versus no current use?
21  A. That's not correct.
22  Q. First of all, what does "no current
23  use" mean?
24  A. The -- Okay. I don't want to

Page 616

1  answer this --
2  Q. That's a terrible question. Let me
3  ask it again.
4      What does "no current use" mean as
5  it was used in your 2004 study?
6  A. Right. Right. Right.
7      (Witness viewing document). Those
8  were patients who were not taking either
9  Rofecoxib or Celecoxib or the other older
10  nonsteroidals that we studied.    .
11  Q. So is it your testimony that there
12  was a statistically significant increased
13  risk of heart attack between Vioxx and the
14  no-use group in your study?
15  A. There is a difference at the level
16  of P.054. And there are some who would
17  argue that because it was .054 and not
18  .050, that renders it a statistically not
19  significant finding. That was the
20  position that Merck took. We did not
21  agree. We felt that it was essentially at
22  the level of P.05, and that it therefore
23  was a meaningful finding.
24  Q. Can reasonable people disagree

Page 617

1  about whether a P-value of .054 is
2  statistically significant or not?
3  A. Yes.
4  Q. Can reasonable people disagree on
5  whether or not a confidence interval that
6  contains the number one reflects an
7  increased risk or not?
8  A. Yes.
9  Q. The study that you did also showed
10  that there was no statistically significant
11  difference in heart attacks when comparing
12  Vioxx to Ibuprofen, correct?
13  A. (Witness viewing document). The
14  point estimate was elevated, but it was
15  not statistically significant.
16  Q. Do you also agree, sir, that there
17  was no statistically significant increase
18  in heart attack rate in your study with
19  Dr. Solomon in 2004 when comparing Vioxx
20  to traditional NSAIDs?
21  A. I think you mean other traditional
22  NSAIDs.
23  Q. Yes.
24  A. Again, the point estimate was

47 (Pages 614 to 617)

Jerry Avorn, M.D.

Page 618

1   elevated, but it missed the test for
2   significance.
3   Q.  Is it true, sir, that there was no
4   statistically significant increase in heart
5   attack rate in your study with Dr. Solomon
6   when you look at Vioxx versus other
7   NSAIDs?
8   A.  If by "other" you mean non
9   Naproxen, non Ibuprofen NSAIDs, that is
10  the case.
11  Q.  Okay.  Did your study also find,
12  sir, that there was an increased heart
13  attack rate, according to you and Dr.
14  Solomon, when Vioxx was used for less than
15  90 days but -- Withdrawn.
16       Am I right, sir, that the finding
17  of your study with Dr. Solomon in 2004 was
18  that there was an increased heart attack
19  risk with Vioxx compared to Celebrex when
20  used for less than 90 days, but there was
21  no increased risk after 90 days?
22  A.  The main finding was at any
23  duration there was a statistically
24  significant increased risk with Vioxx.

Page 619

1   When -- for all durations studied.
2       When that was separated out into
3   shorter duration versus longer duration,
4   the effect was stronger for the shorter
5   duration than for the longer duration
6   where we did not see an effect.
7   Q.  Is it true that you did not see an
8   increased risk of cardiovascular --
9   Withdrawn.
10       Is it true that you did not see an
11  increased heart attack risk for Vioxx when
12  compared to Celebrex in those patients who
13  used Vioxx for more than 90 days?
14  A.  Correct.
15  Q.  There were certain limitations to
16  your study, right?
17  A.  Right.
18  Q.  You couldn't control for body mass
19  index, right?
20  A.  That's not quite correct, in that
21  we did a -- an analysis that looked at
22  measures that we did not have access to in
23  our database, including body mass index,
24  smoking, aspirin use, and other variables

Page 620

1   that are not in the database.
2   Q.  Mm-hmm.
3   A.  And we studied those in a database
4   called the Medicare Current Beneficiary
5   study, in which we tried to determine
6   whether there was any important difference
7   in Vioxx users in relation to body mass
8   index, smoking, aspirin use, et cetera.
9   And we then made adjustments for those
10  differences, which tended to be minimal,
11  in our analysis.
12  Q.  Did your study show that statins
13  actually increase the risk of heart
14  attack?
15  A.  We did not set out -- And I need
16  to explain this carefully.  We did not set
17  out to study the effect of statins,
18  because that would have been a foolish
19  thing to do in an observational study.  We
20  were merely attempting to control for
21  statin use.
22       We would expect that the effect of
23  statins would create the impression of --
24  would be totally problematic in an

