# EXHIBIT "2"
## Part A

# EXHIBIT "2"
## Part A

9/22/2005 Kronmal - Direct & Cross

1443

SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY/CIVIL DIVISION
DOCKET NO. ATL-L-2272-03MT

---------------------------x
FREDERICK HUMESTON, et al.,
    PLAINTIFFS,
    VS.            STENOGRAPHIC TRANSCRIPT
                   OF:
MERCK & CO.,INC.,
                   - TRIAL -
    DEFENDANT.
---------------------------x
    PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
            1201 BACHARACH BOULEVARD
            ATLANTIC CITY, NJ 08401
    DATE:   SEPTEMBER 22, 2005
B E F O R E :
    THE HONORABLE CAROL E. HIGBEE, P.J.Cv.
TRANSCRIPT ORDERED BY:
    DIANE P. SULLIVAN, ESQUIRE
    DAVID R. BUCHANAN, ESQUIRE
A P P E A R A N C E S :
    DAVID BUCHANAN, ESQUIRE
    CHRISTOPHER SEEGER, ESQUIRE
    SEEGER, WEISS, LLC
        ATTORNEYS FOR THE PLAINTIFFS
    DIANE SULLIVAN, ESQUIRE
    DECHERT, LLP
    STEPHEN D. RABER, ESQUIRE
    WILLIAMS AND CONNOLLY, LLP
    CHRISTY D. JONES, ESQUIRE
    BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
        ATTORNEYS FOR THE DEFENDANT
        *     *     *     *     *     *     *
                CAROL A. FARRELL, CSR-CRR-RMR
                OFFICIAL COURT REPORTER
                1201 BACHARACH BOULEVARD
                ATLANTIC CITY, NJ  08401

---

9/22/2005 Kronmal - Direct & Cross

1444

I  N  D  E  X

                Direct    Cross    Redirect    Recross

WITNESSES FOR
THE PLAINTIFFS

RICHARD A. KRONMAL    1447      1605

EXHIBITS                            Ident.      Evid.

None

---

9/22/2005 Kronmal - Direct & Cross

Colloquy                1445

1    P R O C E E D I N G S
2        THE COURT:  We are going to go to a different
3    witness.
4        You can bring the jury in.
5        Counsel, before they bring in the jury, I
6    just want to caution plaintiff's counsel, there were
7    several mentions of amounts of money that the drug was
8    going to make and the cost of -- I don't have -- as
9    I've indicated to you, I was going to let you bring
10   that before the jury as far as part of the issue of
11   failure to warn, and in order to decide why -- in order
12   to show that they had a reason not to warn, basically,
13   but I don't want to overemphasize dollars in a
14   nonpunitive phase.
15       MR. BUCHANAN:  I understand.
16       THE COURT:  So I don't want to have
17   repetition on it.
18       MR. BUCHANAN:  Okay.
19       THE COURT:  Numbers that have already been
20   brought up are there, they are in evidence; they don't
21   have to be repeated.
22       MR. BUCHANAN:  All right.  But, I mean, the
23   case does have numbers involved, and there are other
24   things and other numbers that relate to other things.
25   I have been very careful to focus on the bigger -- I

---

9/22/2005 Kronmal - Direct & Cross

Colloquy                1446

1    mean, I'm obviously not focusing on individual stock
2    sales or profits, I haven't talked about.
3        THE COURT:  I just don't want numbers
4    repeated over and over.
5        MR. BUCHANAN:  Oh, okay.  All right.  I
6    understand.
7        THE COURT:  Then we are getting too much into
8    a punitive area as opposed to anything that's probative
9    on -- It's one thing to know there was a big number.
10   It's another thing to hear it over and over and over
11   again.
12       You can bring the jury in.
13       (The jury entered the courtroom at 9:38 a.m.)
14       THE COURT:  You can be seated.
15       Counsel?
16       MR. SEEGER:  Your Honor, we call Dr. Richard
17   Kronmal to the stand.  He will be examined by
18   Mr. Buchanan.
19       THE COURT:  Okay.
20   RICHARD A. KRONMAL, PLAINTIFF'S WITNESS, SWORN.
21       THE WITNESS:  I do.
22       THE COURT CLERK:  State your full name and
23   spell your last name for the record.
24       THE WITNESS:  My name is Richard A. Kronmal.
25   That's spelled K-R-O-N-M-A-L.

**[Page 4]**

```
 1          THE COURT CLERK:  You can be seated.
 2                   DIRECT EXAMINATION
 3   BY MR. BUCHANAN:
 4        Q    Excuse me, Doctor.  Just make sure we get
 5   that close.  There we go.
 6             Good morning, Dr. Kronmal.
 7    A    Good morning.
 8        Q    Let's just start off by getting to know you a
 9   little bit.
10             Are you married, sir?
11    A    Yes, I am.
12        Q    Okay.  Do you have children, too?
13    A    Yes, I have three.
14        Q    How about grandchildren?
15    A    Two.
16        Q    Are you from our Garden State?
17    A    No, I'm not.  I'm from Washington, State of
18   Washington.
19        Q    Seattle, Washington?
20    A    Yes.
21        Q    Okay.  What is your profession, sir?
22    A    I am a biostatistician.
23        Q    Okay.  And apart from knowing you, I don't
24   know any other biostatisticians.  I don't know if the
25   jurors do either.  So let's direct your comments to
```

**[Page 5]**

```
 1   them and if you could explain a little bit what a
 2   biostatistician is and what a biostatistician does.
 3    A    Well, basically, I'm involved in the management,
 4   design, and analyses of medical studies.  I dedicate
 5   myself to trying to evaluate the results of medical
 6   research.  And I help design the studies, and I help
 7   carry them out, and then I help -- and do a lot of
 8   analysis of the studies.
 9             In addition, I also, of course, have been a
10   professor at the University of Washington for over 40
11   years, so through 35 of those years, I taught courses
12   in biostatistics to medical students, other students in
13   the health sciences, and to train other
14   biostatisticians.
15        Q    When you say medical studies, sir, are those
16   clinical trials?
17    A    Well, everything from clinical trials to what are
18   called observational studies, where rather than assign
19   a drug, for example, to the two treatment -- to the
20   patients in some way, you just observe what happens to
21   people over long periods of time, and from observing
22   them, try to understand, for example, what are the
23   roles that various risk factors play in causing people
24   to have heart disease, for example.
25        Q    Okay.  Well, why do you need a
```

**[Page 6]**

```
 1   biostatistician to look at studies?  What's your role
 2   in that whole process?
 3    A    Well, in human beings, we vary; that is, no two
 4   people are alike.  No two people's response to a risk
 5   factor, for example, is the same.  So you might have
 6   two people, one with a very high cholesterol and
 7   another with a very high cholesterol, yet they are not
 8   all going to have the same outcome.  4pand because
 9   there is tremendous variability in human beings, the
10   data that is generated from human studies are
11   tremendously variable.
12             And, therefore, to assess whether what you
13   observe is a real effect versus one that's due to
14   chance, you need to apply the tools of statistics and
15   probability.  And those are the tools that I have been
16   trained in and trained many others over the years to
17   do.
18        Q    You indicated that you've trained many
19   others.  Have you been a professor at Washington since
20   the '60s?
21    A    Since 1964.
22        Q    And you've taught biostatistics and clinical
23   studies there for that period of time?
24    A    For all but the last five years.
25        Q    Okay.  Apart from your teaching
```

**[Page 7]**

```
 1   responsibilities at the University of Washington, do
 2   you have any other responsibilities?
 3    A    Yeah.  Well, early on, I was chair of our graduate
 4   program for 14 years.  In that capacity, I basically
 5   helped recruit the students to the graduate program,
 6   made sure they got through as frequently as possible.
 7             And then, in addition, I have, of course,
 8   been involved in a large number of medical research
 9   projects over that time period, over those 35 years, 40
10   years, really.
11        Q    Does the University of Washington have a good
12   biostatistics program, sir?
13    A    Yeah.  Many studies would have rated us the number
14   one biostatistics program in the United States and
15   maybe in the world.
16        Q    Is that true to this day?
17    A    As far as I know, yes.
18        Q    Okay.  Let's talk about some of your research
19   interests as distinct from your teaching interests.  Do
20   you have any particular emphasis in your research, sir?
21    A    Well, beyond the statistical, you know, methods of
22   research, which I won't get into because they wouldn't
23   mean much to most of you, my primary emphasis in my
24   career has been in cardiovascular disease.  For most of
25   the 40 years that I've been involved in medical
```

1   research, it's been in heart disease and stroke.

2          And in that capacity, I began with a large

3   clinical trial of looking at whether bypass surgery,

4   that is, surgery to bypass the vessels to the heart

5   that were diseased with another vessel, whether bypass

6   surgery was better than medical therapy.

7          At the time that trial was done, it was --

8   there was a rush to operate on tens of thousands of

9   people in the United States.  And there was some

10  skepticism among some of the medical community,

11  particularly the cardiologists, that the surgery was

12  beneficial or not, over just doing medical therapy.

13         So I was in charge of the data center which

14  helped in the design and the study, management of it,

15  and finally, the analysis of the study, over a period

16  of about ten years.

17  Q   Now, you mentioned you were the head of a

18  data center.  What role does that play in a clinical

19  trial such as the trial you just identified?

20  A   Well, we collected data on 25,000 people, of which

21  about 5,000 are randomized to either medical therapy or

22  bypass surgery.

23         And the amount of data we generated was

24  literally in the hundreds of thousands of numbers.  And

25  someone has to keep track of it.  Someone has to make

1   sure we get all the data on the patients that are in

2   the study, that it's complete, that it's accurate.  So

3   we were heavily involved in the quality control of the

4   data that comes from the study.  And then, in the end,

5   we need to analyze it to see what the results were.

6          And I was involved intrinsically in all of

7   those aspects for that period of 10 to 15 years.

8   Q   Doctor, over the last 40 years that you have

9   been a biostatistician, have you been involved in a

10  bunch of clinical trials?

11  A   Yes, I have.

12         After the coronary surgery study was done,

13  that's the first of the large clinical trials I was

14  involved in, I became involved in a study of prevention

15  of stroke in people who have a disorder called atrial

16  fibrillation.  Atrial fibrillation.  And that's where

17  the heart -- part of the heart doesn't beat properly.

18  It sort of starts fluttering.

19         And that condition, basically, while itself

20  is not directly life-threatening, it's very

21  uncomfortable.  And typically, what happens when

22  somebody goes into atrial fibrillation, they put

23  electrodes on the body and shock them with electrical

24  shock out of the atrial fibrillation.  It's a very

25  uncomfortable procedure, and they have to use

1   anesthetic to keep them unconscious while it's done.

2   And that puts them back into what is called sinus

3   rhythm, where the heart beats in its normal manner.

4          But what happens is that when they're in this

5   atrial fibrillation, when one part of the heart is

6   fluttering, the blood pools in that part of the heart,

7   and clots form.  Those clots can then get into the

8   circulation and can end up in the brain, and cause a

9   stroke, because they block an artery in the brain.

10         The study was -- I was a co-investigator with

11  two other physicians, neurologists, and we proposed to

12  the National Institute of Health, which is part of the

13  federal government, to do a study comparing three

14  possible modalities, aspirin, a drug called warfarin

15  that thins the blood --

16         Aspirin stops platelets from adhering to each

17  other, which means that they don't form a clot very

18  easily.  Warfarin thins the blood so it's basically

19  more -- much thinner, so that it doesn't clot.  And

20  then a placebo, namely, a non -- inactive agent,

21  something that doesn't do anything.  Sometimes they

22  refer to is as a sugar pill, but it often isn't sugar.

23  It's just something that looks the same as aspirin in

24  the case, but it wasn't aspirin.

25         And so we did randomized clinical trial of

1   those three therapies.  The trial ended up being

2   stopped before its completion because the study showed

3   conclusively that both aspirin and warfarin prevented

4   strokes.  The net result of that is that probably in

5   the order of 10,000 people per year in the United

6   States alone were prevented from having a stroke they

7   would have otherwise had, and many more worldwide.  So

8   it was a very important major trial in terms of its

9   outcome.

10         That was followed by a number of other

11  smaller trials looking at various aspects in which

12  people -- which kind of people was aspirin more

13  effective than warfarin.  So we did trials comparing

14  aspirin to warfarin rather than aspirin and warfarin to

15  placebo, to see in what groups of people was aspirin

16  more effective and in what groups of people was

17  warfarin more effective.

18  Q   Doctor, this was a study you did at NIH?

19  A   That is correct.

20  Q   What is the NIH?

21  A   The National Institute of Health was formed right

22  around World War II, maybe the end of World War II, I'm

23  not sure of the exact date, and its purpose was to

24  sponsor medical research in the United States, to

25  basically jump-start our finding of cures and

1   treatments for various diseases.  And it was a very
2   unique endeavor, really, worldwide.  It was the first
3   really concentrated effort by a government to try to
4   find new treatments for the people of the country.  And
5   NIH basically funds research of various kinds.
6         And the way the process works is that either
7   the government, through its advisors, decides that
8   there is an important area that should be studied, and
9   then they'll put out what's called a request for
10  proposals, where you basically, as an investigator,
11  you'll bid to be the person to actually do the study
12  that they've asked you to do.
13        That was the case, for example, with the
14  coronary surgery study.  They put out an RFP saying, We
15  need people to do this study.
16        Q    And you submitted a bid?
17  A    We submitted a bid that's competitive.  You
18  compete against other groups of scientists who are also
19  bidding on it.  And in the case of the coronary surgery
20  study, our group won the bid for the coordinating
21  center for that study.
22        For other kinds of studies, you actually
23  don't -- NIH doesn't ask for something.  You decide
24  that there is research that needs to be done.  You as
25  scientists, medical scientists.  And then you submit a

1   funds.  I was a tenured faculty member, which means
2   that the State guarantees my salary every year to teach
3   classes, to do research, and so on.
4         However, over a period of time, over the last
5   30, 40 years, more and more, I got involved in running
6   very large medical research projects.  They were funded
7   by the federal government.  When I do that, the federal
8   government pays the costs of my salary through these
9   grants or contracts to the University of Washington.
10        Currently, my entire salary is paid by the --
11  from federal funds that the University of Washington
12  receives from the NIH.
13        And the specific studies that I'm involved
14  in, there are really quite a number of them, but I will
15  just talk about the main ones.  I run a large study of
16  cardiovascular disease in the elderly.  We ran the
17  coordinating center for that study that involved
18  clinical centers throughout the United States, four of
19  them.
20        And the study was meant to determine whether
21  we could determine from doing noninvasive procedures on
22  the people, who are healthy, basically -- they were
23  old, but they were healthy.  They were 65 to 99 years of
24  age.  5800 of them were recruited.  And we did a lot of
25  measurements on those people.

1   grant proposal, which is a proposal to do the research.
2         In the case of the stroke prevention/atrial
3   fibrillation study, myself and two other physicians put
4   in a proposal to study whether warfarin or aspirin was
5   better than placebo.  We put that study in, it's
6   reviewed by an independent committee of the NIH which
7   is appointed to review proposals, and we were given a
8   high-end priority score that we were funded to do the
9   research.
10        Q    Is it competitive to get funds from the NIH,
11  sir?
12  A    Yes, it's very competitive.  Probably in the
13  neighborhood of 20 percent of grant requests that go
14  into the NIH get funded.  The other 80 percent do not.
15  Some are turned down on scientific merit that they are
16  not considered meritorious.  Others simply because
17  there are inadequate funds to go around for all the
18  research that we would -- that everyone would like to
19  do, including the government.  There is a limitation on
20  the amount of dollars available.
21        Q    Are you currently funded by the NIH for any
22  studies or research?
23  A    Yes, I am.  My entire support right now -- for
24  many years, I was supported as a faculty member at the
25  University of Washington from State of Washington

1         Among the things we did, we did an
2   echocardiogram of the heart, which means that they send
3   sound waves through the body, which gives them an image
4   of how the heart is pumping.
5         We did MRI of the brain, which allowed us to
6   image the brain to see whether the vascular disease
7   that the people had might be affecting their brain in
8   some physiologic way.
9         We measured through ultrasound the flow of
10  blood through their carotid arteries in the neck to see
11  if they had any narrowing of the vessels of the neck.
12        And so we did a number of measures of what
13  are called subclinical cardiovascular disease,
14  subclinical in that they weren't symptomatic.  They
15  didn't have chest pain, they didn't have -- they had
16  not had a stroke or an MI.  They were asymptomatic.
17        And then we followed them, watching them for
18  when they got events, and tried to figure out whether
19  these measures that we made noninvasively, what they
20  told us about the risk of having subsequently an MI or
21  a stroke or other -- or even Alzheimer's disease, for
22  example.
23        Q    Doctor, you've mentioned that you ran the
24  coordinating center for particular trials over time.
25  Does that mean you, personally, Dr. Richard Kronmal,

1    ran the coordinating center?  How does that work?

2    A    Well, I'm the principal investigator on those

3    projects.  And I get -- I'm the one whose name is on

4    the list, you know, who is the head of the projects,

5    but on the other hand, I have a large staff working for

6    me.

7         I have a center which is called The

8    Collaborative Health Studies Coordinating Centers that

9    has a staff of about 45 people now.  And that staff,

10   which involves Ph.D.s in epidemiology and

11   biostatistics, it involves physicians who are

12   cardiologists and internists, and data processing staff

13   and clerical staff, you know, it's a large number of

14   people to run these studies because they are large.

15   There is lots of data coming in.  And so, basically, I

16   have 45 people working for me, supported by those

17   grants and contracts.

18        By the way, the cardiovascular health study

19   was just one of the studies that I'm doing now.  I also

20   have a study called MESA, which stands for Multi-Ethnic

21   Study of Atherosclerosis.  That study just started.

22   The cardiovascular health study has been going on for

23   17 years.  We have been following this elderly

24   population for that long.

25        The MESA study started about five years ago,

1    six years ago now, and it's a study of 6800 people from

2    45 to 85 in four ethnic groups:  African-American,

3    Chinese-American, Hispanic-American and Caucasians.

4    And the aim of that study is very similar to the CHS

5    study, the cardiovascular health study I described to

6    you earlier with the elderly, except it involves a much

7    broader age range, and all of the new technology that's

8    out there for studying people without doing any

9    invasive procedures on them.

10        So now, we are doing an MRI of the heart.

11   Instead of studying them with an echocardiography with

12   the sound, we now get these exquisite images of the

13   heart that show the vasculature, how the heart is

14   pumping, almost amazing technology that you can

15   actually see the heart, you know, in its complete

16   detail, really.

17        We also do what is called CT scans of the

18   heart, which can image the vessels and can determine

19   how much calcium is in the vessels of the heart.  The

20   reason that's important is that when you get a disease,

21   when you get what's called atherosclerosis of the

22   heart, when you get a plaque in the heart that may lead

23   to a heart attack, that plaque starts becoming

24   calcified as the body tries to heal it, essentially.

25   So it becomes almost like bone.

1         And the amount of calcium in the heart is

2    very much associated with the amount of disease you

3    have in your vessels, surrounding the heart, that feed

4    the heart its blood.  So by trying to study that, we

5    can try to see whether -- you could just do a quick

6    scan of a person that might take only two to three

7    minutes, and from that, see how much calcium they had

8    and, therefore, determine what their risk was of having

9    a heart attack in the future.

10        And if you then found they were at very high

11   risk, you could take actions that potentially would

12   save their lives.  That is, you could, for example, put

13   them on various drugs that are known to help prevent

14   heart attacks.  That would be aspirin and lipid-

15   lowering drugs, drugs that lower cholesterol.

16        In addition, if they had serious, lots of

17   calcium present, you could do invasive procedures.  You

18   could thread a catheter, it's a tube, basically, from

19   their leg up into their heart, up into the vessels of

20   their heart, image where they have nearly blocked

21   vessels, and then what they do is they stick what's

22   called a stent, which is like a spring, into the place

23   where the vessel is nearly occluded.

24        First, they squish it, essentially.  It's

25   soft, a lot of it.  And they will sort of squish it so

1    that the soft plaque will get squished down.  And then

2    they stick a metal stent in, which is a spring which

3    opens up and holds the vessel open.

4         So what might have been a vessel that would

5    have had a -- you know, an occlusion and would have

6    closed up, now is open.  And the person, you know,

7    effectively, for a long time, until that stent fails,

8    in some way, will have a much lower risk of having a

9    heart attack.

10        Or you can do bypass surgery.  In more severe

11   cases where you can't put a stent in, you can't get in

12   there, for example, it's too torturous, the vessel, you

13   can actually take a vessel from somewhere else in the

14   body, and you actually do like a plumbing repair.  You

15   sort of take the vessel and you sew it in on one side

16   of the place where it's narrowed, around it to where

17   it's open again, and now you get blood flow that goes

18   around the place where the vessel was effectively

19   potentially blocked.

20   Q    Sir, now, was this a clinical trial you are

21   talking about or is that an epidemiological study?

