1    this with Dr. Egilman and in that decision, Your Honor
2    made very clear that what another judge said about a
3    witness is not germane to what you said.
4        MR. SEEGER:  In a case that's now settled.
5        MR. BUCHANAN:  There were 20 experts that
6    were dealt with in that and you know it.
7        MS. SULLIVAN:  It specifically cites him as
8    unqualified.
9        MR. BUCHANAN:  On state-of-mind issues.
10       MS. SULLIVAN:  No, FDA regulations on
11   clinical testing, on safety issues.
12       MR. BUCHANAN:  No.
13       MR. SEEGER:  That's a whole different issue.
14       MS. SULLIVAN:  There is more of that opinion,
15   several places they say he is not qualified --
16       MR. BUCHANAN:  Are you talking to the jury or
17   the judge?
18       MR. SEEGER:  Why don't you turn this way.
19       MR. BUCHANAN:  We went through this with
20   Dr. Egilman, too, and Your Honor was very clear.
21       MR. SEEGER:  There are ways to do it and ways
22   not to do it.
23       MS. SULLIVAN:  He is a guy on biostatistics.
24   They put him way beyond.  It's proper.  He is not
25   qualified.  Other Courts find him not qualified.

1        THE COURT:  No.
2        MR. SEEGER:  No.  We tried the Reslin case.
3    You don't know.  You weren't in that litigation.  Dave
4    and I were for years.  The cases have all settled.
5    There is no appeal to this.  We don't have an
6    opportunity to address this with Judge Kaplan or the
7    Second Circuit.  Everything is settled in that case so
8    this is really unfair, and she could have raised it
9    with you, Your Honor.
10       MS. SULLIVAN:  We did.  We filed a motion.
11       MR. SEEGER:  Is think she is trying to force
12   some kind of mistrial, and I don't want to be on the
13   other side of it.
14       MS. SULLIVAN:  That's not true.
15       MR. SEEGER:  I want to take this case to
16   verdict.  I don't want this jury being prejudiced.
17       (Sidebar concluded.)
18       THE COURT:  It's hard to put things out of
19   your mind that you've heard, but you should put that
20   out of your mind.  It is not a relevant fact here.  I
21   have found, in fact, that this witness is qualified to
22   testify, and you should just completely disregard
23   counsel's statement.
24       You can proceed, counsel.
25   BY MS. SULLIVAN:

1        Q.   And, Dr. Kronmal, you were talking about
2    epidemiology and the study of epidemiology, and one of
3    the things you talk to the jury about was the fact that
4    you used statistics to rule out or try to rule out a
5    chance finding, correct?
6        A    That's correct.
7        Q.   For example, if you want to determine whether
8    or not a medicine can cause a heart attack, one of the
9    things that you said you need to do is do studies to
10   compare people who use the medicine against people who
11   don't, correct?
12       A    That's one way, yes.
13       Q.   Controlled clinical trials, you told us was
14   the best evidence to determine that?
15       A    That's correct.
16       Q.   Okay.  And when you do that -- and we know,
17   Doctor, that heart attacks are very common in the
18   general population, correct?
19       A    Yes, they are.
20       Q.   Unfortunately.  And so, it may be that
21   someone's on the medicine and has a heart attack and
22   that could be just by chance, correct?
23       A    It could.
24       Q.   Okay.  And one of the things that people in
25   your business do is analyze information, comparing

1    people who took the medicine against people who didn't
2    to determine whether or not a finding is real or more
3    likely to be due to chance, right?
4        A    That's correct.
5        Q.   Okay.  And, as I understand it, Doctor, you
6    went through and looked at Merck's clinical trial
7    safety data for VIOXX?
8        A    That's correct, also.
9        Q.   You looked at -- and, just to back up, the
10   way that clinical trials are run is that companies like
11   Merck have to get approved investigators to do those
12   studies, correct?
13       A    That's correct.
14       Q.   And those names are submitted to the FDA and
15   they've got to be approved by the FDA to conduct those
16   trials, correct?
17       A    Quite frankly, I don't know whether they
18   specifically have to be approved or not, but --
19       Q.   Fair enough.  That's outside of your area of
20   expertise?
21       A    Right.
22       Q.   You do know enough to know that the protocols
23   for the studies are submitted to the FDA?
24       A    Oh, absolutely.
25       Q.   Okay.  And the FDA signs off on the

```
1    protocols --
2    A    That's correct.
3         Q    And these outside investigators aren't
4    employed by the company, correct?  Typically, they are
5    out there at sites all over the country or all over the
6    world?
7    A    That's correct, although they're paid by company.
8         Q    Yeah, for their time, of course.  But they're
9    not employees of the company.
10   A    That's correct.
11        Q    And they are blinded to the results, they
12   don't know who is getting the medicine and who is
13   getting the placebo, right?
14   A    That's correct.
15        Q    And they -- when there is an adverse event,
16   they fill -- report it back to the company for
17   analysis, correct?
18   A    That's correct.
19        Q    Okay.  And what you looked at was the adverse
20   events reported by these outside investigators, among
21   other things, to do your analysis, correct?
22   A    Well, in general, that's true, although I also --
23   most of the analysis I did was on adjudicated events
24   that were adjudicated by an independent committee, that
25   weren't the investigator --
```

```
1         Q    That's actually a good point.  You know, sir,
2    that Merck, as a result of outside advice it got from
3    an outside board of scientific advisors, had an extra
4    feature to look at cardiovascular events in their
5    safety studies, right?
6    A    That's correct.  They did.
7         Q    Okay.  In other words, in addition to having
8    these outside investigator reports sent to them, they
9    had a board of outside scientists examine the issue of
10   whether or not someone had a heart attack or a
11   thrombotic event in the study?
12   A    That's correct.
13        Q    Okay.  And they did that, you know, at the
14   advice of some outside scientists, correct?
15   A    I've heard something to that effect, yes.
16        Q    Now, Doctor, you'll agree that different
17   populations of patients can have different reactions to
18   medicine, in other words, someone who may be a diabetic
19   or a cancer patient may have a different experience
20   with a medicine than someone that doesn't have those
21   conditions, correct?
22   A    It's certainly possible, yes.
23        Q    And, in fact, populations can vary in terms
24   of their reactions to medicine?
25   A    Oh, of course.
```

```
1         Q    And, Doctor, do you know that Mr. Humeston
2    had osteoarthritis?
3    A    I don't know the details of his case, no.
4         Q    Okay.  I'll represent to you that the
5    plaintiff -- you didn't find out or weren't told or
6    don't know that Mr. Humeston has osteoarthritis?
7         MR. SEEGER:  Objection, Your Honor.  The
8    witness, as counsel knows, has been designated on
9    general science, not on case specific.
10        THE WITNESS:  I may have heard that they said
11   because of -- that your case was around osteoarthritis,
12   I certainly heard that that was an issue.
13   BY MS. SULLIVAN:
14        Q    Fair enough.
15        Do you know that Mr. Humeston was taking
16   VIOXX for osteoarthritis?
17   A    I'm certainly willing to believe that that was the
18   case.
19        Q    Okay.  Fair enough.
20        And, Doctor, you did -- when you did an
21   analysis of the safety studies, you looked at the
22   studies involving osteoarthritis patients like the
23   plaintiff in this case?
24   A    Not specifically.  The only place that I looked at
25   the osteoarthritis studies at all was in the
```

```
1    meta-analysis, where I was duplicating, in a sense, the
2    designation of the studies that were done by the Merck
3    scientists for their meta-analyses, and you're putting
4    up the slide that shows that part of the analysis that
5    I have done.  That was a small part of the analysis I
6    did, yes.
7         Q    No one prevented from you looking at the
8    osteoarthritis studies that were the raw data for that,
9    correct?
10   A    Well, it would have been extremely difficult,
11   because the osteoarthritis studies were in many, many
12   files.  There were a large number of them, they were
13   very small, and it would have very, very hard to break
14   down and do specific analyses for all those little tiny
15   studies.  Had I had more time, probably, and I might
16   well have done that.
17        Q    It's something you could have done; you had
18   the data, correct, for the osteoarthritis studies?
19   A    I assume the data was there, but I don't know for
20   certain, since that was not a focus of the analysis.  I
21   don't know for sure that I had all the data for the
22   osteoarthritis studies.
23        Q    Were you asked not to analyze the
24   osteoarthritis studies?
25   A    No, no, I wasn't told anything about -- I wasn't
```

1  told anything about how to analyze the data.

2       Q.  Now, Doctor, this is a report that your

3  counsel put up and this is actually from your expert

4  report in this case, correct?

5       A.  That's correct.

6       Q.  Okay.  And if we look at your information

7  about the osteoarthritis studies, you'll agree, Doctor,

8  that in patients who took VIOXX, patients like the

9  plaintiff in this case, who had osteoarthritis and took

10 VIOXX, there was no increased risk of a heart attack,

11 correct?

12      A.  Well, that's not totally correct.  Because the

13 ADVANTAGE study was also an osteoarthritis study, and I

14 learned recently that some of the studies listed under

15 nonrheumatoid arthritis were also osteoarthritis

16 studies.  So, in a sense, this classification is very

17 artificial.  And, as you'll notice, in the ADVANTAGE

18 study, shows a relative risk of 4.92, and later data

19 that was presented in a letter to the editor of -- I

20 believe the Archives, internal medicine, someone from

21 Merck, indicated that, actually, there were eight

22 cardiovascular events, which included two sudden

23 deaths, on the VIOXX arm and ADVANTAGE, versus one in

24 the Naproxen arm and ADVANTAGE, an eight-fold increased

25 risk, and those were osteoarthritis, and it was only a

1  four-month study.

2       Q.  And, Doctor, you know that the ADVANTAGE

3  study was a Naproxen study?

4       A.  It had Naproxen as a comparator.

5       Q.  The comparator was Naproxen?

6       A.  That's correct.

7       Q.  And, Doctor, you'll agree that the ADVANTAGE

8  study had too few events to really make any

9  determinations that --

10      A.  Not really.  Eight versus one was statistically

11 significant.  And it so fit with the other studies that

12 I think it's perfectly reasonable to include it in the

13 overall assessment.

14      Q.  Were you made aware, Doctor, that another

15 plaintiffs' expert, Dr. Lucchesi, told the jury that

16 there were too few events in ADVANTAGE to make any

17 determination about heart attack risk?

18      A.  Well,.

19          MR. SEEGER:  Objection, Your Honor.  I don't

20 think that's an accurate reflection of the record.

21          THE COURT:  The attorney shouldn't

22 characterize what Dr. Lucchesi said.  The jury will

23 have their own recollection of it.

24          MS. SULLIVAN:  They will be the judge on it.

25 BY MS. SULLIVAN:

1       Q.  Doctor, in the osteoarthritis studies -- and

2  we'll talk about advantage -- but in the osteoarthritis

3  studies that you analyzed and put in your report,

4  you'll agree that there was no difference, no

5  statistical difference, between people who took VIOXX

6  and people who took the comparator drug in that

7  population?

8       A.  In that subset of the osteoarthritis studies, the

9  company defined that was true.  However, they didn't

10 include the studies that showed an excess risk in that

11 classification.  That I didn't know at the time or I

12 would have combined them differently.

13      Q.  Well, Doctor, isn't it true, even if you

14 combine the ADVANTAGE study and any other

15 osteoarthritis study, there is no statistical

16 difference in people with osteoarthritis, like

17 Mr. Humeston, in terms of a risk of heart attack in any

18 of the Merck studies?

19      A.  That I do not know.  I mean the fact is --

20      Q.  You didn't do that analysis, sir?

21      A.  No, I did not.

22      Q.  Okay.  And looking at the analysis that you

23 did repeat here, Doctor, for osteoarthritis, in fact,

24 there were fewer numbers of people taking VIOXX in the

25 osteoarthritis studies who had heart attacks as

1  compared with the people on the comparator drug,

2  correct?

3       A.  In that subset of osteoarthritis, but it would not

4  be the case if you had included ADVANTAGE and the

5  nonrheumatoid arthritis, as far as I know.

6       Q.  Doctor, even in the ADVANTAGE study, the

7  findings were not statistically significant, correct?

8       A.  They weren't at that time.  But now, they are.

9       Q.  In the ADVANTAGE study?

10      A.  Yes.  Eight versus one.  It reaches statistical

11 significance.

12      Q.  And, Doctor, if you -- and, in fact, Doctor,

13 in the Alzheimer's study, on the issue of heart attack,

14 there is also no difference, correct?

15      A.  When they published this data, they claimed that

16 there was a little over 12 months of follow-up, and in

17 their 12-month analyses that I commented on earlier

18 from a memo written by the statistician from Merck,

19 there was a significant excess of cardiovascular

20 events.  I'm not sure why there is that discrepancy

21 between what's shown in that file that was the MI

22 meta-analysis and the analysis done in April of 2001 by

23 the statistician from Merck.

24      Q.  My question, Doctor -- and you've looked at

25 the data -- on the issue of heart attack, and the

1  Alzheimer's study, there was no difference between the
2  people who took VIOXX and the people who took
3  comparator drugs; there was no statistical difference
4  on heart attack, correct, Doctor?
5  A   If you included -- if you did not include sudden
6  death, that would be a correct statement.
7  Q   Okay.  And you've told us that for people who
8  die from sudden cardiac death, we don't know what the
9  cause is; it could have been a heart attack, it could
10  have been many other things?
11  A   Well, it doesn't really matter.  They died of
12  heart disease.  And it doesn't matter what the
13  mechanism was.
14  Q   But not necessarily a thrombotic event,
15  you'll agree, Doctor?
16  A   That's correct.  But I don't think there is any
17  evidence from anything I've seen that proves that the
18  problem with VIOXX is from thrombosis, necessarily.
19  Certainly, hypertension is not due to thrombosis.
20  Congestive failure is not due to thrombosis.
21  Q   And, Doctor, looking at -- going back and
22  looking at your chart, can we agree, based on your
23  numbers, the only studies that show any statistical
24  significance in terms of an increased risk of heart
25  attack from VIOXX was the VIGOR trial, correct?

1  A   Well, this is an artificial breakdown of the
2  studies.  Most of these studies were way too small to
3  expect statistical significance, and the only reliable
4  estimates you can get are from the overall estimate
5  which is statisticically significant.
6  Q   But my question is, Doctor, yes or no, the
7  only study that shows any statistical difference in
8  terms of an increased risk of heart attack from VIOXX
9  was the VIGOR study?
10  A   At that time, although ADVANTAGE now shows a
11  statistical difference.
12  Q   And, Doctor, we know that the VIGOR study had
13  Naproxen as the comparator.
14  A   That's correct.
15  Q   And if you take out the VIGOR study, the
16  overall estimate would not be statistically
17  significant, correct?  There would be no difference?
18  A   That's correct.
19  Q   Okay.  And, Doctor, in the osteoarthritis
20  studies, where there was no difference between VIOXX
21  and the comparators, the average -- the average
22  duration in terms of how long people took the drug was
23  for four months, correct?
24  A   That's correct.
25  Q   Okay.

1  A   For those particular osteoarthritis studies.
2  Q   Yeah.  And you know, Doctor, that there were
3  several thousand people in those osteoarthritis
4  studies?
5  A   That's correct.  But there were also 5,000 people
6  in ADVANTAGE, and it had three months follow-up, and it
7  showed 8 versus 1.
8  Q   And that was -- that, like VIGOR, was a
9  Naproxen study, correct?
10  A   That had a Naproxen comparator.
11  Q   Okay.  And we'll talk about VIGOR and
12  ADVANTAGE, but those two were Naproxen studies, right?
13  A   That's correct.
14  Q   But looking at the osteoarthritis studies
15  where Naproxen was not a comparator, you'll agree,
16  Doctor, that in no Merck study, in people with
17  osteoarthritis, with VIOXX compared to placebo, or
18  VIOXX compared to any other medicine, other than
19  Naproxen, there was no increased risk for a heart
20  attack, correct?
21  A   That's correct.
22  Q   Okay.  With an average duration of use of
23  four months, correct?
24  A   That's correct.
25  Q   And, Doctor, you did a lot of the KM plots we

1  saw, the curves that you showed the jury and
2  Mr. Buchanan showed the jury?
3  A   That's correct.
4  Q   You didn't do any KM plot for heart attack in
5  the osteoarthritis population, did you, sir?
6  A   No, I did not.
7  Q   Let me show you, Doctor, what's been marked
8  as Defendant's Exhibit 338.
9        MS. SULLIVAN:  Your Honor, may I approach?
10        THE COURT:  You may.
11  BY MS. SULLIVAN:
12  Q   And, Doctor, do you recognize this as a paper
13  published by Dr. Reicin and other coauthors in the
14  American Journal of Cardiology?
15  A   Yes, I do.
16        MR. BUCHANAN:  Do you have a copy, counsel?
17        MS. SULLIVAN:  Oh, I'm sorry.  I thought you
18  had yours.
19  BY MS. SULLIVAN:
20  Q   And, Doctor, the American Journal of
21  Cardiology, you will agree, sir, is one of the leading
22  medical journals in the world, correct?
23  A   It's a good journal.  I don't know if it's
24  leading.
25  Q   And there is a peer-review process for

1    journals, particularly some of the leading journals

2    like this one, where outside scientists review and

3    critique your science, your paper, before you're

4    permitted to publish it?

