# EXHIBIT "3"

# EXHIBIT "3"

# IN RE VIOXX LITIGATION

## ADDENDUM TO REPORT OF RICHARD A. KRONMAL

**May 23, 2006**

M000748454

# Addendum to the Report of Richard A. Kronmal

### *Introduction*

This addendum supplements my Report, submitted on April 7, 2006 (the "Report"), in the following areas:

- Updates to the Alzheimer's section of the Report; and

- Updated analyses of the APPROVe study, including analyses of the data from the study extension.

I have not yet updated the section of my Report concerning Protocol 203 to incorporate the recently produced APPROVe extension data and Oxford VICTOR data, but specifically reserve the right to do so.

### Updates to Alzheimer's Analysis

The following material should be inserted after the second paragraph on page 22 of the Report:

Merck did consider instituting a DSMB for study 078. An urgent meeting was called to discuss this issue (MRK-AFW0019561). This was followed by a meeting at which it was decided by Merck that a DSMB was unnecessary (MRK-NJ0333568). However, had a DSMB been formed, a reasonable DSMB would have been compelled to take immediate steps, including terminating the trial, to protect the patients in the study who never consented to the extreme risks seen in that trial. Evidence for this is the actions taken by the ESMB of the Merck APPROVe study. The APPROVe ESMB recommended termination of the APPROVe trial based on results that were less extreme than was the situation for the Alzheimer's trials. A member of the APPROVe ESMB and a Merck consultant when asked about the decision to terminate the APPROVe trial said:

> *"The reason we recommended termination was that we felt the patients in the APPROVe study were not aware of this and had not been consented to this adverse effect. So, in our judgment, you know, from an ethical viewpoint if you were going to continue you would have to go back and re-consent them and that certainly wasn't practical at that point in time. So, that is the specific reason we*

M00574B455

*recommended termination."*
*(http://www.fda.gov/ohrms/dockets/ac/05/transcripts/2005-4090T1.htm)*

Applying this same logic to the Alzheimer's 078 study would have resulted in a DSMB stopping the trial. In my years of experience with many clinical trials (and the DSMBs associated with such trials), study 078 could not be reasonably continued in the face of *such information.* One could *not reasonably ask* patients to consent to a trial of a drug that had a statistically significant 3 fold increased risk of death associated with it for a speculative benefit. Nor would a reasonable DSMB or IRB charged with protecting patients exposed to the therapy permit the continuation of such a study.

In my opinion, Merck's failure to notify the appropriate organizations of the possible excess risk of death from taking rofecoxib and their decision to not terminate the study sharply deviates from accepted clinical trial practice. The decision by Merck to continue study 078 is in direct violation of the principles of the *DECLARATION OF HELSINKI* that provides the standards for the conduct of medical research involving human subjects. To emphasize the widespread acceptance of this standard, I have provided three website *references to this document, one from the FDA, one from the Office of Human Subjects* Research of the U.S. National Institutes of Health, and one from the World Medical Association (WORLD MEDICAL ASSOCIATION DECLARATION OF HELSINKI Ethical Principles for Medical Research Involving Human Subjects, http://www.fda.gov/oc/health/helsinki89.html, http://ohsr.od.nih.gov/guidelines/helsinki.html , or  http://www.wma.net/e/policy/b3.htm ). Merck indicates on its website that they follow the tenets of the Declaration of Helsinki (http://www.merck.com/cr/science_innovation_and_quality/drug_development_process/c linical_trials/). Continuing the trial when there was strong evidence of excess mortality associated with the use of rofecoxib violated section I.4, which states: "*Biomedical research involving human subjects cannot legitimately be carried out unless the importance of the objective is in proportion to the inherent risk to the subject.*" This principle holds at all times during the trial and is a primary reason why DSMBs are widely utilized to monitor clinical trials. In April of 2001, there was a three times excess risk of mortality associated with the use of rofecoxib, a risk that far exceeded any likely benefits of the therapy for the subjects in the trial. Thus, by allowing the study to continue and thereby exposing the study subjects to the risk of premature death, Merck *failed in its duty to the study subjects as specified in I.4.*

Permitting study 078 to continue also violated the informed consent provisions of the Declaration of Helsinki by not informing the Alzheimer's study participants of the VIGOR MI results and the Alzheimer's mortality results. Section I.9 of the declaration states:

> "In any research on human beings, each potential subject must be adequately informed of the aims, methods, anticipated benefits and potential hazards of the study and the discomfort it may entail."

2

M00574B456

The Alzheimer's 078 study informed consent (MRK-AFK0205452) contains the following provision:

> **"NEW FINDINGS**
> *You will be told of any significant new findings developed during the course of this study which may relate to your willingness to continue your participation."*

Nowhere in the informed consent was there any mention of the adverse events seen in VIGOR, nor was there any mention of the excess mortality seen in the 091 and 078 trials. These 'significant new findings' were not conveyed to the participants in the Alzheimer's study 078 at any time. Further, all patients still in the trial were reconsented in 2002 and at that time they were not informed about the findings in VIGOR or the early mortality findings in the two Alzheimer's trials.

On Dec. 5, 2001, the FDA sent a letter to Merck asking for the answer to a question they had about the ethics of continuing study 078 based on the excess mortality seen in study 091. The question posed to Merck was:

> *"Please clarify whether the safety monitoring board and the IRB overseeing these studies are aware of the excess in total cause mortality in the Vioxx 25 mg group as compared to placebo (p=0.026) and the trend against Vioxx 25 mg on CV mortality compared to placebo.*
>
> *Have these oversight groups commented on the ethics of continuing study 078 in light of the mortality data ..."*

The letter is important from two standpoints. First, it shows that the FDA was concerned about the ethics of continuing study 078 and that they were unaware of the lack of a DSMB for the study. It further indicates that the FDA was not aware of the statistically significant excess of mortality seen in 078 and shown in the Chen report.

Merck was far from forthcoming in their response to the FDA (MRK-AAF0005014). It did not provide the ITT results shown in the Chen report. Instead the Company reiterated the on-drug mortality experience. Merck indicated that it hadn't informed the IRB's of the findings because the study investigators remain blinded to the study results. This response demonstrates that Merck withheld the crucial information concerning the ITT mortality analyses from the IRB's and the FDA.


## APPROVe Extension Analyses

I have now analyzed the extended follow-up from the APPROVe study. The analysis below duplicates what I did in my Report with the addition of data from the follow-up that is now available. It is important to note that the extension did more than add additional follow-up time and events; it also made an intent-to-treat (ITT) analysis for

3 |

M006748457

CV events possible for APPROVe. The extended follow-up included all trial participants who the investigators were able to contact and who agreed to the follow-up. This comprised 84% of the originally randomized participants.

For the analyses presented below I have included all available events and follow-up through 210 weeks from each study participant's entry date. This corresponds to the primary analysis specified in the Merck statistical analysis plan for the extension. As was done in my original Report, I present below the results for MI and hard CHD (MI + sudden cardiac death). I used the same statistical methods described in my Report.

For MI, the RR comparing rofecoxib to placebo is 2.11 (p=0.018, CI=1.13-3.90). This is a small increase in relative risk compared to the result for the "on-drug" analysis (RR= 2.07). The MI event rate curves are shown in Figure 1 of this addendum. Note that there is no evidence from the curves that the excess risk of MI starts after 18 months. Rather, it is clear that the curves separate within the first 6 months of follow-up. Merck's contention, founded on its post hoc analysis, that there is no excess risk for CV events until after 18 months of continuous use is not supported by these data. A statistical test for equality of RR across time is *not* rejected (proportional hazards p=0.43) and thus there is no statistical support for the Merck 18 month argument.

The results for hard CHD are quite similar. The RR is 2.45 (p=0.004, CI=1.34-4.47) compared to the on-drug RR of 2.17. The test for equality of RR across time is *not* rejected (proportional hazards p=0.47). Again, there is no evidence in support of Merck's contention that the risk associated with rofecoxib use is only manifest after 18 months of continuous use.

As I have discussed in my Report, Merck has based many of its arguments about the safety of rofecoxib on results using the APTC and thrombotic endpoints. Specifically, the Company's contention that the increased risk is only for patients who use rofecoxib for 18 months is based on an analysis of these endpoints. In the APPROVe report in the New England Journal of Medicine (NEJM), Merck supports this claim by presenting the event rate curves for the thrombotic endpoint and by doing a test for proportional hazards for the thrombotic endpoint. They report that this test was significant at the p=0.01 level. However, as I also discussed in my Report, this was based on a test done after examining the data and wasn't a prespecified hypothesis in the APPROVe protocol or statistical analysis plan. Such tests are *not considered by the scientific community as being proof* of an effect, rather at best they are considered only worthy of consideration as hypotheses for which confirmation would be needed in other studies before they would be accepted. The result for MI and for hard CHD didn't support this hypothesis and the results from the MI meta-analysis clearly contradicted it since it showed increased risk in studies of less than 1 year of duration.

The follow-up data from the APPROVe extension provides overwhelmingly convincing evidence that the 18 month hypothesis is not supportable even based on the APPROVe data. The additional follow-up not only tallied events that occurred during the one year extension, it also ascertained events that occurred during the first three years of the study

4

M0057/48458

in participants who Merck did not follow for the entire period because they dropped out due to side effects or for other reasons. Thus, for the first three years of the study, the data now reflects more closely the ITT analyses that are the scientific standard for clinical trial results. Merck provided these analyses to the FDA in May of 2006 (MRK-S04020112023).

One of the striking findings shown in this report is that even for the thrombotic and APTC endpoint, the appearance of no increased RR for the first 18 months is no longer present and the test for proportional hazards is no longer near significant. This is shown in the two figures (B1, page 15 and B5, page 24 of the FDA submission) below for the thrombotic and APTC endpoint. Merck reports that the p-values of the test of proportional hazards are 0.75 for both the thrombotic and APTC endpoints. These p-values show that there is no statistical support for any deviation from a constant RR over the follow-up time, *e.g.*, the Merck 18 month hypothesis is no longer supported by the APPROVe data.

Finally, the extension also supports the possibility, first suggested by the Alzheimer's 078 trial results, that the elevated risk associated with rofecoxib might extend beyond the time when the patient stopped taking rofecoxib. In the Alzheimer's trial, this was seen in the continuation of an increased risk of both CHD and all cause mortality in the patients off drug. In the APPROVe trial, this argument is supported by the fact that the RR observed including the extension is virtually identical to that seen for the on drug analyses. For example, for thrombotic events, the on-drug RR reported in the NEJM paper is 1.86 (p=0.008). The ITT RR now is 1.74 (p=0.004), slightly reduced but with a smaller more significant p-value. For the APTC endpoint, the on-drug relative risk was increased from 2.06 in the NEJM paper to the ITT RR of 2.36 now. This indicates that the off-drug contribution to the ITT RR was actually greater than seen during the on-drug RR or the APTC endpoint. The overall implication of this is that it is likely that rofecoxib does some damage to the body that persists for some time after the drug is discontinued.

Richard A. Kronmal, PhD

5

M00574849

Figure 1.  Cumulative MI rates by treatment in APPROVe for 210 weeks of follow-up.



Figure 2.  Cumulative CHD rates by treatment in APPROVe for 210 weeks of follow-up.



6

M00574B460

Figure B1   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Kaplan Meier Plot



| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1221 | 1187 | 1152 | 1131 | 1117 | 1092 | 1032 | 980 |
| Placebo | 1300 | 1247 | 1224 | 1189 | 1173 | 1157 | 1133 | 1071 | 1027 |

Figure B5 All Patients – Confirmed APTC Events – Week 210 Censoring - Kaplan-Meier



| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1220 | 1188 | 1158 | 1140 | 1125 | 1102 | 1042 | 1002 |
| Placebo | 1300 | 1249 | 1228 | 1196 | 1181 | 1165 | 1140 | 1079 | 1036 |

MRK00572484B4

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

EASTERN                  DISTRICT OF                  NEW YORK

SAM RUINSKY and BEATRICE RUINSKY

V.

HARRAH'S ENTERTAINMENT INC., et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] CV-03-4781

TO:  Mr. Bob Hillman, Stanley Access Technologies, Inc.
South Gold Industrial Park, 17C Marlen Drive
Trenton, New Jersey 08691

☑  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| United States District Court, Eastern District of New York 225 Cadman Plaza East, Brooklyn, New York 11201 Courtroom of Hon. Judge Eric Vitaliano | 2nd Floor, Courtroom #1 |
| | DATE AND TIME |
| | 7/13/2006 10:00 am |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | 8/18/2004 10:00 am |

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

SEE ATTACHED RIDER.

| PLACE | DATE AND TIME |
|---|---|
| United States District Court, Eastern District of New York (address set forth above) Courtroom of Judge Eric Vitaliano, 2nd Floor, Courtroom #1 | 7/13/2006 10:00 am |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| | 6/12/2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Marc S. Albert, Seeger Weiss LLP, One William Street, New York, New York 10004
(212) 584-0700

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)  (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless *commanded to appear for deposition, hearing or trial.*

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)  (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena *is* addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

# EXHIBIT "4"

# EXHIBIT "4"



50 Rockefeller Plaza
New York, NY 10112-2200
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

May 24, 2006

**BY HAND**

David R. Buchanan, Esq.
Seeger Weiss LLP
One William Street
New York, NY 10004-2502

> Re:   NJ VIOXX® Litigation

Dear Mr. Buchanan:

I am enclosing with this letter the following items:

1. One DVD containing a supplemental production of SAS files related to the APPROVe study (base and extension data), Bates number MRK-ZBR 0000080 through 0000134; and

2. One CD containing a supplemental production of regulatory filings with the FDA regarding NDA 21-042, including a load file and objective coding, Bates range MRK-S042 0112133 through 0112134.

Sincerely,

John J. Torikashvili
Law Clerk

Enclosures

U.S. Austin Boston Charlotte Harrisburg Hartford New York Newport Beach Palo Alto Philadelphia Princeton
San Francisco Washington DC   EUROPE Brussels Frankfurt London Luxembourg Munich Paris

# EXHIBIT "5"
## Part A

# EXHIBIT "5"
## Part A

2737

```
 1          SUPERIOR COURT OF NEW JERSEY
            ATLANTIC COUNTY/CIVIL DIVISION
 2   ------------------------------x
 3   THOMAS CONA AND JOYCE CONA,    DOCKET NO. ATL-L-3553-05MT
              PLAINTIFFS,
         VS.
 4   MERCK & CO., INC.,
              DEFENDANT.
 5   ------------------------------x
 6   JOHN MCDARBY,               DOCKET NO. ATL-L-1296-05MT
              PLAINTIFF,
 7        VS.                        - TRIAL -
     MERCK & CO., INC.,
 8            DEFENDANT.
     ------------------------------x
 9        PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                  1201 BACHARACH BOULEVARD
10                ATLANTIC CITY, NJ 08401
11        DATE:  March 24, 2006
12   B E F O R E :
         THE HONORABLE CAROL E. HIGBEE, P.J.Cv.
13   TRANSCRIPT ORDERED BY:
         W. MARK LANIER, ESQUIRE
14       CHRISTY D. JONES, ESQUIRE
     A P P E A R A N C E S :
15
         W. MARK LANIER, ESQUIRE
16       THE LANIER FIRM
         JERRY KRISTAL, ESQUIRE
17       ROBERT GORDON, ESQUIRE
         WEITZ & LUXENBERG
18           ATTORNEYS FOR PLAINTIFFS CONA & McDARBY
19       CHRISTY D. JONES, ESQUIRE
         BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
20       KEVIN J. DUNNE, ESQUIRE
         SEDGWICK, DETERT, MORAN & ARNOLD, LLP
21       MICHAEL BROCK, ESQUIRE
         HOPE FRIEWALD, ESQUIRE
22       DECHERT, LLP
             ATTORNEYS FOR THE DEFENDANT
23
             *      *      *      *      *      *      *
24           REGINA A. TELL, CSR-CRR-RPR
             OFFICIAL COURT REPORTER
             1201 BACHARACH BOULEVARD
25           ATLANTIC CITY, NJ  08401     2737
```

---

3/24/2006 Reicin Day One

```
 1   By Mr. Brock      2745
     By Mr. Lanier          2880
 2
     EXHIBITS                 ID.        EVID.
 3
     C-17                                2742
 4   C-265.1                             2742
 5   C-36.1                              2742
 6   C-8.1                               2742
 7   C-8                                 2742
 8   C-32                                2742
 9   D-701                               2788
10   A-660                               2791
11   D-186                               2800
12   D-351.1                             2809
13   D-478                               2818
14   A-550                               2825
15   A-155                               2831
16   D-145                               2837
17   A-150                               2838
18   P-2080                              2882
19   P-2000                              2856
20
21   P-66                                2899
22
23   P-37                                2960
24
25   P-352                               2965
```

2739

---

3/24/2006 Reicin Day One

```
 1   ). ALISE S. REICIN
```

2738

---

3/24/2006 Reicin Day One

```
 1              P R O C E E D I N G S
 2        THE COURT:  You can be seated.
 3        You can bring in the jury.
 4        (Whereupon, the following occurred at
 5   side-bar:)
 6        MS. JONES:  At this time, we offer the
 7   following medical records of Dr. Cona -- of Mr. Cona
 8   that were offered during Dr. Wasserman's testimony:
 9   What's been marked as Defendant's Exhibit C-17,
10   Defendant's Exhibit C-265.1, Defendant's Exhibit
11   C-36.1, Defendant's Exhibit C-8.1, and following it is
12   actually C-8 -- I'm sorry -- and Defendant's Exhibit
13   C-32.
14        They're all medical records of Mr. Cona that
15   were referred to, or at least portions of the records
16   were referred to during the examination of Dr.
17   Wasserman, and we would offer them at this time.
18        MR. LANIER:  Judge, what I expressed to Miss
19   Jones when she mentioned she was going to do this, I
20   have no objection to the medical records coming in,
21   because I specifically said before I close that I was
22   closing with the understanding that I would still be
23   entitled to put the medical records in.
24        I want them all in.  They probably need to be
25   redacted in places.  At least they need to be looked at
```

2740

1  carefully to see if they need to be redacted, and I
2  think they need to come in with a Plaintiff's Exhibit
3  Number so there's not the appearance that the
4  plaintiffs wouldn't put in their own medical records,
5  the defendant had to.
6       So that's the specific reason when I rested I
7  said that I would rest pursuant to the housekeeping of
8  putting in those medical records and other exhibits.
9       Now, Miss Jones has pointed out to me that
10  because she called them by the defendant's number that
11  she wants them in with that, so what my recommendation
12  to the Court is that we give them a double number, we
13  give them a Plaintiff's exhibit number and a
14  Defendant's exhibit number so that they've got both of
15  those for purposes of reference, as far as the record's
16  concerned.
17       But I clearly have reserved the right to make
18  sure I have those admitted as a plaintiff's exhibit,
19  and I do want them redacted before they go back to the
20  jury, or at least looked at for possible redactions.
21       MS. JONES:  Your Honor, I would simply say
22  that they have not yet been offered. We had no choice
23  but to offer them at this time under these
24  circumstances. If Mr. Lanier has redactions that he
25  wishes to make, we'll take it up at that point in time.

