1     having a thrombotic event on VIOXX compared with
2     placebo was one, meaning they were the same or may have
3     been -- it was approximately one.
4       Q.  And a relative risk of approximately one means
5     no increased risk?
6   A.  That is correct or decreased risk.
7       Q.  Right.  Now, up until the time that Merck knew
8     of the APPROVe results can you tell the members of the
9     jury what you thought about VIOXX in terms of the risk
10     that it did or did not pose from a cardiovascular
11     perspective based on everything you knew?
12       MR. LANIER:  Your Honor, I'm going to object
13     if he said you all.  She can speak for her but not for
14     all of Merck.
15       MR. BROCK:  I said you; if it had been you all
16     it would have been y'all.
17       MR. LANIER:  I just wanted to make sure.
18       THE WITNESS:  I thought that VIOXX's effects
19     on the heart were neutral.  I didn't think that it
20     increased the risk of heart attacks, and I didn't think
21     it decreased the risk of heart attacks or serious
22     thrombotic events, and I thought that what we saw in
23     VIGOR was that Naproxen was acting as a
24     cardioprotective agent.
25   BY MR. BROCK:

1       Q.  Now, let me direct your attention to Exhibit
2     B-139.
3   A.  Can you tell me how far --
4       Q.  Sure.  It is about halfway through the book.
5   A.  Oh, I got it.
6       MR. LANIER:  She just handed it to me.
7   BY MR. BROCK:
8       Q.  And can you tell the members of the jury what
9     I have handed to you?
10   A.  This is a review article that I and other authors
11     wrote on -- basically it was a review of the
12     cardiovascular safety of rofecoxib.
13       Q.  And what journal does this article appear in?
14   A.  Oh, gosh, I can't even remember.  American Heart
15     Journal.
16       Q.  And the date of publication, do you recall
17     that?
18   A.  Um, this was in 2003.
19       Q.  And I'll ask you what you and the other
20     authors were attempting to do by this article?
21   A.  Um, we were trying to review the data that was
22     available on the cardiovascular effects of VIOXX.  I
23     think we went through some of the clinical pharmacology
24     data.  Garrett FitzGerald's data.  We went through some
25     of the effects on platelet aggregation of different

1     NSAIDs that I showed you before.  We reviewed -- we
2     reviewed some of the clinical trial data.  So we -- the
3     OA Phase IIb/III studies upon which the FDA actually
4     approved the drug some of them had long-term extensions
5     that went out several years, and we continued to
6     collect cardiovascular data, and when all of those
7     studies were over we updated the Phase IIb/III pooled
8     analysis.  We also had the updated VIGOR data, and we
9     also had done a pooled analysis where we had pooled all
10     of the data from our clinical trials that had VIOXX and
11     a placebo, VIOXX and an -- or VIOXX and an NSAID that
12     were 4 weeks or more in duration from our IIb and
13     beyond.
14       Q.  You had some figures and some data in this
15     article, also, did you not?
16   A.  Yes, we did.
17       Q.  And if we could look at 139.8, Figure 5,
18     please.  Do you see how this is set up?  It has
19     decreased risk on rofecoxib on the left side and
20     increased risk of rofecoxib on the right side, correct?
21   A.  That is correct.
22       Q.  All right.  Tell the members of the jury, if
23     you would, please, what this table is set up to show,
24     and what it, in fact, does show?
25   A.  This is showing the relative risk of what's called

1     an APTC endpoint.  That includes -- the most commonly
2     endpoint used in cardiovascular studies looking at
3     thrombosis, and it includes heart attack, stroke and
4     cardiac death and/or unknown cause of death.  So the
5     triangles point to the relative risk of having an APTC
6     thrombotic endpoint on rofecoxib versus the comparator.
7     The first line shows rofecoxib versus Naproxen.  And
8     you can see that the relative risk is 1.69.  It is
9     elevated on VIOXX compared with Naproxen.  And you can
10     see that it is elevated because it is to the right of
11     the one, the line right in the middle.  And then that
12     bold line through it shows the 95 percent confidence
13     intervals, which means that you've got a 95 percent
14     chance that the relative risk is somewhere in between
15     those lines.  And the fact that it all is on the right
16     side of one that bold line tells you that, you know, it
17     is a significant -- there's a significant difference
18     between VIOXX and Naproxen.
19       If you look at the next line that's VIOXX and
20     NSAIDs other than Naproxen, Ibuprofen, diclofenac,
21     nabumetone, and what you can see here is that the
22     relative risk is a little bit less than one, which
23     would favor rofecoxib, but the black line goes through
24     the line, which means there's no significant difference
25     between a rofecoxib and nonNaproxen NSAIDs and then the

# EXHIBIT "5"
## Part B

# EXHIBIT "5"
## Part B

1    third line is between rofecoxib and placebo.

2        Q.   What does that table say to you in terms of

3    whether or not VIOXX increases risk of thrombotic

4    events?

5    A.   Certainly, this data did not suggest that VIOXX

6    increased the risk compared with nonNaproxen NSAIDs or

7    placebo, but there was an increased risk compared with

8    Naproxen.

9        Q.   Okay.  And Naproxen was the comparator in the

10   VIGOR trial?

11   A.   That is correct.

12       Q.   Now, up until September of 2004 was this the

13   picture of safety as you understood it with regard to

14   cardiovascular risk?

15   A.   Yes, it was, but we were continuing to do more

16   studies to get an even better idea because you can't

17   get, you know, exact estimates with these data.  The

18   confidence intervals going wide means it is based on

19   the amount of data that you have.

20       Q.   Now, I want you to tell the jury again,

21   please, what was the APPROVe trial, what patient

22   population was in that trial and what you were doing in

23   terms of the test of VIOXX in that trial?

24            THE COURT:  Was this chart preAPPROVe?

25            THE WITNESS:  Yes, it is.

2861

1            MR. BROCK:  Yes, ma'am.

2            THE WITNESS:  We submitted this paper in 2002.

3    Basically, the APPROVe study was looking at whether

4    VIOXX compared with placebo could reduce the incidence

5    of colon polyps or colon growths in patients who were

6    at risk of getting these colon growths.

7            So the way that you can screen for

8    precancerous colon lesions is people do colonoscopies

9    where they actually put a tube into someone's

10   intestines, and if you find these polyps, which are

11   precancerous lesions, you remove them.  Sometimes if

12   you don't find them those polyps will then go on to

13   cause cancer.

14           So in patients who had had polyps found on

15   colonoscopy they were then randomized to VIOXX or

16   placebo, and they were followed for a period of 3 or

17   4 years, I think 3 years, and we would look, and they

18   had periodic colonoscopies, and we were looking to see

19   whether VIOXX would actually reduce the rate of colon

20   polyps in patients.

21   BY MR. BROCK:

22       Q.   And why was the colon polyp trial a good model

23   for looking at CV safety?

24   A.   Again, it was a placebo-controlled study, several

25   years in duration.  And there was a known benefit.  We

2862

1    could give -- not a known benefit but a theoretical

2    benefit that we could provide to patients, and

3    therefore, provided an excellent opportunity to collect

4    cardiovascular data.

5        Q.   What, Dr. Reicin, were the results of the

6    APPROVe trial from a cardiovascular standpoint?

7    A.   Um, there were significantly more cardiovascular

8    events on VIOXX compared with placebo beginning after

9    18 months of therapy.

10       Q.   And how did Merck learn of the increased

11   number of events in the APPROVe trial?

12   A.   The Data Safety Monitoring Board -- the study also

13   had an external Data Safety Monitoring Board.  They

14   contacted I think it was called the administrative

15   committee.  It was similar to the Steering Committee

16   that we had.  They told them about the increased rates

17   that they had seen in the study and suggested an early

18   termination to the study.  The head of the

19   administration committee then called Merck and told us

20   of the results and the recommendation.

21       Q.   Did you believe that there was an increased

22   risk of cardiovascular events with VIOXX use prior to

23   this time?

24   A.   Absolutely not.

25       Q.   Was there any evidence that -- well, let me

2863

1    put it this way, did you believe that VIOXX increased

2    risk for persons who used the medication on a

3    short-term basis prior to seeing the APPROVe data?

4    A.   The data is not consistent with this if you looked

5    at the totality of data.  All of the studies.

6        Q.   Now, how did you learn -- how did you

7    personally learn of the APPROVe results?

8    A.   Um, we have a system at Merck called the MVX system

9    where people can leave messages on your office phone,

10   and early Friday morning as I was driving into Merck I

11   checked my messages.  I heard a message from my boss

12   saying that there was an increased rate of

13   cardiovascular events, and I thought, no, no, no.  I

14   have to relisten to that, I didn't hear that right, and

15   subsequent to that I got a phone call that there would

16   be a meeting they wanted me to be at.

17       Q.   And we'll talk about the details of the

18   results in a minute, but as a result of the reporting

19   to Merck of the increased number of events in this

20   patient population did Merck take action based on that?

21   A.   We voluntarily removed VIOXX from the market.

22       Q.   Did you participate in the meetings and

23   discussions that took place about whether or not to

24   take the drug off the market?

25   A.   Yes, I did.

2864

1    Q.   And what was Merck's decision to take the drug
2  off the market based on?
3  A.   Well, we had a single -- we had this study that
4  showed that there was an increased risk of
5  cardiovascular events beginning after 18 months.  At
6  that point in time there was no other NSAID, no other
7  COX-2 inhibitor that had a study that was this large or
8  this long in duration versus placebo, and so we didn't
9  know if this was something that was unique to VIOXX,
10  something that affected the COX-2 inhibitors or the
11  NSAID class in general.
12       In addition, we felt that although we didn't
13  know if this was something that was unique to this
14  patient population that you had to be conservative and
15  assume that it wasn't unique to this patient
16  population, and, therefore, since we couldn't tell if
17  this was something unique to VIOXX we thought that
18  there were alternative therapies, including COX-2
19  inhibitors on the market --
20       MR. LANIER:  I'm sorry, Judge.  I have to
21  object at this point.  She is clearly speaking for
22  Merck.  She is not the corporate representative in this
23  case.  She has an ability to speak on her own, but she
24  didn't make this decision, and I don't think she is the
25  person to give the company explanation.

2865

1       MR. BROCK:  She said she participated in the
2  discussions that led to it and was knowledgeable of it.
3       MR. LANIER:  There's a difference between
4  participating in the discussions that led to it and the
5  actual withdrawal of the drug and who made that
6  decision.  It was not her.
7       THE COURT:  All right.  Well ask who made the
8  decision and how much she participated in the decision.
9  BY MR. BROCK:
10    Q.   The final decision maker in the -- in
11  taking -- in the decision to voluntarily withdraw the
12  drug from the market, the final decision maker was who?
13  A.   Well, I don't know if I can tell you who the final
14  decision maker was.  I know it was Peter Kim, who is
15  the head of Merck Research Labs, made a recommendation
16  to the Chief Executive Officer and management
17  committee.  That recommendation was accepted, and they
18  also went to the Merck's board and informed them of the
19  decision, as well.
20    Q.   Did you participate in the discussions and the
21  meetings that led to the recommendation that was made
22  to withdraw the drug from the market?
23  A.   Yes, I did.
24    Q.   And is that what you have been telling the
25  jury about?

2866

1  A.   Yes.
2    Q.   All right.  Please continue.
3       MR. LANIER:  Your Honor, he has to frame it
4  within that because she was giving a specific answer of
5  here's why we withdrew the drug, and she wasn't in on
6  those meetings, and she doesn't know that reason.  She
7  can talk about her discussion points leading up to it.
8       MR. BROCK:  Let's approach.
9       MR. LANIER:  It is an easy objection.
10       MS. JONES:  No, not when you stand there and
11  make a speech it is not.
12       (Whereupon, the following occurred at
13  side-bar:)
14       THE COURT:  Well, I still don't know to what
15  degree she participated.  It is one thing to say I
16  participated in the conversations.  Those conversations
17  may have been oh, there's a study, what are we going to
18  do, does anybody have any thoughts, and then all the
19  final decisions were made in meetings of executives
20  much higher than her.
21       MR. LANIER:  And that's what happened.  She
22  has given deposition testimony on it.  She was in phone
23  calls and other meetings, but Peter Kim made the
24  decision.
25       THE COURT:  It will be brought out one way or

2867

1  the other.
2       MS. RELKIN:  I also got the drift that she may
3  be going to the class effect defense in the answer of
4  the follow-up question.
5       THE COURT:  There's no question on that.  She
6  is not going to say anything further about the class
7  effect defense, is she?
8       MR. BROCK:  I'm not going to --
9       THE COURT:  There is no defense on that for
10  failure to warn.  That would only be a defense in a
11  risk analysis, so it has no place here.  Secondly,
12  there's absolutely no expert on behalf of Merck or on
13  behalf of the plaintiffs who is willing to say that
14  that is a valid theory.  I have gone through this now
15  for months saying that I would be happy or willing to
16  allow testimony about the class effect of all NSAIDs,
17  if there was any expert being offered by Merck that
18  said it was a valid scientific theory, that I would
19  hold a hearing outside the presence of the jury.  We
20  went through the entire last trial with Merck saying
21  they wanted to get that evidence in with me saying,
22  Bring me one expert who says it is true and I'll do it,
23  that it is scientifically valid or I'll make a decision
24  based on that, but without that I can't do it.
25       And now we have her skirting that issue and --

2868

1   not even skirting it.  Pretty much saying it without --
2   when I have barred it.  You know, if you were going to
3   have her say that you have to have an expert who is
4   going to say it outside the presence of the jury so we
5   can have a little hearing on it.  And that's what I
6   said from the beginning.  So don't go there with her.
7              (End of side-bar.)
8              THE COURT:  All right.  We need to know, Miss
9   Reicin, the exact level of your responsibility as far
10  as the decision to pull the drug.  Were you in the
11  ultimate decision making group?  I assume the decision
12  wasn't made by one person or you don't know?
13             THE WITNESS:  Again, I was in the
14  decision-making group within Merck Research Labs, and
15  Peter Kim told the CEO what our decision was, and he
16  accepted that recommendation, and I was in the room
17  when that recommendation was given to the Chief
18  Executive Officer.
19             THE COURT:  Before the recommendation was made
20  were you with a group of -- you sat with Peter Kim and
21  another group and actually went over whether should we
22  or shouldn't we pull the drug from the market?
23             THE WITNESS:  Yes, I did.
24             THE COURT:  And you were one of the group that
25  made the decision to pull the drug -- to recommend to

2869

1   the CEO to pull the drug off the market?
2              THE WITNESS:  I was part of that group.
3   Ultimately it was Peter Kim's decision.
4              THE COURT:  No, I'm asking you whether you
5   were present when the decision was made.
6              THE WITNESS:  I was present.
7              THE COURT:  And you participated in it?
8              THE WITNESS:  I did.
9              THE COURT:  I'll allow it then.
10             MR. BROCK:  So I don't know where we left off,
11  but, Your Honor, I would like to approach just for one
12  second.
13             (Whereupon, the following occurred at
14  side-bar:)
15             MR. BROCK:  It might be wise if we took a
16  2-minute break and let me mention to her not to mention
17  this class effect thing again.
18             THE COURT:  Okay.  That's a good idea.
19             (End of side-bar.)
20             THE COURT:  Okay.  We're going to take a short
21  break.
22             (The jury leaves the courtroom.)
23             THE COURT:  Just to make sure the record is
24  clear, we're not talking about a COX-2 class effect,
25  we're talking about the hypothesis that all NSAIDs

2870

1   increase the risk of heart attacks.
2              MR. BROCK:  Right.  I think what her testimony
3   was -- we're not going to go back there, but I think
4   what she was saying was that at that time Merck saw
5   that it had -- that VIOXX increased the risk in that
6   trial and there was nothing known about the other
7   NSAIDs that would indicate that they did.  There were
8   alternative therapies available, and, so, that was part
9   of the decision.
10             THE COURT:  And I am not striking what she
11  said.  I don't want her to go past that.
12             MR. BROCK:  I'm with you.  I'm with you.
13             THE COURT:  I'm not striking what she said.  I
14  don't want her to go past what she said.
15             MS. RELKIN:  Or repeat it.
16             THE COURT:  Well --
17             MR. LANIER:  Okay.  We're pulling the
18  testimony.  What she just answered your questions about
19  being in on the decisions is absolutely contradicted by
20  multiple pieces of testimony in this case.  I can do it
21  in cross, but I do want you to see the transcript.
22             MR. BROCK:  You can bring it up if you think
23  you've got it.
24             MR. LANIER:  By Ray Gilmartin and others.
25             MR. BROCK:  That's fine.

