**EXHIBIT "6"**

**EXHIBIT "6"**



*The* NEW ENGLAND JOURNAL *of* MEDICINE

---

ORIGINAL ARTICLE

---

# Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial

Robert S. Bresalier, M.D., Robert S. Sandler, M.D., Hui Quan, Ph.D.,
James A. Bolognese, M.Stat., Bettina Oxenius, M.D., Kevin Horgan, M.D.,
Christopher Lines, Ph.D., Robert Riddell, M.D., Dion Morton, M.D.,
Angel Lanas, M.D., Marvin A. Konstam, M.D., and John A. Baron, M.D.,
for the Adenomatous Polyp Prevention on Vioxx (APPROVe) Trial Investigators*

---

## ABSTRACT

**BACKGROUND**

Selective inhibition of cyclooxygenase-2 (COX-2) may be associated with an increased risk of thrombotic events, but only limited long-term data have been available for analysis. We report on the cardiovascular outcomes associated with the use of the selective COX-2 inhibitor rofecoxib in a long-term, multicenter, randomized, placebo-controlled, double-blind trial designed to determine the effect of three years of treatment with rofecoxib on the risk of recurrent neoplastic polyps of the large bowel in patients with a history of colorectal adenomas.

**METHODS**

A total of 2586 patients with a history of colorectal adenomas underwent randomization: 1287 were assigned to receive 25 mg of rofecoxib daily, and 1299 to receive placebo. All investigator-reported serious adverse events that represented potential thrombotic cardiovascular events were adjudicated in a blinded fashion by an external committee.

**RESULTS**

A total of 46 patients in the rofecoxib group had a confirmed thrombotic event during 3059 patient-years of follow-up (1.50 events per 100 patient-years), as compared with 26 patients in the placebo group during 3327 patient-years of follow-up (0.78 event per 100 patient-years); the corresponding relative risk was 1.92 (95 percent confidence interval, 1.19 to 3.11; $P=0.008$). The increased relative risk became apparent after 18 months of treatment; during the first 18 months, the event rates were similar in the two groups. The results primarily reflect a greater number of myocardial infarctions and ischemic cerebrovascular events in the rofecoxib group. There was earlier separation (at approximately five months) between groups in the incidence of nonadjudicated investigator-reported congestive heart failure, pulmonary edema, or cardiac failure (hazard ratio for the comparison of the rofecoxib group with the placebo group, 4.61; 95 percent confidence interval, 1.50 to 18.83). Overall and cardiovascular mortality was similar in the two groups.

**CONCLUSIONS**

Among patients with a history of colorectal adenomas, the use of rofecoxib was associated with an increased cardiovascular risk.

From the Department of Gastrointestinal Medicine and Nutrition, University of Texas M.D. Anderson Cancer Center, Houston (R.S.B.); the Department of Medicine, University of North Carolina at Chapel Hill, Chapel Hill (R.S.S.); Merck Research Laboratories, West Point, Pa. (H.Q., J.A. Bolognese, B.O., K.H., C.L.); the Department of Pathology, Mount Sinai Hospital, Toronto (R.R.); the Department of Surgery, University of Birmingham, Birmingham, United Kingdom (D.M.); the Department of Medicine, Clinic University Hospital, Zaragoza, Spain (A.L.); the Department of Medicine, Tufts–New England Medical Center, Boston (M.A.K.); and the Departments of Medicine and Community and Family Medicine, Dartmouth Medical School, Hanover, N.H. (J.A. Baron). Address reprint requests to Dr. Bresalier at the Department of Gastrointestinal Medicine and Nutrition, University of Texas M.D. Anderson Cancer Center, 1515 Holcombe Blvd., Houston, TX 77030-4009, or at rbresali@mdanderson.org.

*The members of the APPROVe Trial are listed in the Appendix.

N Engl J Med 2005;352.
Copyright © 2005 Massachusetts Medical Society.

BRESALIER-1

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission
Copyright © 2005 Massachusetts Medical Society. All rights reserved.

P2.0167

*The* NEW ENGLAND JOURNAL *of* MEDICINE

NONSTEROIDAL ANTIINFLAMMATORY drugs (NSAIDs) alleviate pain and inflammation but may cause gastrointestinal ulceration and bleeding, presumably by inhibiting cyclooxygenase (COX)-mediated production of prostaglandins. The discovery that there were two forms of cyclooxygenase, 1 (COX-1) and 2 (COX-2), provided the impetus for the development of selective inhibitors of COX-2 with a reduced risk of gastrointestinal complications whose analgesic and antiinflammatory efficacy was likely to be similar to that of nonselective COX inhibitors.

COX-2 is expressed at sites of inflammation, such as in atheromatous plaques, and in neoplasms, raising the possibility that COX-2 inhibition might also be useful in the treatment or prevention of atherosclerosis and various cancers.[1,2] However, predicting the consequences of COX-2 inhibition on cardiovascular disease is not a straightforward proposition. *COX-2 inhibition has several effects that could increase the risk of cardiovascular disease,* including reducing prostacyclin levels, increasing blood pressure, decreasing angiogenesis,[3–11] and destabilizing plaque.[12]

Rofecoxib is a selective COX-2 inhibitor that has been shown to be associated with significantly fewer gastrointestinal adverse events than nonselective nonsteroidal antiinflammatory drugs (NSAIDs).[13] In one trial,[13] there were more cardiovascular events among patients given a high dose of rofecoxib than among those given naproxen, an NSAID with platelet-inhibiting properties of unclear clinical relevance.[4,5,14–16] Pooled data from other randomized trials have not shown a significant difference in cardiovascular risk between rofecoxib and placebo or other nonselective NSAIDs.[4,5,17] Observational studies have provided conflicting data on the association of rofecoxib with cardiovascular risk: some studies suggested that there was no effect, some suggested that the risk was increased only at high doses, and others indicated a possible increase in the risk of cardiovascular events at standard or unspecified doses.[6,9,11,18–21]

The Adenomatous Polyp Prevention on Vioxx (APPROVe) Trial was designed to evaluate the hypothesis that three years of treatment with rofecoxib would reduce the risk of recurrent adenomatous polyps among patients with a history of colorectal adenomas. *Potential thrombotic events were* adjudicated by an independent committee, and all safety data were monitored by an external safety-monitoring committee. We report the cardiovascular findings from the study.

## METHODS

### DESIGN OF THE TRIAL

Enrollment occurred from February 2000 to November 2001 at 108 centers in 29 countries. Participating investigators are listed in the Appendix. Men and women who were at least 40 years old were eligible if they had had at least one histologically confirmed large-bowel adenoma removed within 12 weeks before study entry and were not anticipated to need long-term NSAID therapy (including high-dose aspirin) during the study. Initially, patients who were taking low-dose aspirin (no more than 100 mg daily) were excluded from the study. However, in May 2000, after the results of the Vioxx Gastrointestinal Research (VIGOR) trial[13] had become available, the protocol was amended to allow randomized subjects to take low-dose aspirin (no more than 100 mg daily) for cardiovascular protection. The proportion of subjects taking low-dose aspirin at enrollment was capped at 20 percent because of the possible chemopreventive effects of the drug.[22] Exclusion criteria were evidence of uncontrolled hypertension (defined by a blood pressure of more than 165/95 mm Hg); angina or congestive heart failure, with symptoms evoked by minimal activity; myocardial infarction, coronary angioplasty, or coronary-artery bypass grafting within the preceding year; or stroke or transient ischemic attack within two years before screening.

Written informed consent was obtained from all patients. The institutional review board at each center approved the study.

### TREATMENT

The randomized treatment period was preceded by a six-week, single-blind, placebo run-in period to assess patients' compliance. Patients who took at least 80 percent of their tablets during the placebo run-in period were randomly assigned to receive either one 25-mg tablet of rofecoxib per day (the maximal recommended long-term daily dose) or one identical-appearing placebo tablet per day for three years. The computer-derived randomization was stratified according to the clinical center and the use or nonuse of low-dose aspirin, with blocks of 2. Patients, investigators, and sponsor personnel who monitored the study, other than the unblinded study statistician, were unaware of the treatment assignments.

Patients were evaluated clinically at randomization and at weeks 4, 17, 35, 52, 69, 86, 104, 121, 138, 156, and 158 or after the discontinuation of

2-BRESALIER

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission.
Copyright © 2005 Massachusetts Medical Society. All rights reserved.



CARDIOVASCULAR EVENTS ASSOCIATED WITH ROFECOXIB



**Figure 1. Enrollment, Randomization, and Outcomes.**
The original study design included a group assigned to receive 50 mg of rofecoxib per day; 26 patients had been assigned to this treatment before it was decided not to proceed with this group.

treatment. Vital signs, including blood pressure obtained while the patient was seated, were measured at each clinic visit during the study according to the usual clinical practice. Adverse events occurring during the study were recorded and evaluated in a blinded fashion by the investigators. Follow-up of the patients for one year after the discontinuation of treatment is ongoing.

### CARDIOVASCULAR EVENTS

Monitoring and analysis of the cardiovascular events in the trial were part of a planned assessment of the cardiovascular safety of rofecoxib. Data presented include events occurring during treatment and up to 14 days after the last dose of the study drug. Serious vascular events were reviewed in a blinded fashion by adjudication committees, which confirmed events that met prespecified case definitions for two sets of events. Thrombotic events included fatal and nonfatal myocardial infarction, unstable angina, sudden death from cardiac causes, fatal and non-

fatal ischemic stroke, transient ischemic attack, peripheral arterial thrombosis, peripheral venous thrombosis, and pulmonary embolism. The end point used in the Antiplatelet Trialists' Collaboration (APTC) study[23] was also analyzed: the combined incidence of death from cardiovascular, hemorrhagic, and unknown causes; nonfatal myocardial infarction; and nonfatal ischemic and hemorrhagic stroke. Other relevant but not independently adjudicated events were also analyzed, including hypertension-related events, edema-related events, and the combined end point of congestive heart failure, pulmonary edema, or cardiac failure.

The procedure for confirming cardiovascular events was prespecified in the protocol. All serious adverse events were identified and recorded by the clinical investigators. Potential thromboembolic events, components of the APTC end point, and all deaths (regardless of cause) were prespecified as eligible for adjudication according to standard procedures for rofecoxib studies initiated by the spon-

BRESALIER-3

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission.
Copyright © 2005 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE

sor in 1998. For each eligible event, source documents were collected and sent to the cardiac, cerebrovascular, or peripheral vascular adjudication committee. Decisions were made on the basis of majority rule with the use of prespecified criteria.

### STATISTICAL ANALYSIS

An independent, external safety-monitoring board met periodically to review safety data provided by a statistician who was aware of patients' study-group assignments. No formal stopping rule was specified for terminating the study.

Data were collected and held by the sponsor. The investigators had full and unfettered access to the data. A statistician who was aware of patients' study-group assignments but who was not otherwise involved in the study analyzed the data using SAS software (version 8.2). All patients who underwent randomization and took at least one dose of study

medication were included in the analyses. For confirmed serious thrombotic events and the APTC end point, event rates were determined and relative risks (with 95 percent confidence intervals) were calculated with the use of Cox proportional-hazards models. However, if there were fewer than 11 events in either group, the rate ratio was computed with the use of the binomial distribution.[24] A test of the proportional-hazards assumption was specified in the cardiovascular-analysis plan. This was accomplished by evaluating the interaction between the logarithm of time and the assigned treatment in the Cox proportional-hazards model. Kaplan–Meier estimates of the cumulative event rates over time were also made.

Several exploratory analyses were performed to delineate the relation between mean arterial pressure and the study findings. One analysis summarized the relative risk of confirmed serious thrombotic adverse events according to the quartiles of change in mean arterial pressure at week 4. This time was chosen because treatment-based differences in mean arterial pressure occurred early and remained constant throughout the treatment period and because only two confirmed serious thrombotic events had occurred by week 4 (one in each group). The second analysis included changes from baseline in mean arterial pressure as a time-varying covariate in a Cox proportional-hazards model in which treatment was the main effect. This model was used to investigate the association of the change in blood pressure over time with the occurrence of confirmed serious thrombotic events.

The data reported here are those available to the authors as of February 14, 2005.

### RESULTS

#### PARTICIPANTS

A total of 3260 patients were screened for the study, of whom 2586 were deemed to be eligible; 1287 of the eligible patients were randomly assigned to receive rofecoxib, and 1299 to receive placebo (Fig. 1). The two groups were generally similar with regard to baseline characteristics, including age, sex, use or nonuse of low-dose aspirin, and cardiovascular-risk status (Table 1). Concomitant medications used at some time during the study included low-dose aspirin (in 20 percent of the rofecoxib group and 19 percent of the placebo group, P=0.52), antihypertensive drugs (44 percent and 36 percent, respectively; P<0.001), lipid-lowering agents (31 percent

| Table 1. Baseline Characteristics of the Patients. | | |
| --- | --- | --- |
| Characteristic | Rofecoxib (N=1287) | Placebo (N=1299) |
| **Age (yr)** | | |
| Mean | 59 | 59 |
| Range | 40–96 | 40–88 |
| **Height (cm)** | | |
| Mean | 170 | 170 |
| Range | 137–198 | 133–199 |
| **Weight (kg)** | | |
| Mean | 81 | 81 |
| Range | 38–160 | 34–159 |
| Male sex (%) | 62 | 62 |
| White race (%)* | 84 | 84 |
| Use of low-dose aspirin (%)† | 17 | 16 |
| Use of antihypertensive medication (%) | 30 | 29 |
| High cardiovascular risk (%)‡ | 30 | 26 |
| History of symptomatic atherosclerotic cardiovascular disease (%) | 9 | 8 |
| History of hypertension (%) | 36 | 34 |
| History of hypercholesterolemia (%) | 29 | 26 |
| History of diabetes (%) | 9 | 9 |
| Current cigarette use (%) | 22 | 22 |

* Race was self-reported.
† Low-dose aspirin was defined as 100 mg per day or less.
‡ A high cardiovascular risk was defined by a history of symptomatic atherosclerotic cardiovascular disease or the presence of at least two of the following risk factors for cardiovascular disease: history of hypertension, history of hypercholesterolemia, history of diabetes, or current cigarette use.

4-BRESALIER

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission.
Copyright © 2005 Massachusetts Medical Society. All rights reserved.

CARDIOVASCULAR EVENTS ASSOCIATED WITH ROFECOXIB

and 28 percent, respectively; P=0.09), antiplatelet agents such as clopidogrel (4 percent and 2 percent, respectively; P=0.003), insulin (3 percent and 2 percent, respectively; P=0.10), and oral hypoglycemic agents (13 percent and 11 percent, respectively; P=0.12).

The study was terminated on September 30, 2004, approximately two months ahead of the planned date of completion, at the recommendation of the external safety-monitoring board and the steering committee. At the time of termination, a total of 877 patients in the rofecoxib group and 980 patients in the placebo group had completed the scheduled three years of treatment. The mean duration of treatment was 2.4 years in the rofecoxib group and 2.6 years in the placebo group.

Before September 30, 2004, more patients discontinued rofecoxib treatment than placebo (32 percent vs. 25 percent) (Fig. 1). The main reason for discontinuation was an adverse clinical event. The three most common adverse events resulting in the discontinuation of treatment were hypertension (25 patients in the rofecoxib group and 7 patients in the placebo group), increased blood pressure (6 in the rofecoxib group and 1 in the placebo group),

and peripheral edema (7 in the rofecoxib group and 1 in the placebo group).

INCIDENCE OF THROMBOTIC EVENTS
AND THE APTC END POINT

A total of 121 patients had investigator-reported serious thrombotic events (77 in the rofecoxib group and 44 in the placebo group). A total of 46 patients in the rofecoxib group had confirmed (i.e., adjudicated) thrombotic events during 3059 patient-years of follow-up (1.50 events per 100 patient-years), and 26 patients in the placebo group had such events during 3327 patient-years of follow-up (0.78 event per 100 patient-years). As compared with the placebo group, the rofecoxib group had an increased risk of confirmed thrombotic events (relative risk, 1.92; 95 percent confidence interval, 1.19 to 3.11). The types of confirmed serious thrombotic events are shown in Table 2. The difference between the two groups was mainly due to an increased number of myocardial infarctions and strokes in the rofecoxib group. There were 10 deaths in each group. Myocardial infarction was the cause of death in two patients in the rofecoxib group and three in the placebo group, sudden death from cardiac causes occurred

| Table 2. Incidence of Adjudicated Thrombotic Adverse Events.* | | | | | |
|---|---|---|---|---|---|
| Adverse Event | Rofecoxib Group (N=1287) | | Placebo Group (N=1299) | | Hazard Ratio (95% CI) |
| | No. of Patients (%) | Rate/100 Patient-yr | No. of Patients (%) | Rate/100 Patient-yr | |
| Total | 46 (3.6) | 1.50 | 26 (2.0) | 0.78 | 1.92 (1.19–3.11) |
| Cardiac events | 31 (2.4) | 1.01 | 12 (0.9) | 0.36 | 2.80 (1.44–5.45) |
| Myocardial infarction | 21 | | 9 | | |
| Fatal myocardial infarction | 2 | | 3 | | |
| Sudden death from cardiac causes | 3 | | 1 | | |
| Unstable angina pectoris | 7 | | 4 | | |
| Cerebrovascular events | 15 (1.2) | 0.49 | 7 (0.5) | 0.21 | 2.32 (0.89–6.74) |
| Fatal ischemic stroke | 1 | | 0 | | |
| Ischemic stroke | 11 | | 6 | | |
| Transient ischemic attack | 5 | | 2 | | |
| Peripheral vascular events | 3 (0.2) | 0.10 | 7 (0.5) | 0.21 | 0.46 (0.08–2.03) |
| Peripheral arterial thrombosis | 1 | | 3 | | |
| Peripheral venous thrombosis | 2 | | 4 | | |
| Pulmonary embolism | 0 | | 2 | | |

* The total duration of follow-up was 3059 patient-years in the rofecoxib group and 3327 patient-years in the placebo group. Although a patient may have had two or more clinical adverse events, the patient was counted once within a category. The same patient may appear in different categories. CI denotes confidence interval.

BRESALIER-5

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission.
Copyright © 2005 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE



**Figure 2. Kaplan–Meier Estimates of the Cumulative Incidence of Confirmed Serious Thrombotic Events.**
Vertical lines indicate 95 percent confidence intervals.

in three patients in the rofecoxib group and one in the placebo group, ischemic stroke was the cause of death in one patient in the rofecoxib group, and hemorrhagic stroke was the cause of death in one patient in the placebo group.

In a post hoc analysis, the difference between the two groups in the incidence of thrombotic events was evident in the second 18 months of the study, whereas the event rates were similar for the first 18 months (Fig. 2 and Table 3). The changing pattern of the treatment effect over time was confirmed by a failed test for proportionality of hazards (P=0.01). Findings for the APTC end point were similar (Table 3).

There were no significant interactions between treatment group and subgroups (P>0.10 for all comparisons) for confirmed serious thrombotic events in subgroup analyses based on country (United States vs. others); age; sex; use or nonuse of antihypertensive drugs at baseline, low-dose aspirin at baseline, or low-dose aspirin for more than 50 percent of follow-up; presence or absence of a history of hypertension, hypercholesterolemia, or ischemic heart disease; presence or absence of current cigarette use; or presence or absence of a high cardiovascular risk. A high cardiovascular risk was defined by a history of symptomatic atherosclerotic cardiovascular disease or the presence of at least two of the following risk factors for coronary artery disease: a history of hypertension, a history of hypercholesterolemia, a history of diabetes, or current cigarette use. However, point estimates for the rel-

ative risk in the rofecoxib group as compared with the placebo group were particularly high among patients with a history of symptomatic atherosclerotic cardiovascular disease (9.59; 95 percent confidence interval, 1.36 to 416) relative to those without such a clinical history (1.58; 95 percent confidence interval, 0.95 to 2.64; P for interaction=0.096). Also, the relative risk in the rofecoxib group as compared with the placebo group was 6.10 among patients with a history of diabetes (95 percent confidence interval, 1.36 to 56.1), in contrast to a relative risk of 1.55 among patients with no history of diabetes (95 percent confidence interval, 0.92 to 2.61; P for interaction=0.091).

### NONADJUDICATED CARDIOVASCULAR EVENTS

As compared with the placebo group, the rofecoxib group had higher percentages of patients with hypertension-related events and edema-related events. The Kaplan–Meier curves for the cumulative incidence of congestive heart failure, pulmonary edema, and cardiac failure (Fig. 3) showed early separation of the two groups (at approximately five months) with no significant departures from proportional hazards over time and a hazard ratio of 4.61 for the comparison of the rofecoxib group with the placebo group (95 percent confidence interval, 1.50 to 18.83). The hazard ratios for edema and hypertension were lower than those for the combined end point of congestive heart failure, pulmonary edema, or cardiac failure (Table 4), but the event curves showed an early separation similar to that for the combined end point (data not shown).

During the trial, the rofecoxib group had mean (±SE) increases of 3.4±0.4 mm Hg in systolic blood pressure and 0.9±0.2 mm Hg in diastolic blood pressure, as compared with respective changes of −0.5±0.3 mm Hg and −0.8±0.2 mm Hg in the placebo group (P<0.01 for the comparison between the two groups). Blood-pressure effects were seen by four weeks and remained relatively constant throughout the study. To investigate the relation between changes in blood pressure and confirmed thrombotic events, we categorized patients according to the change from baseline in mean arterial pressure at four weeks. The relative risks of a confirmed thrombotic event in the rofecoxib group, as compared with the placebo group, were broadly similar across quartile categories of the change in blood pressure (data not shown). The mean arterial pressure throughout the study, included as a time-varying covariate, did not materially modify

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission.
Copyright © 2005 Massachusetts Medical Society. All rights reserved.

CARDIOVASCULAR EVENTS ASSOCIATED WITH ROFECOXIB

the treatment effect (relative risk for the comparison of the rofecoxib group with the placebo group, 1.87; 95 percent confidence interval, 1.14 to 3.06).

## DISCUSSION

COX-2 inhibitors have been widely used as antiinflammatory and pain-relief agents and may hold promise as chemopreventive agents for a variety of epithelial cancers. In this randomized, placebo-controlled, double-blind trial, we found that long-term use of the COX-2 inhibitor rofecoxib was associated with an increased risk of cardiovascular events. In post hoc analyses, the increased relative risk of adjudicated thrombotic events was first observed after approximately 18 months of treatment. The overall risk did not appear to be significantly influenced by baseline or subsequent use of low-dose aspirin. In addition, there was an increased frequency of investigator-reported events, such as hypertension, edema, and congestive heart failure, which occurred much earlier in the study.

Thromboxane $A_2$, a major COX-1–mediated product of arachidonic acid metabolism, causes irreversible platelet aggregation, vasoconstriction, and smooth-muscle proliferation, whereas prostacyclin is an inhibitor of platelet aggregation, a vasodilator, and an inhibitor of smooth-muscle proliferation. COX-2 is the chief source of systemic prostacyclin synthesis,[25] and COX-2 inhibitors may increase the cardiovascular risk by shifting the functional balance of these vasoactive eicosanoids toward the promotion of thrombosis or atherogenesis. COX-2 inhibition combined with thromboxane-receptor antagonism may also lead to the destabilization of atheromatous plaque.[12] In addition, COX-2 plays a role in angiogenesis.[1] How these pharmacologic observations relate to the clinical cardiovascular findings with COX-2 inhibition is unknown. It is also not clear whether the partial inhibition of COX-1 by various nonselective NSAIDs offsets any adverse cardiovascular effects of COX-2 inhibition, since this possibility has not been evaluated explicitly in trials.

The VIGOR study[13] compared 50 mg of rofecoxib daily with 500 mg of naproxen twice daily in patients with rheumatoid arthritis and found rofecoxib to be associated with a higher incidence of myocardial infarction. It was unclear how much of the increase in risk was due to a deleterious effect of high-dose rofecoxib, a protective effect of naproxen, chance, or a combination of these fac-



tors.[26] A recent meta-analysis[21] suggested that the magnitude of any cardioprotective effect of naproxen is unlikely to account entirely for these findings.

