1   Q   (By Mr. Raber)  The fact of the matter is, you don't
2       know what the FDA knew.
3               MR. BUCHANAN:  Objection to form and
4       tone.
5   Q   (By Mr. Raber)  True?
6   A   I know what they said in their reports.
7   Q   You don't know what people at the FDA knew or what
8       data they reviewed, do you?
9               MR. BUCHANAN:  Objection to form.
10      Once again --
11  A   I know what data Merck provided to the FDA.  I know
12      what reports they provided to the FDA.  And the
13      reports that they provided to the FDA did not show the
14      hypertension adverse event data in a way in which it
15      was clear how strong the difference was.
16              MR. RABER:  David, I would note,
17      too, that your posturing about tone and all of that is
18      nonsense.
19              MR. BUCHANAN:  It's not posture at
20      all.
21              MR. TISI:  Actually, to be honest
22      with you, Steve, I think what would be a good idea is,
23      the next time it happens, I will try to call Judge
24      Fallon, because I think enough is enough.
25              MR. RABER:  You can do that.

141

1               MR. TISI:  Just let me tell you, it
2       is four o'clock now.  If it happens in the next 15
3       minutes, we're going to --
4               MR. RABER:  It's two o'clock.
5               MR. TISI:  No.  It's two o'clock now
6       in Seattle.  It's four o'clock where Judge Fallon is.
7       And we'll call him.
8               MR. RABER:  I would be happy to do
9       any of these depositions in a courtroom, with a judge
10      present, with the video, and you guys didn't want it.
11              MR. TISI:  And I would be very happy
12      that Judge Fallon hear the comments that you've made
13      during the course of the deposition.  I've seen him
14      take lawyers to task for that.
15              MR. RABER:  Sir --
16              MR. TISI:  Go ahead.  Proceed.
17      Counsel.
18  Q   (By Mr. Raber)  Dr. Kronmal, some of your
19      colleagues -- well, strike that.
20          It's your opinion that the ITT analysis should be
21      applied to all clinical trials?
22  A   Absolutely.
23              MR. BUCHANAN:  Objection to the
24      form.
25  Q   (By Mr. Raber)  And you're aware, aren't you, that

142

1       some of your colleagues at the University of
2       Washington disagree with you on that point?
3   A   I don't know anyone that would disagree with me.  You
4       can point to one that does?
5   Q   Sure.
6               MR. RABER:  Let's mark this as
7       No. 6.
8                   (Exhibit No. 6 marked
9                   for identification.)
10
11  Q   (By Mr. Raber)  Dr. Kronmal, I've put in front of you
12      Kronmal Exhibit 6, which I'll represent to you is an
13      article called "Intention-to-Treat Analysis in
14      Randomized Trials:  Who Gets Counted?"  And the authors
15      are Milo Gibaldi, Ph.D., and Sean Sullivan, Ph.D.
16          Do you see that?
17  A   I do.
18  Q   And are Drs. Gibaldi and Sullivan affiliated with the
19      University of Washington?
20  A   Apparently they are, yes.
21  Q   And I'd like you to turn, if you would, to Page 671.
22          You're chuckling, sir.  Is there something funny
23      about the article?
24  A   Yes.
25  Q   What?

143

1   A   It's ridiculous.
2   Q   Have you read it?
3   A   No.  I can tell you right now --
4   Q   You know it's ridiculous without reading it?
5   A   Well, I know from just reading the first few
6       paragraphs.
7   Q   On Page 671, the first full paragraph on the
8       right-hand column, it says, "Elliott has suggested
9       that for drug trials, especially of antihypertensive
10      or nonsteroidal antiinflammatory agents, in which
11      patients are likely to switch therapies over time, the
12      actually on-therapy experience analysis may more
13      closely reflect the situation in clinical practice."
14          Do you see that?
15  A   Yeah, I do.
16  Q   Do you agree or disagree with that statement?
17              MR. BUCHANAN:  Objection.
18          You have the ability to read the article, if you
19      would like it.
20  Q   (By Mr. Raber)  Do you agree or disagree with that
21      statement?
22  A   Let me read the sentence again.
23          Well, you're talking about the sentence that --
24  Q   On the far right column, "Elliott has suggested."
25  A   Oh, I see it.  Oh, I don't object to that statement at

144

1    all.

2    Q   And that's the sentence that begins, "Elliott has

3        suggested"?

4    A   Right.  Yeah.

5    Q   The next sentence says, "He also" --

6            MR. BUCHANAN:  I'm sorry.  Were you

7        done?

8            THE WITNESS:  I was going to go on.

9        That's all right.

10   Q   (By Mr. Raber)  The next sentence says, "He also

11       suggested that actually on-therapy experience may be

12       more appropriate when analyzing data on the side

13       effects of therapy."

14           Do you see that?

15   A   I don't agree with that statement.  I don't -- because

16       the part I don't agree with, let me point out, is that

17       it's always appropriate to do an intent-to-treat.

18           It may be appropriate, as well, to look at

19       on-drug.  I have no problem with that.

20   Q   It says, "If the discontinuation during the course of

21       a trial of a drug causing a side effect results in the

22       elimination of a side effect, analyzing data from

23       patients who have stopped taking the drug minimizes

24       the differences between treatment groups and makes

25       them less likely to achieve statistical significance."

1            Do you agree with that?

2    A   That's correct.

3    Q   And it says, "If this were to occur, an important side

4        effect may be discounted unintentionally."

5            Do you see that?

6    A   Absolutely.  I agree totally.  Not a problem.

7    Q   So --

8    A   I have no objection to doing on-drug analyses.  I

9        never said I did.

10   Q   Your opinion is that, based on the VIGOR data, it

11       would have been unethical to do the Alzheimer's study

12       and the APPROVe study; correct?

13           MR. BUCHANAN:  Objection.  Are you

14       referring to his report or just --

15           MR. RABER:  Testimony.

16           MR. BUCHANAN:  Oh.  I'll object.

17   A   Well, number one, I don't know that I've said that.  I

18       don't believe I would have.  But if you can point to

19       where I said it, I'll be glad to look at it.

20           I think that --

21           MR. BUCHANAN:  He's going to show

22       you.

23           THE WITNESS:  Okay.

24   Q   (By Mr. Raber)  Okay.  Look at Page 245, Line 15, and

25       read 245, Line 15, read that question and answer.

1            MR. BUCHANAN:  You can read whatever

2        you like.

3            MR. RABER:  I'm sorry, David?  He

4        can read whatever he likes?

5            MR. BUCHANAN:  Yes.

6            MR. RABER:  I'm just directing him

7        to refresh his recollection.

8            MR. BUCHANAN:  I understand.  He's

9        allowed to read the surrounding sentences for context.

10       He's perfectly entitled to do that.

11           MR. RABER:  What you're doing is

12       improper.

13           MR. BUCHANAN:  It's not improper at

14       all.

15   A   That's not the question that was asked, nor my

16       response.  It has nothing to do with -- it doesn't say

17       anything about Alzheimer's.  It doesn't say anything

18       about APPROVe.

19           Oh, I see.  You're saying the answer to the next

20       question.  I'm sorry.

21   Q   (By Mr. Raber)  No.  Page 245 --

22   A   I didn't use the word "ethical."  He did.  But anyway,

23       I couldn't have done the Alzheimer's study, I couldn't

24       have done the APPROVe study --

25   Q   (By Mr. Raber)  Based on your interpretation.  And you

1        did use the word "ethical," didn't you?

2    A   Yes.

3            MR. BUCHANAN:  You can read keeping.

4    Q   (By Mr. Raber)  So what you said under oath is that

5        based on the VIGOR results, you could not have done

6        either the Alzheimer's studies or the APPROVe studies;

7        correct?

8    A   That's correct.

9    Q   All right.  The FDA disagrees with you on that, don't

10       they?

11   A   Yeah, apparently.

12   Q   And the investigators who were involved in those

13       trials disagree with you about that?

14   A   Apparently they did, yes.  Obviously, or they wouldn't

15       have let it go on.

16   Q   Have you ever done any studies of Vioxx or COX-2

17       inhibitor drugs?

18   A   No, I haven't.

19   Q   You grouped your data after you knew what the results

20       were, didn't you?

21   A   No.

22           MR. BUCHANAN:  Excuse me.

23       Objection.  Form.

24   Q   (By Mr. Raber)  Well, you started out doing your

25       analysis looking at MI; correct?

1    A    Yes.

2    Q    And after you started looking at the data, you changed

3         your group and added sudden cardiac death to it; true?

4    A    I did both MI and cardiac and total CHD.

5    Q    In fact, after looking at the data, you decided to

6         include sudden death; true?

7    A    Well, it was -- yeah, that's true.  Sure.

8    Q    Okay.

9    A    But it was based on the fact that in the Alzheimer's

10        studies, there were a number of deaths that have been

11        classified as sudden death that were clearly MIs, as

12        well.  And so I thought it was appropriate to look at

13        the hard CHD.

14             And probably in retrospect, that's what I should

15        have done for all of them.

16   Q    So you had the benefit of hindsight when you did that?

17   A    Yeah, of course.

18             MR. BUCHANAN:  Objection.

19   Q    (By Mr. Raber)  When Merck set up its groups, it did

20        it before it knew the results; true?

21             MR. BUCHANAN:  Objection to form.

22   A    No, that's not true.

23   Q    (By Mr. Raber)  It set up its confirmed thrombotic

24        events before it knew all the results, didn't it?

25   A    No.

1             MR. BUCHANAN:  Objection.

2    A    They knew all the results from all of their trials

3         well before they set up those -- they added those

4         results for, in some of the cases, years.  They have

5         seen the VIGOR results.

6    Q    (By Mr. Raber)  When did Merck set up its standard

7         operating procedure for thrombotic events?

8    A    Which one?  They set up --

9    Q    The SOP.

10   A    They did several of those.

11   Q    They did?  How many?

12   A    Well, they did the two or three.  Right?

13   Q    I'm talking about the standard operating procedure to

14        adjudicate --

15   A    Oh, to adjudicate?  Yes, I didn't understand your

16        question.

17             The adjudication, I think it was done sometime in

18        2000.

19   Q    They did that before they knew the VIGOR results?

20   A    Yeah, the adjudication.

21   Q    And they identified categories before they knew the

22        VIGOR results?

23   A    They didn't specify --

24             MR. RABER:  Please don't shake your

25        head "no."

1             MR. BUCHANAN:  I'm going to

2         object -- not at all.  I can't believe -- I can't

3         believe you're asking this question.  It is unfounded

4         and misleading.  Objection.  Form.  Misleading.

5             MR. RABER:  Mr. Boehm, was

6         Mr. Buchanan shaking his head when I asked that

7         question?

8             MR. BOEHM:  He's been doing it from

9         the very first question about this.

10             MR. BUCHANAN:  That is absolutely

11        false.  And you should have noted that before.

12             I'm objecting because that question is unfounded,

13        and you know it.  You know that document well.  You

14        don't have a basis to ask that question.

15             MR. RABER:  Sir, don't coach the

16        witness.

17             MR. BUCHANAN:  That's not a coach.

18        That's an improper question.

19             MR. RABER:  Don't point your finger

20        at me.

21             MR. BUCHANAN:  Objection.  Form.

22        Improper question.

23   Q    (By Mr. Raber)  Sir, Merck didn't know the results of

24        the VIGOR study when it set up the categories of

25        events to be adjudicated, did it?

1    A    That's correct.

2    Q    You gave us, in your report, your final analysis of

3         the data; true?

4    A    It's final --

5             MR. BUCHANAN:  Objection to form.

6    A    It's final as of now.  Obviously I will redo the

7         analyses for the -- for the APPROVe extension, because

8         you pointed out some errors.  I want to make sure I

9         get it correct.

10   Q    (By Mr. Raber)  You did some preliminary analyses that

11        you didn't give to us, true, in the context of forming

12        your report?

13   A    I did lots of preliminary analysis, of course.

14   Q    Ones that you didn't give to us?

15             MR. BUCHANAN:  Objection.

16   A    I didn't keep them.  I mean, because they were

17        preliminary.

18   Q    (By Mr. Raber)  And in fact, in doing analyses, if

19        your analysis didn't have the right number of events,

20        you would go on to the next one; true?

21   A    If I knew that, yes.

22   Q    Now, one problem with looking at data after the fact

23        is that you can cut and dice the groups in hundreds of

24        different ways; true?

25   A    You could.

1  Q  And depending on how you cut and dice them, you can

2      get different conclusions; true?

3  A  You might.

4  Q  In fact, you could, for example, find that somebody

5      with one astrological sign has a higher risk of

6      something happening to them?

7  A  Oh, absolutely.

8  Q  Have you read any depositions of the Merck scientists

9      in this case?

10  A  Yes.

11  Q  Whose depositions?

12  A  I don't remember.

13  Q  When did you read them?

14  A  Long time ago.

15  Q  Do you remember testifying in August of last year,

16      that you had not read any depositions?

17  A  At that point, I hadn't.

18  Q  Okay.  Whose did you read?

19  A  I think I've read Shapiro's now.

20  Q  Anybody else come to mind?

21  A  Depositions?  I've heard snippets of Scolnick's, but I

22      didn't -- haven't read his deposition.

23  Q  Did you read Alise Reicin's deposition?

24  A  I don't believe I have.

25  Q  Have you read her testimony?

---

1  A  No, I haven't.

2  Q  Why not?

3           MR. BUCHANAN:  Objection.

4  A  Just, I'm busy, and, you know, it's not relevant to my

5      report.

6      I've read Howard's deposition, by the way.  That

7      one I definitely read.

8  Q  (By Mr. Raber)  Have you looked at the medical records

9      of any particular plaintiff?

10  A  No.

11  Q  And I take it you have no case-specific opinions about

12      whether or not Vioxx caused or contributed to

13      somebody's heart attack or stroke; correct?

14  A  I don't know -- I can't answer that question, because

15      what do you mean by case-specific?

16  Q  Well, in other words, you don't intend to offer an

17      opinion that Vioxx was a substantial factor in causing

18      the heart attack of Mr. McFarland or causing the death

19      of Mr. Hatch in the New Jersey cases, as an example?

20           MR. BUCHANAN:  Objection to form.

21  A  I really don't know how to answer that question,

22      primarily because all of what I've done in my report,

23      my testimony, bears on the issue of whether Vioxx is a

24      cause of MIs and cardiac and death, basically.

25      So in that sense, it relates to the individual.

---

1      So I don't know what you mean by the question.

2  Q  (By Mr. Raber)  Well, let me ask you this question.

3      In APPROVe, how many people took Vioxx?

4  A  It's in the thousands.

5  Q  About 1200?

6  A  Yeah.

7  Q  And there were how many heart attacks in APPROVe?

8  A  I don't know the exact number.  40, 50, 60.

9  Q  Less than 50, probably; right?

10  A  I don't know.  I'd have to look at the numbers.

11  Q  So that means 1100 people didn't have a heart attack;

12      right?

13  A  Of course.

14  Q  So are you going to give an opinion as to whether

15      Mr. McFarland or Mr. Hatch or any individual plaintiff

16      was one of the 1100 who didn't have a heart attack or

17      stroke or was one of the ones who did?

18           MR. BUCHANAN:  Objection to form.

19  Q  (By Mr. Raber)  That's what I'm getting at.

20  A  Well, I still don't understand, because they had a

21      heart attack or stroke.  Otherwise, there wouldn't be

22      a trial.

23      So I don't know -- I mean, you're talking about a

24      hypothetical here.  I don't know how to answer that

25      question.

---

1  Q  Do you intend to offer an opinion at trial that Vioxx

2      played a role in causing a particular plaintiff's

3      heart attack, stroke, or other event?

4           MR. BUCHANAN:  Objection to form.

5  A  Only to the extent that in testifying that increased

6      the risk of having those events -- I mean, to the

7      extent that that is directed towards that individual,

8      the answer would be yes.

9      If you're talking about am I going to specifically

10      say I know for certain that it causes it in that case,

11      no, of course I wouldn't say that.

12  Q  (By Mr. Raber)  Your opinion would apply equally to

13      anyone?

14  A  Yes.

15  Q  Right?

16  A  That's exactly the point I'm trying to make, in so

17      many words.

18           MR. BUCHANAN:  Steve said it better.

19  Q  (By Mr. Raber)  Now, your category of CHD includes

20      heart attack and sudden death; correct?

21  A  That's correct.

22  Q  You have used CHD as a category in other trials,

23      haven't you?

24  A  Yes.

25  Q  And in those other trials, your definition of CHD has

1   also included something called angina; true?

2  A  The only other trial that I -- that I was involved in

3   that used that as an endpoint included unstable

4   angina, hospitalization for unstable angina.

5  Q  How about angina pectoris?

6  A  No, I can't think of a trial I was involved in where

7   that was part of the primary endpoint.

8      You're talking about the primary endpoint or

9   secondary endpoints?

10  Q  I'm talking about a definition.

11  A  Oh, if you mean did -- in clinical trials, you're

12   talking about?

13  Q  Yes.

14  A  Where it was part of the primary endpoint?

15            MR. BUCHANAN:  He's going to show

16   you something.

17            THE WITNESS:  Okay.  I don't know

18   the answer.

19  Q  (By Mr. Raber)  Are you familiar with a study called

20   the association of fasting glucose levels with

21   congestive heart failure in diabetic adults greater

22   than 65 years?

23  A  Yes, I am.

24  Q  That was a study that you were coauthor of with

25   Cardiovascular Health Study; right?

1  Q  Why not?

2  A  Well, the main reason was, there was not good data on

3   angina from the studies.  Merck didn't give me data

4   that would have allowed me to have looked at angina as

5   an endpoint.  Otherwise, I might have.

6      I thought about it, actually, a little bit.

7  Q  Does the 2002 label report angina in a table from the

8   VIGOR study?

9  A  I don't remember.  They might have.  I mean, they

10   treat it as an AE.  And so it's recorded, but there

11   wasn't -- you know, for all -- the signal for VIGOR

12   was MI, and so I focused on MI.

13      And when I saw the Alzheimer's results and

14   recognized that it was easily possible that some MIs

15   were being classified as sudden cardiac deaths, then I

16   thought it was worth looking at the combined, as well.

17   And that was the entire motivation.

18  Q  Do you know whether or not if you add -- or if you

19   include angina in your definition of CHD, whether the

20   ITT results for APPROVe are statistically significant

21   for an increased risk of Vioxx?

22  A  I have no idea.  But the problem is that angina was

23   not adjudicated, as far as I know.  And so I wouldn't

24   have been able to do that.  I mean, it's --

25  Q  Have you seen the list of adjudicated terms in Merck's

1  A  That's correct.

2  Q  And in this study, you said baseline and incident CHD

3   was defined as a history of myocardial infarction for

4   a non-MI event, such as angina pectoris or a

5   revascularization procedure; true?

6  A  Sure.

7  Q  So you have done studies where you define CHD to

8   include angina?

9  A  Of course.  But --

10  Q  You didn't do that --

11  A  But I made the distinction in my report that this was

12   hard CHD.  And the definition of hard CHD is generally

13   given as MI plus sudden cardiac death.

14      If I would have said CHD in general, then I would

15   have -- I could have encompassed a broader definition.

16      And by the way, for different purposes -- that was

17   an epidemiologic study, by the way, not a clinical

18   trial.  I should make that distinction.  But for

19   different purposes, you may well have included CHD all

20   the way through mild angina.  And in that particular

21   case, it included revascularizations.

22  Q  But you decided not to do it here?

23  A  I never thought about doing it here.

24  Q  Why not?

25  A  It wasn't a decision.

1   CV SOP?

2  A  Yes.

3  Q  It includes angina, doesn't it?

4  A  Yeah.  But what they did was, they tried to use that

5   information to decide whether or not someone had an MI

6   or a thrombotic event.  But I don't believe that

7   they...

8  Q  Don't believe that they what?

9  A  Well, I'm not sure what they did.  I don't know.  I

10   shouldn't comment.  I haven't really thought about it.

11  Q  I'm showing what you I'll represent to be the 2002

12   label, and Table 3, which is a table of cardiovascular

13   events from the VIGOR study.

14      Do you see that?

15  A  Yes.

16  Q  And do you see where it's broken out, unstable

17   angina --

18  A  Yes.  Unstable angina, yes.  You're talking about

19   angina pectoris.  Unstable angina is a different

20   thing.

21  Q  How is it different?

22  A  Because it's unstable.  And typically, it requires

23   hospitalization as part of that definition.  That's

24   totally different.

25  Q  You didn't include unstable angina in your definition

```
1        of CHD, did you?
2    A   No, I did not.
3    Q   Okay.  You didn't include stroke in your definition of
4        CHD?
5    A   It's not CHD.  Stroke is CBD.  It's not CHD.
6    Q   You didn't include stroke in your analysis of the
7        data, did you?
8    A   No, I did not.
9                    MR. BUCHANAN:  Asked and answered.
10   Q   (By Mr. Raber)  Sir, do you remember that in your
11       report that you filed in 2005, you accused Merck of
12       misrepresenting the MI data in the label that came out
13       after VIGOR?
14                   MR. BUCHANAN:  Objection.  Asked and
15       answered.
16   A   I don't remember exactly what I said, no.
17       Did I use the word "misrepresented"?  I might
18       have.  I don't know.
19   Q   (By Mr. Raber)  Do you remember that you later
20       admitted in your deposition that your accusation was
21       untrue?
22   A   No, I don't remember.
23                   MR. BUCHANAN:  I have it.  If you
24       can just tell me what page you're on.
25                   MR. RABER:  223.
```

```
1                            (Discussion off the record
2                            between the witness and
3                            his counsel.)
4
5                    MR. BUCHANAN:  You said 223?  Do you
6        have a line, by the way?
7                    MR. RABER:  Line 23.
8    Q   (By Mr. Raber)  It says, "So then, Doctor, if that
9        were in fact true, then the statement in your report
10       on Page 23 is not true?"  And you say, "That's
11       correct."  Right?
12   A   Yeah, that's correct.  That, I do not remember --
13   Q   (By Mr. Raber)  Does that refresh your recollection?
14   A   It does.  And that was an issue that I missed, that
15       there was a line in a table in the label that did show
16       the MIs.
17   Q   So you accused -- in your report, you accused Merck of
18       misrepresenting the MI data in the label --
19   A   Well, I think they still misrepresented it, but they
20       did have it there.  He was asking me a question, was
21       it there.  And I said, then, yes, it was.
22   Q   So you admitted that you made an accusation that was
23       not true?
24                   MR. BUCHANAN:  Objection.
25   A   It's not an accusation.  It was -- it was -- I didn't
```

```
1        notice that one line of that table.  So the statement
2        was untrue.  I don't consider it an accusation or
3        anything.
4    Q   (By Mr. Raber)  But you repeated that -- well, never
5        mind.
6        In your 2005 report, you recall that you said that
7        the trend was unfavorable in the Vioxx group regarding
8        death in the VIGOR study?
9    A   Yes.
10                   MR. BUCHANAN:  Objection.  Asked and
11       answered.
12   Q   (By Mr. Raber)  And you admitted that using the word
13       "trend" was sloppy and you shouldn't have used it?
14   A   Well, I didn't use the word "sloppy," but I agree that
15       it shouldn't have been used, yes.  It was not very
16       precise.
17   Q   Look at Page --
18                   MR. BUCHANAN:  I'm going to
19       interpose an objection, in any event, to going over
20       tired ground.
21                   MR. RABER:  This is called
22       cross-examination.  It's --
23                   MR. BUCHANAN:  It's actually called
24       retreading tired ground.  It's supposed to be --
25                   MR. RABER:  Stop it, David.
```

```
1                    MR. BUCHANAN:  No.  Let me get my
2        objection out for the record.
3                    MR. RABER:  I've heard it.
4                    MR. BUCHANAN:  No.  The reporter
5        needs it.
6                    MR. RABER:  Your witness just denied
7        using the word "sloppy" under oath.
8                    MR. BUCHANAN:  No.  Actually, let me
9        get my objection out.
10       We are retreading tired ground.  I object to this.
11       This deposition is supposed to be conducted for
12       discovery concerning the witness's opinions in his new
13       reports.  We have now spent the last 15 to 20 minutes
14       going over statements --
15                   MR. RABER:  Stop talking.
16                   MR. BUCHANAN:  -- in his last
17       deposition.  I strongly object to that and your
18       discourteousness.
19       Let's go forward.  What page would you like the
20       witness to go to?
21                   MR. RABER:  76 and 77.
22   Q   (By Mr. Raber)  Page 77, Line 5.  77, Line 5,
23       question:  "I'm just trying to understand your use of
24       the word trend."
25       Answer:  "Well, I was sloppy -- it was sloppy
```

```
 1      there."
 2    A  Okay.  That's fine.
 3    Q  Then you go on to say in Line 11 through 13 that "I
 4      shouldn't have used it there."
 5    A  Yes.  I mean, I never disagreed with that.  I just
 6      didn't remember using the word "sloppy."
 7    Q  But you used it again in your 2006 report, didn't you?
 8    A  What?
 9    Q  The word "trend" to describe Vioxx and deaths in the
10      VIGOR study.
11    A  If I did, it was inadvertent.  I meant to take it out.
12    Q  Please look at Exhibit 1.
13    A  No, I believe you when you said if I did.  I have no
14      reason to disbelieve you on that.  I just -- my point
15      is that I wouldn't have -- if I'd have noticed it, I
16      would have taken it out.
17    Q  Would you look at Page 3 of your 2006 report?  Towards
18      the bottom, you say, "Moreover, there was an
19      unfavorable trend against the safety of rofecoxib for
20      congestive heart failure and death."
21        Another mistake?
22    A  Well --
23          MR. BUCHANAN:  Objection to form.
24    A  I would rather have not used the word "trend" there.
25      However, for congestive failure, there was more than a
```

```
 1      trend for -- there was actually a statistically
 2      significant difference for CHF hospitalizations and
 3      for withdrawal from the trial due to CHF events.
 4        So for CHF, I could have said a stronger statement
 5      there.  For death, I shouldn't have used the word
 6      "trend."  I admit, I should have taken it out.  I
 7      missed it.
 8    Q  (By Mr. Raber)  Well, sir, turn to Page 7 of your
 9      report, please.
10        In fact, in your report, you said that CHF was not
11      statistically significant; true?
12          MR. BUCHANAN:  Objection to form.
13    A  I had already mentioned to you that, overall, CHF was
14      not significant, but hospitalizations for CHF was
15      significant, as was people dropping out of the trial
16      due to CHF was also statistically significant.  And
17      that's all I said, is that I could have made a
18      stronger statement there for CHF and a weaker one for
19      death.
20        I apologize for using the word "trend."  It
21      shouldn't have been used.  I don't like using that
22      word anyway.  Just crept in.
23    Q  (By Mr. Raber)  It would be inaccurate to describe the
24      data?
25          MR. BUCHANAN:  Objection.
```

```
 1    A  Well, people use it that way.  I don't like to use it
 2      that way.
 3    Q  (By Mr. Raber)  But you did.
 4    A  I know.  It was a mistake.  You know, choice of words
 5      when you're writing thousands of pages, hundreds of
 6      pages, it's easy to use a word that you would rather
 7      not have used if you thought of the single word in
 8      that context.
 9          MR. BUCHANAN:  Belated objection.
10    Q  (By Mr. Raber)  Let's talk about VIGOR.  One of your
11      criticisms of Merck's reporting of the VIGOR study is
12      that they rounded the incidence of death from .54 to
13      .5 and then from .37 up to .4.  Correct?
14    A  That's correct.
15    Q  And your problem with that is that by rounding the
16      numbers that way, they reduced the apparent difference
17      between the two groups?
18    A  That's correct.  And -- well, there's more than that.
19      It's also that they didn't accurately report the
20      results of enough digits that you could actually tell
21      what the rates were.
22    Q  Have you ever done that before, reported a percentage
23      at one digit?
24    A  I may well have in some -- some case.  But, you know,
25      I would always report the numbers someplace, in a
```

```
 1      table or someplace else.  I wouldn't just give the
 2      percents.
 3    Q  Well, here you said that your criticism here was that
 4      they rounded the numbers to make the difference appear
 5      to be less, on Page 11 of your report.
 6    A  Yeah, they did.  That's a fact.  It doesn't change --
 7      I mean, it's just the fact.
 8          MR. BUCHANAN:  I'm just going to put
 9      it on the record, while he's looking for this, this
10      was again information that was in his original report,
11      about which he's previously been examined.
12        I understand this examination was for the specific
13      purpose of cross-examining -- discovering from
14      Dr. Kronmal the basis for his opinions in the
15      addendum --
16          MR. RABER:  You submitted a
17      different report, didn't you?
18          MR. BUCHANAN:  It's the same
19      information.
20          MR. RABER:  It's not the same
21      report.
22          MR. BUCHANAN:  This is absolutely
23      the same information about which you had a full and
24      fair opportunity to examine him last year.
25          MR. RABER:  I deny that he changed
```

1    it.  I deny that it's the same report.

