# EXHIBIT "8"

# EXHIBIT "8"



**Dechert**
LLP

Rockefeller Plaza
w York, NY 10112-2200
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

SAHBA SALIMI

sahba.salimi@dechert.com
+1 212 430 6832 Direct
+1 212 430 6357 Fax

June 19, 2006

BY HAND

David R. Buchanan, Esq.
Seeger Weiss LLP
One William Street
New York, NY 10004-2502

Re:    *New Jersey VIOXX® Litigation*

Dear Mr. Buchanan:

I have enclosed with this letter one hard drive containing analysis datasets and SAS programs relating to the APPROVe follow up study, Bates range MRK-ZCC 0000001 through 0007281.

Sincerely,

Sahba Salimi

Enclosure

# EXHIBIT "9"

# EXHIBIT "9"



**MERCK & CO., INC.**
Whitehouse Station, NJ 08889, USA

9183802

# VIOXX®
(rofecoxib tablets and oral suspension)

## DESCRIPTION

VIOXX® (rofecoxib) is described chemically as 4-(4-(methylsulfonyl)phenyl)-3-phenyl-2(5H)-furanone. It has the following chemical structure:

Rofecoxib is a white to off-white to light yellow powder. It is sparingly soluble in acetone, slightly soluble in methanol and isopropyl acetate, very slightly soluble in ethanol, practically insoluble in octanol, and insoluble in water. The empirical formula for rofecoxib is $C_{17}H_{14}O_4S$, and the molecular weight is 314.36.

Each tablet of VIOXX for oral administration contains either 12.5 mg, 25 mg, or 50 mg of rofecoxib and the following inactive ingredients: croscarmellose sodium, hydroxypropyl cellulose, lactose, magnesium stearate, microcrystalline cellulose, and yellow ferric oxide. The 50 mg tablets also contain red ferric oxide.

Each 5 mL of the oral suspension contains either 12.5 mg or 25 mg of rofecoxib and the following inactive ingredients: citric acid (monohydrate), sodium citrate (dihydrate), sorbitol solution, strawberry flavor, xanthan gum, and purified water. Added as preservatives are sodium methylparaben 0.13% and sodium propylparaben 0.02%.

## CLINICAL PHARMACOLOGY

### Mechanism of Action

VIOXX is a nonsteroidal anti-inflammatory drug that exhibits anti-inflammatory, analgesic, and antipyretic activities in animal models. The mechanism of action of VIOXX is believed to be due to inhibition of prostaglandin synthesis, via inhibition of cyclooxygenase-2 (COX-2). At therapeutic concentrations in humans, VIOXX does not inhibit the cyclooxygenase-1 (COX-1) isoenzyme.

### Pharmacokinetics

**Absorption**

The mean oral bioavailability of VIOXX at therapeutically recommended doses of 12.5, 25, and 50 mg is approximately 93%. The area under the curve (AUC) and peak plasma level ($C_{max}$) following a single 25-mg dose were 3.28 (±843) ng·hr/mL and 207 (±111) ng/mL, respectively. Both $C_{max}$ and AUC are roughly dose proportional across the clinical dose range. At doses greater than 50 mg, there is a less than proportional increase in $C_{max}$ and AUC, which is thought to be due to the low solubility of the drug in aqueous media. The plasma concentration-time profile exhibited multiple peaks. The median time to maximal concentration ($T_{max}$), as assessed in nine pharmacokinetic studies, is 2 to 3 hours. Individual $T_{max}$ values in these studies ranged between 2 to 9 hours. This may not reflect rate of absorption as $T_{max}$ may occur at a secondary peak in some individuals. With multiple dosing, steady-state conditions are reached by Day 4. The $AUC_{0-24hr}$ and $C_{max}$ at steady state after multiple doses of 25 mg rofecoxib was 4018 (±1140) ng·hr/mL and 321 (±106) ng/mL, respectively. The accumulation factor based on geometric means was 1.67.

VIOXX Tablets 12.5 mg and 25 mg are bioequivalent to VIOXX Oral Suspension 12.5 mg/5 mL and 25 mg/5 mL, respectively.

**Food and Antacid Effects**

Food had no significant effect on either the peak plasma concentration ($C_{max}$) or extent of absorption (AUC) of rofecoxib when VIOXX tablets were taken with a high-fat meal. The time to peak plasma concentration ($T_{max}$), however, was delayed by 1 to 2 hours. The food effect on the suspension formulation has not been studied. VIOXX tablets can be administered without regard to timing of meals.

There was a 13% and 8% decrease in AUC when VIOXX was administered with calcium carbonate antacid and magnesium/aluminum antacid to elderly subjects, respectively. There was an approximate 20% decrease in $C_{max}$ of VIOXX with either antacid.

---

**Distribution**

Rofecoxib is approximately 87% bound to human plasma protein over the range of concentrations of 0.05 to 25 μg/mL. The apparent volume of distribution at steady state ($V_{dss}$) is approximately 91 L following a 12.5-mg dose and 86 L following a 25-mg dose.

Rofecoxib has been shown to cross the placenta in rats and rabbits, and the blood-brain barrier in rats.

**Metabolism**

Metabolism of rofecoxib is primarily mediated through reduction by cytosolic enzymes. The principal metabolic products are the cis-dihydro and trans-dihydro derivatives of rofecoxib, which account for nearly 56% of recovered radioactivity in the urine. An additional 8.8% of the dose was recovered as the glucuronide of the hydroxy derivative, a product of oxidative metabolism. The biotransformation of rofecoxib and that metabolite is reversible to humans to a limited extent (<5%). These metabolites are inactive as COX-1 or COX-2 inhibitors.

Cytochrome P450 plays a minor role in metabolism of rofecoxib. Inhibition of CYP 3A activity by administration of ketoconazole 400 mg daily does not affect rofecoxib disposition. However, induction of general hepatic metabolic activity by administration of the non-specific inducer rifampin 600 mg daily produces a 50% decrease in rofecoxib plasma concentrations. (Also see Drug Interactions.)

**Excretion**

Rofecoxib is eliminated predominantly by hepatic metabolism (with little (<1%) unchanged drug recovered in the urine. Following a single radiolabeled dose of 125 mg, approximately 72% of the dose was excreted into the urine as metabolites and 14% in the feces as unchanged drug.

The plasma clearance after 12.5- and 25-mg doses was approximately 141 and 120 mL/min, respectively. Higher plasma clearance was observed at doses below the therapeutic range, suggesting the presence of a saturable route of metabolism (i.e., non-linear elimination). The effective half-life (based on steady-state levels) was approximately 17 hours.

**Special Populations**

**Gender**

The pharmacokinetics of rofecoxib are comparable in men and women.

**Geriatric**

After a single dose of 25 mg VIOXX in elderly subjects (over 65 years old) a 34% increase in AUC was observed as compared to young subjects. Dosage adjustment in the elderly is not necessary; however, therapy with VIOXX should be limited at the lowest recommended dose.

**Pediatric**

VIOXX has not been investigated in patients below 18 years of age.

**Race**

Meta-analysis of pharmacokinetic studies has suggested a slightly (10-15%) higher AUC of rofecoxib in Blacks and Hispanics as compared to Caucasians. No dosage adjustment is necessary on the basis of race.

**Hepatic Insufficiency**

A pharmacokinetic study in mild (Child-Pugh score ≤6) hepatic insufficiency patients indicated that rofecoxib AUC was similar between these patients and healthy subjects. Limited data in patients with moderate (Child-Pugh score 7-9) hepatic insufficiency suggest a trend towards higher AUC (about 69%) of rofecoxib in these patients, but more data are needed to evaluate pharmacokinetics in these patients. Patients with severe hepatic insufficiency have not been studied.

**Renal Insufficiency**

In a study (N=6) of patients with end stage renal disease undergoing dialysis, peak rofecoxib plasma levels and AUC declined 18% and 9%, respectively, when dialysis occurred four hours after dosing. When dialysis occurred 48 hours after dosing, the elimination profile of rofecoxib was unchanged. While renal insufficiency does not influence the pharmacokinetics of rofecoxib, use of VIOXX in advanced renal disease is not recommended as present because no safety information is available regarding the use of VIOXX in these patients.

**Drug Interactions** (Also see PRECAUTIONS, Drug Interactions.)

**General**

In human studies the potential for rofecoxib to inhibit or induce CYP 3A4 activity was investigated in studies using the intravenous erythromycin breath test and the oral midazolam test. No significant difference in erythromycin demethylation was observed with rofecoxib (75 mg daily) compared to placebo, indicating no induction of hepatic CYP 3A4. A 30% reduction of the AUC of midazolam was observed with rofecoxib (25 mg daily). This reduction is most likely due to increased first pass metabolism through induction of intestinal CYP 3A4 by rofecoxib. In vitro studies in rat hepatocytes also suggest that rofecoxib might be a mild inducer for CYP 3A4.

Drug interaction studies with rofecoxib have identified potentially significant interactions with rifampin, methotrexate and warfarin. Patients receiving these agents with VIOXX should be appropriately monitored. Drug interaction studies do not support the potential for clinically important interactions between antacids or cimetidine with rofecoxib. Similarly to experience with other nonsteroidal anti-inflammatory drugs (NSAIDs), studies with rofecoxib suggest the potential

---

for interaction with ACE inhibitors. The effects of rofecoxib on the pharmacokinetics of other pharmacodynamics of ketoconazole, prednisone/prednisolone, oral contraceptives, and digoxin have been studied in vivo and clinically important interactions have not been found.

## CLINICAL STUDIES

### Osteoarthritis (OA)

VIOXX has demonstrated significant reduction in joint pain compared to placebo. VIOXX was evaluated for the treatment of the signs and symptoms of OA of the knee and hip in placebo- and active-controlled clinical trials of 6 to 86 weeks duration that enrolled approximately 3900 patients. In patients with OA, treatment with VIOXX 12.5 mg and 25 mg once daily resulted in improvement in patient and physician global assessments and in the WOMAC (Western Ontario and McMaster Universities) osteoarthritis questionnaire, including pain, stiffness, and functional measures of OA. In six studies of pain accompanying OA flare, VIOXX provided a significant reduction in pain at the first determination (after one week in one study, after two weeks in the remaining five studies); this continued for the duration of the studies. In all OA clinical studies, once daily treatment in the morning with VIOXX 12.5 and 25 mg was associated with a significant reduction in joint stiffness upon first awakening in the morning. At doses of 12.5 and 25 mg, the effectiveness of VIOXX was shown to be comparable to ibuprofen 800 mg TID and diclofenac 50 mg TID for treatment of the signs and symptoms of OA. The ibuprofen studies were 6-week studies; the diclofenac studies were 12-month studies in which patients could receive additional arthritis medication during the last 6 months.

### Analgesia, Including Dysmenorrhea

In acute analgesic models of post-operative dental pain, post-orthopedic surgical pain, and primary dysmenorrhea, VIOXX relieved pain that was rated by patients as moderate to severe. The analgesic effect (including onset of action) of a single 50-mg dose of VIOXX was generally similar to 550 mg of naproxen sodium or 400 mg of ibuprofen. In single-dose post-operative dental pain studies, the onset of analgesia with a single 50-mg dose of VIOXX occurred within 45 minutes. In a multiple-dose study of post-orthopedic surgical pain in which patients received VIOXX or placebo for up to 5 days, 50 mg of VIOXX once daily was effective in reducing pain. In this study, patients on VIOXX consumed a significantly smaller amount of additional analgesic medication than patients treated with placebo (1.5 versus 2.5 doses per day of additional analgesic medication for VIOXX and placebo, respectively).

### Special Studies

**Upper Endoscopy in Patients with Osteoarthritis**

Two identical (U.S. and Multinational) endoscopy studies in a total of 1516 patients were conducted to compare the percentage of patients who developed endoscopically detectable gastroduodenal ulcers with VIOXX 25 mg daily or 50 mg daily, ibuprofen 2400 mg daily, or placebo. Entry criteria for these studies permitted enrollment of patients with active Helicobacter pylori infection, baseline gastroduodenal erosions, prior history of an upper gastrointestinal perforation, ulcer, or bleed (PUB), and/or age ≥65 years. However, patients receiving aspirin (including low-dose aspirin for cardiovascular prophylaxis) were not enrolled in these studies. Patients who were 50 years of age and older with osteoarthritis and who had no ulcers at baseline were evaluated by endoscopy after weeks 6, 12, and 24 of treatment. The placebo-treatment group was discontinued at week 16 by design.

Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo. See Figures 1 and 2 and the accompanying tables for the results of these studies.



**Figure 1**

**COMPARISON TO IBUPROFEN**

Life-Table Cumulative Incidence Rate of Gastroduodenal Ulcers ≥3mm[*] (Intention-to-Treat)

U.S. Study

[*] 25 mg and 50 mg versus ibuprofen 2400 mg
[**] Results of analyses using a 3-mm gastroduodenal ulcer endpoint were consistent.
[***] The primary endpoint was the cumulative incidence of gastroduodenal ulcers at 12 weeks.

® Registered Trademark of MERCK & CO., INC., Whitehouse Station, New Jersey, USA
COPYRIGHT © MERCK & CO., INC., 1999
All rights reserved.

P1.0463

MRK-LBL0000035

9183802
VIOXX® (rofecoxib tablets and oral suspension)

VIOXX® (rofecoxib tablets and oral suspension)

**TABLE 1**
Endoscopic Gastroduodenal Ulcers at 12 weeks
U.S. Study

| Treatment Group | Number of Patients with Ulcer/Total Number of Patients | Cumulative Incidence Rate* | Raised Rates vs. Placebo | 95% CI on Rate of Rates |
|---|---|---|---|---|
| Placebo | 11/158 | 8.5% | — | — |
| VIOXX 25 mg | 7/186 | 4.1% | 0.4 | (0.1,6, 1.20) |
| VIOXX 50 mg | 12/178 | 7.3% | 0.14 | (0.33, 1.84) |
| Ibuprofen | 42/162 | 27.3% | 2.79 | (1.40, 5.33) |

* by life-table analysis

### Figure 2
COMPARISON TO IBUPROFEN
Life-Table Cumulative Incidence Rate of Gastroduodenal
Ulcers ≥ 3mm*** (Intention-to-Treat)



Multinational Study

* p < 0.001 versus ibuprofen 2400 mg
** Results of analyses using a ≥ 3mm gastroduodenal ulcer endpoint were consistent.
*** The primary endpoint was the cumulative incidence of gastroduodenal ulcer at 12 weeks.

**TABLE 2**
Endoscopic Gastroduodenal Ulcers at 12 weeks
Multinational Study

| Treatment Group | Number of Patients with Ulcer/Total Number of Patients | Cumulative Incidence Rate* | Ratio of Rates vs. Placebo | 95% CI on Rate of Rates |
|---|---|---|---|---|
| Placebo | 5/192 | 5.1% | — | — |
| VIOXX 25 mg | 5/187 | 5.3% | 1.04 | (0.38, 3.01) |
| VIOXX 50 mg | 15/182 | 8.8% | 1.73 | (0.69, 4.61) |
| Ibuprofen | 25/157 | 29.2% | 5.72 | (2.36, 13.89) |

* by life-table analysis

The correlation between findings of endoscopic studies, and the relative incidence of clinically serious upper GI events that may be observed with different products, has not been fully established. Serious clinically significant upper GI bleeding has been observed in patients receiving VIOXX in controlled trials, albeit infrequently (see WARNINGS, *Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation*). Prospective, long-term studies required to compare the incidence of serious, clinically significant upper GI adverse events in patients taking VIOXX versus comparator NSAID products have not been performed.

*Assessment of Fecal Occult Blood Loss in Healthy Subjects*

Occult fecal blood loss associated with VIOXX 25 mg daily, VIOXX 50 mg daily, ibuprofen 2400 mg per day, and placebo was evaluated in a study utilizing 51Cr-tagged red blood cells in 67 healthy males. After 4 weeks of treatment with VIOXX 25 mg daily or VIOXX 50 mg daily, the increase in the amount of fecal blood loss was not statistically significant compared with placebo-treated subjects. In contrast, ibuprofen 2400 mg per day produced a statistically significant increase in fecal blood loss as compared with placebo-treated subjects and VIOXX-treated subjects. The clinical relevance of this finding is unknown.

*Platelets*

Multiple doses of VIOXX 12.5, 25, and up to 375 mg administered daily up to 12 days had no effect on bleeding time relative to placebo. Similarly, bleeding time was not altered in a single-dose study with 500 or 1000 mg of VIOXX. There was no inhibition of *ex vivo* arachidonic acid- or collagen-induced platelet aggregation with 12.5, 25, and 50 mg of VIOXX.

### INDICATIONS AND USAGE

VIOXX is indicated:

For relief of the signs and symptoms of osteoarthritis.

For the management of acute pain in adults (see CLINICAL STUDIES).

For the treatment of primary dysmenorrhea.

---

VIOXX® (rofecoxib tablets and oral suspension)

### CONTRAINDICATIONS

VIOXX is contraindicated in patients with known hypersensitivity to rofecoxib or any other component of VIOXX.

VIOXX should not be given to patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients (see WARNINGS, *Anaphylactoid Reactions* and PRECAUTIONS, *Preexisting Asthma*).

### WARNINGS

*Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation*

Serious gastrointestinal toxicity such as bleeding, ulceration, and perforation of the stomach, small intestine or large intestine, can occur at any time, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs). Minor upper gastrointestinal problems, such as dyspepsia, are common and may also occur at any time during NSAID therapy. Therefore, physicians and patients should remain alert for ulceration and bleeding, even in the absence of previous GI tract symptoms. Patients should be informed about the signs and/or symptoms of serious GI toxicity and the steps to take if they occur. The utility of periodic laboratory monitoring has not been demonstrated, nor has it been adequately assessed. Only one in five patients who develop a serious upper GI adverse event on NSAID therapy is symptomatic. It has been demonstrated that upper GI ulcers, gross bleeding or perforation, caused by NSAIDs, appear to occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. These trends continue thus, increasing the likelihood of developing a serious GI event at some time during the course of therapy. However, even short-term therapy is not without risk.

It is unclear, at the present time, how the above rates apply to VIOXX (see CLINICAL STUDIES, *Special Studies, Upper Endoscopy in Patients with Osteoarthritis*. Among 3357 patients who received VIOXX in controlled clinical trials of 6-weeks to one-year duration (most were enrolled in six-month or longer studies) at a daily dose of 12.5 mg to 50 mg, a total of four patients experienced a serious upper GI event, using protocol-derived criteria. Two patients experienced an upper GI bleed within three months (at day 62 and 87, respectively) (0.06%). One additional patient experienced an obstruction within six months (Day 130) and the remaining patient developed an upper GI bleed within 12 months (Day 322) (0.12%). Approximately 23% of these 3357 patients were in studies that required them to be free of ulcers at study entry. It is unclear if this study population is representative of the general population. Prospective, long-term studies required to compare the incidence of serious, clinically significant upper GI adverse events in patients taking VIOXX vs comparator NSAID products have not been performed.

