Kimmel, Graham, and Levesque. Merck claims that all five of these studies are insufficient to support the theory that short-term use of Vioxx can cause an increase in cardiovascular events.

Second, Merck contends that Professor Ray cannot properly opine that Vioxx accelerates atherosclerosis. In reaching this opinion, Merck claims that Professor Ray once again relied on the Fitzgerald hypothesis, which Merck claims is unreliable.

Third, Merck contends that Professor Ray cannot opine on what doctors should prescribe to patients because Professor Ray is unqualified to do so. Professor Ray is not a medical doctor. He cannot prescribe Vioxx. As such, Merck argues that he is not qualified to opine on the risk-benefit analysis medical doctors make when determining whether to prescribe any medication to a particular patient.

Fourth, Merck argues that Professor Ray may not testify or opine about Mr. Irvin or the specific causation of his death. In support, Merck points out that Professor Ray is not a medical doctor, his expert report is silent on Mr. Irvin, and he even testified that he would not offer an analysis of any clinical information as to an individual patient.

Fifth, Merck asserts that Professor Ray may not testify regarding his disapproval of the actions taken by the FDA. Merck contends that Professor Ray is not an expert in FDA regulatory matters and, under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001), he is not entitled to supplant the judgment of the FDA in balancing the benefits and risks of drugs from the regulatory perspective.

Sixth, Merck argues that Professor Ray cannot testify as to Merck's alleged failure to meet subjective normative standards. Basically, Merck asserts that Professor Ray's opinion as to what Merck should have done based upon his own subjective standards of what standards should

be followed by a pharmaceutical company is unreliable. In addition, Merck asserts that Professor Ray cannot offer inflammatory characterizations of Merck's failure to follow his subjective standards because, in addition to its inflammatory nature, it is irrelevant since Merck must be judged according to legal standards, not Professor Ray's.

Lastly, Merck contends that Professor Ray should not be allowed to testify as to Merck's state of mind, motive, or perceived bias because Professor Ray has no qualifications or specialized expertise in determining a company's knowledge or state of mind.

### b.   Plaintiff's Position

The Plaintiff asserts that Professor Ray's opinions are based on scientifically reliable evidence. There have been numerous studies that have concluded that Vioxx does cause an increase in cardiovascular incidents. Professor Ray has relied on these reports including Merck's VIGOR report. The Plaintiff argues that the reports regarding other drugs are also reliable because they are substantially similar to Vioxx. All the drugs are COX-2 inhibitors; they all are supposed to reduce pain; they all indicate a greater than normal incidence of cardiovascular event.

### c.   Court's Ruling

Professor Ray is currently a professor of preventive medicine at Vanderbilt University School of Medicine. He is the director of Pharmacoepidemiology and of the Master of Public Health Program. He received a B.S. from the University of Washington, a M.S. from Vanderbilt University, and a Ph.D. from Vanderbilt University.

Professor Ray has carried out pharmacoepidemiologic research for thirty years and is actively involved in the design, execution, and analysis of numerous pharmacoepidemiologic

# EXHIBIT "11"
## Part B

# EXHIBIT "11"
## Part B

studies. He is a fellow of the International Society for Pharmacoepidemiology. He is the

principal investigator for the Vanderbilt Center for Education and Research on Therapeutics and

for a Cooperative Agreement with Food and Drug Administration. In these duties, he is

continually required to evaluate and design studies that determine whether or not there is

evidence that a medication causes an adverse reaction.

Professor Ray has published more than 150 manuscripts in the peer reviewed literature.

He also reviews articles for numerous leading medical journals.

As principal investigator for the Cooperative Agreement with the Food and Drug

Administration, Professor Ray regularly meets with officials from the FDA and his work

involves rapid identification and confirmation of adverse medication reactions and assessment of

appropriateness of medication use.

In particular, Professor Ray has conducted several studies of the gastrointestinal and

cardiovascular safety of the NSAIDs and coxibs. These studies have been published in several

peer reviewed scientific journals.

Professor Ray's opinions are derived from his education, training, research, experience,

expertise, and review of the peer-reviewed medical literature and other publicly available

documents concerning the treatment of musculoskeletal disorders, NSAIDs, COX-2 inhibitors,

and cardiovascular illness.

First, the Court finds that Professor Ray is adequately qualified to testify as to whether

short-term use of Vioxx increases the risk of adverse cardiovascular risks. His career has been

based around pharmacoepidemiologic investigations that concern the adverse and beneficial

effects of medications. In particular, he has conducted several studies of the gastrointestinal and

cardiovascular safety of NSAIDs and COX-2 inhibitors. Moreover, Professor Ray has reviewed

the scientifically relevant literature surrounding Vioxx. Although these studies do not

specifically address whether short-term use of Vioxx can cause adverse cardiovascular effects,

these studies were not designed to reach these conclusions. Instead, they were designed for

alternate purposes; however, a general theme running throughout all these studies was that Vioxx

can cause adverse cardiovascular effects. Moreover, Professor Ray points to the raw data of

these studies as support for his conclusion. Professor Ray is qualified to make an analogy based

upon all these tests that short-term Vioxx use can cause adverse cardiovascular effects.

Accordingly, the Court finds that he is qualified to testify as an expert and that he used

scientifically reliable methodology in reaching his opinions.

Besides challenging his general opinion that short-term use of Vioxx can increase

cardiovascular risks, Merck also challenges several other of Professor Ray's opinions. For the

same reasons stated above, Professor Ray is qualified to opine that Vioxx accelerates

atherosclerosis. This opinion is based upon the Fitzgerald hypothesis, which has been supported

by numerous articles as well as recognized medical journals. Although Merck may disagree with

the conclusions reached in the Fitzgerald hypothesis and supporting literature, a disagreement

does not amount to improper methodology or scientifically unreliable data.

Merck has also challenged whether Professor Ray's is qualified to testify on what doctors

should prescribe to patients and on the specific cause of Mr. Irvin's death. The Court finds that

Professor Ray may not opine on these issues. He is not a medical doctor. He is not qualified to

testify as to the risk-benefit analysis performed by medical doctors. Moreover, he is not qualified

to review the clinical information of Mr. Irvin. He is lacking in the necessary training to testify

as to what doctors should have done and to what was the specific cause of Mr. Irvin's death.

Additionally, Merck argues that Professor Ray may not testify as to his disapproval of the actions taken by the FDA. Professor Ray is not an expert in FDA regulatory matters. He does not have experience in this field. As such, Rule 702 bars him from testifying as to matters beyond his range of knowledge. The Court points out, however, that *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), would not bar a qualified expert from testifying as to their opinion on whether the FDA correctly balanced the benefits and risks of a drug from a regulatory standpoint. In *Buckman*, the Supreme Court found that state law fraud-on-the-FDA claims were preempted by federal law. This holding is completely inapplicable to the issue at hand.

Lastly, Merck challenges Professor Ray's qualifications to testify as to what Merck should have done or as to Merck's state of mind. The Court will reserve ruling on these issues until such time as they are presented at trial. At that time, the Court will have a clearer basis for making its ruling. Accordingly, Merck's motion to exclude Professor Ray's testimony is denied in part and granted in part.

### iii.   Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A.

The Plaintiff has designated Dr. Lucchesi as an expert qualified to testify on a host of topics ranging from medical causation to an array of non-scientific issues such as advertising and drug pricing.

#### a.   Merck's Position

First, Merck seeks to exclude Dr. Lucchesi from purporting to address Merck's knowledge and state of mind, whether Merck's development and marketing of Vioxx conformed

-33-

with Dr. Lucchesi's personal standards, and whether Merck's Vioxx warning in physician prescribing information, patent information, and consumer advertising conformed with Dr. Lucchesi's personal standards.

According to Merck, Dr. Lucchesi is a professor of pharmacology. Merck argues that He is not qualified to address what Merck knew, and he is not qualified to opine on the propriety of Merck's actions with respect to Vioxx. *See* In re *Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). In addition, Merck alleges that Dr. Lucchesi's knowledge comes from documents provided by Plaintiff's counsel. From these documents, he draws his inferences and conclusions. In effect, Merck asserts that he is usurping the role of the jury.

As far as Merck's failure to meet Dr. Lucchesi's standards goes, Merck asserts that Dr. Lucchesi is not an expert in the field of drug development, testing, and marketing. Therefore, according to Merck, his personal, subjective views are irrelevant and unreliable. They are not based on objective, empirical, ascertainable, and verifiable bases.

Moreover, Merck contends that Dr. Lucchesi should not be allowed to testify as to the warnings that Vioxx carries or should carry. Merck argues that Dr. Lucchesi is not an expert in the labeling of FDA-regulated drugs. Merck alleges that he is not an expert in the advertising or marketing of prescription medications. Therefore, Merck contends that he should not be allowed to testify as to the adequacy of the warning Vioxx carried. Additionally, according to Merck, this testimony cannot meet the requirement of reliability because Dr. Lucchesi identifies no methodology or standard against which the Court can measure the reliability of his opinion.

Second, Merck claims that Dr. Lucchesi has no scientifically reliable basis to opine on general causation. According to Merck, since Dr. Lucchesi lacked reliable trial and

epidemiologic data, he analogized data from animal studies he conducted and a case report written by Dr. Leslie Crofford to conclude that Vioxx causes a higher risk of cardiovascular events. Merck asserts that the animal studies are unreliable and, even if they are reliable, much of Dr. Lucchesi's animal work involved the use of a drug other than Vioxx, making it even more unreliable. Also, Merck asserts that case reports are unreliable because they describe a single individual or a series of individuals who have coincident exposures and diseases. Merck argues that although they can be useful in generating testable hypotheses, case reports cannot establish a cause and effect relationship because case reports cannot for the role chance, bias, or confounding.

Next, Merck argues that Dr. Lucchesi cannot identify the pharmacological mechanism by which Vioxx supposedly has a thrombotic cardiovascular effect. Dr. Lucchesi relies upon the Fitzgerald hypothesis in reaching his conclusions. Merck, once again, claims that the Fitzgerald hypothesis is not proven and is unreliable.

Lastly, Merck argues that Dr. Lucchesi does not have a scientifically reliable basis to opine on specific causation. Merck alleges that Although he received a medical degree in 1964, Dr. Lucchesi is not a licensed physician, has never been a licensed physician, has never treated a patient, and has never been licensed to prescribe medications. Moreover, Merck contends that he has no basis to opine on whether Mr. Irvin died due to any of the alleged mechanisms by which he believes Vioxx can cause or contribute to sudden cardiac death. Merck asserts that even if the Fitzgerald hypothesis were correct, Dr. Lucchesi has no basis to testify that Mr. Irvin actually suffered an imbalance of prostacyclin and thromboxane from Vioxx use, or even the degree of prostacyclin inhibition necessary to cause a clinically significant result.

In addition, according to Merck, Dr. Lucchesi cannot testify as to whether Mr. Irvin suffered a plaque rupture because he never looked at the pathology slides and he stipulated that he would not opine about whether Mr. Irvin suffered a plaque rupture.  Plus, Merck claims that Dr. Lucchesi cannot testify as to whether Vioxx contributed to the formation of plaque in Mr. Irvin's coronary arteries.  At his deposition, Merck contends that Dr. Lucchesi could only highly suspect that Vioxx contributed to plaque formation in Mr. Irvin.  Plus, Dr. Lucchesi admitted that he could not rule out other potential causes of Mr. Irvin's death.

### b.    Plaintiff's Position

The Plaintiff first points out and stresses Dr. Lucchesi's outstanding qualifications, including the fact that he has researched and published in the very areas of pharmacology that are at issue in this case.  Regarding Dr. Lucchesi's ability to opine on what Merck knew or should have known, the Plaintiff asserts that few, if any, jurors will be able to understand the meaning and significance of scientific articles or documents like patents and emails between scientists.  The Plaintiff contends that Dr. Lucchesi can provide the explanation that the jury will need to understand.  In essence, Dr. Lucchesi will act as a translator.

In assessing what Merck knew or should have known, Dr. Lucchesi reviewed a series of emails between Merck employees.  He also reviewed patents filed by Merck employees, all of which "describe a method for preventing platelet dependent arterial thrombosis in patients being treated with a COX-2 inhibitor.  A reading of the patent indicates that Merck was attempting to develop one or more adjunctive agents to be used in combination with a COX-2 inhibitor to prevent arterial thrombus formation."  It is necessary for an expert like Dr. Lucchesi to interpret these complex documents to the jury, according to the Plaintiff.

The Plaintiff further argues that in the same way that it is necessary for Dr. Lucchesi to address what Merck knew or should have known based on the relevant documentation, it is necessary for Dr. Lucchesi to explain the actions Merck should have taken based on the information evidenced in the documentation. The Plaintiff contends that his testimony is not personal opinion, but valid and reliable testimony about the logical consequences of scientific facts.

Next, the Plaintiff points out that many of the comments which Merck is concerned about are not Dr. Lucchesi's opinions, but comments taken out of context elicited by Merck's counsel.

Regarding Dr. Lucchesi's opinions on causation and his reliance on animal studies and case reports, the Plaintiff asserts that this is reliable, accepted science. First, the Plaintiff asserts that expert testimony does not have to be based on epidemiologic or case studies to prove causation. Second, the Plaintiff points out that the Federal Judicial Center's reference Manual on Scientific Evidence even recognizes that toxicology models based on animal studies may be used to determine adverse effects in humans. Third, the Plaintiff argues that Dr. Lucchesi has based his findings on numerous studies and many of his own studies. Lastly, according to the Plaintiff, all these studies are mutually corroborative.

Regarding mechanism, the Plaintiff asserts that Merck continues to confuse mechanism with plausibility. Biological plausibility is defined as the consideration of existing knowledge about human biology and disease pathology in order to provide a judgment about the plausibility that an agent causes a disease. The Plaintiff contends Biological plausibility lends further credence to an inference of causation established through epidemiology, animal studies, and other evidence. According to the Plaintiff, there is no need to prove the precise mechanism by

which Vioxx causes cardiovascular events, only that it is plausible. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). According to the Plaintiff, it would be unreasonable to conclude that the subject of scientific testimony must be known to a certainty because, in science, there are no certainties.

Regarding Dr. Lucchesi's lack of experience in practicing medicine, the Plaintiff argues that Dr. Lucchesi is well qualified to testify as to specific causation. The Plaintiff alleges that Dr. Lucchesi will not testify as to what Mr. Irvin actually suffered, but he intends to testify as to what might have happened based on his review of the facts of this case and his own expertise.

### c.   Court's Ruling

Dr. Lucchesi received a B.S. and a Masters in Pharmacy from St. John's University in New York City. He then received a Ph.D. in Pharmacology and a M.D. from the University of Michigan. He is presently a professor in the University of Michigan's Department of Pharmacology. He has received numerous awards and honors, is a member of many medical organizations, sits on several advisory boards and committees, and has authored and co-authored 390 publications. In reaching his opinions, Dr. Lucchesi reviewed a significant amount of materials. These materials along with his experience, training, and education form the basis for his testimony.

Merck challenges Dr. Lucchesi's testimony for several reasons. First, Merck contends that Dr. Lucchesi cannot testify as to what Merck knew or whether Merck acted properly in developing and marketing Vioxx. The Court reserves ruling on this issue until such time as it is presented at trial. At that time, the Court will have a clearer basis for making its ruling.

Second, Merck asserts that Dr. Lucchesi does not have a scientifically reliable basis to

opine on general causation. Merck's assertion is incorrect. Just like Professor Ray, Dr. Lucchesi

based his opinion on a thorough review of the scientific literature. In addition, he drew proper

and supported inferences from the studies he reviewed. His opinion is based on reliable,

scientific data.

Lastly, Merck asserts that Dr. Lucchesi cannot testify as to the specific cause of Mr.

Irvin's death. Merck is correct. Dr. Lucchesi is neither a cardiologist or pathologist. As such, he

cannot testify as to what was the specific cause of Mr. Irvin's death. Dr. Lucchesi, however, is

not opining as to what specifically caused Mr. Irvin's death. Instead, based on the facts of this

case, he is testifying as to what role Vioxx might have played in Mr. Irvin's death. This opinion

is based upon his knowledge of Vioxx and his belief that it causes increased risks of

cardiovascular events combined with his education as a medical doctor and professional

experience. He is qualified to state this opinion, and it is based upon proper methodology.

### iv.   Colin M. Bloor, M.D. and Joseph L. Burton, M.D.

The Plaintiff designated both Dr. Bloor and Burton to testify as experts regarding the

alleged role of Vioxx in Mr. Irvin's death.

#### a.   Merck's Position

Merck asserts several reasons why Dr. Burton's opinion should not be admitted. First,

Merck contends that Dr. Burton does not have the necessary training and experience to opine on

general causation. Merck points out that Dr. Burton is a pathologist who has never done any

research on any NSAIDs in general or COX-2 inhibitors in particular. In addition, he has never

published anything on sudden cardiac death. He is not a pharmacologist and is relying on

plaintiff's other experts to address Vioxx pharmacological mechanisms. He admits he is not an

expert in clinical design or statistics and that he is not qualified to analyze and interpret clinical and epidemiological data concerning Vioxx.

Next, Merck contends that Dr. Burton's general causation theories are not supported by the scientific literature on which he relied. He admitted that his opinions on Vioxx's causation of cardiovascular events based upon a prostacyclin and thromboxane imbalance are derived only from other experts. In addition, he cannot determine whether this information is correct or not.

Third, Merck asserts that Dr. Burton has no reliable scientific evidence supporting the hypothesized mechanisms by which he believes Vioxx could cause sudden cardiac death. This assertion is based on the fact that Dr. Burton cannot cite any studies supporting him and he is aware that there are competing views regarding whether Vioxx can cause vasoconstriction.

Fourth, Merck asserts that Dr. Burton does not have reliable scientific evidence to opine on specific causation. As a pathologist, Merck concedes that Dr. Burton may be able to opine that a thrombus formed in Mr. Irvin's artery and that a thrombus led to a sequence of events which resulted in Mr. Irvin's death. This, however, is completely different from Dr. Burton's ability to testify that the thrombus was caused by Mr. Irvin's Vioxx use. Essentially, Dr. Burton's testimony that Vioxx caused Mr. Irvin's death is based completely on the assumption that Vioxx causes an prothrombotic state. He does not have any basis for that conclusion other than the testimony of the Plaintiff's other experts.

Merck makes the same arguments regarding Dr. Bloor.

### b. Plaintiff's Position

The Plaintiff's opposition is similar to that concerning Dr. Gandy. Dr. Burton and Bloor are pathologists. As such, they are not familiar with pharmacology. In reaching their opinions,

however, the doctors do not need to be familiar with every step in the Vioxx process. Instead, they may rely on the expertise of experts in other areas. Here, the doctors have relied on the expertise of the Plaintiff's other experts and formed an opinion based on that review as to what was the cause of Mr. Irvin's death.

### c.    Court's Ruling

Both Dr. Bloor and Burton are pathologists. Dr. Bloor received a B.S. from Denison University and a M.D. from Yale University School of Medicine. He has served as professor of pathology at the University of California San Diego for the last thirty-one years. Prior to that, he held various research positions. He is a member of numerous medical organizations, editorial boards, and committees. He has received several honors and awards for his work. He has authored and co-authored 473 publications.

