Ex 1 - 5-26-06 depo transcript

0001
1                UNITED STATES DISTRICT COURT
2                EASTERN DISTRICT OF LOUISIANA
3
4   In re:  VIOXX                   )
    PRODUCTS LIABILITY LITIGATION   )  MDL Docket No. 1657
5                                   )
    This document relates to        )  Section L
6                                   )
    GERALD BARNETT,                 )  Judge Fallon
7                                   )
                   Plaintiff,       )  Civil Action No.
8                                   )  2:06cv485
              vs                    )
9                                   )
    MERCK & CO., INC.,              )
10                                  )
                   Defendant.       )
11  _____  )
12
13
14
15        DEPOSITION OF CORNELIA PECHMANN, Ph.D.
16              Newport Beach, California
17               Friday, May 26, 2006
18
19
20
21
22  Reported by:
23  DIANA JANNIERE
    CSR NO. 10034
24  LA JOB No. 918215
    PHIL JOB No. 2153
25

0002
1                UNITED STATES DISTRICT COURT
2                EASTERN DISTRICT OF LOUISIANA
3
4   In re:  VIOXX                   )
    PRODUCTS LIABILITY LITIGATION   )  MDL Docket No. 1657
5                                   )
    This document relates to        )  Section L
6                                   )
    GERALD BARNETT,                 )  Judge Fallon
7                                   )
                   Plaintiff,       )  Civil Action No.
8                                   )  2:06cv485
              vs                    )
9                                   )
    MERCK & CO., INC.,              )
10                                  )
                   Defendant.       )
11  _____  )
12
13
14
15          DEPOSITION of CORNELIA PECHMANN, Ph.D., taken
16   on behalf of Defendant at 660 Newport Center, Suite 330,
17   Newport Beach, California, beginning at 8:30 A.M., and
18   ending at 7:30 P.M., Friday, May 26, 2006, before Diana
19   Janniere, Certified Shorthand Reporter No. 10034.
20

Ex 1 - 5-26-06 depo transcript

```
21
22
23
24
25
0003
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4           ROBINSON, CALCAGNIE & ROBINSON
             BY:  MARK ROBINSON, ESQ.
 5           620 Newport Center Drive, 7th Floor
             Newport Beach, California  92660
 6           (949) 720-1288
 7           LOPEZ, HODES, RESTAINO, MILAN & SKIKOS
             BY:  STEVEN J. SKIKOS, ESQ.
 8           625 Market Street, 11th Floor
             San Francisco, California  94105
 9           (415) 956-5257
             sskikos@lopez-hodes.com
10
11   For Defendant:
12           BARTLIT, BECK, HERMAN, PALENCHAR & SCOTT, LLP
             BY:  ANDREW L. GOLDMAN, ESQ.
13           54 West Hubbard Street, Suite 300
             Chicago, Illinois  60610
14           (312) 494-4400
             andrew.goldman@bartlit-beck.com
15
16   For Stewart Grossberg/California Case:
17           GIRARDI AND KEESE
             BY:  JAMES G. O'CALLAHAN, ESQ.
18           1126 Wilshire Boulevard,
             Los Angeles, California  90017-1904
19           (213) 977-0211
20
21
22
23
24
25
0004
 1                         INDEX
 2   WITNESS                          EXAMINATION
 3   CORNELIA PECHMANN, Ph.D.
 4
 5                   MR. GOLDMAN          6, 336
 6                   MR. SKIKOS              288
 7                   MR. O'CALLAHAN          330
 8
 9                       EXHIBITS
10   DEFENDANT'S     DESCRIPTION            PAGE
11       1      Deposition Notice             12
12       2      Dr. Pechmann's Expert Report  35
13       3      Dr. Pechmann's Invoice        35
14       4      Merck Vioxx Case: Involved Parties
                and Technical Terms 4-06        55
15
         5      Handwritten Notes/Scientific Testing  68
16
         6      Blank Sheet with Exhibit Stamp on it  91
17
         7      The National Yough Anti-drug Media
```

Ex 1 - 5-26-06 depo transcript

18
19          8     Campaign Copy Test System                              155
                  Do Consumers Over generalize one-sided
                  Comparative Price Claims and Are.
20                More Stringent Regulations Needed?                     286
21          9     An Assessment of U.S. and Canadian
                  Smoking Objectives for the year 2000                   286
22
            10    Quasi-Experimentation Design and
23                Analysis Issues                                        286
24          11    Outline of Pechmann Expert Report                      287
25          12    Expert Report Exhibit Binder, 1 of 3                   287
0005
1                          INDEX (Continued):
2
3                              EXHIBITS
4    DEFENDANT'S              DESCRIPTION                    PAGE
5          13     Expert Report Exhibit Binder, 1 of 2                   287
6          14     Expert Report Exhibit Binder, 1 of 3                   287
7          15     Various E-mail Correspondence                         287
8
9
10                   INSTRUCTED NOT TO ANSWER
11                        PAGE      LINE
12                        121         6
13
14
15
16
17
18
19
20
21
22
23
24
25
0006
1          Newport Beach, California, Friday, May 26, 2006
2                  8:30 A.M. - 7:30 P.M.
3
4              CORNELIA PECHMANN, Ph.D.,
5          having been duly sworn, testified as follows:
6
7                          EXAMINATION
8    BY MR. GOLDMAN:
9          Q     Good morning, Dr. Pechmann.
10         A     Yes.
11         Q     Can you please state your name for the record?
12         A     Cornelia Pechmann.
13               MR. ROBINSON:  Better known as Connie.
14               THE WITNESS:  Better known as Connie.
15   BY MR. GOLDMAN:
16         Q     Do you understand that you have been designated
17   as an expert witness in the Barnett case in the federal
18   litigation?
19         A     Yes.
20         Q     I am going to remind you of some of the ground
21   rules for deposition.  I know we have been through this
22   drill before.  And I am going to ask you some questions.
23               If you don't understand what I am asking,
24   please ask me to rephrase.  Okay?
25         A     Okay.

Ex 1 - 5-26-06 depo transcript

0007
1      Q      Try not to interrupt each other.  Please let me
2  finish my question and I will try to let you finish your
3  answer.
4      A      Okay.
5      Q      And if you need to take a break for any reason,
6  Dr. Pechmann, let me know, and we will take a break.
7      A      Okay.
8      Q      Can you tell me what you did to prepare for
9  your deposition today?
10     A      I reviewed several boxes of documents regarding
11 Merck's integrated marketing integrations campaign for
12 Vioxx, and I focused particular attention of the science
13 of the campaign.
14            There were six major types of research that
15 they conducted to evaluate the campaign and fine-tuned
16 it.  So I spent about 200 hours total at least on these
17 documents.
18            And about half of that, I spent on the
19 different research studies trying to understand the
20 methods, the findings, the validity of the research;
21 what it all meant.
22     Q      Was -- were the boxes that you reviewed boxes
23 of documents that you prepared or that you were given by
24 plaintiff's lawyers?
25     A      I met every couple of weeks with one of the
0008
1  attorneys at Robinson, Calcagnie and Robinson and worked
2  with that attorney to get the documents I needed.
3            I worked on a similar integrated marketing
4  campaign.  So I knew what key words to use, to search
5  for the documents.  So working with him, primarily Chris
6  Spiro, we identified the documents that I needed.
7            I mean, we did not find everything, but we
8  found a reasonable amount.  The rest he said that he
9  could not find anywhere.
10     Q      What similar integrated marketing
11 communications campaign had you worked on before?
12     A      I worked on the anti-drug ad campaign for about
13 five years.  That was run by the office of National
14 Control Drug Policy, the U.S. Office of National Control
15 Drug Policy.  It is under the White House.
16            And I was one of the six members of the
17 behavioral change expert panel and I was specifically
18 chosen for that panel to oversee all the research, the
19 science.
20     Q      Oversee the research and science in what?
21     A      In that integrated marketing campaign and it
22 was very similar to the science that you see here in
23 this campaign.
24            So I worked with the different marketing
25 research firms.  I evaluated their methods.  I evaluated
0009
1  their findings for that campaign, and I, basically, did
2  the same thing with this campaign.
3     Q      Tell me what you mean by "science," when you
4  say you reviewed and evaluated the science involved in
5  the anti-drug ad campaign?
6     A      Okay.  Well, marketing -- I think a lot of
7  people think marketing is just some creative-type
8  sitting down and figuring out some creative ads; but
9  marketing has become a very, very sophisticated science.
10            And we do two basic types of research.  One is

Ex 1 - 5-26-06 depo transcript

11    a controlled experiment where you expose people to
12    different campaign materials before you are using it and
13    test the effectiveness of it.
14            So a pretest, and do statistical analyses and
15    compare one approach to another and compare different
16    groups, how different people react in statistically.
17            One of the things in the anti-drug campaign
18    that we tried to make sure that none of the ads were --
19    had unintended effects or misleading or confusing to the
20    audience members, which is a challenge.
21            But anyway, we tested all of these ads and all
22    of these ads we tested before they were aired and they
23    did the same thing here in this campaign.
24        Q   I'm sorry.  Who did that?
25        A   The Merck research people.  They had several
0010
1    different research people, research firms.  The primary
2    firm they used was Millward Brown, which we actually
3    used, too, because I worked with Ogilvy and they worked
4    with Ogilvy.  There is two different groups of Ogilvy.
5            Anyway, they were using major vendors and we
6    were using major vendors.  And so there was overlap in
7    the venders that we used and even considerable overlap
8    of the research.
9            (Discussion held off the record.)
10   BY MR. GOLDMAN:
11       Q   What was your role on the anti-drug ad
12   campaign, your role specifically?
13       A   Well, I was a member of this behavioral change
14   expert panel and I was responsible for these two types
15   of research:  Copy testing, and the other type is
16   tracking.
17            So tracking is what you do once the ads have
18   aired.  You continually are surveying members of your
19   target audience every month and asking them their
20   perception of the brand and their behaviors.
21            In this campaign, they actually had sales data.
22   In the case of marijuana, we did not have sales data.
23   It is illegal.  So we cannot track, but they had
24   pharmacy data.  So they could actually look at sales.
25            So what you are doing with tracking is that you
0011
1    are looking for the effect of your campaign out in the
2    field, and that is important because other factors could
3    occur.
4            For in the case of marijuana, you could have a
5    movie that is pro marijuana.  It can really screw up
6    your campaign, temporarily at least.
7            And in this campaign, you had events like the
8    "New York Times" article or a JAMA article; and so they
9    would track what was the effect of those external events
10   on people's perception relative to what was the effect
11   of their campaign; and these were statistical analyses.
12       Q   I am going to come back to the anti-drug
13   campaign in a minute and talk about the similarities
14   that you see in this case.
15       A   Okay.
16       Q   I want to focus first on what you did to
17   prepare for your deposition and you said that you
18   reviewed several boxes of documents on Merck's
19   integrated marketing communications campaign?
20       A   Correct.
21       Q   What else did you do?

Ex 1 - 5-26-06 depo transcript

```
22        A    I met on occasion with the attorneys to request
23   more documents.
24        Q    Um-hmm.
25        A    And yesterday I met with Steve and started to
0012
 1   explain to him my findings and what was the science and
 2   what was the science telling me; what was the different
 3   types of studies.
 4             But up until yesterday, we did not have a
 5   chance to talk about what I found is pretty much what is
 6   in my report.  I had -- I would have spoken to Mark,
 7   too, but except he was sick.
 8        Q    Let me hand you Exhibit 1.
 9             MR. GOLDMAN:  And I should have said this at
10   the beginning of the deposition to be clear, but it is
11   my understanding that this deposition is being taken for
12   purposes of the Barnett case and the MDL.
13             (Discussion held off the record.)
14             (Defendant's Exhibit 1 was marked
15             for identification by the court
16             reporter.)
17             MR. O'CALLAHAN:  Let me interject that this was
18   also noticed in California JCP 4247 Vioxx case and your
19   firm, of course, is involved in that case as well.
20             I spoke yesterday with Ralph Camateo, who
21   indicated that to the extent that Dr. Pechmann's
22   opinions were opinions that would extend to what
23   happened in California, that he would -- he would have
24   no objection to the deposition going forward in
25   California as well.
0013
 1             MR. GOLDMAN:  Okay.  I'm not sure about that
 2   conversation, but you can sort that out with
 3   Mr. Camateo.  All I know is, I am here to take the
 4   deposition for purposes of the Barnett case in the MDL.
 5             THE WITNESS:  Okay.  I want to just point out
 6   that my name is misspelled here.  It is two C's and mine
 7   has one C -- P-E-C-H-M-A-N-N -- in the real world.
 8   BY MR. GOLDMAN:
 9        Q    Okay.
10        A    It's okay.
11        Q    If you turn to the third page of Exhibit 1 or
12   fourth page, Dr. Pechmann, do you see that there are six
13   items asking for documents for you to produce?
14        A    That is on the third page of my document.
15        Q    Okay.  Do you see that?
16        A    Yes.
17        Q    Have you seen this list before?
18        A    No, but I was verbally told what to produce.
19        Q    Looking at the first request, "All
20             Materials that Dr. Pechmann has
21             reviewed prior to and since the time
22             she was retained as an expert in this
23             litigation that relate to Vioxx."
24             Have you produced those materials here today?
25        A    Yes.
0014
 1        Q    No. 2 says, "All materials that
 2             Dr. Pechmann relies and support for
 3             her opinions in the Vioxx
 4             litigation."
 5             Have you produced all of those materials today?
 6        A    Yes.
```

Ex 1 - 5-26-06 depo transcript

```
 7    Q    No. 3 says, "All work product other
 8         Than draft reports that Dr. Pechmann
 9         has prepared in the Vioxx
10         litigation."
11         Have you brought those here today?
12    A    I brought them here.  Some of them I have with
13  me here.  Like, you know, a note that I created.  And I
14  had given this, but I'm not sure you got a copy.  This
15  is just another sheet.
16    Q    I don't think I have.
17    A    Okay.  Well, I can make you copies.
18         MR. GOLDMAN:  Let's go off the record for a
19  second.
20         (Brief recess.)
21  BY MR. GOLDMAN:
22    Q    No. 4 says, "All statements
23         Reflecting time, Dr. Pechmann has
24         spent on Vioxx and bills she
25         submitted for payment."
0015
 1         Have you brought those here today?
 2    A    Yes.
 3    Q    Have you billed the plaintiffs' lawyers for all
 4  of the time that you spent on Vioxx work, and is that
 5  reflected in those bills?
 6    A    Yes, I -- yes.
 7    Q    No. 5, "All notes and other
 8         Memorandum Dr. Pechmann prepared in
 9         the Vioxx litigation."
10         Have you brought those here today?
11    A    Yes.
12    Q    No. 6 says, "All communications
13         Dr. Pechmann has had with any
14         plaintiffs' counsel in the Vioxx
15         litigation."
16         Have you brought those?  That would include the
17  E-mails.
18    A    It might -- yeah, there might -- I did not keep
19  copies of the E-mail correspondence.
20         For example, I would say, I am coming to UCI
21  Irvine tomorrow.  I am going to pick up boxes.  I am
22  going to be there at 3:00 P.M.  Have the boxes ready.
23  That kind of thing.
24         So there were on occasion that type of -- a few
25  of those, and I did not print those out because I didn't
0016
 1  know I was supposed to.  And there might be a few -- a
 2  couple in my E-mail, which we can pull out at some
 3  point.
 4    Q    Would you please produce all the E-mails that
 5  you have on your hard drive whether in your sent mail or
 6  in your in-box or anywhere on your computer that relate
 7  to communications with plaintiffs' counsel in the Vioxx
 8  litigation?
 9    A    Sure.  I don't -- will I have time to do it at
10  lunch?
11    Q    That would be great if you can work any
12  Internet connection and print them out.
13         MR. ROBINSON:  And you can get it after the
14  depo, whatever you prefer.
15  BY MR. GOLDMAN:
16    Q    I would prefer at lunch.
17    A    Yes, whatever is easy.  There aren't many, but
```

