EX 1 - 5-26-06 depo transcript
18   marketing campaigns --
19        Q    In what areas?
20        A    -- when I was an MBA student.
21        Q    Since you graduated --
22        A    Well, I had a master's degree in psychology,
23   so --
24        Q    Since you graduated from business school, have
25   you consulted in any capacity for the integrated
0143
1    marketing communications campaigns for any companies
2    other that what you just described?
3         A    Oh, other than what I just described, yes, I
4    worked on the campaign for Commerce Bank and American
5    Savings Bank, as I supervised teams of students who
6    worked on those projects.
7         Q    Did that involve integrated marketing
8    communications?
9         A    I believe they both did, yes.  And I
10   continually supervise students on projects where they
11   work on integrated marketing communications campaigns.
12        We have projects that students engage in as
13   teams, and I find on a routine basis, I supervise those
14   teams on integrated marketing campaigns.  And I stopped
15   listing them because it would have gotten, too, big on
16   my resume.
17        Q    Any other integrated marketing communications
18   campaigns that you have described that you have been
19   involved with?
20        MR. SKIKOS:  You said companies.  You are not
21   talking about any universities?
22        MR. GOLDMAN:  No, companies.
23        MR. SKIKOS:  Companies.
24        THE WITNESS:  I am helping out the business
25   school.
0144
1    BY MR. GOLDMAN:
2         Q    That is a university?
3         A    Yes.
4         Q    I am interested in companies.
5         A    Companies, okay.
6         Q    How many for profit companies have you worked
7    for or consulted with on their integrated marketing
8    communications --
9         A    Yes, I worked with Ogilvy directly on the
10   anti-drug campaign.  So yes.
11        Q    Other than that?
12        A    I helped them with the campaign for the Tobacco
13   Free Kids, but it is minimal.
14        Yes, it is the major ones that I helped with
15   that I can recall.
16        Q    Have you ever consulted with any pharmaceutical
17   company with its integrated marketing communication --
18        A    Not that I recall.
19        Q    Did you ever work with any ad agency who had
20   developed an integrated marketing communications
21   campaign for a pharmaceutical company?
22        A    No, I have not.
23        Q    Am I right that your work with respect to the
24   anti-drug media campaign that you have been describing
25   involved consulting with an ad agency once a week?
0145
1         A    Approximately once a week, yes, for about four
2    years -- over four years.

                              Page 60

Ex 1 - 5-26-06 depo transcript

```
3        Q    And this was a campaign that was supposed to
4   help the government combat illegal use of drugs?
5        A    Yes.
6        Q    So that integrated marketing communications
7   campaign was for a government, not a company; correct?
8        A    I was hired by Ogilvy and Mather, yes, but --
9        Q    But the campaign that was being implemented was
10  being implemented for the benefit of a government agency
11  not a corporation; correct?
12       A    Well, the government paid the bills, yes.  I
13  was working for Ogilvy and Mather as if I was an
14  employee of Ogilvy and Mather.
15            I never worked with a government official.  I
16  was working with all of the vendors -- all of the for
17  profit companies that worked with Ogilvy and Mather and
18  they treated it like any other campaign.
19       Q    Were you ever employed by Ogilvy and Mather?
20       A    Yes, that is who I was employed by.
21       Q    Page 2 of your report, Dr. Pechmann, you say in
22  the middle of the second paragraph, "I worked
23            As a consultant to the Anti-Drug
24            campaign during approximately the
25            same time frame as the Vioxx
0146
1             campaign."
2             You didn't work on the Vioxx campaign; correct?
3        A    No, I did not.
4        Q    You are not trying to suggest that your
5   involvement in the anti-drug campaign had anything to do
6   with the Vioxx campaign; right?
7             You are just pointing out that those occurred
8   at the same time?
9        A    Well, I am saying that there were tremendous
10  parallels between the two campaigns.  And in terms of
11  the vendors that we used, the amount of money that we
12  used on the campaign were very similar.  So I think
13  there were parallels.
14       Q    What other parallels were there?
15       A    Significant parallels?  Well, the whole
16  approach to integrated marketing communication was the
17  same.
18       Q    To deliver a consistent message?
19       A    Not just to deliver a consistent message, but
20  to engage in extensive upfront research and tracking
21  research, to make sure that that message was being
22  conveyed; and in our case -- and in their case, too, to
23  make sure that no other messages were being conveyed
24  that you didn't want to convey.
25       Q    Did you at the time you were working on this
0147
1   anti-drug campaign do any work whatsoever on the Vioxx
2   campaign?
3        A    I did not.
4        Q    You also point out that "Ogilvy
5             Public Relations which was
6             responsible for Vioxx's public
7             relations campaign is a sister
8             company to the company I worked for"?
9        A    That is correct, yes.
10       Q    But the fact that a sister company was
11  responsible for Vioxx's public relations campaign does
12  not mean that you had any role with Vioxx's campaign;
13  correct?
```

Page 61

Ex 1 - 5-26-06 depo transcript

```
14      A    Well, we use the same vendor, possibly
15  because -- you know, because Ogilvy tends to use
16  Millward Brown. Whether this is Ogilvy Public Relations
17  or Ogilvy and Mather, but basically, we used Millward
18  Brown as a major research vehicle.
19      Q    Is Ogilvy a reputable advertising firm?
20      A    I'm sorry. I didn't finish my other question.
21  Also, we had a public relations firm -- we did
22  not use Ogilvy Public Relations, but I routinely saw
23  information from our public relations firm.
24           So, you know, so many, many ways, it was very
25  similar. We had the same structure of -- in the
0148
1   campaign. The same types of entities were involved,
2   both research wise and just servicewise as they did. It
3   was moneywise very comparable.
4       Q    Did you, when you were at Ogilvy and Mather, do
5   any work on Vioxx's public relations campaign?
6       A    I did not.
7       Q    You agree that Ogilvy and Mather, which
8   consulted with Merck on Vioxx, is a reputable agency?
9       A    Yes, they are.
10      Q    You would not have worked there if they were
11  not?
12      A    Correct.
13      Q    Ogilvy and Mather does their best to make sure
14  that advertisements that they sponsor are accurate;
15  true?
16      A    I worked with Ogilvy and Mather. They did not
17  use Ogilvy and Mather, but that is correct.
18      Q    They used -- they used Ogilvy Public Relations;
19  right?
20      A    Right. The public relations arm does not have
21  advertising. They are doing press releases and that
22  sort of thing.
23      Q    Having worked with Ogilvy, they do their best
24  to convey accurate information in the materials they
25  sponsor?
0149
1       A    Yes. I was not surprised when Ogilvy
2   Publications asked Merck, where the evidence for the
3   Naproxen theory -- where is the evidence? We want to
4   know what the evidence is. Can we help you obtain the
5   evidence you need to substantiate these claims?
6            That is what Ogilvy would do. They did not
7   collect the evidence themselves, but they are concerned
8   and they asked if someone should collect the data, which
9   indicates they themselves thought the data was tenuous.
10      Q    You don't comment at all about that in your
11  report; right?
12      A    You know, I had so much to put in the report, I
13  didn't put that in. That document is in those boxes.
14      Q    You don't intend to offer any opinions about
15  the interactions between Ogilvy and Merck about the
16  Naproxen hypothesis; do you, ma'am?
17           MR. ROBINSON: Objection. She has already been
18  talking on half the depo on that.
19           THE WITNESS: We may decide to use that because
20  it is part of the overall opinion I am giving that they
21  mislead the public.
22  BY MR. GOLDMAN:
23      Q    Nowhere in your report do you mention anything
24  about Ogilvy's discussions with Merck about the Naproxen
```

Page 62

Ex 1 - 5-26-06 depo transcript

25  hypothesis; correct?
0150
1        A      That is correct.
2        Q      And in your report, you included everything you
3   felt was important to your opinion; true?
4        A      To my opinion, yes, and my overall --
5        MR. ROBINSON:  You have enough time.  You have
6   two months.  You heard that new opinion.
7        MR. GOLDMAN:  What are you doing?
8        MR. ROBINSON:  You have a right now to
9   cross-examine her on this because I may want to ask her
10  about that.  Since you asked her about it in depo, I am
11  going to ask her about it at trial.  I am going to put
12  you on notice.  I am going to ask her the same line of
13  questioning at trial.
14  BY MR. GOLDMAN:
15       Q      You know, I am sticking with what is in your
16  report, ma'am.
17       A      I did not leave it out of my report assuming
18  that I didn't want to testify to it.  I said I only had
19  a certain number of pages, and it was consistent with my
20  opinion.  I was told to put my opinion in, not every
21  single fact.
22              There are numerous documents that substantiate
23  these opinions.  I did the best I could to put the main
24  ones in the report, but I mostly was certain that these
25  were my opinions and that is what I felt I needed to put
0151
1   is my opinions.
2        Q      Dr. Pechmann, is your knowledge about any
3   communications between Ogilvy and Merck about the
4   Naproxen hypothesis based on your review of Merck's
5   internal documents?
6        A      It was in the documents that we -- we were
7   given by one of the entities who was subpoenaed.  I
8   mean --
9        Q      Did you understand my question?
10       A      I guess not.
11       Q      Is your understanding about the interactions
12  between Ogilvy and Mather and Merck about Vioxx limited
13  to what you have seen in the documents that the
14  plaintiffs' lawyers have given to you?
15       A      Yes.
16       Q      Okay.  You've never spoken with anyone from
17  Merck about their discussions with Ogilvy about the
18  Naproxen hypothesis; have you, ma'am?
19       A      No, I have not.
20       Q      Nor have you spoken with anybody from Ogilvy;
21  correct?
22       A      That's correct.  It just sounded -- it was a
23  very Ogilvy-like memo from having worked with them.
24       MR. GOLDMAN:  Move to strike the last part of
25  the answer as nonresponsive.
0152
1        Q      You claim to be an expert in misleading
2   advertising; right?
3        A      Yes.  I published articles in that area.
4        Q      Incidentally, have you ever published articles
5   that specifically address integrated marketing
6   communications campaigns?
7        A      I've published articles and in every one of my
8   articles, it addresses an aspect of the integrated
9   marketing communications campaign.

Page 63

Ex 1 - 5-26-06 depo transcript
```
10              You can't, in academia, publish a descriptive
11  article of an integrated marketing communications
12  campaign because that is not considered novel enough to
13  be publishable.
14              So, in other words, someone who did -- if you
15  are involved in a campaign where people are using
16  generally accepted practices to deliver an outstanding
17  integrated marketing campaign, I would love to write an
18  article like that, but it is not publishable because in
19  the type of journals that the --
20      Q   Ma'am, I didn't ask you whether it is
21  publishable.
22      A   No, I have not.
23      Q   My question is did you -- withdrawn.
24          Have you ever published a single article that
25  talks about integrated marketing communications
0153
1   campaigns?
2       A   Yes, all of mine.
3       Q   All of them talk about a segment of it;
4   correct?  Right?
5           You just told me that the articles address
6   different segments of integrated marketing
7   communications campaigns?
8       A   Yes.  Therefore, they address integrated
9   marketing communications.
10      Q   Have you ever written a single article that
11  addressed a single integrated marketing communications
12  campaign along the lines of what you are trying to do in
13  this case?
14          MR. SKIKOS:  Objection.
15          THE WITNESS:  Well, that is what I was trying
16  to answer.
17  BY MR. GOLDMAN:
18      Q   Yes or no?
19          MR. ROBINSON:  Steve, let her go.
20          THE WITNESS:  I have not published that type of
21  article because -- because it is not possible to publish
22  it and get credit for it at UCI Irvine.  And I can't
23  afford to work on things that I don't get credit for.
24  BY MR. GOLDMAN:
25      Q   Well, you feel that your work here in this case
0154
1   is important to talk about Merck's integrated marketing
2   communications campaign; right?  Right?
3       A   What do you mean you think it is important?
4       Q   You feel it is important to participate in this
5   case and evaluate Merck's integrated marketing
6   communications campaign; is that right?
7       A   Yes.
8       Q   And have you written a report in this case
9   where you attempted to describe your view of Merck's
10  integrated marketing communications campaign?
11      A   Yes.
12      Q   You've never attempted to write an article and
13  try to have it published talking about anybody -- any
14  company, any government agency, anybody who has used an
15  integrated marketing communications campaign?
16      A   Yes.  I have published articles about companies
17  that have integrated marketing communications campaigns
18  and describing major parts of those campaigns in
19  articles, yes.
20      Q   Which ones?
```

Page 64

Ex 1 - 5-26-06 depo transcript
```
21      A    Well, I brought one with me.  Where did I put
22  it?  I believe we made a copy for you.  It is the --
23  this one.  We made a copy for you.
24      Q    So the one article that you have cited that
25  talks about integrated marketing communications
0155
1   campaigns is one just titled the National Youth
2   Anti-drug Media Campaign Copy Test Program; right?
3       A    I don't agree that that is the only one that I
4   wrote on integrated marketing communications.  I have
5   written several articles about integrated marketing
6   communications campaigns.
7       Q    Have you published any articles of an
8   integrated marketing communications campaign used by a
9   company?
10      A    And Ogilvy is a company.
11      Q    I am not talking about ad agencies.
12      A    That is a company.
13           (Discussion held off the record.)
14           MR. GOLDMAN:  I am marking as Exhibit 7 the
15  article that you showed me, the National Youth Anti-drug
16  Media Copy Test System.
17           (Defendant's Exhibit 7 was marked
18           for identification by the court
19           reporter.)
20  BY MR. GOLDMAN:
21      Q    Other than the work that you did for Ogilvy
22  concerning the anti-drug campaign, have you ever
23  published an article talking about a complete integrated
24  marketing communications campaign for any company?
25      A    As I said, I did not because I cannot.
0156
1       Q    Okay.  Let's talk about your expertise in
2   misleading advertising.  What does it mean to be an
3   expert in misleading advertising?
4       A    I have to go back to your question because
5   although I didn't publish it, I co-wrote a case on
6   integrated marketing communications for a cell phone
7   company that I used in class for a number of years.
8            And we were thinking of publishing that, but
9   then the case got out of date because cell phones get
10  out of date real fast.
11      Q    You were thinking about publishing, but you did
12  not publish it?
13           MR. ROBINSON:  This is our version.
14  BY MR. GOLDMAN:
15      Q    Can you answer my question?  I am getting tired
16  of the long-winded explanations.  Just like he gets
17  tired of our witnesses.
18           MR. ROBINSON:  It's a good witness.
19  BY MR. GOLDMAN:
20      Q    Dr. Pechmann, other than your work for Ogilvy,
21  you have never published a single article about a
22  complete integrated marketing campaign for any company;
23  true?
24      A    Not that I can think of.
25      Q    Now, let's talk about your expertise that you
0157
1   say that you have in misleading advertising.  Okay?
2            What does it mean to be an expert in misleading
3   advertising?
4       A    It means that I understand the criteria for
5   distinguishing between regular advertising and
```

