Ex 1 - 5-26-06 depo transcript

```
 8   BY MR. GOLDMAN:
 9        Q    Are you finished?
10        A    Yes.
11        Q    You said that you feel like I haven't let you
12   finish your answers.  I don't want to hear at trial, if
13   your going to testify, Dr. Pechmann, that you wanted to
14   say something, but I didn't let you say it.
15             So I would like you to tell me whatever it is
16   that you would like to tell me that I have not let you
17   say.
18        A    Well, the one thing is I misunderstood your
19   question with regard to what ad Barnett saw and when he
20   saw the ad, so --
21        Q    Did you talk to the plaintiffs' lawyers about
22   that issue at a break?
23        A    No.  I've tried to correct my thing --
24        Q    Okay.
25        A    -- but you just jumped ahead.  And I couldn't
0250
 1   correct what I was trying to say.
 2        Q    Go ahead and correct it.
 3        A    That was the most recent example.  I have to
 4   look at the Barnett material, but the Hamill ads were
 5   played later.  So it was when he was continuing, not
 6   when he originally got the drug because the Hamill ads
 7   were not appearing in 1999 or 2000.
 8        Q    Is that all you wanted to say about that
 9   issue?
10        A    Yes, I just misunderstood your question.  So I
11   answered it improperly and then I did not get a chance
12   to correct.
13             So thank you for giving me the chance now.
14        Q    Did Mr. Barnett --
15        A    If I can think of other things, I will bring
16   them up.
17        Q    Did Mr. Barnett rely on the Dorothy Hamill ad
18   in deciding to use Vioxx?
19        A    To continue to use Vioxx, yes.
20        Q    Anything else that you feel I didn't give you
21   an opportunity to say because I don't want to hear at
22   trial that you felt like I was cutting you off.  So I
23   want to give you the chance to say whatever you would
24   like to say.
25             MR. O'CALLAHAN:  I have to interpose an
0251
 1   objection here.  When you throughout the course of the
 2   deposition, you cut her off repeatedly.  I think it is
 3   unfair to, at this point, ask her to recall every answer
 4   that you cut off, that she now needs to fill in the rest
 5   of the answer.  Notwithstanding that --
 6             THE WITNESS:  I feel the same way.  It is
 7   impossible, but if I think of anything that really
 8   sticks out, I will let you know; but I felt that way
 9   several times.
10             MR. SKIKOS:  Let's take a short break.
11             MR. GOLDMAN:  Okay.  Because I will take the
12   deposition again.
13             (Lunch recess.)
14             MR. SKIKOS:  We are going to agree to put the
15   boxes of documents that Dr. Pechmann reviewed and
16   replied upon in the possession of the court reporter and
17   then we are going to send something from Robinson,
18   Calcagnie to the court reporter's office to index all of
```

Page 104

Ex 1 - 5-26-06 depo transcript

19  the documents by Bates number; right?
20          MR. GOLDMAN:  (Nods head.)
21          MR. SKIKOS:  And to avoid having to attach the
22  five boxes of documents as exhibits to the deposition?
23          MR. GOLDMAN:  Yes.
24  Ready?
25          THE WITNESS:  So, the entire box -- all of the
0252
1   boxes?
2           MR. GOLDMAN:  Um-hmm.
3           MR. SKIKOS:  What about the exhibits?
4           MR. GOLDMAN:  We will attach the three binders
5   of exhibits that we have been referring to throughout
6   the deposition, which are the documents that have
7   actually been cited in Dr. Pechmann's report; right?
8           THE WITNESS:  Okay.
9   BY MR. GOLDMAN:
10      Q   Dr. Pechmann, I want to have an understanding
11  that at trial, you are not going to suggest to the jury
12  that you weren't given an opportunity to explain your
13  answers or that I cut you off in a way that didn't allow
14  you to give complete, full, honest answers.
15          That is not --
16      A   Good for you.
17      Q   It is not only not good for me.  It is not at
18  all what I think.  I certainly did not intend for that
19  to happen and I don't want you to leave here thinking
20  that that happened.
21      A   Okay.
22      Q   So if there are things that -- anything that
23  you want to say, that you feel I didn't let you say,
24  please say it.
25      A   Okay.  I would like to say one more thing.
0253
1       Q   Yes.
2       A   When you asked me about the Naproxen hypothesis
3   and did they continue to -- did Merck continue to
4   promulgate the Naproxen hypothesis after the warning
5   letter, I felt that I did not have a chance to
6   adequately respond.
7       Q   Okay.
8       A   The Naproxen hypothesis, of course, is in the
9   New England Journal of Medicine article on Vigor and
10  those reprints were still out there.  So I am not sure
11  if they were being given out, but they were out there.
12          As an expert in misleading ads, I know that if
13  there is something that you did to mislead the public,
14  in order to correct that misperception, you have to
15  overtly correct it.  It does not just correct itself.
16          So not surprisingly what the research shows is
17  that, that perception persisted.  It was never
18  corrected.
19          And one of the doctors in the case states
20  exactly that.  Page 19 in my report, Micola says that
21  his conclusions from the Vigor trial was that Naproxen
22  blocked platelet aggregation and that was never
23  corrected.
24          And also, later on, they just used slightly
25  different words in the brochures that talked about how
0254
1   Vioxx doesn't affect platelets.  So it used wording that
2   would be consistent with the Naproxen hypothesis.
3           So people knowing that Naproxen hypothesis and

Page 105

Ex 1 - 5-26-06 depo transcript

4   reading that, would think it is consistent with the
5   Naproxen hypothesis.
6       Q    Have you now said everything that you wanted to
7   say that you felt that I prevented you from saying?
8       A    That is all I can recall at the moment.  Maybe
9   in the middle of the night, I think of something else,
10  but, no, I feel good that these were the two issues that
11  I felt that I didn't have a chance to adequately
12  address.
13           And you should know my opinion; right?  And it
14  is good that you know them.
15      Q    Can we have an understanding that,
16  Dr. Pechmann, at trial you are not going to say that I
17  cut you off and you did not explain your answer?
18      A    Yes, as long as it doesn't keep happening.
19           MR. GOLDMAN:  Off the record.
20           (Discussion held off the record.)
21  BY MR. GOLDMAN:
22      Q    Can you turn, Dr. Pechmann, please to Page 62
23  of your report and I just want to focus on Paragraph F
24  where you are describing Merck's label that added the
25  Vigor data to it.
0255
1       A    Yes.
2       Q    Do you see that you say, "Further,
3            Merck avoided having to prominently
4            feature cardiovascular risk
5            information in the Vioxx print
6            advertisements, instead Merck simply
7            put some vague and ambiguous
8            cardiovascular information in the
9            fine print of the Vioxx print
10           advertisements"?
11      A    Yes.
12      Q    Am I right that you are just expressing your
13  opinion and your personal view that the language in the
14  print advertisements was vague and ambiguous?
15      A    No, they had research on that.
16      Q    So you can point me to studies showing that the
17  cardiovascular information in the Vigor label was vague
18  and ambiguous?
19      A    I'm sorry.  The cardiovascular information in
20  the print advertisements that consumers saw once the
21  label changed was vague and ambiguous.  It was consumer
22  research.
23      Q    Okay.  So let me ask about, first, the label.
24           Okay.  Is it your opinion that the language
25  that the FDA approved and included in the April, 2002
0256
1   label about the Vigor study was vague and ambiguous?
2       A    Yes, I found it to be vague and ambiguous.
3       Q    And that is your personal view and not based on
4   any research?
5       A    No.  What the research shows --
6            MR. SKIKOS:  He is asking about the specific
7   FDA label, not about the print ads or the integrated
8   marketing campaign.  He is just asking about the label.
9            THE WITNESS:  Well, there is research that
10  shows the effects of the label on physicians and there
11  was a downward turn in sales.  So some -- some people
12  got it.
13  BY MR. GOLDMAN:
14      Q    What research can you point me to that says

Page 106

Ex 1 - 5-26-06 depo transcript

15  that the language about cardiovascular information in
16  the April, 2002 label was vague and ambiguous?
17       A    Well, the research that I am going to refer to
18  is the, the focus group data we talked about earlier
19  when they did the focus group, with similar
20  cardiovascular information and the people said that they
21  were confused.
22       The doctors in this case, who said they didn't
23  understand the risks and other research that shows
24  that -- that overall perceptions of Vioxx, the
25  cardiovascular risks remained remarkably positive over
0257
1   the entire period of the campaign.
2        Q    Do any of the research reports that you just
3   referred to state that doctors believed the language in
4   the April, 2002 label was vague and ambiguous?
5        A    I haven't seen any research where they showed
6   doctors that label exactly and they said that, no.
7        Q    Am I right, Dr. Pechmann, that you are not an
8   expert in the wording of labels for prescription drugs?
9        A    Yes, I would say you are correct.  I am not an
10  expert in that.
11       Q    Let's turn a -- let's turn to Appendix A, which
12  is on Page 72.
13       A    Okay.
14       Q    Who wrote this?
15       A    I did, except where I typed in verbatim and
16  then I didn't write the quotes because they were
17  verbatim quotes.
18       Q    Now, in the text of your report on Page 9, you
19  say in Paragraph 16 that Appendix A to your report,
20  discusses in greater detail your opinion regarding what
21  Merck's marketing executives knew or should have known
22  about Vioxx's potential cardiovascular risk and my basis
23  for that opinion?
24       A    Yes.
25       Q    Now, when you turn to Appendix A, do you see
0258
1   that you're talking -- at least the title of this
2   Appendix says, "Merck's knowledge of Vioxx's
3   Cardiovascular Risk Potential"?
4        A    No.  What was in here is actually what I meant,
5   they knew or should have known.
6        Q    Did you review any of the deposition testimony
7   of any of the scientists at Merck, rather than just the
8   marketing executives?
9        A    Yes.
10       Q    What depositions did you review of a Merck
11  scientist?
12       A    Dr. Demopoulos, on Page 23 of in my report, is
13  a scientist.  This individual was the senior director of
14  cardiovascular clinical research.
15       Q    Is that it?
16       A    Yes.
17       Q    Did any of the plaintiffs' lawyers have input
18  to what you wrote in Appendix A?
19       A    No.
20       Q    How long did you spend reviewing Merck's
21  documents and depositions before you prepared Exhibit A?
22       A    I -- I can't answer that question exactly
23  because I didn't keep a record of that particular task
24  but --
25       Q    I'm sorry.

Page 107

Ex 1 - 5-26-06 depo transcript

0259
1    A    -- but, I mean, days of looking things over
2  would be a good start of what kind of time I spent on
3  this.
4    Q    So before you wrote Exhibit A to your report,
5  you spent several days reviewing documents and
6  depositions; is that right?
7    A    Mostly documents.
8    Q    About how many hours total would you say in
9  those days you spent reviewing materials that allowed
10 you to prepare Exhibit A?
11   A    I'm sorry.  How many hours in each day?
12   Q    Um-hmm.
13   A    Oh, I am assuming eight hour days.
14   Q    So you spent 16 hours reviewing documents or
15 deposition testimony before preparing Exhibit A?
16   A    I don't know that exact.  I mean --
17   Q    Is that about right?
18   A    I'm sure it is not exactly accurate, but it is
19 rough.
20   Q    When do you think Merck knew about the
21 cardiovascular risks that are potentially associated
22 with Vioxx?
23   A    Well, on Page 80, I have a report from 1998 and
24 on Page 79, I have a document from 1997.  So those
25 documents indicate they knew quite a while ago that
0260
1  there could be a potential risk.
2    Q    How can you say that, Dr. Pechmann, when you've
3  only been shown selected documents that the plaintiffs'
4  attorneys gave you and you haven't --
5    MR. SKIKOS:  Objection.
6  BY MR. GOLDMAN:
7    Q    -- and you haven't reviewed all of the
8  documents to be able to say what Merck knew or should
9  have known about cardiovascular risks?
10   A    Well, I am just saying it's potential risk, not
11 a certainty.  And then combining that with the fact that
12 they got the statistically significant results in Vigor,
13 and the FDA told them they couldn't with certainty
14 include or that it was Naproxen; and it could be that,
15 that Vioxx was causing the heart attacks.
16   Q    Do you think there was scientific evidence --
17   A    It is not my opinion that as to exactly when
18 they knew or should have known the risk exactly what
19 date because that is beyond my area of expertise; but
20 certainly, by the time of the Vigor findings, that is
21 when I feel confident in saying.  I mean, it has a
22 statistically significant effect.  So, I mean, I
23 understand that.  I am a scientist and --
24   Q    Do --
25   A    And then the FDA hits them own the head with
0261
1  it, but even when the Vigor study came out, its -- I
2  mean, it is a statistically significant effect.  They
3  knew -- they should have known.
4    Q    Dr. Pechmann, did you understand that there was
5  no placebo arm in the Vigor study?
6    A    Yes.
7    Q    Did you also understand that one interpretation
8  of the results in Vigor could be that Naproxen was
9  cardioprotective, not that Vioxx was harmful for the
10 heart?

