UNCERTIFIED REALTIME ROUGH DRAFT

1
2
3   IN RE VIOXX CASES
4   DEPOSITION OF CONNIE PECHMANN, Ph.D.
5   THURSDAY, JUNE 15, 2006
6   VOLUME I
7
8
9
10          UNCERTIFIED REALTIME ROUGH DRAFT
11
12          *This realtime draft is unedited and uncertified*
13   *and may contain untranslated stenographic symbols, an*
14   *occasional reporter's note, a misspelled proper name*
15   *and/or nonsensical word combinations.*
16          This is an unedited version of the deposition
17   transcript and should not be used in place of a certified
18   copy.  This document should not be duplicated or sold to
19   other persons or businesses.  This document is not to be
20   relied upon in whole or in part as the official
21   transcript.  This uncertified realtime rough draft
22   version has not been reviewed or edited by the certified
23   shorthand reporter for accuracy.  This unedited
24   transcript is computer generated and random translations
25   by the computer may be erroneous or different than that

                                                    1

---

UNCERTIFIED REALTIME ROUGH DRAFT

1   which will appear on the final certified transcript.
2          Due to the need to correct entries prior to
3   certification, the use of this realtime draft is only for
4   the purpose of augmenting counsel's notes and cannot be
5   used to cite in any court proceeding or be distributed to
6   any other parties.
7          Acceptance of this realtime draft is an
8   automatic final copy order.
9
10          CONNIE PECHMANN, Ph.D.,
11   the witness, having been Administered an oath in
12   accordance with CCP Section 2094, certified as follows:
13
14          EXAMINATION
15   BY MR. CAMPILLO:
16      Q.  Would you be kind enough to state your full name
17   for the record, please.
18      A.  Cornelia Pechmann, but I go by Connie.
19      Q.  It is pronounced Pechmann?
20      A.  Yes.
21      Q.  If I mistake it, mispronounce it, I apologize
22   in advance.  I have been saying Pechmann for a few weeks
23   and I will probably make a mistake a few times.
24      A.  That's okay.
25      Q.  Dr. Pechmann, what is your understanding as to

                                                    2

---

UNCERTIFIED REALTIME ROUGH DRAFT

1   the name of the case or cases that this deposition that
2   I'm starting right now is being taken in?
3      A.  Yes.  It's two L.A. cases, Arrigale and Cross --
4   let's see.  Grossberg.
5      Q.  And when did you first hear either the name of
6   Mr. Arrigale or the name of Mr. Grossberg?
7      A.  A month or two ago.
8      Q.  And in what context did you hear either name?
9      A.  Jim Cunningham sent me materials.
10      Q.  Do you mean Jim O'Callahan?
11      A.  O'Callahan.  Sorry.
12          MR. O'CALLAHAN:  It's an Irish name, so it's the
13   same thing.
14          MR. CAMPILLO:  Just to be sure we are talking
15   about the same person.
16      Q.  So Mr. O'Callahan sent you some materials about
17   a month or so ago?
18      A.  Uh-hmm.
19      Q.  Yes?
20      A.  Yes.
21      Q.  And let me show you a series of e-mails that I
22   believe you produced at your prior deposition which we
23   will mark as Exhibit No. 1 for this deposition and ask
24   you to look at the sixth page of Exhibit 1?
25          MR. SKIKOS:  Do you have your own copy?

                                                    3

---

UNCERTIFIED REALTIME ROUGH DRAFT

1          MR. CAMPILLO:  I have one for the witness, one
2   core counsel and one for the court reporter.  I didn't
3   know that you were going to have a group of four.
4          (Deposition Exhibit 1 was marked for
5          identification and is annexed hereto.)
6   BY MR. CAMPILLO:
7      Q.  Preliminarily, do you recognize what we have now
8   marked as Exhibit No. 1?
9          (Witness reviews document.)
10          THE WITNESS:  Yes.
11   BY MR. CAMPILLO:
12      Q.  Could you tell us what that is, your
13   understanding of what Exhibit 1 is.
14      A.  It's a series of correspondence between me and
15   various people primarily at the law firm of Robinson,
16   Calcagno & Robinson with regard to my first depo,
17   finalizing the exhibits, giving them the final copy,
18   letting me know when the depo was taking place and so on.
19      Q.  These documents were produced either by you or
20   by counsel for the plaintiff in that other action in
21   connection with your deposition, correct?
22      A.  Correct.
23      Q.  Okay.  Let me refer your attention to I think I
24   said the fifth page of the exhibit.
25          MS. TUCKER:  Sixth.

                                                    4

UNCERTIFIED REALTIME ROUGH DRAFT

1  MR. CAMPILLO: Sixth? No, actually it's the
2  third. I'm sorry.
3  MR. SKIKOS: Is it the e-mail from Jim
4  O'Callahan?
5  MR. CAMPILLO: Yes. Maybe they are stapled
6  together.
7  THE WITNESS: I've got it.
8  BY MR. CAMPILLO:
9  Q. There is an e-mail dated May 22, 2006 at 6:46
10  A.M. Do you see that?
11  A. Yes.
12  Q. Was that the first time that you heard from
13  Mr. O'Callahan in connection with any aspect of the Vioxx
14  litigation?
15  A. I'm not sure. There might have been a prior
16  e-mail.
17  Q. You're not certain?
18  A. I'm not certain.
19  Q. Is this approximately the time that you first
20  heard of the Arrigale or Grossberg cases?
21  A. Yes, approximately.
22  Q. Okay. For the record, this e-mail is dated May
23  22, 2006. Did you request this information that's
24  referenced in the e-mail from Mr. O'Callahan or from
25  anyone else?

5

UNCERTIFIED REALTIME ROUGH DRAFT

1  A. I did not.
2  Q. So this came to you unsolicited, if you will?
3  A. Yes.
4  Q. And upon receipt of this information and the
5  e-mail, what you did was to forward it to Alexis Nyar and
6  Mark Robinson and basically asked them what you ought to
7  do with this?
8  A. Correct.
9  Q. Okay. Now, prior to this exchange on May 22,
10  2006, had you had any conversations with anyone about
11  being or potentially being an expert in the cases that
12  you have referred to, the Arrigale and Grossberg cases?
13  A. Not those cases. Mark Robinson was involved in
14  a third L.A. case.
15  Q. What was the man so he case?
16  A. The man so he case, exactly. And we had
17  discussed that case briefly, and he had said that had
18  been postponed. And I knew that was tied to two other
19  cases but at the time we did not discuss the other cases.
20  Q. So prior to receiving this e-mail your involvement in
21  Mr. O'Callahan your work on Vioxx or your involvement in
22  Vioxx, as you understood it, involved the Barnett case
23  that's moving forward in the MDL, the case in Florida , I
24  believe the name is Koic.
25  A. Yes, correct.

6

UNCERTIFIED REALTIME ROUGH DRAFT

1  Q. And the man so he case; is that correct?
2  A. I would say it was primarily Barnett.
3  Q. But those are the three cases that you
4  understood you were potentially going to be a witness in,
5  at least as of May 22, 2006; is that correct?
6  A. Well, I also knew that I could potentially be a
7  witness in the two other L.A. cases but I didn't know the
8  names of the plaintiffs or anything or the names of the
9  attorneys or anything.
10  Q. Okay. Now, prior to May 22, 2006 had you given
11  consent in writing or verbally in any fashion to any
12  attorneys to list you as a witness or as a retained
13  expert for the Arrigale and Grossberg plaintiffs
14  specifically?
15  A. Well, when I discussed the cases with Mark he
16  said he was going to list me as an expert on all three.
17  So at that time I did give permission for me to be the
18  expert for the other two, even though I didn't know
19  anything about them.
20  Q. You didn't even know the names of them, correct?
21  A. Correct.
22  Q. As of May 22, 2006 had you received any
23  materials of any sort specifically related to Arrigale or
24  Grossberg cases?
25  A. I may have received something and not opened it.

7

UNCERTIFIED REALTIME ROUGH DRAFT

1  I received some materials around this time in e-mail and
2  FedEx, mail, but I was very busy finalizing the Barnett
3  case so I didn't pay attention to anything else that
4  came.
5  Q. Let me ask you this. To the present time have
6  you received any information, any materials, I should
7  say, that specifically pertains to the Arrigale and/or
8  Grossberg plaintiffs?
9  A. By "plaintiffs" you mean material from the
10  plaintiffs or with the plaintiffs' name on it?
11  Q. Any of the above.
12  A. Okay. Well, I have the call notes for both
13  plaintiffs and the list of visits, Doctor visits. I have
14  those here with me right now.
15  Q. What else have you received that relates
16  directly to or makes reference to Mr. Arrigale or
17  Mr. Grossberg?
18  A. Well, I read the deposition of Riahe, which is a
19  Southern California regional sales representative and
20  part of the cross-functional Vioxx team.
21  Q. And does that deposition mention either
22  Grossberg or Arrigale in any way that you can remember?
23  A. I don't believe by name, although it might. I
24  read through it for a general understanding as to what
25  was going on in Southern California.

8

UNCERTIFIED REALTIME ROUGH DRAFT

1  Q.  But do you recall one way or the other as you
2  sit here right now whether or not the names Arrigale or
3  Grossberg appear anywhere in her deposition?
4  A.  I wouldn't know, because at the time I read it I
5  didn't know these were the plaintiffs, so I wouldn't have
6  noticed one way or the other.
7  Q.  Anything else you have received from anyone that
8  you understood pertains specifically to the Arrigale or
9  Grossberg plaintiffs?
10  A.  I did receive deposition transcripts but I did
11  not review them.
12  Q.  Do you remember the names of the deponents whose
13  transcripts you received but did not read?
14  A.  No.
15  Q.  And who did you receive these from?
16  A.  I'm not sure.  One of the firms.  I don't even
17  know -- are they in the same firm or different firms?
18  Q.  I think they are three different firms.
19  A.  Different firms.  Okay.  So I'm not sure.
20  Q.  And when did you receive those depositions?
21  A.  At some point after May 22nd.
22  Q.  And can you be more precise in terms of was it
23  yesterday, was it closer to May 22nd; any kind of time
24  frame you can provide?
25  A.  Let's see.  Probably late May, early June.

9

UNCERTIFIED REALTIME ROUGH DRAFT

1  Q.  Any particular run haven't read those materials?
2  The depositions I'm talking about.
3  A.  The depositions, yes.  Well, I discussed them
4  with Steve Skikos, because he was at original deposition
5  and was told not to read those materials.
6  Q.  So to this point in time you have not read them
7  and you have no intention of reading them; is that
8  correct?
9  A.  That is correct.
10  MR. SKIKOS:  And she will not be offering
11  opinions as to the content of those depositions at trial.
12  MR. CAMPILLO:  I would hope not if she has not
13  read them.  But I appreciate that.
14  Q.  Now, had you met any of the attorneys next to
15  Mr. Skikos prior to today?
16  A.  I met Jim O'Callahan at my last deposition.  He
17  was there the entire time and made a few objection, as I
18  recall.
19  Q.  I read them.  That was the first time you met
20  Mr. O'Callahan, at your deposition?
21  A.  As I recall, yes.
22  Q.  Had you ever met Mr. Sizemore before?
23  A.  Yes.
24  Q.  When did you meet him?
25  A.  I met him for a couple of times for short

10

UNCERTIFIED REALTIME ROUGH DRAFT

1  periods in mark Robinson's office, as discussed in my
2  last depo.
3  Q.  Had you ever met Mr. Brandt before?
4  A.  No.
5  Q.  You met him today?
6  A.  Yes, I met him today.
7  Q.  Now, when did you receive the call notes and the
8  list of doctor visits that you mentioned a few minutes
9  ago?
10  A.  Around the same time as the other materials, end
11  of May, early June.
12  Q.  They all came together?
13  A.  Not necessarily.  Maybe two or three envelopes.
14  Q.  But about the same time?
15  A.  Roughly.  Within a week or so of each other.
16  Q.  And have you read the call notes and listing of
17  doctor visits?
18  A.  I counted the listing of doctor visits and I
19  read the call notes, yes.
20  Q.  And when did you do that, the counting and the
21  reading?
22  A.  I did it initially a week ago and I did it again
23  just before this deposition, except the counting.  I
24  didn't redo the counting.
25  Q.  Now, other than the call notes and the listing

11

UNCERTIFIED REALTIME ROUGH DRAFT

1  of doctor visits and the deposition of Miss Krahe to the
2  extent it addresses Arrigale or Grossberg, if any, have
3  you received any other materials that you have used or
4  looked at or considered for purposes of your expected
5  testimony in the Grossberg and Arrigale cases?
6  A.  Well, all of the material I looked at for
7  Barnett I'm going to be using in this case.  And then I
8  met with a Los Angeles-based sales representative, as I
9  discussed in my last deposition.
10  Q.  Okay.  Let me ask it this way.  It's probably a
11  good way of shortcutting it.
12  After your deposition and up until today what
13  new materials have you looked at, considered or reviewed
14  in connection with the Vioxx issues and Vioxx litigation?
15  A.  Well, the call notes and the doctor visits.  And
16  I went through some additional materials to respond to
17  your queries, Query 1 and Query 7 in particular.
18  Q.  Okay.  Other than that, and we will identify
19  those more precisely later, other than those categories
20  of materials, have you received and reviewed any other
21  materials that pertain to the Vioxx issues in a summary
22  way to shortcut this since your deposition?
23  A.  Well, I also identified a paper that I worked on
24  that relates to pharmaceutical marketing where I did
25  experiments on pharmaceutical markets and advertising as

12

UNCERTIFIED REALTIME ROUGH DRAFT

1  the fourth experiment in the series of studies, and I
2  brought that paper along.
3      Q.  Is that in the set that you have provided?
4      A.  Yes.
5      Q.  Anything else you have reviewed, relied on or
6  considered since the conclusion of your deposition in the
7  Barnett case and up through today that deals in any way
8  with the Vioxx issues or any lawsuit involving Vioxx?
9      A.  I spoke with Steve Skikos this Thursday and last
10  Thursday.
11      Q.  We will get to materials later but I'm just
12  talking about materials now, just so we have 4 clear
13  index.
14      A.  Nothing comes to mind.
15      Q.  And if something does you will let me know?
16      A.  I will.
17      Q.  Thank you.  How much time did you spend
18  reviewing the call notes and the listing of doctor visits
19  that you made reference to?
20      A.  I didn't record the exact amount of time but I
21  would say two hours.
22      Q.  That's including your review approximately a
23  week ago and whatever time you spent relooking at those
24  materials today?
25      A.  Yes.

13

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.  Is it your understanding, Dr. Pechman that
2  those materials will form some basis of whatever opinions
3  you will be expressing at the trial of the Arrigale or
4  Grossberg cases?
5      A.  Yes, I think it might come up.
6      Q.  Okay.  What is your understanding as to what you
7  will be addressing that pertains to those documents?
8      A.  Well, as you know, I reviewed the Merck
9  integrated marketing campaign for the whole United States
10  and in reviewing the call notes and the visits I was
11  checking to see whether there was any difference in what
12  happened in this situation versus what I had been seeing
13  from all the research and documents nationwide.
14      Q.  And what did you find?
15      A.  And I found that there was no difference.  They
16  are virtually identical patterns in terms of the number
17  of visits, what was talked about and so on.  So the
18  opinion I would express as that -- I have the same
19  opinion as the opinion I stated in the Barnett case are
20  the same as the ones I'm going to state in these cases
21  with the exclusion of the specific opinions that had to
22  do with Barnett.
23      Q.  So is it fair to say, maybe to see if we can
24  shortcut this a little bit, that when I'm referring to
25  your general opinions that apply to any -- strike that.

14

UNCERTIFIED REALTIME ROUGH DRAFT

1  Let me reword that.
2      Putting aside your specific opinions about
3  Barnett, the rest of your testimony that you expressed
4  either in your report that was produced in the Barnett
5  case or was discussed in your deposition taken in the
6  Barnett case is the extent of what you will be testifying
7  about in the Arrigale and Grossberg cases?
8      MR. SKIKOS:  And the answers to your questions.
9  Everything else is correct but you she answered questions
10  in your e-mails and you have those.  Other than that,
11  yes.  Does that make sense?
12      MR. CAMPILLO:  No.  I thought I had it.
13      MR. SKIKOS:  Her opinions are limited to what's
14  in Barnett, her deposition -- that she expressed in her
15  deposition.  And you sent an e-mail asking certain
16  questions and she prepared documents to speed the
17  response to those answers to the questions.  And those
18  are the documents that we provided to you prior to the
19  deposition (indicating).
20      THE WITNESS:  And the call notes and call visits
21  that are specific to this case would also be discussed in
22  this case.
23  BY MR. CAMPILLO:
24      Q.  Okay.  How much time have you spent in total
25  reviewing any of the materials that we have already

15

UNCERTIFIED REALTIME ROUGH DRAFT

1  identified on the record since the conclusion of the
2  deposition in the Barnett case?
3      A.  I should have brought my bill with me.  Let's
4  see.  Well, I know I spent all day yesterday.  Well,
5  let's see.  All of that week, basically, working on it.
6  Let me think.  Did I work on it last Friday?
7      Well, several days.  I would say five, six
8  eight-hour days.  But I could tell you exactly if I had
9  my billing with me, which I didn't bring.
10      Q.  I'll make a request on the record for your
11  billing since the deposition to the present time to be
12  provided to Mr. Skikos.
13      Is that agreeable?
14      MR. SKIKOS:  Yes.
15      THE WITNESS:  I should have brought it.
16  BY MR. CAMPILLO:
17      Q.  Because I think there has been a pretty clear
18  identification of your activities through the time of
19  your deposition.  I just want to update it from the
20  conclusion to the present time.
21      MR. SKIKOS:  No problem.
22      Q.  Has all of the time that you have spent since
23  the conclusion of your deposition been involved either
24  preparing the responses to the list of questions that I
25  intended to address today and/or reviewing the materials

16

UNCERTIFIED REALTIME ROUGH DRAFT

1  that pertain to the call notes and listing of doctor
2  visits in the Arrigale and Grossberg situations?
3      A.  Yes.
4      Q.  Anything else that you have done in that interim
5  time that pertains to the Vioxx litigation?
6      A.  Not that I recall.
7      Q.  Is it fair to say, and I know I'm jumping to a
8  conclusion here, but a lot of the time you spent this
9  week was trying to find the materials that you produced
10  that will be identified in a few minutes that are in
11  response to the list of issues that I had identified?
12      A.  I spent Monday doing that.  Just Monday.
13      Q.  So Monday you spent looking for the literature?
14      A.  Yes.  That would address your issue 7.
15      Q.  So Monday was for Issue 7, literature.  And you
16  said you spent five to six hours that day, roughly?
17      A.  Yeah.  Up to eight.
18      Q.  Okay.
19      A.  Six to eight.
20      Q.  Let's say four to eight.
21      A.  Six to eight.
22      Q.  Six to eight.  All right.  And then what
23  activity did you engage in on Tuesday that had to do with
24  the preparation of your deposition for these cases?
25      A.  I prepared the response about Exhibit 5.  And

17

UNCERTIFIED REALTIME ROUGH DRAFT

1  yesterday I continued to work on the response to Exhibit
2  5 and also read my other deposition, my deposition
3  transcript.
4      Q.  And is it fair to say that both Tuesday and
5  Wednesday you spent six to eight hours each of those two
6  days?
7      A.  Yes.  And also this morning.
8      Q.  Okay.  What did you do this morning?
9      A.  Reviewed all of the materials.  Everything,
10  basically.
11      Q.  Just kind of refresh your memory on what you
12  worked on so far?
13      A.  Right, and answered some questions in my own
14  mind.  I took some notes, which are right here
15  (indicating).
16      Q.  Now, in terms of meetings with counsel or
17  discussions with counsel, have you had any such events
18  since the conclusion of your deposition in Barnett?
19      A.  Yes.
20      Q.  Okay.  Could you identify those for me, please.
21      A.  Yes.  Last Thursday I met with Steve Skikos from
22  4:00 to 6:00 P.M. and he explained that this depo was
23  going to take place.  He showed me the list of the seven
24  questions.  We discussed briefly how I would approach
25  each of these questions.  I gave suggestion.  He mostly

18

UNCERTIFIED REALTIME ROUGH DRAFT

1  agree with what I said.  I think he did agree with
2  everything I said.
3          And we took care of scheduling and that sort of
4  thing.
5      Q.  Okay.  Now, let me ask you this.  Since the
6  conclusion of your deposition in the Barnett case and
7  your meeting with Mr. Skikos last Thursday, had you had
8  any discussions of substance other than scheduling or
9  something like that with any of the lawyers involved in
10  this litigation?
11      A.  Not that I recall.
12      Q.  You certain had certainly not had any
13  discussions with Mr. O'Callahan since the conclusion of
14  the Bar net deposition, correct?
15      A.  Correct.
16      Q.  So basically the first time you did anything
17  since the Barnett deposition related to this litigation
18  was last Thursday when you met with Mr. Skikos?
19      A.  As I recall, yes.
20      Q.  And this week you did some work to prepare for
21  the deposition and your involvement at trial?
22      A.  Right.  And I can't remember what I did on
23  Friday at the moment.
24      Q.  Did you do something last Friday that related to
25  this litigation?

19

UNCERTIFIED REALTIME ROUGH DRAFT

1      A.  Let's see.  I could check my organizer.
2      Q.  Sure.
3      A.  -- if I did.  No.  Very little.  I was at a
4  conference.
5      Q.  I'm sorry?
6      A.  I was at a conference last Friday.
7      Q.  So you didn't do anything related to this
8  litigation last Friday?
9      A.  Maybe just a few hours worth.
10      Q.  Doing what?
11      A.  Looking over some materials I brought to the
12  conference in my hotel room.
13      Q.  Do you remember what those materials were?
14      A.  They were related to this (indicating), to my
15  response to Exhibit 7 on integrated marketing
16  communications.  I stopped by my office to get materials
17  after I met with Steve Skikos on Thursday night and
18  brought them to the hotel and as a break went up --
19  slipped a session and went up and looked at some of the
20  materials.
21      Q.  Okay.  Now, other than meeting with Mr. Skikos
22  last Thursday had you met with any other attorneys
23  relating to this litigation since the conclusion of the
24  Bar net deposition?
25      A.  Not that I recall.

20

UNCERTIFIED REALTIME ROUGH DRAFT

1     Q.  Today did you meet with any of the attorneys
2 that are here today?
3     A.  I met with Steve Skikos.
4     Q.  When did you meet Mr. Skikos?
5     A.  1:30 P.M.
6     Q.  Until approximately 3:00?
7     A.  Quarter of 3:00.
8     Q.  And was anyone else present during your meeting
9 with Mr. Skikos?
10     A.  Mark Robinson came in for a second.
11     Q.  Anyone else?
12     A.  Someone brought the boxes.  That's it.
13     Q.  The other Mr. Skikos?
14     MR. SKIKOS:  The other Mr. Skikos.
15     THE WITNESS:  The other Mr. Skikos.
16 BY MR. CAMPILLO:
17     Q.  So is it fair to say, Dr. Fechmann that other
18 than speaking with Mr. O'Callahan at the Barnett
19 deposition while he was there -- I'm sure you had some
20 pleasantries before and at the conclusion -- that you
21 have had no meetings directly to discuss your testimony
22 in the Vioxx litigation with any of the lawyers that
23 represent Mr. Grossberg and/or Mr. Arrigale in the
24 lawsuits that we are here on?
25     MR. SKIKOS:  That Mr. Sizemore represents?

21

UNCERTIFIED REALTIME ROUGH DRAFT

1     MR. O'CALLAHAN:  Yeah.  He is pro hac vice in
2 the California case, just like Mr. Ismail.
3     MR. CAMPILLO:  You are counsel of record for
4 Arrigale and Grossberg.
5     MR. SIZEMORE:  Right.
6     MR. CAMPILLO:  Or just in the coordinating
7 proceeding?
8     MR. O'CALLAHAN:  I don't think it makes any
9 difference.
10     MR. CAMPILLO:  I'm wondering whether he made an
11 appearance for Grossberg or Arrigale specifically?
12     MR. O'CALLAHAN:  He just got into town today.
13 BY MR. CAMPILLO:
14     Q.  Have you had any discussions with Mr. Sizemore
15 since the Barnett deposition about the Arrigale and
16 Grossberg cases?
17     A.  Yes.
18     Q.  Okay.  When?
19     A.  I talked to him on the phone today.
20     Q.  Okay.  And when did you do that, the time?
21     A.  About noon, 11:30 and then at about 2:30.
22     Q.  Okay.  And did you discuss the substance of your
23 testimony in the Grossberg and Arrigale cases?
24     A.  No.  We discussed just some of the facts of the
25 case.

22

UNCERTIFIED REALTIME ROUGH DRAFT

1     Q.  Okay.  Why don't you tell me what you discussed
2 with Mr. Sizemore about either the Arrigale or Grossberg
3 cases today at 11:30.
4     A.  He told me the dates on which they took Vioxx.
5     Q.  What did he tell you about that?
6     A.  Arrigale, November '01 to March '02.  Grossberg,
7 July '99 to September '01 and then again from '02 to
8 August '04 intermittently.
9     Q.  Did he give you any other details beyond what
10 you just stated on the record?
11     A.  No.
12     Q.  Any other information on any other subject that
13 Mr. Sizemore gave you today provided you during your
14 telephone conversation at 11:30?
15     A.  Yes.  We discussed the medical issues.
16     Q.  Okay.  What do you mean by that?
17     A.  I wanted to go over with him the indications of
18 Vioxx and exactly when each was approved.
19     Q.  And what did you learn in that regard?
20     A.  That -- well, I knew a lot already from the
21 labels that I had but I confirmed that it was originally
22 approved in '99, May of '99 for osteoarthritis,
23 rheumatoid arthritis in adults and acute pain and man
24 central pain, acute men central pain, which is a very
25 complicated title, label.

23

UNCERTIFIED REALTIME ROUGH DRAFT

1     And then I knew that it was approved for
2 rheumatoid arthritis in adults in April '02.  And then I
3 learned that in '04 it was approved sometime in the
4 spring, like April, for migraine.  And in the fall of
5 '04, close to when it was withdrawn, for rheumatoid
6 arthritis with youth.
7     Q.  I don't want to confuse you but I believe you
8 said rheumatoid arthritis as to adults both in May of '99
9 and April of '02.  I expect you may have misspoken.  I
10 just want to clear that up.
11     A.  What did I say?
12     Q.  I thought you said that the May '99 approval was
13 to osteoarthritis, acute point, rheumatoid arthritis in
14 adults and menstrual pain.
15     A.  Yes.
16     Q.  Is that correct?
17     A.  Yes.
18     Q.  Because you said that in April of '02 it was
19 approved for rheumatoid arthritis in adults.
20     A.  Oh, you're right.  I was wrong.  Rheumatoid
21 arthritis in adults was not until '02.  I misspoke.
22     Q.  That's what I'm trying to clarify.
23     A.  Thank you.  Oh, I did have it written down.
24     Q.  You just said it wrong?
25     A.  Yeah.

24

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.   Okay.  Any other information that you gleaned or
2 learned from Mr. Sizemore in your conversation today at
3 approximately 11:30?
4      A.   Not that I recall.
5      Q.   Any other topics discussed?
6      A.   Not that I recall.
7      Q.   Okay.  Then you say you had a second
8 conversation with him at around 2:30, correct?
9      A.   Correct.
10      Q.   And what did you discuss during the second
11 conversation?
12      A.   I got the dates for Grossberg in the first
13 conversation.  I got the dates for Arrigale in the second
14 conversation.
15      Q.   The dates that they ingested Vioxx?
16      A.   Correct.
17      Q.   So the afternoon was Grossberg?
18      A.   The afternoon was Arrigale.
19      Q.   So that's when you learned that he had used
20 Vioxx between November of 2001 and -- did you say March
21 of 2002?
22      A.   Correct.
23      Q.   Did you learn anything else about Arrigale's use
24 of Vioxx during either phone conversation than what you
25 have already told us?

25

---

UNCERTIFIED REALTIME ROUGH DRAFT

1      A.   Not that I recall.
2      Q.   Did you learn anything else about
3 Mr. Grossberg's use of Vioxx during either telephone
4 conversation?
5      A.   Not that I recall.
6      Q.   Did you learn anything else about any of the
7 facts of either case other than what you have already
8 told us during either telephone conversation?
9      A.   Not that I recall.
10      Q.   Other than your phone conversations with
11 Mr. Sizemore today, your meeting with Mr. Skikos last
12 Thursday, have you had any other meetings or discussions
13 with any of the lawyers representing any of the
14 plaintiffs in the Vioxx litigation since the conclusion
15 of your Barnett deposition?
16      A.   Just about scheduling this deposition.
17      Q.   Nothing of substance?
18      A.   Correct.  Not that I recall.
19      Q.   Now, you have some notes of your conversations
20 with Mr. Sizemore?
21      A.   Yes.  That was what I should have referred to
22 where it gave the dates of those approvals.
23      Q.   You have a note pad with several pages with
24 handwriting on it.  What is that pad?
25      A.   This pad I prepared, started last night and then

26

---

UNCERTIFIED REALTIME ROUGH DRAFT

1 this morning.  And what I did was just to go back through
2 the research, each of the six studies that I had
3 identified, to see what were the range of dates for which
4 there are data available.
5      Because each document just talks about a slice
6 of the data and there is not one document that has all
7 six studies or all the data from all the studies, so I
8 just went through each of the documents that was
9 originally in my report and then was recited in Exhibit 5
10 and is now rediscussed in the new document.  And I just
11 went through to see what time period we are talking about
12 where we had research and concluded that for three of the
13 studies we have three years of data, summer/fall 2000 to
14 fall/winter '03.
15      And it's roughly a thousand people per month for
16 three years that were interviewed. 706 physician, 309
17 consumers.
18      And then there's just examples, two examples of
19 copy testing with consumers, one example of copy testing
20 with physicians where small groups or medium-size groups
21 reacted to the materials.  I don't have continual studies
22 of that.
23      And then I have another study for which I have
24 the tracking of the message recall from the sales reps.
25 It goes from September to December '01 and then picks up

27

---

UNCERTIFIED REALTIME ROUGH DRAFT

1 again in May '02 to May '03.  We just don't have the -- I
2 was never provided with the data for the other year.  It
3 just basically cites the years.
4      Q.   We are going to get into that in a little more.
5 I'm trying to understand what you have in front of you so
6 I can decide whether I need to copy it or not.
7      So you have some notes of the materials you
8 reviewed previously that went into, I guess, your update
9 of what was referred to as Exhibit 5 in the Barnett
10 deposition; is that correct?
11      A.   Correct.
12      Q.   How many pages of your handwritten notes relate
13 to that?
14      A.   Two.
15      Q.   All right.  And then what's the third page?
16      A.   So three, four, five and six are the chronology
17 of events from 2000 to 2003.  So basically just going
18 through what were different marketing materials that I
19 looked at in chronological order and different events
20 that occurred, like the JAMA article or the FDA warning
21 letter in chronological order just so I could see it, if
22 I needed to.
23      Q.   Okay.  When did you prepare those pages?
24      A.   This morning.
25      Q.   So a refresher for yourself from documents you

28

UNCERTIFIED REALTIME ROUGH DRAFT

1   had already seen before?

2     A.  Yes.

3     Q.  And how many pages after that?

4     A.  Then there is a page where I took the notes from

5   Paul Sizemore about the approved uses for Vioxx.

6     Q.  That's your conversations from today?

7     A.  Correct.

8     Q.  Okay.

9     A.  And then a couple of notes to myself to check

10  exhibits, which I then did when I got here.

11    Q.  Okay.  What's the next page?

12    A.  Find out years involved in L.A. cases.

13    Q.  That was a note that you had written to yourself

14  before you spoke to Mr. Sizemore or after?

15    A.  This was a note after.

16    Q.  What is the question you are asking?

17    A.  I had written a note to myself with no answer.

18  I had written this part.  "Find out years involved in L.A.

19  cases" maybe yesterday.  And then when he gave me the

20  answer I put the answer on the same page.

21    Q.  Okay.  Anything else?

22    A.  And then this is an overview of my opinion as I

23  was practicing with Steve before we came.

24    Q.  Okay.  That's fine.  I didn't mean to but you

25  off.  I'm sorry.

29

---

UNCERTIFIED REALTIME ROUGH DRAFT

1     A.  That's it.

2     Q.  All right.  Do me a favor.  Without commenting or

3  editorializing just read verbatim your summary of your

4  opinions that you wrote with Mr. Skikos today when you

5  were practicing.  Just read it verbatim slowly for the

6  reporter to take it down.

7    A.  Okay.  "In integrated marketing communication

8  based on science.  Science isn't industry specific.

9  Merck's integrated marketing communications campaign was

10  intense, sophisticated and science based.

11      "Research studied CV risk awareness and

12  awareness low.  They did nothing to increase awareness

13  and actively tried to reduce awareness.

14      "California equals the U.S.  Sales rep, call

15  notes, Krahn, senior business director Southern

16  California, cross-functional team for Vioxx.  Details in

17  Barnett report."

18    Q.  Now, Dr. Fachmann, is it accurate to say that

19  those pages on the pad that you have already described is

20  the totality of the materials that you have created for

21  the Arrigale and -- in connection with the Arrigale and

22  Grossberg cases except for the other materials that you

23  have handed to me that I have yet to identify on the

24  record?

25    A.  Yes, I believe so.

30

---

UNCERTIFIED REALTIME ROUGH DRAFT

1     MR. CAMPILLO:  We can at some point in time make

2  a copy of those sheets and we will mark those as Exhibit

3  2 collectively.

4     THE WITNESS:  I'm sorry my handwriting is so

5  messy.

6  BY MR. CAMPILLO:

7    Q.  That's why I asked you that one part that's more

8  significant to me.

9     (Deposition Exhibit 2 was marked for

10     identification and is annexed hereto.)

11  BY MR. CAMPILLO:

12    Q.  All right.  As is my understanding,

13  Mr. O'Callahan, just to see if we can shortcut this

14  deposition a little bit, that she is not going to express

15  any specific opinions about Arrigale and Grossberg as she

16  did in the Barnett case other than to say that whatever

17  was happening in California was similar or consistant

18  with what was being done everywhere else, but she is

19  going to testify about what the prescribing doctors in

20  Mr. Grossberg's or Arrigale's case knew and things of

21  that nature?  Do I have it correct?

22     MR. O'CALLAHAN:  I think that's generally a fair

23  statement.  She does have specific -- she has reviewed

24  the call notes and records regarding the physicians who

25  were prescribing Vioxx to the trial plaintiffs in this

31

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  case.

2      And as I understand her testimony, she believes

3  that those notes and so on are consistent with what she

4  observed with respect to the Barnett case.  That, I

5  think, further confirms that this was a national

6  integrated marketing plan that was put into effect.

7      I don't want to put words in the witness' mouth

8  but I think that's a summary of what she has done.

9     MR. SKIKOS:  We are going to go off the record

10  for a second.

11     (Recess taken.)

12  BY MR. CAMPILLO:

13    Q.  Dr. Fachmann would you tell me your own

14  understanding of what opinions, and just the opinions.

15  Don't worry about the bases of the opinions for now --

16  oh, she needs her notes?

17     MR. O'CALLAHAN:  I'm going to object to the

18  extent it's cumulative.  She prepared a 87-page report

19  that contains her opinions.  Do you want her to read her

20  report into the record?

21     MR. CAMPILLO:  Just make your objection,

22  Mr. O'Callahan.  I'm really trying to shorten this, not

23  belabor the point.

24     MR. O'CALLAHAN:  Ralph, we all know what you are

25  trying to do here.  So just go ahead.

32

UNCERTIFIED REALTIME ROUGH DRAFT

1  MR. BRANDI: Can we also reflect that there was
2  an off-the-record discussion. I told you that the doctor
3  was not going to testify to as to what any prescribing
4  physician had actual knowledge of but, rather, based on
5  her knowledge, skill, training and experience and review
6  of the materials what information they had and what they
7  likely were told and what effect it was designed to
8  produce.
9  MR. CAMPILLO: Okay. I will just for now say
10  that that is way beyond what was stated to Judge Chaney
11  that she was being proffered for when we agreed that the
12  deposition could be limited to three hours. I will
13  continue but I want to make sure I'm not waiving my right
14  to seek additional time to the extent she is going to say
15  anything about the specific physicians that are involved
16  in the care and treatment of Mr. Arrigale, because those
17  would be case-specific opinions. Whether it's what they
18  were told or what they knew or what was available for
19  them to be told, it's still case-specific and I just want
20  the record to be clear what our position is.
21  MR. BRANDI: Okay. Let's go.
22  MR. SKIKOS: How she is confused.
23  THE WITNESS: No, it's okay. You will ask
24  questions and I will answer.
25  MR. CAMPILLO: We will clarify it. Let me mark

33

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  these other documents just so that we have a clean
2  record.
3  Let's start with the call notes and the listing
4  of Dr. Visits that you made reference to, Dr. Pechmann if
5  you could. Let me look at them really quickly and I will
6  give them back to you.
7  (Documents handed to counsel.)
8  MR. CAMPILLO: Exhibit No. 3 will be a document
9  entitled "Call Notes" which has nine pages and it lists
10  the call notes relating to Dr. Shaw and Mr. Grossberg.
11  (Deposition Exhibit 3 was marked for
12  identification and is annexed hereto.)
13  MR. CAMPILLO: Exhibit No. 4 is a similar
14  document. This one identifies Mr. Arrigale, Dr. Caceres,
15  Dr. Chong, Dr. Nguyen.
16  (Deposition Exhibit 4 was marked for
17  identification and is annexed hereto.)
18  And Exhibit No. 5 is another document. This one
19  does not have a title.
20  (Deposition Exhibit 5 was marked for
21  identification and is annexed hereto.)
22  THE WITNESS: Contact said --
23  BY MR. CAMPILLO:
24  Q. Dr. Pechmann is that your handwriting?
25  A. Yes.

34

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  Q. And it says ID case --
2  A. Those are the headings for the columns but this
3  says contacts and—what does this say? Samples.
4  Q. Okay.
5  A. I would call it a contacts and sample documents.
6  Q. Are these documents, Exhibits 3, 4 and 5, the
7  totality of information that you have received other than
8  what Mr. Sisehure told you on the phone today that
9  pertain specifically to either Mr. Grossberg or
10  Mr. Arrigale or the prescribing physicians?
11  A. Unless Krebe's depo said something about it.
12  Q. So what I said is correct with that caveat?
13  A. Yes.
14  Q. Okay. Have you looked at any of the medical
15  records that pertain to Mr. Arrigale or Mr. Grossberg?
16  A. No.
17  Q. Have you looked at any pharmacy records that
18  pertain to either Mr. Arrigale or Mr. Grossberg or the
19  pharmacies through which they acquired any medical
20  products?
21  A. No.
22  Q. Have you looked at -- do you know anything about
23  the background of Dr. Caceres, Dr. Shaw or any of the
24  other doctors that are listed or mentioned in Exhibits 3,
25  4 and 5?

35

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  A. No.
2  Q. Other than the information that was related to
3  you by Mr. Sisemore on the telephone today, do you have
4  any other knowledge or information relating to whom
5  Mr. Arrigale or Mr. Grossberg used Vioxx, the doses that
6  they used, the time during which they used Vioxx, the
7  duration of use or anything else relating to those
8  topics?
9  A. No.
10  MR. SKIKOS: Ralph, I don't want to speak out of
11  school, but this might be them.
12  MR. CAMPILLO: Sure.
13  MR. SKIKOS: Prior to the deposition
14  Dr. Pechmann and I prepared what she read to you, those
15  seven points. And we did that in an effort to limit her
16  opinions and create a cut off so that certain
17  case-specific opinions that you are concerned about would
18  not be discussed, for example, what was specifically told
19  to the treating physicians is a perfect example on.
20  Unfortunately, my brother took the document, but
21  the seven general topics are the topics that she intends
22  to testify to at trial. Of course, they are supplemented
23  by whatever data is in her Barnett report and whatever
24  she is providing to you here and in response to your
25  e-mails.

36

UNCERTIFIED REALTIME ROUGH DRAFT

1    That is our best effort to narrow the opinions
2  so that you have a clear understanding before going to
3  trial about what she is going to talk about.
4        MR. CAMPILLO:  That's very helpful.  I just want
5  to make sure that counsel of record, who will be the
6  ones, I assume, at trial agree with what your
7  characterization of what her involvement in this case
8  will be.
9        Can you do that?
10       MR. BRANDI:  Yeah.
11       MR. CAMPILLO:  Good enough for me.  Then when we
12  get the document back I will clarify what those are and
13  we are probably fine.  Thank you.
14    Q.  Now, do you have some other materials,
15  Dr. Pechmann in front of you that I just want to make
16  sure I know what they are so I can decide whether I need
17  to mark them.  You can just walk me through them in
18  whatever order you want.
19    A.  This document entitled "Information Formats for
20  Presenting Unfavorable Efficacy Information, Managerial
21  and Regulatory Perspectives".
22    Q.  What is that?
23    A.  It is a document I am working on with a former
24  Ph.D. student, Dipayan Biswas.
25       I brought this because the fourth study is a

37

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  controlled experiment of a real Merck label for Maxalt
2  tablets, which is for migraine headaches.  It's a
3  prescription drug for migraine headache.
4        So this study shows that I have done controlled
5  experiments, independent research on pharmaceutical
6  marketing.  The reason I didn't bring it up at the last
7  deposition was because I didn't conceive of the paper as
8  a paper on pharmaceutical marketing.
9        When I do research I talk about general topics,
10  like the topic here, how do you present unfavorable
11  efficacy information.  And the first study is about sun
12  screen, I believe, first and second studies are about sun
13  screen and it's an over-the-counter sun screen.  One of
14  the study is about cars and one crash results and the
15  final study is about prescription drugs.
16       And that epitomizes what we do.  We try to do
17  research that transcends industries, because we couldn't
18  do a study about every single industry or we would never
19  get anywhere.
20       So when I was originally asked at my last
21  deposition had I done independent research and so on I
22  had said no because I hadn't thought of this paper.  But
23  once I understood their definition of what pharmaceutical
24  research is, I realized that clearly this would qualify.
25    Q.  Okay.

38

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.  So I wanted to make sure that you knew I have
2  this paper.
3    Q.  Now, basically, this is significant to your
4  experience and expertise in marketing and particularly
5  how it relates to pharmaceutical products?
6    A.  Absolutely, yes.
7    Q.  When was this research conducted, just a general
8  time frame?
9    A.  Well, he started it for his dissertation, so it
10  was started three years ago.  He graduated two years ago
11  already.  It takes a long time.
12       And I think that study was done in May full.
13  The last study was done last fall.
14    Q.  Fall of 2005?
15    A.  Yes.
16    Q.  And that part of the work that the student is
17  doing is complete?
18    A.  Yes.
19    Q.  But his dissertation is not complete?
20    A.  No, his dissertation is complete.  His
21  dissertation was the first three studies.
22    Q.  So what is the status of this document?  Is this
23  a draft in process or has it been published?  Where does
24  this stand?
25    A.  This is a draft paper that we are still working

39

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  on.  And within a month we hope to submit it to a
2  journal.
3    Q.  Any particular journals you have in mind at this
4  point?
5    A.  Yes.  Journal of marketing research.
6        MR. CAMPILLO:  All right.  Can we mark this as
7  Exhibit No. 6.
8        (Deposition Exhibit 6 was marked for
9        identification and is annexed hereto.)
10       MR. CAMPILLO:  Mr. Skikos and I have discussed
11  the fact that since this paper is in process, if you
12  will, and not published, that it will not be used for any
13  purpose whatsoever other than possibly to cross-examine
14  Dr. Pechmann and will not be made available to anyone for
15  any other purpose.
16       MR. SKIKOS:  Yes.  Thank you.
17  BY MR. CAMPILLO:
18    Q.  Another document that you have in front of you,
19  Dr. Pechmann I believe, is a set of reprints with a
20  summary in front of it.
21    A.  Yes.
22    Q.  And those are articles that you have personally
23  located and copied for me that address literature which
24  discusses, describes or critiques integrated marketing
25  communication campaigns of pharmaceutical companies?

40

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.   Yes.  Most of them discuss that.

2    Q.   And these are the ones that you searched for and

3    located earlier this week?

4    A.   Yes.

5    Q.   And did you do that solely because that was an

6    area that I had identified personally as an or that I

7    wanted to ask you questions about before you took the

8    stand in the Grossberg and Arrigale cases?

9    A.   Yes.  And also because it was a blank exhibit in

10   my last depo.

11   Q.   Because you were asked some questions about

12   studies but no studies were identified during the Barnett

13   deposition?

14   A.   Correct.

15   Q.   So these are the studies that at least you

16   believe were responsive to those questions and you have

17   now had the opportunity to look for, identify and

18   provide?

19   A.   Correct.

20        MR. CAMPILLO:  So we will have this entire set

21   and the summary sheet which is two-sided marked as

22   Exhibit No. 7.

23        (Deposition Exhibit 7 was marked for

24        identification and is annexed hereto.)

25   BY MR. CAMPILLO:

41

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.   A couple of more questions about Exhibit 7,

2    Dr. Pechmann.  The summary, the two-sided or two-page

3    summary, is that something you prepared yourself?

4    A.   Yes.

5    Q.   Did anyone help you with the searching and

6    identification of these articles or is this something you

7    did personally?

8    A.   I did it personally.

9    Q.   Okay.  And just in very general terms how did

10   you go about conducting the research that identified

11   these articles?

12   A.   I went to the Harvard cases, Stanford cases and

13   Ivy cases that are available on line to proceed

14   professors and I identified ones that dealt with

15   pharmaceutical marketing and integrated market

16   communications.  The only thing I did get help with was

17   my account had expired, so my Ph.D. student, Dip,

18   actually bought them for me.  And then I --

19        MR. SRIMGS:  He dipped into his own account.

20        THE WITNESS:  I also looked at two textbooks,

21   one in consumer behavior and one in marketing management,

22   because they talk about marketing being a science and the

23   different types of science that are involved

24   specifically.

25        I did that because it reinforces my point that

42

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    integrated marketing communications are based on science.

2    That are well known techniques, validated tech next for

3    studying these campaigns and their effects.

4        And the next case from Harvard shows that Merck

5    employed this science, that they changed their approach

6    from a non-science-based to a very marketing

7    science-based approach to integrated marketing

8    communications.

9        And then after that I just show examples of how

10   these types of research are used in other pharmaceutical

11   contexts.

12   Q.   Okay.  Dr. Pechmann had you read any of the

13   materials or articles that are included within Exhibit 7

14   prior to your locating them this week?

15   A.   Some of them, yes.

16   Q.   Which ones had you read before locating them

17   this week?

18   A.   1, 2, 4, 8, 10, 11.

19   Q.   And any others?

20   A.   Not that I recall, no.

21   Q.   I assume you had read those particular items

22   other than in connection with your work in the Barnett

23   case or the cases we are here on today?

24   A.   Yes.  I would like to point out that the last

25   one is about the link between pharmaceutical marketing

43

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    and tobacco marketing, which was specifically asked for

2    at my last deposition.

3    Q.   So any of these materials, which obviously I

4    don't have the time to read at the moment, mention Vioxx

5    or marketing of Vioxx specifically?

6    A.   Yes.

7    Q.   Which one or ones?

8    A.   10.

9    Q.   That's one of the ones you had read before?

10   A.   Yes.

11   Q.   And just in very brief fashion what does that

12   item tell you about Vioxx and the marketing of Vioxx?

13   A.   It gives statistics about Vioxx's advertising

14   expenditures relative to other consumer goods like Pepsi

15   and indicates that the expenditures are very high, say

16   double that compared to what was spent on Campbell's Soup

17   and 50 percent higher than Pepsi.  That sort of thing.

18   Q.   Any other references to Vioxx in any of the

19   materials contained within Exhibit 7 that you can think

20   of?

21   A.   Not that I recall.

22   Q.   And you also provided me with a document

23   entitled "Information about Pechmann Deposition Exhibit

24   No. 5."  To be honest with you, I'm not sure I understand

25   what this is.  Can you try to explain that for me.

44

UNCERTIFIED REALTIME ROUGH DRAFT

A.   Sure.  When I was preparing for the first
deposition the issue arose as to whether I would meet the
standards of an expert, of which I know nothing about
because I'm not a lawyer.  But Steve Skikos talked to me
the day before and said that -- something to the effect
that there has to be a scientific basis for the opinions.

And I said that half of what I looked at were
these studies, that there was extensive research, which
is why initially I said I was interested in the case
because I knew that there would be a lot of research and
that way my background and I felt comfortable with that.

And he said there is probably going to be a
direct beam on those studies and they are not clearly
laid out in your report because they are kind of
interspersed with other things, which is how in many
documents they are.  You talk about that topic and all
the research about that topic as opposed to a
research-by-research layout.

I started to go through the studies with him and
he said, "Why don't you write that down because it's so
much work -- so much material that it might be difficult
for you; you won't remember."

So I prepared this document?

Q.   The handwritten Exhibit 5?

A.   Exactly.  And then we read that you wanted more

---

UNCERTIFIED REALTIME ROUGH DRAFT

information about this Exhibit 5.  And I said to myself
you would be better off with something that was typed
than something that was handwritten and something that
clearly showed that mostly what I did with Exhibit 5 is
just pull the researchers out of Exhibit 5 and put them
in my own handwriting.

The only other thing I did was do it study by
study so that the format was different and talked about
the method at the beginning, which makes sense when you
start talking study by study.

So what I did was, since you wanted more
information about No. 5, was to make a document that I
thought would be helpful would you where I typed it up so
the method is now typed up very clearly stating where
everything was in the original exhibits from my expert
report.  And then everything in bold is out and paced
from my original expert report to show that virtually
everything in therein terms of results was in my original
report.

The only thing I did was reorganize it and add
the method.  So that's what this is.  It's just a way to
clarify what I was doing with Exhibit 5.

Q.   So another way of putting it is that you have
taken the handwritten Exhibit 5 from the Barnett
deposition and you have now typed it up, organized it,

---

UNCERTIFIED REALTIME ROUGH DRAFT

added details to make it more complete and more thorough?
Is that a fair summary?

A.   Well, I organized it the same way but I added
details, because last time for results I would just wrote
very brief results.  And this time I just out and paced
all the results, the detailed results I had in my
original expert report.  So I gave a more complete set of
results.

Q.   Now, if you will recall, Dr. Pechmann during the
Barnett deposition Mr. Skikos towards the end asked you a
series of questions and you identified six types of
studies that you had comments about.  Do you remember
that?

A.   Yes.

Q.   How does that series of questions and your
discussion about those six types of studies relate to
Exhibit 5, if it does at all?

A.   It directly relates to Exhibit 5, because as he
was asking me those questions I was using those notes to
respond.

Q.   I see.  All right.  So this exhibit, when I have
a chance to read it, should track, if you will, your
testimony in response to Mr. Skikos' question in the
Barnett deposition, possibly with more detail of course,
but in a sense discusses those opinions and the bases for

---

UNCERTIFIED REALTIME ROUGH DRAFT

those opinions?

A.   Yes.

Q.   So it's not something different from the
opinions you express on the record during the questions
by Mr. Skikos, it's just a written version of that with
added detail?

A.   Correct.  The added detail is a little bit more
about the method and a little bit more about the
findings.  But what I would like to point out is
everything in bold was from my original report, so if you
read my expert report you will just be repeating the same
thing here.

MR. CAMPILLO:  Let's mark -- what do we want to
call this?

MR. SKIKOS:  The answer to Ralph's question.

MR. CAMPILLO:  We will just call it information
about Pechmann's Opposition on Exhibit 5.  That will be
Exhibit No. 8 to this deposition.

(Deposition Exhibit 8 was marked for
identification and is annexed hereto.)

BY MR. CAMPILLO:

Q.   Okay.  Any other materials, Dr. Pechmann that
you brought with you today that we have not already
discussed or identified on the record?  And I do
understand, by the way, that you have the boxes of

UNCERTIFIED REALTIME ROUGH DRAFT

1    materials that you relied on, read or considered and I
2    assume those are the same five, quote, unquote, boxes
3    *that were at the Barnett deposition?*
4         A.   Yes.
5         Q.   So there is nothing new in the boxes that were
6    not present at the time of your Barnett deposition,
7    correct?
8         A.   Correct.
9         Q.   Okay.  Because I'm not going to copy those as
10   long as they are the same thing that we already have.  Is
11   that correct?
12        A.   Correct.
13        Q.   Anything else that you have here today that we
14   have not already identified on the record?
15        A.   Yes.
16        Q.   Okay.  *What is that?*
17        A.   To help you go through this --
18        Q.   I should ask for more things.  She is so
19   helpful.  I could have thought about ten more questions
20   if I knew she was going to be so responsive.
21             MR. SKIKOS:  You should have.
22             MR. CAMPILLO:  I will next time.
23             Thank you, Dr. Pechmann.  I appreciate it.
24        A.   To assist you with this document that's called
25   information about Pechmann Deposition Exhibit 5 we

49

UNCERTIFIED REALTIME ROUGH DRAFT

1    created a binder that provides the exhibits in the order
2    in which they appear.
3         Q.   *Could we see the binder?*
4         A.   Yes.
5             MR. SKIKOS:  While you are looking, my wife just
6    called.
7             MR. CAMPILLO:  We will go off the record.
8             (Recess taken.)
9             MR. CAMPILLO:  Just to complete the
10   housekeeping, Exhibit 8 to this deposition is going to be
11   a binder, very beautifully organized, tabbed binder
12   prepared by Dr. Pechmann or someone at your request --
13             THE WITNESS:  Someone at my request.
14             MR. CAMPILLO:  And the first one, as I
15   understand it, is a list -- well, it contains all of the
16   exhibits from your original Barnett report.  So when it
17   says Exhibit S9, that's referring to Exhibit S9 to the
18   Barnett expert report.
19        A.   Correct.
20        Q.   And these are the exhibits that correspond to
21   your comments and opinions that relate to the six types
22   of studies that you discussed on the record during the
23   Barnett deposition?
24        A.   Right, that were identified as Exhibit 5 from
25   the deposition.

50

UNCERTIFIED REALTIME ROUGH DRAFT

1         Q.   Okay.
2             (Deposition Exhibit 5 was marked for
3             identification and is annexed hereto.)
4    BY MR. CAMPILLO:
5         Q.   And the next binder which we will mark as No. 10
6    is somewhat similar to No. 9 but it differences that for
7    some of the documents in Exhibit 10 you only have the
8    specific pages that are referenced in Exhibit 5 and not
9    the entire document, correct?
10        A.   Correct.
11        Q.   And there's also some documents under tabs 25,
12   26, 27 and 28 which are some other Merck documents that
13   are also referenced in Exhibit 5?
14        A.   Yes, as Merck documents.
15        Q.   As opposed to an exhibit to your expert report?
16        A.   Correct.  Those were mostly the new papers that
17   I original didn't put in the report because I didn't put
18   the method of the research in the report.
19        Q.   But the number that you use in your column is
20   just the first Bates number for each document but each
21   document is actually multi-paged?
22        A.   Correct.
23        Q.   All right.  Okay.
24   BY MR. CAMPILLO:
25        Q.   And I think with the identification of Exhibits

51

UNCERTIFIED REALTIME ROUGH DRAFT

1    9 and 10, Dr. Pechmann we have now covered everything
2    that you have brought with you to this deposition and
3    also I think with the materials contained in the five
4    boxes that we are not going to mark it's the totality of
5    the materials you have read, relied on or considered for
6    your opinions in this case?  I see there is an exception
7    to that,
8         A.   Just one more item.
9         Q.   Okay.
10        A.   This was the special issue of a journal that
11   described the integrated marketing campaign that we did
12   for the antidrug program.
13        Q.   May I see that, please?
14        A.   It's my only copy (handing).
15             MR. CAMPILLO:  This is -- what do we call this?
16   A periodical?
17             THE WITNESS:  Yes.  Called social marketing
18   quarterly.
19             MR. CAMPILLO:  Social marketing quarterly.  This
20   particular one is Volume 10, No. 2 from the summer of
21   2004.
22        Q.   And the significance of this particular
23   publication, Dr. Pechmann is what?
24        A.   That we used the same scientific studies for
25   that campaign as was used in the MercX campaign.

52

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.   Meaning the types of studies, the methodology?

2    A.   Exactly.  Merck did more studies but we did many

3    of the same studies that they did.  I had already

4    provided my own article from that issue but this gives

5    you the totality of the articles that are written.

6    Q.   All right.  Is it all right if we take this, the

7    court reporter takes it, makes a copy, marks the copy and

8    returns the original to you?

9    A.   Okay.

10   Q.   Is that okay with you?

11   A.   Yes.

12        MR. SKIKOS:  Would you be happier if Mr. Skikos

13   over there copied it and gave it to Mr. Campillo?

14        THE WITNESS:  Yes.

15        MR. CAMPILLO:  That's okay with me.  I'm not

16   going to ask you any questions about it, so he can take

17   it.

18        MR. SKIKOS:  Good luck, Mr. Skikos.

19        THE WITNESS:  All right.  That's it.

20   BY MR. CAMPILLO:

21   Q.   One more exhibit.  This is not the one that you

22   brought.

23        No. 11 will be the marketing journal that we

24   just identified.  And Exhibit 12 will be the plaintiff's

25   expert witness list and declaration served in connection

53

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    with the Arrigale and Grossberg cases dated April 21,

2    2006.

3         (Deposition Exhibit 12 was marked for

4         identification and is annexed hereto.)

5    BY MR. CAMPILLO:

6    Q.   From Pechmann you pointed to something on the

7    first page of Exhibit 12 and kind of chuckled.  Can you

8    tell us what that was about.

9    A.   I said that I got a raise because I'm charging

10   $350 an hour.  But they are going to pay me $400 an hour.

11   Q.   All right.

12   A.   According to this statement.

13   Q.   Well, what is your normal and customary hourly

14   rate for consultation that you are involved in here?

15   A.   $350 an hour.

16   Q.   So this is a mistake, you believe?

17   A.   I don't know.

18   Q.   Well, have you discussed with counsel of record

19   for Mr. Grossberg and Mr. Arrigale what rate you will be

20   charging them for the work you do in this case?

21   A.   No.

22   Q.   Will it be $350 an hour?

23   A.   Yes.  Also my name has two 4's at the end of it.

24   Q.   Okay.  As of April 21, 2006 -- well, let me ask

25   you:  Had you seen this document before this afternoon?

54

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.   No, I had not.

2         MR. O'CALLAHAN:  Mr. Campillo, let me just put

3    on the record that we are an hour and a half into the

4    deposition.  It's a three-hour time limit imposed by the

5    court.  And I don't think you have gotten to the seven

6    areas of questioning you wanted to get so.  I hope that

7    you are able to do that in the next hour and a half.

8         MR. CAMPILLO:  What was my last question?

9         (The last question was read.)

10   BY MR. CAMPILLO:

11   Q.   And had you given your consent to anyone at the

12   law firm of Girardi and Keese to list you as a retained

13   expert in connection with either the Grossberg or

14   Arrigale cases?

15        MR. SKIKOS:  That's asked and answered.  She has

16   already answered that one.

17        MR. CAMPILLO:  I said to Girardi and Keese.

18   Q.   Have you specifically given your consent to

19   anyone at the Girardi and Keese law firm to use you as an

20   expert?

21   A.   I told Mack Robinson that it would be okay.

22   Q.   And that was before April 21, 2006?

23   A.   Yes.

24   Q.   Thank you.  Dr. Pechmann do you have any

25   knowledge as you sit here today about the credentials or

55

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    the professional training and experience of any of the

2    prescribing physicians or physicians who prescribed Vioxx

3    to either Mr. Grossberg or Mr. Arrigale?

4    A.   No.

5    Q.   Do you have any knowledge as to what any of

6    those individuals knew about the risks and benefits of

7    Vioxx at any point in time in between 1999 and 2004?

8    A.   Yes.

9    Q.   Other than the information that you have gleaned

10   from the review of the documents that have already been

11   identified, do you have any specific information about

12   what any of those prescribing physicians knew about the

13   risk and benefits of Vioxx during the time frame 1999

14   through 2004?

15   A.   Beyond what we have already -- beyond my other

16   depo and the report and everything, not that I recall.

17   Q.   Now, you mentioned earlier that you had talked

18   to -- let's see the way you described it -- a sales

19   representative I think you said from the Southern

20   California area.

21   A.   Correct.

22   Q.   Who did you talk to?

23   A.   I don't know.  I don't remember her name.

24        MR. SKIKOS:  She went over this in the last

25   depo.

56

UNCERTIFIED REALTIME ROUGH DRAFT

1    MR. CAMPILLO:  I was going to clarify.
2        Q.   You were referring to the same person you had
3    mentioned in the Barnett deposition?
4        A.   Yes.
5        Q.   Have you talked to that person again?
6        A.   No.
7        Q.   Just the one time described in the Barnett
8    deposition?
9        A.   Correct.
10       Q.   All right.  Have you talked to anyone else
11   involved in any way with the marketing or promotion of
12   Vioxx in the State of California other than that person?
13       A.   Have I spoken with anyone else?
14       Q.   Yes.
15       A.   No.
16       Q.   Do you have any knowledge or information,
17   Dr. Pachmann as to whether or not Mr. Arrigale and/or
18   Mr. Grossberg saw any direct to consumer advertising
19   related to Vioxx at any time?
20       A.   No, I don't know.
21       Q.   Do you have any knowledge as to whether or not
22   any of the physicians that prescribed Vioxx to
23   Mr. Grossberg or Mr. Arrigale attended any events
24   sponsored by Merck at any time pertaining to Vioxx?
25       A.   I believe the call notes make reference to some

                                                    57

UNCERTIFIED REALTIME ROUGH DRAFT

1    events.
2        Q.   Would that be the extent of your knowledge,
3    whatever is reflected in the call notes?
4        A.   Correct.
5        Q.   As you sit here today do you have in mind any
6    particular demonstrative exhibits or audio visual aids
7    that you would use at the trial of the Arrigale and
8    Grossberg cases?
9        A.   Yes.
10       Q.   Okay.  What have you considered?  What do you
11   have in mind as you sit here today?
12       A.   The exhibits that are referred to in this report
13   we call information about Pachmann Deposition Exhibit 5
14   that talks about the science.
15       Q.   If we can call it Deposition Exhibit No. 8.
16       A.   Exhibit 8.  Okay.  And there are several
17   documents throughout my expert report that I would think
18   would be good to show to the jury.
19       Q.   By that you mean that the actual document may be
20   put up on a screen or shown to the jury in some way?
21       A.   I guess.  We haven't really discussed it but
22   that's one way.
23       MR. SKIKOS:  That's a good idea.  I'll do that.
24   BY MR. CAMPILLO:
25       Q.   Okay.  Other than displaying documents that are

                                                    58

UNCERTIFIED REALTIME ROUGH DRAFT

1    referenced in Deposition Exhibit 8 or your Barnett
2    report, have you given any thought to what demonstrative
3    exhibits or any audio visual aids that would be used at
4    the trial of these two plaintiffs' cases?
5        A.   Yes.  And we talked about using the "Be the
6    Power" video.
7        Q.   Okay.  When you say "we talked about using" who
8    are you referring to?
9        A.   I believe Steve and I talked about it.
10       Q.   Mr. Skikos?
11       A.   Yes.  Or perhaps mark -- actually, it was Mark
12   Robinson when he was originally going to do the L.A.
13   trial.
14       Q.   Anything else you have considered to this point
15   in time in terms of audio visual aids or other
16   demonstrative exhibits that you would use to complement
17   along with your testimony?
18       A.   He might show some of the TV ads, the Dorothy
19   Hamill ads.
20       Q.   Anything else?
21       A.   I haven't thought about it yet.
22       Q.   So you have told us at least what you have
23   thought about or considered to this point in time?
24       A.   Yes.  I haven't gone into the specifics.  It
25   would take quite a while to go through every page of my

                                                    59

UNCERTIFIED REALTIME ROUGH DRAFT

1    report and say which documents.
2        Q.   I'm not asking you to tell me which of your
3    exhibits you would display but I'm saying conceptually
4    any other ideas that you have come up within terms of
5    what you would want to do to demonstrate your testimony
6    in front of the jury.
7        A.   We might put some summary opinions up in a
8    PowerPoint or something.
9        Q.   Have you discussed that with any of the
10   attorneys representing either Mr. Arrigale or
11   Mr. Grossberg?
12       A.   No.
13       Q.   Have you began work on any such aids?
14       A.   No.
15       Q.   Dr. Pachmann have you located any published
16   articles authored by anyone in which the Merck integrated
17   marketing campaign for Vioxx is critiqued?
18       A.   I believe there is a case in Europe, and I tried
19   to get a copy of it but I haven't managed to get it yet.
20       Q.   And what is it that you have been trying to get?
21   Can you refer to it by authority or what you have heard
22   about it.
23       A.   It's a case on Vioxx that's disseminated from
24   the European clearing house.
25       Q.   When you say "a case" you mean a lawsuit?

                                                    60

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.  No.  I'm sorry.  In business we refer to cases
2  as business cases.
3    Q.  All right.
4    A.  So many of the materials that I gave you that
5  were in the big packet are business cases; discussions,
6  descriptions of integrated marketing campaigns, the
7  research, et cetera.
8    Q.  Where did you hear there may be such a case on
9  Vioxx in Europe?
10    A.  I looked it up online.
11    Q.  So you found some kind of identification of such
12  a thing and you are trying to get your hands on it?
13    A.  Correct.
14    Q.  Can you tell us what it is you identified, the
15  name of it or title or whatever description you have been
16  able to locate?
17    A.  I could provide that off of my computer later.
18  Basically it's a case if you go to the European business
19  case clearing house, it's the case on Vioxx.
20    MR. CAMPILLO:  I will make a request.
21  Mr. Skikos, if you can give us that information, it would
22  be helpful.
23    MR. SKIKOS:  And you'll let it into evidence at
24  trial?
25    MR. CAMPILLO:  I don't think I can make that

61

UNCERTIFIED REALTIME ROUGH DRAFT

1  stipulation today.  It's under advisement.
2    MR. SKIKOS:  You'll think about it.
3    MR. CAMPILLO:  Yes.
4    Q.  Dr. Fechmann you obviously have not located it
5  yet so you don't know what it says, correct?
6    A.  Correct.
7    Q.  Other than possibly that document, have you seen
8  anything else published anywhere to date that purports to
9  be some kind of a critique of the Vioxx integrated
10  marketing campaign of Merck or by Merck?
11    A.  There are some articles that discuss aspects of
12  the case that use Vioxx as an example of excessive
13  spending or something like that.
14    Q.  Those are the ones in Exhibit -- that would be
15  the one you reference in what is Exhibit No. 7 to the
16  deposition?
17    A.  I didn't include those, but they are in the
18  boxes.
19    Q.  Those have been identified before?  I mean, they
20  were in the boxes you produced in the Barnett case?
21    A.  Correct.
22    Q.  Okay.  Anything that comes to mind other than
23  the items you just described on the record that in your
24  mind or in your judgment appear to be a critique of the
25  Vioxx integrated marketing campaign by Merck?

62

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.  Not that I can think of.
2    Q.  Do you have any knowledge of what the case on
3  Vioxx from Europe deals with, what the topic is or
4  anything are more than what you saw on your hit, I guess?
5    A.  No.  I didn't even know this clearing house
6  existed until I went to France a couple of months ago,
7  and they said, "Oh, we have a couple of cases that are in
8  English," and when I was looking I looked in this new
9  repository that I otherwise wouldn't have even looked at.
10    Q.  Have you come across in any of the work you have
11  done so far of any published articles that critiqued the
12  integrated marketing campaigns of any other manufacturers
13  of COX 2 inhibitors, like Celebrex or Bextra?
14    A.  I did order a few other cases that I couldn't
15  get my hands on.  I don't think any of them involved
16  Celebrex.  But one of the cases I did give you involves
17  Naproxen -- Naprosis.
18    Q.  Naproxen?
19    A.  Naproxen is, I guess, the medical term but the
20  brand name is Naprosis.
21    Q.  That would be included in Exhibit 7?
22    A.  Yes.
23    Q.  Anything else?
24    A.  Other than what I have said, no.
25    Q.  Now I want to turn your attention to the first

63

UNCERTIFIED REALTIME ROUGH DRAFT

1  type of study that you discussed in Exhibit 5, the old
2  Exhibit 5 and the new Deposition Exhibit 8 and I think in
3  response to Mr. Skikos' questions in the Barnett
4  deposition.  If I understand it, those involved copy
5  testing of detailed pieces with doctors?
6    A.  Correct.
7    Q.  And the exhibits that you have identified were
8  not necessarily in the same order but 28, 29, 41 and 59,
9  is that correct?
10    A.  I have 59, 28, 29, 41.
11    Q.  Okay.  Any others that pertain to that first
12  group of studies for or that first type of studies?
13  Those are the same four that I have.
14    A.  Yes, I don't believe there are any others that
15  we were able to find.
16    Q.  What is your opinion about these studies?
17    A.  Well, my opinion is that --
18    (Telephonic interruption.)
19    THE WITNESS:  My opinion is twofold.  One is
20  that the physicians who participated in the research
21  indicate misunderstanding of the cardiovascular,
22  potential cardiovascular risk of Vioxx.  And when they
23  saw these detailed pieces, that they remained
24  misinformed.
25  BY MR. CAMPILLO:

64

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.  That's the first part or is that both?

2    A.  No.  The first part was that they were

3  misinformed from earlier aspects of the integrated

4  marketing campaign.  And when they saw this new piece of

5  the campaign they remained misinformed because the

6  campaign was misleading.

7    Q.  Now, specifically, if we can look at Exhibit

8  28 -- would it help you to have the binder?

9    A.  I have them.  I have my copies, so I'll look.

10  I'm trying to think the best way to do it.

11    Q.  I'm going to be asking you about Exhibit 28

12  first.

13    A.  So you are going to be referring to those based

14  on my original exhibit numbers?

15    Q.  Yes, from your Barnett report.  Does that work

16  for you?

17    A.  Yeah, I think that will work.  And this should

18  do it.  And if not I will get the other box with my

19  original exhibits.

20    MR. SNIBON:  Since there is so much science it's

21  so heavy.

22  BY MR. CAMPILLO:

23    Q.  All right.  You are on 28?

24    A.  Yes.

25    Q.  That's the brochure, strength, safety, QV

65

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  simplicity?

2    A.  With the woman with her hands up, yes.

3    Q.  What about this exhibit specifically tells you

4  that the physicians were confused?  I'm sorry,

5  misinformed about the CV risks of Vioxx?

6    A.  Vioxx.  So you are talking about my opinion No.

7  2?

8    Q.  Let me see if I have it right.  You said with

9  regard to this type of study your opinion was that the

10  physician who participated in the study had some

11  misunderstandings about the potential cardiovascular

12  risks of Vioxx and that the detailed pieces that they saw

13  allowed them to continue to be misinformed?

14    A.  Correct.

15    Q.  Did I mistake that in any significant way?

16    A.  Not that it appears to me.

17    Q.  Okay.

18    A.  So you're asking me about the second part?

19    Q.  Yes.

20    A.  Okay.

21    Q.  And if you can refer me to the portion of the

22  brochure or the detailed piece which you believe caused

23  them to remain miss informed.

24    A.  Well, what they said in response to this is that

25  they want the company to address the CV safety issue.  So

66

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  what they were misled about was the omission about

2  anything about CV risks that would be helpful to these

3  physicians.

4    Q.  Okay.  What was it that was omitted from Exhibit

5  28 that in your judgment should have been included?

6    A.  Vioxx could cause heart attacks and strokes.

7    Q.  In those words?

8    A.  Something to that effect to let people know that

9  there is research indicating that this drug could cause

10  heart attacks.

11    Q.  Okay.

12    A.  Particularly among high-risk elderly consumers

13  with cardiovascular risk factors.

14    Q.  So if I understand you correctly, your criticism

15  of Exhibit 28 as it relates to your first pair of

16  opinions is that the brochure or this detailed piece

17  should have had language to the effect in substance that

18  Vioxx could cause heart attacks and strokes?

19    A.  Right.

20    Q.  And it's your judgment that it didn't?

21    A.  Correct.

22    Q.  Anything else that in your judgment was omitted

23  from Exhibit 28 that pertains to this first group of

24  studies?

25    A.  On Page 2 where it talks about the safety

67

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  profile in elderly patients it says "No substantial

2  difference in safety and effectiveness were observed

3  between older and younger patients."  And it shows the

4  percentages of people who took the drug who were over 65,

5  over 75 and over 80 and applies a very significant number

6  of the patients saying Vioxx are elderly and it clearly

7  indicates it's safe to use in the elderly.

8    Q.  Are you aware of any data anywhere that would

9  show the safety risk or events, adverse events in elderly

10  are higher than in younger patients?

11    A.  It's not age.  It's that the CV risks are higher

12  in the elderly.

13    Q.  And what do you base that opinion on, that the

14  CV risks are higher in the elderly population?

15    A.  Well, the doctors were saying it themselves in

16  this research.

17    Q.  Okay.  Are you aware of any data that elderly

18  patients that use Vioxx have a higher rate of CV events

19  than younger patients who use Vioxx?

20    A.  What I'm saying is that elderly patients in

21  general have an increase in cardiovascular risk with age.

22    Q.  Okay.

23    A.  Independent of Vioxx use.

24    Q.  Okay.  Do you know whether that's a well-known

25  fact or knowledge that's well known among the medical

68

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1   profession across the United States?
 2        A.   Well, I heard the physicians stating it
 3   throughout the research that I reviewed.
 4        Q.   Okay.  So, then, given that -- I'm not sure I
 5   understand what your criticism is of Exhibit 28.
 6        A.   My criticism is to the extent the CV risks are
 7   increased in the elderly and the risk of Vioxx is higher
 8   in people with a CV risk, then putting those two together
 9   there is an increased potential for CV adverse effects in
10   elderly patients with CV risk factors.
11        Q.   Okay.  And where -- I'm sorry, I didn't mean to
12   intercept you.
13        A.   And this implies that there as no difference, no
14   problem.
15        Q.   Can you refer me, Dr. Pechann to any
16   publication, any document that says that older patients
17   on Vioxx have a higher incident of CV events than younger
18   patients?
19        A.   As I said, I's not -- the publication I'm
20   referring to is the bigger study that shows that people
21   with higher CV risk have more of a problem on Vioxx.
22        Q.   That's your interpretation of the VIGOR data?
23        A.   Yes.
24        Q.   Okay.  And what else?
25        A.   And there is a correlation between age and CV
```

69

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1   risk, so it's a two-part argument that I'm making.
 2        Q.   Okay.  Anything else in Exhibit 28 that you
 3   believe is inappropriate or help keep the physicians who
 4   sold these detailed pieces misinformed?
 5        A.   Well, the next page is similar, again implying
 6   that a lot of people who are elderly use Vioxx, and so
 7   it's just a follow-up on what was on the last page.
 8        Q.   Are you aware of any data anywhere that would
 9   say that -- indicate that any of the data that's reported
10   or any of the numbers that are reported in Exhibit 28 are
11   inaccurate?
12        A.   No.
13        Q.   So it's not lack of accuracy.  What is it that
14   you think is misleading about this document?
15        A.   Omissions.
16        Q.   Okay.  You told us about the omission that it
17   didn't say in substance that Vioxx could cause heart
18   attacks and strokes.  Anything else?
19        A.   And it's even more likely to cause heart attacks
20   and strokes in people with CV risk.
21        Q.   And you believe that there was data available at
22   the time this brochure was used that indicated that?
23        A.   This particular brochure was used -- let's see.
24   Which one is this.  This is my original Exhibit 28?
25        Q.   Yes.
```

70

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1        A.   Yes.  This was used in the first quarter of
 2   2003.
 3        Q.   Is that when it was tested or is that when it
 4   was and used in the public?
 5        A.   End used.  It was tested in November of '02.
 6        Q.   Anything else about Exhibit 28 specifically?
 7        A.   No.
 8        Q.   Can I assume that for Exhibit 29 it's basically
 9   the same opinions?  Let me ask you:  Is there anything
10   different about Exhibit 29 -- this is a very similar do
11   you mean -- than what you just told us about Exhibit 28?
12        A.   It is different.
13        Q.   Okay.
14        A.   29 includes the efficacy competency program.  I
15   guess on the fourth page, fifth page it describes that
16   program and there is extensive research to show that
17   people interpreted the program to mean that Vioxx was
18   safer than they had originally thought.
19        So it improved -- there is quite extensive
20   research to know that this program had a halo effect on
21   safety perceptions.  It created the perception that there
22   was less cardiovascular risks and increased people's
23   confidence in Vioxx, which was the objective.
24        Q.   The brochure itself, Exhibit 29, your criticism
25   is it referred to the confidence program?
```

71

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1        A.   It shows the confidence program has been
 2   extended through 2003.
 3        Q.   Okay.  Go ahead, I'm sorry.
 4        A.   So it's stating that Merck stands behind Vioxx,
 5   is going to provide this money-back guarantee for another
 6   year.  It was started in, I think, August of 2002.  And
 7   Merck had data to show that this created the misleading
 8   perception.
 9        Well, they didn't say it was misleading.  I'm
10   saying it's misleading.  But in any event, created the
11   perception that Vioxx was safer than people had thought
12   and seemed to decline in prescribing behavior, and so
13   they decided to extend it.
14        This is an example where they had research
15   showing that instead of increasing awareness of the CV
16   risks they were purposefully trying to decrease awareness
17   in extending a program that was proven to decrease
18   awareness of the risk.
19        MR. SKIKOS:  Are there research studies in
20   Exhibit B?
21        THE WITNESS:  In this exhibit?
22        MR. SKIKOS:  Yes.
23        THE WITNESS:  Yes.  See, it's a different type
24   of study.  That's the efficacy study.
25   BY MR. CAMPILLO:
```

72

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.   Let me ask you this, Dr. Fachmann.  You just
2    stated there was data or you have seen indications that
3    perk purposely tried to decrease the CV awareness.  Is
4    that what you said?
5    A.   What I'm saying is --
6    Q.   Did you say that or mean to say that?
7    A.   I said they continued to the program when they
8    knew it was decreasing concerns about CV safety.  *They*
9    *purposefully decided to continue the program.*  They
10   indicated they were pleased with the results and with the
11   sales by stating it was successful and they wanted to
12   continue the program.
13   Q.   Are you aware of any indication from any
14   documents that you can point us to today that would say
15   to you that Merck purposefully was trying to decrease
16   awareness of CV risks with Vioxx?
17   A.   I did not find a document in which they stated
18   that exactly.
19   Q.   Are there documents in which you are inferring
20   that?
21   A.   Yes.
22   Q.   Okay.  Which documents are you using to infer
23   from that Merck purposefully was trying to decrease the
24   awareness of CV risks with Vioxx?
25   A.   It's later on this report, so it will take a

73

UNCERTIFIED REALTIME ROUGH DRAFT

1    minute to find it.
2    Q.   Sure.
3    (Witness reviews document.)
4    MR. SKIKOS:  While she is doing that, my wife is
5    calling.  Let's take three or four minutes.
6    MR. CAMPILLO:  Whatever you need.
7    (Recess taken.)
8    BY MR. CAMPILLO:
9    Q.   Dr. Fachmann while we were on the break you were
10   able to look through Exhibit 8 to try to answer my last
11   question?
12   A.   Yes.
13   Q.   Can we have the reporter read the last question
14   back.
15   (The last question was read.)
16   THE WITNESS:  I'm going to be using Exhibits 47
17   and 48 that are referred to in this Deposition Exhibit 8.
18   BY MR. CAMPILLO:
19   Q.   All right.  I have Exhibit 47.  Let's go to
20   Exhibit 47 first.  What about 47 allows you to infer that
21   Merck was trying to decrease CV risk awareness?
22   A.   *Well, I would rather start with 48, if I could.*
23   Q.   Sure.
24   A.   Because that's where it begins.
25   Q.   It's your opinion.  Just give me one second.

74

UNCERTIFIED REALTIME ROUGH DRAFT

1    Okay.
2    A.   Well, Exhibit 47 describes research that Merck
3    did to figure out why they were starting to have some
4    problems with Vioxx versus Celebrex.
5    Q.   We are on 47?  I just want to make sure we are
6    not misspeaking here.
7    A.   47, yes.
8    Q.   Okay.  Go ahead.
9    A.   Oh, golly, 48.  We are on 48.
10   Q.   48, 48.
11   A.   It's very confusing.  Okay.  Hold on.
12   The original research is described in Exhibit
13   48, yes.  So they found out what physicians said was the
14   most important was efficacy but what actually was the
15   most important was does not cause edema, does not cause
16   significance increases in blood pressure, does not
17   increase the risk of MI or stroke and it's  safe to use
18   in the elderly.
19   And they said, quota, possible implication was
20   to prevent movement off center on non-GI safety.  So, in
21   other words --
22   Q.   Where in the document does it say that?
23   A.   Exhibit 48, Pages 8 through 12.  I hope we have
24   *the right exhibit* here.  That does not look like the
25   right exhibit.

75

UNCERTIFIED REALTIME ROUGH DRAFT

1    MR. SKIKOS:  I was just flipping through.
2    THE WITNESS:  I'm counting on you.
3    BY MR. CAMPILLO:
4    Q.   *I have all these exhibits.*
5    A.   No, we've got it.
6    Q.   I brought extra copies which I was going to ask
7    you about, which are the same ones in your binder.
8    Dr. Fachmann I have here a copy of Exhibit 48 to
9    your original report.  Will this help you?
10   A.   Okay.  Same thing?
11   Q.   Yes.  We don't have to remark it.  I will
12   represent to you that's Exhibit 48 to your Barnett
13   report.
14   A.   Okay.  Yeah, that looks like it.  So I say it's
15   8 to 12.
16   Well, on Page 11 it says "The most important
17   attributes *that must be defended are non-GI safety*
18   attributes.  More work needs to be done to understand
19   what comprises what's safe for the elderly.  It's likely
20   driven largely by GI, CV and renal risk."
21   Q.   Okay.
22   A.   So Page 12, "Possible implication should prevent
23   movement 'off center' on non-GI safety."
24   So the implication on this is they were starting
25   to see some concerns about safety with this drug among

76

UNCERTIFIED REALTIME ROUGH DRAFT

1  the physicians.  So right after, very close after this
2  was done, this report, they launched this new efficacy
3  guarantee program which they later called efficacy
4  confidence.  And the whole point of it was to, as they
5  say bolster physicians' and consumers' confidence in
6  Vioxx.
7       I have the specific goals somewhere here.
8  That's in my main report.
9       So they launched the program to bolster the
10  confidence and what they found, as shown in Exhibit 47,
11  is a series of very positive results indicating that they
12  had succeeded in preventing movement.  Any further
13  movement off center on non-GI safety and otherwise
14  neutralizing safety concerns, neutralizing physicians'
15  safety concerns, which of course was an objective of
16  their campaign, the stated objective of their campaign.
17       Q.  Let me see if I understand correctly.  Are you
18  saying that on Page 12 of Exhibit 48, because there is a
19  reference to possible implications, bullet point under
20  that that says "prevent movement 'off center' on non-GI
21  safety," that you read into that or your interpretation
22  of that or your opinion about that is that Merck was
23  intentionally, purposefully trying to decrease awareness
24  in the field, in the real world of CV risks?
25       A.  Well, that's part of the evidence.  The evidence

77

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  continues when you actually look at fact that they
2  launched this efficacy guarantee program which stated to
3  consumers and physicians it's a satisfaction back
4  guarantee.  And then they bothered to write up a huge
5  power point in which they focus on all these changes in
6  safety showing that they were preventing movement off
7  center with this program.
8       Q.  Okay.  What support do you have for your
9  statement that the efficacy guarantee or efficacy
10  confidence program was implemented specifically to affect
11  the perceptions and minimize or decrease the awareness of
12  physicians about CV risks of Vioxx?
13       A.  They never state that explicitly.  What they
14  state is when they describe the goals of the program they
15  state that it's to increase confidence.
16       Q.  And you are reading that to mean that Merck was
17  purposefully trying to decrease CV awareness of the
18  doctors?
19       A.  When I look at everything together, particularly
20  their focus on the results once it was launched, that's
21  when I think the other shoe falls and it's clear that the
22  program did decrease awareness of or concern or
23  neutralized physicians' concerns about safety risks.  And
24  then they continued the program even though the research
25  showed they were doing this.  So it's a series of these

78

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  events that when you put them together it looks like the
2  point of the program -- well, in any event, they knew
3  that the program was reducing perceptions about CV risk
4  and they continued it.
5       Q.  Where do you have the support for your statement
6  that they knew that the program was decreasing awareness
7  of CV risks?
8       A.  In Exhibit 47.
9       Q.  Okay.  Let's go to Exhibit 47 now.
10      A.  Okay.  Had I known you were going to be so
11  organized I wouldn't have made all these beautiful
12  binders.
13      This is not a very good copy of this one.
14      MR. SKIKOS:  This one is a better copy.
15      THE WITNESS:  So this is August.  This is
16  October of 2002.  The program was launched in August and
17  they are saying on Page 7 that efficacy perceptions of
18  Vioxx and Celebrex remain fairly consistent.  But on Page
19  8 it says in August, which is when this program launched.
20  and you would expect to see the biggest effects more
21  physicians rated Vioxx and Celebrex equally on the MI
22  stroke which could have contributed to the narrowing of
23  the new prescription shared gap between Vioxx and
24  Celebrex.
25      So basically that was good, because people had

79

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  been rating Vioxx worse than Celebrex.  In fact, they
2  rated them equally showed them in the direction they
3  wanted.
4       In August significant changes were seen in the
5  percentage of physicians that rated Vioxx and Baxtra the
6  same in the elderly and MI stroke attributes.
7       In August the mean rating for Vioxx and the safe
8  for the elderly attributes stabilized and the gap between
9  Vioxx and Celebrex/Baxtra narrowed.  So it just goes on
10  and on.  If you want to keep going, there's blood
11  pressure, edema, CV risk.
12      The original slide showed improvement in
13  prescribing, more new prescriptions.
14      Q.  Let me see -- maybe my questions are not very
15  precisely drafted or articulated.  I'm trying to identify
16  the basis for your statement earlier that Merck was
17  purposefully attempting to decrease the awareness of
18  physicians concerning CV risks, they were purposefully
19  doing that.
20      A.  Right.
21      Q.  And have you now told me your entire basis for
22  making that assertion?
23      MR. SKIKOS:  Well, objection.  You mean as to 47
24  and 48?
25      MR. CAMPILLO:  Well, if there is anything else,

80

UNCERTIFIED REALTIME ROUGH DRAFT

1  I want to look at it.
2      MR. SKIROS:  Her entire Barnett report has all
3  that is there.
4      THE WITNESS:  Right.  And there's a lot of
5  evidence.  Like I said, there were six studies, which we
6  have three years of data on, a thousand people a month.
7  There's a lot of data showing for multiple different
8  studies that Merck was neutralizing the safety risks
9  perceptions.
10 BY MR. CAMPILLO:
11     Q.  Can you point to any document anywhere that
12 states that that was a goal of any of the programs,
13 projects, studies or marketing campaigns conducted by
14 Merck at any time?
15     A.  Yes.
16     Q.  Okay.  Which one?
17     A.  In my expert report.  Let me see if I can find
18 it.  Okay.  Page 24 and 25 of my report, which is Exhibit
19 19 is a document entitled "2001 Profit Plan for Vioxx"
20 Merck stated that "A key objective of the 2001 Vioxx
21 campaign was to 'neutralize' safety concerns about
22 hypertension, edema and MI."
23     And then in describing the objectives for each
24 physician group repeatedly stated that a key goal was to
25 convey Vioxx's, quote, comparable safety versus Celebrex

81

UNCERTIFIED REALTIME ROUGH DRAFT

1  and NSAIDS.  This safety -- then it said high COX
2  inhibitors, physician tended to view Vioxx as slightly
3  better on efficacy see but having some concern relative
4  to hypertension, edema, MI.
5      And since they repeat the same thing in 2002 and
6  they repeat -- something similar, not exactly the same
7  thing but related thing about safety in their plan for
8  consumers.
9      Q.  Is it your testimony, Dr. Pachmann, where any
10 document someone writes that one objective of the Vioxx
11 campaign is to neutralize safety concerns around
12 hypertension, edema and MI, that that means to you that
13 they are purposely trying to decrease the awareness in
14 the physicians' minds about the CV risks of Vioxx?
15     A.  Yes.
16     Q.  That's your interpretation of that language?
17     MR. SKIROS:  Asked and answered.
18 BY MR. CAMPILLO:
19     Q.  Any other basis for you to make that statement?
20     A.  The statement that you just quoted?
21     Q.  Yes, that Merck was purposefully trying to
22 decrease the awareness in the doctors' minds about the CV
23 risks of Vioxx.
24     A.  Yes.  I have lots of other things to say about
25 that.

82

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.  My question is:  Is there any document that in
2  your opinion state that as an objective of Merck's
3  campaign.
4      A.  Oh, state that as an objective.  As I said,
5  there is a comparable statement in 2001 in Exhibit 20.
6  It says "The campaign was designed to ensure that
7  physicians prescribed Vioxx for all patients needing pain
8  relief independent of CV risk factors because Vioxx does
9  not increase the risk of MI, heart attack or stroke."
10     Q.  Okay.  Any other documents that you can point us
11 to where you believe Merck identified as a stated
12 objective of their campaign to minimize the awareness of
13 physicians of the CV risks of Vioxx?
14     A.  Yes.
15     Q.  Okay.  What else?
16     A.  On Page 61 of my report, referring again to
17 Exhibit 19, "In 2001 profit plan for Vioxx the
18 communication objective for consumers was to get them to
19 believe that Vioxx offers a safety of tolerability
20 advantage over traditional medicines."
21     Q.  Okay.
22     A.  It's not as explicit because their ads to
23 consumers were not a medically oriented but it has the
24 same thrust to it and it was an integrated campaign.
25     Q.  Any other documents that in your opinion

83

UNCERTIFIED REALTIME ROUGH DRAFT

1  indicate to you that there was a stated objective by
2  Merck to decrease physicians' awareness of the CV risks
3  of Vioxx?
4      A.  Not that I can recall.
5      Q.  Going back to the first group of studies that we
6  have been talking about, the copy testing of detailed
7  pieces with medical doctors.
8      A.  Yes.
9      Q.  Do you have any other opinions about those
10 studies other than what you have already stated on the
11 record today?
12     MR. SKIROS:  Objection.  Or that was done in a
13 previous deposition.  Because, remember, I asked her a
14 bunch of questions in the last deposition.
15     MR. CAMPILLO:  I'm asking specifically about
16 study type 1, the copy testing of detailed pieces with
17 M.D.'s.
18     Q.  Have we now heard all your opinions that you
19 have about that group of studies or that type of study?
20     A.  So if I stated something in my report I have to
21 restate it here?  Is that what you're saying.
22     Q.  I mean, if there is a part of your report that
23 addresses copy testing of detailed pieces with doctors
24 and that is something other than what you have told us --
25 and I'll represent to you what I understood you to say is

84

UNCERTIFIED REALTIME ROUGH DRAFT

1  the physicians who participated in these studies
2  indicated that they were misinformed about the potential
3  CV risks of Vioxx, and that when they saw these detailed
4  pieces they remained misinformed and you are critical
5  about that for some reason.
6      A.  Right.
7      Q.  Are there any other opinions about the copy
8  testing of detailed pieces with medical physicians other
9  than that?
10     A.  Well, then I would like to just point out that
11 in Exhibit 41, from the copy testing they had done, they
12 found out that this efficacy confidence program would
13 increase new prescriptions, because physicians did find
14 it impressive that Merck was giving a money-back
15 guarantee.  I believe it was very unusual to do that.
16     Q.  And how does that translate into Merck -- how
17 does that translate into these detail pieces leading the
18 physicians to be misinformed?  That's what I'm trying to
19 have you connect.
20     A.  Yes.  Well, it was clear that when the results
21 came out that this campaign isn't affecting efficacy
22 perception.  It was affecting safety perception.  That's
23 why prescriptions were going up.  Physicians were feeling
24 confident that this product was safer than they were
25 worried about.

85

UNCERTIFIED REALTIME ROUGH DRAFT

1  as they indicated, they had some concerns.  And
2  knowing that, Merck continued the program basically until
3  they pulled the product from the market.
4      Q.  Okay.  Anything else?
5      A.  They focused much of their research on CV
6  awareness of various types, because they wanted to know
7  the effect.  They spent a lot of time on the power points,
8  on the slides.  It was a very relevant issue to them.  It
9  wasn't that they didn't notice the results.
10     Q.  Which parts of Exhibit 41 were you referring to
11 for your last comments?
12     A.  Page 71.
13     Q.  71, is that a Bates number?
14     A.  Exhibit 41, Page 71.
15     Q.  The document is not numbered.
16     A.  It's tab 4 here.  Oh, I know.  That's one of
17 those that wasn't numbered, right.  That's why I made the
18 binder that only had the one page in it so you could find
19 it.
20     Q.  But if you can find it in your binder, tell me
21 the Bates number and I can find it.
22     A.  Okay.  I've got it right here.  Tab 4.  That's
23 the one with just the page numbers.  MRK ADG 0057471.
24     Q.  It is 71 of the Bates number.  Okay.  Will you
25 point me to the portion of that page that you believe

86

UNCERTIFIED REALTIME ROUGH DRAFT

1  supports your opinion.
2      A.  The second bullet point.  They did a qualitative
3  study, which is focus group copy test.
4      Q.  Okay.  Give me one second.  If I read the bullet
5  point correctly, it's saying 20 out of 30 physicians felt
6  the efficacy guarantee program might increase by 10 to 15
7  percent of the prescriptions, correct?
8      A.  Correct.  And they actually did increase, which
9  the other data showed.  They did increase prescriptions.
10     Q.  I guess I'm at a little bit of a -- I'm trying
11 to figure out where is there a connection between what
12 they say in this exhibit and their concerns for safety.
13     A.  Well, these people were concerned about safety.
14     Q.  They were or were not?  I didn't hear you.
15     A.  They were.  And yet they said how they were
16 going to have increased in prescribing 10 to 15 percent.
17     Q.  And what concerns did they have, Dr. Pechmann?
18     A.  The safety concerns of the physicians were
19 described in this report.
20     Q.  You are talking about Exhibit 47 or somewhere
21 else?
22     A.  59.  Back to 59.  It's quite confusing because
23 they are different pieces.
24     Q.  I will agree with you.
25     A.  Right.  Having done the antidrug campaign I'm

87

UNCERTIFIED REALTIME ROUGH DRAFT

1  used to this.  It's the same way.
2      MR. SKIROS:  Which is why you need an expert to
3  testify in this area.
4      THE WITNESS:  Because it's little pieces pulled
5  by different people.
6  BY MR. CAMPILLO:
7      Q.  If I understood you correctly, Exhibit 41 is a
8  document prepared in 2001 sometime; is that right?
9      A.  We can check the date.
10     Q.  Let's start over to make sure we are on the same
11 page.  You made a comment about the physicians who are
12 referenced in the second bullet point of Page 71 of
13 Exhibit 41, that they had safety concerns.
14     A.  Yes.
15     Q.  These 20 to 30 physicians had safety concerns;
16 is that what you're saying?
17     A.  I'm saying that based on the physicians that
18 they interviewed that is discussed in Exhibit 59.
19     Q.  All right.  Here is my question.  Let's start
20 over.
21         There is a reference in Exhibit 41, Page 71 to
22 the effect that certain physicians who were queried
23 believed that the efficacy guarantee program might result
24 in increased writing of prescriptions.  Are we together
25 so far?

88

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.   Yes.
2    Q.   All right.  And I believe you stated that those
3  physicians had safety concerns.  So my first question is:
4  Is that what you meant, that the physicians that were
5  being interviewed who gave their opinions about the
6  affect of the efficacy guarantee program, they themselves
7  had safety concerns?
8    A.   I'm inferring that based on the fact that the
9  *other study which had 31 physicians and also said they*
10  liked the efficacy program had safety concerns at the
11  same time.  So I would assume that these guys, which are
12  pulled from the same population, would be like the
13  population for which we know that they had safety
14  concerns.
15    Q.   So first of all, do you have any documentation
16  or support for the proposition that the 30 physicians
17  interviewed and discussed in Exhibit 41, Page 71 had any
18  safety concerns themselves?
19    A.   Not directly.
20    Q.   Do you have any information or any data, any
21  support for the proposition that the 30 physicians
22  *described in Exhibit 41, Page 71 are the same 31*
23  physicians that are reported in Exhibit 59?
24    A.   Not directly.  That's why I answered not
25  directly to your first question.

                                                        89

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.   I'm just trying to get the record to be clear.
2    A.   Very good.
3    Q.   Thank you.  So you have no information that you
4  could point us to that would indicate that the physicians
5  being discussed in Exhibit 41 -- physicians being
6  discussed in Exhibit 41 are the same as the ones
7  discussed in 59 or that they have the same impressions
8  and attitudes about Vioxx?
9    A.   Well, I do have based on my experience.  *When we*
10  did these focus groups you about the same issue you don't
11  go to radically different groups of people.
12    Q.   But you have no knowledge, Dr. Pechmann as to
13  what these particular groups were for the Vioxx studies,
14  do you?
15    A.   I know just based on standard practice that it
16  would be a similar group, but I cannot state with
17  certainty, no.
18    Q.   So you don't know if, for whatever reason, the
19  physicians discussed in Exhibit 41 had a certain level of
20  awareness about CV risk and whether that level of
21  awareness of CV risk was any different than the group as
22  *discussed in Exhibit 59; is that fair?*
23    A.   I can't state with certainty.
24    Q.   One way or the other?
25    A.   Correct.

                                                        90

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.   They could be similar or they could be
2  dissimilar?
3    A.   Correct.
4    Q.   Any other way that Exhibit 41 supports your
5  opinion that the physicians who saw the detailed pieces,
6  Exhibits 28 and 29, remained misinformed about CV risks
7  of Vioxx?  Or have we now covered all the bases of that
8  opinion?
9    A.   I believe we have covered everything.
10    Q.   The second group of studies I think you
11  described as testing of promotion message recall.  Did I
12  get that right?
13    A.   Yes.
14    Q.   Very briefly, what does that mean?
15    A.   Actually, I want to call it an M.D. promotion
16  message recall because what it means is it's a study of
17  physicians to determine what they remembered the
18  salespeople telling them about Vioxx and Celebrex and
19  Bextra.
20    Q.   Doctors as opposed to users or patients?
21    A.   Correct.
22    Q.   And I believe the documents that you would refer
23  us to in this particular type of study would be Exhibits
24  55, 56, 58 and 48; is that correct?
25    A.   Well, also the MRK AJT 006750 document through

                                                        91

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  Page 62.
2    Q.   Okay.  I might have to resort to one of your
3  binders for that one.
4    A.   Yeah.  That describes the method.  It's at the
5  very end of the binder that has that.
6    Q.   Let's take it one at a time.  We will get to
7  that one.
8    A.   So which exhibits did you say?
9    Q.   I identified Exhibits 55, 56, 58 and 48.  Is
10  that complete--
11    A.   It looks like it.
12    Q.   -- inventory with the exception of the other
13  document?
14    A.   Looks good, yes.
15    Q.   Give me the number of the document again, the
16  one that's not in the exhibit to your report.
17    A.   MRK AJT 006750 to 62.
18    Q.   Which is the final tab in your new binder,
19    A.   That's the one that got lost when copies were
20  made.
21    Q.   First I want to understand what your opinion is
22  about this type of testing.  Okay?
23    A.   Okay.
24    Q.   Give me one minute.
25         As I understand it, Dr. Pechmann these are

                                                        92

UNCERTIFIED REALTIME ROUGH DRAFT

1  studies where physicians are being asked what they recall
2  about visits from sales representatives?
3      A.  Correct.
4      Q.  And what is your opinion about these studies?
5      A.  That a very significant number of physicians
6  state or recall that the sales rep told them that Vioxx
7  does not cause heart attacks.  Does not increase the risk
8  of heart attack or stroke and a very substantial number
9  also recalled the reps telling them Vioxx is safe to use
10  in the elderly.
11          And we have data for two years.  There is a year
12  in the middle where we weren't able to get the data.
13      Q.  All right.  Now, what is your criticism of that?
14  They found out this information, according to you.  What
15  is wrong with finding out that information?
16      A.  The sales reps were aggressively telling
17  physicians that Vioxx doesn't cause heart attacks when
18  they know -- this was already September '01 -- that there
19  was research to suggest that that was not true; that
20  Vioxx did cause heart attacks or had a significant
21  potential to cause heart attacks.
22      MR. CAMPILLO:  Could you read the response back,
23  please.
24      (The last question was read.)
25      THE WITNESS:  I would like to clarify.  When I

                                                    93

UNCERTIFIED REALTIME ROUGH DRAFT

1  said, "They" I meant Merck.  I don't know whether the
2  sales reps knew but Merck knew.
3  BY MR. CAMPILLO:
4      Q.  Okay.  So I gather your opinion is that they
5  shouldn't have been making those statements to the
6  physicians because it wasn't true?  Is it that simple or
7  is there something more to it that I'm missing?
8      A.  Right, that's it.
9      Q.  So your opinion assumes that it is true that
10  Vioxx does increase the risk of MI's and strokes?
11      A.  No.
12      Q.  No?  Okay.  If it wasn't known and it wasn't
13  believed that Vioxx increased the risk of MI's and
14  strokes, then what would be wrong with the sales reps
15  making those representations to physicians?
16      A.  That representation wasn't true.  They didn't
17  know that it didn't cause heart attacks.  There was at
18  least as much a likelihood if not a greatly likelihood
19  that it did cause heart attacks.
20      Q.  I'm just trying to understand your opinion.  So
21  your opinion is that it was unknown whether or not Vioxx
22  increased the risk of heart attacks in this time frame
23  and therefore, in your view, it would have been wrong for
24  the sales reps to make representations to the effect that
25  Vioxx decreased or did not increase the risk of heart

                                                    94

UNCERTIFIED REALTIME ROUGH DRAFT

1  attacks, because that wasn't known one way or the other?
2      MR. SKINOS:  Vague.  I interpose an objection
3  that it's a vague question.
4      MR. CAMPILLO:
5      Q.  Did you follow me?  I can restate it.  Let me
6  restate it because I want the record to be clear.
7          The research that you are referring to indicated
8  that the doctors recalled or some doctors recalled that
9  sales reps had said in substance that Vioxx did not
10  increase the risk of MI's and strokes, correct?
11      A.  Correct.
12      Q.  And that Vioxx was safe in the elderly?
13      A.  Correct.
14      Q.  Okay.  I want to talk about just the first one
15  first, the Vioxx increasing or not increasing the risk of
16  MI's and strokes, because they may be different.  Okay?
17  Are you with me?
18      A.  Yes.
19      Q.  And as to that first recall, if you will, that
20  physicians reported.  Your opinion is that that was
21  inappropriate for the representative to be making those
22  statements because at that time it was unknown whether or
23  not Vioxx did or did not increase the risk of MI's and
24  strokes; is that correct?
25      A.  Yes.

                                                    95

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.  Okay.  So anything else about this research that
2  you are critical about?
3      A.  You mean about the findings?
4      Q.  Yes, any other opinions that you have about the
5  results of this research and why you feel that this shows
6  some misconduct on the part of Merck.
7      A.  Yes.  The company's code is what people recall.
8  You see almost no one stating that the rep told them that
9  Vioxx could cause heart attacks.
10      Q.  Just the converse of what we just said?
11      A.  Exactly, yes.  Well, they could have told them
12  both.  They could have caused heart attacks, might not
13  have caused heart attacks.  People would have recalled
14  both but instead they just recalled the one.
15      Q.  If I understand this testing, it's asking the
16  doctors what they recalled.  That doesn't necessarily
17  mean, Dr. Fechmann that something was not said; it's
18  simply what the doctor recalled, correct?
19      MR. BRANDI:  Argumentative.
20      MR. O'CALLAHAN:  Compound.
21      THE WITNESS:  That is true.
22      MR. CAMPILLO:  Before we go on, one of you can
23  make objections but not both.  Take your pick.
24      MR. O'CALLAHAN:  I was making the objection on
25  behalf of Mr. Grossberg.

                                                    96

UNCERTIFIED REALTIME ROUGH DRAFT

1    MR. BRANDI:  I was making the objection on
2  behalf of Mr. Arrigale.  I actually thought
3  Mr. O'Callahan was working on something else.
4         MR. CAMPILLO:  I would one is going to be making
5  the objections?
6         MR. SKIKOS:  Go ahead.
7         MR. BRANDI:  Go ahead.
8         MR. CAMPILLO:  No.  I want to know who is going
9  to be making the objections.
10        MR. BRANDI:  Or what?
11        MR. SKIKOS:  Let's not have a fight.  I'm make
12  the objections.  Go ahead.  Argumentative and compound.
13        MS. CAMPILLO:  Could you read me the last
14  question back, please.
15        (The last question was read.)
16        THE WITNESS:  That is correct, but it's the
17  standard method of doing the research and Merck knew the
18  results.  So if they were concerned that people were
19  getting the wrong impression they could have told their
20  sales reps "Correct this problem."
21  BY MR. CAMPILLO:
22    Q.  Okay.  Thank you.  Now, anything else about that
23  part of the recall before we go to the elderly issue that
24  you are critical about?
25    A.  Well, I went through one month of data where we

                                              97

UNCERTIFIED REALTIME ROUGH DRAFT

1  had all the verbatim comments, we have a whole binder
2  from one of the companies.  And to see exactly what they
3  were saying about what the reps said.
4         So it wasn't just a coding.  It was their
5  actually comments, what they said.  And those are
6  summarized here.
7         I found a comparable number to what they were
8  reporting, 20 percent or one in five physicians recalled
9  that the reps saying that Vioxx didn't cause heart
10  attacks.
11        If you read the comments it's clear that's what
12  they were recalling; there's no cardiovascular risk from
13  using Vioxx, safe from a cardiovascular standpoint, safe
14  and effective and not associated with cardiac deaths,
15  does not cause heart disease.
16        So there is no problem with how the data are
17  treated.  It accurately reflects what people are saying
18  that they recall.
19    Q.  Okay.
20        And also there were some things that weren't
21  coded by the coders that I found striking.  A lot of them
22  said that the Merck representatives criticized the
23  studies concerning Vioxx's having a potential
24  cardiovascular risk, saying the studies were weak or the
25  that pros six hypothesis held that Naproxen was cardiac

                                              98

UNCERTIFIED REALTIME ROUGH DRAFT

1  protective, which the FDA stated they could not state.
2         So it looks like the reps were bad-mouthing any
3  study that indicated that there was a risk.
4    Q.  Okay.
5    A.  And you also had reps complaining about media
6  hype and saying oh, you know, it's just media hype.
7         "Merck felt that recent press about Vioxx was
8  inaccurate.  Vioxx is not cardiac protective but it
9  doesn't cause heart attacks.  No cardiac detriment.  Bad
10  reporting in the press.  Stroke issue not new.  Being
11  blown out of proportion."
12        So, in other words, there is even more evidence
13  that the reps were trying very hard to convey that there
14  was no risk, the one side of the story.  And they were
15  bad-mouthing the press and bad-mouthing other studies and
16  using the Naproxen hypothesis and so on to persuade these
17  physicians to believe there was no problem.
18    Q.  Did you see any data in the materials that you
19  looked at that asked the sales reps what kind of messages
20  they were conveying to physician as opposed to what
21  messages were being remember or what attributes were
22  being recalled by the physicians?
23    A.  Yes.  The call notes say that.  The call notes
24  are the notes from the reps.
25    Q.  Okay.

                                              99

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.  And they say in this case and other cases, they
2  frequently say vague things about safety.  But some of
3  them are quite explicit.  I think in some of the call
4  notes, as I recall, they state much of the same thing.
5  They said Vioxx doesn't cause heart attacks.
6    Q.  We will come to the call notes later.
7    A.  Okay.
8    Q.  Anything else about this group of studies or
9  this type of study that you have not already told us
10  about?
11    A.  Well, only one physician out of 166 said that
12  the rep told them that Vioxx might cause a heart attacks.
13    Q.  You are saying one physician recalled?
14    A.  Yes.
15    Q.  The second part of your original answer was that
16  physicians recalled being told that Vioxx was safe in the
17  elderly.
18    A.  Yes.
19    Q.  Okay.  And you believed that that should not
20  have been stated, if it was stated, because it wasn't
21  true?
22    A.  Correct.
23    Q.  Okay.  What basis do you have for saying that
24  Vioxx was not safe in the elderly?
25        MR. SKIKOS:  I'm going to interpose an

                                              100

UNCERTIFIED REALTIME ROUGH DRAFT

1  objection.  What Merck knew or should have known
2  questions were gone over very detailed by Andy Goldman in
3  the last deposition.  And her opinions relating to
4  medical causation versus what was done from a marketing
5  standpoint I thought were clarified at that last
6  deposition.
7      So to the extent that you're asking again for
8  what Merck knew or should have known, we have done that
9  in the last deposition.  I'm fine with you going through
10  the studies.  I'm willing to let you go even a little
11  longer to get this work done, but to rehash what Merck
12  knew or should have known from a marketing standpoint or a
13  marketing standpoint, that's what Mr. Goldman did.
14  BY MR. CAMPILLO:
15      Q.  Let me ask it this way, Dr. Pachmann.  Your
16  opinion is that the sales reps should not have made comments
17  to the effect that Vioxx was safe for the elderly, if
18  they made those statements, is based on because of your
19  belief that it wasn't safe for the elderly; is that true?
20      A.  It's based on the logic that I told you earlier
21  about the VIGOR study showing increased risk among people
22  with CV risk and there is a correlation between the
23  elderly and the CV risk, which many physicians point out
24  at various points in time.
25      Q.  Are there any documents that you have seen in

101

UNCERTIFIED REALTIME ROUGH DRAFT

1  connection with your work for this case and the other
2  cases that indicated that Merck had any information other
3  than what you just told us about your interpretation of
4  the VIGOR study that showed that Vioxx was not safe for
5  the elderly?
6      A.  No, not that I can think of.
7      Q.  Have we now covered all of the opinions that you
8  have that relate to the second type of study, the M.D.
9  promotion message recall studies?
10      A.  I believe I have covered everything.
11      Q.  Okay.  The third type of study that you
12  addressed I think you referred to as tracking behavior of
13  prescribers by looking at pharmacy records of new and
14  refills of prescriptions.
15      A.  Correct.
16      Q.  Is that a good way to summarize it?
17      A.  Yes.  I just called it behavioral prescription
18  tracking for short.
19      Q.  Okay.  And I understood from your direct
20  examination or by your response to Mr. Skakos' questions
21  in the Barnett deposition that these studies are
22  referenced or described in Exhibits 54 and 56.  Is that
23  true?  Or is that a complete listing?
24      A.  I have 56.  I have 47, 58, 54.  Did I read the
25  same ones that you had?

102

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.  I have 54 and 56.  And you had in addition to
2  that 47 and 58?
3      A.  58, yes.  And what was the other one?
4      Q.  I think you said 47.
5      A.  47, yes, because that's about the efficacy of
6  the guarantee program.  This is the behavioral tracking
7  of that program.
8      Q.  First of all I want to make sure I understand
9  what your opinion is.  First of all, I assume that
10  tracking sales of your product is not a bad thing in your
11  judgment,
12      A.  Correct.
13      Q.  So what is it about tracking the sales via
14  pharmacy records of prescriptions that you are critical
15  about?
16      A.  I'm not critical of the research at all, as you
17  point out.
18      Q.  Okay.
19      A.  What I am critical about is what the research
20  shows.  We have three years of data, very accurate data
21  because these are the actual records.  It's not
22  self-report.
23      And you see that the only time you get drops in
24  sales for the most part is when there is an external
25  factor, external party that discloses the cardiovascular

103

UNCERTIFIED REALTIME ROUGH DRAFT

1  risk such as the August 2001 Journal of the American
2  Medical Association article by Topol and The New York
3  Times article.
4      And so what you see is the market reacted when
5  they were told about the risks.  But Merck actually
6  states in the documents that they launched programs to
7  improve the situation to bolster sales and it shows
8  arrows for the various programs and show the line inching
9  back up, because people forget.
10      So what it indicates in people were being
11  informed mostly by external factors, not by Merck, and
12  that Merck then launched programs to improve sales, one
13  of these being the efficacy confidence program,
14      Q.  In your opinion, I gather, to launch programs to
15  increase sales is a bad thing?
16      A.  If by doing that you are neutralizing risk
17  perceptions and therefore misleading the public, I do
18  think that's wrong.
19      Q.  So assumed in your opinion or subsumed in your
20  opinion is that the perceptions -- well, strike that.
21      Let me hear her answer back, please.
22      (The last answer was read.)
23  BY MR. CAMPILLO:
24      Q.  So in general terms -- let's not talk about
25  Merck or Vioxx right now so I understand the comment or

104

UNCERTIFIED REALTIME ROUGH DRAFT

1  the point that you are making -- a company sees that the
2  market is going in the wrong direction for their product
3  and they launch a campaign to try to reverse that trend
4  and get the sales to go back to where they were or even
5  higher, that's what you do professionally, you advise
6  companies on people to do that, right?
7     A.  Absolutely.
8     Q.  And you teach students how to accomplish that so
9  they can work with clients on how to accomplish that?
10    A.  Exactly.
11    Q.  So that's not the part that's troublesome for
12  you, right?
13    A.  Correct.
14    Q.  What you are saying is that in your opinion
15  Merck was trying to change perceptions that were accurate
16  but that Merck wanted to change to something else?
17    A.  Correct.
18    Q.  All right.  So in other words, people felt X and
19  X was true and Merck wanted them to think something other
20  than X?
21    A.  Correct.
22    Q.  All right.  And that's why you are critical of
23  this?
24    A.  Yes.
25    Q.  Okay.  So in that opinion you are assuming that

105

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  X was true?
2     A.  No.  I'm assuming -- well, X meaning what was
3  true is Vioxx could have had a cardiovascular risk.
4  These attacks that came out as the press did not say it
5  a hundred percent did.  It just disclosed the possibility
6  that there was a significant concern that it could pose a
7  cardiovascular risk.
8          And so what people weren't told that it
9  definitely did cause cardiovascular risks, which you
10 would get plummeting sales like you see now with
11 Celebrex.  It isn't what the sales were before.
12         So what it did is it informed people that there
13 was a cardiovascular risk potential.  And what Merck then
14 did was launch programs to maximize awareness of that or
15 neutralize concerns about that.
16    Q.  Now, let me ask you this.  In the work that you
17 do for companies and clients of yours or in your
18 teachings to students who might be doing that in the
19 nature, if there is a misperception or bad press that's
20 not fair or accurate about your product it would be
21 appropriate for the company who makes that product to
22 launch a campaign to respond to misguided or misinformed
23 criticisms, correct?
24    A.  Yes.
25    Q.  So you are assuming here whatever was said in

106

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  the JAMA article that you made reference to or The New
2  York Times article that it was accurate and fair and it
3  would be inappropriate to try to affect whatever
4  perceptions those publications yielded?
5     A.  No.  What I'm saying is what was true was that
6  there was a significant cardiovascular risk and that
7  this -- risk potential and that these publications
8  managed to convey that information.
9     Q.  You are not assuming that whatever potential
10 risk is true and accurate for purposes of your opinion?
11    MR. SKIKOS:  I'm not sure I understand that
12 question.
13    THE WITNESS:  What I'm not saying is that I
14 could say for a fact that every single word in the
15 article was true.  What I'm saying is what the reserve
16 shows in that it conveyed to people that there was a
17 concern.
18         If you look at other research the rating on a
19 ten-point scale never dropped below six but it had been
20 up like eight and was dropping lower.  It should have
21 been at five, I guess, at 50/50 but lower than what it
22 was and it was way up much.
23         And what these publications managed to do was
24 convey that there was a concern.
25 BY MR. CAMPILLO:

107

---

UNCERTIFIED REALTIME ROUGH DRAFT

1     Q.  Let me ask, first of all, are there any other
2  events or external -- what did you call them?  I think
3  external publications, that yielded or caused sales to
4  drop other than the two that you have identified?
5     A.  Sometimes they put Wall Street Journal on there
6  but it didn't seem to have much of an impact.
7     Q.  Any others that you can think of?
8     A.  The label change.
9     Q.  The April 2 label change?
10    A.  Yes.
11    Q.  Okay.  Anything else that you have been able to
12 find in your work?
13    A.  In terms of reducing perceived risk and
14 increasing sales?
15    Q.  Yes.
16    A.  Not that I can think of.
17    Q.  Let's take them each at one time.  With regard
18 to The New York Times article, what was the program or
19 the strategy that Merck launched to address whatever
20 negative impact The New York Times article had?
21    A.  The launch confidence guarantee.  I mean,
22 efficacy confidence.
23    Q.  Is there a document that indicates that they
24 specifically implemented or launched the efficacy
25 confidence program or the efficacy guarantee program in

108

UNCERTIFIED REALTIME ROUGH DRAFT

1  response to The New York Times article or is that an
2  assumption you are making based on timing?
3      MR. O'CALLAHAN:  Objection; compound.
4      THE WITNESS:  In describing the efficacy
5  confidence they state that they are trying to increase
6  the physicians' and the sales reps' confidence in the
7  drug.
8  BY MR. CAMPILLO:
9      Q.  I understand that.
10     A.  That's basically how they word it.
11     Q.  Can you point us to any document, any exhibit
12  that would indicate or you interpret as saying -- well,
13  first of all, that says in substance that the efficacy
14  confidence program was implemented to respond to The New
15  York Times article or the effect of the New York Times
16  article?
17     A.  What I can state is that in this one exhibit,
18  which is Exhibit 54, it states "The 2002 promotional
19  campaigns for Vioxx lead to new prescription volume
20  rebounds" and then the campaigns are listed as efficacy
21  confidence, Divide and Conquer and Project Jump Start.
22     Q.  Is there any reference in Exhibit 54 that this
23  is in response to The New York Times article?
24     A.  No.  That's from the other exhibit where they
25  did research over the summer and they found that there

109

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  was this mounting concern.  And that was right before
2  they launched it.  And they said we need to prevent
3  movement off center or whatever it was.  And then we got
4  the efficacy confidence.
5      So in this document it says that the campaigns
6  have led to the volume rebounds and it implies very
7  strongly that that was the goal of the campaign.
8      Q.  I'm trying to try to ask very specifically
9  whether you can point us to any document that would
10  indicate that the efficacy confidence program was
11  implemented specifically or at least in part to deal with
12  The New York Times article publication that you made
13  reference to.
14     A.  The research did not specifically cite New York
15  Times.  It just said that there was a concern.
16     Q.  Now, the same question as to the August '03 JAMA
17  article.  Can you point us to any document, any exhibit
18  before us among all the boxes that we have here that
19  would indicate that the efficacy confidence program was
20  implemented in part or as a whole to respond to the
21  publication of the JAMA Topol article?
22     A.  No.  It just said it was in response -- I mean,
23  that there was concern.
24     Q.  Isn't it true that any time a company has
25  concern about sales dropping, that they will consider

110

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  implementing programs, because they care about their
2  product, to get the sales back up?
3      A.  Yes, as long as they are not misleading or
4  deceptive programs.
5      Q.  I want to know if you can point us to anything
6  that would suggest to you that the -- well, not suggest
7  to you.  That states in substance that the program was
8  implemented either because of the New York Times article
9  or the JAMA article.
10     A.  Well, I think that this figure clearly, at least
11  very strongly, I am price that that was the point.
12     Q.  Okay.  Which one implies that?
13     A.  Exhibit 54.
14     Q.  Do you have a page reference there?
15     A.  It says Page 31 and 45.  So it's one of those
16  two pages.
17     Q.  Okay.  Page 31 --
18     A.  It says the promotional campaigns lead to volume
19  rebounds.  I mean, it states that.
20     Q.  Can you go to Page 31.  Here is 54 (handing).
21     A.  So I'm looking at Exhibit 54, Page 31?
22     Q.  You said 31 and 45.
23     A.  Yeah.  That's the label change and that's the
24  increased resources.
25     Q.  We will come to the label change in a minute.

111

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  Right now we are on the low pop JAMA article and The New
2  York Times article.
3      A.  Yes.  So I'm talking about 30 and 31, Pages 30
4  and 31.
5      Q.  Okay.  Can you describe what you see on Page 30
6  that to you is a strong indication that the confidence,
7  its efficacy confidence program was implemented in
8  response to the effect of the JAMA Topol article or the
9  New York Times article?
10     A.  Well, actually I think the best one is Page 45.
11     Q.  First of all, is there anything on Page 30?
12     A.  I think 30.  Total share for Vioxx has
13  stabilized following label change and increased
14  promotional resources.  So what it is indicating is they
15  put in new resources to stabilize the decline.
16     Q.  Okay.  I'm just trying to keep faux us cased.
17  And I know you are trying to be helpful, so I'm not being
18  critical at all.
19     A.  Okay.
20     Q.  I think you said something about Exhibit 54,
21  Pages 30, 31 and 45 that was a strong indication to you
22  that the confidence, efficacy confidence program was
23  implemented in response to the JAMA article and The New
24  York Times article, correct?
25     A.  Yes.  And what I'm saying is, the answer to that

112

UNCERTIFIED REALTIME ROUGH DRAFT

1   question here is the heading and the little arrow
2   pointing to increased resources.  So it is stating
3   that -- and the arrow showing the JAMA, the drop from
4   JAMA.
5         So you see a drop from JAMA and then you see
6   this heading saying -- but it managed to stabilize it by
7   putting in resources.  Well, I think that pretty clearly
8   implies that they put in the resources because of the
9   problems.
10        Q.   Okay.  The reference to resources, if I'm
11  reading this chart appropriately, seems to be in the
12  September '02 or August '02 time frame; am I correct?
13        A.   August.  It's the efficacy confidence program.
14        Q.   August of '02?
15        A.   Yes.
16        Q.   When was The New York Times article published
17  that you referenced before?
18        A.   I think New York Times was May.
19        Q.   Of what year?
20        A.   Of '02, I believe.
21        Q.   Do you have anything that would identify that?
22        A.   Wait a minute.  New York Times.  I have Exhibit
23  4, May 2002.
24        Q.   Okay.  Let's assume that to be the case.  When
25  was the Topol article published in JAMA?

                                        113

UNCERTIFIED REALTIME ROUGH DRAFT

1         A.   8/02.  Wait.  Now.  There is something wrong
2   with this.
3         Q.   I will represent to you that it was published in
4   the fall of 2001.
5         A.   Yes.  This is wrong.
6              MR. SKIROS:  That's what it says on the graph.
7              THE WITNESS:  They have it wrong.  Gees.
8   BY MR. CAMPILLO:
9         Q.   On what do you base your opinion that the
10  efficacy confidence program that was implemented in
11  August of '02 was in response to the publishing of the
12  August '01 JAMA article by Topol?
13        A.   Well, I told you.  I don't know what else I
14  could say other than the fact that they said they put in
15  increased resources and now things have stabilized.  And
16  so the implication is they put in the resources to
17  stabilize the problem which began with JAMA.
18             And I think there are some other power points
19  that make this explicit, too.  And for why it took a
20  whole year, having worked on these campaigns, it takes a
21  while.  I mean, you can't just come up with a program,
22  It had to be approved, it had to be tested.  You can't
23  just launch something within three months.  I mean, a
24  year is good.
25        Q.   If I'm reading this graph correctly, still on

                                        114

UNCERTIFIED REALTIME ROUGH DRAFT

1   Page 30, the market share of Vioxx actually continued to
2   decline and flattened out at around 38.8 percent but
3   didn't go anywhere close to where it had been at the time
4   before, which was above 48 percent, correct?
5         A.   Correct.  It went up slightly.  It's not the
6   total share.  The new share showed increases.  Not back
7   up to the original.
8              I think you can see that on Page 31, yes.
9         Q.   Can anything else in your judgment, in your
10  opinion that Merck implemented other than the efficacy
11  confidence program that you believe was done directly in
12  response to the three events that you have discussed;
13  that is the JAMA article in August '01, the label change
14  in April '02 and The New York Times article in May of
15  '02?
16        A.   Yes.  I do think there were other events that
17  occurred.  If you look on Page 45 you'll see them.
18        Q.   My question is what other programs did you
19  implement.
20        A.   Yeah.  That's on Page 45.  Project offensive is
21  one thing they launched right after the JAMA that is
22  shown here.
23        Q.   Okay.  What was that?
24        A.   That's something I reviewed a couple of months
25  ago so I can't remember it.  I don't have a lot of

                                        115

UNCERTIFIED REALTIME ROUGH DRAFT

1   information on it but it was promotional campaign to get
2   people excited.
3         Q.   As you sat here now do you recall what the
4   program was?
5         A.   I can't at the moment.
6         Q.   Okay.
7         A.   But I do remember reading quite a bit about it.
8         Q.   Okay.  What else did Merck do other than the
9   efficacy confidence program?
10        A.   Well, they also did this divide and concur and
11  project jump start.  I couldn't find anything on Divide
12  and Conquer but I did read some information about Jump
13  Start.
14        Q.   Did you have any knowledge whether or not Divide
15  and Conquer was anything that was ever implemented as
16  opposed to perceived?
17        A.   Oh, no, these were implemented programs.  Divide
18  and Concur, I don't know.  Project Jump Start I heard
19  described and it was clearly implemented as a project.
20             MR. SKIROS:  It looks like it says Divide and
21  Conquer if you look at the top.  It's obvious.
22             THE WITNESS:  It certainly looks like it was
23  implemented.
24  BY MR. CAMPILLO:
25        Q.   Let me ask you with respect to any of these

                                        116

UNCERTIFIED REALTIME ROUGH DRAFT

1  programs that you believe were implemented to respond to
2  the publication in JAMA, the VIGOR label change or the
3  New York Times article where you can specifically point
4  us to something that says that they were implemented for
5  that reason?
6      A.   Just figures like this.
7      Q.   Where you are surmising the intent from
8  something else?
9      A.   Like I said, I think it's very strongly
10 suggested, yes.
11     Q.   Is there anything you can show us, you can point
12 us to where it actually said that Merck implemented any
13 of these programs in part or in full as a result of the
14 events that you have identified, the JAMA article, The
15 New York Times article and the label change?
16     A.   I didn't -- can't point you to any right now but
17 there may be some.
18     Q.   And you would agree, Dr. Rechmann that there
19 were events in this time frame such as the entry of
20 Bextra into the market and other events unrelated to the
21 three that you have identified that affected Merck's
22 Vioxx market share?
23     A.   I agree with that.
24     Q.   Do you have any criticism of Merck attempting to
25 minimize the loss of market share by the entry of other

117

UNCERTIFIED REALTIME ROUGH DRAFT

1  products into the market or other events that may occur
2  that may affect their sales?
3      A.   No, but I have -- I am very troubled by the fact
4  that they could see improvement on the safety attributes.
5      Q.   Okay.  What do you mean by that?
6      A.   That when they launched the efficacy confidence
7  program, that there were these improvements on safety
8  attributes.
9           MR. SKIKOS:  You mean perceptions?
10          THE WITNESS:  Exactly.  Safety attribute
11 perceptions.
12 BY MR. CAMPILLO:
13     Q.   What document, in your judgment, indicates that
14 there were changes in the attribute perceptions of
15 physician after these programs?
16     A.   The document we were looking at earlier.
17     Q.   Which one is that?  Is that 48?
18     A.   47.
19     Q.   Are we still --
20     A.   That was a prior study.  You know, that was a
21 prior type of study.
22     Q.   What do you mean by "prior"?
23     A.   This is tracking the behavior.  The prior study
24 we talked about was tracking the attribute perceptions.
25 So we talked about this in the context of the other

118

UNCERTIFIED REALTIME ROUGH DRAFT

1  study.
2      Q.   You said 47 as opposed to 48?
3      A.   47 is what I have here.
4      Q.   Okay.  I'm sorry.  What is it?
5      A.   We went through all of these -- well, maybe it
6  wasn't clear at the time.  There are a series of power
7  points that indicate that perceptions of Vioxx relative
8  to Celebrex improved.  Remember, I said one was rated the
9  same whereas before people had rated Vioxx inferior,
10 unsafe for the elderly and MI stroke.
11          So basically what I'm saying is this program
12 affected safety perceptions and that was what they had
13 identified the summer before as being the problem.
14     Q.   I'm sorry.  I don't mean to interrupt you but
15 when you say "this program affected perceptions" --
16     A.   Efficacy confidence.
17     Q.   Affected perceptions about safety?
18     A.   The physicians' perceptions, yes.
19     Q.   Okay.  Is there something after the
20 implementation of the efficacy confidence program that
21 looks at any changes over time in the perceptions of the
22 physicians?
23     A.   Yes.
24     Q.   Okay.
25     A.   I think the most important one is the month in

119

UNCERTIFIED REALTIME ROUGH DRAFT

1  which it was launched, because having had experience in
2  this, that's the time when you're going to see the big
3  improvement, if there is going to be one.
4      Q.   And what month was this launched?
5      A.   August.
6      Q.   All right.  And you're saying that Exhibit 47
7  shows a change in the perceptions of physicians in
8  September of 2002?
9      A.   No.  In August.
10     Q.   The same month that it was launched?
11     A.   That's what it should be, yes.
12     Q.   Show me where in Exhibit 47 it shows this
13 increase in August of 2002 and the perception of the
14 physicians.
15     A.   Okay.  How would I best show you this.  I still
16 have your copy.
17     Q.   That's an extra one.  Page 8?
18     A.   Yes.  The interesting thing is there is no
19 change in efficacy perceptions.  Even though it is
20 called efficacy confidence program it was affected
21 efficacy of safety.
22          So Page 8 on the top and the bottom, Page 9 the
23 top and the bottom.  These are really bad copies.  Page
24 10, the top and the bottom.
25     Q.   What is the change that you are referring to in

120

UNCERTIFIED REALTIME ROUGH DRAFT

the safety perceptions of physicians in August.

    A.    Okay.  So it says on Page 8 "In August more
physicians rated Vioxx and Celebrex equally on the MI
attribute which could have contributed to the narrowing
of the new shared gap between Vioxx and Celebrex," which
meant that Celebrex was way ahead and now Vioxx is
catching up.

    Q.    You are assuming, are you not, Dr. Fechmann,
that whatever change there was in August of 2002 in that
particular measurement was somehow relate to the
implementation of the efficacy confidence program?

    A.    Yes.  And plus they said that, too.

    Q.    Okay.  Where did they say this was due to the
efficacy confidence program's implementation?

    A.    I'm not sure I could put my finger on it right
now.

    Q.    Are you confident that is one document or more
than one document that said in August of 2002 in the
perception of physicians that the safety of Vioxx was due
to the implementation of the efficacy confidence program?

    A.    That's what I recall reading, yes.

    Q.    In one of the documents you have identified in
this deposition?

    A.    Yes.

    Q.    Okay.  If it's not in the exhibits that -- in

121

UNCERTIFIED REALTIME ROUGH DRAFT

the binders, then --

    A.    They are in the boxes.  It might be in the
report.

    Q.    Take a minute to see if you can find it.

    A.    This is important.

          (Witness reviews document.)

    MR. O'CALLAHAN:  Let me just put on the record
that we are past the three-hour mark now, well past it.
How much longer do you expect to go?  Ralph, how much
longer do you expect to go?

    MR. CAMPILLO:  I'm looking at my notes to see if
I can try to give you an estimate.  I would say probably
another hour.

    MR. O'CALLAHAN:  Let's go off the record for a
second.

    MR. CAMPILLO:  Sure.

          (Recess taken.)

BY MR. CAMPILLO:

    Q.    Dr. Fechmann when we took the break I think you
were trying to find a document that may indicate that the
change in perceptions concerning the safety of Vioxx had
improved in August of 2002 as a result of the
implementation of the efficacy confidence program.

    A.    Yes.  And I haven't been able to -- I wasn't
able to identify that document.  I think it exists,

123

UNCERTIFIED REALTIME ROUGH DRAFT

although it's also possible that I just put two and two
together and inferred that.

          It could be in my expert report and it could be
in quotes.  But rather than spending another five minutes
looking for it, maybe we could move on.  It may be in my
expert report and it would be in quotes.

    Q.    I will look at the expert report later.  That's
fine.

          Let me ask you this.  Do you know what date the
efficacy confidence program actually started?

    MR. O'CALLAHAN:  Ralph, I'm going to interrupt
you to say we are going to go until 7:00.  I'll give you
another half an hour.

    MR. CAMPILLO:  I'll do my best.  Thank you.

    THE WITNESS:  I cannot recall the date right
off, but I would believe it's in the materials.

BY MR. CAMPILLO:

    Q.    Do you know when the survey that's reflected in
Exhibit 47, when the actual questions for the August time
frame are posed to the physicians?

    A.    That's a good question.  Let's see.  The
behavior is tracked on a continual basis, so some of the
graphs were behavior.  The attribute tracking is
described -- it doesn't say here.  It just says
interviews occurring every month.

123

UNCERTIFIED REALTIME ROUGH DRAFT

    Q.    So you have no specific knowledge as you sit
here today when the interviews were conducted, correct?

    A.    Correct.

    Q.    Switching on study type No. 4, which I think we
have discussed indirectly, as described in your
deposition testimony as attribute tracking studies of
physicians or AMA attribute tracker.

    A.    Yes, uh-hmm.

    Q.    This is where physicians are selected from a
panel at random and then questioned about certain things?

    A.    Yes.

    Q.    And what opinion do you have about these if I
can types of studies conducted by Merck or for Merck?

    A.    Let me just clarify that it's a random sample,
so it's not panelists technically.

    Q.    Okay.

    A.    A panelist is someone who is agreed is a
priority.

    Q.    So randomly selected by the vendor who is doing
this work?

    A.    Yes.  So basically they identified the groups
they were interested in and the company would contact
physicians at random from those.

    Q.    If I understood your testimony before, it was
that somehow the attributes of actual importance were

124

UNCERTIFIED REALTIME ROUGH DRAFT

1  different than the attributes of stated importance.
2      A.  Correct.
3      Q.  Can you in lay terms explain to me what that
4  means.
5      A.  Yes.  The doctors were asked to rate the
6  importance on a ten-point scale, I believe.  They rated
7  each brand on each attribute and then they indicated the
8  prescribing, so you could run a regression analysis, a
9  simple regression, to see what actually affected
10  prescribing as opposed to what they said was affected
11  prescribing.
12      Q.  What are you referring to what led the physician
13  to actually prescribe it?
14      A.  Statistical analysis.  So if they said that safe
15  for the elderly was the least important attribute but
16  every brand -- when a brand was rated high on safe for
17  the elderly they prescribed it and if a brand was rated
18  low on safe for the elderly they never prescribed it.
19  And the best predictor of their prescribing was how that
20  brand was rated on that attribute.
21          It's not the least important.  It's in fact the
22  most important.  So that's how it's done.  Does that make
23  sense?
24      Q.  Honestly?
25      A.  It's a statistical comparison where they -- I

125

UNCERTIFIED REALTIME ROUGH DRAFT

1  don't know how to describe it.  Where they see the actual
2  behavior and see how they rated the brands.
3      Q.  Maybe you can't answer this, but how does a
4  study identify why the doctor wrote the prescription
5  without asking the doctor for a given prescription?  What
6  led you to write this prescription?
7      A.  As I said, if they have the doctors' opinions
8  about all the brands and then they know what the doctor
9  actually prescribed, then they link the opinion to actual
10  behavior.
11      Q.  But knowing the intent of the physician at the
12  time they write the prescription?
13      A.  Because they collect the data at the same time.
14      Q.  You mean they ask the physician why are you
15  writing the prescription?
16      A.  No.  They say give us your records on
17  prescribing for this past time period and rate these
18  brands.  See, because if they ask them, then you run into
19  the problem of finding them.  People say one thing is
20  important but another thing ends up being important.
21      Q.  I think your opinion is that somehow Merck used
22  the efficacy confidence program again, the program we
23  have been talking about to some extent, to direct the
24  attention of the physicians to the attributes of actual
25  importance versus the attributes of stated importance; is

126

UNCERTIFIED REALTIME ROUGH DRAFT

1  that correct?
2      A.  No.
3      Q.  That's not your opinion?
4      A.  Uah-uh.
5      Q.  Okay.  Then you state it, please.
6      A.  Okay.  So my opinion is that they started doing
7  the sophisticated type of research, which is difficult to
8  explain, to be able to infer why people were prescribing
9  at the same time they were giving their prescribing
10  records they asked them to rate their opinion of each
11  brand and then through statistical techniques were able
12  to tell which opinions really mattered.
13          So the opinion about edema, the opinion about
14  safe for the elderly and effectiveness, they found -- and
15  they did this for a couple of years, actually, and they
16  found grad actually the attributes that were
17  differentiating between -- that was causing people to
18  choose between Vioxx versus Celebrex was not efficacy but
19  safety, despite the fact that they said efficacy was the
20  most important thing.  In fact safety was.
21          So from that they concluded we've got to do
22  something about the slippage.  And also they were seeing
23  a slippage in the safety of Vioxx and a reduction in sale
24  of Vioxx, especially new prescriptions of Vioxx.
25          So they said gees, we need to fix that.  And

127

UNCERTIFIED REALTIME ROUGH DRAFT

1  right after that is when they launched the program.
2      Q.  Is at your opinion, if I'm reading between the
3  lines, that by focusing on the efficacy by using the
4  efficacy confidence program, that in a sense it
5  distracted the attention of the physician from safety
6  issues to efficacy issues?
7      A.  No.
8      Q.  That's not your opinion?
9      A.  No.  What actually happened is it created the
10  perception that it was safe because you were giving a
11  money-back guarantee.  So that's like pretty much any
12  guarantee creates perceptions of higher quality.  And
13  here the quality perceptions that were weak were the ones
14  with regard to safety, so those were the ones you would
15  most expect to improve.
16      Q.  So you are saying they conceived that by saying
17  we're going to give your money back if the product didn't
18  help your pain, that that led the physicians to believe
19  that the product was safer?
20      A.  Well, they didn't say if it didn't relief your
21  pain.  What they said is satisfaction guaranteed or your
22  money back.  That's what they told the consumers and
23  that's what most of the ads said for physicians.  In the
24  time principle for physicians it said pain.  But with the
25  consumers it was just any problem satisfaction to get

128

UNCERTIFIED REALTIME ROUGH DRAFT

1  your money back.
2      Q.   For any reason you are not satisfied, let us
3  know and we will give you your money back?
4      A.   Right.
5      Q.   What is your criticism of that program?
6      A.   I mean, in general I'm not critical of that type
7  of program but what I'm saying is that here what they
8  were doing was trying to neutralize safety concerns and
9  create the perception that we stand by this product, that
10  we stand firmly behind the product in its entirety.
11         And the part of the product that was weak was
12  the cardiovascular perception.  So that was the part that
13  improved.  And, likewise, you saw improvements in sales
14  because what were driving sales were the safety
15  perceptions.
16      Q.   And how are you able to measure that --
17         Can you read the answer back.
18         (The last answer was read.)
19  BY MR. CAMPILLO:
20      Q.   Did you see any indication anywhere that Merck
21  was not standing behind Vioxx from the moment it put it
22  on the market until the time it was drawn?
23         MR. SKIKOS:  Vague.  Objection.
24         You can still answer.
25         THE WITNESS:  I didn't see indications of that.

129

UNCERTIFIED REALTIME ROUGH DRAFT

1  I saw every indication that they did stand behind hair
2  product.
3  BY MR. CAMPILLO:
4      Q.   All right.  So --
5      A.   Having an efficacy confidence program is
6  aggressive.  It's a very strong signal to the market.
7      Q.   That, I understand, too.  I'm trying to
8  understand how the implementation of the efficacy
9  confidence program was an effort, as you said, to
10  neutralize safety concerns.
11      A.   Because what we know is when you offer a
12  guarantee it reassures people about the parts, the
13  attributes of the product that they are worried about,
14  whatever those happen to be.  That's what a guarantee is
15  designed to do, to give a signal that you don't have to
16  worry because you can buy the product with confidence, no
17  problem.
18         So if you -- people know that the company would
19  not offer a guarantee if the product was crappy because
20  they would go out of business and everyone would return
21  it.
22      Q.   Okay.
23      A.   So the whole idea is to reassure people,
24  especially about things for which they can't directly
25  observe problems.  It might be not identifiable.  It

130

UNCERTIFIED REALTIME ROUGH DRAFT

1  might not happen for a long period of time or whatever
2  ever.
3         So they use that technique which is well
4  established and well known in a very unique context
5  because it's not very common at all to say have money 0
6  back guarantees for prescription drugs, and it sent a
7  very strong signal to the physicians and you could see it
8  in the data.
9      Q.   Can you point us to any exhibit to your report
10  or any documents here that we have here that indicate
11  that Merck's purpose for I an me. ing the efficacy
12  confidence program was to neutralize safety concerns?
13      A.   I think we went through that.  I said that -- I
14  kind of went through the documents that we talked about
15  before.
16      Q.   We are talking about a different type of study,
17  I believe.  Is it the same document?  Is that what you're
18  saying?
19      A.   Yeah.  We jumped into this study and back to the
20  other study.  I was talking about a variety of studies
21  when I answered that question before.
22      Q.   Let me ask it this way.  Can you identify any
23  documents that we can point to right now that indicate
24  that the efficacy confidence program was implemented to
25  neutralize the safety concerns which had been identified

131

UNCERTIFIED REALTIME ROUGH DRAFT

1  via the sophisticated studies that sought were to infer
2  the real reasons why the people prescribed the
3  medication?
4      A.   The graphs that I showed you that showed
5  increased resources.
6      Q.   That's it?
7      A.   Those are the ones I can identify right now.
8      Q.   Are there any documents that have words in
9  substance that indicate this is being done to neutralize
10  safety concerns, either in that phrase or any other
11  phrase?
12         MR. SKIKOS:  You mean the efficacy safety
13  programs as opposed to the whole integrated marketing?
14         MR. CAMPILLO:  Correct.
15         MR. SKIKOS:  Because you already answered about
16  integrated marketing.
17         MR. CAMPILLO:  Correct.
18         THE WITNESS:  The documents that prescribed that
19  had the objectives did not state that explicitly
20  BY MR. CAMPILLO:
21      Q.   Have we covered all the opinions that you
22  anticipate expressing concerning the sophisticated
23  studies done to infer the real attributes for physicians
24  prescribing Vioxx and your criticisms thereof, of how
25  that was used?

132

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1        A.   With regard to that sophisticated study, I have
 2   stated everything I can think of that I want to state.
 3   This type of study yielded other data as well, and so I
 4   have opinions about the other results of this type of
 5   study.  He didn't just do sophisticated analysis.  They
 6   did some basic analysis, too.
 7        Q.   What other opinion do you have that relates to
 8   these studies?
 9        A.   They tracked over time the ratings of Vioxx on
10   an increased risk heart attack, stroke and safety of the
11   attribute and compared year to year and month to month
12   for three years and showed that overall ratings on both
13   of those attributes remained very high through -- let's
14   see.  I think mid-2003 is where I stopped.  We couldn't
15   find any data after that.  Actually as late as December
16   of 2003.
17        Q.   What exhibit, if any, are you referring to?
18        A.   Okay.  So let's see.  One exhibit is MRK AD
19   00194820.
20        Q.   Which is contained in tab 26 of Exhibit 10?
21        A.   Page 48, 49.
22        Q.   An orthopedic program for Vioxx?
23        A.   Is that the right page?
24        Q.   Give me the Bates number again.  I'm sorry.
25        A.   MRK AD 019 -- I'm sorry.  MRK AD 00194820, Page
```

                                                        133

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1   48.  Is it a bag exhibit?
 2        Q.   Uh-hmm.
 3        A.   Okay.
 4        Q.   I'm looking at Page 48.  Why don't you take a
 5   look and see if maybe Page 48 is the wrong reference.
 6        A.   Where are you finding the page numbers?  There
 7   are no page numbers on this.
 8        Q.   There is a small number at the bottom.
 9        A.   I think I hand counted these numbers.  That's
10   why.  Let me see if I can find it.
11             Yeah, here it is.  That's this page.
12        Q.   Why don't you tell us what the number is on the
13   bottom, just the last five digits.
14        A.   4869.
15        Q.   May I see that?
16             (Document handed to counsel.)
17   BY MR. CAMPILLO:
18        Q.   Can you tell us what the significance of this
19   is?
20        A.   Even as late of September '03 you still have
21   reasonably high ratings and there is no indication that
22   there is a consistent trend down.  So, in other words, we
23   have three years of this data we can put all together and
24   it declined maybe one point in the entire time.
25             So there is no clear trend.  If Merck was
```

                                                        134

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1   disclosing this as a concern you would see a big, you
 2   know, decline from the minute they start doing it.  You
 3   would see a big decline.  And you don't see that.  You
 4   see it kind of bouncing around.
 5        Q.   If Merck had done what?
 6        A.   Had stated, had conveyed there was a possible
 7   risk of heart attack or a stroke.  You would see a very
 8   different pattern.
 9        Q.   That's an assumption you are making or
10   conclusion you are reaching?
11             MR. SKIKOS:  That was answered in the last
12   deposition.
13             MR. CAMPILLO:  I don't recall any discussion of
14   this particular document at all.
15             MR. SKIKOS:  Whether it was known or should have
16   been known.
17             MR. CAMPILLO:  That's not what I'm trying to do.
18        Q.   You are saying the fact that this exhibit, which
19   is in tab 26 of Exhibit 10, that shows that the ratings
20   of Vioxx did not decrease significantly over time somehow
21   shows that Merck did something wrong?
22        A.   It shows they did not have a campaign to
23   disclose the risk.
24        Q.   So is it your opinion they should have had a
25   campaign that disclosed the risk?
```

                                                        135

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1        A.   Yes.
 2        Q.   What risk, in your opinion, should Merck have
 3   been advising physicians of?
 4        A.   The risk of heart attack from the VIGOR study.
 5        Q.   Is it your position that nowhere did Merck
 6   advise physicians of the results of the VIGOR study
 7   before December of 2003?
 8        A.   They did advise them of the results of the VIGOR
 9   study but in such a way to reassure physicians that it
10   wasn't a problem.  For example, they focused on the four
11   percent of patients that were very high risk and should
12   have had aspirin and said if you look at everyone else it
13   was a nonsignificant change in risk.  And the FDA advisor
14   panel said that that type of analysis was not valid.
15        Q.   Have you read the findings of the advisory
16   committee that looked at Vioxx and the VIGOR data in 2001
17   and which ultimately led to the change of the label?
18        A.   Yes.
19        Q.   Okay.  And it's your testimony that you believe
20   that Merck did not put out the information to physicians
21   consistent with what was recommended by that advisory
22   committee?
23        A.   Yes?
24        Q.   Okay.  And is that based on anything other than
25   your comparison of reviewing the advisory committee
```

                                                        136

UNCERTIFIED REALTIME ROUGH DRAFT

1  materials and looking at the label from April '02?

2      A.  Well, it wasn't just the label.  Looking at the

3  detailing pieces that they gave physicians, the CV card,

4  the letters that they sent out, the dear doctor letters,

5  solicited and unsolicited.

6          Those materials contained information that an

7  advisory report was described as invalid.  And also the

8  FDA warning letter had more information about that.

9      Q.  Let's start in April of '02.  Are there any

10 materials that were promulgated, distributed, used by

11 Merck, to your knowledge, after April of '02 that in your

12 opinion is contrary or inconsistent with the advisory

13 committee's recommendations?

14     A.  Yes.

15     Q.  Okay.  Which pieces?

16     A.  That's why I prepared this chronological list.

17     Q.  I just want you to identify the pieces without

18 necessarily any discussions so we can try to get this

19 moved along as much as we can.

20     A.  Which date do you want to talk about?

21     Q.  After April 9th of 2002.

22     A.  Okay.  You can see the ones.  So there was a

23 bulletin on how to present the label change, which is

24 also related to the Cannell PowerPoint.

25     Q.  Which page are we looking at?  Because we don't

137

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  need to go into it in detail.

2      A.  Anything after the April '02 label change.

3      Q.  So there are four items on your list, correct?

4      A.  Well, let's see.  For this year there's three

5  and this year there's four.  And that's it.

6      Q.  Okay.  Just so we can inventory what you're

7  talking about, there are three items, the April 11

8  bulletin to the sales reps.

9      A.  Yes.

10     Q.  There is the power point by Mr. Cannell in 2002?

11     A.  Yes.

12     Q.  And there is an August of 2002 -- well,

13 implementation of the efficacy confidence program?

14     A.  Yes.

15     Q.  And you are saying there are representations in

16 each of those which are inconsistent with the

17 recommendations of the advisory committee from 2001?

18     A.  Yes.

19     Q.  That's also true for the three items on the next

20 page, which are the first quarter 2003 --

21     A.  Well, four items.

22     Q.  I'm sorry.  I misread it.  But the first one is

23 two detailed pieces.  Are those the same ones we have

24 talked about, 28 and 29?

25     A.  I believe those were the numbers.

138

---

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.  Okay.  And the next one is --

2      A.  The obstacle response guide, which basically

3  refers back to that same April 11, 2002 bulletin.

4      Q.  Okay.  Is there a dear doctor letter -- the one

5  you are referring to specifically, the one to Dr. Mikola?

6      A.  Yes.

7      Q.  And you believe that that letter, whatever it

8  was, since I don't know what it is, was inconsistent in

9  some way with the advisory committee recommendation from

10 2001?

11     A.  Yes.

12     Q.  And then the fourth one is -- you are really

13 talking about the bulletin and the --

14     A.  Related to the bulletin is the -- attached to

15 the bulletin is the obstacle handlers.

16     Q.  I just want to make sure we have the inventory.

17 In terms of material that would have disseminated to

18 physician, we are talking about the bulletin and the

19 attached materials?  Go ahead.

20     A.  Those were sent to the sales reps who then used

21 it with physicians.

22     Q.  That's what I'm trying to identify, the material

23 that went to the physicians.

24     A.  Oh, the physicians directly.

25     Q.  You are referring to whatever was attached to

139

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  the bulletin that the sales reps were supposed to or

2  could use.

3      A.  Yes.

4      Q.  That's one item.  Secondly, you are talking

5  about the two detailed pieces, Exhibits 28 and 29.

6      A.  Yes.

7      Q.  And any dear doctor letters such as the one that

8  went to Dr. Mikola?

9      A.  Yes.

10     Q.  Is there anything else that would have gone to

11 the physicians?

12     A.  The efficacy confidence ads.

13     Q.  And the efficacy confidence ads as a class?

14     A.  Yes.

15     Q.  Okay.  So those four items are the ones that you

16 are based your opinion on that Merck was making

17 statements after April of 2002 which were inconsistent

18 with what the advisory committee had recommended in 2001?

19     A.  There could be others but those are the main

20 ones.

21     Q.  Well, are there any others that you are basing

22 your opinions on in this case?

23     A.  There could be something in the report that

24 would be clearly labeled with a date, but when I went

25 through my notes this morning, these are the ones I wrote

140

UNCERTIFIED REALTIME ROUGH DRAFT

1   down.

2      Q.   And then are, then, the items in your opinion
3   that were used by Merck to reinforce, improperly
4   reinforce decisions on the safety attributes of Vioxx?

5      A.   Yes.

6      Q.   Any other basis upon which you base that opinion
7   besides these four documents or categories of documents?

8      A.   Well, the research.  I mean, the research we
9   have been talking about also has led me to the
10  conclusion.

11         So I looked at the materials and then I looked
12  at all the research.

13     Q.   In terms of documents or materials that would
14  have been used out in the field, shown and given to a
15  physician, can you identify anything else?

16     A.   Well, the detailed pieces that we saw.  I think
17  Exhibits 28 and 29, there were other versions of that.
18  That was just for first quarter.

19     Q.   Others that are similarly deficient, in your
20  opinion?

21     A.   Correct.

22     Q.   Is your opinion that these pieces were deficient
23  based on anything other than your comparison of your
24  understanding and your reading of the April or the 2001
25  advisory committee recommendations and then comparing

141

UNCERTIFIED REALTIME ROUGH DRAFT

1   that to your looking at the pieces?

2         MR. SKIROS:   Asked and answered.

3         THE WITNESS:   It's also based on all the
4   research that was done.

5   BY MR. CAMPILLO:

6      Q.   The last group of studies are the direct to
7   consumer advertisements testing, copy testing, correct?

8      A.   Well, there's two more.  There is the consumer
9   tracking and then the consumer copy testing.

10     Q.   You have thrown me for a loop.

11        MR. SKIROS:   It's all Wendy's fault.

12        MS. TUCKER:   No, we have it.

13        THE WITNESS:   It's a very sophisticated,
14  thoroughly researched campaign.

15  BY MR. CAMPILLO:

16     Q.   By the way, Dr. Fechmann in the materials that
17  you reviewed, the entirety of any materials that were
18  disseminated to the public or the physicians, did you see
19  anything where Merck described Vioxx as a miracle drug or
20  used the word "miracle" anywhere in the actual piece?

21     A.   I didn't see that, no.

22     Q.   There is a telephone survey of chronic pain
23  consumers.  Is that the fifth category of studies that
24  you have opinions about?

25     A.   Yes.

142

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.   Okay.  Can you just briefly summarize what the
2   opinion is about those studies or that you have come up
3   within the context of those studies.

4      A.   Yes.  It's not something directly relevant but I
5   think important to know is that awareness of Vioxx was
6   about 85 percent.  You can't get much higher than that.

7         The other thing we learned is a lot of these
8   people were at high risk in that they had hypertension or
9   heart disease.  So that was apparent from the survey.
10  They had age criteria for these people and a lot of them
11  were high risk.

12        The average age of those interviewed was 55.

13     Q.   First if you can just summarize your opinions,
14  because I want to ask you about 5 and 6 and we may not
15  have time to get into any details.

16     A.   So basically consumer perceptions of the brand
17  remained stable.  What shot up was awareness of the brand
18  but what remained stable throughout was the perception of
19  the safety of the brand much.

20        They didn't ask about heart attack because I
21  think people would have been shocked to even be asked a
22  question about heart attack.  But they asked them about
23  safe as a sugar pill and a brand that you could trust by
24  way of safety perceptions.

25     Q.   What is it that in your opinion Merck did or

143

UNCERTIFIED REALTIME ROUGH DRAFT

1   didn't do that they should have in connection with these
2   studies?

3      A.   What this research shows is that the message to
4   the consumer -- that they didn't get a message to the
5   consumer that Vioxx posed a potential cardiovascular
6   risk.

7      Q.   So your criticism in a nutshell is Merck should
8   have but didn't convey messages to the patients that
9   Vioxx could cause increased CV events; is that it?  I
10  mean, in a nutshell.  I'm trying to summarize it.  If you
11  can't, please tell me.

12     A.   No, that's exactly it.

13     Q.   So it's your opinion that they should have sent
14  out information telling the patients that Vioxx use could
15  increase their risks of CV events?

16     A.   They could have put it in the advertisements, in
17  the print advertisements.  Because this included date
18  post -- when the label changed.  And they did have a
19  vague statement in the advertisements about
20  cardiovascular risk but it did not seem to have any
21  effect on people's perceptions of the brand.

22     Q.   So your opinion is they should have done more
23  than that?

24     A.   Yes.  They should have had a much clearer label.

25     Q.   They should have done something other than the

144

UNCERTIFIED REALTIME ROUGH DRAFT

1  patient insert that was prepared and distributed after
2  April of '02?  Have you seen that?
3      A.  I think so, yeah.  The patient label?
4      Q.  Yes.
5      A.  It's exactly the same thing that was in the
6  print ads.
7      Q.  Your opinion is that was not sufficient and
8  Merck should have provided additional information beyond
9  that contained in the ads and in the patient insert?
10     A.  Yes.
11     Q.  What exactly is your opinion that should have
12  been stated by Merck, let's say in the year June of 2002,
13  that was not said about the risks, CV risks of Vioxx in
14  those source of materials?
15     A.  That some research suggested that it could cause
16  heart attacks.
17     Q.  As long as they said that in substance you would
18  be satisfied?
19     A.  Well, no, because I'm a research-based person,
20  so I would do research just like they did.  But what
21  they did in their research -- that's the next category of
22  studies, so maybe it's good that we are moving ahead.
23        In their research they chose a label that had no
24  affect on peel's likely behavior to talk to their
25  physicians.  They saw no significant difference with

145

UNCERTIFIED REALTIME ROUGH DRAFT

1  people that said they were very concerned about the risks
2  that were reported and people that were not.  That's what
3  they wanted.  They didn't want the warning label to
4  distract people from our message or they had euphemisms.
5  Basically they didn't want the risk information to have
6  any affect on people's behavior.
7        What I would do is choose a risk message where
8  you actually see a decline in behavior because people are
9  paying attention to the message and getting the message
10  that it's a problem.
11     Q.  Let me move to the sixth type of study which
12  are, I think, described as copy testing of direct to
13  consumer ads.
14     A.  Yes.
15     Q.  If you can summarize what your opinion is about
16  those tests or the testing.
17     A.  Well, the data indicate that people thought the
18  ads were good and increased their interest in talking to
19  the doctor and finding out about the product.  That's
20  fine.
21        What worries me is that they did these tests of
22  the warnings that I was talking about where they
23  specifically looked at -- compared a motivation to talk
24  to the doctor based on people who indicated that they
25  were very concerned about the warning or not.  And they

146

UNCERTIFIED REALTIME ROUGH DRAFT

1  found no difference.
2        In the warning that they were using they found
3  that even though some people said they were concerned it
4  didn't affect their likelihood to talk to the doctor or
5  do anything proactively to get the drug.
6        So it's kind of like the same thing we were
7  talking about with the physician attribute; it's one
8  thing what people say and another thing what they
9  actually do.  They actually state in the research
10  documents that if they found that the ad did adversely
11  affect willingness to talk to the doctor, they would not
12  have run the ads.
13     Q.  Do you agree, Dr. Pechmann that the primary
14  purpose of direct to consumer advertising is to encourage
15  the patient to go and talk to the physician about the
16  product or about their problem?
17     A.  Well, that was the goal of this research.  I
18  mean, of this direct to consumer ads.
19     Q.  Isn't that the primary goal of the direct to
20  consumer advertising, to get the patient to go and talk
21  to the physician as an intermediary?
22     A.  Yes.
23     Q.  So to the extent an ad would not motivate the
24  patient to go and talk to the physician, then it wouldn't
25  be very effective, would it?

147

UNCERTIFIED REALTIME ROUGH DRAFT

1     A.  The whole point of the warning is to warn
2  people.  So if you do research and tinker with the
3  warning, you get a warning that's worded so vaguely that
4  it has absolutely no effect on their purpose to purchase
5  it.  So it defeats the purpose of the warning.
6        So what I'm saying is the direct to consumer ads
7  are supposed to have warnings and the warnings are
8  supposed to actually warn.
9     Q.  What's basically your opinion that direct to
10  consumer ads have to have warnings?
11     A.  Well, they have to have disclosed risks.  That's
12  what the FDA says.
13     Q.  First of all, do you have any information, any
14  indication that any of the direct to consumer ads that
15  were used by Merck with Vioxx were not in compliance with
16  the FDA guidelines?
17     MR. SKIKOS:  We did that one last time, whether
18  she is going to give opinions about what the FDA should
19  or should not put into an ad.  She is not giving opinions
20  on the FDA.
21     MR. O'CALLAHAN:  I would point out it's after
22  7:00.
23     MR. SKIKOS:  That's okay.  I want you to get the
24  full information.
25     MR. CAMPILLO:  Well, if I can go another five,

148

UNCERTIFIED REALTIME ROUGH DRAFT

1 ten minutes we can stop. If I haven't gotten full
2 information I'll have to figure out what I can do about
3 that at some other point in time.
4        MR. BRANDI: I just want you to know that there
5 is a timer underneath that that's going to eject you in
6 seven minutes.
7        MR. CAMPILLO: I'm looking forward to that.
8        MR. BRANDI: The record should reflect people
9 smiled and laughed but that there is no tension in the
10 room.
11        MR. CAMPILLO: Absolutely.
12    Q.  I could have misheard you, Dr. Pachmann, but I
13 thought you said that one of your criticisms was that the
14 DTC ads that were tested by Merck were -- some of them
15 indicated to Merck that those ads would not cause the
16 patient to go and talk to the physician.
17    A.  No, that's not what I was saying. What I was
18 saying is they tested different types of warnings in the
19 same ad.
20    Q.  By the way, which exhibit addresses these
21 particular ads?
22    A.  Exhibit 64.
23    Q.  Where the warnings are being tested.
24    A.  And 65.
25    Q.  All right.

149

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.  And maybe 67.
2    Q.  I think you identified in your deposition 64,
3 65, 66, 67 and 68 as documents referencing this
4 specifically.
5    A.  Yes.
6    Q.  With regard to the warnings on DTC ads that were
7 being tested, do all of these address that or is it only
8 some of these?
9    A.  Well, let's see. Sometimes it states it. Okay.
10 So 67 and 64 and 65, according to this report, have
11 something about warnings in them.
12    Q.  All right.
13    A.  And side effects.
14    Q.  Your opinion is that the DTC ads should have
15 included more information, more warnings about potential
16 CV risks, so you are critical Merck for not including
17 those additional warnings or additional information on
18 the DTC ads? That's No. 1?
19    A.  Yes.
20    Q.  In addition to that you are critical of what
21 else?
22    A.  Of the fact that they compared -- they tested
23 different warnings looking for the wording that would not
24 affect people's behavior.
25    Q.  Okay.

150

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.  Which seems to under cut the whole point of a
2 warning.
3    Q.  Which document indicates to you that Merck was
4 looking for warnings that would not affect people?
5    A.  Well, in document 64 --
6    Q.  Just pick one and let's see if we can find one
7 example of it, understanding there may be others. I just
8 want to understand your point. 64? Okay. Do you want
9 to see 64?
10        (Document handed to the witness.)
11        THE WITNESS: I'm not sure which document has
12 exactly what in it. But 64 has information that I found
13 problematic, troubling. On Page 14.
14    Q.  VIGOR assessment?
15    A.  Yes. The last bullet point. CV and other
16 aspirin fair balance.
17        So the one they tested in people who used to
18 take aspirin with Vioxx are at greater risk of developing
19 stomach ulcer. Vioxx is not a substitute for the
20 prevention of heart attack. Rarely heart attacks have
21 been reported.
22    Q.  Okay. They tested that?
23    A.  Yes.
24    Q.  And what was the result of the test of that
25 particular message?

151

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.  It didn't keep them from the product claim. If
2 you look at the other research you understand what that
3 means. That it means on the willingness to talk to the
4 doctor that was the criteria for that.
5    Q.  So this language that they tested did not drive
6 the patient to go and talk to the physician?
7    A.  That did not affect their willingness to go talk
8 to the physician about the drug, to basically ask about
9 whether they should take the drug.
10    Q.  And did they use this language in the DTC?
11    A.  No, they did not. They used what might even be
12 considered weaker language. Although we looked carefully
13 for it and they said they were going to do the research,
14 we were not able to get documents on the final label.
15    Q.  Do you know how they came up with the language
16 that was actually used in the final version of the DTC
17 ads?
18    A.  Based on this information, they did comparable
19 research.
20    Q.  But you have even seen that research or what led
21 them to select the particular language that was
22 ultimately used?
23    A.  Well, they state the criteria here for
24 selecting.
25    Q.  Okay. What's the criteria?

152

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.   They say here do not keep from product claim.
2    But from a statistical standpoint what that meant is that
3    there was no change in your motivation to talk to the
4    doctor about getting the drug.  Because other graphs show
5    that.
6         And they said that if in fact adding the wording
7    reduced their likelihood to talk to the doctor, then they
8    would not continue to use product advertising.
9    Q.   Where do you see that?  Where is it saying that?
10   A.   "It's incorrect to reassess media options
11   reminder and help seeking advertising."  So what that
12   means is there is reminder in help seeking
13   *to have a statement of the risks.*
14        And then there is reminder with help seeking
15   advertising, both of which do not require that statement.
16   It's what's called the brief summary.
17   Q.   Okay.  What is the statement that you believe
18   should have been given?
19   A.   Well, that's what I was trying to get amount I
20   would do research to see what statement accurately
21   conveyed the risk.
22   Q.   What is it --
23   A.   It would be something more explicit than what
24   they ended up using, which is -- oh, boy, I can't
25   remember exactly.  Something like heart attacks have been

153

UNCERTIFIED REALTIME ROUGH DRAFT

1    observed in some people taking Vioxx.  I mean, it doesn't
2    even -- just looking at the face value of that statement,
3    it doesn't state that there could be a cause
4    relationship.  It could mean old people take Vioxx and
5    also have heart attacks.
6         MR. CAMPILLO:  I think we better stop.  I mean,
7    I have more.  I probably can spend another two hours
8    going through this but I think under the circumstances
9    this is as good as we can do.  I will, you know, work
10   with counsel and see if we can do something.  If not, we
11   will take things up with the judge.
12        MR. SKIKOS:  The only speech I'm going to make
13   is that --
14        MR. CAMPILLO:  I didn't mean to suggest by that
15   that in anybody is acting inappropriately in any way.  I
16   thank the witness has been cooperative.  Mr. Skikos, I
17   think you have been very cooperative as well to move this
18   along.  I didn't mean to suggest anything by my comment
19   other than I'm not true.  To prepare for trial I think I
20   need at least another two, three hours of deposition.
21        MR. SKIKOS:  All right.  My only speech is that
22   we did do a lot of work to try and make sure this was
23   efficient and that we've gone now, I don't know, four
24   hours and 15 minutes, which is pretty good.  And that we
25   tried to make sure that the opinions are contained in the

154

UNCERTIFIED REALTIME ROUGH DRAFT

1    report or in the documents we provided you and we put
2    together a binder.  So hopefully this will be done.
3         MR. CAMPILLO:  First of all, for once I agree a
4    hundred percent with what you have said on the record.  I
5    have absolutely no qualifications or reservations about
6    that.  And I will look at everything that has been
7    produced, which is a lot of material, which obviously I
8    have not been able to read it.  And I will do that before
9    I make any further inquiry or effort to continue or take
10   a further deposition of the witness.  I find myself in.
11        MR. BRANDI:  So we are absolutely clear, we
12   would oppose any further deposition.  Merck has deposed
13   her now for going on 13 hours.
14        MR. CAMPILLO:  I understand a hundred percent,
15   Mr. Brandi.  I didn't expect anything to the contrary.
16        MR. BRANDI:  And I think you inadvertently left
17   out my name and Mr. O'Callahan's name when you talked
18   about being cooperative.
19        MR. CAMPILLO:  No.  I meant what I said.
20        MR. BRANDI:  And Miss Fechmann's name as well.
21   She has been very cooperative.
22        MR. SKIKOS:  I have one more request.  If there
23   is something brought on Dr. Pechmann, please include me
24   on the notice.

155

UNCERTIFIED REALTIME ROUGH DRAFT

1         MR. CAMPILLO:  for deposition purposes.  I think
2    there is a motion being filed to prevent her for
3    testifying on Kelly Frye grounds but nothing to do with
4    her deposition time or commitment.
5         MR. O'CALLAHAN:  Speaking of time, do you have a
6    check for her?
7         MR. CAMPILLO:  I sure do.  And it was done at
8    $400 an hour.  Since we went over, I probably owe you
9    something.  If you can figure it out, let me know.  We
10   actually thought three hours at $400 an hour based on --
11        THE REPORTER:  Do either Mr. Sizemore or Mr.
12   O'Callahan need a copy of the transcript?
13        MR. O'CALLAHAN:  Send me a copy.
14        MR. CAMPILLO:  Let me propose the stipulation
15   that the original transcript be sent directly to
16   Mr. Skikos and he will procure the witness' review of the
17   transcript as well as corrections and signature; that
18   Mr. Skikos thereafter will provide the original to my
19   office and will give notice to all counsel of any changes
20   and the fact that the deposition has been signed and
21   corrected; that the reporter be relieved of her statutory
22   obligations concerning the original once she has sent the
23   original off to Mr. Skikos; that the deposition can be
24   signed under penalty of perjury without the necessity of
25   a notary and that if the original is lost after it has

156

UNCERTIFIED REALTIME ROUGH DRAFT

1   been sign, that any certified copy can be us used.

2          MR. SKIROS:  I agree.  The one question I have

3   is the trial starts in a week, so you are probably going

4   to want any corrections/revisions before that, I would

5   guess.  But I need to know when we are going to get the

6   transcript.

7          MR. CAMPILLO:  We are requesting it to be

8   expedited.  I'm not sure what that means exactly, but we

9   will get it to you as soon as possible.  I think given

10  the circumstances you just do your best to get it signed

11  and returned at least before the witness takes the

12  witness stand.

13         MR. SKIROS:  Yes, I will agree to that.

14

15         (TIME NOTED:  7:22 P.M.)

16

17

18

19

20

21

22

23

24

25

157

Information About Pechmann Deposition "Exhibit 5"

ABSTRACT:

Pechmann deposition "Exhibit 5" contains a subset of the information provided in Pechmann's Expert Report plus some additional details on the 6 marketing research studies.

NOTE: Bolded text below was copied verbatim from Pechmann's Expert Report

A.  Pechmann Deposition "Exhibit 5" Pages 1-3 Regarding "Copy Testing of Detail Pieces with MDs" Contains a Subset of the Information Provided in Pechmann's Expert Report Plus Some Additional Details.

1)  Pechmann Deposition "Exhibit 5" Page 1 describes the methodology used in these types of Copy Testing Studies with MDs, from Exhibit 59.

   a) Research Objectives (Expert Report Exhibit 59, p.2): "For the two new detail pieces for VIOXX® for use in the 1st quarter of 2003:

   — Assess physicians' reactions to the messages in the pieces

   — Determine the main message communication and flow in each detail aid and the extend to which it is believable and compelling

   — Quantitatively evaluate the complementary role, if any, of the two detail pieces"

   b) Methodology (Expert Report Exhibit 59, p.3): "31 in-depth interviews (IDI's) ~ 45 minutes each, conducted in

   — Rockville, MD on November 21st and 22nd, 2002 &

   — Scottsdale, AZ on November 25th and 26th, 2002

   The research was conducted by Thomas A. Hinkel, TRIAD Research and Consulting, Inc. Generally:

   Detail piece for Group A focuses on the safety of VIOXX® in the elderly.

Detail piece for Group B focuses on efficacy and GI superiority.

All physicians were exposed to both detail ads with the order rotated to avoid position bias."

c) This methodology was briefly described in Pechmann's Expert Report, page 59.

**Merck also tested the two promotional (detail) pieces used with physicians during the first quarter of 2003. The front cover of these pieces showed an older woman and an older man with arms raised in a V. (See Exhibit 28 and Exhibit 29.) A research firm conducted 31 in-depth interviews with physicians in Maryland and Arizona in November 2002. A standard research method was employed. The findings were summarized in a report entitled "Market Research Findings. VIOXX© 1S03 Detail Piece Assessment." (Exhibit 59, page 1.)**

2) Pechmann Deposition "Exhibit 5" Page 1 describes MDs that participated in this particular Copy Testing Study, from Exhibit 59.

a) Research Participants (Expert Report Exhibit 59, p. 4-6):

"Physicians interviewed perceived VIOXX® as an effective agent …

— but also a little less safe (causing hypertension and edema) than other Coxibs.

Therefore:

— many physicians tend to prescribe it mainly for short-term treatment of acute pain …

These physicians also report that these safety concerns also limits their use in elderly patients who often have cardiovascular problems." (page 3)

"Physicians interviewed perceive Celebrex as an effective anti-inflammatory agent that

— has not been as associated with safety issues to the same extent as VIOXX®

… (page 4)

"Physicians interviewed perceive Bextra as being more similar to Celebrex than to VIOXX®" … (page 5)

2

"General points:

Most pointed to being confused about CV risk, but mostly around the bad press and the patient perception of the issue. Even physicians, who initially mentioned being concerned about the CV profile, when asked directly if they thought any COXIB was safer than the other, said no." ... (page 5)

b) These research participants were briefly described in Pechmann's Expert Report, p. 59. **The physicians who were interviewed perceived VIOXX as "a little less safe (causing hypertension and edema) than other Coxibs." However, "Most pointed to being confused about CV [cardiovascular] risk, but mostly around the bad press and the patient perception of the issue." (Exhibit 59, pages 2, 4 and 6.)**

3) Pechmann Deposition "Exhibit 5" Pages 2-3 summarize the results of the Copy Testing Studies with MDs, from Exhibit 59. These results are also summarized in Pechmann's Expert Report, pages 59-60, as shown below. Note that Piece A was about safety in the elderly whereas Piece B discussed Merck's Efficacy Confidence Program for Vioxx.

**When shown the detail piece with the older woman (piece A) that emphasized Vioxx's safety profile in elderly patients, physicians "responded positively" and stated that they "like that it focuses on the use of VIOXX in the elderly – a population avoided due to safety issues." However, "some physicians would like the company to address the CV safety issue." (Exhibit 59, pages 7, 11.)[1] The research also assessed physicians' reactions to the cardiovascular information that appeared in the detail piece with the older man (piece B). The research found: "Physicians do not know how to interpret the information regarding the CV data – to some, it appears to contain conflicting results. Some said that they would have to see more information, some said they have never**

---

[1] "Exhibit 5" also cites Expert Report Exhibit 59, page 8 indicating that "most physicians received this [elderly data] very well, and felt it was important." Further, "Exhibit 5" cites Expert Report Exhibit 59, page 10 indicating that "some physicians want to know how the prescribing of VIOXX has changed since CV safety has come to light."

believed VIOXX has CV [cardiovascular] issues, and yet cannot, and will not, fight patients who might ask for another COXIB by name. Only one physician (in Scottsdale) said that he proactively warns he [his] patients, and rarely starts any patients on Vioxx." The market research report noted that "information perceived missing from *this detail*" included a "*better explanation of CV mortality data.*" (Exhibit 59, pages 16-17.)

4) Pechmann Deposition "Exhibit 5" Page 3 also refers to Exhibit 41. Exhibit 41 describes the results of another Copy Testing Study of MDs. Those results are summarized Pechmann's Expert Report, page 50, as shown below.

In a 2002 presentation, Cannell stated that "Market Research" showed that "Physicians thought the Efficacy Guarantee Program conveyed Merck's confidence in Vioxx©" and that "... on average, physicians qualitatively estimated Vioxx© might receive an additional 10-15 prescriptions out of 100 prescriptions for Cox-2 inhibitors." (See Exhibit 41, page 71.)

5) Pechmann Deposition "Exhibit 5" Pages 1-3 and similar information in Pechmann's Expert Report substantiate Pechmann's opinion as stated on page 53 of the Expert Report that: Merck's marketing executives purchased extensive marketing research to ensure that their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing physicians' concerns that Vioxx posed a potential cardiovascular risk.

B. Pechmann Deposition "Exhibit 5" Pages 4-5 Regarding "MD Tracking: MD Promotional Message Recall" Contains a Subset of the Information Provided in Pechmann's Expert Report Plus Some Additional Details.

4

1) <u>Pechmann Deposition "Exhibit 5" page 4 describes the methodology used for "MD Tracking:</u>
<u>MD Promotional Message Recall" from "2002 Target Rx and dtw Proposals" (See MRK-</u>
<u>AJT0060750-62).</u>[2]

a) <u>Research Objectives (See MRK-AJT0060750-62). Note that Merck used dtw Marketing</u>
<u>Research Group from May to Dec. 2001, and then switched to Impact Rx (TargetRx).</u>

—   <u>Dtw.</u> "The objectives of this message monitoring research are as follows:

- To determine what top messages physicians recall, on an unaided basis, from the in-person sales promotions (details) for selected C2SI [Cox-2 Selective Inhibitor] products;

- To examine what features and benefits are being promoted by sales professionals (aided recall);

- To understand what specific patient types sales professionals are discussing (unaided recall) and what specific patients the physicians believe are most appropriate for the selected products (unaided);

- To learn the specific details around what product comparisons, if any, are being made (unaided);

- To compare the rate of closing the sales call as well as the wording used in making the close;

- To ascertain the impact of the detail on physicians' perceptions and predicted future prescribing behavior for each product;

- To gain a better understanding of what physicians find to be the most important advantages and disadvantages of each of the products." (page 10)

—   <u>Impact Rx.</u> "The TargetRx Detail Audit[SM] will assist the Vioxx team to:

---

[2] The Bates-stamped documents cited in this document were not included in Pechmann's Expert Report but were contained in the boxes of materials that were provided after Pechmann's deposition, day 1.

- Track key messages delivered by the pharmaceutical sales force for *Vioxx and its key competitors*

- Assess and compare message delivery and impact, type and length of call, product sequence, use of detail piece/support materials, and aggressiveness of close" (page 3).

b) Methodology (See MRK-AJT0060750-62). Note that Merck used dtw Marketing Research Group from May to Dec. 2001, and then switched to Impact Rx (TargetRx).

— Dtw. "Merck will provide a list of the 2002 physician target universe to use. We will use the list to select the sample of physicians from our COM.DAT panel who will participate in the study.... The monthly target mix of sample physicians is as follows:

- Primary Care Physicians, including Internal Medicine (75%)

- Rheumatologists (10%)

- Orthopedic Surgeons (15%)" (page 11)

"Merck Market Research desires to track the following products:

- Product Celebrex (Pfizer/Pharmacia) Target Details/Month 120

- Product Vioxx (Merck) Target Details/Month 120

- Product Bextra (Pfizer/Pharmacia) Target Details/Month 120 ..." (page 11)

"Based on the above research protocols and deliverables, our estimated cost for this project is $596,800.00 +/- 10% and is based upon a target of 4800 reported details gathered over the course of 2002 resulting in a cost per reported detail of $124.33." (page 11)

— Impact Rx. "The TargetRx Detail Audit$^{SM}$ for the Chronic Pain market is a monthly tracking study with 480 physician responses in the Chronic Pain market per month. Each physician response is a self-administered on-line questionnaire. The audit can include additional custom questions or products based upon the specific needs of Merck" (page 3). "High prescribing physicians within the Chronic Pain market will

6

be randomly contacted, retrospectively, e.g., 'have you interacted with a representative on the following product(s) *in the past 7 days?*" (page 4). "The standard deliverables in the TargetRx Detail Audit meets or exceeds many of the objectives in the RFP sent from Merck. These include:

- Tracking of physician recall of the detail for:
  - ○ Top message recall on an unaided basis from the in-person sales call
  - ○ Frequency of competitive comparisons made by representatives
  - ○ Comparisons of rate of closing." (page 3)

"Annual subscription, 2002 – 12 monthly reports by specialty (PCP and Rheum) for Vioxx, Celebrex, valdecoxib … for a total of 480 physician responses per month (5,760 responses per year). Two semi-annual reports by region. 2002 Cost: $266,000." (page 4)

c) This methodology was briefly described in Pechmann's Expert Report, pages 53-54.

**Merck purchased monthly marketing research reports that "tracked" physicians' recall of the messages the Vioxx sales representatives were communicating to them, physicians' beliefs about Vioxx and its competitors, and physicians' prescribing behavior. In 2001, Merck purchased these reports from a company called "dtw Marketing Research Group." In 2002, Merck purchased these reports from a company called "Impact Rx."**

2) Pechmann Deposition "Exhibit 5" Pages 4-5 summarize the results regarding "MD Tracking: MD Promotional Message Recall." These results are also summarized in Pechmann's Expert Report, pages 54-59, as shown below.

— **Pechmann Expert Report Page 57.** A Merck report entitled "VIOXX Monthly EAR November 2001" contained results from the dtw tracking study of physicians, for the time period from September through December 2001, regarding how physicians responded to the question: "Which of the product features listed below were discussed by the sales representative?" From 20% - 33% of the participating

physicians responded that Vioxx sales representatives had discussed whether Vioxx "Is safe to use in the elderly," and 18% to 47% of the participating physicians responded that they had discussed that Vioxx "Does not increase the risk of myocardial infarction [heart attack] or stroke." <u>(Exhibit 56, page 17.)</u>[3]

— <u>Pechmann Expert Report Pages 58-59.</u> Yet another Merck report entitled "April 2003 EAR Core Meeting Vioxx" showed that Vioxx continued to do well in 2003, and that the marketing messages for Vioxx remained unchanged ... The report ... stated "Efficacy, Safety, and Tolerability continue to be the top Vioxx messages recalled by PCPs [primary care physicians]." A chart showed that, from May 2002 to May 2003, 34% to 47% of the primary care physicians interviewed recalled that a Vioxx sales representative told them Vioxx was "Safe in the Elderly." <u>(Exhibit 58, page 29.)</u>

— <u>Pechmann Expert Report Pages 54-56:</u> A document entitled "Promotion Message Recall Data" contains data from dtw Marketing Research Group for the period of September to October 2001. The document shows how each member of a physician panel responded to the following written survey question: "What did the sales representative tell you about the product" with the product being Vioxx. (A physician panel is a group of representative physicians who agree to participate in marketing research surveys on a regular basis, in exchange for being paid.) About 166 physicians wrote down what they recalled the Merck sales representatives saying about Vioxx. The findings indicate as follows:

    i) About 20% or 1 in 5 physicians recalled that the Merck sales representatives stated that Vioxx did not cause heart attacks or other cardiovascular problems.

---

[3] "Exhibit 5" cites similar results from Expert Report Exhibit 48, p. 19. Those results indicate that in June 2001, 25.5% of MDs reported that the Vioxx sales reps said that Vioxx "does not increase the risk of myocardial infarction or stroke."

- "Safe and effective and not associated with cardiac deaths." (Exhibit 55, page 4.)

- "Safe from a cardiovascular standpoint." (Exhibit 55, page 5.)

- "More effective than codeine. Much less edema and HTN [hypertension] than thought or purported by competitors. Does not cause heart disease." (Exhibit 55, page 6.)

- "There is no cardiovascular risk from using Vioxx." (Exhibit 55, page 10.)

- "Safe and not a cardiovascular danger and in the 50 mg [dose] as effective as percocet for pain control." (Exhibit 55, page 11.)

ii) A substantial number of physicians recalled that Merck sales representatives criticized studies concerning Vioxx and cardiovascular risk, stating the studies were weak, or merely showed either that Vioxx wasn't cardioprotective, or naproxen (Aleve) was cardioprotective.

- "The study showing cardiac problems with Vioxx was not well done. Safe for pts [patients]. Good pain relief." (Exhibit 55, page 5.)

- "Very successful drug, safe, effective and does not contribute to heart disease as some recent articles suggested." (Exhibit 55, page 6.)

- "It does not increase the risk for heart attacks. He discussed the study used to make this deduction. Was a study comparing Naprosyn to Vioxx. It was intended to look at GI [gastro-intestinal] effects, therefore all patients taking preventive aspirin were excluded. Since Naprosyn has some platelet inhibiting activity, naturally one would expect a lower incidence of MIs [heart attacks] in this group …" (Exhibit 55, page 7.)

- "Showed safety data that heart risk was mostly increased in patients who stopped their aspirin while taking Vioxx. … So there has not yet been any study showing increase risk of stroke or heart disease with Vioxx if people continue to use their usual meds …" (Exhibit 55, page 10.)

- "… talked about the recent published study which seemed to imply that Vioxx caused heart attacks. He said that the study was worthless, that what it really showed [was] that Vioxx does not have any anti-platelet effect. That patients taking Vioxx who are at high risk for heart attacks and strokes should take a baby aspirin every day." (Exhibit 55, page 10.)

iii) A substantial number of physicians recalled that Merck sales representatives characterized concerns about Vioxx and cardiovascular risk as "media hype."

- "Despite all the negative publicity about Vioxx it is a safe and effective medication." (Exhibit 55, page 4.)

- "That Merck felt that the recent press about Vioxx was inaccurate. Vioxx is not cardioprotective but it does not cause heart attacks." (Exhibit 55, page 5.)

- "No cardiac detriment – Bad reporting by press. It's just that it doesn't prevent [heart attacks] since there is no platelet action.…" (Exhibit 55, page 6.)

- "Stroke issue is not new and is being blown out of proportion." (Exhibit 55, page 6.)

- "Safe despite media hype regarding cardiovascular morbidity/mortality." (Exhibit 55, page 7.)

iv) Only one physician recalled being told by a Merck sales representative that Vioxx might cause heart attacks, that "It did increase the risk of heart disease or heart attacks." (Exhibit 55, page 11.) Several physicians recalled talking to Merck sales representatives about Vioxx and cardiovascular risk but did not state that they were warned that Vioxx might cause heart attacks or strokes. Some mentioned that studies were ongoing, e.g., "Ongoing studies about stroke and Vioxx." (Exhibit 55, page 4.)

3) Pechmann Deposition "Exhibit 5" Pages 4-5 and similar information in Pechmann's Expert Report substantiate Pechmann's opinion as stated on page 53 of the Expert Report that: Merck's marketing executives purchased extensive marketing research to ensure that their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing physicians' concerns that Vioxx posed a potential cardiovascular risk.


C. Pechmann Deposition "Exhibit 5" Pages 6-7 Regarding "Behavioral or Prescription Tracking" Contains a Subset of the Information Provided in Pechmann's Expert Report Plus Some Additional Details.

1) Pechmann Deposition "Exhibit 5" Page 6 describes the methodology used for "Behavioral or Prescription Tracking" and states as follows: Method. Pharmacies sell prescription info to IMS and other providers who resell it to companies like Merck. (page 6)[4]

---

[4] See "Turning Medicine Into Snake Oil" pages 19 and A4 (in the materials copied after Pechmann deposition day 1) for a brief discussion of how pharmaceutical firms buy data on doctor's prescribing habits from pharmacies and use these data for marketing purposes.

11

2) <u>Pechmann Deposition "Exhibit 5" Pages 6-7 summarize the results of the "Behavioral or Prescription Tracking." These results are also summarized in Pechmann's Expert Report, as shown below.</u>

— **<u>Pechmann Expert Report, Page 57.</u> A Merck report entitled "VIOXX Monthly EAR [early assessment and response] November 2001" indicated that Merck had neutralized the physicians' concerns about Vioxx that had been raised by the August 2001 Journal of the American Medical Association article on COX-2's potential cardiovascular risk. A chart showed that Vioxx's share of new prescriptions in the analgesic and anti-inflammatory market had declined from 17.3% in July 2001 to 15% in September 2001. However, by November 2001, Vioxx's share had risen to 15.5% and showed a strong positive trajectory. <u>(Exhibit 56, page 8.)</u>**

— **<u>Pechmann Expert Report, Page 51:</u>  By offering this "Efficacy Guarantee" program for Vioxx, and offering consumers complete satisfaction or their money back, Merck succeeded in bolstering physicians' confidence in Vioxx's safety profile including its cardiovascular safety profile. The program's effects on physicians' beliefs about Vioxx and their prescribing behavior are summarized in Exhibit 44, the "VIOXX© Monthly EAR" dated October 8, 2002.  Slide 3 on page 2 states "Issue #1: VIOXX© Market Share Performance, Promotion, and Attitudes" and states "The rate of decline of NRx [new prescriptions] for VIOXX has slowed recently." It also states that "Recall of Efficacy Confidence increased to levels near those of the core messages for VIOXX within one week of launch, without impacting recall of the core messages." <u>(See Exhibit 47, page 2.)</u>**

— **<u>Pechmann Expert Report, Page 53.</u> A Merck report entitled "Operations Review for VIOXX January 31, 2003" showed that … "2002 Promotional Campaigns for VIOXX lead to NRx [new prescription] volume rebounds" and the 2002 campaigns**

are listed as: "Efficacy Confidence," "Divide and Conquer," and "Project Jump Start." Another graph shows "VIOXX has narrowed the NRx share gap with Celebrex." (Exhibit 54, pages 31 and 45.) The report also indicates that the consumer promotions for Vioxx were working well: "Consumer requests drive brand choice: Consumers are generally knowledgeable, willing to ask for a brand by name, and highly influential in physicians' brand choice. Brand awareness of 85% among targets. Physicians honor 90% of requests for VIOXX. Net action is 27%." (Exhibit 54, page 57.) The report also notes that: "VIOXX Controllable Income exceeded the original Profit Plan by 11%," and shows that Vioxx's controllable income in 2002 was $1,494 million (i.e., nearly $1.5 billion). (Exhibit 54, page 27.)

— **Pechmann Expert Report, Page 58.** Yet another Merck report entitled "April 2003 EAR Core Meeting Vioxx" showed that Vioxx continued to do well in 2003 ... Specifically, the report stated that Vioxx's share of total coxib prescriptions "was 37.6% in April 2003, beating plan of 36.6%." (Exhibit 58, page 7.)

3) Pechmann Deposition "Exhibit 5" Pages 6-7 includes some "Behavioral or Prescription Tracking" results that were not contained in Pechmann's Expert Report, but were from the same Expert Report Exhibits and the results were similar. These results are discussed below.

— Expert Report Exhibit 56, page 4, states: "Overall Coxib class continues to recover from the negative impact of NY Times/JAMA articles.

- NRx [new prescription] and TRx [total prescription] shares of Coxib class continue to increase in November
- Brand-level shares have flattened after early separation favoring Celebrex"

— Expert Report Exhibit 56, page 7, states: "NRx share for Coxib Class has been slowly climbing since September 2001." [to 31.7%]

— Expert Report Exhibit 54, page 29, states: "Current Performance. Coxib class penetration rebounded, and reached a new peak in December 2002." Note that this graph shows that Cox 2's (Vioxx and Celebrex) share of total prescriptions declined immediately after the 8/22/01 JAMA article but then rebounded, reaching a new peak of 48.5% in Dec. 2002.

— Expert Report Exhibit 54, page 30, states: "Current Performance. TRx share for VIOXX has stabilized, following label change and increased promotional resources." Note that this graph shows that Vioxx's share of total prescriptions within the Coxib class declined immediately after the 8/22/01 JAMA article, and declined even more after the 4/11/02 Vioxx label change that added the VIGOR study to the Vioxx label. But then Vioxx's share gradually rebounded through 1/3/03, to 38.6%. The rebound is attributed to "Increased Resources (DTC, details) Efficacy Confidence Program 8/12/02."

— Expert Report Exhibit 54, page 31, states: "VIOXX has narrowed the NRx share gap with Celebrex." Note that this graph shows that Vioxx's share of new prescriptions within the Coxib class declined immediately after the 8/22/01 JAMA article, and declined even more after the 4/11/02 Vioxx label change that added the VIGOR study to the Vioxx label. But then Vioxx's share gradually rebounded through 1/3/03, to 39.3%. The rebound is attributed to "Increased Resources (DTC, details) Efficacy Confidence Program 8/12/02."

4) Pechmann Deposition "Exhibit 5" Pages 6-7 and similar information in Pechmann's Expert Report substantiate Pechmann's opinion as stated on page 53 of the Expert Report that: **Merck's marketing executives purchased extensive marketing research to ensure that their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing physicians' concerns that Vioxx posed a potential cardiovascular risk.**

14

D.  Pechmann Deposition "Exhibit 5" Pages 8-11 Regarding "MD Attribute Tracking" Contains a

Subset of the Information Provided in Pechmann's Expert Report Plus Some Additional Details.

1)  Pechmann Deposition "Exhibit 5" page 8 describes the methodology used for "MD Attribute

Tracking" from a document labeled "A&A Attribute Tracker MDs" (MRK-AKP0038549).

a) Research Objectives (See MRK-AKP0038549, page 3).

- ❖  "What are the patterns of use for various patient types?

- ❖  Which attributes drive prescribing of coxibs?

- ❖  What is the impact of non-GI safety issues on physician's Rx?

- ❖  Which attributes are of less importance in the decision process?

- ❖  What are the strengths and weaknesses of each brand?

- ❖  How does Vioxx stack up?

  - ❖  Are the non-GI [gastrointestinal] safety issues for Vioxx a problem?

  - ❖  If so, does Vioxx's strength in GI make up for that problem?"

b) Methodology and Participants (See MRK-AKP0038549, page 8).

- ❖  "Method: Changed from phone-fax to internet (WebSurveyMD, Ziment's Internet

  Panel) in January/February, 2002.

- ❖  Timing: Interviews occurring every month of the year, with a longer 'trimesterly

  interview' occurring in March, August and November.

- ❖  Sample: Random sample taken from Merck's list of targeted physicians.

- ❖  Quota: 315 Physicians interviewed per month, (mix of PCPs, Rheums, Orthopedic

  Surgeons)"

c) The methodology was also described in Pechmann's Expert Report, Pages 47-48.

**For at least two years beginning in early 2002, Merck purchased monthly marketing**

**research reports called "A&A [analgesic and anti-inflammatory pain reliever] Attribute**

**Tracker" from a company called Ziment. Ziment created these reports by paying a**

**panel (group) of representative physicians to rate the attributes of different pain**

15

relievers (Vioxx, Celebrex, etc.) on numerical scales, and to record the number of prescriptions that they wrote for each brand. For instance, physicians were asked: "How well does 'safe to use in elderly' describe Vioxx, 1=Does Not Describe At All, 10=Describes Very Well." (See Exhibit 47 entitled VIOXX© Monthly EAR [early assessment and response], August 2002, Michael Stanton, dated October 8, 2002, page 6.) Every six months, a "derived importance analysis" was conducted to determine which attributes were "really important in the Rx [prescription] decision-making process without directly asking for [attribute] importance ratings." (See Exhibit 48 entitled "A New Paradigm for Understanding Physician Behavior Christopher Posner," page 6.)

2) Pechmann Deposition "Exhibit 5" Pages 9-11 summarize the results of the MD Attribute Tracking Study, focusing particular attention on how the results were used to monitor the effects of the "Efficacy Guarantee" promotional program for Vioxx and other related programs. These results are also summarized in Pechmann's Expert Report, as shown below.

— **Pechmann Expert Report Pages 56-57.** A Merck analysis entitled "Awareness, Action & Attributes for the A & A Franchise" shows that Merck had succeeded in neutralizing the physicians' concerns about Vioxx's potential cardiovascular risk that had been raised by the May 2001 New York Times article on the VIGOR study. The document states: 'Some safety and efficacy attributes registered a significant change in the period surrounding the NY Times article 5/22/01. Nearly all attributes for Vioxx dropped between June and July of 2001, but have recovered since then." (See Exhibit 31a, page 27.)

— **Pechmann Expert Report Pages 57-58.** A Merck report entitled "VIOXX Monthly EAR November 2001" contained results from the dtw tracking study of physicians, for the time period from September through December 2001... The report also showed a corresponding increase in physicians' "Mean rating for VIOXX© on

'Does not increase the risk of MI [heart attack]/stroke' attribute increased versus Celebrex among High coxib [Vioxx-prone] Physicians." (Exhibit 56, page 24.) From August to November 2001, when physicians were asked how well the statement "Does not increase the risk of MI or stroke" described Vioxx, the mean response was 6.7 on a 10 point scale where 10=describes very well and 0=does not describe at all. Although Naproxen received a higher 7.7 rating, Vioxx's 6.75 rating was still favorable because it was well above the midpoint of 5. (Exhibit 56, page 38.)

— Pechmann Expert Report Pages 48-49. The research showed that, by about 2001, physicians began to differentiate between Vioxx and Celebrex on non-gastrointestinal safety issues such as cardiovascular risk and safety in the elderly. Merck executive Posner explained the research findings as follows: "A Derived Importance analysis in 2001 suggested that non-GI [gastrointestinal] safety was becoming a key [brand] differentiator" and that "High Coxib/Celebrex physicians place a premium on non-GI safety in choosing between Vioxx© and Celebrex." The results were similar in 2002: "From the derived importance 2002 analysis, it appears some physicians do feel stronger in the 'non-GI safety' advantage for Celebrex and this does impact their preferences." In 2002, the attributes that were important to physicians' prescribing decisions in order of their derived importance were: "Does not cause edema (9.9/10)," "Does not cause significant increases in blood pressure (9.1)," "Does not increase the risk of myocardial infarction [heart attack] or stroke (7.0)" and "Is safe to use in the elderly (3.7)." Overall, the research "suggests Celebrex would be used preferentially in select 'at-risk' populations," that it was "likely this preferential use of Celebrex would be a subset of chronic [patients] presenting a more meaningful revenue downside" and so "the most important attributes that must be defended are non-GI safety attributes." The

"Possible Implication" was to "Prevent movement off-center on non-GI safety." (See Exhibit 48, pages 8-12.)

— <u>Pechmann Expert Report Pages 49, 51-52.</u> "In August 2002, Merck's marketing executives introduced a marketing program called "Efficacy Guarantee" that was designed to bolster physicians' and consumers' confidence in Vioxx. The program guaranteed patients their money back if they were not completely satisfied with Vioxx and was targeted primarily at physicians, but also at consumers. <u>(See Exhibit 49, Merck's April 31, 2002 memo on the "Efficacy Guarantee" program.)</u> " ... the "Efficacy Guarantee" program had an immediate and discernible impact in terms of bolstering physicians' beliefs about the cardiovascular safety of Vioxx, and persuading physicians to prescribe more Vioxx." (<u>See Exhibit 47.</u>)

    i.  "In August, more physicians rated VIOXX and Celebrex equally in the MI [heart attack]/Stroke attribute, which could have contributed to the narrowing of the NRx [new prescription] share gap between VIOXX and Celebrex." (<u>Exhibit 47, Slide 15, page 8.</u>)

    ii.  "In August, significant changes were seen in the percentage of physicians that rated VIOXX© and Bextra the same in the [Safe for the] Elderly and MI/Stroke attributes." <u>(Exhibit 47, Slide 16, page 8.)</u>

    iii.  "In August, the mean rating for VIOXX on the Safe for the Elderly attribute stabilized and the gap between VIOXX and Celebrex/Bextra narrowed." (<u>Exhibit 47, Slide 17, page 9.</u>)

    iv.  "The mean rating for VIOXX on the Blood Pressure attribute increased [improved] in August, and the gap between VIOXX and Celebrex, Bextra, and Naproxen narrowed." <u>(Exhibit 47, Slide 18, page 9.)</u>

> v. "Ratings on the edema attribute declined less for VIOXX© than for the other tracked products in August." (Exhibit 47, Slide 19, page 10.)
>
> vi. "In August, New to Market Chronic patients increased for VIOXX© BY 0.5%, while NTM [new to market] patients decreased for Celebrex by 3.5% and increased for Bextra by 8.8%." (Exhibit 47, Slide 39, page 20.)
>
> vii. "More chronic patients switching to Bextra came from Celebrex than from VIOXX© in August 2002." (Exhibit 47, Slide 43, page 22.)

— **Pechmann Expert Report Page 58.** A Merck document entitled "Project 'Power Play'" indicates that physicians continued to give Vioxx a favorable rating on cardiovascular safety in 2003. In January 2003, when physicians were asked how well the statement "No increased risk of MI [heart attack]/stroke" described Vioxx, the mean response was 6.5 rating on a 10 point scale, where 10=describes very well and 0=does not describe at all. Although Naproxen received a higher 7.9 rating, Vioxx's 6.5 rating was still favorable because it was well above the midpoint of 5. On the attribute of "Safe for Elderly" Vioxx received a rating of 7.0, which was much better than Naproxen's 4.9 rating. (Exhibit 57, pages 7.)

— Pechmann Deposition "Exhibit 5" page 11 included similar results from a document entitled the 'Specialty Review for VIOXX, December 8, 2003 as shown below (MRK-AD00194820). "Performance [Vioxx] TRx [total prescription] volume trending on plan" (page 48). "Does Not Increase the Risk of MI [heart attack] or Stroke - Total Respondents" (page 49). A graph on page 49 indicated that Vioxx's rating on the "does not cause heart attack/stroke" attribute ranged from about 6.5 to 7.0 on a 10 point scale from Jan. 02 through Sept. 03, with 10 being the most favorable.

3) Pechmann Deposition "Exhibit 5" Pages 8-11 and similar information in Pechmann's Expert Report substantiate Pechmann's opinion as stated on page 53 of the Expert Report that: **Merck's marketing executives purchased extensive marketing research to ensure that their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing physicians' concerns that Vioxx posed a potential cardiovascular risk.**

E. Pechmann Deposition "Exhibit 5" Pages 12-14 Regarding the "Awareness and Action or Chronic Pain Consumer Tracking Study" Contains a Subset of the Information Provided in Pechmann's Expert Report Plus Some Additional Details.

1) Pechmann Deposition "Exhibit 5" page 12 describes the methodology used in the "Awareness and Action or Chronic Pain Consumer Tracking Study."

a) Research Methodology and Participants (See Expert Report Exhibit 30, Pages 5-6). "Methodology and Sub-Groups 2003. Telephone interviewing (CATI) 7 days a week, 12 months, 3600 interviews annually. Arthritis (1st Priority) … Frequent Back Pain (2nd priority) … Tendonitis or Bursitis (3rd Priority) … Other Pain (4th Priority)" (Page 5). "VIOXX® Awareness and Action Study 2003 Overall Questionnaire Structure. Screener → Freq. of Usage of Medication → Satisfaction w/ Medication → Brand Awareness → Advertising Awareness → Net Action Series → Trial and Usage → Brand Imagery → Classification. Millward Brown." (Page 6).

b) This methodology was also described in Pechmann's Expert Report. In addition, Pechmann's Expert Report described in greater detail the consumers who were interviewed.

— **Pechmann Expert Report, Page 32-33.** To monitor the beliefs and behaviors of patients with osteoarthritis and other chronic pain, Merck commissioned a consumer tracking study called the "Awareness and Action Study;" it was also sometimes called the "Chronic Pain Study." The study was conducted by a

20

marketing research firm called Millward Brown from about May 2000 through at least December 20003. Millward Brown conducted telephone interviews of consumers who said that they experienced chronic pain. Interviews were conducted 7 days a week, 12 months a year, and about 3600 interviews were completed annually. Most of the consumers who were interviewed either had arthritis or frequent back pain. (See Exhibit 30, Millward Brown "VIOXX Annual Review 2002 – 2003 January – December," page 5; see also Exhibit 31a, "Awareness, Action & Attributes for the A & A Franchise, T. Hayden June 5, 2002" page 3.) Based on the December 2000 findings, the average age of those interviewed was 55. About 26% were 65 years of age or older, and 50% were 55 years of age or older. (See Exhibit 32, "Vioxx Chronic Pain Study Dec. 1-17, 2000," page 4.)

— Pechmann Expert Report, Page 66-67. Merck also commissioned a tracking study of mostly elderly consumers who suffered from chronic pain. ... Merck's consumer tracking study, which was called the "Awareness and Action Study," was conducted by Millward Brown from May 2000 through at least 2003... The study monitored on a monthly basis what percent of consumers were aware of Vioxx, asked their physicians for Vioxx, filled Vioxx prescriptions, or asked to be taken off of Vioxx and why.

— Pechmann Expert Report, Page 33. Merck's "Awareness and Action Study" showed that a high percentage of the Vioxx target patient population of chronic pain sufferers had preexisting cardiovascular problems. In 2002, approximately 43% to 53% of Vioxx users had hypertension (a cardiovascular disease with high blood pressure as its primary symptom). In 2002, approximately 12% to 22% of Vioxx users had heart disease. (See Exhibit 31b, "Hayden slides and Back up, pages 8-9.)

2) <u>Pechmann Deposition "Exhibit 5" Pages 13-14 summarize the results of the "Awareness and</u> <u>Action or Chronic Pain Consumer Tracking Study." These results are also summarized in</u> <u>Pechmann's Expert Report as shown below.</u>

— **<u>Pechmann Expert Report, Page 67.</u>** Merck's consumer tracking study found that among the primary consumer target audiences, awareness of Vioxx was very high. In December 2003, 87% of arthritic sufferers were aware of Vioxx. By comparison, 93% of them were aware of Tylenol, which was a far more established nonprescription brand. Also, 38% of arthritis sufferers had tried Vioxx as compared to 73% for Tylenol. Sixteen percent currently used Vioxx as compared to 39% for Tylenol. <u>(See Exhibit 30, pages 13-15.)</u> Also in 2003, 59% of arthritic sufferers were aware of Vioxx's advertising; 60% were aware of Tylenol's advertising. <u>(Exhibit 30, page 46.)</u>

— **<u>Pechmann Expert Report, Page 67.</u>** Merck's consumer tracking study also examined Vioxx's "brand imagery." The study found that 40% of arthritic sufferers perceived Vioxx as a "brand that you trust" in 2002 as compared to 41% in 2001. Similarly, 44% of arthritis sufferers perceived Vioxx as a brand that is "prescribed for millions of patients" in both 2002 and 2001. <u>(Exhibit 30, page 79.)</u>

— **<u>Pechmann Expert Report, Pages 67-68.</u>** Finally, Merck's consumer tracking study showed that "the number of patients being treated for heart disease and asking for VIOXX or Celebrex remains similar but is trending down" and a graph showed a downward trend starting about May 2001 when the unfavorable New York Times article about Vioxx appeared, which lasted through April 2002. Another graph of *the same time period* documented a gradual increase in the "percentage of respondents who have asked their doctors to be taken off VIOXX" and noted that this percentage was "significantly higher when compared to those who have asked their doctor to be taken off of CELEBREX." <u>(See Exhibit 31a, pages 8 and 10.)</u>

However, this report and a later report documented that consumer requests to be taken off Vioxx had stabilized by mid 2002 and remained stable through December 2003. (See Exhibit 31a, page 27 and Exhibit 30, pages 33-36.

— Some related results from Pechmann Expert Report Exhibit 31a are listed in Pechmann's Deposition "Exhibit 5" Pages 13-14, as shown below.

- Pechmann Deposition "Exhibit 5" citing Exhibit 31a, pages 16-17. Graphs show that consumers' perceptions of Vioxx as "safe as a sugar pill" and "brand that you can trust" remained stable from Jan. 01 – March 02 despite negative press in the New York Times, JAMA, and Wall St. Journal.

— Also, some related results from Pechmann Expert Report Exhibit 30 are listed in Pechmann's Deposition "Exhibit 5" Pages 13-14, as shown below.

- Pechmann Deposition "Exhibit 5" citing Exhibit 30, pages 68-69. "Impact of DTC Advertising. Net action rate for VIOXX and Celebrex is comparable (6% for VIOXX vs. 8% for Celebrex in 2003. This holds true within all pain subgroups. There is no change over time in net action rate. … Among those who received a prescription for either brand, almost everyone (average of 90%) filled the prescription."

3) Pechmann Deposition "Exhibit 5" Pages 12-14 and similar information in Pechmann's Expert Report substantiate Pechmann's opinion as stated on page 62 of the Expert Report that: **Merck's marketing executives purchased extensive marketing research to ensure their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing consumers' concerns that Vioxx posed a potential cardiovascular risk.**

F. Pechmann Deposition "Exhibit 5" Pages 15-16 Regarding "Consumer Ad Copy Testing" Contains a Subset of the Information Provided in Pechmann's Expert Report Plus Some Additional Details.

23

1) <u>Pechmann Deposition "Exhibit 5" page 15 describes the methodology used for Consumer Ad Copy Testing (See MRK-ACB0005808).</u>

   a) <u>Research Objectives (See MRK-ACB0005808, page 4).</u> "To measure in-market performance ... We learn/know about how advertising works in-market .. To predict in-market performance."

   b) <u>Research Methodology and Participants (See MRK-ACB0005808, pages 5-6).</u> "*Sample: 150 males (40%) / females (60%). Aged 30 and over (24% 30-39, 26% 40-49, 24% 50-59, 23% 60+). Arthritis sufferers (50% and other chronic pain sufferers (50%). Must be taking Rx or OTC medication for arthritis or chronic pain, Last saw doctor about condition in the past 12 months, Take OTC medication at least four times per week or Rx medication at least once a week, and Have asked doctor about a medication they have seen on television, in a magazine or newspaper... Field Dates: Vioxx 'Stairs/Bath' January 6-27, 2000. 'Celebrex' January 20 – February 10, 2000.*"

   c) <u>*The research methodology and participants were briefly described in Pechmann's Expert Report, Page 64.*</u>

   **Merck also commissioned "copy test" studies of its Vioxx television and print ads from a marketing research firm called Millward Brown. Merck commissioned this research to ensure that its advertisements were as persuasive as possible, and did not contain side effect information that would deter consumers from "taking action" in terms of finding out more about Vioxx or requesting a Vioxx prescription. Merck sometimes copy tested Celebrex ads as well. Celebrex was Vioxx's main competitor. Merck wanted to ensure that its Vioxx advertisements were at least as persuasive as those of Celebrex, and at least as innocuous in terms of the risk information conveyed.**

2) <u>Pechmann Deposition "Exhibit 5" Pages 15-16 summarize the results of the Consumer Ad Copy Testing. The results are also summarized in Pechmann's Expert Report as shown below.</u>

— <u>Pechmann Expert Report, Pages 64-65.</u> A Merck document entitled "Vioxx© DTC [*direct-to-consumer advertising*] *Research Review Doug Black and Alan Heaton February 17, 2000*" discusses some of the research findings regarding Vioxx's direct-to-consumer advertisements. The research found that: "Approximately 60 Percent of Consumers Reported that Seeing [the Vioxx television advertisement] Stairs/Bath Would Increase their Interest in Learning More about Vioxx©." (Exhibit 66, page 30.) The findings also indicated that: "Side Effects were NOT the Main Idea that Consumers were Taking Away [from the television advertisement]" and that "As with the TV Ads, Side Effects were NOT the Main Idea that Consumers were Taking Away From the Vioxx© Print Ads." The document noted that: "Consumers are concerned about side effects, but it does not significantly affect motivation [to visit or call their doctor for information about Vioxx]." (Exhibit 66, pages 32, 33 and 36.)[5] The document concluded that Vioxx's direct-to-consumer advertisements were highly effective: "Consumer awareness of ads for Vioxx© rose significantly in January 2000 which added to … Significant increases in awareness of the brand which is associated with … Higher patient-initiated action for Vioxx©. Once patients take action, there is a high conversion rate to the brand for which they initiated action." (Exhibit 66, page 23.) Details were also provided: "At initial read, approximately 40% of the patients receiving Rx for Coxibs in late 1999/early 2000 engaged in some patient-initiated action" and "When a consumer takes action for a brand, an Rx [prescription] is received almost 9 times out of 10. In addition between 70 and 90% of the time the Rx is filled for the Coxibs [Vioxx/Celebrex]." (Exhibit 66, pages 17-19.)

---

[5] Pechmann Expert Report Exhibit 66, page 32 contains a bar chart and shows that there was no statistically significant difference between consumers who reported being very concerned vs. not very concerned about Vioxx's side effects in terms of their motivation to visit or call their doctor for information about Vioxx.

25

— **Pechmann Expert Report, Pages 65-66.** A Merck document entitled "Consumer Perceptions of Side Effects for Vioxx© 'Stairs/Bath' and CELEBREX 'Bicycle' Alan Heaton March 7, 2000" describes the results of a copy test study to test the Stairs/Bath and Bicycle ads. The research showed that "Consumers are concerned about side effects for both Vioxx© and CELEBREX" but "Concern about side effects *[as conveyed in these ads] does not* appear to affect intended action for either product." (Exhibit 67, pages 1-2.) The consumers who participated in the copy test study of these ads were asked: "Do you recall seeing or hearing any mention of side effects from Vioxx/Celebrex in the commercial?" and "What side effects do you remember?" The most common responses were related to stomach or bleeding risks, or liver or kidney risks. Consumers did not mention heart attacks or related problems because these risks weren't included in the ads. Consumers were also asked: "How strongly does the [Vioxx] commercial give you the impression Vioxx is safe to use" and 41% responded: "strongly gave that impression." (Exhibit 67, pages 11- 12.)

— **Pechmann Expert Report, Page 63.** After the FDA had recommended that a cardiovascular warning be included on the new Vioxx label (see Appendix A), Merck commissioned consumer research to assess the "business risk" of including such a warning in its advertisements. Merck also studied how to word or phrase any required cardiovascular warning, *so that the warning* "*would not keep us from our product claim.*" This research is discussed in a Merck document entitled "VIGOR DTC (direct-to-consumer advertising) Strategy Meeting June 7th, 2001." The document states that research was done to: "Assess business risk of new fair balance in product claim" and states that the following potential cardiovascular warning would be tested: "People who need to take asa [aspirin] with VIOXX are at greater risk of developing stomach ulcers. VIOXX is not a substitute for prevention of heart

attack. Rarely, heart attacks have been reported." The document noted that "All of this is dependent upon final [Vioxx] label. Assume qualitative and quantitative research will confirm that additional balance does not keep us from product claim. If incorrect, reassess media options (Reminder) and Help Seeking advertising." (Exhibit 64, page 14.) In other words, if Merck's research showed that including a cardiovascular warning in Vioxx ads detracted from the ads' product claims, Merck would stop using Vioxx product claim ads altogether. Instead, Merck would revert to using "reminder" ads and "help-seeking" ads, which would not require warnings. Reminder ads remind people of a product (e.g., Vioxx). Help-seeking ads tell people to talk to their physicians if they suffer from particular medical problems. Since reminder ads and help seeking ads do not contain product claims, they do not require warnings.

— **Pechmann Expert Report, Page 64.** A Merck document entitled "VIGOR Updated June 29th, 2001" noted that once the Vioxx product label was changed to include the VIGOR study, Vioxx ads might need to include a cardiovascular fair balance warning. The document explained that one warning had already been tested, which stated: "Rarely, heart attacks have been reported." The research showed that "Although another serious side effect, it did not overwhelm the product benefits." (Exhibit 65, pages 6-7.) Note that the cardiovascular information that Merck ultimately included in its print ads for Vioxx used somewhat similar wording.

3) Pechmann Deposition "Exhibit 5" Pages 15-16 and similar information in Pechmann's Expert Report substantiate Pechmann's opinion as stated on page 62 of the Expert Report that: Merck's marketing executives purchased extensive marketing research to ensure their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing consumers' concerns that Vioxx posed a potential cardiovascular risk.

# CORNELIA (CONNIE) PECHMANN
## PROFESSOR, MARKETING
### THE PAUL MERAGE SCHOOL OF BUSINESS
### UNIVERSITY OF CALIFORNIA, IRVINE
### IRVINE, CALIFORNIA 92697

**HOME:** 1604 Harkness Street.
Manhattan Beach, CA 90266

**EMAIL:** cpechman@uci.edu
**WEB:** http://web.gsm.uci.edu/~cpechmann/

**PHONES:**
(949) 824-4058 (work)
(949) 725-2840 (work fax)
(310) 372-9007 (home)
(310) 372-9008 (home fax)

## TEACHING AND RESEARCH AFFILIATIONS SINCE PH.D.
- Graduate School of Management, University of California, Irvine (UCI)
- Renamed The Paul Merage School of Business in 2005.
  - UCI Graduate School of Management (GSM)
    - Assistant Professor of Marketing, Fall 1988 - Spring 1995
    - Associate Professor of Marketing, Summer 1995 - Spring 2003
    - Full Professor of Marketing, Summer 2003 - present
  - UCI School of Social Ecology, Department of Environmental Analysis and Design
    - Adjunct Professor, Fall 1997 - present
  - UCI Center for Health Policy & Research
  - UCI Transdisciplinary Tobacco Use Research Center
  - UCI Cancer Center

## TEACHING AFFILIATION PRIOR TO PH.D.
California State University - Fullerton, School of Business Administration and Economics
  - Assistant Professor of Marketing, Fall 1986 - Spring 1988

## TEACHING AND SERVICE AWARDS
2005 Co-chair of Association for Consumer Research North American Conference
2004 UCI Graduate School of Management "Exceptional Faculty Service" Award
2004 Journal of Public Policy & Marketing "Exceptional Contribution by Reviewer" Honorable Mention
2003 Graduate School of Management "Best Elective" course in Full Time MBA program
2001 Charles and Twyla Martin Excellence in Teaching Award, GSM, UCI
2001 Business 2.0 "Key Professor" List, in article on 20 Top Technology-Savvy Business Schools
2000 Lincoln Mercury Marketing Lab Sponsorship, GSM, UCI (5 year sponsorship)
2000 Conexant Teaching Award, GSM, UCI
2000 BusinessWeek, B-Schools Rankings & Profiles, "Most Popular Professors" Listing
2000 BusinessWeek, B-Schools Rankings & Profiles, "Most Popular Electives" Listing
2000 Journal of Consumer Research "Outstanding Reviewer" Award
1999 Journal of Public Policy & Marketing "Exceptional Contribution by Reviewer" Award

## PARTIAL LIST OF ACADEMIC AND PROFESSIONAL HONORS
"Best Paper in 2002" Award, Journal of Consumer Research (awarded in 2005)
List of Top 50 Marketing Scholars, 2003 (based on citation counts)
Who's Who in Economics, Fourth Edition, 2002 (based on citation counts)
Chair of Terry Zhao's dissertation, runner-up in SCP-Sheth dissertation competition 2004
Chair of Dipayan Biswas' dissertation, recipient of ACR-Sheth dissertation competition 2002
Marketing Science Institute Alden G. Clayton Dissertation Award 1987
American Marketing Association Doctoral Consortium Faculty Member 1993, 1997, 2001
American Marketing Association Doctoral Consortium Fellow, 1986
Phi Beta Kappa National Honor Society (President)
Beta Gamma Sigma National Honor Society (Management)

Alpha Lambda Delta National Honor Society (Psychology)
Bucknell University Rhodes Scholar Nominee
Who's Who of American Women
Who's Who in Advertising
Who's Who in Executives and Professionals
Who's Who in Finance and Business
Who's Who in the West
Who's Who in the World
Who's Who in Executives and Professionals

## COURSES TAUGHT
Introduction to Marketing, Undergraduate
Consumer Behavior, Undergraduate
Freshman Seminar on Tobacco Use Prevention, Undergraduate
Principles of Marketing for Management, MBA
Consumer Behavior, MBA
Database Marketing, MBA
Micro Marketing, MBA
Marketing IT Lab, MBA (on GIS and POS systems)
Marketing Field Study Projects, MBA
Design of Experiments and Quasi Experiments (Ph.D.)
Analysis of Data from Experiments & Quasi Experiments (Ph.D.)
Research Topics in Marketing (Ph.D., team taught)

## EDUCATION
| | |
|---|---|
| Vanderbilt University, Nashville, TN | August 1988, Ph.D. (Marketing Management) |
| | December 1985, M.B.A. (Marketing Management) |
| | May 1985, M.S. (General Psychology) |
| Bucknell University, Lewisburg, PA | May 1981, B.A. (Psych/Spanish), Summa Cum Laude |

## DOCTORAL DISSERTATION IN MARKETING MANAGEMENT
The Development and Partial Validation of a Contingency Model of Comparative Advertising

## MASTER'S THESIS IN GENERAL PSYCHOLOGY
Development of a Scale to Measure the Marital Role Dissonance of Parents with Diabetic Children

## GRANTS
| | |
|---|---|
| Tobacco-Related Disease Research Program of the State of California 2005 | $480,000 |
| UCI Transdisciplinary Tobacco Use Research Center 2003 (Pilot) 25,000 | $ |
| Tobacco-Related Disease Research Program of the State of California 2000 | |
| Tobacco-Related Disease Research Program of the State of California 1999 (Pilot) | $590,375 |
| Tobacco-Related Disease Research Program of the State of California 1997 | $ 10,000 |
| Palmer Jarvis Advertising (for Health Canada) 1996 | $136,953 |
| Tobacco-Related Disease Research Program of the State of California 1993 | $ 3,759 |
| U.C.I. Graduate School of Management, Office of Research Grant 1993 | $192,570 |
| Tobacco-Related Disease Research Program of the State of California 1991 | $ 3,667 |
| U.C.I. Faculty Career Development Grant 1990 | $ 72,837 |
| U.C.I. Faculty Research Grant 1990 | $ 8,563 |
| National Institute of Mental Health Undergraduate Research Grant 1976 | $ 3,600 |
| | $ 5,000 |

2

# REFEREED PUBLICATIONS

**Journal Articles (chronological order)**

1. Pichert, J.W., S.L. Hanson, and C. Pechmann (1984), Modifying Dieticians' Use of Patient Time," *The Diabetes Educator*, 10, 1, 43-46.

2. Pichert, J.W., S.L. Hanson, and C. Pechmann (1985), "A System For Assessing Use of Patients' Time," *Evaluation and The Health Professions*, 8, 1, 39-54.

3. Stewart, D.W., C. Pechmann, S. Ratneshwar, J. Stroud, and B. Bryant (1985), "Methodological and Theoretical Foundations of Advertising Copytesting: A Review," in *Current Issues and Research in Advertising*, J.H. Leigh and C.R. Martin, eds., Ann Arbor, MI: The University of Michigan Press, 1-74.

4. Pechmann, C. and D. W. Stewart (1988), "Advertising Repetition: A Critical Review of Wearin and Wearout," in *Current Issues and Research in Advertising*, J.H. Leigh and C.R. Martin, eds. Ann Arbor, MI: The University of Michigan Press, p. 285-330.

5. Stewart, D.W., G.B. Hickson, C. Pechmann, S. Koslow, and W.A. Altemeier (1989), "Information Search and Decision Making in the Selection of Family Health Care," *Journal of Health Care Marketing*, 9, 2 (June), 29-39.

6. Pechmann, C. and D. W. Stewart (1990), "The Effects of Comparative Advertising on Attention, Memory, and Purchase Intentions," *Journal of Consumer Research*, 17 (September), 180-191.

7. Pechmann, C. and S. Ratneshwar (1991), "The Use of Comparative Advertising for Brand Positioning: Association versus Differentiation," *Journal of Consumer Research*, 18 (September), 145-160.

8. Pechmann, C. and D.W. Stewart (1991), "How Direct Comparative Ads Promoting Low, Moderate and High Share Brands Affect Brand Choice," *Journal of Advertising Research*, 31 (December), 47-55.

9. Pechmann, C. (1992), "Predicting When Two-Sided Ads Will Be More Effective Than One-Sided Ads: The Role of Correlational and Correspondent Inferences," *Journal of Marketing Research*, 29 (November), 441-453.

10. Pechmann, C. and S. Ratneshwar (1992), "Consumer Covariation Judgments: Theory or Data Driven?" *Journal of Consumer Research*, 19 (December), 373-386.

11. Pechmann, C. and S. Ratneshwar (1994), "The Effects of Anti-Smoking and Cigarette Advertising on Young Adolescents' Perceptions of Peers Who Smoke," *Journal of Consumer Research*, 21 (September), 236-251.

12. Pechmann, C. and G. Esteban (1994), "Persuasion Processes Associated with Direct Comparative and Noncomparative Advertising and Implications for Advertising Effectiveness," *Journal of Consumer Psychology*, 2(4), 403-432.

13. Pechmann, C. (1996), "Do Consumers Overgeneralize One-sided Comparative Price Claims and Are More Stringent Regulations Needed?" *Journal of Marketing Research*, 33 (May), 150-162.

14. Ratneshwar, S., C. Pechmann, and A.D. Shocker (1996), "Goal-Derived Categories and the Antecedents of Across-Category Consideration," *Journal of Consumer Research*, 23 (December), 240-250.

15. Pechmann, C., P. Dixon, and N. Layne (1998), "An Assessment of the United States and Canadian Smoking Reduction Objectives for Year 2000," *American Journal of Public Health*, 88 (September), 1362-1367.

16. Pechmann, C. and C.F. Shih (1999), "Smoking Scenes in Movies and Antismoking Advertisements Before Movies: Effects on Youth," *Journal of Marketing*, 63 (July), 1-13.
    o **Presented at California legislative hearings on smoking in movies**
    o **Presented to National Association of Attorneys' General**
    o **Presented to National Association of Theater Owners**

17. Pechmann, C. and E.T. Reibling (2000), "Planning an Effective Anti-Smoking Mass Media Campaign Targeting Adolescents," *Journal of Public Health Management and Practice*, 6 (3), 80-94.

18. Pechmann, C. and E.T. Reibling (2000), "Anti-Smoking Advertising Campaigns Targeting Youth: Case Studies from USA and Canada," *Tobacco Control*, Supplement II, Volume 9, ii18-ii31.

19. Ratneshwar, S., L.W. Barsalou, C. Pechmann, and M. Moore (2001), "Goal-Derived Categories: The Role of Personal and Situational Goals in Category Representations," *Journal of Consumer Psychology*, 10 (3), 147-158.

20. Pechmann, C. (2001), "A Comparison of Health Communication Models: Risk Learning Versus Stereotype Priming," *Media Psychology*, 3 (2), 189-210.

21. Pechmann, C. and S. J. Knight (2002), "An Experimental Investigation of the Joint Effects of Advertising and Peers on Adolescents' Beliefs and Intentions about Cigarette Consumption," *Journal of Consumer Research*, 29 (June), 5-19.
    o **Selected "Best Paper in 2002" by Journal of Consumer Research**
    o **Reprinted in "Consumer Behaviour" edited by Margaret Hogg, Sage Library in Business and Management Series, 2005 (forthcoming)**
    o **Presented during trial of U.S. Attorney General's case against tobacco firms, 2005**

22. Pechmann, C. (2002), "Overview of the Special Issue on Social Marketing Initiatives," *Journal of Public Policy and Marketing*, 21 (Spring), 1-2.

23. Kelder, S., C. Pechmann, M.D. Slater, J.K. Worden, and A. Levitt (2002), "The National Youth Anti-drug Media Campaign," *American Journal of Public Health*, 92 (8), 1211-1212 (letter).

24. Pechmann, C., G. Zhao, M.E. Goldberg, and E.T. Reibling (2003), "What to Convey in Antismoking Advertisements for Adolescents? The Use of Protection Motivation Theory to Identify Effective Message Themes," *Journal of Marketing*, 67 (April), 1-18.

25. Foley, D. and Pechmann, C. (2004), "The National Youth Anti-Drug Media Campaign Copy Test System," *Social Marketing Quarterly*, X-Special Issue (2-Summer), 34-42.

26. Pechmann, C., L. Levine, S. Loughlin, and F. Leslie (2005), "Impulsive and Self-conscious: Adolescents' Vulnerability to Advertising and Promotion, *Journal of Public Policy and Marketing*, forthcoming (Vol. 24, Number 2).

27.   Pechmann, C. and E.T. Reibling (2006), "Antismoking Advertisements for Youth: An Independent Evaluation of Health, Counter-industry, and Industry Approaches," *American Journal of Public Health,* forthcoming.

## Book Chapters and Edited Volumes (chronological order)

28.   Pechmann, C. and D.W. Stewart (1988), "The Multidimensionality of Persuasive Communication: Theoretical and Empirical Foundations," in *Cognitive and Affective Responses to Advertising*, A. Tybout and P. Cafferata eds., Lexington, MA: Lexington Press, 31-65.

29.   Pechmann, C. and D.W. Stewart (1994), "The Psychology of Comparative Advertising" in *Attention, Attitude and Affect in Response to Advertising*, E. M. Clark, T. C. Brock, and D. W. Stewart eds., Hillsdale, NJ: Lawrence Erlbaum Associates, 79-96.

30.   Pechmann, C. (1997), "Does Antismoking Advertising Combat Underage Smoking?  A Review of Past Practices and Research," in *Social Marketing: Theoretical and Practical Perspectives*, M.E. Goldberg, M. Fishbein and S. Middlestadt eds., Hillsdale, NJ:  Lawrence Erlbaum Associates, 189-216.

31.   D. Grewal and C. Pechmann (1998), Editors of *American Marketing Association Winter Educators' Conference Proceedings: Marketing Theory and Applications,* Volume 9, Chicago, Illinois: American Marketing Association.

32.   Pechmann, C. (2002), "Changing Adolescent Smoking Prevalence: Impact of Advertising Interventions," in *Changing Adolescent Smoking Prevalence: Where It Is and Why*, D. Burns, ed., Silver Spring, MD: National Cancer Institute, 171-181.

33.   Pechmann, C., L. FitzSimons and A. Chamie (2003), "Using Geographic Information Systems for Marketing Research," *Marketing Research*, A. Parasuraman, D. Grewal and R. Krishnan, eds., Houghton Mifflin Co., Chapter 5, 128-155.

34.   Pechmann, C. and Slater, M.D. (2005), "Social Marketing Messages That May Motivate Irresponsible Consumption Behavior," in *Inside Consumption: Frontiers of Research on Consumer Motives, Goals, and Desires*, D. Mick and S. Ratneshwar, eds., London, UK: Routledge, 185-207, 185-207.

35.   Pechmann, C. and Price, L. (2006), Editors of *Advances in Consumer Research,* Volume 33, Duluth, MN: Association for Consumer Research, forthcoming.

## Conference Proceedings Papers (chronological order)

36.   Pechmann, C. (1983), "A System For Assessing Use of Time in Clinic," in *Diabetes*, New York, NY: American Diabetes Association, 20.

37.   Stewart, D.W., G.B. Hickson, S. Ratneshwar, C. Pechmann, and W. Altemeier (1985), "Information Search and Decision Strategies Among Health Care Consumers," in *Advances in Consumer Research*, Volume 12, E.C. Hirschman and M.B. Holbrook eds., Provo, Utah: Association for Consumer Research, 252-257.

38.   Stewart, D.W., C. Pechmann, S. Ratneshwar, J. Stroud, and B. Bryant (1985), "Advertising Evaluation: A Review of Measures," in *Marketing Communications - Theory and Research*, M.J. Houston and R.J. Lutz eds., Chicago, IL: American Marketing Association, 3-6.

39.	Pechmann, C. and D.W. Stewart (1989), "A Learning Perspective of How Advertising Works: The Accumulation Model of Advertising Response," in the *Proceedings of the Division of Consumer Psychology*, Washington, DC: American Psychological Association, 97-99.

40.	Pechmann, C. and D.W. Stewart (1989), "Nonverbal Communication in a Natural Context: Consumer Markets," in the *Proceedings of the Division of Consumer Psychology*, Washington, DC: American Psychological Association, 68-71.

41.	Pechmann, C. (1990), "How Do Consumer Inferences Mediate the Effectiveness of Two-Sided Messages?" in *Advances in Consumer Research*, Volume 17, M. Goldberg, G. Gorn and R. Pollay eds., Provo, Utah: Association for Consumer Research, 337-341.

42.	Pechmann, C. and S. Ratneshwar (1990), "The Use of Comparative Advertising for Positioning Unfamiliar Brands: The Moderating Role of Attribute Typicality," in the *Proceedings of the Society for Consumer Psychology*, Washington, DC: American Psychological Association, 35-36.

43.	Pechmann, C. and G. Esteban (1991), "How Comparative Ads Affect Persuasion: The Moderating Role of Prior Motivation" in the *Proceedings of the Society for Consumer Psychology*, Washington, DC: American Psychological Association, 11.

44.	Pechmann, C. and S. Ratneshwar (1993), "Smoking-Related Advertising and Its Effects on Preteens: A Social Cognitive Perspective," in *Advances in Consumer Research*, Volume 20, L. McAlister and M. Rothschild eds., Provo, Utah: Association for Consumer Research, 265.

45.	Ratneshwar, S., C. Pechmann and A.D. Shocker (1994), "Consumer Consideration Sets and Choice Across Nominal Categories: The Role of Individual and Situational Goals," *Advances in Consumer Research*, Volume 22, C.T. Allen and D. Roedder John eds., Provo, Utah: Association for Consumer Research, 589.

46.	Pechmann, C. (1995), "When and How Extraneous Reference Prices Deter Choice of Competitors: Alternative Mediational Paths and Implications for Consumer Deception," *Advances in Consumer Research*, Volume 21, F.R. Kardes and M. Sujan eds., Provo, Utah: Association for Consumer Research, 430-431.

47.	Pechmann, C. and S.J. Knight (1996), "Cigarette Ads, Anti-Smoking Ads and Peers: Why Do Underage Youths Start Smoking Cigarettes?" *Advances in Consumer Research*, Volume 23, K.P. Corfman and J. Lynch eds., Provo, Utah: Association for Consumer Research, 267.

48.	Pechmann, C. and C.F. Shih (1997), "How Smoking in Movies and Antismoking Ads Before Movies may Affect Teenagers' Perceptions of Peers who Smoke, *Advances in Consumer Research*, Volume 24, M. Brucks and D.J. MacInnis eds., Provo, Utah: Association for Consumer Research, 62-63.

49.	Pechmann, C. and M.E. Goldberg (1999), "Should Anti-smoking Ads Attempt to Denormalize Tobacco Use? Alternative Perspectives and Theoretical Frameworks," *Advances in Consumer Research*, Volume 26, E. Arnold and L. Scott, eds., Provo, Utah: Association for Consumer Research, 410-411.

50.	Pechmann, C., M.E. Goldberg, E.T. Reibling and G. Zhao (2001), "Antismoking Advertising Campaigns Targeting Youth in the U.S. and Canada," *Proceedings of the 2001 Conference of the American Academy of Advertising*, C.R. Taylor, ed., Villanova, PA: Villanova University.

51.   Pechmann, C. et al. (2001), "Adolescents and Cigarette Advertising in Popular Magazines: The Fifteen Percent Rule and Beyond," *Marketing and Public Policy Conference Proceedings,* Chicago, Illinois: American Marketing Association, 47-51.

52.   Pechmann, C and E.T. Reibling (2003), "Research on Antismoking Advertising Messages For Youth," American Public Health Association 2003 Conference Abstracts, *http://apha.confex.com/apha/131am/techprogram/paper_59362.htm*.

## Published Working Papers (chronological order)

53.   Pechmann, C. and D.W. Stewart (1990), "Advertising Repetition: A Critical Review of Wear-In and Wear-Out," Marketing Science Institute, 90-106.

54.   Pechmann, C. and D.W. Stewart (1990), "The Development of a Contingency Model of Comparative Advertising," Marketing Science Institute, 90-108.

55.   Pechmann, C. and S. Ratneshwar (1993), "Advertising Versus Prior Beliefs: Does Anti-Smoking and Cigarette Advertising Alter Young Adolescents' Perceptions of Smokers?", Marketing Science Institute, 93-125.

## TECHNICAL REPORT

56.   Pechmann, C. and M.E. Goldberg (1998), "Evaluation of Ad Strategies for Preventing Youth Tobacco Use," report submitted to the California Tobacco Related Disease Research Program.
o   **Highlighted in Tobacco-Related Disease Research Program's "Report of Research from 1990 – 2000," p. 20.**

## PRESENTATIONS AT ACADEMIC CONFERENCES (alphabetical order)

Advertising and Consumer Psychology (1985, 1987, 1995)
American Academy of Advertising (1989, 1992, 2001)
American Diabetes Association (1983)
American Marketing Association (1985-1989, 2004, 2005)
American Public Health Association (2003)
American Psychological Association (1982, 1989-1992, 1994, 1998)
Association for Consumer Research (1987-1996, 1998, 2005)
Evaluation Network/Evaluation Research Society (1982)
Public Policy and Marketing Conference (1994, 2000, 2001)
Society for Consumer Psychology (1997)
Tobacco-Related Disease Research Program, Annual Investigator Meeting (1993, 1997, 1998)

## INVITED PRESENTATIONS (most current listed first)

Stanford University, Department of Marketing, January 2006
University of California Irvine, HCEMBA luncheon talk, July 2005
INSEAD, France, Department of Marketing, April 2005
University of Southern California, Annenberg School for Communication, January 2005
Colorado State University, Ft. Collins, Marketing Dept., November 2004
University of Missouri, Columbia, Marketing Dept., October 2004
Researching Risk Workshop, University of Utah, sponsored by AMA, May 2004

UCI Transdisciplinary Tobacco Use Research PhD trainee program, guest speaker, Spring 2003
University of Pennsylvania, Annenberg Center, Conference on "Reducing Adolescent Risk," June 2002
University of Oregon, Department of Marketing, April 2002
UCLA/USC/UCI Marketing Colloquium, University of California, Los Angeles, April 2002
UCI Transdisciplinary Tobacco Use Research undergraduate class, guest speaker, Fall 2001
American Marketing Association, Doctoral Consortium, University of Miami, June 2001
University of California, Irvine, Graduate School of Management, Corporate Partners, May 2001
Pennsylvania State University, Dept. of Marketing, talks on tobacco research, ITM for MBAs, May 2001
UCI, Transdisciplinary Tobacco Use Research undergraduate class, guest speaker, Fall 2000
University of California, Irvine, Dept. of Psych. & Social Beh., School of Social Ecology, October 2000
Association for Consumer Research Doctoral Consortium, Annual Conference, October 2000
University of Southern California, Instit. for Health Promotion & Disease Prev. Research, July 2000
Georgetown University, School of Business, April 2000
Tri-County Regional Team, Tobacco Education and Prevention, Ventura CA, March 2000
University of California, Irvine, Health Research Seminar, School of Social Ecology, January 2000
University of California, San Diego, Tobacco Control Policies Project, May 1999
University of California, Los Angeles (UCLA), Marketing Camp, January 1999
University of Alabama, Department of Marketing, December 1998
Tobacco-Related Disease Research Program, Annual Investigator Meeting, Plenary Session, Dec 1998
Simi Valley, CA High School Journalism Competition, November 1998
California State Senate Judiciary Committee Hearing on "Antismoking Advertising," October 1998
The Depiction of Tobacco and Illicit Drug Use in Entertainment Forum, June 1998
Project Directors' Meeting, California Department of Health Services, May 1998
University of Pennsylvania, Wharton School of Business Administration, April 1998
University of California, Irvine, Tobacco Research Mini-Conference, March 1998
Dartmouth University, Medical School, Cancer Center, December 1997
California State Senate Judiciary Committee Hearing on "Smoking in the Movies," October 1997
American Marketing Association Doctoral Consortium, University of Cincinnati, August 1997
University of Houston, Department of Marketing, April 1997
Seminar on Conducting Applied Research, CA Dept. of Health Services, Spring 1997
National High School Journalism Convention, CA Dept. of Health Services and Rogers & Assoc., 1996
Televised Press Conference, CA Depart. of Health Services and Rogers & Assoc.,1995
Ph.D. Student Information Session, Association for Consumer Research Conference, October 1995
GSM Corporate Partners and Faculty Speaker Series, June 1995
University of Southern California, UCLA/USC/UCI Marketing Colloquium, June 1995
University of Washington, Department of Marketing, March 1995
Washington State University, Department of Marketing, Winter 1993
Tobacco-Related Disease Research Program, First Scientific Conference, December 1993
American Marketing Association Doctoral Consortium, University of Illinois, August 1993
University of Southern California, Instit. for Health Promotion & Disease Prev. Research, Nov. 1992
University of Southern California, UCLA/USC/UCI Marketing Colloquium, June 1991
University of California, Santa Barbara, Department of Psychology, May 1990

## MEDIA COVERAGE OF RESEARCH (partial list, most current listed first)

- *REAL ORANGE* interview on KOCE-TV, Antismoking Messages in TV Sitcoms, July 15, 2005
- Mike Beirne, Brandweek.com, Effectiveness of anti-smoking messages in sit coms, July 5, 2005
- Gregory, John (2004), "Groundbreaking Research on Antismoking Ads," *i Magazine*, UC Irvine Graduate School of Management, Winter 2004, Issue 4, p. 4.

- Burton, Scot et al. (2003), "Certain Themes in Anti-smoking Ads Deter Teens," *Marketing News*, April 14, p. 30.
- Fairclough, Gordon (2002), "Study Slams Philip Morris Ads Telling Teens Not to Smoke," *Wall Street Journal*, May 29, B1.
- Newman, Deirdre (2002), "Ahead of the Curve," *Daily Pilot*, a division of the *LA Times*, Feb. 26.
- *Prevention File* (2001), "A Q&A With Connie Pechmann," Orange County, CA Edition, Spring, 3-4.
- Martelle, Scott & Yi, Daniel (2001), "Diversity Comes with Division," *LA Times*, April 15, B1 & B5.
- Dill, Mallorre (2000), "Butt-Kicking Advertising," *AdWeek*, November 6, p. 28.
- Rose, Jaimee (2000), "Messages that Cut Through the Smoke," *LA Times*, Aug. 20, B2.
- Orange County Newschannel (2000), Prime Story, Report on Antismoking Advertising Campaigns Targeting Youth, August 15.
- Johansson, Catrine (2000), *Irvine Spectrum News*, "Study Dissects Anti-smoking Campaigns' Effect on Teens," July 24-28, A5 & A7.
- Morgan, John (2000), "Movie Ratings Board Gets an 'F' on Smoking," *USA TODAY.com*, May 26.
- Boucher, Philippe (2000), "Rendez-vous with Cornelia (Connie) Pechmann," *Philippe Boucher's Rendez Vous*, May 15, www.tobacco.org.
- Pollay, Jeff (2000), "Silver Smoke Screen. Reality Bites Back," *Brill's Content*, January, p. 120.
- Beck, Jerome (1999), "Unselling Tobacco: An Overview of Counteradvertising Campaigns," *TRDRP Newsletter*, News from Tobacco-Related Disease Research Program, Vol. 2, No. 3, Nov., p. 6-8.
- Marketing News (1999), "Identifying Enemy is Key Theme in JM," July 19, p. 45.
- Azar, Beth (1999), "Antismoking Ads that Curb Teen Smoking," *American Psychological Association Monitor*, January, p. 14.
- Garvey, Megan (1998), "US Anti-Smoking Drive Falling Short," *LA Times*, Sept. 9, Metro 1.
- Gellene, Denise (1997), "Anti-Smoke Screen: L. A. County Films Ads to Counter Cigarettes' 'Cool' Movie Image --but Few Theaters Show Them," *LA Times*, Dec. 11, D1 & D5.
- Canadian Broadcast Service (1997), Sunday Morning News Show, Depictions of Smoking in Movies, November.
- Russell, Sabin (1997), "Studios Asked to Deglamorize Smoking: State Legislator Wants Films to Stop Gratuitous Tobacco Use," *San Francisco Chronicle*, Oct. 28, A1.
- ABC World News This Morning (1997), Report on Depictions of Smoking in Movies, Oct. 28.
- Eyewitness News (1997), KABC-TV, LA, Report on Depictions of Smoking in Movies, Oct. 27.
- Vanzi, Max (1997), "Lawmaker Targets On-Screen Smoking," *LA Times*, Oct. 26, A3.
- Adelson, Andrea (1997), "Is Anybody Getting the Picture? Despite Ads, Teen-Age Smoking is Unabated, *The New York Times*, July 16, C1 & C6.
- Parker-Pope, Tara (1997), "Push Against Smoking Opens on Silver Screen", *Wall Street Journal*, May 19, B1 & B6.
- Adelson, Andrea (1997), "California Takes on the Tobacco Industry with a $22 Million Campaign to Discourage Smoking," *The New York Times*, April 4, C2.
- Peterson, Karen S. (1997), "Teens Pick Up on Move Smoking. Study: Turn Them Off with Anti-tobacco Ads," *USA Today*, Jan. 6, D1.
- Alsberg, Peter, (1996), "Up in Smoke," *The Washington Post*, Dec. 29, C5.
- Archibold, Randal C., (1996), "Anti-Tobacco Ads 'Inoculate' Teen Filmgoers in UCI Study," *LA Times*, Dec. 20, B1 & B6.

## OTHER PROFESSIONAL ACTIVITIES

**Service to Academic Community**

Editor

Journal of Public Policy and Marketing, Special Issue, Social Marketing Initiatives (Spring '02)

Editorial Review Boards

Journal of Consumer Research (1992 - present)
Journal of Public Policy and Marketing (1993 - present)
Journal of Consumer Psychology (1996 - 2000, 2005 - present)
Current Issues and Research in Advertising (1998 - present)
Media Psychology (1995 - present)
Social Influence (2005 - present)
Journal of Marketing (1996 - 2005)
Journal of Marketing Research (1999 - 2003)

Conference Co-chair

Association for Consumer Research, North American Conference (9/05)
American Marketing Association Winter Educators' Conference (2/98)
Tobacco-Related Disease Research Program, Second Scientific Conference (12/97)
Society for Consumer Psychology Annual Conference (2/97)

Conference Track Chair

American Marketing Association Winter Educators' Conference, Promotions Track, 1995
American Psychological Association Annual Conference, Division 23 Track, 1994

Conference Program Committee

Association for Consumer Research (1991, 1993, 1995, 1997)

Ad Hoc Reviewer

American Journal of Public Health
Health Psychology
Journal of Advertising
Journal of Business Research
Journal of American Medical Association (JAMA)
Journal of Communication
Journal of Health Communication
Journal of International Marketing
Journal of Interactive Marketing
Journal of Marketing
Marketing Letters
National Cancer Institute, Monograph Series on Tobacco
Nicotine and Tobacco Research
Prevention Research Center, Berkeley, California
Psychology and Marketing
Sloan Management Review
Tobacco Control

Conference Paper Reviewer

Association for Consumer Research
American Marketing Association
American Academy of Advertising
Academy of Marketing Science
Public Policy and Marketing
Advertising and Consumer Psychology

Dissertation Award Reviewer

Academy of Marketing Science
American Marketing Association
John A. Howard Dissertation Competition
SCP-Sheth Foundation Dissertation Proposal Competition
Marketing Science Institute
Procter & Gamble

Grant Proposal Reviewer or Grant Evaluator

Louisiana Health Excellence Fund

10

Social Sciences and Humanities Research Council of Canada
Ontario Tobacco Research Unit, University of Toronto
U.S. National Science Foundation

Textbook Reviewer
Prentice Hall
Harper Collins Publishers
South-Western Publishing Company

External Reviewer for Promotion Cases
2004-05: Wrote 4 letters

**School and Campus Service (most current listed first)**
GSM Faculty Chair, 2004 - 2005
GSM Faculty Advisory Committee 2003 - 2005 (chair in 03-04)
GSM Strategic Planning Committee, 2003 - 2005 (chair)
GSM Masters' Program Committee, 1989-1990, 1995-1996, 1999-2001, 2001-2002 (chair), 2002-2003
GSM Information Technology and Management Program Committee, 1998-2001 (chair)
GSM Computing Committee, 1997-1999
GSM Faculty Advisor to Director of Marketing, 1993-1998
GSM Affirmative Action Committee, 1993-1996
GSM Marketing Area Coordinator, 1994-1995
GSM Undergraduate Educational Policy Committee, 1994
GSM Faculty Executive Committee, 1990-1993
GSM Faculty Recruiting Committee, 1988-1989

UCI Council on Research, Computing & Library Resources, 2003-2007 (chair 04-05)
UCI Academic Senate, Council Representative, 2004-2005
UCI Ad-hoc Reviewer of Faculty Career Development Awards (2005)
UCI Human Subjects' Institutional Review Board, member 1998 – 2001, vice chair 2001-2002
UCI Advisory Board, Extension Program in Marketing Communications, 1988-1998
UCI Pregraduate Mentorship Program, Faculty Mentor, 1995-1996
UCI Advisory Committee on Research Infrastructure and Computing, 1995-1996
UCI Fulbright Campus Committee, 1994
UCI Chancellor's Advisory Committee on Intercollegiate Athletics, 1990-1993

**Professional Affiliations**
American Academy of Advertising (AAA)
Association for Consumer Research (ACR)
American Marketing Association (AMA)
American Psychological Association (APA)
American Public Health Association (APHA)
Society for Consumer Psychology (SCP), served as Education and Training Chair

**Consulting – Paid and Pro Bono (most current listed first)**
- Robinson, Calcagnie & Robinson, Newport Beach, CA, tobacco litigation (2004 – present)
- PRISM Awards Reviewer (EIC, NIDA, Robert Wood Johnson; pro-bono, 1997 – present)
- Sentinel Awards Reviewer (Hollywood, Health & Society, CDC, NCI; pro-bono, 2005 – present)
- Wilmer Cutler Pickering Hale & Dorr, Washington DC, American Legacy Foundation v. Lorillard (2004 – 2005)
- Consultant on Mary Ann Pentz's smoking prevention media literacy project, USC (2000 – 2005)
- Youth Media Expert Panel, University of Vermont project on antismoking ads (2001 - 2003)
- American Legacy Foundation, Media and Countermarketing Expert Panel (2000 – 2003)
- White House Office of National Drug Control Policy, Behavior Change Expert Panel, National Youth Anti-Drug Media Campaign (1998 – 2004)
- Blumenthal & Markham, San Diego, CA, tobacco litigation (1999   2003)

11

- Consultant on Don Helme's antismoking ad research project, Cooper Institute, CO (2001 – 2002)
- US Census Bureau, Advisory Committee of Professional Associations (pro-bono, 1998 – 2002)
- Campaign for Tobacco-Free Kids (tobacco policy expert)
- American Psychological Association (pro-bono), contributed to APA response to FDA Tobacco regs.
- Houston Effler Favat Advertising (now Arnold Advertising; contract with Mass. Dept. Health)
- California Air Resources Board (ICAT Program)
- Merrill Lynch (for Munger, Tolles & Olsen - Attorneys at Law)
- Rogers & Sheffield, Attorneys and Counselors At Law, Santa Barbara, CA
- Osler, Hoskin and Harcourt, Barristers & Solicitors, Toronto, Canada (comparative ad litigation)
- American Savings Bank, Irvine, CA
- CommerceBank, Newport Beach, CA
- San Clemente Savings and Loan, Irvine, CA
- The Nashville Consulting Group, Nashville, TN
- Neighborhood Housing Services, Nashville, TN
- The Vanderbilt University Diabetes Research and Training Center, Nashville, TN
- The Program Evaluation Laboratory, Vanderbilt University, Nashville, TN
- The Veterans Administration Hospital, Nashville, TN

## PERSONAL

Mother of Erica Henrietta Leventhal, born October 25, 2002.
USHGA Para IV Advanced Paraglider pilot and safety observer, 1992-1999.
Institute of European Studies Junior Year Abroad Program, Madrid, Spain, 1979-1980.
Founder and 1st President of Gamma Phi Beta Sorority, Bucknell University, 1978-1979.
Rotary International Exchange Student Program, Cochabamba, Bolivia, 1975-1976.