UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| Gerald Barnett v. Merck & Co., Inc. | * | CASE NO. 02:06CV00485 |

### PLAINTIFFS' OPPOSITION TO MERCK'S MOTION TO EXCLUDE TESTIMONY OF DOUGLAS P. ZIPES, M.D.

### (DEFENDANT'S EXPERT CHALLENGE NO. 7)

Plaintiff, by and through his attorneys, files this brief in opposition to Merck's Motion to Exclude the Opinion Testimony of Douglas Zipes, M.D. As outlined below, Dr. Zipes is qualified to proffer each of the opinions challenged in Merck's motion, and his testimony is both reliable and relevant.

**I.   INTRODUCTION**

Merck seeks to eliminate the testimony of one of the most renowned and respected cardiologists in the country. Dr. Zipes's qualifications are impeccable and his expert testimony regarding cardiology issues has previously been accepted by this Court. (*In re Propulsid Products Liability Litigation*, 261 F.Supp.2d 603.) Merck's challenges are wholly without merit and should be soundly rejected.

Dr. Zipes's testimony establishes two basic facts: (1) There is reliable scientific evidence demonstrating that Vioxx causes accelerated atherosclerosis. Plaintiff's opposition to Merck's

1



motion number 1, which is incorporated herein by reference, details the compelling scientific evidence for that conclusion. (2) Vioxx not only caused Mr. Barnett's six-vessel disease, it caused his heart attack, required him to have a 5-vessel bypass, has damaged the bypass vessels and significantly diminished his life expectancy. Dr. Zipes's opinion in this regard is not only supported by a wealth of reliable scientific evidence, it is substantiated by the most accepted methodology for determination of specific causation: the differential diagnosis.

Merck's challenges to Dr. Zipes's testimony are wholly unfounded. Most appalling is Merck's mischaracterization of what Dr. Zipes's opinions are and the bases for those opinions. For example, Merck's motion accuses Dr. Zipes of expressing opinions on "what Merck knew or should have known" and "Merck's compliance with FDA regulations." (Defendant's Memorandum, p. 1.) Dr. Zipes expresses no such opinions.

What Dr. Zipes does do is reference Merck's own documents – documents that contain admissions about Vioxx's mechanism of action, admissions that Vioxx causes accelerated atherosclerosis and admissions that Vioxx causes cardiovascular events like heart attack and stroke. The documents relied on by Dr. Zipes also demonstrate that the information Merck had was not communicated to the FDA.

The relevance of these documents is three-fold. First, they constitute legal admissions by the drug manufacturer about the drug itself - which can reasonably be relied on by plaintiff's expert. Indeed, what better evidence for an expert to rely on than the conclusions by a drug manufacturer's own scientists about what the drug does? Second, the information relied on also establishes a chronology that is necessary to demonstrate that at the time Mr. Barnett was prescribed Vioxx, Merck had sufficient scientific evidence to warrant its withdrawal from the market or, at the very least, a black box warning precluding its use by anyone with any indication

2

of cardiovascular disease. Third, the documents also demonstrate the proposition that, although Merck knew this vital information, it failed to provide it to the FDA in a timely and meaningful way, thus, once again, preventing a timely and meaningful warning to doctors, including plaintiff's doctors, about the cardiovascular risks associated with Vioxx.

Merck also attacks Dr. Zipes's opinions on the grounds that he relied on discussions with other peers and relies on the biostatistical calculations of another expert, Richard Kronmal. But neither of those challenges have either merit or impact.

With respect to Dr. Kronmal's calculations, they are valid and admissible, as set forth in plaintiffs' opposition to motion number 3, which is incorporated herein by reference. With respect to Dr. Zipes's discussions with his peers, applicable law, as discussed below, permits such a basis for an expert's opinions.

Merck's motion is an exercise in futility. Even if the Merck documents are excluded, even if the FDA references are excluded, even if the peer discussion is excluded, Dr. Zipes's opinion – and the scientific basis for it – does not change. As such, there is no basis for excluding Dr. Zipes's opinion under *Daubert*. Indeed, where "only a small part of the basis" of an expert's opinions are deemed to be unreliable, a district court abuses its discretion in granting a motion to exclude the expert's opinions. (*In re Paoli RR Yard PBC Litigation*, 35 F.3d 717 (3rd Cir. 1994).)

Finally, Merck seeks to preclude Dr. Zipes's opinion regarding Mr. Barnett's risk of heart attack at the time he began taking Vioxx because, Merck alleges, that opinion was not disclosed in his expert report. But that is simply not true. In his Rule 26 report, Dr. Zipes spent 5 pages summarizing Mr. Barnett's medical history, discusses his personal examination of Mr. Barnett in an additional three pages and – based on his medical findings in his examination of Mr. Barnett

3

and an analysis of his medical history and test results – analyzing in full detail the basis for his opinion that Vioxx caused Mr. Barnett's injuries. In his expert deposition Dr. Zipes expanded on that analysis, but the basic analysis was part of the original report. At the very least, any claimed "prejudice" can be cured by a further deposition of Dr. Zipes – which is the same procedure utilized by the parties with respect to the depositions of Dr. DeBauche and Dr. Roach, both of whom intend to rely on additional studies and information not disclosed in their expert reports.

In sum, Merck's motion has no merit. Dr. Zipes is a highly qualified expert, his analysis of the accelerated atherogenesis issue is based on sound scientific evidence and his differential diagnosis regarding the cause of Mr. Barnett's injuries is impeccable. Merck's motion must be denied.

## II.   LEGAL STANDARDS

As this Court discussed in its prior Vioxx *Daubert* decision:

> "Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known." (*In re Vioxx Products Liability Litigation*, 401 F.Supp.2d 565, 573 (E.D. La. 2005).)

Notably, "**[t]he focus is not on the result or conclusion, but on the *methodology*.**" (*Id.*, citing *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275-276 (5th Cir. 1998); emphasis added.) Further, "**[t]he proponent need not prove that the expert's testimony is correct**, but must prove by a preponderance of the evidence that the methodology used by the expert was proper." (*Id.*; emphasis added.) Finally, "[t]he validity or correctness of the conclusions is for the fact finder to determine." (*Id.*, at 574.)

4

Although the court has a "gatekeeping" role to play in the admission of expert evidence, that role is not intended to serve as a substitute for the adversary system: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [even] shaky but admissible evidence." (See FRE 702, Adv. Comm. Notes (2000) (internal quotes omitted).)

The admissibility of expert opinion depends on the following:

- Whether the opinion is based on specialized knowledge;
- Whether the opinion would assist the trier of fact;
- Whether the expert is appropriately qualified;
- Whether the opinion is reliable.

(See, F.R.E. 702, 703; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993).)

Merck does not contest that Dr. Zipes's opinions meet the first three requirements. In other words, by failing to challenge Dr. Zipes on those elements, Merck concedes that the opinions are based on specialized knowledge, that the opinions would assist the trier of fact and that Dr. Zipes is qualified to render the opinions. Merck's challenge, instead, focuses on the last prong, i.e., whether the opinions are reliable. In that context, there are three issues:

- Whether the testimony is based upon sufficient facts or data;
- Whether the testimony is the product of reliable principles and methods; and,
- Whether the witness has applied the principles and methods reliably to the facts of the case. (*Id.*)

First, the facts or data relied on by the expert need not themselves be admissible. (F.R.E. 703.) Indeed, experts commonly rely on books, articles and published data in their field of

5

expertise and apply their education, training and experience to the interpretation and application of that information in forming their opinions. (F.R.E. 703; *LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 436, fn. 5 (5th Cir. 1982.) But an expert may even express opinions **without published support** - the lack of support goes to weight, not admissibility. (*Dickenson v. Cardiac & Thoracic Surgery of Eastern Tenn.*, 388 F.3d 976, 980-981 (6th Cir. 2004.)

Experts' medical opinions may be based on the reports of others (F.R.E. 703, Adv. Comm. Notes; *Westfield Ins. Co. v. Harris*, 134 F.3d 608, 612 (4th Cir. 1998)), as well as the reports of calculations by others. (*Triton Corp. v. Hardrives, Inc.*, 85 F.3f 343, 346 (8th Cir. 1996).) And, especially relevant to one of Merck's challenges in this motion, an expert can base an opinion on statements made by other experts during consultation with them. (*Lewis v. Rego Co.*, 757 F.2d 66, 73 (3rd Cir. 1985); *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1988); *United States v. Brown*, 299 F.3d 1256-1257 (11th Cir. 2002).)

Second, the methodology is reliable if the expert has "good grounds" for the opinion, i.e., the opinion *is based on knowledge and experience in the specialty* and not on "subjective belief or unsupported speculation." (*Daubert*, at 589.) As explained in *Daubert* and by this Court in *In re Vioxx*, there is no definitive "checklist or test" for determining the reliability of the methodology, there are factors to be considered, including:

- Whether the methodology can be and has been tested;
- Whether the methodology has been subjected to peer review;
- Whether there is a known potential rate of error;
- Whether there are *standards controlling the technique used*; and
- Whether a know technique is generally accepted in the relevant scientific community.
   (*Daubert*; *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999).)

6

Importantly, when a party tries to discredit studies relied on by an expert, critical considerations include the question of whether the studies are peer-reviewed, developed independent of the litigation and generally accepted by the relevant scientific community.

In this case, Dr. Zipes's opinions are primarily based on the results of published, peer-reviewed studies conducted not only by Merck's own scientists and Scientific Advisory Committee members, but by respected scientists who have nothing to do with this litigation and/or who conducted those studies before this litigation commenced.

### III. DR. ZIPES'S OPINIONS ARE BASED ON RELIABLE SCIENCE

As set forth in detail in Plaintiffs' opposition to Merck's motion number one, which is incorporated herein by reference, the reasoning and methodology underlying the experts' opinions that Vioxx accelerates the development of atherosclerosis is based on sound science and is generally accepted in the relevant medical community. In fact, this Court has already accepted the FitzGerald Hypothesis and the conclusion derived from it that Vioxx accelerates atherogenesis as scientifically reliable under *Daubert*. (*In re Vioxx Products Liability Litigation*, 401 F.Supp.2d 565, 586-587 (E.D. La. 2005).)

Beyond that issue, Merck's specific challenges to Dr. Zipes's opinions are unjustified, unwarranted and insupportable. They should be rejected, and Merck's motion denied.

#### A. **Dr. Zipes is eminently qualified**.

In footnote 1 of its Memorandum, Merck quibbles that Dr. Zipes "renders this opinion despite admitting that, prior to having been retained in this case, he had neither diagnosed a person has having had a heart attack caused by Vioxx, nor had he even prescribed Vioxx to his patients." Given what we know about Vioxx now, the fact that Dr. Zipes never prescribed it was

a blessing to his patients. And to suggest that because Dr. Zipes has never previously diagnosed a Vioxx-cause heart attack is meaningless in light of Dr. Zipes's extensive research and clinical background, as detailed in his report, his curriculum vitae and his declaration. (Expert Report, pp. 1-3 and Exhibit A thereto; Declaration, pp. 1-5.)  Indeed, Dr. Zipes's testimony on cardiology issues has previously been accepted by this Court. (*In re Propulsid Products Liability Litigation*, 261 F.Supp.2d 603.) Based on his education, training and both clinical and research experience, he is supremely well qualified to express his opinions about Vioxx and its effect on Mr. Barnett.

### B. Dr. Zipes's reliance on Bresalier is appropriate and serves as only a part of the universe of scientific evidence supporting the conclusion that Vioxx causes cardiovascular events.

Merck expends considerable effort attacking Dr. Zipes's reliance on the Bresalier study – a peer-reviewed analysis of cardiovascular event data in Merck's own APPROVe study published in the prestigious New England Journal of Medicine in February, 2005 – and asserting that, as a "*post hoc* sub-group analysis," it cannot establish causation. There are several flaws in Merck's challenge.

- First, the study is a peer-reviewed study based on a human randomized clinical trial – the "gold standard" for scientific reliability[1]. Even Merck admits that "whether data has been published and peer-reviewed is an important factor that courts consider in

---

[1] See, e.g., Zipes Report, p. 19; *Graham v. Medical Mutual of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997); *In re Rezulin Products Liability Litigation*, 369 F.Supp.2d 398, 406 (S.D.N.Y. 2005); Michael D. Green et al., *Reference Guide on Epidemiology*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 333, 338-39 (Fed.Jud.Ctr., 2d ed.2000). Also, in his report, Dr. Zipes provides an extensive explanation of clinical trials, how they are designed, what makes a clinical trial's data most reliable and how they should be interpreted and applied. (Zipes Report, pp. 19-20.)

determining the data's scientific reliability," citing to *Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999) and *In re Propulsid Products Liability Litigation*, 261 F.Supp.2d 603, 605.) (Merck Opposition to Plaintiff's Motion to Exclude Opinion Testimony that Naproxen is Sufficiently Cardioprotective to Explain Excess Cardiac Risk in VIGOR, pp 11-12.) Since the Bresalier study is precisely that type of scientific evidence, there is no appropriate basis for Merck's challenge to it.

- Second, Merck itself relies on "second tier" evidence that is only "hypothesis-generating" in support of its own experts' opinions. (Merck Opposition to Plaintiff's Motion to Exclude Opinion Testimony that Naproxen is Sufficiently Cardioprotective to Explain Excess Cardiac Risk in VIGOR, p. 12, fn. 15.)

- Third, the Bresalier study does not stand alone. It is just part of the wealth of reliable scientific evidence that Dr. Zipes relies on for his opinions. It is the expanse, variety and reliability of the many published studies that renders Dr. Zipes' conclusions reliable. (See, e.g., *Glaser v. Thompson Medical Co., Inc.*, 32 F.3d 969 (6th Cir. 1994) [expert may rely on a variety of different types of scientific evidence in support of opinion]; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228-1229 (9th Cir. 1998) [expert's reliance on a variety of scientific information sufficient to admit opinion despite no scientific study demonstrating a direct connection between the product and the injury]; Carl F. Cranor & David A. Eastmond, *Scientific Ignorance and Reliable Patterns of Evidence in Toxic Tort Causation*, 64 Law & Contemp. Probs. 5, 48 (2001) [noting need for courts to recognize a wide variety of reliable scientific evidence that will support inferences about the toxicity of substances].)

Merck also complains that a *post hoc* analysis such as that contained in Bresalier "cannot prove a causal relationship." But, again, Bresalier does not stand alone and is but one of many published, peer-reviewed studies relied on by Dr. Zipes. And clinical studies such as those cited by Dr. Zipes are, in fact, sufficient to demonstrate causation. (*Haggerty v. Upjohn Co.*, 950 F.Supp. 1160, 1164 (S.D. Fla. 1996); *Hollander v. Sandoz Pharmaceuticals Corp.*, 95 F.Supp.2d 1230, 1238 (W.D. Okla. 2000).)

### C.   Dr. Zipes's reliance on Merck's own documents is appropriate in the context in which they are used.

Next, Merck contends that Dr. Zipes's opinions must be rejected because he purports to opine on what Merck knew and when it knew it. (Defendant's Memorandum, pp. 5-6.) Similarly, Merck contends that Dr. Zipes improperly opines about Merck's compliance with FDA regulations. (*Id.*, at p. 7.) But as Merck's own Memorandum notes, Dr. Zipes specifically stated that he could not and does not attempt to interpret what Merck was thinking. In fact, *none* of his opinions include *any* assessment of Merck's state of mind or its compliance with FDA regulations. (Zipes Report, pp 3-4.) All that Dr. Zipes opines is that Vioxx accelerates atherogenesis and that Vioxx caused Mr. Barnett's injuries. He does not even attempt to opine that Merck is a bad company or that it did anything wrong.

What Dr. Zipes *does* do is rely on Merck's own documentation as *factual evidence*. Dr. Zipes quotes from Merck's own documents – documents that constitute admissions about the biological effect of Vioxx – and the law provides that he may reasonably rely on those admissions in forming his opinions. (F.R.E. 801(d)(2)(A); *Donlin v. Aramark Corp.*, 162 F.R.D. 149, 150 (D. Utah 1995) [party's statement regarding causation is admissible as an admission

10

even though it is in the form of an opinion and a guarantee of trustworthiness is not necessary]; *Owens v. Atchinson Topeka & Santa Fe Ry. Co.*, 393 F.2d 77, 79 (5th Cir.1968).)

Similarly, Dr. Zipes's reference to Merck's documents and its communications with the FDA assist in establishing a chronology with respect to Mr. Barnett's use of Vioxx. Essentially, when Mr. Barnett started on Vioxx in early 2000, Merck was aware of the danger signals of cardiovascular risk present in the clinical trials. But Merck failed to inform the FDA, doctors or anyone else about this risk. Dr. Zipes's testimony merely supports causation, i.e., Merck knew, by the time Mr. Barnett started on the drug, that Vioxx increased the risk of cardiovascular injury. There is nothing improper about consideration of these factors in rendering the opinions at issue.

**D.   Dr. Zipes may properly rely on information gathered from his peers.**

At pages 6 and 7 of its Memorandum, Merck challenges Dr. Zipes's testimony to the extent it relies on his discussions with other cardiologists about Vioxx's cardiovascular risks, including accelerated atherogenesis. Merck objects to this testimony on the basis that it is hearsay. But in doing so, Merck ignores the long-standing rule that experts *can* rely on hearsay in forming their opinions. (F.R.E. 703; *LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 436, fn. 5 (5th Cir. 1982).) Additionally, experts may even rely on their own consultations with other experts to support their opinions. (*Lewis v. Rego Co.*, 757 F.2d 66, 73 (3rd Cir. 1985); *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1988); *United States v. Brown*, 299 F.3d 1256-1257 (11th Cir. 2002).) That being the case, there is nothing inappropriate about Dr. Zipes's testimony that he consulted with other experts.

### E. Dr. Zipes's reliance on Dr. Kronmal's calculations is proper.

Similarly, Merck's challenge to Dr. Zipes's opinions on the basis that he cannot properly rely on Dr. Kronmal's calculations must also fail.

Merck inappropriately tries to put plaintiffs "between a rock and a hard place" on this issue by asserting that if Dr. Kronmal testifies at trial, Dr. Zipes cannot because to do so would be duplicative and if Dr. Kronmal does not testify at trial, Dr. Zipes can, but cannot rely on Dr. Kronmal's calculations. This, of course, is not the law.

If Dr. Kronmal does not testify at trial, Dr. Zipes may still rely on Dr. Kronmal's report – just as he could on any other hearsay report, study or published literature. While those items may be hearsay and inadmissible, that does not preclude an expert's reliance on them; it only means that the information cannot be disclosed in direct examination. (F.R.E. 703; *LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 436, fn. 5 (5th Cir. 1982.).) Moreover, an expert may rely on calculations prepared by others in forming their opinions. (*Triton Corp. v. Hardrives, Inc.*, 85 F.3f 343, 346 (8th Cir. 1996).) Thus, even if Dr. Kronmal does not testify at trial about his calculations, Dr. Zipes may still properly rely on them.

And, of course, if Dr. Kronmal does testify at trial, that cannot rationally preclude Dr. Zipes's testimony. Dr. Kronmal's calculations form part of the foundation for Dr. Zipes's opinion. The testimony becomes duplicative if – and only if – their evidence overlaps, i.e., they both testify about how the calculations were made or they both testify in precisely the same way and on the same basis that Vioxx accelerates atherosclerosis. But unless and until that occurs at the time of trial, there is no basis for prematurely precluding the testimony at this point. (F.R.E. 403; F.R.C.P. 16; *Donnelly Corp. v. Gentex Corp.*, 918 F.Supp. 1126 (W.D. Mich. 1996).)

## IV. DR. ZIPES'S OPINIONS AND THE FUNDAMENTAL BASES FOR THEM WERE PROPERLY DISCLOSED

Finally, Merck argues that deposition testimony by Dr. Zipes about his calculation of the risk in 2000 that Mr. Barnett would have a heart attack in the future absent his use of Vioxx must be precluded. This testimony fits squarely within the scope of the opinions that Dr. Zipes expressed in his report, including the fact that given the condition of Mr. Barnett's heart in 1999 and within a month before his heart attack, Mr. Barnett would have had a life expectancy of at least 24 years; that his life expectancy has been reduced by 9-10 years; and that, but for his use of Vioxx, Mr. Barnett would not have had the heart attack that occurred in 2002. (Zipes Report, pp. 43-45.) In his Supplement Report provided prior to his deposition, Dr. Zipes elaborated on this issue and discussed updated guidelines for assessing Mr. Barnett's cardiac health prior to starting Vioxx. (Zipes Supplement Report, pp. 1-2.)

At his deposition, Dr. Zipes confirmed these analyses and added that he had performed an additional calculation of Mr. Barnett's cardiac risk at the time he started using Vioxx using a newly available software. (Zipes Depo., 260:6-262:8.) This additional analyses was wholly consistent with and not a departure from his reports. At most, this additional analysis provides only a basis for allowing Merck to take an additional deposition of Dr. Zipes on that issue after Merck and its experts have had an opportunity to assess it – just like Merck is providing certain of its experts for re-deposition after they conduct further analyses.

## V. CONCLUSION

Merck's effort to "pick through" Dr. Zipes's opinions and surgically remove bits and pieces of it is unavailing. Dr. Zipes's opinions are based on abundant and reliable scientific evidence, most of which Merck did not even bother to challenge. Even with respect to the bits and pieces of evidence that it did elect to contest, Merck has no proper basis and the evidence and information is not excludable. Consequently, Merck's motion should be denied.

Date: June 26, 2006

Respectfully submitted,

By  *Mark P. Robinson, Jr.*
Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California   94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Counsel for Plaintiff

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
**Co-Lead Counsel**

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Shelly Sanford
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas 77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Drew Ranier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1371

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3875
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone: (202) 783-6400
Facsimile: (307) 733-0028

Gerald E. Meunier
Gainesburgh Benjamin David Meunier &
Warshauer
2800 Energy Centre
1100 Polydras Street
New Orleans, LA 70163-2800
Telephone: (504) 522-2304
Facsimile: (504) 528-9973

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8, on this 26th day of June, 2006.

_____
MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson