# Plaintiffs' Response re FOSSLIEN

# Footnote 1A of 28

Egil Fosslien, M.D.

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX | ) |
| PRODUCTS LIABILITY LITIGATION | ) |
| | ) MDL Docket |
| This document relates to: | ) No. 1657 |
| GERALD BARNETT and | ) Section L |
| CORRINE BARNETT, | ) |
| Plaintiffs, | ) Judge Fallon |
| -vs- | ) |
| MERCK & CO., INC., | ) Magistrate Judge |
| Defendant. | ) Knowles |
| | ) |
| Civil Action No. 2:06cv485 | ) |

THE DEPOSITION OF EGIL FOSSLIEN, M.D.


June 8, 2006

Egil Fosslien, M.D.

Page 2

```
 1
 2
 3
 4          The deposition of EGIL FOSSLIEN, M.D., called
 5    by the Defendant for examination, taken pursuant to
 6    the Federal Rules of Civil Procedure of the United
 7    States District Courts pertaining to the taking of
 8    depositions, taken before CORINNE T. MARUT, C.S.R.
 9    No. 84-1968, a Notary Public within and for the
10    County of DuPage, State of Illinois, and a
11    Certified Shorthand Reporter of said state, at the
12    Park Hyatt Chicago, Fairbanks Room, 800 North
13    Michigan Avenue, Chicago, Illinois, on the 8th day
14    of June, A.D. 2006, commencing at 9:09 a.m.
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1    PRESENT:
 2          LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS,
 3          (625 Market Street, 11th Floor,
 4          San Francisco, California 94105,
 5          415-956-5257), by:
 6          MR. MARK G. CRAWFORD,
 7          mcrawford@lopez-hodes.com,
 8                appeared on behalf of the Plaintiffs;
 9          FULBRIGHT & JAWORSKI L.L.P.,
10          (2200 Ross Avenue, Suite 2800,
11          Dallas, Texas 75201-2784,
12          214-855-8000), by:
13          MR. JOE W. TOMASELLI, JR.,
14          jtomaselli@fulbright.com,
15          -and-
16          BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP,
17          (54 West Hubbard Street, Suite 300,
18          Chicago, Illinois  60610,
19          312-494-4400), by:
20          DR. KEN BAUM,
21          ken.baum@bartlit-beck.com,
22                appeared on behalf of the Defendant.
23
24    REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
```

Page 4

```
 1                (WHEREUPON, the witness was duly
 2          sworn.)
 3                EGIL FOSSLIEN, M.D.,
 4    called as a witness herein, having been first duly
 5    sworn, was examined and testified as follows:
 6                EXAMINATION
 7    BY MR. TOMASELLI:
 8          Q.   Dr. Fosslien.  Did I pronounce that
 9    correctly?
10          A.   That's correct.
11          Q.   My name is Joe Tomaselli and we've never
12    met before, have we?
13          A.   No.
14          Q.   Okay.  You understand I represent Merck
15    in this lawsuit?
16          A.   Yes.
17          Q.   Have you had your deposition taken
18    before?
19          A.   Not in this case.
20          Q.   Okay.  Have you had your deposition
21    taken before at any time?
22          A.   Yes.
23          Q.   Okay.  So, you're familiar with the
24    process?
```

Page 5

```
 1          A.   Not this type of process but -- this is
 2    different.
 3          Q.   Okay.
 4          A.   Different room.
 5          Q.   A different room, right.  How many times
 6    have you had your deposition taken?
 7          A.   I don't have an account -- a count.
 8    Correction.  Probably more than five, less than 15.
 9          Q.   Okay.  So you're familiar with the
10    process and I will go over a couple ground rules
11    just to make sure that you and I are on the same
12    page.
13                Because we are in a deposition and we
14    have a Court Reporter taking down every single word
15    we say, we need to try to speak one at a time and I
16    will try to wait for you to finish your answer if
17    you will try to wait for me to finish my question
18    before you answer and before I ask another
19    question.  Is that fair?
20          A.   Yes.
21          Q.   And you're doing a great job so far, but
22    we have to have verbal answers.  Shakes of the head
23    and nods and things like that and uh-huhs and
24    uh-uhs don't come down very well on the transcript.
```

# Egil Fosslien, M.D.

**Page 6**

1  If you wouldn't mind speaking audibly, I would
2  appreciate it. Fair?
3  A.  Yes.
4  Q.  And if you don't understand one of my
5  questions, feel free to say you don't understand it
6  and I will try my best to rephrase it. But, of
7  course, if you do answer I will assume you
8  understood it. Is that fair?
9  A.  That's fair.
10  Q.  Okay. Any reason you can't answer
11  truthfully and honestly today?
12  A.  No.
13  Q.  And, of course, if you need a break,
14  this isn't a marathon or anything. So, if you need
15  to get some water or coffee or whatever, just say,
16  "I need a break," and we will stop and take a
17  break. Okay?
18  A.  Okay.
19      (WHEREUPON, a certain document was
20      marked Fosslien Deposition Exhibit
21      No. 1, for identification, as of
22      6-8-06.)
23  BY MR. TOMASELLI:
24  Q.  I'm handing you what I have marked as

**Page 7**

1  Deposition Exhibit No. 1 and ask you to take a look
2  at that, if you don't mind.
3  MR. CRAWFORD:  Thank you.
4  BY MR. TOMASELLI:
5  Q.  That's your Deposition Notice in this
6  case. Have you seen that before?
7  A.  I think so.
8  Q.  Okay. On the last page -- I'm sorry.
9     On the second-to-last page, there is a
10  page entitled "Attachment A."
11     Do you see that?
12  A.  Yes. But before that there is a
13  correction that's necessary.
14  Q.  Okay.
15  A.  Because my name is misspelled.
16  Q.  Right. You are F-o-s-s-l-i-e-n?
17  A.  Correct.
18  Q.  Okay. We apologize for that but no
19  disrespect intended. Okay?
20  A.  Okay.
21  Q.  The last -- second-to-last page again,
22  Attachment A, has some document requests. Do you
23  see that?
24  A.  Yes.

**Page 8**

1  Q.  And right before we got started
2  Mr. Crawford handed me a stack of documents and I
3  assume that these are all the documents that are
4  responsive to those requests?
5  A.  Those are --
6  MR. CRAWFORD:  Object to form.
7  BY THE WITNESS:
8  A.  Those are the -- from the e-mail binder,
9  the correspondence is put in there and I took what
10  the content was in the binder and gave it to
11  Dr. Restaino and Mr. Crawford.
12  BY MR. TOMASELLI:
13  Q.  Okay. Are there other documents that
14  are requested on Attachment A that you haven't
15  brought?
16  A.  Well, in the report I referred to a
17  number of publications and I didn't bring those
18  because they are just reprints of publications.
19  Q.  Okay.
20  A.  And those are available, of course, from
21  PubMed or from Google.
22  Q.  Okay.
23  A.  So I thought that wasn't necessary to
24  bring those.

**Page 9**

1  Q.  All right. Anything else that was
2  requested and you didn't bring or is that it?
3  A.  That's what I brought, the e-mail
4  correspondence. So...
5  Q.  Nothing else, right?
6  A.  Well, some of the e-mail was lost
7  because my computer break down last year.
8  Q.  Okay. So other than --
9  A.  That's it. That's it.
10  Q.  Other than e-mails that you may have
11  lost last year and reprints of articles that you
12  reference in your -- in your report, as far as
13  other documents you're relying on, et cetera, those
14  I have here?
15  A.  Well, I have other reprints because I
16  have been in this field for a long time and also I
17  have written several articles and I have stacks of
18  reprints. I have boxes of reprints.
19  Q.  So you have additional articles other
20  than the articles referenced in your report?
21  A.  Yes.
22  Q.  As well as other articles that you
23  yourself have authored?
24  A.  Yeah, that also, yes, sir.

## Egil Fosslien, M.D.

Page 10

1    Q.   Okay.  Anything else that you're relying
2 on?
3    A.   Well, there are all versions, the draft
4 and so on.  Most of those were erased.  But they
5 were really the same thing as we have here in the
6 report.
7    Q.   When you say "drafts," you're saying
8 that you have draft reports as you went along but
9 you ultimately had a final report?
10    A.   Right.  When you are writing an
11 article -- I approached this as writing an article;
12 and when you write an article, you write it in
13 pieces.  You don't sit down and write the whole
14 thing straight off the top of your head.  You do it
15 in pieces and gradually you fuse those pieces into
16 a final form.
17    Q.   Okay.  And you don't keep all those
18 pieces; you just keep the final form?
19    A.   Well, some pieces are there, but I
20 don't -- most of them are shredded because
21 otherwise I have all the paper.
22    Q.   Okay.  Just so I'm clear, there is
23 published medical literature that you didn't bring
24 with you?

Page 11

1    A.   Right.
2    Q.   And maybe some of your own articles.
3 Otherwise we have everything that you are relying
4 on?
5    A.   That is the correspondence, yes.
6    Q.   And we have got everything you are
7 relying on for your opinions?
8    A.   That I don't know because I haven't gone
9 through that.
10    Q.   Okay.
11    A.   I just took it out of the two binders,
12 you know.
13    Q.   We will come back to that in a second.
14    A.   There may be things in there that are
15 irrelevant because I didn't use it.  I do not know.
16    Q.   You said you've been an expert witness
17 maybe more than five but less than 15 times in the
18 past, correct?
19    A.   I think that's correct.
20    Q.   And I'm not trying to get the exact
21 number.  I'm just trying to get a ballpark.  Fair?
22    A.   That's fair.
23    Q.   Okay.  When was the last time that you
24 served as an expert witness?

Page 12

1    A.   Well, I can see in my report if I may
2 have the CV.
3    Q.   I will tell you what.  I will mark your
4 CV as Fosslien Deposition Exhibit No. 2 and hand
5 that to you.
6         (WHEREUPON, a certain document was
7          marked Fosslien Deposition Exhibit
8          No. 2, for identification, as of
9          6-8-06.)
10 BY MR. TOMASELLI:
11    Q.   Is that a true and correct copy of your
12 CV, sir?
13    A.   I assume so because I submitted one.  I
14 assume this is the one I submitted, sir.
15    Q.   If you could flip through it and just
16 confirm that, that would be great.
17    A.   Well, I can only say it looks like it.
18 I can't compare line by line.
19    Q.   Nothing jumps out at you as being --
20 that it's an incorrect CV?
21    A.   No.
22    Q.   All right.
23    A.   I will take this apart.
24    Q.   On the last page of Exhibit 2 there is a

Page 13

1 page called Exhibit B.
2    A.   Is this Exhibit 2?
3    Q.   Yes.  The whole document is Exhibit 2.
4    A.   Oh, so the last page.
5    Q.   If you look at the last page, there is
6 an Exhibit B.
7    A.   Oh, here.  Okay.
8    Q.   Is that what you were looking for?
9    A.   Yes, sir.
10    Q.   And --
11    A.   Okay.
12    Q.   So, in answer to my question of the last
13 time you served as an expert witness.
14    A.   It was in, let me see, 2004.
15    Q.   And is it the case that's referenced
16 with A?
17    A.   Yes, sir.  It's from the DHHS office of
18 general counsel for the Region 5 on Michigan Avenue
19 here.
20    Q.   And that is the Department of Health and
21 Human Services?
22    A.   That's right.
23    Q.   And what was the subject of your
24 testimony generally in that case?

4  (Pages 10 to 13)

d1c48430-8b50-46ac-99d5-274a6d1abffd

## Egil Fosslien, M.D.

**Page 14**

1    A.   Am I free to talk about it?
2    Q.   I'm just asking. I'm not asking you to
3 divulge names or anything like that. Just was
4 it --
5    A.   Cause of death.
6    Q.   Cause of death?
7    A.   Yes.
8    Q.   So you looked at medical records, an
9 autopsy report and determined cause of death?
10   A.   To my recollection, yes. Pictures also
11 I think.
12   Q.   Also tissue slides?
13   A.   That I don't recall, but there was
14 photographs.
15   Q.   Oh, photographs of the person?
16   A.   Yes.
17   Q.   Photographs that may typically be in an
18 autopsy file?
19   A.   I think these photographs were clinical
20 photographs, but I don't recall the other
21 photographs.
22   Q.   Okay. And do you remember the time that
23 you served as an expert witness before that? Is
24 that B?

**Page 15**

1    A.   That's to my recollection the one before
2 that, yes, an outside case.
3    Q.   Okay. And what was the -- it says the
4 consultant activity was reviewing medical records,
5 photographs, autopsy report, microscopic slides and
6 rendering opinion as to cause of death.
7      So basically the same types of things?
8    A.   No. As a matter of fact, a much more
9 extensive one because they sent the slides, they
10 sent the courier from Indiana, gave it to me
11 personally, had to sign for it. I looked at the
12 slide, I looked at the records and then I rendered
13 an opinion. Then I came and picked up the slide
14 also by courier from Indiana.
15   Q.   So, in addition, this time you actually
16 looked at the tissue slides of parts of the body?
17   A.   I do remember, yeah, having looked at
18 all the tissue slides that had been made on that
19 particular patient and all the autopsy slides and
20 report.
21   Q.   In these five to 15 cases that you've
22 served as an expert witness, is most of your
23 testimony related to autopsy findings?
24   A.   Not necessarily.

**Page 16**

1    Q.   And cause of death?
2    A.   No.
3    Q.   No. Other than autopsy findings, cause
4 of death, what types of expert witness work have
5 you done?
6    A.   Well, there was one case I seem to
7 remember where a patient had died and there was a
8 question, you know, of medication the patient had
9 received. So, it was not solely the autopsy
10 result. And review of the records to see if were
11 all the entries made sequentially or was any
12 indication that they had been -- any indication
13 that the records had been changed, altered.
14   Q.   Okay.
15   A.   That was one of the questions also.
16   Q.   All right. Other than -- is that a
17 medical malpractice type of case?
18   A.   That was a medical malpractice type of
19 case.
20   Q.   Okay. Other than medical malpractice
21 types of cases and rendering opinions regarding
22 autopsy findings and cause of death, any other
23 areas of expert witness testimony that you can
24 recall?

**Page 17**

1    A.   Can't think of any now.
2    Q.   Okay. But you have testified about
3 gross observations in an autopsy report before?
4   A.   Gross and microscopic, diagnosis,
5 interpretation, review of chart records, review of
6 laboratory records to render an opinion as to the
7 cause of death.
8    Q.   Okay. And I assume that you've -- well,
9 have you ever testified about a sudden cardiac
10 death or a fatal myocardial infarction?
11   A.   I think so, but many of these cases I
12 don't remember because there were inside cases and
13 I'm not supposed to keep any records of those.
14   Q.   Okay. And when you refer to "inside
15 cases," what are you referring to?
16   A.   Those are cases from the University of
17 Illinois. Let's say we did the autopsy and there
18 is a question about the autopsy. Or let's say
19 there is a person that dies in the street, is
20 brought to the hospital, death on arrival. We need
21 to find the cause of death.
22     Or let's say that the patient is
23 transferred from another hospital and comes
24 essentially to the hospital, to university

Egil Fosslien, M.D.

**Page 18**

1   hospital, to die. So it doesn't appear on the
2   death certificates or records for that other
3   hospital. And we then have to determine why the
4   patient died. Sudden cardiac death would be one of
5   them.
6       Q.   Okay. And do you perform those
7   autopsies yourself or do other people do that and
8   you consult with them?
9       A.   No. That depends upon the situation.
10  Right before I left I was the core director of the
11  autopsy service. Before that I served probably 10,
12  15 years as a staff pathologist on that service.
13      Q.   How many autopsies do you think you
14  performed each year over that 10 or 15 years?
15      A.   We used to have over 300 autopsies in
16  the year. Of course, in the recent years that
17  declined somewhat like everywhere. I did a portion
18  of those.
19      Q.   In those autopsies I assume you saw
20  cases of sudden cardiac death and fatal myocardial
21  infarction?
22      A.   Indeed I did and particularly I was
23  close to Dr. Eckner, who just died unfortunately,
24  and his area of interest was cardiovascular

**Page 19**

1   pathology. We dissected hearts together.
2       Q.   Okay.
3       A.   So, I saw a lot of atherosclerotic
4   disease, yes.
5       Q.   Have you ever testified as an expert
6   witness regarding atherosclerosis in coronary
7   arteries or a fatal myocardial infarction that you
8   can recall?
9       A.   I can't recall but I may have, you know.
10  This is several years back now.
11      Q.   Have you ever provided testimony under
12  oath regarding an NSAID or a COX-2 inhibitor?
13      A.   No.
14      Q.   Have you ever testified that a COX-2
15  inhibitor was a cause of death?
16      A.   Do you mean testify in court now?
17      Q.   Testified under oath that a COX-2
18  inhibitor was a cause of death.
19      A.   I have not been subpoenaed to do that.
20      Q.   Okay. So that's no, you haven't?
21      A.   Not to my recollection, no.
22      Q.   Okay. Have you ever testified that a
23  COX-2 inhibitor was a cause of a myocardial
24  infarction?

**Page 20**

1       A.   No, but I have been invited to speak
2   many times about it.
3       Q.   Okay.
4       A.   National meetings.
5       Q.   And I'm --
6       A.   And --
7       Q.   Let me try to be a little bit more
8   clear.
9            You've never testified regarding your
10  opinion that a COX-2 inhibitor was a cause of a
11  myocardial infarction?
12      A.   Not in a legal setting. As I said, I
13  have spoken at national meetings several times
14  about these NSAIDs for several years now. I was
15  invited to the Medical College of Wisconsin to
16  speak.
17           I have spoken at the Association of
18  Clinical Scientists meeting several times about
19  this and similar problems, about NSAIDs in general,
20  gastrointestinal complications, heart complication
21  and so on.
22      Q.   But as far as providing testimony,
23  you've never done that?
24      A.   Not been asked to do that, no.

**Page 21**

1       MR. CRAWFORD:  Do you mean under oath type of
2   thing?
3       MR. TOMASELLI:  Correct.
4       MR. CRAWFORD:  Okay.
5       MR. TOMASELLI:  He's told me that he's spoken
6   at conferences and I'm trying to --
7   BY THE WITNESS:
8       A.   I've been invited to speak about this.
9   BY MR. TOMASELLI:
10      Q.   Okay. Have you ever testified under
11  oath that a COX-2 inhibitor caused any type of
12  adverse event?
13      A.   You mean like Vioxx?  No.
14      Q.   Okay. Have you ever testified
15  previously that a COX-2 inhibitor was responsible
16  for the buildup of atherosclerosis in a person's
17  arteries?
18      MR. CRAWFORD:  Can I interject something?
19  When you say "testify," you mean under oath because
20  there may be some confusion here. In lay terms
21  "testify" may mean, I don't know, may mean give a
22  speech or a conference. I think let's clarify that
23  you mean under oath like in a deposition or trial
24  or a hearing or something like that.

Egil Fosslien, M.D.

**Page 22**

1    MR. TOMASELLI: Okay.
2    MR. CRAWFORD: Right?
3  BY MR. TOMASELLI:
4    Q.   Have you ever testified under oath that
5  a COX-2 inhibitor was responsible for the buildup
6  of atherosclerosis in a person's arteries?
7    A.   This is the first testimony. As I said,
8  I have spoken many, many times. I have written
9  many articles about this. I have studied this
10  field many years now.
11    Q.   Have you ever authored an autopsy report
12  where you concluded that a COX-2 inhibitor was a
13  cause of death?
14    A.   Not to my recollection. I authored
15  several or many autopsy reports. I cannot recall
16  at this time specifically one that involved NSAIDs.
17  Could have been.
18    Q.   Don't recall, though?
19    A.   Don't recall because, I mean, there is
20  so many of these cases.
21    Q.   There are so many cases of people having
22  atherosclerosis?
23    A.   Oh, yes. It's a very predominant
24  disease. It's the one that kills the most

**Page 23**

1  Americans.
2    Q.   Have you ever testified under oath in a
3  case regarding a prescription pharmaceutical drug
4  before?
5    A.   Not under oath. I have talked, as I
6  mentioned, for example, at the University of
7  Wisconsin in Milwaukee about the toxic effects of
8  NSAIDs.
9    Q.   And I'm trying to separate giving talks
10  at universities --
11    A.   Yes, I think I --
12    Q.   -- or lectures versus testifying under
13  oath.
14         Have you ever testified under oath in a
15  pharmaceutical drug case?
16    A.   Not till today.
17    Q.   In these -- let me ask you. Is this the
18  first time you've ever worked for a or been hired
19  by a Plaintiff's attorney?
20    A.   Could you clarify that question because
21  this relates to a specific drug and are you
22  referring to Plaintiff's attorney when it comes to
23  any case? For example, when I was hired by the
24  Department of Health and Human Services, that was

**Page 24**

1  for the Plaintiff's side.
2    Q.   Okay.
3    A.   So, yes, I have testified or provided
4  expert testimony in Plaintiff's cases.
5    Q.   Okay. Setting aside the testimony for
6  the Department of Health and Human Services or the
7  potential inside cases with the University of
8  Illinois, can you tell me how many times you've
9  been hired outside of that setting?
10    A.   Well, as we sit here now and recall
11  these things, it seems to be another case where
12  there was -- a Plaintiff's case, cause of death and
13  so on, involved a patient who died in another
14  hospital. Not ours. But...
15    Q.   Okay. So, most of the -- I guess I am
16  hearing most of your cases are for the Plaintiffs?
17    A.   On the contrary. Most of the cases were
18  on the defensive side because it involved in many
19  cases where we did the autopsies at university and
20  maybe there was a suit against one of the
21  physicians.
22    Q.   Right.
23    A.   And in that case the -- my testimony was
24  very helpful for the defense.

**Page 25**

1    Q.   Okay. And setting aside the University
2  of Illinois cases and the Department of Health and
3  Human Services cases, how does that
4  Plaintiff-Defendant split come out?
5    A.   Well, majority for the defense.
6    Q.   Okay.
7    A.   By far.
8    Q.   How many cases would that be?
9    A.   I don't know how many. The university
10  has all those records. Must be a good number.
11    Q.   Okay. I'm trying to set aside the --
12    A.   Probably.
13    Q.   -- testimony?
14    A.   Ten plus/minus.
15    Q.   Ten plus or minus cases?
16    A.   Yeah, maybe of the 10 to 15, maybe five
17  maximum were for the Plaintiff and maybe ten for
18  the defense.
19    Q.   And those ten for the defense, does that
20  include the University stuff?
21    A.   Yes. There may be more. I don't recall
22  those things. I didn't keep any records of those.
23    Q.   Okay. So, and I don't want to hold you
24  necessarily to the number 15, but let's say --

7 (Pages 22 to 25)

Egil Fosslien, M.D.

Page 26

1    A.   It's a rough estimate because I really
2 don't recall that. As I said, I never kept any
3 records. University keeps the records and so they
4 probably have the records.
5    Q.   Okay. And, so, maybe ten times you've
6 testified for the university or on behalf of the
7 university and the other five times are Plaintiff's
8 cases?
9    A.   That is a very rough estimate.
10    Q.   Fair enough. Have you ever been found
11 unqualified by a Court to give expert testimony?
12    A.   No.
13    Q.   You understand you've been disclosed as
14 an expert witness in the Gerald Barnett case?
15    A.   Barnett case?
16    Q.   Barnett.
17    A.   Could you give me some information
18 there.
19    Q.   Do you know if you've been designated as
20 an expert in the Gerald Barnett case?
21    A.   I need to see the documentation before I
22 can say anything about that.
23    Q.   You just -- you don't have a
24 recollection one way or the other?

Page 27

1    A.   The name seems familiar.
2    Q.   Okay.
3    A.   But I'd like to see the documentation.
4    Q.   Okay. Do you plan to attend the trial
5 of the Gerald Barnett case?
6    A.   Well, I have no plans at this point. I
7 would have to be asked first to do so.
8    Q.   Haven't made any flight arrangements?
9    A.   Not at all.
10          (WHEREUPON, a certain document was
11          marked Fosslien Deposition Exhibit
12          No. 3, for identification, as of
13          6-8-06.)
14 BY MR. TOMASELLI:
15    Q.   I'm going to hand you what I've marked
16 as Fosslien Deposition Exhibit No. 3 and is -- is
17 that your expert report, sir?
18    A.   This is the Rule 26 report as requested
19 by the company. They have asked me to do this
20 thing.
21    Q.   The Plaintiff's attorneys that asked you
22 to do it?
23    A.   It is the -- just a moment. The company
24 is called Lopez, Hodes, Restaino, Milman & Skikos.

Page 28

1    Q.   And they represent Plaintiffs suing
2 Merck, correct?
3    A.   It's my understanding that it's called
4 Plaintiffs consortium.
5    Q.   Okay. You understand they are attorneys
6 representing Plaintiffs?
7    A.   Yes, sir.
8    Q.   Okay.
9          (WHEREUPON, a certain document was
10          marked Fosslien Deposition Exhibit
11          No. 4, for identification, as of
12          6-8-06.)
13 BY MR. TOMASELLI:
14    Q.   I'm going to hand you what I've marked
15 as Fosslien Exhibit No. 4 and ask you to identify
16 that for the record.
17    A.   Yes, sir.
18    Q.   What is that?
19    A.   This is the cumulative billing listing.
20    Q.   Okay.
21    A.   My simple bookkeeping.
22    Q.   Fair enough. Keeps track of how much
23 time you've spent?
24    A.   Approximately. I spend much more time

Page 29

1 on this than is listed here, but it shows what I
2 charge for.
3    Q.   Okay. And the first page of that
4 document, the first entry appears to be on
5 November 1, 2005, is that right?
6    A.   Correct.
7    Q.   And that was a conversation with
8 Dr. Restaino?
9    A.   Correct.
10    Q.   Is that the first time you were
11 contacted by someone involved in the Vioxx
12 litigation?
13    A.   I think the initial contact was by
14 e-mail, but I -- I'm not so sure of that anymore
15 because, you know, it's several months ago.
16    Q.   Okay. Do you think that's about the
17 time you were contacted the first time by someone
18 involved --
19    A.   Yes, I think it was about the time, yes,
20 because it was several months after the -- my last
21 publication was published, the one that dealt with
22 the cardiovascular complication of COX-2
23 inhibitors.
24    Q.   Okay.

Egil Fosslien, M.D.

Page 30

1    (WHEREUPON, certain documents were
2    marked Fosslien Deposition Exhibit
3    No. 5, for identification, as of
4    6-8-06.)
5  BY MR. TOMASELLI:
6    Q.   I'm going to hand you a stack of
7  documents that I've marked as Fosslien Deposition
8  Exhibit No. 5.
9         Are those all the e-mails that you were
10 able to retrieve between you and counsel for the
11 Plaintiffs?
12   A.   A lot of e-mails was lost.  I had
13 several computer breakdowns, three of mine and also
14 my wife's computer, and they are all on the same IP
15 address and I have the university, corporate
16 edition, but I also had two Linux computers.
17   Q.   Did you try to get your e-mails off of
18 all those different places?
19   A.   Yeah, I -- you know, I spent a lot of
20 time.
21   Q.   Sure.
22   A.   Frustrating.
23   Q.   I understand that --
24   A.   These are the more recent ones that I

Page 31

1  printed out because the first ones I lost
2  completely.
3    Q.   Let me just try to finish my question
4  before you answer, if you don't mind.
5         I understand that you're not able to
6  retrieve all of your e-mails for various reasons.
7  But all the ones you are able to retrieve, those
8  are in Exhibit No. 5?
9    A.   Correct.
10   Q.   All right.  And if there was an e-mail
11 in there that was prior to November 1, 2005, then
12 you were contacted before then?
13   A.   Well, that e-mail is lost and all.  I
14 used the Linux computer at the time because I had
15 many problems with my Sony computers; loaded with
16 all sort of things, TV programs and all sorts of
17 things.  The files kept accumulating, accumulating.
18 One day the whole thing failed.  I had to reload
19 and clean that out.
20        The Linux computer I had to take back to
21 the store and have them try to recover the files.
22 I couldn't do that.  They said no, you have to
23 reboot the whole thing.
24   Q.   Believe me, I am not faulting you.  I'm

Page 32

1  just trying to make sure that we have all that you
2  were able to retrieve.  Is that fair?
3    A.   That's correct.
4    Q.   Do you mind handing me back
5  Exhibit No. 4, that --
6    A.   This one?
7    Q.   This one.  That's right.
8         Have you been in contact with any other
9  attorneys representing Plaintiffs other than from
10 the Lopez, Hodes firm?
11   A.   Not that I can recall.
12   Q.   Okay.  Those are your main contacts for
13 this litigation?
14   A.   That's my understanding.
15   Q.   Okay.  Have you had any in-person
16 meetings with counsel?
17   A.   You mean with Dr. Restaino?
18   Q.   Dr. Restaino or someone else from his
19 firm.
20   A.   Yes, I have.
21   Q.   And tell me about the first time you had
22 an in-person meeting with Dr. Restaino.
23   A.   Well, it was this year, earlier this
24 year, out in Pomona, California where my daughter

Page 33

1  is in college.  I met with Dr. Restaino and one
2  other attorney.  I don't recall the name.
3    Q.   How long did you all meet?
4    A.   One hour.
5    Q.   One hour?
6    A.   One hour.
7    Q.   And this was before you started writing
8  your expert report?
9    A.   Was it before?  I started writing
10 already.
11   Q.   Okay.  So you started -- let me back up.
12        The first time you talked to
13 Dr. Restaino, let's say it's early November '05,
14 what did you all talk about?
15   A.   He sent me, to my recollection, an
16 e-mail saying -- stating that he had read the
17 article that I had published about the adverse
18 effects of COX-2 inhibitors on the cardiovascular
19 system and that he was interested in some of the
20 things I had discussed there, some of the opinions
21 I had.
22   Q.   And the first time you all were able to
23 speak substantively, what did you all talk about?
24   A.   We talked about many things.  We met for

## Egil Fosslien, M.D.

Page 34

1  more than two hours, but we had lunch and we talked
2  about marshal arts. We are both interested in
3  marshal arts. So, we spent quite a bit of time on
4  that.
5        And I was particularly interested when
6  it came to the business meeting, which I put down
7  one hour for, about the structure requirement for a
8  Rule 26 report since I have never done that before
9  and it was somewhat unclear to me.
10       I had approached it by writing kind of
11  an article type, what I'm used to. And I then
12  asked for advice, how do you actually format these
13  for the Court.
14    Q.   How many meetings, in-person meetings,
15  do you think you've had with anyone from the Lopez,
16  Hodes law firm?
17    A.   Well, there was a second meeting. I
18  went to the American Heart Association meeting in
19  Denver on atherosclerosis and related diseases,
20  thrombotic diseases. Dr. Restaino was there too,
21  and we spent quite a bit of time together.
22    Q.   Do you remember when that was?
23    A.   Do I have my bag here? Give me a minute
24  and I can tell you.

Page 35

1      MR. CRAWFORD: Would this refresh your
2  recollection? It's the exhibit.
3      THE WITNESS: The program will tell me
4  exactly. Thank you very much.
5  BY THE WITNESS:
6    A.   It was -- okay -- April 27 through 29.
7  BY MR. TOMASELLI:
8    Q.   April?
9    A.   Yes.
10    Q.   Of this year?
11    A.   Yes.
12    Q.   Okay. And that was the second time that
13  you all met in person?
14    A.   Yes.
15    Q.   Okay. Any other in-person meetings
16  after that that you can recall?
17    A.   Well, here, at the hotel.
18    Q.   Yesterday?
19    A.   Yeah, yesterday.
20    Q.   Okay. So, you've basically had three
21  in-person meetings with counsel?
22    A.   To my recollection, that's correct.
23    Q.   And how long did you all meet yesterday?
24    A.   About three hours.

Page 36

1    Q.   And what did you all talk about?
2    A.   We talked about the meeting today, the
3  formalities and so on, what is going to happen
4  today.
5        And I had made some comments in my --
6  some small corrections, you know, the things that
7  through my typing that I made mistakes, for
8  example, a D at the end of a verb and other small
9  corrections. I pointed those out. There should be
10  a copy here about that.
11    Q.   And those are grammatical changes?
12    A.   Most of them are, yes.
13    Q.   Are there any substantive --
14    A.   In one case --
15    Q.   -- changes?
16    A.   Well, I think there may be two
17  substantive changes, namely, towards the end of the
18  writing of this report, things got very hectic
19  because I had a meeting in Florida at the same time
20  and the two things coincided.
21        And so the signature page on the report
22  was on a separate page. There was nothing else on
23  the signature page. So I called Dr. Restaino and
24  asked it doesn't look so good to have a page with

Page 37

1  only a signature on it. It doesn't say page 25 of
2  50.
3    Q.   Okay.
4    A.   So he recommended why don't you just
5  move some lines down from the previous page and put
6  some pages -- some lines on the last signature
7  page so you have some substance on the signature
8  page.
9        While I did that, I must have lost one
10  line. So, it's in here that the line is lost. If
11  I can see my -- the copy that I have comments in,
12  should be here somewhere.
13    Q.   Can you tell me in that Exhibit 3 where
14  you're talking about?
15    A.   I could. It will take some time to do
16  that because I have the notes in the other one.
17    Q.   Okay. Well, the last --
18    A.   If you don't mind the time, I don't
19  mind.
20    Q.   The last page is page 58 it appears?
21    A.   Yes, it's not on the last page because I
22  moved several lines from previous pages over and
23  during that process one line was -- went into
24  cyberspace.

10 (Pages 34 to 37)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 38

1    Q.    Maybe we can track that down in a little
2 bit.
3    A.    It's here.  If I can get the draft that
4 I made comments in, I can find it.
5    Q.    Well, if you can turn to page 58.  If
6 you can turn to page 58 of Exhibit 3 if you don't
7 mind.
8    A.    Yes, yes.
9    Q.    Are you there?
10   A.    Yes.
11   Q.    Okay.  Is that your signature on that
12 page?
13   A.    That's a copy of my signature I think.
14   Q.    And did you in fact sign it on May 21,
15 2006?
16   A.    Yes, I did, and it was sent
17 electronically through a company out in Glen Ellyn.
18   Q.    If you turn to the page before, page 57.
19   A.    Yes.
20   Q.    The last paragraph is 125.  Do you see
21 that?
22   A.    Yes, I do.
23   Q.    And if you turn back to page 58.
24   A.    Okay.

Page 39

1    Q.    Do you see where the last paragraph is
2 page -- is paragraph 85?
3    A.    Yeah, that's strange.
4    Q.    Can you explain that?
5    A.    No.  Must have happened when I did the
6 last-minute changes.  Is that in the --
7    MR. CRAWFORD:  Let me check.
8 BY THE WITNESS:
9    A.    I don't know what that means.
10 BY MR. TOMASELLI:
11   Q.    Did you actually --
12   A.    Maybe I lost another line there.
13   Q.    Did you actually write paragraphs 86
14 through 125?
15   A.    I wrote everything here and then
16 Dr. Restaino reformatted that to be -- to satisfy
17 the formats of the Court.
18   Q.    Okay.  Did Dr. Restaino make any
19 substantive changes to your work?
20   A.    No, because, you know, this was the big
21 difference in doing this than writing an article
22 because you write an article and you discuss with
23 people.  And he didn't say a word.  We went to
24 meetings together.  He just listened.

Page 40

1         So, that was for me a completely new
2 experience and somewhat frustrating.  Nobody could
3 talk to you.
4    Q.    All right.  You obviously hold yourself
5 out as a pathologist.  True?
6    A.    I'm a pathologist, yes.
7    Q.    You don't hold yourself out as a
8 gastroenterologist?
9    A.    I do not.
10   Q.    Or a rheumatologist?
11   A.    I do not.  But neither -- you know, this
12 is an interesting point because if you want to say
13 I cannot say anything about any diseases involving
14 those areas because I'm not a rheumatologist or
15 gastroenterologist, you would have to apply the
16 same to rheumatologists or gastroenterologists,
17 they can't talk about pathology.
18   Q.    I'm just asking if you hold yourself out
19 to the medical community as a gastroenterologist?
20   A.    I'm a pathologist.
21   Q.    You're not a cardiologist?
22   A.    I'm a pathologist.
23   Q.    You're not an epidemiologist,
24 biostatistician or a pharmacologist?

Page 41

1    A.    I'm a pathologist.
2    Q.    You're not any of those things that I
3 said.  You're a pathologist?
4    A.    I'm a pathologist.
5    Q.    Okay.  And what school are you
6 affiliated with?
7    A.    University of Illinois.
8    Q.    And they have many locations I assume?
9    A.    Yes.  Their main location is Chicago and
10 their satellite locations in Champaign, Peoria and
11 Rockford.
12   Q.    And are you -- do you work in the
13 Chicago campus?
14   A.    I'm retired.
15   Q.    Okay.  When did you retire?
16   A.    2004.
17   Q.    Okay.
18   A.    So I'm an emeritus professor.  I am on
19 the staff still.
20   Q.    Do you currently teach medical students
21 or did that end in 2004 when you retired?
22   A.    I have not volunteered to teach at this
23 point.
24   Q.    So that's no?

Golkow Litigation Technologies - 1.877.DEPS.USA

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 42

1    A.    Well, yes, I have not volunteered
2  because once you retire, then you don't get paid to
3  do it. So you would have to volunteer, which I
4  have not done so far.
5    Q.    So the last time you taught patients was
6  in 2004?
7    A.    Not taught patients. Taught medical
8  students, residents and so on.
9    Q.    I'm sorry. The last time you taught
10 medical students and residents, et cetera?
11   A.    Dental students, medical students,
12 residents, clinicians.
13   Q.    That was in 2004?
14   A.    Yes, sir.
15   Q.    Do you currently have --
16   A.    Although I should add that since I go to
17 national meetings and speak there every year, I
18 talk to physicians there and there are clinicians
19 and rheumatologists and all sort of specialties,
20 although mainly pathologists and laboratory people.
21   Q.    Other than national conferences that you
22 might speak at and talk to physicians or others --
23   A.    Yes.
24   Q.    -- you're not formally teaching any

Page 43

1  students these days?
2    A.    No.
3    Q.    Do you have a current clinical practice?
4    A.    No, because it would require liability
5  insurance, medical liability, which is very
6  expensive. If you amortize that over a small
7  number of patients, if you work part time, it
8  doesn't pay. It's a big problem.
9    Q.    You're not currently a practicing
10 physician. Fair?
11   A.    I've been asked to do, but I have said
12 no because of the insurance.
13   Q.    You don't want to buy the insurance?
14   A.    Well, you have to -- insurance is so
15 much. You have to do a lot to pay for it.
16   Q.    I'm not criticizing you, sir. I'm just
17 trying to make sure I understand.
18        So, you don't currently treat patients
19 because malpractice insurance is high?
20   A.    That's one reason. But, yes, I don't
21 treat any patients at this point.
22   Q.    Okay.
23   A.    I do have -- I'm asked questions by
24 patients. They want to know many things and I will

Page 44

1  tell them this is not medical advice. This is
2  educational advice.
3    Q.    So, you provide educational but not
4  necessarily medical advice?
5    A.    Correct.
6    Q.    All right. And when's the last time you
7  provided medical advice?
8    A.    In a university setting? 2004.
9    Q.    Prior -- outside the university setting?
10   A.    Well, some of the meetings we go to are
11 university-affiliated so I may have spoken at the
12 university.
13   Q.    Okay. Did you ever treat living
14 patients during your career?
15   A.    I'm a pathologist.
16   Q.    I don't know what that is. Is that a
17 yes or a no?
18   A.    Well, I'm surprised you don't know
19 because a pathologist usually doesn't treat
20 patients.
21   Q.    Okay. I'm not a doctor.
22   A.    Yeah, okay. It's a separate -- okay.
23 It's a separate specialty.
24   Q.    I apologize.

Page 45

1    A.    As a pathologist, there is biopsies,
2  autopsies, runs the laboratories, including blood
3  bank and so on, and many people don't know what the
4  pathologist does. They look at TV and see the
5  forensic pathologist, which is somewhat different,
6  although I have done that too.
7        But a pathologist really is their
8  background is kind of the physician's physician.
9  If you have a biopsy, for example, the surgeon will
10 take it out, send it over to pathology, they will
11 look at it and render a diagnosis. We then will
12 send the diagnosis back to the clinician. He would
13 talk to you.
14   Q.    So, your practice when you were
15 practicing medicine was autopsies and biopsies and
16 things like that?
17   A.    That's not correct. That was part of
18 the practice and -- but there were times where we
19 in the past went on rounds to look at patient
20 charts, look at patients.
21   Q.    When is the last time you went on
22 rounds?
23   A.    That must be, well, when I was in the
24 laboratory, which was the laboratory director to

12  (Pages 42 to 45)

Egil Fosslien, M.D.

Page 46

1   1986 would be my recollection. Would be making
2   rounds, '86, talking directly to patients, although
3   there have been patients have called me,
4   particularly in the lawsuits. They would like to
5   know "What did you find, Doctor? What do you
6   think?"
7           But in those cases I usually would
8   decline to say anything because of internal
9   policies which state -- stated that the clinician
10  talks to patients.
11      Q.   Okay. And you weren't classified as a
12  clinician, then?
13      A.   No, a pathologist is not classified as a
14  clinician. A clinician is the patient's doctor who
15  sees the patient. But there are pathologists who
16  see patients too. It depends upon the situation.
17  You cannot make a generalized statement really.
18      Q.   Do you have a current license to
19  practice medicine?
20      A.   Yes, I do.
21      Q.   In what state?
22      A.   Illinois.
23      Q.   Any other states?
24      A.   No. I don't -- did not retain those

Page 47

1   because of the cost of doing so.
2       Q.   I saw that you were Board certified in
3   clinical pathology and anatomic pathology, is that
4   right?
5       A.   Correct.
6       Q.   Are you still Boarded today?
7       A.   Correct.
8       Q.   Going back to your litigation report,
9   Exhibit 4 I think it is. It's a fairly lengthy
10  report. True?
11      A.   It got longer than I visualized. It's
12  much more complicated. Not from the point of view
13  of what was involved in the pathogenesis, but the
14  logistics around this was extremely difficult for
15  me. Having no secretary and no help, I have to do
16  it all myself. Not being a particularly good
17  typist, it was extensive.
18      Q.   Okay. I may have referenced Exhibit 4
19  but --
20      A.   What is the Exhibit --
21      Q.   The litigation report is Exhibit -- can
22  you look at which one?
23      A.   I apologize.
24      Q.   It's right down at the bottom there,

Page 48

1   sir.
2       A.   Which one?
3       Q.   The bottom sticker on the bottom.
4       A.   Exhibit -- oh, okay.
5       Q.   3?
6       A.   That's Exhibit 3.
7       Q.   Okay. So your litigation report is
8   Exhibit 3?
9       A.   All right. So, Exhibit 4, is that the
10  one you are talking about?
11      Q.   I'm not. I made a mistake. I was
12  referring to your report and I think I called it 4,
13  but it is 3.
14      A.   I assumed you meant this one.
15      Q.   I did, sir.
16          I assume that lengthy report contains
17  all the opinions that you intend to offer in this
18  case?
19      A.   I don't understand that question really.
20      Q.   Okay. Are there various other topics
21  that you intend to testify about that are not in
22  that report?
23      A.   Well, the problem here is there is a lot
24  of stuff coming out as we speak even being

Page 49

1   published and I have reserved the right to change
2   my report if new data becomes available in the
3   peer-review literature.
4       Q.   I'm not arguing with that, sir. I'm
5   just trying to figure out if that report contains
6   all the topics that you're going to testify about
7   or if there is a whole list of topics that you feel
8   comfortable talking about that aren't in the
9   report.
10      A.   I think at this point the report was
11  finished the 22nd and this is my report here as you
12  see it.
13      Q.   Okay. So, you feel like it's fairly
14  complete except for obviously literature coming out
15  that you might want to update. Fair?
16      A.   I think it represents what I thought was
17  relevant at the time I wrote it.
18      Q.   As of the day you signed it, May 21,
19  2006?
20      A.   Yes, it should be understood that there
21  may be things that I didn't look at because there
22  is a vast amount of literature out there. I looked
23  at the literature that I thought was pertinent to
24  this case and that might explain the pathogenesis.

Egil Fosslien, M.D.

Page 50

1    So, what I tried to do here was to find
2  out, you know, why is it that Vioxx causes these
3  adverse cardiovascular effects because I started
4  working on that and had rendered opinions about
5  that in the publication that came out last fall.
6  And, so, what you have here in the report is my
7  opinion about how this came about.
8      Q.   And this report is limited to Vioxx,
9  right, sir?
10     A.   To the extent that I was able to do so
11 because, you know, there are other COX-2
12 inhibitors.  And the question comes up many times
13 is it a class effect or not.  But I tried to limit
14 it to Vioxx although in here I talked about certain
15 effects of celecoxib in addition.
16     Q.   I think in the report you said you spent
17 a couple hundred hours writing the report.  Fair?
18     A.   At least, at least.
19     Q.   You relied on your general knowledge and
20 research to write that report?
21     A.   Well, I had written several papers about
22 COX-2 in general before that and the COX-2
23 specifically in cardiovascular -- its
24 cardiovascular effects before that.  So I had this

Page 51

1  background to build on.
2      Q.   And that's why I said you relied on your
3  general knowledge and experience and research?
4      A.   I think that's fair, yes.
5      Q.   Did the Plaintiff's attorneys or the
6  people who hired you put any limits on the time you
7  could spend writing the report?
8      A.   No.  This was really confusing for me
9  because you have a goal you are striving towards
10 and it was not clear to me what exactly the goal
11 was, how long is the report going to be, 20 pages,
12 40 pages.  And my impression was that was up to me
13 how much I wanted to put in there.
14     So, I decided to write what you see here
15 as I think that really reflects my opinions at this
16 time.
17     Q.   Okay.  And I think you've said before
18 you didn't necessarily sit down and write that
19 whole report in one session.  It was over a period
20 of time?
21     A.   It was over a period of time and it was
22 revised by me several times, you know.
23     Q.   Can you give me an idea of how long over
24 a period of time that was?

Page 52

1      A.   Well, I started fairly shortly after
2  Dr. Restaino contacted me and the first I did was
3  to look through my own publications and old files
4  and so on to see what can be reused, frankly,
5  instead of having to retype everything.  And I
6  ended up really retyping most of it.
7      Q.   I see.  So, you looked at your prior
8  publications --
9      A.   Right.
10     Q.   -- before you started typing?
11     A.   Yes.
12     Q.   Did you do your own research or did
13 Plaintiff's counsel forward you articles and
14 whatnot?
15     A.   They would -- since I, you know -- let
16 me make this perfectly clear, to quote a famous
17 person.
18     I am an emeritus professor at University
19 of Illinois.  As such, I have access to on-line
20 articles.  So, I used the PubMed system to find out
21 what's relevant.  Then I can go into the university
22 library and enter and get a full text article
23 downloaded on many of these articles, but there are
24 some that I cannot get.

Page 53

1      So, then I would ask Dr. Restaino to get
2  those articles so he would then -- I would send him
3  a request and give the PubMed number and the first
4  author and the year.  Whereupon, he then would in
5  most cases be able to procure that document and
6  send it to me.
7      Q.   But you did your own research?
8      A.   I didn't get any help whatsoever, which
9  was the frustrating part.
10     Q.   Okay.  Now, your billable rate I think
11 it says in your report is $350 an hour?
12     A.   That's correct.
13     Q.   I'm going to hand back Exhibit 4, which
14 is your bookkeeping that you told me.
15     A.   My simplified bookkeeping.
16     Q.   Your simplified bookkeeping.
17     A.   Yes.
18     Q.   And is there a grand total that you've
19 charged the Plaintiff's firm so far?
20     A.   If you look at probably the last page.
21 Let's see what page.  Probably page 6.  Draw your
22 attention to -- you can't see that.  If you go to
23 page 1, you see the headings A, B, C, D, E, F, G,
24 H.

Egil Fosslien, M.D.

**Page 54**

1    Q.   Okay.
2    A.   And heading H underneath it says
3  "Sum Paid."  That's what has been paid as of the
4  last payment.
5    Q.   Okay.
6    A.   And as you can see on page 6 it comes up
7  with 35,000, which has been paid at this point.
8    Q.   Have you incurred further dollars to be
9  charged to the Plaintiff's firm?
10   A.   Then it's listed on page 6 there is some
11  things here, the more recent things.  And I have
12  not charged for yesterday yet.  I have not charged
13  for today yet and there are many things I didn't
14  charge for, if I send out the Fed Ex, so I paid.
15       One reason is at the beginning I used a
16  much smaller format.  I didn't have any space to
17  put in costs or other expenses incurred and as I
18  progressed in my knowledge about how this is done,
19  I expanded the format to legal size now so I can
20  put in more things.
21   Q.   Okay.  But prior to yesterday you had
22  incurred about 35,000 in charges?
23   A.   That's correct.
24   Q.   All right.  How many hours do you think

**Page 55**

1  you've -- I know you say you may not have charged
2  for all of them.  But how many hours do you think
3  you've put into this Vioxx litigation?
4    A.   For this particular report, at least
5  200.  I put down 200.  I think it's more than that.
6    Q.   Okay.  So, we will just call it 200 for
7  the report since that's what you put in there.
8  Fair?
9    A.   Fair.
10   Q.   Other than the 200 for the report how
11  many hours do you think you've spent?
12   A.   Could you explain the question.  I don't
13  understand the question.
14   Q.   Okay.  It looks like you spent 200 hours
15  reviewing the literature and writing this report.
16  Okay?
17       Have you spent time other than that in
18  the 200 hours, I mean have you spent time above and
19  beyond the 200 hours, other than, say, for
20  yesterday and today?
21   A.   Well --
22   MR. CRAWFORD:  Objection; vague.
23  BY THE WITNESS:
24   A.   Well, I'm not quite clear about this

**Page 56**

1  question.
2    MR. CRAWFORD:  Do you mean after he was
3  retained or --
4    MR. TOMASELLI:  I asked him how many hours he
5  spent on the Vioxx litigation.
6    MR. CRAWFORD:  Vioxx litigation.
7    MR. TOMASELLI:  That's what I'm interested in.
8  BY THE WITNESS:
9    A.   Well, it's a very difficult question to
10  answer precisely because of the following:  When
11  you work like I do, I'm a pathologist and I go on
12  the Internet.  I will look at something, say, maybe
13  rofecoxib, and there may be something else of
14  interest and so I click on that and I go on to
15  mitochondria, which I am very interested in and
16  other things, and then I come back to the rofecoxib
17  story.
18       So, there are many things I didn't
19  include because I wanted to focus on this
20  particular report, what I have been asked to do.
21       But I work a little different I think
22  from the legal profession in that I don't focus
23  specifically on the legal part.  I look at the
24  scientific and medical part.

**Page 57**

1       So, the other things I may have done
2  when I surfed the Internet, so to speak, and when
3  I --
4    Q.   Let me --
5    A.   When I am surfing the Internet, I'm
6  talking about the PubMed National Library of
7  Medicine.
8    Q.   So, most of the time, in fact, the great
9  majority of the time spent in the Vioxx litigation,
10  is reviewing medical publications, scientific
11  publications and writing your report.  Is that
12  fair?
13   A.   Well, for this report, what you see
14  here, probably 200 hours I actually spent on it.
15  But I spent time on other things that I didn't
16  pursue further because I wanted to finish this.
17       I have to finish by a certain date.  I
18  could have written three times as much if I had had
19  time to do that, but there was a deadline.  And so
20  I had to stick within the deadline.
21   Q.   Okay.  Has your hourly rate changed for
22  deposition testimony or is it still $350 an hour?
23   A.   Well, the -- to my recollection there
24  was a -- I think the following.  I don't have that

Egil Fosslien, M.D.

**Page 58**

1  with me here.  I think it's 1,400 for the first
2  four hours and then more if it goes beyond four
3  hours.  But I would have to look in the contract to
4  see that.
5       Q.   So, there is a contract between you and
6  the Plaintiff's firm?
7       A.   Yes.
8       Q.   Did you bring that with you today?
9       A.   I didn't know that was requested.  That
10  is not correspondence.  It's a contract.  I did not
11  work that out --
12       Q.   The answer is, "No, I didn't bring it
13  today"?
14       A.   You can say that is the answer, but that
15  contract was worked out between my lawyer and their
16  lawyer.
17       Q.   Okay.  I just want to know --
18       A.   That is not my correspondence.
19       Q.   Okay.
20       MR. CRAWFORD:  Do you have a copy of it?  We
21  didn't bring it because I don't have it.  I'm
22  sorry.
23       MR. TOMASELLI:  And that's fine.  I'm just
24  wanting to know if he brought it today.

**Page 59**

1       MR. CRAWFORD:  We will get you a copy.
2       MR. TOMASELLI:  It's not a big deal.
3       MR. CRAWFORD:  We will get you a copy.
4       DR. BAUM:  We would like a copy.
5       MR. CRAWFORD:  Yes.
6  BY THE WITNESS:
7       A.   See, what I did to --
8  BY MR. TOMASELLI:
9       Q.   Is the -- is the hourly rates that you
10  describe for me for the deposition, is that carried
11  over for any trial testimony?  Do you recall?
12       A.   I don't recall because this is all
13  worked out with my lawyer and their lawyer.
14       Q.   Whatever it is, it's --
15       A.   They suggested the hourly rate and they
16  suggested for the testimony and so on.
17       Q.   Whatever it is, it's in the contract?
18       A.   I would think so.
19       Q.   Okay.  I assume -- I think we talked
20  about this a little bit before.  But in writing
21  your litigation report, you wanted to be, you know,
22  as thorough as possible and do your best to look at
23  the totality of the data with respect to Vioxx,
24  right?

**Page 60**

1       A.   Well, I think that is a very strange
2  question because I don't think anybody can look at
3  the totality of the whole field.  It's an enormous
4  field.  And that is why I said I retained the right
5  to modify my report should new data become
6  available because I don't think anybody -- there is
7  anybody around in the world who knows the whole
8  field.
9            What I did, I was setting out to find
10  out and render an opinion on pathogenesis, namely,
11  the development of the cardiovascular complications
12  caused by this specific inhibitor.
13       Q.   At least you approached this assignment
14  like you would approach a question that you had in
15  your professional life as a pathologist.  Fair?
16       A.   Initially I approached this as I would
17  approach writing an article because that's what I
18  was -- felt comfortable with and I was not really
19  knowledgeable about the Rule 26 report.  I had no
20  idea about that when we started.
21       Q.   Okay.  So, whatever process you brought
22  to writing a scientific article, you tried to bring
23  to writing this litigation report.  Fair?
24       A.   I think that's a fair statement.  Of

**Page 61**

1  course, in the -- in the scientific article you
2  can -- you can discuss things.  There was nobody to
3  discuss with in this case, which was, as I said,
4  frustrating at times.
5       Q.   And when you write a scientific article,
6  I assume you don't look at just one piece of data,
7  but you look at several pieces of data and try to
8  harmonize that, is that correct?
9       A.   Well, this is an interesting question
10  because it gets to the core of the problem, what is
11  believable and what's not believable, what can
12  support an opinion, what cannot support an opinion.
13            We know there was a problem here.  We
14  know that this particular drug has been linked to
15  cardiovascular complications.  And the question was
16  then how does this come about.
17            That's what I set out to try to find out
18  based upon what I had published before also before
19  I was asked to render an opinion here.  I had
20  already rendered an opinion in the literature.
21            I'm sorry if I'm talking too fast.
22       Q.   Again, it's like you do when you write a
23  scientific article.  When you try to figure out why
24  something is happening, you don't look at one

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

**Page 62**

1 article or one piece of data and think you've got
2 the answer. You have to look at -- look at the
3 totality or at least a great -- try to get your
4 hands around what the medical literature as a whole
5 says and then try to harmonize that. Is that -- I
6 mean that's fair, right?
7     A.   I'm happy you brought that up because
8 it's very important. For example, when I look at
9 an article, I first look at the conclusion. First
10 the abstract and the conclusion. To see does the
11 conclusion have anything to do with the problem at
12 hand or does the author talk about something else.
13         Secondly I look at the references. Are
14 the references up to date? Do the references
15 include the recent papers in the field?
16         And then I look at the discussion. And
17 then I will look at how it was done, you know, what
18 sort of animals did they use, what sort of diet did
19 they give the animals.
20         But it's important to prescreen I think
21 instead of spending a lot of time on articles that
22 I don't think are relevant.
23     Q.   And the same thing could be done with
24 your papers, looking at the references you cite

**Page 63**

1 and --
2     A.   Well, that happens of course --
3     Q.   -- are they up to date --
4     A.   Pardon. When you submit a paper for
5 publication to a journal, they will then send it
6 out to three references, sometimes more.
7         I have served as a referee on many
8 papers in the recent years, including British
9 Journal of Cancer and others and -- the list is in
10 my CV there.
11         And so then you get the feedback from
12 the reviewers, which is not always, you know,
13 supportive. They are different views. But --
14     Q.   Is that the peer-review process?
15     A.   That's the peer-review process.
16     Q.   Okay.
17     A.   And I serve on the editorial boards.
18 And so I developed this particular way of looking
19 at things because I found it really worked.
20     Q.   Okay.
21     A.   So, then you get the feedback from the
22 reviewers and you can then do -- there is usually a
23 recommendation from the editor what to do with the
24 article, you know, we like your article, I'd like

**Page 64**

1 to publish it or it needs to have revisions, the
2 reviewers have pointed out these concerns they
3 have, will you please explain more in detail about
4 this, or you can get a flat rejection.
5     Q.   Right.
6     A.   As a -- I rejected a few papers myself.
7     Q.   Sounds like a pretty rigorous process?
8     A.   Well, it's very costly in time.
9     Q.   Lots of people looking at it and lots of
10 eyes on the papers, huh?
11     A.   Well, I cannot speak for all journals,
12 you know, but I can speak for the journals I know.
13     Q.   And the journals you know take that
14 peer-review process fairly seriously I guess?
15     A.   I would think so. The British Journal
16 of Cancer I would think would do so.
17     Q.   And I guess it's something that would
18 come out in the peer-review process that if, for
19 example, somebody submits a paper and they speak
20 heavily about one paper in particular, one study,
21 and the peer reviewers know that there are, I don't
22 know, seven or eight papers and studies that are
23 100 percent contrary or at least bear on the same
24 issue that that one paper said, the peer reviewers

**Page 65**

1 might put that back and say you should include a
2 discussion of all the data?
3     A.   Usually you don't say include any
4 discussion of all the data, but pertinent data.
5 Let's say that somebody submits a paper and it has
6 ten authors. You see that nowadays. And you find
7 that one of the authors has actually published a
8 paper last year that is, you know, almost the same
9 from one paper. They had the same drawing. They
10 went to the library to make sure. The editor says
11 there is a duplication of data here.
12         But I don't think you can actually
13 review everything. That is not possible I think.
14 That's why it's sent to experts, people who work in
15 that field.
16     Q.   Right. I guess I'm trying to understand
17 the process a little bit more. But if there is a
18 scientific issue and there is one paper on one side
19 of the issue and there are eight papers on the
20 other side of the issue, it's probably not good
21 science just to cite the one paper on one side and
22 say that is the Gospel. Is that fair?
23     MR. CRAWFORD:   Objection; form.
24 BY THE WITNESS:

17 (Pages 62 to 65)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 66

1    A.   Well, I'm not sure I understand the
2  question correctly, but I can attempt to answer the
3  question.
4        As I understand it, there are many
5  things that go into forming an opinion about the
6  credibility of a paper.
7        First of all, you have to look in the
8  conclusion to see if it the -- if the authors
9  actually address the question that I'm interested
10 in or the authors who may write the paper talk
11 about.  You can't include everything.
12       Secondly, there is a question of
13 credibility.  And fortunately nowadays and with the
14 Vancouver group recommendations, you are not
15 supposed to have ghost authors, and if somebody is
16 paid by a company and it's declared, you look at
17 that and you say, well, you know, how reliable is
18 it or did the dean get any money.  Many times we
19 don't know that.
20       But there are many other factors that
21 play a role in judging whether a paper is credible.
22    Q.   Okay.  But if there are, say, nine
23 papers that go specifically to a subject and there
24 is one on one side and eight on another, it's not

Page 67

1  good science just to draw conclusions from that one
2  paper.  Is that fair?
3     MR. CRAWFORD:  Objection.
4  BY THE WITNESS:
5     A.   I don't think so.  I think it depends on
6  what they talk about, how did they do the
7  experiments.  For example -- let me give you an
8  example.
9  BY MR. TOMASELLI:
10    Q.   Let me give you a different
11 hypothetical, to try to speed this along.
12       Say the nine papers are of equal
13 quality, equal experiments, so there is not that
14 issue of did they do the right thing.  And there
15 are -- there is one paper on one side and eight on
16 another.
17       It wouldn't be scientifically proper to
18 draw conclusions only from that one study to the
19 exclusion of the others.  Is that fair?
20    A.   I don't think so because you say on one
21 side or the other side.  Many times you don't have
22 just one side or the other side.  You have all the
23 sort of gray levels in between.  You can't make
24 that flat statement in my opinion.  It's

Page 68

1  misleading.
2     Q.   Let me say again, you have these nine
3  studies of equal quality.  One shows an increase in
4  something.  The other eight show a decrease or no
5  effect.  It wouldn't be scientifically proper to
6  say the increase, that is the one that is correct,
7  right?
8     MR. CRAWFORD:  Objection.
9  BY THE WITNESS:
10    A.   It depends upon what the paper says,
11 what sort of the methods did they use.
12       I want to give an example.  Mice are
13 resistant to atherogenesis, atherosclerosis.  So,
14 what sort of manipulations have been used to
15 circumvent that because mice are good models.
16       So, then knock out the apoE gene to make
17 the mouse more susceptible.  You find apoE knockout
18 models are used extensively.
19       Or they will give cholic acid in the
20 diet and many times they don't mention that.  You
21 go to the library and look up the old references to
22 find out.
23       You have to look at all those things
24 before you can really believe the results or give

Page 69

1  it credibility.
2        Now, if you -- if you know somebody is
3  from, let's say, Stanford, somebody on the senior
4  staff at Stanford, who writes an article.  Then you
5  are more inclined to think, well, maybe he knows
6  what he is talking about.
7        So, I don't think you can say that you
8  have papers on that side that say A and the other
9  ones say B and they contradict each other.  You
10 have to look at the fine detail, too.
11    Q.   Say they are all in apoE knockout mice.
12    A.   Yes.
13    Q.   And there is, you know, again, one on
14 one side and several studies on the other showing
15 disparate results.
16       Best way to discuss that data is to
17 discuss all the data, right?
18    A.   Well, if --
19    Q.   And say there is one study on one side,
20 but there are these other studies that go the other
21 way.  That would be the right way to discuss it,
22 fair?
23    A.   If you write a review article, for
24 example, you have the liberty to write whatever you

18 (Pages 66 to 69)

Egil Fosslien, M.D.

Page 70

1  want.  The reviewers can shoot you down and say we
2  don't like your article.
3        But you can select whatever you want to
4  write about because it's exposed to peer review and
5  the reviewers will say you didn't include that
6  article, we don't want to have your article.  That
7  is one of the safety valves that is there.
8        When it comes to the apoE knockout
9  mouse, you have to ask what sort of diet did they
10  use, did they use cholic acid.  Sometimes they
11  don't say that.  You have to go back and look in
12  the fine print and go back to the library and look
13  in very old publication to find out because these
14  are things you have to look for because they can be
15  misleading, can tweak -- you can tweak an
16  experiment sometimes.
17      Q.   Right.  And, again, I'm not trying to
18  tweak the experiment.  I'm just saying
19  hypothetically that they are of equal quality.
20      A.   I disagree with that assumption because
21  I don't think the papers are equal quality.
22      Q.   Okay.  Have you done any original
23  research with respect to NSAIDs?
24      A.   No.  I came close, but for internal

Page 71

1  political reasons Dr. Goldscher and I, when he took
2  over that project because I wrote it up and it was
3  sent to the research board.  We wanted to do
4  studies on the effect of celecoxib on cancer cells
5  and he was supposed to provide the biopsies and
6  cultural cells and see if they express COX-2 and
7  then we would treat the patients and see if there
8  was a response, which was a good project and I
9  think that he probably ended up getting it.
10        At the time it was turned down because
11  it was not enough pilot data, and the reason was
12  that I had a new chairman who was interested in
13  other things.
14      Q.   And for a variety of reasons I
15  understand that you've never done original research
16  on NSAIDs, is that fair?
17      A.   In the laboratory, yes, that's fair.
18      Q.   Have you -- and that would include
19  cardiovascular, any research on cardiovascular
20  effects of NSAIDs, original research?
21      A.   You mean treating animals and so on or
22  patients?  No.
23      Q.   Okay.  Did you write any review articles
24  regarding NSAIDs prior to the -- prior to

Page 72

1  September of 2004?
2      A.   Oh, yes.
3      Q.   You did.  And what were the topics of
4  those review articles?
5      A.   Well, they are listed in my CV here if I
6  may consult the CV.  Which one would that be?
7      Q.   It's No. 2.
8      A.   I beg your pardon?
9      Q.   I think it's Exhibit 2.
10      A.   Okay.  Your question was?
11      Q.   You said you wrote some review articles
12  on NSAIDs --
13      A.   Right.
14      Q.   -- prior to September 2004, and I'm just
15  wondering the topics on which those were related
16  to.
17      A.   We'll see.  I also gave seminars which I
18  also listed here.  Publications.  Get to the end of
19  the publications here.
20        Oh, I see.  Okay.  Are you ready?
21      Q.   Go ahead.
22      A.   On page 85.
23      Q.   Okay.
24      A.   And page -- I would assume 86.  And they

Page 73

1  are listed in reverse order.
2      Q.   Okay.
3      A.   The first one is -- that one that is
4  listed first, I'm not sure reverse order.  Annals
5  of Clinical Laboratory Science 2000, "Molecular
6  pathology of cyclooxygenase-2 in neoplasia."
7      Q.   I think the first one you said was in
8  2000, you wrote about neoplasia.  And what is
9  neoplasia?
10      A.   Neoplasia is new growth.  Neo is new and
11  plasia is growth.
12      Q.   New growth of what?
13      A.   New growth like in tumor cells, like in
14  atherosclerosis when you get proliferation of
15  smooth muscle cells and lesion.
16      Q.   Was this review article, was it related
17  to atherosclerotic lesions or cells?
18      A.   That I don't recall.  I have to look in
19  the articles because I have written several
20  articles, but I have at least in some of these
21  articles talked about the effect on
22  atherosclerosis, yes.
23      Q.   Do you recall writing any review
24  articles prior to September 2004 relating to NSAIDs

19 (Pages 70 to 73)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

**Page 74**

1 and their effect on atherosclerosis?
2    A.   Yes, I think I did.  But we have to look
3 at each article because I don't remember.
4    Q.   Can you tell me which one you think may
5 address that issue?
6    A.   Let me see here.  You have to look at
7 all of them because sometimes I talk about NSAIDs
8 and mitochondria particularly.  If I do that, I
9 usually include a lot of atherosclerosis.
10       There are several here.  Second one is
11 "The biochemistry of cyclooxygenase(COX)-2
12 inhibitors and molecular pathology of COX-2 in
13 neoplasia."  Also 2000.  I was invited to submit
14 that article.  I was invited to submit that
15 article.
16       "Mitochondrial medicine:  Molecular
17 pathology of defects in oxidative phosphorylation,"
18 which involved NSAIDs' effect on mitochondria.  The
19 traditional NSAIDs affect mitochondria.  Many will
20 inhibit or uncouple mitochondria or effect the
21 Krebs cycle like aspirin.
22    Q.   And that issue that you just mentioned,
23 that is not related to Vioxx in particular, that is
24 related to all NSAIDs, right?

**Page 75**

1    A.   The one I talked about I think was
2 traditional NSAIDs, but I don't recall that.  We
3 have to look in the article.
4    Q.   Okay.  But I mean that whole
5 mitochondria uncoupling?
6    A.   Well, the question was does rofecoxib
7 have any effect on mitochondria because it was a
8 very important question to solve, and so far I
9 haven't found much to say either way.
10    Q.   Okay.
11    A.   But the then the next one, "Molecular
12 pathology of cyclooxygenase-2 in cancer-induced
13 angiogenesis."
14    Q.   And that's -- that one you just
15 mentioned, 2001, that's cancer, right?
16    A.   Well, not necessarily.  That is the
17 title.  That was the focus.  But cell proliferation
18 in neoplasia.  There are many similarities to cell
19 proliferation in atherosclerosis.  The Benditt
20 theory.
21    Q.   Okay.  Do COX-2 inhibitors reduce cell
22 proliferation in cancer?
23    A.   Well, depends upon the situation.
24 Experiments that show that.  In this case I talk

**Page 76**

1 about angiogenesis, the formation of new vessels.
2 Not formation of new vessels per se de novo but
3 formation of vessels, extension of vessels.
4 Angiogenesis versus vasculogenesis.
5    Q.   Okay.  I think you said yes, but I'm not
6 sure.  But, yes, COX-2 inhibitors inhibit or stop
7 cell proliferation in cancer?
8    A.   Well, the way it seems to occur is that
9 the cancer induces the formation of vessels in the
10 host and -- but -- this is COX-2 dependent at
11 least.  One of the mechanisms.
12       By inhibiting COX-2, then, you reduce
13 formation of new vessels, which is fine in a tumor
14 situation but not so good if you have a heart where
15 you like to have the collateral circulation.  There
16 you want to have angiogenesis.  In the tumor you
17 don't want to have angiogenesis.
18    Q.   These tumors that have angiogenesis, are
19 those little capillaries or are they big arteries?
20    A.   Well, they start as small capillaries.
21 They may develop into bigger vessels, but
22 usually --
23    Q.   Are they generally capillaries?
24    A.   They start as capillaries.

**Page 77**

1    Q.   Okay.
2    A.   Generally I don't think you can actually
3 state that without some evidence to show it.
4    Q.   But COX-2 inhibition would be a good
5 thing in cancer, right?
6    A.   It depends upon -- again, it depends
7 upon the cancer.
8    Q.   Have you ever written that, that COX-2
9 inhibition is most likely beneficial in cancer
10 patients?
11    A.   Well, I think it's part of this -- of
12 the publication.  We can look in the publication.
13    Q.   I'm just asking --
14    A.   My recollection, you know, I gave a
15 lecture at the national meeting about it and I
16 wrote the article.
17       And I also caution in there because some
18 people told me, well, Egil, you're for these COX
19 inhibitors, because I was for the COX inhibitors in
20 the past.  I was shocked when I saw the recall of
21 this inhibitor, which then sent me out to try to
22 find out why.
23       But I had warned in that paper which is
24 from 2001 that I would not use, for example, COX to

Golkow Litigation Technologies - 1.877.DEPS.USA

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 78

1 inhibit prophylactically because some people have
2 suggested that and because there are some
3 detrimental effects, one should be cautious.
4       But in cancer when the benefits outweigh
5 the risk -- let's say that you have cancer,
6 prostate cancer. You are about to die. Now, would
7 you take a COX-2 inhibitor? Probably because the
8 cancer will kill you and there is a likelihood you
9 will be killed from a myocardial infarction, but
10 that likelihood in that case is less than the risk
11 from dying from the cancer. So, it's a
12 risk/benefit ratio.
13     Q.  I thought you said you were for the
14 development of COX-2s and for COX-2s up to the time
15 that you --
16     A.  Because the alleged beneficial effects
17 on the gastrointestinal tract. I had written a
18 paper which I don't think is listed here.
19     Q.  But you were for them prior to, what,
20 September 2004 when you heard about the withdrawal?
21     A.  Well, let me just elaborate a little
22 here, if I may, so that it's clear what I'm talking
23 about.
24       Because I was invited to speak about the

Page 79

1 toxic effect on the gastrointestinal tract induced
2 by traditional NSAIDs. So, I was really -- and I
3 wrote an article about that. It's in the
4 literature.
5       So, I was really encouraged when I found
6 out there are new drugs coming out that spared the
7 intestinal tract. That was a great advance at the
8 time I thought.
9       Did that answer your question?
10     Q.  I think so. I thought you said you were
11 pretty much for them all the way up to when you
12 heard about the withdrawal and that is -- I was
13 just confirming that.
14     A.  Well, that's not entirely correct
15 because there were publications coming out. I
16 looked at them and it was very controversial at the
17 time. I didn't have access to all of these
18 publications but those I looked at, I said, well,
19 this was controversial.
20       I think I wrote in the paper there was
21 controversy and ethical issues were raised and
22 there was -- about delay, undue delay and so on.
23       I wrote that in the article because I
24 didn't want to take a position on that at the time.

Page 80

1 I said okay, it's been approved by the FDA. Should
2 be okay. So, I waited. When I saw it was
3 withdrawn I started to say, okay, this is for real.
4 I would like to find out what's the mechanism
5 involved.
6       So that it's of interest to me also how
7 can we make better drugs in the future, and to do
8 that we have to find out what the mechanism is in
9 this case.
10     Q.  Okay.
11     A.  There are beneficial effects to these
12 drugs and there are adverse effects.
13     Q.  And the beneficial effects of these
14 drugs are what?
15     A.  Well, for the rofecoxib itself, it may
16 be more spare the intestinal tract, you know, is
17 problem there, you know, is COX-2 is involved in
18 the healing phase of gastrointestinal lesions.
19     Q.  I guess any traditional NSAID inhibits
20 COX-2, though. So, that is pretty much --
21     A.  Well, the traditional NSAIDs, you know,
22 it's the thought that they inhibit mainly COX-1
23 that causes the problems and then it was discovered
24 I understand that COX-2 is involved in the healing

Page 81

1 phase too.
2     Q.  Are you saying -- let me -- I'm not
3 clear. Are you saying that traditional NSAIDs
4 don't inhibit COX-2?
5     A.  Well, you can't say that flat out
6 because that is not correct.
7     Q.  I'm actually wondering. Do you agree
8 that non-selective NSAIDs inhibit both COX-1 and
9 COX-2?
10     A.  Well, to the extent that they are
11 inhibitors, to a certain extent. But you have to
12 talk about selectivity because they are all
13 different. You can't put them in one heap and say,
14 well, they all have the same effect.
15       Aspirin inhibits COX-1 more than COX-2
16 and as there is a whole range if you look in the
17 literature. Even the range is contested.
18     Q.  I see. So, low-dose aspirin is a COX-1
19 selective inhibitor versus Vioxx, which is a COX-2
20 selective inhibitor? Is that what you're getting
21 at?
22     A.  In general, yes. Aspirin has other
23 effects. It inhibits the Krebs cycle enzymes. One
24 of its metabolites uncouples mitochondria. Many

Egil Fosslien, M.D.

Page 82

1 other effects.
2    Q.   I'm sure there are.  But as far as
3 low-dose aspirin and COX-1, low-dose aspirin is a
4 COX-1 selective inhibitor versus Vioxx; that is a
5 COX-2 selective inhibitor?
6    A.   That is my opinion, yes.
7    Q.   Okay.
8    A.   It's not completely exactly like that
9 because, you know, the selectivity of COX -- of
10 Vioxx -- of rofecoxib.  But I prefer to use the
11 generic term because that's what I have to do when
12 I publish.  They don't permit me to use the
13 trademark.
14         That depends on the protein
15 concentration because it binds the proteins.  So if
16 you have a high protein concentration, rofecoxib
17 may not inhibit COX-1.  The low protein
18 concentration, there is more free rofecoxib and it
19 may inhibit COX-1.
20         But this is controversial.  I talked to
21 experts about it and ask, well, so what?  How do
22 you know what the protein concentration is in the
23 cell, the various parts?  And he said -- he didn't
24 know.

Page 83

1    Q.   Okay.  Would you agree that when you're
2 trying to determine if a drug has a specific
3 effect, it's best to look at studies with that
4 actual drug?
5    A.   I'm not sure I understand that question.
6 Could you explain, please.
7    Q.   Sure.  When you're trying to assess
8 effects of a drug, do you think it's best to look
9 at studies with that actual drug?
10    A.   I think that would be the final
11 determination because you would start probably in
12 the test tube to see its effect.  You would have
13 biochemists looking at that.  Then you start
14 with -- continue with animal experiments.  Then you
15 do a small study on a limited number of healthy
16 patients to see if there is any toxic effect.
17         And the problem there is most of those
18 are short term.  And then they are applied --
19 companies apply to the FDA from what I understand
20 and they get the approvals or not and then come the
21 clinical tests.
22    Q.   Okay.  And, so, the answer to my
23 question is if you want to look at the effects of a
24 specific drug, it's good to look at studies with

Page 84

1 that exact drug, right?
2         MR. CRAWFORD:  Objection; vague.
3 BY THE WITNESS:
4    A.   Well --
5 BY MR. TOMASELLI:
6    Q.   Let me put it to you simply.
7         It's best to look at the effects of
8 Vioxx in studies that actually looked at Vioxx, is
9 that fair?
10         MR. CRAWFORD:  Objection; vague.
11 BY THE WITNESS:
12    A.   The -- I'm not sure I understand your
13 question because there are -- in one case I think
14 Merck provided an analog to a researcher and they
15 studied the tricyclic analog.
16 BY MR. TOMASELLI:
17    Q.   Sir, I don't mean to interrupt.  If you
18 disagree with me, just say, "I don't think you're
19 right."
20    A.   No, I'm not saying you're wrong.  I'm
21 saying that sometimes there is not a yes or no
22 answer to a question and I think that it may be
23 misleading for the jury to hear testimony or read
24 testimony if it's not clear what we are talking

Page 85

1 about.
2    Q.   Okay.  So, do you think that to
3 determine the effects of a -- the effects of Vioxx,
4 the best studies to look at -- I'm not saying they
5 are the only studies -- but the best studies to
6 look at are the ones with Vioxx?
7         MR. CRAWFORD:  Objection.
8 BY THE WITNESS:
9    A.   Well, you know, I'm interested in the
10 pathogenesis of the problems here and I think you
11 should look at other drugs, too, to see how they
12 effect and how is Vioxx -- how is rofecoxib, Vioxx,
13 different or similar to the other drugs.  You can
14 learn from other studies.
15 BY MR. TOMASELLI:
16    Q.   Right.  Drugs are in classes.  Fair?
17    A.   Well, there has been a lot of study
18 about the class effect.  I think you can't really
19 say there is a class effect.  You have to look at
20 each drug separately.  There are common features
21 and separate features.
22    Q.   I think you just answered my question.
23 You can look at class effects, but each drug may be
24 different so it's best to look at what happens with

22  (Pages 82 to 85)

Egil Fosslien, M.D.

Page 86

1 that drug?
2     A.   Well, if you want to understand the
3 pathogenesis, you may want to look far beyond that
4 because there may be limited publicly available
5 data on that particular drug and there may be other
6 drugs that also inhibit COX-2 and you look at the
7 effects of those drugs and you say does rofecoxib
8 also have these effects.
9     Q.   And, listen, I'm not quibbling with you
10 that class effects or mechanisms of other drugs in
11 the class are worth looking into.
12         I'm just trying to establish that if
13 you're looking at a specific effect of a drug, it's
14 good, it's the best evidence to see what that drug
15 actually did?
16    A.   I think --
17    Q.   Is that fair?
18    A.   I think we are talking about two
19 different things.  You are looking at the legal
20 aspects.  I'm looking at the medical and scientific
21 aspects.  I'm looking at pathogenesis, how do these
22 changes come about.
23         And there I think you can't just look at
24 one drug.  You have to take it and look at findings

Page 87

1 where drugs have similar effects.  They may not
2 have all the effects, but similar effects, to try
3 to figure out how does this come about.
4         So I disagree with you.  As I concluded
5 in my previous article, I said at that time that
6 because I read several people who said there is a
7 class effect, others saying no, there is no class
8 effect, and I conclude at that time that there is
9 no credible evidence to conclude there is
10 definitely a class effect applying to all these
11 drugs.
12         I think we are talking about different
13 things.  I am interested in the mechanism,
14 pathogenesis, because I am a pathologist.  I don't
15 think you can limit yourself to look at only one
16 thing.  You have to know where to look.
17    Q.   I'm not trying to limit the evidence
18 that's valuable to look at pathogenesis to only
19 studies involving that drug.  I'm just asking
20 whether, for example, if you had identical studies
21 with -- some with Vioxx, some with another NSAID,
22 is it reasonable to look at the studies with Vioxx?
23    A.   You should look at those, too, but you
24 should look at the others also; otherwise, you have

Page 88

1 a very narrow view.
2    Q.   So, the studies with Vioxx are no more
3 important than the studies without Vioxx?
4    A.   I didn't say that.
5    Q.   So you think they are more important?
6    A.   Well, it depends upon the situation.
7 First if you want to find the pathogenesis, you
8 have to have a concept.  So you develop a concept
9 by looking at other NSAIDs too and see how does
10 Vioxx or rofecoxib compare with these effects.
11         Example in the report here, I think I
12 talk about the effect of celecoxib on MCP-1.
13    Q.   Right.
14    A.   And there was --
15    Q.   I remember that.
16    A.   -- a short-term effect and a long-term
17 effect.  I could not find similar data for
18 rofecoxib, which really surprised me because it
19 seems to be very important.  I didn't understand
20 that.
21         So, I pointed that out in the report
22 because I think it's a important aspect, what is
23 the effect of short term and long term on certain
24 parts.  These drugs have several effects, not just

Page 89

1 one effect.
2    Q.   Let's talk about that MCP-1 since you
3 brought it up.
4    MR. CRAWFORD:  Can we take a quick bathroom
5 break?
6    MR. TOMASELLI:  Sure.
7         (WHEREUPON, a recess was had
8          from 10:38 to 10:52 a.m.)
9 BY MR. TOMASELLI:
10    Q.   Dr. Fosslien, are you ready?
11    A.   Yes, sir.
12    Q.   Okay.  Before we get into some other
13 topics, I want to make sure I'm clear on the
14 opinions that you're not offering in this
15 litigation so I can again try to understand the
16 scope of your opinions.
17         You're not offering any opinions
18 regarding Mr. Barnett, right?
19    A.   I don't know Mr. Barnett, sir.
20    Q.   Okay.  You're not offering any opinions
21 regarding the FDA's or the FDA advisory committee's
22 actions with respect to Vioxx, is that fair?
23    A.   Well, it depends upon.  Opinion would
24 probably not be the correct word.  Certain things

23  (Pages 86 to 89)

d1c48430-8b50-46ac-99d5-274a6d1abffd

● Egil Fosslien, M.D. ●

Page 90

1 are interesting. 32 panel members agreed on the
2 decision. That is not an opinion. That is a
3 finding.
4     Q.   32 panels members agreed that what?
5     A.   That's what it said. Agreed to turn
6 down the Vioxx -- pardon me -- the rofecoxib
7 application. I think it was in the Farquar
8 document.
9     Q.   That's not true. You know that.
10     A.   I don't know that. I have no reason to
11 believe what they write. I don't know that.
12     Q.   So, you're not --
13     A.   You show it to me.
14     Q.   You're not going to offer any FDA or the
15 FDA advisory opinion?
16     A.   That's what I said. I don't offer an
17 opinion. But, you see, there are things that are
18 important in this case.
19     Q.   Okay.
20     A.   But I don't offer an opinion.
21     Q.   I know there are things that you may
22 find interesting, but I want to know and I have a
23 right what your opinions are and what I can expect
24 to hear from you at trial.

Page 91

1         As I understand it you may think some
2 things are interesting but you're not going to
3 offer opinions with respect to the FDA or the FDA
4 advisory committee meeting, the FDA advisory
5 committee's actions with respect to Vioxx, is that
6 fair?
7     A.   You asked me if I have an opinion. I
8 certainly have an opinion. I think it's very sad
9 that the FDA evidently did not proceed very rapidly
10 on this case or the FDA had different opinions than
11 the company that applied for the approval and --
12 but it's not my report. I wanted to avoid that.
13 That is a different story in my opinion. But it's
14 certainly there and I have an opinion about it.
15     Q.   You're not going to be talking about
16 that at trial. Fair?
17     A.   I don't intend to do so unless you bring
18 it up.
19     Q.   It's not in your expert report and it's
20 not something that you're going to bring up at
21 trial. Fair?
22     A.   I don't think that particular statement
23 is in there. I may talk about the FDA and I do
24 that in review paper that was finished before this

Page 92

1 report was made, I do talk about the problems, how
2 this come about. The drug was recalled and there
3 was controversy about why it was recalled.
4         MR. TOMASELLI: Mark, is he going to be
5 offering opinions on FDA?
6         MR. CRAWFORD: I think there is a little bit
7 of confusion there. He is not going to be offering
8 any opinion on any regulatory actions or
9 questioning.
10         All he is saying, I think, is that
11 actions taken by the FDA are something that
12 obviously I think is relevant to the whole
13 consideration of the whole.
14         So, to say you won't be talking about
15 the FDA, you know, I don't know, there might be a
16 reference to it in putting something into context.
17 But he is not going to be testifying about the
18 regulatory -- he is not an FDA expert. Is that
19 what you're asking?
20         MR. TOMASELLI: Yeah. I mean --
21         MR. CRAWFORD: He is not an FDA expert.
22 BY MR. TOMASELLI:
23     Q.   You are not going to be offering any
24 opinions regarding the FDA's original approval of

Page 93

1 the drug or any of the labeling or anything like
2 that, correct?
3     A.   Well, I have an opinion, if you ask me
4 the general term "opinion."
5         MR. CRAWFORD: Let me --
6 BY THE WITNESS:
7     A.   Opinion about the FDA.
8         MR. CRAWFORD: I'm sorry. Let me --
9 BY THE WITNESS:
10     A.   Because why is it that the FDA did not
11 take action?
12         MR. CRAWFORD: I will --
13         MR. TOMASELLI: We are going to have to stop
14 because I've got a 90-page expert report that
15 doesn't have anything in it with respect to the
16 FDA's labeling, the FDA's approval of the drug,
17 whether that was correct, whether the labeling is
18 accurate, anything like that.
19         MR. CRAWFORD: Those are more specific
20 questions.
21         MR. TOMASELLI: I'm trying to figure out what
22 his opinions are, and I get these really long
23 speeches about how I have opinions but I don't
24 know.

Egil Fosslien, M.D.

1    So, does he have opinions or doesn't he.
2    MR. CRAWFORD:  Okay.  I think maybe it's a --
3  it's the legal versus the more lay type of
4  understanding.
5    MR. TOMASELLI:  I'm interested --
6    MR. CRAWFORD:  Let me finish my answer here.
7    He has not been designated as an expert
8  in any of those FDA areas that you just mentioned,
9  on the label, the adequacy of the labeling, the FDA
10  actions.
11    But what I'm interpreting him saying is
12  that the FDA taking certain actions is something
13  that has an impact on his thinking about Vioxx and
14  what it is, but he is not testifying about whether
15  it was correct or incorrect.  So, your question I
16  thought was a little bit --
17  BY MR. TOMASELLI:
18    Q.   Is that true?
19    A.   Well, I --
20    MR. CRAWFORD:  -- vague.
21  BY THE WITNESS:
22    A.   Well, I think the misunderstanding here
23  is that there is this report and there is the paper
24  I wrote before.  In the paper I wrote before I

1  pointed this out, that there was controversy about
2  the effect of rofecoxib on the cardiovascular
3  system.  I pointed that out.  I wrote it.
4    And then more and more it became clear
5  that there are real problems and there are some
6  people who actually, and I quoted them and I put
7  the reference in, they said that they question the
8  FDA and its action.
9    I'm not rendering that opinion in this
10  report.  But if you ask me if I have an opinion
11  about the FDA, yes.  I'm saddened to see that there
12  was a delay.
13    Q.   Sir, are you offering an opinion on
14  whether the original approval of the drug was
15  correct or incorrect?
16    A.   No, I'm not.
17    Q.   Are you offering an opinion in this
18  litigation regarding any statement in the labeling
19  as being correct, incorrect, adequate or
20  inadequate?
21    A.   No, I'm talking about the paper that I
22  wrote and was published in the fall.  I think we
23  are talking about two different things here.
24    Q.   So, the paper you wrote in the fall --

1    A.   I talk about --
2    Q.   -- that's what you thought --
3    A.   Yeah.
4    Q.   -- in the fall?
5    A.   I talked about the controversy because I
6  was really saddened to see that.
7    Q.   You looked at a lot of -- I guess you
8  looked at a lot of stuff and put your opinions in
9  that paper?
10    A.   In the paper I looked at the literature.
11  As it became clear the drug had been withdrawn, I
12  went back to see what was the story here.  And I
13  quoted those that were for the drug, I quoted those
14  that were against the drug, and I pointed that out.
15  You have to read.  All the references are there.
16    Also I quoted that some people raised
17  ethical questions about the delay in the action.
18  It's in there in the article.  You can just look it
19  up and see it.  That was written before this whole
20  thing came up whatsoever.
21    Q.   That's before you got involved in
22  litigation?
23    A.   Yes.
24    Q.   You reviewed all the literature you

1  could get your hands on and tried to figure out
2  what the issues with Vioxx and other NSAIDs were?
3    A.   As I pointed out to you before, when you
4  write an academic article, it is submitted for peer
5  review and you can put in whatever you want there.
6    If the reviewers don't like it or they
7  have an article they want to have put in, they will
8  write that and then you have to go back and if you
9  haven't included it, then you will have to include
10  it with a proper discussion.
11    Q.   Have you ever read the labeling that was
12  approved in the US for Vioxx?
13    A.   No.
14    Q.   Have you ever read --
15    A.   Except, you know, there was some
16  controversy on the Internet.
17    I don't get much information from the
18  company that I'm a consultant to.  So, I go to the
19  Internet to see what's going on, frankly, and there
20  are all sort of discussions about labeling there.
21  But I don't think that belongs in this report.
22    Q.   Have you read the FDA-approved labeling
23  for Vioxx?
24    A.   No.  You mean before it was withdrawn

25 (Pages 94 to 97)

d1c48430-8b50-46ac-99d5-274a6d1abffd

## Egil Fosslien, M.D.

Page 98

1    or -- it was attempted to -- to get it approved
2    again I understand.
3        Q.    Have you ever read any labeling --
4        A.    I think I answered that question just a
5    minute ago.
6        Q.    And the answer is no?
7        A.    The answer was no.  I haven't read that
8    labeling for Vioxx.  That's what you asked about,
9    right?
10       Q.    Then you said but, but, but, and so I'm
11   trying --
12       A.    I have a right to clarify the answer so
13   it's not misleading to the jury.
14       Q.    I don't think if you have read something
15   or not read something needs an explanation.  It's
16   either I have read it or I haven't read it.
17       A.    I said that I read about it on the
18   Internet because there is a lot of stuff on the
19   Internet.  Sometimes --
20       Q.    You read an article, but not the
21   labeling, right?
22       A.    An article about the labeling, the
23   claims about the labeling.
24       MR. CRAWFORD:  I think --

Page 99

1    BY THE WITNESS:
2        A.    I have not read the labeling.  I told
3    you that.
4    BY MR. TOMASELLI:
5        Q.    Are you familiar with the FDA
6    regulations regarding the marketing of
7    pharmaceutical drugs in the United States?
8        A.    No.
9        Q.    Do you know what division of the FDA
10   regulates the marketing of pharmaceutical drugs in
11   the United States?
12       A.    I beg your pardon?  I don't understand
13   your question.  Could you explain, please.
14       Q.    Do you know what division of the FDA
15   regulates the marketing of pharmaceutical drugs in
16   the United States?
17       A.    What do you mean by "the vision"?
18       Q.    Division.
19       A.    Oh, the division.  I thought you said
20   "vision."
21       Q.    The division within the FDA that
22   regulates the marketing of pharmaceutical drugs in
23   the United States.
24       A.    No, I understand there is pre-market

Page 100

1    approval and things like that, but I'm not involved
2    in that.
3        Q.    Okay.  Do you intend to offer any
4    opinions regarding what Merck employees were
5    thinking at any certain point in time or what their
6    intent is?
7        A.    Intent and thinking, well, there is some
8    e-mail and, you know, I don't think there is any
9    question about what they were thinking from the
10   e-mail.
11       Q.    You're just --
12       A.    That is the Scolnick e-mail and it's in
13   my report here.
14       Q.    And you're just looking at the e-mails
15   and interpreting them, correct?
16       A.    No, I don't think that's correct.  It
17   goes into the whole picture.  You can't look at
18   just one thing.  I think that is again misleading.
19       Q.    You're not interpreting the e-mail?
20       A.    I beg your pardon?
21       Q.    You're not interpreting the e-mail?
22       A.    What do you mean by "interpreting"?
23   You're putting words in my mouth, you know.  I read
24   the e-mail.  I quoted it here.  We can look at it

Page 101

1    if you want to.
2        Q.    I'm just asking if you have read and
3    interpreted the e-mail.
4        A.    I read it --
5        MR. CRAWFORD:  Objection.
6    BY THE WITNESS:
7        A.    -- the e-mail and I put it in the
8    report.  There it is.
9        MR. CRAWFORD:  Interpreting.
10   BY MR. TOMASELLI:
11       Q.    Have you read --
12       MR. CRAWFORD:  Counsel.
13   BY MR. TOMASELLI:
14       Q.    Have you read any other e-mails by
15   Ed Scolnick except for the ones that you have put
16   in your report?
17       A.    I think there are two in this report
18   here.  I don't recall how many there are but --
19       Q.    Have you read all of his e-mails?
20       A.    No, I have not been given all of his
21   e-mails.
22       Q.    Did you ask for them?
23       A.    I have not asked for it because I
24   usually get that from the -- from the company.

Golkow Litigation Technologies - 1.877.DEPS.USA

d1c48430-8b50-46ac-99d5-274a6d1abffd

# Egil Fosslien, M.D.

Page 102

1  They send me information.  I ask, you know -- I,
2  for example, asked them, well, in this case, please
3  send on rofecoxib, did they find out what the
4  effect on leukocyte addition is.  Did they find out
5  what the effect on the --
6      Q.   Sir, my question is:  Did you ask for
7  all the e-mails of Edward Scolnick?
8      A.   No.  Was I supposed to?
9      Q.   Have you read the deposition testimony
10 of Edward Scolnick?
11     A.   No, I have not.  It's not been available
12 to me.
13     Q.   Have you read any deposition testimony
14 of any Merck employee?
15     A.   That I don't recall.  I don't think so,
16 but -- I don't think so.
17     Q.   When was the last time you reviewed
18 internal company documents and e-mails --
19     A.   I think --
20     Q.   I'm sorry.  I'm not done with my
21 question.
22          When is the last time that you
23 interpreted and read internal company e-mails as
24 far as helping you render a scientific opinion

Page 103

1  regarding pathogenesis of a drug?  Have you ever
2  done that before?
3      A.   Well, you talk again about the
4  interpretation.  If you talk about having read, I
5  will answer that.
6      Q.   Okay.
7      A.   The interpretation is a different story.
8      Q.   Have you ever read internal company
9  e-mails before in an attempt to determine the
10 pathogenesis of a drug?
11     A.   I think the e-mail really reflects the
12 background of the drug and --
13     Q.   Sir --
14     A.   I'm trying to answer your question.
15     Q.   I mean, if you can just answer my
16 question.
17     A.   Well, I'm trying to answer your
18 question.
19     Q.   My question is pretty simple.
20     A.   It's not simple to me.  It's simple to
21 you.  You're a lawyer.  I'm not.
22     Q.   Have you read internal company e-mails
23 for any company in your regular practice as a
24 pathologist in determining pathogenesis of a drug?

Page 104

1  Have you done that?
2      A.   I have not been involved in this sort of
3  drug case before.  I have told you that.
4      Q.   So you have never done that before?
5      A.   No, not to my recollection.
6      Q.   Okay.  In your practice as a
7  pathologist, I assume that you would look at
8  certain medications that people were on, is that
9  right?
10     A.   Yes, it would -- would be important,
11 yes.  For example, statins.
12     Q.   And you would consider those medications
13 and their -- any effects on the person or autopsy
14 or case you were looking at.  Is that fair?
15     A.   As a physician I usually relied on the
16 FDA.  If they have approval, I think the drug must
17 be okay.
18     Q.   Okay.  And with respect to all of those
19 other drugs that you may have considered throughout
20 your career, did you ever look at internal company
21 e-mails with respect to those products?
22     A.   No.
23     Q.   Do you have any personal knowledge of
24 what any Merck employee was thinking at the time

Page 105

1  they wrote an e-mail that you may have looked at?
2      A.   I have not met any of the people that
3  I've -- from which I've seen e-mail.  From whom
4  I've seen e-mail.
5      Q.   Are you offering any opinions regarding
6  at what point in time Vioxx should have been
7  withdrawn from the market, if at all?
8      A.   No, I have not.  I have quoted the
9  opinions of others, but --
10     Q.   You quoted the opinion of Dr. Cleland?
11     A.   In the report here you mean?
12     Q.   Yes, sir.
13     A.   Or do you mean in the paper?
14          I addressed that question long before
15 this report was written.  I wrote about it in my
16 article that came out in 2005.
17          Now, if you can point to me where in the
18 report I talk about this, I will be happy to
19 comment.
20     Q.   Let me just make this simple.
21          You're not offering any opinion
22 regarding when Vioxx should have or should not have
23 been withdrawn from the market?
24     A.   No.  I think, you know -- let me make

27 (Pages 102 to 105)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 106

1  this perfectly clear. Company is there to make
2  money for the shareholders. And I don't blame
3  anybody inside for the company for what their
4  actions are. That is a whole different story. I
5  am looking at the pathogenesis of this drug.
6      Q.   Okay. You're not --
7      A.   The rest --
8      Q.   You're not looking at the company.
9  You're looking at science. Fair?
10     A.   I'm looking at science. I'm also
11 interested, of course, to find out what did -- what
12 did they think, what went on, why did this happen.
13 That is background information for me to motivate
14 me to look at it. Why should I sit hour after hour
15 looking at this thing when I can be outside and
16 doing something else?
17     Q.   And certainly in your practice as a
18 pathologist in all the years of that that you have
19 done, you generally relied on the peer-reviewed
20 published literature for your opinions, correct?
21     A.   What opinions?
22     Q.   Opinions regarding drugs, of effects of
23 drugs, pathogenesis of disease.
24     A.   Usually you would go and look at the

Page 107

1  Physician Desk Reference and see what's in there,
2  look at the disclaimers particularly, you know.
3  What if I want to take the drug myself? There are
4  many drugs I wouldn't want to take because of side
5  effects.
6      Q.   So, in your --
7      A.   That is what most --
8      Q.   I'm trying to understand.
9          When you were practicing as a physician
10 or as a pathologist in your daily practice, you
11 refer to the Physicians' Desk Reference and the
12 published medical literature, is that right?
13     A.   Yes, that would be correct to assume.
14 You assume, you assume that the FDA is doing the
15 right thing.
16     Q.   So, my statement was correct, is that
17 fair?
18     A.   Can you rephrase the question, please.
19     Q.   Sure. I was just saying that when you
20 were practicing as a pathologist, the things that
21 you relied upon for your opinions and
22 interpretation and practice was the PDR and the
23 published peer-reviewed medical literature?
24     MR. CRAWFORD: Objection; form.

Page 108

1  BY THE WITNESS:
2      A.   And the clinicians.
3  BY MR. TOMASELLI:
4      Q.   And other clinicians?
5      A.   Yes, and clinicians.
6      Q.   Other opinions of clinicians and
7  pathologists?
8      A.   The -- what they experience. For
9  example, if a patient that dies in the -- it turns
10 out to be probably due to specific drug, in this
11 case was not Vioxx, I am thinking about a different
12 drug. And there is general consensus it caused the
13 disease. Yes, you discuss it. It may be in the
14 PDR in fine print but people didn't read it. There
15 may be other variations and other things.
16     Q.   I will call those professional
17 discussions with colleagues?
18     A.   Yes, I think that's correct.
19     Q.   PDR, peer-reviewed published literature
20 and professional discussions with colleagues?
21     A.   I think that's correct.
22     Q.   I want to make sure I understand the big
23 picture of your report. I know it's fairly
24 lengthy. I know it's fairly detailed, but I'm

Page 109

1  trying to understand major concepts. Is that
2  understandable to you?
3      A.   Yeah.
4      Q.   Okay. As I read your report I
5  understand you have the opinion that Vioxx causes
6  atherogenesis. Is that fair?
7      A.   Accelerates atherogenesis, that's fair.
8      Q.   That Vioxx causes thrombosis?
9      A.   Yes, it's involved in thrombosis, that's
10 fair.
11     Q.   And that Vioxx inhibits collateral
12 circulation in the heart?
13     A.   That's what I also think it will do
14 because it inhibits COX-2. Those are --
15     Q.   Those are -- I'm going to get to the
16 mechanisms behind all those things. But those are
17 the three major points, is that fair?
18     A.   Well, you didn't mention hypertension,
19 which occurs very quickly and which is not unique
20 to Vioxx or to rofecoxib, incidentally. But
21 hypertension is an important thing.
22     Q.   Okay. And that was -- maybe I'm wrong,
23 but that was going to be one of my "mechanisms."
24 You cite hypertension as a mechanism for

Egil Fosslien, M.D.

Page 110

1  atherosclerosis, so I was going to get to that.
2       But can we -- do you understand what I'm
3  trying to do?
4     A.   No.
5     Q.   Okay.  I thought you had three major
6  opinions in your report, that Vioxx was associated
7  with atherogenesis, thrombosis?
8     A.   Well, let's go through it, because I
9  have written it down here and I like to stick to
10 the report so we don't get sidetracked into a
11 thousand other avenues.
12    Q.   You can't go with me that there are
13 three main points of your report?
14    A.   Well, I want to see what I wrote here to
15 make sure that is correct.
16    Q.   Take your time.
17    A.   Thank you.
18         Okay.  I think it is here.  Okay.  I
19 think it starts on page 12.  And this is kind of
20 the background and the summation.  Okay?
21    Q.   Okay.
22    A.   And it may not necessarily include all
23 the details.
24         So it goes here -- should I read to you

Page 111

1  or do you want to read quietly?
2     Q.   I don't really want you to read the
3  report to me because, as it may surprise you, I
4  have actually read it.
5         Do you hold the opinion that Vioxx
6  accelerates atherogenesis?
7     A.   I think that Vioxx or rofecoxib, it has
8  several effects.  One effect is very soon,
9  immediate effect, it increases blood pressure.
10 Blood pressure is an independent risk factor both
11 for atherogenesis and for myocardial infarction.
12    Q.   So, number one, Vioxx increases
13 hypertension.  Okay.
14         Do you believe Vioxx increases
15 atherogenesis?
16    A.   Hypertension is a risk factor for
17 atherogenesis.  I think it's commonly agreed upon.
18    Q.   Vioxx increases atherosclerosis?
19    A.   Yes.  It's a risk factor.  I didn't say
20 it increases.  The right term is to say it's a risk
21 factor, an independent risk factor, like smoking,
22 hypertension, diabetes.
23    Q.   Vioxx is an independent risk factor
24 for --

Page 112

1     A.   I did not say that.  I said that Vioxx
2  causes hypertension, comma, hypertension is
3  recognized as an independent risk factor for
4  atherogenesis.
5     Q.   Okay.  So, Vioxx increases hypertension
6  and hypertension is known to be an independent risk
7  factor for atherosclerosis?
8     A.   Correct.
9     Q.   Okay.  I believe you've also talked
10 about in your report that Vioxx increases
11 vasoconstriction, reduces vascular profusion and is
12 associated with a decrease in vasodilation, is that
13 fair?
14    A.   That sounds reasonable.
15    Q.   Okay.  And what process do those things
16 relate to?  Do they relate to atherosclerosis or
17 thrombosis?
18    A.   Both.
19    Q.   I also saw in your report where
20 you said that Vioxx increases platelet aggregation
21 and activating -- and Vioxx activates platelets,
22 right?
23    A.   That sounds reasonable.
24    Q.   Okay.  And is that also related to

Page 113

1  atherosclerosis and thrombosis?
2     A.   Thrombosis is involved in atherogenesis.
3  You can find several articles on that.  I think I
4  quoted it.
5     Q.   Okay.  I also saw where you said Vioxx
6  increases chemotaxis, is that right?
7     A.   That seems to be the case and although I
8  modify that -- I wouldn't say I modify.  I -- what
9  do you say?  I gave an explanation for that because
10 there is direct and indirect evidence for this.
11         There is direct evidence that it effects
12 the chemotaxis because it affects a receptor that
13 is involved in chemotaxis.  That is the direct
14 evidence.  Indirect evidence would be to look at
15 another COX-2 inhibitor, namely, celecoxib.  There
16 the literature is there.  Shows the difference
17 between short-term and long-term effect.
18    Q.   Okay.  And we will talk about those
19 things.
20         Do you hold the opinion that Vioxx
21 increases reactive oxygen species or ROS?
22    A.   I have quoted that.  If we can look at
23 that.
24    Q.   Do you believe that?

29 (Pages 110 to 113)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 114

1      A.    You are talking about belief or opinion?
2      Q.    Is it your expert opinion in this case
3    that Vioxx increases ROS?
4      A.    I have put the reference in here, if I
5    may look at it, to show there is a reference that
6    states that.
7      Q.    And whether the reference states that or
8    not, is it your expert opinion that Vioxx increases
9    ROS?
10      A.    I think this is a very strange question
11    because I have given you the reference and I said
12    this is what I base that opinion upon.  Should we
13    then discuss that reference?
14      Q.    Let me give you some context,
15    Dr. Fosslien.
16      A.    Yes, sir.
17      Q.    We are going to have a trial in this
18    case and you may come, you may not come.  I don't
19    know.  But if you do come and they put you on the
20    witness stand, they will ask you a series of
21    questions.  And I'm going to be sitting at counsel
22    table or I may be somewhere else.  Somebody else
23    may be there.
24            But what they don't want to hear with

Page 115

1    you on the witness stand is Dr. Fosslien saying, "I
2    think Vioxx increases reactive oxygen species or
3    ROS."
4      A.    I did not say that.
5      Q.    And if that's not your opinion, then you
6    say, "No, that's not my opinion.  I have cited an
7    article for it, but I don't -- that is not my
8    expert opinion."
9      A.    Do you want me to answer?
10      Q.    Is it or is it not your opinion --
11      A.    What are you talking about, think versus
12    opinion versus belief?  Three different words here.
13      Q.    Are you going to testify -- let me ask
14    it this way.
15            Are you going to testify at trial that
16    Vioxx increases reactive oxygen species?
17      A.    I will refer to this and say yes, that's
18    what the literature shows.
19      Q.    You don't believe it personally but
20    that's what the literature shows?
21      A.    You are using the term "belief," which
22    implies to me that you have an impression of
23    something without any evidence.
24            Here there is evidence.  There is a

Page 116

1    publication showing that.
2      Q.    Okay.  So, it is your opinion and it is
3    your belief --
4      A.    No.  There's a difference between belief
5    and opinion.  It's my opinion, yes.
6      Q.    Your expert opinion is that, yes, Vioxx
7    increases reactive oxygen species?
8      A.    It's based upon what is published in the
9    literature, yes.
10      Q.    That is fine.  We will talk about the
11    basis.  But I'm just trying to understand that you
12    believe that Vioxx increases reactive oxygen
13    species?
14      A.    We are getting lost in words because you
15    used the term "belief" and I say this is not
16    belief.  This is opinion based upon the evidence.
17      Q.    It's your expert opinion in this case
18    that Vioxx increases ROS?
19      A.    It's my opinion based upon the
20    literature that it does.
21      Q.    Okay.  I also read that it is your
22    opinion that Vioxx increases oxidation of LDL
23    cholesterol.  Is that accurate?
24      A.    Again, there is literature to show that,

Page 117

1    and that is what I have quoted.  The reference is
2    there.  You can read it yourself.
3            And that is a very, very important
4    aspect because oxidized LDL is an independent risk
5    factor too.  It's a strong risk factor.
6      Q.    Okay.  And that's --
7      A.    And going back to the ROS question, ROS
8    is very bad because it increases isoprostanes,
9    which also signal through the thromboxane receptor.
10      Q.    And ROS ultimately through all those
11    channels increases atherosclerosis?
12      A.    Well, if you increase the thromboxane
13    signal, yes, that is very bad because now you get
14    in the prothrombotic situation.  You get an
15    increase in thrombus formation.
16      Q.    Increase in thrombosis or increase in
17    atherosclerosis?
18      A.    Increase in thrombus formation, which is
19    again involved in atherogenesis.  And I quoted the
20    literature here.  It's in the report.
21      Q.    Okay.  Is it your expert opinion in this
22    case that Vioxx increases LDL oxidation?
23      A.    It's my opinion based upon the
24    literature based upon the evidence that I have