**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| **This document relates to:** | * | **MAGISTRATE JUDGE** |
| | * | **KNOWLES** |
| | * | |
| **Gerald D. Barnett v. Merck & Co, Inc.** | * | **CASE NO. 06-0485** |

---

## PLAINTIFF'S BRIEF RE MERCK'S OBJECTIONS TO DEPOSITION DESIGNATIONS

---

### I.    INTRODUCTION

On June 28, 2006, Counsel for Merck proposed to read portions of the Barnett prescribing doctors' depositions (Mikola and McCaffrey) as well as portions of the deposition of Dr. Epstein (a researcher who Merck hired to do a study to see if Vioxx causes atherosclerosis—Dr. Epstein's study confirmed accelerated atherosclerosis in his mice study.)  All three of these witnesses are identified with Merck.  In spite of this fact, Merck Counsel apparently wants to object to leading questions and showing Merck documents to these witnesses who are all identified with Merck.  Plaintiff cannot anticipate where Merck Counsel will go with their arguments but Plaintiff will give anticipatory responses based on prior statements in court about contact with Dr. Mikola, as well as leading question objections, and personal knowledge objections regarding Merck documents shown to these three witnesses.

Plaintiff anticipates that Merck will take this opportunity to again raise the issue of ex parte communication.  (If Plaintiff's Counsel is wrong, we would ask the Court to disregard this part of the brief!!!)  It is not fair for the Defendant to use the Court's overall concerns regarding

contact with physicians in MDL cases, to influence decisions under the unusual facts of the Barnett action. Nor would it be fair for Merck to use what were necessary and appropriate pre-deposition contacts in the Barnett case, to seek unduly restrictive constraints to the prejudice of the rest of the plaintiffs in the MDL. Mark Robinson would be happy to join Russ Herman and defense counsel after this trial to establish a suggested protocol for contact with prescribing physicians which would allay any concerns of either side. However, the Court must be made aware that, with respect to Mr. Barnett's prescribing physicians, this issue is unique. Unlike the typical Vioxx case, the two prescribing physicians in Barnett v. Merck are both <u>identified with</u> the manufacturer and have had contacts with Merck which are far beyond the ordinary communications with pharmaceutical sales representatives.

The initial prescribing physician, Dr. McCaffrey, has had such an extensive relationship with Merck over the last several years, that he could be considered the Defendant's agent. Dr. McCaffrey has signed a partnership agreement with Merck as a paid speaker each year for the last seven or eight years. He was also paid by Merck for preceptorships, (McCaffrey Deposition, Exhibit A, 114:2-177-22) and received payments for speaking including expenses and 'honoraria.' (123:21- 125:3) He was considered to be a Merck 'top earner' for Vioxx (118:16-119:12 and 235:17-20).

As if Dr. McCaffrey's extraordinary relationship with Merck were not enough, the other prescribing physician, Dr. Mikola, has his own unique connection with the Defendant- Sharon Mikola, his wife, was actually employed by Merck as a sales representative at the time he was treating Mr. Barnett. Mrs. Mikola was receiving communications directly from Merck regarding the safety of Vioxx, and in fact, actually detailed the doctor on Vioxx. (Mikola Deposition, Exhibit B, 58:3-19)

In short, both prescribing doctors have significant ties to the Defendant which existed before, during and after their prescription of the drug to the Plaintiff. To describe these circumstances as atypical would be an understatement. Both of these physicians are 'identified with an adverse party'- Defendant Merck. That is why, pursuant to Rule 611(c), leading questions by counsel for the Plaintiff were entirely appropriate, and why it was necessary to show documents to the witnesses during their depositions. That is also why there was nothing improper about counsel for Plaintiff's minimal communication with Dr. Mikola prior to his deposition.

## II.    MERCK'S OBJECTIONS

The following excerpts are examples of Merck's objections to Plaintiff's affirmative deposition designations:

From the Deposition of Michael Mikola, MD:

Merck's objection to the following excerpts is: "401, 402 403 / Merck objects to the use of the document with the witness, witness has no personal knowledge of the document or its subject matter – 602."

EXAMINATION BY MR. ROBINSON:

69
6  MR. ROBINSON:  Exhibit Number 12 is --
7  is Ed Scolnick's response to the proposed label
8  change.
70
3  Q.  Okay.  And why don't we read -- I think
4  it appears that -- yeah, why don't you read from
5  the bottom up because it looks like the first
6  e-mail was October 15, 2001 at 6:02 from Scolnick
7  to Anstice, subject Vioxx label.  Do you see that?
8      A.  Yes, sir.
9      Q.  Would you read that into the record,
10  please.

11     A.   Yes, sir.  David, be assured we will
12   not accept this label.  If we need to, we will ask
13   to go to an advisory committee meeting/Ed.
14     Q.   Okay.  Now read -- can you read David's
15   response to Ed.
16     A.   Yes, sir.  Ed, thanks.  I just received
17   a copy five minutes ago and will digest tonight.
18   We knew it would be ugly, in capital letters, and
19   it is.  We'll fight back and see where we get.  I
20   agree that we should ask for an advisory committee
21   if necessary.  David.
22     Q.   Okay, will you read the e-mail back
23   from Edward Scolnick to David Anstice?
24     A.   It is ugly cubed, they are bastards.

71

15   Q.   This is Exhibit Number 13, I believe,
16   and it's an e-mail from Edward Scolnick to various
17   people at Merck, including Douglas Greene, Alise
18   Reicin, Alan Nies, Harry Guess, Deborah Shapiro,
19   Thomas Simon dated February 8th, 2001.  And we'll
20   mark a clean one.  So will you look at Exhibit
21   Number 13 and read who it was to and then read into
22   the record what the e-mail said.

72

11   Q.   The bottom, the yellow portion, yes.
12     A.   Okay.  To all, I bit my nails all day.
13   You all were fantastic.  You made them look like
14   Grade D high school students and you won big, huge
15   and completely.  You should be proud, happy and
16   exhausted.  Enjoy and bask in the warmth of having
17   done an impossible job superbly, signed Ed.
18     Q.   Now, were you -- have you ever --
19   strike that.
20          Were you ever told that Merck was able
21   to negotiate the April 2002 label with the FDA
22   before today?
23     MR. GOLDMAN:  Object to the form.
24     THE WITNESS:  No, sir.

4

Merck objects to the following excerpt on 611 grounds: "leading question."

EXAMINATION BY MR. WACKER:

361

11   Q.   And you as a prescribing physician rely
12   upon a pharmaceutical company providing you with a
13   fair and balanced presentation of the scientific
14   evidence, correct?

361

16   THE WITNESS:  I rely on the
17   presentation of evidence to be fair and balanced,
18   yes.
19   BY MR. WACKER:
20        Q.   And that would include that if there's
21   two possibilities that you would expect the company
22   to give you both of those, correct?

361

24   THE WITNESS:  The conclusion is there's
25   speculation in this instance.  Would I -- they

362

1   speculate that the difference is due to a
2   protective effect of Naprosyn.  Would I expect them
3   to also speculate that it may be due to a
4   prothrombotic effect of Vioxx?  I don't know.
5   BY MR. WACKER:
6        Q.   Well, if -- if they're going to provide
7   you with one area --
8        A.   Yes.
9        Q.   -- area of speculation, would it be
10   equally fair and reasonable to give you the other
11   side of that equation?
12        A.   Yes, sir.

From Dr. McCaffrey's deposition:

Merck objects to the following excerpts from Dr. McCaffrey's deposition: "611(c) --

leading an independent, third party witness."

EXAMINATION BY MR. ROBINSON:

189

10 Q.  You could -- so you're -- you're
11 susceptible if you have a medicine that increases
12 your blood pressure to either stroke or heart
13 attack, right?

189

15 HE WITNESS:  Yes, sir.
16 BY MR. ROBINSON:
17     Q.  Now, you've had something like
18 four-and-a-half years experience of prescribing
19 Vioxx, right?
20     A.  Yes, sir.
21     Q.  And today in 2006, you're speaking from
22 having all that experience, right?
23     A.  Yes, sir.


From Dr. Karavan's Deposition:

Merck objects to the following excerpt as "602 – there is no foundation.  Plainitff shows

the witness an internal Merck document he has never seen before, and then asks the witness

questions about it."

EXAMINATION BY MR. ROBINSON:

86

2 Q.  Okay.  Had you ever read anything
3 before today about the destabilization of the cap
4 of these plaques by inflammatory cells making them
5 rupture prone?

86

7 THE WITNESS:  I would infer that the --
8 this would be possible given the fact that the --
9 that antiinflammatories may be prothrombotic --
10 BY MR. ROBINSON:
11     Q.  Okay.
12     A.  -- meaning that -- you know, having a
13 propensity for thrombus formation, which would go
14 along with essentially that statement but not
15 the -- what I'm trying to say is not -- I wasn't
16 aware of any development of -- of atherosclerosis
17 lipid-rich coronary plaquing but aware of the fact
18 that they're potentially prothrombotic.

6

### III. LEADING QUESTIONS ARE APPROPRIATE WHERE THE WITNESS IS IDENTIFIED WITH AN ADVERSE PARTY.

FRE 611(c) (Mode and Order of Interrogation and Presentation) provides:

> "Leading questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."

"When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions. The Advisory Committee Notes to Rule 611(c) state that with respect to leading questions, "[t]he matter clearly falls within the area of control by the judge over the mode and order of interrogation and presentation and accordingly is phrased in words of suggestion rather than command."" U.S. v. Grassrope, 342 F.3d 866, 869, 62 Fed. R. Evid. Serv. 506, (8th Cir.2003).

Courts have applied 'identified with an adverse party' in a variety of contexts, although typically in connection with former employees of a party. See e.g. Chonich v. Wayne County Community College, 874 F.2d 359, 368, (6th Cir.1989) (District court did not abuse its discretion in allowing community college administrators to call college's former president and personnel director as adverse witnesses in employment discrimination action. "Such use of leading questions during direct examination falls within the trial court's sound discretion, and an appellate court should not intervene once a trial court has exercised its supervisory authority unless there has been a clear abuse of that discretion.")

According to Wright & Gold, although the meaning of 'identified with an adverse party' has not been entirely clear, a "witness must have or had some relationship" with that party. They also point out that the drafters of the rule intended to enlarge the category of the persons callable:

7

"[T]he meaning of "identified with an adverse party" has not been entirely clear. It seems obvious that, to be "identified" with an adverse party, a witness must have or had some relationship with that party. The statutory predecessor of Rule 611(c), Federal Rule of Civil Procedure 43(b), required a formal legal relationship, permitting leading on direct only if the witness was "an officer, director, or managing agent" of an adverse party. However, the drafters of Rule 611(c) expressly stated their intent to "enlarge the category of persons thus callable." (internal footnote omitted) As a consequence, the courts have held that a party's employee (internal footnote omitted) and girlfriend (internal footnote omitted) are sufficiently "identified" with that party to permit leading on direct examination. Similarly, in a criminal prosecution the courts have concluded that an investigating officer (internal footnote omitted) and even an informant (internal footnote omitted) are "identified" with the prosecution. At least one court has gone so far as to hold that a prosecution witness testifying pursuant to a plea agreement may be considered hostile to the prosecution because the witness had been involved with the defendant in illegal activity."

28 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6168(c).

Where a witness is identified with an adverse party, no showing of hostility is necessary, because even where a witness is cooperative he or she can be inclined to slant their answers toward the party with which they are identified:

"[9:66] Adverse party or witness identified with adverse party: 'When a party calls ... an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.' [FRE 611(c); United States v. Mora-Higuera (8th Cir. 2001) 269 F3d 905, 912]
(a) [9:67] Rationale: However cooperative, the witness has a 'built-in incentive to slide away from the question or slant the answer.' [Rodriguez v. Banco Central Corp. (1st Cir. 1993) 990 F2d 7, 13]
(b) [9:68] Hostility not required: An adverse party (or witness identified with an adverse party) can be examined by leading questions without any showing of actual hostility. [Haney v. Mizell Mem. Hosp. (11th Cir. 1985) 744 F2d 1467, 1477; Ellis v. City of Chicago (7th Cir. 1981) 667 F2d 606, 612-613]"

Jones, Rosen, Wegner & Jones, RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL TRIALS & EVIDENCE (The Rutter Group 2005).

**IV.    DR. MIKOLA AND DR. MCCAFFREY ARE BOTH IDENTIFIED WITH THE DEFENDANT BY VIRTUE OF THEIR UNIQUE PREEXISTING RELATIONSHIPS WITH MERCK.**

**Dr. Michael McCaffrey**

Initially, Plaintiff counsel's questions to Dr. McCaffrey were all on cross-examination and re-cross-examination.  Therefore, leading questions were appropriate even if Dr. McCaffrey were not identified with Merck.  However, the court should be aware of inappropriate leading questions asked by defense counsel.

Despite the fact he was conducting direct examination of a witness who has had a lengthy business relationship with his client, counsel for Merck engaged lengthy and repeated use of what were clearly leading questions. He used this opportunity to elicit testimony consistently favorable to Merck on a number of important issues:

(McCaffrey Deposition, Exhibit A)

Examination by Mr. Goldman:

                                        58
        11  Q.  Why did you agree to become a speaker
        12  for Merck, sir?
        13        A.  Because I liked the product.
        14        Q.  Do you sometimes attend events where
        15  other doctors are speaking about other medications?
        16        A.  Yes, sir.
        17        Q.  Do you find it helpful to attend those
        18  type of functions?
        19        A.  Yes, I do.

                                        59
        11        Q.  The decision that you made to become a
        12  speaker for Merck, sir, did you review that as
        13  requiring you to actually prescribe the medicine
        14  you were talking about?
        15        A.  No, sir.
        16        Q.  Did you ever feel while you were a
        17  speaker for Merck or other pharmaceutical companies
        18  that you were obligated to prescribe the
        19  medications that you were talking about at these

20   various functions?
21       A.  No, sir.

                              61

14   Q.  Have you ever felt during the time that
15   Merck was paying you to speak about some of their
16   products that they were trying to buy you off or to
17   stop you from prescribing other medications?
18       A.  No, sir.
19       Q.  When you were prescribing Vioxx to your
20   patients, was that because you were a speaker who
21   was compensated on occasion for your speaks --
22   speeches?
23       A.  I don't understand the question.
24       Q.  It didn't make sense, that's why.
25           Your decision to prescribe Vioxx to

                              62

1    your patients, was that based on your judgment that
2    that was the best medication for your patients or
3    was that because you were speaking on behalf of
4    Merck?
5        A.  I thought it was the best medication
6    for my patients.

                              69

3    .  Did you view and do you view these
4    dinner talks and other programs such as roundtables
5    to be inappropriate in some way?
6        A.  No, sir.

                              69

12       Q.  Am I right that you participate in
13   these dinner talks for multiple pharmaceutical
14   companies, not just Merck?
15       A.  That is correct.
16       Q.  You received on January 21st of 1999 a
17   1500-dollar honoraria.
18       A.  That's correct.
19       Q.  Why do you accept compensation, sir,
20   for the time you spend educating doctors about
21   diseases or medications to treat those diseases?
22       A.  It's my time taken away from my family.
23   You have -- like anybody else, everybody that's
24   sitting here right now is charging an hourly rate,
25   so same concept, this is my time, you can pay for

70

```
1   it.  They have a lot higher speakers that come in,
2   they pay them 3,000 to 5,000 dollars for a lecture,
3   so the local speakers, this is what the local
4   speaker rate is.
5        Q.  And that's for all pharmaceutical
6   companies, not just Merck?
7        A.  Every pharmaceutical company, the
8   Pharma guidelines tell you exactly what you can pay
9   people now.  Merck at the time was on the same rate
10  that everybody else was paying.  Everybody would
11  pay somewhere between 1250 to 2,000 dollars a
12  lecture.  Merck for a nighttime talk would pay
13  somewhere around 1500 dollars, a lunchtime talk
14  somewhere between 750 and a thousand.
15       Q.  And did you view that, sir, as an
16  inappropriate way to get you to prescribe
17  medication?
18       A.  No, sir, because Maxalt was still my
19  third drug on the list.  I still prescribe more
20  Zomig and Vioxx -- and Imitrex for migraine.  And
21  if you look at my numbers and look at my drug list,
22  I still prescribe more Imitrex and Maxalt and I
23  still speak for the company.  So it comes down to
24  the patient, what's going to be the appropriate
25  drug for them and the medications that have been
```

71

```
1   tried already.
```

72

```
13  Q.  Am I right based on what we just
14  discussed that before you prescribed Vioxx to
15  Mr. Barnett on December 30th of 1999, you had
16  participated in four programs for Merck?
17       A.  Yes, sir.
18       Q.  Three of those programs occurred before
19  Vioxx was even on the market?
20       A.  That's correct.
21       Q.  Before you prescribed Vioxx to
22  Mr. Barnett, you did not participate in any
23  programs for Vioxx and you weren't paid to discuss
24  Vioxx, true?
25       A.  That's correct.
```

73

```
1        Q.  All of the speeches that you gave on
```

2 behalf of Merck before you prescribed Vioxx to
3 Mr. Barnett involved migraine treatment and Maxalt?
4     A.   That's correct.
5     Q.   By our count, sir, prior to the time
6 you prescribed Vioxx to Mr. Barnett, you received a
7 total of 3,300 dollars for Maxalt programs and one
8 preceptorship, okay?
9     A.   That is correct.
10         MR. ROBINSON:  Objection, move to
11 strike.
12 BY MR. GOLDMAN:
13    Q.   Did the 3,300 dollars that you were
14 paid by Merck dictate what medicine you prescribed
15 to Mr. Barnett or your other patients?
16    A.   No, sir.
17    Q.   Did the 3,300 dollars in payments you
18 received before December 30th, 1999 influence you
19 in any way in deciding to prescribe Vioxx to
20 Mr. Barnett as opposed to Celebrex?
21    A.   No, sir.

                            79
9  Q.   Was it your understanding while you
10 were serving as a speaker for Merck that Merck
11 didn't determine the content of your presentations?
12    A.   That's correct.
13    Q.   You decided what you thought was
14 appropriate to talk about a particular disease or a
15 particular medication, right?
16    A.   That's correct.

                            81
4  Q.   Did you understand while you were
5 serving as a speaker that the things that you said
6 about a particular medication were -- let's see.
7 Withdrawn.
8         When you were a speaker for Merck or
9 for other pharmaceutical companies, do you
10 understand that what you say about the medicine
11 that you're talking about has to be consistent with
12 FDA-approved labels?
13    A.   Yes, sir.

                            81
23 Q.   Did you understand while you were
24 serving as a speaker for Merck that you couldn't
25 violate FDA regulations when you were speaking

                            12

82

1   about a particular product?
2       A.  Yes, sir.

91

25  Q.  When you sign the speaker agreements

92

1   for Merck, do you understand that Merck is taking
2   seriously the requirements of the FDA?
3       A.  Yes, sir.

97

4   Q.  Do you have discussions with sales
5   representatives on occasion?
6       A.  Yes, I do.
7       Q.  Do sales representatives from different
8   pharmaceutical companies come to your office to
9   meet with you sometimes?
10      A.  Daily.

97

11  Q.  Can you describe a little bit about how
12  often and --
13      A.  Well, I mean, there's --
14      Q.  -- how common that is?
15      A.  It's very common.  On a daily basis you
16  have sales representatives that come by that have
17  sample medications for you to try on patients.  And
18  so most of the reps are only there for you to sign
19  so the medications are stored in your closet, then
20  they're disbursed to patients to try on them for
21  that particular disorder.  Others sales reps I
22  might sit down -- if I have time, I might sit down
23  and talk to them for five minutes about their drug.
24  If it's a drug I already know about, that they know
25  I use the medication, they don't bother me.  They

98

1   just -- you know, as I say, the more you bother me,
2   the less likely I am to use your drug.  So if
3   you're pushing, I'm not going to use it.  I'm only
4   going to use your drug if I think it's right for
5   the patient.
6       Q.  I don't know how many times Merck
7   representatives came to call on your office, but is
8   it safe to say that the majority of those, if not
9   the vast majority of those occasions, involved

10   situations where representatives dropped off
11   samples --
12          MR. ROBINSON:  Object --
13   BY MR. GOLDMAN:
14      Q.   -- and didn't meet with you in person?
15          MR. ROBINSON:  Objection, leading and
16   suggestive.
17          THE WITNESS:  It was mainly to drop off
18   medications.
19   BY MR. GOLDMAN:
20      Q.   I have to respond to that objection.
21   I'm going to ask the question in a different way
22   now.
23      A.   Okay.
24      Q.   When Merck sales representatives came
25   to visit you about Maxalt or Vioxx or some other

                                    99
1   product, did they typically come just to drop off
2   sales -- samples?
3          MR. ROBINSON:  Same objection.
4          THE WITNESS:  Well, I'm very -- I have
5   a very busy practice so to even get one minute of
6   my time is very difficult.
7   BY MR. GOLDMAN:
8      Q.   Is it fair to say that given how busy
9   you are, you don't have time to sit down with sales
10   representatives and talk about the benefits and
11   risks associated with medicine?
12      A.   That's correct.
13   Q.   Because you don't have time to sit with
14   sales representatives to talk about the benefits
15   and risks, I take it you don't rely on sales
16   representatives for safety information?
17      A.   I don't rely on sales representatives.
18   What I'll do is if a new drug comes out, I'll sit
19   down for 10 or 15 minutes and go over the drug with
20   a new representative -- if it's a new rep, it might
21   be somebody I already know, they have a new drug --
22   and go over and start going through the package
23   insert from that day forward and see if this is
24   something that's an option for them -- for my
25   patients.  And so on the first visit, first time

                                   100
1   I'm going to see it come out, I'm going to sit down
2   and talk about it.  After that, I -- you know, I

3   might give them a little feedback, it's working,
4   it's not working, you know, there's a side
5   effect -- certain side effects, how do I get by
6   this side effect, what's the other doctors saying
7   about it, how can I get rid of this side effect?
8           Like there's a drug called Exelon.
9   It's an Alzheimer's medication, has a high
10  incidence of nausea in patients.  One of the ways
11  of getting rid of it is by drinking Ensure or skim
12  milk.  That gets rid of that side effect.  Well,
13  that's a very simple thing to do with patients.
14  Those are the kind of things you want to know,
15  simple things that can get rid of side effects
16  where they can still take the medicine.  So the
17  second and third and fourth visit, what are the
18  other guys saying out there, what are the other
19  girls saying out there about the medicine?
20          And then after that, if I'm using the
21  drug, they're just, let me get out of here, I don't
22  need to talk to you.  The people where I don't use
23  their drugs, they want to talk to me all the time.
24  They want to stop me at every opportunity and see
25  if they can get me to use their medication, but the

101

1   people where I like their drug, it works very well,
2   they're in and out.

109

8   Q.  Dr. McCaffrey, did anybody from Merck
9   ever intimidate you into prescribing Vioxx?
10      A.  No, sir.

109

23  Q.  Has anyone from Merck ever offered you
24  research money if you were to prescribe Vioxx or
25  stop criticizing Vioxx?

110

1       A.  No, sir.

203

22  Q.  Did the sales calls that you received
23  by sales reps influence your decision to prescribe

15

24  Vioxx to Mr. Barnett?
25        A.  No, sir.

As can be seen, Mr. Goldman on direct was essentially conducting a clinic in leading questions. Against this backdrop, leading questions by counsel for Plaintiff were entirely appropriate. More importantly, because of his relationship with Merck, there is no question that Dr. McCaffrey, like Dr. Mikola, is 'identified with' the Defendant. Judging by his responses to the leading questions of defense counsel, Dr. McCaffrey may as well have been a Merck employee answering questions in exactly the manner he was prepared by counsel.

His eight years of contracts up to the present with Merck to be a thought leader and speaker, his honorariums from Merck, his paid lunches and expenses all point to an identification with the Defendant. In light of his testimony it is not surprising that he would not return calls form counsel for Plaintiff prior to the deposition. No documents were sent to him, nor did he speak with counsel for Plaintiff before his testimony.

Dr. McCaffrey is, for all intents and purposes, an agent of Merck. Under 611(c) even if Plaintiff's counsel had begun the questioning, under these circumstances he should have been permitted to use leading questions. Plaintiff's counsel felt lucky to get any admissions out of Dr. McCaffrey. On direct exam defense counsel tried to underplay the money, the honorariums, the thought leader contracts, the lunches, the 374 meetings with Merck sales reps on Vioxx, etc.

Only under leading questions on cross-examination was counsel for Plaintiff able to obtain accurate testimony from Dr. McCaffrey. This includes questions regarding hypertension and the April 2002 label. During its direct exam, while asking about Dr. McCaffrey's practice as to discussing side effects with his patients, the defense elicited testimony from the witness regarding issues of hypertension:

EXAMINATION BY MR. GOLDMAN:

16

49

11  Q.  Do you make it a practice,
12  Dr. McCaffrey, to discuss with your patients
13  potential side effects of medicines you prescribe?
14      A.  Yes, sir.
15      Q.  Did you do that with Mr. Barnett when
16  you prescribed Vioxx to him?
17      A.  What I usually do with patients is I
18  have a package insert and I hand them the package
19  insert and if they have any questions -- I'll go
20  over the basic things, which is dyspepsia, it can
21  happen with Vioxx, you can develop -- I've had
22  patients develop headaches with Vioxx.  I've had
23  people develop elevated blood pressure.  So I go
24  over the very basic things, but I'll hand them a
25  package insert and make sure they take it with

50

1       them.

When the Plaintiff made further inquiry into this issue, Dr. McCaffrey spoke at length about hypertension as a side effect in patients taking Vioxx (175:25-180:4, 181:1-184:10, 186:16-190:15, 191:25-194:8).  This testimony, to which defense opened the door, was not favorable to Merck, and now they seek to exclude it.  Additionally, during its redirect examination, the defense asked Dr. McCaffrey about his understanding of the April 2002 label:

EXAMINATION BY MR. GOLDMAN:

215

7   Q.  In April of 2002, did you see from this
8   letter, sir, that there's a discussion about the
9   VIGOR study?
10      A.  Yes, sir.

220

17  Q.  Then further down there's a discussion
18  about -- these are actually Alzheimer's studies
19  where it says:  In a placebo-controlled database
20  derived from two studies with a total of 2,142
21  elderly patients with a median duration of exposure
22  of approximately 14 months, the number of patients
23  with serious cardiovascular thrombotic events was
24  21 versus 35 for patients treated with Vioxx 25
25  milligrams once daily versus placebo respectively.

221

1       Do you see that?
2       A.  The placebo was higher.
3       Q.  Can you explain that?
4       A.  I can't explain that.
5       Q.  No, can you explain why you said
6    placebo is higher?
7       A.  Placebo is higher than the actual Vioxx
8    so it's trying to say -- it says from the study
9    that -- that the -- Vioxx doesn't cause
10   cardiovascular thrombotic events.  It's higher when
11   giving somebody a sugar pill.

To which Plaintiff responded on re-cross:

EXAMINATION BY MR. ROBINSON:

226

4    Q.  Now, you -- you pointed out something.
5    Could you read the section that you said appears to
6    show that there's -- there's no increased
7    cardiovascular events for Vioxx versus the placebo.
8    Could you read that into the record.
9       A.  I said there was -- that there was
10   higher with placebo.
11      Q.  So in other words, it says the number
12   of patients with serious cardiovascular thrombotic
13   events was 21 for Vioxx and 35 for placebo at -- at
14   a dose of 25 milligrams, right?
15      A.  That's correct.
16      Q.  Okay.  So as a doctor reading that, at
17   25 milligrams, it appears to be actually safer than
18   placebo, right?
19      A.  For that study.

Here, upon further exploration, the Plaintiff was able to determine that Dr. McCaffrey

interpreted the April 2002 label as showing fewer CV events on Vioxx than placebo despite the

fact that the label purported to convey a stronger precaution regarding CV events while on

Vioxx.  In both this instance and the one above, during Plaintiff's examination of Dr. McCaffrey

on cross, the witness made admissions which were harmful to Merck, and now defense counsel

wants to keep those admissions regarding hypertension and Vioxx, as well as admissions

regarding the 2002 label, out of evidence. Under these circumstances, Merck's objections are meritless.

**Dr. Michael Mikola**

As to Merck's 'leading question' objections, it should first be pointed out that it could just as easily have been Plaintiff's counsel conducting the cross-examination on Dr. Mikola instead of defense counsel. There was significant disagreement between the parties as to who would go first with these two depositions. With regard to the McCaffrey deposition, the Plaintiff acceded and let counsel for Merck begin, and so Plaintiff's counsel was arbitrarily placed in the position of going second and 'cross-examining' the witness. With Dr. Mikola's deposition, the questioning was arbitrarily reversed. However, from the Plaintiff's perspective, Dr. Mikola is still 'identified with an adverse party,' and therefore leading questions by counsel for Plaintiff were appropriate, despite the fact counsel for Plaintiff arbitrarily began the deposition.

Like Dr. McCaffrey, Dr. Mikola has a unique connection with Merck. Dr. Mikola's wife was an agent and/or employee of the Defendant who was receiving Merck's communications regarding the safety of Vioxx at the time he was treating and prescribing Vioxx to the Plaintiff. It would not be unreasonable for a trier of fact to conclude that she would have shared her impressions and information she received from Merck to the effect that Vioxx did not pose any clear-cut cardiovascular safety risks or heart attack risk. Nor is it unreasonable to suggest his testimony would be slanted in favor of Merck when answering leading questions by counsel for Merck.

The influence of his pre-existing relationship with Merck through his spouse is evident in his testimony. In response to <u>leading questions from counsel for Merck</u> Dr. Mikola's testimony was consistently favorable to Merck:

19

(Mikola Deposition, Exhibit B)

Examination by Mr. Goldman:

224

21  Q.  I know you didn't look inside
22  Mr. Barnett's arteries in January of 2000, but
23  based on the diagnosis of ischemia, that would
24  suggest that he had plaque and atherosclerotic
25  lesions before January of 2000, right?

225

1       Yes, sir.

234

18  Q.  Do you remember that Mr. Barnett's wife
19  was unfortunately diagnosed with neck and head
20  cancer in 1999?
21       A.  Now that you mention it, I do recall
22  that, yes, sir.
23       Q.  Can that be a stressful event?
24       A.  Definitely.
25       Q.  Can stress affect plaque formation and

235

1  the development of heart disease?
2       A.  Yes, we believe that it can.
3       Q.  Can stress be related to the
4  development of ischemia?
5       A.  Yes.

237

6  Q.  Based on your experience with ischemia
7  and these stress test results, I think you said
8  before that you would believe that the patient who
9  was diagnosed with ischemia would have developed
10  plaque and coronary artery disease?
11       A.  The patient diagnosed with ischemia is
12  likely to have significant coronary disease and
13  plaques, yes.

244

1  Q.  Either way, whether he was taking
2  Feldene or Vioxx, you didn't believe that either
3  one contributed in any way to his ischemia
4  condition, true?
5       MR. ROBINSON:  He didn't know.
6       THE WITNESS:  I don't believe that

7   either one contributed to his atherosclerosis.

267

14   Q.   You would have stopped Mr. Barnett from
15   using Vioxx if you believed it contributed in any
16   way to his heart attack, correct?
17       A.   Yes, sir.
18       Q.   And if you thought Vioxx might cause
19   Mr. Barnett heart problems in the future, you would
20   have told him to stop using it?
21       A.   Yes, sir.

333

16   Q.   And when you were deciding to prescribe
17   Vioxx to Mr. Barnett who needed to have pain
18   relief, you were weighing the risks and the
19   benefits associated with Vioxx, right?
20       A.   That's correct.

333

23   Q.   Are you weighing the risks and benefits
24   of Vioxx based on how they're described in the
25   package insert when you're deciding whether to

334

1   prescribe Vioxx to Mr. Barnett?
2       A.   That's one part of the decision-making
3   process.
4       Q.   And here in April of 2002, the
5   FDA-approved label is indicating that the reason
6   for the difference in VIGOR and these
7   placebo-controlled studies is uncertain.  Do you
8   see that?
9       A.   Yes, sir.
10      Q.   When you're making a risk-benefit
11   decision about whether to prescribe Vioxx to
12   Mr. Barnett, it's important that you know that --
13   when you were prescribing the Vioxx to Mr. Barnett
14   after April of 2002, you understood the
15   FDA-approved label saying that the results of VIGOR
16   and these placebo-controlled studies were unknown,
17   correct?
18          MR. WACKER:  Objection,
19   mischaracterizes the evidence of -- and vague and
20   ambiguous as to FDA approved.
21          THE WITNESS:  I would interpret it as
22   the results of the VIGOR and the other two studies

21

23    are not definitive.

Also in response to defense counsel's leading questions Dr. Mikola defended the sales force.

He readily denied that his decisions regarding Mr. Barnett were influenced by his wife or Merck

sales reps, claiming that he instead relied on PIRS and articles Merck published in open

literature:

(Mikola Deposition, Exhibit B)

Examination by Mr. Goldman:

174

19   Q.  Did your decision to recommend that
20   Mr. Barnett use Vioxx have anything to do with your
21   wife being a sales representative for Merck?
22        A.  No, sir.
23        Q.  If Mr. Barnett --
24        A.  That's -- I did not start Mr. Barnett
25   on Vioxx, Dr. McCaffrey did.

175

1        MR. ROBINSON:  And we're not claiming
2    that I'll just tell you.  McCaffrey started him.
3        THE WITNESS:  Due to the fact that it
4    was working well for him at that time and I felt it
5    was a safe drug, I didn't see any reason to change
6    it.
7    BY MR. GOLDMAN:
8        Q.  If there's a suggestion at trial that
9    you prescribed Vioxx to Mr. Barnett because your
10   wife sells Vioxx -- or sold Vioxx at Merck, would
11   that be accurate, sir?
12        A.  That would not be accurate.

180

3    Q.  How would you describe your
4    interactions with Merck sales representatives who
5    were detailing Vioxx other than your wife?
6        A.  Generally not only Merck but most of
7    the pharmaceutical reps I would typically prefer
8    not to be detailed to extent and generally I would
9    ask them for copies of the original articles from
10   which they drew their detail pieces.

11          When you practice medicine, I'll see
12   the Pfizer rep come in and tell me why Lipitor is
13   the best drug.  Three minutes later, the Merck rep
14   comes in and tells me why Zocor is the best drug.
15   Three minutes later, the Novartis rep will come in
16   and tell me why Lescol is the best drug.  They
17   can't all be right.  They have a lot of glossies
18   and detail pieces which contain factual
19   information, but it generally doesn't contain all
20   the information available.  So I would generally
21   ask that they not particularly detail me but
22   present me with the original articles from -- that
23   I could read it and draw my own conclusion.
24          Q.   Was that your practice while you were
25   prescribing Vioxx, sir?

181

1          A.   Yes, sir.
2          Q.   Did you find that Merck sales
3    representatives were professional with you?
4          A.   Yes, sir.
5          Q.   Did you feel that they were trying to
6    hide any information about safety?
7          A.   No, sir.
8          Q.   Did any representative of Merck ever
9    refuse to answer or avoid questions you had about
10   Vioxx?
11          A.   If I had questions that they could not
12   answer, they would -- either because they didn't
13   know the answer or they weren't allowed to speak
14   off label, they would generally submit my question
15   to Merck for a written response so no.
16          Q.   What do you mean when you say they
17   could not speak about Vioxx off label?
18          A.   As I understand it, the FDA has rules
19   and regulations about what drug reps can and can't
20   say to physicians.  They are allowed to give you
21   information from the package insert, but in order
22   for them to present us with a detail piece of
23   information, it has to be approved first by either
24   the FDA or some regulatory board to make sure that
25   they don't presumably pass misinformation.

182

1          Q.   Did you find that Merck sales
2    representatives who were detailing you on Vioxx
3    were responsive to your questions?

4     A.  Yes, sir.
5        Q.  Did you ever feel that Merck sales
6     representatives were dodging or trying to avoid
7     your questions?

8        No, sir.

                                    199
12    Q.  You didn't choose to switch Mr. Barnett
13    to Vioxx because your wife worked at Merck or
14    because sales representatives had called on you
15    about Vioxx?
16           MR. ROBINSON:  I'm going to object,
17    that's ambiguous.  Could you read that back, the
18    question.
19    BY MR. GOLDMAN:
20        Q.  I'll ask it differently.  New question.
21           In October of 1999 when you first met
22    Mr. Barnett and he was doing well on Feldene, did
23    you switch him to Vioxx at all?
24        A.  No, sir.
25        Q.  You didn't switch him to Vioxx because

                                    200
1     Sharon worked at Merck, right?
2        A.  I didn't switch him to Vioxx at all,
3     that's right.
4        Q.  You recommended that Mr. Barnett stay
5     on Feldene because at that point at least, you felt
6     it was in his best interest to do so?
7        A.  Yes, sir.  It had been effective for
8     him and he seemed to be tolerating it without any
9     apparent adverse effects.

                                    335
15    BY MR. GOLDMAN:
16        Q.  I'm marking as Exhibit 45, Dr. Mikola,
17    a letter dated March 28th, 2003 from Merck to you.
18    Do you see that?
19        A.  Yes, sir.
20        Q.  And in the first paragraph, what does
21    it say?
22        A.  Our professional representative, Steven
23    Calder, has referred your request for information
24    regarding Vioxx, in parentheses, Rofecoxib tablets
25    and oral suspension.  Your inquiry concerned the

                                    24

337
1 development of cardiovascular thrombotic events in
2 the elderly patient, placebo-controlled data set
3 for Vioxx.
4     Q.  So is this an example where you were
5 inquiring about cardiovascular safety in a
6 discussion you're having with one of Merck's sales
7 reps, Steve Calder?
8     A.  Yes.  Yes, sir.
9     Q.  What's your impression of Mr. Calder?
10     A.  A very nice young man.
11     Q.  Did Mr. Calder ever try to dodge or
12 avoid your question?
13         MR. WACKER:  Well, objection, that
14 assumes facts not in evidence.  He wouldn't know
15 what information --
16         THE WITNESS:  Not to my recollection.
17 BY MR. GOLDMAN:
18     Q.  Is Mr. Calder the type of person who
19 thinks it's important to present fair balance?
20         MR. WACKER:  Objection, calls for
21 character testimony.
22 BY MR. GOLDMAN:
23     Q.  That's a bad question.  Let's just
24 stick with the document.
25     A.  Okay.

338
1     Q.  Merck then sent you responsive
2 information in March of 2003 and in the third
3 paragraph, one line, it says, a search of the
4 literature has identified the following reference
5 pertaining to your inquiry.
6         Do you see that?
7     A.  Yes, sir.
8     Q.  In this document, I won't go through it
9 in that much detail, but do you see that Merck is
10 describing Dr. Reicin's analysis of the
11 cardiovascular safety profile of Vioxx in elderly
12 patients with Alzheimer's disease or mild cognitive
13 impairment?
14     A.  Yes, sir.
15     Q.  And if you turn to the second page, the
16 table at the top, do you see that in that
17 population of elderly patients, if you look at
18 confirmed adjudicated, do you know what that means?
19     A.  Not exactly.

20    Q.  Okay.
21    A.  I know what confirmed is, I'm not sure.
22    Q.  What does confirmed mean?
23    A.  It means that it's been documented that
24  it met criteria for the reported event, whatever
25  the criteria basically.

339

1    Q.  And adjudicated is the process of
2  deciding whether or not the event has met those
3  criteria.
4    A.  Okay.
5    Q.  Do you see that for confirmed
6  adjudicated serious thrombotic adverse events --
7  cardiovascular adverse events in elderly people
8  that there were 25 cases in the Vioxx 25-milligram
9  arm compared to 39 cases in the placebo arm?
10    A.  Yes, sir.
11    Q.  And then if you look in the far right
12  column under relative risk.
13    A.  Yes, sir.
14    Q.  What does .72 mean to you in terms of
15  the risk of serious thrombotic cardiovascular
16  adverse events in this placebo-controlled database?
17    A.  It means that there were 28 percent
18  less events in the Vioxx group compared to the
19  placebo group.
20    Q.  And then do you see on the third page
21  that Merck is including toward the bottom -- almost
22  done.
23    A.  It's okay.
24    Q.  On the third page, Merck is including
25  the prescribing information for Vioxx and if you

340

1  flip through, you'll see it's a verbatim
2  description of what is in the April 2002 label
3  concerning VIGOR?
4    A.  Yes, sir.
5    Q.  And when you were prescribing Vioxx to
6  Mr. Barnett, now this is after his heart attack in
7  March of 2003, you understood this information and
8  you believed that the benefits of Vioxx outweighed
9  the risks?
10    A.  Yes, sir, at the doses prescribed, yes,
11  sir.

26

Regardless of his denials of influence from his wife and other Merck sales representatives in response to Mr. Goldman's leading questions, Dr. Mikola's connection to Merck is evidence that he was in fact potentially subject to substantial and unique influence from Merck and its sales force. He was not only married to a Merck sales representative, but his wife actually detailed him on Vioxx:

(Mikola Deposition, Exhibit B)

Examination by Mr. Robinson:

58

```
 3   Q.  And does that appear accurate in terms
 4  of the number of contacts the reps would have had
 5  with you regarding Vioxx on behalf of Merck?
 6         MR. GOLDMAN:  Objection, asked and
 7  answered, foundation.
 8         THE WITNESS:  I would assume it's
 9  reasonable.
10  BY MR. ROBINSON:
11     Q.  And one of the reps was your wife you
12  said?
13     A.  That's correct.
14     Q.  What's her name?
15     A.  Sharon.  Now Sharon Mikola.  At the
16  time, Sharon Mikolajczyk.
17     Q.  And she actually for a short period of
18  time detailed you on Vioxx as well?
19     A.  She called on me, yes, sir.
```

Dr. Mikola is identified with Merck, and a jury could reasonably draw the inference that Dr. Mikola's official Merck contact with his wife regarding Vioxx, along with the obvious potential for 'unofficial' contact regarding Vioxx due to their personal relationship, did in fact have some influence over his decision-making processes over the years, and created an impression in his mind that Vioxx was safe.

Regardless of his testimony for Merck, whether or not his wife's actions did influence his decision to prescribe or to continue Mr. Barnett on Vioxx, are questions for the jury. See Anderson v. Sandoz Pharmaceuticals Corp., 77 F.Supp.2d 804, 808-809 (S.D.Tex. 1999), wherein the court denied the manufacturer's motion for summary judgment, even though the prescribing physician testified that he was aware of the risks and continued to prescribe the drug:

> "Despite the wealth of evidence provided by Defendants on this issue, the fact remains that Dr. Holt may not have been fully apprised of all the attendant risks associated with reactive hyperprolactimia patients who take Parlodel. And while Defendants urge the Court to rely exclusively upon that portion of Dr. Holt's deposition testimony in which he states that at the time he prescribed Parlodel to Ms. Anderson he had ample knowledge from alternative sources about the risks associated with the drug, the Court nevertheless notes other portions of his deposition testimony *809 in which Dr. Holt admits having no knowledge of a variety of studies concerning Parlodel and stroke and myocardial infarction. And, because some of these studies may have been sponsored by Defendant, the Court finds it possible to conclude that Dr. Holt was not in a position to fully appreciate Parlodel's risks--even through independent knowledge--at the time he prescribed the drug to Ms. Anderson."

Similarly, Dr. Mikola was not fully apprised as to the risks associated with Vioxx and known to Merck. The evidence suggests he was misled by the information he did receive from his extensive contacts with Merck sales representatives, which numbered in the hundreds. Yet, as would be expected of a witness so closely connected with Merck, Dr. Mikola was protective of his wife in responses to certain questions, where he attempted to deny any reliance upon anything told to him by sales representatives:

(Mikola Deposition, Exhibit B)

Examination by Mr. Robinson:

55
13  BY MR. ROBINSON:
14      Q.  What generally do you -- can you tell
15  us about the sales rep discussions regarding

16  Naproxen?
17       MR. GOLDMAN:  Object to the form.
18       THE WITNESS:  Generally -- let me back
19  up and say that my wife was a sales rep and she's
20  worked for different companies over the years.
21  Generally the detailing from the reps, I try to get
22  my medical education from journal articles.
23  Usually I've requested the reps give me the actual
24  articles or reprints of the articles versus
25  detailing so they would generally call on me -- if

56

1  I had questions, they would answer them or refer --
2  make a referral for a request from their company
3  for further information, but generally they didn't
4  do a lot of detailing.

Again, regardless of Dr. Mikola's defensive position in favor of Merck's sales force and

his wife, there is significant circumstantial evidence that he did in fact rely on representations

made by these agents of the Defendant.

(Mikola Deposition, Exhibit B)

Examination by Mr. Robinson:

57

11  Q.  I'll put it this way:  Is it true if
12  you look at Exhibit Number 9 that you were
13  contacted by Merck sales reps on Vioxx over 330
14  times --
15       MR. GOLDMAN:  Objection.
16  BY MR. ROBINSON:
17       Q.  -- from 1999 to 2004?
18       MR. GOLDMAN:  Objection, lacks
19  foundation.
20       THE WITNESS:  I can't confirm the
21  number, but I can tell you that I was contacted by
22  Merck reps many times in that period.
23  BY MR. ROBINSON:
24       Q.  Okay.  So if the -- if the -- if you
25  look at Exhibit Number -- would you look at Exhibit

58

1  Number 9, please.
2       A.  Yes, sir.

29

```
3       Q.  And does that appear accurate in terms
4   of the number of contacts the reps would have had
5   with you regarding Vioxx on behalf of Merck?
6           MR. GOLDMAN:  Objection, asked and
7   answered, foundation.
8           THE WITNESS:  I would assume it's
9   reasonable.
```

Dr. Mikola had hundreds of contacts with Merck sales reps regarding Vioxx, was in daily contact with a Merck sales representative who was marketing Vioxx, was asking Merck for information regarding the safety of Vioxx, was receiving PIR letters from Merck regarding the Konstam meta-analysis, and was told in letters that Vioxx was safe for the elderly, and would clearly be safe for Mr. Barnett. He was not told anything in these letters which would have revealed the information in Merck's possession showing that Vioxx could increase the risk of a heart attack in Mr. Barnett. Nor did he receive and information which would have informed him that Vioxx could cause Mr. Barnett's blood pressure spikes (several over 160 systolic). The evidence shows that despite his testimony, Dr. Mikola in fact received a completely biased and one-sided story from Merck regarding the safety of Vioxx.

Given the potential adverse position of Dr. Mikola with his multiple contacts with Merck and his wife being a sales representative, under this set of facts, where Plaintiff's counsel did not know what effect all these five years of contacts with Merck had on Dr. Mikola, it was entirely fair and reasonable to regard Dr. Mikola as 'identified with an adverse party' on important questions, and to examine him with leading questions.

**There Was No Improper Ex Parte Communication**

Merck has asserted that Dr. Mikola was in some way inappropriately influenced because Plaintiff's counsel sent him documents before his deposition. These documents demonstrate facts known to Merck regarding the cardiovascular risk of Vioxx which should have been shared with

Dr. Mikola in 2000, in 2001 and 2002. The reality is that because of the nature of this type of case, the Plaintiff still faces an extraordinary dilemma, in that he has the burden of showing that had Dr. Mikola known the true facts about the cardiovascular risks which were knowable or known to Merck, he would probably would not have prescribed Vioxx, and he would have instead kept Mr. Barnett on Feldene, an anti-inflammatory drug which he was doing well with. (66:6-67:11)

To add to that burden, the Plaintiff has another obstacle to overcome. One would be hard pressed to find another Vioxx case with two prescribing physicians having such a close relationship with Merck. The Court should examine the validity of Merck's assertions of impropriety in this context. Counsel for Plaintiff were very careful in their communication with Dr. Mikola, and in sending him documents. Dr. Mikola was not told what to say, nor instructed as to what testimony would be favorable to the Plaintiff. For Merck to imply that this occurred, or that his testimony was somehow 'shaded' by ex parte communication is not only totally inaccurate, but overreaching.

The Court needs to remember that like Dr. McCaffrey, Dr. Mikola had unique contacts with Merck. He had over 200 contacts with Merck sales reps. He went to Merck lunches and dinners and presentations conducted by Merck thought leaders including Dr. McCaffrey. Dr. Mikola was married to a Merck sales representative. Plaintiff's counsel carefully sent documents to Dr. Mikola accompanied by a two or three minute call by the young attorney who sent the documents.

There was no preparation of Dr. Mikola regarding his testimony and no improper communication by counsel for Plaintiff. Rather, by sending the documents to Dr. Mikola sometime before his deposition, Plaintiff was taking the risk that Dr. Mikola would say that had he seen those documents it would not have made a difference.

31

Counsel for Plaintiff had no intention of "woodshedding" any witness, and are aware of this Court's statements and positions on that matter. However, if Plaintiff's counsel has to wait to show a document to a doctor for the first time at a deposition, where the doctor does not have the opportunity to "reflect" on the meaning of the documents, where the doctor does not have time to reflect on what he was told and what these documents mean in reference to what he was told by Merck, where the doctor is shown a sentence out of context or that may be out of context and may very well have to say "I don't know" at a deposition, it would be very unfair to the Plaintiff, who has the burden of showing the subjective state of mind of the doctor was such that he would not have prescribed Vioxx had he known this information.

Plaintiff's counsel are left with a deep dilemma in these cases, and that is why in the Diet Drugs, Fen Phen, Rezulin, Baycol and pharmaceutical mass torts, plaintiffs' counsel have been allowed to send the prescribers some of the key documents so that they can obtain an informed subjective opinion from the prescriber at his subsequent deposition. For subsequent cases where there is not now any clear protocol on sending documents, it may be appropriate to do something similar to what was worked out with counsel for Pfizer in the Rezulin cases- to give the prescriber both documents offered by the Plaintiff from Merck's own files, as well as documents such as the Merck study shown by Merck counsel to Dr. Mikola at his deposition.

However, in this unusual circumstance, where both Drs. Mikola and McCaffrey have had hundreds of contacts with sales reps, where Mikola was shown the Bombardier article, where he has read the Konstam meta-analysis published by Merck during the time period they were prescribing Vioxx, there has been no undue prejudice to the Defendant. Dr. Mikola was married to a Merck sales representative, and he read Konstam as well as Bombardier. He read Bombardier the way Merck wanted him to read it, namely that Naproxen being cardioprotective was the explanation for the 5 to 1 (Bombardier said 4 to 1) elevation in CV risk for Vioxx over

32

Naproxen in the VIGOR study.  It was only after discovering what Merck actually knew about Vioxx, that he realized he should not have prescribed Vioxx to Mr. Barnett.

### Dr. Stephen Epstein

Dr. Epstein is another witness who should be considered identified with Merck. He also had a relationship with Merck in that the research he conducted was dependent upon obtaining approval for funding from the Defendant.  Dr. Epstein is a cardiologist who is head of the Cardiovascular Research Institute. He is responsible for all research done by the Institute, (Epstein Depo, Exhibit M, 13:8-21), and in order to conduct the study in question he had to request and obtain funding from Merck.

He approached Merck in March of 2000 to see if Merck would assist in funding a study of Vioxx. Exhibit M, 147:17-148:12. After his initial proposal and request for funding was turned down, 294:12-16, Merck approved funding for a study he conducted regarding the inhibition of Cox-2 in June of 2000.  41:17-42:8.  Merck provided the funding as well as the Cox-2 inhibitor used in the study. 59:3-10.   He was looking to see if a COX-2 inhibitor would do away with atherosclerosis formation and progression. However, instead his study showed that it 'clearly made atherosclerosis worse.' 68:21-70:14; 170:1-18.

Because of Dr. Epstein's relationship with and ties to the Defendant, he should also be considered a witness identified with an adverse party, and leading questions by counsel for Plaintiff were appropriate.


## V.     RULE 602 IS INAPPLICABLE TO THE DOCUMENTS SHOWN TO THE PRESCRIBING DOCTORS AT THEIR DEPOSITIONS

In addition to objecting to Plaintiff sending documents to Dr. Mikola prior to his deposition, Merck also objects to counsel for Plaintiff reading Merck documents to Dr. Mikola

during the deposition, and questioning the doctors about documents they had never before seen.

Merck's objection is based upon lack of personal knowledge under Rule 602, which provides:

> "Lack of Personal Knowledge—
> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses."

However, Rule 602 is not at all applicable as to the documents which were shown by Plaintiff's counsel to Drs. McCaffrey and Mikola. With respect to the documents showing the risks of Vioxx, the witnesses were not 'testifying about a matter,' for which personal knowledge would be required. As to these documents, they had no personal knowledge- which is precisely the point.

The documents were introduced to demonstrate their *lack of personal knowledge,* and not to show they new anything about the matters stated therein. The lack of knowledge regarding the matters in those documents is a key issue in this action. The very fact these witnesses do not have personal knowledge of these documents, nor the information contained therein, when such should have been communicated to them, establishes that they did not have the requisite information to be learned intermediaries, and to make informed decisions regarding the prescription of Vioxx.

It also demonstrates that Merck withheld information vital to making the   correct decision, which would have been to not prescribe Vioxx to Mr. Barnett. This is proper response to the essence of Merck's claim that a better warning or communication of what the Defendant knew would not have changed the minds of these physicians. Their lack of knowledge of these documents and the information contained therein regarding the risks of Vioxx, demonstrates not

only that these physicians were uninformed, but that the information was concealed from them.

Those documents include the following:

1) Email from Scolnick to Nies and Shapiro dated March 2000 – Scolnick, the president of Merck research laboratories, after seeing the results of the VIGOR study, says that CV events are "clearly there." 41:13-44:23   ((Mikola Deposition, Exhibit 6), attached hereto as Exhibit C.)

2) Email from Gertz (Merck employee) re Carlo Patrono (consultant to Merck) about his concern regarding naproxen – he does not think the CV events can be explained by naproxen. 46:5 -49:6 ((Mikola Deposition, Exhibit 7), attached hereto as Exhibit D.)

3) Merck press release April 2000 after VIGOR saying that the results could be explained by naproxen theory. 49:15- 60:16 ((Mikola Deposition, Exhibit 8), attached hereto as Exhibit E.)

4) Email from Scolnick saying that it is "impossible to prove" the naproxen theory. 61:24 -63:1   ((Mikola Deposition, Exhibit 10), attached hereto as Exhibit F.)

5) Email from Scolnick to Anstice re changing the label to add CV risks. 63:25- 70:24 ((Mikola Deposition, Exhibit 12), attached hereto as Exhibit G.)

6) Email from Ed Scolnick congratulating Merck employees and telling them they made the FDA look like Grade D high schoolers. 71:15 -73:11   ((Mikola Deposition, Exhibit 13), attached hereto as Exhibit H.)

7) Email from Scolnick regarding whether Vioxx should be used with an antiplatelet regimen. 73:12 -75:23  ((Mikola Deposition, Exhibit 14), attached hereto as Exhibit I.)

8) Email from Dr. Epstein (researcher) to Ian Rodger (Merck employee) regarding the study he did on mice showing a drug like Vioxx caused accelerated atherosclerosis. 95:25-98:10 ((Mikola Deposition, Exhibit 17), attached hereto as Exhibit J.)

9) Discussion of the FDA advisory committee briefing document about Vioxx. 120: 9 - 133:2  ((Mikola Deposition, Exhibit 24), attached hereto as Exhibit K.)

10) Discussion of the VIGOR study published in the NEJM and the lack of inclusion of a KM curve showing CV risks. 374:24- 378:25  ((Mikola Deposition, Exhibits 40 and 47), attached hereto as Exhibit L.)

When Dr. Mikola was questioned regarding the subject documents, which all contained

information regarding the risks of Vioxx which should have been provided to him, it became

evident that prior to Mr. Barnett's heart attack, he had not been made aware of any of this information:

(Mikola Deposition, Exhibit B)

Examination by Mr. Robinson:

46

16  Q.  The Exhibit Number 7, will you read who
17  it's to and from and the date, please.
18      A.  It's to Barry Gertz from Alan Nies.
19  The date is March 28th, 2000.
20      Q.  And what's the subject?
21      A.  Carlo Patrono on VIGOR, in capitals.
22      Q.  So going back to Number 6, what was
23  the -- the one we just read in from Dr. Scolnick
24  regarding the CV events are clearly there, what was
25  the subject of that study?

47

1      A.  The VIGOR trial -- or VIGOR I should
2  say.

47

22  Q.  Okay.  Would you read the -- the first
23  sentence into the record, please, of the next
24  paragraph.
25      A.  He said that he does not think that the

48

1  CV effect that we observed can be attributed to
2  Naproxen for a couple of good reasons.
3      Q.  Then he gives the reasons.  Could you
4  read those into the record, please.
5      A.  Yes, sir.  First there is a weak
6  pharmacological basis and no epidemiological
7  evidence, in parentheses, Garcia Rodriguez and
8  Patrono epidemiology, in press, end of parentheses,
9  for cardio -- for CV protection associated with
10  conventional NSAIDs.  Additionally, the magnitude
11  of the effect would not be plausible even if the
12  comparator had been aspirin itself.  In fact, in at
13  least three different trials, aspirin has shown no
14  effect on the primary prevention of stroke, while

15  we have seen a 50 percent lower incidence of stroke
16  in the Naprosyn (sic) arm of VIGOR; additionally,
17  we have an overall reduction in the risk of CV
18  events of 47 percent with Naprosyn -- Naproxen,
19  excuse me, while aspirin has shown a reduction of
20  cumulative CV risk of a magnitude between 15 and 18
21  percent.  Aspirin data come from a primary
22  prevention setting, in parentheses, similar to
23  VIGOR, end parentheses, and include the Physicians
24  Health Study, the Thrombosis Prevention Trial,
25  parentheses, Lancet 1998, end parentheses, and the

49

1   Hypertension Optimal Treatment Trial.
2        Q.  Okay.  Let me ask you this:  Up until
3   the heart attack that Mr. Barnett encountered in
4   September of 2002, were you ever told by anybody
5   that Carl Patrono had made this statement to Merck
6    regarding Naproxen?

49

8   THE WITNESS:  No, sir.

69

1   Q.  And had you ever seen Exhibit Number 12
2   while you were prescribing Vioxx for Mr. Barnett?
3        A.  No, sir.

70

3   Q.  Okay.  And why don't we read -- I think
4   it appears that -- yeah, why don't you read from
5   the bottom up because it looks like the first
6   e-mail was October 15, 2001 at 6:02 from Scolnick
7   to Anstice, subject Vioxx label.  Do you see that?
8        A.  Yes, sir.
9        Q.  Would you read that into the record,
10  please.
11       A.  Yes, sir.  David, be assured we will
12  not accept this label.  If we need to, we will ask
13  to go to an advisory committee meeting/Ed.
14       Q.  Okay.  Now read -- can you read David's
15  response to Ed.
16       A.  Yes, sir.  Ed, thanks.  I just received
17  a copy five minutes ago and will digest tonight.
18  We knew it would be ugly, in capital letters, and
19  it is.  We'll fight back and see where we get.  I
20  agree that we should ask for an advisory committee
21  if necessary.  David.

37

22     Q.  Okay, will you read the e-mail back
23  from Edward Scolnick to David Anstice?
24     A.  It is ugly cubed, they are bastards.

50

4  Exhibit Number 8 is a Merck press
5   release, right?

50

THE WITNESS:  I believe that's correct.

Examination by Mr. Wacker:

362

24     Q.  And nowhere in this article does it
25  indicate what Dr. Patrono's e-mail indicated that

363

1  we've already reviewed, correct?

363

3        THE WITNESS:  That's correct.
4  BY MR. WACKER:
5     Q.  And in fact, nowhere in this article
6  does it indicate what we've reviewed today that
7  Dr. Scolnick indicated that the CV events are
8  clearly there and it is mechanism based as we
9  worried it was?

364

7     Q.  And again, similarly, Dr. Mikola, you
8  would also expect that if there were that type of
9  evidence like we've reviewed in the Scolnick e-mail
10  that you would expect a pharmaceutical company to
11  provide you with that type of scientific
12  conclusion?

364

15       THE WITNESS:  I would think if they had
16  a belief among their research specialists that
17  there were prothrombotic effects of Vioxx, then it
18  should have been made known, yes, or at least
19  studied further and made known that there were
20  ongoing studies.
21  BY MR. WACKER:
22     Q.  And if they did have that evidence that
23  there were those potential prothrombotic effects of

24  Vioxx and as you indicated that they should have
25      made it known, it would be wrong not to, wouldn't

365

1  it?

365

3       THE WITNESS:  It could potentially
4  result in -- in problems, yes, sir.
5  BY MR. WACKER:
6       Q.  It could result in misleading a
7  prescriber that's prescribing the drug, correct?

365

9       THE WITNESS:  I believe so, yes.
10  BY MR. WACKER:
11      Q.  In other words, here you are, you're
12  treating in this case Mr. Barnett and this is
13  information that you would have wanted to know?

365

15      THE WITNESS:  Yes, sir.
24      Q.  Yeah, you -- whether they brought that
25  particular article to your attention --

372

1      A.  Yes.
2      Q.  -- you would expect that Merck would
3  advise you of the potential of one of their drugs
4  like Vioxx to increase the risk of cardiovascular
5  events?
6      A.  I would think that they would make me
7  aware of it, yes, sir.
8      Q.  And that didn't happen while you were
9  treating Mr. Barnett?
10      A.  Not to my recollection, no, sir.

373

22  Q.  And you would agree that the -- the
23     proposed label that we showed you earlier that had
24     the cardiovascular events in the warnings section
25     is a more heightened location of that warning than

374

1  in -- in the precautions section that it's -- that
2  it ended up in April 2002.

374

39

4   THE WITNESS: Yes, sir.
5   BY MR. WACKER:
6       Q.   And when you're weighing the risks and
7   benefits of a drug, that's something that you take
8   into consideration, where that warning is placed in
9   the actual product insert?

374

11   THE WITNESS: Yes, sir.

380

18   Q.   Yeah.  Taking -- taking the information
19   from this expression of concern, would you agree
20   that the information that's contained within this
21   expression of concern regarding the -- the missing
22   information from the original Bombardier article
23   would have been information that you would have
24   wanted to know as a prescribing physician –

381

2   Q.   -- at the time you were prescribing
3   Vioxx to Mr. Barnett?
4       A.   Yes, sir.

381

7   Q.   And specifically, Doctor, if you look
8   down to the -- it's the third full indented
9   paragraph, it starts with the fact.  Do you see
10   that?
11       A.   Yes, sir.
12       Q.   The fact that these three myocardial
13   infarctions were not included made certain
14   calculations and conclusions in the article
15   incorrect.
16           Do you see that?
17       A.   Yes, sir.
18       Q.   And then in the next paragraph, it
19   says, lack of inclusion of these -- of the three
20   events resulted in an understatement of the
21   difference in risk of myocardial infarction between
22   the Rofecoxib and Naproxen groups.

382

1   Q.   Do you see that?
2       A.   Yes, sir.

382

6   Q.  And then it says, it has also resulted
7   in the misleading conclusion that there was a
8   difference in the risk of myocardial infarction
9   between the aspirin indicated and the aspirin
10   not -- not indicated groups.
11          Do you see that?

382

15   THE WITNESS:  Yes, sir.
16   BY MR. WACKER:
17          Q.  And again, had that information been
18   included in the original article, that would have
19   been something that you would have relied upon,
20   correct?

383

1   THE WITNESS:  Yes, sir.

384

18   Q.  And Doctor, following the publication
19   of the Bombardier article regarding VIGOR, to your
20   knowledge, the company Merck never updated that
21   article with this -- with any of this updated
22   information regarding the three heart attacks or
23   this table in the July 5th, 2000 Shapiro memo,
24   correct?

385

1   THE WITNESS:  To my knowledge, that's
2   correct.

405

24          Q.  Dr. Mikola, in the April 2002 package
25   insert, counsel pointed to a specific section where

406

1   he indicated special studies, VIGOR, other safety
2   findings, cardiovascular safety.  It says, in a
3   placebo-controlled database derived from two
4   studies with a total of 2,142 elderly patients,
5   mean age 75 with a median duration of exposure of
6   approximately 14 months, the number of patients
7   with serious cardiovascular thrombotic events was
8   21 versus 35 for patients treated with Vioxx 25
9   milligrams once daily versus placebo respectively.
10          Do you see that?
11          A.  What page are you on, first, second?
12          Q.  That is under precautions,

41

13 cardiovascular effects on the right-hand column.
14     A.  Okay, I remember the text from earlier.
15     Q.  Yeah.  And in --
16     A.  Yes, sir.
17     Q.  -- in prescribing the medication to
18 Mr. Barnett as of April 2002, you relied upon that
19 statement as being accurate, correct?

                        406
21          THE WITNESS:  That would be correct.
22 BY MR. WACKER:
23     Q.  And if there was information that was
24 contrary to that, that's something that you're
25 unaware of, correct?

                        407
3          THE WITNESS:  That would be correct.
4 BY MR. WACKER:
5     Q.  So if there was information that
6 indicated that even at 25 milligrams, there was a
7 statistically-significant increase in risk for
8 Vioxx, that's something that Merck did not share
9 with you, correct?

                        407
11          THE WITNESS:  That would be correct.


    To his credit, despite his connection with Merck, Dr. Mikola was honest enough to admit

he would not have prescribed the drug to the Plaintiff had he known what Merck had known all

along:



(Mikola Deposition, Exhibit B)

Examination by Mr. Robinson:

                        114

11  Q.  And given what you've read today, that
12  combined with his angina, would you say that from
13  everything you've read about Vioxx today that you
14  probably would not have prescribed Vioxx for him if
15  you'd known all this information --

                        42

16      MR. GOLDMAN:  Object to the form.

17  BY MR. ROBINSON:

18    Q.   -- in 2000?

114

22  A.  Having known today what I know about

23  Vioxx, I would not have prescribed it.

Examination by Mr. Goldman:

157

4  Q.  Did you understand, Mr. Barnett, that

5  the questions that you were being asked about what

6  you would have done were based on hindsight?

7    A.  Yes, sir.

8    Q.  You understand that the questions you

9  were asked about what you would have done

10  concerning Vioxx were based on documents that were

11  created -- some of which were created after you

12  treated Mr. Barnett?

13    A.  Yes, sir.

14    Q.  You understand that some of the

15  documents that you saw that you were asked about by

16  Mr. Barnett's lawyers included documents that were

17  generated after the withdrawal of Vioxx?

18    A.  Yes, sir.

19    Q.  And those sorts of materials were not

20  available to you at the time you were making a

21  treatment decision for Mr. Barnett, right?

22    A.  That's correct.

23    Q.  And it's a different thing to ask you

24  why you made the decision you made to prescribe

25  Vioxx to Mr. Barnett back at the time you were

158

1  prescribing it to him as opposed to what would you

2  have done if you had all of this information that

3  was obtained subsequent to your treatment of

4  Mr. Barnett, correct?

158

6  THE WITNESS:  I'd say the difference is

7  at the time I didn't know that Vioxx was going to

8  be withdrawn from the market and knowing that it

9  was going to be withdrawn from the market, I would

10   not have used it.

With respect to the Merck documents concerning Dr. McCaffrey which were shown to him, those documents were used as impeachment, and reflect upon his credibility by showing bias.   They reveal the extent of his connections with Merck, including the contacts with Merck and the money paid to him by Merck. They also establish his loyalty to Merck and demonstrate the fact he is identified with Merck. The documents were also used to impeach Dr. McCaffrey's testimony at the deposition. For example, Dr. McCaffrey stated that he did recall acting as a speaker on behalf of Vioxx for Merck. Yet when confronted with a document to the contrary he admitted that he may in fact have done so:

(McCaffrey Deposition, Exhibit A)

Examination by Mr. Robinson:

117

3     Q.   And is it true, sir, that for Vioxx you
4 had approximately 374 contacts with the Merck sales
5 reps –
8     Q.   -- during the period Vioxx was on the
9 market?
12       THE WITNESS:  How many years would that
13 be over?
14 BY MR. ROBINSON:
15     Q.   From '99 through 2004.
16     A.   Once a week at least.  Most reps have
17 to see me every week.
18     Q.   And in addition, you were paid for --
19 by Merck when sales reps sat in your office under
20 what you call preceptorships, is that right?

117

22       THE WITNESS:  That's correct.
23 BY MR. ROBINSON:
24     Q.   And in addition, is it true that from
26       1999 through 2004, you were given 8,435 Vioxx

118

1 samples by Merck?
2     A.   That's probably correct, but with the
3 medications we stock different offices and there's
4 five neurologists and, well, three -- four

5 orthopaedic surgeons now so the medication would
6 get distributed between them.

### 118

19       Were you aware that -- that you were
20 considered a Merck, quote, top earner for Vioxx?
21       A.   I'm a top earner for many -- many
22 pharmaceutical companies.  Merck's not special.
23       Q.   But you were aware you were considered
24 a Merck top earner for the drug Vioxx?

### 119

1       THE WITNESS:  I knew that I used a lot
2 of medication, yes.
3 BY MR. ROBINSON:
4       Q.   And you were a top earner for Vioxx,
5 right?

### 119

7       THE WITNESS:  I mean, reps would say,
8 you know, you know, you're doing well with the
9 medication.
10 BY MR. ROBINSON:
11       Q.   For Vioxx?  I just --
12       A.   Yes, for Vioxx, yes.
13       Q.   Okay.  That's -- that was my question.
14 And you also were involved in HEL programs with
15 Vioxx, is that right?
16       A.   What's that?
17       Q.   I was going to ask you.  It had to do
18 with what they call colloquia.  Do you know what
19 the term colloquia refers to?
20       A.   I've never spoken for Vioxx.
21       Q.   Okay.  Were you involved with HEL
22 programs involving colloquia for other Merck drugs?
23       A.   Just Maxalt.
24       Q.   And how much would you get per event
25 when you spoke at one of these colloquia?

### 120

1       A.   Lunchtime talk was usually between 750
2 and a thousand and a dinnertime talk was usually
3 1500.
4       Q.   And is it true that at least from 1999
5 to 2002 that you prescribed 30 -- or over 30
6 percent of your prescriptions for Merck Medco?
7       A.   30 percent of what?

131

9      Q.   And Exhibit Number 9 appears to be an
10 e-mail Merck document dated 8/3/2000, is that
11 correct?  Do you see that?
12     A.   Yes, sir.
13     Q.   And do you see where it says the
14 subject is FW:  Speaker top earner Vioxx?
15     A.   Yes, sir.


132

2      Q.   The -- do you see where -- where the --
3 there's a Bates number at the bottom of these
4 pages, Doctor?
5      A.   Um-hum.
6      Q.   Okay.  If we -- if we go deep into this
7 to Bates Number 45244 --
8      A.   45?
9      Q.   45244 at the bottom there.
10     A.   45244, got it.
11     Q.   Correct.
12     A.   There's my name.
13     Q.   So you're listed as -- as one of the
14 speaker top earners for Vioxx and your rate is 750
15 dollars, is that right?
16     A.   That's correct.
17     Q.   And then if we go to 45289, you're
18 listed again in that document.  Do you see that?
19     A.   Yes, sir.
20     Q.   And your rate there is 750 dollars as
21 well, is that right?
22     A.   That's correct.
23     Q.   Okay.  Now let's go to the next
24 exhibit, which is Number 10.


133

3      Q.   Here you go, Doctor.  Now, this is
4 another e-mail from Merck, Bates Number
5 MRK ADK 0006184.
6      A.   That's the first page.
7      Q.   Yes.  And do you see where it says SE
8 executive team right there --


133

16       THE WITNESS:  How far -- oh, SE
17 executive team, okay.
18 BY MR. ROBINSON:

19      Q.  Yes.  And then it says:  Since there is
20  so much opportunity with Vioxx and Zocor, I asked
21  Tara deHaan -- small D-E, capital H-A-A-N -- to run
22  a report looking at all of our Vioxx and Zocor HEL
23  programs for the remainder of the year.  There is
24  one tab by HEL budget and each tab can be sorted by
25  region.

134

1       Did I read that right?
2       A.  Yes.
3       Q.  And then if we go to actually the next
4  page, do you see under Atlanta region there under
5  program type colloquia, you're listed as speaking
6  at the Collectors Cafe in Myrtle Beach?
7       A.  Okay.
8       Q.  So did you speak concerning Vioxx?
9       A.  Don't remember speaking for Vioxx.
10      Q.  Pardon me?
11      A.  I don't remember speaking for Vioxx.

134

14      Q.  Do you see on Bates Numbers
15  MRK ADK 0006185 that you -- that apparently you
16  gave a speech?
17      A.  I may have.  I don't remember giving
18  a -- because I had talked to the company before.  I
19  always spoke for Maxalt and they said they didn't
20  need me to speak for Vioxx so I don't remember
21  speaking for them.  If this says it actually
22  happened, then it happened.
23      Q.  Okay.  If you go -- they -- they
24  actually give a date, I think.  If you go to the
25  next page, it appears to be 9/6/2001.  Do you see

135

1  at Bates Number 6186, it showed that you got 800
2  dollars?
3       A.  9/6/2001?
4       Q.  Yes.
5       A.  Okay.

136

21      Q.  I see.  Now, let's go to the next
22  exhibit, Number 12.

137

47

1      Q.  There you go.  This is a list of
2  preceptorships, roundtables and colloquia that
3  Merck gave us that you were involved in.  Do you
4  remember being involved with preceptorships,
5  roundtables, colloquia and tutorials?
6      A.  Yes, sir.
7      Q.  And --
8      A.  This looks pretty accurate.
9      Q.  This looks accurate to you?
10     A.  Yes, sir.
11     Q.  As I look at this, from 1999 through
12  December of 2001 when your prescription for Vioxx
13  was completed, you were involved in 18 either
14  colloquials (sic), tutorials, roundtables or
15  preceptorships with Merck, is that right?
16     A.  That's correct.

138
9      Q.  Okay.  13 appears to be lectures, is
10  that right?
11     A.  Yes, sir.

139
9      Q.  These are lectures that you attended?
10     A.  Lectures I attended or they brought a
11  speaker into the office so if you match the dates
12  up, you can see -- I think they brought a speaker
13  into the office, like a visiting consultant came in
14  and talked to us, they sat and ate lunch with us so
15  somebody else got paid for that.
16     Q.  Okay.  Okay.  Let me show you Exhibit
17  Number 14.

139
21     Q.  14 appears to be monies paid for meals,
22  miscellaneous, speaker expenses, speaker fees,
23  program support, et cetera, right?
24     A.  That's correct.
25     Q.  And just going through, the ones that

140
1  are listed for you, you received 461 dollars on
2  August 15, 2002, right?

140
4      THE WITNESS:  That was paying --

48

140

6        THE WITNESS:  That's paying for lunch
7 for the office.
8 BY MR. ROBINSON:
9      Q.   Okay.
10     A.   I didn't receive any money.
11     Q.   Okay.  But this is money spent by
12 Merck --
13     A.   Right.
14     Q.   -- on your office's behalf, right?
15     A.   That's correct.

141

16     Q.   Okay, let's just go down it.  So -- so
17 the first entry is 8/15/20002.  That's $461.15 for
18 meals and hospitality for your office, right?
19     A.   That's correct.

142

7      Q.   And then there's 461 dollars the same
8 day for meals and hospitality again?
9      A.   That's correct, that was the food in
10 the office.

142

19     Q.   Okay.  Okay.  Now, the next group of
20 numbers here, the rep was Timothy Bailey, is that
21 right?
22     A.   That's correct.

143

3      Q.   Okay.  And it says that meals and
4 hospitality for 5/15/2001 was 836 dollars?

143

16     Q.   Okay.  Now, the next date was March
17 21st, 2000 and the rep there was Latrell Fowler, is
18 that right?
19     A.   That's correct.

143

25     Q.   Okay.  So the meals and hospitality

144

1 were $387.45 that day, right?
2      A.   That's what paid for my staff, yeah.

144

12      Q.   Okay.  Okay, let's show you Exhibit
13 Number 15.

144

17      Q.   Exhibit Number 15 appears to be
18 honorariums, is that right?
19      A.   Correct.
20      Q.   And so if we track the numbers through
21 to the last page of Exhibit Number 15 and just view
22 the dates, it appears that you received 1500
23 dollars honoraria for -- on July 15th, 1999, right?
24      A.   That's correct.
25      Q.   And you received 1500 dollars on March

145

1 29th, 2000 from Merck?
2       A.   That's correct.
3       Q.   You received 1500 dollars on May 30th,
4 2000 from Merck, right?
5       A.   That's correct.
6       Q.   And then on 9/12/2000 you received 300?
7       A.   That's correct.
8       Q.   And then on 3/15/2001 you received 500?
9       A.   That's correct.
10      Q.   And then on April 13th, 2001 you
11 received 250 dollars?
12      A.   That's correct.
13      Q.   And then on September 26, 2001 you
14 received 500 dollars?
15      A.   That's correct.
16      Q.   And lastly on November 30th, 2001 you
17 received another thousand dollars?
18      A.   That's correct.

146

3       Q.   Yes.  All of those honorariums came
4 before the last prescription that was filled on
5 behalf of Mr. Barnett -- was completed in December
6 of 2001?
7       A.   That's correct.
8       Q.   Okay, let me go to Exhibit Number 16
9 now.

146

12      Q.   Okay.  Okay, let's show you Exhibit
13 Number 15.

50

146

17    Q.  Exhibit Number 15 appears to be
18 honorariums, is that right?
19    A.  Correct.
20    Q.  And so if we track the numbers through
21 to the last page of Exhibit Number 15 and just view
22 the dates, it appears that you received 1500
23 dollars honoraria for -- on July 15th, 1999, right?
24    A.  That's correct.
25    Q.  And you received 1500 dollars on March

Page 145

1 29th, 2000 from Merck?
2    A.  That's correct.
3    Q.  You received 1500 dollars on May 30th,
4 2000 from Merck, right?
5    A.  That's correct.
6    Q.  And then on 9/12/2000 you received 300?
7    A.  That's correct.
8    Q.  And then on 3/15/2001 you received 500?
9    A.  That's correct.
10    Q.  And then on April 13th, 2001 you
11 received 250 dollars?
12    A.  That's correct.
13    Q.  And then on September 26, 2001 you
14 received 500 dollars?
15    A.  That's correct.
16    Q.  And lastly on November 30th, 2001 you
17 received another thousand dollars?
18    A.  That's correct.

146

3    Q.  Yes.  All of those honorariums came
4 before the last prescription that was filled on
5 behalf of Mr. Barnett -- was completed in December
6 of 2001?
7    A.  That's correct.
8    Q.  Okay, let me go to Exhibit Number 16
9 now.

150

2    Q.  There you go, 17 over here.  These
3 appear to be all the contacts with you regarding
4 Vioxx, is that right?

152

12      Q.  You certainly saw over -- from 1999
13 through -- through 2002 Vioxx ads on TV.
14      A.  Yes, sir.
15      Q.  From 1999 through 2002, you -- you had
16 sales call appointments with reps coming to your
17 office for Vioxx, right?
18      A.  Yes, sir.
19      Q.  From 1999 to 2002, you had
20 preceptorships?
21      A.  That's correct.
22      Q.  And the same is true for some of the
23 other lectures that you -- that you were involved
24 in with Merck, correct?
25      A.  Yes, sir.

153
1      Q.  Okay.  Now, let's go to Page 88 of 116.
2      A.  Okay.  I know it's down here someplace.
3      Q.  Do you see where it says -- it starts
4 with Michael McCaffrey there?
5      A.  Doctor, right.
6      Q.  And we've counted those up and would it
7 surprise you if there were over 8400 samples given
8 to your office?

## VI.    CONCLUSION

This case presents a rare circumstance where both prescribing physicians, Dr. Mikola and

Dr. McCaffrey, have significant ties to the Defendant. Those ties existed before, during and after

their prescription of the drug to the Plaintiff.  Even so, both of them were kept in the dark by

Merck regarding the true risks of Vioxx.  There was nothing improper about counsel for

Plaintiff's minimal communication with Dr. Mikola prior to his deposition.  Moreover, both of

these physicians are 'identified with an adverse party'- Defendant Merck.  That is why, pursuant

to Rule 611(c), leading questions by counsel for the Plaintiff were entirely appropriate, and why

it was necessary to show documents to the both witnesses during their depositions.  The

documents were used to impeach these witnesses, and to demonstrate that they were not

provided with information concerning the risks of Vioxx which was known to Merck.

Accordingly Merck's objections should be overruled.


Date:  July 5, 2006                              Respectfully submitted,

                                                 By  _____
                                                       Mark P. Robinson, Jr.
                                                       Kevin F. Calcagnie
                                                       Carlos A. Prietto, III
                                                       Ted B. Wacker
                                                       Lexi W. Myer
                                                       ROBINSON, CALCAGNIE & ROBINSON
                                                       620 Newport Center Dr., 7th Floor
                                                       Newport Beach, California  92660
                                                       Telephone:  (949) 720-1288
                                                       Facsimile: (949) 720-1292

                                                       Andy D. Birchfield, Jr.
                                                       P. Leigh O'Dell
                                                       BEASLEY, ALLEN, CROW,
                                                       METHVIN, PORTIS & MILES, P.C.
                                                       P.O. Box 4160
                                                       234 Commerce Street
                                                       Montgomery, Alabama  36103-4160
                                                       Telephone:  (334) 269-2343
                                                       Facsimile:  (334) 954-7555

                                                       Donald C. Arbitblit
                                                       LIEFF, CABRASER, HEIMANN and
                                                       BERNSTEIN, LLP
                                                       275 Battery Street, 30th Floor
                                                       San Francisco, California  94111
                                                       Telephone:  (415) 956-1000
                                                       Facsimile:  (415) 956-1008

                                                       Counsel for Plaintiff

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana  70013
Telephone:  (504) 581-4892
Facsimile:  (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York  10004
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799
**Co-Lead Counsel**

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana  71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Shelly Sanford
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas  77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Drew Ranier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana  70601
Telephone:  (337) 494-7171
Facsimile:  (337) 494-7218

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania  19102
Telephone:  (215) 772-1000
Facsimile:  (215) 772-1371

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California  92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania  19106-3875
Telephone:  (215) 592-1500
Facsimile:  (215) 592-4663

Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone:  (202) 783-6400
Facsimile:  (307) 733-0028

Gerald E. Meunier
Gainesburgh Benjamin David Meunier &
Warshauer
2800 Energy Centre
1100 Polydras Street
New Orleans, LA 70163-2800
Telephone:  (504) 522-2304
Facsimile:  (504) 528-9973

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8, on this 5th   day of July, 2006.

MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson