Confidential - Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  VIOXX            * MDL Docket No. 1657
PRODUCTS LIABILITY       *
LITIGATION               * Section L
                      *
THIS DOCUMENT RELATES TO:  * Judge Fallon
GERALD BARNETT v. MERCK   * Mag. Judge Knowles

****************************


VIDEOTAPE
DEPOSITION OF:MICHAEL McCAFFREY, MD

DATE:          May 3, 2006

TIME:          1:04 PM

LOCATION:      Strand Regional Specialty Assoc.
               8170 Rourk Street
               Myrtle Beach, SC

TAKEN BY:      Counsel for Defendant

REPORTED BY:   TERRI L. BRUSSEAU,
               Registered Professional
               Reporter, CP, CRR

Confidential - Subject to Protective Order

---

**Page 2**

1 APPEARANCES OF COUNSEL:
2 ATTORNEYS FOR THE PLAINTIFF
GERALD BARNETT:
3
LAW OFFICES OF
4 ROBINSON, CALCAGNIE & ROBINSON
BY: MARK P. ROBINSON, JR.
5     LEXI W. MYER
620 Newport Center Drive, Seventh Floor
6 Newport Beach, California 92660
(949) 720-1288
7
ATTORNEYS FOR THE DEFENDANT:
8
BARTLIT, BECK, HERMAN,
9 PALENCHAR & SCOTT, LLP
BY: ANDREW L. GOLDMAN
10     HAMILTON H. HILL
Courthouse Place
11 54 West Hubbard Street
Chicago, IL 60610
12 (312) 494-4469
andrew.goldman@bartlit-beck.com
13 hamilton.hill@bartlit-beck.com
14
ALSO PRESENT:
15
Alan Metts, Video Technician
16
17 (INDEX AT REAR OF TRANSCRIPT)
18
19
20
21
22
23
24
25

---

**Page 3**

1       VIDEO TECHNICIAN:  This is the
2 videotape deposition of Dr. Michael McCaffrey taken
3 by counsel in the matter of the Vioxx Products
4 Liability Litigation relating to Gerald Barnett
5 versus Merck, being MDL Docket Number 1657 pending
6 in the United States District Court, Eastern
7 District of Louisiana.  Today's date is May 3rd,
8 2006.  The deposition is being held at the Strand
9 Regional Specialty Associates, 8170 Rourk Street,
10 Myrtle Beach, South Carolina.  I am Alan Metts, the
11 Videotape Technician.  The Court Reporter is Terri
12 Brusseau.  The time is approximately 1:04 PM.
13       And will the Court Reporter now swear
14 in the witness.
15       MICHAEL McCAFFREY, MD
16 being first duly sworn, testified as follows:
17       VIDEO TECHNICIAN:  And will counsel
18 introduce themselves.
19       MR. GOLDMAN:  My name is Andy Goldman
20 and I represent Merck.
21       MR. HILL:  Hamilton Hill for Merck.
22       MR. ROBINSON:  Mark Robinson for
23 Plaintiff.
24       MS. MYER:  Lexi Myer for Plaintiff.
25       EXAMINATION

---

**Page 4**

1 BY MR. GOLDMAN:
2    Q.  Good afternoon, sir.
3    A.  Good afternoon.
4    Q.  Can you please state your name for the
5 record.
6    A.  Michael McCaffrey, MD.
7    Q.  Dr. McCaffrey, my name is Andy Goldman.
8 We haven't met before, have we?
9    A.  No, sir.
10    Q.  Have you had your deposition taken
11 before, Dr. McCaffrey?
12    A.  Yes, sir.
13    Q.  Well, I'm going to ask you just a few
14 questions in a minute, but I want to go through
15 some of the rules about depositions so that we're
16 on the same page.  You've been through this process
17 before --
18    A.  Yes, sir.
19    Q.  -- but just so we're on the same page,
20 okay?  I'm going to ask you some questions and if
21 you don't understand the questions I ask, please
22 ask me to rephrase and I'm happy to do that.
23    A.  Yes, sir.
24    Q.  If you want to take a break for any
25 reason, Doctor, I'm happy to accommodate you.  If

---

**Page 5**

1 you have a patient that calls, just let me know --
2    A.  Yes, sir.
3    Q.  -- okay?  Do you understand,
4 Dr. McCaffrey, that we are here today because one
5 of your former patients, Mr. Gerald Barnett, has
6 filed a lawsuit against Merck concerning his use of
7 Vioxx?
8    A.  Yes, sir.
9    Q.  Before today have you had any meetings
10 with Plaintiff's counsel?
11    A.  No, sir.
12    Q.  Can you describe for the ladies and
13 gentlemen of the jury your education and your
14 medical training?
15    A.  How far back would you like me to go?
16    Q.  You can start after college.
17    A.  After college.  I went to medical
18 school at St. George's University School of
19 Medicine in Grenada, West Indies starting in 1984.
20 I graduated from St. George's on December 28th,
21 1988.  I started my internal medicine residency in
22 May of -- March of 2000 -- make that March of 1989
23 at the Western Pennsylvania Hospital in Pittsburgh,
24 Pennsylvania.  I did two years of internal medicine
25 at the Western Pennsylvania Hospital.

---

2 (Pages 2 to 5)

Confidential - Subject to Protective Order

**Page 6**

1   In April — on April 1st, 1991, I
2   started my neurology residency at Medical College
3   of Virginia in Richmond.  My third year of
4   residency I was solo chief resident in addition to
5   my other duties and after my residency was over, I
6   did a one year neuromuscle fellowship at Medical
7   College of Virginia from 1994 to 1995.
8        I practiced for one year at the Heart
9   and Family Health Institute in Port Saint Lucie,
10  Florida as a solo neurologist for a multispecialty
11  group.  I remained there for one year.  I came to
12  Myrtle Beach and worked for Executive Court Medical
13  Specialists owned by John Rathman.  I worked for
14  them for one year, came to the group I'm presently
15  in, which is Strand Regional Specialty Associates,
16  and I've been here going on my ninth year.
17      Q.  You mentioned that you did a residency
18  in internal medicine?
19      A.  Yes, sir.
20      Q.  Can you explain what a residency is.
21      A.  A residency is a training program where
22  there are requirements, different rotations you
23  have to accomplish to fill a residency.  Most of
24  those will be for work, different subspecialties,
25  emergency room medicine.  You do -- and in ICU

**Page 7**

1   medicine where you're doing an internal medicine
2   residency.
3        Q.  You also mentioned you did a neurology
4   residency?
5        A.  That is correct.
6        Q.  What is neurology?
7        A.  Neurology is the study of the brain,
8   spinal cord, muscle and nerves.
9        Q.  Do you consider yourself a neurologist?
10       A.  Yes, sir.
11       Q.  Does that mean that you specialize in
12  the diagnosis and treatment of diseases and
13  disorders affecting the brain and the spinal cord?
14       A.  That is correct.
15       Q.  You also mentioned that you had been
16  chief resident.  What does that mean to be chief
17  resident?
18       A.  Chief resident, you're -- you're more
19  like the sergeant major of all the other residents
20  and you have to interact with the different faculty
21  so there's -- it's a fine balance between the
22  faculty and the residents on who's happy at that
23  particular time in history.  But making sure people
24  show up for being on call, making sure they show up
25  at the appropriate clinics, get their work done,

**Page 8**

1   make sure they do all their dictations, so it's a
2   go-between between the staff and the residents.
3   And plus you're -- you know, you have to interact
4   with all the other specialties in the hospital so
5   you're the -- you're the representative for the
6   department dealing with all the other chief
7   residents.
8        Q.  Is it true that being a chief resident
9   is considered an honor?
10       A.  It is an honor.
11       Q.  In your practice, Dr. McCaffrey, have
12  you treated many patients who have faced acute or
13  chronic pain?
14       A.  Yes, sir.
15       Q.  Is it a challenge to treat those
16  patients?
17       A.  Yes, it is.
18       Q.  Why is it?
19       A.  It's, number one, trying to diagnose
20  what the exact problem is.  Sometimes you can go
21  through different studies, sometimes exhaustive to
22  actually try and make a diagnosis and at the same
23  time trying to alleviate their problem.
24       Q.  Why is it difficult to alleviate the
25  problem that patients who have chronic pain face?

**Page 9**

1        A.  Because everybody's different.
2   Everybody has a different problem whether it be a
3   peripheral neuropathy, which is a disease of the
4   nerves and legs or arms, whether it's chronic
5   abdominal pain, whether it's low back pain, neck
6   pain, chronic migraine headaches, different types
7   of facial pain, but there's a multitude of pains
8   that you can describe in every part of the body.
9        Q.  Have you treated patients who have
10  suffered from a condition called osteoarthritis?
11       A.  Yes, sir.
12       Q.  What is osteoarthritis?
13       A.  Osteoarthritis is the most common type
14  of arthritis.  It's an overgrowth of calcium or
15  bony material around different joints.  It's the
16  most common type of arthritis we face in the world.
17       Q.  Is osteoarthritis a disease that mostly
18  affects the cartilage?
19       A.  It starts in the cartilage and it grows
20  out from there.
21       Q.  And what is cartilage?
22       A.  Cartilage is a -- if you want to
23  consider it a soft tissue, it's very flexible.
24  When your bones are being formed you -- when you're
25  born you have very little ossification of your

3 (Pages 6 to 9)

Confidential - Subject to Protective Order

## Page 10

1   bones and your bones grow longer.
2        Q.  What does that mean, ossification?
3        A.  Ossification, the actual process of
4   laying down bone.
5        Q.  Is healthy cartilage something that
6   allows our bones to glide over one another?
7        A.  Yes, it is.
8        Q.  You mentioned that osteoarthritis is a
9   very common or the most common type of arthritis.
10  Do you consider it to be a serious health problem?
11       A.  I don't understand the question.
12       Q.  Do you know whether osteoarthritis is
13  one of the most common causes of disability in
14  the United States?
15       A.  Yes, it is.
16       Q.  Can osteoarthritis be debilitating for
17  certain patients?
18       A.  Yes, it can.
19       Q.  Can it limit patients' ability to
20  function normally?
21       A.  Yes, sir.
22       Q.  What is rheumatoid arthritis?
23       A.  A degenerative arthritis.  If you think
24  of osteoarthritis, osteoarthritis is essentially
25  bone growth on the edge of the bones.  Rheumatoid

## Page 11

1   arthritis is a destructive arthritis where the bone
2   is, and the cartilages are being affected by an
3   inflammatory process known as rheumatoid arthritis.
4   It's very debilitating and the bones actually in a
5   sense become shorter from the arthritis itself.
6        Q.  Can you describe what happens to
7   patients who have rheumatoid arthritis if you are
8   unable to control their pain?
9        A.  They go find another doctor.  They find
10  one able to control the pain.
11       Q.  Have you found that it's difficult at
12  times to find the appropriate treatment for
13  patients with rheumatoid arthritis?
14       A.  Yes, it is.
15       Q.  Are those some of the patients who
16  sometimes face chronic pain?
17       A.  Yes, they are.
18       Q.  Whether it's from osteoarthritis or
19  rheumatoid arthritis or one of the other conditions
20  you mentioned before, Doctor, can chronic pain
21  itself be a health problem?
22       A.  Yes, it can.
23       Q.  Can you explain why.
24       A.  People in chronic pain spend more time
25  in doctors' offices.  They're looking for a cure

## Page 12

1   for their chronic pain.  Some studies show that
2   they actually have a shorter life -- life
3   expectancy.  Not all the studies equal each other
4   when you look at them, but they're -- across the
5   board your life expectancy because you have -- a
6   lot of people with chronic pain have other health
7   disorders along with their chronic pain.
8        Q.  When --
9        A.  Or -- or the actual treatments you give
10  them can make them develop other medical problems.
11  If you had to put somebody on Prednisone, which is
12  a steroid, they can develop osteoporosis, they can
13  develop diabetes mellitus, they can develop
14  cataracts in their eyes.  And just having somebody
15  on chronic steroids, which is very common with
16  rheumatoid arthritis, it can cause other health
17  problems.
18       Q.  When patients are suffering from
19  chronic pain, whether it's osteoarthritis or
20  rheumatoid arthritis, does that sometimes affect
21  their ability to exercise?
22       A.  Yes, it does.
23       Q.  What are the consequences, sir, for
24  patients who are unable to exercise and stay in
25  shape as a result of being in too much pain?

## Page 13

1        A.  Well, their muscles become debilitated.
2   They have very poor tolerance in doing various
3   things, especially any activity around the house,
4   whether it be yard work, housework, caring for
5   children or parents.  It can also inversely affect
6   the heart so --
7        Q.  How does it do that?
8        A.  Well, it just -- it puts a higher
9   demand on the heart itself because the heart's no
10  longer healthy.  It becomes -- you become unhealthy
11  when you decrease your activity.
12       Q.  Have you found that patients who are in
13  chronic pain sometimes become depressed?
14       A.  Yes, they do.
15       Q.  Why does that happen to them?
16       A.  It's the loss of function -- it's a
17  loss of person.  Most people don't feel like
18  they're worth anything.  They can develop sleep
19  disorders where they don't sleep properly.  They
20  can develop insomnia.  Those are the main ones with
21  depression.
22       Q.  Dr. McCaffrey, before COX-2 inhibitors
23  like Vioxx came to the market in the United States,
24  what treatment options were available for people
25  who were in pain from osteoarthritis or rheumatoid

Confidential - Subject to Protective Order

Page 14

1    arthritis?
2        A.   Well, there are various other
3    nonsteroidal medications.  Probably the -- the most
4    popular prior to the COX-2's was Voltaren or
5    Diclofenac.  Also, another popular one was
6    ibuprofen and Naprosyn.
7        Q.   So nonsteroidal antiinflammatory drugs,
8    or NSAIDs, that was one class of medication that
9    was available for patients who were experiencing
10   pain?
11       A.   Yes, sir.
12       Q.   Can you identify some other treatment
13   options before Vioxx came out.
14       A.   Other treatment options would be
15   narcotic medications, whether it be codeine or the
16   codeine-based medications, which include
17   hydrocodone or Oxycodone.  Then there's the -- the
18   morphine-based medications so you've got morphine.
19   And if I'm quoting myself right, Dilaudid is
20   morphine based, might be wrong, I just don't use a
21   lot of Dilaudid.  But those are the main drugs and,
22   you know, a very common drug you hear, OxyContin,
23   which is an Oxycodone drug.  There's also Fentanyl,
24   which is in a different category of narcotics,
25   which is in a patch form we use for chronic pain.

Page 15

1        Q.   So narcotics were available to treat
2    pain before COX-2 inhibitors, NSAIDs were
3    available?
4        A.   Tylenol.
5        Q.   Tylenol?
6        A.   Tylenol, which is the acetaminophen.
7    There's other drugs in that category that are
8    available in other countries in the world, but the
9    only one we have is acetaminophen in this country.
10       Q.   You also mentioned steroids before?
11       A.   Yes, sir.
12       Q.   Have you ever used aspirin to try to
13   treat patients who were in pain from
14   osteoarthritis?
15       A.   Yes, sir.  And there's also a drug
16   called salicylate, which is very commonly used for
17   rheumatoid arthritis, and that's preferable so --
18   it seems to be a little bit easier on the stomach
19   than aspirin itself.
20       Q.   Let's go through some of those other
21   treatment options and I'd like to talk about the
22   benefits and the risks that you're aware of for
23   each of those categories of medicines, okay?
24       A.   Yes, sir.
25       Q.   Let's start with aspirin.  What are the

Page 16

1    benefits of aspirin in terms of pain relief?
2        A.   It works very well.  I mean, it's a
3    medication you can use two or three times a day.
4    You can get almost complete pain resolution with
5    aspirin.
6        Q.   Does aspirin reduce inflammation,
7    though?
8        A.   Yes, it does.
9        Q.   And does it also have side effects?
10       A.   It does have side effects.  The main
11   side effects you're worried about are the
12   gastrointestinal tract, GI bleeding.  You also
13   worry about the kidney and the liver, especially
14   the kidney.  Long-term use of aspirin can cause
15   renal failure and also cause liver failure and you
16   can also become toxic on aspirin.
17       Q.   What does that mean?
18       A.   You can develop an acute psychosis from
19   aspirin, which I've seen happen before to patients.
20       Q.   When you mentioned that aspirin can
21   lead to GI bleeds, can you explain to the jury what
22   you mean by that, GI bleeds.
23       A.   Gastrointestinal bleed is a -- a
24   hemorrhage in the stomach that's caused by a
25   compromise in the wall of the gastric mucosa and it

Page 17

1    causes the small blood vessels to leak blood into
2    the stomach contents, which can cause somebody to
3    become nauseated and eventually start throwing up.
4    In some patients that -- they're getting pain
5    relief from the aspirin, they might not feel any
6    side effects and they have a very slow bleed which
7    can be picked up on a routine rectal examination or
8    a guaiac test on a patient.  So that's the hard
9    part about treating people with pain medicine if it
10   can cause GI bleeding is they might not feel it and
11   they can become anemic and run into the problems
12   long term.
13       Q.   What does it mean to become anemic?
14       A.   Your blood count goes down.  You have
15   a -- for men and women there's a normal
16   hemoglobin/hematocrit and then from a slow GI
17   bleed, your hemoglobin will go down and you'll
18   start feeling fatigued, might start having problems
19   with your memory.  And then it gets diagnosed by a
20   blood test usually.
21       Q.   You also mentioned narcotics.
22   Narcotics can sometimes be helpful at stopping
23   pain, right?
24       A.   That's correct.
25       Q.   Do narcotics have side effects?

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 18

1    A.  Yes, they do.
2    Q.  Can you explain some.
3    A.  Addiction is the number one side effect
4  you worry about where people become either
5  psychologically addicted or physically addicted to
6  narcotic medications.  And psychologically it's --
7  they think they need the medications.  They go out
8  actively seeking, they go to multiple doctors.  The
9  physical addiction, if you have someone on a
10  long-acting narcotic two or three times a day or
11  any other narcotic whether they're taking it for
12  two or three weeks, they've already developed a
13  physical addiction and they will go through
14  withdrawal when they come off the medication.
15    Q.  Is another side effect of narcotics
16  impaired thinking?
17    A.  Impaired thinking, chronic
18  constipation, chronic fatigue.  They become very
19  tired after being on the medication for a time
20  period.
21    Q.  Let's talk for a minute about steroids.
22  Are steroids useful in reducing inflammation?
23    A.  Yes, they are.
24    Q.  Do they also sometimes have a helpful
25  effect on reducing pain?

Page 19

1    A.  Yes, they do.
2    Q.  What are some of the side effects of
3  steroids?
4    A.  Side effects of steroids are
5  osteoporosis --
6    Q.  What is that?
7    A.  -- which is a thinning of the bones
8  where you can actually get -- on long-term use you
9  can get fractures of the bones, especially in the
10  spine.  You can develop cataracts.  You can develop
11  diabetes mellitus.  It can cause you to have
12  hypertension, chronic insomnia.  You can develop a
13  mood disorder.  You can actually develop depression
14  on chronic steroid use.
15    Q.  If there are all these side effects
16  that are associated with steroids, why do you
17  prescribe them to your patients on occasion?
18    A.  It's our last line of defense, it's
19  after you've tried everything else.  Basic example
20  is I saw a lady this morning in the office.  She's
21  29 years old.  She's been diagnosed with myasthenia
22  gravis.  Myasthenia --
23    Q.  What is --
24    A.  Myasthenia gravis is a disorder of the
25  neuromuscular junction where it causes a weakness

Page 20

1  in patients and she has double vision, trouble
2  swallowing, trouble pursing her lips to even drink.
3  She was put on Prednisone, her symptoms went
4  completely away.  They started tapering back the
5  medication, her symptoms are returning.  Prednisone
6  in her case is the safest medication for her
7  disease because the disease and the medication
8  we're going to be using for her disease state that
9  a 29-year-old who hasn't had her first child yet
10  are far reaching because we're going to be using
11  immunosuppressive medications in her or using
12  intravenous immunoglobulin.  So for her it's the
13  safest medication.  In an arthritis patient or
14  chronic pain patient, it's the last defense.  It's
15  the last medication you would use because of the
16  side effects.
17    Q.  You also mentioned NSAIDs, or
18  nonsteroidal antiinflammatory drugs, like ibuprofen
19  and naproxen.
20    A.  Yes, sir.
21    Q.  What are the benefits of traditional or
22  nonselective NSAIDs?  Do you understand what I mean
23  when I say nonselective NSAIDs?
24    A.  Yes, sir, they're COX-1 and COX-2.
25    Q.  Correct.  What are some of the benefits

Page 21

1  of nonselective or traditional NSAIDs like
2  ibuprofen?
3    A.  Pain resolution, easy to use.
4  There's -- initially when you're starting somebody
5  on the medication, you can do some blood monitoring
6  on them, but once you've checked, as long as
7  they're not abusing the medications, it's usually a
8  safe form of therapy.
9    Q.  Are some of the side effects associated
10  with NSAIDs stomach problems?
11    A.  Yes, they are.  You can have the same
12  problems with GI bleeding or gastrointestinal
13  hemorrhage.  And this can be a slow process also
14  because it helps pain so you might lose blood
15  slowly over time.
16    Q.  Have you heard of patients who have
17  actually had perforations and ulcers in their
18  stomach as a result of taking traditional or
19  nonselective NSAIDs?
20    A.  Yes, sir.
21    Q.  Are you aware of whether the stomach
22  problems and the perforations, ulcers and bleeds
23  are considered a serious health problem in this
24  country?
25    A.  Yes, they are.

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

## Page 22

1  Q. Why are they a serious problem, sir?
2  A. Because they can be lethal. With
3  traditional NSAIDs, I don't know if I'm quoting my
4  numbers right, but there are probably between a
5  hundred and 150 deaths per year on traditional
6  NSAIDs. That number might be higher.
7  Q. And are you also aware that there are
8  thousands of NSAID users who have to be
9  hospitalized because of GI-related problems?
10  A. Yes, sir.
11  Q. Is tolerability also a problem with
12  some NSAIDs?
13  A. Yes, sir.
14  Q. What is tolerability?
15  A. Being able to take a medicine without
16  the side effects. So every medication on the
17  market can have side effects on a particular
18  patient. I mean, you can hand Tylenol to a hundred
19  patients and two or three patients might have some
20  kind of side effect, whether it be dizziness or
21  whether it be fatigue or some side effect that's
22  intolerable to them, they can't take the medicine
23  because of it.
24  Q. Do NSAIDs -- nonselective NSAIDs also
25  cause increased blood pressure or hypertension?

## Page 23

1  A. Yes, sir.
2  Q. Finally, you mentioned Tylenol.
3  Tylenol can help reduce pain in certain patients?
4  A. Yes, it can.
5  Q. Did Tylenol also have side effects?
6  A. Yes, it can. It has -- they're very
7  limited -- I mean, it's very rare you see a side
8  effect. You will find people that will develop a
9  skin rash like any other medication. Very rare you
10  see the blood pressure go up or -- but I've seen
11  dizziness with Tylenol. I've seen fatigue with
12  Tylenol. If you open the package insert, just
13  about every side effect you can imagine is in
14  there. It's tolerated, but you have to take it
15  four times a day so one of those medications that
16  is limited in what it can do.
17  Q. Now let's turn to COX-2 inhibitors like
18  Vioxx, okay?
19  A. Yes, sir.
20  Q. When did you start prescribing COX-2
21  inhibitors?
22  A. When they became available on the
23  market, I guess Celebrex was the first COX-2.
24  Q. Why did you decide to prescribe
25  Celebrex and Vioxx over traditional NSAIDs?

## Page 24

1  A. Number one, they were more effective
2  from a pain standpoint. Number two, the risk of GI
3  side effects was lower. These are actual
4  medications you could give to people while on
5  Coumadin.
6  Q. What is Coumadin?
7  A. Coumadin is a blood thinner. It's the
8  most potent of the blood thinners that we use short
9  of injectable blood thinners, Lovenox, in private
10  practice.
11  Q. And why is it helpful to be able to
12  give COX-2 inhibitors to patients who are taking
13  blood thinners?
14  A. Because you cannot give traditional
15  medications. You cannot give Prednisone or
16  steroids. You cannot give traditional nonselective
17  nonsteroidal medications to these patients because
18  of the side effect -- of the possible bleeding
19  contraindications for the patient.
20  Q. Did you find it helpful when Vioxx and
21  Bextra were on the market to have multiple COX-2
22  inhibitors to choose from for your patients?
23  A. Yes, sir.
24  Q. Why is it helpful from your perspective
25  as a doctor to have more than one type of

## Page 25

1  medication in a class available to you to
2  prescribe?
3  A. Well, everybody's created differently.
4  Sort of a joke I say to my patients, if we were all
5  from West Virginia, we'd only need one medication.
6  But people are born different, they're from
7  different ethnic backgrounds. And probably some
8  day when we start looking at medications, you might
9  see where people from a different genetic --
10  whether it be black, Caucasian or Asian, might
11  respond to a different medication better. We
12  haven't been able to break that down yet because
13  the medical community is not sophisticated yet.
14  It's going to come down to all the genetic studies
15  and we're able to break things down genetically.
16      But to have it -- number one, Bextra
17  and Celebrex have a sulfa backbone so you cannot
18  use those in people that are sensitive to sulfa
19  drugs. So Vioxx is the only one in the class --
20  Q. What is a sulfur drug?
21  A. A sulfa drug is a -- it's a type of
22  antibiotic that has a sulfur or a sulfonamide
23  attached to it. We'd be here for awhile talking
24  about what it actually does, but most people know
25  about sulfa drugs. It is the original antibiotics

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

Page 26

1  that came onto the market in World War II.
2      Q.  Okay.
3      A.  And then penicillin came onto the
4  market soon after that, but -- it's to fight
5  infection, but people who have taken sulfa drugs --
6  and there's many drugs on the market that have a
7  sulfa backbone you cannot take if you are sensitive
8  to it.  So Bextra and Celebrex you have to watch
9  very cautiously if you even try and give it to
10  somebody with a sulfa allergy.
11      Q.  Is it fair, Dr. McCaffrey, that because
12  different people respond differently to the same
13  medication, it is helpful to have more than one
14  medication to prescribe to them?
15      A.  Yes, sir.
16      Q.  Have you seen patients who did not
17  respond well to Celebrex but did respond well to
18  Vioxx?
19      A.  Yes, sir.
20      Q.  Have you seen patients who did respond
21  well to Motrin, or ibuprofen, but not to naproxen?
22      A.  Yes, sir.
23      Q.  During what period of time did you
24  prescribe Vioxx, sir?
25      A.  From the time it was released to the

Page 27

1  time it was recalled.
2      Q.  Why did you prescribe Vioxx to your
3  patients?
4      A.  It was a very excellent medication for
5  the treatment of osteoarthritis and rheumatoid
6  arthritis.
7      Q.  Did you and your colleagues, sir, who
8  focus on pain relief consider COX-2 inhibitors and
9  Vioxx to be a major advance in the treatment of
10  pain?
11      A.  Yes, sir.
12      Q.  You mentioned before that to take
13  Tylenol, you often have to take it four times a
14  day.  Do you remember saying that?
15      A.  That's correct.
16      Q.  How many times a day were patients told
17  to take Vioxx typically?
18      A.  Once a day.
19      Q.  Is it --
20      A.  And a very rare patient took it twice a
21  day.
22      Q.  Is it helpful for patients to have to
23  take medicine only once a day versus four times a
24  day?
25      A.  Yes, it is, because it's easier to

Page 28

1  remember to take the medication, therefore the
2  patient remains compliant with their medication.
3          The other beauty of the newer
4  medications, Vioxx, Celebrex and Bextra, was the
5  advantage of -- and this may sound strange to the
6  academic world, to the private practice it makes
7  more sense.  I could put somebody on Vioxx for a
8  one-week time period and then they'd be off the
9  medication for three weeks.  So they actually take
10  their Vioxx one week per month and that's all they
11  had to take for their pain relief.  It would calm
12  the pain down enough that they wouldn't have to
13  take it for the next three weeks.  So it's not
14  uncommon in my practice where I'd have patients
15  that, you know, from a cost standpoint they'd say,
16  I cannot afford the medication and so we'd figure
17  out how to be able to take the medication and
18  they'd also give themself a holiday where they were
19  off the drug at the same time.
20      Q.  And for some of those patients if they
21  had to take traditional NSAIDs, would they have to
22  take those more regularly and more often?
23      A.  Yes, sir.
24      Q.  Before you prescribed Vioxx to
25  Mr. Barnett, and we're going to talk about

Page 29

1  Mr. Barnett shortly, had the Food and Drug
2  Administration approved Vioxx as safe and
3  effective?
4      A.  Yes, they had.
5      Q.  Is it important to you as a treating
6  physician that the Food and Drug Administration
7  approve medicine as safe and effective, sir?
8      A.  Yes, sir.
9      Q.  Why is that important to you?
10      A.  Because it's given a seal of approval
11  by the Federal Government.  They've done
12  appropriate studies on the medication and -- you
13  know, it's like going to a bank, if you're FDIC
14  approved -- I mean -- is it FDIC?
15      Q.  I think so.
16      A.  Yeah.  I know I can put my money in
17  there and there's a safeguard from the Federal
18  Government saying if something happens to your
19  bank, you're still going to have your money.  So
20  it's the same thing with the Federal Government,
21  here's the medication.  We put our trust in this
22  medication.  It went through a rigorous program.
23  The United States has the most rigorous program of
24  any drug program.
25          MR. ROBINSON:  I'm going to move to

8 (Pages 26 to 29)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 30

1  strike.
2  BY MR. GOLDMAN:
3      Q.   Now, -- withdrawn.
4           Is it your understanding,
5  Dr. McCaffrey, that the Food and Drug
6  Administration has scientists there to review
7  clinical trials and make an assessment about
8  whether a drug is safe and effective before it can
9  be used in the marketplace?
10     A.   Yes, sir.
11     Q.   Were you aware while you were trying --
12 withdrawn.
13          Were you aware, Dr. McCaffrey, while
14 you were prescribing Vioxx that the FDA approved it
15 as safe and effective for different uses over time?
16     A.   Yeah, toward -- you know, after Vioxx
17 had been out for awhile, it actually was approved
18 for migraine headaches.
19     Q.   Do you remember that after Vioxx was
20 originally released in the market, it was
21 subsequently approved for the treatment of
22 rheumatoid arthritis?
23     A.   Yes, sir.
24     Q.   Did you find that to be helpful for
25 your patients?

Page 31

1      A.   Yes, sir.
2      Q.   In March of 2004, do you know that the
3  Food and Drug Administration approved Vioxx for use
4  in treating migraine headaches?
5      A.   Yes, sir.
6      Q.   Do you treat patients who have migraine
7  headaches, sir?
8      A.   That's 60 percent of my practice.
9      Q.   How much of a problem are migraine
10 headaches for some of your patients, sir?
11     A.   The people that I see for migraine
12 headaches aren't the routine migraine patients.
13 These are mostly patients that have 15 headache
14 days a month or more so these are the -- what I
15 call -- I call them the lepers.  I see the lepers.
16     Q.   What happens to patients who have
17 chronic migraines who come in to see you because
18 they have them so often, what is life like for
19 those patients?
20     A.   Life is horrible for them.  You have to
21 view chronic migraines as a chronic pain syndrome.
22 It's a chronic disorder where they have headaches
23 at least every other day per month.  They're on
24 multiple medications.  They develop depression.
25 They can't interact in social events because

Page 32

1  they're constantly having migraine headaches,
2  they're missing events, they miss time with their
3  kids.  They're unemployable.  No one employs
4  somebody that has headaches every day of their
5  life.  Very difficult to keep them at work.
6      Q.   Was Vioxx helpful in treating migraine
7  headaches in some of your patients?
8      A.   Yes, it was.
9      Q.   Were you also aware that a month before
10 Merck withdrew Vioxx from the market, the FDA
11 approved Vioxx for treatment of juvenile rheumatoid
12 arthritis?
13     A.   I was probably aware at the time, I
14 just don't -- doesn't jump into my memory at this
15 time.
16     Q.   Have you seen children or kids who
17 suffer from rheumatoid arthritis?
18     A.   I don't see anybody under the age of
19 18.
20     Q.   Are you aware that children who have
21 rheumatoid arthritis have a very, very difficult
22 life?
23     A.   It's a very bad disorder.
24     Q.   Do other physicians in your practice,
25 rheumatologists and so forth, treat patients who

Page 33

1  are kids with rheumatoid arthritis?
2      A.   We don't have any rheumatologists in
3  our group.
4      Q.   How did your clinical experience,
5  Dr. McCaffrey, with Vioxx compare with the FDA's
6  conclusion that it was a safe and effective
7  medicine?
8           MR. ROBINSON:  Object.
9           THE WITNESS:  I thought it was a very
10 safe medication.
11 BY MR. GOLDMAN:
12     Q.   Did you think it was a very helpful
13 medication for your patients?
14     A.   Yes, I did.
15     Q.   Let's turn now to your treatment of
16 Gerald Barnett, okay?
17     A.   Yes, sir.
18     Q.   What is that in front of you, by the
19 way, for the ladies and gentlemen of the jury?
20     A.   This is a PDA.  It's basically a
21 screen, goes to a server which is on 48th Avenue
22 which is about 40 blocks from here.
23     Q.   It just basically contains medical
24 records?
25     A.   It brings in his whole chart and stores

9 (Pages 30 to 33)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

## Page 34

1  it right here until I release it back to the
2  server.
3      Q.  When did you first meet Gerald Barnett?
4      A.  Pull his name up here.  Mr. Barnett, I
5  first met him on March 26th, 1990 -- I take that
6  back -- yeah, March 26th, 1998.
7      Q.  I'm going to hand you what I've marked
8  as Exhibit 1 to your deposition, sir.
9          (DFT. EXH. 1, Strand Regional Specialty
10  medical record, was marked for identification.)
11  BY MR. GOLDMAN:
12      Q.  Is this a document that reflects your
13  first visit with Mr. Barnett on March 26th of 1998?
14      A.  Yes, sir.
15      Q.  We're going to go through this in a
16  minute, but I want to ask you how many total visits
17  you had with Mr. Barnett, period.
18      A.  Four visits.
19      Q.  When was the last time you saw
20  Mr. Barnett?
21      A.  It was on December 30th, 1999.
22      Q.  So you treated Mr. Barnett from March
23  28th, 1998 through December 30th of 1999 and during
24  that period, you saw him a total of four times?
25      A.  Yes, sir.

## Page 35

1      Q.  Why did Mr. Barnett come to see you on
2  March 26th, 1998?
3      A.  His main complaint on the first visit
4  was complaining about low back pain which radiated
5  into his left leg.  He related he was involved in a
6  motor vehicular accident on December 30th, 1978.
7  He suffered neck and back injuries with this
8  accident resulting in chronic back pain, neck pain
9  and right shoulder pain.
10      Q.  Are you reading from the second and
11  third sentence?
12      A.  That's correct.
13      Q.  -- from Exhibit 1?  So he came to see
14  you because he was experiencing lower back pain in
15  March of 1998?
16      A.  That's correct.
17      Q.  Do you also indicate, sir, that -- on
18  the third page that Mr. Barnett was also suffering
19  from chronic shoulder pain?
20      A.  That's correct.
21      Q.  Did Mr. Barnett explain to you the
22  medications that he had been taking to try to
23  address his chronic neck pain and back pain?
24      A.  Yes, sir, he did.  He said --
25      Q.  What were those?

## Page 36

1      A.  He said he had taken Feldene, which is
2  an antiinflammatory, from --
3      Q.  Is that a traditional NSAID?
4      A.  It's a traditional NSAID.  It would be
5  in the same family as Mobic, which is a newer
6  medication that's out now -- from December 1980
7  through October 1996 with significant improvement
8  of his symptoms and he had stopped his medication
9  in 1996, started taking ibuprofen.  And I'm not
10  sure at that time, I didn't go into detail why he
11  stopped it.
12      Q.  So Mr. Barnett told you he had taken
13  Feldene for 16 years to try to resolve his back
14  pain and his neck pain and then he had switched to
15  ibuprofen?
16      A.  Over-the-counter ibuprofen.
17      Q.  Did Mr. Barnett tell you that Feldene
18  actually did help him for awhile resolving his
19  pain?
20      A.  Yes, he did.
21      Q.  And did you at this point in time
22  decide that it would be appropriate to put him back
23  on Feldene?
24      A.  And that -- that's what I did, I put
25  him back on Feldene that day and talked to him

## Page 37

1  about doing an MRI scan of his lower back to
2  evaluate for lumbar disc disease and also do a
3  nerve conduction study, EMG, of the left leg to
4  evaluate for any evidence of an active or chronic
5  lumbosacral radiculopathy.
6      Q.  I don't know what that means.  I'm not
7  going to ask you to explain it, but --
8      A.  Just means a pinched nerve.
9      Q.  Okay.
10      A.  He's coming in for back pain.  It's
11  going into one leg.  Does he have a pinched nerve
12  in his back which is significant.
13      Q.  The medication that you prescribed on
14  this occasion, March 26th of 1998, was Feldene,
15  right?
16      A.  Yes, sir.
17      Q.  Why did you decide to prescribe Feldene
18  as opposed to some other medication to Mr. Barnett?
19      A.  It's a medication that had worked for
20  him before.
21      Q.  When you prescribe medications to your
22  patients, sir, do you listen to them concerning
23  what medications have worked and what haven't
24  worked in the past?
25      A.  It's probably the most important part

Page 38

1  of their history.
2      Q.  Do you prescribe medications to your
3  patients, sir, because you have some self-interest
4  in the medication you prescribe?
5      A.  No, sir.
6      Q.  If a patient comes to you and says, I
7  really think I should be on Celebrex as opposed to
8  Vioxx, would you say, no, I want you on Vioxx or
9  would you say, okay, let's try Celebrex?
10     A.  Well, first I'd ask them do they have a
11 sulfur allergy because if they have a sulfur
12 allergy, I'm not going to put them on Celebrex.
13     Q.  Assuming they don't have a sulfur
14 allergy --
15     A.  And they want to be on Vioxx --
16     Q.  Celebrex, let's say.
17     A.  Let's say they're -- oh, they're on
18 Vioxx and they want to go on Celebrex?  I don't
19 really have a problem with it.  If they have good
20 control on the medication they're on and have no
21 side effects, I try and talk them into saying,
22 here's the medication you did well on, let's stay
23 with the medication you did well on.
24     Q.  On this date, March 26th of 1998, did
25 Mr. Barnett tell you that over the previous three

Page 39

1  months, his low back pain had been getting worse?
2      A.  Yes, he did.
3      Q.  Did Mr. Barnett tell you in March of
4  1998 that the pain he was experiencing was
5  radiating down his left leg?
6      A.  That is correct.
7      Q.  The next time you saw Mr. Barnett was
8  on -- was it March 31st of 1998?
9      A.  Yes, it was.
10         (DFT. EXH. 2, Strand Regional Specialty
11 medical record, was marked for identification.)
12 BY MR. GOLDMAN:
13     Q.  Let me hand you Exhibit 2, sir.  Is
14 this a medical record concerning your visit with
15 Mr. Barnett on March 31st, 1998?
16     A.  Yes, it is.
17     Q.  Why did he come to see you on this
18 occasion?
19     A.  We performed a nerve conduction study,
20 EMG, on the patient to evaluate for evidence of a
21 radiculopathy.
22     Q.  And a radiculopathy is again?
23     A.  A pinched nerve in the back.
24     Q.  Did you discuss the results of that
25 test with Mr. Barnett?

Page 40

1      A.  It was discussed at the time of the
2  test itself, yes, I did.
3      Q.  What was your conclusion, sir, about
4  the cause of Mr. Barnett's leg pain and lower back
5  pain?
6      A.  Well, he had evidence on the test from
7  the study that demonstrated a chronic, which means
8  something that had been going on longer than six
9  months, and an active, something going on less than
10 six months -- a chronic active pinched nerve in his
11 back.  So he had ongoing changes to the nerve
12 itself from the study so at that time I said, you
13 know, you have a chronic pinched nerve.  We talked
14 about we need to schedule you for an MRI or get on
15 with the MRI to see exactly what's going on in your
16 back.  We had previously done X-rays on the first
17 visit when he came in that showed some arthritic
18 changes in his lumbosacral spine and we were going
19 to review the MRI once we got the results back.
20     Q.  Focusing your attention, sir, on the
21 last paragraph of the March 31st, 1998 visit.
22     A.  Yes, sir.
23     Q.  Do you see that you wrote, quote, we
24 will see the patient in follow-up after this MRI is
25 completed, we will continue him on Feldene 20

Page 41

1  milligrams -- what does PO Q mean?
2      A.  By mouth every day.
3      Q.  He has had a significant improvement in
4  his pain since restarting Feldene.
5          Do you see that?
6      A.  That's correct.
7      Q.  Why did you decide to continue him on
8  Feldene as opposed to putting him on some other
9  medication to help control his back pain?
10     A.  Because he did well on the medicine.
11     Q.  When did you see Mr. Barnett next?
12     A.  I saw Mr. Barnett next on April 6th,
13 1998.
14     Q.  1998?
15     A.  1998.
16         (DFT. EXH. 3, Strand Regional Specialty
17 medical record, was marked for identification.)
18 BY MR. GOLDMAN:
19     Q.  Let me hand you Exhibit 3, sir.
20         MR. ROBINSON:  Thanks.
21 BY MR. GOLDMAN:
22     Q.  Is this a medical record dated April
23 6th of 1998 concerning your visit with Mr. Barnett?
24     A.  Yes, it is.
25     Q.  Why did he come to see you on this

65417542-bdd2-408c-b6ac-735533c8aa68

## Confidential - Subject to Protective Order

Page 42

```
1    occasion?
2        A.  He came to follow up to go over the
3    results of his MRI scan.
4        Q.  What were the results as -- withdrawn.
5            Can you describe briefly in terms that
6    I can understand what the results of his MRI scan
7    were.
8        A.  Underwent his MRI on April 3rd, 1998.
9    His MRI demonstrated mild spondylitic changes and
10   these are changes you see with osteoarthritis at
11   all levels with a disc bulge with posterior
12   spurring noted at L-5/S-1. That's the fifth lumbar
13   and the first sacral, which is a very common site.
14       Q.  Is that in the lower back?
15       A.  That's correct.
16       Q.  Is that what was causing his lower back
17   pain?
18       A.  More than likely it was causing his
19   back pain, yes, sir.
20       Q.  In the middle of the paragraph that
21   starts history of present illness, do you see that
22   you wrote, he was started on Feldene 20 milligrams
23   by mouth per day and has been doing fine on this
24   medication, his symptoms have improved by 75
25   percent?
```

Page 43

```
1        A.  Yes, sir.
2        Q.  So he was still doing all right on
3    Feldene at this point?
4        A.  Yes, sir.
5        Q.  Did you continue him on Feldene because
6    the medicine was working at that point to help his
7    back pain?
8        A.  Yes, I did.
9        Q.  The next visit, I believe, was the last
10   visit that you had with Mr. Barnett?
11       A.  That's correct.
12       Q.  And that was on December 30th of 1999,
13   right?
14       A.  That is correct.
15           (DFT. EXH. 4, Strand Regional Specialty
16   medical record, was marked for identification.)
17   BY MR. GOLDMAN:
18       Q.  Let me hand you Exhibit 4, sir.  Is
19   this a medical record that addresses the visit you
20   had with Mr. Barnett on December 30th of 1999?
21       A.  Yes, it is.
22       Q.  Why did Mr. Barnett come to see you on
23   this occasion?
24       A.  Well, his back pain had worsened since
25   I had seen him almost eight months prior.
```

Page 44

```
1        Q.  If you look in the history of present
2    illness paragraph, do you see that you wrote,
3    patient is a 54-year-old --
4        A.  Right-handed white male.
5        Q.  -- seen for follow-up of lower back
6    pain and left leg radiation secondary to a lumbar
7    radiculopathy?
8        A.  That's correct.
9        Q.  And then you write, since his last
10   visit, his lower back pain has been acting up
11   approximately five days a week.
12       A.  That's correct.
13       Q.  And then you indicate that he's had
14   improvement since he stopped playing golf a few
15   weeks ago.
16       A.  That's correct.
17       Q.  Under current medications, you wrote,
18   Feldene 20 milligrams by mouth once a day which we
19   will -- what does DC stand for?
20       A.  Discontinue.
21       Q.  Today we will start him on Vioxx 25
22   milligrams by mouth once daily.
23       A.  That's correct.
24       Q.  Why did you decide to recommend that
25   Mr. Barnett use Vioxx instead of Feldene?
```

Page 45

```
1        A.  He was losing an effect with Feldene.
2    It wasn't working for him anymore so we decided to
3    change to something that might be more efficacious.
4        Q.  When you say might be more efficacious,
5    what does that mean?
6        A.  More effective.
7        Q.  Was it your feeling on December 30th,
8    1999 that even though Feldene had worked in the
9    past to help Mr. Barnett's back pain that now it
10   wasn't working well?
11       A.  That's correct.
12       Q.  If you turn the page, Dr. McCaffrey, to
13   impression, do you see that you wrote, Number 1,
14   worsening right shoulder/deltoid pain?
15       A.  That's correct.
16       Q.  Was Mr. Barnett experiencing more
17   shoulder pain than he had in the past?
18       A.  Yes, he had.
19       Q.  And he was taking Feldene at this
20   point, right?
21       A.  Yes, he was.
22       Q.  Patient does also relate a history of
23   mild neck pain with this.  Do you see that?
24       A.  Yes, I do.
25       Q.  And then you wrote, examination showed
```

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

Page 46

1  decreased sensation over the median nerve
2  distribution of the left hand.
3         What does that mean in simple English?
4         A.  Well, he was complaining of right
5  shoulder and deltoid pain, but over -- the
6  sensation over his thumb, index, middle and part of
7  his fourth finger of his right hand he had
8  decreased sensation.  That's the median nerve
9  distribution.
10         Q.  And then at the bottom of that
11  paragraph you write, we will empirically start him
12  on Vioxx 25 milligrams by mouth once daily for this
13  discomfort.
14         What did you mean when you wrote, we
15  will empirically start him on Vioxx?
16         A.  We're going to give him a trial on the
17  medication and see if it helps and if it doesn't
18  help -- in reviewing my notes earlier today, I gave
19  him four sample pills and at the end of the four
20  sample pills if he was not better, he was supposed
21  to call me back and we would think about a
22  different medicine or a different treatment
23  regimen.
24         Q.  Do you know one way or the other
25  whether Mr. Barnett took those sample pills and

Page 47

1  when he took them?
2         A.  He must have because he filled his
3  prescription and I had given him a prescription.
4  He asked me at the time that he had a prescription
5  plan where he had to get three months at a time so
6  I wrote a prescription for him to obtain his
7  medications three months at a time.
8         Q.  Do you have any idea what particular
9  day Mr. Barnett started taking the sample pills?
10         A.  More than likely, the day he saw me.
11         Q.  Mr. Barnett said that he started taking
12  Vioxx around January 11th --
13         MR. ROBINSON:  I'm sorry, can I go
14  back?  You're saying the day he saw him.  Can we
15  get the date?
16         THE WITNESS:  That was December 30th,
17  1999.  I can only assume that he took them that day
18  or the next day.
19  BY MR. GOLDMAN:
20         Q.  Would you defer to Mr. Barnett in terms
21  of when he thinks he took Vioxx?
22         A.  That's fine.
23         Q.  You wrote in the --
24         MR. ROBINSON:  I won't.
25  BY MR. GOLDMAN:

Page 48

1         Q.  -- in the second paragraph, lower back
2  pain with left leg radiation.  This has been
3  problematic over time and is secondary to lumbar
4  radiculopathy.
5         We had talked about that before?
6         A.  Yes, sir.
7         Q.  Hopefully this will improve with Vioxx.
8         Do you see that?
9         A.  Yes, sir.
10         Q.  Was it your hope that by switching
11  Mr. Barnett from Feldene to Vioxx that it would not
12  only help his shoulder pain but also his lower back
13  pain?
14         A.  That's correct.
15         Q.  If Feldene were working to reduce
16  Mr. Barnett's neck pain and shoulder pain and back
17  pain, would you have changed him to Vioxx?
18         A.  No, sir.
19         Q.  Did Mr. Barnett explain to you on
20  December 30th of 1999, Dr. McCaffrey, how painful
21  his pain really was?
22         A.  Can you say that again, please?
23         Q.  Sure.  Did Mr. Barnett explain to you
24  on December 30th of 1999 when he said his back pain
25  was occurring five days a week how painful it was?

Page 49

1         A.  Yes, sir.
2         Q.  Was it painful to him?
3         A.  It was painful to the point where he
4  had to stop playing golf.  And for him he played a
5  lot of golf so to stop playing golf, it had to be
6  painful.
7         Q.  In December 1999, would you say that
8  Mr. Barnett was still experiencing low back pain
9  and shoulder pain despite being on Feldene?
10         A.  Yes, sir.
11         Q.  Do you make it a practice,
12  Dr. McCaffrey, to discuss with your patients
13  potential side effects of medicines you prescribe?
14         A.  Yes, sir.
15         Q.  Did you do that with Mr. Barnett when
16  you prescribed Vioxx to him?
17         A.  What I usually do with patients is I
18  have a package insert and I hand them the package
19  insert and if they have any questions -- I'll go
20  over the basic things, which is dyspepsia, it can
21  happen with Vioxx, you can develop — I've had
22  patients develop headaches with Vioxx.  I've had
23  people develop elevated blood pressure.  So I go
24  over the very basic things, but I'll hand them a
25  package insert and make sure they take it with

13  (Pages 46 to 49)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 50

1   them.
2       Q.  Did you believe that Mr. Barnett
3   understood the side effects associated with Vioxx
4   when you prescribed it to him?
5       A.  Yes, sir.
6       Q.  Did you ever see Mr. Barnett again
7   after December 30th of 1999?
8       A.  No, sir.
9       Q.  Did you ever discuss the risks and
10  benefits of Vioxx with Mr. Barnett after December
11  3oth of 1999?
12      A.  No, sir.
13      Q.  Back when you prescribed Vioxx to
14  Mr. Barnett, sir, had he been diagnosed with angina
15  to your knowledge?
16      A.  No, sir.
17      Q.  Did Mr. Barnett ever tell you whether
18  he had experienced angina or heart pain prior to
19  you prescribing Vioxx to him?
20      A.  No, sir.
21      Q.  Did you know when you were prescribing
22  Vioxx whether he had ever been diagnosed with
23  ischemia?
24      A.  No, sir.  I went over -- over all this
25  with him.  And I do a handwritten form that I can

Page 51

1   sit down and go over with patients about heart
2   disease and everything else prior to starting them
3   on anything.  In going through his review of
4   systems, chest pain, cardiovascular, everything was
5   negative.
6       Q.  And I'm going to return to that
7   document in a little bit, sir, but thank you for
8   pointing that out.
9           So when you were treating Mr. Barnett
10  between March of 1998 and December of 1999, you
11  didn't know whether he had angina or ischemia
12  because he didn't tell you that he did?
13      A.  That's correct.
14      Q.  You might not know this, sir, but
15  subsequently Mr. Barnett was diagnosed with severe
16  multivessel coronary artery disease and had a mild
17  heart attack in September of 2002.  Do you know any
18  of that?
19          MR. ROBINSON:  Objection, move to
20  strike.
21          THE WITNESS:  No, sir.
22  BY MR. GOLDMAN:
23      Q.  Did Mr. Barnett on December 30th of
24  1999 come into your office and ask to be put on
25  Celebrex because he had seen commercials for

Page 52

1   Celebrex?
2       A.  No, sir.
3       Q.  Is that something you would remember?
4       A.  If it was something significant, I
5   would have documented it.  Let me look through my
6   handwritten notes.  It might give us a better idea
7   because my handwritten notes, I'm writing it as
8   they're talking to me so if there's something
9   significant, I'll write it down.
10      Q.  If a patient says to you --
11          MR. ROBINSON:  Can you wait, let him
12  look through his notes?
13          MR. GOLDMAN:  Sure.
14          THE WITNESS:  I don't see anything
15  written about him saying anything about Celebrex.
16  BY MR. GOLDMAN:
17      Q.  If Mr. Barnett had come into your
18  office on December 30th of 1999 and told you he had
19  been watching television and saw commercials for
20  Celebrex and wanted to be put on Celebrex, is that
21  something you would have written down?
22      A.  Probably saw how pushed for time -- I
23  probably am writing -- I'm sitting there writing as
24  they're talking so I would probably write it down.
25      Q.  Let me ask you, sir, whether you

Page 53

1   remember Mr. Barnett coming into your office on
2   December 30th, 1999 and saying, I really want to be
3   on Celebrex because I've seen commercials about it
4   and you saying, no, I insist that you go on Vioxx?
5   Does that square with your recollection of what
6   occurred on December 30th of 1999?
7       A.  No, sir.
8           (DFT. EXH. 5, Excerpt testimony of
9   Gerald D. Barnett taken on 4/20/06, was marked for
10  identification.)
11  BY MR. GOLDMAN:
12      Q.  I'm going to hand you an excerpt of a
13  deposition that we took of Mr. Barnett on April
14  20th, 2006, okay?  And I've marked that as Exhibit
15  5.  Focusing --
16          MR. ROBINSON:  For the record, I'm
17  going to object to this approach and this exhibit.
18  BY MR. GOLDMAN:
19      Q.  Focusing on your -- withdrawn.
20          If you look, sir, on Page 128, Line 20,
21  toward the bottom, do you see that I asked this
22  question:  Why did Dr. McCaffrey decide to
23  prescribe you Vioxx rather than Feldene?
24          And his answer was:  Well, I went to
25  him for lower back pain and I had at the time

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

---

Page 54

1  just -- I had heard commercials on TV mainly on --
2  on Celebrex. And I asked him his opinion of
3  Celebrex because I was happy with Feldene. And he
4  said, oh, well, I'm going to change you from
5  Feldene, but I'm not putting you on Celebrex. I'm
6  putting you on Vioxx.
7         I said, no, I would rather be on
8  Celebrex because that sounds to me on -- by
9  watching the TV ads that that's really good.
10        He said, meaning you, Dr. McCaffrey,
11  no, I'm putting you on Vioxx because it's easier on
12  your stomach. Feldene was hard or Feldene -- that
13  is better than Feldene because Feldene can affect
14  your acid reflux?
15        And then Mr. Barnett continues: And I
16  thought that's good. I thought, doesn't Celebrex
17  do the same? They say it on TV, it's better for
18  your stomach.
19        He said, yes, they're in the same
20  class, but I just think Vioxx is better for you.
21        Well, at that point, he thought it was
22  better for me, I'll go with it. So that's how
23  we -- that's how that came about.
24        Do you see that testimony?
25    A.  Yes, sir.

---

Page 55

1    Q.  Does that square with your recollection
2  and your notes of the meeting you had with
3  Mr. Barnett on December 30th, 1999?
4         MR. ROBINSON: Same objection. Same
5  objection.
6         THE WITNESS: I don't know. I just...
7  BY MR. GOLDMAN:
8    Q.  If a patient, sir, came into your
9  office and said, I really want to be on Celebrex,
10  would you put him on Celebrex if he didn't have any
11  allergies?
12    A.  Yes, I would.
13    Q.  If Mr. Barnett came into your office on
14  December 30th of 1999 and said, I really want to be
15  on Celebrex because Feldene is not working for me,
16  would you have prescribed Celebrex?
17    A.  I would have given him samples of
18  Celebrex to try.
19    Q.  Have you ever insisted that a
20  patient -- withdrawn.
21        Assuming Mr. Barnett came in and said,
22  I really want to be on Celebrex because I've seen
23  commercials about it, would you have given him
24  samples of Celebrex to try rather than samples of
25  Vioxx?

---

Page 56

1    A.  Depends on the patient. If we go to
2  Mr. Barnett's case, I would have given him samples
3  of Celebrex to try.
4    Q.  And if Mr. Barnett responded well to
5  the samples of Celebrex, would you then have
6  prescribed Celebrex to him?
7    A.  That's correct.
8    Q.  Do you remember ever being insistent
9  that Mr. Barnett take Vioxx over some other
10  medicine?
11    A.  No, sir.
12    Q.  During the visits that you had with
13  Mr. Barnett, do your notes indicate that he ever
14  indicated to you that he had been watching
15  advertisements on TV about Vioxx that he found to
16  be reassuring?
17    A.  No, sir.
18    Q.  Does Mr. Barnett strike you as the type
19  of patient, sir, who asks a lot of questions of
20  doctors and defers to doctors in terms of their
21  judgment or don't you really know because you
22  didn't see him that often?
23    A.  I didn't see him that often so -- and
24  he didn't call constantly. You have patients that
25  call every other day for reassurance.

---

Page 57

1    Q.  Is there any indication in your notes
2  during the five visits that you had -- or was it
3  four, I can't remember?
4    A.  Four visits.
5    Q.  Start a new question.
6         During the four visits you had with
7  Mr. Barnett, sir, did you indicate in any of your
8  notes whether he saw advertisements for Celebrex
9  and Vioxx?
10    A.  No, sir.
11    Q.  Dr. McCaffrey, there might be evidence
12  in this trial that you served as a speaker for
13  Merck.
14    A.  Yes, sir.
15    Q.  During what period of time did you
16  serve as a speaker for Merck?
17    A.  I'm still a speaker for Merck.
18    Q.  For what products?
19    A.  Maxalt.
20    Q.  What is Maxalt?
21    A.  Maxalt is a migraine medication.
22    Q.  How did you first become a speaker for
23  Merck, sir?
24    A.  I was approached by the company when
25  the drug was -- was released. I was a speaker for

---

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 58

1  Imitrex and Zomig at the time and they asked me to
2  speak on their medication.  And Imitrex and Zomig
3  are also migraine medications.
4      Q.  Who manufactures Imitrex and --
5      A.  Imitrex is GlaxoWellcome and Zomig is
6  back to being AstraZeneca again.
7      Q.  So you were first approached by Merck
8  to speak about Maxalt and that was before Vioxx
9  ever came on the market, right?
10     A.  That's correct.
11     Q.  Why did you agree to become a speaker
12 for Merck, sir?
13     A.  Because I liked the product.
14     Q.  Do you sometimes attend events where
15 other doctors are speaking about other medications?
16     A.  Yes, sir.
17     Q.  Do you find it helpful to attend those
18 type of functions?
19     A.  Yes, I do.
20     Q.  Why?
21     A.  It's informative.  You can usually talk
22 to them on the side about their results with
23 patients and are there any other indications that
24 are offlabel that might help a patient with
25 different disorders.

Page 59

1      Q.  Why do you mean offlabel?
2      A.  Say take Vioxx, it was approved for
3  rheumatoid arthritis and osteoarthritis.  Early on
4  we were discovering that it was working for
5  migraines so if you talk to a headache specialist
6  who's actually doing a study on Vioxx who's coming
7  to give the talk, you can talk to them about their
8  data that has not been released yet and they'll
9  say, I'm getting a good result or I'm getting a bad
10 result from a particular drug.
11     Q.  The decision that you made to become a
12 speaker for Merck, sir, did you review that as
13 requiring you to actually prescribe the medicine
14 you were talking about?
15     A.  No, sir.
16     Q.  Did you ever feel while you were a
17 speaker for Merck or other pharmaceutical companies
18 that you were obligated to prescribe the
19 medications that you were talking about at these
20 various functions?
21     A.  No, sir.
22     Q.  Have you been a speaker for other
23 pharmaceutical companies?
24     A.  I speak for multiple pharmaceutical
25 companies.

Page 60

1      Q.  Which ones?
2      A.  I speak for Allergan on Botox.  My
3  specialty is Botox, I'm a Botox injector.  I speak
4  for GlaxoWellcome.  I speak for Merck.  I speak for
5  Pfizer.  I speak for Forest Pharmaceuticals.  I
6  speak for UBC -- UCPharma -- UCPharma.  I speak for
7  Abbott on Depakote and I've spoken for other
8  companies in the past.
9      Q.  Why have you decided to be a speaker
10 for those pharmaceutical companies that you just
11 mentioned?
12     A.  The main two topics that I speak on, I
13 speak on Alzheimer's/dementia or the different
14 demented disorders and migraine headaches.  Those
15 are the two main things that I give lectures on.
16     Q.  Why have you decided to give lectures
17 on those topics, Alzheimer's disease and migraines,
18 on behalf of these pharmaceutical companies?
19     A.  Well, it's -- I call it a double-edged
20 sword.  Number one, it's getting out in the
21 community, especially the local community, showing
22 your expertise to the other physicians who want to
23 refer to you.  You also get paid for giving the
24 actual talks.
25     Q.  Why do you call it a double-edged

Page 61

1  sword?
2      A.  Because you get paid, but at the same
3  time, you're trying to get business so you're
4  trying to get paid twice.
5      Q.  Are you accepting compensation from
6  these pharmaceutical companies because they expect
7  you to prescribe the medication that you're talking
8  about, sir?
9      A.  No, sir.
10     Q.  Is it customary for pharmaceutical
11 companies to pay you for the time you're spending
12 speaking on these various products?
13     A.  Yes, sir.
14     Q.  Have you ever felt during the time that
15 Merck was paying you to speak about some of their
16 products that they were trying to buy you off or to
17 stop you from prescribing other medications?
18     A.  No, sir.
19     Q.  When you were prescribing Vioxx to your
20 patients, was that because you were a speaker who
21 was compensated on occasion for your speaks --
22 speeches?
23     A.  I don't understand the question.
24     Q.  It didn't make sense, that's why.
25         Your decision to prescribe Vioxx to

16 (Pages 58 to 61)

Page 62

1   your patients, was that based on your judgment that
2   that was the best medication for your patients or
3   was that because you were speaking on behalf of
4   Merck?
5        A.  I thought it was the best medication
6   for my patients.
7        Q.  While you were a speaker for Merck
8   during the time that Vioxx was on the market, did
9   you also prescribe traditional NSAIDs?
10       A.  Yes, I did.
11       Q.  Which other NSAIDs did you prescribe?
12       A.  Well, the -- at the time, the
13  traditional NSAID that had a long-acting form was
14  Voltaren XR.  That's a once-a-day 100 milligram
15  pill.  Also ibuprofen and Naprosyn were the top
16  three that I would prescribe.
17       Q.  During the time that Vioxx was on the
18  market, did you also occasionally prescribe
19  Relafen?
20       A.  Very little.
21       Q.  Did you sometimes prescribe Ultram?
22       A.  Yes, sir.
23       Q.  Did you sometimes prescribe Mobic?
24       A.  Yes, sir.
25       Q.  Did you sometimes prescribe nabumetone

Page 63

1   during the time that Vioxx was on the market?
2        A.  Is that Relafen?
3        Q.  Yes.
4        A.  Yes, very little.
5        Q.  During the time that Vioxx was on the
6   market, did you also prescribe other COX-2
7   inhibitors?
8        A.  Yes, sir.
9        Q.  Which?
10       A.  Bextra and Celebrex.
11       Q.  Do you know of the three COX-2
12  inhibitors that you prescribed which ones you
13  prescribed the most often?
14       A.  Probably Bextra and Vioxx.
15       Q.  Which pharmaceutical company
16  manufactured Bextra?
17       A.  Pfizer.  Well, Pfizer has the -- or had
18  the drug at the time.  I think they were the
19  manufacturers.
20       Q.  Have you been a speaker for Pfizer as
21  well?
22       A.  Yes, I have.
23       Q.  Can you estimate, Dr. McCaffrey, how
24  many prescriptions you wrote for either traditional
25  NSAIDs or for COX-2 inhibitors other than Vioxx

Page 64

1   while Vioxx was on the market?
2        A.  I'd probably say it's -- greater than
3   50 percent of my prescriptions would have been
4   COX-2 inhibitors.
5        Q.  Were different -- withdrawn.
6            Did you prescribe to many of your
7   patients Celebrex or Bextra if you thought it was
8   in their best interest to receive that medication?
9        A.  Yes, I did.
10       Q.  I'm going to ask you a few questions
11  about the particular programs that you participated
12  in for Merck before and during the time that Vioxx
13  was on the market, okay, sir?
14       A.  Okay.
15       Q.  And just so we're clear, the time
16  period when you treated Mr. Barnett was from March
17  of 1998 to December of 1999, right?
18       A.  Correct.
19       Q.  Our records indicate, sir, that you
20  participated in four programs during that period.
21       A.  Okay.
22       Q.  Three of those you received honoraria
23  payments, okay?
24       A.  Yes, sir.
25           MR. ROBINSON:  I'm going to object,

Page 65

1   move to strike, leading and suggestive.
2   BY MR. GOLDMAN:
3        Q.  Do you have any reason to dispute that
4   you participated in four programs for Merck before
5   you prescribed Vioxx to Mr. Barnett in December of
6   1999?
7        A.  I have no reason to dispute that.
8        Q.  One of the programs you participated in
9   was on September 9th, 1998 and you received a
10  300-dollar payment on that occasion.  It's called a
11  preceptorship.
12       A.  Correct.
13       Q.  What is a preceptorship?
14       A.  Preceptorship is where you actually
15  have one of the drug representatives in the office
16  and they want to -- the company wants them to
17  interact with the doctor, see what they actually do
18  on a daily basis.  And back then it was a
19  requirement for the representatives to undergo
20  these preceptorships.
21       Q.  And are those requirements common to
22  all pharmaceutical companies, not just Merck?
23       A.  They were common back then.  They're --
24  with HIPAA guidelines nowadays, they're not --
25  they're not limited to them.

Page 66

1     Q.   But back then in September of '98, that
2   was something that you saw from different
3   pharmaceutical companies, not just Merck?
4     A.   I had a lot of -- almost every
5   pharmaceutical company would ask me if they could
6   do a preceptorship.
7     Q.   On November 16th, 1998, you gave a talk
8   called a new treatment option in migraine.
9     A.   That's correct.
10    Q.   That occurred in a roundtable setting.
11  Do you know what a roundtable is?
12    A.   Yes, I do.
13    Q.   What is a roundtable?
14    A.   Roundtable is sitting around with a
15  group of people.  We might use notes where I'll
16  type out notes for patients -- I mean not for
17  patients, for the doctors or nurses or nurse
18  practitioners who are just sitting there so we're
19  not using slides on a screen.  So we'll sit there
20  and converse about migraine in general or whatever
21  the topic's going to be that night.
22    Q.   During these roundtable discussions,
23  are you addressing healthcare providers?
24    A.   Yes, I am.
25    Q.   The topic a new treatment option in

Page 67

1   migraine, this occurred before Vioxx was on the
2   market so were you talking about Maxalt then?
3     A.   Talking about Maxalt.
4     Q.   Why were --
5     A.   Maxalt was a fairly new drug on the
6   market in 1998.
7     Q.   Why were you telling these healthcare
8   providers about Maxalt in November of 1998?
9     A.   Just about -- trying to increase their
10  knowledge in migraine itself and tell them that
11  there is new medication for migraine and how it can
12  be used.
13    Q.   Are these roundtable discussions one
14  way that doctors and nurses can learn about
15  diseases and medications to treat those diseases?
16    A.   Yes, sir.
17    Q.   On January 21st of 1999, this is,
18  again, before Vioxx is on the market?
19    A.   Yes, sir.
20    Q.   You spoke at a colloquia, do you know
21  what that is?
22    A.   I'm not sure.
23    Q.   It's a -- it's a situation where there
24  are more doctors where maybe you do use a screen to
25  present.

Page 68

1     A.   Okay, so it was a dinner talk.
2     Q.   A dinner talk?
3     A.   A dinner talk.
4     Q.   Explain what happens at these dinner
5   talks.
6     A.   At the dinner talks there will be a set
7   of slides that talk about migraine itself, the
8   etiology of migraine, the prevalence, different
9   groups of people that suffer from migraine and then
10  treatment options for migraine headache.  So I'll
11  go through the slides.  There might even be slides
12  at the end to tell you about the drug itself, its
13  side effects of the medication, who should not use
14  the medication and especially people with kidney
15  problems or liver problems or people that are
16  pregnant.  And then if there's any questions at the
17  end, you field any questions people have about
18  migraine and you sit down and after that, you just
19  talk about anything from -- you know, doctors are
20  famous for sitting around talking about business
21  all the time so usually the rest of the night you
22  spend talking business about neurology or what
23  other aspects of medicine -- and it's usually
24  shared patients, a primary care doctor that does
25  not see me regularly to say, thanks for taking care

Page 69

1   of so and so, how can I do things better?  And it
2   might have nothing to do with migraine headaches.
3     Q.   Did you view and do you view these
4   dinner talks and other programs such as roundtables
5   to be inappropriate in some way?
6     A.   No, sir.
7     Q.   Why not?
8     A.   It's a very good way for the doctors in
9   the community to interact.  They actually get to
10  know each other and talk about business and talk
11  about how to take care of patients better.
12    Q.   Am I right that you participate in
13  these dinner talks for multiple pharmaceutical
14  companies, not just Merck?
15    A.   That is correct.
16    Q.   You received on January 21st of 1999 a
17  1500-dollar honoraria.
18    A.   That's correct.
19    Q.   Why do you accept compensation, sir,
20  for the time you spend educating doctors about
21  diseases or medications to treat those diseases?
22    A.   It's my time taken away from my family.
23  You have -- like anybody else, everybody that's
24  sitting here right now is charging an hourly rate,
25  so same concept, this is my time, you can pay for

18 (Pages 66 to 69)

Confidential - Subject to Protective Order

**Page 70**

1    it. They have a lot higher speakers that come in,
2    they pay them 3,000 to 5,000 dollars for a lecture,
3    so the local speakers, this is what the local
4    speaker rate is.
5        Q.   And that's for all pharmaceutical
6    companies, not just Merck?
7        A.   Every pharmaceutical company, the
8    Pharma guidelines tell you exactly what you can pay
9    people now. Merck at the time was on the same rate
10   that everybody else was paying. Everybody would
11   pay somewhere between 1250 to 2,000 dollars a
12   lecture. Merck for a nighttime talk would pay
13   somewhere around 1500 dollars, a lunchtime talk
14   somewhere between 750 and a thousand.
15       Q.   And did you view that, sir, as an
16   inappropriate way to get you to prescribe
17   medication?
18       A.   No, sir, because Maxalt was still my
19   third drug on the list. I still prescribe more
20   Zomig and Vioxx -- and Imitrex for migraine. And
21   if you look at my numbers and look at my drug list,
22   I still prescribe more Imitrex and Maxalt and I
23   still speak for the company. So it comes down to
24   the patient, what's going to be the appropriate
25   drug for them and the medications that have been

**Page 71**

1    tried already.
2        Q.   So as I understand your testimony, even
3    though you were serving as a speaker for Merck for
4    the medicine Maxalt --
5        A.   Yes, sir.
6        Q.   -- that was not the drug you prescribed
7    the most to treat migraines?
8        A.   No, it was not.
9        Q.   The next time you spoke where Merck
10   compensated you for your time was on July 8th, 1999
11   and that, again, had to do with the treatment of
12   migraine and it was a talk called special
13   considerations in the management of migraine in
14   women.
15       A.   That's correct.
16       Q.   Why did you speak on the topic of
17   management of migraine in women?
18       A.   Well, emerging topic at that time was
19   talking about menstrual migraine and Merck had
20   started to do studies about -- I mean, very common
21   time to have migraine headaches is during the
22   menstrual cycle so we talked about the -- the
23   women's menstrual cycle, went through the different
24   days, ovulation, menses, and talked about how we
25   can use the medication to prevent women from having

**Page 72**

1    menstrual migraines or to try and prevent headaches
2    during the month. And we started concentrating on
3    it from a women's standpoint instead of -- instead
4    of saying the routine migraine talk.
5        Q.   You were paid 1500 dollars on that
6    occasion from Merck?
7        A.   That is correct.
8        Q.   Those are the programs that we have
9    records of you participating in before you
10   prescribed medicine to Mr. Barnett on December
11   30th, 1999, okay?
12       A.   Yes, sir.
13       Q.   Am I right based on what we just
14   discussed that before you prescribed Vioxx to
15   Mr. Barnett on December 30th of 1999, you had
16   participated in four programs for Merck?
17       A.   Yes, sir.
18       Q.   Three of those programs occurred before
19   Vioxx was even on the market?
20       A.   That's correct.
21       Q.   Before you prescribed Vioxx to
22   Mr. Barnett, you did not participate in any
23   programs for Vioxx and you weren't paid to discuss
24   Vioxx, true?
25       A.   That's correct.

**Page 73**

1        Q.   All of the speeches that you gave on
2    behalf of Merck before you prescribed Vioxx to
3    Mr. Barnett involved migraine treatment and Maxalt?
4        A.   That's correct.
5        Q.   By our count, sir, prior to the time
6    you prescribed Vioxx to Mr. Barnett, you received a
7    total of 3,300 dollars for Maxalt programs and one
8    preceptorship, okay?
9        A.   That is correct.
10            MR. ROBINSON:  Objection, move to
11   strike.
12   BY MR. GOLDMAN:
13       Q.   Did the 3,300 dollars that you were
14   paid by Merck dictate what medicine you prescribed
15   to Mr. Barnett or your other patients?
16       A.   No, no.
17       Q.   Did the 3,300 dollars in payments you
18   received before December 30th, 1999 influence you
19   in any way in deciding to prescribe Vioxx to
20   Mr. Barnett as opposed to Celebrex?
21       A.   No, sir.
22       Q.   Had you been a speaker for Pfizer
23   before you prescribed medicine to Mr. Barnett or
24   other pharmaceutical companies?
25       A.   Yes, sir.

19 (Pages 70 to 73)

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

---

**Page 74**

1    Q.  Did your role as a speaker, sir, for
2  Merck have anything to do with your decision to
3  prescribe Vioxx to Mr. Barnett on December 30th of
4  1999?
5    A.  No, sir.
6    Q.  Why do you say that?
7    A.  Because I speak for multiple companies.
8  I have a -- when I go into partnership with a
9  company, and Merck has been the first company to
10  step out this year and say it, is I tell them I'll
11  speak -- I'll present the slides, but after the
12  talk's over, we're going to go free flow on what
13  people want to ask about.  If they don't want to
14  talk about migraine, we'll talk about something
15  else.  I had to sign a contract with Merck this
16  year saying we're not even going to use slides any
17  more when I give a talk about migraine.  We're
18  going to walk in when we're doing a lunchtime talk
19  or dinner talk or a roundtable and let people talk
20  about what they want to talk about about neurology.
21        So there won't even be information
22  that's given to them anymore.  We'll go in and if
23  they want to talk about migraine, talk about
24  migraine.  If they want to talk about low back
25  pain, we'll talk about low back pain.  But this --

**Page 75**

1  you have to sign this contract and show you're not
2  going to talk about anything on label with our --
3  our product unless asked to talk about it.
4    Q.  Does your testimony here today, sir,
5  have any -- withdrawn.
6        Does the fact that you are a speaker
7  for Merck influence your testimony here today?
8    A.  No, sir.
9    Q.  Did you ever tell Mr. Barnett that you
10  were a speaker for Merck or other pharmaceutical
11  companies before you prescribed Vioxx to him?
12    A.  I don't think so.
13    Q.  Why wouldn't you tell Mr. Barnett that
14  you were a speaker for Merck when you were
15  prescribed Vioxx to him?
16    A.  I don't understand the question.
17    Q.  The Plaintiff's lawyers in this case
18  have told the Judge --
19        MR. ROBINSON:  Wait a minute.  I'm
20  going to move to strike here.  Okay.  I really am.
21  I don't think that's appropriate what lawyers are
22  telling people.
23  BY MR. GOLDMAN:
24    Q.  If there's a suggestion at trial,
25  Dr. McCaffrey, that Mr. Barnett didn't know that

**Page 76**

1  you were a speaker for Merck and would have wanted
2  to know that you were a speaker for Merck --
3    A.  I would have told him.
4    Q.  Why did you not tell Mr. Barnett and
5  why don't you tell your other patients that you
6  speak on behalf of pharmaceutical companies?
7    A.  If a patient asks me if I speak on a
8  drug, I'll tell them.  I mean, otherwise, I only
9  have so many minutes in the room with patients.  We
10  concentrate on their disorder, we don't concentrate
11  on what I do in my private time after work.
12    Q.  If you felt that Celebrex or Feldene or
13  Mobic was a better choice to address Mr. Barnett's
14  osteoarthritis, what would you have done?
15    A.  I would have put him on that
16  medication.
17    Q.  You want to take a couple-minute break?
18    A.  I'm fine, let's rock and roll.
19    Q.  Okay.
20        MR. ROBINSON:  Almost done?
21        MR. GOLDMAN:  No.  Almost, getting
22  there.
23  BY MR. GOLDMAN:
24    Q.  Okay.  Let me hand you, Dr. McCaffrey,
25  an exhibit that I'll mark as Exhibit 6.

**Page 77**

1        (DFT. EXH. 6, Speaker/Moderator
2  Agreement Letter, was marked for identification.)
3  BY MR. GOLDMAN:
4    Q.  For the record, this is a document
5  dated November 12th, 2001 Bates stamped
6  MRK MPF 0173678 through 681.  This appears to be a
7  speaker/moderator agreement letter.
8    A.  That is correct.
9    Q.  Is your signature on the fourth page?
10        MR. ROBINSON:  What is -- what exhibit
11  number is this, Andy, 6?
12        MR. GOLDMAN:  6.
13        MR. ROBINSON:  Thank you.
14        THE WITNESS:  My initials are on every
15  page to show that I went over every page and then
16  it was on the last page and signed and dated on the
17  date.
18  BY MR. GOLDMAN:
19    Q.  I have to ask the question again
20  because I think Mr. Robinson asked me a question in
21  the middle so let me ask you, sir --
22        MR. ROBINSON:  Excuse me.
23        MR. GOLDMAN:  That's okay.
24  BY MR. GOLDMAN:
25    Q.  Dr. McCaffrey, is Exhibit 6 a copy of a

---

20 (Pages 74 to 77)

Confidential - Subject to Protective Order

---

Page 78

1  speaker agreement that you entered into with Merck
2  and initialed on every page and signed on December
3  19th, 2002?
4      A.  Yes, it is.
5      Q.  Is this an example of a type of speaker
6  agreement that you would enter into with Merck?
7      A.  Yes, it is.  These agreements I have
8  with multiple companies I have to sign every year
9  so I get a -- from every company when I speak for
10  them, I -- sometime during each year I get a new
11  contract.
12      Q.  I want to talk about some of the terms
13  in this agreement, okay?  Focusing your attention
14  on the second paragraph where it says, scope of
15  work.
16      A.  Yes, sir.
17      Q.  Do you see that your contract says:
18  From time to time, you may be asked to speak at or
19  act as a moderator for educational programs on
20  topics as you and Merck agree?
21      A.  That's correct.
22      Q.  If you don't agree to speak on a
23  particular topic and Merck or Pfizer or
24  GlaxoSmithKline wants you to speak on that topic,
25  would you decline?

---

Page 79

1      A.  That's correct.
2      Q.  If you choose to speak at or act as
3  moderator for such programs, and then it says,
4  except as provided below under compliance with FDA
5  regulations, Merck agrees not to dictate the
6  content of your presentations.
7          Do you see that?
8      A.  Yes, sir.
9      Q.  Was it your understanding while you
10  were serving as a speaker for Merck that Merck
11  didn't determine the content of your presentations?
12      A.  That's correct.
13      Q.  You decided what you thought was
14  appropriate to talk about a particular disease or a
15  particular medication, right?
16      A.  That's correct.
17      Q.  Then it says:  Merck does not guarantee
18  a minimum number of programs or minimum amount of
19  speaker fees.
20          Do you see that?
21      A.  That's correct.
22      Q.  And then under speaker fees/expense
23  reimbursement, your contract states:  Merck agrees
24  to pay you a reasonable fee in return for your
25  services, right?

---

Page 80

1      A.  That's correct.
2      Q.  The amount will be agreed upon in
3  writing at the time that each program is scheduled
4  and then you will be reimbursed for certain
5  expenses.
6          Do you see that?
7      A.  That's correct.
8      Q.  And then at the bottom it says:  Merck
9  will not pay for any travel or subsistence expenses
10  for spouses.
11      A.  Yes, sir.
12      Q.  Do you see that?
13      A.  That's correct.
14      Q.  So you were agreeing to be a speaker
15  for Merck and they were agreeing to pay you
16  reasonable compensation for your time?
17      A.  That's correct.
18      Q.  If you'd turn to the next page, sir, do
19  you see a section called Compliance with FDA
20  Regulations?
21      A.  Yes, sir.
22      Q.  And I won't read the entire paragraph,
23  but if you want to, feel free.  In the middle it
24  says:  The FDA has decided that programs in which
25  you participate that are scheduled by a company or

---

Page 81

1  for which you are paid directly by a company are
2  subject to FDA promotion regulations.
3      A.  That's correct.
4      Q.  Did you understand while you were
5  serving as a speaker that the things that you said
6  about a particular medication were -- let's see.
7  Withdrawn.
8          When you were a speaker for Merck or
9  for other pharmaceutical companies, do you
10  understand that what you say about the medicine
11  that you're talking about has to be consistent with
12  FDA-approved labels?
13      A.  Yes, sir.
14      Q.  And then the next sentence says:  This
15  is true regardless of the role played by the
16  company in the development of the content of the
17  program.  Violations of such regulations can have
18  significant legal consequences for the company and
19  the speaker or moderator who is considered an agent
20  of the company in this context.
21          Do you see that?
22      A.  Yes, sir.
23      Q.  Did you understand while you were
24  serving as a speaker for Merck that you couldn't
25  violate FDA regulations when you were speaking

---

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

Page 82

1  about a particular product?
2       A.  Yes, sir.
3       Q.  And then the next section says:
4  Programs subject to FDA promotion regulations.  To
5  help ensure your presentations for Merck are in
6  compliance with FDA promotion regulations, it is
7  necessary for us to impose certain requirements set
8  forth below that apply when Merck schedules you as
9  the speaker or moderator and directly pays your
10  speaker fee.  We wish to emphasize that you are not
11  obligated to discuss Merck products during your
12  presentations except as described below, and we'll
13  get to that.
14       A.  Right.  Okay.
15       Q.  Did you understand while you were
16  serving as a speaker and do you understand today as
17  a speaker for Merck that there are certain
18  requirements that you have to comply with as a
19  speaker?
20       A.  Yes, sir.
21       Q.  And your initials to the right of
22  Number 1 and 2 indicate that you understand those
23  requirements?
24       A.  Yes, sir.
25       Q.  Number 1 -- let me back up for a

Page 83

1  minute.
2            Do you see the sentence above that
3  says:  We wish to emphasize that you are not
4  obligated to discuss Merck products during your
5  presentations, do you see that?
6       A.  Yes, sir.
7       Q.  What does that mean to you, sir?
8       A.  You don't have to discuss -- I mean,
9  you're there -- if you're to talk about Maxalt, you
10  don't have to talk about other products.  So if
11  they have a blood pressure medicine or a COX-2 or
12  whatever, you don't have to discuss it.  I'm there
13  to talk about migraine, there to talk about Maxalt.
14  If somebody asks me a question, I can answer it,
15  but I'm not obligated to.  I can say, that's --
16  it's a blood pressure medicine, I don't really know
17  much about blood pressure medicines.
18       Q.  Okay.
19       A.  Okay?
20       Q.  And Number 1 which is under FDA
21  promotion regulations, it states:  Your remarks
22  will conform to the package circular for any
23  product discussed whether the product is sold by
24  Merck or another company.  Your answers to
25  questions should also conform to the package

Page 84

1  circular.
2            Do you see that?
3       A.  Yes, sir.
4       Q.  What is a package circular?
5       A.  It's a little package insert that comes
6  with the drug itself.  If you -- it's the exact
7  print usually from the Physicians' Desk Reference.
8       Q.  Is a package circular another term for
9  a label that's approved by the FDA?
10       A.  Yes, sir.
11            MR. GOLDMAN:  Let's take a break
12  because we have to change the video, okay?
13            THE WITNESS:  Okay.
14            VIDEO TECHNICIAN:  This is the end of
15  Tape Number 1 in the deposition of Dr. Michael
16  McCaffrey.  The time is approximately 2:25 PM.  The
17  date is May 3rd, 2006.  We will now go off the
18  record.
19            (A recess transpired.)
20            VIDEO TECHNICIAN:  This is the
21  beginning of Tape Number 2 in the deposition of
22  Michael McCaffrey.  The time is approximately 2:27
23  PM.  The date is May 3rd, 2006.  We are now back on
24  the record.
25  BY MR. GOLDMAN:

Page 85

1       Q.  Dr. McCaffrey, I had asked you about
2  the first two sentences in Point 1.  What do you
3  understand the requirement that your remarks
4  conform to the package circular or label mean?
5       A.  That your talk should be on label is
6  what it's called.  We talk about on-label use of
7  the medication.
8       Q.  Before you speak about a particular
9  product to healthcare providers and physicians, do
10  you make it a point to understand what's in the
11  package label?
12       A.  Yes, I do.
13       Q.  And are your remarks about the product
14  that you're speaking about consistent with the
15  label?
16       A.  Yes, they are.
17       Q.  In the second point under FDA promotion
18  regulations, it says:  Your presentation will focus
19  on the educational needs of the audience.
20            What does that mean?
21       A.  That means you'll focus on helping them
22  understand the actual disease state itself.
23       Q.  Point 3 says:  You will present
24  balanced information about each drug you discuss
25  covering both the risks and benefits.

Page 86

1          Do you see that?
2          A.   Yes, sir.
3          Q.   Why is it important that you talk about
4    both the risks and benefits associated with
5    medicine?
6          A.   Talking about possible side effects of
7    a particular medication, especially if you're
8    talking about a class of medication, so if chest
9    tightness is a common thing in a class of
10   naratriptan medications, which is usually caused by
11   esophageal spasm, which one causes more, which one
12   causes less, that's fair and balanced.  You can
13   open up a package insert on each drug and look at
14   it and it'll tell you exactly what it is so it
15   isn't something I have to make up information
16   about, I can go right to the information on each
17   drug.
18         Q.   To be able to make balanced
19   presentations about benefits and risks, do you have
20   to be familiar with the risks that are set forth in
21   the package label?
22         A.   Yes, sir.
23         Q.   When you review a package label, you're
24   familiar with all the risks, the contraindications,
25   the warnings and the precautions, right?

Page 87

1          A.   Yes, sir.
2          Q.   What is a contraindication, by the way?
3          A.   A certain disease state or a certain
4    type of patient that you do not use the drug on.
5          Q.   On Point 5 on Page 3, it states:  You
6    will present information on products based on
7    scientific methods generally accepted in the
8    medical community.  Anecdotal evidence and
9    unsupported opinion must not form a part of your
10   presentation.
11         Can you explain that, sir.
12         A.   It's talking about different articles
13   that have been written about a particular drug.  If
14   you're going to say -- if somebody says, well, what
15   do you think about such and such, I can say, well,
16   this is my own personal information, this has
17   nothing to do with the company.  You should clarify
18   yourself and say, this is what I see happening with
19   a particular medication, but, you know, this is
20   myself, this is not what's been reported about the
21   medication.
22         Q.   When you were speaking about Maxalt
23   before you prescribed medicine to Mr. Barnett,
24   would you make it a point to talk about the
25   benefits and the risks of Maxalt?

Page 88

1          A.   Yes, I would.
2          Q.   In the last sentence in Paragraph 5, it
3    says:  You will not disparage any product of
4    another company.
5          A.   That's correct.
6          Q.   Does that mean you won't say anything
7    negative about another company?
8          A.   You won't trash talk another drug, yes.
9          Q.   And when you are a speaker for multiple
10   pharmaceutical companies, that wouldn't be in your
11   interest to do anyway?
12         A.   That's correct.
13         Q.   Number 6, your presentation will not
14   otherwise be false and misleading -- or misleading?
15         A.   That's correct.
16         Q.   That means you just have to tell the
17   truth about the benefits and risks of the medicine?
18         A.   That's correct.
19         Q.   In the Paragraph 7, do you see at the
20   end, Merck representatives present at each of your
21   presentations will provide package circulars to
22   attendees if Merck products are discussed, do you
23   see that?
24         A.   Yes, sir.
25         Q.   So if you are speaking about Maxalt or

Page 89

1    later Vioxx after Mr. Barnett's use of it, would
2    you -- would Merck representatives pass out package
3    inserts to those who attended?
4          A.   Usually what happens is as you walk
5    into a talk, you'd have a table of different
6    information about the medication and the -- the
7    circular would be attached to every single piece
8    except maybe for the pens that were laying there.
9    So you'd automatically have it and people would
10   pick this up and set it down so whenever we were
11   giving a talk, they might be reading through it and
12   ask questions about what they're reading.
13         Q.   In Paragraph 9A, which was referenced
14   on the first page, it says:  For all programs
15   designated by Merck as remote speaker programs,
16   e.g., programs conducted via teleconference or
17   Internet, Merck will provide you with a prepared
18   slide presentation for your use in the remote
19   presentation.
20         Have you done any of these remote
21   presentations?
22         A.   No, sir.
23         Q.   You agree to review the prepared slide
24   presentation and the current package circular for
25   the Merck product in advance of each remote speaker

23 (Pages 86 to 89)

Page 90

1    program that you conduct.
2            Now, you didn't do any of the
3    programs --
4        A.  No, sir.
5        Q.  -- so you didn't review any
6    presentations, right?
7        A.  No, sir.
8        Q.  In 9B, it says:  For all other speaker
9    programs scheduled by Merck, Merck will prepare and
10   forward to you slide packages that provide balanced
11   information about the products distributed by
12   Merck.  You may or may not choose to discuss Merck
13   products as part of your presentations.
14           Do you see that?
15       A.  Yes, sir.
16       Q.  You agree to review the product slide
17   packages and the current package circular for the
18   Merck product in advance of each presentation that
19   you make that is scheduled by Merck and at which
20   you might discuss the particular product.
21           You see that?
22       A.  Yes, sir.
23       Q.  Is this another way of saying that if
24   you decide to talk about a particular product at
25   one of these dinner occasions or roundtable

Page 91

1    discussions, you have to make it a point to be up
2    to speed on the current information in the package
3    insert?
4        A.  That's correct.
5        Q.  If you decide to discuss a Merck
6    product, you agree to either use the product slide
7    packages with balanced information -- and does that
8    mean when it says balanced information risks and
9    benefits?
10       A.  That is correct.
11       Q.  -- or to provide comparable information
12   about the product.  This does not mean that you are
13   obligated to discuss any of Merck's products.
14           Do you see that?
15       A.  Yes, sir.
16       Q.  And then in the last paragraph it says:
17   In imposing these requirements, we are attempting
18   to ensure compliance with FDA regulations.  As
19   such, Merck will monitor your presentations and
20   reserves the right to terminate this agreement if,
21   in Merck's judgment, you fail to comply with these
22   regulations -- I'm sorry, with these requirements.
23           You see that?
24       A.  Yes, sir.
25       Q.  When you sign the speaker agreements

Page 92

1    for Merck, do you understand that Merck is taking
2    seriously the requirements of the FDA?
3        A.  Yes, sir.
4        Q.  Do you take seriously the requirements
5    of the FDA when you give your presentations?
6        A.  Yes, sir.
7        Q.  On the next page under behavior at the
8    top:  It is the policy of Merck & Company,
9    Incorporated that employees and independent
10   contractors for Merck maintain behavior of the
11   highest professional and ethical levels regarding
12   their interactions with customers, the public,
13   consultants and other employees of Merck.  You will
14   be held to these high standards and alleged
15   incidents of inappropriate behavior will be
16   promptly and thoroughly investigated.  Any
17   violation of these standards will result in
18   immediate termination of this agreement.
19           Do you understand that, again, to be
20   Merck wanting you to -- to act in a professional
21   and ethical way when discussing Merck's products?
22       A.  Yes, sir.
23       Q.  Let's turn to a different topic,
24   Dr. McCaffrey, just to talk about your prescribing
25   practices in general, okay?

Page 93

1        A.  Yes, sir.
2        Q.  When you prescribe medicine to your
3    patients, do you make a risk-benefit assessment?
4        A.  Yes, sir, I do.
5        Q.  Can you explain what that means.
6        A.  Well, you have to look at what are the
7    disease states they suffer from.  Basic example in
8    the last patient I saw this morning, she has
9    worsening migraine headaches, but she's also gone
10   on to develop what sounded like partial and --
11   proceeding onto complex partial seizures.  She has
12   a history of kidney stones.  One -- a good
13   medication for treatment of both migraine headaches
14   and seizures is Topamax.  Unfortunately, you can
15   develop kidney stones while on Topamax, not a
16   medication I can use.  I don't want to give her an
17   episode of kidney stones.  She's also on multiple
18   other medications for depression.  She also has
19   chronic low back pain.  I chose Keppra, which is
20   the cleanest out of the seizure medications, to use
21   on her.  It might not be the best for her
22   headaches, but if it does improve her
23   headaches, but I'm hoping to resolve her seizures
24   and get her back to driving, which is going to be
25   another five-and-a-half months from now because the

Confidential - Subject to Protective Order

## Page 94

1  state law says if you have a seizure, you can't
2  drive for six months.
3      Q.  Is it true that every medicine sold in
4  this country has risks?
5      A.  Yes, that -- yes, it's true.
6      Q.  How do you learn of the risks of the
7  medicine that you prescribe for your patients?
8      A.  I want to say trial and error, but it's
9  not really trial and error.  It's trying patients
10  on the medication and if you see side effects that
11  are over what's prescribed in the package insert,
12  then you might shy away from a particular
13  medication.
14      Q.  So one source that you look to is the
15  package insert --
16      A.  Certainly.
17      Q.  -- to see what the side effects are?
18      A.  Exactly.
19      Q.  And when I say package insert, do you
20  understand that I'm referring to the package insert
21  that is approved by the Food and Drug
22  Administration?
23      A.  That's correct, or the -- or the
24  Physicians' Desk Reference, which would be the --
25  the holy grail of the medical field.

## Page 95

1      Q.  Is the Physicians' Desk Reference --
2      A.  It's an accumulation of all the package
3  inserts.  Whatever is on the package insert is in
4  the Physicians' Desk Reference unless there's
5  another insert that's in with the medicine which
6  might be a quick synopsis for patients because
7  over -- Merck used to put both of those in their
8  medications and they've gone strictly to the
9  package insert now.
10      Q.  So if you want to learn about the
11  benefits and risks associated with a particular
12  medicine, you turn to the Physicians' Desk
13  Reference because that contains all of the
14  FDA-approved package inserts for all medications?
15      A.  That's correct.
16      Q.  Do you also read medical literature to
17  stay abreast of some of the benefits and risks
18  associated with the medicine you prescribe?
19      A.  Yes, sir.
20      Q.  Do you also listen to colleagues and
21  members of the medical community to see what their
22  experience is like with medicine?
23      A.  Yes, I do.
24      Q.  And when you said earlier that you try
25  patients on particular medications, do you ever

## Page 96

1  prescribe a medication to a patient that you think
2  is going to result in a side effect?
3      A.  No, sir.
4      Q.  You're seeing, though, if the
5  particular patient has something unique about them
6  that causes the -- withdrawn, that's a terrible
7  question.
8          What is the reason why you monitor
9  patients after you prescribe the medication to
10  them?
11      A.  To make sure that they're not having
12  side effects.  There's many people -- that's a
13  bad -- that's a bad word.  There are many people
14  that will go to the doctor and take the medication
15  having side effects because the doctor told them to
16  take the medication.  It happens on a weekly basis.
17  It's not something that's a rare occasion where
18  someone will come back and they've had nausea for
19  one month straight or three weeks straight while
20  they're waiting to come back and I'll, why didn't
21  you stop the medicine?  Because you told me to take
22  it.  So it's not an uncommon scenario for somebody
23  to come back still taking the medicine with a side
24  effect.  It might have been helping their symptoms,
25  but they were having a side effect so you sit down

## Page 97

1  with them, see if there's another treatment option
2  that might give you the same result helping their
3  disorder with no side effects.
4      Q.  Do you have discussions with sales
5  representatives on occasion?
6      A.  Yes, I do.
7      Q.  Do sales representatives from different
8  pharmaceutical companies come to your office to
9  meet with you sometimes?
10      A.  Daily.
11      Q.  Can you describe a little bit about how
12  often and --
13      A.  Well, I mean, there's --
14      Q.  -- how common that is?
15      A.  It's very common.  On a daily basis you
16  have sales representatives that come by that have
17  sample medications for you to try on patients.  And
18  so most of the reps are only there for you to sign
19  so the medications are stored in your closet, then
20  they're disbursed to patients to try on them for
21  that particular disorder.  Others sales reps I
22  might sit down -- if I have time, I might sit down
23  and talk to them for five minutes about their drug.
24  If it's a drug I already know about, that they know
25  I use the medication, they don't bother me.  They

Golkow Litigation Technologies - 877.DEPS.USA

65417542-bdd2-408c-b6ac-735533c8aa68

Confidential - Subject to Protective Order

Page 98

1  just -- you know, as I say, the more you bother me,
2  the less likely I am to use your drug.  So if
3  you're pushing, I'm not going to use it.  I'm only
4  going to use your drug if I think it's right for
5  the patient.
6       Q.  I don't know how many times Merck
7  representatives came to call on your office, but is
8  it safe to say that the majority of those, if not
9  the vast majority of those occasions, involved
10  situations where representatives dropped off
11  samples --
12       MR. ROBINSON:  Object --
13  BY MR. GOLDMAN:
14       Q.  -- and didn't meet with you in person?
15       MR. ROBINSON:  Objection, leading and
16  suggestive.
17       THE WITNESS:  It was mainly to drop off
18  medications.
19  BY MR. GOLDMAN:
20       Q.  I have to respond to that objection.
21  I'm going to ask the question in a different way
22  now.
23       A.  Okay.
24       Q.  When Merck sales representatives came
25  to visit you about Maxalt or Vioxx or some other

Page 99

1  product, did they typically come just to drop off
2  sales -- samples?
3       MR. ROBINSON:  Same objection.
4       THE WITNESS:  Well, I'm very -- I have
5  a very busy practice so to even get one minute of
6  my time is very difficult.
7  BY MR. GOLDMAN:
8       Q.  Is it fair to say that given how busy
9  you are, you don't have time to sit down with sales
10  representatives and talk about the benefits and
11  risks associated with medicine?
12       A.  That's correct.
13       Q.  Because you don't have time to sit with
14  sales representatives to talk about the benefits
15  and risks, I take it you don't rely on sales
16  representatives for safety information?
17       A.  I don't rely on sales representatives.
18  What I'll do is if a new drug comes out, I'll sit
19  down for 10 or 15 minutes and go over the drug with
20  a new representative -- if it's a new rep, it might
21  be somebody I already know, they have a new drug --
22  and go over and start going through the package
23  insert from that day forward and see if this is
24  something that's an option for them -- for my
25  patients.  And so on the first visit, first time

Page 100

1  I'm going to see it come out, I'm going to sit down
2  and talk about it.  After that, I -- you know, I
3  might give them a little feedback, it's working,
4  it's not working, you know, there's a side
5  effect -- certain side effects, how do I get by
6  this side effect, what's the other doctors saying
7  about it, how can I get rid of this side effect?
8       Like there's a drug called Exelon.
9  It's an Alzheimer's medication, has a high
10  incidence of nausea in patients.  One of the ways
11  of getting rid of it is by drinking Ensure or skim
12  milk.  That gets rid of that side effect.  Well,
13  that's a very simple thing to do with patients.
14  Those are the kind of things you want to know,
15  simple things that can get rid of side effects
16  where they can still take the medicine.  So the
17  second and third and fourth visit, what are the
18  other guys saying out there, what are the other
19  girls saying out there about the medicine?
20       And then after that, if I'm using the
21  drug, they're just, let me get out of here, I don't
22  need to talk to you.  The people where I don't use
23  their drugs, they want to talk to me all the time.
24  They want to stop me at every opportunity and see
25  if they can get me to use their medication, but the

Page 101

1  people where I like their drug, it works very well,
2  they're in and out.
3       Q.  When you assess the risks and benefits
4  of medication you prescribe, do you consider even
5  the tiniest risks in your assessment?
6       A.  If they're lethal risks, yes.
7       Q.  Are you aware and has it been your
8  experience, Dr. McCaffrey, that sometimes
9  pharmaceutical companies and the FDA will learn
10  more about a medicine after it's on the market than
11  before it's approved?
12       A.  Yes, sir.
13       Q.  Are there occasions when medications
14  get approved for new indications or new use after
15  it's on the market?
16       A.  Yes, sir.
17       Q.  Have you also seen that medicine you
18  prescribed sometimes develop side effects that were
19  not originally included in a package insert but
20  then get added to a package insert later?
21       A.  Yes, sir.
22       Q.  And is it important to keep up to speed
23  as best you can with the benefits and risks
24  associated with medicine you prescribe?
25       A.  Yes, sir.

26 (Pages 98 to 101)

Page 102

1  Q.  And that was true for Vioxx while you
2  prescribed it?
3     A.  Yes, sir.
4     Q.  Did you do your best to stay familiar
5  with the current package insert and other
6  information about the benefits and risks associated
7  with Vioxx and other medicine you prescribe?
8     A.  Yes, sir.
9     Q.  After you prescribed Vioxx to
10 Mr. Barnett, sir, did you subsequently come to
11 learn about a study -- clinical trial called the
12 VIGOR trial or a GI Outcomes trial for Vioxx?
13    A.  I can't remember.
14    Q.  Do you read the New England Journal of
15 Medicine?
16    A.  No, sir.
17    Q.  Did you ever read an article about the
18 VIGOR trial in the New England Journal of Medicine?
19    A.  No, sir.
20    Q.  Whatever the New England Journal of
21 Medicine article said about the difference in heart
22 attacks seen in one arm of a Vioxx trial, Vioxx
23 compared to naproxen, didn't factor into your
24 decision to prescribe Vioxx, true?
25    A.  True.

Page 103

1     MR. ROBINSON:  Objection, leading, move
2  to strike.  Go ahead.
3  BY MR. GOLDMAN:
4     Q.  Did you -- did you consider when you
5  prescribed Vioxx to other patients other than
6  Mr. Barnett what the New England Journal of
7  Medicine article on the VIGOR trial had to say
8  about the number or percentage of patients who had
9  heart attacks in the Vioxx arm compared to the
10 naproxen arm?
11    MR. ROBINSON:  Objection.
12    THE WITNESS:  I don't understand the
13 question.
14 BY MR. GOLDMAN:
15    Q.  Let me hand you Exhibit 7, sir.
16    A.  Okay.
17    (DFT. EXH. 7, Article entitled
18 Comparison Of Upper Gastrointestinal Toxicity Of
19 Rofecoxib And Naproxen In Patients With Rheumatoid
20 Arthritis, was marked for identification.)
21    MR. ROBINSON:  I thought he just said
22 he didn't read it.  Is that what I heard?
23 BY MR. GOLDMAN:
24    Q.  This is an article that's titled,
25 comparison of upper gastrointestinal toxicity or --

Page 104

1  of the Vioxx.
2     A.  The conclusion talks about what they
3  were saying was that fewer clinical --
4     MR. ROBINSON:  Can I --
5     MR. GOLDMAN:  Let me just finish --
6     MR. ROBINSON:  -- try --
7     MR. GOLDMAN:  Okay, good.  Good.
8     MR. ROBINSON:  You know, I'm going to
9  make an objection to -- to this document which he
10 said he didn't read and now you want to show it to
11 him?  Anyway, you can do what you want.
12 BY MR. GOLDMAN:
13    Q.  The document I just handed you, sir, is
14 called, comparison of upper gastrointestinal
15 toxicity of Vioxx and naproxen in patients with
16 rheumatoid arthritis.  This is the study that you
17 said you didn't read, right?
18    A.  No, I didn't read it.
19    Q.  If the study which you didn't read says
20 that there is a four times difference in heart
21 attack -- withdrawn.
22    I don't have to ask you questions about
23 the study since you didn't read it.
24    MR. ROBINSON:  That's the point.  That
25 was my point.

Page 105

1  BY MR. GOLDMAN:
2     Q.  The Plaintiffs in this case and some of
3  their expert witnesses are claiming that Merck
4  should have changed the warning label for Vioxx in
5  March of 2000 to reflect the results of this VIGOR
6  trial, okay?
7     A.  Okay.
8     Q.  And --
9     MR. ROBINSON:  I'm going to object just
10 for the record.  Go ahead.
11 BY MR. GOLDMAN:
12    Q.  The VIGOR trial was a trial that was
13 completed after you prescribed medicine to
14 Mr. Barnett.
15    A.  That's correct.
16    Q.  Whatever information Merck would have
17 included in a package insert in March of 2000,
18 could that have factored into your decision in
19 prescribing Vioxx to Mr. Barnett in December of
20 1999?
21    MR. ROBINSON:  Objection, calls for
22 speculation.  I --
23    THE WITNESS:  Say that again.
24 BY MR. GOLDMAN:
25    Q.  If Merck and the FDA had revised --

Confidential - Subject to Protective Order

---

Page 106

1  THE WITNESS: Well, I mean, you're
2  yelling and I can't understand what he's saying.
3  MR. ROBINSON: I understand.  He
4  changed the question to the FDA and -- so go ahead.
5  BY MR. GOLDMAN:
6  Q.  If Merck and the FDA revised the Vioxx
7  label to include information about the VIGOR trial
8  in March of 2000, could that have impacted your
9  decision to prescribe Vioxx to Mr. Barnett when you
10  made that decision in December of 1999?
11  MR. ROBINSON: Objection about the
12  Merck and the FDA.
13  THE WITNESS: No.
14  MR. ROBINSON: But go ahead.
15  BY MR. GOLDMAN:
16  Q.  If Merck had decided that it somehow
17  were -- withdrawn.
18  Do you know the FDA regulations about
19  when a pharmaceutical company can make a change in
20  a label without FDA prior approval versus with FDA
21  prior approval or is that something that you would
22  defer to others?
23  A.  I would defer to others on that.
24  Q.  If a label in March of 2000 came out
25  and indicated the cardiovascular results of this

---

Page 107

1  VIGOR trial, could that have influenced you in any
2  way in December of 1999 when you prescribed Vioxx
3  to Mr. Barnett?
4  A.  No.
5  Q.  Since you did not read the New England
6  Journal of Medicine article back when it came out
7  in November of 1999, is it true or not that the
8  author's reporting of a four rather than five times
9  difference in heart attacks between Vioxx patients
10  and naproxen patients made no difference in your
11  decision to prescribe Vioxx to Mr. Barnett?
12  A.  No difference.
13  Q.  If there were a number indicated in the
14  VIGOR paper concerning the number of heart attacks
15  seen in this trial rather than percentages
16  expressed in the paper, could that have made a
17  difference in your decision to prescribe Vioxx to
18  Mr. Barnett in December of 1999?
19  A.  No.
20  Q.  The conclusion that the authors reached
21  in this paper that was published in November of
22  2000 that naproxen might be cardioprotective and
23  explained the difference in cardiovascular events
24  seen in the VIGOR trial, that isn't something that
25  could have influenced you to prescribe Vioxx to

---

Page 108

1  Mr. Barnett because you didn't read the paper,
2  correct?
3  MR. ROBINSON: Objection, leading.
4  THE WITNESS: Correct.
5  BY MR. GOLDMAN:
6  Q.  Could the conclusion that the authors
7  reached about naproxen being cardioprotective and
8  that being the explanation for the difference in
9  heart attacks seen in the VIGOR trial have
10  influenced you in any way in your decision to
11  prescribe Vioxx to Mr. Barnett in December of 1999?
12  MR. ROBINSON: Objection.
13  THE WITNESS: No, sir.
14  BY MR. GOLDMAN:
15  Q.  Did you ever use Vioxx yourself,
16  Doctor?
17  A.  Yes, sir.
18  Q.  For what?
19  A.  For arthritis pain.  I suffer from
20  arthritis.  I still take Bextra intermittently for
21  my pain.  I actually had bilateral carpal tunnel
22  surgery on my hands.  I took narcotics for about a
23  day and a half and -- and I took Vioxx and it
24  completely took the pain away.  So I took it for
25  about a week after that, after my carpal tunnel

---

Page 109

1  surgery.
2  Q.  When did you take Vioxx?
3  A.  Three or four years ago.
4  Q.  Do you remember what dose?
5  A.  50 milligrams.
6  Q.  Did it work for you?
7  A.  Yes, it did.
8  Q.  Dr. McCaffrey, did anybody from Merck
9  ever intimidate you into prescribing Vioxx?
10  A.  No, sir.
11  Q.  Did you ever meet or talk with a man
12  named Lou Sherwood?
13  A.  I'm not sure.
14  Q.  Have you ever attended an audio
15  conference or a presentation that was moderated by
16  somebody named Dr. Peter Holt?
17  A.  No, sir.
18  Q.  Whatever Dr. Holt had to say about
19  Vioxx in an audio presentation, did that play any
20  role in your decision to prescribe Vioxx to
21  Mr. Barnett?
22  A.  No, sir.
23  Q.  Has anyone from Merck ever offered you
24  research money if you were to prescribe Vioxx or
25  stop criticizing Vioxx?

---

28 (Pages 106 to 109)

65417542-bdd2-408c-b6ac-735533c8aa68

## Page 110

1    A.  No, sir.

2    Q.  Have you ever seen a video press

3  conference held by Merck discussing the results of

4  the VIGOR trial?

5    A.  No, sir.

6    Q.  Have you ever read a Merck Manual?

7    A.  When I was in medical school.

8    Q.  Have you ever since you've been

9  practicing medicine looked in the Merck Manual for

10  a discussion about prostacyclin or thromboxane?

11    A.  No, sir.

12    Q.  Do you subscribe to a journal called

13  Circulation?

14    A.  No, sir.

15    Q.  Have you ever read a study published by

16  Circulation concerning, quote, the relationship

17  between selective COX-2 inhibitors and acute MI in

18  older adults?

19    A.  No, sir.

20    Q.  This study which involved a doctor

21  named Dr. Solomon was published in May of 2004.

22  Was that years after you prescribed Vioxx to

23  Mr. Barnett?

24    A.  Yes, sir.

25    Q.  Whether a particular Merck scientist

## Page 111

1  was or was not included as an author on that study

2  that was published in May of 2004, did that have

3  any impact on your decision to prescribe Vioxx to

4  Mr. Barnett?

5    A.  No, sir.

6    MR. GOLDMAN:  Let's take a break. I

7  might have one more area before Mr. Robinson has

8  questions.

9    THE WITNESS:  I'm on call for three

10  hospitals right now so the faster we go, the better

11  we're off right now.

12    VIDEO TECHNICIAN:  We are now off the

13  record. The time is approximately 2:54 PM.

14    (A recess transpired.)

15    VIDEO TECHNICIAN:  We're back on the

16  record. The time is approximately 2:57 PM.

17  BY MR. GOLDMAN:

18    Q.  Dr. McCaffrey, based on your experience

19  in taking Vioxx and prescribing it to your

20  patients, did you believe it was safe and effective

21  if used according to the FDA-approved label?

22    A.  Yes, I did.

23    MR. GOLDMAN:  I don't have any

24  questions at this point, but I may follow up

25  depending on what Mr. Robinson says.

## Page 112

1    MR. ROBINSON:  Sure.

2    EXAMINATION

3  BY MR. ROBINSON:

4    Q.  Okay, Doctor, I – I represent Gerald

5  Barnett, the patient we're talking about here.

6    MR. ROBINSON:  And for the record,

7  Andy, because I did let you go first in this

8  deposition, I brought it up with Judge Fallon

9  but -- but, for example, I may -- if I'm going to

10  designate first in my case, I may want to put my

11  portion first before your portion. We can raise

12  that issue later.

13    MR. GOLDMAN:  We can talk about it.

14    MR. ROBINSON:  Okay. Can you hear me

15  okay?

16    VIDEO TECHNICIAN:  A little bit louder.

17    MR. ROBINSON:  Okay.

18  BY MR. ROBINSON:

19    Q.  Doctor, what medical school did you go

20  to?

21    A.  St. George's University School of

22  Medicine, Grenada, West Indies.

23    Q.  Okay, I didn't catch the Grenada. I

24  heard the West Indies. And Grenada, I think, was

25  made famous, I think -- was it President Reagan?

## Page 113

1    A.  The intervention. I was actually in

2  the military at the time of the intervention.

3    Q.  And you were down there?

4    A.  No, I was -- they took two Special

5  Forces guys out of my class. I was at my officers

6  basic at Fort Sam Houston, Texas and they just sort

7  of disappeared in the night so when I showed up in

8  the morning and they said there was a war and I

9  looked down the squad, I knew it was for real

10  because the one Special Forces officer in my squad

11  was gone.

12    Q.  Okay. Let me ask it this way, I'm not

13  trying to get into your military background, but

14  you did go to medical school in Grenada, is that

15  right?

16    A.  Yes, sir.

17    Q.  And where did you go to undergraduate?

18    A.  Indiana University of Pennsylvania in

19  Indiana, Pennsylvania.

20    Q.  Okay. I see. And I didn't hear it,

21  but what is -- what is your board -- what board

22  certification --

23    A.  I'm board certified in neurology and I

24  just recertified in August -- on August 10th, 2005.

25  And I'm also board certified in electrodiagnostic

Confidential - Subject to Protective Order

Page 114

1  medicine and I'm going to be reboarding in October.
2      Q.  Okay.  Now, I think you said earlier
3  that you signed a partnership agreement with Merck
4  as a paid speaker sometime about four or five years
5  ago, is that right?
6          MR. GOLDMAN:  Objection, it
7  mischaracterizes the document and the witness'
8  testimony.  It's also leading.
9  BY MR. ROBINSON:
10     Q.  Go ahead.  You --
11     A.  If I -- every year if I'm -- if I'm
12 going to speak for Merck that year, there's
13 probably on record someplace where I've signed a
14 contract with them every year --
15     Q.  Okay.
16     A.  -- since I started speaking when Maxalt
17 became available, which might have been 1998.
18     Q.  Okay.  So you -- you've signed a
19 contract with Merck to be a speaker for about the
20 last seven or eight years?
21     A.  That's correct.
22     Q.  And that contract entitled you to be
23 paid by Merck for your time that you contribute
24 speaking, is that right?
25     A.  That's correct.

Page 115

1      Q.  And how much are you paid an hour
2  typically to speak for Merck?
3      A.  It's usually just a flat rate so
4  however long it takes for the speaking engagement.
5  So if a speaking engagement takes an hour and a
6  half, it's the same rate if I'm there for three
7  hours.
8      Q.  What are you charging per hour for this
9  deposition?
10     A.  750 dollars an hour.
11     Q.  And I heard you say something --
12         MR. GOLDMAN:  To whom?
13 BY MR. ROBINSON:
14     Q.  Well, unfortunately, I'd love to get
15 Merck to pay half of it, but I've advanced it so
16 far, is that right?
17     A.  Thank you.
18         MR. GOLDMAN:  We've made clear that
19 it's not Merck that's -- that's paying him,
20 Mr. Robinson, so I don't have to ask that.
21         MR. ROBINSON:  Move to strike.
22         THE WITNESS:  Pretty soon he's going to
23 make you put that on your glasses.
24         MR. ROBINSON:  I know, I can't get it
25 any higher.  Or, you're talking about the witness?

Page 116

1  Oh, go --
2          THE WITNESS:  You've got to put yours
3  higher.
4          MR. ROBINSON:  Okay.  Can we go back?
5  I want to -- we've had a lot of banter here, but
6  can I get the last question read, the actual one
7  with the answer, not Mr. Goldman.
8          (The Court Reporter read the question
9  commencing on Page 115, Line 8 and the answer
10 concluding on Page 115, Line 11.)
11         MR. ROBINSON:  Okay.  Let me strike
12 that.  Withdraw it.
13 BY MR. ROBINSON:
14     Q.  Now, you said in -- that -- that in the
15 '9 -- in the 2006 version of the grant to speak for
16 Merck, you no longer are required to use their
17 slides, is that right?
18     A.  Usually from every company you get a
19 set of slide kits and Merck has gone to the point
20 where they said they're no longer using slide kits
21 so there would be no pressure to sit there and show
22 somebody a laptop or, you know, push the product on
23 some -- on someone.
24     Q.  But -- but while Vioxx was on the
25 market from 1999 through 2004, you did use the

Page 117

1  Merck slide kits?
2      A.  For Maxalt.
3      Q.  And is it true, sir, that for Vioxx you
4  had approximately 374 contacts with the Merck sales
5  reps --
6          MR. GOLDMAN:  Object to the form.
7  BY MR. ROBINSON:
8      Q.  -- during the period Vioxx was on the
9  market?
10         MR. GOLDMAN:  Same objection, lacks
11 foundation.
12         THE WITNESS:  How many years would that
13 be over?
14 BY MR. ROBINSON:
15     Q.  From '99 through 2004.
16     A.  Once a week at least.  Most reps have
17 to see me every week.
18     Q.  And in addition, you were paid for --
19 by Merck when sales reps sat in your office under
20 what you call preceptorships, is that right?
21         MR. GOLDMAN:  Object.
22         THE WITNESS:  That's correct.
23 BY MR. ROBINSON:
24     Q.  And in addition, is it true that from
25 1999 through 2004, you were given 8,435 Vioxx

30  (Pages 114 to 117)

65417542-bdd2-408c-b6ac-735533c8aa68

Page 118

1   samples by Merck?
2       A.  That's probably correct, but with the
3   medications we stock different offices and there's
4   five neurologists and, well, three -- four
5   orthopaedic surgeons now so the medication would
6   get distributed between them.
7       Q.  Even though the records showed it went
8   to you, the -- the 8,435 samples would go to other
9   physicians here?
10      MR. GOLDMAN:  Object to the form.
11      THE WITNESS:  Well, we have -- we have
12  closets where we put the sample medications so if
13  I'm in a particular office, then I'll sign that day
14  for that office.
15  BY MR. ROBINSON:
16      Q.  We'll go back to the exhibit, but let
17  me see, maybe you can explain it by looking at the
18  exhibit.
19      Were you aware that -- that you were
20  considered a Merck, quote, top earner for Vioxx?
21      A.  I'm a top earner for many -- many
22  pharmaceutical companies.  Merck's not special.
23      Q.  But you were aware you were considered
24  a Merck top earner for the drug Vioxx?
25      MR. GOLDMAN:  Object to the form.

Page 119

1       THE WITNESS:  I knew that I used a lot
2   of medication, yes.
3   BY MR. ROBINSON:
4       Q.  And you were a top earner for Vioxx,
5   right?
6       MR. GOLDMAN:  Object to the form.
7       THE WITNESS:  I mean, reps would say,
8   you know, you know, you're doing well with the
9   medication.
10  BY MR. ROBINSON:
11      Q.  For Vioxx?  I just --
12      A.  Yes, for Vioxx, yes.
13      Q.  Okay.  That's -- that was my question.
14  And you also were involved in HEL programs with
15  Vioxx, is that right?
16      A.  What's that?
17      Q.  I was going to ask you.  It had to do
18  with what they call colloquia.  Do you know what
19  the term colloquia refers to?
20      A.  I've never spoken for Vioxx.
21      Q.  Okay.  Were you involved with HEL
22  programs involving colloquia for other Merck drugs?
23      A.  Just Maxalt.
24      Q.  And how much would you get per event
25  when you spoke at one of these colloquia?

Page 120

1       A.  Lunchtime talk was usually between 750
2   and a thousand and a dinnertime talk was usually
3   1500.
4       Q.  And is it true that at least from 1999
5   to 2002 that you prescribed 30 -- or over 30
6   percent of your prescriptions for Merck Medco?
7       A.  30 percent of what?
8       MR. GOLDMAN:  Object to the form.
9   BY MR. ROBINSON:
10      Q.  Of the prescriptions that you -- that
11  you gave to your patients were prescribed from
12  Merck Medco?
13      A.  I don't understand the question.
14      Q.  Well, did you write prescriptions that
15  were filled through Merck Medco?
16      A.  If that was somebody's pharmacy, I
17  mean, that's where they went.
18      Q.  Okay.
19      A.  I mean, at that period in time, Merck
20  Medco was the send-away pharmacy.  They controlled
21  the whole market -- or they controlled the
22  predominant market at that time.  So if you wrote a
23  prescription and somebody said it's Merck Medco,
24  you're thinking, oh, my God, it's Merck Medco
25  because it was -- you know, you had to send it in,

Page 121

1   you had to fax it.  There was a lot of paperwork
2   involved just sending it in.
3       Q.  But would it surprise you that from
4   January of 2000 through December of 2001 that
5   prescriptions you issued for Vioxx on behalf of
6   Mr. Barnett were all filled at Merck Medco?
7       MR. GOLDMAN:  Objection, lacks
8   foundation.
9       THE WITNESS:  I'm not surprised.  I
10  mean, if that's where his clearinghouse was for his
11  pharmacy, that's where it would be filled.
12  BY MR. ROBINSON:
13      Q.  Okay.  I'll show you that exhibit.
14      A.  I've got it right here.  I can get it.
15      Q.  Okay.  Can you -- can you read from
16  your computer what you see there about that
17  subject.
18      A.  Yeah, there's -- yeah, there's two
19  prescriptions in here, one -- I wrote a
20  prescription on 12 -- and you can't read it very
21  well, we changed it on the computer, I can't do it
22  right here, that shows it was written on 12 --
23      Q.  30.
24      A.  -- 30/99 that it was actually 90 pills
25  of three refills.

31 (Pages 118 to 121)