Michael Mikola, M.D.

**Page 126**

1  Q. Could you read Number C into the
2  record.
3  A. The absence of a meaningful
4  prothrombotic signal in the original NDA may be
5  explained by the short duration and low doses of
6  Rofecoxib used in the majority of the OA database.
7  Q. Is that some of those studies that
8  Ms. Reicin was referring to in that letter?
9  MR. GOLDMAN: Object to the form.
10 BY MR. ROBINSON:
11 Q. Dr. Reicin, I'm sorry.
12 A. That I don't know.
13 Q. Okay. Can you read D into the record,
14 please.
15 A. As shown in?
16 Q. No, go to D.
17 A. D. Several other studies, parentheses,
18 085, 090 and 102, to be noted later in this review
19 suggest trends toward higher rates of myocardial
20 infarction in the Rofecoxib group compared to
21 active control groups. Of note, these studies
22 involved lower doses and duration of exposure to
23 Rofecoxib than the VIGOR trial and allowed the use
24 of low-dose ASA.
25 Q. Okay. Thank you. Did you ever --

**Page 127**

1  strike that.
2  Did Merck ever show you this
3  information that was in the FDA files regarding
4  Vioxx?
5  A. No, sir.
6  MR. GOLDMAN: Object to the form.
7  BY MR. ROBINSON:
8  Q. Did you ever see this -- strike that.
9  Did Merck in any way ever share this
10 information that you just read in about these Vioxx
11 studies from the FDA review?
12 A. I do not remember being informed of
13 them, no, sir.
14 Q. And then going to Page 16. Do you see
15 where it says, Studies --
16 (The proceedings were interrupted.)
17 BY MR. ROBINSON:
18 Q. See where it says, Studies 085 and 090?
19 A. Yes, sir.
20 Q. At the bottom would you read into the
21 record starting with there were six.
22 A. There were six cases of serious
23 cardiovascular events in the Rofecoxib group,
24 parentheses, four MI and two CVA's, parentheses,
25 three in the Nabumetone group, parentheses, one MI,

**Page 128**

1  one coronary artery disease and one CHF.
2  Q. Okay. Now would you go to Page 17.
3  A. Yes, sir.
4  Q. And go -- do you see it says Study 102?
5  A. Yes, sir.
6  Q. And that was a 12-week randomized
7  double-blind active-controlled study of Rofecoxib,
8  25 milligrams a day, and Naproxen, a thousand
9  milligrams a day, in approximately 5500 patients
10 with OA who were allowed low-dose aspirin, 81 to
11 325 milligrams a day. Patients taking low-dose
12 aspirin were 12.1 percent and 12.8 percent in the
13 Rofecoxib and Naproxen treatment group
14 respectively.
15 Did I read that right?
16 MR. GOLDMAN: Object to the form.
17 THE WITNESS: Yes, sir.
18 BY MR. ROBINSON:
19 Q. And it says, this study was completed
20 in March of 2000.
21 Did I read that right?
22 A. Yes, sir.
23 Q. Did --
24 MR. GOLDMAN: Same objection, not so
25 fast.

**Page 129**

1  BY MR. ROBINSON:
2  Q. Did Merck ever tell you about that
3  study?
4  A. Not that I recall.
5  Q. Okay. And then will you read into the
6  record B, which is serious CV events, on the next
7  page.
8  A. There were six myocardial infarctions,
9  in parentheses, MI, in the Rofecoxib 25-milligram
10 group and one MI in the Naproxen 1,000-milligram
11 group. Of the six MI in the Rofecoxib group, three
12 were in patients taking low ASA for cardiovascular
13 prophylaxis. The patient with MI in the Naproxen
14 group was a non-QASA user.
15 Q. Go ahead.
16 A. A trend towards an excess of MI's in
17 the Rofecoxib 25-milligram group in a 12-week study
18 is noted. This observation is consistent with the
19 pattern seen in VIGOR.
20 Q. Were you ever told about this at any
21 time while you're prescribing Vioxx to Mr. Barnett?
22 A. Not to my recollection, no, sir.
23 Q. Can you go to Page 19.
24 A. Yes, sir.
25 Q. And in the middle of the page, do you

Michael Mikola, M.D.

Page 130

1  see where it says, similarly, the sponsor conducted
2  a metanalysis of CV thrombotic events in the OA
3  database?
4      A.  Yes, sir.
5      Q.  And actually, if you go to -- where is
6  the call note -- was it a call note exhibit?  Here
7  it is, the call note exhibit that I gave you
8  earlier, 22.
9      A.  Number 22?  Yes, sir.
10     Q.  I don't know the numbers, I'm sorry.
11     A.  Yes, sir.
12     Q.  Can you go to Page 2 of that exhibit.
13     A.  Yes, sir.
14     Q.  And you see down near the bottom they
15 talk about a metanalysis.  You were asking
16 questions about it or some discussion according to
17 this.
18     A.  Yes, sir.
19         MR. GOLDMAN:  What exhibit is it for a
20 second?
21         MR. ROBINSON:  Exhibit 22, Page 2.
22 BY MR. ROBINSON:
23     Q.  Do you see that?
24     A.  Yes, sir.
25     Q.  Okay.  I'd like you to go back to this

Page 131

1  Exhibit 24 and I'd like you to read in the record
2  what the FDA medical officer says about the sponsor
3  conducting the metanalysis.
4      A.  The italicized portion on Page 19?
5      Q.  Well, start with similarly.
6      A.  Similarly?
7      Q.  Well, start -- start with the paragraph
8  above it and then go to that.
9      A.  The division has serious concerns with
10 a combined analysis of studies of different length
11 and dosing regimens.  Furthermore, combining
12 multiple different drugs within a single comparator
13 arm may not be reflective of the risk of any one
14 drug.  These concerns were discussed extensively
15 during the advisory committee meeting of April
16 20th, 1999.
17     Q.  Now can you read the next --
18     A.  Similarly --
19     Q.  -- line?
20     A.  -- the sponsor conducted a metanalysis
21 of CV thrombotic events in the OA database.
22         This database overall included
23 short-term low doses of Rofecoxib.  Most of the
24 exposure for more than six months was at the 12.5
25 and 25-milligram QD doses.  272 patients received

Page 132

1  50 milligrams QD for -- there's a squibble and then
2  six months, parentheses, 265 in OA trials,
3  parentheses; the rest of the exposure to, and
4  another symbol, 50 milligrams was in short-term
5  studies.  The division has requested a metanalysis
6  based on dose and duration.
7          None of the studies were powered to
8  detect differences in serious CV thrombotic events
9  compared with the active comparator, but more
10 important, the studies involved a different
11 population.
12         Patients with RA have recently reported
13 to have twice the risk of cardiovascular events
14 compared with OA.  There is increasing evidence
15 that ongoing inflammation is a risk factor for
16 coronary disease, in parentheses, plaque
17 instability -- or it says unstability.  It is
18 likely that RA population is a very sensitive model
19 for detecting differences in the beneficial or
20 deleterious effects of any drug on cardiovascular
21 risk.
22     Q.  Okay.  Did -- did Merck ever share any
23 of that information with you that you just read
24 from the FDA document?
25         MR. GOLDMAN:  Object to the form.

Page 133

1          THE WITNESS:  Not to my recollection,
2  no, sir.
3  BY MR. ROBINSON:
4      Q.  When you had discussions -- strike
5  that.
6          Do you remember any discussions you had
7  with some sales rep about a metanalysis --
8          MR. GOLDMAN:  Objection.
9          THE WITNESS:  I do not.
10         MR. GOLDMAN:  Asked and answered.
11 BY MR. ROBINSON:
12     Q.  -- as you sit here now?
13     A.  I do not.
14     Q.  You do not?
15     A.  I do not remember.
16     Q.  But you clearly remember that the FDA
17 didn't -- strike that.
18         I just want to mark quickly some other
19 documents that Merck provided us with that relate
20 to you.  The first is a PGM expense list.
21         MR. ROBINSON:  What exhibit number is
22 this?
23         COURT REPORTER:  25.
24         (PLF. EXH. 25, PGM expense list, was
25 marked for identification.)

34  (Pages 130 to 133)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

| Page 134 |
| --- |

BY MR. ROBINSON:
1  BY MR. ROBINSON:
2      Q.  It's 25, Exhibit 25.  Did you know
3  they're keeping track of meals and things like
4  that?
5      A.  Oh, yes.
6      Q.  Okay.  If you go to Page 3, it looks
7  like -- Page 4, Dr. Conaway -- is the guy named
8  Doug Conaway?
9      A.  Yes, sir, he's a rheumatologist.
10     Q.  Okay.  Looks like he got --
11         MR. GOLDMAN:  Wait, I'm sorry, where
12 are you?
13         MR. ROBINSON:  Page 4 of 16.
14         MR. GOLDMAN:  Yeah.
15 BY MR. ROBINSON:
16     Q.  He got a 3800-dollar meal?
17         MR. GOLDMAN:  Object, lacks foundation.
18 You're asking this witness about another doctor --
19         MR. ROBINSON:  No, I just feel that
20 Dr. Mikola got cheated.
21         MR. GOLDMAN:  The document speaks for
22 itself.
23 BY MR. ROBINSON:
24     Q.  Anyway, it didn't look like you got any
25 3800-dollar meal, right?

| Page 135 |
| --- |

1      A.  Well, my wife worked for them so that
2  would be on the radar screen.
3      Q.  Okay.  Well, they've got -- it must
4  have been part of a big meal for 17 -- for 1700,
5  but Deanna Guyon -- oh, it's a lecture, right?
6      A.  Um-hum.
7      Q.  Okay.  But she didn't make the 3,000
8  category.  You got candy from Steven Calder.
9          Next document that they sent us was
10 the --
11         (PLF. EXH. 26, Contact List, was marked
12 for identification.)
13 BY MR. ROBINSON:
14     Q.  -- 26.  If you go to Exhibit 26, Bates
15 Number at the bottom 309, Page 309.
16     A.  I have 308, 306, 311, 310, 312.
17     Q.  Out of order?
18     A.  305, 307.  Here's 309.
19     Q.  I don't know how we can read this, but
20 there's incidental expense.  Would there be time to
21 time when Merck would pay an incidental expense?
22     A.  No, these would be most likely speaker
23 fees where I gave a presentation to a group -- a
24 group of doctors.
25     Q.  Okay.  So you would speak to doctors

| Page 136 |
| --- |

1  about Vioxx?
2      A.  Zocor.
3      Q.  Zocor?
4      A.  Um-hum.
5      Q.  Okay, good.  So it wasn't Vioxx?
6      A.  I don't recall doing any presentations
7  for Vioxx.
8      Q.  For the jury, Zocor is a statin drug,
9  right?
10     A.  Correct.
11     Q.  And it works -- does it work pretty
12 well?
13     A.  Yes, sir.
14         MR. ROBINSON:  Here's what I want to
15 do.  Let's take a lunch break.  I'm not necessarily
16 done, but I'm not going to have that much more.
17 We'll take a lunch break and maybe I'll do 10 or 15
18 minutes when I come back.
19         MR. GOLDMAN:  Okay.
20         MR. ROBINSON:  Okay?
21         VIDEO TECHNICIAN:  We will now go off
22 the record.  The time is approximately 12:28 PM.
23         (A recess transpired.)
24         VIDEO TECHNICIAN:  We're back on the
25 record.  The time is approximately 1:10 PM.

| Page 137 |
| --- |

1          (Off-the-record conference.)
2  BY MR. ROBINSON:
3      Q.  Doctor, Miss Myer from my office sent
4  you your records because you didn't have them,
5  right --
6      A.  Correct.
7      Q.  -- medical records, at least part of
8  your chart, is that right?
9      A.  Correct.
10     Q.  Okay.  In addition, she sent you
11 certain documents that we haven't yet marked on the
12 record and I wanted to mark them for the record,
13 okay?  I don't know if you reviewed them or not,
14 but some of them have yellow lines so I want to
15 identify them, okay?
16     A.  Yes, sir.[.
17     Q.  One is a December 29, 1999 memo from
18 Dr. Michael Weinblatt regarding VIGOR and we'll
19 call -- we'll mark that Number 27.  And then
20 another one is -- Number 28 is an October 18th,
21 2000 metanalysis, correct?
22     A.  Yes, sir.
23     Q.  Another one is -- we'll make 29 is an
24 article by Juni.  It's another metanalysis.
25         MR. GOLDMAN:  What are you doing,

Michael Mikola, M.D.

| Page 138 | Page 140 |
|---|---|
| 1 you're just asking him what documents are? Object<br>2 on lack of foundation on each of these except for<br>3 the medical records.<br>4     MR. ROBINSON: Okay.<br>5 BY MR. ROBINSON:<br>6     Q. What number was that, 29?<br>7     A. 29.<br>8     Q. Okay. And then a letter from Grady<br>9 Kirschman to the New England journal, that would be<br>10 30.<br>11     MR. GOLDMAN: Same objections.<br>12 BY MR. ROBINSON:<br>13     Q. You've already --<br>14     MR. GOLDMAN: You're showing him --<br>15 these are highlighted versions of --<br>16     MR. ROBINSON: Oh, these are documents<br>17 that he highlighted, I believe.<br>18 BY MR. ROBINSON:<br>19     Q. Is that right, Doctor?<br>20     A. No, sir.<br>21     Q. Are they highlighted -- I highlighted<br>22 those?<br>23     A. I did not highlight them.<br>24     Q. Okay.<br>25     MR. ROBINSON: So then I am showing him | 1     MR. GOLDMAN: Okay.<br>2     MR. ROBINSON: Maybe we'll -- why don't<br>3 we -- I want to go back on the record here. I<br>4 previously marked them 28 and 29. I think we can<br>5 just actually mark this entire group 29 --<br>6     MS. MYER: 2 --<br>7     MR. ROBINSON: 2 -- 28.<br>8     MS. MYER: No, 27.<br>9     MR. ROBINSON: Huh?<br>10     MS. MYER: 2 -- we started with 27.<br>11     MR. ROBINSON: Okay, well, let's mark<br>12 this entire group 27, documents that Miss Myer sent<br>13 you.<br>14     (PLF. EXH. 27, Scientific Advisors'<br>15 Meeting May 3-May 6, 1998 Programmatic Review Vioxx<br>16 Program, with attachments, was marked for<br>17 identification.)<br>18     MR. ROBINSON: And then here's another<br>19 one within that group.<br>20     MR. GOLDMAN: Is there a cover letter<br>21 too?<br>22     MR. ROBINSON: Yes. We'll mark the<br>23 cover letter as Number 29 --<br>24     MS. MYER: 28.<br>25     MR. ROBINSON: -- 28 with it. |

| Page 139 | Page 141 |
|---|---|
| 1 highlighted versions.<br>2     MR. GOLDMAN: Are you asking if he's<br>3 seen these before today?<br>4     MR. GOLDMAN: Yes.<br>5     MR. GOLDMAN: And the answer is?<br>6     THE WITNESS: Yes.<br>7     MR. GOLDMAN: Okay.<br>8 BY MR. ROBINSON:<br>9     Q. And they are documents that Miss Myer<br>10 sent you, right?<br>11     A. That's correct.<br>12     Q. And another one is 3 -- this is<br>13 Exhibit -- the 3/9/2000 Scolnick memo, right?<br>14     A. Yes, sir.<br>15     Q. And then another one is an e-mail<br>16 2/26/97, right?<br>17     A. Yes, sir.<br>18     Q. And then here's another one, January<br>19 24th, 2000 from Michael Weinblatt. And then a<br>20 February 2nd, 1999 -- 1998 document.<br>21     MR. GOLDMAN: Are you marking these as<br>22 actual exhibits?<br>23     MR. ROBINSON: I think what I'm going<br>24 to do is mark them as a group of documents that we<br>25 sent him. | 1     (PLF. EXH. 28, Letter dated 1/31/06 to<br>2 Dr. Michael Mikolajczyk from Lexi W. Myer, was<br>3 marked for identification.)<br>4     MR. ROBINSON: And then we'll mark<br>5 this -- this group with a cover letter 29. Okay?<br>6     (PLF. EXH. 29, Letter dated 4/14/06 to<br>7 Michael Mikola, MD from Lexi W. Myer, with<br>8 attachments, was marked for identification.)<br>9 BY MR. ROBINSON:<br>10     Q. There's one -- there's some --<br>11 there's -- there's another part of 28 that includes<br>12 your medical chart that was sent, right?<br>13     A. Yes, sir.<br>14     Q. And I don't know, is that -- that<br>15 sitting on the table somewhere?<br>16     A. Yeah, it was. Yes, sir. Labs I think<br>17 were presented today. I brought it in with me.<br>18 Let me just find it.<br>19     Q. What are we looking for?<br>20     A. The documents I brought, which is the<br>21 clinical record and the -- the data that Miss Myer<br>22 sent me. I brought it in and put it on the table,<br>23 but I don't see where it is.<br>24     Q. Was it your chart you mean?<br>25     A. Yes, sir. |

36 (Pages 138 to 141)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 142

1    Q.  Is that on this --
2    A.  But it wasn't marked as -- it wasn't
3  marked.
4         MR. GOLDMAN:  I'd like to just be able
5  to see what was sent if we -- so far all I know
6  what was sent, the highlighted copies are marked as
7  28 and this cover letter, right?
8         THE WITNESS:  I remember reviewing this
9  document.
10  BY MR. ROBINSON:
11    Q.  I think the issue is where are the rest
12  of your chart?  Do you -- is it possible they're in
13  your car or something?
14    A.  No, I brought them to this meeting and
15  I haven't taken them out of the room.  I have the
16  records that --
17    Q.  Anyway, the medical -- they were parts
18  of your medical chart?
19    A.  Yes, sir.
20    Q.  Okay.
21    A.  And also, I brought the -- this
22  information that I received previously.
23    Q.  I understand we have that, but we're
24  looking for the chart.
25         MR. GOLDMAN:  What do you need it for?

Page 143

1  I know you want it because you brought it, but do
2  you want -- can you finish your exam?
3         MR. ROBINSON:  Yeah, I can finish it.
4  I'm just seeing if we can find it, that's all.
5         MR. GOLDMAN:  Doctor, would you mind
6  handing me the highlighted copies that you got?  I
7  think it's these.  He marked those.  I think it's
8  documents that you were sent.  Is that what you
9  were sent?
10         THE WITNESS:  Yes, sir.
11         MR. ROBINSON:  Okay.  Let's go off the
12  record.  We're going to go off the record.
13         VIDEO TECHNICIAN:  This is the end of
14  Tape Number 3 in the deposition of Dr. Michael
15  Mikola.  The time is approximately 1:19 PM.  The
16  date is April 25th, 2006.  We will now go off the
17  record.
18         (Off-the-record conference.)
19         VIDEO TECHNICIAN:  This is the
20  beginning of Tape Number 4 in the deposition of
21  Dr. Michael Mikola.  The time is approximately 1:25
22  PM.  The date is April 25th, 2006.  We are now back
23  on the record.
24  BY MR. ROBINSON:
25    Q.  So basically what you got was a copy of

Page 144

1  your chart from Miss Myer, is that right?
2    A.  Yes, sir.
3    Q.  And you got certain exhibits, which I
4  think we've now marked as Exhibit 27 --
5         MR. GOLDMAN:  28.  28.
6  BY MR. ROBINSON:
7    Q.  28, okay.  And were there some other
8  exhibits that you also received or was that -- is
9  that one of them in front of you right there?
10    A.  I believe you marked this one.  I don't
11  believe this is -- I did receive a copy of this,
12  but I don't think it was this actual document.
13    Q.  Okay.
14    A.  But I did receive a copy of this
15  document.
16    Q.  Okay.  Okay.  I don't know if it's in
17  that group or not.
18         MR. GOLDMAN:  Let me add it to it.
19  Thanks.
20         MR. ROBINSON:  Is that an exhibit right
21  now, though?
22         MR. GOLDMAN:  No, it's not.
23         MR. ROBINSON:  Okay.
24  BY MR. ROBINSON:
25    Q.  And did you receive that document right

Page 145

1  there in front of you?  Yes?
2    A.  Yes, sir.
3    Q.  Okay.  Is that -- is that the copy you
4  received?  Has that got a letter attached?
5    A.  I don't know if this is the actual copy
6  or not.  I didn't mark on it so I'm not sure.
7         MR. GOLDMAN:  Can I see that?
8         THE WITNESS:  Yes, sir.
9         MR. ROBINSON:  Can I look at that too?
10         MR. GOLDMAN:  Are these stickers that
11  are yours or are these --
12         THE WITNESS:  They're not mine.  The
13  copies I received had stickers on them.
14         MR. GOLDMAN:  Okay.
15         MR. ROBINSON:  Okay, so let's make this
16  entire group of exhibits an exhibit.
17         MR. GOLDMAN:  Well, there are two
18  different dates.  Let's just make -- first, to
19  clean up the record, we have a cover letter dated
20  January 31st, 2006 with documents attached that
21  Mr. Robinson just went through.
22         And then what's the next exhibit
23  number?
24         MR. ROBINSON:  29.
25         MR. GOLDMAN:  29 is a cover letter

37 (Pages 142 to 145)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 146**

1  dated April 14th, 2006 from Miss Myer to Dr. Mikola
2  enclosing a proposed warning label after Vioxx was
3  removed from the market, okay?
4  　　MR. ROBINSON: Okay.
5  　　MR. GOLDMAN: I'm going to keep these
6  with me unless you want to use them.
7  　　MR. ROBINSON: No, that's fine.
8  　　MR. GOLDMAN: Okay.
9  　　MR. ROBINSON: As long as they're
10 exhibits.
11 　　MR. GOLDMAN: Okay.
12 BY MR. ROBINSON:
13 　　Q.  So Doctor, when was the last time you
14 saw Mr. Barnett?
15 　　A.  I don't recall.  I believe it was
16 probably in April of 2000 (sic).
17 　　Q.  And the first time you met me was last
18 night --
19 　　A.  Yes, sir.
20 　　Q.  -- is that correct?  I met you for
21 what, about a half hour?
22 　　A.  That's correct, yes, sir.
23 　　Q.  And --
24 　　MR. GOLDMAN: I'm sorry, did you say
25 the last time you saw Mr. Barnett was April of

**Page 147**

1  2000?
2  　　THE WITNESS: I'm sorry, 2004.
3  BY MR. ROBINSON:
4  　　Q.  And you met me last night with Miss
5  Myer in your office for about a half hour, is that
6  right?
7  　　A.  Yes, sir.
8  　　Q.  Have you met face to face with anybody
9  else on this case besides me and Miss Myer?
10 　　A.  No, sir.
11 　　Q.  Okay.
12 　　MR. ROBINSON: I have nothing further.
13 Thank you.
14 　　　　EXAMINATION
15 BY MR. GOLDMAN:
16 　　Q.  Good afternoon, sir.
17 　　A.  Good afternoon.
18 　　Q.  My name is Andy Goldman and I represent
19 Merck.  You and I haven't met before today,
20 correct?
21 　　A.  That's correct.
22 　　Q.  I want to start with where Mr. Robinson
23 left off on your meetings with Plaintiff's counsel,
24 okay?
25 　　A.  Yes, sir.

**Page 148**

1  　　Q.  And other communications that you had
2  with Plaintiff's counsel, I'm going to ask you
3  about that too, okay?
4  　　A.  Yes, sir.
5  　　Q.  And I'm not faulting you for this at
6  all, you understand?
7  　　A.  Yes, sir.
8  　　Q.  On January --
9  　　MR. ROBINSON: I'll move to strike your
10 comment.
11 BY MR. GOLDMAN:
12 　　Q.  On January 31st, 2006, you were sent a
13 letter by Lexi Myer who is one of the lawyers from
14 Mr. Robinson's firm, correct?
15 　　A.  I believe that's correct.
16 　　Q.  And the letter that Miss Myer wrote to
17 you says, Dear Dr. Mikola, it was a pleasure
18 speaking with you today regarding the Vioxx case of
19 Gerald Barnett.  Pursuant to your request, I am
20 enclosing his chart and discharge summary from the
21 hospital for your review.  In addition, I am also
22 sending some Merck documents for your
23 consideration.  Please recognize that these
24 documents are confidential and are not to be
25 disclosed.

**Page 149**

1  　　　　Is that one of the things that you
2  received on January 31st of 2006 from Plaintiff's
3  counsel?
4  　　A.  I believe that's correct.  I don't know
5  about the exact date, but...
6  　　Q.  Did you speak on the phone with
7  Miss Myer before she sent you this material?
8  　　A.  Yes, sir.
9  　　Q.  How long did you speak with her?
10 　　A.  Probably two minutes, three minutes.
11 　　Q.  In that conversation, you asked to see
12 Mr. Barnett's chart and discharge summary so you
13 could refamiliarize yourself with your treatment of
14 Mr. Barnett?
15 　　A.  Correct.
16 　　Q.  But you didn't ask for Merck documents
17 to be sent for your consideration, did you?
18 　　A.  That's correct.
19 　　Q.  Miss Myers (sic) chose to send you
20 Merck documents that she and Mr. Robinson's firm
21 wanted you to read before your deposition today?
22 　　A.  She chose to send those documents, yes,
23 sir.
24 　　Q.  The documents that Miss Myers and
25 Mr. Robinson's firm sent you include many of the

Michael Mikola, M.D.

Page 150

1    documents that you were shown today by
2    Mr. Robinson, correct?
3        A.  Yes, sir.
4        Q.  And I'm just going to identify them for
5    the record.  The Plaintiff's lawyers sent you the
6    scientific advisors meeting minutes from May of
7    1998, right?
8        A.  May I see those?  Yes, sir.
9        Q.  I noticed that --
10       A.  Excuse me.  I don't recall exactly --
11   this initial deposition was supposed to be in
12   April.  I don't recall if I received them before
13   April or more recently, but I did receive them
14   before today.
15       Q.  I noticed that there are tabs included,
16   orange tabs.  Can you just take a look at those for
17   a minute.
18       A.  Yes, sir.
19       Q.  Were those tabs that you put on the
20   documents that you were sent or are those tabs that
21   Plaintiff's counsel included?
22       A.  I assume that Plaintiff's counsel put
23   them on because I did not.
24       Q.  The highlighting that's included on the
25   document there for the scientific advisors meeting,

Page 151

1    that was Plaintiff's counsel's and not yours?
2        A.  I did not put highlighting on the
3    document.
4        Q.  And the next document that Plaintiff's
5    counsel sent you is a e-mail exchange in March of
6    2000 and this had to do with Dr. Patrono.  Do you
7    remember being asked about that today?
8        A.  Yes.
9        Q.  Let me show you this document and ask
10   you if the highlighting that you see in that
11   document was highlighting that you made or the
12   Plaintiff's counsel made for you?
13       A.  The Plaintiff's counsel.
14       Q.  This is a letter dated January 24th of
15   2000 from Dr. Weinblatt to Dr. Reicin with
16   highlighting.  I assume that was Plaintiff's
17   counsel's and not yours?
18       A.  Correct.
19       Q.  You were sent another e-mail exchange
20   about a GI Outcomes trial February of 1997 and
21   there's selected highlighting on this document.  I
22   assume that was the highlighting that Plaintiff's
23   lawyers did and not you?
24       A.  May I see it?
25       Q.  Sure.

Page 152

1        A.  That's correct.
2        Q.  You were shown this document earlier
3    today.  It's a March 9th, 2000 document from
4    Dr. Scolnick to Dr. Shapiro about VIGOR and there's
5    highlighting that says, I just received and went
6    through the data.  The CV events are clearly there.
7            That was another document that the
8    Plaintiff's lawyers wanted you to see before your
9    deposition, right?
10       A.  Yes, sir.
11       Q.  Did you ever see -- did they ever send
12   you subsequent e-mails that Dr. Scolnick wrote
13   concerning his view about the VIGOR results?
14       A.  Not that I recall.
15       Q.  Did the Plaintiff's lawyers ever send
16   you Dr. Shapiro's response to Dr. Scolnick in about
17   March of 2000?
18       A.  Not that I recall.
19       Q.  Did the Plaintiff's lawyers send you a
20   article that Dr. Patrono wrote about the Naproxen
21   hypothesis for you to review before your
22   deposition?
23       A.  I don't believe so.
24       Q.  Mr. Barnett's lawyers also sent you a
25   expression of concern that was published in the New

Page 153

1    England Journal of Medicine.  Do you remember that?
2        A.  Yes, sir.
3        Q.  That was a editorial that was written
4    in part by Dr. Kirschman?
5        A.  Yes, sir.
6        Q.  And again, the highlighting on this
7    document is the Plaintiff's lawyers and not yours?
8        A.  That's correct.
9        Q.  Did the Plaintiff's lawyers ever send
10   you the response that the authors of the VIGOR
11   study submitted to the New England Journal of
12   Medicine to explain their position on why the New
13   England Journal of Medicine's publication about the
14   VIGOR trial was accurate?
15       A.  I don't believe so, no.
16       Q.  I'm going to show you a document that
17   is also among the materials you were sent.  This is
18   a study by Dr. Peter Juni and it too contains
19   highlighting.  I assume that was highlighting that
20   the Plaintiff's lawyers did, put on here, not you.
21       A.  I did not put the highlighting on,
22   correct.
23       Q.  You were also sent a December 22nd,
24   1999 memo from Dr. Weinblatt about the
25   cardiovascular safety analysis of VIGOR, unblinded

39 (Pages 150 to 153)

Michael Mikola, M.D.

---

**Page 154**

1  minutes, and then you were directed to the second
2  page which contained certain highlighting as well,
3  correct?
4       A.   May I see it?  Yes, sir, that's
5  correct.
6       Q.   And then you were sent by Plaintiff's
7  counsel a February 2nd, 1998 document called final
8  results of an analysis of the incidence of
9  cardiovascular SAE's in the Phase IIb/III Vioxx
10 osteoarthritis clinical trials.  And there are
11 certain pages that are flagged by the lawyers for
12 Mr. Barnett, right?
13      A.   That's correct.
14      Q.   Focusing on a different document which
15 has been marked as Exhibit 29, this is a cover
16 letter from Miss Myers to you April 14th of 2006
17 that says, quote, Dear Dr. Mikola, we would like
18 you to see the following document which was the
19 Merck proposed warning label after Vioxx was
20 removed from the market.  Please review.
21           Is that what the cover letter says and
22 it attaches a rather thick document from Merck's
23 files?
24      A.   Yes, sir, that's correct.
25      Q.   And that green Post-It is a Post-It

---

**Page 155**

1  that was on the document that you received and you
2  didn't put it there, right?
3       A.   Correct.
4       Q.   Did any of the Plaintiff lawyers before
5  your deposition, sir, send to you any of the
6  depositions of the individuals who wrote some of
7  the e-mails that you were shown today so that you
8  could get a full understanding about the meaning of
9  them?
10      A.   No, sir.
11      Q.   Were you ever sent the entire
12 submission -- withdrawn.
13           Do you have any idea, sir, about the
14 circumstances surrounding a proposed warning label
15 after Vioxx was withdrawn from the market?
16      A.   Could you restate that question?
17      Q.   Do you have any personal knowledge of,
18 for example, what's in Exhibit 29 about the
19 circumstances behind this proposed warning label
20 that was generated after Vioxx was withdrawn from
21 the market?
22      A.   No, sir.
23      Q.   When you read the letter from
24 Miss Myers where it says, the following document
25 which was the Merck proposed warning label after

---

**Page 156**

1  Vioxx was removed from the market, do you
2  understand, sir, that Merck voluntarily withdrew
3  the medicine from the market?
4       A.   Yes, sir.
5       Q.   When you testified earlier that based
6  on the information that you've seen here today and
7  that you've seen subsequent to the withdrawal of
8  Vioxx, you said you would have prescribed Feldene
9  to Mr. Barnett.  Do you remember that?
10      A.   Yes, sir.
11      Q.   Or you would not have prescribed Vioxx.
12 Do you remember that?
13      A.   Yes, sir.
14      Q.   And the materials that you reviewed in
15 forming that judgment include the materials that
16 you were sent by the Plaintiff's lawyers, correct?
17      A.   Correct.
18      Q.   You were not shown all the documents
19 surrounding these issues, were you, Dr. Mikola?
20      A.   I don't know.
21      Q.   We're going to talk about the issue
22 about hindsight and what you would have done four
23 years ago when we get more into Mr. Barnett's
24 medical history, okay?
25           MR. ROBINSON:  I'm going to object to

---

**Page 157**

1  just making a statement without a question, move to
2  strike.
3  BY MR. GOLDMAN:
4       Q.   Did you understand, Mr. Barnett, that
5  the questions that you were being asked about what
6  you would have done were based on hindsight?
7       A.   Yes, sir.
8       Q.   You understand that the questions you
9  were asked about what you would have done
10 concerning Vioxx were based on documents that were
11 created -- some of which were created after you
12 treated Mr. Barnett?
13      A.   Yes, sir.
14      Q.   You understand that some of the
15 documents that you saw that you were asked about by
16 Mr. Barnett's lawyers included documents that were
17 generated after the withdrawal of Vioxx?
18      A.   Yes, sir.
19      Q.   And those sorts of materials were not
20 available to you at the time you were making a
21 treatment decision for Mr. Barnett, right?
22      A.   That's correct.
23      Q.   And it's a different thing to ask you
24 why you made the decision you made to prescribe
25 Vioxx to Mr. Barnett back at the time you were

---

Michael Mikola, M.D.

**Page 158**

1  prescribing it to him as opposed to what would you
2  have done if you had all of this information that
3  was obtained subsequent to your treatment of
4  Mr. Barnett, correct?
5      MR. ROBINSON:  Objection.
6      THE WITNESS:  I'd say the difference is
7  at the time I didn't know that Vioxx was going to
8  be withdrawn from the market and knowing that it
9  was going to be withdrawn from the market, I would
10  not have used it.
11  BY MR. GOLDMAN:
12      Q.  You also understand that there was a
13  placebo-controlled study done involving Alzheimer's
14  patients called the APPROVe study.  You remember
15  that?
16      MR. ROBINSON:  Objection.
17      THE WITNESS:  Vaguely.
18  BY MR. GOLDMAN:
19      Q.  That was a study that led Merck to
20  voluntarily withdraw Vioxx from the market.
21      A.  Okay.
22      Q.  That wasn't a study you had available
23  to you while you were making treatment decisions
24  for Mr. Barnett, right?
25      A.  That's correct.

**Page 159**

1      Q.  My question about hindsight, sir, is
2  whether when you were making your treatment
3  decisions for Mr. Barnett, you were making them
4  based on best medical information you had
5  available -- before -- withdrawn.
6      When you were prescribing Vioxx to
7  Mr. Barnett, sir, you were making your treatment
8  decision based on the medical information that you
9  had available to you at the time, right?
10      A.  Correct.
11      MR. ROBINSON:  Objection, leading.
12  BY MR. GOLDMAN:
13      Q.  When you were making treatment
14  decisions for Mr. Barnett and prescribing Vioxx,
15  were you or were you not relying on the medical
16  information that was available to you at the time?
17      A.  That's correct.
18      Q.  You obviously could not have made a
19  treatment decision about whether to use Vioxx or
20  Feldene for Mr. Barnett based on the APPROVe study
21  that hadn't been completed at that time, right?
22      A.  That's correct.
23      Q.  By the way, on the New England Journal
24  of Medicine expression of concern that you were
25  sent -- remember that?

**Page 160**

1      A.  Is that the Bombardier?
2      Q.  Yes.
3      A.  Yes, sir.
4      Q.  Did the Plaintiff's lawyers ever send
5  you Dr. Reicin's response to what Dr. Kirschman had
6  to say about the VIGOR study?
7      A.  No.
8      Q.  Did the Plaintiff's lawyers ever send
9  you either Dr. Reicin's deposition or
10  Dr. Kirschman's deposition so that you could have a
11  complete picture of the circumstances around the
12  VIGOR publication?
13      A.  No, sir.
14      Q.  Let's move now, Dr. Mikola, to your
15  medical practice --
16      A.  Yes, sir.
17      Q.  -- just so the jury can get a better
18  understanding of the nature of your practice and,
19  in particular, what you were doing as a doctor
20  during the time that you were treating Mr. Barnett.
21      A.  For the most part, I practiced internal
22  medicine in an office setting.  Monday through
23  Friday generally I would see patients in the
24  office.  The group that I was affiliated with also
25  had a hospital service, which are a group of

**Page 161**

1  internists who only work in the hospital.  I would
2  do probably 10 to 20 percent of my own hospital
3  admissions in addition to the office.  The
4  hospitals would probably do 80 to 90 percent of my
5  admissions depending on how busy they were or I
6  was.  We sort of helped each other out, but they
7  saw a fair number of my patients.
8      Q.  Did you work for a outfit called the
9  Carolina Health Specialists?
10      A.  Yes, sir.
11      Q.  Can you describe that to the ladies and
12  gentlemen of the jury.
13      A.  Yes, sir.  That was a multispecialty
14  medical group at that time probably composed of
15  about 40 physicians that included internists,
16  family practitioners, rheumatologists,
17  pulmonologists, endocrinologists and ER physicians
18  in several different office locations.
19      Q.  In South Carolina?
20      A.  In South Carolina.
21      Q.  Can you tell us some of the common
22  medical problems that you treat as a physician,
23  sir.
24      A.  The common ones would include high
25  blood pressure, high cholesterol, diabetes,

41 (Pages 158 to 161)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 162**

1 respiratory infections, routine sort of sick visits
2 to the office, predominantly what we call diseases
3 of metabolism.
4     Q.  Is it fair to say that you've had a
5 fair amount of experience treating patients who
6 have risk factors for heart disease like high
7 cholesterol?
8     A.  Yes, sir.
9     Q.  Have you also treated patients like
10 Mr. Barnett who had a condition called
11 osteoarthritis?
12     A.  Yes, sir.
13     Q.  You mentioned on your examination with
14 Mr. Barnett that you prescribed Vioxx to
15 Mr. Barnett because -- withdrawn, I think I said
16 Mr. Barnett.
17         MR. ROBINSON:  I like him.  He's my
18 buddy.
19 BY MR. GOLDMAN:
20     Q.  I believe you said in response to
21 Mr. Robinson's questions that you prescribed Vioxx
22 to Mr. Barnett because he had osteoarthritis?
23     A.  Yes, sir, that was the indication for
24 the prescription.
25     Q.  What is osteoarthritis?

**Page 163**

1     A.  Osteoarthritis is a degenerative
2 disease involving the joints summarized largely by
3 wearing out and deterioration of the cartilage
4 which serves not only as a cushion between the
5 bones so that they articulate smoothly with one
6 another, but it also makes joint fluid that bathes
7 the joint to keep the inflammation down to keep
8 movement smooth and range of motion preserved.
9     Q.  So if people have healthy cartilage,
10 that allows their bones to sort of glide over one
11 another without causing pain?
12     A.  Um-hum.  Usually, yes.
13     Q.  Do you agree that for many people,
14 including Mr. Barnett, osteoarthritis is a serious
15 health problem?
16     A.  Yes.
17     Q.  Why is that?
18     A.  Especially for someone like
19 Mr. Barnett, if his arthritis is untreated, it
20 can limit their ability to exercise and stay
21 active.  And in an individual with a family history
22 of heart disease and high cholesterol, exercise is
23 an important part of reducing his risk factors for
24 vascular disease.  It can also lead to other
25 debilitation that makes weight loss more difficult.

**Page 164**

1 If you're unable to exercise due to the pain of
2 arthritis and -- it can complicate a lot of other
3 medical issues.
4     Q.  When you said that osteoarthritis might
5 prevent individuals like Mr. Barnett from
6 exercising, why is that a problem for somebody like
7 Mr. Barnett?
8     A.  It causes them pain.  Generally if they
9 do a lot of physical activity, the joints that are
10 involved will become painful and it can limit their
11 ability to exercise, walk --
12     Q.  Ex --
13     A.  -- specifically walk.  Jogging is very
14 painful for them.  Some people can ride a
15 stationary bicycle depending on if their knees are
16 involved, but if their knees are significantly
17 involved, that may be limited as well.
18     Q.  Is it true that the more exercise
19 people like Mr. Barnett are able to do, the lower
20 their chances are of developing heart disease or a
21 heart attack?
22     A.  Yes, sir.  I would say the more
23 exercise that they do do versus able to do reduces
24 their chance of heart attacks and vascular events.
25     Q.  Has it been your experience, sir, that

**Page 165**

1 osteoarthritis can adversely affect a patient's
2 quality of life?
3     A.  Yes, sir.
4     Q.  Have you seen that osteoarthritis can
5 be so painful that it can lead to depression and
6 stress?
7     A.  Yes, sir.
8     Q.  Are you aware of whether osteoarthritis
9 is one of the most frequent causes of disability in
10 the United States?
11     A.  I know it's a frequent cause of
12 disability, yes, sir.
13     Q.  In your years of treating
14 osteoarthritis, have you tried different pain and
15 antiinflammatory medication for your patients?
16     A.  Yes, sir.
17     Q.  Have you used narcotics on occasion for
18 your patients who have osteoarthritis?
19     A.  Yes, sir.
20     Q.  Can you describe for the ladies and
21 gentlemen of the jury what the benefits and some of
22 the significant risks are of narcotics to treat
23 osteoarthritis.
24     A.  The benefits are that they're very
25 effective in terms of pain control.  Typically

42  (Pages 162 to 165)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 166

1   there is sort of a ceiling effect of
2   antiinflammatory medicines on how much pain they
3   will relieve and in some patients -- and I've used
4   both together.  Some patients are not adequately
5   relieved by antiinflammatory medicines and
6   nonnarcotic analgesics.  And the narcotics are more
7   potent and they're able to provide relief of more
8   severe pain generally than the antiinflammatory
9   medicines are.
10       Some of the complications, constipation
11  is a very common problem, impairment in
12  coordination.  In elderly persons, narcotics can
13  increase the risk of falling and having fractured
14  bones as a result and more commonly in elderly
15  patients, it can cause confusion.  I should say
16  confusion is more common in elderly patients
17  treated with narcotics.
18       Q.  Can narcotics also be addictive?
19       A.  Yes, sir.
20       Q.  Can they also impair thinking of those
21  who take them?
22       A.  Yes, sir.
23       Q.  Can narcotics also have a side effect
24  of causing drowsiness?
25       A.  Yes, sir.

Page 167

1       Q.  Have you also used aspirin in trying to
2   treat osteoarthritis?
3       A.  Very rarely.
4       Q.  Why is that?
5       A.  Generally the dose of aspirin necessary
6   to treat the symptoms of osteoarthritis have a
7   higher risk of causing gastrointestinal problems
8   than effective doses of especially specifically
9   COX-2 inhibitors.
10      Q.  What are some of the gastrointestinal
11  problems that you understand aspirin can cause?
12      A.  Gastritis, which is an inflammation in
13  the lining of the stomach.  It can cause gastric
14  erosions and ulcerations and they can also cause --
15  or aspirin can also cause intestinal ulceration as
16  well.
17      Q.  Can aspirin also cause stomach bleeds?
18      A.  Yes, sir.
19      Q.  Have you also tried prescribing
20  traditional or nonselective NSAIDs?
21      A.  Yes, sir.
22      Q.  Which NSAIDs have you prescribed to
23  your patients in the past, sir, if you can remember
24  them?
25      A.  Relafen, which is nabumetone,

Page 168

1   Piroxicam, Voltaren, which is diclofenac, Clinoril,
2   which is sulindac, Naproxen, ibuprofen, Ketoralac,
3   salicylate of magnesium or magnesium salicylate,
4   which is a nonacetylated salicylate similar to
5   aspirin but a little bit different.
6       Q.  I don't understand what that means.
7   Can you --
8       A.  It's the way the molecule is produced
9   chemically.  It is in theory a little bit less
10  likely to cause stomach ulceration than plain
11  aspirin in theory.
12      Q.  Okay.
13      A.  And I think those are probably the main
14  ones.
15      Q.  Do you still prescribe most of those
16  NSAIDs today?
17      A.  Not that often since Advil and Aleve
18  are over-the-counter now.  I usually would
19  prescribe the over-the-counter medication because
20  it's a lot less expensive for most folks.  And I do
21  also prescribe some Celebrex still.
22      Q.  Can you describe some of the potential
23  side effects of NSAIDs that you've seen in your
24  practice, sir.
25      A.  Same -- it would be essentially the

Page 169

1   same as aspirin, stomach problems including --
2   ranging from ulcers to bleeding.  They can
3   occasionally raise blood pressure.  It can cause
4   edema.
5       Q.  What is edema?
6       A.  Swelling, fluid retention, most
7   prominently seen around the ankles.
8       Q.  Can they cause kidney complications as
9   well?
10      A.  Yes, sir.
11      Q.  Are you aware that the stomach
12  complications of NSAIDs can be a serious health
13  problem?
14      A.  Yes, sir.
15      Q.  Do you know, sir, and did you while you
16  were prescribing Vioxx to Mr. Barnett that
17  thousands of people are hospitalized or die each
18  year from GI bleeds as a result of taking NSAIDs?
19          MR. ROBINSON:  Objection.
20          THE WITNESS:  Yes, sir.
21  BY MR. GOLDMAN:
22      Q.  When did you start prescribing COX-2
23  inhibitors or selective NSAIDs?
24      A.  Probably within a few months of their
25  introduction into the United States market.  I

43  (Pages 166 to 169)

Michael Mikola, M.D.

Page 170

1    don't remember the exact year.  I believe Vioxx and
2    Celebrex came to market relatively close in time.
3    If I remember correctly, within a few months after
4    they hit the US market or were approved by the FDA
5    for sale in the United States.
6        Q.   Why did you prescribe Celebrex and
7    Vioxx rather than traditional NSAIDs for some of
8    your patients?
9        A.   Generally because I believed that the
10   safety specifically for gastrointestinal
11   complications was superior with the COX-2
12   inhibitors versus the traditional nonselective
13   NSAIDs.
14       Q.   And do you know why that is that COX-2
15   inhibitors are more beneficial to the stomach than
16   traditional NSAIDs?
17       A.   COX-2 inhibition reduces
18   inflammation -- generally reduces inflammation.
19   COX-1 inhibition reduces the production of
20   prostaglandin E2, which is a prostaglandin
21   necessary for the stomach to make a protective
22   mucous coating, and if you block that prostaglandin
23   with a nonselective agent, number one, the stomach
24   is unable to make the protective mucouses
25   effectively and it makes them prone to develop

Page 171

1    erosions and ulcerations from the stomach acids.
2        Q.   Did you consider the availability of
3    COX-2 inhibitors to be a major advance for the
4    treatment of arthritis and acute pain?
5        A.   In terms of GI safety, yes.
6        Q.   Can you describe, sir, your general
7    experience with Vioxx while you were prescribing it
8    when it was on the market, sir?
9        A.   I had very good success with it.
10   Occasionally I would see some patients with stomach
11   upset and GI side effects.  If I -- and don't quote
12   me on the number, but I saw over the course of
13   several years maybe three or four patients with GI
14   bleeding, but for the most part, it was very well
15   tolerated, very effective.  In my experience
16   treating patients with COX-2 inhibitors or
17   nonselective agents, much of the treatment
18   unfortunately is sort of trial and error.  Some
19   people will get a really good response to one drug
20   and not such a good response to another.  So you'll
21   generally put them on one.  If they do well on it,
22   continue it, if not, then we'll switch to another.
23       Q.   Were you pleased while you were using
24   Vioxx to have it as a choice to treat patients
25   with?

Page 172

1        A.   Yes, sir.
2        Q.   Did you feel that Vioxx was effective
3    at treating pain?
4        A.   Yes, sir.
5        Q.   Did you feel that Vioxx allowed
6    patients to lead more active and functional lives?
7        A.   Yes, sir.
8        Q.   Did you feel that Vioxx was more
9    tolerable than many of the other NSAIDs?
10       A.   Yes, sir.
11       Q.   Did you also feel while you were
12   prescribing Vioxx that some patients who could not
13   tolerate Celebrex or Bextra would do better on
14   Vioxx?
15       A.   That's a possibility, yes.
16       Q.   The COX-2 inhibitors that you
17   prescribed over time include Vioxx and Celebrex?
18       A.   And Bextra.
19       Q.   Let me ask it this way --
20       A.   Okay.
21       Q.   -- what COX-2 inhibitors have you
22   prescribed, sir?
23       A.   Celebrex, Vioxx and Bextra.
24       Q.   You prescribed Celebrex and Bextra even
25   though your wife worked as a sales representative

Page 173

1    at Merck?
2        A.   Correct.
3        Q.   Why is that?
4        A.   My first alliance is to my patients'
5    health and benefit and Vioxx doesn't work for -- as
6    I mentioned before, one drug doesn't work for
7    everyone.  And some people either had side effects
8    or didn't get improvement with Vioxx and I would
9    use the others.
10       Q.   Mr. Robinson asked you about whether
11   your wife -- what's her name, Sharon?
12       A.   Sharon.
13       Q.   -- whether Sharon made sales calls or
14   detailed you on Vioxx.  Do you remember that?
15       A.   She generally did not.
16       Q.   Why not?
17       A.   It was Merck policy because of our
18   relationship that she not call on me.  I was -- she
19   called on my partners and she could come in the
20   office, but she wasn't supposed to sample or detail
21   me if I remember correctly.
22       Q.   Did she?
23       A.   No.
24       Q.   Would it be uncomfortable?
25       A.   She -- she -- she may have come by a

44  (Pages 170 to 173)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 174**

1 couple times, but she generally didn't detail me.
2 I helped her study to some degree for a lot of the
3 products that she learned about so I kind of
4 already got detailed, you know.
5     Q.  Was your wife's job as a sales
6 representative for Merck ever a factor in your
7 decision to prescribe Vioxx to your patients?
8     A.  Was it a factor. I would say that if I
9 had a patient who would benefit from a COX-2
10 inhibitor and at that time, and to this day I still
11 probably don't believe that any of the three that
12 were available were more effective than the others,
13 I may be inclined to use Vioxx first, but if -- as
14 I mentioned, if it didn't work for the patient, I
15 would not hesitate to switch them or if a patient
16 came in, for instance, and asked for Celebrex -- or
17 Bextra, I would not be opposed to putting them
18 on it first.
19     Q.  Did your decision to recommend that
20 Mr. Barnett use Vioxx have anything to do with your
21 wife being a sales representative for Merck?
22     A.  No, sir.
23     Q.  If Mr. Barnett --
24     A.  That's -- I did not start Mr. Barnett
25 on Vioxx, Dr. McCaffrey did.

**Page 175**

1     MR. ROBINSON:  And we're not claiming
2 that I'll just tell you. McCaffrey started him.
3     THE WITNESS:  Due to the fact that it
4 was working well for him at that time and I felt it
5 was a safe drug, I didn't see any reason to change
6 it.
7 BY MR. GOLDMAN:
8     Q.  If there's a suggestion at trial that
9 you prescribed Vioxx to Mr. Barnett because your
10 wife sells Vioxx -- or sold Vioxx at Merck, would
11 that be accurate, sir?
12     A.  That would not be accurate.
13     Q.  You were also -- withdrawn.
14     You also prescribed Bextra and Celebrex
15 even though you participated in certain programs
16 for Merck, right?
17     A.  Yes, sir.
18     Q.  Remember you were asked about whether
19 you were a speaker for Zocor?
20     A.  I was asked if I was a speaker for
21 Vioxx and I stated not to my recollection, I was a
22 speaker for Zocor -- for Merck about the drug
23 Zocor.
24     Q.  Were you compensated, sir, for your
25 time when you were a speaker for Zocor?

**Page 176**

1     A.  Yes, sir.
2     Q.  Was there anything inappropriate in
3 your mind about being compensated for your time?
4     A.  No, sir.
5     Q.  Why not?
6     A.  My compensation involved educational
7 programs with other physicians. For instance, I
8 generally would go to their office -- to another
9 physician groups' office at lunch and talk to them
10 about Vioxx and give them information, answer
11 questions, so I really was, you know, basically
12 providing a consulting service to some extent.
13     Q.  Why did you want to do that, sir?
14     A.  Mainly because my wife asked me to.
15     Q.  Did you think --
16     A.  But I have spoken for other
17 pharmaceutical companies that my wife didn't work
18 for. It's -- it's an alternative source of some
19 income that gives you a break from the daily grind,
20 so to speak, and it also is a good way to learn
21 more about the products and the class of drugs.
22     Q.  Have you participated in programs that
23 other pharmaceutical companies have had?
24     A.  Yes, sir.
25     Q.  Have you been a speaker for companies

**Page 177**

1 like Pfizer?
2     A.  I have not -- don't believe I've spoken
3 for Pfizer.
4     Q.  But you have for other pharmaceutical
5 companies?
6     A.  I've spoken for Bayer Pharmaceuticals
7 and I've spoken for Coast Pharmaceuticals. I think
8 those are the main ones.
9     Q.  Were you compensated for your time by
10 those pharmaceutical companies?
11     A.  Yes, sir.
12     Q.  Did you feel that when you were a
13 speaker for Merck concerning Zocor that you had to
14 prescribe Zocor to your patients?
15     A.  No, sir.
16     Q.  Even though you were a speaker for
17 Merck and you were compensated for speaking about
18 Zocor, did that influence you in deciding whether
19 to prescribe Zocor to your patients?
20     A.  No, sir. I should say that part of the
21 reason that I spoke on behalf of Zocor is because I
22 believed it was an effective drug and that's the
23 reason that I prescribed it. I wouldn't speak for
24 a drug that I didn't believe in, that I didn't
25 believe was effective or safe. So I guess there is

45 (Pages 174 to 177)

Michael Mikola, M.D.

| | |
|---|---|
| **Page 178** | **Page 180** |

**Page 178**

1   some relationship, but it's probably inverse of
2   what you asked.
3       Q.  Tell me how it's inverse.
4       A.  I didn't -- I didn't write Zocor
5   because I was paid to speak for it.  I spoke on
6   behalf of Zocor because I believed it was a good
7   drug and that's why I prescribed it.
8       Q.  You were also asked questions, sir,
9   about visits by sales representatives?
10      A.  Yes, sir.
11      Q.  You were shown a document that
12  contained a number of visits by sales
13  representatives, some of which were detailing Vioxx
14  and some detailing other Merck products, right?
15      A.  Correct.
16      Q.  Has it been your experience that large
17  pharmaceutical companies like Merck employ a fair
18  number of sales representatives to try to detail
19  their drugs?
20      A.  Gracious plenty.
21      Q.  Too many?
22      A.  Yes, sir, a gracious plenty.
23      Q.  Has it been your experience, sir, that
24  it's common in the pharmaceutical industry for
25  sales representatives to try to sell medicine that

**Page 180**

1       Q.  I'm sorry, withdrawn.
2       A.  Yes.
3       Q.  How would you describe your
4   interactions with Merck sales representatives who
5   were detailing Vioxx other than your wife?
6       A.  Generally not only Merck but most of
7   the pharmaceutical reps I would typically prefer
8   not to be detailed to extent and generally I would
9   ask them for copies of the original articles from
10  which they drew their detail pieces.
11          When you practice medicine, I'll see
12  the Pfizer rep come in and tell me why Lipitor is
13  the best drug.  Three minutes later, the Merck rep
14  comes in and tells me why Zocor is the best drug.
15  Three minutes later, the Novartis rep will come in
16  and tell me why Lescol is the best drug.  They
17  can't all be right.  They have a lot of glossies
18  and detail pieces which contain factual
19  information, but it generally doesn't contain all
20  the information available.  So I would generally
21  ask that they not particularly detail me but
22  present me with the original articles from -- that
23  I could read it and draw my own conclusion.
24      Q.  Was that your practice while you were
25  prescribing Vioxx, sir?

| | |
|---|---|
| **Page 179** | **Page 181** |

**Page 179**

1   they think would help patients?
2       A.  Yes, sir.
3       Q.  I think you mentioned that on any given
4   day, there might be up to five sales
5   representatives in your office at once?
6       A.  Ten to 15, um-hum.
7       Q.  And that's not all for Merck?
8       A.  That's correct.
9       Q.  Did you see anything wrong with Merck
10  or these other pharmaceuticals companies sending
11  out their sales representatives to try to promote
12  their products to you?
13      A.  No, sir.  It's pretty much the nature
14  of the business.
15      Q.  How would you describe your
16  interactions with the Merck sales representatives
17  who were dealing Vioxx?
18          MR. ROBINSON:  I'm going to stipulate
19  that he likes at least one of them very -- very
20  deeply.  Do you mean the other ones?
21  BY MR. GOLDMAN:
22      Q.  Apart from your relationship with your
23  wife, how would you describe your interactions with
24  Merck representatives while you were selling Vioxx?
25      A.  Very --

**Page 181**

1       A.  Yes, sir.
2       Q.  Did you find that Merck sales
3   representatives were professional with you?
4       A.  Yes, sir.
5       Q.  Did you feel that they were trying to
6   hide any information about safety?
7       A.  No, sir.
8       Q.  Did any representative of Merck ever
9   refuse to answer or avoid questions you had about
10  Vioxx?
11      A.  If I had questions that they could not
12  answer, they would -- either because they didn't
13  know the answer or they weren't allowed to speak
14  off label, they would generally submit my question
15  to Merck for a written response so no.
16      Q.  What do you mean when you say they
17  could not speak about Vioxx off label?
18      A.  As I understand it, the FDA has rules
19  and regulations about what drug reps can and can't
20  say to physicians.  They are allowed to give you
21  information from the package insert, but in order
22  for them to present us with a detail piece of
23  information, it has to be approved first by either
24  the FDA or some regulatory board to make sure that
25  they don't presumably pass misinformation.

46 (Pages 178 to 181)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 182

1    Q.  Did you find that Merck sales
2  representatives who were detailing you on Vioxx
3  were responsive to your questions?
4    A.  Yes, sir.
5    Q.  Did you ever feel that Merck sales
6  representatives were dodging or trying to avoid
7  your questions?
8    A.  No, sir.
9    Q.  In fact, as you mentioned a minute ago
10  and I think Mr. Robinson used this as Exhibit 23,
11  sales representatives would suggest to Merck that
12  they send you letters about products like Vioxx?
13    A.  In response to my questions, correct.
14    Q.  And in each of the letters that you
15  would receive in response, they would include the
16  package insert that was approved by the FDA?
17    A.  Typically, yes.
18    Q.  And typically Merck would include
19  references that were cited in the letters to you?
20    A.  Yes, sir.
21    Q.  Did you find the letters -- withdrawn.
22        Was it helpful to you to be able to
23  obtain scientific information directly from Merck
24  about questions you had rather than a sales
25  representative?

Page 183

1    A.  Yes.
2    Q.  Why is it that --
3        MR. ROBINSON:  Go ahead.
4        THE WITNESS:  I mean, there's more
5  information -- more detailed information available
6  in a printed handout that I received than a rep
7  would be able to memorize in all likelihood and
8  spew back.  It wouldn't have mattered to me if it
9  came directly from rep -- from Merck or if the rep
10  had an article in their hand and gave you the same
11  package.  So the source -- it was nice to be able
12  to have the information, but whether it came from
13  Merck directly or the rep it didn't matter, if that
14  makes sense.
15  BY MR. GOLDMAN:
16    Q.  It does.  Let's talk a little bit, sir,
17  about your practice when you prescribe medications,
18  okay?
19    A.  Yes, sir.
20    Q.  When you prescribe medications to
21  patients, do you make a risk-benefit assessment of
22  the drug that you're prescribing?
23    A.  Yes, sir.
24    Q.  Can you explain what that means.
25    A.  Yes.  As I alluded earlier, all drugs

Page 184

1  have potential side effects and most drugs
2  hopefully that we -- all drugs hopefully that we
3  prescribe have potential benefits.  And when you --
4  or when I prescribe a drug to a patient, I evaluate
5  the potential risks versus the potential benefits.
6  Generally I'll discuss it with the patient and then
7  you come up with a decision regarding whether that
8  drug is appropriate for that patient or that the
9  benefits outweigh the risks basically.
10    Q.  Are there risks with every medicine
11  that's sold in the United States?
12    A.  Yes, sir.
13    Q.  Do you attempt to weigh those risks,
14  however tiny, against the benefits of a medicine
15  and make the best medical judgment you can?
16    A.  Yes, the -- the -- if you have a drug
17  that has a lot of potential benefit and a very,
18  very, very rare but serious complication, from a
19  statistical standpoint, patients are much more
20  likely to get the benefit from the side -- adverse
21  effect even though the adverse effect may be
22  serious.  So the frequency of adverse effects is
23  important to determine the ratio.
24    Q.  Is it true that people have died while
25  taking aspirin?

Page 185

1    A.  Yes, sir.
2    Q.  Is aspirin a medicine that you
3  prescribe quite often despite the risk of death?
4    A.  Yes, sir.
5    Q.  That's an example where a serious side
6  effect might not occur very often and therefore you
7  determine that the benefits of the medicine
8  outweigh those risks?
9    A.  Yes, we believe that the benefits would
10  outweigh the risks.
11    Q.  Is it true that FDA-approved package
12  inserts are one of your primary sources of
13  information concerning the benefits and risks of
14  medicines you prescribe?
15    A.  Yes, sir.
16    Q.  When you review package inserts for
17  medicines you prescribe, you make sure you're
18  familiar with all aspects of the package insert,
19  right?
20    A.  I read the all package -- all aspects
21  of the package insert, yes, sir.
22    Q.  So for Vioxx you make it a point to
23  review the contraindications, the warnings and the
24  precautions section, right?
25    A.  Yes, sir.

47 (Pages 182 to 185)

Michael Mikola, M.D.

---

Page 186

1    Q. Do you also monitor a -- well,
2  withdrawn.
3         You were asked a number of questions
4  about e-mails that were internal within Merck.
5  Remember that?
6    A. Yes, sir.
7    Q. And you were asked questions, did Merck
8  ever show you this information. Do you remember
9  those questions?
10   A. Yes, sir.
11   Q. There were articles that were in the
12 public domain that you were asked about and
13 Mr. Robinson said, did Merck ever show you this
14 article, right?
15   A. Correct.
16   Q. As a physician, I assume that you don't
17 have time to review e-mails from every drug company
18 that makes medicine in the United States, do you,
19 sir?
20   A. That's correct. Correct.
21   Q. Do you rely on the Food and Drug
22 Administration to review the scientific data about
23 a medicine and determine what the risks and the
24 benefits are?
25   A. To a very large extent, yes, sir.

---

Page 187

1    Q. Because you're not capable of reviewing
2  every e-mail or every theory that somebody within a
3  drug company might have?
4    A. That's correct.
5    Q. And as a responsible physician, you
6  expect that the Food and Drug Administration will
7  take all studies into account in deciding what the
8  risks and the benefits are for medications sold in
9  the US?
10   A. All studies presented to the FDA, yes.
11   Q. Mr. --
12   A. I don't know if all studies are
13 presented to the FDA. I would assume studies done
14 in other countries may not be, but...
15   Q. It's your expectation that -- do you
16 expect that the Food and Drug Administration would
17 be familiar with all the clinical trials concerning
18 a medicine that they approve as safe and effective?
19   A. I would certainly hope so.
20   Q. When you prescribe a medication to your
21 patients, do you monitor them to see if they're
22 experiencing any side effects?
23   A. Generally, yes, sir.
24   Q. If a patient were experiencing an
25 adverse side effect on a medication you prescribed,

---

Page 188

1  would you take that patient off of that medicine?
2    A. If the adverse side effect was
3  potentially serious or if the severity of the side
4  effect outweighed the benefit of the drug, yes.
5  For instance, I'll pick edema. Edema or swelling
6  in the ankles is a -- is a common side effect of
7  many medicines, ranging from blood pressure
8  medicines to arthritis medicines to diabetes
9  medicines. Many people will get edema and it's
10 very mild, but in many cases, keeping their blood
11 pressure under control or their diabetes under
12 control is thought to confer more health benefit
13 than the adverse effect that edema can cause. So
14 the risk-benefit ratio still pertains.
15   Q. If an adverse event is serious and you
16 see a patient experiencing one on a medication,
17 then you would determine whether or not the
18 medicine was causing the side effect and take that
19 person -- person off if you determined that it was?
20   A. If I determined that it was, yes.
21   Q. Let's turn now to Mr. Barnett and talk
22 about his medical condition, okay?
23   A. Okay.
24   Q. Did you first meet Mr. Barnett on
25 October 22nd of 1999?

---

Page 189

1    A. Yes, sir, my first office visit with
2  him is when we first met.
3    Q. Were you Mr. Barnett's primary care
4  physician from October 22nd of 1999 until about May
5  of 2004?
6    A. Yes, sir.
7    Q. Were you familiar with Mr. Barnett's
8  medical condition during that time?
9    A. Yes, sir.
10   Q. Did you find that Mr. Barnett was a
11 careful patient who would come to you if he was
12 experiencing a problem?
13   A. Yes, sir.
14   Q. If Mr. Barnett were experiencing angina
15 or heart pain, he would make it a point to tell you
16 about that, right?
17   A. Usually. Not always. But Mr. Barnett
18 is a very complicated case in the fact that he had
19 more than one potential cause for chest pain. He
20 had known esophageal disease. Esophageal spasm,
21 which is common -- can be common in people with
22 reflux, is almost identical to angina in terms of
23 the symptoms and it's very difficult in many
24 patients to differentiate the two. He also had a
25 fairly high anxiety level and as you may remember

---

48 (Pages 186 to 189)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 190

1  from Dr. Pamela Pyle's note, that was the first
2  time she had ever seen him, she noted that he was
3  very anxious.  Anxiety can cause chest pain.
4         So he had several things going on at
5  one time that can manifest as chest pain and he had
6  several different patterns of chest pain so in his
7  case, it was very difficult to try to determine is
8  his chest pain from the esophagus.  Sometimes it
9  got better with Prilosec and sometimes it didn't.
10 Is it anxiety, is it angina.  It was -- it was very
11 unclear in Mr. Barnett's case.
12        Q.  And we'll go through some of his
13 records and see what judgments you made --
14        A.  Okay.
15        Q.  -- and what you thought about his
16 particular chest pain on a given occasion, okay?
17        A.  Um-hum.
18        Q.  Let me hand to you what I'll mark --
19        VIDEO TECHNICIAN:  We will now go off
20 the record.  The time is approximately 2:20 PM.
21        (Off-the-record conference.)
22        (DFT. EXH. 30, Carolina Health
23 Specialists medical records for Gerald Barnett, was
24 marked for identification.)
25        VIDEO TECHNICIAN:  We're back on the

Page 191

1  record.  The time is approximately 2:22 PM.
2  BY MR. GOLDMAN:
3         Q.  Mr. Mikola -- I'm sorry, Dr. Mikola,
4  I've handed you Exhibit 30, which appears to be a
5  set of Mr. Barnett's medical records from your
6  former office, doesn't it?
7         A.  That's correct.
8         Q.  Rather than refer to some of the
9  exhibits that Mr. Robinson used, I'm going to refer
10 quite often to Exhibit 30 and ask you to go to
11 particular pages referenced at the bottom Huberty
12 and then a number --
13        A.  Yes, sir.
14        Q.  -- okay?  Starting on the first page,
15 October 22nd of 1999, this is the first day that
16 Mr. Barnett came to see you?
17        A.  Yes, sir.
18        Q.  What do you do when a patient first
19 comes to see you?
20        A.  Generally we do what's called a history
21 and physical, which basically entails taking a
22 history of their previous medical problems, current
23 medications, drug allergies, family history and
24 current symptoms.  After that we'll do an exam -- a
25 physical examination and typically develop a plan

Page 192

1  for their ongoing healthcare and any acute needs
2  that they have at the time.
3         Q.  The first two pages of Exhibit 30 are
4  your office notes from that first visit with
5  Mr. Barnett, right?
6         A.  That's correct.
7         Q.  Turning your attention in the first
8  page to past medical history, do you see the first
9  entry, elevated lipids?
10        A.  Yes, sir.
11        Q.  What does that mean?
12        A.  That means his cholesterol has been
13 high in the past.
14        Q.  Was that important to you when you were
15 evaluating Mr. Barnett's health?
16        A.  Yes, sir.
17        Q.  Why?
18        A.  Because it is a risk factor for the
19 development of vascular disease.  And an important
20 part of what I do on a daily basis, or at least try
21 to do, is prevent health consequences of modifiable
22 things like that.
23        Q.  When somebody has elevated lipids or
24 high cholesterol, you're concerned that that might
25 be a risk factor for heart disease or a heart

Page 193

1  attack?
2         A.  Yes, sir.
3         Q.  The second entry says, disc bulge in
4  the cervical spine times three.
5         A.  Yes, sir.
6         Q.  Can you describe what that means, sir.
7         A.  Yes, that would mean that he has three
8  bulging discs in the neck.  The spine -- cervical
9  spine is the spine in the neck.
10        Q.  Did the bulging discs in Mr. Barnett's
11 neck cause him pain?
12        A.  Yes, sir.
13        Q.  Was that one of the ways that his
14 arthritis would manifest itself?
15        A.  Yes, sir.  That's probably not
16 accurate.  It is one of the causes of his pain.
17 Disc bulge and arthritis are two different
18 processes.  They can occur concomitantly, but they
19 are not necessarily related.
20        Q.  When you prescribed Vioxx eventually
21 for Mr. Barnett, was one of the reasons you
22 prescribed it because he had neck pain as a result
23 of his bulging discs?
24        A.  That's correct.
25        Q.  What is the third entry under past

49 (Pages 190 to 193)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

## Page 194

1    medical history?
2        A.  Gastroesophageal reflux.
3        Q.  Can you briefly describe what that
4    means.
5        A.  That's a condition where stomach
6    contents, including stomach acid, moves from the
7    stomach back up into the esophagus.  The stomach is
8    made to handle acid that it produces, it has
9    protective mucous as I mentioned before.  The
10   esophagus is not able to handle repeated exposures
11   to acid without potential problems.
12       Q.  And what are the problems?
13       A.  Esophageal stricture, which is a
14   narrowing in the esophagus.  Heartburn is a very
15   common symptom and it can also increase the risk of
16   malignancy in the esophagus, cancer, in certain
17   patients.
18       Q.  Did Mr. Barnett struggle to control his
19   reflux while he was seeing you?
20       A.  He had symptoms that were consistent
21   with reflux while he saw me, yes, despite taking
22   medicine for it.
23       Q.  You also wrote here, lumbar bulging
24   disc.  Can you describe what that is.
25       A.  That's a disc in the lower spine, in

## Page 195

1    the lower part of the back that's also moved out of
2    its normal position slightly called a bulge,
3    bulging disc.
4        Q.  Did that cause Mr. Barnett back pain?
5        A.  That would cause -- yes, it caused low
6    back pain.
7        Q.  Was one of the reasons that you
8    prescribed Vioxx to Mr. Barnett the fact that he
9    had a bulging disc in his lower back and was
10   suffering back pain?
11       A.  That's correct.
12       Q.  Can you briefly describe Number 5.
13       A.  Yes, that's esophageal dilatation,
14   which is a procedure -- when people develop a
15   narrowing in their esophagus most commonly related
16   to reflux, the esophagus will almost develop some
17   scarring and it gets narrowed.  And when people
18   swallow food, will get stuck and it can be painful
19   to swallow.  Dilatation is when the
20   gastroenterologist passes a flexible scope down
21   into the esophagus, blows up a balloon and dilates
22   or widens the esophagus.
23       Q.  Why does he do that?
24       A.  To restore the patency to the esophagus
25   so they can swallow and the food doesn't get stuck

## Page 196

1    and it's not as painful to swallow.  That's a --
2    stricture is a complication of reflux disease and
3    the dilatation is the -- one of the treatments for
4    it.  And sigmoidoscopy in 1997 is a screening test
5    for colon cancer.
6        Q.  By the way, Mr. Barnett was never
7    diagnosed with colon polyps, was he?
8        A.  Let me look at the records.  I do not
9    believe that he was diagnosed with colon polyps,
10   that's correct.  He had diverticulosis in the colon
11   but no polyps.
12       Q.  In light of the fact that -- withdrawn.
13           Was it important to you in deciding to
14   prescribe Vioxx to Mr. Barnett the fact that he had
15   reflux and he had these stomach-related problems
16   and you knew that Vioxx as a COX-2 inhibitor would
17   be more beneficial on his stomach than traditional
18   NSAIDs?
19       A.  I can't say that NSAIDs or Vioxx affect
20   reflux, but the reduction in complications between
21   the two classes of drugs is mainly in terms of
22   stomach symptoms and ulcers and bleeding.
23       Q.  Let's look at the next section of your
24   first meeting with Mr. Barnett under family
25   history.  Can you please read 1, 2 and 3.

## Page 197

1        A.  Yes, sir.  His mom is alive at 84 and
2    healthy except for hypertension and mini strokes.
3    That's a layman's term for TIA's, transient
4    ischemic attacks.
5        Q.  What is a transient ischemic attack?
6        A.  It's a stroke that doesn't result in
7    permanent damage.  The body's clot-dissolving
8    system is able to dissolve the clot that's formed.
9    We have a clot-forming and a clot-dissolving
10   system.  When a clot forms, our body is able to
11   dissolve it before it causes permanent damage to
12   the brain so you'll develop stroke symptoms that
13   resolve in less than 24 hours and they don't leave
14   permanent neurologic damage.
15           Father died at 68 of coronary disease
16   and possible hypertension.  Sister with mini
17   strokes at age 45 who is not a smoker.
18       Q.  You can read 4 and 5 also.
19       A.  Other siblings are healthy and there is
20   a family history of reflux.
21       Q.  Did Mr. Barnett tell you these things
22   about his family history when you first met him in
23   October of 1999?
24       A.  Yes, sir.
25       Q.  Was it significant to you that his

Golkow Litigation Technologies - 1.877.DEPS.USA

Michael Mikola, M.D.

Page 198

1  mother had TIA's, hypertension, his father had died
2  of coronary disease and possibly hypertension and
3  his sister had mini strokes at age 45?
4       A.  Yes, sir.
5       Q.  Why?
6       A.  It tells me that he may be genetically
7  at higher risk of having vascular disease.
8       Q.  Was it your belief --
9       A.  I should say arterial vascular disease.
10      Q.  Was it your belief, Dr. Mikola, that
11  Mr. Barnett was at risk of heart disease and a
12  heart attack given his family history?
13      A.  Yes, sir.
14      Q.  Did you subsequently become aware that
15  Mr. Barnett's father also had a nonfatal heart
16  attack in his fifties or early sixties?
17      A.  My notes say that he had coronary
18  disease.  I don't know from this note if it was a
19  nonfatal MI.  It could have been bypass surgery,
20  angioplasty stint or a heart attack.  Those would
21  all be classified as coronary disease.
22      Q.  When we get to some of the later
23  records, I'll show you some of the entries and
24  maybe that will refresh your recollection --
25      A.  Okay.

Page 199

1       Q.  -- about Mr. Barnett's family history.
2       A.  Okay.
3       Q.  On Page 2, sir, under assessment and
4  plan, you indicate, osteoarthritis.  Continue
5  Feldene.  He takes it fairly regularly and it seems
6  to be effective for him.  Do you see that?
7       A.  Yes, sir.
8       Q.  The reason that you wanted him to
9  continue Feldene was because at that point at
10  least, it seemed to be doing a good job?
11      A.  Correct.
12      Q.  You didn't choose to switch Mr. Barnett
13  to Vioxx because your wife worked at Merck or
14  because sales representatives had called on you
15  about Vioxx?
16          MR. ROBINSON:  I'm going to object,
17  that's ambiguous.  Could you read that back, the
18  question.
19  BY MR. GOLDMAN:
20      Q.  I'll ask it differently.  New question.
21          In October of 1999 when you first met
22  Mr. Barnett and he was doing well on Feldene, did
23  you switch him to Vioxx at all?
24      A.  No, sir.
25      Q.  You didn't switch him to Vioxx because

Page 200

1  Sharon worked at Merck, right?
2       A.  I didn't switch him to Vioxx at all,
3  that's right.
4       Q.  You recommended that Mr. Barnett stay
5  on Feldene because at that point at least, you felt
6  it was in his best interest to do so?
7       A.  Yes, sir.  It had been effective for
8  him and he seemed to be tolerating it without any
9  apparent adverse effects.
10      Q.  When -- withdrawn.
11          I think earlier you said that
12  Dr. McCaffrey is the physician who first prescribed
13  Vioxx to Mr. Barnett?
14      A.  Yes, sir.
15      Q.  Did Mr. Barnett ever tell you, sir,
16  that he wanted to be on Celebrex because of
17  advertisements he had seen but that Dr. McCaffrey
18  was urging him to stay on Vioxx?
19      A.  I don't recall that conversation.
20      Q.  Did Mr. Barnett ever tell you he felt
21  Dr. McCaffrey was pushing him to use Vioxx even
22  though he had requested Celebrex?
23      A.  No, sir.
24      Q.  If you felt that Celebrex or Feldene or
25  another drug were a better choice for Mr. Barnett,

Page 201

1  you would have suggested what?
2       A.  What I would have suggested, I would
3  have likely given him samples of one of the two,
4  either Celebrex or Feldene.  Probably wouldn't have
5  given him samples of Feldene because we already
6  know it's effective.  I would have given him
7  samples of Celebrex and said, take it for two
8  weeks.  If it's as effective, either you or I
9  should talk to Dr. McCaffrey about changing it
10  because I think this is a safer drug.
11      Q.  Did Mr. Barnett ever ask you to switch
12  him to Celebrex or some other medication because of
13  advertisements he saw?
14      A.  I think he did at one point, let me
15  refer to the records.
16      Q.  Well, let me make sure that you are
17  with me on the question.
18      A.  Okay.
19      Q.  My question is:  Did Mr. Barnett ever
20  approach you and say, I saw advertisements about
21  Celebrex on TV?
22      A.  I don't believe so.
23      Q.  Will you switch me?
24      A.  I don't believe so.
25      Q.  It's unclear when Mr. Barnett began

Michael Mikola, M.D.

Page 202

1  using Vioxx, sir, but he says January 10th or
2  January 11th, okay?
3       MR. ROBINSON:  Actually, he said
4  January 10th.  You tried to say January 11th so
5  we're going to stick with the 10th.
6  BY MR. GOLDMAN:
7       Q.  Well, Mr. Barnett said either January
8  10th or January 11th, but for our purposes, let's
9  just say January 10th of 2000, okay?
10      A.  Okay.  All I can tell you is between --
11  according to my notes, January 27, 2000, continue
12  Feldene, 20 milligrams a day, so he had not
13  informed me that he had changed as of that date.
14      Q.  Was it your understanding that as of
15  January 27, 2000, Mr. Barnett was taking Feldene
16  and not Vioxx?
17      MR. ROBINSON:  Objection.
18      THE WITNESS:  That's my understanding.
19      MR. ROBINSON:  That's from your record,
20  right?
21      THE WITNESS:  Correct.
22      MR. ROBINSON:  Okay.
23      THE WITNESS:  And then March 21st,
24  2000, he is on Vioxx.  So from my records, it was
25  sometime between those two dates.

Page 203

1  BY MR. GOLDMAN:
2       Q.  I believe your first prescription of
3  Vioxx for Mr. Barnett was on December 28th of 2001
4  based on those pharmacy records we reviewed
5  earlier?
6       A.  That's very possible.
7       Q.  Even though Dr. McCaffrey was the
8  physician who first suggested Vioxx to Mr. Barnett,
9  did you concur that Vioxx was an appropriate
10  medication for him?
11      A.  Yes, sir.
12      Q.  You then continued to refill Vioxx for
13  Mr. Barnett until he stopped using it?
14      A.  Yes, sir.
15      Q.  How often did you tell Mr. Barnett to
16  use Vioxx, sir?
17      A.  I don't know if it's documented.  I do
18  recall seeing one entry in the record that says
19  he's using it on an as-needed basis.  Generally in
20  someone with discogenic pain and arthritis and
21  their problem is a daily -- pretty close to daily,
22  generally I would tell people to use the lowest
23  effective dose.  If you can get by on two times a
24  week, take it a few times a week.  If you need it
25  every day, take it every day.

Page 204

1       Q.  Did you tell Mr. Barnett at any point
2  that he would need to be on Vioxx for the rest of
3  his life or some other pain medication for the rest
4  of his life?
5       A.  I don't know if I told him that, but
6  it's probably true.
7       Q.  Why?
8       A.  Because degenerative disc disease and
9  degenerative joint disease get worse with age, not
10  better, and as he continues to age, those diseases
11  are going to get worse unless he has surgical
12  intervention.
13      Q.  Did you record in various medical
14  records here, sir, that Mr. Barnett was stable
15  while taking Vioxx?
16      A.  Yes, sir.
17      Q.  What did that mean when you said stable
18  on Vioxx?
19      A.  That meant that his symptoms were under
20  control and he did not show evidence of significant
21  side effects.
22      Q.  Is that why you continued to prescribe
23  Vioxx, sir, to him?
24      A.  Yes, sir.
25      Q.  You were asked some questions about

Page 205

1  Mr. Barnett's January 2000 ischemia.  Do you
2  remember that?
3       A.  Yes, sir.
4       Q.  Mr. Robinson kept referring to it as
5  angina and I'm going to refer to it as the medical
6  records do as ischemia, okay?
7       A.  Okay.
8       Q.  Let me mark an exhibit I don't think
9  you were shown.
10      MR. ROBINSON:  For the record, I'm
11  going to -- the records say both angina and
12  ischemia at various points, but let's -- let's go
13  on.
14  BY MR. GOLDMAN:
15      Q.  I'm going to mark as Exhibit 31 a
16  medical record, sir --
17      (DFT. EXH. 31, Grand Strand Regional
18  Medical Center medical record for Gerald Barnett,
19  was marked for identification.)
20  BY MR. GOLDMAN:
21      Q.  I think you need to look at that.
22      A.  Okay.
23      Q.  That I'll identify as
24  BarnettG-GrandStrandRMC 15.  You can just take a
25  minute to look at it and I'll ask you some

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 206

1    questions.
2         A.   Okay.
3         Q.   Is this your dictation of what occurred
4    with Mr. Barnett in the January 19th, 20th time
5    frame of 2000?
6         A.   Yes, sir.
7         Q.   Directing your attention to the fifth
8    sentence.  What does it say starting with after,
9    after he was told?
10        A.   After he was told he may require
11   cardiac catheterization, he became quite anxious.
12        Q.   You can continue.
13        A.   This lasted a few seconds and resolved
14   without any specific treatment.  He had an episode
15   of chest pain, fairly severe, in the ER.  He took a
16   sublingual nitroglycerin and pain was resolved
17   within 30 seconds.
18        Q.   You can stop there.  Do you remember,
19   Doctor, that you thought he might need to have a
20   cardiac catheterization in January of 2000?
21        A.   Yes, sir.
22        Q.   What is a cardiac catheterization and
23   why did you think that he might need one?
24        A.   A cardiac catheterization is a
25   diagnostic test where the cardiologist threads a

Page 207

1    catheter into an artery either in the arm or the
2    leg and runs it through the artery up into the
3    heart.  They then inject dye which they can see on
4    fluoroscopy or on moving x-ray into the coronary
5    arteries and take pictures of the dye filling the
6    arteries.
7         Q.   What are the coronary arteries?
8         A.   Arteries to the heart.
9         Q.   Please continue.
10        A.   That gives them an indication or an
11   idea about plaque development, movement of the
12   heart muscle to see if there are areas not -- that
13   are not moving properly that you may see in a
14   previous heart attack and also how well the heart's
15   pumping, the strength of the heartbeat.
16        Q.   So you thought that -- that it was
17   possible that he would need a cardiac
18   catheterization in January of 2000, but as I
19   understand it, Mr. Barnett didn't want to go that
20   route?
21        A.   That's correct.
22        Q.   Why not?
23        A.   My best guess is he was just too scared
24   of the procedure.  With -- with a heart
25   catheterization when the cardiologist talks to the

Page 208

1    patient about it, generally they'll quote odds of
2    about one to a thousand -- one to a thousand chance
3    of dying or one to 10,000.  Those statistics are
4    for all heart catheterizations and many of the
5    people that get heart catheterizations are in the
6    midst of an acute MI or an acute heart attack and
7    their risk is a lot higher, but Mr. Barnett was
8    quite anxious and didn't want to have the
9    catheterization done.
10        Q.   Did Mr. Barnett want to follow a more
11   conservative approach?
12        A.   That's correct.
13        Q.   If you look further down in Exhibit 31,
14   do you see where it says, he was ruled out for
15   myocardial infarction with serial enzymes?
16        A.   Same page?
17        Q.   Yes.
18        A.   Yes, sir.
19        Q.   Myocardial infarction is a fancy term
20   for a heart attack?
21        A.   Correct.
22        Q.   What are serial enzymes?
23        A.   Generally when an individual has a
24   heart attack, as the heart muscle is damaged, the
25   proteins that are contained in the heart muscle are

Page 209

1    released into the bloodstream.  As the cells die,
2    they release their contents.  The heart has certain
3    enzymes that are relatively unique to heart muscle
4    called CPK.  If an individual has an event that
5    damages -- that damages their heart muscle,
6    generally those enzymes will increase over the next
7    24 hours as they're released into the bloodstream,
8    you draw the blood, measure the levels of CPK.  And
9    they can also tell you if it's MB, which is myo --
10   heart muscle, or MM, which is skeletal muscle,
11   because they both contain CPK.  And we'll do a set
12   of three enzymes eight hours apart.  If they've had
13   damage to the heart, generally those enzymes will
14   increase above normal limits and that's what serial
15   enzymes are, a series of three.
16        Q.   In January of 2000, Mr. Barnett had
17   serial enzyme tests and they showed no elevation?
18        A.   Correct.
19        Q.   In January of 2000, Mr. Barnett did not
20   have a heart attack, did he?
21        A.   That's correct.
22        Q.   In January of 2000, you believed he
23   didn't have -- withdrawn.
24             MR. GOLDMAN:  I think we have to go off
25   the tape because it's about to finish.  Do you need

53 (Pages 206 to 209)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 210

1   to take a quick break?
2         THE WITNESS: I'll take a quick break.
3         VIDEO TECHNICIAN: This is the end of
4   Tape Number 4 in the deposition of Dr. Michael
5   Mikola. The time is approximately 2:45 PM. The
6   date is April 25th, 2006. We will now go off the
7   record.
8         (A recess transpired.)
9         VIDEO TECHNICIAN: We're back on the
10  record. This is the beginning of Tape Number 5 in
11  the deposition of Dr. Michael Mikola. The time is
12  approximately 2:52 AM. The date is April 25th,
13  2006.
14  BY MR. GOLDMAN:
15      Q.  Dr. Mikola, while we were at a break,
16  you told us that there was something you wanted to
17  clarify in this Exhibit 31.
18      A.  Yes, sir. I probably dictated it out
19  of order. What occurred when I talked to him about
20  the heart catheterization, it says he did brady
21  down into the 30's after he was told he may require
22  a cardiac catheterization.
23      Q.  What does that mean, first of all,
24  brady down into the 30's?
25      A.  When I talked to him about the cardiac

Page 211

1   catheterization, that he may need one, he almost
2   passed out. Brady down means his pulse went down
3   to 30, 30 beats a minute, and he almost lost
4   consciousness. He fainted basically and
5   fortunately he was in bed and didn't fall. But
6   that's how apprehensive he was about the heart
7   catheterization.
8       Q.  Is that one reason why you felt it
9   wasn't necessary to do the catheterization and to
10  go a more conservative route?
11      A.  I don't think he would have agreed to a
12  catheterization. And that's the decision made
13  between the patient and the cardiologist
14  ultimately, but he was not at that time interested
15  in having a cardiac catheterization.
16      Q.  Do you see under discharge meds or D
17  meds, what pain medication is identified?
18      A.  It says Feldene, 20 milligrams a day.
19      Q.  And this is dated when?
20      A.  January 20th -- or actually, it was
21  dictated on January 20th, 2000 and transcribed on
22  the 21st.
23          MR. ROBINSON: Andy, for completeness,
24  I want to --
25          MR. GOLDMAN: If you have another

Page 212

1   document, you can use it.
2         MR. ROBINSON: I -- it's the same
3   hospital -- I want to point out so we don't mislead
4   the record here --
5         MR. GOLDMAN: I'm going to go through
6   them.
7         MR. ROBINSON: On the same -- same
8   hospitalization, Dr. Swami takes a history of Vioxx
9   and Prilosec.
10        MR. GOLDMAN: Okay. You should -- you
11  should use that then because I'm going through in
12  order.
13        MR. ROBINSON: Okay. I'm just trying
14  to show you. There's no --
15        MR. GOLDMAN: I've read the records.
16        MR. ROBINSON: Okay.
17  BY MR. GOLDMAN:
18      Q.  You remember that Mr. Robinson was
19  asking you about aspirin and whether Mr. Barnett
20  used it prior to his heart attack?
21      A.  I remember.
22        MR. ROBINSON: No, I asked if he
23  consistently used it.
24  BY MR. GOLDMAN:
25      Q.  Do you remember that?

Page 213

1       A.  I remember, yes, sir.
2       Q.  I said that I would show you some
3   documents to see if your refresh -- your
4   recollection might be refreshed.
5       A.  Um-hum.
6       Q.  Let me hand you what I'll mark as
7   Exhibit 32.
8         (DFT. EXH. 32, Grand Strand Regional
9   Medical Center medical records for Gerald Barnett,
10  was marked for identification.)
11  BY MR. GOLDMAN:
12      Q.  This is a document Bates stamped
13  BarnettG-GrandStrandRMC 19 through 21. And is this
14  an office note that you dictated on January 19th of
15  2000?
16      A.  No, sir, this would be the history and
17  physical to admit him to the hospital on the 19th.
18  It is a note that I dictated, yes.
19      Q.  Did you dictate Exhibit 32 on or about
20  January 19th?
21      A.  Correct.
22      Q.  I want to direct your attention to the
23  second page under assessment plan.
24      A.  Yes, sir.
25      Q.  The last sentence says, we will also

54 (Pages 210 to 213)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 214**

1   give supplemental oxygen and start him on a
2   low-dose beta blocker metroprolol (sic) --
3       A.  Metoprolol.
4       Q.  -- metoprolol, 25 --
5       A.  BID, which means twice a day.
6       Q.  And what is the next two words?
7       A.  Daily aspirin.
8       Q.  And then it continues.
9       A.  Yes.
10      Q.  Recognizing that Mr. Barnett was
11  indicated for aspirin in light of his ischemia
12  condition in January of 2000, did you recommend
13  that he should take aspirin on a daily basis?
14      A.  I don't recall specifically.  I
15  would -- I would have assumed that I did, but I
16  don't recall specifically.  My -- my page with my
17  medicine list in it, which is where I would record
18  the medicines that I had him on, are not in the
19  documents.
20      Q.  Do you agree in light of Mr. Barnett's
21  age at this time, 56 years old, his family history
22  of heart disease, his high cholesterol and his
23  ischemia in January of 2000 that he was indicated
24  for aspirin?
25      A.  Yes, sir.

**Page 215**

1       Q.  That's why you told him to take daily
2   aspirin on January 19th according to this record?
3       A.  On January 19, it doesn't exactly say
4   that I told him to take aspirin.  It says that I
5   started him on aspirin while in the hospital.
6       Q.  And it says, aspirin daily?
7       A.  Yes.
8           MR. ROBINSON:  In the hospital he said.
9   BY MR. GOLDMAN:
10      Q.  As you sit here today -- I'll go to the
11  next topic.
12          MR. ROBINSON:  Good.
13  BY MR. GOLDMAN:
14      Q.  Mr. Robinson showed you certain
15  documents about Mr. Barnett's cholesterol and on
16  occasion, you had indicated that his cholesterol
17  ratios were acceptable.  Do you remember that?
18      A.  Yes, sir.
19      Q.  Do you see in the document that I just
20  showed you that at this point in January of 1999
21  under hyperlipidemia, Page 2 --
22      A.  January of 1999?
23      Q.  That's the document --
24      A.  2000.
25      Q.  Sorry.

**Page 216**

1       A.  Okay.
2       Q.  January 2000.
3       A.  All right.
4       Q.  Under hyperlipidemia on the second page
5   it indicates in the middle he did lower his LDL
6   from 190 to 152 with dietary changes and further
7   decisions regarding his therapy will be made after
8   the results of his cardiac work-up.  Do you see
9   that?
10      A.  Yes, sir.
11      Q.  How would you describe an LDL level of
12  190?
13      A.  High.
14      Q.  How would you describe an LDL level of
15  152?
16      A.  Still high.  I should clarify if I may,
17  the recommendations for lipid levels have changed
18  in the last few years.  Prior to that time, it was
19  recommended that if you don't have two or more risk
20  factors for heart disease, a goal of LDL less than
21  130 is acceptable.  They've subsequently lowered it
22  to 120.  If you have coronary disease, it's
23  recommended that you get it below 100.  So that's
24  why -- that's just -- the target is different
25  depending on risk factors or the presence of

**Page 217**

1   disease.
2       Q.  Mr. Barnett had multiple risk factors
3   for heart disease, didn't he?
4       A.  He had two, yes, sir.
5       Q.  High cholesterol?
6       A.  Well, three, male sex, he's a male.
7       Q.  Male, high cholesterol?
8       A.  Family history.
9       Q.  Family history.  Did you consider
10  Mr. Barnett's sex -- gender, male, his high
11  cholesterol and his family history to be risk
12  factors for heart disease in January of 2000?
13      A.  Yes, sir.
14      Q.  I'm going to mark as Exhibit 33, sir,
15  an exhibit Bates stamped
16  BarnettG-CardiogasAssoc 51.
17          (DFT. EXH. 33,
18  Cardiology/Gastroenterology Associates medical
19  record for Gerald Barnett, was marked for
20  identification.)
21  BY MR. GOLDMAN:
22      Q.  And this is a Cardiolite stress test
23  that was done on January 24th of 2000.  Do you see
24  that?
25      A.  Correct.

Michael Mikola, M.D.

---

**Page 218**

1    Q.   You are listed as a referring
2  physician?
3    A.   Yes, sir.
4    Q.   What does that mean?
5    A.   That means I -- this was the stress
6  test that was done from his follow-up
7  hospitalization.  At the time he was hospitalized
8  in January of 2000 when he came in with the chest
9  pain, he was seen in consultation by the
10  cardiologist if I remember correctly.  She thought
11  that he was stable and that the stress test could
12  be done as an outpatient, so then I referred
13  Mr. Barnett to their office to have the stress test
14  done and this is the stress test.
15    Q.   Do you see toward the top of the page,
16  it says, stress, the patient exercised 15 minutes
17  zero seconds into a Bruce protocol?
18    A.   Yes.
19    Q.   What is a Bruce protocol?
20    A.   A Bruce protocol is the way that they
21  change the speed and the slope of the treadmill.
22  You start out in a moderate speed on a flat
23  surface.  Every three minutes the slope increases
24  so you walk progressively more and more uphill and
25  they'll also increase the speed incrementally.  So

---

**Page 219**

1  to go 15 minutes on a Bruce protocol stress test
2  means that you're in pretty good shape to do that.
3    Q.   Would you consider Mr. Barnett's
4  ability to last for 15 minutes on the treadmill
5  given this Bruce protocol to be an excellent
6  exercise tolerance?
7    A.   Yes, sir.
8    Q.   That's what it says actually in
9  conclusions, excellent exercise tolerance.
10    A.   Yes, sir.
11    Q.   Do you see that?  Looking further down
12  under perfusion report, can you just briefly
13  describe what a perfusion report is.
14    A.   The concept of stress testing is to
15  determine the adequacy of the arteries to the heart
16  to provide the heart muscle with the necessary
17  blood and oxygen that it needs.  When you and I or
18  anyone who's sitting at a table at rest, our heart
19  really doesn't need a lot of oxygen to do its job.
20  When you and I are walking up a hill at a fast pace
21  and the heart is really pumping to feed the
22  muscles, it requires much more flow.  The concept
23  is if you have fixed plaques or plaque in the
24  arteries that are 70 percent occlusive or more, the
25  narrowing in the artery will prevent the provision

---

**Page 220**

1  of adequate blood supply to the heart muscle.
2    When they -- the way that they measure
3  that is they inject you with a radioactive dye.
4  They follow it into the heart muscle and this
5  dye -- they'll use thallium or a sestamibi goes
6  preferentially into the heart muscle.  They'll use
7  a camera to take pictures of the heart muscle and
8  what they really take a picture is -- a picture of
9  the amount of dye that's being emitted -- or the
10  radiation that's being emitted from the dye.
11    If you have an area of significant
12  plaque build-up, you will not get as much dye to
13  that area because there's limitation in the blood
14  flow and it's carried by the bloodstream.  If you
15  have an old heart attack, you'll see an area that
16  doesn't take up any dye because it's dead scar
17  tissue and it's not metabolically active.  So
18  lateral wall ischemia -- a small area of lateral
19  ischemia would suggest that there is -- an ischemia
20  is different than a scar.  Ischemia means that it
21  does take up dye but not as rapidly as the rest of
22  the heart.  So it is alive and it's getting blood
23  supply, but the blood supply is slow to that -- to
24  that area.
25    Q.   And when blood supply is slow to that

---

**Page 221**

1  particular area, you mean that there is plaque that
2  is preventing the blood flow from going through?
3    A.   That's the general presumption, yes,
4  sir.
5    Q.   And the more plaque you have, the
6  harder the blood supply is -- withdrawn.  Let me
7  ask you another one.
8    The more plaque you have, the less
9  blood flow you have through your arteries?
10    A.   Yes.  And one thing that may be
11  important for the jury to understand is that the
12  coronary arteries have tremendous amount of
13  reserve.  If you and I had every artery in our
14  heart 50 percent blockages, we could get up and run
15  a marathon or run whatever you want to do.  It's
16  not until about 70 percent vessel occlusion that
17  flow limitation occurs.  So stress tests are very
18  good at picking up blockages greater than 70
19  percent, but you can have a normal stress test and
20  have five 50 percent blockages in your arteries,
21  which subsequently is what turned out to some
22  degree with Mr. Barnett.
23    Q.   You understand that in September of
24  2002 when Mr. Barnett had a cardiac
25  catheterization, it was determined that he had six

---

Michael Mikola, M.D.

**Page 222**

1  vessels that were occluded, several of which were
2  above 80 percent?
3      A.  Yes.  He had at least five.
4      Q.  And it's your understanding that if you
5  have normal stress tests over time, that doesn't
6  mean that you don't have plaque build-up in your
7  arteries?
8      A.  That's absolutely correct.
9      Q.  It's only until you have 70 percent, in
10 your view, or more occlusion that a stress test
11 might pick up the reduced blood flow?
12     A.  That's correct.
13     Q.  Turning back to the Cardiolite exam, do
14 you see under conclusions, left ventricular
15 ejection fraction 56 percent?
16     A.  Yes, sir.
17     Q.  What does that mean briefly?
18     A.  That means that his heart ejects
19 approximately 56 percent of the blood that it fills
20 with.  Normally a heart of a healthy individual
21 will pump out about 55 to 60 percent of the blood
22 that it's filled with at any time.  The heart
23 doesn't completely empty.  It empties about 60
24 percent of the blood that's in it when it pumps.
25 When they do this dye test, they also do what are

**Page 223**

1  called gated images where they time the heart
2  contractions.  They measure the amount of dye that
3  comes in and the amount that goes out and they give
4  you an ejection fraction and that's -- that's an
5  indication that the heart muscle is pumping well.
6      Q.  Is a 56 percent ejection fraction
7  normal for a man of 56?
8      A.  That's correct.
9      Q.  Does that mean that in January of 2000,
10 Mr. Barnett's heart was pumping adequately?
11     A.  Yes, sir, that's correct.
12     Q.  Mr. Robinson asked you whether it was
13 possible that the stress test in January of 2000
14 was a false positive.  Do you remember that?
15     A.  I don't remember if he asked me that,
16 but I remember stating that.
17     Q.  Am I right, Dr. Mikola, that the
18 cardiologist and you at the time reviewed the
19 stress test and your best medical judgment at the
20 time was that Mr. Barnett had ischemia, right?
21     A.  Yes, the stress test suggested he did
22 have a small area of ischemia.
23     Q.  If that's true and the test accurately
24 described his ischemia, then am I right that
25 Mr. Barnett had coronary artery disease and plaque

**Page 224**

1  build-up in January of 2000?
2      A.  I believe that's true.
3      Q.  Do you understand that coronary artery
4  disease or atherosclerosis is a process that
5  develops over decades?
6      A.  Yes, sir.
7      Q.  Coronary heart disease and
8  atherosclerosis doesn't appear after ten days, does
9  it?
10     A.  Atherosclerosis does not appear after
11 ten days, correct.
12     Q.  Atherosclerosis is a chronic process
13 that takes many years to develop, correct?
14     A.  Atherosclerosis, that's correct.  It's
15 thought that the fatty streaks of atherosclerosis
16 generally begin during childhood.
17     Q.  Is it also your understanding,
18 Dr. Mikola, that atherosclerosis builds up over
19 time and gets progressively worse?
20     A.  Atherosclerosis, yes, sir.
21     Q.  I know you didn't look inside
22 Mr. Barnett's arteries in January of 2000, but
23 based on the diagnosis of ischemia, that would
24 suggest that he had plaque and atherosclerotic
25 lesions before January of 2000, right?

**Page 225**

1      A.  Yes, sir.
2      Q.  Plaque and atherosclerotic lesions are
3  things that take awhile to develop --
4      A.  Correct.
5      Q.  -- to the point where you start having
6  ischemia, correct?
7          MR. ROBINSON:  Objection, leading.
8          THE WITNESS:  That is correct.
9  BY MR. GOLDMAN:
10     Q.  Is it your understanding or not, sir,
11 that it takes many years for plaque to develop and
12 atherosclerotic lesions to develop to the point
13 where you have ischemia?
14         MR. ROBINSON:  Objection, vague.
15         THE WITNESS:  Yes, sir, that's correct.
16 BY MR. GOLDMAN:
17     Q.  Did you understand my question?
18     A.  Yes, sir.
19     Q.  You were shown a single study about
20 mice.  Do you remember that?
21     A.  Yes, sir.
22     Q.  Mr. Barnett (sic) showed you Exhibit 18
23 and if you wouldn't mind, Dr. Mikola, could you
24 just find that.  I only have one copy.
25     A.  It's not Mr. Barnett.

57 (Pages 222 to 225)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 226

1     MR. ROBINSON: I'm here for Mr. Barnett
2 so I'll -- it's okay. Let it go.
3     MR. GOLDMAN: Sorry.
4     THE WITNESS: No problem. I have it.
5     (Off-the-record conference.)
6 BY MR. GOLDMAN:
7     Q. Dr. Mikola, have you found the mice
8 study --
9     A. Yes, sir.
10     Q. -- that Mr. Robinson marked as Exhibit
11 18?
12     A. Yes, sir.
13     MR. ROBINSON: By the way, I don't
14 think it's called mice study. It's something like
15 atherogenesis or something like that.
16     THE WITNESS: I have it.
17 BY MR. GOLDMAN:
18     Q. Well, if you just look at the title, do
19 you see -- I can't even pronounce half the words,
20 but do you see at the end, it says, knockout mice?
21     A. Yes, sir.
22     Q. I know you weren't given much of an
23 opportunity to review this study. In fact, you
24 weren't given any. Do you see --
25     MR. ROBINSON: I'm going to move to

Page 227

1 strike.
2 BY MR. GOLDMAN:
3     Q. Do you see, sir, you can take as long
4 as you want, that this animal study involved mice
5 and not human beings?
6     A. Yes, sir.
7     Q. When you make treatment decisions for
8 your patients, do you rely on human clinical trials
9 or animal studies?
10     A. Human clinical trials.
11     Q. When you're deciding whether to
12 prescribe Vioxx to Mr. Barnett, are you interested
13 in knowing how Vioxx did in a clinical trial with
14 human beings?
15     A. Yes, sir.
16     Q. Is the information that's contained in
17 the FDA-approved package insert information about
18 human beings or animals? I know there are certain
19 animal studies in there, but they're clinical
20 studies that the FDA reports on?
21     A. On human beings, yes. They usually
22 will do teratogenesis studies on mice just because
23 we don't like to give massive amounts of drugs to
24 pregnant women to see if it affects the fetus or
25 not.

Page 228

1     MR. ROBINSON: That sounds pretty good.
2 BY MR. GOLDMAN:
3     Q. Mr. Robinson showed you this and said
4 did Merck ever tell you about this study. Do you
5 remember that?
6     A. Yes, I do.
7     Q. This was a study that was published in
8 the Journal of the American College of Cardiology.
9 Do you see that?
10     A. Yes, sir.
11     Q. In 2003.
12     A. Yes, sir.
13     Q. I'm not going to spend much time on
14 this study because I think it's going to be the
15 subject of maybe some discussion at trial, but can
16 you turn just to the second to last page.
17     MR. ROBINSON: I'm going to move to
18 strike just the first comment about what your goal
19 is at trial, but go from there.
20 BY MR. GOLDMAN:
21     Q. Turning your attention to the second to
22 last page of this mouse study, do you see in the
23 second to last paragraph, second sentence, however,
24 extrapolation of our results obtained in a mouse
25 model to humans taking COX-2 inhibitors may not

Page 229

1 necessarily be valid?
2     A. Yes, sir, I see that.
3     Q. And there is other discussion in this
4 article about other studies showing a COX-2
5 inhibition reduces the rate of atherosclerosis. Do
6 you see that anywhere or do you want to take your
7 time and look?
8     A. I'll have to review it.
9     Q. Let me do it this way: You don't have
10 to read it all. If you had this mouse study back
11 at the time you were prescribing medicine to Dr. --
12 to Mr. Barnett, would it have made any difference
13 in your decision to prescribe Vioxx to him?
14     A. It's very unlikely.
15     Q. Do you also know that there are
16 inconsistent results in animal studies on occasion?
17     A. Yes, sir, and in human studies as well,
18 that's correct.
19     Q. Did Dr. Robinson show you any of the
20 studies involving mice or other animals where the
21 inhibition of COX-2 reduced the rate of
22 atherosclerosis?
23     A. No, sir.
24     Q. Would you be surprised to learn that
25 this one mouse study is the only animal study out

58 (Pages 226 to 229)

Michael Mikola, M.D.

## Page 230

1 of eight different articles on this issue that
2 shows the potential for the development of an
3 atherosclerotic lesion --
4         MR. ROBINSON: Objection.
5 BY MR. GOLDMAN:
6         Q.   -- from COX-2 inhibition?
7         MR. ROBINSON: Objection.
8         THE WITNESS: Yes. One -- one thing
9 about the ApoE knockout mice --
10 BY MR. GOLDMAN:
11        Q.   Wait. I want to make sure I understand
12 your --
13        A.   Okay.
14        Q.   -- answer because I don't think you
15 meant it or maybe I didn't ask the question --
16        A.   Would I be interested in --
17        Q.   No, I asked you would be you surprised.
18 I'll ask both.
19        A.   Okay.
20        Q.   Before deciding whether or not a single
21 mouse study would be interesting to you, would you
22 want to know what all of the animal studies
23 concerning the issue about atherosclerosis and
24 COX-2 inhibition said?
25        A.   Yes, sir.

## Page 231

1         Q.   Would you be interested in knowing the
2 eight other animal studies that show either no
3 effect of COX-2 inhibition on atherosclerosis or
4 show that it reduces the rate of atherosclerosis?
5         A.   Yes, sir.
6         MR. ROBINSON: Objection.
7 BY MR. GOLDMAN:
8         Q.   You were going to say?
9         A.   The ApoE knockout mice is a
10 genetically-modified mouse that develops
11 atherosclerosis. It's not a -- it's a
12 genetically-modified mouse. Mice don't get
13 atherosclerosis, humans do. In order to do studies
14 with them, they have to change them genetically so
15 that they -- either feed them a very high-fat
16 diet. They have to do things to them to make them
17 develop plaque so you can see if they have vascular
18 events or not.
19        Q.   Why would that be significant to you in
20 determining the relevance of a mouse study
21 involving knockout mice?
22        A.   Studies with -- in animals that were
23 more similar to humans in terms of atherogenesis
24 would also be very helpful to have.
25        Q.   Do you know if mice have heart attacks?

## Page 232

1         A.   On their own, I don't know. I don't
2 know. Do they?
3         Q.   I don't think so.
4         A.   I don't think so, but I'm not sure.
5         Q.   Turning back to the January 2000
6 ischemia. Did Mr. Barnett's chest pain resolve
7 promptly?
8         A.   In January 2000?
9         Q.   Yes.
10        A.   I believe it resolved with the
11 nitroglycerine.
12        Q.   What is nitroglycerin?
13        A.   It is a medication that relaxes smooth
14 muscle. Smooth muscle is the type of muscle cells
15 present in the esophagus and also the coronary
16 arteries. The arterial wall of arteries contain
17 muscles, muscle cells, and the muscles cells
18 regulate the tone of the artery, whether it
19 contracts or relaxes. Nitroglycerin relaxes the
20 smooth muscle cells in places including the
21 arterial wall of the coronary artery so if you have
22 an arterial wall with spasm or it's clamped down
23 for various reasons, nitroglycerin helps it to
24 relax and dilate.
25        Q.   And Mr. -- Mr. Barnett responded well

## Page 233

1 to the nitroglycerine and his chest pain resolved I
2 believe in 30 seconds?
3         A.   Yes, sir.
4         Q.   Turning your attention to Exhibit 30 on
5 the Bates stamp at the bottom Huberty 4. Tell me
6 when you're there.
7         A.   Okay. Yes, sir.
8         Q.   Is this an office record of yours for
9 Mr. Barnett dated January 27th of 2000?
10        A.   That is correct.
11        Q.   Do you see at the top under history of
12 present illness you wrote that he was admitted to
13 the hospital with chest pain and underwent a stress
14 thallium test and then indicate his chest pain is
15 improving?
16        A.   Yes, sir, and that postoperatively is a
17 typo.
18        Q.   What should it say?
19        A.   Underwent a stress thallium...
20        Q.   I think he underwent a stress thallium
21 test after he left the hospital?
22        A.   After he left the hospital, yes. Post
23 hospitalization.
24        Q.   Can you read what you wrote out loud in
25 the second and third sentence -- second and third

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

| Page 234 | Page 236 |
|---|---|

**Page 234**

1  to the last sentence.
2      A.  In the first paragraph?
3      Q.  Let me back up.
4          Can you please read, Dr. Mikola, what
5  you wrote in the second to last and last sentence
6  under history of present illness.
7      A.  Yes, sir, it's referring to chest pain.
8  He thinks it may have been related to stress and
9  exercising after a layoff and overuse.  It is
10  nearly resolved.
11      Q.  What did you understand Mr. Barnett to
12  mean -- to mean when he said that he thought it may
13  have been related to stress?
14      A.  The episode of chest pain.
15      Q.  Do you know what stress Mr. Barnett was
16  under in January of 2000?
17      A.  Not specifically, no, sir.
18      Q.  Do you remember that Mr. Barnett's wife
19  was unfortunately diagnosed with neck and head
20  cancer in 1999?
21      A.  Now that you mention it, I do recall
22  that, yes, sir.
23      Q.  Can that be a stressful event?
24      A.  Definitely.
25      Q.  Can stress affect plaque formation and

**Page 235**

1  the development of heart disease?
2      A.  Yes, we believe that it can.
3      Q.  Can stress be related to the
4  development of ischemia?
5      A.  Yes.
6      Q.  The end of that sentence you wrote that
7  Mr. Barnett thinks it may have been related to
8  stress and exercising after a layoff and overuse.
9  What did you understand that to mean?
10      A.  He exercised fairly regularly and
11  lifted weights.  It's not unusual for people to
12  develop muscle soreness if they lift weights and
13  they haven't been doing it for a period of time,
14  it's very common.  And he from what I gathered
15  talking to him thought that his chest pain may have
16  been related to muscle soreness from resuming his
17  weight-lifting activity.
18      Q.  You indicate your view of what caused
19  his chest pain under assessment and plan and you
20  wrote, chest pain.  It is probably related to a
21  combination of things.
22          What did you think, sir, Mr. Barnett's
23  chest pain was related to other than the
24  development of plaque that you said predated
25  January of 2000?

**Page 236**

1      A.  I thought it was probably related to
2  anxiety as well.  It's a very common symptom of
3  anxiety to develop chest pain.  He also had a
4  history of esophageal symptoms.
5          And the one thing that probably bears
6  mention in his stress test is that he did not
7  develop the same symptoms while his stress test was
8  showing inadequate blood supply.  Again,
9  Mr. Barnett is one of those patients who just
10  doesn't fit the typical patterns.  If a patient has
11  a stress test that suggests ischemia and they get
12  their pain and they say, oh, yeah, that's the pain
13  I've been having, that's pretty good evidence to
14  suggest that it's angina that's causing their pain.
15  If they have a stress test and it shows ischemia
16  and they feel great, then that sort of is not quite
17  as clear-cut.
18      Q.  Um-hum.
19      A.  Is the ischemia an incidental finding?
20  How is it that they have chest pain sometimes from
21  ischemia but not when they are walking up a steep
22  hill fast?
23          I think if he had developed chest pain
24  when he was on the treadmill, the cardiologist and
25  myself probably would have pushed him a lot harder

**Page 237**

1  for catheterization.  So in his case, it's -- his
2  chest pain is very difficult to determine what's
3  actually causing it.  He's not a clear-cut, you
4  know, when I walk I get chest pain, when I slow
5  down it stops person.
6      Q.  Based on your experience with ischemia
7  and these stress test results, I think you said
8  before that you would believe that the patient who
9  was diagnosed with ischemia would have developed
10  plaque and coronary artery disease?
11      A.  The patient diagnosed with ischemia is
12  likely to have significant coronary disease and
13  plaques, yes.
14      Q.  And --
15      A.  The exception to that would be -- there
16  are probably a couple exceptions, cocaine use,
17  which causes spasm which I don't believe he's ever
18  used cocaine and had no reason to believe that, or
19  there's a disorder called coronary vasospasm where
20  people have spasm in the arteries that can cause
21  ischemia but they don't have plaque build-up, but I
22  don't think that was -- I don't think that was the
23  case in his case.
24      Q.  To be clear, Mr. Barnett in January of
25  2000 had coronary heart disease that had been

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 238

1  developing over years?
2      A.  I believe that's the case, yes, sir.
3      Q.  What did you write on January 27th
4  under osteoarthritis concerning the medication that
5  Mr. Barnett was using?
6      A.  Continue Feldene, 20 milligrams a day.
7      Q.  Was it your belief that Mr. Barnett was
8  using Feldene at that point and not Vioxx?
9      A.  That's correct.
10      Q.  Do you see just above that in chest
11  pain, the last sentence you say, we will treat him
12  conservatively and treat his modifiable risk
13  factors.
14          Can you describe what you meant by
15  that --
16      A.  Yes, sir.
17      Q.  -- and how you did that.
18      A.  There are really two approaches to
19  treating coronary artery disease.  There is
20  aggressive and conservative.  Aggressive treatment,
21  it involves heart catheterization and vascular
22  intervention if indicated at that time.
23  Conservative therapy is generally treating with
24  medications to try to prevent subsequent plaque
25  build-up and subsequent angina or ischemic

Page 239

1  episodes.  Most of the studies would show that in
2  patients with a very small area of ischemia,
3  especially if it's not a large area of the anterior
4  wall which is supplied by a really large artery,
5  either one of those two approaches is about
6  equivalent at the end of a year.  So you can treat
7  him conservatively with medicines, you can put him
8  through the -- the catheterization, the other test,
9  and the outcome at the end of the year is not
10  dramatically different with mild, small area of
11  ischemia that's not involving a major arterial
12  distribution.
13      Q.  And in your medical judgment and the
14  cardiologist's was that it was okay to treat his
15  condition conservatively?
16      A.  Yes, sir.  And -- that and also by the
17  fact that he did not want to have cardiac
18  catheterization.  If he had said, you know, yes,
19  I'm all for a cardiac cath, it would have been done
20  I'm pretty sure.
21      Q.  The --
22      A.  Cardiologists like to do caths.
23      Q.  Well, you would have been in favor of
24  Mr. Barnett having a cardiac catheterization if
25  Mr. Barnett was willing to do that back in January

Page 240

1  of 2002?
2      A.  I would have largely due to the fact
3  that his chest pain came on at rest and that
4  confers a higher risk than chest pain that comes on
5  with exertion.  There's a difference between stable
6  and unstable angina.
7      Q.  Okay.  Let me hand you a document I'll
8  mark as Exhibit 34.
9          (DFT. EXH. 34, Physician's Orders, was
10  marked for identification.)
11  BY MR. GOLDMAN:
12      Q.  This is a record from -- I'll just
13  identify the Bates number, Barnett PPR, which means
14  Plaintiff produced record, 467.
15          Can you identify what this is, sir.
16      A.  That's the admission orders when he was
17  admitted to Grand Strand Hospital that I wrote on
18  January 19th.
19      Q.  If you look toward the bottom of the
20  page in the fourth line under aspirin --
21      A.  Yes, sir.
22      Q.  -- what did you write?
23      A.  Enteric-coated aspirin, 325 milligrams
24  QD, or daily.  And the nurse note out to the side
25  says, took prior to arrival.

Page 241

1          Generally when someone is admitted to
2  the hospital with a possible coronary syndrome,
3  standard of care is to give them a full dose of
4  aspirin.
5      Q.  What do you write in the next line?
6      A.  Feldene, 20 milligrams QD, hold, which
7  means I listed it as a medicine so I wouldn't
8  forget it, but I didn't want him to receive it at
9  that time.
10          (DFT. EXH. 35, Medication
11  Administration Record, was marked for
12  identification.)
13          (DFT. EXH. 36, VOID.)
14  BY MR. GOLDMAN:
15      Q.  Let me hand you Exhibit 35, which is a
16  document Bates stamped BarnettG-PPR 476.  What is
17  this, sir?
18      A.  This is the medication list from the
19  hospital.  We call it a MAR, medication
20  administration record.
21      Q.  Who is it prepared by?
22      A.  It's prepared -- I don't know if it's
23  the nurse or the pharmacy, but it's the hospital
24  staff.  I think the pharmacy prepares it.
25      Q.  What does the person who prepared this

Michael Mikola, M.D.

| Page 242 |
|---|

1 write in the second to last box?
2     A.  Feldene, 20 milligrams PO QD, hold.
3     Q.  Is that consistent with your
4 understanding that Mr. Barnett was taking Feldene
5 as of January -- January 19th of 2000?
6     A.  That is consistent with the orders that
7 I wrote and I wrote the order because I thought he
8 was taking Feldene.
9     MR. ROBINSON:  Now, and really to be --
10 I'm going to make the record again to be for
11 completeness, on the same day, October 20th, the
12 record here at the hospital from Swami says meds,
13 Prilosec and Vioxx.  So someone got --
14     MR. GOLDMAN:  You can use the one
15 document that refers to Vioxx.
16     MR. ROBINSON:  Well, where did he come
17 up with Vioxx?  Come on.
18 BY MR. GOLDMAN:
19     Q.  Based on your discussions with
20 Mr. Barnett and to the best of your knowledge, sir,
21 based on the records that we've reviewed so far,
22 was Mr. Barnett taking Vioxx or Feldene in January
23 of 2000 before his ischemia diagnosis?
24     MR. ROBINSON:  Before he answers for
25 completeness, I want him to see the record I'm

| Page 243 |
|---|

1 talking about, which is Exhibit Number 2.  Thank
2 you.
3     THE WITNESS:  Will you repeat the
4 question.
5 BY MR. GOLDMAN:
6     Q.  To the best of your knowledge, sir,
7 based on the medical records you prepared and your
8 discussions with Mr. Barnett, did you believe he
9 was taking Vioxx or Feldene at the time he was
10 diagnosed with ischemia in January of 2000?
11     MR. ROBINSON:  Object, you changed the
12 question, what he believed.
13 BY MR. GOLDMAN:
14     Q.  Can you answer the question?
15     MR. ROBINSON:  Are you asking him what
16 he believes now or what he believed then?
17 BY MR. GOLDMAN:
18     Q.  Can you answer the question?  Do you
19 understand?
20     MR. ROBINSON:  I'm going to object as
21 vague.
22     THE WITNESS:  On January 19th, 2000, I
23 believe he was taking Feldene.  At this point in
24 time, I'm not certain.
25 BY MR. GOLDMAN:

| Page 244 |
|---|

1     Q.  Either way, whether he was taking
2 Feldene or Vioxx, you didn't believe that either
3 one contributed in any way to his ischemia
4 condition, true?
5     MR. ROBINSON:  He didn't know.
6     THE WITNESS:  I don't believe that
7 either one contributed to his atherosclerosis.
8 BY MR. GOLDMAN:
9     Q.  And the Feldene that you wrote in your
10 records that you thought he was taking is a
11 medication that you felt he should continue to
12 take?
13     A.  I'm sorry, say that again.
14     Q.  You believe that as of January of 2000
15 when you said continue Feldene, you felt that that
16 would be an appropriate medication for him even in
17 light of his ischemia condition?
18     A.  Yes, sir.
19     Q.  Let me just show --
20     A.  Let me clarify.  I probably would
21 feel -- or I felt that it would be appropriate
22 medicine for him to take at the time of discharge.
23 I held it on admission to the hospital until we
24 determined whether he had coronary disease or was
25 going to have tests such as a dye contrast study

| Page 245 |
|---|

1 where you don't want patients taking a lot of
2 additional antiinflammatory drugs, if that -- if
3 that's clear.
4     Q.  It is.  I want to talk now about
5 Mr. Barnett's medical condition between January of
6 2000 and September of 2002 when he had his heart
7 attack, okay?
8     A.  Yes, sir.
9     Q.  If you turn to Huberty 5 in Exhibit 30.
10     A.  Yes, sir.
11     Q.  Now, this is two months after
12 Mr. Barnett was diagnosed with ischemia, right?
13     A.  That's correct.
14     Q.  And you see here that he's on Vioxx,
15 toward the bottom, stable on the Vioxx?
16     A.  Yes, sir.
17     MR. ROBINSON:  Where did he get on
18 Vioxx, how did he get on Vioxx?
19 BY MR. GOLDMAN:
20     Q.  And assuming that Mr. Barnett was
21 taking Vioxx every day in, let's say, January and
22 February and March of 2000, do you see that he was
23 not experiencing any angina at that time in March
24 of 2000?
25     A.  No, he was not according to what he

62  (Pages 242 to 245)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

| Page 246 |
| --- |

1  told me.
2      Q.  On this occasion, Mr. Barnett indicated
3  that he went skiing and really didn't have any
4  chest pain suggestive of angina.  Do you see that?
5      A.  Yes, sir.
6      Q.  Was it Mr. Barnett's and your judgment
7  that whatever chest pain Mr. Barnett was
8  experiencing in March of 2000 related to his reflux
9  condition and not to his heart?
10      A.  Skiing is essentially a stress test.  I
11  mean, you're at high altitudes, the oxygen levels
12  are low, depending on where you go skiing.
13  Mr. Barnett and I both felt that if he was able to
14  ski without symptoms, that it was unlikely that he
15  was having -- that he had significant angina at
16  that time.
17      Q.  And in fact, it indicates that he did
18  not have any chest pain suggestive of angina.  You
19  see that?
20      A.  Yes, sir.
21      Q.  And then when you wrote, stable on the
22  Vioxx, does that mean that Vioxx was working to
23  control Mr. Barnett's osteoarthritis neck and back
24  pain?
25      A.  Yes, sir.

| Page 247 |
| --- |

1      Q.  And he wasn't having any adverse
2  effects on it?
3      A.  Correct.
4      Q.  Can you read your handwriting down at
5  the bottom under H/P, history/physical, the first
6  one.
7      A.  That's A/P, assessment/plan.
8      Q.  Oh, okay.
9      A.  It's my handwriting.  This -- just so
10  everyone's clear, I generally dictate my notes and
11  you see the reason why.  This is an office visit
12  between March 21st and August 2nd.  I can look at
13  that sheet with the blood pressures on it and tell
14  you what the day is.  I did not write the day.
15      Q.  That's okay.
16      A.  But this is a separate office visit
17  from that day, but I'd be glad to read it.
18      Q.  So between March of 2000 and August of
19  2000, you wrote this note.  And what did you write
20  under A/P or assessment/plan?
21      A.  Increase -- increase cholesterol, trial
22  Lipitor, ten milligrams QD, or daily.  What had
23  conspired is that Mr. Barnett told me he preferred
24  not to take medicine -- and this is from memory,
25  it's not in the chart -- wanted to get his

| Page 248 |
| --- |

1  cholesterol down with diet and exercise.  We tried
2  that and he got it from 190 to 152.  I didn't think
3  that 152 was adequate given his risk factors.  He
4  was supposed to have labs done before he came in
5  March 21st.  Generally that way I have them in
6  front of me when I see the patient and can make the
7  medical decision.  He forgot, didn't have his blood
8  work, so I had him come in in the near future to
9  get the blood work done.  Then I brought him in to
10  discuss it with him and tell him about the side
11  effects to the medicine that I thought he --
12      MR. ROBINSON:  Can we find out what the
13  date of -- is there -- is there a blood test record
14  or something where we have a date?
15      THE WITNESS:  Yeah, I think it was on,
16  I think, one of the exhibits that you gave me.  It
17  was a one-page sheet with all the blood pressure
18  readings.
19      MR. ROBINSON:  Actually, it's the first
20  page of the exhibit.
21      MR. GOLDMAN:  You know, I'll let you do
22  it this time, but --
23      MR. ROBINSON:  I'm doing it just one
24  time.
25      MR. GOLDMAN:  Just let me finish and

| Page 249 |
| --- |

1  then you can.
2      THE WITNESS:  I'm sorry.
3      MR. GOLDMAN:  Okay.
4      MR. ROBINSON:  I'm just trying -- I'm
5  just trying to get a date.  Go ahead.  Go ahead.
6      MR. GOLDMAN:  We'll do it afterward.
7      MR. ROBINSON:  All right.
8  BY MR. GOLDMAN:
9      Q.  And then what did you write under
10  assessment plan under Number 4?
11      A.  4, that's a symbol meaning psychiatry
12  or psychological.  Worried about wife's tongue
13  cancer which has spread into her neck nodes.
14      Q.  Why did you write psych?
15      A.  That's -- we -- generally in the
16  assessment plan, we list the illness that we're
17  addressing such as high cholesterol, leg cramps,
18  gastroesophageal reflux, psychological issues.
19      Q.  And you felt he was having some in
20  light of his wife's cancer condition?
21      A.  Yes, sir.
22      Q.  Can you turn in Exhibit 30 to Huberty
23  29.
24      A.  Yes, sir.
25      Q.  Is this a blood test based on blood

63  (Pages 246 to 249)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 250**

1  drawn on March 24th of 2000, sir?
2      A.  Yes, sir.
3      Q.  What does this indicate about
4  Mr. Barnett's LDL cholesterol?
5      A.  This is the blood that he had -- that
6  he was supposed to have before the 21st that I
7  asked him to come back and get.  It indicated that
8  his cholesterol is significantly elevated.
9      Q.  What is the number indicated after LDL
10  cholesterol?
11     A.  174.
12     Q.  Is that significantly high to you, sir?
13     A.  Yes, sir.
14     Q.  And how about his total cholesterol?
15     A.  250.
16     Q.  I'm not sure if this will come up by
17  the time the jury sees this video, but what is LDL
18  cholesterol?
19     A.  LDL is the subfraction of cholesterol
20  that we attribute largely to the plaque-forming
21  process.  Cholesterol generally doesn't float
22  around in the bloodstream on its own.  It's bound
23  to proteins and a protein-cholesterol complex is
24  referred to as HDL, LDL, VLDL, IDL.  There are
25  several different types, but epidemiologically most

**Page 251**

1  data would suggest that high levels of LDL
2  cholesterol in appropriate patients will increase
3  the risk of vascular disease.
4      Q.  And is LDL cholesterol otherwise known
5  as bad cholesterol?
6      A.  Yes, sir.
7      Q.  That's what you don't want to have in
8  your arteries?
9      A.  That's correct.
10     Q.  And high cholesterol is good
11  cholesterol and you do want to have that?
12     A.  HDL --
13     Q.  I'm sorry.
14     A.  -- is high density, yes.  HDL is the
15  good cholesterol.
16     Q.  Let me ask again.  Is HDL considered
17  the good cholesterol and you want that to be
18  higher?
19     A.  That's correct.
20     MR. ROBINSON:  For completion,
21  completeness on this document, so his HDL of 50 was
22  within normal limits.
23     MR. GOLDMAN:  You know --
24     MR. ROBINSON:  His total cholesterol --
25  5.0 was normal.

**Page 252**

1      MR. GOLDMAN:  Mr. Robinson, do you want
2  to -- if you want to examine --
3      MR. ROBINSON:  No, I'm just going to do
4  what you did this morning.
5      MR. GOLDMAN:  I asked you first to read
6  for completeness.
7      MR. ROBINSON:  I'm reading it right
8  now.
9      MR. GOLDMAN:  No, I asked you if it --
10  it would be okay to read for completeness.  Please
11  ask me.
12     MR. ROBINSON:  Oh, I apologize.  I
13  didn't know.  You were just reading, but I
14  appreciate it.  Can I ask -- can I have him read
15  for completeness?
16     MR. GOLDMAN:  Sure.
17     MR. ROBINSON:  Doctor, would you read
18  the HDL and the total cholesterol portion that's
19  under the normal column.
20     THE WITNESS:  Yes, sir.  The
21  triglycerides were 130 and normal is considered
22  currently to be less than 150, although this
23  reference at the time was below 200.  In either
24  event, that would be normal.  The HDL was listed as
25  50.  Normal we consider to be anything above 40.

**Page 253**

1  At that time, the normal range -- as I mentioned
2  earlier, the recommended levels of blood lipids
3  have changed in the last few years.  The VLDL
4  cholesterol is 26 and the total cholesterol-to-HDL
5  ratio was 5.0.
6  BY MR. GOLDMAN:
7      Q.  Can you turn now to Huberty Exhibit 6,
8  sir.  This is an August 2nd of 2000 record of a
9  visit that you had with Mr. Barnett.
10     A.  Yes, sir.
11     Q.  I just want to ask you about the second
12  to last sentence in the first paragraph.  You
13  write, he has not had any angina.
14     A.  Second to last in the first paragraph.
15  He has not had any angina, yes, sir.
16     Q.  By angina you're referring there to
17  heart pain due to reduced blood flow?
18     A.  Yes, sir.
19     Q.  So at this point Mr. Barnett is taking
20  Vioxx every day and if he was taking it after his
21  January 19th, 2000 visit, he'd be taking it for
22  seven or so months every day, right?
23     A.  Yes, sir.
24     Q.  And as of August 2nd of 2000, he was
25  not having any heart trouble?

64  (Pages 250 to 253)