Michael Mikola, M.D.

Page 254

1     A.  Yes, sir.
2     Q.  I'm not going to go through each one of
3  these records.  I just want you, if you wouldn't
4  mind, to review each of the visits between August
5  of 2000 and September of 2002 and those visits are
6  on Huberty 7, Huberty 8, Huberty 9, Huberty 10,
7  Huberty 11 and Huberty 12.  And those are visits
8  from October 24th of 2000, December 28th of 2000,
9  July 12th of 2001, February 18th of 2002 and August
10  20th of 2002.  And my question to you, sir, after
11  you do that is whether you see any indication in
12  the medical records of you believing that
13  Mr. Barnett had angina or heart pain, heart
14  problems.
15     A.  I did not see anything to that effect.
16     Q.  Mr. Barnett was taking Vioxx every day
17  during that time period through August 20th of 2002
18  and you didn't see any symptoms of angina in any of
19  the visits that we just mentioned?
20     A.  The only potential one would be on
21  2/18/02 when he has some discomfort in his left
22  shoulder.  In retrospect, that may have been a
23  symptom, but at the time I did not think it was
24  suggestive of angina.
25     Q.  And this is Huberty 11.  You're looking

Page 255

1  in February 18th of 2002 and your best medical
2  judgment at the time was that it wasn't angina and
3  now you think, well, maybe it is?
4     A.  The retrospectoscope is 20/20, but at
5  the time I did not think it was angina.
6     Q.  And to the extent he had any angina, if
7  he did then, that would be a surprise given his
8  ischemia condition back in January of 2000,
9  wouldn't it?
10     A.  Can you say that again?
11     Q.  If he had angina in February of 2002,
12  that wouldn't be a surprise given his ischemia
13  condition diagnosed in January of 2000?
14     A.  That's correct.
15     Q.  Based on your review of the record,
16  sir, would you agree that between January of 2000
17  when Mr. Barnett was diagnosed with ischemia and
18  September 6th of 2002 when he had a heart attack,
19  he did not have symptoms of ischemia?
20     A.  Let me review the note from 8/20.  That
21  is correct.
22     Q.  During that time frame after January of
23  2000 through September of 2002, he didn't have any
24  angina?
25     A.  Correct.

Page 256

1     Q.  Any chest pain that Mr. Barnett was
2  experiencing between January of 2000 and September
3  of 2002 was chest pain that was typically relieved
4  with Prilosec and that you believe was related to
5  reflux?
6     A.  Yes, sir, either reflux or possibly
7  anxiety.
8     Q.  Do you also see in Huberty 11, which is
9  the February 18, 2002 visit, that you indicate
10  under assessment plan difficulty losing weight?
11     A.  Yes, sir.
12     Q.  Number 4?  Do you remember a time when
13  Mr. Barnett had gained weight and was trying to
14  lose it on a high-protein diet?
15     A.  Vaguely, yes, sir.
16     Q.  I think you testified before you
17  thought that he was mildly overweight?
18     A.  Um-hum, yes.  Can I --
19     Q.  Let me ask you for -- I'm sorry.
20     A.  Can I comment on that?
21     Q.  Sure.
22     A.  His overall weight he was never
23  morbidly obese.  He had -- tended to have abdominal
24  obesity.  So he wasn't markedly overweight, but he
25  had the type of obesity or the fat deposition in

Page 257

1  the abdomen that is generally associated with an
2  increased risk of metabolic syndrome and
3  atherosclerotic disease, vascular disease.  So
4  although he wasn't markedly overweight, his weight
5  was concentrated in an area that confers a little
6  bit higher risk than if it was distributed, say, in
7  his thighs or buttocks or elsewhere.
8     Q.  Higher risk for heart disease and heart
9  attack?
10     A.  Yes, sir.
11     Q.  Now I want to turn your attention to
12  September 6th through the 14th of 2002.  That was
13  the time that Mr. Barnett was in the hospital for
14  his heart attack?
15     A.  Yes, sir.
16     Q.  He was admitted to a hospital called
17  Grand Strand Regional Medical Center?
18     A.  Yes, sir.
19     Q.  Is that a respected hospital?
20     A.  Yes, sir.
21     Q.  Do you know a cardiologist named
22  Dr. Karavan?
23     A.  Yes, sir.
24     Q.  He was primarily responsible for
25  evaluating Mr. Barnett's heart condition during the

65  (Pages 254 to 257)

Michael Mikola, M.D.

---

**Page 258**

1  hospitalization, right?
2      A.  Yes, sir.
3      Q.   And Dr. Karavan diagnosed Mr. Barnett
4  with a heart attack back then?
5      A.  Yes, sir.
6      Q.   Did you understand that Mr. Barnett had
7  a mild heart attack?
8      A.  Yes, sir.
9      Q.   Why do you say that?
10      A.   Two reasons.  The elevation of his
11  enzymes, if I remember the numbers, his CPK went to
12  217 or possibly a little higher.  The degree of
13  elevation of the CPK is an indicator of the amount
14  of heart muscle that's been damaged by the heart
15  attack.  A large heart attack would most likely
16  give you CPK's in the 2, 3, 4,000 range.  A CPK in
17  the 200's would indicate a small area of heart
18  muscle has been damaged.
19          The other reason is he was diagnosed
20  with a non-Q wave MI, which means the heart attack
21  did not involve the entire thickness of the heart
22  muscle.  The arteries to the heart don't exactly
23  branch out through the heart muscle like muscles --
24  skeletal muscles.  They are located on top of the
25  heart.  They perfuse through the heart muscle and

**Page 259**

1  sort of almost percolates through the wall of the
2  heart muscle, the blood does.
3          In a larger heart attack, generally the
4  entire thickness of the cardiac muscle, of the
5  heart muscle wall, will be damaged and that's what
6  we call a Q wave MI.  He had a non-Q wave MI which
7  suggested it wasn't the entire thickness of the
8  heart muscle.
9      Q.   And what is the basis, Mr. -- I'm
10  sorry, what is the basis, Dr. Mikola, for your
11  assessment that -- that a small elevation in CK
12  (sic) and what you just described about the nature
13  of Mr. Barnett's heart attack -- what makes you
14  comfortable, sir, concluding that Mr. Barnett's
15  heart attack was mild given what you just
16  described?
17      A.   It indicates the information I just
18  shared with you as well as the fact that after the
19  heart attack, the function of his heart, the
20  pumping ability, was still relatively well
21  preserved and maintained.  If you had a large,
22  massive MI, for instance, that knocked out a large
23  part of the heart muscle, you would expect an
24  individual's ejection fraction to go from 55 to 25,
25  30 percent and to the best of my recollection,

**Page 260**

1  they -- his ejection fraction was still fairly well
2  preserved after the MI.
3      Q.   I believe his ejection fraction during
4  the period when he had his MI was 50 percent.
5      A.   Okay.
6      Q.   Does that ring a bell?
7      A.   Okay.  That's about the figure that I
8  recall.
9      Q.   That's still in the normal range,
10  right?
11      A.   Pretty close, yes, sir.
12      Q.   And then subsequently in July of 2003,
13  Mr. Barnett had another stress test and that's when
14  his ejection fraction was 58 percent.  Do you
15  remember that?
16      A.   I don't specifically --
17      Q.   We'll get to that.
18      A.   Okay.
19      Q.   Dr. Curtis Bryan performed a quintuple
20  bypass surgery on Mr. Barnett?
21      A.  Yes, sir.
22      Q.   And then you were saying --
23      A.   Can I ask a quick question?
24      Q.   Yes.
25      A.   What -- which exhibit number is the

**Page 261**

1  hospital record?  I got it.  Okay.
2      Q.   Do you remember that Mr. Barnett was
3  diagnosed with coronary artery disease in his
4  discharge summary?  I'll show it to you if you
5  don't remember.
6      A.   Yes, sir, I remember.  Discharge
7  summary from September.
8      Q.   Yes.  Let me hand it to you.
9          (DFT. EXH. 37, Grand Strand Regional
10  Medical Center medical records for Gerald Barnett,
11  was marked for identification.)
12  BY MR. GOLDMAN:
13      Q.   This is Exhibit 37.  Do you see that --
14          MR. ROBINSON:  I'm sorry, there's
15  writing on this.
16          COURT REPORTER:  What number?
17          MR. ROBINSON:  Is this -- do I have the
18  wrong one?  Just hope he doesn't have writing on
19  it.
20  BY MR. GOLDMAN:
21      Q.   It's Exhibit 37 and it's GrandStrandRMC
22  64 to 65.  Do you see at the top of the page
23  there's a diagnosis, Number 2, coronary artery
24  disease?
25      A.  Yes, sir.

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 262**

1    Q.  Do you understand that that is a
2  condition that takes years and years to develop?
3    A.  That's correct.
4    Q.  Mr. --
5    A.  I should say atherosclerotic coronary
6  artery disease takes years and years to develop.
7    Q.  And that's what Mr. Barnett had?
8    A.  Yes.
9    Q.  Do you see in the -- under -- is it
10  procedure, P-R-O-C?
11    A.  Yes, sir.
12    Q.  -- that there's a reference to
13  Mr. Barnett having significant three-vessel
14  coronary artery disease?
15    A.  Yes, sir.
16    Q.  Based on your experience, sir, does it
17  take many years to develop significant three-vessel
18  coronary artery disease?
19    A.  Yes, sir.
20    Q.  Is coronary artery disease and heart
21  attacks among the leading causes of death in the
22  United States?
23    A.  Correct.
24    Q.  Do you know whether since 1990
25  cardiovascular disease has been the number one

**Page 263**

1  cause of death other than during World War I?
2    A.  I believe that's correct, yes.
3    Q.  The discharge summary also indicates
4  that -- under discharge diagnosis that Mr. Barnett
5  had hyperlipidemia, Number 3, that's high
6  cholesterol?
7    A.  Correct.
8    Q.  And then 4 says, systemic hypertension.
9  Do you see that?
10    A.  Yes, sir.
11    Q.  Does that mean that Mr. Barnett had
12  high blood pressure?
13    A.  That's correct.
14    Q.  Is high blood pressure a risk factor
15  for heart disease or heart attack?
16    A.  Yes, sir.
17    Q.  Let me ask the question in a more clean
18  way.
19       Is hypertension a risk factor for heart
20  disease or a heart attack?
21    A.  No, sir.
22    Q.  Based on your review of the discharge
23  summary from the time Mr. Barnett spent in the
24  hospital, did he recover quickly from his heart
25  attack being released four days after his bypass

**Page 264**

1  surgery?
2    A.  Yes, sir.
3    Q.  I'm going to review as quickly as I can
4  so I don't irritate the jury the visits that you
5  had with Mr. Barnett after September of 2002.
6    A.  Okay.
7    Q.  And you understand that after
8  December -- I'm sorry --
9       MR. ROBINSON:  I'm going to move to
10  strike the last sentence about the irritating a
11  jury.  I don't want that --
12       MR. GOLDMAN:  You want me to irritate
13  them?
14       MR. ROBINSON:  Judge Fallon doesn't
15  like that.  I want you to irritate them.  No, but
16  rephrase it.
17  BY MR. GOLDMAN:
18    Q.  Dr. Mikola, I want to review the visits
19  that you had with Mr. Barnett after he had a heart
20  attack in September of 2002, okay?
21    A.  Yes, sir.
22    Q.  And I'm trying to do this as quickly as
23  I can --
24    A.  Okay.
25    Q.  -- for your sake and others.

**Page 265**

1    A.  All right.
2    Q.  If you --
3       MR. ROBINSON:  Move to strike.  Move to
4  strike.
5  BY MR. GOLDMAN:
6    Q.  If you turn to Huberty 13, do you see
7  this is a visit that Mr. Barnett had with you on
8  December 24th of 2002?
9    A.  That's correct.
10    Q.  That's three months after his
11  hospitalization for a heart attack?
12    A.  Correct.
13    Q.  As far as you know, Mr. Barnett was
14  taking Vioxx every day after his heart attack
15  through December of 2002, right?
16    A.  I believe so, yes.  I don't know
17  exactly when he restarted it, but it's my
18  understanding he continued to take it, yes.
19    Q.  In the second sentence you indicate he
20  was admitted with an MI, underwent bypass surgery,
21  he has done well since then.
22    A.  Correct.
23    Q.  What did you mean by that?
24    A.  That means he felt relatively well.  He
25  was not having any prolonged setbacks or

Michael Mikola, M.D.

Page 266

1  complications from the procedure.
2      Q.   Then do you see a few sentences later
3  you say, no angina?
4      A.   Yes, sir.
5      Q.   Does that mean that he was not
6  experiencing heart pain related to limited blood
7  flow?
8      A.   Yes, sir.
9      Q.   Further down in that paragraph you
10  write, he has been exercising.
11      A.   Yes, sir.
12      Q.   Is that an indication that Mr. Barnett
13  recovered quickly from his heart attack?
14      A.   Yes, sir.
15      Q.   And then --
16      A.   It's fairly standard.  Generally at
17  Grand Strand after a heart attack, patients will be
18  enrolled in a cardiac rehab program where they go
19  to supervised exercise to get them up and mobile
20  again.
21      Q.   In the last sentence you indicate, I
22  spent approximately 30 minutes today answering
23  numerous questions about his medicines, BP, or
24  blood pressure, heart disease, plaque build-up, et
25  cetera.

Page 267

1      Do you see that?
2      A.   Yes, sir.
3      Q.   Did you, sir, attempt to determine
4  after Mr. Barnett's heart attack whether any of the
5  medication that he was taking might harm his heart?
6      A.   Yes, sir.
7      Q.   And you understood that Mr. Barnett was
8  taking Vioxx in December of 2002, right?
9      A.   Yes, sir.
10      Q.   You understood that he was going to
11  continue taking Vioxx after that point because it
12  was helping his pain?
13      A.   Yes, sir.
14      Q.   You would have stopped Mr. Barnett from
15  using Vioxx if you believed it contributed in any
16  way to his heart attack, correct?
17      A.   Yes, sir.
18      Q.   And if you thought Vioxx might cause
19  Mr. Barnett heart problems in the future, you would
20  have told him to stop using it?
21      A.   Yes, sir.
22      Q.   Therefore, you didn't believe the Vioxx
23  had anything to do, sir, with Mr. Barnett's heart
24  attack in September of 2002?
25      MR. ROBINSON:   Objection.  Two

Page 268

1  objections.  Number one, it's leading and number
2  two --
3      MR. GOLDMAN:   Okay.  I'll cure that.
4      MR. ROBINSON:   -- I have an objection
5  to -- to time.  You're saying at the time that he
6  was treating Mr. Barnett versus now.
7      MR. GOLDMAN:   Oh, I'd love to ask him
8  now.
9      MR. ROBINSON:   No, I understand.
10  BY MR. GOLDMAN:
11      Q.   But let me stick with the judgment at
12  the time first and then we'll go further.
13      Mr. -- Dr. Mikola, when you determined
14  that it was okay for Mr. Barnett to continue to
15  take Vioxx after his heart attack, that was in part
16  because you believed at the time that Vioxx had
17  nothing to do with his heart attack?
18      A.   That's correct.
19      Q.   I believe you answered in response to
20  Mr. Robinson's questions that today based on
21  information that you've seen that you would
22  consider Vioxx as a possible -- I can't remember
23  your exact testimony, but you were shown
24  information today and you were asked whether or not
25  you would consider it a possible cause.

Page 269

1      MR. ROBINSON:   Okay, I'm going to
2  move -- I'm going to object, misstates what the
3  testimony was.
4  BY MR. GOLDMAN:
5      Q.   Well, I believe your testimony was that
6  based on everything you've seen today that maybe
7  you would consider Vioxx as a possible cause.  Was
8  that your testimony?
9      MR. ROBINSON:   Your Honor, I'm going
10  to --
11      MR. GOLDMAN:   Your Honor, that's good.
12      MR. ROBINSON:   -- I'm just going to
13  make -- I object and I think prior testimony speaks
14  for itself.  If you want to ask him a question --
15  but to go back and recite what my question was
16  without having the question and looking at the
17  answer, I mean, it's not fair.
18  BY MR. GOLDMAN:
19      Q.   When you testified previously, sir,
20  about the role that you think Vioxx might have in
21  Mr. Barnett's heart attack today, you were basing
22  that on information that you've seen since you
23  stopped prescribing Vioxx, right?
24      A.   Yes, sir.
25      Q.   And you didn't form the opinion one way

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 270**

1  or the other about whether Vioxx contributed?
2  MR. ROBINSON: I'm going to object.
3  MR. GOLDMAN: Okay.
4  MR. ROBINSON: Leading.
5  BY MR. GOLDMAN:
6  Q.  Have you reviewed all of the literature
7  concerning COX-2 inhibition and the possible
8  imbalance that that creates in the body?
9  A.  No, sir.
10  Q.  And there are other people who have
11  reviewed all the literature concerning COX-2
12  inhibition and whether that may or may not put
13  patients in a prothrombotic or proclotting state,
14  right?
15  A.  I don't know that.  I assume there are,
16  but I -- I don't know if anyone's reviewed all the
17  literature.
18  Q.  And you haven't reviewed all the
19  literature relating to any possible imbalance that
20  there might be from taking Vioxx or Celebrex in
21  terms of putting patients in a prothrombotic state,
22  true?
23  MR. ROBINSON: I object.
24  THE WITNESS: That's correct.  I
25  haven't reviewed all the literature.  There's

**Page 271**

1  tremendous amounts of medical literature on a lot
2  of subjects that -- it's just not feasible to
3  review every article that's been -- and every study
4  that's been done.
5  BY MR. GOLDMAN:
6  Q.  Can you turn to Huberty 14 for me, sir,
7  which is a March 24th, 2003 visit that you had with
8  Mr. Barnett --
9  A.  Yes, sir.
10  Q.  -- Bates stamped Huberty 14.
11  A.  Yes, sir.
12  Q.  This indicates that Mr. Barnett was
13  hospitalized at the end of February 2003 for
14  atypical chest pain.  And what did you write in the
15  third sentence in the first paragraph?
16  A.  Is that where he had seen Dr. Karavan?
17  Q.  Dr. Hollingsworth.
18  A.  Dr. Hollingsworth admitted him and
19  ruled out MI and discharged him.
20  Q.  And then the next sentence.
21  A.  He had seen Dr. Karavan who, per the
22  patient's report, did not think his chest pain was
23  cardiac.
24  Q.  Was it your understanding that in
25  February of 2003, Mr. Barnett was not suffering any

**Page 272**

1  angina or heart trouble?
2  MR. ROBINSON: Objection.
3  THE WITNESS: That's correct.
4  BY MR. GOLDMAN:
5  Q.  And then do you see further down it
6  indicates, however, it does not occur during
7  cardiovascular stress such as a treadmill, et
8  cetera, only when he lifted weights.  When he cut
9  back on his weights, it got better.
10  A.  Yes, sir.
11  Q.  Why did you write that?
12  A.  Generally angina from plaque build-up
13  occurs at times when the heart muscle needs more
14  blood supply.  As I mentioned before, if you're
15  sitting around doing nothing, your heart doesn't
16  need a lot of blood to meet its demands.  When you
17  do cardiovascular exercise such as walking on a
18  treadmill, the heart needs more blood supply and
19  more oxygen because it has to work harder.  And if
20  you have angina -- or I should say if you have
21  significant atherosclerotic disease, those are
22  generally times when angina will present itself.
23  So if your chest pain has come from significant
24  plaque build-up in the coronary arteries, it's more
25  likely to become apparent during emotional stress

**Page 273**

1  or during physical activity than it is at other
2  times.
3  Q.  And you understood that in July of
4  2003 -- or not in July.
5  A.  March.
6  Q.  In March.  In March of 2003,
7  Mr. Barnett was still taking Vioxx every day,
8  right?
9  A.  Yes, sir.
10  Q.  Let's turn to the next visit, August
11  19th of 2003 on the next page.
12  A.  I have -- okay.  I have 7/15/03 and
13  8/19/03.
14  Q.  Let's skip one visit for the benefit of
15  the jury and go to August 19th of 2003.
16  A.  Okay.
17  Q.  Is this a medical record indicating
18  that Mr. Barnett had a question of SVT while he was
19  walking on the treadmill at the health club?
20  A.  Yes, sir.
21  Q.  What is SVT?
22  A.  SVT is supraventricular tachycardia.
23  It's a rapid heart rate that generally is initiated
24  by areas of the top part of the heart, the atrium,
25  other than the normal sinus -- normal pacemaker of

69 (Pages 270 to 273)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 274**

1  the heart. And typically the rate will be very
2  fast. It tends to come on suddenly. It can end
3  suddenly or it can last for quite some time. But
4  at that time his history was that when he was
5  walking on the treadmill, his pulse would suddenly
6  shoot up and that suggests an irregular rhythm.
7  Q. Is that the reason — I'm sorry. Are
8  you done?
9  A. Yes.
10  Q. Is that the reason why, Dr. Mikola, you
11  suggested a stress test?
12  A. Yes, sir.
13  (DFT. EXH. 38,
14  Cardiology/Gastroenterology Associates medical
15  record for Gerald Barnett, was marked for
16  identification.)
17  (DFT. EXH. 39,
18  Cardiology/Gastroenterology Associates medical
19  record for Gerald Barnett, was marked for
20  identification.)
21  BY MR. GOLDMAN:
22  Q. Let me hand you Exhibit 38.
23  A. The reason is -- the other reason is
24  that ischemic disease can sometimes present with
25  rhythm disturbances.

**Page 275**

1  Q. This is a document Bates stamped
2  Cardiogas Associates 54. It's dated July 18th,
3  2003. Does it identify you as the referring
4  physician?
5  A. Yes, sir.
6  Q. Is this the same type of stress test
7  that was conducted back in January of 2000,
8  Cardiolite?
9  A. Yes, that's correct.
10  Q. Directing your attention just to the
11  impression. What does it say under Number 1?
12  A. Excellent exercise tolerance.
13  Q. How long if you look above under stress
14  procedure did Mr. Barnett last on the treadmill
15  that involved a Bruce protocol?
16  A. Again, 15 minutes.
17  Q. What did that indicate to you about the
18  condition of Mr. Barnett's heart in July of 2003?
19  A. It would really indicate two things,
20  one, that he's in pretty good cardiovascular
21  condition and two, that he's unlikely to be able to
22  exercise that long with significant plaque
23  build-up.
24  Q. If you look under impression again,
25  Number 4, it says, left ventricular ejection

**Page 276**

1  fraction. What is the number there?
2  A. 58 percent.
3  Q. Do you remember that that is actually
4  higher than what it was in January of 2000?
5  A. It was 56 percent, I think, just --
6  yes. 1 or 2 percent may be splitting hairs, but
7  it's certainly as good as it was before.
8  Q. And an ejection fraction of 58 percent
9  in July of 2003 you would consider to be normal?
10  A. Yes, sir.
11  Q. Turning back to Huberty 16, in the
12  first paragraph do you see that you wrote in the
13  middle, he had a list of about six questions today
14  that were answered at length. He has not had any
15  recurrent angina. He is going to -- it says give
16  but I think you mean dive in Cozumel if possible.
17  A. Yes, sir.
18  Q. Did you believe that Mr. Barnett's
19  heart was in good enough condition to go scuba
20  diving in Cozumel if he wanted to?
21  A. Yes, sir.
22  Q. Did you ever tell Mr. Barnett that he
23  couldn't go scuba diving because he had had a heart
24  attack?
25  A. No, sir.

**Page 277**

1  Q. Was it your understanding that
2  Mr. Barnett intended when he went to Cozumel here
3  in August of 2003 that he was going to scuba dive?
4  A. Yes, sir.
5  MR. GOLDMAN: Let's go off the video --
6  MR. ROBINSON: Do you want to take a
7  break?
8  MR. GOLDMAN: — and take a quick
9  break.
10  VIDEO TECHNICIAN: This is the end of
11  Tape Number 5 in the deposition of Dr. Michael
12  Mikola. The time is approximately 4:10 PM. The
13  date is April 25th, 2006. We will now go off the
14  record.
15  (A recess transpired.)
16  VIDEO TECHNICIAN: This is the
17  beginning of Tape Number 6 in the deposition of
18  Dr. Michael Mikola. The time is approximately 4:19
19  PM. The date is April 25th, 2006. We are now back
20  on the record.
21  BY MR. GOLDMAN:
22  Q. Dr. Mikola, can you turn with me,
23  please, to Huberty 17.
24  A. Yes, sir.
25  Q. This is a December 8, 2003 visit that

70 (Pages 274 to 277)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 278

1 you had with Mr. Barnett, right?
2    A.  That's correct.
3    Q.  Is this 13 months after his heart
4 attack?  Actually, 12?
5    A.  12, 13, 14, 15.  14 and a half.
6    Q.  How many months after Mr. Barnett's
7 heart attack is this visit?
8    A.  Approximately 14 and a half, I believe.
9    Q.  Do you see any indication, sir, that
10 he's suffering from angina or heart trouble?
11    A.  No, sir.
12    Q.  And to your knowledge, he's taking
13 Vioxx every day?
14    A.  Yes, sir.
15    Q.  Turn, please, to Huberty 18.  This is
16 January 20th of 2004.  Do you see under assessment
17 plan Number 2, chest pain, I do not think it is
18 suggestive of angina?
19    A.  Yes, sir.
20    Q.  Do you also see that above the end of
21 the history, he has inquired -- or he also inquires
22 about Viagra use?
23    A.  Yes, sir.
24    MR. ROBINSON:  Do you know what --
25    MR. GOLDMAN:  Oh, you're going to drop

Page 279

1 that?  For the record --
2    MR. ROBINSON:  Put it this way --
3    MR. GOLDMAN:  We're glad.  We're glad.
4    MR. ROBINSON:  You can read that in --
5 off the record.
6    VIDEO TECHNICIAN:  One sec.  We will
7 now go off the record.  The time is approximately
8 4:21 PM.
9    (Off-the-record conference.)
10    VIDEO TECHNICIAN:  We're back on the
11 record.  The time is approximately 4:22 PM.
12 BY MR. GOLDMAN:
13    Q.  Dr. Mikola, did you understand that
14 Mr. Barnett was complaining about erectile
15 dysfunction in January of 2004?
16    A.  Yes, sir.
17    Q.  Do you have any reason to believe that
18 had anything to do with Vioxx?
19    A.  The erectile dysfunction?
20    Q.  Yes.
21    A.  No, sir.
22    Q.  Any reason to think that the erectile
23 dysfunction had anything to do with Mr. Barnett's
24 heart attack?
25    A.  Indirectly.  I think that

Page 280

1 atherosclerotic disease can contribute to both.
2 It's quite possible the erectile dysfunction is a
3 complication of the beta blocker therapy that he
4 had to take after his heart attack.  Almost all
5 patients after an MI are put on beta blockers.
6    Q.  And he was?
7    A.  A side -- yes.  And a side effect can
8 be erectile dysfunction.
9    Q.  And just quickly, I want to turn back
10 to before his heart attack, the Huberty 9.  This is
11 a July 12th, 2001 visit.  Do you see under
12 subjective, the last sentence, Mr. Barnett is
13 explaining that he is experiencing symptoms of
14 erectile dysfunction back then?
15    A.  Yes, sir.
16    Q.  This was before his heart attack?
17    A.  That's correct, about two months -- his
18 heart attack was in '02?  That's correct, before
19 his heart attack.
20    Q.  You never told Mr. Barnett that he
21 ought to refrain from intercourse because of his
22 heart attack, did you?
23    A.  No, sir.  After his heart attack, he
24 had bypass and after bypass he should be okay
25 because he's got new patent vessels to plaque.

Page 281

1    Q.  Just a couple more visits and then
2 we're going to move on.  February 11th of 2004,
3 I'll show you a document from Dr. Karavan that he
4 e-mailed -- that he sent to you.  It's Bates
5 stamped CardiogasAssociates 39 to 40.  And do you
6 see that you are cc'd on the second page at the
7 bottom?
8    A.  Yes, sir.
9    Q.  And Dr. Karavan indicates at the top
10 that he's -- Mr. Barnett is walking an hour a day
11 without any exertional chest pain.  Do you see that
12 on the first page?
13    A.  Yes, sir.
14    Q.  And at the bottom of the page, he
15 indicates that Mr. Barnett is doing well from a
16 cardiac standpoint?
17    A.  Yes, sir.
18    Q.  Is that consistent with your assessment
19 of Mr. Barnett's heart condition in February of
20 2004?
21    A.  Let me refer to my notes.  Yes, sir,
22 that's correct.
23    Q.  The last visit that you had was May 19,
24 2004 and I think it's Huberty 19.
25    A.  Yes, sir.

71 (Pages 278 to 281)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 282

1    Q. And then here you indicate --
2  withdrawn.
3        What do you say in the second sentence
4  under history?
5    A. No angina PND --
6    Q. You can actually stop there. I was
7  interesting in no angina.
8    A. Okay.
9    Q. And then in the sentence after that, he
10 had some atypical chest discomfort usually
11 associated with abdominal bloating, what did you
12 mean by that?
13   A. That means when he gets his chest
14 discomfort, he also gets a bloating sensation in
15 his abdomen.
16   Q. The chest discomfort that Mr. Barnett
17 was experiencing around May of 2004 was not the
18 type that was in the upper part of the chest and
19 went out to the left of the heart?
20   A. That's correct, it was dissimilar from
21 that type of pain.
22   Q. Let me ask you to please turn to
23 Huberty 19 again. Oh, you're still on it?
24   A. Yes, sir.
25   Q. Do you see Number 5, elevated

Page 283

1  homocysteine?
2    A. Yes, sir.
3    Q. Is that a vitamin deficiency?
4    A. It is actually an elevation of amino
5  acid that is thought to be -- thought to increase
6  the risk of vascular disease and it's treated with
7  vitamin supplementation.
8    Q. Okay. Homocysteine, is that a genetic
9  condition?
10   A. It can be, yes. Severe -- there are
11 genetic conditions that result in severe elevations
12 of homocysteine and those patients tend to have
13 heart disease in their twenties and early thirties.
14   Q. I'm not sure when the first time you
15 diagnosed Mr. Barnett with elevated homocysteine
16 was, but was it your understanding that Mr. Barnett
17 had that condition before his heart attack?
18   A. I don't know the answer to that.
19   Q. Based on your --
20   A. I can -- if you want, I can review the
21 labs, but I'd have to see when I documented it
22 first.
23   Q. That's okay.
24        MR. ROBINSON: What page are you on
25 now?

Page 284

1        MR. GOLDMAN: My outline, 21.
2  BY MR. GOLDMAN:
3    Q. Is there any indication in your medical
4  records, sir, for Mr. Barnett that he was suffering
5  any psychological or emotional problems as a result
6  of his heart attack?
7    A. No, sir.
8    Q. Has Mr. Barnett ever told you in the
9  years that you've seen him that he believes he
10 cannot do certain activities because of his heart
11 attack?
12   A. No, sir.
13   Q. Has Mr. Barnett ever told you that he
14 did not believe --
15        MR. ROBINSON: Well, I'm going to
16 object. Okay, you mean up until May of --
17        MR. GOLDMAN: Up until May of 2004.
18        MR. ROBINSON: Yeah, okay.
19 BY MR. GOLDMAN:
20   Q. Through May of 2004, which is --
21        MR. ROBINSON: Two years ago.
22        THE WITNESS: Two years almost.
23 BY MR. GOLDMAN:
24   Q. -- two years ago -- let me phrase it
25 differently.

Page 285

1        As of May of 2004 -- which is more than
2  a year and a half after his heart attack, right?
3    A. Correct.
4    Q. -- Mr. Barnett never said that he felt
5  that his physical activities were limited, is that
6  true?
7    A. Correct.
8    Q. Did Mr. Barnett at any point up until
9  May of 2004 tell you that he didn't think he could
10 golf as much as he would like to because of his
11 heart condition?
12   A. I don't recall that --
13   Q. Did Mr. Barnett ever --
14   A. -- conversation.
15   Q. I'm sorry?
16   A. I don't recall that conversation.
17   Q. Do you see any indication in the
18 medical records that Mr. Barnett said he cannot ski
19 because of his heart?
20   A. No, sir.
21   Q. Do you see any indication in the
22 medical records that Mr. Barnett cannot dance as
23 often as he wants to because of his heart attack?
24   A. No, sir.
25   Q. Did Mr. Barnett ever tell you that he

72 (Pages 282 to 285)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 286**

1  felt he could not exercise as much because of his
2  heart attack?
3  　　A.  No, sir.
4  　　Q.  As of your last visit with Mr. Barnett,
5  was it your view that he could do all of those
6  things?
7  　　A.  Yes, sir.
8  　　Q.  Let's switch subjects to the VIGOR
9  study, okay?  You testified that part of your
10 understanding of the risks associated with Vioxx
11 were based on the publication of the VIGOR study,
12 is that right or am I wrong?
13 　　A.  Can you say that again?
14 　　　　MR. ROBINSON:  Object.  I'm going to
15 object.  Well, you're striking it, right?
16 　　　　MR. GOLDMAN:  Yeah, I'll strike it.
17 BY MR. GOLDMAN:
18 　　Q.  During the time that you were treating
19 Mr. Barnett, did you know about the GI Outcome
20 study or the VIGOR study that Merck had conducted?
21 　　A.  Yes, sir.
22 　　Q.  Prior to Mr. Barnett's heart attack,
23 did you read the article that was published about
24 (sic) the New England Journal of Medicine?
25 　　A.  I don't know about the exact date.  Was

**Page 287**

1  it published before September '02?
2  　　Q.  It was published in November of 2000.
3  　　A.  Yes, sir.
4  　　Q.  Did you read the New England Journal of
5  Medicine article about the VIGOR study or the GI
6  Outcome study on or about November of 2000?
7  　　A.  Yes, sir.
8  　　Q.  I want to show you a copy of that and
9  ask you a few questions about it.
10 　　　　MR. GOLDMAN:  I'll mark this as Exhibit
11 40.
12 　　　　(DFT. EXH. 40, Article entitled
13 Comparison Of Upper Gastrointestinal Toxicity O
14 Rofecoxib And Naproxen In Patients With Rheumatoid
15 Arthritis, was marked for identification.)
16 BY MR. GOLDMAN:
17 　　Q.  And this is the publication by the New
18 England Journal of Medicine about the VIGOR study,
19 okay?
20 　　A.  Yes, sir.
21 　　Q.  I want to talk a little bit about the
22 study itself and if you need to review this
23 article, feel free.  Do you remember whether the
24 study involved patients with rheumatoid arthritis?
25 　　A.  I believe it did.

**Page 288**

1  　　Q.  Is that a chronic condition?
2  　　A.  Yes, sir.
3  　　Q.  Did Mr. Barnett have rheumatoid
4  arthritis?
5  　　A.  No, sir.
6  　　Q.  Did the VIGOR study involve a
7  comparison of 50 milligrams of Vioxx versus 1,000
8  milligrams of Naproxen or 500 milligrams twice a
9  day?
10 　　A.  Yes, sir.
11 　　Q.  Did Mr. Barnett use 50 milligrams of
12 Vioxx?
13 　　A.  No, sir.
14 　　Q.  What did he use?
15 　　A.  I believe it was 25 milligrams.
16 　　Q.  Did you understand --
17 　　A.  My --
18 　　Q.  I'm sorry?
19 　　A.  My medicine list is not present, but
20 I'm almost certain it was 25 milligrams.
21 　　Q.  Do you understand the purpose of the
22 VIGOR study was to determine if Vioxx reduced pain
23 and inflammation and serious GI events more than a
24 thousand milligrams of Naproxen daily?
25 　　A.  Can you say that again?

**Page 289**

1  　　Q.  Sure.  Did you understand that the
2  purpose of the VIGOR study was to compare how 50
3  milligrams of Vioxx compared with a thousand
4  milligrams of Naproxen in terms of its ability to
5  reduce pain and inflammation and in terms of its
6  ability to reduce GI events?
7  　　A.  Yes, sir.
8  　　Q.  Were you aware that the result of the
9  study, at least the GI portion, indicated that
10 Vioxx reduced serious GI events by 50 percent
11 compared to Naproxen?
12 　　A.  Yes, sir.
13 　　Q.  I want to turn your attention, please,
14 to first in the abstract of this article under
15 results.  In the last sentence, did you know on or
16 about November of 2000 that the incidence of
17 myocardial infarction was lower among patients in
18 the Naproxen group than among those in the Vioxx
19 group, .1 percent versus .4 percent?
20 　　A.  Yes, sir.
21 　　Q.  Did you understand that that indicated
22 that there were four times as many heart attacks in
23 the patients using Vioxx 50 milligrams compared to
24 the patients using a thousand milligrams of
25 Naproxen?

73 (Pages 286 to 289)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 290

1          MR. WACKER: Objection, misstates
2  the -- the way it's written here, that's flipping
3  it.
4  BY MR. GOLDMAN:
5          Q.  Do you understand?  I want to -- I want
6  to get your understanding of the .1 percent versus
7  .4 percent, okay?
8          A.  Yes.  Yes, that would indicate there
9  were four times more likely -- four times more
10  events.
11          Q.  Did you know in about November of 2000
12  that there were four times as many heart attack
13  events in the Vioxx arm of the VIGOR study compared
14  to the Naproxen arm?
15          MR. WACKER:  Again, that's flipping the
16  data, objection.
17          THE WITNESS: Yes, sir.
18  BY MR. GOLDMAN:
19          Q.  And there's been an allegation, sir,
20  that Merck and the non-Q Merck authors should have
21  included the actual number of heart attacks in this
22  study as opposed to the percentage, okay?  Are you
23  with me?
24          A.  Not exactly.  Say that again.
25          Q.  There's been an allegation that Merck

Page 291

1  should have -- and the non-Q Merck authors should
2  have included the number of heart attacks, 17
3  versus 4 or as it started out ultimately 20 versus
4  4, in the VIGOR publication as opposed to referring
5  to percentages.
6          MR. ROBINSON: Objection.
7  BY MR. GOLDMAN:
8          Q.  Okay.
9          A.  Yes.
10          MR. ROBINSON: Objection. Objection to
11  the question as misstating the allegation.  You
12  state one part of the allegation.
13  BY MR. GOLDMAN:
14          Q.  We'll go through the other parts.
15  Would it have made a difference to you, Dr. Mikola,
16  if in that sentence the non-Q Merck authors and
17  Merck had written that there were 17 heart attacks
18  in the Vioxx arm versus 4 heart attacks in the
19  Naproxen arm?
20          A.  Probably not.
21          Q.  Do you also understand from reading the
22  VIGOR study that there was a
23  statistically-significant difference in the number
24  of heart attacks that occurred in the Vioxx arm
25  versus the Naproxen arm?

Page 292

1          A.  Yes, sir.
2          Q.  And the difference was four times,
3  right?
4          A.  Roughly, yes.
5          Q.  There's been an allegation that Merck
6  should have updated information that occurred after
7  the cutoff date in this study.  Do you know what I
8  mean by cutoff date?
9          A.  Yes, sir.
10          Q.  And that Merck should have included
11  three additional heart attack events that occurred
12  after the cutoff date, okay?
13          A.  Yes, sir.
14          Q.  Now, if Merck had included three
15  additional heart attacks that occurred after the
16  cutoff date of this study, that would have changed
17  the percentages to five times, in other words,
18  there would have been five times as many heart
19  attacks in the Vioxx arm versus the Naproxen arm.
20  Are you with me?
21          A.  Yes, sir.
22          Q.  Would it have made a difference to you
23  if the number was five times as opposed to four
24  times?
25          A.  I don't believe so.

Page 293

1          Q.  The conclusion that I believe you said
2  you drew from the VIGOR study was that the reason
3  there was a difference in heart attacks in this
4  study was because Naproxen has aspirin-like
5  effects.  Is that your testimony?
6          A.  My testimony was that that was the
7  conclusion of the authors.
8          Q.  And if you look on the second to last
9  page and the last page of this study, on the last
10  sentence, the right column, it says, thus, our
11  results are consistent with the theory that
12  Naproxen has a coronary protective effect and
13  highlight the fact that Vioxx does not provide this
14  type of protection, and then it continues.
15          Do you see that?
16          A.  Yes, sir.
17          Q.  And then it says, the finding that
18  Naproxen therapy was associated with a lower rate
19  of myocardial infarction needs further confirmation
20  in larger studies.
21          A.  Yes.
22          Q.  Do you see that, sir?
23          A.  Yes, sir.
24          Q.  I believe that Mr. Robinson asked you
25  about e-mails involving Dr. Patrono.  Do you

74  (Pages 290 to 293)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 294

1  remember that?
2      A.  Yes, sir.
3      Q.  Could you find for me, sir, Exhibit 7
4  that was used by the Plaintiff's attorneys.
5      A.  Yellow 7, correct.  Yes, sir.
6      Q.  This was also one of the e-mails that
7  Miss Myer sent to you in advance of your
8  deposition, okay?
9      A.  For Exhibit 7 I have the office note.
10     Q.  Let me find out what this exhibit is.
11  It's -- I'm looking for the Alan Nies to Barry
12  Gertz e-mail.  Let me just check my notes.
13         MR. ROBINSON:  If you hand me that
14  stack, I can find it for you.
15         THE WITNESS:  Sorry, I'm not used to
16  juggling 45 different stacks of paper.
17         MR. ROBINSON:  You get to leave it.
18  Okay.  I'm going to find it.  Who's got it?  Which
19  one is it that -- which --
20         MR. WACKER:  Patrono.
21         MR. ROBINSON:  Okay.
22         MR. GOLDMAN:  Have you found it?
23         MR. ROBINSON:  No, I found another one
24  we were looking for.  Hold on, we'll find it.
25  We'll put those in order.  Let me look at these.

Page 295

1          MR. GOLDMAN:  6.
2          VIDEO TECHNICIAN:  We will now go off
3  the record.  The time is approximately 4:41 PM.
4          (Off-the-record conference.)
5          VIDEO TECHNICIAN:  We're back on the
6  record.  The time is approximately 4:42 PM.
7  BY MR. GOLDMAN:
8      Q.  I'm handing you one of the documents
9  that Mr. Barnett's lawyers sent you in advance of
10  your deposition and it's an e-mail from at the
11  bottom Martine Arenzi (ph) to various people and it
12  is referencing the subject of Carlo Patrono on
13  VIGOR.
14         And this is the document that was
15  highlighted when it was sent to you, right?
16     A.  Yes, sir.
17     Q.  I want to direct your attention to a
18  portion that was not highlighted and that's in the
19  third paragraph.  Follow along with me and -- when
20  I read, quote, Carlo does not think that the CV
21  effect can be explained by the inhibition of
22  prostacyclin given that Vioxx inhibits only the
23  COX-2 component of prostacyclin secretion and he
24  has conceptual difficulties in explaining how this
25  could translate in an increase of the CV risk of

Page 296

1  the magnitude that we observed.  His conclusion is
2  that what we saw in VIGOR is to be attributed to a
3  large extent to chance.  Do you see that?
4      A.  Yes, sir.
5      Q.  Merck didn't show you that portion of
6  this e-mail back when you were treating
7  Mr. Barnett, did they?
8      A.  That's correct.
9      Q.  Nobody from Merck ever said to you that
10  Mr. Patrono thinks that the reason for the
11  difference in heart attacks in VIGOR is because of
12  chance, did anyone?
13     A.  That's correct.
14     Q.  Is this an example of why it's
15  important to have the context of a document before
16  you reach a conclusion about the importance of it
17  to you?
18     A.  Yes.
19     Q.  Let me also show you an article that
20  Mr. -- I'm sorry, that Dr. Patrono wrote.
21         MR. GOLDMAN:  I'll mark this as Exhibit
22  3 -- I'm sorry, 41.
23         (DFT. EXH. 41, Article entitled
24  Platelet-Active Drugs:  The Relationships Among
25  Dose, Effectiveness, and Side Effects, was marked

Page 297

1  for identification.)
2          THE WITNESS:  Do you want this back?
3  BY MR. GOLDMAN:
4      Q.  Yes.  Thanks.  This is an article
5  called, platelet-active drugs, the relationships
6  among dose, effectiveness, and side effects.  And
7  do you see that Dr. Patrono is one of -- is the
8  first author?
9      A.  Yes, sir.
10     Q.  Do you recognize the publication that
11  this is in, CHEST Journal?
12     A.  Yes, sir.
13     Q.  Is that a reputable journal?
14     A.  Yes, sir.
15     Q.  Do you know if that's peer reviewed?
16     A.  I believe it is.
17     Q.  Which means that other doctors who
18  don't write the article review it for accuracy?
19     A.  Yes, sir.
20     Q.  I want to direct your attention, sir,
21  to the page at the bottom that is 245S.  It doesn't
22  have a Bates number, but that's the page of the
23  article.
24     A.  Yes, sir.
25     Q.  Do you see the Section 2.1 called,

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 298**

1  coxibs and cardiovascular disease?
2      A.  Yes, sir.
3      Q.  And the first paragraph there,
4  Dr. Patrono is talking about the VIGOR study in
5  part.  Do you see that?
6      A.  Yes, sir.
7      Q.  If you turn the page --
8          MR. WACKER:  Which page?
9  BY MR. GOLDMAN:
10     Q.  -- to 246S, as in Sam, toward the end
11 of the first paragraph, do you see Dr. Patrono
12 wrote, quote, while the cause of the apparent
13 excess risk of MI in the Vioxx GI Outcomes Research
14 trial, that's VIGOR, cannot be conclusively
15 established, a combination of some cardioprotective
16 effect of Naproxen and the play of chance does seem
17 to offer a plausible explanation for these
18 unexpected findings.  While other mechanisms cannot
19 be discounted, there is currently little evidence
20 in humans to support a prothrombotic effect for
21 coxibs.
22         Do you see that, sir?
23     A.  Yes, sir.
24     Q.  And the date of this article is in 2004
25 if you look at the bottom of the abstract on the

**Page 299**

1  first page.
2      A.  Okay.
3      Q.  Okay?
4      A.  Yes, sir.
5      Q.  Did Mr. Barnett's lawyers show you what
6  Dr. Patrono had to say in this article?
7      A.  No, sir.
8      Q.  Is this article the type of thing that
9  you would want to know before drawing a conclusion
10 about whether Naproxen is or is not a reasonable
11 explanation for the difference in heart attacks in
12 the VIGOR study?
13     A.  Can you rephrase -- or restate it?
14     Q.  Is Dr. Patrono's article the type of
15 information that you would want to know before
16 reaching a conclusion about the reasonableness of
17 the theory that Naproxen explained the difference
18 in heart attacks in the VIGOR study?
19     A.  I would say yes.
20         MR. ROBINSON:  Can we take a break?  I
21 have to go.  I'm going to miss my last plane out of
22 here.  I'd like to have been here for the whole
23 depo.  Doctor, I want to thank you for today.
24         VIDEO TECHNICIAN:  We will now go off
25 the record.  The time is approximately 4:48 PM.

**Page 300**

1          (Off-the-record conference.)
2          VIDEO TECHNICIAN:  We're back on the
3  record.  The time is approximately 4:49 PM.
4  BY MR. GOLDMAN:
5      Q.  Even though you read in the VIGOR
6  article that the authors concluded that Naproxen
7  was a reasonable explanation for the heart attack
8  difference in the VIGOR study, did you also
9  understand, sir, that there were others who
10 disagreed with that?
11     A.  At the time that I read the VIGOR study
12 or since that time?
13     Q.  Since that time.
14     A.  Yes.
15     Q.  Were you aware, sir, that there were
16 others in the medical community in the 2002 and
17 2001 time frame who questioned whether Naproxen was
18 the appropriate explanation for the VIGOR results?
19     A.  Yes, sir.
20     Q.  And there was much public discussion --
21 was -- withdrawn.
22         Was there much public discussion about
23 the VIGOR study and whether or not the results in
24 the VIGOR study were due to Naproxen or due to
25 Vioxx causing heart attacks?

**Page 301**

1      A.  I don't recall if there was a lot of
2  public discussion.  I know there was after the
3  colon polyp study.
4      Q.  Do you remember that after the VIGOR
5  study even before -- withdrawn.
6          Do you -- after Merck reported the
7  results of the VIGOR study in March of 2000, did
8  you hear from sales representatives from
9  competitors of Merck about their interpretation of
10 the VIGOR study?
11     A.  Oh, yes.
12     Q.  Tell me a little bit about that.
13     A.  Basically the Pfizer reps who sell the
14 competitor Celebrex tried to say that Celebrex was
15 a safer drug than Vioxx.
16     Q.  Did the Pfizer reps indicate that they
17 believed that Vioxx was causing heart attacks?
18     A.  I don't know if I could say that.
19     Q.  How would you describe the way that
20 Pfizer representatives were discussing the VIGOR
21 study?
22     A.  They essentially said that the risk of
23 vascular complications is totally higher with Vioxx
24 than with Celebrex.
25     Q.  And Pfizer representatives were out

Michael Mikola, M.D.

**Page 302**

1 there taking that position before Mr. Barnett's
2 heart attack, correct?
3      A.  Yes.
4      Q.  Which was in December of 2002?
5      A.  Correct.
6      Q.  Let me ask it differently.
7          Were Pfizer representatives who visited
8 you taking the position that -- withdrawn.
9          Shortly after Merck announced the
10 results of the VIGOR study in March of 2000, were
11 Pfizer representatives telling you that they
12 believed there was a higher risk of vascular
13 complications with Vioxx than with Celebrex?
14      A.  Yes, sir.
15      Q.  Mr. Robinson showed you an FDA briefing
16 document from February of 2001.  Do you remember
17 that?
18      A.  Yes, sir.
19      Q.  He asked you whether Merck gave you at
20 the time you were prescribing Vioxx to Mr. Barnett
21 this FDA briefing document which is Exhibit 24.
22      A.  That's correct.
23      Q.  Do you remember that?
24      A.  Yes, sir.
25      Q.  And do you understand from reading the

**Page 303**

1 few portions that Mr. Robinson covered with you
2 that this is a document that a member of the Food
3 and Drug Administration prepared based on her
4 assessment of the clinical trials involving Vioxx?
5      A.  Can I refer to the document?
6      Q.  Sure.
7      A.  What -- I can look for it, but --
8      Q.  It's Exhibit 24.
9      A.  Okay.  Okay.  Now go on.
10      Q.  Okay.  Let me ask it differently, sir.
11          Do you see that -- on Page 2 of Exhibit
12 24 that there are different sections to this
13 briefing document and concerning cardiovascular
14 safety Section 3, there's a Dr. Shari Targum listed
15 there?
16      A.  Yes, sir.
17      Q.  Dr. Targum works for the FDA as you
18 probably can tell from this document, right?
19      A.  Yes, sir.
20      Q.  This document, sir, was prepared for
21 members of an advisory committee that met to
22 discuss the safety of COX-2 inhibitors in February
23 of 2001, okay?
24      A.  Yes, sir.
25      Q.  You remember, sir, that because of the

**Page 304**

1 results of the Vioxx and Naproxen study in VIGOR --
2 withdrawn.
3          Do you understand back in February of
4 2001 that the question about whether Vioxx was
5 causing heart attacks in the VIGOR study or
6 Naproxen was preventing them was a discussion that
7 was the subject of an advisory committee meeting
8 with the FDA?
9      A.  One of the subjects, yes, sir.
10      Q.  Did you understand back in February of
11 2001 that the advisory committee, who made
12 recommendations to the FDA, was deciding what
13 should be done in light of the VIGOR results in
14 terms of changes to the warning label, et cetera?
15      MR. WACKER:  Objection as to time.  Are
16 you talking about as to his knowledge then --
17      MR. GOLDMAN:  Yes.
18      MR. WACKER:  -- back in February or to
19 his knowledge today looking back?
20      MR. GOLDMAN:  Yes, February.
21      THE WITNESS:  In February of 2001, I
22 was not aware of that.
23 BY MR. GOLDMAN:
24      Q.  Did you — did you know at any point
25 during the time that you were prescribing Vioxx to

**Page 305**

1 Mr. Barnett that the Food and Drug Administration
2 held an advisory committee meeting to discuss the
3 question about how to interpret the results of
4 VIGOR?
5      A.  I don't believe that I did.
6      Q.  Do you now know, sir, that the Food and
7 Drug Administration was well aware of the VIGOR
8 results and analyzed the question about what was
9 the difference between -- in the heart attacks in
10 VIGOR, whether it was due to Vioxx or Naproxen?
11      MR. WACKER:  Objection, calls for
12 speculation.
13      MR. GOLDMAN:  So did half the questions
14 that Mr. Robinson asked.
15 BY MR. GOLDMAN:
16      Q.  Based on your very brief review of
17 Exhibit 24 during Mr. Robinson's examination, do
18 you see that the FDA was intimately aware of the
19 VIGOR study in February of 2001?
20      A.  Yes, sir.
21      Q.  And do you expect the scientists at the
22 FDA to analyze clinical trials like the VIGOR study
23 and determine whether or not the drug should stay
24 on the market?
25      MR. WACKER:  Objection, calls for

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 306

1  expert testimony.
2        THE WITNESS:  That's one of their jobs.
3  BY MR. GOLDMAN:
4        Q.  Do you see based on the briefing
5  document here, Exhibit 24, that Merck didn't
6  withhold any information about the VIGOR study or
7  Study 085 or Study 090 or any of the other studies
8  that Mr. Robinson was discussing with you earlier?
9        MR. WACKER:  Objection, calls for
10  speculation, also vague and ambiguous.
11  BY MR. GOLDMAN:
12        Q.  Do you see that?
13        A.  It would appear that the FDA had
14  information about all those studies.
15        Q.  And would you defer to the Food and
16  Drug Administration to determine whether or not a
17  drug should stay on the market based on clinical
18  trials that are ongoing while the drug is on the
19  market?
20        MR. WACKER:  Objection, calls for
21  speculation and expert testimony beyond the scope.
22        THE WITNESS:  Would I defer to the FDA
23  to make recommendations whether the drug that was
24  under scrutiny should be allowed to remain -- to
25  stay on the market?

Page 307

1  BY MR. GOLDMAN:
2        Q.  Yes.  Yes.
3        A.  Yes.
4        Q.  You said that one of the sources of
5  information that you turn to to gain an
6  understanding of the risks of medicines that you
7  prescribe are journal articles, right?
8        A.  Yes, sir.
9        Q.  I want to show you an article that I'll
10  mark as Exhibit 42.
11        (DFT. EXH. 42, Article entitled Risk of
12  Cardiovascular Events Associated With Selective
13  COX-2 Inhibitors, was marked for identification.)
14  BY MR. GOLDMAN:
15        Q.  This is an article published in JAMA in
16  2001.  Are you familiar with JAMA?
17        A.  Yes, sir.
18        Q.  Is that one of the more reputable
19  medical journals?
20        A.  Yes.
21        Q.  And it's called risk of cardiovascular
22  events associated with selective COX-2 inhibitors,
23  and among the authors is Dr. Topol.  Do you see
24  that?
25        A.  Yes, sir.

Page 308

1        Q.  I want to show you just a few portions
2  of this document, okay, sir?
3        A.  Yes, sir.
4        Q.  If you turn to the third to last page,
5  which is 957, in the first column, last paragraph,
6  do you see that Dr. Topol writes, quote, the
7  results of the VIGOR study can be explained by
8  either a significant prothrombotic effect from
9  Vioxx or an antithrombotic effect from Naproxen or
10  conceivably both?  Do you see that?
11        A.  Yes, sir.
12        Q.  Do you interpret that to mean that
13  Dr. Topol was saying that one possible explanation
14  of the VIGOR study was that the Naproxen was
15  protecting the heart and preventing heart attacks?
16        A.  Yes, sir.
17        Q.  And that another possibility is that
18  Vioxx was prothrombotic and causing heart attacks
19  in the VIGOR study?
20        A.  Yes, sir.
21        Q.  And then in the middle column, first
22  full paragraph after Dr. Topol discusses Naproxen's
23  significant antiplatelet effects, he says, quote,
24  because of the evidence for an antiplatelet effect
25  of Naproxen, it is difficult to assess whether the

Page 309

1  difference in cardiovascular event rates in VIGOR
2  was due to a benefit from Naproxen or to a
3  prothrombotic effect from Vioxx.
4        Do you see that?
5        A.  Yes, sir.
6        Q.  And you're not expected, sir, to be
7  familiar with every journal article that's out
8  there on medicine you prescribe, but having
9  reviewed the -- well, let me stand back and ask the
10  foundation question.
11        Do you remember whether you reviewed
12  Dr. Topol's article on or about August of 2001?
13        A.  I don't remember specifically.  I read
14  many of the articles in the JAMA, but I don't
15  remember this specific article.
16        Q.  It's conceivable that you did, but
17  you're not sure?
18        A.  It's conceivable.
19        MR. WACKER:  Objection, calls for
20  speculation.
21  BY MR. GOLDMAN:
22        Q.  Do you think that you might have
23  reviewed this article back in August of 2001?
24        MR. WACKER:  Objection, asked and
25  answered.  He's already testified and it misstates

78  (Pages 306 to 309)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 310

1  prior testimony that he didn't recall.  To try
2  to --
3          MR. GOLDMAN:  You objected so I'm
4  curing the objection.
5          MR. WACKER:  Well, what you're trying
6  to do is have him adopt your answer, but in any
7  event, go ahead.
8  BY MR. GOLDMAN:
9      Q.  Can you answer my question?
10     A.  I may have read it.
11         MR. WACKER:  Misstates prior testimony.
12 BY MR. GOLDMAN:
13     Q.  Did you know that because there was no
14 placebo arm of the VIGOR study that it was
15 impossible to know for sure whether Vioxx was
16 causing the heart attacks in the VIGOR study or
17 Naproxen was preventing them?
18     A.  Yes.
19     Q.  Can you explain a little bit about why
20 that's so.
21     A.  Yes.  When a study is done, the
22 assumption is that the placebo really doesn't do
23 much of either.
24     Q.  And that's a sugar pill?
25     A.  It's a pill that doesn't have

Page 311

1  metabolically -- or active medication in it.  The
2  concept is that a placebo should not reduce the
3  risk of heart attacks and in a study like that,
4  should not increase the risk of heart attacks.  If
5  you compare, and I'll use Vioxx for an example, to
6  placebo in a study, let's say the VIGOR trial, if
7  there were a difference between the two groups in
8  terms of the heart attacks, for example, you would
9  expect that difference if it was statistically
10 significant to be due to effects of the Vioxx much
11 less so than any effect of the placebo because the
12 assumption is the placebo should not have
13 significant effects.
14         When you compare a drug to another drug
15 and you're comparing two drugs that both have
16 effects, then it makes it much more difficult to
17 tease out how much is due to a beneficial effect of
18 one drug versus a disadvantageous effect of another
19 drug.  It clouds the water, so to speak, so it
20 really makes the comparison very -- it makes
21 drawing the conclusion which one contributed to the
22 outcome much more difficult.
23     Q.  And for those people who believe like
24 Merck that there was evidence showing that Naproxen
25 explained the difference in the VIGOR study --

Page 312

1  terrible question.
2          Based on all that you knew, sir, about
3  the VIGOR study during the time that you were
4  prescribing Vioxx to Mr. Barnett before his heart
5  attack, did you believe the benefits of Vioxx
6  outweighed the risks?
7      A.  Yes, sir.
8      Q.  And before Mr. Barnett had his heart
9  attack, you understood that you couldn't be certain
10 whether the difference in the VIGOR trial was due
11 to Vioxx or Naproxen, right?
12     A.  I couldn't be certain that the
13 difference was due to --
14     Q.  Did I ask that?  Wait, I didn't ask the
15 question right.
16         Because there was no placebo arm in the
17 VIGOR study, you understood while you were
18 prescribing Vioxx to Mr. Barnett before his heart
19 attack that you couldn't be certain whether Vioxx
20 was contributing to heart attacks or Naproxen was
21 preventing them in the bigger study?
22     A.  That's correct.
23     Q.  And there was debate in the medical
24 community about that question?
25     A.  There was --

Page 313

1          MR. WACKER:  Objection, calls for
2  speculation, asked and answered.
3  BY MR. GOLDMAN:
4      Q.  What was the answer?
5      A.  -- much debate.
6      Q.  Let me now show you what I'll mark as
7  Exhibit 43.
8          (DFT. EXH. 43, Merck Prescribing
9  Information, was marked for identification.)
10 BY MR. GOLDMAN:
11     Q.  Mr. Robinson didn't show you this
12 exhibit, but it is a dear healthcare professional
13 letter that Merck sent to 300,000 or so physicians
14 to inform them about the results of the change in
15 the label for Vioxx, okay?
16     A.  Um-hum.
17         MR. WACKER:  Objection, assumes facts
18 not in evidence, strike the commentary, it's not a
19 question.
20 BY MR. GOLDMAN:
21     Q.  Do you see that Exhibit 43 is a dear
22 healthcare professional letter that Merck sent in
23 April of 2002 indicating in the second paragraph,
24 the prescribing information has been revised to
25 reflect the results of the VIGOR study and the FDA

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 314

1  approval of Vioxx for the relief of the signs and
2  symptoms of rheumatoid arthritis in adults?
3      A.  Yes, sir.
4      Q.  And then I'm going to ask you a number
5  of questions about this, but do you see on the
6  first page, it says, important prescribing
7  information, and on the second it says the same
8  thing at the top?
9      A.  Yes, sir.
10     Q.  And you periodically receive from
11 pharmaceutical companies updated information about
12 changes to the label based on new information about
13 the drug, right?
14     A.  I receive stacks of mail from
15 pharmaceutical companies on a routine basis.
16     Q.  This is I don't think going to be a
17 dispute or anything, but the information that we
18 have is that your name appears on the address list
19 and you were one of the prescribers who was sent
20 this letter.
21     A.  Okay.
22         MR. WACKER:  Objection, strike the
23 commentary and the prefatory statement.
24 BY MR. GOLDMAN:
25     Q.  Do you have any reason to believe that

Page 315

1  you didn't receive Exhibit 43 back in April of
2  2002?
3          MR. WACKER:  Why don't you ask him if
4  he recalls he received it?
5  BY MR. GOLDMAN:
6      Q.  Can you answer the question I asked?
7      A.  Can you restate it, please?
8      Q.  Do you recall one way or the other
9  whether or not you received the dear healthcare
10 professional letter in April of 2002?
11     A.  I don't specifically recall.
12     Q.  Do you have any reason to dispute that
13 you were sent the letter and that it arrived at
14 your office?
15     A.  No.
16         MR. WACKER:  Objection, calls for
17 speculation.
18 BY MR. GOLDMAN:
19     Q.  What was your answer?
20     A.  No.
21     Q.  I want to show you portions of the
22 letter.  Do you see how in the first page Merck is
23 including under clinical studies the portion of the
24 label change -- the label that was changed to
25 reflect the VIGOR study?

Page 316

1      A.  Yes, sir.
2      Q.  So if you turn to the second page, do
3  you see under study results, there's
4  gastrointestinal safety in VIGOR?  Do you see that,
5  sir?
6          MR. WACKER:  Which label, are you
7  talking about this watered down -- this one?
8          MR. GOLDMAN:  If you make any more
9  comments like that, I'll call Judge Fallon, so
10 don't do that, please.
11         MR. WACKER:  Which -- which label are
12 you talking about?
13         MR. GOLDMAN:  I'm talking about the one
14 I'm looking at.
15         THE WITNESS:  Table 1?
16         MR. WACKER:  Well -- well, you've shown
17 him two, so I want to know which -- there's been
18 two labels in the deposition.  Which one are you --
19 BY MR. GOLDMAN:
20     Q.  The document that you're looking at,
21 sir, do you see that Merck is indicating the study
22 results of the gastrointestinal safety of VIGOR?
23     A.  Yes, sir.
24     Q.  And then there's a table.  Do you see
25 that?

Page 317

1      A.  Yes, sir.
2      Q.  Then there's other safety findings and
3  it describes cardiovascular safety at the bottom of
4  Page 2, correct?
5      A.  Yes, sir.
6      Q.  On Table 2, do you see that it --
7  there's a comparison of patients with serious
8  cardiovascular thrombotic adverse events over time?
9      A.  Yes, sir.
10     Q.  And that if you look in the table on
11 the far right, do you see that for Vioxx 50
12 milligrams, there were 45 events at ten-and-a-half
13 months compared to 19 events for Naproxen?
14     A.  Yes, sir.
15     Q.  And that's 1.81 percent of the patients
16 who had serious cardiovascular adverse events in
17 the Vioxx arm and .60 percent in the Naproxen arm?
18     A.  That's the cumulative rate, yes, sir.
19     Q.  Do you also see the asterisk above the
20 1.81 percent and that that is a
21 statistically-significant difference as evidenced
22 at the bottom of the table where it says, P value
23 is less than .002?
24     A.  Yes, sir.
25     Q.  You were asked a question about whether

Michael Mikola, M.D.

**Page 318**

1   or not if you had seen the FDA's proposed label
2   change about using caution in patients with angina
3   that you would have prescribed Feldene for
4   Mr. Barnett?
5           MR. WACKER: Objection, prior
6   statement --
7   BY MR. GOLDMAN:
8       Q.   Am I characterizing it right or wrong?
9           MR. WACKER: Prior statement speaks for
10  itself.
11          THE WITNESS: I believe I was asked if
12  I had all the available -- the data available to me
13  now versus that I had -- if I had all the data
14  available to me now, would I prescribe Vioxx for
15  him at that time and my answer was no. That's how
16  I recall the question.
17  BY MR. GOLDMAN:
18      Q.   To the extent that there's any
19  confusion about the previous question that
20  Mr. Robinson asked you and your answer, is it your
21  testimony that if you had just seen a proposed
22  warning label from the FDA saying use caution in
23  patients with angina that that wouldn't have caused
24  you to put Mr. Barnett on Feldene?
25          MR. WACKER: Objection, misstates prior

**Page 319**

1   testimony.
2           THE WITNESS: Can you restate that to
3   me? I'm sorry.
4   BY MR. GOLDMAN:
5       Q.   To the extent that there's any
6   confusion about the previous testimony, I know it's
7   been a long day, I want to know if your testimony
8   is that if you had seen the proposed label change
9   in language that the FDA had included about using
10  caution in patients who have a history of angina --
11      A.   Okay.
12      Q.   My question is: If you had seen that
13  back when you were prescribing medicine to — Vioxx
14  to Mr. Barnett --
15      A.   Yeah.
16      Q.   -- would that have caused you not to
17  prescribe Vioxx and instead to prescribe Feldene?
18          MR. WACKER: Objection, misstates prior
19  testimony. Go ahead.
20          THE WITNESS: It's quite possible.
21  BY MR. GOLDMAN:
22      Q.   And that if you had seen a --
23      A.   Again, it sort of depends. I think to
24  some degree here is a dose issue. This is a
25  50-milligram dose. I rarely prescribed 50

**Page 320**

1   milligrams. Would the safety issues be the same at
2   25 milligrams or 12.5 milligrams? That would
3   probably make a difference. If the FDA said that
4   25 milligrams may not be safe and unstable in
5   patients with risk factors for heart disease, then
6   that probably would have had a significant impact
7   on my prescribing ability.
8       Q.   And that's not what Mr. Robinson showed
9   you the FDA said, right?
10      A.   Correct.
11      Q.   So focusing just on that FDA draft
12  document that you saw earlier today, are you in a
13  position to say one way or the other whether that
14  would have altered your decision to prescribe Vioxx
15  to Mr. Barnett?
16      A.   May I review that again, that document?
17      Q.   Sure.
18      A.   I'm sorry, I just want to make sure I
19  answer accurately. That is --
20      Q.   Exhibit 11.
21      A.   11, yeah.
22      Q.   And I just want to focus on the
23  language they asked you about, okay?
24      A.   Yes, sir.
25      Q.   Because you didn't have a chance to

**Page 321**

1   review the entire document here, did you?
2       A.   I did not review it in detail.
3       Q.   Do you see that on the page that ends
4   8572 --
5       A.   Okay.
6       Q.   -- on the top, it says, Vioxx should be
7   used with caution in patients at risk of developing
8   cardiovascular thrombotic events such as those with
9   a history of myocardial infection and angina in
10  patients with preexisting -- preexisting
11  hypertension and congestive heart failure?
12          Do you see that?
13      A.   Yes, sir.
14      Q.   If you had read that particular
15  statement at the time you were prescribing Vioxx to
16  Mr. Barnett before he had his heart attack, would
17  that statement in the warning label have changed
18  your decision to use Vioxx?
19      A.   Probably so.
20      Q.   Would a statement in a package insert
21  that said that caution should be exercised when
22  Vioxx is used in patients with a medical history of
23  ischemic heart disease have impacted your decision
24  to prescribe Vioxx to Mr. Barnett?
25      A.   I would definitely not have prescribed

81 (Pages 318 to 321)

Michael Mikola, M.D.

Page 322

1  it after September 2002, after his heart attack,
2  yes. Does that answer your question?
3       Q.  Yes, but if you had known before
4  Mr. Barnett's heart attack that you should use
5  caution in prescribing Vioxx in patients who had a
6  medical history of ischemic heart disease, in light
7  of Mr. Barnett's January 2000 ischemic event, would
8  you have prescribed Vioxx to Mr. Barnett?
9       A.  I don't believe so.
10      MR. WACKER:  Objection, incomplete
11  hypothetical.
12      MR. GOLDMAN:  We'll take a quick break,
13  okay?
14      VIDEO TECHNICIAN:  We will now go off
15  the record.  The time is approximately 5:16 PM.
16      (A recess transpired.)
17      (DFT. EXH. 44, Vioxx Label Description,
18  was marked for identification.)
19      VIDEO TECHNICIAN:  We're back on the
20  record.  The time is approximately 5:20 PM.
21  BY MR. GOLDMAN:
22      Q.  I've handed you what I've marked as
23  Exhibit 44 --
24      A.  Yes, sir.
25      Q.  -- a package insert that is dated April

Page 323

1  of 2002 approved by the Food and Drug
2  Administration, okay?
3       A.  Yes, sir.
4       Q.  When you were prescribing Vioxx to
5  Mr. Barnett in the April 2002 time frame, were you
6  familiar with the risks and benefits of the label
7  that was in existence at the time?
8       A.  Yes, sir.
9       Q.  So you would have been familiar with
10  the information contained in Exhibit 44?
11      A.  Yes, sir.
12      Q.  Do you see that in the right-hand
13  column there's a description of the VIGOR study and
14  it describes the design of the study, right column?
15      A.  Yes, sir.
16      Q.  Then there are study results in the
17  middle of the column, gastrointestinal safety in
18  VIGOR.  Do you see that?
19      A.  Yes, sir.
20      Q.  And under Table 1 there's an indication
21  that says, quote, the risk reduction for PUB's and
22  complicated PUB's for Vioxx compared to Naproxen,
23  approximately 50 percent, was maintained in
24  patients, and then it continues.
25      Do you see that?

Page 324

1       A.  Yes, sir.
2       Q.  That's an indication that Vioxx did
3  what it was supposed to do by reducing the number
4  of GI bleeds relative to Naproxen?
5       A.  Yes, sir.
6       MR. WACKER:  Well, it misstates the
7  document.
8  BY MR. GOLDMAN:
9       Q.  And you --
10      MR. WACKER:  And just -- just so that
11  my objection is clear, I don't know that it
12  specifically says GI bleeds.
13      THE WITNESS:  PUB I think is peptic
14  ulcer bleeds.
15  BY MR. GOLDMAN:
16      Q.  Perforations, ulcers, bleeds?
17      A.  Yeah.
18      Q.  What is your understanding of the
19  acronym PUB's?
20      A.  It stands for symptomatic ulcers, upper
21  GI perforation obstruction, major or minor, upper
22  GI bleed.
23      Q.  And did you understand from reading
24  this -- from knowing the VIGOR study while you were
25  prescribing Vioxx to Mr. Barnett before his heart

Page 325

1  attack that Vioxx had reduced by 50 percent the
2  number of -- the frequency of PUB's relative to a
3  thousand milligrams of Naproxen?
4       A.  Yes, sir.
5       Q.  And then further down where it says,
6  other safety findings, cardiovascular safety, do
7  you see that it indicates the VIGOR study showed a
8  higher incidence of adjudicated serious
9  cardiovascular thrombotic events in patients
10  treated with Vioxx 50 milligrams once daily as
11  compared to patients treated with Naproxen 500
12  milligrams twice daily?
13      A.  Yes, sir.
14      Q.  You understood that information back in
15  November of 2000 when you read the VIGOR study,
16  right?
17      A.  Yes, sir.
18      Q.  And then you see there's Table 2, which
19  again --
20      MR. WACKER:  I'm sorry, let me just lay
21  a late-founded objection to the last question that
22  that's not -- not what the VIGOR study shows.  That
23  misstates the VIGOR study specifically.
24      MR. GOLDMAN:  Okay.  Well, this is a
25  Food and Drug Administration-approved label and I'm

82 (Pages 322 to 325)

Golkow Litigation Technologies - 1.877.DEPS.USA

Michael Mikola, M.D.

Page 326

1　just reading what it says.
2　　　　MR. WACKER: Right, but you're --
3　BY MR. GOLDMAN:
4　　　Q.　Do you see --
5　　　　MR. WACKER: This is what this says and
6　now you're relating that back to what the VIGOR
7　study said in the Bombardier article and that's not
8　what it says in the Bombardier article.  It never
9　says there was a significant --
10　　　　MR. GOLDMAN: Can you just make your
11　objection and not a speech, please?
12　　　　MR. WACKER: Well, I want the record to
13　be clear.
14　　　　MR. GOLDMAN: Okay.  You can clear that
15　up.
16　BY MR. GOLDMAN:
17　　　Q.　Do you see Table 2 in the bottom of the
18　right-hand corner, VIGOR summary of patients with
19　serious cardiovascular thrombotic adverse events
20　over time?  Do you see that?
21　　　A.　Yes, sir.
22　　　Q.　And that, again, is the same
23　information we just had in the dear healthcare
24　professional letter where there's a 45-to-19
25　numerical difference in serious cardiovascular

Page 327

1　thrombotic events at ten-and-a-half months between
2　Vioxx 50 milligrams and Naproxen a thousand
3　milligrams?
4　　　A.　Yes, sir.
5　　　Q.　And then if you look on the next page
6　where it says, Table 3, serious cardiovascular
7　thrombotic adverse events, in the middle of that
8　table, do you see that under cardiac events, if you
9　look at nonfatal MI, the label indicates that there
10　were 18 events on Vioxx 50 milligrams and 4 on
11　Naproxen thousand milligrams?
12　　　A.　Yes, sir.
13　　　Q.　And that's a four to five times
14　difference?
15　　　A.　Yes, sir, four-and-a-half times
16　difference.
17　　　Q.　And you understood in April of 2002
18　that -- that there was a four to five times
19　difference in the number of heart attacks between
20　Vioxx and Naproxen for this dosage?
21　　　A.　Yes, sir.
22　　　Q.　And then if you look in the precautions
23　section -- so that -- those tables were on the
24　front page and the top of the second page of the
25　label and that's information that you read back in

Page 328

1　April of 2002, right?
2　　　A.　This came out April 2002?
3　　　Q.　Yeah.
4　　　A.　Yes, sir.
5　　　Q.　And if you look on the right-hand
6　column under precautions under cardiovascular
7　effects, the information below should be taken into
8　consideration and caution should be exercised when
9　Vioxx is used in patients with a medical history of
10　ischemic heart disease and then it continues to
11　describe the VIGOR study.
12　　　　Do you see that?
13　　　A.　Not yet.
14　　　Q.　Right-hand column under precautions,
15　cardiovascular effects.
16　　　A.　Oh, yes, sir.
17　　　Q.　Do you see the sentence, the
18　information below should be taken into
19　consideration and caution should be exercised when
20　Vioxx is used in patients with a medical history of
21　ischemic heart disease?  Do you see that?
22　　　A.　Yes, sir.
23　　　Q.　But this is, I think, really important
24　as well, sir, that I want to ask you about.
25　　　　MR. WACKER: Objection, strike the

Page 329

1　commentary.
2　BY MR. GOLDMAN:
3　　　Q.　Do you see how in that next paragraph,
4　there is a description of the number of serious
5　cardiovascular thrombotic events that says that the
6　number of serious cardiovascular thrombotic events
7　was significantly higher in patients treated with
8　Vioxx versus Naproxen?  Do you see that?
9　　　A.　I don't find that yet.
10　　　Q.　Okay.  It's the second sentence --
11　actually, it's in the first sentence of the second
12　paragraph under cardiovascular effects.  It says,
13　in VIGOR, and it describes it.
14　　　A.　Yes, sir.
15　　　Q.　And after the comma, it says, the risk
16　of developing a serious cardiovascular thrombotic
17　event was significantly higher in patients treated
18　with Vioxx 50 milligrams once a day as compared to
19　patients treated with Naproxen 500 milligrams twice
20　a day.  Do you see that?
21　　　A.　Yes, sir.
22　　　Q.　And then further down, it says, in a
23　placebo-controlled database derived from two
24　studies with a total of 2,142 elderly patients,
25　mean age 75 with a median duration of exposure of

83  (Pages 326 to 329)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 330

1  approximately 14 months, the number of patients
2  with serious cardiovascular thrombotic events was
3  21 versus 35 for patients treated with Vioxx 25
4  milligrams once daily, versus placebo.
5       A.  Yes, sir.
6       Q.  What's the significance of that to you?
7       A.  I would have to know the P value to
8  know if it was statistically significant, but I
9  could state that in that data, there were less
10  cardiovascular events in patients on Vioxx 25
11  milligrams than on placebo.
12       Q.  And knowing that back in April of 2002,
13  why was that significant to you?
14       A.  Well, comparing that to the VIGOR
15  trial, and it's not always valid to compare one
16  trial to the other due to a number of variables, it
17  seemed to indicate that at least in elderly
18  patients, 25-milligram dose of Vioxx daily for I
19  think up to nine months did not increase their risk
20  of vascular -- of major cardiovascular events.
21       Q.  And when you have results in a
22  placebo-controlled environment like they're
23  describing here and there is no difference between
24  Vioxx and placebo concerning serious cardiovascular
25  thrombotic events, that would suggest that there is

Page 331

1  no increase in risk associated with Vioxx, correct?
2       A.  That would suggest that there's no
3  increased risk, yes, sir.
4       Q.  And it was your understanding back in
5  April of 2002 that the positive results of the
6  placebo-controlled studies, in other words, that
7  Vioxx did not increase cardiovascular events,
8  supported the interpretation of VIGOR that Naproxen
9  was cardioprotective and not that Vioxx was causing
10  heart attacks?
11       MR. WACKER:  Objection, calls for
12  expert testimony beyond the scope.  It also
13  misstates the evidence.  It doesn't say
14  placebo-controlled studies.  It says a database
15  that apparently Merck selected.
16       THE WITNESS:  You're asking me if --
17  you're going back to the VIGOR trial and asking me
18  if my interpretation --
19  BY MR. GOLDMAN:
20       Q.  I'll ask it differently.
21       A.  Okay.
22       Q.  To you as a prescribing physician when
23  you were prescribing Vioxx to Mr. Barnett before
24  his heart attack, was the most important clinical
25  trial evidence concerning heart attack risk

Page 332

1  evidence that would be generated in
2  placebo-controlled studies?
3       A.  I think conclusions drawn from
4  placebo-controlled studies are easier to interpret
5  cause and effect and probably more generalizable
6  when you're looking at safety and efficacy.
7       Q.  And when you say they are more -- well,
8  you say that placebo-controlled studies are easier
9  to interpret cause and effect and probably more
10  generally able to --
11       A.  Generalizable.
12       Q.  I couldn't --
13       A.  I don't know if that's a word, but --
14       Q.  Let me ask the question.
15       A.  Okay.
16       Q.  When you say that placebo-controlled
17  studies are easier to interpret cause and effect
18  and probably more generalizable to safety and
19  efficacy, what do you mean?
20       A.  That means that there are less
21  potentially-confounding variables when you look at
22  the results of the study if a drug is compared to
23  placebo versus a drug that's compared to another
24  drug because the adverse or beneficial effects of
25  the other drug also have to be taken into

Page 333

1  consideration.  And it varies dramatically between
2  different patient populations, the way the study's
3  set up, the way the questions are asked.  It
4  induces a lot more variability into interpreting
5  the outcomes.
6       Q.  If you skip down to the next sentence,
7  the significance of the cardiovascular findings
8  from these three studies, VIGOR and two
9  placebo-controlled studies, is unknown.
10       Do you see that?
11       A.  Not yet.  I'll find it, though.  Yes,
12  sir.
13       Q.  That was information you knew in April
14  of 2002, right?
15       A.  Yes, sir.
16       Q.  And when you were deciding to prescribe
17  Vioxx to Mr. Barnett who needed to have pain
18  relief, you were weighing the risks and the
19  benefits associated with Vioxx, right?
20       A.  That's correct.
21       MR. WACKER:  Objection, leading.
22  BY MR. GOLDMAN:
23       Q.  Are you weighing the risks and benefits
24  of Vioxx based on how they're described in the
25  package insert when you're deciding whether to

84  (Pages 330 to 333)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

---

**Page 334**

1  prescribe Vioxx to Mr. Barnett?
2      A.  That's one part of the decision-making
3  process.
4      Q.  And here in April of 2002, the
5  FDA-approved label is indicating that the reason
6  for the difference in VIGOR and these
7  placebo-controlled studies is uncertain.  Do you
8  see that?
9      A.  Yes, sir.
10      Q.  When you're making a risk-benefit
11  decision about whether to prescribe Vioxx to
12  Mr. Barnett, it's important that you know that --
13  when you were prescribing the Vioxx to Mr. Barnett
14  after April of 2002, you understood the
15  FDA-approved label saying that the results of VIGOR
16  and these placebo-controlled studies were unknown,
17  correct?
18          MR. WACKER:  Objection,
19  mischaracterizes the evidence of -- and vague and
20  ambiguous as to FDA approved.
21          THE WITNESS:  I would interpret it as
22  the results of the VIGOR and the other two studies
23  are not definitive.
24  BY MR. GOLDMAN:
25      Q.  And you understood that back in April

---

**Page 335**

1  of 2002?
2      A.  Yes, sir.
3      Q.  Based on that, you felt that the
4  benefits of Vioxx outweighed the risks for
5  Mr. Barnett --
6          MR. WACKER:  Objection, assumes
7  facts --
8  BY MR. GOLDMAN:
9      Q.  -- in part?
10          MR. WACKER:  Objection, assumes facts
11  not in evidence, overbroad, vague and ambiguous.
12          THE WITNESS:  I thought -- I thought
13  that the risk-to-benefit ratio was acceptable for
14  Mr. Barnett.
15  BY MR. GOLDMAN:
16      Q.  Your conclusion that the risk-benefit
17  ratio for prescribing Vioxx -- okay.  You can set
18  that aside now.
19      A.  Okay.
20      Q.  I want to go back to one of the letters
21  that Mr. Robinson was briefly asking you about and
22  it was the March 28th, 2003 letter that Merck sent
23  you.  I'll tell you the exhibit number in a minute.
24  Exhibit 23.
25      A.  Okay.

---

**Page 336**

1      Q.  You found it?
2      A.  Yes.
3      Q.  What is the Bates number at the bottom
4  right?
5      A.  It says -- MRK-AKT 400523 is one of
6  them.  I moved them out of order.
7      Q.  Here, you know what?  I'm going to just
8  show it you.
9      A.  Okay.
10      Q.  Here.  And we don't have to mark it
11  separately.
12          (DFT. EXH. 45, Letter dated 3/28/03 to
13  Michael Mikolajczyk, MD from Leonard I.
14  Silverstein, MD, was marked for identification.)
15  BY MR. GOLDMAN:
16      Q.  I'm marking as Exhibit 45, Dr. Mikola,
17  a letter dated March 28th, 2003 from Merck to you.
18  Do you see that?
19      A.  Yes, sir.
20      Q.  And in the first paragraph, what does
21  it say?
22      A.  Our professional representative, Steven
23  Calder, has referred your request for information
24  regarding Vioxx, in parentheses, Rofecoxib tablets
25  and oral suspension.  Your inquiry concerned the

---

**Page 337**

1  development of cardiovascular thrombotic events in
2  the elderly patient, placebo-controlled data set
3  for Vioxx.
4      Q.  So is this an example where you were
5  inquiring about cardiovascular safety in a
6  discussion you're having with one of Merck's sales
7  reps, Steve Calder?
8      A.  Yes.  Yes, sir.
9      Q.  What's your impression of Mr. Calder?
10      A.  A very nice young man.
11      Q.  Did Mr. Calder ever try to dodge or
12  avoid your question?
13          MR. WACKER:  Well, objection, that
14  assumes facts not in evidence.  He wouldn't know
15  what information --
16          THE WITNESS:  Not to my recollection.
17  BY MR. GOLDMAN:
18      Q.  Is Mr. Calder the type of person who
19  thinks it's important to present fair balance?
20          MR. WACKER:  Objection, calls for
21  character testimony.
22  BY MR. GOLDMAN:
23      Q.  That's a bad question.  Let's just
24  stick with the document.
25      A.  Okay.

---

# Michael Mikola, M.D.

## Page 338

1  Q.  Merck then sent you responsive
2  information in March of 2003 and in the third
3  paragraph, one line, it says, a search of the
4  literature has identified the following reference
5  pertaining to your inquiry.
6      Do you see that?
7  A.  Yes, sir.
8  Q.  In this document, I won't go through it
9  in that much detail, but do you see that Merck is
10 describing Dr. Reicin's analysis of the
11 cardiovascular safety profile of Vioxx in elderly
12 patients with Alzheimer's disease or mild cognitive
13 impairment?
14 A.  Yes, sir.
15 Q.  And if you turn to the second page, the
16 table at the top, do you see that in that
17 population of elderly patients, if you look at
18 confirmed adjudicated, do you know what that means?
19 A.  Not exactly.
20 Q.  Okay.
21 A.  I know what confirmed is, I'm not sure.
22 Q.  What does confirmed mean?
23 A.  It means that it's been documented that
24 it met criteria for the reported event, whatever
25 the criteria basically.

## Page 339

1  Q.  And adjudicated is the process of
2  deciding whether or not the event has met those
3  criteria.
4  A.  Okay.
5  Q.  Do you see that for confirmed
6  adjudicated serious thrombotic adverse events --
7  cardiovascular adverse events in elderly people
8  that there were 25 cases in the Vioxx 25-milligram
9  arm compared to 39 cases in the placebo arm?
10 A.  Yes, sir.
11 Q.  And then if you look in the far right
12 column under relative risk.
13 A.  Yes, sir.
14 Q.  What does .72 mean to you in terms of
15 the risk of serious thrombotic cardiovascular
16 adverse events in this placebo-controlled database?
17 A.  It means that there were 28 percent
18 less events in the Vioxx group compared to the
19 placebo group.
20 Q.  And then do you see on the third page
21 that Merck is including toward the bottom -- almost
22 done.
23 A.  It's okay.
24 Q.  On the third page, Merck is including
25 the prescribing information for Vioxx and if you

## Page 340

1  flip through, you'll see it's a verbatim
2  description of what is in the April 2002 label
3  concerning VIGOR?
4  A.  Yes, sir.
5  Q.  And when you were prescribing Vioxx to
6  Mr. Barnett, now this is after his heart attack in
7  March of 2003, you understood this information and
8  you believed that the benefits of Vioxx outweighed
9  the risks?
10 A.  Yes, sir, at the doses prescribed, yes,
11 sir.
12 Q.  Let me ask you a few questions that
13 don't necessarily relate to one another, okay?
14 A.  Okay.
15 Q.  Did anybody from Merck ever intimidate
16 you into prescribing Vioxx?
17 A.  No, sir.
18 Q.  Did anybody from Merck ever take away
19 funding or refuse to give you research grants
20 because you were criticizing Vioxx?
21 A.  No, sir.
22 Q.  Did you ever meet or talk to anybody
23 named Lou Sherwood from Merck?
24 A.  Not that I recall.
25 Q.  Have you ever attended an audio

## Page 341

1  conference or presentation moderated by Dr. Peter
2  Holt about Vioxx?
3  A.  Not that I recall.
4  Q.  Whatever Dr. Holt said about Vioxx
5  played no role in your decision to prescribe Vioxx
6  to Mr. Barnett, did it?
7      MR. WACKER:  Objection, calls for
8  speculation to the extent that he doesn't know
9  what -- where the information Holt said went to.
10 BY MR. GOLDMAN:
11 Q.  I'm asking about your decision to
12 prescribe Vioxx to Mr. Barnett, okay?
13 A.  Not to my recollection.
14 Q.  Did anything that Dr. Holt say at some
15 audio conference or presentation play any role in
16 your decision to prescribe Vioxx to Mr. Barnett?
17     MR. WACKER:  Objection, assumes facts
18 not in evidence to the extent that the foundation
19 has not been laid as to where that information that
20 Dr. Holt presented was circulated to.
21     THE WITNESS:  Not to my recollection.
22 BY MR. GOLDMAN:
23 Q.  Have you ever seen any video press
24 conferences held by -- well, I don't need to ask
25 that.

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 342**

1      Were you aware that Merck --
2      MR. GOLDMAN:  I guess we have to change
3 the tape.  Okay.  Go for -- take a minute.
4      VIDEO TECHNICIAN:  This is the end of
5 Tape Number 6 in the deposition of Dr. Michael
6 Mikola.  The time is approximately 5:43 PM.  The
7 date is April 25th, 2006.  We will now go off the
8 record.
9      (A recess transpired.)
10      VIDEO TECHNICIAN:  This is the
11 beginning of Tape Number 7 in the deposition of
12 Dr. Michael Mikola.  The time is approximately 5:46
13 PM.  The date is April 25th, 2006.  We are now back
14 on the record.
15 BY MR. GOLDMAN:
16    Q.  Dr. Mikola, were you aware during the
17 time you were prescribing Vioxx to Mr. Barnett that
18 Merck advertised on television for Vioxx?
19    A.  I believe I do recall, yes, sir.
20    Q.  Are you aware that Pfizer advertised on
21 TV for Celebrex?
22    A.  Yes, sir.
23    Q.  Is it common for pharmaceutical
24 companies to advertise their drug products?
25      MR. WACKER:  Objection, vague and

**Page 343**

1 ambiguous.
2      THE WITNESS:  More and more so, yes,
3 sir.
4 BY MR. GOLDMAN:
5    Q.  Did the advertisements such as Dorothy
6 Hamill skating about Vioxx play any role in your
7 decision to prescribe Vioxx to Mr. Barnett?
8    A.  No, sir.
9      MR. WACKER:  Objection, calls for
10 speculation.
11 BY MR. GOLDMAN:
12    Q.  What was your answer?
13    A.  No, sir.
14    Q.  Did Mr. Barnett ever tell you that he
15 believed the advertisements about Vioxx were
16 reassuring to him?
17    A.  Not that I recall.
18    Q.  Does Mr. Barnett strike you as the type
19 of individual that relies on what doctors have to
20 say and not commercials?
21      MR. WACKER:  Objection, calls for
22 complete rank speculation.
23      THE WITNESS:  Largely.
24 BY MR. GOLDMAN:
25    Q.  You've had much experience with

**Page 344**

1 Mr. Barnett over the years?
2    A.  Yes, sir.
3    Q.  Does -- did Mr. Barnett ask you many
4 careful questions about medications he took over
5 time?
6    A.  Mr. Barnett was probably one of the
7 most informed patients that I have ever seen in
8 terms of side effects of medicines, new therapies.
9 He was very aware of new medical therapies, drugs,
10 et cetera.
11    Q.  Mr. Barnett even approached you on
12 occasion with studies he found on the Internet
13 about drugs he was taking?
14    A.  Yes, sir.
15    Q.  Based on your experience with
16 Mr. Barnett and the type of patient he is, does he
17 strike you as somebody who would rely on what a
18 doctor like you had to say about medication as
19 opposed to a commercial?
20      MR. WACKER:  Objection, calls for
21 speculation.
22      THE WITNESS:  Yes, sir.
23 BY MR. GOLDMAN:
24    Q.  Have you ever used something called the
25 Merck Manual in your practice?

**Page 345**

1    A.  Yes, sir.
2    Q.  Have you ever used it specifically to
3 focus on prostacyclin or thromboxane?
4    A.  Not to my recollection.
5    Q.  Just one more line of questions,
6 Dr. Mikola.  When Mr. Robinson was asking you if
7 you had known everything that he showed you today
8 and everything you've learned since the withdrawal
9 of Vioxx, whether you would have prescribed it to
10 Mr. Barnett, you said you would have prescribed
11 Feldene, right?
12      MR. WACKER:  Objection, asked and
13 answered.
14      THE WITNESS:  Yes, sir.
15      MR. WACKER:  Testimony speaks for
16 itself.
17 BY MR. GOLDMAN:
18    Q.  Has it been your experience,
19 Dr. Mikola, that new information is learned about
20 medicine after it's on the market sometimes?
21    A.  Yes, sir.
22    Q.  Has it been your experience that as
23 thorough as clinical trials might be before a
24 medicine is brought to market, oftentimes the FDA
25 and drug companies learn more information about

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 346

1  benefits and side effects of medicine once it's on
2  the market and used by millions of people?
3       A.  Yes, sir.
4       Q.  Because information evolves over time
5  concerning the risks and benefits of medicine,
6  don't you find it difficult to determine whether in
7  hindsight you would have prescribed Vioxx or not?
8       MR. WACKER:  Objection, calls for --
9  well, we'll just leave it as objection.
10      THE WITNESS:  No, sir.  In hindsight, I
11  wouldn't have prescribed it because I would have
12  known it was going to be the target of a major
13  lawsuit.
14  BY MR. GOLDMAN:
15      Q.  So because it was a target of a major
16  lawsuit, of course that would have dissuaded you
17  from prescribing Vioxx and you wouldn't have had to
18  stay with us for the last day?
19      A.  Correct.  Doctors in general try to
20  avoid lawsuits.
21      Q.  I'm sure you haven't had any.  I hope
22  you haven't.
23      Let me show you -- well, given the
24  severity of Mr. Barnett's osteoarthritis, his neck
25  and his back condition, was it your medical

Page 347

1  judgment that he needed to be on a NSAID or a COX-2
2  inhibitor?
3       MR. WACKER:  Objection, leading and
4  misstates the evidence.
5       THE WITNESS:  It's my opinion that he
6  needed to be on some type of medical therapy for
7  his arthritis, yes, sir.
8  BY MR. GOLDMAN:
9       Q.  The fact that -- does the fact that
10  Mr. Barnett -- is the fact that Mr. Barnett having
11  taken Vioxx every day for years and Feldene for
12  years consistent with your view that he needed to
13  be on an NSAID or a COX-2 inhibitor?
14      MR. WACKER:  Objection, compound.
15      THE WITNESS:  I think his options would
16  have been an NSAID or a COX-2 inhibitor or a
17  narcotic analgesic.
18  BY MR. GOLDMAN:
19      Q.  There was a reason that Mr. Barnett
20  took Feldene for as many years as he did, right?
21      A.  Yes, sir.
22      Q.  Why was that?
23      A.  For pain relief.
24      Q.  Was there a reason why Mr. Barnett took
25  Vioxx for so many years?

Page 348

1       A.  Same reason, pain relief.
2       Q.  Do you know that Mr. Barnett continues
3  to take NSAIDs to this day?
4       A.  It would not surprise me.  I did not
5  know that, but...
6       (DFT. EXH. 46, Feldene package insert,
7  was marked for identification.)
8  BY MR. GOLDMAN:
9       Q.  Let me hand you, Dr. Mikola, what I've
10  marked as Exhibit 46.  This is a current version of
11  the Feldene package insert, okay?
12      A.  Yes, sir.
13      Q.  Are you familiar with the current
14  version of the Feldene package insert?
15      A.  No, sir.
16      Q.  Let me show you --
17      MR. WACKER:  I'm sorry, let me just
18  object that this is -- the objection is it's
19  irrelevant.
20      MR. GOLDMAN:  Well, that's not an
21  appropriate objection for a deposition and if that
22  applies, we should strike almost everything that
23  was asked before by Mr. Robinson, but...
24      THE WITNESS:  May I ask when this
25  updated version --

Page 349

1  BY MR. GOLDMAN:
2       Q.  Yes.  If you look on the fourth to last
3  page, the last page of the package insert before
4  the medication guide --
5       A.  Okay.
6       Q.  -- it says 2006.
7       A.  Okay.
8       Q.  That's for Pfizer.  And then on the
9  next page under this medication guide for Feldene,
10  it says, revised March of 2006.
11      A.  Okay.  Thank you.
12      Q.  Do you see that the current warning --
13  withdrawn.
14      Do you see on the first page of the
15  Feldene package insert that there is a black box
16  for cardiovascular risk?
17      A.  Yes, sir.
18      MR. WACKER:  Again, let me -- I'll just
19  make it a standing objection to this document.
20      MR. GOLDMAN:  Okay.
21  BY MR. GOLDMAN:
22      Q.  Can you read the first bullet point
23  under cardiovascular risk in the black box for
24  Feldene.
25      A.  Yes, sir.

88  (Pages 346 to 349)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

## Page 350

1    Q.   Out loud.
2    A.   NSAIDs may cause an increased risk of
3  serious cardiovascular thrombotic events,
4  myocardial infarction and stroke, which can be
5  fatal.  This risk may increase with duration of
6  use.  Patients with cardiovascular disease or risk
7  factors for cardiovascular disease may be at
8  greater risk.  See warnings.
9    Q.   And do you see that there are several
10 may references like potentially cause increased
11 risk or may increase --
12   A.   In the paragraph that I read?
13   Q.   Yes.
14   A.   Yes, sir.
15   Q.   If you turn three pages -- to the third
16 page under warnings, do you see under
17 cardiovascular effects -- cardiovascular thrombotic
18 effects, it states, quote, clinical trials of
19 several COX-2 selective and nonselective NSAIDs of
20 up to three years duration have shown an increased
21 risk of serious cardiovascular thrombotic events,
22 myocardial infarction and stroke, which can be
23 fatal?  Do you see that?
24   A.   Yes, sir.
25   Q.   Did you know that back when Mr. Barnett

## Page 351

1  was using Feldene when he first came to you?
2    A.   No, sir.
3    Q.   The next sentence says, all NSAIDs,
4  both COX-2 selective and nonselective, may have a
5  similar risk.
6        Do you see that?
7    A.   Yes, sir.
8    Q.   Did you know that when you were
9  prescribing Feldene to Mr. Barnett?
10   A.   No, sir.
11   Q.   Are you aware that Celebrex and Mobic
12 and the other NSAIDs have the same black box
13 warning today?
14   A.   Yes, sir.
15   Q.   Is that the type of example of how
16 information changes over time and package inserts
17 get updated over time and you need to -- that's a
18 terrible question.
19       Is the Feldene example of this black
20 box warning an example where package inserts get
21 changed by pharmaceutical companies and the FDA
22 based on new information that is learned over time?
23   A.   Yes, sir, I believe so.
24   Q.   Is it difficult to make a risk-benefit
25 assessment as a doctor back in 2000, 2001, 2002

## Page 352

1  based on information that isn't available such as a
2  black box warning about Feldene?
3    A.   Yes, sir.
4    Q.   You can't decide whether the risks
5  outweigh the benefits of Feldene concerning
6  cardiovascular effects if there isn't a reference
7  in the label, right, or in other -- in
8  peer-reviewed literature?
9    A.   Yes.  Correct.
10   Q.   Even though there is a black box
11 warning for potential cardiovascular risks, however
12 small, in Feldene and other NSAIDs, you still
13 prescribe those NSAIDs if you think the benefits
14 outweigh the risks, right?
15   A.   Yes, sir.
16   Q.   And even if there's the potential for
17 some small increased cardiovascular risk for a
18 particular patient, that pain that that patient is
19 experiencing every day is a relevant factor in
20 deciding whether or not the benefits outweigh the
21 risks for that particular medicine, true?
22   A.   Yes, sir.  The pain affects their
23 quality of life issues significantly.
24   Q.   Has it been your experience that there
25 have been patients you've treated who have been

## Page 353

1  willing to take small risks of even serious side
2  effects of medicine because they are getting
3  significant benefits from that medicine?
4        MR. WACKER:  Objection, incomplete
5  hypothetical.
6        THE WITNESS:  Yes, sir.
7  BY MR. GOLDMAN:
8    Q.   Dr. Mikola, I don't believe I have any
9  more questions.  Let me just look through my
10 outline real quickly.
11       Just one more question, Dr. Mikola, do
12 you remember ever seeing something called the CV
13 card?
14   A.   I do not recall seeing the CV card.
15       MR. GOLDMAN:  Thank you, sir.
16       THE WITNESS:  Yes, sir.
17       EXAMINATION
18 BY MR. WACKER:
19   Q.   Dr. Mikola, Ted Wacker again, I
20 introduced myself earlier.  I'm obviously standing
21 in the shoes of Mr. Robinson to finish up the
22 deposition and I feel like it's at the end of the
23 circus here and I've got to do the final sweep
24 after all the animals have left, but --
25       MR. GOLDMAN:  All the mice.

89 (Pages 350 to 353)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 354**

1  BY MR. WACKER:
2     Q.  -- let me just ask you a few follow-up
3  questions and then we'll get out of here.
4         In Exhibit 2, and I just wanted to
5  clarify, this was the -- the document that Grand
6  Strand Regional Medical Center -- what appears to
7  be some sort of -- I don't know if it's a discharge
8  summary or a summary by Dr. Swami, but it does
9  indicate that Mr. Barnett was on Vioxx.
10        Do you see that?
11    A.  Yes, sir.
12    Q.  Okay.  And even though your record that
13 we previously went over with counsel didn't
14 specifically indicate Vioxx, you're not disputing
15 that he was on Vioxx at that time?
16        MR. GOLDMAN:  Object to the form.
17        THE WITNESS:  He apparently told
18 Dr. Swami or the PA, I think it was Vicki Allen
19 that saw him at that time, that he was taking
20 Vioxx.
21 BY MR. WACKER:
22    Q.  And it's not completely uncommon for --
23 when patients are providing a list of medications
24 that -- that the medication list is not -- is
25 different between doctors?

**Page 355**

1     A.  Yes.
2     Q.  You've seen that often?
3     A.  Yes.  And if it's not updated, it's
4  very possible that Dr. McCaffrey put him on Vioxx
5  and according to my records, he was still on
6  Feldene.
7     Q.  And obviously whatever the pharm -- the
8  prescription records indicate, you wouldn't have
9  any reason to dispute what medications he was on
10 from the prescription records?
11        MR. GOLDMAN:  Well, let me object,
12 that's a vague question.  What he was on and what
13 the prescription records say are two different
14 things.
15        THE WITNESS:  I would say that I
16 couldn't draw that conclusion.  I would say that he
17 had the prescription filled.  Sometimes patients
18 will finish old prescriptions before they start new
19 ones.  I would be speculating what he was actually
20 taking.
21 BY MR. WACKER:
22    Q.  And equally, it would be also
23 speculation to say that he was not taking Vioxx?
24    A.  On my part, yes.
25    Q.  Doctor, you're aware that Vioxx

**Page 356**

1  increases hypertension or at least increases blood
2  pressure?
3     A.  It can, yes.
4     Q.  And increase in hypertension, are you
5  aware of the literature that indicates that an
6  increase in hypertension can also lead to the
7  progression of atherogenesis?
8     A.  The literature states that elevated
9  blood pressure -- would show that elevated blood
10 pressure over time can increase the risk of
11 atherogenesis.  It's not clear whether it's --
12 blood pressure elevations is a cause of medication
13 versus essential hypertension.
14    Q.  Assuming that Mr. Barnett had started
15 Vioxx by Dr. McCaffrey in December of '99 or
16 January -- early January of 2000, would you agree
17 that you can't rule out that the Vioxx could have
18 potentially contributed to the ischemia that you
19 observed in late January of 2000?
20        MR. GOLDMAN:  Object to the form.
21        THE WITNESS:  The question, I think,
22 becomes whether or not Vioxx contributes to
23 instability of plaques and plaque rupture.  I can't
24 say that it does, I can't say that it doesn't.
25 BY MR. WACKER:

**Page 357**

1     Q.  So in other words, you can't rule that
2  out?
3     A.  That's correct.
4     Q.  Now, Dr. Mikola, if you can turn to
5  Exhibit 40 that defense counsel showed you.
6     A.  Yes, sir.
7     Q.  That is the Bombardier article?
8     A.  Yes, sir.
9     Q.  And can you read the title for the
10 record.
11    A.  Comparison of upper gastrointestinal
12 toxicity of Rofecoxib and Naproxen in patients with
13 rheumatoid arthritis.
14    Q.  Does the title anywhere indicate to
15 you, Doctor, that Vioxx increases the risk of
16 cardiovascular disease or cardiovascular events?
17    A.  No, sir.
18    Q.  Is there anywhere in the abstract that
19 indicates that Vioxx significantly increases the
20 risk of cardiovascular events?
21    A.  No, sir.
22    Q.  And again, going to Page 1526 of the
23 article that counsel pointed out, first of all,
24 this discussion of the cardiovascular events is on
25 the seventh page of this article in the right-hand

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

# Michael Mikola, M.D.

| Page 358 |
|---|

1  column, third paragraph down, correct?
2           MR. GOLDMAN:  Other than the abstract?
3           MR. WACKER:  Of the discussion.
4           THE WITNESS:  Seventh page, right
5  column.
6  BY MR. WACKER:
7       Q.  Fourth paragraph.
8       A.  Fourth paragraph, yes, sir.
9       Q.  Would you agree with me that this
10  discussion was not prominently displayed in the
11  beginning of the article --
12       A.  Yes, sir.
13       Q.  -- for somebody like yourself as a
14  prescriber to review and for the company to
15  highlight?
16       A.  Yes, sir.
17           MR. GOLDMAN:  Object to the form.
18  BY MR. WACKER:
19       Q.  And specifically, if you could read,
20  Doctor, where it starts in the second sentence, the
21  rate of myocardial infarction.  Could you read that
22  for the record.
23       A.  The rate of myocardial infarction was
24  significantly lower in the Naproxen group than in
25  the Rofecoxib group, parentheses, .1 percent versus

| Page 359 |
|---|

1  .4 percent, parentheses.  This difference was --
2       Q.  That's fine.
3       A.  Okay.
4       Q.  Just taking that statement alone, that
5  gives you the impression as the prescribing doctor
6  that the difference between the two arms was
7  because of a reduction in myocardial infarctions
8  due to Naproxen, correct?
9           MR. GOLDMAN:  Object to the form.
10           THE WITNESS:  That sentence does not.
11  The following --
12  BY MR. WACKER:
13       Q.  Well --
14       A.  That sentence, it doesn't allude to the
15  reason for the difference, it just says that the
16  myocardial infarction was significantly lower.
17       Q.  Well, but what it doesn't say is what
18  counsel -- defense counsel indicated.  It doesn't
19  say that -- that the -- the rate of myocardial
20  infarctions was significantly higher in the Vioxx
21  arm, right?
22           MR. GOLDMAN:  Object to the form.
23  BY MR. WACKER:
24       Q.  It doesn't say that --
25           MR. GOLDMAN:  That sentence doesn't say

| Page 360 |
|---|

1  that, is that what you're saying?
2  BY MR. WACKER:
3       Q.  Yeah, that sentence doesn't say that.
4       A.  No --
5       Q.  The rate of myocardial infarction was
6  significantly higher in the Vioxx group than in the
7  Naproxen group, it doesn't say that?
8       A.  Correct, it does not directly say that.
9       Q.  And -- and at the last sentence, it
10  says, the difference in the rates of myocardial
11  infarction between the Rofecoxib and Naproxen
12  groups was -- well, back up.  Strike that.
13           In the last paragraph, last sentence
14  where it starts thus, do you see that?
15       A.  Yes, sir.
16       Q.  It says, thus, our results are
17  consistent with the theory that Naproxen has a
18  coronary protective effect and highlights the fact
19  that Rofecoxib does not provide this type of
20  protection owing to its selective inhibition of
21  cycloxygenase-2 at its therapeutic dose and at
22  higher doses.
23           Do you see that?
24       A.  Yes, sir.
25       Q.  Other than my butchering of the word.

| Page 361 |
|---|

1           Dr. Mikola, this conclusion doesn't
2  give you the other side of the coin in terms of
3  indicating that there is a potential prothrombotic
4  effect of Vioxx, does it?
5       A.  That's correct, it does not.
6           MR. GOLDMAN:  I missed an objection to
7  form.
8           THE WITNESS:  It does not indicate a
9  prothrombotic effect.
10  BY MR. WACKER:
11       Q.  And you as a prescribing physician rely
12  upon a pharmaceutical company providing you with a
13  fair and balanced presentation of the scientific
14  evidence, correct?
15           MR. GOLDMAN:  Object to the form.
16           THE WITNESS:  I rely on the
17  presentation of evidence to be fair and balanced,
18  yes.
19  BY MR. WACKER:
20       Q.  And that would include that if there's
21  two possibilities that you would expect the company
22  to give you both of those, correct?
23           MR. GOLDMAN:  Object to the form.
24           THE WITNESS:  The conclusion is there's
25  speculation in this instance.  Would I -- they

91 (Pages 358 to 361)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

**Page 362**

1  speculate that the difference is due to a
2  protective effect of Naprosyn. Would I expect them
3  to also speculate that it may be due to a
4  prothrombotic effect of Vioxx? I don't know.
5  BY MR. WACKER:
6     Q.  Well, if -- if they're going to provide
7  you with one area --
8     A.  Yes.
9     Q.  -- area of speculation, would it be
10 equally fair and reasonable to give you the other
11 side of that equation?
12    A.  Yes, sir.
13       MR. GOLDMAN: Objection, asked and
14 answered.
15 BY MR. WACKER:
16    Q.  And that's especially true in light of
17 what you've seen today wherein Dr. Patrono
18 specifically indicated in his e-mail that you
19 couldn't explain the difference because of
20 Naproxen, true?
21       MR. GOLDMAN: Object to the form.
22       THE WITNESS: Yes, sir.
23 BY MR. WACKER:
24    Q.  And nowhere in this article does it
25 indicate what Dr. Patrono's e-mail indicated that

**Page 363**

1  we've already reviewed, correct?
2        MR. GOLDMAN: Object to the form.
3        THE WITNESS: That's correct.
4  BY MR. WACKER:
5     Q.  And in fact, nowhere in this article
6  does it indicate what we've reviewed today that
7  Dr. Scolnick indicated that the CV events are
8  clearly there and it is mechanism based as we
9  worried it was?
10       MR. GOLDMAN: Object to the form.
11 BY MR. WACKER:
12    Q.  Nowhere in that -- in this article does
13 it indicate that?
14       MR. GOLDMAN: Object to the form. That
15 part wasn't read and -- or part of it wasn't read
16 to the witness and there's also a lot of other
17 problems with the question.
18       MR. WACKER: Well, I -- that part was
19 read.
20       MR. GOLDMAN: As to where he was?
21       MR. WACKER: Absolutely. Well,
22 we'll -- we'll let the record speak for itself.
23 We'll let the record speak for itself.
24       MR. GOLDMAN: If that's true, I'm glad
25 you pointed that out.

**Page 364**

1        MR. WACKER: You read the whole thing,
2  Counsel.
3        MR. GOLDMAN: Oh, you're right, I did.
4        MR. WACKER: I've got a good memory.
5        MR. GOLDMAN: In which case, I will --
6  BY MR. WACKER:
7     Q.  And again, similarly, Dr. Mikola, you
8  would also expect that if there were that type of
9  evidence like we've reviewed in the Scolnick e-mail
10 that you would expect a pharmaceutical company to
11 provide you with that type of scientific
12 conclusion?
13       MR. GOLDMAN: Object to the form, vague
14 and leading.
15       THE WITNESS: I would think if they had
16 a belief among their research specialists that
17 there were prothrombotic effects of Vioxx, then it
18 should have been made known, yes, or at least
19 studied further and made known that there were
20 ongoing studies.
21 BY MR. WACKER:
22    Q.  And if they did have that evidence that
23 there were those potential prothrombotic effects of
24 Vioxx and as you indicated that they should have
25 made it known, it would be wrong not to, wouldn't

**Page 365**

1  it?
2        MR. GOLDMAN: Object to the form.
3        THE WITNESS: It could potentially
4  result in -- in problems, yes, sir.
5  BY MR. WACKER:
6     Q.  It could result in misleading a
7  prescriber that's prescribing the drug, correct?
8        MR. GOLDMAN: Object to the form.
9        THE WITNESS: I believe so, yes.
10 BY MR. WACKER:
11    Q.  In other words, here you are, you're
12 treating in this case Mr. Barnett and this is
13 information that you would have wanted to know?
14       MR. GOLDMAN: Object to the form.
15       THE WITNESS: Yes, sir.
16       MR. GOLDMAN: What information? Object
17 to the form.
18 BY MR. WACKER:
19    Q.  If you can pull out Exhibit 41.
20       MR. GOLDMAN: Which one is that, Ted?
21       MR. WACKER: That's the Patrono
22 article.
23       MR. GOLDMAN: If I had bet the chances
24 that Dr. Patrono would be discussed this often in
25 this deposition, I would have placed it pretty low.

92 (Pages 362 to 365)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 366

1     THE WITNESS: 41?
2     MR. GOLDMAN: Looks like this. Here
3 you go.
4     THE WITNESS: Thanks.
5     MR. GOLDMAN: We'll have to get this
6 disaster together after this.
7     THE WITNESS: Okay.
8 BY MR. WACKER:
9     Q.  Okay, Doctor, do you see anywhere in
10 this article that it indicates that Dr. Patrono was
11 a paid consultant for Merck?
12    A.  No, sir.
13    Q.  Is it your understanding that based on
14 the current status of peer-reviewed medical
15 literature that in order to obtain a fair and
16 balanced and an unbiased review of literature that
17 somebody that's a paid consultant should disclose
18 that fact?
19    MR. GOLDMAN: Object to the form.
20    THE WITNESS: Yes, I think that's
21 information that should be disclosed.
22 BY MR. WACKER:
23    Q.  And you did see earlier in one of the
24 earlier exhibits where Merck had written an e-mail
25 about their consulting with Dr. Patrono on the

Page 367

1 specific issue of -- of Naproxen, correct?
2     A.  Yes, sir.
3     Q.  And a summary of that --
4     MR. GOLDMAN: Object to the form of the
5 last question.
6 BY MR. WACKER:
7     Q.  The summary of that e-mail that was in
8 the Merck files is -- reaches a different
9 conclusion than what this article stands for?
10    A.  I hate to do this, but I'm going to
11 need -- can I see that particular e-mail again that
12 you're referring to?
13    Q.  Yeah.
14    MR. GOLDMAN: Good luck.
15    THE WITNESS: There were several of
16 them.
17    MR. GOLDMAN: It's Exhibit 6.
18    THE WITNESS: I want to make sure --
19    MR. WACKER: It was Exhibit 6.
20    THE WITNESS: -- I'm commenting on the
21 right one. Exhibit 6, okay.
22 BY MR. WACKER:
23    Q.  That's actually not it.
24    A.  Okay.
25    Q.  So it must be -- that's the Scolnick.

Page 368

1 We got the wrong exhibit.
2     MR. WACKER: Hold on, let's go off the
3 record.
4     VIDEO TECHNICIAN: We will now go off
5 the record. The time is approximately 6:18 PM.
6     (Off-the-record conference.)
7     VIDEO TECHNICIAN: We're back on the
8 record. The time is approximately 6:18 PM.
9     THE WITNESS: Okay. Can you restate
10 the question, please?
11 BY MR. WACKER:
12    Q.  Yeah. Do you see in that e-mail,
13 Dr. Patrono is indicating that the difference in
14 the VIGOR study cannot be explained by the
15 cardioprotective effect of Naproxen for various
16 reasons?
17    MR. GOLDMAN: Are you going to ask him
18 to read the rest of it where it talks about chance
19 or are you going to just keep talking about the
20 first part?
21    MR. WACKER: Well, you can -- he can
22 read the whole thing if he wants.
23    MR. GOLDMAN: Objection to the form.
24    THE WITNESS: The answer to the
25 question is yes.

Page 369

1     MR. GOLDMAN: Did you get the
2 objection?
3 BY MR. WACKER:
4     Q.  Let's go to Exhibit 42. Doctor, if you
5 don't have it there, we'll find it, but this is
6 the -- the article by Mukherjee, Nissen and Topol.
7 Do you see that?
8     A.  Yes, sir.
9     Q.  Now, counsel asked you about your
10 awareness of that article and I believe your
11 testimony was you didn't recall specifically
12 reviewing that article at the time, correct?
13    A.  I'm not certain if I reviewed it or
14 not, that's correct.
15    Q.  And for certain, that was not an
16 article that anybody from Merck came and delivered
17 on your -- on your doorstep at your doctor's office
18 to wave in your -- in your -- you know, in your
19 doctor's office that, oh, boy, look, Vioxx
20 increases the risk of cardiovascular disease, was
21 it?
22    MR. GOLDMAN: Object to the form.
23 That's not at all what the -- the article says.
24    THE WITNESS: That is correct.
25 BY MR. WACKER:

## Michael Mikola, M.D.

**Page 370**

1      Q.   Well, let me rephrase the question.  It
2  was a horrible question.
3         Merck -- nobody from Merck brought you
4  that article, did they?
5      A.   That's correct.
6      Q.   And nobody from Merck, including sales
7  reps or otherwise, ever called attention to that
8  article in relation to Vioxx as a COX-2 inhibitor
9  increasing the risk of cardiovascular events?
10        MR. GOLDMAN:  Object to the form.
11        THE WITNESS:  Not to my recollection.
12  BY MR. WACKER:
13     Q.   And again, as a prescribing physician,
14  if that is something that Merck was aware of, you
15  would -- would you expect that they would bring
16  that to your attention as a prescribing physician
17  in terms of -- of review of and knowledge of the
18  medical literature concerning one of their drugs?
19        MR. GOLDMAN:  Object to the form.
20  You're asking him whether you should bring every
21  article that has to do with a medicine to the
22  attention of a physician?
23  BY MR. WACKER:
24     Q.   Well, an article -- certainly an
25  article of significance indicating the potential

**Page 371**

1  for increased risk of cardiovascular events.
2      A.   Can you restate the question?
3      Q.   Yeah, would you expect that Merck or
4  somebody from Merck would bring to your attention
5  when they're detailing you or otherwise discussing
6  with you the risks and benefits of Vioxx that they
7  would bring to your attention an article that
8  discusses the risk and not just focus on articles
9  that discuss the benefit?
10     A.   I would --
11        MR. GOLDMAN:  Object to the form.
12        THE WITNESS:  I would prefer it and
13  appreciate it.  I would not expect it because none
14  of the pharmaceutical companies do that,
15  unfortunately.
16  BY MR. WACKER:
17     Q.   Well, whether -- whether they brought
18  the article to your attention, you would expect
19  that they would alert you to potential risks of
20  their own drug like Vioxx?
21        MR. GOLDMAN:  Object to the form.
22        THE WITNESS:  Can you restate it?
23  BY MR. WACKER:
24     Q.   Yeah, you -- whether they brought that
25  particular article to your attention --

**Page 372**

1      A.   Yes.
2      Q.   -- you would expect that Merck would
3  advise you of the potential of one of their drugs
4  like Vioxx to increase the risk of cardiovascular
5  events?
6      A.   I would think that they would make me
7  aware of it, yes, sir.
8      Q.   And that didn't happen while you were
9  treating Mr. Barnett?
10     A.   Not to my recollection, no, sir.
11        MR. GOLDMAN:  Object to the form.
12  BY MR. WACKER:
13     Q.   If you want to refer to Exhibit 44,
14  which is the product insert or label.
15     A.   I have 45, 46, 40.
16     Q.   Here, you can use this one.
17     A.   Okay.  Thank you.
18     Q.   Doctor, you would agree that in terms
19  of product labeling, there's various levels of --
20  of warnings, correct?
21     A.   Yes, sir.
22     Q.   At the top of that list is a black box
23  warning, correct?
24        MR. GOLDMAN:  Object to the form.
25        THE WITNESS:  Yes, sir.

**Page 373**

1  BY MR. WACKER:
2      Q.   And -- well, strike that.
3         At the top of that list truly is -- is
4  an absolute contraindication, correct?
5      A.   Correct.
6      Q.   And then from there, there's a relative
7  contraindication?
8      A.   Yes, sir.
9      Q.   And then from there, there's a black
10  box warning, correct?
11        MR. GOLDMAN:  Object to the form.
12        THE WITNESS:  Yes.
13  BY MR. WACKER:
14     Q.   And then below the black box warning is
15  a warning, correct?
16        MR. GOLDMAN:  Object to the form.
17        THE WITNESS:  Yes, sir.
18  BY MR. WACKER:
19     Q.   And then below that is a precaution,
20  correct?
21     A.   Yes, sir.
22     Q.   And you would agree that the -- the
23  proposed label that we showed you earlier that had
24  the cardiovascular events in the warnings section
25  is a more heightened location of that warning than

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

**Page 374**

1   in -- in the precautions section that it's -- that
2   it ended up in April 2002.
3           MR. GOLDMAN: Object to the form.
4           THE WITNESS: Yes, sir.
5   BY MR. WACKER:
6       Q.   And when you're weighing the risks and
7   benefits of a drug, that's something that you take
8   into consideration, where that warning is placed in
9   the actual product insert?
10          MR. GOLDMAN: Object to the form.
11          THE WITNESS: Yes, sir.
12  BY MR. WACKER:
13      Q.   Now again, if you can take Exhibit
14  40 --
15      A.   I have it.
16      Q.   Oh, you have it.
17          MR. WACKER: And we'll go ahead and
18  mark this as next, which is --
19          (Off-the-record conference.)
20          (PLF. EXH. 47, Memo dated 7/5/00 to
21  Drs. Alise Reicin, Eliav Barr and Dennis Erb from
22  Dr. Deborah Shapiro, was marked for identification.)
23  BY MR. WACKER:
24      Q.   Here you go, Doctor. I'm going to hand
25  you Exhibit 47. This is a memo dated July 5th,

**Page 375**

1   2000, correct?
2       A.   Yes, sir.
3           MR. GOLDMAN: I'm -- I'm going to
4   object again to you using an internal memo from
5   Merck that Dr. Mikola has never seen before and
6   you're asking about an issue that is so complicated
7   with such a long history, to ask him to express any
8   opinion on this is wholly improper.
9           MR. WACKER: That assumes that you know
10  what I'm going to ask.
11          MR. GOLDMAN: Well, I know the
12  document. I can predict what you're going to ask.
13          MR. WACKER: Maybe, maybe not.
14          MR. GOLDMAN: Anyway, the objection
15  is -- can I have a standing objection on foundation
16  grounds and it's also beyond the scope?
17          MR. WACKER: You can have a standing
18  objection.
19  BY MR. WACKER:
20      Q.   Doctor, if you look at Exhibit 40,
21  which is the Bombardier article --
22      A.   Yes, sir.
23      Q.   -- and now if you look at Exhibit 47,
24  which is the July 5th memo from Deborah Shapiro.
25      A.   Yes, sir.

**Page 376**

1       Q.   And if you go to Figure 1, Page 4 of
2   the -- of the memo.
3           MR. GOLDMAN: Why don't you read the
4   first memo -- first sentence so he understands what
5   this is about.
6   BY MR. WACKER:
7       Q.   Are you with me?
8       A.   Yes, sir.
9       Q.   I'm on this --
10      A.   Table -- Table 3?
11          MR. GOLDMAN: Can you --
12  BY MR. WACKER:
13      Q.   Figure 1.
14          MR. GOLDMAN: For optimal completeness,
15  can you at least let the witness read the memo
16  attaching the tables.
17          MR. WACKER: It says, subject,
18  cardiovascular update, VIGOR.
19          MR. GOLDMAN: Yeah, but you're just
20  turning to a table within a document. You're going
21  to ask him about it and you haven't had him --
22  given him a chance to read the context at all.
23          MR. WACKER: Well, I'll let you do
24  that.
25          MR. GOLDMAN: Okay.

**Page 377**

1           MR. WACKER: I want to ask him my
2   questions and you can ask him your questions.
3   BY MR. WACKER:
4       Q.   Do you see Figure 1 on Page 4 of the
5   July 5th memo?
6       A.   Yes, sir.
7       Q.   And do you see that that's a graph, a
8   Kaplan-Meier Curve?
9       A.   Says so.
10      Q.   And it indicates, confirmed
11  thromboembolic cardiovascular serious adverse
12  experiences. Do you see that?
13          MR. GOLDMAN: Object, lacks foundation
14  and beyond the scope.
15          THE WITNESS: Yes, sir.
16  BY MR. WACKER:
17      Q.   And that's for the bigger study,
18  correct?
19      A.   Yes, sir.
20      Q.   Now, turn to the Bombardier article
21  itself.
22      A.   Yes, sir.
23      Q.   Do you see that graph depicted anywhere
24  in the Bombardier article?
25      A.   No, sir.

95 (Pages 374 to 377)

Michael Mikola, M.D.

**Page 378**

1    Q.  Now, what you do see in the Bombardier
2  article is a graph on Page 1524.  That is -- is a
3  graph just discussing the benefit side of the
4  equation, meaning the -- the PUB data, correct?
5    A.  Yes, sir.
6    Q.  And you were never provided as a
7  prescribing physician this particular Kaplan-Meier
8  Curve that shows the risk side of the equation --
9    MR. GOLDMAN:  Object to the form.
10  BY MR. WACKER:
11    Q.  -- for Vioxx, correct?
12    A.  To the best of my recollection, that's
13  correct.
14    Q.  And is that something that you would
15  have wanted to know when reviewing that article in
16  making a decision regarding the risk-benefit of
17  Vioxx?
18    MR. GOLDMAN:  Object to the form.
19  You're asking about an isolated figure without any
20  context whatsoever.
21    MR. WACKER:  You can state your
22  objection.
23  BY MR. WACKER:
24    Q.  Go ahead.
25    A.  Yes, sir.

**Page 379**

1    MR. GOLDMAN:  The objection is to form.
2    (PLF. EXH. 48, Article entitled
3  Expression of Concern: Bombardier et al.,
4  "Comparison of Upper Gastrointestinal Toxicity of
5  Rofecoxib and Naproxen in Patients with Rheumatoid
6  Arthritis," N Engl J Med 2000;343:1520-8, was
7  marked for identification.)
8  BY MR. WACKER:
9    Q.  Dr. Mikola, I'm now going to hand you
10  Exhibit 48.  Can you read the title of that article
11  into the record.
12    A.  Yes, sir.  Expression of concern:
13  Bombardier and others, comparison of upper
14  gastrointestinal toxicity of Rofecoxib and Naproxen
15  in patients with rheumatoid arthritis, New England
16  Journal of Medicine, 2000.
17    Q.  And is this an article that you've seen
18  before I just handed it to you?
19    MR. GOLDMAN:  As one that you sent to
20  him?
21    THE WITNESS:  I don't believe that you
22  guys sent it to me, but I do --
23    MR. GOLDMAN:  Oh, yeah, they did.
24    THE WITNESS:  Okay.  I was going to say
25  I do believe I've seen it before.

**Page 380**

1  BY MR. WACKER:
2    Q.  Okay.  And taken collectively reviewing
3  this article, would you agree that the information
4  that was missing from the underlying Bombardier
5  article as discussed in this expression of concern
6  would have been relevant information that you would
7  have wanted to know --
8    MR. GOLDMAN:  Object to the form.
9  BY MR. WACKER:
10    Q.  -- regarding the VIGOR study?
11    MR. GOLDMAN:  Object to the form, lacks
12  foundation and it is such a sweepingly-broad
13  question without any context at all like the
14  response of the authors.
15    THE WITNESS:  Can you restate that,
16  please?
17  BY MR. WACKER:
18    Q.  Yeah.  Taking -- taking the information
19  from this expression of concern, would you agree
20  that the information that's contained within this
21  expression of concern regarding the -- the missing
22  information from the original Bombardier article
23  would have been information that you would have
24  wanted to know as a prescribing physician --
25    MR. GOLDMAN:  Object to the form.

**Page 381**

1  BY MR. WACKER:
2    Q.  -- at the time you were prescribing
3  Vioxx to Mr. Barnett?
4    A.  Yes, sir.
5    MR. GOLDMAN:  Object to the form.
6  BY MR. WACKER:
7    Q.  And specifically, Doctor, if you look
8  down to the -- it's the third full indented
9  paragraph, it starts with the fact.  Do you see
10  that?
11    A.  Yes, sir.
12    Q.  The fact that these three myocardial
13  infarctions were not included made certain
14  calculations and conclusions in the article
15  incorrect.
16    Do you see that?
17    A.  Yes, sir.
18    Q.  And then in the next paragraph, it
19  says, lack of inclusion of these -- of the three
20  events resulted in an understatement of the
21  difference in risk of myocardial infarction between
22  the Rofecoxib and Naproxen groups.
23    MR. GOLDMAN:  Object to the form, the
24  document speaks for itself.
25  BY MR. WACKER:

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

Page 382

1   Q.  Do you see that?
2   A.  Yes, sir.
3        MR. GOLDMAN:  And you've given him no
4   context and we've already asked him about it.
5   BY MR. WACKER:
6   Q.  And then it says, it has also resulted
7   in the misleading conclusion that there was a
8   difference in the risk of myocardial infarction
9   between the aspirin indicated and the aspirin
10  not -- not indicated groups.
11       Do you see that?
12       MR. GOLDMAN:  Object to the form,
13  beyond the scope.  I also want to object to the
14  form of the last question before that.
15       THE WITNESS:  Yes, sir.
16  BY MR. WACKER:
17  Q.  And again, had that information been
18  included in the original article, that would have
19  been something that you would have relied upon,
20  correct?
21       MR. GOLDMAN:  Object to the form.
22  You're asking him about an article, you're not
23  giving him any context whatsoever.
24       MR. WACKER:  You've stated your
25  objection.

Page 383

1        THE WITNESS:  Yes, sir.
2        (PLF. EXH. 49, Editorial entitled
3   Expression of Concern Reaffirmed, was marked for
4   identification.)
5   BY MR. WACKER:
6   Q.  This next document is Exhibit 49.
7        MR. GOLDMAN:  You know, you're going so
8   far beyond the scope, now you're showing him
9   documents you didn't even use on direct.
10       MR. WACKER:  I don't know, I thought
11  you -- I thought I'm just responding to some of
12  your -- your cross-examination.
13       MR. GOLDMAN:  I didn't even bring -- I
14  didn't even bring out the -- the articles.  You're
15  showing him another one.
16  BY MR. WACKER:
17  Q.  Okay, Doctor, this is Exhibit 49.  Can
18  you read the title, please.
19  A.  Expression of concern reaffirmed.
20  Q.  And the name of the journal?
21  A.  This is the New England Journal of
22  Medicine.
23  Q.  Can you just read the last paragraph of
24  this article.
25       MR. GOLDMAN:  Object to the form, lacks

Page 384

1   foundation.
2        THE WITNESS:  The information we have
3   indicates that the VIGOR article, because it did
4   not contain relevant safety data available to the
5   authors more than four months before publication,
6   did not accurately reflect the potential for
7   serious cardiovascular toxicity with Rofecoxib.
8   We, therefore, reaffirm our expression of concern.
9   BY MR. WACKER:
10  Q.  And again, this is information that you
11  would have wanted to know at the time when you were
12  prescribing Vioxx to Mr. Barnett?
13       MR. GOLDMAN:  Object to the form.
14       THE WITNESS:  The information about the
15  additional deaths and outcomes, yes, I would have
16  liked to have known that information.
17  BY MR. WACKER:
18  Q.  And Doctor, following the publication
19  of the Bombardier article regarding VIGOR, to your
20  knowledge, the company Merck never updated that
21  article with this -- with any of this updated
22  information regarding the three heart attacks or
23  this table in the July 5th, 2000 Shapiro memo,
24  correct?
25       MR. GOLDMAN:  Object to the form.

Page 385

1        THE WITNESS:  To my knowledge, that's
2   correct.
3        MR. WACKER:  Okay, Doctor, that's all
4   the questions I have.  Thank you.
5        EXAMINATION
6   BY MR. GOLDMAN:
7   Q.  Can you turn back -- let me go in
8   order.  You were asked about whether Vioxx can
9   increase the risk of hypertension.  Do you remember
10  that?
11  A.  Yes, sir.
12  Q.  Or increase hypertension?
13  A.  Yes, sir.
14  Q.  Are you aware that Vioxx and its
15  warning label always warned about the potential
16  increased risk of hypertension?
17       MR. WACKER:  Objection, misstates the
18  evidence in terms of a warning.
19       THE WITNESS:  It was always in the
20  package insert, yes.
21  BY MR. GOLDMAN:
22  Q.  Do you understand -- is it your
23  understanding, sir, that all COX-2 inhibitors and
24  NSAIDs have the potential to increase the risk of
25  hypertension?

Michael Mikola, M.D.

Page 386

1    A.  Yes, sir.
2    Q.  In Feldene's warning label that I
3  handed you before, it indicates the whole section
4  on hypotension stating, NSAIDs, including Feldene,
5  can lead to onset of new hypertension and worsening
6  of preexisting hypertension, either of which may
7  contribute to the incidence -- increased incidence
8  of CV events.
9        Do you see that?
10   A.  What page?
11   Q.  It's on Page 4.
12   A.  Yes, sir.
13   Q.  Did you notice at all, sir, while
14  Mr. Barnett was taking Vioxx his hypertension did
15  not increase?
16   A.  I would have to look at my records.
17  Mr. Barnett had what we call white coat
18  hypertension.  His blood pressures in the office
19  were generally elevated -- or frequently, not
20  always, and that's often attributable to
21  apprehension.  When I questioned him about it and
22  he told me he had his blood pressure checked other
23  places, it was generally normal, 120 over 80 range.
24  So outside the office, per his report, his blood
25  pressure wasn't affected.

Page 387

1    Q.  You didn't see any evidence while you
2  were treating Mr. Barnett that Vioxx was increasing
3  his hypertension, true?
4    A.  That's correct.
5    Q.  You were asked questions about
6  whether -- you were asked whether you could
7  discount the possibility that Vioxx somehow
8  contributed to Mr. Barnett's ischemia in January of
9  2000.  Do you remember that?
10   MR. WACKER:  Objection, unintelligible.
11   THE WITNESS:  I was asked if I could
12  rule out the fact that it may have contributed to
13  his ischemic event.
14  BY MR. GOLDMAN:
15   Q.  And that line of questioning led to,
16  well, then the question is whether Vioxx can
17  increase the risk of -- withdrawn.
18       That discussion that you had with
19  Plaintiff's counsel then led to the question that
20  you posed of whether Vioxx can cause plaque
21  formation and the acceleration of atherosclerosis.
22  Do you remember that?
23   MR. WACKER:  Objection, the testimony
24  speaks for itself.
25   THE WITNESS:  My question was plaque

Page 388

1  destabilization and rupture, can Vioxx contribute
2  to plaque destabilization and plaque rupture.
3  BY MR. GOLDMAN:
4    Q.  Have you ever seen in any peer-reviewed
5  article concerning any clinical study with any
6  human being evidence that Vioxx or any other COX-2
7  inhibitor can increase plaque destabilization or
8  the likelihood of plaque rupture?
9    A.  No, sir, not directly.
10   Q.  And you're not a pharmacologist, are
11  you?
12   A.  That's correct.
13   Q.  I'm handing you what I'll mark as
14  Exhibit 48.
15       MR. WACKER:  I think we're at 50.
16       (DFT. EXH. 50, E-mail dated 2/5/01 to
17  Thomas Rhodes, et al., from Harry A. Guess, was
18  marked for identification.)
19  BY MR. GOLDMAN:
20   Q.  50.
21   A.  Should I change this to 50?
22   Q.  Yes.  Do you remember Mr. Wacker was
23  asking you about an e-mail that Dr. Scolnick wrote
24  in March of 2000 about being worried and thinking
25  that the VIGOR results were mechanism based?

Page 389

1    A.  Yes, sir.
2    Q.  I've handed you another e-mail that the
3  Plaintiff's lawyers didn't show you or send you.
4  It's dated February 4th, 2001 from Dr. Scolnick to
5  a number of scientists at Merck, Bates stamped
6  MRK-ACT 0009918.
7        Do you see in the -- first of all, I
8  assume you haven't seen this e-mail just like you
9  haven't seen any of the other e-mails that
10  Mr. Wacker had shown you?
11   A.  I have not seen this e-mail before
12  today, no.
13   Q.  Do you see that in the middle of the
14  bottom e-mail, it says, but I was sick at the
15  thought that we might be doing harm to patients.  I
16  know each of you well enough to know you felt the
17  same way.  With all the data now available, I am no
18  longer worried.
19       Do you see that, sir?
20   A.  Yes, sir.
21   Q.  This is the president of Merck Research
22  Laboratories who wrote that e-mail, okay?
23   A.  I now know that, yes, sir.
24   Q.  And when you were talking before with
25  Mr. Wacker about whether Merck should tell you

Michael Mikola, M.D.

Page 390

1   information about scientists being concerned about
2   Vioxx being prothrombotic, you understand that
3   scientists can have a theory at one point in time
4   and analyze data and then have a different theory
5   later, right?
6       A.  Yes, sir.
7       Q.  So here is an example in February of
8   2001 before you even prescribed Vioxx to
9   Mr. Barnett where the head scientist at Merck is
10  saying he's not worried about Vioxx causing the
11  heart attacks in VIGOR.  Do you see that?
12      MR. WACKER:  Objection, it misstates
13  the evidence.
14      THE WITNESS:  I can't say from this
15  document that he's referring to VIGOR.
16  BY MR. GOLDMAN:
17      Q.  Okay, he's testified that he had --
18  that he did -- and that's one of the problems with
19  this whole area is you're being asked questions and
20  you're not shown testimony.
21      A.  Yes.
22      Q.  Do you have a problem, Dr. Mikola,
23  being shown e-mails that you've never seen before
24  without other documents to give you the full
25  context of them?

Page 391

1       MR. WACKER:  Objection, vague and
2   ambiguous.
3       THE WITNESS:  Taken out of context, the
4   interpretation is subject to interpretation.
5   BY MR. GOLDMAN:
6       Q.  And so as a prescribing physician, you
7   wouldn't expect Merck sales representatives to run
8   into your office on one day and say, there's a
9   scientist at Merck who's worried, and then a week
10  later come in and say that same scientist is not
11  worried?
12      MR. WACKER:  Well, this isn't a week
13  later.  This is February 5th, 2001, so that's about
14  a year later.
15      THE WITNESS:  That's correct.
16  BY MR. GOLDMAN:
17      Q.  From February 4th of 2001, the date of
18  this e-mail by Dr. Scolnick, through 2004, you
19  continued to prescribe Vioxx believing that the
20  benefits outweighed its risks, correct?
21      A.  Yes, sir.
22      Q.  And if Merck had come to you and said
23  in February of 2001 that its head scientist and
24  other scientists were not worried about the results
25  in VIGOR, would that have encouraged you to

Page 392

1   prescribe Vioxx or discourage you?
2       MR. WACKER:  Objection, vague and
3   ambiguous, compound.
4       THE WITNESS:  It would have been
5   reassuring in providing -- in prescribing Vioxx.
6   BY MR. GOLDMAN:
7       Q.  You were asked whether the VIGOR
8   publication in the New England Journal of Medicine
9   specifically indicated if the risk was
10  significantly higher -- the heart attack risk was
11  significantly higher in the Vioxx arm than it was
12  in the Naproxen arm.  Do you remember that?
13      A.  Yes, sir.
14      Q.  You understand from reading the
15  abstract in the VIGOR article and elsewhere in the
16  VIGOR article that there was a
17  statistically-significant difference in heart
18  attacks in the Vioxx arm versus the Naproxen arm,
19  right?
20      A.  I remember it from the body, I don't
21  recall it from the abstract.
22      Q.  In the package insert that you
23  testified you knew about in April of 2002, I'm just
24  going to read it to you, there's a statement that
25  says, the VIGOR study showed a higher incidence of

Page 393

1   adjudicated serious cardiovascular thrombotic
2   events in patients treated with Vioxx 50 milligrams
3   as opposed to patients treated with Naproxen 500
4   milligrams twice a day?
5       A.  Correct.
6       Q.  That's not Merck hiding the results of
7   the VIGOR study, is it?
8       MR. WACKER:  Objection, vague and
9   ambiguous.
10      THE WITNESS:  No, sir.
11  BY MR. GOLDMAN:
12      Q.  You understood from reading the warning
13  label at the time you were prescribing Vioxx to
14  Mr. Barnett that there was a
15  statistically-significant difference in heart
16  attacks between the Vioxx arm and the Naproxen arm,
17  true?
18      MR. WACKER:  Okay, that -- that's --
19  that's a different -- yeah, difference.
20  BY MR. GOLDMAN:
21      Q.  True?
22      A.  In the VIGOR study, yes.
23      MR. WACKER:  Before you were saying
24  higher incidence, now you're saying different.
25  BY MR. GOLDMAN:

99 (Pages 390 to 393)

66ee2519-35e8-4f59-b6aa-6c8725dd3eda

Michael Mikola, M.D.

Page 394

1    Q.  Well, the package insert says, the
2   VIGOR study showed a higher incidence of
3   adjudicated serious cardiovascular thrombotic
4   events in patients treated with Vioxx 50 milligrams
5   once daily as compared to patients treating with
6   Naproxen 500 milligrams twice daily.  That was what
7   the package insert said in April of 2002?
8    A.  To the best of my recollection, that's
9   correct.
10    Q.  And that information didn't dissuade
11   you from prescribing the medicine to Mr. Barnett,
12   did it?
13    A.  No, sir.
14    Q.  You were shown information about the
15   number of heart attacks -- withdrawn.
16        Mr. Wacker showed you, again, the
17   expression of concern by the New England Journal of
18   Medicine and then a reaffirmation of that
19   expression of concern?
20    A.  Yes, sir.
21    Q.  Do you have any knowledge of the
22   interaction between the Plaintiff's lawyers in this
23   litigation and the New England Journal of Medicine
24   before those editorials came out?
25    A.  I do not.

Page 395

1    Q.  Do you have any knowledge, sir, about
2   the timing of when the New England Journal of
3   Medicine published the expressions of concern and
4   that a jury was about to decide the first Vioxx
5   case?
6    A.  I do not.
7    Q.  Did you ever review or did the
8   Plaintiff's lawyers ever bother to show you our
9   cross-examination of Dr. Kirschman about his
10   conclusions in this expression of concern?
11        MR. WACKER:  Objection, argumentative.
12        THE WITNESS:  Did they show me?
13   BY MR. GOLDMAN:
14    Q.  Yes.
15    A.  No, sir.
16    Q.  Before accepting the characterizations
17   of Dr. Kirschman concerning the VIGOR study, would
18   you agree that it would be helpful to know what
19   Dr. Kirschman has to say about basic --
20    A.  Yes, sir.
21    Q.  Would you agree that it would be
22   helpful to know what the authors of the VIGOR paper
23   had to say about the New England Journal or
24   Medicine's criticism of the VIGOR study?
25    A.  Yes, sir.

Page 396

1    Q.  I asked you before whether you knew at
2   the time you were prescribing Vioxx to Mr. Barnett
3   beginning around November of 2000 there was a four
4   to five times difference in heart attacks in the
5   Vioxx arm versus the Naproxen arm of VIGOR.  Do you
6   remember that?
7    A.  Yes, sir.
8        MR. WACKER:  That -- that's what you're
9   saying now.  Before you said --
10   BY MR. GOLDMAN:
11    Q.  Do you remember that?
12    A.  Yes, sir.
13        MR. WACKER:  Before you said higher
14   incidence, which the article didn't say.
15   BY MR. GOLDMAN:
16    Q.  I asked you whether there would have
17   been any difference if you knew about three
18   additional heart attacks so that the rate would
19   have been five times versus four times.  Remember
20   that?
21    A.  Yes, sir.
22    Q.  And your testimony was that it wouldn't
23   have made a difference to you.  Remember that?
24    A.  In Mr. Barnett's case, that's correct.
25        MR. WACKER:  Objection, prior testimony

Page 397

1   makes it --
2   BY MR. GOLDMAN:
3    Q.  I'm sorry?
4    A.  In Mr. Barnett's case, that's correct.
5        MR. WACKER:  I'm -- I'm sorry, the --
6   it's asked and answered.
7   BY MR. GOLDMAN:
8    Q.  The number of heart attacks in the
9   VIGOR study in the Vioxx arm versus the Naproxen
10   arm was displayed very clearly on the first page
11   and the second page of the April 2002 label.
12   Remember?
13    A.  Yes, sir.
14    Q.  And in Table 3, there is an indication
15   that the number of cardiac events in Vioxx was 28
16   versus 10 in Naproxen, there's an indication that
17   there were 18 nonfatal MI's in Vioxx versus four in
18   Naproxen and there's also information about the
19   number of cardiovascular deaths in the VIGOR
20   study --
21    A.  Yes, sir.
22    Q.  -- okay?  And in knowing all that
23   information, you still believed that the benefits
24   outweighed the risks for prescribing Vioxx to
25   Mr. Barnett before his heart attack, correct?

100  (Pages 394 to 397)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

## Page 398

1      MR. WACKER: Objection, assumes that
2   that's accurate information.
3      MR. GOLDMAN: Well, it's in the
4   FDA-approved package insert.
5      MR. WACKER: Well, just because it's in
6   the FDA-approved package insert, we all know that
7   that doesn't always make it accurate --
8      THE WITNESS: Yes, sir.
9      MR. WACKER: -- unfortunately because
10  sometimes pharmaceutical companies don't always
11  provide accurate information. But anyway, that's
12  another story we can get on to.
13     So I guess --
14     MR. GOLDMAN: Plaintiff's lawyers don't
15  either.
16     MR. WACKER: I guess in that sense, it
17  assumes facts not in evidence, that the information
18  is accurate.
19     MR. GOLDMAN: Move to strike all that
20  colloquy.
21  BY MR. GOLDMAN:
22     Q.  The -- the fact that Mr. Patrono --
23     MR. GOLDMAN: Sorry.
24     MR. WACKER: Doctor.
25  BY MR. GOLDMAN:

## Page 399

1      Q.  The fact that Dr. Patrono in his
2   peer-reviewed article in CHEST where he agrees that
3   Naproxen is a reasonable explanation for VIGOR, do
4   you have any reason to believe that Dr. Patrono
5   published this information for some ulterior
6   motive?
7      MR. WACKER: Objection, calls for
8   speculation.
9      THE WITNESS: I don't know the answer
10  to that.
11  BY MR. GOLDMAN:
12     Q.  Dr. Patrono didn't appear to be just
13  telling Merck what they wanted to hear during the
14  time that Vioxx was on the market, right? You saw
15  an e-mail earlier where he said he had questions
16  about Naproxen. Remember that?
17     A.  Yes, sir.
18     MR. WACKER: Objection, that calls for
19  speculation as well.
20  BY MR. GOLDMAN:
21     Q.  Do you remember reading in the e-mail
22  that Dr. Patrono believed the reason for the
23  difference in heart attacks in VIGOR was due to
24  chance?
25     A.  Yes, sir.

## Page 400

1      Q.  And in this article that Dr. Patrono
2   published in 2004, the number of heart attacks
3   being 20 in the Vioxx arm and four in the Naproxen
4   arm is specifically mentioned. Do you know that to
5   be true?
6      A.  May I see it?
7      Q.  Sure.
8      A.  Yes, sir.
9      MR. WACKER: Let me just lay a
10  late-founded objection to the previous question
11  where you said Patrono played a -- that -- that it
12  was due to play a chance (sic). The objection is
13  vague and ambiguous because I don't -- I don't
14  think he said it was all due to chance.
15  BY MR. GOLDMAN:
16     Q.  The memo that Mr. Wacker used, Exhibit
17  47, that had the Kaplan-Meier Curve in Figure 1 --
18     A.  Yes, sir.
19     Q.  -- I'd like you to actually read the
20  first page -- I'll read it because you're tired.
21     A.  Okay.
22     Q.  The first page of the memo says, after
23  the February 10th, 2000 cutoff, 11 additional
24  patients experienced serious thrombotic
25  cardiovascular AE's that were sent for

## Page 401

1   adjudication, nine on Vioxx and two on Naproxen.
2   Five of the 11 were confirmed events, three
3   confirmed MI's on Vioxx, one confirmed
4   peripheral -- how do you pronounce the rest?
5      A.  Venous thrombosis.
6      Q.  -- on Vioxx and one confirmed ischemic
7   cerebrovascular stroke on Naproxen. None of the
8   five patients were indicated for prophylactic
9   aspirin.
10     Then it says that table -- then it
11  talks about tables and it says, none of the
12  conclusions have changed.
13     A.  Yes, sir.
14     Q.  Do you understand that the conclusions
15  in the VIGOR study did not change because of the
16  three additional heart attacks on Vioxx?
17     MR. WACKER: Well, objection, that
18  calls for speculation, calls for expert opinion
19  testimony to the extent that he needs to review all
20  of that.
21  BY MR. GOLDMAN:
22     Q.  Do you understand that the -- when
23  you -- withdrawn.
24     When you read the VIGOR study in
25  November of 2000, you understand -- stood that

101 (Pages 398 to 401)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Page 402

1   there was a statistically-significant difference in
2   heart attacks in the Vioxx arm versus the Naproxen
3   arm, correct?
4       A.  Yes, sir.
5       Q.  And that difference is statistically
6   significant whether it's four times or five times
7   of a difference, true?
8       A.  Correct.
9       Q.  So the conclusion that you would draw
10  from that study wouldn't change if you knew that
11  there were five times difference in MI's between
12  Vioxx and Naproxen or four times?
13      A.  Correct.
14      MR. WACKER:  Well, that — that
15  misstates the evidence because we have already read
16  Kirschman's expression of concern where he
17  indicates --
18      MR. GOLDMAN:  I don't care what
19  Kirschman says.
20      THE WITNESS:  It also resulted in the
21  misleading conclusion that there was a difference
22  in the risk of myocardial infarction between the
23  aspirin indicated and the aspirin not indicated.
24      MR. GOLDMAN:  Can you just make an
25  objection instead of reading?

Page 403

1       MR. WACKER:  Well, it --
2   BY MR. GOLDMAN:
3       Q.  Can you answer the question again.
4       MR. WACKER:  -- misstates the record.
5   BY MR. GOLDMAN:
6       Q.  You said correct?
7       A.  Yes, correct.
8       Q.  Now, just looking at this one
9   Kaplan-Meier Curve here on Page 4 of this memo, do
10  you see that there is no difference between Vioxx
11  and Naproxen in the first several months of use?
12      MR. WACKER:  Objection, that calls for
13  expert opinion testimony in terms of --
14      MR. GOLDMAN:  Well, you showed him
15  the --
16      MR. WACKER:  -- you know, biostatistics
17  and --
18      MR. GOLDMAN:  Well, you showed him the
19  figure and asked him if he wanted to know it.
20      THE WITNESS:  It's difficult to
21  ascertain from the graph if the difference is
22  statistically significant.  It would appear that a
23  difference appears around nine months.
24  BY MR. GOLDMAN:
25      Q.  So --

Page 404

1       A.  But again, I don't --
2       MR. WACKER:  Again, that has to do with
3   issues of power and --
4       THE WITNESS:  I can't say if it's
5   statistically significantly different.
6       MR. MORTARA:  It does not have issues
7   of power.
8       MR. WACKER:  Oh, I'm sorry, I forgot
9   you were an expert.
10      MR. MORTARA:  I am not.
11      MR. WACKER:  I did see he was a
12  Ph.D. in something.
13  BY MR. GOLDMAN:
14      Q.  Do you have any reason to believe that
15  if Mr. Barnett started Vioxx on January 10th or
16  11th of 2000, that he developed ischemia on January
17  19th of 2000 because of Vioxx?
18      MR. WACKER:  Objection, asked and
19  answered.  It's already been covered.
20      THE WITNESS:  I don't really know if I
21  can answer that question.  I don't know the answer.
22  BY MR. GOLDMAN:
23      Q.  Okay.
24      A.  I don't think he developed
25  atherosclerosis because of Vioxx.  Whether he

Page 405

1   developed ischemia, I don't know.
2       MR. GOLDMAN:  Thank you, sir.  Go home.
3   I appreciate your time.
4       MR. WACKER:  I just have a few
5   follow-up questions.  Let me just -- can we go off
6   for just a second?
7       VIDEO TECHNICIAN:  We will now go off
8   the record.  The time is approximately 6:59 PM.
9       (A recess transpired.)
10      VIDEO TECHNICIAN:  We're back on the
11  record.  The time is approximately 7:00 PM.
12          EXAMINATION
13  BY MR. WACKER:
14      Q.  Doctor, do you have the April 2002
15  product insert?  Here it is.
16      A.  Somewhere.
17      MR. GOLDMAN:  You want my highlighted
18  version?
19      THE WITNESS:  You want me -- yeah, I'll
20  look for it.  I'm sure I have it here.
21  BY MR. WACKER:
22      Q.  Here, I've got it here.
23      A.  Okay.
24      Q.  Dr. Mikola, in the April 2002 package
25  insert, counsel pointed to a specific section where

102  (Pages 402 to 405)

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

## Michael Mikola, M.D.

Page 406

1  he indicated special studies, VIGOR, other safety
2  findings, cardiovascular safety.  It says, in a
3  placebo-controlled database derived from two
4  studies with a total of 2,142 elderly patients,
5  mean age 75 with a median duration of exposure of
6  approximately 14 months, the number of patients
7  with serious cardiovascular thrombotic events was
8  21 versus 35 for patients treated with Vioxx 25
9  milligrams once daily versus placebo respectively.
10      Do you see that?
11  A.  What page are you on, first, second?
12  Q.  That is under precautions,
13  cardiovascular effects on the right-hand column.
14  A.  Okay, I remember the text from earlier.
15  Q.  Yeah.  And in —
16  A.  Yes, sir.
17  Q.  — in prescribing the medication to
18  Mr. Barnett as of April 2002, you relied upon that
19  statement as being accurate, correct?
20      MR. GOLDMAN:  Object to the form.
21      THE WITNESS:  That would be correct.
22  BY MR. WACKER:
23  Q.  And if there was information that was
24  contrary to that, that's something that you're
25  unaware of, correct?

Page 407

1      MR. GOLDMAN:  Object to the form,
2  completely assumes facts not in evidence.
3      THE WITNESS:  That would be correct.
4  BY MR. WACKER:
5  Q.  So if there was information that
6  indicated that even at 25 milligrams, there was a
7  statistically-significant increase in risk for
8  Vioxx, that's something that Merck did not share
9  with you, correct?
10     MR. GOLDMAN:  Object to the form.
11     THE WITNESS:  That would be correct.
12  BY MR. WACKER:
13  Q.  Now, this is part of Exhibit 28.
14     MR. GOLDMAN:  I'm going to object to
15  your use of this interim metanalysis by
16  Dr. Shapiro.  Is that what you're about to show
17  him?
18     MR. WACKER:  Yeah.
19     MR. GOLDMAN:  I object.  It's beyond
20  the scope.  It's a new document on redirect.  He
21  has no personal knowledge of it, has never seen the
22  final data.  So I object for all those reasons and
23  it lacks foundation.
24  BY MR. WACKER:
25  Q.  Dr. Mikola, if you could look at

Page 408

1  MRK-MJ 0070394, it's — it's part of the Vioxx
2  preliminary cardiovascular metanalysis by Deborah
3  Shapiro dated October 18th, 2000.  And on that —
4  on that Bates number, you'll see it's entitled,
5  metanalysis, relative risk of MIN points with 95
6  percent CI confidence interval overall and within
7  blocks.
8      Do you see that?
9      MR. GOLDMAN:  Okay, now, can you give
10 him a minute to look at the document?  And this
11 is — you're showing him a document that I've
12 already objected to.
13     MR. WACKER:  Right.
14     MR. GOLDMAN:  So the objection is
15 preserved.
16     THE WITNESS:  Yes, sir.
17 BY MR. WACKER:
18 Q.  And do you see down at the bottom of
19 the document it says, total cohort?
20 A.  Yes, sir.
21 Q.  And does that indicate to you that
22 the — that the total cohort for MI was
23 statistically significant for those studies —
24     MR. GOLDMAN:  Object to the form.  This
25 is —

Page 409

1  BY MR. WACKER:
2  Q.  — for that metanalysis?
3      MR. GOLDMAN:  This is — there are so
4  many issues, heterogeneity issues, there are so
5  many issues that — that are involved in this and
6  you're just asking him out of nowhere to answer
7  that.
8      MR. WACKER:  Just based upon the
9  document.
10     MR. GOLDMAN:  Object to the form, lacks
11 foundation.
12 BY MR. WACKER:
13 Q.  That document indicates that the risk
14 of MI is more than double, right, 2.02?
15     MR. GOLDMAN:  Same objection.
16 BY MR. WACKER:
17 Q.  Do you see that?
18     MR. GOLDMAN:  Allow him to read things
19 so he can answer in an informed way.
20     THE WITNESS:  Yes, I can't tell if it's
21 statistically significant, but it suggests what the
22 total cohort is.
23 BY MR. WACKER:
24 Q.  Let me see.  Do you see here, Doctor,
25 where the confidence interval does not cross 1?

Michael Mikola, M.D.

Page 410

1    A.  Yes, okay.  Yes.
2    Q.  And that would indicate the statistical
3  significance?
4        MR. GOLDMAN:  Objection, you're just
5  basing it on that and he needs to read the entire
6  study in order to make that assessment.  Lacks
7  foundation.
8        MR. WACKER:  You're -- you're asking me
9  to rely upon -- on Merck?
10       MR. GOLDMAN:  Yes, I am, and science.
11       MR. WACKER:  Apparently the New England
12  Journal didn't work out too well.
13  BY MR. WACKER:
14   Q.  All right.  And Doctor, on this
15  exhibit, the Scolnick memo from February 4th, 2001,
16  do you have any -- do you have any knowledge as to
17  what motivated Dr. Scolnick to write that e-mail?
18   A.  No, sir.
19   Q.  Do you know what his stock options
20  were --
21       MR. GOLDMAN:  Object, come on.
22  BY MR. WACKER:
23   Q.  -- how much he stood to lose by the
24  fact that Vioxx was going off the market?
25   A.  No, sir.

Page 411

1    Q.  Do you know how much the company
2  estimated its forecast would be if -- if the --
3        MR. GOLDMAN:  Objection.
4  BY MR. WACKER:
5    Q.  -- if the product insert -- if the CV
6  risk was in the warnings section versus the
7  label --
8        MR. GOLDMAN:  Objection.
9  BY MR. WACKER:
10   Q.  -- I mean versus the precaution?
11       MR. GOLDMAN:  Objection, Mr. Wacker,
12  can we please move on?  We have a flight to catch.
13       MR. WACKER:  I understand.
14       MR. GOLDMAN:  This is way, way, way
15  beyond.
16  BY MR. WACKER:
17   Q.  Do you understand --
18   A.  I do not know the answer to that
19  question.
20   Q.  So if -- if it turns out --
21   A.  I don't know how much --
22   Q.  -- that Merck stood to lose 500 million
23  a year in terms of the -- the warnings for CV being
24  in the precaution instead of the warning, would
25  that influence your evaluation of this memo by

Page 412

1  Dr. Scolnick?
2        MR. GOLDMAN:  Object to the form, that
3  completely misstates the fact -- facts.  It has
4  absolutely nothing to do with the memo and -- and
5  the accusation is insulting and the witness is
6  being asked to opine on a document at issue he's
7  never been exposed to before, has no knowledge of.
8        MR. WACKER:  You -- you brought it up.
9        THE WITNESS:  I don't know Mr. Scolnick
10  and -- I don't know.
11       MR. WACKER:  Okay, that's all the
12  questions I have.
13       VIDEO TECHNICIAN:  The deposition is
14  concluded.  The time is approximately 7:07 PM.  We
15  will now go off the record.
16       (WHEREUPON, the proceedings concluded
17  at 7:07 PM.)
18
19
20
21
22
23
24
25

Page 413

1        SIGNATURE OF DEPONENT
2    I, the undersigned, MICHAEL MIKOLA, MD, do
3  hereby certify that I have read the foregoing
4  deposition and find it to be a true and accurate
5  transcription of my testimony, with the following
6  corrections, if any:
7
8  PAGE  LINE        CHANGE            REASON
9
10
11
12
13
14
15
16
17
18
19
    _____
20   MICHAEL MIKOLA, MD         Date
21
22
23
24
25

Golkow Litigation Technologies - 1.877.DEPS.USA

66ee2519-35e8-4f59-b6ea-6c8725dd3eda

Michael Mikola, M.D.

---

Page 414

```
 1          CERTIFICATE OF REPORTER
 2      I, Terri L. Brusseau, Registered
 3   Professional Reporter and Notary Public for the
 4   State of South Carolina at Large, do hereby certify
 5   that the foregoing transcript is a true, accurate,
 6   and complete record.
 7      I further certify that I am neither related
 8   to nor counsel for any party to the cause pending
 9   or interested in the events thereof.
10      Witness my hand, I have hereunto affixed my
11   official seal this 1st day of May, 2006 at
12   Charleston, Charleston County, South Carolina.
13
14
15
16
           _____
           Terri L. Brusseau,
17         Registered Professional
           Reporter, CP, CRR
18         My Commission expires
           May 7, 2006.
19
20
21
22
23
24
25
```

---

Page 416

```
 1   PLF. EXH. 16, Scientific Advisors'      87
     Meeting May 3-May 6, 1998 Programmatic
 2   Review Vioxx Program
     PLF. EXH. 17, E-mail dated 10/12/01 to  95
 3   ian_rodger@merck.com from
     Stephen Epstein@medstar.net, with
 4   attachments
     PLF. EXH. 18, Article entitled Effects  95
 5   of MF-Tricyclic, a Selective
     Cyclooxygenase-2 Inhibitor, on
 6   Atherosclerosis Progression and
     Susceptibility to Cytomegalovirus
 7   Replication in Apolipoprotein-E
     Knockout Mice
 8   PLF. EXH. 19, Article entitled          98
     COX-2-Derived Prostacyclin Confers
 9   Atheroprotection on Female Mice
     PLF. EXH. 20, Carolina Health          105
10   Specialists/Laboratory medical records
     for Gerald Barnett
11   PLF. EXH. 21, Carolina Health          107
     Specialists medical records for Gerald
12   Barnett
     PLF. EXH. 22, Call Notes               115
13   PLF. EXH. 23, Letter dated 6/21/99 to   116
     Michael Mikolajczyk from Leonard I.
14   Silverstein, MD, with attachments
     PLF. EXH. 24, FDA Advisory Committee    120
15   Briefing Document
     PLF. EXH. 25, PGM expense list         133
16   PLF. EXH. 26, Contact List             135
     PLF. EXH. 27, Scientific Advisors'     140
17   Meeting May 3-May 6, 1998 Programmatic
     Review Vioxx Program, with attachments
18   PLF. EXH. 28, Letter dated 1/31/06 to   141
     Dr. Michael Mikolajczyk from Lesl W.
19   Myer
     PLF. EXH. 29, Letter dated 4/14/06 to   141
20   Michael Mikola, MD from Lesl W. Myer,
     with attachments
21   DFT. EXH. 30, Carolina Health          190
     Specialists medical records for Gerald
22   Barnett
     DFT. EXH. 31, Grand Strand Regional    205
23   Medical Center medical record for
     Gerald Barnett
24   DFT. EXH. 32, Grand Strand Regional    213
     Medical Center medical records for
25   Gerald Barnett
     DFT. EXH. 33,                          217
```

---

Page 415

```
 1          I N D E X
 2   MICHAEL G. MIKOLA, MD           3
       EXAMINATION            3
 3   BY MR. ROBINSON
       EXAMINATION          147
 4   BY MR. GOLDMAN
       EXAMINATION          353
 5   BY MR. WACKER
       EXAMINATION          385
 6   BY MR. GOLDMAN
       EXAMINATION          405
 7   BY MR. WACKER
 8       E X H I B I T S
     PLF. EXH. 1, Carolina Health      6
 9   Specialists medical record for Gerald
     Barnett
10   PLF. EXH. 2, Grand Strand Regional   9
11   Medical Center medical record for
     Gerald Barnett
12   PLF. EXH. 3, Vioxx prescription, with  26
     attachments
13   PLF. EXH. 4, Medical records for Gerald  30
     Barnett
14   PLF. EXH. 5, Vioxx box label        40
     PLF. EXH. 6, E-mail dated 3/9/00 to   41
15   Deborah R. Shapiro, Alise S. Reicin and
     Alan S. Nies from Edward M. Scolnick
16   PLF. EXH. 7, E-mail dated 3/28/00 to   46
     Barry J. Gertz from Alan S. Nies
17   PLF. EXH. 8, News Release dated 4/28/00  49
     PLF. EXH. 9, Contact List          51
18   PLF. EXH. 10, E-mail dated 1/31/01 to  61
     Raymond Gilmartin and David W. Anstice
19   from Edward M. Scolnick
     PLF. EXH. 11, Vioxx Label Description  64
20   PLF. EXH. 12, E-mail dated 10/16/01 to  68
     David W. Anstice from Edward M.
21   Scolnick
     PLF. EXH. 13, E-mail dated 2/13/01 to  70
22   Douglas J. Watson, et al., from Harry
     A. Guess
23   PLF. EXH. 14, E-mail dated 11/22/01 to  73
     Thomas R. Cannell, Mark P. Stejbach and
24   Steven R. Vigna from Adam H. Schechter
     PLF. EXH. 15, Grand Strand Regional   76
25   Medical Center medical records for
     Gerald Barnett
```

---

Page 417

```
 1   Cardiology/Gastroenterology Associates
     medical record for Gerald Barnett
 2   DFT. EXH. 34, Physician's Orders      240
     DFT. EXH. 35, Medication Administration 241
 3   Record
     DFT. EXH. 36, VOID                    241
 4   DFT. EXH. 37, Grand Strand Regional   261
     Medical Center medical records for
 5   Gerald Barnett
     DFT. EXH. 38,                        274
 6   Cardiology/Gastroenterology Associates
     medical record for Gerald Barnett
 7   DFT. EXH. 39,                        274
     Cardiology/Gastroenterology Associates
 8   medical record for Gerald Barnett
     DFT. EXH. 40, Article entitled       287
 9   Comparison Of Upper Gastrointestinal
     Toxicity O Rofecoxib And Naproxen in
10   Patients With Rheumatoid Arthritis
     DFT. EXH. 41, Article entitled       296
11   Platelet-Active Drugs: The
     Relationships Among Dose,
12   Effectiveness, and Side Effects
     DFT. EXH. 42, Article entitled Risk of  307
13   Cardiovascular Events Associated With
     Selective COX-2 Inhibitors
14   DFT. EXH. 43, Merck Prescribing      313
     Information
15   DFT. EXH. 44, Vioxx Label Description  322
     DFT. EXH. 45, Letter dated 3/28/03 to  336
16   Michael Mikolajczyk, MD from Leonard I.
     Silverstein, MD
17   DFT. EXH. 46, Feldene package insert  348
     PLF. EXH. 47, Memo dated 7/5/00 to Drs.  374
18   Alise Reicin, Eliav Barr and Dennis Erb
     from Dr. Deborah Shapiro
19   PLF. EXH. 48, Article entitled       379
     Expression of Concern: Bombardier et
20   al., "Comparison of Upper
     Gastrointestinal Toxicity of Rofecoxib
21   and Naproxen in Patients with
     Rheumatoid Arthritis," N Engl J Med
22   2000;343:1520-8
     PLF. EXH. 49, Editorial entitled     383
23   Expression of Concern Reaffirmed
     DFT. EXH. 50, E-mail dated 2/5/01 to  388
24   Thomas Rhodes, et al, from Harry A.
     Guess
25
```

---

105 (Pages 414 to 417)