bold complete

Bold 3-11-05 (Multi-clip)
TB 1724 17:24-18:22

Q. In preparation for this deposition, did you meet with defense counsel?
ESQUIRE DEPOSITION SERVICES
A. I did.
Q. And which counsel did you meet with?
A. I met with the counsel which is present as of today.
Q. How many?
A. Four.
Q. For how long?
A. I met with the counsel on various occasions.
Q. How many occasions?
A. Three.
Q. How long was each occasion?
A. The first occasion was about three to four hours. The next two occasions were seven to eight hours.
Q. Were all four attorneys present for all three of those sessions from start to finish?
A. No.
Q. In total, you spent, if my math is correct, somewhere around 20 hours preparing for this deposition?
A. I think this is correct.

TB 4625 46:25-47:3

Q. Do you accept the APPROVe data
ESQUIRE DEPOSITION SERVICES
published by Merck as demonstrating that Vioxx did, in fact, cause myocardial infarctions that would not have otherwise occurred?

TB 4705 47:5-47:9

THE WITNESS: I accept the findings from the APPROVe trial that there was a difference between Vioxx and placebo after a prolonged period of treatment with regard to development of cardiovascular thromboembolic events.

TB 4905 49:5-49:14

Q. Do you see in the results in the abstract section that the relative risk was 1.92 for the Vioxx versus placebo group and that the P value was 0.008?
A. I see that.
Q. And do you understand that that P value means in statistical terms that there was -- there was about eight chances in a thousand that the result was due to chance?
A. I understand that.

TB 8103 81:3-81:22

Δ: 701, 702 CAlls for expert opinion. If allowed, Merck counter designats 47:11-19

π: Not expert opionion; AS AN MD/Ph.D and Senior Director of Clinical Risk Management & Safety Surveillance w/in witness' knowledge; Merck employee in this position for Vioxx, Approve data proper lay testimony for

Δ: 602 - at 48:16 - 49:4, witness says He never Read Approve article Before, then π's counsel proceeds to ask the witness questions about the article. 701, 702

π: Given witness' knowledge & Background, witness did not have to see this particular journal article copy of the study to answer these questions; same as above

Δ: 602, 701, 702

bold complete

Q. Now, you said before the break that you considered the APPROVe study a signal, correct?
A. I said that, that is correct.
Q. And what do you consider it to be a signal of?
A. Well, the signal was with regard to a higher risk with regard to thromboembolic cardiovascular events on the patients being treated with Vioxx compared to placebo after a prolonged period of time, continuous use of the drug for more than 18 months.
Q. And what makes it a signal to you is, in part, that it's a comparison of Vioxx exposed to placebo patients that showed a statistically significant difference in the incidence of the adverse event, right?
A. Correct. The result indicating the difference statistically significant between the two treatment arms of prolonged treatment I would consider as a signal.

π: same responses As Above

TB 9220 92:20-95:7

Q. Were you aware that there was a statistically significant difference in the incidence of edema in Vioxx groups versus placebo groups in the clinical phase?
A. The knowledge I had at that time point was not necessarily with regard to specific

92:ESQUIRE DEPOSITION SERVICES

93: 93

protocols from the -- and the results thereof in the clinical trials. However, I mean, I was aware of the product circular, which includes findings from these clinical trials, including potential adverse experiences or side effects. So I cannot speak with authority what I knew on February 1999, but, generally speaking, with regard to edema, Vioxx was an NSAID, there was a product circular, edema is a recognized potential side effect of NSAIDs, mechanism-based. So I think in that context I was familiar with edema. But I don't know anything specific from any individual protocols.
Q. You said it's mechanism-based. What's the mechanism?
A. Well, the mechanism is depending on the kidney function. And it's believed that edema is the result of sodium retention, which leads to water increase, fluid retention, which results in edema.
Q. And is it believed that that has to do with reduced prostaglandin in the kidney due to COX-2 inhibition?
A. Well, I'm not sure that the mechanisms are completely understood, but the expression of the COX-2 enzymes, COX-1 and COX-2, in

93:ESQUIRE DEPOSITION SERVICES

94: 94

the kidneys is known. So it is believed that the inhibition of these prostacyclins, COX-1 and COX-2 in the kidney, lead to the renal effects.
Q. The renal effects being diminished ability to excrete sodium, or salt?

Δ: Edema is not An issue in this case, so this testimony is irrelevant and prejudicial

π: Testimony goes to fact that Vioxx causes side effects that can lead to heart failure And Merck HAD Both Notice and knowledge of these facts

bold complete

A. One of them, yes.
Q. And inability to sufficiently excrete salt leads to retention of water?
A. That is correct.
Q. And retention of water results in edema?
A. It can result in edema.
Q. And edema causes the heart to work harder?
A. Generally speaking, there is more fluids in the cardiovascular system, so, generally, yes, that can lead for the heart to work harder.
Q. And in some people, that causes congestive heart failure?
A. In some people, that can cause congestive heart failure.
Q. Now, edema can occur in lots of places in the body, can't it?
A. That is correct.
Q. You can have lower extremity edema?

94:ESQUIRE DEPOSITION SERVICES
95: 95

A. That is correct.
Q. And you saw that with Vioxx?
A. When you say I saw that with Vioxx, what are you referring to?
Q. You saw adverse event reports, many of them, reporting lower extremity edema with Vioxx, correct?

801, 802, 401, 402 403 All testimony relating to adverse event reports is Hearsay, inherently unreliable, and they cannot be used to est. causation. AER's relate to any medical issue someone who is taking Vioxx might have, regardless of whether there is any connection b/w the medical issue and Vioxx. It is unfairly prejudicial to show this evidence to the jury b/c it gives the jury impression that Vioxx caused the medical issues that are being reported.

TB 9509 95:9-96:8

THE WITNESS: Well, I don't know what you mean by many, but I saw reports with lower extremity edema reported in adverse experience reports.
BY MR. ARBITBLIT:
Q. And you saw upper extremity edema?
A. I have seen upper extremity edema.
Q. And you've seen facial edema?
A. I have seen facial edema.
Q. And you've seen pulmonary edema?
A. I have seen pulmonary edema.
Q. And what is pulmonary edema?
A. Pulmonary edema is basically fluids in the lung.
Q. And pulmonary edema is particularly strongly associated with congestive heart failure, isn't it?

95:ESQUIRE DEPOSITION SERVICES
96: 96

A. It can be.
Q. And you've -- you've seen adverse events of congestive heart failure and pulmonary edema in Vioxx patients in your adverse event database, haven't you?
A. I have seen reports in the database with regard to pulmonary edema and congestive heart failure in patients being treated with Vioxx.

TB 9808 98:8-99:13

Q. Could you take a look at Exhibit 1 in

π: Please see introductory response to Δ's objections in its entirety.

Δ: [illegible] at 48:16-49:4, witness said he has never read the APPROVe article before; here π's counsel shows the witness the article and asks questions about it. Also relates to congestive heart failure and edema which are not issues here.
π: same responses as to 49:5-49:14; and 92:20-95:7

bold complete

front of you, which is the New England Journal APPROVe study?
A. Yes. Yes.
Q. And take a look at page nine, Table 4, showing the congestive heart failure pulmonary edema or cardiac failure combined events. And you would agree those are biologically related events, aren't they? We talked about that. Pulmonary edema is strongly associated with congestive heart failure?
A. Yes, I agree.
Q. And cardiac failure is another way of saying congestive heart failure?
A. I believe so, yes.
Q. And the relative risk for Vioxx versus placebo was 4.61, correct?
A. 4.61, correct.

ESQUIRE DEPOSITION SERVICES

Q. And you understand that the 95 percent confidence interval column there shows a confidence interval of 1.50 to 18.83?
A. I see that.
Q. And you understand that that is a statistically significant result, correct?
A. I understand that is statistically significant, yes.
Q. It's statistically significant because the lower bound of the confidence interval is greater than 1.0, correct?
A. It does not cross one, that is correct.

TB 10321 103:21-104:7

Q. "The monitoring of our products is to identify potential signal, and the ultimate goal of safety surveillance is to assess the potential for association, a reasonable association as stated by FDA guidelines, for example, between the use of a

ESQUIRE DEPOSITION SERVICES

product, a Merck product in this case, and any reported AE."
Do you still agree with that?
A. Thank you.
I think this is in essence what I just tried to indicate, that the -- I think this is consistent with what I just said.

TB 10613 106:13-107:15

Q. Exhibit 3 is a computer printout from Lexis Publishing's Code of Federal Regulations 21 CFR 201.57 and refers to specific requirements on content and format of labeling for human prescription drugs. And, in particular, I'd refer you to the third page of the document, subparagraph E. Could you read the first two sentences into the record.
A. Yes. Page three, subparagraph E, "Warnings. Under this section heading, the labeling shall describe serious adverse reactions and

Δ: Adverse Event issue is irrelevant, prejudicial, inherently unreliable and cannot be used to establish causation. See objections above. If allowed, need to also 101:2-102:7
π: How could the CFR re: warning labels NOT be relevant? The regulation itself, read by witness, affirms that a causal relationship need not be →

Page 5 Objection does not make sense.

bold complete

potential safety hazards, limitations in use imposed by them, and steps that should be taken if they

ESQUIRE DEPOSITION SERVICES

107

occur. The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug."
Do you want me to continue?
Q. Just the last clause there.
A. "A causal relationship need not have been proved."
Q. Now, is that a regulation you've seen before today?
A. That is a regulation I have seen before.
Q. And is it your understanding that it's Merck's obligation to comply with that regulation in terms of its warnings on its pharmaceutical products?

TB 10720 107:20-107:22

THE WITNESS: It is my understanding that Merck complies with all federal regulations by FDA.

Δ: Adverse event issue is irrelevant, prejudicial, inherently unreliable and cannot be used to establish causation. Also see objections above. This testimony and the documents discussed should not be allowed.

π: Please see introductory response to Δ's objections in its entirety; see also responses to objections above.

TB 11818 118:18-119:5

This is a document that referred to your work as a RESS physician, correct? It says applicable to RESS physicians on the first page.
A. That's what it says on the first page.
Q. And at page two it lists referenced FDA regulations having to do with the postmarketing reporting of adverse drug experiences, it actually

ESQUIRE DEPOSITION SERVICES

119

goes on to page three, do you see that, the second entry on page three, referenced regulations include those for postmarketing reporting of adverse drug experiences?
A. I see that.

TB 12124 121:24-122:2

Q. And you kept the responsibility for monitoring the safety profile and adverse event

ESQUIRE DEPOSITION SERVICES

122

review?
A. That is correct.

TB 13208 132:8-132:15

Δ: Article is hearsay; testimony about article is irrelevant

π: Again, document is being offered for notice purposes; see π's introductory response to Δ's objections

Q. Doctor, Exhibit 6 is an article entitled "Identification of Sulfonamide-like Adverse Drug Reactions to Celecoxib in the World Health Organization Database" by Bengt-Erik Wiholm. Did I pronounce his name correctly?
A. I believe you did, yes.
Q. Have you seen this article before?
A. I believe so, yes.

bold complete

TB 16624 166:24-167:7

Q. And this is an article with the same Dr. Schoors as the lead author. And in this
ESQUIRE DEPOSITION SERVICES
167
publication in 1995, Dr. Schoors is identified with the group as Merck Research Laboratories, Clinical Pharmacology Europe, Brussels, Belgium. Do you see that?
A. I see that.
Q. You didn't know that before today?
A. I did not. I have not seen that.

TB 16714 167:14-167:18

Q. Just tell me whether you see any reference to Dr. Schoors' affiliation with Merck in the letter to the editor of Clinical Therapeutics marked as Exhibit 12.
A. Right.

TB 16720 167:20-170:4

THE WITNESS: I don't see it.
BY MR. ARBITBLIT:
Q. Okay. Now, look at Dr. Schoors' letter, in the middle paragraph, where he states that "in the latest available dataset from the WHO database (through March 2001), there are 60 reports
ESQUIRE DEPOSITION SERVICES
168
of myocardial infarctions (MIs) with celecoxib and 58 with rofecoxib. At that time, 4.8 million patient-years had accumulated for celecoxib and 3.2 million patient-years for rofecoxib." Do you see that reference?
A. I see that reference.
Q. And I read it correctly?
A. You read it correctly.
Q. And the adverse event reports can be used as numerators and the patient-years as denominators, and a reporting rate can be calculated based on 60 MIs over 4.8 million patient-years for celecoxib and 58 with rofecoxib over 3.2 million patient-years? That's how you would calculate those rates, correct?
A. That is correct.
Q. And if you did that, you would come up with a relative reporting rate of about 1.45 for Vioxx greater than Celebrex, wouldn't you?
A. Are these reporting rates in the article?
Q. Well, actually, they're not. I did them myself, and I'd ask you to either do them or accept that I did the math right. Which would you prefer? Would you like to use a calculator and do
ESQUIRE DEPOSITION SERVICES
169
them yourself?
A. Sure.
Q. Okay.

Δ: Article is hearsay, and testimony about it is irrelevant. Additionally, this refers to the same Adverse event issue that is mentioned Above. This testimony is irrelevant, prejudicial, hearsay, inherently unreliable and cannot be used to establish causation. Also see objections Above. This testimony And the document Being discussed should not Be allowed.

Π: Same as Above; witness is calculating reporting rates just as he would in his capacity as Sr Director of Risk Management At Merck. Goes to Notice of potential MI's associated with Vioxx

bold complete

A. Thank you.
What were your rates?
Q. I had, for Vioxx, 58 reports over 3.2 million patient-years, and I came up with 18.1 per million patient-years. Can you confirm that that's right or wrong?
A. 18.125 per million.
Q. Then I took the 60 reports, from Dr Schoors' article, over 4.8 million patient-years, also from his article, for the Celebrex, and I got a reporting rate for Celebrex of 12.5 million -- 12.5 per million patient-years?
A. Yes, 12.5.
Q. And then I did a final fraction of the Vioxx reporting rate of 18.1 over the Celebrex reporting rate of 12.5 and calculated a relative reporting rate of 1.45, Vioxx being the greater compared to Celebrex. Do you get the same result?
A. 1.448, yes.
Q. And that is exactly the same relative reporting rate method that Dr. Wiholm used to compare the Celebrex versus Vioxx sulfonamide

169:ESQUIRE DEPOSITION SERVICES
170: 170

reactions in terms of the ADR counts from the WHO database over the patient-years of exposure to Celebrex versus Vioxx, isn't it?
A. Presumably, yes.

TB 17715 177:15-178:5

Q. 18 is a document, "Comparison of Selected ADRs From the AERS Database For Selected NSAIDs," which has the same title as the one marked as Exhibit 17, and it says dated 10/15/2001. Can you look through this document and tell me whether any of the handwriting on these pages is your handwriting?
A. Yes, I believe this is my handwriting.
Q. Does that help refresh your memory that this project of "Comparison of Selected ADRs

177:ESQUIRE DEPOSITION SERVICES
178: 178

From the AERS Database for selected NSAIDs" was a project that you worked on, having seen your own handwriting on the document?
A. Yeah, this is my handwriting, so -- so I was participating at least in this.

TB 18407 184:7-186:7

Q. And this Document 18 does have reporting rates, doesn't it?
A. Yes, that is correct.
Q. And you either calculated them yourself or used someone else's calculations in your report. Which was it?
A. Again, I don't recall in detail, but it is factually correct that these -- for various AE terms, they are calculated reporting rates. I may have done that by myself or somebody else has done it. I cannot speak to that. So I don't know. I

Δ: Same objections. If Allowed, Merck counter-designates 184:8-15
Π: Same as Above

bold complete

don't recall that.
Q. But the fact is that this document that you worked on includes reporting rates for fluid retention, renal impairment, renal failure, hypertension --
A. Yes.
Q. -- and cardiac failure, correct?
A. That is correct.

184:ESQUIRE DEPOSITION SERVICES
185: 185

Q. And you did not do relative reporting rates or you did not present them in this document, right?
A. What do you mean by "relative reporting rates"?
Q. Well, the same statistic that Dr. Wiholm did in his published article and the same statistic that you calculated on the calculator a little while ago, the reporting rate for Vioxx over the reporting rate for Celebrex.
A. Right.
Q. And, for example, if you do that for cardiac failure, you see that what you would get is a reporting rate of 1.8 over 0.7, which is a relative reporting rate of 2.6 for Vioxx versus Celebrex?
A. That is correct. I did not do that.
Q. And do you also see that hypertension would give you a 2.8 reporting rate versus 1.2 and that the relative reporting rate would be 2.3 Vioxx versus Celebrex?
A. I see the 1.2 for hypertension. I see the 2.8 for rofecoxib.
Q. And that fraction, 2.8 over 1.2, gives you a relative reporting rate of 2.3 for

185:ESQUIRE DEPOSITION SERVICES
186: 186

Vioxx, right?
A. Right.
Q. And renal failure, the reporting rate is 1.7 over 0.8, or 2.1 Vioxx versus Celebrex, correct?
A. Well, I didn't do the math, so I'll take your word for it.

Δ: Same objections. If allowed, Merck counter-designates 186:25-188:7
Π: Same as Above

TB 18616 186:16-186:24

Q. It's the same database Wiholm used in a peer-reviewed article that came out favorably for Vioxx, right?
A. Wiholm used the WHO database, but, in essence, he used postmarketing AE reports.
Q. And a substantial percentage of the WHO database came from the FDA?
A. A substantial amount. About 60 percent.

Bold 7-29-05 (Multi-clip)
TB 23919 239:19-239:22

Δ: Same objections
Π: Same As Above

This is a document that was marked as Bold Exhibit 5 on March 11, 2005, and I recall that

bold complete

that is a document that you are familiar with; correct?

TB 24005 240:5-240:8

Q. This is a document that you worked with when you were assigned to review adverse event reports for Vioxx at Merck; correct?
A. That is correct.

TB 24201 242:1-242:14

Q. Taking a look at Page 4, does this accurately describe the process that Merck went through to obtain information to enter into the database of adverse events?
A. (Witness reviewing document.)
I believe that's correct. And WAES stands for worldwide adverse experience system.
Q. That's the database where all this information about adverse events is entered for use in your post-marketing surveillance program; correct?
A. WAES is a database which collects all spontaneous reports and serious reports from clinical trials.

D: Same objections. - the document is irrelevant AND prejudicial. Additionally, this relates to the same Adverse event issue that is mentioned Above. The testimony is irrelevant, prejudicial, Hearsay, inherently unreliable and cannot Be used to establish causation. Also see objections Above. The testimony And the document Being discussed should not Be allowed.

Π: Same As Above; same As Π's introductory response to D's objections; highly relevant re: Merck's system for receiving notice of potential Vioxx related Adverse events

TB 24422 244:22-245:3

Q. Your role is to review the information that was gathered by others?
A. My role is, and I'm part of a team of physicians who are responsible for safety
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order
surveillance. My responsibility specifically relates to spontaneous reports, not reports from clinical trials or from epidemiological studies.

TB 25425 254:25-255:15

Q. Going back to the previously marked
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order
exhibit, SOP number 1, on page 10 of the document underneath all of the activities -- the page numbers are up in the boxes at the top.
A. I've noticed that. Thank you.
Q. Do you see underneath the list of activities, there's a Paragraph 2: "Ensures that the data entered for each episode are accurate and include, as appropriate," and then there are several subparagraphs. Do you see that?
A. Yes, I see that.
Q. The third one, Paragraph c, says, "Coding of each AE and suspect therapy, 'association with the use of the drug,' action taken, result of dechallenge and/or rechallenge." Do you see that?
A. Yes, I see that.

D: Same objections. Additionally, in this designation the lawyer just uses the witness as a prop to read in portions of the document. If allowed, must also include 257: 1-14

Π: same As Above; testimony used as lead in to questions that follow

TB 25814 258:14-259:5

Δ: Same objections. Additionally whether or not there was a field on the document for "causality" that does not change the fact that this Adverse event data is unreliable, is hearsay and cannot be used to show causation. It is not clear who is making the causality determination here, and even a "Y" in the causality field could mean "definite," "probable" or "possible." Therefore this document and the testimony about it should be excluded. If allowed, must also include 259:6-13

Π: Same as above;

bold complete

Q. Do you know whether your spontaneous reports in the WAES database include a reference to the drug relationship or not?
A. The WAES report of the reports we have in the WAES database from spontaneous reporting does have a field of causality.
Q. That field of causality is either filled in with a "Y" for yes or an "N" for no; correct?
A. This is either filled in with a "Y" for yes and for no or a "U" for unknown.
Q. Was it the practice during your work

258:ESQUIRE DEPOSITION SERVICES
258:Confidential - Subject to Protective Order
259: 259

on Vioxx at Merck that the field would be filled in with the letter "Y" for yes if the reporting individual stated to Merck that the relationship to the drug was "definite," "probable" or "possible"?
A. I believe that is correct.

TB 26302 263:2-264:7

Same as Π's introductory response to Δ's objections - goes to Notice of AE's potentially associated with Vioxx

Q. Now, in the same subparagraph we were looking at before, 2. c., there is a use of the phrase "dechallenge and/or rechallenge." First of all, what is dechallenge?
A. Dechallenge refers to what happens to an adverse experience after discontinuation of the suspect therapy.
Q. And is a positive dechallenge interpreted as the person's condition got better after they were no longer using the drug?
A. A positive dechallenge would indicate that the AE in question would get better after discontinuation of a drug.
Q. As a rechallenge, what happens when a person who had an adverse event is then exposed to the drug again?
A. Rechallenge is when a drug is being discontinued after an AE occurs and a drug is being reintroduced at a later time point.
Q. When you say "discontinued," you don't mean taken off the market, you mean discontinued as to that particular patient; correct?
A. That is correct.
Q. So, just to summarize then, a person

263:ESQUIRE DEPOSITION SERVICES
263:Confidential - Subject to Protective Order
264: 264

is given a drug, and in a sense that's a challenge to see how they respond to it. Then they go off the drug, and that's a dechallenge and you see what happens. Then if they take the drug again, that's a rechallenge, and you see what happens. And if a person has a positive rechallenge, that means they get the adverse event again. Is that right?

Δ: Same objections. Document and testimony relate to the Adverse event issue and should not be allowed. See above

Π: Same as above

TB 26409 264:9-264:14

THE WITNESS: A positive rechallenge, complete positive rechallenge would mean that any AE

bold complete

in question would disappear after a drug has been discontinued by the patient, not withdrawn from the market. After the reintroduction of the drug, the AE would reoccur, that is a positive rechallenge.

TB 26602 266:2-268:2

Q. Exhibit 25 was previously marked as Exhibit 7 in a previous deposition that you gave in June of 2004, and I wanted to direct your attention to the second page of the document under the heading "Data Review." Let me know when you are there. Do you see that, "Data Review"?
A. I see that, yes.
Q. This procedure refers to labeling review. So, maybe you should just explain what a labeling review is before we talk about that specific section.
MR. VAN KIRK: If you need to, take time to read either the paragraph in full or the document yourself.
MR. ARBITBLIT: Let's just talk about a question without the document for a moment.
BY MR. ARBITBLIT:
Q. What is a labeling review?
A. Well, Merck has procedures in place to monitoring and reviewing safety information from spontaneous reports, and the labeling review is a part of those procedures.
Q. And the labeling review involves looking at your adverse event experience to

266:ESQUIRE DEPOSITION SERVICES
266:Confidential - Subject to Protective Order
267: 267

determine whether any types of adverse experiences need to be added to the label in some form; is that right?
A. Well, the goal of labeling review is the identification of a safety signal, depending on the signal, whatever action to follow. But one of the actions could be adding AE terms to the label in the safety sections.
Q. Now, with that background, if you'll look at the "Data Review" section, I think it relates to the answer you gave a couple of moments ago concerning positive rechallenges and how they are treated at Merck. Do you see under "Data Review," could you just read the first two sentences into the record?
A. "For the labeling review, the AEIM Associate will generate the AE Labeling Report. The output should be forwarded to the RESS physician who has the primary responsibility of determining what adverse experiences need to be reviewed by the AERT."
Q. Okay. Just that far. The "AERT" refers to the adverse event review team?
A. That's correct.
Q. You were a part of that team?

267:ESQUIRE DEPOSITION SERVICES
267:Confidential - Subject to Protective Order
268: 268

A. That is correct. For Vioxx, I was a

Δ: Calls for speculation

Π: Does not call for speculation; witness was a member of the AERT team; it is well within his knowledge whether 7 reports would have been considered by the team

bold complete

268: 2 part of that team.

TB 27218 272:18-272:21

Q. If you had seven reports of a serious adverse experience such as a myocardial infarction, that would be something that should be considered by the AERT during its labeling report review; correct?

TB 27223 272:23-273:7

THE WITNESS: If you have something like seven MIs, that could be considered and could have been considered for AERT review.

272:ESQUIRE DEPOSITION SERVICES
272:Confidential - Subject to Protective Order
273: 273

BY MR. ARBITBLIT:
Q. That should be considered is what your policy said?
A. It should be considered.
Q. And it should be considered by the AERT?
A. It should be considered, yes.

TB 27308 273:8-273:19

Q. What was the policy in terms of positive rechallenges before it became mandatory? Was it a similar practice to what you just described, that generally the directive that it should be considered was heeded?
A. I would say it was heeded. It should be considered. I mean, as I explained, depending on the nature of the AE, seven was not a minimum threshold, so, it could have been less than seven, and certainly reports, especially serious reports with a positive rechallenge, would fall under this category.

TB 27903 279:3-279:22

Q. Were you the highest ranking person at Merck who was assigned to review adverse experience reports concerning Vioxx on a regular basis?
A. Highest ranked person, you mean with regard to spontaneous reports?
Q. Yes.
A. On a regular basis, continuous monitoring, I am the person who was responsible and is still responsible of safety monitoring of spontaneous reports.
Q. And it was your job to identify issues that may have implications for the safety information sections for the assigned products with regard to labeling?
A. Well, it is my job, as I said, to continuously monitor the safety of spontaneous reports and to identify signals using the procedures we have in place and, therefore, informing upper management about any potential findings.

bold complete

TB 28010 280:10-283:3

Q. 27 is a document previously marked as Exhibit 6 in a different deposition. It's SOP Number 210, title "RESS Physician Medical Review." And that refers to your job at the time; correct?
A. That is correct.
Q. And you were the RESS physician, and this describes your job duties at that time.
A. That is correct.
Q. At Page 5 of the document, the RESS physician is in the left-hand column under section 2 heading "Label/Product Circular Review (Marketed Products)," and it reads: "In collaboration with other AERT (Adverse Experience Review Team) members, identify issues that may have implications for the safety information sections for assigned products." Do you see that?

ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order
281

A. I see that.
Q. So, it was your job with the other members of the AERT to do what it says here, right, "identify issues that may have implications for the safety information sections for assigned products"?
A. That is correct.
Q. What they're talking about is the labeling that goes with the product that includes information about adverse events, whether it's warnings, precautions, adverse reactions, the entire spectrum; correct?
A. I'm not sure I understand "the entire spectrum."
Q. Well, there are various levels of information that a company can include on a label, correct, going from rare events regardless of causality all the way up to a black box warning?
A. There are various levels, that is correct.
Q. Your job was to identify issues that may have implications for the safety information sections of this, and when they say "safety information sections," they are referring to labeling; right? Safety information sections of the label?

ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order
282

A. Right. They refer to my responsibility of safety monitoring for signal detection from the spontaneous environment.
Q. And you know that clinical trials can identify some events, but it's accepted in your field that clinical trials can't identify all events. That's why we have post-marketing surveillance; right?
A. That is correct. Clinical trials, because of the size of clinical trials, cannot detect especially the very rare adverse experiences.
Q. They also can't detect adverse experiences that might happen more frequently in sensitive populations who aren't included in those

bold complete

trials; correct?
A. Well, I would say generally, if a certain population is not included in the clinical trial, then you cannot detect if you don't include. You can only detect from what is included in the clinical trial.
Q. Also, if an event is somewhat common, you might not have enough power in a small study to detect a difference between the exposed and the control in a clinical trial; correct?
A. It is correct, depending on the size
282:ESQUIRE DEPOSITION SERVICES
282:Confidential - Subject to Protective Order
283: 283
of the study, depending on the power you have in the study, that you need the right size of a study to take a certain signal.

TB 28408 284:8-284:14

Q. And if you're looking at information about heart attacks and there is a debatable signal, if there's a determination that there's no signal and no warning and it turns out that the signal was there and it was real and people took the drug because there was no warning, then they could die, couldn't they?

D: Compound, Argumentative, assumes facts not in evidence

π: proper hypothetical; witness understands question & is easily able to answer

TB 28416 284:16-284:23

THE WITNESS: Well, again, to die is an outcome, and that may be due to an adverse experience.
BY MR. ARBITBLIT:
Q. Let's take death out of it. If the signal was there and you missed it, people could take the drug and have the adverse experience, in this case, a heart attack, couldn't they?

TB 28425 284:25-285:5

THE WITNESS: Well, in theory, you
284:ESQUIRE DEPOSITION SERVICES
284:Confidential - Subject to Protective Order
285: 285
can have -- yes. I mean, if anybody detects a signal or does not detect a signal and something happens to patients and we don't know about it, then any patient can suffer from adverse experiences which were not detected, that is correct.

D: Argumentative; assumes facts not in evidence

π: same as above; witness has experience & knowledge to adequately answer question

TB 31325 313:25-315:4

Do you have personal knowledge that
313:ESQUIRE DEPOSITION SERVICES
313:Confidential - Subject to Protective Order
314: 314
senior management reviewed the WAES database of myocardial infarction reports following the March 2000 release of the VIGOR results?
A. The knowledge I have about that is limited to the knowledge I obtained when the information was made public, and by "public," I mean

Δ: 314:15 - 315:1 - 602, no foundation to ask witness what senior management did, and witness says he does not know

π: On the contrary, in witness' response at 314:23-315:1, witness confirms it is within his knowledge that 2 people reviewed the reports and presented them at meetings.

bold complete

at the time of the memo, not the publication. I don't know the details of what analyses were done by upper management, but I was told that upper management, including senior management of my department, looked at all spontaneous reports, including reports of myocardial infarction.
Q. Would that have been Peter Gruer, Sandy Smith and Linda Hostelley?
A. That is correct.
Q. And it's your understanding that those three looked at the spontaneous reports of myocardial infarction in the aftermath of the press release of March 2000 concerning the VIGOR results?
A. It is my understanding that -- I don't know. I'm not sure that all three of them were involved because Linda Hostelley is not part of the safety surveillance, but it is my understanding that Dr. Peter Gruer and Dr. Sandy Smith looked at information and that the information was presented

ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order

to the membership of those meetings.
Q. Just to complete this particular subject, did you not look at those same reports in that same time frame?

TB 31506 315:6-315:11

THE WITNESS: At that very specific time frame, I did not look at those reports. I had looked at those reports continuously since the drug was approved, so, I knew these reports. But I was not involved in the analysis of all these reports at the time when these meetings happened.

TB 33509 335:9-337:3

Δ: 401, 402

π: The fact that the company core label changes did not include MI's or thrombotic events is highly relevant to π's case and is reflected by this witness' document

Q. Exhibit 34 is an excerpt from a document that has your name and your department, "Worldwide Product Safety and Epidemiology," on the front. And inside on the document marked Page 21 there's a reference to the "Company Core Label Changes, March 2000 - March 2001."
I didn't bring the whole document in the interest of saving paper, and I don't have questions about the rest of it, but from seeing the cover, do you recall having prepared a document in 2001 that included a presentation concerning rofecoxib in which you included a summary of the company's core label changes?
A. 2001? I'm not 100 percent sure, but I believe that this was a presentation I put together for a company internal meeting, a worldwide meeting of the safety departments from all the

ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order

subsidiaries all over the world. I believe that was the purpose of that presentation.
Q. March 2001 is a year after the VIGOR results were made public; correct?
A. Correct.