bold complete

Q. And the company core label changes include those that you listed at Page 21, but nothing about myocardial infarction or thrombotic events; correct?

A. As stated on this slide, it is summarizing the label changes to the company core data sheet, which is an acronym for the WPC.

Q. Which is the worldwide product --

A. Worldwide product circular. Sometimes it is also called IPC. That is the older nomenclature of that, international product circular.

And this is summarizing the changes of the core label between March 2000 and 2001, which did not include myocardial infarction.

Q. And you managed to get alopecia or hair loss into the label which was recommended for discussion by the WPCRC on June 28, 2000. That was in the label by March 2001; wasn't it?

A. As stated in here, it doesn't refer

to when it was added, but it must have been added in that time frame as indicated on that slide that alopecia was added.

TB 33908 339:8-340:5

Q. Exhibit 36 is a memo dated November 28, 2001 from Roseanne Carney. You were one of the recipients, and Judith Cohn and Ken Truitt are the others. Who are they?

A. Ken Truitt was the clinical monitor at that time point, and Judith Cohn I believe was the editor.

Q. So, they were other members of the AERT?

A. Yes.

Q. This memo was sent stating that "The following terms have been selected for analysis by members of the AERT," in advance of your meeting scheduled for Monday, December 10. Do you see that?

A. I see that.

Q. Is this your handwriting on the document?

A. I believe so.

Q. Can you read what it says next to "CVA/TIA"? First, can we confirm that that stands for cerebrovascular accident and transient ischemic attack?

A. That is correct.

TB 34102 341:2-341:14

Q. Now, can you read and tell us what the abbreviations stand for in reading the line that you wrote next to "CVA/TIA"?

A. I was writing blood pressure increases, mental changes, TIA often unclear

D: Same objections - the document is irrelevant and prejudicial. Additionally this relates to the same adverse event issue that is mentioned above. The testimony is irrelevant, prejudicial, hearsay, inherently unreliable and cannot be used to establish causation. Also see objections above. The testimony and document are also irrelevant because they relate to strokes, and strokes are not an issue in this case.

The testimony and the document being discussed should not be allowed. →

bold complete diagnosis, no pattern for ischemic changes. Hypertension -- hypertensive crisis, DD, which means differential diagnosis, TIA.

Q. Meaning that these patients had either suffered some type of hypertensive encephalopathy that mimics the symptoms of a TIA or a TIA itself?

A. That is correct.

TB 34206 342:6-342:13

Q. Now, the next line is "hypertensive crisis." Correct?

A. The next line is "Hypertensive crisis," that is correct.

Q. Can you read what you wrote there?

A. I said, "Cannot rule out hypertensive crisis. Fast onset." Then I said, first, "Immediately," second, "within 3 days."

TB 34421 344:21-345:3

Q. Doctor, Exhibit 37 is a memo dated March 18, 2002 that references the discussion at the WPCRC meeting coming up on Friday, March 22nd. Do you see that?

A. I see that.

ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order

Q. You are one of the recipients at the bottom?

A. Yes, I am.

TB 34610 346:10-348:25

Q. Now, at this particular meeting, the plan was to discuss "hypertensive crisis and CVA/TIA." Right?

A. Yes.

Q. Now, can you read, I assume, from the similar handwriting that this is yours?

A. I believe so.

Q. Can you read what it says next to that line?

A. Next to hypertensive crisis?

Q. Yes.

A. It says, "Out of 140 CVA, abbreviated reports, potential 29 H.Z.," which stands for hypertensive crisis, "plus additional 46 hypertensive crisis reports, including three positive rechallenge."

ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order

Q. So, you had 140 cerebrovascular accidents that you looked at. Is that what that means, out of 140 CVA?

A. I don't know whether or not we looked at 140 CVAs at that time point. It summarizes that out of 140 that potentially 29 indicated, at least in my estimation, hypertensive crisis.

Π: Highly relevant to show Δ is aware of reports of adverse events potentially related to Vioxx and how they handled such data - again - goes to Notice - see Π's introductory response to Δ's objections on this subject

Δ: Same objections. The memo being referred to here contains data from the adverse event reports, so this testimony is irrelevant, prejudicial, hearsay, inherently unreliable and cannot be used to establish causation. Also see objections above. Also, improper opinion testimony. Also, irrelevant to this case because there is no allegations relating to a "hypertensive crisis" here. The testimony and the document being discussed should not be allowed. →

Π: Same As Above; hyper-tension is an issue in this case

bold complete

Q. Now, a hypertensive crisis involves an extreme elevation of both the systolic and diastolic blood pressure; correct?
A. That is correct.
Q. Sometimes defined as over 180 systolic and 110 diastolic?
A. I would think the numbers you mentioned are conservative. Typically, the systolic blood pressure for hypertensive crisis is greater than 210, 220, and diastolic, typically it is greater than 100, 110.
Q. Blood pressures of that magnitude are immediately life-threatening, aren't they, if not treated?
A. I would say they are very serious situations, potentially life-threatening. I would say these are emergency situations.

347:ESQUIRE DEPOSITION SERVICES
347:Confidential - Subject to Protective Order
348: 348

Q. If you don't treat them, the hypertensive crisis will cause what's called target organ damage?
A. When not treated, hypertensive crisis can lead to target organ damage.
Q. What is target organ damage?
A. Well, target organ damage means that certain tissues and certain organs are susceptible to these high blood pressures, and those high blood pressures could lead to serious damage of those tissues of those vessels and the tissues surrounding those vessels.
Q. Which tissues?
A. Well, one of the tissues would be the brain, also kidneys. But I would say mainly one of the main symptoms is probably the brain.
Q. And a hypertensive crisis can, in fact, cause cerebrovascular accident, can't it?
A. Hypertensive crisis can lead to a cerebrovascular accident. Hypertensive crisis, even when not leading to a cerebrovascular accident, can have symptoms which look similar to symptoms of cerebrovascular accidents. Or there may be a point in time where it's clinically not easy to distinguish between those two.

TB 35207 352:7-352:10

Q. Exhibit 40 is another WAES adverse experience report. Is this more the form that you see in your work reviewing the forms?
A. That is correct.

D: Same objections. Totally irrelevant to our case to focus on something that happened to a different patient, especially when there is no proven link between what happened to that patient and Vioxx, and when that patient suffered from something different that Π alleges he suffered.

TB 35322 353:22-354:5

So, this involved a situation where the person was taking Vioxx, and "After one month of treatment the patient suddenly experienced hypertension, pulmonary edema, respiratory arrest

353:ESQUIRE DEPOSITION SERVICES
353:Confidential - Subject to Protective Order
354: 354

and cardiac arrest." Do you see that?

bold complete

A. I see that.
Q. And blood pressure measurement was 280 over 180. Do you see that?
A. I see that.

TB 35514 355:14-355:22

Q. The measurements themselves of 280 over 180 clearly exceed the standard that you've stated for hypertensive crisis, don't they?
A. That is correct.
Q. And this "reporting physician felt that pulmonary edema, respiratory arrest, cardiac arrest and hypertension increased were definitely related to therapy with rofecoxib." Do you see that?

TB 35524 355:24-355:25

THE WITNESS: I see that. This is what it states in the narrative.

Π: Same as Above; goes to Notice; Same response as Π's introductory response to Δ's objections.

TB 38120 381:20-382:2

Q. Exhibit 45 is a February 27, 2002 memo to file from Roseanne Carney, and the AE review team terms reviewed are listed, including hypertensive crisis, CVA, TIA, and "The following terms were selected for discussion at WPCRC: Hypertensive crisis and CVA/TIA." That's how the
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order
382
process worked; right?
A. That is correct.

TB 38212 382:12-382:13

Q. Exhibit 46 is the report that you forwarded to Bea Loran on April 3rd --

TB 38222 382:22-383:3

Did you prepare a report on hypertensive crisis for Merck as part of your review?
A. I would have done that. None of the
ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order
383
people, Ann Strauss or Bea Loran, would have done that, so, this is an expert report, which is coming from our department. It's coming from me.

TB 38405 384:5-384:20

Now, in the first full paragraph on your report on hypertensive crisis, you see it says, "A small number of hypertensive patients may present with hypertensive crisis. In these patients blood pressure is usually markedly elevated and there may be evidence of acute dysfunction in the cardiovascular, neurologic, or renal organ system."

Δ: Same objections. Both the document And the testimony Should Be excluded

Π: Hypertension is An issue in this case; committees' Actions As A response to learning About potential side effects highly relevant

bold complete

Did I read that correctly?
A. Yes, you did.
Q. Could you read the next sentence into the record, please?
A. "Common clinical presentations of acute target organ disease include hypertensive encephalopathy, myocardial ischemia/infarction, pulmonary edema, aortic dissection and acute renal failure."

TB 38508 385:8-385:16

Q. Did you present your information about hypertensive crisis to the committee?
A. Yes.
Q. And the response was to add hypertensive crisis to the label?
A. The response was that the committee concurred with the recommendation of AERT, and as a consequence, hypertensive crisis was added to the list of side effects in the company core data sheet.

Δ: Same objections. Also irrelevant because "hypertensive crisis" is not something Mr. Barnett alleges he suffered from.

TB 38602 386:2-387:8

Q. Doctor, Exhibit 47 is a memorandum from Dawn Chitty to a group of Merck employees and officers, and you are cc'd at the bottom. This is dated April 5th, 2002, MRK-ACO0007709. You've seen this document before; correct?
A. Not -- well, I was cc'd on the document, but I'm not one of the addressees of this document.
Q. Okay.
So, you received it as a cc?
A. Yes.
Q. It confirms what you just stated, the "BACKGROUND: Based on the review of the WAES database, WPCRC agreed that the HQ, US and EU documents should include the following terms: 'blurred vision, insomnia, hypertensive crisis.'" Do you see that?
A. I see that.
Q. What does the "HQ" document refer to? Is that the core document?
A. Yes. That is basically the headquarter document, yes.
Q. "EU" is the European Union countries?
A. That is correct.
386:ESQUIRE DEPOSITION SERVICES
386:Confidential - Subject to Protective Order
387: 387
Q. So, under the Adverse Reactions section, "'hypertensive crisis' was added under 'Cardiovascular.'"
A. Correct.
Q. And the method of submission is "Changes Being Effected." Is that right?
A. In this case, I believe so, "Changes Being Effected," yes.

Π: Same as above; hypertension is at issue in this case

Δ: Same objections and 602 - no foundation. The witness says at 389:12-13 that he is not involved in the submission of the information to the FDA. Also 701/702

TB 38919 389:19-389:22

You didn't submit a proposed label

π: SAME AS ABOVE; witness refers to document and answers to the best of his knowledge

bold complete
including hypertensive crisis and then wait for the FDA to tell you it was okay, did you?
A. It doesn't appear that way.

TB 39009 390:9-391:15

Δ: 602, 701, 702 No foundation for this blood pressure testimony, and the witness has not been shown to be an expert in hypertension and how it can impact the cardiovascular system

π: Witness is an M.D. and is highly knowledgeable, as Sr. Director of Risk Management & Safety Surveillance of Vioxx of the side effects associated with Vioxx, including hypertension and MI's.

Q. Doctor, how does hypertension act as a risk factor for myocardial infarction?
A. Well, hypertension is a risk factor because it basically increases, and it is a risk factor for over a long time. It is a long-term risk factor for myocardial infarction, because you have basically a resistance in the buildup of your arteries, of your cardiovascular system. It may be related to also changes in the arteries. It's also risk factors for the development of atherosclerotic disease. So, there are various components how hypertension adds to the susceptibility of your cardiovascular system for myocardial infarction.
Q. Is it consistent with your understanding that increased blood pressure within the blood vessel increases the risk of shearing off plaque that can act as a clot or thrombus?
390:ESQUIRE DEPOSITION SERVICES
390:Confidential - Subject to Protective Order
391: 391
A. It can be, not necessarily. I mean, plaque, it depends on the plaque. There are various forms of plaque. There can be very hard plaque, there can be very soft plaque. Soft plaque is the plaque which would more acutely lead to a thrombus formation; hard plaque, not so acutely, that would be more over time.
Q. Along that line, the higher the pressure, the greater the risk that soft plaque could be sheared off and turn into a thrombus or clot; is that right?
A. Generally speaking, I would say, yeah, the higher the pressure, the longer uncontrolled. So, the risk for a patient would increase over time.

TB 39125 391:25-392:5

Q. For whatever time that excessive
391:ESQUIRE DEPOSITION SERVICES
391:Confidential - Subject to Protective Order
392: 392
blood pressure continues, the risk of breaking off a plaque is greater than it was before that increase or after it; correct?
A. I would think that is probably a generally correct statement.

TB 39605 396:5-397:10

Δ: The hypertensive crisis question (397:6-10) is irrelevant in this case.

Q. Could you go back to Exhibit 41, the draft briefing document of April 22nd?
A. Okay.
Q. Do you see in the third paragraph there's a statement about the label change and the dates when it would go into the packaging? Do you see that "The new labels will be included with

→

bold complete

packaging of the product starting June 1st with the requirement that beginning August 1st, all product distributed from the warehouse must contain the new label"?

A. I see that.

Q. That June 1st date was less than two months after the WPCRC approved the label change on April 5th, 2002; right? That's Exhibit 47, April 5th, 2002.

A. One moment. I'm not sure that the April 5th relates to when WPCRC approved it. This is a memo which goes to, I referred to that earlier, to upper management, which has to agree to any changes suggested by WPCRC.

396:ESQUIRE DEPOSITION SERVICES
396:Confidential - Subject to Protective Order
397: 397

Q. You're right. There's a box above her signature saying that their approval should be forwarded to Dawn Chitty by 3:00 p.m. on Monday, April 8th, 2002; correct?

A. Correct.

Q. And the briefing document of April 22nd states that the new labels with hypertensive crisis added would be included with the packaging of the product starting June 1; right?

A. That is correct.

TB 40901 409:1-409:23

Q. But your job in particular is post-market surveillance?

A. My job is post-marketing surveillance, that is correct.

Q. And there are a couple of things that follow from that that I'd like to ask you about, one of which is that it's your job, isn't it, to tell the other people at the company if you've got 40 healthcare professionals saying my patient had a heart attack and your drug caused it, don't you think they would want to know that as soon as possible?

A. Well, my job is safety monitoring for signals from spontaneous reports. I work as part of a team. I'm not holding back, I'm not withholding that information from my colleagues. All the reports, when being reviewed, are being looked at not only by me, but also by my colleagues, by AERT colleagues.

The information that a healthcare professional thought that may be related to the use of the drug is provided to them, this data, this information is not being withheld.

TB 42106 421:6-421:13

Q. Well, you had, just as Brinker had clinical trial data to see whether his reporting rate analysis was consistent or inconsistent, you had clinical trial data and could have done a reporting rate analysis to see if it was inconsistent or consistent; correct? You could have done that?

π: Hypertension is At issue; Also demonstrates what Δ felt should be added to label and when ~ relevant to the broader context of what was & wasn't included on the label and when, as compared to what potential side effects they had notice of at that time

Δ: 409:5-23 Assumes facts not in evidence

π: Use of hypothetical to clarify job responsibilities

bold complete

A. I agree that it could have been done.

TB 42310 423:10-423:12

MR. ARBITBLIT: This is a set of adverse event reports marked as, what, 39?
THE WITNESS: Yes.

TB 42411 424:11-424:17

Have you ever before today tried to compile the reports where doctors said that they thought Vioxx probably caused myocardial infarction to determine whether the weight of that evidence was significant in determining whether there was a signal of that adverse event? Have you ever done it before today? Yes or no?

TB 42419 424:19-425:7

THE WITNESS: A compilation as you presented here?
BY MR. ARBITBLIT:
Q. Yes. Have you ever looked at a bunch of reports where the doctors all said it was probable and gone through them to see what the weight of that evidence was?
424:ESQUIRE DEPOSITION SERVICES
424:Confidential - Subject to Protective Order
425: 425
A. I have looked at all of those reports. I have read all -- every single of those reports.
Q. Have you ever put all the ones where it was stated to be "probable" together and read them at one time to see whether you agreed or disagreed with those doctors?

TB 42509 425:9-425:10

THE WITNESS: I don't think I have done that.

TB 42512 425:12-426:5

Q. Hopefully you will find the documents in the same order. We've tried our best to do that. Please take a look at Tab Number 13, and this one is a version that has both the printout from the disk and the Bates stamped version from Merck's hard copies. So, you can examine them and see. As far as I can tell, the narratives and salient information are identical.
This is a report of February 11, 2002 in which the -- do you see those letters, "D" and "R" at the top right of the Merck form?
A. I see those.
Q. Do those stand for dechallenge and rechallenge?
425:ESQUIRE DEPOSITION SERVICES
425:Confidential - Subject to Protective Order
426: 426
A. That is correct.

D: The Adverse event reports and the testimony relating to them must be excluded. They are irrelevant, prejudicial, contain hearsay and give the mistaken impression to the jury that they relate to causation. Also see objections above.

π: Please see introductory response to Δ's objections in its entirety.

bold complete

Q. And does the "Y" in each column mean that there was a positive dechallenge and a positive rechallenge?
A. That is correct.

TB 42918 429:18-430:10

Q. Can you see in the narrative that "the physician reported that between July 2001 and September 2001 the patient experienced two episodes of angina, associated with clots found in the coronary arteries, suffered a non Q myocardial infarction and was hospitalized"? Do you see that?
A. I see that.
Q. Do you see that "The physician noted

429:ESQUIRE DEPOSITION SERVICES
429:Confidential - Subject to Protective Order
430: 430

that the patient's experiences abated after rofecoxib was stopped or the dose was reduced and reoccurred after rofecoxib was reinitiated"? Do you see that text?
A. I see that text.
Q. Did I read it correctly?
A. You read it correctly.
Q. Is it your understanding that the person who took this history entered the data as a rechallenge based on that history?

TB 43012 430:12-430:20

THE WITNESS: That is correct. The person who entered that information interpreted the information as stated on the form.
BY MR. ARBITBLIT:
Q. And you never changed this entry yourself after you had reviewed it, did you? You never said, this wasn't a rechallenge, let's change the form?
A. No, I have not. I --

TB 43208 432:8-432:17

THE WITNESS: All I was trying to say was that with regard to that specific case, I don't know whether or not -- and based on this information, I don't know whether or not we tried to obtain more information, whether or not the positive dechallenge/rechallenge was challenged by anybody who reviewed that report. I cannot tell you that.
All I can tell you is what I read here and what I see checked as a box, and I'm not sure that that necessarily correlates.

Δ: Same objections. Counsel is just going through notes regarding other patients who have nothing to do with this case. Irrelevant, prejudicial, contains hearsay and will confuse the jury. Also irrelevant because relates to pulmonary edema, which is Not an issue here.

TB 44124 441:24-442:3

Q. Let's look at Number 6. "The physician reported that the patient developed

441:ESQUIRE DEPOSITION SERVICES
441:Confidential - Subject to Protective Order
442: 442

pulmonary edema, which led to an MI." Now, do you disagree with the doctor's view that a pulmonary

bold complete
edema can lead to an MI?

TB 44207 442:7-442:11

Q. That's the question. I'm not asking you for anything else about this document. I'm asking you whether you agree or disagree with this doctor's opinion expressed to Merck that pulmonary edema led to an MI?

TB 44213 442:13-442:18

THE WITNESS: I'm not sure that I understand and follow the mechanism, the pathomechanism between pulmonary edema and myocardial infarction. I'm not sure that I fully understand the thinking, what the doctor tried to convey in this report.

TB 44816 448:16-450:20

Q. Now then, look at Number 22. You've got a physician telling you that he had eight patients who were placed on therapy with rofecoxib 25 milligram tablets who experienced myocardial infarctions and stated that "some of the patients 'should never have been started on rofecoxib,'" and that "The reporting physician felt that the myocardial infarctions were related to therapy with rofecoxib. Additional information has been requested."

448:ESQUIRE DEPOSITION SERVICES
448:Confidential - Subject to Protective Order
449: 449

Did you recall any follow-up about those eight patients with heart attacks referred by a single doctor for your consideration?

A. Well, again, I mean, I cannot recall any specific actions undertaken trying to obtain more information, but it also says that "The physician did not remember the specific patients," which seems to be very odd in my opinion at least. I mean, if a doctor reports on eight patients, makes certain statements without providing any detailed information and then saying he did not remember the specific patients, I mean, one has to be careful. I mean, I read these reports, of course. I mean, I'm not saying those patients never existed. I would never do that. But what information can you take out of a report such as that?

Q. Well, you could get additional information. Do you see any evidence that that was done?

A. And, again, I cannot speak what attempts were made with regard to the specific reports. I'm sure there's a record, and that could be found out. But it is also telling to a certain extent when the original report, I assume that this is the original report, said that the physician did

449:ESQUIRE DEPOSITION SERVICES
449:Confidential - Subject to Protective Order
450: 450

not remember the specific patients.

Π: Same As Above; the issue is whether MI's are caused by Vioxx, (whether through pulmonary edema or otherwise) & the fact that Merck had notice of this (and other) potential associations

Δ: Same objections. Counsel is now referring to a note regarding eight other patients who have nothing to do with this case

Π: Same As Above - goes to notice - same as introductory objection

bold complete

So, that is -- when you look at the back sides, that is information which was provided through a company representative. So, this is most likely that the company representative visited the office and the doctor told the representative about something, but he would not remember the specific patients.

Q. So, in other words --

A. Which I find -- I mean, if you have eight patients, as a doctor, who all had a myocardial infarction as stated here, I would think, as a doctor, if I report my patients, that I'm able to identify those patients and give this information to a company representative.

Q. Do you have patients?

A. I don't treat patients.

Q. And this doctor did, and he felt that eight of his patients got a heart attack because of Merck's drug. That's what he says.

TB 45023 450:23-451:25

Q. Right?

A. Well, that may be so, but whether or not these were his patients or whether or not he

450:ESQUIRE DEPOSITION SERVICES
450:Confidential - Subject to Protective Order
451: 451

heard about that, I'm not so sure. I mean, what clearly is striking, if these are his patients, that he would not remember the specific patients.

Q. It's more striking to you that he doesn't remember the specific patients, according to whoever entered this data, than that eight people had myocardial infarctions that this doctor attributed to your drug? Is that what's most striking to you about this document, Doctor?

A. I recognize that somebody reports -- no specific information with regard to any of those patients, but there is a report telling the sales representatives, at least that's the way it appears, that there are eight patients who were placed on therapy with rofecoxib and experienced myocardial infarctions. This I will not deny. I'm not saying this never happened. I recognize that.

But I also recognize the additional information. I mean, these cannot be unrecognized either. And the fact is that the physician did not remember the specific patients. So, if the physician doesn't remember specific patients, it is very difficult to obtain follow-up information to be able to assess these reports. That's all I'm saying.

D: Same objections. Counsel is now referring to a note regarding a patient in Germany who has diabetes. This has nothing to do with our case. →

TB 45201 452:1-453:16

Q. Okay. Take a look at Number 32, which is information received from a physician via the German agency concerning a 70-year-old male patient with quite a bit of detail. And the statement at the bottom of the second page, page MRK-AC00058987 had: "The reporting physician felt that angina pectoris, posterior myocardial

Π: Same As Above - goes to notice of MI's potentially associated with Vioxx and Merck's reaction/action upon receipt of such information

bold complete

infarction and coronary single vessel disease were related to therapy with rofecoxib. He stated that classical NSAIDs like diclofenac and ibuprofen had been well tolerated by the patient in former years."

Now, do you have a basis to disagree with this reporting physician's interpretation that Vioxx caused the heart attack?

A. Again, I'm not -- I mean, the physician is entitled to his opinion. What I would say, what we know now is that -- and there are two findings really which were not necessarily apparent in April of 2004. We know that basically all NSAIDs, selective, nonselective NSAIDs, are recognized as drugs which potentially can increase the risk of myocardial infarctions, and that would include diclofenac and ibuprofen.

I would also point out that the patient has been on therapy for a very short period

ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order

453

of time, a matter of several weeks. In the APPROVe trial, I mean, we did not see any separation of an increased risk for 18 months. And then again, even if there's an increased risk, that doesn't mean causality between use of a specific drug and the AE itself.

So, I'm also looking at the patient situation. I see this is a Type II diabetes mellitus, the patient has hypertension, the patient has hypercholesterolemia. I mean, all this information has been taken into account in looking at those reports.

Q. And it has been taken into account by the treating doctor as well, and he knew his patient and concluded that Vioxx was the cause of the event; is that right? Yes or no?

TB 45318 453:18-453:22

THE WITNESS: It is correct that there is a statement by the reporting physician that he felt that the angina, the posterior MI, coronary single vessel disease was "related to therapy with rofecoxib." That is correct.

Δ: 701, 702, 602 No foundation, calls for improper opinion testimony

Π: Considering witness' Background as well as work w/in company, this is well within witness' knowledge

TB 45424 454:24-455:4

So, what I'm saying, Doctor, is that comparing Vioxx to an active comparator that has its

ESQUIRE DEPOSITION SERVICES
Confidential - Subject to Protective Order

455

own cardiovascular risks does not tell you whether Vioxx is safe from a cardiovascular standpoint. It only tells you that it's not worse than diclofenac if the results are similar.

TB 45506 455:6-455:9

THE WITNESS: Well, that statement is correct, that if you make a comparator study against diclofenac and the findings are no different, then

bold complete

you can only speak in comparison to diclofenac.

TB 45511 455:11-455:21

Q. And in contrast to that, the study against naproxen showed that Vioxx had a five times greater rate of myocardial infarction than naproxen; correct?

A. Well, you refer to the findings from the VIGOR trial where there was a difference between therapy in Vioxx and naproxen. And naproxen, we believe, has the potential to be beneficial, aspirin-like properties with regard to the development or the protection of these cardiovascular thromboembolic events.

TB 46005 460:5-460:16

Q. Doctor, Exhibit 55 is an "Addendum 3 Rofecoxib Tablets Cumulative summary tabulations for serious and non-serious spontaneous reports." What would this have been attached to, PSUR, or some type of safety update?

A. (Witness reviewing document.)

I cannot tell you specifically what this document was attached to, but these would be addendums typically we would add to periodic safety update reports summarizing the information basically and breaking it down into serious and nonserious according to body system.

Δ: Same objections As Above regarding adverse event reports.

π: Same As Above re: AER's - goes to notice; shows what Merck did in terms of processing this information

TB 46024 460:24-461:5

Q. If you could take a look at the page that has 2082 at the bottom, the last four digits of

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order

the Bates Number.

A. Yes.

Q. You will see that as of January 31st, 2000, there were 13 myocardial infarctions listed, and 12 were serious. Do you see that?

→ Δ: Same objections. Counsel just reading from the document and only asks witness, "do you see that?" The document and this designation should Be excluded.

TB 46325 463:25-464:21

Q. In the stack here, if you could look

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order

for the adverse event summary from June 2001 to November 2001. It is in your stack of documents. That's Exhibit 31. If you could look at page 16 of the document, which is 30024 on the Bates page. Do you see that?

A. I see that.

Q. Do you see under myocardial infarction reports this period, there are 58 serious reports?

A. I see that.

Q. And that's far more than seven under your rule of seven should have been considered for AERT review at that time; correct?

π: Same As Above - goes to Notice

→ see next page

Δ: Same objections as above regarding adverse event reports. Plaintiff's counsel seeks to show a total # of serious myocardial infarctions (in this designation, 58), and leave the jury with the impression that Vioxx caused all of these serious myocardial infarctions. This is irrelevant, prejudicial, based on hearsay, and inherently unreliable.

bold complete

A. The rule of seven indicated it should have been considered for AERT review.
Q. All the way over in the cumulative reports, you see "143"?
A. Yes, I see that.
Q. So, that would have been the total since marketing began?
A. That is correct.

TB 46506 465:6-465:19

Q. Does that have the 12/3/03 review? Is that what you're looking at? That's Exhibit 57.
A. Yes.
Q. Again, it's excerpted. If you'll look at Page 7 of the document which has last Bates digits 7717.
A. Yes.
Q. You see under myocardial infarction, there were 81 reports and 1 positive rechallenge during the reporting period?
A. I see that.
Q. And the cumulative report total was 473. Do you see that?
A. I see that.

π: Same as above - the examiner is establishing that a certain process should have been undertaken (AERT review) upon Merck's receipt of notice of 58 MI's potentially associated with Vioxx use.

Total Length - 01:19:32

Δ: Same objections. The document and testimony should be excluded.

π: Same as above; same as introductory response to Δ's objections.