**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JUL 14  AM 10: 25

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to: | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
| | * | |
| ALL CASES | * | CASE NO. 06-0485 |

---

### PLAINTIFFS' STEERING COMMITTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JEROME L. AVORN, M.D.

---

#### (DEFENDANT'S EXPERT CHALLENGE NO. 2)

The Plaintiff's Steering Committee (PSC) files this supplement to its pleading entitled "Plaintiff's Opposition to Merck's Motion to Exclude the Testimony of Jerry Avorn, M.D." filed on June 26, 2006. The purpose of this supplement is to provide the Court with the transcript of Dr. Avorn's actual proposed trial testimony as obtained by the PSC in his Trial Preservation Deposition (hereinafter referred to as "Avorn Tr. Pres. Dep."). This trial preservation deposition was conducted by the PSC on June 29 and June 30, 2006. [Avorn Tr. Pres. Dep. attached as Exhibit 1 and Exhibit 2]. The PSC contends that the proposed trial testimony as actually elicited from Dr. Avorn, and not as mischaracterized by Merck in its

____ Fee_____
____ Process_____
_X_ Dktd_____
____ CtRmDep_____
____ Doc. No_____

opening motion, is fully admissible under the rules announced by the Supreme Court in Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993).[1]

As a preliminary matter, it is important to recognize that Dr. Avorn is a unique witness. He is both a "fact witness" who worked directly with Merck on several Vioxx studies between 2001 and 2004 and an "expert witness" who was first retained by the PSC in May 2005 to render opinions within his areas of expertise. Dr. Avorn's "fact" testimony starts at page 108 of his trial preservation deposition ("I'm going to ask you some questions about your factual involvement with Merck and your actual work in studying these drugs…") and continues through page 256. ("Let's talk a little bit about your expert testimony….").[2] This factual testimony, which recounts Dr. Avorn's first-hand involvement with Merck and Vioxx, is not "expert testimony" and therefore does at all not implicate Daubert. See, e.g., In Re Diet Drug Product Liability Litig., 2001 WL 454586 *19, fn. 22.( Dr. Rich is both a fact witness and an expert witness in this litigation. To the extent that Dr. Rich testifies as to regulatory matters and occurrences of which he has firsthand, personal knowledge, such as his participation in FDA advisory committee hearings, the court's [Daubert] ruling concerning opinions on regulatory matters is inapplicable.").

The only portion of Dr. Avorn's testimony that implicates Daubert is his expert testimony, which begins at page 256 of his trial deposition. Concerning the "expert opinions" actually offered, Merck appears to make three challenges. *First*, it primarily

---

[1] Merck's motion and supporting brief based mainly upon Dr. Avorn's *curriculum vitae* and his Expert Report. Merck's motion was drafted before the conclusion of Dr. Avorn's Discovery Deposition testimony of June 15-16, 2006 and certainly before his trial testimony was obtained. Because juries will ultimately hear at trial Dr. Avorn's trial preservation testimony, the PSC respectfully requests that the focus of this challenge should be on Dr. Avorn's testimony of June 29-30, 2006

[2] Dr Avorn's Trial Preservation Testimony was consciously divided into three discrete parts. The first portion, Pages 30-108, recount Dr. Avorn's extensive experience and expertise and Merck's vior dire of him. The second portion, pages 108 through 256, recounts his personal experience and factual testimony concerning Merck and Vioxx and his own observational studies on Naproxen and Vioxx. The third portion, pages 256 through 453, recounts his expert opinions.

argues that Dr. Avorn is not qualified to render some of the opinions that he has offered, suggesting that he can only testify to the interpretation of "observational studies concerning the cardiovascular risks of Vioxx."  Tr.  Pres. Dep. at 95.  (Objection of Mr. Beck). Specifically, Merck argues that he is not qualified to testify that the "methods by which Merck managed (and communicated) the issues of Vioxx risk" throughout the time that Vioxx was developed and marketed was unreasonable and violated the standard of due care. Id at 95-97.  *Second*, Merck claims that even if Dr Avorn is qualified, he has employed "no scientific methodology," and that his opinions amount to nothing more than his personal, *ex post facto* opinion as to Merck's motive, intent and "state of mind" and a substitute for "lawyer arguments."  Id.

As set forth in the PSC's opposition, and as set forth below, Merck's primary argument about Dr. Avorn's expertise is based on a flawed and narrow reading of Dr. Avorn's extensive experience and writings as testified to in his preservation deposition. Specifically, Dr. Avorn is fully qualified—and uniquely so—to testify to the topics that he has been proffered in.   These qualifications include Dr. Avorn's extensive professional research and writings in the areas of  phamacoepidemiology, the factors which drive prescribing habits of physicians, the risks and benefits of NSAIDS, the risks and benefits of COX-2 inhibitors and the risks and benefits of Vioxx., and the standard of care for investigating and managing drug risks  See generally, Avorn Tr. Pres. Dep. at 31-69; 311-319; See also, Memorandum in Support of PSC Opposition to Merck's Motion to Exclude Testimony of Jerry Avorn, at 4-18.

Merck's second and third arguments in opposition to Dr. Avorn testimony must also fail. Specifically, Merck seriously misstates the methodology employed by Dr. Avorn in

reaching his conclusions.  The expert opinions expressed by Dr. Avorn in his specific areas of expertise beginning on page 256 were informed not by hindsight, but rather by his personal factual knowledge generated long before his first consultation with the PSC regarding Vioxx litigation, and were supplemented by the very kinds of documents and materials typically relied upon by experts in the fields of epidemiology, drug safety and risk communication.  See Avorn Tr. Pres. Dep. at 256-274 (for a summary of documents relied on); see also Id. at 846-851 (same). See also Smith v. Wyeth, 278 F. Supp. 2d 684, 701-702 (E.D. N.C. 2003) ("Defendant's criticism of [plaintiff's expert] curious. [He] has reviewed the FDA Advisory Committee Hearings for Redux as well as the majority of the medical literature in forming his opinion.  ***The Court takes judicial notice that this process is not unusual, but rather how experts go about developing an opinion within their discipline.***") (Emphasis added)  These options do not go to Defendant's "motive," "intent" or "state of mind" but to the issue of "reasonable care."  This is not a substitute for lawyer argument but an essential element of Plaintiff's claims.

## ARGUMENT

### I.   <u>MERCK MISSTATES DR. AVORN'S FIELD OF EXPERTISE</u>

In a three-step process, Merck attempts to narrow Dr. Avorn's expertise.  Initially, it tries to generally limit his field of Pharmacoepidemiology to simply the conduct and interpretation of "observational studies."  Having done so, Merck then argues that this field (as narrowly defined by Merck) does not include the evaluation of the totality of the scientific evidence surrounding the risks and benefits of any drug, including Vioxx, or to the evaluation of the accuracy and completeness of scientific and medical evidence about those

benefits and risks.  Finally, it attempts to limit Dr. Avorn's expertise to only the area of Pharmacoepidemiology.

None of these "limitations" on Dr. Avorn's qualifications is fair or accurate.

**A.** **Merck Misstates the Scope of Dr. Avorn's Expertise in Pharmacoepidemiology, including the Pharmacoepidemiology of Vioxx**

In its first attempt to narrow Dr. Avorn's expertise, Merck misstates the scope of Pharmacoepidemiology.  According to Merck, this field of study is limited to the conduct and interpretation of "observational studies."  Avorn Tr. Pres. Dep. at  94.  (Comments of Mr. Beck)   By implication, Merck does not agree that the discipline includes: 1) the design of studies to assess drug risks and benefits; 2) the evaluation of all medical and scientific evidence concerning risks and benefits; and 3) the fair and accurate communication of risks and benefits to medical providers and to consumers.

Merck's cramped view of Pharmacoepidemiology is way off the mark.   The professional organization for phamacoepidemilogist is called the "International Society of Pharmacoepidemiology" or ISPE.

According to ISPE's website, phamacoepidemiology is <u>not</u> confined to the conduct of observational studies as narrowly defined by Merck.  Rather, the field involves the utilization of all evidence, including clinical trials, observational studies, pharmacology studies and other evidence to accurately define and communicate the benefits and the risks of drugs: According to the ISPE website, the field of Phamacoepidemiology is defined as:

> **Pharmacoepidemiology** may be defined as the study of the *utilization* and *effects* of drugs in large numbers of people. To accomplish this study, Pharmacoepidemiology borrows from both pharmacology and epidemiology. Thus, Pharmacoepidemiology can be called a bridge science spanning both pharmacology and epidemiology. **Pharmacology** is the study of the effect of drugs and clinical

pharmacology is the study of effect of drugs in humans. ***Part of the task of clinical pharmacology is to provide a risk benefit assessment for the effect of drugs in patients. Doing the studies needed to provide an estimate of the probability of beneficial effects in populations, or the probability of adverse effects in populations and other parameters relating to drug use may benefit from using epidemiological methodology.*** Pharmacoepidemiology then can also be defined as the application of epidemiological methods to pharmacological issues.

***Epidemiology can be defined as the study of the distribution and determinants of diseases in populations***. Epidemiological studies can be divided into two main types: 1.**Descriptive epidemiology** describes disease and/or exposure and may consist of calculating rates, e.g., incidence and prevalence. Such descriptive studies do not use control groups and can only generate hypotheses, not test them. Studies of drug utilization would generally fall under descriptive studies. ***2.Analytic epidemiology includes two types of studies: observational studies, such as case-control and cohort studies, and experimental studies which would include clinical trials such as randomized clinical trials***. The analytic studies compare an exposed group with a control group and are usually designed as hypothesis testing studies.

See, www.phamacoepi.org.aboutpe.com

As a former president of ISPE and as a current Fellow to the organization, Dr. Avorn is in the best position to know and understand the boundaries of the field of study. He testified that:

[Pharmacoepidemiology] is the study of the beneficial and adverse effects of drugs as seen in the real world as typical doctors and typical patients use those medications, both the good effects and the bad effects.

Avorn Tr. Pres. Dep. at p. 33, l. 3-8.

In his description of the Pharmacoepidemiology Division of Brigham and Women's Hospital, which is one of the main Harvard teaching hospitals, he explained:

6

> [O]ur main agenda is the study of patterns of medication use, side effects caused by drugs, good effects caused by drugs, the cost effectiveness of drugs, the impact of policy such as reimbursement and other sorts of policy on how doctors prescribe drugs, how patients use drugs, and, finally, the way that physicians make prescribing decisions and how those decisions can be made better.

Id. at 32, lines 10-20. Dr. Avorn further explained:

> One of the missions of our division is to help advise the hospital about what medications should be used at the hospital and also to teach the interns and residents and medical students and physicians who are practicing at the hospital about the best way to use the drugs that are on our list of drugs or the formulary.

Id. at 37, lines 9-17; see also Id. at 36, line 18 to p. 37, line 3; see also, Memorandum in Support of PSC Opposition to Merck's Motion to Exclude Testimony of Jerry Avorn at 4-13.

Clearly, the study of Pharmacoepidemiology deals with all scientific evidence of drug risks and benefits, whether they come from pharmacology, observational studies, clinical trials or other sources. It also includes synthesizing and communicating those benefits and risks for the medical community in a fashion that would allow the medical community to act upon that evidence. The field is simply not limited to interpretation of "observational studies" as contended by Merck.

**B.**     **Merck Misstates Dr. Avorn's Expertise in the Pharmacoepidemiology of Vioxx**

Dr. Avorn's experience is not limited to phamacoepidemiology generally. Rather, his expertise extends to phamacoepidemiologic issues related directly to NSAIDS, Cox-2 drugs and, specifically Vioxx. Unlike most of Merck's experts, Dr. Avorn's expertise is derived from his non-litigation experience with Merck and with this class of drugs. Thus, Dr. Avorn is exceptionally well-qualified to testify regarding the risks of these drugs, the benefits of

these drugs, and, more specifically, the scientific accuracy of the scientific and medical information disseminated by Merck pertaining to Vioxx. These qualifications have been recognized in cases where, unlike here, Dr. Avorn has personal knowledge and experience with the drug at issue. See, In Re Diet Drugs Product Liability Litig., WL 8769000 (E.D.Pa) (Dr. Avorn is *"fully qualified to opine as to the fact and science regarding the risks and benefits of the diet drugs in question..."* and is further *"qualified to render an opinion as to the label's completeness, accuracy--and it follows from that--the extent to which inaccuracies or omissions could either deprive or mislead a reader of what the risks and benefits of the diet drugs at issue are or were at the time the labeling was published "*)[3]

As set forth in the PSC's original brief in opposition to Merck's motion to Exclude Dr. Avorn's testimony, Dr. Avorn is widely published in the specific areas of NSAIDs, Cox-2s and Vioxx. Avorn Tr. Pres. Dep. at 50, line 12 to page 51 line 6. Dr. Avorn has been studying the NSAIDS since before 1990. Id. at 43, lines 13-17. His original publications include the risks and benefits of these drugs. Id. at 51-55 (identifying fourteen peer-reviewed publications regarding NSAIDs, Cox-2s and Vioxx.) To support his research, he has received grants from pharmaceutical companies-- including funding from Merck for three of his peer-reviewed publications regarding Vioxx, and Pfizer concerning Celebrex. See generally Id. at 43-44; and 56-58. In addition, he has received funding from the National Institutes of Health.

---

[3] In In Re Diet Drug Product Liability Litigation, Judge Bechtle affirmed the decision he made with respect to Dr. Avorn and re-emphasized this holding as it related to other epidemiologists in addition to Dr. Avorn. In referring to his holding with regard to Dr. Avorn, Judge Bechtle held that "The court concludes that Drs. Barst and Rich are eminently qualified to "opine on the medical facts and science" regarding the risks of the diet drugs in question as such testimony relates to the risks of PH and PPH. (Pretrial Order No. 1332 [referring to Dr. Avorn] at 27.) Thus, Drs. Barst and Rich may opine as to the labels' accuracy *and the extent to which an inaccuracy or omission could either deprive or mislead a reader as to the risks of these diet drugs at the time the labeling was published"* In Re Diet Drug Product Liability Litig. 2001 WL 454586 (E.D.Pa.) (emphasis supplied)

Dr. Avorn further explained why he is an expert on the issue of Vioxx's risks throughout the development and marketing of the drug:

> Because, as I said before, pharmacoepidemiology and also the research about medication risks and benefits beyond the epidemiology is about looking at **all aspects** of the drug's properties, the pharmacology, the clinical effects in the early trials, the randomized trials that occur on a larger scale, and the post-marketing use of that drug.  And all of that is a part of what I teach at Harvard and write papers about.

Id. at 108, lines 2-13 (emphasis added); see also Id. at 128, line 3 to page 129, line 19 (explaining why, as a pharmacoepidemiologist, the finding about the cardiovascular risk posed by Vioxx, at the time it was made public in 2000, was of significant concern to Dr. Avorn professionally); see also, Memorandum in Support of PSC Opposition to Merck's Motion to Exclude Testimony of Jerry Avorn at 23-24.

Dr. Avorn is clearly qualified to testify to pharmacoepidemiology generally and phamacoepidemiology of Cox-2's and Vioxx specifically.  This includes "facts and science regarding" the benefits of Vioxx, the risks of Vioxx , the risk-benefit ratio of Vioxx.  In Re Diet Drugs, at  * 11.   It also includes his opinions on the accuracy (or inaccuracy) of Merck's *description* of the risks and benefits of Vioxx  and "the extent to which inaccuracies or omissions could either deprive or mislead a reader of what the risks and benefits" of Vioxx.  In Re Diet Drugs, at *11.

## C.   Pharmacology is Not Dr. Avorn's Only Area of Expertise

It is true that Dr. Avorn is a widely published Phamacoepidemilogist and former President of the International Society of Pharmacoepidemiology as Merck must concede.  However, this is not his only area of expertise.  In fact, Dr. Avorn is well-published and well-credentialed in other areas which are critical to his opinions.  As outlined below, these areas

including the scientific and non- scientific factors which motivate physician prescribing practices, and the standard of care for the investigation of pharmaceutical risks and benefits

**1.     Dr. Avorn's Expertise in Factors Which Motivate Physician Prescribing Practices**

A bedrock of Dr. Avorn's career is his research evaluating the safe and effective use of drugs in our healthcare system. This includes his systematic study and publication about the effects of both scientific and medical information, as well as the commercial information provided to physicians by drug manufacturers.

A review of Dr. Avorn's extensive *curriculum vitae* demonstrates that he has written 17 articles in the peer-reviewed literature on this very topic—*including specific studies relating what influences physicians to prescribe Vioxx.* See Memorandum in Support of PSC Opposition to Merck's Motion to Exclude Testimony of Jerry Avorn at 8-9 (and articles cited therein). In his trial testimony, he further explained his qualifications:

> Q:     Would you describe your particular interest in that area?
>
> A.     Sure. The first paper I published in that area was actually back in 1982 in which I was interested in how doctors make decisions about what drugs to use. And I was interested in whether-- the balance between the information that we as prescribers get from the medical literature versus from commercial sources like advertising or sales reps. And so we did a study of primary care docs in the Boston area, and we asked them where they got their information from, and then we gave them little quizzes about the drugs that they commonly used. And although they thought that they got most of their information from just reading the medical journals, in fact, what our quiz showed was that a lot of what they believed actually came from what you could only find in ads or from sales reps.
>
> Q.     What is academic detailing, Doctor?

10

A.    Academic dealing is an approach that I pretty much invented in the late 1970s and early 1980s. And it was based on the following idea:   That we know that the drug manufacturers are awfully good communicators. They send people into our offices. They have very well-presented spiels that they give us. They interact with us in a very friendly way. They've got great graphical material. They will have dinner meetings in good restaurants and show us their presentations. And that's really very effective communication, but it's just to sell product.    That's the only reason that they do that communication.   By contrast, faculty in medical schools tend to have a pretty good handle on the evidence and don't usually have a particular axe to grind about selling a product, but we tend to be lousy communicators. We give dull lectures. We don't really have very good graphical material. We stay in our ivory tower and we don't go out to doctor's offices.

And what I began to wonder about in the late '70s and early '80s is whether we could kind of marry that very effective communication approach that the pharmaceutical industry has with the more balanced evidence-based approach that medical school or academic faculty have. And because the approach of the sales reps in the drug industry is called detailing, I call that academic detailing.   And our first study was funded by the federal government in 1979 and ultimately was published in the New England Journal in 1983 in which we showed that by sending pharmacists that we trained to be the so-called unsales reps out to doctors' offices to teach them about how to prescribe better in this interactive and engaging manner, we could actually influence their prescribing for the better in a way that was both effective and actually paid for itself.

Avorn Tr. Pres. Dep. at 37-41. In this regard, Dr. Avorn further explained:

Q.    Doctor, you testified that you're an expert in the factors that go into physician prescribing practices. What are those factors?

A.    We've done a number of studies about what shapes physician prescribing decisions, and I mentioned the first one I published in 1982. And in doing that work, we tried to define what predicts or drives what a doctor prescribes. And a great deal of it is the doctor's perception of benefit versus risk which he or she learns from a variety of sources.

Q.   What are the sources in which a pharmaceutical company communicates with doctors about their products?

A.     Well, the legal governing document that is probably central because it determines what the company is allowed to say in all of its promotional material and all of its sales presentations is what FDA calls the labeling or sometimes it's called the package insert.  But it's a lengthy document, usually in small print, that describes everything about a drug, what it's used for, what its benefits are, what its risks are, what its dose is and so forth.

Q.   Are there any other methods by which a pharmaceutical company communicates with doctors that you're familiar with?

A.   Sure.  They will also, of course, send out sales reps to doctors' offices to talk to us about the attributes of their drug, and, of course, they will take out ads in medical Journals.  They will also take out ads or put commercials on TV for patients.  And they will sponsor continuing education programs for physicians.

Q.   What about publication of medical articles?

A.     Very often companies are heavily involved, as we've learned, in the publication of articles in the medical literature.

Id. at 380, line 10 to page 382, line 10.

Not only has Dr. Avorn *generally* studied the factors that motivate physician prescribing practices, but he has studied them *specifically* with respect to Vioxx. For example, Dr. Avorn has published an epidemiologic study entitled *"Determinants of Selective Cyclooxygenase-2 Inhibitor Prescribing: Are Patient or Physician Characteristics More Important?"* American Journal of Medicine 2003 Vol. 115, 715 – 720.  In. that article, Dr. Avorn applied a systematic scientific approach to learn about the prescribing patterns and motivations of Physicians when prescribing Vioxx. Avorn Tr. Pres. Dep. at 256-259.  In this regard, Dr. Avorn further testified that:

Q.   Do you have any experience, Doctor, in the training of detailers on how to present information in a medically and scientifically accurate way to doctors so that they can make accurate prescribing decisions?

A.   Yes.  I've been working in that area since the early 1980s, and there's a number of publications in my CV in the New England Journal of Medicine on two occasions and an editorial in JAMA and a long list, but since the hour is late, I won't get into.

But suffice it to say that even continuing to the present, we are engaged in a large program in which we train nurses and pharmacists to go out and teach doctors about these issues.  *In fact, as luck would have it, one of the topics we teach them about is how to present the risk and benefit information about cardiovascular outcomes of coxibs such as Vioxx and Celebrex, as well as other nonsteroidals.*

*We have put together training materials about this.  We have reviewed the literature.  We have a fairly systematic approach to trying to get a fair cut on all the available information and present it as even-handedly as we can to doctors.  And  in the program in Pennsylvania, we will bring the nurses and pharmacists to Boston for several days, we'll provide them with extensive materials summarizing the world literature talking about the bad news and the good news.  We also teach them how to communicate, how to get their point across, how to engage with doctors.*

I've written a paper in JAMA called "Principles of Academic Detailing" in which we set forth ways of presenting information to doctors in a fair manner so as to guide their prescribing toward the most evidence-based approach.

I think it's probably fair to say that I'm one of the world's experts of how that is done outside of drug company land, but done in a public interest and evidence-based manner.

We go to great lengths to make sure that the nurses and pharmacists that we have trained over the years, and there now are 25 or such years, are presented with all the aspects of the problem at hand.  And we encourage them to, as I said in the paper in JAMA in the1990s, to discuss both sides of the question and to make sure that physicians are comfortable with the ambiguity of evidence when there is some.

13

Id. at 426-429 (emphasis added).

Clearly, Dr. Avorn has the requisite expertise to opine as to whether Merck's communications with physicians generally was reasonable, prudent and accurate based on information known to Merck and the effect of that communication on prescribing doctors.

### 2. Dr. Avorn's Expertise in the Standard of Care for Investigation of Drug Risk

In its opening brief, Merck makes the fundamental mistake of equating testimony concerning "intent" ("corporate motive" testimony) with testimony concerning reasonable care ("reasonable care" testimony). While testimony concerning the former is not permissible, testimony concerning the latter is not only permissible but is most often required as an element of a negligence cause of action.

In both his discovery and his trial preservation deposition, Dr. Avorn made clear that he does not profess to be an expert in discerning corporate motive and intent. Nevertheless, he also made clear that he does have expertise in evaluating the reasonableness of scientists (including company scientists at Merck) in evaluating the risks and benefits of a drug like Vioxx. This expertise was discussed in the PSC opening brief and will not be repeated here. See generally, Memorandum in Support of PSC Opposition to Merck's Motion to Exclude Testimony of Jerry Avorn. at 22-24. Nor will the PSC repeat that Dr. Avorn has specific experience with Merck and its conduct in investigating Vioxx's risks. See, Avorn Tr. Pres Dep. at 96-256.

However, it is important to emphasize that Dr. Avorn does have very specific experience in evaluating and teaching such conduct as an academician, as a consultant to

government regulatory agencies like the FDA[4] and as a consultant to the pharmaceutical industry. With respect to the latter, Dr. Avorn has actually taught reasonable standards of care to the pharmaceutical industry executives:

> Q At Tufts Medical School, you teach pharmaceutical executives on how to construct and investigate their clinical trial program?
>
> A. Right. They have a course there for pharmaceutical executives that I lecture in each year, and the topic of my lecture is how to think about risks and benefits throughout the so-called life cycle of the drug.
>
> Q. Would you tell me a little bit about that, Doctor.
>
> A. Sure. There's a group called the Center for the Study of Drug Development at Tufts University Medical School, which I have a longstanding and collegial relationship with. Even though they are usually thought of as kind of a pro-industry group, we get along fine. And every year they ask me to come and give a talk to their attendees in this annual course on drug development. And what they've asked me to talk about each year for the last many years is how to think about risks and benefits as a drug is in Phase I, Phase II, which are the earliest clinical trials for safety, and then Phase III, which are the big clinical trials, and also Phase IV.
>
> Last year they started to have me spend a whole afternoon with their trainees to help them work through issues about drug risk in the course of drug evaluation. These are usually mid to senior level managers from a variety of pharmaceutical companies, as well as students. But the company people are usually folks who are responsible for the drug development process within their companies.

Id. at 317-319; See also, Id. at 314-16.

---

[4] Dr, Avorn was a consultant to the DFDA evaluating the evaluation of the risks and benefits of Lotronex . See Avorn Tr. Pres. Dep. at 58-59. In addition, he has testified to these issues before both Houses of the United States Congress and was an Advisor to the President-Elect Clinton on Drug Policy. Id. at 59-61.

Indeed, Dr. Avorn's expertise in evaluating the standard of care for investigating benefits and risks is subsumed in his expertise as a pharmacoepidemiologist. Dr. Avorn testified that:

> Well, the reason that I differ from the line of questioning that Mr. Beck was just using was that pharmacoepidemiology and the study of drug benefits and risks is not just about studies of drugs once they are on the market. It's about the relationship of risks and benefits from the moment a drug starts to be studied, it's about the pharmacology that leads up to what one would expect to see as a benefit or as a risk and the way that plays itself out throughout the course of a drug's development. I give lectures on the epidemiology of a drug's side effects during drug development from Phase I, Phase II, Phase III. These are the earliest stages of tests in humans. All of that is about the study of the risks and benefits of drugs. It's not just about reading epidemiologic studies.

Id. at 98, line 16 to page 99, line 18

Clearly, Dr. Avorn is qualified to testify to the reasonableness of Merck's investigation of the Vioxx risk.

## II.    DR. AVORN EMPLOYED AN APPROPRIATE SCIENTIFIC METHODOLOGY TO REACH HIS OPINIONS

In addition to challenging Dr. Avorn's qualifications, Merck challenges the methodology he employed in reaching his opinions. In concluding its voir dire of Dr. Avorn , Merck counsel made the following generic objection:

> We object to any testimony on what the report calls the methods by which Merck evaluated and managed the issues of Vioxx's risks throughout the development and marketing of Vioxx. We believe that Dr. Avorn is not qualified to opine on those subjects. *There's no scientific methodology that's been applied, no analysis that can be tested.*

Id. at 94-95 (emphasis added). This is simply untrue and inaccurate as it applies to the opinions of Dr. Avorn.

16

As a preliminary matter, it must be reemphasized that most, if not all of Dr. Avorn's expert opinions, were developed *long* before he was retained as an expert by the PSC in May of 2005.  Before that time, he was actively involved in the study of NSAIDS, Cox-2 drugs and Vioxx.  Long before there was Vioxx litigation, he concluded--and published in the peer reviewed literature--that Vioxx carried unacceptable risks, that the risks exceeded the benefits, that Merck did not reasonably study those risks and that Merck did not accurately report those risks to physicians and the medical community.  See Memorandum in Support of PSC Opposition to Merck's Motion to Exclude Testimony of Jerry Avorn at 4-15; see also, Avorn Tr. Pres. Dep. at 108-266.  His methodology and thought process have been laid out for Merck in his numerous peer-reviewed articles, his book and his other writings and speeches and are the same methodologies that he has used in his professional life.  Finally, Dr. Avorn is not being paid for his participation as an expert in this case.  The fact that his opinions were formed, in large part, before his participation in this litigation, and that his methodology has been clearly set forth weighs heavily in favor of their admissibility.  As the Ninth Circuit held upon remand of the Daubert case itself:

> One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.

Daubert v. Merrill Dow Pharmaceuticals, Inc, 43 F3d 1311 (9th Cir. 1995).

Even if Dr. Avorn's methodology were not so transparent from his own writings, they made clear by his report and in his testimony.  In his trial testimony he described precisely

what materials he reviewed, what materials he did not review and why he considered the materials that he considered. See, Avorn Tr. Pres. Dep. at 256-274 (discussing what he reviewed and did not review); 460-470 (discussing documents he was provided that relate to Merck defenses); 848-858 (same).  Among the items reviewed were FDA medical officer reviews, published literature, clinical study reports by Merck, Advisory Committee meeting transcripts, data reports and summaries generated by Merck, depositions and other Merck documents.  Id.  Under those circumstances, it is hard to give any credit Merck's assertion that Dr. Avorn did not identify or employ an appropriate methodology in support of his opinions.  Indeed, in a similar circumstance, the Court in the Diet Drug litigation rejected such a challenge stating that:

> Defendant's criticism of [Plaintiff's expert's] preparation is curious.  [Plaintiff's generic liability and causation expert] has reviewed the FDA Advisory Committee Hearings for Redux as well as the majority of the medical literature in forming his opinion.  ***The Court takes judicial notice that this process is not unusual, but rather how experts go about developing an opinion within their discipline.***  Given [his] educational background, as well as his experience as a clinical trial investigator and consultant, his qualifications in this area are beyond question.

Smith, 278 F. Supp 701 (emphasis added).

Merck's challenge to Dr. Avorn's methodology must fail.

### III.   DR. AVORN DID NOT TESTIFY TO MERCK'S STATE OF MIND AND CORPORATE INTENT IN EXPRESSING HIS OPINIONS ABOUT THE REASONABLENESS OF MERCK'S CONDUCT

In addition to arguing that Dr. Avorn's opinions cannot be "tested" and that he did not apply an appropriate "methodology," Merck argues that the testimony about the reasonableness of Merck's scientific conduct is improper.  In challenging Dr. Avorn, Merck's counsel stated that:

> The testimony goes to Merck's state of mind and intent, which is an improper subject for expert testimony in any case, and Judge Fallon has already ruled in this case that it's inappropriate subject matter for expert testimony in the Vioxx litigation.

Avorn Tr. Pres. Dep. at 95.

As set forth above, Dr Avorn is eminently qualified to address the reasonableness of Merck's conduct as judged by the objective scientific standards and principles that he is intimately familiar with as an expert in drug safety. In assessing Merck's' conduct was objectively unreasonable, he did not express any views as to Merck's motivation. As such, his opinions are clearly within the bounds of this Courts prohibition against such testimony.

## IV.     DR. AVORN DID NOT TESTIFY TO "LAWYER ARGUMENTS"

In its final bid to strip Dr. Avorn of his expert opinions, Merck has interposed that the PSC's offer of Dr. Avorn's testimony is nothing more than an attempt to "supplant the role of counsel and making argument." Id. at 96. (Objection of Mr. Beck). Other than its argument saying that this is so, there is no evidence of this. As such, this argument can be easily dispatched.

It is self-evident that a jury judging Merck's conduct must hear from experts—on both sides—who can testify whether that conduct met the standard of reasonable and prudent care. Without such testimony, the jury is left either rudderless as how to measure Merck's conduct or, most unfairly, in a position of having no choice but to accept the self-serving testimony of Merck corporate witnesses who swear that their own conduct was fair, truthful, accurate and reasonable. There is no expert more qualified than Dr. Avorn whose experience in general—and whose experience with Merck and Vioxx—qualify him to testify whether Merck met the standard of care in investigating the Vioxx risk

19

## V.   CONCLUSION

In considering Dr. Avorn's <u>Daubert</u> qualifications, the Court should focus its review on Dr. Avorn's testimony and opinions as presented in his trial preservation deposition, in addition to his qualifications and opinions as presented in his Curriculum Vitae, Expert Report, and previous Discovery Deposition testimony.   He is qualified to testify in this litigation regarding the aforementioned issues by way of his Trial Preservation testimony, in addition to the reasons highlighted in the PSC's original opposition brief.  The PSC therefore requests that this Court deny Merck's motion to exclude the testimony of Dr. Avorn.

Dated:  July 13, 2006                                   Respectfully submitted,

By: *Mark P. Robinson, Jr.*
Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
ROBINSON, CALCAGNIE &
ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California  92660
Telephone:  (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, .
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama  36103-4160
Telephone:  (334) 269-2343
Facsimile: (334) 954-7555

Christopher V. Tisi (on brief)
Jennifer L. Orendi (on brief)
ASHCRAFT and GEREL, LLP
2000 L Street, NW
Suite 400
Washington, DC 20036

Telephone: (202)783-6400
Facsimile:  (202)413-6392

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024
**PLAINTIFF'S LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1371

Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3875
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

*Co-Counsel*

Shelly Sanford
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas 77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Drew Ranier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone: (202) 783-6400
Facsimile: (307) 733-0028

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8, on this 13th day of July, 2006.

*Mark P. Robinson, Jr.*

MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson

FOR PLAINTIFF'S STEERING
COMMITTEE

24