UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\- - -

IN RE: VIOXX LITIGATION : MDL DOCKET NO. 1657

---

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - ATLANTIC COUNTY

\- - -

IN RE: VIOXX LITIGATION : CASE NO. 619

---

CAUSE NO. 05-59499

IN RE: : IN THE DISTRICT COURT
VIOXX LITIGATION : 157TH JUDICIAL DISTRICT
APPLIES TO ALL CASES : HARRIS COUNTY, TEXAS

---

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
CENTRAL CIVIL WEST

VIOXX CASES : JCCP NO. 4247 : ASSIGNED TO HON : VICTORIA CHEYNEY

\- - -

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

\- - -

June 29, 2006

\- - -

Videotaped deposition of JEROME L. AVORN, M.D.

\- - -

GOLKOW LITIGATION TECHNOLOGIES
1600 John F. Kennedy Boulevard
Suite 1210
Philadelphia, Pennsylvania 19103
877.DEPS.USA

3821cc6c-711a-49b8-994f-51a1f40221c0

- - -

Videotape deposition of JEROME L. AVORN, M.D., held at The Sheraton Boston Hotel, 39 Dalton Street, Boston, Massachusetts, 02199, commencing at 1:20 p.m., on the above date, before Linda L. Golkow, a Federally-Approved Registered Diplomate Reporter and Certified Shorthand Reporter.

- - -

GOLKOW LITIGATION TECHNOLOGIES
Four Penn Center
1600 John F. Kennedy Boulevard
Suite 1210
Philadelphia, Pennsylvania 19103
877.DEPS.USA

- - -

APPEARANCES:

ASHCRAFT & GEREL
BY: CHRISTOPHER TISI, ESQUIRE
Suite 400 - 2000 L Street, N.W.
Washington, D.C. 20036
(202) 783-6400
Counsel for Plaintiffs

KLINE & SPECTER, P.C.
BY: THOMAS R. KLINE, ESQUIRE
and
LISA DAGOSTINO, M.D., J.D.
19th Floor - 1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000
Counsel for Plaintiffs

SEEGER WEISS LLP
BY: DAVID R. BUCHANAN, ESQUIRE
and
JEFFREY GRAND, ESQUIRE
Suite 920 - 550 Broad Street
Newark, New Jersey 07102
(973) 639-9100
Counsel for Plaintiffs

THE O'QUINN LAW FIRM
BY: STEPHANIE SHAPIRO, ESQUIRE
2300 Lyric Centre Building
Houston, Texas 77002
(713) 223-1000
Counsel for the Plaintiffs

- - -

APPEARANCES: (CONTINUED)

BARTLIT BECK HERMAN
BY: PHILIP S. BECK, ESQUIRE
and
ANDREW L. GOLDMAN, ESQUIRE
and
ADAM K. MORTARA, ESQUIRE
Courthouse Place
54 West Hubbard Street
Chicago, Illinois 60610
(312) 494-4451
Counsel for Merck and Co., Inc.

STOLL, KEENON, OGDEN PLLC
BY: SETH A. GLADSTEIN, ESQUIRE
2000 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky 40202
(502) 333-6000
(Via Telephone)

DARBY AND GAZAK, P.S.C.
BY: ROBB SHILTS, ESQUIRE
Suite 220
3220 Office Pointe Place
Louisville, Kentucky 40220
(502) 412-5020
Counsel for physicians
(Via Telephone)

- - -

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 6

APPEARANCES: (CONTINUED)

CRUSE, SCOTT, HENDERSON & ALLEN, LLP
BY: VICTORIA A. FILIPPOV, ESQUIRE
7th Floor
2777 Allen Parkway
Houston, Texas 77019-2133
(713) 650-6600
Counsel for Texas physicians
(Via Telephone)

- - -

Page 7

- - -

INDEX

| WITNESS | PAGE NO. |
| --- | --- |
| JEROME L. AVORN, M.D. | |
| By Mr. Tisi | 21, 95 |
| By Mr. Beck | 68 |

- - -

EXHIBITS

| NO. | DESCRIPTION | PAGE NO. |
| --- | --- | --- |
| Avorn-1 | Curriculum Vitae of Jerome Avorn | 34 |
| Avorn-2 | "Iniatiation of Antihypertensive Treatment During Nonsteroidal Anti-inflammatory Drug Therapy" (Avorn, et al) JAMA 9-14-94 Vol. 272, No. 10, 781 - 786 | 51 |
| Avorn-3 | "Patterns of Drug Use in Rheumatoid Arthritis" (Avorn, et al) The Journal of Rheumatology 2000 27:7, 1648 - 1655 | 52 |
| Avorn-4 | E-mail 4-12-00 MRK-ABC0033809 | 52 |
| Avorn-5 | "The Hidden Cost of Nonselective Nonsteroidal Antiinflammatory Drugs in Older Plants" (Avorn, et al) The Journal of Rheumatology 2003 30:4, 792 - 798 | 52 |
| Avorn-6 | "Determinants of Selective Cyclooxygenase-2 Inhibitor Prescribing: Are Patient or Physician Characteristics More Important?" (Avorn, et al) American Journal of Medicine 2003 Vol. 115, 715 - 720 | 52 |
| Avorn-7 | "Relationship Between Selective Cyclooxygenase2 Inhibitors and Acute Myocardial Infarction in Older Adults" (Avorn, et al) Circulation 2004, 2068 - 2073 | 53 |

Page 8

Page 9

3821cc6c-711a-49b8-994f-51a1f40221c0

Avorn-8 "Relationship Between COX-2 Specific Inhibitors and Hypertension" (Avorn, et al) Hypertension 2004, 140 - 145 53

Avorn-9 "Adjusting for Unmeasured Confounders in Pharmacoepidemiologic Claims Data Using External Information" (Avorn, et al) 2005 Epidemiology Vol. 16 No. 1, 17 - 24 53

Avorn-10 "Medicaid Prior Authorization Programs and the Use of Cyclooxygenase Inhibitors" (Avorn, et al) New England Journal of Medicine 2004, 2187 - 2194 53

Avorn-11 Analytic Strategies to Adjust Confounding Using Exposure Propensity Score and Disease" (Avorn, et al) American Journal of Epidemiology 2005:161, 891 - 898 54

Avorn-12 A Medicare database review found that physician preferences increasingly outweigh patient characteristics as determinants of first-time prescriptions for COX-2 inhibitors" (Avorn, et al) Journal of Clinical Epidemiology 58:2005, 98 - 102 54

Page 13

ESQUIRE DEPOSITION SERVICES

Page 14

Avorn-15 "Coxibs, Science, and the Public Trust" (Avorn, et al) Archives of Internal Medicine 2005 Vol. 165, 158 - 160 — 55

Avorn-16 Article, NEJM, "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxin in Patients with Rheumatoid Arthritis," Pages 1520-1528 — 123

Avorn-17 Memo dated 8.28.01, MRK-ACC0018681 - MRK-ACC0018692 — 159

Avorn-18 E-mails, MRK-ABY0020300 — 164

Page 13

Avorn-13 "Cardiovascular Outcomes in New Users of Coxibs and Nonsteroidal Antiinflammatory Drugs" (Avorn, et al) Arthritis & Rheumatism 2006 Vol. 54 No. 5, 1378 - 1389 — 54

Avorn-14 "COX-2 selective non-steroidal anti-inflammatory drugs and cardiovascular disease" (Avorn, et al) Pharmacoepidemiology and Drug Safety 2003 12, 67 - 70 — 55

Page 15

Avorn-19 Letter 11-6-01 MRK-ABC0024417 - MRK-ABC0024525 — 171

Avorn-20 E-mails, MRK-ACT001605 - MRK-ACT0016060 — 187

Avorn-21 Contract between Merck & Co. and Brigham and Women's Hospital, MRK-ACQ0000246 - MRK-ACQ0000263 — 191

Avorn-22 "GI Label Change for Vioxx Public Affairs Plan, dated 3.23.01, MRK-ADJ0020162 - MRK-ADJ0020183 — 193

Avorn-23A-K Study protocols — 200

Avorn-24 E-mails, MRK-ACT0050572 - MRK-ACT0050573 — 202

Avorn-25 Contract dated 209
2.25.03,
MRK-ACQ0000001 -
MRK-ACQ00000032

Avorn-26 Document entitled, 213
"The Relationship
Between Selective
COX-2 Inhibitors
and Acute
Myocardial
Infarction,
MRK-AAD0196670 -
MRK-AAD0196695

Avorn-27 E-mail 4-28-03 221
MRK-ADC0018638 -
MRK-ADC0018639

Avorn-28 ARC 2003 225
Presentation
MRK-AAD0333175 -
MRK-AAD0333207

Avorn-29 E-mail 4-5-04 237
MRK-ACQ0001088 -
MRK-ACQ0001091

Avorn-30 Bulletin 4-21-04 247
MRK-AAR0069284

Avorn-31 Research Management 305
Committee 4-10-96
MRK-ABC0048699 -
MRK-ABC0048706

Avorn-32 Scientific Advisors 309
Meeting Minutes May
3 - May 6, 1998,
MRK-AEI0002734 -
MRK-AEI0002746

Avorn-33 FDA Advisory 342
Committee Briefing
Document 2-8-01 (27
pages)

Avorn-34 Dr. Targum's FDA 352
Medical Reviewer
Report 2-1-02
MRK-ABX0002368 -
MRK-ABX0002404

Avorn-35 Memo 5-1-01 363
MRK-ABY0030000 -
MRK-ABY0030030

Avorn-36 E-mail 4-12-00 375
MRK-ABC0033809

Avorn-37 Vioxx label 1999 384
MRK-LBL0000035 -
MRK-LBL0000038

Avorn-38 Vioxx label 2002 391
MRK-LBL0000063 -
MRK-LBL0000066

Avorn-39 U.S. Long Range 403
Operating Plan
Vioxx, July 2001,
with Chart,
MRK-ABI0008659 and
MRK-ABI0008674

Avorn-40 News Release 407
5-22-01,
MRK-ABI0003228 -
MRK-ABI0003230

- - -

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer
Page Line Page Line
(None)

Request For Production of Documents
Page Line Page Line
(None)

Stipulations
Page Line Page Line
(None)

Questions Marked
Page Line Page Line
(None)

- - -

- - -

THE VIDEOTAPE TECHNICIAN: We are on the record. This is the video operator speaking, Sean Budd.

Today's date is June 29th, 2006, and the time is 20 minutes after 1:00.

We are here at the Sheraton Hotel located in Boston, Massachusetts to take the videotaped deposition of Dr. Jerome Avorn in the matter of Vioxx Products Liability Litigation in the United States District Court Eastern District of Louisiana.

Would counsel please introduce themselves.

MR. TISI: Yes. My name is Chris Tisi. I'm here on behalf of the – I'll be doing the questioning today on behalf of the Plaintiffs' Steering Committee in

the Vioxx MDL.

Also questioning with me on the MDL is Lisa Dagostino and Tom Kline.

I'll also be questioning on behalf the New Jersey litigation, which has noticed this deposition, and with me is Jeff Grand.

And I'll also be questioning on behalf of the California litigation for which this deposition has been cross-noticed.

MR. BECK: Phil Beck on behalf of Merck. With me is Andy Goldman and Adam Mortara.

MS. SHAPIRO: I'm Stephanie Shapiro. I'm here on behalf of The O'Quinn Firm, and this deposition was also cross-noticed for all the Texas cases.

THE COURT REPORTER: Counsel on the phone?

MR. TISI: Please identify yourselves.

MR. GLADSTEIN: Seth Gladstein from the law firm of Stoll, Keenon, Ogden in Louisville, Kentucky.

MR. SHILTS: Rob Shilts from the law firm of Darby & Gazak in Louisville, Kentucky.

THE VIDEOTAPE TECHNICIAN: The court reporter is Linda Golkow. Would you please swear in the witness.

- - -

JEROME L. AVORN, M.D., after having been duly sworn, was examined and testified as follows:

- - -

VOIR DIRE EXAMINATION

- - -

BY MR. TISI:

Q. Good afternoon.

A. Good afternoon.

MR. BECK: Chris?

MR. TISI: Yes.

MR. BECK: I'm sorry, before

you start.

MR. TISI: Sure, go ahead.

MR. BECK: A couple preliminaries.

One is that pursuant to Judge Fallon's instructions, I'll be making objections as I would at trial rather than preserving objections as in a typical discovery deposition.

As I'm sure you know, the judge said that for trial preservation depositions, we should make all of our objections or else they may be waived and none of them are preserved.

So, I apologize, Doctor, but you'll be hearing more objections from me than you typically would in a discovery deposition.

Second, I would ask that since this is a trial preservation deposition that will be used in part in the MDL that when you get

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 24

to the point where you've established the doctor's credentials and tendered him in his claimed areas of expertise, that I be permitted to voir dire on those issues, as I have been permitted to do in the two trials that we've had in front of Judge Fallon.

Then third, sequence and timing, and I just had a question as to how long you anticipated going on direct in the first instance?

MR. TISI: It's hard for me to tell, Phil. It really is. In part, it has to do with the amount of objections.

I mean, on dealing with the objections, I understand that we're preserving them, but I would ask you as a professional courtesy to exercise some restraint in terms of speaking. I think if

Page 25

it's a relevancy objection, relevancy. I will try to do the same thing if it is misleading or whatever as opposed to giving sidebar-type arguments. I assume I should ask you whether that's okay with you just so we can get through this.

MR. BECK: Sure. I mean, there will objections, and since we're going to be dealing with a written record --

MR. TISI: Understood.

MR. BECK: -- I'll have to say more than a word or two, but --

MR. TISI: I'd just ask you to use some discretion in that because --

MR. BECK: Sure.

MR. TISI: -- otherwise, we I'll never get done here.

MR. BECK: Right. I understand.

Page 26

MR. TISI: And it will take a long time. Oftentimes I often find at sidebars it takes a judge to cut us off to stop us, so, if we can do that. On that, it's going to be very difficult for me to figure out how long it would be. It really depends on how we go. I would hope to be done in somewhere around five hours.

MR. BECK: Okay. Then --

MR. TISI: And I think, as well, I let Mr. Goldman know that we have Dr. Avorn -- because I think you requested a later start time, I asked Dr. Avorn, because it is difficult, given the holiday weekend, to stay late tonight. So, I think he's agreed to stay until 7:00. So, if we get done, I'd appreciate it if we just started right into the cross-examination, if possible.

MR. BECK: I'll be prepared

Page 27

to begin cross. Then this may be an issue that we won't have to grapple with, but if you end up doing a redirect-examination –

MR. TISI: Yes.

MR. BECK: – then because this is also going to be used in New Jersey and California and Texas, and I know that in New Jersey and California recrosses are permitted, just for planning purposes, if you are going to be doing a redirect and you've got a time where you want to end this thing, leave roughly equal time for me for recross. Okay?

MR. TISI: Okay.

I don't know about the -- I will try to leave you time for sure. We'll talk about timing issues as we go on.

MR. BECK: Okay.

MR. TISI: Are we done?

MR. BECK: Yes.

MR. GRAND: Actually, if we can get on the record, for New Jersey, in the spirit of keeping this flowing and having as little interruptions as possible, unless Chris has raised an objection that's substantively different in New Jersey, we would like to share in the objections.

MR. BECK: Yes. I'm fine with for all plaintiffs that any objection made by Chris is an objection on behalf of all plaintiffs in all jurisdictions, and if somebody has some peculiar objection they need to make under their state law, they can raise their hand and interrupt.

MR. TISI: And while we're off, I don't know if you want to do this, Phil, or not, I really toyed with this as well, and I ask, quite frankly, your guidance because I can go either way on

this.

Do you think that it would be appropriate to do the objections, to the extent that they call for something more than simply "objection, relevance," to do that off the videotape record and just do it on the stenography so that it helps us later?

MR. BECK: I don't think it helps us any. I mean, it's going to be edited out --

MR. TISI: Okay.

MR. BECK: -- in any event. And I think in the interest of getting it done, I think actually going off the video and then on the video would consume extra time.

MR. TISI: That's fine.

MR. BECK: I see Linda nodding in agreement. She knows more about this than most of us.

MR. TISI: Okay.

The only other thing I would say, and because of the peculiar situation we find ourselves in, and I ask Dr. Avorn as well, to pay particular close attention to pausing for a moment before we move on to the next question. I'll try, I'm sure Mr. Beck will try, we'll all try very hard not to step on each other's words, and I'll try to do that with you, Phil. And if I don't, it is not intentional.

MR. BECK: I understand. And you'll forgive me if you get into a rhythm and I'm sort of getting left behind if I'll ask everybody to slow down once in a while to give me an opportunity to object, if I feel I need to.

MR. TISI: All right.

\- - -

VOIR DIRE EXAMINATION

\- - -

BY MR. TISI:

Q. Good afternoon, Doctor.

A. Good afternoon.

Q. Would you please introduce yourself to the members of the jury.

A. Yes. My name is Jerry Avorn.

Q. And where do you currently live, sir?

A. In Brookline, just outside of Boston, Massachusetts.

Q. And do you hold any academic positions?

A. Yes. I'm a professor of medicine at Harvard Medical School.

Q. And do you hold any other professional positions at Harvard Medical School?

A. Yes. I am the chief of the division of pharmacoepidemiology and pharmacoeconomics at the Brigham and Women's Hospital, which is one of the main Harvard teaching hospitals.

Q. And would you tell us a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 32

little bit about the division of pharmacoepidemiology and pharmacoeconomics?

A. Yes. That's a division that I was asked to start in 1997, and it opened its doors in 1998. And it is a collection of 25 researchers of whom there's 11 faculty, and the rest are programmers and research assistants and administrators. And our main agenda is the study of patterns of medication use, side effects caused by drugs, good effects caused by drugs, the cost effectiveness of drugs, the impact of policy such as reimbursement and other sorts of policy on how doctors prescribe drugs, how patients use drugs, and, finally, the way that physicians make prescribing decisions and how those decisions can be made better.

Q. And forgive me if occasionally I ask you to explain some terms.

You mentioned the term

Page 33

"pharmacoepidemiology." Would you please describe what that is?

A. Sure. That is the study of the beneficial and adverse effects of drugs as seen in, quote, the real world as typical doctors and typical patients use those medications, both the good effects and the bad effects.

Q. And what about the term "pharmacoeconomics"?

A. Pharmacoeconomics is the study of the relationship between what a drug does and what its cost is. So, we try to understand whether a given drug is worth its price and whether it's cost effective, whether it might even save money for the healthcare system, and how those balance out.

Q. How is your division funded, Dr. Avorn?

A. Primarily by our peer-reviewed research grants from the National Institutes of Health, which is, of course, the federal agency that

Page 34

supports scientific research. We also receive money from foundations that are devoted to, let's say, arthritis and other areas that we are concerned in. And we also will accept research grants from pharmaceutical companies.

- - -

(Whereupon, Deposition Exhibit Avorn-1, Curriculum Vitae of Jerome Avorn, was marked for identification.)

- - -

BY MR. TISI:

Q. I would like to hand you what we've had marked as Exhibit Number 1 to your testimony here today.

A. Yes.

Q. Do you recognize that, sir?

A. Yes. This is my CV or my resume.

Q. Okay.

And just for the members of the jury, "CV" is a professional term for a resume?

Page 35

A. Right.

Q. Okay.

Does this curriculum vitae summarize your professional experience over the course of your professional career?

A. Pretty much.

Q. Okay.

I'd like to go through some of your education and experience a little bit. Okay?

A. Sure.

Q. All right.

Would you please tell the men and women of the jury a little bit about your educational background, how you became a professor of medicine at Harvard?

A. Sure. In brief, I grew up in New York City. I went to Columbia as an undergrad. I then went to Harvard Medical School, where I was awarded the M.D. degree in 1974. I then did my internship and residency in various of

3821cc6c-711a-49b8-994f-51a1f40221c0

the Harvard teaching hospitals and became certified in internal medicine. And around the time that I was a resident, I also began teaching at the medical school in a variety of areas that primarily related to medication use.
Q. Do you currently teach medical students and residents at Harvard?
A. Yes. That's where I just came from an hour ago.
Q. Okay.
And do you conduct independent research?
A. Yes, I do.
Q. And in what medical and scientific -- excuse me.
In what medical and scientific fields do you conduct medical research?
A. The utilization of drugs by doctors, the side effects of those drugs, the utilization of drugs by patients, the relationship between the healthcare

system and medication use, and in general, the outcomes of drug use and how it can be improved.
Q. Now, you mentioned Brigham and Women's Hospital. Does the division that you head have any relationship to the day-to-day function of the Brigham and Women's Hospital?
A. Yes. One of the missions of our division is to help advise the hospital about what medications should be used at the hospital and also to teach the interns and residents and medical students and physicians who are practicing at the hospital about the best way to use the drugs that are on our list of drugs or the formulary.
Q. Okay.
Now, you previously described to the members of the jury pharmacoepidemiology, pharmacoeconomics. You also mentioned that you do research in the field of looking at the factors that affect prescribing choices of

physicians?
A. That's right.
Q. Okay.
Would you describe your particular interest in that area?
A. Sure. The first paper I published in that area was actually back in 1982 in which I was interested in how doctors make decisions about what drugs to use. And I was interested in whether -- the balance between the information that we as prescribers get from the medical literature versus from commercial sources like advertising or sales reps. And so we did a study of primary care docs in the Boston area, and we asked them where they got their information from, and then we gave them little quizzes about the drugs that they commonly used. And although they thought that they got most of their information from just reading the medical journals, in fact, what our quiz showed was that a lot of what they believed actually came

from what you could only find in ads or from sales reps.
Q. What is academic detailing, Doctor?
A. Academic dealing is an approach that I pretty much invented in the late 1970s and early 1980s. And it was based on the following idea: That we know that the drug manufacturers are awfully good communicators. They send people into our offices. They have very well-presented spiels that they give us. They interact with us in a very friendly way. They've got great graphical material. They will have dinner meetings in good restaurants and show us their presentations. And that's really very effective communication, but it's just to sell product. That's the only reason that they do that communication.
By contrast, faculty in medical schools tend to have a pretty good handle on the evidence and don't usually have a particular axe to grind

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 40

about selling a product, but we tend to be lousy communicators. We give dull lectures. We don't really have very good graphical material. We stay in our ivory tower and we don't go out to doctors' offices.

And what I began to wonder about in the late '70s and early '80s is whether we could kind of marry that very effective communication approach that the pharmaceutical industry has with the more balanced evidence-based approach that medical school or academic faculty have. And because the approach of the sales reps in the drug industry is called detailing, I call that academic detailing.

And our first study was funded by the federal government in 1979 and ultimately was published in the New England Journal in 1983 in which we showed that by sending pharmacists that we trained to be the so-called unsales reps out to doctors' offices to teach

Page 41

them about how to prescribe better in this interactive and engaging manner, we could actually influence their prescribing for the better in a way that was both effective and actually paid for itself.

Q. Doctor, have various governments and different organizations adopted the concept of academic detailing?

A. Yes. As a matter of fact, just a few weeks ago I came back from Australia where the entire country has a very large program of academic detailing which we actually helped them set up based on our early research in which they have pharmacists and nurses going out to doctors all over the country to advise them on how to prescribe so that they are not dependent on ads or sales reps from the drug companies to know about the drugs they use.

Q. Any states have programs and --

Page 42

A. Yes. We're actually running a program on behalf of the State of Pennsylvania which has asked our group to put together educational materials for doctors all over Pennsylvania. And the State of Pennsylvania funds nurses and pharmacists to go out and teach doctors how to prescribe so that they are not, again, dependent on just what they hear from the sales reps and see in the ads.

Q. Okay.

Well, I'm going to speak more about your publications in a moment, but before I do, let me ask you generally.

Have you published in each of the areas that you've identified, pharmacoepidemiology, pharmacoeconomics, and physician drug practices?

A. Yes, I have.

Q. In the course of your career, Dr. Avorn, have pharmaceutical companies funded some of your research?

A. Yes. As I said, we do have

Page 43

research support from a number of drug companies.

Q. Do these include some of the studies that you have conducted with respect --

Well, first of all, let me back up.

Have you studied the class of drugs that we'll talk about here today called nonsteroidal anti-inflammatory drugs or NSAIDs?

A. That's right.

Q. And have you studied COX-2 drugs?

A. That's right. We've been looking at that class of drugs since before 1990.

Q. Okay.

And have you received grants and funds from various pharmaceutical companies to study that class of drugs?

A. Yes. Both drug companies and also the National Institutes of Health.

3821cc6c-711a-49b8-994f-51a1f40221c0

Q. Would you tell us some of the drug companies who have funded your research?
A. Pfizer – you mean research in general or research only about nonsteroidals?
Q. In general.
A. In general, Pfizer, Glaxo, Pharmacia, Kabi, Merck.
Q. Are you currently being funded by Merck?
A. Yes. Dr. Solomon in our group has a project in which I'm participating in which Merck has funded us to look at the underuse of drugs for osteoporosis or bone thinning.
Q. And have you been funded by Merck to do studies in the field of COX-2 drugs including Vioxx?
A. Yes, we have.
Q. Other than your experience with Vioxx, which we'll talk about during the course of this deposition, putting that aside for a moment, how would you

have described your experience with Merck?
A. Other than with our Vioxx experience?
Q. Yes.
A. I always thought of Merck as the most respected, upstanding, careful pharmaceutical company in the country, as most everybody else did back in, let's say, the 1980s and early '90s.
Q. Was your, and we'll talk about this, but was your experience with Merck different with respect to the COX-2 drugs?
A. Yes, it was.
Q. Do you currently hold any leadership appointments within your field?
A. Well, I have served in the past as the president of the International Society for Pharmacoepidemiology, which is the main professional body of researchers all around the world who study drug side

effects and drug utilization and drug cost effectiveness.
Q. And are you licensed to practice medicine?
A. Yes, I am, in Massachusetts.
Q. And are you board certified in any specialty of medicine?
A. Internal medicine.
Q. Do you supervise the treatment of patients at Harvard's Brigham and Young -- Brigham Hospital?
A. Brigham and Women's, yes, I do.
Q. Has there ever been a time in the past 20 years where you have not treated or supervised treatment of patients?
A. No. I've treated or supervised continuously pretty much since I got my M.D.
Q. Okay.
Do you specialize in the treatment of any particular patient populations, Dr. Avorn?

A. I've had a particular expertise and interest in medication use in the elderly, people over 65.
Q. As an internist, do you supervise the treatment of patients with chronic pain conditions such as arthritis?
A. Sure.
Q. As an internist, you supervise patients with acute pain conditions?
A. Yes.
Q. How about cardiovascular disease?
A. Certainly.
Q. Okay.
Have you had occasion to prescribe or supervise the prescription of medications for patients at the Brigham Hospital, including nonsteroidal anti-inflammatory drugs?
A. Yes.
Q. In addition to your --
Let me talk for a moment

about your publications, Doctor. Approximately how many original articles have you written for the peer-reviewed medical literature?

A. About 200.

Q. What is peer review?

A. Peer reviewed refers to a journal that accepts articles only after they have been sent out for review by independent experts around the country to determine their worth.

Q. What are some of the medical, the peer-review medical journals in which you have been published?

A. The New England Journal of Medicine, the Journal of the American Medical Association, the British Medical Journal, Health Affairs, the Archives of Internal Medicine, the Annals of Internal Medicine and a few dozen others.

Q. Okay.

Have you been or --

Are you now or have you been a peer reviewer yourself?

A. Yes. I regularly review articles for the New England Journal of Medicine and for JAMA in particular, "JAMA" being the Journal of the American Medical Association.

Q. Thank you.

Has your publications --

Has your work as an academician in publishing information been recognized generally?

A. Yes.

Q. Would you tell us a little bit about that?

A. Sure. I somewhat unexpectedly got a memo from --

MR. BECK: I'm sorry, since a new thing has popped up on the screen, could you just identify, is this something from his own resume or is this something that somebody else said about him?

MR. TISI: Yes. This is from his curriculum vitae.

MR. BECK: All right.

THE WITNESS: That I was identified by the scientific body that keeps track of all medical references in the world as one of the most highly cited researchers in the field of medicine and social science because of the number of citations to my research that have been in the medical literature.

BY MR. TISI:

Q. Doctor, have you published specifically about the safety of Vioxx?

A. Yes, I have.

Q. Have you published specifically regarding the safety of COX-2 drugs including both Vioxx and Celebrex?

A. Yes.

Q. Have you published specifically about the safety of nonsteroidal anti-inflammatory drugs?

A. That's right.

Q. How long have you been

publishing in that particular field?

A. I think the first paper on nonsteroidals was one that I did with Dr. Gurwitz that I believe was in the Journal of the American Medical Association back in 1990.

Q. Have you published specifically about Merck's conduct in their communication of risk and benefit of Vioxx to physicians?

A. I've written about that, yes.

Q. Dr. Avorn, from the almost 200 peer-reviewed articles that are in your curriculum vitae, I have pulled documents from your peer-reviewed documents, the articles which I'm going to hand to you as an exhibit, and they would be Exhibits 2 through 15.

A. Right.

- - -

(Whereupon, Deposition Exhibit Avorn-2, "Initiation of Antihypertensive Treatment During

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 52

Nonsteroidal Anti-inflammatory Drug Therapy" (Avorn, et al) JAMA 9-14-94 Vol. 272, No. 10, 781 - 786; Whereupon, Deposition Exhibit Avorn-3, "Patterns of Drug Use in Rheumatoid Arthritis" (Avorn, et al) The Journal of Rheumatology 2000 27:7, 1648 - 1655; Whereupon, Deposition Exhibit Avorn-4, E-mail 4-12-00 MRK-ABC0033809; Whereupon, Deposition Exhibit Avorn-5, "The Hidden Cost of Nonselective Nonsteroidal Antiinflammatory Drugs in Older Plants" (Avorn, et al) The Journal of Rheumatology 2003 30:4, 792 - 798; Whereupon, Deposition Exhibit Avorn-6, "Determinants of Selective Cyclooxygenase-2 Inhibitor Prescribing: Are Patient or Physician Characteristics More Important?" (Avorn, et al) American Journal of Medicine 2003

Page 53

Vol. 115, 715 - 720; Whereupon, Deposition Exhibit Avorn-7, "Relationship Between Selective Cyclooxygenase2 Inhibitors and Acute Myocardial Infarction in Older Adults" (Avorn, et al) Circulation 2004, 2068 - 2073; Whereupon, Deposition Exhibit Avorn-8, "Relationship Between COX-2 Specific Inhibitors and Hypertension" (Avorn, et al) Hypertension 2004, 140 - 145; Whereupon, Deposition Exhibit Avorn-9, "Adjusting for Unmeasured Confounders in Pharmacoepidemiologic Claims Data Using External Information" (Avorn, et al) 2005 Epidemiology Vol. 16 No. 1, 17 - 24; Whereupon, Deposition Exhibit Avorn-10, "Medicaid Prior Authorization Programs and the Use of Cyclooxygenase Inhibitors" (Avorn, et al) New England

Page 54

Journal of Medicine 2004, 2187 - 2194; Whereupon, Deposition Exhibit Avorn-11, "Analytic Strategies to Adjust Confounding Using Exposure Propensity Score and Disease" (Avorn, et al) American Journal of Epidemiology 2005:161, 891 - 898; Whereupon, Deposition Exhibit Avorn-12, "A Medicare database review found that physician preferences increasingly outweigh patient characteristics as determinants of first-time prescriptions for COX-2 inhibitors" (Avorn, et al) Journal of Clinical Epidemiology 58:2005, 98 - 102; Whereupon, Deposition Exhibit Avorn-13, "Cardiovascular Outcomes in New Users of Coxibs and Nonsteroidal Antiinflammatory Drugs" (Avorn, et al) Arthritis & Rheumatism 2006 Vol. 54 No. 5, 1378 - 1389; Whereupon, Deposition Exhibit

Page 55

Avorn-14, "COX-2 selective non-steroidal anti-inflammatory drugs and cardiovascular disease" (Avorn, et al) Pharmacoepidemiology and Drug Safety 2003 12, 67 - 70; Whereupon, Deposition Exhibit Avorn-15, "Coxibs, Science, and the Public Trust" (Avorn, et al) Archives of Internal Medicine 2005 Vol. 165, 158 - 160, were marked for identification.)

\- - -

BY MR. TISI:

Q. Would these be the articles that you have written in the peer-reviewed medical literature pertaining to nonsteroidal anti-inflammatory drugs?

A. (Witness reviewing documents.)

Yes, that's some of them.

Q. Okay.

Would that include articles

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 56

you've written on various COX-2 drugs including Vioxx?
A. Yes.
Q. Are any of these studies funded by Merck?
A. Yes. The one from Circulation that appeared in 2004 was supported by Merck. And several of the others were based on our research funded by Merck as well.
Q. Could you identify the article that was supported by Merck?
A. Sure.
Q. And identify it by exhibit number.
A. Sure.
(Witness reviewing documents.)
Okay. One of them is Exhibit Number 7, which is the one that appeared in the journal called Circulation in 2004.
There's another one that appeared in the journal called

Page 57

Epidemiology in 2005 that was also supported by Merck.
Q. And the title of that --
A. I'm sorry.
Q. Those both involve Vioxx?
A. Yes. Those are both about the COX-2 drugs, which were basically Vioxx and Celebrex primarily.
There's also a paper we had in the New England Journal of Medicine in 2004 called "Medicaid Prior-Authorization Programs and the Use of COX-2 Inhibitors," and we acknowledge there that we also were receiving a grant from Merck which contributed to that study.
I'm checking carefully because we usually don't pay attention to who's paying for the study when we do the work.
We acknowledged in a paper that came out in the Journal of Clinical Epidemiology in 2005 about physician preferences in relation to the use of COX-2 drugs like Vioxx and Celebrex in

Page 58

which we received funding from Merck, but Merck did not specifically fund that study.
There's another paper here, Exhibit Number 13, "Cardiovascular Outcomes in New Users of Coxibs and NSAIDs," that also acknowledges that we've received support from Merck to do that work.
Not that one.
So, that's pretty much it.
Q. Have you written any books which pertain to issues of drug safety?
A. Yes, I have.
Q. Doctor, I'm going to hand you a book. I'm not going to mark it as an exhibit unless we have to. Is that the book that you've written?
A. Yes. "Powerful Medicines: The Benefits, Risks, and Costs of Prescription Drugs." It came out in 2004.
Q. Doctor, have you been a consultant for the United States Food &

Page 59

Drug Administration at any time in the past?
A. Yes, I have.
Q. Would you describe for the members of the jury what that is about?
A. Sure. There was a medication on the market called Lotronex, which was a drug for irritable bowel syndrome. And there was a concern that it was causing severe side effects, even death, in patients who took it, and the FDA was trying to determine whether its safety was such that it should be kept on the market or pulled from the market. And the FDA asked me to consult with it as part of its Advisory Committee that would look at the safety of that drug.
Q. Have you testified before the United States Congress on issues relating to drug safety and healthcare policy?
A. Yes. On a number of occasions, I was invited to testify by the U.S. Senate, Special Committee on

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 60

Aging, the House Committee on Aging, and other committees of Congress about medication effects.
Q. Have you advised the President of the United States on drug safety or drug policy?
A. I was invited by a transition team of the president-elect to advise about drug policy.
Q. And have you received grants from the National Institute of Health to conduct your research?
A. Yes.
Q. I'm going to ask you some questions, Doctor, about your expertise directly.
A. Okay.
Q. Dr. Avorn, are you an expert in the field of pharmacoepidemiology?
A. Yes.
Q. Are you an expert in the field of pharmacoeconomics?
A. Yes.
Q. Are you an expert in the

Page 61

field of pharmaceutical study design?
A. Yes.
Q. And are you an expert in the field of the conduct of pharmaceutical studies?
A. Yes.
Q. Are you an expert in the factors that drive prescribing practices and habits of physicians generally?
A. Yes.
Q. Are you an expert in the field of internal medicine?
A. Yes.
Q. Geriatric medicine?
A. Yes.
Q. An expert in the communication of risks and benefits to physicians and elder health care providers?
A. Yes.
Q. Are you an expert in the risks and benefits of a class of drugs known as nonsteroidal anti-inflammatory drugs?

Page 62

A. Yes.
Q. COX-2 inhibitors?
A. Yes.
Q. How about an expert in the field in the risks and benefits of Vioxx?
A. Yes.
Q. Are all the areas that I've just asked you your expertise about areas in which you have actually published in the peer-reviewed medical literature?
A. That's right.
Q. Dr. Avorn, are you prepared to offer the jury in this case your professional opinions regarding the drug Vioxx manufactured by Merck?
A. Yes.
Q. During the time that Vioxx was on the market, did you have occasion to speak with Merck officials concerning Vioxx?
A. Yes.
Q. During the time that Vioxx was on the market, did you formulate opinions regarding Vioxx's safety,

Page 63

efficacy and its cardiovascular risk?
A. Yes.
Q. Did you share those opinions with Merck?
A. Yes.
Q. Until 2004, when Vioxx was no longer available on the market, were you asked to present your scientific and medical opinions on Vioxx and other NSAIDs, including naproxen, which we'll talk about, at national and international scientific and professional meetings?
A. Yes.
Q. During the time Vioxx was on the market and shortly thereafter, did you publish articles and editorials in the peer-reviewed literature concerning the FDA's role in evaluating Vioxx?
A. I did.
Q. Until 2004, were you formulating these opinions and publishing them --
When you were formulating these opinions and publishing them in the

3821cc6c-711a-49b8-994f-51a1f40221c0

medical literature, were you consulting with any lawyers like myself who were representing individuals who claim that they were injured as a result of Vioxx?

A. No. I try to avoid consulting with lawyers whenever I can.

Q. Okay.

When was the first time you agreed to meet with any attorney representing people who claim injury related to Vioxx?

A. I had a number of solicitations from the moment the drug was withdrawn, and I rebuffed pretty much all of them until I would say the spring of 2005. Probably the end of May, I would guess.

Q. When is the first time you met with any lawyer representing people who claimed injuries as a result of Vioxx?

A. I would say the only time I actually -- well, the first time I actually met with anybody, as opposed to

calling them back and saying no thank you, would have been May of '05.

Q. Since May of 2005 when you first had your meeting with lawyers representing people who claim injuries as a result of Vioxx, have you been provided with additional materials that you had not had an opportunity to see while you were conducting studies involving Vioxx, NSAIDs and COX-2s?

A. Yes. There was a lot of material that came out as a result of the discovery process that I had not had access to before.

Q. Have you formed additional opinions since May of 2005 as a result of reviewing those additional documents that were provided to you?

A. Yes.

Q. Are you prepared to offer those additional opinions to the members of the jury today?

A. Sure.

Q. Doctor, are all the opinions

that you will testify about today, whether they were formed before you were retained as an expert in this litigation or since you were retained as an expert in this litigation, opinions that you hold to a reasonable degree of medical and scientific certainty?

A. Definitely.

Q. By the way, Dr. Avorn -- and I should have asked you earlier, and I apologize.

Are you aware that your testimony is being videotaped so it could be shown to the members of the jury?

A. Yes. The clue was that big video camera in front of me.

Q. Okay.

Why is it that you are not appearing live to give your opinions to the members of this jury?

A. Because I have a day job, and I spend an enormous amount of time just running my division at Harvard and at the Brigham and teaching medical

students and occasionally supervising patient care, and I wouldn't have time to do this for more than just once.

Q. Are you being paid personally for the time that you spent consulting with us and appearing at this videotape testimony?

A. No. I received no payment for any of my work in this case.

Q. Well, don't doctors like yourself usually submit bills when they do work like this?

A. They traditionally do, but I prefer, since I've established a policy in my division that none of us accepts any direct payment from drug companies, it seemed reasonable to also not accept any payment personally from plaintiffs' lawyers or plaintiffs either, and so I do this pro bono, and if the attorneys I'm working with want to make a donation to a charitable cause, that's fine with me. But I don't take any personal remuneration.

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Q. Have you set up a charitable fund which any money that would be billed would go into that fund?
A. Sure. Right.
Q. And what is the purpose of this charitable fund?
A. It is basically to have an endowment to support noncommercial research about medication use and medication effects, because I think there's a real need for that to be a source of funding that is independent of any particular companies.
Q. Do you derive any personal monetary benefit as a result of the money that we may hourly -- any hourly rate you may bill us which we pay into this charitable fund?
A. No, I don't.
MR. TISI: At this time, I would like to proffer Dr. Avorn as an expert in pharmacoepidemiology, pharmacoeconomics, pharmaceutical study design and conduct, factors

which affect prescribing practices, internal medicine, geriatrics, risk/benefit analysis, NSAIDs, COX-2 inhibitors and Vioxx.

- - -

VOIR DIRE EXAMINATION

- - -

BY MR. BECK:
Q. Doctor, my name is Phil Beck. I represent Merck.
Do you have your report handy or would you like me to give you a copy?
A. Why don't you give me a copy so we're working from the same document.
MR. BECK: Do you need one, Mr. Tisi, or do you have your own?
(Handing over document.)
MR. TISI: Thank you.
BY MR. BECK:
Q. I don't think we need to mark your report as an exhibit, and I don't know if Mr. Tisi has got some

premarked things, so, I don't want to foul up his numbering scheme.
In any event, if you'd turn over to Page 2 of your report. Do you identify on Page 2 the areas where you were asked by the plaintiffs' lawyers in this case to provide opinion testimony?
A. Yes.
Q. And underneath the heading "The Present Assignment," does your report say, "I was asked by plaintiffs' attorneys to consider the question of whether rofecoxib (Vioxx) increases the risk of cardiovascular disease and to assess the methods by which Merck evaluated and managed this issue throughout the development and marketing Vioxx"?
A. Right.
Q. Now, in those two areas, the first one being whether Vioxx increases the risk of cardiovascular disease, on that point, as I think you said, you are a pharmacoepidemiologist, correct?

A. Right.
Q. And you have published observational studies on the safety of Vioxx, right?
A. Right.
Q. And you're familiar with other scientists' publications on that same subject; is that correct?
A. Right.
Q. And then this report of yours, how many pages is this report?
A. 25.
Q. Am I correct, sir, that on these 25 pages, single-spaced report, there's only one paragraph appearing at Page 19 that deals with the observational studies of Vioxx and risk?
A. Right.
Q. And most of the rest of the report deals with the second subject that was identified on Page 2, and that is assessing Merck's conduct in developing and marketing Vioxx. Is that a fair statement?

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 72

A. No, it's a completely unfair statement.
Q. Well, does much of the rest of the report deal with that second issue that you say you're here to opine on?
A. Well, some of it does, but it's a false distinction to say that the way that -- whether or not rofecoxib increases the risk of cardiovascular disease is relegated to one paragraph. I think that's a complete misstatement of my report.
Q. I'm sorry.
I'm asking whether much of the rest of your report deals with the second subject that you identified on Page 2, which is, "Assessing the Methods by which Merck Evaluated and Managed the Issue Throughout the Development and Marketing of Vioxx"?
A. No. What you asked was whether all the rest of my report, apart from that paragraph, deals with the second point, and we can read that back

Page 73

if you'd like. In fact --
Q. Okay.
Let's read it back, sir, if you are going to argue about what I asked you.
Page 41, Line 2. "And most of the rest of the report deals with the second subject that was identified on Page 2?"
A. Yeah, that's wrong.
Q. Well, I didn't ask "all," I asked "most," right? You say "most" is wrong?
A. Yeah.
Q. Well, let me ask, for example, on VIGOR, which is one of the subjects that you'll be discussing later on, I'm sure, you've got about seven pages in your report concerning documents about the VIGOR trial; is that right?
A. If you say it's seven pages, I assume that's correct.
Q. That's what you testified to in your deposition a couple of weeks ago.

Page 74

A. Fine.
Q. And basically your discussion of the VIGOR trial, which I hope the jury will have heard about before your deposition is played, it is an interpretation or your reading of internal Merck documents, right?
A. It also talks about the findings of the VIGOR trial and the number of heart attacks that patients had in it as well.
Q. Well, basically doesn't your discussion consist of your reading of Merck documents?
MR. TISI: Let me just object. I don't think this goes to qualifications, but you may answer.
THE WITNESS: I talk about the findings of the VIGOR trial, as well as the way that it was handled by Merck; both.
BY MR. BECK:
Q. In the deposition that you

Page 75

gave in this case, what was that, a couple of weeks ago you gave a deposition?
A. Right.
Q. Page 353.
MS. DAGOSTINO: I'm sorry, what page are you on?
MR. BECK: Page 353.
BY MR. BECK:
Q. Starting at line 15.
"In the portion of your expert report starting on Page 7, sir, through Page 14 you talk about the VIGOR trial.
"Answer: Right.
"Question: Okay? So I want to talk about that.
The vast majority of your analysis here concerning VIGOR appears to be based on your interpretation of Merck's internal documents; is that true?
"Answer: My reading of them, yes."
Was that your sworn

3821cc6c-711a-49b8-994f-51a1f40221c0

testimony a couple of weeks ago?
A. That the majority of it is about reading of documents? Yes.
Q. And the plaintiffs' lawyers decided which internal Merck documents you would read, right?
A. Well, they also provided me with Dr. Scolnick's deposition so I could hear Merck's side of the story as well.
Q. In terms of the internal Merck documents --
A. Right.
Q. -- did the plaintiffs' lawyers decide which ones you were going to be able to read?
A. Well, actually, no, because I asked them if they could please make sure they provided me with any other kinds of exculpatory evidence that they had from Merck. If there were evidence that things were not as bad as they seemed, I told them I wanted to see that as well, and I trust that that's what they did.

Q. So, of course, you left it up to the plaintiffs' lawyers to decide whether there was evidence on behalf of Merck and what that evidence is that you should see; is that right?
MR. TISI: Let me just object. This doesn't really go to qualifications.
MR. BECK: It goes to methodology, which is fair game on voir dire.
MR. TISI: I disagree, but go ahead.
THE WITNESS: No. I read Dr. Scolnick's deposition, which I assume would depict the Merck position, and I read that much -- nearly all of it. And I explicitly asked -- I have no way of getting internal Merck documents except through counsel.
BY MR. BECK:
Q. Well, in your report, what you're basically trying to do is put

together a chronology based on the documents the plaintiffs' lawyers gave you of Merck's internal documents to try to show what Merck knew about the VIGOR trial; is that right?
MR. TISI: Objection.
THE WITNESS: Right.
BY MR. BECK:
Q. Do you have any personal knowledge of the facts that are described in those documents?
A. Well, I did have a conversation with Dr. Sherwood when I had him come up to the Brigham around the time that VIGOR came out, and we discussed his understanding. Dr. Sherwood was, I think, vice president for research or something like that at Merck at the time. And I discussed the VIGOR study with Dr. Guess, who was the head of epidemiology at Merck I believe in 2001 at a meeting that we both attended.
Q. So, are you claiming today that you do have some form of personal

knowledge about these facts?
MR. TISI: Objection.
THE WITNESS: Tell me what facts you mean.
BY MR. BECK:
Q. About the documents and the chronology that you set forth in your report.
A. Yeah. I think that's what I just said.
Q. Page 453 of your sworn deposition two weeks ago.
"Question: Am I right, sir, that you don't have any personal knowledge of the facts described in those documents; you're just relying on those documents, true?
"Answer: Correct."
Was that your sworn testimony a couple of weeks ago?
A. Right. I think the difference, sir, is that you asked whether I had any personal knowledge of the events around VIGOR, which I do.

3821cc6c-711a-49b8-994f-51a1f40221c0

Whether I have personal knowledge of the documents that were given to me, no, I don't, because they were internal Merck documents.
Q. Actually, my question, sir, was, do you have any personal knowledge of the facts that are described in those documents?
A. Right. And --
Q. The same question that you were asked two weeks ago.
A. No. I think you are misreading either your question or what I was asked two weeks ago, because you just indicated that the question two weeks ago was, do I have any personal knowledge of those documents? And to that I answered, no, I don't.
You asked today whether I have any personal knowledge of the circumstances related to the VIGOR trial, and to that I answered yes, and both are correct.
Q. Well, happily, we have a

transcript of what you were asked two weeks ago, and the question was:
"Am I right, sir, that you don't have any personal knowledge of the facts described in those documents; you're just relying on the documents," right?
"Answer: Correct."
Was that your sworn testimony?
MR. TISI: Objection, mischaracterization.
THE WITNESS: Mr. Beck, as I said a minute ago --
BY MR. BECK:
Q. Was that your sworn testimony?
A. Yes.
Q. Thank you.
A. The documents.
Q. On this question of whether you are charging for the work that you did in this case, do you have an established hourly rate?

A. Yes.
Q. And for consulting with lawyers?
A. Yes.
Q. And what is the hourly rate that you use when consulting with lawyers?
A. $750 an hour.
Q. And how many hours have you worked on this case?
A. Thus far, I would estimate about 200, I think. I don't keep real close track.
Q. So, 200 times 750, I'm not good at math, but how much does that -- can you figure out --
A. I think you should do the math if you are asking the question.
Q. Okay. I'll do that then.
When I do the math, that comes to $150,000.
A. Sounds about right.
Q. And have you actually sent out any bills to Mr. Tisi?

A. I sent Mr. Tisi a bill several months ago indicating how much time I had spent as of some point in I think the end of '05, and I don't think any check was ever issued around that.
Q. And as I recall from your deposition, the bill that you sent was for about $90,000, is that right?
A. Right.
Q. And you say that nothing has been paid on that?
A. No.
Q. And as far as you're concerned, do I understand correctly that it's up to Mr. Tisi whether he ever makes a contribution to your foundation in compensation for your testimony here?
A. Well, it wouldn't be in compensation for, but, yeah, it's up to him.
Q. What's the name of the foundation that you referred to?
A. It's the Fidelity Charitable Gift Fund.

Q. And you have some personal funds set up with Fidelity?
A. Right. They give you an account number, and you can have monies put into it, and then they spend it only on nonprofit entities.
Q. That you designate?
A. Right. Or you recommend and they send it if they agree.
Q. What's the Alosa Foundation?
A. That is a separate 501(c)(3). That is a not-for-profit organization that was set up in order to get the work done in the Pennsylvania program that I described a couple of minutes ago.
Q. Is any of the money, if Mr. Tisi decides to pay it, to go to the Alosa Foundation?
A. No.
Q. Now, am I right that Mr. Tisi can decide whether or not to pay the bills based on anything he wants, including how the cases come out?

MR. TISI: Objection.
THE WITNESS: That's a kind of offensive question. I --
BY MR. BECK:
Q. Well, I'd like an answer to it.
A. I would -- I think more of Mr. Tisi than to think that he would somehow make this contingent on how the case comes out. I think that's really, really a very bad way to think of this.
Q. Well, do you know why he hasn't paid the bill that you sent him last year?
A. It wasn't last year. It was a couple of months ago. And he's told me that things take a long time. We're waiting for money from the State of Pennsylvania. A lot of entities take a long time to pay. But I really resent and have to specifically deny the idea, and I think it verges on really offensive questioning, that somehow my testimony is contingent or my payment is contingent on

how the case comes out. I don't work like that.
Q. You said that you try to avoid consulting with lawyers whenever you can, right?
A. For exactly this reason.
Q. And how many times have you consulted with Mr. Tisi before the Vioxx litigation?
A. Before the Vioxx litigation? Once.
Q. And what was that in connection with?
A. A drug called Rezulin.
Q. Have you also overcome your reluctance to consult with lawyers and work with them, plaintiffs' lawyers, on the diet drug litigation?
A. Right. I think there have been about four cases total that I've become involved with.
Q. So, Rezulin, which you did with Mr. Tisi, right?
A. Right.

Q. And just so we don't have any loose ends, did he pay the bill in Rezulin?
A. I don't even know who the bill was paid by because there's these consortia of lawyers, but something got paid independent of the outcome of the case.
Q. And diet drugs, you consulted with plaintiffs' lawyers, right?
A. Yes.
Q. Am I correct that you also consulted with plaintiffs' lawyers on a drug called Baycol?
A. Yes.
Q. And did you say there was another one other than those?
A. PPA, phenylpropanolamine.
Q. PPA?
A. Yes.
Q. And all of this has been, what, within the last five, six years?
A. Probably.

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 88

Q. On the subject that you are proposing to testify about concerning Merck's conduct in how they manage the risk when developing and marketing the drug, am I correct, sir, that at least two federal judges have said that you're not qualified to give testimony on that general subject matter?

MR. TISI: Objection.

THE WITNESS: I don't know what judges have or haven't said. I know that there are various Daubert appeals and statements and pleadings, but I don't understand how that works, and I don't get involved in that.

BY MR. BECK:

Q. Well, did any of the lawyers that you worked with in the diet drug case tell you that the judge held that you would not be allowed to testify about the manner in which corporations in the pharmaceutical marketplace react, behave or think regarding their nonscientific

Page 89

goals of maintaining a profit-making organization?

MR. TISI: Objection, mischaracterizes -- A, mischaracterizes what The Court held; and B, inappropriate voir dire.

Go ahead.

MR. BECK: But, A, it's actually a direct quote.

MR. TISI: Actually, it's not a complete quote.

Go ahead.

BY MR. BECK:

Q. Anyway, did anybody ever tell you that?

A. My understanding is that there have been Daubert objections to my testimony, as there seem to be for every expert's testimony, and that judges in the past have accepted some testimony and not accepted other pieces of the testimony.

Q. And can you remember right

Page 90

now whether in the diet drugs case you had proposed to give similar testimony about the manner in which the defendant there managed the risk, and you were forbidden from doing so by federal court order?

MR. TISI: Objection.

THE WITNESS: I was not forbidden from anything. I think what happened was that the drug company objected to pieces of my testimony, and as I understand it, the judge accepted some parts of my testimony and did not accept other parts. But I was not forbidden from testifying.

BY MR. BECK:

Q. Well, do you remember that he refused to allow you to testify on the subject of how the pharmaceutical companies in the marketplace react and behave and think regarding things such as their profit motives and that sort of thing?

Page 91

MR. TISI: Objection.

THE WITNESS: No. I think you don't understand what happened. I give my testimony, I call it like I see it. After that, the lawyers get together and the lawyers for the drug companies typically say that a lot of the experts don't know what they're talking about, and then the lawyers for the plaintiffs say that the testimony should be admitted, and then the lawyers fight it out.

And all that happens after the testimony is over, and I don't keep track of that. So, I was never forbidden by any judge from doing anything.

BY MR. BECK:

Q. Well, did anybody tell you the outcome of the fight when the federal judge heard those arguments about whether you were qualified to testify on that

subject?
MR. TISI: Objection.
THE WITNESS: Much later I heard that there was a Daubert, whatever it's called, questioning of parts of my testimony and that parts were accepted by the judge and parts were not. And that's about as much of it as I know about.
BY MR. BECK:
Q. In the Rezulin case, were you told that the judge ruled that you were not qualified to render opinions describing or interpreting FDA regulations or commenting on the defendants' adherence to those regulations?
MR. TISI: Objection.
THE WITNESS: No.
BY MR. BECK:
Q. So, you didn't know that?
A. Right.
Q. And similarly, did you know

in diet drugs that the judge said that your testimony could not be accepted as to the requirements of federal regulations concerning labeling and the warning for FDA-approved drugs?
MR. TISI: Objection.
THE WITNESS: No.
BY MR. BECK:
Q. You didn't know that either?
A. No.
MR. TISI: Objection.
BY MR. BECK:
Q. Do you intend to offer any opinions on the subject of whether Merck withheld information from the FDA?
A. I will indicate that there's information that I became aware of that was known to Merck and that I am not aware of its having been transmitted to FDA in a timely way. And if plaintiffs' attorneys failed to show me something that I should have seen, I'd be happy to take a look at that and reassess my opinion.

Q. Well, has anyone told you that in the Rezulin case, the judge said that your testimony on that kind of a subject should not be accepted because it does not implicate Dr. Avorn's expertise in pharmacoepidemiology, it is a simple inference drawn from his review of two documents?
MR. TISI: Objection.
THE WITNESS: I've not read that judgment.
BY MR. BECK:
Q. And no one told you that in the Rezulin case that testimony was deemed inadmissible?
MR. TISI: Objection.
THE WITNESS: No.
MR. BECK: That ends our voir dire.
We agree that Dr. Avorn is qualified to testify about the observational studies concerning cardiovascular risks of Vioxx.
We object to any testimony

on what the report calls the methods by which Merck evaluated and managed the issues of Vioxx's risks throughout the development and marketing of Vioxx. We believe that Dr. Avorn is not qualified to opine on those subjects. There's no scientific methodology that's been applied, no analysis that can be tested. The testimony goes to Merck's state of mind and intent, which is an improper subject for expert testimony in any case, and Judge Fallon has already ruled in this case that it's inappropriate subject matter for expert testimony in the Vioxx litigation. And the testimony amounts to the witness interpreting the meaning of internal documents and assessing the reasonableness of the party's conduct, which as the courts held in diet drugs and Rezulin, is the proper subject of

3821cc6c-711a-49b8-994f-51a1f40221c0

lawyer's argument, not expert testimony. And as the judge said in Rezulin, experts should not be permitted to "supplant the role of counsel and making argument of trial and the role of the jury in interpreting the evidence."

So, that's our position on the proper scope of Dr. Avorn's testimony.

MR. TISI: Let me ask you some followup questions, Dr. Avorn, if I could.

- - -

EXAMINATION

- - -

BY MR. TISI:

Q. First of all, I'm going to read back what Mr. Beck just said to you. "We object to any testimony that the report calls the methods by which Merck evaluated and managed issues of Vioxx's risks throughout the development and marketing of Vioxx."

First of all, were you personally involved in how Merck managed the risks of Vioxx through your work with them on the observational studies that you testified to earlier?

A. Yes. We performed research funded by them with which we worked very closely with Merck epidemiologists on the development of the study and on the conduct of the study and on the interpretation of the findings. And that was germane to what was known at the time as it was developing about the cardiac risks of Vioxx.

Q. Could you turn to Page 24 of your report that you issued in this case.

A. Yes.

Q. Roman Numeral IX.

A. Yes.

Q. Did you also indicate that you would present evidence concerning the experience that your research team had in its work on your Merck-funded epidemiologic study and the relationship

between Vioxx and heart attack that was ultimately published in the cardiology journal Circulation in 2004?

A. That's right.

Q. Did you also, in the context of this or what we asked you to do as an expert, look at the various studies, study reports, and apply an appropriate scientific methodology to analyzing the various published and unpublished studies involving Vioxx?

MR. BECK: Objection, leading.

THE WITNESS: Absolutely.

BY MR. TISI:

Q. Why are you qualified to testify to the conduct of Merck in evaluating the concerns of cardiovascular safety and efficacy related to the drug Vioxx?

A. Well, the reason that I differ from the line of questioning that Mr. Beck was just using was that pharmacoepidemiology and the study of

drug benefits and risks is not just about studies of drugs once they are on the market. It's about the relationship of risks and benefits from the moment a drug starts to be studied, it's about the pharmacology that leads up to what one would expect to see as a benefit or as a risk and the way that plays itself out throughout the course of a drug's development.

I give lectures on the epidemiology of a drug's side effects during drug development from Phase I, Phase II, Phase III. These are the earliest stages of tests in humans. All of that is about the study of the risks and benefits of drugs. It's not just about reading epidemiologic studies.

Q. Are you --

You also were asked about the documents that we showed you during the course of our consulting with you since May of last year?

A. Right.

Page 100

Q. You had your discovery deposition taken several weeks ago?
A. Right.
Q. Mr. Beck's colleague, Mr. Goldman, questioned you for almost two days?
A. Right.
Q. Did Mr. Beck's associate have the opportunity to give you documents, and did he do so during the course of that deposition?
A. He showed me a number of documents.
Q. Was there anything that Mr. Goldman showed you that changed your views and opinions?
A. No.
Q. You testified with respect to your personal experience, and Mr. Beck pointed you to some testimony in your deposition. I'd like you to turn to Page 196 and 197 of your testimony several weeks ago, if you could do that.
A. (Witness complies.)

Page 101

Q. Did you testify in response to questions by Mr. Goldman about your communications with Dr. Sherwood?
A. Yes.
Q. Okay.
Did you also testify with respect to communications with other Merck officials, including Dr. Guess, Dr. Santanello and Dr. Cannuscio?
A. I believe that I did.
Q. Now, Mr. Beck asked you some questions about various litigations in which you have offered expert testimony. I think he mentioned Rezulin?
A. Right.
Q. Was Rezulin taken off the market because the benefits outweighed the risks -- I mean the risks outweighed the benefits?
A. Correct.
Q. How about phenylpropanolamine?
MR. BECK: Excuse me. I object on relevance.

Page 102

BY MR. TISI:
Q. How about phenylpropanolamine?
A. Yeah. That was --
MR. BECK: Objection.
Doctor, can you let me interpose my objections each time?
THE WITNESS: Okay.
MR. TISI: Let me rephrase the question.
BY MR. TISI:
Q. Was phenopropalamine taken off the market because the risks outweighed the benefits? The risks outweighed the benefits?
MR. BECK: Object on relevance, as well as foundation.
THE WITNESS: Yes, it was.
BY MR. TISI:
Q. And were the other drugs that you testified to, Baycol, taken off the market because the risks outweighed the benefits?
MR. BECK: Object on

Page 103

relevance and foundation.
THE WITNESS: Yes, it was.
BY MR. TISI:
Q. So, you were right in all those instances, weren't you?
MR. BECK: I'm going to object.
BY MR. TISI:
Q. Doctor --
MR. BECK: I'm going to object as argumentative and misleading since the testimony was given after all hose drugs were taken off the market.
THE WITNESS: Yes, I was right.
BY MR. TISI:
Q. Doctor, have you also testified on behalf of a pharmaceutical company in the past?
A. Yes.
Q. Okay.
Would you describe that circumstance?

CONFIDENTI[●] - SUBJECT TO PROTE[●]IVE ORDER

Page 104

A. Sure. The very first time I testified was on behalf of Pfizer. They had a drug product that contained an antibiotic called streptomycin. And that's an antibiotic that can be useful in some circumstances, it's a very old drug, but it can also cause deafness. And a doctor in Florida had been prescribing it kind of randomly to patients in a way that made no sense at all. And it was a bad prescribing decision that he had made. And one of the people, a child he had prescribed the drug to, became deaf, and that's a known side effect of streptomycin.

And Pfizer was sued, I guess because they felt they had the deepest pockets, and Pfizer communicated with the Harvard Medical School, and I guess the dean's office, and said, we feel that we're being sued unfairly because our drug was well labeled and we warned about it, and it was just a very bad prescribing decision by the doctor who

Page 105

shouldn't have been using it, we don't think we should be sued, and do you have anybody there that can help us.

And the request came to me, and I said, sure, I think that the drug company is being unfairly sued here, and I went down, I think the case was in Florida, and testified on behalf of Pfizer that the drug was well labeled, it was well made, the doctor was the one who made the mistake in that the kid didn't need streptomycin, and Pfizer should not be held culpable for the fact that the kid went deaf while taking their drug. And I think Pfizer won that case.

Q. Do you know -- do you have --

Mr. Beck asked you some questions about, quote, findings of some federal court judges, and you just, to move this process along, you testified there was some portions of your testimony that were allowed and some that were not allowed. Do you know the factual record

Page 106

that was presented to each one of these judges upon which they made their decision one way or the other?

A. No. All that happened after my testimony was over, and I don't know what was said about what.

Q. Do you know, for example, whether or not the judge was presented with your qualifications about how you have done research over the years into the prescribing practices of doctors and what goes into the decision-making process? Do you know whether that has ever been developed on the record in any case in which you have been involved as an expert?

A. No. I remember hearing when I was told that there were parts of my testimony that the judge disallowed wondering, didn't they show them all the papers that I had written in this area, and apparently they hadn't.

Q. So, you don't know whether the lawyers in that case actually did

Page 107

their job, do you?

A. The lawyers might have blown it.

MR. BECK: Was that Mr. Tisi?

MR. TISI: It was not. It was not.

MR. KLINE: It sure wasn't me.

MR. BECK: He's on the papers in one of them.

MR. KLINE: Do you have the opinion?

MR. BECK: No. But I can read the opinion when Mr. Tisi --

BY MR. TISI:

Q. Doctor, are you an expert on the issue of Vioxx's risks throughout the development and marketing of that drug?

A. Yes.

Q. Thank you.

Why?

A. Is that a question?

Q. Yes. Why?

3821cc6c-711a-49b8-994f-51a1f40221c0

A. Okay.

Because, as I said before, pharmacoepidemiology and also the research about medication risks and benefits beyond the epidemiology is about looking at all aspects of the drug's properties, the pharmacology, the clinical effects in the early trials, the randomized trials that occur on a larger scale, and the post-marketing use of that drug. And all of that is a part of what I study and teach at Harvard and write papers about.

MR. TISI: Thank you. With that, I'm going to move into the testimony.

- - -

DIRECT EXAMINATION.

- - -

BY MR. TISI:

Q. Doctor, just so you understand where I'm going to go with the testimony. I'm going to ask you some questions about your factual involvement

with Merck and your actual work in studying these drugs until the time that you and I first met in May of 2005. Then I'm going to move into your expert opinions later on in the day, just so you know where I'm going.

A. Fine.

Q. But before we do that, let me ask you a couple of questions.

You've carefully --

Have you carefully studied. Vioxx?

A. Yes, I have.

Q. And have you carefully studied Merck's conduct?

A. Yes, I have.

Q. Is it your --

Do you have an opinion that you hold to a reasonable degree of medical certainty as to whether or not Vioxx is a drug for which the risks outweigh the benefits?

A. Yes, I have that opinion.

Q. What is that opinion?

A. That Vioxx's risks do indeed outweigh its benefits, which is the view that the FDA agreed with as well.

Q. And do you have an opinion that you hold to a reasonable degree of medical certainty as to whether or not Merck accurately conveyed through all of its activities, publications, detailing, direct-to-consumer advertising, labeling, "Dear Doctor" letters, et cetera, effectively communicated the risks and benefits so doctors can make evidence-based prescribing decisions?

MR. BECK: Objection, improper subject for expert testimony, lack of foundation and hearsay.

THE WITNESS: Yes, I have such an opinion.

BY MR. TISI:

Q. Okay.

And what is that opinion?

MR. BECK: Same objections.

THE WITNESS: That Merck's

conduct over the research program and analysis of its data and communication of those data to physicians, to patients, even to FDA, was inadequate in that it failed to truthfully represent what was known to Merck at the time about the risks of its drug in relation to the cardiovascular symptoms.

BY MR. TISI:

Q. Do you think that they acted reasonably and prudently in their communicating that risk to physicians?

MR. BECK: Objection, improper subject for expert testimony, lack of foundation, hearsay.

THE WITNESS: Yes, I have such an opinion.

BY MR. TISI:

Q. And what is that opinion?

A. That -- you know, I'm going to need for you to read back the

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 112

question.
Q. Do you have an opinion as to whether or not Merck acted reasonably and prudently in communicating the risks of Vioxx to physicians?
MR. BECK: Same objections, and I should add, I meant to include that he lacks qualifications to opine on these subjects as well.
THE WITNESS: As someone who has conducted years of research on how physicians make prescribing decisions in relation to what evidence is available to them and have conducted studies and actual interventions to improve physicians' use of drugs which have been published in the New England Journal of Medicine and other peer-reviewed journals, I think a lot about how physicians use information that they have available to them in making

Page 113

prescribing decisions. And my clear impression is that doctors did not have adequate information presented to them by Merck to make a fair and reasonable evidence-based decision about Vioxx.
BY MR. TISI:
Q. Doctor, let me move into your, what I would call your factual testimony portion of your deposition here. But before I do, let me ask you some basic questions about it so we can orient the jury as to what some of the terms are that we're talking about here.
A. Am I allowed to steal the water from that attorney?
Q. You certainly can.
A. Thank you.
Go ahead.
Q. First, I would like to help the jury understand a little bit about the drugs we'll be talking about today.
What are nonsteroidal

Page 114

anti-inflammatory drugs?
A. That's a class of drugs that actually includes aspirin, but the more modern nonsteroidal anti-inflammatory drugs began to appear in the 1970s, and they are called nonsteroidal anti-inflammatory drugs because they reduce inflammation like steroids do, but they are not steroids. They have a different mechanism of action that's a little bit more like aspirin.
Q. Would you give us examples of commonly known nonsteroidal anti-inflammatory drugs that the jury might be familiar with?
A. Sure. The most common and oldest ones are ibuprofen, which is sold as Motrin, and it's also available over-the-counter as Advil or Nuprin.
Another older and commonly used one is naproxen, which used to be, I guess is still sold as Naprosyn as a prescription drug, and that's sold as Aleve over the counter.

Page 115

Q. Let's talk about aspirin for a moment. Prior to 2000, 1999/2000 when Vioxx came on the market, was there any evidence that you're aware of that aspirin might be good for the heart?
A. Yes. There were studies that were actually done by colleagues of mine at Harvard and the Brigham and Women's Hospital in which thousands of doctors were actually randomized to get aspirin or a placebo or a dummy pill. And they were followed for years. And then Dr. Hennekens, who did the study, and his colleagues attempted to find out whether they had heart attacks or not.
MR. TISI: Can we go off the record, please?
THE VIDEOTAPE TECHNICIAN: The time is 2:33. We're off the record.
- - -
(Whereupon, a recess was taken from 2:33 p.m. until 2:41 p.m.)

Golkow Litigation Technologies - 877.DEPS.USA

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 116

- - -

THE VIDEOTAPE TECHNICIAN: We are back on the record. The time is 2:41.

BY MR. TISI:

Q. Doctor, in 2000 when Vioxx was being promoted on the market, was the use of aspirin, low-dose aspirin a standard of care for treatment of patients with cardiovascular risk factors?

A. Yes.

Q. And have you ever personally prescribed aspirin to patients at risk for heart disease?

A. Yes.

Q. And switching to a drug called naproxen, I think we talked about before, Aleve?

A. Yes.

Q. How long has naproxen or Aleve been on the market?

A. I would say since the 1970s.

Q. And what, if any, evidence

Page 117

existed prior to 2000 that naproxen was good for the heart in the same way that aspirin was?

A. Virtually no evidence.

Q. Did the manufacturers of naproxen ever make the claim that that drug was what we call cardioprotective?

A. They couldn't because they had no grounds to claim that.

Q. Do the manufacture --

Do you know whether the manufacturer of naproxen makes that claim even today?

A. No, they don't.

Q. Is it and has it ever been the standard of care for physicians such as yourself to prescribe naproxen to patients to protect their hearts?

A. No.

Q. Have you ever prescribed naproxen to patients for the purpose of protecting their hearts?

A. No. There's no evidence that it protects your heart in any useful

Page 118

way.

Q. And do you know anybody who does that?

A. No.

Q. Second question.

NSAIDs in general, traditional NSAIDs as a class --

A. Right.

Q. -- are there safety issues that are understood about traditional NSAIDs?

A. Sure.

Q. Would you describe the significant side effects of NSAIDs as you knew them back in 2000, 1999, 2000, 2001?

A. Sure. We actually did some of those studies in which we looked at the capacity of the older NSAIDs, like Motrin, to reduce kidney function in older people. We did studies showing that the older NSAIDs like, again, like Motrin, which is ibuprofen, can raise your blood pressure. Other people have done studies showing the association

Page 119

between the older nonsteroidals or NSAIDs and congestive heart failure. That was pretty well known by 2000.

Q. What about GI, what we call gastrointestinal issues?

A. Yeah. That's the biggest problem from the traditional nonsteroidals. They can cause stomach pain, stomach upset in a lot of patients, and they also can cause gastrointestinal bleeding.

Q. Is that a serious problem associated with traditional nonsteroidal anti-inflammatories?

A. Yes, it can be.

Q. Now, with that in mind, did there come a time when you became familiar with the fact that certain drug manufacturers were developing a class of drugs called COX-2 inhibitors?

A. Right.

Q. Would you describe for the members of the jury what a COX-2 inhibitor is and your understanding about

Page 120

why they were being developed?
A. Sure. The COX-2 inhibitors, sometimes called coxibs, are a subset of the bigger class of nonsteroidal anti-inflammatory drugs or NSAIDs. And the hope was that -- well, I should back up.
It turns out that there's an enzyme called cyclooxygenase, which is abbreviated as COX. And people discovered that there are two subsets of that, COX-1 and COX-2. And one kind of simple way of thinking about it was that COX-2 was the bad subset, because that's the one that caused pain and inflammation, and COX-1, in a very simplistic way, was thought to be the good COX because that protected the lining of your stomach.
And viewed in that kind of simple black and white way, the hope was that if you could develop a drug -- since nonsteroidals tend to block both the COX-1 and the COX-2 enzymes, if you could

Page 121

develop a drug that would only block the bad COX, or COX-2, you would be able to get rid of pain and inflammation without blocking the good COX, or COX-1, which protects the stomach lining.
And the hope was, and this is what went into the development of Vioxx and Celebrex, that by doing so, you would be able to have a drug that would treat pain and inflammation and not cause as much risk of stomach bleeding.
Q. Do you have any problem, Dr. Avorn, with Merck investigating COX-2s as a potential pain medication with the lack of a GI side effect?
A. No. It seemed like a neat idea at the time.
Q. Okay.
Now, when did the COX-2 inhibitors come to market?
A. Well, Celebrex, which was made by Pfizer, was the first one that got FDA approval. And that was in late '98, as I recall. And Merck's Vioxx was

Page 122

sort of the second one to the market, and that was approved in '99.
Q. And as a physician in the field, did you have any appreciation for whether or not these drugs were going to be received widely or whether they were intended to be a niche of small drug?
A. Well, our hope was that they would be -- especially because they were so very expensive, that they would be used primarily in people who were at risk of stomach bleeding, and that other people who were doing fine on the older drugs like Motrin could stay on them.
Q. Okay.
Now, moving forward in time, after Vioxx came on the market in 1999, did there come a time after Vioxx was on the market that you learned about a study called VIGOR?
A. Yes.
Q. Was VIGOR actually --
Was Vioxx actually on the market when VIGOR was published?

Page 123

A. Yes. It was published in November of 2000.
MR. TISI: I'm going to hand you what I'd like to have marked as the next exhibit, Exhibit Number 16.
- - -
(Whereupon, Deposition Exhibit Avorn-16, Article, NEJM, "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," Pages 1520-1528, was marked for identification.)
- - -
BY MR. TISI:
Q. Doctor, do you recognize that?
A. Yes. That is the VIGOR study as it was published in the New England Journal of Medicine in November of 2000.
Q. And what is the exact date

of this article?
A. November 23, 2000.
Q. When did you first learn of the VIGOR study?
A. Well, actually, information about the findings began to circulate in the spring of 2000, I think it would have been March when I guess it was either presented or Merck issued a statement about the findings.
Q. And do you know, would you briefly describe the study and what it was designed to do?
A. Sure. It was funded by Merck, and a number of the co-authors were Merck employees. And it was designed to ask the question, is Vioxx safer on your stomach than older nonsteroidals? And so about 8,000 patients who all had rheumatoid arthritis, which is a kind of arthritis, but were otherwise reasonably healthy, were --
MR. BECK: Excuse me. The

witness appears to be reading from something. Are you looking at Exhibit 16?
THE WITNESS: Yes.
MR. BECK: Oh, I'm sorry. Okay. I couldn't see what you were looking at.
THE WITNESS: Right. But I can do it without Exhibit 16.
MR. BECK: No, that's fine. I just want to know what --
BY MR. TISI:
Q. It's not a test, Doctor. If you need to refer to Exhibit 16, feel free.
A. I know the study.
MR. BECK: No, that's fine with me. I just want to know what the witness is looking at so I can look at the same thing.
THE WITNESS: Right. I am looking at the exhibit he just handed me and asked me to look at.
MR. BECK: Okay.

THE WITNESS: About 8,000 patients were randomly divided into two groups. One group was given Vioxx at a dose of 50 milligrams a day, and the other group was given naproxen, this older nonsteroidal. And then they were followed for a median period of nine months. And there were a number of outcomes that were studied. One was whether or -- what kind of pain relief it gave, because its purpose was to be a pain reliever. And another outcome, which was the one of particular interest, was whether or not the patients who were randomly assigned to the Vioxx group were having a lower rate of stomach bleeding and perforation and ulcer.
And the findings, as they emerged, were that as a pain reliever, Vioxx worked about as

well as naproxen, no better, no worse, but there was the hope for reduction in gastrointestinal events like ulcers and perforations in the patients taking Vioxx compared to the patients taking naproxen. And a surprise finding that emerged from that study was that there was an approximately five-fold increase in heart attacks in the people randomly assigned to take Vioxx as compared to taking naproxen.
BY MR. TISI:
Q. When you say "surprise finding," was it a surprise to you, Doctor?
A. Well, there had been evidence of a potential there, but this was a large demonstration of this in a big randomized trial, even though there had been other evidence of patients who had been given Vioxx having similar problems. But I think to the medical