CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 176

1     position from what we have said
2     both in writing and in public.
3 BY MR. TISI:
4     Q.   Let's talk about what you --
5         MR. BECK:  Move to strike
6     that answer as speculation
7     concerning others' state of mind
8     and also irrelevant concerning
9     this witness' emotional reaction.
10 BY MR. TISI:
11     Q.   Doctor, was that a fair --
12        Looking at that document, is
13 that a fair and accurate representation
14 of the science that you presented to Dr.
15 Guess at the ISPE meeting in August of
16 2001?
17     A.   No, it's a distortion of
18 what was presented.
19     Q.   Moving forward, Doctor.
20        MR. BECK:  Object to the
21     characterization, move to strike.
22 BY MR. TISI:
23     Q.   Doctor, moving forward.  Did
24 you -- have you also --

Page 177

1        You mentioned the study that
2 we talked about before, the published
3 version of this study.  Have you on other
4 occasions said that the results of your
5 study does not explain cardioprotective
6 -- does not explain the results that were
7 seen in VIGOR?
8     A.   Yes.  There are a number of
9 times in the course of early 2000 where I
10 stated that.
11     Q.   Okay.
12        Would you go to another
13 article that I have in your book, Exhibit
14 Number 14?
15     A.   Yes.
16     Q.   Do you recognize that,
17 Doctor?
18     A.   Yes.  That is a paper that
19 was published in a journal called
20 "Pharmacoepidemiology and Drug Safety"
21 describing a panel that I was invited to
22 be on at another meeting of the
23 Pharmacoepidemiology Society that was
24 held in Edinborough in Scotland in August

Page 178

1 of 2002.
2     Q.   And among the co-authors is
3 a gentleman by the name of Dr. Wayne Ray?
4     A.   Correct.
5     Q.   Who is Dr. Ray?
6     A.   Dr. Ray is a very respected
7 pharmacoepidemiologist, probably one of
8 the best in the field, who is a professor
9 at Vanderbilt University.
10     Q.   And David Graham, do you see
11 he's represented there as well?
12     A.   Yes.  Dr. Graham is a
13 physician and epidemiologist at the Food
14 & Drug Administration.
15     Q.   Okay.
16        And Dr. Solomon is there as
17 well?
18     A.   Right.
19     Q.   Don't want to leave Dr.
20 MacDonald out.  Who is Dr. MacDonald?
21     A.   Tom MacDonald is a
22 pharmacoepidemiologist who works in
23 Scotland.
24     Q.   And, of course, you are

Page 179

1 listed there as well?
2     A.   Right.
3     Q.   Did you anywhere indicate,
4 again, your feelings about the naproxen
5 hypothesis as an explanation of VIGOR?
6     A.   Yes, I did.
7     Q.   Okay.
8        Would you please go to the
9 last page of the document, please?
10     A.   Yes.  The last full page?
11     Q.   Actually the last full page.
12     A.   Yes.
13     Q.   Okay.
14        Would you tell the members
15 of the jury what you wrote in 2000, and I
16 guess this is 2003?
17     A.   It was based on the
18 presentation that occurred in 2002.
19     Q.   Okay.
20        The top of the second
21 column.
22     A.   I'm sorry.  We're on a
23 different pages, I'm sorry.  You are on a
24 page with a Bates Number of 798 or Page

46  (Pages 176 to 179)

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 180

1  68. Right? Okay. Fine.
2       Right. In brief, the key
3  sentence there is, "These studies," which
4  reviews what was known at the time,
5  "suggest that any potential protective
6  effect of naproxen does not fully account
7  for the findings in the VIGOR study."
8     Q.   And what were you trying to
9  convey there in this article that was
10 published in 2002 -- 2003, excuse me.
11    A.   Right. But based on
12 statements that we made in August of
13 2002, and this was pretty much a
14 transcript of what we had said at that
15 point. That we reviewed as a group the
16 existing data about evidence relating to
17 cardiac outcomes from nonsteroidal drugs.
18 And we discussed the dramatic increase in
19 rate of heart attack in VIGOR in people
20 taking naproxen -- in people taking Vioxx
21 compared to naproxen and the hypothesis
22 that had been offered by Merck that that
23 was because naproxen protects your heart.
24    And in that August of '02

Page 181

1  symposium, all of us, I think, were in
2  accord since we all signed off on this,
3  "These studies suggest that any potential
4  protective effect of naproxen does not
5  fully account for the findings in the
6  VIGOR study."
7     Q.   What is the implication of
8  that, Doctor?
9     A.   Well, if naproxen -- if the
10 five-fold increase in heart attack --
11       MR. BECK: I'm going to
12    object to asking -- speculation
13    and hearsay and foundation.
14       MR. TISI: All right.
15       Well, let me withdraw the
16    question.
17       THE WITNESS: There's really
18    only two logical --
19       MR. BECK: Let me withdraw
20    the question, Doctor.
21       THE WITNESS: Okay.
22 BY MR. TISI:
23    Q.   What were you trying to
24 communicate there in this sentence?

Page 182

1       MR. BECK: I'm going to
2  object to the relevance of what
3  he's trying to communicate versus
4  what he said.
5       THE WITNESS: Okay.
6       What I said was, there are
7  only -- and the context of the
8  proceeding paragraph, there's only
9  two ways that you can explain a
10 five-fold difference in heart
11 attack between group A and group B
12 in a randomized trial. Either the
13 people in the group that has the
14 higher number of heart attacks
15 were given a drug that causes
16 heart attacks, or the people in
17 the group given the comparison
18 drug got a drug that prevents
19 heart attacks or perhaps some
20 combination of the two.
21       And what that sentence says
22 is that you can't explain the
23 five-fold increase in number of
24 heart attacks in VIGOR seen in

Page 183

1  people given Vioxx by the data
2  that were available at the time
3  about naproxen preventing heart
4  attacks because it just wasn't
5  there.
6  BY MR. TISI:
7     Q.   And did you draw any
8  conclusions from that?
9     A.   The only logical alternative
10 is that --
11       MR. BECK: Again, I'm going
12    to object.
13 BY MR. TISI:
14    Q.   You can answer.
15    A.   The only logical -- this was
16 discussed widely from the podium, I
17 recall it vividly. The only logical
18 alternative is that if it is not because
19 naproxen is preventing heart attacks or
20 if only a teeny fraction of the
21 difference can possibly be expected, be
22 explained by that, then the only other
23 logical possibility is that Vioxx caused
24 heart attacks.

47 (Pages 180 to 183)

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 184

1    Q.   Is that the same thing you
2  told Dr. Guess in mid-2001?
3    A.   In mid-2001, I told --
4         MR. BECK:  Object, leading.
5         THE WITNESS:  In mid-2001, I
6    told Dr. Guess that I thought that
7    was an important question that
8    needed to be addressed.
9  BY MR. TISI:
10   Q.   All right.  Moving forward.
11       Let's go back to your
12  negotiations with Merck to do your study.
13       Following the September fish
14  or cut bait e-mail with Dr. Cannuscio,
15  September 2001 fish or cut bait memo with
16  Dr. Cannuscio, did they execute a
17  contract?
18   A.   Not for many, many months
19  until later did they finally actually
20  sign the contract.
21   Q.   Did your group have to send
22  additional e-mails to Dr. Cannuscio,
23  again, effectively telling her to fish or
24  cut bait?

Page 185

1         MR. BECK:  Object, leading.
2         THE WITNESS:  I asked Dr.
3    Solomon to -- over the succeeding
4    months, I think the contract was
5    finally agreed to by Merck in
6    April of the next year.  And I
7    asked Dr. Solomon on numerous
8    occasions to please get Merck
9    going on this.  And they continued
10   to say that they were working on
11   it.  There was one conference call
12   that I remember participating in
13   in which Dr. Guess was on the line
14   as well, and we indicated that we
15   just needed to move forward to get
16   this work done.
17       MR. TISI:  I'm going to show
18   you what I've had marked as
19   Exhibit Number 20.
20       - - -
21       (Whereupon, Deposition
22   Exhibit Avorn-20, E-mails,
23   MRK-ACT001605 - MRK-ACT0016060,
24   was marked for identification.)

Page 186

1         - - -
2  BY MR. TISI:
3    Q.   Do you see that, Doctor?
4  And I'm referring specifically to the
5  e-mail from Dr. Solomon with your being
6  cc'd to Dr. Cannuscio.
7    A.   Right.
8    Q.   Okay.
9         First of all, what role did
10  you have in sending this e-mail, if any?
11   A.   The instance of this e-mail
12  was that it was in March of -- the end of
13  March of 2002, and we still didn't have a
14  contract.  And the latest -- at that
15  point, the latest obstacle was that Merck
16  had sent us a conflict of interest
17  statement that we were expected to sign
18  in order to try and move forward to get
19  the contract signed, and this was, what,
20  six months after the -- the fish or cut
21  bait memo was in September of 2001, and
22  now we're in April of 2002, six months
23  later, still didn't have a contract.
24       And then they send us this

Page 187

1  conflict of interest statement, which was
2  totally unacceptable, and it had many
3  things in it which we as academics could
4  not possibly sign.  And I discussed it,
5  as Dr. Solomon indicates, that he had
6  reviewed the statement with me, and I
7  said, this is no good, we can't sign away
8  our rights to be able to study this any
9  way that we want because that's just not
10  the way we do things in our unit.  And I
11  told him that he should reject this
12  conflict of interest statement and,
13  again, let's see if we can get to a
14  contract.
15   Q.   Okay.
16       Let's look at the first
17  sentence of that e-mail.
18   A.   Yes.
19   Q.   Could you please read it for
20  the members of the jury?
21   A.   Yes.  It is from Dr. Solomon
22  to Dr. Cannuscio, cc'd to me.
23   Q.   And what does it say?
24   A.   "Having started this

48  (Pages 184 to 187)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 188

1  conversation over last summer and made so
2  much progress on developing quite a
3  sophisticated proposal, I would hate to
4  see this project die before getting off
5  the ground."
6      Q.   What was being communicated
7  there, Doctor?
8      A.   That we were --
9          MR. BECK:  Object, again, to
10     interpreting what is clear
11     language in the e-mail and asking
12     him what is being communicated.
13         THE WITNESS:  I had
14     instructed Dr. Solomon to tell Dr.
15     Cannuscio that we were pretty much
16     at the end of our rope and that we
17     were at the point where the
18     project was going to not happen if
19     we continued to have obstacles
20     thrown up by the company and have
21     them now well over a year since
22     his initial conversation with Dr.
23     Cannuscio in February of '01 and
24     our meeting with Dr. Guess in

Page 189

1      August of '02, that we were at the
2      point where we were going to need
3      to just throw in the towel and try
4      to get funding from somewhere
5      else.
6  BY MR. TISI:
7      Q.   Okay.
8          Doctor, did there come a
9  time that the contract was actually
10 signed?
11     A.   Yes.  My recollection is
12 that it was in April of 2002, about 15
13 months after the initial conversation
14 that Dr. Solomon had with Dr. Cannuscio
15 that the contract was eventually signed.
16         MR. TISI:  Doctor, I'm going
17     to hand you the next exhibit,
18     which I'll represent to you is a
19     contract.
20         - - -
21         (Whereupon, Deposition
22     Exhibit Avorn-21, Contract
23     between Merck & Co. and Brigham
24     and Women's Hospital,

Page 190

1      MRK-ACQ0000246 - MRK-ACQ0000263,
2      was marked for identification.)
3          - - -
4  BY MR. TISI:
5      Q.   Is that the contract between
6  Harvard University, Brigham and Women's
7  Hospital, and Merck to conduct a study
8  into the role of Vioxx and COX-2s in
9  myocardial infarction?
10     A.   Yes.
11     Q.   Okay.
12         And can you tell us the date
13 that it was executed, Page 7 of the
14 document?
15     A.   Okay.
16         Well, interestingly, Merck
17 didn't date their signature.  But I know
18 that we signed it immediately upon
19 getting it because we were really eager
20 to go.  And so Dr. Solomon's signature
21 and the official institutional signature
22 from the hospital was April 24th of 2002.
23     Q.   Okay.
24         Are you aware that at the

Page 191

1  time that Merck executed the contract for
2  your study on April 24th, 2002 that Merck
3  had just received two weeks prior to the
4  approval for the new label that did not
5  contain a cardiovascular warning?
6      A.   I was not aware of that.
7      Q.   Doctor, are you familiar
8  with the term "First, do no harm"?
9      A.   Yes.
10     Q.   What does that mean to
11 doctors?
12     A.   Well, it's one of the basic
13 precepts of medicine.  I think it goes
14 back to Hippocrates.  And the idea is
15 that, above all, it is the physician's
16 responsibility not to hurt the patient.
17 It's one of the first things we try to
18 teach medical students.
19         MR. TISI:  Doctor, I'm going
20     to hand you what I've had marked
21     as Exhibit Number 22.
22         - - -
23         (Whereupon, Deposition
24     Exhibit Avorn-22, "GI Label

49 (Pages 188 to 191)

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 192

1    Change for Vioxx Public Affairs
2    Plan, dated 3.23.01,
3    MRK-ADJ0020162 - MRK-ADJ0020183,
4    was marked for identification.)
5          - - -
6    BY MR. TISI:
7        Q.   Doctor, have you seen that
8    document before?
9        A.   Yes, I have.
10       Q.   Was that a document that you
11   were aware of at the time --
12       MR. BECK: Excuse me. Can
13   we go off the record for a second?
14       MR. TISI: Sure.
15       THE VIDEOTAPE TECHNICIAN:
16   The time is 3:44. We are off the
17   record.
18       MR. BECK: I've been trying
19   to keep up as best I can and I've
20   succeeded so far, but can you just
21   tell me, Chris, whether this was
22   one of the documents that was --
23       MR. TISI: It is on the
24   reliance list.

Page 193

1        MR. BECK: It's on the
2    reliance list? Okay, thanks.
3        THE VIDEOTAPE TECHNICIAN:
4    We're back on the record. The
5    time is 3:45.
6    BY MR. TISI:
7        Q.   Doctor, before we broke, I
8    showed you a public affairs plan for the
9    GI label change for Vioxx dated March
10   23rd, 2001.
11       A.   Right.
12       Q.   Have you seen that before?
13   I've shown you that in context of showing
14   you documents for litigation here.
15       A.   That's right.
16       Q.   Okay.
17          Would you please turn to the
18   page containing the Bates range 20167.
19   Do you see that?
20       A.   Yes.
21       Q.   See "Overall Communication
22   Objectives." Do you see that?
23       A.   Yes.
24       Q.   Do you see the first bullet

Page 194

1    point?
2        A.   Yes.
3        Q.   Would you please tell the
4    members of the jury what it says?
5        A.   It says "Do no harm."
6        Q.   Can you read the rest?
7        A.   Yes.
8          "Refrain from proactively
9    generating coverage that jeopardizes
10   label negotiations and/or that links
11   Vioxx to cardiovascular adverse events."
12       Q.   Doctor, were you concerned
13   in 2001 and 2002 about the delay in
14   actually getting your study off the
15   ground?
16       A.   Very concerned.
17       Q.   Do you have any explanation
18   for Merck's inability to execute a
19   contract until after the label was
20   approved for Vioxx?
21       MR. BECK: Object, leading,
22   calls for speculation, lack of
23   foundation.
24       THE WITNESS: At that time,

Page 195

1    I had no understanding of the
2    label discussions that were going
3    on. I just was concerned that
4    either this was a very big company
5    that couldn't get out of its own
6    way and make a decision in less
7    than a year on an important study,
8    or perhaps, and I vividly recall
9    raising this possibility with Dr.
10   Solomon, perhaps the foot dragging
11   was intentional because they
12   really didn't want the study to
13   get done.
14       MR. BECK: Move to strike
15   the answer, it was rank
16   speculation.
17       MR. TISI: Is that a degree
18   of speculation that's different?
19       MR. BECK: It was. It was
20   worse than his normal speculation.
21   It is rank speculation.
22   BY MR. TISI:
23       Q.   Okay.
24          First of all, was that what

50 (Pages 192 to 195)

Page 196

1   was on your mind at the time, that there
2   was a concern there was foot dragging on
3   the part of the company?
4       A.   We had --
5           MR. BECK:  Objection,
6   relevance, at what was on his mind
7   at the time.
8           THE WITNESS:  We had
9   conversations on almost a biweekly
10  basis about why is it taking so
11  long.
12  BY MR. TISI:
13      Q.   Okay.
14          Now, Doctor, I assume that
15  once the contract was signed, you got
16  right to work on actually doing the
17  study; is that correct?
18          MR. BECK:  Object, leading.
19          THE WITNESS:  We -- that was
20  our plan, but...
21  BY MR. TISI:
22      Q.   What happened?
23      A.   There was -- I learned a
24  lesson, which is that I had learned with

Page 197

1   discussions with other pharmaceutical
2   companies to never allow the funding to
3   be contingent upon their acceptance of
4   the work product because that, in effect,
5   would give a company censorship over what
6   we were able to publish.  And we managed
7   every step of the way except for one to
8   not have as any of the benchmarks in the
9   contract any words like "produce a
10  manuscript that is acceptable to Merck"
11  or "produce data that are satisfactory to
12  Merck" because I learned not to do that.
13          The thing I hadn't learned
14  yet but learned from this was that as one
15  of the -- as the only benchmark that was
16  there in the beginning was language, and
17  it's in the contract, and perhaps I
18  should actually refer to the contract,
19  the first milestone or benchmark was,
20  payment to our hospital to fund the
21  research "will be made upon acceptance of
22  a detailed protocol."
23          And it turns out that --
24  that's not a mistake I'll make again.  It

Page 198

1   turns out that Merck's acceptance of the
2   protocol even after more than a year of
3   discussion about getting the contract
4   signed, took another nine months before
5   they actually accepted the protocol.
6           MR. TISI:  Doctor, I'm going
7   to hand you a group of documents
8   that I'm going to collectively
9   refer to as Exhibits 23A through,
10  I think it's K.
11          - - -
12          (Whereupon, Deposition
13  Exhibit 23A-K, Study protocols,
14  was marked for identification.)
15          - - -
16  BY MR. TISI:
17      Q.   Doctor, is this -- what are
18  those, Doctor?
19      A.   This is a succession of
20  study protocols that we submitted to
21  Merck and which Merck then was not
22  satisfied with and then resubmit -- asked
23  us to make this change or that change,
24  often matters that seemed to us to be

Page 199

1   relatively modest to trivial, but each
2   step of the way we were told, no, you
3   need to fix that, you need to change
4   that.  And this is what occupied the
5   better part of 2002 before we could
6   actually get their okay to start doing
7   the work.
8       Q.   How long did it take
9   Harvard and Merck to agree on the
10  protocol of the study?
11      A.   Well, the first one in your
12  pile is dated June 7th, 2002, which was
13  relatively soon after the contract was
14  signed in the end of April.  And then
15  there's another one dated September 4th,
16  2002, and then another revision dated --
17  let's see, there's several revisions,
18  "Comments from Dan from 10-1," another
19  revision October 4th; October 22nd;
20  October 24th; another revision dated
21  October 31st, and then changed November
22  6th; another one from November 12th;
23  another one from December 17th; and
24  another one from February 2003.

51 (Pages 196 to 199)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 200

1    And this was unprecedented
2 in my many years of research, that there
3 would be this long a period before a
4 company signs off on a research protocol.
5    MR. BECK:  Move to strike
6    the answer as nonresponsive and
7    narrative.
8    - - -
9    (Whereupon, Deposition
10    Exhibit Avorn-24, E-mails,
11    MRK-ACT0050572 - MRK-ACT0050573,
12    was marked for identification.)
13    - - -
14 BY MR. TISI:
15    Q.  Doctor, I'm going to hand
16 you what has been marked as Exhibit
17 Number 24.  Is this an email?  This is an
18 e-mail, to move things along, an e-mail
19 from Dr. Solomon to Dr. Cannuscio
20 regarding the protocol dated November
21 26th, 2002; is that correct?
22    A.  That's correct.
23    Q.  Have you seen this before?
24    A.  Yes.

Page 201

1    Q.  Is this a document that you
2 would have seen in the normal course of
3 business?
4    A.  Yes.  I eventually had Dr.
5 Solomon blind copy me on the
6 correspondence just so I could keep track
7 of why things were taking so long to
8 actually get the clearance from Merck to
9 go ahead.
10    Q.  Do you believe you received
11 this at the time it was -- at or about
12 the time that it was sent?
13    A.  Yes.
14    Q.  Okay.
15    If you would look at the
16 last paragraph, an e-mail to Dr.
17 Cannuscio?
18    A.  Yes.
19    Q.  Okay.
20    Would you read that for the
21 members of the jury, please?
22    A.  Yes.  Maybe I should begin
23 by saying that this was a note that I
24 asked Dan to send to Carolyn Cannuscio.

Page 202

1 It had gotten kind of testy between us
2 and Merck, and I really was concerned
3 that Dr. Cannuscio had been put in the
4 middle of this.  She was a bright
5 epidemiologist, wanted to do the right
6 thing, had been a good student when she
7 was at Harvard, people thought well of
8 her, and yet she was the person that we
9 kept having to have to butt heads with.
10    And I asked Dan to convey to
11 her that although we were absolutely fed
12 up with the fact that the company was not
13 giving us the authorization, first, to
14 get the funding and then to begin the
15 study, that we didn't -- you know,
16 nothing personal, that it was not her
17 fault and we understood that, because we
18 valued her as a colleague.
19    So, the paragraph says from
20 Dr. Solomon to Dr. Cannuscio, "You should
21 know that while I have conveyed my
22 disappointment to you regarding the
23 process, it is not about your work that I
24 am referring.  You have been a very

Page 203

1 honest and responsive collaborator in
2 this process.  Thanks.  Regards, Dan."
3    MR. BECK:  Move to strike
4    the answer except for the portion
5    where he actually answered when
6    and you asked to read him what was
7    said in the last paragraph.
8 BY MR. TISI:
9    Q.  Doctor, the protocols that I
10 laid in front of you, after those
11 protocols in early 2003, did you actually
12 get to start the study?
13    A.  Well, no.  Part of what
14 Merck asked us to do during this many,
15 many months of negotiation was they asked
16 us to go back and review the individual
17 patient records for a sample of the
18 subjects in our study to see if the
19 people that we were studying as having
20 heart attacks actually had heart attacks.
21    And we pointed out to Merck
22 that that was a question that had been
23 studied by other groups previously and
24 that there was pretty good evidence in

Golkow Litigation Technologies - 877.DEPS.USA

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Page 204**

1    the medical literature that a combination
2    of diagnosis codes and hospital codes
3    virtually always meant that the person
4    had had a heart attack. And Merck's
5    response was, no, we really want to be
6    sure, and so go out and validate, have
7    people go down to Pennsylvania, get in
8    contact with the hospitals, have them
9    pull the patient's actual medical records
10   and check to see if they really had heart
11   attacks.
12       Q.   Doctor, you've done -- how
13   many studies have you done with this
14   particular database that you're talking
15   about here?
16       A.   Dozens.
17       Q.   Have you ever had any
18   company ask you to do the kind of
19   validation that Merck asked you to do?
20       A.   No.
21       Q.   Did you actually do what
22   Merck asked you to do?
23       A.   We had to.
24       Q.   What did you do? What

**Page 205**

1    happened?
2        A.   We hired a professional
3    review organization to go down to
4    Pennsylvania, we established a protocol
5    for how they would review the charts, the
6    criteria from the World Health
7    Organization about how you define a heart
8    attack, and we gave them the list of a
9    sample of patients. And they went and
10   pulled each one of their medical records,
11   which was both an expensive and a time
12   consuming process. And they then
13   confirmed that indeed in about 93 or 94
14   percent of the cases, they had heart
15   attacks, which is about as good as any
16   validation study gets.
17       Q.   Doctor, who conducted the
18   independent validation?
19       A.   It was a company that was a
20   professional review organization. I
21   think they were called KeyPro, which is a
22   group sanctioned by the government to go
23   in and inspect hospital records.
24       Q.   And did they find any

**Page 206**

1    problem with what you did?
2        A.   No. They found that we had
3    a remarkably high rate of validation.
4        Q.   Okay.
5            And when you finally got the
6    approval and the contract was signed and
7    all of the protocols were done and the
8    independent evaluation was done and all
9    those things, did you finally get to do
10   your study?
11       A.   No.
12       Q.   What happened?
13       A.   Merck told us that we could
14   not proceed until we had an independent
15   epidemiologist come in and review the
16   protocol as an outsider and also review
17   all the programming code that our
18   programmers had written to do the
19   analyses.
20       Q.   And who was that? Who did
21   that?
22       A.   That was Dr. Rhonda Bohn.
23       Q.   Okay.
24            And when was that?

**Page 207**

1        A.   I would want to look at her
2    report to be sure of the date.
3        Q.   Well, let me see if I can
4    refresh your recollection, Doctor.
5            MR. TISI: I'm going to have
6        this marked as Exhibit Number 25.
7            - - -
8            (Whereupon, Deposition
9        Exhibit Avorn-25, Contract dated
10       2.25.03, MRK-ACQ0000001 -
11       MRK-ACQ00000032, was marked for
12       identification.)
13           - - -
14   BY MR. TISI:
15       Q.   I'm not going to ask you
16   about the document, but I'll just ask
17   you, does this refresh your recollection
18   --
19       A.   Yes.
20       Q.   -- at or about the time that
21   Dr. Bohn was asked to do her work?
22       A.   Right. Merck wanted to
23   contract with her separately by them and
24   not by us so that it would be completely

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 208

1  at arm's length, which was really rather
2  odd, because Rhonda Bohn was somebody who
3  had worked in our division for years, and
4  I was her dissertation supervisor, and
5  she was involved in most of the research
6  we did while she was working with us.
7        So, the idea that she was an
8  arm's length outsider struck us as
9  bizarre, but they were fully aware of
10  that at Merck, and they, nonetheless,
11  said, no, we want to have Rhonda Bohn
12  come essentially back into your division
13  and review the code that she actually had
14  -- all of our protocols and codes were
15  essentially the same as we had done when
16  Rhonda worked with us.  So, frankly, if
17  we had gotten it wrong, I don't think
18  that somebody who had worked with us for
19  years would have spotted it.
20        But that was the way they
21  wanted to do it.  They wanted to contract
22  with her independently.  And this exhibit
23  is a letter from February of 2003 in
24  which they contracted with Dr. Bohn

Page 209

1  to do --
2        Q.   Doctor --
3        MR. BECK:  I'm going to
4  object and move to strike.  The
5  question was, does this refresh
6  your recollection --
7        MR. TISI:  Does this.
8        MR. BECK:  -- at about the
9  time that Dr. Bohn was asked to do
10  her work?  And we just got a
11  page-and-a-half speech.  I object
12  and move to strike his
13  nonresponsive speech.
14        MR. TISI:  Let me rephrase
15  the question.
16        THE WITNESS:  Yes.
17  BY MR. TISI:
18        Q.   Doctor, does this refresh
19  your recollection as to the time frame in
20  which Dr. Bohn was asked to do the work?
21        A.   Yes, it does.
22        Q.   Okay.
23        And does this now refresh
24  your recollection as to when that was?

Page 210

1        A.   Yes. February of 2003 -
2        Q.   All right.
3        A.   -- was when she was
4  contracted.
5        Q.   And did she do her work?
6        A.   Yes, she did.
7        Q.   Did she find any problems
8  with your codes and the things she was
9  asked to do?
10        A.   No.
11        Q.   Okay.
12        Now, Doctor, did there
13  finally come a time where you actually
14  had an opportunity to do the study?
15        A.   Yes.  By spring of 2003,
16  we -- there was finally no other concerns
17  that Merck had and we were given a green
18  light to proceed.
19        Q.   And did you actually do the
20  data analysis at that time?
21        A.   Yes.
22        Q.   And what did you find?
23        A.   We found that there was a
24  significant increase in the risk of heart

Page 211

1  attack in patients taking Vioxx compared
2  to comparator drugs.
3        MR. TISI:  Let me show you
4  what I'd like to have marked as
5  Exhibit Number 26, Doctor.
6        - - -
7        (Whereupon, Deposition
8  Exhibit Avorn-26, Document
9  entitled, "The Relationship
10  Between Selective COX-2
11  Inhibitors and Acute Myocardial
12  Infarction, MRK-AAD0196670 -
13  MRK-AAD0196695, was marked for
14  identification.)
15        - - -
16  BY MR. TISI:
17        Q.   Do you recognize this?
18        A.   Yes.  This is the analytic
19  tables that we provided to Merck in May
20  of 2003.
21        Q.   First of all, let me back up
22  for a moment.  Now we're in the early
23  part of 2003.  You had gone through the
24  protocol procedure, you had the contract

54 (Pages 208 to 211)

Page 212

```
1   signed, you had your codes validated, you
2   had everything you talked about done.
3         Let me ask you these
4   questions.
5         Did Merck have input into
6   the design of the study?
7         A.   Yes, in that they would not
8   let us proceed until they were perfectly
9   satisfied with the protocol.
10        Q.   And did they indicate that
11  they were satisfied with the protocol in
12  the end of the day?
13        A.   Yes.  They signed off on the
14  protocol.
15        Q.   Okay.
16        Did they have one of
17  their --
18        Did they have any employees
19  who they employed working on the study?
20        A.   Yes. Dr. Cannuscio was a
21  key member of the project team, and she
22  was a Merck employee.
23        Q.   All right.
24        Now, I put in front of you a
```

Page 213

```
1   document entitled "The Relationship
2   Between COX-2 Inhibitors and Acute
3   Myocardial Infarction" dated May 5th,
4   2003.  Would you tell me what this is?
5         A.   Yes.  This is just the
6   tables, basically the data as we had it
7   in May of 2003 from the study.
8         Q.   Okay.
9         In an overview, what did it
10  tell the people at Merck about the
11  results of your study of the -- the
12  epidemiologic study?
13        A.   That we found an increased
14  rate of heart attacks in people taking
15  Vioxx compared to comparison drugs.
16        Q.   Okay.
17        And what comparisons did you
18  use?
19        A.   Well, the one that we had
20  indicated would be the most relevant
21  would be Celebrex.  And the reason for
22  that, I was --
23        Q.   What was the reason for
24  that?
```

Page 214

```
1         A.   The reason for that was
2   that -- I was actually just teaching the
3   medical students and residents about that
4   this morning -- the fact that if you have
5   a new drug, you want to make sure that it
6   is not preferentially maybe being given
7   to sicker people or people with more
8   severe arthritis or maybe people who had
9   flunked all other treatments might be
10  given Vioxx when it came on the market.
11  And we didn't want to penalize the drug
12  because it was being given to sicker
13  people.
14        And so we reasoned that
15  Celebrex was a drug that was very, very
16  much like Vioxx and was being used, as
17  far as we could tell, pretty much
18  interchangeably with Vioxx.  And so the
19  most important comparison seemed to us to
20  be Vioxx versus Celebrex.
21        Q.   Okay.
22        Now, the results that you
23  saw here, from a public health
24  standpoint, did you consider them to be
```

Page 215

```
1   important findings?
2         A.   Yes.
3         Q.   Why?
4         A.   Because in there -- let me
5   just turn to the page with the data on it
6   as it was eventually published.  We found
7   that in the final tables, there was a
8   significant increase in the risk of heart
9   attack that we found with Vioxx compared
10  to with Celebrex.  We also found that it
11  was particularly high in people who were
12  taking higher doses of Vioxx.  And that
13  seemed like an important finding.  The
14  data for the high-dose Vioxx versus
15  high-dose Celebrex was a 70 percent
16  increase, or almost a doubling of the
17  risk of heart attack in our patient
18  population.
19        Q.   Did you find an increased
20  risk with low dose?
21        A.   Yes.
22        Q.   Did you find an increased
23  risk at less than 30 days?
24        A.   Yes.
```

Page 216

1     Q. Did you find an increased
2 risk at 30 to 90 days?
3     A. Yes.
4     Q. And was that increased risk
5 seen whether you were comparing it to
6 Celebrex or other NSAIDs?
7     A. We found it with a wide
8 variety of comparison drugs or
9 nonexposures.
10     Q. What does the word
11 "consistency" mean in your business?
12     A. That if you find one weird
13 number out there, you always have to
14 wonder whether that doesn't fit with the
15 rest of the picture. Whereas if you see
16 the same pattern coming out again and
17 again, whatever the dose, whatever the
18 duration, whatever the comparison group,
19 it's trying to tell you something.
20     Q. Was there consistent
21 findings here in what you printed and
22 sent to Merck in early 2003?
23     A. Yes. This is the report we
24 sent them.

Page 217

1     Q. Okay.
2     Doctor, did there come a
3 time where you sought to write these
4 results up in an abstract?
5     A. Yes.
6     Q. Did you speak to Dr.
7 Cannuscio about doing that?
8     A. Yes. The terms of our
9 contract were that we would allow them to
10 see what we were publishing, although
11 they did not have the right to censure it
12 or to hold it back, but as a courtesy, we
13 agreed to let them see what we were going
14 to submit and give them a period of time
15 to comment.
16     Q. Did you speak to Dr.
17 Cannuscio about the conduct -- the
18 context -- the content of the abstract?
19     A. Dr. Solomon represented our
20 group in talking with her about it.
21     Q. Okay.
22     And were you involved in
23 that process?
24     A. Yes.

Page 218

1     Q. Okay.
2     Doctor, did there come a
3 time where there was discussion about
4 whether or not Dr. Cannuscio would
5 actually be on the paper?
6     A. Yes.
7     Q. Would you describe the
8 process there, Doctor?
9     A. Yes. There are criteria for
10 who gets to be a co-author of a paper.
11 It was established that Dr. Solomon would
12 be the first author and I would be the
13 senior author, but then for everyone else
14 participating, one needs to decide is
15 what they did the kind of work that would
16 warrant being a co-author.
17     And it was clear to us that
18 Dr. Cannuscio had had that level of
19 meaningful involvement. She had
20 participated over many, many, many months
21 in the development of the protocol and
22 over revisions of the protocol, in
23 thinking about how the data would be
24 analyzed. And she was our representative

Page 219

1 of Merck to our group and did that
2 admirably.
3     And she also talked with us
4 about how the data would be interpreted
5 and how they would be written up. We
6 were a little nervous about whether she
7 would be free, as Dr. Solomon indicates,
8 to be on the paper, given her employment
9 status, but we felt that in light of her
10 contribution, she definitely should be
11 from our perspective.
12     - - -
13     (Whereupon, Deposition
14     Exhibit Avorn-27, E-mail 4-28-03
15     MRK-ADC0018638 - MRK-ADC0018639,
16     was marked for identification.)
17     - - -
18 BY MR. TISI:
19     Q. Doctor, did you --
20     I've handed you what I've
21 had marked as Exhibit 27.
22     A. Yes.
23     Q. Okay.
24     Is that a document you've

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 220

1  seen before?
2     A.  Yes.
3     Q.  Is that a document you saw
4  at or about the time that it was written?
5     A.  Yes.  We had many
6  conversations about this.
7     Q.  Was it written in the normal
8  course of business?
9     A.  Yes.
10    Q.  Is it dated March 28, 2003?
11    A.  April 28th.
12    Q.  April.  Okay.
13    A.  Yes.
14    Q.  Does this include the
15 abstract that was written by your
16 division?
17    A.  Correct.
18    Q.  And there's an e-mail there
19 as well, correct?
20    A.  Right.
21    Q.  What does the e-mail say
22 about the tables?  It says, "These tables
23 all suggest that the higher adjusted odds
24 ratios seen in shorter duration use is

Page 221

1  not confined to high....risk users."
2  What does that --
3     A.  "High dosage users."
4     Q.  "High dosage users."
5        What does that mean?
6     A.  That's a note from Dr.
7  Solomon to Dr. Cannuscio pointing out
8  something about our findings, which is
9  that this was not just about people
10 taking high-dose Vioxx, this was about
11 people taking regular dose Vioxx as well.
12    Q.  Okay.
13       And was there further
14 discussion about the co-authorship of the
15 paper?
16    A.  Yes.
17    Q.  Okay.
18       Would you please read that?
19    A.  Yes.  In Paragraph 2, Dr.
20 Solomon writes, "I would like to discuss
21 your co-authorship on the paper.  You
22 have contributed substantially to the
23 project and I am very comfortable with
24 you being a co-author, assuming that you

Page 222

1  are comfortable with its content.  In
2  light of our findings, there may be
3  aspects of the paper that will be
4  problematic from Merck's perspective.
5  You may be in a difficult position as a
6  Merck employee and a co-author."
7     Q.  Stop right there, Doctor.
8        What did you and Dr. --
9        What was your concern as
10 reflected in this paragraph?
11    A.  Well, this, again, was a
12 note that he sent to Dr. Cannuscio at my
13 suggestion to convey to her that we did
14 feel that she was a member of the project
15 team, but that we were both worried, now
16 that the study had shown that Vioxx did
17 increase the risk of heart attack, would
18 that be a problem for Merck and would
19 that be problematic for her to have her
20 name on the paper.
21    Q.  Did you actually present
22 this paper --
23       Did you actually present
24 this at a professional meeting?

Page 223

1     A.  Dr. Solomon presented it in
2  the fall of 2003 at the American College
3  of Rheumatology.
4     - - -
5        (Whereupon, Deposition
6     Exhibit Avorn-28, ARC 2003
7     Presentation MRK-AAD0333175 -
8     MRK-AAD0333207, was marked for
9     identification.)
10    - - -
11 BY MR. TISI:
12    Q.  I'm handing you what's
13 marked as Exhibit Number 23.
14    A.  Yes.
15    Q.  Okay.
16       If you would turn to
17 somewhere in the middle there.  I don't
18 have the Bates range here.  Do you see
19 your paper?
20    A.  It's here somewhere.
21 Actually it's the first one.  Oh, no,
22 that's hypertension.  Okay.
23       MR. BECK:  We have a new
24 exhibit?

57 (Pages 220 to 223)

Page 224

1    MR. TISI: Yeah. I'm sorry.
2  Did I mark it?
3        MS. SHAPIRO: Exhibit 23.
4        MR. TISI: Right there,
5  Doctor.
6        MR. BECK: So, this is
7  Exhibit 28?
8        MR. TISI: It's 28. Yes. I
9  did say 23.
10       MR. BECK: So, this is
11 Exhibit 28?
12       MR. TISI: Correct.
13       THE WITNESS: Correct.
14       And I'm leafing through it
15 to find our paper. This is a
16 collection of the papers presented
17 at that rheumatology meeting in
18 the fall of '03.
19       MR. TISI: It looks like
20 this, Doctor. (Indicating.)
21       THE WITNESS: Okay.
22       Are you referring to Dr.
23 Schneeweiss' paper?
24       MR. TISI: No. I'm talking

Page 225

1  about yours.
2        MR. BECK: Chris, can we go
3  off the record for a second, off
4  the video for a second?
5        MR. TISI: Yes.
6        THE VIDEOTAPE TECHNICIAN:
7  It is 8 minutes after 4:00. We
8  are off the record.
9        MR. GOLDMAN: This isn't
10 Bates stamped, and I don't
11 remember it being on his reliance
12 materials.
13       MR. TISI: It came from your
14 files. It came from your files.
15 It is the same problem we had
16 before, Phil. I represent it came
17 from the files.
18       MS. DAGOSTINO: There's a
19 Bates number on the bottom of the
20 one that's up there. It is the
21 same document.
22       MR. TISI: He is not relying
23 on it. It is fact testimony.
24 This came from his files, it is

Page 226

1  his report.
2        MR. BECK: I'm sorry. I had
3  I had three people talking to me.
4  I feel like a court reporter.
5            - - -
6        (Whereupon, a discussion off
7  the record occurred.)
8            - - -
9        MR. TISI: This did not come
10 from his files. It came from
11 yours.
12       MR. BECK: I understand.
13 This came from our files. It is
14 not on the reliance lists, but
15 this is what you call fact
16 testimony.
17       MR. TISI: Yes.
18       THE VIDEOTAPE TECHNICIAN:
19 We are back on the record. The
20 time is 9 minutes after 4:00.
21 BY MR. TISI:
22   Q.   Doctor, is this the abstract
23 that was presented in -- at the
24 association --

Page 227

1    A.   The American.
2    Q.   -- the American College of
3  Rheumatology in 2003?
4    A.   Correct.
5    Q.   Okay.
6        And is this the results of
7  your study, your Merck-funded study?
8    A.   Correct.
9    Q.   Okay.
10       And does it have Carolyn
11 Cannuscio's name on the top?
12   A.   Yes, it does.
13   Q.   Does it have your name on
14 the top?
15   A.   Yes, it does.
16   Q.   As a senior author?
17   A.   Correct.
18   Q.   Okay.
19       And does this --
20       Is this the results we've
21 been talking about today?
22   A.   Correct.
23   Q.   Okay. And we'll just move
24 on, Doctor.

58 (Pages 224 to 227)

Page 228

```
 1    A.  Okay.
 2    Q.  Okay.
 3        Doctor, did there come a
 4  time when you sought to convert this
 5  abstract into an actual published
 6  article?
 7    A.  Yes.
 8    Q.  And did you do that?
 9    A.  Yes.
10    Q.  Could you tell us the
11  process that that entailed?
12    A.  Sure.  Not long after the
13  abstract was submitted, we began
14  preparing it for publication.  And,
15  again, Dr. Solomon was the first author,
16  and I was the senior author.  And we put
17  it in a much longer form and submitted it
18  for publication.
19    Q.  Okay.
20        Did you submit that
21  manuscript to Merck for its comment?
22    A.  Yes, we did.
23    Q.  Okay.
24        Did they have an opportunity
```

Page 229

```
 1  to make comments?
 2    A.  Yes.
 3    Q.  Did you accept some
 4  comments?
 5    A.  We accepted some and we
 6  didn't accept others.
 7    Q.  Okay.
 8        Would you describe for us
 9  the comments that Merck did not accept?
10    A.  You mean that we did not
11  accept?
12    Q.  You did not accept that
13  Merck --
14    A.  Right, sure.
15        There were some helpful
16  comments that Merck made about making
17  things clearer.  We accepted those.  And
18  then there were others which we felt
19  would have deemphasized the importance or
20  the extent of our findings, and we tended
21  to not accept those.
22    Q.  Would you give me some
23  examples of what you --
24    A.  Sure.
```

Page 230

```
 1        MR. BECK:  I'm going to
 2  object on hearsay ground if there
 3  are documents that contain this.
 4        MR. TISI:  Well, he can
 5  testify from his personal
 6  recollection.
 7  BY MR. TISI:
 8    Q.  But go ahead.
 9        MR. BECK:  I can object on
10  hearsay grounds if he's
11  characterizing what's in a
12  document.  So, there's my
13  objection.
14        MR. TISI:  Fine.
15        MR. KLINE:  Do it both ways.
16  BY MR. TISI:
17    Q.  Would you please tell us
18  what was rejected by you that Merck had
19  suggested?
20    A.  Sure.  As best I can recall,
21  there were, for example, in the abstract
22  of the paper, as it was eventually
23  presented, there was one finding that
24  demonstrated an increased risk of Vioxx,
```

Page 231

```
 1  and the statistical significance of that
 2  was a p-value of .054.  Now, let me
 3  explain what that means.
 4        A p-value of .05 or 5
 5  percent means that there's a 95 percent
 6  certainty that the finding you are
 7  reporting was not the result of chance.
 8  And that is a benchmark that is often
 9  used, it's not engraved in stone, but it
10  is a convenient benchmark that people
11  often use to understand how likely it is
12  that this was not just the result of
13  happenstance.
14        And one of our findings had
15  a p-value of 0.54, which means that
16  instead of a 95 percent certainty or
17  likelihood that this was not the result
18  of chance, there was instead of 95
19  percent, 94.6 percent likelihood that
20  this was not the result of chance.  We
21  felt that given particularly the public
22  health importance of heart attack and the
23  widespread use of this drug that that
24  needed to be in the abstract.
```

59 (Pages 228 to 231)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 232

```
1          Merck objected that this
2    was, quote, not a significant finding
3    because it was a 94.6 percent probability
4    that it was not chance instead of a 95
5    percent and said we should take it out of
6    the abstract.
7          They also told us that we
8    should change the way we described that
9    finding as a numerical difference that
10   was not significant or something to that
11   effect.  And we disagreed on both points.
12       Q.   And did you have discussions
13   with Merck about this?
14       A.   Yes.
15       Q.   And did there come a time
16   where you had to make a decision about
17   what remained in the paper and what did
18   not remain in the paper?
19       A.   Yes.  Dr. Solomon and I
20   discussed this on an almost daily basis
21   at that point.
22       Q.   Okay.
23          And did you actually submit
24   the paper as you wished it to be?
```

Page 233

```
1        A.   Yes.
2        Q.   And was it accepted for
3    publication?
4        A.   Yes.  It was initially sent
5    to the New England Journal and JAMA, and
6    they passed on it, and it was eventually
7    accepted in Cardiology -- I'm sorry, in
8    Circulation, which is the number one
9    cardiology journal in the world.
10       Q.   And did anything unusual
11   happen at about the time of the
12   publication of the article that we've
13   been talking about?
14       A.   Yes.  As the article was in
15   galley on page proof, which is the
16   printed version of the article that is
17   sent back to the authors to make sure
18   there's no typos, we received a phone
19   call from Dr. Santanello instructing us
20   to remove Dr. Cannuscio's name from the
21   paper.
22          MR. BECK:  I'm going to
23   object just on foundation grounds
24   that "we" received.  There's no
```

Page 234

```
1    foundation that he was part of
2    this conversation.
3    BY MR. TISI:
4        Q.   Doctor, were you involved in
5    the discussions with Dr. Solomon about
6    whether Dr. Cannuscio would be on the
7    paper or not on the paper?
8        A.   Intimately.
9        Q.   Okay.
10          And did you see copies of
11   correspondence and e-mails at or about
12   the time that all of this was taking
13   place?
14       A.   Yes.  I asked him to copy me
15   on his correspondence around this issue
16   because it was a pretty heavy issue.
17       Q.   And why was it that you in
18   particular wanted to see what was going
19   on?
20       A.   Because as the senior
21   author, I have kind of overall ultimate
22   responsibility for the quality and the
23   integrity of the product since it
24   happened in my division kind of under my
```

Page 235

```
1    authority even though Dr. Solomon did
2    most of the heavy lifting and the hard
3    work.  And I take authorship issues very
4    seriously, as all of us in universities
5    do, and we had anticipated, as we just
6    discussed in that previous memo, that it
7    might be problematic, as was written, for
8    Dr. Cannuscio to remain a co-author of a
9    paper that showed that her employer's
10   product increased the risk of heart
11   attack.  And Dr. Solomon and I would
12   discuss this, at that point, on a daily
13   basis.
14          MR. BECK:  I'm going to move
15   to strike the last three answers.
16   The foundation is not laid by the
17   fact that he has hearsay
18   conversations with somebody that
19   works with him.  My objection was
20   that it's hearsay and foundation
21   that there's no testimony that he
22   was involved in the discussions
23   with people from Merck about --
24          MR. TISI:  I understand your
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 236

```
 1    objection.  I understand your
 2    objection, Counsel.
 3          - - -
 4          (Whereupon, Deposition
 5    Exhibit Avorn-29, E-mail 4-5-04
 6    MRK-ACQ0001088 - MRK-ACQ0001091,
 7    was marked for identification.)
 8          - - -
 9    BY MR. TISI:
10    Q.   Doctor, did you receive a
11    copy of an e-mail that Dr. Cannuscio sent
12    to your group regarding Dr. Cannuscio's
13    involvement in the study that you were
14    talking about?
15    A.   I think you mean did Dr.
16    Solomon --
17    Q.   Dr. Solomon.
18    A.   -- receive.  Yes.
19    Q.   Did you receive a copy of
20    it?
21    A.   Can't recall, although I
22    know that we discussed it immediately
23    upon its arrival because I instructed him
24    that we --
```

Page 237

```
 1    Q.   Okay.  Go to the second
 2    page --
 3    A.   Okay.
 4    Q.   -- of the document.
 5    A.   Which?
 6    Q.   April 5th, 2004.  Do you see
 7    it?  The middle of the page.
 8    A.   Okay.  Yes.
 9    Q.   Do you see that e-mail from
10    Dr. Santanello at Merck to Dr. Solomon?
11    A.   Yes.
12    Q.   "Subject:  Thank you for
13    your time."
14    A.   Yes.
15    Q.   Do you see that?
16    A.   Yes.
17    Q.   And did you receive a copy
18    of this e-mail at or about the time it
19    was sent to your company?
20    A.   I know that Dr. Solomon
21    forwarded material to me around this
22    Cannuscio authorship business, and I
23    can't recall whether he sent me this one
24    or others.
```

Page 238

```
 1    Q.   Okay.
 2          Well, then, let's move on
 3    then.
 4          Did there come a time when
 5    anything unusual happened with respect to
 6    Dr. Cannuscio's co-authorship of the
 7    paper?
 8    A.   Dr. Solomon asked me what to
 9    do about the fact that he had been
10    instructed by Merck to pull Dr.
11    Cannuscio's name off the paper.
12    Q.   What was your response?
13    A.   My response to him was that
14    that was not accept --
15          MR. BECK:  I'm going to
16    object, hearsay.
17          THE WITNESS:  I responded to
18    him that that was not acceptable,
19    because authorship is authorship,
20    and Dr. Cannuscio had been a
21    meaningful member of our team.
22    And I told him that it was not
23    okay for him to -- and he
24    agreed -- for him to accede to Dr.
```

Page 239

```
 1    Santanello's instructions because
 2    it was Dr. Cannuscio's decision
 3    rather than Merck's decision as to
 4    whether -- it should be Dr.
 5    Cannuscio's decision rather than
 6    Merck's as to whether she was
 7    going to remain as a co-author on
 8    the paper.
 9    BY MR. TISI:
10    Q.   Let's skip right to the
11    publication of the paper, Doctor.
12          When the paper was
13    published, did anything unusual happen?
14    A.   Yes.  The difficulty that
15    Dr. Solomon was having was that I had
16    instructed him to not pull Dr.
17    Cannuscio's name off the paper on the
18    say-so of her boss, and that we needed to
19    hear from her, if at all.  Dr. Cannuscio
20    at the time was on maternity leave and
21    was apparently difficult to reach, and
22    so --
23          MR. BECK:  I'm going to
24    object.  This is all hearsay and
```

61 (Pages 236 to 239)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 240

1    there's no foundation.
2  BY MR. TISI:
3    Q.   Actually, let me lay a
4  foundation here, Doctor.
5        Were you intimately involved
6  in the issue of whether Dr. Cannuscio was
7  to remain on your paper or not?
8    A.   Yes.
9    Q.   Okay.
10       And in the context of that,
11  did you ever learn that Dr. Cannuscio
12  requested that her name be taken off the
13  paper?
14   A.   Yes.
15       MR. BECK:  I'm going to
16   object, foundation and hearsay.
17       MR. TISI:  You can object.
18   That's fine.
19  BY MR. TISI:
20   Q.   What happened?
21   A.   Dr. Solomon told me that as
22  I have --
23       MR. BECK:  Object, hearsay.
24  BY MR. TISI:

Page 241

1    Q.   I'm asking what happened.
2        Did her name come off the
3  paper?
4    A.   Her name came off the paper,
5  and I reluctantly agreed to let that
6  happen.
7    Q.   Okay.
8        And when it was published,
9  did it have her name on it?
10   A.   Yes and no.
11   Q.   Well, would you explain what
12  happened?
13   A.   Yes.  I became – and now
14  we're at the kind of hour by hour stage
15  of involvement.  The journal Circulation
16  was pressuring us to finalize the
17  authorship list, because it was already
18  virtually -- it was in print, and it was
19  about to be sent off to the printer.  The
20  page proofs or the galleys were complete.
21  And I instructed Dr. Solomon that until
22  we had heard from Dr. Cannuscio directly,
23  we would not remove her name from the
24  paper.

Page 242

1        He then asked me what to do
2  because --
3        MR. BECK:  Object, hearsay.
4        THE WITNESS:  -- because
5        Circulation was pressuring him for
6        a final decision.  And in the
7        course of our sending the galleys
8        back to Circulation, we received a
9        call from Dr. Cannuscio indicating
10       that she needed to have her name
11       off the paper.  And I instructed
12       Dr. Solomon that we needed to have
13       that in writing in a fax or an
14       e-mail in order for that to be
15       legitimate.
16  BY MR. TISI:
17   Q.   Did you get that fax or
18  e-mail?
19   A.   Yes.
20   Q.   Did you take her off the
21  paper?
22   A.   Yes.
23   Q.   When it was published, what
24  happened?

Page 243

1    A.   Well, the word from Dr.
2  Cannuscio arrived late enough in the
3  process that when the paper actually went
4  up on the journal's website, she was
5  still on it because we had not yet gotten
6  her request to have her taken off of it.
7        We then immediately upon
8  getting her request contacted Circulation
9  and asked them to correct the website.
10   Q.   Did you do that?
11   A.   Yes.
12   Q.   Did you acknowledge Dr.
13  Cannuscio in any other way in that paper?
14   A.   Yes.  I wrote an
15  acknowledgment that I asked Dr. Solomon
16  to include in the paper.
17   Q.   And you did that?
18   A.   Yes.  That was my -- those
19  are my words.
20       Because I felt that leaving
21  aside the ethics of it, here was a young
22  woman starting out her career who was
23  about to have a paper in the best
24  cardiology journal in the world and that

62 (Pages 240 to 243)

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 244

1  she deserved to be a co-author of. And I
2  was concerned, almost in my faculty role,
3  that here somebody's hard work was being
4  snatched away from her.
5       So, I wrote that language
6  that indicated there was an unnamed
7  epidemiologist who had worked with us, as
8  it says, "Actively in the study design,
9  statistical analysis, and interpretation
10 of the date and preparation of the
11 manuscript," which are, in fact, the
12 criteria for authorship. And while we
13 are forbidden from using Dr. Cannuscio's
14 name, I wanted her to be able to refer to
15 that as she went on in her career and say
16 that was really me. And so we did put
17 the acknowledgment that I wrote at the
18 end of the paper, but still respected her
19 wishes to be not listed as a co-author.
20      MR. BECK: I object and move
21      to strike the nonresponsive
22      answer. The question was, "And
23      you did that?"
24 BY MR. TISI:

Page 245

1       Q.   Did you explain to us why
2  you did that, Doctor?
3       A.   Yes.
4       Q.   Now, Doctor, this article
5  was then published in Circulation?
6       A.   That's right.
7       MR. TISI: Okay.
8       And I'm going to show you
9       what I would like to have marked
10      as Exhibit 30.
11           - - -
12      (Whereupon, Deposition
13      Exhibit Avorn-30, Bulletin
14      4-21-04 MRK-AAR0069284, was
15      marked for identification.)
16           - - -
17 BY MR. TISI:
18      Q.   And you testified before,
19 and I just want to refer you to that
20 testimony, that you felt this was an
21 important public health issue that your
22 study was addressing?
23      A.   I've said that, and I felt
24 that, and I feel that.

Page 246

1       Q.   Okay.
2       Now, let me show you what I
3  have had marked as Exhibit Number 29 --
4       THE COURT REPORTER: 30.
5  BY MR. TISI:
6       Q.   30. I will represent to you
7  that it is a bulletin being used for
8  detailers detailing Vioxx.
9       A.   You mean the sales
10 representatives?
11      Q.   The sales representatives.
12      A.   For Merck?
13      Q.   Yes.
14      And it's dated April 21st,
15 2004.
16      A.   Correct.
17      Q.   Do you see that, Doctor?
18      And does it refer to your
19 particular study?
20      A.   Yes.
21      Q.   And it's called an "Obstacle
22 Response." Do you see that?
23      A.   Right.
24      Q.   Did you consider your paper

Page 247

1  an obstacle?
2       A.   No.
3       Q.   You're smiling. Why do you
4  smile?
5       MR. BECK: Object,
6       relevance.
7       THE WITNESS: Because it was
8       an important finding about the
9       risks of a very, very widely-used
10      drug in relation to a very common
11      and important and dangerous side
12      effect that was only an obstacle,
13      I suppose, from the perspective of
14      Vioxx sales, but it was not an
15      obstacle in terms of science.
16      MR. BECK: Move to strike
17      both as nonresponsive and
18      speculative.
19 BY MR. TISI:
20      Q.   When it says "Action
21 required," it says, "Do not initiate
22 discussions on this article with
23 physicians." Do you see that?
24      A.   I see that.

Page 248

```
 1      Q.   Doctor, as somebody who has
 2  been involved in academic detailing,
 3  which we spoke about before, can you
 4  think of any medical or scientific reason
 5  why a responsible drug company would not
 6  want to have all of the evidence
 7  discussed with physicians?
 8          MR. BECK:  Object, improper
 9      subject for expert testimony.
10      He's not qualified in it.  It
11      calls for speculation.
12  BY MR. TISI:
13      Q.   I'm not asking you to
14  speculate, Doctor.  I'm asking you as
15  somebody who has done research in this
16  area, is there any medical or scientific
17  reason why this article and this research
18  should not be shared with doctors?
19          MR. BECK:  Same objections.
20          THE WITNESS:  No.
21  BY MR. TISI:
22      Q.   Why not?
23      A.   As someone who has spent his
24  life studying how doctors make
```

Page 249

```
 1  prescribing decisions and written papers
 2  about and conducted programs in the fair
 3  and evidenced-based presentations of both
 4  benefit and risk data to physicians so
 5  that they can be helped to make more
 6  appropriate decisions to benefit their
 7  patients, I can think of no reason that
 8  anybody would -- no legitimate reason why
 9  it would be ever appropriate to suppress
10  negative findings about a drug risk.
11          MR. BECK:  Same objection,
12      and move to strike.
13  BY MR. TISI:
14      Q.   Is there anything in this
15  obstacle response that indicates that
16  Merck funded this study, approved the
17  protocol, approved the statistical
18  analysis and worked on the manuscript?
19      A.   No.
20      Q.   Doctor, I'd like for you to
21  turn, and I'm going to switch topics for
22  a moment.  Let's go to Avorn Exhibit
23  Number 9, which is in the binder there.
24  And it's an article entitled "Adjustment
```

Page 250

```
 1  for Unmeasured Confounders."
 2      A.   Yes.
 3      Q.   Do you remember that study?
 4      A.   Yes.
 5      Q.   Was that Merck funded?
 6      A.   Yes.
 7      Q.   And what was the purpose of
 8  that study?
 9      A.   We wanted to be certain in
10  --
11          When we found that there was
12  a higher risk of heart attack in patients
13  taking Vioxx, as I said before, we wanted
14  to make sure that to be fair to the drug,
15  that was not because people who happened
16  to be on Vioxx were sicker had -- or
17  were more likely to be smokers, which we
18  know causes heart attack, or might have
19  been more overweight or perhaps were less
20  likely to be taking aspirin.
21          And these are all potential
22  risk factors for heart attack, but we did
23  not have information about them in our
24  data about their drug prescriptions and
```

Page 251

```
 1  their medical history.  And we wanted to
 2  have some independent assessment of maybe
 3  people who were taking Vioxx were sicker
 4  than people taking Celebrex.  And if that
 5  was the case, it would cast our findings
 6  into doubt and we wanted to get it right.
 7      Q.   And when you did the study,
 8  what did you find?
 9      A.   That there was no meaningful
10  difference between Vioxx users and
11  Celebrex users, and, in fact, to the very
12  small extent that there was a little bit
13  of a difference, it indicated that our
14  findings would have underestimated the
15  risk of Vioxx.
16      Q.   Go to the next document,
17  Exhibit Number 6.  It's another article,
18  "Determinants of Selective COX-2
19  Prescribing."
20      A.   Yes.
21      Q.   Do you see that?
22      A.   Yes.
23      Q.   Okay.
24          "Are patient or physician
```

Page 252

1  characteristics more important?"
2      A.   Right.
3      Q.   Do you see that?
4      A.   Yes.
5      Q.   Okay.
6          Is that an article you
7  wrote?
8      A.   Yes.  With my team.
9      Q.   And it was published in
10 2003?
11     A.   Yes.
12     Q.   Okay.
13         What, if anything, briefly,
14 did you conclude?
15     A.   Well, we were at that point
16 trying to understand how it could be that
17 the use of COX-2 drugs, both Vioxx and
18 Celebrex, were going through the roof
19 despite the fact that they had never been
20 shown to be better pain relievers or
21 anti-inflammatory drugs and with the
22 evidence that was already out there about
23 their risks.  The benefit that they had
24 in relation to less stomach symptoms did

Page 253

1  not seem to us to be enough reason to
2  explain that astronomical rise.
3          So, we looked in our
4  database at the patterns of use, and we
5  thought, well, maybe there are more
6  people out there who are getting this
7  drug because they have a history of ulcer
8  or a bleeding problem or are on
9  anticoagulants, all of which would be
10 reasons to use them.
11     Q.   And what did you find?
12     A.   We found that that really
13 didn't predict who was getting these
14 drugs.
15     Q.   In the conclusion, if you go
16 to Page 720, it says, "Important
17 questions have emerged as to whether or
18 not possible increases in cardiovascular
19 risk associated with these agents should
20 limit their use to patients who are most
21 likely to benefit from improved
22 gastrointestinal safety."
23     A.   Correct.
24     Q.   What, if anything, are you

Page 254

1  saying here about the risk/benefit of
2  Vioxx?
3      A.   That by 2003, we were
4  writing that there was already, as we
5  say, important questions about they
6  might -- about whether they increase
7  cardiovascular risk, and that, therefore,
8  these should be drugs used in patients
9  who are -- in whom it's worth taking that
10 risk if you really needed to have a drug
11 that was gentler on the stomach, but not
12 in other people who didn't need that
13 extra degree of stomach protection.
14     Q.   Could you turn to Page
15 718 -- 719, excuse me.
16     A.   Yes.
17     Q.   It says, "Other factors" in
18 the middle of the page.  "Other factors
19 may also be important correlates to
20 prescribing, such as patients education
21 level and...social" work, as well as --
22     A.   Social network.
23     Q.   -- "social network," and
24 "patient...exposure to advertising."

Page 255

1          Do you see that?
2      A.   Patient and physician
3  exposure to advertising.
4      Q.   Yeah.  And what did you mean
5  by that?
6      A.   That since we couldn't
7  explain the very, very widespread use of
8  these drugs based on their being
9  prescribed to patients in whom it would
10 be worth the tradeoff of higher heart
11 attack risk in exchange for perhaps more
12 ulcer protection, that there must be
13 something else going on.  And one of the
14 factors that was an obvious potential
15 cause was the extensive advertising to
16 patients and to doctors.
17     Q.   Have you written about the
18 effect of direct-to-consumer advertising
19 in commercial detailing on prescribing
20 practices?
21     A.   Yes, I have.
22     Q.   What, if any, effect does
23 direct-to-consumer advertising have on
24 physician prescribing behavior?

65 (Pages 252 to 255)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 256

1      A.   As I've written, and as many
2   people have found, it drives physician
3   prescribing, which is why it gets done so
4   much.  And that patients will often tell
5   a doctor, I saw this ad or I heard this
6   commercial, do you think I ought to be on
7   this drug, give me t drug.
8      Q.   Now, you've testified to a
9   lot of issues that you developed during
10  the course of your work with Merck and
11  during the course of the time the drug
12  was on the market.  Do you hold those
13  opinions in things that you've testified
14  to to a reasonable degree of medical
15  certainty, Doctor?
16     A.   Yes, I do.
17     Q.   Okay.
18          And you still hold those
19  opinions to a reasonable degree of
20  medical certainty today?
21     A.   Absolutely.
22     Q.   Doctor, we've talked about
23  what you were doing between 2000,
24  actually, earlier, and 2004 regarding

Page 257

1   Vioxx. Let's talk a little bit about
2   your expert testimony that you are
3   involved with here.
4      A.   Okay.
5          MR. TISI:  Let's take a
6   quick break if you don't mind.
7          THE WITNESS:  Good.
8          THE VIDEOTAPE TECHNICIAN:
9   The time is 4:31.  We are off the
10  record.
11              - - -
12          (Whereupon, a recess was
13  taken from 4:31 p.m. until
14  4:54 p.m.)
15              - - -
16          THE VIDEOTAPE TECHNICIAN:
17  We are back on the record.  The
18  time is 4:54.
19  BY MR. TISI:
20     Q.   Doctor, we talked about what
21  you were doing between -- up to 2004 when
22  the drug was taken off the market.  We
23  met in early 2005, in May of 2005?
24     A.   Right, right.

Page 258

1      Q.   Did we ask you to do
2   anything -- well, let me ask you this
3   question.
4          Did we provide you with
5   information when I first met you in May
6   of 2005 that you had not previously seen,
7   some of which was not publicly available?
8      A.   Yes.
9      Q.   What did we specifically ask
10  you to do in preparing to give expert
11  opinions to the jury in this case?
12     A.   To look at the information
13  about Vioxx, both what was available in
14  the open literature and what was
15  available to FDA, what was available to
16  Merck, and to evaluate the whole
17  portfolio of information to determine
18  whether, A, there was a likelihood that
19  Vioxx does cause cardiovascular damage;
20  and B, to assess the way that Merck
21  handled that information, what it
22  developed, what it didn't develop, and
23  whether their behavior was reasonable in
24  light of the studies they conducted and

Page 259

1   their communication with physicians and
2   patients about the risks and benefits of
3   Vioxx.
4      Q.   Are those --
5          Did we ask you to perform
6   tasks that you would normally do in your
7   professional and scientific practice?
8      A.   Yes.  Most of those are the
9   kinds of things that a person in my line
10  of work would do.
11     Q.   Now, have you -- I'm going
12  to ask you some of the things you
13  reviewed and some things that you didn't
14  review.
15          Have you reviewed additional
16  study material including internal Merck
17  clinical study reports?
18     A.   Yes.
19     Q.   Have you reviewed the
20  transcripts from the FDA Advisory
21  Committees concerning Vioxx for 2001?
22     A.   Yes.
23     Q.   And the Advisory Committee
24  for Vioxx for 2005?

66  (Pages 256 to 259)

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 260

1    A.   Yes.
2    Q.   Have you reviewed documents
3  from the Food & Drug Administration?
4    A.   Yes.
5    Q.   What kind of documents did
6  we ask you to take a look at?
7    A.   In relation to the FDA in
8  particular?
9    Q.   Yes.
10   A.   The medical officer's
11  valuation of the new drug application
12  that Merck submitted to FDA when it was
13  first trying to get Vioxx on the market,
14  as well as their ongoing assessment of
15  the safety and efficacy of the drug and
16  the other valuations done by FDA
17  personnel.
18   Q.   Have you reviewed internal
19  documents from Merck?
20   A.   Yes.
21   Q.   And what kind of documents
22  did we give you to review for Merck?
23   A.   Merck's assessment of data
24  from its own clinical trials, some of

Page 261

1  which I have not seen published in the
2  literature; their memos to one another
3  about their progress, their
4  interpretation of what was being found,
5  their plans for what to do; their
6  communication packages that they were
7  going to use to train their sales reps to
8  talk to doctors about Vioxx; their
9  discussions with FDA about the labeling
10  changes that FDA had proposed and their
11  response to that.
12   Q.   Have you reviewed materials
13  related to a study that we've referred to
14  and the jury hasn't heard yet called
15  APPROVe?
16   A.   Yes.
17   Q.   What kind of materials did
18  you review in connection with a study
19  called APPROVe?
20   A.   Well, that's a study that I
21  have been following just apart from
22  anything related to this litigation
23  because it's of interest to our group.
24  And so there was certainly the material

Page 262

1  that was published in the New England
2  Journal of Medicine.  There was also
3  additional material around the changes or
4  the followup data that became available
5  recently about APPROVe that I had
6  actually seen from other sources that was
7  sent to me to evaluate.
8        And so there was the
9  followup data, and as recently last week,
10  again, unrelated to litigation, my
11  colleagues and I have been reviewing what
12  appeared in the New England Journal of
13  Medicine on its website as recently as a
14  week or so ago about the APPROVe data.
15   Q.   What about the ADVANTAGE
16  study, have you reviewed documents
17  related to the ADVANTAGE study?
18   A.   Yes.
19   Q.   Have you reviewed documents
20  from studies which we have called 090 and
21  085?
22   A.   Correct.
23   Q.   Have you reviewed materials
24  relating to the osteoarthritis Vioxx

Page 263

1  studies?
2    A.   Yes.
3    Q.   Have you reviewed —
4        First of all, was ADVANTAGE
5  an osteoarthritis study?
6    A.   Yes, it was.
7    Q.   Okay.
8        Have you reviewed various
9  meta-analysis?  First of all, what is a
10  meta-analysis?
11   A.   A meta-analysis is a kind of
12  study of studies in which a scientist
13  tries to pull together all of the
14  information or all of the trials or all
15  of the epidemiologic studies that were
16  done on a given topic and to try to see
17  if there is a consistent picture that
18  emerges from looking at all the studies
19  together as opposed to looking at each
20  study separately.
21   Q.   Are there concerns --
22        Are there limitations in
23  doing a meta-analysis?
24   A.   They have strengths and they

67 (Pages 260 to 263)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 264

1  have weaknesses. The strengths are that
2  if they are done well, you can get a
3  perspective that you might not get from
4  studies one looked at one at a time. But
5  the problem is that you've got to make
6  sure that you have all the information
7  and that you need to evaluate studies
8  that are done well, and you don't want to
9  mix in studies that were done poorly, and
10 that can give you a false impression.
11     Q.   Have you reviewed various
12 meta-analyses that were done relating to
13 Vioxx?
14     A.   Yes.
15     Q.   Have you reviewed what the
16 jury may or may not have heard of
17 already, the Konstam meta-analysis?
18     A.   Yes.
19     Q.   Okay.
20         And that was published in
21 Circulation in 2001?
22     A.   Right.
23     Q.   Have you reviewed what has
24 been referred to as the Juni

Page 265

1  meta-analysis?
2      A.   Yes.
3      Q.   Okay.
4          And have you considered
5  that?
6      A.   Yeah, that was in Lancet.
7      Q.   Okay.
8          Have you reviewed a
9  meta-analysis done by Dr. Topol and Dr.
10 Nissen?
11     A.   Yes.
12     Q.   Okay.
13         And have you considered
14 that?
15     A.   Yes.
16     Q.   Have you reviewed Merck-run
17 Alzheimer's studies including study 078
18 and 091?
19     A.   Yes.
20     Q.   Have you considered the
21 various pharmacologic studies concerning
22 potential mechanisms of how Vioxx
23 actually works?
24     A.   Yes, I have.

Page 266

1      Q.   Have you reviewed the
2  original label for Vioxx that was used
3  between 1999 and April of 2002?
4      A.   Right.
5      Q.   Have you reviewed the label
6  that was changed in April of 2002 with
7  respect to the VIGOR study?
8      A.   Yes.
9      Q.   Have you reviewed the
10 documents related to the --
11         Have you reviewed
12 depositions in this case?
13     A.   Some.
14     Q.   Okay.
15         You mentioned Ed Scolnick
16 before. Why is it that you reviewed Ed
17 Scolnick?
18     A.   Because he was really one of
19 the central figures on the Merck side in
20 the development and the launch and
21 followup of the whole Vioxx story. He
22 was really a main character.
23     Q.   And did you review the
24 deposition of Gregory Curfman?

Page 267

1      A.   Yes.
2      Q.   And do you know Dr. Curfman?
3      A.   Yes.
4      Q.   Who is Dr. Curfman?
5      A.   Dr. Curfman is the executive
6  editor of the New England Journal of
7  Medicine.
8      Q.   What is his reputation in
9  the medical community?
10     A.   Stellar.
11         MR. BECK: Objection.
12         THE WITNESS: He is seen as
13 a superb reviewer, superb editor,
14 superb physician.
15         MR. BECK: Move to strike
16 one witness commenting on the
17 credibility or reputation of
18 another.
19 BY MR. TISI:
20     Q.   Do you know whether or not
21 the editor of the New England Journal of
22 Medicine -- strike that question.
23         Did you review the
24 deposition of Eric Topol?

68 (Pages 264 to 267)

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 268

1     A.   I believe I did.
2     Q.   And who is Dr. Topol?
3     A.   He is a cardiologist who --
4  a fairly renowned cardiologist who was at
5  the Cleveland Clinic until recently and
6  was, I believe, provost there.
7     Q.   And have you reviewed the
8  deposition of any other Merck or
9  non-Merck witnesses that you can recall?
10    A.   None that come to mind.
11    Q.   Do you feel it important to
12 the issues that we asked you to address
13 to review the deposition testimony or the
14 trial testimony of every Merck witness
15 who has testified in this litigation?
16    A.   That would not even be
17 possible even if I wanted to.  But my
18 concern has been on what was done and
19 said and acted upon at the time, not a
20 reconstruction of that years later in the
21 midst of litigation.
22    Q.   Dr. Avorn, are you a
23 pharmacologist?
24    A.   No.

Page 269

1     Q.   What relevance, if any, do
2  pharmacologic evidence concerning Vioxx
3  work have in considering the questions of
4  Vioxx's effect in human beings?
5     A.   Well, pharmacology is a
6  piece of the story in that it can provide
7  evidence about how a drug may or may not
8  exert its beneficial effects or its side
9  effects.  But very often, we don't
10 understand the pharmacology even for very
11 commonly used drugs well enough to really
12 be able to use that to predict every last
13 aspect of how a drug is going to behave.
14    Q.   Well, let me ask you this
15 point blank, Doctor.
16         Is it necessary for
17 scientists to make decisions about drug's
18 risks and benefits for them to know
19 precisely how a drug works in order to
20 conclude that a drug is either beneficial
21 or harmful?
22    A.   No.  Most drugs that we use,
23 or many drugs, we don't have an intimate
24 knowledge of the exact mechanism.  It's

Page 270

1  interesting, it is perhaps a clue, but it
2  is not necessary.
3     Q.   We talked about
4  epidemiologic studies earlier, clinical
5  trials.  Are there any other kinds of
6  evidence that people such as yourself
7  rely upon in looking at risks and
8  benefits of drugs?
9     A.   Well, there is primarily the
10 two kinds of studies I talked about
11 before, the clinical trials where
12 patients are enrolled and randomly
13 assigned to get treatment A or treatment
14 B, and the observational studies in which
15 you observe large numbers of people as
16 they are being treated by their doctors.
17    Q.   Have you considered the
18 various epidemiologic studies that were
19 published in addition to your own in
20 forming your opinions in this case?
21    A.   Yes.
22    Q.   Does it include studies that
23 may have disagreed with some of your
24 results in certain respects?

Page 271

1     A.   Sure.  We followed those
2  studies very carefully because they were
3  on the same trail that we were, so to
4  speak, and they were looking at similar
5  questions, and we were very interested in
6  the details of how they were looking at
7  those questions.
8     Q.   Are epidemiologic studies
9  such as the ones that you conduct
10 important in defining risks?
11    A.   Yes.  They are one important
12 part.
13    Q.   Why are they important as
14 contrasted with a clinical trial, a
15 controlled clinical trial?
16    A.   Each kind of study has its
17 own strengths and weaknesses.  Clinical
18 trials are great for being able to really
19 get a clear answer about whether a drug
20 works in a particular setting in the
21 patients that are being studied.  But it
22 also has down sides, in that often the
23 people in the trial are not exactly or
24 even close to being like the people who

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 272

1  are actually taking the drug in the real
2  world. So that there's evidence, and
3  we've actually published a paper in JAMA
4  on this, that people in clinical trials
5  are more likely to be younger and
6  healthier, for example, than the people
7  who are taking the drug in normal
8  practice.
9        Also, clinical trials tend
10 to be often modest in size. They may be
11 just a few thousand people because these
12 are very expensive studies to do. And
13 sometimes you can miss an adverse effect
14 if you restrict your analysis only to
15 clinical trials that were done.
16       In addition, there are other
17 limitations about clinical trials. They
18 may last a brief duration. Even for a
19 drug that someone is going to take for a
20 lifetime, the study may only go on for a
21 few months. And if there's a side effect
22 that might take a while to develop, you
23 could miss it.
24       And, in addition, clinical

Page 273

1  trials tend to be done in settings where
2  you have volunteer patients and
3  physicians who do clinical trials, by
4  definition, with very carefully monitored
5  situations so that the patient taking the
6  drug is observed carefully to make sure
7  they are taking it and lab tests are done
8  in a predetermined manner which is
9  necessary for a clinical trial, but,
10 again, that may not reflect typical
11 practice with regular doctors giving
12 these drugs to regular patients in normal
13 practice.
14       Q.   Did you read the entire new
15 drug application for Vioxx?
16       A.   I couldn't possibly. It
17 would have filled up a room.
18       Q.   Well, let me ask you.
19       What is a new drug
20 application?
21       A.   A new drug application is
22 the very, very large volume of data which
23 a manufacturer has to present to the Food
24 & Drug Administration in order to get its

Page 274

1  drug approved.
2        Q.   For the purpose of answering
3  the questions that we asked you to
4  address, did you feel that it was
5  important to review the roomful of
6  documents that you just testified to of
7  pages of the new drug application?
8        A.   Well, the FDA actually does
9  review those roomful of documents, and I
10 was quite comfortable reviewing the FDA
11 medical officer's report on those
12 millions of pages.
13       Q.   Now, let me ask you some of
14 your opinions generally, and we can
15 hopefully move through these fairly
16 quickly.
17       Doctor, we addressed this
18 previously about what your opinions were
19 at the time that you were studying Vioxx.
20 Let's move forward in time.
21       As of today, do you have an
22 opinion to a reasonable degree of medical
23 certainty as to whether or not Vioxx was
24 any more effective as a pain reliever

Page 275

1  than other nonsteroidal
2  anti-inflammatories, whether it be
3  aspirin, Motrin, naproxen, all the others
4  we've talked about?
5        A.   Yes, I have such an opinion.
6        MR. BECK: I'm going to
7  object. I don't think this is
8  anywhere in his expert disclosure.
9        MR. TISI: I think it is,
10 but you can go ahead. We can
11 point it out. We'll get the
12 opinion and we'll figure it out.
13 BY MR. TISI:
14       Q.   What is your opinion,
15 Doctor?
16       A.   My opinion --
17       MR. BECK: Again, until
18 somebody can point to it...
19       MR. TISI: I can, but I'm
20 not going to waste my time doing
21 it now, Phil. It's in the report.
22 BY MR. TISI:
23       Q.   What is your opinion?
24       A.   My opinion, I think it's

Page 276

1 pretty universal, is that there's really
2 no evidence that Vioxx was or is any more
3 effective as an analgesic or a pain
4 reliever than any of the older
5 nonsteroidals that are on the market.
6    Q.   Do you know whether or not
7 Merck ever claimed that Vioxx was better
8 at pain relief than any other drug that
9 was on the market?
10    A.   It did not.
11    Q.   Is that important in
12 applying the risk/benefit analysis that
13 we talked about before?
14    A.   Yes.  Because if there were
15 a drug that was — when Vioxx first came
16 out, there were a lot of articles in the
17 newspapers calling it the super aspirin
18 and kind of implying that it worked much
19 better than aspirin or Motrin.  If that
20 were true, then maybe for somebody with
21 really bad arthritis, you might even be
22 willing to consider a slight increase in
23 some other risks if this was really the
24 most fantastic pain reliever ever.  But

Page 277

1 it's about as good as all the others we
2 have.
3    Q.   Let me go on.
4       Do you know whether or
5 not -- do you have an opinion as to
6 whether or not Vioxx had any effect on
7 the GI system?
8    A.   Yes.
9    Q.   And what is that opinion?
10    A.   Well, like all drugs in the
11 nonsteroidal class, it's more irritating
12 than not taking anything.  But it also,
13 in the VIGOR study, was found to actually
14 be less irritating to the stomach and
15 less producing of important gastric
16 problems than other drugs like naproxen
17 in particular.
18    Q.   Have you considered the fact
19 that for --
20       In assessing the benefits
21 and the risks of Vioxx, have you
22 considered the fact that at least
23 compared to naproxen it had a better GI
24 benefit?

Page 278

1    A.   Yes.  That was actually the
2 substance of the discussions that I had
3 with my colleagues around the time that
4 the VIGOR data was coming out, that,
5 well, if it is worse for your heart but
6 better for your stomach, is that a
7 tradeoff that was worth making?  Because
8 often in either practice or research or
9 teaching medical students or residents, I
10 have to confront the issue of this drug
11 is worse in this respect but better in
12 this respect, and how do you balance
13 those two.
14       There's a couple of sections
15 in my book about that, because a lot of
16 drugs will have some pluses and some
17 minuses, and you have to be able to
18 measure them and then weigh them.
19    Q.   Do you know whether or not
20 Merck, in connection with Vioxx, as time
21 went on, suggested that patients who are
22 at risk for heart problems should take
23 aspirin?
24    A.   Yes.

Page 279

1    Q.   That Vioxx was no substitute
2 for aspirin?
3    A.   Correct.  They stated that.
4    Q.   In patients in which aspirin
5 and Vioxx were taken, how did that affect
6 the GI benefit?  Do you have an opinion
7 as to that?
8    A.   I have an opinion.
9    Q.   And what is that opinion?
10    A.   Well, based on Merck's own
11 study, they did a study which I think was
12 called the aspirin endoscopy study in
13 which they actually looked at whether or
14 not the gentler on your stomach advantage
15 of Vioxx would still be there in patients
16 who needed to take a baby aspirin a day
17 to protect their heart.
18       Because after the VIGOR
19 study came out, Merck themselves were
20 saying, if you need to be on aspirin
21 while you're taking Vioxx, you should
22 take aspirin to protect your heart.
23       And in the study which they
24 conducted of patients who were given both

71 (Pages 276 to 279)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

---

Page 280

1  aspirin and Vioxx, what they found was
2  that the protective effect on the stomach
3  of Vioxx was actually lost if a patient
4  was taking aspirin in addition. That is,
5  you couldn't demonstrate the
6  gastroprotective effect of Vioxx if a
7  patient was taking a baby aspirin
8  alongside it.
9      Q.  Doctor, let me turn to a
10 slightly different topic.
11     Do you have an opinion that
12 you hold to a reasonable degree of
13 medical and scientific certainty as to
14 whether or not Vioxx is capable of
15 causing heart attacks in human beings?
16     A.  I have an opinion.
17     Q.  And what is that opinion?
18     A.  That Vioxx does cause heart
19 disease, specifically heart attacks in
20 human beings.
21     Q.  Would you briefly give us
22 the basis of that opinion?
23     A.  Yes. I think that there's a
24 number of different reasons for coming to

---

Page 281

1  that opinion, all of which, in my view,
2  point in the same direction.
3      There is initially the
4  pharmacology and animal studies
5  suggesting that inhibiting COX-2, which
6  is what Vioxx does --
7      MR. BECK: Excuse me. I
8      object to this portion. He said
9      he's not an expert in this area
10     and --
11     MR. TISI: Let me rephrase
12     the question.
13 BY MR. TISI:
14     Q.  Let me be clear, Doctor.
15     A.  Okay.
16     Q.  An epidemiologist -- does an
17 epidemiologist need to be a
18 pharmacologist to understand pharmacology
19 studies?
20     A.  No. But it helps to look at
21 those studies and to understand them.
22     Q.  And, in fact, in almost
23 every study that you published on the
24 issue of COX-2, did you or did you not

---

Page 282

1  refer to the mechanism of action as being
2  a biologically plausible mechanism that
3  would support Vioxx being a drug that
4  would cause heart attacks?
5      A.  Yes.
6      Q.  Okay.
7      Why is it, as a
8  non-pharmacologist, that you would refer
9  to pharmacology studies in the context of
10 an epidemiology study?
11     A.  Because it's an important,
12 as I said earlier, indication as to
13 whether there is more plausibility to a
14 given finding or argument that a paper
15 might be making. So that, for example,
16 if there is no reason on earth to ever
17 suspect that drug A can cause problem B,
18 you might be less likely to believe that
19 than if there were a bunch of studies in
20 rabbits and rats and in other animals
21 that all found the same problem, and then
22 you find it in humans, it's all about
23 putting the different pieces together.
24     Q.  But let's be absolutely

---

Page 283

1  clear here. Do you have to understand
2  using rabbits and mice and cells and test
3  tubes, do you have to absolutely
4  understand how a drug works in order to
5  get to the issue of what we call biologic
6  plausibility?
7      A.  No.
8      Q.  In other words --
9      A.  It's part of the story.
10     Q.  In other words, is there a
11 difference in an epidemiologist's mind
12 between biologic plausibility and
13 biologic proof and biologic certainty?
14     A.  Sure. One is certainty and
15 one is plausibility.
16     Q.  Okay.
17     What do you need as an
18 epidemiologist to factor into your
19 decisions on causation?
20     A.  Well, among the list of
21 things that we usually think of as ways
22 of being more certain about causation is
23 the strength of the association and the
24 replicability of the findings. There's a

---

72 (Pages 280 to 283)

Page 284

```
1   whole list of them.  And on that list is,
2   is there a biologically plausible
3   argument that would strengthen this
4   association.  And it is not absolutely
5   required, but like many things, if it's
6   there, it makes it somewhat more likely
7   that you are right.
8       Q.  All right.
9           So, now, let me turn back to
10  my question, which was this, Doctor:
11          What are the bases of your
12  opinion as an epidemiologist that Vioxx
13  is capable of causing heart attacks in
14  human beings?
15      A.  The clinical trial evidence
16  I think is the number one strongest
17  indication for -- or evidence for this,
18  that randomized controlled clinical
19  trials double blind in which patients who
20  were given Vioxx compared to other drugs,
21  the consistency of the evidence that
22  Vioxx causes a higher number of heart
23  attacks or other cardiovascular adverse
24  events from a number of studies which we
```

Page 285

```
1   could go through, that is one key
2   foundation of this association.  And that
3   was found in VIGOR, in 090, in ADVANTAGE,
4   in a number of studies, most of which
5   actually were conducted by Merck which
6   showed --
7       Q.  APPROVe?
8       A.  -- a higher -- I'm sorry?
9       Q.  APPROVe, does APPROVe fit in
10  there?
11      A.  APPROVe, I'm sorry, that was
12  the one that got it off the market.
13          All of those are studies
14  which showed a higher rate of heart
15  attacks and other cardiovascular outcomes
16  in patients given Vioxx.  That is one
17  line of evidence.
18          The other line of evidence,
19  which is totally separate, but also
20  points in the same direction, is studies
21  of the kind that we have done where you
22  look at people taking Vioxx compared to
23  people taking Celebrex compared to other
24  medications, and, again, finding that the
```

Page 286

```
1   people taking Vioxx out there in the
2   normal world, not in the clinical trial,
3   are having more heart attacks than people
4   not taking it.
5           And then in a way, the icing
6   on the cake is if there is some reason
7   for being able to say we think we may
8   know why this happens, that is additional
9   helpful information.
10      Q.  And did you have all three
11  of those in connection with -- to support
12  Vioxx?
13      A.  All three --
14          MR. BECK:  I'm going to
15  object.  I don't believe that this
16  line of questioning about
17  biological plausibility was
18  disclosed in his report.  If you
19  can point to me where it is --
20          MR. TISI:  I'm just going to
21  go on and we can fight about that
22  later.  It's in there and
23  certainly was in his deposition
24  testimony.
```

Page 287

```
1   BY MR. TISI:
2       Q.  Go ahead.
3       A.  Yes.  I think all three
4   lines of argument were present and
5   reasonably clear in the case of Vioxx.
6       Q.  All right.  Moving forward,
7   Doctor.
8           Do you have an opinion as to
9   whether or not it is generally accepted
10  in the medical and scientific community
11  today that Vioxx is capable of causing
12  heart attacks in human beings?
13      A.  Yes.  That was the unanimous
14  view of the FDA Advisory Committee that
15  met in 2005.
16      Q.  When you say "the unanimous
17  view," what do you mean?
18      A.  I think there were 32 people
19  voting, and I believe that 32 in answer
20  to the question, does Vioxx cause
21  cardiovascular disease in humans, I think
22  32 out of the 32 said yes, and I don't
23  think anyone said no.
24      Q.  Okay.
```

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 288

1    Dr. Avorn, do you have an
2  opinion that you hold to a reasonable
3  degree of medical certainty as to whether
4  or not a person has to be taking Vioxx
5  for any particular period of time before
6  they are actually at risk for a
7  Vioxx-induced heart attack?
8    A.   Well, in our study, we found
9  an increase in risk in 1 to 30 days, as
10  well as 30 to 90 days.  So -- and we've
11  recently just in the last week or two
12  seen that the contention --
13    Q.   Let me ask you a question.
14    A.   Okay.
15    Q.   Has there been any
16  additional evidence that you are aware of
17  that there is no particular period of
18  time where it is necessary for Vioxx to
19  cause heart attacks in human beings?
20    MR. BECK:  I'm going to
21  object that this is going to
22  elicit previously undisclosed
23  opinions or bases.  As Judge
24  Fallon has said in connection with

Page 289

1  some of plaintiffs' other experts,
2  if they get updated information
3  that they are going to testify
4  about at trial, they are obliged
5  to file a supplemental report of
6  some nature, and nothing was
7  done --
8    MR. TISI:  I understand your
9  objection, Phil, and I think that
10  there are various judges out there
11  who have held different views, and
12  since this is being taken in
13  different jurisdictions, and I
14  think there's a trial going on in
15  New Jersey right now which allowed
16  this testimony to come in, so,
17  this isn't only for the MDL.
18    MR. KLINE:  And it may not
19  run afoul of Judge Fallon's rule.
20    MR. TISI:  And it may not.
21  And I don't think information that
22  became available two days ago runs
23  foul of that rule.
24    Go ahead.

Page 290

1  BY MR. TISI:
2    Q.   Doctor, let me ask you this,
3  and I'm going to separate this out, just
4  so that we can do this fairly.
5    Has there been any evidence
6  that has come out in the past two days
7  that support your opinion that there is
8  not a period of time in which it is
9  necessary for a person to be on Vioxx
10  before they develop a Vioxx-induced heart
11  attack?
12    MR. BECK:  Same objection.
13  BY MR. TISI:
14    Q.   Go ahead.
15    A.   Well, let's call it the last
16  week, because it was put up on the
17  website of the New England Journal of
18  Medicine in the last several days, and I
19  don't remember if it was two or three.
20    Q.   Go ahead.
21    A.   But it has just become known
22  to the world at large that the analysis
23  which was performed on the data from the
24  APPROVe study, which was the study that

Page 291

1  was released in September of '04, which
2  was the occasion for withdrawing the drug
3  from the market, that the analysis which
4  was initially done and reported in the
5  New England Journal, to their
6  embarrassment, was incorrect, and that it
7  was -- it looked at this issue of before
8  18 months versus after 18 months in a way
9  that was erroneous in a statistical
10  sense.  And that if one looks at it in
11  the correct way, that there is not this
12  phenomenon of no effect before 18 months
13  and then the effect starts.
14    Q.   And --
15    A.   And if I could just complete
16  that thought.
17    The New England Journal
18  required the authors of that paper to
19  publish a correction to their original
20  report, which is the new element that has
21  come out in just the last few days.
22    Q.   Doctor --
23    MR. BECK:  Move to strike
24  the last portion as hearsay.

74 (Pages 288 to 291)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 292

1  BY MR. TISI:
2      Q.  Doctor, are there any other
3  clinical trials that you are aware of in
4  reviewing the materials we asked you to
5  review which were shorter term studies
6  where risks were seen?
7      A.   Yes.  The VIGOR study itself
8  only lasted nine months, and that was the
9  study in which the four or five-fold
10  increase in heart attacks was seen.  So,
11  if there was no effect before 18 months,
12  it would have not been seen in VIGOR, but
13  it was.
14        In addition, studies like
15  ADVANTAGE and study 090 were much briefer
16  than that, and they also found an effect
17  that was different in Vioxx users versus
18  the comparison group in well under six
19  months.
20      Q.   And looking at all of those
21  together, in your opinion, did a pattern
22  emerge that in any way suggested, good or
23  bad, that there was not a cutoff period
24  of time where the risk begins?

Page 293

1      A.   I think looking at all the
2  data together from the clinical trials,
3  and in addition, separately looking at
4  the data from the observational or the
5  epidemiologic studies, the totality of
6  the evidence does not suggest that there
7  is a, quote, safe period early on when
8  you don't get into trouble with the drug.
9      Q.   Can you think of any
10  biologically plausible mechanism where a
11  drug would have no harmful effect at 17
12  months and 30 days, but on 17 months and
13  31 days it would have an effect?
14        MR. BECK:  I'm going to
15  object here.
16        Number one, there's no
17  disclosure whatsoever on this; and
18  Number two, we're not talking
19  about plausibility now, we're
20  talking -- you're asking him for
21  an expert opinion on pharmaco --
22        MR. TISI:  Causation.
23        MR. BECK:  -- on an area
24  that he has disclaimed any

Page 294

1  expertise in, and he's testified
2  in his deposition that he's never
3  written on this.
4        MR. TISI:  I disagree, but
5  go ahead.
6  BY MR. TISI:
7      Q.   Is there any biologically
8  plausible reason that you can think of
9  for this drug or any drug to have an
10  effect that switches on at 18 months or
11  at six months or at two months?
12      A.   It would be unusual for a
13  drug to be risk free for 18 months and
14  then suddenly impose a risk, especially
15  if the risk is a doubling of
16  cardiovascular outcomes.
17      Q.   Doctor --
18        MR. BECK:  Move to strike
19  the answer.  It's not responsive.
20  BY MR. TISI:
21      Q.   Doctor, we talked about the
22  VIGOR study in the earlier part of your
23  deposition.  Have you since come to learn
24  that the data from the VIGOR study is

Page 295

1  different than you initially thought it
2  was at the time it was published?
3      A.   Yes.
4      Q.   What did you understand is
5  now different than what was originally
6  reported by Merck in November of 2000?
7      A.   Well, apparently -- not
8  apparently, it is now agreed, I think, by
9  all parties that there were three cases
10  of heart attack in patients who were in
11  the VIGOR study, who actually were in the
12  Vioxx arm of the VIGOR study whose heart
13  attacks were not included in the original
14  report as it was published in the New
15  England Journal of Medicine.
16      Q.   Were those in any particular
17  subgroup in the VIGOR study that is of
18  clinical importance?
19      A.   All of them were in what was
20  called the aspirin not indicated group,
21  which was the supposedly lower risk for
22  cardiac disease subgroup of the study.
23      Q.   In terms of the whole, what
24  we call the naproxen issue, what

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 296

1 significance, in as simple a way as you
2 can explain it, what significance is it
3 that the three deaths --
4     A.   Heart attacks.
5     Q.   -- heart attacks were not in
6 the aspirin-indicated group?
7         MR. BECK: I'm going to
8 object. I don't believe this was
9 disclosed in his report.
10         MR. TISI: Sure was. Go
11 ahead.
12         MR. BECK: Where?
13         MR. GOLDMAN: Where was it,
14 Chris?
15         MR. TISI: It was in the
16 section where he talks about the
17 expression of concern. It sure
18 was.
19         MR. GOLDMAN: The
20 significance of the fact that the
21 three heart attacks were on the
22 aspirin --
23         MR. TISI: I'm not going to
24 spend my time arguing over it,

Page 297

1 Andy. The expression of concern
2 and the significance of the three
3 deaths was indicated in the
4 report.
5         MR. GOLDMAN: Well, that's a
6 different question.
7         MR. TISI: Well, I'm going
8 to allow him to answer the
9 question, and we can certainly
10 move on from there.
11         THE WITNESS: Okay.
12         The fact that the three
13 heart attacks that were not
14 originally reported in the first
15 -- in the publication of the
16 Vioxx -- of the VIGOR study, the
17 importance of their having all
18 occurred in the, quote, aspirin
19 not indicated group is the
20 following:
21         The argument that was being
22 made in the VIGOR study as it was
23 published was that the reason that
24 there were more heart attacks seen

Page 298

1 in people taking Vioxx compared to
2 people taking naproxen was that
3 naproxen had this very powerful
4 aspirin-like effect on your
5 platelets which made them not
6 clot, and that Vioxx didn't have
7 that effect, and that's how
8 naproxen was supposedly preventing
9 heart attacks rather than having
10 Vioxx cause heart attacks.
11         The importance of those
12 three cases occurring in the
13 patients who didn't need aspirin
14 group is that that doesn't fit,
15 that if the issue was that Vioxx
16 lacked the aspirin-like effect
17 that naproxen supposedly had, then
18 you would not expect people who
19 didn't need aspirin to do any
20 worse, but, in fact, the people
21 who didn't need aspirin also did
22 worse on Vioxx, which is
23 consistent with the idea that it
24 wasn't just about some imagined

Page 299

1 naproxen protective effect, but,
2 rather, about the likelihood,
3 which I think is now quite
4 plausible that Vioxx was actually
5 precipitating the heart attacks.
6 BY MR. TISI:
7     Q.   Now, Doctor, have you
8 reviewed and relied upon any -- well,
9 strike that. Let's move on.
10         Do you have an opinion to a
11 reasonable degree of medical certainty as
12 to whether Vioxx is capable of causing
13 strokes in human beings?
14     A.   I believe that it does.
15     Q.   Based on what evidence?
16     A.   The fact that in the
17 composite endpoint in APPROVe was
18 cardiovascular thrombotic events, which
19 included heart attacks and strokes.
20 Strokes tend to be less common than heart
21 attacks, and so when they are looked at
22 separately, there's often not the power
23 or the statistical significance, but
24 typically things which cause heart

76 (Pages 296 to 299)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 300

1 attacks usually cause strokes.
2        And there's one other piece
3 of that argument, which is that in the
4 followup to APPROVe data, there was a
5 statistically significant increase in
6 strokes in the patients who had been on
7 Vioxx compared to the patients who had
8 been on placebo.
9    Q.   Let's go to the next
10 question that we asked you to address,
11 which is Merck's investigation and
12 management of -- investigation of the
13 potential of Vioxx to cause heart attacks
14 and their management of that issue, the
15 studies, the communications, et cetera.
16 Okay?
17        First of all, have you
18 reviewed documents that were before the
19 new drug application was filed for Vioxx?
20    A.   Yes. There were some
21 initial reports of clinical trials that
22 had been conducted.
23    Q.   What is the term "signal,"
24 Doctor? First of all, is the term

Page 301

1 "signal" something that is commonly used
2 in your field of pharmacoepidemiology?
3    A.   Yes.
4    Q.   Would you please explain to
5 the jury what a "signal" is?
6    A.   Yes. I think a good regular
7 language word would be "clue." That if
8 there may be some evidence that comes up
9 that is not in itself a slam dunk proof
10 that there's a problem, but something
11 that might be called a smoking gun,
12 something that sure looks suspicious and
13 warrants followup, even though in itself
14 it does not absolutely wrap up the
15 certainty that there's a problem.
16    Q.   Do you have an opinion as
17 to --
18        MR. BECK: I'm going to move
19    to strike that answer as
20    nonresponsive.
21 BY MR. TISI:
22    Q.   Okay.
23        Doctor, do you have an
24 opinion as to whether or not Merck should

Page 302

1 have recognized -- a reasonable and
2 prudent company with the knowledge that
3 Merck had before the drug was on the
4 market should have recognized that there
5 was the potential for cardiovascular
6 disease in patients who took Vioxx?
7    A.   Yes.
8        MR. BECK: Object. I object
9    to the improper subject matter for
10    expert testimony, lack of
11    qualification by this witness and
12    lack of foundation and hearsay.
13        THE WITNESS: Okay.
14        If one looks at the totality
15    of the information that was
16    available as of the time that the
17    new drug application was
18    submitted, there were a number of
19    pieces of information from
20    clinical trial data, as well as
21    from other sources, that certainly
22    raised a question as to whether or
23    not this was a problem. And I'm
24    not saying that they were slam

Page 303

1    dunk, to use a phrase from the
2    current administration, slam dunk
3    evidence that there was a problem,
4    but that certainly were very
5    suspicious worries.
6             - - -
7        (Whereupon, Deposition
8    Exhibit Avorn-31, Research
9    Management Committee 4-10-96
10    MRK-ABC0048699 - MRK-ABC0048706,
11    was marked for identification.)
12             - - -
13 BY MR. TISI:
14    Q.   I'm going to hand you what I
15 have had marked as Exhibit Number 31.
16 And for the record, this is a Research
17 Management Committee document dated
18 October 10, 1996, MRK-ABC0048699.
19        Have you seen this document
20 before?
21    A.   Yes, I have.
22    Q.   Is this a document you
23 relied on in supporting your opinion that
24 there was a, quote, signal of potential

77 (Pages 300 to 303)

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 304

1  cardiotoxicity for Vioxx prior to filing
2  of the new drug application?
3       A.   In part.
4       Q.   Okay.
5            Would you please go to Page
6  8.
7       A.   Yes.
8       Q.   First of all, what is
9  MK-966?
10      A.   That was the working name
11 for Vioxx before it was called Vioxx.
12      Q.   And is this a document that
13 is a Merck document?
14      A.   Yes.
15      Q.   In Section 3, it indicates a
16 section that says "Adverse Events."  Do
17 you see that?
18      A.   Yes.
19      Q.   Okay.
20           Would you tell us what, if
21 anything, was significant in your review
22 of this document which supports your
23 opinions?
24      A.   Sure.  In fairness, I should

Page 305

1  point out that these were very, very big
2  doses of Vioxx.  This was before they
3  really knew what the right dose would be,
4  and so these doses were 125 to 175
5  milligrams.  I think that's part of the
6  picture here.
7       Q.   Sure.
8       A.   Having said that, the second
9  paragraph -- and the other important
10 point was that this study lasted only six
11 weeks.  And so it was a really remarkably
12 short period of time in which you really
13 would not expect to see a cardiovascular
14 risk because it was only a
15 month-and-a-half long.
16           And the second paragraph
17 reads, "Adverse events of most concern
18 were in the cardiovascular system (e.g.,
19 MI" or heart attack, "unstable angina"
20 which is increasing chest pain from heart
21 disease, "rapid fall in hemoglobin and
22 hematocrit in some subjects, and a small
23 increase in blood pressure."
24      Q.   And this is October of 1996?

Page 306

1       A.   Correct.
2            And then the next sentence
3  which I think is also relevant, "We plan
4  to evaluate MK-966" or Vioxx "in a study
5  where subjects are also given low-dose
6  aspirin."
7       Q.   Was that study ever done?
8       A.   It was not until the VIGOR
9  data came out in 2000 that Merck began to
10 advocate using aspirin in people taking
11 Vioxx, and so that would have been, oh,
12 four years later.
13      Q.   All right.
14           Now, Doctor, did you also
15 review the medical officer reviews for
16 Vioxx, the FDA medical officer review for
17 Vioxx when the drug was approved?
18      A.   Yes.
19      Q.   And did you consider the
20 views of the medical officer when forming
21 your opinions?
22      A.   Yes.  Because that was what
23 was known at the time.
24      Q.   What, if any, significance,

Page 307

1  and I'm going to try to go through these
2  fairly quickly, what, if any,
3  significance was there in the
4  cardiovascular section of the medical
5  officer review for the Vioxx clinical
6  trial program that assisted you in
7  formulating your opinions?
8       A.   Well, a number of the FDA
9  staff that were evaluating Vioxx, and I'm
10 thinking of Dr. Pulayo, Dr. Villalba and
11 Dr. Targum, were struck with and noticed
12 and wrote about the fact that there
13 appeared to be an excess of
14 cardiovascular disease in patients who
15 were given Vioxx in the clinical trials
16 that were submitted by Merck to FDA in
17 the late '90s.
18      MR. TISI:  All right.
19      Moving on, I'd like to show you a
20      document.
21           - - -
22           (Whereupon, Deposition
23      Exhibit Avorn-32, Scientific
24      Advisors Meeting Minutes May 3 -

Page 308

1    May 6, 1998, MRK-AEI0002734 -
2    MRK-AEI0002746, was marked for
3    identification.)
4        - - -
5    BY MR. TISI:
6        Q.   I'm going to show you a
7    document.  First of all, is this a
8    document that you reviewed in the context
9    of your opinions that you prepared to
10   render in this case?
11       A.   Yes.
12       Q.   Okay.
13           What is this document,
14   Doctor?
15       A.   This is labeled "Scientific
16   Advisors Meeting, May 3-May 6, 1998."
17       Q.   And what is this document?
18       A.   This is a summary of the
19   report of a group of scientific advisors
20   that Merck pulled together to advise it
21   on the development of the -- of Vioxx as
22   it was in its preapproval state, that is,
23   before it was -- before the FDA approved
24   it.

Page 309

1        Q.   Would you turn to Page 11 of
2    this document?
3        A.   Yes.
4        Q.   Under the section entitled
5    "Cardiovascular."
6        A.   Yes.
7        Q.   Do you see that?
8        A.   Yes.
9        Q.   Would you please tell the
10   members of the jury what Merck was being
11   told by its Board of Scientific Advisors
12   about the potential problems for Vioxx
13   prior to the drug being on the market?
14       A.   Yes.
15           MR. BECK:  I'm going to
16       object if this witness is simply
17       going to characterize the contents
18       of the document that speaks for
19       itself.
20           MR. TISI:  Understood.
21           THE WITNESS:  The Board of
22       Scientific Advisors drew the
23       company's attention to three
24       specific issues that are numbered

Page 310

1    here.  One was the possibility of,
2    we talked about this balance of
3    COX-1 and COX-2, that if you block
4    COX-2 and don't block COX-1, the
5    committee, which was outside
6    pharmacologists of some renown,
7    said here's something that could
8    happen that one might expect or
9    worry about if you block COX-2 and
10   don't block COX-1 as much.
11           One is "the development of
12   lipid rich coronary plaques."  And
13   that's basically gunk developed,
14   building up in the artery of the
15   heart, which can then erupt and
16   form a clot and cause heart
17   disease.
18           Two, 'The destabilization of
19   the cap of these plaques by
20   inflammatory cells, making them
21   'rupture prone'."  And that is
22   what we now believe is the
23   mechanism of heart attacks.  That
24   you have this fatty gunk sitting

Page 311

1    in your arteries, and then for
2    some reason it ruptures and the
3    fat is kind of spilled into the
4    artery and that causes the clot to
5    form and that causes the heart
6    attack.
7            And three, "The thrombotic
8    occlusion of the vessel at the
9    site of plaque rupture with
10   ensuing consequences of ischemia."
11   That basically means having a
12   heart attack.
13           MR. BECK:  Move to strike
14       the answer, particularly the
15       portion about "what we now believe
16       to be the mechanism of the heart
17       attack" as undisclosed in his
18       expert report, as well as outside
19       his area of claimed expertise.
20   BY MR. TISI:
21       Q.   Doctor, putting all the kind
22   of evidence that we've been talking about
23   together, do you have an opinion as to
24   whether or not there was evidence prior

79 (Pages 308 to 311)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 312

1   to Vioxx being on the market that a
2   reasonable and prudent company reviewing
3   the safety profile of this drug would
4   have considered in terms of designing
5   their clinical trial program and
6   investigating this signal?
7       A.   Yes.
8       Q.   What is that opinion?
9            MR. BECK:  I'm going to --
10           THE WITNESS:  I'm sorry.
11           MR. BECK:  Before you give
12  your opinion, I object.  That's
13  improper subject for expert
14  testimony.  It is just a
15  substitute for lawyer's argument,
16  invades the province of the jury,
17  and this witness is not qualified
18  to speak on it, it lacks
19  foundation, and it is hearsay.
20           THE WITNESS:  Okay.
21           MR. TISI:  Hold on.  Any
22  others?
23           MR. BECK:  (No response.)
24           MR. TISI:  Okay.

Page 313

1           Go ahead.
2           THE WITNESS:  In developing
3   a drug or looking at drug risks
4   and benefits, it is necessary to
5   look not just at what is found in
6   a particular study, but also what
7   is all the evidence about what
8   might work and what might not
9   work.  And, in fact, what might
10  work can be very useful in
11  planning the development of the
12  drug.
13          And when I teach in a course
14  at Tufts Medical School for drug
15  company executives about thinking
16  about risks and benefits in drug
17  development, one of the points I
18  mention is that it's key to pull
19  together everything that's known
20  so that you can plan your clinical
21  development program, whether it's
22  animal studies or human studies or
23  followup epidemiologic studies so
24  as to follow up on signals.  Some

Page 314

1   signals may be good signals, like
2   here is a potential really good
3   effect of this drug that we want
4   to find out more about, as well as
5   the bad signals.
6           And looking at it all
7   together, there is the evidence
8   from Merck's own pharmacology
9   advisors saying here's some
10  problems that you guys need to
11  keep an eye out for because,
12  specifically, 1, 2, 3, here are
13  ways in which this drug might
14  cause heart attacks.  Nobody knew
15  specifically at the time that it
16  would, but they were told, watch
17  out for this.  I think there was
18  some phrase in here that they
19  should be actively pursued or
20  something to that effect.
21          There were the earlier
22  clinical trials that Merck had
23  performed in which whatever the
24  dose, if you have a drug that

Page 315

1   increases heart attacks in a
2   six-week study, that's an
3   important signal to worry about.
4           There were the animal
5   studies and other pharmacologic
6   studies that say, gee, you know,
7   maybe blocking COX-2 selectively
8   is not a totally good idea, maybe
9   there are some important good
10  things a COX-2 does that you don't
11  want to block totally.  And that
12  was in the literature before the
13  drug was on the market.
14          And so combining the advice
15  from their scientific advisors,
16  the evidence from the animal
17  studies, from the pharmacologic
18  literature and the evidence from
19  their own clinical trial
20  suggesting an increase in events,
21  I'm not saying they should have
22  not marketed the drug, I'm not
23  saying they should have pulled it
24  off the market the day it was

80 (Pages 312 to 315)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 316

1  approved, but I am saying that
2  these were some smoking guns that
3  a reasonable company would have
4  said, as we market this drug,
5  let's make sure that we're also
6  keeping an eye on this potential
7  problem that we've been warned
8  about from multiple sources.
9      MR. BECK: Now that he's
10  finished his answer, I have an
11  additional objection, and that is,
12  that the opinion that he just gave
13  is not disclosed in his report.
14  BY MR. TISI:
15     Q.  Doctor, let's talk about the
16  post approval period of time.  When I say
17  "post approval," I know we've had some
18  confusion in the past.  When I say "post
19  approval," I mean post approval of the
20  drug as opposed to post APPROVe study.
21     A.  Right.  Well, the APPROVe
22  study having been released in '04, but
23  approval having happened in '99.
24     Q.  Post when the drug went on

Page 317

1  the market --
2     A.  Right.
3     Q.  -- having reviewed the Vioxx
4  clinical trials that you've described,
5  and having been involved in epidemiologic
6  studies, and given your personal contact
7  with Merck, do you have an opinion as to
8  whether Merck acted with reasonable
9  prudence in investigating the signals of
10  cardiotoxicity for Vioxx?
11     MR. BECK: I object.  It's
12  an improper subject for expert
13  testimony.  This witness is not
14  qualified to give such an opinion,
15  it lacks foundation, and it's
16  hearsay.
17  BY MR. TISI:
18     Q.  Actually, before you answer
19  that question, you said something before
20  that I think I need to follow up on.
21     At Tufts Medical School, you
22  teach pharmaceutical executives on how to
23  construct and investigate their clinical
24  trial program?

Page 318

1     A.  Right.  They have a course
2  there for pharmaceutical executives that
3  I lecture in each year, and the topic of
4  my lecture is how to think about risks
5  and benefits throughout the so-called
6  life cycle of the drug.
7     Q.  Would you tell me a little
8  bit about that, Doctor.
9     A.  Sure.  There's a group
10  called the Center for the Study of Drug
11  Development at Tufts University Medical
12  School, which I have a longstanding and
13  collegial relationship with.  Even though
14  they are usually thought of as kind of a
15  pro-industry group, we get along fine.
16     And every year they ask me
17  to come and give a talk to their
18  attendees in this annual course on drug
19  development.  And what they've asked me
20  to talk about each year for the last many
21  years is how to think about risks and
22  benefits as a drug is in Phase I, Phase
23  II, which are the earliest clinical
24  trials for safety, and then Phase III,

Page 319

1  which are the big clinical trials, and
2  also Phase IV.
3     Last year they started to
4  have me spend a whole afternoon with
5  their trainees to help them work through
6  issues about drug risk in the course of
7  drug evaluation.  These are usually mid
8  to senior level managers from a variety
9  of pharmaceutical companies, as well as
10  students.  But the company people are
11  usually folks who are responsible for the
12  drug development process within their
13  companies.
14     Q.  Do you know whether or not
15  any of these people include people from
16  Merck?
17     A.  I have no way of knowing
18  which companies they are from.
19     Q.  Okay.  All right.
20     Let me ask you just a couple
21  of preliminary questions.
22     Having reviewed the Vioxx
23  clinical trials you described, and having
24  been involved in the conduct of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 320

1  epidemiologic studies with respect to
2  Vioxx, and given your personal
3  interaction with Vioxx, and looking at
4  all the information we've provided you in
5  the context of this litigation, do you
6  have an opinion as to whether or not
7  Merck acted reasonably in terms of
8  investigating the potential of
9  cardiovascular problems associated with
10  Vioxx?
11         MR. BECK: I object. It's
12  an improper subject for expert
13  testimony. It is lawyer's
14  argument, invades the province of
15  the jury. This witness is not
16  qualified to opine on that
17  subject, lack of foundation, and
18  it is hearsay.
19         MR. TISI: Okay.
20         THE WITNESS: Yes, I have
21  such an opinion.
22  BY MR. TISI:
23     Q.   Okay.
24         Now, before you give that

Page 321

1  opinion, I want to ask you a couple of
2  preliminary questions, Doctor.
3         What is the difference in
4  your mind between causation and
5  association?
6     A.   Okay.
7         That's an important
8  question. And it's really the substance
9  of a lot of the work that we do.
10         Causation is when one knows
11  that A causes B. So, for example, if I
12  were to punch you in the nose and you
13  were to bleed, that would be because I
14  punched you and my punch caused your
15  bleeding.
16         Association would be A
17  happened and then B happened. So, for
18  example, I was swinging my arm and then
19  suddenly your nose was bloody and nobody
20  saw me hit you. And a lot of what we do
21  in our research, as well as what a lot of
22  drug development and surveillance is
23  about, is trying to understand whether A
24  happened and then B happened, the patient

Page 322

1  took this drug and then this thing
2  happened. Was that because the drug
3  caused the outcome, which would be
4  causation, or is that just because, you
5  know, stuff happens.
6         And there's a lot of
7  frivolous lawsuits out there by
8  plaintiffs' attorneys for patients who
9  had bad things happen to them after some
10  doctor did something and it's got no
11  relationship at all. And so part of the
12  research that we do is to try to say, how
13  can you tell unrelated events from causal
14  events.
15     Q.   Let me just ask you this
16  question, Doctor.
17         Do you have an opinion to a
18  reasonable degree of medical certainty as
19  to --
20         MR. GOLDMAN: Whether this
21  case is frivolous?
22         MR. TISI: Do you want me to
23  ask that question? Because I'd be
24  happy to do that.

Page 323

1         MR. KLINE: Sure, ask it.
2  BY MR. TISI:
3     Q.   Is this such a case?
4     A.   This is not such a case.
5     Q.   Okay.
6         MR. BECK: I'm going to
7  object and move to strike.
8  BY MR. TISI:
9     Q.   Doctor, do you have an
10  opinion --
11         First of all, do you
12  understand the concept of reasonable
13  evidence of an association?
14     A.   Yes.
15     Q.   What does that mean?
16     A.   All right.
17         That is a substance of our
18  research. That is, is there — and this
19  is short of the absolute 12 people saw me
20  punch you in the nose. Reasonable
21  evidence of association is, would prudent
22  scientists looking at all the data say
23  that there is a good likelihood that A
24  causes B. Now, it doesn't have to be a

82  (Pages 320 to 323)

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 324

1  proof.
2      Q.  Okay.  Do you have an
3  opinion --
4          Now that we've gone through
5  that, do you have an opinion that you
6  hold to a reasonable degree of medical
7  certainty as to whether or not there was
8  reasonable evidence of an association
9  between Vioxx and heart attacks at any
10  point during the time that Vioxx was on
11  the market?
12      A.  Yes, I do.
13      Q.  You can just answer.  I know
14  you are expecting --
15      A.  Yes, I have such an opinion.
16      Q.  Okay.
17          What is your opinion?
18      A.  My opinion is that there was
19  a reasonable evidence for an association
20  between Vioxx and heart attack while the
21  drug was on the market.
22      Q.  And when was that in the
23  context of what you now know?
24      A.  Well, I think it's more fair

Page 325

1  to look at about what was known at the
2  time because --
3      Q.  What --
4      A.  What I now know about what
5  was known then.
6      Q.  Exactly.
7      A.  Okay.
8          Because I don't think it
9  would be fair to Merck to ask them to
10  have made decisions in 2001 based on what
11  we know in 2006.
12      Q.  Okay.
13      A.  But so I am focusing on what
14  was known in 2000/2001.  And I think a
15  reasonable person who is used to
16  evaluating drug outcome data would look
17  at the total body of evidence that --
18          MR. BECK:  Now that I hear
19      where we're going, let me object
20      before he gets there.  It's an
21      improper subject for expert
22      testimony, what a reasonable
23      person would do.  He's not
24      qualified to opine on that, it's

Page 326

1      simply substituting it for
2      lawyer's argument, invades the
3      province of the jury, lacks
4      foundation and is hearsay.
5  BY MR. TISI:
6      Q.  Okay.
7          Doctor --
8      A.  Let me --
9      Q.  Since this question has been
10  interrupted, and I'm not blaming anybody,
11  let me just reask it.
12      A.  Let me just clarify.
13      Q.  No.  Actually, I really have
14  to ask you.
15      A.  Okay.
16      Q.  Let me do it because it is
17  important we get it on the record.
18      A.  I think the videographer
19  wants to --
20          MR. TISI:  Oh, I'm sorry.
21          THE VIDEOTAPE TECHNICIAN:
22      This is the end of Tape 2.  The
23      time is 5:49.  We're off the
24      record.

Page 327

1              - - -
2          (Whereupon, a recess was
3      taken from 5:49 p.m. until
4      5:58 p.m.)
5              - - -
6          THE VIDEOTAPE TECHNICIAN:
7      We are back on the record.  This
8      is Tape Number 3.  The time is
9      5:58.
10  BY MR. TISI:
11      Q.  Dr. Avorn, do you have an
12  opinion that you hold to a reasonable
13  degree of medical certainty as to when
14  there was reasonable evidence of an
15  association between Vioxx and a heart
16  attack?
17          Let's do this again.
18          Dr. Avorn, do you have an
19  opinion that you hold to a reasonable
20  degree of medical certainty as to when
21  there was reasonable evidence of an
22  association between Vioxx and heart
23  attacks?
24      A.  Yes.

83  (Pages 324 to 327)

Page 328

1    Q.  What is that opinion?
2        MR. BECK: Object. This is
3    not the proper subject of expert
4    testimony. It is lawyer's
5    argument about the weight of the
6    evidence and what a reasonable
7    person would conclude, invades the
8    province of the jury. This
9    witness is not qualified to opine
10   on those subjects, lacks
11   foundation and is hearsay.
12 BY MR. TISI:
13   Q.  Before you answer that
14 question, let me ask you this one
15 question.
16       Is reasonable evidence of
17 association an epidemiologic concept?
18   A.  Absolutely.
19   Q.  Okay.
20       You may answer the question.
21   A.  Okay.
22       MR. BECK: Same objections.
23       THE COURT REPORTER: Would
24   you like to hear the question

Page 329

1    again?
2        THE WITNESS: Okay.
3        No, I've got question. I
4    just want to clarify, it being
5    late in the day, it's almost 6:00.
6        When I said "reasonable
7    person," I didn't mean the man on
8    the street. What I meant was
9    somebody in my field, a colleague
10   who studies drug benefits and
11   risks. And when I say a
12   reasonable person looking at the
13   burden of the evidence, I referred
14   not to somebody who is a
15   layperson, but to somebody with
16   expertise in evaluating such data,
17   which is what I do and what my
18   field is about.
19       That said, I have such an
20   opinion, and it is that by the
21   time the data from the VIGOR study
22   were available to Merck, which
23   would have been the spring of
24   2000, combining the VIGOR data

Page 330

1    with the evidence from the other
2    clinical trials, all of which
3    Merck had conducted itself,
4    coupled with the guidance that
5    Merck had sought and received from
6    its own Board of Scientific
7    Advisors, coupled with the
8    pharmacologic evidence that was
9    out there in the literature prior
10   to that point, by the spring of
11   2000, the burden of evidence was
12   enough to suggest that there was
13   indeed a reason for concern that
14   Vioxx was associated with heart
15   attack and other cardiovascular
16   disease in humans.
17 BY MR. TISI:
18   Q.  Was there reasonable
19 evidence of association as of that time?
20   A.  Yes.
21       MR. BECK: Excuse me.
22   Object on the same grounds that I
23   articulated last time.
24       MR. TISI: Understood.

Page 331

1        MR. BECK: Is that okay,
2    Chris?
3        MR. TISI: Absolutely.
4  BY MR. TISI:
5    Q.  Let's talk about a couple of
6  those trials. You mentioned the
7  ADVANTAGE trial before. Could you tell
8  me, first of all, when did the ADVANTAGE
9  trial data become available to Merck as
10 best as you could tell from your review
11 of the evidence?
12   A.  As I understand it,
13 ADVANTAGE was conducted around the same
14 time frame as VIGOR, so that the evidence
15 from ADVANTAGE was becoming available in
16 2000 just as the evidence from VIGOR was
17 becoming available.
18   Q.  Let's talk about ADVANTAGE
19 for a little bit.
20       Would you please describe
21 for the members of the jury what, if any,
22 significance you attach to the ADVANTAGE
23 study?
24   A.  Yes. That was a study that,

84  (Pages 328 to 331)

Page 332

1  as I recall, enrolled a smaller number
2  than VIGOR, my recollection would be
3  something like 4 or 5,000 patients who
4  were randomly allocated -- they were
5  patients with osteoarthritis. And that's
6  important because one of the concerns
7  that was raised by Merck was, well, the
8  VIGOR study was in patients with
9  rheumatoid arthritis, and they are not
10 like typical patients, and they have more
11 heart disease, so that must be part of
12 why there were more heart attacks.
13        But ADVANTAGE was not about
14 rheumatoid arthritis, it was about
15 patients who had osteoarthritis, which is
16 the garden variety arthritis people get
17 in their hips and hands and knees and so
18 forth.
19        Secondly, ADVANTAGE was not
20 in comparison -- well, it was in
21 comparison with naproxen, but there were
22 patients in it who were taking aspirin as
23 I recall. And as a result, the issue of,
24 well, this is only seen if you don't have

Page 333

1  people taking aspirin I don't believe was
2  the case in ADVANTAGE.
3        It was also a relatively
4  brief study. It did not last for the
5  full nine months on average that VIGOR
6  lasted. It was much briefer than that,
7  and yet there was still a
8  disproportionate number of heart attacks
9  in the Vioxx group compared to the
10 comparison group. And that was another
11 kind of brick in the wall indicating that
12 there was a higher rate of cardiovascular
13 disease in people given Vioxx.
14    Q.   What was the dose in that
15 case?
16    A.   12-and-a-half milligrams.
17    Q.   I'm sorry. In ADVANTAGE?
18    A.   Right. It was either
19 12-and-a-half or 25.
20    Q.   Okay.
21    A.   It was not the high dose of
22 50 milligrams that was seen in VIGOR.
23    Q.   Let's talk about the 090
24 trial that you mentioned before.

Page 334

1    A.   Right.
2    Q.   What is the 090 trial?
3    A.   That was another study done
4  in patients who had arthritis, and it was
5  reviewed on the FDA materials along with
6  study 085, I believe. And 090 was
7  important in this whole story because it
8  was not testing Vioxx against naproxen,
9  and so the idea that this was all because
10 naproxen prevents heart attacks and that
11 explains the VIGOR findings did not apply
12 because the comparison groups in 090 were
13 another nonsteroidal called nabumetone
14 and placebo. And there again, there was
15 an increase in study 090 in the number of
16 cardiovascular events that were in people
17 randomly assigned to Vioxx compared to
18 people on placebo or nabumetone.
19    Q.   Now, was the fact that there
20 were an excess number of heart attacks --
21        Going back to ADVANTAGE, the
22 ADVANTAGE study was actually published,
23 wasn't it?
24    A.   Eventually it was, yes.

Page 335

1    Q.   Was it published, do you
2  remember when it was in the --
3    A.   Much less quickly than the
4  VIGOR study was.
5    Q.   Okay.
6        And what was the endpoint
7  that was studied in the ADVANTAGE study?
8    A.   I'd want to review the
9  actual documents. There was a whole
10 collection of cardiovascular thrombotic
11 outcomes, and sometimes it's something
12 called the APTC, which stands for the
13 Anti-Platelet Trialists Collaborative,
14 which is a group of researchers who look
15 at drugs that affect platelets. And many
16 of these studies, quite appropriately,
17 look at a whole bunch of different
18 outcomes, some of which are composite,
19 some of which were not. And so I'd want
20 to refer to the actual findings.
21    Q.   Let me just ask you this.
22        Do you know whether or not
23 the, I think you used the word
24 disproportionate distribution of heart

85 (Pages 332 to 335)

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 336

1  attacks in that study, was that reported
2  in the ADVANTAGE study in the published
3  literature?
4      A.   My understanding is that the
5  version that eventually found its way
6  into the press reported the so-called
7  APTC composite but did not, as I
8  understand it, report the actual number
9  of heart attacks.  And the difference in
10 the number of heart attacks on Vioxx
11 compared to nabumetone or placebo was
12 much more striking than the difference in
13 the so-called APTC composite outcome.
14 But that was not the way it was reported.
15     Q.   Let's talk about 090 for a
16 moment.  Do you know whether that study
17 was ever published by Merck?
18     A.   I can't recall that it was.
19     Q.   Okay.
20         And does that study -- I
21 think you said it was disproportionate.
22 When you look at these three studies
23 together --
24         First of all, I forgot to

Page 337

1  ask you this question.  Was 090, when did
2  that become available to Merck?
3      A.   My understanding is that
4  that was also around the same time of
5  2000.
6      Q.   Okay.
7          Now, in fairness, there's
8  also another study called 085.  Are you
9  familiar with that study?
10     A.   Yes.  That was very much
11 like 090.  And when the FDA reviewed the
12 data, they reviewed them both together
13 and did find this imbalance with more
14 events in the Vioxx group than in the two
15 other comparison groups, but for reasons
16 that are unclear, most of the action
17 seemed to be in the 090 and not in the
18 085 piece of the study.
19     Q.   In small studies like this,
20 in other words, I think you mentioned it
21 was a small study, if you see something
22 in one small study and you don't see it
23 in another study, do you ignore what you
24 see or how does that work in your

Page 338

1  profession?
2      A.   The absence of a finding
3  does not cancel out the presence of a
4  finding especially if the finding is an
5  excess risk of heart attacks.  And --
6      Q.   Why is that?  Why is that?
7      A.   Because sometimes you don't
8  find a bad thing.  Sometimes you don't
9  find a good thing.  So, for example,
10 companies will often do multiple clinical
11 trials, and if some show good effect and
12 the others don't, very often they will
13 bring the ones that show a good effect to
14 FDA and say approve our drug on that
15 basis because a lot of things can cause a
16 study to yield a null finding, either a
17 good effect or a bad effect, and we know
18 that.  Studies are good things to do, and
19 often things don't go as expected.
20     Q.   Okay.
21     A.   But I think when one looks
22 at a 12-week study and you are seeing
23 heart attacks, that's enormously
24 important because you shouldn't be on

Page 339

1  anything that will cause a higher risk of
2  heart attacks in 12 weeks.
3      Q.   Using VIGOR, 090 and
4  ADVANTAGE and all the other evidence you
5  talked about before, do you have an
6  opinion to a reasonable degree of medical
7  certainty as to what a reasonable and
8  prudent company looking at the totality
9  of that evidence should have concluded
10 about the cardiovascular safety of Vioxx
11 in the spring of 2000 when --
12         MR. BECK:  Object -- I'm
13 sorry, were you finished with your
14 question, Chris?
15         MR. TISI:  Yes, that was it.
16 Thank you.
17         MR. BECK:  I object.  It is
18 an improper subject for expert
19 testimony, it is lawyer's argument
20 concerning the significance of
21 evidence, invades the province of
22 the jury.  This witness is not
23 qualified to opine on this
24 subject, and lack of foundation

86 (Pages 336 to 339)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 340

1    and hearsay.
2  BY MR. TISI:
3      Q.   Doctor, what is your
4  opinion?
5      A.   My opinion is that the
6  burden of evidence in the spring of 2000
7  was such that there was evidence of a
8  likely association between Vioxx and
9  heart disease in humans.
10              - - -
11         (Whereupon, Deposition
12      Exhibit Avorn-33, FDA Advisory
13      Committee Briefing Document
14      2-8-01 (27 pages), was marked for
15      identification.)
16              - - -
17  BY MR. TISI:
18      Q.   Doctor, I'm going to show
19  you two documents I'm going to hand you
20  side by side. One is Exhibit Number 33,
21  which is the FDA Advisory Committee
22  briefing document, specifically the
23  report of Dr. Villalba, and that is
24  February 8th, 2001.

Page 341

1         And I'm also going to hand
2  you a second document, which is the FDA's
3  cardiovascular report consultation of a
4  Shari Targum.
5         Have you seen both of these
6  documents in connection with your
7  opinions?
8      A.   I've reviewed both of these.
9      Q.   Okay.
10         Are these the kinds of
11  things that experts like yourself would
12  review in considering issues like the
13  ones we've asked you to address?
14      A.   Yes. This is exactly the
15  kind of information that FDA asked me to
16  evaluate in relation to Lotronex around
17  the question of whether it should be
18  taken off the market around 2000 or so.
19      Q.   Now, Doctor, let me ask you
20  this.
21         You reviewed both of these
22  reports of these FDA medical officers.
23  Do you know that or do you have an
24  understanding as to whether they looked

Page 342

1  at these three studies together,
2  ADVANTAGE, 090, 085 -- actually, we'll
3  add 085 in there as well, and VIGOR, and
4  reached the same conclusions you've
5  reached?
6      A.   That is my impression.
7      Q.   Okay.
8         Doctor, let me show you --
9  let's go to Dr. Villalba's report for a
10  moment. If you can look at Page 11 and
11  12.
12      A.   Yes.
13      Q.   Do you see at the bottom of
14  there, there is a paragraph that starts,
15  "The sponsor explanation for the excess
16  of cardiovascular events in the VIGOR
17  study"? Do you see that?
18      A.   Right. Yes.
19      Q.   Would you describe --
20         And, of course, this is Dr.
21  Villalba's report. Would you describe
22  the facts that -- what does Dr. Villalba
23  conclude here?
24      A.   Okay.

Page 343

1         Dr. Villalba, again, who is
2  an FDA official who --
3         MR. BECK: I'm going to --
4  excuse me.
5         I'm going to object to the
6  witness characterizing the written
7  conclusion from the medical
8  examiner.
9         MR. TISI: That's fine.
10         THE WITNESS: Shall I go on?
11  BY MR. TISI:
12      Q.   You shall.
13      A.   Okay.
14         Dr. Villalba, who is an FDA
15  official who has reviewed all the data
16  submitted while the drug was still on the
17  market, concluded that it was implausible
18  that the difference between -- in the
19  VIGOR study, that the difference in heart
20  attack rates, and one can see that graph
21  go up quite high for incidence of heart
22  attacks in -- or thrombotic
23  cardiovascular serious adverse
24  experiences, the evidence that this could

87 (Pages 340 to 343)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 344

1  be explained by the fact that naproxen
2  was preventing heart attacks was
3  implausible.
4        Q.   And what are the factors
5  that Dr. Villalba indicates?
6        A.   Well, one is the absence
7  of --
8           MR. BECK:  The same
9  objection.
10          MR. TISI:  Sure.  How about
11  a continuing objection?  I'd be
12  more than happy to grant that to
13  you.
14          MR. BECK:  I'm concerned
15  about, given the judge's -- I'm
16  trying to keep them --
17          MR. TISI:  That's fine.  No,
18  and I understand.  But I'm willing
19  to give you -- because I'm going
20  to ask him questions about this
21  document.  That's fine.  You can
22  object if you want.  I'm not going
23  to stand in your way.   I was just
24  trying to be nice.

Page 345

1           MR. BECK:  Thanks so much.
2           MR. TISI:  You're welcome.
3           MR. BECK:  Including for
4  allowing me to object.
5           MR. TISI:  I'm trying to be
6  nice, Phil.
7           MR. BECK:  I know you are.
8  Thanks so much.  Including for
9  allowing me to object.
10          I object to this witness
11  characterizing the content of
12  another person's written document.
13  BY MR. TISI:
14        Q.   Go ahead.
15        A.   Can we make that box go away
16  so I can refer to that graph?
17        Q.   Yes.
18        A.   Dr. Villalba was speaking
19  specifically to the rapid rise in the
20  incidence of heart attacks in people
21  taking Vioxx as compared with naproxen.
22  And she notes that there is no -- there
23  are no placebo-controlled trials of
24  naproxen that ever have shown that it

Page 346

1  reduces heart attacks.
2        Q.   Stop right there.
3           Is that something that you
4  agree with?
5        A.   Sure.
6        Q.   Is that something you agreed
7  with at the time?
8        A.   I agree with it now too.
9        Q.   Okay.
10          Is it something that you
11  actually investigated?
12        A.   Yes.
13        Q.   And you concluded that there
14  was no evidence -- did you conclude --
15          What did you conclude about
16  the evidence of naproxen?
17        A.   At the time that this was
18  being discussed at FDA, we were
19  concurrently doing research in my
20  division on whether naproxen causes a
21  reduction in the risk of heart attacks.
22        Q.   Okay.
23          Going to the next fact here
24  noted by Dr. Villalba.

Page 347

1        A.   This is also in parallel
2  with our own research, in that she points
3  out that the effect of naproxen, and this
4  is almost the exact language that we used
5  in our paper, even though I had not seen
6  her report at the time, that the effect
7  size that you would need to have, that
8  is, the protective effect of naproxen
9  would need to be so huge that it would
10  make it huger than had ever been seen
11  with aspirin or with, frankly, any other
12  drug for that matter, and that that also
13  made the naproxen idea implausible.
14          MR. BECK:  I have the same
15  objection to the characterization
16  of the document, particularly
17  since his characterization and
18  what the doctor actually said are
19  not the same things.  So, I have
20  an objection to this witness
21  mischaracterizing the content of
22  Dr. Villalba's memorandum.
23  BY MR. TISI:
24        Q.   Okay.  Next thing.

Golkow Litigation Technologies - 877.DEPS.USA

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 348

1    Go to Section D.
2    A.   Okay.
3        She cites the other studies
4  which we've talked about just now, 085,
5  090 and 102, suggest — this is her exact
6  words.
7        "Suggest trends towards
8  higher rates of myocardial infarction,"
9  or heart attack "in the rofecoxib," that
10  is, Vioxx "group compared to active
11  control groups."
12    Q.   Doctor, let's turn to --
13    A.   I'm sorry, just one other
14  point, Mr. Tisi.
15    Q.   Go ahead.
16    A.   The next sentence, which I
17  think is relevant here, is that she also
18  points out — because one of the things
19  that we study in pharmacoepidemiology is
20  doses and duration and whether or not
21  there's a relationship to the effect.
22  And she points out in 2001 that 085, 090
23  and 102 involve lower doses of Vioxx and
24  shorter durations of exposure than were

Page 349

1  seen in VIGOR and also allow the use of
2  aspirin.
3        So, the reasons that had
4  been put forward by Merck about why the
5  VIGOR findings could be explained away,
6  that is, no aspirin, patients had
7  rheumatoid arthritis, there was a big
8  dose of Vioxx used, and so this wouldn't
9  apply to lower doses, and it was a long
10  study, none of those were present in
11  these studies, and yet the same increase
12  in heart attack was seen.
13    Q.   Okay.
14        MR. BECK:  Move to strike
15    the portion of the answer that
16    began with the word "so" since it
17    bore no relationship to what was
18    in the document being
19    characterized.
20  BY MR. TISI:
21    Q.   Now, this document, by the
22  way, is this written at about the same
23  time that you had your conversation with
24  Dr. Sherwood?

Page 350

1    A.   Let's see.  Well, in an
2  interesting example of government
3  confusion, the pages are dated 2/8/00,
4  but the title page is 2/8/01.  And my
5  understanding is that this really is
6  2/8/01.
7    Q.   Assuming it is February 8th,
8  2001, is that about the time you had your
9  conversation with Dr. Sherwood?
10    A.   Yes.
11    Q.   Now, let's go to Dr.
12  Targum's report.
13    A.   Okay.
14    Q.   First of all, can we bring
15  that up?
16            - - -
17        (Whereupon, Deposition
18    Exhibit Avorn-34, Dr Targum's FDA
19    Medical Reviewer Report 2-1-02
20    MRK-ABX0002368 - MRK-ABX0002404,
21    was marked for identification.)
22            - - -
23        THE WITNESS:  And that's
24    Exhibit 34?

Page 351

1        MR. TISI:  That's Exhibit
2    Number 34.
3  BY MR. TISI:
4    Q.   And this is dated February
5  1st, Dr. Targum's report, the next one.
6        MS. DAGOSTINO:  Yes.  It's
7    the one on the right.
8        MR. TISI: The next page.
9  BY MR. TISI:
10    Q.   Okay.
11        This is the report of Dr.
12  Targum at the cardiorenal division,
13  correct?
14    A.   Yes.
15    Q.   Okay.
16    February 1st, 2004 --
17    A.   2001.
18    Q.   -- 2001, excuse me.
19    A.   Right.
20    Q.   Okay.
21        If you'd go to page --
22  actually 36 -- 34.
23    A.   Got it.
24    Q.   Do you see the Section 4 at

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 352

1  the bottom of the page there, it talks
2  about "Assessment of the sponsor's claim
3  of CV risk"?
4      A.  Yes.
5      Q.  First of all, the sponsor's
6  claim there that the "Sponsor claims that
7  the difference in myocardial infarctions
8  between the two groups is primarily due
9  to the anti-platelet effects of
10  naproxen."
11      A.  Yes, I reviewed that
12  section.
13      Q.  Is that what they said in
14  the VIGOR paper that we reviewed earlier
15  today?
16      A.  Yes.
17      Q.  Okay.
18         Is that what they were
19  telling you and your people at Harvard?
20      A.  That's what Dr. Sherwood
21  told me.
22      Q.  Okay.
23         Is that what was being said
24  by Merck publicly in your experience in

Page 354

1  on the next page.  "The sponsor claims
2  that the majority of the cardiovascular
3  events in the VIGOR study occurred in
4  those patients who should have been
5  taking aspirin for cardioprotection."
6      A.  Yes.
7      Q.  Is that the issue that we
8  talked about before that had to be
9  corrected in the New England Journal of
10  Medicine?
11      A.  That's right.
12      Q.  And that was corrected in
13  2005?
14      A.  That's correct.
15      Q.  Okay.
16         Do you agree with Dr. Targum
17  as to the significance of that fact?
18      A.  Yes.  As she states it in
19  her own words, "This claim has not
20  convinced this medical reviewer," and she
21  goes on to say that there are increased
22  events, heart attacks in the Vioxx group
23  even in patients who did not fall into
24  the aspirin-indicated subgroup.

Page 353

1  2000 and 2001?
2      A.  Correct.
3      Q.  Okay.
4         What does Dr. Targum say
5  about the, quote, naproxen hypothesis?
6      A.  I'll just read her words.
7  "The sponsor claims that the difference
8  in myocardial infarctions between the two
9  groups is primarily due to the
10  anti-platelet effects" or the protective
11  effects "of naproxen."
12         And then she goes on to say,
13  "This hypothesis is not supported by any
14  prospective placebo-controlled trials
15  with naproxen.  One can further argue
16  that, no matter what the attribution, the
17  results (from the cardiovascular
18  standpoint) are favorable for naproxen."
19      Q.  Do you agree with that?
20      A.  Yes.
21      Q.  Is that what you testified
22  to earlier?
23      A.  Yes.
24      Q.  Next one, next bullet point

Page 355

1      Q.  And the next claim of the
2  sponsor here?
3      A.  Yes.  She points out that
4  the other argument that Merck had made
5  was that, well VIGOR was in patients who
6  had rheumatoid arthritis and that maybe
7  that's what was going on in VIGOR.
8  Although I should point out as somebody
9  who studies clinical trial data,
10  everybody in VIGOR had rheumatoid
11  arthritis, even the people on naproxen.
12  So, it would be implausible that that
13  would have caused that difference.
14      Q.  Well, actually doesn't she
15  note that down at the bottom.  It says,
16  "And given the premise that rheumatoid
17  arthritis patients are at increased risk,
18  could" not one contend that argument for
19  any patient?
20      A.  Right.  Although she's
21  saying -- I'm making a slightly
22  different argument.  I'm saying that
23  whether or not it was about rheumatoid
24  arthritis should not explain away the

90 (Pages 352 to 355)