Page 621

1   observational study, because on the one
2   hand, we know that statins prevent MIs --
3   from randomized trials of statins -- and
4   yet we also know is that statin use is a
5   marker of people with high cholesterol.
6       And so it is impossible to predict
7   whether there would be an increase or a
8   decrease in MIs because of statin use.
9   And so this was by no means an attempt to
10  demonstrate the effect of statins, because
11  you can't do that adequately in a study of
12  this kind.
13  Q.  Whether or not it was your intent
14  in conducting your observational study with
15  Dr. Solomon, isn't it true that one
16  finding in your study was that statins
17  increase the risk of heart attack?
18  A.  That is not true.
19  Q.  Is it true, sir, that in your study
20  it was observed that statins do not
21  prevent heart attacks and strokes?
22  A.  We did not study strokes, and as I
23  said before, we were not -- the presence
24  of stat -- It is a misunderstanding of why

48 (Pages 618 to 621)

Jerry Avorn, M.D.

Page 622

1  statins are in that model.
2      We did not -- The study was not
3  about looking at the effects of statins.
4  And I just explained why the statin effect
5  is not something one can consider, except
6  as an adjustment for compounding.
7      Q.  Isn't it true, sir, that one
8  observation, however unimportant you think
9  it is, of your study with Dr. Solomon was
10  that the statins that were used by the
11  patients in your study did not reduce the
12  risk of heart attack?
13      A.  That is not true.
14      Q.  Putting aside all the caveats that
15  you did before about that you weren't
16  intending to study statins and studying
17  statins would not be a good idea in an
18  observational study, can you describe
19  succinctly for me what the finding was
20  concerning statin use in your study with
21  Dr. Solomon?
22      A.  No significant difference.
23      Q.  So one observation that you made
24  with Dr. Solomon in your study in 2004 was

Page 623

1  that there was no statistically significant
2  decrease in the risk of heart attack for
3  those patients who used statins compared
4  to those patients who didn't use statins?
5      A.  That is not correct. And I'm not
6  trying to be difficult, but I think you
7  need to understand that if you
8  characterize it as an observation that we
9  made --
10      Q.  Okay.
11      A.  -- that's incorrect.
12      Q.  Can I call it a finding?
13      A.  No.
14      Q.  Can I call it a --
15      A.  You can call it a co-variant.
16      Q.  Can you come up with a word that a
17  jury might understand other than
18  co-variant?
19      MR. TISI:  Well, we need
20  expert testimony.
21      A.  I don't think I can, because it's
22  -- it's deceptive to depict it as a
23  finding.
24      Q.  Can you help me out here and show

Page 624

1  me where the statin discussion is?  What
2  page is it on?
3      A.  There is no discussion, because it
4  was not a finding.  There's a line in a
5  table.
6      Q.  Okay.  Where is that?
7      A.  And the only people who made
8  anything of that were the people at Merck.
9  Everyone else knew that.  It's in Table 2.
10      Q.  Oh, got it.
11      Am I right, Dr. Avorn, that in
12  Table 2, in your study with Dr. Solomon,
13  there is an indication that the use of
14  statins did not lead to a statistically
15  significant decrease in heart attack risk
16  compared to those who didn't use statins?
17      A.  To be accurate, our Table 2
18  indicates that statin use did not have an
19  association with acute MI.
20      Q.  Did your study also indicate that
21  hormone replacement therapy decreased the
22  risk of heart attack?
23      A.  That hormone replacement therapy
24  was associated in a lower rate of heart

Page 625

1  attack, yes.
2      Q.  And is it true that in clinical
3  trials there's actually been evidence that
4  hormone replacement therapy can increase
5  the risk for cardiovascular events?
6      A.  Some have indicated an increase,
7  some have indicated no effect.
8      Q.  It was your opinion, sir, after you
9  conducted your study with Dr. Solomon,
10  that more research should be done and more
11  trials should be conducted concerning
12  cardiovascular effects that might exist
13  with Vioxx?
14      A.  Yes.
15      Q.  I noticed in your expert report
16  that you mention that you want to talk
17  about the interactions you had with Merck
18  concerning your 2004 study with Dr.
19  Solomon?
20      A.  Correct.
21      Q.  Can you please tell me everything
22  that you think is important about your
23  interactions with Merck concerning your
24  study with Dr. Solomon in 2004?

49 (Pages 622 to 625)

Jerry Avorn, M.D.

Page 626

1   MR. TISI:  Just to be
2  clear, Counsel, I think his report reads
3  he's prepared to testify to it.
4       As to him wanting to testify to it,
5  that's a decision that I make, number one.
6       Number two is, it's an improper
7  question to say tell me everything that
8  you know from -- in a period that covered
9  many years.
10      With that caveat, I mean, I assume
11  you want him -- I mean, you have a
12  responsibility to ask specific questions.
13  With that caveat, you can try to answer
14  that question.
15      BY MR. GOLDMAN:
16      Q.  On Page .24 of your report, sir,
17  you say, "I will also present evidence
18  concerning the experience of my research
19  team in its work on our Merck-funded
20  epidemiologic study of the relationship
21  between Vioxx and heart attack that was
22  ultimately published in the cardiology
23  journal Circulation in 2004," right?
24      A.  Right.

Page 627

1       Q.  What evidence do you intend to
2  present, sir, on that issue?
3       MR. TISI:  Objection for the
4  reasons stated.
5       A.  In overview --
6       Q.  Actually, I would like you to be as
7  specific as you can --
8       A.  Okay.
9       Q.  -- so I know everything about the
10  interactions you had with Merck concerning
11  the 2004 study.
12      A.  Okay.  I want to begin by stating
13  that we have had and have ongoing very
14  productive relationships with a number of
15  pharmaceutical manufacturers in conducting
16  pharmacoepidemiologic studies, which they
17  have funded in our research group.
18      Two examples that come to mind are
19  Glaxo and Pfizer.  And although counsel
20  yesterday depicted me as a foe of the
21  pharmaceutical industry, we actually have
22  very close ties to companies for whom we
23  have done studies without any interference
24  with the conduct of that work or the

Page 628

1  presentation of those outcomes.  And there
2  have been other companies that I could
3  list with whom that has been the case.
4       We sometimes accept funding from
5  drug companies because there is very
6  little external funding otherwise available
7  for the conduct of pharmacoepidemiologic
8  research.  And the companies are often
9  quite eager to support groups that are
10  nationally known for their work in
11  studying adverse events.
12      Our experience with Merck was
13  unlike our experience with any other drug
14  company, whose -- which have funded any
15  other studies that we've done with the
16  industry.
17      It began with the longest and most
18  protracted period of contract negotiation
19  that I have ever experienced in my
20  academic life.  In fact, I've -- I put
21  together a timeline -- which I'd be happy
22  to share with counsel -- after I just
23  refer to some dates on it.
24      Because during the time of our

Page 629

1  work, Dr. Solomon and I would frequently
2  ask one another, "Is this taking so long
3  in being allowed to proceed on this study
4  because this is just a big company, or is
5  something else going on?"  And we, for a
6  period of several years, were not sure
7  what the answer to that was.
8       The chronology begins in February
9  of 2001, when Dr. Solomon first proposed
10  doing a study of Vioxx to Carolyn
11  Cannuscio.  C-A-N --
12      MR. GOLDMAN:  I'll get it
13  to you.
14      A.  Okay.  Cannuscio.  Who, at that
15  point, had just finished her doctorate in
16  epidemiology at Harvard, and had then gone
17  to work at Merck as an epidemiologist.
18      Those discussions, having begun in
19  February of '01, continued through the
20  spring and summer of '01.  By the time it
21  got to August of 2001, there was a meeting
22  of the International Society for
23  Pharmacoepidemiology that Dr. Solomon and I
24  attended, in which I approached Dr. Harry

50 (Pages 626 to 629)

Jerry Avorn, M.D.

Page 630

1  Guess, who was the head of epidemiology at
2  the time at Merck, and I indicated that I
3  thought that there was a real need for
4  there to be an observational study of
5  cardiovascular complications from Vioxx, in
6  light of the VIGOR study, which had been
7  published, and that we were eager to get
8  the study done. And it seemed to me that
9  Merck should be eager to do such research
10  as well. And Harry agreed that this was
11  an important study to do, and that we had
12  the capacity to do that study, and that we
13  should go forward in making those plans.
14       Those conversations continued
15  through the fall of '01, through the
16  winter of '02, and into the spring of '02,
17  in trying -- in our trying to get Merck
18  to actually commit to doing the study.
19       And as I said, I have never
20  experienced a period of exceeding one year
21  between the time that a study is proposed
22  and a company expresses interest in doing
23  it, to the point where the contract
24  actually was signed.

Page 631

1       The contract was eventually signed
2  in April of 2002. And there then began a
3  period of about -- let's see -- April to
4  December would be about seven months --
5  eight months of protracted discussion with
6  Merck about the study design. Protracted
7  on Merck's part, not on our part, because
8  this also was the longest and most
9  protracted period of discussion about study
10  design that I had ever experienced to this
11  day, with any sponsor, corporate or other,
12  of a study design.
13       It seemed to us that it was a
14  fairly straightforward, case-controlled
15  design, and yet we could not get Merck,
16  even after they had signed the contract,
17  and even though we had been discussing the
18  concept of the study for about a year or
19  more, to sign off on the actual study
20  design.
21       And I remember Dan Solomon and I
22  would ask Carolyn Cannuscio, primarily Dan,
23  who was the contact with Carolyn, what's
24  going on, why is this taking so long, and

Page 632

1  she said, "Well, it's a very big company,
2  and they have a lot of committees."
3       It was not until December of 2002
4  that -- so about -- nearly two years after
5  Dan first proposed the study to Dr.
6  Cannuscio -- that Merck finally accepted
7  the protocol that we had proposed. And
8  there were then additional steps, which
9  were plausible, such as Merck insisting
10  that we go back to the patient's primary
11  medical records in Pennsylvania to confirm
12  that each person -- that the people we
13  thought had had heart attacks had had
14  them. Our position was that this
15  validation had been done in other settings
16  with a very high degree of validity
17  demonstrated. But Merck asked us to do it
18  again in Pennsylvania, which we did.
19       Merck then asked that a -- an
20  outside reviewer be brought in to review
21  the programming associated with our study.
22  And this is before any data had been
23  generated. And, again, this is the first
24  and only time I've ever had any funder,

Page 633

1  corporate or governmental, ask to have an
2  external person come in to review our
3  code. But we complied. And each of
4  these steps continued to really slow down
5  our capacity to get the work done, because
6  Merck refused to release funding for the
7  next step of the work until the -- the
8  steps had been done, as -- you know, as
9  to their requirements.
10       It was not until March of 2003,
11  because of all of these delays, that we
12  were able to get the -- the work done to
13  the point where we were able to deliver
14  some preliminary data tables to Merck,
15  which we did.
16       And in the course of March and
17  April, Dan had ongoing conversations with
18  Dr. Cannuscio about her being a co-author
19  of the paper. And our position had been
20  that, since she was participating
21  meaningfully in the conduct of the work
22  and was making important contributions as
23  a collaborator that -- from our
24  perspective, that would warrant authorship,

51 (Pages 630 to 633)

Jerry Avorn, M.D.

Page 634

1  and she actually was a co-author of the
2  original abstract that Dr. Solomon
3  presented at the meeting. Well, he
4  submitted it in May of 2003 to the
5  American College of Rheumatology annual
6  meeting. And at that point we also sent
7  the full paper to Merck as per the terms
8  of our contract, which allowed them to see
9  and comment on the paper, but did not give
10  them any rights of censorship over the
11  content.
12      We then submitted the paper
13  initially to two journals. One was the
14  New England Journal and one was JAMA. And
15  both of them said no, thank you. And our
16  third choice was Circulation, which is the
17  preeminent journal in cardiology. And at
18  around the same time, which is October of
19  2003, Dr. Solomon presented the paper at
20  the American College of Rheumatology
21  meetings.
22      The paper was accepted at
23  Circulation in February of 2004. And we
24  kept sending notice of where things stood

Page 636

1  paper. And he indicated to Dr. Santanello
2  that we would not do so because she
3  demanded it, because Dr. Cannuscio was a
4  colleague of ours, as well as whatever
5  role she has as a Merck employee, and that
6  we could not accept a colleague's employer
7  telling us to take her name off the paper.
8      And the understanding that I have
9  is that Merck was concerned about having a
10  Merck employee as a co-author of a paper
11  which documented a -- an increase in risk
12  of heart attack caused by its drug, and
13  then indicated to Dr. Santanello that that
14  would not be something that we could do,
15  and that any request would have to be
16  something that Carolyn Cannuscio wanted,
17  rather than what Merck wanted.
18      As it turns out, Carolyn was, I
19  believe, on maternity leave at that point,
20  and was a little difficult to reach. But
21  at one point in -- in April of 2004, Dr.
22  Solomon got a call from Dr. Cannuscio
23  saying that she felt it was necessary for
24  her to request that her name not be on

Page 635

1  to the sponsor, Merck, as all this was
2  evolving.
3      And then, as the paper was actually
4  in galley at Circulation, we began to get
5  calls from Merck, from Nancy Santanello,
6  in particular, who had numerous
7  conversations with Dan demanding that he
8  make changes to the findings so as --
9  which would have had the effect of
10  softening the -- the blow, so to speak,
11  about the risk that we had detected of
12  Vioxx in -- in association with -- or in
13  causing heart attack.
14      Dan and Nancy had prolonged
15  discussions about the changes that they
16  proposed. Some we accepted. Some we did
17  not. The ones we did not were changes
18  which we felt would have watered down the
19  conclusion in a way that we felt would
20  have been misleading.
21      And as the paper was in galley at
22  Circulation, Dr. Solomon received a call
23  from Dr. Santanello demanding that Dr.
24  Cannuscio's name be removed from the

Page 637

1  the paper.
2      Bizarrely, it took so long for that
3  request to eventually get made, that even
4  though Merck had seen many, many versions
5  of the paper, it was already in galley at
6  that point. And we did not get Dr.
7  Cannuscio's request in time for Circulation
8  to remove her from the gal -- the Web
9  version of the paper, because it had
10  already been posted on their Web site in
11  advance of the publication. But we were
12  able to get them to remove it from the
13  print version.
14      And we acknowledged Dr. Cannuscio's
15  participation anonymously, as we were
16  required to do, at the end of the paper
17  by noting the -- by thanking an
18  epidemiologist who participated actively in
19  the study design, statistical analysis and
20  interpretation of the data and preparation
21  of the manuscript, all of which would
22  normally have constituted grounds for
23  authorship in common, academic behavior.
24      That difference was -- was noted by

52 (Pages 634 to 637)

Jerry Avorn, M.D.

Page 638

1    -- I believe a reporter for the Wall
2    Street Journal, who had originally covered
3    Dr. Solomon's presentation at the -- at
4    the rheumatology meetings. And he
5    investigated why Dr. Cannuscio had been on
6    the abstract but had not been on the final
7    paper. I believe that as a journalist he
8    got access to the Web version of the paper
9    and noticed that she was there on the Web
10   version and not on the printed version,
11   and asked about what had happened, and
12   ended up writing an article in the Wall
13   Street Journal about Merck, with a
14   headline that ran something like that
15   Merck pulls author off of study and
16   something about raising ethical questions
17   about their -- their doing so.
18        I know that Dr. Cannuscio wanted to
19   be a co-author of the paper because she
20   was a young person just starting out in
21   the field, and a paper in Circulation is a
22   very big deal at any point in one's
23   career. And I know that she's been
24   deposed. I've not read her deposition.

Page 639

1    But my understanding is that this was not
2    something that she saw as a -- a good
3    development in her career.
4         I have no way of being certain as
5    to why it took more than a year and a
6    half or about a year and a half to get
7    the contract signed and why it took an
8    additional eight months for Merck to
9    approve the protocol.
10        But, as I said, that's
11   unprecedented in my experience and that of
12   anybody else that I'm aware of in the
13   field. That was one of the matters that
14   interested me with the pace of the Ingenix
15   study, which we talked about, which also
16   was funded, I believe, at the same time,
17   and also took much longer than one would
18   have expected to see the light of print.
19        So I guess, in summary, those are
20   the high points of our experience with the
21   company in relation to the performance of
22   this research.
23   Q.   When you say that those are the
24   high points, Dr. Avorn, am I right that

Page 640

1    those are the -- the details that you
2    remember as you're sitting here today
3    about your interactions with Merck
4    concerning your study with Dr. Solomon in
5    2004?
6         MR. TISI:  Objection,
7    Counsel. As you know, I think it's
8    difficult to -- unless you have specific
9    questions, you're entitled to do that. He
10   summarized the experience over several
11   years.
12        MR. GOLDMAN:  Just object.
13        MR. TISI:  No.  I mean --
14   BY MR. GOLDMAN:
15   Q.   Dr. Avorn --
16        MR. TISI:  It's a totally
17   inappropriate question.  Go ahead.
18   A.   I'm having trouble understanding
19   what the meaning of the question is.
20   Q.   I asked you to be as specific as
21   you could about your interactions with
22   Merck, and I didn't interrupt you and gave
23   you all the opportunity to talk about the
24   details you remember about your

Page 641

1    interactions with Merck concerning your
2    study. And I just want to be clear that
3    there's no details that you remember right
4    now that you haven't shared with me,
5    right?
6    A.   Well, I could spend another hour
7    talking about conference calls and getting
8    Harry Guess involved. But you know, they
9    were --
10   Q.   Have you told me the most important
11   details in your mind about your
12   interactions --
13   A.   I certainly have.
14   Q.   -- with Merck?
15        Can I mark just your --
16   A.   Yes.
17   Q.   -- chronology as Exhibit 20?
18   A.   Yes.
19        (Exhibit-20, Chronology of
20   Dr. Avorn's Interactions with Merck, marked
21   for identification).
22        BY MR. GOLDMAN:
23   Q.   When did you prepare this
24   chronology?

53 (Pages 638 to 641)

Jerry Avorn, M.D.

Page 642

1  A.  Months ago, actually unrelated to
2  this case, our group received a -- I think
3  it was a subpoena from the New York State
4  Attorney General in relation to a criminal
5  investigation, I think -- I hope I'm using
6  the right legal terms -- that the New York
7  State Attorney General was conducting
8  vis-a-vis Merck. And they asked us to
9  retain all information we have in relation
10  to our contact with Merck. And so it
11  seemed at that point that it would be
12  helpful for Dan and me to reconstruct the
13  chronology while it was fresh in our
14  memories.
15  MR. GOLDMAN: Okay. I
16  assume that, Mr. Tisi, you have no
17  intention of eliciting that testimony about
18  the investigation by the Attorney General?
19  MR. TISI: If it becomes
20  relevant -- If it's relevant in your
21  cross-examination, if you ask a question
22  that opens the door, that's up to you.
23  BY MR. GOLDMAN:
24  Q.  I just have a couple follow-up

Page 643

1  questions to what you said, okay, Doctor?
2  The first is: You said that Nancy
3  Santanello demanded that you and Dr.
4  Solomon make certain changes to your
5  findings so as to soften the blow
6  concerning the cardiovascular risk that you
7  detected. Do you remember that testimony?
8  A.  I think I meant to say or did say
9  that the effect of those changes would
10  have softened the blow.
11  Q.  All right.
12  A.  I don't remember that I imputed
13  that intent to her.
14  Q.  Can you tell me the specific
15  changes that Dr. Santanello asked you to
16  make to your study --
17  A.  Okay.
18  Q.  -- article?
19  A.  To give you -- okay. To give you
20  a complete answer, I -- I'd want to be
21  able to go back and pull out specific
22  memos.
23  But for example, one of the things
24  that struck me was her saying that we

Page 644

1  should remove the finding that we talked
2  about a few minutes ago of -- Let me just
3  find it in the abstract here.
4  (Witness viewing document). Our
5  finding that there is an increased risk of
6  Vioxx compared with no NSAID use, she said
7  that that should not be in the abstract
8  and should be taken out of the abstract.
9  Q.  Did she say why?
10  A.  Her view was that because it was a
11  P of .054 and not .050, it should not be
12  reported in the abstract.
13  And our view was that it was so
14  close to being a meaningful and, quote,
15  significant -- that it was so meaningful
16  and so close to quote, significant, that
17  as long as we presented the actual
18  P-value, it was appropriate to put it in
19  the abstract.
20  Q.  Let me stop you there, and I'm
21  going to ask you about more changes.
22  When you say that Dr. Santanello
23  demanded that you make that change, do you
24  mean that you felt that Dr. Santanello was

Page 645

1  not acting professionally or was aggressive
2  toward you all about making the change, or
3  was she instead asking that -- that you
4  make a change that she felt better
5  reflected the results of the study?
6  A.  She was forceful in her suggestion.
7  But -- but not bizarrely so.
8  Q.  Can you be more specific --
9  A.  Sure.
10  Q.  -- what you mean by that?
11  A.  Well, she -- she -- I mean, I
12  don't want to claim that she behaved
13  strangely or erratically. She just made
14  it clear that it was her very strong
15  belief that this should not be in the
16  abstract, and that it was not acceptable
17  or appropriate for us to put it there.
18  Q.  And what is the second change that
19  you remember Dr. Santanello asking you to
20  make?
21  A.  (Witness viewing document). I
22  think -- and I would want to go back,
23  because I truly don't recall off the top
24  of my head -- there were a number of

Jerry Avorn, M.D.

Page 646

1  wording changes. Some of them had to do
2  with the previous studies about -- I
3  believe it was other cardiovascular effects
4  of Vioxx, which I believe we had either in
5  the introduction or in the discussion,
6  which she felt were non contributory and
7  did not need to be included.
8       And there was one other about a
9  specific comparison of Vioxx with one of
10 the other nonsteroidals which she had an
11 issue about. And I -- I'm sorry that I
12 don't recall the specific issue.
13   Q.  I'm going to ask you to find, at a
14 break, the document that you think
15 reflects the changes that Dr. Santanello
16 was requesting that you make. Okay?
17       MR. TISI:  Well -- Let's go
18 off the record.
19   A.  Okay. There is not a document I
20 have with me.
21   Q.  Keep this.
22   A.  Yeah. Well, no, there is not a
23 document I have with me that I can go to,
24 because if there was, I would do so.

Page 647

1    Q.  When you were -- I thought you
2  referred a minute ago to having to go look
3  to find something that would help you
4  answer the question about exactly what
5  changes Dr. Santanello was suggesting --
6       MR. TISI:  Yeah. Yeah.
7       BY MR. GOLDMAN:
8    Q.  -- and I'm asking what that
9  document is or where would you find that.
10   A.  Okay. I would need to go back to
11 the office and talk with Dr. Solomon and
12 ask him to go through his files.
13   Q.  Okay. I thought -- I was talking
14 about what you have here --
15   A.  No. No. If I had it, I would
16 have produced --
17   Q.  What you've produced --
18   A.  I would --
19       MR. TISI:  Let me just make
20 clear, because I know that this is -- I
21 brought this to your attention yesterday,
22 that your notice of deposition did not ask
23 him to bring documents related to his --
24       MR. GOLDMAN:  Yeah.

Page 648

1       MR. TISI:  -- related to
2  his conduct and his communications and
3  actions with the company prior to -- prior
4  -- you know, absent being involved in an
5  -- his expert report; it all revolved
6  around his expert report.
7       I've made it clear from day one
8  that we're going to -- you know, that
9  issues of his factual involvement are
10 issues in this case. You didn't ask for
11 it, so he didn't bring it with him. So
12 if you ask him to pull out a document
13 here, obviously he didn't have it with him
14 because he wasn't asked by you to bring it
15 with him.
16       MR. GOLDMAN:  Do you intend,
17 Chris, to use documents that Dr. Solomon
18 or Dr. Avorn have --
19       MR. TISI:  I would --
20       MR. GOLDMAN:  -- that have
21 not been produced in this litigation?
22       MR. TISI:  I have not --
23 Honestly, Counsel, I have not looked at
24 documents that they may have in their

Page 649

1  possession. I may do that.
2       MR. GOLDMAN:  Okay.
3       MR. TISI:  I -- I can tell
4  you I have looked at the documents that
5  are in the Merck database --
6       MR. GOLDMAN:  Mm-hmm.
7       MR. TISI:  -- related to
8  his communications with the company, and I
9  certainly intend to use some of those.
10       MR. GOLDMAN:  Okay. I need
11 to know, if you're planning on asking --
12       MR. TISI:  I don't have to
13 tell you that.
14       MR. GOLDMAN:  Okay. Then
15 I'm going to need to have the documents.
16       MR. TISI:  Okay. You have
17 to -- You make the request, but obviously
18 -- we can deal with this. You make the
19 request, and we can -- we can certainly
20 deal with the request, and if it's an
21 appropriate request, we'll get it done.
22 But you have had notice of Dr. Avorn's
23 involvement for months and months and
24 months now, and you never made an effort

Jerry Avorn, M.D.

Page 650

1  to get it.
2           MR. GOLDMAN:  You know,
3  Chris, you've served an expert report
4  here, and I asked for all the documents
5  that support his opinions in this case,
6  and among the opinions in this case --
7           MR. TISI:  No.  That's not
8  exactly true.
9           MR. GOLDMAN:  -- is what --
10  Let me finish.
11           MR. TISI:  You didn't do
12  that, Counsel.
13           MR. GOLDMAN:  Let me finish.
14  Let me finish.
15           I asked for all the documents
16  that --
17           MR. TISI:  Okay.
18           MR. GOLDMAN:  -- that Dr.
19  Avorn is relying on in support of his
20  opinion.  And in the expert report there's
21  a specific statement that refers to Dr.
22  Avorn wanting to discuss his
23  relationship --
24           MR. TISI:  No.

Page 652

1           MR. TISI:  I will also note
2  that back many months ago, he was
3  scheduled to appear in the New Jersey
4  trial to give solely factual testimony.
5           So you guys have known about it,
6  not only from his expert report, but Merck
7  has known about it for -- in fact, there
8  was a motion before Judge Higbee on this
9  issue back in September.
10           I will also note that in your
11  notice of deposition you asked -- because
12  I specifically -- I specifically looked
13  for it -- you specifically asked for his
14  expert opinion developed in this case, and
15  specifically limited it to that.  Because
16  I would have asked Dr. Avorn to produce
17  documents consistent with your report.
18           So let's -- Let's just be clear,
19  you didn't ask him to produce all
20  documents related to Vioxx.
21           MR. GOLDMAN:  I asked Dr.
22  Avorn to bring all materials on which Dr.
23  Avorn relies as support for his opinions
24  in the litigation, and all --

Page 651

1           MR. GOLDMAN:  -- with Merck
2  over the study, and I don't want to --
3           MR. TISI:  Of course you
4  want to cut -- of course you want to put
5  what you want to put on the record, and
6  you don't want me to put it on the
7  record.
8           MR. GOLDMAN:  Okay.  Go
9  ahead.  Say whatever you want.
10           MR. TISI:  Okay.  Thank
11  you.
12           First of all, the reason why that
13  statement is in there is because I asked
14  Dr. Avorn to make it abundantly clear in
15  his expert report that he's prepared to
16  give factual testimony in addition to his
17  expert testimony so that there would be no
18  surprise at the time of trial.
19           That was my -- That was my intent,
20  and I will represent to you that I
21  intentionally asked Dr. Avorn to make it
22  clear that he is prepared to give factual
23  testimony.
24           MR. GOLDMAN:  Mm-hmm.

Page 653

1           MR. TISI:  Well, let's read
2  exactly what you stated, Counsel --
3           MR. GOLDMAN:  I just read
4  it.
5           (Reporter interruption).
6           MR. TISI:  I just have to
7  see it.  I'm over your shoulder here.
8  His -- for his opinions in the Vioxx
9  litigation.
10           MR. GOLDMAN:  Yeah.
11           MR. TISI:  That's excluding
12  his factual testimony.  The next page --
13           MR. GOLDMAN:  Does it say
14  that?
15           MR. TISI:  Yeah.  You read
16  this whole thing.
17           MR. GOLDMAN:  Hold on.
18  Time out.
19           MR. TISI:  We're going to
20  go -- We're going to go --
21           MR. GOLDMAN:  Chris --
22           MR. TISI:  I think it will
23  stand on its own.  I wanted to make my
24  objection on the record to your

56 (Pages 650 to 653)

Jerry Avorn, M.D.

Page 654

1    characterization of what was asked for.
2         If you want to ask for it, we'll
3    talk getting you documents.
4         MR. GOLDMAN: You know,
5    Chris, I don't want any surprises, and I'm
6    sure Dr. Avorn, in all fairness, you want
7    to tell your story, and you don't want to
8    surprise us with documents that I haven't
9    seen, right?
10        THE WITNESS: (Witness nods
11   head).
12        MR. GOLDMAN: That would be
13   unfair?
14        THE WITNESS: I'll do
15   whatever both of you agree I should do.
16        MR. GOLDMAN: Sure.
17        MR. TISI: And nor do I,
18   Counsel.
19        MR. GOLDMAN: Okay. All
20   I'm saying is, Chris, if you intend to use
21   documents that he has in his file, and
22   you're going to do that, and you're going
23   to have Dr. Avorn testify about what they
24   say or the documents themselves, then I

Page 655

1    need to see those.
2         MR. TISI: But I will --
3    and I said, you make a request and I will
4    attempt to do that.
5         MR. GOLDMAN: Okay.
6         MR. TISI: But I don't know
7    the volume of documents. As I told you,
8    I've never seen them.
9         MR. GOLDMAN: Okay.
10        MR. TISI: So I don't know
11   the volume of documents. I don't know how
12   easy they're going to be to get. I don't
13   -- You know, I don't -- I don't know a
14   lot of variables that may -- that may take
15   these things into consideration.
16        MR. GOLDMAN: All right.
17   We will decide whether to make a request
18   after the deposition, okay, sir?
19        THE WITNESS: I will do as
20   told.
21        MR. GOLDMAN: Thank you.
22        BY MR. GOLDMAN:
23   Q.   You mentioned before the three
24   things that you remember Dr. Santanello

Page 656

1    asking you to change in your paper, and as
2    you sit here today, do you remember any
3    other changes that she wanted you to make?
4    A.   No.
5    Q.   You also said, sir, that -- okay.
6    You testified that it was your
7    understanding that the reason Dr.
8    Cannuscio's name was taken off of your
9    paper was because Merck was concerned
10   about having a Merck employee as a
11   co-author of a paper which documented an
12   increase in risk of heart attack caused by
13   its drug. Do you remember testifying to
14   that?
15   A.   That is my belief.
16   Q.   Can you tell me the basis for your
17   belief, sir?
18   A.   Well, it was never the case that
19   Dr. Cannuscio -- Dr. Cannuscio's
20   involvement with the project failed to
21   meet the standard requirements for
22   authorship. And it was never the plan
23   that she would be stricken from the list
24   of authors as we were working on the

Page 657

1    study.
2    Q.   Mm-hmm.
3    A.   It was only when we had come up
4    with findings that were unfavorable to the
5    drug that that demand was made. And it
6    was not made initially by Dr. Cannuscio;
7    it was made by the company. And that is
8    my -- the basis for my expect -- or my
9    belief that the company had a problem with
10   Dr. Cannuscio being a co-author.
11        And ironically, she was -- she
12   remained a co-author of the versions that
13   would -- that had been submitted
14   previously. And it was only at the moment
15   of publication, it was indeed almost after
16   the moment of publication that the company
17   became insistent about this change.
18   Q.   Did Merck demand that Dr.
19   Cannuscio's name be removed as an author
20   on your paper when you first informed
21   Merck of the findings of your study?
22   A.   No. When it was submitted as an
23   abstract, no.
24   Q.   I just want to make clear, Dr.

57 (Pages 654 to 657)