22   A    It was called an epidemiological study.  It was an

23   observational study in the sense that we don't

24   intervene.  All we do is watch.  We collect data on the

25   people, and then we watch to see what happens.  There

1   is no intervention on our part.
2        That's not quite complete in the sense that
3   if we were to find something wrong with the person,
4   then we would tell them and their doctor that we found
5   something wrong and that something should be done. We
6   don't let people go out from our clinics around the
7   country with serious disease without warning them.
8        So for example, suppose we find that they are
9   hypertensive, that they had high blood pressure, we
10  would tell their doctor. If we found out that their
11  cholesterol levels were extraordinarily high, we would
12  tell them and their doctor so that their doctor could
13  take the appropriate action on those people.
14       And sometimes we find really serious things.
15  For example, when we are doing this imaging with the CT
16  scan, we may see a lump on the lung. It's not our
17  purpose to study the lung. We may see one by chance.
18  We would immediately let their doctor know that they
19  had a lump on their lung that might be, say, lung
20  cancer, and so some action could be taken.
21  Q   Sir, I just want to draw a distinction. We
22  have been here for several days now and we have talked
23  about clinical trials and epidemiological trials or
24  observational trials. Can we use those terms
25  interchangeably for purposes of our discussion today

1   or --
2   A   Well, they are not interchangeable in that a
3   clinical trial is the strongest form of evidence for
4   causality. When we do studies, we are trying to
5   understand what the causal underpinnings are of
6   whatever it is we're studying.
7        In the hierarchy of studies, the clinical
8   trial is by far the strongest evidence that we can put
9   together from the -- the results from a clinical trial
10  is the strongest kinds of evidence we can put together
11  about causal effects.
12       The reason for that is that in an
13  observational study, when we're comparing two people
14  who have similar characteristics, we can't measure
15  everything on them.
16  Q   Doctor, if you could just characterize
17  briefly what an observational trial is. In an
18  observational trial, are the people being studied being
19  given medication and other therapies in a controlled
20  environment?
21  A   No, they are not. In an observational study, as I
22  said before, we just observe them and see what happens
23  so we can try to understand as best we can from
24  observing people, what is happening with them.
25       But the problem with observational studies,

1   and it's a very fundamental one, is that people differ,
2   as I have said earlier, on a variety of
3   characteristics. We don't know everything that's
4   important about how they differ, and so we can't
5   measure everything about them that's different.
6        Some people have different diets. They have
7   different amounts of exercise. They have different
8   life stressors in their life. They take different
9   medications in variable amounts at various times.
10  Their genetic composition is different.
11       There is a lot of things different about the
12  people that we can't capture. And because of that, and
13  because of the variability in people, observational
14  studies, the best we can do is try and measure what we
15  can and what we think is important, and from that, in
16  really complicated ways, try to tease out what factors
17  we think might be causally related to outcomes.
18       But, at best, we're just trying to get a
19  handle on that and trying to get the best evidence we
20  can. But that evidence is, frankly, quite weak from
21  observational studies. Observational studies are also
22  largely to generate hypotheses. For example, we might
23  measure something in the blood of the people that has
24  not been measured before, and we find that that thing
25  in the blood is associated with them having heart

1   attacks. So now we have a hypothesis that that might
2   be important.
3        And then other scientists will go back into a
4   laboratory and do experiments with animals. Drug
5   companies may try to develop drugs that change that
6   thing we have measured in the blood to make it more
7   normal, in the hopes that -- in the hope, not the
8   guarantee, in the hope that by changing it, we might
9   modify the disease process. But the only way to find
10  out whether changing something has an effect is by
11  doing it. You can't find out by just looking at people
12  and how they vary.
13  Q   And Doctor, when you say the only way to find
14  out is by changing something and doing it, is that what
15  you do in a clinical trial?
16  A   That's exactly right. The key in a clinical trial
17  is that we randomly assign the treatment to the
18  patient. So when a patient comes into the clinic for
19  entry into a randomized trial, effectively, we flip a
20  coin -- it's not done that way, it's done by a
21  computer -- we flip a coin to decide what therapy they
22  get. But we only do that with their consent, clearly.
23  In other words, they are informed that the treatment
24  will be chosen for them at random. And you might ask,
25  why would they be willing to do that?

1    Well, the answer is, if no one knows what's
2  the best treatment, particularly in the case of an
3  experimental treatment -- if I have a disease and
4  someone comes to me and says, Dick Kronmal, you have
5  this disease.  We don't know what the best treatment
6  is.  We have this experimental treatment that we hope
7  is better than the current treatment, but we don't
8  really know.  We have no data.
9    So we can give you the regular treatment that
10  everybody gets, or, you can enter this clinical trial,
11  and you will have a 50 percent chance of having a new
12  treatment, a 50 percent chance of having the old one,
13  and from that, we may actually learn which of those two
14  is better.  And then not only will you benefit from
15  that in the future, but everyone will benefit from that
16  who gets this disease later on.
17    And you know, you do -- you know, you, as an
18  individual, enter these studies, not necessarily to
19  benefit yourself.  Because if you think about studies
20  where people have, say, serious cancers, for example,
21  or AIDS, the chance of those treatments actually
22  benefitting them is fairly low.  They may get lucky and
23  the treatment, the experimental treatment might be
24  better, but there is absolutely no guarantee.
25    Most experimental treatments do not work.

1  It's probably no more than 7 or 8 percent of the new
2  treatments actually do anything beneficial.  And some
3  of them are harmful.
4    Q    Doctor, I just want to direct your attention
5  to this randomization or random concept.  Is that the
6  tool in clinical trials through which investigators
7  like yourself try to control for the differences in
8  people that you see in observational trials?
9    A    That's exactly right.
10    If -- what randomization gives you, and it's
11  extraordinarily important, is that the two groups that
12  are randomized, because of the randomization, will be
13  very similar in almost all their characteristics, even
14  the ones you can't even measure, because which person
15  got which drug was chosen at random.  Therefore, it was
16  not associated with any characteristic they have.  That
17  is, the sicker people didn't get one drug and the
18  healthy people get another, because it was randomized.
19    And when you randomize enough people, all of
20  the differences that might have existed between the two
21  groups of people, those getting one drug, those
22  getting the other, or the placebo, are washed out by
23  the randomization.
24    So by chance, basically, by using -- it was a
25  very clever idea that came about in the early part of

1  the 19th century -- the 20th century, rather, about
2  1900, by a very clever man by the name of R.A. Fisher,
3  who said, We can control for things we can't even
4  measure if we randomize people to the therapies.
5    And in his time, they were interested in
6  whether different treatments of plots of land would
7  increase yield of crops, not whether human beings, for
8  example, would benefit from one therapy versus another.
9  But the principles are exactly the same.  By
10  randomizing the people, we take out any systematic
11  difference between the groups, so now the groups of
12  people will be nonsystematically different.  They will
13  be the same in almost every characteristics you can
14  talk about, even ones you don't even know about that
15  might be important.
16    Q    Doctor, I'm going to introduce one more
17  statistical concept or clinical trial concept that we
18  have heard a little bit about, and that's statistical
19  significance.  And we remember maybe a long time ago
20  hearing that term, but can you try to explain to us in
21  simple terms what that concept means and how it applies
22  to clinical trials?
23    A    That's actually quite a hard concept, and it's
24  hard when we teach it, and it's going to be hard in
25  this context, obviously.  But you can think of it this

1  way:
2    Suppose you were doing a treatment of two
3  groups of people, and you start with a hypothesis that
4  the treatment and whatever the control is, the other
5  treatment, are equal.  That's your hypothesis.  It's a
6  hypothesis.  You don't know if it's true or not.  And
7  what you are trying to do in the trial is to get enough
8  data to rule out the possibility that they are equal.
9    But if you think about it, that's almost like
10  flipping -- suppose the end point is some end point
11  like MI, for example.
12    Q    And MI is heart attacks?
13    A    Heart attacks.
14    And suppose instead of that, we were just
15  flipping a coin, as an example, and I flip the coin 100
16  times, and I get 60 heads and 40 tails.  Now, from
17  that, am I sure whether that's a fair coin, that is
18  it's weighted equally on both sides, or whether it's an
19  unfair coin, that the weight is uneven?
20    Well, 60/40 in 100 trials might not be enough
21  information to tell, but what if I got 80 versus 20 or
22  90 versus 10?  Well, intuitively, you would be pretty
23  sure that wasn't a fair coin, right?  It's pretty
24  unlikely that that was a fair coin.
25    So what we do when we do significance testing

1  is we assess the probability that we would have
2  observed something that extreme if there really was a
3  fair coin.  In other words, if we really had a fair
4  coin, what's the chance we would have observed 80 out
5  of 100 or more?  90 out of 100?  99 out of 100?  What's
6  the probability we will get an event that's more
7  extreme than that?
8        In the clinical trial context, it's the same
9  basic idea.  We try to assess the probability that when
10  there was no difference at all in these treatments, we
11  would have observed this large difference that we saw
12  in the trial.  And we set up the trial big enough, with
13  enough people in it, that we have a really high
14  probability of being able to detect whether or not
15  there is a difference between the treatments.
16        So again, giving you my coin example, if I
17  flipped a coin 10 times now instead of 100, and I got
18  seven out of ten heads, you might not know whether it
19  was a fair coin or not, but if I had 10,000 people and
20  I got 7,000 heads and 3,000 tails, you would be pretty
21  darn sure it wasn't a fair coin.
22        So basically, the size of your sample is
23  *predicated on your ability to detect a difference*.  And
24  the p-value, the statistical significance, as it's
25  called, is a way of assessing whether we don't --

1  whether there is evidence enough to rule out that the
2  treatments are equivalent.
3        Q   Doctor, you just said p-value, and that's
4  another statistical concept.  Does that equate with
5  statistical significance?
6        A   Yes, the statistical significance is a probability
7  value.  So we might say that the p-value is .05, for
8  example.  That means that if we flipped our coin, did
9  an experiment, say, with 100 people, 100 times flipping
10  the coin, doubled every number of heads or tails we
11  had, that we would not expect to see that sort of
12  difference that we observed.  It would be less than 5
13  percent of the time if we got a p-value of .05.
14        It would say that it's very unlikely, less
15  than 5 percent of the experiments we would do would
16  give us a result that extreme if there was no
17  difference, if that coin was fair.  No difference in
18  the treatments.  Less than five percent of the time, we
19  would get a value that extreme.
20        If we had a p-value of .01, it would mean
21  that one in 100 times, when the treatments were equal,
22  would we get a value that extreme.
23        So what we do, basically, in clinical trials
24  is we try to minimize the probability we are going to
25  make a mistake.  Because, after all, chance is always

1  working.  You could get a chance result that was
2  extreme.  That can happen.  But what you do is try to
3  minimize the probability that that happens and to
4  assess that probability.
5        So, for example, we'll see examples where the
6  p-value was .005, for example.  That means that when
7  there was no difference in the treatment, we would only
8  get a result as extreme as the one we observed five
9  times in 1,000, very unlikely event.  So it's unlikely
10  under that circumstances that that was due to chance,
11  that result we got.  It's much more likely it was due
12  the real effect, a causal effect.
13        Q   And that's what we do clinical trials for, to
14  determine if there is a cause and effect
15  relationship --
16        A   That's correct.
17        Q   -- between an agent and an effect?
18        A   That's right.
19        Q   Okay.
20        A   It is the only real way we can determine cause and
21  effect on human beings, is through a clinical trial.
22        Q   Now, Doctor, I just want to give us a little
23  bit of background before we got into some specific
24  clinical trials today.  One other thing, though.
25        We have heard a little bit about something

1  called a DSMB or a Data Safety Monitoring Board in
2  prior testimony.  Can you explain what a Data Safety
3  Monitoring Board is in the *context of a clinical trial*?
4        A   Yes.  For approximately the last 15 years, the
5  standard for doing clinical trials is to make sure that
6  you have an independent body that monitors the trial to
7  protect the safety of the patients in the trial.
8        The reason for that is investigators, no
9  matter how honest and, you know, what kind of people
10  they are, have a vested interest in the outcome of
11  their trials.  They are emotionally involved in their
12  trials.  They want to see the drug succeed.  And that's
13  just human nature.  You know, you have a hypothesis
14  that the drug is good, you want to see it succeed.
15  That's human nature.
16        And so there is a danger, if the individuals
17  doing the trial are the ones responsible for monitoring
18  it, that they will not respond appropriately to serious
19  adverse events that are occurring among the patients in
20  the trial; that they will discount them.  They will
21  say, oh, these don't make sense.  These are not due to
22  the drug.  These don't make sense.  I don't believe
23  they are real.  I believe they are due to chance.  And
24  their judgment, while it may be all right, may not be;
25  and it's not a risk you want to take.

1  So approximately 15 years ago, the standard
2  in clinical trials became that an independent body of
3  scientists who are not connected in any way to the
4  study, have no vested interest in the outcome of the
5  study, are appointed to monitor the study.
6  And what the DSMB, Data Safety Monitoring
7  Board, does is they get data from the study on all of
8  the side effects that occurred in the study, by
9  treatment arm. They also usually get data on the
10  efficacy of the drug, namely, whatever it is they are
11  trying to show the benefit for. And their job is to
12  assess the risk/benefit ratio. That is, every drug has
13  risks. The real question is do the risks outweigh the
14  benefits?
15  And clearly, if you're trying to treat, say,
16  a cancer that kills 50 percent of the people, you can
17  afford to have some risk involved in the treatment if
18  you're going to improve that to a 25 percent death
19  rate. Those people may -- some may get heart disease,
20  some of them may get neurologic problems and so on, but
21  if you can save 25 percent of them, it's worth it. On
22  the other hand, if you end up killing off 60 percent of
23  them, you don't want to do that. You know, that's not
24  worth it.
25  And, of course, depending on what the drug is

1  for. If a drug is for pain relief, you can tolerate
2  very little in the way of side effects. I mean, you
3  can't afford to have people get serious side effects if
4  all you are trying to do is relieve their pain. Not
5  that pain is a small thing. It's not. On the other
6  hand, damaging your heart is a much bigger thing.
7  And so when you assess the risk benefit, you
8  take into account what is the magnitude of the benefit
9  versus what is the magnitude of the risk. And the
10  DSMBs are charged with doing that. They are
11  specifically charged with stopping the trial, with
12  recommending stopping the trial if they see that the
13  risks are exceeding the benefits.
14  Q  Doctor, do you have any first-hand experience
15  with DSMBs?
16  A  Yeah. I have served on approximately 25 DSMBs. I
17  have chaired about five or six of them over the years.
18  And I have been in the position where I've had to, as
19  part of the committee or the chair of the committee,
20  recommend that a trial be stopped because it was
21  causing serious adverse events.
22  Q  Let's be clear, then. When you're on a DSMB,
23  sir, what are you looking out for?
24  A  Well, specifically, we're looking at every
25  possible side effect that is more frequent than one

1  group versus the other, to see whether or not those
2  side effects are likely to be due to the drug.
3  When you reach a certain threshold where the
4  side effects are starting to look like they're too
5  many, particularly if they are serious -- and the real
6  big concern is death, of course, because you don't
7  recover from death. And so if you see any kind of a
8  significant trend towards higher mortality, at that
9  point, you have to look very hard at the positive side
10  of whether the drug is doing any good or not for
11  whatever the condition is.
12  If the condition is very serious, say it's
13  someone who has had a stroke, and you're trying to
14  prevent the damage of the stroke, the paralysis, the
15  loss of speech and things like that, then you might be
16  willing to tolerate a few extra people dying if you
17  could prevent a lot of people from having paralysis.
18  So you have to balance those, but your
19  tolerance for the side effects is proportional to the
20  seriousness of the side effect. If the drug is causing
21  a rash in a lot of people, and the rash resolves after
22  you take them off the drug, you may say that's not
23  good, but you might not stop a trial because of a lot
24  of extra rashes. On the other hand, if a lot of people
25  are getting MI's or dying, you're going to stop the

1  trial.
2  But the other thing that the DSMBs are
3  responsible for is reporting to what are called the
4  IRBs.
5  Q  What are IRBs?
6  A  They are the Institutional Review Boards, I guess
7  they're called.
8  The IRBs basically are from each of the
9  institutions that are participating in the study. So
10  if my university is participating in a study, before I
11  can ever get permission to do the study, I have to
12  submit to the IRB the protocol, and they review it, and
13  they decide, first of all, is it an ethical study to do
14  in the first place? And if they don't feel it's
15  ethical, they can tell me I can't do it.
16  They also review things like the informed
17  consent, to make sure --
18  Q  What's informed consent?
19  A  Informed consent is the document that s person is
20  given before they enter the trial asking them if they
21  are willing to be in the trial, and spelling out to
22  them the possible risks and benefits of being in that
23  trial. In laymen's language, it's meant to allow the
24  person to assess whether they are willing to be in that
25  trial.

1    And the IRBs review the informed consent form
2  to make sure that it meets the standards of truly
3  informing the people of whether they should be in the
4  trial -- whether they are fully informed when they
5  enter the trial or not.
6    Q    Doctor, I just want to see if we can
7  understand the structure a little bit.
8    In a clinical trial, do you need to have a
9  sponsor of the trial?
10   A    Certainly, someone has to pay the costs of the
11 trial. And you know, *obviously, it can be the NIH, the*
12 National Institute of Health, it can be private
13 foundations who sponsor trials, and then pharmaceutical
14 companies sponsor trials.
15   Q    Okay. So in a pharmaceutically sponsored
16 clinical trial, the pharmaceutical company would be the
17 sponsor?
18   A    That's correct.
19   Q    Okay. When you do a clinical trial for the
20 NIH, would the NIH be the sponsor of that trial?
21   A    That's correct.
22   Q    Okay. Now, just so we can understand the
23 hierarchy or the structure, you mentioned IRBs. That's
24 a board that oversees the investigators?
25   A    It's a board that is charged with protecting the

1  individuals at that institution who are enrolled in the
2  trial. And it does oversee the investigators in the
3  sense that they can stop that investigator from
4  participating, or they can stop that investigator from
5  continuing to participate in the trial if they feel the
6  risks are too great.
7    The DSMBs, one of the charges of the DSMB is
8  to report to the IRBs. That is, when we as a DSMB, we
9  will, at the end of our evaluation, make a statement
10 that we believe that it's still ethical and safe to
11 continue that trial, that information is conveyed to
12 the IRBs at the various institutions.
13   If we don't feel that way, if we decide, for
14 example, that we think the trial should be stopped
15 because the drug is unsafe, that information is also
16 conveyed to the IRBs.
17   By the way, the drug company or the sponsor
18 of the trial does not have to stop the trial because
19 the Data Safety Monitoring Board says it's unsafe.
20 It's a recommendation to the study and to the
21 investigators. But it is extraordinarily rare, and in
22 my experience, I don't know of a case, but there may be
23 some out there, where the recommendation of the DSMB is
24 not followed by the study.
25   Q    And I just want to be clear. You said the

1  DSMBs are looking out for all of the patients in the
2  trial.
3    A    That's right.
4    Q    The IRBs are looking out for the patients in
5  that particular site?
6    A    That's correct.
7    Q    So in a big clinical trial, there could be
8  more than one site?
9    A    Oh, there may be as many as 50 or 100 various
10 clinics or hospitals that are involved in a clinical
11 trial.
12   Q    Now, what type of information is the sponsor
13 of the trial supposed to give to the IRBs and the DSMB
14 about the potential risks and benefits of whatever is
15 being studied?
16   MS. SULLIVAN:  Objection.
17   Your Honor, can I have a sidebar?
18   THE COURT:  Yes.
19   (The following transpired at sidebar.)
20   MS. SULLIVAN:  Judge, this goes way outside
21 the scope of his report. His report dealt with
22 biostatistics and the analysis of the studies. There
23 is nothing in there about opinions on what IRBs are
24 told or --
25   MR. BUCHANAN:  They absolutely went into it.

1  They spent five or ten pages in his deposition --
2    MS. SULLIVAN:  It's not in this report.
3    MR. BUCHANAN:  They were trying to
4  cross-examine on his experience and DSMBs, and they
5  don't like his answers and don't want him testifying
6  about it.
7    MS. SULLIVAN:  It's not in this report.
8    *MR. BUCHANAN:  It's in the deposition. Your*
9  counsel elicited it and didn't like the answer, just --
10   MS. SULLIVAN:  We did background on
11 qualifications, but it's not proper -- We'd have spent
12 a lot more time on it, Judge, if it was one of the
13 opinions in his report. It's not in his report.
14   MR. BUCHANAN:  You spent substantial time on
15 it, Counsel.
16   MS. SULLIVAN:  It's clearly not in the
17 report. He is a biostatistician.
18   THE COURT:  I think his testimony really
19 hasn't been opinions at this point. Isn't he basically
20 just describing the procedure?
21   MS. SULLIVAN:  He just asked him what
22 sponsors should tell IRBs, and that goes way beyond.
23   MR. BUCHANAN:  What information do the
24 sponsors provide to DSMBs and to IRBs. He has
25 tremendous experience over 40 years --

1    MS. SULLIVAN:  He should have put it in his
2  report.
3    MR. BUCHANAN:  It's absolutely elicited in
4  the deposition that you took of him.  You went down
5  that road and got his opinion.  Now you don't like it.
6    MS. SULLIVAN:  We didn't get his opinions.
7  We went through his qualifications.  It's way beyond
8  the scope of his report, Your Honor.
9    MR. BUCHANAN:  They wanted his opinion --
10  they wanted to know what his opinion was on each of the
11  DSMB numbers and what they were showing.
12    MS. SULLIVAN:  Show me that.
13    MR. BUCHANAN:  Let's get the transcript.
14    MS. SULLIVAN:  It's not in his report.
15    THE COURT:  We will take a short break.  Take
16  the jury out.
17    (The jury left the courtroom at 10:24 a.m.)
18    THE COURT:  Are you bringing me the dep
19  section?
20    MR. BUCHANAN:  Yes.  Someone is getting the
21  deposition for me.  Diane may have it more handy
22  because she was planning on cross-examining.
23    MS. SULLIVAN:  I have the deposition.
24    Your Honor, there is also, Your Honor, an
25  issue of what this has to do with the case.  The issue

1  is whether or not Merck appropriately warned
2  prescribers, not what they warned the IRBs or DSMBs.
3    MR. BUCHANAN:  They know darn well they
4  didn't use the word getting out to investigators.
5  They had 5,000 or 1,000 investigators.  If you warn
6  about the potential to CV risk to investigators --
7  that's why you have standby statements.
8    MS. SULLIVAN:  It's not what we told the IRBs
9  or the DSMBs.  This is a sideshow, Your Honor, and it's
10  not in his report.  We would have had an expert on this
11  to counter it if it had been in his report.
12    MR. BUCHANAN:  Here is one.  Have you ever
13  seen a DSMB on a study --
14    MS. SULLIVAN:  That's qualifications.  That's
15  not opinions about informed consent.
16    MR. BUCHANAN:  Then they ask questions about
17  opinions about the DSMB members.  Did they act
18  appropriately?  Did they get the information they were
19  supposed to?
20    MS. SULLIVAN:  That's not in the report.
21    MR. BUCHANAN:  Did they get the information
22  they should have gotten from the company?  That's
23  exactly what he was asked, and you know it.
24    MS. SULLIVAN:  It's not informed consent and
25  it's still way beyond the scope of his report.  Just

1  because you go through qualifications in a
2  deposition -- we would have had an expert to counter
3  this, Your Honor.  This is not an issue in this case.
4    MR. BUCHANAN:  You're bringing what, two,
5  three clinical trial experts in this -- his report also
6  talks about his DSMB report, Your Honor.
7    MS. SULLIVAN:  It's not an opinion about
8  what's appropriate for sponsors to warn about.  That is
9  not in his report.
10    MR. BUCHANAN:  Is a sponsor supposed to warn
11  about the potential risks and benefits of a drug?  He
12  is also asked about Debra Shapiro's actions with DSMB
13  from the VIGOR trial.
14    MS. SULLIVAN:  That's different than --
15    MR. BUCHANAN:  He gives an answer.
16    MS. SULLIVAN:  That's different than informed
17  consent.
18    THE COURT:  Well, this is an informed
19  consent, isn't it?
20    MR. BUCHANAN:  He is asking about what
21  information was given to sponsors in the IRBs.
22    MS. SULLIVAN:  The pending question is what
23  information should be provided.
24    THE COURT:  Not to patients.
25    MR. BUCHANAN:  To the DSMBs and IRBs.

1    MS. SULLIVAN:  They will deal with informed
2  consent issues.  And even that, Your Honor, has nothing
3  to do with it because what information should be
4  provided to Data Safety Monitoring Boards or IRBs is
5  not the issue in the case.  The issue is what should be
6  provided to prescribers.
7    So A, it's not in his report, he wasn't
8  proffered as an expert in this area; and B, it's not
9  relevant to this case, and it's got 403 issues.
10    MR. BUCHANAN:  Your Honor, we are going to
11  see documents in this case that are going to show they
12  developed standby statements and took actions because
13  they were required to give notice to certain
14  investigators of issues that arose in clinical trials.
15  They knew that if word got out to 100, 200, 300
16  investigators about potential issues, because they had
17  to tell them, then it would get out to a broader group.
18    The truth of the matter is they didn't
19  disclose the potential risks of the drug in the VIGOR
20  trial to anybody, and that was at a very susceptible
21  time for the company because they didn't want the word
22  to get out.
23    MS. SULLIVAN:  You didn't put him up on that.
24    MR. BUCHANAN:  You put him up on that.
25    MS. SULLIVAN:  That's not the rule in New

1   Jersey.  If you ask a question -- first of all, that's
2   not in his deposition, and that's not the rule in New
3   Jersey.  It's got to be somewhere in the report.  It's
4   nowhere.
5          MR. BUCHANAN:  It was absolutely disclosed,
6   Your Honor.  They had it up to six weeks on this issue.
7          MS. SULLIVAN:  Show me the letter where you
8   said he is going to testify about this.
9          MR. BUCHANAN:  It's in his deposition.
10         MS. SULLIVAN:  It's not in the report.  You
11  haven't proffered him as an expert and it's not covered
12  in his deposition.
13         MR. BUCHANAN:   Do you want to agree anything
14  that is not in his report, that you are not going to
15  cross-examine him on it?
16         MS. SULLIVAN:  He's going to be
17  cross-examined on the opinions he is giving here.
18         MR. BUCHANAN:  Your Honor --
19         MS. SULLIVAN:  It would have been easy for
20  you to put this in his report.
21         MR. BUCHANAN:  They deposed him on it.  I
22  can't imagine Ms. Sullivan is going to limit her
23  cross-examination to things he was deposed on that were
24  only in his report.
25         I hate to tell you, we have been talking now

1   about clinical trials and the understanding of this and
2   been talking about how they work, and then you object
3   to is a sponsor supposed to get information about
4   potential risks.
5          MS. SULLIVAN:  Because it's way beyond the
6   scope of his report.
7          MR. BUCHANAN:  Do you find that
8   objectionable?  There is nothing controversial about
9   that, Your Honor.  It's well within his qualifications.
10         MS. SULLIVAN:  As a biostatistician?
11         MR. BUCHANAN:  Yeah, as a guy who runs
12  clinical trials and has 45 people working under him for
13  the NIH.
14         MS. SULLIVAN:  Debra Shapiro was --
15         MR. BUCHANAN:  The qualifications, Your
16  Honor, are in this report.  I'm sorry.
17         THE COURT:  Well, I don't need his
18  qualifications.
19         MR. BUCHANAN:  Oh.
20         THE COURT:  I don't think that's the issue.
21  The objection is not based on his qualifications.
22         MS. SULLIVAN:  No, Judge.  Well, it's mostly
23  based on the fact that it's not in his report.  We
24  haven't deposed him on his qualifications on informed
25  consent issues, because he wasn't put up -- he wasn't

1   put up on that.
2          MR. BUCHANAN:  You absolutely did.  You
3   deposed him on it.
4          Did Debra Shapiro act appropriately?  Did she
5   give the information she was supposed to give?  Did the
6   DSMB act appropriately?  How about the ESMB in the
7   APPROVe trial?  Did they get the information?  How
8   should it be done?
9          THE COURT:  Where is it in the dep
10  specifically asked?
11         MR. BUCHANAN:  32.  Actually, I'm sorry, 32
12  and 33.  Okay.  Starting on 29, he starts about DSMB
13  experience and continues through at least 33.
14         THE COURT:  Is there a question in the dep
15  about what -- DSMB, what they should be told?
16         MS. SULLIVAN:  No, Your Honor.  Even if that
17  were the standard, and it's not, it's not in the
18  deposition.
19         MR. BUCHANAN:  It's in here.  I was there.  I
20  remember.
21         There is a question on 35, Do you know,
22  factually, have you formed any opinions as to whether,
23  in fact, anything inappropriate happened with respect
24  to Debra Shapiro's participation as part of the
25  VIGOR DSMB?

1          MS. SULLIVAN:  That's not informed consent.
2          MR. BUCHANAN:  Information provided to the
3   DSMB -- he is talking generally, about blinding,
4   unblinding of DSMBs, there's pages and pages --
5          MS. SULLIVAN:  You can ask him about blinding
6   and unblinding --
7          MR. BUCHANAN:  Pages and pages --
8          MS. SULLIVAN:  -- but there is nothing about
9   informed consent anywhere, about warnings to the DSMB
10  or IRB.  There is nothing about that in the report or
11  in his deposition.
12         MR. BUCHANAN:  Your Honor, they go through
13  all these DSMB members, as you read forward from 32,
14  33, through 37, 38 identifying the DSMB members.  Do
15  you challenge their integrity as scientists?
16         MS. SULLIVAN:  It's not informed consent.
17         MR. BUCHANAN:  But you are going to stack him
18  up against all the DSMB members.  He is not entitled to
19  talk about this type of information --
20         MS. SULLIVAN:  If you put it in his report,
21  he would be, but we had no notice he was going to talk
22  about this.
23         MR. BUCHANAN:  Yes, you did.
24         MS. SULLIVAN:  We did not.  Where is it?
25  It's not in his deposition and it's not in his report.

1  We would have had an expert to counter this.

2       MR. BUCHANAN:  It is.

3       MS. SULLIVAN:  Show me where it's in his

4  report.  It's not in his report.

5       THE COURT:  What is he going to say, that

6  they should have been told that they were concerned

7  about --

8       MR. BUCHANAN:  No, not at all.  He's not

9  going to be case specific at all.  He is going to talk

10  about the type of information a DSMB is supposed to be

11  given.  DSMBs and IRBs are supposed to be told about

12  the known potential risks of the drug.

13      THE COURT:  I will allow that.  That doesn't

14  have to be specifically stated in his report for him to

15  say.

16      MS. SULLIVAN:  Thank you.

17      (Sidebar concluded.)

18      THE COURT:  Let's take another five minutes.

19      (A recess was taken at 10:34 a.m.)

20      THE COURT:  Bring the jury in.

21      (The jury entered the courtroom at

22  10:54 a.m.)

23      THE COURT:  You could be seated.

24      You can proceed, Counsel.

25      MR. BUCHANAN:  Thank you, Your Honor.

1  BY MR. BUCHANAN:

2       Q    Dr. Kronmal, before we get back to talking

3  about clinical trials in general, I just want to ask

4  you a quick question.

5            I have been calling you "Doctor."  You are a

6  biostatistician, correct?

7       A    That's correct.

8       Q    Are you a medical doctor?

9       A    No, I'm not.  Ph.D.

10      Q    You don't treat patients?

11      A    No, I do not.

12      Q    Okay.  I just wanted to be clear about that.

13           Getting back to the clinical trial overview,

14  we were just talking about these two bodies, DSMBs and

15  IRBs, that have some function in clinical trials.  Do

16  you recall that?

17      A    Yes, I do.

18      Q    Okay.  And I was asking you before the break,

19  what information the sponsor -- let's go back.  The

20  sponsor of the clinical trials is the one that's

21  funding it?

22      A    That's correct.

23      Q    My question to you, sir, was what obligation

24  does the sponsor of the clinical trial have to provide

25  information about potential or known risks and benefits

1  of whatever is going to be studied to the DSMBs and the

2  IRBs?

3       A    They have an obligation to both.  It's one of the

4  most important principles of clinical and medical

5  research, basically, is that you protect the welfare of

6  patients in the trials.  That's a paramount principle

7  that is clearly inviolate.

8       Q    Well, after that initial information, before

9  the clinical trial starts, after that initial

10  information is given by the sponsor to the DSMB or the

11  IRBs, if new information is learned by the sponsor,

12  does the sponsor have an obligation to provide that

13  information to the DSMBs and IRBs?

14      A    Absolutely, because for the same reason.  If --

15  particularly during -- before the trial, you obviously

16  don't know what's going to happen.  Once the trial is

17  underway, if there is an observation of an excess risk

18  for any kind of end point that's important to the

19  health and welfare of the patients, that has to be

20  communicated to the DSMB.

21           The DSMB would then base its best judgment as

22  to whether it was important enough to report to the

23  IRBs and the individual institutions or whether it was

24  so important that they would recommend stopping the

25  trial.

1       Q    Now, is that true if a sponsor learns

2  information even from a completely different clinical

3  trial?

4       A    Absolutely.  They need to provide all the

5  information that's relevant to an assessment of the

6  safety of the drug whether it comes from the same trial

7  or a different trial, or even from a related drug in a

8  different company.

9       Q    I see from your resume -- you call it a

10  curriculum vitae, right?

11      A    Yeah.  Same thing.

12      Q    That's what they call it in your field?

13      A    Yeah.

14      Q    I see from your curriculum vitae that you

15  have worked with the FDA in the past.  Is that true?

16      A    That's correct.

17      Q    What have you done with the FDA in the past?

18      A    I was a member for four years of the

19  Cardiovascular and Renal Advisory Committee of the FDA.

20      Q    Doctor, before you get into that, what is an

21  advisory committee?

22      A    That's what I was going to talk about.

23           The advisory committee basically is a group

24  that's appointed by the FDA for a four-year term to

25  advise them as to whether or not to approve a

1  particular drug, or, for that matter, whether to

2  withdraw a particular drug from the market, if that

3  were to come up.

4        So the committee evaluates the New Drug

5  Applications that the companies bring forward .  So,

6  for example, while I was on the committee, one of the

7  *things we evaluated was whether aspirin was useful for*

8  prevention of heart disease in people who didn't have

9  heart disease before they started.  And so we would

10  evaluate the data.  In that case, many companies --

11  actually, Bayer probably brought it forward because

12  they are a major manufacturer of aspirin.

13        And then we would also get studies that were

14  new experimental drugs that they had tested to see

15  whether they were beneficial for one indication or

16  another.

17     Q   You worked on an FDA advisory committee in

18  the past?

19     A   Yes, I did, for four years.

20     Q   What FDA advisory committee?

21     A   It was the Cardiovascular and Renal Advisory

22  Committee.  That is, we reviewed all of the drugs that

23  were being put forward for treatment of heart disease

24  or renal disease, renal disease meaning disease of the

25  kidneys.

1  number of occasions as a representative from the

2  sponsors of various drugs, where they have asked me to

3  go to the FDA to help them in their presentation to the

4  FDA of their initial plans for trials, help them in

5  their -- basically, they'll meet prior to the start of

6  any trials to get the FDA's agreement that the trials

7  they are planning are appropriate.

8        And so I have been involved in some of those

9  meetings in representing the companies, where they have

10  asked me to talk about the statistical issues involved

11  in their particular trial and the design issues of

12  their particular trial to the FDA.  I've done that on

13  probably half a dozen occasions or maybe slightly more

14  than that.

15     Q   Over the years, sir, I mean, you have spoken

16  about your relatively extensive work with the NIH.

17  Correct?

18     A   That's correct.

19     Q   You have also worked with pharmaceutical

20  companies over the years?

21     A   Yeah.  I have been a consultant to probably 20

22  different pharmaceutical companies, maybe more than

23  that, over my 40-year career.

24     Q   *What type of consulting did you provide to*

25  *those companies over the years, in general terms?*

1     Q   Okay.  You did that what, back in the '80s?

2     A   Yes.

3     Q   What was your position on the advisory

4  committee in those years?

5     A   Well, I was a member of the committee for most of

6  the time.  The very last meeting of the committee, I

7  was asked to chair it by the FDA, and I chaired the

8  committee at that time.

9     Q   As a biostatistician, sir, you chaired --

10     A   That's right.

11     Q   The Cardio Renal Advisory Committee?

12     A   That's correct.

13     Q   Do you remember when that was?

14     A   Not the exact year, no.

15     Q   Okay.

16     A   It's in my curriculum vitae.

17     Q   Okay.  Apart from sitting on an FDA advisory

18  committee for four years, you said --

19     A   *Yes.*

20     Q   -- have you had any other interaction with

21  the FDA over the years?

22     A   Yeah.  There have been several occasions when I've

23  been asked to advise them on very specific statistical

24  issues that have come up in certain clinical trials.

25       I have also interacted with the FDA on a

1     A   Well, it varied quite bit, but typically, it was

2  helping in the design of some of their trials, so I

3  would be called in as part of a committee to help

4  design the studies.  In some cases, I was asked to

5  advise them on analyses of their data.  And in other

6  cases, I have actually been involved in helping them

7  prepare for their presentations to the FDA, the results

8  of their trials.

9       So they would -- I handled one very recently

10  for one of the large pharmaceutical firms.  I went to

11  several meetings where they rehearsed their

12  presentation.  I was asked to critique it for them as

13  to what they could have done better or be more clear in

14  their presentation.  And then I was asked to go to the

15  FDA meeting with them in case some statistical

16  questions came up that they didn't feel comfortable

17  answering.

18     Q   Is that fair, Doctor, that you have provided

19  statistical consulting to both companies and the FDA?

20     A   That's correct.

21     Q   Okay.  You have also provided statistical

22  consulting for plaintiffs in this litigation, correct?

23     A   That's correct.

24     Q   Okay.  Do you do a lot of that?

25     A   Not a great deal, actually.  This is the first

1   very large activity I have had in that area for almost
2   25 years.  But I've been involved at a lesser level in
3   probably another four or five cases over that 25-year
4   span.  And those have varied from very minimal to
5   maybe, you know, a couple days' worth of work.
6           About 25 years ago, I was asked to be a
7   consultant for a litigation involving the Dalkon
8   shield, which was an intrauterine birth control device.
9       Q   Who were you retained by in that case?
10      A   I was retained by the company's lawyers.  And that
11  was a very, very large activity at that time for me.  I
12  spent a good deal of time involved in that.
13          And I have been involved, for example, in
14  things like where a judge for the Superior Court of
15  Washington, Federal Court, asked me to be a consultant
16  to the judge, where she specifically was interested in
17  the statistical arguments the two sides were
18  presenting, and wanted an independent consultant to
19  help her understand what the issues were.
20      Q   Obviously, sir, you are getting paid for your
21  time today, correct?
22      A   That's correct.
23      Q   And what's your hourly rate?
24      A   My hourly rate is $500 per hour.
25      Q   Sir, you said that you have done more work in

1   this case than you had in prior cases.  Why is that?
2       A   Well, when you first asked me to be involved in
3   this case, I thought it was going to be like the
4   typical one where I would spend maybe a few days of my
5   time and that would be the end of it.  However, this
6   turned into a massive project.
7           The company provided the attorneys for the
8   plaintiffs with literally tens of thousands of data
9   files and associated files on computer, on hard disk.
10  There was no -- almost no documentation of what was in
11  the files.  There were no directories.  There was no
12  specification of what the files were originally for.
13          So we would have files called MRK-001346.  I
14  had no idea, I had no way of knowing what that file was
15  for.  It might be in a folder that I could guess as to
16  what the content was.
17          So what I had to do, basically, and I had an
18  assistant helping me as well, was to go through all of
19  those files, open them up, find out what was in them,
20  try to do simple tabulations from the files to match
21  them up with various reports and journal articles that
22  the company had done, until the point I was able to
23  actually figure out which files were the relevant ones
24  that the company had based their final results on.
25          What made it really hard is that some files

1   would be almost identical to another file that was in
2   another directory, but would differ in one case.  I had
3   no idea why.  There was no documentation as to why.  So
4   it was a very time-consuming, arduous, difficult
5   process.
6           Beyond that, there is extensive literature,
7   there was extensive data from the litigation, from the
8   FDA, all the FDA hearings that took place.  I had to
9   read all that material, and that comprised thousands of
10  pages of documents.  So it was a very time-consuming
11  activity.
12          MR. BUCHANAN:  Dr. Kronmal, and I guess
13  before we get into specifically what you did, I just
14  want to tender Dr. Kronmal to the Court as an expert in
15  biostatistics and clinical studies.
16          MS. SULLIVAN:  Your Honor, defendant will
17  reserve voir dire on qualifications to
18  cross-examination.
19          THE COURT:  The Court finds the doctor is
20  qualified to give opinions in the area of
21  biostatistics.
22          You can proceed.
23  BY MR. BUCHANAN:
24      Q   And Doctor, before we get into more of what
25  you did, and specifically what you looked at and your

1   conclusions, I just want to address one issue that you
2   raised before.
3           You were talking about these different types
4   of I will call them lines of evidence, clinical trials
5   and observational trials that are used in assessing
6   potential cause and effect relationships.  Do you
7   recall what you were saying earlier about those?
8       A   Yes.
9       Q   Are observational trials relevant to
10  assessing cause and effect relationships?
11      A   Observational data is relevant, but weaker
12  information.  There are many times you can't do
13  randomized clinical trials.  For example, we pretty
14  well know now with very, very high probability that
15  smoking is a cause of lung cancer and heart disease.
16  But we couldn't very well randomize people that smoke
17  and did not smoke and then follow them for 20 years to
18  see if they got heart disease or cancer.  That just
19  wouldn't be ethical, it wouldn't be practical, it
20  couldn't be done.  So the best thing we can do then is
21  to look at the observational data.
22          And so what was done, basically, there were
23  large studies that followed smokers and nonsmokers, and
24  determined whether or not smokers tended to have more
25  diseases of various kinds than nonsmokers.  But even

1   those studies, as big as they were and as obvious as
2   the relationship was, were controversial. There were
3   people, scientists, who argued that smoking didn't
4   really cause lung cancer; that people who smoked were
5   different kinds of people; and because they were
6   different kinds of people, that was why they got lung
7   cancer.
8        And it was only basically after about 20
9   years of studies that, finally, the consensus in the
10  scientific and medical community was it was quite clear
11  that smoking caused lung cancer and smoking caused
12  heart disease.
13       But observational studies are valuable in
14  generating hypotheses and in situations where you can't
15  do clinical trials. It provides the best data that you
16  can get, even though it is not -- it is far from
17  perfect.
18       I run a number of observational studies, as
19  *I've pointed out to you, that, you know, are trying to*
20  *assess various aspects of what data tells you about*
21  *future risks.*
22       Q   How many of those do you have ongoing now,
23  sir?
24  A   Oh, quite a large number, but I have two major
25  ones that I mentioned earlier, the cardiovascular

1   health study, which is the elderly study, and the
2   Multi-Ethnic Study of Atherosclerosis are the two major
3   ones that I have ongoing.
4        I also have a number of studies going on in
5   cystic fibrosis, where I help run a clinical trials and
6   observational studies center for the Cystic Fibrosis
7   Foundation and for the NIH.
8        Q   All right, sir. Now I want to turn to
9   specifically what you did in connection with your role
10  for us in this litigation.
11       What did you look at?
12  A   Well, I began this process by looking at the
13  literature first, because I wanted to know what's said
14  in the literature about VIOXX and the risks for CHD.
15  So I started with the literature that was published. I
16  specifically started with the VIGOR study because that
17  was the largest one, and that's where the first major
18  signal that this drug might cause CHD events,
19  cardiovascular events, appeared, at least to the best
20  of my knowledge.
21       And then I started getting from you and the
22  other plaintiffs' attorneys this large volume of data
23  files.
24       Q   And let's just pause on that for a second.
25  You say data files. What was in the data files?

1   A   Well, there was a variety of things in the data
2   files, actually. There were some reports generated by
3   the company. There were what I call command files that
4   are the commands that were used by the statisticians
5   for the drug company to produce certain output, the
6   tables that they would give to the FDA, internal
7   reports, things of that sort.
8        And there were these numerous data files that
9   had the raw data, or sometimes data that wasn't exactly
10  raw, but it had been processed and put into a form that
11  was easier to analyze for the company, but, again, were
12  not labeled, not described anywhere. And there were
13  very, very large numbers of them, literally thousands.
14       And our first big task, which primarily was
15  done by my assistant, who is another Ph.D.
16  statistician, was to try to sort out which files were
17  which, which files were relevant to which studies,
18  which files were the latest files, that corresponded to
19  the final reports or the publications that came out of
20  the VIGOR -- out of these various Merck studies.
21       Q   And, Doctor, I just want to be clear on how
22  you got this information. Could you get this
23  information by going to a website and downloading it?
24  A   No. It was very much privileged information that
25  *was gotten from the company from this litigation. That*

1   is not data that would be available to the general
2   public in any sense because the drug companies,
3   naturally, try to protect their proprietary
4   information.
5        Q   You can't go to the NIH website and download
6   this clinical trial data?
7   A   No, you can't.
8        Q   To your understanding, do any other
9   biostatisticians around the country who aren't working
10  for Merck have this information?
11  A   Not to the best of my knowledge, no.
12       Q   Some information was given to the FDA, wasn't
13  it, sir?
14  A   Yes.
15       Q   Do you know what was given to the FDA and
16  what wasn't among the thousands of files you got?
17  A   Not precisely, no. I know that some -- towards
18  the end of the litigation, within this period, maybe a
19  month ago, we finally got a list of what files they
20  said they had submitted to the FDA. We had been asking
21  for that for months before that because it would have
22  made the task substantially easier, but we actually
23  received a listing of the files that they had submitted
24  to the FDA approximately a month ago, maybe a little
25  longer than that.

9/22/2005 Kronmal - Direct & Cross

1     Q   And I just want to be clear.  A
2   biostatistician who didn't have access to these files,
3   say, through litigation, could they go to the FDA
4   website and download these files?
5     A   Not to the best of my knowledge, no.
6     THE COURT:  Just so the jury knows, the
7   discovery in this case has been ongoing.  The files
8   have been produced by Merck over a long period of time.
9   Millions of documents have been produced.  You
10   shouldn't hold it against Merck one way or the other as
11   to when the file was produced.
12     On the other hand, you can consider it for
13   what I think counsel is offering it for, which is that
14   it's not available to the general public or all
15   scientists.
16     MR. BUCHANAN:  That's correct.
17     THE COURT:  You can proceed, Counsel.
18     MR. BUCHANAN:  Thank you, Your Honor.
19   BY MR. BUCHANAN:
20     Q   Doctor, we are going to start in general
21   terms with some of the opinions you formed as a result
22   of your review of all this data, okay?
23     A   Yes.
24     Q   All right.  Actually before we do that, let
25   me pass up to you what I'm marking as plaintiffs

---

9/22/2005 Kronmal - Direct & Cross

1     (The following transpired at sidebar.)
2     MS. SULLIVAN:  This is a statistician, not a
3   physician, not a clinical epidemiologist.  He can talk
4   about whether there was an increased risk based on
5   numbers in a study, but he can't talk about causation.
6     THE COURT:  I think the question should
7   probably be reframed, Mr. Buchanan, based on an
8   analysis of the statistical data in the studies.
9     MR. BUCHANAN:  We can do that, Your Honor.
10   I was going to support it on the back end, but I can go
11   through the study now and ask these questions at the
12   end.  That's fine.
13     MS. SULLIVAN:  I think --
14     MR. BUCHANAN:  That's a cause and effect
15   relationship.
16     THE COURT:  I think you can ask the question
17   now, but I think the question should be couched in
18   terms of *based on statistical evidence, there is*
19   statistical proof of --
20     MR. BUCHANAN:  That's fine.
21     THE COURT:  Would you agree, Counsel?
22     MS. SULLIVAN:  I would agree he can talk
23   about increased risk.  Causation from a nonclinician is
24   improper, Your Honor, under 702.
25     MR. BUCHANAN:  It's not improper.  I will

---

9/22/2005 Kronmal - Direct & Cross

1   Exhibit 5.0002 and 5.0003 for identification.
2     Sir, have you seen those before?
3     A   Yes, I have.
4     Q   What are they?
5     A   These are two reports that I produced on the
6   results of the various trials, and one report on a --
7   what we call a supplemental report, that was
8   essentially a critique of a report that had been
9   produced by a man named Watson who works for Merck,
10   quite early on in the process, looking at CHD.
11     Q   Doctor, if I could just have you pause for a
12   second, I just wanted you to identify those and let you
13   know you are free to look at those if you need to.
14     You did a lot of numbers in this, right?
15     A   That's correct.
16     Q   Crunched a lot of numbers for us?
17     A   That's correct.
18     Q   If you need to make reference to any of your
19   analyses, please feel free.  Okay?
20     Before we get into the nitty-gritty, I just
21   *want to find out on a broad basis whether you have an*
22   opinion as to whether or not VIOXX can cause serious
23   heart injury.
24     MS. SULLIVAN:  Objection, Your Honor.
25     Can we approach?

---

9/22/2005 Kronmal - Direct & Cross

1   tell you, *they* determine causal relationships from
2   clinical trials.
3     MS. SULLIVAN:  He's not a clinical
4   epidemiologist.
5     THE COURT:  He runs clinical trials and he
6   does --
7     MS. SULLIVAN:  He crunches numbers.
8     THE COURT:  Yeah.  Well, he can say from the
9   number crunching, whether they -- whether the numbers
10   uphold -- look, somebody else is dealing with the
11   science, and that's the effect.  Other cardiologists
12   are coming, but he can say, based on the numbers, that
13   the causation is there under the statistics.
14     But reframe your question to include that.
15     MR. BUCHANAN:  I will.
16     (Sidebar concluded.)
17   BY MR. BUCHANAN:
18     Q   Sorry about that.
19     I want to know, sir, based on your number
20   crunching you did on these data files you looked at, do
21   you have an opinion as to whether VIOXX can cause
22   serious heart injury?
23     A   Based on the analysis I've done, I think there is
24   little doubt that VIOXX can cause heart injury.
25     Q   What types of heart injury, sir, based on the

1   analysis that you did?

2   A    Well, very specifically, there is strong evidence

3   that VIOXX can cause myocardial infarctions.  It's

4   basically what is generally called a heart attack.

5        It can cause what is called sudden death,

6   which is where the heart actually goes into an

7   arrhythmia, where it just -- the whole heart,

8   basically, the big chamber that pumps the blood to the

9   body, instead of pumping, just sort of wiggles, and

10  that goes on for a few minutes, and the person dies,

11  basically.  That's called sudden death.

12       It's called sudden death because it's usually

13  not observed, or if it's observed, there is no one

14  right around the person.  They just drop dead right in

15  their sleep or they are found dead on the floor

16  someplace.

17       There is little doubt that there is evidence

18  that, from the data, that it can cause both of those

19  events.

20       There is also very little doubt that it can

21  cause congestive heart failure, which I know is not a

22  specific end point that's involved in this particular

23  litigation, but which is a very serious disease where

24  the heart muscle basically stops having the ability to

25  pump sufficiently, so it becomes weaker and weaker, and

1   can't pump the blood to the body, and ultimately

2   results in death.  And there is no doubt in my mind

3   that there is substantial evidence that it can cause

4   congestive heart failure.

5        Finally, although it's not heart disease, per

6   se, it can cause hypertension, which is another serious

7   medical condition of high blood pressure that, in

8   itself, can lead to heart disease, heart attack,

9   stroke, and a variety of other conditions.

10  Q    Let me just catch up to you, Doctor.

11  A    What?

12  Q    Let me just catch up to you.

13  A    Okay.

14  Q    Did you say congestive heart failure?

15  A    Yes, I did.

16  Q    Can we call that CHF?

17  A    Yes.

18  Q    I think you also said heart attacks, right?

19  A    Well, I talked about sudden death.

20  Q    I wrote down MIs.  Is that the same thing as

21  a heart attack?

22  A    Yes, it is.

23  Q    Okay.

24  A    A heart attack is actually a broader term than

25  just MIs.  People can suffer what's called angina,

1   where they get chest pain because the vessels are

2   narrowed, or there may be clots that are forming that

3   are small that are narrowing it even further, the

4   vessels, and then the heart doesn't get enough blood.

5   If it doesn't get enough blood, the person experiences

6   pain.  There may be even some death to some of the

7   heart muscle.  And that's called angina.  And that's

8   CHD as well.

9        I didn't specifically look at angina in the

10  studies because it was not part of the data that was

11  readily available to me at the time.

12  Q    Okay.  All these items here in your list, MI,

13  congestive heart failure, hypertension, and sudden

14  death, are those serious?

15  A    All of them are serious.

16  Q    Sudden death, obviously.

17  A    Yes.

18  Q    How about congestive heart failure?

19  A    Congestive heart failure is a terrible disease.

20  It leads to substantial hospitalization, becoming

21  ultimately bedridden, short of breath because fluids

22  accumulate in the lungs, and ultimately, will lead to

23  death.

24       The average survival of someone with

25  congestive failure is about five years.  It is an

1   extraordinarily serious disease.  It's one of the major

2   causes of death of the elderly.

3   Q    Okay, Doctor.  I want to focus now on heart

4   attack, specifically, for a moment.

5        Based on all the data that you looked at in

6   doing your analysis, is the data consistent with an

7   increased risk of heart attacks for less than 18

8   months?

9   A    Yes.

10  Q    There has been a lot of talk in this

11  litigation about there is no evidence to support an

12  increased risk for under 18 months.  Are you aware of

13  that?

14  A    I've heard that that's been the case, yes.

15  Q    But your review of the data is inconsistent,

16  then?

17  A    That's correct.

18  Q    Okay.  Do you have an opinion as to what the

19  extent of that increased risk is for heart attacks,

20  even with short-term use?

21  A    Well, the best data that's available indicates

22  that the risk is probably somewhat larger than twice,

23  maybe more than a two-fold increased risk, doubling the

24  risk, approximately, maybe a little higher than that.

25  Q    VIOXX can double the risk of heart attack

1   even with short-term use is the best evidence?

2   A    The best evidence is that there is no difference

3   between short-term and long-term use.

4       Q    And that was for heart attack, sir?

5   A    That's correct.  I would include in that sudden

6   death, as well.

7       Q    Sudden death.  Okay.

8       All right.  I want to talk about the sources

9   of information you looked at, not, you know, data files

10  or command files or things like that.  What clinical

11  trials did you look at?

12  A    Well, very specifically, I started with the VIGOR

13  trial.  That was at the time the one that first showed

14  an excess risk of myocardial infarction.  And then

15  after I had done the analysis of the VIGOR trial, then

16  I began to look at what's called a meta-analysis.

17      A meta-analysis is trying to take the

18  combined experience from a large number of other

19  trials, and combining them to get a single estimate of

20  the overall risk that's based on this large collection

21  of trials.

22      The reason I focused on the meta-analysis is

23  not because I thought a meta-analysis was an

24  appropriate or reasonable thing to do, but because the

25  company had done a meta-analysis and published it and

1   used it in their FDA hearings in an attempt to show

2   that they thought there was no excess risk of CHD

3   events.  So I wanted to find out what they had done and

4   what my own independent conclusion would have been --

5       Q    Doctor, you just used an acronym I don't

6   think I wrote down yet.  You said CHD events.  What are

7   those?

8   A    Well, they are variously defined, and without

9   getting into a lot of detail, CHD would involve,

10  depending on the specific study, MI, sudden death,

11  what's called unstable angina.

12      That's the same kind of chest pain I

13  mentioned earlier, except it's unstable in the sense

14  that it comes and goes, and it's very severe when it

15  comes, severe enough often to require hospitalization

16  to try to control it.  The pain becomes so severe that

17  the patient has to be hospitalized.  It's unstable

18  angina.

19      It could include angina, as well, and in most

20  studies, it would.  Here, for reasons I don't really

21  understand, angina was not included in their definition

22  of cardiac events, even though I think it should have

23  been, in retrospect.

24      And then -- that's -- and then sudden death.

25  That's basically it.  Sudden death, MI, unstable angina

1   is what they called cardiac events.

2       Q    Okay.

3   A    CHD.

4       Q    You said CHD is defined differently based on

5   different studies?

6   A    Yeah.  Depends on the study.  I mean, the term is

7   a generic term for cardiovascular disease.  And so it

8   can mean different things depending on the study.  So

9   as I say, some studies would include angina, some would

10  not.  Some would include just the fatal events, for

11  example.

12      Q    In this case, you studied CHD, right?

13  A    That's correct.

14      Q    Okay.  You included what end points -- I'm

15  calling these end points.  Are these end points?

16  A    Yes.

17      Q    Okay.  What end points did you study in your

18  CHD analysis, sir?

19  A    Well, I started off primarily with MIs, but later

20  on, as I looked at the data particularly from the

21  Alzheimer's studies, I realized that I probably should

22  have, from the start, included sudden deaths.  The

23  problem is that the VIGOR study only looked at MIs.

24  They didn't include sudden death in their -- as their

25  composite end point, so I didn't also.

1       When I got to Alzheimer's study and realized

2   that there was a big excess of sudden deaths in the

3   VIOXX group, I basically decided that I should have

4   used the broader definition of CHD, which would be MI

5   plus sudden death.

6       The reason for that is that sudden death is

7   often triggered by an MI, but there is no one around to

8   observe it so no one knows that the person has been

9   having chest pain before they drop dead.  And so

10  particularly in the elderly , where people are

11  hospitalized, you know, or are in institutions, may not

12  be monitored very well, and may be in bed most of the

13  time, they may not have had any chest pain, they may

14  not have been observed, and they just suddenly died.

15      And the immediate trigger for the arrhythmia,

16  for the you know, fluttering of the heart, could well

17  have been the MI that killed some of the heart muscle,

18  followed by arrhythmia, which ended up killing the

19  person.

20      So you can't really distinguish between those

21  two if you don't observe them.  And further, you can't

22  even distinguish in that, often, unless you do an

23  autopsy on the person.  And even with an autopsy, you

24  can't be absolutely sure, because sometimes the clot

25  that caused the MI is gone by the time you have done

1    the autopsy on the person.

2            So I thought at that point in time that the

3    appropriate end point was probably MI plus sudden

4    death, but of course, I had already done the analysis

5    for MI in VIGOR, and I kept it the same way.

6        Q   Doctor, you talked about I think three of the

7    studies or analyses that you looked at.  One was VIGOR,

8    correct?

9        A   Yes.

10       Q   The second was this pooled analysis?

11       A   Yes, this meta-analysis, which I did for MI rather

12   than the end point that they used, which we will talk

13   about later, I'm sure.

14       Q   Okay.  The third was the Alzheimer's trial?

15       A   The third were the Alzheimer's trials, yes.

16       Q   And what was the other trial?

17       A   And the fourth was the APPROVe trial.

18       Q   Let's go through these one at a time, okay?

19       A   Yes.

20       Q   The VIGOR trial, what was the VIGOR trial?

21       A   It was a large clinical trial in rheumatoid

22   arthritis.  It was a comparison of VIOXX at 50

23   milligrams versus Naproxen, which is another pain

24   reliever used for treatment of rheumatoid arthritis and

25   other pain conditions.  And it went on for about a

1    year, and I don't remember the exact number of people

2    randomized for the trial but it was quite a large

3    number of people.

4        Q   Okay.  Doctor, you were looking at the VIGOR

5    trial initially, you said, for heart attacks, right?

6        A   Yes.

7        Q   And why was that?

8        A   Well, first, this trial was about heart attacks,

9    so that's the instruction I was given, that I was

10   supposed to look at the safety profile for heart

11   disease, for heart attacks.  And further, that's where

12   the major signal was that the company had observed, was

13   for MIs.

14           Further, I learned later, not at the time I

15   did the VIGOR analysis, that the company had been

16   concerned about the possibility that the drug might

17   cause heart attacks, prior to even doing VIGOR.  That

18   had been a concern of the company for -- because there

19   was a biological theory --

20           MS. SULLIVAN:  Your Honor, I'm going to

21   object as to what was in Merck's mind for this witness.

22           MR. BUCHANAN:  Your Honor, as to why he did

23   his analysis, it's an issue as to why he picked

24   particular end points.  We don't want to get any

25   argument that he was data mining or something.

1            THE COURT:  I'm going to allow him to testify

2    along this line, and the jury will make the final

3    decision as to what Merck did or didn't know and why

4    they did or didn't do what they did.

5            You can proceed, Counsel.

6    BY MR. BUCHANAN:

7        Q   Can you answer?

8        A   I had seen documents from Merck scientists that

9    were prior to the start of the VIGOR trial that

10   indicated they were worried that the drug might cause

11   cardiovascular disease.  The most definite and easiest

12   to determine of those kinds of events are MI and sudden

13   death.

14           And angina can be caused by heart disease,

15   but there is a lot of false angina, particularly in

16   women, where a woman will have chest pain and it's not

17   really angina, it's due to other causes.  And so from

18   that point of view, the cleanest end point and the one

19   where the signal was MI.  The VIGOR study showed a

20   dramatic increase in risk for MI.

21       Q   Doctor, we have heard a little bit about that

22   already, but do you know how many MIs were suffered by

23   people taking VIOXX in the trial compared to people

24   with Naproxen?

25       A   Yes.  There were 20 MIs that occurred in the VIOXX

1    arm of the VIGOR trial, and there were four MIs that

2    occurred in the placebo trial -- in the Naproxen arm,

3    rather, of that trial.

4        Q   Okay.

5        A   That's a five-fold increase in risk.

6        Q   Okay.  Five-fold increase in risk.  What does

7    that mean to laypeople?

8        A   Well, it means that you are five times as

9    likely -- you know, this is an estimate, of course,

10   because it's based on these numbers.  It's based on

11   small numbers.  It's an estimate of the risk you would

12   have of taking -- when you are taking the drug compared

13   to what risk you would have had you been taking

14   Naproxen.  And the risk is five times as large, 20

15   versus four, a ratio of five.

16       Q   Doctor, I'm writing RR down here.  What does

17   that mean?

18       A   It means relative risk, basically.  It's the ratio

19   of the probability of having the event under one

20   treatment to the risk when you take -- probability,

21   namely, if you have the other treatment.

22       Q   Okay.  So to get beyond relative risk and I

23   guess I introduced statistics there, not you, people

24   taking VIOXX were five times more likely to have a

25   heart attack as compared to people who were taking

Naproxen?

2  A    That's correct.  And by the way, that was
3  significant in terms of their statistical significance
4  argument at what's called the .005 level, which means
5  that it was very, very unlikely that it was a chance
6  event.  In other words, chance was not a likely
7  explanation for that big a difference.

8         It's like, you know, if you went and were
9  gambling with someone and you flipped a coin 24 times
10  and got 20 heads, you'd be very, very sure that there
11  was something wrong with that coin, that it wasn't just
12  a chance happening.

13        And we assessed the probability, as I said
14  earlier, by this p-value, which is .005, and five times
15  in 1,000, would you get this extreme a result just due
16  to chance?  Very unlikely.

17  Q    Let's be clear about that.  This p-value you
18  just quoted, you said five times in 1,000, you might
19  get this particular result by chance?

20  A    Or worse.  Or more extreme.

21  Q    Or worse?

22  A    About 21-3, 22 -- 21-3, 22-2, 23-1, and 24-0.
23  That's the probability of any of those really extreme
24  events occurring if there was no difference in the
25  rates between the two treatment arms.

1  Q    So to a statistician, when you have -- you
2  call it a p-value, but when you have five in 1,000
3  chances of getting a result that extreme by chance, do
4  you attribute this result to chance?

5  A    No, you don't.

6  Q    Okay.  Did you see anything else of concern
7  from a cardiovascular perspective in the VIGOR trial
8  that you looked at, sir?

9  A    Absolutely.  One of the things I noted in the
10  trial was that there was much more -- much more
11  frequent hypertension adverse events in the VIOXX arms
12  than in the placebo arms; that is, many more people had
13  either elevation of their blood pressures while they
14  were taking VIOXX, new onset hypertension, that is they
15  became hypertensive when they weren't before, or when
16  they were already hypertensive -- - had hypertension,
17  and their hypertension became worse, or they actually
18  needed to be hospitalized because their hypertension
19  got so severe that it required hospitalization.

20        By the way, that is an extremely rare event
21  in modern times, and yet, it was seen in these clinical
22  trials of VIOXX.  That difference was highly
23  statistically significant with p-values less than one
24  in 10,000.

25  Q    And that means what, sir, again?

1  A    Again, the chance that those results were due to
2  chance were extremely low.

3  Q    Okay.

4  A    That it clearly is a drug that has severe effects
5  on the vascular system.  What the mechanism is by which
6  it causes hypertension, I don't know and I don't think
7  anyone does, but it clearly does that.

8  Q    Well, to be clear, sir, the VIGOR trial was
9  comparing VIOXX to another NSAID, right?

10  A    That's correct.

11  Q    Okay.  And VIOXX showed more hypertension
12  compared to traditional NSAIDs?

13  A    Than Naproxen, yes, that's correct.

14  Q    Okay.  Any other things you saw from a
15  cardiovascular perspective in your analysis of the
16  data?

17  A    Yes.  There was an excess of congestive heart
18  failure in the VIGOR trial in the VIOXX group.  Very
19  specifically -- I will refer to my notes here -- there
20  were 19 cases of CHF in the VIOXX arm compared to nine
21  in the Naproxen arm, a relative risk of slightly bigger
22  than two.  That did not quite reach statistical
23  significance, that is, the p-value was at the .065.
24  Statistical significance is usually at the 05 level.
25  It was close, but it didn't reach statistical

1  significance.

2         However, of the -- of those 28 cases of
3  congestive heart failure, 15 were judged by the
4  investigators to be severe adverse events.  And a
5  severe adverse event in congestive failures will be
6  typically hospitalization for the congestive failure.
7  That is, the person was so sick they had to be
8  hospitalized.

9         For the 15 that were severe, 12 of them were
10  in the VIOXX group and three were in the placebo -- in
11  the Naproxen group, which is a relative risk of
12  approximately four.  They were about four times as
13  likely to have a severe congestive heart failure if
14  they were taking VIOXX than if they were taking
15  Naproxen.

16        As I mentioned earlier, congestive failure is
17  an extraordinarily serious disease with very poor
18  prognosis.

19  Q    Okay.  So just so we are clear on this, and
20  it's starting to slant down, I don't know if you can
21  read this, you said there were 19 cases of congestive
22  heart failure on VIOXX and nine on Naproxen in the
23  VIGOR trial, right?

24  A    That's right.

25  Q    You said even though it's a little more than

1  two times as many, it wasn't statistically significant?

2    A    That's correct.

3    Q    So that, as a statistician, by traditional

4  measures, you couldn't rule out that that was just a

5  chance effect?

6    A    That's correct. You could not rule it out.

7    Q    Okay. But then there was also data on

8  serious congestive heart failure, true?

9    A    That's correct.

10   MS. SULLIVAN: Your Honor, I'm going to

11  object. I've let this go on some, in the interest of

12  not interrupting, but the issue in this case is heart

13  attack, not congestive heart failure, not hypertension,

14  not sudden cardiac death. Can we just stick to heart

15  attack? Because that's what Mr. Humeston is claiming.

16   MR. BUCHANAN: Your Honor, actually, the

17  issue is the risks of the drug that were in the

18  labeling and what a prescribing physician would do with

19  full information. Counsel has made that quite clear in

20  various arguments throughout the trial. What was the

21  risk profile of the drug? This is a serious cardiac

22  risk profile.

23   THE COURT: The objection is overruled. I

24  will allow the testimony to what the risks were.

25  BY MR. BUCHANAN:

---

1  studying is, for example.

2    So a .025 means that two and a half times out

3  of 100, you would get this result by chance when there

4  was no difference. That's a very unlikely occurrence.

5    Q    So very unlikely from this trial that the

6  difference in congestive heart failure between VIOXX

7  and Naproxen was due to chance?

8    A    That's correct. But beyond that, hypertension is

9  the major cause of congestive heart failure. So that

10  the excess risk of congestive heart failure was really

11  to be expected, really. When you have that much

12  additional hypertension, you would expect to see more

13  congestive heart failure. So it was hardly any

14  surprise once I had seen the hypertension data.

15    I've done studies over the years of

16  prediction of congestive heart failure, for example,

17  and by far, the biggest risk factor for congestive

18  heart failure is hypertension. Well, that's not quite

19  true. MI is the biggest risk factor for congestive

20  heart failure. After that, it's hypertension.

21    Q    Sir, did you look at deaths that were

22  reported?

23    A    Yes, I did. Yes, I did.

24    Q    What type of deaths did you look at in the

25  VIGOR trial?

---

1    Q    Okay. Continuing --

2    THE COURT: As long as we are dealing with

3  cardiovascular events.

4  BY MR. BUCHANAN:

5    Q    You can have serious congestive heart failure

6  too, right, sir?

7    A    That's correct.

8    Q    You told me 12 versus 3?

9    A    Right.

10    Q    Relative risk of four?

11    A    Approximately.

12    Q    Patients on VIOXX were four times more likely

13  to suffer congestive heart failure, serious congestive

14  heart failure?

15    A    That's correct.

16    Q    Was that statistically significant?

17    A    Yes, it was at the .025 level.

18    Q    Which means what?

19    A    Well, it just means that -- the criteria for

20  statistical significance is less than an 0.05 level.

21  That's the standard that's used in medical research,

22  basically. You are willing to take a 1 in 20 chance of

23  making a mistake that this was a chance finding. So

24  that anything below a 1 in 20, .05, you will decide is

25  probably due to the -- whatever the drug you are

---

1    A    All-cause mortality.

2    Q    What's all-cause mortality, sir?

3    A    It means deaths from all the various causes that

4  are listed, basically, that are defined.

5    Q    Well, can you explain to us why you would

6  look at all-cause mortality rather than just death from

7  heart attacks or cardiovascular disease?

8    A    Well, it's certainly relevant to look at deaths

9  from heart attacks, and later on, as you'll see, I did

10  that particularly with the Alzheimer's data.

11    The main reason is that there weren't a huge

12  number of deaths in the VIGOR study. It was only a

13  year long, and the patients were fairly young, so there

14  weren't a large number of deaths.

15    The other thing is that deaths typically are

16  not easy to classify because you can't always determine

17  exactly why a person died. So a person might have had

18  a pneumonia, for example. The death, the cause of

19  death would be ascribed to that pneumonia, but that

20  person, if their heart wasn't bad, might have survived

21  the pneumonia. In the end, their heart stopped.

22  That's what killed them. But still, the cause of death

23  would be said to be pneumonia. But how can you be sure

24  that that person would not have survived had they not

25  had a problem with their heart?

1    So it's very difficult to really classify it,
2  even in things where it seems obvious that you know the
3  cause of death. Say, for example someone had a cancer,
4  and the listed cause of death is cancer. Your ability
5  to survive the treatment for cancer is heavily
6  dependent on your heart condition. People with strong
7  hearts can stand a lot more chemotherapy than people
8  with hearts that are not strong, that are damaged.
9    So the point is the heart disease that they
10 may have had could have contributed to the fact that
11 they died, even though they died -- the actual proximal
12 cause of death was cancer, for example.
13    I mean, in even something like a car
14 accident, and the person died of the trauma of the car
15 accident, how does anyone know that that person didn't
16 have the accident because they had a heart attack while
17 they were driving their car? You can't tell. No one
18 can tell.
19    And so, it's -- if you see a signal in total
20 mortality, because for the very reason that some people
21 die of things that are unrelated to the drug. But when
22 you see a signal in total mortality, you have to be
23 very, very worried that something bad is going on.
24    Q   Okay. Let's talk about this. Well, total
25 mortality, that's the term you used, is that an end

1  point that's typically looked at in analyzing clinical
2  trials?
3    A   It's always monitored in clinical trials.
4    Q   All the studies --
5    A   The first thing you look at is to be sure you are
6  not killing people. Because obviously, in a trial,
7  that's the worst thing you can possibly do.
8    Q   And in your work for the NIH and other people
9  you do clinical trials for, do you look at total
10 mortality?
11   A   Absolutely, always.
12   Q   Did you look at total mortality in the VIGOR
13 trial?
14   A   Yes, we did.
15   Q   Do you remember what the numbers were?
16   A   I have them here, but I'm having trouble finding
17 them. Just a second.
18     Well, the deaths were 22 in the VIOXX -- in
19 the VIOXX arm, and 15 in the Naproxen arm. That did
20 not obtain statistical significance. It corresponds to
21 a relative risk of 1.46, a 46 percent increase.
22     And by itself, that would not have caused me,
23 if I had been, say, monitoring the trial in the DSMB,
24 to be extraordinarily concerned by itself. But when
25 you add to it the extraordinary number of excess MIs,

1  the congestive heart failure, the hypertensions, that
2  would have been worrisome to me, and should have been
3  worrisome to the company.
4    Q   Doctor, we just laid out some numbers here.
5  When you did your analysis, you actually graphed some
6  of this out too, didn't you?
7    A   Yes, I did.
8    Q   Okay. Let me pass up to you what we are
9  marking as P5.0004 for identification.
10     Sir, can you tell us what it is I just passed
11 over to you?
12   A   These are what are called mortality curves. And
13 we can go to the blackboard or something or show one, I
14 can explain to you what they are. They are a way of
15 showing not only how many events occurred, but when
16 they occur, the pattern of occurrence of the events
17 across time.
18     MR. BUCHANAN:   Okay. I'm just going to pass
19 one up to the Court.
20     Isn't that 004?
21     THE COURT CLERK:   Yes.
22 BY MR. BUCHANAN:
23   Q   So Dr. Kronmal, do I understand correctly you
24 took these files that you analyzed -- are these big
25 files that you analyzed?

1    A   They are moderate size, I would say.
2    Q   A lot of data in them?
3    A   Yes.
4    Q   Hard to understand what the significance of
5  the data is just by looking at the data itself?
6    A   Of course. You have a thousand people's data.
7  It's not easy to just look at all these numbers and
8  make any sense out of it, so you have to find ways of
9  displaying them that convey the information in a
10 compact form that's easily understandable. In fact,
11 that is one of the primary things statisticians do,
12 really, is try to determine ways of displaying the data
13 that will convey what the data actually tells you.
14   Q   Okay. Is that what you did in these figures,
15 sir?
16   A   Yes, I did.
17     MR. BUCHANAN:   Counsel, do you have any
18 objection?
19     MS. SULLIVAN:   I'm sorry. To these?
20     MR. BUCHANAN:   Do you have any objection to
21 putting this up?
22     MS. SULLIVAN:   No.
23     MR. BUCHANAN:   Can you put up Figure 1,
24 please?
25 BY MR. BUCHANAN:

1      Q   Okay.  Dr. Kronmal, what is that?

2      A   That is a cumulative event rate curve, it's

3   called.  Cumulative because it adds up across time.

4   Events because it's events.  And it's a curve.  And if

5   I could go to the blackboard, maybe I could explain how

6   that curve is drawn.

7      Q   Sure.

8      A   First, these are the axes.  And every time a

9   person has an event, that is, if someone had an MI,

10  like in the graph up ahead that you see there, the

11  curve will go along, there are no events, and then

12  someone has an event, the curve goes up in a step, what

13  is called a step.

14          That's one for the number of events that

15  occurred at that time point divided by how many people

16  were at risk at that time point, in other words, how

17  many people were in the trial still alive and being

18  followed at that particular time point.

19          So one event, say, occurred here, we went up

20  one over whatever the number of people were, say there

21  were a thousand people in study, we would have gone up

22  one-thousandths on the graph.

23          And then we would go along, say there would

24  be another event there, and then maybe another event

25  there, another one there, another one there, and so on,

1   until, finally, you get this curve.  And what you can

2   read off of the curve is the cumulative number of MIs

3   or the proportion of people who had MIs at any given

4   time point.

5          So if you go out to, say, 12 months, that's

6   the time to MI in months at the axes, for the VIOXX

7   group, or what's called rofecoxib, which is the

8   generic -- I think it's the trade name, rofecoxib,

9   you'll see that approximately nine in a thousand people

10  had MIs by the time one year occurred in the study.

11          If you look at the Naproxen group, as you can

12  see, approximately one in a thousand people had an MI

13  by the end of the study.  There were only four MIs in

14  the Naproxen group, and that's why there are four steps

15  in the curve.  If you were to count, there would be 20

16  steps in the curve for VIOXX or rofecoxib.  There would

17  be 20 steps up.

18          Now, you notice that some of the steps are

19  bigger than others.  That's because particularly

20  towards the end of the trial, you don't have very many

21  people still under observation.  So remember, the step

22  size that you take is the number of people at risk --

23  is the number of events, one, in this case, divided by

24  the number of people still at risk.

25          So at the end -- at the beginning, you might

1   have had, say, a thousand people at risk who are still

2   in the study, but by the end, a lot of people had

3   dropped out, they have had events or they had quit the

4   study or died, and maybe at the end, you only have 750

5   people in the study.  So the step size would be 1 over

6   750 at the end.  At the beginning, it would be 1 over

7   1,000, a bigger step size.

8          Further, though it's not shown here, the

9   reliability of the curves are less at the beginning and

10  at the end.  They are less at the beginning because not

11  very many events have occurred, so there is much more

12  variability at the beginning.

13          So we only have, if you look at the very

14  beginning of that curve, say, in the first three

15  months, there were like eight events, seven events,

16  something like that, so our estimate of the risk is not

17  very precise.  But as you get more and more events

18  accumulating, the estimate of the risk becomes more and

19  more precise.  And that's really very important.

20          Plus, at the end, the actual estimate isn't

21  so good because the jump is very dependent on

22  relatively few people still at risk in some cases.  As

23  you will see in some of the other survival curves,

24  there will be big jumps at the end, and that's because

25  there may have been only 50 people still in study at

1   four years to follow up, for example.

2          So the jump size is 1 over 50, whereas the

3   beginning of the study, it may have been 1 over 1,000.

4   But either way, the estimate you get at the end is the

5   proportion of people by that time point who had an

6   event of that kind in the study.

7          And by the way, you can read off from this as

8   well the proportion of people at six months who had an

9   event, the estimated proportion in the two groups, the

10  proportion of people who, in two months, had an event

11  in each group.

12          So if you were talking about the two-month

13  point, there were about -- one, two, three, four,

14  five -- about five events in the VIOXX group and

15  approximately two in the Naproxen group.  So the risk

16  at two months would have been two and a half, 5 over 2,

17  approximately.

18          Now, that is an imprecise number, of course,

19  because there aren't very many events.  It's like our

20  flipping of the coin example.  You don't have much

21  precision when you haven't accumulated very much

22  observation, and the precision gets greater and greater

23  as you go along in the study.

24          So that's basically the idea.  I hope I was

25  clear.  It's not easy to do it under these

1  circumstances.  It is something that is probably an
2  hour and a half lecture in a beginning stats class,
3  so --
4      Q    Thank you, Doctor.
5      A    At the graduate level, at that.
6      Q    Can we go to the next slide, please.
7           Doctor -- I will wait until you get back.
8           Doctor, what's this chart?
9      A    This is a chart showing the mortality in the VIGOR
10 trial.  And, again, what you can see is that there was
11 some variation early on, maybe in the first few months,
12 the first -- less than a month, there were three events
13 in the Naproxen group and none in the VIGOR -- in the
14 VIOXX group.
15          But then you had a series of events very
16 rapidly in the deaths in the VIOXX group.  As you can
17 see, there was probably one, two, three, four, five
18 maybe five events that occurred at about the one-month
19 mark.
20          And then overall, the curve for mortality for
21 VIOXX exceeded that for the Naproxen group by a
22 reasonable margin, not statistically significant,
23 admittedly, but certainly very suggestive that there
24 might be a problem.
25          But when it comes to mortality, there is

1  something that really needs to be emphasized, and that
2  is you don't take risks with people's lives.  You don't
3  need statistical significance to stop a trial based on
4  mortality.  What you need is basically enough evidence
5  that makes you significantly worried that you may be
6  causing deaths.
7           In this trial, not only did we have the worry
8  here, but we also had this extraordinary risk for MI of
9  five-fold.  We had a four-fold risk of serious
10 congestive heart failure.  We had excessive amounts of
11 hypertension in the VIOXX group compared to the
12 Naproxen group.  We had an overall extraordinary
13 picture of a drug that was not safe.
14     Q    Doctor, before we go to the next slide, to be
15 clear, when did the VIGOR study conclude, roughly?
16     A    The dates?
17     Q    Do you remember the year?
18     A    Not the exact year.  It's probably in here
19 somewhere.
20     Q    We'll have a document for you in a little bit
21 and we will refresh your memory on that.
22          What is this Figure 3, sir?
23     A    This shows the same kind of curve for hypertensive
24 adverse events.  And the one thing to note is that the
25 scale on the vertical axis goes up to 15 percent.  So

1  we are now talking about a very fairly common side
2  effect.
3           Now, of course, it's fairly common in the
4  Naproxen group too.  And by the way, Naproxen is known
5  to increase blood pressure, so this is doing worse than
6  another drug that also increases blood pressure.  It's
7  not only -- if you had a placebo group here, almost
8  unquestionably, the risk of new onset hypertension or
9  hypertensive adverse events would be extremely low,
10 because people don't, in a year's time, become
11 hypertensive very often.
12     Q    Doctor, this curve here, this is for -- this
13 is representing people who had a hypertensive event who
14 hadn't had a previous -- who were not hypertensive when
15 they started the trial?
16     A    Yeah.  The way I did it is I broke it down into
17 two groups, those who were not hypertensive at
18 baseline, that is, when they started the trial, and
19 then a second group who were hypertensive at baseline,
20 when they started the trial, because they are different
21 kinds of people, because one are under treatment, the
22 others are not.
23          So these people had their blood pressure go
24 up or they became hypertensive, or they had
25 hypertensive crises that caused them to be

1  hospitalized, various kinds of hypertensive adverse
2  events.
3           And by the way, you notice one sort of
4  strange appearance of this curve is that it goes up in
5  bumps, you know it kind of has a sort of bumpy
6  appearance, and that's because those were roughly the
7  times that people were brought back to their clinics to
8  have their hypertension evaluated.  So in between those
9  times, they could have had a hypertensive adverse event
10 and the investigators wouldn't have known about it
11 because they were not under observation at those times.
12          So the only times they could pick up those
13 events in large part were at the times of examinations.
14 So that first curve you saw was for the people who were
15 not hypertensive at baseline, showing an excess
16 increased risk, and this curve is showing the increased
17 risk which is really substantial of making the person's
18 hypertension worse.  People who were already under
19 treatment for hypertension, now their hypertension
20 actually got worse.
21          And that has substantial implications because
22 in the first place, they're already taking drugs for
23 their hypertension, trying to control it.  Now they
24 take VIOXX, and their hypertension becomes much worse.
25          That would mean that either they would have

1  to up the dose of the drugs they were taking which, in
2  turn, would cause them side effects, almost -- in many
3  cases, or they would have to have had other drugs
4  added, or they would have to change drugs to more
5  potent drugs.  And those more potent drugs would
6  probably be more expensive, would probably have
7  greater -- a worse side effect profile.
8         So in other words, there are consequences.
9  And beyond that, hypertension is a big risk factor for
10 sudden death, for congestive heart failure, for
11 myocardial infarction, and for stroke.
12    Q    All right, Doctor.  I just want to go back to
13 the earlier chart you prepared with me.
14         At some point in time, the results of the
15 VIGOR trial were published in the peer-reviewed
16 literature?
17    A    That's correct.
18    Q    Okay.  Where were they published?
19    A    The New England Journal of Medicine.
20    Q    Okay.  Did you review that publication?
21    A    Yes, I did.
22    Q    You considered it in forming your opinions?
23    A    Yes, I did.
24    Q    Okay.  Can you tell me, though, without me
25 pulling up the charts, can you tell me whether the

1  information reflected -- let's start with the slides.
2  Were there slides or graphs like that that we have
3  shown to the jury in the publication, The New England
4  Journal of Medicine?
5    A    No, there were not.  The fact is, for
6  hypertension, they only made a comment in passing that
7  the hypertension events were similar to what was
8  expected from other NSAIDs, nonsteroidal
9  anti-inflammatory drugs, when Naproxen is an NSAID, and
10 the results are highly statistically different from
11 Naproxen.
12         Further, they went on to say that there was
13 an increase in blood pressure with Naproxen versus -- I
14 mean, for their drugs versus -- VIOXX versus Naproxen
15 of about 5 millimeters of mercury, and then sort of
16 just passed that off as unimportant.  Yet a 5
17 millimeter mercury increase in blood pressure is an
18 extraordinarily important thing, because it will cause
19 some people to become hypertensive that weren't and
20 would cause other people who were already hypertensive
21 to require additional drugs.
22         For congestive heart failure, there was no
23 mention, not a word, in their paper about the risks
24 seen for congestive heart failure.
25    Q    Well, Doctor, let's be fair.  Was there any

1  mention of the risk of suffering a heart attack on
2  VIOXX in that particular publication?
3    A    Yes.  Yes, there was.  It was somewhat
4  misrepresented in that they basically indicated the
5  risk was four.  And why they did that, I don't know.
6  By the time that publication was out, they had the
7  data, and knew the risk was five-fold, but they still
8  put in the paper that it was four-fold.
9         But they didn't actually say it was
10 four-fold.  They actually said that Naproxen reduced
11 the risk of having an MI rather than to say that their
12 drug increased the risk.  And they hypothesized that
13 and displayed the data in that fashion, in a very
14 nonstandard fashion, as a matter of fact.  And I won't
15 go into the details of that, but basically, they put
16 the impression to the medical community that Naproxen
17 was this sort of miracle drug that prevented MIs.
18    Q    Doctor, did you look at the data from the
19 VIGOR trial with respect to heart attacks to examine
20 whether or not, statistically, that made sense, to
21 suggest you could explain the results 20 to 4 on heart
22 attacks by virtue of Naproxen's cardioprotective
23 benefit?
24    A    Yes, I did.  There is extensive data in the
25 literature on the effects of the most important and

1  most effective anti-platelet agent around, which is
2  aspirin.  And that data basically shows for almost all
3  groups of people you can look at, that aspirin reduces
4  the risk approximately by one-third, by .33 percent,
5  for having a heart attack.  This is a five-fold
6  reduction in risk here, not a .33 percent reduction.
7         So I tested the hypothesis that Naproxen was
8  equivalent, was the same, basically, as aspirin.  And
9  in testing that, it's soundly rejected.
10         For this kind of result to have occurred, you
11 would have concluded that Naproxen was far superior to
12 aspirin.  There was no data then and there is no data
13 today that would imply that Naproxen is better than
14 aspirin.  In fact, what data there is today on
15 Naproxen -- there was a recent clinical trial that was
16 stopped, it was Naproxen against placebo --
17    Q    Doctor, I just want to stay focused on your
18 particular statistical analysis for now, okay?
19    A    Sure.  All right.
20    Q    You looked at the relative cardioprotective
21 benefit that aspirin has been found to have in trials,
22 correct?
23    A    That's correct.
24    Q    And you tested whether if Naproxen had the
25 same cardioprotective benefit, could that explain this

1   result?  Is that what you did?

2   A    That's correct.

3         Q    And you found that it couldn't?

4   A    That's correct.

5         Q    Okay.  What about deaths?  Did the company

6   report death data in The New England Journal article?

7   A    I actually don't remember.

8         Q    Okay.

9   A    I just don't remember.

10        Q    We can direct you to your report later.

11  A    Okay.

12        Q    To be clear, congestive heart failure was not

13  reported?

14  A    No, it was not.

15        Q    Hypertension?

16  A    It was reported, but in a way that would not have

17  allowed someone in the medical community to realize how

18  severe the hypertensive side effect profile was.

19        Q    And this particular risk reflected in your

20  Figure 1 was -- first of all, Figure 1 was never in The

21  New England Journal of Medicine?

22  A    No, it was not.  They did not show the actual

23  Kaplan Meier curve for MI.

24        Q    Have you ever see Figure 1 anywhere?  Have

25  you ever seen the company ever put that forth anywhere?

1   A    I don't remember seeing it, no.

2         MR. BUCHANAN:  Okay.  Your Honor, I'm going

3   to move into -- well, why don't -- Do you want to take

4   a break, Your Honor?  Or I can go for another 30

5   minutes.

6         THE COURT:  I don't really care.

7         Does the jury want lunch now or would you

8   rather wait another half hour?

9         Let's keep going.

10        Well, unless you want to break now.  If you

11  do, raise your hand.

12        Let's just go a little longer.

13        MR. BUCHANAN:  Thank you.  Great, Your

14  Honor.

15        THE COURT:  Are you going --

16        MR. BUCHANAN:  I am, Your Honor, but I was

17  going to move the whole stack in.  I can offer them

18  now.  Your Honor, plaintiffs offer P5.0004 as summary

19  charts of the statistical data examined and presented

20  and summarized by Dr. Kronmal by his analysis.

21        MS. SULLIVAN:  Your Honor, they are not on

22  the plaintiffs' exhibit list and they are

23  demonstratives.

24        MR. BUCHANAN:  They are actually summaries,

25  Your Honor, and they are encompassed all within

1   Dr. Kronmal's report that was served some five months

2   ago.

3         MS. SULLIVAN:  It's cumulative, Your Honor.

4   He has testified about it, and they are demonstrative

5   exhibits.  And they also were weren't on plaintiffs'

6   exhibit list.

7         MR. BUCHANAN:  Your Honor, defense offered

8   graphical representations of their trials in their

9   opening statement.  They haven't offered any graphical

10  representations of the particular end point at issue.

11        THE COURT:  This is twelve graphs that you

12  are offering?

13        MR. BUCHANAN:  Yes.

14        MS. SULLIVAN:  We are not saying they can't

15  consider them as demonstratives, they just shouldn't be

16  evidence.

17        MR. BUCHANAN:  They are proper summaries,

18  Your Honor, pursuant to Dr. Kronmal's very specific

19  analysis of their very own data that they have had.

20        THE COURT:  All right.  Keep going.  Let me

21  look at the -- the jury can consider them as evidence

22  at this point.  It's a question of whether they are

23  going to get copies of them in the jury room, and

24  that's something that I will make a decision about over

25  lunch.

1         MS. SULLIVAN:  Your Honor, in terms of

2   considering them as evidence, Dr. Kronmal has not

3   furnished defendants with the basis, the underlying

4   basis of his analysis that make up this demonstrative.

5   We don't know how he arrived at this because he hasn't

6   provided the basis consistent with the evidence rules

7   for this summary.

8         MR. BUCHANAN:  Sir -- I can lay the

9   foundation, Your Honor.

10  BY MR. BUCHANAN:

11        Q    Sir, this particular analysis of the VIGOR

12  data that is reflected on the screens in these figures,

13  where did you get the data from?

14  A    Basically, the file that I used for doing the

15  analysis was -- the file that they listed was a file

16  that they gave to the FDA to summarize the data.  So I

17  basically took their file that they used for their FDA

18  presentations, and used it for the analysis.

19        Q    Doctor, did you use standard methodology in

20  analyzing these particular files?

21  A    Absolutely.  This is absolutely standard for the

22  way you analyze data from clinical trials.

23        Q    Okay.  And the actual underlying data would

24  be voluminous?

25  A    I'm sorry?

1  Q   The actual underlying data from which you
2  generated these graphs would be voluminous?
3  A   Well, you could list it all.  I mean, it wouldn't
4  be incredibly voluminous to list that specific data.
5  No, it wouldn't be.
6  Q   Could you get this type of graphical
7  representation out of looking at lines of events in the
8  tables that you looked at, sir?
9  A   If one wanted to go to that much trouble, you
10  could, yes.
11  Q   You would have to graph it?
12  A   Yeah, by hand.  That would be very time-consuming.
13  Q   Sir, do these accurately reflect the
14  cumulative event rates as demonstrated in your analysis
15  of the underlying -- of the company's underlying data
16  files?
17  A   Assuming that the data files I had are correct,
18  yes.
19      MS. SULLIVAN:  Your Honor --
20      MR. BUCHANAN:  I can go on to the next area.
21  We can take it at sidebar.
22      MS. SULLIVAN:  Your Honor, the issue is that
23  Dr. Kronmal has not provided his analysis.  We don't
24  have his worksheets, his calculations.  He hasn't
25  provided us any information as to how he got to this.

1      MR. BUCHANAN:  Your Honor, all of
2  Dr. Kronmal's files were turned over to defense on hard
3  drives.
4      MS. SULLIVAN:  Not his analysis.
5      MR. BUCHANAN:  All of his hard drives.  You
6  inquired of it during his deposition.
7      THE COURT:  All right.  They had the
8  opportunity to have his data and they also had the
9  opportunity to take his deposition pretrial.
10      The contents of voluminous writings that
11  cannot conveniently be examined may be presented by a
12  qualified witness in the form of a chart, summary, or
13  calculation.  Rule 1006.  This fits Rule 1006, and I
14  will admit it into evidence.
15      MR. BUCHANAN:  Thank you, Your Honor.
16  BY MR. BUCHANAN:
17  Q   Dr. Kronmal, after we got beyond the VIGOR
18  trial, or you got beyond looking at the VIGOR data,
19  what did you look at next?
20  A   Next I went to the meta-analyses that were --
21  because the company had basically used the
22  meta-analysis they conducted afterwards as a defense to
23  basically say that the VIGOR data was not in any way
24  representative of what the drug actually did.
25      So they did what they call the meta-analysis

1  where they took data from all of their mostly very
2  small clinical trials, very, very short-term trials,
3  against different comparator agents, so some would be
4  against Naproxen, some against ibuprofen, some against
5  diclofenac, a few against placebo, and then they
6  basically combined those in trying to get an -- to show
7  overall that there was no excess risk, basically.
8  That was the -- I think the attempt, at least, and to
9  convince the FDA that they didn't have a serious
10  problem, and presumably convince the medical community,
11  as well, that they didn't have a serious problem.
12  Q   Okay, Doctor.  I'm --
13      Actually, why don't we pull up Table 1,
14  please.
15      Doctor, what is this Table 1?
16  A   Table 1 shows for a grouping of studies that were
17  in their data files -- That is, I used a grouping that
18  they had put in their data file.  At the time, I didn't
19  really know what a lot of these studies actually were.
20      This is very early in my analysis of the
21  data, and so I didn't know exactly what all these
22  studies were, but they had grouped their data files,
23  they had a variable that was defined in these one, two,
24  three, four, five, six categories.
25      So what I did, basically, in my report, is

1  display what the relative risks were for each of those
2  groupings that the company had defined.  I didn't
3  define them.  And these were the labels that they gave
4  for those categories.  And --
5  Q   Doctor, looking through these, just to be
6  clear, we see names of trials or indications?  How is
7  this organized?
8  A   It's very unclear to me and it was unclear to me
9  at the time.  Some of these are a whole group of
10  trials, like osteoarthritis was a whole group of
11  trials.  ADVANTAGE was a single trial.  Alzheimer's was
12  two trials.  Rheumatoid arthritis was, again, a whole
13  series of trials.  VIGOR, you already heard about, was
14  a single trial.  Non-rheumatoid arthritis was a group
15  of trials that was a mixed bag of various kinds of
16  trials which included, by the way, some osteoarthritis
17  trials as well.  And some other trials, headache, I
18  think, and back pain maybe.  I'm not sure exactly what
19  all of them were.
20  Q   Okay.  Then you have at the bottom, you have
21  something called overall estimate.  What is that?
22  A   Well, the approach I used was -- By the way, this
23  is for myocardial infarction because that's where the
24  signal was in the VIGOR study, so that was the
25  appropriate end point to focus on, and that's where I

1    put my focus.

2            And basically, what the overall estimate is

3    is a summary estimate of what the risk is based on

4    combining the estimates from all of those trials.

5            Now, you need to remember that, as I

6    explained to you before, that any individual trial or

7    even groups of trials are going to vary.  There is

8    going to be a lot of chance variation in the rates.

9    And you expect when you look at a lot of trials that

10   some of them will show one thing and some of them will

11   show another, just due the chance.

12           And one of the ways we assess that is what's

13   called a confidence interval.  And that basically is

14   saying, how confident are we about where the true value

15   of the risk actually lies?  And so we can sort of say

16   we are not -- but I'm being very loose about how I

17   define this because I can't go into the details, but

18   basically, this says we are 95 percent confident that

19   the risk is somewhere between those two limits that are

20   shown.

21           So if you look, for example, at the one

22   labeled osteoarthritis, we are pretty sure that the

23   risk is somewhere between .24 in any protective to as

24   high as a relative risk of 2.62, which would be against

25   the drug.  And for ADVANTAGE, the estimate is 4.92, but

1    the confidence interval extends from a protection, .55,

2    to an excess risk of 232-fold.

3            In other words, what this shows is that we

4    are not terribly confident about these rates, except

5    for VIGOR, where the rates are all above one.  A

6    risk of one would be no excess risk.  It would be equal

7    in the two groups.  If you have a relative risk of one,

8    it would be equal in two groups.

9            So the only one we are very confident on is

10   not one is VIGOR, but they're all -- the purpose of

11   displaying this table was to show that these are all

12   consistent with the possibility that the relative risk

13   is somewhere close to two.  In this particular

14   analysis, it came out 1.87.

15       Q   Doctor, just so we are clear, when we go

16   through these, the Alzheimer's line there, that was a

17   study that involved VIOXX in treatment of Alzheimer's

18   disease?

19       A   That's correct, versus placebo.

20       Q   Okay.  You have non-rheumatoid arthritis.

21   Are those -- what types of trials are those?

22       A   Those are a mixed bag.  Some of them are

23   osteoarthritis, some of them are not.  Some of them are

24   other things.

25       Q   Did you group them this way or --

1    A   No, I did not.  These were grouped by the company

2    in this fashion.  I just took what was there.

3        Q   Is ADVANTAGE also an osteoarthritis trial?

4    A   Yes, ADVANTAGE is an osteoarthritis trial.  In

5    retrospect, now that I know what these trials are, I

6    don't understand why they grouped them the way they

7    did.  If they wanted to call some group osteoarthritis,

8    they should have included ADVANTAGE and the

9    nonrheumatoid arthritis trials that were

10   osteoarthritis.

11           Why they made it this way, I don't know.  Had

12   they included, of course, ADVANTAGE and the other

13   non-rheumatoid arthritis that were also osteoarthritis,

14   then that relative risk would not be .77 but would

15   almost certainly be above one.  How high it is, I don't

16   know off the top of my head.

17       Q   Doctor, you calculated an overall estimate of

18   the relative risk of heart attacks for patients taking

19   VIOXX compared to patients taking comparator agents,

20   right?

21       A   That's correct.

22       Q   Comparator agents means another study drug

23   that VIOXX was compared to?

24       A   Yes.  There was a wide variety of drugs used here,

25   some of which now are thought to increase the risk of

1    MI also.  So in a sense, this may be above and beyond

2    what those other drugs were thought to do --

3        Q   Doctor, we have --

4    A   -- in some cases.

5        Q   We have an overall relative risk of 1.87.  Do

6    you see that?

7    A   Yes.

8        Q   That means by this analysis, that the point

9    estimate or the specific -- the center of your

10   confidence interval is an 87 percent increased risk?

11       A   That's correct.

12       Q   Okay.  Can you give us some perspective on

13   what it means to -- well, let's talk about what it

14   means to reduce the risk of heart attack.  Are there

15   drugs that help reduce the risk of heart attack, sir?

16       A   Yes, there are.

17       Q   Okay.  What's one of the most lifesaving

18   or -- what's one of the most cardioprotective drugs we

19   know?

20       A   There are probably two that are really strongly

21   cardioprotective, and that is the aspirin and what I

22   call the statins, which lower cholesterol levels.

23   Roughly speaking, the aspirin reduces the risk by about

24   .33.

25       Q   So that's a 33 percent reduction in risk?

1   A    That's right, and this is compared to an 87

2   percent increase.

3        And then, the statins vary from, depending on

4   the patient population, from about a 25 percent

5   reduction in risk for people who are healthy, who are

6   at risk for CHD, and maybe as high as a 30 or 40

7   percent reduction in risk for people who have existing

8   CHD.

9    Q    Doctor, I want to -- let's go to the next

10  slide, actually, and see what this looks like.

11       What's this, sir?

12   A    This is taking all of the data from all of those

13  studies that I showed you on the previous slide, and

14  showing the same kind of curve, this is the Kaplan

15  Meier curve, also called the event rate curve, for MI

16  versus control.

17       Control here means a whole different bunch of

18  drugs, sometimes it was placebo, sometimes it was

19  ibuprofen, sometimes it was Naproxen, sometimes it was

20  diclofenac, and there may be other drugs as well that I

21  don't know about.

22       And as you can see, the pattern is that there

23  is almost an immediate increase in risk that occurs

24  right, you know, within weeks of the people starting

25  the drug, and that it continues on in a linear fashion.

1   identical.

2    Q    Sir, we just have to explain what APTC means.

3    A    The company, rather than focus on MI, where they

4   had a big signal of excess risk, instead, for reasons

5   that I don't understand to this day, decided that they

6   would take a broader end point.

7        And the broader end point they chose was an

8   end point that included myocardial infarction, unstable

9   angina, peripheral vascular thrombosis, pulmonary

10  thrombosis, strokes, hemorrhages.  They had this broad

11  end point that they called the APTC end point.

12       Now that comes from Anti-Platelet Trialist

13  Collaboration.  And that -- there was a group that got

14  together that wanted to combine all of the aspirin

15  studies to try to get an estimate of the benefit of

16  aspirin, the benefit, not the harm of aspirin, but the

17  benefit of aspirin.

18       And what they did was they combined all of

19  the studies they had.  They first looked at MI

20  separately.  They looked at stroke separately.  They

21  looked at peripheral vascular events separately, and so

22  on.  So they looked at all these events separately, and

23  found that aspirin for every one of them reduced the

24  risk, except for hemorrhages, where it increases the

25  risk.

1   So that the composite data from all of their studies

2   basically shows a constant rate of risk associated with

3   taking VIOXX across the entire range of time.

4    Q    Now, sir, the company, you said, I think, did

5   their own meta-analysis, right?

6    A    That's correct.

7    Q    Okay.  Did you ever see one of these charts

8   in anything the company published about their

9   meta-analysis?

10   A    No, I did not.

11   Q    Okay.  Did you ever see anything published

12  that reflected the data from the MI meta-analysis that

13  you did?

14   A    Not in the way I did it, no, I did not.

15   Q    Okay.  Where did you get the data to create

16  this particular chart?

17   A    Well, the company had a file that was entitled

18  meta-analysis.  That was one of the few ones I could

19  actually figure out what it was without delving very

20  deeply.  And in that file were -- in that folder were

21  two files, one called meta-APTC, the other called meta-

22  MI, or it might have been MI-meta.  I'm not sure of the

23  order of the two parts.

24       And I compared the APTC file and the results

25  from that with what they had published, and they were

1        And then -- hemorrhages are bleeds, by the

2   way, and they can be serious bleeds.  There can be

3   bleeds in the brain that are deadly.  There can be

4   bleeds in the gut that are deadly.

5        And then they wanted to have a global

6   estimate of the benefit of aspirin, and I emphasize

7   benefit of aspirin, and so they created this APTC end

8   point.  It was never meant for evaluating the negative

9   side effects of the drug.  It was meant as a global

10  estimate of the benefit of aspirin.

11       For reasons, as I say, that I don't

12  understand, the company chose to use this broad end

13  point rather than MI.  But, they had an analysis plan

14  for the meta-analysis, and included in that analysis

15  plan, they stated that their secondary analysis was

16  going to be MI, that they were going to be a

17  meta-analysis of MI.  And they never presented the

18  meta-analysis of MI anywhere.

19   Q    And this -- when we say meta-analysis of MI,

20  we are talking about a meta-analysis of heart attacks?

21   A    That's right, along the lines that I've done here.

22   Q    Okay.

23   A    Later, however, an independent investigator that

24  had no ties to the company by the name of Juni,

25  J-U-N-I, got data from the FDA website, which was

**EXHIBIT "2"**
**Part B**

**EXHIBIT "2"**
**Part B**

1  basically not the broad data like I had, but, rather,
2  studies of the number of MIs there were in each of the
3  two groups, whatever the drugs that were being used at
4  the time were, and did a meta-analysis.
5         It was published in The Lancet, one of the
6  most prestigious medical journals in world.  And in
7  that paper, he got results that were very, very
8  comparable to my meta-analysis that I've shown here.
9         And he found that the relative risk was about
10 2.3-fold because he included slightly different studies
11 than what the company had done.  I was just trying to
12 replicate the company's approach, although not their
13 exact analyses, because I wasn't interested in the APTC
14 end point.
15    Q    Okay.  So what you did, sir, to be clear, you
16 took the company's data file they had in a folder
17 called meta-analysis?
18    A    That's correct.
19    Q    Okay.  And they had a data file with all the
20 data on just heart attacks?
21    A    Included -- it was called MI, and that's what it
22 included.
23         MR. BUCHANAN:  Okay.  Your Honor, I'm getting
24 ready to move on to another area.
25         THE COURT:  Let's break now.

1         We will ask the jury to report back at 1:30
2  and not discuss the case during the break.  See you
3  back at 1:30.
4         (The jury left the courtroom at 12:20 p.m.)
5         (A luncheon recess was taken from 12:21 p.m.
6  to 1:30 p.m.)
7         THE COURT:  You can bring the jury in.
8         MS. SULLIVAN:  Your Honor, before we do that,
9  I'm obviously very concerned about time, given
10 plaintiffs' representation that Dr. Kronmal has to
11 leave today, and I just don't want to be slammed
12 against the clock with cross-examination.  Obviously,
13 we need adequate time to cross the witness.
14         MR. BUCHANAN:  Your Honor, I think I will be
15 done by 2:15.
16         THE COURT:  Okay.  Will that be okay?
17         MS. SULLIVAN:  I'm not sure, Your Honor.  I
18 think that's cutting it close if we give the jury their
19 normal break.  We will do the best we can.  I just want
20 to let you know, Judge.
21         MR. BUCHANAN:  If necessary, Your Honor,
22 could we -- could we work a few extra minutes today if
23 we need to accommodate the witness?
24         THE COURT:  I'm always for it, if you want
25 to, but the jury can't always stay and staff can't

1  always stay.  We'll see what we can do.
2         You can bring the jury in.
3         MR. BUCHANAN:  Speed science.
4         THE COURT:  Speed it up.
5         You don't want the jury spending all the time
6  looking at the back of your jacket.
7         MR. BUCHANAN:  I get style points from him.
8         MR. SEEGER:  Yeah, like I have style.
9         THE COURT:  Have you guys been living in a
10 hotel for a week?
11         MR. SEEGER:  Yeah.  Bad, bad.
12         Not together.  We have separate rooms.
13         (Laughter.)
14         MR. SEEGER:  Since she's typing, Judge.
15         THE COURT:  You can bring the jury in.
16         (The jury entered the courtroom at 1:35 p.m.)
17         THE COURT:  You can be seated.
18         You can proceed, counselor.
19 BY MR. BUCHANAN:
20    Q    Dr. Kronmal, I'm going to try and focus
21 pretty quickly on the remainder of the analyses that
22 you did.  We are a little squeezed on time, so let's
23 try and focus in particular on the highlights.
24         Can you pull up Table 2, Ben?
25         Dr. Kronmal, can you turn to that in your

1  set?
2         Dr. Kronmal, you also looked at what we call
3  the Alzheimer's trials, correct?
4    A    That's correct.
5    Q    Okay.  What were those trials?
6    A    There were two trials in Alzheimer's disease.
7         One was in patients who already had
8  Alzheimer's, and it was an attempt to see if using
9  VIOXX would decrease the progression of the disease.
10        The other was in people who had mild
11 cognitive imparment but did not have Alzheimer's
12 disease, and the purpose of that study was to see
13 whether VIOXX would prevent them fro becoming diseased
14 with Alzheimer's.
15    Q    Did the VIOXX prevent people from getting
16 Alzheimer's disease, sir?
17    A    No.  On the contrary.  When the trial was ended,
18 there was a 46 percent excess risk of Alzheimer's in
19 those taking VIOXX compared to those taking placebo.
20    Q    Was that due to chance?
21    A    It was statistically significant.
22    Q    Was that particular -- did that particular
23 trial have a number?  We track things by protocol
24 numbers.
25    A    Yeah.  It was Study 78, so called.

1    Q.  Okay.  I want to focus on the Table 2

2  analysis that you have up here, sir.  These are, again,

3  some of those, I called them end points that you

4  examined for some of the other trials, correct?

5    A.  That's correct.

6    Q.  Okay.  First item on your line there is MI,

7  that's heart attacks, right?

8    A.  That's correct.

9    Q.  What was the relative risk?

10    A.  1.63.

11    Q.  That wasn't statistically significant in

12  those trials, though?

13    A.  That's correct.

14    Q.  Okay.  But you also looked at something else,

15  didn't you?

16    A.  I look at CHD, which was the combination of

17  myocardial infarction and sudden death.

18    Q.  Okay.  And what did you find for that one?

19    A.  And there, the relative risk was 2.04.

20    Q.  And, sir, was that statistically significant?

21    A.  Yes, it was, the .025 level.

22    Q.  Can you remind us what it means to have a

23  relative risk of 2.04 for what you call CHD?

24    A.  It's a doubling of the risk.  A little over double

25  the risk.

---

1    Q.  Does that mean that patients who are taking

2  VIOXX, 25 milligrams, in the Alzheimer trials had a two

3  *times greater risk of either heart attack or sudden*

4  *death?*

5    A.  That's correct.

6    Q.  Okay.  I have that as MI there, so I'll put

7  CHD on this side.  RR, that's relative risk, right?

8  RR?

9    A.  Yes.

10    Q.  What did you have for MI?

11    A.  1.63.

12    Q.  And for CHD?

13    A.  2.04.

14    Q.  Okay.  And I will just put a little asterisk

15  here because this one -- that MI rate wasn't

16  statistically significant, you said.

17    A.  That's correct.

18    Q.  CHD is a measure of risk to the heart?

19    A.  Well, it's -- in old people, as I mentioned

20  earlier, it's frequently not possible to tell whether

21  someone who had a sudden death might not have also had

22  an MI prior to that because they are found mostly dead

23  in their sleep, and the next morning, someone finds

24  them dead.  *You can't really tell what happened to*

25  *them.*  All you know is that death was sudden.  And the

---

1  likelihood is that many of those were MI.

2    *In fact, in Study 78, when they actually*

3  published the data in 2005, for reasons that I don't

4  understand again, at this point, they had reclassified

5  a lot of the sudden deaths to MIs because the data

6  didn't correspond to what was in their files currently,

7  which for reasons, again, I don't understand.

8    Q.  Sir, I just want to keep you focused on your

9  chart here.

10    A.  Sure.

11    Q.  We are a little limited on time.

12    You also listed something called CHD

13  mortality.  What's that?

14    A.  Those were deaths that were due to either an MI

15  that was fatal or a sudden death, which is always

16  fatal, essentially, unless they manage to resuscitate

17  the person, which is very rare.

18    So the striking thing here is that that

19  relative risk was 4.33, that means there was four-fold

20  increased risk of dying of a heart attack, basically,

21  in the Alzheimer's studies.  That's an extraordinary

22  risk.

23    Q.  Was that *statistically significant?*

24    A.  Highly statistically significant at the .005

25  level.  Extremely unlikely to be due to chance.

---

1    Q.  And you also analyzed something called

2  all-cause mortality?

3    A.  That's correct.

4    Q.  What's that?

5    A.  That's basically people -- all of the deaths,

6  every last one of them that occurred.

7    Q.  That includes people dying from a fluky event

8  as well as people dying from a heart attack?

9    A.  All causes.

10    Q.  Okay.  Is that an accepted end point in

11  science, sir?

12    A.  Absolutely.  It's -- you always -- always in

13  clinical trials, monitor all-cause mortality because

14  there is no misclassification there.  That is, if a

15  person is dead, they're dead.  You can't -- there is

16  not a possibility that you made a mistake, that you

17  misclassified the event.  They're dead.

18    And, further, it's quite possible in some

19  drugs, not in this one, but in some drugs for the drug,

20  for example, to increase the risk of death from one

21  cause, and decrease the risk from another, so that

22  overall, it comes out equal.  You know, it didn't have

23  any overall global effect.  In this drug, there was no

24  compensating benefit from some other cause of death;

25  rather, the overall mortality was statistically

1   significant at the 001 level, and --
2        Q   Excuse me.  You said to the 001 level.  Just
3   remind us.
4        A   To one in a thousand level --
5        Q   So there is a one in a thousand odds that
6   that was due to chance?
7        A   Well, that's one way of saying it.  More
8   precisely, that it was unlikely because of the -- that
9   it was a chance finding.
10       Q   Okay.
11       A   And I do also want to comment that that is
12  extraordinary to see a trial go on to completion that
13  has excess mortality of that magnitude.  And, in my
14  experience, I don't know of another trial where that
15  happened, where it wasn't stopped because the mortality
16  was -- was unacceptable.
17       Q   Was there a DSMB on these Alzheimer's trials
18  you're talking about?
19       A   No, there was not.
20       Q   Who was protecting the patients in the
21  Alzheimer's trials?
22       A   I believe it was Merck employees.
23       Q   Okay.  Did Merck just learn about this
24  mortality issue in 2005?  You said it was published in
25  2005?

1        A   2001.
2        Q   Okay.  Prior to the time my client had his
3   heart attack?
4        A   That's -- if you say so, yeah.
5        Q   Okay.  Could we pull up another slide,
6   please.
7        A   Could I make one last comment on this, if it's all
8   right?
9            In April of 2001, they should have stopped
10  that trial.  It was scientifically, totally wrong not
11  to have stopped that trial.  They had evidence that
12  they were potentially killing people, and they let that
13  trial go on for another two years, to 2003.
14           Had there been a DSMB, that trial would have
15  been stopped.  There is absolutely no question in my
16  mind.
17           They had an obligation to report that finding
18  to the FDA, and they had an obligation to report it to
19  the IRBs from the individual institutions.
20           They put at risk the people who were still in
21  that trial and the people who stayed in it from then
22  on, as well as tens of thousands of people who were
23  taking the drug who were elderly in the general
24  population.  They did not do that.
25           To me, that was scientific misconduct.

1        A   That is correct.
2        Q   Did Merck just learn about this mortality
3   issue in 2005?
4        A   No.  The statis- -- one of the -- the statistician
5   that was assigned to the Alzheimer's study in April of
6   2001, did analyses that showed that in both of the
7   clinical trials that were going on, Study 78 and 79 --
8   91, that there was a significant excess mortality
9   associated with the use of VIOXX, and the relative
10  risks were over two for mortality, both statistically
11  significant in both studies.  And this was -- this was
12  with only a year of follow-up -- 91 was complete at the
13  time.  78 was still ongoing.  And 78 had another three
14  years to run almost at that time.  And yet they had
15  data from two studies, both significant, about the
16  point of 01 level.
17       Q   One in a hundred?
18       A   One in a hundred, for both.  Combined, they were
19  less than .001.
20       Q   So that's a one in a thousand chance that the
21  combined number --
22       A   That's correct.
23       Q   -- was a fluke?
24       A   That's correct.  And that was in April.
25       Q   April of?

1        Q   Okay.  Let's go to the slide, sir.
2            You called these Kaplan Meier curves before.
3        A   Yeah.
4        Q   These are just event rate curves?
5        A   That's correct.
6        Q   That's what they may be known as in the
7   scientific community?
8        A   That's correct.
9        Q   Okay.  What's this one show?
10       A   This shows the overall total mortality.
11       Q   Okay.  And this is, again, all what you
12  called all-cause mortality?
13       A   That's correct.
14       Q   Okay.  And this is the one that may have some
15  of the deaths due to, say, noncardiovascular causes in
16  here, right?
17       A   Certainly.
18       Q   But, again, still a standard way of analyzing
19  data?
20       A   Absolutely.
21       Q   Is this the way you do it for the NIH?
22       A   Yes.
23       Q   Is this the way you do it when you work for
24  other pharmaceutical companies?
25       A   Correct.

1    Q    Is this the way you would have done it for
2  Merck, if they had called you?
3    A    Yes.
4    Q    Okay.  Next slide, please.
5         What's this one, sir?
6    A    This is the CHD mortality that I referenced
7  before.  It's people who died of a myocardial
8  infarction or of sudden death.
9         And, as you can see, this is where the
10  four-fold increased risk comes from.  There is
11  substantially increased risk of dying of CHD in the
12  Alzheimer's trial.
13         And, by the way, notice that at one year, is
14  when they should have stopped these trials, at one year
15  of follow-up.  You'll notice that the curves actually
16  continue to widen, which means they were accumulating
17  additional deaths on the treatment.  Those people who
18  died on treatment here might very well not have died,
19  had they not been kept on VIOXX.
20         The trials should have been stopped.
21    Q    Doctor, I just want to understand the way you
22  did this analysis.  You did something called an
23  intention to treat analysis?
24    A    That's correct.
25    Q    Is that a standard way of analyzing clinical

1  trial data?
2    A    It is the standard way.  It's what the FDA
3  requires.
4         And what intention to treat means is that all
5  people are randomized, are included in the analysis.
6  And that's true whether they're still on the drug or
7  not.  They're all included.
8         And there is a distinct reason for doing
9  that, is that the detrimental effects of the drug may
10  be delayed.  They may be much in the future.
11         For example, the drug could have damaged the
12  heart in some way, but the person didn't know it was
13  damaged, and then six months, a year later, they die of
14  the effects of the drug.
15         It could have damaged the kidneys.  It could
16  have damaged the vessels that feed the heart.  All of
17  those damages could have taken place while they were on
18  the drug.  Later when they were off, the actual event
19  that kills them occurs.
20         And that is not uncommon with drugs.  I mean,
21  some drugs, the effects of the drugs are not seen for
22  years, until after the person has taken a drug.
23    Q    Doctor, are these levels of all-cause or CHD
24  death mortality common in your experience in dealing
25  with drugs?

1    A    No, because -- currently, all -- basically, almost
2  all studies done have a DSMB -- except for this one,
3  apparently.  And no DSMB would have allowed a study of
4  this kind to go on.  Once that yearly data came in.  It
5  would have been stopped.  There is no question in my
6  mind.  You cannot risk people dying in clinical trials.
7  You just can't do it.  It's not fair to the people who
8  risk -- put their lives at stake in those trials.
9    Q    And, Doctor, just to speak in terms of
10  people's lives, each of those little steps going up in
11  the orange curve or the red curve, are those lives?
12    A    Those are lives.  Those are people who died.
13    Q    So if the trial should have been stopped at
14  one year, that excess number of steps going up over the
15  green step are the number of people whose lives could
16  have been saved, had the trial been stopped?
17    A    Some of them.
18         MS. SULLIVAN:  I object, Your Honor.  This is
19  really going -- this calls for speculation.  This is
20  way beyond this witness's expertise.  This is a
21  statistician.  He is not an expert on this kind of
22  thing.  He is not a physician, he is not a clinician,
23  he is not a medical person.  He is a statistician.  And
24  they have taken it way beyond his area of
25  qualifications and we object, Judge.

1         MR. BUCHANAN:  Your Honor, this is how
2  clinical trials get analyzed and how they are done.
3  Statistically significant results.
4         THE COURT:  He testified that he is an expert
5  in the field of clinical trials, how they are analyzed,
6  and how they are statistically -- how their results are
7  statistically interpreted.  I'm going to allow it.  The
8  objection is overruled.
9  BY MR. BUCHANAN:
10    Q    Doctor, let's move on to the next trial that
11  you analyzed.  Next slide, please.
12         Actually, Doctor, you highlight in this
13  table, and we are just going to go through it quickly
14  because we're squeezed on time, but you highlighted
15  some anomalies between the data that you looked at in
16  the Alzheimer's data file between the company's
17  presentation to the FDA?
18    A    Yeah.  When -- one of the ways I tried to check
19  what I did was to compare it to -- what was in the data
20  files to what was reported to the FDA.
21         And in 2005, or just before 2005, they
22  reported the data that's shown on the right-hand side.
23  And what you will notice is that the fatal events
24  that -- from the data file showed six fatal MIs versus
25  one VIOXX versus placebo -- versus placebo.  They

1   reported to the FDA in that 2005 hearings two VIOXX and

2   one placebo.

3          For sudden cardiac death, the data files

4   showed 12 versus 4. They reported 8 versus 4.

5          My guess is that -- although it's just a

6   guess -- that they didn't report the ones that were off

7   treatment at the time they had their events and, again,

8   that's inappropriate. It's -- the attempt to treat is

9   what the FDA expects, and to report this was misleading

10   the FDA and it was misleading the advisors who were

11   trying to make decisions.

12          MS. SULLIVAN: Again, Your Honor, I'm going

13   to object and move to strike. Dr. Kronmal is not an

14   expert in FDA regulations and FDA regulatory process.

15   Again, they are proffering him way beyond his area of

16   expertise on this issues.

17          MR. BUCHANAN: Your Honor, he is reporting on

18   the accuracy of the data that was reflected in the

19   information to the FDA. This was well within the

20   disclosure that went to defense counsel. They had an

21   opportunity to raise any issues relating to this and

22   they didn't.

23          THE COURT: He specifically testified that he

24   worked with the FDA and --

25          MS. SULLIVAN: No, I'm sorry, Judge.

1          THE COURT: He didn't work for them.

2          MS. SULLIVAN: He never worked at the FDA.

3          THE COURT: He was on an advisory board.

4          MR. BUCHANAN: He was actually the chair of a

5   cardiorenal advisory committee, well, for one year, and

6   he was on the committee for three others.

7          MS. SULLIVAN: Your Honor --

8          THE COURT: I realizehe wasn't an employee of

9   the FDA --

10          MR. SEEGER: Right.

11          THE COURT: I'm going to allow it, counsel.

12   You can bring in your own testimony that contradicts

13   what he says and/or cross-examine him on it, but it's

14   up to the jury the evaluate it

15   BY MR. BUCHANAN:

16      Q   Could we go to the next slide, please.

17          You also analyzed the trial known as APPROVe,

18   correct?

19      A   That's correct.

20      Q   What kind of trial was APPROVe?

21      A   It was a trial that looked at whether VIOXX would

22   prevent colon polyps, which is a precursor to colon

23   cancer.

24      Q   And, Doctor, we're looking at the MI event

25   curve?

1      A   That's correct.

2      Q   You generated this?

3      A   That's correct.

4      Q   Okay. You generated it from data files you

5   got from the company?

6      A   That is correct.

7      Q   Through plaintiffs' counsel?

8      A   That's correct.

9      Q   Okay. What's this curve show?

10      A   Well, this shows, basically, the similar results

11   to what was being seen in all the trials, that the MI

12   rate increased at a relatively linear rate across time,

13   maybe with a very slight increase after about

14   two-and-a-half years, but you can't really look at

15   these curves and focus on any specific feature of them

16   because there is so much variability in it and the

17   human eye is such that you always pick up patterns.

18   But the overall picture is that the relative risk was

19   increasing with time. I mean, it was about -- it was

20   constant with time, and the way you can tell is whether

21   or not a straight line would fit those curves fairly

22   well. And a straight line does -- is about what you

23   would expect, given the fact that was there is this

24   variable in these curves.

25      Q   I realize, Doctor, when you look at the --

1   there is a tendency to just do it with your eye, but

2   did you run statistical tests on this to determine --

3      A   Yes. I tested the hypothesis that the rate was

4   constant, basically, the difference in the relative

5   rates between the two treatments was constant over

6   time. And the test did not reject that hypothesis.

7   That doesn't mean it's necessarily true. It just means

8   there is not enough data to say that there is a

9   difference in rates with time. In other words, you

10   don't reject the hypothesis that it's constant with

11   time.

12      Q   So, Doctor, then, in that circumstance, what

13   is the overall risk then of heart attack on VIOXX as

14   shown in the APPROVe trial?

15      A   It's -- I have to look at my report -- 2 for the

16   APPROVe trial, from my recollection.

17          It's 2.07 is the relative risk. And it's

18   significant at the .05 level.

19      Q   You said that was statistically significant?

20      A   Yes, at the .05 level?

21      Q   Doubling of risk of heart attacks, again, on

22   VIOXX?

23      A   That's correct.

24      Q   Okay. Did you also do a CHD calculation for

25   APPROVe?

9/22/2005 Kronmal - Direct & Cross

1   A   Yes, I did. CHD being MI and sudden death. There
2   the relative risk was 2.17. And that was also
3   statistically significant now at the 025 level -- .025
4   level.
5       Q   Looking at this chart, Doctor -- I have been
6   taking notes as we have been going along. Did you get
7   consistent results across all these trials?
8   A   Relatively. I mean, it's what you'd expect with
9   clinical trials, that they'll -- that the rates will
10  vary, the relative risks will vary, because there is
11  variability. That's what I was telling you about human
12  beings and being variable.
13      And chance plays a role. Just like if you
14  were to gamble here, chance is going to determine what
15  happens to you, to some extent, and skill may play a
16  role, but the point is it's very -- you would expect to
17  have variation to occur, and these results are all
18  consistent with the relative risk that exceeds two.
19      Q   Okay, Doctor. If we go through these time
20  lines, VIGOR was 2000?
21  A   That's right.
22      Q   The meta-analysis was in 2000?
23  A   2000 -- 2001 maybe. I'm not sure exact dates.
24      Q   Okay. Are you able to date your Alzheimer's
25  analysis?

9/22/2005 Kronmal - Direct & Cross

1   A   Well. Alzheimer's was complete in 2003. So,
2   presumably, that's when the data was generated. But,
3   of course, they knew that they had an excess risk as
4   early as 2001.
5       Q   When in 2001?
6   A   April, 2001.
7       Q   Okay. And then APPROVe, that's more recent?
8   A   That was just this year or just -- well, actually,
9   just a little earlier than last year -- late last year.
10      Q   Can we go to the next slide?
11      This is your CHD Chart?
12  A   Yeah, for APPROVe, that's right.
13      Q   What do those lines tell you?
14  A   Basically the same thing, that the risk is going
15  up at a pretty much linear -- that the curves are
16  pretty much linear, which means that the risk is
17  relatively constant across time.
18      Q   Okay. APPROVe with also a placebo-controlled
19  trial?
20  A   That's correct.
21      Q   Okay. There were two other
22  placebo-controlled trials the company was doing that
23  were terminated when the APPROVe trial terminated,
24  right?
25  A   That's my understanding, yes.

9/22/2005 Kronmal - Direct & Cross

1       Q   Do you know the names of those two?
2   A   VIP and VICTOR, I believe.
3       MR. BUCHANAN: 1.1123.
4       THE COURT: Counsel, the jury has indicated
5   they can't see your board.
6       MR. BUCHANAN: Oh, I'm sorry. All my great
7   artwork, I'd hate to hide it. I think I'm a little too
8   big for this place.
9       MR. BUCHANAN: Your Honor, may I approach the
10  witness?
11      MS. SULLIVAN: Your Honor, I'm sorry. Can we
12  have a sidebar?
13      THE COURT: Sure.
14      (The following transpired at sidebar.)
15      MS. SULLIVAN: Your Honor, I believe he is
16  about to go into two studies that were not in his
17  report and that he hadn't reviewed at the time of his
18  deposition, and I object.
19      MR. BUCHANAN: They produced it to us two
20  weeks ago.
21      MS. SULLIVAN: No, it was produced in July
22  and I will give you information --
23      MR. BUCHANAN: No. You want to see it?
24      MS. SULLIVAN: It was produced in July.
25      MR. BUCHANAN: Was it produced in July?

9/22/2005 Kronmal - Direct & Cross

1       MS. SULLIVAN: That's the update.
2       MR. BUCHANAN: August --
3       MS. SULLIVAN: That's still a month ago.
4       MR. BUCHANAN: I got it two weeks ago. I
5   want to know why I had to wait until two weeks ago.
6       MS. SULLIVAN: You didn't give a supplemental
7   report. You didn't give any notice this witness was
8   going testify --
9       MR. BUCHANAN: He saw it when he got into
10  town last night so you opened on VIP and VICTOR and
11  said you're not going see these from plaintiffs'
12  counsel. I'm happy to show them.
13      MS. SULLIVAN: But you -- we gave notice that
14  our expert would talk about this. You did not.
15      MR. BUCHANAN: You did? Where? Where?
16      THE COURT: Do you have anything saying you
17  are going to talk about it?
18      MS. SULLIVAN: Our expert?
19      THE COURT: Yeah, in your expert report or --
20      MS. SULLIVAN: I'm not sure if it's in the
21  report, Judge, but Mr. Buchanan deposed our expert at
22  length on these studies --
23      MR. BUCHANAN: A January -- a January e-mail.
24  I'm happy to show the January e-mail. He has seen
25  that. That was produced here.

9/22/2005 Kronmal - Direct & Cross

1    MS. SULLIVAN:  But here is my issue, Judge.
2  He was deposed just, what, two, three weeks ago and --
3    MR. BUCHANAN:  Five weeks ago.
4    MS. SULLIVAN:  This was produced in plenty of
5  time before his deposition and he didn't talk about it
6  and he said --
7    MR. BUCHANAN:  If that's dated August 8th to
8  the FDA, when do you think we got it, Your Honor?
9    MS. SULLIVAN:  You've got to give some notice
10 your witness is going to talk about it -- you take a
11 deposition or not.
12    MR. BUCHANAN:  Counsel, please.
13    MS. SULLIVAN:  You just decide --
14    MR. BUCHANAN:  She opened on it and showed
15 the slides.
16    THE COURT:  Are you going to use these
17 things?
18    MS. SULLIVAN:  Yes, Your Honor.  He --
19    THE COURT:  Do you have a letter?
20    MS. SULLIVAN:  He deposed our expert at
21 length on it, at Dr. Gaziano's deposition in August.
22    MR. BUCHANAN:  I just got these.  I didn't
23 have it.  I couldn't --
24    MS. SULLIVAN:  This is a supplement.  There
25 was a prior copy, a prior version.

9/22/2005 Kronmal - Direct & Cross

1    MR. BUCHANAN:  Diane, this is your VIP and
2  VICTOR letter.  We got it about two weeks ago, after
3  repeated requests from me.
4    MS. SULLIVAN:  It was just finished.  Those
5  are preliminary numbers produced in July.
6    MR. BUCHANAN:  This would be a real sword and
7  shield.
8    MS. SULLIVAN:  You have got to give notice
9  your people are going to talk about this stuff.  You
10 don't just spring it in the middle of trial.
11    MR. BUCHANAN:  Just stop.
12    THE COURT:  What's good for one side is good
13 for the other.  If you don't want to use something that
14 just came out -- one of the ways we can resolve this is
15 have neither side use it because it just came out in
16 August.  The other way we can do it is to let both
17 sides comment on it.
18    MR. BUCHANAN:  Look, I got an e-mail --
19    THE COURT:  You did not depose him on this
20 document.
21    MR. BUCHANAN:  No.
22    THE COURT:  You deposed him on?
23    MR. BUCHANAN:  In January, 2005.
24    MS. SULLIVAN:  Yeah, about the results of
25 these two studies.

9/22/2005 Kronmal - Direct & Cross

1    MR. BUCHANAN:  No, about --
2    THE COURT:  An e-mail is a lot different than
3  the data.
4    MR. BUCHANAN:  It is.  Don't you think she is
5  going to cross-examine him -- didn't you see VIP,
6  didn't you see VICTOR, never saw that.  We did see it.
7    MS. SULLIVAN:  What, last night?
8    MR. BUCHANAN:  I just got it, Diane, in the
9  middle of trial.
10    MS. SULLIVAN:  Yeah, but you had it in July.
11 That is an updated version.
12    MR. BUCHANAN:  I didn't have it in July.  I
13 don't know what you're talking about, I had it in July.
14    MS. SULLIVAN:  I can show you pages and pages
15 of Gaziano's deposition where you went through it with
16 him.
17    MR. BUCHANAN:  I went through an e-mail in
18 January.
19    THE COURT:  That's all you discussed with him
20 is an e-mail?
21    MR. BUCHANAN:  I think so.  Pull it up.
22    MS. SULLIVAN:  One second, Judge.
23    MR. BUCHANAN:  I'll get the e-mail.
24    MS. SULLIVAN:  Your Honor, we will agree it
25 comes out as to both of us.

9/22/2005 Kronmal - Direct & Cross

1    THE COURT:  What?
2    MS. SULLIVAN:  We'll agree it shouldn't come
3  in as to either of us.
4    THE COURT:  Okay.  It's out as to everybody.
5    MR. BUCHANAN:  Okay.  Then I will use my
6  e-mail.  Of course, they had plenty of notice.
7    MS. SULLIVAN:  That's not fair.
8    MR. BUCHANAN:  You had plenty of notice on
9  this.
10    MS. SULLIVAN:  You want --
11    MR. BUCHANAN:  You are the one who wants to
12 keep the study out, Diane.  You had the data a lot
13 longer than me.  You put two charts in your opening
14 statement, plus -- the one chart you are not going the
15 see is VIP.  I'm happy to address it.  I don't want to
16 get --
17    MS. SULLIVAN:  You had this --
18    MR. BUCHANAN:  -- for not having addressed
19 VIP.  That's the data for VIP in that packet, P-1123.
20    MS. SULLIVAN:  You had this since July,
21 David.  You could have given us notice.
22    MR. BUCHANAN:  Diane, you are just making
23 that up.
24    MS. SULLIVAN:  No, I'm not.
25    MR. BUCHANAN:  You absolutely are.

9/22/2005 Kronmal - Direct & Cross

1    MS. SULLIVAN:  And you deposed our expert at
2  length about it.
3    MR. BUCHANAN:  No, I deposed him on this
4  document right here.  Pull the transcript.
5    MS. SULLIVAN:  I agree, Your Honor, it should
6  come in for both or not for both, and I agree we had no
7  notice, but you can't have part of the study and not
8  all of the study coming in.
9    MR. BUCHANAN:  This was served to you with
10  reliance -- you got a copy of this as reliance
11  materials with this witness.
12    THE COURT:  This was provided to her?
13    MR. BUCHANAN:  Yes, that was produced back as
14  reliance materials.
15    THE COURT:  Was it produced as something he
16  was relying on?
17    MR. BUCHANAN:  Yes.
18    MS. SULLIVAN:  Why -- well, if that's true,
19  why in his report is it not mentioned and why, when he
20  was deposed, he said he didn't have it yet?
21    MR. BUCHANAN:  Because he --
22    MS. SULLIVAN:  Three weeks ago, he said he
23  hadn't seen it.
24    MR. BUCHANAN:  Your Honor, there is a
25  distinction here.  He is the guy who worked at SAS

---

9/22/2005 Kronmal - Direct & Cross

1  data, he produced that two weeks ago, he hasn't
2  analyzed any of that.  All he did was look at the
3  report.
4    What he said was I have been waiting for the
5  VIP and VICTOR data.  I was trying to get it for him.
6  We didn't get it in time to use it in trial.  He didn't
7  have time to look at that data.  All I can do is go --
8    MS. SULLIVAN:  That's fine.  Let him use it.
9  That's fine.  Let it all come in.  That's fine.
10    MR. BUCHANAN:  Are you sure?
11    MS. SULLIVAN:  Yeah.  That's fine, Judge.
12  Let it all come in.
13    (Sidebar concluded.)
14  BY MR. BUCHANAN:
15    Q   Doctor, I'm going to pass you what we are
16  marking as P.1123.  Doctor, can you identify that
17  document for the record, please?
18    A   Yeah.  These are the reports for the VIP and the
19  VICTOR study, and they are dated August, 2005 -- August
20  8, 2005.
21    Q   Sir, I would like to direct your attention to
22  Page 22 of the first document.
23    MR. BUCHANAN:  Any objection to showing him
24  the page?
25    MS. SULLIVAN:  No, no objection.

---

9/22/2005 Kronmal - Direct & Cross

1    MR. BUCHANAN:  Thank you.
2    THE WITNESS:  Okay.
3  BY MR. BUCHANAN:
4    Q   This is the table from the VIP trial,
5  correct?
6    A   That's correct.
7    Q   What's the VIP trial?
8    A   I'm not sure of the details of the VIP trial.
9  It's -- I have not looked at these trials because we
10  didn't have the data until maybe two weeks ago, three
11  weeks ago.
12    Q   Sir, did -- did that trial finish?
13    A   I believe it was stopped when APPROVe was stopped.
14    Q   Okay.  There was another trial that was also
15  being done at the same time, right?
16    A   Yeah.  That was VICTOR.
17    Q   Did that trial finish?
18    A   No, I believe it was stopped also early.
19    Q   Okay.  Looking up on the screen or in your
20  hand, I want to keep track of how many heart attacks
21  were on VIOXX versus placebo in this particular trial.
22  It didn't complete, you said, right?
23    A   That's correct.
24    Q   Okay.  VIP, how many heart attacks?
25    A   It isn't what you call heart attacks, but if you

---

9/22/2005 Kronmal - Direct & Cross

1  just add up MI, fatal MRIs and sudden cardiac death,
2  you would have six on --
3    Q   Well, is that CHD, sir, or is that heart
4  attacks?
5    A   Heart attacks would include acute MI at the very
6  top line.  If you add those up, you would get six --
7  seven, rather -- no, six.
8    Q   Six heart attacks?
9    A   Right.
10    Q   Okay.  And is that on placebo?
11    A   That was placebo.
12    Q   Okay.  That was placebo there.
13    A   If you add up the same thing for the rofecoxib or
14  VIOXX, you'd get six as well.
15    Q   Okay.  How about CHD, sir?
16    A   Then it's total -- which includes unstable angina,
17  that would be a total of five, six -- eight -- well,
18  it's up at the top line -- it's eight versus ten.
19    Q   So cardiac events are --
20    A   Are cumulative of those, too.  The eight versus
21  ten.
22    Q   Okay.  And that's eight on placebo and ten on
23  VIOXX?
24    A   Right.
25    Q   How about using your same definition of CHD

```
 1   that you used for your earlier analysis, without
 2   unstable angina, what would the numbers be?
 3   A    Well, that's what you already had.  It's the six
 4   versus six.
 5        Q    Okay.  It's the same?
 6   A    It would be the six versus six.
 7        Q    Okay.  Actually, there is five heart
 8   attacks -- I have a heart attack column, and I guess
 9   you can't see it.  Maybe that's my problem.
10   A    There is five acute MIs, one fatal, and then
11   that's all for VIOXX, and then there is also six, if
12   you count them, for rofe- -- for placebo.
13        Q    Okay.  Can you turn to Page -- there is
14   little numbers in the corner -- the numbers that end in
15   441, lower right corner.
16        Let's do the VICTOR data.
17   A    I'm not sure what number you are referring to.
18        Q    Here you go.  I can pass you mine.
19   A    Here it is.  You are talking about the VIP
20   numbers?
21        Q    Yes.  You want to just look at mine, sir?
22   It's not highlighted.  There you go.
23   A    It's on the screen here, so I didn't have to look
24   at it.  There, you can have it back.
25        Q    Thanks.  All right.
```

```
 1        All right.  Can you tell me how many heart
 2   attacks on VIOXX in this particular trial?
 3   A    Well, there are a total of three in placebo, and
 4   there is 11 -- 12 -- no, actually 14 -- let's see --
 5   11, 14 -- some of these may have more than one event
 6   because they don't add up, so it's a little hard to
 7   tell.
 8        Q    Okay.  So some of these --
 9   A    People may have had more than one of those events.
10   Unstable angina and also had an MI later, so they may
11   be counted twice.
12        Q    So the best numbers for --
13   A    14 versus 4, that would be the best number.
14        Q    Well, 14 versus 4 is cardiac events or is
15   that something else?
16   A    That's the total -- I'm sorry.  It's 8 versus 2.
17        Q    8 versus 2?
18   A    Yeah.
19        Q    Okay.
20   A    No, they are separate events.  I take it back.
21   It's correct.  It's 8 versus 2.  I was looking at the
22   wrong column -- the wrong row.
23        Q    Okay.
24   A    And that's -- that includes the unstable angina.
25   If you dropped it out, it would be 7 versus 3.  I'm
```

```
 1   sorry.  7 versus 1.
 2        Q    Okay.  8 versus 2 for what, sir?
 3   A    I'm sorry.  It's hard to do this.
 4        So it would be three, six -- yeah, so it
 5   would be one -- if you just do CHD events, without
 6   counting the unstable angina, it would be -- I'm
 7   sorry -- one in the placebo, and seven in VIOXX.
 8        Q    Okay.  All right.
 9   A    Both these studies had about six months average
10   follow-up.
11        Q    So they were terminated before they got --
12   A    Right.  So all these events are early events.
13   They were within the first six months of treatment.
14        MR. BUCHANAN:  Any objection, counsel?
15   BY MR. BUCHANAN:
16        Q    Doctor, let me show you a summary of the
17   information that I was trying to keep up with you on.
18   A    This is -- what I'm looking at is the combined
19   results of VIP and VICTOR, for, basically, heart
20   attacks, which is -- I presume MI is the point of "MI"
21   here, and the combined would be 12 MIs in VIOXX versus
22   5 in placebo.  For heart attacks, MI plus sudden death
23   is 13 versus 7.
24        MR. BUCHANAN:  Do you mind if I put it up on
25   the screen, Diane?
```

```
 1        MS. SULLIVAN:  Yeah, that's fine.
 2        MR. BUCHANAN:  Do you want to pull up the
 3   combined?  Thank you.  Let me move this out of the way.
 4   Excuse me.
 5   BY MR. BUCHANAN:
 6   A    These are the combined from the two, very latest
 7   trials that came in which, as I say, have six months
 8   follow-up, on average.
 9        Q    So heart attacks, 12 versus 5, VIOXX versus
10   placebo?
11   A    Yes, right.  13 versus 7 for what I called CHD,
12   which is MI and sudden death.  And for all cardiac
13   events, which adds in the unstable angina, it's 18
14   versus 10.
15        Q    Okay.  All cardiac events doesn't include
16   things like hypertension, does it?
17   A    No, it does not.
18        Q    Doctor, are these numbers from these combined
19   trials consistent with the increased risk that you saw
20   on your earlier analysis, I guess back here?
21   A    Yes.  They are perfectly consistent.  It's sort of
22   what you'd expect with just the random fluctuations
23   that you get in clinical trials of this sort.
24        Q    Do you have any curves to show the results --
25   A    No, because that data -- some of that data came
```

1   about two weeks ago, and others we -- to this date, I
2   don't have.  So I didn't have any time to do that
3   analysis.  I was gone all that time period.  Maybe
4   three weeks ago.  I don't know.
5          MR. BUCHANAN:  Any objection?
6          MS. SULLIVAN:  Yes, counsel.  These are
7   preliminary findings.  I prefer you use the final.
8          MR. BUCHANAN:  Didn't I?  Actually, do you
9   have an objection to me using this?
10         MS. SULLIVAN:  You don't want to use the
11  final report?
12         MR. BUCHANAN:  No, I'd like to use it because
13  this has the 2005 --
14         MS. SULLIVAN:  I'm not sure why you have
15  these preliminaries instead of the final.
16         MR. BUCHANAN:  Can we sidebar, Your Honor?
17         THE COURT:  She hasn't really objected.
18         MS. SULLIVAN:  That's fine.  I don't know why
19  you don't want to use the final.
20         MR. BUCHANAN:  All right.  Can you pull up
21  P1.0014, please?
22  BY MR. BUCHANAN:
23     Q   You can set that aside.
24     A   Thank you.
25     Q   All right.  What's the date of that document,

1   sir?
2      A   It's 2-1-2005.
3      Q   It says preliminary VICTOR CV counts; do you
4   see that?
5      A   That's correct.
6      Q   And, as counsel pointed out, this is, quote,
7   preliminary data, is that true?
8      A   That's correct.
9      Q   Okay.  It's talking about TCVSAE results.  Do
10  you see that?
11     A   Right.
12     Q   Okay.  What's TCVSAE?
13     A   That's total cardiovascular serious adverse
14  events.
15     Q   Okay.  What's it say there?
16     A   It says that it was statistically significant, 12
17  versus 4, relative risk was over 3, 3.13.
18     Q   Okay.  This is prior to the February, 2005,
19  advisory committee, isn't it?
20     A   That's correct.
21     Q   Okay.
22         MR. BUCHANAN:  Can we go to the next page?
23  Actually, I believe it's -- for some reason, they're
24  separately marked -- P1.0015.
25  BY MR. BUCHANAN:

1      Q   Doctor, what's this curve show?
2      A   Well, again, this is the event rate curve, and
3   this is the total CV thrombotic event which, again,
4   included MI, sudden death, and unstable angina.  It
5   shows an increasing risk that begins, actually, within
6   the first few days of the patient population, this
7   particular population, taking VIOXX.
8          As you can see, there is a jump almost
9   immediately, and there are probably four events that
10  occurred within a month of starting the therapy.  And
11  then it, you know, moves around up above, as you go
12  along.  The accrual on this trial was fairly slow and
13  you notice it got out to 24 months, but the average
14  follow-up was only six months, so that there is very
15  little data out when you get beyond about six months --
16  eight months, a year.
17     Q   Doctor, this is a different end point,
18  though, than what you looked at, right?
19     A   That's correct.
20     Q   What's this say at the top?
21     A   It says, confirmed thrombotic CV events.
22     Q   Does that include things other than just
23  heart attacks?
24     A   Yeah, it includes unstable angina.  That's the big
25  difference -- that's the one difference.  But there

1   weren't very many unstable anginas.
2      Q   Does it include ischemic strokes?
3      A   No -- well, no -- well, I don't know.  I don't
4   think so, but I don't know for sure.
5      Q   Okay.  Let's go to the next page.  I believe
6   it's P.0016.  And here is that APTC end point that you
7   talked about.
8      A   Right.
9      Q   Slightly different curve?
10     A   Yes, of course.  Fewer events shown.
11     Q   All right.
12     A   Although you can still see some of the same
13  pattern.
14     Q   Okay.  I know it's not a heart attack curve
15  like you did, but do you see an increased risk early or
16  late?
17     A   Well, it's early, clearly.
18     Q   Okay.
19     A   But I don't want to make too much of that.  It's
20  small numbers, you know.
21     Q   Okay.  Doctor, I want to circle back to a few
22  points real quick and we'll get you down.
23         By the time that the VIGOR results were known
24  in 2000, was there reasonable evidence of an
25  association between VIOXX and heart attack?

1   A   Absolutely -- absolutely.

2   Q   Okay.  How about for congestive heart

3   failure?

4   A   I think it was close.  It was certainly strongly

5   suggestive and probably met the criteria of a

6   reasonable association, yes, because of the very

7   seriousness of the side effect.

8   Q   And how about for the hypertension?

9   A   Oh, there it was quite clear.

10   Q   Okay.  Those things are -- are they serious

11   hazards?

12   A   Absolutely.

13   Q   Okay.  How about by April, 2001?

14   A   Well, April 2001, as I pointed out, they knew,

15   because there was a report from their statistician,

16   that both Alzheimer's studies showed an excess risk of

17   total mortality.

18   Q   So by April, 2001, was there a reasonable

19   association between VIOXX and cardiovascular mortality?

20   A   I don't know what the data was for cardiovascular

21   at that point in time.  But it is certainly true for

22   total mortality.

23   Q   Okay.  That's -- death is obviously a serious

24   hazard?

25   A   Absolutely.

1   Q   Okay.  Doctor, just taking us back to where

2   we started from, do you have an opinion as to whether

3   or not VIOXX can cause serious cardiac injury?

4   A   I do.  I think there's clear evidence that it

5   does.

6   Q   Okay.  Can it cause heart attacks?

7   A   Yes.

8   Q   Can it cause congestive heart failure?

9   A   Now we know it certainly can.  APPROVe shows that,

10   as well as the previous VIGOR study.

11   Q   Can it cause CHD?

12   A   Yes.

13   Q   Okay.  Is the data you looked at consistent

14   with no increased risk of those things until after 18

15   months?

16   A   No, it's not consistent with that.

17   Q   Do you have an opinion as to the extent of

18   the risk for even short-term use?

19   A   The best estimate of risk we have is the overall

20   risk seen in all these trials, and it's clearly over

21   two.

22   Q   Doctor, we've talked a lot of science today.

23   I just need to ask a couple of legal questions.

24   All the opinions you expressed today, did you

25   express them all to a reasonable degree of scientific

1   probability?

2   A   Yes, I did.

3   Q   Okay.  Thank you, sir.

4              CROSS-EXAMINATION

5   BY MS. SULLIVAN:

6   Q   Good afternoon, Dr. Kronmal.  How are you?

7   A   Fine, thank you.  How are you?

8   Q   Okay.  We haven't met before.  My name is

9   Diane, Diane Sullivan, and I represent the folks at

10   Merck, and I have a few questions for you, if you'll

11   bear with me, sir.

12   A   All right.

13   Q   Dr. Kronmal, you have acknowledged that you

14   are not a Medical Doctor, right?

15   A   That's correct.

16   Q   And you don't prescribe medicines or treat

17   patients?

18   A   That is correct.

19   Q   In fact, it would be against the law for you

20   to diagnose or treat someone with a heart attack?

21   A   Absolutely.

22   Q   Okay.  And, Dr. Kronmal, you have not

23   reviewed Mr. Humeston's medical records, correct?

24   A   That is correct.

25   Q   And you're not here to tell the jury anything

1   about Mr. Humeston's medical condition, correct?

2   A   That's correct.

3   Q   You also don't conduct laboratory research in

4   animals?

5   A   No, I do not.

6   Q   And you don't hold yourself as an expert in

7   enzyme prostacyclin/thromboxane issues?

8   A   No, I do not.

9   Q   Fair enough.

10   You haven't published any papers on COX-2

11   inhibitors?

12   A   I have not published any papers on COX-2

13   inhibitors.

14   Q   And, Dr. Kronmal, you've done an analysis

15   here, in connection with the litigation, of the studies

16   related to VIOXX.  You have not published the opinions

17   you are giving here or that analysis in any journals,

18   correct?

19   A   That's correct.  I was not a -- I would not be

20   allowed to do that because I have a Court order

21   prohibiting that sort of thing.

22   Q   You haven't presented your opinions for any

23   critique by any scientists?

24   A   No, I have not.

25   Q   You essentially just did the analysis for the

1    lawsuit at plaintiffs' request?

2    A    That's correct.

3         Q    And, as I understand it, one of plaintiffs'

4    attorneys, Mr. Buchanan, called you about a year ago,

5    to assist in the litigation?

6    A    Somewhat more than that, but yes.

7         Q    Okay.  And you have acknowledged that you

8    charge $500 an hour for your services?

9    A    That's correct.

10        Q    And so far, you've billed approximately

11   $75,000 or so?

12   A    A bit less than that, more like 70, a little under

13   70.

14        Q    70,000?

15             And you also have an assistant who has billed

16   a substantial amount of time, as well, correct?

17   A    I believe she has.  I don't know what she's billed

18   specifically.

19        Q    And, Dr. Kronmal, this is not the first time

20   you have offered your services for plaintiffs in

21   lawsuits, correct?

22   A    For these plaintiffs?

23        Q    Yes.

24   A    It is the first time.

25        Q    For plaintiffs in general, correct?

1    A    There has been one -- at least one other occasion,

2    probably two more, in 40 years, yes.

3         Q    And, Doctor, you testified or agreed to

4    testify as an expert for a lawyer at the Seeger Weiss

5    firm, plaintiffs' counsel, first in the Reslin

6    litigation, correct?

7    A    No.

8             MR. BUCHANAN:  Objection, Your Honor.  That's

9    unfounded.

10            THE COURT:  Well, did he answer no?

11            THE WITNESS:  I answered no.

12            I can save you time, counsel, in that.  At

13   the time of the deposition, I had said yes initially

14   because I had confused Chris Seeger with Chris Teazey,

15   and I thought they were the same firm.

16            MS. SULLIVAN:  Fair enough.

17            MR. SEEGER:  I ended up on better side of

18   that.

19            THE WITNESS:  It was corrected later in

20   deposition.

21   BY MS. SULLIVAN:

22        Q    Fair enough.

23             You testified for plaintiffs' lawyers in the

24   Reslin litigation?

25   A    I did not testify.  I prepared some materials for

1    them and I was deposed.

2         Q    Fair enough, Doctor.

3             In fact, the Federal Court, in the Reslin

4    litigation, excluded your testimony because you weren't

5    qualified, correct?

6             MR. BUCHANAN:  Objection, Your Honor.

7    *Objection, Your Honor.*

8             THE COURT:  That statement should be stricken

9    from the record and the jury should completely

10   disregard it.  It's totally improper.

11            The Court has found that he is qualified to

12   testify.

13            MR. SEEGER:  Could I just have a brief

14   sidebar because of what just happened?  Would that be

15   all right?

16            MS. SULLIVAN:  It goes to his credentials,

17   Your Honor.

18            (The following transpired at sidebar.)

19            MR. SEEGER:  I am really trying to -- with

20   the track record that has developed with

21   *Ms. Sullivan --*

22            MS. SULLIVAN:  That's a question that's asked

23   a lot.

24            MR. SEEGER:  I want to finish my objection.

25            THE COURT:  It's totally improper.

1             MR. SEEGER:  I would ask you to please make

2    sure the jury understands that, and could we get an

3    assurance from counsel that she is got going to

4    continue to do this with this witness?  It's unfair.

5    We have to --

6             MS. SULLIVAN:  Not qualified, that goes to

7    his credentials.

8             THE COURT:  No, it doesn't.

9             MR. SEEGER:  No, it doesn't, and it was a

10   different issue.

11            THE COURT:  It was something you could have

12   either made a motion or voir dired him on or you could

13   have voir dired him in front of -- outside the jury.

14   You couldn't have voir dired him in front of the jury.

15            MS. SULLIVAN:  Your Honor, we did make a

16   motion on it and this is one of the reasons.

17            MR. SEEGER:  Did you notice when I objected,

18   she continued to push the question out?  The harm has

19   been done.  I would *please just ask* you to make sure

20   the jury understands it.

21            MR. BUCHANAN:  There was not an issue with

22   his credentials.

23            THE COURT:  Let me see it.

24            MR. SEEGER:  Completely different litigation.

25            MR. BUCHANAN:  Your Honor, we went through