5    A    That's correct.

6    Q    And many, many papers get rejected because

7    the editors or reviewers think it's not good science,

8    correct?

9    A    That's correct.

10   Q    And here, Dr. Kronmal, Dr. Reicin and her

11   coauthors are describing the VIOXX development program,

12   correct?

13   A    That's correct.

14   Q    And they talk about the fact that

15   cardiovascular safety was assessed in 5,435

16   participants in eight Phase IIB/3 osteoarthritis

17   trials, correct?

18   A    That's correct.

19   Q    And they talk about fact that the median

20   treatment exposure was three-and-a-half months, right?

21   A    That's also correct.

22   Q    And there were people who took it for a lot

23   longer and people who took it for a lot shorter but

24   that was the average, right, the median?

25   A    That's correct.

1    Q    Okay.  And if we look, Doctor, they also give

2    us a breakdown of the kinds of people that were in the

3    study in terms of their risk factors?

4    A    That's correct.

5    Q    And if we look at the kinds of folks that

6    were in Merck's safety studies in connection with their

7    development of VIOXX, we see, for example, that 6.9

8    percent, almost 7 percent of the people had coronary

9    artery disease, correct?

10   A    That's correct.

11   Q    Two-and-a-half percent had had a heart attack

12   in the past, correct?

13   A    That's also correct.

14   Q    And, similarly, any cardiovascular risk

15   factor, almost 60 percent had some cardiovascular risk

16   factor, right?

17   A    That's correct.

18   Q    They have a -- 8 percent of the people in the

19   studies were diabetics, right?

20   A    That's correct.

21   Q    17.2 percent of the people had high

22   cholesterol and they also included about 11 percent of

23   the people who took VIOXX in the development studies

24   were smokers, right?

25   A    That's correct, also.

1    Q    Okay.  And they analyzed these studies,

2    Doctor, for whether or not there was an increased risk

3    of various events, including heart attack, right?

4    A    That's correct.

5    Q    And, Doctor, on the issue of heart attack,

6    there was no difference between people who took VIOXX

7    and people who took comparator pain relievers, right,

8    other NSAIDs?

9    A    That's correct.  Although, again, they

10   conveniently left off the ADVANTAGE study, that was as

11   large as the combined data from these studies.

12   Q    Dr. Kronmal, we're going to talk about the

13   ADVANTAGE study.  The VIGOR study, like the VIGOR

14   study, involved Naproxen, correct?

15   A    That's correct.  But if you're going to do

16   analyses like this, you should include all your data,

17   not just selected ones.

18   Q    Do you know, Doctor, on the issue of heart

19   attack in the studies that were reported in the

20   American Journal of Cardiology, there was no difference

21   between people who took VIOXX and people who took other

22   pain relievers in these studies on the issue of heart

23   attack, correct?

24   A    That's what they reported, yes.  I have not

25   analyzed it myself, so I can't really verify it.

1    Q    Well, you have all of Merck's -- we have

2    provided to you and your counsel all of Merck's safety

3    trials?

4    A    Right.  But I did not --

5    Q    You didn't do that analysis.

6    And, Doctor, on the issue, again, looking at

7    cardiovascular end points, VIOXX versus placebo, that's

8    a sugar pill, correct?

9    A    I'm not sure whether it was sugar or not, but it

10   was an inactivator.

11   Q    An inactive pill.

12   It looks like more people had heart attacks

13   on the inactive pill than they did on VIOXX in the

14   osteoarthritis population, correct?

15   A    Yeah.  These are very, very small numbers, you

16   have to realize.  It's .28 percent of 711.  It's

17   probably, let's see, that's less than -- it's probably

18   a handful of people.  It's based on extremely small

19   numbers.  There is no statistical significance.  There

20   is no confidence given for the difference in the rates.

21   Doesn't mean a lot.

22   Q    But both in the -- both in looking at people

23   who took VIOXX compared to other pain relievers, and

24   looking at people who took VIOXX compared to placebo,

25   in people with osteoarthritis, like Mr. Humeston in

1  this case, there was no difference in heart attack

2  rate, correct?

3    A    These studies were too small to tell that but yes,

4  that's correct.

5    Q    Well, sir, do you know how long Mr. Humeston

6  took VIOXX?

7    A    I understand it was around two months.

8    Q    And, Doctor, this is -- now, you told us that

9  you didn't do a Kaplan Meier plot for osteoarthritis

10  studies in heart attacks, right?

11   A    That's correct.

12   Q    But Dr. Reicin and her colleagues did do a

13  Kaplan Meier curve for these osteoarthritis studies,

14  correct?

15   A    That's correct.

16   Q    And, looking at their Kaplan Meier curves,

17  Doctor, it shows no difference between VIOXX and other

18  pain relievers, correct?

19   A    That's correct.

20   Q    Consistent with their study results, right?

21   A    Well, that's what they already reported, yes.

22   Q    And, Doctor -- and you have the data. You

23  haven't seen anything different, looking at their data,

24  correct?

25   A    I have not analyzed that specifically.

1    Q    And, looking at the two months, there is no

2  difference, right? People who took it for two months

3  who had osteoarthritis, there is no difference?

4    A    There is maybe five events total in those two.

5  It's not enough to tell.

6    Q    And carrying it out over a year, there is no

7  difference, right?

8    A    Right. But, again, very small numbers and

9  selected studies.

10   Q    But you're saying in the ADVANTAGE study,

11  with eight events, that's enough to tell, but five

12  events, that's not enough to tell?

13   A    That's correct.

14   Q    Okay.

15   A    It was 8 versus 1.

16   Q    Well, do you know in these studies what the

17  comparison -- there was no difference, right, in the

18  osteoarthritis studies?

19   A    In those, there wasn't.

20   Q    And, by the way, neither the peer reviewers

21  or the journal told these authors that there were too

22  few events and so it was improper to report their data

23  in this manner, correct?

24   A    Oh, I'm not saying it was improper for them to

25  report it. That was not what I said.

1    Q    And, Doctor, going back to the chart, in this

2  study, it looks like about a quarter of a percent of

3  the people on VIOXX, of the thousands of people on

4  VIOXX in these studies, about a quarter of a percent

5  had a heart attack, right?

6    A    That's correct.

7    Q    Okay. And, similarly, about a quarter of a

8  percent had a heart attack on placebo?

9    A    That's correct.

10   Q    And, Doctor, you'll agree, as it relates to

11  testing of medicines, the best kinds of studies are

12  placebo-controlled studies?

13   A    That is true.

14   Q    That's viewed as the gold standard by the FDA

15  and by scientists, comparing a medicine to nothing?

16   A    That's correct, also.

17   Q    And you'll agree, Doctor, that neither the

18  VIGOR study or the ADVANTAGE study was a

19  placebo-controlled study, correct?

20   A    They were not.

21   Q    But, Doctor, you do know that Merck did do

22  placebo-controlled studies, as well as studies

23  comparing VIOXX to other medicines, right?

24   A    They -- later they did. They had some very small

25  ones early that were very short term, and then they did

1  the Alzheimer's studies and APPROVe, and then VICTOR

2  and VIP that were placebo-controlled.

3    Q    In fact, Doctor, you know that Merck did --

4  there were thousands of people on placebo-controlled

5  studies that Merck did on VIOXX?

6    A    If you count up the ones that is mentioned, yes.

7    Q    And, incidentally, Doctor, there is no

8  studies to indicate that taking VIOXX intermittently,

9  rather than continuously, increases your risk of heart

10  attack, correct?

11   A    I don't think they ran any studies where they had

12  people take the drug intermittently.

13   Q    So there is no evidence to indicate that

14  somebody is at increased risk, no clinical trial

15  evidence to indicate somebody is at increased risk of a

16  heart attack from taking VIOXX intermittently?

17   A    They didn't do any studies of that kind, so there

18  is no way of knowing.

19   Q    And you're not aware of any studies out there

20  by the government or anybody else that show that?

21   A    I'm not aware of any, no.

22   Q    Doctor, you talked a little bit about

23  Dr. Konstam's meta-analysis.

24   A    That's correct.

25   Q    I want to talk about that for a little bit.

1    Let me show you -- if I may, Your Honor --

2  what's been marked as Defendant's Exhibit 313.

3    A    Thank you.

4    Q    Incidentally, Doctor, before we get to that,

5  the FDA has scientists who review and analyze safety

6  data submitted by companies, correct?

7    A    That's correct.

8    Q    And the FDA -- and, Doctor, you're not aware

9  of at any point where the FDA, reviewing the VIGOR data

10  or reviewing any of Merck's safety data, concluded what

11  you're concluding, that VIOXX, with short-term use,

12  increases your risk of heart attack; the FDA has never

13  said that, never concluded that?

14    A    Well, that's partially true, I mean, in the sense

15  that they never formally did, but they were very

16  concerned about the safety profile of VIOXX, from the

17  very beginning, and often asked Merck for additional

18  data, safety data, on frequent occasions.

19    Q    Well, that's a good -- that's a good point,

20  *Doctor.  The FDA is always concerned about safety for*

21  medicines and frequently asks companies for additional

22  data, and they did that with Merck, right?

23    A    That's correct.

24    Q    And at no time did the FDA conclude,

25  notwithstanding the additional safety data provided by

1  Merck, at no time did the FDA conclude that VIOXX

2  caused heart attacks, correct?

3    A    That's correct.

4    Q    Okay.  I want to talk about Dr. Konstam's

5  analysis, if you could look at it, sir.  And, Doctor,

6  this was also a paper that was published in a

7  peer-reviewed journal?

8    A    That's correct.

9    Q    The journal of Circulation, also another one

10  of the leading journals in the field of cardiology,

11  right?

12    A    That is also correct.

13    Q    And, Doctor, in this study of Merck, in

14  response to the VIGOR study, Merck went back and

15  analyzed their safety data across all studies, correct?

16    A    That's correct.

17    Q    And I think you've said that was an

18  appropriate thing for the Merck scientists to do.

19    A    Yes.

20    Q    And they looked to see, in all of their

21  studies, whether that there was any increased risk of

22  heart attack in any of their other safety studies after

23  VIGOR, right?

24    A    That's also correct.

25    Q    And they looked at studies that involved more

1  than 28,000 patients, right?

2    A    That's correct, also.

3    Q    And studies that compared VIOXX against other

4  pain relievers like diclofenac, which is Voltaren, I

5  believe?

6    A    Could be.  I don't know.

7    Q    Okay.  Ibuprofen.

8    A    Yes.

9    Q    And nabumetone, which is Relafen, correct?

10    A    Yes.

11    Q    And they also looked at the studies comparing

12  VIOXX to placebo, right?

13    A    That's also correct.

14    Q    And, in their analysis, peer reviewed by the

15  scientists, Circulation, they found no evidence of

16  increased risk of CV, cardiovascular events, for VIOXX,

17  relative to either placebo or non-Naproxen NSAIDs,

18  right?

19    A    With the definition of CV events that they use,

20  yes, that's correct.  This was the APTC definition.

21    Q    Yes.  And, Doctor, that's a good point.  You

22  know, sir, there was an outside board of scientists who

23  advised Merck to use the APTC definition for CV events,

24  right?

25    A    No, I don't.

1    Q    Oh, you don't?  You didn't review those

2  documents?

3    A    No.

4        MR. SEEGER:  Objection, Your Honor.  That

5  suggests there is a document.  She should show the

6  witness if there is.

7        MS. SULLIVAN:  Well, we'll talk about that,

8  Doctor.

9  BY MS. SULLIVAN:

10    Q    I'm going to show you the CV protocols.  Are

11  you not aware that outside scientists advised Merck to

12  use the APTC --

13    A    I don't know about that at all.

14        MR. SEEGER:  Objection.

15        THE COURT:  Do you have a document that says

16  that?

17        MS. SULLIVAN:  I have the protocol, Your

18  Honor, and we've got testimony we can show him.

19        MR. SEEGER:  May we sidebar for one second,

20  Your Honor?

21        *THE COURT:  Okay.*

22        (The following transpired at sidebar.)

23        MR. SEEGER:  I'm sorry, Your Honor.  My

24  concern here is, again, this is now, I think I count

25  the third time that -- this suggestion to the jury that

1   a document exists just to elicit an answer.

2       MS. SULLIVAN:  That's a foundation, you guys

3   know -- that's just garbage.  You guy knows that Merck

4   used that criteria because of a board of outside

5   scientists.  There is tons of deposition testimony.

6   There is a CV protocol.  That is a good-faith

7   foundation to ask the question.

8       MR. SEEGER:  Judge, that's not true.

9       MS. SULLIVAN:  They come up here saying

10  *that's not a good way to analyze it without telling*

11  *him --*

12      MR. SEEGER:  The board of scientific advisors

13  told them make them predetermined end points.  It's

14  working.  I'm just saying if the cross is going to go

15  that way, there should be a good-faith basis for the

16  question.

17      MS. SULLIVAN:  There is a good-faith basis,

18  Your Honor.  An outside board told him.

19      THE COURT:  Do you have any document?

20      MS. SULLIVAN:  I didn't bring them.  This is

21  a nondisputed fact --

22      THE COURT:  No, it's clearly disputed.  It's

23  clearly disputed and if you raise your voice, I will do

24  it, too, and let's keep it low so we are just talking

25  to the Judge.  Your Honor, the --

1   being an idiot here.  It's competitive, I know she has

2   a lot of pressure, but we all do.  I don't like losing,

3   either.

4       (Sidebar concluded.)

5       (A recess was taken at 2:55 p.m.)

6       THE COURT:  Did they do a report?

7       MS. SULLIVAN:  We're looking for the

8   documents.  We're trying to pull it quickly, and we

9   have some deposition, too, we are still trying to dig

10  out.

11      MR. SEEGER:  Whose deposition?

12      MS. SULLIVAN:  It's a deposition of

13  Dr. Shapiro.

14      MR. SEEGER:  I have to look at that, Your

15  Honor.

16      THE COURT:  You can look at that.

17      MR. SEEGER:  Oh, thank you.

18      THE COURT:  Did he do a report?

19      MS. SULLIVAN:  We are looking for the

20  documents, Your Honor, but there is multiple testimony

21  in documents, on who advised us to do that.

22      THE COURT:  These are in a report?

23      MS. SULLIVAN:  I don't know.

24      MR. SEEGER:  I remind -- board of scientific

25  advisors.  I remind you of one thing, Judge.  There

1       MS. SULLIVAN:  I will move on, Judge.  I will

2   move on.

3       MR. SEEGER:  I would like to, at the next

4   break, I don't want to interrupt her cross, I will show

5   you the document.  There was not a good-faith basis for

6   that question, and I just wanted to make the objection

7   on the record.

8       MS. SULLIVAN:  You're playing games.

9       (Sidebar concluded.)

10      THE COURT:  We need a break.  We will take a

11  break.  See if you can locate the document at the

12  break, counselor.

13      MR. SEEGER:  Your Honor, can we keep you here

14  for one more second?  I'm sorry.

15      *THE COURT:  Yeah.*

16      (The following transpired at sidebar.)

17      MR. SEEGER:  She just made another comment in

18  front of the jury, there was a good-faith basis and you

19  know it.  I'm really trying to live by your rules but

20  it's like a boxing match where the ref says keep your

21  hands up, and if you don't, you get hit, and it's your

22  fault.  I don't know what to do here.  So, you know,

23  when I walk across the floor with her, she shouldn't

24  make comments like, you know I have a good-faith basis

25  or stuff like that to me.  It makes me look like I'm

1   were a lot of letters to Merck telling them what to do.

2   There is very few documenting anything that Merck did.

3       The recommendation by the board of scientific

4   advisors is to make a predetermined end point in the

5   clinical trials.  There is going -- there has been and

6   there will continue to be testimony that that is not

7   APTCPTC end points.  APTCPTC end points waters down the

8   result.  They're told there to put them in the

9   protocols, in the clinical trials, so the trial

10  investigators can find them.

11      I really frankly don't care what a Merck

12  employee said about it.  They do not have one document.

13  And when you say to a witness, are you aware that they

14  were recommended by outside consultants, it's a

15  misleading question and there is no good-faith basis

16  for it.

17      MS. SULLIVAN:  There is a good-faith basis

18  because our witnesses have said it, and we're looking

19  for internal documents that say it, and our witnesses

20  talked to these people.  They are consultants --

21      MR. SEEGER:  The outside consultants do not

22  speak in terms of APTCPTC, and I understand this may

23  sound like I'm slitting hairs, but I'm really not.

24      MS. SULLIVAN:  You are splitting hairs.

25  You're playing games.

1    MR. SEEGER:  Predetermined end points --
2    predetermined end points in clinical trials is
3    different from the company then collecting the events
4    and determining this APTC code, which has only been
5    used in aspirin trials.  And they do it for the reason
6    to make the drug look good.
7        So my point is, if you're going to say to
8    witnesses, are you aware someone said something, come
9    up with a document.
10       MS. SULLIVAN:  I don't know what he's saying.
11       MR. SEEGER:  I don't know anything about --
12       MS. SULLIVAN:  Did the outside board
13   recommend APTC?
14       MR. FITZPATRICK:  Yes.  No, not the board of
15   scientific advisors.  The consultants --
16       MR. SEEGER:  Who?
17       MR. FITZPATRICK:  The consultants --
18       MR. SEEGER:  Is there a document?
19       MR. FITZPATRICK:  I don't think I have a
20   document.  It was testified about --
21       MR. SEEGER:  That's my point.  She made it
22   sound like there was something.
23       MR. FITZPATRICK:  That's correct, there was.
24       MR. SEEGER:  Show the document.
25       MS. SULLIVAN:  There is sworn testimony.

1        MR. SEEGER:  That testimony is Merck's spin
2    on it.
3        MS. SULLIVAN:  Well, cross-examine our people
4    on it then.
5        MR. SEEGER:  Well, that's -- okay, well, the
6    one document we do have, Judge, on the outside board of
7    consultants is right here, and it doesn't speak in
8    terms of ATPC codes.  Those are different than
9    predetermined end points in clinical trials.
10       MR. FITZPATRICK:  That's correct, and we also
11   did that analysis.  That's accurate.  The board of
12   scientific advisors recommended that we look at all
13   thrombotic events, which we did.
14       MR. SEEGER:  Okay.  Well, that wasn't the
15   question Diane asked, Jim, and that's fine.
16       MS. SULLIVAN:  I said, do you know that
17   outside advisors recommended that we look at it this
18   way --
19       MR. SEEGER:  Do you have her last question
20   that I objected to?  I think she said APTCPTC --
21   APTCPTC end points in that question.
22       THE COURT:  Whose deposition is this?
23       MS. SULLIVAN:  She is a statistician -- that's
24   the witness.
25       THE COURT:  Do you know who was questioning

1    the witness?
2        MS. JONES:  I don't know.
3        MS. SULLIVAN:  I don't know.  Your Honor, we
4    are going to be really crammed on time with this
5    witness.
6        THE COURT:  Who was it who suggested the APTC
7    -- there is a line in the deposition that says, who was
8    it that suggested that APTC end points be used?  And
9    then they say, we had some that we brought in, and we
10   have this end point that we got from the adjudication
11   SOP.
12       MR. SEEGER:  That's made by Merck.
13       THE COURT:  They felt the more relevant end
14   points, so we could compare our results to these in a
15   platelet trial, would be to use this end point instead.
16       MR. SEEGER:  Rather than what the consultants
17   told them.  That's my point.
18       MS. SULLIVAN:  But the point is, you didn't
19   show him any of that.  You didn't show him that they
20   said look at thrombotic events, you didn't show him
21   that they said look at APTC end points.
22       THE COURT:  Where do they say it?  They're
23   not showing it to him.
24       MS. SULLIVAN:  The board of scientific
25   advisors should look at thrombotic events, and then the

1    deposition says look at APTC end points.
2        MR. SEEGER:  It says cardiovascular.
3        THE COURT:  It says coronary here.
4        MR. SEEGER:  That's broader than thrombotic
5    events.  And the reason they picked the APTC end points
6    is because that excluded congestive heart failure; that
7    excluded enlarged hearts; that excluded ventricular
8    fibrillation, all events that are secondary to an MI --
9        MS. SULLIVAN:  And you crossed our people on
10   it and they say the consultants told them -- everybody
11   uses that end point in the studies.
12       MR. SEEGER:  There isn't a document that says
13   it.
14       THE COURT:  The uniform criteria for
15   characterization of myocardial infarction, sudden
16   cardiac death, and strokes should be established.
17       MR. SEEGER:  Right.  They went broader than
18   that, and that's how they watered down their data and
19   they watered down their findings, by using the broader
20   codes.
21       MS. SULLIVAN:  No, the opposite would be true.
22       MR. SEEGER:  It's an important point in the
23   trial.  That's --
24       MS. SULLIVAN:  We would water it down if we
25   didn't focus on thrombotic events.  That's the issue.

9/22/2005 Kronmal - Direct & Cross

```
1        MR. SEEGER:  You can ask our witness that.  I
2   don't have a problem with that.
3        MS. SULLIVAN:  No, you have this witness up
4   here saying, I don't know why they used it, when they
5   had the board of scientific advisors and they had
6   outside consultants talk to them about what kinds of
7   end points they should be --
8        MR. SEEGER:  Diane, the point is when you say
9   in front of a jury, did you see that our outside
10  consultants said something, and you don't have a
11  document for it, any evidence --
12       MS. SULLIVAN:  There is testimony.
13       MR. SEEGER:  -- that's a problem.  That
14  testimony is not clear.
15       MS. SULLIVAN:  I've got sworn testimony that
16  gives me a good-faith basis to ask that question.  And
17  that's the truth.
18       MR. SEEGER:  The testimony says you did
19  something other than what the board told you to do.
20       THE COURT:  Who was it that suggested the
21  APTC end points be used for the pooled analysis?  We
22  have consultants that we brought in to evaluate data.
23  All, from adjudication SOP.
24       They felt that the more relevant end points,
25  so we could compare results to these antiplatelets
```

9/22/2005 Kronmal - Direct & Cross

```
1   trials, would be to use this end point instead.
2        MS. SULLIVAN:  Exactly.
3        THE COURT:  There were many similarities
4   between the end points.
5        What is this end point instead.
6        MS. SULLIVAN:  They felt, the outside
7   consultants, that the APTC end point was the more
8   appropriate one.  That's why Merck used it.
9        MR. SEEGER:  Other than what that witness
10  says there, there isn't a document to substantiate it.
11  In fact, the only document that tells them what to do
12  is the one in your hand.
13       MS. JONES:  But THEY also did that one.
14       MS. SULLIVAN:  We did both of them.
15       MR. SEEGER:  That wasn't the way the question
16  was asked, and my problem is the question is misleading
17  and there wasn't a good-faith basis.
18       MS. SULLIVAN:  There was.  In fact, I have
19  sworn testimony from witnesses there is a good-faith
20  basis and they did both of them.  You haven't come in
21  saying I don't know why they didn't.  You didn't show
22  him the document.
23       MR. SEEGER:  And you didn't either.  I mean.
24  I don't have to try my case at sidebar.  But you didn't
25  do that and we will show that.
```

9/22/2005 Kronmal - Direct & Cross

```
1        THE COURT:  If we can't finish with this
2   witness, we'll come back tomorrow.
3        MS. SULLIVAN:  It's not right, Your Honor.
4        THE WITNESS:  (Indicating.)
5        THE COURT:  Come on.  You're in for a penny,
6   you're in for a pound.
7        MR. SEEGER:  It will push Anstice to later
8   but we will call him back Monday.
9        MS. SULLIVAN:  We can't.  He is in Japan.
10  This is an expert.
11       MR. SEEGER:  Sorry.  Trials go that way.
12  Same thing with a lot of people.
13       MS. SULLIVAN:  You told us you wanted Anstice
14  Monday and Tuesday.
15       THE COURT:  He is going to be here Monday.
16       MR. SEEGER:  Well, Dr. Kronmal, if he has to
17  come tomorrow morning?  Yeah, if he has to, Dr. Kronmal
18  says he can come in the morning.
19       THE COURT:  Maybe you'll get him done today.
20       All right.  Go back to the table.
21       (Sidebar concluded.)
22       THE COURT:  The question was asked:  "And,
23  Doctor, that's a good point.  You know, sir, there was
24  an outside board of scientists who advised Merck to use
25  the APTC definition for CV events, right?"  "No, I
```

9/22/2005 Kronmal - Direct & Cross

```
1   don't."  "Oh, you don't?  You didn't review those
2   documents?"  "No."
3        MR. SEEGER:  That was my problem.
4        MS. SULLIVAN:  Well, the document you just
5   showed the Court said look at CV events from the board
6   of scientific advisors.
7        MR. SEEGER:  And then she produced testimony
8   to Your Honor.
9        THE COURT:  "Doctor, we'll talk about that.
10  I'm going to show you the CV protocols.  Are you not
11  aware that outside scientists advised Merck."  Where
12  are the CV protocols?
13       MS. SULLIVAN:  I have the CV protocols, Your
14  Honor, but those won't say someone told me to do it.
15  They are just the protocols we implemented.  Those are
16  the documents that tell us -- those are the ones you've
17  got, Judge.
18       THE COURT:  All right.  I'm going to advise
19  the jury that there is no document.  There is no
20  document, counsel.
21       MS. SULLIVAN:  You've go --
22       THE COURT:  Three times you said to the jury
23  there is a document.  There is no document.
24       MS. SULLIVAN:  You've got the board of
25  scientific advisors saying look at CV events.
```

1        MR. SEEGER:  Now we're out to CV events,

2  Judge.

3        THE COURT:  I thought CV events compared to

4  APTC was what it was all about.

5        MS. SULLIVAN: I don't have the question in

6  front of me, Judge.

7        THE COURT:  What question?

8        MS. SULLIVAN:  My question.

9        THE COURT:  Your question is -- he's talking

10  about CV events.  And he says, "You used the APTC

11  definition for CV events."  And then -- or, no, you

12  say -- got to go back further.  He's talking about

13  what's the definition of CV events they use?  That's

14  correct.  This was an APTC definition?  Yes, Doctor.

15  That's a good point.  You know there was an outside

16  board who advised Merck to use the APTC definition?  I

17  don't.  You didn't review those documents?

18        MS. SULLIVAN:  The depositions, Your Honor.

19        MR. SEEGER: Oh, now we're at the deposition.

20        THE COURT:  Then you go on and say, we'll

21  talk about that, Doctor.  I'm going to show you the CV

22  protocols.

23        MS. SULLIVAN: I have them.  We will go

24  through them, Your Honor, but they --

25        THE COURT:  But they don't say what you said

---

1  instruction like that, unless you say that it's not a

2  document, it's deposition testimony that she's

3  referring to.

4        MR. SEEGER:  So you want the Judge to

5  instruct the jury that your misstatement -- now you

6  want the Judge to the cure that for you?  I don't think

7  that's aappropriate, Judge.  This is happened --

8  because it's happened more than once, we would like an

9  instruction that the document doesn't exist.  In fact,

10  the document does not exist.  The CV protocols were

11  created by Merck and it's something different --

12        I would expect to be called on that by Merck

13  if I did that to one of their witnesses, as well.

14        MS. SULLIVAN: Some people don't object to

15  every question because we would like get the trial over

16  with.

17        MR. SEEGER:  The questions are objectionable.

18        THE COURT:  When the jury comes back in, I'm

19  going to tell them that they should disregard the

20  question that was asked, and I'm not going to say

21  anything else to them.

22        But I'm telling you, Ms. Sullivan, the next

23  time you mention a document and say did you read this

24  document, did you see this document, are you aware of

25  this document, you better have that document on the

---

1  they say.  Here you go.

2        MS. SULLIVAN: The CV protocols define the

3  events that --

4        THE COURT:  Counsel, you can have your

5  witnesses testify to whatever you want as far as what

6  was asked.

7        My problem is not that you asked him did you

8  read so-and-so's deposition where he said -- or did you

9  read Ms. Shapiro's deposition where she said she was

10  told by outside consultants to use APTC.  Then the jury

11  knows that one of your witnesses claims that to be the

12  case.  That's a lot different than saying twice that

13  you have a document and there is protocols and they

14  were from outside consultants and that is no such

15  things exists.  They may have told them that, but we

16  don't have any evidence of that other than your people

17  testifying to that.  But you certainly can bring in,

18  you can have your people testify -- this is the

19  first time we've stopped to say let me see the document

20  and there is no document.

21        MS. SULLIVAN:  Well, only because, Judge,

22  Mr. Seeger objects to every question.  If I did the

23  same thing, there would be a host of documents he

24  wouldn't be able to bring in.

25        And, Judge, it's improper to give an

---

1  podium, ready to show to the witness.  Because I'm not

2  going to let you suggest there are documents to the

3  jury that don't exist.

4        Bring the jury in.

5        Oh, and there is another thing.  When we were

6  at sidebar, we finished sidebar, counsel turned, were

7  walking away from me, and Ms. Sullivan said to

8  Mr. Seeger, you're playing games, loudly enough so

9  that, certainly, I could hear it, Chris heard it over

10  here, and I'm sure the jury heard it since you were

11  facing the jury when you said it.  A totally

12  inappropriate comment.

13        Do not call Mr. Seeger names.  Do not argue

14  with him in front of the jury.  If you have anything to

15  say about him, say it to me at sidebar.  Do not say it

16  so the jury can hear it.  It's wrong.

17        MS. SULLIVAN:  Fair enough.

18        THE COURT:  Bring the jury in.

19        (The jury entered the courtroom at 3:30 p.m.)

20        THE COURT:  You could be seated.

21        Ladies and gentlemen, there was a question,

22  Doctor, that's a good point, you know there was an

23  outside board who advised Merck to use the APTC

24  definition, and there was an answer no, you didn't.

25  Please disregard that question and the answer.  Forget

1    about it.  It's not part of the case at this point.

2    It's stricken.

3         You can proceed.  Counsel.

4         MS. SULLIVAN: Thank you, Your Honor

5    BY MS. SULLIVAN:

6         Q    Dr. Kronmal, have you reviewed the

7    depositions of the Merck scientists on the issue of why

8    they used the APTC end point in adjudicating

9    cardiovascular events in their safety studies?

10        A    No, I did not.

11        Q    Okay.  Doctor, before we broke, we were

12   looking at the Dr. Konstam study, Defendant's Exhibit

13   313, published in the journal of Circulation, right?

14        A    That's correct.

15        Q    And, Doctor, this was another analysis, an

16   updated analysis done by the scientists at Merck, again

17   looking at all of the safety data on VIOXX and,

18   *specifically, the issue of whether there was an*

19   increased cardiovascular risk, right?

20        A    It was for the APTC end point, yes.  Not for

21   cardiovascular risks per se.  APTC is broader than

22   cardiovascular disease.

23        Q    Well, they did break out heart attacks and

24   other cardiovascular events in the study, correct?

25        A    Not in the meta-analysis that they presented.

1    They have a little table where they have a few numbers,

2    yes.

3         Q    A few numbers, they reported all of the heart

4    attacks in the study and we'll look at that, right,

5    sir?

6         A    We can do that, yes.

7         Q    Okay.  And, Doctor, Merck went back and

8    looked at 23 studies involving more than 28,000

9    patients, correct?

10        A    That's correct.

11        Q    And they found that the analysis provided no

12   evidence for an excess of cardiovascular events for

13   VIOXX, relative to either placebo or non-Naproxen pain

14   relievers, right, NSAIDs?

15        A    That's what they say.  But, again, they're not

16   looking at CV events per se.  They're looking at

17   broader end point of the APTC.

18        Q    And, Doctor, you have found no in your review

19   that the FDA ever took issue with Merck looking at CV

20   events in that fashion, right?

21        A    Well, they have substantial questions about the

22   validity of the meta-analysis that were posed to Merck.

23   They pretty much disregarded the meta-analysis.  They

24   didn't think it was worth a whole lot.

25        Q    For the same reasons that your meta-analysis

1    is limited, the one you've done here, because there is

2    an issue about combining a lot of studies together,

3    right?

4         A    There is -- there is certainly an issue of

5    combining lots of different studies with different

6    comparators, for sure.

7         Q    Okay.  The same issue that we face with --

8         A    Absolutely.

9         Q    Okay.  And what you've done here is

10   compare -- is added all of Merck's studies together to

11   come out with your opinion that there is an increased

12   risk, and that's a meta-analysis that suffers from a

13   lot of limitations?

14        A    Right.  But, of course, I looked at MI, which was

15   the -- where the signal was.

16        Q    And, Doctor, you know in Merck's safety

17   studies that they did specifically -- there were two

18   *check points.*  They had investigator-reported events,

19   in other words, when doctors who were looking at the

20   patients in the studies reported heart attacks,

21   strokes, et cetera, they looked at those, right?

22        A    They did, yes.

23        Q    Okay.  And so they looked at each and every

24   kind of event, correct?  In their analysis.

25        A    Well, I don't know that.  They may well have.

1         Q    And the FDA looks at that?

2         A    Yes.

3         Q    Okay.  So we had the Merck scientists looking

4    at that, the FDA scientists looking at that, and then

5    Merck had a special feature that's not required by the

6    FDA; they had an outside board of people looking at

7    thrombotic events?

8         A    Are you talking about the *adjudication of the*

9    thrombotic events?

10        Q    I am, sir, yes.

11        A    Yes, they had outside people adjudicating

12   thrombotic events.

13        Q    And so Merck instituted a special feature

14   where they used outside scientists to double-check the

15   issue of cardiovascular thrombotic events?

16        A    Double-check?  I don't think that's the right

17   word.

18             I mean, they had a separate group that tried

19   to determine specifically whether some of the

20   cardiovascular events were really cardiovascular or

21   not, or whether they could be ruled out as

22   noncardiovascular events.

23        Q    Right.  Because there was an issue -- there

24   was this question of whether or not there was --

25   whether or not VIOXX was prothrombotic after the VIGOR

1  trial?

2  A    That's true.

3       Q    And in order to help answer that question,

4  Merck did something that was not required by the FDA;

5  they had a board of scientific people take a specific

6  look at that issue, adjudicate those events.

7  A    Well, they had someone adjudicate the events.

8  They didn't have a separate board take a look at the

9  issue of whether the drug was thrombotic or had other

10  side effects that might cause an increased risk of

11  events.

12       Q    Well, certainly, the FDA looks at that on a

13  continual basis, for all medicines?

14  A    They *should*.

15       Q    Okay, Doctor, going back to Dr. Konstam's

16  analysis, and we know, Doctor, and we talked about the

17  fact that Merck compared VIOXX to placebo and they

18  compared VIOXX to several other pain relievers, right?

19  A    That's correct.

20       Q    And, looking at this table, it shows the same

21  thing, but more patients as the earlier study, and that

22  is, that Merck included in their clinical trials for

23  VIOXX, people with cardiovascular risk factors, right?

24  A    They were some people in the study who had

25  casualty risk factors, correct.

1       Q    For example, there was 54 percent of the

2  people in their studies had at least one risk for

3  coronary disease, right?

4  A    That's correct.

5       Q    Okay. And they have 18 percent -- I'm

6  sorry -- 18 percent have high cholesterol in the

7  osteoarthritis studies, right?

8  A    That's correct.

9       Q    40 percent have high blood pressure in the

10  osteoarthritis studies, right?

11  A    Well, it's a little less than that because there

12  is some in the placebo that -- there was only 35

13  percent in the placebo, but I'm not going to quibble

14  about it. It's about 37-and-a-half percent.

15       Q    Okay. And they had about ten percent of

16  smokers in the osteoarthritis studies, right?

17  A    That's approximately right.

18       Q    Okay. I'm sorry about this machine here.

19       And in the osteoarthritis studies, they had

20  over 3,000 patients, right?

21  A    Again, that is excluding a number of

22  osteoarthritis studies that they had data on, including

23  the largest osteoarthritis study they had, which was

24  ADVANTAGE.

25       Q    We'll talk about -- you mentioned ADVANTAGE

1  and we're going to talk about ADVANTAGE.

2       And you had mentioned that your recollection

3  is that the events were 8 to 0. Are you sure about

4  that?

5  A    8 to 1.

6       Q    Are you sure about that?

7  A    That's what was said in recent documents.

8       Q    And is it your opinion, Doctor, that that's

9  statistically significant in the ADVANTAGE study?

10  A    I believe 8 to 1 is --

11       Q    Isn't it true, sir, that in the ADVANTAGE

12  study, that was a Naproxen study for heart attack,

13  there was no statistical difference between people on

14  VIOXX and people on Naproxen in the ADVANTAGE study for

15  heart attack?

16  A    There was not at the time that they reported it,

17  but they asked an event late, that was misclassified as

18  a non-CVD event, and they hadn't counted the two sudden

19  deaths.

20       Q    But I'm talking about heart attacks, sir,

21  even with the event added, isn't it true that there is

22  no statistical difference on the issue of the risk of

23  heart attack in the ADVANTAGE study between people who

24  took VIOXX and people who took the comparator drug?

25  A    If you take out the sudden death and then the

1  rates would be 6 versus 1, which would not have reached

2  statistical significance.

3       Q    And, Doctor, in the arthritis studies

4  reported by Dr. Konstam, there was no statistical

5  difference between people who took VIOXX and people who

6  took placebo, correct?

7  A    The relative risk estimate is 1.53, which

8  includes, of course. At least a doubling of risk. But

9  beyond that, this is the APTC end point. This is not

10  MI.

11       Q    We'll talk about MI, Doctor.

12       *But on thrombotic events -- the issue is that*

13  -- Doctor, do you understand that the plaintiffs have

14  alleged that VIOXX causes thrombotic events?

15       MR. SEEGER:  Objection, Your Honor. I'm not

16  sure that accurately characterizes our allegation. I

17  can state it.

18       MS. SULLIVAN:  I'll move on, Your Honor.

19       MR. SEEGER:  Caused Mr. Humeston's heart

20  attack, that's what we said.

21  BY MS. SULLIVAN:

22       Q    And a heart attack, we can agree, is a

23  thrombotic event?

24  A    Not necessarily.

25       Q    Okay.

1   A   There is spasm of the arteries can also cause MIs.

2        Q   Doctor, you are not a clinician, right?  You

3   are not a physician?

4   A   I spent the last 40 years working in

5   cardiovascular disease studies.  I know substantially

6   more about cardiovascular disease than most physicians.

7        Q   Doctor, in the paper that Dr. Konstam and his

8   colleagues reported with over 28,000 patients, peer

9   reviewed in one of the leading journals in the country,

10  it's true, sir, that compared to placebo and every

11  other *pain reliever except Naproxen, there was no*

12  statistical difference between VIOXX and the comparator

13  on the risk of heart attack; that's right, sir, right?

14  A   That's correct.

15       Q   Okay, Doctor, I want to talk about the VIGOR

16  study, if we may.  You mentioned, Doctor -- and the

17  VIGOR study was the study that, in your view, was the

18  first signal that Merck had that VIOXX may increase the

19  risk of heart attack.

20  A   That's the first one I know about.

21       Q   And you've looked at all the data?

22  A   I have not looked at the preapproval.  I

23  don't know what was in the preapproval data.

24       Q   Well, you're not aware that the SAS files you

25  were given contain all of the safety development

---

1   studies?

2   A   I believe they probably do, but I did not look at

3   the preapproval.

4        Q   You didn't --

5   A   I looked at the Phase III trials.

6        Q   You didn't look at any of the studies Merck

7   did before the drug was approved?

8   A   *Well, not specifically.  And they're included in*

9   the meta-analysis, but I did not specifically analyze

10  those data.

11       Q   And those were all the osteoarthritis studies

12  or most of them?

13  A   Many of them were.  Some of them were rheumatoid

14  arthritis.

15       Q   So for purposes of giving your opinion in

16  this case, Dr. Kronmal, you didn't review most of the

17  studies on people who had osteoarthritis and look at

18  the issue of whether or not, in those studies, there

19  was an increased risk of heart attack?

20  A   Other than what was done in the meta-analysis,

21  that's correct.

22       Q   You're aware, sir, that the FDA concluded

23  that there was no increased risk of heart attack based

24  on the osteoarthritis studies when they approved VIOXX,

25  right?

---

1   A   I don't think that's precisely correct.  One thing

2   that they do say is that the osteoarthritis studies --

3   essentially,  one of the reviewers said the

4   osteoarthritis studies were not sufficient to conclude

5   that the drug was safe --

6        MS. SULLIVAN:  Objection.  This is hearsay.

7        THE WITNESS:  -- in terms of cardiovascular

8   disease

9   BY MS. SULLIVAN:

10       Q   Doctor, that's actually an important

11  question.  As part of forming your opinions in this

12  case, I noted from your deposition that you downloaded

13  a lot of material from the FDA website.

14  A   I did download some and I read some on the web

15  page.

16       Q   And you relied on some of that for your

17  opinions in this case?

18  A   *I'm -- it's certainly affected my views in some*

19  sense.

20       Q   And some of the things you looked at is the

21  FDA review memos of the scientists who reviewed the

22  safety data and looked at VIOXX and approved VIOXX

23  continually over time.  You looked at their review

24  memos?

25  A   I did.

---

1        Q   And you looked at some of the Public Health

2   Advisories issued by the FDA in forming your opinion in

3   this case that were downloaded off of the FDA website?

4   A   I'm not sure what those documents are, but I

5   looked at the website, so I probably did.

6        Q   Okay.  And, Doctor, you're aware that there

7   was a big hearing this year with the scientists and

8   *outside advisory committee that looked at the issue of*

9   the safety of VIOXX and the safety of other pain

10  relievers?

11  A   That's correct, I am aware of that.

12       Q   And have you, before rendering your opinions

13  in this case, did you review and look at the

14  conclusions from that advisory committee and the

15  conclusions from the FDA?

16  A   I did, but I also looked at what Merck had

17  presented, and it was misleading.

18       Q   Well, we will talk about that, Doctor, but I

19  want to make sure I get the basis for your opinions.

20       Part of the things you looked at are the FDA

21  conclusions this year on the issue of VIOXX and other

22  pain relievers from the FDA website?

23  A   I did look at that, yes.

24       MS. SULLIVAN:  May I approach, Your Honor?

25       (The following transpired at sidebar.)

1    MS. SULLIVAN:  Judge, I have in his box that
2  he has the specific FDA decision memo as part of the
3  things he relied on.
4    MR. SEEGER:  It doesn't make it hearsay.
5    MS. SULLIVAN:  It makes it appropriate
6  cross-examination, Your Honor, as part of this witness
7  as far as his reliance on materials.  He considered it
8  and relied on it.
9    MR. SEEGER:  That doesn't mean that's
10  appropriate for cross-examination.  You can
11  cross-examine him --
12    MS. SULLIVAN:  I just want to cross-examine
13  him with respect to his reliance on materials.
14    MR. SEEGER:  Your Honor, it has the same
15  lack of reliability whether it was shown to the witness
16  or not shown to the witness.  Your Honor has already
17  ruled on it.  They were supposed to bring a witness in,
18  they were going to put an expert --
19    MS. SULLIVAN:  Reliable to consider --
20    THE COURT:  He just said he thought it was
21  based on misinformation presented by Merck.  That's
22  what he said.
23    MR. BUCHANAN:  Whether he endorses --
24    MS. SULLIVAN:  He is not talking about the
25  FDA's review.

1    THE COURT:  He said, I read it and I felt
2  that their decision was based on misinformation
3  provided by Merck.
4    MS. SULLIVAN:  We can cross-examine --
5    MR. SEEGER:  They were supposed to bring an
6  expert in --
7    MS. SULLIVAN:  That's before I saw your expert
8  relied on it.  That's proper cross-examination.
9    MR. SEEGER:  You have had those boxes of
10  materials for five weeks, Diane.  You know it.  Five
11  weeks.  That's when the deposition took place.
12    MS. SULLIVAN:  The FDA --
13    MR. SEEGER:  Your Honor, you set forth a
14  process --
15    MS. SULLIVAN:  I don't know how you can have
16  a guy look at it and rely on it and not let me
17  cross-examine on it.
18    MR. SEEGER:  You set up a process last week
19  or earlier this week that if they wanted to deal with
20  these CLASS issues, if they wanted to deal with it,
21  they were supposed to request a 104 hearing, bring in
22  an expert, put him on the stand, and have somebody
23  swear about all the facts that you are concerned about
24  and the plaintiffs are concerned about.  They haven't
25  done it.

1    MS. SULLIVAN:  Dr. Lucchesi already testified
2  about the CLASS issue.  That's already in the case.  He
3  testified that if you take out your little bottle, they
4  are all going to have warnings.
5    MR. SEEGER:  It wasn't even a close call as
6  to what the process was.  Everybody knew full well.  We
7  asked for 24 hours now --
8    MS. SULLIVAN:  That was before your expert
9  said he relied on it.
10    MR. BUCHANAN:  No, it wasn't.  It was in a
11  box.
12    THE COURT:  He said he reviewed it.
13    MS. SULLIVAN:  Considered it.
14    THE COURT:  He said he reviewed it and
15  considered it, and he felt it was misrepresented.
16    MS. SULLIVAN:  No, he said --
17    THE COURT:  What you want to do is say the
18  FDA has made these findings --
19    MS. SULLIVAN:  I want to cross-examine him.
20    THE COURT:  -- these scientific findings.
21  And I'm going to allow you to do that as soon as you
22  produce an expert who says that it has any scientific
23  validity.
24    MR. SEEGER:  We will wait for that too.
25    (Sidebar concluded.)

1  BY MS. SULLIVAN:
2    Q    Doctor, I'm going to show you what's been
3  marked as Defense Exhibit 476, if I may, Your Honor.
4  Whoops, that's my copy.  I'm sorry, Doctor.
5    A    That's okay.  Thank you.
6    Q    And Doctor, this is part of the materials you
7  downloaded off the FDA website to get more information
8  about VIOXX in connection with your opinions?
9    A    I don't think I specifically downloaded this
10  document, but I certainly have seen it.
11    MR. SEEGER:  Excuse me, Your Honor.  That's
12  the same issue.
13    MS. SULLIVAN:  No, it's not.
14    (Discussion held off the record.)
15    MR. SEEGER:  Your Honor, may we approach?
16    (The following transpired at sidebar.)
17    MR. BUCHANAN:  It was withdrawn.
18    MS. SULLIVAN:  I'm not going to show him what
19  was withdrawn, Your Honor.  I'm just going to show him
20  what the FDA reviewed, the same letter he did.
21    MR. SEEGER:  There was a voluntary
22  withdrawal.
23    MS. SULLIVAN:  No increased risk of heart
24  attack.  That's proper cross-examination.  He said he
25  reviewed this before.

1     MR. SEEGER:  Do you want to get in a hearsay
2  statement from the FDA?
3     MS. SULLIVAN:  *That's not hearsay.*
4     MR. BUCHANAN:  It absolutely is.
5     MS. SULLIVAN:  Wait a second.
6     MR. SEEGER:  Two days ago, when we wanted to
7  get in the medical officer reviews, you objected.
8     MS. SULLIVAN:  He's already talked about the
9  medical officer reviews.  There's the problem.  He
10  *already* talked about that.
11     MR. SEEGER:  The FDA --
12     MS. SULLIVAN:  He --
13     MR. SEEGER:  In a memo that talks about
14  withdrawal --
15     MS. SULLIVAN:  I'm not going to show him
16  anything about the withdrawal.  I'm just going to talk
17  about the FDA review, the same database.
18     MR. SEEGER:  Wasn't it Tuesday when we
19  weren't allowed to use --
20     MS. SULLIVAN:  He just talked bit.
21     MR. SEEGER:  This is the political body of
22  the FDA, Your Honor.  This isn't the --
23     MS. SULLIVAN:  Everything is political.
24  Everything is conspiracy.
25     MR. SEEGER:  This isn't Shari Targum or

1  Maria Vallalba.  It's other people.  They want the FDA,
2  an expert, to say they did everything right.
3     MS. SULLIVAN:  He is just talking about --
4     MR. SEEGER:  Why don't you establish the
5  science?
6     MS. SULLIVAN:  He can talk about hearsay
7  findings and reviewing memos and we can't talk about
8  final statements by the FDA about information?
9     MR. SEEGER:  You pulled this document out.
10  It's improper.
11     MS. SULLIVAN:  He has reviewed it.
12     MR. SEEGER:  Whether he reviewed it or
13  not --
14     MS. SULLIVAN:  It's not hearsay.  This is a
15  public record.
16     MR. SEEGER:  What do you mean, public
17  record?  It's got to have reliability.  You want to use
18  a statement --
19     MS. SULLIVAN:  You don't think --
20     MR. SEEGER:  Why don't you find that from
21  1999?  Why don't --
22     MS. SULLIVAN:  This is their statement now.
23     *MR. SEEGER:  When is that from?  When they*
24  withdrew the drug?
25     MS. SULLIVAN:  He is objecting to everything,

1  and you have him talking about hearsay on FDA interim
2  review memos.
3     MR. SEEGER:  Please.  You asked for it.
4  This is improper.  She can't open the door on one memo
5  and then walk through it with this.  That's not proper.
6  She's leading the examination.
7     THE COURT:  These are completely hearsay.
8  They are not admissible.  This is a document, for the
9  record, Defendant's Exhibit 478.  It's four sentences,
10  one, two, three, four.  The document is hearsay.  The
11  expert didn't state that he relied on it.  He didn't
12  use it in his direct examination.
13     He may have read tons of things, but if he
14  didn't rely on them or found them to be credible or
15  didn't use them or it doesn't lay a basis for saying --
16  I recognize that hearsay can -- documents can be used
17  by the experts, but what you want to do is say, okay,
18  you read the newspaper, you read what the press said
19  yesterday about the case --
20     MS. SULLIVAN:  This isn't a newspaper.  It's
21  a public record.
22     THE COURT:  No, that's not a public record.
23  I'm sorry.
24     Well, counsel, let me see it.
25     It's questions and answers for the public.

1     MS. SULLIVAN:  FDA's final to the public.
2     MR. SEEGER:  Written at the time of
3  withdrawal, Your Honor.  How about writing something
4  about 1999, 2000, 2001, not at a point when the FDA --
5  remember, David Graham had already come out a month
6  before this and raised concerns.  There is a storm of
7  controversy --
8     MS. SULLIVAN:  I can't talk about what the
9  whole FDA says, and they want to talk about what David
10  Graham says?
11     MR. SEEGER:  This is peer-reviewed
12  literature.
13     MS. SULLIVAN:  It's a public record.  It's
14  the final statement of the FDA.
15     THE COURT:  This is not -- everything you've
16  produced from *the FDA you say is the final statement,*
17  the final decision.  One, it's just a memo.
18     MS. SULLIVAN:  This goes through substantial
19  review before it's issued, Your Honor.  They just don't
20  say anything to the public about safety issues.
21     THE COURT:  This is a question and answer for
22  the public.  It's not scientifically -- you know what?
23  *Even if it's a government record, which I really*
24  don't -- I question whether it is or isn't, but let's
25  assume it is a government record.  And probably -- I

1  don't know, it may fit the definition.  It doesn't make
2  any difference.  It still has to have some inherent
3  reliability to come in, and it doesn't.
4        (Sidebar concluded.)
5        MS. SULLIVAN:  Thank you, Judge.
6  BY MS. SULLIVAN:
7        Q    Dr. Kronmal, you are aware the FDA approved
8  VIOXX as safe and effective in 1999 based upon a review
9  of the safety studies that Merck had done?
10       A    I'm aware of that, yes.
11       Q    And Doctor, you're also aware that the FDA
12  subsequently approved VIOXX on several different
13  occasions, including as late as August, 2004, as safe
14  and effective based on the entirety of the safety data,
15  correct?
16       A    That's correct.
17       Q    And Doctor, I know you are not an expert in
18  FDA regulations, but you know that there are scientists
19  and biostatisticians like yourself and toxicologists
20  and pharmacologists at the FDA that review safety
21  studies provided by companies?
22       A    That's correct.
23       Q    Okay.  Doctor, let's talk about the VIGOR
24  study, Doctor.
25            You had mentioned, Doctor, that -- you talked

1  about the hypertension finding in the VIGOR study.
2        A    That's correct.
3        Q    And you're aware that all NSAIDs, all pain
4  relievers, increase your risk of hypertension, correct?
5        A    The answer to that is a little unclear.  There is
6  a large number of pain relievers, number one.  Not all
7  of them increase blood pressure.  Some do.  And in
8  fact, Naproxen does.
9        Q    Well, let's talk about the NSAIDs.  Are you
10  aware, sir, that there was a class warning for all
11  NSAIDs on the issue of hypertension, that they all have
12  to warn about that risk?
13       A    That's correct, but the recent studies have shown
14  that some increase blood pressure quite a bit, and
15  others, almost none.
16       Q    Okay.  And if you want to -- if you want a
17  fair comparison as to whether one drug increases
18  hypertension more than another drug, you'd like to give
19  equivalent doses, right?
20       A    You'd like to give doses that are used in
21  practice.  I don't know what -- you can't really talk
22  about what an equivalent dose is of two different
23  drugs.  There is no way of knowing what the equivalence
24  is.
25       Q    Are you aware, Doctor, that the dose of VIOXX

1  used in the VIGOR study was four times the recommended
2  starting dose?
3        A    I knew it was 50 milligrams.  I don't know whether
4  it was four times --
5        Q    You don't know that that's four times the
6  recommended --
7        A    No.
8        Q    And do you know that the dose of Naproxen in
9  the VIGOR study was the standard recommended daily
10  dose?
11       A    No, I don't know what the dose --
12       Q    But dose would matter on the issue of
13  hypertension?
14       A    It depends on the action of the drug.  Some drugs,
15  dose matters, some, it may not.  The only way to tell
16  would be to do experiments with different doses.
17       Q    But side effects from drugs are often dose-
18  dependent?
19       A    Often, they are, but not always.
20       Q    If you give higher dosages, you are more
21  likely to see an adverse event?
22       A    That's often the case, but it is not universally
23  the case.
24       Q    And Doctor, I know you are a biostatistician
25  and not a physician.  Do you know how the dose used in

1  the VIGOR study for VIOXX compares with the dose used
2  for Naproxen in terms of equivalencies?
3        A    No, I don't.
4        Q    Okay.  Fair enough, Doctor.
5            Let me give you -- did I not give you a copy
6  of the VIGOR study, Doctor?  I'm sorry.  Let me give
7  you what we have marked as Defendant's Exhibit 210.
8        A    Thank you.
9        Q    And, Doctor, we -- you've talked with your
10  counsel about how the VIGOR study compared VIOXX
11  as against Naproxen, right?
12       A    That's correct.
13       Q    This was not a placebo-controlled study?
14       A    That is correct.
15       Q    It wasn't what you referred to as the gold
16  standard in terms of determining safety or efficacy?
17       A    I mean, that's not quite true because
18  studies compared against active agents are also
19  perfectly reasonable to do.
20       Q    But the FDA requires companies to do some
21  placebo-controlled studies before a drug can get
22  approved?
23       A    If they can.  They don't do that in cancer
24  treatment.  For example, you don't take people with
25  cancer and give them placebo.  You don't give AIDS

1  patients placebo-controlled trials.  You have to give
2  them active agents.  So it varies with the disease and
3  the circumstance.  For pain relief, I would imagine
4  they would want some placebo-controlled trials.
5      Q   And, Doctor, this was also published in a
6  peer-reviewed journal, The New England Journal of
7  Medicine?
8  A   That's correct.
9      Q   And that's also one of the leading journals,
10  medical journals in world?
11  A   It is a very prestigious journal, yes.
12      Q   And it was published in November of 2000 for
13  all the scientific community to look at, correct?
14  A   That's correct.
15      Q   And you agree, Doctor, it's a good thing for
16  pharmaceutical companies to publish the results of
17  their research?
18  A   They should do that, yes, promptly.
19      Q   And Doctor, I believe you told this jury that
20  in your view, Merck presented the results of the VIGOR
21  study in an inappropriate or misleading fashion.
22  A   Absolutely.
23      Q   Okay.  Doctor, do you know that there were
24  ten coauthors of the VIGOR study in addition to the two
25  Merck authors?

1  Journal of Medicine?
2  A   It is hard to get published.
3      Q   Many more papers are rejected than are
4  accepted?
5  A   That's correct.
6      Q   And they send studies out to outside
7  scientists to review the scientific information being
8  presented and critique it?
9  A   That's correct also.
10      Q   And have you looked at the reviewers'
11  comments for the VIGOR study?
12  A   No, I have not seen the reviewers' comments.
13      Q   And Doctor, you will agree with me that given
14  the fact that it was published, that neither the
15  outside reviewers for the VIGOR study or the editors of
16  The New England Journal believed that Merck was
17  presenting the data in a misleading fashion.
18      MR. SEEGER:  Objection.  How would he know
19  what the editors would know?
20      THE WITNESS:  Well, in answering your
21  question, I don't know --
22      THE COURT:  He can answer it, Counsel.
23      MR. SEEGER:  Okay.
24      THE WITNESS:  They did not see the data
25  presented in the way that I analyzed it and showed it

1  A   I do know that, yes.
2      Q   So there were ten scientists who didn't work
3  for Merck who also were involved in publishing the
4  VIGOR study?
5  A   That's correct.
6      Q   Okay.  And, Doctor, I take it you as a
7  scientist wouldn't put your name on a paper that you
8  didn't think was scientifically correct?
9  A   I wouldn't, no.
10      Q   All right.  And you are suggesting to this
11  jury that these ten outside scientists put their name
12  on a paper that was scientifically false?
13  A   I didn't say it was false.  I said it was
14  misleading.  There is a difference.
15      Q   But certainly, Doctor, looking at these ten
16  authors, they didn't believe that the results presented
17  in the VIGOR study were misleading?
18  A   I don't know what they believed.
19      MR. SEEGER:  Objection, but he just answered
20  it.  Don't worry about it.
21      Q   And Doctor, similarly, you know that The New
22  England Journal of Medicine has an extensive peer-
23  review process?
24  A   That's correct.
25      Q   It's hard to get published in The New England

1  to you today.  Had they seen it in that fashion, I
2  think they would have thought that this was extremely
3  misleading, what was presented.
4  BY MS. SULLIVAN:
5      Q   Well, Doctor, they did see the difference
6  between the heart attack rates and how that was
7  presented, right?  The --
8  A   Well, it wasn't presented accurately, as I said.
9  The rates were misleading in the sense they were
10  underestimated in that paper.  That's number one.  But
11  that was mentioned in a small -- two or three lines in
12  the paper.
13      And how carefully and how thoroughly the
14  reviewers, who were primarily probably
15  gastroenterologists, or those who were expert at
16  arthritis, how well those people reviewed the
17  cardiovascular profile, I don't know.  And did they
18  have any cardiovascular people reviewing this paper?  I
19  don't know.
20      Q   Do you know the credentials of some of the
21  coauthors?
22  A   No, I don't.  Are any of them cardiologists?  Are
23  you saying that some of them are cardiologists?
24      Q   Do you know, sir?
25  A   I don't know.  I'm asking you.  I mean, you are --

# EXHIBIT "2"
## Part C



# EXHIBIT "2"
## Part C

9/22/2005 Kronmal - Direct & Cross

1        THE COURT: You can't ask questions.

2        MS. SULLIVAN: I will show you -- We will get

3  there.

4        THE WITNESS: I don't know if any were

5  cardiologists. Okay.

6  BY MS. SULLIVAN:

7     Q  But Doctor, you haven't seen any evidence

8  that the scientists who coauthored and presented this

9  paper with Merck or anyone from The New England Journal

10  of Medicine or any of the outside reviewers agreed with

11  your opinion that Merck was being misleading in its

12  presentation of the paper?

13     A  I have no idea whether they even tried to evaluate

14  that, so how do I know if they believed it was

15  misleading? They haven't heard me talk about it. They

16  haven't seen the results that I have. How do I know

17  what they would have thought if they had?

18     Q  Well, Doctor, the VIGOR study was pretty well

19  publicized, correct?

20     A  It was -- it appeared in The New England Journal

21  of Medicine. That is a well-publicized journal.

22     Q  And it was debated in other medical journals

23  as well? The results were debated. There was more

24  than one article about the VIGOR results. There were

25  letters to the editor, there was discussion about it in

---

9/22/2005 Kronmal - Direct & Cross

1     Q  On Page 155, Doctor, you were asked about the

2  VIGOR results, and you said, quote, everybody knew the

3  VIGOR results.

4        MR. SEEGER: Objection, Your Honor. Is this

5  the appropriate way to present this, to read the

6  question and the answer?

7        MS. SULLIVAN: I'm just trying to save some

8  time, Your Honor.

9  BY MS. SULLIVAN:

10     Q  Have I read your testimony accurately?

11        THE COURT: We have to know what the question

12  is.

13     A  I can see the question here. I mean, that's

14  obviously, you know, a colloquialism that you say in

15  the course of five hours of people asking you

16  questions.

17        I don't believe that everybody knew the VIGOR

18  results, no.

19     Q  It was pretty well publicized, you will

20  agree, Doctor?

21     A  I agree to that.

22     Q  And Merck reported -- Merck and their ten --

23  Merck and the ten scientists who coauthored the paper

24  in The New England Journal reported right up front the

25  difference in the myocardial infarction found, heart

---

9/22/2005 Kronmal - Direct & Cross

1  other journals, correct?

2     A  There was some concern about the cardiovascular

3  side effect rates, yes.

4     Q  And there was also a lot of discussion about

5  the stomach benefit finding, the GI benefit finding?

6     A  I'm sure there was. I didn't review that, though.

7     Q  And do you know, sir, that the VIGOR results

8  were presented at medical -- many medical conferences?

9     A  I don't know that, but I assume that's reasonable.

10     Q  In fact, Doctor, everybody in the scientific

11  community knew about the VIGOR results.

12        MR. SEEGER: Objection.

13     A  That's a very broad statement. I think that's

14  highly unlikely that everyone knew about the VIGOR

15  results in the scientific community. Not everyone

16  reads The New England Journal of Medicine. Not

17  everyone reads papers on areas in The New England

18  Journal of Medicine that's not their scientific

19  specialty. So that's too broad of a statement.

20     Q  Let me show you, Doctor -- you gave a

21  deposition in this case, sir?

22     A  Yes, I did.

23     Q  Where you swore and you testified under oath,

24  correct?

25     A  Yes, I did.

---

9/22/2005 Kronmal - Direct & Cross

1  attack rate found between the VIOXX users and the

2  Naproxen users, right? That was right in the first

3  page of the paper?

4     A  Yeah, but it's reported inaccurately, number one,

5  because the actual rate difference was .1 versus .5,

6  not .1 versus .4, so it was five-fold, not four-fold.

7        And further, they specified the relative risk

8  in the reverse fashion. Rather than say there was a

9  five-fold increased risk, or maybe they would have said

10  four-fold if they had -- they hadn't used their

11  inaccurate data, they said it was .2 relative risk.

12        And that's very misleading because it's

13  implying, implicitly, that it's the other drug that's

14  protective, and it's leaving the impression among those

15  who quickly read this and who are not experts at

16  Naproxen's effects that Naproxen is protective.

17     Q  Now, Doctor, do you know when Merck submitted

18  the article for publication to The New England Journal?

19     A  It's probably at the bottom of the page. They

20  usually specify that. But I don't know offhand, no.

21     Q  Do you recall, Doctor, that it was within a

22  couple of months of getting the preliminary results of

23  the VIGOR study?

24     A  I have no idea when they submitted it.

25     Q  You don't fault them for trying to get the

1    information out there as quickly as possible?

2    A    No.

3         Q    Okay.  And if -- if, later, they obtained, as

4    they got final data coming in, they obtained more

5    information about heart attacks, and the rate changed

6    from .4 to -- from .4 to .5, you don't fault them for

7    trying to get that information out early?

8    A    They knew -- they had that information prior to

9    the publication of the paper.  They had every -- they

10   had ample opportunity to correct it if it was

11   incorrect.

12        And by way, they would have corrected --

13   certainly -- suppose the extra events they found were

14   in Naproxen.  I mean, they would have corrected that,

15   you bet, instantaneously.

16        Q    You are speculating, aren't you, Doctor?

17   A    No.  I don't think that's speculation.

18        Q    Doctor, you also talked about the fact that

19   you thought Merck didn't disclose the mortality rate in

20   the VIGOR study?  You talked to the jury about that.

21   That's not true, is it?

22   A    I didn't say that.

23        MR. SEEGER:    Objection, Your Honor.

24        THE WITNESS:    I never said that.

25        MR. SEEGER:    That's not what he testified

1    to, Your Honor.

2         THE COURT:    That's for the jury to recall

3    what he said.

4    BY MS. SULLIVAN:

5         Q    In fact, Merck does talk about the fact that

6    the rate of overall mortality is not different in the

7    VIGOR -- in the Naproxen versus the VIOXX trial?

8    A    But there is a difference between saying something

9    is not different and saying that the relative risk was

10   1.46.  Those convey a different message.  And while it

11   wasn't statistically significant, they should have

12   displayed the rates and discussed them.

13        Q    Well, The New England Journal of Medicine

14   didn't agree with you, or the peer reviewers, right?

15   A    I don't know if they noticed it.  I don't know if

16   they thought about it.

17        Q    And, Doctor, you know that based on your

18   review of the SAS files, you know that Merck submitted

19   all of the VIGOR results to the FDA?

20   A    They did.

21        Q    Okay.  And, Doctor, at no point did the FDA

22   come back to Merck and says, You are being misleading

23   in your presentation of data.  The FDA scientists never

24   did that?

25   A    Well, they are not reviewers of the journal, and

1    they don't have anything to say about that, as far as I

2    know, once the paper is published.

3         Q    In fact, Doctor, in terms of published

4    literature or FDA scientists' statements, you are the

5    only scientist who has publicly said that Merck was

6    misleading in The New England Journal of Medicine.

7    That's not found in any other peer-reviewed journal or

8    in any other place?

9    A    There is no one, as far as I know, who has had the

10   Merck data.  I'm the only person who has ever had the

11   Merck data, except for Merck scientists.

12        Q    And the FDA scientists?

13   A    And the FDA knew it, had the data, that's correct.

14        Q    And the FDA has teams of scientists who look

15   at data?

16   A    Well, they usually assign a single biostatistician

17   to the project, usually it's some very junior person.

18   And what they did or did not do or know, I don't know.

19        Q    They assign more than a biostatistician,

20   Doctor.  The FDA assigns a cardiologist, they assign

21   renal specialists, they assign toxicologists?

22   A    Oh, yes.

23        Q    They assign pharmacologists.

24        So it was more than just a biostatistician

25   from the FDA looking at safety data.  They had a team

1    of scientists at the FDA --

2    A    That's correct.  I wasn't saying they didn't.

3         Q    And, Doctor, the VIGOR study involved people

4    with rheumatoid arthritis, correct?

5    A    That's correct.

6         Q    And I know you are not a physician, but do

7    you know enough to know that people with rheumatoid

8    arthritis are at an increased risk for heart attack?

9    A    I know that in general, that's true.  However, one

10   has to keep in mind that in the criteria for selecting

11   patients for this study, Merck tried to select patients

12   who were at low risk for CHD events because they didn't

13   want to take the chance that they would be denying

14   aspirin to people who were at high risk, so they

15   deliberately selected people at low risk.

16        Whether that population is at higher risk

17   than anyone else, I don't have any way of knowing, and

18   no one does.

19        Q    But you agree, Doctor, that populations make

20   a difference?

21   A    They can.

22        Q    In other words, something may have an effect

23   in people with rheumatoid arthritis that doesn't have

24   an effect in people with another condition, like

25   osteoarthritis?

1    A    That's possible.

2    Q    And, Doctor, in the VIGOR study, in terms of

3    the number of heart attacks, there was less than one

4    percent in the VIOXX arm, correct, if you want to talk

5    about absolute risks?

6    A    That's correct.

7    Q    In fact, in the VIOXX arm, it was about half

8    of one percent of the people, of the 4,000 people in

9    the VIOXX arm, half of one percent had a heart attack?

10   A    That's correct, but that was over a very short

11   time, and one doesn't expect a large rate.

12   Q    Actually, there was a -- there was a variety

13   in terms of duration of use.  Some people used it for a

14   couple of months, some people used it as long as a

15   year?

16   A    That's correct.

17   Q    The average was about nine months?

18   A    But that's a short time for cardiovascular

19   disease.

20   Q    Incidentally, Doctor, do you know how -- what

21   Merck did in terms of their safety studies compared

22   with what FDA requires?

23   A    I don't know what the FDA requirements are.

24   Q    You are not an expert in FDA regulations?

25   A    No.

1    Q    And not an expert in the issue of FDA

2    requirements and the conduct of clinical trials?

3    A    I know a good deal about what they expect for

4    conduct of clinical trials, yes, but if you are asking

5    me do I know the details of each of these regulations,

6    the answer is no.

7    Q    Well, do you know, sir, enough to know that

8    Merck conducted three-and-a-half times the number of

9    studies that FDA requires for drug approval?

10   A    Well, I think that's -- that's quite variable.  I

11   don't know that there is a single figure for that.  If

12   you are studying -- if you want to show that you have a

13   new drug for hypertension, you might -- they might

14   require you to do substantially larger studies, maybe

15   in the tens of thousands, even.

16   Q    Well, Doctor, are you aware that the FDA

17   issues guidance documents to companies telling them

18   what the standards are in terms of how many people

19   should be in a study?

20   A    They may well do that.

21   Q    Okay.  You don't know what that number is?

22   A    No, I don't.

23   Q    So you don't know whether Merck exceeded that

24   number --

25   A    No, I don't.

1    Q    Fair enough, Doctor.

2    Now, Doctor, I think you told the jury that

3    you believe Merck should have stopped the VIGOR study.

4    A    I didn't say that.

5    Q    Oh, I'm sorry.  You said it in on your expert

6    report.  Have you changed your mind on that?

7    A    I don't believe I said it in the expert report.

8    It depends on when people knew that the excess risk was

9    four-fold -- five-fold.  If they knew that early ,

10   they should have stopped the study.  If they didn't

11   know it until the end -- and it was a fairly short

12   study, so I don't know when they had the information

13   that would have allowed them to validate that.

14   Q    Now, the FDA had the information from the

15   VIGOR study after the study was complete, and the FDA

16   scientists and Merck scientists continued to talk about

17   and did do further safety studies?

18   A    They did additional studies, yes.

19   Q    In other words, the FDA scientists didn't

20   conclude what you are concluding.  They didn't say,

21   Merck, looking at the VIGOR study, VIOXX causes heart

22   attacks, you can't do any more testing on people?

23   A    That is correct, they did not do that.

24   Q    In fact, the FDA looked at subsequent

25   clinical study protocols from Merck, correct?

1    A    Um-hum.

2    Q    And Merck -- Merck, in communication with the

3    FDA, did several more studies after the VIGOR trial?

4    A    We have already talk about those studies, yes.

5    Q    And Doctor, did you review the -- you talked

6    about the fact that there is an outside scientific

7    board involved in safety studies.

8    A    Data Safety Monitoring Board, yes.

9    Q    You know that's not required by the FDA,

10   right?

11   A    Again, I don't know the exact -- again, I'm not an

12   expert at their requirements.  However --

13   Q    Fair enough.

14   A    -- they have a document that certainly strongly

15   suggests that there be DSMBs in Phase III clinical

16   trials.  I don't know whether it's in the form of a

17   requirement or just a strong opinion.

18   Q    You don't know, Doctor, you are not aware of

19   what the FDA regulations or guidance is on the issue of

20   DSMBs?

21   A    I don't know the details of that document, no.

22   Q    Fair enough.

23   Doctor, did you look -- as part of your

24   review, Doctor, I think I saw that you looked at the

25   Data Safety Monitoring Board minutes for the VIGOR

study?

A    I did look at those, yes.

Q    And you know, Doctor, that -- and the Data Safety Monitoring Board, you told the jury, are the outside scientists who were charged with protecting patient safety?

A    That's correct.

Q    And Doctor, you know that the outside scientists who reviewed the safety data for the VIGOR study as it was coming in, that they -- they never decided that the study should be stopped?

A    That's correct, but I don't know what data they were provided with and I don't know when they were provided it.

Q    Well, did you review the minutes?  It talked about the difference --

A    The minutes were very vague and incomplete, and I don't -- I don't have any documents that show what the *closed session reports from the company showed.*  I wanted those documents and requested them on numerous occasions, and I never have gotten to be able to get them.

Q    Let's look at the Data Safety Monitoring Board minutes that you looked at.  But you'll agree, Doctor, that these outside scientists who looked at the

safety data coming in from the VIGOR study, that they didn't agree with you that the VIGOR study showed that VIOXX was causing heart attacks?

A    I don't know that, because I don't know whether they had the data to make that judgment.

Q    Well, let's take a look at that, Doctor.  Let me show you Defendants Exhibit 727.

THE COURT:  What was the number, Counsel?

MS. SULLIVAN:  Defendant's Exhibit 727.

THE COURT:  727?

MS. SULLIVAN:  Yes, Your Honor

BY MS. SULLIVAN:

Q    Doctor, these were the outside scientists whose job it was to protect patient safety in the VIGOR study, right?  Dr. Bjorkman, Dr. Neaton, Dr. Shapiro, who was a nonvoting member, Dr. Silman and Dr. Sturrock?

A    That's correct.

Q    And you know Dr. Neaton?

A    Yes, I do.

Q    And I think you told us he is a man of scientific integrity, in your opinion?

A    That's correct.

Q    And it looks like from the minutes that on November 17th, 1999, during the VIGOR study, the

outside scientific board convened to discuss the *analysis of the safety data in the VIGOR trial,* right?

A    That's correct.

Q    And you see, Doctor, the report in the minutes of excess cardiovascular events in one group compared to the other, correct?

A    That's correct.

Q    Okay.  And, Doctor, going to the end of the minutes, the minutes reflect the fact that the board members decided that the differences between the treatment groups were noted as being significant beyond the level of chance, however, it was also noted that there is no ability in this trial to distinguish between a potentially harmful effect of Treatment A and a cardiovascular protective effect of Treatment B due to its anti-platelet effects.

It was also noted that while the trends are disconcerting, the numbers of events are small. Members were concerned and want to follow up on these data more thoroughly and frequently, but did not believe that the trial should be stopped at this time.

Do you see that?

A    Yeah, I do.

Q    Okay.  So the outside scientists who were looking at the safety data from the VIGOR trial,

including the disparity in cardiovascular events, did not believe that the VIGOR trial should be stopped, correct?

A    That's what they concluded, yes.

Q    In fact, these outside scientists believed that the difference may be explained by the cardioprotective effects of Naproxen, correct?

A    That's an interesting point because --

Q    Just looking at the minutes, my question, Doctor, is isn't that what the scientists on the outside safety board, scientists outside Merck, concluded in November of 1999, that the difference may be due to the cardioprotective effect of Naproxen?

A    That is what they concluded.  However --

Q    You have answered my question, sir.  I'm sure counsel can bring out whatever he likes on --

MR. SEEGER:  Your Honor, can he please explain his answer?  It's a "however."  It's a qualified answer.

MS. SULLIVAN:  Your Honor, he can bring it out on redirect, Judge.  I would just like to get through this.

MR. SEEGER:  Your Honor, the record is going to be misleading *if he doesn't answer the question.*

THE COURT:  Let him answer it on redirect.

1    Go ahead.

2    THE WITNESS:  In my view --

3    MS. SULLIVAN:  I think the judge said you

4  have to save that one.

5    THE COURT:  Yes, that's okay.

6    Sir, you will have a chance to say it if your

7  counsel wants.

8    THE WITNESS:  That's fine.

9  BY MS. SULLIVAN:

10    Q    All right.  Doctor, there was -- let me show

11  you what's been marked as Defendant's Exhibit 728.  And

12  Doctor, you know that the FDA gets adverse event

13  reports as studies go on.  I know you are not an FDA

14  expert, but you have done studies, and you know that,

15  correct?

16    A    Yes, that's correct.

17    Q    So the scientists on the outside review

18  committee for safety are getting the adverse event

19  information and the FDA scientists are also getting

20  adverse event information from the study, correct, from

21  the VIGOR study?

22    A    That's correct.

23    Q    And neither the FDA scientists or the outside

24  scientists monitoring the safety of the VIGOR study

25  concluded that VIOXX was causing heart attacks,

1  correct?

2    A    They did not reach that conclusion, that's

3  correct.

4    Q    Let me show you, Doctor, Defendant's Exhibit

5  727.  This is a meeting a month later, Doctor, correct?

6    A    That's correct.

7    Q    Of the safety board.  And they're, again,

8  talking about the cardiovascular safety analysis of the

9  VIGOR trial.  Do you see that, sir?

10    A    Yeah, I did.

11    Q    Okay.  And they see that the trends continue,

12  in other words, the difference in cardiovascular events

13  between Treatment A and Treatment B continue.  Do you

14  see that?

15    A    That's correct.

16    Q    And, again, Doctor, looking at here, none of

17  the members believed that the trial should be stopped

18  based on these results, and members expressed the

19  belief that the differences may be due to a

20  cardioprotective effect of treatment B.  However, all

21  members believed that these results are important in

22  evaluating the risks and benefits.

23    Do you see that, Doctor?

24    A    I do.  Quite frankly, I don't understand why they

25  didn't stop that trial.

1    Q    Well --

2    A    In point of fact, it doesn't really matter from

3  the point of view of patient safety whether Naproxen

4  was protective or VIOXX was dangerous.  They were

5  subjecting people to increased risks.  If it was

6  because Naproxen was protective, they should have still

7  stopped the trial because those people should have been

8  put on Naproxen.  They shouldn't have been subjected to

9  the excess risk of CHD events.

10    Q    I understand that's your opinion, Doctor, but

11  the outside scientists who looked at the data from the

12  VIGOR study, the same data that you did, they didn't

13  agree with you, did they, Doctor?

14    A    Apparently not.

15    Q    And the FDA didn't agree with you?

16    A    I don't know what the FDA agreed to or not.

17    Q    The FDA never told Merck they should have

18  stopped the VIGOR trial, right?

19    A    But they didn't have this interim data,

20  presumably.

21    Q    They had the adverse events that would have

22  been reported on the 15-day requirement, correct?

23    MR. SEEGER:  Objection, Your Honor.  Your

24  Honor, the study was blinded --

25    THE WITNESS:  I presume they would have had

1  that, yes.

2    MR. SEEGER:  Objection.

3    MS. SULLIVAN:  And, Doctor --

4    THE COURT:  The objection is that the FDA

5  would not have been advised if it was a blinded study?

6    MR. SEEGER:  They would not have known,

7  Your Honor.  It's blinded.

8    MS. SULLIVAN:  It would have shown the

9  difference.

10    THE COURT:  The jury should disregard the

11  statement of counsel.

12  BY MS. SULLIVAN:

13    Q    Well, Doctor, even after the data was

14  unblinded, the FDA never came back to Merck and said,

15  You should have stopped the VIGOR trial?

16    A    I don't know if the FDA ever goes and says after a

17  trial is over what they should have done.

18    Q    They never -- as far as you know, there has

19  never been a sanction or a citation or any issue

20  between the FDA and Merck as it relates to the conduct

21  of the VIGOR trial?

22    A    As far as I know, that's not been done.

23    Q    Okay.  And, Doctor, these outside scientists

24  who looked at the safety data from the VIGOR trial as

25  it came in, believed that the differences between the

1 cardiovascular events may be due to the
2 cardioprotective effect of Naproxen?
3   A   That's what they say.
4   Q   Okay.  And you disagree with them?
5   A   Totally.
6   Q   All right.  And Doctor, it's your view that
7 these outside scientists who looked at the VIGOR data,
8 it's your view that their opinion that Naproxen may be
9 cardioprotective was unreasonable?
10  A   That's my view, yes.
11  Q   And you believe that the Merck scientists
12 were unreasonable in that view?
13  A   That's correct.
14  Q   And you believe the FDA was unreasonable in
15 that view?
16      MR. SEEGER:  Objection, Your Honor.
17      THE WITNESS:  I don't know what the FDA
18 believed or not believed.  They were skeptical about
19 the Naproxen.
20      MR. SEEGER:  Objection, Your Honor.  That is
21 not the FDA's views on Naproxen.
22      MS. SULLIVAN:  Well, Your Honor could we
23 talk --
24 BY MS. SULLIVAN:
25  Q   Have you seen any information about the FDA's

1 view on Naproxen in 2005 and whether or not it's
2 cardioprotective?
3       MR. SEEGER:  Objection, Your Honor.
4       THE WITNESS:  I don't know what they said
5 specifically about that.
6       MS. SULLIVAN:  Fair enough.
7       THE COURT:  Do you want a sidebar on that?
8       MR. SEEGER:  Yes, Your Honor.
9       (The following transpired at sidebar.)
10      MR. SEEGER:  We can do it quickly.  I mean,
11 we have warning letters where the FDA told them to stop
12 saying it's Naproxen.  To suggest the FDA is now -- and
13 that was the time frame.  I don't even know if they say
14 it now.  I just don't know.
15      THE COURT:  What do you have from 2005 that
16 the FDA says Naproxen --
17      MS. SULLIVAN:  It says Naproxen may be
18 cardioprotective in the decision memo.
19      MR. SEEGER:  That is in the new memo.
20      MS. SULLIVAN:  In the decision memo.
21      MR. SEEGER:  It's not the case now, Your
22 Honor.  It was never the case.
23      MS. SULLIVAN:  It's the case today.
24      MR. SEEGER:  It is not the case.  She can ask
25 him that question.  She knows --

1       MS. SULLIVAN:  It's the case today that
2 Naproxen may be cardioprotective.
3       MR. SEEGER:  This is intentional.  This is
4 just -- the bottom line is that the FDA admonished them
5 for saying that Naproxen was cardioprotective.  They
6 admonished them for saying it was the difference in
7 VIGOR.
8       MS. SULLIVAN:  No, they didn't admonish.  The
9 FDA says today that Naproxen may be cardioprotective.
10      THE COURT:  Maybe?
11      MR. SEEGER:  It also raises your risk of
12 cardiovascular events.  She can't decide which side she
13 wants to be on.
14      MS. SULLIVAN:  I don't know what the
15 objection is.
16      MR. SEEGER:  The objection is it's another
17 total --
18      MS. SULLIVAN:  I asked him, do you know what
19 the FDA says today on it?
20      MR. SEEGER:  They don't say it.
21      MS. SULLIVAN:  He has downloaded a bunch of
22 files.  It's proper --
23      THE COURT:  All right.
24      MR. SEEGER:  Lucchesi said it.
25      THE COURT:  The objection is overruled.  You

1 can ask him on cross.
2       MR. SEEGER:  All right.
3       (Sidebar concluded.)
4 BY MS. SULLIVAN:
5   Q   Doctor, you know that after the -- after the
6 VIGOR study, that the FDA convened an advisory
7 committee?
8   A   That's correct.
9   Q   Of outside scientists?
10  A   That's correct.
11  Q   And you, yourself, have told us that you
12 served on committees like that?
13  A   That's correct.
14  Q   And that's akin to sort of a peer review
15 process with a lot of scientists reviewing data and
16 coming up with critiques and giving recommendations to
17 the FDA?
18  A   Depends on what they are asked to do, but
19 something of that sort is not unreasonable.
20  Q   And you believe it's a reliable way for FDA
21 to obtain information, scientific information?
22  A   It's -- it's a good way for them to get input from
23 outside people.
24  Q   Okay.  And the FDA often makes conclusions
25 based on what its advisory committee recommends,

1  correct?
2  A    They often follow the advice of the advisory
3  committee.  Sometimes they don't.
4       Q    And at the 2001 advisory committee meeting,
5  Dr. Kurnool, concerning the VIGOR data and what it
6  means, there was a lot of scientific discussion and
7  debate as to whether or not VIOXX increased your risk
8  of heart attack or Naproxen was cardioprotective,
9  correct?
10 A    There was some debate about that issue, yes.
11      Q    There were a lot of scientists on both sides
12 of that issue, correct?
13 A    I didn't count them up.
14      Q    But there were scientists on both sides of
15 that issue?
16 A    There may have been.  There probably were.
17      Q    And, Doctor, have you taken a look at the
18 label that FDA approved in 2002 describing the VIGOR
19 results?
20 A    Yes, I have.
21           MR. SEEGER:  Your Honor, could we have a
22 sidebar on this?
23           THE COURT:  Okay.  Don't put it up.
24           (The following transpired at sidebar.)
25           MR. SEEGER:  Are we going down the road of a

1  2002 label where they moved to keep it out?  They
2  didn't elicit any testimony on direct.
3           MS. SULLIVAN:  You wanted it in.
4           THE COURT:  You didn't.  You moved to keep it
5  out.
6           MS. SULLIVAN:  But then everybody said -- not
7  the labels, Your Honor.  We did move to keep out post-
8  incident communications with the FDA.  You overruled
9  that, and the label is -- has science in it.  It talks
10 about the scientists' impression of the studies.
11 That's proper cross-examination.
12           MR. SEEGER:  It's after -- I'm trying to
13 figure out how this relates to anything that was done
14 on direct.
15           MS. SULLIVAN:  You said VIOXX causes heart
16 attack.  I think it's relative to say the FDA didn't
17 say that in their label.  Their scientists interpreted
18 it and they didn't agree with it.
19           MR. BUCHANAN:  The April 15th, 2002 label,
20 you want to cross-examine our experts on?
21           MS. SULLIVAN:  Yes.  That's proper
22 cross-examination.  That's science.  You had Lucchesi
23 talk about what should or shouldn't be in a label.
24           MR. SEEGER:  Actually, we're talking about
25 what was in the 1999 and 2001 label, what should or

1  shouldn't have been in the 1999 and 2001 label.
2           MS. SULLIVAN:  They can't have it both ways.
3  They have all these things.  Dr. Scolnick calling the
4  FDA names and everything else, and they want keep out
5  the label.
6           MR. SEEGER:  It shows they were fighting the
7  warning.  I don't know that this is relevant to --
8           THE COURT:  We are going to have this witness
9  back tomorrow, so we might as well let him go.
10          MS. SULLIVAN:  Okay.
11          THE COURT:  Well, we don't have any choice, I
12 don't think.
13          Are you done?
14          MS. SULLIVAN:  I have about another hour and
15 ten.
16          THE COURT:  Another hour?
17          MS. SULLIVAN:  45 minutes.  40 minutes.
18          MR. SEEGER:  I've got ten.
19          THE COURT:  That's it?
20          MR. SEEGER:  Ten.
21          THE COURT:  All right.  Let's see if we can
22 finish.
23          MS. SULLIVAN:  Now?
24          THE COURT:  You want to ask him about warning
25 labels.

1           MS. SULLIVAN:  Yeah.  That's proper, Your
2  Honor.  They have all the post-incident stuff.  They
3  can't have it both ways.
4           MR. SEEGER:  Isn't that the adequacy of the
5  '99 label?
6           MS. SULLIVAN:  That's what you wanted, but
7  you want to get in all the post-incident e-mails about
8  communications with the FDA.
9           MR. SEEGER:  About the refusal to warn.
10 That's what it's about.
11          MS. SULLIVAN:  You can't have it both ways.
12          THE COURT:  Well, let me see the label.
13          That's what you want to put in?
14          MS. SULLIVAN:  Yeah.  I show a section -- Let
15 me just find it here.  VIGOR, VIGOR, VIGOR, VIGOR,
16 VIGOR.  Precautions.  This section here talks about the
17 science.
18          MR. BUCHANAN:  The science is what your
19 clinical trials is.
20          MS. SULLIVAN:  You guys had to bring up
21 e-mails and learned treatises.
22          MR. SEEGER:  No --
23          MS. SULLIVAN:  If he says VIOXX causes heart
24 attack, it's relevant to show him the FDA scientists
25 didn't agree with him.

1    MR. SEEGER:  It's, frankly, a little
2  gratuitous.  It's not necessary.
3    MS. SULLIVAN:  He said he reviewed it, Judge,
4  as part of his -- for preparation.
5    MR. SEEGER:  He didn't even testify to it.
6  He didn't offer any opinions on it.
7    MS. SULLIVAN:  It's proper cross-examination
8  on causation.  He said he reviewed it.
9    THE COURT:  Does it say anything about
10  cardiovascular?
11    MS. SULLIVAN:  Yeah, it does.
12    THE COURT:  Where?
13    MR. SEEGER:  There it is.  There is the
14  table.
15    MS. SULLIVAN:  I'll find it, Judge.  I can
16  move on.  I just want to show him -- I don't know this
17  isn't a proper.  He brings in all the post-incident FDA
18  stuff, and then I can't show him the FDA's final
19  conclusions.  That's not fair.
20    THE COURT:  Let me see what it says.
21    MR. SEEGER:  It's right here.  It's right
22  here.
23    MS. SULLIVAN:  No, I want to find out -- I
24  want the part that says -- I have it cued up on the --
25  oh, here.

1    MR. SEEGER:  These are not user friendly.
2    THE COURT:  Yeah, I know.
3    MS. SULLIVAN:  I'm looking for
4  the Alzheimer's stuff.  Oh, here it is, Judge.  I'm
5  sorry.
6    THE COURT:  Well, it's not VIGOR.
7    MS. SULLIVAN:  He talked about Alzheimer's.
8  It's VIGOR and Alzheimer's.
9    MR. SEEGER:  I got a good document.
10    MS. SULLIVAN:  You're going there, anyway.
11  You got all the post-incident stuff.  The Alzheimer's
12  studies were concluded post-incident, Judge.  They are
13  talking about that.  Let us talk about what the FDA
14  thinks of them.  I mean, he can't have it both ways,
15  that you bring in all this post-incident stuff and we
16  can't --
17    MR. SEEGER:  We brought it in for another
18  purpose.
19    MS. SULLIVAN:  Not appropriate.
20    MR. SEEGER:  You are asking to offer these
21  as the true incidence but you guys have the CSRs.  Use
22  the CSRs.
23    MS. SULLIVAN:  This is outside science, after
24  the advisory committee that you guys opened on.
25    THE COURT:  Does it say anything about

1  Naproxen?
2    MS. SULLIVAN:  No, Judge, it talks about
3  Alzheimer's and VIGOR.  The VIGOR study is Naproxen.
4  No, it says VIGOR.
5    THE COURT:  But I thought you were using this
6  to show --
7    MS. SULLIVAN:  I am, but it says that there
8  is -- the clinical effect is unknown of VIGOR, which
9  goes to the Naproxen issue.  You want to let them go --
10    THE COURT:  Is there anything in there that
11  says its effects are unknown or the reasons are
12  unknown?
13    MS. SULLIVAN:  Yes.
14    MR. SEEGER:  This will be some of the best
15  testimony of the day, the three of us trying to find
16  it.
17    THE COURT:  Who has got your tab?
18    MS. SULLIVAN:  It's up on the screen.
19    THE COURT:  Can't you put it on the small
20  screen?  Can you pull that up on the small screen
21  without putting it on the big screen?
22    Thank you.
23    (Sidebar concluded.)
24    THE COURT:  Can you now put it up so I can
25  read it?  Okay.

1    Approach sidebar.
2    (The following transpired at sidebar.)
3    THE COURT:  That's what you are going to show
4  him?
5    MS. SULLIVAN:  Yeah, just that piece.
6    MR. SEEGER:  Now the jury is going to think
7  there is a cardiovascular warning label.
8    MS. SULLIVAN:  Also, just to -- actually,
9  this is in, you know, Judge?  In his report, he says,
10  We report the MI is wrong in the 2002 label.  He talks
11  about it in his report.
12    MR. SEEGER:  This isn't a 2002 label case.
13    MS. SULLIVAN:  In the report you served to me
14  in the Humeston case, he talks about the 2002 label.
15    MR. SEEGER:  That's a general report for all
16  cases.  Your Honor, this was served in five cases, some
17  of which were post-label change, and you know that.
18    THE COURT:  Did he testify about that?  He
19  didn't testify about that?
20    MR. SEEGER:  He didn't testify at all about
21  the 2002 label.  Nothing.  Not a word.
22    MS. SULLIVAN:  This goes to the science.
23  This goes to what FDA scientists concluded about the
24  science.  That's proper cross-examination what other
25  scientists concluded.

1    THE COURT: Remedial conduct in the change
2  label.
3    MS. SULLIVAN: No.
4    MR. SEEGER: Now the jury is going to think
5  this was a warning.
6    MS. SULLIVAN: You know what is not fair?
7    THE COURT: Well, the jury will be made
8  aware.
9    MS. SULLIVAN: Your Honor, you asked both
10  parties, let's not talk about post-incident issues. We
11  were happy to do it. They didn't want to do it.
12    MS. SULLIVAN: They brought in a whole bunch
13  of post-incident stuff. We should be able -- about FDA
14  and Merck. We --
15    MR. SEEGER: Pre-incident conduct. That's
16  exactly what it was.
17    MR. SEEGER: Use your science.
18    MS. SULLIVAN: This is science.
19    MR. SEEGER: That's a label.
20    MS. SULLIVAN: That's not fair, Your Honor.
21    THE COURT: The FDA approved the label.
22    MR. SEEGER: It's an FDA-approved label. I
23  don't dispute that, Your Honor. With a witness --
24    MS. SULLIVAN: He said he reviewed it and
25  it's in his report.

1    MR. SEEGER: He didn't testify to it, Diane.
2    MS. SULLIVAN: It's proper cross-examination.
3    MR. SEEGER: Why? He didn't testify to it.
4    THE COURT: What's your objection to it if
5  the jury is told that this label did not exist in 2001?
6    MR. SEEGER: Well, he didn't testify to it,
7  and frankly, I don't see how it's germane to this case.
8    MS. SULLIVAN: Of course you don't.
9    MR. SEEGER: With this witness.
10    MS. SULLIVAN: It goes to science. He is
11  saying VIOXX caused heart attacks, Your Honor.
12  Everybody knew that. And he --
13    THE COURT: It says it caused a lot more
14  heart attacks.
15    MS. SULLIVAN: He can cross on that.
16    THE COURT: It just says they don't know why.
17    MS. SULLIVAN: He can ask about that.
18    MR. SEEGER: I guess my concern is quite
19  primary. It's a 2002 label and -- and I would like it
20  to be shown first with all the fine print now.
21    MS. SULLIVAN: I don't know that they can get
22  in all the back and forth about what should go in the
23  label and what --
24    THE COURT: The final label doesn't exist
25  because you took it off the market.

1    MS. SULLIVAN: No, this is the -- well, the
2  ultimate label, after the back and forth on the VIGOR
3  study. He's got a whole case about the back and forth
4  with the FDA on the VIGOR study, even though it's,
5  under all the circumstances, post-incident. So the
6  label comes in, Your Honor, on that issue.
7    MS. SULLIVAN: I don't know why you are
8  objecting.
9    THE COURT: She is saying it's probative of
10  the fact that the FDA didn't make -- it's the same
11  thing she has been arguing. She has been
12  cross-examining the witness on this when, in fact,
13  nobody else interpreted VIGOR the way you guys
14  interpreted VIGOR.
15    MR. BUCHANAN: So what is the question
16  pending to the witness?
17    MS. SULLIVAN: I said, Did you review the
18  label? I'm going to show him this as what the FDA-
19  approved label said about the VIGOR trial and about the
20  Alzheimer's trial.
21    MR. SEEGER: You want to reflect how data
22  was reported?
23    MS. SULLIVAN: And the fact that FDA denied
24  it --
25    THE COURT: Are you going to show him the

1  one --
2    MS. SULLIVAN: The 2002 label, the one you
3  have.
4    THE COURT: You have to show him the 2001 and
5  2002 then, right?
6    MS. SULLIVAN: The VIGOR study is in 2002.
7  I'm going to show him the label you just looked at.
8    THE COURT: We can't confuse the jury. Is
9  there anything about cardiovascular in the first one?
10    MR. BUCHANAN: No.
11    MS. SULLIVAN: There was. In terms of
12  reported adverse events, there was.
13    MR. SEEGER: No reported warning or
14  contraindication.
15    MS. SULLIVAN: Agreed, but it was a --
16    THE COURT: So tell the jury --
17    MS. SULLIVAN: No, you can't, Judge, because
18  there was a cardiovascular adverse event --
19    THE COURT: Why can't you just tell them this
20  was not the warning label that was in effect at the
21  time of Mr. Humeston's heart attack? That's fine.
22  That's a proper instruction, instead of characterizing
23  it.
24    MR. SEEGER: I'm just trying to find out
25  where this is going. It's confusing.

1    MS. SULLIVAN:  You guys object to everything.

2    MR. SEEGER:  Please, Diane, you are going

3  down a road that we didn't go down with the witness.

4    MS. SULLIVAN:  You opened the door going

5  through all the back and forth with the FDA after

6  Mr. Humeston's heart attack.  This is the final

7  decision.  After all the back and forth that they go

8  into, this is the final decision.

9    MR. BUCHANAN:  Your Honor, I'm not going to

10  fight it anymore.  I want to let the witness off today.

11  If you could just caution the jury --

12    MS. SULLIVAN:  You've got to bring him back.

13  You took three-quarters of the day.

14    THE COURT:  You have more time.  Finish him

15  up.

16    (Sidebar concluded.)

17    THE COURT:  I'm going to let counsel show you

18  the 2002 label.  Just so you understand, this is not

19  the label that was on VIOXX when Mr. Humeston had his

20  heart attack.  This was language added afterwards.

21    MS. SULLIVAN:  Can we blow it up?

22  BY MS. SULLIVAN:

23    Q    And Dr. Kronmal, you said you've looked at

24  that, and I've looked at your report where you mention

25  it.

1  jury, that VIOXX caused heart attacks, right?

2    A    I don't know what they concluded, but I can tell

3  you, this label is grossly inaccurate.

4    Q    So the FDA scientists looked at the same data

5  that you did, the Alzheimer's data and the VIGOR data,

6  and they approved a label that said the significance of

7  the cardiovascular findings from these three studies,

8  VIGOR and the two placebo-controlled studies -- and

9  those are the Alzheimer's studies, right, sir, the two

10  placebo-controlled studies?

11    A    Yes, it is.

12    Q    And they tell the public that the

13  cardiovascular findings is unknown, right?  That's what

14  FDA concluded in 2002?

15    A    That's what they approved.

16    THE COURT:  He said the significance is

17  unknown, not the finding.

18    THE WITNESS:  The significance is unknown,

19  yes.  But this is where the problem really comes in

20  with what --

21  BY MS. SULLIVAN:

22    Q    Doctor --

23    A    You were asking about this label.  I'm trying to

24  discuss it.

25    Q    My question was a yes or no.  You can talk

1    Okay.  And, Doctor, the FDA-approved label,

2  after the FDA scientists looked at the VIGOR studies

3  and looked at the Alzheimer's studies, it talks about

4  the VIGOR studies and the Alzheimer's studies in terms

5  of what doctors should know about them, right?

6    A    That's correct.

7    Q    Okay.  And the FDA-approved label talks about

8  the fact that --

9    MR. SEEGER:  Objection, Your Honor.  It's

10  Merck's label.  "The FDA-approved label" is not a

11  proper characterization.

12    THE COURT:  It's Merck's label.  They

13  approved it.  Let's just call it the label, not the

14  Merck label or the FDA label.

15    MR. SEEGER:  Thank you.

16    MS. SULLIVAN:  There is no dispute it was

17  approved by FDA.

18    MR. SEEGER:  It's Merck's label.

19    MS. SULLIVAN:  Approved by the FDA.

20    THE COURT:  It's the label that Merck put on

21  its product and it was approved by the FDA.

22  BY MS. SULLIVAN:

23    Q    And Doctor, after the FDA scientists looked

24  at the Alzheimer's studies and the VIGOR study, the FDA

25  scientists did not conclude what you are telling this

1  about it with your --

2    THE COURT:  He can answer the question.

3  BY MS. SULLIVAN:

4    Q    I am sorry, Doctor.

5    A    This is basically the fundamental problem in that

6  this does not address the total mortality, which the

7  company knew was statistically significant at this time

8  point.  It doesn't discuss it at all, so it's

9  misleading in that respect.  They misled the FDA in

10  that respect, as far as I can tell.

11    Q    We'll talk about that.

12    A    Because the FDA did not seem to know that.

13    Q    We'll talk about that.

14    A    And secondly, if you look at the cardiovascular

15  events for VIGOR, they don't show in here, as you know,

16  the 20 versus 4, the five-fold increased risk.  All

17  they say is it was significant.  That could mean it was

18  15-5, 18-6.  A lot of results would have been

19  significant, but five-fold is a lot bigger.

20    This label was carefully crafted by Merck to

21  make sure that people did not know what the safety

22  profile of this drug was.  The FDA may have approved

23  it, but that wasn't the point.

24    MS. SULLIVAN:  I object.  I move to strike.

25  BY MS. SULLIVAN:

1    Q    Doctor, you have absolutely no firsthand
2  knowledge about what the FDA and Merck communicated
3  concerning this label.
4         MR. SEEGER:   Objection.
5         THE WITNESS:   That's correct.
6         MR. SEEGER:   She is arguing with the
7  witness, Your Honor.
8         THE COURT:   He has answered the question.
9  BY MS. SULLIVAN:
10   Q    Doctor, you are just speculating on what went
11 on between Merck and the FDA; you have no firsthand
12 knowledge?
13   A    I know this is inaccurate and displays the data in
14 an inappropriate and misleading way.
15   Q    And Doctor, you've looked at the SAS files
16 that Merck turned over to the FDA.  In fact, Merck
17 reported all of the mortality data to the FDA from the
18 Alzheimer's trials, correct?
19   A    I don't know that.  In fact, the fact is in some
20 cases, the files I looked at that were sent clearly did
21 not include all the mortality.  I don't know whether
22 they actually showed them all the mortality or not.
23   Q    We will look at that, Doctor.  But what we
24 know from 2002 is that when the FDA scientists looked
25 at the VIGOR data and the Alzheimer's data, they did

1  four years.
2         Being on a drug for long periods of time may
3  have a totally different effect on mortality than being
4  on it a short time, and likely did.  You, yourself,
5  commented that dose is important.  Well, the more you
6  take the drug over a longer period of time, the more
7  you are dosed with it.
8    Q    Well, Doctor, are you aware that none of the
9  other studies that you looked at showed that VIOXX
10 increased death rate, increased all-cause mortality?
11   A    VIGOR increases -- shows an increase in all-cause
12 mortality --
13   Q    Not statistically significant.
14   A    But it's there.
15   Q    But scientists like you don't call that --
16 that could be a chance finding?
17   A    It could be.
18   Q    Okay.  In other words, you can't rule out a
19 chance finding?
20   A    I can't.
21   Q    And did you look, Doctor, at the all-cause
22 mortality in the osteoarthritis studies in patients
23 like Mr. Humeston?
24   A    I did not look at all-cause mortality --
25   Q    So you do not know what the --

1  not conclude what you are telling this jury, they did
2  not conclude that VIOXX caused heart attack, they
3  concluded that the risk was unknown, right?
4    A    I don't know what they concluded.  All I know is
5  they approved this particular label.
6    Q    Okay.  Thank you, Doctor.
7         I want to move to the discussion of the
8  Alzheimer's mortality data that you spent a fair amount
9  of time talking to the jury about.
10        Now, Doctor, you'd agree with me that it's
11 not good science to cherry-pick one study and ignore
12 other studies on the same medicine?
13   A    You need to look at the totality of the evidence.
14   Q    You need to look at the totality of the
15 evidence?
16   A    That's correct.
17   Q    And in looking at the issue of VIOXX and
18 all-cause mortality, you'll agree with me, Doctor, that
19 on the osteoarthritis studies, for example, there
20 actually was a lower rate of all-cause deaths with
21 VIOXX compared to other medicines and placebo, right?
22   A    I don't know that it was a statistically
23 significantly lower rate, number one.  Number two, the
24 osteoarthritis studies were very short term.  They were
25 only a few months.  The Alzheimer's studies extended to

1    A    The exposure time was way too low for that to be
2  of particular interest.
3    Q    The average time was four months?
4    A    That's right.  That is way too low.
5    Q    And Doctor, did you look at the all-cause
6  mortality for any of the other studies?
7    A    No, I didn't, because at the time I did the
8  analyses I was focusing on MI.  It was only because I
9  happened to notice that there was this incredible
10 number of sudden deaths that I started to look at the
11 all-cause mortality.  Had I known that when I started
12 it, I would have done an analysis of all-cause
13 mortality for all the studies.
14   Q    So you came in and told the jury that VIOXX
15 increases your risk of all-cause mortality without
16 looking at any of the studies except Alzheimer's on
17 that issue?
18   A    That was the primary one that showed that it did.
19   Q    But you didn't look at what any of the others
20 showed on that issue?
21   A    I did not look at the other studies, except for
22 VIGOR and APPROVe.
23   Q    Okay.  And in terms of APPROVe, there was no
24 difference, correct?
25   A    In APPROVe, there was no difference.  In VIGOR,

1   there was.

2       Q   No difference in APPROVe.

3           And Doctor, did you look at Merck's -- the

4   background package that Merck submitted to the FDA?

5   A   Which background --

6       Q   In 2005?

7   A   I looked at it, yes.

8       Q   Okay.  And in that package, they provide the

9   FDA with data concerning all-cause mortality for all

10  studies, right?

11  A   They do not actually do -- first, they don't do a

12  test hypothesis.  They don't show the survival curves.

13  They break it up into little pieces so that the people

14  reading it would not notice that all-cause mortality

15  was higher.

16          They would say things like there were three

17  events in one -- for one cause of death and five for

18  another, seven for this one, some were off therapy,

19  some were on therapy.  So they break it up into a lot

20  of little pieces and never really display the mortality

21  rate.

22      Q   Dr. Kurnool, teams of FDA scientists had the

23  same raw data you did to look at that issue.  They

24  analyzed the raw data, correct?

25  A   That's correct.

1       Q   Okay.

2   A   However, the data that I saw that they submitted

3   for that meeting did not include all the deaths.

4       Q   We'll talk about that.

5           Isn't it true, sir, that you *included as*

6   deaths caused by VIOXX people who weren't on the drug

7   for a year or two years; they had stopped taking the

8   drug for a year or two?

9   A   That's correct.

10      Q   And you counted them?

11  A   And I have already said that, yes.

12      Q   And you counted them?

13  A   That's right.

14      Q   And other scientists will tell you that

15  that's not the right way to do a study.  You don't --

16  A   I don't believe that anyone, any statistician who

17  analyzes clinical trials, will tell you that the intent

18  to treat analyses that I did was not the correct

19  analyses to do.

20      Q   Well, we will talk about that, Doctor.  But

21  you included in your counting of heart attacks caused

22  by VIOXX, people who had a heart attack a year, two

23  years, three years, after they stopped taking VIOXX,

24  right?

25  A   That's correct.

1       Q   Okay.  And, Doctor, do you know what the

2   half-life is on VIOXX, when it stops to be activated?

3   Do you know that's about 85 hours?

4   A   Yeah.  That's irrelevant.

5       Q   Okay.  Derek, I'm sorry, let me get this so

6   the jury can *see it.*

7           All right.  And, Doctor, in

8   Merck's background submission to the FDA in January,

9   2005, they talk about the all-cause mortality, right,

10  the deaths seen in studies, and whether there is a

11  difference in people who took VIOXX and people who took

12  sugar pill or other pain relievers, right?

13  A   They did.

14      Q   Okay.  And they -- and they say -- this is

15  Page 184, Counsel -- and they say in some studies,

16  their mortality incidence was numerically lower with

17  VIOXX than the control group, right?

18  A   Yes, they say that.

19      Q   While in others, the rate was numerically

20  higher, right?

21  A   That's correct.

22      Q   And they say in the osteoarthritis studies,

23  in studies in people like Mr. Humeston, our plaintiff

24  here, the mortality incidence was significantly lower

25  on VIOXX, right?

1   A   I don't know where they get that.  They are saying

2   5 versus 8 is statistically significantly different?

3       Q   You didn't do that analysis, correct?

4   A   That's not statistically significant.  I can tell

5   you that right now.

6       Q   But you didn't do that analysis.  You didn't

7   look at the deaths from OA studies?

8   A   No, because they were too short.

9       Q   And then they actually give the FDA a chart

10  about the deaths reported in the studies between people

11  taking VIOXX and people taking placebo or sugar pill,

12  right?

13  A   I have not seen this before, but yes.

14      Q   Well, did you skip this page?  You reviewed

15  the FDA --

16  A   I don't know.  There was thousands of pages, and I

17  have no idea.

18      Q   And, Doctor, in this document submitted to

19  the FDA with the raw data, Merck states that other than

20  the imbalances discussed above for the osteoarthritis

21  Phase III program -- where it was lower, right?  The

22  deaths were lower in VIOXX?

23  A   It wasn't statistically significantly lower,

24  but --

25      Q   But lower?

1    A    It was a small difference, very small numbers.

2         Q    And for the Alzheimer's program in other

3    large databases, VIGOR, the RA phase and APPROVe,

4    differences in the rates of mortality were not seen for

5    VIOXX compared to Naproxen or VIOXX compared to

6    placebo, right?

7    A    That's correct.

8         Q    And then they show a chart here.  And so when

9    you look at the chart, all-cause deaths in

10   osteoarthritis was actually lower on VIOXX, right?

11   A    It wasn't statistically different.

12        Q    And in VIGOR, similar, not statistically

13   different.  We have already talked about that, right?

14   A    That is correct.  It was higher.

15        Q    But not statistically different?

16   A    No, it was not statistically different.

17        Q    And in the rheumatoid arthritis studies,

18   again, not statistically different?

19   A    That's correct.

20        Q    And in ADVANTAGE, not statistically

21   different, right?

22   A    That's correct.

23        Q    So you came in to talk to the jury about one

24   study where there was a difference, and in all of these

25   other studies, there was no difference in all-cause

1    deaths, right?

2    A    That's correct, but you have to keep in mind that

3    the Alzheimer's were placebo-controlled, and it was in

4    a vulnerable population where the risk of CHD and of

5    death is much, much higher.

6              It's very difficult in low-risk populations

7    to show a death difference in short-term studies.

8    People just don't die in these studies.  First of all,

9    they come in, they are mostly healthy.  They come in,

10   they have -- they don't have a lot of chronic diseases

11   or they wouldn't be in the study in the first place.

12             The one studies where they were vulnerable

13   patients was the Alzheimer's study.  And that study

14   showed dramatic differences.  And by way, this analysis

15   that they show here is also misleading from the

16   Alzheimer's because it does not include all of the

17   deaths.  They have basically taken out deaths that

18   occurred over 14 days after the treatment was stopped

19   in this analysis.

20        Q    And the FDA said that's proper --

21   A    No, they didn't say it was proper.  They didn't

22   probably know it.

23        Q    I will show you the document where it was

24   submitted to the FDA either today --

25             THE COURT:  Counsel --

1              MR. SEEGER:  Objection, Your Honor.

2              THE COURT:  Do you have that document?

3              MS. SULLIVAN:  I do, Your Honor.

4              THE COURT:  Don't refer to documents unless

5    you have it.

6              MS. SULLIVAN:  I have it, Your Honor.  I have

7    that document.

8              THE COURT:  Let's show it to the witness.

9              MS. SULLIVAN:  I would like to finish up with

10   this point, Your Honor, on all-cause deaths, and I'm

11   happy to show him that document either today or

12   tomorrow when he comes back, Judge.

13             MR. SEEGER:  We won't forget about it.

14             MS. SULLIVAN:  I won't either.

15             THE COURT:  We are attempting to finish the

16   witness tonight.

17             MR. SEEGER:   Thank you.

18   BY MS. SULLIVAN:

19        Q    Dr. Kurnool, you would agree with me that you

20   cherry-picked the data here.  You picked one study and

21   talked to the jury bit and ignored all of the other

22   studies that showed no difference between VIOXX and

23   comparators and death rates; in fact, the

24   osteoarthritis study showed a lower rate?

25   A    That is an incorrect characterization.  It's not

1    what I did.  I was looking at each of the studies as

2    they came up, and I noticed the increased risk of

3    sudden death.

4         Q    In one study?

5    A    In one study, because that's what -- because

6    sudden death was part of the CHD end point.  And when I

7    saw that, I asked the question, well, is it just sudden

8    death or is it total mortality as well?  When I looked,

9    it was total mortality.

10             Then I found out that the drug company

11   itself, two years before the end of the study, had also

12   seen the same thing and chose to ignore it.  To me,

13   that was unconscionable.

14        Q    They reported all these events to the FDA,

15   didn't they, Doctor?

16   A    I don't know that.

17        Q    Okay.  And Doctor, so you didn't -- you

18   didn't bother looking at the death rate for the APPROVe

19   study in your analysis?  You had the data, you didn't

20   look at it?

21   A    It was in their paper.  It was the same number

22   between both groups.

23        Q    No difference.  Okay.

24   A    Yes.  Low-risk group.

25        Q    And you didn't do a Kaplan Meier curve about

1  death rates for any of these studies except the
2  Alzheimer's study?
3  A   That's correct.
4      No, I did it for the VIGOR study as well.
5  Q   Not on death rate?
6  A   Yes.
7  Q   Okay.  Doctor, I want to show you Merck's
8  submission, one of Merck's submissions to the FDA on
9  the Alzheimer's study, if we could.
10     THE COURT:  Approach sidebar for a second.
11     (The following transpired at sidebar.)
12     THE COURT:  Mr. Seeger -- Mr. Buchanan, do
13 you want to go with this witness?
14     MR. SEEGER:  What's that?
15     THE COURT:  Do you want to go with this
16 witness?
17     MS. SULLIVAN:  They've got to bring him back.
18     MR. SEEGER:  I don't want to push the jury.
19     MR. SEEGER:  I think they are tired.
20     MR. SEEGER:  She's got five more minutes?
21     THE COURT:  One of them has to pick up a
22 child.  They indicated they could make a phone call.
23     MR. SEEGER:  If we could get him done in the
24 first hour.
25     MS. SULLIVAN:  I can agree --

1      MR. SEEGER:  They have to --
2      THE COURT:  You are going to have Anstice
3  here, and you are going to get going.  We will start at
4  9:30.
5      MS. SULLIVAN:  With him?
6      THE COURT:  With him, and then Anstice.
7      (Sidebar concluded.)
8      THE COURT:  Ladies and gentlemen, we are
9  going to break for today.  This witness will be back
10 tomorrow morning, followed by Mr. Anstice, who will be
11 back tomorrow.  So we will see them both again
12 tomorrow.
13     9:30 tomorrow.
14     (The jury left the courtroom at 4:52 p.m.)
15     MS. JONES:  I was just thinking, we have a
16 lot to do.
17     THE COURT:  You do?
18     Is there any problem starting at 9:00
19 tomorrow?
20     MR. SEEGER:  9:00 is better.
21     THE COURT:  We will start at 9:00.  Tell the
22 jurors to be here at 9:00, all right?  See you tomorrow
23 at 9:00.
24     MR. SEEGER:  Thank you, Judge.
25     (The proceedings concluded at 4:55 p.m.)

1737

1      - - - - -
2
3          CERTIFICATION
4
5      I, Carol A. Farrell, CRR, RMR, C.S.R. License
6  Number XI01173, an Official Court Reporter in and for
7  the State of New Jersey, do hereby certify the
8  foregoing to be prepared in full compliance with the
9  current Transcript Format for Judicial Proceedings and
10 is a true and accurate compressed transcript, to the
11 best of my knowledge and ability.
12
13 _____        _____
14 Carol A. Farrell, CRR, RMR, CSR          Date
15 Official Court Reporter
16 Cumberland County Courthouse
17
18
19
20
21
22
23
24
25