1       We have not been furnished with any evidence
2  of any request for redactions at this point in time. I
3  certainly understand these are being admitted subject
4  to their right to raise some issue with respect to
5  redaction.
6       THE COURT:  All right. The records will be
7  admitted subject to the issue of redaction. The
8  defendants may not argue in closing that these were
9  admitted by the defense or that they're defense
10  exhibits, as opposed to plaintiff's exhibits.
11       As far as the actual number on them, I'm
12  keeping them the defense number, because it is already
13  in the record, and I have absolute 100 percent -- at
14  least 99.99.99 confidence that the jury could care less
15  whether they're a P or D exhibit, and they're not going
16  to infer anything from that.
17       MR. LANIER:  Okay. Thank you, Judge.
18       THE COURT:  We have all kinds of numbers on
19  the exhibits. We'll be fortunate if they look at them
20  for what you want them to look at them for, let alone
21  try to figure who put them in. I don't think that's an
22  issue.
23       So they're marked into evidence as of this
24  point, subject to redaction.
25       Give them to the clerk and let her know

1  they're in right here.
2       (Whereupon, Exhibit C-17, Exhibit C-265.1,
3  Exhibit C-36.1, Exhibit C-8.1, Exhibit C-8, and Exhibit
4  C-32 were marked into evidence.)
5       MR. KRISTAL:  I wanted to share an observation
6  that when there were lengthy side-bars, there seems to
7  be some -- I don't want to say mugging it up, but
8  smiling and discussion with the jurors, at least
9  communication, nonverbal with the jurors from certain
10  witnesses.
11       So I would ask the Court, perhaps, if there
12  are going to be lengthy side-bars that the witness
13  should step down, or perhaps there should be an
14  instruction not to do that. I know it is hard for the
15  Court to see and when the attorneys' backs are here,
16  but I was sitting at counsel table watching exactly
17  that, so --
18       MS. JONES:  Your Honor --
19       MR. KRISTAL:  -- I wanted to raise it as an
20  issue.
21       MS. JONES:  I'm not sure what the issue is
22  or how many witnesses or anything else, but every
23  witness thus far that has testified has sat in that
24  chair during the course of any side-bars.
25       I don't know -- and I'm not sure what you were

1  referring to. I haven't seen it. But to make any
2  exception based upon the defense witnesses at this
3  point is, I think, totally improper.
4       MR. KRISTAL:  I'm just sharing an observation.
5  Perhaps, if you could --
6       THE COURT:  I'll give an instruction to the
7  witness. I'm not going to make them get out of the
8  chair.
9       MR. LANIER:  Instruction would be preferable.
10       MR. GORDON:  I also noticed that during the
11  side-bars that at least Dr. Morrison and Dr. Wasserman
12  while we're having side-bars are reading off this
13  screen. I'm watching as they're looking, and I was
14  wondering, I thought it was in code, that's why I just
15  came over to see if is it actually in English, which it
16  is. It usually comes up as stenographer language,
17  which I don't understand.
18       So I'm just concerned about that, as well,
19  because if it is something the witness isn't supposed
20  to be hearing and they're reading our side-bar, there's
21  a concern.
22       THE COURT:  Well, Regina will take care of
23  that.
24       Mr. Brock, caution your witness, caution your
25  witness that when she is at side-bar, when there's

1  side-bars or the breaks, she shouldn't engage in any --
2  you know, she might say to the jury, It is cold in
3  here, or something like that.  No conversations, no
4  exchanges.  She should look forward, basically, not do
5  *any kind of -- I mean, I know it wouldn't be anything.*
6  She is not going to be whispering facts, but she may
7  just say to them, It is cold.  It is human nature if
8  they're sitting over there.  But just make sure she
9  doesn't do that.
10          And although I'm very liberal on leading, make
11  sure you try to let this witness answer her own
12  questions.  She is more than capable with doing it.
13  She is a scientist, and, you know, she is an important
14  witness for both sides, and I want to make sure that
15  she provides her own answers.  That doesn't mean you
16  can't lead and set things up.
17          (The jury enters the courtroom.)
18          *THE COURT:  You can be seated.*
19          Your next witness.
20          MR. BROCK:  Your Honor, Merck calls Dr. Alise
21  Reicin.
22          THE COURT:  Dr. Reicin to the stand.
23          (Whereupon, ALISE S. REICIN, Defense witness,
24  sworn.)
25  DIRECT EXAMINATION BY MR. BROCK:

1          Q.  Are you comfortable?
2          Good morning.  Would you introduce yourself to
3  the jury, please.
4          A.  I'm Dr. Alise Reicin.
5          Q.  And Dr. Reicin, would you tell the members of
6  the jury where you live and work.
7          A.  I live in Englewood, New Jersey, and I work at
8  Merck Research Labs.
9          Q.  What is your current position with Merck?
10          A.  I'm a vice-president of clinical research at Merck.
11          Q.  Okay.  How long have you been employed with
12  Merck?
13          A.  I have been employed with Merck about 10 years,
14  since February of 1996.
15          Q.  Would you describe for the members of the jury
16  your educational background in terms of your college
17  and your medical education.
18          A.  I graduated with a bachelor's in biochemistry from
19  Barnard College of Columbia University, which is the
20  women's college at Columbia.  And then I got my M.D.
21  from Harvard.  I was in a joint program there between
22  Harvard and MIT.
23          Q.  And would you describe the joint program that
24  you were in when you were obtaining your combined
25  program.

1          A.  Basically, I got -- it is a joint program for
2  people who had a strong interest in research.  The
3  first two years were a combination of classes at
4  Harvard and MIT with a very strong focus on basic
5  science and pathophysiology; you know, how disease
6  works at a very, you know, molecular level.
7          And then the last two years, you're in the
8  hospital, and that's with the rest of the Harvard
9  Medical School class.
10          You also have to do a research project in
11  order to graduate, and, therefore, I took off a year
12  during medical school and did research at Sloan
13  Kettering Cancer Institute.
14          Q.  And very briefly, what was your area of
15  interest at Sloan Kettering?
16          A.  I worked on a mass tumor virus, so it was a virus
17  in mice that could cause cancer.
18          Q.  You did that during your joint program at
19  Harvard and MIT?
20          A.  I took off a year between my second and third
21  years.
22          Q.  Upon completion of that work, did you enter
23  into an internship and residency for a medical
24  specialty?
25          A.  I did my internship in internal medicine at

1  Columbia Presbyterian Hospital in New York City, which
2  is a part of Columbia University, and then I did a
3  two-year residency in internal medicine at Columbia, as
4  well.
5          Q.  Would you describe Columbia Presbyterian
6  Hospital in New York City.  That is the place where you
7  did your training for your internship and residency in
8  internal medicine?
9          A.  It is a large tertiary care -- actually, it does
10  both primary care and tertiary care, which means many
11  patients are coming in from other hospitals.  It is
12  located in Harlem, and it is a part of Columbia Medical
13  School.
14          Q.  Did you obtain formal education in terms of
15  medical education and training after you completed your
16  internship and residency at Columbia Presbyterian
17  Hospital?
18          A.  I did both a clinical and research fellowship in
19  infectious diseases at Columbia Presbyterian Hospital,
20  as well.
21          Q.  Would you describe for the members of the jury
22  what the practice of infectious disease is.
23          A.  Basically, very often in the hospital, we see
24  referrals for patients who might have fevers or other
25  infections caused either by bacteria or by viruses, or

1  other infectious agents, and so I spent a year --
2  basically, you would see surgical patients, internal
3  medicine patients, either to help treat an infection or
4  to help diagnose an infection.
5      Q.  Okay.  When you were in your fellowship at
6  Columbia Presbyterian Hospital, were you a practicing
7  physician during that time?
8      A.  Yes, absolutely.  I also had an outpatient clinic.
9      Q.  Would you describe your outpatient clinic work
10 for the members of the jury, please.
11     A.  I had -- during my internship and residency, I had
12 a general internal medicine outpatient clinic.  During
13 my fellowship, I had an infectious disease outpatient
14 clinic.
15         About 90 percent of my patients had AIDS or
16 were infected with the virus that causes AIDS, and then
17 the other 10 percent had a variety of unusual
18 infectious diseases.
19     Q.  Was the practice of infectious disease that
20 you were engaged in -- was the treatment of HIV and
21 AIDS, is that within that area of specialty?
22     A.  Yes, it is within infectious diseases.
23     Q.  Did you have a special interest in that?
24     A.  Yes.  When I then did my research, I did basic
25 science, AIDS research.

2749

1      Q.  How many years of private practice did you
2  have before joining Merck?
3      A.  I was never in private practice.  I always saw
4  patients within the medical center.
5      Q.  All right.  So I have asked the wrong
6  question.  Let me rephrase it.
7          How many years of practice did you have taking
8  care of patients before you joined Merck?
9      A.  Approximately 10 years before I joined Merck.  I
10 started my internship in 1987, and I joined Merck in
11 1996.
12     Q.  Prior to joining Merck, did you ever serve as
13 a teacher in a medical school setting?
14     A.  In 1993, I joined the faculty at Columbia
15 Presbyterian Hospital as an assistant professor, and I
16 would teach as a part of that, and I actually continued
17 to volunteer my time at Columbia teaching and seeing
18 patients one month a year up until about three years
19 ago.
20     Q.  All right.  And I believe you have mentioned
21 that you joined Merck in about 1996, or in 1996.
22     A.  That's correct.
23     Q.  Can you tell the members of the jury why you
24 decided to leave your teaching position and come to
25 Merck.

2750

1      A.  Um, I was being successful in the research that I
2  was doing.  I was publishing papers, I was getting
3  grants, and I enjoyed it.  But what I realized was that
4  if I was lucky enough to find something that could
5  actually help in the treatment of patients with AIDS,
6  it was unlikely that I was ever going to be able to
7  develop that drug and test it myself.  It would need to
8  be done at a pharmaceutical company.
9      MR. LANIER:  Judge, can I object for a second?
10 I'm sorry, Dr. Reicin.  Forgive me.
11     I think this was one of the matters that you
12 told us to discuss privately, and I hate to take a
13 side-bar, but...
14     THE COURT:  Okay.
15     (Whereupon, the following occurred at
16 side-bar:)
17     MR. LANIER:  Okay.  It is one thing to pander
18 on cancer.  It is another thing all together when it is
19 most likely we have at least one gay person on the jury
20 to be pandering with all of this AIDS stuff.  This is
21 the exact same thing.
22     Excuse me.
23     She has now said six times -- she is talking
24 about how this is her study, it was her private
25 practice, what she wanted to do, and she is just going

2751

1  on and on, and he specifically said -- this was
2  earlier, and I just let it go because I thought, surely
3  he won't revisit it, and he said, Is that a special
4  interest of yours, trying to help the AIDS patients?
5      Oh, yes.
6      That's just so outrageous to me that I can't
7  believe it is being done.
8      MR. BROCK:  I have not done anything other
9  than give her background in terms of what she did, and
10 she has now said why she came to Merck, and that is
11 well within what --
12     THE COURT:  Did she go right to work at an
13 AIDS program at Merck?
14     MR. BROCK:  I don't think...
15 I'm not sure.
16     THE COURT:  I don't think she ever did any
17 work in that area.
18     MR. LANIER:  She didn't.  This is pandering.
19 This is flat out pandering.
20     THE COURT:  What is the request?  I order him
21 to move on?
22     MR. LANIER:  That we just stop it.  I don't
23 know how you fix it without underscoring it, but this
24 needs to stop, and this is Mr. Brock.
25     THE COURT:  Let's move on.

2752

1    (End of side-bar.)
2  BY MR. BROCK:
3    Q.   You joined Merck in 1996, and you were
4  involved in the VIOXX development program, correct?
5  A.   Not initially.
6    Q.   Right.  But during your period of time at
7  Merck, you were involved in the VIOXX development
8  program?
9  A.   That's correct.
10   Q.   And can you tell the members of the jury in
11 what year you began working on the development of the
12 medicine VIOXX.
13 A.   Um, I started working on the VIOXX program in 1997.
14   Q.   So you had been there a year or so prior to
15 beginning your work on VIOXX?
16 A.   Correct.  In that year, I was working on another
17 drug.
18   Q.   Now, can you describe for the members of the
19 jury briefly, just so they'll have the background for
20 this as we discuss your role with the medicine further
21 today, just give them an overview of your involvement
22 with the development of the drug and then things that
23 you did after the medicine was approved for use in the
24 United States.
25 A.   Um, in 1997, I was asked to start designing a

1  large, what we call GI outcomes study.  It was a study
2  to try and test whether VIOXX would be associated with
3  fewer serious gastrointestinal problems compared with
4  traditional NSAIDs, such as Motrin or Advil.
5         And what we meant by kind of serious
6  gastrointestinal problems are ulcers of the stomach or
7  bleeding from the stomach.
8         I worked on that study design for several
9  months.
10        A decision was made not to do that study, and
11 I started to -- I then helped design a study looking at
12 whether VIOXX could be used to treat pain in patients
13 who had just had hip or knee replacement.
14        And that would be beneficial, because VIOXX
15 doesn't make people bleed more, and some of the NSAIDs
16 can cause that because they interfere with platelet
17 clumping.
18        I then did, again, develop the design for a GI
19 outcomes study that's called the VIGOR study.  We
20 conducted that study.  So I was involved with that.
21        And then I took on increasing levels of
22 responsibility for the development program in, you
23 know, about 2001, 2002 -- this was after VIOXX was
24 already on the market -- and then took on
25 responsibility for other medications, novel therapies

1  that Merck was developing, as well.
2    Q.   Okay.  So the first project that you had was
3  to look at designing a study that would show VIOXX did
4  not cause as many perforations and ulcers and bleeds?
5  A.   That's correct.
6    Q.   And was that an expected benefit of VIOXX for
7  patients who would take the medicine if it was approved
8  for use in the United States?
9  A.   Yes, it was.  That was one of the key reasons we
10 were developing the drug is that we thought it would be
11 a benefit of the drug.
12   Q.   The jury has heard about COX-1 and COX-2 and
13 that the COX-2 selective medicine is to protect the
14 stomach.  If you have that general understanding, why
15 is it that Merck needed a GI megatrial to study this
16 issue?
17 A.   I'm sorry, can you repeat the question for me
18 again?
19   Q.   Sure.
20        The jury has heard about COX-1 and COX-2 and
21 that the COX-2 selective medicine is designed -- it's
22 intent is so that patients can take the medicine, get
23 pain relief, and still not have as many problems with
24 the stomach.
25        So that's the conceptual basis of the

1  development of the medicine.
2  A.   That is correct.
3    Q.   So if you have that general understanding, why
4  do you need a trial to prove that?
5  A.   Well, there are all sorts of hypotheses that don't
6  pan out, so to speak, things that people think are
7  going to work and they don't work.
8         Now, we were doing endoscopy studies, meaning
9  that we were putting tubes down people's stomachs who
10 were taking our drug or an NSAID, looking for ulcers,
11 and I would say in 1997, there was controversy as to
12 whether that was enough.  The theory from those who
13 said endoscopy is enough, saying if you have an ulcer
14 -- if you don't have ulcers on endoscopy, you're not
15 going to get them out in clinical practice.
16        Other people said, you know, sometimes you see
17 ulcers on endoscopy patients who never know they have
18 them, they come and they go, you really need to do
19 something that's more real world and prove not only in
20 the endoscopy studies but in real GI outcomes study you
21 have a benefit over the traditional NSAIDs.
22   Q.   The test that you were doing prior to doing
23 the megatrial where you would stick the tube down in
24 the stomach to see if there was damage, was that
25 showing that VIOXX was safer that the traditional

1   NSAIDs just in what you saw in those tests?

2   A.   Those tests did demonstrate that VIOXX was

3   significantly safer than the NSAIDs in that patients

4   had fewer holes -- I don't want to use the word

5   "hole" -- fewer ulcers in their stomachs.

6   Q.   And the megatrial, the big trial with lots of

7   patients, was with the idea that you would look at it

8   to see if in clinical practice you saw clinically

9   significant differences?

10   A.   Um, that's correct. It was still within the

11   confines of a clinical trial, but these were patients,

12   they didn't have to have endoscopies, they would have

13   an endoscopy if their physician felt based on their

14   symptoms or complaints that they needed an endoscopy.

15   So more like it would happen in the real world.

16   Q.   Did you work with Dr. Briggs Morrison in the

17   design of the megatrial?

18   A.   Um, well, Briggs and I and other physicians in my

19   group often collaborated. In 1997, when I put together

20   the initial kind of draft of the protocol which

21   outlines how we'll study the patients, how we'll

22   conduct the study, I did send a copy of it to Briggs

23   and other colleagues with some questions that I had for

24   them. I wanted their input on the study design.

25   Q.   Was there an issue when you were looking at

1   the design of the trial to see if you got clinically

2   significant differences in outcomes when you looked at

3   VIOXX versus a traditional NSAID? Was there discussion

4   about whether or not to put aspirin in the trial?

5   A.   It was something that was discussed a lot.

6   Q.   I want to ask you just a couple of questions

7   about aspirin.

8   By 1997, was it pretty well understood that

9   aspirin was cardioprotective; that is, that if you were

10   taking aspirin on a regular basis, you had a better

11   chance of not having a heart attack.

12   A.   Yes, especially in patients who had had previous

13   heart attacks or strokes, taking aspirin was

14   beneficial. We had found that to be in many, many

15   studies.

16   Q.   So could we say aspirin, then, was known by

17   then to protect the heart?

18   A.   That's correct.

19   Q.   If you did a trial of aspirin versus placebo

20   based on what you knew in 1997, would you expect that

21   you would see more events, assuming that you set it up

22   right and you randomized it right and you had the right

23   number of patients, you would see more events on the

24   placebo side than you would on the aspirin side of the

25   trial?

1   A.   Yes. You would have more, for instance, heart

2   attacks in the placebo patients than --

3   Q.   Is that because placebo would be considered

4   neutral for that trial?

5   A.   That's correct. So higher on placebo, lower on

6   aspirin, because aspirin is providing cardioprotection.

7   Q.   The fact that you saw in a hypothetical trial

8   like this more events on placebo, would that mean that

9   placebo was causing the events?

10   A.   No. I mean, your assumption would be that aspirin

11   was protecting patients and therefore was decreasing

12   the events.

13   Q.   Okay. If we fast forward to the point of time

14   where we're talking about the trial of VIOXX versus

15   traditional NSAIDs to see if it is better on the

16   stomach, did one of the physicians and scientists at

17   Merck prepare a memo that looked at the consequences of

18   NSAID antiplatelet effects on the cardiovascular events

19   if you did a trial of VIOXX versus a traditional NSAID?

20   A.   Yes. Dr. Tom Musliner had looked at that. It is a

21   commonly held belief that aspirin protects the heart

22   because it prevents platelets from clumping, so it has

23   antiplatelet activities. And NSAIDs can have some of

24   the same effects on platelets. It can inhibit platelet

25   clumping.

1   And so what Dr. Musliner was talking about was

2   the question of whether NSAIDs could act like aspirin

3   in terms of protecting the heart from having a heart

4   attack.

5   Q.   All right. So let's look at Exhibit Number

6   A-13. This is the Musliner memo that is already in

7   evidence. I'll put your binder right here.

8   And if you'll turn to 13.4, all right, the

9   jury has seen this document, so we're not going to go

10   back through the whole thing and replow ground that we

11   have already been over, but do you see the highlighted

12   part that says "Figures for Different Assumed CV Event

13   Rates. Assumptions underlying these numbers include

14   the following," and then you see A there?

15   A.   Yes, I do.

16   Q.   And does it say "Patients treated with

17   standard NSAIDs will experience antiplatelet effects

18   and resultant CV protection similar to that produced by

19   aspirin"?

20   THE COURT: Mr. Brock, the jury can't see the

21   screen.

22   MR. BROCK: Thank you, Mary. And I apologize.

23   BY MR. BROCK:

24   Q.   So "Figures are provided for different assumed

25   CV event rates. Assumptions underlying these numbers

1  include the following:  Patients treated with standard
2  NSAIDs will experience antiplatelet effects and
3  resultant CV protection similar to that produced by
4  aspirin."
5       *Right?*
6  A.   That's correct.
7       Q.   Is that saying that if you do a trial where
8  you're looking to test VIOXX versus a standard NSAID
9  that Dr. Musliner, based on what he said here, is that
10  we may see protection in the NSAID group like what you
11  would see with aspirin?
12  A.   That was the assumption that he was making.
13      Q.   And I believe he says here, "There are good
14  theoretical arguments, as well as limited clinical data
15  to support this assumption."
16      Do you see that, the parens?
17  A.   Yes, I do.
18      Q.   *Standard NSAIDs are things like Naproxen?*
19  A.   Like Naproxen, which when it is sold over the
20  counter in lower dosage is known as Aleve.
21      Q.   Now, what does Dr. Musliner say in 1996 about
22  VIOXX in terms of its effect on the heart if you do a
23  big trial testing for protection on the stomach?
24  A.   That it would have a neutral effect.  It wouldn't
25  increase the rate of events and it wouldn't decrease

1  the rate of events.
2      Q.   And was that the understanding about Merck --
3  by Merck at this point in time?
4      MR. LANIER:  I'm going to object to her
5  speaking about "by Merck."  She is not a corporate
6  representative.  She can only speak for herself.
7      MR. BROCK:  I'll rephrase the question.
8  BY MR. BROCK:
9      Q.   Was the understanding of Merck as reflected in
10  the document that VIOXX was neutral?
11      MR. LANIER:  Again, Judge, I have to object to
12  *her speaking about the understanding of Merck.  She can*
13  say what the document means to her.  That's it.
14      THE COURT:  Well, the document is written by a
15  Merck employee, correct?
16      MR. BROCK:  Yes, ma'am.
17      THE COURT:  The issue is whether one doctor at
18  Merck or two doctors at Merck, what their opinion is,
19  whether that was the corporate -- whether that was the
20  *opinion of everyone at Merck.  If you want to lay that*
21  foundation, you can; otherwise, you should ask her
22  whether this physician from Merck felt this way.
23  BY MR. BROCK:
24      Q.   All right.  Let's do it this way.
25      The document in 1996 reflects that VIOXX will

1  be neutral on the heart.
2  A.   Yes.
3      Q.   Okay.  Was that your personal understanding
4  from the memo?
5  A.   That was my understanding.
6      Q.   From your many conversations and dealings with
7  people in the VIOXX program, was that the understanding
8  of the physicians and scientists of Merck during that
9  period of time?
10  A.   Yes, it was.
11      Q.   So what Dr. Musliner is saying here is that...
12      Well, let me ask the question this way:  If
13  *you did this trial like this and you did NSAIDs versus*
14  VIOXX and you saw that you had more cardiovascular
15  events in the VIOXX arm, could you conclude from that
16  that VIOXX was causing events?
17  A.   No.  The assumption here that he was making is that
18  if you did that trial, in fact, you could find that the
19  event rate would be higher on the VIOXX arm than on the
20  NSAID arm, but not because VIOXX was increasing the
21  rate; rather, because the NSAIDs were acting *like*
22  aspirin and decreasing the rate.
23      Q.   Because VIOXX would be like placebo, and the
24  standard NSAID like Naproxen or other NSAIDs would be
25  like aspirin?

1  A.   Yes, that's exactly what he was saying.
2      Q.   Now, if you'll turn, please, to Exhibit 29,
3  which is the second one in your notebook, please.  It
4  is P-29.  And this was admitted into evidence through
5  Dr. Morrison.
6      Do you see the e-mail on 29.2 that references
7  *a note from you to Dr. Simon, Eric, and Dr. Briggs*
8  *Morrison?*
9  A.   Yes, I do.
10      Q.   And do you see that it refers to at the
11  bottom, "Attached is a preliminary draft of the GIOT,"
12  that's the GI outcomes protocol, correct?
13  A.   The T was for trial.
14      Q.   "You can see throughout I have written
15  comments and questions."  *And can you tell the members*
16  of the jury what this refers to?
17  A.   I had attached to this e-mail the protocol, which
18  is a document that sets out the design of the study,
19  what the question you're trying to answer in the study
20  is, the hypothesis, what type of patients can be
21  enrolled in the study, how those patients will be
22  treated, how often they'll be seen by their physicians,
23  how you'll analyze the data that's in the protocol.
24  And I had attached this along with questions that I
25  inserted into the protocol on wanting to get their

1    advice.

2        Q.   All right.   Turn to the next exhibit, which is

3    Exhibit Number 512.   A-512.1.

4             And is this the draft of the protocol that you

5    have just referenced?

6    A.   Um, this is a draft of the protocol.

7        Q.   And it refers to MK 0966 GI clinical outcomes

8    study, just as was referenced in the memo?

9    A.   That's correct.

10       Q.   And if you turn to 512.22, do you see the part

11   I have highlighted under F?

12   A.   Yes, I do.

13       Q.   Is this a comment that you are making to the

14   recipients of the e-mail that we just looked at?

15   A.   That is correct.

16       Q.   And tell the members of the jury what you were

17   communicating to the recipients of the e-mail here.

18   A.   Um, I was concerned that if we did a study with an

19   NSAID and VIOXX that we, in fact, -- and there was

20   going to be no placebo in this group, so no sugar pill,

21   because this was a long-term study in arthritis

22   patients, and those patients need to take either an

23   NSAID or a COX-2 inhibitor to treat their pain.   So

24   there was no placebo group.

25             And I was concerned if Tom Musliner was right,

2765

1    then we might, in fact, see a higher rate of events on

2    the VIOXX group compared to the NSAID group, because

3    the NSAID group would be providing cardioprotection and

4    the VIOXX group was not.

5             And so we were discussing whether we should

6    allow aspirin into the study or not, and if you allowed

7    patients on aspirin, you would also -- you would be

8    allowing patients who were at high risk for having

9    cardiovascular disease.

10            So the issue was around whether you allow

11   patients on aspirin into the study.

12       Q.   You say, "I sent you and Alan an article on

13   flurbiprofen given after PTCA.   It decreased the

14   reocclusion rate compared to placebo.   No comparison to

15   aspirin."

16            Does this reflect that you looked at some

17   literature in connection with this analysis?

18   A.   That's correct.   I had gone back and tried to find

19   literature to whether there were any clinical studies

20   to test whether NSAIDs could, in fact, be

21   cardioprotective, and there was one I found on

22   flurbiprofen, which is an NSAID that is sold here in

23   the United States, and, in fact, they had found, I

24   think, a 70 percent -- in this study, patients had come

25   in and had either a heart attack or about to have had a

2766

1    heart attack and they had opened up the artery.   And

2    then they took those patients and they didn't give them

3    aspirin.

4             You couldn't do this study nowadays.   It would

5    not be considered an ethical study to do, because all

6    of those patients are now given aspirin.   But back

7    then, they didn't give them aspirin, they gave them

8    placebo or flurbiprofen, and what they found were that

9    the patients on flurbiprofen, which is an NSAID, had a

10   70 percent reduction in reclotting of the artery.

11       Q.   Now, going back to the Exhibit 29, I want to

12   direct your attention to 29.1, paragraph five.   And

13   there's a -- this relates to an e-mail from you to Dr.

14   Simon, Daniels, Eric, and Morrison again, is that

15   correct?

16   A.   That's correct.

17       Q.   There's a note in paragraph five, "Low-dose

18   aspirin.   I hear you.   This is a no-win situation."

19            When you are communicating to them that

20   there's a no-win situation, what do you refer to there?

21   A.   So, again, this was around the question of do you

22   allow patients in the study on aspirin.   We were trying

23   to answer a very specific question in this study, and

24   that is, would patients who took a drug that only

25   inhibited cyclooxygenase-2 have less serious GI events

2767

1    compared with patients who took a nonselective NSAID

2    that inhibit both COX-1 and COX-2.

3             Aspirin inhibits COX-1, so if you allowed

4    patients into the study who were taking aspirin, in

5    those patients you wouldn't be testing the COX-2

6    hypothesis, because the VIOXX patients who are on

7    aspirin would not only have inhibition of COX-2, they

8    would have inhibition of COX-1, as well.

9             And while testing the GI safety in that

10   population is an important question, it is a different

11   question than the one we were trying to answer in this

12   particular study.

13       Q.   Okay.   It says, "The relative risk of even

14   low-dose aspirin may be as high as two to fourfold."

15            What relative risk is that referring to?

16   A.   Potentially of GI bleeding.

17       Q.   So if you're taking aspirin, you're at higher

18   risk for problems with the stomach?

19   A.   That's correct.

20       Q.   "Yet the possibility of increased CV events is

21   of great concern.   I just can't wait to be the one to

22   present those results to senior management."

23            What does that refer to?

24   A.   Well, I was concerned that if we allowed VIOXX and

25   we studied VIOXX and the NSAID and we didn't have

2768

1   patients in the study with aspirin, you might see what
2   they saw in the flurbiprofen study, lower rate of
3   *events on the NSAID group, higher rate of events on the*
4   VIOXX group.  There would be no placebo.
5        And so you would have this new drug, and the
6   question is, without a placebo, how could you tell
7   whether it was the NSAIDs decreased the rate or that
8   VIOXX was increasing the rate?
9        Q.  So what you're referring to now, I think
10  you're telling us is that if you do this trial and you
11  have fewer events on the NSAID group than you do on the
12  VIOXX group...
13       Well, let me ask the question this way:  If
14  *you do this trial and you see fewer events on the NSAID*
15  group than you do on the VIOXX group, does that mean
16  that VIOXX is causing the heart attacks?
17  A.  Well, according to the data we had at that time, we
18  thought, in fact, it would mean that the NSAIDs were
19  decreasing the rate.  But, of course, without a placebo
20  in the trial, you couldn't be sure.
21       Q.  Okay.  Thank you.
22       Now, during this period of time when you were
23  working on the GI megatrial in the '98 time frame, were
24  you aware of the study that had been done, Study 023,
25  which has been described to the jury as the FitzGerald

1   study?
2   A.  Well, this was in 1997, early 1997, and it was
3   before we had results from the Garrett FitzGerald
4   study.  At that point in time, there was no animal data
5   or other data that suggested that VIOXX would increase
6   the risk of cardiovascular events.
7        Q.  Thank you.
8        In a later point in time, did you learn about
9   the 023 study?
10  A.  Yes, I did.
11       Q.  And the 023 study, just to summarize very
12  quickly, so that we can put a couple questions in
13  context for the jury, 023, the FitzGerald study, saw a
14  reduction of the waste products of prostacyclin but not
15  thromboxane in the urine?
16  A.  In patients treated with VIOXX, they saw a
17  reduction in a breakdown product of prostacyclin in the
18  urine and no change in thromboxane.
19       Q.  From that study did you know if the reduction
20  in prostacyclin that you saw in the waste products of
21  the urine, whether that was from the blood vessels, the
22  vasculature?
23  A.  No, you could not tell that from the study.
24  Prostacyclin is made in many organs in the body.
25       Q.  Could you tell from that study whether

1   prostacyclin was being made in the vasculature by COX-1
2   or COX-2?
3   A.  No, you could not tell from that study.  In fact,
4   the majority of studies suggested that prostacyclin in
5   the vasculature was made by COX-1, which is why the
6   results of the study were so surprising to everybody.
7        Q.  If prostacyclin is made by COX-1 and VIOXX is
8   a COX-2 inhibitor, just if you go with that statement,
9   then is VIOXX going to reduce anywhere in the
10  vasculature prostacyclin?
11  A.  Not if COX-1 is making prostacyclin in the
12  vasculature.
13       Q.  Now, we have talked extensively with the jury
14  about what Merck did in response to the FitzGerald
15  hypothesis, and we won't go back through all of those
16  steps, but I do need to ask you this question:
17       There's been statements made that Merck in its
18  development program of the medicine VIOXX did not test
19  the medicine in patients that were older or who had
20  health problems.  I want to ask you if that statement
21  is true.
22       MR. LANIER:  Obviously, Your Honor, I object
23  to him saying that statement is made.  That's not the
24  statement we have made.  We made the statement about
25  *high risk patients.*

1        THE COURT:  *The jury should disregard the*
2   *question, and you can reframe the question in terms of*
3   *were older populations included.*
4   BY MR. BROCK:
5        Q.  Did Merck test the medicine VIOXX before it
6   asked the FDA for permission to sell it in the United
7   States in patients who were older or in patients who
8   had risk factors for heart disease?
9   A.  Yes, it did.
10       Q.  Tell the jury about that.
11  A.  Um, in our osteoarthritis studies, the average age
12  of the patients was 65, I think.  About -- or 63.  I
13  think about 40 percent were over the age of 65.
14       Forty percent of them had hypertension, high
15  blood pressure.  I think 20 percent of them had high
16  cholesterol.  Eight or 9 percent had diabetes.  I think
17  about 8 percent had actually had a previous heart
18  attack or a stroke.  And if you looked at what many
19  define as, quote, high risk -- so patients who had two
20  or more risk factors or had had a previous heart attack
21  or stroke -- it was about 20 percent of patients in the
22  osteoarthritis studies.
23       Q.  Now, the next question I have for you is
24  whether or not Merck in the period of time leading up
25  to asking for permission to sell the medicine in the

1   United States, did Merck track the cardiovascular
2   events that were occurring in the trials?
3   A.   Um, we had a very large clinical development
4   *program, and we collect all safety data on patients,*
5   blood pressures taken during the studies.  We collect
6   blood from patients, and any adverse experiences,
7   whether or not they're related to the drug, are
8   reported in and put in the database.  And so, of
9   course, all cardiovascular events would have been
10  included in that.
11       Q.   Prior to the time that the FDA approved VIOXX
12  for sale in the United States, did Merck do a specific
13  safety trial where the only outcome of the trial was to
14  look at cardiovascular safety?
15  A.   No, we did not.  That would not have been standard,
16  um, and I think probably at that period of time would
17  not have been necessary.
18       Q.   Could you tell the members of the jury why.
19  A.   The FitzGerald hypothesis certainly did -- he
20  raised the question, could this decrease in
21  prostacyclin put patients who take VIOXX at increased
22  risk of cardiovascular events?  But there was really no
23  data at that time to suggest that prostacyclin was, in
24  fact, reduced in the vessels.
25          There were alternate theories also in the

1   literature at that time.  There was a theory that
2   VIOXX, because it was an anti-inflammatory agent, could
3   actually help the heart and be cardioprotective.
4           So you had many -- you had differing theories
5   at that point in time.
6           Nothing in our animal data suggested that
7   there was an issue, and in addition, we looked very
8   carefully after we saw Dr. FitzGerald's data at our
9   entire Phase IIb/III database.  So our OA database had
10  over 5,000 patients, who some of the studies were
11  six weeks, but some of them went a year or longer.  And
12  we did a specific analysis looking at cardiovascular
13  *events.*
14          And, in fact, the rate of serious
15  cardiovascular events, including heart attacks, was the
16  same on VIOXX and placebo, although the placebo data
17  set was small.
18          And, also, importantly, it was the same
19  between VIOXX and the NSAID.  And in this case, the
20  NSAIDs were Ibuprofen and diclofenac.
21          We discussed that data with the FDA.  We
22  submitted that data to the FDA.  That data was
23  discussed at the public FDA advisory committee meeting,
24  and at no point in time did anybody say they thought it
25  was necessary for a cardiovascular outcomes study to be

1   done prior to the drug being put on the market.
2           However, we tend to be very careful at Merck,
3   and so we said, we haven't seen anything, but we have a
4   lot more studies that are about to start, let's be
5   proactive and put together a process to proactively
6   collect and have outside experts look at and adjudicate
7   to see whether something that is reported as a heart
8   attack really is a heart attack or something that's
9   reported as angina maybe is a heart attack, and let's
10  do that prospectively in our studies of four weeks or
11  more duration that we're about to start with any of our
12  COX-2 inhibitors.
13       Q.   Okay.  So just to summarize briefly, you
14  looked at in the database the major application when
15  you made your application to sell the drug VIOXX versus
16  placebo.  And what did you do?
17  A.   *We saw that the rates of cardiovascular events was*
18  similar.  And when I'm talking about cardiovascular
19  events, because I think people use the terminology in
20  all different ways, I'm talking now about potential
21  thrombotic events.  I'm not talking about hypertension,
22  which is higher on VIOXX than placebo, as it is on
23  NSAIDs versus placebo.
24       Q.   And you looked at VIOXX versus the NSAIDs in
25  the trials that you had conducted, IIb and III, and

1   what did you see?
2   A.   Again, the rate of potential thrombotic events,
3   serious cardiovascular events was similar on VIOXX and
4   the comparator NSAIDs.
5       Q.   And you put in place this CVSOP that you have
6   just described --
7   A.   Correct.
8       Q.   -- so that you can get a better look at what
9   you do?
10  A.   That was...
11          We started that in about, I think, December of
12  1998, early 1999.
13       Q.   The jury has seen the documents.  VIOXX was
14  approved for sale in the United States in May of 1999,
15  correct?
16  A.   That's correct.
17       Q.   Now, I want to go back to one point before I
18  get to the next step along the way.
19          Did Merck do the GI outcomes megatrial that we
20  were talking about in terms of the memos that went back
21  and forth between you and Dr. Morrison and others?  Was
22  that actual trial conducted?
23  A.   We did not do that actual trial.  As I said, in
24  that period of time, there was controversy of whether
25  endoscopy studies would actually be enough.  We did not

1    do that trial then, but in the 1998/1999 time frame, I

2    was asked to start working on the design of another GI

3    outcomes study.

4        Q.   And that's the one the jury has heard about.

5    That's the VIGOR trial?

6    A.   Yes, it is.

7        Q.   And you were very involved in that trial?

8    A.   Yes, I was.

9        Q.   In fact, you were one of the primary drafters

10   of the protocols?

11   A.   Yes.

12       Q.   And I need you to just take a minute and tell

13   the jury what a trial protocol is and why it is

14   important to understanding the results of a trial.

15   A.   Um, the protocol I think I said before kind of

16   outlines the specific questions that you're going to

17   ask, and you like to prespecify those questions, to

18   state in advance, these are the questions that we're

19   going to try to address during this study.

20            It tells you the types of patients that you're

21   going to enroll in the study.  It tells you how you're

22   going to give the drug, the test drugs, and what dose

23   of the test drugs you're going to give.  It tells the

24   physicians how often they should see the patients in

25   what type of safety tests they should do on the

1    patients during the studies.

2            It also -- in this particular case, we told

3    them if they told them about reporting gastrointestinal

4    events and specific reporting for cardiovascular

5    events, and all of that was outlined in the protocol.

6        Q.   You served in the role as the clinical monitor

7    of the trial, correct?

8    A.   Correct.

9        Q.   This was a study that's referred to as a

10   blinding trial, correct?

11   A.   That is correct.

12       Q.   I know everybody understands that.  They're

13   not sitting there with a blindfold over their eyes, but

14   what does that mean, to be blinded?

15   A.   It means the patients don't know what therapy

16   they're on.  The physicians who are taking care of them

17   don't know what therapy they're on.  And it also means

18   that we at Merck don't know what therapy they're on.

19       Q.   So what is the role of the clinical monitor in

20   a blinded trial like VIGOR?

21   A.   You're saying during the conduct of the study?

22       Q.   During the conduct of the study, yes, ma'am.

23   A.   During the conduct of the study, I reviewed

24   laboratory results on all the patients.  They also went

25   to the investigators, but I would kind of also review

1    them, and if I saw labs that were of concern to me, we

2    would call the investigators, make sure they were aware

3    of them, making sure they were following up on

4    patients.

5            I would review any adverse experiences that

6    were being reported in.  I would look at all serious

7    adverse experiences, and if I didn't think...

8            They would have to give us a narrative, a

9    little story about what happened.  If I didn't think

10   they were clear, I had questions, we would go back to

11   the investigator.

12            I would answer questions from any

13   investigators ongoing during the study and worked with

14   the Steering Committee, that was an outside group of

15   experts that was overseeing the conduct of the study to

16   ensure the study was conducted appropriately.

17       Q.   When you have records come in someone had had

18   an adverse experience or there was a report, would you

19   know if that patient was taking VIOXX or the comparator

20   drug?

21   A.   No, I was blinded.

22       Q.   So you would be following up with questions,

23   but not knowing which treatment the patient was

24   receiving?

25   A.   That's correct.

1        Q.   How many patients were in the VIGOR trial,

2    approximately?

3    A.   Approximately 8,000 patients.

4        Q.   And can you tell the members of the jury what

5    was the purpose of the VIGOR trial?

6    A.   Similar to the purpose we were talking about for

7    the study I was working on in 1997.  The purpose was to

8    test whether VIOXX was associated with fewer clinical

9    GI outcomes, such as ulcers in the stomach, bleeding

10   from the stomach, or actually holes in the stomach,

11   compared with the comparator NSAID, which inhibits both

12   COX-1 and COX-2.  And in this case, that comparator

13   NSAID was Naproxen, otherwise known as Aleve.

14       Q.   Did Merck have interaction with the FDA in

15   terms of the design of the VIGOR trial?

16   A.   Yes, we did.  We sent them a copy of the protocol,

17   and then we, along with the Steering Committee chairs,

18   went down to discuss that with them.

19       Q.   Let me get you to look at 50, Exhibit 50 and

20   turn to page 50.

21   A.   Is that A-50?

22       Q.   A-50.  And do you have the cover sheet there?

23   A.   Yes, I do.

24       Q.   And is this the cover sheet for a letter that

25   is written to Robert Delap at FDA from Bob Silverman.

1   A.   Yes.  You can see that on the second page.  I can't
2   tell that --
3        Q.   On the second page.  I apologize.  Page 50.2,
4   please.
5             And the date of that is December 18th, 1998.
6   A.   That's correct.
7        Q.   And it says, "Reference is made to the above
8   Investigational New Drug Application (IND), a
9   background briefing document submitted on September
10  2nd, 1998, draft comments received from the agency on
11  October 30th, 1998, and a meeting between
12  representatives of MRL and the agency on November 5th,
13  1998.  By this letter and attachment, MRL is providing
14  minutes prepared by MRL of this proceeding."
15            Did I read that right?
16  A.   You did.
17       Q.   What does that refer to?
18  A.   We sent the protocol down to the FDA, it looks like
19  in September of 1998.  They sent us some comments back
20  on it, and then we met with them to discuss their
21  comments and how we would address them.
22       Q.   And if you look at 50.7, paragraph number 1,
23  does it say that the agency and MRL generally concurred
24  on the design of the proposed GI outcomes trial?
25  A.   That's correct.

1   were considering were given three times a day, and our
2   consultants were telling us that rheumatoid arthritis
3   patients often have complicated medical regimens, and
4   if we wanted them to be able to take the drug during
5   the whole course that twice a day was about the most
6   that you could expect them to take a drug.
7             So that was one reason.
8             Naproxen also is the most commonly used
9   nonsteroidal for the treatment of rheumatoid arthritis.
10            And, thirdly, we had gotten a lot of data on
11  Ibuprofen and diclofenac, other NSAIDs, in our OA
12  studies, as well as I think nabumetone, and this would
13  provide us the opportunity to get more data on VIOXX
14  versus yet another nonsteroidal anti-inflammatory.
15       Q.   All right.  What dosage of VIOXX was selected
16  for the VIGOR trial, and why?
17  A.   For Naproxen, it was the most commonly used dose,
18  which is 500 milligrams twice a day.  For VIOXX,
19  actually, we chose 50 milligrams, which is two times
20  the maximum dose that's recommended.
21            And the reason for that is, actually, the
22  agency had requested that we look to see if the GI
23  safety for VIOXX would be maintained even if patients
24  went to a dose that was higher than recommended for
25  use.

1        Q.   And that is the VIGOR trial?
2   A.   That is the VIGOR trial.
3        Q.   Now, in the VIGOR trial, was there a placebo
4   arm?
5   A.   No.  We did the VIGOR trial in patients with
6   rheumatoid arthritis, which is a severe form of
7   arthritis that can be crippling in some patients.  And
8   those patients usually -- or often need to take high
9   doses of nonsteroidal anti-inflammatories or other pain
10  medications to treat their pain, and you can't ask them
11  to go on placebo for a prolonged period of time, and,
12  therefore, there was no placebo in this study.
13       Q.   Okay.  You mentioned that --
14  A.   That means they wouldn't be getting treatment for
15  their pain if you asked them to take a placebo.
16       Q.   So if you had a trial of patients that were --
17  that had rheumatoid arthritis that had a lot of pain,
18  you couldn't ask them to stay in the trial nine to
19  13 months without pain relief.
20  A.   That's correct.
21       Q.   Why was Naproxen selected as the comparator
22  drug?
23  A.   There was several reasons for that.
24            First of all, Naproxen is given twice a day.
25  Some of the other nonsteroidal anti-inflammatories we

1        Q.   So the trial that you ended up with was one in
2   which you had Naproxen as a comparator at
3   500 milligrams times two?
4   A.   500 milligrams twice a day.
5        Q.   And 50 milligrams of VIOXX, which was twice
6   the recommended dose?
7   A.   That's correct, for chronic use.  For acute pain,
8   you could take 50 milligrams for up to five days.
9        Q.   Now, was there a board of physicians in place
10  to monitor developments in the trial as relates to
11  patient safety?
12  A.   For this study, we convened, we put together a data
13  safety monitoring board, which are a group of experts
14  who do not work at Merck, experts in the field of
15  rheumatology, clinical trial design,
16  gastroenterologist, statistics, and there's a Merck
17  statistician who works with them, in this case, Deborah
18  Shapiro.  She didn't vote, but she would provide them
19  the analyses.
20            And at several points during the study, they
21  would actually analyze the data in an unblinded manner
22  in that they would see safety events on patients on
23  treatment A versus treatment B.  Some data safety
24  monitoring boards say they know what the treatments
25  are, but this particular board said we want to see it

1    by A versus B.
2         Q.   Okay.  So as events were being reported during
3    the VIGOR trial, would the data safety monitoring board
4    periodically receive summaries of those events or
5    information about the events?
6    A.   When they meet in the beginning, they decide how
7    often they want to meet and how they want to see the
8    data, and so at set times, Dr. Shapiro would do
9    analyses that included the safety data, and she would
10   show those to the board.  And once she was unblinded,
11   she was kind of -- she wasn't allowed to speak to
12   anybody else at Merck about either the study conduct or
13   the study design or results, obviously.
14        Q.   At any point in time did the data safety
15   monitoring board relative to the VIGOR trial, recommend
16   that the trial be halted?
17   A.   No, they did not.
18        Q.   Now, when you have a trial of 8,000 patients
19   and you're testing to see if one drug or another is
20   safer on the stomach, you have to have a way for the
21   trial to end, don't you?  How do you get to the end
22   point after trial?
23   A.   That's correct.  Trials are designed in many ways.
24   Some would say, okay, everybody has to be on study drug
25   for a year, and when the last patient has completed a

2785

1    year of therapy, the study is over.
2         This particular study had a prespecified
3    number of end points that needed to occur.  In this
4    case, we needed at least 120 what we call PUBS, that's
5    perforations, ulcers, or bleeds, and 40 confirmed
6    complicated events.  These were the more serious ones.
7    It wouldn't include asymptomatical ulcers.  It would be
8    major GI bleed or perforations, or maybe even
9    obstructions.
10        And when we reached that number of end points,
11   we would then terminate the study.  So we couldn't
12   predict in advance the exact date the study would end.
13        Q.   Okay.  What was the start date for the VIGOR
14   trial?
15   A.   I believe it was in January, 1999.
16        Q.   And is this what you would refer to as an
17   event-driven trial in terms of the termination date?
18   A.   That's correct.  We would call it an event-driven
19   trial.
20        Q.   As GI events were being reported during the
21   trial, would independent folks look at them to see
22   whether or not they were actually GI events?
23   A.   So if a GI event was reported, we would then go
24   back to the site and say, could you provide us with the
25   patient's medical records as they relate to this event.

2786

1         So if they had an endoscopy, we would ask for
2    that data.  They would put a tube down to find an
3    ulcer.  If there was laboratory data, anything that --
4    you know, we had certain documents we would ask for.
5         And these would come into us blinded.  We
6    didn't know who the patient was or what treatment they
7    were on, other than what we call an allocation number,
8    kind of a number by which we can identify a patient in
9    a study.
10        And then that was sent to an outside group of
11   experts, who would review the data in a blinded manner,
12   and say, yes, this was really a perforation, an ulcer,
13   or a bleed, or it was a complicated bleed or, no, this
14   was not.
15        Q.   Okay.  Now, I want to go back in time --
16   A.   And if they said it was, it was considered a
17   confirmed event.  And that was what the primary
18   analysis was based on.
19        Q.   All right.  So one of the things that you're
20   looking at in the VIGOR trial is clinically significant
21   problems on the stomach.  That's one of the issues that
22   you're looking at, and you've got an adjudication
23   process in place to see if they're a real event or not.
24   A.   That's correct.
25        Q.   Did you also have in place for the VIGOR trial

2787

1    the cardiovascular standard operating procedure that
2    the jury has heard about?
3    A.   Yes.  As I said, when we had completed our Phase
4    III studies, even though we saw no evidence of a signal
5    in terms of an increase in thrombotic events on VIOXX,
6    we proactively started this, what we say,
7    cardiovascular SOP with the intent that we would
8    collect serious cardiovascular events in ongoing -- or,
9    you know, studies in the future, and then we would
10   analyze them in a pooled analysis.
11        We had done a GI pooled analysis as a part of
12   the original NDA, and we would do something similar in
13   terms of a cardiovascular pooled analysis.
14        Q.   So the CVSOP contemplated that in trials from
15   a certain point forward, VIGOR included, you would look
16   at the thrombotic events, you would send them out to
17   independent adjudicators, and then you would pool
18   results to see what you saw?
19   A.   Right.  From VIGOR, as well as other studies.
20        Q.   Okay.  And that CVSOP was in place for the
21   VIGOR trial?
22   A.   Yes, that is correct.  It was one of the first
23   studies to use the CVSOP.
24        Q.   Now, did you, as the trial was coming to its
25   close in December of 1999, receive correspondence from

2788

1    the data safety monitoring board about what they felt
2    would be appropriate in terms of adjudication of
3    events?
4    A.   It wasn't necessarily my recollection, at least
5    about adjudication.  Rather, they were recommending
6    that we do a specific cardiovascular -- analysis of the
7    potential thrombotic events, the adjudicated events
8    from VIGOR alone.
9        Q.   Okay.  And let me direct your attention to
10   Exhibit A-701.
11            Do you have it there?
12   A.   I do.
13       Q.   And is that a letter that you received from
14   Dr. Michael Weinblatt concerning the issue that we have
15   just discussed?
16   A.   That is correct.
17            MR. BROCK:  Your Honor, at this point, we
18   would offer 701.
19            THE COURT:  Any objection?
20            MR. LANIER:  I don't have an objection, Judge.
21            THE COURT:  701 will be marked into evidence.
22            (Whereupon, Defense Exhibit 701 was marked
23   into evidence.)
24   BY MR. BROCK:
25       Q.   Do you see the date of this is December 20th

2789

1        Q.   It is simply saying, instead of sending it out
2    and pooling it with everything else, look at it on its
3    own.
4    A.   It is not so much the sending it out.  It is more
5    once you get the data, the plan was to pool it with
6    other data sets, because we didn't think we would have
7    that much information from one study alone.  And they
8    were suggesting that we do the analysis on this study
9    alone.
10       Q.   Okay.  Then if we could see Exhibit A-660.1,
11   please.
12            Tell the jury what this is, please.  Do you
13   have it?
14   A.   661.1.
15       Q.   A-660, correct.
16   A.   Okay.  This is another letter that I received from
17   Dr. Weinblatt in January.
18            We had gone back to him.  We thought maybe he
19   didn't realize that we were going to be analyzing the
20   data pooled with other trials, and we went back to him
21   and said, no, we think this study is under-powered, we
22   plan to do this for all trials.
23            And so what he came back to was saying, no, we
24   understand, we want you to prespecify a specific
25   analysis just for the VIGOR study.

2791

1    of 1999?
2    A.   Mr. Brock, I think you have to move the...
3        Q.   Thank you.  I don't know where I would be
4    without my witnesses.
5            MR. LANIER:  Home.
6            MR. BROCK:  Don't tempt me.
7    BY MR. BROCK:
8        Q.   All right.  December 20th of 1999?
9    A.   That's correct.
10       Q.   And it is to you from Dr. Weinblatt, and you
11   see I've got a piece highlighted here that says "We
12   recommend that an analysis plan be developed to analyze
13   adjudicated serious vascular events in the VIGOR trial
14   separately from any other planned analyses of these
15   data"?
16   A.   Correct.
17       Q.   What does that mean?
18   A.   He was suggesting that we analyze cardiovascular
19   events from VIGOR alone and that we prespecify how we
20   were going to do that.
21       Q.   All right.  So this suggestion doesn't change
22   the fact that you were going to send the
23   investigator-reported events to adjudicators.
24   A.   Oh, no.  That was already ongoing since the
25   beginning of the study.

2790

1        Q.   And that's what he said there to you, "An
2    analysis of these cardiovascular data must be provided
3    separately for VIGOR as part of the study report"?
4    A.   That's correct.
5        Q.   And does he also say that "The plan for the
6    analysis of adjudicated serious cardiovascular data
7    must be written and approved prior to unblinding"?
8    A.   That is correct.
9        Q.   What does that mean?
10   A.   He wanted us to prespecify what our plan was for
11   doing the analysis before we saw any of the data from
12   the study.
13       Q.   Okay.  Did you agree to the suggestion that
14   was being made by Dr. Weinblatt of the data safety
15   monitoring board to look at the data in the way he is
16   suggesting?
17   A.   Yes, we did.
18       Q.   Could we see A...
19            MR. BROCK:  Let me at this point offer A-660.
20            THE COURT:  Any objection?
21            MR. LANIER:  No, Judge.
22            THE COURT:  A-660 will be marked into
23   evidence.
24            (Whereupon, Defense Exhibit A-660 was marked
25   into evidence.)

2792

1    MR. BROCK:  A-661, please.
2  BY MR. BROCK:
3    Q.  Can you tell the members of the jury what this
4  letter is.
5    A.  This was my letter back to Dr. Weinblatt outlining
6  the specifics of how we planned to get the data
7  together to do the analysis.
8    Q.  It says here in the first sentence, "I want to
9  share with you Merck's plan for analyzing serious"
10  thromboem -- "thrombolic and embolic adverse
11  experiences from the VIGOR study."
12    Did I get that right?
13  A.  Yes.
14    Q.  Go down to "Timing and logistics."
15    Does it say a cutoff date and reporting these
16  events to Merck will be February the 10th?
17  A.  That is correct.
18    Q.  In the last sentence of that document, does it
19  say "Any events which are reported after February 10th
20  will be adjudicated; however, they will not be included
21  in the initial analyses"?
22  A.  That is correct.
23    Q.  What does it mean when you say that you are
24  establishing a cutoff date for reporting events?
25  A.  Um, it is not intuitive.  I know before I came to

1  Merck, I thought, well, you do a clinical trial, you
2  get the data, you analyze it, and that's it.
3    It turns out that data can come in long after
4  you have already done your analyses.  I mean, I have
5  had serious adverse experiences reported a year after a
6  study is already completed.
7    And so the question is, do you keep redoing
8  your analyses every time you get a new piece of
9  information?  And what you have to do is you prespecify
10  what your cutoff date is, when you close the database.
11  If you don't do that, you can...
12    There's two things.
13    First of all, you would be continually
14  updating your analyses.  And, number two, maybe the
15  analyses will change and then people could choose the
16  analysis they like the best.  And so, you don't want
17  that to happen, and so the rigorous thing to do, and
18  what Merck always does, is we prespecify what the
19  cutoff date will be.
20    And so for cardiovascular events, it was going
21  to be February 10th, which was the day that we were
22  terminating the study.
23    Q.  Now, you had a different cutoff date for the
24  GI events?
25  A.  That is correct.  We did.  The GI event cutoff date

1  was about, I think, a month later.
2    And the reason that the dates were not the
3  same is that we were finding it was taking us much
4  longer to get the medical records for the serious
5  thrombotic events than it was for the GI events.
6    The actual adjudication, meaning the
7  committees looking at the data and deciding whether it
8  is a confirmed event or not, that doesn't take --
9  that's the same amount of time, whether it is a CV
10  event or GI event.  But almost all of the patients who
11  had serious cardiovascular events were hospitalized.
12  Some of them in countries all around the world.
13    And we were finding it was just taking the
14  sites a lot of time to get the hospital records into
15  us.  And we thought it was important, even though Dr.
16  Weinblatt in one of his letters said it is okay, even
17  if you freeze the file, which is you say, okay, we're
18  going to unblind the data here, he said we could
19  adjudicate the events after we were unblinded to the
20  data, but we had done that -- he said as long as the
21  adjudicators don't know what the patient is on.
22    We had done that in our initial VIOXX program
23  for our GI events, meaning that the studies were over
24  and the cases went to the adjudication committee after
25  we had already seen data from the study.

1    The adjudicators were blinded, and the FDA had
2  concerns about that.  They thought that maybe somewhere
3  along the way we had gotten unblinded, and it wasn't
4  true, but it had raised concerns, and therefore, we
5  didn't want to repeat that, and we wanted to make sure
6  that all of the adjudication was done before the final
7  unblinding of the database.
8    Q.  So in terms of having one cutoff date for CV
9  and another cutoff date for GI, I think what you have
10  expressed to the jury is that there was a practical
11  issue in terms of getting medical records in for the
12  patients who had had thrombotic events.
13  A.  That is correct.
14    MR. LANIER:  Objection, leading.  Judge, he
15  does it at the end of every one.
16    THE COURT:  The objection is sustained.
17  BY MR. BROCK:
18    Q.  Did it take longer to get the medical records
19  in for the folks that had had thrombotic events?
20  A.  Yes.  It was taking longer.  In some cases, you
21  know, it was going up to six months, and so therefore,
22  we thought we needed the extra time to get the medical
23  records in so we can get them to the adjudicators
24  before the complete unblinding of the database in
25  April.

1    Q.   Now, the jury has heard testimony about heart
2    attacks that were reported to Merck after the February
3    10th cutoff date that were not included in the paper
4    that was submitted to the New England Journal of
5    Medicine.
6    A.   That is correct.  There were heart attacks, there
7    were some strokes, and we had some GI events that came
8    in after the GI cutoff date, as well.  And we had
9    prespecified that they would not be included in the
10   primary analysis, but that we would provide those to
11   regulatory agencies in a safety update report.
12   Q.   So where you say in this letter to Dr.
13   Weinblatt, "Any events which are reported after
14   February 10th will be adjudicated; however, they will
15   not be included in the initial analyses," how does that
16   relate to what you have just said?
17   A.   That is prespecifying and outlining before I saw
18   any of the data how the analysis would be done and what
19   data would be included in the analysis.
20   Q.   All right.  Now, can you tell the members of
21   the jury what the results of the VIGOR trial were?
22   A.   We met our primary hypothesis and secondary
23   hypothesis, which meant that there was significantly
24   fewer perforations, ulcers, and bleeds and complicated
25   perforations, ulcers, and bleeds in patients who were

1    taking VIOXX compared to patients taking the
2    traditional NSAID Naproxen.
3            In addition, there were more serious
4    cardiovascular events, and when -- I'm talking about
5    thrombotic events, significantly more thrombotic events
6    on VIOXX compared with Naproxen.  And that result was
7    mainly driven by a difference in heart attacks.
8    Q.   Did you have reduced ulcers, bleeds, and
9    perforations on the VIOXX arm of the trial?
10   A.   Yes, we did.
11   Q.   By what percentage?
12   A.   It was about a twofold reduction.  It was cut in
13   half.
14   Q.   Did you also have fewer heart attacks on
15   Naproxen than you had on VIOXX?
16   A.   Yes, there were.  There were fewer heart attacks on
17   VIOXX -- on Naproxen than there were on VIOXX.
18   Q.   To be clear, were the results statistically
19   significant; that is, you had enough events to say
20   there is statistical significance?
21   A.   It was statistically significant.
22   Q.   Now, there was no placebo arm in the trial,
23   correct?
24   A.   That is correct.  There was no placebo arm.
25   Q.   So could you look at the trial results alone

1    and tell whether or not Naproxen was decreasing the
2    rate of events or VIOXX was increasing the rate of
3    events?
4    A.   No.  This was kind of what I had predicted or Dr.
5    Musliner had predicted in 1997.  We saw a difference,
6    the rate being higher on VIOXX than the NSAID.  We
7    didn't have a placebo group, and therefore, you
8    couldn't tell from looking at VIGOR alone, was this
9    because Naproxen had decreased the heart attack rate
10   because it was acting as a cardioprotective agent, or
11   because VIOXX was increasing the heart attack rate?
12   Q.   When did you learn of the results of the VIGOR
13   trial?
14   A.   Well, as I said, the official unblinding where the
15   whole team working on the study was going to be
16   unblinded was in April.  We had prespecified a plan
17   where a very small group of us could get unblinded to
18   the data earlier before we had final data so that we
19   could start working on regulatory documentation and a
20   paper.
21           Once any of us -- myself in particular -- once
22   I was unblinded, I now had nothing to do with the
23   study.  Briggs Morrison took over for me as the
24   monitor.  Since I had seen the study results, I
25   couldn't take part in any discussions about data or

1    questions of that manner.
2    Q.   All right.  And what was your reaction to the
3    results of the VIGOR trial?
4    A.   Um, obviously, I was very happy that we had met the
5    primary end point.  As I said, you're never quite sure
6    until you do a study what the outcome is going to be.
7    And I was concerned about the cardiovascular data.
8    Q.   While...
9            Why were you surprised or concerned about the
10   cardiovascular data?
11   A.   Well, my first reaction was actually not that
12   Naproxen was cardioprotective, but is VIOXX being
13   prothrombotic, and I wondered whether there was
14   something unusual about rheumatoid arthritis patients
15   where VIOXX might act in that way.
16   Q.   Okay.  We've seen the e-mail, the jury has
17   seen the e-mail of Dr. Scolnick where he refers to the
18   fact that he is also concerned about the results.  You
19   have seen that?
20   A.   I have seen that e-mail.
21   Q.   And have you had discussions and been involved
22   in meetings with Dr. Scolnick after the VIGOR results
23   were received?
24   A.   Yes.  We met often during the weeks after we first
25   saw the preliminary results.

1   Q.   I want to show you Exhibit A-186, please.
2        This e-mail fast forwards for a period of time
3   to February of 2001, does it not?
4   A.   Yes, it does.
5        Q.   And it is from Dr. Scolnick to Alan Nies,
6   yourself, and Harry Guess, right?
7   A.   Yes.
8        Q.   And you are a recipient of this e-mail?
9   A.   Yes, I was.
10       MR. BROCK:   Your Honor, we would offer A-186.
11       THE COURT:   Any objection?
12       MR. LANIER:   I think it may be in evidence,
13  but I've got no objection either way.
14       THE COURT:   All right.  186 will be marked
15  into evidence if it hasn't already been.
16       (Whereupon, Defense Exhibit 186 was marked
17  into evidence.)
18  BY MR. BROCK:
19       Q.   And just to put things in context, Dr. Reicin,
20  what is going on at Merck in February of 2001?
21  A.   Um, we were just getting ready to go to a public
22  FDA advisory committee meeting.
23       Q.   Did this relate to the VIGOR results?
24  A.   Yes, to talk about the VIGOR study results.
25       Q.   Okay.  And Dr. Scolnick makes the comment in

1   A.   Yes, it does.  As I said, I was initially very
2   concerned, and I think he said it right.  I was sick
3   about the fact that -- the thought that we might have
4   done harm to patients inadvertently.  But once I had a
5   chance to review all of the data -- and not just VIGOR,
6   it was an extensive other database -- I thought that
7   the only way, the best way to put all of the evidence
8   that we had together was that Naproxen was actually
9   acting as a cardioprotective agent.
10       Q.   Now, I want to talk to you now about that
11  period of time immediately following the receipt of the
12  VIGOR results, and let me direct you to some things
13  that I think you looked at during that period of time.
14       First of all, did Merck go back and look at
15  the data that it had through March of 2000 in order to
16  see if there was any signal for cardiovascular risk as
17  one of the responses to the receipt of the VIGOR data?
18  A.   Right.  So when we got the VIGOR data, part of the
19  reason that it was a surprise, even though we had
20  talked about stuff in the Tom Musliner memo and Garrett
21  Fitzgerald had raised a hypothesis, was, as I said, we
22  saw no signal in our osteoarthritis database.
23       And so we said, did we miss something?  And we
24  went back and we reanalyzed the data in a manner more
25  consistent with how the VIGOR data was analyzed, and,

1   the first sentence, "I want one more time to thank you
2   for the fantastic effort you have all made preparing
3   for the meeting this week.  I have never seen better
4   preparation for an advisory meeting."
5        Does that refer to the meeting you just told
6   the jury about?
7   A.   Yes, that's correct.
8        Q.   And he says, "As I said the other day and as I
9   have told Ray and MC, no matter what the ultimate
10  outcome, you have distinguished yourselves.  We all
11  worried to death about the CV events last spring."
12       Does that reference to the March time frame
13  when the results were received?
14  A.   Yes, they did.
15       Q.   "Merck is, of course, always an issue.  But I
16  was sick at the thought that we might be doing harm to
17  patients.  I know each of you well enough to know you
18  felt the same way.  With all the data now available, I
19  am no longer worried."
20       Is that what he said?
21  A.   That is what he said.
22       Q.   By the time you went to the advisory committee
23  to present the results of VIGOR, and even well before
24  that, does this reflect your feelings about the VIGOR
25  result, also?

1   again, we saw no signal, no evidence of a difference in
2   serious thrombotic events between placebo, VIOXX, or
3   the NSAID comparators, Ibuprofen, diclofenac,
4   nabumetone.  That was from our Phase IIb/III OA
5   database.
6        We also -- we happened to have ongoing at the
7   time two studies in elderly patients with either
8   Alzheimer's, early Alzheimer's disease or
9   preAlzheimer's disease.  Those were the studies I think
10  that were being done in about 2,000 patients, long-term
11  therapy, and we were studying VIOXX, 25 milligrams
12  compared with placebo.
13       And so even though VIGOR didn't have placebo,
14  we were fortunate to have a database where there was a
15  lot of placebo-controlled information.
16       Now, these studies were ongoing.  They were
17  partially unblinded, I believe over a weekend, so that
18  we could just look at the serious thrombotic events.
19  And what we found was that there was no evidence of an
20  increased risk on VIOXX compared with placebo of
21  serious thrombotic events, including heart attacks.  If
22  anything, numerically, the rate was actually lower on
23  VIOXX than it was on placebo.
24       And that was extremely comforting data,
25  because if VIOXX had been increasing the rate of heart

1    attacks compared with Naproxen in the VIGOR study, I
2    think we should have seen a difference versus placebo,
3    in these large databases an increase, or we should have
4    seen an increase versus the other NSAIDs in the OA
5    database or versus placebo in the OA database.
6         Q.   So you looked again at the OA database, and
7    you saw no increased risk?
8              MR. LANIER:  Objection.  Leading.
9              MR. BROCK:  I'll ask it another way.
10             THE COURT:  Counsel, don't summarize her
11   testimony.
12   BY MR. BROCK:
13        Q.   Did you look at the OA database and the AZ
14   database?
15   A.   So we looked at the OA database, and once again, we
16   found no evidence of an increased risk compared with
17   the comparator NSAIDs or the placebo, although, as I
18   said, the placebo database is pretty small from the OA
19   database.
20             And in addition, we saw no evidence of an
21   increase in the Alzheimer's studies versus placebo.
22        Q.   All right.  Because I'm not a good speller and
23   I have run out of room, I put AZ for that, but can you
24   tell the members of the jury what the AZ trial was, the
25   Alzheimer's trial.

1    A.   Well, there were actually two.  One of them was a
2    trial in patients...
3              Oh, you're correct.  There were three.  I'm
4    not sure three were ongoing at this time, however.  You
5    would have to check.
6         Q.   Go ahead.
7    A.   I think only two were ongoing at this time.
8              So of the two that I know were ongoing at this
9    time, um, one was Protocol 078, which was testing VIOXX
10   compared with placebo in patients who didn't quite have
11   Alzheimer's disease yet.  They had what we call early
12   cognitive impairment, so some evidence that they
13   weren't thinking clearly, but they did not yet have
14   Alzheimer's.
15             And then the other one was 091, which was
16   looking at patients with early Alzheimer's to see if
17   VIOXX could actually improve their Alzheimer's disease.
18             There was another one, Protocol 126, but I
19   don't recall that that was actually -- had been started
20   yet.  I think we started it right after that.  I could
21   be wrong, or maybe -- and it was also a treatment
22   study.
23        Q.   Now, in terms of clinical studies, where does
24   a placebo-controlled study like these AZ trials rank?
25   A.   Well, to me, that's the gold standard.  As I have

1    said when I described the VIGOR study, when you have
2    two active comparators and you see a difference in the
3    rate of any adverse event, if you look at that study
4    alone, you don't know if one drug is increasing the
5    rate or the other drug is decreasing the rate.
6              Placebo should be neutral, and so if you see
7    an increase compared with placebo, that's evidence that
8    you have an increase in the rate.  If you're the same
9    or a decrease, it is the same, you would say it is the
10   same as placebo, it is neutral.  If you have a
11   decrease, you would actually say it has a beneficial
12   effect.
13        Q.   Did you consider in any way the properties of
14   Naproxen as you looked at the meaning of the VIGOR
15   trial?
16   A.   Well, so, we now had three databases.  We had the
17   OA database where we saw no signal between VIOXX and
18   the NSAID comparators, which were Ibuprofen,
19   diclofenac, and a little bit of nabumetone data.  We
20   had no evidence of an increased risk of VIOXX compared
21   *with placebo in the Alzheimer's studies.*  But we did
22   have a difference -- there was an increased risk of
23   heart attacks in patients in the VIGOR study compared
24   with Naproxen.
25             So it didn't make sense to us.  So if Naproxen

1    was then acting as a cardioprotective agent, why hadn't
2    we seen that in the OA database?  Why didn't Ibuprofen
3    and diclofenac act as a cardioprotective agent?
4              And I was actually with Dr. Barry Gertz, who
5    *was then the head* of clinical pharmacology, discussing
6    the issues and how we could interpret this data, and he
7    said, Alise --
8              MR. LANIER:  Objection, hearsay.
9              THE COURT:  Sustained.
10             THE WITNESS:  He took out a clinical study
11   report --
12   BY MR. BROCK:
13        Q.   Let me stop you right there.
14             Would you turn to Exhibit A-351.  I may have
15   jumped ahead of you, but is this the document you were
16   referring to?
17   A.   I'm not sure it was this exact document, no.  He
18   took out a document where he showed me that the
19   antiplatelet effects of Naproxen were actually
20   different than Ibuprofen or diclofenac.  It is felt
21   that you need...
22             Remember, aspirin inhibits platelet clumping
23   by inhibiting COX-1.  And you need to have 90 to
24   95 percent inhibition of COX-1 and thromboxane in order
25   for aspirin to act as a cardioprotective agent.

1  Sixty percent inhibition is not felt to be enough. And
2  you need that 90 to 95 percent inhibition to be
3  sustained over the entire dosing interval, meaning
4  between when you take one dose and you take your next
5  dose.
6       And if you looked at that study, Naproxen was
7  the only one that inhibited thromboxane by 90 to
8  95 percent over the entire dosing interval. Ibuprofen
9  got up to 90 to 95 percent, but only for about
10  four hours. So by the time you were redosing, it was
11  already back down, and diclofenac never got up to 90 to
12  95 percent.
13       Q.  Let me get you to look at Defendant's Exhibit
14  A-351. And...
15       You got it?
16       MR. LANIER:  Yes, from the other day.  Thanks.
17       MR. BROCK:  Is this in evidence, do you know?
18       MR. LANIER:  I don't think it is in evidence,
19  but you gave it to me the other day.
20       MR. BROCK:  We offer A-351.1, Your Honor.
21       This is minutes for a June PT meeting,
22  7-10-98.
23       THE COURT:  Any objection, counsel?
24       MR. LANIER:  I don't care, Judge.
25       THE COURT:  Okay.  351.1 will be admitted into

2809

1  evidence.
2       (Whereupon, Defense Exhibit 351.1 was marked
3  into evidence.)
4  BY MR. BROCK:
5       Q.  If you would turn to 351.4 --
6       A.  I'm there.
7       Q.  Does this illustrate what you were referring
8  to just a minute ago?
9       A.  Yes, it does.
10      So what you see here is actually inhibition of
11  platelet clumping. That's where it goes from minus 20
12  to 100 percent. 100 percent would be 100 percent
13  inhibition of platelet clumping. And then going
14  horizontally, this is looking over time.
15      You see baseline, so this is where patients
16  are coming in, they're not on any drug. And then time
17  zero is they have already been dosed with their last
18  dose of study medication, and now here they are right
19  before they're about to take another dose. So they're
20  at what we call trough, t-r-o-u-g-h.
21      For Ibuprofen and diclofenac, that's about
22  eight hours after they have taken their last dose of
23  study drug, because you take that medicine three times
24  a day.
25      For Naproxen, that's about 12 hours after they

2810

1  took their last dose of study drug, because you take
2  Naproxen twice a day.
3       And what you can see is the yellow, the one
4  you have highlighted in yellow is Naproxen. And even
5  at trough, that's Day 60 hours, you're at over
6  90 percent inhibition of platelet clumping. And that's
7  sustained...
8       Well, here it only goes out to eight hours,
9  but the 12-hour time point was also at Day zero -- at
10  Day 60 hours.
11      If you see the next one underneath that, the
12  diamonds, that's Ibuprofen, and you can see that it
13  gets up to 90 to 95 percent, but by the time you have
14  to take your next dose eight hours later, it is down to
15  50 percent.
16      And diclofenac is in the squares. It only
17  gets up to about 30 percent inhibition of platelet
18  clumping.
19      And so what that means is Naproxen, in terms
20  of its ability to inhibit platelet clumping, looks like
21  aspirin, other than the fact that for Naproxen, you
22  would have to take it at this dose, 500 milligrams,
23  twice a day in order to get that inhibition of platelet
24  clumping. With aspirin, you actually can take a dose
25  today, you can wait two or three days. You don't have

2811

1  that type of -- you don't have to take it quite as
2  often, whereas Ibuprofen and diclofenac don't give you
3  maximal inhibition of platelet clumping.
4       Q.  There have been questions during the trial
5  about whether or not there is a randomized controlled
6  trial showing that Naproxen is cardioprotective; that
7  is, where you take one group or another and you
8  randomize it and you test it to see if you get a
9  positive result. And I would like to ask you, is there
10  such a trial, and if not, why?
11      A.  There is no randomized clinical trial looking at
12  Naproxen to see if it is cardioprotective, and I think
13  there are a couple of reasons.
14      Number one, aspirin is the gold standard. It
15  has been studied in, I don't know, over 100,000
16  patients. It is now considered standard of care for
17  treating patients who are at high risk of having
18  cardiovascular disease.
19      And you remember the study I told you about
20  with flurbiprofen, where I said they took patients and
21  they put them on flurbiprofen versus placebo. You
22  could no longer do that study, because all of those
23  patients would be on aspirin.
24      In addition, Naproxen, as we demonstrated in
25  the VIGOR study, is associated with a significant

2812

1    amount of GI complications, and while aspirin is, as
2    well, low-dose aspirin, which is used for
3    cardioprotection, not to the degree that Naproxen is.
4          And in addition, you would have to take
5    Naproxen twice a day, and you couldn't really -- you
6    would have to do that every day, whereas, aspirin you
7    can take it today, if you forget to take at this time
8    the next day, you can take it the day after that.
9          So that's why no study has been done.
10         THE COURT:  We'll take a break here, Mr.
11   Brock.
12         (Break taken.)
13
14
15
16
17
18
19
20
21
22
23
24
25

2813

1          MR. LANIER:  I'm going to object to
2    continually leading.  Three in a row.
3          THE COURT:  Try to rephrase your question.
4    BY MR. BROCK:
5      Q.   Is this the study that you were referring to
6    the jury earlier today?
7      A.   Yes, it is.
8      Q.   And if you'll look at the...
9          If you would pull that up, please.
10         At the top, is it "Evaluation of Flurbiprofen
11   for Prevention of Reinfarction and Reocclusion After
12   Successful Thrombolysis or Angioplasty in Acute
13   Myocardial Infarction"?
14         MR. LANIER:  Your Honor, I don't object to him
15   using this as a learned treatise and putting it up on
16   the board, but I would ask for a copy of it if he is
17   going to do that.
18         And I have no objection, Judge.
19         THE COURT:  It is not marked into evidence.
20   It is an exhibit that can be used with the jury.
21   BY MR. BROCK:
22     Q.   And flurbiprofen is an NSAID like Naproxen?
23     A.   Yes, they both inhibit cyclooxygenase-1 and
24   cyclooxygenase-2.
25     Q.   If we can see 32.4, please.

2815

1          A F T E R N O O N   S E S S I O N
2          THE COURT:  You can be seated.
3          You can bring the jury in.
4          (The jury enters the courtroom.)
5          THE COURT:  You can be seated.
6          You can proceed.
7          MR. BROCK:  Thank you, Your Honor.
8    BY MR. BROCK:
9      Q.   Early this morning you were talking to the
10   jury about a flurbiprofen article that you had found
11   back in the '97/'98 time frame.  I don't remember
12   precisely the year.
13         Let me get you to turn to B-32.1.
14         MR. LANIER:  Which number?
15         MR. BROCK:  B-32.1.
16   BY MR. BROCK:
17     Q.   And is this the article that you were
18   referring to the jury earlier today?
19     A.   Yes, it is.
20     Q.   And is this an article that relates to
21   reocclusion rates in patients that are taking
22   flurbiprofen?
23     A.   That is correct, compared with placebo.
24     Q.   This is the study you said could not be done
25   today?

2814

1          And the paragraph that begins on the right
2    hand column, "In this study"?
3      A.   Yes.  I do see that.
4      Q.   "In this study, flurbiprofen, 50 milligrams
5    twice daily, significantly decreased the rate of
6    reinfarction compared with placebo, reducing the
7    overall risk during the six-month follow-up period by
8    71 percent.  Most of the reinfarctions occurred within
9    the first three weeks."
10         Correct?
11     A.   That is correct.
12     Q.   How does that relate to Naproxen?
13     A.   Well, obviously, the VIGOR study was different than
14   this study, but this provided some clinical evidence
15   that an NSAID could act as a cardioprotective agent.
16         There were also several studies done with
17   another agent called indobufen, which inhibits also
18   cyclooxygenase-1 and cyclooxygenase-2.  It is not sold
19   in the United States, but it is in the market in
20   several European countries, not to treat pain, but
21   actually to prevent heart attacks.
22         It is sold, maybe it is not just to prevent
23   heart attacks, but it is sold as a cardioprotective
24   agent, and there have been several studies where they
25   have compared indobufen to aspirin in its ability to

2816

3/24/2006 Reicin Day One

1    prevent clotting.
2         Q.   Let me now direct your attention to
3    Exhibit 114, which is the next one.
4         And is this an e-mail from David Bjorkman to
5    Deborah Shapiro?
6    A.   Yes, it is.
7         Q.   And can you tell me who Deborah Shapiro is or
8    tell the jury who she is?  I think you mentioned her
9    earlier today.
10   A.   Deborah Shapiro was the statistician at Merck who
11   did the analyses for the Data Safety Monitoring Board.
12   So these were the unblinded analyses that were done
13   during the course of the study.
14        MR. BROCK:  Your Honor, at this time we offer
15   114.
16        THE COURT:  Any objection?
17        MR. LANIER:  I haven't seen it yet.
18        Yes, Judge, right now there's an objection
19   based upon what I am seeing.  We have hearsay in an
20   e-mail from David Bjorkman, who is not with Merck, to
21   Deborah Shapiro and I haven't been able to
22   cross-examine Mr. Bjorkman.  I believe he is a dean at
23   the University of Utah School of Medicine.
24        So this would be hearsay absent my ability to
25   cross-examine him.

2817

3/24/2006 Reicin Day One

1         THE COURT:  Do you want to approach,
2    Mr. Brock?
3         (Whereupon, the following occurred at
4    side-bar:)
5         THE COURT:  The objection is sustained.  It is
6    hearsay.  The objection is sustained.
7         (End of side-bar.)
8    BY MR. BROCK:
9         Q.   Did the folks that participated in the VIGOR
10   trial and others seek the publication of the results of
11   the VIGOR trial?
12   A.   Yes, we did.
13        Q.   And let me ask you to turn to Exhibit 478, if
14   you would, please.
15        Do you have it?
16   A.   I do.  Thank you.
17        Q.   And is this a letter directed to the New
18   England Journal of Medicine by you and other proposed
19   authors of the paper?
20   A.   Yes, it is.  It is a letter to one of the deputy
21   editors at the New England Journal.
22        Q.   Is it dated May 18th of 2000?
23   A.   Yes, it is.
24        MR. BROCK:  Your Honor, we would offer
25   Exhibit 478.

2818

3/24/2006 Reicin Day One

1         THE COURT:  Any objection?
2         MR. LANIER:  I haven't seen it yet, Judge.
3         THE COURT:  Okay.
4         MR. LANIER:  No objection, Your Honor.
5         THE COURT:  Okay.  The document will be marked
6    into evidence.
7         (Whereupon, Defendant's Exhibit 478 marked
8    into evidence.)
9    BY MR. BROCK:
10        Q.   Would you pull up the first page of that, and
11   that's May 18th of 2000, correct?
12   A.   That's correct.
13        Q.   And Merck, small group of folks at Merck were
14   unblinded to the results on March the 9th of 2000; is
15   that correct?
16   A.   That is correct.
17        Q.   And there was a later unblinding after that?
18   A.   That is correct, for the primary analysis, yes.
19        Q.   And this is enclosing a draft manuscript of
20   the results of the VIGOR trial, correct?
21   A.   This was a manuscript that we had written based on
22   the primary analysis of the results.  This is based on
23   the April closing of the database, it is based on the
24   February 10th cutoff for cardiovascular events, and the
25   March cutoff date for gastrointestinal events.

2819

3/24/2006 Reicin Day One

1         Q.   And does this tell the New England Journal
2    that you are sending along a manuscript on the
3    incidence of clinically important upper GI events
4    relating to the VIGOR trial, there in the first
5    paragraph?
6    A.   Yes, it does.
7         Q.   Okay.  And do you say in the third paragraph,
8    "As we discussed during our recent telephone
9    conversation, a preliminary analysis of the data showed
10   a reduction in the number of myocardial infarctions in
11   the Naproxen patients, compared to those taking
12   rofecoxib or VIOXX"?
13   A.   Yes, it does.
14        Q.   Turn to 478.2, please.
15        Does your name appear on the submission?
16   A.   Yes, it does, over on the right-hand side.
17        Q.   Okay.  You see on the left-hand side is Claire
18   Bombardier?
19   A.   That's correct.
20        Q.   Who is that?
21   A.   She was the chair of the Steering Committee, which
22   was kind of the oversight committee for the conduct of
23   the study.  And Claire is a very well-respected
24   rheumatologist at University of Toronto.
25        Q.   Is she a Merck employee?

2820

```
1    A.    She is not.
2          Q.    Who is Loren Laine?
3    A.    Loren Laine was the cochair of the Steering
4    Committee.  He is a gastroenterologist from California.
5    And he had signed on a separate sheet of paper.
6          Q.    Look back at the first page, 478.1.
7                Did you say to the New England Journal of
8    Medicine, in the second paragraph, "We ask that you
9    please consider this manuscript for an expedited
10   review"?
11   A.    Yes, we did.
12         Q.    And why was that request made?
13   A.    We thought that the results of the study were very
14   important, and we were requesting that they publish
15   this quickly.
16         Q.    Look at 478.3, please.
17               Is this the title page for the draft of the
18   paper that you sent to the New England Journal of
19   Medicine?
20   A.    Yes, it is.
21         Q.    Look over to page A-478.27.
22               And if you could call out the first full
23   paragraph there.
24               Just going through the chronology of how the
25   paper came to its final form, this is the draft that
```

```
1    you initially sent to the New England Journal of
2    Medicine?
3    A.    That is correct.
4          Q.    And in the first draft, did you have a
5    paragraph "COX-2 selective inhibitors and nonselective
6    NSAIDs both may decrease production of prostacyclin, a
7    vasodilator and an inhibitor of platelet aggregation.
8          "It has been theorized that the inhibition of
9    prostacyclin without the concomitant inhibition of
10   thromboxane could potentially be prothrombotic.
11   However, this theoretical risk was not demonstrated
12   with rofecoxib in placebo-controlled studies."
13               Does that refer to the FitzGerald theory, the
14   FitzGerald hypothesis that we have talked about?
15   A.    That is correct.  And I think if you look at the
16   references, it is to studies done by Dr. FitzGerald
17   with COX-2 selective inhibitors.
18         Q.    The next sentence in the draft says, "Combined
19   analyses of randomized, double-blind trials, including
20   7,535 patients with osteoarthritis or Alzheimer's
21   disease, show similar rates of cardiovascular adverse
22   events and myocardial infarctions with rofecoxib,
23   placebo, or the nonselective NSAIDs."
24               Did I read that part of it right?
25   A.    Yes, you did.
```

```
1          Q.    "Which, unlike Naproxen, do not maintain
2    maximal inhibition of platelet aggregation over their
3    dosing interval."
4                Did I read that right?
5    A.    That's correct.
6          Q.    Does that relate to the chart we looked at
7    where Naproxen goes up and it sustains for the dosing
8    interval and then comes down?
9    A.    No, Naproxen goes up and it stays up.  The other
10   NSAIDs, Ibuprofen goes up temporarily and comes down
11   before you would redose.  And diclofenac didn't get up
12   to the top.
13         Q.    All right.  So we're saying the same thing.
14   It goes up, it stays up.
15   A.    Naproxen does.
16         Q.    At some point it would fall?
17   A.    That's correct.
18         Q.    But it stays up during the dosing interval.
19   Okay.
20               Now, turn, if you would, please, to A-550.1
21   and tell the members of the jury what this is, please.
22   A.    We sent in our draft manuscript in May, and the New
23   England Journal then takes that draft manuscript and
24   sends it to external experts to review and to comment
25   on the manuscript.
```

```
1                We then received from Marshall Kaplan, one of
2    the editors at the New England Journal, their comments
3    on the manuscript, as well as the comments of the
4    reviewers asking us -- telling us, basically, the way
5    we sent in the paper initially could not be published,
6    but that they would reconsider the paper if we
7    addressed the comments that were raised by the
8    reviewers.
9          Q.    Okay.  So, just in terms of -- so that the
10   jury can understand it, when you submit a paper for
11   peer review to a journal like the New England Journal
12   of Medicine, do they just publish the first draft you
13   send in?
14   A.    Highly unusual.
15         Q.    So when you talk about the peer review
16   process, what are you describing?
17   A.    The fact that when you send it into a journal that
18   has a peer review process, they take your paper, they
19   send it out to experts to review.  They gather that
20   information, they send you back the comments, and then
21   you're asked to address the comments.
22         Q.    All right.  And is this Exhibit A-550, the
23   letter that was sent by Claire on behalf of the authors
24   to the New England Journal, incorporating proposed
25   changes?
```

1    A.   I may have misspoken before.

2         So this was our response to the New England

3    Journal where we were basically -- the way you write

4    these letters you say, here was the reviewer comment,

5    here is how we're addressing it or we're not addressing

6    it, and we also attached an updated draft of the paper.

7    Q.   All right.

8         MR. BROCK:  Your Honor, at this time we would

9    offer A-550.

10        MR. LANIER:  Judge, I'm not sure how you would

11   handle this.  This is from Claire Bombardier.  It seems

12   to me a hearsay letter.  I have not been able to

13   cross-examine her either.

14        THE COURT:  Can I see it?

15        I think you can use it.  Ask her a few

16   additional questions about whether the entire committee

17   responded or just as you did.  Why don't you lay a

18   little more foundation.  Okay.

19   BY MR. BROCK:

20   Q.   Dr. Reicin, does this document incorporate the

21   changes...

22        Is this document responding to suggested

23   changes by the New England Journal of Medicine peer

24   reviewers?

25   A.   Yes, it was.

2825

---

1    BY MR. BROCK:

2    Q.   If you would, turn to the first page of that

3    document, please, which is dated July 17th, 2000.

4         Does it say, "Thank you for your letter of

5    June 30th.  We have done extensive revisions to our

6    manuscript in accordance with your letter and comments

7    from the reviewers"?

8         Is that the first sentence?

9    A.   Yes.

10   Q.   And does that reflect the peer review process

11   that you have just described to the jury, the back and

12   forth about you think you need to make a change here or

13   reform it there?

14   A.   Yes, it does.

15   Q.   Now, if you would turn over to page 11 of that

16   document, A-50.11, and if you would, pull out number

17   seven at the bottom, please, the conclusions.

18        The jury will see the document when they

19   deliberate, but do you see that on this page, the one

20   you're looking at, there's a four, the five, the six,

21   and the seven, and out to the right of the number is an

22   italicized portion of the document?

23        If you look at your page, I'm just trying to

24   set this up so the jury will understand.

25   A.   Oh, yes, yes.

2827

---

1    Q.   Were you knowledgeable about the changes that

2    were being made to the paper in response to peer

3    reviewer comments?

4    A.   Yes, I was.

5    Q.   And were you staying up to date on the

6    requested changes and the changes to the draft?

7    A.   Yes, yes, with the other authors.  We all -- and

8    then we had to send in a revised manuscript that we

9    would all have to read and sign off on, as well.

10   Q.   And does this document here represent the

11   changes that the authors were making in response to the

12   peer review comments?

13   A.   Yes, it does.

14        MR. BROCK:  We offer again A-550.

15        THE COURT:  So the letter is not just from

16   Miss Bombardier?

17        THE WITNESS:  It is a letter from all the

18   authors.

19        THE COURT:  From all the authors?

20        THE WITNESS:  That is correct.

21        MR. LANIER:  In that event, I have no

22   objection.

23        THE COURT:  It will be marked into evidence.

24        (Whereupon, Defendant's Exhibit A-550 marked

25   into evidence.)

2826

---

1    Q.   So that's the reviewer's comment in italics?

2    A.   In italics, and also in quotes.

3    Q.   And so this one, number seven, is, "The

4    conclusion section is somewhat awkward.  I understand

5    that the emphasis on the apparent increased comparative

6    risk of cardiovascular events in the rofecoxib group is

7    relevant.  However, this needs to be tightened up."

8         Did I read that right?

9    A.   You did.

10   Q.   "The emphasis on the apparent increased

11   comparative risk in the rofecoxib group is relevant.

12   However, it needs to be tightened up."

13        What does that mean?

14   A.   We interpreted it to mean that --

15        THE COURT:  How did you interpret it?

16   BY MR. BROCK:

17   Q.   How did you interpret it?

18   A.   I interpreted it to mean that they understood why

19   we were emphasizing the difference in the paper.  We

20   had put it in the abstract, in the abstract, in the

21   data section, as well as in the conclusions.  But he

22   felt that the discussion was awkward and it was too

23   long and it needed to be shortened.

24   Q.   So if we can go to 5550.12, please...

25        And this refers to "Overall mortality, as well

2828

1  as deaths, due to GI events and cardiovascular causes

2  were comparable in the two treatment groups.

3  "A significantly lower rate of myocardial

4  infarction was noted with Naproxen as compared to

5  rofecoxib, .1 versus .4 percent."

6  Did I get that right?

7  A.  You did.

8  Q.  And I'll ask you, ma'am, if the paper was

9  ultimately published in the New England Journal of

10  Medicine on November 23rd of 2000.

11  A.  Yes, it was.

12  Q.  There's been discussion about three heart

13  attacks that Merck learned about before the publication

14  of the article that are not included in the actual

15  manuscript.

16  Are you aware of that?

17  A.  That is correct -- not aware that they have been

18  discussed here, but...

19  Q.  Well, there has been discussion about that.

20  A.  That is correct.

21  Q.  Tell the members of the jury why the events

22  that you learned about before the publication of the

23  article, the journal article, were not included in the

24  journal article.

25  A.  Um, those three heart attacks, which occurred on

1  VIOXX, as well as one stroke, which occurred on

2  Naproxen, came in after the February 10th cutoff date.

3  And there may have been an unstable angina or something

4  like that that came in, as well.

5  Q.  Okay.  And I'll ask you if the results of the

6  VIGOR trial in terms of the difference in event rates

7  in VIOXX versus Naproxen, if those differences were

8  statistically significant.

9  A.  Based on the February 10th cutoff date and the

10  primary analysis, which was included in this paper,

11  that was statistically significant.  And that was

12  included in the paper.  We put in what we call

13  95 percent confidence intervals, and based on what they

14  were, you could tell that it was statistically

15  significant.

16  Q.  Let's look at B-69.4, please.

17  First of all, is this one of the pages from

18  the New England Journal of Medicine article?

19  A.  Yes, it is.

20  Q.  And it is dated November the 23rd of 2000?

21  A.  I don't see that on this paper.

22  Q.  Look at the first page.

23  A.  Yes.  November 23rd, 2000.

24  Q.  And you appear as an author on this paper.

25  A.  I am one of the authors.

1  Q.  As does Dr. Bombardier and Dr. Loren Laine --

2  A.  Correct.

3  Q.  -- and others.

4  Now, under "General Safety," B-69.4, do you

5  write "The mortality rate was .5 percent in the

6  rofecoxib group and .4 percent in the Naproxen group"?

7  A.  Yes, we do.

8  Q.  Do you write "The rate of death from

9  cardiovascular causes was .2 percent in both groups"?

10  A.  That is correct.

11  Q.  "Ischemic cardiovascular events occurred in

12  .2 percent of the patients in each group.  Myocardial

13  infarctions were less common in the Naproxen group than

14  in the rofecoxib group .1 versus .4 percent"?

15  A.  That is correct.

16  Q.  And I think we have heard this.  Can you

17  confirm for the jury that the New England Journal of

18  Medicine is a widely-read journal?

19  A.  Yes, it is.

20  Q.  Let me see A-155, please.

21  Before the publication of the New England

22  Journal of Medicine article in November of 2000, did

23  Merck communicate the three myocardial infarctions that

24  had come in after the prespecified cutoff date to the

25  FDA?

1  A.  Yes, we had.

2  Q.  And if you look at A-155, is that a document

3  that's dated, Safety Update Report?

4  A.  Yes, it is.  I think I mentioned previously when

5  you have a cutoff date for a study and you prespecify

6  it, your primary analysis is based on that, and that is

7  what you send in as a part of your initial regulatory

8  filing.

9  The FDA does, then, have you provide a Safety

10  Update Report a couple of months later, which should

11  include other relevant data that's come in since that

12  time.  And we updated the analyses with any of the new

13  events that had come in after the February 10th cutoff

14  date.

15  MR. BROCK:  So, Your Honor, at this time, if

16  it is not in evidence, I would offer A-155, which is

17  the October 13th, 2000 Safety Update Report filed by

18  Merck.

19  THE COURT:  Any objection?

20  MR. LANIER:  None, Your Honor.  None.

21  THE COURT:  Okay.  The document will be marked

22  into evidence.  It is A-155.

23  (Whereupon, Exhibit A-155 was marked into

24  evidence.)

25  BY MR. BROCK:

1    Q.   Do I have it right, October 13th, 2000, Merck
2    filed its Safety Update Report with regard to the VIGOR
3    study?
4    A.   That is correct.
5    Q.   If you will turn to page 155.25, and it says
6    there, "results of the adjudication of thrombotic
7    cardiovascular serious adverse experiences in the VIGOR
8    study."
9         Do I have that right?
10   A.   Yes, you do.
11   Q.   "Adjudication" means events that have been
12   reported.  They have been sent out to an independent
13   group of folks, who have looked at them and determined
14   that they are, in fact, thrombotic events, and now they
15   are listed as events in the study report?
16   A.   That's correct.  They have been confirmed as
17   potential thrombotic events by the outside group of
18   experts.
19   Q.   All right.  And if you come down to the
20   section "Cardiac Events," on October 13th of 2000, do
21   you disclose to the FDA that there were 20 acute
22   myocardial infarctions in the VIOXX arm and four events
23   in the Naproxen arm?
24   A.   Yes.
25   Q.   Now, when you received the VIGOR results, you

1    saw that there was a benefit to the stomach in terms of
2    a reduction in clinically significant events, right?
3    A.   That is correct.
4    Q.   And you also saw that there was a difference
5    in the cardiovascular events?
6    A.   That is also correct.
7    Q.   Did Merck immediately send what it knew about
8    VIGOR to the FDA?
9    A.   Yes.  These were interim analyses.  As I said,
10   there was a small group of us that got unblinded to
11   very preliminary data, and we saw the difference in GI
12   events, we saw the difference in cardiovascular events
13   and very quickly put that together in a study -- in a
14   report to send to the FDA.  And I think that was done
15   within two weeks.
16   Q.   And did Merck ask the FDA to consider the data
17   and allow for a label change incorporating the data?
18   A.   We didn't specifically ask for that in March.  In
19   June, when we had the primary analysis that I talked
20   about, we submitted what's called an SNDA, a
21   Supplemental New Drug Application, and we asked for a
22   label change which would include both the
23   cardiovascular and the GI data.
24   Q.   Let's see Exhibit A-145.2, please.
25        And is this the June 29th, 2000 Supplemental

1    New Drug Application?
2    A.   I'm sorry, can you give me the name of that again?
3    Q.   145.2.  Just 145.  Look at Exhibit 145.
4    A.   It is back.
5    Q.   It is about four documents from the very --
6    A.   Okay.  I have it.
7    Q.   Do you have it?
8    A.   I do.
9         MR. BROCK:  Your Honor, at this time we would
10   offer Exhibit 145.
11        THE COURT:  Any objection?
12        MR. LANIER:  I don't have a clue.  They
13   haven't given me a copy of it, Judge.
14        Judge, I have an objection to two pages of
15   this document, Page 1 and Page 8 being offered and
16   entered into evidence.  I would like to see the whole
17   document, and I would like to have the whole document
18   entered into evidence.
19        THE COURT:  Is there any objection to the
20   whole document going in?
21        MR. LANIER:  I don't know.  I need to see what
22   the whole document is.
23        THE COURT:  Are you saying you withdraw your
24   objection?
25        MR. LANIER:  I don't know what it is --

1         MR. BROCK:  I don't have any problem with the
2    whole document.  I'm really just trying to show --
3         THE COURT:  Let me see.
4         Let's break for lunch at this time, and I'll
5    ask the jury to come back at 1:10.
6         (The jury leaves the courtroom.)
7         MR. BROCK:  I think this is one of those
8    documents, it is a pretty substantial filing, but I'll
9    find out about it at lunch.  There's only one point to
10   it, which is the date, so she pretty much said it.
11        THE COURT:  Give it to him to look at it.
12        Over the break, if defendants have any other
13   documents they're going to use with this witness on
14   direct, there's only an hour left, that aren't already
15   in evidence, that haven't been referred to, I would
16   appreciate it if you could show them to counsel so we
17   don't have to stop and review them.  Okay?
18        (Break taken.)
19        THE COURT:  You can be seated.  Is there an
20   issue?
21        MR. BROCK:  This is exhibit 145.2.  It is the
22   transmittal letter of the NDA.  This is the complete
23   letter.  It is not the complete -- it is not the
24   complete supplemental NDA with the VIGOR information.
25   The entire submission I'm told was 10,000 pages or so.

1   MR. LANIER: Actually 1,100.

2   MR. BROCK: 1,100? Okay.

3   THE COURT: Is there an objection to 145.2?

4   MR. LANIER: Not as long as he clarifies to

5   the jury that this is the cover letter, and it has all

6   the pages of the cover letter.

7   THE COURT: You can bring the jury in.

8   (The jury enters the courtroom.)

9   THE COURT: You can be seated. Are you ready

10  to proceed? You can continue, counselor.

11  MR. BROCK: Thank you, Your Honor.

12  BY MR. BROCK:

13  Q. Good afternoon. Before the break we were

14  talking about Merck's request to have a label change

15  that took place -- that request took place on June 29th

16  of 2000, and do you have in front of you now Exhibit

17  A-145?

18  A. Yes, I do.

19  Q. And is that the document that you were

20  referring to that reflects Merck's request in June to

21  have the FDA approve a supplemental New Drug

22  Application?

23  A. Yes, it is. This is the cover letter that would go

24  along with the supplemental application asking to

25  change the label.

2837

1   THE COURT: Any objection?

2   MR. LANIER: I have not seen it yet, Your

3   Honor. I did ask for them over the lunch break.

4   BY MR. BROCK:

5   Q. Does this document reflect that Merck was in

6   discussions with FDA about an expedited review?

7   THE COURT: Any objection, counselor?

8   MR. LANIER: No objection, Your Honor. Is

9   this the whole document? I can't tell. I don't think

10  I have an objection.

11  I'll say no objection, Judge.

12  THE COURT: A-150 will be marked into

13  evidence.

14  (Whereupon, Exhibit A-150 is marked into

15  evidence.)

16  BY MR. BROCK:

17  Q. It says, "by this letter MRL requests

18  reconsideration of the therapeutic classification of

19  these supplements during the conversation between Dr.

20  Erb and Ms. Cook. It was agreed that a teleconference

21  would be conducted between representatives of FDA and

22  MRL on August 8th at 10:00 a.m. to discuss the agency's

23  rationale for a standard classification and Merck's

24  request for a reclassification as a priority review."

25  Did I read that right?

2838

1   Q. And this is just the cover letter, right,

2   there's a supplemental presentation of information that

3   would go with the letter?

4   A. Correct.

5   Q. And we have here just the letter?

6   A. That's correct.

7   MR. BROCK: So at this time, Your Honor, we

8   would offer 145.

9   MR. LANIER: No objection, Judge.

10  THE COURT: 145 will be marked into evidence.

11  (Whereupon, Exhibit 145 was marked into

12  evidence.)

13  BY MR. BROCK:

14  Q. I'll ask you, also, if you would look at

15  Exhibit 150 that is right there. Yes, ma'am.

16  And is this a letter of August 7th of 2000

17  from Karen Midthurn -- excuse me, to Karen Midthurn

18  from Dennis Erb of regulatory affairs?

19  A. Yes, it is.

20  Q. And Dennis Erb is with Merck?

21  A. That's correct.

22  Q. He is actually Dr. Erb?

23  A. That is also correct. He is a Ph.D.

24  Q. Ph.D. Dr. Erb. And does this letter

25  reflect -- at this point we would offer exhibit A-150?

2839

1   A. You did.

2   Q. Now, what is a priority review?

3   A. A priority review is when the FDA will review an

4   application, I think it is with a 6-month time clock

5   instead of the standard, which is approximately

6   10 months.

7   Q. This refers to a conference call that took

8   place on August the 8th of 2000.

9   Do you see that?

10  A. Yes, I do.

11  Q. Would you have participated in that conference

12  call?

13  A. Yes, I was on that conference call.

14  Q. And without getting into what FDA said, what

15  was the decision about whether there would be a

16  priority review or not?

17  A. The decision was that they could not grant a

18  priority review, that it would be a standard review.

19  They not only had our application, they had an

20  application for a similar request from Pfizer for their

21  COX-2 inhibitor Celebrex, and they told us there would

22  be a standard review and there would be an FDA public

23  advisory committee where they would have external

24  experts in February. I can't remember if they gave us

25  the date during that meeting.

2840

1    Q.  But they advised you that it would not be a
2  priority review, but that an advisory committee would
3  be convened to review the information?
4           MR. LANIER:  Objection.  Leading and
5  summarizing.
6           THE COURT:  The objection is sustained.
7  BY MR. BROCK:
8    Q.  Was it your understanding or not that there
9  would be an advisory committee that would take place
10  early the next year to consider the data from VIGOR and
11  from another trial?
12    A.  Um, again, I can't remember if we had -- if we knew
13  it would be the end of 2001 -- the end of 2000 or early
14  2001, but we understood from this meeting that it would
15  be a standard review, not a priority review, and there
16  would be an FDA advisory committee.
17    Q.  Did the FDA convene an advisory committee in
18  February of 2001?
19    A.  Yes, they did.
20    Q.  And why was the -- what was your understanding
21  as to why the FDA convened an advisory committee?
22    A.  They wanted an external group of experts to review
23  the data from the VIGOR study, as well as to review the
24  data from a similar but different study done with
25  Celebrex.

1    Q.  And the Celebrex trial that was like the VIGOR
2  trial was that a trial known as CLASS?
3    A.  That's correct.
4    Q.  And were you a presenter at the FDA advisory
5  committee?
6    A.  I was one of the presenters, yes.
7    Q.  Who else presented for Merck?
8    A.  Dr. Bonnie Goldmann from regulatory affairs gave, I
9  think, a brief introduction.  And then Dr. Alan Nies,
10  who was a vice-president at Merck Research Labs and a
11  clinical pharmacologist gave part of the presentation.
12  And then I also gave a presentation.
13    Q.  What was the subject of your presentation?
14    A.  I did a general overview of the VIGOR study, the
15  study design, the overall study results.  So the GI
16  results, efficacy results and general safety results,
17  including the cardiovascular results, and then I also
18  reviewed some of the cardiovascular data from our Phase
19  IIb/III OA studies and our Alzheimer's studies.
20    Q.  Did the FDA medical officers or did an FDA
21  medical officer also make a presentation?
22    A.  Um, I think there were a few FDA medical officers
23  who made presentations.
24    Q.  The folks that are sitting on the advisory
25  committee, what do they do during the -- during the day

1  of presentation?
2    A.  They listen.  They ask questions of the presenters
3  and then they discuss the data, and usually the agency,
4  the FDA gives them specific questions that they ask
5  them to answer.
6    Q.  Was the presentation schedule such that
7  Celebrex folks presented on one day and Merck presented
8  on another day?
9    A.  That's correct.  The first day people from Pfizer
10  presented -- it was either Pfizer or another company at
11  the time -- presented the CLASS results, and then on
12  the second day we presented the results from the VIGOR
13  study.
14    Q.  At the end of the advisory committee meeting
15  what was your understanding of the advisory committee's
16  view of what should occur next?
17    A.  They suggested that --
18           MR. LANIER:  Objection, Your Honor.  Hearsay.
19           MR. BROCK:  Your Honor, it is not being
20  offered for the truth.  It is being offered for her
21  understanding of what the direction was, and it relates
22  to what Merck does next.
23           THE COURT:  Well, I think the question as to
24  what their view was is -- the objection is sustained.
25  However, you can ask her what, if any, directions they

1  gave.
2           THE WITNESS:  The directions they gave to the
3  agency were they thought that the VIGOR data should be
4  included in the label.  They thought both the GI data
5  should be included in the label, as well as the
6  cardiovascular data should be included.  They thought
7  we should highlight the fact that VIOXX is not an
8  inhibitor of platelet clumping, and they were unclear
9  of the significance of the findings, and I think they
10  also suggested that further research be done.
11  BY MR. BROCK:
12    Q.  Okay.  Now, following the advisory committee
13  did Merck send to the FDA a proposed label change in
14  March?
15    A.  Yes.  We had sent them a proposed label in June,
16  but based on what -- June of 2000 -- based on what we
17  heard from the external experts in February of 2001 we
18  revised the label, and then sent it to
19  the FDA in the hopes that we could expedite discussions
20  about changing the label.
21    Q.  Did you participate in the preparation of the
22  draft label change that was sent to FDA?
23    A.  Yes, I did.
24    Q.  And that was sent, I believe, in March?
25    A.  Um, the timing sounds about right.

1    Q.   And then FDA responded with the proposed label
2    change of its own.  I believe we heard testimony in
3    October.
4    A.   That's correct.  They asked us to provide more
5    information to them in April.
6    Q.   And did Merck do that?
7    A.   Yes, we did.
8    Q.   Was a label reflecting the VIGOR data approved
9    by the FDA on April the 9th of 2002?
10   A.   I'm sorry, can you ask me the question again?
11   Q.   Was a label reflecting the VIGOR data approved
12   by the FDA in April of 2002?
13   A.   Yes, it was.
14   Q.   Let me get you to turn, if I could, to A-272.
15   Do you have it there?
16   A.   I do.
17   Q.   This has been admitted into evidence, and, so,
18   let me ask you, if you would, please, to focus on this
19   document and tell the jury if this label reflects
20   changes made on April 11th, 2002, including the VIGOR
21   data.
22   A.   Yes, it does.  I see the VIGOR data is included
23   here.
24   Q.   Did the label show the difference in
25   myocardial infarction rates that were seen in VIGOR?

2845

1    A.   Um, yes, it did.  It is in Table 3 -- or at least
2    that's one place, Table 3 on the second page.
3    Q.   Let's look at Table 3, if we could.  At
4    A-272.2.  Can you pull that out?  Does it show in Table
5    3 any CV thrombotic event, 45 on VIOXX, and 19 on
6    Naproxen?
7    A.   That is correct.
8    Q.   Does it show cardiac events 28 and 10?
9    A.   Correct.
10   Q.   Does it show fatal MI, sudden death, 5 for
11   VIOXX and 4 for Naproxen?
12   A.   That's correct.  It included two fatal myocardial
13   infarctions.
14   Q.   And nonfatal MI, 18?
15   MR. LANIER:  Your Honor in the interest of
16   moving on, this has been covered with other witnesses
17   and read word-for-word the way it is being read now.
18   MR. BROCK:  I have a point to this.
19   THE COURT:  That's true, counselor, it is
20   repetitive.  Move through it quickly.
21   MR. BROCK:  I'm to the point I want to make.
22   BY MR. BROCK:
23   Q.   You see it says nonfatal MI 18 on VIOXX, and
24   on Naproxen it shows 4?
25   A.   That is correct.

2846

1    Q.   And we saw earlier in the submission that we
2    made to the FDA that there were 20 heart attacks on
3    VIOXX and 4 on Naproxen.
4    Do you remember that?
5    A.   That's correct.
6    Q.   Where are the other two in this chart?
7    A.   They're in the fatal MI sudden death category.
8    This is the way the FDA asked us to kind of tabulate
9    the events in the table.
10   Q.   So all the data is there?
11   A.   Yes, it is.
12   Q.   And is it correct, also, that there's a Table
13   2 that shows the comparison to Naproxen, which shows
14   the number of events that occur over time?
15   A.   Yes, that is correct.
16   Q.   On 272.1?
17   A.   That is correct.
18   Q.   Let me turn your attention, if I could,
19   quickly to the precautions section under
20   "cardiovascular effects."  This is the precautions
21   section of the label, correct?
22   A.   That is correct.
23   Q.   And is this where Merck believed the VIGOR
24   data should appear?
25   A.   When we sent in our label to the FDA in March of

2847

1    2001 we suggested that it appear in the precautions
2    section, that is correct.  We thought it was most
3    appropriate here.
4    Q.   Did the FDA agree that the CV events or risks
5    should go in the precautions section?
6    A.   Yes, they did, or that wouldn't be what the
7    ultimate label showed --
8    MR. LANIER:  Objection.  This calls for
9    speculation.  She is not able to say what the FDA
10   thought was appropriate.
11   THE COURT:  The objection is sustained.  You
12   can ask her if they approved the label with it in the
13   precautions section.
14   BY MR. BROCK:
15   Q.   Did the FDA approve the label with the CV risk
16   in the precautions section?
17   A.   Yes, they did.
18   Q.   Did the FDA also agree to show the results in
19   the label of the two Alzheimer's trials that we spoke
20   about earlier today?
21   A.   Um, they agreed to have us put interim data in the
22   label in the precautions section.
23   Q.   If you would look in the part that I have
24   blown up it says, "In a placebo-controlled database
25   derived from two studies with a total of 2,142 elderly

2848

1  patient with a mean duration of exposure of
2  approximately 14 months the number of patients with
3  serious cardiovascular thrombotic events was 21 versus
4  35 for patients treated with VIOXX once daily versus
5  placebo respectively." Right?
6  A.  That is correct.
7      Q.  And that trial database at that time there
8  were more events on placebo than there were on VIOXX?
9  A.  That is correct.
10     Q.  That trial had not completed at that point,
11 though, right?
12 A.  No, it had not.
13     Q.  And it also goes on to -- and the FDA approved
14 the language for the label, correct?
15 A.  Actually, one of the studies might have completed,
16 and the other one was still ongoing.
17     Q.  And these two placebo-controlled studies
18 mortality due to cardiovascular thrombotic events was 8
19 versus 3 for VIOXX versus placebo respectively?
20 A.  That's correct.
21     Q.  That refers to the total number of deaths that
22 occurred due to cardiovascular thrombotic events in
23 those two placebo-controlled trials?
24 A.  That is correct --
25     Q.  And FDA approved --

1  A.  -- at that point in time.
2      Q.  Correct.  And the FDA approved that language?
3  A.  That is correct.
4      Q.  And then the FDA approved the language which
5  says, "the significance of the cardiovascular findings
6  from these three studies is unknown."
7  A.  That is correct.
8      Q.  Now, is there a term in science and medicine
9  that is called "all-cause mortality?
10 A.  Yes, there is.
11     Q.  Is the mortality number that's given in the
12 label in terms of the language approved by FDA is that
13 all cause mortality?
14 A.  No.  That's just mortality for cardiovascular
15 thrombotic events.
16     Q.  Okay.  What is all-cause mortality?
17 A.  Basically that's death due to any cause.
18     Q.  And what all could be included in that?  Just
19 give some examples.
20 A.  Death for any reason.  It could be death due to an
21 MI.  It could be death due to an infection.  It could
22 be death due to a motor vehicle accident.  We had a
23 death due to an electrocution during the study, so any
24 cancer deaths.  And what we say death is an outcome it
25 is not a cause.

1      Q.  And did Merck present the all-cause mortality
2  data to the FDA?
3  A.  Yes, we did.  When we sent them in additional data
4  in the summer of 2001, which was prior to them sending
5  their first label back to us we included the all-cause
6  mortality data from the Alzheimer's studies, as well as
7  serious adverse experience data from those studies.
8      Q.  Now, we talked earlier today about whether
9  Merck had done a CV outcomes study before asking that
10 the FDA approve the medicine for sale in the United
11 States.  I want to now focus on the period of time
12 after the VIGOR results.
13     Did Merck conduct an outcomes trial to look at
14 cardiovascular risks after VIGOR?
15 A.  Um, yes we did.  We implemented a protocol, a
16 study, protocol 203, which I consider to be a CV
17 outcomes study where we prespecified a hypothesis that
18 we would look at the incidence of cardiovascular events
19 on VIOXX compared with placebo from three large studies
20 in cancer chemoprevention.
21     Q.  And is one of those studies called the APPROVe
22 trial that the jury has heard about?
23 A.  One of those three studies was the APPROVe -- the
24 APPROVe trial.
25     Q.  The jury has seen, I think, some e-mails

1  relating to trial design in terms of putting together a
2  CV outcomes trial.
3      Can you tell the jury why that's a difficult
4  trial to design and implement?
5  A.  Well, we talked about the fact that it was
6  difficult to interpret the VIGOR results when you
7  looked at VIGOR alone because you had two active
8  comparators.  And the best way to determine the
9  absolute safety of a drug, not the comparative safety,
10 which is also important, but the absolute safety to
11 know if VIOXX actually increased was neutral or
12 decreased the cardiovascular event rate would be to do
13 a placebo-controlled study.
14     But you can't just enroll patients and say
15 here we're going to give you this drug and see if it
16 has a negative effect.  There has to be a benefit that
17 you're providing to patients, and, so, therefore, there
18 was an extensive literature, animal studies, there was
19 an epidemiologic literature, as well as some clinical
20 trial literature that suggested that NSAIDs, inhibition
21 of COX-2 which you get with both NSAIDs and COX-2
22 inhibitors might actually be beneficial in preventing
23 cancer.  And, therefore, we felt these were studies
24 that could ethically be done where the patient would be
25 potentially getting a significant benefit, but would

1  also provide us long-term placebo-controlled data where
2  we could proactively collect and adjudicate and then
3  analyze in a prespecified manner cardiovascular events.
4          Now, it would have been nice if we could have
5  done this in arthritis patients, but as I discussed
6  before, you can't keep patients who need NSAIDs on
7  placebo for greater than a couple of months. And, so,
8  it actually took us a long time to figure how we were
9  going to do this study, the best type of study to do,
10  met with a lot of experts over, you know, probably a
11  year or even longer period of time.
12          MR. BROCK: Okay. I'm handing to Mr. Lanier
13  FDA advisory committee VIGOR outcomes slide deck, and I
14  would ask you to look, if you would, at Page 120 there
15  that I have handed you. I'm focusing on 120 and 124?
16          MR. LANIER: Again, this is another one I
17  didn't get over lunch, and I'm being asked to look at a
18  130-page document to make a decision. I'm not going to
19  file an objection right now, but I would ask you to
20  repeat your request that you made before lunch so we
21  can do this.
22          THE COURT: Counselor, any documents you're
23  going to use with the witness please give to the
24  plaintiff's counsel so he can look at them.
25          MR. BROCK: Right. And I have been doing

                                                      2853

1  that.
2          THE COURT: No, I asked you to give them to
3  him at lunchtime, didn't I?
4          MR. BROCK: I misunderstood you. I thought
5  you said if you've got any others like pages taken out.
6  So I may have misunderstood, but, yes, we'll get them
7  to him.
8          THE COURT: All right. At this point you're
9  going to show these on the screen?
10          MR. BROCK: Yes, ma'am.
11          THE COURT: All of them or one page?
12          MR. BROCK: Two pages.
13          THE COURT: Let counsel know which two pages.
14          MR. BROCK: Page 120 and 124.
15          THE COURT: You can make an offer in evidence
16  later.
17          You have no objection to the last two pages?
18          MR. LANIER: I have no objection to him
19  putting it into evidence. I'll just read it fast.
20          THE COURT: We'll mark the document into
21  evidence.
22  BY MR. BROCK:
23      Q.  You see Page 120 from the slide set that --
24  was this what you were using at the FDA advisory
25  committee?

                                                      2854

1      A.  Yes, it is.
2      Q.  And can you tell the members of the jury as of
3  February of 2001 what does this document reflect?
4      A.  This is looking at the incidence of investigator
5  reported thrombotic cardiovascular events. That means
6  these had not gone to adjudication. So investigator
7  reported events that occurred in the Phase IIb/III OA
8  database. That was the database that we had before we
9  implemented the cardiovascular SOP, so none of those
10  were adjudicated. And, also, the VIGOR database.
11          So you have the incidence on the vertical axis
12  and how long patients have been on therapy is on that
13  horizontal axis. And even if you had placebo there you
14  would expect the rates to go up over time because more
15  patients would have events even if you were on placebo.
16  But what you can see here is that in VIGOR -- let's
17  start with the OA database. In the OA database the
18  cumulative incidence of investigator reported
19  thrombotic events was similar on the NSAID group and
20  the rofecoxib group. Those are the two lines in the
21  middle.
22          And if you look in the VIGOR database you have
23  rofecoxib and then Naproxen, which is showing you that
24  it is a lower event rate. So this kind of summarizes
25  in a figure some of the data that I had discussed

                                                      2855

1  earlier.
2      Q.  Okay. And then tell the members of the jury
3  what 124 represents.
4      A.  These were investigator reported thrombotic events
5  from the Alzheimer's studies, and, again, very similar
6  to what I showed you on the other one this shows you
7  the event rates over time, and you can see that the
8  rofecoxib event rate is just a little bit lower than
9  the placebo event rate. That wasn't statistically
10  significant, so I would say that they were similar
11  because there was only a small numeric difference, but
12  certainly no difference that the rate on VIOXX was
13  higher than placebo.
14      Q.  And this shows these trials through it looks
15  like around 16 months or so, does it not?
16      A.  That is correct.
17      Q.  And this trial continued on for a period of
18  time?
19      A.  Um, one of the studies, 078, went on past 3 years.
20  091 was approximately a 1-year study.
21      Q.  At the end of that process what did the
22  relative risk look like?
23      A.  When all the studies were completed, and we had
24  actually confirmed thrombotic events. All of the
25  events had been adjudicated. The relative risk of

                                                      2856