2871

1              THE COURT:  Well, talk to her.  That's what we
2   broke for.  Mr. Brock, move away from the issue all
3   together.
4              MR. BROCK:  She can finish the explanation or
5   the reason for the withdrawal, that's what we were --
6              THE COURT:  She already gave the reason for
7   the withdrawal, actually.  I don't want her to talk
8   about that other NSAIDs might have the same effect.
9   She could talk about the reason for withdrawal for
10  safety, for concern, for that there were other
11  alternatives we thought were available.
12             MR. BROCK:  Okay.
13             (Break taken.)
14             THE COURT:  You can be seated.  You can bring
15  the jury in.
16             (The following side-bar discussion was had:)
17             MR. LANIER:  The silent lawyer brought up a
18  good point.
19             MR. GORDON:  Here's what concerns me.  The
20  testimony is we weren't concerned about the dangers
21  about VIOXX, then we were concerned about the dangers
22  of VIOXX, then after VIGOR we weren't concerned about
23  the dangers of VIOXX, then came APPROVe and we were
24  concerned about the dangers of the VIOXX, then came the
25  Alzheimer's data and we weren't concerned about the

2872

1   dangers of VIOXX, and then we can't ask what about the
2   APPROVe follow-up data now.
3           MR. LANIER:  We pulled it just because we were
4   better safe than sorry.  We just pulled it, and now it
5   turns out it wasn't bad after all.
6           MR. GORDON:  And we're all done.  All the
7   research is over.
8           MR. LANIER:  And that's how they get out of
9   the we pulled the drug trap.  It makes them look nice.
10  The second we had general concern we pulled the drug
11  and then history has shown we didn't need to pull it
12  after all.
13          MR. GORDON:  Why can't we at least ask without
14  going through the results that did you know there was
15  follow-up data from the APPROVe people to see whether
16  or not there's dangers and that the results aren't in
17  yet.  That we should at least be able to say.
18          MR. BROCK:  We'll need to have a hearing on
19  this.
20          THE COURT:  Well, the Alzheimer's data --
21          MR. BROCK:  That came before.
22          MR. LANIER:  It is not Alzheimer's.
23          THE COURT:  She hasn't said anything after
24  APPROVe.
25          MR. GORDON:  Believe me, she is going there.

2873

1   which that's just a true fact.  This other stuff is not
2   final.  I don't even know if she knows that data.
3           MR. GORDON:  So you're going to go do that
4   with Dr. Rayburn the post APPROVe stuff?
5           MR. BROCK:  I don't think I'm going to stand
6   here and answer that.
7           MR. LANIER:  Then we don't have a problem.
8           MR. BROCK:  No, I said I'm not answering that
9   question.
10          MR. GORDON:  I took his deposition.  I know
11  where he is going to go.
12          THE COURT:  Well, he is not doing that with
13  this witness.  Let's move on.
14          (End of side-bar.
15          (The jury enters the courtroom.)
16          THE COURT:  Be seated.  You can proceed.
17  BY MR. BROCK:
18      Q.  Before the break we were asking you some
19  questions about whether or not you were knowledgeable
20  about Merck's -- the reasons for Merck's decision to
21  withdraw voluntarily VIOXX from the market.
22          Do you remember those questions?
23      A.  I do.
24      Q.  And did you participate in discussions with
25  Dr. Kim and Mr. Gilmartin and other folks at MRL about

2875

1           THE COURT:  What is she going to say after
2   APPROVe?
3           MR. BROCK:  Nothing.
4           MR. LANIER:  She's not going to say it turns
5   out it was not dangerous after all?
6           MR. BROCK:  She will say if you ask her --
7           MR. LANIER:  You're not going to ask her that,
8   and she won't volunteer it.
9           MR. GORDON:  Then I'll withdraw the question.
10          MR. BROCK:  Do I get to speak?
11          MR. LANIER:  I haven't said anything.
12          MR. BROCK:  I was starting to talk, and you
13  cut me off.
14          MR. LANIER:  I haven't cut you off.
15          MR. BROCK:  She will say that this is what we
16  saw up until APPROVe.  She has said that.  She has said
17  what APPROVe shows is an increased risk in that trial,
18  and unless she has asked questions about -- from them
19  about what do you think about it now, um, I don't
20  anticipate that that will be asked.  If she is asked
21  questions about what did you think in, you know, on the
22  basis of the withdrawal what did the data show at that
23  point in time if he asks her that she will say the data
24  is inconsistent because if you look back at other
25  placebo data that you see something that's different,

2874

1   the options that were available during that period of
2   time?
3       A.  There were conversations between Merck Research Lab
4   personnel including Dr. Kim, and I was there, and then
5   I was at a separate meeting in Whitehouse Station where
6   Dr. Kim presented his recommendation to Ray Gilmartin
7   and other members of management committee.
8       Q.  And did you have an understanding of the
9   reasons that Merck decided to voluntarily withdraw the
10  drug from the market?
11      A.  Yes, I did.
12      Q.  And I think you have said that to the jury,
13  but could you just give the short version of that
14  again, please?
15      A.  Um, basically --
16          MR. LANIER:  Judge, maybe I'm out of line, and
17  so I apologize, but I think this is hearsay, unless
18  this is what she was saying at the meeting.  They've
19  got the witnesses; let them bring them in for
20  cross-examination.
21          THE COURT:  I think she has expressed what the
22  company's position was.  Are you asking her what was
23  said at the management conference meeting?
24          MR. BROCK:  I guess that was my question.
25          MR. LANIER:  Then my objection is hearsay.

2876

MR. BROCK: That's fine. I think she answered the question.

THE COURT: You can ask her if there were other items that were discussed, other than what she told the jury about.

BY MR. BROCK:

Q. Let's do it this way. Have you told the jury your understanding as to why the drug was withdrawn from the market on a volunteer basis?

A. Basically other than we thought it was the best thing to do for patients.

Q. Now, turn, if you would, to Exhibit B-169. It is in your notebook there, Dr. Reicin. And it is toward the back.

Is this the published paper regarding the APPROVe trial?

A. Yes, it is.

Q. And the lead author is identified as Robert Bresalier?

A. That is correct.

Q. If you would look over at exhibit -- I mean, page 169.6 to that exhibit, please.

A. Yes.

Q. And if we could see that on the screen, please. Pull that out, if you don't mind.

All right. And is that what we have been calling a Kaplan-Meier curve?

A. That is correct, showing the incidence of confirmed cardiovascular events over time.

Q. And do you see that for the first 18 months or so the VIOXX curve and the rofecoxib curve or line they lay right on top of each other?

A. That is correct.

Q. And then beginning at about 18 months there is some separation in the curves?

A. That is correct.

Q. Now, what I want to ask you is this, is the separation that occurs at 18 months, is that statistically significant at that point in time?

A. No, not at 18 months.

Q. There's a numerical difference at that time?

A. That's correct.

Q. When does the difference in the risk that's seen in this plot become statistically significant?

A. I believe it was at 30 months.

Q. Now, if you can come back to the full page 169.6.

THE COURT: Which study is this one?

MR. BROCK: This is the APPROVe trial, Your Honor.

THE WITNESS: APPROVe.

BY MR. BROCK:

Q. Actually, go back to 169.1. And if you would pull out the paragraph under results. And does that show that in this trial there were 46 patients that had confirmed thrombotic events during the 3,000 patient years of follow-up --

A. Um --

Q. I'm sorry.

-- as compared with 26 patients in the placebo group?

A. That's correct.

Q. Is that showing in the placebo group there were 26 patients that had cardiovascular thrombotic events?

A. That is correct.

Q. And it says, "the increased relative risk became apparent after 18 months of treatment. During the first 18 months the event rates were similar in the two groups"?

A. That's correct.

Q. And so in the first 18 months that would reflect those curves that we saw where the lines laid right on top of each other?

A. Correct.

Q. And then they began to separate.

Let me see 169.6 again, please. There's a paragraph, the second paragraph in the left hand column. There were no significant interactions?

A. Yes, I see that.

Q. All right. Where it says, "there were no significant interactions between treatment group and subgroups for confirmed serious thrombotic events in subgroup analyses based on country, age, sex, use or nonuse of hypertension drugs at baseline, low-dose aspirin," and it goes on to list a bunch of other things. What does that mean, "no significant interactions between subgroups"?

A. What that means is while you might see numeric differences in the relative risk between -- in subgroups the fact that there's not a significant interaction means that you're supposed to assume that the relative risk in any one subgroup is the same as the overall cohort. So you might see that, you know, in patients who smoked -- I'm making these numbers up. Maybe the relative risk was 1.5, but in patients who didn't smoke the relative risk was 3, but if the treatment by subgroup interaction is not significant you're supposed to assume that the relative risk is similar whether you smoke or you don't smoke.

1    Q.   Okay.  And I just want to ask you this last
2    question, if I could.  Before Merck saw the results in
3    APPROVe and voluntarily removed the drug from the
4    market did Merck believe that there was not an
5    increased risk of cardiovascular events from VIOXX use?
6         MR. LANIER:   Objection.  She can't testify
7    about what Merck believed.  She can only testify about
8    what she believed.
9         THE COURT:   The objection is sustained.
10   BY MR. BROCK:
11   Q.   Answer it for Dr. Reicin.
12   A.   I did not believe that there was an increased risk
13   of cardiovascular events prior to seeing the APPROVe
14   data.
15        MR. BROCK:   Thank you.
16        THE COURT:   Okay.  Cross.
17        MR. LANIER:   Thank you, Judge.
18   CROSS-EXAMINATION BY MR. LANIER:
19   Q.   May it please the Court.
20        Good afternoon, y'all.
21        Good afternoon, Dr. Reicin.  And he calls you
22   Dr. Reicin, but it is Dr. Reicin, isn't it?
23   A.   You're correct.
24   Q.   Because this is not the first time you and I
25   have had a chance to visit, is it?

1    A.   That's correct.
2    Q.   In fact, I guess this is my fourth time to
3    cross-examine you, isn't it?
4    A.   Um, I haven't kept track, but that's possible.
5    Q.   Let's see.  I cross-examined you, I took your
6    deposition about a year or so before you pulled the
7    drug, remember that?
8    A.   Yes.
9    Q.   In a case where I was trying to get y'all to
10   pull the drug, remember?
11        MR. BROCK:   Object to that.  That is not an
12   appropriate question.
13        THE COURT:   The objection is sustained as to
14   what the purpose of prior testimony was.
15        MR. LANIER:   The jury should disregard it.
16   You can ask her if, in fact, she has testified
17   previously but not the purpose of those times.
18   BY MR. LANIER:
19   Q.   Then I took your deposition again after the
20   drug -- after the drug was pulled?
21   A.   That's right.
22   Q.   And I have cross-examined you on another case
23   involving this drug, right?
24   A.   That's correct.
25   Q.   All right.  Then let's go through -- you

1    probably know everything I'm going to ask you, but we
2    have to do it again, okay?
3    A.   Okay.
4    Q.   First subject.  You -- is it fair for the jury
5    to assume that one of your job responsibilities has
6    been "defending the VIOXX franchise," and I'll put that
7    in quotes because it belongs in quotes.  True?
8    A.   My supervisor has in some of my evaluations
9    referred to me as "defending the VIOXX franchise."  I
10   have never considered that one of my specific
11   responsibilities, but I think he has -- he has said
12   that in reference to me making public presentations,
13   presenting data, discussing data in scientific forums
14   and in other situations.
15   Q.   Well, in fact, if we look at Plaintiff's
16   Exhibit 2080, which we move into evidence, Your Honor.
17   It is the personnel file, and we'll move it subsequent
18   to any necessary revisions or excisions or whatever or
19   redactions.
20        THE COURT:   Any objection?
21        MR. BROCK:   No.
22        THE COURT:   P-2080 will be moved into
23   evidence.
24        (Whereupon, Exhibit P-2080 was marked into
25   evidence.)

1    BY MR. LANIER:
2    Q.   If we look at your performance review form for
3    the year 2001 this is where Alise Reicin -- that's you,
4    right?
5    A.   That's correct.
6    Q.   And in this performance review -- by the way,
7    you have progressed a lot in job titles since then,
8    haven't you?
9    A.   Um, I am now a vice-president.
10   Q.   They have moved you up from a senior director
11   to a vice-president, haven't they?
12   A.   I was an executive director first and then a
13   vice-president.
14   Q.   So you have actually had two jumps since
15   senior director?
16   A.   That's correct.
17   Q.   Okay.  Well, back two jumps ago --
18   A.   I don't know if I would refer to them as "jumps,"
19   but...
20   Q.   Okay.  Two promotions ago?
21   A.   That's correct.
22   Q.   Excuse me.  This is on 32.  It says first
23   sentence right out of the box on your performance
24   review, "Your major efforts this past year were focused
25   on defending the VIOXX franchise.  And building a

1   scientific base." Is that what it says, doesn't it?
2   A.   Yes, it does, and I think you can say it was as I
3   described it presently at FDA advisory committee
4   meetings.
5        Q.   And you and I have done this three other
6   times, and one thing I'm going to ask you because I
7   know your time is precious this afternoon, and I'm on a
8   clock.  I'll ask short questions with yes or no answers
9   usually; if you'll try to restrict yourself to it, it
10  will go by a lot quicker and we'll get it done.
11  A.   I'll do my best.
12       MR. BROCK:  I would object to him instructing
13  the witness.
14       MR. LANIER:  I'm asking as a favor.
15       THE COURT:  The Court will instruct you to
16  answer yes or no when you can.  If you can't indicate
17  for the record that you can't.
18       MR. LANIER:  Thank you, Judge.
19  BY MR. LANIER:
20       Q.   So let's go back to that and try it again.
21  This says that "your major efforts this past year were
22  focused on defending the VIOXX franchise."  That's
23  right so far, true?
24  A.   That's correct.
25       Q.   "And building the scientific base for a COX-2

1   A.   I think some people had a concern about the label.
2        MR. LANIER:  Your Honor, I offer into evidence
3   Plaintiff's Exhibit 2000.  This dealt with David
4   Anstice's testimony.
5        THE COURT:  Any objection?
6        MR. BROCK:  Is it in evidence?
7        MR. LANIER:  I don't believe we ever formally
8   offered it at this point, so I offer it now.
9        MR. BROCK:  No objection.
10       THE COURT:  All right.  2000 will be marked
11  into evidence.
12       (Whereupon, Exhibit 2000 was marked into
13  evidence.)
14  BY MR. LANIER:
15       Q.   In fact, there was a question of what might
16  happen financially to your company depending upon what
17  happened with the label during the year 2001 and
18  following, right?
19  A.   I think that's a mischaracterization.
20       Q.   Well, do you have the document in front of
21  you?
22  A.   I do.
23       Q.   Do you know who David Anstice is?
24  A.   I do.
25       Q.   This is a document that gave a forecast of how

1   business"?
2   A.   That's correct.
3        Q.   So in a sense you had a twofold job that year,
4   defending the VIOXX franchise and building a scientific
5   base for it, right?
6   A.   I think they were intertwined and one in the same.
7        Q.   I would agree with you.  But wouldn't you
8   think realistically y'all should have built the base
9   for the business first before you started selling the
10  drug, built the scientific base?
11  A.   And I think we did.  I think he was referring to
12  adding to that.
13       Q.   Building the scientific base.  You think he
14  was referring to adding to it, but, really, all you've
15  got is what he said here, right?
16  A.   I know that we had a scientific basis for the drug
17  or it would not have been approved.
18       Q.   And not only did -- 2001 was a pretty critical
19  year for y'all with this drug, wasn't it?
20  A.   Um, certainly there were many critical years for
21  us.
22       Q.   But 2001 was a year where y'all were focused
23  really hard on trying to make sure that the label came
24  out just right because there was a concern about the
25  label, wasn't there?

1   your drug would sell, true?
2   A.   That is correct.  Responsible companies always do
3   that.
4        Q.   Okay.  Ma'am, you can just answer my question,
5   please.  It has a forecast, true?
6   A.   That is correct.
7        Q.   Okay.  And by the same token it's got how that
8   forecast might change depending upon how the label
9   turns out, right?
10  A.   Can you tell me what page you're on?
11       Q.   Page 17.  This is the graph entitled "key
12  sensitivities."
13       Do you see that?
14  A.   Yes, I do.
15       Q.   It has the upside and it has the downside in
16  the sales forecast in millions of dollars.  Is that
17  right?
18  A.   That is correct.
19       Q.   And if we look at it so that like 2,500
20  million, that's 2.5 billion with a B, right?
21  A.   Yes.
22       Q.   And the upside, and this charts out from the
23  year 2001 all the way to 2006.  It is a five-year
24  projection, right?
25  A.   That is correct.

1    Q.   The upside is if your CV label is mild you
2    don't have any language that says it causes clots and
3    heart attacks then you got the upside and you get to go
4    up to over 3 billion and kind of come back down just
5    under 3 billion, right?
6    A.   That's correct.
7    Q.   But --
8         MR. BROCK:   Your Honor, one brief objection.
9    This is the document that was gone over in detail with
10   Mr. Anstice, and as I recall Your Honor limited the
11   examination on this document.
12        MR. LANIER:   No, Your Honor.   This was a
13   document that was not initially on the exhibit list,
14   and so I didn't admit it at that point in time so they
15   would have a chance to look at it.
16        THE COURT:   It is already admitted into
17   evidence.
18        MR. BROCK:   This is the one.
19        (Whereupon, the following occurred at
20   side-bar:)
21        MR. BROCK:   It is -- this is the one -- it was
22   this one or one like it he was examining Anstice about
23   it.   He was going on and on and on and 2.5 billion, say
24   it one time and that's enough.   It is also beyond --
25   way beyond the scope of the direct exam, so I would ask

1    that he move off this money stuff in accordance with
2    what Your Honor instructed when he was examining David
3    Anstice.
4         MR. LANIER:   A, I never showed it with David
5    Anstice.   B, it is dead on because she brought up the
6    label and the label negotiations she was in, and this
7    is in the height of it, and this is --
8         THE COURT:   I think that it is relevant
9    because she specifically is involved in label
10   negotiations.   I'm going to allow it.
11        (End of side-bar.)
12        MR. LANIER:   May I continue, Your Honor?
13        THE COURT:   You may.
14        MR. LANIER:   Thank you.
15   BY MR. LANIER:
16   Q.   And then there was just the base case, which
17   said if there is just a class CV label in the
18   precaution you would have that middle line where you
19   might not hit 3 billion and you would probably come
20   back down to looks around $2 billion.   Do you see that?
21   A.   That's correct.
22   Q.   The upside would be a 25 percent increase over
23   the base, right?
24   A.   That's correct.
25   Q.   Now, the downside would be if that CV label

1    actually had a warning, wasn't in the precautions
2    section but had to go in the warnings section, you know
3    the difference, don't you?
4    A.   I do, but I think it is saying more than that.   I
5    think it is saying that the first one could have a
6    class CV label.   In other words, the class of drugs
7    would have something versus a nonclass label in the
8    warnings section.
9    Q.   I'm not fussing that with you, ma'am.   I'm
10   just saying on this fourth one or third one there is a
11   section of the label, a section of the insert that's a
12   warnings section, right?
13   A.   That's correct.
14   Q.   That's the section where the FDA said
15   initially they thought that the language should go
16   about possible heart attacks, right?
17   A.   That's correct.   Initially, but that wasn't their
18   ultimate decision.
19   Q.   Okay.   I'll get to that.   Just keep to my
20   questions, please.
21        And then Merck suggested no, no, no, can we
22   put it in the precautions section and the FDA
23   ultimately agreed with that, fair?
24   A.   Well, I don't think the way you characterized it is
25   accurate.   We sent back a label with it in the

1    precautions section, and they accepted it.
2    Q.   Eventually?
3    A.   No, not eventually.   Their next label back to us
4    before we even met with them had moved it to the
5    precautions section.
6    Q.   Well, but -- all right.   We'll get to labeling
7    in a bit because I think you left out a couple steps
8    the jury ought to hear.   But for these purposes --
9         MR. BROCK:   I'm objecting to the commentary.
10        THE COURT:   The jury should disregard the last
11   statement of counsel.
12   BY MR. LANIER:
13   Q.   If the CV label, the cardiovascular label is
14   in the warning instead of in the precautions section
15   sales could plummet by half?
16   A.   That is what that says.
17   Q.   So -- and so we're clear this was prepared in
18   the middle of that year, July, 2001, right?
19   A.   That is correct.
20   Q.   The year where you -- at the end of the year
21   got a promotion and were applauded for the way you were
22   defending the VIOXX franchise and building the science
23   base, right?
24   A.   But I think you're adding things that have no
25   correlation.   What we did with the label was based on

1    what we thought was scientifically accurate, not
2    business reasons.
3         Q.   That wasn't my question.  I just asked you if
4    it was the same year.  Was it?
5    A.   I can't remember if I was promoted that year, but
6    it was the same year, I believe, that you read my
7    performance evaluation.
8         Q.   In fact, you did your own year end employee
9    form where you filled out what you did for the year,
10   didn't you?
11   A.   That's correct.
12        Q.   And we can find that, also, in your personnel
13   file on Page 29.
14        MR. BROCK:  Thank you.
15   BY MR. LANIER:
16        Q.   You had an area called "planned objectives."
17   Do you see that?
18   A.   That's correct.
19        Q.   Get it on the screen.  The number one
20   planned -- and this is a form you typed and prepared?
21   A.   That's correct.
22        Q.   The number one planned objective you had for
23   that year was "VIGOR/VIOXX CV safety," right?
24   A.   It is number one on the list.  That doesn't mean it
25   was the most important.  But it was certainly something

2893

1    important that we were working on.
2         Q.   When you typed it up you typed it up as the
3    first thing you put, the first thing for those people
4    reviewing you to read.
5    A.   That is correct.
6         Q.   Some of the objectives you met.  Some of them
7    you even exceeded, right?
8    A.   Correct.  We exceeded that because we got the label
9    changing earlier than we expected.
10        Q.   I'm not asking you why, I'm asking you to
11   follow with me in the interest of time?
12   A.   I'm sorry.
13        Q.   That's okay.  Objectives exceeded.  You
14   obtained favorable changes describing the VIGOR results
15   to the EU label?
16   A.   Correct.
17        Q.   And you published results -- that was where
18   you exceed the objective?
19   A.   We exceeded it because we didn't anticipate we
20   would get the label change that quickly.
21        Q.   And you also exceeded the objective publishing
22   the results of the CV meta-analysis, right?
23   A.   Correct, because I hadn't had that as an initial
24   objective.
25        Q.   I'm just asking you if that's correct.

2894

1         MR. BROCK:  Judge, there are some answers that
2    are just natural to give, and every answer does not
3    have to be a yes or no.  He has cut her off five or six
4    times now, and I object to it.
5         MR. LANIER:  Your Honor, when he lead on
6    direct he got 19 "that's correct" in a row that I
7    counted.  I think I ought to get two.
8         THE COURT:  He can lead on cross, however, it
9    is allowed, and he is allowed to ask yes or no
10   questions.  I have instructed the witness she should
11   when she can if it is a yes-or-no question answer yes
12   or no.  If she can't answer that way she can advise
13   him.
14   BY MR. LANIER:
15        Q.   Now, your concerns about defending the VIOXX
16   franchise were not just in 2001.  You had an active eye
17   on VIOXX in 2000, also, didn't you?
18   A.   I'm not sure what you're referring to, but I was
19   certainly working on VIOXX and VIGOR in 2000.
20        Q.   Well, not just working on it.  You were also
21   involved in monitoring the stock market and what the
22   analysts were reporting about VIOXX and your company,
23   weren't you?
24   A.   No.  That's completely not true.
25        MR. LANIER:  I would like to offer into

2895

1    evidence, Your Honor, Plaintiff's Exhibit 1463.
2         THE COURT:  Any objection?
3         MR. BROCK:  Your Honor, I do object to this on
4    the basis that it has a lot of hearsay information in
5    it.
6         MR. LANIER:  It doesn't go to the truth of the
7    matter asserted, but it is certainly an e-mail to her,
8    Judge.
9         (Whereupon, the following occurred at
10   side-bar:)
11        MR. BROCK:  Judge, Christy advices me in the
12   last case that you had everything below this redacted.
13   But I'll let her speak to that, if necessary.
14        MR. LANIER:  I'm not going to go into detail,
15   just the top part.
16        THE COURT:  Everything should be redacted
17   below the regards.
18        MR. LANIER:  No problem.
19        (End of side-bar.)
20   BY MR. LANIER:
21        Q.   Look specifically at an e-mail you got on May
22   25th of 2000.  Do you see that?
23   A.   Yes, I do.
24        Q.   And that's you, Alise Reicin, correct?
25   A.   That's correct.

2896

```
 1    Q.  Copied to Edward Scolnick.  He is the
 2  president at the time of the whole Merck Research Labs,
 3  right?
 4  A.  That's correct.
 5    Q.  Top, top scientist?
 6  A.  That's correct.
 7    Q.  It is from Margie McGlynn?
 8  A.  That's also correct.
 9    Q.  And the subject is "VIGOR analyst reports" and
10  it is talking about stock analysts, correct?
11  A.  I believe it is, yes.
12    Q.  And this e-mail to you says, Alise -- actually
13  it says "Alice," but your name is Alise?
14  A.  That is correct, as well.
15    Q.  "Alice, attached are two analyst reports which
16  most clearly demonstrate the success of our efforts to
17  defuse the cardiovascular risk issue for VIOXX..."
18        "Alice, attached are two analyst reports which
19  most clearly demonstrate the success of our efforts to
20  defuse the cardiovascular risk issue for VIOXX."
21        Did I read that right?
22  A.  You did.
23    Q.  You, and it is talking about you "Alise"
24  there?
25  A.  I believe so.
```

```
 1  that you've been asked to speak with analysts, that
 2  Merck has asked you to speak with analysts on occasion.
 3  I thought your brother was in the stock market?
 4        MR. BROCK:  Your Honor, I object to that.
 5  That's not an appropriate question.
 6        THE COURT:  The objection is sustained.
 7  BY MR. LANIER:
 8    Q.  Um, you were actually asked by Merck to speak
 9  to stock analysts, true?
10  A.  As I said, I recall one occasion where I was asked
11  after we had the VIGOR label change to speak to the
12  analysts and explain what exactly was changed in the
13  label.
14    Q.  Not only that, but during this same time
15  period, and at this point I'm back in 2001, and you
16  were off for a little bit in 2001, weren't you?
17  A.  That is correct.  I took a personal leave.
18    Q.  And when you came back, ma'am, from your
19  personal leave there was kind of a relief by your boss,
20  wasn't there?
21  A.  Um, my boss and I get along well.  He thinks I do a
22  good job.
23    Q.  I don't deny it.  Barry Gertz, right, he is
24  the one who found you defending the VIOXX franchise,
25  isn't he?
```

```
 1    Q.  "You played a major role in making this happen
 2  along with Brian and I know many others supporting you
 3  in Merck Research Labs.  I wanted to personally thank
 4  you for all your efforts and the tremendous support you
 5  provide for the marketing organization.  Regards,
 6  Margie."
 7        Did I read that correctly?
 8  A.  Yes, you did.
 9    Q.  You didn't just get stock analyst reports
10  e-mailed to you with appreciation notes with what you
11  were doing.  You actually got sent to talk to Wall
12  Street analysts, didn't you?
13  A.  That was not a part of my job.  I think there was
14  one occasion after we had the label change that I did
15  speak to analysts.
16    Q.  Well, you say on one occasion.  Now, in your
17  deposition you said "on rare occasions," plural, "I
18  have been asked to speak with analysts," plural.
19  A.  Again, I do remember the one time after at the
20  VIGOR label occasionally I will be approached by an
21  analyst at a scientific meeting who has questions, but
22  we have professional people in the organization who
23  deal with the analysts, and that is not one of my
24  primary activities.
25    Q.  Actually, in your deposition, ma'am, you said
```

```
 1  A.  That's correct.
 2    Q.  Not only defending it but that same year -- is
 3  this in evidence yet?  I apologize.  It is Plaintiff's
 4  Exhibit 66.  I move it into evidence, please.
 5        THE COURT:  Any objection.
 6        MR. BROCK:  One second, please, Your Honor.
 7  No objection.
 8        THE COURT:  All right.  No objection.  66 will
 9  be marked into evidence.
10        (Whereupon, Exhibit 66 was marked into
11  evidence.)
12  BY MR. LANIER:
13    Q.  And we can maybe put it into some context with
14  the last page, and the last page it says it is an
15  e-mail October 3rd of 2001.
16        Do you see that?
17  A.  Yes, I do.  Can I have the whole document so I can
18  look at it?
19    Q.  Sure.  That's one you and I have discussed on
20  multiple occasions.  I don't think there's much
21  difference.
22        MR. BROCK:  Your Honor, I'll object to that.
23  There is not any reason to keep having commentary about
24  things.
25        THE COURT:  Try to restrain yourself from
```

1   making comments.

2        MR. LANIER:  Okay, Your Honor.  I'm sorry.  I

3   was trying to be polite.  I apologize.

4   BY MR. LANIER:

5        Q.  Do you have it in front of you now, ma'am?

6   A.  Yes, I do.

7        Q.  It says, "at the end" -- this is we're

8   starting out with an e-mail with a fellow named

9   Waldemar something, right?"

10  A.  Radziszewski, I believe.

11      Q.  Can you say that again for me?

12  A.  Probably not.

13      Q.  It is October 3rd, 2001.  Do you see that?

14  A.  Yes.

15      Q.  And he is talking about a lecture that he went

16  to that went very well.  Do you see the reference at

17  the top?

18  A.  Yes, I do.

19      Q.  He says, "very fortunately as a backup I had

20  some slides supporting VIOXX's safety, including our

21  results of meta-analysis studies."  That's probably

22  Konstam, don't you think?

23  A.  It may have been.

24      Q.  We'll talk about him later.  "At the end of

25  the afternoon session, however, a Dr. Singh appeared, a

1   statistician from U.S."  You know Dr. Singh, don't you?

2  A.  Yes, I do.

3      Q.  "Who probably came only to question our

4  'Naproxen theory.'"  This fellow even put it in

5  quotation marks, didn't he?

6  A.  He did put it in quotation marks.

7      Q.  The Naproxen theory.  "He showed up only for

8  discussion on heart safety.  Last session of the second

9  day.  And together with Isakson..." is that some other

10  person?

11  A.  Peter Isakson works for Pharmacia.  They made a

12  competitor drug called Celebrex.

13      Q.  "So together with Isakson they both strongly

14  and aggressively implied that one could not explain

15  differences in MI in VIGOR by aspirin-like effect of

16  Naproxen."

17      Did I read that right?

18  A.  You did.

19      Q.  Now, Dr. Singh, is that the Dr. Singh at the

20  Stanford Medical School in California?

21  A.  That is correct.

22      Q.  "I was firmly staying behind our data.

23  Afterwards Sir John..." I'll bet you that's John Vane,

24  don't you think?

25  A.  I believe.

1      Q.  Won the Nobel Prize for understanding COX

2  issues, didn't he?

3  A.  For prostaglandin research, you are correct.

4      Q.  "Sir John concluded that at this point we

5  can't draw any firm conclusion on the Naproxen effect."

6  Did I read that, correct?

7  A.  Yes, you did.

8      Q.  Within the context of that e-mail chain if we

9  fast forward a little bit your boss comes into the

10  picture on October 14th, 2001, right?

11  A.  That's correct.

12      Q.  And he talks about what y'all need to do now

13  that you're back in the picture to stop this type of

14  questioning at conferences?

15  A.  No, I don't think that fairly characterizes it.  I

16  think what he was saying is that I would be able to go

17  to such scientific conferences and speak about the data

18  since I was one of the ones who knew the data best.

19      Q.  Well, let's look at it and see how it wrote

20  out.  "With Alise back we should be in a better

21  position to cover such 'events.'  Note we're focused on

22  getting our data into the best peer-reviewed journals

23  like Circulation."

24      An aside here he indicates that there are some

25  journals that are better than others like Circulation

1   might be one of the best.

2      Do you see that?

3  A.  He may be implying that.

4      Q.  Dr. Krumholz said that.  You wouldn't fuss

5  that with that point, would you?

6  A.  That Circulation is a good journal?

7      Q.  One of the best.

8  A.  I don't know.  I'm not a cardiologist, but I think

9  in the cardiology field it is considered one of the

10  best.

11      Q.  All right.  He goes down at the bottom here.

12  "I will review this with..." now he is calling you

13  "Alsie" but he probably typed the S before the I.

14  That's Alise, right?

15  A.  That's correct.

16      Q.  "I will review with Alise and Wendy how to

17  better be prepared to meet the barbarians at the gate."

18      Did I read that right?

19  A.  Yes, you did.

20      Q.  And then I think the ultimate end of this was

21  an e-mail back to him from Doug Greene, who also works

22  at Merck, right?

23  A.  He worked at Merck at that period of time.

24      Q.  Who said, "we may need to seek them out..."  I

25  guess those are the barbarians "...and destroy them

1   where they live."  Right?

2   A.   I think he was being cute or thought he was being

3   cute.

4        Q.   Fair enough.  This is the same Barry Gertz,

5   though, who took you that year and the year before to a

6   number of different events to talk to people, didn't

7   he?

8   A.   I don't know that you can say that Barry took me to

9   events.

10       Q.   Well, for example, didn't you go to the VIGOR

11  cardiology consultants meeting in October of 2000?

12  A.   Yes, I did.

13       MR. LANIER:  Your Honor I move into evidence

14  Plaintiff's Exhibit 76.

15       THE WITNESS:  I, actually, helped set up that

16  meeting.

17       THE COURT:  Any objection to 76?

18       MR. LANIER:  I think -- didn't you give it to

19  him a few minutes ago?

20       MS. HEGAR:  Yes.

21       (Whereupon, the following occurred at

22  side-bar.)

23       MR. BROCK:  Your Honor, in a long line of

24  hearsay this document is filled with hearsay statements

25  of other physicians, other people that are at the

2905

1   who made the statement --

2        MR. LANIER:  Okay.

3        THE COURT:  -- and if she received a copy of

4   it.

5        MR. LANIER:  Yes.

6        THE COURT:  We're not going to go through the

7   whole thing.  We're only going to go to one section.

8        MR. LANIER:  That's it on Page 3.

9        THE COURT:  Show that --

10       MR. BROCK:  This is Rory Collins, RC, this

11  isn't Barry Gertz's statement.

12       MR. LANIER:  I don't think that is Rory.

13       MR. BROCK:  Rory Collins, that's his statement

14  there.

15       MR. LANIER:  This is --

16       MR. KRISTAL:  I took his deposition.  That's

17  exactly what he said.  That's his handwriting.  These

18  are his notes.

19       THE COURT:  Well, you're just putting in this.

20       MR. LANIER:  I'm putting in in that bracketed

21  part, "Alise, reduce the emphasis on MI."

22       THE COURT:  Ask her who said that to her.

23       (End of side-bar.)

24  BY MR. LANIER:

25       Q.   Do you have it in front of you, ma'am?

2907

1   meeting.

2        MR. LANIER:  Judge, this is the sentence I'm

3   going to read.  It is that bracketed part.

4        THE COURT:  What?

5        MR. LANIER:  The bracketed parts Barry Gertz,

6   her boss, wrote it.  It is an affidavit from him

7   certifying that he wrote it because he wanted to keep

8   it confidential.

9        THE COURT:  Page 3?

10       MR. LANIER:  Yes, Your Honor.  It is just that

11  bracketed part.  And she has testified about this

12  before.

13       MR. BROCK:  Barry Gertz is not here.  That

14  affidavit is not admissible in this case.  I'm not even

15  sure what that is.

16       MR. LANIER:  It is an affidavit in this case.

17       MR. BROCK:  But it is still hearsay, same

18  objection you've been making all day.

19       MR. LANIER:  It is an admission of a party

20  opponent.  He works for Merck.  It is not hearsay when

21  you say it.

22       MR. BROCK:  It is right there.  It is hearsay.

23  It is a statement out of court.

24       MR. LANIER:  No.

25       THE COURT:  Not if it is by Merck.  Ask her

2906

1   A.   Yes, I do.

2        Q.   Do you understand these are Barry Gertz's

3   notes, your boss?

4   A.   Yes, I do.

5        Q.   And there's a reference on them for you to

6   reduce the emphasis on MI.  Is that information or

7   something you were, in fact, told to do?

8   A.   He was jotting down one -- what one of the

9   consultants there had said at the meeting.

10       Q.   So you were told in some way, shape, form or

11  fashion to reduce the emphasis on MI, meaning heart

12  attack?

13  A.   No, I think you have to read the rest of it.  Just

14  subdivision of subdivision.  In other words --

15       Q.   Subdivision and subdivision?

16  A.   I'm sorry.  Subdivision and subdivision.  I don't

17  remember whether Barry told me this or not.  He was

18  saying that some of the consultants felt that we should

19  be talking about confirmed thrombotic events rather

20  than just MI because it was a subdivision of the

21  cardiac events and then of the confirmed thrombotic

22  events.

23       Q.   So 2001, 2001 you were in the thick of matters

24  as far as building a scientific base and defending the

25  VIOXX franchise, agreed?

2908

1   A.  Again, I wouldn't use the term "defending the VIOXX
2   franchise," but...
3       Q.  Your boss did.
4   A.  My boss did.  I was very active working on VIOXX,
5   the VIGOR study, preparing regulatory documents and
6   going to regulatory meetings, as well and scientific
7   meetings.
8       Q.  Okay.  Next subject.  I want to talk to you
9   for a while about this FitzGerald hypothesis that you
10  have been testifying about, okay?  You know what I mean
11  by that, don't you.
12  A.  I believe I do.
13      Q.  And Mr. Brock had a little chart with you.
14  And in that chart he asked you basically, if I can
15  understand it, whether or not VIOXX was neutral as it
16  was compared to an NSAID or whether or not VIOXX might
17  cause some type of prothrombotic or proclot type
18  response, remember?
19  A.  I think he was asking me what we thought in 1997.
20      Q.  Okay.  And in that regard I want to see first
21  if I understand what you're telling the jury today.
22  You prepared to study VIOXX against Naproxen in a GI
23  trial, right?
24  A.  That's correct.
25      Q.  And so it was going to be VIOXX versus

2909

1   Naproxen, right?
2   A.  That's correct.
3       Q.  And --
4   A.  That wasn't the study we were looking at in 1997,
5   but that is ultimately we did for the VIGOR study a
6   little bit later.
7       Q.  Well, in 1997 you were looking at a GI study
8   that ultimately -- VIGOR was the GI study you
9   ultimately did?
10  A.  Ultimately did, but in 1997 it was going to be
11  VIOXX versus Ibuprofen and diclofenac.
12      Q.  Okay.  So let's do it this way.  It was VIOXX
13  versus an NSAID, fair?
14  A.  That's correct.
15      Q.  And if -- there are some e-mails that you have
16  been discussing, Plaintiff's Exhibit 29.  Do you
17  remember the e-mails?
18  A.  If you can show me which ones you're referring to.
19      Q.  These are the ones we also talked about them
20  with Mr. Morrison.
21  A.  Yes, I am familiar with those.
22      Q.  You're familiar with one where Mr. Morrison
23  said, "I would allow low-dose aspirin I know this has
24  been discussed to death, but real world is everyone is
25  on it so why exclude it?  Without COX-1 inhibition you

2910

1   will get more thrombotic events and kill the drug"?
2   A.  That's correct.  That's what he said.
3       Q.  And this was one where you responded, "I hear
4   you.  This is a no-win situation"?
5   A.  That's correct.
6       Q.  If you put them on aspirin they're going to
7   have more stomach problems, and you can't win.  It is
8   not good for your VIOXX drug in the study, right?
9   A.  Well, not exactly.  I said you -- you're not going
10  to be able to answer the question you're trying to
11  answer.
12      Q.  Well, you said, "the relative risk of even
13  low-dose aspirin may be as high as two to fourfold"?
14  A.  That's correct.
15      Q.  That's what you said?
16  A.  That's correct.
17      Q.  You didn't say you won't be able to measure.
18  You said if we put them on aspirin you're not going to
19  get that great label change that says we reduced GI
20  problems because the aspirin is going to cause them.
21  A.  We didn't know what we would see.
22      Q.  And so putting them on aspirin is not going to
23  help.  And then you said, "yet, if we don't, the
24  possibility of increased heart attacks is a great
25  concern."  That's what you said, didn't you?

2911

1   A.  That is correct.
2       Q.  Because you're not going to have inhibition of
3   COX-1, right?
4   A.  Because we won't have inhibition of COX-1, and it
5   wouldn't act as a cardioprotective agent in the way the
6   NSAID would.  It would be neutral.
7       Q.  Yes.  Well, you didn't say it will be
8   neutral.
9   A.  That is what I said in the attached document that
10  went with it.
11      Q.  All right.  We'll go to that in just a minute.
12  "I just can't wait to be the one to present those
13  results to senior management."
14          See that?
15  A.  I do.
16      Q.  "What about the idea of excluding high risk CV
17  patients, those that have already had an MI a CABG or a
18  PTCA" y'all did that in VIGOR, you eliminated those,
19  didn't you?
20  A.  That's not completely true.  If they had an event
21  within 1 year of randomization they were excluded or if
22  they were taking aspirin.  There were, in fact, some
23  patients who were in the study who had had prior MIs.
24      Q.  But as a practical matter, Dr. Reicin, even
25  though you're not a cardiologist you know that almost

2912

1  anybody who has ever had a heart attack is going to be
2  taking aspirin for the rest of their lives?
3  A.  They should be, and that's why we couldn't allow
4  them in the study if we weren't going to allow patients
5  on aspirin in the study.
6  Q.  My point is, ma'am, y'all did exclude high
7  risk CV patients, didn't you?
8  A.  Um, we excluded patients who were on aspirin, that
9  is correct.  Some high risk CV patients were in the
10  study, however.
11  Q.  You said this may decrease the CV event rate,
12  so a difference between the two groups would not be
13  evident, didn't you?
14  A.  That's correct.
15  Q.  Now, ma'am, if I'm understanding your
16  testimony today to the jury, you're saying that my only
17  concern was that NSAIDs will be cardioprotective.
18  A.  That's correct.
19  Q.  I wasn't concerned that VIOXX may hurt the
20  heart?
21  A.  That's 100 percent correct.
22  Q.  Are you sure?
23  A.  I am 100 percent positive, Mr. Lanier.
24  Q.  Because ma'am, when y'all run these trials it
25  is extremely important, it involves human health,

1  doesn't it?
2  A.  That's correct, and I take that responsibility
3  extremely seriously.
4  Q.  Because you were running this trial on people,
5  not on guinea pigs, right?
6  A.  That's correct.
7  Q.  And you have obligation as a scientist, you
8  have obligations as a doctor, you have obligations as a
9  person who is running a clinical trial, don't you?
10  A.  I take those obligations extremely seriously.  I
11  went into medicine to help patients.  To imply that I
12  wouldn't take those obligations seriously is
13  outrageous.
14  Q.  Let me tell you why I'm implying it.  Because
15  one of the things you have to do under law, you have to
16  inform anybody coming in for one of your tests of any
17  possible risks, don't you?
18  MR. BROCK:  Object to the statement about the
19  law and the argument of counsel and the relevance.
20  THE COURT:  Well, is there any dispute there's
21  a dispute that there's a law that they have to advise
22  people of the risks?
23  BY MR. LANIER:
24  Q.  Ma'am, you're --
25  MR. BROCK:  Just a minute.

1  (Whereupon, the following occurred at
2  side-bar:)
3  MR. BROCK:  The basis for my objection is
4  that, first of all, he is standing there saying what
5  the law is, and I don't know if that's the law or not.
6  You can't examine a witness on a statute.
7  MR. LANIER:  Yes, I can.
8  MR. BROCK:  No you can't.
9  MR. LANIER:  I'll show you why if you'll just
10  sit back and let me do it.  I'll do it right by the
11  rules.
12  MR. BROCK:  No.  That's not on the exhibit
13  list.
14  MR. LANIER:  It doesn't have to be.  It is the
15  law.
16  MR. BROCK:  You can't examine a witness on a
17  legal matter.  Legal matters are for the Court.
18  MR. LANIER:  Watch.
19  MR. BROCK:  And, Your Honor, informed consent
20  in a clinical trial is not relevant to the issues of
21  this case.  That's a whole different issue.  Entirely
22  different issue.
23  MR. LANIER:  Judge, I think this is important.
24  MR. KRISTAL:  This is the third time that I
25  saw Dr. Reicin look directly at a juror and smile at

1  them while there's been a side-bar.  I have been doing
2  nothing but watching that, and I have waited, and when
3  I saw her do it for the third time --
4  And Mr. Collins looked away, and what brought
5  it to my attention was when she was smiling at him.
6  This is the very thing --
7  MR. BROCK:  If you saw that -- and I have not
8  seen it.
9  MR. KRISTAL:  A, I'm not blind; and, B, I'm
10  not a liar.  This is the third time.
11  MR. BROCK:  If you saw it you should have
12  brought it up.
13  MR. KRISTAL:  That's --
14  MR. BROCK:  It wouldn't be three if you saw it
15  and said something.  I have not seen that.
16  MR. GORDON:  The he smiled the first time she
17  said AIDS and cancer, too.
18  THE COURT:  Mr. Lanier?
19  MR. LANIER:  I think you --
20  THE COURT:  I think you should rephrase your
21  question that people in studies have to be given
22  informed consent of not every single possible risk
23  because I think that's a misstatement.
24  MR. GORDON:  Could you instruct the witness to
25  stop smiling at the jury during the breaks?  It is just

3/24/2006 Reicin Day One

```
1    really a problem.
2         MR. BROCK:  What do you want her to do?  She
3    can't look at the screen.
4         MR. KRISTAL:  The reason this was raised is
5    because it has been a problem at other trials, and
6    we're watching it happen.
7         (End of side-bar.)
8         MR. LANIER:  May I continue?
9         THE COURT:  Yes.
10        MR. LANIER:  Thank you.
11   BY MR. LANIER:
12        Q.   Your Honor, I've got Plaintiff's Exhibit 1958,
13   which I would like to move into evidence, although I
14   believe honestly it was admitted under a defense
15   number.
16        MR. BROCK:  1958 isn't in.  It was a
17   Defendant's Exhibit, I think.
18   BY MR. LANIER:
19        Q.   Ma'am, when you were being asked questions by
20   Mr. Brock earlier he put up on the board an outcome
21   trial that you actually wrote.  Clinical outcome study.
22   GI clinical outcomes study.  Do you remember this?
23        A.   Is this the same one that he put up?
24        Q.   Yes, ma'am?
25        A.   Yes, I see that.
```

2917

3/24/2006 Reicin Day One

```
1    BY MR. LANIER:
2         Q.   I have the regulations right here.  Those are
3    them, aren't they?
4         THE COURT:  Are they the ones you attached to
5    your study?
6         THE WITNESS:  We wouldn't have attached this
7    to the protocol.
8    BY MR. LANIER:
9         Q.   Would not have attached that form.  You had
10   them on a different sheet of paper.  It is the same
11   regulations, isn't it?
12   A.   We didn't attach the regulations; we attached the
13   informed consent, I believe.
14        Q.   So where it says on page 37 "a copy of the FDA
15   regulations regarding informed consent and a consent
16   form are attached to this protocol" you're saying you
17   weren't really doing that?
18   A.   I don't recall.  Maybe because I see it in a
19   different form.
20        Q.   Regardless, those are the regulations you're
21   obligated to follow, and you're familiar with them,
22   aren't you?
23   A.   That's correct.
24        MR. LANIER:  With that, Your Honor, may I
25   proceed?
```

2919

3/24/2006 Reicin Day One

```
1         Q.   This is you writing a potential trial?
2    A.   That's correct.
3         Q.   And if you'll look on page 37, on page 37 you
4    actually put a copy of the FDA regulations regarding
5    informed consent and a consent form are attached to
6    this protocol.  Do you see that?
7    A.   Um, that is correct.  That's standard language.
8    There probably was no consent form attached to this
9    protocol because we didn't end up doing it.
10        Q.   I understand that, but I'm just showing you
11   that to make sure that you are familiar with what the
12   FDA regulations are regarding informed consent.  You
13   certainly have to know those in your job, don't you?
14   A.   That's correct.
15        Q.   And so you are well aware of the fact that you
16   have an obligation --
17        MR. BROCK:  Your Honor, whoa, whoa, whoa, take
18   that off the screen.  She has not given you permission
19   to use that.
20        MR. LANIER:  Judge, these are the regulations
21   that she is referencing.
22        THE COURT:  These are the regs that she
23   attached to her study.  I'll allow it.
24        MR. BROCK:  The regs were not attached to the
25   study.
```

2918

3/24/2006 Reicin Day One

```
1         THE COURT:  You can.
2         MR. LANIER:  Thank you.
3    BY MR. LANIER:
4         Q.   So what you're obligated to do, ma'am --
5         THE COURT:  The Court will instruct the jury
6    on the law.
7         MR. BROCK:  I'm going to object to putting
8    that up on the screen, Your Honor.  I'm sorry.
9         THE COURT:  Okay.  The objection is overruled.
10   You should not consider this evidence of what the regs
11   are or a statement of what the law is.  I will tell you
12   what the law is at the end of the case.  However, you
13   can use it for the purpose of what her understanding of
14   what the regs are.
15   BY MR. LANIER:
16        Q.   Ma'am, you understand that "the following
17   information shall," that means required, right?  "Shall
18   be provided to each subject," true?
19   A.   That's correct.
20        Q.   "And that includes a description of any
21   reasonably foreseeable risks," true?
22   A.   Correct.
23        Q.   "And a disclosure of appropriate alternative
24   procedures or courses of treatment, if any, that might
25   be advantageous to the subject."
```

2920

1      True?

2    A.  That's correct.

3      Q.  Now, ma'am, if you truly were concerned before

4  VIGOR that folks who were taking VIOXX were going to

5  have more heart attacks than folks who were on Naproxen

6  because you thought Naproxen was cardioprotective you

7  had an obligation to tell that to those people who were

8  in your study, didn't you?

9    A.  Well, first of all, it was a theoretical concern,

10  and, secondly, that was in 1997 that that e-mail was

11  written before we had our Phase III data.  The VIGOR

12  study was done after we had our Phase III data, and we

13  saw no evidence of a difference in cardiovascular risk

14  between VIOXX and the NSAIDs we had studied.

15      Q.  Ma'am, we'll go through all the Phase III data

16  in a little bit, but Phase III were a lot of different

17  studies not just one study, true?

18    A.  Oh, yes, that is true.

19      Q.  And, in fact, Phase III data is the very data

20  that the FDA told you could not be used to say that

21  there's no concern about heart problems, true?

22    A.  Um, I think you're mischaracterizing it.

23      Q.  Do you not remember Villalba's comments?

24    A.  I'm not sure what you're referring to, but it was

25  the Phase III data upon which the drug was approved,

1  and there was nothing based on that Phase III data that

2  the FDA asked us to put in the label to suggest that

3  VIOXX was associated with a cardiovascular risk or that

4  NSAIDs could be cardioprotective.

5      Q.  But, ma'am, y'all were putting people in the

6  VIGOR trial before you got the drug approved?

7    A.  Before we got the drug approved, but after we had

8  the Phase III data and had already submitted it to the

9  FDA.

10      Q.  But before the FDA signed off on it you

11  already had -- ma'am, let me do it this way, your whole

12  concern was that VIOXX was going to have more heart

13  attacks than Naproxen, that was your concern, wasn't

14  it?

15    A.  As I said, it was back in 1997.  It was not

16  Naproxen, it was versus Ibuprofen and diclofenac, and

17  we didn't see that in our Phase III data.

18      Q.  Ma'am, what you went into this test -- the

19  whole reason y'all were thinking about giving aspirin

20  and worried about it killing the drug is because you

21  were concerned that Naproxen was going to cause less

22  heart attacks than VIOXX, that was what you foresaw,

23  that's what you told this jury this morning and this

24  afternoon?

25    A.  Except I think you're mixing chronology a little

1  bit, Mr. Lanier.  That protocol was written in 1997.

2  We weren't even talking about Naproxen at that point in

3  time.  We were talking about Ibuprofen and diclofenac.

4  By the time we started this protocol we had our Phase

5  III data, and there was no difference in cardiovascular

6  events between VIOXX and the NSAID comparators.

7      Q.  How about between VIOXX and Naproxen?

8    A.  In our Phase IIb/III OA studies we did not see a

9  difference.  We hadn't done studies versus Naproxen at

10  the time that we submitted.

11      Q.  All right.  Let me see if I have this right.

12  So here's the story now.  In 1997 y'all are concerned

13  because you think NSAIDs are cardioprotective and VIOXX

14  is not?

15    A.  There was the theoretical concern.  We couldn't be

16  sure, theoretical concern.

17      Q.  And then by the time 1998 rolls along and you

18  actually write the protocol for VIGOR y'all decide at

19  that point that NSAIDs are not cardioprotective and

20  neither is VIOXX, right?

21    A.  Well, all I could tell you at that point in time is

22  we didn't see a difference between VIOXX and the

23  comparator NSAIDs, so it wasn't consistent with the

24  NSAIDs being cardioprotective.  I couldn't have ruled

25  it out, but it was not consistent with it.

1      Q.  So you changed your mind between '97 and '98.

2  The NSAIDs went from being cardioprotective to not

3  cardioprotective, and then as soon as the tests came

4  out and VIGOR caused more heart attacks then it went

5  back to being cardioprotective again?

6    A.  Again, I think you're mischaracterizing what

7  happened.

8      Q.  Well, in 1998 and when these people were

9  enrolling in 1999 was it cardioprotective or not?

10    A.  Again, there was the theoretical issue that was

11  still there, but we had --

12      Q.  Was it a reasonably foreseeable risk that you

13  were going to have more heart attacks in one group than

14  the other?

15    A.  No, I don't believe it was a reasonably foreseeable

16  risk.

17      Q.  So when your guys -- when you get this e-mail

18  that you put out where you said "the possibility of

19  increased CV events is of great concern"?

20    A.  That's correct, that was in 1997.

21      Q.  In 1998 the next year it was no longer a great

22  concern, and that's why you never warned anybody about

23  it in the informed consent?

24    A.  That is correct.  It wouldn't -- we did not feel

25  that it was necessary to put in the informed consent

1  and, in fact, to put something like that in the
2  informed consent for another drug when it wasn't in
3  their label would have been quite unusual.  IRBs
4  reviewed -- that's an institutional review board
5  reviewed our informed consent, reviewed the protocol,
6  and they also did not ask us to put anything in.
7      Q.  Well, ma'am, "possibility of increased CV
8  events is of great concern.  Without COX-1 inhibition
9  you'll get more thrombotic events and kill the drug."
10  All of the sudden did you decide that y'all were going
11  to get COX-1 inhibition in 1998?
12     A.  No, Mr. Lanier, but in 1998 we had safety data on
13  over 5,000 patients.  That's very different than the
14  situation in early 1997.
15     Q.  Ma'am, that safety data, how many of those
16  people had taken the drug for 7 months?
17     A.  I can't -- I think --
18     Q.  800.  800.
19     A.  No.  No.  No.  I think -- I think it was 800 for a
20  year or more.  I believe it was over 1,600.  I should
21  check my notes for over 6 months.
22     Q.  And you know enough about studies to know
23  that's not enough clinical power to decide if something
24  is safe for the heart or not you have to have at least
25  4,000 according to Braunwald and according to everybody

2925

1      Q.  And then to get to the bottom line of this,
2  Dara, have I given them 834 yet?
3      MS. HEGAR:  Yes.
4      MR. LANIER:  I move that into evidence.  It is
5  one of the patient consent forms.
6      THE COURT:  Any objection?  What is your
7  objection?
8      MR. BROCK:  I object.  It is not relevant to
9  the issues of the case.  What kind of --
10     THE COURT:  Your objection is relevancy.  Your
11  objection is overruled.
12     MR. LANIER:  Thanks, Judge.  Ma'am, here's a
13  copy --
14     THE COURT:  Wait.  He has a second objection.
15     (The following side-bar discussion was had:)
16     MR. BROCK:  It also has personal information
17  about the name of an investigator in here.  It has --
18     MR. LANIER:  We can redact that, Judge.
19     MR. BROCK:  -- patient information in there.
20     MR. LANIER:  We can redact that, as well.
21     THE COURT:  Is this the form that was used
22  with VIGOR?
23     MR. LANIER:  It is a form signed by someone.
24  We'll redact the names.
25     THE COURT:  All identification information

2927

1  that has written on this?
2      A.  The issue is not the number of patients, it is the
3  number of events you see.
4      Q.  That's like you ever play roulette in the
5  casinos?
6      A.  No, I haven't.
7      Q.  Do you know what it is, the wheel that goes
8  around?
9      A.  Yes.
10     Q.  Do you think you can study three times it goes
11  around, watch it three times and decide which numbers
12  it is always going to land on by those three?
13     A.  No, I don't.
14     Q.  But you've got to watch enough to know
15  statistically what the chances are, you have to have
16  enough power, you have to have enough people, you have
17  to have enough turns of the wheel, don't you?
18     A.  You do, that's true.
19     Q.  All right.  "Without COX-1 inhibition you will
20  get more thrombotic events."  That's what you were told
21  by Dr. Morrison, isn't it?
22     A.  That's what he wrote.
23     Q.  And that's what you agreed with as "the
24  possibility is of great concern," true?
25     A.  That is what I wrote in 1997.

2926

1  should be redacted and shouldn't be shown to the jury.
2      (End of side-bar.)
3  BY MR. LANIER:
4      Q.  Here you go.
5      A.  Thank you.
6      Q.  If you'll turn, please, to the page first that
7  has exclusions.  "You may not enter this study if
8  you..."  do you see that?
9      A.  Yes, I do.
10     Q.  And if you'll follow down you can't enter the
11  study if you use low-dose aspirin?
12     A.  That's correct.
13     Q.  You kept those people out, didn't you?
14     A.  Um, we did not include them in the study, that is
15  true.
16     Q.  And then if you'll flip the page you're
17  telling everybody all of the risks associated with the
18  drug, do you see that or with the study, not just with
19  the drug, right?
20     A.  We do have risks that may be associated with the
21  drug.
22     Q.  You go through and look at all of the risks of
23  being in this study, risks of VIOXX, risks of Naproxen,
24  you go through all of the risks, and not one time do
25  you tell people that y'all are concerned that one group

2928

1    in that study is going to have more heart attacks than
2    the other group, do you?
3    A.   Again, we didn't -- even in 1997 we didn't think
4    that was a risk of VIOXX. We thought that it would be
5    cardioprotection of Naproxen. By the time we got to
6    1998 you can see the drug has been tested in over 5,500
7    individuals. We were basing our analysis of the safety
8    profile on that. We -- and we wrote here, there may be
9    other side effects that are not yet known. What we had
10   submitted to the FDA and the label that the FDA
11   approved did not have a warning or precaution for
12   cardiovascular effects. This informed consent was
13   consistent with that label and was appropriate.
14       Q.   Ma'am, you never sent the FDA your e-mails
15   where y'all are talking about you're going to have more
16   events because you don't have COX-1 suppression it is
17   going to kill the drug, it is going to look bad, it is
18   a no-win situation. The possibilities of increased CV
19   events is real?
20   A.   Again, that was a discussion of cardioprotection of
21   the NSAIDs not that VIOXX would be prothrombotic.
22       Q.   Ma'am, don't you remember the e-mail Ed
23   Scolnick sent out when you got the results from the
24   VIGOR study when he said the CV events were real, were
25   mechanism based and it was, quote, "as we worried,"

2929

1    past tense, "it would be"?
2   A.   I think that's what he was saying when we got the
3   FitzGerald results. We were worried, and they got --
4       Q.   This was after VIGOR?
5   A.   I understand that.
6       MR. BROCK:   Your Honor, he cut the witness
7   off. If she could finish, please.
8   BY MR. LANIER:
9       Q.   The e-mail is right after VIGOR, isn't it?
10   A.   I understand that, but to the best of my knowledge
11   nobody after the Phase III results came out were
12   worried about the cardiovascular safety profile of
13   VIOXX.
14       Q.   Ma'am, you don't even have all your Phase III
15   results in at this point. Did you think you do?
16   A.   We had everything in upon which the FDA I
17   believe -- well, maybe not the safety update report had
18   not gone in yet and we had extensions that were still
19   ongoing.
20       Q.   Yes. That's my point, and the jury has been
21   shown this exhaustively. Phase III you're enrolling
22   these people in 1998 in this trial. You don't have
23   your Phase III studies done. You don't have your Phase
24   III results in?
25   A.   Those were long-term extensions. The FDA approved

2930

1    the drug while those extensions were going on. That's
2   a careful thing for us to do, and when we got the data
3   from those extensions they showed the same thing,
4   cardiovascular safety of VIOXX was similar to the NSAID
5   comparators.
6       Q.   Ma'am, y'all started getting in some results.
7   You have had a chance to look at the VIGOR results,
8   haven't you?
9   A.   I have, of course, seen them.
10       MR. LANIER:   Your Honor, I move into evidence
11   1993.
12       THE COURT:   Any objection.
13       MR. BROCK:   I don't know what this document
14   is.
15       MR. LANIER:   It is a Merck document. He knows
16   that from the lower right-hand corner. It is in our
17   exhibit list as 1993. It comes out of their VIGOR
18   analysis.
19       MR. BROCK:   I would say some predicate should
20   be laid. If he is referring -- I don't believe it
21   is --
22       THE COURT:   I'll let you use it with the
23   witness and see if he can lay a foundation.
24   BY MR. LANIER:
25       Q.   Ma'am, you're familiar with this document,

2931

1    aren't you?
2   A.   I don't recall. I certainly may have seen it
3   before. I just don't recall.
4       MR. LANIER:   Your Honor, I'll represent this
5   was produced to us in a self-authenticating manner by
6   Merck out of the Merck offices. It has a Merck Bates
7   stamp number out of their New Jersey litigation
8   specifically in your court.
9       MR. BROCK:   There's no such thing as a
10   self-authenticating document, and I object to him
11   standing there making a speech about it. He can
12   establish a predicate to the witness if he can.
13       THE COURT:   Is it from the VIGOR study?
14       MR. LANIER:   Yes, Your Honor, it is.
15       THE COURT:   And how do you know that?
16       MR. LANIER:   This is a writeup from Merck
17   where they analyzed these are the ones each --
18       MR. BROCK:   Where is the rest of the document?
19   Before we can put it in context --
20       MR. LANIER:   You'll have to look at your Bates
21   number.
22       MR. BROCK:   You're supposed to come up with a
23   complete copy.
24       MR. LANIER:   That is -- those are all of the
25   charts. You can --

2932

1    MR. BROCK: This is not the whole document.
2    MR. LANIER: That's the way we were given it.
3    MR. BROCK: Are you sure about that?
4    MR. LANIER: I'm sure we were given it that
5    way.
6    MR. BROCK: I don't know what it is.
7    MR. LANIER: He gave to it me, Judge.
8    MR. BROCK: I did not give you this.
9    THE COURT: You can question her on it.
10   MR. LANIER: Thank you.
11   BY MR. LANIER:
12   Q.    Ma'am, if you look, please, with the jury and
13   help us understand what we have here, these are the
14   actual heart attacks that happened in the VIGOR study,
15   aren't they?
16   MR. BROCK: I'm going to object to him
17   testifying about it unless he lays a predicate for it.
18   She didn't say that.
19   BY MR. LANIER:
20   Q.    That's why I'm asking her. Aren't they?
21   A.    Looking at it what I'm going to guess is that each
22   of the boxes represents somebody having a heart attack
23   during the VIGOR study. And I would assume that the
24   numbers in those boxes are the day that they had that
25   heart attack.

1    Q.    Ma'am, where is it on the informed consent
2    form?
3    A.    We told them they weren't allowed to take aspirin.
4    Q.    I see this. You may not enter this if you use
5    low-dose aspirin, and you got them to sign -- you got
6    each person being tested to sign that. Where did you
7    tell the people in this same form that they could go
8    ahead and take aspirin?
9    A.    We didn't say they could take aspirin.
10   Q.    All right. But, yet, you had people that you
11   call aspirin indicated. By that it means they had the
12   risk factors they should have been on aspirin?
13   A.    That's correct. And they were not.
14   Q.    And you never warned any of those people that
15   they were at an increased risk of a heart attack, did
16   you?
17   A.    These were patients that were being --
18   Q.    Did you warn those people they were at an
19   increased risk of a heart attack, yes or no?
20   MR. BROCK: That's a misleading question that
21   she should be allowed to explain. I object to that. I
22   ask she be allowed to explain her answer.
23   BY MR. LANIER:
24   Q.    Did you warn those patients that they were at
25   risk for a heart attack?

1    Q.    You can see that up at the top. It is not a
2    hard assumption. "Individual Events Labeled By Study
3    Day."
4    Do you see that?
5    A.    That's correct.
6    Q.    And heavy outline means it is a patient that
7    probably should have been on low-dose aspirin, doesn't
8    it?
9    A.    That's correct.
10   Q.    By the way, y'all wouldn't allow them to take
11   low-dose aspirin, would you?
12   A.    That's correct, and we specifically told
13   physicians --
14   Q.    Ma'am, please limit it to my questions or we
15   won't get through this.
16   Y'all did not limit them to be on low-dose
17   aspirin, true?
18   MR. BROCK: I object.
19   THE WITNESS: That is correct, but we also
20   told physicians not to stop aspirin in order for
21   patients to be enrolled in the study.
22   BY MR. LANIER:
23   Q.    And that's on the informed consent they signed
24   where?
25   A.    We instructed the investigators --

1    THE COURT: She can answer yes or no, and you
2    can bring it out on redirect.
3    THE WITNESS: I'm going to answer no, and I
4    would like to explain so there's not a misimpression.
5    BY MR. LANIER:
6    Q.    You'll get to explain on their clock instead
7    of mine, okay?
8    Now, above the time line those are people who
9    were taking VIOXX, right, this group is VIOXX?
10   A.    That's correct.
11   Q.    And below the line those folks are taking
12   Naproxen, right?
13   A.    That is correct.
14   Q.    And then we also have here how many days
15   before they had their heart attack, right?
16   A.    That's correct. How many days they had been on
17   therapy before they had it.
18   Q.    So first heart attack happens on day seven.
19   We'll cover up day 100. Look at the first hundred
20   days, okay?
21   A.    That's correct.
22   Q.    First heart attack is a Naproxen heart attack
23   1 week into the study, right?
24   A.    That's correct.
25   Q.    And then after that you have a VIOXX heart

1 attack on day 17, don't you?

2 A. That's correct.

3  Q. And then another VIOXX heart attack on day 30,

4 don't you?

5 A. That's correct.

6  Q. Then another VIOXX heart attack on day 41,

7 correct?

8 A. That's correct.

9  Q. Then you pick up your second Naproxen heart

10 attack?

11 A. Correct.

12  Q. And then you got VIOXX, VIOXX, Naproxen and

13 VIOXX, right?

14 A. That's correct.

15  Q. So you have six heart attacks on VIOXX in just

16 the first three months, hundred days, a little over

17 3 months, right?

18 A. Out of 4,000 patients, that's correct.

19  Q. And you only have three on Naproxen?

20 A. That's correct.

21  Q. And then if we keep going look at the next

22 hundred days.  You've got one, two, three, four, five,

23 six more heart attacks the next hundred days on VIOXX,

24 don't you?

25 A. That's correct.

1  Q. And you have one on Naproxen, don't you?

2 A. Correct.

3  Q. And the study keeps going, doesn't it?

4 A. That's correct.

5  Q. And the next hundred days.  You don't have any

6 on Naproxen, do you?

7 A. That's correct.  It was quite unusual.  You would

8 have expected you would have gotten some.

9  Q. Ma'am, please limit your answers to my

10 questions so we can keep this going.  You've got one,

11 two, three, four, five, six more.  Y'all seem to have

12 six every hundred days on VIOXX, don't you?

13 A. According to those calculations, yes.

14  Q. And the study is almost over at this point,

15 isn't it?

16 A. That's correct.

17  Q. You do pick up one more heart attack there on

18 VIOXX.  Actually two.  There's one at 305, isn't there?

19 A. That's correct.

20  Q. Now, you tell this jury that based upon your

21 earlier studies you didn't think there was any risk of

22 heart attacks, right?

23 A. That is correct, based on the Phase IIb/III safety

24 database we did not believe there was an increased

25 risk.

1  Q. Yet Eric Topol wrote about study 090, which

2 was a random placebo-controlled parallel group

3 double-blind trial of VIOXX versus nabumetone placebo,

4 just 12 and-a-half milligrams, right?

5 A. That's correct.  This was not part of our Phase

6 IIb/III OA database.

7  Q. Yeah, this is one that shows a lot more heart

8 attacks, doesn't it?

9 A. I don't think you can show -- say it shows a lot

10 more heart attacks.  Numerically in this study there

11 were more heart attacks on VIOXX than placebo.

12  Q. Six to one?

13 A. No.  That's not heart attacks.

14  Q. Well, those are serious cardiovascular events.

15 A. But they include things that aren't heart attacks

16 or thrombotic events.

17  Q. Well, I understand that, and we're going to

18 cover that, too, because I think that's an important

19 point, but just for our purposes, ma'am, serious

20 cardiovascular events y'all group together in that

21 study, didn't you?

22 A. No, that's the body system, that's the way the

23 dictionary is made up.

24  Q. It is like 010, 010 was one of your risk

25 trials, wasn't it?

1 A. That was one of the early studies that studied

2 VIOXX 25, 125, which is about five times the

3 recommended dose, and there were --

4  Q. Ma'am, I ask if that was one of your early

5 studies?

6 A. Yes.

7  Q. Yes, it was, wasn't it.

8  And in that one you compared VIOXX 25 and 125

9 against placebo, didn't you?

10 A. That's correct.

11  Q. And in that study you had three times as many

12 cardiovascular events on 25 milligrams of VIOXX as you

13 did placebo, true?

14 A. Well, --

15  Q. Is that true?

16 A. I would not use the word three times when you're

17 dealing with three and one.  It just sounds different

18 than it is.  There were three on VIOXX, one on placebo,

19 two of those were hypertensive adverse experiences.

20  Q. What is one times three?

21 A. I understand that you are factually correct, Mr.

22 Lanier.

23  Q. Then that's all I need you to do is say, "yes,

24 that's correct."

25 A. That's correct then, Mr. Lanier.

```
 1        Q.   I mean, this is -- I'm just asking you.
 2        You had three times as many heart attacks --
 3   not heart attacks, cardiovascular problems on
 4   25 milligrams of VIOXX as you did on placebo, true?
 5   A.   There were no heart attacks in that study.
 6        Q.   Is that true?
 7   A.   You mentioned heart attacks.  There were no heart
 8   attacks.
 9        Q.   And I'm sorry cardiovascular --
10        MR. BROCK:  I object to him cutting her off.
11   If he asked her a question then she starts to answer,
12   and he jumps right in before she can finish.
13        THE COURT:  He changed it to cardiovascular,
14   and she clarified what she was -- the exchange was
15   okay.  I'm sure the jury can follow it.  It was
16   appropriate.
17        MR. LANIER:  Thank you, Judge.
18   BY MR. LANIER:
19        Q.   By the way, the jury heard about the
20   difference between Phase II and Phase III studies, and
21   you were telling us oh, based on our Phase III data
22   earlier, do you remember that?
23   A.   That's correct.
24        Q.   Ma'am, the truth is regardless of what may
25   have been written by other witnesses Phase II is where
```

```
 1   you're supposed to evaluate whether a drug has
 2   biological activity, and you're supposed to estimate
 3   the rate of adverse events, isn't that true?
 4   A.   You estimate the rate of adverse events in all
 5   phases of your clinical studies.
 6        Q.   But it is supposed to be done in Phase II
 7   before you go to Phase III trials, true?
 8   A.   And it was.
 9        Q.   Well, actually --
10   A.   In fact, you showed them the data estimating the
11   adverse experience rates that were seen in that study.
12        Q.   Ma'am, y'all had not finished estimating the
13   rate of adverse events when you started Phase III
14   because you were doing them simultaneously at that
15   point, did you not know that?
16   A.   We did start Phase III when Phase II was still
17   ongoing.  That is perfectly acceptable.
18        Q.   Actually, that's not the way you're supposed
19   to do it generally.  Didn't you know that's not the
20   general rule?
21   A.   I think if you would look at updated textbooks you
22   would not see that's the case.
23        Q.   Which textbook do you think I ought to look
24   at?
25   A.   I can't tell you exactly, but there are a lot of
```

```
 1   discussions now about being able to take Phase II
 2   trials and potentially use them as Phase III trials.
 3        Q.   This one is 1996, isn't that kind of the time
 4   period y'all should have been under?
 5   A.   As I said, the risk was to us not to patients.  The
 6   final safety data you get is from Phase III.  Phase II
 7   studies are often too small to have a big enough
 8   database to know --
 9        MR. LANIER:  I asked her if 1996 is the year
10   we should be concerned about on the textbook.
11        THE COURT:  That was the question.
12   BY MR. LANIER:
13        Q.   1996 is the year, isn't it, ma'am?
14   A.   That was the year we started our -- I can't see
15   from here.  It looks like we started our Phase III
16   trials.
17        Q.   Now, I want to clarify another subject you
18   talked about this morning.  You said at no point --
19   that Merck was, in essence, being Mr. Cautious.  The
20   way you said it is, you know, there may be a question,
21   let's be proactive and let's do an SOP, a protocol to
22   see if there are going to be any CV events because we
23   just want to be extra careful even though we're not
24   worried, even though it is 1998 and we have decided
25   that NSAIDs aren't cardioprotective, just in case let's
```

```
 1   do an SOP.  Remember that?
 2   A.   Well, I think you slightly have mischaracterized
 3   what I said, but I did say we were trying to be
 4   proactive.  We had discussions with our scientific
 5   board of advisors.  They recommended we started this,
 6   and we agreed with them and we did.
 7        Q.   That's the point I wanted to get at.  Y'all
 8   didn't do it on your own.  You got told to do it by
 9   your board of scientific advisors in 1998, didn't you?
10   A.   I don't think you can characterize it like that.
11   Merck as a part of --
12        Q.   Then just say no.
13   A.   I think you mischaracterized it, Mr. Lanier.
14        Q.   If you think I mischaracterized it then I
15   would like to look at some specific portions of this
16   with you.
17        By the way, while in 1998 you have just told
18   the jury the reason we didn't put a warning in the --
19   can y'all see this okay with the board or have I ruined
20   it?  Okay.  I'm sorry.
21        In 1998 you told the jury, oh, we didn't put a
22   warning in the informed consent where people say, okay,
23   this is a risk I'm running.  We didn't do that because
24   we weren't worried about heart problems in 1998,
25   remember you said that?
```

1    A.    That's correct, we were not.

2         Q.    It was in the middle of 1998 when the

3    scientific advisors had a meeting with y'all, wasn't

4    it?

5    A.    I was not at that meeting, but they did have a

6    meeting.

7         Q.    Did you know at that meeting that there were

8    some concerns about what might happen whether or not

9    there might be a development of coronary plaques,

10   whether or not those plaques might destabilize making

11   them rupture prone and whether or not there might be a

12   blood clot occluding the vessel at the cite of the

13   plaque rupture?

14   A.    No, you just mischaracterized that.  The first two,

15   *if you read down they were* actually suggesting that

16   VIOXX might prevent coronary plaques and that VIOXX

17   might prevent plaques from being rupture prone, and

18   then the third one was the FitzGerald hypothesis, so,

19   actually, there was several hypotheses they were

20   raising.

21        Q.    So when you just told the jury I didn't know

22   that when I testified here, it looks to me like maybe

23   you do know this memo after all?

24   A.    I'm sorry, I didn't hear what you just said.

25        Q.    When I was about to challenge you on this memo

                                                2945

---

1    you said "I wasn't at that meeting, Senator," but you

2    know this memo, don't you?

3    A.    I was not at that meeting.

4         Q.    But you do know that memo.

5    A.    I have seen it.  I have been asking about it at

6    that time.

7         Q.    So you know in this memo that in 1998 even

8    though you have just sworn to the jury that in 1998

9    y'all didn't think it was possible, you didn't think it

10   was a risk that there could be heart problems, you're

11   to go going to admit in 1998 your scientific advisors

12   were telling you that that might happen, right?

13   A.    They were telling us that there was a potential

14   benefit.  In fact, two potential benefits --

15        Q.    Ma'am, that wasn't my question.

16   A.    -- and one potential risk.

17        MR. BROCK:    That was the question.

18        MR. LANIER:    No.  Judge.

19        THE COURT:    Rephrase the question that that

20   might happen.

21   BY MR. LANIER:

22        Q.    You were told specifically, and I'm not going

23   to take time to fuss over the first two points with

24   you.  We'll fuss about those when we get to the APPROVe

25   article, but you were specifically told, you being

                                                2946

---

1    Merck, "the thrombotic occlusion of the vessel at the

2    site of plaque rupture with ensuing consequences of

3    ischemia," in other words heart attacks, "are of

4    concern of the advisors," right?

5    A.    I don't know if I could use the word "concern."

6    This is the FitzGerald hypothesis, and they were saying

7    this is one of the potentials, as well as the other

8    two, which would have been benefits.

9         Q.    Well, then I'm going back to this.  How can

10   you sit here and tell the jury, gee, the reason I

11   didn't warn anybody in the informed consent that we're

12   expecting more heart attacks in one group than the

13   other, I didn't warn anybody because I didn't think we

14   were really worried about it or even thought about it?

15   A.    Because at the same time I would have had to tell

16   them that there were two potential benefits, and there

17   wasn't enough science for any of these to do it, that

18   would not have been allowed by IRBs in an informed

19   consent.

20        Q.    Well, ma'am, if you're going to put me on a

21   drug I would like to know if you've got scientific

22   advisors so concerned about it that they're saying you

23   better put in a protocol, you better test for this, and

24   you better start looking for it, wouldn't you?

25        MR. BROCK:    Objection.

                                                2947

---

1         THE WITNESS:    I think that mischaracterizes

2    what they said.

3         THE COURT:    The objection is overruled.

4    BY MR. LANIER:

5         Q.    All right, ma'am.  Y'all didn't want to look

6    at those VIGOR test results by themselves.  You wanted

7    to blend them in with all the other tests you had done,

8    right?

9    A.    Again, I think you mischaracterized it.  As I said

10   earlier, we didn't think we would have enough events

11   from *VIGOR alone*, and, therefore, the plan was to pool

12   it so we would have enough events.

13        Q.    Well, you had plenty of events on VIGOR,

14   ma'am, didn't you?

15   A.    I can't -- we ended up having about 60 confirmed

16   thrombotic events.

17        Q.    That's plenty.  Let me put it to you this way,

18   you're telling me the whole reason y'all weren't

19   warning people is because of your pooled events from

20   other studies, and you didn't have that many heart

21   attacks in those studies you pooled, did you?

22   A.    You're correct.

23        Q.    All right.  So it is not enough when it serves

24   your purposes, but when it doesn't serve your purposes

25   then all of a sudden, whoa, that's plenty?

                                                2948

1   A.   I think that's a mischaracterization, Mr. Lanier.

2        Q.   Okay.  Let's go into some detail on VIGOR.

3        Your first reaction to VIGOR was that your

4   drug was killing people, right?

5   A.   Again, I think that's a mischaracterization.

6        Q.   Well, look at what it says.  How many -- those

7   people, some of those people with the heart attacks

8   died, didn't they?

9   A.   Yes, they did, but the cardiovascular mortality was

10  similar between VIOXX and Naproxen in the study.  The

11  difference was --

12       Q.   I just asked you simply did some of those

13  people with heart attacks die?

14  A.   Yes.

15       Q.   And that's on both groups; some died with

16  VIOXX, some died with Naproxen?

17  A.   Correct.  Similar numbers.

18       Q.   And this is the e-mail Ed Scolnick, the head

19  president of Merck Research Labs, put out that the jury

20  has heard enough times to mumble it in their sleep so

21  I'm not going to spend time on it, but "CV events are

22  clearly there.  It is real.  Let's find out about what

23  Oates told us."

24       You know who Oates is?

25  A.   John Oates.

2949

1        Q.   He's a big doctor who had written y'all a

2   letter in 1998 saying you better be careful, right?

3   A.   I'm not familiar with the letter.  If you showed it

4   to me it might remind me of it.

5        Q.   "It is a shame."  He really says that, doesn't

6   he?  "It is a shame."

7   A.   That is what it says.

8        Q.   "But it is a low incidence."  Not that many

9   people had the heart attacks.  "And it is

10  mechanism-based," that means it is our pill causing it,

11  doesn't it?

12  A.   That's what he was assuming.

13       Q.   "As we worried it was."  See that?  Worried?

14  A.   Correct.

15       Q.   Now, is your testimony to the jury that he

16  wasn't worried about it in '98 or '99, he is flipping

17  back to his worries in '97?

18  A.   I don't think I could speak for Dr. Scolnick.

19       Q.   Ma'am, if y'all were worried about it in '98

20  and '99 it sure should have -- should have been in the

21  informed consented that you get these people to sign

22  before they test their drug out for you?

23  A.   You didn't let me finish.  I was not aware when I

24  was putting the VIGOR study together that anybody was

25  worried about cardiovascular safety of VIOXX at Merck.

2950

1        Q.   Well, ma'am, you're the one who said it is

2   no-win, we're going to have more events, and I can't

3   wait to be the one to have to present that to senior

4   management, that was your e-mail, wasn't it?

5   A.   I did in 1997, but I wasn't saying that VIOXX would

6   increase the rate.  I was saying that the NSAIDs would

7   decrease the rate.

8        Q.   And then if I understand what Mr. Brock put up

9   here earlier he put up exhibit -- what we marked or he

10  marked as Defendant's Exhibit 186.  It is a year later

11  that Dr. Scolnick finally says "we worried to death

12  about the CV events last spring."  Merck is an issue.

13  But he was also sick that they might be doing harm to

14  patients?

15  A.   Correct.

16       Q.   Well, if y'all are Mr. Safety, instead of

17  pulling the drug immediately once there's any concern

18  you should have pulled the drug after the VIGOR study

19  or you should have at least started warning people,

20  right?

21  A.   I disagree with that.  The data that we had at the

22  time was not consistent with VIOXX having an increased

23  risk.

24       Q.   Ma'am the only data you're comparing it to is

25  data you have told us doesn't have enough numbers.

2951

1   A.   No.  We had data from several different sources.

2   We had the OA database.

3        Q.   Which didn't have enough numbers, right?

4   A.   We had the Alzheimer's database.

5        Q.   Answer my question.  OA didn't have enough

6   numbers?

7   A.   I don't know what that means, "not enough."

8        Q.   Yes, you do.  Your clinical trials, you know

9   what power is to a study.  It did not have enough power

10  for heart attack events, and you know that to be true,

11  don't you?

12  A.   Power -- excuse me, Mr. Lanier, power is something

13  you determine before you see the results.  We did it --

14  no, you have to let me finish.

15       Q.   And there weren't enough numbers for it?

16  A.   But that's before you see the results.  We did an

17  analysis when we got the VIGOR results and said if

18  VIGOR is true, and if VIOXX was really increasing the

19  risk of thrombotic events by twofold what's the chance

20  that we would have seen the results we saw in the Phase

21  IIb study and the results that we saw in the

22  Alzheimer's study.  And the answer was highly, highly

23  unlikely.

24       Q.   Ma'am, have you seen Dr. Krumholz's chart,

25  Exhibit 2003, where he goes through your studies?

2952

1   A.   You'll have to show that to me.

2        THE COURT:   It is not in evidence, so don't

3   show it to the jury, but he can show it to her.

4   BY MR. LANIER:

5        Q.   Where he goes through study by study and shows

6   how many heart attacks were on VIOXX versus how many

7   were on the placebo and comparators?

8   A.   I do see that.

9        Q.   According to him you had a heart attack on

10  VIOXX in 029, and you didn't have any on placebo; is

11  that correct?

12  A.   I don't know.  I see other mistakes in this, so I

13  can't, sitting here right now, verify that.

14       Q.   Which mistakes do you see?

15  A.   Well, he doesn't have anything in the bone study.

16       Q.   Well, that's not a mistake; he hadn't filled

17  it in, he didn't have the data?

18  A.   In 078 there were not 18 on VIOXX and 15 on

19  placebo.

20       Q.   Are you sure?

21  A.   Um, that is correct.

22       Q.   How many were there?

23  A.   I think it was 13 and 10.  We would have to look,

24  but it was not 18 and 15.

25       Q.   Make a note, please.  And make sure we're

2953

1   clear on the record because you'll be gone, but I'll

2   get some other witness on this, you're talking 078?

3   A.   That's correct.

4        Q.   Did you see any other errors when you said "I

5   see errors"?

6   A.   I would have to go study by study.

7        Q.   I'm not asking you to do that.  When you said

8   you saw errors I wanted to know what you had seen that

9   triggered that?

10  A.   Well, that's what I'm seeing right here.

11       Q.   Well, let's look at what he's got here.  You

12  had a heart attack on 029.  He didn't have any on

13  placebo?

14  A.   Yes.  Although you have to point out that we had

15  more patients on VIOXX than on placebo.

16       Q.   I'm looking at the 25-milligram dose.  You had

17  one heart attack on 25 milligrams and --

18  A.   But none on 50.

19       Q.   What?

20  A.   But none on 50.

21       Q.   Ma'am, I understand that.  I'm looking at the

22  25-milligram dose.  There's 137 people on versus 145,

23  that's the dose Tom Cona was on?

24  A.   Okay.

25       Q.   He had a heart attack on it?

2954

1   A.   That's correct.

2        Q.   Didn't have one on placebo?

3   A.   That's correct.

4        Q.   Look at the other study.  017 he had a heart

5   attack on VIOXX.  Didn't have one on placebo, did you?

6   A.   Okay.  But you can go to 045.  You had two on

7   placebo, none on VIOXX, and we had twice as many

8   patients on VIOXX so you can't cherry-pick.

9        Q.   I'll go to that too, but please answer my

10  question.

11  A.   Which question?

12       Q.   I just pointed out a study.  I pointed out

13  another one.  017 you had a heart attack on VIOXX not

14  placebo?

15  A.   That's correct.

16       Q.   Now, the only place you're going to find

17  anything more on placebo are in two studies out of all,

18  what you figure, 30, 40 studies, 044 the one you point

19  to, and you can come down here and find another one

20  091, see?

21  A.   The problem is the time on therapy and placebo is

22  also less than the time on therapy and VIOXX.  And you

23  have to take that into account.  And when we looked at

24  the data, as I said, if you look at our

25  placebo-controlled data the rate of cardiovascular

2955

1   events was similar on VIOXX and placebo prior to

2   APPROVe.

3        Q.   That's the Konstam analysis, and we're going

4   to get to that in just a minute.  You went out

5   immediately after the --

6   A.   I think, by the way, that in the bone study there

7   were events on the comparator and not on VIOXX, the one

8   that he hadn't filled out.  I'm sorry, I just

9   remembered that.

10       Q.   We'll try and get that data from y'all and

11  look at it.

12       MR. BROCK:   I got it.

13       MR. LANIER:   All right.  Yeah.

14       The VIGOR study comes out.  Your Honor, if

15  we're taking an afternoon break now is a good time.  If

16  we're not taking one I'm going to suck it up and go.

17  But I'm about to move subjects is what I'm saying.

18       MR. BROCK:   Can I approach on this?

19       MR. LANIER:   What are we doing about that?

20  Can we keep going?

21       (Whereupon, the following occurred at

22  side-bar:)

23       MR. BROCK:   Can you move over just a little

24  bit?

25       MR. LANIER:   Sorry.

2956

1    THE COURT:  Is the witness available?

2    MR. BROCK:  She needs to leave about 4:15 to

3    get home in time to be at home when she needs to be

4    there.

5    THE COURT:  So we either break now or we break

6    at 4:15.

7    MR. LANIER:  I would ask you to ask the jury

8    if they're comfortable going.  I have been pounding for

9    a while.  If they're comfortable continuing for 15,

10   20 minutes if it shortens the trial let's keep going.

11   (End of side-bar.)

12   THE COURT:  Ladies and gentlemen, we can

13   either break now or we can break at 4:15.  Are any of

14   you uncomfortable and need a break now?  We're not

15   going to stay past 4:15.  When we break you're leaving.

16   Is that okay?  Is there anyone who needs a break now?

17   If you do just let us know.

18   Okay.  Let's proceed.

19   BY MR. LANIER:

20   Q.   So after the VIGOR study comes out if I'm

21   understanding your testimony today y'all made a shift

22   back and decided that y'all were right in '97 but wrong

23   in '98, and it turns out Naproxen is cardioprotective

24   after all?

25   A.   Again, I don't think I would characterize it like

2957

1    that.

2    Q.   So you went to work to try and find any study

3    that could say that maybe they're cardiovascular, maybe

4    Naproxen is cardioprotective, do you remember that

5    assignment?

6    A.   Well, actually, I found the study in 1997, but I

7    did go back to relook for them.

8    Q.   That's my point, ma'am.  If you just sort of

9    focus in on my question.  You got an assignment to go

10   look for any study you can find.  Any study you could

11   find that indicated that maybe an NSAID is

12   cardioprotective, do you remember that assignment?

13   A.   No, I don't recall getting that as an assignment.

14   I think it is something that I proactively started to

15   do.

16   Q.   Well, you did it, do you remember what day of

17   the week this was, the 13th of March, the year 2000?

18   A.   It certainly may have been over a weekend.

19   Q.   Over a weekend at 8:00 -- that's at 1:20 in

20   the morning, isn't it?

21   A.   That's correct.  I have young kids, and so I work

22   after they go to bed.

23   Q.   I've got them all ages, and I can't work at

24   any time.  By the time they're teenagers they're up

25   then they're asleep, and it doesn't work.

2958

1    You sent out an e-mail at 1:20 in the morning,

2    and it says "additional article request," that's why I

3    thought you might have had it as a task given to you.

4    It looked like an assignment.  Request -- see that word

5    "request"?

6    A.   That's me requesting it from our library.

7    Q.   Oh, and then what it says is "below is

8    attached the abstract for the only study I could find

9    which assessed the potential cardioprotective effects

10   of an NSAID."  This is that flurbiprofen French trial

11   true?

12   A.   That's correct.

13   Q.   So we're not clear on that trial this wasn't a

14   trial to give this to healthy people and see how fewer

15   heart attacks they have.  That trial was one of you got

16   a bunch of people that were having heart attacks, let's

17   use flurbiprofen in the heart attacks to see if we can

18   keep a recurrence from happening, right?

19   A.   No, you slightly mischaracterized that.

20   Q.   Well, then let's look at it for a second.

21   A.   Can you give me a copy, again?

22   Q.   I think he gave you one in the notebook.

23   A.   Is it in the notebook?

24   MR. BROCK:  We can probably find it.

25   MR. LANIER:  I'll tell you what, instead of

2959

1    taking time for that...

2    BY MR. LANIER:

3    Q.   Ma'am, I'll put it up here so we can see it

4    together with the jury.  This is the flurbiprofen

5    article, isn't it?

6    A.   That's correct.

7    Q.   And this is after successful thrombolysis or

8    angioplasty in acute heart attack, right?

9    A.   Correct.  So they weren't in the middle of having a

10   heart attack.  They had aborted the heart attack by

11   reopening their vessel.

12   Q.   Ma'am, that was my statement to you.  In other

13   words, this was not a study of does flurbiprofen reduce

14   heart attacks in healthy people.  This is a study that

15   says you got people who have already had heart attacks?

16   A.   That's correct.

17   Q.   And does flurbiprofen keep it from happening

18   to them again?

19   A.   That's correct.

20   Q.   And that's the only study you could find?

21   A.   Well, as I said, there were other studies.  That's

22   the only study I could find that might.  Indobufen has

23   studies, as well.

24   Q.   And what you did, ma'am -- and that study was

25   what, 1993, write up, anyway.  Is 37 in evidence, Dara?

2960

1     MS. HEGAR:  No.

2     MR. LANIER:  I move into evidence Plaintiff's

3  Exhibit P-37, the e-mail chain from Merck.

4     THE COURT:  Any objection?

5     MR. BROCK:  I'm looking at it now.  No, Your

6  Honor.

7     THE COURT:  37 will be marked into evidence.

8     (Whereupon, Exhibit P-37 marked into

9  evidence.)

10 BY MR. LANIER:

11    Q.  It says it is another e-mail to you from Ed

12 Scolnick with a high priority?

13    A.  That's correct.

14    Q.  It is a month later, isn't it?

15    A.  That is correct.

16    Q.  It says, "I'll tell you, my worry quotient is

17 high.  I'm actually in minor agony"?

18    A.  That's correct.

19    Q.  So now you had a whole month, and, by the way,

20 how many millions of people worldwide are taking your

21 drug that month while y'all are worried sick about it?

22    A.  I can't tell you how many patients were taking

23 the drug then.

24    Q.  Minor agony for a month.  Were you in minor

25 agony and were you worried, was your worry quotient

1  high that month while those millions of people were

2  taking your drug?

3     A.  No.  After we had seen the totality of data,

4  including the Alzheimer's data, I actually was quite

5  comforted and felt very comfortable with the data.

6     Q.  That's different between you and the head

7  scientist Edward Scolnick, would you agree with me?

8     A.  Ed takes his responsibilities as the head scientist

9  very, very seriously, and he often worried.

10    Q.  That wasn't my question.  My question was

11 would you agree with me, yes or no?

12    A.  I would agree with you that's what it says here.

13    Q.  He says "I'll tell you my worry quotient is

14 high."  Not was high, it is high, right?  "I actually

15 am in minor agony.  What I really want to do is a

16 10,000 versus 10,000 patient study in mild to moderate

17 OA Tylenol versus VIOXX with an as-needed low-dose

18 aspirin for those judged to need it.  Safety first

19 primary endpoint efficacy secondary to co-primary" and

20 then he put in all caps -- are you with me so far?

21    A.  I am.

22    Q.  "WE WILL NOT KNOW FOR SURE WHAT IS GOING ON

23 UNTIL WE DO THIS STUDY."

24    Did I read that correctly?

25    A.  You did.

1     Q.  Y'all never did that study, true or false?

2     A.  That is true, we did not do the study because we

3  didn't think we could do the study.

4     Q.  Because you were spending hundreds of millions

5  of dollars advertising for Peggy Flemming, and you

6  didn't have the money?

7     A.  No.  That's completely inaccurate.

8     Q.  Ma'am, it was a budget concern that Ed

9  Scolnick --

10    MR. BROCK:  She was answering that question.

11 He threw out an argumentative question.  She was

12 starting to answer it, and he cut her off again.

13    THE COURT:  She answered, no, that's

14 completely inaccurate.

15 BY MR. LANIER:

16    Q.  Ma'am, have you even -- the budget issues that

17 Ed Scolnick had if there's only money to do a study the

18 one essential study that we need to do is a CV study,

19 did you see that budget e-mail?

20    A.  And we did that CV study.  This was not the study.

21 We didn't think you could keep patients in the study

22 because those patients who need an NSAID wouldn't --

23    MR. LANIER:  Objection.  I asked if she had

24 seen the e-mail, and she is going on with a speech.

25 BY MR. LANIER:

1     Q.  Did you see the e-mail?

2     THE COURT:  Did you see the budget e-mail is

3  the question.

4     THE WITNESS:  I have in the past seen that

5  budget e-mail.  It was not in reference to this study.

6  BY MR. LANIER:

7     Q.  Ma'am -- actually, ma'am, it has been marked

8  as Plaintiff's Exhibit 16, and now we fast forward it

9  we're now in September of '01.  September of '01.  "MRL

10 has just completed its annual planning meeting.  We

11 reviewed strategy for each franchise and new projects.

12 I want to give you a list of the only studies that I

13 regard as ESSENTIAL."  Essential means just that.

14 Essential.  Not preferred, not useful, not helpful,

15 essential.  "We will, it is clear, only be able to

16 carry out the ESSENTIAL studies for the franchises and

17 be able to carry out the new Phase IIb and III

18 programs."  Y'all are still doing Phase II programs?

19    A.  This is probably talking about with other drugs.

20    Q.  Look at this.  "For VIOXX, only the CV

21 outcomes study" all capitals, "ONLY ESSENTIAL STUDY."

22    Do you see that?

23    A.  That's correct.

24    Q.  Now, the truth of the matter is y'all hit a

25 point where you talked about doing a study called

```
1    VALOR.  Do you remember the VALOR study?
2    A.  I do remember the VALOR study.
3         Q.  And I believe the testimony has already been
4    offered by Dr. Scolnick in his deposition that VALOR
5    was the CV outcomes study.
6         MR. BROCK:  I'm going to object to him saying
7    what Dr. Scolnick in this case testified.
8         MR. LANIER:  I'll be glad to put it on
9    overhead.
10        MR. BROCK:  No.  It is not in evidence.  It is
11   not appropriate to put it up there.
12        MR. LANIER:  It is an admission by a party
13   opponent.  Ed Scolnick said it under oath.
14        MR. BROCK:  It is a deposition.
15        THE COURT:  Is it a deposition of Dr.
16   Scolnick?
17        MR. LANIER:  Yes.
18        THE COURT:  Do you intend to offer it into
19   evidence?
20        MR. LANIER:  I would love to at this point in
21   time, page 107 line 8 through line 10.
22        MR. BROCK:  He has rested his case, Your
23   Honor, and he did not offer the deposition of Dr.
24   Scolnick, although he talked about doing it.
25        MR. LANIER:  I'll reask it a different way in
```

```
1    the interest of time.
2    BY MR. LANIER:
3         Q.  Ma'am, would you fuss with Ed Scolnick in this
4    case if he said that Merck has already testified to --
5    if he said that the VALOR study was the CV outcomes
6    study, would you fuss with him over that?
7    A.   I'm not sure what he is referring to because we did
8    do what we considered a CV outcomes study, which I
9    talked about before.  We did not do the VALOR study,
10   and I can go through with you the reasons why.
11        Q.  Ma'am, you did not do one where the primary
12   endpoint, the one primary endpoint was CV safety, true
13   or false?
14   A.   False.  Protocol 203 had a primary CV safety
15   endpoint.
16        MR. LANIER:  Objection, Your Honor.  This is
17   speeching.
18        MR. BROCK:  I object to that.
19        THE COURT:  She said, false, 203 had a primary
20   CV safety endpoint.
21        MR. LANIER:  352 into evidence, please, Your
22   Honor.
23        THE WITNESS:  Can I get a copy of that?
24        MR. BROCK:  No objection.
25        (Whereupon, Exhibit P-352 marked into
```

```
1    evidence.)
2    BY MR. LANIER:
3         Q.  Ma'am, are you familiar with plaintiff's
4    Exhibit 352?
5    A.   No, I am not.
6         Q.  This is a letter from Alan Nies.
7         MR. BROCK:  Your Honor, she is not familiar
8    with it.  She shouldn't be questioned about it, so I
9    object to it.
10        MR. LANIER:  Well, it is in evidence now,
11   Judge.  I can question her about it.
12        MR. BROCK:  Just because it is in evidence
13   doesn't mean you can question the witness about it.
14        MR. LANIER:  Yes, it does.
15        MR. BROCK:  You objected to me doing that
16   already.
17        THE COURT:  All right.  It is in evidence.
18   Let's hear what the question is.
19   BY MR. LANIER:
20        Q.  Ma'am, do you know who Alan Nies is?
21   A.   Yes, I do.
22        Q.  He was head of the VIOXX development team,
23   wasn't he?
24   A.   At one point he was, yes, that's correct.
25        Q.  And do you see the date on this letter is
```

```
1    February 13th, 2002?
2    A.   Yes, I do.
3         Q.  And do you see that this letter is about doing
4    the VALOR study, "which was a randomized double-blind
5    parallel placebo-controlled trial to evaluate the
6    cardiovascular safety and efficacy of VIOXX on
7    cardiovascular events in patients with recent acute
8    coronary syndromes."
9         VALOR?
10        Do you see that?
11   A.   Yes, I do.
12        Q.  And it was going to cost $213,600.  Do you see
13   that?
14   A.   No, I don't think the study would have cost
15   $213,600.
16        Q.  It actually would have cost more.  That was
17   for the necessary preparations, true?
18   A.   I would have to read the whole budget to see what
19   exactly it was for.
20        Q.  "Merck hereby authorized Brigham to begin the
21   necessary preparations for the study at a cost not to
22   exceed $213,600."
23        Do you see that?
24   A.   Yes, I do.
25        MR. BROCK:  I would like to approach for one
```

1    second.

2         (Whereupon, the following occurred at

3    side-bar:)

4         MR. BROCK:  This is the only point I want to

5    make is that when I try to examine my witness about

6    documents she had not seen he stood up and objected and

7    Your Honor sustained the objection.  Now he stands up

8    with a document she has not seen and examination

9    continues, and I just don't think there's a fairness in

10   that.

11        THE COURT:  It is not an area that she doesn't

12   know about.  She said she knows about the VALOR study.

13        MR. BROCK:  But she knew about the other

14   documents I was showing her that she had not seen.

15   There were Merck documents --

16        MR. LANIER:  There's a difference.

17        MR. BROCK:  Where is the fairness allowing the

18   examination on documents she has not seen when he does

19   it and I can't do it?

20        MR. LANIER:  It is the difference between

21   cross-examination and direct.

22        MR. BROCK:  No, it is not.

23        MR. LANIER:  You're trying to get a direct

24   examination witness to put in your case.

25        THE COURT:  I believe there's a distinction,

1    and I'm going to allow it.

2         (End of side-bar.)

3    BY MR. LANIER:

4         Q.   And this contract was actually even signed by

5    Alan Nies, senior vice-president for Merck, as well as

6    by the Brigham and Women's Hospital.

7              Do you see that?

8    A.   I do.

9         Q.   Did you know that that study was never done?

10   A.   That is correct.

11        Q.   Did you know that that study was cancelled?

12   Right after y'all finished the label negotiations with

13   FDA you announced you weren't going to do the study

14   after all, did you know that?

15   A.   I can't tell you the timing.  It had nothing,

16   nothing whatsoever to do with the label negotiations.

17   That I can tell you for sure.

18        MR. LANIER:  I got 10 minutes?

19        THE COURT:  You have 10 minutes.  Do you want

20   to break now?

21        MR. LANIER:  No.

22        THE COURT:  All right.  Take your 10 minutes.

23   BY MR. LANIER:

24        Q.   Let's start with the New England Journal of

25   Medicine before the weekend.  We'll go out on something

1    fun, okay?

2              Would you agree with me that y'all kind of

3    fudged that article any way you could to your

4    advantage?

5    A.   No, I do not agree with that.

6         Q.   For example, in that article, and this is an

7    article that -- this is it, isn't it, this is the

8    article New England Journal of Medicine, right?

9    A.   This is the VIGOR article.  We had other ones

10   subsequent to this, but this is the first one.

11        Q.   And this is it.  This is the one y'all wanted

12   an expedited review, you didn't get it, but you wanted

13   it?

14   A.   That's correct.

15        Q.   Did y'all want an expedited review because you

16   didn't want anybody to look too close in detail at some

17   of these things?

18   A.   No, that's completely ridiculous.  They do the same

19   exact type of review with an expedited review as they

20   do with a regular review.

21        Q.   The reason I'm asking that is because I'm

22   looking here at Loren Laine, he is one of the fellows

23   on this, isn't he?

24   A.   Yes, he is.

25        Q.   He is a stomach doctor out at USC, right?

1    A.   That's correct.

2         Q.   Y'all put this article out; you're right next

3    to him, aren't you?

4    A.   Yes, I am.

5         Q.   Y'all put this article out saying "it has been

6    estimated that more than 100,000 patients are

7    hospitalized and 16,500 die each year in the U.S. as a

8    result of NSAID stomach problems."

9              Do you remember saying that?

10   A.   I do.

11        Q.   And the truth is that's a bogus number, and

12   you knew it was a bogus number, didn't you?

13   A.   No, I don't agree with that.

14        MR. LANIER:  Your Honor, we offer into

15   evidence a video release.  No, we already have it in

16   evidence.  I want that clip of the video news release

17   of Loren Laine that went with this article.

18        MR. BROCK:  I'm going to object to playing it

19   again.  It has been played it it doesn't need to be

20   played again.

21        MR. LANIER:  I'm going to quit after this.

22        THE COURT:  I'm going to allow it to be used

23   with this witness so she can testify about it.

24        (Video clip played for jury.)

25   BY MR. LANIER:

1      Q.    That is him, isn't it?

2      A.    That is Dr. Laine

3            MR. BROCK:  This is not in evidence.

4            MR. LANIER:  Wrong clip.  Time out.  Time out.

5      Stop the audio, please.  I want to play the video news

6      release.  I want to play the one we played for them

7      that has the Star Wars thing.  Cue it up, please.

8            All right.  Your Honor, we don't have it cued

9      up.  That's okay, Phillip.  Stop it and prepare the

10     other one.

11     BY MR. LANIER:

12     Q.    Ma'am, did you ever see that video, this video

13     release news release where y'all use those same

14     numbers, and you actually had Loren Laine, this fellow

15     saying that there's 16,500 that die each year as a

16     result of stomach problems?

17     A.    I think you may have showed it in Texas.  Other

18     than that or whatever you showed there I have not seen

19     it.

20     Q.    Well, we have shown it here to this jury, as

21     well.  You think maybe you saw it when we tried the

22     case down there, right?

23     A.    I think the video release is possible.

24     Q.    Okay.  Ma'am, what I would like to ask you is

25     did you know that your Merck people actually talked to

1      Loren Laine and took -- please stop any audio.

2            That your Merck people talked to Loren Laine

3      and took video of him practicing for what y'all put

4      together.  In other words, you know how like when they

5      shoot a movie they don't shoot it, they take a whole

6      bunch of film and then they go into the editing room

7      and somebody wins a Grammy because they can put

8      everything together to look good?

9      A.    The editor.

10     Q.    Y'all actually took a whole bunch of film of

11     him.  Have you seen the outtakes?

12     A.    No, I have not.

13     Q.    Did you know that he specifically told y'all

14     that these figures are bogus, and he can tell you tons

15     of reasons they're bogus and inflated, but y'all used

16     them anyway?

17           MR. BROCK:  I object.  That terminology is not

18     used.

19           MR. LANIER:  Yes, it is, Judge.  I have the

20     exact terminology where he says it is bogus.  Your

21     Honor, I offer into evidence the outtakes of Loren

22     Laine.  We have marked them previously as exhibits.

23     166, we believe.  And we have it ready to play.

24           MR. BROCK:  I would like to see it before it

25     is played.

1            THE COURT:  I don't remember it being played

2      the first time.

3            MR. LANIER:  We played --

4            MR. KRISTAL:  Your Honor, we played the video

5      news release that was entered into evidence.  These are

6      the outtakes.

7            THE COURT:  Okay.  I don't remember any bogus

8      words.

9            MR. LANIER:  Can I call them the outtakes, and

10     we'll come up with the exhibit number in a minute and

11     play it, please.

12           MR. BROCK:  I want to see it before he plays

13     it.  He already cued it up, and I don't know --

14           MR. LANIER:  I'm playing this outtake from

15     Exhibit 166 where people are there.  He is a Merck guy.

16           And with that I'll be done for the day, Judge.

17           (Whereupon, the following occurred at

18     side-bar:)

19           MR. BROCK:  Your Honor, this is clearly

20     hearsay.  It is out of court admissions.

21           THE COURT:  It is an admission.

22           MR. BROCK:  Loren Laine doesn't work for us.

23           MR. LANIER:  He is on contract with you at

24     this point in time.

25           MR. BROCK:  Whoa, whoa, whoa.  That doesn't --

1      the fact that he is under a contract doesn't make him

2      an agent.  It is not an admission.

3            THE COURT:  He is working for you at this

4      point in time.  Actually filming a news release for

5      you, isn't he?

6            MR. LANIER:  Yes, and they put it out.  It

7      doesn't make him an agent.

8            THE COURT:  When he is working for you, and he

9      is making a news release --

10           MR. BROCK:  I don't think he becomes our agent

11     because he is giving a talk, no.  An independent

12     physician.

13           THE COURT:  It is not a talk, is it a press

14     release that he was being used for.

15           MR. LANIER:  Yes, that's exactly right.

16           THE COURT:  I'm going to allow it.

17           (End of side-bar.)

18           MR. LANIER:  Ma'am I would like you to watch

19     one of the outtake clips, please.  Is there a way to

20     turn the -- can y'all see that okay?  That's okay.

21           (Video clip played for the jury.)

22     BY MR. LANIER:

23     Q.    Now, ma'am, those numbers that y'all put in

24     here, the guy who is the author with you, Loren Laine,

25     we'll go back to this, he can tell you five reasons,

1   and he was talking to the Merck people there getting
2   ready for that video press release why those numbers
3   are totally bogus?
4   A.   Well, he had never said that to me.  That's the
5   first time I have seen that.  This paper was written
6   before that.  I know he had made comments about them
7   being controversial, but that everyone accepted that
8   there was an increased risk, and these were really the
9   only numbers that were available.  If he hadn't agreed
10  with them we wouldn't have put them in the paper.
11       Q.   Ma'am, the truth is -- unless you wanted to
12  kind of -- I think the reason he put them in the paper
13  that way is he said the only way he would do it is if
14  you said it has been estimated because he says it is
15  true it has been estimated, it is just wrong, so he can
16  truthfully say it has been estimated.  It is just that
17  it is bogus.
18  A.   Well, Loren never said that to me, and he was
19  actually the person that drafted the first part of the
20  introduction, so it is possible he put those -- that
21  wording in.  I don't recall.  And he never told me he
22  had a problem with having it in the paper.
23       Q.   All right.  I will try to finish you, Your
24  Honor, in 30 minutes on Monday morning and, ma'am, what
25  I would like to urge you to do is I'm going to look

                                        2977

1   with you, please, in some more detail at the New
2   England Journal of Medicine when we start up, okay?
3   A.   Thank you.
4        MR. LANIER:  With that I'll rest right now for
5   this evening.
6        THE COURT:  All right.  The jury is excused
7   for the weekend.  Please don't discuss the case, and
8   we'll see you 9:00 Monday morning.
9        (The jury leaves the courtroom.)
10
11
12
13
14
15
16
17
18