In aggregate, previous randomized, controlled trials comparing rofecoxib with placebo or conventional NSAIDs other than naproxen have not demonstrated an increased cardiovascular risk associated with rofecoxib use. Analysis of a database including 5435 patients with osteoarthritis in eight double-blind, placebo-controlled, phase 2B, or phase 3 trials reported similar rates of thrombotic cardiovascular adverse events with rofecoxib, placebo, and various nonselective NSAIDs.[3] A pooled analysis of data from more than 28,000 patients with various diseases (representing more than 14,000 patient-years at risk) from 23 previous trials of rofecoxib (phase 2B through phase 5), including patients from the VIGOR trial, also did not demonstrate a significant increase in cardiovascular risk for rofecoxib as compared with placebo or NSAIDs other than naproxen.[4] This analysis used the APTC end point we evaluated. An updated analysis that included data from various placebo-controlled studies investigating rofecoxib for the treatment or prevention of Alzheimer's disease did not demonstrate an excess of cardiovascular events associated with rofecoxib therapy.[5] A recent meta-analysis comparing cardiovascular risk in trials that included various doses of rofecoxib suggested an increased relative risk among patients taking rofecoxib, as compared with those taking naproxen, but not placebo.[22] Dif-

BRESALIER-7

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission.
Copyright © 2005 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE

**Table 1. Summary of Rates and Relative Risks of Confirmed Serious Thrombotic Events and the APTC End Point.**

| Adverse Event | Rofecoxib Group | | | | Placebo Group | | | | Difference in Rate (95% CI) | Relative Risk (95% CI) |
|---|---|---|---|---|---|---|---|---|---|---|
| | No. at Risk | No. of Events | No. of Patient-yr at Risk | Rate/100 Patient-yr | No. at Risk | No. of Events | No. of Patient-yr at Risk | Rate/100 Patient-yr | | |
| **Confirmed event** | | | | | | | | | | |
| Overall | 1287 | 46 | 3059 | 1.50 | 1299 | 26 | 3327 | 0.78 | 0.72 (0.19 to 1.25) | 1.92 (1.19 to 3.11) |
| Month 0–18 | 1287 | 22 | 1656 | 1.33 | 1299 | 20 | 1765 | 1.13 | 0.20 (−0.55 to 0.94) | 1.18 (0.64 to 2.15) |
| Month 19–36 | 989 | 24 | 1403 | 1.71 | 1079 | 6 | 1561 | 0.38 | 1.33 (0.58 to 2.08) | 4.45 (1.77 to 13.32) |
| **APTC end point** | | | | | | | | | | |
| Overall | 1287 | 34 | 3070 | 1.11 | 1299 | 18 | 3334 | 0.54 | 0.57 (0.12 to 1.02) | 2.06 (1.16 to 3.64) |
| Month 0–18 | 1287 | 14 | 1658 | 0.84 | 1299 | 12 | 1769 | 0.68 | 0.17 (−0.42 to 0.75) | 1.25 (0.58 to 2.69) |
| Month 19–36 | 994 | 20 | 1412 | 1.42 | 1083 | 6 | 1565 | 0.38 | 1.03 (0.34 to 1.73) | 3.69 (1.43 to 11.24) |

* CI denotes confidence interval, and APTC Antiplatelet Trialists' Collaboration.

ferences between our results and these earlier clinical-trial data may be related to differences in defined end points or the duration of treatment, a possibility supported by the apparent absence of a difference in adjudicated thrombotic events during the first 18 months of our study.

Observational studies have provided conflicting data on the cardiovascular safety of rofecoxib. A Canadian retrospective cohort study did not demonstrate an increased risk of myocardial infarction among new users of rofecoxib as compared with control subjects,[18] but a case–control study of patients 65 years of age or older suggested a dose-dependent elevation in the relative risk of acute myocardial infarction with rofecoxib therapy.[7] Unlike the findings in the current study, this risk was elevated during the first 90 days of use, but not thereafter. A retrospective cohort study that assessed the occurrence of serious coronary heart disease among NSAID users[19] showed an elevated cardiovascular risk associated with the use of high-dose rofecoxib, but no increased risk with the use of doses of 25 mg or less.

In our randomized, placebo-controlled trial, we found an increased risk of confirmed thrombotic events associated with the long-term use of rofecoxib. The increase in adjudicated thrombotic events associated with rofecoxib therapy was not evident during the first 18 months of the trial. Other investigator-reported cardiovascular events known to be associated with NSAID use, such as congestive heart failure and pulmonary edema, although less well defined, occurred earlier (at approximately five months) and at a higher rate among patients taking rofecoxib than among those taking placebo.

Patients in the rofecoxib group had increases in systemic arterial pressure during the trial, a finding that is consistent with the previously reported renovascular effects of NSAIDs. These changes in blood pressure were observed early in the study, along with investigator-reported edema and congestive heart failure. Mean arterial pressure did not appear to have a significant association with confirmed thrombotic events, however, according to an assessment of changes from baseline to four weeks and an analysis that included mean arterial pressure as a time-varying covariate in a model of treatment effects. On the basis of these findings, it is unlikely that changes in blood pressure were the explanation for the excess cardiovascular risk in our study. However, hemodynamic changes could have contributed to a degree that is difficult to determine from the available data.

It is unclear whether the results seen with rofecoxib represent a general effect of COX-2 inhibitors or a specific effect of rofecoxib. A recent case–control study[27] suggested that the odds of nonfatal myocardial infarction differ between patients who take

8 · BRESALIER

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission.
Copyright © 2005 Massachusetts Medical Society. All rights reserved.



CARDIOVASCULAR EVENTS ASSOCIATED WITH ROFECOXIB

**Table 4. Incidence of Nonadjudicated Cardiovascular Adverse Events.\***

| Adverse Event† | Rofecoxib Group (N=1287) | | Placebo Group (N=1299) | | Hazard Ratio (95% CI) |
|---|---|---|---|---|---|
| | No. of Patients (%) | Rate/100 Patient-yr | No. of Patients (%) | Rate/100 Patient-yr | |
| Hypertension | 377 (29.3) | 14.9 | 219 (16.9) | 7.3 | 2.02 (1.71–2.38) |
| Serious event | 11 | | 1 | | |
| Edema | 111 (8.6) | 3.8 | 76 (5.9) | 2.4 | 1.57 (1.17–2.10) |
| Serious event | 3 | | 0 | | |
| Congestive heart failure, pulmonary edema, or cardiac failure | 17 (1.3) | 0.6 | 4 (0.3) | 0.1 | 4.61 (1.50–18.83) |
| Serious event | 12 | | 2 | | |

\* The total duration of follow-up was 3059 patient-years in the rofecoxib group and 3327 patient-years in the placebo group. Although a patient may have had two or more clinical adverse events, the patient was counted once within a category. The same patient may appear in different categories. CI denotes confidence interval.

† A serious event was defined as one that was life-threatening, resulted in (or prolonged) hospitalization, or caused permanent disability.

rofecoxib and those who take celecoxib, and a nested case–control study[20] also suggested that there are differences in the risk of serious coronary heart disease between the two agents. Elsewhere in this issue of the *Journal*, Nussmeier et al. report that patients who received parecoxib and valdecoxib for pain in the first 10 days after coronary-artery bypass grafting had an increased risk of cardiovascular events during 30 days of follow-up.[28] Also in this issue, Solomon et al. report that an ongoing safety review of the Adenoma Prevention with Celecoxib Trial revealed that the risk of fatal or nonfatal cardiovascular events was increased by a factor of 2.3 among patients who were randomly assigned to receive celecoxib, as compared with those who were

assigned to receive placebo,[29] leading the National Cancer Institute to suspend the trial. The possibility that conventional NSAIDs may have similar effects also has to be considered. Possible cardiovascular effects will need to be taken into account in an assessment of the potential ability of any of these drugs to prevent neoplasia in the large bowel and other organs.

Funded by Merck Research Laboratories.

Drs. Bresalier, Sandler, Riddell, Morton, Lanas, and Baron report having received consulting fees from Merck Research Laboratories. Dr. Baron also reports having served as an unpaid consultant to Bayer. Dr. Konstam reports having received consulting fees from Merck. Mr. Bolognese and Drs. Quan, Oxenius, Horgan, and Lines are employees of Merck, and Drs. Quan, Bolognese, Oxenius, Horgan, and Lines own equity in the company.

**APPENDIX**

The following persons and institutions participated in the APPROVe Trial: Steering Committee — J.A. Baron (chair), R.S. Bresalier, R.S. Sandler, R. Riddell, D. Morton, A. Lanas, B. Oxenius (nonvoting member), J.A. Bolognese (nonvoting member), K. Horgan (nonvoting member); External Safety Monitoring Board — J. Neaton (chair), M.A. Konstam, D. Bjorkman, R. Logan, H. Quan (nonvoting member); Adjudication Committees — Cardiology: L.S. Dreifus, G. Vetrovec, B. Chaitman; Neurology: H. Adams, J.P. Mohr, J. Zivin; Peripheral Vascular: J. Ginsberg, C. Kearon, T. Rooke; Gastrointestinal: M. Griffin, M. Langman, D. Jensen; Investigators — M. Aguilar, Clinica Aguilar Bonilla, San Jose, Costa Rica; P. Angus, Austin & Repatriation Medical Centre, Heidelberg, Australia; N. Arber, Tel Aviv Sourasky Medical Center, Tel Aviv; J.M.P. Badia, Hospital Clinic i Provincial, Barcelona, Spain; R.D. Baerg, Tacoma Digestive Disease Center, Tacoma, Wash.; H. Baistrocchi, Unidad de Aparato Digestivo Julio Dante Baistrocchi, Cordoba, Argentina; M.L. Barclay, Christchurch Hospital, Christchurch, New Zealand; C. Beglinger, University of Basel, Basel, Switzerland; G. Bianchi-Porro, Ospedale Luigi Sacco, Milan, Italy; T. Bolin, Prince of Wales Hospital, Randwick, Australia; R.M. Bostick, Palmetto Health South Carolina Cancer Center, Columbia; R.S. Bresalier, A.A. Dekovich, T. Ben-Menachem, S.K. Batra, Henry Ford Hospital, Detroit; R. Bruno, J. Christiansen, Amtssygehuset i Herlev, Herlev, Denmark; L. Burke, Cleveland Clinic Foundation, Cleveland; R. Butruk, Akademie Medyczna w Warszawie, Warsaw; L. Capurso, Azienda Ospedaliera San Filippo, Rome; J.P. Cello, San Francisco General Hospital, San Francisco; S. Chaussade, Hospital Cochin Saint-Jacques, Paris; D.R. Cleland, Montreal General Hospital, Montreal; O. Costamagna, Universita Cattolica del Sacro Cuore, Rome; P. Crone, Kobenhavns Amtssygehus i Glostrup, Glostrup, Denmark; E.V. Cutsem, Universitaire Ziekenhuizen, Leuven, Belgium; G.R. D'Haens, Imeldaziekenhuis, Bon Heiden, Belgium; W. Dekker, J. Ferwerda, Kennemer Gasthuis, Haarlem, the Netherlands; E. Domaignee-Munoz, Hospital de Conxo, La Coruna, Spain; D.S. Eikrem, R.B. Tepper, Long Island Clinical Research Associates, Great Neck, N.Y., R. Estela, Hospital Clinico San Borja-Arriaran, Santiago, Chile; M. Farkkila, University Central Hospital, Helsinki; G.M. Fugarolas, J.F. deDios, Hospital Universitario Reina Sofia, Cordoba, Spain; A. Giacosa, Instituto Nazionale Per La Ricerca Sul Cancro, Genoa, Italy; M.J. Goldstein, Long Island Gastro Intestinal Research Group, Great Neck, N.Y.; F. Gomollon-Garcia, Hospital Universitario Miguel Servet, Zaragoza, Spain; P. Gandrup, Aalborg Syen-

BRESALIER-9

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission.
Copyright © 2005 Massachusetts Medical Society. All rights reserved.



The NEW ENGLAND JOURNAL of MEDICINE

hus, Aalborg, Denmark; A. Habr-Gama, Hospital das Clinicas da Faculdade de Medicina da Universidade de São Paulo, São Paulo; M. Haque, S. Parry, Middlemore Hospital, Auckland, New Zealand; R. Hardi, Metropolitan Gastroenterology Group, Chevy Chase, Md.; W. Harford, Veterans Affairs Medical Center, Dallas; S.N. Harris, N.B. Vakil, Aurora Sinai Medical Center, Milwaukee; R.R. Holt, D.P. Koder, Saint Luke's–Roosevelt Hospital, New York; P.A. Holt, Endoscopic Microsurgery Associates, Towson, Md.; R.W. Hultcrantz, Karolinska Universitetssjukhuset-Solna, Stockholm; S.H. Itzkowitz, Mount Sinai Medical Center, New York; R.F. Jacoby, University of Wisconsin Medical School, Madison; K.E.J. Jensen, Centralsygehuset Esbjerg Varde, Esbjerb, Denmark; J.R. Johanson, Rockford Gastroenterology Associates, Rockford, Ill.; P.W. Jørgensen, Bispebjerg Hospital, Copenhagen; K.E. Kim, University of Chicago Medical Center, Chicago; P. Knoflach, AKH Barmherzige, Schwestern von heiligen Kreuz, Wels, Austria; M. Koch, Capital Gastroenterology Consultants, Silver Spring, Md.; B. Koch, St. Vincent Krankenhaus, Datteln, Germany; A. Lanas, University Clinical Hospital, Zaragoza, Spain; M.R. Lane, Auckland City Hospital, Auckland, New Zealand; T.R. Liebermann, Radiant Research, Austin, Tex.; M. Lukas, Univerzita Karlova, Prague; C.M. Schmitt, Southern Clinical Research, Chattanooga, Tenn.; F. Macrae, Cabrini Hospital, Malvern, Australia; E.E. Mainz, Hospital José Joaquin Aguirre, Santiago, Chile; M.B. Marcus, Toronto; R.D. Marks, Alabama Digestive Research Center, Alabaster; C.E. Martinez, Hospital Militar Central, Bogota, Colombia; R. McLeod, Mount Sinai Hospital, Toronto; K.R. McQuaid, Veterans Affairs Medical Center, San Francisco; G. Minoli, Ospedale Valduce Reparto, Como, Italy; M. Montoro, Hospital San Jorge, Huesca, Spain; A. Montoya, Clinica Shaio, Bogota, Colombia; G. Morelli, Optimum Clinical Research, Montreal; D.G. Morton, Queen Elizabeth Hospital, Edgbaston, United Kingdom; T.J. Myrhøj, J.R. Anderson, Hvidovre Hospital, Hvidovre, Denmark; A. Nakad, Hospital Notre Dame, Tournai, Belgium; V. Nassym, Gastrointestinal Diagnostic Center, Baltimore; Y. Niv, Rabin Medical Center, Petah Tikva, Israel; P.M. Pardoll, S. Scheinert, Center for Digestive Diseases, St. Petersburg, Fla.; C. Phinn, J.M. Soares, Celestial Ordem Terceira da Santissima, Porto, Portugal; J. Pokorny, Prerov, Czech Republic; J. Ponce-Garcia, Hospital Universitari La Fe Valencia, Valencia, Spain; T. Ponchon, Hospital Edouard Herriot, Lyon, France; J.H. Pressman, San Diego Digestive Disease Consultants, San Diego, Calif.; V. Prochazka, Fakultni Nemocnice Olomouc, Olomouc, Czech Republic; J.M. Provenza, Louisiana Research Center, Shreveport; W.S. Putnam, Seattle Gastroenterology Associates, Seattle; B. Quintero-Carrion, Hospital Universitario de Canarias Tenerife, Santa Cruz de Tenerife, Spain; J.P. Raufman, V. Raj, University of Arkansas for Medical Sciences, Little Rock; D.K. Rex, Indiana University Hospital, Indianapolis; R.P. Rossini, M. Spandre, Azienda Sanitaria Ospedaliera, Turin, Italy; R.L. Rothstein, Dartmouth Hitchcock Medical Center, Lebanon, N.H.; A.K. Rustgi, University of Pennsylvania, Philadelphia; R. Sandler, University of North Carolina at Chapel Hill, Chapel Hill; B. Schmelzer, Stanninghill Clinic, Sandton, South Africa; R.E. Schoen, University of Pittsburgh Medical Center, Pittsburgh; T.T. Schubert, Allenmore Medical Center, Tacoma, Wash.; H.I. Schwartz, Miami Research Associates, Miami; E. Segal, Hospital General de Agudos Carlos G. Durand, Buenos Aires; F. Seow-Choen, K.W. Eu, Singapore General Hospital, Singapore; N.A. Shah, Philip J. Bean Medical Center, Hollywood, Md.; N. Skandalis, Peripheral General Hospital, Athens; P.L. Szego, Royal Victoria Hospital, Montreal; N. Toribara, University of Colorado Health Sciences Center, Denver; J. Torosis, Gastrointestinal Research, Redwood City, Calif.; D.K. Turgeon, University of Michigan, Ann Arbor; S.W. Van der Merwe, Pretoria, South Africa; R. VanStolk, C.W. Howden, Northwestern University, Chicago; P. Vergauwe, Algemeen Ziekenhuis Groeninge, Kortrijk, Belgium; B. Vergean, C. Nizou, Hôpital d'Instruction des Armées, Paris; G. Wlode, Klinikum Kreis Herford, Herford, Germany; J. Wolosin, M.W. Swain, Regional Research Institute, Jackson, Tenn.; J.C. Wolper, P.L. Yodelman, Digestive Health Physicians, Fort Myers, Fla.; B.C.Y. Wong, University of Hong Kong Queen Mary Hospital, Hong Kong; J.P. Wright, Kinsbury Hospital, Claremont, South Africa; A. Zambelli, Ospedale Maggiore Azienda Ospedaliera, Crema, Italy.

REFERENCES

1. Dannenberg AJ, Subbaramaiah K. Targeting cyclooxygenase-2 in human neoplasia: rationale and promise. Cancer Cell 2003;4:431-6.

2. Crofford LJ, Lipsky PE, Brooks P, Abramson SB, Simon LS, van de Putte LB. Basic biology and clinical application of specific cyclooxygenase-2 inhibitors. Arthritis Rheum 2000;43:4-13.

3. Howard PA, Delafontaine P. Nonsteroidal anti-inflammatory drugs and cardiovascular risk. J Am Coll Cardiol 2004;43:519-25.

4. Konstam MA, Weir MR, Reicin A, et al. Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib. Circulation 2001;104:2280-8.

5. Weir MR, Sperling RS, Reicin A, Gertz BJ. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J 2003;146:591-604.

6. Solomon DH, Glynn RJ, Levin R, Avorn J. Nonsteroidal anti-inflammatory drug use and acute myocardial infarction. Arch Intern Med 2002;162:1099-104.

7. Solomon DH, Schneeweiss S, Glynn RJ, et al. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. Circulation 2004;109:2068-73.

8. Strand V, Hochberg MC. The risk of cardiovascular thrombotic events with selective cyclooxygenase-2 inhibitors. Arthritis Rheum 2002;47:349-55.

9. Mamdani M, Juurlink DN, Lee DS, et al. Cyclo-oxygenase-2 inhibitors versus non-selective non-steroidal anti-inflammatory drugs and congestive heart failure outcomes in elderly patients: a population-based cohort study. Lancet 2004;363:1751-6.

10. Whelton A, Fort JG, Puma JA, Normandin D, Bello AE, Verburg KM. Cyclooxygenase-2-specific inhibitors and cardiorenal function: a randomized, controlled trial of celecoxib and rofecoxib in older hypertensive osteoarthritis patients. Am J Ther 2001;8:85-95. [Erratum, Am J Ther 2001;8:220.]

11. Whelton A, White WB, Bello AE, Puma JA, Fort JG. Effects of celecoxib and rofecoxib on blood pressure and edema in patients ≥65 years of age with systemic hypertension and osteoarthritis. Am J Cardiol 2002;90:959-63.

12. Egan KM, Wang M, Lucht MB, et al. Cyclooxygenases, thromboxane, and atherosclerosis: plaque destabilization by cyclooxygenase-2 inhibition combined with thromboxane receptor antagonism. Circulation 2005;111:334-42.

13. Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxic-

ity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000;343:1520-8.

14. Rahme E, Pilote L, LeLorier J. Association between naproxen use and protection against acute myocardial infarction. Arch Intern Med 2002;162:1111-5. [Erratum, Arch Intern Med 2002;162:1858.]

15. Watson DJ, Rhodes T, Cai B, Guess HA. Lower risk of thromboembolic cardiovascular events with naproxen among patients with rheumatoid arthritis. Arch Intern Med 2002;162:1105-10. [Erratum, Arch Intern Med 2002;162:1779.]

16. Farkouh ME, Kirshner H, Harrington RA, et al. Comparison of lumiracoxib with naproxen and ibuprofen in the Therapeutic Arthritis Research and Gastrointestinal Event Trial (TARGET), cardiovascular outcomes: randomised controlled trial. Lancet 2004;364:675-84.

17. Reicin AS, Shapiro D, Sperling RS, Barr B, Yu Q. Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (ibuprofen, diclofenac, and nabumetone). Am J Cardiol 2002;89:204-9.

18. Mamdani M, Rochon P, Juurlink DN, et al. Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-term risk of

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission.
Copyright © 2005 Massachusetts Medical Society. All rights reserved.

CARDIOVASCULAR EVENTS ASSOCIATED WITH ROFECOXIB

acute myocardial infarction in the elderly. Arch Intern Med 2003;163:481-6.

18. Ray WA, Stein CM, Daugherty JR, Hall K, Arbogast PG, Griffin MR. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. Lancet 2002;360:1071-3.

20. Graham DJ, Campen D, Hui R, et al. Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study. Lancet 2005;365:475-81.

21. Juni P, Nartey L, Reichenbach S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. Lancet 2004;364:2021-9.

22. Baron JA, Cole BF, Sandler RS, et al. A randomized trial of aspirin to prevent colorectal adenomas. N Engl J Med 2003;348: 891-9.

23. Antiplatelet Trialists' Collaboration. Collaborative overview of randomised trials of antiplatelet therapy. 1. Prevention of death, myocardial infarction, and stroke by prolonged antiplatelet therapy in various categories of patients. BMJ 1994;308:81-106. [Erratum, BMJ 1994;308:1540.]

24. Guess HA, Lydick EG, Small RD, Miller LP. Epidemiologic programs for computers and calculators: exact binomial confidence intervals for the relative risk in follow-up studies with sparsely stratified incidence density data. Am J Epidemiol 1987;125:340-7.

25. McAdam BF, Catella-Lawson F, Mardini IA, Kapoor S, Lawson JA, FitzGerald GA. Systemic biosynthesis of prostacyclin by cyclooxygenase (COX)-2: the human pharmacology of a selective inhibitor of COX-2. Proc Natl Acad Sci U S A 1999;96:272-7.

26. Fitzgerald GA, Patrono C. The coxibs, selective inhibitors of cyclooxygenase-2. N Engl J Med 2001;345:433-42.

27. Kimmel SE, Berlin JA, Reilly M, et al. Patients exposed to rofecoxib and celecoxib have different odds of nonfatal myocardial infarction. Ann Intern Med 2005;142:157-64.

28. Nussmeier NA, Whelton AA, Brown MT, et al. Complications of the COX-2 inhibitors parecoxib and valdecoxib after cardiac surgery. N Engl J Med 2005;352.

29. Solomon SD, McMurray JJV, Pfeffer MA, et al. Cardiovascular risk associated with celecoxib use in a clinical trial for colorectal adenoma prevention. N Engl J Med 2005; 352.

Copyright © 2005 Massachusetts Medical Society.

BRESALIER-11

Downloaded from www.nejm.org on February 15, 2005 . For personal use only. No other uses without permission.
Copyright © 2005 Massachusetts Medical Society. All rights reserved.

# EXHIBIT "7"
## Part A

# EXHIBIT "7"
## Part A

```
1    ROBERT MCFARLAND,              )
2                  Plaintiff,       )  SUPERIOR COURT OF
                                    )  NEW JERSEY LAW
3          vs.                      )  DIVISION: ATLANTIC
                                    )  COUNTY
4    MERCK & CO., INC.,             )
5                  Defendant.       )  No. ATL-L-0199-04-MT
                                    )
6    _____       )
                                    )
7    PATRICIA HATCH, Administrator of )
     the Estate of STEPHEN HATCH,   )
8    Deceased and PATRICIA HATCH, In )  SUPERIOR COURT OF
     Her Own Right,                 )  NEW JERSEY LAW
9                                   )  DIVISION: ATLANTIC
                                    )  COUNTY
10                 Plaintiff,       )
11                                  )  No. ATL-L0403-05-MT
                                    )
12         vs.                      )
13                                  )
                                    )
14   MERCK & CO., INC.,             )
15                                  )
                                    )
16                 Defendant.       )
17   _____       )
18
19
20         DEPOSITION OF RICHARD A. KRONMAL, PH.D.
21                    June 7, 2006
22                 Seattle, Washington
23
24
25
```

```
1                      APPEARANCES
2
3    For Plaintiff McFarland:
4
5              David R. Buchanan
               Seeger Weiss LLP
               One William Street
6              New York, NY 10004
               212.584.0700
7
8
     For Plaintiffs:
9
10             Christopher Tisi
               Ashcraft & Gerel
11             2000 L Street, NW
               Suite 400
12             Washington, D.C. 20036
               202.783.6400
13
14
     For the Defendant Merck:
15
16             Stephen D. Raber
               Paul Boehm
17             Williams & Connolly, LLP
               725 Twelfth Street, N.W.
18             Washington, D.C. 20005
               202.434.5538
19             202.434.5029 Fax
20
21
22
23
24
25
```

EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| MR. RABER | 12 |
| MR. BUCHANAN | 287 |
| MR. RABER | 329 |
| MR. BUCHANAN | 354 |
| MR. RABER | 355 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Exhibit No. 1 | In Re Vioxx Litigation Report of Richard A. Kronmal. | 12 |
| Exhibit No. 2 | In re Vioxx Litigation, Addendum to Report of Richard A. Kronmal, May 23, 2006. | 12 |
| Exhibit No. 3 | Notice of Videotaped Oral Deposition. | 15 |
| Exhibit No. 4 | Supplement to Exhibit 1, Pages 38 and 39, last page unnumbered. | 21 |
| Exhibit No. 5 | Document entitled "Hypotheses." | 119 |
| Exhibit No. 6 | "Intention-to-Treat Analysis in Randomized Trials: Who Gets Counted?" By Milo Gibaldi, Ph.D., and Sean Sullivan, Ph.D. | 143 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Exhibit No. 7 | "Prospective evaluation of a prostacylin-sparing aspirin formulation and heparin/warfarin in aspirin users with unstable angina or non-Q wave myocardial infarction at rest," by Cohen, et al. | 169 |
| Exhibit No. 8 | Figure 3. Comparison of MI Rates Among Subjects Receiving Placebo vs Rofecoxib or Celecoxib. | 182 |
| Exhibit No. 9 | Table 5. Incidence of Serious Adverse Events after Randomization. | 209 |
| Exhibit No. 10 | "Risk of cardiovascular events and rofecoxib: Cumulative meta-analysis," by Jnni, et al. | 216 |

(Request marked testimony on Page 193.)

1    BE IT REMEMBERED that on Wednesday,
2  June 7, 2006, at 4507 Brooklyn Avenue NE, Seattle,
3  Washington, at 9:43 a.m., before KARMEN M. FOX, CCR,
4  RPR, CRR, Notary Public in and for the State of
5  Washington, appeared RICHARD A. KRONMAL, PH.D., the
6  witness herein;
7    WHEREUPON, the following proceedings
8  were had, to wit:
9
10    <<<<<< >>>>>>
11
12  (Conference call with Judge Higbee via speakerphone.)
13
14    MR. BUCHANAN:  Good morning, Judge.
15  Dave Buchanan here with Mr. Raber at the deposition of
16  Dr. Kronmal.
17    JUDGE HIGBEE:  Okay.
18    MR. BUCHANAN:  This is the discovery
19  deposition of Dr. Kronmal.  And when I brought
20  Dr. Kronmal into the room today, I noticed that there
21  was actually a video camera and extensive video
22  equipment set up for the deposition.
23    It is a discovery deposition.  I'm advised by
24  Mr. Raber that the notice that was served, but
25  apparently served after I left on Monday to come here

1    In prior instances -- and my experience is only
2  Humeston at this point -- where there was going to be
3  a discovery dep followed by a trial dep, at least of
4  treaters, Your Honor had directed that the tape be
5  turned off during the discovery portion of the
6  treater, and then it could be turned on in the trial
7  portion.
8    So we object to going forward on this basis.
9  And --
10    JUDGE HIGBEE:  All right.  Defense
11  counsel, anything you want to say?
12    MR. RABER:  Yes.  The notice was
13  served on Monday, June 5th, on the file and
14  serve, Your Honor.  We're not trying to pull a fast
15  one or anything here.  This is a deposition of a
16  witness that it's a little bigger than New Jersey,
17  because the lawyers in the California case have said
18  that they're going to use Dr. Kronmal's testimony as
19  an unretained expert.  There's been talk of using him
20  in the MDL.  So this deposition has been cross-noticed
21  for California and the MDL, in addition to New Jersey.
22    And we think that, in this day and age, video
23  depositions are nothing unusual.  The notices that
24  have been served in these cases have not -- none of
25  them have, you know, adhered to the ten days or the

1  for this deposition, reflects it's a videotape
2  deposition.  We objected that the witness, frankly, is
3  not dressed like he would be dressed in court.  And he
4  was not prepared for it, and frankly, I think the
5  notice is insufficient.
6    JUDGE HIGBEE:  Does the notice
7  say -- does the notice say anything about videotape?
8    MR. RABER:  Yes.
9    MR. BUCHANAN:  There was no notice
10  served prior to yesterday.  All other depositions that
11  were done, in my experience at least in the case that
12  I've been involved with of experts, have not been
13  video'd by the plaintiffs or the defense.  That's an
14  agreement that I was content to proceed with, with
15  respect to McFarland.
16    At no point in my discussions, in extensive
17  conversations with defense counsel about scheduling
18  depositions, has any deposition been noticed -- has it
19  been discussed that they would be noticed for
20  videotape.
21    There is a de bene esse deposition that has been
22  set for Dr. Kronmal at the end of this month that will
23  be videotaped, that was noticed by the plaintiffs, and
24  that, of course, his testimony will be recorded for
25  trial.

1  twenty days, whatever the limitations are for this.
2    Dr. Kronmal looks fine to me.  I said to
3  Mr. Buchanan, if all my witnesses were this
4  good-looking, I'd like to have them on camera.  And
5  there's nobody here from California objecting to this.
6    I think at a minimum, we have to have this
7  videotape, Your Honor.  And a decision can be made
8  later as to whether or not it's allowed to be used in
9  any capacity.
10    MR. BUCHANAN:  Your Honor --
11    JUDGE HIGBEE:  All right.  I'm not
12  going to allow you to videotape the discovery
13  deposition.  I don't think it's appropriate.  You can,
14  of course, cross-notice and video notice the de bene
15  esse deposition, which is going to be in about a
16  month.  And if Counsel want to use that in their
17  cases, they can, but a discovery dep should not or
18  need not be videotaped.
19    MR. RABER:  Your Honor, but I have
20  the problem here that this has been cross-noticed in
21  California, and so I need to videotape it for that
22  particular matter.
23    MR. BUCHANAN:  I --
24    JUDGE HIGBEE:  I'm not going to let
25  you videotape it.  Is there somebody there from

California?

                    MR. RABER:  No, there's not.

                    JUDGE HIGBEE:  Well, then --

                    MR. RABER:  But the notice was
served, and --

                    JUDGE HIGBEE:  Well, then just
change your cross-notice and do it for the videotape.
*I'm not going to accommodate the California litigation*
*by having our discovery deps videotaped.  When it's a*
*de bene esse dep, we can videotape it.*

                    MR. RABER:  Do I understand Your
Honor's ruling, then, that no videotape is allowed for
California MDL or New Jersey?

                    MR. BUCHANAN:  Well, I think in
fairness, as I understood it, Your Honor, you're
ruling with respect to this in New Jersey.  And if the
defense wants to make an application to California --

                    MR. RABER:  It's been noticed in
California and the MDL as a video.  And so my point
is, I think we need to videotape it.  And --

                    *JUDGE HIGBEE:  I have nothing to do*
*with that.  I'm not going to -- and I don't know --*
how would it be ever played in a California court as a
plaintiff's expert, when the plaintiff's attorney from
California is not even there?

                    MR. RABER:  It certainly could be
used for -- well, it's just a notice, Your Honor.
They don't have to show up.

                    JUDGE HIGBEE:  I know, because it's
not their deposition.  So your idea that they're going
to be using this deposition, they're going to use it
as a discovery dep, which is what everybody is going
to use it for.  And you don't need to videotape a
discovery dep; not in the MDL, not in California, not
here.  You do not need to videotape a discovery dep.
And it's not going to be used in California for a
trial deposition, when there's no plaintiff's lawyer
there.  I don't believe you're going to call
Dr. Kronmal as your witness.

                    MR. RABER:  No.  But Your Honor --

                    JUDGE HIGBEE:  And they're certainly
not to call them, unless they set up a videotape
deposition of him.

                    MR. RABER:  But certainly for
cross-examination purposes, should he appear live, we
have the right to have a video for impeachment, Your
Honor.

                    JUDGE HIGBEE:  No, you don't.
You'll have a transcript which you can use, which is
used in every case.  The de bene esse deposition will

be videotaped.  You'll have a transcript of the
discovery deposition.  If he says anything
inconsistent, you can use that transcript.

                    MR. RABER:  So do I understand --

                    JUDGE HIGBEE:  That's my ruling.

                    MR. BUCHANAN:  Thank you, Your
Honor.

                    MR. RABER:  So the ruling is, the
camera is off for all three cases, Your Honor?  Is
that what your ruling is?

                    JUDGE HIGBEE:  The ruling is, this
New Jersey deposition will not be videotaped.

                    MR. RABER:  Right.  But it is also a
deposition --

                    JUDGE HIGBEE:  It will not be
videotaped for any proceeding.

        If you want to question Dr. Kronmal for the
New Jersey and then do something else for somebody
else, I guess -- there's nobody there for California.
There's nobody there for the MDL.  It's a discovery
deposition.  You may not videotape it.

                    MR. RABER:  All right.  We'll follow
that order, but note our objection.

                    (Recess 9:50-10:01 a.m.)

////

                    (Exhibit Nos. 1-2 marked
                     for identification.)


RICHARD A. KRONMAL, PH.D., having been first duly swor
                     by the Notary, deposed and
                     testified as follows:


                         EXAMINATION

BY MR. RABER:

Q    Good morning, Dr. Kronmal.  My name is Steve Raber,
     and I represent Merck in the Vioxx litigation --

A    Good morning.

Q    -- and we're here today for your deposition.
        Before we get started, are you taking any
     medications that would interfere with your ability to
     give truthful and accurate answers today?

A    No.

Q    Do you have any physical condition that would
     interfere with your ability to give truthful and
     accurate answers today?

A    No.

Q    I'd like to show you a document that has been marked
     as Kronmal Exhibit 1.  Can you tell us what that is,
     please?

1   A    That's my report for this proceeding.

2                MR. BUCHANAN:  You should probably

3        try and date them in time, because you have multiple

4        reports in the action.

5                THE WITNESS:  This is basically end

6        of May?  What's the date on -- I don't remember the

7        date.

8            Well, I can look.

9                MR. BUCHANAN:  For purposes of his

10       question, you can just identify, is this a report

11       regarding 2006 or 2005?

12               THE WITNESS:  Yes, it's the report

13       from 3/20/2006.

14  Q    (By Mr. Raber)  I understand that for the Humeston

15       case in New Jersey, you filed a report in August of

16       2005, or thereabouts.

17               MR. BUCHANAN:  It was April 2005.

18               MR. RABER:  I'm sorry.

19  Q    (By Mr. Raber)  In 2005.  And this report, Exhibit 1

20       here, was served in approximately April of 2006.

21  A    That's correct.

22  Q    Is that right?  Okay.

23  A    March.

24  Q    And did you serve an identical report for the MDL

25       proceeding in federal court in New Orleans?

1   A    I have not submitted --

2                MR. BUCHANAN:  Objection.  Form.

3   A    On my own, I have not submitted this to anyone.

4                MR. RABER:  David, can we just

5        stipulate that the report you served in the MDL is

6        identical to this one?

7                MR. BUCHANAN:  They're identical --

8                MR. RABER:  Okay.

9                MR. BUCHANAN:  -- as it was served

10       in California, the same report there.

11               MR. RABER:  Okay.

12  Q    (By Mr. Raber)  Dr. Kronmal, can you please tell us

13       what Exhibit 2 is?

14  A    It's an addendum to my report.  It's dated May 23rd,

15       2006.

16               MR. BUCHANAN:  Before you

17       continue -- and I'm sorry.  I should have stated this

18       at the outset.  I don't know what the caption reads,

19       but the deposition today is noticed in the New Jersey

20       proceedings, MDL proceedings, and the California

21       proceedings, although I have not seen cross-notices

22       for California in the MDL.  It is proceeding by

23       agreement per my conversations with Mr. Cohen, Andy

24       Goldman, and myself.

25           Thank you, Counsel.

1   Q    (By Mr. Raber)  Dr. Kronmal, can you just briefly tell

2        us, what was your purpose in preparing the addendum to

3        the report?

4   A    Well, new information became available from Merck; a

5        number of aspects.

6            And in addition, I had been continuing my work on

7        the Alzheimer's issues, and had new information on

8        that, that I wasn't aware of before this time.

9                MR. RABER:  Let's mark this as

10       Exhibit 3, if we could.

11                       (Exhibit No. 3 marked

12                        for identification.)

13

14  Q    (By Mr. Raber)  Dr. Kronmal, we've put in front of you

15       a document that's been marked as Exhibit 3.  I'll

16       represent to you that that's a Notice of Deposition

17       for today's deposition.  And if you look at Exhibit 3,

18       you'll see that it requests you bring some documents

19       with you today.

20           Do you see that?

21  A    Yes, I do.

22  Q    Have you brought any documents with you today?

23               MR. BUCHANAN:  I'll just object

24       initially and state that due to travel and timing of

25       the deposition, as I indicated to you previously, I

1        didn't see the deposition and the schedule until this

2        morning.  I shared it with Dr. Kronmal this morning.

3        And I do understand he's had an opportunity to review

4        it.  And I believe that the hard drive that you'll see

5        here --

6   A    Well, the answer to the question is, I have most of

7        the things that you requested here.  However, there

8        are -- there's a very broad request, and there are

9        some things that I have that are not included here.

10  Q    (By Mr. Raber)  Can you tell us what you have not

11       brought with you?

12  A    What I have not brought with me, I am precluded from

13       discussing with you because of a confidentiality

14       agreement I signed.

15  Q    With whom?

16  A    I'm not even sure I'm allowed to tell you that.

17  Q    Are they analyses of data and information?

18  A    Well, they're basically -- let me put it this way:

19       There's nothing in them that is new or that would be

20       particularly relevant to this case.  I'm not allowed

21       to discuss it, as I understand it.

22  Q    Do they relate to this case?

23  A    No.

24               MR. BUCHANAN:  Well, let's be

25       clear --

1    THE WITNESS:  Well, not in a direct
2  sense, they don't relate to --
3    MR. BUCHANAN:  Steve, can we go off
4  the record here so I can provide some information?
5    MR. RABER:  Yes.
6    (Discussion off the record.)
7
8  Q  (By Mr. Raber)  Dr. Kronmal, do you have any documents
9  that pertain to the analyses that you did in
10  connection with your opinions in Exhibits 1 and 2,
11  that you did not bring today?
12  A  Not -- again, it's complicated.
13    There are certainly data -- there are certainly
14  files that I constructed from Merck's files, that I
15  have not put on the hard drive.  I can even give them
16  to you, if you want.  They're basically copies of the
17  files that Merck provided, that you guys provided.
18  And if you want those, you can have them.  They're
19  just in a different format.  I have no problem with
20  giving them to you.
21    *But beyond that, and the matter we talked about*
22  before, I have not brought time sheets, bills,
23  invoices.
24    MR. BUCHANAN:  I think there's only
25  one bill, Steve, that's been provided to us.

1    that notice of deposition?
2  A  Yes.  I brought basically everything that I had,
3  except -- again, I didn't bring e-mails.  You're
4  welcome to have those, too.
5  Q  Okay.
6  A  They're just, would you please meet me at this time or
7  place; or, you know, when can we call each other.  You
8  know, things like that.  But you're welcome to have
9  them.
10  Q  I'll deal with Counsel on that.
11    MR. BUCHANAN:  And I'll reserve on
12  that, just so the record is clear.
13  A  Let me go over the rest of your list here, if you
14  don't mind.  I haven't had a chance to review this.
15    My publications or writings related to NSAIDS, I
16  don't actually know if I have -- if any of the
17  publications that I've written, there are reference to
18  say NSAIDS or not.  I just don't know.  I mean, I have
19  over 200 papers, and it's conceivable that in some
20  paper, you know, we said we adjusted for use of NSAIDS
21  and I wouldn't remember that.  So I didn't bring
22  anything.  There was no paper specifically on NSAIDS
23  that I have written.
24    I have some papers on aspirin, but you didn't ask
25  for those.  They're in my CV.

1    MR. RABER:  Off the record.
2    (Discussion off the record.)
3    (Answer on Page 17,
4    Lines 12 through 23,
5    read by the reporter.)
6
7    MR. BUCHANAN:  There's only one
8  invoice, Steve, that --
9    MR. RABER:  How about if I have him
10  testify, Dave?
11    MR. BUCHANAN:  Okay.  Well, I'm
12  trying to help you.
13    MR. RABER:  I know that you're
14  trying to help.
15  Q  (By Mr. Raber)  Can you estimate for us, Dr. Kronmal,
16  the total amount that you have billed for your time in
17  the Vioxx litigation?
18  A  In all Vioxx litigation?
19  Q  Yes.
20  A  Probably about $120,000, approximately.
21  Q  Do you know the approximate amount of the most recent
22  bill or invoice, that you said you didn't bring today?
23  A  I think it was twelve or fourteen thousand.  I'm not
24  absolutely sure.  It was for the MDL, not for this.
25  Q  Did you bring anything with you that's requested in

1    I can't provide you with correspondence on --
2  relating to conduct of any pharmaceutical
3  manufacturer, because the only correspondence I have
4  with pharmaceutical manufacturers has to do with
5  service on DSMBs.  And those are confidential, and I
6  cannot provide them.
7  Q  (By Mr. Raber)  Okay.
8  A  You have my current syllabus.
9    I'm sorry, I haven't taught any courses in the
10  last five years, so that's not relevant.
11    The rest of them aren't relevant.
12  Q  When you say not relevant, you mean you don't have
13  them?
14  A  I have not corresponded with the FDA and I have not
15  corresponded to the Congress.  I don't have any papers
16  under preparation at the moment on this matter.
17  Q  Okay.  And what numbered paragraphs were you referring
18  to when you said the rest of them are not relevant?
19  Can you just look and tell us what they are?
20  A  I don't know if you've been provided with the Rezulin
21  deposition that I gave within the last five years.
22  That's the only other one that there is.  I mean, you
23  had it at the previous deposition --
24  Q  Sure.
25  A  -- so I assume you have it now.

1  Q  Okay.  I just wanted -- the question is, which

2     numbered paragraphs were you referring to when you

3     said that the rest of these are irrelevant?  If you

4     can just tell me the numbers.

5  A  Sure.

6       11, 12, 15, 16.  And I already referenced 17 that

7     I can't do.  18, 19, 20.

8  Q  Okay.

9          MR. RABER:  I want to mark the next

10    document as Exhibit 4.

11           (Exhibit No. 4 marked

12           for identification.)

13

14  Q  (By Mr. Raber)  Dr. Kronmal, there's three pages that

15     are not fastened together yet, but they've been marked

16     as Exhibit 4.

17       Can you tell us what those three pages are?

18  A  Yeah.  The first two are corrections to Figure 10, 11,

19     and 12 of my report, Pages 38 and 39, where previously

20     I had erroneously marked a line that should have been

21     placebo as Vioxx.  And now they've been changed back

22     to placebo correctly.

23       And the third page of this document are a list of

24     references that I've looked at recently that relate to

25     a number of issues that conceivably could come up,

---

1     although I have no specific plans to bring any of them

2     up.

3  Q  Dr. Kronmal, I take it, then, that you carefully

4     reviewed your report before today's deposition?

5  A  I've reviewed it, yes.

6  Q  And you made corrections because you wanted to ensure

7     that your report was accurate?

8          MR. BUCHANAN:  Objection.  Form.

9  A  Well, I mean, for example, the change of the labeling.

10    Yeah, if I found anything inaccurate, I corrected it.

11  Q  (By Mr. Raber)  You knew that this report was

12     important as it relates to your opinions in the Vioxx

13     cases; true?

14  A  Absolutely.

15          MR. BUCHANAN:  Objection.  Form.

16  Q  (By Mr. Raber)  And you want to be careful to make

17     sure that your report is accurate?

18  A  Absolutely.

19  Q  And in reviewing your report, you found a couple of

20     errors that you are correcting by giving us Exhibit 4?

21  A  Yeah, absolutely.  Yes.

22  Q  And it's your belief that both Exhibits 1 and 2, your

23     report and the addendum to your report, are accurate?

24  A  To the best of my knowledge, they are, yes.

25  Q  And you stand by them?

---

1  A  Yes.

2  Q  Did you meet with Counsel to prepare for your

3     deposition today?

4  A  Briefly, yes.

5  Q  When?

6  A  8:30 this morning.

7  Q  With whom did you meet?

8  A  What?

9  Q  With whom did you meet?

10  A  With Dave Buchanan, Chris Tisi.

11  Q  What did you discuss?

12          MR. BUCHANAN:  Objection.  Just a

13    moment.  I thought we had an understanding that we're

14    not getting into dialogue back and forth between

15    witnesses and experts.  Is that a stipulation you're

16    not going to accept?

17          MR. RABER:  Well, I don't know

18    whether it is in the MDL in California.

19          MR. BUCHANAN:  I think it has held

20    true there, as well.  I mean, I thought that was the

21    working agreement in the MDL.

22          MR. RABER:  Okay.

23          MR. BUCHANAN:  If you're going to

24    violate it, we'll be violating it for everything.  I

25    just want you to understand that.

---

1          MR. RABER:  All right.  We'll move

2    on, then.  I seem to remember that, at least with

3    Dr. Ray.

4          MR. TISI:  Steve, while we're doing

5    this, I want to make sure -- I'm here with my MDL hat

6    on, as well as New Jersey.  Do you want me to object

7    in accordance with the MDL pretrial order, or is

8    Dave's objections, in your mind, preserving the MDL

9    objections, as well?

10          MR. RABER:  I'll have to tell you, I

11    confess, I'm not familiar with what the MDL order is

12    on this issue.

13          MR. TISI:  No, I'm talking about in

14    general.  Do you want to hear "objection" and

15    "objection" from both of us on every -- on questions

16    on form, et cetera?

17          MR. RABER:  If the substance of it

18    is covered by Mr. Buchanan's objection, I don't need

19    it in stereo.

20          MR. TISI:  That's fine.  I

21    appreciate that.

22          MR. BUCHANAN:  And again, I don't

23    know what the current state of that stipulation is.  I

24    caution you that it's a one-for-all rule.

25          MR. RABER:  We'll move on, then.

1   Q   (By Mr. Raber)  How long did you meet with
2       Mr. Buchanan and Mr. Tisi?
3   A   Well, I met yesterday for about seven hours and this
4       morning for about an hour.
5   Q   You met with both of them yesterday, as well?
6   A   Yes.
7   Q   I thought you just said you just met with them this
8       morning.
9   A   You asked me today.  That was your question.
10  Q   So you spent seven hours yesterday?
11  A   That's correct.
12  Q   Anytime before that?
13  A   We've talked on the phone occasionally.
14  Q   Your report has attached to it what I presume is the
15      most recent version of your CV?
16  A   It's the most recent that I've produced.  I mean,
17      there's certainly papers coming out, you know, every
18      other week or so.  So there may be some additional
19      paper.
20  Q   Aside from some additional papers, is it accurate?
21  A   Yes.
22  Q   Dr. Kronmal, do you plan to come testify live in
23      New Jersey for the trial that's set for September 11th
24      of this year?
25  A   I believe --

1               MR. BUCHANAN:  Objection.
2   A   I believe so.  I have no -- no formal arrangements
3       have been made to this point.
4   Q   (By Mr. Raber)  Do you understand that there is a
5       trial that is going to begin in federal court in
6       New Orleans in July of this year?
7   A   Not specifically, no.
8   Q   Have you been asked to come testify live at that
9       trial?
10  A   No.
11  Q   Do you have plans to do that?
12  A   Not at the moment.
13  Q   Will you do it if asked?
14              MR. BUCHANAN:  Objection.
15          Do you even know when it is?
16              THE WITNESS:  No.
17              MR. TISI:  And I object.  We reserve
18      the right, as the MDL, to ask Dr. Kronmal to testify.
19      He may not know that.
20          Go ahead.
21  A   I don't know.  It would depend on the timing.
22  Q   (By Mr. Raber)  Similar question.  There's a trial set
23      to begin in California in Los Angeles later this
24      month.  Have you been asked to testify live at that
25      trial?

1   A   I was asked, but I have refused.
2   Q   So I take it, as we sit here today, you have no plans
3       to appear and testify live at that trial.  Is that
4       correct?
5   A   At this moment, that is correct.  It could change.
6   Q   What could change that in your mind?
7   A   If Dave were to request that I do so, I might.
8   Q   Okay.
9   A   Again, it would depend on the timing.
10  Q   And why does it matter whether it's Dave requesting
11      you or someone else?
12  A   Primarily because most of the work I've done has been
13      for Dave, and I -- I value his advice as to when and
14      where I should appear.
15  Q   And by "Dave," you're referring to Mr. Buchanan?
16  A   That's correct.
17  Q   Dr. Kronmal, you're a biostatistician?
18  A   That's correct.
19  Q   What does a biostatistician do?
20  A   Well, it varies, obviously, with individuals.  But in
21      my case, I -- well, there's a number of things I do.
22          I run a large center that has, as the primary
23      responsibility, the running of medical research
24      projects, primarily for the federal government.  They
25      run the gamut of long-term, longitudinal studies,

1       primarily in the area of cardiovascular disease.
2           I also -- I'm responsible for the running of
3       several clinical trials.  And I am a codirector of a
4       large center that does clinical trial research in
5       cystic fibrosis.
6   Q   And a biostatistician, I take it you're not a medical
7       doctor.  Correct?
8   A   That's correct.
9   Q   And a biostatistician, as I understand it, takes the
10      data from the clinical trials and analyzes the data
11      and helps report the data.  Is that a fair summary?
12  A   That's some of the things we do.  It's not entirely
13      what we do.  I mean, I also am involved in designing
14      of clinical trials.  I have initiated -- helped
15      initiate clinical trials, where my expertise in the
16      medical areas was an important component of that.
17  Q   Would you agree with me that in analyzing and
18      reporting data, it's important to follow generally
19      accepted statistical rules and principles?
20  A   Absolutely.
21  Q   By doing that, you ensure that people are making valid
22      conclusions about data?
23              MR. BUCHANAN:  Objection.  Form.
24  A   In general, that's true, yes.
25  Q   (By Mr. Raber)  And these statistical rules help guard

1    against people making either misleading or erroneous
2    conclusions based on data; true?
3 A  They help prevent that, yes.
4 Q  And they help with uniformity in terms of analyzing
5    and interpreting data; correct?
6 A  Well, they provide some level of uniformity, but, you
7    know, like most fields, there's lots of ways of
8    analyzing data.  There's no -- we're not asked to
9    conform to, you know, a whole set of specific rules.
10 Q But, for example, statistical significance would be a
11   generally accepted principle of statistics that's
12   followed?
13 A Yes, that's correct.
14 Q And the concept of statistical significance is one
15   that statisticians rely on so that conclusions --
16   strike that.
17       Statistical significance helps us identify
18   outcomes that occur by chance versus outcomes that are
19   actually caused by something or associated with
20   something.
21       Is that a fair statement, generally?
22            MR. BUCHANAN:  Objection.  Form.
23 A Generally it's correct, yes.
24 Q (By Mr. Raber)  Because we recognize -- for example,
25   if I take five or six coins and flip them in the air

29

1    at the same time and it comes up five to one, that
2    kind of thing happens by chance?
3 A  With certainly probability, yes, that's correct.
4            MR. BUCHANAN:  Objection to form.
5 Q  (By Mr. Raber)  Is there a concept in statistics
6    called heterogeneity?
7 A  Yes.
8 Q  What is that?
9 A  It just means that within the set of results, there is
10   differences between various components of the -- that
11   make up the whole, if you want to look at it that way.
12 Q So is it fair to say that the test for heterogeneity,
13   one of its purposes is to make sure that you're
14   comparing apples with apples instead of apples and
15   oranges?
16 A In a very broad sense, that's true.
17 Q Okay.
18 A It's not -- that's not entirely the case, but it's
19   close.
20 Q Is heterogeneity an important statistical principle to
21   follow in analyzing and reporting data?
22            MR. BUCHANAN:  Objection to form.
23 A It depends on the context.
24 Q (By Mr. Raber)  Let me give you an example, and you
25   tell me whether this is an example of heterogeneity.

30

1        If you're looking at calories of drinks and you
2    were comparing sodas against, let's say, fruit juices,
3    would you agree with me that lumping diet sodas
4    together with sodas that have sugar in them, for
5    caloric content, that those would be heterogeneous?
6        In other words, you probably shouldn't lump them
7    together as sodas in one category when you're looking
8    at calories?
9            MR. BUCHANAN:  Objection.
10   Incomplete hypothetical.
11 A It depends on what your purpose was in lumping them
12   together.  If you wanted to be able to say, for
13   example, that country X, what is the total calorie
14   consumption from taking soda, then lumping together
15   would be perfectly reasonable.
16 Q (By Mr. Raber)  Right.  If you wanted to conclude, for
17   example, that sodas had fewer calories than fruit
18   juices, it would probably be misleading to combine
19   diet sodas with the sodas with sugar in them; correct?
20 A Again, it would depend how much you wanted to prove.
21       If you wanted to say that the amount of calories
22   from soda consumption was the same or different from
23   the amount of calories in, say, some community or
24   countries or whatever, was different from the amount
25   of calories consumed from fruit juices, it would be

31

1    perfectly reasonable to combine them.
2        If you were, on the other hand, interested in
3    whether the specific source for the calories was the
4    same, then of course not.
5        And then again, fruit juices, you would have to
6    say what kind of fruit juice.  I mean, it's --
7 Q  But if you're interested in the specific source on the
8    sodas, did I hear you to say that it would not be
9    proper to combine diet soda with regular soda?
10 A Again, it depends on what your purpose is.  If your
11   purpose was to summarize the overall amount of
12   calories that people were taking in with sodas, it
13   would be perfectly reasonable to combine them.
14 Q I'm asking about if you're comparing, say, that sodas
15   have fewer calories than juices.
16            MR. BUCHANAN:  Objection.
17   Incomplete hypothetical.
18 A That question doesn't make sense, because you would
19   have to say, does sodas of kind X have fewer calories
20   than fruit juices of kind Y.
21 Q (By Mr. Raber)  Give me an example in my hypothetical
22   of sodas versus fruit juices of where it would be
23   improper to combine diet soda with regular soda.
24            MR. BUCHANAN:  Objection.  Form.
25   Incomplete hypothetical.

32

1    You can answer if you can.

2         MR. RABER:  By the way, while we're

3    at it here, I don't want to have any coaching of the

4    witness, David.  You can object to form and that's

5    sufficient.  You don't need to say other things.

6         MR. BUCHANAN:  I have been at

7    numerous depositions where that has been done by your

8    side --

9         MR. RABER:  We're not going to do

10   it.

11        MR. BUCHANAN:  You don't think

12   that's necessary to protect the record?

13        MR. RABER:  No.

14        MR. BUCHANAN:  Oh, okay.

15   Can you read back the question, please?

16        MR. RABER:  Particularly in federal

17   court.

18        MR. BUCHANAN:  This is a

19   cross-noticed deposition, and we're going to have to

20   deal with those issues all day.

21  Q  (By Mr. Raber)  Go ahead, Doctor.

22        MR. BUCHANAN:  Could you read back

23   the question, please?

24  ////

25  ////

1              (Question on Page 32,

2               Lines 21 through 23,

3               read by the reporter.)

4

5  A  Well, if -- yeah, for example, if your question was,

6     does regular soda have more or less calories than

7     fruit juices, you wouldn't want to include diet soda.

8        If your question was, does diet soda have more or

9     fewer calories than fruit juices, you wouldn't want to

10    combine regular soda.

11  Q  (By Mr. Raber)  And that's because regular soda and

12    diet soda are different with regard to calorie

13    content?

14  A  Absolutely.

15        MR. BUCHANAN:  And just before you

16   go on, Counsel, because I'm taking some cross-noticed

17   deps next week, same deal?  Whatever you do here today

18   applies against your witnesses next week?

19        MR. RABER:  My practice is, if you

20   object to the form, you object to the form.  You don't

21   need to have a talking objection.

22        MR. BUCHANAN:  It's not your

23   practice.  It's going to be the arrangement.  I want

24   to know whether we have an agreement --

25        MR. RABER:  That's what the rules

1    are.

2         MR. BUCHANAN:  My objection is

3    proper under New Jersey practice --

4         MR. RABER:  David, I don't need to

5    commit to something that's going to apply once and for

6    all from now until the end of time.  I'm saying for

7    today's deposition, this is how we're going to do it.

8         MR. TISI:  In fairness, we have

9    other depositions coming up that are cross-noticed

10   similarly.

11        MR. RABER:  That's fine.

12        MR. TISI:  I'm willing to abide by

13   whatever rules you're willing to abide by, Steve.  So

14   you should probably --

15        MR. RABER:  I'm saying, I'm

16   following the rules that say no speaking objections.

17   So let's do that.

18        MR. TISI:  If that's the rule, I

19   expect it to be the rules across the board.

20        MR. RABER:  I'm not going to agree

21   to anything with anybody, because other lawyers may

22   not agree to stuff.

23   Stop interfering with the nonsense.  Let's go by

24   the rules and do this deposition.

25        MR. BUCHANAN:  I'm not going to deal

1    with your lectures, Steve.  I think it was a proper

2    objection under New Jersey practice, but if you say

3    that because it's cross-noticed, there's an umbrella

4    that makes it improper, I'll object according to your

5    rules.  And I'll --

6         MR. RABER:  You don't need to do

7    speaking objections, as far as I'm concerned.  I will

8    not take the position that you've waived it.

9         MR. BUCHANAN:  You took the position

10   that they were improper, and you took the position

11   that objection was improper.

12        MR. RABER:  Right.  It's a speaking

13   objection.

14        MR. BUCHANAN:  I just want to

15   know --

16        MR. RABER:  Well --

17        MR. BUCHANAN:  -- that I'm dealing

18   with these depositions perspectively.

19   Go ahead.  I'm guided.

20        MR. RABER:  You can talk to whomever

21   you need to talk to at that deposition.

22  Q  (By Mr. Raber)  Dr. Kronmal, can you tell me -- I've

23   noticed in your report in a number of places, you

24   referred to something called an ITT analysis.

25  A  That's correct.

1  Q  Can you tell us what your definition is of an ITT
2     analysis?
3  A  An ITT analysis is where you basically include
4     everyone that you possibly can who was randomized in
5     the final analyses of the data, for the full course of
6     the trial.
7  Q  Is there some source or publication that you're
8     relying on for that definition?
9  A  I mean, I've taught courses in clinical trials for
10     several decades, and it is absolutely a standard
11     concept that is used by everyone in the field.
12        So I'm not relying on a specific source. If you
13     want some, the two books that I gave you in that
14     supplemental list define ITT analyses exactly that
15     way.
16  Q  Is there any time limit about how long you follow
17     people, in your definition of an ITT analysis?
18  A  You follow people to the end of the -- of the designed
19     study.
20  Q  Is the data better the longer you follow people?
21  A  It's better if you follow them to the end of the
22     study, whatever it is.
23  Q  What if you have data that goes a few months beyond
24     *the end of the study? Is* it better to include that in
25     your analysis?

37

1  A  It would depend on how those events are ascertained.
2           MR. BUCHANAN:  Belated objection to
3     form.
4           MR. TISI:  I was just going to
5     object too.
6  A  If they're ascertained in a unbiased fashion, then
7     they can be included. However, it's extremely
8     unusual, if not -- in my experience, I don't know of a
9     single study where people included events that
10     occurred beyond the end of the study.
11  Q  (By Mr. Raber)  Well, for example, we've seen the
12     extension data for the APPROVe study.
13  A  Right.
14  Q  Correct?
15        And there was data that ran to week 210; correct?
16  A  That's correct.
17  Q  And then there was data that ran beyond that for
18     certain periods of time; true?
19  A  That's correct.
20  Q  And I noticed in your report that you did an analysis
21     of the data that ended at week 210.
22  A  *That's correct.*
23  Q  Why did you do it that way rather than looking at the
24     data that went beyond that?
25  A  Because that was Merck's pre-specified endpoint.

38

1  Q  Is there anything wrong or inappropriate in analyzing
2     the data that goes beyond week 210?
3           MR. BUCHANAN:  Objection.  Form.
4  A  Again, it would depend on how they ascertained that
5     data.  And beyond that, the -- what you make your
6     judgments on in clinical trials is your pre-specified
7     analyses, unless there's some very, very strong reason
8     not to use those.  And Merck pre-specified that 210
9     was going to be their analyses, and that's what I
10     used.
11  Q  (By Mr. Raber)  Did you do any analyses of the data
12     that went beyond week 210?
13  A  No.
14  Q  Were you curious about that?
15  A  Merck had done it.  I had their results.  I knew what
16     it showed.
17  Q  Well, Merck had done the analysis for the week 210
18     also, hadn't they?
19  A  Yes.
20  Q  Then why did you do your own analysis?
21  A  Because that's what I was mandated to do.
22        And further, Merck did not present MI and hard CHD
23     analyses in their report.
24  Q  They provided the raw numbers and you did the
25     analysis; correct?

39

1           MR. BUCHANAN:  Objection.  Form.
2  A  They provided the specific data files, and I did the
3     analysis, that's correct.
4  Q  (By Mr. Raber)  Dr. Kronmal, what is your definition
5     of a subgroup?
6           MR. BUCHANAN:  Objection.  Form.
7  A  Well, that's a hard one, in the sense that people use
8     the term loosely.
9        Generally a subgroup is some subset of the overall
10     population, but people also use it to specify subsets
11     on events; for example, different time periods, things
12     like that.  But generally speaking, it's some subset
13     of the population.
14  Q  (By Mr. Raber)  How do you use the term?
15  A  When I use it, I generally use it as a subset of the
16     population.
17  Q  Is there any source that you are relying on for that
18     definition?
19  A  Again, it's so standard, that I don't think there's
20     anybody who specifically writes down the subgroup.
21     It's completely standard.
22  Q  I want to talk to you, if I can, about this concept of
23     something called a nonproportional hazard.
24        Are you familiar with that concept?
25  A  Absolutely.

40

**Page 41**

1  Q  Can you tell us generally what that is?
2  A  Yeah.  Again, it's hard to put this into lay terms,
3     but when you have events occurring across time, you're
4     interested in -- at times, you may be interested in
5     whether or not the risk difference, the risk ratio,
6     really, the ratio of the two risks stays constant as
7     you go across time.  That would be considered to be
8     proportional hazards.
9        Nonproportional hazards would mean the risk is
10    changing with time in some way.
11 Q  I noticed in looking at the KM curves that you
12    prepared in this case, that you used something called
13    linear time on the X axis for your KM files.  Is that
14    correct?
15 A  Well, I plotted them -- that's -- to plot it that way
16    is completely standard.  You wouldn't want to plot on
17    some other scale because it would not allow you to
18    easily read off what the actual rates were at a given
19    time point.
20 Q  Are there different ways to analyze this question
21    about whether or not a ratio is constant over time or
22    changes over time?
23 A  Yeah, there's lots of different ways.
24 Q  Okay.
25 A  Probably a dozen different methods that could be used.

**Page 42**

1  Q  Can you tell us what some of the more commonly used
2     methods are?
3  A  There's certainly the Schoenfeld residuals.  A lot of
4     times, people look at interactions with log time.
5     Sometimes people use linear time.  Sometimes people
6     use graphical methods.
7        There are others.  I just don't remember the
8     specific names of them.
9  Q  Okay.  The four that you've mentioned -- Schoenfeld,
10    interaction with log, linear time, and graphicals --
11    are those all appropriate statistical methods to
12    analyze whether or not a ratio is constant over time
13    or changing over time?
14       MR. BUCHANAN:  Objection.  Form.
15 A  And again, in the context that you decided on which
16    one to use, the one you decided to use is the one you
17    should use.  That should be the one you do and one you
18    would report.
19       The general standard in the field is to use log or
20    Schoenfeld residuals.  That's by far the most commonly
21    used, but it's not the only ones.
22 Q  (By Mr. Raber)  Is it a fair statement that certain of
23    these tests or methods fit different data better than
24    others?
25       MR. BUCHANAN:  Objection.  Form.

**Page 43**

1  A  You shouldn't pick the method without -- unless -- you
2     should pick the method before you've seen the data.
3     So that question can't be answered.
4  Q  (By Mr. Raber)  Is it common that when analyzing
5     whether or not a ratio was constant over time, you use
6     more than one method to try to answer that question?
7        MR. BUCHANAN:  Objection.  Form.
8  A  No, it's not common that -- that doesn't mean people
9     don't do it, but it's not common.  And you shouldn't
10    pick the one that gives you the highest p-value -- the
11    smallest p-value, for example.  You should pick the
12    one you pre-specify.
13 Q  (By Mr. Raber)  What if you specify multiple tests and
14    methods?  Is there anything inappropriate about doing
15    more than one, applying more than one method to this
16    question, in your view?
17       MR. BUCHANAN:  Objection.  Form.
18 A  It would be inappropriate to do multiple methods and
19    then -- and then report the one that you like the
20    best, after the fact.  That would be inappropriate.
21 Q  (By Mr. Raber)  Well, isn't this a way of -- isn't it
22    true, Doctor, that when looking at this question,
23    there's something called a null hypothesis?
24 A  That's correct.
25 Q  And the null hypothesis would be that the rates are

**Page 44**

1     constant over time?
2        MR. BUCHANAN:  Objection.
3  A  The rate ratio is constant over time, yes.
4  Q  (By Mr. Raber)  And if you were to do a test that
5     found an insignificant p-value, that would simply fail
6     to reject the null hypothesis.
7        Are you following me?
8  A  That's correct.  That's correct.
9  Q  You haven't proven that the rates are the same.
10    You've just failed to prove that they're different.
11    Correct?
12 A  That's correct.
13 Q  Okay.
14 A  That's right.
15 Q  If you do another test on that same data which gives
16    you a statistically significant number for the
17    nonproportionality test, that would allow one to
18    conclude that the null hypothesis has been rejected
19    using that method; correct?
20 A  No, it's not correct.
21 Q  What's wrong with that?
22 A  Because if you do multiple tests of different kinds,
23    you can't pick the one that's significant and say, on
24    the basis of that, I reject the null hypothesis.  That
25    is improper, completely.

1  Q  Are you familiar with the concept of a data fitting
2     problem when it comes to nonproportional hazard
3     testing?
4  A  Sure.
5  Q  And what does that describe?
6  A  I assume you mean that whatever model you fit wasn't
7     proper, wasn't the correct model. But that's --
8     again, those are after-the-fact determinations and
9     those are not of any real validity.
10        You can't look at data after you've seen and it
11    then say, oh, I've looked at it and I see that it now
12    looks like this or looks like this, whatever, and then
13    say, oh, I'm going to make a test that is going to be
14    significant for what I actually saw.
15        That's improper. That's a standard principle that
16    you don't do tests after you've looked at -- you don't
17    make up your test after you're going to use after
18    you've examined the data for the pattern that you see.
19  Q  But if you say, before you look at the data, that
20    you're going to do certain tests, that's appropriate;
21    correct?
22  A  Sure.
23  Q  What approach have you used in your opinions in this
24    case to analyze the nonproportional hazard?
25  A  I used Schoenfeld residuals.

45

1  Q  Why did you use that particular test?
2  A  It's pretty much what's considered to be the standard
3     in the field.
4  Q  How does that differ from the interaction with log
5     tests?
6  A  It's very similar. They're approximately the same.
7  Q  How does it differ from the linear test?
8  A  It's quite different.
9  Q  In what way?
10 A  The linear test weights all of the times about the
11    same. The log test brings in the extreme -- the ones
12    at the extreme end -- the events that occurred at the
13    extreme end. And there's a good reason for doing
14    that, is that you don't want the -- at the end of
15    trials, you tend to have lower exposure rates because
16    people have been dropped out, people have had events,
17    and so on. So you don't want to tend to over-weight
18    the data in the tail end of the time distribution.
19    And for that reason, you generally don't use linear.
20 Q  Have you used the linear model or method in any of
21    your studies?
22        MR. BUCHANAN: I'm sorry. Just --
23    for this case, or generally?
24        MR. RABER: No. Generally.
25 A  I don't really know. I don't remember. I mean, I

46

1     might have. You need to test proportional hazards a
2     lot.
3         I don't put a whole lot of weight on the testing
4     of proportional hazards, frankly, because in the end,
5     what you're interested in is the average hazard ratio.
6     You don't really care whether there's some
7     fluctuations in it over time. That's really usually
8     *relatively irrelevant*.
9         So, you know, perfunctorily, I have done tests for
10    proportional hazards on papers. I don't remember
11    whether I used Schoenfeld residuals -- I might have in
12    some cases. I might have even used linear in some
13    cases. But I would have pre-specified it, in any
14    event. And I wouldn't have done five different tests.
15    I would have done the one test and then been done with
16    it.
17 Q  (By Mr. Raber) I take it, though, that there's no
18    generally set rule for which model or method to use in
19    analyzing nonproportional hazard. True?
20        MR. BUCHANAN: Objection to form.
21 A  Well, there's nobody that writes rules for how you do
22    things. You do what is thought to be the best method
23    that's available, you know, in terms of the context of
24    your particular problem.
25 Q  (By Mr. Raber) Let's see, Dr. Kronmal. I'd like to

47

1     ask you some questions about Exhibit 2, which is
2     your --
3         MR. BUCHANAN: The skinny one?
4  Q  (By Mr. Raber)  -- addendum to your report.
5  A  Yes.
6  Q  Now, this addendum to your report generally includes
7     two matters. It includes a supplement relating to
8     your Alzheimer's analysis, and it includes something
9     called the APPROVe extension analyses; correct?
10 A  That's correct.
11 Q  I want to focus, if we can, on the APPROVe extension
12    analyses.
13 A  Sure.
14 Q  You believe that your analysis of this extension data
15    is important to your opinions in this case; true?
16 A  It's one of the aspects of my opinions. I don't think
17    it's crucial to it, but it's important.
18 Q  And you have concluded in *your analysis that the data*
19    from the APPROVe extension analysis is consistent with
20    other findings you made in your original report; true?
21 A  That's correct.
22 Q  Specifically, you state in your addendum that this new
23    data shows that the risk of Vioxx actually increases
24    when a person is off-drug.
25 A  No, I didn't say that. I said it was similar.

48

1  Q  Similar?

2  A  Yeah.

3  Q  Similar in what way?

4  A  That the overall risk ratio basically did not change

5     when you added on the off-drug extension data.

6  Q  And in fact, in your report, you concluded that in

7     several measurements, the relative risk actually

8     increased when you added the off-drug data.

9  A  That's correct.  That was actually based on Merck's

10    own reporting of the data.

11 Q  And your analysis of the data?

12 A  And mine.  Both.

13 Q  And you felt that your analysis of this extension data

14    confirms the opinions that you've given in your

15    original report?

16       MR. BUCHANAN:  Objection to form.

17 A  Confirms?  I mean, what I said in the original report

18    doesn't need confirmation.  It just adds additional

19    data.

20 Q  (By Mr. Raber)  Well, look at Page 5, if you would, of

21    your Exhibit 2.  The very last paragraph of your

22    addendum says, "Finally, the extension also supports

23    the possibility, first suggested by the Alzheimer's

24    078 trial results, that the elevated risk associated

25    with rofecoxib might extend beyond the time when the

1     patient stopped taking rofecoxib."

2        True?

3  A  That's correct.

4  Q  And that's what this data and your analysis told you?

5  A  That's correct.

6  Q  And the last sentence -- last two sentences, you say,

7     "This indicates that the off-drug contribution to the

8     ITT RR was actually greater than seen during the

9     on-drug RR or the APTC endpoint."

10 A  Actually, there's a typo.  That should have said "for

11    the ATPC endpoint."  It refers back to the previous

12    sentence.

13       Yeah.

14 Q  And what you mean by that is, when you analyzed these

15    relative risks, you found that when you added in the

16    data for people who were off the drug, your analysis

17    told you that the relative risk actually increased.

18 A  For that particular endpoint.  It wasn't my analysis.

19    It was Merck's.

20 Q  Well, it's your analysis, isn't it?

21 A  No.  It's Merck's.  I just took that right off Merck's

22    report.

23 Q  Okay.

24 A  I don't --

25 Q  And you state here, "The overall implication of this

1     is that it is likely that rofecoxib does some damage

2     to the body that persists for some time after the drug

3     is discontinued."

4        That's your opinion?

5  A  That's my opinion.

6  Q  There's one problem with that opinion, isn't there,

7     Dr. Kronmal?

8  A  What is that?

9  Q  That your analysis is wrong in this addendum to the

10    report.

11       MR. BUCHANAN:  Objection to form.

12 A  Well, are you saying that Merck's analysis is

13    incorrect?

14 Q  (By Mr. Raber)  No.  I'm saying that your analysis and

15    what you wrote in this extension [sic] is wrong.

16 A  On what basis?

17       MR. BUCHANAN:  Objection to form.

18 Q  (By Mr. Raber)  Well, let's look at it.

19       Do you have -- you have that in front of you.  I

20    think you may need to have also the Merck data that

21    was submitted to the FDA.

22       Do you have that on your computer?

23 A  I do.

24       Okay.

25 Q  First of all, on Page 4 of your report -- I'm sorry.

1     Let's go to Page 5, Dr. Kronmal.

2        MR. TISI:  Of the addendum?

3        MR. RABER:  Of the addendum.

4  Q  (By Mr. Raber)  Halfway through the last paragraph,

5     you state, "For example, for thrombotic events, the

6     on-drug RR reported in the NEJM paper is 1.86."

7        Do you see that?

8  A  That's correct.

9  Q  That's wrong, isn't it?

10 A  Not as far as I know.

11 Q  In fact, the number is 1.92, isn't it?

12 A  If it is, I misread it from the table.  But if you can

13    show it to me that it's wrong, I'll be happy with

14    1.92.

15 Q  I'll represent to you that it's 1.92.

16 A  Let me look at that paper, then.

17 Q  Okay.  You can do that?

18 A  Sure.

19       MR. BUCHANAN:  There's a printed

20    copy.

21       THE WITNESS:  Thanks.

22 A  Oh, I see.

23       Wait a minute.  Are you referring to the

24    thrombotic or APTC?

25 Q  (By Mr. Raber)  I'm referring to the thrombotic.

1  A   Yeah, you're right.  It's 1.92.

2  Q   So your addendum report is incorrect?

3  A   Well, I mis- -- I miscopied -- mistyped that number.

4  Q   Sir, your report is incorrect?

5  A   Oh, come on.

6              MR. BUCHANAN:  Objection.  Asked and

7       answered.

8  A   I mean, if I mistyped one number in there, it's not

9       incorrect.  1.86 is not different from 1.92 in any

10      substantive way.

11 Q   (By Mr. Raber)  Sir, in the sentence before, you made

12      the point, "In the APPROVe trial, this argument is

13      *supported by the fact that the RR observed including*

14      the extension is virtually identical to that seen for

15      the on drug analyses."  And then you compare the

16      numbers 1.86 to 1.74; correct?

17 A   Well, it's even -- yeah.  But 1.92 and 1.74, you're

18      talking about minuscule differences.

19 Q   Sir, the difference between 1.92 and 1.74 is greater

20      than what you've written in your report?

21 A   It is, but it is not substantially different --

22 Q   And you made a mistake in your report, didn't you?

23              MR. BUCHANAN:  Excuse me.  You're

24      talking over each other.  I'm going to interpose an

25      objection.  I'm going to object to form.

1        You can answer.

2  A   The answer is, those are not important differences.

3  Q   (By Mr. Raber)  Sir, you made a mistake in your

4       report.

5  A   I did.  I miscopied that number, yes.

6  Q   And you not only miscopied it.  You made a statement

7       about the fact that the numbers were virtually

8       identical.

9  A   They're still virtually identical.  That statement is

10      still true.  So whether it's 1.92 or 1.86, it's the

11      same thing.  It's all within --

12 Q   But you got the numbers wrong.

13 A   I miscopied that number, as I said that.

14 Q   All right.  Looking at Page 5 of your report, you

15      say -- I'm sorry.  Page 5 of your extension, you say

16      that "For the APTC endpoint, the on-drug" --

17              MR. TISI:  I'm sorry.  Where are

18      you, Steve?

19              MR. RABER:  Last paragraph on

20      Page 5.

21 Q   (By Mr. Raber)  "For the APTC endpoint, the on-drug

22      relative risk was increased from from 2.06 in the NEJM

23      paper to the ITT RR of 2.36 now."

24              MR. BUCHANAN:  Okay.  Your question?

25 Q   (By Mr. Raber)  Are you with me, what you said in your

1       report?

2  A   Yeah.

3  Q   And the APTC number from APPROVe is 2.06; correct?

4  A   That's correct.

5  Q   And you said that it increases to 2.36 on the ITT;

6       correct?

7  A   That's correct.

8  Q   And you've commented on that by saying that "This

9       indicates that the off-drug contribution to the ITT RR

10      was actually greater than seen during the on-drug RR

11      for the APTC endpoint"; correct?

12 A   Yes.

13 Q   You were making the argument that this shows that when

14      you add the off-drug deaths, the relative risk gets

15      higher; right?

16              MR. BUCHANAN:  Objection.  Form.

17      You said "deaths," by the way.

18 A   I was basically commenting that it was larger.  That's

19      a fact.

20 Q   (By Mr. Raber)  In fact, you're wrong, aren't you,

21      Doctor?

22 A   I don't know I'm wrong.  Why am I wrong now?

23 Q   Because the ITT relative risk for the APTC endpoint

24      actually decreased when you add the off-drug data,

25      didn't it?

1  A   *What are you referring to specifically?*

2  Q   Look at Table B9, sir, of the Merck data to the FDA.

3              MR. BUCHANAN:  Objection.  Form.

4  Q   (By Mr. Raber)  Do you see that?  Can you tell us what

5       that table shows for the relative risk for the APTC

6       endpoint for ITT population at week 210?

7  A   Shows 1.86.

8  Q   Right.  That APTC number decreased; correct?

9  A   You're right.  I don't know -- I can't figure out what

10      I did.

11 Q   Your addendum is wrong, isn't it?

12 A   It's certainly wrong on that number.

13 Q   And the conclusions you drew from those numbers are

14      wrong, aren't they?

15              MR. BUCHANAN:  Objection.  Form.

16 A   I'd really need to look at the documents I had at the

17      time, because I just can't believe I would miscopy

18      that number.  So I want to look back and see what

19      actual documents I was looking at.

20 Q   (By Mr. Raber)  It's a pretty big mistake, isn't it?

21              MR. BUCHANAN:  Objection.  Asked and

22      answered.

23 A   I made a mistake, obviously.  If the -- you know, I...

24 Q   (By Mr. Raber)  You're shaking your head.

25              MR. BUCHANAN:  Objection to the

1    characterization.

2  Q  (By Mr. Raber)  You were shaking your head.

3  A  I was, because I don't understand where I got that

4    number from.  And I know that I copied it from a Merck

5    report, from this -- from this thing.

6        So the question is, did I have another preliminary

7    version and this is the later version and they

8    changed?  I don't know.  At this point in time, I

9    can't --

10  Q  Could it just be possible that Dr. Kronmal made a

11    mistake rather than Merck changing numbers?  Is it

12    possible?

13  A  I'm capable of making mistakes.  It's possible.  I

14    obviously made a mistake in copying the number 1.92,

15    that you previously pointed out.

16  Q  And not only did you make a mistake, but you made a

17    conclusion that is incorrect.

18          MR. BUCHANAN:  Objection.

19  A  If I made a mistake, that conclusion was incorrect.

20    That's correct.

21  Q  (By Mr. Raber)  And based on your mistake, that

22    finding is incorrect -- or I'm sorry -- is

23    inconsistent with the Alzheimer's data that you were

24    talking about in this report?

25  A  It's not inconsistent.  It's just that the numbers are

1    small and there's a lot of variability.  So -- but it

2    certainly wouldn't justify the strength of what I

3    said, yes.

4  Q  But in fact, the number goes down instead of going up.

5  A  Yeah, but I wasn't making a big point of it going up.

6    *I was only trying to say that basically that the*

7    *off-drug experience didn't change the relative risk*

8    *much.*

9  Q  When you said -- the last sentence of your addendum

10    report says, "The overall implication of this is that

11    it is likely that rofecoxib does some damage to the

12    body that persists for some time after the drug is

13    discontinued."

14        You said that, didn't you?

15          MR. BUCHANAN:  Excuse me.  Just

16    objection to form.

17        You can answer.

18  A  It's too strong a statement based on -- if those

19    numbers are correct -- and I have to check to see if

20    the earlier version -- see, the thing is, there were

21    two reports that came out on this subject.  And it's

22    conceivable the earlier one had different numbers in

23    it, because I can't believe I would have made that

24    mistake.

25        But assuming that I did -- and it's possible that

1    I did.  I'm fallible, although I can't imagine where I

2    got that number from.  But I'm fallible.  And if I

3    made that mistake, then that statement was too strong,

4    yes.

5  Q  (By Mr. Raber)  It's not only too strong.  It's

6    incorrect.

7  A  It's not incorrect.  There's not enough data to tell.

8        The point is, it's not inconsistent with it

9    *going* -- it's staying up, but *it doesn't prove it.*  And

10    it's too strong, I admit it.  If those numbers that I

11    quoted were miscopied from someplace, then that

12    statement is too strong.

13  Q  Dr. Kronmal, let's look at Page 4 of your extension --

14    of your addendum, please.

15        On Page 4 of your addendum, the third paragraph,

16    you say, "For MI, the RR comparing rofecoxib to

17    placebo is 2.11.  This is a small increase in relative

18    risk compared to the result for the 'on-drug' analysis

19    (RR = 2.07)."

20  A  Mm-hm.

21  Q  Correct?

22  A  That's correct.

23  Q  So you're making a point there again that the relative

24    risk is increasing when you look at the people who had

25    off-drug events?

1  A  No.  I'm making the point that they're similar.

2  Q  Well, you say "a small increase."

3  A  That doesn't mean anything.

4  Q  You didn't say "similar."  You said "a small

5    increase."  Right?

6          MR. BUCHANAN:  Objection to form.

7        You can answer.

8  A  That's a -- I mean, when I say "a small increase," I

9    mean similar.  Even if it would have been a small

10    decrease, I would have said it's similar.  It doesn't

11    matter.

12  Q  (By Mr. Raber)  In fact, isn't it true that the

13    relative risk actually decreases for MIs when you add

14    the off-drug data?

15  A  They didn't in the data file I had.

16  Q  Well, let's look and see.  I had a question for you.

17    If you can pull up Table B5 of the extension data.

18  A  Yeah, that -- yeah, I've seen that data.

19  Q  And B5 indicates that the number of heart attacks for

20    the people off-drug was ten in the Vioxx group and six

21    on placebo; correct?

22  A  That's correct.

23  Q  Now, my question is, if you have a relative risk

24    that's greater than two, how is it that adding ten and

25    six will cause that relative risk to go up?

6/7/2006 Kronmal, Richard

1  A   It depends when the events occurred.
2  Q   That's just impossible, isn't it?
3  A   No, it's not impossible.  It depends when the events
4      occurred.
5  Q   Your analysis here is wrong, isn't it?
6  A   I don't believe it is.  It's based on their data.
7  Q   You don't want to admit it?  You're going to make us
8      prove it?
9          MR. BUCHANAN:  Objection, Counsel.
10     That's ridiculous.
11 A   You give me another data file that shows it's wrong,
12     and I'll be willing to admit it's wrong.
13 Q   (By Mr. Raber)  So you stand by your position on
14     Paragraph 3 of Page 4 of your addendum, you stand by
15     your statement here that there was a small increase in
16     relative risk compared to the result in the on-drug
17     analysis?
18 A   I stand by the fact that the file I used that was
19     given to me, that was Merck's file --
20 Q   Sir, please answer the question.
21         MR. BUCHANAN:  Objection.  Don't
22     interrupt him.
23 A   I am.
24         MR. BUCHANAN:  Can you read back the
25     prior question he was trying to answer before he was

6/7/2006 Kronmal, Richard

1          MR. BUCHANAN:  Objection.  Form.
2  Q   (By Mr. Raber)  Well, you made a mistake on the 1.92
3      versus 1.86; right?
4  A   You're not letting me answer the question.
5  Q   You made a mistake.
6          MR. BUCHANAN:  Objection.  Are you
7      just going to badger him, Steve, or are you going to
8      let him answer the questions?  Okay?  There's four on
9      top of each other.
10         Can you read back the last full question, please.
11                 (Question on Page 63,
12                 Lines 2 through 3,
13                 read by the reporter.)
14
15 A   You asked me based on the file.  The mistake I made in
16     the previous instance was not based on any data files.
17     It was based on some misrecording on my part of, one,
18     the rate in the New England Journal of Medicine paper,
19     and potentially a misrecording of the rate in their
20     report, but had nothing to do with the data file.
21 Q   (By Mr. Raber)  Okay.
22 A   The result I reported there was based on the data file
23     that I had.
24         Now, if it turns out to be incorrect, then it
25     means that the data file was incorrect.

6/7/2006 Kronmal, Richard

1      rudely interrupted?
2  Q   (By Mr. Raber)  Sir, my question --
3          MR. BUCHANAN:  No.  He gets to
4      finish his answer.
5          MR. RABER:  David, stop it.
6          MR. BUCHANAN:  You asked a question.
7      He answers it.  You don't get to stop his answer.
8          Can you read the question back?
9  Q   (By Mr. Raber)  Let's hear your answer.  I have the
10     feeling I'm going to have to ask the question again.
11         Go ahead, Doctor.
12 A   The answer is, based on the file that I received, I
13     stand by what the analysis showed from that data
14     analysis.
15 Q   Do you stand by the statement in the addendum to your
16     report that this is a small increase in relative risk
17     compared to the result for the on-drug analysis?
18 A   Absolutely.  That is true.  2.11, whatever
19     the number was, is bigger than the other number.  But
20     that is based on that file.
21         Now, if there's another file that has different
22     data, then it's a different issue.
23 Q   Well, we've seen that based on the file, you've made
24     two mistakes before this one.
25 A   No, that is incorrect.

6/7/2006 Kronmal, Richard

1  Q   So it's always somebody else rather than you?
2          MR. BUCHANAN:  Objection.  Form.
3  A   Always?
4  Q   (By Mr. Raber)  You're saying somebody else must have
5      made a mistake.
6          MR. BUCHANAN:  Objection.  Form.
7      Badgering.
8          MR. TISI:  And I'm also going to
9      object on behalf of the MDL.  I think the judge has
10     been very specific about being courteous to witnesses.
11         MR. RABER:  I'm being courteous.
12         MR. TISI:  You're being particularly
13     unprofessional and discourteous, and I'm going to make
14     an objection based upon that.
15         MR. RABER:  I wish we had the video
16     here, sir.
17         MR. BUCHANAN:  So do I.
18         MR. TISI:  Actually, I wish I could
19     pull that back.
20         MR. BUCHANAN:  I think you'd like to
21     listen to yourself, Counsel.
22 A   The answer is, I've admitted that if I miscopied those
23     numbers, that's a mistake, no doubt.  And I apologize
24     to David and them that I made that mistake.  I don't
25     understand how I did it.

1    Q   (By Mr. Raber)  Sir, how did you calculate a relative
2      risk of 2.07 --
3    A   I used the data file.
4    Q   Excuse me.  How did you calculate a relative risk for
5      2.07 for MIs in the APPROVe base study?
6    A   I took the data file that I had from the APPROVe study
7      and I calculated it.
8    Q   How many events were there in the Vioxx arm and the
9      placebo arm?
10    A   I don't remember.  I don't remember.
11    Q   Is it possible that you made a mistake?
12            MR. BUCHANAN:  Objection.
13    A   It's always possible to make mistakes.  Obviously I've
14      already made some, apparently.  At least one for sure.
15      And the other one, probable.
16    Q   (By Mr. Raber)  Would you agree with me that just in
17      looking at this data, that if the MIs off-drug are ten
18      to six, that it would be unusual for that to increase
19      a relative risk that's greater than two?
20    A   It would be.
21    Q   Does that suggest to you that maybe you made a
22      mistake?
23    A   It's unlikely, for the following reason:  That I just
24      took the data that was in that file and ran the
25      analyses.  And that is a standard process.  That

1      doesn't mean it's inconceivable, but it's fairly
2      unlikely.
3    Q   Could you have written down the wrong data or the
4      wrong numbers?
5    A   That's conceivable, but unlikely, for the following
6      reason:  I don't tend to write down the numbers.  I
7      tend to paste them in.  And -- from the analysis
8      files.  So again -- but, you know, given that I've
9      made some of these mistakes, yeah, it's possible.
10    Q   Is it possible that you double counted some heart
11      attacks?
12            MR. BUCHANAN:  Objection.  Asked and
13      answered.
14    A   No, not unless they were in the file twice.
15    Q   (By Mr. Raber)  All right.  Let's look further down on
16      Page 4 of your addendum.  You say, "The results for
17      hard CHD are quite similar."
18    A   That's correct.
19    Q   "The RR is 2.45 compared to the on-drug RR of 2.17."
20    A   Yes.
21    Q   And what you've concluded from that is that the
22      relative risk increased from 2.17 up to 2.45 when you
23      added the off-drug data for MI and sudden cardiac
24      death; correct?
25    A   That's correct.

1    Q   Now, if you would look, please, at Table B5.
2    A   Yeah.  Yeah.
3    Q   Do you see that the number of events for sudden
4      cardiac death plus myocardial infarction, it's
5      fourteen for Vioxx and eleven for placebo?
6    A   That is also correct.
7    Q   Now, in looking at those numbers, does that suggest to
8      you that when you add fourteen versus eleven events,
9      that a relative risk that starts out above two is not
10      going to get bigger?
11    A   That's --
12            MR. BUCHANAN:  Objection.  Form.
13    A   That's correct also.
14    Q   (By Mr. Raber)  Does it appear to you that you've made
15      a mistake in your statements and calculations relating
16      to the results for hard CHD in your addendum?
17    A   What it suggests to me is that the file I had was not
18      correct or not up to date.
19    Q   So you're going to blame the file?
20            MR. BUCHANAN:  Objection to form.
21    A   I'm not blaming anything.  I'm just saying that's the
22      only explanation for it.  It's the only logical
23      explanation.
24    Q   (By Mr. Raber)  It appears to me that your statement
25      in the fourth paragraph on Page 4 of your addendum is

1      incorrect.
2          Would you agree with that?
3            MR. BUCHANAN:  Objection.
4    A   I don't know.  I haven't looked at the -- I mean, all
5      I can say is that the file I had gave those results.
6          Now, if there was a more recent file -- and there
7      are more recent files -- that give a different result,
8      then I'll say that whatever that different result is,
9      is the result.
10          I'm not trying to make up data here.  This is what
11      I had.  And --
12    Q   (By Mr. Raber)  But you're drawing -- go ahead.
13    A   And if they're wrong, then of course everything
14      follows from that.
15    Q   And your conclusions would be wrong, as well?
16    A   They would be different.
17    Q   Well, looking at Table B8, if you would, please.
18    A   Yes.
19    Q   Okay.  Table B8 lists the confirmed APTC endpoint by
20      class of terms for the ITT population; is that
21      correct?
22    A   That's correct.
23    Q   Ending at week 210?
24    A   Mm-hm.
25    Q   And that's the same analysis that you did; correct?

1    A    To the best of my knowledge, yes.

2    Q    And if we look at the -- what you defined as CHD, that

3         would include the fatal and non-fatal acute myocardial

4         infarction and the sudden cardiac death?

5    A    That's correct.

6    Q    And those numbers, looking at Table B8, are 38 to 21?

7    A    That's correct.

8    Q    Can you conceive of any circumstance where with those

9         numbers, 38 to 21, you have a relative risk of 2.45?

10   A    I think it's highly unlikely.

11   Q    Looks like you made a mistake.

12   A    Looks like the file I had was not comparable to this

13        file.

14   Q    You made a mistake, didn't you?

15   A    I --

16                    MR. BUCHANAN:  Objection.  Asked and

17        answered.

18   A    *I've answered that question four times to you.  The*

19        *data I had gave that result.*

20   Q    (By Mr. Raber)  Sir --

21   A    If the data in here is different, then that's the

22        fact.  But I can't -- I can't verify that now.

23   Q    Is the statement in your report, in the addendum, that

24        the relative risk is 2.45 for hard CHD for the ITT

25        analysis, is that statement correct or incorrect?

1    A    If -- it depends on whether this data is correct in

2         the report.  I don't have any way of validating right

3         now whether the data that's in Merck's report is

4         accurate.

5    Q    Sir --

6    A    Until I can do that, I can't tell you the answer to

7         that question.

8    Q    Sir, true or false:  The relative risk for hard CHD

9         for the ITT population censored at week 210 is 2.45?

10        True or false?

11   A    I don't know now.  And I don't know because there's

12        data reported here in this report that doesn't

13        correspond to the data I had in my data file.  If

14        those two don't correspond, we need to resolve why

15        they don't correspond.

16        Now, it may be that they supplemented the data.

17        They may have updated it, for all I know.  I don't

18        know.

19        And it's even possible I made a mistake.  That's

20        possible.

21   Q    We've referred --

22   A    I don't know.

23   Q    We've referred to at least four matters now where you

24        at least admit it's a possible mistake.

25                    MR. BUCHANAN:  Objection.

1    A    I didn't count them.  There's one --

2    Q    (By Mr. Raber)  The 1.86 --

3    A    There's one place where I definitely made a mistake,

4         where I copied the number wrong on the other report.

5         The others could have been based on different

6         reports that were available.  I don't know.

7    Q    And in each situation, that possible mistake made your

8         opinions stronger; correct?

9                     MR. BUCHANAN:  Objection.

10   A    I don't know that, to this point.  But probably --

11   Q    (By Mr. Raber)  They supported your opinions?

12   A    They probably did, yes.

13   Q    More so than had they gone the other way?

14   A    That's correct.

15                    MR. BUCHANAN:  Steve, when you get a

16        chance, can we take a break?

17                    MR. RABER:  We'll take a break.

18                    (Recess 11:18-11:36 a.m.)

19

20

21                    EXAMINATION (Continuing)

22   BY MR. RABER:

23   Q    Dr. Kronmal, I want to ask you a general question now

24        that relates to the APPROVe extension analysis that's

25        in your addendum to your report.

1         My general question is, can you tell us what

2         opinions you have that relate to that data?

3    A    Well --

4                     MR. TISI:  Let me just place an

5         objection.  I think it's an ambiguous question.

6         Go ahead.

7                     MR. BUCHANAN:  Objection.  Form.

8    A    *Well, until I get a chance to redo the analyses for*

9         *the MI, it's kind of hard for me to state what my*

10        *opinions would be based on analyses I have not done*

11        *currently.*

12        Clearly if the data in these tables that were in

13        the final FDA report are correct, then all I probably

14        could say at that point in time was that the follow-up

15        data was neither confirmatory or not confirmatory of

16        an increased risk.

17   Q    (By Mr. Raber)  Has no impact?

18   A    Very little on that specific issue.  It has a big

19        impact on the 18-month issue.  But for that specific

20        issue, there's almost no --

21   Q    All right.  Well, let me hear your opinion about that.

22                    MR. TISI:  Objection.

23   Q    (By Mr. Raber)  The 18-month issue.

24   A    Well, I express it in the report.  But basically, that

25        the new data quite clearly shows -- and this is based

1   on Merck's analysis, not on mine.  On Merck's analyses
2   presented in the FDA report and illustrated in Figures
3   B1 and B2, and if you wanted to, B2 and B6, which I
4   didn't put in the report, it clearly showed that
5   there's no longer any substantive evidence for an
6   18-month increase in risk.
7   Q   What's your basis for saying that?
8   A   The overall test for significance as reported in -- by
9   Merck in -- on the bottom of Figure B2 and B5 were
10  nowhere's near significant.  They were like .7,
11  something like that.
12  Q   Are you talking about the nonproportionality numbers?
13  A   That's correct.
14  Q   What does the nonproportionality test show for
15  confirmed thrombotic events?
16              MR. BUCHANAN:  Do you want that?
17              THE WITNESS:  Do you have that
18  report?  Yeah, it would be easier than looking at the
19  computer.
20  A   It's Figure B2, and the footnote, it says
21  proportionality p-value, .748.
22  Q   (By Mr. Raber)  And it's on that basis that you
23  conclude that there's no evidence that --
24  A   There's no statistical evidence, that's correct.
25  Q   No statistical evidence.

1       Did you consider whether the declining rate for
2   people off-drug would have any impact on that
3   analysis?
4               MR. BUCHANAN:  Objection.  Form.
5   A   Well, it almost had to have.  And likewise -- in the
6   late period.
7       On the other hand, it had to have also been
8   higher in the early period in order to get the
9   proportionality back in track.  And that's what, in
10  effect, happened if you look at the tables.
11  Q   (By Mr. Raber)  Did you do an analysis to look at the
12  data for the first 18 months as one set, the second 18
13  months for a second, and then the off-drug as a third?
14  A   No.  It would have been inappropriate to do that.
15  Q   Why?
16  A   Because the way you treat this kind of a secondary
17  post hoc analysis is, you do the overall test, and if
18  it's clearly nonsignificant, as this is, with a p
19  of .7, you stop there.  That's the appropriate thing
20  to do.
21      You don't go and say, oh, well, what if I look at
22  the period from six to 18 months, maybe there was an
23  increased risk there, and maybe if I look at the
24  period 12 to 14 months, there's a decrease there,
25  because once you've looked at the data, you can see

1   all kinds of patterns.  There's always patterns in
2   data, always, even when it's totally random.
3       And so you don't do that.  You base it on the
4   entire -- on the specific test.  And then if that test
5   is significant, then you might want to look to
6   describe how it actually occurred.
7       In other words, if you get a significant
8   difference, you wouldn't say, oh, gee, look, it
9   appears to be in the first 18 months or the last 18
10  months or the first six months, or whatever it was.
11  Q   What's wrong with looking at a Kaplan-Meier curve to
12  answer that question?
13  A   Well, you can't look at the curve -- the curves
14  themselves are not easy to look at from that point of
15  view, because they magnify differences at the end,
16  because they're cumulative, so they add up.  So they
17  will always get wider apart if the same rate of events
18  are occurring across time.  So you always look closer
19  at the beginning, because there aren't very many
20  events at the beginning.
21      So say there's twice as many events in the first
22  month.  Say it's two/one, and there happens to be two
23  events and one in the other.  You wouldn't be able to
24  see that on the graph at all; yet, it's two times.
25  But when you get out to the end, when there are, say,

1   200 versus 100, you get this big gap.
2   Q   Okay.
3   A   So you can't look at those graphs and come to
4   conclusions that way.  You have to base it on the
5   test.  The test is straightforward.  It gives a
6   p-value of .7.
7   Q   At what point in time does the difference between
8   Vioxx and placebo become statistically significant for
9   confirmed thrombotic events?
10  A   That's, again, an irrelevant question.  The question
11  is -- you're asking a question -- the question that's
12  being addressed is --
13  Q   I'd like an answer.
14  A   I don't know.  It's not relevant to anything.
15  Q   Well, the Court decides what's relevant.
16              MR. BUCHANAN:  Objection.  I'm
17  sorry; he should be entitled to answer, and you can
18  move to strike if the answer is not responsive to your
19  question.
20              MR. RABER:  Move to strike.
21  Nonresponsive.
22              MR. BUCHANAN:  Can he finish his
23  answer, please?
24              MR. RABER:  No, because it's
25  nonresponsive.

1     MR. BUCHANAN:  You're not the judge.

2     MR. RABER:  The answer is either --

3     MR. BUCHANAN:  Why don't you restate

4 your question.

5     MR. RABER:  -- "I don't know" or --

6     MR. BUCHANAN:  When you're the

7 judge, Steve, you can make those calls.  Don't

8 interrupt the witness when he's trying to answer

9 that way.

10     MR. RABER:  Please don't talk to me

11     MR. BUCHANAN:  You know the rules.

12 Q (By Mr. Raber)  At what point in time, Dr. Kronmal,

13 does the difference between Vioxx and placebo become

14 statistically significant for confirmed thrombotic

15 events in the APPROVe study on the ITT analysis?

16     MR. BUCHANAN:  Objection.  Form.

17 A As I said, it's irrelevant.  And I don't know, to make

18 it simple on you.

19 Q (By Mr. Raber)  Did you attempt to determine the

20 answer to that?

21 A No.  I would never do that.  It's -- why would I do

22 something that's totally irrelevant?

23 Q What's something called an error bar?

24 A I assume you're talking about the confidence interval

25 bars.

1 Q Have you ever used error bars or confidence interval

2 bars on the Kaplan-Meier curve?

3 A Probably.

4 Q Okay.  Why would you do that if it's irrelevant?

5 A Why would I do that if it's irrelevant?  I wouldn't

6 test at any given point on the curve, if that's what

7 you mean.  That's what I said was irrelevant.

8    Putting a confidence bar is reasonable to do.

9 It's not for purpose of testing it, though.

10 Q I noticed that in Figure 1 and Figure 2 on Page 6 of

11 your addendum, you did not include any confidence

12 intervals.  Is that correct?

13 A That's correct.  It's not typical that they're

14 included, but you can.

15 Q How many confirmed thrombotic events were there in

16 Vioxx versus placebo at 18 months in your MI category?

17 A I don't remember.

18 Q Was the difference statistically significant?

19 A As I told you before, I would never test that.  It

20 wasn't relevant.

21 Q Was it, do you know?

22 A I don't know.  I wouldn't have tested it.

23 Q How many CHD events were there at 18 months in the

24 APPROVe ITT data set?

25 A I didn't count them up.  I don't know.

1 Q Was the difference at 18 months statistically

2 significant?

3 A As I said, it's irrelevant.  I don't know.

4     MR. TISI:  Belated objection on --

5 just on form.

6 Q (By Mr. Raber)  Looking at Page 4 of your addendum --

7 actually, let's go to the last page.  I'm sorry.  Page

8 7.

9    Those are Figures B1 and B5 from Merck's

10 submission to the FDA; is that correct?

11 A That's correct.

12 Q These Kaplan-Meier plots have confidence intervals

13 shown on them, don't they?

14 A That's correct.

15 Q And in looking at -- let's look at Figure B1, which is

16 for confirmed thrombotic events.

17    At what point in time do the differences between

18 Vioxx and placebo become statistically significant,

19 according to this figure?

20     MR. BUCHANAN:  Objection to the

21 form.

22 A I can't really tell.  It's probably towards the

23 36-month point.

24    But you have to remember, it can't be significant

25 at the early phase, because the number of events

1 aren't very high.  There's no chance whatsoever that

2 if you go -- say you took one month as a example, and

3 say the rate was twice as high.  You can't get

4 statistical significance at one month because you

5 don't have enough exposure.  And you don't have,

6 therefore, enough events.

7    The statistical significance can only be at the

8 end.  I mean, that's just plain logic, number one, but

9 it's also a statistical fact.  So testing these at

10 these early points is a complete irrelevance.  It's

11 wrong.  It's statistically wrong.  It would be

12 incorrect.  And it shouldn't be done.

13    So you can question me all you want on it, but

14 it's a total waste of time.  It's wrong to do it,

15 period.

16 Q According to Figure B1, is the difference between

17 Vioxx and placebo statistically significant at 18

18 months?

19 A Probably not.

20 Q Looking at Figure B5 on Page 7, can you tell us when

21 it appears the difference between Vioxx and placebo

22 becomes statistically significant for confirmed APTC

23 events?

24     MR. BUCHANAN:  Objection.

25 A Probably about 36 months.

1  But by the way, if you want to make that argument,
2  then it's even more significant at 48 months, when
3  they've been off the drug for a long time.  So what
4  does that prove?
5          MR. RABER:  Sir, I'll move to strike
6  that last question [sic] as nonresponsive.
7  Q  (By Mr. Raber)  Sir, at 18 months, is the difference
8  between Vioxx and placebo statistically significant
9  for confirmed APTC events?
10 A  I'm sure it's not.
11 Q  Going back to Page 4 of your addendum report.  In the
12 third and fourth paragraphs, you refer to a
13 statistical rest for equality of RR across time, and
14 report values of 0.43 and 0.47.
15      Do you see where I'm reading there?
16 A  Yes.
17 Q  What is the test that you used in order to come up
18 with that figure?
19 A  The Schoenfeld residuals.
20 Q  Did you use any other tests in analyzing that
21 question?
22 A  No.  I used the Schoenfeld residuals.
23 Q  How did you decide to use that particular test?
24 A  It's pretty standard.  It's the one I would normally
25 use.

1  is after the fact.  I don't know what you mean.
2  Q  Well, you knew what the data was before you formed
3  your opinions.
4  A  Oh, no.  I didn't.  Actually, most cases, that's not
5  true.  In the vast majority of cases, I had no idea
6  what the data was.  I knew what Merck reported.  I had
7  no idea what the truth was.
8  Q  But you knew what they reported?
9  A  I knew what they reported, with the exception of the
10 Alzheimer's.
11 Q  And you knew what the FDA --
12 A  With the exception of Alzheimer's.  With the
13 Alzheimer's, I didn't know, at the time I did the
14 analysis, what they reported.
15 Q  But the data that you knew about, you already knew the
16 data that -- the results that had been reported when
17 you formed your opinions?
18          MR. BUCHANAN:  Objection.
19 A  Well, in many cases, I did.  And other cases, I
20 didn't.
21      I mean, it depends what specifically we're talking
22 about.  I mean, I didn't, for example, know the
23 results of doing the proportional hazards test,
24 because I hadn't done it yet, so how could I have
25 known it in advance?

1  Q  And is that the test that you use for all of your
2  tests for equality of relative risk across time?
3  A  I can't say that, because first place, there was a
4  time when Schoenfeld residuals weren't even known, so
5  I couldn't --
6  Q  I mean in connection with this case.
7  A  Oh.  Yes, I used Schoenfeld residuals all the way
8  through.
9  Q  Now, to be fair, in its publication of the APPROVe
10 data, the authors of that paper indicated that this
11 particular analysis of the 18-month issue was a post
12 hoc analysis.
13 A  That's correct.
14 Q  They were up-front about that.
15          MR. BUCHANAN:  Objection.
16          MR. TISI:  Yeah, objection.
17 A  They said it was post hoc.  I mean, up-front?  They
18 didn't hide it.
19          MR. BUCHANAN:  Objection.
20          MR. TISI:  Objection.
21 Q  (By Mr. Raber)  And your opinions in this case are
22 post hoc?
23 A  Post hoc means after the fact.
24 Q  Right.
25 A  Well, every opinion -- anytime you do anything on data

1  Q  But you new, for example, that the VIGOR study showed
2  a higher rate of heart attacks on Vioxx as compared to
3  naproxen?
4  A  Absolutely.  No question about that.
5  Q  And you knew that at the time the study came out,
6  didn't you?
7  A  Well, I may have.  I just don't remember.  I mean, I
8  read New England Journal of Medicine regularly, but
9  how much attention I paid to that specific article, I
10 don't remember.
11 Q  But you spend a lot of time in the cardiovascular
12 field; right?
13 A  Right.  But that paper was about -- as you well know,
14 was not about cardiovascular disease.  It was about,
15 you know, osteoarthritis and bleeds in the stomach.
16 That's not an article that I would have normally paid
17 a lot of attention to, because it's not a
18 cardiovascular article.
19 Q  There was discussion that you recall in the medical
20 community and the press about whether Vioxx increased
21 the risk for heart attack?
22 A  I actually wasn't very much aware of that.  I mean,
23 that was not something I paid any attention to.  I
24 might have heard it, but I certainly didn't remember
25 it.

1  When I was first contacted in this case, I didn't
2  remember what the details were about what was in the
3  press, or anywhere else, for that matter.
4 Q  And to be fair, you don't treat patients, so that's
5  not something that you would necessarily take account
6  of; correct?
7         MR. BUCHANAN: Objection. Form.
8 A  Well, I wouldn't take account of it for the purposes
9  of treating patients, no.
10 Q  (By Mr. Raber)  I want to look earlier in your
11  addendum, where you were talking about the Alzheimer's
12  analysis.
13  On Page 2, you refer to something called the
14  Declaration of Helsinki.  Do you see that?
15 A  That's right.
16 Q  And I take it that your basic opinion here is that
17  Merck should have stopped the Alzheimer's trials
18  earlier?
19 A  That's correct.
20 Q  And that it's your view here that Merck violated
21  *something called the Declaration of Helsinki* in
22  allowing these trials -- in not stopping those trials
23  earlier?
24 A  That's correct.
25 Q  And you cite here -- well, let me back up.

85

1  might have affected whether those particular
2  plaintiffs took the drug.
3 Q  Well, we know two of the three Alzheimer's studies
4  were stopped early; true?  Protocol 091 and protocol
5  126.
6         MR. BUCHANAN: Objection.
7 A  That's not accurate, actually.  126 was stopped early.
8  091 completed.  078 was *actually stopped a bit early.*
9 Q  (By Mr. Raber)  I'm sorry.  I got my numbers -- you're
10  correct.  I made a mistake.
11 A  See?  We're all human.
12 Q  Some of us admit our mistakes.
13 A  I admit mine too.
14         MR. BUCHANAN: Objection.
15 A  I admitted my mistake when you --
16 Q  (By Mr. Raber)  So let me just make sure the record is
17  clear.
18  You would agree that two of the three Alzheimer's
19  studies, 078 and 126, were stopped early?
20 A  078 was not actually stopped early, in the sense that
21  the original planning for 078 would have had completed
22  a lot sooner.  It was stopped before they had reached
23  the goal of the number of Alzheimer's events that had
24  actually -- was planned for.
25 Q  It was stopped --

87

1  This opinion about stopping the Alzheimer's
2  trials, does that have anything to do with either the
3  two plaintiffs in the New Jersey case, the plaintiff
4  in the MDL case, or the individual plaintiff in the
5  California cases?
6         MR. TISI: Actually, let me just
7  interpose an objection.  This is a generic opinion
8  that potentially applies to cases beyond that.
9 Q  (By Mr. Raber)  Sir, let me rephrase it.
10  Does this opinion have any relationship to any
11  specific plaintiffs who are suing Merck?
12 A  I have no idea.  I mean, I don't know anything about
13  the plaintiffs suing Merck, so I can't really tell
14  you.
15 Q  This opinion relates to people who are in the
16  Alzheimer's trials?
17 A  It relates to what was known -- what should have been
18  done, and, therefore, what should have been known to
19  the medical community in April of 2001.  To the extent
20  that that would have affected those plaintiffs, it
21  might well have, because had Merck stopped the trial
22  in 2001, that would have been public knowledge.  They
23  would have had to report that to the FDA.  It would
24  have been in the public domain.  It would have been
25  known to the medical community.  And that -- and that

86

1 A  But it was not stopped based on the mortality data.
2 Q  It was stopped before it was completed; true?
3 A  It was stopped before it was completed.
4 Q  Now, in your addendum here, you quote language that's
5  in italics from the Declaration of Helsinki.  It says,
6  "Biomedical research involving human subjects cannot
7  legitimately be carried out unless the importance of
8  the objective is in proportion to the inherent risk to
9  the subject."
10  Do you see that?
11 A  That's correct.
12 Q  And that's the principle that you contend Merck
13  violated in not stopping the Alzheimer's trials
14  earlier?
15         MR. BUCHANAN: Objection. Form.
16 A  That's the principle that they violated in not
17  stopping 078 earlier.
18  126 was stopped because 091 didn't reach a
19  statistically significant result in 091.
20 Q  (By Mr. Raber)  I'm just trying to understand.  The
21  basis for your -- the standard that you're applying in
22  saying Merck didn't stop 078 early enough is this
23  language that you've quoted in italics here; correct?
24 A  It's one of them; not the only one.
25 Q  Well, there's nothing else quoted here; correct?

88

1  A  Yeah, I do -- I quote the next paragraph --

2  Q  Well, that has to do with informed consent.  I'm

3     talking about stopping the trial.

4  A  Yes, that's the primary reason.  Yes.

5  Q  And in looking at that, that appears to me that that

6     requires some type of a risk/benefit analysis.

7     Correct?

8  A  That's correct, it should be.

9  Q  Did you conduct a risk/benefit analysis in forming

10    this opinion?

11  A  Yes.

12  Q  Where is it?

13  A  I record in my original report that there was a

14     significant increased risk of Alzheimer's in the -- in

15     the -- in 078 associated with the drug.  That's -- so

16     there was no benefit, clearly.

17  Q  Well, it says the importance of the objective, which

18     would be preventing Alzheimer's.

19  A  I know.  But at the time --

20  Q  Is that an important objective?

21  A  Oh, absolutely.

22  Q  Okay.  But --

23  A  Let me finish.

24        At the time that they had this data on 078 on the

25     mortality excess, they also, if they had looked, would

1     have seen that there was already an excess risk of

2     Alzheimer's disease in those taking Vioxx.

3        Therefore, there was no benefit -- in fact, there

4     was an excess risk -- of the primary endpoint at that

5     point in time.  And even if they had seen a benefit,

6     even if they had seen it, it wouldn't have justified

7     continuing it when they were seeing a two- to

8     threefold increased risk of death.

9  Q  Now, that's your subjective risk/benefit analysis;

10    correct?

11  A  I don't believe it's fully subjective.

12  Q  It's your opinion.

13  A  It is based on my experience in clinical trials, that

14     I have never heard of a clinical trial, in all of my

15     experience in --

16  Q  Sir --

17        MR. BUCHANAN:  Objection.

18  A  You're not letting me finish the question.

19  Q  (By Mr. Raber)  Sir, it's your objective opinion?

20        MR. BUCHANAN:  No, Steve, that

21     question can't be answered until he answered the last

22     question.

23        MR. RABER:  I'm not going to have

24     him give speeches.

25        MR. BUCHANAN:  No.  You're going to

1     have to accept his answer.

2        MR. RABER:  No, I'm not.

3        MR. BUCHANAN:  Can you read back the

4     question, please?

5        MR. TISI:  You can move to strike

6     it, Counsel.

7        MR. BUCHANAN:  Can you read back the

8     question and answer before the interruption?

9        MR. RABER:  I don't have to sit here

10    and listen to an evasive witness.

11        MR. BUCHANAN:  He's not evasive.

12     He's answering your question.

13        THE WITNESS:  I was directly

14     answering your question.

15  Q  (By Mr. Raber)  Is it your subjective opinion --

16        MR. BUCHANAN:  No.  Stop.

17     Please read back the question and answer.  Thank

18     you.

19            (Questions/Answers on

20             Page 90, Lines 9 through 15

21             read by the reporter.)

22

23        MR. BUCHANAN:  Continue.

24  A  Where a trial that had an excess of mortality, that

25     wasn't for a life-threatening condition -- well, even

1     then it wouldn't matter.

2        Where a trial that showed a statistically

3     significant excess in mortality was allowed to

4     continue, I know of not a single instance of that.

5  Q  (By Mr. Raber)  Okay.  But your opinion here about

6     stopping the trial is your personal opinion?

7  A  Well, everything is somebody's personal opinion, but

8     it's based on my experience as a clinical trial expert

9     over -- over four decades, and extensive reading of

10     the literature over that period, and being involved in

11     multiple data safety monitoring boards where some of

12     these issues have come up.

13  Q  Further down on Page 2, you make a reference that

14     permitting 078 to continue also violated the informed

15     consent provisions of the Declaration of Helsinki.

16        Do you see that?

17  A  Yes, I do.

18  Q  And again, that standard relates to risks and

19     benefits; correct?

20  A  Well, it --

21        MR. BUCHANAN:  Objection.  Form.

22  A  It certainly -- it says potential hazards.  And, I

23     mean, it doesn't have to --

24  Q  (By Mr. Raber)  It also said anticipated deaths.

25  A  Yeah, both.  They should know about both.

1  Q  So it's a risk/benefit determination that needs to be

2      made; correct?

3  A  Not necessarily.  They have to be informed about

4      potential benefits and the potential risks.

5              MR. BUCHANAN:  Belated objection to

6      the form.

7  Q  (By Mr. Raber)  Right.  And your opinion here that

8      Merck violated the informed consent provisions is a

9      subjective one --

10             MR. BUCHANAN:  Objection.

11             MR. TISI:  Objection.

12  Q  (By Mr. Raber)  -- based on your own analysis of risk

13      and benefit?

14  A  No.  It is based on the statement of the Helsinki that

15      they should have been informed of the risks and the

16      benefits both.  They were not informed.  It's not a

17      ratio issue.

18  Q  That's your opinion.

19  A  No.  It's what the says.

20  Q  Your conclusion from that, that Merck violated it, is

21      your opinion?

22             MR. BUCHANAN:  Objection.

23  A  Well, everything is somebody's -- is my opinion.

24      Obviously I can't write down something that isn't my

25      opinion.

1  Q  (By Mr. Raber)  Did the FDA ever conclude that Merck

2      should have stopped study No. 078 earlier?

3  A  They were very concerned about it.

4  Q  Did the FDA ever conclude that Merck should have

5      stopped study No. 078 earlier?

6  A  I don't know what the FDA concluded or didn't

7      conclude.  They clearly let it go on.  But why they

8      reached that decision was largely, in my view, was

9      Merck's not fully disclosing the results that they had

10      from 078 at that time.

11  Q  Well, that's your view.

12  A  Well, it's a fact.

13             MR. BUCHANAN:  Objection.  Come on.

14  A  It's not my view.  It's a fact.  They didn't report

15      the ITT analysis, so how is that my view?

16  Q  (By Mr. Raber)  Sir --

17  A  It's a fact.

18  Q  Sir --

19      Can you show me where they reported the ITT analysis?

20  Q  Sir, do you know the rule of holes?

21  A  Yeah.

22  Q  Did the FDA ever conclude that Merck violated the

23      informed consent standards of the Declaration of

24      Helsinki in connection with study No. 078?

25  A  As far as I know, they didn't.

1  Q  Now, in the middle of Page 3 of your addendum, you

2      refer to a December 5th, 2001 letter from the FDA to

3      Merck; correct?

4  A  That's correct.

5  Q  And a couple paragraphs down, you're referring to the

6      letter, and you say the letter is important from two

7      standpoints.

8      Do you see that?

9  A  Yes.

10  Q  And you conclude in your report, "It further

11      indicates" -- that's referring to the letter; correct?

12  A  That's correct.

13  Q  "It further indicates that the FDA was not aware of

14      the statistically significant excess of mortality seen

15      in 078 and shown in the Chen report."

16  A  That's my view.

17  Q  Well, look at the language in italics immediately

18      above that.

19  A  Yes.

20  Q  The FDA says, "Please clarify whether the safety

21      monitoring board and the IRB overseeing these studies

22      are aware of the excess in total cause mortality in

23      the Vioxx 25 milligram group as compared to placebo

24      (p = 0.206)."

25      Do you see that?

1  A  I do.

2  Q  Doesn't that indicate to you that the FDA was aware

3      that there was a statistically significant difference

4      in mortality between Vioxx and placebo?

5  A  They were aware of it for study 091.  They were not

6      aware of that -- that's the study 091 result.  They

7      were not aware of it for study 078, because if they

8      were aware of it for study 078, the overall

9      significance would have been .001 for the combined.

10  Q  The next sentence says, "Have these oversight groups

11      commented on the ethics of continuing study 078 in

12      light of the mortality data..."

13  A  Yeah.  They're referring to the 091 mortality data.

14  Q  The FDA wasn't in the dark here.  They knew there was

15      an excess in total cause mortality, didn't they?

16  A  In 091, not in 078.  I didn't say they didn't know

17      about 091.  I said 078.  I specifically stated that.

18  Q  Did you do any analysis of the tables that Merck

19      submitted to the FDA with the APPROVe extension data?

20  A  Of the tables themselves?

21  Q  Yes.

22  A  No.

23  Q  And is it fair to say you only looked at the data that

24      related to the ITT group censored at week 210?

25  A  Oh, I looked at it all.  That's the only one that I

1   based my opinion on.
2   Q   Did you do any other analyses other than the ones for
3       the period ending at week 210?
4   A   No, I didn't.
5   Q   Dr. Kronmal, is it appropriate for drug companies to
6       get advice from outside consultants?
7   A   Of course.
8   Q   Is there anything wrong with a drug company paying a
9       consultant for their time or for their work?
10  A   No, of course not.
11  Q   And in fact, when you do work for drug companies, you
12      get paid?
13  A   That's correct.
14  Q   And you're able to maintain your objectivity?
15  A   I try to.
16  Q   Have you served on DSMBs before?
17  A   Yes.
18  Q   Were you paid for that work?
19  A   That's correct.
20  Q   Is there anything wrong with that, in your opinion?
21  A   No.
22  Q   And I take it, then, if someone were to question the
23      integrity of members of a DSMB because they're being
24      paid, you would disagree with that?
25  A   On that basis alone, yes, absolutely.

97

1   Q   So in your view, then, a trend towards excess
2       mortality is a basis for stopping a study?
3   A   Could be.  Could be.  But it would depend on other
4       things.
5           We would not have stopped it if, for example --
6       this was a really serious thing, because it was a
7       stroke.
8   Q   Sure.
9   A   A drug to prevent damage in stroke, even if it
10      actually had a little higher mortality, you might very
11      well let go on if you were showing a big benefit in
12      preventing the damage from stroke, because stroke may
13      be as bad as death.  You know, you're balancing two
14      really bad outcomes.
15          But that just didn't turn out to be the case.
16      all of the other endpoints, including the primary
17      endpoint, were in the wrong direction.  And so we
18      stopped it.
19  Q   So in your opinion, if there's no efficacy being shown
20      and a trend in death in the experimental drug, that
21      would be a basis for stopping the study?
22  A   It could be.  Could be.  It would depend how strong it
23      was, but yes.
24          Now, you wanted the other one too?
25  Q   Yes.

98

1   Q   It would be somewhat of an insult to the doctors on a
2       DSMB?
3           MR. BUCHANAN:  Objection to form.
4   A   Well, I just think it would be inappropriate.
5   Q   (By Mr. Raber)  Inappropriate to make that accusation?
6   A   That's correct, based on their pay.  You could
7       disagree with what they did, but that's a different
8       issue.
9   Q   Have you ever served on a DSMB where you stopped a
10      study for safety reasons?
11  A   Yes.
12  Q   How many times?
13  A   Twice.
14  Q   What studies were those?
15  A   The first one I don't --
16          MR. BUCHANAN:  Objection.  This is
17      asked and answered in the last deposition.
18  A   I don't remember the first one.  It was -- I just
19      don't remember it.  It was a drug to prevent the
20      damage from stroke.  And it ended up having a bit
21      higher mortality, big increases in blood pressure, and
22      no evidence of efficacy.  And we stopped it.
23  Q   (By Mr. Raber)  Was the difference in mortality
24      statistically significant?
25  A   No.  It was trending that direction.

98

1   A   The other one was very recent.  And they are -- it was
2       a drug to prevent the kind of pneumonia in people who
3       were on ventilators.  And the primary endpoint was
4       prevention of pneumonia, plus mortality.  So it was a
5       combined endpoint.
6           We saw a significant difference at the -- barely
7       at the .05 level from mortality.  We looked at the
8       primary endpoint, and it was not -- it was negative.
9       It was in the wrong direction, but it wasn't
10      statistically significant.  And we stopped the trial.
11  Q   What was the safety concern?
12  A   Death.
13  Q   Death?
14  A   And again, no clear benefit that was being shown.
15  Q   Do you have any estimate about what the numbers were?
16          MR. BUCHANAN:  Objection.  Form.
17  A   It was substantially less than what was in the
18      Alzheimer's, but I don't remember them.
19  Q   (By Mr. Raber)  Could a difference of, let's say, five
20      to nothing in deaths --
21  A   Oh, that would not have stopped the trial, or seven to
22      nothing wouldn't have stopped trial.  Thirty versus
23      ten would have.
24  Q   Are you familiar with the concept of biological
25      plausibility --

100

1   A   Of course.

2   Q   -- in determining causation?

3       What is that?

4   A   Well, I'm not sure what you're exactly referring to.

5   Q   Didn't you say "of course"?

6   A   I said I know what biological plausibility means, but
7       I don't know what it means in the context you're
8       referring to.

9   Q   Well, in the context of determining association
10      between a drug and an adverse event.

11  A   That's not actually a requirement for determining
12      association.  It doesn't have to be biologically
13      plausible, because we don't know the answer.

14      It's mostly what drugs do.  So it's not -- you
15      don't need biological plausibility to decide that
16      there's an association between a drug and a side
17      effect.  It just has to occur.

18  Q   What about causation?

19          MR. BUCHANAN:  Objection.  Form.

20  A   Well, we base our determination of causation on the
21      very thing you discussed:  On whether the difference
22      reaches statistical significance or not, or comes
23      close to it in the case of side effect.  And once it
24      reaches statistical significance, that's enough.

25  Q   (By Mr. Raber)  That's enough for a placebo-controlled

1       trial?

2   A   Yeah, to stop it.  Sure.

3   Q   Is it ever important to look at the data and say, Does
4       *this make sense?*

5          MR. BUCHANAN:  Objection to the
6       form.

7   A   Well, I mean, you would look for -- obviously you
8       would look to see if there was some other explanation
9       for it.

10      Suppose, as an example, that you saw an excess of
11      mortality, and what you found out was that all of the
12      people on the drug for some reason were on a plane
13      together and the plane crashed.  You know, you
14      wouldn't blame that on the drug.  But, you know, other
15      than some really oddball kind of circumstances that
16      it's hard to believe would ever really occur in real
17      life in a randomized trial, in a blind randomized
18      trial at that, no, it's not a relevant issue when
19      deciding whether to stop a trial or not.

20  Q   (By Mr. Raber)  Well, I'm not limiting my question no
21      whether to stop a trial.  My question is in terms of
22      attributing causation between a drug and an adverse
23      event.

24  A   Well, once you observe a statistically significant
25      difference, you have to assume it's causal.  I mean,

1       that's the rules we set up for doing this sort of
2       thing.

3       Now, you know, if you had other evidence from --
4       you know, from another -- exactly the same trial, and
5       it didn't there, then you would take that into
6       account, clearly.

7   Q   Does dosage of a drug make a difference in determining
8       association and causation?

9   A   Oh, certainly.

10          MR. TISI:  Objection.  Compound.

11  Q   (By Mr. Raber)  Does the patient population make a
12      difference in determining association and causation?

13          MR. TISI:  Objection.  Compound.

14          MR. BUCHANAN:  Compound.

15  A   I don't know what you mean by association/causation.
16      If you're trying to say --

17  Q   (By Mr. Raber)  Association and --

18  A   -- could a drug have a much more damaging effect on
19      one population than another, yes, it could.

20      I mean, you take a healthy young person that's got
21      nothing wrong with them and you give them a drug, they
22      might tolerate it.  You give an old, sick person a
23      drug, it might kill them.

24  Q   Dr. Kronmal, do you have any data showing that
25      osteoarthritis patients have a statistically

1       significant increased risk of heart attack with Vioxx?

2          MR. BUCHANAN:  Can you read that
3       back?

4          (Question on Pages 103-104
5          Lines 24 through 1,
6          read by the reporter.)

7

8   A   No.

9   Q   (By Mr. Raber)  And in fact, in forming your opinions
10      and writing your report, you didn't analyze the data
11      that Merck had for its studies in osteoarthritis
12      patients; right?

13  A   I looked at them.  I mean, I certainly looked at them,
14      particularly for the last -- in the last -- earlier
15      report, yeah.

16  Q   But you didn't lay it out in your report; right?

17  A   No.  I didn't think it was particularly relevant.

18  Q   Did you understand that that was the data that was the
19      basis for Vioxx being approved by the FDA?

20  A   For osteoarthritis, yeah.  Sure.

21  Q   Now, I want to look at your report, if we can go back
22      to your report for a moment.

23          MR. TISI:  Is this the supplement or
24      the original?

25          MR. RABER:  The original.  Sorry.

1    Exhibit 1.

2  Q  (By Mr. Raber)  And if you would, turn to Page 41.

3  A  Mm-hm.

4  Q  In the second paragraph on Page 41, you say, "As

5     expressed in this report, by early 2000, there was

6     reasonable evidence of an association between

7     rofecoxib and the development of a spectrum of

8     cardiovascular disease, including MI, hard CHD, CHF,

9     and hypertension."

10       Do you see that?

11 A  Mm-hm.

12 Q  While Vioxx was on the market, was there reasonable

13    evidence of an association between rofecoxib and

14    stroke?

15              MR. BUCHANAN:  Objection.

16 A  Well, I didn't really specifically look at stroke.

17    That was not -- the signal for a serious side effect

18    for rofecoxib was primarily MI and hypertension.

19    That's what I focused on.

20 Q  (By Mr. Raber)  Okay.  Let me repeat the question.

21       While Vioxx was on the market, was there

22    reasonable evidence of an association between Vioxx

23    and stroke?

24              MR. TISI:  Objection.  Asked and

25    answered.

1  A  Because the signal from VIGOR was MI, and that's what

2     I focused on.

3  Q  So the other side of that coin, there was no signal

4     from VIGOR of a problem with stroke, was there?

5  A  That's correct, there was none.

6  Q  And while Vioxx was on the market, there was no signal

7     for a problem with Vioxx and stroke?

8              MR. BUCHANAN:  Objection.  Asked and

9     answered.

10 A  I don't know -- I didn't analyze the stroke data.  You

11    could well be right.  I did not analyze it.

12       My impression is that there may not have been,

13    because VIGOR didn't show it, and therefore, there was

14    no reason to look at any further than that, as far as

15    I was concerned.

16 Q  (By Mr. Raber)  And you're familiar with a study

17    called the ADVANTAGE study?

18 A  Yes, I am.

19 Q  And you know that the numbers there were that there

20    were zero strokes in the Vioxx group and six in the

21    naproxen group?

22              MR. BUCHANAN:  Objection to form.

23 A  I think that's roughly correct.  I --

24 Q  (By Mr. Raber)  And that would be a signal to you that

25    naproxen actually may increase the risk of stroke as

1              MR. BUCHANAN:  Objection.  Asked and

2     answered.

3  A  I don't know.  I didn't really look at the stroke

4     issue.

5  Q  (By Mr. Raber)  Well, the studies you looked at had

6     stroke data, didn't they?

7  A  They did.  They did.

8  Q  And --

9  A  I didn't do any analysis of stroke by itself, so I

10    don't know the answer to that question.

11 Q  Well, when you were doing your analysis, you were

12    looking for cardiovascular events that were increased

13    with Vioxx; correct?

14 A  No.  I was looking at the signal that came out of

15    VIGOR.  The signal that came out of VIGOR was MI,

16    hypertension, congestive heart failure.  That's what I

17    was looking at.

18 Q  And you looked at other trials, as well, didn't you?

19 A  I did some analyses of other trials, yes.

20 Q  And in none of these analyses did you see a reasonable

21    evidence of an association between Vioxx and stroke;

22    correct?

23 A  I didn't look at that.  I didn't -- I never did any

24    analyses of stroke, so I can't answer your question.

25 Q  Why not?

1     compared to Vioxx; correct?

2              MR. BUCHANAN:  Objection to the

3     form.

4  A  It would be in that direction, yeah.  I wouldn't jump

5     to any conclusions on zero versus six.  I wouldn't

6     jump to any conclusions on the basis of that, but,

7     yeah, it would raise that possibility, certainly.

8  Q  (By Mr. Raber)  It's certainly not a signal that Vioxx

9     increases the risk of stroke, is it?

10 A  No, it's not.

11             MR. BUCHANAN:  Objection.  Asked and

12    answered.

13 Q  (By Mr. Raber)  While Vioxx was on the market, was

14    there any reasonable evidence of an association

15    between Vioxx and arrhythmia?

16 A  That I really can't answer, because I didn't look at

17    that at all.

18       There was -- no, I mean, I just didn't look at

19    that.  I have no idea.  I don't have a clue.

20 Q  When Vioxx was on the market, was there reasonable

21    evidence of an association between intermittent use of

22    Vioxx and serious hazard?

23 A  I don't know.

24             MR. BUCHANAN:  Objection to form.

25 A  I have no idea.  I mean, Merck never did any analyses

1   of intermittent use.  It would have been very
2   difficult to do, because you can't really -- it's very
3   hard to know how much -- unless you did extremely
4   accurate diaries of people taking the medication over
5   time, you wouldn't be able to tell.
6       And Merck did no studies of intermittent use, that
7   I know of.
8   Q   The studies that were done involved continuous use;
9       correct?
10  A   Well, they involved asking the people to take it
11      continuously.  But, in fact, people don't do that.
12      And, you know, as you know, there were large numbers
13      of people who dropped out of the trials, who stopped
14      taking it.  There were certainly -- there were --
15      there were -- certainly adherence to the drug was not
16      perfect in these trials.  So I don't know whether
17      people were taking it intermittently or continuously
18      or some combination thereof.
19  Q   Well, certainly the protocols for the studies called
20      for regular usage; correct?
21  A   That's it.  That's correct.
22  Q   And there were measures in place to try to ensure
23      compliance with that; correct?
24  A   I don't know what measures they took to ensure
25      compliance.

1   Q   You don't know?
2   A   No.
3   Q   And so you don't know whether people who failed to
4       comply were not allowed to continue in the study, or
5       something like that?
6   A   Well, I mean, if they knew that they weren't
7       complying, I would imagine they wouldn't have kept
8       them in.  But I don't know specifically.  I haven't
9       looked at every one of those trials to see exactly
10      what they did.
11  Q   Have you ever done protocols that had provisions in
12      them to try to ensure that the patients regularly took
13      the drug being studied?
14  A   We always do.  We always make that attempt.
15  Q   And that's the best any of us can do; correct?
16          MR. BUCHANAN:  Objection.
17  A   Well, it's certainly the best that I can do.  I don't
18      know about anybody.  But yeah.
19  Q   (By Mr. Raber)  Now, you mentioned here, on Page 41 --
20          MR. BUCHANAN:  Is that in the big
21      one?
22  Q   (By Mr. Raber)  You mentioned "reasonable evidence of
23      an association" between rofecoxib and hypertension.
24      Do you see that?
25  A   That's correct.

1   Q   Now, is it your opinion that hypertension is the
2       primary mechanism for the increased risk of CHD?
3   A   I have no idea.  It's a possibility.
4   Q   In your experience in the cardiovascular field, is it
5       well-known that hypertension causes an increased risk
6       of heart attack and stroke?
7   A   Yes.
8   Q   Based on your experience and your knowledge, how much
9       hypertension is necessary to promote atherosclerosis?
10  A   I haven't got a clue.  Nobody knows that.  In fact,
11      there's no one that really understands the mechanism
12      by which hypertension causes MIs and strokes.  It's
13      not understood.
14      So I mean, you expect me to understand it?  It's
15      not understood by anyone.  There are theories, but
16      that's all.
17  Q   Based on your analysis of the data in the Vioxx
18      studies, do the patients taking Vioxx have
19      intermittent or constant rises in their blood
20      pressure?
21  A   I have no idea.  They didn't collect data in a way
22      that would have allowed me to determine that.
23  Q   Does that matter?
24  A   It might.
25  Q   How might it matter?

1   A   Well, if they had spikes in the blood pressure,
2       extremely high spikes, that could be very damaging to
3       the vascular system.  So I just don't know the answer.
4       Wildly fluctuating blood pressures is probably
5       worse than a constant increase.  But whether that's
6       what Vioxx does or not, I don't know.
7       As far as I know, Merck never did studies to try
8       to find that out, as far as I know.
9           MR. RABER:  I'm going to move to
10      strike that.
11  Q   (By Mr. Raber)  Did I ask that question?
12          MR. BUCHANAN:  Objection.
13  A   You were asking me about the hypertension, and you
14      were asking me whether the variation in
15      hypertension --
16          MR. BUCHANAN:  Ask a question.
17  Q   (By Mr. Raber)  I asked you whether --
18          MR. BUCHANAN:  That's an insult.
19      That's not a question.
20  Q   (By Mr. Raber)  And I was asking --
21  A   And I tried to explain why it might matter.  And I
22      was --
23  Q   How does the fact whether or not a company did a study
24      or didn't do a study bear on the question of why it
25      might matter?

6/7/2006 Kronmal, Richard

1            MR. BUCHANAN:  Objection.
2  Argumentative.
3            MR. RABER:  I'm going to ask Counsel
4  to instruct the witness not to make gratuitous
5  statements about Merck.
6            MR. TISI:  I'm going to ask --
7            MR. BUCHANAN:  Counsel, your tone is
8  entirely inappropriate.  I wish we had a video record
9  here today.  You're insulting the witness --
10           MR. RABER:  My tone is proper.  You
11 didn't want the video.
12           MR. BUCHANAN:  I didn't realize that
13 was an invitation for you to be rude to the witness.
14 And that's exactly what's going on.
15           MR. RABER:  I'm not being rude.
16 Q  (By Mr. Raber)  Sir, on Page 13 of your report, near
17 the top, you say, "In short, it was unreasonable for
18 Merck to presume that the VIGOR trial brought a
19 previously unseen cardioprotective effect of naproxen,
20 rather than the more obvious and rational conclusion
21 that rofecoxib significantly increased the risk of
22 myocardial infarctions."
23      Do you see that?
24 A  That's correct.
25 Q  So in your view -- strike that.

113

---

6/7/2006 Kronmal, Richard

1       What made it so obvious -- strike that.
2       What made the conclusion that Vioxx was increasing
3  the risk of heart attacks so obvious?
4            MR. BUCHANAN:  Objection to form.
5  A  No drug for cardiovascular disease, none, would have
6  reduced the risk in the amount that was seen -- that
7  was hypothesized for naproxen based on the results of
8  VIGOR.  No drug known to man.  So they had to assume
9  that a previously unseen incredibly protective -- that
10 naproxen was a miracle drug, literally.
11      Further, naproxen has been on the market for 20
12 years.  There was no clinical evidence whatsoever,
13 nothing, that naproxen prevented heart attacks.
14      Further, when you have a new drug, you have to
15 make the -- versus a drug that's been on the market
16 for 20 years, and you see a substantial increase in
17 risk associated with that new drug, it is incumbent on
18 the company to begin with the assumption that it's
19 likely that the new drug causes it.
20 Q  (By Mr. Raber)  Do you know whether Merck did that?
21 A  They clearly did not.
22 Q  What do you base that on?
23 A  Their statements in the VIGOR paper.
24 Q  Did you see --
25 A  They said naproxen was the explanation.

114

---

6/7/2006 Kronmal, Richard

1  Q  Are you familiar with what Merck did to try and
2  understand the results of the VIGOR study?
3  A  No.
4  Q  Have you read the testimony of Alise Reicin to
5  describe what she and what Merck did to understand the
6  results of the VIGOR trial?
7  A  No.
8  Q  Have you read the deposition or the testimony of
9  Dr. Ed Scolnick to see what Merck did to understand
10 the results of the VIGOR study?
11 A  I've seen a little bit of Scolnick's deposition, but I
12 don't -- I don't -- I didn't see that part of it.
13 Q  As we sit here today, can you tell me anything that
14 Merck did to try and understand why there was a
15 difference between the rate of heart attacks in Vioxx
16 versus naproxen?
17 A  I can only tell you what they did in terms of clinical
18 trials.  And that was nothing.
19 Q  But other than that, you can't tell me anything?
20 A  No, I don't know what they did.
21 Q  And so is it your opinion then that the data, the
22 number of heart attacks between naproxen and Vioxx,
23 that one conclusion from that, that was obvious to
24 anybody that looked at it, was that Vioxx might be
25 increasing the risk of heart attack?

115

---

6/7/2006 Kronmal, Richard

1            MR. BUCHANAN:  Objection to form.
2            MR. TISI:  Objection.
3  A  Yeah, I think that might be -- yes, sure.  Absolutely.
4  Q  (By Mr. Raber)  It's not like some secret out there --
5  strike that.
6       That wouldn't be something that would be hard for
7  somebody to do, looking at a difference between the
8  heart attacks; correct?
9            MR. BUCHANAN:  Objection to form.
10           MR. TISI:  Objection.
11 A  That's certainly correct.
12 Q  (By Mr. Raber)  And that's true whether the ratio of
13 heart attacks is four to one or five to one, isn't it?
14           MR. BUCHANAN:  Objection.
15 A  Well, obviously the more it is, the worse it looks.
16 Q  (By Mr. Raber)  But it's obvious either way, isn't it?
17           MR. BUCHANAN:  Objection.
18 A  It would depend on the statistical significance, but
19 it certainly would be pointing in the same direction
20 of -- the force of that would be different depending
21 on the magnitude.
22 Q  (By Mr. Raber)  It would be an obvious conclusion that
23 at least one possibility is that Vioxx is increasing
24 the risk of heart attacks?
25 A  Absolutely.

116

1             MR. TISI:  Of what, Counsel?  Let's

2 be clear.

3             MR. BUCHANAN:  Objection to form.

4             MR. TISI:  Objection.

5 Q  (By Mr. Raber)  And you would expect any doctor --

6             MR. TISI:  You don't want to clarify

7 that, Counsel?

8             MR. RABER:  I don't know what I'm

9 being asked to clarify.

10             MR. TISI:  Well, I think that

11 question is totally misleading.

12             MR. RABER:  Okay.

13             MR. TISI:  Go ahead.

14             MR. RABER:  That's fine.  We'll move

15 on.

16 Q  (By Mr. Raber)  Are you familiar with a drug called

17 Flurbiprofen, F-L-U-R-B-I-P-R-O-F-E-N?

18 A  I've heard of it.

19 Q  Have you ever seen any studies about the ability of

20 Flurbiprofen to reduce of risk of heart attack?

21 A  Yeah, I've seen those studies.  Yes.

22 Q  By what percentage has Flurbiprofen been shown to

23 reduce heart attack?

24 A  I don't remember.

25       And those were not, by the way, studies in primary

117

1 prevention.  They were studies in people who already

2 had heart disease.  And they were very narrow, small

3 studies, not particularly -- and never been verified.

4       That drug is not approved for prevention of heart

5 disease.

6 Q  Was the reduction seen in Flurbiprofen studies in the

7 ballpark of the reduction or the difference in the

8 VIGOR study?

9 A  I doubt it, but I don't know.

10 Q  You don't know one way or the other?

11 A  I don't remember.  But I don't know what relevance it

12 has, anyway.

13 Q  Would you agree -- your endpoint of CHD, which is

14 heart attack plus sudden cardiac death, did you do an

15 analysis to determine whether the people who were

16 off-drug in the APPROVe study were at an increased

17 risk for CHD?

18 A  No.

19 Q  Do you know what the answer is to that?

20 A  Well, from the table, it didn't appear to be.

21             MR. BUCHANAN:  Steve, I'll just note

22 the clock.

23             MR. RABER:  Yeah.  Let me just do

24 one more thing.

25       Let's mark this as -- what are we up to?  No. 5?

118

1             THE REPORTER:  Yes.

2             (Exhibit No. 5 marked

3             for identification.)

4

5 Q  (By Mr. Raber)  Dr. Kronmal, I've put in front of you

6 a document that's been marked as Kronmal Exhibit 5.

7 It has the word "Hypotheses" at the top, and then two

8 paragraphs labeled "Primary" and "Secondary."

9       Do you see that?

10 A  Yes.

11 Q  I'd like you to look at this and tell me -- and answer

12 this question:  Does what's described on Exhibit 5

13 describe a CV outcomes trial?

14             MR. BUCHANAN:  Objection.  Form.

15 A  It doesn't describe any trial at all.  It just

16 describes the strategy for testing.

17 Q  (By Mr. Raber)  Would it describe strategy for testing

18 for a CV outcomes trial?  Is that what it looks like

19 to you?

20             MR. BUCHANAN:  Objection to the

21 form, again.

22 A  It is -- it is -- it's kind of a funny hypothesis

23 statement, because it's talking about noninferiority.

24 And typically, that's not the way you do

25 cardiovascular trials.  You look to see whether one

119

1 treatment is better than the other.

2       So if you were doing a noninferiority trial, yeah,

3 it describes how you might test for a noninferiority

4 trial.

5 Q  (By Mr. Raber)  In a CV outcomes trial?

6 A  In a CV outcomes.  That's what I was talking about,

7 yeah.

8 Q  So it is one type of CV outcomes trial?

9             MR. BUCHANAN:  Objection.

10 A  It's not describing a trial at all.  It's describing a

11 method of analyses.  It's not the same as describing a

12 trial.

13 Q  (By Mr. Raber)  But the method of analyses, it looks

14 to you like a CV outcomes trial; true?

15 A  No.

16             MR. BUCHANAN:  Objection.

17 A  It doesn't describe a trial at all.  It just says

18 they're going to do a test of thrombotic endpoints.

19 That's all.

20 Q  (By Mr. Raber)  In a clinical trial?

21 A  I assume so.  It doesn't say so.

22 Q  Well, I will tell you that this is --

23 A  I know what this is from, so you don't have to tell

24 me.

25 Q  What is it?

120

**EXHIBIT "7"**
**Part B**

**EXHIBIT "7"**
**Part B**

1    A   It's what they wrote in their statistical plan for the
2        protocol 203.
3    Q   Would you describe protocol 203 as a CV outcomes
4        study?
5    A   No.
6    Q   Why not?
7    A   It was simply taking three studies that were ongoing
8        and looking at it for cardiovascular side effects.  It
9        was not designed to -- those three trials were not
10       designed to determine whether Vioxx was causing
11       cardiovascular events.
12   Q   Have you read the protocol for --
13   A   Yes, I have.
14   Q   -- 203?
15   A   Yes, I have.
16   Q   And it's your opinion that it's not a CV outcomes
17       trial?
18   A   It's not.  It's clearly not.  Has nothing to do with
19       CV outcomes.
20           I mean, one was a polyp prevention trial.  I can't
21       remember; one was --
22   Q   Is a pre-specified --
23           MR. BUCHANAN:  I'm sorry.  He's not
24       done answering.
25   A   The answer is:  They were not CV outcome trials.  None

1        of them were.
2    Q   (By Mr. Raber)  Were CV outcomes pre-specified
3        endpoints in protocol 203?
4    A   They were pre-specified endpoints for adjudication for
5        CV events.
6    Q   And doesn't that make them CV outcomes trial?
7    A   No.
8    Q   How would you design a CV outcomes trial?
9    A   I would have done what they're doing now for the
10       comparison of Celebrex to naproxen to placebo.  That's
11       what I would have done.
12   Q   And who is doing that?
13   A   Pfizer, is my understanding.
14   Q   And it's your opinion that there's a placebo arm of
15       that study?
16   A   That's my recollection, but --
17   Q   Are you sure about that?
18   A   No, I'm not.  I think there should have been, if there
19       wasn't, but I don't know.
20   Q   Well, in order to do that, wouldn't you have to offer
21       some benefit to patients?
22   A   No; because the drugs might be harmful.
23   Q   I'm sorry?
24   A   The drugs might be harmful.
25   Q   So how would you --

1    A   It's a case of -- it's a case of equipoise, where you
2        don't know whether the drugs will be beneficial or
3        harmful; and therefore, a placebo is perfectly
4        ethical.
5    Q   So you're saying you would have two groups of people,
6        and give one group placebo and one group pain
7        reliever, to see which group had more heart attacks?
8        That's an ethical study, in your opinion?
9    A   Well, it wouldn't --
10           MR. TISI:  Let me just ask, what
11       population?
12           MR. BUCHANAN:  Objection to form.
13   A   Yes, what population, exactly?
14   Q   (By Mr. Raber)  Any population.
15   A   Oh, yeah.  If it were a population of people who were
16       high risk of inflammatory CV events, that is -- say
17       you took people, for example, who had unstable angina,
18       which is thought to be an inflammatory process in
19       part, and you randomize them to -- I don't care --
20       naproxen, Vioxx, Celebrex, and placebo, yes, it would
21       be a perfectly reasonable trial to do.
22   Q   That's because you have a theory or a hypothesis that
23       the anti-inflammatory effects of the drug might
24       provide some benefit to the patients?
25   A   That's correct.

1    Q   Correct?
2    A   That's correct.  And you also have the hypothesis it
3        might do harm.  So you don't know whether it's going
4        to be harmful or beneficial.  That's the reason to do
5        the trial.
6            And placebo control would be almost mandatory in
7        that circumstance, in my opinion.
8    Q   And so you would agree that if you just compared one
9        NSAID to another, that that wouldn't really be a CV
10       outcomes study; correct?
11   A   Oh, it would still be a CV outcomes study, if CV
12       outcomes were the primary endpoint.  But it wouldn't
13       be as good as --
14   Q   It would be difficult to interpret the results;
15       correct?
16           MR. BUCHANAN:  Objection to form.
17   A   It depends what they came out to be.  If one of them
18       was much worse than the other, you could interpret
19       that.  If they came out the same, you wouldn't know
20       whether they were both bad.
21   Q   (By Mr. Raber)  But without a placebo to give you a
22       background or a baseline, it would be hard to
23       interpret the results of a study of one comparator
24       versus another; true?
25           MR. BUCHANAN:  Objection.

1    A    No, that's not true.  I just explained to you, if one
2         was much worse than the other, you would conclude that
3         one was much worse than the other.  That's clear, and
4         you would have an answer to that question.
5              If somebody wants to know is Celebrex worse than
6         naproxen, they could test that.
7    Q    (By Mr. Raber)  What if --
8    A    If they both came out the same in the trial, if they
9         had exactly the same result in the trial, you would
10        not know whether they were both bad, both good, or
11        both neutral.
12   Q    But in the case, even where there's a big difference,
13        you wouldn't know if the higher one was better than
14        taking nothing at all or worse than taking nothing at
15        all; true?
16                  MR. BUCHANAN:  Objection to form.
17   A    You would not know compared to nothing at all, because
18        you haven't tested nothing at all.  You would know
19        compared to the other treatment.
20   Q    (By Mr. Raber)  That's all I'm saying.
21   A    I don't disagree with that.
22   Q    Now, you would agree with me that right up until the
23        time -- strike that.
24             Until the third quarter of 2004, there were people
25        who believed that Vioxx or other COX-2 inhibitors

1         might prevent heart attacks because of their
2         anti-inflammatory properties; true?
3                  MR. BUCHANAN:  Objection.
4    A    Well, I don't think anybody believed Vioxx did,
5         because of the VIGOR result.  But I think there
6         certainly were people who thought that other
7         anti-inflammatories might have that effect, yes.
8    Q    (By Mr. Raber)  I'm talking about COX-2 inhibitors,
9         including Vioxx.
10   A    I don't know what people thought about COX-2
11        inhibitors.
12   Q    Well, you were involved in studies looking, for
13        example, at whether infection could increase the risk
14        of heart attack and stroke; correct?
15   A    That's correct, I was.
16   Q    And there were others who looked at things like
17        C-reactive protein; correct?
18   A    There are studies ongoing now to see whether
19        C-reactive protein -- whether giving
20        anti-inflammatories with a placebo with -- yeah, there
21        are studies now.
22   Q    There were scientists into 2004 who believed that a
23        COX-2 inhibitor could reduce the risk of heart attack
24        and stroke by reducing inflammation; true?
25   A    There may be --

1                  MR. BUCHANAN:  Objection.
2    A    There might well have been.  I don't know.  I didn't
3         interview any particular scientist who said to me, you
4         know, COX-2 inhibitors will have that effect.  But I
5         wouldn't doubt that there was some who believed that.
6              I mean, I'm not trying to be argumentative about
7         it.  That it's certainly likely.
8                  MR. BUCHANAN:  Steve --
9                  MR. RABER:  Do you want to take a
10        lunch break?
11                 MR. BUCHANAN:  Please.
12                 (Recess 12:39-1:47 p.m.)
13
14
15                 EXAMINATION (Continuing)
16   BY MR. RABER:
17   Q    Dr. Kronmal, I want to just ask you a couple questions
18        about this testing for nonproportional hazards.  We
19        talked about it a bit this morning.
20   A    Mm-hm.
21   Q    Do scientists ever explore data to find out which of
22        the nonproportional hazards tests fits the data the
23        best?
24   A    They shouldn't.
25                 MR. BUCHANAN:  Objection.  Asked and

1         answered.
2    Q    (By Mr. Raber)  They shouldn't?
3    A    No.
4                  MR. BUCHANAN:  Asked and answered.
5    A    Because it's biased.
6    Q    (By Mr. Raber)  Is there any source that you can point
7         to as the basis for your opinion on that?
8    A    Again, you have to put it into context, of course.
9              I mean, if you were doing a completely exploratory
10        analysis, you just wanted to describe your data, then
11        it would be perfectly all right to look at what model
12        would fit it the best.  There's nothing wrong with
13        that.
14             If you wanted to test a hypothesis about
15        proportional hazards, you would not do that kind of
16        exploration.  You would pick your test -- in the
17        clinical trial setting, you would pick your test in
18        advance.  You would do that test.  If it wasn't
19        significant, you would go on to the next step, which
20        was to do nothing, basically.
21             Or if you wanted to do more descriptive things,
22        you could do it, but you would basically treat that as
23        highly exploratory and not worth of, you know, much in
24        the way of comment.
25   Q    (By Mr. Raber)  If protocol called for additional

1    analyses beyond the primary one, would it be
2    appropriate to do that?
3                MR. BUCHANAN: Objection. Form.
4    A  Well, I mean, I've read that protocol. And as I read
5       it -- and again, I don't have it in front of me, so I
6       can't quote it exactly. But as I read it, they
7       basically sort of -- they specifically said that they
8       would do the overall test using log or Schoenfeld
9       residual, and if they didn't see anything, they would
10      basically not continue on.
11          They only said they would explore it if they saw a
12      significant result, as I remember it.
13          And since they didn't, you know...
14   Q  (By Mr. Raber) Okay. Since they didn't -- what?
15      What was the conclusion?
16   A  Well, if they didn't, there was no point in really
17      doing much more.
18   Q  Dr. Kronmal, are you aware of any data that shows an
19      increased risk of using Vioxx if it's used
20      intermittently?
21              MR. BUCHANAN: Objection.
22   A  I've already addressed that; that, no, there was never
23      any study that addressed that issue.
24   Q  (By Mr. Raber) Are you aware of any mechanism that
25      would explain an increased risk of Vioxx for

1    intermittent use?
2    A  I could speculate on some, if you want. I can't prove
3       any, if that's what you mean.
4    Q  Okay.
5    A  Do you want me to speculate on mechanisms?
6    Q  Sure.
7    A  You could have a spike in blood pressure when you were
8       on it that would damage the arteries, and that damage
9       wouldn't go away. So it wouldn't matter whether you
10      were taking it intermittently or continuously. It
11      wouldn't make any difference.
12   Q  That's speculation?
13   A  Of course.
14   Q  Are you aware of any evidence that Vioxx increases the
15      risk of arrhythmic events?
16   A  No.
17              MR. TISI: Objection. Asked and
18      answered.
19              MR. BUCHANAN: Objection. Asked and
20      answered.
21   A  I don't know. I haven't looked at it specifically
22      from that point of view.
23   Q  (By Mr. Raber) And you can't point to any evidence
24      that Vioxx increases the risk of arrhythmic events;
25      correct?

1                MR. BUCHANAN: Objection. Asked and
2       answered.
3    Q  (By Mr. Raber) True?
4                MR. BUCHANAN: Objection.
5    A  Again, I haven't looked at it in any detail.
6           In the Alzheimer's study, at least in the original
7       classification, there was more sudden deaths in the --
8       in the Vioxx group than the placebo. But then they
9       reclassified them to -- a lot of those arrhythmic
10      deaths to MIs, for reasons I don't understand, but
11      they did. And that wouldn't have been there any
12      longer.
13          So the answer is, I don't know.
14   Q  (By Mr. Raber) Who reclassified events?
15   A  It was done between the time that Merck reported to
16      the FDA the results and Thal published the paper in
17      2005. That's all I know. Because those two don't
18      correspond on that issue.
19   Q  Is it your understanding that one reports investigator
20      reported events, and the other adjudicated events?
21   A  Not in this case. They were both adjudicated.
22   Q  They were?
23   A  Yeah.
24   Q  Okay. Should a DSMB be formed for every clinical
25      study of a drug?

1                MR. BUCHANAN: Objection. You said
2       "the drug"?
3                MR. RABER: "Of a drug."
4    A  It would depend on the study. If you're doing a
5       study, a long-term study where there is potential for
6       safety issues, you know, then you should always have a
7       DSMB, yes. Absolutely.
8    Q  (By Mr. Raber) If you don't believe that there's a
9       potential for a safety issue --
10   A  It doesn't matter whether you believe it or not.
11      That's irrelevant. If the potential exists.
12   Q  Well, doesn't that exist in every case?
13   A  No. Suppose you were doing a two-week study of
14      aspirin. You have lots of information, you know that
15      it's not going to do anything in two-weeks' time. You
16      don't have to have a DSMB. There wouldn't be any
17      point, because the study would be over before a DSMB
18      could do anything.
19          So there are certainly studies that are innocuous
20      enough, that you don't have to do a DSMB. But if
21      you're talking about a study where you have elderly
22      people with mild cognitive impairment and it's going
23      to last for three years or more, then, you know, it's
24      absolutely clear there should have been a DSMB.
25   Q  Can you point to any source, authoritative source, to

1       support that opinion?

2  A  I can find you papers that basically say that all

3       studies should have DSMBs, if you want.

4  Q  Are those authoritative?

5  A  Yeah; in the literature.

6  Q  Can you identify any, as we sit here today?

7  A  There's a paper by Tom Fleming.  There's several books

8       on the subject that say that -- I mean, I could find

9       you some.

10  Q  Have you ever heard of a standard or a practice of

11      having a DSMB when the study has a safety endpoint?

12  A  Sure.

13  Q  Okay.  But not necessarily for other studies?

14             MR. BUCHANAN:  Objection to form.

15  A  I don't know what you mean by that.  I'm sorry.

16  Q  (By Mr. Raber)  Well, have you ever understood that

17      the existence of a safety endpoint is a determinative

18      factor in deciding whether or not to have a DSMB?

19  A  All studies should be monitored for safety.  I don't

20      know what you mean by that question.  I don't know how

21      to answer.

22       By the way, a good example, if you want, of

23      authoritative source for -- that there should be DSMBs

24      is the NIH.  The NIH requires DSMBs for all clinical

25      trials.  There's an authoritative -- and I can point

1       you to the website where it describes it, if you want.

2  Q  Okay.  The NIH website?

3  A  It would be on there, yeah.

4  Q  Is it your experience that a relative risk is rarely

5      calculated in a safety analysis?

6             MR. BUCHANAN:  Objection to form.

7  A  That's a good question.  I don't know the answer.  I

8      mean, I have not --

9  Q  (By Mr. Raber)  Have you ever tested --

10  A  -- studied, you know, whether people do well -- you

11      know, most -- a lot of times, they do risk differences

12      rather than relative risk in the safety analyses.  And

13      that's typically because the frequency of the risk is

14      so low, that it's hard to compute a relative risk.

15       Say, for example, there was zero events in one

16      group and seven in the other, and the relative risk

17      would be infinite.  You know, seven divided by zero is

18      infinity.  And so it would not be very descriptive to

19      do that.  So it varies.

20  Q  Have you ever testified that a relative risk is rarely

21      calculated in a safety analysis?

22  A  Not that I remember.  I mean, I don't -- I could have.

23      I don't remember doing it.

24  Q  Dr. Kronmal, is it your opinion that all drugs are

25      dangerous?

1             MR. BUCHANAN:  Objection.

2  A  All drugs have side effects, that I have ever heard.

3  Q  (By Mr. Raber)  Have you ever testified that, in your

4      opinion, all drugs are dangerous?

5  A  I might have said that.  They all have dangers

6      associated with them.

7  Q  And you would include aspirin and ibuprofen in that

8      category?

9  A  Absolutely.  That's well-known, actually.

10  Q  You've got -- that they're dangerous?

11  A  Yeah.  But they have dangers associated with them.

12  Q  How about that they're dangerous?

13  A  That's -- if by that you mean that they're not worth

14      taking, then of course that's incorrect.  I mean,

15      that's not what I meant.

16       What I meant was, they have dangers associated

17      with their use, and there are -- there are no drugs,

18      that I know of, that don't.

19  Q  You've had experience as a member of an FDA advisory

20      committee; correct?

21  A  Yes.

22  Q  Based on your experience with the FDA, is it your

23      understanding that the FDA has complete authority over

24      whether a new drug application can be approved?

25  A  They do.

1  Q  Has it been your experience with the FDA that the FDA

2      is overcautious about safety?

3             MR. BUCHANAN:  Objection to form.

4  A  Up to -- up to my experience with VIGOR, I would have

5      said yes.  After that, I don't know what's happened in

6      the FDA.  I really don't understand what's going on.

7  Q  (By Mr. Raber)  Has it been your experience that the

8      FDA is very concerned about side effects?

9             MR. BUCHANAN:  Objection.

10             MR. TISI:  Objection.  Vague.

11  A  I assume they are.  I can't speak for everybody in the

12      FDA, but --

13  Q  (By Mr. Raber)  Have you ever testified to that?

14  A  I probably did.  I mean, if you say I did, I -- I have

15      no problem with saying that, because I'm sure they're

16      concerned about side effects.  Of course.

17             MR. BUCHANAN:  He's not saying you

18      did.  He's asking you a question.

19             THE WITNESS:  I don't remember.  But

20      if I did, I wouldn't disagree with that now.

21  Q  (By Mr. Raber)  Okay.  Now, you testified in the

22      Humeston case.  Do you remember that?

23  A  That's correct.

24  Q  And it was argued by the plaintiff in that case that

25      the FDA advisory committee in February of 2001 was

1   essentially bought by Merck.
2         MR. BUCHANAN:  Objection to the
3   characterization.
4  Q (By Mr. Raber)  Do you agree with that?
5  A I have no idea.  I had nothing -- I didn't testify
6   about that, and I wouldn't have.
7  Q Based on your experience on advisory committees, is it
8   often the case that members of the advisory committee
9   have either real or perceived conflicts of interest?
10        MR. BUCHANAN:  Objection to form.
11  A They're not supposed to.
12  Q (By Mr. Raber)  Do they have them?
13  A I don't know.  Probably.
14  Q Are there procedures for people to disclose potential
15   conflicts --
16  A There are.
17  Q -- on an advisory committee?
18  A There are, yeah.
19  Q And do you agree that the -- do you have an opinion as
20   to whether or not the advisory committee in February
21   of 2001 that looked at Vioxx was biased in favor of
22   Merck because of conflicts of interest?
23  A I have no idea.  I don't even know who was on it, who
24   the specific members were.
25      Plus, even if I knew that, I wouldn't know whether

1   they had a conflict of interest.  So I don't know the
2   answer to that.
3  Q Do you think that the fact that a scientist has done
4   work or received payments for work from a company
5   makes them unqualified to sit on an advisory
6   committee?
7        MR. BUCHANAN:  Objection to form.
8  A No, I don't think it makes them unqualified.
9  Q (By Mr. Raber)  Now, you have been a professor at the
10   University of Washington for how many years?
11  A Since 1964.
12  Q The opinions that you're expressing in this case are
13   your personal opinions; correct?
14        MR. BUCHANAN:  Objection.
15        MR. TISI:  Objection.
16  A Well, you've asked that before.  Every opinion that
17   one gives is based on experience and training.  And,
18   therefore -- I mean, if you want to call that
19   personal, you can.  I'm not going to object to that.
20  Q (By Mr. Raber)  Your opinions that you're expressing
21   are not the opinions of the University of Washington?
22  A Oh, absolutely not.  I'm not representing the
23   University of Washington.
24  Q And in fact, respected scientists disagree with your
25   opinions in this case?

1        MR. BUCHANAN:  Objection.
2  A I mean, I don't -- I don't know whether respected
3   scientists disagree with my opinions, because I don't
4   know if they've reviewed my report.
5  Q (By Mr. Raber)  Well, one of your opinions is that
6   after VIGOR, Vioxx should have been taken from the
7   market; true?
8        MR. BUCHANAN:  Objection.
9  A No, I didn't -- I didn't characterize it quite that
10   strong.  It should have been considered for taking off
11   the market, yes, but I don't -- my view was that the
12   decision to take it off the market should have come
13   when the Alzheimer's mortality data was known.
14  Q (By Mr. Raber)  Well, but back to VIGOR, it was your
15   opinion that VIGOR should have -- that the label
16   should have had a stronger warning?
17  A That's true.
18  Q And so in that respect, the FDA disagreed with you;
19   true?
20        MR. TISI:  Objection.
21   Mischaracterizes the evidence.
22        MR. BUCHANAN:  Objection.
23  A I don't know what the FDA thought.  How should I know?
24  Q (By Mr. Raber)  Well, the FDA approved the label.
25        MR. BUCHANAN:  Objection.

1  A I don't know on what basis the FDA decided what they
2   decided.
3  Q (By Mr. Raber)  They approved the label, didn't they?
4  A They did approve it.  Yes, that's a fact.
5  Q And so they disagreed with you, your interpretation of
6   VIGOR, didn't they?
7        MR. TISI:  Objection.
8        MR. BUCHANAN:  Objection.
9  A I don't know whether they did or did not.  I mean, if
10   I -- as I read the reviews of Targum and of Villalba
11   and the statistician that worked on it, I don't think
12   they disagreed in a marked way with what I have
13   thought about VIGOR.
14      On the other hand, they didn't know everything I
15   knew about VIGOR.  They didn't know how different the
16   hypertension results were between Vioxx and naproxen.
17  Q (By Mr. Raber)  You're just making that up, aren't
18   you?
19        MR. BUCHANAN:  Objection.
20  A No.  It's in my report.
21        MR. BUCHANAN:  You're doing it
22   again.  Stop.
23      You have the right to answer the question.  He
24   can't cut you off.  Was your answer before complete?
25        THE WITNESS:  Yes.