2                MR. BUCHANAN:  You deny that this

3    information is in the original report?

4                MR. RABER:  He added stuff.

5                MR. BUCHANAN:  Was this in the

6    original report?

7                MR. RABER:  Let's mark this as

8    No. 7.

9                (Exhibit No. 7 marked

10                for identification.)

11

12                MR. RABER:  His name was in the

13    original report.  You didn't stop me from asking that.

14                MR. BUCHANAN:  Counsel, you're

15    grossing violating the process, and this is going to

16    expose your witnesses to the same thing.

17  Q  (By Mr. Raber)  Dr. Kronmal, do you recognize Exhibit

18    7 as an article called "Prospective evaluation of a

19    prostacyclin-sparing aspirin formulation and

20    heparin/warfarin in aspirin users with unstable angina

21    or non-Q wave myocardial infarction at rest"?

22  A  Yeah, I do.

23  Q  Published in the European Heart Journal in 1994?

24  A  Yes.

25  Q  And your name is on there as a coauthor; is that

1    correct?

2  A  It is.  It is.

3  Q  Is this in a peer-reviewed journal?

4  A  Yes, it is.

5  Q  This was a clinical trial?

6  A  Mm-hm.

7  Q  "Yes"?

8  A  Yes.

9  Q  And what you wanted to do was, you had a theory that

10    prostacyclin in the blood vessels could help prevent

11    heart attacks; correct?

12  A  I didn't have a theory.

13  Q  The people on this study did?

14  A  They -- the main author did.  I was just a

15    co-investigator with him.

16  Q  Okay.  That was the hypothesis of the article, was

17    that if you increased the amount of prostacyclin in

18    the endothelium, that you could reduce the risk of

19    heart attack; correct?

20  A  Well, I'd have to read the paper again.  It's been a

21    long time since this paper was written, and I don't

22    remember details of it very much at all.  I was only a

23    minor player in this.  So let me read it.

24    Well, I have to say, I don't understand the

25    details of this.  I mean, I'm not an expert of the

1    biology of aspirin.  You know, they talk about the

2    pre-systematic acetylation, A-C-E-T-Y-L-A-T-I-O-N, of

3    platelets without endothelial cell, cyclooxygenase

4    inhibition.  I don't actually know what that exactly

5    means.

6  Q  It's pretty easy to understand on the front page,

7    though, the last sentence in italics of the front

8    page, where it says, "Prostacyclin-sparing aspirin

9    offers no clinical benefit over conventional aspirin."

10    You can understand that, can't you?

11  A  Yeah, exactly.

12  Q  And that means that an aspirin that preserves the

13    amount of prostacyclin in your endothelium doesn't

14    protect any better against a heart attack than regular

15    aspirin.

16                MR. BUCHANAN:  Objection.  Form.

17  Q  (By Mr. Raber)  True?

18                MR. BUCHANAN:  Objection.

19    Foundation.  Form.

20  A  That's what this study was meant to study, yeah.

21    Among other things.

22  Q  (By Mr. Raber)  And when you put your name on this

23    paper, that meant that you agreed with the content of

24    it; true?

25                MR. BUCHANAN:  Objection to form.

1  A  I agree with the content, sure.  I mean, not

2    necessarily the theories about the biology of it.  I

3    don't know enough about that to comment.  That's what

4    these other experts are for.  I can't tell you --

5  Q  (By Mr. Raber)  You agreed with the statistical

6    analysis?

7  A  Yes.

8  Q  You agreed with the presentation of the data?

9  A  Yeah, sure.

10  Q  Let's look at Page 1200 of this paper.  Do you see

11    Table 2?

12  A  Yes.

13  Q  Where it says "Primary end-points"?

14  A  Yes, I do.

15  Q  And there's a table there where it says "Myocardial

16    infarction"; correct?

17  A  That's correct.

18  Q  That's a heart attack?

19  A  That's correct.

20  Q  And you report that two people in the controlled-

21    release aspirin group had heart attacks, and that

22    three in the other group had heart attacks; right?

23  A  That's correct.

24  Q  And you report the percentages as 3 percent versus 4

25    percent; correct?

1   A    That's what's in the table, yes.

2   Q    And actually, that 3 percent is a number that's been

3        rounded up, hasn't it?

4   A    I don't know.  I'd have to compute it, but I think --

5   Q    Let me give you a calculator.

6   A    I think that's probably true.

7             Yes, it's been rounded up.  I can tell from this

8        2.078, it's been founded up.

9   Q    It's been rounded up from 2.078?

10  A    Yes, something like that.

11  Q    And that's in the experimental group; right?

12  A    Yeah.

13  Q    And in the other group, it's reported as 4 percent;

14       right?

15  A    I see that.

16  Q    And that's rounded down, isn't it?

17  A    Yes.

18  Q    Rounded down from about 4.17 percent?

19  A    That's correct.

20  Q    And the effect of the rounding there was to make the

21       difference appear to be less; true?

22  A    But -- but we reported the numbers.  Merck did not.

23  Q    True?

24  A    Merck didn't report the numbers.  If Merck had

25       reported the numbers, I would not have said a word

173

1        about their percentages.

2   Q    If Merck had reported the numbers of what?

3   A    Of deaths.  They didn't report them, and that's the

4        key factor.

5   Q    Sir, did you round up and round down the percentages?

6   A    Yes, of course.

7   Q    And does that have the effect of making the numbers

8        look like less than a difference?

9   A    Not when you see the 3 versus 2.  You know the exact

10       numbers.  There's no need for the percentages.  That's

11       just sort of a convention to put them in when you put

12       the numbers in.

13  Q    Sir, looking at this experiment that you were involved

14       in, it looks like five people died when they were

15       given more prostacyclin.

16  A    No.  They were given warfarin.

17  Q    Controlled-release aspirin, plus heparin/warfarin, did

18       you understand that the controlled-release aspirin was

19       to increase the amount of prostacyclin versus regular

20       aspirin?

21  A    Right.

22  Q    As to the people who had more prostacyclin in their

23       endothelium, five of those people died in this study;

24       right?

25  A    That's correct.

174

1   Q    And nobody died in the study that got just the

2        conventional aspirin?

3   A    That's correct.

4   Q    You don't report any kind of a p-value there, do you?

5   A    It's nonsignificant.  It says nonsignificant.

6   Q    Right.  What was the p-value for that?

7   A    I don't know.  It's -- well, I can tell you right -- I

8        can tell you approximately what it is.  I can't tell

9        you exactly, because I don't have the raw numbers.  I

10       can tell you approximately.  It's about .06

11       something, .07.

12  Q    Pretty close to significant.

13  A    That's not the point.

14  Q    It's pretty close to statistically significant, isn't

15       it?

16  A    It is.  It is.

17  Q    Did you consider stopping this study?

18  A    With five versus zero?  No.

19  Q    There was no efficacy, was there?

20  A    And this -- this study was a short-term -- what was

21       the time?  This is so many years ago, you have to

22       remember.  I have to read back as to how long the

23       study was.

24  Q    Five out of 72 patients --

25  A    This is a twelve-week treatment period study.  We

175

1        didn't know the results until the study was over.  So

2        there was no -- there was no point you could have

3        stopped it.  And five versus zero wouldn't have been

4        enough anyway.

5   Q    Five out of 72 people died in twelve weeks in your

6        experimental group; true?

7   A    Yes.

8             MR. BUCHANAN:  Objection.

9   A    Yes.  As pointed out to you earlier, I wouldn't have

10       stopped on five out of zero.

11  Q    (By Mr. Raber)  You didn't report relative risks for

12       any of these safety endpoints, did you?

13  A    No.

14  Q    And in fact, in the text of this study on Page 1200,

15       you state, "There was no difference in outcome between

16       controlled-release versus conventional aspirin in

17       combination with anticoagulation."

18            Do you see that?

19  A    Yes.

20  Q    And it refers to Table 2.

21  A    That's right.

22  Q    Yet, there were five deaths in one group and none in

23       the other.

24  A    Right.  It was nonsignificant.

25            MR. BUCHANAN:  Objection.  Asked and

176

1  answered.

2  A  It's one -- primary endpoint of the study based on

3  intent-to-treat had identical results in the two

4  groups.  And that's what that statement was based on.

5  Q  (By Mr. Raber)  Okay.

6  A  And that's what it should have been based on.

7  Q  There was a difference in deaths, wasn't there, of

8  five to nothing?

9  A  Nonsignificant, yes.  But there were five -- there

10  were one, two, three, four -- five endpoints here.  If

11  you made any kind of adjustment for the multiple

12  testing, that wouldn't be anywheres near significant.

13  You expect to see random of things like that in any

14  trial.

15     That isn't to say, by the way, that I know for a

16  fact that this other regiment might not be dangerous.

17  It might be.  I have no way of knowing that.

18  Q  So I think we might -- you know, what you're saying,

19  then, is if you see a study where the events are five

20  against one drug and zero for the other, you can't

21  reach the conclusion that that drug that had the five

22  events is dangerous or that it's a signal, can you?

23  A  No.  I have already said that.  I said that before you

24  ever brought this study up.

25  Q  You see, because the lawyers for the plaintiffs have

1  stood up and said that you can.

2     MR. BUCHANAN:  Objection.  That's an

3  absolutely improper way to phrase a question.

4  A  I have no idea what the lawyers said.

5     MR. BUCHANAN:  Objection.

6  Q  (By Mr. Raber)  If somebody were to stand up in front

7  of a jury and say a five to nothing difference was a

8  basis for concluding that a drug was unreasonably

9  dangerous, you would say, "I, Dr. Kronmal, would

10  disagree with that"; correct?

11  A  Correct.

12     MR. BUCHANAN:  Objection to form.

13  A  By itself.  If that was the only thing that they said

14  and that was the only piece of information they

15  presented, I would disagree with it, yeah, absolutely.

16  No question about it.

17  Q  (By Mr. Raber)  And have you heard of this thing

18  called the Fitzgerald theory?

19  A  Yes, I've heard of it.

20  Q  And what's your understanding of that?

21  A  Well, apparently he had a paper or a presentation of

22  some sort where he indicated that he thought that it

23  was possible that the COX-2 inhibitors would have the

24  effect of being pro-thrombotic.

25  Q  By reducing prostacyclin?

1  A  I believe that's the mechanism he assumed.

2  Q  And the study that you're a coauthor of is

3  inconsistent with that, isn't it?

4     MR. BUCHANAN:  Objection to form.

5  A  I don't know enough about the balance, either, to

6  comment on that.

7  Q  (By Mr. Raber)  Because you found that by maximizing

8  prostacyclin, you had no effect?

9     MR. BUCHANAN:  Objection to form.

10  A  I don't know if that proves anything about COX-2

11  inhibitors.  I just don't know enough about the

12  biology of the way thromboxin works and the way

13  anti-platelet agents work, to comment on that.

14     This isn't aspirin, remember, and it's a totally

15  different set of circumstances.

16  Q  (By Mr. Raber)  Are you knowledgeable about whether or

17  not the prostacyclin that exists in the endothelium is

18  made by the COX-1 enzyme or the COX-2 enzyme?

19  A  I don't know much about the -- what human prostacyclin

20  is produced in the artery wall.

21  Q  Do you know the answer?

22  A  No.

23  Q  Do you have an opinion about that?

24  A  No.  I'm not an expert in that.

25  Q  Have you ever done any work for Merck?

1  A  Not as far as I know.  I mean, the reason I say that

2  that way is that companies merge all the time, and

3  there could have been somebody who merged with Merck

4  at some point in time that I had worked for and I

5  didn't know they merged with them.  So anything's

6  possible.

7     As far as I know, I haven't.

8  Q  On Page 2 of your report, you say that you were

9  requested to review Merck's clinical trial data, "much

10  in the same way that I would have done had I been

11  asked to do so by Merck."

12  A  That's correct.

13  Q  How do you know what Merck would have asked you to do?

14     MR. BUCHANAN:  Objection.

15  A  No.  What I was saying is, I would have done this

16  review the same way as if Merck had asked me to review

17  their clinical trial data.

18  Q  (By Mr. Raber)  Do you think Merck would have asked

19  you not to look at the studies that formed the basis

20  for the approval for the drug?

21     MR. BUCHANAN:  Objection.

22  A  I have no idea what they would have asked me.  I

23  wasn't specifying it that way.  I'm just saying, if

24  Merck had said to me, "Dr. Kronmal, please review the

25  data from our clinical trials with the aim of

1  determining whether there was a safety issue," I would
2  have done the analysis identically the same.
3  Q    (By Mr. Raber)  Have you reviewed any studies that
4  address the question of whether naproxen can mimic
5  aspirin in its cardioprotective -- by protecting the
6  heart against heart attack?
7  A    I did look at the study of cats that Merck refers to.
8  I didn't --
9  Q    C-A-T-S, cats, the animals?
10 A    Yeah, the animals.  I did look at that study briefly.
11 And I think there were eight cats that were sacrificed
12 or something.  And they gave them a whole bunch of
13 naproxen, some of them, and not the others.  And they
14 saw some effect on the cats.
15 Q    Have you looked at any studies by Carlo Patrono on
16 this question?
17 A    I have not looked at his studies.  I have seen his --
18 I have seen a series of e-mails from Merck, describing
19 how Patrono did not believe that naproxen was
20 cardioprotective.
21 Q    Have you seen his study afterwards where he says that
22 a combination of the protective effect of naproxen and
23 the play of chance is a plausible explanation for the
24 VIGOR results?
25       MR. BUCHANAN:  Objection to form.

181

1  A    No, I haven't seen that particular paper.
2  Q    (By Mr. Raber)  Have you looked at any of the
3  scientific literature, other than this study involving
4  cats, have you looked at any of the other literature
5  on the question of whether naproxen can be
6  cardioprotective?
7  A    No, I haven't.  I looked for whether there was any
8  clinical trial data, and I haven't found any.
9  Q    Are you familiar with Eric Topol?
10 A    Yes.
11 Q    Have you read the paper that Dr. Topol wrote with
12 Dr. Nissen and another doctor?
13 A    Yes, I did read that paper.
14 Q    And the method Dr. Topol used would show a protective
15 effect of naproxen of greater than 70 percent,
16 wouldn't it?
17 A    I don't know what you're talking about.
18       MR. RABER:  Mark this as Exhibit 8.
19              (Exhibit No. 8 marked
20              for identification.)
21
22       MR. BUCHANAN:  Do you have the whole
23 article?  I don't know what you're going to refer to.
24       I have one.  I don't know if he's going to need
25 it, but as a courtesy.

182

1        MR. RABER:  I don't think he will.
2  Q    (By Mr. Raber)  Exhibit 8, I'll represent to you,
3  Dr. Kronmal, is a portion of Dr. Topol's article.
4  Specifically, it's Figure 3 that's been blown up and
5  highlighted.
6  A    I see that.
7  Q    And the second page of this exhibit is a document from
8  the FDA review of Vioxx.
9  A    Yeah, I see that.
10 Q    Okay.  And do you understand that in Dr. Topol's
11 study, what he did was, he took the annualized rate
12 for myocardial infarction in some placebo studies and
13 compared that against myocardial infarction rate for
14 Vioxx from the VIGOR trial and Celebrex from the CLASS
15 trial, and that's what Figure 3 represents?
16 A    Yes.
17 Q    And what he concluded was that, based on this type of
18 analysis, that there was an excess risk of Vioxx
19 compared to placebo.
20 A    That's what he concluded.
21       MR. BUCHANAN:  Objection to the
22 form.
23 Q    (By Mr. Raber)  Now, do you see on the second page,
24 that he took that annualized rate for Vioxx from the
25 FDA review memo here, where it's highlighted with .747

183

1  A    I see that.
2  Q    And that the naproxen rate was .15?
3  A    Mm-hm.
4  Q    "Yes"?
5  A    Yeah, I see it.
6  Q    Now, if we were to plot the naproxen rate on Figure 3
7  on placebo -- you see where there's a yellow bar that
8  goes across there?
9  A    Mm-hm.
10 Q    And if we were to put 0.15 there, using Dr. Topol's
11 method, that's a cardioprotective effect of naproxen
12 of greater than 70 percent, isn't it?
13       MR. BUCHANAN:  Objection to form.
14 Q    (By Mr. Raber)  You're smiling.
15 A    Yes.  It's based on four events.  That's not enough to
16 estimate the rate.  It's clearly not enough.  No one
17 would estimate a rate based on four events.
18 Q    Sir, using Dr. Topol's method --
19 A    But he didn't base this result on four events.  He
20 based it on a much larger placebo experience.  If he
21 would have based it on four events, I would have said
22 this paper was full of it, was just totally crap.
23 Q    But you're basing your conclusions of Vioxx versus
24 naproxen on the same four events.
25 A    I'm not -- I'm not doing it on the rate.  I'm doing it

184

**Page 185**

```
1    on the comparison of within a randomized clinical
2    trial of naproxen versus Vioxx, where there was 20
3    versus four.
4  Q  Well, we're doing the same thing here.
5  A  No, you're not.
6              MR. BUCHANAN:  Objection to form.
7  A  You're absolutely not.
8  Q  (By Mr. Raber)  What if you plot the annualized
9    myocardial infarction rate for naproxen from the VIGOR
10   trial, the same trial that's portrayed here for Vioxx,
11   is the cardioprotective effect of naproxen greater
12   than 70 percent?
13 A  It's not -- you can't do that.  It's four events.
14 Q  Is it greater than 70 percent?
15 A  You can't estimate a rate based on four events.
16 Q  Sir, is it greater than 70 percent?
17 A  I don't care what it is.  It's irrelevant.  It's
18   totally irrelevant.  You want me to make a statement
19   that is scientifically unjustified based on four
20   events.
21 Q  Sir, mathematically, is it more than 70 percent?
22 A  Mathematically, it well may be.  That's a totally
23   useless number.
24 Q  So what do you think of -- do you have any opinions
25   about the methodology used by Dr. Topol here,
```

185

**Page 186**

```
1    comparing the placebo rate from other trials to the
2    rates from the VIGOR study?
3  A  I'm not --
4              MR. BUCHANAN:  Objection.  Form.
5  A  I'm not impressed with it as a very strong way of
6    doing things, no.  It's weak.  You know, it may have
7    been the best he could do under the circumstances, but
8    it's weak.  I think he would agree to that, actually,
9    if he was asked.
10 Q  (By Mr. Raber)  I guess you haven't met Dr. Topol.
11 A  No, I have not.
12             MR. BUCHANAN:  Objection to form.
13 A  I have not.
14             MR. BUCHANAN:  Steve, are you moving
15   into a new area?
16             MR. RABER:  You want to take a
17   break?
18             MR. BUCHANAN:  I do.
19             MR. RABER:  Yeah.
20             MR. BUCHANAN:  Thanks.
21                (Recess 2:53-3:12 p.m.)
22   ////
23   ////
24   ////
25   ////
```

186

**Page 187**

```
1                    EXAMINATION (Continuing)
2  BY MR. RABER:
3  Q  Sir, on Page 13 of your report, you talk about an
4    Expression of Concern that was published by the New
5    England Journal of Medicine.
6  A  That's correct.
7  Q  What have you read or reviewed in connection with
8    forming that opinion?
9  A  I read the Expression of Concern.
10 Q  Did you read anything else?
11 A  I read the responses to the Expression of Concern.
12 Q  Have you read any of the testimony of the people
13   involved?
14 A  Actually, I think I've seen the deposition of somebody
15   from the New England Journal.
16 Q  Curfman?
17 A  Might have been.  I don't remember.
18 Q  Do you know which one you saw?
19 A  No.  I didn't -- I didn't really care for that.  Just
20   sort of skimmed it.
21 Q  Do you feel like you know enough facts about that
22   episode to form judgments and conclusions about it?
23 A  About what episode?
24             MR. BUCHANAN:  Objection to form.
25 Q  (By Mr. Raber)  About the Expression of Concern.
```

187

**Page 188**

```
1  A  I mean, I have written my conclusions in here,
2    obviously.
3  Q  Were you aware that the New England Journal of
4    Medicine hired a PR firm to help it with its timing of
5    filing this thing?
6  A  No, I don't know that.
7              MR. BUCHANAN:  Objection to form.
8  Q  (By Mr. Raber)  Would it be appropriate, in your view
9    as a scientist, to time the release of an Expression
10   of Concern in connection with a trial that was going
11   on involving Vioxx?
12             MR. TISI:  Objection.  Incomplete
13   statement of facts.
14             MR. BUCHANAN:  Objection.
15 A  I don't have any idea why they did what they did in
16   connection with that.  I don't know what they did, I
17   don't know why they did it, and I don't know when they
18   did it.
19 Q  (By Mr. Raber)  Do you know whether or not anyone ever
20   sent a letter to the New England Journal of Medicine,
21   alerting them to -- let me back up.
22       You've said that the additional events changed the
23   results in a meaningful way because there's a
24   difference in the relative risk.  True?
25 A  Yes.
```

188

1  Q  Okay.  What did Merck report as the relative risk in
2     the original VIGOR manuscript?  0.2; correct?
3  A  That's correct.
4  Q  And what was the relative risk after the change?
5  A  I think the same.
6  Q  So the relative risk remained the same, didn't it?
7  A  Yeah, that's true enough.  But the number of events
8     they reported did not stay the same and statistical
9     significance did not stay the same.
10 Q  But it was still significant under both scenarios;
11    true?
12 A  Not as much in the first case.
13 Q  Do you believe that the original numbers reported in
14    the New England Journal of Medicine were strong signal
15    of a heart attack risk in Vioxx?
16 A  Yes.  But, you know, there's an obligation to present
17    the data accurately and completely.
18 Q  Have you ever used pre-specified cut-off points for
19    data in a study?
20 A  To the best of my knowledge -- and I can't tell you
21    for certain that there wasn't some study where it
22    wasn't true -- we tried in all studies I've been
23    involved with to report the most up-to-date data we
24    had available to us, and as complete as we possibly
25    could make it.

1  Q  Do you understand that somebody could accuse a company
2     of cherry-picking if they decided in some
3     circumstances to honor a pre-specified cut-off date
4     and didn't in others?
5  A  I don't think that's true.
6        MR. BUCHANAN:  Objection to form.
7  A  Not -- not in this case.  Because in this case, you
8     want to get all the events reported.  And for somebody
9     to say that they're dishonest because they're being
10    accurate, to me, is ridiculous.  That would be
11    ridiculous for someone to do.
12 Q  (By Mr. Raber)  Did you know that there was an
13    additional GI event in the naproxen group that would
14    have made Vioxx look better had they reported that?
15 A  They should have reported it then.
16 Q  Did you know that Merck provided all of the
17    information to the FDA in October of 2000?
18 A  Yes, I do.
19 Q  And did you know that that information was publicly
20    available on the FDA website in February of 2001?
21       MR. BUCHANAN:  Objection.  Form.
22 A  I believe you.  And I don't remember the exact dates.
23       MR. BOEHM:  Mr. Buchanan, you
24    probably don't notice that you're doing it, but you
25    continue to -- just let me finish -- you continue to

1     shake your head yes and no.  It could be construed as
2     coaching the witness.
3        MR. BUCHANAN:  And I appreciate
4     that.  I'm asking a question foundationally, I guess.
5     And I could have objected to foundation, if I was
6     making those objections, but I think we're reserving
7     those, because I don't believe that factually to be
8     true.  So that's my concern.
9        MR. BOEHM:  I understand.  I'm
10    talking strictly about your nonverbal cues.
11       MR. BUCHANAN:  I appreciate that,
12    and I'll accept that comment, but I was questioning
13    the accuracy of the question or the premise of the
14    question.
15       MR. TISI:  Are you both on the same
16    side here?  I mean, you represent a different party
17    here, or we have one questioner and one --
18       MR. RABER:  You know what?  You know
19    what?  Do you represent a party?
20       MR. TISI:  Yes, I do.  I represent
21    the MDL in this litigation, and he represents New
22    Jersey.
23       MR. RABER:  Just let him talk.  It's
24    between Mr. Buchanan and him.
25       MR. BOEHM:  That's all I had to say,

1     Chris.  That's fine.  It's going to be fine.
2        MR. TISI:  I think that's
3     inappropriate.
4        THE WITNESS:  By the way, I never
5     noticed what he was doing.
6        MR. BUCHANAN:  I was actually
7     admiring that you got the answer to the question,
8     frankly.  I didn't know that was the case, and I'll
9     validate that.
10 Q  (By Mr. Raber)  Are you aware that a doctor sent a
11    letter to the New England Journal of Medicine in June
12    of 2001, alerting them to the FDA's posting the
13    website of these additional data, and that the New
14    England Journal refused to publish the letter because
15    they said they didn't have enough space?
16    Are you aware of those facts?
17       MR. BUCHANAN:  Objection.
18    Can I get a read back?
19             (Question on Page 192,
20              Lines 10 through 16,
21              read by the reporter.)
22
23 A  Not that detail, no.
24 Q  (By Mr. Raber)  Did you consider that in forming your
25    opinions about the validity of this Expression of

1    Concern?

2                    MR. TISI:  Let me just pose an

3    objection.  Assumes facts not in evidence.

4  A  No, I don't even know why it's relevant to that.  I

5    didn't consider it.

6  Q  (By Mr. Raber)  Don't you think it would be unusual

7    for someone to know about something in 2001 and then

8    make a big deal of it in December of 2005, something

9    they had known about more than four years?

10 A  Well, I don't know who knew about it within the New

11   England Journal, so I have no idea.  The person that

12   made that decision could have been totally different

13   than who made the decision about the Expression of

14   Concern.

15 Q  (By Mr. Raber)  Do you know the term CYA?

16                   MR. BUCHANAN:  Objection.

17 A  No.

18 Q  (By Mr. Raber)  Cover your back side?

19 A  Yeah, yeah, I've heard it before.

20 Q  Does that sound like a CYA move to the New England

21   Journal, to you?

22                   MR. TISI:  Objection.  Improper

23   question.

24 A  I can't say what New England Journal thought or didn't

25   think.  I mean, I don't know what's going on with

1    them.

2  Q  (By Mr. Raber)  Do you understand that --

3                    MR. TISI:  Please mark that question

4    and answer in case we have to go to the judge, please.

5    Thank you.

6                    MR. RABER:  On what?

7                    MR. TISI:  Inappropriate and

8    unprofessional behavior.

9      Go ahead.

10                   MR. RABER:  What's inappropriate

11   about it?

12                   MR. TISI:  The questions and the

13   manner in which you're asking a lot these questions is

14   inappropriate.

15                   MR. RABER:  What was wrong with the

16   question about a CYA response?

17                   MR. TISI:  You think that's an

18   appropriate question to ask an expert witness?

19                   MR. RABER:  Yeah.

20                   MR. TISI:  Okay.  We'll see what the

21   judge says.  Go ahead.

22                   MR. RABER:  I mean, I'm no Mark

23   Lanier.

24                   MR. TISI:  Nor am I, and nor is

25   anybody in this room.

1                    MR. BUCHANAN:  Now you're making

2    faces.

3  Q  (By Mr. Raber)  Have you reviewed the materials that

4    Merck submitted to the FDA advisory committee for the

5    advisory committee that occurred in February of 2001,

6    relating to the VIGOR study?

7  A  Yes.

8  Q  And do you have any opinions about whether Merck

9    appropriately disclosed the data about heart attacks?

10 A  Unless it says specifically in my report, I don't have

11   any other comments about that.  I just don't -- I

12   don't remember if it's -- if I said something in my

13   report, then I'll be glad to look at that.

14 Q  They reported the actual final number of heart attacks

15   to them?

16 A  Oh, yes, they did.  If that's what you're asking me,

17   yes, they did.  They reported 20 versus four.

18 Q  So the advisory committee had the benefit of that full

19   information in deciding how to label Vioxx?

20 A  That's correct.

21                   MR. TISI:  Objection.

22 A  Well, I don't know about that, but they had the full

23   information, yes.

24 Q  (By Mr. Raber)  And in its submissions to the FDA,

25   Merck laid out that there were at least two possible

1    explanations for the difference that was seen in VIGOR

2    for heart attacks:  One that Vioxx could be

3    pro-thrombotic, and one that Vioxx could be

4    protective?

5                    MR. TISI:  Objection to form.

6    Objection.

7  A  Well, I mean, they may have mentioned that there were

8    two, but they -- the emphasis entirely was on the

9    naproxen protective aspect.  But that's --

10 Q  (By Mr. Raber)  Because that's what they believed.

11                   MR. BUCHANAN:  Objection.

12 A  Yeah, they believed that, that's correct.  They

13   believed it, no doubt.

14 Q  (By Mr. Raber)  But everybody knew there was that

15   other possibility?

16 A  I sure hope so, yes.

17 Q  Well, they did; right?

18                   MR. BUCHANAN:  Objection.

19 A  I believe they did, yes.

20 Q  (By Mr. Raber)  Can you cite any source that supports

21   your opinion that Merck should have included data

22   beyond the specified cut-off point in its New England

23   Journal of Medicine publication?

24                   MR. TISI:  Objection.  Assumes facts

25   not in evidence.

```
 1  A   Again, you're asking me a question about whether or
 2      not data should be reported accurately or not, and I
 3      don't think that's something that somebody has to
 4      write down on a piece of paper and say there's some
 5      code that you have to report data accurately.
 6  Q   (By Mr. Raber)  The data was accurate given the
 7      cut-off points, wasn't it?
 8              MR. TISI:  Incorrect statement of
 9      fact.
10              MR. RABER:  What?  Don't -- you're
11      answering that question, sir.  Say "objection to
12      form."  Don't answer the question.
13              MR. TISI:  Okay.  Objection.
14      Misstates the fact.
15              MR. RABER:  And my tone is loud
16      right now because that is an improper --
17              MR. TISI:  It's a misstatement of
18      fact, and you know it is.
19              MR. RABER:  No.  He can correct me.
20              MR. BUCHANAN:  No --
21              MR. TISI:  There was no
22      pre-specified cut-off.  You know that.
23              MR. RABER:  You know there was too.
24              MR. TISI:  You know there was not.
25  A   Well, two aspects of that I'll try to answer.
```

197

```
 1          One is, there's nothing in the New England Journal
 2      article that says there was a pre-specified cut-off
 3      point.  There's not a word.  Not one word, by the way.
 4  Q   (By Mr. Raber)  That was peer-reviewed, wasn't it?
 5  A   Yes.
 6  Q   Assuming that there was a pre-specified cut-off
 7      date --
 8  A   I don't know about the pre-specified cut-off date.
 9  Q   I'm asking you to assume that.
10  A   All right.
11  Q   If you're reporting data as of that date, it's
12      accurate; right?
13  A   It's accurate of that date.  It's not an accurate
14      representation of what you know.  And it's what you
15      know that is much more important than the date.  The
16      date is an arbitrary thing.
17          As an example, suppose they had found 18 more
18      events in naproxen.  Suppose they had.
19  Q   Yes.
20  A   And now there was absolutely no difference between the
21      two groups.  Do you think they should have reported
22      that that was five times increased risk?
23  Q   I think that the Merck people would say that they did
24      find a GI event that was different --
25  A   You're talking about one event that didn't materially
```

198

```
 1      change anything at all.  We're talking about -- I'm
 2      giving you an example.
 3  Q   Thank you for that answer.
 4  A   You're wanting to do hypotheticals, so I will give you
 5      one back.
 6  Q   Okay.
 7  A   There are 18 additional --
 8  Q   I'm not here to answer questions, sir.
 9  A   I know you aren't, but I'm giving this answer.
10          Suppose there were 18 additional --
11  Q   Well --
12  A   I'm trying to explain why.
13  Q   I get your point.  You said a small number of events
14      is not material.
15              MR. BUCHANAN:  He's entitled to
16      explain his answer.
17  A   I didn't say that at all.  You misunderstood what I
18      said, then.
19  Q   (By Mr. Raber)  The record is clear.
20              MR. BUCHANAN:  He can finish his
21      answer.  This is ridiculous.  He's entitled to explain
22      his answer.
23              MR. RABER:  You're raising your
24      voice, Mr. Buchanan.
25              MR. BUCHANAN:  You know what?  The
```

199

```
 1      conduct in this deposition has been so unprofessional,
 2      in my opinion.  You don't have factual foundation for
 3      questions.  Your premises are loaded, and they're --
 4              MR. RABER:  Save it for the jury.
 5              MR. BUCHANAN:  -- and they're not
 6      properly founded.
 7              MR. RABER:  Save it for the jury.
 8              MR. BUCHANAN:  No, you're not
 9      entitled to do that.
10          Please feel free to answer the question.
11              MR. RABER:  No, I don't want him
12      to --
13              MR. BUCHANAN:  That's rude to the
14      witness.
15              MR. RABER:  I don't want a
16      filibuster.
17              MR. BUCHANAN:  It's not a
18      filibuster.
19              MR. RABER:  It is a filibuster.
20              MR. BUCHANAN:  You know what a
21      filibuster is?  It's spending two hours today
22      retreading his old report.
23              MR. RABER:  Don't point your finger
24      at me.
25              MR. BUCHANAN:  It's spending two
```

200

1    hours retreading his old report.
2                    MR. RABER:  Don't point your finger
3    at me.
4                    MR. BUCHANAN:  That's not pointing.
5        Can you please read back his last answer before he
6    was rudely interrupted?
7                    MR. RABER:  No, let's go.  Let's
8    question and answer.  Come on.
9                    MR. BUCHANAN:  No, he's entitled to
10   answer the question.
11                   MR. RABER:  There was no question
12   pending.
13                   MR. BUCHANAN:  Please explain
14   yourself, Dr. Kronmal.
15       Can you read back where he was -- at the point
16   where he was interrupted?
17                   THE REPORTER:  Give me one second to
18   *find it.*
19                             (Question/Answer on Page 199,
20                              Lines 13 through 14 and
21                              17 through 18,
22                              read by the reporter.)
23
24   A   That's what I was trying to elaborate.  And my point
25       is, that's not the issue.  The issue is, if you have

                                                           201

1    Q   What's the basis for that?
2    A   I said, you need to report the data accurately.
3        Doesn't matter whether I believe it changes it or not.
4    Q   If you reported it as of a cut-off date, it's
5        accurate, regardless of if there's data later; true?
6                    MR. BUCHANAN:  Just, make sure you
7        get your answers in before you accept the next
8        question.
9    A   No, it is not accurate if you don't supply all of the
10       data you know.  It is simply inaccurate.
11   Q   (By Mr. Raber)  What's the source, the basis, for your
12       opinion on that, that you always report everything you
13       know?
14   A   Well, New England Journal of Medicine published an
15       Expression of Concern based on that.
16   Q   Right.
17   A   That's a very serious thing for them to do.  They
18       agree with me.  I don't know.  What other source do
19       you want?
20   Q   But you don't know all the facts and circumstances
21       surrounding that, do you?
22   A   I don't need to know any other facts.  They didn't
23       report the data accurately to the New England Journal
24       of Medicine.  They should have.
25   Q   Well, there are, what, ten non-Merck authors who

                                                           203

1    other data that's available -- let me finish.
2                    MR. RABER:  This is nonresponsive.
3                    MR. BUCHANAN:  You're interrupting
4    him again.
5    A   I'm trying to answer the question.  You may not think
6        it's what -- it's relevant.  I do.
7        If you have important information that would
8        change the interpretation of the results, and you know
9        that before the publication, you should always change
10       the paper.
11       And my illustration was -- you gave me a
12       hypothetical, too.  My illustration was, if you had
13       seen 18 more events in naproxen and no new events in
14       Vioxx, it would be absolutely inappropriate to report
15       that the relative risk was five when it was one.
16       And the point is, you don't report in the medical
17       literature data that you know to be inaccurate.  And
18       that's what was done here.
19   Q   (By Mr. Raber)  Well, you had a key qualifier in your
20       last answer.  You said, if you believe it to change
21       the analysis or change the --
22   A   No.  No.
23   Q   You said that.  And so if someone doesn't believe
24       that, do you give a different answer?
25   A   No.  I said you need to --

                                                           202

1    disagree with you on that; true?
2                    MR. BUCHANAN:  Objection.
3    A   They, first of all, said they didn't know about those
4        three other events.
5    Q   Sir, please answer the question.
6                    MR. BUCHANAN:  He's trying --
7        objection.  He is trying to answer the question.  The
8        record *should not reflect* that he was not answering
9        the question.  You're cutting him off over and over
10       and over.
11   Q   (By Mr. Raber)  Sir, there are ten non-Merck authors
12       on the VIGOR study who disagree with you, aren't
13       there?
14                   MR. BUCHANAN:  Objection to form.
15   A   Disagree that they should have provided that data?
16   Q   (By Mr. Raber)  Yes.
17   A   I don't know if they disagree with me, all ten of
18       them.
19   Q   Did you read their response?
20   A   Yes.  It was exactly the same as Merck's.
21   Q   And they disagree with you.
22   A   They disagree, sure.
23   Q   Sir, would you agree with me that extreme caution
24       should be used in extrapolating results to portions of
25       a population that were not represented by a sample

                                                           204

1   included in a study?

2   A   Yes, I do.

3   Q   You published -- or you were an author in drafting

4       some guidelines for the management of transient

5       ischemic attacks.

6           Do you remember that?

7   A   Yes.

8   Q   Through the American Heart Association?

9   A   Yes, I do.

10  Q   And among the recommendations that you gave in 1994,

11      you stated that aspirin is the standard medical

12      therapy used for prevention in patients at risk of

13      stroke.

14  A   That's correct.

15  Q   And you cited studies that said that aspirin reduces

16      the risk of stroke or death.

17  A   That's correct.

18  Q   In 1998, you did a study called "Aspirin use and

19      incident stroke in the Cardiovascular Health Study,"

20      where you were the lead author.

21          Do you remember that?

22  A   I do.

23  Q   And in that particular study, in 1998, you told the

24      scientific community that aspirin use was associated

25      with increased risks of stroke; true?

1   A   In that very old population, yes, I did.

2   Q   That's different from what was being said in 1994;

3       true?

4   A   That's correct.

5   Q   And then in 2003, you published something called

6       "Lessons from the stroke prevention in atrial

7       fibrillation trials"; true?

8   A   Yes.

9   Q   And in that, you went back and said that aspirin

10      reduces the risk of stroke.

11  A   In patients with atrial fibrillation, yes.

12  Q   Okay.

13  A   But the people in the previous paper you referenced

14      weren't in atrial fibrillation.

15  Q   So is that an example of how a drug can have different

16      effects on different patient populations?

17  A   Absolutely.  No question about it.

18  Q   And that we should use caution in taking results from

19      one patient population and generalizing them to a

20      different patient population?

21  A   True.  Truly.

22  Q   And also, this aspirin use and incident stroke study

23      that you did, that was what's called an

24      epidemiological study?

25  A   That's correct.

1   Q   And I take it you would agree with me that one

2       generally cannot infer or determine causation from an

3       epidemiological study?

4   A   Absolutely.  And we say that.  As a matter of fact, we

5       point out all the reasons why that may or may not be a

6       real finding that we have.

7   Q   Even if you have a doubling of a risk; true?

8   A   In an epidemiologic study?

9   Q   Yes.

10  A   Absolutely.  No question.

11  Q   So if someone were to, in this case, point to an

12      epidemiological study that had a relative risk of,

13      let's say, anywhere from 1.2 to 2, and argued that

14      that shows that Vioxx causes heart attacks and

15      strokes, you would disagree with that; true?

16          MR. BUCHANAN:  I didn't get your

17  numbers.

18          MR. RABER:  1.2 to 2.

19          MR. TISI:  Let me object.

20          MR. BUCHANAN:  Objection.

21  A   I would say that you would not want to make causal

22      inferences from epidemiologic studies.

23  Q   (By Mr. Raber)  And if someone were to argue that to a

24      jury in this case, that an epidemiological study with

25      a relative risk of, let's say, 1.2 to 2 against Vioxx,

1   you would disagree with that; right?

2           MR. TISI:  Objection.

3           MR. BUCHANAN:  Objection to form.

4   A   Well, not necessarily.  It depends on what context it

5       was placed in.

6           If they were to say that, for example, that given

7       the clinical trial data, this other epidemiologic

8       study seems to support this hypothesis, I wouldn't

9       disagree with them.

10          If they were to make the statement that on the

11      basis of that epidemiologic study alone, that that was

12      enough information to say that Vioxx causes it, I

13      would disagree with that.

14  Q   (By Mr. Raber)  And you would especially disagree with

15      using epidemiological studies to infer causation when

16      the results of epidemiological studies are a mixed

17      bag; in other words, some show an increased risk, some

18      show no increased risk?

19          MR. BUCHANAN:  Objection to form.

20          MR. TISI:  Objection.

21  A   It's not whether some show an increase or some don't,

22      because you expect that.  There's this random

23      variation; there's different comparison groups,

24      there's different compilations.  There's all those

25      differences.

1   If you're wanting to know whether or not I believe
2   that the inferences from epidemiologic studies are
3   much weaker than from clinical trials, I absolutely
4   agree, they are.
5   Q   (By Mr. Raber)  And it would be wrong to infer
6   causation just from the epidemiological studies?
7   A   Just from the epidemiological?  Yes, that would be
8   wrong.
9   Q   Okay.
10  A   No question about it.
11  Q   I want to show you something that we'll mark as
12  Exhibit --
13              MR. RABER:  What are we up to?
14              THE REPORTER:  9.
15                  (Exhibit No. 9 marked
16                      for identification.)
17
18  A   You're probably the only person in the world that's
19  read all my papers, literally.
20              MR. BUCHANAN:  You may be praising
21  him too much.
22              THE WITNESS:  I'm impressed.  That's
23  good.
24              MR. BUCHANAN:  What are we looking
25  at?

209

1                   MR. BUCHANAN:  Objection to the
2   form.  Incomplete hypothetical.
3   A   Well, I mean, "might" is a hard-to-quantify word.  I
4   don't think it's particularly strong one way or the
5   other.
6   Q   (By Mr. Raber)  It's a placebo-controlled trial?
7   A   I know.  The numbers are too small.
8   Q   Well, if you combine myocardial infarction and
9   stroke -- which you have done before as an endpoint;
10  true?
11  A   No, I haven't.
12  Q   You've never done that?
13  A   Well, no, not in this context.
14          You mean in my Vioxx report?
15  Q   Any study.  Have you ever combined myocardial
16  infarction and stroke?
17  A   Oh, surely, but for a totally different purpose.
18  Q   But they're both thrombotic events; true?
19  A   Yes.
20  Q   Both serious?
21  A   Yeah.
22  Q   All right.  If you combine myocardial infarction and
23  stroke, you have a ten-to-one difference --
24  A   Yeah.
25  Q   -- between the NSAID and placebo.  Do you see that?

211

1   Q   (By Mr. Raber)  Exhibit 9, I'll represent to you, is a
2   Table 5 from a study.  And I'll represent to you that
3   I have written in "Dose 1 NSAID" and "Dose 2 NSAID,"
4   but that this is actual data from a study.
5               MR. TISI:  Which study?
6   Q   (By Mr. Raber)  Doctor, in looking at those numbers --
7               MR. TISI:  Can I ask what study?
8               MR. RABER:  You can ask.
9               MR. TISI:  And you're not going to
10  say?
11              MR. RABER:  That's right.
12              MR. TISI:  Okay.
13  Q   (By Mr. Raber)  In looking at this data, I will tell
14  you that this was a study to see whether or not a drug
15  could prevent colorectal adenomas.  Okay?
16  A   Mm-hm.
17  Q   Now, you see there that for myocardial infarction, the
18  placebo group had one heart attack, and that the NSAID
19  had two heart attacks in one group and five in the
20  other group?
21  A   Mm-hm.
22  Q   Correct?
23  A   Yes, I see it.
24  Q   Is that a signal that the NSAID that's there might
25  cause heart attacks?

210

1   A   Yes, I do.
2   Q   Is that a strong signal that there might be a problem
3   with that drug?
4   A   It's certainly a signal.
5   Q   A strong one?
6   A   The numbers are still small, but I would be concerned
7   about it if I was involved in it.
8   Q   And I think -- would that be statistically
9   significant, ten to one?
10              MR. BUCHANAN:  Objection to form.
11  A   Again, you would have to -- yes, it would be.
12  Q   (By Mr. Raber)  And you told us this morning that if
13  you had a statistically significant result in a
14  placebo-controlled trial, that that means there's
15  causation; true?
16              MR. BUCHANAN:  Objection to form.
17  A   It's evidence of causation.  It doesn't mean there
18  were, because it could be chance.
19  Q   (By Mr. Raber)  But it's statistically significant.
20  A   I know.  It still could be chance.  Statistically
21  significant results occur by chance.
22  Q   Okay.  But unlikely to be chance?
23              MR. BUCHANAN:  Objection to form.
24  A   Well, if this were pre -- I mean, the -- but the
25  combining of it obviously makes it a little bit harder

212

1  to assess, because -- because you could have included
2  cardiovascular revascularizations in there if you
3  wanted, too, and then it would have not been
4  significant.  So -- and you could have included death
5  in there and it wouldn't have been significant.
6        So it's certainly enough to be of concern.  Let's
7  put it that way.
8  Q  Isn't that what you did here?  You decided to combine
9     heart attack and sudden cardiac death; true?
10              MR. BUCHANAN:  Objection to the
11  form.
12  Q  (By Mr. Raber)  True?
13  A  I included sudden cardiac death for the reason I
14     specified, which is that oftentimes it is actually a
15     myocardial infarction.  In old people, particularly
16     it's hard to tell.  For that reason, I thought it was
17     appropriate to combine it.
18        To say in retrospect, I probably should have used
19     hard CHD all the way through, but that's in
20     retrospect.
21  Q  But certainly the five to one on heart attacks is a
22     signal of potential for thrombosis; true?
23  A  It would be a concern, yes.  Absolutely.
24  Q  And that might lead you then to see other thrombotic
25     events, such as stroke, and want to combine them

213

1  together; true?
2  A  No, you wouldn't want to combine together.  It would
3     be confirmatory that there might be a problem, yes.
4        I mean, if I saw this, I would think there
5     probably was a problem with this drug and that
6     something should be looked at more carefully.
7  Q  And would you advocate allowing people to take this
8     drug?
9              MR. BUCHANAN:  Objection to form.
10  Incomplete hypothetical.
11  A  It would depend on what other information there was.
12     I wouldn't know enough about this to know.  There may
13     have been another trial just like this that showed
14     something totally different.
15  Q  (By Mr. Raber)  Could this reflect that people with
16     colorectal adenomas are a different type of patient
17     population that is susceptible to heart attack or
18     stroke with NSAIDS?
19  A  Could.  It could.  I mean, it could be if you took
20     people who were children and you gave them the same
21     drug, nothing would happen to them.  I don't know.
22        The problem is, we don't know what would happen in
23     other groups, unless there's been a study that looks
24     at those other groups.  And if you don't know, then
25     you have to be cautious and say, We don't know; and,

214

1  therefore, we shouldn't be using it in anybody.
2  Q  Okay.  Would you -- based on this data, would you
3     advocate doing another study like this, with this
4     drug?
5              MR. BUCHANAN:  Objection to form.
6  A  Depends what other information there were out there.
7     The answer is, I might.  It depends on what other
8     information that was available.
9  Q  (By Mr. Raber)  Even with a ten to one statistically
10     significant difference of heart attacks?
11  A  I personally would not want to use this dose in
12     another study, you know, this second dose.  But the
13     intermediate dose, I wouldn't have enough information
14     to know.
15        But you're right, I would be very worried about
16     this if I saw this.
17  Q  You would be worried about this drug?
18  A  Yes, I would be.
19  Q  And its propensity to cause heart attack or stroke?
20  A  I would be worried about that possibility that it was
21     dangerous.  If this was the only information I had, if
22     there were no other studies, this was it, I would be
23     worried about it, yes, absolutely.  No question about
24     it.
25        Are you going to leave us in the dark about what

215

1  this is?  I can guess, but...
2              MR. BUCHANAN:  I'll just object to
3     the prior inquiry.  I think it's improper.  But go
4     ahead.
5  Q  (By Mr. Raber)  You refer to the Jnni article in your
6     report.
7        Do you remember that?
8  A  That's correct.
9  Q  And what Jnni purported to do was look at the relative
10     risk for heart attack for Vioxx across all Vioxx
11     studies; true?
12  A  That's correct.
13  Q  But Jnni did not --
14  A  All arthritis studies.
15  Q  Well, more than that, right, because he included
16     studies involving low back pain and some things like
17     that; true?
18  A  I don't think so.  I think he just included arthritis
19     studies.  My recollection is, entirely arthritis
20     studies.
21  Q  I'm looking at -- here, I'll give you a copy.
22              MR. RABER:  Let's mark this.
23              (Exhibit No. 10 marked
24              for identification.)
25  ////

215

```
 1   A   Yeah, he specifically says musculoskeletal disorders.
 2       I mean, that could have included back pain.  I don't
 3       know.
 4   Q   (By Mr. Raber)  Sir, look at Table 1.  It's on Page 3.
 5       Do you see there, about the third study from the
 6       bottom, he includes the chronic low back pain studies?
 7   A   Yeah, he did.  I just didn't remember that.
 8   Q   One thing Jnni did not include, though, was the
 9       Alzheimer's data.  True?
10   A   That's correct.
11   Q   Can you think of any reason why he would exclude that?
12   A   Yeah.  He said the reason.  The data wasn't available
13       to him at the time.  That was one reason.
14           And the other reason commented on was that -- oh,
15       by then, it might have been available, actually, come
16       to think of it.
17   Q   Are you saying in November of 2004, it wasn't
18       available?
19   A   Yeah, it probably was available to him.
20           I mean, I'm not Jnni, so I can't totally speak for
21       him, but he said -- when he was questioned about that
22       by Merck, he said basically that the osteoarthritis
23       was the approved indication for the drug, and
24       therefore, he restricted his analyses to the approved
25       indication.
```

```
 1   Q   Right.  Now, you know that when the VIGOR study was
 2       done, that 50 milligrams wasn't approved for chronic
 3       use, don't you?
 4   A   I understand it wasn't, yes.
 5   Q   But he included that in this, didn't he?
 6   A   Yeah, but because it was approved at this time.
 7   Q   It wasn't approved when it was used with patients, was
 8       it?
 9   A   No.  But what is approved at the time he did the --
10           MR. BUCHANAN:  Objection to form.
11   A   It was approved at the time he did his analyses.
12   Q   (By Mr. Raber)  Do you think that's a valid basis for
13       excluding data from over -- from that number of
14       patients?
15   A   I think, actually, if he had really known what the
16       results were from the Alzheimer's, he wouldn't have
17       probably included it, but it wasn't favorable.
18   Q   For heart attacks?
19   A   Yeah.  It wasn't favorable.
20   Q   It was not statistically significant, was it?
21   A   It was if you included --
22   Q   Sir, heart attacks --
23   A   It was if you included -- I consider a sudden cardiac
24       death a heart attack.
25   Q   You do?
```

```
 1   A   Yeah.  It is.  You can ask any cardiologist in the
 2       world, they will tell you it's a heart attack.
 3   Q   A sudden cardiac death is a heart attack, according to
 4       any cardiologist?
 5   A   That's true.
 6   Q   But you did more than that, because you took sudden
 7       deaths that you just inferred that they were heart
 8       attacks; true?
 9   A   No, I didn't.  I mean, I -- because if you looked at
10       the actual Thal paper, which I mentioned before, they
11       reclassified a large number of them as MIs.  So I had
12       indirect evidence that they even thought they were
13       MIs; even Merck thought they were MIs.
14   Q   Who reclassified them?
15   A   Merck.  That's the only one that could have.
16   Q   Are you sure about that?
17   A   Who else would have done it?
18   Q   Are you sure that they reclassified them?
19           MR. BUCHANAN:  Objection to form.
20       Asked and answered.
21   A   Well, how could they change the numbers?
22   Q   (By Mr. Raber)  Is it possible that the Thal article
23       reported investigator reported events and the CSR to
24       the FDA reported adjudicated events?
25   A   No.  I checked that, and he reported the same events.
```

```
 1       He changed the classification.
 2   Q   Sir --
 3   A   He could have changed it on the basis of the
 4       investigator.  I don't know why he said that.  He said
 5       they were adjudicated.  I don't know.
 6   Q   Thal said that they were adjudicated?
 7   A   I believe so.
 8   Q   We'll look at that.
 9           MR. RABER:  Can we get the Thal
10       articles out, Paul?
11           MR. BOEHM:  Sure.
12   A   I believe he did.  But the point is, it's immaterial
13       because --
14   Q   (By Mr. Raber)  No, don't change the subject.
15           MR. BUCHANAN:  No.
16           MR. RABER:  There's no question
17       pending.
18           MR. BUCHANAN:  He's finishing his
19       last point.
20           MR. RABER:  He's arguing.
21           MR. BUCHANAN:  You're arguing.
22       You can answer.
23   A   The point I was trying to make was that Thal
24       thought -- or if he did it itself and it wasn't
25       adjudicated, he thought those were MIs, and reported
```

1    it that way.

2         And the point is, if he's making the same point I

3    am, you can't tell an MI from a sudden death in

4    someone who is on the floor and there's no one that

5    observed them and there was no autopsy done.

6         So --

7  Q  (By Mr. Raber)  Have you ever talked with Thal?

8  A  No, I haven't.

9  Q  How do you know what Thal thought?

10  A  It's what's in his paper.  I'm not basing it on what

11    he thought.

12  Q  You just told me what Thal taught.

13         MR. BUCHANAN:  Objection.

14    Argumentative.

15  A  If he put --

16         MR. BUCHANAN:  We are winding down

17    if that's the direction this is going to go in.  You

18    know, it's been all day.  I've about had it.  I think

19    the witness has, and I think everybody has.  You've

20    been talking on him, you've been stepping on him,

21    you've been insulting, and that's enough.

22         MR. RABER:  I disagree with that

23    characterization.

24         MR. BUCHANAN:  Well, you know what?

25    The record is what it is, and I think everyone in the

221

1    room knows what it is.

2  A  If he had put in this paper that those were MIs, he

3    must have thought they were.  If you disagree with

4    that, that's your business, but I don't understand how

5    you can make that statement.

6  Q  (By Mr. Raber)  Sir, let's look at Defense Exhibit

7    688.

8  A  No, we haven't finished looking at Thal's paper.  I

9    want to see if it --

10  Q  Jnni?

11  A  No.  I'm talking about Thal.

12  Q  You don't have Thal there.

13         MR. TISI:  I just gave it to him.

14         MR. BUCHANAN:  Do you want to mark

15    it?

16         MR. RABER:  No, this is mine.

17         MR. BUCHANAN:  Oh, I thought you

18    wanted to mark it.

19  Q  (By Mr. Raber)  We can look at Thal.  Let me just show

20    you something here.

21         If you look at Thal on Page 7 -- are you on Page

22    7?

23  A  No.  I'm just looking at the -- oh, they were all

24    adjudicated, says here.

25  Q  What page?

222

1  A  Says on Page 3, on the bottom of the left-hand

2    paragraph, if you look at the very bottom of that, it

3    says, "All serious vascular events, including

4    (inaudible)" --

5         THE REPORTER:  You're talking to

6    fast.  I can't understand.

7  Q  (By Mr. Raber)  It doesn't say deaths.

8  A  No, it doesn't say deaths.  You're right.  But deaths

9    were adjudicated by Merck in the same way as these

10    events, so I can't believe he would have taken a

11    non-adjudicated.

12  Q  Well, let's look at Page 7.

13         So you were incorrect in suggesting that deaths

14    were adjudicated in this paper; right?

15  A  No, I don't know that.

16         MR. BUCHANAN:  Objection.  The

17    record was MIs.

18         Go ahead.

19  A  I don't know that.

20  Q  (By Mr. Raber)  I'm sorry, sir?

21  A  I don't know whether I was wrong or not.  He doesn't

22    say.

23  Q  On Page 7 --

24  A  I'm looking there.  Give me time, please.

25  Q  Do you see about three-quarters of the way down the

223

1    page, he says -- refers to the term "cardiac arrest"?

2  A  Yes.

3  Q  Do you know that cardiac arrest was not an adjudicated

4    term under Merck's protocol and adjudication program?

5         MR. BUCHANAN:  Objection.

6  A  Merck adjudicated all deaths.

7  Q  (By Mr. Raber)  Sir --

8  A  In their protocol, they adjudicated all deaths.

9  Q  Do you know that the term "cardiac arrest" was not an

10    adjudicated label for a death?

11  A  Well, they called it sudden cardiac death.  That's the

12    same term.

13  Q  Sir, doesn't that indicate to you that cardiac arrest

14    was investigator reported rather than adjudicated?

15  A  No, it doesn't indicate that.  It might have been.  It

16    might have been.  I don't know.

17  Q  Well, wouldn't that have an impact on your opinion --

18  A  No.

19  Q  -- that people were changing things?

20         MR. BUCHANAN:  Objection to form.

21  A  They changed -- he changed -- one way or another, this

22    has Merck authors on it.  Every other author, except

23    for Thal, I think, is a Merck employee.  Okay?  They

24    saw this data.  They had the adjudicated mortality

25    data available to them.

224

1     If they thought that this wasn't the right thing
2   to report, they could have changed it.
3 Q   (By Mr. Raber)  Do you know whether --
4 A   The statistical analyses in this paper was done by
5   Merck's statistician, not by Thal.
6 Q   Do you know whether the adjudication had been
7   completed when this was submitted for publication?
8 A   Yes, they were.  2005.
9 Q   When it was submitted for publication?
10 A   That was in late 2003.  It was already reported to the
11   FDA, the studies, with adjudicated events.
12 Q   But you don't know whether or not the events reported
13   here are adjudicated or investigator reported, do you?
14       MR. BUCHANAN:  Objection to the
15   form.
16 Q   (By Mr. Raber)  Just admit, you don't know.
17 A   I don't know --
18       MR. BUCHANAN:  Objection.
19 A   -- but it's irrelevant.  But it makes the same point.
20 Q   (By Mr. Raber)  But you're accusing people of changing
21   things, when --
22       MR. BUCHANAN:  Objection to the
23   characterization.
24 Q   (By Mr. Raber)  Are you accusing Merck of changing
25   things?

1 A   I have said that the results that were reported here
2   are not the same results as they reported to the FDA.
3 Q   (By Mr. Raber)  And my simple question --
4 A   That's true.  That's a true statement.
5 Q   Yes.  And my question is, can that difference be
6   explained by one set being adjudicated and another
7   being investigator reporting?
8 A   It could be.
9 Q   Okay.  And you just don't know one way or the other?
10 A   No, I don't.
11 Q   But you made the accusation that people changed things
12   without knowing the answer to that question; true?
13       MR. BUCHANAN:  Objection to form.
14 A   I didn't say they changed things.  I said they were
15   different.  That's a change.  I mean, isn't it?
16     If Merck thought this wasn't accurate, they had
17   the ample opportunity to change it to the accurate
18   representation.  Merck's authors are on here.  They
19   did the analyses.
20 Q   (By Mr. Raber)  You said they reclassified them.
21   True?
22 A   Somebody reclassified them.
23 Q   Well, how are they reclassified if they go from
24   investigator reported to adjudicated --
25 A   Does he say there -- you show me where he says --

1 Q   Sir, please don't interrupt.
2 A   -- investigator reported.  You show me where he says
3   that.
4 Q   I'm telling you that in that article -- well, I don't
5   need to do that.
6     My question for you is --
7 A   Do you have the testimony of Thal?
8 Q   Sir, my question for you --
9       MR. RABER:  Sir, would you please
10   tell your witness not to be so combative and to ask me
11   questions?
12       MR. BUCHANAN:  With due respect,
13   Counsel, I think you've been nothing but combative for
14   most of the day.
15       MR. RABER:  Sir --
16       MR. TISI:  If you would like to take
17   a break, we can take a break, because I think you're
18   both -- I think this is going the wrong direction.
19 Q   (By Mr. Raber)  Let me ask you this question.  If an
20   event is investigator reported and then it's
21   adjudicated and there is a different description for
22   the event as a result of the adjudication -- are you
23   with me so far?
24 A   Yes.
25 Q   -- is it fair to call that a reclassification?

1 A   You could.
2 Q   Okay.
3 A   It is.
4 Q   Is there anything improper about doing an adjudication
5   and having a result or a description that's different
6   from an investigator reported event?
7 A   No.  But in 2005, to report events that have now been
8   changed in their classification as something different
9   is improper.
10 Q   Now, see, there you've said it again.  You said
11   "change."  And you've been denying it, and you just
12   said it again.
13 A   No.  No.  The evidence --
14       MR. BUCHANAN:  Objection again.
15 Q   (By Mr. Raber)  You said --
16       MR. BUCHANAN:  I'd like to take a
17   break.  I think we need a break from this, Counsel.
18   This is wrong.  Your tone, your tenor, is wrong.
19       MR. RABER:  My tone is fine.
20       MR. BUCHANAN:  There you go again.
21   You're being insulting.
22       MR. RABER:  He keeps using the word
23   "change" and then he denies it.  It's in the
24   transcript.
25       MR. BUCHANAN:  Counsel, this is not

1  professional, the conduct of this deposition.  It's
2  wrong.  Let's take a break.
3            MR. RABER:  There's a question
4  pending.  You can't take a break when there's a
5  question pending.
6            MR. BUCHANAN:  You know what?  I'll
7  take a break.
8       Let's go.  We'll be back in a minute.
9       I won't discuss the question with him.  I think
10  this room is the wrong atmosphere for this conduct
11  right now.  I think that the tone, the tenor, what
12  you're trying to do with this witness is wrong.  I'm
13  not going to allow the witness to be exposed to it.
14  If there was still a judge on the East Coast or
15  Central time who could hear this right now, I'd be
16  comfortable taking it to him.
17            MR. RABER:  Well, you didn't want
18  the camera.
19            MR. BUCHANAN:  That's it, huh,
20  Steve?  If there's not a referee in the room, that's
21  the way you behave?
22            MR. RABER:  I'm just telling you --
23            MR. BUCHANAN:  I'm out of the room,
24  off the record.
25            MR. TISI:  You know what?  I'm going

---

1   really need, in old people particularly, to combine
2   those two into a single endpoint.  That's my only
3   point.
4  Q  But the change that you saw from what was reported to
5     the FDA in the CSR and what was reported in the Thal
6     article, you don't know whether that was the result of
7     adjudicated, do you?
8  A  No, I don't for sure.  I don't.  I hypothesize that
9     because the adjudication was done well before this
10    paper was published, that the Merck authors would have
11    insisted that the adjudicated events be put in there.
12    But maybe they didn't.  I don't know.
13  Q  And you just don't know one way or the other?
14  A  No.  I don't think it's important one way or the
15    other, either.
16  Q  All right.  Let's go back to Dr. Jnni, if we can.
17  A  Okay.
18  Spanning the globe.
19            MR. BUCHANAN:  How did we get to
20  Thal from Jnni?
21            THE WITNESS:  Let's not worry about
22  it.
23            MR. RABER:  It had to do with
24  excluding Alzheimer's.
25            MR. BUCHANAN:  Thank you.

---

1  to call and see if Judge Fallon is around.
2            (Recess 2:52-2:59 p.m.)
3
4
5            EXAMINATION (Continuing)
6  BY MR. RABER:
7  Q  Let me see if I can just understand your opinion.
8     Your opinion is that Merck reported the death data
9     in a certain way to the FDA in a CSR --
10  A  That's correct.
11  Q  -- and that between the time of that reporting and the
12    publication of the Thal article, the classification of
13    certain deaths changed?
14  A  Were different.
15  Q  Were different?
16  A  Yes.
17  Q  Okay.
18  A  That's a fact.
19  Q  And is it your opinion that that was improper?
20  A  I don't think it's improper, particularly, no.  I
21    never said that.  I just -- my only point about that
22    was largely that there's a difficulty in telling
23    whether someone who dies suddenly, unobserved, died of
24    an MI or a cardiac arrhythmia or both.
25       And in that -- that was -- and that means that you

---

1            THE WITNESS:  That's correct.
2  Q  (By Mr. Raber)  Sir, isn't it true that if the data
3     from Alzheimer's had been included in the Jnni study,
4     his relative risk for heart attack would have been
5     lower?
6  A  Yes.
7  Q  And if we look at the Jnni article, isn't it true that
8     the only statistically significant difference he saw
9     was for a type of control was when you compared Vioxx
10    to naproxen?
11  A  That's not true.
12  Q  Look at --
13  A  He combined all the studies.
14  Q  Look at Table 2, sir.  Table 2 on Page 4.
15       Do you see that?
16  A  I see the studies, yes.
17  Q  Are you looking at this table right here, Table 2?
18  A  Yeah.
19  Q  Now, do you see where he --
20  A  Oh, yeah, sure.
21  Q  He reports relative risk for all comparators, but then
22    he breaks it down for type of control.
23       Do you see that?
24  A  I do.
25  Q  And when you compare Vioxx against placebo, you get a

1  relative risk of 1.04 that's not statistically

2  significant; true?

3  A  That's correct.

4  Q  And that was Jnni doing that; true?

5  A  Yeah, that's correct.

6  Q  And when Jnni compared Vioxx to non-naproxen NSAIDS,

7  he got a relative risk of 1.55, which again was not

8  statistically significant; true?

9  A  That's correct.

10  Q  So the only control that produced a statistically

11  significant difference was Vioxx against naproxen;

12  true?

13  A  That's correct.

14  Q  And when you looked at dose, isn't it true that the

15  only dose at which Dr. Jnni found a statistically

16  significant difference was the 50 milligram dose?

17  True?

18  A  That's true, although the 12 and a half was very

19  close.  Yeah, that's true.

20  Q  And the only statistically significant difference he

21  found for trial duration was greater than six months;

22  true?

23  A  That's correct.

24  Q  Now, doesn't that reflect the fact that VIGOR is

25  dominating these results?

1  A  VIGOR has a major influence on these results,

2  absolutely.

3  Q  Because VIGOR was against naproxen; true?

4  A  Yeah.

5  Q  VIGOR was at 50 milligrams; correct?

6  A  That's correct.

7  Q  And VIGOR had an average exposure of about nine

8  months?

9  A  That's correct.

10  Q  All right.  And so this table from Jnni isn't really

11  telling us anything that VIGOR didn't tell us; true?

12  A  Well, it's telling us something.  It adds a little bit

13  more information to say that the other studies that

14  looked at MI, that didn't show a markedly different

15  results, in the sense -- by markedly, I mean that they

16  didn't show a flat-out one relative risk throughout.

17  And, you know, if you want me to say that I don't

18  think a whole lot of these meta-analyses, I don't.  I

19  never have.  I say so in my report.  I don't think the

20  meta-analysis was worth much of anything.

21  Q  And you're referring to the Jnni meta-analysis?

22  A  No.  I'm referring to all the meta-analyses.

23  Q  But you include Jnni?

24  A  That's correct.  The only thing that makes Jnni's

25  better than what Merck did was, he looked at the right

1  endpoint.  He looked at MI.

2  Q  You're concerned with placebo-controlled clinical

3  studies?  That's what you like to look at; true?

4          MR. BUCHANAN:  Objection.

5  A  Well, that's certainly the best thing to look at.

6  However, I'm interested in where the signals were.

7  The signals were in VIGOR.  VIGOR showed

8  dramatically poor side effect profile.  And it wasn't

9  just MI.  It was hypertension, big time.  It was

10  congestive heart failure for hospitalization and for

11  going off therapy.  So you had a really what I

12  thought, from just VIGOR, was a nasty side effect

13  profile; one that, for a drug for pain relief, was

14  unacceptable in my view.

15  Q  (By Mr. Raber)  Better for naproxen for reducing

16  serious perforations, ulcers, and bleeds; true?

17  A  It was, but I don't think that was worth it.

18  Q  Significantly better.

19  A  Yeah, I know.  I don't think that was worth it

20  compared to the hypertension and the CHF and MI.

21  But you could have argued that.  If Merck would

22  have said -- frankly, if Merck would have said in the

23  literature and in the label, gee, we have a bad side

24  effect for cardiovascular associated events, but our

25  benefit in terms of GI bleeds is sufficient to

1  overwhelm that, I wouldn't have had any quarrel with

2  them.  Not a bit.  That would have been a fair

3  assessment.

4  They could have made the assessment the

5  risk/benefit ratio was positive, and I would have had

6  a hard time arguing it because I wouldn't know.  But

7  they didn't.

8  Q  Well, after VIGOR, the FDA changed the label and

9  concluded that Vioxx was safe and effective as

10  labeled; true?

11          MR. BUCHANAN:  Objection to form.

12          MR. TISI:  Objection.

13  A  I don't know that the FDA changed it.  I mean, you

14  said changed it.  I don't know that they changed it.

15  They agreed with -- they ended up with an agreement

16  with Merck about what the label should read.  That's

17  true.

18  Q  (By Mr. Raber)  The FDA has final authority over that;

19  that's true?

20          MR. TISI:  Objection.

21  A  Yes.

22  Q  (By Mr. Raber)  And based on your experience with the

23  FDA, they would have done a risk/benefit analysis in

24  making that determination?

25  A  I don't know if they did or not.

1 Q Sir, I believe you testified that in the ADVANTAGE
2 trial, that the number of heart attacks was eight to
3 one against Vioxx.
4 Do you remember that?
5 A Yeah, vaguely. Yes.
6 Q I'd like to show you --
7 MR. RABER: Paul, can you find the
8 copy of this, please?
9 MR. BOEHM: Yeah.
10 Q (By Mr. Raber) Let me show you a document that's
11 already been marked as Defendants' Exhibit 657. I'll
12 represent to you that this was the peer-reviewed
13 publication of the ADVANTAGE study.
14 Have you ever seen that before?
15 A Yes.
16 Q And I'll ask you, if you would, to turn to Page 543.
17 Are you there, sir?
18 A I'm trying to find the page number.
19 Q It's there in the bottom right corner.
20 A Yeah, I see.
21 Q 543.
22 A Mm-hm.
23 Q The left-hand column, maybe two-thirds of the way
24 down, it says, "Five myocardial infarctions occurred
25 in the rofecoxib group and one occurred in the

1 naproxen group."
2 Do you see that?
3 A Yes.
4 Q Do you understand that those events were adjudicated
5 by blinded independent experts?
6 A I don't know for sure. I think they are. I mean,
7 because I didn't know the date when this was done, as
8 you say, relative to the adjudication, but it's
9 certainly reasonable that they were. I wouldn't --
10 Q Do you place much -- do those numbers concern you?
11 A Not particularly, because there was one additional MI
12 that Merck had not classified, that was admitted --
13 that they admitted to in a later letter to the editor.
14 So that made it six versus one. And I believe there
15 were two sudden deaths that weren't counted here. So
16 that would have made it nine versus one.
17 Q But that's assuming a sudden death is a myocardial
18 infarction.
19 A No. It's assuming we're looking at hard CHD.
20 Q Right. But we're looking at heart attacks.
21 A I consider a sudden cardiac death a heart attack.
22 Are you talking about MIs?
23 Q I don't want to quibble here, but you said "sudden
24 death," and then you just said "sudden cardiac death."
25 Is there a difference in your mind between sudden

1 death and sudden cardiac death?
2 A Well, there is other -- there can be other sudden
3 deaths that aren't cardiac, but the vast majority of
4 them are cardiac. And if you don't know, you have to
5 classify them that way.
6 Q Let's say -- you're not saying that sudden death and
7 myocardial infarction are the same thing, are you?
8 A No, but they frequently come together.
9 Q Okay. But from the data as adjudicated by the
10 independent doctors, they classified five myocardial
11 infarctions for Vioxx and one for naproxen?
12 A And the additional one that they weren't asked to
13 adjudicate, that Merck later admitted was a myocardial
14 infarction.
15 Q Where does it say that?
16 A There's a letter to the editor by one of the Merck
17 scientists.
18 Q And you're sure that they said it was a myocardial
19 infarction?
20 A Yes. They said it should have been classified as a
21 myocardial infarction.
22 Q A letter to the editor?
23 A Yes.
24 Q Which paper?
25 A Relative to this paper. (Indicating.)

1 Q Is that in your reliance materials?
2 A I don't know.
3 Q Can you identify it any more than that?
4 A It was the letter to the editor of this journal,
5 several years later, and it was based on the fact --
6 my understanding is, it was reported in the New York
7 Times that there was an additional event. And then
8 there was a letter to the editor from one of the Merck
9 scientists, saying, yes, there was a -- what they had
10 classified as a hypertensive death, that was in fact
11 an MI, and should have been classified that way. And
12 they said that there was a flaw in the adjudication
13 protocol, that they didn't send hypertensive deaths to
14 the adjudication committee.
15 Q Merck said that?
16 A Yeah, mm-hm. I can find it with time. I can't --
17 Q Okay. I'm going to ask you to -- since you've
18 testified about it, to find it and have your Counsel
19 provide it to me.
20 A Sure.
21 MR. BUCHANAN: And we'll take it
22 under advisement.
23 THE WITNESS: Sure.
24 Q (By Mr. Raber) And I think we mentioned earlier that
25 this reports zero strokes for Vioxx and six for

1  naproxen.
2  A  Yeah, you said that.
3  Q  Would that be a concern for naproxen?
4  A  Yeah, might be.  I can't say it wouldn't be.  I would
5     be a little worried about it.  I'm not convinced that
6     naproxen isn't dangerous.
7  Q  Have you seen the recent publication from Dr. Baigent,
8     B-A-I-G-E-N-T?
9  A  No.  I've never heard of him.
10 Q  Have you reviewed the memorandum from the FDA dated
11    April of 2005?
12 A  About what?
13 Q  Concerning the risk of heart attacks and strokes for
14    not only the COX-2 inhibitors, but for all NSAIDS.
15 A  I know about it.  I've seen press releases, you know,
16    press reports about it.
17 Q  Are you aware that the issue being debated as to
18    whether or not all NSAIDS increase the risk of heart
19    attack, CHD --
20 A  I'm quite aware of that, yes.
21 Q  And how are you aware of that?
22 A  I've seen it in the literature.
23 Q  And what have you concluded from looking at the
24    literature, if anything?
25 A  I think it's a concern.

1  Q  A concern about what?
2  A  That they may all be.
3  Q  That they may all be what?
4  A  They may all increase the risk of cardiovascular
5     events.
6  Q  And that would be -- when you say "they," you mean
7     both COX-2 inhibitors and traditional NSAIDS?
8  A  I think it's certainly true of some COX-2 -- of the
9     COX-2 class.  And I think it may be true of some of
10    the NSAIDS; not necessarily all of them.
11       I don't think we just have enough data.  And we
12    don't have enough data yet on whether there's a dose-
13    related effect.  I mean, even within the COX-2
14    inhibitors, there could be a dose-related effect.
15       I'm not even sure, for example, for rofecoxib that
16    there isn't a dose effect.
17 Q  So in other words --
18 A  12 and a half might be safe, for all I know.
19 Q  25 might be safe?
20 A  Not from the Alzheimer's, no.  No way.
21 Q  In certain patient populations?
22 A  Well, that's certainly true.
23              MR. BUCHANAN:  Objection to the
24    form.
25 A  If you give it to a young child, it may well be safe;

1     or a healthy adult, it may be safe.
2  Q  (By Mr. Raber)  Or an osteoarthritis patient?
3  A  They're old, mostly.  I would be worried about them.
4  Q  Someone in their 50s?
5  A  Maybe.
6  Q  Might be safe?
7  A  Maybe.  Maybe.  I don't know.  We don't have the data.
8     That's a problem.  There's no data.
9  Q  Well, you haven't analyzed the data that looked at
10    osteoarthritis patients in their 50s and 60s?
11 A  There's not enough exposure in those studies.  They're
12    too short.
13 Q  How long were those studies?
14 A  Oh, they varied, but most of them were only under --
15    the average exposure in the osteoarthritis studies, in
16    my recollection, is about four months.
17 Q  And how long did they range?
18 A  Oh, there may have been a few of them that went on a
19    year or so.
20 Q  Anything more than that?
21 A  There might have been, but they were very small.  I
22    don't remember.  Very inadequate individually to tell
23    whether there was an increased risk or not.
24 Q  In your report, on Page 22 -- I want to compare
25    something in your report, because I'm a little

1     confused.  On Page 22, near the top, you say, "Thus
2     the data from the two Alzheimer's studies provide
3     strong evidence of a major mortality excess associated
4     with taking rofecoxib -- a startling three-fold
5     increase in the risk of death."
6        Do you see that?
7  A  Yes.
8  Q  Then I look at Page 25, and below the table there, you
9     say, "For deaths from all causes, the relative risk of
10    death for rofecoxib treatment was 2.13."
11 A  That's correct.
12 Q  Which one is it?
13 A  The first one I was reporting was Chen's analysis, and
14    that was -- that was in April of 2001.  This analyses
15    is through 2003.
16 Q  And so the Chen numbers that you were referring to
17    were not final; true?
18 A  They were --
19              MR. BUCHANAN:  Objection.
20 A  They were the data that was available at that time.
21 Q  (By Mr. Raber)  But the 078 study was not completed;
22    true?
23 A  That's correct, it wasn't.
24 Q  Dr. Kronmal, as I understand it, your main
25    criticism -- one of your criticisms of Merck relating

1 to Alzheimer's studies is that they had information
2 about the ITT population, but they only reported the
3 on-drug information to the FDA.
4 A  Well, that's a little mischaracterization.  They --
5   they listed all the deaths.  I mean, they were there,
6   you know, listed in a big long list.  So they reported
7   them.
8     What my objection is, they didn't report the
9   analyses of the ITT.
10 Q  I see.  Do you know what the primary analysis was for
11   the safety endpoint in the protocols for --
12 A  It was 14 days.
13 Q  For 078 and 091?
14 A  Yes.  It was on-drug, plus 14 days.
15 Q  And Merck did that analysis and reported that analysis
16   to the FDA; true?
17 A  That's correct, they did.
18 Q  And that was the primary pre-specified analysis?
19 A  That was the pre-specified, yes.
20 Q  And what you're saying is that Merck should have also
21   reported the secondary analysis?
22 A  Well, I consider the ITT what should have been the
23   primary.  I think that was -- that was really -- they
24   should have had both of them in there.
25     You could call them primary -- for safety, you

245

1 fluid accumulations in the lungs, you then went to the
2 hospital, you then acquired a hospital-acquired
3 pneumonia and you died.
4     Well, that's the point.  That death was due to the
5   drug.  You should have counted it.  And that's why the
6   ITT is appropriate.
7 Q  Do you know whether Merck counted, as on-drug deaths,
8   a death where the event happened within 14 days of
9   stopping the drug, but the death occurred beyond 14
10   days?
11 A  They selectively did that.  But the problem with that
12   is, they had no firm rule as to how to do that.  And
13   the example I gave you, they would never have counted
14   it.  Not in a million years, because they wouldn't
15   have connected the two events.
16     Certainly, yeah, they did.  They took --
17 Q  How do you know that?
18 A  Because there weren't any.  There were not one.
19 Q  Not one what?
20 A  Not a single person who died later of a cardiovascular
21   event who -- where they were off-drug, who they count
22   as an on-drug death.  Not one.
23 Q  Who they counted as an on-drug death?
24 A  That's correct.  There wasn't a one.  And there had to
25   be people like that.

247

1 don't normally have a primary and a secondary
2 endpoint.  You just have safety.  And both are
3 relevant to safety, both the ITT and the on-drug are
4 relevant to safety for two different reasons.  The
5 on-drug is relevant if the effect is entirely acute;
6 that is, if it's only when they're on the drug that --
7 say it was a rash, as an example.  You're just going to
8 get the rash if you're not on the drug.  It just
9 doesn't happen.  So the on-drug would be absolutely
10 appropriate for looking at rashes.
11     But on the other hand, for CHD, totally different
12 issue.  There, if you damage the vascular system in
13 some way or the heart in some way or the brain or the
14 kidney, or any organs, really, you could see the
15 effect months later, even though the person had been
16 off the drug.  And, therefore, you must do ITT
17 analyses of such endpoints.
18     And Merck had the ITT analysis for death.  They
19 had it.  Death takes a long time to happen.  You don't
20 die instantaneously most times, nowadays.  What
21 happens is -- congestive heart failure is a good
22 example.  You get ill with congestive heart failure,
23 maybe due to the drug, and then you linger.  And six
24 months later, you die because you got a pneumonia that
25 was due to the fact you went into failure.  You got

246

1 Q  Okay.
2 A  The other thing is, but the only few that they
3   counted -- there aren't very many they counted, by the
4   way, that were cancers.  Somebody was having -- had
5   pancreatic cancer and they had pancreatic cancer and
6   they died six months later, they counted it.  I mean,
7   arguably, you wouldn't want to count that one, but I'm
8   going to let them -- give them the leeway to do that.
9   But...
10 Q  Do you know what the final numbers were for all caused
11   deaths for the ITT?
12 A  Yeah, I don't remember the exact numbers, but I
13   could --
14     MR. TISI:  Can I ask you what study
15   you're talking about?  Or are you talking about all of
16   them together?
17     MR. RABER:  All of them together.
18 A  I don't remember the exact numbers.
19 Q  (By Mr. Raber)  Does the number 61 to 34 ring a bell?
20 A  Yes.
21 Q  And is the 61 to 34 how you calculated a relative risk
22   of 2.13?
23 A  Yep.  There was much less exposure in the rofecoxib
24   group, because they had many more people drop out for
25   side effects and for new-onset Alzheimer's.

248

**EXHIBIT "7"**
**Part C**

**EXHIBIT "7"**
**Part C**

1  Q  Is it true that more people in the Vioxx group were
2      followed?
3  A  No.  More dropped out.  Just the opposite.
4  Q  In the ITT, they still count, don't they?
5  A  If Merck had continued to follow them, yeah.  They
6      didn't.
7  Q  And isn't it true that --
8  A  They didn't follow them.  They didn't follow them.
9  Q  Isn't it true that --
10  A  They should have.
11  Q  It true that, on average, Merck followed the Vioxx
12      patients for a longer period of time?
13  A  No.  Less.  Just the opposite.  There were many more
14      people who dropped out of the study on Vioxx, and they
15      were not followed.  They should have.
16  Q  Now, one thing you criticized is -- there's a
17      publication of the 091 study, and in your report, you
18      criticize that, because you *said that they only*
19      reported the on-drug deaths of nine to two.
20        Do you remember that?
21  A  Yeah.  I said they should have reported the ITT.
22  Q  Do you know what the final ITT numbers were for study
23      091?
24  A  Yeah.  It was -- I think it was 13/4.
25  Q  15/9, wasn't it?

1  A  Yeah.  I told you, it's 13 to 3.
2  Q  Actually, it's 14 to 4, isn't it?
3  A  Well, there were two other events.  I don't know where
4      they came from.  But they're 13 to 3 that Chen
5      reports.
6  Q  Doesn't the CSR say 14 to 4?
7  A  It might.  I don't remember.
8  Q  Have you read the CSRs?
9  A  I don't remember.  It's been a lot of reading and a
10      long time over a period of two years.  I don't
11      remember every number.  I don't have that kind of
12      mind.
13        It wouldn't matter.  14/4, 13/3, they're still
14      significant.
15  Q  9/2?
16  A  Yes.
17      They're all significant.  So what's your criticism?
18  A  My criticism, they should have reported the ITT,
19      because the ITT is the right thing to report --
20      But --
21      -- for cardiovascular events.  You should report them
22      both.  You should report 9/2 or 13/3, 14/4.
23  Q  Would it have reflected a difference in risk?
24  A  It would have reflected more data on the mortality.
25      Should have been reported.

1  A  Well, I could look it up, but I don't have it handy.
2      They were -- study 091, as I described in my
3      report, was a 12-month study, parallel design study.
4      The paper reporting the results of study 091 only
5      reported the results for the 12 months.
6      For the 12 months, I believe -- oh, I have it
7      here.  The results for 091 on ITT was 13 versus three
8      as reported by Chen.
9  Q  Right.  As reported by Chen back in --
10  A  The study was over then.
11  Q  Okay.  But do you know what the ITT showed for zero to
12      15 months?
13  A  Yes.  It showed a different result.  It showed more --
14      but that wasn't what the paper was about.  The paper
15      was specifically about the zero to 12-month time
16      point.
17  Q  Do you know, if Merck had reported the ITT results for
18      the zero to 15 months rather than the on-drug reports,
19      would Vioxx have looked better or worse?
20  A  It would look a little better.  But that's not what
21      the paper was about.  They would have a very hard time
22      reporting it that way, when the study was a 12-month
23      study.
24  Q  Do you know what the results would have shown at 12
25      months for ITT?

1  Q  So under that rationale -- well, let me ask you this.
2      If they knew the zero to 15-month data --
3  A  They should have said something about it.  Yeah, they
4      could have said it in the paper, if they wanted to.  I
5      wouldn't have any objection to that.
6  Q  And had they done that, that would have made Vioxx
7      look better; true?
8  A  Yeah.
9  Q  It would have made Vioxx look better?
10        MR. BUCHANAN:  Objection.  Asked and
11      answered.
12  Q  (By Mr. Raber)  And they didn't do it?
13  A  That's correct, because it was a 12-month study.
14  Q  Well, but you told me in connection with the VIGOR
15      article with the New England Journal of Medicine, that
16      you tell everything you know; right?
17  A  Yeah.  See, I have no objection to that.
18  Q  So Merck had data on the zero to 15 months, didn't
19      they?
20  A  Yeah.
21  Q  And data that made Vioxx look better; true?
22  A  Yes.
23  Q  But they didn't report it, did they?
24  A  No, they didn't.  The author of that paper decided
25      that this was a 12-month study, and that's what he was

```
 1    going to report.
 2  Q How do you know that?  Did you talk to the author?
 3  A Well, that's what he reported.  It's a fact.
 4  Q You just testified that the author of the paper
 5    decided something.  Did you talk to the author?
 6  A Well --
 7            MR. BUCHANAN:  Objection.
 8  A -- if the paper is zero to 12 months, he made that
 9    decision.  Who else made it?
10  Q (By Mr. Raber)  Peer reviewers, perhaps?
11  A Not likely.  The peer reviewers don't tell people what
12    study to report.  And it was designed to be a zero to
13    12-month study.  He even says so.  He even mentions
14    the other three months.  He doesn't report anything
15    about it, because it's irregular.
16      What they did in those three months is so
17    irregular, that most studies wouldn't report it.  I
18    mean, you take 90 percent of the people on the drug
19    and you put them on a placebo.  What kind of study is
20    that?
21      I mean, clearly he didn't report it.  It wasn't
22    much of a study.
23  Q Was the ITT zero to 15 months relevant safety
24    information?
25  A Yeah, I have no problem with him reporting it.  I
```

253

```
 1    mean, some of the deaths, I think, were arguably
 2    not -- shouldn't have been counted.  Like the cancers
 3    that occurred way after the study was over, that's
 4    very irregular.
 5      But, you know, again, I have no problem with them
 6    doing it, as long as they were clear that those
 7    cancers occurred well after the study had ended.
 8  Q Well, do you know -- of the deaths in the 078 study,
 9    do you know how many of them occurred more than 48
10    weeks or 300 days after the drug was stopped?
11  A Yeah, right.
12  Q Do you recall that it was eleven from the Vioxx group
13    and only one from the placebo group?
14  A That's correct.
15  Q Can you think of any mechanism that would cause an
16    eleven-to-one difference more than 300 days after
17    discontinuation of the drug?
18  A Oh, lots of different mechanisms.
19  Q Okay.  What are they?
20  A Kidney damage, damage to the vascular system, damage
21    to the heart, damage to the brain, damage to the
22    liver, damage to almost any organ system in the body.
23  Q Do you have any medical support for those possible
24    theories that you've just thrown out?
25  A There's lots of drugs that -- I mean, yeah, sure.
```

254

```
 1  Q I'm asking about Vioxx.
 2  A Well, I don't know.  I don't.  Do you have any
 3    explanation for the eleven/one?
 4  Q Sir, sounds a lot like -- you know, we had a ten to
 5    one on that other thing, didn't we, the heart attack
 6    and stroke?
 7            MR. BUCHANAN:  Objection.
 8  A And I said it was of concern.
 9  Q (By Mr. Raber)  But you have to look and see what's
10    going on in order to make that judgment, don't you?
11  A No.  It's death.
12  Q But you need --
13  A It's a simple matter.
14  Q Sir, are you qualified -- have you ever done an
15    autopsy?
16            MR. BUCHANAN:  Objection.
17            MR. TISI:  Objection.
18  A No, of course not.
19  Q (By Mr. Raber)  Have you ever determined a cause of
20    death?
21  A No.
22  Q Are you trained to do that?
23  A No.
24  Q Okay.  You would need to look and see what's causing
25    those deaths, wouldn't you?
```

255

```
 1  A No.  No, you would not.  Death is -- if you're dead,
 2    you're dead.  It doesn't matter what caused it.
 3  Q If you're trying to say that a drug caused a death in
 4    someone when the death occurred more than 300 days
 5    after they stopped taking the drug, don't you think it
 6    would be prudent to look at each of those cases and
 7    see what caused the death?
 8  A It's prudent to look at it.  It has no relevance to
 9    the issue of whether the drug caused it or not.
10  Q So if someone ate a bromide tablet and died, you would
11    say that the drug caused that?
12  A No.  I would say that if over the -- over the full
13    study, if you had an excess death in one group versus
14    the other on the basis of randomization, the frequency
15    of these bromide deaths or any other non-caused death
16    by the drug should be even in both groups.
17  Q Should be even?
18  A Well, they will be on average.
19  Q On average?
20  A Yeah.  That's what statistics is about.  What
21    explanation do you have -- well, I won't ask you that.
22    I shouldn't ask you questions.
23            THE WITNESS:  Sorry about that.
24            MR. BUCHANAN:  That's okay.
25  Q (By Mr. Raber)  Have you reviewed the FDA review memo
```

256

1   from December of 2004 that looked at the Alzheimer's
2   death data?
3   A   I reviewed Merck -- well, I don't know the answer to
4   that.  I don't remember.
5           MR. BUCHANAN:  Did you say February?
6           MR. RABER:  I said December of 2004.
7   I meant to.
8   A   I don't remember.  I probably have, but I don't
9   remember.
10  Q   (By Mr. Raber)  Would that have any relevance in your
11  mind as to what the FDA knew or didn't know?
12  A   Surely it would have some relevance.  Although I do
13  know what they said they knew -- I did review very
14  carefully the transcripts of the 2005 meeting, So I
15  have a pretty good idea what they knew.  If you want
16  to ask me about what they knew, I could certainly tell
17  you.
18  Q   Did they know about the ITT data?
19  A   They said they didn't.  They said it was pending.
20  That's what Brooke Villalba said when asked about the
21  ITT analysis, whether it was --
22  Q   I didn't ask analysis.  I said the ITT data.
23  A   Oh, sorry.
24          MR. BUCHANAN:  Objection to form.
25  A   They always had all of the deaths from the very start.

257

1   Merck reported every death in a table, big long table,
2   all the deaths listed.  Yes.  Always had that.
3   Q   (By Mr. Raber)  And if somebody wanted to do an
4   analysis by ITT or by on-drug, or anything they
5   *wanted, they could have done that*; true?
6   A   They could have done it.  They were taken to task by
7   the reviewers for not doing it, in that committee
8   meeting.
9   Q   Who took them to task?
10  A   The members of the committee.  Three of them, at
11  least.
12  Q   Who?
13  A   Tom Fleming, D'Agostino, Allister somebody.  Wood,
14  maybe.  And maybe Nissen.  And Nissen.  There were
15  four that took them to task.
16  Q   Is it fair to say, though, that even when you studied
17  MI in the Alzheimer's studies, the difference you
18  found was not statistically significant?  Is that
19  true?
20  A   By MI itself, that's true.
21          MR. RABER:  Let's take a five-minute
22  break.  I just want to sort through and make sure I'm
23  not missing anything.
24              (Recess 4:32-5:04 p.m.)
25  ////

258

1               EXAMINATION (Continuing)
2   BY MR. RABER:
3   Q   Dr. Kronmal, during our break, did you meet with
4   Mr. Buchanan and Mr. Tisi?
5   A   I was there.  I didn't -- I don't know what you mean
6   by there.  I was there.
7   Q   Did you discuss your testimony in any way with them?
8   A   No, I didn't.
9   Q   Would you agree with me, Dr. Kronmal, that if you
10  observe a signal of abnormal events in a trial, that
11  it would be wrong to make an inference that this
12  signal was causal?
13          MR. BUCHANAN:  Objection.  Form.
14  A   Wrong --
15          MR. TISI:  Could you repeat the
16  question?  I'm sorry.  I apologize, Steve.
17              (Question on Page 259,
18               Lines 9 through 12,
19               read by the reporter.)
20
21          MR. TISI:  Objection.  Vague.
22  A   I'm not sure what you mean.  How big a signal is it?
23  What kind of results are you talking about?  20 versus
24  four?
25  Q   (By Mr. Raber)  I'm looking at your testimony from the

259

1   Rezulin deposition.  And you were asked, "Does that
2   mean that you can't really draw any inference about a
3   potential causal relationship between Rezulin and
4   liver enzyme elevations from the clinical trials?"
5           And your answer was:  "I don't think it's
6   appropriate to do causal inference in this kind of
7   context anyway."
8   A   I have no idea what that refers to.
9   Q   You said, "Trials were not designed to evaluate
10  whether or not Rezulin caused liver function
11  abnormalities or not.  They were to look for efficacy.
12  Therefore, when you observe a single, you know, group
13  of abnormal events, you have to think of them as a
14  signal.  That's why they call it signal, not proof.
15  And, no, it would be wrong to make an inference that
16  it was causal under those circumstances, absolutely."
17  A   Yeah.  I was talking about --
18          MR. BUCHANAN:  Objection.
19  A   What I was talking about *there was a situation where*
20  there was very small numbers, and there was
21  non-statistically significant.  And what I don't
22  basically trying to say is, when you don't have
23  statistical significance, you can look at, you know,
24  side effect data, but that you can't make strong
25  inferences based on them.

260

1    Q   (By Mr. Raber)  And you can't make inferences of
2        causality?
3    A   When you have inadequate numbers, you can't make
4        inferences about causality.  But not in general terms,
5        I certainly didn't mean it.
6    Q   And when you have differences that are not
7        statistically significant, it's inappropriate to make
8        causal inferences?
9    A   That's correct.  If it was not statistically
10       significant, it would be inappropriate.  That's what I
11       said there, and I still say it.
12   Q   Dr. Kronmal, in your -- let me ask you this.  Was
13       there any placebo-controlled study involving Vioxx
14       that showed an increased risk of myocardial infarction
15       before the APPROVe study?
16   A   Individually?
17   Q   Yes.
18   A   No.
19   Q   Was there any combination of placebo-controlled
20       studies prior to APPROVE that showed a statistically
21       significant increased risk of myocardial infarction?
22   A   No, there were not.
23   Q   In your report, you mention that when Merck filed its
24       SUR, Safety Update Report, for the Alzheimer's studies
25       in July of 2001, they only reported the on-drug

1        information.
2            Do you remember that?
3    A   From 078, yes.
4    Q   However, Merck told the FDA in that Safety Update
5        Report that it would be providing the
6        intention-to-treat data with the CSR; true?
7    A   I'm not sure whether they said with it the CSR or when
8        the study was completed.  I don't remember.
9    Q   They told the FDA in the July 2001 SUR that that
10       particular submission did not include the ITT data;
11       true?
12   A   They did tell them that, yes.
13   Q   So the FDA knew that the ITT data was not in that
14       submission?
15   A   That's true.
16   Q   And they told them that it would be coming at a later
17       date; true?
18   A   That's correct.
19   Q   And the FDA could have requested the ITT data or an
20       ITT analysis at any time; true?
21           MR. BUCHANAN:  Objection to form.
22   A   They could have, of course.
23   Q   (By Mr. Raber)  And ultimately, when Merck provided
24       the CSR for protocol 078 to the FDA, it provided all
25       of the ITT data; true?

1    A   They --
2            MR. BUCHANAN:  Objection to form.
3    A   No.  They did not do an ITT analysis, even in the --
4        even in that study.
5    Q   (By Mr. Raber)  Sir, they provided all the ITT data;
6        true?
7    A   They -- they provided all cause -- all deaths that
8        occurred during the study, whether they were on or
9        off-drug.
10   Q   They accounted for every death in the Alzheimer's
11       studies?
12   A   Yeah, but ITT --
13   Q   Yes.
14   A   -- means you do an ITT analysis.  It doesn't mean you
15       just list them all.
16   Q   Well, they provided the data for the ITT population;
17       true?
18   A   They provided the data for the ITT population, yes.
19       Stated that way, I agree.
20   Q   Sir, I want to just show you something and ask you --
21       I'm not going to mark it.  I'm just going to show it
22       to you, and you tell me whether it's what I think it
23       is.
24           Do you remember at the Humeston trial, when you
25       were asked some questions by the jury, that you

1        referenced a book called "How to Lie with Statistics"?
2    A   Yeah, I did.
3    Q   You described that as a wonderful book?
4    A   It's a nice book, yeah.
5    Q   I've got a book here.  It's blue.  It's called "How to
6        Lie with Statistics," and the author is Darrell Huff.
7    A   Yeah.
8    Q   That's the one you were referring to?
9    A   Yeah.  Must have been reprinted.  Mine was in a brown
10       cover.
11   Q   You've read it?
12   A   Yeah, a long time ago.  Must be 50 years old or 40
13       years old.
14   Q   Is it your experience with the FDA that the FDA helps
15       drug companies ensure that the trials they do are
16       appropriate, clinical trials?
17           MR. BUCHANAN:  Objection.
18           MR. TISI:  Objection.
19   A   They try to do that, yes.  They don't always succeed,
20       but they certainly try.
21   Q   (By Mr. Raber)  And the FDA, as you understand it,
22       approves the protocols for clinical trials?
23   A   That's true, they do.  They do.  If it's under an IND,
24       they do.
25   Q   Did they approve the protocols for the Alzheimer's

1    studies?

2  A  They must have, yes.

3  Q  Has the FDA ever concluded that Vioxx causes heart

4     attacks?

5  A  I don't know what they've specifically concluded.  I

6     don't have any clue about that.

7  Q  Doctor, if you were to go out on the street and

8     randomly select a hundred people between the ages of

9     40 and 96 and followed them for a year, how many of

10    them would you predict would have an MI during that

11    year?

12 A  It depends on what proportion of the people were 40

13    and what proportion were 96.  And it would also depend

14    on how many men -- whether they were men or women or

15    whether they were black or white.  Where am I doing

16    this?

17 Q  Say a random sample --

18 A  On the street of Seattle?

19 Q  -- in the United States.  Sure.

20 A  In a year?

21         MR. BUCHANAN:  Objection to form.

22         MR. TISI:  Let me just object too.

23 A  I have no idea.  Maybe a half a percent.  But it would

24    depend on the age mixture, the racial mixture, how

25    many were females.  It would depend on so many things,

1    it's hard to estimate.

2  Q  (By Mr. Raber)  But you would ballpark a half a

3     percentage?

4          MR. TISI:  Objection.

5  A  It's really a guess.  It's impossible to make that

6     judgment.

7  Q  (By Mr. Raber)  Well, don't people make judgments

8     about how prevalent the heart attacks are?

9  A  Yeah.  If you told me the United States, I could give

10    you a rough idea.

11 Q  Okay.  Can you tell me, in the United States, for

12    every, let's say, what the rate is per hundred people

13    in an age range between 40 and 96?

14         MR. BUCHANAN:  Objection to form.

15 A  I'd have to look it up.  And it would depends on the

16    mix -- I don't know the mixture -- I don't know how

17    many 96-year-olds in the United States versus --

18    that's really hard to do.

19 Q  (By Mr. Raber)  Let's say the median age is about 60.

20 A  That's not enough.  I would have to know the actual

21    distribution of people within those age groups.  How

22    many blacks or whites --

23 Q  Let's say the VIGOR -- are you familiar with the

24    demographics of the VIGOR population?

25 A  Not in detail.  I know the average age, roughly.

1  Q  So let's assume the average age, then, of a random

2     hundred people in VIGOR.

3  A  I don't know.  I mean, VIGOR was -- you have to

4     remember that VIGOR was a study that selected people

5     based on two criteria -- a number of criteria.

6  Q  I asked you simply a question about the age of VIGOR

7     or random population.

8          MR. BUCHANAN:  Objection.

9  Q  (By Mr. Raber)  Can you answer that?

10         MR. BUCHANAN:  Objection.

11 A  Just a random population?

12 Q  (By Mr. Raber)  Just a random population of adults in

13    the United States in that age range.

14 A  I can't answer that question.  There's no way.

15 Q  Okay.  Now, you understand that there was a DSMB for

16    the VIGOR study?

17 A  Yes, I do.

18 Q  And the DSMB saw the difference in the treatment

19    groups for cardiovascular events before the study was

20    over?

21 A  They saw, I think, A versus B.  They didn't know which

22    was which.

23 Q  But they saw that there was a difference?

24 A  Yes, they did.

25 Q  And they decided not stop the study?

1  A  Yeah, they did.

2          MR. BUCHANAN:  Objection.  Asked and

3     answered.

4  Q  (By Mr. Raber)  And is it your understanding that that

5     committee believed that the difference they were

6     seeing could be because of the cardiovascular

7     protective effect of one of the treatments?

8  A  I don't know what they believed.

9  Q  Have you seen documents that say that?

10 A  I've seen something that said something along those

11    lines, but I have no quotes directly from them that I

12    saw.  And I don't know if all the members believed

13    that or just some of the members or -- you know?

14 Q  Would you agree that the number of -- the overall

15    number of heart attacks in the VIGOR study was small?

16 A  Small compared to what?

17         MR. BUCHANAN:  Objection to form.

18 Q  (By Mr. Raber)  Compared to what you might expect in a

19    normal population?

20 A  No.

21 Q  .5 and .1 percent?

22 A  No.

23 Q  You think those are big numbers?

24 A  I don't have any opinion as to where they are, because

25    the selection criteria that puts people into clinical

1    trials selects a very unusual group of people.

2        First of all, the physician makes a selection on

3    the basis of what they think of the health of the

4    person.  There are selection criteria that are imposed

5    by the protocol.  And then there are volunteers.  And

6    that makes it a very, very select group.  And you

7    can't extrapolate from the general population to that

8    very select group about what the rates should or

9    shouldn't be.  It's really impossible to tell.

10  Q  I'm going to read you just a list of names from the

11    people, and I'll represent to you, these were members

12    of the advisory committee in February of 2001.  And I

13    just want to ask you whether you're familiar with any

14    of these folks.  Okay?

15        Nigel Harris from the Ohio School of Medicine?

16  A  Never heard of him.

17  Q  Leigh Callahan from the University of North Carolina?

18  A  Don't know him.

19  Q  James Williams from the University of Utah?

20  A  No.

21  Q  Janet Elashoff, Ph.D., adjunct professor of

22    biomathematics from UCLA?

23  A  I know Janet.

24  Q  What's her reputation as a scientist?

25  A  I don't have any idea.  I know her.  I don't know --

1    due to beneficial cardioprotective effects of naproxen

2    or pro-thrombotic effects of the agent, and leave it

3    at that, but basically we don't know the reason?

4        Do you recall reading that?

5  A  That sounds familiar to me.

6  Q  And that would be different from what your reaction

7    was to the VIGOR data; true?

8  A  Absolutely.

9  Q  And Dr. Nissen is a respected cardiologist?

10  A  He is.  But he didn't know the data I knew about in

11    terms of hypertension.

12  Q  Well, we're talking about the cardioprotective effects

13    of naproxen, not hypertension.

14  A  But hypertension is a major cause of cardiovascular

15    disease.  He may not have recognized that there was

16    this huge difference in hypertension, because Merck

17    didn't report it to them.

18  Q  You're saying Merck didn't report the hypertension

19    data to the advisory committee?

20  A  They did not.  They reported no analyses of the

21    hypertension data.

22  Q  But I think you told us this morning, you didn't

23    review any of the data of the pharmacological

24    information addressing whether or not naproxen is

25    cardioprotective.  True?

1  Q  Do you consider her to be a good scientist?

2  A  I don't know one way or the other.  I just haven't

3    reviewed her work.  She doesn't publish much in

4    statistics or biostatistics.  That much I know.

5        I wouldn't say she has a reputation as being a

6    leader in the field, by any stretch of the

7    imagination.

8  Q  David Wofsy, W-O-F-S-Y, M.D., from UC San Francisco?

9  A  Never heard of him.

10  Q  Stephen Nissen?

11  A  I know of Steve Nissen.

12  Q  Do you know of his reputation as a cardiologist?

13  A  No, I don't really.  I've seen papers by him, and he's

14    certainly written a lot.

15  Q  Have you read the transcript of the advisory committee

16    in February of 2001?

17  A  Yeah.  Several -- almost two years ago.

18  Q  And you're familiar with what Dr. Nissen said about

19    the data involving --

20  A  I don't remember what he said.

21  Q  Do you recall that he said that when proposing what

22    the label should say, he said, briefly, I think that

23    what I would say on the label is that there was an

24    excess of cardiovascular events in comparison to

25    naproxen, that it remains uncertain whether this is

1  A  That's correct, yes.

2  Q  Ileana Pina, P-I-N-A?

3  A  Never heard of her.

4  Q  Michael Wolfe from the Boston University School of

5    Medicine?

6  A  I don't think I know him.

7  Q  Allan Sampson, S-A-M-P-S-O-N, from the University of

8    Pittsburgh Department of Statistics, do you know him?

9  A  No.

10  Q  Frank Harrell, H-A-R-R-E-L-L, Ph.D.?

11  A  Yeah, I know Frank.

12  Q  Is he a good biostatistician?

13  A  Yeah, he is.

14  Q  Competent?

15  A  Yes.

16  Q  Knows how to analyze data?

17  A  Yes, he does.

18  Q  Byron, B-Y-R-O-N, Cryor, C-R-Y-O-R, M.D.?

19  A  No, don't know him.

20  Q  Sir, what's your opinion as to whether -- are you

21    familiar with something called the Bradford-Hill

22    criteria?

23  A  For epidemiologic studies?

24  Q  I don't know.

25  A  That's what they're for.

1   Q  Do you have an opinion as to whether the Bradford-Hill
2      criteria have any application to clinical trials?
3   A  They don't.
4   Q  Are there people who disagree with you on that?
5   A  I don't know.  I don't see why anybody would, but
6      there may be somebody out there who does.
7         I think maybe George Howard seems to.  I -- but I
8      don't know of anyone else who would.
9   Q  Do you know somebody named Poulter, P-O-U-L-T-E-R?
10  A  No.
11  Q  Do you know somebody named Hayes -- actually, do you
12     know a Dr. Furberg?
13  A  Yes.
14  Q  You respect him?
15  A  Yes, I do.
16  Q  You've worked with him?
17  A  Yes.
18  Q  Have you ever seen anything that he's written on this
19     question about interpreting the results of clinical
20     trials?
21  A  Yes.  He has a book on clinical trials, where he's the
22     coauthor of a book on clinical trials.
23  Q  Now, in looking to determine whether drugs are safe or
24     unsafe, one needs to do a risk/benefit analysis; true?
25  A  Yes, you should.

1   Q  And have you ever looked at the GI data regarding
2     Vioxx?
3   A  I've read the paper, yes.
4   Q  Have you ever analyzed the data to do a risk/benefit
5     analysis to compare GI benefits to --
6   A  No, I'm not really qualified to do that, because I
7     don't know how one -- how to assess whether the excess
8     MIs, hypertension, congestive failure, weigh out
9     versus the benefit in terms of bleeds.
10       I do know what the FDA reviewers said.  And they
11     said if you had to make a risk/benefit decision, you
12     would make it in favor of naproxen.  It was said by, I
13     think, Targum in her report.  But I'm not qualified to
14     make that...
15  Q  Okay.  I noticed in your reliance materials, that you
16     cited an article called "Cardiovascular Complications
17     of Cocaine Use," by Richard Lange.
18  A  That was just one of the articles I had -- I didn't
19     cite it.  I mean, I gathered a lot of articles, and I
20     was trying to find articles on -- to see if I could
21     find any drug that had a profile that was similar to
22     Vioxx.  And the only one I was able to find in the
23     literature was cocaine.
24  Q  What do you think of a cocaine user blaming Vioxx for
25     a heart attack?

1   A  I think it would be a rather strange thing.
2   Q  What do you think about someone who was never
3     prescribed Vioxx claiming that Vioxx caused a death?
4         MR. BUCHANAN:  Objection to form.
5         MR. TISI:  Yeah, objection to form.
6   A  I think that person would be dishonest.
7   Q  (By Mr. Raber)  What do you think about a claim by
8     someone who told a different court that something else
9     caused his heart attack, and then telling another
10     court that Vioxx caused his heart attack?
11         MR. BUCHANAN:  Objection to form.
12  A  I think that would be a -- someone who wasn't all
13     there.
14         MR. TISI:  Objection.
15  Q  (By Mr. Raber)  You've said in your report that you
16     felt that prior to 2002, the Vioxx label was
17     inaccurate and incomplete.
18  A  Yes.
19  Q  Have you seen any quotes or statements from the FDA
20     that disagree with your opinion on that?
21  A  I don't remember any in particular.
22         MR. BUCHANAN:  I thought you were
23     going home with all those folders.
24  Q  (By Mr. Raber)  I want to show you a document that has
25     already been marked as Defendants' Exhibit 133.  It's

1     called FDA WebView.
2         MR. BUCHANAN:  Counsel, is this an
3     FDA document?
4         MR. RABER:  I'm not sure what it is.
5         MR. TISI:  You're not sure what it
6     is?  I'm sorry; is that what you said?
7         MR. BUCHANAN:  Do you have an answer
8     for me?  I was just asking for a copy.
9         MR. RABER:  Yeah, I'll give it to
10     you in just a second here.
11  Q  (By Mr. Raber)  Have you ever seen Defendants' Exhibit
12     133?
13         MR. RABER:  It's already marked as
14     Defense Exhibit 133 for identification.
15  A  I have no idea what this is about.
16  Q  (By Mr. Raber)  In forming your opinions, did you
17     consider statements from people within the FDA on the
18     questions about which you have opinions?
19  A  I considered them.
20  Q  Do you see in Exhibit 133, it says, "DeLap told FDA
21     WebView 5/1 that the cardiac events data from the
22     VIGOR study that the agency has seen are preliminary,
23     and he is expecting more to be submitted shortly.  For
24     now, DeLap is convinced the product is labeled
25     appropriately."

1       Do you see that?

2  A  Yeah, I see that.

3  Q  Does that appear to you that Robert DeLap from the FDA

4     disagreed with your opinion?

5  A  Apparently.

6          (Discussion off the record.)

7

8  Q  (By Mr. Raber)  On Page 41 of your -- I'm sorry.

9     Never mind.

10     You said you're not a big fan of pooled analyses?

11  A  Yeah, I'm not.

12  Q  Can you use a pooled analyses to provide strong

13     evidence of causation?

14     Can you?

15          MR. BUCHANAN:  Objection to form.

16  Q  (By Mr. Raber)  Yeah.  Is it appropriate to do that?

17  A  It really depends.  It depends on the nature of the

18     studies.  If there are a lot of studies of very

19     similar designs, you know, they're well conducted,

20     then -- and, you know, that are fairly comparable,

21     then, yes.  It helps you to combine them to get an

22     overall better estimate.

23  Q  If the studies involved different doses, different

24     patient populations, and different durations, is it

25     appropriate to infer causation based on a pooled

277

1     analysis?

2          MR. BUCHANAN:  Objection to form.

3  A  I think it's a weak kind of inference to make under

4     those circumstances, based on pooled analysis.

5  Q  (By Mr. Raber)  Could you turn to Page 40 of your

6     report, please?

7  A  Sure.

8  Q  Do you see you referred to a pooled MI analysis of all

9     Merck trials?

10  A  Yeah, I do.

11  Q  And that pooled analysis involved studies of --

12     involving different patient populations?

13  A  Absolutely.

14  Q  Different dosages?

15  A  Absolutely.

16  Q  And in your report, you said that your pooled analysis

17     provides overwhelming evidence that rofecoxib causes

18     MIs.

19     Do you see that?

20  A  Yeah.

21  Q  That's a mistake, isn't it?

22  A  No, no, no.  Here, it is not.  Mainly because at this

23     point, the data is so -- you have all of the data now

24     from all of the studies, including APPROVe, including

25     VICTOR, including the VIp.  And now we're at the

278

1     significance level of the .00002 level, and now the

2     data is just completely overwhelming.

3     If you mean --

4          MR. BUCHANAN:  I'll object, Counsel.

5     If we're going to comment on my face, I'm going to

6     comment on yours.

7  A  If you were to try to say to me do I think that the

8     meta-analysis of MI that I did in the earlier part of

9     this report was weak in terms of the ability to make

10     inference, I'll agree with that, because the studies

11     involved are mostly these little, tiny studies of --

12     that were not long-term, they didn't have a large

13     number of people in them, and they varied all over the

14     place.

15     By this point in time, you have APPROVe, which is

16     a very large study; you have VIGOR, a very large

17     study; you have the Alzheimer's, which is a large

18     study; and then you have modest size studies in VIp

19     and VICTOR.  And the result is so dramatically large

20     in terms of the p-value, that there's overwhelming

21     evidence that it's causally related.

22     But you have to remember, there's -- one other

23     thing.  You have to remember that there are now, at

24     the time this is done, you have two major studies done

25     by Merck, both showing highly statistically

279

1     significant excess risk of MI.  You have VIGOR and you

2     have APPROVe.  That's enough by itself.  You don't

3     need anything else.  This just is sort of icing on the

4     cake, if you like.  It just shows that, gee, if you

5     include them all, every one, no matter how small, how

6     inadequate they were, you get this incredibly

7     significant result.

8     Yes, I think that's sufficient to say causality.

9  Q  (By Mr. Raber)  And the only one that anybody knew

10     about while the drug was on the market was VIGOR, of

11     all the studies you just mentioned; true?

12          MR. BUCHANAN:  Objection.  Form.

13  A  Well, eventually they knew about Alzheimer's, but --

14  Q  (By Mr. Raber)  But Alzheimer's does not show a

15     statistically significant increased risk for

16     myocardial infarction, does it?

17  A  No, but it shows a much worse outcome -- shows

18     statistically significant excess of death, which is

19     much worse.  I'd much rather have an MI than be dead.

20  Q  Now, when do you decide whether or not to use an

21     adjusted p-value versus an unadjusted p-value?  What

22     are the rules on that?

23  A  You mean in terms of adjusting for what?  What are you

24     talking about?

25  Q  Well, in your report, you talk about the Aisen,

280

1   A-I-S-E-N, paper dealing with Alzheimer's, and you
2   mention that the more appropriate p-value to use is
3   the unadjusted one.
4   A   Right.  Oh, in that context?
5   Q   Right.
6   A   I'm sorry.  I didn't know what the context was.
7       In the context of -- this was in the context of
8   Thal's discussion of the other results from other
9   studies.  And what he was trying to do was to say,
10  were there other studies that compared Vioxx to
11  placebo in Alzheimer's disease, that also showed an
12  excess risk of cognitive impairment.
13      And there was one.  And it specifically had data
14  on Vioxx and placebo, and it was an NIH-sponsored
15  study.  And it actually shows a statistically
16  significant difference in the comparison, the pairwise
17  comparison of Vioxx to placebo.
18      From that -- in that context, the relevant p-value
19  was the unadjusted, because there's only one contrast
20  that was of concern to Thal, and that was that
21  specific one.  He wasn't concerned with whether
22  naproxen caused a decline in functioning.  He was only
23  concerned with the one question.
24      Now, if you were concerned with the two questions,
25  then you might want to adjust.  Even that's arguable.

281

1       Many statisticians would not adjust for the
2   multiple comparisons in that case either.  I don't
3   have a strong position on that.
4   Q   Now, on Page 18 of your report, in the last paragraph,
5   you talk about the fact that you used MI as an
6   endpoint.
7   A   That's correct.
8   Q   And you say, "By using MI as the endpoint, my analysis
9   is not subject to the dilution effect due to including
10  in the composite endpoint, events that were not
11  associated with rofecoxib use."
12      Do you see that?
13  A   That's correct.
14  Q   And is it your opinion that by using the composite
15  endpoint, that that had the effect of diluting the
16  effect associated with Vioxx use?
17  A   Yes.
18  Q   What events within the composite endpoint had that
19  diluting effect --
20  A   I don't --
21  Q   -- specifically?
22  A   Probably stroke.  But I didn't specifically, you know,
23  look at the individual components of the APTC, since I
24  didn't think it was the right thing to use anyway.
25      Hemorrhage probably did, too, but I don't think

282

1   that Vioxx causes hemorrhages; more than naproxen
2   does, at least.
3                    MR. BUCHANAN:  Are you getting
4   close, Steve?
5                    MR. RABER:  Yeah.
6   Q   (By Mr. Raber)  And when you say would have a diluting
7   effect, it means the risk would be either not
8   significant or not high enough, and it would drag down
9   the higher risk of myocardial infarction --
10  A   That's correct.
11  Q   -- when you combine the two?
12  A   That's correct.
13  Q   Now, you criticize Merck for not including the -- a
14  discussion of hypertension or the congestive heart
15  failure results in the New England Journal publication
16  on VIGOR; true?
17  A   Yes, I did.
18  Q   Did you review any of the peer-reviewed comments back
19  and forth about the content of that article?
20  A   No, I didn't.
21  Q   Do you understand that there are page limits and word
22  limits that are imposed in various studies?
23  A   Yeah, but there's no reason not to report -- I mean,
24  in every clinical trial that I'm aware of, you always
25  report the AEs that were important, like hypertension

283

1   would have been, in a table.  And one of the few
2   papers I've ever seen that didn't do that was
3   Merck's --
4   Q   Are you aware of --
5   A   -- in their paper.
6   Q   -- of any guidelines or limitations with the New
7   England Journal of Medicine or other publications that
8   limit the number of tables that they'll allow in a
9   publication?
10  A   I know there are some, but that's not a hard-and-fast
11  thing.  They -- particularly for clinical trials, they
12  tend to be more liberal if there's important data that
13  needs to be presented.
14  Q   Do you know whether or not the New England Journal of
15  Medicine ever advised Merck in the peer-review process
16  that they needed to limit their number of tables to
17  five in the VIGOR paper?
18  A   I don't know what they told them.
19      I mean, I just had a paper published in the New
20  England Journal of Medicine on a clinical trial.  We
21  reported all the side effect data.  They didn't object
22  to that.  They would have objected if we hadn't.
23  Q   Well, wouldn't you agree, though, that studies have
24  different purposes and different hypotheses --
25  A   There's never a reason not to report the important

284

1    side effect data.  Never.

2  Q  Would you agree with me that when you have a small

3    number of patients that are still under observation

4    late in a study, that that can cause a large and

5    potentially misleading increase in event rates when

6    just a few events occur?

7  A  Oh, absolutely.  That's one of the reasons you use log

8    time in doing proportional hazards analysis.

9  Q  Or linear?

10  A  No.  That's the reason you use the log.  You don't --

11    that's a reason you don't use the linear.

12  Q  Okay.  You have no way of knowing whether any

13    physician was actually misled by anything that Merck

14    said about Vioxx; true?

15  A  Well, I know that Mr. Humeston's physician said he

16    was.

17  Q  Do you know --

18  A  But that's the only one I know specifically.

19  Q  You know what the jury thought of that; right?

20  A  No, I don't.  Not that particular thing, no.

21  Q  You know that the jury found for Merck in that trial?

22  A  I know they did, but I don't know what they thought of

23    that specific issue.

24  Q  My question to you is:  You have no way of knowing if

25    any physician was actually misled by Merck with regard

1    to Vioxx?

2            MR. BUCHANAN:  Objection.  Asked and

3    answered.

4  A  I don't know.  I already said what I knew.  I already

5    told you the answer to that.  The only one I know who

6    said he was misled was that particular physician.  I

7    don't know about any other physician.  I haven't

8    talked -- I haven't gone out and surveyed the

9    physicians in the United States to see if they were

10    misled or not.

11        Has Merck done that?

12        I'm sorry.  I shouldn't ask you questions.

13  Q  (By Mr. Raber)  Why would you ask me a question like

14    that?

15  A  I don't know.

16  Q  Late in the day?

17  A  I'm tired.

18            MR. BUCHANAN:  It truly is, Counsel.

19    That was a five-minute warning an hour ago.

20            MR. RABER:  Well, listen,

21    "Mr. Thirty-minute break, let's take ten minutes."

22            MR. BUCHANAN:  I think we've been

23    very accommodating.  The breaks have been few and far

24    between, and we're now at quarter of 6:00.  And we've

25    been very accommodating.

1            MR. RABER:  I'm going to be done

2    pretty soon here.

3            MR. BUCHANAN:  That's what I thought

4    an hour ago.  That's my point.

5            MR. RABER:  Dr. Kronmal, thank you

6    for your time.  I think that's all I have right now.

7            THE WITNESS:  You're welcome.

8

9

10                EXAMINATION

11    BY MR. BUCHANAN:

12  Q  Doctor, I just want to pick up with the last area of

13    inquiry by counsel concerning whether or not you're

14    aware of individual physicians having been misled

15    concerning data with Vioxx by Merck.

16        Apart from the doctor in the case that you heard

17    testimony on, the Humeston case, have you reviewed the

18    New England Journal of Medicine's Expression of

19    Concern?

20  A  Yes, I have.

21  Q  And who authored that?

22  A  The New England Journal of Medicine editors.

23  Q  What is your understanding of the concern they

24    expressed in the Expression of Concern?

25            MR. RABER:  Objection to form.

1  A  They basically said that they thought that Merck's

2    reporting was misleading and incomplete.

3  Q  (By Mr. Buchanan)  Okay.  Dr. Kronmal, I just want to

4    read to you from the New England Journal of Medicine

5    Expression of Concern.  I believe it's dated December

6    29, 2005.

7        The article states that, "Lack of inclusion of the

8    three events resulted in an understatement of the

9    difference in risk of myocardial infarction between

10    the rofecoxib and naproxen groups, presented in the

11    article as a reduction in the risk with naproxen but

12    shown here as an increase in the risk with rofecoxib.

13    It also resulted in the misleading conclusion that

14    there was a difference in the risk of myocardial

15    infarction between the aspirin-indicated and aspirin-

16    non-indicated groups."

17        Do you recall reading that language?

18  A  Yes, I do.

19  Q  Do you agree that the presentation of the data in the

20    original Bombardier article concerning the VIGOR trial

21    was misleading in its presentation of certain of the

22    risk data from the VIGOR trial?

23  A  Yes.

24            MR. RABER:  Objection to form.

25    Leading.

1  A   Not only do I agree with it.  I said the same thing in
2      my report prior to the New England Journal publication
3      of the Expression of Concern.
4  Q   (By Mr. Buchanan)  Okay.  You noted, I believe, that
5      you had read not only the Expression of Concern, but
6      also Merck's response, as well as the reaffirmation of
7      the Expression of Concern.
8          Do you recall that?
9  A   Yes.
10 Q   Do you recall reading the Expression of Concern?
11 A   Yes.
12 Q   The reaffirmed --
13 A   Yes, I did read that.
14 Q   In the reaffirmance, Drs. Curfman, Morrisey and
15     Dr. Drazen -- do you know who they are, by the way?
16 A   I do.  The editors of the journal.
17 Q   In the reaffirmance, the New England Journal commented
18     as follows:  "The authors state that these events did
19     occur during the trial, but did not qualify for
20     inclusion in the article because they were reported
21     after a pre-specified cut-off date for the reporting
22     of cardiovascular events.  This date, which the
23     sponsor selected shortly before the trial ended, was
24     one month earlier than the cut-off date for the
25     reporting of adverse gastrointestinal events.  This

289

1      just going to ask you, for purposes of the record, did
2      you bring with you today a hard drive that contained
3      what you consider to be your complete file in
4      connection with the reports generated for this
5      litigation?
6  A   Yes, I did.
7  Q   And --
8                  MR. RABER:  Let me jump in.  How do
9      we arrange to get that?
10                 MR. BUCHANAN:  I'll make a copy for
11     you.  Happy to.  Last time, defense trusted me to do
12     it accurately.  I mean, I can do it for you, if that's
13     fine with you.
14                 MR. RABER:  Okay.
15 Q   (By Mr. Buchanan)  Turning back to some of the recent
16     questions by Mr. Raber.
17         Have you examined the details of any specific case
18     regarding whether a patient was on Vioxx or not on
19     Vioxx?
20 A   No.
21 Q   Have you examined the detail of -- the detail of any
22     particular case as to whether a patient got Vioxx by a
23     prescription or by samples?
24 A   No, I didn't.
25 Q   You are aware that drug companies provide samples to

291

1      untenable feature of the trial design, which
2      inevitably skewed the results, was not disclosed to
3      the editors or the academic authors of the study."
4          Do you recall reading that?
5  A   Yes, I do.
6  Q   Do you agree that that type of information should be
7      disclosed -- withdrawn.
8          Should that type of information be disclosed in
9      journals in connection with the peer-review process?
10                 MR. RABER:  Objection to form.
11 A   Yes, it should be.
12 Q   (By Mr. Buchanan)  Should it be disclosed to the
13     non-company authors of company-sponsored clinical
14     trials?
15 A   Absolutely.
16                 MR. RABER:  Objection to form.
17 A   In fact, they're -- they have to sign something that
18     says that they've actually looked at all the data from
19     the study and know all of the statistical analyses and
20     how it was performed.
21 Q   (By Mr. Buchanan)  All right.  Just to get back to the
22     beginning of where we started today, you were asked
23     some questions about the notice and some materials
24     that you brought today.
25         I know we talked about it off the record.  I'm

280

1      doctors to provide to patients?
2  A   Yes.
3          Actually, I should modify that.  I saw at one
4      point in time, one of the cases that was in the South
5      somewheres, where there was an issue about whether or
6      not they got it by samples or by prescription or
7      things like that.  But I don't remember any of the
8      details.  And I wasn't involved in that case.  I just
9      happened to be asked about it.
10 Q   I understand.  And is it fair to say, sir, that you
11     don't know the particulars in any particular case
12     about whether a person may have gotten Vioxx by
13     samples or whether they got them from a prescription?
14 A   No, I don't know that.
15 Q   And anybody reading this transcript down the road
16     shouldn't interpret your testimony today to be a
17     commentary on whether somebody was likely to have
18     gotten samples or likely to have gotten the drug by
19     prescription or not at all?
20                 MR. RABER:  Objection to form.
21     Leading.
22 Q   (By Mr. Buchanan)  Can you answer, sir?
23 A   No, I don't know anything about that issue at all.
24 Q   I understand.  I just wanted to make sure the record
25     is clear.

292

1    There was also some commentary by you -- or,
2    actually, a question by Mr. Raber concerning, what do
3    you think of somebody who says in one court they had a
4    heart attack for one reason, and in another court,
5    they had it because of Vioxx.
6         Do you recall that question and answer?
7    A  Yes, I do.
8    Q  And I think you said something along the lines of,
9    "Well, I'd be concerned about whether they were all
10   there," or something.
11   A  Something like that.
12   Q  Fair to say that you haven't examined the
13   circumstances of any particular case as to why
14   somebody would make a claim concerning cause of their
15   heart attack in a particular case?
16         MR. RABER:  Object to form.
17   A  I have not examined any case in that regard.
18   Q  (By Mr. Buchanan)  Sitting here today, do you feel
19   comfortable providing an opinion as to why somebody
20   would say one thing in one court and a different thing
21   in a different court, depending on the circumstances?
22         MR. RABER:  Objection.  Leading.
23   A  I don't -- I have no idea what the circumstances were,
24   so how can I comment as to why they didn't or didn't
25   do it?  I don't know.

1    today, do you recall when Merck provided its initial
2    analysis of the VIGOR results to the FDA?  Was it
3    before or after 5/1/2000?
4    A  I don't remember, David, the exact date.  I just don't
5    know.  It was somewheres in that period.  I don't know
6    exactly when.
7    Q  Well, sitting here today, and looking at this
8    statement talking about whether it's premature to draw
9    conclusions from recent clinical trial and data on
10   Merck's arthritis drug, Vioxx, are you aware of
11   whether the FDA had even gotten Merck's preliminary
12   submission of Vioxx data as of this point in time?
13   A  I don't know when they got it.  I don't know.  It was
14   in that general period, but I don't know --
15         MR. RABER:  Objection.  You're going
16   to accuse me about asking a question without
17   foundation, and you ask that one?
18         MR. BUCHANAN:  Absolutely.  You
19   provided it in June, late June.
20         MR. RABER:  March 2000, pal.
21         MR. BUCHANAN:  False.  June 28,
22   2000, is when you filed your supplemental new drug
23   application --
24         MR. RABER:  Preliminary information
25   faxed on March 23rd and sent on --

1    Q  (By Mr. Buchanan)  I'd like to turn back to the FDA
2    WebView document.
3         First of all, do you have a copy of that?
4    A  No, I don't.  I can look at that one.
5    Q  Looking at the document, does it appear to be a
6    document like the FDA documents that you've looked at?
7    A  Well, it's not from the FDA.
8    Q  How do you know that, sir?
9    A  Because it has -- would have FDA.gov on it.  It would
10   say it's an FDA official document.  It doesn't say
11   that.
12   Q  In fairness, there's not a URL, so to speak, a Web
13   address?
14   A  No.  But it says Dickinson's FDA WebView, which is not
15   exactly how you would identify the FDA.
16   Q  This document is dated 5/1/2000.  Did you see that
17   date?
18   A  No, I didn't notice it.
19   Q  I'll direct your attention to that.
20   A  Yeah, I see that now.
21   Q  When did the VIGOR results, the preliminary VIGOR
22   results, come into the company?
23   A  I don't know.
24   Q  Do you recall, sitting here today -- and I realize
25   you've looked at a lot of things, but sitting here

1         MR. BUCHANAN:  I'll accept my
2    question.
3    Q  (By Mr. Raber)  Dr. Targum, you mentioned her earlier
4    today.
5    A  Yes.
6    Q  Who is she?
7    A  She's an FDA medical reviewer that was called in to
8    review the cardiovascular event rates in VIGOR.
9    Q  To your memory, was she a cardiologist?
10   A  I believe she was.  I don't know for certain.
11   Q  And did she prepare a memorandum concerning her review
12   of the VIGOR data?
13   A  Yes, she did.
14   Q  Did she suggest a warning for the drug?
15   A  I believe she did.
16   Q  That was after May of 2000?
17   A  I believe it was.
18   Q  And after Merck had submitted its supplemental -- I'll
19   represent, Merck submitted their supplemental new drug
20   application to the FDA concerning VIGOR in June --
21   A  I think it was close to December, I believe.  Wasn't
22   it?
23   Q  You were reminded, I think today, of some of your
24   earlier testimony -- it may have been in your
25   deposition -- concerning whether you, knowing what you

1   know about VIGOR, could have allowed the Alzheimer's
2   and APPROVe trials to go forward.
3       Do you recall that?
4   A   That's correct.
5   Q   Is that because you had different analyses in your
6   report than what were reflected in the New England
7   Journal of Medicine?
8           MR. RABER: Objection. Leading.
9   A   That's correct. I --
10  Q   (By Mr. Buchanan) Well, did you have different
11  information -- does your report contain different
12  information than the New England Journal of Medical
13  [sic] article concerning the VIGOR trial?
14  A   That's right, it does.
15          MR. RABER: Objection. Leading.
16  Q   (By Mr. Buchanan) Have you seen any evidence that
17  Merck presented the VIGOR data in the way you've
18  analyzed it in your reports, to the FDA, concerning CV
19  events?
20  A   No, they never presented it that way.
21  Q   Did you see them ever analyze the hypertension and
22  congestive heart failure data and present it to the
23  FDA or their advisory committee?
24          MR. RABER: Objection to form.
25  A   Not the hypertension. There was certainly in the

297

1   report, the congestive failure data.
2   Q   (By Mr. Buchanan) I want to turn now to Dr. Jnni's
3   article. There was some testimony about whether
4   Dr. Jnni had included the Alzheimer's trials in his
5   meta-analysis.
6       Do you recall that?
7   A   Yes, I do.
8   Q   I believe you testified that if you included the
9   Alzheimer's results, it would have pulled down the
10  relative risk, the global endpoint?
11  A   Yeah, slightly.
12  Q   Did you do any calculation to figure out how much it
13  would pull it down?
14  A   No.
15  Q   Do you have an opinion as to whether it would have
16  been a significant amount?
17  A   It wouldn't have been much.
18  Q   Now, did the Jnni analysis include data from the
19  chemo prevention trials?
20  A   No. They weren't done yet.
21  Q   Do you know what the chemo prevention trials are?
22  A   Yes. APPROVe, VICTOR, and VIp.
23  Q   Was the relative risk for MIs greater in the APPROVe
24  trial than in the Alzheimer's trial?
25  A   Yes, it was greater.

298

1   Q   And again, the APPROVe data was not in the -- included
2   in the Jnni article?
3   A   No, they were not.
4   Q   While we're talking about APPROVe, I want to talk
5   about the APPROVe extension. We talked about that a
6   little bit this morning.
7   A   Right.
8   Q   And Mr. Raber highlighted the -- had you look at the
9   printed report and some printed tables concerning MIs,
10  and I think maybe even sudden death.
11      Do you recall that?
12  A   Yes, I do.
13  Q   Your testimony earlier today was, you calculated the
14  relative risk, I believe, from a data file. Is that
15  right?
16  A   That's correct.
17  Q   The data file from data Merck gave you?
18  A   Yes. Well, through you, obviously.
19  Q   They gave it to me; I gave it to you?
20  A   Right.
21  Q   Have you since -- and prior to preparing your report
22  on the APPROVe extension data, had you received a
23  supplemental production of APPROVe data?
24  A   Prior or after?
25  Q   I'm asking whether -- before you prepared your report,

299

1   the addendum to your report, had you received more
2   recent APPROVe data?
3   A   Not at that time, no.
4   Q   Did you, at some point in time, receive more recent
5   APPROVe data?
6   A   Yeah. Within about the last week or so.
7   Q   And your extension [sic] is not based on that?
8   A   No, it's not.
9   Q   Excuse me. Your addendum is not based on that?
10  A   No, it's not. I didn't have time.
11  Q   Do you intend to review that data?
12  A   Now I certainly do, yes.
13  Q   Do you intend to determine whether or not the results
14  from the new data set are different from the results
15  generated from the old data set?
16  A   Yeah, absolutely.
17  Q   A couple quick questions. And I'm sorry to hop
18  around.
19  A   That's okay.
20  Q   My notes are not the best organized.
21      I'd like to turn back to VIGOR, and specifically
22  the death issue.
23      Did the prior report, the report you disclosed in
24  connection with the New Jersey proceedings back in
25  April of 2005, contain a discussion of the 15 versus

300

1      22?

2   A   Yes.

3   Q   And the death information that was contained in the

4      old report, was that the same as what you reflected in

5      the new report for the VIGOR trials?

6   A   Exactly the same.

7   Q   Let's turn now briefly to Alzheimer's.  Okay?

8        There was some discussion this morning about the

9      078 trial and whether -- what information was given to

10      the FDA in particular with regard to the 078 trial.

11        You referenced an analysis that was conducted in

12      April 2001.  And I just want to be clear for the

13      record, what were you referring to about an analysis

14      conducted for ITT information from 078 in April 2001?

15   A   I was referring to the Chen memos.

16   Q   And who is Chen?

17   A   Chen is a statistician who works for Merck who was

18      asked by Merck physicians to do analyses of the

19      survival data, the mortality data, from 091, 078.  And

20      he did both an ITT and an on-drug plus 14 day

21      analyses.

22   Q   And when you testified earlier that Merck didn't give

23      certain of the mortality analyses to the FDA for 078,

24      what were you referring to?

25   A   I was basically referring to what Chen did; or if it

1      was later on, an update to that information.

2   Q   I want to turn now to some testimony you gave with

3      regard to the APPROVe graphs over time, talking about

4      this 18-month hypothesis.  Okay?

5        I believe you testified that you wouldn't expect

6      to see statistical significance in terms of the

7      difference between cardiovascular events in one

8      treatment arm for APPROVe versus the other treatment

9      arm in a short period of time in a study.

10        Do you recall that?

11   A   Yes.

12   Q   Now, why is that?

13   A   Well, if you -- if you limit yourself to, say -- say

14      as an example, suppose you only went one day into the

15      study, and suppose the risks were five times as large

16      in one treatment arm versus the other.  That doesn't

17      mean you're going to get an event in one day in either

18      group.  So you might get zero versus zero.  And if you

19      go to two days, it may still be zero versus zero;

20      nonsignificant.

21        Maybe you go to a month and it's three versus one.

22      Still not significant.

23        Maybe you go two months, and it's now nine versus

24      two.  Marginally significant.  And you go out.  And

25      the further you go out, the events cumulate.

1        And as your sample size in terms of events gets

2      larger, then the statistical significance gets larger,

3      And that's basically the reason you don't do analyses

4      looking at a specific time points.

5        If you have a constant excess risk associated with

6      one treatment or another, the longer you wait, the

7      more significant it will become.  And the shorter time

8      period you look at, the less significant it will

9      become.

10        That's just algebra.  It doesn't even require any

11      statistics.  The number of events is proportionate to

12      the amount of time that people are at risk and the

13      number of people at risk.  The longer the risk period

14      is, the more events.  The more events, the greater

15      statistical significance given that there's a

16      difference.

17   Q   So based on your review of the APPROVe data, for

18      somebody that had -- if you wanted to know, for

19      example, at a particular point in time, what the

20      relative risk was, what's the best estimate of the

21      relative risk, say at a year?

22   A   It's the overall global relative risk.  That is the

23      only reliable estimate of the relative risk that you

24      have, is the relative risk over the whole time period.

25   Q   I want to turn now to some testimony you gave on

1      DSMBs.

2        To be clear, you know, when there's a DSMB, whose

3      responsibility is it to look out for patient safety

4      with a study drug?

5             MR. RABER:  Objection to form.

6   A   It's the DSMB's responsibility.

7   Q   (By Mr. Buchanan)  In those instances where you've

8      been involved with DSMBs that have recommended

9      stopping the trials, who makes the recommendations to

10      stop the trial:  the FDA or the DSMB?

11   A   The DSMB makes the recommendation.

12   Q   Okay.  That's fine.

13        There was some testimony earlier today about the

14      inclusion of your CHD endpoint.  Do you recall that?

15   A   Yes.

16   Q   I should be more specific.  You used an endpoint

17      called hard CHD?

18   A   That's correct.

19   Q   And that is what?

20   A   It's sudden death and myocardial infarction.

21   Q   And I think you testified you treated sudden cardiac

22      deaths the same way you treated MIs for purposes of

23      that analysis.  Correct?

24   A   I included them in the analyses, yes.

25   Q   Is a sudden cardiac death the same thing as a heart

```
 1   attack?
 2   A   Heart attack in its global, you know, everyday use,
 3       you would include a sudden death as called a heart
 4       attack.
 5   Q   Let me ask you this:  Is a sudden death the same thing
 6       as a myocardial infarction?
 7   A   It is not the same thing, no.  It is an arrhythmia.
 8       And arrhythmic death may or may not be accompanied by
 9       an MI.  It may be preceded by an MI.  May even be
10       followed by an MI.  Typically, though, MIs are the
11       triggering event for a sudden cardiac death.  But that
12       is not always the case.  There is sometimes
13       arrhythmias that occur through some sort of fault in
14       the electrical system of the heart, that is
15       unconnected to an MI.
16   Q   So if we're doing, you know, more likely than not, if
17       we're just asking more likely than not --
18                   MR. RABER:  Excuse me.  David.  If
19       you're going to go into this and turn him into a
20       cardiology expert, we're going to go a long time and
21       this is not going to be at the end of your deposition.
22       This is well beyond the scope.
23                   MR. BUCHANAN:  It's well --
24                   MR. RABER:  If you're going to ask
25       him on a more likely than not about cardiology and
```

```
 1   cause of death --
 2                   MR. BUCHANAN:  No.  I'm going the
 3       opposite way.  It's a very direct question.
 4   Q   (By Mr. Buchanan)  In terms of more likely than not,
 5       in your experience in cardiac literature, et cetera,
 6       when you see a sudden death, is that presentation more
 7       likely or less likely to be secondary to a heart
 8       attack -- excuse me -- an MI?
 9   A   The majority of sudden cardiac deaths are preceded by
10       MIs.  That's just a statistic.  It's not a medical
11       decision.
12                   MR. RABER:  The majority of what?
13                   THE REPORTER:  "Sudden cardiac
14       deaths."
15                   THE WITNESS:  Are proceeded by an
16       MI.
17   Q   (By Mr. Buchanan)  Do you know what that statistic is?
18   A   No, not exactly.
19   Q   I'd like to turn briefly now to the Thal article.
20       There is a lot of testimony on this issue, and I won't
21       characterize it, but I'm not exactly clear if the
22       answer is clear.
23           Is there anywhere in the Thal article that says
24       that the deaths, in reporting the deaths, they were
25       using investigator reported deaths?
```

```
 1   A   There is no such notation.
 2                   (Discussion off the record.)
 3                   (Recess 6:08-6:12 p.m.)
 4
 5
 6                   EXAMINATION (Continuing)
 7   BY MR. BUCHANAN:
 8   Q   Doctor, there was some testimony earlier regarding
 9       statistical significance and how you interpret
10       nonsignificant effects.
11           Do you recall that?
12   A   Yes.
13   Q   Can nonsignificant findings from clinical trials be
14       important to assessing safety issues?
15   A   Yes.
16                   MR. RABER:  Objection to form.
17   Q   (By Mr. Buchanan)  In your role on DSMBs, do you
18       require statistically significant findings on safety
19       issues before taking action?
20   A   No.
21   Q   And have you taken action in your role as a DSMB
22       member in the face of nonsignificant findings?
23   A   Well, one of the trials, as I say, was very marginal.
24       It was right on the boundary of .05.
25           The other one, I don't remember whether it crossed
```

```
 1   it.  It was close.  It might have crossed it.  It
 2   might not have.
 3   Q   And with that, you're referring to mortality issues?
 4   A   Yes, primarily.
 5   Q   There was some talk earlier today about five-oh and
 6       six-oh, and what that tells you about whether
 7       something is statistically significant or not.
 8           Do you recall testifying about that?
 9   A   You mean five versus zero and six --
10   Q   Five versus zero and six versus zero.  Do you recall
11       that?
12   A   Yes.
13   Q   When you were discussing the five versus zero, I think
14       you stated that that wouldn't be particularly
15       concerning.  And I want to know why that is.
16   A   Well, I didn't say it wouldn't be particularly
17       concerning.  I just think it wouldn't reach the level
18       that you would -- that you would necessarily take any
19       significant action based object it.  Because -- it
20       wouldn't reach statistical significance, because when
21       it was one of many endpoints, and, you know, you
22       expect to see some imbalances when you look at a lot
23       of endpoints.
24           An example is, there was one trial I was on the
25       monitoring board, and we had seven cases of breast
```

1  cancers versus none in the two treatment arms.  And we
2  wondered about it.  We asked the company to look at
3  all the other trials they had to see if they had seen
4  any breast cancer excess, but we didn't stop the trial
5  on the basis of that, because it was one of many
6  endpoints.  It could have been, you know, out of
7  balance.  And by chance, you expect some to be.
8  Q  Okay.  Doctor, I want to follow up with you on some
9     questions you were asked about the relative risk or
10    the excess risk for heart attacks that was seen in the
11    VIGOR trial.  Okay?
12 A  Mm-hm.
13 Q  Do you recall discussing the five-to-one difference
14    between heart attacks on Vioxx versus naproxen in the
15    VIGOR today?
16 A  Yes, sir.
17 Q  I know we talked about it, and you discussed it with
18    Mr. Raber in a lot of different ways.
19       I think you were asked whether a five-to-one risk
20    difference between Vioxx and naproxen would be obvious
21    that there's an issue between the two from a relative
22    risk perspective.
23       Do you recall that?
24 A  Yes.
25 Q  What is the data in the Bombardier paper presented to

1  show an increased risk on Vioxx or a decreased risk on
2  naproxen?
3  A  It was given as a decreased risk associated with
4     naproxen.  They showed a .2 relative risk, where
5     naproxen was basically a numerator and Vioxx was a
6     denominator.
7  Q  In your opinion, is a relative risk of .2 an obvious
8     presentation of an increased risk of heart attack on
9     Vioxx as compared to naproxen?
10        MR. RABER:  Objection to form.
11 A  As I said in my report, it was extremely unusual to
12    report a relative risk for an experimental agent
13    against an agent that has been in use for 20 years,
14    with the experimental agent in the denominator and the
15    widely-used 20-year-old drug in the numerator.
16        And, you know, most unsophisticated people, as a
17    lot of physicians are about reading these papers,
18    would not readily pick up that a .2 relative risk is a
19    fivefold increased risk.  Put the other direction,
20    that doesn't mean they couldn't.  And certainly the
21    more sophisticated reader would certainly pick up on
22    that.  But it's unusual.  It's a very unusual
23    presentation.  I can't remember ever seeing that done.
24 Q  Thank you.
25        I'd like to direct your attention to the article

1  itself, sir.  I'll read this sentence, the portion I
2  want to focus on.  The article stated, "The difference
3  in the rates of myocardial infarction between the
4  rofecoxib and the naproxen groups was not significant
5  among the patients without indications for aspirin
6  therapy, a secondary prophylaxis."
7     Do you know what that's referring to?
8  A  Yes.  It was that they divided up people into those
9     that potentially should have been on aspirin versus
10    those who had no indication for aspirin.
11 Q  And when the company included -- excuse me.  When the
12    additional three MIs that were identified after the
13    publication of the Bombardier article -- excuse me.
14    Withdrawn.
15        With the inclusion of the additional three MIs,
16    does the relative risk change in the aspirin-indicated
17    population?
18 A  Yes.  It's larger.
19 Q  Were those -- excuse me.  I believe it's the aspirin-
20    not-indicated population.  Let me rephrase the
21    question, Doctor.
22        With the inclusion of the additional three events
23    in the non-aspirin-indicated population, does the
24    relative risk increase between Vioxx and naproxen?
25 A  Yes, it does.

1  Q  That, of course, was not in the paper?
2  A  That's correct.
3  Q  There was some testimony earlier, I think it was a
4     hypothetical that Mr. Raber presented to you, talking
5     about -- or asking you what conclusions you can draw
6     in studies where you're not comparing -- where you're
7     comparing two active agents rather than an active
8     agent versus a placebo.
9        Do you recall talking about that?
10 A  Yes, I do.
11 Q  In the VIGOR trial, there was no placebo; correct?
12 A  That's correct.
13 Q  There were two active agents?
14 A  That's correct.
15 Q  And you were asked about what conclusions you can draw
16    from a difference in the frequency of events in one
17    arm of an active agent versus those in another arm;
18    correct?
19 A  That's correct.
20 Q  Now, if the difference is quite large, a large
21    relative risk difference, does that provide
22    information to you in assessing risk about the target
23    drug in an active versus inactive comparative trial?
24        MR. RABER:  Objection.  Leading.
25 A  It provides some information, yes.

1  Q  (By Mr. Buchanan)  What if one of the comparators was
2     well-known and well understood?  Does that add to the
3     understanding in the difference in relative risks?
4  A  Yes, it does.  In fact, the issue, of course, that was
5     framed by Merck was that naproxen was equivalent to
6     aspirin and would have the same effect on reducing the
7     risk that aspirin would.
8        There was substantial data at that point in time
9     on what the benefits of aspirin are in cardiovascular
10    prevention of MI and in other cardiovascular events.
11    And roughly, that reduction is about .33.  About a 33
12    percent reduction at maximum.
13 Q  Okay.
14 A  And the data from the VIGOR study for the excess risk
15    seen with Vioxx was not consistent with that on a
16    statistical basis.  The data was sufficient to rule
17    out that naproxen was an equivalent to aspirin.  It
18    would have to have been much better than aspirin.
19        MR. RABER:  Objection.
20    Nonresponsive.
21 Q  (By Mr. Buchanan)  I'm going to turn back to the
22    actual -- did you conduct a statistical analysis of
23    the data from the VIGOR trial to determine whether or
24    not there was statistical support for the naproxen
25    hypothesis that Merck would hold?

1  A  I did.
2  Q  And what did you conclude when you did that?
3  A  I concluded that there was not.
4  Q  I want to read you a statement, sir.  It's from
5     Dr. Villalba.  I believe it's from the 2001 advisory
6     committee, concerning naproxen explanation.
7        The statement is, "Therefore, it is not very
8     convincing to us that this is the whole explanation,
9     and there are no controlled studies of naproxen versus
10    placebo for cardiovascular prophylaxis."
11       Did you read the transcript, by the way?
12 A  Yes, I did.
13 Q  Do you agree with that statement --
14 A  Yes.
15 Q  -- as of that point in time?
16 A  Yes.
17 Q  And how about as of today?
18 A  It's -- well, today, there's the ADAPT study.  And the
19    ADAPT study was stopped.  It was a study of naproxen
20    versus placebo.  There is the first -- actually, the
21    first large placebo-controlled trial of naproxen, and
22    it was stopped early because they had seen an excess
23    risk of CV events in the naproxen group.
24       I think that data basically is now the only --
25    really the only clinical trial they did, that I know

1     of.  And it goes the wrong direction.  It really
2     contradicts the naproxen hypothesis.  It makes it very
3     untenable, really.
4  Q  Now, does that data mean that Vioxx and naproxen have
5     the same risk of cardiac events?
6  A  No, no, because we already know from VIGOR that they
7     don't; that Vioxx has a much greater increased risk.
8     And actually, the ADVANTAGE shows the same thing,
9     which is also a naproxen-controlled clinical trial.
10       MR. RABER:  I'm sorry, can I hear
11    that answer back again?
12             (Answer on Page 315,
13             Lines 6 through 9,
14             read by the reporter.)
15
16 Q  (By Mr. Buchanan)  I want to turn now to some
17    questions you were asked by Mr. Merck -- not
18    Mr. Merck.
19       MR. BUCHANAN:  There you go, Steve.
20    Getting late for all of us.
21 Q  (By Mr. Buchanan)  I want to turn back to some some
22    questions you were asked by Mr. Raber about what Merck
23    believed and the FDA believed.
24       Do you remember being asked questions along those
25    lines?

1  A  Yes.
2  Q  At any point in time, do you know what Merck believed
3     about anything with the drug?
4  A  No, I don't really know what they believed.  I know
5     what they said and what they did.  I don't know what
6     they believed.
7  Q  And how about the FDA?  At any point in time, do you
8     know what the FDA believed versus --
9  A  No.  The FDA is not one person, of course.  And there
10    were many people in the FDA who were very worried
11    about Vioxx.  So I don't know what anybody believed,
12    per se.
13 Q  My question is:  The conclusions that you've drawn,
14    though, about the safety or the risks with Vioxx, do
15    you draw that from data that you've looked at or
16    things people have said?
17 A  It's from the data I've looked at.
18 Q  You were shown an article.  I don't know if I actually
19    looked at the article, but it was one that was done, I
20    believe, by you, perhaps some point in the '90s, an
21    aspirin plus prostacyclin plus an aspirin study?
22 A  Yeah.  It's a prostacyclin-sparing aspirin formulation
23    combined with with heparin/warfarin versus aspirin
24    alone with warfarin.
25 Q  First of all, what was your role in the study?

1 A  I was sort of a consultant to the study. I wasn't
2    directly involved in it. I was more a consultant.
3 Q  Okay. And what was your focus?
4 A  Mostly on getting the data in good shape. We had a
5    little consulting activity going on with various
6    investigators. And this particular investigator knew
7    us from another study, and asked us if we would handle
8    the data management for his study. And we did so.
9        And I provided a little statistical input to him
10   too.
11 Q  Just so the record is clear on this, you don't
12   consider yourself to be an expert in prostaglandins,
13   do you?
14 A  No, I don't.
15 Q  You were asked a question earlier today with regard to
16   a statement you made on Page 13 of your report. It
17   was about whether or not the additional events, the
18   additional heart attacks that were discussed in the
19   Expression of Concern, affected the relative risk.
20       Do you recall that?
21 A  Yes, I do.
22 Q  Did the additional events -- and you state in this
23   paragraph here, first, as pointed out by the NEJM, the
24   additional events do in fact change the results in a
25   meaningful way because there is a difference in the

1    magnitude of the relative risk.
2        And the magnitude in relative risk is, what, .4 to
3    .5?
4 A  Mm-hm.
5 Q  A statistical significance, what do you mean by that?
6 A  I mean that p-value become more significant.
7 Q  Okay. And the interpretation of the subgroup in which
8    the events occurred, what are you referring to?
9 A  That was the aspirin indicated or not.
10 Q  And again, the relative risk changed?
11 A  Yes.
12 Q  You were reminded, I think, earlier today about an
13   error I think you identified or an oversight in your
14   first report in April 2005, about something relating
15   to MIs in the April -- in the April 2002 label.
16       Do you recall that?
17 A  Yes, I remember that.
18 Q  In connection with preparation of your new report, did
19   you review your section on labeling?
20 A  Yes, I did.
21 Q  And did you correct that error?
22 A  I believe so. I'd have to look.
23 Q  Take a look.
24 A  I thought I had corrected the statements about trend
25   too. I missed one. So I can't -- what page is it?

1 Q  I think it's towards the end.
2 A  I'm not sure. I say, in particular, prior to -- oh,
3    prior to 2002, the rofecoxib -- well, you say -- I
4    don't know what -- oh, prior to 2002, I said. Okay.
5        Oh, no, it is corrected. Yes.
6 Q  Okay.
7 A  Yes, it's corrected.
8 Q  All right. I want to turn now to what was identified
9    as Kronmal Exhibit 9. This was the mystery table,
10   Table 5, Incidence of Serious Adverse Events After
11   Randomization.
12 A  Right.
13 Q  Could you look at that, please?
14 A  Yes.
15 Q  Just so the record is clear, based on the chart --
16   okay? -- if someone was just reading the transcript,
17   based on the chart, do you know what the therapies are
18   that were tested against placebo?
19 A  No, I don't.
20 Q  Based on what's reflected on control Exhibit 9, can
21   you tell us anything about -- do you know what the
22   primary endpoint of the trial was?
23 A  No, I don't.
24 Q  Do you know anything about the patient population?
25 A  No, I don't.

1 Q  Do you know anything about the duration of the trial?
2 A  No, I don't.
3 Q  Do you feel comfortable making conclusions about the
4    safety of two different doses of a drug from a trial
5    you don't know anything about?
6        MR. RABER: Objection. Leading.
7 A  Well, I said the same thing earlier. I don't think
8    you can come to much in the way of any conclusions on
9    this, except to be a little concerned. I think there
10   should -- you know, seeing this data cold, without
11   knowing anything about the details, you know, five
12   versus one of myocardial infarction, five versus zero
13   in stroke, would be reason for concern.
14 Q  (By Mr. Buchanan) And when you looked at the Vioxx --
15   when you did your Vioxx analysis, did you examine the
16   patient populations that were being looked at?
17 A  Yes.
18 Q  Did you look at the length of the studies?
19 A  Yes.
20 Q  Did you consider the size?
21 A  Yes.
22 Q  Did you consider the study designs?
23 A  Yes.
24       MR. RABER: We are past ten minutes,
25   just FYI.

1                   MR. BUCHANAN:  I wish I reminded you

2  throughout the day as we were passing marks.

3                   MR. RABER:  I never made any time

4  promises.

5                   MR. BUCHANAN:  I should have.

6  That's my fault.  You did go long.

7  Q  (By Mr. Buchanan)  Quick question.  Mr. Raber put the

8    book away, but I think he pulled out a book that you

9    referenced in connection with your testimony at trial

10    in an earlier Vioxx proceeding.

11    Do you recall that?

12  A  Yes.

13  Q  Something entitled "How to Lie with Statistics."

14  A  Right.

15  Q  Sir, you did an extensive analysis that included a lot

16    of statistical analyses; correct?

17  A  Yes.

18  Q  Did you lie with statistics when doing that analyses?

19  A  No.

20  Q  Let me be more particular there.  In doing your

21    analysis, did you use standard statistical methods?

22  A  Yes, I did.

23  Q  And standard statistical tests?

24  A  Yes, I did.

25  Q  Did you consider the type of data that you would

1    consider if you were examining the safety of this

2    particular drug, Vioxx, say on a DSMB?

3  A  Yes.

4  Q  Same type of data that you would consider in your

5    day-to-day practice, if exposed to it?

6  A  Yes.

7  Q  Did you apply these methods to this data in the way

8    you would ordinarily do so?

9  A  Yes.

10                   MR. RABER:  Objection to form.

11    Leading.

12  A  Yes, I did.

13  Q  (By Mr. Buchanan)  Doctor, I just want to ask you

14    quickly.  Merck recently issued a press release about

15    the method through which it did its post hoc 18-month

16    analysis, whether there was a different risk in the

17    first 18 months versus the later 18 months.

18  A  Yes, they did.

19  Q  You saw that press release?

20  A  Yes, I did.

21  Q  When they had done -- when they presented the data

22    previously, do you recall whether the manner in which

23    they presented it reflected a linear time risk or a

24    log time?

25  A  They said it was log time.

1  Q  And do you know what was called for by the protocol?

2  A  It was log time.

3  Q  And in fact, Merck has since advised the public that

4    they didn't use log time; correct?

5  A  They reported the p-value -- the statistical

6    significance, "P" as in Paul, p-value statistical

7    significance based on a linear test, though the paper

8    says it was based on log time.

9  Q  Accepting that it was a post hoc analysis to begin

10    with, is there even any statistical -- any statistical

11    evidence using Merck's pre-specified endpoint that

12    there's a difference in the risk in the first 18

13    months and the later 18 months?

14                   MR. RABER:  Objection to form.

15  A  The test that was pre-specified, it was a test for

16    proportional hazards.  And that test was not rejected

17    based on the log time test, indicating that it did

18    not -- there was not statistically significant

19    evidence that there was in fact a difference in the

20    risks across time.

21  Q  (By Mr. Buchanan)  Okay.

22  A  The relative risks across time.

23  Q  Doctor, I want to turn quickly -- you were presented

24    with an article about intention-to-treat analysis.

25    Do you recall that?

1  A  Yes.

2  Q  And I think it was written by some folks at the

3    University of Washington.

4  A  Mm-hm.

5  Q  I think your initial reaction was something that the

6    article was absurd.  Or I can't remember your exact

7    word.

8  A  I didn't really read it.

9  Q  Did you understand -- what was your understanding,

10    when you were presented with the article, as to what

11    you were --

12  A  Well, when I first was presented, I thought this was

13    an article that said you shouldn't do intent-to-treat

14    analyses.  And that was not the case, actually.  It

15    was just simply trying to make the case that there are

16    occasions where you need to be very cognizant of the

17    on-drug experience.  And that's something that I agree

18    with.

19    Now, I -- my own view is that you could never do

20    on-drug without also doing ITT, intent-to-treat

21    analyses, and that you have to look at them both in

22    context.  And one without the other is not going to

23    tell you a reasonable answer.

24    And the final thing, before you stop that -- I

25    don't mean to lecture -- but is that the ITT is the

1  only unbiased assessment of risk in a clinical trial.
2  The on-drug analyses is always subject to the strong
3  potential for bias.
4  Q  (By Mr. Buchanan)  What do you mean by that?
5  A  Well, I mean, the best way to explain it is an
6  illustration, really.  And that is, suppose you're
7  looking at a drug that has a side effect -- oh, let's
8  say bleeding ulcers.  That's a side effect you're
9  concerned with.  And that drug also causes people to
10  become nauseous early on in the study.  And so the
11  people who are most likely to get bleeding ulcers are
12  also much more likely to get nauseous.  And the nausea
13  causes those people to drop out of the study.
14      So now all the people that were susceptible to a
15  bleeding ulcer are gone from the study.  They've all
16  dropped out.  So all you have left are people who
17  would never, under any circumstances, get a bleeding
18  ulcer in the one treatment arm.
19      The other treatment arm doesn't cause nausea, so
20  you're going to get people in there who are high risk
21  for getting bleeding ulcers, and they do.  So now you
22  compare the two groups and you find, lo and behold,
23  that the drug that caused people to drop out has less
24  risk than the drug that didn't cause people to drop
25  out.  And it's only because the drop-outs are

325

1  different from the people who stayed in the study.
2      And that's not uncommon.  It's -- and it's one of
3  the reasons you have to do intent-to-treat, is because
4  as soon as you deviate from intent-to-treat, there's
5  some kind of selection going on based on patient
6  characteristics, and people can stay in the trial in
7  one treatment arm may be very different than people
8  who stay in, in the other.  And the two groups are no
9  longer comparable.
10  Q  Doctor, quickly, just another statement from the
11  article, or at least one that I'd like to read to you.
12      The article states in the first column, second
13  paragraph, "Most statisticians, notably those at the
14  United States Food and Drug Administration, believe
15  the primary analysis of a randomized clinical trial
16  should compare patients groups according to random
17  assignment.  Statisticians call this intention-to-
18  treat analysis or analysis as randomized."
19      Do you agree with those statements?
20  A  Yes, I do.
21  Q  You were asked some questions earlier today about
22  what's been referred to as a CV SOP.  Do you recall
23  that?
24  A  Yes.
25  Q  To your understanding, sir, was there a data analysis

326

1  plan for analyzing events that had been adjudicated
2  pursuant to the CV SOP as of the time the VIGOR trial
3  concluded?
4  A  As far as I know, there was no such plan.
5  Q  Was there a data analysis plan as of the time the
6  VIGOR trial concluded, that specified grouping
7  individual event endpoints into an APTC endpoint at
8  the time of VIGOR?
9  A  No, there was not, to the best of my knowledge.
10  Q  Have you seen anything to support the contention that
11  Merck had pre-specified an analysis across all trials
12  using the APTC endpoint prior to the conclusion of
13  VIGOR?
14  A  No, I have seen no such document.
15  Q  How about prior to combining the Alzheimer's trials in
16  March of 2000?
17  A  No, there was nothing I've seen.
18  Q  Now, sir, I think you testified that you had reviewed
19  the February 2005 advisory committee vote.
20  A  Yes, I did.
21  Q  You reviewed the advisory committee transcripts.  Do
22  you recall that?
23  A  Yes, I did.
24  Q  Do you recall looking at the actual vote of the
25  advisory committee members on specific questions?

327

1  A  I've seen what it was.
2      MR. RABER:  Are you talking April of
3  '05 or February of '01?
4      MR. BUCHANAN:  Did I say April of
5  '05?  That's my fault.  I meant February '05.
6      MR. RABER:  I didn't ask him about
7  '05.
8      MR. BUCHANAN:  Well, I'll ask him.
9      MR. RABER:  So he's remembering
10  something we didn't talk about?
11      MR. BUCHANAN:  I thought you did ask
12  about the '05 advisory committee.
13  Q  (By Mr. Buchanan)  Do you recall the FDA taking a vote
14  of the advisory committee members of February of 2005?
15  A  Yes, I do.
16  Q  And did they vote 32 to nothing that Vioxx increased
17  cardiac hazard?
18  A  I believe they did, yes.
19  Q  Do you agree with the vote of that advisory committee?
20  A  I do.
21  Q  To your understanding, was the advisory committee in
22  2005 presented with evidence of the ITT mortality
23  information from the Alzheimer's trials?
24  A  They were --
25      MR. RABER:  Objection.

328

1  A  They were not presented with that data.

2  Q  (By Mr. Buchanan)  Doctor, I just want to be clear.

3     Apart from the questions that you were asked and a

4     couple clarifications you made with respect to your

5     report, do you continue to hold the opinions that you

6     expressed in your report?

7  A  I do.

8  Q  And do you hold those opinions to a reasonable degree

9     of scientific probability?

10 A  I do.

11          MR. BUCHANAN:  Thank you.  I have no

12     further questions.

13

14

15                  FURTHER EXAMINATION

16 BY MR. RABER:

17 Q  Sir, how did the advisory committee vote on the

18     question of whether Vioxx should be allowed to come

19     back on the market in February of 2005?

20 A  I think it was something like 16/15, something like

21     that.

22 Q  In favor of Vioxx coming back?

23 A  I don't remember which direction it was.

24 Q  You don't remember that?

25 A  No, I don't.  I assume by your tone, it was in favor,

1  A  No, it doesn't change anything.

2  Q  Number of events, time of events?

3  A  No, doesn't change anything.

4  Q  It only changed one method used to analyze the data;

5     true?

6  A  It changed the interpretation of the result that has

7     been a centerpiece for some of the legal cases; at

8     least the one I was involved in.

9  Q  It changes a method used to analyze the data?

10 A  It changes the interpretation of the result.

11 Q  Well, it --

12 A  You change the method, you change the interpretation.

13 Q  The press release reported that Merck had said in the

14     method section that they did a log test, when in fact

15     they did a linear test; true?

16 A  That's correct.

17 Q  And a linear test is a means for testing the

18     nonproportional hazard assumption; true?

19          MR. BUCHANAN:  Objection to form.

20 A  It is one method of testing.  It is not the method

21     they specified, however.

22 Q  (By Mr. Raber)  And the fact that the log test was not

23     statistically significant, that did not prove that the

24     relative risk was constant over time, did it?

25 A  No.  It just -- it says that there's no statistical

1     but --

2  Q  Do you think that the advisory committee in February

3     of 2005 was biased in favor of Merck?

4  A  I don't know.  I know some of the members were

5     definitely non-biased in favor of Merck, because

6     they're colleagues of mine and I know them well.

7  Q  And they were not biased?

8  A  Those individuals were not.

9  Q  Would you agree with me that tolerability of a drug is

10     an important medical question to answer in a clinical

11     study?

12          MR. BUCHANAN:  Objection to form.

13 Q  (By Mr. Raber)  I asked that because you mentioned

14     people becoming nauseous and dropping out of studies.

15          So in that context, would you agree with me that

16     tolerability of a drug is a important medical question

17     for doctors to know?

18 A  Sure, of course.

19 Q  Now, you talked about the Merck press release recently

20     about this log test.

21 A  Yes.

22 Q  That didn't change any of the data from the APPROVe

23     study, did it?

24 A  You mean -- by the data, you mean the raw data?

25 Q  The raw data.

1     evidence to support it.  It doesn't prove it one way

2     or the other.  You can't prove a null hypothesis.

3  Q  And the linear analysis that Merck did rejected the

4     null hypothesis; true?

5  A  That's correct.

6  Q  Now, we talked about your prostacyclin-sparing aspirin

7     paper.  You mentioned that you were just a consultant

8     on that study?

9  A  Yes, largely.  Yes.

10 Q  You were listed as an author, weren't you?

11 A  Yes, I know, because I contributed to discussions with

12     them.  I helped them at times with questions.

13 Q  Does the paper say anywhere that you were just a

14     consultant?

15 A  No.  It doesn't have to, though.  There's no --

16     there's no requirement to say you were a consultant or

17     what your relationship is, as long as you contributed

18     to the paper.  Which I did.

19 Q  Well, you appear to be minimizing your role in that

20     paper.  Is there a reason for that?

21          MR. BUCHANAN:  I'll object to the

22     characterization.

23 A  No, no reason.  I didn't have a large role.  I mean,

24     I'm not minimizing it.  It was what it was.

25          MR. BUCHANAN:  Objection.

1  A  Yes. And I think it's a good paper. I have no
2     problem with that. That was a good study.
3  Q  (By Mr. Raber) Now, you mentioned that you had
4     corrected your mistake about Merck misleading people
5     with its 2002 label.
6        Do you remember that testimony?
7           MR. BUCHANAN: Objection to the
8     form.
9  A  Yeah, I mentioned that the -- no, not about the
10    misleading issue. No, I didn't mean that. I
11    corrected that the 2000 label did not include the MI
12    information.
13 Q  (By Mr. Raber) The 2002 label?
14 A  Yes. Right.
15          MR. BUCHANAN: Late in the day.
16 Q  (By Mr. Raber) And, yet, knowing that, you repeated
17    that mistake under oath to the jury in the Humeston
18    case, didn't you?
19          MR. BUCHANAN: Objection. Show him
20    the testimony.
21 Q  (By Mr. Raber) Look at Pages 1721 through 1723.
22          MR. BUCHANAN: Okay, I'll look at
23    it.
24       I don't have it. Can you share it?
25          MR. TISI: Which lines?

333

1           MR. RABER: Look at Page 1722.
2           MR. BUCHANAN: Got it.
3  Q  (By Mr. Raber) Lines 14 through 23. Did you testify,
4     "And secondly, if you look at the cardiovascular
5     events for VIGOR, they don't show in here, as you
6     know, the 20 versus 4, the fivefold increased risk.
7     All they say is it was significant. That could mean
8     it was 15 to 5, 18 to 6. A lot of results would have
9     been significant, but fivefold is a lot bigger. This
10    label was carefully crafted by Merck to make sure that
11    people did not know what the safety profile of this
12    drug was. The FDA may have approved it, but that
13    wasn't the point."
14       Did you testify to that under oath?
15 A  Yeah, I said that.
16 Q  And you knew that that testimony was incorrect, didn't
17    you?
18          MR. BUCHANAN: Objection.
19 A  Not at that time, I didn't. I wouldn't have said it
20    if I knew it was incorrect.
21 Q  (By Mr. Raber) Well, in August of 2005, you had your
22    deposition taken, and you conceded that it was a
23    mistake to say that the label didn't identify the
24    number of heart attacks in the VIGOR study; true?
25 A  In the deposition?

334

1  Q  Yes.
2           MR. BUCHANAN: Objection. You're
3     mischaracterizing the testimony.
4           MR. RABER: I am not
5     mischaracterizing anything.
6           MR. BUCHANAN: You absolutely are.
7  A  I'd have to look at the label again. I just don't
8     know what specifically I was referring to there. This
9     is a long time ago.
10 Q  (By Mr. Raber) You know that the 2002 label lists the
11    number of heart attacks, doesn't it?
12 A  Yes, it does.
13 Q  And so when you say that the label didn't show the
14    number of heart attacks, that's incorrect; true?
15          MR. BUCHANAN: Objection.
16    Mischaracterizes the testimony.
17 Q  (By Mr. Raber) Lines 14 through 16, you say, "They
18    don't show in here, as you know, the 20 versus 4, the
19    fivefold increased risk."
20       That's what you said; right?
21          MR. BUCHANAN: I'm going object to
22    selectively doing this.
23 Q  (By Mr. Raber) Did you say that?
24 A  That's what it says.
25 Q  And you were talking about the label, weren't you?

335

1           MR. BUCHANAN: Objection.
2     Objection. You're mischaracterizing it. I'm telling
3     you, read the surrounding pages.
4           MR. RABER: I'm asking him.
5  Q  (By Mr. Raber) You were talking about the label,
6     weren't you?
7           MR. BUCHANAN: Objection. Then show
8     him the surrounding testimony.
9           MR. RABER: Don't coach the witness.
10          MR. BUCHANAN: No. I want to see
11    the surrounding pages. I'm not going to allow to you
12    ask the witness about trial testimony if you're only
13    going to show him one page.
14          MR. RABER: He can look at 1721,
15    1722, 1723.
16 Q  (By Mr. Raber) On Page 1721, lines 2 to 3, you said,
17    "I don't know what they concluded, but I can tell you
18    this label is grossly inaccurate."
19       Did you see that?
20 A  I mean, it's written here. I must have said it. It's
21    the transcript.
22 Q  So on Pages 1721 through 1723, you were talking about
23    the 2002 label, weren't you?
24 A  I don't know.
25 Q  Well, look at Page 1721, Line 12. Question: "And

336

1   they tell the public that the cardiovascular findings
2   is unknown; right?  That's what the FDA concluded in
3   2002."
4        Answer:  "That's what they approved."
5        That question and answer relates to the 2002
6   label, doesn't it?
7                 MR. BUCHANAN:  Objection.
8   A  I don't see that.  Where are you reading now?
9   Q  (By Mr. Raber)  Page 1721, Lines 12 through 15.
10  A  I don't have that.
11                MR. RABER:  Paul, do you have the
12       minuscript?
13                MR. BOEHM:  Yeah, I do.
14  Q  (By Mr. Raber)  You can have all the pages on one page
15       here, sir.
16  A  That's fine.
17  Q  1721, 1722, and 1723.
18        Sir, it's clear on Pages 1721, 1722, and 1723,
19   that you were testifying about the 2002 label that
20   included the VIGOR results, yes or no?
21                MR. BUCHANAN:  Objection.  I object
22       to that statement.
23  A  It's not absolutely clear to me what was being
24   discussed there.
25  Q  (By Mr. Raber)  Okay.  Hang on.  Look at Page 1721,

1   14, 15, 16, 17, 18, 19.
2   Q  (By Mr. Raber)  You're talking about the label in
3        Lines 14 through 23.
4   A  Yeah.
5   Q  You're talking about the VIGOR label, aren't you, the
6        2002 label?
7                 MR. BUCHANAN:  Objection.
8   A  Maybe.  I may well have been.  I don't remember.  It
9        was a long time ago.
10  Q  (By Mr. Raber)  But you knew that it was a mistake to
11       say that the 2002 label didn't include the numbers of
12       heart attacks, didn't you?
13                MR. BUCHANAN:  Objection.  His
14       answer, as he already said, he doesn't know what he
15       was --
16                MR. RABER:  Don't coach the witness.
17                MR. BUCHANAN:  No.  You know the
18       premise is flawed.  He just gave you an answer, and
19       you're ignoring it.
20  A  I don't know what I was thinking at that point in
21   time.  And certainly had I known that -- had I
22   remembered, if that was what it was saying here -- and
23   it's been a long time, and it was at the end of a very
24   long day, as you know.  This is the very last page of
25   this very arduous cross-examination.  And I may have

1        Line 23.  What was your answer there?  Would you
2   please read that?
3   A  Yes.  It says, "You were talking about this label."  I
4   don't know what label.
5   Q  Then what does it say after that?
6        No, in the same answer.
7   A  I'm trying to discuss it.
8   Q  You were talking about the 2002 label, weren't you?
9                 MR. BUCHANAN:  Objection, Counsel.
10  A  No.  It says I am talking about the cardiovascular
11   findings.  That's what the -- of the FDA discussion in
12   2002.  I didn't --
13  Q  (By Mr. Raber)  Right.  And that refers to the fact
14   that it says that it referred to Alzheimer's, VIGOR,
15   the two placebo-controlled studies, and that the
16   cardiovascular findings is unknown, you know that that
17   language is in the 2002 label, don't you?
18                MR. BUCHANAN:  Objection.  Asked and
19       answered over and over and over again.
20  A  I say, "They misled the FDA in this respect," and
21   that's as far as I can tell.  I don't say that -- when
22   you go to this line here --
23                MR. BUCHANAN:  You have to note
24       where you're indicating.
25                THE WITNESS:  I'm looking at 1722,

1   been confused at that point in time and may have
2   forgotten about it.  I don't know.
3        I certainly didn't intentionally say something
4   about the label that was untrue.  If I did, it was a
5   mistake.  But I certainly didn't intentionally do it.
6   Q  (By Mr. Raber)  Well --
7   A  And I'm not even sure what I was talking about here,
8   to be honest with you.  It's so garbled, that I'm not
9   certain.  But it certainly wasn't intentional, in any
10  event.
11       By the way, if I had misrepresented it, why didn't
12  she say, "Look, here's the label, and you've
13  misrepresented it"?  There's no sentence there that
14  she says that I've done this wrong.
15       Do you see anything in here that says I've done
16  this incorrectly?
17                MR. BUCHANAN:  You don't need to ask
18       him questions.
19  A  There's nothing in here where she calls me on this and
20  says, "You misrepresented the label."  If she'd have
21  said that and pointed me to the label and shown me
22  where I was wrong, I would have said, "Jeez, I'm
23  sorry.  I made a mistake."
24  Q  (By Mr. Raber)  Well, somebody did that to you in the
25  deposition, didn't they?

1    A    They did.

2    Q    And you admitted the mistake, didn't you?

3    A    Yes, I did.

4    Q    But you repeated it in your trial testimony?

5              MR. BUCHANAN:  Objection.  Again, no

6    foundation.  Asked and answered repeatedly.

7    A    I've already answered that question.  I don't know

8    what I was trying to say here.  I was -- at that point

9    in time, I was tired and confused.  And I -- if she'd

10   have specifically said, "Is this the right data,

11   Dr. Kronmal," then you'll show me the label and it

12   shows it's there.  I would have said, "Gee, I'm really

13   sorry.  Obviously I misrepresented that."

14   Q    (By Mr. Raber)  You said that the ADVANTAGE study

15   shows the same thing as VIGOR.

16             MR. BUCHANAN:  Objection.

17   Q    (By Mr. Raber)  I had that answer read back.

18   A    I said something to that effect.

19   Q    That's an incorrect statement?

20             MR. BUCHANAN:  Objection.  From a

21   cardiac perspective.

22   A    I was trying to say that it also showed an excess

23   risk.

24   Q    (By Mr. Raber)  Well, I think you told me, in response

25   to my questions, that it was not statistically

1    significant.

2    A    Well, if you added in -- well, the MI was not, but it

3    was in the same direction.  The FDA said the same

4    thing, that it was supportive of what was seen in

5    VIGOR.  And that's all I was trying to say.  And if I

6    overstated it, I apologize.

7    Q    Well, do you realize you're making very serious

8    allegations in this case?

9              MR. BUCHANAN:  Objection.

10   Objection.

11   Q    (By Mr. Raber)  Do you understand that?

12             MR. BUCHANAN:  Objection.  That's

13   not a question.  It's a lecture.  Objection.

14   Argumentative.

15   A    The answer to that question is:  I think that Merck

16   did some very serious things with respect to the

17   Alzheimer's.  I think they --

18   Q    Sir, I didn't ask you about Merck.  I asked about you.

19   I said, Do you understand that you are making serious

20   allegations in this case?

21   A    Yes.  Yes.

22   Q    Now, you mentioned an analysis you did about naproxen.

23        Do you remember that?

24   A    Yes.

25   Q    Did you review all of the literature on naproxen --

1              MR. BUCHANAN:  Objection.

2    Q    (By Mr. Raber)  -- in your analysis?

3    A    No, of course not.

4    Q    In your analysis of naproxen, did you look at any of

5    the pharmacological data relating to naproxen?

6    A    I already answered that question.  I did not.

7    Q    In your analysis of naproxen, did you look at data for

8    similar NSAIDS?

9              MR. BUCHANAN:  Objection.  Asked and

10   answered.

11   A    No, I did not.  I wasn't -- it wasn't relevant to the

12   question.  The question was whether it had the same

13   effect as aspirin.  I specified what I did.  I was

14   very clear.

15   Q    (By Mr. Raber)  Sir, you mentioned that it was unusual

16   to report a relative risk of .2 when referring to the

17   heart attacks between Vioxx and naproxen.

18        Do you understand that the reporting of it that

19   way went through the peer-review process at the New

20   England Journal of Medicine?

21   A    Yes, it did.

22   Q    And regardless of whether it's reported as a .2

23   relative risk or a five relative risk, the magnitude

24   of that difference, the conclusion that Vioxx may be

25   causing that excess risk is an obvious possibility,

1    isn't it?

2              MR. BUCHANAN:  Objection.

3    A    It's an obvious possibility.  But if someone reading

4    it quickly might have interpreted it as naproxen being

5    protective rather than -- obviously the impact -- you

6    know, like anything you do, the way you present data

7    changes the way people perceive it, if they don't read

8    it carefully and think about it carefully.

9    Q    (By Mr. Raber)  Sir, you testified that a majority of

10   sudden cardiac deaths are preceded by MI.

11        Do you remember that?

12   A    That's correct.

13   Q    Can you identify any peer-reviewed journal that

14   supports that opinion?

15   A    I'd have to look that up, frankly.  It's well-known

16   that most of the people who die in hospitals after an

17   MI die of cardiac arrhythmias, the vast majority.

18   Q    But you can't point me to any peer-reviewed journals?

19   A    No, not off the top of my head.

20   Q    Can you identify anything in the materials you cited

21   in your report that you relied on for your opinions,

22   that supports that statement?

23   A    No.

24   Q    And you're not a cardiologist, are you?

25   A    No, but I know cardiology very well.

```
 1    Q    You've never been trained in cardiology?
 2              MR. BUCHANAN:  Objection.  Asked and
 3    answered.
 4    A    Formally?
 5    Q    (By Mr. Raber)  Yes.
 6    A    No.
 7    Q    You've never treated a patient?
 8    A    No.
 9    Q    You've never done an autopsy?
10    A    No.
11    Q    Never determined a cause of death?
12              MR. BUCHANAN:  Objection.  These are
13    asked and answered several times.
14              THE WITNESS:  Yes.
15    Q    (By Mr. Raber)  You said that typically, MIs are the
16    trigger for arrhythmia.
17         Do you remember that?
18    A    They typically are, yes.
19    Q    Is it true that severe atherosclerosis and physical
20    exertion are a very common trigger for arrhythmia?
21              MR. BUCHANAN:  Objection to the
22    form.
23    A    They can be.
24    Q    (By Mr. Raber)  You mentioned that studies that don't
25    last very long, it's going to be difficult, if not
```

```
 1    impossible, to show a statistically significant risk.
 2         Do you remember that?
 3    A    Yes.
 4    Q    But if a drug has a high risk for short-term use,
 5    can't you see a difference early?
 6    A    It would have to be extraordinarily high.  Then it
 7    would be obvious.  I mean, it would be -- if people
 8    suddenly started dropping like flies, of course you'd
 9    know.
10    Q    Now, you testified about the Chen data involving
11    Alzheimer's that you relied on in your report?
12    A    Yes, that's correct.
13    Q    Is that data final data or preliminary data?
14    A    It was the data that was available at that time.
15    Q    Is it final or preliminary?
16    A    I don't know what you mean by that.  It's the data
17    that was available at that time.
18    Q    Does it represent --
19    A    That tells you exactly what the data was.
20    Q    Were all of the Alzheimer's studies completed when
21    Chen did that --
22    A    No.  078 was not completed.
23    Q    So it was preliminary data?
24    A    It wasn't preliminary.  It was the data that was
25    available at that point in time.  It's not preliminary
```

```
 1    to anything.
 2    Q    Preliminary to the conclusion of the study?
 3    A    It's before the conclusion of the study.
 4    Q    Didn't have all the data from the study?
 5    A    It didn't have data that didn't occur yet, yes.
 6              MR. BUCHANAN:  Objection.  Form.
 7    A    How could it?  That's the whole point.
 8    Q    (By Mr. Raber)  Now, I think I heard you say to
 9    Mr. Buchanan that you didn't have enough time to
10    review certain data relating to the APPROVe study
11    before you submitted your addendum?
12    A    That's correct.
13    Q    You signed your name to that report, didn't you?
14    A    Yes.
15    Q    You didn't say in there --
16              MR. BUCHANAN:  Objection.
17    Q    (By Mr. Raber)  -- that you didn't have enough time,
18    did you?
19              MR. BUCHANAN:  Objection.  Misstates
20    his whole testimony.
21    Q    (By Mr. Raber)  You signed your original report and
22    your addendum; true?
23    A    Yes.
24              MR. BUCHANAN:  I'm going to object
25    to this line.  It misrepresents his testimony.
```

```
 1              MR. RABER:  David, do you want to
 2    keep coaching?
 3              MR. BUCHANAN:  No, Counsel, the
 4    premise for your question is flawed, and you heard his
 5    answer.
 6              MR. RABER:  Just stop it.  I gave
 7    you a lot courtesy when you were questioning, and
 8    you're acting like a jerk right now.
 9              MR. TISI:  What was that?
10              MR. RABER:  I said he's acting like
11    a jerk right now.
12              MR. BUCHANAN:  Oh, really?  We've
13    been here for a long day, and now you're
14    misrepresenting his answer.
15              MR. RABER:  David, you're a good
16    guy, and just please stop.  We're almost done.  We're
17    almost done.
18              MR. BUCHANAN:  Please don't
19    patronize me.  Just represent his testimony
20    accurately.
21    Q    (By Mr. Raber)  You testified that you didn't have
22    enough time to review certain data relating to the
23    APPROVe study; true?
24    A    I didn't have time to review data that didn't come to
25    me until after my statement was already done and
```

1    submitted.

2  Q  And when you submitted your statement, you signed it?

3  A  Yes.

4  Q  And you didn't say in the statement, "I need more data

5     to look at," did you?

6  A  No.

7  Q  You didn't say, "I don't have enough time," did you?

8        MR. BUCHANAN:  Objection.

9  A  I think I probably stated somewheres in there that if

10    more data were to accrue, I would reserve the right to

11    look at it.

12 Q  (By Mr. Raber)  And you mentioned that the information

13    in your -- let me back up.

14       You said that Dr. Targum at the FDA suggested a

15    warning for Vioxx after the VIGOR study; correct?

16 A  I said she was concerned about the safety profile in

17    terms of cardiovascular events.

18 Q  And that she thought maybe a warning would be

19    appropriate?

20 A  I don't really remember.

21 Q  At the end of the day, when the FDA approved the April

22    2002 label, it presented the heart attack data for

23    VIGOR; true?

24 A  Not as a warning.

25 Q  It presented the data; true?

1    publication of peer-reviewed articles?

2  A  I'm an expert at what governs clinical trials.

3  Q  Are you an expert in the standards that govern the

4     publication of peer-reviewed articles?

5  A  I've written over 200 articles.  I've had over 200

6     articles reviewed by journals.  And I think I have a

7     pretty good idea what goes into the -- and I've been a

8     reviewer for journals for 40 years.

9  Q  Sir --

10 A  So I have a pretty good idea what goes into the

11    process.

12 Q  Sir, are you an expert in the standards that govern

13    publication of peer-reviewed articles?

14 A  I don't know what that means.  Who is an expert?  What

15    is the criteria to be --

16 Q  Are there standards that govern disclosure rules and

17    protocols for publishing articles in peer-reviewed

18    journals?

19 A  There are some things that are written down, but most

20    are not.

21 Q  Are you familiar with those?

22 A  Some of them, yes.

23 Q  Can you identify any standards or codes that govern

24    publication of peer-reviewed articles?

25       MR. TISI:  Objection.

1  A  It didn't present it as a warning, though.

2  Q  It presented the data; true?

3  A  Yes, it presented the data.

4  Q  On the first page of the label?

5  A  I don't know what page it was on.

6        MR. BUCHANAN:  Objection.  Which

7     label?

8  Q  (By Mr. Raber)  It didn't say that naproxen was the

9     explanation, did it?

10 A  I don't remember what it said about that.

11 Q  It said the significance is unknown; true?

12 A  It may have said that, yes.

13 Q  And it also had a discussion of the VIGOR study in the

14    precaution section; true?

15 A  That's true.

16 Q  Now, you mentioned that Merck should have disclosed

17    any pre-specified cut-off for the VIGOR study both to

18    the New England Journal of Medicine and to other

19    authors of the paper?

20 A  Yes.

21 Q  What is the source for that opinion?

22 A  It's just my opinion.

23 Q  Your personal opinion?

24 A  Yes, it is.

25 Q  Are you an expert in the standards that govern

1  A  I can tell you about some things associated with it.

2        I mean, for example, you can't publish a paper

3     that -- with results that have already been published

4     somewheres else.

5  Q  (By Mr. Raber)  I didn't ask you that.  I asked you --

6        MR. BUCHANAN:  Objection.  Cutting

7     him off.

8  Q  (By Mr. Raber)  -- can you identify any codes,

9     standards, publications, that address the -- let's

10    call them rules or standards that govern publication

11    of articles in peer-reviewed journals?

12 A  The answer is, I don't know of any such document.

13 Q  Would you agree with me that if you were an author of

14    a peer-reviewed article, that you would expect that

15    before, let's say, the New England Journal of Medicine

16    published an Expression of Concern about your article,

17    that you would be given an opportunity to respond to

18    what they had to say before they published it?

19       MR. BUCHANAN:  Objection.  Form,

20    foundation.

21 A  I don't know.  I've never been in that position.  I

22    wouldn't --

23 Q  (By Mr. Raber)  Wouldn't that seem to be the fair

24    thing to do?

25       MR. BUCHANAN:  Objection.

1  A  I don't know.  I mean, Expression of Concern is a very
2     serious matter, and I think that journals don't take
3     it lightly.  In fact, it's mostly reserved for people
4     where they have evidence of falsification of data.
5     And I don't think they inform those people in advance,
6     but I don't know what the laws of -- what courtesy
7     would require --
8  Q  (By Mr. Raber)  I'm just asking, as a matter of
9     general fairness, wouldn't you think it would be fair
10    to give somebody an opportunity to respond before an
11    Expression of Concern is published?
12               MR. BUCHANAN:  I'm going to object.
13 A  I don't know.  I don't have an opinion on that.
14 Q  (By Mr. Raber)  You're not saying that Merck falsified
15    data in the VIGOR article, are you?
16 A  No.
17 Q  Now, do you know whether Merck or the non-Merck
18    authors were given an opportunity to respond to the
19    New England Journal of Medicine before the Expression
20    of Concern was published?
21 A  No, I don't know one way or the other what was done.
22               MR. RABER:  Thank you.  That's it.
23               MR. BUCHANAN:  Just one second.
24                    (Discussion off the record.)
25    ////

1            FURTHER EXAMINATION
2  BY MR. BUCHANAN:
3  Q  Doctor, I'm going to suggest it will be two questions,
4     but maybe it will be five.
5        There were some questions about your expertise and
6     training in cardiovascular medicine.  Do you recall
7     that?
8  A  Yes.
9  Q  Are you an expert in trials concerning cardiovascular
10    issues?
11 A  Yes, I am.
12 Q  Are you an expert in assessing the risk of agents in
13    clinical trial populations --
14 A  Yes, I am.
15 Q  -- for cardiovascular disease?
16 A  Yes, frankly, I am.
17 Q  On a population basis -- withdrawn.
18       Are biostatisticians with expertise in clinical
19    trial analysis experts in the analysis of the effect
20    of drugs on a risk?
21 A  Yes.
22 Q  Is that the domain of statistics?
23 A  Yes.
24 Q  To your knowledge, can you get a drug approved by the
25    FDA based on anecdotal evidence of efficacy?

1  A  No.  You require clinical trials with statistical --
2     in fact, you require generally two clinical trials
3     with statistically significant evidence for efficacy,
4     and sufficient safety data to indicate that the safety
5     profile is sufficient to justify approval.
6  Q  Okay.  Quick question for you on the 2002 label.
7        There was some presentation of some Alzheimer's
8     data in the 2002 label; correct?
9  A  I believe there was.
10 Q  Was that data final Alzheimer's data?
11 A  No.
12 Q  So that data was presented before all the data had
13    accumulated in the Alzheimer's trials?
14 A  That's correct.
15               MR. BUCHANAN:  No further questions.
16
17
18            FURTHER EXAMINATION
19 BY MR. RABER:
20 Q  Two quick ones.
21       You mentioned you're an expert in clinical trials
22    involving cardiovascular matters; true?
23 A  That's correct.
24 Q  And in interpreting those?
25 A  Yes.

1  Q  What were the clinical implications of your clinical
2     trial of prostacyclin-sparing aspirin to protect
3     against thrombus?
4  A  It didn't work.
5  Q  And what were the clinical implications of the role of
6     localized prostacyclin in protecting against
7     thrombotic events?
8               MR. BUCHANAN:  Objection to form.
9  A  I don't know.  I have no idea.
10 Q  (By Mr. Raber)  Did your paper address that?
11 A  No, it didn't.  It specifically -- it was very
12    specific to people who were taking warfarin at the
13    same time.  And that's a different -- that's a totally
14    different question.  It's in combination with
15    warfarin.  And what happens when you don't have
16    warfarin available, I don't know.
17 Q  Sir, on Page 1202 of Exhibit -- of the
18    prostacyclin-sparing aspirin article, about halfway
19    down in the left-hand column, it says, "Unlike other
20    cardiac conditions where interference with
21    prostaglandin and prostacyclin synthesis appears to be
22    detrimental, such as heart failure and infarct
23    reperfusion injury, preservation of local prostacyclin
24    may not be as influential in unstable angina."
25       Do you see that?

**Page 357**

1  A  Yes.

2  Q  What does that mean?

3  A  That means what it says.  I'm not an expert in

4     prostaglandin and prostacyclin synthesis, so I

5     didn't -- I mean, I didn't write that sentence.  This

6     was written by the cardiologist.

7  Q  But you're an expert in clinical studies that assess

8     cardiovascular issues, aren't you?

9         MR. BUCHANAN:  Objection.

10  A  Not the details about how prostaglandin works.  I

11     never said that.  In fact, I said specifically I

12     wasn't an expert in that aspect of it.

13  Q  (By Mr. Raber)  And this talks about the impact of

14     prostaglandins on unstable angina, doesn't it?

15  A  It does.

16  Q  Can you tell me what that means?

17         MR. BUCHANAN:  Objection.  Asked and

18     answered.

19  A  I've already said, I don't -- I'm not an expert on

20     prostaglandin, prostacyclin.

21  Q  (By Mr. Raber)  Well, your expertise in the area of

22     the effect of drugs on heart attacks is limited.

23     Would you agree with that?

24         MR. BUCHANAN:  Objection.

25  A  It's not infinite.

357

**Page 358**

1  Q  (By Mr. Raber)  It's limited, isn't it?

2  A  It's not infinite.

3  Q  It's limited, isn't it?

4  A  I've answered the question.  It's not infinite.

5     That's answering your question directly.

6  Q  In fact, your article states, "In fact, administration

7     of exogenous prostacyclin in experimental arterial

8     injury did not result in less platelet thrombus."

9     Do you see that?

10  A  Yes.

11  Q  What's that referring to?

12  A  It's referring to some study that's referenced in

13     reference 20.

14  Q  Well, what does it mean?

15  A  I don't know.  I'm not -- I told you, I'm not an

16     expert in prostacyclin.

17  Q  Well, this is talking about thrombus, isn't it, and

18     arterial injury?

19  A  No.  It's talking about --

20         MR. BUCHANAN:  Objection.  Asked and

21     answered multiple times.  He's already told you he's

22     not an expert in that area.

23  Q  (By Mr. Raber)  How does this study relate to

24     Fitzgerald's hypothesis about the mechanism for Vioxx

25     increasing the risk of heart attacks or stroke?

358

**Page 359**

1         MR. BUCHANAN:  Objection.  Beyond my

2     redirect.

3  A  I haven't got a clue.

4         MR. RABER:  No further questions.

5         (Signature reserved.)

6         (Deposition concluded at

7         7:15 p.m.)

8

9

10

          RICHARD A. KRONMAL, PH.D.

11

12

13  Subscribed and sworn to before me

14  this _____ day of _____, 2006.

15

16

   _____   _____

17  (Notary Public)   My Commission Expires:

18

19

20

21

22

23

24

25

359

**Certificate Page**

STATE OF WASHINGTON )    I, Karmen M. Fox, CCR, RPR, C
              ) ss CCR # 1935, a duly authorized
County of Pierce  )    Notary Public in and for the
                of Washington, residing at
                Milton, do hereby certify:

      That the foregoing deposition of RICHARD A.
KRONMAL, PH.D., was taken before me and completed on
2006, and thereafter was transcribed under my directio
that the deposition is a full, true and complete trans
of the testimony of said witness, including all questi
answers, objections, motions and exceptions;

      That the witness, before examination, was by
duly sworn to testify the truth, the whole truth, and
nothing but the truth, and that the witness reserved t
right of signature;

      That I am not a relative, employee, attorney
counsel of any party to this action or relative or emp
of any such attorney or counsel and that I am not
financially interested in the said action or the outco
thereof;

      That I am herewith securely sealing the said
deposition and promptly delivering the same to
Attorney Stephen D. Raber.

      IN WITNESS WHEREOF, I have hereunto set my h
and affixed my official seal this 8th day of
June, 2006.

          Karmen M. Fox, CCR, RPR, CRR
          Notary Public in and for the State
          of Washington, residing at
          Milton.