NSAIDs should be prescribed with extreme caution in patients with a prior history of ulcer disease or gastrointestinal bleeding. Most spontaneous reports of fatal GI events are in elderly or debilitated patients and therefore special care should be taken in treating this population. To minimize the potential risk for an adverse GI event, the lowest effective dose should be used for the shortest possible duration. For high risk patients, alternate therapies that do not involve NSAIDs should be considered.

Studies have shown that patients with a *prior history of peptic ulcer disease and/or gastrointestinal bleeding* and who use NSAIDs, have a greater than 10-fold higher risk for developing a GI bleed than patients with neither of these risk factors. In addition to a past history of ulcer disease, pharmacoepidemiological studies have identified several other co-therapies or co-morbid conditions that may increase the risk for GI bleeding such as: treatment with oral corticosteroids, treatment with anticoagulants, longer duration of NSAID therapy, smoking, alcoholism, older age, and poor general health status.

*Anaphylactoid Reactions*

Anaphylactoid reactions were not reported in patients receiving VIOXX in clinical trials. However, as with NSAIDs in general, anaphylactoid reactions may occur in patients without known prior exposure to VIOXX. VIOXX should not be given to patients with the aspirin triad. This symptom complex typically occurs in asthmatic patients who experience rhinitis with or without nasal polyps, or who exhibit severe, potentially fatal bronchospasm after taking aspirin or other NSAIDs (see CONTRAINDICATIONS and PRECAUTIONS, *Preexisting Asthma*). Emergency help should be sought in cases where an anaphylactoid reaction occurs.

*Advanced Renal Disease*

No safety information is available regarding the use of VIOXX in patients with advanced kidney disease. Therefore, treatment with VIOXX is not recommended in these patients. If VIOXX therapy must be initiated, close monitoring of the patient's kidney function is advisable (see PRECAUTIONS, *Renal Effects*).

*Pregnancy*

In late pregnancy VIOXX should be avoided because it may cause premature closure of the ductus arteriosus.

### PRECAUTIONS

*General*

VIOXX cannot be expected to substitute for corticosteroids or to treat corticosteroid insufficiency. Abrupt discontinuation of corticosteroids may lead to exacerbation of corticosteroid-responsive illness. Patients on prolonged corticosteroid

---

VIOXX®
(rofecoxib tablets and oral suspension)

Circular Number 9183802

VIOXX®
(rofecoxib tablets and oral suspension)

Circular Number 9183802

VIOXX®
(rofecoxib tablets and oral suspension)

Circular Number 9183802

VIOXX®
(rofecoxib tablets and oral suspension)

Circular Number 9183802

VIOXX®
(rofecoxib tablets and oral suspension)



VIOXX® (rofecoxib tablets and oral suspension)

therapy should have their therapy tapered slowly if a decision is made to discontinue corticosteroids.

The pharmacological activity of VIOXX in reducing inflammation, and possibly fever, may diminish the utility of these diagnostic signs in detecting infectious complications of presumed noninfectious, painful conditions.

**Hepatic Effects**

Borderline elevations of one or more liver tests may occur in up to 15% of patients taking NSAIDs, and notable elevations of ALT or AST (approximately three or more times the upper limit of normal) have been reported in approximately 1% of patients in clinical trials with NSAIDs. These laboratory abnormalities may progress, may remain unchanged, or may be transient with continuing therapy. Rare cases of severe hepatic reactions, including jaundice and fatal fulminant hepatitis, liver necrosis and hepatic failure (some with fatal outcome) have been reported with NSAIDs. In controlled clinical trials of VIOXX, the incidence of borderline elevations of liver tests at doses of 12.5 and 25 mg was comparable to the incidence observed with ibuprofen and lower than that observed with diclofenac. In placebo-controlled trials, approximately 0.5% of patients taking rofecoxib (12.5 or 25 mg QD) and 0.1% of patients taking placebo had notable elevations of ALT or AST.

A patient with symptoms and/or signs suggesting liver dysfunction, or in whom an abnormal liver test has occurred, should be monitored carefully for evidence of the development of a more severe hepatic reaction while on therapy with VIOXX. Use of VIOXX is not recommended in patients with moderate or severe hepatic insufficiency (see *Pharmacokinetics, Special Populations*). If clinical signs and symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g., eosinophilia, rash, etc.), VIOXX should be discontinued.

**Renal Effects**

Long-term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury. Renal toxicity has also been seen in patients in whom renal prostaglandins have a compensatory role in the maintenance of renal perfusion. In these patients, administration of a nonsteroidal anti-inflammatory drug may cause a dose-dependent reduction in prostaglandin formation and, secondarily, in renal blood flow, which may precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and ACE inhibitors, and the elderly. Discontinuation of NSAID therapy is usually followed by recovery to the pretreatment state. Clinical trials with VIOXX at daily doses of 12.5 and 25 mg have shown renal effects (e.g., hypertension, edema) similar to those observed with comparator NSAIDs; these occur with an increased frequency with chronic use of VIOXX at doses above the 12.5 to 25 mg range. (See ADVERSE REACTIONS.)

Caution should be used when initiating treatment with VIOXX in patients with considerable dehydration. It is advisable to rehydrate patients first and then start therapy with VIOXX. Caution is also recommended in patients with pre-existing kidney disease (see WARNINGS, *Advanced Renal Disease*).

**Hematological Effects**

Anemia is sometimes seen in patients receiving VIOXX. In placebo-controlled trials, there were no significant differences observed between VIOXX and placebo in clinical reports of anemia. Patients on long-term treatment with VIOXX should have their hemoglobin or hematocrit checked if they exhibit any signs or symptoms of anemia or blood loss. VIOXX does not generally affect platelet counts, prothrombin time (PT), or partial thromboplastin time (PTT), and does not inhibit platelet aggregation at indicated dosages (see CLINICAL STUDIES, *Special Studies, Platelets*).

**Fluid Retention and Edema**

Fluid retention and edema have been observed in some patients taking VIOXX (see ADVERSE REACTIONS). VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

**Preexisting Asthma**

Patients with asthma may have aspirin-sensitive asthma. The use of aspirin in patients with aspirin-sensitive asthma has been associated with severe bronchospasm which can be fatal. Since cross reactivity, including bronchospasm, between aspirin and other nonsteroidal anti-inflammatory drugs has been reported in such aspirin-sensitive patients, VIOXX should not be administered to patients with this form of aspirin sensitivity and should be used with caution in patients with preexisting asthma.

**Information for Patients**

VIOXX can cause discomfort and, rarely, more serious side effects, such as gastrointestinal bleeding, which may result in hospitalization and even fatal outcomes. Although serious GI tract ulcerations and bleeding can occur without warning symptoms, patients should be alert for the signs and symptoms of ulcerations and bleeding, and should ask for medical advice when observing any indicative signs or symptoms. Patients should be apprised of the importance of this follow-up (see WARNINGS, *Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation*).

Patients should promptly report signs or symptoms of gastrointestinal ulceration or bleeding, skin rash, unexplained weight gain, or edema to their physicians.

9183802
VIOXX® (rofecoxib tablets and oral suspension)

Patients should be informed of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms). If these occur, patients should be instructed to stop therapy and seek immediate medical therapy.

Patients should also be instructed to seek immediate emergency help in the case of an anaphylactoid reaction (see WARNINGS).

In late pregnancy VIOXX should be avoided because it may cause premature closure of the ductus arteriosus.

**Laboratory Tests**

Because serious GI tract ulcerations and bleeding can occur without warning symptoms, physicians should monitor for signs or symptoms of GI bleeding.

**Drug Interactions**

*ACE inhibitors:* Reports suggest that NSAIDs may diminish the antihypertensive effect of Angiotensin Converting Enzyme (ACE) inhibitors. In patients with mild to moderate hypertension, administration of 25 mg daily of VIOXX with the ACE inhibitor benazepril, 10 to 40 mg for 4 weeks, was associated with an average increase in mean arterial pressure of about 3 mm Hg compared to ACE inhibitor alone. This interaction should be given consideration in patients taking VIOXX concomitantly with ACE inhibitors.

*Aspirin:* Concomitant administration of low-dose aspirin with VIOXX may result in an increased rate of GI ulceration or other complications, compared to use of VIOXX alone. At steady state, VIOXX 50 mg once daily had no effect on the anti-platelet activity of low-dose (81 mg once daily) aspirin, as assessed by ex vivo platelet aggregation and serum TXB2 generation in clotting blood. VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.

*Cimetidine:* Co-administration with high doses of cimetidine (800 mg twice daily) increased the $C_{max}$ of rofecoxib by 21%, the $AUC_{0-120hr}$ by 23% and the $t_{1/2}$ by 15%. These small changes are not clinically significant and no dose adjustment is necessary.

*Digoxin:* Rofecoxib 75 mg once daily for 11 days does not alter the plasma concentration profile or renal elimination of digoxin after a single 0.5 mg oral dose.

*Furosemide:* Clinical studies, as well as post-marketing observations, have shown that NSAIDs can reduce the natriuretic effect of furosemide and thiazides in some patients. This response has been attributed to inhibition of renal prostaglandin synthesis.

*Ketoconazole:* Ketoconazole 400 mg daily did not have any clinically important effect on the pharmacokinetics of rofecoxib.

*Lithium:* NSAIDs have produced an elevation of plasma lithium levels and a reduction in renal lithium clearance. Thus, when VIOXX and lithium are administered concurrently, subjects should be observed carefully for signs of lithium toxicity.

*Methotrexate:* VIOXX 75 mg administered once daily for 10 days increased plasma concentrations by 23% as measured by $AUC_{0-24hr}$ in patients receiving methotrexate 7.5 to 15 mg/week for rheumatoid arthritis. An equivalent magnitude of reduction in methotrexate renal clearance was observed. At 24 hours postdose, a similar proportion of patients treated with methotrexate alone (94%) and subsequently treated with methotrexate co-administered with 75 mg of rofecoxib (88%) had methotrexate plasma concentrations below the measurable level (15 ng/mL). The effects of the recommended doses for osteoarthritis (12.5 and 25 mg) of VIOXX on plasma methotrexate levels are unknown. Standard monitoring of methotrexate-related toxicity should be continued if VIOXX and methotrexate are administered concomitantly.

*Oral Contraceptives:* Rofecoxib did not have any clinically important effect on the pharmacokinetics of ethinyl estradiol and norethindrone.

*Prednisone/prednisolone:* Rofecoxib did not have any clinically important effect on the pharmacokinetics of prednisolone or prednisone.

*Rifampin:* Co-administration of VIOXX with rifampin 600 mg daily, a potent inducer of hepatic metabolism, produced an approximate 50% decrease in rofecoxib plasma concentrations. Therefore, a starting daily dose of 25 mg of VIOXX should be considered for the treatment of osteoarthritis when VIOXX is co-administered with potent inducers of hepatic metabolism.

*Warfarin:* Prothrombin time measured as INR increased in both single and multiple dose cross-over studies in healthy individuals receiving both warfarin and rofecoxib. In a 21-day multiple-dose study in healthy individuals stabilized on warfarin (2 to 8.5 mg daily), administration of rofecoxib 25 mg QD was associated with mean increases in INR of approximately 8% (range of INR on warfarin alone, 1.1 to 2.7; range of INR on warfarin plus rofecoxib, 1.2 to 2.4). Somewhat greater mean increases in INR of approximately 11% (range of maximum INR on warfarin alone, 1.5 to 2.7; range of maximum INR on warfarin plus rofecoxib, 1.8 to 4.4) were also seen in a single dose PK screening study using a 30-mg dose of warfarin and 50 mg of rofecoxib. In post-marketing experience there have been reports of increases in INR, some of which prompted reversal of anticoagulation, in patients taking VIOXX at clinical doses concurrently with warfarin. Standard monitoring of INR values should be conducted when therapy with VIOXX is initiated or changed, particularly in the first few days, in patients receiving warfarin or similar agents.

*Carcinogenesis, Mutagenesis, Impairment of Fertility*

Rofecoxib was not carcinogenic in mice given oral doses up to 30 mg/kg (male) and 60 mg/kg (female) (approximately 5-

VIOXX® (rofecoxib tablets and oral suspension)

and 2-fold the human exposure at 25 and 50 mg daily based on $AUC_{0-24}$) and in male and female rats given oral doses up to 8 mg/kg (approximately 8- and 2-fold the human exposure at 25 and 50 mg daily based on $AUC_{0-24}$) for two years.

Rofecoxib was not mutagenic in an Ames test or in a V-79 mammalian cell mutagenesis assay, nor clastogenic in a chromosome aberration assay in Chinese hamster ovary (CHO) cells, in an in vitro and an in vivo alkaline elution assay, or in an in vivo chromosomal aberration test in mouse bone marrow.

Rofecoxib did not impair male fertility in rats at oral doses up to 100 mg/kg (approximately 20- and 7-fold human exposure at 25 and 50 mg daily based on the $AUC_{0-24}$) and rofecoxib had no effect on fertility in female rats at doses up to 50 mg/kg (approximately 19- and 7-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$).

**Pregnancy**

*Teratogenic effects: Pregnancy Category C.*

Rofecoxib was not teratogenic in rats at doses up to 50 mg/kg/day (approximately 28- and 10-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). There was a slight, non-statistically significant increase in the overall incidence of vertebral malformations only in the rabbit at doses of 50 mg/kg/day (approximately 1- or <1-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). There are no studies in pregnant women. VIOXX should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

*Nonteratogenic effects:* Rofecoxib produced peri-implantation and post-implantation losses and reduced embryo/fetal survival in rats and rabbits at oral doses 2-10 and 2 mg/kg/day, respectively (approximately 9- and 3-fold [rats] and 2- and <1-fold [rabbits] human exposure based on the $AUC_{0-24}$ at 25 and 50 mg daily). These changes are expected with inhibition of prostaglandin synthesis and are not the result of permanent alteration of female reproductive function. There was an increase in the incidence of postnatal pup mortality in rats at 25 mg/kg/day (approximately 9- and 7-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). In studies in pregnant rats administered single doses of rofecoxib, there was a treatment-related decrease in the diameter of the ductus arteriosus at all doses used (3-300 mg/kg; 3 mg/kg is approximately 2- and <1-fold human exposure at 25 or 50 mg daily based on $AUC_{0-24}$). As with other drugs known to inhibit prostaglandin synthesis, use of VIOXX during the third trimester of pregnancy should be avoided.

**Labor and delivery**

Rofecoxib produced no evidence of significantly delayed labor or parturition in females at doses 15 mg/kg in rats (approximately 10- and 3-fold human exposure as measured by the $AUC_{0-24}$ at 25 and 50 mg). The effects of VIOXX on labor and delivery in pregnant women are unknown.

Merck & Co., Inc. maintains a registry to monitor the pregnancy outcomes of women exposed to VIOXX while pregnant. Healthcare providers are encouraged to report any prenatal exposure to VIOXX by calling the Pregnancy Registry at (800) 986-8999.

**Nursing mothers**

Rofecoxib is excreted in the milk of lactating rats at concentrations similar to those in plasma. There was an increase in pup mortality and a decrease in pup body following exposure of pups to milk from dams administered VIOXX during lactation. The dose tested represents an approximate 18- and 6-fold human exposure at 25 and 50 mg based on $AUC_{0-24}$. It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from VIOXX, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**Pediatric Use**

Safety and effectiveness in pediatric patients below the age of 18 years have not been evaluated.

**Geriatric Use**

Of the patients who received VIOXX in osteoarthritis clinical trials, 1455 were 65 years of age or older (this included 460 who were 75 years or older). No substantial differences in safety and effectiveness were observed between these subjects and younger subjects. Greater sensitivity of some older individuals cannot be ruled out. Dosage adjustment in the elderly is not necessary; however, therapy with VIOXX should be initiated at the lowest recommended dose.

In one of these studies (a six-week, double-blind, randomized clinical trial), VIOXX 12.5 or 25 mg once daily was administered to 174 osteoarthritis patients 280 years of age. The safety profile in this elderly population was similar to that of younger patients treated with VIOXX.

**ADVERSE REACTIONS**

**Osteoarthritis**

Approximately 3600 patients with osteoarthritis were treated with VIOXX; approximately 1400 patients received VIOXX for 6 months or longer and approximately 800 patients for one year or longer. The following table of adverse experiences lists all adverse events, regardless of causality, occurring in at least 2% of patients receiving VIOXX in nine controlled studies of 6-week to 6-month duration conducted in patients with OA at the therapeutically recommended doses

---

9183202

VIOXX® (rofecoxib tablets and oral suspension)

(12.5 and 25 mg), which included a placebo and/or positive control group.

| | Placebo | VIOXX 12.5 or 25 mg daily | Ibuprofen 2400 mg daily | Diclofenac 150 mg daily |
|---|---|---|---|---|
| | (N = 783) | (N = 2829) | (N = 847) | (N = 498) |
| **Body As A Whole/Site Unassigned** | | | | |
| Abdominal Pain | 4.1 | 3.4 | 4.6 | 5.3 |
| Asthenia/Fatigue | 1.6 | 1.3 | 2.0 | 2.5 |
| Dizziness | 2.2 | 2.2 | 1.7 | 3.4 |
| Influenza-Like Disease | 3.1 | 1.9 | 1.1 | 2.2 |
| Lower Extremity Edema | 1.1 | 3.7 | 3.8 | 3.4 |
| Upper Respiratory Infection | 7.8 | 1.1 | 5.4 | 8.3 |
| **Cardiovascular System** | | | | |
| Hypertension | 1.3 | 3.5 | 3.0 | 1.0 |
| **Digestive System** | | | | |
| Diarrhea | 6.8 | 6.5 | 7.1 | 10.6 |
| Dyspepsia | 2.7 | 3.5 | 4.7 | 4.0 |
| Epigastric Discomfort | 2.8 | 3.8 | 9.2 | 5.4 |
| Heartburn | 3.6 | 4.2 | 5.2 | 4.6 |
| Nausea | 2.9 | 5.2 | 7.1 | 7.4 |
| **Eyes, Ears, Nose, And Throat** | | | | |
| Sinusitis | 2.6 | 2.7 | 1.9 | 2.4 |
| **Musculoskeletal System** | | | | |
| Back Pain | 1.8 | 2.5 | 1.4 | 2.6 |
| **Nervous System** | | | | |
| Headache | 7.5 | 4.7 | 6.1 | 8.0 |
| **Respiratory System** | | | | |
| Bronchitis | 0.9 | 2.0 | 1.4 | 2.7 |
| **Urogenital System** | | | | |
| Urinary Tract Infection | 2.7 | 2.8 | 2.5 | 3.6 |

The general safety profile of VIOXX 50 mg QD in OA clinical trials of up to 6 months (476 patients) was similar to that of VIOXX at the recommended OA doses of 12.5 and 25 mg QD, except for a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema (6.3%) and hypertension (8.2%).

In the OA studies, the following spontaneous adverse events occurred in >0.1% to 1.9% of patients treated with VIOXX regardless of causality:

*Body as a Whole:* abdominal distension, abdominal tenderness, abscess, chest pain, chills, contusion, cyst, diaphragmatic hernia, fever, fluid retention, flushing, fungal infection, infection, laceration, pain, pelvic pain, peripheral edema, postoperative pain, syncope, trauma, upper extremity edema, viral syndrome.

*Cardiovascular System:* angina pectoris, atrial fibrillation, bradycardia, hematoma, irregular heartbeat, palpitation, premature ventricular contraction, tachycardia, venous insufficiency.

*Digestive System:* acid reflux, aphthous stomatitis, constipation, dental caries, dental pain, digestive gas symptoms, dry mouth, duodenal disorder, dysgeusia, esophagitis, flatulence, gastric disorder, gastritis, gastroenteritis, hematochezia, hemorrhoids, infectious gastroenteritis, oral infection, oral lesion, oral ulcer, vomiting.

*Eyes, Ears, Nose, and Throat:* allergic rhinitis, blurred vision, cerumen impaction, conjunctivitis, dry throat, epistaxis, laryngitis, nasal congestion, nasal secretion, ophthalmic injection, otic pain, otitis, otitis media, pharyngitis, tinnitus, tonsillitis.

*Immune System:* allergy, insect bite reaction.

*Metabolism and Nutrition:* appetite change, hypercholesterolemia, weight gain.

*Musculoskeletal System:* ankle sprain, arm pain, arthralgia, back strain, bursitis, cartilage trauma, joint swelling, muscular cramp, muscular disorder, muscular weakness, musculoskeletal pain, musculoskeletal stiffness, myalgia, osteoarthritis, tendinitis, traumatic arthropathy, wrist fracture.

*Nervous System:* hypesthesia, insomnia, median nerve neuropathy, migraine, muscular spasm, paresthesia, sciatica, somnolence, vertigo.

*Psychiatric Disorder:* anxiety, depression, mental acuity decreased.

*Respiratory System:* asthma, cough, dyspnea, pneumonia, pulmonary congestion, respiratory infection.

*Skin and Skin Appendages:* abrasion, alopecia, atopic dermatitis, basal cell carcinoma, blister, cellulitis, contact dermatitis, herpes simplex, herpes zoster, nail unit disorder, perspiration, pruritus, rash, skin erythema, urticaria, xerosis.

*Urogenital System:* breast mass, cystitis, dysuria, menopausal symptoms, menstrual disorder, nocturia, urinary retention, vaginitis.

Other serious adverse reactions which occur rarely (<0.1%), regardless of causality: The following serious adverse events have occurred rarely in patients taking VIOXX:

*Cardiovascular:* cerebrovascular accident, congestive heart failure, deep venous thrombosis, myocardial infarction, pulmonary embolism, transient ischemic attack, unstable angina.

*Gastrointestinal:* colitis, colonic malignant neoplasm, cholecystitis, duodenal ulcer, gastrointestinal bleeding, intestinal obstruction, pancreatitis.

*Hemic and lymphatic:* lymphoma.

*Urogenital:* breast malignant neoplasm, prostatic malignant neoplasm, urolithiasis.

In 1-week controlled clinical trials and extension studies for up to 86 weeks (approximately 800 patients treated with VIOXX for one year or longer), the adverse experience profile was qualitatively similar to that observed in studies of shorter duration.

---

VIOXX® (rofecoxib tablets and oral suspension)

*Analgesia, including primary dysmenorrhea*

Approximately one thousand patients were treated with VIOXX in analgesia studies. All patients in post-dental surgery pain studies received only a single dose of study medication. Patients in primary dysmenorrhea studies may have taken up to 3 daily doses of VIOXX, and those in the post-orthopedic surgery pain study were prescribed 5 daily doses of VIOXX.

The adverse experience profile in the analgesia studies was generally similar to those reported in the osteoarthritis studies. The following additional adverse experience, which occurred at an incidence of at least 2% of patients treated with VIOXX, was observed in the post-dental pain surgery studies: post-dental extraction alveolitis (dry socket).

In 110 patients treated with VIOXX (average age approximately 65 years) in the post-orthopedic surgery pain study, the most commonly reported adverse experiences were constipation, fever, and nausea.

*Post-marketing experience*

The following adverse reactions have been reported in postmarketing experience:

*Body as a Whole:* Hypersensitivity reactions, including angioedema, pruritus, rash, and urticaria.

**OVERDOSAGE**

No overdoses of VIOXX were reported during clinical trials. Administration of single doses of VIOXX 1000 mg to 6 healthy volunteers and multiple doses of 250 mg/day for 14 days to 75 healthy volunteers did not result in serious toxicity.

In the event of overdose, it is reasonable to employ the usual supportive measures, e.g., remove unabsorbed material from the gastrointestinal tract, employ clinical monitoring, and institute supportive therapy, if required.

Rofecoxib is not removed by hemodialysis; it is not known whether rofecoxib is removed by peritoneal dialysis.

**DOSAGE AND ADMINISTRATION**

VIOXX is administered orally. The lowest dose of VIOXX should be sought for each patient.

*Osteoarthritis*

The recommended starting dose of VIOXX is 12.5 mg once daily. Some patients may receive additional benefit by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg.

*Management of Acute Pain and Treatment of Primary Dysmenorrhea*

The recommended initial dose of VIOXX is 50 mg once daily. Subsequent doses should be 50 mg once daily as needed. Use of VIOXX for more than 5 days in management of pain has not been studied (see CLINICAL STUDIES, Analgesia, including dysmenorrhea).

VIOXX tablets may be taken with or without food.

*Oral Suspension*

VIOXX Oral Suspension 12.5 mg/5 mL or 25 mg/5 mL may be substituted for VIOXX Tablets 12.5 or 25 mg, respectively, in any of the above indications. Shake before using.

**HOW SUPPLIED**

No. 3810 — Tablets VIOXX, 12.5 mg, are cream/off-white, round, shallow cup tablets engraved MRK 74 on one side and VIOXX on the other. They are supplied as follows:
NDC 0006-0074-31 unit of use bottles of 30
NDC 0006-0074-28 unit dose packages of 100
NDC 0006-0074-68 bottles of 100
NDC 0006-0074-82 bottles of 1000
NDC 0006-0074-80 bottles of 8000.

No. 3811 — Tablets VIOXX, 25 mg, are yellow, round, tablets engraved MRK 110 on one side and VIOXX on the other. They are supplied as follows:
NDC 0006-0110-31 unit of use bottles of 30
NDC 0006-0110-28 unit dose packages of 100
NDC 0006-0110-68 bottles of 100
NDC 0006-0110-82 bottles of 1000
NDC 0006-0110-80 bottles of 8000.

No. 3813 — Tablets VIOXX, 50 mg, are orange, round, tablets engraved MRK 114 on one side and VIOXX on the other. They are supplied as follows:
NDC 0006-0114-31 unit of use bottles of 30
NDC 0006-0114-28 unit dose packages of 100
NDC 0006-0114-68 bottles of 100
NDC 0006-0114-74 bottles of 500
NDC 0006-0114-81 bottles of 4000.

No. 3784 — Oral Suspension VIOXX, 12.5 mg/5 mL is an opaque, white to faint yellow suspension with a strawberry flavor that is easily resuspended upon shaking.
NDC 0006-3784-64 unit of use bottles containing 150 mL (12.5 mg/5 mL).

No. 3785 — Oral Suspension VIOXX, 25 mg/5 mL, is an opaque, white to faint yellow suspension with a strawberry flavor that is easily resuspended upon shaking.
NDC 0006-3785-64 unit of use bottles containing 150 mL (25 mg/5 mL).

*Storage*

VIOXX Tablets:
Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F). [See USP Controlled Room Temperature.]

VIOXX Oral Suspension:
Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F). [See USP Controlled Room Temperature.]

Rx only

Dist. by
MERCK & CO., INC., Whitehouse Station, NJ 08889, USA

Issued November 1999
Printed in USA

# EXHIBIT "10"

# EXHIBIT "10"

# Special Report

# Cyclooxygenase Inhibition and Cardiovascular Risk

Elliott M. Antman, MD; David DeMets, PhD; Joseph Loscalzo, MD, PhD

Over the past several months clinicians have been confronted at an escalating rate with reports describing the risks of COX-2 inhibitors (coxibs). Information on this class of drugs appears not only in traditional medical journals and textbooks, but also on the Web sites of regulatory agencies, professional societies, and pharmaceutical manufacturers.[1-9] An unusual, but noteworthy, aspect of the state of affairs is the high rate of reporting new findings and opinions (at times voiced in a strident tone) in the lay press.[10-13] Understandably, patients are concerned about the potential risks associated with their antiinflammatory medications, and now, either spontaneously or in response to a public health warning, call their healthcare professional with questions or arrive for an office visit armed with publicly accessed information they wish to discuss.

Owing to the widespread use of antiinflammatory drugs and the fact that the reported risks are cardiovascular in nature, we offer the readers of *Circulation* this special article. Our goals are to provide an overview of the relevant biology and pharmacology, to synthesize the data on the cardiovascular risks associated with antiinflammatory medications, to offer suggestions on strategies for prescribing these medications, and to make observations on the regulatory and research implications of the data and their interpretation.

## Biology of Eicosanoids

Eicosanoids are oxidized derivatives of the polyunsaturated long-chain fatty acids, arachidonic acid and eicosapentaenoic acid, that serve many roles in cardiovascular biology and disease. Eicosanoid biosynthesis can be initiated by release of arachidonic acid from membrane phospholipids by lipases (predominantly of the phospholipase $A_2$ type) (Figure 1). Once mobilized, arachidonic acid is oxygenated into eicosanoids along the following 4 pathways: (1) prostaglandin (PG) endoperoxide synthase (cyclooxygenase [COX]), (2) lipoxygenase (LO), (3) P450 epoxygenase, and (4) nonenzymatic isoprostane synthesis. Details of the pharmacology of products of the LO, epoxygenase, and isoprostane pathways, as well as the lipoxins, are reviewed elsewhere.[14-16] Here, we focus on products of the COX pathway. These derivatives of arachidonic acid are collectively referred to as prostanoids and comprise the PGs and thromboxanes. COX, a key enzyme in eicosanoid metabolism, converts arachidonic acid liberated from membrane phospholipids into $PGG_2$ and $PGH_2$.

The fate of $PGH_2$ and the distribution of prostanoids formed from it depend on the cell type in which it is synthesized and the tissue-specific isomerases found within that cell. For example, leukocytes, vascular smooth muscle cells, endothelial cells, and platelets express PGE synthase and, as a result, are all capable of generating the inflammatory prostanoid $PGE_2$; platelets express thromboxane synthase and elaborate the prothrombotic, vasoconstrictor prostanoid thromboxane $A_2$; and endothelial cells express PGI synthase and synthesize the antithrombotic, vasodilator prostanoid $PGI_2$ or prostacyclin. In addition to cell-specific synthesis, the biological effects of prostanoids are governed by cell-specific receptor-dependent signaling pathways (the receptors DP, EP, FP, IP, and TP for $PGD_2$, $PGE_2$, $PGF_{2alpha}$, $PGI_2$, and $TxA_2$, respectively) that define biological responses. Importantly, prostanoid intermediates can also undergo transcellular metabolism (ie, $PGH_2$ can be produced in a platelet and then taken up by a leukocyte in which it is converted to $PGE_2$).[17]

## Pharmacology and Molecular Biology of Inhibition of Prostanoid Synthesis

The pharmacological inhibition of prostanoid synthesis has been the focus of drug development for >100 years. From aspirin and other nonsteroidal antiinflammatory drugs (NSAIDs) that inhibit COX, the field evolved rapidly in the 1980s to yield a wide range of agents with varying antiinflammatory and analgesic potencies and varying pharmacodynamics. These NSAIDs comprise a class of agents with heterogeneous structures (Figure 2). As a therapeutic class, they provide antipyretic, analgesic, and inflammatory activities, but the relative degree of these effects varies markedly among the compounds (eg, acetaminophen has antipyretic and analgesic effects but little antiinflammatory activity). In addition, as a therapeutic class, the NSAIDs share the common side effects of gastrointestinal ulceration, inhibition of uterine motility, inhibition of PG-mediated renal function, and hypersensitivity reactions. The relative frequencies of these side effects, however, vary markedly among the members of the class.

From the Cardiovascular Division, Department of Medicine, Brigham and Women's Hospital, Boston, Mass (E.M.A., J.L.); and Department of Biostatistics and Medical Informatics, University of Wisconsin, Madison (D.D.).

Correspondence to Dr Elliott M. Antman, Cardiovascular Division, Brigham & Women's Hospital, 75 Francis St, Boston, MA 02115. E-mail eantman@rics.bwh.harvard.edu

(*Circulation*. 2005;112:759-770.)

© 2005 American Heart Association, Inc.

*Circulation* is available at http://www.circulationaha.org

DOI: 10.1161/CIRCULATIONAHA.105.568451

P2.0275



**Figure 1.** Molecular pathways for formation of eicosanoids and prostanoids. Arachidonic acid released from the cell membrane is metabolized along the 4 eicosanoid pathways shown. The COX pathway is responsible prostanoid formation.

With the recognition that aspirin inhibits platelet function, the antithrombotic effect of these agents gained unique therapeutic emphasis and, of course, has proved to be a most important treatment strategy in atherothrombotic disease. Because the endothelial prostanoid prostacyclin has antithrombotic action while the platelet prostanoid thromboxane $A_2$ has prothrombotic action, investigators realized in the 1970s that nonselective inhibition of COX pools in these 2 cell types could theoretically result in an attenuation of the antithrombotic effect of inhibition of platelet COX. At that time, investigators defined doses and conditions under which the suppression of thromboxane $A_2$ synthesis by aspirin predominates over the suppression of prostacyclin synthesis; as a result of the irreversible inhibition (via acetylation) of COX by aspirin and the difference in half-lives of inhibited platelet and endothelial COX, low-dose aspirin was found to provide sufficient antithrombotic selectivity for primary and secondary prevention of atherothrombotic events.

In the early 1990s, a new wrinkle in the complex molecular events governing vascular prostanoid synthesis arose with the identification of 2 members of the COX family. COX-1 is constitutively expressed in many cells and is the only isozyme expressed in platelets; COX-2 is induced by inflammatory cytokines in many cell types (Table 1 and Figure 3).[18,19] This distinction developed in the face of concern about the hemorrhagic risk of nonselective COX inhibition, especially gastrointestinal bleeding. The recognition that there are 2 different COXs led to the straightforward view that COX-2 is responsible for the adverse proinflammatory effects of prostanoids and that nonspecific COX inhibitors cause bleeding by inhibiting COX-1 in platelets. This working paradigm led the pharmaceutical industry to develop COX-2–selective inhibitors, the coxibs, arguing that these agents would provide adequate analgesia and antiinflammatory effects without hemorrhagic risk. The incidence of gastropathy accompanying the use of nonselective NSAIDs was felt to be of

sufficient magnitude to warrant the development of coxibs; according to one meta-analysis,[20] approximately one-third of patients taking NSAIDs had gastric or duodenal ulcers by endoscopy, but the risk of serious gastrointestinal bleeding is much lower,[21] with 107 000 patients hospitalized each year for gastrointestinal complications of NSAID use.[22] Despite their development to provide a therapeutic option for patients at risk of gastrointestinal bleeding, survey reports suggest that coxibs are prescribed with approximately equal frequency to patients who are at low or high risk of gastrointestinal bleeding.[23]

Unfortunately, this clean mechanistic distinction between the COXs is an oversimplification. As a class, the NSAIDs have a broad range of relative COX-1 and COX-2 selectivity (Figure 2). Furthermore, COX-2 is expressed in normal endothelial cells in response to shear stress,[24] and inhibition of COX-2 is associated with significant suppression of prostacyclin synthesis in human subjects[25,26] (Figure 4). Both COX-1 and COX-2 are detectable in human atherosclerotic lesions[27,28]; however, the specific effect of COX inhibition on lesion progression is currently controversial. Low-dose aspirin and selective COX-2 inhibitors have been shown to improve[29,30] or worsen[31] endothelial dysfunction in hypercholesterolemia and hypertension. COX-2 may also play a role in destabilizing plaques as suggested by its increased expression and colocalization with microsomal PGE synthase-1 and metalloproteinases-2 and -9 in carotid plaques from individuals with symptomatic disease before endarterectomy.[32] Studies in hypercholesterolemic mice have also been inconsistent, with reports showing that COX-2 inhibitors worsen, retard, or fail to affect the course of atherosclerosis,[33–35] and evidence exists to support the view that COX-2–derived prostacyclin is atheroprotective, but only in female mice.[36] Possible explanations for these divergent outcomes include differences among the methods of suppressing COX-2 activity, the timing of administration of the inhibitor, and the



**Figure 2.** NSAIDs. The 9 chemical groupings of NSAIDs are shown, along with key compounds in each class. Relative degree of COX-1 vs COX-2 selectivity is shown at the bottom of the figure (adapted with permission from Warner and Mitchell[19]). Common therapeutic effects (in varying degrees of activity) for NSAIDs are antipyretic, analgesic, and antiinflammatory. Common side effects (in varying relative frequencies) are gastrointestinal ulceration, inhibition of platelet aggregation, inhibition of uterine motility, inhibition of PG-mediated renal function, and hypersensitivity reactions.

genetic backgrounds of the animals studied. In addition, COX-2–derived prostanoid products have divergent effects on the molecular and cellular mechanisms underlying disease pathogenesis. For example, through its interaction with the E-prostanoid receptor EP4 on macrophages, COX-2–derived $PGE_2$ suppresses chemokine production,[37] whereas TP antagonism retards atherogenesis.[38] Moreover, COX-2 is differentially expressed among cell types in the plaque, as are the predominant prostanoids derived from those cells.

Inhibition of COX-2 also has as a theoretical side effect an increase in the flux of arachidonate through the LO pathways, which may be especially important in the setting of inflammation in the atheromatous plaque. The 12-,15-, and 5-LOs all have key roles in inflammation, and the role of each in atherosclerosis has been examined. Although 12-LO and 15-LO appear to contribute to LDL oxidation, the data supporting the proatherogenic role of these enzymes are inconsistent.[39] Data suggest that 15-LO products may be antiinflammatory.[40] Furthermore, work from Serhan's group

shows that acetylation of COX-2 by low-dose aspirin leads to its biosynthesis of 15R-hydroxyeicosatetraenoic acid.[40] This intermediate is then converted by transcellular metabolism to the antiinflammatory lipoxin 15-epi-lipoxin $A_4$ in leukocytes.[41]

Mehrabian and colleagues[42] have demonstrated convincingly that 5-LO is a critical determinant of atherogenesis in mouse models of the disease, even in the setting of profound hypercholesterolemia. The inflammatory eicosanoids derived from increased 5-LO expression in plaque—leukotriene $B_4$ and the cysteinyl-leukotrienes—are active in the atherothrombotic vasculature, having been shown to promote inflammatory cell activation, cell proliferation, and vasoconstriction. In human subjects, Dwyer and colleagues[43] showed that variant 5-LO genotypes—tandem promoter repeats of Sp-1 binding motifs—identify a subpopulation of individuals with increased atherosclerosis (determined as carotid intima-media thickness). Helgadottir and colleagues[44] showed that a promoter haplotype comprising 4 linked polymorphisms in the 5-LO activating peptide (an accessory protein that facilitates presenta-

**TABLE 1.   Comparison of COX-1 and COX-2 Enzymes**

| | COX-1 | COX-2 |
|---|---|---|
| Chromosome location for gene coding for protein | 9 | 1 |
| Location in cell | Membrane bound | |
| Biochemical action | Catalyzes conversion of arachidonic acid liberated from cell membrane to PGG$_2$ and PGH$_2$ | |
| Basis for selectivity of inhibitors (see Figure 3) | Isoleucine (bulky) in position 523 blocks access to side pocket | Less bulky valine in position 523 allows binding of "selective" drugs to side pocket |
| Cellular expression | Constitutively in many cells | Induced by inflammatory cytokines but can be expressed in normal endothelial cells exposed to shear stress; role in atherosclerotic plaque development is uncertain |

tion of substrate arachidonate to 5-LO) confers an approximately 2-fold increased risk of myocardial infarction (MI) and stroke in an Icelandic population. Thus, the potential importance of shifting the flux of arachidonate through the LO pathway by inhibiting COX activity bears consideration as we attempt to dissect the vascular consequences of coxib use.

To appreciate the complexity of interactions among the small-molecule vascular mediators in the system, we also need to consider nitric oxide (NO) and superoxide anion. NO activates prostacyclin synthase and suppresses thromboxane synthase, likely by nitrosylating bound heme.[45] In addition, NO potentiates the vascular effects of prostacyclin, likely via the cGMP-dependent inhibition of cAMP phosphodiesterase.[46] This potentiation of prostacyclin by NO has also been demonstrated to account for the synergistic inhibition of platelets by these vascular effectors.[47,48] Niwano and colleagues[49] have shown that a stable prostacyclin analogue (beraprost) increases endothelial NO synthase (eNOS) expression by activating a cAMP-dependent transcriptional element in the eNOS promoter. In the setting of an inflammatory stimulus that induces expression of inducible NO synthase (iNOS) and a source of superoxide [such as NAD(P)H oxidase], peroxynitrite generation ensues and leads to 3-nitration of tyrosine 430 in prostacyclin synthase, inactivating the enzyme,[50,51] and activation of the TxA$_2$ receptor TP.[50] TxA$_2$, in turn, induces gp91$^{phox}$ expression and NAD(P)H oxidase–dependent superoxide generation,[52] increasing oxidant stress in the inflamed vasculature. NO derived from iNOS also increases expression and activity of COX-2.[53,28] In addition, other inflammatory mediators may modulate these interactions; eg, evidence suggests that C-reactive protein decreases prostacyclin release from endothelial cells.[54]

Consideration of these interactions is essential for understanding the full spectrum of activities of COX-2–dependent eicosanoid synthesis in the context of their interaction with NO. For example, COX-2 not only has been recognized as a key source of prostacyclin under normal laminar flow conditions in the vasculature but also is cardioprotective in ischemia-reperfusion injury[55] and has antiproliferative effects toward vascular smooth muscle cells in conjunction with NO.[56] NO can also inhibit 5-LO, likely by peroxynitrite-dependent S-nitrosation and/or 3-nitrotyrosination.[57,58] Induction of iNOS by endotoxin leads to inhibition of 5-LO activity

without an effect on expression,[59] likely via a peroxynitrite-dependent mechanism.

The interrelationships among COX-2, 5-LO, and NO in the endothelium can best be analyzed when considered under 2 sets of conditions: in the normal state of laminar flow and in an inflammatory state (Figure 5). Under normal conditions, laminar flow induces COX-2 in the endothelial cell to promote the synthesis of prostacyclin, and stimulates elaboration of NO by eNOS. NO derived from eNOS, in turn, stimulates prostacyclin synthase activity and suppresses thromboxane synthase activity; NO also activates guanylyl cyclase to increase cGMP and acts synergistically with prostacyclin to increase cAMP levels in target cells (eg, platelets). Taken together, the net effect of these actions is to impair platelet activation, as summarized in Figure 4 (left) and Figure 5A.

In states of vascular inflammation, COX-2, iNOS, and NAD(P)H oxidase are induced in endothelial cells; these enzymes, together with 5-LO, are also expressed in inflammatory leukocytes. High-flux production of NO (from iNOS) together with superoxide anion [from NAD(P)H oxidase, COXs, LOs, and uncoupled NO synthases, among other sources] leads to the synthesis of peroxynitrite (OONO$^-$), which inhibits prostacyclin synthase, activates TP-dependent signaling, and promotes additional COX-2 activity. The COX pathways also promote NAD(P)H oxidase activation via TxA$_2$,[33] whereas 5-LO promotes NAD(P)H oxidase activation via leukotriene B$_4$[60] and the cysteinyl-leukotrienes. Moreover, PGE$_2$, the synthesis of which is enhanced by COX2-derived PGH$_2$ owing to kinetic selectivity and compartmentalization,[61] promotes platelet activation by increasing intraplatelet calcium flux and decreasing cAMP via its interaction with the platelet surface EP$_3$ receptor.[62] (For a review of the effects of NO-derived reactive nitrogen species in inflammatory states on COXs, LOs, and peroxidases, see Coffey and colleagues.[63]) Taken together, the net effect of these actions is to promote platelet activation, as summarized in Figure 4 (right) and Figure 5B.

We can use the models shown in Figures 4 and 5 to construct working hypotheses about the use of coxibs in the normal state and in states of vascular inflammation. Central to this model is the balance between prostacyclin (PGI$_2$) and thromboxane A$_2$ in normal and diseased vessels.[37,64,65] The use of a coxib under normal (ie, noninflammatory) conditions would be expected to have limited effects on platelet activa-



**A**    **Arachidonic Acid Binding**

Cox-1    Cox-2

Arg 120
Ile 523 (Cox 1), Val 523 (Cox 2)
Hydrophobic Binding Pocket

**B**    **Cox Inhibitor Binding**

Cox-1    Cox-2

Naproxen    Celecoxib

Arg 120
Ile 523 (Cox 1), Val 523 (Cox 2)
Hydrophobic Binding Pocket

Figure 3. Structural determinants of inhibition of arachidonic acid binding to COXs. A, Arachidonic acid binding sites for COX-1 (left) and COX-2 (right), illustrating the location of arg 120, which forms an ionic bond with the carboxyl group of the fatty acid, and the hydrophobic pocket. In addition, note difference in amino acid at position 523, which is isoleucine in COX-1 and valine in COX-2, neither of which affects arachidonic acid binding. B, COX inhibitor binding to the arachidonic acid binding site for naproxen bound to COX-1 (left) and celecoxib bound to COX-2 (right). The difference in the amino acid at position 523 accounts, in part, for the selectivity of coxib, with the smaller valine accommodating the binding of the sulfonamide moiety in the side pocket.

tion in that NO production by eNOS is relatively unimpaired, and COX-1–dependent generation of prostacyclin would still be maintained. In contrast, the use of a coxib in vascular inflammatory states would lead to a decrease in antithrombotic prostacyclin made by arachidonate flux through COX-2 and would, therefore, make available more arachidonate for leukotriene synthesis. Leukotrienes, especially leukotriene B$_4$ and the cysteinyl-leukotrienes, would increase reactive oxygen species generation by leukocytes, especially superoxide, thereby consuming antithrombotic NO through the synthesis

of peroxynitrite. Peroxynitrite, in turn, would further limit prostacyclin synthesis via synthase nitration.[47] Coxibs may also increase reactive oxygen species generation via uncoupling of mitochondrial oxidative phosphorylation.[66] Thus, the net result of coxib action in diseased vessels is an increase in the amount of TxA$_2$ relative to PGI$_2$ (see Figure 4).

In addition to the considerations at the molecular level discussed above, it should be noted that manipulation of the relative balance of COX-1 and COX-2 activity may alter important cardiorenal responses in patients.[19] COX-1 and COX-2 are colocalized in the macula densa. In elderly patients or under conditions of sodium or fluid depletion, selective COX-2 inhibitors cause sodium retention and may result in edema formation.[67] Administration of COX-2 inhibitors has also been associated with a reduction in glomerular filtration rate and exacerbation of hypertension.[68–70] Increases in blood pressure have been proposed as a mechanism by which COX-2 inhibitors may promote an increased risk of cardiovascular events.[71]

### Synthesis of Data on Risk of Cardiovascular Events

The emerging data on the potential for an increased risk of cardiovascular events with coxib use present a disturbing and confusing message for clinicians and patients. The concept of assessing the risk-to-benefit ratio of any medication is familiar to clinicians but is difficult to operationalize for the coxibs. Although the benefits of coxibs (eg, a convenient form of analgesia for arthritic and musculoskeletal discomfort) are more apparent, the risks associated with their use are less clear. Critical questions remain unanswered: What is the magnitude of the increased risk of cardiovascular events with coxib use? Does the risk vary among the coxibs, or is it a true class effect? Is a similar increased risk of cardiovascular events seen with the nonselective NSAIDs?

The evidence base with regard to the risk of cardiovascular events consists of randomized controlled trials (RCTs), new drug application databases submitted to regulatory authorities, and analyses from community- and hospital-based prescription practices. Many of the individual RCT and prescription practice reports can be found in the medical literature, although some are unpublished reports that have been made available on Web sites.[72] Meta-analyses of the available RCT data have also been published.[73] Rather than reiterate the details of previous reports, we offer potential explanations for the nature of the data and present a model that synthesizes the information in a clinically meaningful fashion.

We begin the discussion of the RCT data by a worked example summarizing the cardiovascular risk associated with celecoxib in a clinical trial (APC) for prevention of colorectal adenoma (Figure 6).[74] A total of 2035 patients with a history of colorectal neoplasia were randomized to receive either placebo or 1 of 2 doses of celecoxib (200 or 400 mg twice daily). After 2.8 to 3.1 years of follow-up, an independent Data Safety Monitoring Board concluded that continued exposure to celecoxib placed patients at increased risk for serious cardiovascular events. The APC study was designed for a noncardiovascular purpose–prevention of colorectal adenoma–yet an increased risk of cardiovascular events was identified. The situation surrounding the APC study and



**Figure 4.** Consequences of COX inhibition for prostacyclin and thromboxane $A_2$ production in normal and atherosclerotic arteries. Endothelial cells are shown as a source of prostacyclin ($PGI_2$) and platelets as a source of thromboxane $A_2$ ($TxA_2$) under untreated conditions (top row) or treated with low-dose aspirin (middle row) or a coxib (bottom row) in the normal (left column) and atherosclerotic artery (right column) for comparison. COX-1 is the only isoenzyme expressed in platelets; endothelial cells express both COX-1 and COX-2. In the normal artery, the balance between $PGI_2$ and $TxA_2$ production favors $PGI_2$ and inhibition of platelet-dependent thrombus formation. In the atherosclerotic artery, both $PGI_2$ and $TxA_2$ production is increased, owing in part to increased platelet activation with compensatory $PGI_2$ formation via both COX-1 and COX-2 in endothelial cell; the net effect is an imbalance favoring $TxA_2$ production and platelet-dependent thrombus formation. Low-dose aspirin selectively impairs COX-1-mediated $TxA_2$ production in platelets restoring the net antithrombotic balance. Coxib use suppresses COX-2–dependent $PGI_2$ production in endothelial cells, which has only a marginal effect on the net antithrombotic balance owing to the importance of COX-1 as a source of $PGI_2$ in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of $PGI_2$ and more $TxA_2$ is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring $TxA_2$ production and promoting platelet-dependent thrombosis.

cardiovascular risk is representative of many of the coxib trial data to date.

What kind of observations might have concerned the Data Safety Monitoring Board? Of the 679 patients randomized to placebo, 4 patients (0.6%) either died or sustained a nonfatal MI. In contrast, of the 1356 patients assigned to either of the celecoxib arms, 27 (2.0%) died or had a nonfatal MI. After the data are entered into a 2×2 table, several statistical tests of the treatment effect (harm in this case) of celecoxib can be performed. Regardless of whether one uses a $\chi^2$ test (or the equivalent binomial comparison of proportions) or Fisher's exact test, the difference in event rates in the combined celecoxib group is statistically significantly higher than that in the placebo group (Figure 6).

Another important message is also illustrated by the APC trial findings. The event rates are relatively low compared with those seen in trials enrolling acute coronary syndrome patients in which the death/MI rate may be 10% at 1 year, depending on the level of risk at the time of enrollment. Statements about the relative risk (RR) and odds ratio (OR) convey information about the proportionate increase in risk with celecoxib use versus placebo (3.4-fold increased risk in this example) (Figure 6). (For low event rates, as in this example, the OR approximates the RR.) Such ratios are often the only statistic quoted in the lay press but do not present the full range of clinically relevant information. For example, the absolute risk difference (ARD) in event rates is 1.4%. To interpret the information from the APC trial in the context of



**Figure 5.** Relationships between vascular eicosanoids and NO under normal conditions (A) and in inflammatory states. PGI₂S indicates prostacyclin synthase; TxA₂S, thromboxane synthase; TxA₂R, thromboxane A₂/PGH₂ receptor; and blue lines, factors that modulate specific pathways positively (solid blue line) or negatively (dashed blue line).

data from other trials, it is useful to calculate the number of patients who need to be treated with celecoxib to observe 1 death or MI event, ie, the number needed to harm (NNH). In this case, NNH=1/ARD=71 patients (Figure 6).

In contrast to the APC trial in which there was a straightforward comparison of a coxib (celecoxib) with placebo, the Vioxx Gastrointestinal Outcome Study (VIGOR) compared the occurrence of gastrointestinal toxicity with a different coxib (rofecoxib 50 mg/d) and another NSAID (naproxen 1000 mg/d) in patients with rheumatoid arthritis.[75] Aspirin use was not permitted in VIGOR. A signal of increased risk (RR, 2.38; 95% CI, 1.39 to 4.00; $P<0.001$) of serious thrombotic cardiovascular events (MI, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) was found in a report submitted to the US Food and Drug Administration (FDA) subsequent to the publication of the original VIGOR manuscript. This increased risk of cardiovascular events with rofecoxib was observed whether or not the patient would (RR, 4.89; 95% CI, 1.41 to 16.88; $P=0.01$) or would not (RR, 1.89; 95% CI, 1.03 to 3.45; $P=0.04$) have been eligible to receive aspirin.[76]

The active comparator naproxen in VIGOR was a confounding factor that made interpretation of the RR associated with rofecoxib more difficult to assess. It was initially argued that naproxen had a protective antithrombotic effect that reduced the event rate (compared with a putative placebo) and led to an apparent increased RR with rofecoxib. However, more compelling data consistent with a true increase in the RR with rofecoxib emerged from reports such as a cumulative meta-analysis of RCTs comparing rofecoxib with placebo,[75] a case-control study of 54 475 Medicare beneficiaries,[77] a case-control study of 8518 patients from a database of 36 hospitals in 5 counties,[78] a retrospective case-control study of 113 927 patients in Quebec's administrative health databases,[79] and a nested case-control study from the Kaiser Permanente database in California.[80]

Eventually, when the Adenomatous Polyp Prevention on Vioxx trial (APPROVe), comparing rofecoxib 25 mg/d with placebo in patients with a history of colorectal adenomas, reported an excess risk of thrombotic cardiovascular events in the rofecoxib group (RR, 1.92; 95% CI, 1.19 to 3.11; $P=0.008$), Merck, the manufacturer of rofecoxib, voluntarily withdrew the drug from the market in September, 2004.[1] Between September, 2004, and December, 2004, reports of increased risk of thrombotic cardiovascular events had accumulated not only for rofecoxib and celecoxib but also for the third coxib available in the United States, valdecoxib, to the point that on December 23, 2004, the FDA issued a public health advisory concerning the use of all coxibs.[81,82] Of additional concern was a report from the NIH on December 20, 2004 about the Alzheimer's Disease Anti-Inflammatory Prevention Trial (ADAPT), which was designed to assess the potential benefit of long-term use of naproxen (220 mg twice daily) or celecoxib (200 mg twice daily) versus placebo in decreasing the risk of developing Alzheimer's disease in subjects ≥70 years of age.[83] There was an apparent increase (quantitative details not specified) in cardiovascular and cerebrovascular events in the naproxen group compared with placebo in this trial. Thus, while continuing to review the data, the FDA issued an advisory in December, 2004, as an interim measure, sensitizing clinicians and patients to the emerging data on increased risk of thrombotic events not only with coxibs but NSAIDs in general.[81,82]

In February, 2005, a special 3-day advisory committee meeting was convened by the FDA to provide a forum for full discussion of the issues. The advisory panel recommended that celecoxib and valdecoxib remain on the market but advocated that "black box" warnings be added to the label. At the same time, the European Medicines Agency imposed strong warnings on coxibs, recommending that they not be prescribed to patients who have coronary heart disease or who have had a stroke and that they should be used with caution in patients at risk for vascular disease.[84,85]

Additional information bearing on the issue of cardiovascular risk comes from the Therapeutic Arthritis Research and Gastrointestinal Event Trial (TARGET), which compared the most selective coxib, lumiracoxib (see Figure 2), 400 mg once daily with either naproxen 500 mg twice daily or ibuprofen 800 mg 3 times daily for 1 year in 18 000 patients with osteoarthritis.[86] Low-dose aspirin (75 to 100 mg daily)



**Figure 6.** Biostatistical considerations in a trial of a coxib vs placebo. Left, Main findings of the APC trial. Right, A 2×2 table is used to arrange the data for the calculation of statistical tests of treatment effect. Clinically useful methods of describing the treatment effect are shown (bottom right). Data from Solomon et al.[74].

was permitted in TARGET. There were only 109 cardiovascular or cerebrovascular events reported, of which 59 (0.65%) occurred in the lumiracoxib group and 50 (0.55%) occurred in the NSAID groups (hazard ratio, 1.14; 95% CI, 0.78 to 1.66; $P=0.51$). Although these findings might be interpreted as showing that lumiracoxib is as safe as either naproxen or ibuprofen, in the absence of a placebo group, the results are also consistent with the possibility that all 3 drugs are associated with increased risk of events with little difference among them.

The next major event in this rapidly evolving story occurred on April 7, 2005.[87] The FDA concluded that the overall risk-to-benefit profile for valdecoxib was unfavorable

and that valdecoxib lacked any demonstrable advantage compared with other NSAIDs. The agency requested that Pfizer voluntarily withdraw valdecoxib from the market, which Pfizer agreed to do. While permitting celecoxib to remain on the market, the FDA requested revision to the labeling of celecoxib and 18 other nonselective NSAIDs to highlight the increased risk for cardiovascular events and stated that all NSAID prescriptions must be accompanied by a medication guide to inform patients. In support of this decision by the FDA is a report from a registry experience in Denmark of 10 280 cases of first-time hospitalization for MI and 102 797 controls.[88] Current and new users of all classes of non-aspirin NSAIDs had elevated RR estimates for MI.



**Figure 7.** Detection of harm with coxibs. Factors related to trial design (top) and to the patient and drug being investigated (bottom) are shown. The interplay of these factors influences the ability to detect signal of increased risk of cardiovascular events with coxib use. See text for discussion.



**Figure 8.** Number needed to harm. The relationship of the event rate in the control group and relative risk of cardiovascular events with the drug being investigated determines the number of patients who need to be treated with the drug to observe 1 cardiovascular event (Number Needed to Harm). The surface generated can be used to understand the relative ease or difficulty of detecting a signal of harm and to formulate a strategy for use of NSAIDs. See text for discussion.

How might the seemingly contradictory evidence about the increased risk of cardiovascular events with COX-2 inhibitor use (and NSAID use in general) be explained? Figure 7 summarizes the interplay of a variety of factors that influence the ability of investigators to detect a signal of increased risk of cardiovascular events associated with COX-2 inhibition. Certain variables are set by investigators during the design of a clinical trial. These include (1) the definition of events that constitute the trial end points (eg, a hard end point such as death is infrequent, resulting in fewer events observed compared with a composite end point), (2) the duration of follow-up (short-term follow-up limits the time during which events may occur and reduces the likelihood of detecting harm), and (3) sample size (an inadequate sample size places investigators at the risk of a large type II error and failure to conclude correctly that evidence of harm from COX-2 inhibition exists).

Variables related to both the patient and the drug being investigated influence the relative difference in events in the treatment groups and may minimize or magnify the signal of increased risk of events. Variables of note include (1) the risk of events in the control group (the impact of COX-2 inhibition may be less evident in healthier subjects in whom relatively few events occur in the control group), (2) the RR of events in the treatment group (related to both the intrinsic properties of the drug being investigated and the choice of the comparator arm—eg, a signal of harm with a coxib is more easily detected if the comparator arm is placebo and less readily detected in trials with an active comparator unless that active comparator actually is cardioprotective, thus magnifying the RR with a coxib), 3) and drug interactions (concomitant medications may exacerbate the risk with COX-2 inhibitors by such mechanisms as worsening of renal function or diminishing the cardioprotective effects of drugs such as aspirin [low dose]).[69] To complicate the situation further, the patient and drug variables may change over the course of exposure to the drug. For example, development of diabetes or worsening hypertension may culminate in disruption of a high-risk or vulnerable plaque with the development of a superimposed thrombus. As the acute situation evolves, the risk in the control arm may change, and the RR associated with the drug may also change, both in an adverse direction.

Building on these concepts, one may depict the relationship among the risk of events in the control group (control event rate, CER), the RR of events with a particular drug, and the NNH (critically related to the ability to detect a signal of harm), which are related to each other by the formula: $NNH = 1/[(RR-1) \times CER]$. The surface shown in Figure 8 rises steeply to a high NNH (difficulty in detecting harm) with a low rate of events in the control group and/or low RR in the treatment group. The ability to detect harm improves as the NNH drops with increasing rates in the control arm and/or increasing RR in the treatment arm (Figures 7 and 8).

## Strategies for Use of NSAIDs

Although the evidence base is incomplete, one can use the concepts articulated in this report to develop strategies for the use of NSAIDs.[7] The general goal is to operate on the steep portion of the surface in Figure 8, thereby minimizing patient risk. This can be accomplished by preferentially prescribing NSAIDs only to patients at low risk of thrombotic events (ie,

**TABLE 2.   Strategies for Use of NSAIDs**

1. Prescribe NSAIDs preferentially to patients at low risk of thrombotic events (eg, no history of ischemic heart disease or stroke; low-risk-factor profile for vascular disease).

2. Initially prescribe drugs with lowest risk of thrombotic events (aspirin, acetaminophen); if symptoms are not adequately controlled, assess risk-to-benefit ratio before moving to drugs with a higher risk of thrombotic events (relative degree of COX-2 selectivity cannot be used to assess comparative risks of drugs).

3. Minimize duration of treatment with NSAIDs to decrease period of risk.

4. Prescribe lowest dose of NSAID to control symptoms.

5. If clinical circumstances necessitate that NSAIDs be prescribed to patients at increased risk of thrombotic events and/or for extended periods, add aspirin 81 mg (enteric coated) in combination. The antithrombotic effects of low-dose aspirin may be helpful but do not necessarily completely neutralize the risks of other NSAIDs. When aspirin is used in combination with another NSAID, consider prescribing a proton pump inhibitor to reduce the risk of gastrointestinal bleeding.

6. During the period of treatment with an NSAID, monitor the patient for increases in blood pressure, development of edema, deterioration of renal function, or development of gastrointestinal bleeding.

Information derived from Bennett et al.[11]

moving to lower rates of events in the control group in Figure 8). Selecting drugs with a lower risk of thrombotic events and minimizing the dose and duration of treatment are also advisable (ie, moving to a lower RR in Figure 8). If clinical circumstances call for using an NSAID in a higher-risk patient and/or for extended periods, concomitant prescription of low-dose aspirin (81 mg/d) may help to mitigate the tendency to thrombotic events but may not eliminate the risk entirely[90] (Figure 4). A suggested strategic plan for the use of NSAIDs is shown in Table 2.

## Regulatory and Research Implications

The coxib story has brought into sharp focus issues related to the drug approval process and surveillance for adverse events for approved drugs. It has been argued that the passage of the Prescription Drug User Fee Act (PDUFA) in response to pressure from the pharmaceutical industry, medical community, and patients to hasten the speed of approval of new drugs set the stage for the tsunami of events between September, 2004, and April, 2005.[91] PDUFA provided a mechanism for sponsors of new drugs to pay a fee to the FDA to cover the costs of accelerating the review and approval process. Although concern has been raised by some authors, it is not clear whether acceleration of the review and approval process under PDUFA resulted in less attention to the safety database for the coxibs.[92] Another element in the coxib story was the introduction of direct-to-consumer advertising.[93] In the case of the coxibs, aggressive direct-to-consumer advertising rapidly generated a large number of requests by patients for prescriptions.

What lessons can be learned from the early signals of harm that were detected with coxib use so that the drug approval process can be improved? We propose that for all new drugs under review, a minimum number of patient-years of safety experience be obtained before approval for use. These data may be acquired in a few very large trials or in a series of smaller trials provided that the cumulative patient-years of safety data are sufficient, which appears not to have been the case for the coxibs before their approvals. Exactly what the minimum number of patient-years of safety observation should be is not clear, but this is an important topic for future biostatistical and regulatory research efforts. A reasonable starting point is to examine the compiled number of patient-years of safety experience before approval of drugs that were later withdrawn from clinical use because of toxicity. Depending on the rate of adverse events, it can be argued that such an analysis would help frame the minimum requirement for patient-years of safety experience to acquire a comfort level (from a regulatory perspective) with a new drug.[94]

Once drugs are approved, continued surveillance for safety issues is needed. An initial step at augmenting postmarketing surveillance was the announcement by Health and Human Services Secretary Michael Leavitt that a new Drug Safety Oversight Board would be established within the FDA.[95] This organizational and oversight strategy is a welcome start, but it is likely that more will be required, including efforts independent of the FDA.[91,96,97] One possible modification is to require a mandatory registry of the first several thousand patients exposed to a newly approved drug and followed up

for a period of several years. While this mandatory registry would not have an ideal control, it at least would provide a more accurate estimate of adverse events. Also, given the potential for ascertainment bias (ie, overreporting or underreporting of adverse events) in the present postmarketing surveillance system, efforts to standardize protocols for adverse event reporting are needed.

Finally, the panic of some patients after the withdrawal of rofecoxib and valdecoxib from the marketplace when these were the drugs that relieved their symptoms most effectively underscores the need for continued pharmacological research. Investigators need to explore whether other compounds may be identified that truly treat inflammation without an adverse impact on the course of atherothrombosis. Nevertheless, it should be noted that it is unrealistic to expect any pharmaceutical entity to be completely devoid of side effects and that the decision-making process during evaluation of new agents remains complicated even for experienced investigators and regulatory authorities.[98]

## Note Added in Proof

Additional support for the concept of an increased risk of MI with both conventional NSAIDs and coxibs is found in a report from the United Kingdom that analyzed 9218 cases and 86 349 controls in a clinical database containing records from 468 practices.[99] Further discussion of the marketing influences surrounding the coxibs and regulatory considerations can be found in a perspective written by Henry Waxman, a US Representative from California.[100]

## Acknowledgments

We thank Drs Joseph Vita, Jane Leopold, and Charles Serhan for helpful comments.

## References

1. Bresalier RS, Sandler RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. *N Engl J Med.* 2005;352:1092–102.
2. Pratico D, Dogne J. Selective COX-2 inhibitors development in cardiovascular medicine. *Circulation.* In press.
3. Brophy J. Hot Topic: Cyclooxygenase-2 inhibition and coronary risk. Available at: McGraw-Hill's AccessMedicine, Harrison's Online Updates, 2005. Accessed March 25, 2005.
4. Statement of Sandra Kweder, MD, Deputy Director, Office of New Drugs, Center for Drug Evaluation and Research, US Food and Drug Administration. Washington, DC: Committee on Finance, United States Senate; November 18, 2004. Available at: http://www.fda/gov/ola/2004/vioxx1118.html. Accessed December 31, 2004.
5. US Food and Drug Administration, Center for Drug Evaluation and Research, Public Health Advisory. Non-steroidal anti-inflammatory drug products (NSAIDS). Available at: http://www.fda.gov/cder/drug/advisory/nsaids.htm. Accessed January 19, 2005.
6. American College of Rheumatology. American College of Rheumatology offers guidance for assessing arthritis pain medication usage. Press release, 2005. Available at: http://www.rheumatology.org/press/2004/cox_2_news.asp. Accessed January 23, 2005.
7. Bennett JS, Daugherty A, Herrington D, et al. The use of nonsteroidal anti-inflammatory drugs (NSAIDs): a science advisory from the American Heart Association. *Circulation.* 2005;111:1713–1716.
8. Crawford L. Letter to FDA revealing heart dangers in an unpublished clinical trial of Celebrex (HRG Publication #1721). Public Citizen, citizen.org, 2005. Available at: http://www.citizen.org/publications/release.cfm?ID=7359. Accessed on February 1, 2005.
9. Summary of Prepared Testimony, Raymond V. Gilmartin, President, Chairman and Chief Executive Officer, Merck and Co, Inc, before the US Senate Committee on Finance, November 18, 2004. Merck News Item, 2005. Available at: http://www.merck.com/newsroom/vioxx_withdrawal/11182004.html. Accessed April 12, 2005.

10. Rubin R. Painkillers hang in the balance. USATODAY.com, 2005. http://www.usatoday.com/news/health/2005-02-10-painkillers_x.htm. Accessed February 11, 2005.

11. Schmid R. FDA scientist warns of COX-2 drug dangers. USA TODAY. February 18, 2005:4A.

12. Hla T. A balanced look at COX-2 drugs. Boston Globe. March 25, 2005.

13. Henderson D, Rowland C. Once "too slow," FDA approvals called "too fast." Boston Globe. Available at: http://www.boston.com/business/articles/2005/04/10/fda_criticized_as_too_quick_to_ok_drugs/. Accessed on April 10, 2005.

14. Foegh M, Ramwell P. The eicosanoids: prostaglandins, thromboxanes, leukotrienes, and related compounds. In: Katzung BG, ed. Basic and Clinical Pharmacology. 9th ed. New York, NY: Lange Medical Books/McGraw-Hill; 2004.

15. Wagner W, Khanna P, Furst DE. Nonsteroidal anti-inflammatory drugs, disease-modifying antirheumatic drugs, nonopioid analgesics, and drugs used in gout. In: Katzung BG, ed. Basic and Clinical Pharmacology. 9th ed. New York, NY: Lange Medical Books/McGraw-Hill; 2004.

16. Samuelsson B, Dahlen SE, Lindgren JA, et al. Leukotrienes and lipoxins: structures, biosynthesis, and biological effects. Science. 1987; 237:1171–1186.

17. Marcus AJ. Transcellular metabolism of eicosanoids. Prog Hemost Thromb. 1986;8:127–142.

18. Hawkey CJ. COX-2 inhibitors. Lancet. 1999;353:307–314.

19. Warner TD, Mitchell JA. Cyclooxygenases: new forms, new inhibitors, and lessons from the clinic. FASEB J. 2004;18:790–804.

20. Huang JQ, Sridhar S, Hunt RH. Role of Helicobacter pylori infection and non-steroidal anti-inflammatory drugs in peptic-ulcer disease: a meta-analysis. Lancet. 2002;359:14–22.

21. Ofman JJ, MacLean CH, Straus WL, et al. A metaanalysis of severe upper gastrointestinal complications of nonsteroidal antiinflammatory drugs. J Rheumatol. 2002;29:804–812.

22. Singh G. Recent considerations in nonsteroidal anti-inflammatory drug gastropathy. Am J Med. 1998;105:31S–38S.

23. Kaufman DW, Kelly JP, Rosenberg L, et al. Are cyclooxygenase-2 inhibitors being taken only by those who need them? Arch Intern Med. 2005;165:1066–1067.

24. Gimbrone MA, Jr., Topper JN, Nagel T, et al. Endothelial dysfunction, hemodynamic forces, and atherogenesis. Ann N Y Acad Sci. 2000;902: 230–239; discussion 239–240.

25. McAdam BF, Catella-Lawson F, Mardini IA, et al. Systemic biosynthesis of prostacyclin by cyclooxygenase (COX)-2: the human pharmacology of a selective inhibitor of COX-2. Proc Natl Acad Sci U S A. 1999;96:272–277.

26. Hansson GK. Inflammation, atherosclerosis, and coronary artery disease. N Engl J Med. 2005;352:1685–1695.

27. Belton O, Byrne D, Kearney D, et al. Cyclooxygenase-1 and -2-dependent prostacyclin formation in patients with atherosclerosis. Circulation. 2000;102:840–845.

28. Schonbeck U, Sukhova GK, Graber P, et al. Augmented expression of cyclooxygenase-2 in human atherosclerotic lesions. Am J Pathol. 1999; 155:1281–1291.

29. Monobe H, Yamanari H, Nakamura K, et al. Effects of low-dose aspirin on endothelial function in hypertensive patients. Clin Cardiol. 2001;24: 705-709.

30. Widlansky ME, Price DT, Gokce N, et al. Short- and long-term COX-2 inhibition reverses endothelial dysfunction in patients with hypertension. Hypertension. 2003;42:310–315.

31. Bulut V, Liaghat S, Hanefeld C, et al. Selective cyclo-oxygenase-2 inhibition with parecoxib acutely impairs endothelium-dependent vasodilatation in patients with essential hypertension. J Hypertens. 2003;21: 1663–1667.

32. Cipollone F, Prontera C, Pini B, et al. Overexpression of functionally coupled cyclooxygenase-2 and prostaglandin E synthase in symptomatic atherosclerotic plaques as a basis of prostaglandin E(2)-dependent plaque instability. Circulation. 2001;104:921–927.

33. Burleigh ME, Babaev VR, Oates JA, et al. Cyclooxygenase-2 promotes early atherosclerotic lesion formation in LDL receptor-deficient mice. Circulation. 2002;105:1816–1823.

34. Olesen M, Kwong E, Mezili A, et al. No effect of cyclooxygenase inhibition on plaque size in atherosclerosis-prone mice. Scand Cardiovasc J. 2002;36:362–367.

35. Rott D, Zhu J, Burnett MS, et al. Effects of MF-tricyclic, a selective cyclooxygenase-2 inhibitor, on atherosclerosis progression and susceptibility to cytomegalovirus replication in apolipoprotein-E knockout mice. J Am Coll Cardiol. 2003;41:1812–1819.

36. Egan KM, Lawson JA, Fries S, et al. COX-2-derived prostacyclin confers atheroprotection on female mice. Science. 2004;306: 1954–1957.

37. Takayama K, Garcia-Cardena G, Sukhova GK, et al. Prostaglandin E2 suppresses chemokine production in human macrophages through the EP4 receptor. J Biol Chem. 2002;277:44147–44154.

38. Cayatte AJ, Du Y, Oliver-Krasinski J, et al. The thromboxane receptor antagonist S18886 but not aspirin inhibits atherogenesis in apo E-deficient mice: evidence that eicosanoids other than thromboxane contribute to atherosclerosis. Arterioscler Thromb Vasc Biol. 2000;20: 1724–1728.

39. Funk CD, Cyrus T. 12/15-lipoxygenase, oxidative modification of LDL and atherogenesis. Trends Cardiovasc Med. 2001;11:116–124.

40. Serhan CN, Jain A, Marleau S, et al. Reduced inflammation and tissue damage in transgenic rabbits overexpressing 15-lipoxygenase and endogenous anti-inflammatory lipid mediators. J Immunol. 2003;171: 6856–6865.

41. Chiang N, Bermudez EA, Ridker PM, et al. Aspirin triggers antiinflammatory 15-epi-lipoxin A4 and inhibits thromboxane in a randomized human trial. Proc Natl Acad Sci U S A. 2004;101:15178–15183.

42. Mehrabian M, Allayee H, Wong J, et al. Identification of 5-lipoxygenase as a major gene contributing to atherosclerosis susceptibility in mice. Circ Res. 2002;91:120–126.

43. Dwyer JH, Allayee H, Dwyer KM, et al. Arachidonate 5-lipoxygenase promoter genotype, dietary arachidonic acid, and atherosclerosis. N Engl J Med. 2004;350:29–37.

44. Helgadottir A, Manolescu A, Thorleifsson G, et al. The gene encoding 5-lipoxygenase activating protein confers risk of myocardial infarction and stroke. Nat Genet. 2004;36:233–239.

45. Wade ML, Fitzpatrick FA. Nitric oxide modulates the activity of the hemoproteins prostaglandin I2 synthase and thromboxane A2 synthase. Arch Biochem Biophys. 1997;314:174–180.

46. Zellers TM, Wu YQ, McCormick J, et al. Prostacyclin-induced relaxations of small porcine pulmonary arteries are enhanced by the basal release of endothelium-derived nitric oxide through an effect on cyclic GMP-inhibited-cyclic AMP phosphodiesterase. Acta Pharmacol Sin. 2001;22:131–138.

47. Koga T, Az-ma T, Yuge O. Prostaglandin E1 at clinically relevant concentrations inhibits aggregation of platelets under synergic interaction with endothelial cells. Acta Anaesthesiol Scand. 2002;46: 987–993.

48. Stamler JS, Vaughan DE, Loscalzo J. Synergistic disaggregation of platelets by tissue-type plasminogen activator, prostaglandin E1, and nitroglycerin. Circ Res. 1989;65:796–804.

49. Niwano K, Arai M, Tomaru K, et al. Transcriptional stimulation of the eNOS gene by the stable prostacyclin analogue beraprost is mediated through cAMP-responsive element in vascular endothelial cells: close link between PGI2 signal and NO pathways. Circ Res. 2003;93: 523–530.

50. Bachschmid M, Thurau S, Zou MH, et al. Endothelial cell activation by endotoxin involves superoxide/NO-mediated nitration of prostacyclin synthase and thromboxane receptor stimulation. FASEB J. 2003;17: 914–916.

51. Schmidt P, Youhnovski N, Daiber A, et al. Specific nitration at tyrosine 430 revealed by high resolution mass spectrometry as basis for redox regulation of bovine prostacyclin synthase. J Biol Chem. 2003;278: 12813–12819.

52. Muzaffar S, Shukla N, Lobo C, et al. Iloprost inhibits superoxide formation and gp91phox expression induced by the thromboxane A2 analogue U46619, 8-isoprostane F2α, prostaglandin F2α, cytokines and endotoxin in the pig pulmonary artery. Br J Pharmacol. 2004;141: 488–496.

53. Perez-Sala D, Lamas S. Regulation of cyclooxygenase-2 expression by nitric oxide in cells. Antioxid Redox Signal. 2001;3:231–248.

54. Venugopal SK, Devaraj S, Jialal I. C-reactive protein decreases prostacyclin release from human aortic endothelial cells. Circulation. 2003; 108:1676–1678.

55. Bolli R, Shinmura K, Tang XL, et al. Discovery of a new function of cyclooxygenase (COX)-2: COX-2 is a cardioprotective protein that alleviates ischemia/reperfusion injury and mediates the late phase of preconditioning. Cardiovasc Res. 2002;55:506–519.

56. Haider A, Lee I, Grabarek J, et al. Dual functionality of cyclooxygenase-2 as a regulator of tumor necrosis factor-mediated G1 shortening and

56. nitric oxide-mediated inhibition of vascular smooth muscle cell proliferation. *Circulation.* 2003;108;1015–1021.

57. Coffey MJ, Phare SM, Peters-Golden M. Interaction between nitric oxide, reactive oxygen intermediates, and peroxynitrite in the regulation of 5-lipoxygenase metabolism. *Biochim Biophys Acta.* 2002;1584: 81–90.

58. Velardez MO, Ogando D, Franchi AM, et al. Role of nitric oxide in the metabolism of arachidonic acid in the rat anterior pituitary gland. *Mol Cell Endocrinol.* 2001;172:7–12.

59. Coffey MJ, Phare SM, Peters-Golden M. Prolonged exposure to lipopolysaccharide inhibits macrophage 5-lipoxygenase metabolism via induction of nitric oxide synthesis. *J Immunol.* 2000;165:3592–3598.

60. Luchtefeld M, Drexler H, Schieffer B. 5-Lipoxygenase is involved in the angiotensin II–induced NAD(P)H-oxidase activation. *Biochem Biophys Res Commun.* 2003;308:668–672.

61. Penglis PS, Cleland LG, Demasi M, et al. Differential regulation of prostaglandin E2 and thromboxane A2 production in human monocytes: implications for the use of cyclooxygenase inhibitors. *J Immunol.* 2000; 165:1605–1611.

62. Ma H, Hara A, Xiao CY, et al. Increased bleeding tendency and decreased susceptibility to thromboembolism in mice lacking the prostaglandin E receptor subtype EP(3), *Circulation.* 2001;104:1176–1180.

63. Coffey MJ, Coles B, O'Donnell VB. Interactions of nitric oxide-derived reactive nitrogen species with peroxidases and lipoxygenases. *Free Radic Res.* 2001;35:447–464.

64. Kobayashi T, Tahara Y, Matsumoto M, et al. Roles of thromboxane A(2) and prostacyclin in the development of atherosclerosis in apoE-deficient mice. *J Clin Invest.* 2004;114:784–794.

65. FitzGerald GA, Smith B, Pedersen AK, et al. Increased prostacyclin biosynthesis in patients with severe atherosclerosis and platelet activation. *N Engl J Med.* 1984;310:1065–1068.

66. Moreno-Sanchez R, Bravo C, Vasquez C, et al. Inhibition and uncoupling of oxidative phosphorylation by nonsteroidal anti-inflammatory drugs: study in mitochondria, submitochondrial particles, cells, and whole heart. *Biochem Pharmacol.* 1999;57:743–752.

67. Rossat J, Maillard M, Nussberger J, et al. Renal effects of selective cyclooxygenase-2 inhibition in normotensive salt-depleted subjects. *Clin Pharmacol Ther.* 1999;66:76–84.

68. Aw TJ, Haas SJ, Liew D, et al. Meta-analysis of cyclooxygenase-2 inhibitors and their effects on blood pressure. *Arch Intern Med.* 2005; 165:490–496.

69. Sowers JR, White WB, Pitt B, et al. The effects of cyclooxygenase-2 inhibitors and nonsteroidal anti-inflammatory therapy on 24-hour blood pressure in patients with hypertension, osteoarthritis, and type 2 diabetes mellitus. *Arch Intern Med.* 2005;165:161–168.

70. Swan SK, Rudy DW, Lasseter KC, et al. Effect of cyclooxygenase-2 inhibition on renal function in elderly persons receiving a low-salt diet: a randomized, controlled trial. *Ann Intern Med.* 2000;133:1–9.

71. Singh G, Miller JD, Huse DM, et al. Consequences of increased systolic blood pressure in patients with osteoarthritis and rheumatoid arthritis. *J Rheumatol.* 2003;30:714–719.

72. Pfizer Inc. Protocol No. IQ5-97–02–001: a double-blind, randomized, placebo-controlled, comparative study of Celecoxib (SC-58635) for the inhibition of progression of Alzheimer's disease; Protocol No. EQ5-98–02–002: a placebo-controlled evaluation of the long-term efficacy and safety of Celecoxib (SC-58635) in Alzheimer's disease. ClinicalStudyResults.org, Available at: http://www.clinicalstudyresults.org/drugdetails/?inn_name_id=55&sort=c.company_name&. Accessed February 1, 2005.

73. Juni P, Nartey L, Reichenbach S, et al. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. *Lancet.* 2004;364:2021–2029.

74. Solomon SD, McMurray JJ, Pfeffer MA, et al. Cardiovascular risk associated with celecoxib in a clinical trial for colorectal adenoma prevention. *N Engl J Med.* 2005;352:1071–1080.

75. Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis: VIGOR Study Group. *N Engl J Med.* 2000;343:1520–1528.

76. Mukherjee D, Nissen SE, Topol EJ. Risk of cardiovascular events associated with selective COX-2 inhibitors. *JAMA.* 2001;286:954–959.

77. Solomon DH, Schneeweiss S, Glynn RJ, et al. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. *Circulation.* 2004;109:2068–2073.

78. Kimmel SE, Berlin JA, Reilly M, et al. Patients exposed to rofecoxib and celecoxib have different odds of nonfatal myocardial infarction. *Ann Intern Med.* 2005;142:157–164.

79. Levesque LE, Brophy JM, Zhang B The risk for myocardial infarction with cyclooxygenase-2 inhibitors: a population study of elderly adults. *Ann Intern Med.* 2005;142:481–489.

80. Graham DJ, Campen D, Hui R, et al. Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study. *Lancet.* 2005;365:475–481.

81. Furberg CD, Psaty BM, FitzGerald GA. Parecoxib, valdecoxib, and cardiovascular risk. *Circulation.* 2005;111:249.

82. US Food and Drug Administration. FDA issues Public Health Advisory recommending limited use of Cox-2 inhibitors: agency requires evaluation of prevention studies involving Cox-2 inhibitors. FDA Talk Paper, 2004. Available at: http://www.fda.gov/bbs/topics/ANSWERS/2004/ANS01336.html. Accessed January 19, 2005.

83. National Institutes of Health, NIH Office of Communications and Public Liaison. Use of non-steroidal anti-inflammatory drugs suspended in large Alzheimer's disease prevention trial. Available at: http://www.nih.gov/news/pr/dec2004/od-20.htm. Accessed April 12, 2005.

84. Whalen J. Stronger warnings are ordered for Cox-2 inhibitors in Europe. *The Wall Street Journal Europe.* February 18–February 20, 2005:A4.

85. Adetunji L, Bowe C Watchdog imposes curbs on dosages of Cox-2 pain drugs. *London Financial Times.* February 18, 2005:15.

86. Farkouh ME, Kirshner H, Harrington RA, et al. Comparison of lumiracoxib with naproxen and ibuprofen in the Therapeutic Arthritis Research and Gastrointestinal Event Trial (TARGET), cardiovascular outcomes: randomised controlled trial. *Lancet.* 2004;364:675–684.

87. US Food and Drug Administration. FDA announces series of changes to the class of marketed non-steroidal anti-inflammatory drugs (NSAIDS). FDA News. Available at: http://www.fda.gov/bbs/topics/news/2005/NEW01171.html. Accessed April 7, 2005.

88. Johnsen SP, Larsson H, Tarone RE, et al. Risk of hospitalization for myocardial infarction among users of rofecoxib, celecoxib, and other NSAIDs: a population based case-control study. *Arch Intern Med.* 2005; 165:978–984.

89. Catella-Lawson F, Reilly MP, Kapoor SC, et al. Cyclooxygenase inhibitors and the antiplatelet effects of aspirin. *N Engl J Med.* 2001;345: 1809–1817.

90. Wetsler BB, Pett SB, Alonso D, et al. Differential inhibition by aspirin of vascular and platelet prostaglandin synthesis in atherosclerotic patients. *N Engl J Med.* 1983;308:800–805.

91. Okie S. What ails the FDA? *N Engl J Med.* 2005;352:1063–1066.

92. Hawthorne F. How powerful is industry? In: *Inside the FDA: The Business and Politics Behind the Drugs We Take and the Food We Eat.* Hoboken, NJ: John Wiley & Sons; 2005:143–177.

93. Hawthorne F. The FDA meets Madison Avenue. In: *Inside the FDA: The Business and Politics Behind the Drugs We Take and the Food We Eat.* Hoboken, NJ: John Wiley & Sons; 2005:253–272.

94. Coronary Drug Project Research Group. Practical aspects of decision making in clinical trials: the coronary drug project as a case study. *Control Clin Trials.* 1981;1:363–376.

95. US Department of Health and Human Services. Reforms will improve oversight and openness at FDA: Secretary Leavitt meets with employees and announces a new day at FDA. FDA Press Office, 2/15/05. Available at: www.fda.gov/oc/er/drugsafety.htm. http://www.hhs.gov/news. Accessed April 12, 2005.

96. Hawthorne F. The next 100 years. In: *Inside the FDA: The Business and Politics Behind the Drugs We Take and the Food We Eat.* Hoboken, NJ: John Wiley & Sons; 2005:285–308.

97. Bennett CL, Nebeker JR, Lyons EA, et al. The Research on Adverse Drug Events and Reports (RADAR) project. *JAMA.* 2005;293: 2131–2140.

98. Roden DM, Temple R. The US Food and Drug Administration Cardiorenal Advisory Panel and the drug approval process. *Circulation.* 2005;111:1697–1702.

99. Hippisley-Cox J, Coupland C. Risk of myocardial infarction in patients taking cyclo-oxygenase 2 inhibitors or conventional non-steroidal anti-inflammatory drugs: population based nested case-control analysis. *Br Med J.* 2005;330:1366–1343.

100. Waxman HA. The lessons of Vioxx: drug safety and sales. *N Engl J Med.* 2005;352:2576–2578.

KEY WORDS: inflammation ■ pharmacology ■ platelets ■ prostaglandins ■ thromboxane

**EXHIBIT "11"**
**Part A**

**EXHIBIT "11"**
**Part A**



U.S. DISTRIC
EASTERN DISTRICT
FILED   NOV 18 2005
Nov 18 2005
4:46 PM
LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

|   |   |   |
|---|---|---|
| | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : | |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION: L** |
| | : | |
| | : | **JUDGE FALLON** |
| | : | **MAG. JUDGE KNOWLES** |

. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. : 

**THIS DOCUMENT RELATES TO**
   *Plunkett v. Merck & Co., Inc.*, 05-4046

### ORDER & REASONS

Before the Court are several *Daubert* and *Daubert*-like motions filed by both the Plaintiff

and Defendant. For the following reasons, the Court rules as follows:

**I.     Background**

Vioxx (known generically as rofecoxib) belongs to a general class of pain relievers

known as non-steroidal anti-inflammatory drugs ("NSAIDs"). This class of drugs contains well-

known medications sold either over the counter—such as Advil (ibuprofen) and Aleve

(naproxen)—or by prescription—such as Daypro (oxaprozin) and Voltaren (diclofenac).

NSAIDs work by inhibiting cyclooxygenase (COX), an enzyme that stimulates synthesis of

prostaglandins, which are chemicals produced in the body that promote certain effects.

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep._____
___ Doc. No. _____

Traditional NSAIDs have been a longstanding treatment option for patients needing relief from chronic or acute inflammation and pain associated with osteoarthritis. rheumatoid arthritis, and other musculoskeletal conditions. This relief, however, comes with significant adverse side effects. Specifically, traditional NSAIDs greatly increase the risk of gastrointestinal perforations, ulcers, and bleeds ("PUBs"). This risk is increased when high doses are ingested, which is often necessary to remedy chronic or acute inflammation and pain. Scientists estimated that traditional NSAID-induced PUBs caused a significant number of deaths and hospitalizations each year in the United States.

In the early 1990s, scientists discovered that the COX enzyme had two forms—COX-1 and COX-2—each of which appeared to have several distinct functions. Scientists believed that COX-1 affected the synthesis or production of prostaglandins responsible for protection of the stomach lining, whereas COX-2 mediated the synthesis or production of prostaglandins responsible for pain and inflammation. This belief led scientists to hypothesize that "selective" NSAIDs designed to inhibit COX-2, but not COX-1, could offer the same pain relief as traditional NSAIDs with the reduced risk of fatal or debilitating PUBs. In addition, scientists believed that such drugs might be able to prove beneficial for the prevention or treatment of other conditions, such as Alzheimer's disease and certain cancers, where evidence suggested that inflammation may play a causative role.

In light of these scientific developments, Merck & Co., Inc. ("Merck") and several other pharmaceutical companies began the development of such drugs, which became known as "COX-2 inhibitors" or "coxibs." Vioxx is a COX-2 inhibitor.

On May 20, 1999, the Food and Drug Administration ("FDA") approved Vioxx for sale

-2-

in the United States. From its initial approval, Vioxx gained widespread acceptance among physicians treating patients with arthritis and other conditions causing chronic or acute pain.

Before and after its initial approval, Vioxx was subjected to a number of studies and tests, including, but not limited to, VIGOR, APPROVe, ViP, VICTOR, ADVANTAGE, the Alzheimer's studies, Professor Kronmal's reanalysis of Merck's clinical data, the Solomon study, the Juni study, the Ray study, the Graham study, the Kimmel study, the Levesque study, the Mamdani study, the Ingenix study, the Johnsen study, the Nussmeier study, and the Fitzgerald hypothesis. In addition, a large amount of scientific literature was written on the effects of Vioxx and other COX-2 inhibitors.

On September 30, 2004, Merck withdrew Vioxx from the market when interim unblinded data from a long-term, blinded, randomized placebo-controlled clinical trial, known as APPROVe, seeking to assess whether Vioxx could help prevent the recurrence of precancerous colon polyps, indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions and ischemic stroke.

Thousands of lawsuits followed in both state and federal court. On February 16, 2005, as a result of the sheer mass of these lawsuits and the potential for many more, the Judicial Panel on Multidistrict Litigation ordered that the Vioxx litigation be centralized, designated as an MDL, and assigned to this Court.

One of this Court's first tasks was to set cases for early federal court trial. With the consent of both the Plaintiff and Merck, this case was set for trial in late November in New Orleans, Louisiana. Due to Hurricane Katrina, the location of the trial was moved with the consent of the parties to Houston, Texas, but the timing of the trial remained the same. This case

involves the death of Richard Irvin, Jr.

Mr. Irvin was a 53-year-old man with severe lower back and hip pain. He weighed approximately 230 lbs. and stood 6' tall. On April 9, 2001, he asked his son-in-law, Dr. Christopher Schirmer, an emergency room physician, to give him something for pain. Dr. Schirmer gave Mr. Irvin a prescription for Vicoprofen 7.5/200 mg and Methocarbmol 750 mg each to be taken once every six hours. Mr. Irvin was unable to tolerate this medication because it produced severe nausea and vomiting. In addition, it provided no significant pain relief.

Subsequently, Mr. Irvin received some samples of Vioxx 25 mg from a friend. He was able to tolerate the Vioxx, and it also reduced his pain. On April 15, 2001, he again contacted Dr. Schirmer and, this time, requested a prescription for Vioxx. Dr. Schirmer sent Mr. Irvin a prescription for 30 tablets of Vioxx 25 mg to be taken once daily. This prescription was filled on April 22, 2001.

On May 15, 2001, while at work, Mr. Irvin suffered a heart attack. Extensive resuscitative efforts were then carried out by the Fire Department Emergency Medical Technicians and later by emergency room personnel at Flagler Hospital in St. Augustine, Florida, where Mr. Irvin had been taken. These efforts were unsuccessful, and Mr. Irvin was pronounced dead at 9:02 a.m. on May 15, 2001. An autopsy revealed an unattached coronary thrombus, or clot, in the left anterior descending coronary artery.

Mr. Irvin's surviving spouse, Evelyn Irvin Plunkett, has brought this suit against Merck on behalf of herself, Mr. Irvin's two minor children, and the Estate of Richard Irvin, Jr. She alleges that Vioxx was a defective product, Merck knew Vioxx was defective, and Merck failed to adequately warn Mr. Irvin of Vioxx's defective nature. As such, she asserts that Merck is

liable for Mr. Irvin's death.

In particular, the Plaintiff asserts that the scientific tests conducted on and the scientific literature written on Vioxx revealed that Vioxx increases the risk of cardiovascular thrombotic events. To put it simply, the Plaintiff contends that Vioxx creates an imbalance between thromboxane and prostacyclin. Thromboxane promotes platelet aggregation, vessel constriction, and proliferation of smooth muscle cells. Prostacyclin, however, opposes the action of thromboxane inhibiting platelet aggregation, facilitating vasodilation, and preventing proliferation of smooth muscle cells. COX-2 is the dominant source of prostacyclin; therefore, the Plaintiff claims that the inhibition of COX-2 favors thrombogenesis, hypertension, and the promotion of atherosclerosis. Specifically, the Plaintiff claims that this mechanism ultimately led to the formation of the thrombus in Mr. Irvin's left anterior descending coronary artery and caused his death.

Merck asserts that none of the tests specifically revealed that Vioxx 25 mg ingested for less than a month can increase the risk of adverse cardiovascular events or create a prothrombotic state.

The Plaintiff and Merck intend to call experts to support their respective positions and each has filed *Daubert* motions to exclude the other's witnesses.

## II.    LAW AND ANALYSIS

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrel Dow Pharmaceuticals*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court held that trial courts should serve as the gatekeeeper for expert testimony and should not admit such

testimony without first determining that the testimony is both "reliable" and "relevant." *Id.* at 589.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Id.* at 592-93. In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* at 593-95. These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

In addition to the five factors laid out in *Daubert*, a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999). Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g., id.* at 313; *Moore v. Ashland Chem., Inc.*,

151 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106,

1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 678 (W.D. Tex. 2002).

      Scientific testimony is relevant only if the expert's reasoning or methodology can be

properly applied to the facts in issue, meaning that there is an appropriate fit between the

scientific testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593. Scientific

evidence is irrelevant, however, when there is too great an analytical gap between the data and

the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

      The party seeking to introduce the expert testimony bears the burden of demonstrating

that the testimony is both relevant and reliable. *Moore*, 151 F.3d at 275-76. The focus is not on

the result or conclusion, but on the methodology. *Id.* The proponent need not prove that the

expert's testimony is correct, but must prove by a preponderance of the evidence that the

methodology used by the expert was proper. *Id.*

      The trial court is the gatekeeper of scientific evidence. *Daubert*, 509 U.S. at 596. It has a

special obligation to ensure that any and all expert testimony meets these standards. *Id.*

Accordingly, it must make a preliminary assessment of whether the reasoning or methodology

underlying the testimony is scientifically valid and whether the reasoning or methodology can be

properly applied to the facts in issue. *Id.* at 592-93. In making this assessment, the trial court

need not take the expert's word for it. *Joiner*, 522 U.S. at 147. Instead, when expert testimony

is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to

exclude it. *Moore*, 151 F.3d at 279.

      In satisfying its "gatekeeper" duty, the Court will look at the qualifications of the experts

and the methodology used in reaching their opinions and not attempt to determine the accuracy of

the conclusion reached by the expert. The validity or correctness of the conclusions is for the

fact finder to determine.

## III.    Present Motions

The Plaintiff has filed the following eight motions: (1) A Motion to Exclude the

Testimony of Dr. Thomas Wheeler (Rec. Doc. 1139); (2) A Motion to Exclude the Testimony of

Dr. Janet Arrowsmith-Lowe (Rec. Doc. 1372); (3) A Motion to Exclude the Testimony of

Doctors Frank Lanza and Merlin Wilson (Rec. Doc. 1142); (4) A Motion to Exclude the

Testimony of Dr. David Silver (Rec. Doc. 1143); (5) A Motion to Exclude Testimony that

Adverse Thrombotic Cardiac Events Occur Only if Vioxx is Ingested 18 Months or Longer (Rec.

Doc. 1144); (6) A Motion to Exclude Testimony that Vioxx is the Same as All NSAIDs

Regarding Cardiotoxic Effects (Rec. Doc. 1138); (7) A Motion to Exclude Testimony that

Naproxen is Sufficiently Cardioprotective to Explain the Excess Cardiac Risk in VIGOR (Rec.

Doc. 1141); and (8) A Motion to Exclude Testimony that Merck Could Not Provide Risk

Information Through Labeling or Marketing Without Prior Approval of the FDA (Rec. Doc.

1140).[1]

Merck has also filed the following eight motions: (1) A Motion to Exclude the Testimony

of Winston Gandy, Jr., M.D. (Rec. Doc. 1118); (2) A Motion to Exclude the Testimony of

Wayne A. Ray, Ph.D. (Rec. Doc. 1117); (3) A Motion to Exclude the Testimony of Benedict

Lucchesi, M.D., Ph.D., M.S., F.A.H.A. (Rec. Doc. 1172); (4) A Motion to Exclude the

Testimony of Colin M. Bloor, M.D., and Joseph L. Burton, M.D. (Rec. Doc. 1120); (5) A Motion

---

[1] The Court is classifying the Plaintiff's last four motions and Merck's last motion as *Daubert*-like motions, as opposed to *Daubert* motions. These five motions do not challenge a specific expert's qualifications and methodology, but challenge the reliability of certain scientific conclusions.

to Exclude the Testimony of Thomas Baldwin, M.D. (Rec. Doc. 1121); (6) A Motion to Exclude

the Testimony of John W. Farquhar, M.D. (Rec. Doc. 1122); (7) A Motion to Exclude the

Testimony of Richard M. Kapit, M.D. (Rec. Doc. 1119); and (8) A Motion to Exclude Evidence

of the Plaintiff's Experts Regarding Causation (Rec Doc. 1515).

The Court has reviewed the reports from the experts at issue and studied the extensive

briefs submitted by the parties. Counsel further presented their respective positions at a hearing

specifically set for this purpose on November 14-15, 2005. It is now appropriate for the Court to

rule on these motions.

Generally, in *Daubert* motions, the parties attack the methodology used by the proposed

expert or question the expertise of the expert. Here, at least in most of these motions, the movant

questions the interpretation or accuracy of the underlying source studies or literature relied on by

the expert and suggests that the conclusions drawn or formulated by the expert are flawed. The

Court will address each challenged expert in turn starting first with the Plaintiff's motions and

then proceeding to Merck's motions. Once the Court has reviewed these *Daubert* motions, the

Court will rule on the *Daubert*-like motions.

## A.    Plaintiff's Motions

### I.    Dr. Thomas Wheeler

Dr. Wheeler was retained by Merck to testify as an expert regarding: (1) the cause and

manner of Irvin's death; (2) the role of Irvin's pre-existing artherosclerosis in his death,

specifically as it relates to an ostensible rupture of Irvin's artherosclerotic plaque; (3) the role of

hypertrophy of Irvin's heart in his death; and (4) the lack of evidence to link short-term use of

Vioxx 25 mg with serious adverse cardiovascular events.

a.      **Plaintiff's Position**

First, the Plaintiff argues that Dr. Wheeler lacks the necessary expertise to express an opinion. It is thus appropriate to review his curriculum vitae. Dr. Wheeler completed a residency in general pathology in 1981. There was no specialization in cardiac pathology at that time. Following his residency, he did not do any formal postgraduate training in cardiac pathology or any other subspecialty of pathology. After that, he became an Assistant Professor of Pathology at the Baylor College of Medicine. Since that time, according to the Plaintiff, Dr. Wheeler has become an authority on prostate pathology, but has done little work in the area of cardiac pathology. He has never conducted an independent study of his own on sudden cardiac death; he does not recall ever offering pathological expertise in any formal study in sudden cardiac death; he has not authored or co-authored a publication in sudden cardiac death. He is not a medical examiner or forensic pathologist who specifically addresses causes of death as a matter of routine. In addition, he only considers himself an expert in cardiac arrhythmias in a general medical sense, not as a cardiologist. He has never diagnosed a case of drug-induced myocardial infarction or cardiac thrombosis formation.

The Plaintiff also challenges Dr. Wheeler's ability to offer an opinion concerning cardiac hypertrophy (enlargement of the heart) because he has not done any research, published an article, or lectured on cardiac hypertrophy. Moreover, the Plaintiff suggests that mean weight, the tool used by Dr. Wheeler in diagnosing hypertrophy, is not reliable for determining hypertrophy.

The Plaintiff also challenges Dr. Wheeler's expertise to testify as to the focal rupture of the fibrous cap because Dr. Wheeler could not visualize one, but rather concluded one was

present based on other observable phenomena in autopsy slides.

### b.    Merck's Position

According to Merck, Dr. Wheeler posses sufficient expertise to testify on the cause and manner of Mr. Irvin's death.  He has been board certified in both anatomic and clinical pathology, which includes cardiac pathology, for nearly 25 years.  For three years in the late 1990s, Dr. Wheeler served on the Anatomic Pathology Test Committee of the American Board of Pathology and helped design the anatomic pathology certification examination.  Over the course of his career, Dr. Wheeler has conducted numerous autopsies involving cardiovascular issues and performed/supervised several hundred autopsies, many involving atherosclerotic coronary vascular disease.  Additionally, Merck points out that an expert need not be an internationally recognized cardiac pathologist to provide expert testimony on cardiac-related causes of death.

As to cardiac hypertrophy, Merck asserts that Dr. Wheeler's substantial experience and training as a pathologist and his voluminous experience with respect to cardiac-related autopsies more than qualifies him to provide expert testimony as to cardiac hypertrophy despite the fact that it was not his primary research focus.  In addition, Dr. Wheeler testified that certain studies have classified hearts with weights greater than the mean as enlarged hearts.  Since Mr. Irvin's heart weight was greater than the mean, he classified it as enlarged.

As to the focal rupture of the fibrous cap, Merck asserts that two of the Plaintiff's experts agree with Dr. Wheeler.  Next, Merck asserts that the observations made by Dr. Wheeler which led him to conclude that there was a focal rupture are consistent with the standard method for arriving at that diagnosis.  Also, Merck points out that the focal rupture appears on other slides

produced by the Plaintiff after the submission of Dr. Wheeler's report. In summary, Merck

contends that Dr. Wheeler arrived at his diagnosis through standard diagnosis procedure, it was

agreed to by two of the Plaintiff's experts, and was subsequently confirmed by additional

evidence. As such, his opinion cannot be classified as conjecture, according to Merck.

### c.    Court's Ruling

Dr. Wheeler is a board certified physician in both anatomical pathology and clinical

pathology with a subspecialty in cytopathology. He is currently licensed to practice medicine in

the state of Texas. He has been a practicing physician for the past 24 years and is currently the

Interim Chair of the Department of Pathology at Baylor College of Medicine in Houston, Texas.

Over the course of his career, he has performed hundreds of autopsies and signed off on hundreds

more.

In formulating his opinion, he reviewed the report and histological slides from Mr. Irvin's

autopsy, as well as Mr. Irvin's personal medical records, including reports from a 1998

emergency room visit as well as a report on the day of his death. He also reviewed the expert

reports of Doctors Burton and Bloor, who are the Plaintiff's expert pathologists, and the

depositions of both Dr. Schirmer and the Plaintiff. He based his opinions on these materials and

his education, training, and experience.

At oral argument, the Plaintiff's main attack on Dr. Wheeler's qualifications was that he

is an expert in prostrate pathology, not cardiovascular pathology. While Dr. Wheeler may spend

the majority of his research time and academic pursuits in prostrate pathology, he is still qualified

to opine in this case. He has conducted a large number of autopsies, many involving

cardiovascular issues. In the 1990s, he served on the American Board of Pathology Anatomic

Pathology Test Committee and helped design the anatomic pathology certification examination. In addition, he has numerous credentials and experience in the field of pathology. The Plaintiff's attack is fodder for cross-examination, not grounds to exclude Dr. Wheeler from testifying at all.

Additionally, there is nothing speculative or unreliable about the methodology used by Dr. Wheeler. He reviewed Mr. Irvin's autopsy slides and medical records. He also reviewed the expert reports of Dr. Bloor and Dr. Burton and the depositions of Dr. Schirmer and the Plaintiff. Dr. Wheeler based his opinion on his review of these materials and his training and experience. In fact, Dr. Wheeler reached the same conclusions as both of the Plaintiff's experts. Therefore, there is no reason to exclude Dr. Wheeler's expert testimony. He is qualified, and he used proper methodology in reaching his opinions. Accordingly, the Plaintiff's motion to disqualify Dr. Wheeler is denied.

### ii.   Dr. Janet Arrowsmith-Lowe

Merck has designated Dr. Arrowsmith-Lowe to testify as an expert witness on Merck's interactions with the FDA and on the company's communications with the medical community.

### a.   Plaintiff's Position

The Plaintiff asserts several reasons for excluding Dr. Arrowsmith-Lowe's testimony. First, the Plaintiff asserts that she did not properly review the data or results from the studies which she cites. Instead, she simply relied upon the quality of Merck's scientists and the FDA's review of their work. The Plaintiff asserts that her vouching for the work of others and the quality of government regulations is inadequate under *Daubert*.

Second, the Plaintiff challenges her testimony based on her inability to correctly answer how many people would have to be in a study to detect a doubling of the incidence rate from one

in a thousand to two in a thousand. The Plaintiff asserts that her inability to answer this question along with her tortured explanation proves she is not a qualified expert.

Third, the Plaintiff challenges Dr. Arrowsmith-Lowe's qualifications. According to the Plaintiff, Dr. Arrowsmith-Lowe has not been at the FDA since 1996 and was never a medical officer in charge of reviewing a new drug application or a supplemental new drug application. She never designed a randomized clinical study. She never engaged in direct negotiation with a sponsor over drug labeling. In addition, her current contact with the FDA is limited.

Moreover, the Plaintiff asserts that the FDA has changed significantly since she left. In specific, in 1997, the Food and Drug Administration Modernization Act was enacted which reauthorized the Prescription Drug User Fee Act. These changes required the FDA to refund fees to drug companies for any aspect of their fee going towards drug approvals not matched by the FDA. As such, the Plaintiff claims that she is not an expert in post-1996 FDA standards.

In addition, the Plaintiff claims that Dr. Arrowsmith-Lowe is biased. In support, the Plaintiff points out that her deposition testimony was full of holes, her consulting company makes $500,000 annually by providing testimony on behalf of pharmaceutical companies in drug litigation, and she has testified in 36 trials or depositions in the last four years—one every six weeks.

### b.  Merck's Position

According to Merck, Dr. Arrowsmith-Lowe is well-qualified to offer her opinions as to Merck's interactions with the FDA and the company's communications with the medical community. First, Merck argues that Dr. Arrowsmith-Lowe did review the data and did not rely solely upon the opinions of others in reaching her conclusions. Second, Merck is offering Dr.

Arrowsmith-Lowe as a regulatory expert, not an expert in epidemiology or biostatistics. She is not required to crunch numbers from every Merck study ever conducted to reach reliable conclusions about the adequacy of those studies from a regulatory standpoint. Instead, as a regulatory expert, it was reasonable for her to rely on what Merck submitted to the FDA, as well as what the FDA did in response to those submissions.

Third, regarding Dr. Arrowsmith-Lowe's alleged inability to testify about the doubling of the incidence rate, Merck contends that she is not being called to testify as a statistician. She is being called to testify as a regulatory expert to explain the nature of the FDA's review of Merck's testing of Vioxx. Lastly, Merck asserts that the Plaintiff's arguments concerning Dr. Arrowsmith-Lowe's qualifications and alleged bias are unfounded and completely untrue.

### c.   Court's Ruling

Dr. Arrowsmith-Lowe is a board certified physician in Internal Medicine, a fellow of the American College of Physicians, and an elected member of the American College of Epidemiology. From 1984-1996, she served as a medical review officer at the FDA and was acting Director of the Office of Surveillance and Biometrics, Center for Devices and Radiologic Health at the FDA from 1993-1995. She is currently licensed in New Mexico and has also passed the federal licensing exam.

In formulating her opinion, Dr. Arrowsmith-Lowe relied on her training and experience as a medical doctor, epidemiologist, and FDA medical review officer and acting director of the Office of Surveillance and Biometrics. Additionally, her opinions are based on her knowledge of the requirements applicable to pharmaceutical manufacturers under the Federal Food, Drug, and Cosmetic Act and federal regulations pursuant to the Act; her knowledge of general FDA

-15-

policies, procedures, and industry practices through her FDA and consultant experience; and her

knowledge of practices in the pharmaceutical industry involving the development of innovative

medicines. Furthermore, she reviewed the following: Merck's communications with as well as

their submissions to the FDA, including portions of the Investigational New Drug Application

for Vioxx and Supplemental New Drug Applications for Vioxx; FDA commentary; protocols and

data from Vioxx clinical studies and clinical study reports; the minutes and transcripts of several

Advisory Committee Meetings; the FDA's April 6, 2005 Decision Memorandum; the reports of

Dr. Richard M. Kapit and Dr. John L. Gueriguian, who are the Plaintiff's expert witness; and

other literature and material.

Regarding Dr. Arrowsmith-Lowe's qualifications, the Plaintiff asserts that she is

unqualified to render her opinions because she has not been employed by the FDA since 1996

and was never in charge of reviewing a new drug application or supplemental new drug

application. Nonetheless, Dr. Arrowsmith-Lowe was employed by the FDA for 12 years, has

maintained contact with the FDA, and has worked as a consultant for pharmaceutical companies

in their dealing with the FDA since 1996. Moreover, although she was never in charge of

reviewing a new drug application or supplemental new drug application, she has substantial

experience reviewing them and is knowledgeable of the applicable regulations.

Specifically, the Plaintiff asserts that the enactment of the Food and Drug Administration

Modernization Act in 1997 renders Dr. Arrowsmith-Lowe unqualified; however, the Plaintiff

does not assert any specific reasons why this renders her unqualified. Instead, at oral argument,

all of the regulations that the Plaintiff cited in support of her position were enacted well before

1996. As such, the Court finds the Plaintiff's arguments unpersuasive.

The Court finds that Dr. Arrowsmith-Lowe is qualified and her testimony is based on reliable methodology. Once again, the Plaintiff's position is appropriate to attack credibility of the expert at cross-examination instead, not to preclude her from testifying under *Daubert*. Accordingly, the Plaintiff's motion to exclude Dr. Arrowsmith-Lowe is denied.

### iii.    Dr. Frank Lanza and Dr. Merlin Wilson

Dr. Lanza, a gastroenterologist, was retained by Merck to offer his opinions that Vioxx and other COX-2 inhibitors serve as an important treatment option for patients with a history of gastrointestinal complications.

Dr. Wilson, a rheumatologist, was retained by Merck to offer his opinions that Vioxx was a safe and effective treatment for pain and inflammation associated with rheumatoid arthritis, osteoarthritis, and other musculoskeletal disorders; that Vioxx was an important medicine for physicians like him; that in his patient practice, patients experienced fewer gastrointestinal side effects on Vioxx than on traditional NSAIDs; and that the results of VIGOR were disseminated widely in the medical community starting in March 2000.

### a.    Plaintiff's Position

The Plaintiff claims that Dr. Lanza and Dr. Wilson's testimony is irrelevant because Mr. Irvin was not being treated by either a gastroenterologist or a rheumatologist. In addition, the Plaintiff asserts that their testimony is not reliable under *Daubert* because their opinions are based solely on their practice.

### b.    Merck's Position

Merck claims that their testimony is relevant because it rebuts the Plaintiff's allegations that the principal purpose of Vioxx was to generate profits for Merck and that Merck was

-17-

negligent. By testifying as to the benefits of Vioxx and that Vioxx was fit for its ordinary purposes, Dr. Lanza and Wilson can rebut the Plaintiff's contentions.

Regarding the specific relevancy as to Mr. Irvin, Merck claims that their testimony is relevant because Mr. Irvin did suffer severe gastrointestinal side effects while he was on Vicoprofen and, as such, switched to Vioxx. Moreover, Mr. Irvin did not have any reported medical history and his son-in-law testified that he complained about arthritis type pain. Therefore, the opinion of an expert gastroenterologist and rheumatologist is relevant to explain the efficacy of Vioxx.

Regarding the basis of their testimony, Merck claims that Doctors Lanza and Wilson have reviewed and relied upon substantial published literature proving that Vioxx has a safer GI profile as compared to traditional NSAIDs. This was the reason for introducing COX-2 inhibitors. Merck also claims that they have substantial clinical experience in their fields. As such, Merck asserts that *Daubert* allows experts to testify regarding their clinical experience if it is consistent with otherwise reliable evidence.

### c.    Court's Ruling

Dr. Lanza is a board certified physician in Internal Medicine and Gastroenterology. He has a B.S. in Bacteriology from the University of Maryland, a M.A. in Biochemistry from the University of Texas Medical Branch, and a M.D. from the University of Texas Medical Branch. He did his residency at Baylor University and did a fellowship at the University of Texas.

Over the past 40 years, Dr. Lanza has held numerous academic appointments and professional positions. He currently serves as a Clinical Professor of Medicine in the Department of Gastroenterology at Baylor College of Medicine and as the Chief Emeritus for the Endoscopic

Training Program at Ben Taub Hospital in Bellaire, Texas, and for the Sharpstown General Hospital in Houston, Texas. He has served as the Chief of Gastroenterology at Memorial Hospital in Houston, Texas. In addition, he has served as the Director and Principal Investigator at the Houston Institute for Clinical Research. He was also the Consulting Editor in Gastroenterology for the Journal of Muculoskeletal Medicine and a past President of the American College of Gastroenterology. In addition to his professional and academic qualifications, Dr. Lanza also currently maintains his own active gastroenterology practice in Houston, Texas.

In formulating his opinion, Dr. Lanza reviewed the scientific information on Vioxx and other COX-2 inhibitors, Mr. Irvin's medical records from the day of his death and his autopsy, two depositions of Dr. Schirmer, the deposition of the Plaintiff, and the Plaintiff's responses to Merck's first set of interrogatories. In addition, his opinion is based on his 35 years of clinical experience in the filed of gastroenterology.

Dr. Wilson is a board certified physician in Internal Medicine, a diplomat of the American Board of Internal Medicine with a subspecialty in Rheumatology, a fellow of the American College of Physicians and the American College of Rheumatology, and a Clinical Professor of Medicine at LSU Health Sciences Center and Tulane Medical School. In addition to his formal education, he has been a practicing rheumatologist for the past twenty-five years.

In formulating his opinion, Dr. Wilson reviewed the scientific literature regarding Vioxx. In addition, his opinion is based on his experience as a prescribing physician.

The Plaintiff raised no challenges to the qualifications or methodology of Dr. Lanza or Dr. Wilson. Much like the Plaintiff, the Court finds no reason to challenge the experts on these

-19-

grounds either. Simply put, Dr. Lanza and Dr. Wilson are qualified to testify as an expert witness.

Although the Plaintiff does not challenge the qualifications of Dr. Lanza or Dr. Wilson, the Plaintiff does challenge the relevancy of their testimony. According to the Plaintiff, Mr. Irvin was never treated by a gastroenterologist or rheumatologist and never suffered from a gastrointestinal injury or any form of arthritis. As such, their testimony has no relevance to this case.

To the contrary, Mr. Irvin did suffer from gastrointestinal side effects while he was on Vicoprofen. This is why Dr. Schirmer prescribed him Vioxx. Moreover, Dr. Schirmer testified that Mr. Irvin did complain about having arthritis type pain. Furthermore, their testimony is relevant to refuting the Plaintiff's claims. Dr. Lanza and Dr. Wilson will testify that the benefits of Vioxx outweighed its risks. In addition, the Plaintiff asserts that Merck's primary motivation in manufacturing and distributing Vioxx was to generate the greatest amount of profits possible. This testimony describes the benefits of Vioxx and is relevant to refuting the Plaintiff's claims.

Moreover, the Plaintiff challenges the admissibility of Dr. Lanza's and Dr. Wilson's testimony because it is anecdotal as opposed to scientific. According to the Plaintiff, since their testimony simply recounts their clinical experiences, it cannot be admitted as expert testimony. This assertion is incorrect. Expert witnesses are allowed to base their opinions on personal experiences provided that their opinions are confirmed by scientifically reliable data. *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1014 (6th Cir. 1993). Here, both doctors' personal experiences are supported by reliable scientific data. As such, their testimony is reliable, relevant, and admissible. Accordingly, the Plaintiff's motion to exclude the testimony of Dr. Lanza and Dr.

Wilson is denied. The testimony of these doctors, however, may well be redundant and Merck should reevaluate whether they are needed at trial.

### iv.    Dr. David Silver

Dr. Silver, a rheumatologist, was retained by Merck to offer his opinions relating to a threshold for duration of 36 months, the naproxen hypothesis, alleged gastrointestinal safety relating to Vioxx, adequacy of labeling for Vioxx, and specific causation as to the death of Richard Irvin.

### a.    Plaintiff's Position

The Plaintiff argues that Dr. Silver is not qualified to testify because he does not have the qualifications to render the opinions offered. First, Dr. Silver is not a cardiologist, pharmacologist, biostatistician, neurologist, regulatory expert, hematologist/clot expert, or pharmacoepidemiologist. He has no expertise in cardiology or cardiac pathology. As such, the Plaintiff argues that any opinion in these areas falls outside his area of expertise.

Second, the Plaintiff that Dr. Silver, as a rheumatologist, is not qualified to opine on the past medical treatment of Mr. Irvin, including why he ingested Vioxx. Specifically, osteoarthritis and rheumatoid arthritis are not diagnosed conditions for Mr. Irvin. As such, there is no importance regarding Dr. Silver's knowledge of whether Mr. Irvin had arthritis.

Third, the Plaintiff alleges that there were no gastrointestinal issues relating to Mr. Irvin's use of Vioxx that warrant the opinion testimony of Dr. Silver. To the extent that Dr. Silver bases any opinions of the gastrointestinal tolerability of Vioxx in his own patient population, such testimony is merely anecdotal and cannot qualify as scientific and reliable data.

Finally, the Plaintiff alleges that, with no cardiac training, Dr. Silver's medical experience

does not qualify him to testify as to the specific cause of Mr. Irvin's thrombotic cardiac event and death.

### b.       Merck's Position

First, based on his experience, Merck contends that Dr. Silver is an expert in pain management and the use of COX-2 inhibitors to treat pain. Merck argues that Dr. Silver, in his testimony, will explain the challenges of treating chronic pain and the benefits of COX-2 inhibitors such as Vioxx.

Second, regarding the Plaintiff's assertion concerning the fact that Mr. Irvin was never diagnosed with osteoarthritis or arthritis and never experienced any gastrointestinal issues, Merck argues that this is factually incorrect. In addition, even if it were correct, Merck argues that Dr. Silver can still testify because the gastrointestinal benefits of Vioxx are relevant to understanding the overall benefits of the drug and comparing those benefits to the known risks of the drug.

As far as testifying as to the cause of Mr. Irvin's death, Merck asserts that Dr. Silver's clinical experience and review of the published literature allow him to testify that based on the undisputed facts surrounding Mr. Irvin's death Vioxx did not cause his death.

As far as testifying as to the adequacy of Vioxx labeling, Merck asserts that Dr. Silver is qualified to give his opinion because of his experience as a routine prescriber, researcher, and primary care physician.

Lastly, regarding Dr. Silver's ability to testify as to the clinical trials conducted on Vioxx, Merck asserts that Dr. Silver is qualified because he has participated in a substantial number of clinical trials and he has first-hand knowledge concerning the design, implementation, and interpretation of clinical trials involving Vioxx.

-22-

c.    **Court's Ruling**

Dr. Silver is a board certified physician in Internal Medicine and Rheumatology. He is a licensed physician in California and Illinois and is on the National Board of Medical Examiners. He has held numerous distinguished appointments.

Presently, he is Associate Clinical Professor of Medicine at the University of California at Los Angeles, Director of the Chronic Pain Rehabilitation Program at Cedars-Sinai Medical Center in Los Angeles, and Associate Director of the Osteoporosis Medical Center. He has consulted with numerous pharmaceutical interests and was a clinical investigator for Merck in the ADVANTAGE trial and on Arcoxia. In addition, he is a practicing physician.

Furthermore, he is also a distinguished researcher, who is currently the beneficiary of 15 research grants. He has been involved in over fifty clinical trials involving arthritis, including more than twenty pertaining to COX-2 inhibitors. He has authored a number of publications and given over 200 lectures on the subject of NSAIDs and COX-2 inhibitors over the course of his career.

In formulating his opinion, Dr. Silver reviewed the relevant published, peer-reviewed medical literature and had even actively followed it before being retained in this case. Moreover, his opinion is based on his years of clinical experience.

The Plaintiff makes a broad-brush challenge to Dr. Silver's qualifications. To the extent that Dr. Silver may testify regarding chronic pain and the risk/benefit calculations of COX-2 inhibitors, he is certainly qualified. His experience with and understanding of these subjects, as evidenced by his expert report, support his qualifications. In addition, he has based his opinions on scientifically reliable information.

To the extent that Dr. Silver may testify that Vioxx did not contribute Mr. Irvin's death, Dr. Silver is qualified to testify. Dr. Silver is a board certified internist with years of experience treating his patients' cardiac conditions. He has reviewed all the relevant literature and studies. If the Plaintiff wishes to attack Dr. Silver because he is not a cardiologist, pharmacologist, biostatistician, neurologist, regulatory expert, hematologist/clot expert, or pharmacoepidemiologist, she will be allowed to do so on cross-examination. Moreover, for the same reasons as Dr. Lanza's testimony, Dr. Silver's testimony as to the gastrointestinal effects of Vioxx is both relevant and admissible. But again, such testimony is at best overlapping and at worst redundant.

### B.   Merck's Motions

#### I.   Winston Gandy, Jr., M.D.

The Plaintiff has designated Dr. Gandy to opine that (a) Vioxx 25 mg increases the risk of blood clots in short-term use, and (b) that Vioxx contributed to Mr. Irvin's sudden cardiac death.

##### a.   Merck's Position

Merck contends that Dr. Gandy is not qualified to opine that Vioxx 25 mg increases the risk of blood clots or that Mr. Irvin died as a result of his ingestion of Vioxx. Specifically, Merck argues that Dr. Gandy's professional training and experience does not qualify him to opine on general causation because he is not a researcher, has never done any research on NSAIDs prior to this case, never done any research on COX-2 inhibitors prior to this case, has never authored a publication on sudden cardiac death, and does not have any extensive experience with Vioxx. In addition, based on Dr. Gandy's lack of experience, Merck argues that he failed to undertake the proper study to opine on causation. Merck argues that the 10 to 15

hours spent by Dr. Gandy reviewing materials was insufficient, the materials reviewed by Dr.

Gandy were incomplete and provided by the Plaintiff's counsel, and he only reviewed two Vioxx

clinical studies.

Next, Merck argues that Dr. Gandy's opinion that Vioxx causes a prothrombotic state is

not based on reliable scientific evidence. Dr. Gandy testified that he believes Vioxx causes a

prothrombotic state based on the VIGOR results and his opinion that COX-2 inhibitor drugs

create an imbalance in the thromboxane and prostacyclin levels in the vasculature. Merck

contends that VIGOR does not support Dr. Gandy's opinion and that Dr. Gandy has no scientific

support for his assertion that Vioxx causes a prostacyclin/thromboxane imbalance.

Lastly, Merck argues that Dr. Gandy does not have a scientific basis to opine that Vioxx

caused Mr. Irvin's death. Moreover, Merck argues that Dr. Gandy has no evidence that Vioxx, at

the dose and duration used by Mr. Irvin, causes increased cardiovascular risks.

### b.    Plaintiff's Position

The Plaintiff argues that Dr. Gandy is a board certified cardiologist with extensive

clinical experience and is eminently qualified to testify regarding the specific cause of Mr. Irvin's

death. The Plaintiff asserts that there are hundreds of articles describing the relationship between

COX-2 and prostacyclin and that Dr. Gandy is familiar with these articles. Although Dr. Gandy

is not an expert pharmacologist, epidemiologist, or biostatistician, the Plaintiff argues that he

does not need to be because he is allowed to rely on the opinions of others in formulating his

own. The Plaintiff argues that Dr. Gandy does not have to reevaluate the raw data of each study.

### c.    Court's Ruling

Dr. Gandy is a board certified cardiologist. He has a B.S. in Chemistry from the

University of Maryland. He has an M.D. from Howard University College of Medicine. He

interned and was a resident in Internal Medicine at Emory University. He held a fellowship at

the University of Alabama Birmingham from 1989-1992.

Dr. Gandy is licensed in both Alabama and Georgia. He has held several medical special

appointments and is a staff member of several hospitals. He is a fellow of the American College

of Cardiology and a member of the American Medical Association, National Medical

Association, American Heart Association, Atlanta Medical Association, American Society of

Echocardiography, and the American College of Physicians. He has co-authored two

publications.

In formulating his opinions, **Dr.** Gandy relied upon his training, knowledge, and

experience as a cardiologist. In addition, Dr. Gandy relied on numerous studies, reports,

documents, and emails. In fact, twelve of the nineteen pages of Dr. Gandy's expert report

contain a listing of the studies, reports, documents, and emails reviewed by Dr. Gandy.

Regarding **Dr.** Gandy's qualifications, Merck asserts that Dr. Gandy is not qualified to

testify as an expert because he is not a researcher, but rather a cardiologist who specializes in

reading echocardiograms. Furthermore, Merck contends that Dr. Gandy did not undertake the

necessary research to make himself knowledgeable enough to testify as an expert witness.

There are several problems with Dr. Gandy's testimony. First, his expert report is

nineteen pages long. The first fifteen pages consist of an introduction, his qualifications, and the

materials reviewed by him. The last page and a half consists of his conclusions. As such, there

are only two and a half pages of analysis by Dr. Gandy in his expert report. Dr. Gandy's analysis

in these pages is wholly conclusive, rather than explanatory. In addition, his deposition

testimony is littered with circular reasoning and instances where he is unable to answer certain questions regarding the literature and studies he said he had read.

The Court acknowledges that Dr. Gandy is a cardiologist who is well qualified to testify as an expert regarding Mr. Irvin's cardiac condition at his time of death. The Court, however, is faced with a much tougher decision of whether Dr. Gandy is qualified to testify that Vioxx was a cause of Mr. Irvin's death. Dr. Gandy's deposition as well as his report reveals that Dr. Gandy does not possess a superior understanding of how Vioxx increases cardiovascular risks. Yet, the Court acknowledges that Dr. Gandy did utilize proper methodology. He reviewed all the proper studies and literature. Although his comprehension of these studies may have been somewhat lacking, he was entitled to and did rely upon experts in the field of pharmacology and epidemiology. As such, the Court finds that his methodology was proper and that he is qualified to render an opinion on Mr. Irvin's cardiac state based upon his review of the relevant materials. To the extent that Merck asserts that Dr. Gandy does not understand Vioxx and its alleged effects, Merck will be able to attack Dr. Gandy at cross-examination much like it did at his deposition. Accordingly, the jury will be entitled to draw its own conclusions as to how much weight Dr. Gandy's opinion should be afforded. Accordingly, Merck's motion to exclude Dr. Gandy's testimony is denied.

### ii.    Wayne A. Ray, Ph.D.

The Plaintiff has designated Professor Ray to opine whether: (1) Vioxx increases the risk of heart attacks and heart disease; (2) if so, the magnitude of that risk; and (3) if there was an increased risk, could it come from a use of Vioxx for less than 30 days.

### a.    Merck's Position

First, Merck challenges the data upon which Professor Ray relied upon to reach his conclusion that short-term use of Vioxx increases cardiovascular risk. Professor Ray claims four lines of evidence support his position: (1) biological plausibility; (2) short-term studies of other COX-2 inhibitors; (3) data from clinical trials of Vioxx for shorter periods of use; and (4) data from epidemiologic studies for shorter periods of time. Merck claims that these four lines of evidence do not support Professor Ray's claims.

As to biological plausibility, Merck claims that Professor Ray relied solely upon the Fitzgerald hypothesis to reach his conclusion that Vioxx causes a greater incidence of cardiovascular events. Merck claims that the Fitzgerald hypothesis is pure speculation. As such, Professor Ray's conclusion is based on unreliable information.

As to short-term studies of other COX-2 inhibitors (celecoxib, lumiracoxib, and valdecoxib/parecoxib), Merck asserts that these studies are unreliable for three reasons. First, Merck claims that Professor Ray's conclusion is based on the unreliable Fitzgerald hypothesis. Second, Merck argues that studies of other COX-2 inhibitors cannot prove causation as to Vioxx because of the differences between the drugs.

As to clinical trials for shorter periods of time, Professor Ray reached his opinion by relying upon Professor Kronmal's re-analysis of Merck's clinical trial data. Merck claims that this re-analysis is unreliable because it was conducted for purposes of this litigation, has not been published, and has not been subject to peer review, and it does not demonstrate that 25 mg of Vioxx can cause thrombotic cardiovascular events during the first month of use.

As to epidemiologic studies, Professor Ray reviewed five studies: Solomon, Johnsen,