Dr. Burton received a B.A. and a M.D. from Emory University. He is a licensed physician in Georgia. He has served as a medical examiner for over twenty-five years. Currently, he is Chief Medical Examiner, Emeritus for DeKalb County, Georgia, and Senior Consulting Pathologist for Cobb, Gwinnett, and Paulding County, Georgia. He has served in other medical capacities, has received several special appointments, and is a member of numerous professional associations. In addition, he has presented a vast number of articles at medical conferences. In reaching their opinions, Dr. Bloor and Dr. Burton both reviewed the relevant literature on Vioxx, fourteen expert reports from other designated experts, and Mr. Irvin's medical and autopsy reports.

The crux of Merck's argument to exclude Dr. Bloor's and Dr. Burton's testimony is that they are not qualified to testify that Vioxx was the cause of Mr. Irvin's death and that their

testimony is based on scientifically unreliable evidence. Merck acknowledges that they are both

expert pathologists, but Merck asserts that this, by itself, does not qualify them to testify as to

how Vioxx caused Mr. Irvin's death. Merck is somewhat correct. Neither Dr. Bloor nor Dr.

Burton have done any research on NSAIDs, published anything on NSAID, or have any

pharmacological experience. They have, however, read the relevant materials and have a basic

understanding of Vioxx and its hypothesized prothrombotic effects. They are entitled to rely on

these materials, which are relevant and reliable, in reaching their own conclusions just as an

orthopaedic surgeon, who is not an expert X-Ray technician and has no knowledge of the

mechanics of an X-Ray machine, can rely on an X-Ray to diagnose a broken arm. Essentially,

Merck is not attacking their methodology. Instead, Merck is attacking the level of their

understanding. This is fodder for cross-examination, not exclusion under *Daubert*. Accordingly,

Merck's motion to exclude the testimony of Dr. Bloor and Dr. Burton is denied. The anticipated

testimony from these witnesses seems to be repetitive and may be excluded by the Court for this

reason.

### v.    Thomas Baldwin, M.D.

The Plaintiff has designated Dr. Baldwin to opine that Mr. Irvin's use of Vioxx for less

than 60 days created an increased risk of a sudden cardiac death and that Vioxx caused or

substantially contributed to the development of an acute thrombosis which resulted in coronary

occlusion, subsequent cardiac ischemia, a clinically evolving acute myocardial infarction, and the

sudden death of Mr. Irvin.

### a.    Merck's Position

First, Merck asserts that Dr. Baldwin is not qualified to render opinions on general

causation because of his lack of training and experience and his lack of the requisite study. In regards to experience and training, Dr. Baldwin has little experience with Vioxx. He has never done any research on NSAIDs or COX-2 inhibitors. He has never treated a patient who had taken Vioxx and suffered a thrombotic event. In short, Merck alleges that Dr. Baldwin, in his practice, has never seen a patient like Mr. Irvin—one who took Vioxx and suffered a fatal thrombotic event.

In regards to research, Dr. Baldwin cannot point to any specific piece of literature or data that supports his view that short-term ingestion of Vioxx increases the risk of cardiovascular events. In addition, Merck asserts that the literature which Dr. Baldwin read does not support his position.

Merck also contends that the studies relied on by Dr. Baldwin do not support the hypothesized mechanism by which Vioxx could cause sudden cardiac death. This assertion is based on Merck's challenges concerning the Fitzgerald hypothesis.

Lastly, Merck asserts that Dr. Baldwin has been unable to specifically show that Vioxx, as opposed to atherosclerosis, obesity, or a sedentary lifestyle, caused Mr. Irvin's death. Moreover, Dr. Baldwin does not know specifically how Mr. Irvin's clot formed and acknowledges that clots can form in the absence of Vioxx. Therefore, Merck claims Dr. Baldwin cannot show that Vioxx caused Mr. Irvin's death to a reasonable degree of medical certainty.

### b.    Plaintiff's Position

Basically, the Plaintiff's position is similar to its defense regarding Dr. Gandy. The Plaintiff contends that there are countless numbers of articles supporting the position that Vioxx causes an imbalance in the homeostasis between thromboxane and prostacyclin. In addition, the

Plaintiff defines Dr. Baldwin's interpretation of this data and ultimate conclusion as biological plausibility. Dr. Baldwin does not have to explain precisely how an agent causes a disease, but instead must only provide a judgment about the plausibility that an agent causes a disease.

### c.    Court's Ruling

Dr. Baldwin received a B.S. from Kansas State University and a M.D. from the University of Kansas School of Medicine. Following his graduation from medical school, Dr. Baldwin interned at and did his residency at the University of Kansas School of Medicine, Internal Medicine. After that, he was a fellow at the University of Kansas School of Medicine, Cardiovascular Medicine. Since that time, he has been a practicing cardiologist. He is licensed in both Kansas and Missouri, is a diplomat in the American Board of Internal Medicine and the American College of Cardiology, is a member of the American College of Physicians, and is a fellow in the American College of Cardiology. In addition, he has written three publications.

Merck's challenge to Dr. Baldwin is quite similar to its challenge of Dr. Gandy. Like Dr. Gandy, Dr. Baldwin's expert report is quite short and conclusory. It is only twelve pages long. The first seven pages concern his qualifications, background, and materials reviewed. The last five pages consist of a recitation of the facts and seven paragraphs of conclusions. Furthermore, Dr. Baldwin's deposition testimony also reveals his lack of understanding. During repeated points in his deposition testimony, Dr. Baldwin made assertions that certain studies supported his position, but was unable to name or describe the studies he was relying on. At other points in his deposition, Dr. Baldwin admitted that he did not understand how to interpret certain studies.

Similar to Dr. Gandy, however, the Court acknowledges that Dr. Baldwin is a cardiologist who is qualified to testify as an expert regarding Mr. Irvin's cardiac condition at his time of

death. Moreover, Dr. Baldwin did review all the relevant materials and is entitled to rely on

pharmacological and epidemiological experts. As such, his methodology was proper. Merck

will be allowed to attack Dr. Baldwin's understanding during cross-examination, but will not be

able to entirely exclude him based on it.

      **vi.**    **Richard M. Kapit, M.D.**

Plaintiff has designated Dr. Kapit as an expert to testify that: (1) Merck was not

forthcoming with the FDA with respect to the risks of Vioxx; (2) Merck should have changed the

label without the FDA's approval; (3) Merck had an ethical or moral obligation to ensure the

safety of the medication; (4) Merck was motivated by competition to withhold information

regarding the danger of Vioxx; and (5) Merck violated FDA requirements.

      **a.**    **Merck's Position**

First, Merck contends that Dr. Kapit's testimony regarding the inadequacy of Merck's

interactions is preempted by *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350, 353

(2001).

Second, Merck asserts that Dr. Kapit's testimony is neither scientific nor technical

evidence and, thus, is not admissible under Rule 702. As far as his testimony as to what should

have been done, Merck argues that this testimony is unreliable because it is purely speculative,

irrelevant to legal liability, and likely to prejudice the jury. In addition, Merck asserts that this

testimony is unreliable because it is based solely on Dr. Kapit's subjective determination of what

is ethical or proper or what Merck's state of mind was. This is not proper scientific

methodology. In fact, according to Merck, it is not scientific at all.

Third, Merck asserts that Dr. Kapit is not an expert as to Merck's state of mind. Dr.

Kapit reached his opinions as to Merck's state of mind by viewing internal Merck documentation. Merck argues that he is in no better position to evaluate Merck's state of mind based on these documents than a jury would be because this issue requires no special skill.

### b.   Plaintiff's Position

As to the *Buckman* argument, the Plaintiff asserts that *Buckman* is inapplicable because it concerned claims of fraud on the FDA. In this case, the Plaintiff argues that there is no claim of fraud on the FDA, and courts which have addressed *Buckman* have concluded that evidence relating to a defendant's conduct or representations in the course of FDA proceedings is admissible in support of the plaintiff's state law product liability or tort causes of action. *See, e.g., Globetti v. Sandoz Pharm. Corp.*, 2001 WL 419160 (N.D. Ala. 2001); *Eve v. Sandoz Pharm. Corp.*, 2002 WL 181972 (S.D. Ind. 2002).

Additionally, the Plaintiff asserts that Merck mischaracterizes Dr. Kapit's testimony. The Plaintiff contends that Dr. Kapit's testimony is based upon his experience and knowledge as a FDA regulatory official with the responsibility for interacting with pharmaceutical companies on issues of drug safety. Based upon his experience and federal regulations, Dr. Kapit opined that once the VIGOR results were made known, Merck had an obligation to inform the medical profession of a serious medical question regarding the safety of Vioxx. In addition, based on his experience, Dr. Kapit opined on several other Merck-FDA issues. The Plaintiff argues that these opinions were not based on his purely subjective views, but upon his background, expertise, and knowledge of the regulations governing drug safety.

As far as Merck's state of mind, the Plaintiff contends that Dr. Kapit is not attempting to read the mind of Merck and its employees, but translate to the jury the significance of certain

-46-

documents and how these documents fit into the complex regulatory scheme which governs the

conduct of pharmaceutical companies. The Plaintiff asserts that Mr. Kapit is qualified to testify

as to these matters based on his knowledge and expertise of FDA procedures, regulations, and

regulatory guidelines as well as his first hand knowledge of a pharmaceutical company's

obligations and required disclosures regarding their drugs.

### c.    Court's Ruling

Dr. Kapit received a B.A. from Columbia University and a M.D. from N.Y.U. School of

Medicine. He did his residency in Psychiatry at the National Institute of Mental Health,

Overholser Division of Training and Research, St. Elizabeth's Hospital, Washington, DC. After

that, he worked as a Medical Officer at the Bureau of Forensic Psychiatry, Department of Human

Services for five years while also running his own private practice. Following this employment,

he spent the next 18 years as a Medical Officer: first within the Division of

Neuropharmacological Drug Products, next within the Clinical Trials Bureau, and finally within

the Division of Epidemiology, all of which were within the FDA. For the past three years, Dr.

Kapit has been the President of MD-Writer, LLC, which does research, preparation, and

composition of medical articles and scientific articles for newspapers, magazines, and other

publications as well as consulting on matters related to pharmaceuticals and their adverse effects.

While employed by the FDA, he made recommendations about unapproved and approved

pharmaceuticals, about the adequacy of Investigational New Drug Applications and New Drug

Applications supporting the approval of pharmaceuticals, about labeling, and about

postmarketing surveillance reports related to pharmaceuticals. His recommendations often

focused on whether pharmaceuticals were safe for human beings.

The Court finds that Dr. Kapit is qualified to testify as an expert witness in this case. First, as stated in the Court's ruling on Professor Ray, *Buckman* is not applicable to this case or issue at all. Second, just like Dr. Arrowsmith-Lowe's testimony, Dr. Kapit's testimony will help the jury understand the applicable FDA regulations and Merck's responses. He is more than qualified to testify on this. Lastly, regarding Merck's state of mind, Dr. Kapit may not testify as to what Merck was thinking. Instead, his testimony should focus on the significance of certain documents and how these documents fit into the FDA's regulatory scheme. If Dr. Kapit attempts to testify at trial as to Merck's state of mind, Merck should raise this objection at that time. Until then, the Court reserves ruling on this issue.

### vii.   John W. Farquhar, M.D.

The Plaintiff has retained Dr. Farquhar, a cardiologist, to offer his opinion that Vioxx causes cardiovascular disease, hypertension, and that the risk of heart attack associated with taking Vioxx begins when the patient first takes Vioxx and continues throughout the period of usage. The Defendants asserts that Dr. Farquhar's opinions on general causation lack a reliable scientific basis and that his opinion regarding the Defendant's state of mind is inadmissible because he is not an expert on this subject and his opinions are irrelevant.

### a.   Merck's Position

First, Merck contends that Dr. Farquhar does not have a reliable scientific basis on which to render an opinion as to whether Vioxx generally causes an increased risk of thrombotic cardiovascular risk. Specifically, Merck contends that Dr. Farquhar misinterpreted the APPROve trial and the other clinical trials upon which his opinion rests, that the observational studies he reviewed do not supply a reliable scientific basis for his opinions, and that his opinion is

inadmissable because he did not offer a scientifically valid explanation for the mechanism by which he contends that the short-term use of Vioxx causes cardiovascular diseases.

Second, Merck contends that Dr. Farquhar cannot testify as to Merck's knowledge or whether Merck acted appropriately. Specifically, Dr. Farquhar is not an expert as to Merck's state of mind. Also, Dr. Farquhar's opinion is based on a review of internal Merck documents and selected deposition testimony. Merck contends that these documents and testimony are not the type of evidence that require expert testimony, and that a jury will be able to understand this evidence without Dr. Farquhar's assistance. Moreover, Merck asserts that Dr. Farquhar's personal opinions as to whether Merck acted appropriately are irrelevant and unreliable.

### b.    Plaintiff's Position

In response, the Plaintiff asserts that Dr. Farquhar's testimony as to causation is supported by the APPROVe study as well as the VIGOR, ADVANTAGE, and the Rheumatoid Arthritis studies. In addition, the Plaintiff contends that Dr. Farquhar is well qualified to testify as to biologically plausible mechanisms and the results of statistical analyses that he directed. Regarding testimony as to appropriateness, the Plaintiff stipulates that Dr. Farquhar will not testify about the ethics of Merck's conduct. Instead, the Plaintiff argues that he will testify that Merck made unreasonable and unsupported interpretations of its scientific data. The Plaintiff contends that he will not be attacking Merck's business ethics, but will be testifying that Merck departed from the scientific method.

### c.    Court's Ruling

Dr. Farquhar is a Professor Emeritus of Medicine at the Stanford University School of Medicine. He has been a Professor of Medicine since 1973. He was an Assistant Professor from

1962-1966 and an Associate Professor from 1966-1973. He is also a Professor of Health

Research and Policy at Stanford. He has held this position since 1978.

Dr. Farquhar received an A.B. in Medicine from the University of California School of

Medicine, Berkeley and an M.D. from the University of California School of Medicine, San

Francisco. He was an intern and resident at U.C. San Francisco, a resident at the University of

Minnesota School of Medicine, Minneapolis, and a postdoctoral fellow with the United States

Health Service at U.C. San Francisco.

In his career, Dr. Farquhar has received a litany of awards and is a member of numerous

medical organizations. His principal areas of research include epidemiology and cardiovascular

risk factors. He was the Director of the Preventative Cardiology Clinic, Stanford Medical Center

from 1978 to 1996 and has been Co-Director since that time. From 1973 to 1984, he served as

the Director, Stanford Heart Disease Prevention Program. He also maintained an active clinical

cardiology practice from 1962 to 2001.

Dr. Farquhar has authored or co-authored approximately 200 peer-reviewed articles,

predominantly in the fields of epidemiology and cardiovascular risk factors such as cholesterol,

hypertension, smoking, and atherosclerosis. He has also co-authored one book and authored

another book. Dr. Farquhar based his opinion on his review of the literature pertaining to COX-2

inhibitors and his own training and experience in the fields of epidemiology and cardiology.

Merck challenges Dr. Farquhar on two grounds. First, Merck asserts that Dr. Farquhar's

opinion is based on scientifically unreliable information. This assertion is unpersuasive. Dr.

Farquhar has reviewed all the relevant literature on Vioxx. The materials he reviewed are the

same materials reviewed by Merck's experts. Dr. Farquhar, however, has reached a different

conclusion than Merck's experts. Differing conclusions are permissible under Rule 702; improper methodology is not. If Dr. Farquhar's reliance on these studies is improper, than the same reliance by Merck's experts is improper. As evidenced by his thorough and explanatory ninety-five page expert report, Dr. Farquhar is qualified and relied on proper methodology.

Second, to the extent that Dr. Farquhar may testify as to Merck's state of mind, the Court reserves ruling on this issue until it is presented at trial. At that time, the Court will have a clearer basis for making its ruling.

### C.    *Daubert*-Like Motions

#### i.    Testimony that Adverse Thrombotic Cardiac Events Occur Only if Vioxx is Ingested 18 Months or Longer

The Plaintiff asserts that the Defendant's position that Vioxx only causes prothrombotic effects if ingested for 18 months or longer is scientifically unreliable because this opinion is based upon a speculative post hoc sub group analysis by Merck from the APPROVe study, flies in the face of the results from Merck's own clinical trials and other epidemiologic studies, and is wholly without any biological plausibility. In opposition, Merck claims that the APPROVe study was reliable, its opinion is supported by its own clinical trials, and its opinion is supported by substantial literature and testing.

This motion concerns the results of the APPROVe study. The Plaintiff has interpreted the data collected by the APPROVe to mean that Vioxx can cause adverse thrombotic cardiovascular events after short-term use. Her position is based on adjudicated data from the study. Merck, however, takes the position that the APPROVe study shows that Vioxx only causes adverse thrombotic cardiovascular events after long-term use. Its position is based on confirmed data.

In essence, both parties are relying on the same test. Both parties agree that the test was conducted properly. The parties are disagreeing as to the conclusions reached by the other parties. As a gatekeeper, the Court must evaluate methodology, not conclusions. The proper forum for challenging conclusions is at cross-examination, not in a *Daubert* motion. Accordingly, the Plaintiff's motion to exclude this testimony is denied.

### ii.   Testimony that Vioxx is the Same as All NSAIDs Regarding Cardiotoxic Effects

The Plaintiff asserts that Merck's position that Vioxx is the same as all NSAIDs regarding cardiotoxic effects is scientifically unreliable because it is based on an untested hypothesis; it has not been subjected to peer review or publication; it is impossible to know the rate of error or potential rate of error given its broad-sweeping application to all NSAIDs; there is no indication that it is generally accepted in the relevant scientific community; and there is a huge analytical gap between existing scientific certainty and a hypothetical opinion that Vioxx is like all other NSAIDs, with the exception of naproxen. Merck contends that each of the Plaintiff's arguments is incorrect and that its opinion is scientifically reliable.

Merck's position that Vioxx, based on all the present information, is the same as all NSAIDs regarding cardiotoxic effects is predominantly based on an April 6, 2005 FDA Decision Memorandum reaching this conclusion. In addition, this position is also supported by an analysis presented at Health Canada. The Plaintiff contends that these two materials are scientifically unreliable because they are based on limited, unpublished, and non-peer-reviewed data.

In reaching the conclusions set forth in its April 6, 2005 Decision Memorandum, the FDA' advisory panel reviewed a large body of data. It reviewed an internal review by the FDA's Center for Drug Evaluation and Research of available data regarding the cardiovascular safety

issues for COX-2 inhibitors and NSAIDs. In addition, it reviewed the regulatory histories, New

Drug Applications, and postmarketing databases of the various NSAIDs. It reviewed FDA and

sponsor background documents prepared for the advisory committee meeting. It reviewed all the

materials and data submitted by and presentations made by interested parties. Lastly, the FDA

Memorandum itself analyzes the results of the numerous clinical trials and epidemiological

studies concerning NSAIDs that the advisory committee reviewed in reaching its conclusions.

The Court finds that the FDA's conclusions were reached after a review of scientifically reliable

data.

The Plaintiff is primarily challenging the conclusions reached by the FDA. Once again, it

is not the Court's task to scrutinize conclusions. The Court is charged with the duty of ensuring

proper methodology. Here, the FDA's Decision Memorandum is based on proper methodology.

Accordingly, the Plaintiff's motion is denied.

### iii.   Testimony that Naproxen is Sufficiently Cardioprotective to Explain Excess Cardiac Risk in VIGOR

The Plaintiff asserts that the Defendant's position that naproxen is sufficiently

cardioprotective to explain the excess cardiac risks in the VIGOR study is scientifically

unreliable because it has never been tested in a controlled clinical trial, it has never been accepted

as scientifically true in a peer reviewed publication; it has an unknown rate of error and/or a high

rate of error since it has been proven to the contrary in large epidemiological studies; it has not

been generally accepted within the relevant scientific community; and there is an overwhelming

analytical gap between the underlying data and the opinion proffered. Merck, however, asserts

that its opinion is scientifically reliable.

The Court finds that there is significant, scientifically reliable information supporting

Merck's contention that naproxen is sufficiently cardioprotective to explain the VIGOR test results. In reaching this position, Merck relies on a wide array of materials. First, two peer-reviewed studies supported Merck's position. One of the studies was published in 2000 by Merck and the other was published in 2004 by an independent author. Second, several other clinical and basic research studies suggest that naproxen has cardioprotective effects. Moreover, naproxen's own warning label states that it may reduce platelet aggregation and prolong bleeding. Third, numerous observational epidemiologic studies have detected a statistically significant lower rate of cardiovascular events for patients taking naproxen. Lastly, the results of the TARGET study lend support to Merck's position. TARGET consisted of two sub-trials comparing lumiracoxib, a COX-2 inhibitor, with ibuprofen and naproxen. The results of TARGET revealed significantly less myocardial infarctions and adverse cardiovascular events in the naproxen sub-trial than in the ibuprofen sub-trial. The cumulative effect of all these materials tends to support Merck's position and corroborate the evidence it is relying on. As such, the Court finds that Merck's position is based on scientifically reliable evidence. Accordingly, the Plaintiff's motion is denied.

### iv.    Testimony that Merck Could Not Provide Risk Information through Labeling or Marketing Without Prior Approval of the FDA

The Plaintiff asserts that the Defendant's position that it could not provide risk information through labeling or marketing without prior approval of the FDA is factually untrue and legally unsupported. As such, the Plaintiff contends that it is not helpful to the trier of fact and is contrary to what is considered to constitute generally accepted and reliable scientific testimony. Merck argues that FDA regulations and its past interactions with the FDA support its position that it could not change its label without prior FDA approval.

The Plaintiff argues that under the applicable FDA regulations and guidelines Merck had authority to strengthen its warning label at any time. Merck contends that it did not have this authority. This disagreement stems from the classification of the label change. If the Vioxx label change is classified as "moderate" under the applicable guidelines, then the Plaintiff is correct. If the Vioxx label change is classified as "major" under the applicable guidelines, then Merck is correct. Merck is seeking to introduce evidence that the Vioxx label change was major and, as such, it could not make the label change without prior FDA approval. The Court finds that there is nothing false or legally unsupportable concerning Merck's position. Accordingly, the Plaintiff's motion is denied.

### v.   Testimony of Plaintiff's Experts Regarding Causation

Merck has moved to exclude the testimony of the Plaintiff's experts to as whether Vioxx 25 mg causes an increased risk of thrombotic cardiovascular events because this testimony is based on scientifically unreliable evidence. In addition, the Defendant has moved to exclude any expert testimony as to whether Mr. Irvin's ingestion of Vioxx caused his death because it is based on scientifically unreliable evidence.

The Plaintiff contends that there is more than enough scientific literature and data to support the position that Vioxx taken at 25 mg doses increases the risk of thrombotic cardiovascular events.

There have been at least several clinical trials and observational studies which reveal that Vioxx can increase the risk of cardiac incidents. The issue, at least in this case, is temporal. Merck points out that no randomized, blind trials with a placebo counterpoint have specifically concluded that Vioxx can cause cardiac incidents within the first month of consumption. The

Plaintiff argues that that was not the objective or goal set for these studies. So, it is not surprising.

The Plaintiff, however, points out that the raw data from these studies shows that the cardiac incidents, including sudden death, occurred within the first month. She also points to a significant number of peer reviewed articles and observational studies which appear in credible and well recognized medical publications and support her conclusion.

In essence, both the Plaintiff and Merck rely on the same material. They simply interpret it differently and reach contrary conclusions. The Court's role as gate-keeper is to scrutinize the methodology, not the conclusions. Accordingly, Merck's motion is denied.

## IV.   CONCLUSION

For the foregoing reasons, the Court rules that: (1) the Plaintiff's Motion to Exclude the Testimony of Dr. Thomas Wheeler is Denied; (2) the Plaintiff's Motion to Exclude the Testimony of Dr. Janet Arrowsmith-Lowe is Denied; (3) the Plaintiff's Motion to Exclude the Testimony of Doctors Frank Lanza and Merlin Wilson is Denied; (4) the Plaintiff's Motion to Exclude the Testimony of Dr. David Silver is Denied; (5) the Plaintiff's Motion to Exclude Testimony that Adverse Thrombotic Cardiac Events Occur Only if Vioxx is Ingested 18 Months or Longer is Denied; (6) the Plaintiff's Motion to Exclude Testimony that Vioxx is the Same as All NSAIDs Regarding Cardiotoxic Effects is Denied; (7) the Plaintiff's Motion to Exclude Testimony that Naproxen is Sufficiently Cardioprotective to Explain the Excess Cardiac Risk in VIGOR is Denied;(8) the Plaintiff's Motion to Exclude Testimony that Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the FDA is Denied; (9) Merck's Motion to Exclude the Testimony of Winston Gandy, Jr., M.D. is Denied;

-56-

(10) Merck's Motion to Exclude the Testimony of Wayne A. Ray, Ph.D. is Granted in Part and Denied in Part; (11) Merck's Motion to Exclude the Testimony of Benedict Lucchesi, M.D., Ph.D., M.S., F.A.H.A. is Denied; (12) Merck's Motion to Exclude the Testimony of Colin M. Bloor, M.D., and Joseph L. Burton, M.D. is Denied; (13) Merck's Motion to Exclude the Testimony of Thomas Baldwin, M.D. is Denied; (14) Merck's Motion to Exclude the Testimony of John W. Farquhar, M.D. is Denied; (15) Merck's Motion to Exclude the Testimony of Richard M. Kapit, M.D. is Denied; and (16) Merck's Motion to Exclude Evidence of the Plaintiff's Experts Regarding Causation is Denied.

New Orleans, Louisiana, this ___18th___ day of ___November___, 2005.


UNITED STATES DISTRICT JUDGE

**EXHIBIT "12"**
**Part A**

**EXHIBIT "12"**
**Part A**

2505

SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY/CIVIL DIVISION
DOCKET NO. ATL-L-2272-03MT
------------------------------x
FREDERICK HUMESTON, et al.,
          PLAINTIFFS,
     VS.                    STENOGRAPHIC TRANSCRIPT
                            OF:
MERCK & CO.,INC.,
                            - TRIAL -
          DEFENDANT.
------------------------------x
     PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
             1201 BACHARACH BOULEVARD
             ATLANTIC CITY, NJ 08401
     DATE:   SEPTEMBER 29, 2005
B E F O R E:
     THE HONORABLE CAROL E. HIGBEE, P.J.Cv.
TRANSCRIPT ORDERED BY:
     DIANE P. SULLIVAN, ESQUIRE
     DAVID R. BUCHANAN, ESQUIRE
A P P E A R A N C E S:
     DAVID BUCHANAN, ESQUIRE
     CHRISTOPHER SEEGER, ESQUIRE
     MOSHE HORN, ESQUIRE
     SEEGER, WEISS, LLC
        ATTORNEYS FOR THE PLAINTIFFS
     DIANE SULLIVAN, ESQUIRE
     HOPE FREIWALD, ESQUIRE
     DECHERT, LLP
     STEPHEN D. RABER, ESQUIRE
     WILLIAMS AND CONNOLLY, LLP
     CHRISTY D. JONES, ESQUIRE
     BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
        ATTORNEYS FOR THE DEFENDANT
       *    *    *    *    *    *    *
                  CAROL A. FARRELL, CSR-CRR-RMR
                  OFFICIAL COURT REPORTER
                  1201 BACHARACH BOULEVARD
                  ATLANTIC CITY, NJ  08401

2506

                    I N D E X

          Direct    Cross    Redirect    Recross

WITNESSES FOR

THE PLAINTIFFS

DAVID N. SIM, M.D. (videotaped testimony)    Page 2546

SETH HUMESTON    2548

NICHOLAS L. DePACE    2589

EXHIBITS                        Ident.    Evid.
None

1    P R O C E E D I N G S
2        (The following conference transpired in
3    chambers at 8:50 a.m.)
4        THE COURT:  The issue that's, I think, before
5    the Court and on the record is the Sim deposition, Page
6    126, starting at Line 6, going through Page 127, 128,
7    129, 130 and 131.  There is testimony concerning when
8    he began to consider that VIOXX might be a causative
9    factor in the heart attack or relevant to the heart
10   attack.  Counsel for the defense is objecting to that
11   portion being read in.
12       Counsel, you want to put on the record what
13   your argument is?
14       MS. FREIWALD:  Yes, Your Honor, and just to
15   expand upon your references a little bit, there is
16   also -- if I can find my notation here -- there is also
17   reference later in the deposition, at Page 212 and 216,
18   217, to Dr. Topol's publications and what he knows or
19   doesn't know of the various studies that have been done
20   related to VIOXX, and if Your Honor's initial
21   inclinations regarding causation opinions hold, we
22   would submit that that testimony is part and parcel of
23   the same concept; that testimony, we object similarly
24   to that testimony because it's fundamentally linked to
25   the issue of whether he can offer an opinion on the

1    ultimate causative issue.
2        THE COURT:  Okay.  Well, let's look at 126
3    first and then we will come to that.
4        MS. FREIWALD:  Fair enough, Your Honor.
5        Our position, as you know, Your Honor, is
6    that Dr. Sim is the treating cardiologist who has never
7    offered an opinion in the course and scope of his
8    treatment with regard to VIOXX.
9        His testimony at this deposition was that at
10   the time that he assumed the care of Mr. Humeston, in
11   the hospital, he did not look at the patient health
12   information with regard to what medicines the patient
13   had used.  He similarly testified that he did not,
14   himself, take Mr. Humeston off of VIOXX.
15       He speculated that Dr. Lewer did so.  As we
16   know, that's an inaccurate speculation because
17   Dr. Lewer testified to the contrary, and I think it's
18   pretty much undisputed that Mr. Humeston made his own
19   decision about what to do.
20       After the heart attack, he's never put in his
21   medical record anywhere that he thinks that VIOXX is
22   causative.  In fact, he has treated him like a person
23   who has had a standard heart attack.
24       Beyond that, his opinions are so speculative,
25   and so all over, as I believe Your Honor noted

1   yesterday, that they clearly don't meet any kind of a
2   test for an expert/fact opinion. He talks about what
3   might be causative, what might potentially VIOXX's role
4   would be. VIOXX is the drug that's potentially
5   relative, he says. VIOXX might have been implicated.
6   All of that is clearly speculation.
7           He's not an expert in coxibs. He has not
8   done, even by his own account, a thorough review of the
9   literature. Whether or not he can testify as to the
10  state of the coronary arteries or whether he thinks
11  that the heart attack happened, as heart attacks
12  typically do, he does not have the kind of reliable
13  opinions stated to anything close to a reasonable
14  degree of expert probability, that one would want under
15  the Stigliano test.
16          And, of course, in that case, it was quite
17  the contrary. The treating physicians were engaged in
18  their treatment for the purposes of deciding the cause
19  of the child's injury. Why was she having seizures?
20  And they specifically reached that question in their
21  care. They documented those opinions in their medical
22  records. And they held those opinions with a very high
23  degree of certainty.
24          This is not at all that case. This is just a
25  case where there is going to be prejudice in the

1   *suggestion that a treating physician has an opinion,*
2   *when, in fact, what he has, at very best, is a -- an*
3   *uninformed guess or speculation.*
4           So we would submit that, for two reasons, the
5   lack of connection to the care and treatment, and,
6   frankly, just the lack of any kind of reliability,
7   *Dr. Lewer should not be allowed to testify as to VIOXX*
8   *being potentially or maybe the cause of Mr. Humeston's*
9   *heart attack.*
10          THE COURT: Counsel?
11          MR. BUCHANAN: Your Honor, I think this does
12  go back to the Stigliano case, at least as -- to give
13  us the framework on it, and the *Stigliano* case, I
14  think, makes it quite clear that treating physicians
15  are entitled to provide testimony concerning their
16  factual impressions and even opinions, the Court noting
17  that opinions and facts are often a blurry line as it
18  relates to issues like we're talking about. But he can
19  provide those opinions and testimony under a lay
20  opinion standard, under a 701 standard rather than a
21  702 standard.
22          The testimony at issue here, while counsel's
23  highlighted certain words that suggest a lack of
24  certainty, this is not a 702 standard that we're
25  looking at. This is a lay opinion standard, and the

1   standard is going to be whether if that were to go to
2   the jury and submit the testimony that is submitted
3   here, if we exclude the portion where he talks about
4   VIOXX being potentially implicated, would leave the
5   jury with an impression that -- he says was something
6   else going on in this case that caused him to have an
7   event? Or that's his -- the full sentence is, And even
8   though I was unable to formulate what that cause might
9   have been at that point in time, it was apparent that
10  there very likely was something else going on in his
11  case that had caused him to have his event.
12          We had heard from the defense yesterday that,
13  apparently, stress is going to be a centerpiece of the
14  trigger for Mr. Humeston's heart attack. There is
15  certainly a lingering inference by cutting off the next
16  series of questions and answers that maybe that
17  something else was stress that he's referring to, when,
18  in reality, as we can see from the transcript, he's
19  considering VIOXX as being that potential other thing
20  that caused him to have his event.
21          So, you know, I think it would be very
22  misleading to stop where we had previously discussed
23  stopping, and that was at 127-4 of his deposition, and
24  exclude portions that relate to his findings or
25  potential conclusions with respect to VIOXX.

1           The one thing that's quite significant, I
2   think, is that the treating physician did put VIOXX in
3   the differential diagnosis. He may not have reached
4   the firm conclusion, yes, VIOXX was the cause, but he
5   does say that it was potentially relevant to his
6   particular heart attack, and, from a 701 standard, Your
7   Honor, that's fine. The jury can certainly consider
8   other -- other facts elucidated on cross-examination as
9   to the strength of which that particular opinion can be
10  considered, but it should not be excluded.
11          MS. FREIWALD: Your Honor, if I may, just two
12  points in response to Mr. Buchanan.
13          Dr. Lewer absolutely does not put VIOXX in
14  the differential. I think --
15          MR. BUCHANAN: You mean Dr. Sim.
16          MS. FREIWALD: Dr. Sim. I'm sorry.
17          I think we have to be absolutely clear about
18  this. A differential diagnosis is what is happening to
19  this patient now. At the time of the heart attack,
20  Dr. Sim didn't diagnose him as having a heart attack,
21  and he most surely didn't diagnose him as having a
22  heart attack caused by VIOXX. I mean, that's
23  absolutely clear in the record.
24          The only thing that Dr. Sim has done is look
25  at how do I manage this patient now that he has had a

1  heart attack?  And in his management of this patient,
2  he did not even stop the patient from taking VIOXX.  He
3  doesn't even know exactly when the patient stopped
4  taking VIOXX or why the patient stopped taking VIOXX.
5  In fact, his best guess, we all know to be wrong, so
6  VIOXX was in no way part of his differential.
7         The second thing is that the Stigliano
8  reference to lay opinion testimony comes at a part of
9  the case where the Court is merely making the point
10 that you don't need to designate a treating physician
11 as an expert with a formal expert report because their
12 opinions are a mixture of fact and expert testimony.
13 *However, clearly, the Court says that they --*
14 doubtlessly, the treating physician doubtlessly has to
15 have the right expertise, and you're relying on their
16 expertise, and the presumption is that if they form the
17 opinion with sufficient certainty in the course and
18 scope of their care of the patient, you can take them
19 as having the appropriate level of expertise.
20        Dr. Sim -- excuse me -- did not do that.  He
21 did not document anywhere that he thought that VIOXX
22 was causative, and he admittedly doesn't really know
23 very much about what the data on VIOXX do and don't
24 show.
25        You know that our view is that all of his

2513

1  *views about whether plaque rupture was involved or not*
2  should come out because they leak into this issue of
3  VIOXX.  But even if you cut off where you were
4  yesterday, it's not confusing.  They will have
5  Dr. DePace to testify as to causation.
6         They -- I believe Dr. Lewer has given his
7  opinion on the theory that that was in his medical
8  record.  They surely don't need Dr. Sim to speculate on
9  the issue.  He is the absolutely most confused and
10 uncertain and I think your words were yesterday all
11 over the board or all over the map on what may have
12 been or might have been or possibly could have been the
13 role of VIOXX.
14        MR. BUCHANAN:  I don't agree with that
15 characterization.
16        Just to tell you one thing, Your Honor, he
17 did testify above at 124, that it is his practice as a
18 cardiologist when he begins the care and treatment for
19 somebody who has already had a heart attack to do an
20 assessment of the risk factors and the potential causes
21 of the heart attack.  And then it goes -- it follows
22 logically in the next section as to what was done in
23 the case of Mr. Humeston.
24        I understand there is not a documented
25 medical record but that's not a requirement.

2514

1         MS. FREIWALD:  Not only is there not a
2  documented record, there is affirmative testimony that
3  he didn't look at the product use, never thought about
4  the product use, never made a decision about the
5  product use.
6         MR. BUCHANAN:  It's absolutely in the medical
7  records in his admit note.  He knew he was on VIOXX.
8         MS. FREIWALD:  He testified, if you read the
9  deposition, he looked at the note about the patient
10 taking VIOXX, and he says, I didn't look at this, I
11 didn't discuss it with Mr. Humeston.
12        THE COURT:  All right.  Well, the Court's
13 *looking at the testimony of Dr. Sim as a treating*
14 doctor.  And he's not only a treating doctor, I mean,
15 he was a treating doctor immediately after the heart
16 attack or very shortly after the heart attack.  In
17 addition, he had been a treating doctor before the
18 heart attack.  And, in fact, he is still a treating
19 doctor and *still treating the patient.*
20        So there is no question that we have to look
21 at him in a light -- in a light differently, according
22 to the caselaw, and according to the New Jersey
23 decisions, and the Supreme Court's decision,
24 particularly, on how treating doctors should be
25 considered.

2515

1         And I looked last night in more detail at
2  some of the caselaw.  And I've read Stigliano many
3  times but, until yesterday, I really had not taken note
4  of the fact, as Mr. Buchanan pointed out, that the
5  evidence record -- that the reference in the evidence
6  book is to -- by the Supreme Court is to New Jersey
7  Evidence Rule 701, *permitting a fact witness to testify*
8  and to form an opinion, as opposed to a reference to
9  702 or 703, the expert evidence opinions.
10        Stigliano, in fact, has always -- was an
11 important decision by the Supreme Court.  There is no
12 question about that.  And it has somewhat changed
13 trials since it was made in 1994.
14        What the Court says at that point is that
15 determinative causation partakes of both fact and
16 opinion.  The critical point is that treating doctors,
17 to treat their patients, must determine the cause of a
18 disease, whether that determination is characterized as
19 fact or opinion.  As fact witnesses, treating doctors
20 may testify about their diagnosis and treatment,
21 including their determination of the disorder's cause.
22 Their testimony about likely and unlikely causes is
23 factual information, albeit in the form of opinion.
24        So they talk specifically in the opinion
25 about likely and unlikely causes.  And referring to the

2516

1  fact witness evidence rule N.J.R.E. 701, they indicate
2  that a fact witness can testify in the form of opinion
3  to assist a -- the jury in their fact finding.
4       They further note at the end of the opinion
5  that, without impugning expert witnesses who may
6  testify for either plaintiffs or defendants, the
7  treating doctors may be the only medical witnesses who
8  have not been retained in a anticipation of trial. A
9  jury could find treating doctors' testimony to be more
10  impartial and credible than retained experts, and
11  excluding treating doctors' testimony undermines the
12  ultimate objective of trial, the determination of
13  truth. We find the probative value of a treating
14  doctor's testimony outweighs any prejudice to the
15  plaintiffs.
16       Now, I note that there is -- as I said,
17  Stigliano is a major decision by the Supreme Court. I
18  guess they would think that all their decisions are,
19  and I guess they all are, certainly, since they
20  determine the law of the State, but this particular one
21  actually had a strong influence on how trials have been
22  operated since then.
23       And in 1996, which was only actually a year
24  later, the Appellate Division is saying it's well
25  settled that treating physicians may testify as to any

2517

1  subject relevant to the evaluation and treatment of
2  their patients. And that's in Ginsberg versus Saint
3  Michael's Hospital, 292 N.J. Super 21. So by 1996, it
4  was considered well settled law that treating doctors
5  were to have a great deal of flexibility.
6       I looked through the other states and the
7  majority of states seem to agree that treating doctors
8  should be allowed to testify as to causation.
9       I found some interesting language in a case
10  in Texas which I think sums up somehow how I feel about
11  this particular issue, and that is the case of Green
12  versus Texas Worker's Comp, 993 S.W. 2nd 839.
13       Interestingly, in this particular case, they
14  actually -- the trial judge in this case barred
15  causation testimony by the treating doctor and barred
16  any testimony really by the treating doctor. The Court
17  looked at it as abuse of discretion and decided that
18  they wouldn't -- actually did not overturn the trial
19  judge's decision on causation, but what they said was
20  we'll allow it to go and we'll -- they sort of said
21  what we're going to do is rule that we're going to
22  reverse because he should have allowed it in on the
23  other -- as to everything else. They don't actually
24  reverse on the causation decision but they -- they
25  certainly don't seem to approve of what the trial judge

2518

1  did. And it seems to me that they basically were
2  saying that, in their discretion, they would have done
3  something else.
4       They specifically said, as mentioned, we test
5  the decision on an abuse of discretion standard, which
6  is a heavy burden for Green to meet. We begin with the
7  observation that medicine is as much an art as a
8  science, and clinical medicine necessarily evolves from
9  a process of trial and error. As such, clinical
10  medicine has traditionally been granted leeway in a
11  determination of admissibility. A physician may not
12  always be able to isolate to mathematical certainty why
13  human beings react in a certain way or why certain
14  ailments respond to particular cures, but this does not
15  render such diagnoses or treatments ineffective or
16  unreliable. We have -- unfortunately, we have yet to
17  reduce all of life's mysteries to a discrete set of
18  scientific principles.
19       The bottom line is that in this case, we have
20  two treating doctors, Dr. Lewer and Dr. Sim. They are
21  very different.
22       One being an internist, who treated the
23  patient and prescribed VIOXX. He testified that in
24  medical probability, he believes that VIOXX caused the
25  heart attack. He gave that testimony saying that at

2519

1  the time he prescribed it, he didn't understand that,
2  but subsequent to it -- and he basically testified that
3  shortly thereafter, within a few months of this, he
4  began to realize that there was literature out there
5  about cardiovascular risks. He reviewed it, and he
6  based his opinion, basically, on the fact that he
7  hadn't had prior cardiac risk, that he didn't see his
8  patient as being someone who had cardiac risk, that the
9  angiogram didn't show that this was a patient who had
10  cardiovascular disease and he, therefore, felt that, in
11  his opinion, it was, in fact, caused by VIOXX. I
12  allowed that opinion to go to the jury.
13       Sim is a cardiologist and, therefore, much
14  more knowledgeable about cardiology probably than
15  Lewer, although they're both doctors and I think both
16  qualified to give opinions in the area.
17       Dr. Sim treated -- is a treating doctor. He
18  treated Humeston before the heart attack. He treated
19  him after the heart attack. He treated him basically
20  for the heart attack. He has subsequently continued to
21  treat him. And since he's a cardiologist, he is
22  obviously treating him for his heart.
23       He says -- his testimony really -- he doesn't
24  actually -- his testimony, basically, is very similar
25  to Dr. Lewer's, although he says he did not discuss it

2520

1  with Dr. Lewer.  He is not a friend of Dr. Lewer's.  He
2  didn't really have contact with Dr. Lewer, except very
3  limited about the patient.
4        But his position is, and I think it's
5  important, very probative for the jury to know, that
6  here is a second doctor who was not aware of the risks
7  of VIOXX, or that there was any controversy about the
8  risks of VIOXX, prior to seeing Mr. Humeston.  I think
9  that's certainly probative information for the jury to
10  know, particularly in light of the fact that counsel
11  has opened by saying that you'd have to be under a rock
12  not to know what was happening about VIOXX, that there
13  was a controversy.  Counsel the other day for defense
14  put in the fact in evidence that there were numerous
15  newspaper articles about VIOXX and of the VIGOR trial.
16  And Dr. Lewer said, well, I wasn't aware of that.  The
17  literature that I got and the statements from the reps
18  and the other, didn't lead me to believe that VIOXX was
19  a problem before.  But, shortly thereafter, I did
20  become aware of it.
21        And, actually, Sim's testimony is the same.
22  Sim says at the time when I first saw him, I didn't
23  know about it.  I didn't realize there was a
24  controversy.  And he is a cardiologist.  I hadn't heard
25  about it.  But within a month or two, couple months, I

2521

1  started to hear about it.  I mean, isn't that what he
2  says?
3        MS. FREIWALD:  He --
4        MR. BUCHANAN:  Yes.
5        MS. FREIWALD:  He does claim that.
6        Your Honor, I would suggest that what Dr. Sim
7  knew or didn't know prior to the heart attack is not
8  even remotely probative.  He, one, was not
9  Mr. Humeston's prescriber, and, two, he said he really
10  didn't prescribe.  He was a cardiologist.  This wasn't
11  his area.
12        So I can't imagine that Merck is going to be
13  held to the standard of proving that anybody and
14  everybody had the same level of knowledge as somebody
15  who was prescribing and making prescribing decisions.
16  It's not relevant in this case.
17        THE COURT:  Well, it's more relevant what the
18  cardiology people -- what the cardiologist knew than it
19  is was what --
20        MS. FREIWALD:  Actually, cardiologists were
21  less frequent -- less frequent prescribers because of
22  the nature of their practice.
23        MR. BUCHANAN:  More sensitive to the risks.
24        THE COURT:  All right.  Regardless, you know,
25  I feel that that is a probative issue, and I think that

2522

1  it is something that should go to the jury.
2        But, more important, he is allowed to testify
3  to causation and what he thought caused this heart
4  attack.
5        And the important thing, when you read
6  Dr. Sim's testimony and when the jury hears it, is not
7  that he is saying VIOXX caused it, but that he is
8  saying there is no other logical reason for this, that
9  there isn't -- that some people -- he admits that some
10  people just have heart attacks and we don't know why
11  and he acknowledges that.  He also says that that's
12  infrequent and doesn't happen very often.  He says that
13  this man had no risks, or no problem with his arteries
14  and no problem with his cardiovascular system, and that
15  he examined the angiogram and didn't see that he had
16  had any risk for heart attack, significant risks, and
17  he felt -- at first he had no -- nothing about VIOXX,
18  then he hears about it, just about the same time Lewer
19  hears about it.  He considers that, and in the end --
20  and he says, he's considering it's relevant, he's
21  thinking about it, but he is describing how he was
22  thinking in October of 2001, I guess.  He's talking
23  about how he felt.  But in the end, he says, if we're
24  talking about scientific -- you don't have to use the
25  magic word "probability."  In the end, he says, I'm

2523

1  left -- and this is now all the way at Page 227.  He
2  says, I'm left, in retrospect, with a patient who had
3  no or minimal coronary risk factors; who, by angiogram,
4  did not have coronary disease; who had a myocardial
5  infarction who was on VIOXX.  If somebody asked me, did
6  VIOXX play a contributing role or did he have a plaque
7  rupture, my tendency -- no, not tendency -- my strong
8  feeling is that in view of the fact that he did not
9  have discernible coronary disease, it's unlikely he had
10  a plaque rupture.  More likely, he had something else,
11  a thrombosis or spasm of a normal vessel.
12        MS. FREIWALD:  He then goes on to say that
13  there is no evidence of spasm and you can't distinguish
14  between the plaque and the thrombosis.
15        Your Honor, I understand your ruling, but I
16  just have to put on the record, if it were the case
17  that you read Stigliano to mean that any opinion can
18  come in, if it's uttered at any level by a treating
19  doctor because it's a quote, unquote, lay opinion, you
20  would be so far down the slippery slope of speculation
21  and lack of reliability.
22        And Your Honor hit the nail on the head.
23  There is a great likelihood that the jury will put more
24  weight on these opinions because they are coming from a
25  treating doctor, and yet they are made without any

2524

1 level of confidence, without any level of real
2 expertise in the COX-2s, and, as this commentary at 701
3 says, somebody can -- the man on the street can testify
4 that somebody looked intoxicated, but if the issue of
5 the defendant's intoxication is part of the defense,
6 you need more than just a -- you know, I was drunk kind
7 of opinion.
8          And that's really what we have here.  They
9 have Dr. DePace.  They have other experts.  They have
10 gotten Dr. Lewer's opinion in.  Dr. Sim is way more
11 *prejudicial than it is probative, given how all over*
12 the board he is, and that he didn't make any --
13          THE COURT:  Well, he is not all over the
14 board.  He says the same thing consistently.  What he
15 says is -- when you're saying all over the board, he
16 uses terms, different spots, just like -- doctors who
17 aren't expert witnesses don't talk in legal terms.  And
18 what he talks about is I had a tendency, and then he
19 goes, no, look, I had a strong feeling.  That, I think,
20 comes to more probable -- more probable than not.
21          He then talks about how -- and he doesn't
22 *specifically say -- what he is saying is there is no*
23 other cause.  That's what he says, that he believes
24 there is no legitimate cause.  And that is an opinion
25 that the cardiologist who treated him, who has looked

                                                    2525

1 at his angiogram, who treats him today, should
2 certainly be allowed to give.
3          I agree with you, Stigliano doesn't go as far
4 to say that any doctor who says anything can be
5 admitted.
6          There is a treating cardiologist, treating
7 the patient, and this isn't a decision that he made in
8 2006 or 2005.  I guess he couldn't make it in 2006.
9 It's not a decision made in 2004 or 2005.  He says that
10 he made these -- this was part of his thought process.
11 He started to hear about the literature and look at the
12 literature while he is treating him, and he
13 specifically says in October of 2001, I started to look
14 at the VIOXX things and this -- this is his position on
15 causation as of 2001, two years before the litigation,
16 two years before anything's happened, and he gives his
17 reasons in detail for it.  It's not just speculation --
18 well, I don't know what caused his heart attack,
19 therefore, I think it was VIOXX.  And he never says
20 that.  What he says is there is no other good
21 explanation for this from a cardiovascular point of
22 view.  And that's what his opinion is.
23          MR. BUCHANAN:  I mean, the other important
24 point, Your Honor, is now we have -- we have a
25 prescribing physician and a cardiologist living under

                                                    2526

1 the same rock who apparently missed all the news
2 relating to VIOXX.
3          THE COURT:  Which I also think is a second
4 reason why I think it's probative myself, and I really
5 don't have any doubt but that that's a probative fact.
6          I'm going to allow in the testimony on Page
7 126, 127, 128.  We will take out from the bottom of
8 128, Line 16, where he speculates about when he went
9 off of VIOXX, 128 -- it's Page 26 of the transcript --
10 or 28 of the transcript.  Page 28 of the transcript.
11 128.
12          MR. BUCHANAN:  Taking that out, okay?
13          THE COURT:  Take out Question 16 and 17
14 through to 125.
15          MR. BUCHANAN:  Excuse me, Your Honor.
16          THE COURT:  129-5.
17          MR. BUCHANAN:  129-5, okay.
18          THE COURT:  The next page, 129-5.  That's
19 where he speculates about when he -- or who took him
20 off of VIOXX or -- I had not prescribed it when he was
21 seen.  I believe it was discontinued by his primary
22 *care physician.*  Counsel for defense has indicated that
23 that's supposedly speculation because he didn't
24 specifically see that or know.  And I'll exclude that.
25          But, starting at Line 6, do you recall,

                                                    2527

1 though, in terms of opinion you have about VIOXX being
2 implicated, whether you held that before or after
3 November, 2001, and he says it was in the October
4 visit.  I'm going to allow that in.
5          So the rest of that will all be in now.  And
6 all through 130 is in.  131 is in.
7          MR. BUCHANAN:  Okay.
8          THE COURT:  And all that section is in.
9          Now, there was an objection, too, to his
10 future prognosis, I think that's on Page 32 of the --
11 of the document, Page 146 of the transcript.  Where he
12 says -- where he says, it's basically an unknown what's
13 going to happen in the future.  He doesn't give a
14 specific opinion that he is going to have heart failure
15 or that this is going to happen or that's going to
16 happen.  He basically says the prognosis is uncertain,
17 and I'm going to allow that.
18          Anything else?
19          MS. FREIWALD:  Your Honor, just to make --
20          THE COURT:  What do you want to put in?
21          MS. FREIWALD:  I want to make my record on
22 the prognosis issue -- that what he is saying is I
23 don't have data and, under the standard, if there is a
24 lack of data, the Court shouldn't hear it.  He's saying
25 I don't have data, I don't know if there's data, and

                                                    2528

1  the implication is that something bad might happen and
2  he doesn't know.  I mean, the fact is something bad
3  might happen to all of us and none of us know.  And if
4  that's all he's going to say, it's essentially an
5  opinion that Mr. Humeston may be like the entire rest
6  of the world, but the implication is clearly much more
7  aggrieved than that.
8          MR. BUCHANAN:  Well, certainly, a patient
9  who's in a very unsettled position medically, whether
10  their condition could dramatically worsen at any moment
11  and beta blockers fail or not, it goes right to
12  Mr. Humeston as well and his views.  He is aware of
13  this.  He is aware of what this therapy could do to him
14  or not do to him over time and the uncertain success of
15  it perspectively and I think that's part of his
16  damages, Your Honor.
17          MS. FREIWALD:  Again, it's an opinion based
18  on the absence of data.
19          MR. BUCHANAN:  Mr. Humeston is in an
20  uncertain place.  That's an unsettling thing and that
21  goes to damages.
22          THE COURT:  Okay.  I'm going to leave it in.
23          MR. BUCHANAN:  Okay.
24          THE COURT:  I think, basically, he's saying
25  that we don't really know what the future will bring is

2529

1  that happen than others.  I'm going to allow that in.
2  That's --
3          MR. BUCHANAN:  Is this another section?  I
4  mean, are these your questions at this point, or are
5  they still ours?
6          MS. FREIWALD:  These are my questions.
7          MR. BUCHANAN:  So you will have to make that
8  change in your --
9          MS. FREIWALD:  I think -- actually, I'm
10  not -- it's actually Chris's question.
11          MR. BUCHANAN:  Okay.
12          THE COURT:  Line 12 to 18 is out.
13          MR. BUCHANAN:  Fair enough.
14          THE COURT:  All right.  Okay.
15          MS. FREIWALD:  The next issue, unless Your
16  Honor has a particular order that you want to go in,
17  really, is the reference to the materials provided by
18  counsel and discussions with counsel, and, to a lesser
19  but related extent, knowledge of the video recording.
20          The testimony is that Dr. Sim was faxed
21  several articles that went directly to the issues in
22  the case, and the issues about which he was going to
23  offer opinions at his deposition.  He was provided an
24  article on the role of borderline blood pressure.  He
25  was provided an article on thromboxane/prostacyclin

2531

1  fair testimony.
2          On Page 147, are there side effects with beta
3  blockers, I'm going to allow in the section, Lines 5
4  through 11, which talks about sleepiness and fatigue.
5  I'm going to remove Lines 12 through 19 where he talks
6  about the loss of sexual function.  Plaintiff didn't
7  testify that he has a loss of sexual function.  He
8  testifies that he has a specter of death or some
9  such language.
10          MR. BUCHANAN:  I'm not sure that his wife
11  won't be addressing that but --
12          MS. FREIWALD:  There is --
13          THE COURT:  We can only hope not but --
14          MS. FREIWALD:  There is --
15          MR. BUCHANAN:  Okay.
16          MS. FREIWALD:  Yeah, there was actually no
17  testimony -- I believe yesterday he said, Your Honor,
18  that if Mr. Humeston links it up to his beta blockers,
19  it would be in.  He testified to some fatigue, but he
20  didn't testify to any relationship between the beta
21  blockers.  Nobody has at this point --
22          THE COURT:  No, but Dr. Sim does.  Dr. Sim
23  says beta blockers can cause fatigue.  Some patients
24  have sedate effects, they become sleepy and more
25  fatigued.  Some beta blockers are more prone to have

2530

1  imbalance, and he was provided a third article and --
2  it's escaping me right now exactly what it was on -- it
3  will come to me in a minute.
4          And, surely, if the plaintiffs are going to
5  be allowed to suggest to the jury that this doctor
6  reached an opinion in the course and scope of his
7  treatment, the jury needs to hear that he had numerous
8  conversations with plaintiffs' counsel prior to the
9  deposition, that he was provided information by them
10  going directly to his opinions prior to the deposition,
11  and that some of that information was stuff that he had
12  never seen before.  It goes to bias, it goes to
13  knowledge, and it would be entirely one-sided to allow
14  the suggestion out there that this is an unbiased, as
15  you say, more credible than the paid expert doctor,
16  without having the jury hear what the extent of his
17  relationship is in this litigation.
18          Of course, the defense counsel don't have the
19  right, under Your Honor's order, to have prior
20  communications with a treating doctor.  So we went out
21  to this deposition and saw that there had been numerous
22  communications, and that much of what was going to be
23  discussed at the deposition had previously been readied
24  with this doctor.
25          MR. BUCHANAN:  Your Honor --

2532

1    THE COURT: Well, that's true, I did put it
2  out, partly because there wasn't going to be an opinion
3  on causation.
4    MR. BUCHANAN: Your Honor, I mean, as a
5  factual matter, the record is that he asked for
6  articles and we sent them. He asked for two or three
7  articles and we sent them, and the communications with
8  counsel are not the hours and hours and hours you
9  portray. I think in the record, there were a few
10  scheduling calls, which you're aware of, and there was
11  a meeting 15 minutes before the deposition.
12    MS. FREIWALD: The jury can decide how
13  probative that is, just like they can decide how
14  probative his opinions are, but to let them hear
15  one-half of the story, with the implication being that
16  he is entirely neutral, and that he is coming to each
17  side fresh, as -- not in hire or not coached in any
18  way, and not let the jury hear what his contacts had
19  been is just an inaccurate portrayal of events.
20    MR. BUCHANAN: Your Honor, the one thing
21  that's clear, though, from the testimony that's been
22  elicited here, is that he formed this opinion back in
23  2001, long before this litigation was even conceived or
24  filed. To put that in, with the suggestion that he
25  didn't actually form them, when there is no testimony

2533

1  otherwise, I submit is improper, Your Honor. And we
2  have operated under this rule throughout the
3  litigation. If that is not going to be probative and
4  it is not going to come in -- I'd love to know how many
5  days and days and days they spent with each witness
6  before they offer them up.
7    MS. FREIWALD: And that's even for both
8  sides, because plaintiffs have hired experts and we
9  have hired experts, and that's absolutely even.
10    What's not even here is access to fact
11  witnesses such as treating doctors. That's not even.
12  The defense doesn't have the ability to reach out to
13  them on an ex parte basis and the plaintiffs do, and
14  this isn't a swipe at lawyers or lawyering. It just
15  goes to bias, it goes to knowledge.
16    THE COURT: I'm going to allow on the -- I'm
17  going to allow back in on Page 11, 12.
18    MS. FREIWALD: Actually, it starts on Page 10
19  at the very bottom, Your Honor, I believe, at 25. It's
20  just one line.
21    THE COURT: To save -- that's not even asked.
22  That's not part of your lined testimony.
23    MS. FREIWALD: Yeah, it is. It is. Page
24  10-25, 11-5.
25    THE COURT: Page 10 -- oh, 11. Oh, 24, you

2534

1  mean?
2    MS. FREIWALD: Line 25. Page 10, Line 25.
3    THE COURT: Did you have any communication --
4  I knew that some of the basics, I did have some
5  questions and I asked for some assistance as far as
6  some background information. I will allow that.
7    And I will allow 11, 12, 13, 14, 15 and 16
8  in, through the -- through the end of the Line at 17-2.
9    MR. BUCHANAN: Excuse me? Where, Your Honor?
10    MS. FREIWALD: It's to the bottom of 17-2.
11    THE COURT: Those sections that are marked
12  with a bold line.
13    MS. FREIWALD: And then by my notes, Your
14  Honor, it jumps to 21. And there were objections at
15  21 --
16    THE COURT: Did you meet with Mr. Whitehead
17  or Mr. Seeger in person before this deposition?
18  Briefly, I met with Mr. Seeger when he came to town.
19  He came by my office and said hello, and that was two
20  days ago when he came to town.
21    MS. FREIWALD: It's all part of the entire
22  thing.
23    THE COURT: I'll allow it.
24    MR. BUCHANAN: I, frankly, would rather have
25  it in.

2535

1    THE COURT: I will allow it.
2    MR. BUCHANAN: If we are going to put the
3  other stuff in, to say it's only 15 minutes, that's
4  fine with me.
5    MS. FREIWALD: And then at 25-17, this
6  just -- this just goes to the exhibits that we
7  discussed, so this wouldn't --
8    THE COURT: That should be out.
9    MS. FREIWALD: It needs to come in because
10  the exhibits -- the documents that were sent --
11    THE COURT: No documents are going to come
12  in. The fact that he sent him some articles will come
13  in. The documents themselves aren't going to come in.
14  The articles, learned treatises wouldn't come in.
15    MS. FREIWALD: Are we allowed to show the
16  jury just the fax cover sheets?
17    THE COURT: No.
18    MR. BUCHANAN: No.
19    THE COURT: That's not necessary.
20    So Line 25, through 17 to 25 and 26 --
21    MS. FREIWALD: We actually --
22    THE COURT: Stopped at 25.
23    MS. FREIWALD: Just so the record is clear,
24  Sim-3 is a medical record, so that actually does have
25  to come in. That has nothing to do with this issue.

2536

1    MR. BUCHANAN:  If it's a medical record,
2    that's fine.
3    MS. FREIWALD:  Yeah.  It's separate from this
4    issue.
5    And then it goes to, I believe, Page 46.
6    THE COURT:  17 through 25 can come out but
7    Sim-3 can be marked.
8    MR. BUCHANAN:  That's fine.
9    MS. FREIWALD:  We cut and pasted it so it
10   only says, let's mark Sim-3.
11   THE COURT:  Okay.  That's fine.
12   All right.  And then the next -- you get back
13   into it again at the end then, and I don't think I'm
14   going to let you do that because you start asking him
15   about this fatty omega acid thing, which has nothing to
16   do with the case.
17   MS. FREIWALD:  Well, no, the point is --
18   MR. BUCHANAN:  Mr. Whitehead is a doctor.  He
19   is a doctor and they actually had conversations about
20   this other issue.
21   MS. FREIWALD:  No, this is actually, Your
22   Honor, the most significant thing because Dr. Sim
23   fought me on it.  What happened was that Mr. Whitehead
24   sent Dr. Sim an index to abridged medical journal
25   article and behind that, an article on

1    prostacyclin/thromboxane imbalance.  And Dr. Sim tried
2    to say to me that the only reason this document was
3    sent to him was because of the shared interest with
4    Mr. Whitehead about the fatty acids, and in fact, the
5    point I was making to him was, well, that's
6    interesting, because he didn't send you that article.
7    The article he sent you was the one on
8    prostacyclin/thromboxane imbalance.
9    MR. BUCHANAN:  Your Honor, it does start to
10   get --
11   MS. FREIWALD:  The whole thrust of the
12   discussion is that -- and the fax cover sheet shows --
13   says prostacyclin, et cetera.  So it goes to the
14   doctor's credibility.  Maybe it won't come off on the
15   videotape, but it goes to the doctor's credibility.
16   And that's -- that's why it's an issue.
17   MR. BUCHANAN:  What page are you on?
18   MS. FREIWALD:  40 -- well, I don't know
19   exactly where it comes in.  I next pick up with this
20   whole subject on 46-24.
21   THE COURT:  What page are we at?
22   MS. FREIWALD:  Well, 46-24 --
23   THE COURT:  Page what?
24   MS. FREIWALD:  I'm looking at Page 11 of the
25   printout, Page 46, Line 24 of the transcript.

1    THE COURT:  Page 11 of the printout.
2    MS. FREIWALD:  Mr. Seeger asks him about his
3    re-review of -- I'm sorry.  I ask him about his
4    re-review of the angiogram, and then I ask him and when
5    you did that, you had talked to Mr. Whitehead about the
6    20 percent narrowing in the vessel.
7    MR. BUCHANAN:  Oh --
8    MS. FREIWALD:  And then --
9    MR. BUCHANAN:  He says I don't know.
10   THE COURT:  He says, I already answered that
11   question, so that's out.  It's a question and answer
12   that's only -- the question tries to prejudice the
13   jury.  The answer doesn't add anything.
14   As to Line 150 -- so that's out.  156 is
15   what --
16   MS. FREIWALD:  I think I pick up next at 151
17   actually, Your Honor.
18   THE COURT:  151.
19   MR. BUCHANAN:  I don't see that one, Hope.
20   MS. FREIWALD:  It's at the top of Page 34.
21   Actually, I don't -- I don't particularly care about
22   that one.  What I do care about is -- it's really --
23   THE COURT:  So you are going to withdraw your
24   request at 150?
25   MS. FREIWALD:  Well, it's really only in

1    there for context, which is when we get to 153.
2    MR. BUCHANAN:  That's the same issue again.
3    THE COURT:  You know, you can't do it twice.
4    This is the problem with a discovery dep and a cross.
5    You covered it in the discovery dep.  Then you covered
6    it in the cross.  And which one do you want in?
7    MS. FREIWALD:  Well, I'm certainly willing to
8    cut it down.  The problem was, is that it was -- we
9    were very limited in our time, and because Mr. Seeger
10   agreed to the using of both, it was easier not to
11   duplicate the effort with the doctor in the cross.
12   Why don't we start with it in the cross
13   and --
14   MR. BUCHANAN:  So eliminate it up front?
15   MS. FREIWALD:  I will try -- it's a little
16   bit hard for me to do this on the fly, but I think it's
17   probably cleaner if we do it in the cross, and I will
18   try to do it that way.
19   MR. BUCHANAN:  I just want to make sure
20   that --
21   MS. FREIWALD:  Okay.  Well, let's look
22   through this and I think we can do this.
23   153 -- I'd prefer to do it in the cross, Your
24   Honor, if you are only going to allow me to do it in
25   one place.

1        THE COURT:  All right.  So you are going to
2  eliminate the beginning sections?
3        MS. FREIWALD:  Okay.
4        MR. BUCHANAN:  So we don't have to worry
5  about putting the beginning back in, anything from
6  discovery on this?
7        MS. FREIWALD:  That's right, if we can get
8  through it on cross.
9        THE COURT:  You just want to start it here on
10  the cross?
11        MS. FREIWALD:  I think it's my obligation to
12  put it in, anyway.
13        MR. BUCHANAN:  I think if you are going to do
14  the cross, then you've got to include the beginning
15  that I had scheduling conversations with him.  That was
16  the nature of it.
17        MS. FREIWALD:  So Mr. Buchanan is requesting
18  that I put in 151 --
19        MR. BUCHANAN:  Well, I don't know how it
20  makes sense otherwise.
21        MS. FREIWALD:  That was my point.
22        THE COURT:  So 151, Line 13 to 25, you are
23  going to put in?
24        MS. FREIWALD:  Yes.
25        THE COURT:  153 --

1        MS. FREIWALD:  Um-hum.
2        THE COURT:  They sent you certain literature.
3        MS. FREIWALD:  Right.
4        THE COURT:  That's going to come in.
5        MS. FREIWALD:  Yes.
6        153 through 154-3.
7        THE COURT:  Well, it should be --
8        MS. FREIWALD:  It's 153-10 through 154-3,
9  then 155-6 to 155-10.  155-24 and 25.
10        THE COURT:  Okay.
11        MS. FREIWALD:  156-3 to 18.  158-14 through
12  159-13.  160-11 through 161-20.  And 162-1 through 14.
13        THE COURT:  All right.  I'll allow it in.
14        MS. FREIWALD:  Okay.  And then --
15        MR. BUCHANAN:  The one thing I just ask,
16  Hope, I have to review the interspersed questions and
17  answers to see if there is anything on completeness so
18  I'll look at them.  I have to get my guy started on the
19  changes.
20        MS. FREIWALD:  It's actually going to take
21  awhile to do this, and we can talk about logistically.
22        Your Honor, the other issue --
23        THE COURT:  You've got to get it done so we
24  can get Sim on right after -- all right.  Let's go.
25  You're going to put the son on?

1        MR. BUCHANAN:  Actually, this was --
2        THE COURT:  Sim was going to go first?
3        MR. BUCHANAN:  He was.  Let me see if the son
4  is here because we were icing him back at the hotel,
5  thinking Sim was going on first.
6        MS. FREIWALD:  Your Honor, one last point
7  related to the video recording.
8        Again, if Dr. Sim is going to testify as to
9  causation, it seems to me, in fairness, we should be
10  allowed to elicit that he doesn't know anything about
11  the video recording which we say was a stressor for
12  Mr. Humeston.  It just goes to the completeness of his
13  picture.  I think it's one question and answer on
14  158-18 -- I'm sorry -- 58-18 to 59-11.
15        THE COURT:  Page what?
16        MS. FREIWALD:  58-18, going by the
17  transcript, not the printout pages, to 59-11.
18  Actually, it's the couple questions and answers.
19        THE COURT:  58-18.
20        MS. FREIWALD:  To 59-11.
21        MR. BUCHANAN:  This gets into -- my question
22  was whether the lawyers talked to you about the fact
23  that you might be getting questions about whether you
24  knew anything related to the video?
25        MS. FREIWALD:  Yeah.

1        MR. BUCHANAN:  You don't have that
2  designated.
3        MS. FREIWALD:  It ends on 11.
4        THE COURT:  I will allow it.  You can put it
5  back in.  May go to his credibility.  Okay?
6        MR. BUCHANAN:  That's in your discovery
7  section.
8        MS. FREIWALD:  It's in my section.  I just
9  wanted to talk to you about something logistically.
10        MR. BUCHANAN:  Let me just go check to see if
11  we've got the son there because that will give us 20
12  minutes.
13        MS. FREIWALD:  Thank you, Your Honor.
14        (Conference concluded at 9:50 a.m.)
15        THE COURT:  We're ready to go?
16        MR. BUCHANAN:  We are, your Honor.
17        THE COURT:  We are going to start with
18  Dr. Sim?
19        MR. BUCHANAN:  We are going to start with
20  Dr. Sim.  The plaintiffs have about an hour and 20
21  minutes.
22        How long are your cuts?
23        MS. FREIWALD:  Last night it was a little bit
24  shorter than it is now.
25        MR. BUCHANAN:  Okay.

1    MS. FREIWALD:  It's under an hour, I believe.

2    MR. BUCHANAN:  Okay.  We may need to stop at

3    the plaintiffs' cuts, Your Honor, just to provide

4    them -- if you guys need any more time to make sure all

5    your changes are in, before we switch over to them.

6    THE COURT:  That may be a good time to stop,

7    anyway.

8    MR. BUCHANAN:  Okay.  That's fine.

9    MS. FREIWALD:  It's an hour, 20, because we

10   are also playing your designations from within the

11   sections where I was --

12   MR. BUCHANAN:  Fair enough.

13   THE COURT:  You can bring the jury in.

14   Are those seats okay that you guys are

15   sitting in?  Do they feel all right?  I don't want to

16   have an accident where the entire press falls over.

17   THE JURY ATTENDANT:  All rise.

18   (The jury entered the courtroom at

19   10:15 a.m.)

20   THE COURT:  You can be seated.

21   Counsel, your next witness.

22   MR. BUCHANAN:  Yes, Your Honor.

23   We are going to play the videotaped

24   deposition, trial preparation deposition, of

25   Mr. Humeston's treating cardiologist, Dr. Sim.

1    hour and 20 minutes to three minutes.  So --

2    THE COURT:  Okay.  And then we have another

3    witness.

4    MR. BUCHANAN:  Then we have a live witness.

5    THE COURT:  Bring the jury in.

6    MR. RABER:  Also, part of that, there is an

7    agreement between counsel, there will be no foundation

8    objection to Dr. Sim's medical records for the part of

9    cutting the amount of time from our side.

10   THE COURT:  Okay.

11   (The jury entered the courtroom at

12   11:47 a.m.)

13   THE COURT:  You can be seated.

14   MR. RABER:  Your Honor, the defense now

15   intends to play its portion of the videotape.  In the

16   interim time, we have cut it from an hour and 20

17   minutes to three minutes.

18   THE COURT:  Okay.

19   (The videotaped testimony of Dr. Sim

20   continued playing from 11:48 a.m. to 11:52 a.m.)

21   THE COURT:  Okay.  Your next witness,

22   counselor?

23   MR. SEEGER:  Your Honor, we are going to call

24   Seth Humeston to the stand at this point.  He will be

25   examined by Moshe Horn.

1    Plaintiffs' portions will go first, includes about an

2    hour and 20 minutes worth of them, to be followed by

3    the defense portion, which includes both defendant's

4    and plaintiffs' designations.

5    THE COURT:  We will proceed.

6    (The videotaped deposition of Dr. Sim played

7    from 10:16 a.m.)

8    MR. BUCHANAN:  Your Honor, I think that

9    concludes the portion from plaintiffs' direct

10   examination.  There is some designations from

11   plaintiffs and defendants from defense examination.

12   THE COURT:  Do any of the jurors need a

13   break?  All right, if you want it?  Okay.  Well, let's

14   proceed then.  Are you ready or do you need a break?

15   MS. FREIWALD:  Your Honor, we need about two

16   minutes so we can print out a report of this, so we can

17   follow along and plaintiffs' counsel can follow along.

18   THE COURT:  Why don't you take a short break

19   then.  You can go out.

20   THE JURY ATTENDANT:  All rise.

21   THE COURT:  We will just take a few minutes.

22   (The jury left the courtroom at 11:04 a.m.)

23   (A recess was taken at 11:04 a.m.)

24   MR. BUCHANAN:  Your Honor, the estimate for

25   the next piece of tape has dropped from, I think, an

1    THE COURT:  Okay.

SETH HUMESTON, PLAINTIFFS' WITNESS, SWORN.

3    THE WITNESS:  Yes.

4    THE COURT CLERK:  State your full name and

5    spell your last name for the record.

6    THE WITNESS:  Seth Humeston.

7    THE COURT CLERK:  Spell your last name.

8    THE WITNESS:  H-U-M-E-S-T-O-N.

9    MR. HORN:  Proceed, Your Honor?

10   THE COURT:  You may.

11            DIRECT EXAMINATION

12   BY MR. HORN:

13   Q    Good morning, Mr. Humeston.  How are you

14   doing?

15   A    Good.

16   Q    Did you ever testify before?

17   A    No.

18   Q    Ever been in a courtroom before?

19   A    No.

20   Q    Just relax.  Answer my questions.  You don't

21   understand anything, you let me know.  Okay?

22   A    Okay.

23   Q    How old are you?

24   A    21.

25   Q    And tell us a little about your schooling.

1   Are you in school now?
2   A   Yes.
3       Q   Where are you in school?
4   A   Boise State University.
5       Q   And what are you studying?
6   A   My major is business management.
7       Q   And what year are you in now?
8   A   I believe my sophomore.
9       Q   Do you work, as well?
10  A   Yes.
11      Q   Where do you work?
12  A   The Home Depot.
13      Q   How long have you worked there?
14  A   Almost a year.
15      Q   Where do you live?
16  A   Boise, Idaho.
17      Q   And who do you live with?
18  A   My parents.
19      Q   And do you know what?  We all know.  Are your
20  parents sitting here in the courtroom?
21  A   Yes.
22      Q   Are you married?
23  A   No, not yet.  I'm engaged.
24      Q   Oh, you are engaged.
25          Now, Seth, I'm going to ask you to come back

1   with me now to September 18th, 2001, okay?
2   A   Okay.
3       Q   Do you remember that date?
4   A   Yes.
5       Q   Okay.  How do you remember that date?
6   A   Well, that's the day that my dad had his heart
7   attack.
8       Q   I'm going to ask you if you can walk through
9   it for us, tell us where you were when you found out
10  about your dad's heart attack.
11  A   I had just gone over to my buddy's house, and we
12  were kind of just playing some video games, and my
13  phone rang and I looked at it, and it's my mom, and I
14  was kind of disappointed that it was her because she is
15  always calling me, bothering me.  And so I answer the
16  phone, and at the time, we were sharing a car, my
17  parents and I.  I didn't have my own car.  And so she
18  calls me up and she said, hey, you need to come home,
19  and I -- you know, I'm like, oh, why.  And she said,
20  you know, I think your dad's having a heart attack, you
21  need to come home.  And so I said, okay, and I hung up
22  the phone.  My buddies are like, oh, you got to go home
23  again, and I'm like, I think my dad's having a heart
24  attack.  And so I ran out the door and drove home, and
25  I got home, and my parents were outside waiting for me,

1   and I just jumped out of the car and they got in and
2   they left.
3       Q   And did you stay home?
4   A   Yes.
5       Q   At some point did you go to the hospital?
6   A   Yes.  Shortly after, my sister came and picked me
7   up.
8       Q   Which sister was that?
9   A   I believe it was Olivia.
10      Q   And how many siblings do you have?
11  A   Three.
12      Q   And did Olivia drive you to the hospital?
13  A   Yes.
14      Q   When you got to the hospital, what was going
15  on?
16  A   We got in the elevator, went up, and we went to
17  the waiting room, and my mom and some friends were
18  there, and everyone was just kind of waiting in the
19  waiting room, waiting for the doctors to come out.
20  They had my dad in the operating room.
21      Q   Okay.  And then what happened?
22  A   Everyone kind of waited there, the area that we
23  were in, one-half of it -- it's like a big loop.
24  One-half is like where the patients stay after their
25  operations, and then the other side is the operating

1   room, so I went into the hallway and I waited outside
2   the operating room.
3       Q   Okay.  Let me stop you right there.  You said
4   a minute ago, everyone was waiting there.  Who was
5   everyone?  Who was at the hospital at that time?
6   A   My sisters that were in town, and friends and
7   family.
8       Q   Okay.  Do you have a sister who is not in
9   town?
10  A   Yes.
11      Q   Who is that?
12  A   That was Rachel.
13      Q   And did she at some point come to Boise?
14  A   I don't think so.
15      Q   Okay.
16  A   I don't remember.
17      Q   And your friends came, as well?
18  A   My parents' friends and things like that, and then
19  my friends came later.
20      Q   Okay.  Do you remember how long you were
21  waiting?
22  A   I don't really remember how long.  I was just --
23  my parents -- or my mom and friends were in the
24  waiting room, and then I was just in the hallway.  And
25  I'm not sure how long.

```
 1    Q    Okay.  What happened after you were in the
 2   hallway?
 3    A    Then they opened the door and they were pulling my
 4   dad out on the -- on the gurney, right after they had
 5   just gotten done, and they were wheeling him to his
 6   room.
 7    Q    Was he awake at the time?
 8    A    Not really.  He was -- I mean, it was just like
 9   right -- as soon as they came out of the operating
10   room, so he was really kind of groggy, but his eyes
11   were kind of open.  And I just kind of grabbed his hand
12   as he was going by and then they took him to his room.
13    Q    When was the next time you saw him?
14    A    Well, I went back to the -- to the waiting room,
15   to let everyone know that he was out of the operating
16   room, and so I'm not sure of the -- 15 minutes or a
17   half hour later, they didn't let us go in right away,
18   and then, like, 15 minutes or a half hour later, we
19   went in, into his room.
20    Q    And, again, you said "we."  Who was that?
21    A    My two sisters, my mom, and our friends.
22    Q    Okay.  And did you see your dad then when you
23   went in?
24    A    Yes.
25    Q    And how was he doing then?
```

2553

```
 1    A    He was still a little out of it, just really, I
 2   mean, you know, just kind of laying there a little bit.
 3   Not really talking a whole lot, just, you know, he was
 4   just really groggy.
 5    Q    Now, did you come back and visit him at the
 6   hospital again at some other point?
 7    A    Yes.  I stayed there until like late, really late,
 8   and I went to school the next day, skipped football
 9   practice, and went to the hospital, and stayed with him
10   for -- for quite awhile.  I forget exactly how long.
11   And he was just able to talk -- talk then and just
12   visit.
13    Q    So the next day when you came back, when you
14   missed the practice, was he awake when you came back to
15   the hospital?
16    A    Yes.
17    Q    And how was he doing?
18    A    He was still a little groggy and kind of -- I mean
19   my dad's ornery as it is, just kind of -- so he wasn't
20   too happy to be in the hospital.
21    Q    Okay.  How did you handle that?  Did you try
22   to calm him down?
23    A    Yeah.  I just tried to talk to him about, like, my
24   day and, you know, just -- you know, about upcoming
25   football events and stuff like that.
```

2554

```
 1    Q    Had you ever sen your dad sick like that
 2   before?
 3    A    Not like that.
 4    Q    Do you remember when he came home?
 5    A    I think it was the next day or the day after.  I
 6   was -- I was at school and I came home, and he was
 7   home.  They had brought him home.  So --
 8    Q    Tell us how he was doing when you saw him,
 9   when you came home and found him there.
10    A    He was just pretty lackadaisical.  You know, he
11   was happy to be out of the hospital, but he definitely
12   wasn't himself.  Just kind of, you know, resting up
13   and, you know, just kind of staying put and --
14    Q    Okay.  How was your mom doing this whole
15   time, when he was in the hospital?
16    A    While he was in the hospital, especially the night
17   of, she was -- I mean, she was crying, she was just a
18   wreck.  And, you know, she was extremely worried and,
19   you know, her friends were there to kind of help and
20   support her.
21         And then, once he got out of the operating
22   room, you know, she was still just really worried about
23   him and, you know, each day she was just a little bit
24   happier that he, you know, was doing well, and, you
25   know, that he was gonna be okay.  So -- you know, she
```

2555

```
 1   was just -- she was just really worried about him.
 2    Q    Okay.  Now, Seth, I'm going to ask you to
 3   help us out now.  Tell us a little bit about the
 4   differences that -- let me ask you this:  Did you see
 5   any differences in your father before and after this
 6   heart attack?
 7    A    Yes.
 8    Q    Okay.  I'm going to ask you to help us out
 9   now and tell us about that.  Tell us, how was he
10   different to you now or after the heart attack than he
11   was before September of 2001?
12    A    He isn't nearly as active as he was.
13    Q    Let me stop you there.  What kind of
14   activities -- well, what activities are you referring
15   to when you say that?
16    A    Just kind of like everyday things, you know, the
17   kind of things that not everybody can do, you know,
18   moving heavy things, things around the house, mowing
19   the yard, trimming trees, you know, gardening, stuff
20   like that.
21    Q    Was your father that kind of guy before the
22   heart attack, he took care of the house?
23    A    Yeah.  I mean, his -- his house is his castle and
24   he likes it to look a certain way, and he was always
25   out pruning and, you know, always, you know, taking
```

2556

1  care of the stuff, like that.
2      Q   Okay. And since the heart attack, things
3  like pruning, taking care of the stuff, what you're
4  referring to, who does all that?
5  A   I do.
6      Q   Okay. You're still living there?
7  A   Yes.
8      Q   So have you taken over those jobs since the
9  heart attack?
10  A   Yes.
11      Q   Has he ever talked to you about that? Has he
12  asked you to take over?
13  A   Not -- not really officially. My mom, more so,
14  talked to me about it a little bit more.
15      Q   Does he ever come out and help you when
16  you're doing it?
17  A   Not really.
18      Q   Before the heart attack, would he have helped
19  you do that kind of stuff?
20  A   Yes.
21      Q   Okay. Tell us some more about that. What
22  other kinds of differences do you see in him?
23  A   What do you mean, like physically or just --
24      Q   Physically, emotionally, anything that you've
25  seen personally that you can tell us about.

2557

1  A   Sometimes he's a little bit -- I guess depressed,
2  you know. Every once in awhile I'll come home from
3  work and he is usually home by then, and, you know,
4  more often than not during the week, you know, I ask
5  him how his day is going, you know, and he is like.
6  Oh, you know, it was all right. And, you know, when
7  normally, you know, it's like, yeah, you know, it was
8  great, you know, how was your day, and we would have an
9  upbeat conversation.
10      Q   When you say normally, do you mean before the
11  heart attack?
12  A   Yeah, before the heart attack.
13      Q   We have heard a lot about your father's
14  hiking in this case. Tell us about that. Do you
15  remember him hiking before the heart attack?
16  A   Yes.
17      Q   Okay. What kind of hikes did he go on, how
18  often?
19  A   Just -- I mean, he always -- he loved the Owyhee
20  desert. He would always go out and, you know, go on
21  these hikes, you know, through canyons and across the
22  desert and things like that, with his buddies and even
23  with my mom.
24      Q   Did you ever go on those hikes with him?
25  A   I went on a few of them, not the really long,

2558

1  strenuous ones. I'm -- you know, I was never really
2  thin, so --
3      Q   Now, we've heard a lot about his knee
4  problems. Was he able to do these kind of hikes when
5  his knee was bad?
6  A   Yeah. I mean, he had his brace on, and he could,
7  you know, just kind of take care of that. And, I mean,
8  he's a tough guy and, I mean, he will always just -- I
9  mean, he loved doing it, so he would do whatever he
10  could so he could do it.
11      Q   Since the heart attack, have you seen him
12  doing those kind of things?
13  A   Not -- not like he was. He -- you know, pretty
14  much stays more towards the car.
15          We recently took a trip out to Jordan
16  craters, and we went out and --
17      Q   Let me stop you there. When you say "we,"
18  who is "we"?
19  A   My fiance' and my sister and her husband, my mom
20  and our friends. We just kind of walked around the --
21  it's not really a hike, just because it's short and
22  it's not very strenuous, but we walked around and he
23  had to stick around the car.
24      Q   Did anybody stay back with him?
25  A   Not that I recall.

2559

1      Q   How far was that, was this walk or hike
2  you're referring to?
3  A   Roughly a mile. It wasn't too long, and it was,
4  you know, just kind of around the crater.
5      Q   Okay. And before the heart attack, would he
6  have been to do that with you?
7  A   Definitely.
8      Q   We heard about -- something about you
9  building a fence for him yesterday. Could you tell us
10  about that?
11  A   On the side of the house, there's a strip of our
12  property that's adjacent to the house and the driveway,
13  and we had wanted to pave it over, move the fence back,
14  and, you know, pave it all over so it would be like an
15  extra spot for cars, for some storage and things like
16  that. And, quite a few years ago, we had started that,
17  put in some gravel and we -- he had me dig out some
18  dirt and things like that, and then we were going to
19  build this fence and tear down the old one and, you
20  know, a basic home project, things like that.
21          And, you know, things just kind of happened
22  and it just didn't get done. I got busy with school
23  and work, and, you know, it's been sitting for quite a
24  few years now. And on one of the recent trips when
25  they were gone, over Father's Day, I -- while I was

2560

1  mowing the yard, I just looked at it, and I was like, I
2  should probably build that.  That would really make him
3  happy, and do it as a Father's Day gift.  So I built
4  the whole fence across there, and when he got home, he
5  was really, really pleased and happy.
6      Q    Now, before the heart attack, is that the
7  kind of thing he could have done?
8  A    Yes.
9      Q    Those are the kind of projects you did
10 together?
11 A    Yes.
12     Q    *Have you seen any effect on your mother since*
13 the heart attack in terms of her role at the home?
14 A    Yes.
15     Q    Can you tell us about that?
16 A    I usually do most of, you know, like the heavy
17 lifting or the everyday things around the house.  But
18 if I'm not available, and things have to get done, you
19 know, she'll pick up, you know, *usually where I left*
20 off, you know, and I mean, obviously, she's really
21 worried about, you know, her husband, my dad, his
22 health, and, I mean, she's -- and, I mean, with -- in
23 addition to, you know, um, having to just kind of take
24 care of him a little bit more.
25     Q    We've heard about something called the Thing

                                                    2581

1  rally.  What's a Thing rally?
2  A    A Thing rally is -- a Thing is a Volkswagen car,
3  *and it's kind of like a tightly knit group of friends*
4  that they all kind of get together and go on these
5  trips, you know, for a few days.  It's usually to,
6  like, a -- like a national monument or something like
7  that, certain parks, where they just kind of all group
8  together and they have a big convoy of Things, and they
9  go out and just kind of go see the sites and stuff like
10 that.
11     Q    Do you worry about your dad going on these
12 Thing rallies?
13 A    No.
14     Q    Why is that?
15 A    Well, I mean, they're always out -- I mean, I have
16 a full itinerary of where they're staying, the bed and
17 breakfasts, hotels and things and stuff, stuff like
18 that, where they're staying.  There is usually, like,
19 15 cars, you know, usually like at least two per car,
20 you know, just a, you know, big group of older folks
21 out having a good time.
22     Q    Have you ever gone on these?
23 A    When I was younger, I did go on quite a few of
24 them.
25     Q    Were they fun?

                                                    2582

1  A    Yeah.  Yeah.
2      Q    *Now, you mentioned you play football.*
3  A    Yes.
4      Q    Do -- did your parents come to your games?
5  A    Yes.
6      Q    Do they come to all your games?
7  A    Yeah, -- well, for the most part.
8      Q    What do you mean by "for the most part"?
9  A    Well, I played football ever since I was a little
10 kid, I played Optimist, which is like peewee football,
11 and I went through -- all the way up through high
12 school, and my senior year, you know, my parents would
13 always make it to my games, whether they be home or
14 away, with the exception to certain really long
15 distance trips, where, you know, sometimes we played
16 teams that were all the way up in North Idaho and they
17 couldn't make the trip.  But, for the most part, they
18 made pretty much all my games.
19     And, *after my dad's heart attack, he wasn't*
20 able to make all the games.  He would usually make
21 my -- he would almost always make my home games because
22 it's only like a mile away from our house, my school
23 is, but, you know, usually, my away games, you know, he
24 wasn't going to be there.
25     Q    Before the heart attack, would he make those

                                                    2583

1  long trips to your games?
2  A    Yes.
3      Q    Did he ever talk to you about not being able
4  to go?
5  A    No.
6      Q    So I think before you said it bothered him.
7  How would you know it bothered him that he couldn't go
8  to your games if he never talked to you about it?
9  A    Well, I mean, he was always there before, and, you
10 know, *he always loved going*, and he'd -- you know, come
11 over after, you know, like during half time or after
12 the game, when we come off the field, and be taking
13 pictures and, you know, just totally into it, and I
14 mean, we have pictures of me and my buddies, you know,
15 in our football uniforms and things like that.  My dad
16 was just always -- he just loved it.  And, you know, it
17 just -- I could always kind of *tell that it bugged him*
18 that he couldn't make those -- make all those games.
19     Q    Okay.  Just the bottom line, Seth, just to
20 wrap it up, you told us a lot about things you have
21 seen in your father and your mother.  How has it
22 changed for you, since the heart attack?
23 A    Well, I mean, like I had talked about was, you
24 know, just picking up a lot more slack in the house,
25 you know, I -- sometimes, you know, I have certain

                                                    2584

1   obligations like work and school that doesn't allow me

2   to, you know, be there the whole time for them.  And,

3   in addition to -- I mean, I'm getting married in the

4   spring, so, you know, I'm going to be leaving them,

5   makes me worry, you know, about -- you know, if they're

6   going to be okay, my dad and my mom, when I'm not there

7   for them.

8        Q    And has your father ever talked to you about

9   you doing the yardwork, you doing the painting, things

10  like that?

11  A    No.  He just says that he appreciates it a lot and

12  *it means a lot to him, that, you know, that I'm there*

13  *for him to help with, you know, with the things that he*

14  *could have done before.*

15           MR. HORN:  Just a second, Your Honor, please.

16           Thanks a lot, Seth.

17           MS. JONES:  We have no questions of this

18  witness, Your Honor.  Thank you.

19           THE COURT:  Okay.  Thank you.  You can step

20  down.

21           Take THE jury out to see if there are any

22  questions.  Take them out to see.

23           THE JURY ATTENDANT:  All rise.

24           (The jury left the courtroom at 12:09 p.m.)

25           THE COURT:  You can be seated.

1            Counsel, who do we have next?

2            MR. SEEGER:  We have Dr. DePace.

3            MS. SULLIVAN:  Your Honor, we have a motion

4   on Dr. DePace concerning his supplemental report and

5   IME that were served approximately three weeks before

6   the trial, in fact, during the last day of his

7   deposition.

8            MR. BUCHANAN:  It was served prior to his

9   deposition, and I thought this was already resolved.

10           MS. SULLIVAN:  We haven't gotten a ruling,

11  Your Honor, on that issue.

12           MR. BUCHANAN:  Your Honor, the history on the

13  IME.

14           THE JURY ATTENDANT:  No questions.

15           THE COURT:  No questions?  All right.  Tell

16  the jury to go to lunch, come back at 1:30.  There is

17  no questions.

18           MR. BUCHANAN:  Your Honor --

19           THE COURT:  We are going to break until 1:30.

20  I will hear this motion first.

21           MR. BUCHANAN:  Your Honor, the history on the

22  IME, and there was a request, as you may recall, that

23  was served where plaintiffs initially believed late, as

24  it related to their request for an IME of Mr. Humeston

25  by their expert, I spoke to Ms. Sullivan in either late

1   May or early June and discussed certain scheduling

2   issues we had had with getting Mr. Humeston back east

3   to see Dr. DePace, and we were going to try and

4   coordinate both -- no, there is absolute e-mails on

5   this Diane, and I will dig them out.  If I need to

6   produce the records, I will, Your Honor.

7            I had conversations with Ms. Sullivan

8   concerning bringing Mr. Humeston back east and we would

9   bring him back east to see both Dr. DePace and whatever

10  of their experts wanted to see him.

11           It was later learned it was Dr. Tyberg who

12  *wanted to do an IME, and there were conversations over*

13  *the next two, four, six weeks about precisely when that*

14  would be.  As Your Honor is aware, this even crept into

15  your monthly status conferences as to whether or not

16  their physician would be entitled to draw blood and do

17  other certain forms of mildly invasive examinations.

18           I thought the issue was resolved with respect

19  to Dr. DePace.  But I can certainly produce e-mail

20  records that reflect the back and forth between

21  Ms. Sullivan on the IME issue, but it was very clear

22  from the beginning that we were going to bring him back

23  both for them, for their expert, and for Dr. DePace at

24  the same time and, hopefully, in advance of

25  Dr. DePace's deposition, so that he wouldn't have to be

1   redeposed on his IME.

2            The IME was produced prior to the completion

3   of his deposition, several days or two days before.

4   They had it, they examined him on it, and I don't know

5   what basis there would be for excluding it at this

6   point.

7            THE COURT:  I'm going -- is there anything

8   else you want to say?

9            MS. SULLIVAN:  Only, Your Honor, there was --

10  and I challenge Mr. Buchanan to show any correspondence

11  regarding an IME by Dr. DePace.  We did have

12  discussions about IME from defense experts which was

13  requested before the end of expert discovery and before

14  the time that our expert reports are due.  Dr. DePace's

15  IME and report were served three months -- I'm sorry --

16  three weeks before this trial started, Your Honor, and

17  it was way out of time.

18           They had access to the medical records, it's

19  their client, they can talk to the treaters.  Under our

20  best practices rule, there was no reasonable

21  explanation for not discovering this information or

22  doing the IME prior to three weeks before trial and,

23  because of the untimeliness, we ask the Court to

24  exclude any testimony regarding the new -- not only the

25  IME, Your Honor.  There is a set of new opinions about

1  VIOXX causation in the late report, and there is simply
2  no excuse for an eve-of-trial supplemental expert
3  report from this witness.
4         MR. BUCHANAN:  I don't know what could be
5  more eve of trial than raising this motion minutes
6  before Dr. DePace get on the stand.
7         MS. SULLIVAN:  We filed it.  We filed it in
8  limine --
9         MR. BUCHANAN:  I thought this was resolved in
10  connection --
11         THE COURT:  All right, counsel.  I have read
12  the brief.  There was some -- you know, we didn't
13  really follow best practices as far as exchange of
14  expert reports in this case.  Not -- because that was
15  part of what we were doing.  We were having monthly
16  management meetings.  We had agreed on trying this case
17  first.  There had been intensive discovery, obviously,
18  relating to general VIOXX issues, experts relating to
19  VIOXX issues.  And, basically, for the years before
20  this, there have been exchange of expert reports.  It
21  happened in the spring, it was a culmination of
22  reviewing multiple records, and I think we had first
23  put in a May deadline for expert reports.  But it was
24  understood throughout the meetings that we had through
25  the summer that discovery was ongoing, that, in fact,

2569

1  discovery would continue to be exchanged, there were
2  updated reports, there was -- you know, there was an
3  IME done for the defense.  There was a lot of work that
4  was done in the last month before the trial.  There is
5  no question about that.  And I think it was done
6  completely with the Court's knowledge and the Court's
7  understanding that both sides were trying to prepare
8  for the case, and both -- everybody wanted to move a
9  test case forward -- not a test case necessarily, but a
10  representative case, and it was -- and it's under that
11  scenario that I look at this motion.  The motion was
12  filed pretrial to bar Dr. DePace for that.  It also
13  wanted to bar him because he supposedly didn't have
14  scientific basis for his opinion.
15         When we had oral argument, there was no
16  request for a hearing.  When we had oral argument,
17  there was no request to argue Dr. DePace's, and now a
18  motion.  But I understand you still preserve that
19  motion and that's fine.
20         The fact is, however, I don't find that there
21  has been any prejudice here.  You have had the
22  opportunity to depose him prior to trial.  You have had
23  the report.  And the motion of the defense to bar
24  Dr. DePace, to limit him from testifying to what was in
25  his supplemental report is denied.

2570

1         Anything else?
2         MS. SULLIVAN:  Actually, Your Honor, there is
3  an issue, as I understand it, Mr. Buchanan has with an
4  exhibit that was introduced with Dr. Lewer.  There was
5  no objection at the time it was put on the screen.  We
6  asked if there was an objection, there was none.
7  Dr. Lewer testified about it.  We would like to move it
8  in to use with other witnesses and experts.
9         THE COURT:  Let me see it.
10         MR. SEEGER:  We raised this with Your Honor
11  immediately --
12         MS. SULLIVAN:  This was Exhibit 547, Defense
13  Exhibit 547.  It is Page 186 of Dr. -- OF the Genesis
14  medical records.
15         THE COURT:  Where are the Genesis medical
16  records?
17         MS. SULLIVAN:  They're in Dr. Lewer's file,
18  Your Honor.
19         And Dr. Lewer testified specifically
20  regarding that, and the testimony was that either
21  Dr. Lewer or Dr. Sim recommended that the plaintiff go
22  through a complete metabolic panel, a series of blood
23  testing, and Dr. Lewer testified that Mr. Humeston
24  objected to that because of the VIOXX trial.
25         MR. BUCHANAN:  Your Honor, as Your Honor is

2571

1  aware, this was raised either at the conclusion of
2  Dr. Lewer's testimony or at the end of that day, I
3  can't remember which it was.
4         The concern expressed by plaintiffs, again,
5  was that the -- the record itself reflects what was
6  going on at that point in time with whether or not
7  there would be blood drawn pursuant to an IME the
8  defendants have requested.  The issue had not yet been
9  resolved, it was still open.  In fact, a panel was
10  ultimately done in the subsequent weeks and the
11  inference suggested by that particular record is, I
12  think, factually unfounded but inevitably prejudicial,
13  and we certainly object to it coming into evidence.
14  And I wasn't prepared to address this right now.  I
15  would be happy to look back at the -- at the transcript
16  on it, but I don't recall --
17         MS. SULLIVAN:  I'm happy to have --
18         MR. BUCHANAN:  I don't recall you consulting
19  with us before you popped it on the screen, and I
20  didn't want to raise further attention to it while it
21  was on the screen.
22         MR. SEEGER:  I raised that with Your Honor.
23  I didn't want to object at the time.
24         MS. SULLIVAN:  There was no objection.  Two
25  things, Your Honor.

2572

1    MR. BUCHANAN:  You didn't show it to us on
2  our screen --
3         THE COURT:  This was addressed pretrial.
4         MR. SEEGER:  Yes.
5         MS. SULLIVAN:  No, Your Honor.
6         MR. BUCHANAN:  Actually, this particular
7  record, Your Honor, was not --
8         THE COURT:  This isn't the first time I heard
9  this argument.
10        MR. BUCHANAN:  You heard this right after
11  Dr. Lewer testified, and I thought it was that they
12  would not use this with any subsequent witnesses before
13  coming back to Your Honor.  I take it that's what this
14  is right now.
15        MS. SULLIVAN:  That's what this is, Your
16  Honor.
17        Your Honor, what Mr. Buchanan has stated is
18  dramatically inconsistent with the state of the record.
19        The record is that Dr. Lewer testified it was
20  he who recommended the testing, he or Dr. Sim, the CMP
21  testing, and that Mr. Humeston objected to it.  There
22  was no discussion about lawyers or IMEs or litigation
23  exams.  So the foundation for that document was laid
24  through Dr. Lewer, where he said as part of the
25  patient's healthcare that he or Dr. Sim recommended the

                                                      2573

1  test, and Mr. Humeston objected as a result of the
2  VIOXX trial.
3         MR. BUCHANAN:  Because Mr. Humeston was going
4  to have to give blood perhaps pursuant to an IME.
5         MR. SEEGER:  He took the blood test after
6  that --
7         MS. SULLIVAN:  That's not part of the
8  evidence, Your Honor.
9         MR. BUCHANAN:  That's why it's very
10  misleading.  The Court is aware of the debate, it was
11  initially raised in June, subsequently raised in July,
12  and finally confirmed in a letter from Ms. Sullivan
13  only two or three days before Dr. Tyberg's IME about
14  whether they were going to request blood.
15        I don't want to reveal what my conversations
16  with my client were, but the bottom line is that there
17  was a suggestion that he was going to have to give
18  blood, and if he was going to have to give blood, it
19  should be given in whatever setting it was going to
20  have to be given.
21        MS. SULLIVAN:  That request for our expert to
22  draw blood, Your Honor.  That was a completely
23  different issue, whether our expert could draw blood or
24  not.  This relates to his treating doctors asking for a
25  blood test, and Mr. Humeston saying he objects due to

                                                      2574

1  the VIOXX trial.  There is -- so I'm not sure what the
2  basis of the objection is, given the state of the
3  record, and given the fact that there was no objection
4  at the time it was used and at the time that Dr. Lewer
5  testified about it.
6         MR. SEEGER:  Judge --
7         MR. BUCHANAN:  What's the probative value,
8  period, though?  What is the probative value, period?
9  To blood work done four years after the point in time
10  of his heart attack?  Okay?
11        MS. SULLIVAN:  Dr. Lewer testified very
12  specifically that that test gives information about
13  somebody's risk of cardiovascular disease.
14        MR. SEEGER:  Well, why didn't you tell the
15  jury that there was a blood test taken right after
16  that?
17        MS. SULLIVAN:  You could.  That's your job.
18        MR. SEEGER:  That's the point.  She wants to
19  sum up and say that that test was never taken, and it's
20  misleading and it also is based on --
21        MS. SULLIVAN:  That's a different test.
22  That's not a complete --
23        THE COURT:  All right, stop.
24        7-15-05, there is a note in the record -- is
25  it COMP?

                                                      2575

1         MS. SULLIVAN:  CMP.
2         THE COURT:  CMP not done.  CMP stands for?
3         MS. JONES:  Complete metabolic panel, Your
4  Honor.
5         THE COURT:  It's a blood test.  And it says
6  request of plaintiff, VIOXX trial.  It suggests -- the
7  statement here is that the CMP was not done because of
8  the VIOXX trial.  It's 7-15-05.  At that point in time,
9  this summer, there was a discussion between counsel and
10  the Court, and it was brought -- this issue of whether
11  or not Mr. Humeston was going to have to submit to
12  certain tests by the defense doctor, which included not
13  just drawing blood but other invasive tests, we went
14  through the whole -- and there were quite a few tests,
15  several different tests --
16        MR. BUCHANAN:  At that point we thought it
17  was just blood, Your Honor.
18        THE COURT:  Well, there was a discussion
19  later on about other tests.  At any rate, I found that
20  the plaintiff did not have to submit to invasive
21  testing.
22        MS. SULLIVAN:  That's different, Your Honor.
23        THE COURT:  I understand what this is.  What
24  this is -- and counsel is representing that they
25  advised Mr. Humeston, they're telling me as officers of

                                                      2576

1  the court, and they told me then that they advised
2  Mr. Humeston not to submit to the test until after I
3  ruled as to whether or not --
4            MS. SULLIVAN:  The test that was the subject
5  of the Court conference was THE test by our expert,
6  Your Honor, not by his treating physicians.
7            THE COURT:  And they're saying they told him,
8  don't take a blood test until after we decide if you
9  are going to be taking a blood test with defense
10  counsel.  I said, you're not going to take a test with
11  defense counsel.  There subsequently was a test.
12           The only thing this could suggest is that
13  Mr. Humeston's trying to hide something, which is not
14  fair.  It's prejudicial.  It's not probative.  And
15  whatever test needed to be done at 7-15-05 or whatever
16  he was doing at that point was being done at orders of
17  his lawyers, and it was based on the fact that there
18  was issues before the Court at that time, and I
19  finally -- it's not appropriate, it's prejudicial, it's
20  not probative, it doesn't prove anything, and I'm going
21  to order that it be not included in the
22  cross-examination or presented to the jury in any way.
23           Anything else?
24            MR. RABER:  Yes, Your Honor.
25            THE COURT:  Do you have the FDA papers?  I

1  The jury has been shown it.  You can argue it.  So the
2  documents themselves contain a lot of other
3  information.
4            MR. RABER:  Your Honor, we won't use the
5  attachments then.
6            THE COURT:  Even the letters contain other
7  information.
8            MR. RABER:  But, Your Honor, the point is,
9  there is no dispute that Mr. Humeston had a heart
10  attack, so under that rationale, why do we put in the
11  medical records talking about his heart attack?
12  It's -- you know, the documents --
13            THE COURT:  We don't put in every record
14  about his heart attack, if it's got other information
15  in it, that people haven't testified or it's not
16  relevant.
17           There is other stuff in there about
18  misbranding and if you use it with that change in the
19  label, it could be considered misbranding.
20            MR. RABER:  It explains the conduct, Your
21  Honor.  The issue in this case is what are the risks --
22            THE COURT:  If you want to put in the letter
23  with everything redacted except it's been found to be
24  safe and effective, I will allow it.  Because that's
25  the only purpose you told me you wanted to use it for.

1  have issues with those.  I looked at them.  First of
2  all, they are not just -- there is several documents
3  attached to each one of those FDA approval letters.
4  And there is lots of information in the letters
5  themselves, complex information, talks about
6  regulations.
7           Counsel has gotten before the jury the fact
8  that the FDA approved the drug as safe and effective on
9  several different occasions, the dates of that.  The
10  letters themselves don't add anything to that.  What
11  they do is they have attached to them the package
12  inserts for 19 -- or 2002, the package inserts for
13  later, modified package inserts, which I think would be
14  unduly confusing to the jury.  I'm not going to allow
15  it in.
16           The FDA letters are -- include a lot of
17  information in there that doesn't just say that it's
18  safe and effective, and I don't think it's relevant.
19  It hasn't been testified to by anyone.  I'm concerned
20  about how it can be used.  If you have -- I don't know
21  what you want to -- I don't know what you want to get
22  in with them.  The only thing you've told me you want
23  to get in with those documents is that the FDA approved
24  it as safe and effective.  There is no dispute about
25  that.  It's been admitted.  The jury has been told it.

1  And my position is for that purpose, it's fine.  But it
2  certainly has a lot of other things in there, and I'm
3  not going to let extraneous things come in.
4            MR. RABER:  So my understanding is then we
5  can --
6            THE COURT:  You can put the date, that it's
7  the FDA, and that it's safe and effective, and what the
8  indication was.  You can do that.
9            MR. RABER:  And what the indication was.
10  Fine.  Thank you, Your Honor.
11            THE COURT:  As far as the package insert's
12  concerned, I think we're going -- I assume the 1999
13  package insert is going to be placed into evidence.
14            MR. SEEGER:  Yeah.
15            THE COURT:  I think the original package
16  insert.
17            MR. RABER:  Is the 2002.
18            MS. SULLIVAN:  2002 --
19            MR. RABER:  2002 is already in, also.
20            THE COURT:  They should be put in in insert
21  form, though, not a summary of them on typed paper.  I
22  want them put in in their original form, so the jury
23  can actually see what a package insert looks like, not
24  what a typed out package insert looks like, which is
25  not what it looks like when the doctor gets it.

1    MR. BUCHANAN:  We have those, Your Honor.

2    THE COURT:  1999 and 2002 are admitted,

3    should be admitted, but they should be admitted in

4    package insert form.  If the jury is going to be

5    looking at something, they should see what it is that's

6    with these medicines.

7    Anything else?

8    MR. RABER:  Yes.

9    THE COURT:  If you redact those letters, I

10   will allow them in that way.

11   MR. BUCHANAN:  I would like an opportunity to

12   review it, Your Honor, because there may actually be

13   something that they would like redact -- if the safe

14   and effective language is coming in, there may be

15   another sentence or two.  I will look at it with them.

16   THE COURT:  I will give them back to you and

17   you look at it.  If you agree on what goes in, I have

18   no problem with it.  You can put in whatever you want.

19   If you both want the letters in, fine.  You said you

20   objected, I looked at it, but --

21   MR. BUCHANAN:  I did.  If I'm going to lose

22   that piece of it, then I want to have an opportunity to

23   look at what would be excluded.

24   THE COURT:  All right.  Well, look at both of

25   it and see what you want to do.

                                                2581

1    MR. RABER:  Your Honor, yesterday --

2    THE COURT:  Anything you can work out is fine

3    with me.

4    MR. RABER:  Your Honor, yesterday we filed a

5    motion for mistrial and to strike the improper,

6    irrelevant, inflammatory testimony given by

7    Dr. Kronmal.  Blatantly violated several of this

8    Court's orders --

9    THE COURT:  I haven't gotten the opposition

10   to that yet.  Are you planning on filing it?

11   MR. BUCHANAN:  I think we are, Your Honor.

12   We will be opposing the request for a mistrial.

13   MR. SEEGER:  We would like the case to go to

14   verdict.

15   MR. BUCHANAN:  We haven't had an opportunity

16   find out it together yet.

17   MR. RABER:  I just point that out, Your

18   Honor, and I won't argue about it anymore.  I just

19   point out that fact.

20   But, in addition, to the arguments about --

21   THE COURT:  I will hear that motion,

22   obviously, but not until the plaintiffs have a chance

23   to oppose it.

24   MR. RABER:  In addition, however, Your Honor,

25   similar to what we did with Dr. Lucchesi a couple days

                                                2582

1    ago, we ask the Court to strike his purported causation

2    testimony on the grounds that it's not scientifically

3    reliable --

4    THE COURT:  Whose?

5    MR. RABER:  Dr. Kronmal.  He repeatedly

6    opined about causation as distinguished from

7    statistical association, without a proper foundation or

8    sufficient data to support conclusions about medical

9    causation in the case.

10   Notably, he conceded that there is no data

11   concerning whether intermittent short-term ingestion of

12   VIOXX can cause heart attacks.  Likewise, in discussing

13   the supposed significance of variations in all-cause

14   mortality, the Alzheimer's studies, he completely

15   failed to establish clinical significance by looking

16   behind the data.  He relies on the remarkable assertion

17   that even car accidents could have been caused by heart

18   attacks or VIOXX.  That's speculation, not science.

19   Nor is there any scientific basis to conclude that even

20   if a car accident was, in fact, caused by a

21   preceding heart attack, that the heart attack would

22   have remained undetected.

23   In addition, Dr. Kronmal ignored numerous

24   studies, most obviously, the osteoarthritis studies,

25   despite the fact that osteoarthritis is precisely what

                                                2583

1    Mr. Humeston was treated for in this case.

2    The osteoarthritis data showed no

3    statistically significant increase in the risk of heart

4    attacks, and Dr. Kronmal conceded that

5    placebo-controlled studies are superior to studies

6    comparing to active drugs, such as the VIGOR study,

7    upon which he relied.

8    Dr. Kronmal also inappropriately pooled

9    studies with nonheterogenous comparatives, ignoring

10   peer-reviewed published literature demonstrating that

11   Naproxen has antiplatelet effects similar to aspirin

12   when used continuously in the doses administered in

13   Merck's clinical trial VIGOR.

14   Dr. Kronmal also inappropriately rejected

15   prespecified thrombotic event endpoints used in the

16   clinical trials, and instead decided to evaluate his

17   own MI plus sudden death criterion, ignoring other

18   thrombotic events in the prespecified endpoints, only

19   after concluding that there was an excess of sudden

20   deaths in the VIOXX group.

21   His analysis was prepared solely for

22   litigation, it's not peer reviewed or published, and

23   it's not scientifically valid.

24   Finally, his reliance on alleged

25   nonthrombotic risks of VIOXX is contrary to plaintiffs

                                                2584

```
 1   theory of this case.  Plaintiffs cannot identify the
 2   FitzGerald hypothesis as that which gave Merck notice
 3   and then introduce expert testimony rejecting
 4   thrombotic events as the prespecified endpoints on the
 5   after-the-fact rationale that VIOXX also increases the
 6   risk of hypertension, congestive heart failure, and
 7   even Alzheimer's disease.
 8           We would ask the Court to strike his
 9   causation testimony and his testimony about his own
10   unreliable statistical analysis, as well as the
11   exhibits and charts he created.
12           Thank you.
13           MR. BUCHANAN:  Your Honor, if -- if defense
14   counsel has a challenge that it wasn't published or
15   peer reviewed, I just ask whether you would consult to
16   him publishing his new data that he has gotten from the
17   litigation site.
18           MR. SEEGER:  He wants to publish a paper.
19           MR. BUCHANAN:  If you would consent to that,
20   I'm sure he would appreciate to hear from you.
21           Your Honor, there is ample evidence from
22   Dr. Kronmal's testimony about the increased risk of
23   VIOXX.  He highlighted very clear signal from the VIGOR
24   was heart attacks.  What he did was he looked at heart
25   attacks; he also looked at sudden cardiac death which
```

2585

```
 1   is a corollary to heart attacks.  He looked at that
 2   over the range of clinical trials.
 3           Ms. Sullivan said in their opening statement,
 4   science is supposed to be determined on the basis of
 5   the totality of the evidence.
 6           Now we hear from defense counsel, he is
 7   cherry-picking, look at the osteoarthritis trials.  He
 8   did look at the osteoarthritis trials and he did it the
 9   way the company did.  He looked at it aggregated with
10   the company's meta-analysis, in the same subgroupings
11   they used, and did an aggregate endpoint and saw
12   statistically significant increased risk in the
13   meta-analysis, using not only the -- using the
14   prespecified endpoint they had in their own study.
15   Heart attacks.  They prespecified it, and they are
16   criticizing him for not using prespecified endpoint.
17   It was in there.  They never published it, they never
18   gave it to the FDA, they never put it in a press
19   release or gave it to anybody.
20           So, in terms of attacking his analysis about
21   relying on unreliable endpoints, it's very clear from
22   the testimony he actually relied on an endpoint the
23   company had prespecified and used that across the range
24   of clinical trial data that he analyzed.
25           The real question is:  Why was this not in
```

2586

```
 1   the peer-reviewed literature?  Why was it not in the
 2   article they published in the New England Journal on
 3   APPROVe?  Why was it not separately broken out in the
 4   VIGOR trial?
 5           To question whether it's scientifically
 6   reliable is to question their own analysis, where they
 7   prespecified it.  It's absolutely reliable and
 8   absolutely probative on causation, and, as Your Honor
 9   saw from the charts, and as Dr. Kronmal testified,
10   demonstrates an increased risk, even with short-term
11   use.  There is no basis to strike the testimony as
12   being scientifically unreliable, there has been no
13   serious challenge to his qualifications or credentials.
14   The analysis was done using their data, using standard
15   methodology, using standard statistical techniques,
16   there is absolutely zero basis to strike his testimony.
17           Thank you, Your Honor.
18           THE COURT:  The Court agrees with plaintiffs'
19   counsel that there is absolutely no basis whatsoever to
20   strike Dr. Kronmal's testimony.  His qualifications
21   are -- he is clearly well-qualified to testify as a
22   biostatistician.  He clearly has devoted his life to
23   being trained and experienced in doing clinical studies
24   and doing statistical analysis of clinical studies, and
25   he approached this from, certainly, a different point
```

2587

```
 1   of view than Dr. Lucchesi.  He approached it from a
 2   statistical point of view of what the studies that had
 3   been done and what the studies that had been done by
 4   Merck actually showed.  His position was that what
 5   Merck said the statistics showed was not what the
 6   statistics actually showed, and that, in fact, their
 7   studies were not properly reported, and that, in fact,
 8   their own data showed that there was effects that they
 9   dispute.
10           His testimony certainly can be challenged by
11   the defense as far as whether the jury should believe
12   or not his final opinions, but the Court finds that
13   his -- his approach was certainly scientifically valid
14   and the Court finds that the motion should be denied.
15           All right.  See you at 1:30.
16           (A luncheon recess was taken from 12:40 to
17   1:40 p.m.)
18           THE COURT:  Are you ready to bring the jury
19   in?
20           MR. SEEGER:  Yeah.
21           THE COURT:  Bring the jury in.
22           (The jury entered the courtroom at 1:41 p.m.)
23           THE COURT:  You can be seated.
24           Your next witness, counsel.
25           MR. SEEGER:  Your Honor, we would like to
```

2588

1    call Dr. Nicholas DePace.

2    NICHOLAS L. DePACE, PLAINTIFFS' WITNESS, SWORN.

3         THE WITNESS:  I do.

4         THE COURT CLERK:  State your full name and

5    spell your last name for the record.

6         THE WITNESS:  Nicholas DePace, D-E capital

7    P-A-C-E.

8              DIRECT EXAMINATION

9    BY MR. SEEGER:

10        Q    Good afternoon, Doctor.  How are you?

11   A    Good.

12        Q    Doctor, where are you from?

13   A    Originally?

14        Q    Yeah.

15   A    Newark, New Jersey.

16        Q    Where do you live now?

17   A    South Jersey.

18        Q    Where is your practice, sir?

19   A    South Philadelphia, Center City; and South Jersey,

20   specifically, Washington Township.

21        Q    Okay.  We are going to talk about what you do

22   for a living.  Let's just talk a little bit about your

23   education.

24             What kind of degrees have you received after

25   high school?

2589

1    A    I entered medical school without my Bachelor's,

2    after I completed 90 somewhat credits, and received my

3    Bachelor's retrospectively, so eventually I got a

4    Bachelor's of Science.

5         Q    So you were in medical school and you also

6    got your Bachelor's Degree while you were in medical

7    school?

8    A    Yes, applied my medical school credits, yes.

9         Q    All right.

10   A    In 1978, I graduated the Mount Sinai School of

11   Medicine in New York.

12             I went to Philadelphia, and did my internship

13   at -- my residency at Hahnemann Hospital.

14        Q    Okay.

15   A    I was chief medical resident in 1981.

16             Did my cardiology training, which we call a

17   fellowship program, from '81 to '83.

18        Q    Okay.

19   A    And that was pretty much my --

20        Q    That's your training?

21   A    -- training.

22        Q    Okay.  And do you have -- today, you are a

23   cardiologist?

24   A    Yes.

25        Q    Do you have professional affiliations with

2590

1    hospitals?

2    A    Yes.  I currently am on staff at the Hahnemann

3    University Hospital, the Jefferson University Hospital.

4         Q    Hahnemann is in Philadelphia?

5    A    Yes.

6         Q    And where is Jefferson?

7    A    Also in Philadelphia.

8         Q    Okay.

9    A    The Methodist Hospital, division of Jefferson.

10   And I have consulting privileges at the Washington

11   Township Hospital in Washington Township.

12        Q    Dr. DePace, are you board certified in any

13   areas of medicine?

14   A    Yes.  I obtained my board certification in

15   internal medicine in 1982; my cardiology board

16   certification in 1984; and, recently, I obtained my

17   third board certification in echocardiography; so I

18   have three boards.

19        Q    Okay.  Let's just briefly talk about what

20   does it mean to be board certified in internal

21   medicine?

22   A    To be board certified in internal medicine means

23   that you have to pass an examination of your peers, a

24   written examination, generally a two-day examination,

25   and it's scored on a computer, and you're compared with

2591

1    your peers, and you have to have had satisfactory

2    training requirements just to sit for it, then you have

3    to have a sufficient passing score to be able to get

4    the certification for your boards.

5         Q    Okay.  So you passed your boards for internal

6    medicine; you subsequently became board certified in

7    cardiology?

8    A    That's correct.

9         Q    And that's the area you practice in?

10   A    Yes.

11        Q    Okay.  And then you say recently, you were

12   board certified in echocardiography?

13   A    Yes.  Echocardiography is a subspecialty of

14   cardiology which deals with noninvasive imaging,

15   examining ultrasounds of the heart, and that is a

16   subspecialty, so to speak, of cardiology.  It's

17   considered noninvasive because no instruments have to

18   be put into the body to take these tests.  These are

19   ultrasounds on the surface.  And there is a separate

20   board certification for that.  And I had the necessary

21   requirements and I was allowed to sit for that and I

22   passed that on my first try, also.

23        Q    Okay.  And did you receive a score on that

24   exam, the echocardiography?

25   A    Yes.

2592

1    Q    Did it place you in any particular percentile
2    of people?
3    A    Yes, actually, I scored fairly high on that.  I
4    think I had to get 497 to pass, and I got 651, so I was
5    in the top six percentile in that.
6    Q    And what percentage --
7    A    Of the people that took it.
8    Q    What percentage of cardiologists also go on
9    to become board certified in echocardiography?
10   A    Very small percent.  I would think much less than
11   10 percent, maybe 5.  I could find that out.  It's a
12   very low percent.  Only 400 and some patients --
13   doctors sat for it this year.
14   Q    Let's --
15   A    Cardiologists or --
16   Q    Let's just explain to the jury what that
17   means.  So there are cardiologists that practice
18   medicine with regard to the heart but are not
19   echocardiographers, correct?
20   A    That is correct.
21   Q    So where would they -- how do they get --
22   echocardiograms are a very important diagnostic tool in
23   medicine, correct?
24   A    Yes.
25   Q    So how would cardiologists who aren't

1    echocardiographers get those results read?
2    A    They will -- cardiologists will read echoes, many
3    of them are qualified in their training, many of them
4    aren't and learn it on the job.  But in order to get
5    specific qualifications or credentialed, they have to
6    have performed a certain amount over a five-year
7    period, and had a certain amount of training
8    background, and then pass an exam, which is rather
9    rigorous, to -- it's about a six-and-a-half hour exam
10   with visual pictures and questions, maybe 2, 300
11   questions, and this was in Boston, was offered in
12   Boston this year.  And approximately two-thirds,
13   generally, pass it; one-third fail it.  So it's a high
14   fail rate.  It's a difficult, challenging exam.
15   Q    Let's talk a little bit about -- and we are
16   going to come back to echocardiography because I know
17   that you want to read a few for the jury involving
18   Mr. Humeston.
19        But let's talk a little bit about some of the
20   other things you do.  Are you on any editorial boards
21   for any journals?
22   A    Yes.  I am on the editorial board of the American
23   Journal of Cardiology.
24   Q    Tell the jury a little bit about what the
25   American Journal of Cardiology is all about.

1    A    The American Journal of Cardiology is one of the
2    five or six leading peer-reviewed journals in the world
3    in cardiology.  And there is about a hundred members to
4    the editorial board throughout the world, not just the
5    United States.  And they will send me papers to review,
6    critique, peer review them, and I'll decide whether
7    they should be accepted, revised, rejected and so
8    forth.  I have been doing that about seven or eight
9    years as an editorial board member, although I have
10   been reviewing manuscripts since 1984 for various other
11   journals but this one is a specific appointment I have
12   to the board.
13   Q    Okay.  And do you belong to any professional
14   societies?
15   A    I'm -- yes.  I'm a fellow of the American College
16   of Cardiology.  I'm a fellow of the American Society of
17   Echocardiography.  I belong to the Philadelphia Chapter
18   of Medicine, Philadelphia Medical Society, which is one
19   of the oldest in the country.  That's pretty much the
20   medical societies.
21   Q    And have you published, yourself, in
22   peer-reviewed journals?
23   A    Yes.  I published, predominantly in the 1980s, in
24   the noninvasive field, when it became -- when it became
25   an explosive field, predominantly in ultrasound or

1    echocardiography and nuclear cardiology, which are the
2    noninvasive areas of my expertise, but I've also
3    published in other various areas of cardiology.
4    Q    Have you published any books or book
5    chapters?
6    A    I've published about six book chapters.  Recent
7    one, which I don't have on my CV, was a few years ago,
8    I did one with -- on prosthetic valves.  Jefferson put
9    out an anti-coagulation type book on clotting and blood
10   thinning.  And I published in that by Gino Maui
11   (phonetic), et al.
12        The book I published was the Heart Repair
13   Manual in the early '90s by W. W. Norton, and that is a
14   book I wrote for my patients, for everyday lay people.
15   It's not for medical students or doctors.  It's more
16   for the everyday patient.
17   Q    Why did you feel the need to write that book?
18   A    That book was a self-study program, where patients
19   could score their risks for heart disease and then
20   could effect different interventions and see if they
21   could lower those risks.  And this was before
22   Framingham came out with scoring systems and --
23   Q    What's Framingham?  You've got to tell us.
24   A    Oh, I'm sorry.
25        Before some sophisticated epidemiology

1  centers came out with scoring systems, I developed a
2  real simple one that the average Joe in their house
3  could just, with a pen and pencil, calculate a couple
4  of numbers and find out, hey, where is my risk of
5  having heart disease and how do I lower it.  Simple
6  formula I developed where you throw numbers in and you
7  find it yourself, like your cholesterol, your blood
8  pressure.
9      Q    This is something you provide for your
10  patients?
11  A    Yes.
12      Q    Okay.  Now, have you done any public service?
13  I understand you did some radio work at one point.
14  A    Yes, I did about a decade on WPEN.  I was the
15  medical expert, on 950, in health.  I used to follow
16  Ken Garland, Elaine Soncini, and do a small, couple
17  minutes in the medical section, and I would do that
18  every morning at 10:00.  Those are prerecorded so I
19  wasn't in the studio.  I was in the studio once a
20  month.  But I would do that, that was a public service,
21  and I did all fields, just not cardiology, but
22  medicine, answered questions on write-ins and things
23  like that.  It was a lot of fun.
24      Q    Now, Dr. DePace, do you teach medicine to
25  medical students?

1  What is that all about?
2  A    Yes.  I worked for the federal government for, I
3  would estimate, about five years or maybe more up at
4  Plymouth Meeting.  I would go once or twice a month and
5  review peer review articles -- not articles -- charts,
6  to police the doctors.  In other words, if a patient
7  died, they would give me a chart to see if a doctor did
8  anything wrong.  I would police the doctors on standard
9  of care.
10      If a patient left the hospital and came back
11  three days later, I would look at the chart to see if
12  the doctors did anything wrong, critique the doctors so
13  it would be a standard of care peer review at -- sort
14  of to police ourselves.  And we didn't want it to go
15  outside of the hands of the doctors, so the doctors
16  would get involved with that, and I was one of them.
17  And they would pay us per hour.  I think it was
18  something like -- I forget what the number was -- maybe
19  a hundred dollars an hour or something, and we would go
20  up there and it was quite interesting.
21      Sometimes they would send charts to my office
22  to review, also.
23      Q    You mentioned policing doctors.  Is that
24  something that you feel is important to do, that
25  doctors need to do that with other doctors?

1  A    Yes, through Hahnemann and Jefferson, we have
2  access to medical students.  Medical students rotate
3  through my office periodically, through the hospital,
4  especially the downtown Jefferson branch.  And we
5  lecture, we teach, do physical and bedside diagnosis.
6      I don't teach out of a classroom with a
7  curriculum in the medical school proper, but we will do
8  it in the clinical setting.
9      Q    And, in fact, it's mostly clinical, you were
10  about to say that.  That's pretty much what you do.
11      How much of your time do you spend actually
12  working with patients?
13  A    Oh, the majority of the time, maybe -- since I
14  haven't done much research in recent years, about 90
15  percent of the time or more is with patients, the rest
16  divided with lecturing, teaching, some medical/legal
17  work, peer review for different organizations, for
18  hospitals and things like that.
19      Q    And what -- I'm sorry, Doctor.  I didn't mean
20  to cut you off.
21      What states are you licensed in?
22  A    I'm licensed in New Jersey, since 1978, I believe;
23  and Pennsylvania since 1979.
24      Q    Now, we understand you also -- I understand
25  you also did some work for the government.  KePRO?

1  A    Yes, absolutely.
2      Q    And why is that, Doctor?
3  A    I think that if certain agencies, not just in
4  medicine, don't police each other, it will invite in
5  for more governmental regulation with people that don't
6  know much about the field.  For example, doctors know
7  about medicine.  Government regulations don't know
8  about medicine.  So if we police ourselves, we will be
9  able to keep a tight lid on things, and we will keep
10  away external agencies that may not understand medicine
11  from coming in and regulating us, and that's important.
12      Q    Okay.  And you also mentioned a little bit
13  before that you do medical/legal work.  When you say
14  that, you mean sort of like what you're doing here
15  today?
16  A    Yes.
17      Q    Testifying as an expert?
18  A    Yeah.
19      Q    A medical expert?
20  A    That's correct.
21      Q    What percentage of your time, would you say,
22  do you spend -- or let's do it this way.
23      What percentage of your income would you say
24  you earn doing the kind of work you're doing today?
25  A    We did an estimate of that over the last nine

1  years, and it's roughly six or seven percent.
2      Q    Okay.  And the rest of the time you spend
3  being a doctor --
4      A    93 percent of the income would be derived from --
5      Q    Your medical practice?
6      A    Yes.
7      Q    And you, in fact, lecture from time to time
8  for pharmaceutical companies, don't you?
9      A    Yes.  Often, actually.
10      Q    What pharmaceutical companies do you lecture
11  for?  And tell us a little bit about that.
12      A    Well, I have been lecturing since the 1980s.  I
13  have been a full professor since 1985 or '86, so once I
14  attained full professor status, I used to get a lot of
15  didactic lecture assignments, get trained by different
16  pharmaceutical companies.
17          I've lectured and still lecture for Pfizer.
18  Lectured and still lecture for Merck.  Glaxo.
19  Beringer.  I'm sure there's -- Abbott.  There's five or
20  six other companies that I've been lecturing for in the
21  last 12 months.
22      Q    And you say you lectured and still lecture
23  for Merck?
24      A    Yes.  I lectured for Zetia, it's a product for
25  cholesterol lowering.

1      Q    What other products?
2      A    They have a product for cholesterol lowering,
3  Vitorin, which they joint with Schering-Plough, who I
4  also lecture with.  And I'm currently doing lectures,
5  as we speak today, in that subject.
6      Q    You understand, Doctor, you're here today
7  testifying on behalf of Mr. Humeston in a case
8  involving a drug Merck makes, correct?
9      A    Yes.
10      Q    Why are you doing that?
11      A    I don't feel there is a conflict of interest in,
12  you know, testifying for what I consider an injured
13  party.  I mean, I've always -- you know, whether I
14  defend an injured patient or defend a doctor against a
15  patient claiming they're injured, I'll look at the
16  evaluation, do my peer review or my standard of care
17  review like I always did with the government, look at
18  the chart objectively, and I'll call it the way I feel,
19  if there is definite -- if I feel I can definitely
20  explain the case.
21      Q    Now, Doctor, do you get a lot of requests
22  from lawyers, both defense lawyers and plaintiffs'
23  lawyers, to testify for them in cases?
24      A    Yes.  I get called frequently to look at cases and
25  screen them.

1      Q    Do you accept every engagement you're asked?
2      A    Well, I will accept a chart to screen a chart.  I
3  will look at the chart and screen it, and then I'll
4  decide if the chart has merit or if it doesn't have
5  merit, in terms of formulating an opinion, and that's
6  what I'll do.  So I'll screen a chart and maybe accept
7  it or reject it.
8      Q    And do you often get requests, just like we
9  asked you to come in, do you get requests from
10  pharmaceutical companies that you turn down to lecture
11  for them on behalf of their drugs?
12      A    Yes.  Usually, that will be the case if I'm not
13  familiar with the drug, or I don't use it so I can't
14  really evaluate clinical efficacy.  If somebody comes
15  in and wants me to lecture on a certain cardiac drug
16  that I haven't used, if I haven't used it and had
17  experience and don't have efficacy, I may -- I probably
18  will not take that assignment.  Or, if I don't believe
19  the data is strong enough, I won't take the assignment.
20      Q    Now, Doctor, I want to ask you a question
21  about something.  Actually, I have a letter here, and I
22  need your assistance on this.
23          MS. SULLIVAN:  May I see it, counsel?
24          MR. SEEGER:  Oh.
25  BY MR. SEEGER:

1      Q    This is a letter that talks about you, and
2  it's sent to a lawyer in Philadelphia.  Do you know who
3  that lawyer is?
4      A    I don't know him personally, but he is one of the
5  senior lawyers in a defense firm, Pepper, Hamilton,
6  that's fairly prominent in Philadelphia.
7      Q    And that's a plaintiffs' firm or a defense
8  firm?
9      A    A defense firm.
10      Q    And who is Helene Silverstein?
11      A    Helene Silverstein is the person that
12  administrated and orchestrated over my radio
13  engagements with WPN, the public service, and some of
14  my -- and some of the writings I do, my public service
15  writings in the newspaper.
16      Q    All right.  And, Doctor --
17      A    Newspapers.
18      Q    -- do you have any idea why this letter was
19  sent out to this defense lawyer that mentions -- you
20  know, just mentions the fact -- tells -- sort of talks
21  about who you are, what your expertise is, and that
22  you'd be available to testify for this defense firm
23  for, you know, litigation purposes?
24      A    Yes.  That was in 2001, and where I had done an
25  enormous amount of work with the fen-phen issue, since