Ex 1 - 5-26-06 depo transcript

```
18    they are there.
19        Q    Have you kept notes of conversations that you
20    have had with plaintiffs' counsel in the Vioxx
21    litigation?
22        A    No.
23        Q    Did you have notes at one point and then
24    discarded them, or did you not take notes at all?
25        A    I didn't take notes.
0017
 1        Q    When were you first contacted, Dr. Pechmann, to
 2    be an expert in this case?
 3        A    December of 2005 -- end of December.
 4        Q    Who contacted you?
 5        A    Mark Robinson.
 6        Q    What did Mr. Robinson ask you to do?
 7        A    He first explained the case said that he had a
 8    case on Vioxx and asked if I would be interested in
 9    working as an expert, reviewing the integrated marketing
10    campaign, or the marketing campaign he probably said.
11    I'm not sure if he used the words integrated marketing.
12            And then we discussed the case a little bit
13    more and realized that Ogilvy was involved, which was
14    the same firm that I worked on the anti-drug campaign.
15            And so at that point, I knew that this was a
16    highly-sophisticated integrated marketing campaign with
17    extensive research because that is the way Ogilvy is.
18            And so I became interested in serving as an
19    expert because I knew there would be a lot of studies to
20    review and a lot of research.  And it wouldn't just be
21    my opinion.  There would be a lot of data and
22    statistics.
23            That is my area of expertise.  I really am a
24    scientist.  That is what I am comfortable doing and I
25    knew that I would know this research because we did
0018
 1    similar research in the anti-drug -- let me just say,
 2    too, that I also helped oversee the census ad campaign.
 3            They did an big integrated campaign to get
 4    people to fill out the census, and I have been involved
 5    in other integrated campaigns; but the anti-drug one was
 6    the most comparable; similar research techniques, and
 7    vendors; and I was most involved in this one.
 8        Q    So in late December 2005, Mr. Robinson, who is
 9    one of the plaintiffs' lawyers in these cases, called
10    you up and explained the case to you; right?
11        A    Well, I think -- not really explained the case.
12    He just said there was a Vioxx case and he thought he
13    might want a marketing expert.
14            Then I tried to explain -- and then I explained
15    to him that -- we spoke and then he said Ogilvy.  And I
16    said, oh, I worked at Ogilvy.
17            And I tried to explain to him that it was
18    probably a very sophisticated marketing campaign with
19    lots of research.  And that I think I would be able to
20    help out.  That is my area of expertise.
21            And so then that is when he decided to retain
22    me.  And then as I looked at the documents, I realized I
23    was correct.
24        Q    Why did Mr. Robinson say he was considering
25    using you as a marketing expert?
0019
 1        A    Because we -- I was involved in a tobacco
 2    litigation called Daniels.  And he -- that was a class
```

```
                              Ex 1 - 5-26-06 depo transcript
 3      action case, and he had another related class action
 4      case.
 5                  So the lawyer in Daniels asked me if I would
 6      work with Mark, too.  So I think we met once -- maybe
 7      not with Mark, but with someone else at his firm.  So
 8      they knew who I was.
 9                  You will have to ask Mark exactly why he
10      thought of me.  The reason he knew me was that I was --
11      I had worked with him for -- for a few hours on that
12      other case.
13                  Their other case ended up not going anywhere.
14      So I don't think that I ever submitted a bill or
15      anything, but I do recall that at one point we met with
16      somebody at his firm.  I don't remember -- really
17      remember if it was Mark or someone else.  He probably
18      remembers.
19           Q    What specifically did Mr. Robinson ask you to
20      do after you expressed an interest in the case?
21           A    To -- he asked me to come get the documents and
22      start looking at them.
23           Q    When did he formally retain you as an expert
24      witness?
25           A    I -- I think maybe even the first day we spoke,
0020
 1      he made it clear that he wanted me to start working on
 2      it.
 3           Q    So you were retained the end of 2005?
 4           A    Right.
 5           Q    When did you start your work on the case?
 6           A    I would have to refer to my invoices.
 7                MR. ROBINSON:  They are coming.
 8                THE WITNESS:  I think it was December or
 9      probably early January.  I recall it being right around
10      New Year's.  So I believe I started after and in January
11      after New Year's, but maybe I started it at the end of
12      December.
13      BY MR. GOLDMAN:
14           Q    When did you form the opinions, Dr. Pechmann,
15      that you express in your report?
16           A    I finalized my opinions when I finalized the
17      report at the -- I prepared a semifinal report at the
18      end of last month, end of April.
19           Q    Had you reached your opinions about Merck's
20      marketing campaign before you finalized your report at
21      the end of April, 2005?
22           A    No.
23           Q    So you were actually forming your opinions as
24      you were writing them?
25           A    As I was looking at the research -- looking at
0021
 1      the research and what the research said, and it took a
 2      while to get the documents.  So they kind of trickled
 3      in.
 4                  It wasn't really until then when I had the
 5      complete set of documents and all -- by "documents," I
 6      mean these extensive research reports and data and
 7      interpretations of the data; and the statistical
 8      analyses.
 9                  And I looked at each set of findings, assessed
10      the validity of the research, the validity of their
11      conclusions.  Stepped back:  What does this really mean
12      in terms of what the campaign was doing?
13                  And then by the end of last month, I had
```

Page 9

Ex 1 - 5-26-06 depo transcript

14    reached the conclusions that are in my report.
15        Q    When did you begin to receive documents to
16    review that were sent by Mr. Robinson's firm?
17        A    Early January or maybe end of December.  I
18    can't remember the first date that we met.
19             After we spoke on the phone, I came to his
20    offices and picked up some documents then.
21        Q    When did you begin to review the extensive
22    research reports that you say that you reviewed?
23        A    In January.
24        Q    Well, you said it took a while for you to get
25    all of the documents --
0022
1        A    Well, some of them were --
2        Q    -- and so I am trying to get a sense from when
3    you received the materials that you really wanted to
4    review.
5        A    I started to receive them in January, yeah.  So
6    we received -- I received some of the materials right
7    away.  And some I received in February.
8             I received a huge slue towards the end of
9    February.  And then I received some in March.  And then
10   I think we uncovered a few more in early April.
11            After that, I don't think there were any new
12   ones.  It was just a matter of me going through them
13   all.
14        Q    So the big shipment of documents that you
15   received from the plaintiffs' lawyers came in February
16   of 2005?
17        A    Right.
18        Q    At the end of February?
19        A    Towards the end.  I can also --
20            MR. ROBINSON:  We are going to get them.  Why
21   don't we defer those questions until we get her bills
22   back?
23            THE WITNESS:  Yeah.  Mid to end of February.
24   BY MR. GOLDMAN:
25        Q    If we need to see your invoices for this, we
0023
1    can wait for this, too, but do you know how much time
2    you have actually spent reviewing documents prior to the
3    time you formed your opinions in this case?
4        A    I would have to look to give you the exact
5    number.  I would have to look at the invoices.
6        Q    Okay.
7        A    But, roughly, 200 hours.
8        Q    Do you know how many pages of documents you've
9    reviewed in those 200 hours?
10        A    I reviewed the documents that are in those
11   boxes.  So I have no idea how many pages that is.
12        Q    We will mark the boxes later, but you have
13   produced to me here --
14        A    Five boxes.
15        Q    -- one, two, three, four, five.  Five boxes of
16   documents; right?
17        A    Right.
18        Q    And we will inventory those five boxes of
19   documents shortly.  Okay.
20            How much are you charging the plaintiffs'
21   lawyers to testify in this litigation, ma'am?
22        A    $350 an hour.
23        Q    Do you keep that money or does it go somewhere?
24   Like charity?

Page 10

Ex 1 - 5-26-06 depo transcript

```
25        A    I am putting it in my child's college fund.
0024
1         Q    Good idea.
2         A    She is four.  So I have some time, but college
3    costs a lot.
4         Q    How many different meetings or conversations
5    have you had with plaintiffs' counsel in the Vioxx
6    litigation?
7              And if you could try to give it to me in
8    chronological order, great.  If you need your invoices
9    to be able to do that, then we can wait.
10        A    I think I could do it.
11             So we spoke at the end of December on the
12   phone.  We met in January.
13        Q    How long did you speak on the phone in
14   December?
15        A    An hour.  And then we met for -- well, you
16   know, it might help to look at the invoices, to tell you
17   the truth.
18        Q    You mentioned that you had served as an expert
19   witness for Mr. Robinson's firm.  Was that against
20   tobacco companies?
21             MR. ROBINSON:  I think I am going to object.
22             THE WITNESS:  I didn't actually say I worked
23   for his firm.  They approached me about being an expert
24   in the case, but the case never went anywhere, so I
25   never --
0025
1              MR. ROBINSON:  Were you actually deposed in
2    Daniels?
3              THE WITNESS:  Yes.
4              MR. ROBINSON:  I wasn't a lawyer on Daniels.
5    So I --
6    BY MR. GOLDMAN:
7         Q    Have you done any consulting work for the
8    Robinson, Calcagnie, and Robinson firm relating to
9    tobacco?
10        A    No.
11             MR. ROBINSON:  I want to say I did meet --
12             (Telephonic interruption.)
13             THE WITNESS:  "Work" meaning paid work or --
14   BY MR. GOLDMAN:
15        Q    Paid or pro bono work?
16        A    I would say it was a preliminary meeting.
17             MR. ROBINSON:  We had a consultation meeting.
18             THE WITNESS:  Well, yeah --
19             MR. GOLDMAN:  Mark, I am trying to get the
20   witness to answer, not you.
21             MR. ROBINSON:  Okay.
22             THE WITNESS:  In my mind, I would not
23   characterize it as working for them because I was not
24   billing.  It was just a meet -- an initial meeting where
25   we met as a group and talked about some issues regarding
0026
1    the case.  And I believe I mostly just sat in and listened
2    to what another expert was saying and that is my
3    recollection.  I was really there for the Daniels' case;
4    but in the back of my mind, I knew that the Robinson,
5    Calcagnie, Robinson firm had another case that I might
6    get involved in; but it never went anywhere, so --
7    BY MR. GOLDMAN:
8         Q    Would it be incorrect then to say that you were
9
```

Page 11

Ex 1 - 5-26-06 depo transcript

10  a consultant, or did consulting for Mr. Robinson's firm
11  in the tobacco litigation in 2004?
12      A    I don't know how you want to characterize it.
13  I met with some of the attorneys for an afternoon.  I
14  was never retained as an expert or paid, so --
15      Q    Dr. Pechmann, let me ask you whether you agree
16  with this or not:  Were you a consultant, whether you
17  were paid or not, for Mr. Robinson's firm in the tobacco
18  litigation in 2004?
19      A    To be conservative, I would will say yes
20  because I did meet with him that afternoon.
21      Q    Your C.V. indicates that you have been a
22  consultant to that firm from 2004 to the present in
23  tobacco litigation; is that not accurate?
24      A    It is not accurate.  My C.V. says that?
25      Q    Page 11.
0027
1       A    Wow, that is wrong.  I know at the time that I
2   wrote that -- I am thinking about this.  I knew that the
3   case could warm up or could reappear.
4            So at the time I wrote that, I knew I was on
5   hold, but when I spoke to Mark on this case, he said
6   that other case had pretty much died.
7            I should fix that now.
8       Q    Have you served as an expert witness in cases
9   involving tobacco?
10      A    Yes.
11      Q    Have you served as an expert witness in any
12  other type of case?
13      A    Yes.
14      Q    What other cases have you been an expert in?
15      A    One of my first -- I participated in a case
16  involving comparative advertising and --
17      Q    What is comparative advertising?
18      A    Comparative advertising is advertising where
19  the sponsoring brand names the competitor brand and
20  shows their trademark and uses their trademark.
21           And this case involved a Canadian trademark law
22  and whether the comparative ad complied or did not
23  comply with Canadian trademark law.
24      Q    Other than tobacco cases and this Canadian
25  trademark case, what other cases have you testified as
0028
1   an expert witness in?
2       A    I testified in an arbitration for Rogers and
3   Sheffield involving sales force negotiations.
4       Q    Are you looking somewhere on your C.V.?
5       A    Yes.  Right here, on Page 12.
6       Q    Which entry is that?
7       A    Rogers and Sheffield about halfway down the
8   list on Page 12.
9       Q    Did you testify as an expert in this case?
10      A    In an arbitration, yes.
11      Q    And what was that case about?
12      A    It was a long time ago, but it had to do with
13  sales representatives discussion of a product.
14      Q    What product?
15      A    I believe it was a high tech product.
16      Q    Where did the sales representatives work?  What
17  company?
18      A    I have no idea.  I cannot remember.
19      Q    Do you have any transcripts or reports that you
20  generated in that case?

Ex 1 - 5-26-06 depo transcript

```
21     A    No.
22     Q    What was the name of the lawyer who you worked
23  with at Rogers and Sheffield on the arbitration?
24     A    I can't remember.  It was a long time ago.
25     Q    When was it?
0029
 1     A    Late '80's.
 2     Q    Can you be anymore specific about your expert
 3  testimony in the case that you worked on for Rogers and
 4  Sheffield in the late 1980's?
 5     A    I believe it had to do with whether the sales
 6  representatives were complying with a contract.  They
 7  had a contract to maybe sell this product and not a
 8  competitive product; and what they were doing was
 9  selling the competitor product in violation of the
10  contract.
11     Q    So what was your role?
12     A    I think it was just to discuss what would
13  typically happen in these types of conversations and
14  how -- what typically would happen compared to what did
15  happen.  And I really can't remember the details.
16     Q    When you say it was part of your role to
17  testify about what typically happens in these types of
18  conversations, what are you talking about?
19     A    A face-to-face sales meeting.
20     Q    With whom?
21     A    So it was with a sales rep and a company, a
22  buyer at a company versus a sales rep.
23     Q    And what expertise do you have in knowing what
24  types of conversations typically occur between buyers at
25  companies and sales reps?
0030
 1          MR. ROBINSON:  I'm sorry.  Are we back on the
 2  1988 thing?
 3          MR. GOLDMAN:  Yes.
 4          THE WITNESS:  I teach a course that covers that
 5  topic.  Sales -- that covers as part of the material.
 6  BY MR. GOLDMAN:
 7     Q    What is the course that you teach on sales
 8  representative's interactions with buyers at companies?
 9     A    Marketing Management -- actually, it was called
10  Principles of Marketing.
11     Q    What types of --
12     A    Or manage -- or Marketing Management, one of
13  those two titles.
14     Q    What types of sales reps do you discuss in that
15  course?
16     A    We discuss a variety of sales rep encounters.
17  I stress that what happens between a sales rep and a
18  buyer is very consistent across industries.
19     Q    What does that mean?
20     A    Meaning, that the same techniques apply.
21     Q    What are the techniques?
22          MR. ROBINSON:  I am going to object.  This
23  calls for a narrative.
24  BY MR. GOLDMAN:
25     Q    You can answer.
0031
 1     A    Okay.  Well, you get to know the buyer.  You
 2  know your product.  You figure out the match between
 3  your product and what the buyer wants.  You interview
 4  the buyer.  You --
 5     Q    So these --
```

Ex 1 - 5-26-06 depo transcript

```
  6              MR. SKIKOS:  Let her finish.
  7  BY MR. GOLDMAN:
  8       Q    I now get the point.
  9       A    Okay.
 10       Q    The types of interactions that you are
 11  describing between the sales representatives and buyers
 12  of companies are different between the noninteractions
 13  between sales reps that sell drugs and doctors; true?
 14       A    No, they are similar.  I mean, that is an
 15  extensive encounter with a sales representative; but
 16  then there could be brief encounters, too, where you
 17  just drop off a sample or drop off information; pop in
 18  and ask if they have any questions or concerns.
 19              So there is a variety of different sales
 20  encounters and I taught that in the course.
 21       Q    Are you holding yourself as an expert,
 22  Dr. Pechmann, in the interactions between sales
 23  representatives and physicians?
 24       A    I am holding myself out as an expert in
 25  integrated marketing communications, and one major
0032
  1  communication is between a sales rep and the doctor.
  2       Q    Have you ever surveyed doctors about their
  3  interactions with pharmaceutical sales representatives?
  4       A    No.  I have not personally done the surveys.
  5       Q    Have you ever --
  6              MR. SKIKOS:  She is not finished.
  7              MR. ROBINSON:  Were you finished with your
  8  answer?
  9              THE WITNESS:  Yes.
 10  BY MR. GOLDMAN:
 11       Q    Had you ever conducted any surveys or research
 12  of pharmaceutical representatives?
 13       A    I have not done research on pharmaceutical
 14  representatives.
 15       Q    Have you ever -- go ahead.
 16       A    I have done extensive reading on -- in ad
 17  journals about those types of encounters.  So I am
 18  familiar with the research, quite familiar with the
 19  research, but myself have not done that research.
 20       Q    What publications are you thinking about that
 21  discuss interactions between pharmaceutical sales
 22  representatives and doctors?
 23       A    Well, in my -- one of my folders, I have
 24  several articles.  A whole pile of articles, actually.
 25       Q    Would you find those for me on a break?
0033
  1       A    Sure.
  2       Q    Okay.  Other than the comparative advertising
  3  case where you testified about Canadian trademark law
  4  and the case in the late 1980's when you were talking
  5  about sales representatives and their interactions with
  6  buyers of products, what other cases have you worked as
  7  an expert witness in other than tobacco?
  8       A    I was involved in the case against Orange
  9  County.  Munger, Tolls and Olson was the law firm and I
 10  conducted research for them regarding changing the venue
 11  from Orange County to some other neutral county.
 12              And I did an analysis of the media coverage of
 13  the Orange County bankruptcy to argue that -- to reach
 14  the conclusion that, that citizens of Orange County had
 15  seen extensive negative coverage of -- you know, of --
 16  actually, it is the -- it was one of the financial firms
```

Ex 1 - 5-26-06 depo transcript

```
17   that worked with Orange County.
18           One of the accounting firms that worked at
19   Orange County that worked through Munger, Tolls and
20   Olson -- I can't remember.  Maybe it was Merrill Lynch.
21   I'm not sure what firm it was in.
22           Orange County was in bankruptcy.  There was an
23   accounting firm that worked with Orange County.  They
24   were faced with litigation and I assessed the media
25   coverage in Orange County with regard to moving the
0034
1   venue outside of Orange County.
2       Q    Remind me, and jurors, who might hear this --
3       A    Oh, here it is.  It is Merrill Lynch.  Yes.  It
4   was on my vitae.  Sorry.
5       Q    What was the -- why were you -- withdrawn.
6           Tell me about the issue about moving the venue
7   of Orange County, briefly.
8           What does that have to do --
9       A    Well, they wanted to find out what the
10   newspapers were saying about Merrill Lynch.
11      Q    Oh, you are talking about a litigant, who was
12   interested in knowing whether they should move a case
13   away from Orange County based on publicity that was
14   made?
15      A    Correct.
16      Q    Okay.  Can you name any other cases that you
17   have testified or consulted as an expert?
18      A    No.
19      Q    Have you ever consulted or testified as an
20   expert in a case involving prescription drugs?
21      A    No.
22      Q    Let me hand you a corrected copy of your
23   report.
24      A    Okay.
25           MR. GOLDMAN:  I will mark this as Exhibit 2.
0035
1           (Defendant's Exhibit 2 was marked
2           for identification by the court
3           reporter.)
4   BY MR. GOLDMAN:
5       Q    Just for the record, the corrected copy
6   contains a few corrected citations; right?
7       A    Correct.
8       Q    The opinions that you expressed and the
9   substantive changes that you made in your original
10   report have not changed?
11      A    Correct.
12      Q    When did you start writing your report,
13   Dr. Pechmann?
14      A    I think towards the end of January, mid to --
15   middle of January, yes.  So as you see here on the
16   invoice there was a week in January where I started to
17   work on the report.
18      Q    Can I get a copy now of the time entries?
19           MR. ROBINSON:  We gave you one.  I handed you a
20   stack of stuff.
21           MR. GOLDMAN:  I will mark as Exhibit 3, your
22   time records for the time you have spent in the Vioxx
23   litigation.
24           (Defendant's Exhibit 3 was marked
25           for identification by the court
0036
1           reporter.)
```

EX 1 - 5-26-06 depo transcript

2  BY MR. GOLDMAN:
3      Q    Is that right, Dr. Pechmann?
4      A    Yes.  I have to state now that it was actually
5  March that things were -- is it was not February.  It
6  was March when --
7          MR. ROBINSON:  When what?
8          THE WITNESS:  -- when I started to get a lot of
9  documents.  I was one month off.
10  BY MR. GOLDMAN:
11     Q    So you --
12     A    I didn't do any work in February.
13     Q    You started to prepare your report in January
14  of 2006 and then you received the bulk of your materials
15  to review in March of 2006; right?
16     A    I received a lot of materials in January.  So I
17  said I spent about half of the time on research and half
18  of the time understanding other aspects of the case like
19  the depositions of the marketing experts and what the
20  FDA said about the product.
21          Right from the beginning, I could see all of
22  the ads that they used.  So there was quite a bit that I
23  had received in January.  And then I found many --
24  working with the attorneys, I found many additional
25  documents that I was receiving in February and reviewing
0037
1  in February and March.
2          MR. ROBINSON:  I'm sorry.  February?
3          THE WITNESS:  I'm sorry.  I keep saying it
4  wrong.
5          MR. ROBINSON:  Right.
6          THE WITNESS:  March and April.
7  BY MR. GOLDMAN:
8      Q    Can you tell me looking at the first page of
9  Exhibit 1 -- Exhibit 3, what these handwritten notes
10  mean?  Are they your handwritten notes?
11     A    I'm sorry.  Page 1?
12     Q    Yes.
13     A    Yes.  So these are hours that I spent just over
14  the past week on refreshing, getting back up to speed on
15  my report and on all of the studies that I had reviewed.
16     Q    So today is May 26th; right?
17     A    Is it?
18     Q    And you worked two hours on May 20th,
19  four-and-a-half hours on May 22nd, five-and-a-half hours
20  on May 23rd; right?
21     A    Well, I am a little confused because you said
22  today is the 26th.  So something must be wrong with the
23  dates.
24          MR. ROBINSON:  Thursday was not May 24th.
25          THE WITNESS:  Okay.  Thursday was the 25th.
0038
1          Got it.  That's right.  Okay.  I'm sorry.
2          Can you ask me the question again?
3  BY MR. GOLDMAN:
4      Q    Did you work two hours on May 20,
5  four-and-a-half hours on May 22nd, five-and-a-half hours
6  on May 23rd?
7      A    Correct.
8      Q    Did you work at all yesterday May 24th
9  preparing for your deposition?
10     A    Yesterday was May 25th.  That is where I made
11  the typo.
12     Q    Got it.

Page 16

Ex 1 - 5-26-06 depo transcript
```
13       A    Yes.  I did work yesterday.  I spent most of
14  the day with Steve.  I think we started at 10:00 in the
15  morning and finished -- I should have written it down --
16  maybe 7:00 at night.
17       Q    Can I write that down on this exhibit?
18       A    Sure.
19       Q    So on May 25th, you worked with Steve and
20  Steve's last name is Skikos?
21       A    Skikos.
22       Q    And he is one of the plaintiffs' lawyers in the
23  case?
24       A    Yes.
25       Q    So you worked with Steve Skikos from 10:00 A.M.
0039
1   to 7:00 P.M.?
2        A    Yes.
3        Q    What did you guys work on?
4        A    I went through each of the studies that I
5   reviewed and described what the study was, what was the
6   method; what I called -- what I called the method; what
7   my background was in that type of research; what was the
8   findings; and how did I reach my conclusions; and my
9   opinions based on those findings.
10       Q    Can you identify each of the studies that you
11  just referred to?
12       A    Yes.  In fact, I took -- I should have asked
13  for copies to be made.  I'm sorry.
14            I took notes as I was going through the
15  documents and so these are all of the different studies
16  and the findings.
17       Q    If you can make a copy on that and I can ask
18  you some questions about that.
19       A    I'm sorry.  I was not thinking.
20       Q    Looking at the second page, Dr. Pechmann, on
21  Exhibit 3, it indicates that between December 28, 2005
22  and January 19th, 2006, you worked for 123 1/2 hours for
23  a total of $43,225; right?
24       A    Yes.
25       Q    And do you know based on the entries on this
0040
1   page, which of the entries relate to discussions with
2   plaintiffs' counsel, and which related to your own
3   independent work?
4        A    Well, I know that the -- though, I am not 100
5   percent certain.  I know that one of these -- I would
6   assume -- my guess would be that the 28th -- the time on
7   the 20th is when we met.  And then --
8        Q    That was for two-and-a-half hours with
9   Mr. Robinson?
10       A    I am not 100 percent certain, but that is what
11  I believe it represents, yes.  And I am not -- I don't
12  remember meeting with him again at all at that time.
13       Q    What about meetings --
14       A    With anyone.  Let me explain that.
15            There is another attorney in the office, Lexi
16  Myer --
17       Q    Um-hmm.
18       A    -- who lives right by my house.  So she would
19  drop off boxes of documents at my house.  I wasn't
20  teaching in January.  So I was not down there that much.
21       Q    Which of the entries on Exhibit 3 in the first
22  page where you list your hours relate to meetings with
23  plaintiffs' counsel other than Mr. Robinson?
```

Ex 1 - 5-26-06 depo transcript

```
24              MR. SKIKOS:  I think you mean the second page;
25    don't you?
0041
 1              MR. GOLDMAN:  The first page with the detail.
 2    Let me ask the question again.
 3         Q    On Exhibit 3, second page, can you tell me
 4    which of the entries there relate to meetings or
 5    telephone conversations you had with plaintiffs' counsel
 6    other than Mr. Robinson?
 7         A    I don't recall there being any other meetings,
 8    but there could have possibly been a brief phone
 9    conversation saying more documents were coming or
10    describing the documents, or me requesting documents of
11    Lexi when she dropped them off.
12         Q    Okay.  Second page indicates that from March 10
13    to March --
14              MR. ROBINSON:  Actually, this is the third
15    page.  I'm sorry.
16              THE WITNESS:  Yeah.
17    BY MR. GOLDMAN:
18         Q    The third page of Exhibit 3 indicates that you
19    worked 34 hours from March 10th, 2006, through
20    March 17th, 2006; right?
21         A    Yes.
22         Q    So you did not work on the Vioxx litigation or
23    your report at any point between January 19th and
24    February 10, 2006; correct?
25         A    March 10th.  You are doing the same thing as
0042
 1    me.
 2         Q    Sorry.
 3         A    March 10, correct.
 4         Q    Am I right, Dr. Pechmann, that you didn't work
 5    on the Vioxx litigation or your report or reading
 6    documents at any point between January 19, 2006 and
 7    March 10, 2006?
 8         A    Correct.
 9         Q    Are any of the entries on the third page of
10    Exhibit 3 meetings you had with plaintiffs' counsel?
11         A    Yes.
12         Q    Which ones?
13         A    I believe it is 3/15/06 and I can check with my
14    organizer, but I think the 4:00 P.M. to 11:00 P.M. was
15    the trip I took to San Jose to meet with Steve Skikos.
16         Q    And during your meeting with Steve Skikos on
17    March 15 of 2006, did you review your draft report with
18    him?
19         A    I actually should clarify that Mark was also
20    there.  So Mark was up there.  Steve was there, and I
21    was there.
22              No, we didn't spend much time.  Maybe we spent
23    a little time on the draft report, but I spent a lot of
24    time describing the type of research that I know goes
25    into this campaign and describing the types of documents
0043
 1    I still wanted to see to help me understand what was
 2    going on with this campaign.
 3         Q    Did you meet with Mr. Robinson and Mr. Skikos
 4    to obtain feedback on the report that you had drafted in
 5    January of 2006?
 6         A    They didn't tell me why we were meeting.
 7         Q    That wasn't my question.
 8              When you met with plaintiffs' counsel on March
```

Ex 1 - 5-26-06 depo transcript

9   15th of 2006, did you obtain feedback on the report that
10  you had drafted in January?
11       A    Yes, I received something back.
12       Q    Did you discuss strategy with Mr. Robinson and
13  Mr. Skikos on March 15th, 2006?
14       A    What do you mean by "strategy"?
15       Q    Well, you wrote it down on the third page and
16  you say, "Tasks:  Discuss strategy."
17            So tell me what strategy you discussed with
18  Mr. Robinson and Mr. Skikos on March 15 of 2006.
19       A    I can't be certain what I was thinking when I
20  wrote that, but my recollection is that we extensively
21  discussed the general orientation of the report.
22            And I said that I wanted it to be focused on
23  marketing and the marketing research and not just -- not
24  on the medical issues.  So not on, you know, what the
25  FDA said or what any of their other medical experts
0044
1   said; or what the articles were that I wanted to focus
2   and research -- I wanted to focus the report on what my
3   area of expertise was, which was marketing research.
4            And they agreed that it was a good thing to do.
5        Q    Did you then revise your report after you
6   obtained feedback from plaintiffs' counsel on March 15,
7   2006?
8        A    I would say I extended the report and I put the
9   medical part of it in the Appendix.  So I reorganized
10  it.
11       Q    When you say the medical part of your report,
12  you are referring to your opinion about what Merck knew
13  or should have known about the cardiovascular risks
14  associated with Vioxx?
15       A    Yes, and I am also referring to the FDA
16  regulations.
17       Q    Would you agree with me, Dr. Pechmann, you are
18  not an expert of what Merck knew or should have known
19  about the cardiovascular risks associated with Vioxx?
20       A    I formed an opinion about what they knew or
21  should have known.  I think that I have enough expertise
22  as a scientist to understand what the FDA was telling
23  them and what some of the basic studies were about.
24            And, yes, I do think I have expertise to answer
25  that question.
0045
1        Q    Dr. Pechmann, are you holding yourself out as
2   an expert in what Merck knew or should have known about
3   the cardiovascular risks associated with Vioxx?
4        A    Yes.
5        Q    What experience do you have, ma'am, in the
6   cardiovascular risks associated with COX-2 inhibitors?
7        A    I read what the FDA reports were on Vioxx.
8        Q    What reports?
9        A    Of the Advisory Committee Report.
10       Q    And you read that after you were retained as an
11  expert in this case; correct?
12       A    Yes.
13       Q    Okay.
14       A    I read the -- the reports of the staff at FDA
15  that -- that preceded the Advisory Committee Report, so
16  the medical officers reviews.
17            I read the Vigor Study that was published in
18  the Journal of American -- I mean, New England Journal
19  of Medicine.

Page 19

Ex 1 - 5-26-06 depo transcript

```
20        I read all of the subsequent editorials and
21   rejoiners that appeared in the New England Journal of
22   Medicine.  Let's see, what else?
23        And I read the label -- the proposed label for
24   Vioxx and all of the labels for Vioxx -- the proposed
25   labels and the actual labels.
0046
 1        Q    Have you told me all of the reasons why you
 2   think you are an expert in what Merck knew or should
 3   have known about the cardiovascular risks associated
 4   with Vioxx?
 5        A    I believe I have, but I may have missed
 6   something.
 7        Q    We will examine the Appendix a little bit
 8   later.  Okay?
 9        A    Okay.
10        Q    Why did you tell the plaintiffs' lawyers that
11   you wanted to put the section about what Merck knew or
12   should have known in an Appendix and not in the thrust
13   of your report?
14        A    Because I wanted the main body of the report to
15   talk about the integrated marketing campaign.
16        Q    Would you agree that at least you think you
17   have the experience to offer the opinions in the thrust
18   of your report, but you have real questions about
19   whether you have the experience to offer opinions about
20   what is in Appendix A?
21        A    No, I don't agree with that at all.  Really, it
22   was more of an editorial thing.  That it didn't flow
23   well to have that material in the Appendix in the front
24   end.
25        If I had been uncertain about my opinion, I
0047
 1   would not put it in the Appendix.  I would have taken it
 2   out completely.
 3        Q    In Exhibit 3, Page 3, you bill Mr. Robinson
 4   $11,942 for 34 hours work; right?
 5        A    Well, I billed $42 for the taxi.  So 11,900 for
 6   the work.
 7        Q    And the only meeting that you think occurred
 8   and the only material communications you think occurred
 9   here were on March 15, 2006?
10        A    That's my recollection, yes.
11        Q    Okay.  If you can turn to the next page.
12        This is the time you spent from March 30, 2006
13   through April 28, 2006, and you worked 67 hours during
14   that time frame; right?
15        A    Yes.
16        Q    For a total of $23,450; right?
17        A    Correct.
18        Q    And then here under Tasks, you wrote:
19        "Reviewed additional documents,
20        revised expert report, and met with
21        Paul Sizemore, Chris Spiro" --
22        A    Spiro.
23        Q    -- "Mark Robinson, Shannon Lukei --
24        A    Lukei.
25        Q    -- "other attorneys and a Vioxx
0048
 1        Sales representative."
 2        A    Yes.
 3        Q    Let's talk about that meeting.  How did that
 4   come about?
```

Page 20

Ex 1 - 5-26-06 depo transcript

```
 5              MR. ROBINSON:  The sales reps, you mean?
 6   BY MR. GOLDMAN:
 7       Q    Is this one meeting that you had with Paul
 8   Sizemore, Chris Spiro, Mark Robinson, Shannon --
 9       A    No.
10       Q    Different meetings?
11       A    Yes.  Well, I believe on one day, I met with
12   Paul Sizemore and Mark Robinson briefly.  I met with
13   Shannon Lukei very briefly -- actually, I spoke with
14   Shannon Lukei over the phone.  I'm not sure I met her in
15   person.
16       Q    Um-hmm.
17       A    But she was the one that arranged the meeting
18   with a Vioxx representative because it was her friend.
19       Q    Who is Shannon Lukei?
20       A    She works part-time in Mark Robinson's office
21   as an attorney.
22       Q    You also indicate that you met with Chris
23   Spiro.  When did you meet with him?
24       A    Chris Spiro.
25       Q    Sorry.
0049
 1       A    He was the person who helped me pull the
 2   documents.  At this point, I was teaching at UCI Irvine
 3   and I would stop by their offices after teaching and
 4   pick up documents from him and asked him to look for
 5   certain documents.
 6       Q    When did you meet with Mr. Sizemore and
 7   Mr. Robinson in this time frame?
 8       A    I'm not sure which date it was.
 9       Q    Can you look at the times and try to refresh
10   your recollection as to how much time you spent with
11   them?
12       A    It was a very short period of time.  I remember
13   it was late in the day and Paul wanted to meet with me
14   and so maybe an hour and a half.  And then maybe 15
15   minutes of that Mark was there.
16       Q    And what did you talk about with Mr. Sizemore?
17       A    He discussed the case that he was involved in
18   that he would like me to be an expert on.  It is a case
19   in Florida.
20       Q    Another Vioxx case?
21       A    Yes.  It is in one of these handouts.  It is,
22   actually, in one of these handouts.  It is a case
23   involving Rafik Kozic, K-O-Z-I-C, and it is going to
24   take place -- the trial date is expected to be July 31,
25   2002 in Tampa, Florida.  And it might be televised on
0050
 1   Court TV.
 2       Q    I feel sorry for the viewers.
 3       A    Me, too.
 4       Q    You indicate here that you met with Chris
 5   Spiro.  Do you have any idea how much time you spent
 6   with him as you were discussing the documents?
 7              MR. ROBINSON:  I --
 8              THE WITNESS:  Maybe a total of half an hour to
 9   an hour.  It is mostly just picking things up and --
10   BY MR. GOLDMAN:
11       Q    You also reference here other attorneys.
12              Do you know what other attorneys you met within
13   this time frame, April of 2006?
14       A    I met with an attorney -- Ted is an attorney;
15   right?
```

EX 1 - 5-26-06 depo transcript

```
16          MR. ROBINSON:  Right.
17          THE WITNESS:  Ted Wacker.
18  BY MR. GOLDMAN:
19     Q    Of Mr. Robinson's firm?
20     A    Yes.  I think maybe the same meeting with Paul
21  Sizemore.  He came in and showed us the label or --
22  clarified an issue.  At one point, he came in and
23  clarified an issue with regard to a document.
24     Q    Who did?
25     A    Ted Wacker.
0051
1      Q    What was the issue he clarified?
2      A    We were looking -- I can't remember, but I
3  believe it was where something was on the label -- on
4  the Vioxx label.
5      Q    Do you remember what the something was or where
6  it was?
7      A    Or maybe he just brought in the labels.
8      Q    Is that the first time you have ever seen the
9  Vioxx labels?
10     A    Oh, no.
11     Q    Have you seen the Vioxx labels before this
12  litigation?
13     A    No, I had not.
14     Q    Do you remember any substantive discussions you
15  had with Mr. Wacker about Vioxx's label?
16     A    No, I don't remember.  I believe I just met
17  with him and he gave us the different versions of the
18  label, and possibly explained that there were more than
19  one version.
20          But in terms of cardiovascular risk, they were
21  all about the same until the label changed in April of
22  2002.
23     Q    That is what Mr. Wacker told you?
24     A    He showed us -- he showed me the documents, and
25  then I reviewed them for myself and that is when I
0052
1  reached the conclusion.
2      Q    That?
3      A    That they -- the labels were substantively the
4  same with regard to cardiovascular risk unless the
5  labels changed and included the Vigor Study.
6      Q    On the last page of Exhibit 3, you spent 19
7  hours between May 15 and May 19th and billed $6,650;
8  right?
9      A    Correct.
10     Q    You indicate that you reviewed additional
11  documents.  Do you know, as you sit here today, what
12  documents you reviewed then?
13     A    I remember some of the documents I got towards
14  the end were additional Dear Doctor letters.  The
15  documents that were specific to the Barnett case.  Some
16  of the depositions weren't even taken.
17          And so towards the end, I was reviewing
18  depositions that had just been taken for the Barnett
19  case.  So that was either in May -- well, it was either
20  of these documents involving May hours.
21     Q    How much time did you spend reviewing
22  documents specific to the Barnett case before you
23  reached the conclusions about what Mr. Barnett knew or
24  didn't know about the cardiovascular risk associated
25  with Vioxx?
0053
```

Page 22

Ex 1 - 5-26-06 depo transcript

1    A.   I don't remember exactly, but it was however
2  long it took me to read those depositions and read
3  through all of the exhibits that accompanied the
4  depositions -- the relevant depositions that went with
5  the depositions.
6    Q    So the basis of your opinion about what
7  Mr. Barnett was told and knew about the cardiovascular
8  risks associated with Vioxx is based upon your review of
9  his deposition and the exhibits?
10   A    No.
11   Q    What else is it based on?
12   A    Well, he was part of the integrated -- he was a
13 subject of the integrated marketing communications
14 campaign.
15        So all of the work I did to understand the
16 campaign applies to what happened to him and the
17 doctors.
18   Q    Have you ever met with Mr. Barnett?
19   A    I think, as I recall, one day when I was
20 picking up boxes he happened to be there and I said
21 hello to him.
22   Q    Have you ever spoken to Mr. Barnett about
23 Vioxx?
24   A    No, not that I recall.
25   Q    Have you ever spoken with Mr. Barnett about
0054
1  what effect, if any, and how much -- withdrawn.
2        Have you ever spoken with Mr. Barnett about
3  what importance he attaches to advertising when he makes
4  decisions?
5    A    So what was the question again?  Have I ever
6  spoken to Mr. --
7    Q    To Mr. Barnett what impact, if any, he thinks
8  advertisements has on his decisions?
9    A    I don't believe so.  When we met briefly, we
10 may have spoken a few minutes, but I am not quite sure
11 what we spoke about.  I don't believe we spoke about
12 that.
13   Q    Okay.  On the last page of Exhibit 3, you
14 indicate that you reviewed additional documents, revised
15 your expert report, and met with Paul Sizemore, Chris
16 Spiro and Mark Robinson.
17        Did you meet with those individuals at the same
18 time, on the same day?
19   A    Again, I believe the meeting with Paul Sizemore
20 and Mark was on the same day, and Chris was just picking
21 up documents.
22   Q    Did you review your report with Mr. Robinson
23 and Mr. Sizemore and Mr. Spiro?
24   A    Paul Sizemore went through and commented on
25 typos.  He found a few typos and commented on a couple
0055
1  of words and said, do you want to make -- use that exact
2  word?  Is that precise?
3        You know, basically, said don't overstate your
4  opinion.  Make sure that what you state is something
5  that you can defend, but he didn't get into any
6  specifics.
7    Q    Did you get into any specifics about your
8  expert report with Mr. Robinson or Mr. Spiro?
9    A    No, not that I recall.
10        MR. GOLDMAN:  I am going to mark as Exhibit 4,
11 a document you produced today.  It is a document called

Page 23

```
                              Ex 1 - 5-26-06 depo transcript
12      Merck Vioxx Case Involved Parties and Technical Terms,
13      April, 2006.
14                  (Defendant's Exhibit 4 was marked
15                  for identification by the court
16                  reporter.)
17      BY MR. GOLDMAN:
18          Q    Do you see that?
19          A    Yes.
20          Q    Now -- or April 6th; right?  Is that what that
21      means?
22          A    April, 2006.
23          Q    That is not a day of April; that is the year
24      that you are reflecting?
25          A    Correct.
0056
1           Q    Who prepared this document?
2           A    I did.
3           Q    And it starts off by saying, "Barnett case."
4                "Barnett took Vioxx from late
5                December, '99 or early January,
6                2000 through September, 2004
7                when it was taken off the market."
8                Who told you that?
9           A    I received that information from the depos of
10      the physicians that treated Barnett.  And possibly, he
11      also said it in his depo, but it was from the
12      depositions in this case.
13          Q    Are you sure about that?
14               MR. ROBINSON:  Well, --
15               THE WITNESS:  Yes.
16      BY MR. GOLDMAN:
17          Q    Did you read all of Mr. Barnett's deposition?
18          A    I skimmed through it and then spent more time
19      on parts that were more of greater relevance.  I had it
20      on a PDF on my computer.  Actually, a text file on my
21      computer.
22          Q    Actually, the materials that you reviewed,
23      according to your report, were certain excerpts of
24      Mr. Barnett's deposition.
25               Do you remember those certain pages?
0057
1           A    No, I reviewed the whole deposition.  I cited
2       certain parts in my report.
3           Q    So if, at the end of your report, you have a
4       table or an index listing pages of depositions, are you
5       saying that you actually reviewed the entire deposition
6       and just cited to those particular pages?
7           A    Correct.
8           Q    So the next sentence says, "The
9                Initial prescribing physician was
10               Dr. McCaffrey who refilled Barnett's
11               prescriptions without seeing him
12               through late 2000."
13               How did you know that?
14          A    From the depositions.  I believe from
15      McCaffrey's deposition.
16          Q    "In the meantime, internist
17               Dr. Micola took over Barnett's care
18               and filled Barnett's Vioxx
19               prescriptions after McCaffrey."
20               How did you know that?
21          A    From the depositions.
22          Q    "Trial date July 24, 2006.
```

```
                               Ex 1 - 5-26-06 depo transcript
23               New Orleans (MDL) Mark Robinson lead
24               attorney."
25               How did you know that?
0058
 1      A     Mark -- well, either Mark or Lexi Myer told me
 2   the date and that he was lead attorney.
 3      Q     Then there is a reference to Manzo case, and
 4   there is a discussion about Tony Manzo.
 5               "Tony Manzo took Vioxx August 1, 2003
 6               to December 29, 2003 when he had his
 7               heart attack."
 8               Do you see that?
 9      A     Yes.
10      Q     How did you know that?
11      A     I believe -- I believe Mark Robinson told me
12   that.
13      Q     Do you think that it is possible that
14   Mr. Sizemore told you that, or was it the Kozic case
15   Mr. Sizemore's case?
16      A     Kozic is Sizemore.  This -- I'm pretty sure
17   Mark Robinson told me this.
18      Q     "Rafik Kozic, a former professional
19               Athlete, who still played in club
20               leagues, took Vioxx in February, 2001
21               through April, 2001, when he had a
22               heart attack, caused by a thrombotic
23               clot."
24               Who told you that?
25      A     Paul Sizemore.
0059
 1      Q     Does it appear to you, Dr. Pechmann, that this
 2   document reflects notes that you took during a meeting
 3   with Mr. Robinson and Mr. Sizemore?
 4      A     These were two separate meetings, yes.  Um-hmm.
 5   Probably.
 6      Q     And then you list drugs and you have
 7   Naproxen -- actually, let me go back.  What is a
 8   thrombotic clot?
 9      A     I have -- I probably have it described.
10      Q     Well, without looking at your report, can you
11   just tell me --
12      A     Well, it is basically a blocked blood vessel --
13   well, thromboembolic event is a blood clot.  So
14   thrombotic is just a blood clot.
15      Q     And who told you that?
16      A     I think -- basically, I looked these things up
17   in a dictionary.
18      Q     Under drugs, you wrote "Naproxen equals
19               Aleve, comparator in Vigor Study."
20               That was something that Mr. Robinson or
21   Mr. Sizemore told you; right?
22      A     No.  I believe that -- I believe I read that in
23   a document.  In one of the many documents that I read
24   about the Vigor Study.
25      Q     Did you read -- do you see "Celebrex = first
0060
 1   COX-2 inhibitor Pharmacia/Pfizer" -- Did you read that
 2   somewhere?
 3      A     In the marketing documents.  There is a lot
 4   about Celebrex in the marketing documents because that
 5   is the competitor.  That is the major competitor to
 6   Vioxx.
 7      Q     Do you see under Studies it says, "Vigor," and
```

Page 25

Ex 1 - 5-26-06 depo transcript

```
 8      then there is a description about the Vigor Study?
 9              Do you see that?
10          A   Yes.
11          Q   Did you write that based on your own review of
12      the Vigor Study?
13          A   Yes.
14          Q   Do you see in the middle of the paragraph it
15      says, "Three Vioxx deaths were excluded
16                  That if included it would show a
17                  fivefold increase of aspirin
18                  indicated patients and a threefold
19                  marginal significant increase in
20                  nonaspirin indicated patients."
21              Do you see that?
22          A   Yes.
23          Q   Where did you get that?
24          A   From the corrected findings reporter in the New
25      England Journal of Medicine, December 29, 2005.
0061
 1          Q   And the plaintiffs gave you that to read?
 2          A   Yes, I believe they gave it to me.
 3          Q   The Vigor on Label section, is it your
 4      testimony that you prepared that after doing your own
 5      review of the Vigor label?
 6          A   Yes.
 7          Q   What was the Advantage Study?  Without looking
 8      at your notes, can you tell me what the Advantage Study
 9      was?
10          A   It was a study that --
11          Q   You are looking at your notes.
12          A   Oh, I'm sorry.
13          Q   Can you tell me what the Advantage Study was?
14          A   Yes.  It was a study that Merck conducted that
15      was -- I believe it was against a placebo as opposed to
16      Naproxen and they found an increased risk --
17      cardiovascular risk.
18              And so they recommended that it be put on the
19      -- in the label because there was a distinct pattern and
20      it was against a placebo.  So --
21          Q   Was Naproxen in the Advantage Study?
22          A   Oh, no.  I was incorrect.  Wow.  So it was
23      against Naproxen but anyway it was similar to -- it
24      was -- the results were very similar.
25          Q   To what?
0062
 1          A   To the Vigor Study.
 2          Q   How were the results of the Vigor Study similar
 3      to the results of the Advantage Study?
 4          A   Both of them indicated an increase
 5      cardiovascular risk relative to the comparater --
 6      competitor drug for vioxx.
 7          Q   Is it your testimony that there was a higher
 8      statistically significant risk of thrombotic events seen
 9      in the Vioxx arm of Advantage compared to the Naproxen
10      arm of Placebo?
11              MR. ROBINSON:  Calling for an expert opinion.
12              THE WITNESS:  What I would like to do is refer
13      to my description of the Advantage Study.  I don't have
14      everything memorized in here.
15              Later on, I have the information about the
16      Advantage Study that was in the proposed label.  Let's
17      see -- oh, I remember what happened here.  They used
18      aspirin.  That is what was -- that is what they -- in
```

Page 26

Ex 1 - 5-26-06 depo transcript

19    the Advantage Study, they used aspirin.
20         So that is why it was very interesting because
21    it was -- even though there was a change in the
22    protocol, you got very similar results.
23    BY MR. GOLDMAN:
24         Q    What results were similar?
25         A    You saw elevated cardiovascular events for
0063
1     Vioxx versus the comparator drug.
2          Q    Were there more strokes seen in the Vioxx arm
3     than the Naproxen arm of Advantage?
4          A    I would have to refer to the study.  I have a
5     copy of the study and I looked at the study.
6          At this point, I cannot remember what the --
7     exactly what the specifics were.
8          Q    Did you review the Approve Study?  Because all
9     you wrote here is "randomized trial of placebo calls
10    Vioxx withdrawal of September, 2004."
11         A    I believe I was not given it and did not ask
12    for and did not review it -- I'm not sure.  I can't
13    remember.  I have to check.  I may have the article that
14    came out from Approve.
15         Q    Did you review the Alzheimer's studies?
16         A    I reviewed the FDA discussion of these studies.
17         Q    Did you review the Alzheimer's studies?
18         A    You mean the actual studies themselves, no.
19         Q    Yes.
20         A    No.
21         Q    You referred to class on the second -- the back
22    page here, and there is a description of class; is that
23    a description that the plaintiffs' attorneys told you?
24         A    No.  I wrote all of this myself.
25         Q    I know you wrote it yourself, but the
0064
1     information that you were writing --
2          A    No.
3          Q    You read the study?
4          A    I read the study.  I am a scientist.  I read
5     studies all of the time.
6          Q    But you are not a medical doctor?
7          A    No, but I review for the American Medical
8     Association and I review scientific work all of the
9     time.  And I also review medical protocols that come to
10    the institutional review board.
11         Q    Let's skip down to Marketers and Marketing
12    Research.  Is this information that the plaintiffs'
13    attorneys gave to you?
14         A    I don't understand the question.  Can you
15    rephrase?
16         Q    Were you typing this information based on a
17    discussion you had with the plaintiffs' attorneys in
18    this case?
19         A    No.
20         Q    Do you see under Terms, PIR equals Professional
21    Information Request?
22         A    Yes.
23         Q    Did you know that before you became an expert
24    in this case?
25         A    That particular term, I did not know.  I
0065
1     learned it in going through the documents.
2          Q    Did you know the term OBR before you became
3     retained in this case?

Page 27

Ex 1 - 5-26-06 depo transcript

4    A   No, I did not. I learned it in the case.

5    Q   If you turn to the next page, did you know what
6  TRX meant before you became an expert in this case?

7    A   No, I did not. I had to find that in the
8  documents.

9    Q   How about A&A? Did you know what that meant
10  before you were retained as an expert in this case?

11    A   Not this meaning, no. I learned how they
12  defined it in reviewing the materials in this case.

13    Q   Do you see APTC? And you describe what that
14  is?

15    A   Yes.

16    Q   Where did you get that meaning of APTC from?
17        "The Anti-platelet Trial
18        Collaboration = cardiovascular (CV),
19        hemorrhagic (heavy bleeding), and
20        unknown death."

21    A   Found in a document. I am not sure which one,
22  but I found it in a document. I don't remember which
23  one.

24        But as I read a document and I see a term, I
25  would stop and add it to my list here in case it was
0066
1  important.

2        So some things I left out that I should have
3  put in, and some things that I put in, that maybe I
4  didn't end up using that much.

5        But that was one term that I figured I better
6  define because it was complicated.

7    Q   Did you see under Merck -- skip the FDA to now
8  Merck?

9    A   Yes.

10    Q   The individuals you name here: Gilmartin,
11  Anstice, Scolnick, Weiner, et cetera -- where did you
12  get those from?

13    A   I was given their depositions. Or oftentimes,
14  they were on -- their names were on documents that I
15  had. Marketing documents that I had.

16    Q   On the fourth page, you have Academics and you
17  list Kurfm and Bombardier.

18        Do you see that?

19    A   Yes.

20    Q   Why did you write them down?

21    A   Well, those are the -- two of the articles that
22  I reviewed. At that point, I stopped writing down every
23  academic. It would have been too much.

24    Q   Why did you choose the article that reflected
25  the worst on Merck?
0067
1    A   I believe those are the first two articles that
2  I did look at. That is the Vigor and then the
3  comment -- the editorial on Vigor.

4    Q   In that order?

5    A   No. I'm sure I reviewed the New England
6  Journal 2000 first.

7    Q   And then you have a bunch of names under
8  Robinson, Calcagnie and Robinson, and why did you write
9  down those names?

10    A   So I would remember who they were.

11    Q   And then under MDL, you wrote down other names
12  including the name of the judge in New Orleans, Judge
13  Fallon. Why did you write down his name?

14    A   Because if someone mentions the name, I would

Ex 1 - 5-26-06 depo transcript
```
15  know who they are talking about.
16       Q    Who gave you this information about the MDL?
17       A    I believe that Mark gave me the names --
18  Robinson.
19       Q    And then Vioxx Label Change Information, is it
20  your testimony that you wrote all of this after
21  independently reading the material as opposed to
22  being -- the material being explained to you by lawyers?
23       A    I wrote it all myself.  I pulled it off the
24  label and typed it in myself because I felt it was
25  important that I had notes of it.  So I wouldn't have to
0068
1  refer to the original document.
2            If you want to know what I knew about
3  Advantage, it is here on Page 5 -- some of it.
4       Q    Did you read the Victor Study?
5       A    Victor?
6       Q    V-I-C-T-O-R.
7       A    I'm not sure.  What else -- can you describe
8  the study in greater detail?
9            MR. ROBINSON:  We just got that data this week.
10           MR. GOLDMAN:  No, I mean the original.
11       Q    Have you ever read any articles or information
12  about cancer studies that were done with Vioxx?
13       A    I read several articles about Vioxx and they
14  are in my files.  And there is a possibility that one of
15  them involved cancer.
16           I don't remember at the moment because I can't
17  answer that question without referring to my documents.
18           MR. GOLDMAN:  Let me mark this as an exhibit.
19  This is Exhibit 5.
20           (Defendant's Exhibit 5 was marked
21           for identification by the court
22           reporter.)
23  BY MR. GOLDMAN:
24       Q    It is this, Dr. Pechmann.
25       A    Okay.
0069
1       Q    What is Exhibit 5?
2       A    Again, this is Exhibit 5; correct?  This one?
3       Q    The one that has handwriting on it, it starts
4  Scientific Testing of Details with Specific M.D.'s.
5       A    Okay.
6       Q    Can you tell me what this document is?
7       A    This is a document that I prepared yesterday
8  when I met with Steve Skikos.  I started to discuss the
9  science with Steve, and he started to realize that the
10  depth of this -- the depth of this information and the
11  level of detail.
12           And he suggested that I write down relevant
13  information about each study.  So that is what I did.  I
14  went through, pulled out the exhibits and for my own
15  purposes, wrote down relevant information about the
16  method; my background on the method; and then the
17  results.
18           And as I worked on it, I would discuss it with
19  him, certain key parts or I would show him a graph.  He
20  started to become familiar with the scientific studies.
21       Q    Did the attorneys for the plaintiffs assist you
22  in drafting your expert report?
23       A    No, they did not.
24       Q    Did they provide any input?
25       A    They provided the documents.
```

                              Page 29

Ex 1 - 5-26-06 depo transcript

0070
1      Q    Did you ever get any request by the plaintiffs'
2  attorney -- plaintiffs' lawyers to include certain
3  information in your report?
4      A    No.
5      Q    How long did you spend drafting your report?
6      A    I don't have a record of it exactly.
7      Q    Can you give me a ballpark?
8      A    I mean, it would be hard to describe because I
9  might spend two or three hours looking at a study and
10 going page to page; and then I might write a couple of
11 paragraphs or a paragraph.
12          So would that count as half an hour that I
13 wrote the paragraph or the two and a half? But I don't
14 know how you would describe it, but that is how I
15 basically worked.
16     Q    Can you tell me how much time you sat at your
17 computer and typed out your report?
18     A    No, I can't.
19     Q    Do you intend to give opinions at trial,
20 Dr. Pechmann, other than those contained in your report?
21     A    No, I do not.
22     Q    The most current version of your Curriculum
23 Vitae is in your report?
24     A    Vitae, yes.
25     Q    And it is an accurate and complete description
0071
1  of your education and experience?
2      A    Yes.
3      Q    Anything that you want to add to your C.V. that
4  you think is important?
5      A    No.
6      Q    Would you agree, Dr. Pechmann, that the vast
7  majority of your professional life has been spent
8  analyzing the effect of cigarette advertisements on
9  youth?
10     A    No, I would not agree with that.
11     Q    Do you think a lot of your professional life
12 has been analyzing the effect of cigarette ads on youth?
13     A    No.
14     Q    Well, in your report, you say that your two
15 primary areas of experience -- you talk about how you
16 have an international reputation for your work on
17 controversial forms of advertising and their effects on
18 consumers on Paragraph 4 of your report.
19          Do you remember that?
20     A    Yes.
21     Q    What are controversial forms of advertising?
22     A    Well, it is actually described in there in my
23 report; right? So controversial forms of advertising --
24 let's see. What page are you on?
25     Q    Two, Paragraph 4.
0072
1      A    I mean advertising that receives a high degree
2  of scrutiny and criticism by public courts or the
3  government. And I indicate that I have done work on
4  comparative advertising.
5      Q    And then you --
6      A    And also, tobacco-related -- what I mean by
7  that is, both cigarette ads and anti-smoking ads and
8  also various other communications; product placement in
9  movies; in sit-coms; that sort of thing.
10     Q    Would you agree then, Dr. Pechmann, that the

Page 30

Ex 1 - 5-26-06 depo transcript

11  majority of your professional life has been devoted to
12  analyzing the effect of cigarette advertisements,
13  anti-smoking advertisements, and other forms of
14  communication relating to tobacco?
15          MR. ROBINSON:  Andy, when you say "professional
16  life," she teaches things like that, you are excluding?
17          THE WITNESS:  Right.  And I don't agree with
18  that statement, no.  Not the majority.
19  BY MR. GOLDMAN:
20      Q   Have you spent a lot of time, Dr. Pechmann,
21  focusing on cigarette advertisements, anti-smoke
22  advertisements and other forms relating to tobacco?
23      A   Yes, I have spent a lot of time on that topic.
24      Q   It is your view that tobacco advertising
25  entices young people to want to start smoking; right?
0073
1       A   Well, no.  Some -- certain types of tobacco ads
2   entice young people, yes, but not all tobacco
3   advertising.
4       Q   If I represented a tobacco company, I would
5   explore that with you, and I don't.  So I am going to do
6   you a favor.
7           MR. ROBINSON:  Thank you.  Since my case has
8   been dismissed --
9   BY MR. GOLDMAN:
10      Q   Can you describe the type of research that you
11  did, Dr. Pechmann, before forming the view that tobacco
12  advertising at least entices some adolescents to use
13  cigarettes?
14      A   I conducted controlled experiments.
15      Q   Can you be a little more specific about that?
16  What type of experiments?
17      A   Well, just like what Merck did in this case.  I
18  conducted controlled studies where people saw different
19  stimuli, and I compared their reaction statistically and
20  I compared the reactions of different groups of people
21  to different stimuli; and saw that -- that, actually, in
22  my case, regardless of the group, that cigarette ads
23  that I studied increased the youths intent to smoke.
24      Q   How many controlled experiments would you say
25  you have done concerning tobacco advertising?
0074
1       A   All tobacco advertising?
2       Q   Yes.
3       A   Well, let's see.  We can look at my
4   publications.  I would say pretty much all of them have
5   resulted in publications.
6           So I have -- I have publication No. 11 in my
7   vitae on Page 3.  Publication No. 15, 16, 21, 24, 27 and
8   then one other study that is ongoing -- actually, two
9   that are ongoing.
10          So that is one, two, three, four, five, six --
11  eight.
12      Q   So you have conducted in your -- in your career
13  eight different controlled experiments on the effects of
14  tobacco advertising?
15      A   Yes.  And by "tobacco advertising," I mean the
16  broad definition that I described, anti-smoking.
17      Q   How many controlled experiments have you done
18  on pharmaceutical advertising?
19      A   I have not done any.  I just reviewed the
20  studies that were conducted.  Just like I review the
21  studies for journals all the time as a reviewer or on

Ex 1 - 5-26-06 depo transcript

```
22   the editorial review board.
23        Q    My question was a little bit different.
24             How many controlled experiments have you
25   performed on pharmaceutical advertising?
0075
 1        A    None.
 2        Q    Okay.  How much time do you think you spent
 3   researching the question of the effects on adolescents
 4   of tobacco advertising in whatever form?
 5        A    I have no idea.
 6        Q    Thousands?
 7        A    But I have been working on the topic since
 8   1990.
 9        Q    So you spent years focusing on the question of
10   the effects of cigarette advertising on the youth?
11        A    Well, that was one of the things I was working
12   on.  Correct.
13        Q    How many tobacco advertisements have you
14   reviewed in your life you think?
15        A    Hundreds.
16        Q    Do you have a database of tobacco
17   advertising -- advertisements?
18        A    No.
19        Q    Did you ever have a database of tobacco
20   advertisements?
21        A    No.
22        Q    Have you ever used a database of tobacco
23   advertisements?
24        A    Well, by "tobacco," you mean cigarettes or you
25   mean anti-smoking?
0076
 1        Q    Yeah, cigarettes.
 2        A    Yeah.  Have I ever used?  No.
 3        Q    Have you ever actually observed young people as
 4   they watch a television advertisement or some other form
 5   of advertising for tobacco?
 6        A    No.
 7        Q    You never sat and actually watched how a
 8   particular adolescent responds, reacts to a form of
 9   tobacco advertising?
10        A    That's correct.  I have not.  My team of
11   researchers collect the data.
12        Q    Okay.  So you have had teams of people who have
13   gone out and looked at young people and how they react
14   to different forms of tobacco advertising?
15        A    No.  What we do in our studies, just like they
16   did, is we do not take any measures of how people are
17   reacting to the ads, you know, observe them, try to code
18   their reactions.  That is not the type of research I do.
19             What I do is, I ask people to complete surveys
20   and bring the surveys back, and analyze the surveys.
21   Just like Merck did, Merck's people.
22        Q    How many different surveys have you reviewed
23   concerning the effects of tobacco advertising in
24   whatever form?
25        A    How many -- tell me again what is the question?
0077
 1        Q    How many surveys have you conducted or reviewed
 2   concerning the effects of tobacco advertising on the
 3   youth?
 4        A    Well, we just established how many I conducted;
 5   right?
 6        Q    Yes.
```

Page 32

Ex 1 - 5-26-06 depo transcript
```
 7      A    Wasn't it eight?
 8      Q    Um-hmm.
 9      A    And then in terms of how many more articles I
10 have reviewed, maybe 10.
11      Q    When you did your research to form an opinion
12 on the effects of tobacco advertising on adolescents,
13 did you focus on one tobacco company or more than one
14 tobacco company's ads?
15      A    More than one tobacco company.
16      Q    Why didn't you just focus on one?
17      A    I am trying to remember at the time.  I think I
18 wanted to show the subjects of representative samples of
19 cigarettes from different firms.  So I could draw
20 conclusions about cigarette advertising in general.
21      Q    About how many tobacco companies have you
22 looked at in terms of their advertising in your research
23 concerning the effects of tobacco advertising on the
24 youth?
25      A    I haven't studied any of the tobacco companies.
0078
 1      Q    Their advertisements you studied?
 2      A    Yeah.  I said I looked at a couple of hundred
 3 ads probably in the whole time I have been --
 4      Q    What particular companies?  Phillip Morris?  Or
 5 others in the tobacco industry, have you looked at in
 6 terms of what advertisements they used in your analysis
 7 of the question of the effect of the advertisement on
 8 the youth?
 9      A    I don't understand the question.  I'm sorry.
10      Q    You said before that you have reviewed research
11 and conducted research on the effect of tobacco ads on
12 the youth, and that those ads were not just limited to
13 one tobacco company, but to more than one; right?
14      A    Okay.  If you are asking me which companies
15 were representative of the ads that I studied?
16      Q    Yes.
17      A    Reynolds and Morris -- Phillip Morris, and
18 maybe some others, but those are the two.
19      Q    Have you ever compared the type of marketing
20 campaigns that one tobacco company has used compared to
21 a marketing campaign of another tobacco company?
22      A    No.
23      Q    Have you ever assessed the integrated marketing
24 communications campaign of tobacco companies?
25      A    I have reviewed papers that address that topic.
0079
 1 I myself have not conducted research on tobacco
 2 companies integrated campaigns, but I have reviewed
 3 papers that have done that.
 4      Q    What companies have you conducted research on
 5 in terms of their integrated marketing communications
 6 campaigns?
 7      A    I was an expert panel -- panelist that reviewed
 8 the integrated marketing communications campaigns of the
 9 Census Bureau, the anti-drug ad campaign, the
10 Massachusetts anti-smoking campaign.
11      I am trying to think if there were any others.
12 That might be the only ones that I served as an expert
13 panel; but in teaching courses, I reviewed a large
14 number other of integrated marketing communications
15 campaign that have been taught to the students.
16      Q    Have you ever analysed any integrated marketing
17 communications campaigns for any pharmaceutical company
```

Page 33

Ex 1 - 5-26-06 depo transcript
18  other than Merck in this case?
19       A    I have read articles that have assessed their
20  campaigns.  I have not done any prior research on my
21  own.
22       Q    You have never directly analyzed any integrated
23  marketing communications campaign for any pharmaceutical
24  company?
25       A    No, that's not correct.  When I review
0080
1   articles, I am analyzing the campaign.
2        Q    What pharmaceutical companies do you believe
3   you have analyzed in terms of their integrated
4   advertising marketing -- what pharmaceutical companies
5   do you believe that you analyzed in terms of their
6   integrated marketing communications campaign?
7        A    I can't remember specific articles that I have
8   read because that I didn't get together for my report;
9   but over the years, I have read numerous articles on
10  pharmaceutical marketing and integrated marketing
11  campaigns.
12            There are several articles in this journal and
13  I review those on an ongoing basis.  So, you know, that
14  was part of my general knowledge before even coming into
15  this -- into this case.
16            And I have been thinking of starting to do some
17  research in the area, so -- on my own.  So I have been
18  reading those types of articles.
19       Q    Have you ever done any independent research,
20  Dr. Pechmann, on the integrated marketing communications
21  campaigns of any pharmaceutical company?
22       A    Have I done any independent research, no.
23       Q    I noticed that you receive several grants for
24  research for tobacco related research; is that right?
25       A    Yes, it is correct.
0081
1        Q    All of the research grants that you have
2   received have been for tobacco-related research; is that
3   right?
4        A    Yes, that's correct.
5        Q    Would you agree, Dr. Pechmann, that virtually
6   all of your research and publications have been in the
7   area of tobacco advertising or comparative advertising?
8        A    No.  I have several articles on other topics.
9        Q    Would you agree that a vast majority of your
10  research and publications have been in the area of
11  tobacco advertising or comparative advertising?
12       A    I would say the majority.
13       Q    When you were describing --
14       A    But, for example, I was just going to say that
15  in the case of anti-drug campaign, I had not done any
16  independent work on anti-drug; but they still chose me
17  as the national expert to oversee that campaign.  And
18  marijuana is very different from tobacco.
19       Q    Marijuana is also very different from
20  prescription drugs?
21       A    But they are both drugs.
22       Q    But one is allowed and prescribed and one is
23  illegal and not prescribed.
24       A    There is a lot of difference between tobacco
25  and marijuana, too, but I would not say the difference
0082
1   is any greater.  They are different.
2            But the point is, I had the knowledge that I

Page 34

Ex 1 - 5-26-06 depo transcript

3  had and the research that I had in one, transfers to the
4  other.  And there was no question and the senators of
5  this state recommended me for that panel.
6       Q    The reason that you were recommended on the
7  panel for anti-drug campaigns is because you are one of
8  the leading experts in tobacco advertising in tobacco
9  campaigns; right?
10      A    No, that wasn't the only reason.  It was
11 because --
12      Q    Well, that was a reason?
13      A    That was a reason, but the main reason is that
14 I know about research involved in integrated marketing
15 campaigns.
16           The reason why I was chosen, they needed
17 someone that knew copy testing and tracking.  And that
18 is what I know, and that is why I was chosen.  There are
19 lots of other people that have expertise in tobacco.
20      Q    Are advertise -- withdrawn.
21           Would you agree, Dr. Pechmann, that
22 prescription drugs are different from tobacco?
23      A    In what way?
24      Q    In how they are used?
25           MR. SKIKOS:  I'll object.  I don't understand
0083
1  that.
2           THE WITNESS:  I don't know.  That is such a
3  vague question.  I don't understand the question.
4  BY MR. GOLDMAN:
5       Q    Were you -- can you tell me any differences
6  between tobacco advertising and pharmaceutical
7  advertising?
8       A    The main difference is in pharmaceutical
9  advertising, there is a sales representative selling to
10 the physicians to encourage them to -- let them know
11 about the drug, so that they can prescribe it.
12      Q    Any other differences between tobacco
13 advertising and pharmaceutical advertising?
14           MR. SKIKOS:  Objection.
15           THE WITNESS:  Well, the regulations are
16 different.  The FDA is covering pharmaceutical and they
17 tried to cover tobacco.
18           And I wrote -- I helped write a -- prepared a
19 response for the American Psychological Association, but
20 the supreme court did not allow the FDA to get involved.
21           MR. GOLDMAN:  We will get to that in a minute.
22      Q    The Vioxx advertisements are not in the form of
23 comparative advertising.  Do you agree with that?
24      A    Some of them were.
25      Q    The vast majority of Vioxx advertising did not
0084
1  comment on any other competitive products; right?
2       A    That -- I don't agree with that.  Much of the
3  materials that the physicians saw were comparative.
4       Q    Let's talk about the advertising on television,
5  direct-to-consumer advertising for a minute.
6       A    You're correct.
7       Q    On direct-to-consumer advertising that people
8  see on TV, you agree that, that form of advertising that
9  Merck used for Vioxx is not comparative advertising?
10      A    Yes.  I agree with that.  It is not a direct
11 comparative ad.
12      Q    The vast majority of presentations you have
13 given at academic conferences and universities have

Page 35

Ex 1 - 5-26-06 depo transcript
```
14  related to your work in tobacco advertising; true?
15      A    Oh, absolutely not.
16      Q    Well, I don't want to go through your whole CV
17  and look at all of your presentations.
18           Would you agree that a significant number of
19  your presentations given at universities and academic
20  conferences have involved tobacco advertising?
21      A    I would agree that I have given a number of
22  presentations on tobacco-related advertising or
23  marketing at conferences.
24      Q    You refer in your C.V. to a technical report
25  that you wrote on strategies for preventing youth
0085
 1  tobacco use.
 2           Do you remember that?
 3      A    Yes.
 4      Q    You never written a technical report on
 5  pharmaceutical advertising; have you?
 6      A    No, I have not.
 7      Q    You have been on television before and you have
 8  been quoted in various newspapers and news magazines;
 9  true?
10      A    Yes.
11      Q    And all of that related to your work in tobacco
12  advertising; right?
13      A    No.
14      Q    What else did it relate to?
15      A    Well, I was just interviewed for an article on
16  retailing.  I was the main person that they cited.  So I
17  am interviewed on a variety of marketing issues.
18      Q    Have you ever been interviewed or appeared on
19  television to discuss pharmaceutical advertising?
20      A    Not that I recall, but I might have.
21      Q    Would you agree, Dr. Pechmann, that the -- we
22  talked about this briefly, but that the marketing that
23  is involved in tobacco is much different from the
24  marketing that is involved in the pharmaceutical market?
25      A    I don't agree with that.
0086
 1      Q    Cigarette advertising is not regulated; is it?
 2      A    There are industry regulations.  It is
 3  self-regulated.
 4      Q    There is no independent, outside body that
 5  regulates cigarette advertising; is there?
 6      A    In the United States, no.
 7      Q    But in the United States, the Food and Drug
 8  Administration regulates marketing for prescription
 9  drugs; do they not?
10      A    Yes, they do.
11      Q    And prescription drugs are heavily regulated by
12  the Food and Drug Administration; right?
13      A    I wouldn't know if you would characterize it as
14  "heavily," but it is regulated.
15      Q    You are not an expert on FDA regulations on
16  prescription drugs; are you?
17      A    I am an expert now.
18      Q    Based on what?
19      A    Having reviewed all of the documents.
20      Q    What documents?
21      A    The FDA -- the FDA has documents on all their
22  regulations.
23      Q    Have you read all of the FDA's documents on the
24  regulations?
```

EX 1 - 5-26-06 depo transcript
```
25        A    Yes.  And I spoke with the DDMAC person also
0087
 1   and I spoke -- when I spoke to the sales rep, I also got
 2   her perspective on it and I read numerous articles on
 3   this topic.
 4        Q    Before you were retained as an expert witness
 5   in the Vioxx litigation, would you agree that you never
 6   held yourself out as an expert in FDA regulations over
 7   pharmaceutical drugs?
 8        A    Correct.
 9             MR. SKIKOS:  Can we take a bathroom break?
10             (Brief recess.)
11   BY MR. GOLDMAN:
12        Q    What is A CFR?
13             MR. ROBINSON:  Is it a level X?
14             THE WITNESS:  Is it on my list?
15   BY MR. GOLDMAN:
16        Q    Have you ever heard of FDA documents referring
17   to CFR?
18        A    Oh, yeah, federal register.
19        Q    And how much time did you spend reviewing the
20   regulations in the federal register?
21        A    All of the different relations?
22        Q    Um-hmm.
23        A    Meaning my entire life?  Everything that is in
24   CFR?  I don't know.  Days, weeks -- probably weeks.  I
25   mean, overall, I would say actually, weeks.
0088
 1        Q    Have you ever consulted anybody on the FDA
 2   regulations or served as an expert in on FDA
 3   regulations?
 4        A    Have I ever consulted on FDA regulations prior
 5   to this time?
 6        Q    Um-hmm.
 7        A    Yes, I recommended American Psychological
 8   Association with regard to the FDA regulations for
 9   tobacco.
10        Q    That was you assisting the American
11   Psychological Association in response when the FDA was
12   attempting to exert jurisdiction and try to implement
13   guidelines for the tobacco industry?
14        A    Well, we were commenting on the proposed
15   regulations and -- and so it wasn't we commenting
16   whether or not we had the authority, we were commenting
17   on the regulations.  And I was one of the few people in
18   the country that was hand picked to do that work.
19        Q    Other than consulting with the American
20   Psychological Association --
21        A    I'm sorry.  It was also the American Marketing
22   Association.
23        Q    Other than consulting for the American
24   Marketing Association and the American Psychological
25   Association on the FDA proposed rules on -- concerns to
0089
 1   tobacco advertising, have you had any other dealings
 2   with the FDA?
 3        A    Yes.  I regularly attend sessions that are --
 4   where there are speakers from the FDA.  The FDA comes to
 5   our conferences.  I review papers related to the FDA in
 6   journals.
 7             There may be more, but I'm not sure if I can
 8   think of it off the top of my head.
 9        Q    Do you know the name of the division that
```

Page 37

Ex 1 - 5-26-06 depo transcript
10  oversees marketing of pharmaceutical drugs?
11      A    DDMAC.
12      Q    And do you know what that stands for?
13      A    I used to.  Let's see.  You know, I used so.  I
14  may have forgotten what it stands for.
15      Q    Have you ever reviewed any --
16      A    I used to know, and I probably would remember
17  if I wasn't a little bit nervous.
18      Q    Would you agree, Dr. Pechmann, that the effect
19  of a tobacco advertisement on a child's or youth's
20  decisions to smoke is different in kind from the effect
21  of a prescription drug advertisement on an adult's
22  decision to use medicine?
23      A    No, I don't agree with that statement.  Nor is
24  the research any different.  The research to study the
25  effects are identical.
0090
1       Q    Can you cite any article, any study, any
2   research anything in the world that says that a
3   pharmaceutical advertising and the effects on an adult's
4   decision to use medicine is similar to tobacco's
5   advertising and its influence on children to smoke?
6       A    You are saying:  Are there articles that have
7   compared them?
8       Q    Yes.
9       A    There probably are.
10      Q    But you don't know any?
11      A    If I had time to think it over for about a half
12  an hour, I might be able to come up with something.
13      Q    Why don't you think it over during the course
14  of the deposition.  And if you can cite --
15      A    I am not going to be able to think about it
16  during the deposition, but I do believe there are
17  studies that have been written about that.
18           MR. GOLDMAN:  I am going to mark an exhibit
19  that is going to be blank and it is going to be
20  Exhibit 6.
21           MR. ROBINSON:  I am going to object to that.
22           MR. GOLDMAN:  And Exhibit 6 is going to be the
23  research that you are going to find that is saying
24  pharmaceutical advertising and its affects on an adult's
25  decision to use prescription drugs is similar to the way
0091
1   that tobacco advertising affects a youth's decision to
2   use cigarettes.  Okay?
3           MR. ROBINSON:  I have an objection.
4           THE WITNESS:  I am positive that these
5   articles -- that they exist.  I'm positive that they are
6   discussed in textbooks in similar parts of textbooks.
7   They are discussed in numerous articles.  I don't have
8   time to go get that research now.
9           MR. GOLDMAN:  Why don't we mark it as a blank
10  exhibit.  We will mark Exhibit 6.
11           (Defendant's Exhibit 6 was marked
12            for identification by the court
13            reporter.)
14  BY MR. GOLDMAN:
15      Q    And, Dr. Pechmann, will you do me a favor and
16  before the trial, we can identify and we can add it to
17  the transcript, all of the articles that you can find
18  that specifically discuss how pharmaceutical advertising
19  and its influence on an adults' decision to use
20  prescription drugs is similar to tobacco advertising and

Page 38

Ex 1 - 5-26-06 depo transcript
21  its ability to influence youth?
22          A    I have a clarification question.
23              MR. O'CALLAHAN:  I am also going objecting in
24  the California litigation that this is an inappropriate
25  use of exhibits in a deposition.
0092
 1              The only comparable or sensible way might be to
 2  leave a blank and ask her to provide information in the
 3  blank; but you cannot have a blank exhibit.  It is a
 4  nonstarter.
 5              MR. SKIKOS:  She had a clarification.
 6              THE WITNESS:  Yes.  Also, there is -- in
 7  marketing and advertising, we do not -- there is no
 8  literature to indicate that people react fundamentally
 9  differently to different types of ads.
10              There is no literature on that.  I am not an
11  expert --
12  BY MR. GOLDMAN:
13          Q    Because it is an obvious truth?
14          A    No, because it is absolutely false.  I am not
15  considered to be an expert in academia on -- in the
16  sense that all I know is how tobacco advertising affects
17  children and how tobacco advertising affects adults.
18              I am an expert in integrated marketing
19  communications on people.  Okay.  We do not have
20  expert -- there is no such thing as someone, who is on
21  tobacco marketing affects on kids because what you have
22  is, you have expertise on how advertising affects
23  everyone, and then you also done studies to apply those
24  principles to advertising affecting kids.
25              Many, many times when I have worked on
0093
 1  research, people have said, why even bother, do the
 2  study on tobacco.  We know that phenomenon already
 3  occurs with adults.  Why do we even need an extra study
 4  on tobacco.
 5              And I have to fight is because people don't
 6  understand that the study necessarily applies, the
 7  general public might not realize that, so it helps if
 8  you have a trial to be able to replicate the same result
 9  with adolescents and kids; but we, in academia, know
10  that we are doing that not because we expect there to be
11  any difference.
12              In fact, I have to fight to get things
13  published when people say we already know this effect.
14  It is the same effect, so --
15          Q    Okay.
16          A    You know, it's -- that is why it would be kind
17  of hard exactly what you are describing.
18              What I will find is articles that they are
19  talking about it on the same page, same -- same general
20  type of advertising, but saying that the effect is the
21  same.  It would be saying that the earth is round or
22  something.
23              You just would not say that.  It makes no
24  sense.  It is so obvious to everyone in academia that
25  advertising effects are -- are fundamental effects that
0094
 1  occur regardless of the ad and regardless of the viewer.
 2  You know what I am saying?
 3              It wouldn't be something to state that there is
 4  something obvious -- such an obvious belief to us.  It
 5  is underpinning of our whole field.

Page 39

Ex 1 - 5-26-06 depo transcript

6       MR. ROBINSON:  I want to make an objection for
7   the record.  I don't know if this is kind of a
8   circus-like device to come up with a blank exhibit; but
9   I am going to object that these blank exhibits should
10  not be used in the Barnett case.
11          Judge Fallon does not like these circus kind of
12  games.  And frankly, if you want to leave a blank in the
13  deposition, or if you want to ask her to look for
14  documents, fine, but I am not going to have a blank
15  exhibit.
16  BY MR. GOLDMAN:
17      Q    Will you do me a favor, Dr. Pechmann, and try
18  to find all of the articles and literature that you said
19  existed, showing that the effects of tobacco advertising
20  on children are similar to the effects of pharmaceutical
21  advertising on an adult's decision to use prescription
22  medication?
23      A    What I just told you right now is that
24  something that states it as obvious as that, you
25  wouldn't be able to find because it is so obvious that
0095
1   nobody would be able to publish it.
2          What I can find is articles of controversial
3   forms of advertising, which is my area of expertise or
4   integrated marketing communication campaigns and use as
5   examples of pharmaceutical and tobacco.  That is all I
6   can find.
7          I can never find the exact thing you are
8   stating because it would be like stating that the earth
9   is round.
10      Q    Would you agree, Dr. Pechmann, that different
11  people can respond to the same advertisement
12  differently?
13      A    Yes.  That is why we do research.
14      Q    One of the reasons that people respond
15  differently to the same advertisement is because people
16  have different belief systems; right?
17      A    That is one of the reasons, yes.
18      Q    And people come from different backgrounds and
19  have different values and different levels of education,
20  and so an advertisement that you and I look at, it means
21  one thing to you and it might be something else to me;
22  true?
23      A    It might although there is many, many more
24  consistencies in how people react than inconsistencies.
25      Q    Are children more impressionable than adults
0096
1   when it comes to advertising?
2       A    The research does not show that, no.  And I did
3   not study children anyway.  I chose to study
4   adolescents.
5       Q    You will agree that adolescents are more
6   impressionable than 55-year-old men?
7       A    No, I don't -- it depends on the exact type of
8   issues you are talking about, but as a general rule, I
9   think 55-year-old men can be impressed by ads just like
10  15-year-old men can be impressed or have an impression
11  from advertising.
12      Q    Will you agree, Dr. Pechmann, that adolescents
13  lack the sophistication that a lot of adults have to be
14  able to see through some of the -- you are shaking your
15  head like you know my question.
16      A    I do.  Um-hmm.  Go ahead finish your question.

Page 40

Ex 1 - 5-26-06 depo transcript

17      Q    Will you agree, Dr. Pechmann, that adolescents
18  lack the sophistication -- some might have it, but some
19  might not, generally adolescents lack the sophistication
20  that adults have in interpreting the advertisements?
21      A    No.  The research does not show that.
22      Q    Would you agree that children or adolescents
23  are more impulsive than adults when it comes to
24  advertisements?
25      A    Not when it comes to advertisements.
0097
1       Q    When adolescents used to see cigarette
2   advertisements on television, it was fairly easy for
3   them to go buy cigarettes; right?
4       A    I believe there have been regulations that
5   would prohibit the sale of cigarettes below a certain
6   age.
7       Q    Well, you agree --
8       A    For state, regulations about that.
9       Q    You will agree, Dr. Pechmann, that it is much
10  easier for an adolescent to go get cigarettes after
11  seeing some tobacco advertisement than it is for an
12  adult to go get a prescription drug --
13          MR. SKIKOS:  Hmm-um.
14          THE WITNESS:  I guess that is an objection.
15  BY MR. GOLDMAN:
16      Q    -- after seeing a pharmaceutical advertisement.
17      A    Well, I have not done research to study that
18  topic, but in both cases, there are major barriers
19  involved.
20      Q    What are the barriers with respect to an adult
21  getting a prescription drug after seeing a
22  pharmaceutical advertisement?
23      A    They have to go to the physician.
24      Q    And for tobacco products, adolescents and
25  adults don't have to go see a doctor in order to get
0098
1   cigarettes; right?
2       A    That's correct.
3       Q    And the whole purpose of direct-to-consumer
4   advertising in the pharmaceutical industry is to attempt
5   to persuade people to talk to their doctor about a
6   particular product for a disease that they may be
7   experiencing or a condition that they may be
8   experiencing; true?
9       A    Yes.  Or well, that is one of the purposes.
10  Another would be to find more information out in other
11  ways.
12      Q    So the purpose of direct-to-consumer
13  advertising is to try to get those who see the ads to go
14  talk to their doctor about the medicine?
15      A    That is one of the purposes.
16      Q    And the training that the doctors have allow
17  them to be learned intermediaries.
18          Do you know what that is?
19      A    Yes, I do.
20      Q    You don't have learned intermediaries in the
21  smoking world; do you?
22      A    Well, parents.
23      Q    Well, parents might tell a child, "I don't want
24  you to smoke," but the child could go smoke and often
25  does; right?
0099
1       A    No.  In many cases, the child gets their

Page 41

EX 1 - 5-26-06 depo transcript

2  cigarettes from the parent.  The parent either decides
3  to give the cigarette or not give the cigarette.  It is
4  a very similar situation.
5        Q     But in a situation where a intermediary is
6  trying to stop --
7        A     No.  Some parents let their kids smoke.
8        Q     Do you agree, Dr. Pechmann, that adults can't
9  get prescription drugs unless a doctor tells them that
10 they can and prescribes the medicine to them?
11       A     Yes, I agree with that --
12       Q     And --
13       A     -- as a general rule.
14       Q     And doctors in a much better position to
15 determine the risks and benefits of medicine than most
16 lay people; correct?
17       A     Well, the reason we have prescription drug
18 advertising is because we as a society decided to give
19 people a greater role in their medical decisions.
20             So we understand people to be capable of
21 learning information from the ads and having a greater
22 role in whether they should take prescription medicine.
23       Q     Are doctors in a better position than lay
24 people to determine the risk of benefits of medicine?
25       A     Yes, as a general rule.
0100
1        Q     Will you agree that all patients defer to the
2  medical judgment of their doctors before taking
3  medicine?
4             MR. SKIKOS:  Before taking the prescription
5  drug?
6             MR. GOLDMAN:  Yeah.  I will ask the question --
7             THE WITNESS:  Well, they can't get a
8  prescription generally unless the doctor has given it to
9  them, but the research shows that doctors are heavily
10 influenced by patients who have seen drug --
11 prescription drug advertising.
12             And Merck research shows that a very
13 significant percentage of the doctors who were
14 confronted by patients wanting Vioxx gave them the
15 prescription for Vioxx.
16 BY MR. GOLDMAN:
17       Q     Would you agree that --
18       A     The number -- if you would give me a second to
19 find the number -- but it is a very high number, I
20 think -- well, if you give me one second, I can do it.
21       Q     It was actually not responsive to my question.
22 I will ask it again.
23       A     I would say 90 percent of the time.
24       Q     90 percent of the time what?
25       A     That patients asked for Vioxx, they got it
0101
1  according to Merck's own records.
2        Q     Back to the question I asked.
3             Dr. Pechmann, will you agree that the vast
4  majority of patients defer to the medical doctors to
5  decide what prescription medicine to take?
6        A     I am trying to answer your question.  What I am
7  saying is that the research shows that patients asked
8  the doctors for certain drugs and so in that sense --
9             MR. SKIKOS:  Let her answer.
10            THE WITNESS:  If the doctor says, no, they
11 don't get the prescription.  And, therefore, they have
12 to go to a different doctor.

Page 42

Ex 1 - 5-26-06 depo transcript

13  BY MR. GOLDMAN:
14      Q    If the doctor says, "yes, I think this medicine
15  is good for you," generally patients refer to their
16  doctors; correct?
17          MR. SKIKOS:  Objection.
18          THE WITNESS:  I am telling you that the
19  research suggested on -- what the research consistently
20  shows is that a significant percentage of the patients,
21  who request a drug, get either that brand or a very
22  similar drug.
23          And that it is a statistically significant
24  increase relative to people who didn't ask for that
25  drug.
0102
1   BY MR. GOLDMAN:
2       Q    I am not asking you about patients who asked
3   for drugs.  Let's exclude that from my question.  Okay?
4       A    Okay.
5       Q    Will you agree that for those patients who go
6   into the doctor's office and they have a medical
7   condition, regardless of what they have seen on
8   television about a particular drug, they are going to
9   defer to the medical judgment of their doctor as to what
10  drug is the best one to take?
11      A    I am not an expert in that.  I am an expert in
12  marketing prescription drugs.
13      Q    You are not an expert as to why people decide
14  to use prescription drugs?
15      A    I am an expert on how integrated marketing
16  affects that decision.  Whether they saw that or talk
17  about ads, you just took me outside of my area of
18  expertise.  You just took me outside of my expertise in
19  the question.
20      Q    No, I didn't.
21      A    I thought your question is if they didn't see
22  the ad or didn't ask for the product.
23      Q    No, I said they did not ask for the product.
24          So assume with me that you have a patient who
25  hasn't asked the doctor for a particular medication, but
0103
1   had seen an advertisement for the medicine and the
2   patient goes to the doctor's office, "My back is hurting
3   me.  I can use some medication to treat it"; and I think
4   the doctor says, "I think you should take prescription
5   strength Ibuprofen."
6       A    And then the patient might ask for some other
7   drug having seen the ad.
8       Q    And the patient might say, "Okay.  I will
9   because you are my doctor and I trust your judgment"?
10      A    They might say that, too, and then they may
11  fill or not fill the prescription based on the ads they
12  have seen.  They may or may not take the drug based on
13  the ads.
14          Every step of the way, the ads could influence
15  them on not influence them.  And that is why you do
16  research to find out exactly what is happening in your
17  case.
18      Q    Because each individual patient reacts
19  differently to particular advertisements they see with
20  respect to pharmaceutical drugs?
21      A    No, that is not true.  Why do you do research?
22          Marketing is the science and we can predict
23  with quite a degree of certainty of how people are going

Page 43

Ex 1 - 5-26-06 depo transcript
24  to react to ads.  That is our whole field.
25       Q    How will Mr. Barnett react when he sees a
0104
1   advertisement about --
2        A    Cigarettes?
3        Q    No.
4        A    I'm kidding.
5        MR. ROBINSON:  I am not going to help you.
6        MR. SKIKOS:  Plus, I am going to object.
7   BY MR. GOLDMAN:
8        Q    Is it you -- withdrawn.
9        Is it your testimony, Dr. Pechmann, that you
10  can predict how Mr. Barnett is going to respond on
11  certain advertisements on televisions?
12       A    I am saying that what Merck's own research
13  shows which is the type of research that is generally
14  accepted -- it is accepted practice.  It is the
15  validated research people rely on all of the time, told
16  them statistically what percentage of people would be
17  influenced by the ad to talk to the doctor.  That was
18  six percent year after year.
19       Q    That was different from my question.
20       A    Then we have to ask Barnett what happened with
21  him and he said the ads influenced him.
22       Q    Let me ask my question again.
23       Is it your testimony, Dr. Pechmann, that you
24  can tell me how Mr. Barnett will respond to a particular
25  advertisement he sees on television?
0105
1        A    No.  That is not my testimony.  My testimony is
2   that once they have research about a patient like him, I
3   can give a statistical prediction about him as a member
4   of that class of people might respond.
5        Q    Well, was Mr. Barnett in the exact sample of
6   people that you say were the subject of this research
7   that Merck did?
8        A    Yes, he was.  He fit into the sample of the
9   people that they studied, 300 a month for three years.
10       Q    Okay.  And we will look at some of that.
11       Do you agree, Dr. Pechmann, that before a
12  patient can use a prescription medication, the doctor
13  has to be convinced that the benefits outweigh the risks
14  of the medicine?
15       A    I believe that, yes, that is what they are
16  supposed to do.
17       Q    And doctors obtain information about the risks
18  of medicine from a number of sources; true?
19       A    Yes, I would assume they do.
20       Q    Doctors obtain information about the risks of
21  medicine from FDA approved labels; right?
22       A    Yes, they do.
23       Q    Doctors obtain information about risks of
24  medicine from other medical colleagues; true?
25       A    Yes, they do.
0106
1        Q    Doctors obtain information about risks of
2   medicine that is prescribed by medical articles and
3   conferences they attend; right?
4        A    Yes, they do as a general rule.
5        Q    Doctors obtain information about the risk of
6   medicine that they prescribe from their own experience
7   prescribing the medicine; right?
8        A    Yes.

Page 44

                              Ex 1 - 5-26-06 depo transcript
 9        Q      You never prescribed any medicine in your life;
10   right?
11        A      I am not a medical doctor.
12        Q      And you never surveyed a doctor to see how they
13   prescribe medicine; right?
14        A      I have not, but I have read articles about that
15   with respect to integrated marketing communications.
16        Q      You have done no independent research into what
17   motivates doctors to prescribe medicine; right?
18        A      Well, I would say that what I did in this case
19   is --
20        Q      I am not talking about this case.
21        A      Oh, in this case -- okay.  Outside of this
22   case --
23        Q      Let me ask the question again.
24        A      -- I have not done independent research.
25        Q      Before you were retained as an expert in this
0107
 1   Vioxx litigation you have not done any independent
 2   research into what motivates doctors to prescribe
 3   medicine; right?
 4        A      Correct.
 5        Q      Do you agree, Dr. Pechmann, that what one
 6   doctor knows about the risk of medicine may vary from
 7   what another doctor knows about the risk of medicine?
 8        A      Depending on the situation, there could be a
 9   great deal of similarity in what people know or a great
10   deal of difference.  It really depends.  I cannot make
11   an answer to the question.
12        I think that, for example, that if the risks
13   are clearly conveyed, virtually everyone will know those
14   risks, and so this would be homogeneity.  Everyone will
15   know the risk.
16        If the risk is not clearly conveyed, only some
17   people are going to figure it out and some people are
18   not.  There are going to be considerable homogeneity.
19        Q      Some doctors pay close attention to the warning
20   label that is approved by the Food and Drug
21   Administration and other doctors don't pay attention to
22   the label and they base their prescription decisions on
23   their experience prescribing the drug?
24        A      Well, I don't know about that, but all I know
25   is that marketing influences the information that they
0108
 1   have very extensively.  Prescription drug marketing
 2   influences the decisions they have, the information they
 3   have, and therefore, the decisions that they make.
 4        Q      Some doctors will be influenced by
 5   conversations that they have with sales representatives
 6   about medicine and other doctors won't be influenced by
 7   conversations they have with sales representatives;
 8   true?
 9        A      Well, I would say that the research indicates
10   that people are influenced by the information from the
11   sales representatives.
12        Q      All 100 percent?
13        A      Oh, no.  But they at least get information from
14   the sales representatives, or they get -- that this was
15   given to them by the sales representatives.
16        Q      Let's take Dr. Micola, for example, one of
17   Mr. Barnett's treating physicians.  Okay?
18        A      Yes.
19        Q      Did you read his entire deposition?

                              Page 45

```
                         Ex 1 - 5-26-06 depo transcript
20      A    Well, I at least skimmed every bit of it and
21  carefully read sections that look particularly relevant.
22      Q    What did Dr. Micola say about the role, if any,
23  that sales representatives had in his decision to
24  prescribe medicine?
25      A    I would need to refer to the deposition to
0109
1   remember exactly, but --
2       Q    Well, you expressed an opinion in this case.
3       A    Well, I can refer to my report.  That is just a
4   part of what I read that he said.  So I could refer to
5   that.  I don't have everything memorized in an 80-page
6   report.  I have to refer to my report to remember.
7       Q    Okay.  Well, let's turn then to the part about
8   Dr. Micola and look on Page 18.
9       A    Yeah.
10      Q    Do you see anything here about Dr. Micola
11  saying he relies on sales representatives to learn about
12  the risks of Vioxx?
13      A    Well, yes.  On Page 19, "You would
14           Expect that Merck would advise you of
15           the potential of one of their drugs
16           like Vioxx to increase the risk of
17           cardiovascular problems?"
18           And he said, "I would think that
19           They would make me aware of it."
20           And he says, yes, that is the sales rep's job.
21      Q    What is the sale rep's job?
22      A    To advise of the risk if they are promoting the
23  drug.
24      Q    Do you remember from Dr. Micola's deposition
25  what he said about how he used sales representatives in
0110
1   his practice?
2       A    I would have to refer to the deposition.
3       Q    I am asking:  If you remember now without doing
4   that?
5       A    I think I remember, but --
6       Q    What do you think you remember?
7            MR. ROBINSON:  Don't speculate.
8            THE WITNESS:  Yeah, I am told I am not supposed
9   to speculate.  So why would I have to speculate?
10  BY MR. GOLDMAN:
11      Q    Well, you don't know, as you sit here today,
12  what Dr. Micola said about how he uses sales
13  representatives; correct?
14      A    I'm pretty sure I know, but I would like to
15  refer to the deposition to make sure that I am talking
16  about the right person.
17      Q    Okay.
18           MR. ROBINSON:  Do you want me to get the depo?
19           MR. GOLDMAN:  Sure.
20           THE WITNESS:  I believe it is in this -- it is
21  right here.
22           MR. ROBINSON:  Hold on.  I think --
23           MR. GOLDMAN:  She has got the portion.
24           THE WITNESS:  I have the whole deposition.
25           MR. ROBINSON:  You do?
0111
1            THE WITNESS:  I believe so.
2   BY MR. GOLDMAN:
3       Q    What tab are you looking at in your binder?
4       A    8.  Exhibit 8.
```

Page 46

Ex 1 - 5-26-06 depo transcript
5      Q    Is Exhibit 8 consistent of all of the pages of
6   Dr. Micola's transcript that you reviewed?
7      A    No.
8         MR. ROBINSON:  No.  Let me get the depo.
9         THE WITNESS:  It doesn't include all of it.
10  BY MR. GOLDMAN:
11     Q    Well, that is what's found to be important.
12     A    No.  No.  I mean that --
13        MR. ROBINSON:  You asked a specific question.
14        THE WITNESS:  There was a lot of things that is
15  consistent with my opinion, but isn't in this report.  I
16  mean, I read boxes and boxes of documents.  I --
17  BY MR. GOLDMAN:
18     Q    Okay.  Who would be in a better position,
19  Dr. Pechmann, to know --
20     A    Well, shouldn't we be getting the report?
21     Q    Okay.  He is getting it.
22        Who would be in the better position to know how
23  much attention Dr. Micola pays to what sales
24  representatives say about safety, Dr. Micola or you?
25     A    I think we both contribute to that because --
0112
1      Q    My question was not do you both contribute.  I
2   am saying:  Who would be -- who is in a better position
3   to know whether sales representatives and what they say
4   about medicine in terms of safety play a role in
5   Dr. Micola's decision to prescribe a medicine, you or
6   Dr. Micola?
7      A    I think we both have something to say about it
8   and I'm not sure what the relative -- it would depend
9   on --
10     Q    Have you ever talked to Dr. Micola about what
11  factors he considers before he prescribed medicines?
12     A    No, I have not.  I just read his deposition.
13     Q    And Dr. Micola --
14     A    But in general, what I am saying that in
15  research, we do not ask people -- simply ask people.  We
16  do not ask people:  How did that ad affect you and then
17  rely on them.
18     Q    Dr. --
19     A    We do everything possible in our research to
20  understand the answer to that question without a direct
21  question to the person because a person is invariably
22  wrong in answering that question.
23     Q    Dr. Pechmann --
24     A    They may know something about it, but there is
25  a huge amount of research in here to figure out derived
0113
1   importance weight, very sophisticated because they could
2   not trust the doctors even to say what attributes were
3   important in prescribing the drug.  And the research
4   showed that something that they said was twelfth in
5   importance was like first in importance.  So we have a
6   lot to say beyond what they can say about how they are
7   prescribing from the research.
8      Q    Dr. Pechmann, are you in a better position than
9   Dr. Micola to know what factors he considers when he
10  decides to prescribe a medicine like Vioxx?
11        MR. O'CALLAHAN:  Asked and answered.
12        MR. SKIKOS:  That is a different question.
13        Go ahead.  Read that question back.
14        (Whereupon, the question was read
15        back as follows:

Ex 1 - 5-26-06 depo transcript

```
16              "Q   Dr. Pechmann, are you in a
17         better position than Dr. Micola to
18         know what factors he considers when
19         he decides to prescribe a medicine
20         like Vioxx?")
21         THE WITNESS:   I know things about his decision
22    that he doesn't know.
23    BY MR. GOLDMAN:
24         Q    Okay.  I will leave it at that.
25              MR. ROBINSON:  So we don't need to go to the
0114
1     depo?
2              MR. GOLDMAN:  No.
3         Q    Whether an advertisement misleads a particular
4     patient varies from patient to patient; right?
5         A    The research tells you that.  So sometimes it
6     is consistent.  Sometimes it depends on the segment.  It
7     depends on the specifics of the case.
8         Q    Do you know what percentage of former Vioxx
9     users use Vioxx because of advertisements they saw?
10        A    I am trying to think if I saw that number.
11             Merck had research to suggest how the ads were
12    influencing people and I reviewed that research.  I did
13    not refresh my memory with regard to that particular
14    question at the moment, but --
15        Q    As you sit here today, you don't know what
16    percentage of Vioxx users use Vioxx because of
17    advertisements they saw; correct?
18        A    I know that 6 percent of people who saw the ads
19    said that they were going to take action.  And I know
20    some other facts, too.
21             If we look at Exhibit 66, it has the research
22    findings -- some of the research findings with regard to
23    that question or you can look at my report on Page 65.
24             So, yeah, it says, "Approximately 40
25             Percent of the patients receiving
0115
1              prescription for Coxibs in late
2              1999/early 2000 engaged in some
3              patient-initiated action and when a
4              consumer takes action for a brand, a
5              prescription is received almost 9
6              times out of 10."
7              And then between 70 and 90 percent of the time
8     it is filled because you don't have to necessarily fill
9     it.  So their estimate based on their research is that
10    40 percent is patient initiated.
11        Q    And so --
12        A    Largely patient initiated -- see, the thing is
13    you cannot just look at the ad effect immediately.  The
14    ad has a spill over effect on through word of mouth.
15             So one person saw the ad, caused someone else
16    to take initiation.  You know what I am saying?  So
17    their -- their estimate of the percent of who received
18    it is 40 percent and their --
19        Q    No, that is not what that says.
20        A    "Engaged in some patient-initiated action."
21        Q    Right.
22        A    And the patient initiated action is believed to
23    be in some way linked to the direct consumer ads or some
24    other aspect of the integrated marketing communications
25    campaign.
0116
```

Page 48

Ex 1 - 5-26-06 depo transcript

```
 1       Q    What percentage of former Vioxx users used
 2  Vioxx because of advertisements on television?
 3       A    Because they personally saw it?
 4       Q    Yes.
 5       A    It is not a relevant question and I don't know
 6  the answer.  It is too much of a narrow of a question.
 7            You would ask the question they asked and it is
 8  40 percent.
 9       Q    So it is your testimony that 40 percent of
10  people who saw Vioxx advertisements initiated action and
11  went to their doctors to ask about Vioxx?
12       A    No.  It is my testimony that based on the Merck
13  research, which was very good research, that their
14  estimate was that 40 percent of the people who took
15  Vioxx or Celebrex were influenced by their integrated
16  marketing communications campaign.
17       Q    So 60 percent were not?
18       A    That's their estimate, yes.
19       Q    How does the --
20       A    Well, I'm sorry.  That is not correct.  This is
21  just the patient part of the -- direct-to-consumer part
22  of the integrated?
23       Q    Yes.
24       A    So not all the other -- most of the money in
25  integrated marketing communications was spent on the
0117
 1  physicians, not the consumer.
 2       Q    I am asking about the consumer.  Just stick to
 3  my question.
 4       A    I'm sorry.  I didn't understand it.
 5       Q    As I understand your testimony, you are relying
 6  on the research that Merck did to form the conclusion
 7  that 40 percent of people who saw Vioxx advertisements
 8  initiated action by going to their doctors and asking
 9  them to prescribe Vioxx; true?
10       A    No, I did not say that.  What they are saying
11  is exactly what they are saying here.
12       Q    Yes.
13       A    40 percent of the people who got the -- who
14  received a prescription -- who received a prescription
15  not as -- who received a prescription and engaged in
16  patient-initiated action, meaning they didn't
17  necessarily -- they -- they initiated the request of the
18  doctor.
19            As to whether they exactly saw the ad or
20  someone else saw the ad and told it to them, which is a
21  huge part of advertising effects, I am not claiming what
22  caused it.
23       Q    You have no medical training; right?
24       A    Correct.  I am not -- I have not gone to
25  medical school.  No.
0118
 1       Q    You have never consulted, written or done any
 2  research addressing risks of prescription drugs?
 3       MR. SKIKOS:  Medical risks, you are asking?
 4       THE WITNESS:  Are you asking about the medical
 5  risks?
 6       MR. GOLDMAN:  Yes.
 7       Q    So you never done any consulting, writing, or
 8  research addressing the medical risks of prescription
 9  drugs?
10       A    Correct.
11       Q    You never published any work on prescription
```

Ex 1 - 5-26-06 depo transcript
```
12  drug advertising; correct?
13      A    I have never published anything on prescription
14  drug advertising, no.
15      Q    Am I right?
16      A    I'm sorry.  You are correct.  I have not, yes.
17      Q    You have never --
18      A    But I published 50 articles on integrated
19  marketing communications, which is what they used, and I
20  was considered a national expert brought in on this
21  federal campaign because I had expertise in that area.
22           And as I told you, we don't discriminate.  We
23  don't say someone is an expert in that type --
24      Q    Dr. Pechmann, you can explain all you want when
25  Mr. Robinson asks you questions.  Please just try to
0119
1   stick with the questions that I ask.
2           MR. ROBINSON:  We can actually save time.  This
3   way I don't have to ask her questions.
4   BY MR. GOLDMAN:
5       Q    You have not --
6       A    Just like trying to --
7       Q    -- conducted any independent research on
8   pharmaceutical advertising and its affects; correct?
9       A    Well, I did this research.  So you mean other
10  than this case?
11      Q    Would you consider what you did in this case to
12  be independent research or are you relying on research
13  that others did?
14      A    I did my own independent assessment of the
15  research.
16      Q    Before you were --
17           MR. SKIKOS:  She did not finish.
18  BY MR. GOLDMAN:
19      Q    Before you were retained as an expert witness
20  in this case, did you do any research in pharmaceutical
21  advertising?
22      A    Any independent research?
23      Q    Yes.
24      A    No.
25      Q    Before you were retained as an expert witness
0120
1   in this case, did you do any independent research into
2   integrated marketing campaigns used by pharmaceutical
3   companies?
4       A    No.
5       Q    Would you agree that you are not an expert in
6   the following areas:  Assessing risks associated with
7   prescription drugs?
8       A    Medical risks?
9       Q    Yes.  What other risks are there other than
10  medical risks?
11      A    Advertising risks.  There is advertising risks.
12  There is a risk to advertising.
13      Q    Okay.  Would you agree that you are not an
14  expert in the following areas:  Assessing medical risks
15  associated with prescription drugs?
16      A    Yes, I agree I am not an expert.
17      Q    Assessing potential cardiovascular risks
18  associated with Vioxx?
19      A    I do believe I have expertise in that, yes.
20      Q    Do you believe you are an expert --
21      A    So I disagree with that statement.
22           I am confused because I am not sure of
```

Page 50

                              Ex 1 - 5-26-06 depo transcript
23   answering his question properly.  So ask it again.
24       Q    Do you believe you are an expert in assessing
25   potential cardiovascular risks associated with Vioxx?
0121
1        A    Yes.
2        Q    Based on what?
3        A    I -- I am an expert in whether Merck knew or
4    should have known about the cardiovascular risks from
5    having reviewed all of these documents.
6        Q    You are claiming to be an expert in what Merck
7    knew or should have known on cardiovascular risks of
8    Vioxx based on documents that lawyers that have a
9    financial interest in the outcome of this case gave you?
10           MR. ROBINSON:  I am going to object.  Move to
11   strike.  No.  No, I don't think you have to answer when
12   he throws the financial interest and that kind of stuff
13   in there.
14   BY MR. GOLDMAN:
15       Q    Dr. Pechmann --
16       A    It was independent documents.
17           MR. ROBINSON:  Hold on.  Don't answer.  You
18   don't have to answer.  That is an insulting question.
19   BY MR. GOLDMAN:
20       Q    Dr. Pechmann, you were claiming to be an expert
21   in assessing potential cardiovascular risks associated
22   with Vioxx based on documents that you were given by
23   plaintiffs' lawyers in this case?
24           MR. SKIKOS:  Objection.
25           THE WITNESS:  Yes, based on my scientific
0122
1    review of documents that they gave me.
2    BY MR. GOLDMAN:
3        Q    What experience do you have in cardiovascular
4    medicine?
5        A    I do not have experience in cardiovascular
6    medicine.
7        Q    What are the cardiovascular risks associated
8    with Celebrex?
9        A    I didn't study Celebrex.
10       Q    Have you ever studied the cardiovascular risks
11   associated with any drug?
12       A    Yes, with Vioxx.
13       Q    Other than --
14           MR. SKIKOS:  Hold on.
15           MR. ROBINSON:  She answered it.
16   BY MR. GOLDMAN:
17       Q    Other than -- withdrawn.
18           Since you have been retained in this case, have
19   you ever assessed the potential cardiovascular risks of
20   any medicine?
21           MR. SKIKOS:  Objection.
22           THE WITNESS:  No, I have not.
23   BY MR. GOLDMAN:
24       Q    You are not a cardiologist; right?
25       A    That is correct.
0123
1        Q    You are not a gastroenterologist?
2        A    That's correct.
3        Q    You are not an expert in biostatistics?
4        A    Biostatistics, no.
5        Q    You are not an expert in epidemiology?
6        A    Why, I have expertise in the techniques that
7    are used in epidemiology.

                              Page 51

```
                         Ex 1 - 5-26-06 depo transcript
 8      Q     Are you an epidemiologist?
 9      A     No, but I teach classes and statistics on
10   epidemiology as part of my Ph.D. classes in experimental
11   design and people from all across the campus come to
12   take.
13      Q     Have you ever held yourself out as an expert in
14   epidemiology?
15            MR. SKIKOS:  Objection.  Asked and answered.
16            MR. ROBINSON:  Go ahead.
17            THE WITNESS:  Well, I published -- there is
18   epidemiological methods that I used --
19            MR. GOLDMAN:  That is different.
20      Q     Have you ever held yourself out as an expert --
21            MR. ROBINSON:  Let her answer the question.
22            Go ahead and answer the question.
23            THE WITNESS:  I published an article in the
24   American Journal of Public Health in which we use
25   epidemiological statistics, measures, approaches.
0124
 1   BY MR. GOLDMAN:
 2      Q     Does that make you an expert in epidemiology?
 3      A     In the statistical approaches for epidemiology.
 4      Q     Did you use any statistical approaches to
 5   epidemiology in your analysis in this case?
 6      A     Yes.  We -- there is several studies that
 7   involve observational -- observational data, analysis of
 8   observational data, and that is my characterization of
 9   what is epidemiology.
10            You may have a different characterization, but
11   that is my characterization.  Epidemiology research is
12   observational research, and that is what I -- I know the
13   statistics that are involved with that type of research.
14   And I teach and I have published in it.
15      Q     Have you ever represented to anybody that you
16   are an expert in epidemiology?
17      A     Medical epidemiology, no.
18      Q     Do you know what Prostacyclin is?
19      A     Yes, I do.
20      Q     What is it?
21      A     I have a basic understanding.  It is a
22   substance in the blood that is thinning -- a thinning
23   substance.
24      Q     Is that your complete understanding of
25   Prostacyclin?
0125
 1      A     Yes.
 2      Q     What is Thromboxane?
 3      A     It is another substance in the blood that is
 4   the opposite effect, more of a thickening agent.
 5      Q     What is the relationship between Prostacyclin
 6   and Thromboxane in the body?
 7      A     They are counter -- they are opposing forces.
 8      Q     Who told you that?
 9      A     I learned that from Paul Sizemore.
10      Q     So your understanding about the relationship
11   between Prostacyclin and Thromboxane comes from one of
12   the plaintiffs' lawyers in this case?
13      A     No.  It also comes from a Merck manual.
14      Q     What Merck manual?
15      A     Their medical manual that describes it.
16      Q     When did you read the Merck manual on
17   Prostacyclin and Thromboxane?
18      A     I am a scientist.  I like reading things.  I
```

Page 52

                    Ex 1 - 5-26-06 depo transcript
19  saw it after -- I think I asked him some questions.  So
20  he gave me a really basic understanding and he gave me
21  the manual and I looked it over.
22       Q    You would agree that you are not an expert in
23  pharmacology?  Prostacyclin?  Thromboxane?
24       A    The medicine of pharmacology, no.
25       Q    Have you ever read the -- have you ever drafted
0126
1  a label for a prescription drug?
2       A    No.
3       Q    Do you consider yourself to be an expert in
4  clinical trials or how to interpret them?
5       A    I -- I am an expert in the statistics that are
6  used to analyze data from clinical trials because I also
7  teach that in the course.
8            When we do experiments with placebo, it is the
9  same type of method and same type of statistics as in
10  medical trials.  And I also am involved in the IRB
11  process whereby you get permission and I served on
12  committees involving medical protocols.  So I do have
13  some expertise in clinical trials.
14       Q    Have you ever taken any statistics courses?
15       A    Yes, several.  I teach a Ph.D. class.  They
16  don't let you teach them unless you've taken a class.
17       Q    How many statistics courses have you taken?
18       A    Eight.
19       Q    Have you ever published any articles describing
20  how you think clinical trials should be done or how they
21  should be interpreted?
22       A    No, I have not.
23       Q    Have you ever held yourself out as an expert in
24  clinical trials, ma'am?
25       A    In the statistics, underlining controlled
0127
1  experiments, I am an expert.  In -- as I told you, I am
2  an expert in how you analyze the data from a clinical
3  trial because it is the same as how you analyze the data
4  within the controlled experiments in marketing.
5            There is some aspects of the clinical trial
6  that I am not familiar with and I am not an expert in.
7       Q    Have you ever done any research or publish any
8  articles about Vioxx?
9       A    I have done extensive research on Vioxx for
10  this case.
11       Q    Before you were retained by plaintiffs' lawyers
12  in this case, have you ever done any research or
13  published any articles on Vioxx?
14       A    No, I had not.
15       Q    Do you know when Vioxx was first approved by
16  the FDA?
17       A    I knew that at one time.  I may have it down
18  here.
19            It was 1999.
20       Q    Do you know for what conditions?
21       A    I believe it was -- well, I should check it
22  because I think -- I need to look at the initial label.
23       Q    Well, I'm --
24       A    In all of these cases, I am 90 percent sure,
25  but I would rather be 100 percent sure and really check
0128
1  the label.
2       Q    You are planning to go to trial and you are
3  planning to testify about how you think Merck misled

Ex 1 - 5-26-06 depo transcript

```
 4   doctors and patients through their advertising campaign,
 5   and you can't tell me off the top of your head what
 6   indications Vioxx was approved for?
 7         MR. SKIKOS:  Objection.
 8         THE WITNESS:  Well, I said I could tell you
 9   with 90 percent certainty if you would like.  It is
10   osteoarthritis.
11   BY MR. GOLDMAN:
12      Q     Any other conditions that it was approved for?
13         MR. ROBINSON:  At what time?
14   BY MR. GOLDMAN:
15      Q     Initially?
16      A     Based on their marketing documents, that is the
17   main one they were focusing on initially.
18      Q     Do you know what other conditions Vioxx was
19   approved for during the time that it was on the market?
20      A     I believe it was approved for rheumatoid
21   arthritis.  And I know they had marketing discussions
22   about menstrual cramps, for dental -- so there was
23   marketing discussions about different indications.
24      Q     But you don't know whether Vioxx was ever
25   approved for those?
0129
 1      A     Not with certainty, no.  My expertise is about
 2   the integrated marketing campaign.  And that was not a
 3   big issue in the integrated marketing campaign.
 4      Q     Have you ever reviewed any materials that Merck
 5   submitted to the FDA?
 6      A     I am trying to think if I did.  I may have
 7   but -- but I would say that in general, that is not --
 8   that is not what I was looking at.
 9            So I may have, but I wasn't -- it may have been
10   something that I looked at, but it was not labeled as
11   something they had submitted to the FDA.
12            I never received anything that said this is the
13   package of information that Merck sent to the FDA.
14      Q     Don't you think, Dr. Pechmann, as a scientist
15   wouldn't you want to know what Merck sent to the FDA
16   before coming to court and telling jurors what Merck
17   knew about the risks of Vioxx?
18         MR. ROBINSON:  Objection.  Argumentative.
19         THE WITNESS:  No, I don't think that is
20   important.  I know what the FDA told them.
21   BY MR. GOLDMAN:
22      Q     What did they tell them?
23      A     They sent them a warning letter about their
24   marketing and that told them exactly what the FDA
25   standard card was for what they should and should not
0130
 1   say in their marketing.
 2            And they -- and they continued to make
 3   statements or leave out information, despite the fact
 4   that the FDA told them that that was misleading or
 5   false.
 6            Merck -- the letter says these -- this type of
 7   marketing campaign is misleading or false.  And they
 8   continued to do it.  So that is what I am basing it on.
 9      Q     What did Merck continue to do that you claim
10   the FDA said was false and misleading in that warning
11   letter?
12      A     They said the following, it says here:
13            "You have engaged in a promotional
14            campaign for Vioxx that minimizes" --
```

Page 54

Ex 1 - 5-26-06 depo transcript

```
15    Q    You are reading from the warning letter?
16    A    Yes. "-- that minimizes the
17         potentially serious cardiovascular
18         findings that were observed in the
19         Vioxx gastrointestinal outcomes
20         research Vigor Study, and thus,
21         misrepresents the safety profile of
22         Vioxx."
23              "Specifically your promotional
24         campaign discounts the fact that in
25         the Vigor Study patients on Vioxx
0131
1          were observed to have a four- to
2          fivefold increase in myocardial
3          infarctions, MI, compared to patients
4          on the comparator nonsteroidal
5          anti-inflammatory drug NSAID,
6          Naprosyn, and then Naproxen."
7          It is not easy to read because there is
8     parentheses.
9              MR. ROBINSON:  Keep reading.  Let her keep
10    reading.
11              THE WITNESS:  Well, that is what they did.  I
12    mean, if you look at the marketing materials, they did
13    not reveal the fact -- in fact, they left out in the
14    materials -- the fact that there was a four- or fivefold
15    increase of myocardial, the Dear Doctor letters.
16              The detail materials that they gave to
17    physicians.  The ads to consumers, the ads to physicians
18    did not -- the PR, the press releases, did not -- did
19    not disclose that information.
20              There were possibly a few pieces of the
21    promotional that -- a few pieces of the promotional
22    materials that might have said that; but then they would
23    have qualifications which as it gets to the next
24    paragraph -- the next paragraph it says you can't
25    qualify or try to blow it off because -- "although
0132
1          The exact reason for the increase
2          rate of MI's observed in the Vioxx
3          treatment is unknown, your
4          promotional campaign selectively
5          presents the following hypothetical
6          explanation for the observed increase
7          in MI" --
8              MR. ROBINSON:  Let her go.
9              MR. GOLDMAN:  I don't need for --
10             MR. ROBINSON:  Connie, just finish that
11    sentence.
12    BY MR. GOLDMAN:
13    Q    Ma'am, I am not interested in hearing the
14    entire warning letter.  I read it.  I know exactly what
15    it says.
16             My question was very simple:  What practices do
17    you claim Merck engaged in after receiving the warning
18    letter from the Food and Drug Administration that you
19    think the Food and Drug Administration had told Merck
20    not to do?
21             MR. SKIKOS:  Well, she was going to tell you.
22             MR. ROBINSON:  You cut her off and she was
23    reading it.
24             Go ahead and finish your reading.
25
```

Ex 1 - 5-26-06 depo transcript

0133
1   BY MR. GOLDMAN:
2       Q    No.  No, I don't want you to finish your
3   reading.  Okay.
4           It is not about Mr. Robinson conducting the
5   deposition, Dr. Pechmann.  Can you answer my question?
6       A    Well, first I think we have to say -- it says
7   here, do you assert that Vioxx doesn't increase the risk
8   of MI's, and that the Vigor Study finds consistent with
9   Naproxen's ability to block platelet aggregation like
10  aspirin, that is a possible explanation, but you failed
11  to disclose that your explanation is a hypothetical and
12  it has not been demonstrated by evidence that --
13      Q    Ma'am --
14      A    -- reasonable explanation --
15      Q    -- Ma'am, I --
16      A    I need to explain this to them, so that we can
17  just expose it to what they actually said in their press
18  releases.
19          MR. SKIKOS:  You are asking her.
20  BY MR. GOLDMAN:
21      Q    Can you put that down, please?
22      A    Let me just say, it wasn't just this, but it is
23  the exact same thing that the FDA had told them in
24  February of 2001 about the study, the implications of
25  the study, the fact they could not assert that it was
0134
1   Naproxen.
2           So they were given substantial information from
3   the FDA as to what -- what the FDA expected of them,
4   what the FDA believed to be true and not true with
5   regard to the risks.
6           And I am relying on the FDA's information to
7   say that they knew or should have known because the FDA
8   told them.  How can they have not have known?
9           The FDA is the body that they have to listen
10  to.
11      Q    Are you done?
12      A    Yes.
13      Q    Is it your position, Dr. Pechmann, that after
14  Merck received the warning letter that it, in its
15  advertisements and in its marketing campaign, was saying
16  that the reason for the difference in heart attacks in
17  Vigor was because of Naproxen; is that your sworn
18  testimony?
19      A    I would need to look at the exact dates of when
20  they stopped saying Naproxen.  Let's see.
21          But certainly, after the February warning about
22  Naproxen -- the February, 2001 warning about Naproxen
23  not being the only possible explanation.
24      Q    That was not my question.
25      A    Then they did continue to state that after this
0135
1   warning label.
2       Q    Let me ask the question again then.
3       A    I have to double-check the date.  What happened
4   subsequent to this date.
5       Q    Is it your testimony that Merck continued to
6   tell people that in advertising that they thought
7   Naproxen explained the difference between the heart
8   attacks and the Vigor Study between -- is it your
9   testimony, Dr. Pechmann, sworn testimony, that after
10  Merck received that letter from the Food and Drug

Page 56

Ex 1 - 5-26-06 depo transcript

11  Administration, it continued in a marketing campaign to
12  advance the Naproxen hypothesis?  Is that your sworn
13  testimony?
14        MR. SKIKOS:  Argumentative.
15        Go ahead.
16        THE WITNESS:  It is my sworn testimony that
17  they violated the mandate of this warning letter.  That
18  they misrepresented the safety profile.
19  BY MR. GOLDMAN:
20      Q    Did the Food and Drug Administration ever send
21  Merck another warning letter after September of 2001
22  saying that they felt Merck violated the rules that they
23  were setting forth in that September, 2001 letter?
24      A    Not that I have seen, but that doesn't mean it
25  didn't happen.
0136
1       Q    It doesn't mean that it did either?
2       A    Of course not.  That is why I looked at all of
3  the research.
4         MR. O'CALLAHAN:  Mr. Goldman, let's put in here
5  for the California plaintiffs, I think there is an
6  unfortunate tendency to interrupt her answers.
7         For purposes of the record, I would just ask
8  that you let her finish her answers before you
9  interject.
10        MR. ROBINSON:  We have been going three hours.
11  Can we break for lunch, please?
12        MR. GOLDMAN:  It is just three hours.  We will
13  stop shortly.
14      Q    Am I right, Dr. Pechmann, that the only
15  knowledge that you have about Vioxx and Merck's
16  integrated marketing communications campaign is based on
17  work that you have done as an expert witness in this
18  case?
19      A    The only expertise I have on Merck's integrated
20  marketing campaign is from the work that I have done in
21  this case.  Yes, that's correct.
22      Q    And your only knowledge about Vioxx and any
23  cardiovascular risk associated with Vioxx came from your
24  review of documents that the plaintiffs' lawyers gave
25  you in this case; correct?
0137
1       A    A few documents I obtained on the web, but
2  largely, yes.
3         (Discussion held off the record.)
4         (Lunch recess.)
5  BY MR. GOLDMAN:
6       Q    Dr. Pechmann, have you ever done any research
7  or published any articles about prescription drugs?
8       A    I did research for this case.
9       Q    Other than your involvement in the Vioxx
10  litigation, have you ever done any research or published
11  any articles about prescription drugs?
12      A    No, I have not.
13      Q    Have you done any research or published any
14  articles on pharmaceutical marketing other than --
15  withdrawn.
16        Other than in your involvement in this case,
17  have you done any research or published any articles on
18  pharmaceutical marketing?
19      A    Not on pharmaceutical marketing per se.  Just
20  on integrated marketing communications.
21      Q    Have you ever prior to this case done any

Page 57

Ex 1 - 5-26-06 depo transcript
22  research or published any articles on direct-to-consumer
23  advertising in a pharmaceutical industry?
24      A    No.
25      Q    Have you ever done any research or published
0138
1   any articles on the effects of pharmaceutical
2   advertising on patients or doctors?
3       A    You mean prior to this case?
4       Q    Yes.
5       A    I believe that the 50 articles that I have
6   written about integrated marketing communications relate
7   to this -- relate to pharmaceutical marketing -- not --
8   yeah.
9       Q    Have you ever done any research or published
10  any articles on the effects of pharmaceutical
11  advertising on patients or doctors?
12      A    As I said, I believe the research I have done
13  relates to that topic.
14      Q    Has any --
15      A    All of the research that I have done.
16      Q    Have you published any articles at all
17  specifically mentioning pharmaceutical advertising and
18  their effects on patients or doctors?
19      A    No, I have not.
20      Q    Have you done any survey or interviews of any
21  doctors or patients about their reactions to
22  advertisements about pharmaceutical products?
23      A    No, I have not.
24      Q    Have you ever observed any patients or doctors
25  as they watch advertisements on television?
0139
1       A    Not in any of my research as to how my research
2   is done.
3       Q    Have you ever interviewed anybody that ever
4   used Vioxx?
5       A    Yes, I have.
6       Q    Who?
7            MR. SKIKOS:  Objection.  Was it as part of your
8   research or is this something some person who --
9            THE WITNESS:  Just some person.
10           MR. SKIKOS:  He doesn't want to know.  It's
11  irrelevant.
12  BY MR. GOLDMAN:
13      Q    In formulating your opinions in this case,
14  Dr. Pechmann, have you ever spoken to a single person
15  who had used Vioxx?
16      A    No, I have not.
17      Q    Have you ever spoken with a single doctor who
18  has prescribed Vioxx as part of your analysis here in
19  this litigation?
20      A    I read the depositions only.
21      Q    Of Dr. --
22      A    Micola and McCaffrey.
23      Q    Other than reading the depositions of
24  Drs. Micola and McCaffrey, have you ever spoken to any
25  doctors that ever prescribed Vioxx?
0140
1       A    I read hundreds of pages on research on
2   doctors.
3       Q    Have you ever interviewed or spoken with any
4   doctors who have prescribed Vioxx to their patients?
5       A    I have read the interviews but I personally did
6   not conduct any of the interviews, but I never do in my

Ex 1 - 5-26-06 depo transcript

```
 7   research.
 8         Q    You said in your article -- in your --
 9   withdrawn.
10              In your report, you are saying that you are an
11   expert in integrated marketing communications campaigns;
12   right?
13         A    Yes.
14         Q    Can you just briefly describe what that is?
15         A    Sure.  It is an approach to marketing where you
16   have a comprehensive plan that involves several
17   different methods of communications and several
18   different communication disciplines:  Advertising, sales
19   promotion, public relations, packaging; and combines all
20   of these forms of communication to disseminate a
21   consistent, clear message so that it maximizes the
22   impact.
23              And as part of it, you conduct research on
24   different segments to figure out what this clear message
25   is going to be.  And you study the affects on consumers
0141
 1   of this message --
 2         Q    Are you reading your report as you are giving
 3   the answer?
 4         A    No.  No.
 5         Q    All right.
 6         A    And make adjustments to the plan.  So that it
 7   is effective, but always trying to have a consistent
 8   message across all of the different types of
 9   communications.
10         Q    Is it fair to say that integrated marketing
11   communications plan is a term that can describe
12   marketing efforts through a number of avenues that
13   companies can use to market their products?
14         A    That is one aspect.  That you are using
15   multiple avenues, yes, but it is not all of it by any
16   means.
17              (Discussion held off the record.)
18   BY MR. GOLDMAN:
19         Q    Have you ever consulted for any conditions that
20   had used an integrated marketing communications plan?
21         A    Yes, several.
22         Q    Which ones?
23         A    Well, I worked for Ogilvy and Mather, who had
24   the contract from the Office of National Drug Control
25   Policy to run the anti-drug advertising campaign.  I was
0142
 1   hired by an ad agency in Massachusetts, who was
 2   responsible for the anti-smoking campaign.
 3              Let's see.  What was the name of that --
 4   anyway, Houston Efler, Dafett (phonetic), which is now
 5   Arnold.  That is the name of them.  They are a very
 6   well-known ad agency.  And we -- and I, on behalf of the
 7   American Marketing Association, assisted the Census
 8   Bureau and their ad agency with the census advertising
 9   campaign for the 2000 Census.  I believe it was Y & R.
10         Q    Any other companies that you have consulted for
11   with respect to their integrated marketing
12   communications plan?
13         A    Yes.  I worked with the University of Vermont
14   to help with an anti-smoking ad campaign in Vermont.
15         Q    Anything else?
16         A    A long time ago when I worked for the National
17   consulting Group, I helped with several integrated
```

Page 59