Page 65

Ex 1 - 5-26-06 depo transcript

```
 6   misleading advertising.  And I know how to conduct
 7   research to find out if an ad is misleading.
 8        Q    What research have you conducted to determine
 9   whether any of Merck's advertisements are misleading
10   about Vioxx?
11        A    I didn't have to conduct any of my own research
12   because they conducted their own research -- extensive
13   research.
14        Q    What research did you do to determine that
15   Merck's advertisements for Vioxx were misleading?
16        A    Let me explain it this way.  I conducted -- I
17   view what I did as research because I looked at their
18   research.
19        Q    You looked at documents that were created by
20   other companies that performed certain surveys and that
21   kind of thing?
22        A    Exactly.  And I did my research on their
23   research, but I didn't collect any data myself.
24        Q    You never analyzed the underlying data that
25   these other companies did when they conducted their
0158
 1   surveys for Merck on Vioxx?
 2        A    I did double-check one survey.  I recalculated
 3   the numbers -- well, I didn't actually have their
 4   summary.  So I only had the data and then it coincided
 5   with what they concluded when I got that data.  So in
 6   one case, yes, I did.
 7        Q    Have you ever published any articles that
 8   addressed misleading advertising other than in the
 9   tobacco industry?
10        A    Yes.
11        Q    Have you ever --
12        A    You don't want it?
13        Q    No, that's okay.  I don't need to see it.
14             When you say that you are an expert in
15   misleading advertising, whose definition of misleading
16   are you using?
17        A    I have one in my report.  And it is the common
18   definition of misleading advertising that is used in
19   marketing.  It is a term of art in marketing.
20        Q    You said that your definition of misleading is
21   consistent with the FDA's definition of misleading; is
22   that what you said in your report?
23        A    Yes.
24        Q    What is the definition of the FDA's of
25   misleading?
0159
 1        A    Well, they have several documents that discuss
 2   what is misleading.  So they don't have a single one
 3   sentence definition.
 4        Q    How would you describe the FDA's definition of
 5   misleading, ma'am, when it comes to advertising for
 6   prescription drugs?
 7        A    By choice of words or omission, you could not
 8   have a meaning that's contrary to the facts or contrary
 9   to truth.
10        Q    And that is what -- that is how you think FDA
11   defines misleading?
12        A    Yes, roughly.
13        Q    You are not an FDA expert; true?
14        A    I am an expert in the FDA rules governing
15   advertising.
16        Q    Ma'am, before you signed up to be a plaintiffs'
```

Page 66

Ex 1 - 5-26-06 depo transcript

17   expert in this case, you never analyzed a single FDA
18   regulation on pharmaceutical advertising?
19         You told me that earlier.
20     A   I analyzed the regulation for tobacco.
21     Q   Dr. Pechmann, that is not my question.
22         Dr. Pechmann, my question was prior to you
23   signing up to be an expert witness in this litigation,
24   you never reviewed a single regulation by the FDA
25   concerning advertising pharmaceutical products; true?
0160
1     A   Of course, I did.  You mean was I not familiar
2   with these regulations?
3     Q   Yes.
4     A   I have seen them before.
5     Q   When have you seen them?  In what context?
6     A   I review articles about the FDA in journals.  I
7   am on the review board of the General Public Policy in
8   Marketing.  There are articles submitted all of the time
9   by FDA and FDC and I get those articles.
10     Q   What section of the CFR code addresses the
11   advertising for pharmaceutical products?
12         MR. ROBINSON:  Can she look at her --
13         THE WITNESS:  I need to look.  I don't have
14   that memorized.
15   BY MR. GOLDMAN:
16     Q   You don't know off the top of your head and you
17   say that you are an expert in FDA advertising?
18     A   21 CFR, 2.2 F1.
19     Q   When was the first time you read that?
20     A   I don't remember but years ago.
21     Q   Dr. Pechmann, have you ever written a single
22   article about the FDA regulations that apply to
23   pharmaceutical advertising?
24     A   No.
25     Q   Have you ever given a single speech, a single
0161
1   lecture about the FDA regulations on pharmaceutical
2   advertising?
3     A   I may have discussed it in class.  I discussed
4   FTC and I may have discussed the FDA, too.
5     Q   Have you ever presented anywhere to any
6   audience, other than maybe in your classroom, your
7   interpretation of the FDA regulations on pharmaceutical
8   advertising?
9     A   No.
10     Q   Have you ever written anything about your
11   understanding of what is misleading under the FDA
12   regulations?
13     A   My report.
14     Q   Other than the report that you generated as a
15   plaintiffs' expert in the Vioxx litigation, have you
16   ever written anything about your interpretation of the
17   FDA regulations when it comes to pharmaceutical
18   advertising?
19     A   No, just for tobacco.
20     Q   Do you think that you are in a better position,
21   Dr. Pechmann, to look at a Vioxx advertisement and
22   determine whether it is misleading compared to a juror?
23     A   Yes.
24     Q   Why?
25     A   Because I have extensive research that shows
0162
1   what -- what they found when they did research on

Page 67

Ex 1 - 5-26-06 depo transcript
2  various types of promotional materials and what the
3  research shows from tracking; so what happened when the
4  ads were out in the real world.
5       And that is the kind of thing that a juror
6  could not understand and the reason I can understand it
7  is because of my extensive expertise.
8       Q    You claim to be an expert in misleading
9  advertising of any kind?
10      A    Yeah.  Well, there is a general definition of
11 what is misleading.  We don't distinguish between
12 industry.
13      Q    Are you an expert in misleading advertising in
14 every industry for every product?
15      A    Yes.  That is how we are in academia.  We are
16 not industry specific.
17      Q    You said you are -- have expertise in reading
18 medical journals; is that right?
19      A    Yes.
20      Q    What is your expertise in that area?
21      A    I review for the journal of American Medical
22 Association and other related journals.  Those are --
23      Q    You are a peer reviewer?
24      A    Yes.
25      Q    For what publications?
0163
1       A    Well, one that I can think of is the journal of
2  the American Medical Association, American Journal of
3  Public Health.  I am wondering if any of the others are
4  medical -- I reviewed for the National Cancer Institute,
5  for preventative medicine, tobacco control -- just
6  several articles that publish medical articles.
7       Q    Have you ever consulted or been retained as an
8  expert in medical journals and how to interpret them?
9       A    How to interpret articles in --
10      Q    Yes.
11      A    I mean, I review articles for medical journals.
12 So in that review, you evaluate the validity of the
13 research and the conclusions.
14      Q    Okay.
15      A    And I also review research.  I was elected to
16 the committee on research.  At UC Irvine, we are
17 continually reviewing medical research to determine what
18 would get funding.  And I also review medical protocols
19 for the institution's review board where I was an
20 advisory chair.
21      Q    You are not going to come into court and
22 attempt to interpret the medical journal articles
23 written by Vioxx; are you, ma'am?
24      A    Well, I have the Vigor in my -- in the New
25 England Journal materials in my Appendix.  So if it came
0164
1  up, I would speak about them.
2       Q    When was the first time you read the Vigor
3  article?
4       A    December of '05 or January of '06.
5       Q    And you have read the editorial of concerns
6  written by the New England Journal of Medicine about
7  that article?
8       A    Yes, that's right.  There is a series of them.
9  I think there were two.
10      Q    Did you read the author's responses to that?
11      A    Absolutely.
12      Q    Do you know who Dr. Kurfm is?

Page 68

Ex 1 - 5-26-06 depo transcript

13    A    Yes.
14    Q    Have you read his deposition?
15    A    I looked it over.
16    Q    Did you read Dr. Kurfm's entire deposition?
17    A    I skimmed through it and read relevant parts.
18    Q    Dr. Kurfm and our cross-examination of him
19 would be a better way to describe the Vigor article
20 then for you to describe it at trial; do you agree with
21 that?
22           MR. ROBINSON:  I object to tone.
23           MR. GOLDMAN:  Let me ask it a different way.
24           THE WITNESS:  I have an opinion about --
25
0165
1 BY MR. GOLDMAN:
2    Q    I'm sure you have an opinion about that.  You
3 are not the best person to interpret the Vigor Study for
4 the jury?
5    A    I disagree because I am a marketing person and
6 we are talking about integrated marketing communications
7 campaign --
8    Q    Ma'am --
9    A    -- and I worked on the integrated marketing
10 communication campaigns where we had to compare the
11 science to actually what we were doing.  And that is
12 what I am trying to do here.
13    Q    Ma'am --
14    A    So from a marketing perspective, I am much
15 better than he is to state what that article said to a
16 marketer.
17    Q    What dose of Naproxen was used in the Vigor
18 study?
19    A    50 milligrams.
20    Q    What dose of Vioxx was used in the --
21    A    Oh, I'm sorry.  Vioxx was 50 milligrams and --
22    Q    What does was Naproxen?
23    A    -- Naproxen was, I think, 200-something.
24    Q    What was the difference in serious
25 gastrointestinal problems in the Vioxx arm versus the
0166
1 Naproxen arm?
2    A    Gastrointestinal, I know there was a
3 significant difference in the favored Vioxx.
4    Q    How much of a difference?
5    A    I can't remember -- significant.
6    Q    How many cardiovascular events were seen in the
7 Vigor trial for Vioxx and Naproxen?
8    A    What I remember is that the incidents of heart
9 attacks was .5 for Vioxx and .1 for Naproxen, which
10 means, you know, out of 1,000, so five versus one.
11    Q    How many patients were involved in the Vigor
12 Study?
13    A    Over 8,000.
14    Q    You mentioned that Merck sold, you say, $9 1/2
15 billion of Vioxx between March of 2000 and
16 September 2004; is that right?
17    A    I believe that is a little bit of an under
18 estimate, but it is close.
19    Q    Do you consider yourself an expert of knowing
20 how much Merck sold of Vioxx?
21    A    Yes.  I reviewed the documents.
22    Q    Other than reviewing the documents that have
23 the number 9.5 billion on it, you agree that you don't

Page 69

```
                         Ex 1 - 5-26-06 depo transcript
24   have any independent knowledge of what Merck made when
25   it sold Vioxx; true?
0167
1        A    What do you mean; dollar sales or profits?
2        Q    Either.
3        A    Yes, I do.  I have several documents that
4    provide information.  Some which were from Merck and
5    some were independent.  And some were in publications
6    that are in my folders.
7        Q    Have you ever reviewed any of Merck's financial
8    statements?
9        A    Yes, I have.  The ones that are in the
10   documents.
11       Q    Do you consider yourself an expert in
12   interpreting financial statements?
13       A    Those related to marketing, yes.
14       Q    What about those related to the sales of drugs?
15       A    Yes.
16       Q    Do you think you are in a better position,
17   ma'am, than a juror to understand that Merck made a lot
18   of money selling Vioxx?
19            MR. ROBINSON:  Objection.
20   BY MR. GOLDMAN:
21       Q    You think the jurors might get that in the case
22   without your help?
23            MR. ROBINSON:  Objection.  Compound.
24            MR. O'CALLAHAN:  Join.
25            THE WITNESS:  I think it would have to have an
0168
1    marketing expert in the study.  I find that with MBA
2    students, they don't really understand those numbers.
3    BY MR. GOLDMAN:
4        Q    Do you think that if a witness for Merck were
5    asked a question of how much money Merck made on Vioxx,
6    that the jurors would understand that testimony; how
7    much money Merck made on Vioxx?
8        A    No.
9        Q    You think you need to be there to tell the jury
10   the exact amount?
11       A    I thought you said understand how much you
12   made?
13       Q    Yeah.
14       A    Understand is different from hearing a word.
15   Hearing a word is just knowing the number, but
16   understanding means you have a context to understand
17   what does that mean.  And I don't believe the -- juries
18   don't understand.  I'm pretty sure they don't.  MBA's
19   don't understand that.
20       Q    MBA's don't understand what it means when a
21   company sells $9 1/2 billion of a drug?
22       A    No, they don't understand what that number
23   means.  You have to have a context.
24       Q    You said that -- you asked the question, how
25   did Merck sell so much given Vioxx's significant CV
0169
1    potential; right?  Do you remember being asked that?
2        A    Yes, I do.  Something like that.
3        Q    You don't know how significant the
4    cardiovascular risk was of Vioxx; do you, ma'am?
5        A    I know that it was -- that there was a
6    significant potential.  It was a statistically
7    significant effect.  It was a significant potential.
8        Q    Were there clinical trials that showed there
```

Ex 1 - 5-26-06 depo transcript

```
 9    was no difference in cardiovascular events between Vioxx
10    and placebo?
11         A    On what?
12         Q    Vioxx.
13         A    You mean what outcome?
14         Q    Any outcome.  Are you aware of clinical trials,
15    ma'am, when you say that there was a significant
16    cardiovascular risk that showed that the difference
17    between Vioxx and placebo in terms of cardiovascular
18    risk was at zero?
19         A    I am aware of studies that they put in their CV
20    card that the FDA told them that they could not put on
21    the label that were against --
22         Q    Is that an answer to my question?  Is that in
23    any way an answer to my question?
24         A    Tell me your question again.
25         MR. O'CALLAHAN:  That is argumentative.
0170
 1    BY MR. GOLDMAN:
 2         Q    Look, Dr. Pechmann, my question was very
 3    simple:  Did you review studies, not CV cards -- did you
 4    review any studies showing the difference between Vioxx
 5    and placebo in terms of cardiovascular risks was at
 6    zero?
 7         A    I reviewed descriptions of the studies.
 8         Q    But not the studies themselves?
 9         A    No, I don't believe -- I may have, but I don't
10    recall doing that.
11         Q    You said that Merck devised and implemented an
12    unprecedented integrated management communications
13    campaign for Vioxx?
14         A    No.  It is a marketing communications campaign.
15         (Discussion held off the record.)
16    BY MR. GOLDMAN:
17         Q    Dr. Pechmann, you said that Merck devised and
18    implemented an unprecedented integrated marketing
19    campaign for Vioxx; correct?  Right?
20         A    Yes.
21         Q    When you say "unprecedented,"what are you
22    talking about?
23         A    What I am talking about is that it was the
24    number one prescription drug advertised in the United
25    States.  I believe it was 2000, and it was unprecedented
0171
 1    in its scope and its sophistication.
 2         Q    Have you ever analyzed any integrated
 3    management -- marketing communications plan for Pfizer?
 4         A    I have read articles on multiple different --
 5    on different pharmaceutical campaigns.  I don't have the
 6    details about any other campaign like I do about this
 7    one.
 8         Q    Have you ever analyzed the integrated marketing
 9    communications campaign for Pfizer and its sale of
10    Celebrex?
11         A    Well, many of those documents were in here.
12    They describe Celebrex -- I mean, aspects of the
13    Celebrex campaign in here.  For example, they tested the
14    Celebrex ads.
15         Q    Do you consider your review of the documents in
16    this case to put you in the position to say, yes, I have
17    reviewed and analyzed Pfizer's integrated marketing
18    communications campaign for Celebrex?
19         A    Not the entire campaign, no.
```

Page 71

```
                    Ex 1 - 5-26-06 depo transcript
20       Q    You have never analyzed an integrated
21  communications marketing campaign -- withdrawn.
22            You've never analyzed an integrated marketing
23  communications campaign for any pharmaceutical company?
24       MR. ROBINSON:  Objection.  Asked and answered.
25
0172
1   BY MR. GOLDMAN:
2        Q    Other than your involvement in this case?
3        A    Yes, I have read pharmaceutical campaigns.
4        MR. ROBINSON:  We are retreading.
5   BY MR. GOLDMAN:
6        Q    Which ones?
7        A    I read hundreds of articles a month -- a year,
8   so --
9        Q    What integrated marketing communications
10  campaigns have you read about pharmaceutical companies?
11            MR. O'CALLAHAN:  I am going to object.  You cut
12  off her answer.  I just think that it's -- it's a lack
13  of courtesy, which I don't think it is characteristic of
14  you?
15            MR. GOLDMAN:  Thank you.  I appreciate that.  I
16  am not trying to be discourteous.  I am trying to move
17  forward.
18       Q    New question:  Did you ever --
19       A    Let me just say some of the articles are there
20  about other campaigns.
21       Q    Other than your work in this case,
22  Dr. Pechmann, am I right that you've never analyzed an
23  integrated marketing communications campaign for any
24  drug company?
25       A    What do you mean by "analyze"?  Some of those
0173
1   articles in my folder I read before I was involved in
2   the case and those described -- I have not done any
3   research on any other integrated marketing communication
4   campaign that involved pharmaceuticals.
5        Q    You have never done any research or published
6   any articles on integrated marketing campaigns for any
7   drug company; right?
8        A    Yes, I agree with that statement.
9        Q    You said Merck's integrated marketing
10  communications campaign for Vioxx was perfect except on
11  the most important dimension of all; campaign was
12  misleading.
13            Do you remember making that statement?
14       A    Yes, I do.
15       Q    Who was the campaign misleading to?
16       A    Physicians, consumers, and the general public.
17       Q    What objective criteria do you use to decide
18  that Merck's marketing campaign was misleading?
19       A    I used the data from the studies.
20       Q    What studies?
21       A    Well, for example, there is a physician
22  tracking study, very extensive, and it shows what the
23  sales representatives -- well, what the physicians
24  recalled that the sales representatives said to them
25  about Vioxx.
0174
1        Q    Okay.
2        A    And they said that the sales representatives
3   affirmatively asserted that --
4        Q    What page are you on?  If you can point me to
                    Page 72
```

Ex 1 - 5-26-06 depo transcript

```
 5   the page, you don't need to read the whole thing.
 6       A    Exhibit 56, Page 17.
 7       Q    Okay.  Now, here you were relying on a document
 8   that purports to report what doctors sometimes after
 9   they meet with sales representatives remember sales
10   representatives telling them about Vioxx?
11       A    Yes, and that is the standard -- generally
12   accepted research method in this industry and in any
13   evaluation of an integrated marketing communications
14   campaign.
15       Q    So you were relying on a study report of what
16   166 doctors seem to remember about their interactions
17   with certain sales representatives and you are
18   concluding that Merck --
19       A    No.  No.  I'm sorry.  First of all, it was 300
20   a month for years.  It was not 166.  You are talking
21   about a different document.  That is Exhibit 55.
22       Q    Um-hmm.
23       A    That is where I independently counted up the
24   comments to see whether in that sample it coincided with
25   the numbers that they said and it did.  That is where I
0175
 1   validated their numbers.
 2       Q    You think that you are in a better position
 3   than a juror, ma'am, to look at a comment by a doctor
 4   and see whether or not what he remembers a sales
 5   representative telling him is misleading?
 6       A    What I am saying is that the jury --
 7       Q    Can you answer my question yes or no?
 8       A    Yes.  I do believe I am better qualified than
 9   the jury, yes.
10       Q    Do you believe that the jury is not capable of
11   determining whether Vioxx's marketing efforts was
12   misleading if you are not there to help them?
13       A    I think that I could add a huge amount to their
14   knowledge.  That -- I think that they will not be able
15   to understand the vast majority of the documents in this
16   case that are relevant to that issue unless they have an
17   expert like me to explain it to them.
18       Q    You don't think that the jury can understand a
19   report about what doctors remembered sales
20   representatives telling them?
21       A    No, I think that jurors would need to be --
22   need to be explained -- needs someone to explain to them
23   what the research method is, what the validity of that
24   method is, what the different data points indicate; what
25   the statistical, statistical analyses were done.
0176
 1            I don't think a jury -- and it is not just this
 2   one study.  There is six different types of studies.
 3   And I do not think that a jury could handle this on
 4   their own.
 5            Many of the documents, you can't even
 6   understand them.  If you were to put the document up,
 7   they would have no idea how to read it.  So you need an
 8   expert to explain what the X axis is, what the Y axis
 9   is, what are the acronyms; what are the statistical
10   tests; is it valid -- you know, is this a valid
11   technique?  How do we know it's valid?  I mean for every
12   study.
13            I just think they would have a difficult time
14   and they would not understand the majority of the
15   evidence.
```

Page 73

Ex 1 - 5-26-06 depo transcript

16        Q    Let's look at an example -- well, actually, we
17  will get there in a minute.
18             You claim that Merck's marketing campaign was
19  expressly designed to neutralize the concerns of Vioxx's
20  cardiovascular potential; is that your testimony?
21        A    Yes, I found that in the documents in several
22  places.
23        Q    And that is your personal interpretation of the
24  documents; right?
25        A    No, it is verbatim from the documents.
0177
1         Q    So the jury can understand that; right?
2         A    That statement, yes.
3         Q    There are actually lots of examples in your
4   report where all you are doing is quoting from documents
5   and then going to your next example of what you think is
6   misleading; right?
7         A    Because -- yes, because what I was trying to do
8   was describe the campaign before getting into all of the
9   research.
10        Q    Can you --
11        A    But, really, what I spent most of my time is on
12  the research.  Much of my time was on the research.
13        Q    Would you do me a favor and point me to
14  paragraphs in your report where you are talking about
15  the six studies and the research that you think you
16  need to explain to the jury?
17        A    Okay.  Well, first of all, the materials that
18  you would need to know is on Page 6 and 7 and top of 8.
19  You can't understand many of the documents unless you
20  know the definitions for those terms.
21        Q    I don't think 90 percent of those terms are
22  even in those documents, but --
23        A    But that is where I got every single term.  I
24  didn't pick a term right out of my head.  They were all
25  from a document.
0178
1         Q    Okay.  Let me ask you:  On the actual studies
2   themselves, Dr. Pechmann, tell me where in your report
3   and just mention the paragraphs, do you offer opinions
4   about the six studies that you want to tell the jury
5   about?
6         A    It is really throughout the report.  So I will
7   go page by page and find --
8         Q    Okay.
9         A    -- and find them.
10             Okay.  There is material on Page 32 and 33.
11        Q    Let me get there.
12             Okay.  You are referring here to an Awareness
13  and Action Study?
14        A    Yes, or the Chronic Pain Study.  That is what
15  they more commonly called it.
16        Q    That is one study?
17        A    Yeah.
18        Q    Okay.
19        A    It was conducted monthly from May 2000 through
20  December, 2003.
21        Q    So that is paragraph 27(b) of your report?
22        A    Yes.
23        Q    Where is the next time you talk about the
24  second study?
25        A    Okay.  47, the Attribute Tracker Study.
0179

Page 74

```
                        Ex 1 - 5-26-06 depo transcript
 1       Q    That's Paragraph 35(a)?
 2       A    Yes, and (b).  And then there is some
 3  additional research on Page 50.
 4       Q    Where is that?
 5       A    It is at the top of the page.  It is part of
 6  (c) from Page 49.
 7       Q    I want you to identify the study.
 8       A    Additional 10 to 15 prescriptions, so it is
 9  Exhibit 41.  Do you see it on the top of Page 50?
10       Q    Yes.  So Exhibit 41, that is cited in
11  subparagraph (d) that is on Page 50.
12            Okay.  What is the next study that you want to
13  talk about?
14       A    Page 51, 52, 53.
15       Q    What study is that?
16       A    Well, you know, let me explain.  I am
17  describing several studies sometimes.  I don't say -- I
18  was -- I addressed several studies that all reached the
19  same conclusion.
20       Q    Yes.
21       A    And so on Page 50 and 51, that is the -- I
22  believe that is the Attribute Tracking Study.
23       Q    Okay.  That is the one that we already covered?
24       A    Yeah, more data from it.  Let me make sure.
25            And on Page 53, that is a different research
0180
 1  project.
 2       Q    Which one?
 3       A    The middle of the paragraph, so that is
 4  Exhibit 54.
 5       Q    Okay.  Paragraph H on 53.
 6            What is the next study that you wanted to talk
 7  about?
 8       A    Okay.  That is the Message Tracking Study.  The
 9  sales rep message tracking study that looked at what the
10  physicians recalled from the sales reps and how it
11  affected their prescribing behavior.
12            MR. ROBINSON:  Are you on Page 53?
13            THE WITNESS:  Yes.  53, 54, 55, 56.
14  BY MR. GOLDMAN:
15       Q    Let me just ask you about this study as an
16  example.
17            Do you see on Page 54, where you are reporting
18  on the findings of that study, and you have a bullet
19  that says, "Safe and effective and not associated with
20  cardiac deaths"?
21            Do you see that?
22       A    Yes.  That is a quote from a doctor.
23       Q    That is a quote from a doctor.  Do you think
24  that the jury can understand that without your
25  particular help?
0181
 1       A    That particular quote?
 2       Q    Yes.
 3       A    Yes, but not the research, not the validity of
 4  the research, not the approach to the research, not the
 5  statistics involved.  I mean, there is --
 6       Q    What statistics do you report on here?  What
 7  statistics are you reporting on here?
 8       A    This particular one, is very, very, very clever
 9  statistics.
10       Q    Where do you report on the statistics in your
11  study -- in your report, ma'am?
```

Page 75

Ex 1 - 5-26-06 depo transcript

```
12        A    I don't.  I just talk about my opinion, but in
13   the -- in the -- and said I was going to talk about
14   these studies.
15             So I did not get into all of the details, the
16   methods, and all of the statistics in this report.  I
17   focused on my conclusions and the studies that I used to
18   reach those conclusions.
19             So this study had very significant -- had --
20        Q    Let's go to the next study.
21        MR. SKIKOS:  So you don't want her --
22        THE WITNESS:  You didn't want me to answer the
23   question about the statistics?
24        MR. GOLDMAN:  No.
25        MR. ROBINSON:  Let her keep going.
0182
1    BY MR. GOLDMAN:
2         Q    What is the next study?  Tell me the next study
3    that you would want to talk to the jury about.
4         MR. ROBINSON:  Here, Page 54, DTW Marketing and
5    Research Group; is that what you are --
6         MR. GOLDMAN:  That is the one that she just
7    covered.  Mark, let me handle the dep, please.
8         Q    Dr. Pechmann, what is the next study that you
9    would like to talk to the jury about?
10        A    On 57(c), that is prescribing data.  So that is
11   behavioral tracking.  There is extensive charts and
12   figures and statistics associated with that because they
13   tracked that continuously.
14        Q    So you want to talk about C on 57?
15        A    Uh-huh.
16        Q    Okay.  And what is the next study that you want
17   to talk about?
18        A    And (d).
19        Q    Okay.  And these are Merck reports.
20             What are Vioxx Monthly EAR's?
21        A    Early Assessments and Response.
22        Q    Okay.
23        A    It was research designed to help them adjust
24   the campaign if something went wrong, which they did do.
25   They used their research to adjust the campaign.
0183
1         Q    Okay.  Keep going.
2         A    Page 58 at the top.
3         Q    Yeah.  which?
4         A    And (e) and (f).
5         Q    Exhibit 57, you want to talk about?
6         A    Um-hmm.
7         MR. ROBINSON:  You mean page?  Oh, --
8         THE WITNESS:  Page 58.  There are other
9    exhibits that have comparable -- there is a pattern
10   across multiple different studies, multiple different
11   exhibits.  I just put in representative ones.
12   BY MR. GOLDMAN:
13        Q    Tell me what other studies in your report that
14   you want to talk about.
15        A    So everything on Page 58.
16        Q    Okay.
17        A    Page 59 is another.  It says, Copy Test of
18   Physicians is on Page 59.
19        Q    Okay.
20        A    And Page 60 at the top.  And then, I believe,
21   the research picks up again on 63.  That is the Consumer
22   Copy Test Research.  64, that is the Consumer Copy Test.
```

Ex 1 - 5-26-06 depo transcript

23   65, Consumer Copy Test.
24          These reports are 100-pages long and I know for
25   a fact a jury cannot understand them because we had to
0184
1    present this type of thing to the government officials
2    and they didn't understand.
3          Q    I did not ask you about whether the jury can
4    understand.  I want to know which studies you would like
5    to talk about that are in this report.
6          A    And Page 66.
7          Q    Which one on 66?
8          A    Well, there are different copy tests.  So it is
9    on the top of Page 66.
10         Q    Which is Exhibit 67?
11         A    Yes.  And then on Page 66 at the bottom, that
12   is the same study, again, but more details on it.  So it
13   picks up again.  66, 67, 68.
14         Q    Through -- before 39; right?
15         A    Yeah.
16         Q    Paragraph 39; right?
17         A    Yes.
18         Q    What about after Paragraph 39, what research
19   studies?
20         A    39(a).
21         Q    Where is the research study there?
22         A    Well, that was a progression -- I mean, a trend
23   analysis.
24         Q    Is that a research study?
25         A    Oh, yeah.  There is a whole class that is
0185
1    taught on that.
2          Q    This is a Profit Plan?
3          A    No, no.  There is a forecast in there.  It is a
4    research based --
5          Q    Is it a Profit Plan, ma'am, that you are
6    quoting from?
7          A    The document is called Profit Plan, but it
8    reports research, yes.
9          Q    What else do you want to talk to the jury about
10   concerning research?
11         A    56, at the top, it is another forecast.  I
12   mean, 69.
13         Q    This is another financial forecast you want to
14   talk about?
15         A    Right.  Well, it is a progression.  It is a
16   sales -- it is a progression.  It is not a financial --
17   well, it is a -- it forecast sales.  So if you think
18   sales is financial, that is okay.  We consider that
19   marketing -- a marketing forecast.
20         Q    What other research studies in your report?
21         A    So (c), that is another --
22         Q    Profit Plan?
23         A    It is a --
24         Q    It is a Merck document --
25         A    It is a forecasting model.
0186
1          Q    -- called a Profit Plan?
2          A    I don't think that is -- Oh, yes, it is.  It
3    says, Profit Plan -- "Profit Plan 2002."  It is.
4               It has forecasts in them.  That is research.
5          Q    You want to talk about Profit Plans as
6    research.
7               What is the next type of research that you

Page 77

Ex 1 - 5-26-06 depo transcript
```
 8   would like to talk about to the jury?
 9           MR. SKIKOS:  No, that misstates what she said.
10           THE WITNESS:  It is.  No.  There is research
11   that is reported in the plan.
12           MR. O'CALLAHAN:  She did not name the document.
13   It says what it says and the information in there is
14   what it is, and it is exactly as she described it.
15   BY MR. GOLDMAN:
16       Q   I would like to know what other research
17   reports that you would like to talk to the jury about.
18       A   Well, like I said, I would like to talk to them
19   about the research showing their sales, which is 69 and
20   70.  Giving them a context to understand that.
21       Q   Okay.
22       A   And that's it.
23       Q   Okay.
24       A   It is about half of the boxes of documents,
25   that are about research.
0187
 1       Q   Are you familiar with the procedure that Merck
 2   followed before approving an advertisement for use on
 3   Vioxx?
 4       A   Yes.
 5       Q   What procedure did Merck follow?
 6       A   Well, I read the document that described it and
 7   I read the FDA documents.  And so they had to submit it
 8   to the FDA.  The FDA did not approve the ad, but they
 9   had to, basically, file it with the FDA, with DDMAC.
10       Q   What did Merck do internally to approve
11   advertisements or other promotional material that were
12   used for Vioxx?
13       A   They had an office that looked it over.  I
14   can't remember the name of the office, but there was an
15   internal office that looked it over before it went to
16   FDA.
17       Q   Do you know what the procedure that Merck
18   followed internally to make sure that its promotional
19   pieces were fairly balanced and accurate?
20       A   Yes, I read a document that described it.
21       Q   Tell me what the process was.
22       A   The people -- there was a key -- a list of
23   different types of materials.  And there were -- they
24   all had to be submitted to this office for review.
25           And then that office would forward some of it
0188
 1   onto the FDA.  And that nothing could be used until it
 2   was approved by that office.
 3       Q   Do you know if Merck sent direct-to-consumer
 4   advertising to the FDA in advance of using their ads?
 5       A   Yes, they did and I know they did.
 6       Q   You mentioned that you met with and/or
 7   interviewed a former sales representative.
 8           Who was that?
 9       A   I don't remember her name.  She was a friend of
10   Shannon's and I just wanted to speak to someone to get,
11   you know, a human -- a human's validation of everything
12   I was seeing.
13       Q   What did this person, whose name you don't
14   remember, tell you?
15       A   Well, she described her typical day as a sales
16   rep and -- and then I -- let's see, I asked her some
17   specific questions about Vioxx.  Did she know that it
18   posed a cardiovascular risk?  Did she tell the doctors?
```
Page 78

Ex 1 - 5-26-06 depo transcript

```
19        And she said, no, that they believed -- she
20   believed the Naproxen hypothesis.  And then I showed her
21   some of the materials that I had reviewed and confirmed
22   that she would use those materials.
23        I asked her about the confidence -- Efficacy
24   Confidence Program because it was a huge success.  And
25   that is when she left the company and so she didn't know
0189
 1   about that one.
 2        Q    When did she leave the company?
 3        A    Right before the Efficacy Confidence.  I
 4   believe it was August of '02 -- August '02.
 5        Q    What else did you discuss with this former
 6   sales representative?
 7        A    What she knew about the FDA regulations or
 8   Merck's own regulations regarding advertising.
 9        Q    Anything else?
10        A    What were the challenges to her in selling
11   Vioxx.
12        Q    What did she say about that?
13        A    She said they were concerned about the bad
14   press.  The salespeople were concerned about the bad
15   press.
16        And that is, of course, apparent in the Be The
17   Power videotape that they created and the Efficacy
18   Confidence Program.  And so the salespeople were getting
19   a little discouraged because they felt they were getting
20   unfair bad press.
21        Q    You are talking about the one sales rep?
22        A    That's correct, but the documents state that in
23   general, the sales reps were -- needed boosting up.
24   They were a little discouraged.
25        Q    What else did you discuss with this sales
0190
 1   representative whose name you can't remember?
 2        A    Those are the main things that I remember
 3   discussing.
 4        Q    When did you meet with her or him?
 5        A    It is a her.  And it was a Friday morning.
 6        Q    For how long?
 7        A    For maybe four hours.
 8        Q    Who else was there?
 9        A    Maybe my daughter was in the back room for part
10   of the time with the nanny.
11        MR. ROBINSON:  Your four-year-old daughter?
12        THE WITNESS:  Um-hmm.
13   BY MR. GOLDMAN:
14        Q    This was at your house?
15        A    Yes, she came to my house.  She lives by me.
16        Q    Did this former salesperson ever call on
17   Dr. Micola or Dr. McCaffrey?
18        A    No, she called around here.
19        Q    Which is in California?
20        A    Los Angeles is her territory.  Yeah, South Bay.
21   Los Angeles County, not L.A. city.
22        Q    You don't know what doctors this person called
23   on; do you, ma'am?
24        A    No.
25        Q    How is the interview with the one sales
0191
 1   representative relevant to your opinions here today?
 2        A    They just helped me to validate what I was
 3   seeing.  There was nothing that she said that surprised
```

Page 79

Ex 1 - 5-26-06 depo transcript

4   me.
5           That is what we learn in doing research.  You
6   want to triangulate, use multiple sources of
7   information.  So you can feel that you are confident
8   that you've got the story right.
9       Q    So this sales rep validated what you have seen.
10  What does that mean?
11      A    Well, in terms of what the message was -- I
12  mean, we have several other documents that say what the
13  messages was.  We have several of the documents that say
14  how ads were approved, both within Merck and going to
15  the FDA.
16          We have several other documents that say how
17  they used the promotional materials, how they
18  approached, how often they approached doctors; how they
19  worked in teams; and all of that.
20          And you know, so she just confirmed what I was
21  seeing.
22      Q    Did you think it might be a good idea to talk
23  to more than one sales representative?
24      A    If there had been discrepancies between what
25  she said and what I saw, then I would have had to do
0192
1   something.
2       Q    So you think meeting with one sales
3   representative is sufficient validation of your
4   findings?
5       A    No, she didn't validate any of the research
6   findings.
7       Q    You said she validated what you saw?
8       A    She validated certain parts of the story -- a
9   very, very, small part.  I mean, I didn't discuss any of
10  the research with her.
11          I'm sure the sales reps didn't see the research
12  and would not understand the research.  So mostly I --
13  she validated what -- how these promotion materials were
14  used, the CV card and so forth.
15          And she validated what Kaghe said, who is in
16  Southern California, that they did not tell the doctors
17  about the heart attack risk because they didn't think
18  there was one; and they told them the Naproxen
19  hypothesis.
20      Q    Did you think that you might want to speak to
21  more than one sales representative to validate what you
22  had seen in the documents that the plaintiffs' lawyers
23  gave you?
24      A    No, because I had the documents months for
25  years and it did not validate itself.  I was not
0193
1   actually talking to her to validate the research.  It
2   was just to validate what the experience was of the
3   sales rep.
4       Q    On Page 6, Paragraph 14, you refer to having
5   expertise in pharmaceutical marketing matrix.
6           What does that mean?
7       A    Well, okay, I list them:  Patient volume, total
8   patients, new-to-market patients, reinitiated patients,
9   which volume.  These are all terms of art that are very
10  related to any other type of marketing.
11          It says, "patient" instead of "consumer," you
12  know.  So I was familiar with the general terms and the
13  general constructs; but I learned how they are worded,
14  what the correct term is in pharmaceutical marketing.

Page 80

Ex 1 - 5-26-06 depo transcript

```
15      Q     You learned that as part of your role as an
16  expert in this case?
17      A     Yes.  Some of the words, I knew, and some of
18  them, I learned.  But you become --
19      Q     So you became an expert in pharmaceutical
20  marketing matrix during your work in this case?
21      A     Well, no.  I knew the matrix before.  All I
22  learned was how the acronyms for what they are called in
23  the pharmaceutical marketing, so -- you know --
24      Q     What --
25      A     -- TRX, ANRX, those things.
0194
1       Q     What experience do you have that makes you an
2   expert in pharmaceutical marketing matrix?
3       A     I am an expert in marketing matrix.
4   Pharmaceutical marketing is the same matrix as any other
5   marketing, so --
6       Q     So you are not an expert in pharmaceutical
7   marketing matrix, you are an expert in marketing matrix?
8           MR. SKIKOS:  Objection.
9           THE WITNESS:  Including pharmaceutical
10  marketing matrix.  I don't agree with your assessment of
11  my expertise.
12          I am an expert in pharmaceutical marketing
13  matrix and the marketing matrix used in other
14  industries.  It is the same matrix.
15  BY MR. GOLDMAN:
16      Q     Have you written any articles, done any
17  research involving pharmaceutical marketing matrix?
18      A     I have not published any research that
19  discusses pharmaceutical marketing matrix to date.
20      Q     Have you written any articles anywhere on
21  pharmaceutical marketing matrix, Dr. Pechmann?
22      A     Have I written any articles?  No.
23      Q     Is there a particular place in your report
24  where you apply these pharmaceutical marketing matrix?
25      A     Yes.  Those matrixes were primarily used to
0195
1   understand the behavioral tracking data.  Although --
2   and also, the data that is the tracking of the sales rep
3   messages.  So in both -- those two types of studies.
4           Oh, and also, the Attribute Tracking Study had
5   to do with efficacy and safety perceptions and gaps and
6   all of that.  So three of the studies use those matrix.
7           Like I said, I am familiar with the matrix
8   before.  They just have a -- they have a spin on them
9   for -- I mean, a certain label in pharmaceutical is
10  slightly different than what you would use in another
11  industry, but the matrixes are the same.
12      Q     You say that you want to help the jury
13  understand testimony in the case; is that right?
14      A     Well, to understand the research and --
15      Q     What testimony do you want the jurors to --
16  withdrawn.
17          Is there a particular testimony that you are
18  saying that is going to come into evidence in the trial
19  that you need to explain to the jury?
20          MR. SKIKOS:  Huh?  Objection.
21          MR. O'CALLAHAN:  Objection.
22          THE WITNESS:  Am I supposed to answer the
23  question?
24  BY MR. GOLDMAN:
25      Q     Do you understand?
```

Ex 1 - 5-26-06 depo transcript

0196
1      A    I don't understand that question.
2      Q    I didn't understand the statement that you made
3  in here about testimony. Maybe I can find it.
4           Okay. Let's talk about Dr. McCaffrey. You
5  said that he was mislead by Merck's marketing campaign;
6  right?
7      A    Yes.
8      Q    And your basis for that is based on your
9  skimming of his deposition; correct?
10     A    No.
11          MR. SKIKOS:  Objection.
12 BY MR. GOLDMAN:
13     Q    Did you ever talk with Dr. McCaffrey?
14     A    No, I did not.
15     Q    Did you ever read his deposition carefully?
16     A    Parts of it, I read very carefully and I read
17 all of it.
18     Q    You didn't skim the deposition?
19     A    No. Actually, not with these guys.  I read
20 through --
21     Q    Did you take notes on Dr. McCaffrey's
22 deposition?
23     A    No, I don't believe I did.
24     Q    Did you highlight anything in Dr. McCaffrey's
25 deposition?
0197
1      A    No, I watched -- saw it on a computer screen.
2      Q    What do you mean, you saw it on a computer
3  screen?
4      A    I pulled it up on a computer screen.
5      Q    What did Dr. McCaffrey know about the potential
6  cardiovascular risks of Vioxx?
7      A    He testified that he didn't know.
8      Q    Is that --
9      A    I'm sorry.  I will tell you exactly what he
10 testified to.  It's very interesting.
11          So in Exhibit 5, he was asked, "During
12          The two years you prescribed Vioxx
13          for Dr. Barnett, were you ever given
14          a warning by Merck that Vioxx caused
15          heart attacks?"
16          And he said, "No, sir."
17          And he went into quite a bit of detail -- at
18 least two points in his depo about how -- as to when the
19 label was changed and Vigor was put on the label, he and
20 the rep sat down.
21          And the rep said, I don't know how to make
22 heads or tails out of this.
23          And he said, I didn't see any evidence that
24 Vioxx was causing heart attacks.
25     Q    Do you think that the jury is capable of
0198
1  understanding that testimony without your help?
2          MR. SKIKOS:  Objection.
3          THE WITNESS:  What I want to talk about is the
4  research that puts this in the context.  I don't think
5  they understand.
6  BY MR. GOLDMAN:
7      Q    My question is do you think that the jury can
8  understand the testimony by Dr. McCaffrey without your
9  help?
10          MR. ROBINSON:  You mean just the testimony

Page 82

Ex 1 - 5-26-06 depo transcript

```
11  itself?
12          MR. GOLDMAN:  Yes.
13          THE WITNESS:  No, I don't think they can really
14  understand it unless they have a context of
15  understanding the whole integrated marketing
16  communications campaign and what the research was
17  showing and what --
18  BY MR. GOLDMAN:
19      Q    Okay.  Sorry?
20      A    Yeah.  And so I think other -- I think this is
21  the crux of why it is misleading is because this was
22  happening across the country.
23          And it was because that was the goal of their
24  campaign to neutralize the heart attack risks, and they
25  did extensive research to make sure that this was
0199
1   happening.  And they adjusted things when it looked like
2   things weren't going right.
3           So I don't think they would understand this
4   testimony unless they understood the research --
5       Q    Do you think --
6       A    -- as it relates to the testimony.
7       Q    You think that you need to come to trial to
8   help the jury understand as to what Dr. McCaffrey had
9   testified about as to his knowledge of the
10  cardiovascular risks of Vioxx?
11      A    No.  I think that they can understand his words
12  and what he is saying, yes, I think they will understand
13  that.
14      Q    Okay.  Do you have any idea what the sales
15  representative who called on Dr. McCaffrey said to him
16  about Vioxx and any cardiovascular risks?
17      A    Yes, there is research on that.
18      Q    There is research on what the sales
19  representative told Dr. McCaffrey?
20      A    Yes, we have the call notes.
21      Q    The call notes?
22      A    Right.
23      Q    Okay.  Let's look at the call notes.
24          MR. ROBINSON:  Can she get a copy of it or do
25  we have a copy?
0200
1           THE WITNESS:  It should be Exhibit 7.
2   BY MR. GOLDMAN:
3       Q    In your binder?
4       A    Yes.
5       Q    Let's look in your binder, Exhibit 7.
6       A    And they were also notes indicating how many
7   meetings they had had, which I don't think I have in
8   here, but there was every single meeting he had.
9       Q    Let's talk about one that you mention in your
10  report.
11          MR. ROBINSON:  She said 7.  Let's go to 7.
12          THE WITNESS:  Yeah, Exhibit 7.
13  BY MR. GOLDMAN:
14      Q    And Exhibit 7 in your binder --
15      A    Yes.
16      Q    -- you point out that on September 14 of 1999,
17  there is an indication that Sherry Elder, who is a
18  representative, wrote a note that said, three S's of
19  Vioxx; is that what you are talking about?
20      A    Yes.
21      Q    What did Sherry Elder tell Dr. McCaffrey on
```

Page 83

Ex 1 - 5-26-06 depo transcript

22   that date about the three S's, ma'am?
23       MR. SKIKOS:  Objection.
24       MR. ROBINSON:  Go ahead.
25       THE WITNESS:  Well, I am saying that she said
0201
1    she discussed the three S's.  So that means strength,
2    safety and QD simplicity.  So she discussed safety at
3    that meeting.
4    BY MR. GOLDMAN:
5        Q    What about safety did Ms. Elder say to
6    Dr. McCaffrey?
7        A    I don't know for certain, but I know what the
8    research says that in general was happening.
9        Q    You don't know what any particular sales
10   representative said to Dr. McCaffrey; do you, ma'am?
11       A    I know what they are instructed to tell
12   McCaffrey.
13       Q    What were they instructed to tell
14   Dr. McCaffrey?
15       A    They were given detailed instructions on what
16   to stay.  That was part of the integrated marketing
17   campaign.  So they had detailing pieces.
18       Q    What did -- withdrawn.
19            You don't know, Dr. Pechmann, what the sales
20   representatives of South Carolina said to Dr. McCaffrey
21   or to Dr. Micola; do you, ma'am, about Vioxx or its
22   cardio -- withdrawn.
23       A    I have research that it --
24       Q    You don't know what the sales representatives
25   of South Carolina said to Drs. Micola or McCaffrey about
0202
1    the cardiovascular risks associated with Vioxx; do you,
2    ma'am?
3        A    Yes, he testified.
4        Q    Other than the testimony you read, you don't
5    have any other knowledge about what the sales
6    representatives said to Dr. Micola and Dr. McCaffrey
7    about the cardiovascular risk associated with Vioxx?
8        A    Yes, I do.
9        Q    What sales representatives have you spoken with
10   from South Carolina?
11       A    I am saying in order to understand what the
12   sales reps were saying to the physicians, Merck spent
13   hundreds of millions of dollars.
14            And based on that research, we have a
15   statistical understanding or prediction of what they
16   were hearing.
17       Q    What --
18       A    So I do have a statistical basis for predicting
19   what they were told.
20       Q    What did Ms. Elder tell Dr. McCaffrey on
21   September 4th of 2002?
22       MR. SKIKOS:  He is asking if you were in the
23   room.
24       THE WITNESS:  No.  I know the general topics
25   they discussed and I know what they were told
0203
1    specifically to say on each topic.
2            But as to how the exact statistic applies in
3    this case, I cannot state what happened in that one
4    instance, but I can give you statistics about it.
5    BY MR. GOLDMAN:
6        Q    Try to answer my question yes or no.  Without

Page 84

Ex 1 - 5-26-06 depo transcript
```
 7   talking about statistics.
 8           MR. ROBINSON:  Objection.
 9           You don't have to answer yes or no.  You just
10   answer his question.
11   BY MR. GOLDMAN:
12       Q    Dr. Pechmann, do you know what the sales
13   representatives of South Carolina told Dr. McCaffrey and
14   Dr. Micola about the cardiovascular risk associated with
15   Vioxx?
16       A    Yes, I have a statistical prediction of what
17   they were told.
18       Q    Did you speak to any sales representative in
19   South Carolina?
20       A    I don't believe so.
21       Q    Did you ever read any depositions of any sales
22   representatives in South Carolina?
23       A    I didn't read the depositions.  No.
24       Q    Did you ever speak to Dr. Micola and
25   Dr. McCaffrey about what the sales representatives
0204
 1   telling them about cardiovascular risks associated with
 2   Vioxx?
 3       A    No, I read it in their depositions.
 4           THE WITNESS:  I have to take a break.
 5           (Brief recess.)
 6   BY MR. GOLDMAN:
 7       Q    Do you know, Dr. Pechmann, what promotional
 8   pieces or advertisements Dr. Micola and Dr. McCaffrey
 9   actually saw?
10       A    I know what promotional pieces the sales reps
11   were instructed to show them and I know when there was
12   enough -- because they actually had a meeting and they
13   recorded it.  And so I have a pretty good idea of what
14   they say, but I would not know with certainty.
15       Q    You don't know, Dr. Pechmann, what the sales
16   representatives actually showed Dr. Micola and
17   Dr. McCaffrey; do you, ma'am?
18       A    Yes, I do.
19       Q    How do you know what promotional pieces sales
20   representatives actually showed those doctors?
21       A    Because there was one that they were required
22   to show.
23       Q    How do you know they showed it?
24       A    I mean, he might not have seen it, but they
25   showed it to him because that is what they were required
0205
 1   to do.  And they used for several months.  So there is
 2   no way they would not have shown it to them.
 3       Q    Are you talking about the CV card?
 4       A    No.  The core promotional pieces.
 5       Q    Were you ever with the sales representatives
 6   and the doctors when they had their discussions?
 7       A    No, I was not.
 8       Q    You don't know, ma'am, what sales promotional
 9   pieces or advertisements Dr. Micola and Dr. McCaffrey
10   actually saw; true?
11       A    I know what they were shown by the sales reps.
12       Q    Did you talk to the sales reps to see what they
13   actually showed Dr. Micola and Dr. McCaffrey?
14       A    They were given one piece.  They had to show
15   that to the doctor.  That was their job.
16       Q    Did you talk to any sales representatives to
17   see what they showed Dr. Micola and Dr. McCaffrey?
```

Page 85

Ex 1 - 5-26-06 depo transcript

18    A    No.
19    Q    You don't know what the sales representatives
20 actually showed Dr. Micola and Dr. McCaffrey; true?
21    A    False.  They have -- the sales reps were
22 scripted and they were required to show a certain
23 brochure.  It is the core piece.  I don't know what else
24 they showed, but I do know they showed that core piece.
25    Q    Do you know that sales representatives were
0206
1 instructed to discuss the label change in April of 2002
2 with doctors?
3    A    Yes, I saw the bulletin.
4    Q    Did the sales representatives in South Carolina
5 talk to Dr. Micola and Dr. McCaffrey about the changes
6 to the April, 2002 label?
7    A    We just saw that Micola -- I'm sorry.
8         McCaffrey did discuss the change with the sales
9 rep.
10    Q    Ma'am, I understand that --
11    A    So that -- so that was testimony.  So, yes, I
12 know that they discussed it.
13    Q    I understand that you have read training
14 materials and you have interpreted Merck's documents,
15 and you believe you know what the sales representatives
16 were instructed to do.  Okay.  I know that.
17    A    Okay.
18         MR. ROBINSON:  But she did say she read the
19 deposes of Micola and McCaffrey.
20 BY MR. GOLDMAN:
21    Q    You do not know what materials the sales reps
22 actually showed Dr. Micola and Dr. McCaffrey; true?
23    A    With virtual certainty -- I don't know a
24 hundred percent, but with a very, very high probability,
25 I know.
0207
1         I don't know what ads they saw, but I know what
2 brochure that they showed.  They were required to show
3 that.  It -- they can't get away with not showing that.
4         That is their job.  That is their one thing
5 they had to do, and they had that one brochure for
6 several months.
7    Q    Dr. Pechmann, you do not know what the sales
8 representatives actually showed Dr. Micola and
9 Dr. McCaffrey concerning the cardiovascular risks
10 associated with Vioxx; do you, ma'am?
11    A    Oh, concerning the cardiovascular risks?
12    Q    Yes.
13    A    Oh, you reworded the question.
14         Not with certainty.  I just have a statistical
15 probability.  A statistical estimate based on the
16 research that they conducted for the very reason to
17 answer that question.  That is why they did the research
18 to answer that question.
19    Q    Ma'am, you are really not answering my
20 question.  My question really calls for a yes or no.
21    A    I am a scientist.  No, that is not how
22 scientists --
23    Q    Can you answer it yes or no?
24    A    No.  I said I know the statistical estimate
25 whether they saw -- what they said to them.  I have a
0208
1 statistical estimate.
2    Q    See, if you can answer this question yes or no

Page 86

Ex 1 - 5-26-06 depo transcript
3   and then we can talk about your statistical estimate.
4   Okay?
5           Do you know what materials the sales
6   representatives showed Dr. Micola and Dr. McCaffrey?
7       A   With virtual certainty, yes.
8       Q   How do you know with virtual certainty what the
9   sales representatives showed those doctors when you
10  never talked to the sales representatives?
11      A   Because they only had one core marketing
12  brochure.  That is their job.  They have to.  There are
13  other reps coming into the office.  If they didn't show
14  that material, they would be fired.  I mean --
15      Q   How do you know?
16      A   How do I know?
17      Q   How many sales representatives got fired from
18  Merck because they didn't show certain materials?
19      A   In there -- you see, the three S's.  There is a
20  brochure that goes with that.  So the person recorded --
21  I showed them that -- the core thing, the three S's
22  because I have the call notes --
23      Q   Dr. Pechmann --
24      A   -- and I know what brochure was being used, and
25  the person is saying, I did the three S's -- I guess,
0209
1   the person could be lying.
2           So there is a slight chance.
3       Q   Dr. Pechmann --
4       A   That is why I am saying, I am not 100 percent
5   sure, but I am virtually sure.
6       Q   I am going to ask you one more time and see if
7   you can answer this one yes or no.
8           Do you know what materials the sales
9   representatives in South Carolina showed Dr. Micola and
10  Dr. McCaffrey?
11          MR. ROBINSON:  Objection.  Asked and answered
12  about three times.
13          THE WITNESS:  I know.
14  BY MR. GOLDMAN:
15      Q   Can you answer it yes or no?
16      A   I don't have a different answer than what I
17  said.
18      Q   So you think you know?
19      A   Yes, with virtually --
20      Q   Without speaking to Dr. Micola and
21  Dr. McCaffrey; right?
22          MR. ROBINSON:  Same objections.  Repeated.
23  Repeated.
24          THE WITNESS:  Merck monitored these people.
25
0210
1   BY MR. GOLDMAN:
2       Q   What is your statistical estimate of the
3   chances that the Merck representatives used this
4   brochure with Dr. Micola and Dr. McCaffrey?
5       A   Oh, the statistical -- they used the brochure?
6       Q   Yes.
7       A   It is virtually 100 percent.
8       Q   Where is your support for that?
9       A   Because the sale reps had one promotional
10  brochure.  The main core -- I cannot tell you what else
11  they showed, but the whole point of their job was to
12  show the core brochure.
13      Q   So your statistical estimate --

Page 87

Ex 1 - 5-26-06 depo transcript

14    A    And their call notes indicate that they did
15 three times.
16    Q    Your statistical estimate is based on
17 instructions that were given to sales representatives?
18    A    No.  No.  My statistical estimate was whether
19 they talked to them about -- told them there was no M.I.
20 risk.  That is what I have a --
21    Q    I didn't ask you about that.  You are talking
22 about statistical estimates.
23    A    Yeah.  Well, you did, I believe, ask that
24 question because that is what I was answering in
25 response to -- in response to:  Did they see a
0211
1 particular brochure?  The core brochure, I said virtual
2 certainty.
3    Q    Do you plan to come to trial and tell the jury
4 what you think that Dr. Micola and Dr. McCaffrey were
5 shown by sales representatives?
6    A    No, I am going to use the call notes and the
7 instructions and say the call notes indicated they
8 showed this brochure, which they are required to do, and
9 this is the brochure they saw.
10    Q    You point out a few different times that
11 Dr. Micola was called on 374 times and there were a
12 number of samples left?
13         MR. ROBINSON:  That was McCaffrey.
14 BY MR. GOLDMAN:
15    Q    You point out a few times in your report the
16 number of times that sales representatives visited the
17 doctors in the Barnett case.
18         Do you know that, ma'am?
19    A    Yes, I counted those numbers.
20    Q    Do you think the jury can count those numbers,
21 too?
22    A    Well, I don't think they could -- well, they
23 would count, but they could, I guess, if you want to
24 spend the time.
25    Q    The jury does not need you to add up the number
0212
1 of call visits that the sales representatives made on
2 Dr. Micola and Dr. McCaffrey; do they, ma'am?
3    A    I'm sorry.  What was the question?
4    Q    The jury does not need you to add up the number
5 of call visits that the sales representatives made on
6 Dr. Micola and Dr. McCaffrey; do they?
7         MR. SKIKOS:  Objection.
8         THE WITNESS:  They need someone to count it up.
9 BY MR. GOLDMAN:
10    Q    Do they need you to do that?
11    A    No.  Someone else could do it I can explain the
12 context, what it means.
13    Q    What do the 374 call visits mean?
14    A    That they saw him a lot.
15    Q    What number of times out of the 374 visits did
16 Dr. McCaffrey did they actually speak with
17 Dr. McCaffrey?
18    A    Those are what the call notes tell us.  So,
19 roughly, once a -- what did I say?  Once every week.
20         MR. SKIKOS:  No.  That was --
21         THE WITNESS:  No.  That is what McCaffrey said.
22         Most reps have to see me every week, but in
23 terms of the call notes, it was about once a month, I
24 believe.  I had this in here somewhere.  Yeah, I believe

Page 88

Ex 1 - 5-26-06 depo transcript

25    it was once a month.
0213
1    BY MR. GOLDMAN:
2        Q    You believe that the sales representatives
3    actually spoke with Dr. McCaffrey once a month?
4        MR. ROBINSON:  No, I am going to object.  She
5    said there were contacts once a week.
6        MR. GOLDMAN:  Just object.  Don't insert the
7    testimony, Mr. Robinson.
8        THE WITNESS:  I'm sorry.  What was the
9    question?
10   BY MR. GOLDMAN:
11       Q    The question was how many visits out of the 374
12   with Dr. McCaffrey, do you believe the sales
13   representatives actually spoke with Dr. McCaffrey?
14       A    Well, according to the call notes, when they
15   had lengthy discussions, it was about once a month; but
16   when they were brief discussions, it was much more
17   frequently than that.
18       Q    Do you know what the sales representatives told
19   Dr. McCaffrey in their brief discussions?
20       A    No.  No, not specifically.
21       Q    Do you know --
22       A    I have a statistical estimate as to what they
23   likely said based on the research that Merck did.
24       Q    Do you know what, if any, significance
25   Dr. McCaffrey -- strike that.
0214
1            Do you know whether Dr. McCaffrey considered
2    what he was told about the sales representatives in his
3    decision to prescribe Vioxx?
4        MR. SKIKOS:  Asked and answered.
5        THE WITNESS:  I'm sorry.  State the question
6    again.
7    BY MR. GOLDMAN:
8        Q    Do you know whether Dr. McCaffrey took into
9    account what sales representatives told him when he
10   decided to prescribe Vioxx?
11       A    Yes.
12       Q    What is that based on?
13       A    Well, he, Dr. McCaffrey, states that he talked
14   to the sales representative about the label.  So it is
15   clear that he is getting advice from the sales rep and
16   he is listening to the sales rep.
17       Q    Is it your opinion about what Dr. McCaffrey
18   considered based on his discussions with the sales reps
19   when he prescribed Vioxx based on your interpretation of
20   Dr. McCaffrey's deposition testimony?
21       A    I don't know what the question was.  I'm sorry.
22       Q    As I understand your testimony, Dr. Pechmann,
23   you believe that Dr. McCaffrey relied on information
24   that he received from sales representatives when he
25   decided to prescribe Vioxx to Mr. Barnett; is that your
0215
1    testimony?
2        A    When he decided to -- well, he wouldn't even
3    know that Vioxx existed if the sales rep didn't tell him
4    about it.
5        Q    Why not?  Don't doctors hear about medicine
6    from other people other than sales reps?
7        A    Not exactly at the time that it's available.
8        Q    I don't understand.
9        A    I mean, he clearly had talked to sales reps

Page 89

Ex 1 - 5-26-06 depo transcript

10   about Vioxx and has relied on information from the sales
11   reps because he said he was trying to get the sales reps
12   to explain the label to him.
13        Q    Is your opinion that what Dr. McCaffrey and
14   what Dr. Micola considered -- withdrawn.
15        Let me ask you this way:  You believe that Drs.
16   Micola and McCaffrey used information that they obtained
17   from sales representatives in their decision to
18   prescribe Vioxx; is that your testimony?
19        A    Yes.  Yes.
20        Q    And your opinion is based on your review of
21   Dr. Micola and Dr. McCaffrey's testimony; true?
22        A    And the research that I have seen.
23        Q    The question about whether Dr. Micola and
24   Dr. McCaffrey specifically relied on information about
25   the risks of Vioxx that they learned from sales
0216
1    representatives, my question to you is --
2         A    They said they didn't know.  They were never
3    told of the heart attack risks, and they said they
4    wouldn't have prescribed it had they known it was a
5    relevant fact.
6         Q    Actually, that is not what they say.
7         A    I'm sorry.  They would have appreciated
8    knowing.  So if they had appreciated knowing, they
9    indicated that they thought it was relevant.
10        So the ultimate decision is unclear, but they
11   said it would have influenced their decision making
12   about it because McCaffrey said he wanted to know about
13   it.
14        Q    I am going to ask this one more time.
15        Is your opinion about what Dr. Micola and Dr.
16   McCaffrey relied on in terms of their conversations with
17   sales representatives and their decision to prescribe
18   Vioxx based on your review of the deposition testimony
19   of those witnesses?
20        MR. ROBINSON:  Asked and answered.  She said
21   that and the research.
22        THE WITNESS:  The research and the call notes
23   and the instructions to the sales reps.  The whole
24   picture not just the depositions, no.
25   BY MR. GOLDMAN:
0217
1         Q    If Dr. Micola testified that he makes his
2    prescribing decisions based on medical articles and not
3    based on what sales representatives tell him, you agree,
4    that you have no reason to dispute that?
5         A    They are one and the same thing.  The sales
6    representatives gave out the articles.
7         Q    Do you understand my question?
8         A    No, I didn't understand your question because
9    you said there was a difference between what the sales
10   reps gave them and the article.
11        Q    Dr. Pechmann, do you have any reason to dispute
12   Dr. Micola's testimony that he said that he does not
13   rely on information that a sales rep tells him about
14   safety and instead he relies on medical journals
15   published in the medical community?
16        MR. SKIKOS:  Objection.
17        THE WITNESS:  They gave him the article.
18   BY MR. GOLDMAN:
19        Q    Can you answer my question?  Do you dispute his
20   testimony; yes or no?

Page 90

Ex 1 - 5-26-06 depo transcript

```
21      A    Yes.  And there is extensive research that
22 shows that people don't have a thorough understanding of
23 how they make decisions and how they underestimate the
24 influence of marketing on that.
25      Q    So you are going to come tell the jury that
0218
1  Dr. Micola doesn't know why he made decisions about
2  prescribing Vioxx?
3
4           MR. SKIKOS:  Objection.
5           THE WITNESS:  No.  I am going to tell them the
6  research.
7  BY MR. GOLDMAN:
8      Q    You added on to my question before.  So I am
9  going to ask again and see if you can answer this yes or
10 no.
11          Do you dispute Dr. Micola's testimony about
12 what he relies on in deciding to prescribe medicine like
13 Vioxx; yes or no?
14     A    His testimony is conflicting about whether he
15 does or does not rely on the sales reps.
16     Q    Do you believe --
17     A    And he said at least at one point, that he
18 relies on the sales reps and I believe that testimony
19 where he said he relies on the sales rep.
20     Q    You don't believe the testimony where he says
21 he didn't rely on the sales rep?
22     A    Correct.
23     Q    And do you think that you are in a better
24 position to assess credibility of Dr. Micola on whether
25 or not he relied on sales representatives in making
0219
1  treatment decisions than a jury?
2      A    It's the whole reason that this research was
3  done was to understand what the doctors are doing
4  without asking them directly because they don't know.
5      Q    Do you believe that?
6      A    They don't necessarily know.  So, yes, I think
7  I am an expert on his behavior.  And I know things about
8  his behavior that he may not know about because I looked
9  at the research very carefully.
10     Q    Do you believe that you are in a better
11 position to assess Dr. Micola's credibility concerning
12 whether he relied on sales representatives or not than
13 the jury is?
14          MR. ROBINSON:  Objection.  Credibility?
15          THE WITNESS:  I am not addressing his
16 credibility.
17 BY MR. GOLDMAN:
18     Q    How about the accuracy of his testimony?
19     A    He has conflicting testimony.  Obviously,
20 something is wrong.  He has conflicting testimony.
21     Q    Was Dr. Micola aware of the April, 2002 label
22 change containing the Vigor data?
23     A    Yes.  I mean, at some point, he was familiar
24 with the Vigor Study.
25     Q    Do you know what advertisements Dr. Micola and
0220
1  Dr. McCaffrey saw concerning Vioxx or what role they
2  played in their decision to prescribe Vioxx to Mr.
3  Barnett?
4
5           MR. ROBINSON:  Do you want to go to your
```

Page 91

Ex 1 - 5-26-06 depo transcript

```
 6   reporter?
 7   BY MR. GOLDMAN:
 8        Q    No.  Answer the question.
 9             MR. ROBINSON:  She can see her report if she
10   wants to.
11   BY MR. GOLDMAN:
12        Q    Do you know what advertisements Dr. Micola and
13   Dr. McCaffrey saw concerning Vioxx, ma'am?
14             MR. ROBINSON:  Objection.  Compound.  You threw
15   in Micola and McCaffrey.
16             THE WITNESS:  Right.  Shouldn't we talk about
17   Dr. Micola?
18   BY MR. GOLDMAN:
19        Q    Do you know what advertisements Dr. Micola saw
20   concerning Vioxx?
21        A    Well, I can tell by the call notes what people
22   were talking about.  They were showing the main
23   promotional brochure because that is the three S's.
24        Q    I am talking about the television advertising.
25        A    Oh, television advertising.
0221
 1        Q    Do you know what television advertising
 2   Dr. Micola or Dr. McCaffrey saw about Vioxx?
 3        A    No, I know what ads were running at different
 4   times.  Not what they say saw, no.
 5        Q    Do you know what ads Mr. Barnett saw concerning
 6   Vioxx?
 7        A    Yes, he testified.
 8        Q    What ads?
 9        A    That he saw the Dorothy Hamill.  All of which
10   were very similar.  Remember, it is a very integrated
11   marketing campaign, they all basically said the same
12   thing.
13        Q    Did Dr. -- sorry.  Withdrawn.
14             Is it your opinion that Mr. Barnett relied on
15   the Dorothy Hamill ad when he decided to use Vioxx?
16        A    He said it factored into his decision both to
17   take it and to continuing to take it.
18        Q    And that is based on deposition testimony you
19   read?
20        A    Yes.  Plus the research that shows 85 percent
21   of people in the target audience did see these ads and
22   were well-aware of the brand.
23             MR. GOLDMAN:  Move to strike the last part of
24   that answer.
25             THE WITNESS:  Well, you asked me, what I was
0222
 1   relying on.
 2   BY MR. GOLDMAN:
 3        Q    No, I didn't.
 4        A    Oh, I thought you did.
 5        Q    Dr. -- withdrawn.
 6             Your testimony is that you believe Mr. Barnett
 7   relied on Dorothy Hamil's advertisement about Vioxx when
 8   he decided to use Vioxx; right?
 9             MR. ROBINSON:  Object.  Not when he decided to.
10             MR. GOLDMAN:  Yes, she did.  Stop coaching.
11        Q    Ma'am, I don't know what you are looking at.
12        A    I am looking at the deposition.
13        Q    What page of the deposition are you looking at?
14        A    Page 25.
15        Q    Are you looking at your report?
16        A    Exhibit 13.  Right.  I'm sorry.  The verbatim
```

Page 92

                        Ex 1 - 5-26-06 depo transcript
17  quote from the deposition.  So this is with regard to
18  Micola, not when he initially -- let's see, is this
19  Dr. Micola?
20          MR. ROBINSON:  He is asking about Mr. Barnett
21  now.
22          THE WITNESS:  I know.  I'm sorry.  I am
23  confused.
24          So let's see -- so, yeah.
25  BY MR. GOLDMAN:
0223
1       Q    Okay.  Now, I am going to move to a different
2   question.
3           MR. ROBINSON:  Let's slow down.
4           THE WITNESS:  So, yes, I misunderstood your
5   question.
6   BY MR. GOLDMAN:
7       Q    Do you know if Mr. Barnett saw advertisements
8   other than Dorothy Hamill?
9       A    Based on the research, we have a statistical
10  probability of which of the ads that he saw.  We know
11  ads were running and we know what percentage of the
12  audience saw those ads and --
13      Q    Do you know what advertisements Mr. Barnett saw
14  for Vioxx other than Dorothy Hamill?
15      A    Not with certainty, no.
16      Q    Mr. Barnett relied on his doctors to decide
17  what medicine he should take; right?
18      A    In part, yes.
19      Q    And did you read Mr. Barnett's wife's testimony
20  about whether she thinks he was influenced by
21  advertising?
22      A    His wife's testimony?
23      Q    Yes.
24      A    No.
25      Q    Did you read any of Dr. Micola's and
0224
1   Dr. McCaffrey's testimony about whether they thought
2   Mr. Barnett is a type of person who relied on
3   commercials to decide what medicine to use?
4       A    I believe I recall seeing that, but I mean,
5   it's not valid.
6       Q    "It's not valid," what do you mean?
7       A    Well, he is not an expert.  Neither of those
8   doctors are an expert on what ads people did or did not
9   see or if that is the type of person -- I mean, that
10  requires expertise.  They don't have expertise.
11      Q    Who spent more time --
12      A    Unless they had direct -- they had a
13  conversation about it and they did not say they did.
14      Q    Who is more familiar with Mr. Barnett and his
15  medical care and the type of patient he is; you or
16  Dr. Micola?
17      A    The type of patient he is in general?
18      Q    Um-hmm.
19      A    His doctor.
20      Q    Who is more familiar with Mr. Barnett's
21  knowledge about risks of medicine that he uses; you or
22  his doctors?
23      A    I would hope his doctors.
24      Q    Do you know whether Mr. Barnett takes any
25  medication today because of advertisements he saw on TV?
0225
1       A    No, I don't.

                            Page 93

Ex 1 - 5-26-06 depo transcript

```
 2      Q     You said --
 3      A     Most customers don't know that either.
 4      Q     You said in your report --
 5      MR. GOLDMAN:  Move to strike the last answer.
 6      Q     You said in your report that Merck never
 7  disclosed the potential cardiovascular risk of Vioxx to
 8  the public?  Is that your testimony?
 9      A     Yes.
10      Q     Did Merck publish the Vigor Study?
11      A     Merck authors did, yes.
12      Q     Did Merck inform the FDA about the Vigor Study?
13      A     Yes.
14      Q     Did Merck send press releases about the Vigor
15  Study?
16      A     Yes.
17      Q     Did Merck talk about potential cardiovascular
18  risks at a Advisory Committee Meeting held by the FDA in
19  February of 2001?
20      A     Did Merck talk about the --
21      Q     Um-hmm.
22      A     At the Advisory Committee Meeting?  I don't
23  know.
24      Q     Have you ever read any of the materials that
25  were presented at the Advisory Committee Meeting in
0226
 1  February of 2001?
 2      A     Yes.
 3      Q     What materials did you review?
 4      A     Well, I read the -- the report and I read the
 5  medical officer reviews.
 6      Q     What report?  The Targum Memo?
 7      A     The Advisory Committee Report.
 8      Q     You think --
 9      A     Well, we can look at it in the Appendix.  It is
10  in the Appendix, Exhibit 24.
11      Q     Exhibit 24, FDA Advisory Committee Briefing
12  document, did you review that?  This is in your
13  notebook; right?
14      A     Yes.
15      Q     You reviewed it?
16      A     Yes.
17      Q     Did you make any markings on it when you
18  reviewed it?
19      A     Probably.
20      Q     Where are they?
21      A     Well, this is a clean copy from the exhibit.
22      MR. SKIKOS:  They would be in one of the boxes.
23      THE WITNESS:  You know, these are all clean
24  copies.
25      MR. SKIKOS:  The exhibits are clean.  The boxes
0227
 1  are dirty.
 2      THE WITNESS:  My originals are in there.
 3      MR. GOLDMAN:  Okay.  We will look at that in a
 4  minute.
 5      Q     You said in your report that promotional pieces
 6  emphasized Vioxx's safety profile in elderly patients
 7  even though Vioxx posed a significantly higher potential
 8  CV risks in elderly patients with preexisting
 9  cardiovascular problems?
10      A     Their own research shown that.
11      Q     You are not qualified to say that there were
12  significantly higher potential cardiovascular risks of
```

Page 94

Ex 1 - 5-26-06 depo transcript

13  Vioxx in elderly patients; are you, ma'am?
14       A    In patients with cardiovascular risks, yes,
15  that was in Vigor.
16       Q    What was in Vigor?
17       A    That cardiovascular risk was higher among
18  people with preexisting cardiovascular problems.
19       Q    Dr. Pechmann, is your basis for concluding that
20  there was a significantly higher potential
21  cardiovascular risk in elderly patients, who had
22  preexisting cardiovascular problems based on your review
23  of the Vigor Study?
24       A    Yes.
25       Q    Anything else?
0228
1        A    Not that I can think of at the moment.
2        Q    You say that Merck's research reports show that
3   doctors were confused by cardiovascular information in
4   promotional pieces shown by representatives.
5             Do you remember that?
6        A    Yes.
7        Q    Did you ask Dr. Micola and/or Dr. McCaffrey if
8   they were confused about promotional pieces they saw?
9        A    No, but it is in their testimony.
10       Q    Are you relying on your interpretation of
11  their -- withdrawn.
12            Are you relying on the deposition testimony of
13  Dr. Micola and Dr. McCaffrey concerning whether they
14  were confused by promotional pieces?
15       A    In part.  And in part on the research where
16  they tested.
17       Q    They tested what?
18       A    The promotional pieces.
19       Q    What research reports are you relying on when
20  you say doctors were confused by cardiovascular
21  information in promotional pieces?
22       A    Well, one study is in here.  I am getting
23  tired.
24            MR. ROBINSON:  Why don't we take a break?
25            THE WITNESS:  That's okay.  I am just getting
0229
1   tired.  It is taking me a little longer to find.
2             Yes, it is Exhibit 59.
3   BY MR. GOLDMAN:
4        Q    Let's take a look at 59 in your books.
5        A    It is one of the pieces of information that
6   suggests that.
7        Q    I want to know all.  Tell me your list of all
8   of the sources that you are relying on that doctors were
9   confused about cardiovascular information in promotional
10  pieces.
11       A    Okay.  I believe 59 is in there.  So in here --
12  this was a major detailing piece that they used and I
13  can show you the detail piece itself.
14       Q    I want you to show me how you know that the
15  doctors were confused.
16       A    They said they were.  Most pointed to being
17  confused about the CV risk.  That's the General Points.
18       Q    What page is that?
19       A    Page 6.
20       Q    What drug is that talking about?
21       A    It is talking about Vioxx.  As it is clear
22  later on, too.
23       Q    Wait a minute.  The page that you are talking

Page 95

Ex 1 - 5-26-06 depo transcript

24 about is Bates stamped MRK --
25    A    Yes, but that is General Points.  So it is not
0230
1  specific.  You see, there is Celebrex, Bextra.  The next
2  heading is General Points.
3    Q    Okay.
4    A    So it should have been put on a different page.
5    Q    So you are interpreting Page 6 of this research
6  finding to mean that doctors were confused about
7  cardiovascular risk?
8    A    That is one place that says that they were
9  confused.
10   Q    How was that study done?
11   A    They did one-to-one interviews --
12   Q    How many --
13   A    -- with doctors.
14   Q    How many doctors were interviewed?
15   A    45 minute in-depth interviews with 31 doctors,
16 which is generally accepted practice.  Actually, that is
17 a high number of subjects and a long interview.
18   Q    So is it your position that because that
19 research report indicates that some of the doctors were
20 confused about cardiovascular risks that Dr. Micola and
21 Dr. McCaffrey were confused about it?
22   A    Well, they said that they were never told that
23 it had a cardiovascular risk by Merck.
24   Q    That is based on your review of their
25 testimony?
0231
1    A    Yes.
2    Q    Which the jury can understand as well as you;
3  right?
4    A    No, I don't think -- they can understand the
5  words, but not the whole context in which the program is
6  existing.
7         They need to understand the whole integrated
8  marketing communications campaign to understand the
9  specific testimony.  They need to understand the
10 context.
11   Q    What other sources are you relying on showing
12 that doctors were confused about the cardiovascular
13 risks in promotional pieces?
14   A    There are several points in here that says --
15   Q    That is the same document; right?
16   A    Yes.
17   Q    What other documents are you relying on other
18 than Exhibit 59 in your book?
19   A    Well, shouldn't I go what they say here?
20   Q    No, that is just one study; right?
21   A    Yes.
22   Q    I want to know what other studies that you are
23 relying on that supports your opinions that doctors were
24 confused about cardiovascular risks in Merck's
25 promotional pieces?
0232
1    A    There are several other studies that show
2  attributes towards -- attribute ratings on Vioxx and
3  sales of Vioxx, prescriptions of Vioxx.  That show that
4  there was no discernible change in perceptions of Vioxx
5  or prescribing for Vioxx --
6    Q    That was not my question.
7    A    -- except when there was like the JAMA article
8  or when the label changed you saw --

Page 96

Ex 1 - 5-26-06 depo transcript

9      Q     So, Dr. Pechmann, other than Exhibit 59 in your
10  binder, what other materials are you relying on to
11  support your opinion that doctors were confused by the
12  cardiovascular information in promotional pieces for
13  Vioxx?
14     A     I will show you the other.
15     Q     What are you looking at?
16     A     My notes about the different research products
17  which you have a copy of.
18     Q     Okay.  That is Exhibit 5 for the record.
19     A     Well, okay, this is a good one.  Exhibit 56.
20     Q     If you could just name them.  What did that one
21  say?  Tell me what you think it says.
22     A     18 to 47 percent of the physicians said that
23  the sales reps said that Vioxx does not increase the
24  risk of M.I. or stroke.
25     Q     Does that tell you that -- does Exhibit 56 say
0233
1   that doctors are confused, ma'am, about the
2   cardiovascular risks in promotion material?
3      A     It says that they were mislead by the sales
4   reps.
5      Q     It is your testimony that Exhibit 56 in your
6   binder, which is a document called Vioxx Monthly EAR
7   review November, 2001, that, that says that doctors were
8   confused about what the cardiovascular information was
9   contained in Vioxx's promotional pieces?
10     A     It shows that they were mislead.
11     Q     That was not my question.
12     A     Yes, I think it means they were confused.
13     Q     Okay.  So you relied on that, Exhibit 56.
14           What else do you rely on to support your
15  opinion that?
16     A     20 to 33 percent said the reps said that Vioxx
17  was safe for the elderly.  So they were getting the
18  impression that Vioxx was safe.  The elderly could have
19  CV risks.
20           E58 shows the same thing.
21     Q     Does Exhibit 58 in your binder say that doctors
22  were confused about the cardiovascular risks as
23  described in promotional pieces?
24     A     They were concluding that the --
25     Q     Can you answer that yes or no?
0234
1      A     Yes.
2      Q     Okay.  Your testimony is that Exhibit, what?
3      A     58.
4      Q     58 in your binder, showed that doctors were
5   confused about cardiovascular risks in promotional
6   pieces.
7            Anything else that supports your opinion that
8   doctors were confused about cardiovascular information?
9      A     Exhibit 48.
10     Q     What else?
11     A     Exhibit 55.
12     Q     What else?
13     A     Exhibit 56.
14     Q     We talked about that.
15     A     Exhibit 54, Exhibit 48, Exhibit 47 -- that's
16  it.
17     Q     Do you plan to --
18     A     You know, there are other -- there could be
19  other documents that would lead me to reach the same

Page 97

Ex 1 - 5-26-06 depo transcript
```
20  opinion.
21      Q      Do you plan to use the documents that you just
22  mentioned to tell the jury that doctors were either
23  confused by cardiovascular information in Merck's
24  promotional pieces or mislead by them?
25      A      Yes.
0235
 1      Q      You talked about Obstacle Handlers in your
 2  report.  Do you remember that?
 3      A      Yes.
 4      Q      Did you ever hear of Merck's explanation as to
 5  what Obstacle Handlers are?
 6      A      Yes.
 7      Q      What is it?  What is Merck's explanation?
 8      A      Merck's explanation is that -- well, that when
 9  physicians felt hesitant about prescribing Vioxx, they
10  tried to reassure them or convince them to prescribe it
11  by telling them what the Obstacle Handlers -- you know,
12  by stating the Obstacle Handler.
13      Q      What is the basis for your testimony there?
14      A      With regard to the cardio --
15      Q      No, with regard to the --
16      A      Well, I think the Obstacle Handling materials
17  were misleading.
18      Q      And that is based on your interpretation of
19  Merck's documents; right?
20      A      It is based on the face of what the documents
21  state versus what Merck knew or should have know.
22      Q      Because you still hold yourself out as an
23  expert about what Merck knew or should have known about
24  the cardiovascular risks?
25      A      Yes.
0236
 1      Q      You talk about the CV card in your report.
 2  Do you know whether there are any false
 3  statements on the CV card?
 4      A      I -- I used the standard misleading, not out
 5  right false lies.  So I didn't evaluate it based on a
 6  higher standard of false statements.
 7      Q      If you could answer my question.
 8          Is there anything untrue or false about the
 9  statements on the CV card?
10      A      I don't recall there being any outright false
11  statements that were misleading.
12      Q      Can you answer my question?
13      A      I did.  I can't recall at the moment there
14  being any false statements.
15      Q      You don't have any reason to believe that
16  there were untrue or false statements on the CV card;
17  correct?
18      A      They were misleading.
19      Q      I did not ask you that, ma'am.
20      A      Okay.  I already said the answer to that other
21  question; didn't I?
22      Q      Dr. Pechmann, you have no reason to believe
23  that the statements in the CV card are untrue --
24      A      At this point, I don't recall any false
25  statements in the CV card.
0237
 1      Q      -- am I right?
 2          Do you know whether any of the sales
 3  representatives in South Carolina used the CV card with
 4  Dr. Micola or Dr. McCaffrey?
```

Page 98

Ex 1 - 5-26-06 depo transcript

```
 5      A    I didn't see it on the call notes.  So I have
 6  no -- I don't know one way or the other.
 7      Q    Do you -- did you watch the Be The Power video?
 8      A    Yes, I did.
 9      Q    Do you know if any of the sales representatives
10  who called on Dr. Micola and Dr. McCaffrey watched the
11  Be The Power video?
12      A    No.
13      Q    Do you know whether it is common that drug
14  companies do things sometimes that are meant to motivate
15  the sales force to sell?
16      A    Yes, it is very common.
17      Q    And having a Be The Power video or something
18  like that, that is meant to motivate the sales force is
19  not necessarily a campaign to deceive doctors; is it,
20  ma'am?
21           MR. O'CALLAHAN:  Assumes facts not in evidence.
22           THE WITNESS:  That video was providing
23  misleading information.
24  BY MR. GOLDMAN:
25      Q    Okay.  Did you understand my question?
0238
 1           When sales representatives are shown videos or
 2  go to launch parties, and there is motivational things
 3  that happen, that is not an effort or campaign to
 4  mislead doctors; is it?
 5           MR. SKIKOS:  Objection.
 6           THE WITNESS:  You mean as a general rule?
 7           MR. O'CALLAHAN:  Join.
 8  BY MR. GOLDMAN:
 9      Q    Yes.
10      A    I don't know.  I have not done research on
11  that.  I would hope not.
12      Q    By the way, it is common, isn't it, in the
13  pharmaceutical industry for sales representatives to
14  call on doctors?
15      A    Yes.
16      Q    It is common for pharmaceutical reps of all
17  different companies to drop off samples; right?
18      A    Yes.
19      Q    You don't have any reason to think that Merck's
20  sales representatives visited doctors more often than
21  sales representatives of other companies; do you, ma'am?
22           MR. SKIKOS:  Objection.
23           MR. O'CALLAHAN:  Join.
24           THE WITNESS:  Yes.  There is data on the
25  frequency, which the Merck representatives saw the
0239
 1  physicians versus Celebrex and others.  They kept
 2  detailed records on that.
 3  BY MR. GOLDMAN:
 4      Q    Is it your testimony, Dr. Pechmann, that Merck
 5  sales representatives visited doctors more often about
 6  Vioxx than Pfizer sales representatives visited doctors
 7  about Celebrex and Bextra?
 8      A    I would have to review that data, but I didn't
 9  review that prior to being here.  There is data on that
10  to answer that question.
11      Q    You don't know the answer?
12      A    At this point in time, no.
13      Q    You talked about an audio conference by Peter
14  Holt.  Do you remember that --
15      A    Yes.
```

Page 99

Ex 1 - 5-26-06 depo transcript

```
16    Q    -- in your report?
17         Did you listen to that audio conference?
18    A    No.
19    Q    Did Dr. McCaffrey or Dr. Micola attend that
20 audio conference?
21    A    They didn't testify that they had.
22    Q    Did Merck respond --
23    A    I believe they said they did not.
24    Q    Did Merck respond appropriately when the FDA
25 sent its warning letter about Peter Holt?
0240
1     A    I don't think they responded appropriately to
2 that warning letter, no.
3     Q    What did Merck do with respect to Pete Holt
4 after Merck got the warning letter from the FDA?
5     A    As I recall, they sent out a letter to correct
6 the problem to the people that were at the seminar.
7     Q    What did the FDA say after they received a
8 letter from Merck advising them of what Merck was going
9 to do in response to the FDA's letter -- strike that.
10         Do you know whether the FDA took any further
11 action after Merck sent out letters correcting
12 misstatements that were made by Dr. Holt?
13    A    I didn't see that they did anything else, no.
14    Q    Did you ever see Merck's response to the FDA
15 warning letter?
16    A    I saw the correction letters that -- but, no, I
17 did not.  I don't recall seeing a response to the
18 warning letter from Merck.
19    Q    The plaintiffs' lawyers never showed you that?
20    A    I don't recall seeing it.
21    Q    By the way, do you know whether you have
22 received and reviewed all of the research reports that
23 were done concerning Merck's marketing efforts for
24 Vioxx?
25    A    Well, I -- I asked for very specific reports
0241
1 and I got what I asked for.
2     Q    Do you know whether you have received and
3 reviewed all of the research that Merck has done on
4 Vioxx?
5     A    Well, I am positive I haven't, no -- well, I am
6 not positive, but I think there is research that we
7 don't have, but -- that wasn't in the deposit --
8 repository.  Is that what it is called?
9          It seems like there is missing pieces of
10 research, but I think I got everything that we could get
11 my hands on.  There clearly seems to be missing research
12 because they said they were going to do this subsequent
13 research, and there is no record of it.
14    Q    Dr. Pechmann, throughout your report, you quote
15 from Merck's internal documents and then you express
16 your opinions about them; right?
17    A    No, I would not say it is throughout the
18 report.  Part of the report, I do that.
19    Q    Okay.  Let's look as an example at 29 and do
20 you see in Paragraph C, you are talking about a March,
21 2000, Vioxx promotional piece for physicians which
22 features an elderly woman Ms. Guzman.  It is Exhibit 26
23 in your binder.
24    A    Yes.
25    Q    And you quote from it and you say,
0242
```

Ex 1 - 5-26-06 depo transcript

```
 1          "The promotional piece went on to
 2       state that in a specific six-week
 3       study of patients 80-years-of-age or
 4       older" and then it continues, and
 5       then it says, "As with all NSAIDs,
 6       Vioxx should be used with caution in
 7       patients with fluid retention,
 8       hypertension and heart failure."
 9       Do you see that?
10    A  Yes.
11    Q  And then you add, "However, the
12       Overall message of the promotional
13       piece was that Vioxx was safe to use
14       in the elderly, more effective than
15       other nonsteroidal pain relievers and
16       simpler to use."
17       Do you see that?
18    A  Yes.
19    Q  You are just offering your interpretation of
20 that promotional piece; right?
21    A  No, we actually have research on that
22 promotional piece and that is why I put it in there.
23    Q  Do you cite any of the research here?
24    A  I believe I do.  Well, it must be in a
25 different part of the report, but I did cite the
0243
 1 research on this because I chose -- is it this one?
 2       Let's see.  Okay.  Okay.  I'm sorry.  It is not
 3 that one.  It is the first quarter of 2003, that we have
 4 research on.
 5    Q  You are offering your subjective interpretation
 6 of this March, 2000 promotional piece?
 7    A  No.  We have tracking research that shows what
 8 physicians believed about Vioxx, what they said the
 9 sales reps were telling them when they were shown these
10 promotional brochures --
11    Q  Dr. Pechmann --
12    A  -- and it shows that they were getting the
13 impression that Vioxx was safe to use in the elderly.
14 The statistics are --
15    Q  Dr. Pechmann, I am not asking about statistics.
16 Please focus with me.
17       MR. SKIKOS:  I think you did.
18       THE WITNESS:  -- 18 to 40 percent, that is the
19 basis on which I am reaching the conclusion that it was
20 safe.
21 BY MR. GOLDMAN:
22    Q  Are you talking about the promotional ad?
23    A  Yes, I have data from when they were shown that
24 promotional piece.
25    Q  Show me the data that shows that the overall
0244
 1 message of the March, 2000, Vioxx promotional piece was
 2 that Vioxx was safe to use in the elderly, more
 3 effective than nonsteroidal pain relievers, and simpler
 4 to use.
 5    A  I'm not sure if I have it from that exact
 6 promotional piece, but I have it from a very similar
 7 promotional piece.
 8    Q  I want to talk about this one because that is
 9 the one I am on now.
10    A  Okay.  Well, March, 2000, I believe that
11 particular data is missing.
```

Page 101

Ex 1 - 5-26-06 depo transcript

12    Q    You are expressing your subjective view,
13  Dr. Pechmann, about your interpretation of this March,
14  2000 promotional piece?
15    A    No, because there are other promotional pieces
16  that have the exact same wording and we have research on
17  those.  So there should be no difference in the
18  response.
19         You see, they kept using the exact same wording
20  over and over again.  You know, in the integrated
21  marketing communications campaign that is what you do.
22  You repeat the same thing over and over again.  You
23  change the cover.  You change -- you know, if it is not
24  Liz Guzman, it is someone else.
25    Q    Is it your testimony that every time you say in
0245
1   your report that the "overall message of a promotional
2   piece was that Vioxx was safe to use in the elderly"
3   that that is based on research and that is not your own
4   subjective opinion?
5     A    Yes, that is my testimony.
6     Q    Turn with me, please, to Page 61, Paragraph
7   C -- actually, Paragraph E.
8     A    E, okay.
9     Q    Do you see that you are talking about the FDA
10  recommending that a Vioxx product label be changed to
11  include a cardiovascular warning?
12         Do you see that?
13    A    Yes.
14    Q    And then you say, "If a cardiovascular
15         warning had been included in the new
16         Vioxx product label, Merck had to
17         prominently convey such a warning in
18         all Vioxx television and print
19         advertisements."
20         Do you see that?
21    A    Yes.
22    Q    And then you say, "However, Merck
23         Executives put intense pressure on
24         the FDA and persuaded the agency to
25         allow them to move Vioxx
0246
1          cardiovascular risk information from
2          the warning section to the precaution
3          section of the new Vioxx label."
4     A    Yes, I saw evidence on that.
5     Q    What is your basis that Merck executives put
6   intense pressure on the FDA?
7     A    Memos that I saw.
8     Q    It is your basis for concluding that Merck
9   executives put intense pressure on the FDA based on your
10  review of the selective documents that the plaintiffs'
11  lawyers gave you?
12    A    And also, what the outcome was, that the FDA
13  said very clearly, there should be a warning about CV
14  risks, and they proposed that warning.  And the outcome
15  was no warning.
16    Q    Did you review all of the correspondence
17  between Merck and the FDA and their discussions about
18  the Vigor label?
19    A    I reviewed a lot of it.  I am not sure --
20    Q    Did you review all of the correspondence
21  between the FDA and Merck concerning the addition of the
22  Vigor label?  I'm sorry.  Withdrawn.

Ex 1 - 5-26-06 depo transcript
```
23        A    I'm not sure because I know I reviewed a lot of
24   it, but I am not sure if it was 100 percent of what it
25   was.
0247
1         Q    Do you know, Mr. Pechmann, whether you reviewed
2    all of the correspondence between Merck and the FDA
3    concerning the addition of the Vigor data into the Vioxx
4    package insert?
5         A    No, I don't know with certainty.
6         Q    And you are expressing your opinion here --
7    your subjective opinion about Merck putting pressure on
8    the FDA; are you not?
9         A    I looked at the documents, yes.
10        Q    And a juror could look at the same documents
11   and reach the same conclusions or disagree with you,
12   they don't need your help to reach a conclusion; right?
13        A    I think in this case, yes, they could probably
14   understand it.  Although it would help to provide the
15   marketing context of it in terms of what the research
16   showed had the warning been in the ad -- in the TV ad.
17             There is research -- they started to do
18   research on what would happen if they had to put the
19   warning label on TV.  And basically, that research
20   showed --
21        Q    Did you hear my question?
22             MR. O'CALLAHAN:  I'm sorry.  She is answering
23   your question.
24             MR. GOLDMAN:  No, She is not answering.
25             THE WITNESS:  I am not?  What was your
0248
1    question?
2             MR. SKIKOS:  I think she is on this one.
3    BY MR. GOLDMAN:
4         Q    What was my question?
5             MR. SKIKOS:  No.  Finish your answer.  She gets
6    to finish her answer.
7    BY MR. GOLDMAN:
8         Q    I don't mean to interrupt you, but
9    Dr. Pechmann, my question was really straightforward.
10            MR. O'CALLAHAN:  You know, for the record, I
11   think she has got to be allowed to finish the answer.
12            MR. GOLDMAN:  Go ahead.
13            THE WITNESS:  Because I have had innumerable
14   times, I have been interrupted and I have never been
15   able to finish my answer, and I was trying very hard to
16   answer your question.
17   BY MR. GOLDMAN:
18        Q    Oh, if there is anything that you would like to
19   say that you haven't said in this deposition, say it
20   now.
21        A    Well, I can't remember back, but there were
22   several times that I wanted to say something and I --
23            MR. SKIKOS:  Just finish this answer.
24            THE WITNESS:  So what I was saying is that
25   there is research that shows what would -- that there
0249
1    was concern about having -- significant concerns about
2    having a heart attack warning in their television ads,
3    and they were doing research, and, basically, said, that
4    if the warning -- heart attack warning was on the TV
5    ads, then they might not even run product ads any longer
6    because it would be devastating.  It would be
7    de-marketing the product.
```

Page 103