Page 108

Ex 1 - 5-26-06 depo transcript

11            MR. O'CALLAHAN:  Objection.  Foundation and
12  scope.
13            THE WITNESS:  That that was a possible
14  explanation, yes.
15  BY MR. GOLDMAN:
16       Q    And your reading of the FDA's letter in
17  September of 2001, is that -- told Merck that it wasn't
18  a certainty that Naproxen explained the different heart
19  attack events in the Vigor study?
20       A    I did not understand that question.  Can you
21  rephrase it?
22       Q    Is it your testimony, Dr. Pechmann, that the
23  FDA's warning letter told Merck that it wasn't a
24  certainty that the Naproxen hypothesis, if you will, was
25  the explanation for the difference in heart attacks seen
0262
1   in the Vigor study?
2        A    I mean, the thrust of the letter was, it was
3   misleading to put that out as the sole explanation.
4        Q    Would you agree with me, Dr. Pechmann, that a
5   jury could read the FDA's warning letter and would
6   understand it, and wouldn't need your help in
7   interpreting it?
8             MR. O'CALLAHAN:  Objection.  Compound.
9             THE WITNESS:  I guess, I disagree.  In order to
10  interpret it, they need to understand the integrated
11  marketing communications campaign.
12  BY MR. GOLDMAN:
13       Q    You think the jury has to understand the
14  integrated marketing communications campaign to be able
15  to understand the meaning of the FDA's warning letter?
16       A    Yes.
17       Q    Why?
18       A    Because what that was telling Merck is that
19  their integrated marketing communications campaign that
20  they worked so hard on was -- was misleading; and so
21  what they had done was created a misleading impression
22  on people that then was perpetuated.
23            So I think they have to understand it in the
24  context of the whole picture, so that the FDA put out
25  this warning letter, but the damage was already done.
0263
1             And the evidence shows that the damage was done
2   and just writing to Dr. Holt's seminar participants and
3   correcting it, doesn't undue the damage as the research
4   shows.  They wouldn't understand that on their own.
5        Q    Based on your review of the research reports,
6   would you agree, Dr. Pechmann, that Vioxx was affective
7   for the vast majority of people who used it without
8   causing them any side effects?
9             MR. SKIKOS:  Objection.  You are asking a
10  medical opinion now.
11            THE WITNESS:  Yeah, that is not in my area of
12  expertise.
13  BY MR. GOLDMAN:
14       Q    It is also not in your area of expertise to be
15  able to say what Merck knew or should have known about
16  cardiovascular risks?
17       A    I disagree with that We look at science all of
18  the time and we look at the statistically significant
19  effects to see if we can make claims or not make claims.
20            And it is similar to what marketers had to do
21  here.  You have to have that expertise.  Otherwise, you

Page 109

Ex 1 - 5-26-06 depo transcript
22  cannot run the campaign because you could be misleading
23  people.
24       Q    What did Merck know about potential
25  cardiovascular risks in 1997?
0264
1        A    That is beyond my expertise to describe in
2   detail.  I know one memo that I included in here, which
3   I thought was particularly telling.
4        Q    What did Merck know about the cardiovascular
5   risks of Vioxx in 1998?
6        A    Merck had evidence that there could be a
7   problem.  It started to obtain evidence that there could
8   be a problem based on these memos.
9        Q    Are you basing that on the one scientific
10  advisors meeting from May of 1998?
11       A    Well, that is important, a scientific advisors
12  meeting.  I mean, that is not some guy shooting off a
13  memo to someone else, you know.
14       Q    Do you understand --
15       A    -- but like I said, I don't have an opinion on
16  exactly who knew, how much they knew, you know, whether
17  there was disagreement.
18            I know that there was some evidence available
19  to them, and I put a couple of representative memos in
20  the report.
21       Q    Is it true, Dr. Pechmann, that you don't have
22  an opinion on exactly what Merck knew, how much they
23  knew, and whether there was any disagreement about the
24  cardiovascular effects of Vioxx?
25       A    I have an opinion that they knew or should have
0265
1   known by the time the Vigor study was completed.
2        Q    So --
3        A    Because that is the kind of study that we would
4   look at to run any other integrated marketing campaign.
5   At that point, it was clear it was a statistically
6   significant effect.
7        Q    Are you aware of any evidence that came out
8   after the Vigor study or evidence that predated the
9   Vigor study that suggested that Naproxen could explain
10  the difference in the Vigor study as opposed to Vioxx
11  being responsible for the increased heart attacks?
12       A    I see what the FDA said about that.
13       Q    Is that all that you know about that topic?
14       A    No, I have seen other material on it.
15       Q    Do you feel that you are in a position,
16  Dr. Pechmann, to be able to assess whether there is
17  merit to the Naproxen hypothesis?
18       A    Not medical expertise.  I --
19       Q    Have you looked at any observational studies
20  involving cardiovascular risks of COX-2 inhibitors?
21            MR. O'CALLAHAN:  I object.  It's not the gold
22  standard.
23            THE WITNESS:  I know that there were some
24  studies -- I don't recall seeing any observational
25  studies, but I may have seen one.
0266
1   BY MR. GOLDMAN:
2        Q    Okay.  I am going to now focus on the documents
3   that you have produced here at deposition.  Okay.  And I
4   have some questions about them.
5        A    Okay.
6        Q    We are going to index all of these and there is

Page 110

Ex 1 - 5-26-06 depo transcript

7  going to be an index attached to the deposition and that
8  is how we will know exactly what you produced here
9  today.
10       A    Yes.  Can I make a statement, though?  There
11  were sometimes when we had a -- sales brochures that
12  they were very large number of detailing pieces and so
13  after going through them, I didn't keep all of them in
14  the box.
15            So to match updates to the research, which
16  makes sense to do, I may have to add a few of those
17  detailing pieces.  You know, they are very -- I mean, I
18  found them to be -- the wording to be identical, but I
19  have to prove that.
20       Q    I am going to start with the first redwell in
21  Box 1 and I am not going to go through each of these
22  documents, but just a few.  Okay?
23       A    Okay.
24       Q    This is a document called Monthly Report for
25  Vioxx, September, 2001.  It is has got a Bates stamp at
0267
1  the bottom MRK-AJT 0061075 through 1126.
2            Whose handwriting is on the right side?
3       A    Mine.
4       Q    What does this say?
5       A    I didn't have time -- "Didn't review.  No
6  time."
7       Q    So the document we just described, you didn't
8  have time to review before you formulated your opinions
9  and wrote your report?
10       A    I didn't review it thoroughly.  In other words,
11  I went through, skimmed it, saw if it was consistent
12  with what documents I had because there are ERA reports
13  every month.  So there is quite a bit -- it is just like
14  the detailing.
15            There is a very, very large number of similar
16  pieces, but I didn't -- when I looked at it and it
17  looked similar to the others, I decided not to include
18  it in the report.
19       Q    Do you stand by your statement that you didn't
20  review this September, 2001 Monthly Report because you
21  didn't have time?
22       A    What I mean is I didn't review it thoroughly.
23  I just skimmed through it.  By "review," I mean read
24  every page, be very careful.
25       Q    There is an October, 2001 Monthly Report for
0268
1  Vioxx MRK-AKC 39095 through 39149.  This document also
2  says, "Didn't review.  No time."
3            Is that in your handwriting?
4       A    They are exactly the same.  I wrote the notes
5  at the same time and I meant the same in both.
6       Q    This is a document called Vioxx Monthly EAR,
7  May 2002, MRK-ADA 0057461 through 603.
8            Whose handwriting is this?
9       A    Mine.
10       Q    And this here, too, on the left side?
11       A    Yes.  I call myself Connie.
12       Q    Whose handwriting is up in the right-hand
13  corner?
14       A    Mine.
15       Q    So the handwriting on the entire page is yours?
16       A    Yes.
17       Q    Did you make these notes as you were reviewing

Ex 1 - 5-26-06 depo transcript

18   this document or were these notes that you made when you
19   were talking to plaintiffs' counsel?
20      A    When I was reviewing it initially.  Sometimes I
21   would change my opinion in looking at something again.
22      Q    Did you sit down with the plaintiffs' lawyers
23   to review these documents and talk about what was
24   significant in them?
25      A    No.  I'm not sure if they even know I had them.
0269
1       Q    This is another document that is MRK-ADN 010988
2    through 919.  It is the ANA Physician Attribute Tracker,
3    September, 2002, Top Line Results.
4            Is this your handwriting on the first page?
5       A    Yes.
6       Q    Were those notes you made when you reviewed the
7    document?
8       A    When I initially reviewed it, yes.
9       Q    On some of these, such as Situation Analysis
10   March, 2003, MRK-AKC 0068277 through 316, there is a
11   Post-it that says, "Physician Message Tracking."
12           It shows increasing concern over non-G.I.
13   safety, whose handwriting is that?
14      A    Chris Spiro.
15      Q    And did he prepare this Post-it and put it on
16   the document for your benefit?
17      A    No, I didn't ask him to do that, and I ignored
18   what he put, but he did put that on there.  I guess
19   because he was an eager beaver and thought it was
20   helpful, but it wasn't because I am drawing my own
21   conclusions because I, basically, ignored what he said
22   on those Post-it notes.
23      Q    Why would you ignore what he said?
24      A    Well, I am the marketing expert.  He is not.
25      Q    Okay.  This is an Attribute Tracker MDS
0270
1    Summary, MRK-AKP 0038549 through 659.
2            Whose handwriting is on the first page of the
3    document?
4       A    Mine.
5       Q    And whose handwriting is on the Post-it that
6    says, "Competitive need to boost non-G.I. safety"?
7       A    That's Chris Spiro's.
8       Q    This is a five-page handwritten document that
9    doesn't have a Bates number because it is your
10   handwritten notes, I think, on the five yellow pages.
11   Is this your handwriting?
12      A    Yes, it is.
13      Q    And what does it say at the top?
14      A    "New docs and report."
15      Q    Do you know when you prepared this document?
16      A    It was a while ago.  So it was probably after I
17   completed all of this work in April.  That I added those
18   to the report.
19      Q    These were documents -- these were your notes
20   based on documents that you were sent in April of
21   2005 -- 2006?
22      A    No, I might have had those earlier.
23      Q    What does No. 3 say?
24      A    "Be The Power Video on day one of McDarby/Cona
25   versus Merck Trial, 3:00 p.m. segment."
0271
1       Q    What does that mean?
2       A    That was one of the things that I added to the

Page 112

Ex 1 - 5-26-06 depo transcript

```
 3       report.  I watched that video.
 4            Q      You watched the Cona/McDarby trial in New
 5       Jersey?
 6            A      No, I just watched that part of it.  We did not
 7       have a copy of the video, just the video.  So I watched
 8       it in the trial.  And then I got a copy of the video.
 9            Q      There is highlighting on some of the original
10       documents, Dr. Pechmann, is that your handwriting or was
11       it handwriting on documents that you received?
12            A      You mean highlighting?
13            Q      Yes.
14            A      That is my highlighting.
15            Q      This is another handwritten document that you
16       have here.  It is just before the response to the
17       expression to concern or expression of concern.
18            A      Okay.
19            Q      This is your handwriting, too?  It is a
20       two-page document.  It says, "Be The Power"?
21            A      Yes.
22            Q      What does that document say?
23            A      Mark McDarby; New Jersey; Mark McDarby/Cona
24       versus Merck.  So these were part of the notes that I
25       took when I saw the video as part of that trial.
0272
 1            Q      So you were taking notes while as you were
 2       watching the Be The Power video?
 3            A      Well, I stopped it and then take notes.
 4            Q      Did you watch anything else in the Cona/McDarby
 5       Vioxx trial other than Be The Power video?
 6            A      I saw what Anstice looked like, but I think he
 7       was there, Anstice, but that was all.  I forwarded it
 8       through the video and that is all I watched.
 9            Q      Did you watch Mr. Anstice's trial testimony in
10       the Cona/McDarby case?
11            A      No.
12            Q      Why not?
13            A      I didn't have time.  I am a professor and I
14       have a day job.  I am not a, you know, professional
15       expert witness or anything.
16            Q      These are some handwritten notes that you took
17       on the back of the Waxman report.
18                   Did you read the Waxman report?
19            A      Yes.
20            Q      Can you tell me what this page means on the
21       very back with your handwritten notes where you are
22       identifying numbers?
23            A      Those are his references.  The reports referred
24       to other documents.
25            Q      So you read the Waxman record to find certain
0273
 1       documents that you then wanted to see?
 2            A      Well, no, I read it to find out what Waxman had
 3       to say about the CV card or Merck.  And then I found it
 4       useful to make a list of documents that he cited in case
 5       I might want to look at them.
 6            Q      Okay.  Bear with me.
 7                   This is a printout of portions of
 8       Dr. McCaffrey's deposition testimony.  And there are
 9       excerpts and then there are certain things that are
10       bolded.
11                   Do you see that?  It goes from Page 1 to 41.
12            A      Let's see, yes, I bolded that myself.
13            Q      Did you read the entire deposition or just the
```

Ex 1 - 5-26-06 depo transcript

14  excerpts that you were sent there?
15     A   Oh, no, the entire thing.  I had it in my
16  computer.
17     Q   Yes.
18     A   And then when there was a page that I thought I
19  really needed, I bolded it and printed it out.  Isn't
20  much of it printed out or is it just each page where I
21  bolded?  Does it jump around?
22        Oh, yeah, so if I bolded something on a page,
23  then, I guess, I printed just that page, so that I would
24  have it.  And I stopped doing that because it wasn't
25  really helpful, really.
0274

1     Q   Do you have any experience, Dr. Pechmann,
2  reviewing call notes that are prepared by sales
3  representatives, other than in your work in this case?
4     A   I reviewed very similar documents in the past,
5  not -- I mean the same type of data.  You know,
6  instances of something.  Coding -- it is -- from a
7  scientific perspective, I have done that type of
8  research before; and I am familiar with that type of
9  data.
10    Q   Do you --
11    A   I'm sorry.  In answer to your question, I never
12  prior to this case analyzed the sales call notes
13  involving pharmaceuticals.
14    Q   Prior to this case, Dr. Pechmann, you never
15  reviewed sales call notes for pharmaceutical sales
16  representatives; right?
17    A   That's correct.
18    Q   Prior to this case, you never reviewed the
19  number of visits that were paid on a particular doctor
20  by sales representatives; correct?
21    A   Is that a different question from the other
22  one?
23    Q   Yes.
24    A   So have I ever --
25    Q   You have reviewed documents in this case,
0275

1  Dr. Pechmann, that reflects the number of sales calls,
2  not just sales notes, but sales calls on Drs. Micola and
3  McCaffrey; right?
4     A   Yes.
5     Q   And am I right that before this case, you have
6  never reviewed documents like that?
7     A   No, I disagree with that statement.  I had
8  never reviewed sales call -- what would you call that
9  one?  Sales call documents?  Because you are
10  distinguishing between sales call notes and sales call
11  records.
12    Q   The documents that you reviewed showing the
13  number of visits between sales representatives and
14  Dr. Micola and Dr. McCaffrey, those types of documents
15  you never reviewed before for any pharmaceutical
16  company; true?
17    A   For any pharmaceutical company, no.
18    Q   I am correct; right?
19    A   That is correct.
20    Q   Down to two more boxes.
21    A   Okay.
22    Q   It will go fast.
23        Were you sent depositions from the plaintiffs'
24  lawyers in this case?

Page 114

Ex 1 - 5-26-06 depo transcript
```
25      A    Yes.
0276
1       Q    And I am going to --
2            MR. O'CALLAHAN:  Read the titles into the
3       record.
4            MR. GOLDMAN:  Yes.
5       Q    Read the depositions here and ask you whether
6       you reviewed them in their entirety.  Okay?
7       A    Okay.
8       Q    The deposition of Dr. Michael Micola, April 25,
9       2006?
10      A    Yes.
11      Q    Is the copy that I am holding in my hand the
12      version that you reviewed?
13      A    I read an electronic version of that.
14      Q    Did you review in its entirety of Marilyn
15      Krahe, K-R-A-H-E?
16      A    My recollection is yes.
17      Q    Did you review the exhibits that were attached
18      to Marilyn Krahe's deposition?
19      A    Yes.
20      Q    Did you review the deposition in its entirety
21      of Mary Elizabeth Blake?
22      A    Yes.
23      Q    Did you review in its entirety the deposition
24      of David Anstice from March 16, 2005, March 17, 2004,
25      March 18, 2005, and April 12, 2005, and May 20, 2005?
0277
1       A    No.  My recollection is that I received one of
2       those early and I looked through that one and then the
3       other ones I skimmed through.
4       Q    So you at least skimmed through all of the
5       deposition transcripts for the dates I just mentioned
6       for David Anstice?
7       A    No, I cannot testify to that.  I might have
8       missed -- I believe I received some of those kind of
9       late.  And so I did not -- by "skim," I mean to see what
10      is on each page.
11           And what I did, as I recall, is look for key
12      words to see if I could find relevant things in there
13      because it was too much.  I did not have time to go
14      through all completely.
15           I think there was one deposition that I got
16      early.  Can we -- I mean, are they all -- are some of
17      them during trial and some --
18      Q    Yes.
19      A    Yes, I think I received -- what was his actual
20      deposition?
21      Q    I believe -- the video deposition, the first
22      one that you were given of David Anstice is March 16,
23      2005, and that was in the New Jersey case, as well as
24      the Ernst case, Texas.
25      A    So that was just one day.  Yeah, I believe I
0278
1       got that early and I looked at that completely.  And
2       then the other ones --
3       Q    And there was the second day March 17, 2004,
4       did you review that one?
5       A    Can I see it?
6       Q    Sure.
7       A    I can't recall.  My recollection is that I
8       reviewed the original deposition.  There is only one day
9       in 2004.
```
Page 115

Ex 1 - 5-26-06 depo transcript

```
10        Q    March 17, 2004, deposition of David Anstice,
11   you remember that?
12        A    Yes.  And I remember going in key word search
13   trying to find relevant text in these others.
14        Q    Okay.  Did you review the following depositions
15   of Debra Shapiro?
16        A    I don't believe so, no.
17        Q    So you did not review any depositions of Debra
18   Shapiro?
19        A    No, that's not my recollection.
20             MR. GOLDMAN:  Can I take it out of here?
21             MR. SKIKOS:  (Nods head.)
22             THE WITNESS:  Yeah.
23   BY MR. GOLDMAN:
24        Q    Did you review any of the depositions of
25   Dr. Scolnick, S-C-O-L-N-I-C-K.
0279
 1        A    I reviewed -- my recollection is that I
 2   reviewed part of it.
 3        Q    Let me hand you --
 4        A    No, let --
 5        Q    I am handing you three transcripts:  April 29,
 6   2005, June 1st, 2005, and August 16, 2005 of
 7   Dr. Scolnick?
 8        A    This first one looks familiar.  I do believe I
 9   went through at least parts of these -- or at least the
10   first one.
11        Q    So you believe you reviewed parts of
12   Dr. Scolnick's April 29, 2005, deposition transcript?
13        A    Right.
14        Q    How about the others?
15        A    I don't recall looking at these.
16        Q    Okay.  So we are going to just keep in the box
17   the one that you do remember reading April 29, 2005.
18        A    Okay.
19        Q    Did you review the deposition transcript of
20   Susan Baumgartner on February 25, 2005?
21        A    I did review the deposition transcript, yes.  I
22   will rely on you for the date.
23        Q    Did you review Susan Baumgartner's deposition
24   of March 11, 2005?
25        A    I recall reviewing everything I had with
0280
 1   those -- with regard to her depo.
 2        Q    Do you remember reading Susan Baumgartner's
 3   September 30, 2005 deposition?
 4        A    I need to look -- well, let me see all three to
 5   be absolutely sure.
 6             Yes, I believe I did review this.
 7        Q    So the three deposition dates that I just read
 8   of Susan Baumgartner's --
 9        A    My recollection is that I went through her -- I
10   forgot those three dates, but I remember going through
11   Baumgartner's.
12        Q    Do you remember reviewing the entire deposition
13   of Gerald Barnett?
14        A    Yes.
15        Q    Did you review the entire deposition of Michael
16   McCaffrey?
17        A    Yes, both Michael McCaffrey's.
18             MR. SKIKOS:  Didn't you say yes on that one?
19             MR. GOLDMAN:  Yes.  There is two of them here.
20        Q    Did you review the deposition of Dr. Kurfm,
```

Page 116

```
                        Ex 1 - 5-26-06 depo transcript
21  November 21, 2005, January 24, 2006?
22       A    No.
23       Q    Did you review the deposition testimony of
24  Charlotte McKines?
25       A    McKines?
0281
1        Q    Yes.
2        A    Yes.
3        Q    How do you know how to pronounce her last name?
4        A    Well, that is how I pronounce it.  I really
5   don't know.
6        Q    Do you know Charlotte McKines?
7        A    No.  You might be right and I may be wrong.
8        Q    I have no idea.
9             Did you review Charlotte McKines's deposition
10  of August 3rd and August 4th, 2005?
11       A    My recollection is yes.
12       Q    Did you review the depositions of Dr. Alise
13  Reicin?
14       A    No.
15       Q    Let me just identify the three depositions of
16  Charlotte McKines:  August 3rd, 2005, August 4, 2005,
17  September 9, 2005.
18            Did you review the deposition of good old
19  Dr. Topol?
20       A    No.
21       Q    Did you review the deposition of Jan Weiner?
22       A    Yes.
23       Q    There is an August 10, August 11, and
24  August 12th?
25       A    Yes.
0282
1        Q    Did you review the deposition testimony of
2   Ellen Westrick?
3        A    Yes.
4        Q    Okay.  That is all of the depositions and now,
5   I will go through the box of binders.
6             I have here what probably will end up being Box
7   4 and 4(b), which are blue binders one, two, three,
8   four, five from Mr. Robinson's firm and the first is a
9   deposition of Laura Demopolous, D-E-M-O-P-O-L-O-U-S.
10            Did you read that?
11       A    Yes.
12       Q    The second binder looks like it has a bunch of
13  documents?
14       A    Yes.
15       Q    Maybe you can tell me what this consists of
16  because I don't want to go through each one.  I will, if
17  I have to, but maybe you can summarize what that binder
18  contains.
19       A    Okay.  The first set of documents has to do
20  with the FDA regulations.  And then there is documents
21  from the FDA Advisory Committee Meeting or -- let me
22  see, and the teleconference; and then there is a
23  discussion, instructions on how the sales reps should go
24  through the Bombardier reprint; and then -- I mean, it
25  is a set of miscellaneous documents.  I guess, we have
0283
1   to go through every one.
2        Q    No.
3        A    Some of them are repeats that you saw in
4   another binder.
5        Q    Did you review all of the materials that are
```

Page 117

Ex 1 - 5-26-06 depo transcript

6   contained in the second binder that we are going through
7   right now?
8        A    This binder?
9        Q    Yes.
10       A    Yes.
11       Q    Okay.  This is a binder of documents called
12   Tracking Documents DTW Physician Messages?
13       A    Yes.
14       Q    Did you review this entire binder?
15       A    No.
16       Q    Did you review any of it?
17       A    Yes.
18       Q    Well, can you, as best you can, indicate what
19   documents you reviewed in this Tracking Docs Binder?
20       A    Well, I reviewed the summary sheets.  It is by
21   month, so they are summary sheets and I reviewed the
22   questionnaire.  This is the tracking of the sales reps
23   messages by DTW.
24       Q    Okay.
25       A    And you know, scanned through and stopped at
0284
1    certain pages to see what the different questions were
2    that were being asked.
3             But I mostly focused on the summary sheets at
4    the beginning of each one when there was one.  Some of
5    them we didn't have summary sheets, but sometimes we
6    did.
7             And I spent time on -- you know, the sample.
8    So each document gives you the sample.  So who was it
9    that, that they were interviewing; but I did not spend a
10   lot of time on the raw data.  You know, I looked at the
11   summaries.
12       Q    Okay.  The fourth binder is -- has a binder
13   label that has 1996 to 2005.  And it contains in
14   chronological order what looks like plaintiffs' trial
15   exhibits, starting with P1.0020 and then that was in
16   1996 and it goes all the way to P1 through 1238.
17            Did you review this?
18       A    Can I see it?
19       Q    Yes.
20       A    To the best of my recollection, no.
21       Q    So you are not going to include the fourth
22   binder and so we will not copy it because you did not
23   review that?
24       A    Right.
25       Q    The fifth binder starts with FDA, AAC, which is
0285
1    the Advisory Committee, February 8, 2001, Statistical,
2    Bates No. MRK-ABT 0003756 and it ends at MRK-HBH 0013917
3    and it contains numerous documents separated by blue
4    sheets?
5        A    And documents in that.
6        Q    And there are documents in the left sleeve as
7    well.  Did you review this, what will be the fourth
8    binder?
9        A    Yes.
10       Q    In its entirety?
11       A    There may be some parts that I did not look at.
12   Farquhar, I did not review.
13       Q    You did not review.  Can I take a quick look at
14   that?
15       A    Ray, I didn't review.  Yeah, so I reviewed up
16   to that.

Ex 1 - 5-26-06 depo transcript

17    Q    Okay.  So I am going to take out --
18    A    Let's see I did not see that.
19    Q    Okay.  So I am going to reidentify the fourth
20 binder because we took out documents that you had not
21 reviewed.
22         The new ending is MRK-CAAD 0001757 and it
23 starts -- MRK-ABT 0003756.
24         Did you review the documents on the left sleeve
25 also?
0286
1    A    Yes.
2    Q    Okay.  Let me just look at my notes to see if I
3 have anymore questions.
4    A    If you have an Internet, I can print out the
5 E-mails.
6    Q    Yes.
7    A    Do we have a printer?
8         MR. SKIKOS:  We can go to Robinson's office,
9 but I have some questions, too.
10         MR. GOLDMAN:  Let's go off the record for a
11 second.
12         (Discussion held off the record.)
13         MR. GOLDMAN:  Okay.  Exhibit 8 is
14 Dr. Pechmann's article called Do Consumers Over
15 generalize one-sided Comparative Price Claims and Are
16 More Stringent Regulations Needed?
17         Exhibit 9 is an article by Dr. Pechmann called
18 An Assessment of U.S. and Canadian Smoking Objectives
19 for the year 2000.
20         Exhibit 10 is a printout of a book on
21 Amazon.Com called Quasi-Experimentation Design and
22 Analysis Issues.
23         (Defendants' Exhibits 8 through 10
24         were marked for identification by
25         the court reporter.)
0287
1         THE WITNESS:  In Field Settings.  It says it on
2 the book.
3 BY MR. GOLDMAN:
4    Q    In Field Settings.
5         Do you intend to go to trial in New Orleans in
6 July?
7    A    Yes.
8         MR. GOLDMAN:  Okay.  Those are all of the
9 questions that I have right now subject to me reviewing
10 your E-mails, and then I might have some more questions.
11         THE WITNESS:  Okay.
12         MR. SKIKOS:  Let's go off the record for a
13 second.
14         (Brief recess.)
15         MR. GOLDMAN:  We are just going to mark as a
16 Exhibit 15 a compilation of E-mails that Dr. Pechmann
17 just printed off and it consists of eleven E-mails and
18 then we are going to have somebody inventory the four --
19 it may turn into five boxes that we discussed today.
20         (Defendant's Exhibits 11 through 15
21         were marked for identification by
22         the court reporter.)
23         MR. GOLDMAN:  And we will attach a copy of the
24 inventory of documents to the deposition.
25         Thank you, Dr. Pechmann.
0288
1         THE WITNESS:  You're welcome.

Page 119

Ex 1 - 5-26-06 depo transcript

2
3                        EXAMINATION
4  BY MR. SKIKOS:
5      Q    Dr. Pechmann, I am going to ask you about 25,
6  to 30 minutes worth of questions and then you can go
7  home.
8      A    Okay.
9      Q    It is almost about 6 o'clock.
10          Are you a Ph.D.?
11     A    Yes.
12     Q    In what?
13     A    In marketing management.
14     Q    Are you a full professor?
15     A    Yes, I am.
16     Q    You are tenured?
17     A    Yes.
18     Q    About approximately how many peer-reviewed
19  articles have you published?
20     A    Fifty.
21     Q    Have you -- do you consider yourself an expert
22  in integrated marketing campaigns?
23     A    Yes.
24     Q    Approximately how long have you been working in
25  the area of integrated marketing campaigns?
0289
1      A    Twenty years.
2      Q    Of the 50 peer-reviewed articles published in
3  journals, how many of them relate to aspects of
4  integrated marketing campaigns?
5      A    All of them.
6      Q    You mentioned before editorial boards?
7      A    Yes.
8      Q    What is that?
9      A    I am on several editorial boards, meaning that
10  I am one of a small group that -- that is considered to
11  be a top reviewer and would review -- when someone from
12  the review board reviews these papers to help ensure
13  that the quality of the journal is maintained.
14          It is very prestiges to be on the review
15  board because it means that you are just below an
16  editor.
17     Q    At one point, you were on three review boards
18  on three prestiges journals at the same time?
19     A    Yes.  The three top journals in marketing are
20  Journal of Consumer Research, Journal Marketing and
21  Journal Marketing Research and not one person is on all
22  three reviews boards and I was on all three review
23  boards for a while.
24     Q    Have you peer-reviewed articles on aspects of
25  integrated marketing campaigns?
0290
1      A    Yes, I have all of the time.
2      Q    Do you teach as a full professor on aspects of
3  integrated marketing campaigns?
4      A    Yes.
5      Q    There is something in your C.V. about top 50
6  Marketing Scholars.  Can you describe that?
7      A    Yes.  Someone did a study of the impact of
8  different marketing scholars based on the citation index
9  and I appeared in the top 50 in terms of people citing
10  my work.  So, basically, the impact of my work on
11  academia.
12          And I also was named the top scholar in

Page 120

Ex 1 - 5-26-06 depo transcript

13    economics for my citation count.  Even though, I am not
14    technically in economics.
15        Q    Is marketing a science?
16        A    Yes.
17        Q    Is it a subspecialty of any particular science?
18        A    It is a behavioral science.
19        Q    What are other behavioral sciences?
20        A    Psychology, economics.
21        Q    Do you in marketing use the scientific method?
22        A    Yes.
23        Q    Can you describe that?
24        A    The scientific method?
25        Q    As applied in marketing.
0291
 1        A    Okay.  Well, you identify hypotheses.  You
 2    tests hypotheses using a controlled study and using
 3    valid methods and run statistical analysis; and write up
 4    reports.
 5        Q    Is there any difference in the scientific
 6    methods used in marketing versus the scientific methods,
 7    say, used in medical research, to your knowledge?
 8        A    No, they are very similar.
 9        Q    Are there scientific principles and
10    methodologies applied to integrated marketing campaigns?
11        A    Yes.  I mean I wouldn't say all, but integrated
12    marketing campaigns, these days virtually all -- well,
13    many apply the scientific method to test the messages,
14    understand their impact before they go out, and then to
15    track the messages afterwards.
16        Q    Does the scientific method used by Merck in
17    conducting its integrated marketing campaign in
18    conducting the studies that it used in this
19    integrated --
20        A    Can you rephrase your question?
21        Q    Let me get to that in a second -- I will do it
22    now.
23             Did Merck researchers who did work on their
24    integrated marketing campaign use the scientific method
25    to conduct their studies?
0292
 1        A    Yes.
 2        Q    Is there any distinction, in your mind, as an
 3    expert in integrated marketing campaigns whether the
 4    integrated marketing campaign is done by a
 5    pharmaceutical company, versus a tobacco industry,
 6    versus the government, versus the university, versus a
 7    small company?
 8             MR. GOLDMAN:  Object to the form.
 9             THE WITNESS:  No.  No, there is no difference
10    based on industry.
11    BY MR. SKIKOS:
12        Q    Would you use the same scientific methodology
13    used to perform an integrated marketing campaign studies
14    no matter what the industry was?
15        A    Yes.  What really determines it is how much
16    money you have.
17        Q    Your experience in running integrated marketing
18    campaigns for the anti-drug -- can you describe that?
19        A    My experience?
20        Q    Yes.
21        A    I was involved in developing the strategy to
22    the campaign, the core messages.  I developed the
23    scientific method for testing the messages.

Page 121

Ex 1 - 5-26-06 depo transcript

24   I reviewed the focus group work that was done
25 on the messages as before they were filmed because it
0293
1 costs about -- a lot of money to film the TV ads.  So we
2 did extensive testing of the storyboards and preliminary
3 ads.
4       As I said, I developed overall the protocol and
5 statistical analyses involved in testing the final TV
6 ads.
7       And then I was also heavily involved in
8 reviewing the tracking research that we did after the
9 ads were running.  We tracked both youth and parents.
10 So we tracked adults as well as kids because it was a
11 campaign that included ads for adults, parents and for
12 kids.  It wasn't just a youth campaign.
13       I mean, it was designed to prevent youth from
14 using drugs, but parents was one of the target markets.
15 And so with regard to tracking, I helped to oversee the
16 design of the studies, learned about all of the
17 findings, was involved in the statistical analyses; was
18 involved in adjusting the campaign based on the results.
19       So I was heavily involved in the research at
20 all levels and also strategy decisions.
21    Q   When you did the anti-drug campaign, you did
22 that from the standpoint of a marketing science;
23 correct?
24       MR. GOLDMAN:  Object to the form.
25       THE WITNESS:  I was chosen because of my
0294
1 expertise in the science of integrated marketing of the
2 people who chose me said that I was chosen for that
3 purpose.
4       The campaign was required to have testing.  I
5 believe it was in the bill that passed in Congress and
6 so then they wanted to find someone who had expertise
7 and they chose me because people knew me.
8 BY MR. SKIKOS:
9    Q   I think there has been some confusion about
10 where you are rendering opinions.  So let me try and
11 clarify that in this particular case.
12       From a medical standpoint, are you offering
13 cause and effect opinions on the relationship between
14 Vioxx and cardiovascular events?
15    A   No.
16    Q   Okay.  From a marketing standpoint, are you
17 offering opinions on whether the Merck marketing
18 executives knew or should have known that there was a
19 cardiovascular risk?
20    A   Yes.
21    Q   From a marketing standpoint, are you offering
22 opinions whether Merck did perform a integrated
23 marketing campaign on Vioxx?
24    A   Yes.
25    Q   What is your opinion?
0295
1    A   That they did clearly perform an integrated
2 marketing communications campaign.  It is even in their
3 documents.
4    Q   Now, are you offering opinions on your analysis
5 of the tests performed by Merck to determine whether the
6 cardiovascular risk was being conveyed and received by
7 the doctors and patients?
8       MR. GOLDMAN:  Objection to form.

Page 122

Ex 1 - 5-26-06 depo transcript

```
 9          THE WITNESS:  Can you state that again?
10  BY MR. SKIKOS:
11      Q    Sure.  Let me do it in two steps.
12           In your review of the materials that were
13  provided to you on the studies conducted by Merck in
14  performing your integrated marketing campaign, did you
15  actually see categories of studies performed?
16      A    Yes, I did.  I saw six categories of studies.
17      Q    And did you as an integrated marketing campaign
18  expert analyze those studies?
19      A    Yes, each of them.
20      Q    Okay.  Can you tell me what the six categories
21  of studies were that were performed by Merck in their
22  integrated marketing campaign?
23      A    Yes.  So there was tracking of the sales reps
24  visits to the physicians.
25           There was tracking of the perception -- the
0296
 1  physicians' perceptions of Vioxx and Celebrex and their
 2  prescribing behavior.  That was a panel of physicians.
 3           And then there was tracking of overall sales
 4  data that was purchased from -- from pharmacies.  That
 5  was the complete data on prescriptions -- filled
 6  prescriptions at pharmacies.
 7           Then there was consumer tracking of their
 8  perception of the different brands and the different
 9  attributes and their behavior -- their stated behavior.
10           And let me say that the tracking of the sales
11  and the pharmacies was a combination of physicians
12  prescribing and the consumers filling it out.  You know
13  what I am saying?  So it is a combination of both.
14           And then the final study was -- let's see,
15  there is two more -- there is a copying testing of the
16  physician material and the copying testing of the
17  patient material.
18      Q    Now, the categories of studies that you
19  reviewed and analyzed, did you use the same scientific
20  methods in analyzing those studies that you did -- that
21  you would do in performing integrated marketing
22  campaigns as a university professor?
23      A    I didn't understand the question.
24      Q    Bad question.
25           You analyzed each of the categories of studies?
0297
 1      A    Yes, I analyzed the methods, the statistics,
 2  the results, the validity of the study --
 3      Q    Is there --
 4      A    -- their findings.
 5      Q    I'm sorry.  I should not have cut you off.  It
 6  is a theme we have.
 7           Is there a statement or analysis of each of the
 8  categories of studies in any of the documents that we
 9  have looked at today.
10      A    Yes, in my report.
11      Q    Okay.  Yesterday you prepared an exhibit that
12  counsel put as Exhibit 5, can you describe what that is?
13      A    Yes.  When I discussed the studies with you
14  yesterday, it became apparent that, that it would be
15  useful to have a document that clearly stated these six
16  types of studies and describe the methods and my
17  background on the method and the results.
18           I hadn't structured my report that way, but
19  that is how I structured it in my own mind.
```

Page 123

Ex 1 - 5-26-06 depo transcript

```
20          And so explaining it to you yesterday, I was
21   basically describing each study this way.  And so I
22   decided to write it all down because it might come up
23   today.
24       Q    Okay.  Let's -- Can you briefly go through for
25   each category of study what you have in Exhibit 5?
0298
 1       A    Yes.  So let me say, I just did this in random
 2   order.  So it is not in the same order -- or maybe I
 3   should go back in the same order that -- I don't
 4   remember the order that I originally gave you.
 5       Q    It doesn't matter.
 6       A    Okay.  Fine.
 7            So one type of study is the Scientific Testing
 8   of the Detail Pieces with the M.D.'s and they used
 9   accepted practice for doing this type of research.
10            They did in-depth interviews with about -- I
11   have one example where they spoke to 31 doctors in two
12   different cities.  That is a standard approach.
13            They have to have it in a couple of cities and
14   they showed them detailing pieces in counter-balanced
15   order, and asked open-ended questions to try to
16   understand their perceptions of the material.
17       Q    All right.  Are those studies referenced in the
18   exhibit binders?
19       A    Yes.
20       Q    That are attached to your report?
21       A    Yes.
22       Q    What exhibits?
23       A    Exhibits 28 and 29, and 59, and Exhibit 5 --
24   This is Exhibit 5.  It does not look like the right
25   number.  Right.  This is Exhibit 5 now.
0299
 1       Q    It's Andrew's Exhibit 5 for his reports.
 2       A    Right.  This is the type of research we did in
 3   the anti-drug campaign and in the U.S. Census Campaign.
 4   I did this a long time ago when I worked at the National
 5   Consulting Group.  It is a type of research that I talk
 6   a lot about in teaching.
 7       Q    What were the findings of this?
 8       A    Well, overall the physicians said, first of
 9   all, they responded very favorably to the material about
10   safe for the elderly.
11            This was a population that -- that felt that
12   Vioxx had concerns -- had some possible problems with
13   elderly due to their CV risks and they felt that the
14   materials helped them to overcome obstacles.
15            And they said that they were confused about the
16   CV information and they wanted more information about
17   it.  They did not understand how to interpret it.
18            They said it was conflicting and the brochure
19   was not changed to address that issue.  It was changed
20   to address some other issues but not that issue.
21       Q    In reviewing the conclusions and the methods
22   and the design of this particular study, do you agree
23   with the conclusions?
24       A    Yes.
25       Q    And was the methodology used by Merck, in your
0300
 1   opinion, scientifically valid?
 2       A    Yes.
 3       Q    Okay.  Let's go to the next.
 4       A    Okay.  The second -- let's see.  Let's see if
```

Page 124

Ex 1 - 5-26-06 depo transcript

5  we have notes here.  Hold on.
6            In that same study, they found that only one
7  physician said that he proactively warned his patients
8  about Vioxx's cardiac risk.
9       Q    One out of the 31?
10      A    Right.  And the rest of them said that
11  primarily the patients were concerned or there was bad
12  press and so they didn't warn their patients.
13            MR. GOLDMAN:  Objection.  Move to strike as
14  nonresponsive.
15            THE WITNESS:  What did I do wrong?
16  BY MR. SKIKOS:
17      Q    You are still talking about the first study?
18      A    Yes, I am.
19      Q    Okay.  I will accept that answer with respect
20  to the first category of studies.
21      A    Yes, and those exhibits are 41 -- did I already
22  say 41?
23            Okay.  So, now, I remember this -- I'm sorry.
24            Also, this type of study was discussed in
25  Exhibit 41.
0301
1            MR. GOLDMAN:  Which one are we on now?
2            THE WITNESS:  The same first type of study.
3  BY MR. SKIKOS:
4       Q    We are going to go back to the first type of
5  study.
6       A    Yes, we are still -- I have not gone to the
7  second type of study.  This is all the first type of
8  study.  I'm sorry.
9       Q    Okay.
10      A    And Exhibit 41 also describes another similar
11  study where people were asked to look at the Efficacy
12  Confidence Program -- it had two names, but that is one
13  of the names -- and assess, you know, was it a
14  convincing program.  Would they prescribe more Vioxx?
15            And you had 10 to 15 percent saying that they
16  felt that -- that overall they said they would expect a
17  10 to 15 percent increase in prescriptions for Vioxx
18  from that program.
19            And the -- yeah.  So they were very favorable
20  towards that program when they saw the detailing
21  materials about it.
22      Q    Okay.  What is the second category?
23            MR. GOLDMAN:  Can you just be clear?  What
24  category of studies were you just talking about?
25            THE WITNESS:  Well, Copy Testing of Detailed
0302
1  Pieces with M.D.'s.
2            MR. GOLDMAN:  Okay.
3            THE WITNESS:  Let me make sure that is how it
4  is labeled.  It's Scientific Copy Testing with Detail
5  Pieces with M.D.'s, which is what I sort of called it.
6            Okay.  Another type of study is the Scientific
7  Testing of Promotion Message Recall.  So another way of
8  saying it is Tracking of Promotion Message Recall.
9            And that study involved about 300 interviews a
10  month with a detail survey of about 25 questions.  It
11  was initially conducted by DTW Research, and then it was
12  picked up by Impact Rx.
13            And it looks like -- we don't know how much --
14  DTW did the research in 2001 and Impact RX took over in
15  2002.

Ex 1 - 5-26-06 depo transcript

```
16         And just to give you some sense of the amount
17   of money that proposal that DTW had put in to get the
18   work in 2002, that was ultimately rejected, it was
19   600,000 for a year's worth of work.  So it is a lot of
20   money.  And they studied high NSAID and high Coxib
21   doctors and they --
22   BY MR. SKIKOS:
23         Q    You mean prescribing doctors?
24         A    Yes.
25         Q    Okay.
0303
1          A    And the relevant exhibits are 55, 56, and 58.
2               The method I did not include in my binders, but
3    it is in my exhibits, but it is in the binder that says
4    Tracking Research.  That we saw a little bit earlier.
5          Q    Okay.
6          A    And we tracked promotional message recall on
7    the anti-drug campaign and I routinely teach classes
8    where they did this type of research.
9          Q    What were the findings?
10         A    The findings were that a substantial number of
11   physicians said that the reps told them Vioxx does not
12   increase the risk of M.I. or stroke.
13              So in this one time period that I looked at, it
14   was 18 to 47 percent of physicians said the reps told
15   them that Vioxx does not increase the risk of M.I. or
16   stroke.
17              And in the time period I looked at, basically,
18   the research shows a substantial number of reps were
19   telling physicians that Vioxx was safe for the elderly.
20              So in this one period of time, it was 20 to
21   33 percent and in another period of time, it was 34 to
22   47 percent.  They have this plotted out.
23              So we don't have a complete list of every month
24   and every, you know, data point, but there were several
25   figures that describe for various periods of time, what
0304
1    these percentages were and they were high.
2          Q    What exhibits are you referring to now?
3          A    55, 56, 58.  There is also some data in 48.
4          Q    Do you -- is it your opinion that you have
5    sufficient data to come up with an opinion on whether
6    this study is valid?
7          A    Yes.
8          Q    What is your opinion?
9          A    It is valid.
10         Q    Okay.  Is that all you have for the second
11   category of studies or is there more?
12         A    I also did my independent coding of some of the
13   data to see what I came up with and the month I looked
14   at, it was 20 percent.  So it was consistent with what
15   they said.
16         Q    20 percent what?
17         A    20 percent of -- I'm sorry -- of the doctors
18   recalled the reps saying that Vioxx doesn't increase the
19   risk of M.I. or stroke.
20         Q    Okay.  Go to the next category, please.
21         A    Another category is Tracking of the Behavior,
22   so that the prescriptions -- the filled prescriptions at
23   the retail level.
24         Q    Oh, I'm sorry.  Before I go back, go back to
25   the second category.
0305
```

Page 126

Ex 1 - 5-26-06 depo transcript
```
 1          Assume the data is valid at 20 percent of the
 2  sales reps told the doctors that Vioxx does not increase
 3  cardiovascular risk and the doctors recalled it a
 4  sufficient time later, did Merck in any of the documents
 5  that you reviewed, change their detailing methods to fix
 6  that potential problem?
 7      A    No, I didn't see any evidence of that.  The
 8  numbers are very consistent.
 9      Q    Go ahead.
10          Oh, in any of the internal documents that you
11  reviewed, that are contained in your report or in the
12  files there, did anyone at Merck work to combat the
13  potential problems that physicians were being told by
14  their sales reps that there is no increase of
15  cardiovascular --
16          MR. GOLDMAN:  Object to the form.  Assumes
17  facts not in evidence.
18          THE WITNESS:  Okay.  What was the question
19  again?
20  BY MR. SKIKOS:
21      Q    The question sucked.  Go to the next one.
22      A    Well, I did want to say something which is
23  related -- I think it was the answer -- the question
24  that you were asking.
25          But there is -- there is documentation that an
0306
 1  objective of the campaign of the integrated marketing
 2  communications campaign, was to convince doctors to
 3  prescribe Vioxx regardless of the patient's
 4  cardiovascular risk because Vioxx does not cause heart
 5  attacks.
 6          That was a major communication objective of the
 7  campaign.
 8          MR. GOLDMAN:  I move to strike as
 9  nonresponsive.
10  BY MR. SKIKOS:
11      Q    Pretend that I asked that at the end, would the
12  answer be the same?
13      A    Yes.  I thought you asked something related to
14  that.
15      Q    I did.
16      A    You asked, did they do something about it?  And
17  I was saying, no, they didn't do anything about it
18  because that was the objective of the campaign.
19      Q    Okay.  What is the third category?
20      A    The third category was Tracking of Behavior
21  through Prescription -- through prescriptions at
22  pharmacies.
23          So pharmacies that sell data on the
24  prescriptions filled overall and by doctor.  They don't
25  identify the patient, but they identify the doctor.
0307
 1          So you are able to track how the sales are
 2  doing and they have -- the way it is tracked is total
 3  prescriptions and then new prescriptions.  So,
 4  obviously, one is subtracted from the other are refills.
 5          So total and new and the other is refills.  So
 6  total, minus new would be the refilled prescriptions.
 7  And so this is the count of prescriptions.
 8          Now, this type of collection of data -- of
 9  sales data is what I teach in a course -- a whole course
10  on how to use this data.  It is called Micromarketing.
11          Also, the tracking of behavioral data is
```

Page 127

Ex 1 - 5-26-06 depo transcript

12  something that I have expertise in and I have published
13  on that topic.
14          I have American Journal Public Health Article
15  with Dickson and Lane on, you know, analyzing this type
16  of data.
17          In a drug case, we didn't have that because,
18  obviously, we will not be tracking marijuana purchases.
19  And even with the tobacco, because it is adolescent.  So
20  there is no data on adolescents.
21      Q   And what are the findings?
22      A   The findings indicate that sales were high for
23  Vioxx and they were neck to neck with Celebrex.  And
24  there were, what we call shock to the system where there
25  were a decline in sales.
0308
1           Primarily when the market learned about the CV
2   risk from the New York Times and the JAMA article in
3   2002, not what they learned from Merck.
4           And then there was another reaction when the
5   label came out in April, 2002.
6       Q   Now, in a jury or a court --
7       A   And then -- wait.  I'm sorry.  Can I finish?  I
8   did not finish the answer.
9       Q   Of course.  Of course.
10      A   And the integrated marketing communications
11  campaign managed to improve the situation and so that
12  over time sales inched back up.
13      Q   Okay.  If a jury wanted to see those graphs are
14  they in the binders somewhere?
15      A   Yes.  And those are Exhibits 56 and 54.
16      Q   Okay.
17      A   There could be others, but those are -- but
18  anyway that is the date -- one of the sets of data that
19  is in the EAR report, the Early Assessment and Response.
20      Q   Did Merck, in your review of their studies,
21  keep track of what you called shocks to the system that
22  affected the overall COX-2 market in addition to its
23  own?
24      A   Yes.
25      Q   Those are in those exhibits?
0309
1       A   Yes.
2       Q   So -- I'm sorry.
3       A   So in the shocks to the system from both of
4   those, as I recall, was to both Vioxx and Celebrex.
5           And the shock to the system from the Vioxx
6   label change was to Vioxx only and then --
7       Q   Those are supported in the graphs?
8       A   Yes, graphs.  Yes.
9           And the rebound from the campaign -- from the
10  integrated campaign is largely seen among new patients
11  and is attributed to the Efficacy Confidence Program
12  because it started to rebound the very month that that
13  program started.
14      Q   Can you briefly describe the Efficacy
15  Confidence Program?
16      A   That was the program where they offered
17  satisfaction guaranteed or your money back to patients.
18      Q   And do you have an opinion as to why that
19  program was successful in helping Vioxx rebound?
20      A   Because it -- well, the research shows that --
21  shows that it increased physicians' confidence in Vioxx
22  and it motivated the sales force.

Page 128

Ex 1 - 5-26-06 depo transcript
23      Q     Have you done studies on or researched on
24 guaranteed -- money back guarantees?
25      A     I haven't personally done that type of
0310
1  research, but I read it all of the time.
2       Q     And what is the general understanding or the
3  general accepted belief on the impact of a guarantee
4  money back on a marketing campaign?
5             MR. GOLDMAN:  Object to the form.
6             THE WITNESS:  It is a signal of quality and
7  confidence in the product.  So it, generally, does have
8  an effect of improving sales.
9  BY MR. SKIKOS:
10      Q     Now, in particular the Merck Guaranteed
11 Program, did you note any difference between the
12 physician guarantee and the patient guarantee?
13      A     Yes.  Let me just state that the ads were ads
14 for the program appeared in both the physician and --
15 there were physician ads and there were patient ads.
16 And so one -- I could compare what was stated in those
17 two types of ads.
18            And to answer your question, in the consumer ad
19 it just said, "Satisfaction guaranteed or your money
20 back," but in the physician ad in fine print, it was
21 clarified that it was only money back, if it was a
22 problem with pain relief.
23      Q     An efficacy problem?
24      A     Yes, an efficacy problem.  And that is why it
25 was sometimes called Efficacy Guarantee.  And then other
0311
1  times -- it was initially called Efficacy Guarantee and
2  then Efficacy Confidence.  And I think they changed it
3  because they had learned from their research that it
4  built confidence.
5       Q     Is that all of the studies that you reviewed in
6  the third category of studies?
7             MR. GOLDMAN:  Fourth.
8             MR. SKIKOS:  This is the fourth or is this the
9  third?
10            THE WITNESS:  I think this is the third; right?
11            MR. SKIKOS:  Third.  From the impartial juror.
12            THE WITNESS:  So the first type of study was
13 the Copy Testing of the Detail Pieces with the
14 Physician.
15            The second type of study was the Tracking of
16 Promotional Message Recall among physicians and their
17 behavior.
18            And the third type of message was a complete
19 census of prescription -- prescriptions filled overtime
20 by month.
21            In the second case, it is just a sample and in
22 the third case, it is all of the prescriptions.
23 BY MR. SKIKOS:
24      Q     Now, can you describe the fourth category of
25 the scientific study performed by Merck on the
0312
1  integrated marketing program?
2       A     It is another study of physicians.  I call it
3  the Attribute Tracking Study of Physicians.
4             So this was a study where you had about a
5  little over 300 -- 315 to 325 physicians from a panel,
6  randomly selected each month to complete a written
7  survey and record their prescribing behavior.

Page 129

Ex 1 - 5-26-06 depo transcript

8  And, initially, it was done via phone and fax,
9 and on the Internet on something called WebMD Survey.
10  And they asked a host of questions.  I did not
11 write down the number, but a large number of questions
12 about Vioxx, Celebrex, Bextra.
13  And the questions would say, how well does the
14 statement describe Vioxx?  One, does not describe it at
15 all.  Ten, describes it very well.
16  And the firm that I saw them using was Ziment,
17 Z-I-M-E-N-T.  And the time period I started to see this
18 was 2002 and it went through 2003.  And it is not clear
19 when it ended, but that is where I stopped seeing data.
20  And the sample included a third Vioxx users or
21 heavy users of Vioxx; a third Celebrex and a third
22 NSAID.  So they had a nice sample.
23  And also, a third was chronic pain.  A third
24 acute and a third recurrent.  And so they had a very
25 sophisticated sampling plan.  So that the results would
0313
1 not change based on the sample.  This was called the ANA
2 Attribute Tracker.
3  Q Is there an exhibit for that one in your
4 binder?
5  A Yes.  It is Exhibit 48 and then I actually have
6 another Merck exhibit that I wrote down which described
7 the method in greater detail.
8  I read that and it is in the binders, but it
9 isn't in my exhibits.  I can give you the Merck number.
10  Q Yeah.
11  A MRK-AKP 0038549.
12  Q And those are the documents that you reviewed
13 and relied on in the boxes that some nice person is
14 going to copy tonight?
15  A Yes.  They were originally sticking up, so we
16 could see them, but they are not anymore.
17  Q What were the findings of these studies?
18  A Well, the one finding was that what physicians
19 said they were relying on in terms of deciding what
20 prescriptions to write and what they were actually
21 relying on weren't the same.  There were marked
22 differences.
23  The way they were able to do that is they did a
24 very sophisticated drive importance analysis.  The
25 equations are on the exhibit.  It is a mathematical
0314
1 equation linking the ratings to the actual behavior.
2  And so from then on, they used the attributes
3 that were really important, not the ones that the
4 doctors said; but the ones that were really important in
5 the survey; and they tracked those carefully over time
6 to see how those were changing.
7  And the most important attributes were doesn't
8 cause edema, doesn't increase blood pressure, doesn't
9 increase risk of M.I, safe to use in the elderly.
10  So what they found was that their -- these
11 non-G.I. safety attributes were becoming a key
12 differentiator between Celebrex and Vioxx.
13  And so then what they decided to do was launch
14 the Efficacy Confidence Program.  And then the research
15 showed that once that program was launched, you saw
16 improvements on all of these attributes.
17  Improvements in M.I. perceptions, safe for the
18 elderly -- significant improvement in safe for the

Page 130

Ex 1 - 5-26-06 depo transcript

19  elderly.  Improvements in the blood pressure, which was
20  another thing they measured.  Increase in self-reported
21  new prescriptions for Vioxx.
22          And a pattern where instead of losing so much
23  sales to Bextra, Vioxx was losing a lot of sales to
24  Bextra and that was stent.  And it was Celebrex that was
25  losing a little bit more rather than Vioxx.
0315
1       Q    So the Efficacy Campaign helped stent the loss
2   of sales to Bextra; is that what you are saying?
3            MR. GOLDMAN:  Object to form.
4            THE WITNESS:  Correct.
5   BY MR. SKIKOS:
6       Q    Okay.
7       A    And then this research also showed that overall
8   perceptions of Vioxx does not increase risk of M.I. or
9   stroke remained remarkably stable.
10          And so it never got below -- I don't know why I
11  don't have the notes, but I recall they didn't get
12  below -- I think it might have been 6.5.  I think was
13  the lowest they ever dropped on a 10-point scale.  So
14  they were above the mean of 5.
15      Q    And I saw graphs on those yesterday.  Are those
16  graphs in the binders or Exhibits?
17      A    Yes.
18      Q    And those are graphs you can show a court in
19  terms of the analysis of the awareness of the
20  cardiovascular risk?
21      A    The perception of the cardiovascular risks,
22  right, or awareness.  Those similar words, yes.
23      Q    Did you notice any change in the marketing
24  messages that was designed to increase physician
25  awareness of the cardiovascular risk of Vioxx exposure?
0316
1       A    No, I didn't see any evidence of that.
2       Q    What is the next category of study?
3       A    Okay.  It was an Attribute Tracking Study of
4   Consumers and it was called the Awareness and Action or
5   Chronic Pain Study.  They had two different names for
6   that one, too.
7           And that was a telephone survey with chronic
8   pain consumers.  3600 a year conducted every day of the
9   year.
10          The company was Millward Brown.  That is
11  exactly what we did with Millward Brown with the
12  anti-drug campaign.
13          It was related to the type of a research I did
14  that is published in the American Journal of Public
15  Health -- no, actually, that is incorrect.  That is not
16  correct.
17      Q    What part is incorrect?
18      A    That last part.  This is different from the
19  American Journal of Public Health.
20      Q    But the same for Millward Brown?
21      A    The Millward -- okay.  The American Journal of
22  Public Heath just studied behaviors and this studies
23  attributes.  And so I think it is best -- I think it is
24  a unique study.
25          So it is probably best to say that my
0317
1   familiarity with this -- I have a strong familiarity
2   with this exact type of study from the anti-drug ad
3   campaign.  And I also see this type of data and teach

Page 131

Ex 1 - 5-26-06 depo transcript

4  cases on this at U.C. Irvine.
5      Q    What were the findings?
6      A    The findings were -- I'm sorry.  I am not -- I
7  didn't finish with the method, actually.
8      Q    Oh, I'm sorry.  I cut you off.
9          He has got a free card now.
10     A    So is it okay?
11     Q    You can keep going.
12     A    The exhibits that are relevant are E30 and E32
13  and the method --
14          MR. GOLDMAN:  What is E30?  Is that in one of
15  the binders?
16          THE WITNESS:  It is Exhibits 30 and 32 in the
17  binders.
18          Okay.  So the time period that this was
19  conducted -- best I could tell, it started around May,
20  2000 and it was still going in December '03.
21          50 percent of the subjects were 55 years or
22  older.  All of them had chronic pain.  One of the
23  findings was that -- I'm sorry.  This is in Exhibit
24  31 (b).
25          They have findings that, essentially, say a lot
0318
1  of these people were in hypertension and many had heart
2  disease.  Like, 40 to 50 percent had hypertension and 20
3  to 22 percent had heart disease depending on the month
4  because they were randomly selecting people, calling
5  them up on the phone.
6          And that a lot of these people were taking
7  Vioxx.  They actually tracked how many took Vioxx on
8  each of these conditions -- I mean, with each of these
9  conditions and whether that changed over time, and
10  whether they were switching to Celebrex.
11     Q    And what were the findings?
12     A    And the findings were -- let me say, I am still
13  going to method.  They also asked awareness of the brand
14  as part of this research.  And I believe awareness of
15  the ads.
16          Anyway, the awareness of the brand started out
17  low and it went up to 85 percent in '02, and remained
18  about 85 percent in '03 and then characterized it as a
19  universal awareness.
20     Q    Is that for Vioxx?
21     A    For Vioxx.  Because you cannot get 100 percent
22  awareness if you don't watch TV or whatever.  So they
23  were very pleased.
24          They showed that Vioxx was up there with
25  Tylenol in terms of brand awareness.  Let's see, what
0319
1  else they showed.
2          They showed the trial was high even in 2003 of
3  Vioxx.  There was a slight decrease in current usage of
4  Vioxx towards the end of the study.  It was down from 15
5  percent to 13 percent.
6      Q    What does trial mean?
7      A    I'm sorry.  That 15 percent and 13 percent, as
8  I recall, is current usage.
9          And trial was, you know, did they get a new
10  prescription.  And current usage includes new and
11  refills.
12          And they carefully studied why people didn't
13  fill prescriptions and they found that most people did,
14  the vast majority; but there was a creeping up in the

Page 132

Ex 1 - 5-26-06 depo transcript

15   percentage, who didn't fill because of safety issues;
16   but it wasn't clear what the safety issues were.
17          And let me say that, in this study, they never
18   asked about heart attacks because that would get the
19   word out.  I believe one -- well, I can't infer as to
20   why they didn't do it, but they did not ask about heart
21   attack as a risk.
22          The questions they asked were vague questions.
23   Like, brands you can trust.  Is it effective as a pain
24   reliever?  Is it safe as a sugar pill?  That sort of
25   thing.
0320
1          And the numbers for brand you can trust, the
2   top box, meaning, they rated it highly on brand you can
3   trust was 40 percent in 2002 and 41 percent in 2003.
4      Q   Is that a very positive finding in your
5   experience in looking at integrated marketing campaign
6   studies like this one?
7      A   Yes, given that it was what we call a top box
8   score.  And it was one of the highest attributes in
9   which -- in other words, they received very high
10   attributes on this, relative to other attributes they
11   measured.
12          Like, effective pain relief wasn't much higher
13   than 40 percent.  You know what I am saying?  You don't
14   get that much higher.  So it was not like effective pain
15   relief was 90 percent and this was 40 percent.  And
16   maybe effective pain relief was maybe 40 something -- in
17   the 40's also.
18      Q   What exhibits are we talking about now?
19      A   30, 31, 32, 31(b).
20          Let's see, we also found, you know, brand
21   awareness increased dramatically, like I said, from '00
22   to '02 and then stabilized.
23      Q   Are there any documents --
24      A   There was some trend -- people trying to get
25   off both Vioxx and Celebrex.  But when they tried to
0321
1   figure out why that was happening, the safety attributes
2   that they measured remained stable.
3          And when there was a decline, the brand you can
4   trust -- let's see.  There was some problems with the
5   New York Times article and the JAMA article in terms of
6   you saw little change in perception of the brand.
7          But oddly enough mostly in efficacy, not
8   safety.  So there was -- it tainted the brand a little
9   bit, those events -- those external events.
10          So that is the type of result that you get.
11   This is a very, very good study.  I mean a very
12   sophisticated study and I believe in the validity of the
13   study and the conclusions.
14      Q   Okay.  What is the next category of study you
15   looked at?
16      A   There is the direct-to-consumer copy testing of
17   the ads and warning that might be in the ads.  And
18   Millward Brown did this type of research, too, for them
19   and they called it the Link TV Commercial Copy Test.
20          And I have several of the results, I think,
21   starting in 1999 to 2000 and then they stopped.  So I'm
22   not sure why that is, but in -- they tested not only
23   their own ad, but they tested Celebrex's ads to see how
24   their ad compared to Celebrex.
25          And this is similar to the research that I

Page 133

Ex 1 - 5-26-06 depo transcript

0322
1   published in the American Journal of Public Health with
2   Foley.
3          In fact, this type of copy test research
4   described virtually all of my research and that is what
5   I worked on in the anti-drug campaign and the
6   Massachusetts' campaign.  I worked on it way back when I
7   worked for the National Consulting Group.  So this is
8   the type of research I do all of the time.
9       Q    What were the findings of this particular
10  series of studies?
11      A    Well, one thing they did was they measured
12  whether consumers were concerned about side effects from
13  seeing the ads.
14         And they said that people did notice the side
15  effects, but they did a statistical comparison of the
16  people who remembered the side effects or who were
17  concerned about the side effects and weren't concern on
18  motivation to ask the doctor more about the drug; and
19  there was no statistical difference.
20         So, in other words, whether they -- I'm not
21  sure if it was recall or were concerned about the side
22  effects, but the way they segmented the consumers on the
23  side effects issue was not a predictor of whether they
24  were going to ask the doctor about the drug.
25         So they said -- their conclusion it doesn't
0323
1   keep us from our product claim.  It doesn't affect
2   motivation to ask, so we don't need to worry about it.
3          They also said that 40 percent of the ads -- 40
4   percent of the people said the ad strongly gave a safety
5   impression, which was high.
6          And they said that they tested some warnings
7   and they found no problem with the vague wording that
8   they test, which is somewhat similar to the one that
9   they ended up using.  So it wasn't the same.  And they
10  said they were going to do more research, but I was not
11  able to get that research.
12      Q    Did they test in that particular study the
13  impact of saying that there might be a cause and effect
14  relationship between Vioxx exposure and a heart attack?
15      A    No, they did not.  The warning wasn't -- did
16  not talk about the cause and effect relationship.  It
17  was a vaguely worded warning about heart attacks have
18  been observed in some people taking Vioxx, something
19  like that.
20         And they found, again, no difference between
21  people who remembered that warning and didn't.  So they
22  said it wasn't a concern.
23         But if they did find -- if they tested the
24  final warning and found -- which they knew that they
25  would eventually have to need, so there would be a final
0324
1   warning, if the research showed otherwise and showed
2   that it was what they called keeping us from the product
3   claim or affecting people's willingness to talk to the
4   doctor, that they would reassess the media options.
5          And they would not use product advertising at
6   all.  They would -- they considered using reminder
7   advertising and help-seeking advertising.
8          So it indicates what they might do with the
9   results if the results came out differently.  And we
10  know that they didn't.  They continued to use product

Page 134

Ex 1 - 5-26-06 depo transcript
```
11   advertising.
12         Does that make sense?
13     Q    Sort of.  He got it.
14     A    So what they said is if these ads are -- if
15   they put in the final warning that they had to use, they
16   found that the ad -- that the warning was having a
17   negative effect on consumers, they would stop running
18   product ads.
19     Q    I see.
20     A    See, because product ads required the warning.
21   You know, required the information.
22         If -- you know, it is a risk disclosure.  I
23   guess is what you would call it.  This listing of the
24   risk.
25         I don't know if you would actually -- I don't
0325
1    know whether you would actually call all of the fine
2    print in the ads a warning or not, but it is a list of
3    the risks.
4          So instead they would do help seek, which means
5    if you have this general problem of pain, go get help,
6    or a reminder where you just say Vioxx, but with no
7    information.
8          Neither of those would require this risk
9    information in the ad.
10     Q    That is what the study showed?
11     A    That was -- the conclusion was the risk
12   messages that they put in, there was no problem.  It
13   didn't effect -- adversely effect consumers.
14         But if in a subsequent research when they
15   tested the final version, it did slow an adverse
16   reaction that they said they should -- Merck should
17   reassess the media options and just consider using
18   reminders and help-seeking ads.
19     Q    Because it would impact sales if they continued
20   to do direct-to-consumer advertising in the face of that
21   warning?
22         MR. GOLDMAN:  Object to form.
23         THE WITNESS:  Exactly.
24   BY MR. SKIKOS:
25     Q    Go to the next study.
0326
1    A    That's it.
2    Q    Okay.  Now, let's run to the conclusions -- oh,
3    you did not give an Exhibit for that one; did you, for
4    the sixth category?
5          An exhibit to your report in one of the binders
6    look in the sixth category is there an exhibit?
7      A    Oh, I'm sorry.  I understand the question now.
8          MR. O'CALLAHAN:  66; isn't it?
9          THE WITNESS:  64 and 66 -- 65, 67, and 68, I
10   had several of those copy tests.
11   BY MR. SKIKOS:
12     Q    Okay.  These are the exhibits to your report?
13     A    Correct.
14     Q    Let me go to a clarification before we go to
15   conclusions.  You're not saying that your an expert
16   in how the FDA determines what goes into a label;
17   correct?
18     A    That is correct.
19     Q    But is it correct that your expertise of
20   integrated marketing campaigns includes all aspects of
21   the messaging to the consumer and in this particular
```
Page 135

```
                        Ex 1 - 5-26-06 depo transcript
22  place, one of the aspects of the messaging includes a
23  label?
24                  MR. GOLDMAN:  Object to the form.
25                  THE WITNESS:  Yes.
0327
 1  BY MR. SKIKOS:
 2       Q    Now, did we ask what percentage of time you
 3  spent in reviewing documents was actually reviewing the
 4  studies?
 5       A    I would estimate it is about half as you can
 6  tell by the piles of documents that are on this type in
 7  the boxes.
 8       Q    In any of the categories of studies or study
 9  that you described, did you find any methodological
10  flaws used by Merck in conducting those studies?
11       A    No.  They used generally accepted practices for
12  doing this type of research.
13       Q    The results of these studies, did they show any
14  consistency?
15       A    Yes, they did.
16       Q    Okay.  Is that part of the integrated marketing
17  campaign analysis, is to look at the results of various
18  studies and category of studies and determine if there
19  is consistent application?
20       A    Yes.  Because the hypothesis that you are
21  testing is that you are giving a consistent messages.
22       Q    Okay.  And the consistent message is contained
23  in the report, in X number of page report, that we have
24  been going over today; correct?
25       A    Correct.
0328
 1                  MR. GOLDMAN:  What was your question?  I'm
 2  sorry.
 3  BY MR. SKIKOS:
 4       Q    The consistent methods that these studies were
 5  designed to ensure that were getting out to the
 6  patients, what that message is, is contained in this
 7  report?
 8       A    Yes.
 9       Q    And the internal documents that you reviewed
10  and are referenced in this report, are they consistent
11  with the messages that you found were trying to be
12  promoted in the studies?
13       A    I don't understand your question.
14       Q    Okay.  You reference a number of internal
15  documents in this report?
16       A    Yes.
17       Q    All right.  Is the statements that were
18  contained in the internal documents by the Merck
19  employees --
20       A    You mean with regard to their -- because they
21  are all internal documents in the sense that we,
22  ultimately, got them from Merck is, as I recall.
23       Q    Right.  Let me do it again.
24            There are statements that defense counsel used
25  in the examination of you that said you were just
0329
 1  reading documents.
 2            Do you remember that?
 3       A    Yes.
 4       Q    The importance of those internal documents and
 5  the statements contained by the Merck executives when
 6  they made those statements, how does that relate to the
```

Page 136

```
                      Ex 1 - 5-26-06 depo transcript
 7  studies that were conducted in the integrated marketing
 8  campaign?
 9       A    You mean the statements made about the
10  objectives of the campaign?
11       Q    Yes.  Sorry.
12       A    Well, the statements are part of the whole
13  picture.  You have to understand what was the objective
14  of the campaign and then you test the hypothesis that
15  that objective has met.
16           And the answer to that hypothesis test based on
17  all of the research is, yes, they obtained the objective
18  that they sought, which was to neutralize the CV risks.
19           MR. SKIKOS:  Okay.  Let me take a quick second.
20           (Brief recess.)
21           MR. SKIKOS:  Back on the record.
22       Q    Turning to Exhibit 3 on your binders, which is
23  your C.V.  Very early in the day, you mentioned a
24  change -- an error that needs to be fixed in the
25  Robinson, Calcagnie & Robinson, Newport Beach, on Page
0330
 1  11, how are you going to fix that?
 2       A    I am going to just change that to 2004 because
 3  the case -- I never did any subsequent work and I
 4  didn't -- I didn't know until I met with Mark on this
 5  case that the case is over.  There will never be any
 6  work on it.
 7       Q    So you would change the word present and cross
 8  that out; is that correct?
 9       A    Correct.  So it will be 2004 and I am crossing
10  out dash present.
11       Q    And when did you discover that the case was
12  dead?
13       A    I asked him when he contacted me about this
14  case.
15           MR. SKIKOS:  Okay.  That is all I have.
16
17                      EXAMINATION
18  BY MR. O'CALLAHAN:
19       Q    Dr. Pechmann, my name is Jim O'Callahan and I
20  represent the various plaintiffs in California JCCP
21  Vioxx action and I wanted to ask you a couple of
22  questions, first of all, about your report.
23           If I turn to Page 11 of your report and that is
24  Paragraph 19, subparagraphs A, B, and C are paragraphs
25  that deal specifically with the Barnett case; correct?
0331
 1       A    Yes.
 2       Q    And then if we turn to Page 15 starting at
 3  Paragraph 21, and going through Page 21, up to the part
 4  where Paragraph 24 starts, is it correct that those are
 5  the only pages of your report that deal specifically
 6  with the Barnett case?
 7       A    Yes, that is correct.
 8       Q    And your report is a total of 87 pages;
 9  correct?
10       A    Yes.
11       Q    So, essentially, we got about six pages out of
12  the 87 pages that deal specifically with the Barnett
13  issues; correct?
14       A    Yes.
15       Q    Now, it is correct that this integrated
16  marketing campaign that Merck utilized was a national
17  campaign; correct?
```

Page 137

Ex 1 - 5-26-06 depo transcript

```
18          MR. GOLDMAN:  Objection to form.
19          THE WITNESS:  That's correct.
20  BY MR. O'CALLAHAN:
21     Q    And with respect to the 81 pages of your report
22  that don't deal with the Barnett case, would the
23  opinions and the basis for the opinions that you layout
24  in your report be just as true for a case in California,
25  as a case that came out of South Carolina?
0332
1      A    Yes.
2      Q    One of the things that interested me is your
3   statements regarding the effectiveness of the Vioxx
4   integrated marketing campaign.
5           And it is my understanding that people are
6   usually reluctant to admit that they are influenced by
7   ads; is that correct?
8      A    Yes, that is what the research shows.
9           MR. GOLDMAN:  Objection to form.
10  BY MR. O'CALLAHAN:
11     Q    And does research also show that
12  notwithstanding people's reluctance to admit that they
13  were influenced by ads that, in fact, they are
14  influenced by them?
15     A    Yes.
16     Q    And is that something that has been proven
17  through scientific studies?
18     A    Yes.
19     Q    And if, for example, we look at the
20  direct-to-consumer ads that Merck utilized in
21  advertising Vioxx, did they do calculations as to how
22  effective the money that they spent on ads prove to be
23  with respect to sales of Vioxx?
24     A    They did not do specific financial
25  calculations, but they concluded that many of the ads
0333
1   were effective.
2      Q    And was the -- was the underlying premise of
3   the money that Merck spent on ads, the premise that
4   direct-to-consumer ads would be effective in generating
5   sales of Vioxx?
6      A    Yes.  I mean, they had data statistics that
7   showed what percentage of consumers were likely to
8   initiate a discussion with their doctors about Vioxx
9   having seen the ads and it was about 6 percent.
10          So -- and that, of course, is the first step to
11  getting a prescription and affecting sales.
12     Q    Now, one of the other terms, I think, you used
13  during the course of the deposition was the word
14  "impressions."
15          Do you recall using that word?
16     A    Yes.
17     Q    I wasn't sure exactly what you meant when you
18  used the word impressions in the context of advertising.
19     A    Well, that was, as I recall, that was used in
20  the context of the press releases.  The press releases,
21  they did not -- I didn't see any consumer research on
22  the press releases per se in the sense that they didn't
23  interview, track consumers, or the general public saying
24  what was your impression or that sort of thing.
25          What they did was, they -- as a standard with
0334
1   PR, they looked at the coverage in the media of Vioxx,
2   and for each publication where there was coverage, they
```

Page 138

Ex 1 - 5-26-06 depo transcript
3  weighted it by the estimated viewership or listenership;
4  and so it is really opportunity to see.  And that is
5  what they call impression.
6      So it is not the actual verified -- it is a
7  number that -- of how many people could have seen that
8  coverage.
9      Q    Does it also factor into the idea that somebody
10  can be told about something by another viewer, so they
11  use the word impressions to incorporate people who are
12  told about products by other people?
13      MR. GOLDMAN:  Objection to the form.
14      THE WITNESS:  Generally not.
15  BY MR. O'CALLAHAN:
16      Q    How do they describe that?
17      A    That is called word of mouth and they did not
18  quantify that.
19      Q    Okay.
20      A    I just -- okay.  Well --
21      Q    I'm sorry.
22           In the course of an integrated market campaign
23  by a pharmaceutical company, would you expect to see, in
24  this case, Merck making efforts to shape scientific
25  discussions to support their core messages about Vioxx?
0335
1      A    I don't have an opinion about that.
2      Q    Is that a part of the material that you
3  reviewed for purposes of -- or did you review any
4  material of that nature for purposes of your report and
5  deposition?
6      A    I didn't see any material about that one way or
7  the other.
8      Q    With respect to -- with respect to your -- your
9  opinions, you reviewed training materials that were used
10  to prepare Merck's sales people for their job?
11      A    Yes.
12      Q    And in addition, did you utilize materials that
13  was provided to sales representatives as the promotion
14  and marketing of Vioxx went on after its introduction in
15  1999?
16      A    Yes.
17      Q    And are those the materials which you either
18  identified in your report or have otherwise provided in
19  the boxes that Mr. Goldman went through?
20      A    Well, there are some materials that I looked at
21  that were very similar to the ones that I kept.  That I
22  did not keep because the wording was identical and I
23  felt that I had a representation -- a representative
24  sample of the promotional materials.
25      MR. O'CALLAHAN:  That's all I have.
0336
1      MR. GOLDMAN:  Just a few questions,
2  Dr. Pechmann.
3
4              FURTHER EXAMINATION
5  BY MR. GOLDMAN:
6      Q    Dr. Pechmann, do you agree that Exhibit 5 that
7  you reviewed with Mr. Skikos is different in many ways
8  from the report that you wrote in the Barnett case?
9      A    No.
10      Q    The Exhibit 5 that you discussed and the
11  methodology that you discussed and the findings, and the
12  nature of the different studies are not described in
13  that type of detail in your report; are they, ma'am?

Page 139

                          Ex 1 - 5-26-06 depo transcript
14        A    The findings are and I was told -- my
15   understanding was to state my opinions and the documents
16   on which they were based.  So I -- I my report includes
17   the studies and the conclusions, but does not include
18   the method.
19             That is the main thing that is different here,
20   but in terms of substantive opinions, they are
21   identical.
22        Q    Is it your testimony, Dr. Pechmann, that what
23   you said in response to Mr. Skikos' questions is in your
24   report?
25        A    As I said, the method is sometimes in the
0337
1    report, but not systematically in the report.
2         Q    The findings that you described to Mr. Skikos
3    and the question about the validity of the studies that
4    you discussed with Mr. Skikos, and the description with
5    the six different studies that you described with
6    Mr. Skikos, you agree that that is not in your report,
7    and that is why you prepared Exhibit 5 yesterday?
8         A    No, I disagree.  If you would ask each question
9    separately, I can answer each question separately.  That
10   was a compound question.
11        MR. SKIKOS:  Do you want to do it with the
12   court reporter?
13             THE WITNESS:  However, you want to do it.
14   BY MR. GOLDMAN:
15        Q    Dr. Pechmann, we will be able to compare what
16   you said in response to Mr. Skikos' questions and what
17   is in your report later; but would you acknowledge,
18   Doctor, that what you said in Exhibit 5 and your
19   discussions with the methods used in these studies is
20   not anywhere in your report?
21        A    Some of it is not.  Some of it is.  That is
22   correct.
23        Q    Your description about all of the findings that
24   you mentioned in response to Mr. Skikos' questions,
25   those aren't all in your report; are they?
0338
1         A    Yes, the findings are there.
2         Q    So it is your testimony that all of the
3    findings that you described with Mr. Skikos are in your
4    report?
5         A    Let me -- yes, except that if I found the same
6    thing twice, I would only state it once.  So if the same
7    study found something repeatedly, I would only state it
8    once.
9         Q    Your conclusions that the studies were valid
10   are not contained in your report?
11        A    It is not explicitly stated, but since I relied
12   on the studies to reach my conclusions, I obviously
13   assumed they were valid.
14        Q    Do you comment about the validity of any of the
15   studies that you discussed with Mr. Skikos in your
16   report?
17        A    I do not explicitly discuss the validity, no.
18        Q    You were asked by Mr. Skidos whether you agreed
19   with the conclusions that the different studies found.
20             Do you remember that?
21        A    Yes.
22        Q    Nowhere in your report do you state that you
23   agree with the conclusions that are evident in these six
24   studies; correct?

                              Page 140

Ex 1 - 5-26-06 depo transcript

25    A    I do believe I state that in the report, yes.
0339
1    Q    Show me where you say that you agree with the
2  conclusions of the different studies in your report?
3    A    Well, I state the findings and by not
4  questioning their validity, I am assuming that you are
5  going to believe that they are valid.  So that is why I
6  didn't bother to say it.
7    Q    Am I right, Dr. Pechmann, that you do not say
8  anywhere in your report that you agreed with the
9  conclusions reached in these six studies?
10    A    I did not exclusively state --
11    Q    You agree, Dr. Pechmann, your reporter in the
12  Barnett case, do you state your opinion that you think
13  that the conclusions in these six different studies are
14  correct?
15    MR. O'CALLAHAN:  I'm going to object.  The
16  document speaks for itself.
17    THE WITNESS:  Well, that is what I said.  Yeah,
18  so the reason I didn't explicitly state that was because
19  I thought it was clear from the way I was describing the
20  results, that I believed the results.
21    I never -- if I didn't believe them, I would
22  have said, this is the result.  I don't believe the
23  result.
24    By putting them in with no qualification, I
25  thought it was very clear that I believed them.  It
0340
1  never occurred to me someone would be confused by that.
2  BY MR. GOLDMAN:
3    Q    What hypothesis did you test in this case,
4  Dr. Peckman?
5    MR. SKIKOS:  I am Skidos and your Peckman now.
6    MR. GOLDMAN:  It's a long day.  Sorry.
7    THE WITNESS:  I tested the hypothesis that the
8  campaign was effective in obtaining the objectives --
9  the stated objectives.
10  BY MR. GOLDMAN:
11    Q    What were the stated objectives of Merck's
12  integrated marketing campaign that you tested?
13    A    To neutralize safety concerns.  To encourage
14  doctors to prescribe Vioxx to patients regardless of
15  their CV risk because Vioxx does not cause heart attacks
16  or strokes or maybe it said M.I. or strokes.
17    And with consumers, I believe the objective
18  was -- I have to find my other document.  Give me one
19  second.
20    Basically, the objectives are very similar
21  because it was an integrated campaign.  So they were
22  disseminating similar messages across the groups.
23    Q    You mentioned that as part of the scientific
24  method that you typically use, you use a controlled
25  study approach?
0341
1    A    Well, by "controlled," I mean there is a
2  comparison group, maybe another ad, or another point in
3  time.
4    Q    You didn't use a controlled study approach in
5  your analysis in this case; did you, ma'am?
6    MR. SKIKOS:  Objection.
7    THE WITNESS:  All of the studies involved
8  control.  All of the studies were controlled studies.
9  BY MR. GOLDMAN:

Ex 1 - 5-26-06 depo transcript

10     Q    You mentioned a statistical analysis.  Did you
11  apply one in this case?
12     A    I evaluated their statistical analyses.
13     Q    Did you create any separate analysis --
14  statistical analysis of the material that you reviewed
15  in this case?
16     A    In one case, I validated the count of
17  physicians that said the sales rep told them there was
18  an M.I. -- there was no M.I. risk or stroke risk from
19  Vioxx that validated that statistic.
20     Q    Other than that one statistic, did you prepare
21  any other statistical analyses in this case?
22     A    No, I relied on their statistics.
23     MR. GOLDMAN:  I have to make clear that even
24  though Mr. O'Callahan asked questions, my questions to
25  you are not meant to respond to his because I am not
0342
1  here on behalf of Merck in the California cases.
2     So I just wanted to make that clear for the
3  record.  My questions were in response to the Barnett
4  case and I'm sure the lawyers in the California case
5  will want to take their own deposition.
6     THE WITNESS:  Okay.
7     MR. O'CALLAHAN:  Just so the record reflects,
8  we are all laughing and we are all looking at
9  Mr. Goldman as part of the Bartlit Beck firm, which is
10  also trying one of the cases in the California case.
11     MR. GOLDMAN:  That is true.  I do work with
12  Bartlit Beck.
13     However, I was here to ask you questions about
14  the Barnett case and that is why I spent as much time as
15  I did on the Barnett case.
16     MR. SKIKOS:  She does not have to answer.
17  There is no question pending.  He is just commenting.
18     MR. GOLDMAN:  That's correct.
19     MR. O'CALLAHAN:  I propose we relieve the court
20  reporter of her duties under the Code.  That the
21  original of the deposition be sent to Mr. --
22     MR. SKIKOS:  -- Robinson.
23     MR. O'CALLAHAN:  Mr. Robinson, who will in turn
24  provide it to Dr. Pechmann.  Dr. Pechmann will review it
25  and notify Mr. Robinson of any changes.
0343
1     And in turn, Mr. Robinson will notify
2  Mr. Goldman or the appropriate individual at his law
3  firm of those changes.
4     In the event that no one is notified of any
5  changes, a certified copy can be used for any and all
6  purposes including trial of the matter.
7     MR. GOLDMAN:  I agree with that with the MDL.
8  We still have this dispute about California.
9     MR. SKIKOS:  I agree, but on behalf of
10  California.
11  ///
12  ///
13
14
15
16
17
18
19
20

Page 142

Ex 1 - 5-26-06 depo transcript

```
21
22
23
24
25
0344
1
2
3
4
5
6
7          I, CORNELIA PECHMANN, Ph.D., do hereby declare
8     under penalty of perjury that I have read the foregoing
9     transcript; that I have made any corrections as appear
10    noted, in ink, initialed by me, or attached hereto; that
11    my testimony as contained herein, as corrected, is true
12    and correct.
13          EXECUTED this _____ day of
14    _____,
15    20__, at _____, _____.
16                              (City)        (State)
17
18
19    _____
20     CORNELIA PECHMANN, Ph.D.
21
22
23
24
25
0345
1          I, the undersigned, a Certified Shorthand
2     Reporter of the State of California, do hereby certify:
3          That the foregoing proceedings were taken
4     before me at the time and place herein set forth; that
5     any witnesses in the foregoing proceedings, prior to
6     testifying, were placed under oath; that a verbatim
7     record of the proceedings was made by me using machine
8     shorthand which was thereafter transcribed under my
9     direction; further, that the foregoing is an accurate
10    transcription thereof.
11          I further certify that I am neither
12    financially interested in the action nor a relative or
13    employee of any attorney of any of the parties.
14          IN WITNESS WHEREOF, I have this date
15    subscribed my name.
16
17
          Dated: _____
18
19
                  _____
                       Diana Janniere
20                     CSR No. 10034
21
22
23
24
25
0346
1          -  -  -  -  -  -
            E R R A T A
2          -  -  -  -  -  -
```

Page 143

Ex 1 - 5-26-06 depo transcript

| | PAGE | LINE | CHANGE |
|---|---|---|---|
| 3 | | | |
| 4 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 5 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 6 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 7 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 8 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 9 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 10 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 11 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 12 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 13 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 14 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 15 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 16 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 17 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 18 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 19 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 20 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 21 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 22 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 23 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |
| 24 | ‾‾‾ | ‾‾‾ | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ |