CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 128

1 public as a whole, it was something which
2 they did not know was going to happen.
3      Q.   Now, as a
4 pharmacoepidemiologist, was the finding
5 about the cardiovascular risk a concern
6 to you personally?
7      A.   If you mean personally in my
8 professional role?
9      Q.   Yes.
10     A.   Yes.
11     Q.   Okay.
12          And why was that a
13 significant concern to you
14 professionally?
15     A.   Because if there were a drug
16 that causes a five-fold increase in your
17 risk of having a heart attack, that's a
18 real problem.  It's not a drug that you
19 would be happy about giving to a patient
20 unless it had some other incredible
21 benefit to outweigh that.
22     Q.   At the time that VIGOR came
23 out, how prevalent was the use of Vioxx?
24     A.   It was on the upswing.  The

Page 129

1 curve of Vioxx use was just heading for
2 the moon, and by November of 2000, it was
3 well on that upswing.
4      Q.   Given the findings of VIGOR
5 and the number of patients that were
6 actually taking it, did you have an
7 opinion at the time as to whether or not
8 there were any potential public health
9 issues concerned with Vioxx?
10     A.   Yes.  At the time, I clearly
11 remember saying and discussing with my
12 colleagues and with Dr. Sherwood and with
13 a number of people that if it were true
14 that this drug causes a five-fold or
15 four-fold increase in the risk of heart
16 attacks, then that could be a real issue
17 that could well outweigh whatever benefit
18 it might have in reducing stomach
19 problems.
20     Q.   Now, turning to the actual
21 paper itself, if you would, Doctor, was
22 the rate -- I'm sorry.
23          Was the incidence reported
24 in any way that was unusual to you as a

Page 130

1 pharmacoepidemiologist?
2          MR. BECK:  Object, leading.
3          THE WITNESS:  Well, what
4 struck many of us at the time was
5 that --
6          MR. BECK:  I'm going to just
7 interrupt and object on hearsay
8 grounds since you're introducing
9 it with "what struck many of us."
10 BY MR. TISI:
11     Q.   Well, let me rephrase the
12 question, Doctor.
13     A.   Okay.
14     Q.   When you reviewed the actual
15 text of the VIGOR article, as an
16 epidemiologist, in the way in which the
17 statistics were reported, were they
18 reported in a way that was of concern to
19 you?
20     A.   Yes.
21          MR. BECK:  Again, objection,
22 leading.
23 BY MR. TISI:
24     Q.   You may answer.

Page 131

1      A.   Okay.
2          What was very unusual and
3 unorthodox about the way the findings
4 were presented in the VIGOR paper was
5 that instead of saying patients randomly
6 assigned to take Vioxx had five times the
7 number of heart attacks or four times,
8 there's different numbers in different
9 parts of the paper, compared to people
10 assigned to take naproxen, instead, it
11 was flipped around in a way that is
12 virtually never done in reporting a
13 clinical trial, which is to say the
14 patients assigned to take naproxen had a
15 reduction in their heart attack rate.
16 And that was striking.  I remember the
17 first time I read the paper, that was a
18 striking difference, because you just
19 never see reports written like that.
20     Q.   What, if anything, does the
21 reporting of a statistic like that
22 suggest to physicians?
23          MR. BECK:  Object,
24 foundation, hearsay.

34  (Pages 128 to 131)

Page 132

BY MR. TISI:
1
2    Q.   Then let me ask you this.
3        As somebody who does
4  epidemiology, you work with statistics,
5  would that be fair to say?
6    A.   Yes.
7    Q.   And in doing so, does the
8  manner in which you convey statistics,
9  present statistics, can that sometimes
10  convey a message about what the
11  statistics mean?
12    A.   Yes.  In fact, there's a
13  whole section in my book about what's
14  called framing of risk information.  And
15  it's been well known, and there's groups
16  at Stanford and, in fact, the Nobel Prize
17  was awarded in economics on this topic,
18  that how you frame a question can often
19  drive the kind of answer that you get or
20  the kind of belief that somebody has.
21        So, if you say that here's
22  an operation that works 95 percent of the
23  time, do you want to have that operation,
24  you get a different answer than if you

Page 133

1  say 5 percent of people who have this
2  operation will get no benefit from it.
3  And similarly -- and we think a lot about
4  framing when we do our programs to
5  present information to doctors about
6  choices, and what you want to do is have
7  the framing be as neutral as possible and
8  let the data speak for themselves.
9        And if you frame the VIGOR
10  study as naproxen reduces the risk of
11  heart attack instead of framing it as
12  there were five times more people who
13  were given Vioxx who had heart attacks
14  than people given naproxen, it creates a
15  very different sense of the riskiness of
16  the drug to the doctor.
17        MR. BECK:  I'm going to
18    object.  Move to strike the last
19    portion of the answer as
20    speculation, lack of foundation,
21    hearsay.
22  BY MR. TISI:
23    Q.   Doctor, having read the
24  paper, and I return your attention to the

Page 134

1  last page of the paper and actually the
2  page before the last paragraph --
3    A.   Yes.
4    Q.   -- does it discuss the
5  cardiovascular findings in VIGOR in that
6  section of the paper?
7    A.   Yes.
8    Q.   Okay.
9        What, if anything, does the
10  paper say about naproxen and the role of
11  naproxen in heart disease?
12    A.   Okay.
13        At the very bottom of Page
14  1526, the last two words "Thus, our,"
15  and then it goes on to 1527.  "Thus, our
16  results are consistent with the theory
17  that naproxen has a coronary protective
18  effect and highlight the fact that
19  rofecoxib does not provide this kind of
20  protection owing to its selective
21  inhibition of cyclogenase-2," or COX-2,
22  "at its therapeutic dose and at higher
23  doses."
24    Q.   Doctor, having reviewed the

Page 135

1  entirety of the paper, but looking at
2  this particular statement as well, did
3  Merck and the Merck authors on this paper
4  ever communicate that there was a
5  potential for an increased risk of heart
6  attacks related to the use of Vioxx as
7  opposed to a decreased risk associated
8  with the cardioprotectiveness of
9  naproxen?
10    A.   I don't think there is
11  anything in the paper that suggests that
12  Vioxx increases the risk of heart attack.
13    Q.   Doctor, have you developed
14  an opinion as to whether or not --
15        Did you have an opinion at
16  the time as to whether or not this was a
17  fair and balanced presentation of the
18  evidence about the potential for Vioxx to
19  be a potentially harmful drug?
20        MR. BECK:  Object.  It's --
21        THE WITNESS:  Yes, I had --
22    I'm sorry.  I thought you were
23    done.
24        MR. BECK:  Let me finish my

Page 136

```
1       statement.
2            I object.  It's
3       irrelevant --
4            MR. TISI:  Let me rephrase
5       the question.
6   BY MR. TISI:
7       Q.  Did you have any concerns
8   about the way in which this particular
9   article was written in terms of the
10  accurate presentation of the potential
11  benefits and the potential risks?
12           MR. BECK:  Object, relevance
13      of his particular concerns.
14           THE WITNESS:  Yes.  As
15      someone who thinks about drug
16      benefits and risks and patterns of
17      use of drugs and has written about
18      the presentation of risk data to
19      physicians, I was concerned that
20      it did not seem to be an accurate
21      way of presenting the risk and, in
22      fact, it was, I think the term
23      that the Merck people might have
24      used was "flipped" from the way
```

Page 137

```
1       that one would normally present
2       risk information.
3   BY MR. TISI:
4       Q.  Let me ask you this
5   question, Doctor.
6            A reasonable and prudent
7   company presenting the risks and the
8   benefits, potential risks and benefits of
9   a drug using evidence-based medicine,
10  does this comport with what is expected
11  of pharmaceutical companies in doing
12  that?
13           MR. BECK:  Object, improper
14      subject for expert testimony.
15      He's not qualified to opine on it.
16      It lacks foundation, hearsay.
17           THE WITNESS:  Well, as
18      someone who reviews papers for the
19      New England Journal of Medicine
20      and JAMA and also runs programs
21      about communication of risks and
22      benefits to physicians and has
23      written a book about that topic, I
24      don't feel that this was a fair
```

Page 138

```
1       way of presenting the data.  I
2       think a fair way would have been
3       to say, in essence, the good news
4       is, our drug seems to cause less
5       gastrointestinal problems.  The
6       bad news is, it doesn't work any
7       better or any worse than the
8       comparison drug in terms of being
9       a pain reliever.  And the really
10      bad news is that the people given
11      our drug had five times more heart
12      attacks than the people given a
13      comparison drug.  I think that
14      would have been a fair and neutral
15      presentation of the good and bad
16      news that came out of this study.
17  BY MR. TISI:
18      Q.  Now, Doctor, did there come
19  a time where you had contact with Merck
20  officials about the results of VIGOR?
21      A.  Yes.
22      Q.  Who is Lou Sherwood?
23      A.  Lou Sherwood was actually a
24  physician at the Beth Israel Hospital in
```

Page 139

```
1   Boston, another one of the Harvard
2   teaching hospitals, at around the same
3   time that I was there.  He was in
4   academics before he went to work for
5   Merck.  And I kind of knew him a little
6   bit around those years, and we had been
7   at some meetings together in the
8   intervening years.
9            And around January of 2000,
10  I was asked by the chairman of our
11  department of medicine to set up a weekly
12  lecture that would be about controversies
13  in pharmaceuticals.  And they asked me to
14  moderate it and to pick the presenters.
15  So, I thought it would be fair to pick
16  somebody from the pharmaceutical industry
17  and somebody from an HMO who had been
18  critical of the pharmaceutical industry
19  and have them discuss issues about
20  medications.
21           And I identified Dr.
22  Sherwood as somebody who had been an
23  academic who was known to me and who was
24  now in a senior position with the drug
```

36  (Pages 136 to 139)

**Page 140**

1  company, and I asked Lou to come and be
2  the pharmaceutical company guy. And I
3  asked somebody from one of the HMOs in
4  Boston to be the critic guy. And it was
5  a very stimulating discussion which I was
6  just kind of the referee for.
7        And then afterwards, we
8  arranged to have Dr. Sherwood meet with
9  me and members of my division to talk
10 about matters of mutual interest, our
11 work on drugs, his work at Merck. And
12 since this was within a brief number of
13 weeks after the VIGOR study had come out,
14 and because Dr. Solomon, who is my
15 colleague who is a rheumatologist as well
16 as an epidemiologist was there, the
17 conversation turned to VIGOR and my
18 noting that it was a disturbing finding
19 that there was this dramatic increase in
20 the number of people who had heart
21 attacks in the VIGOR group -- in the
22 Vioxx group, I'm sorry.
23        And I was somewhat taken
24 aback because Dr. Sherwood said, oh,

**Page 141**

1  that's just because naproxen prevents
2  heart attacks.
3        And I remember asking at the
4  time, well, how do we know that? Is that
5  something that should be studied or
6  tested? And he kind of dismissed it as,
7  well, you know, sort of it's an obvious
8  finding, and that's what was said in the
9  paper, and there was really nothing more
10 to be discussed.
11       Q.   Doctor, at the time you were
12 having this conversation with Dr.
13 Sherwood, were you in the process of
14 doing any research on the issue of the
15 effect of NSAIDs on the heart?
16       A.   Yes. As a matter of fact,
17 Dr. Solomon in my division and I had
18 already become interested in this
19 question of regular nonsteroidals and the
20 heart. And we realized that there was
21 essentially no literature out there in
22 humans that suggested that the older
23 nonsteroidals like naproxen or Motrin or
24 ibuprofen can protect the heart.

**Page 142**

1        And Dr. Solomon and I
2  decided it would be interesting to look
3  at whether that was something you could
4  find. If there was such a massive
5  protective effect of naproxen as was
6  found in VIGOR, you'd think that you
7  would be able to find that in a study
8  looking at tens of thousands of people,
9  and we have databases in our division in
10 which we have information about
11 medication use and hospitalizations and
12 doctor visits for hundreds of thousands
13 of people, although we have their names
14 and identifiers stripped off. But we can
15 look at all the people who were
16 prescribed any drug and see if their rate
17 of heart attacks was higher or lower than
18 the rate of heart attacks of people
19 either not taking that drug or taking
20 another drug.
21       And so I believe we had been
22 talking about that throughout 2000. Our
23 interest in it was increased in the
24 spring of 2000 when the initial VIGOR

**Page 143**

1  findings were released. And then, of
2  course, when they were published in the
3  New England Journal in 2000, we decided
4  that this was definitely something that
5  we wanted to proceed on just because it
6  seemed like an important question. If
7  naproxen was that great and no one had
8  ever discovered it before, maybe that
9  would be something that was worth
10 knowing.
11       Q.   And did you do that study?
12       A.   Yes, we did.
13       Q.   Did you perform what we call
14 an epidemiologic study that studied the
15 question of naproxen's effect on the
16 heart?
17       A.   Yes, we did.
18       Q.   And what is --
19            You mentioned an
20 epidemiologic study using a database.
21 Just so the jury understands what that
22 is --
23       A.   Sure.
24       Q.   -- would you describe what

37 (Pages 140 to 143)

Page 144

1  an epidemiologic study is in terms that I
2  could understand?
3      A.  Sure.  Even you, Chris.
4      Q.  Even me.
5      A.  There are basically two, to
6  kind of put it in straightforward words,
7  there's two kinds of studies that one can
8  do.
9          One would be a clinical
10 trial, where you actually enroll hundreds
11 or thousands of patients, and then you
12 randomly assign them to get drug A or
13 drug B.  And those are very important
14 studies, but they are very expensive and
15 they are cumbersome and they are
16 difficult to do.
17         Another way of looking at
18 drug effects, particularly for side
19 effects, but also for other kinds of
20 effects, is to look at the drugs that
21 people are taking out there just in
22 natural life.  And if, for example,
23 somebody belongs to an HMO or gets their
24 drugs from Medicaid or you have a

Page 145

1  computer record of all the different
2  prescriptions that they filled, and you
3  also have a record of all of their
4  diagnoses and all the times that they
5  were admitted to the hospital, you can do
6  what's called an epidemiologic study or
7  an observational study where you ask a
8  question like, of the 200,000 people in a
9  given population of Medicaid patients or
10 HMO patients, if we look at all the
11 people who took drug A and all the people
12 who took drug B and we try to make them
13 as comparable as we can, do the people
14 who took drug A get into more difficulty
15 with a particular side effect than the
16 people who took drug B.  And that's the
17 kind of observational study we did.
18      Q.  And the database you used is
19 the Medicaid database of New Jersey and
20 Pennsylvania?
21      A.  Right.
22      Q.  And you mentioned Dr.
23 Solomon before.  What is his relationship
24 to you?

Page 146

1      A.  He is a faculty member in my
2  division.  We've worked together since he
3  was in training at the Brigham, and he's
4  now an associate professor.  He has
5  training in rheumatology, which is the
6  study of arthritis and other related
7  diseases, and so he had a particular
8  interest in arthritis medications, as
9  well as having a degree from Harvard in
10 epidemiology.  And so he was a natural
11 person to lead our studies of Vioxx and
12 related nonsteroidals.
13     Q.  And, in fact, did you
14 publish a study, the study results that
15 came out of this epidemiologic study that
16 we just talked about?
17     A.  Yes, we did.
18     Q.  And it's all right just for
19 the purposes of this deposition, I know
20 you studied a lot of drugs in the context
21 of that particular study, if I call it
22 the naproxen study?
23     A.  That's fine.
24     Q.  Okay.

Page 147

1          Did you —
2          You published it — do you
3  remember where it was published, Doctor?
4      A.  Yeah, why don't I just get
5  it in front of me.  It is in the --
6      Q.  If you look in there.
7      A.  -- it's in this one, I'm
8  sorry.
9      Q.  I think it's Number 4.
10     A.  Okay.  Okay.
11         It was published in the
12 Archives of Internal Medicine in 2002, in
13 May of 2002.
14     Q.  Are you the senior author on
15 the paper?
16     A.  That's right.
17     Q.  What is the senior author?
18     A.  That is the person, usually
19 the leader of a given research unit, as I
20 am in our division, who oversees all the
21 work that goes into that paper.
22     Q.  And what, if any,
23 conclusions did you and Dr. Solomon reach
24 regarding naproxen?

38  (Pages 144 to 147)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 148

1      A.   Well, overall, we found that
2   nonsteroidals in general like Motrin and
3   so forth taken as a group did not seem to
4   have any important protective effect on
5   the heart.  But when you looked at
6   naproxen separately, it had a very modest
7   reduction in the risk of heart disease in
8   people who took it compared to the
9   comparison patients who were similar in
10  all other ways.  That is, there was about
11  a 16 percent reduction in the risk of
12  heart attack, which is a pretty small
13  reduction.
14      Q.   Did you address the findings
15  of VIGOR in the context of this article?
16      A.   Yes, we did.
17      Q.   Okay.
18          Would you please turn to
19  Page 1104, please.  I think it's the last
20  page of the article.
21      A.   Yes.  Yes.
22      Q.   Okay.
23          Do you see at the top of the
24  page, does that refer to the VIGOR study?

Page 149

1      A.   Yes.  Bombardier was the
2   first author of the VIGOR study.
3      Q.   And do you acknowledge in
4   here that the question had arisen whether
5   or not naproxen had a cardioprotective
6   effect that might explain the results of
7   VIGOR?
8      A.   Right.
9      Q.   Did you address that
10  question later on in the paper?
11     A.   Yes.
12     Q.   Would you please go to the
13  section where that is addressed?  And if
14  you go down to the last paragraph, I
15  think that's where that is.
16     A.   Yes.  Right.
17          In the end of the
18  discussion, "To place the effect of
19  naproxen in perspective, in a large
20  randomized trial of daily aspirin use in
21  primary prevention, patients in the
22  intervention arm experienced a 44%
23  reduction in the risk of acute myocardial
24  infarction" or heart attack.  "Therefore,

Page 150

1   it would be false to equate the more
2   modest effect of naproxen," that is a 16
3   percent reduction as compared to a 44
4   percent reduction, "it would be false to
5   equate the more modest effect of naproxen
6   suggested in this study with the
7   cardioprotection afforded by aspirin."
8      Q.   Would you tell the members
9   of the jury in a very simple way what you
10  were saying there about the VIGOR study?
11     A.   Yes.  What we said in that
12  paper that came out in 2002 was that the
13  very, I guess you could say wimpy effect
14  of naproxen in protecting the heart of
15  just reducing the rate by 16 percent was
16  in no way big enough to account for what
17  would have had to have been an 80 percent
18  reduction in risk to give you that 5 to 1
19  difference that was seen between Vioxx
20  and naproxen in the VIGOR study.
21  Naproxen would have had to have been the
22  most magical drug to protect your heart
23  that was ever invented, and we didn't
24  find that.

Page 151

1      Q.   And you wrote this in 2002,
2   correct?
3      A.   Right.
4      Q.   And was that before you and
5   I had ever met on the issue of Vioxx?
6      A.   Right.  And in fact, let me
7   look at -- the paper, it says lower on
8   that page, was accepted for publication
9   in January 31st, 2002, which meant that
10  we would have written it in 2001.
11     Q.   And is this consistent with
12  your reaction to Dr. Sherwood's comment
13  about the effect of naproxen in early
14  2001?
15          MR. BECK:  Object, leading.
16          THE WITNESS:  That's right.
17  BY MR. TISI:
18     Q.   Okay.
19          Doctor, were the results of
20  this paper actually presented before it
21  was actually published?
22     A.   Yes, it was.  Dr. Solomon
23  presented them at the International
24  Society for Pharmacoepidemiology

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 152

```
1   meetings.
2       Q.   The International Society
3   for Pharmacoepidemiology, is that the
4   international society that you had been a
5   president of?
6       A.   That's right.
7       Q.   Okay.
8            And do you remember actually
9   that presentation?
10      A.   Yes.
11      Q.   And who made the
12  presentation?
13      A.   Dr. Solomon did.
14      Q.   Do you remember when it was
15  in relationship to this paper?
16      A.   Yes.  The meetings occur in
17  August, and so given that we finished the
18  paper in late'01, this would have been
19  the August '01 presentation.
20      Q.   And do you recall, do you
21  have any specific recollection whether
22  there were any people from Merck in the
23  audience to hear the presentation on your
24  naproxen study?
```

Page 153

```
1       A.   Yes, there were.
2       Q.   Okay.
3            Do you remember who was in
4   the audience from Merck to hear your
5   presentation about the effect of
6   naproxen?
7       A.   One person I remember
8   clearly, because we talked about it right
9   at the end of the presentation, was Dr.
10  Harry Guess, who at that time was the
11  head of epidemiology at Merck.
12      Q.   What, if anything, was
13  presented to the audience, including Dr.
14  Guess, about the likelihood of Vioxx
15  being cardiotoxic as a result of your
16  study which you presented?
17      A.   In the presentation, I
18  recall that Dr. Solomon -- clearly what
19  was interesting was what does this mean
20  about the VIGOR findings.  And I recall
21  that Dr. Solomon said essentially what is
22  in the paper that we later wrote on that
23  topic later that year, that we had found
24  only a very small effect, about 16
```

Page 154

```
1   percent of reduction from naproxen, and
2   that that made it unlikely that naproxen
3   was the reason that -- that a
4   cardioprotective effect of naproxen was
5   the reason to explain this five-fold
6   increase in heart attacks in the Vioxx
7   group of patients in the VIGOR study
8   compared to the naproxen group of
9   patients.  And that, therefore, the only
10  other possible explanation if it
11  wasn't that naproxen was preventing heart
12  attacks, the only other logical
13  possibility was that Vioxx was causing
14  heart attacks.
15      Q.   And this was in mid-2001?
16      A.   The presentation was in
17  August of 2001, and we finished the
18  work -- actually, we finished the work
19  that summer.
20      Q.   And you personally spoke to
21  Dr. Guess about these results?
22      A.   Yes.  The reason I spoke
23  with Dr. Guess was that Dr. Solomon had
24  been in touch with Dr. Cannuscio at Merck
```

Page 155

```
1   since actually the beginning of 2001,
2   because he had indicated to her that he
3   thought this was --
4            MR. BECK:  I'm going to
5       object, hearsay.
6   BY MR. TISI:
7       Q.   Go ahead.
8       A.   -- that there was an issue
9   which we had been discussing in our
10  division that this needed to be studied
11  subsequent to the VIGOR paper.  And I
12  instructed Dr. Solomon to see whether
13  this was something which a study could be
14  funded by anybody.  And one of the
15  difficulties about adverse effects
16  research is that FDA doesn't have hardly
17  any money to spend on them and the
18  National Institutes of Health doesn't
19  spend that much money on them.  And
20  often, if you are a scientist studying
21  drug side effects, as we are, one needs
22  to go to the manufacturer of the drug and
23  say, we think this is an important issue
24  in relation to the drug that you're
```

40 (Pages 152 to 155)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 156

1  making, and we want to do a study.
2       And as I said earlier, we've
3  often had perfectly fine relationships
4  with companies. Sometimes a company will
5  come to us and say we think there may be
6  a problem with our drug, would you study
7  it for us so that we can know what's true
8  about our drug. We had a very good
9  experience with a Parkinson's drug not
10 long ago in that way.
11      And so I asked Dr. Solomon
12 to talk with people at Merck, and as it
13 turns out, Dr. Cannuscio had recently
14 graduated from the Harvard School of
15 Public Health in epidemiology and then
16 went to work for Merck, so, she was kind
17 of a conduit for our communications with
18 Merck. And nothing had come of those
19 discussions even though he was trying
20 hard.
21      And so I took Dr. Guess
22 aside as Dr. Cannuscio's boss at that
23 pharmacoepi meeting in August of 2001,
24 and sort of chief to chief, and I said,

Page 157

1  Harry, my guy has been talking to your
2  person and it doesn't seem to be getting
3  anywhere. We think this issue is
4  important, and we now can study Vioxx as
5  well as naproxen, because when we first
6  did this study, Vioxx was new enough on
7  the market that there weren't enough
8  people actually taking it for us to be
9  able to do a big population study. But
10 by the time it was getting to be the
11 summer of 2001, it was being very heavily
12 promoted, and the number of people taking
13 it was on the rise.
14      And I told Dr. Guess that I
15 thought that this really was something
16 that ought to move forward, because we
17 could do a study very much like the study
18 that we're looking at now, but instead of
19 looking at naproxen and the older
20 nonsteroidals, we would be able to have
21 the same design and to look at Vioxx and
22 Celebrex as well and answer that question
23 in a large population to try to get to
24 the bottom of this.

Page 158

1       Q.  Did Dr. Guess take any
2  exception when he spoke to you chief to
3  chief with the presentation that Dr.
4  Solomon had made?
5       A.  No.
6           MR. TISI: I'm going to show
7       you what I would like to have
8       marked as Exhibit Number 17.
9           - - -
10          (Whereupon, Deposition
11      Exhibit Avorn-17, Memo dated
12      8.28.01, MRK-ACC0018681 -
13      MRK-ACC0018692, was marked for
14      identification.)
15          - - -
16 BY MR. TISI:
17      Q.  I'm going to represent that
18 this document came from the Merck files.
19 It is Bates Number MRK-ACC0018681.
20      It's a memo from a gentleman
21 by the name of Doug Watson to various
22 people. These are some of the people
23 you've mentioned here in your testimony
24 here today?

Page 159

1       A.  Right.
2       Q.  And it includes some of the
3  papers, actually, some of the
4  presentations that were made at that
5  meeting in mid-2001?
6       A.  Right.
7       Q.  If you'd go to Page 1 -- the
8  document that ends with 686. Is that the
9  paper that Dr. Solomon presented?
10      A.  Yes.
11      Q.  Okay.
12          And following that is some
13 notes that Dr. Guess made of that
14 meeting. Do you see that?
15      A.  Right. Handwritten notes.
16      Q.  Have you had an opportunity
17 to read this, Doctor?
18      A.  Yes.
19      Q.  Is this something --
20          Just to be fair, is this
21 something I presented to you -- is this a
22 document you had ever seen at the time of
23 your involvement with Vioxx in mid-2001?
24      A.  No.

41 (Pages 156 to 159)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 160

1    Q.   Okay.
2         And do you see at the bottom
3  of the second page where it says, "The
4  Conclusion"?
5    A.   Yes.
6    Q.   Okay.
7         Would you go to the next
8  page, two pages down, please.  Keep
9  going.  One more.
10   A.   Actually, a couple more.
11   Q.   One more.
12        Now, have you read this,
13 Doctor?
14   A.   Yes.
15   Q.   Does this appear to comport
16 with your recollection of Dr. Solomon's
17 presentation at that meeting?
18   A.   Correct.
19   Q.   Would you please read the
20 conclusion as recorded by Dr. Guess?
21   A.   Yes.
22        "NSAIDs as group, no effect.
23 Naproxen, 16-20% decrease in risk.
24 Hypothesis that selective" that is

Page 161

1  selective COX-2 inhibitors like Vioxx,
2  "may increase risk."
3    Q.   Is this something --
4         Does this comport with your
5  recollection of what you and Dr. Guess
6  talked about?
7    A.   Absolutely.
8    Q.   Did you consider it
9  important in mid-2001 to specifically
10 study the relationship between COX-2s and
11 heart attacks?
12   A.   Yes.
13   Q.   Why?
14   A.   Because there are a couple
15 of reasons, the largest of which was the
16 VIGOR study, which, as I said, had been
17 published in November of 2000, had been
18 kind of announced, the findings, in
19 spring of 2000, and here was sitting out
20 there this finding that five times more
21 people in the Vioxx group were having
22 heart attacks than people in the naproxen
23 group, and that seemed like an important
24 public health issue that somebody should

Page 162

1  look at.
2    Q.   How much does a study like
3  that you discussed with Dr. Guess cost?
4    A.   Oh, about 5 or $600,000.
5    Q.   And how long does such a
6  study typically take?
7    A.   If we pull out all the stops
8  and can proceed real quickly, we can do
9  it in about a year or less.
10   Q.   And was there any interest
11 by Merck before this meeting with Dr.
12 Guess chief to chief in actually
13 initiating this study that you can
14 recall?
15   A.   From Dr. Guess?
16        MR. BECK:  Objection.
17 BY MR. TISI:
18   Q.   Yes.
19        MR. BECK:  Lack of
20 foundation, speculation as to
21 interest in Merck.
22        THE WITNESS:  Right.  Of
23 course, I have no way of knowing
24 what Dr. Guess was interested in,

Page 163

1  but we had never been approached
2  by Dr. Guess.
3        MR. TISI:  Okay.
4        I'm going to show you what
5  I'd like to have marked as Exhibit
6  Number 18.
7              - - -
8        (Whereupon, Deposition
9  Exhibit Avorn-18, E-mails,
10 MRK-ABY0020300, was marked for
11 identification.)
12             - - -
13 BY MR. TISI:
14   Q.   Following the meeting, the
15 ISPE meeting in August of 2001, did you
16 have followup contacts with Merck
17 regarding the proposed study to study
18 Vioxx and heart attacks?
19   A.   Frequently.
20   Q.   Okay.
21        When you say "frequently,"
22 what do you mean?
23   A.   That there was ongoing
24 discussion from -- really from the

42  (Pages 160 to 163)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 164

1   beginning of 2001, I believe, that it was
2   February of 2001 when I asked Dr. Solomon
3   to begin those conversations through
4   until actually the publication of the
5   paper in 2004.
6       Q.   And is this an e-mail that
7   you recall?
8       A.   Yes.
9       Q.   Okay.
10          Did you have any role in
11  this e-mail exchange?
12      A.   Yes.  I urged Dr. Solomon or
13  instructed Dr. Solomon to please move
14  things along as best he could with Merck.
15  Once there was an expression of interest
16  in such a study, to please get it
17  finalized so that we could actually get
18  the funding we needed to do the work.
19      Q.   Okay.
20          Could you please go down to
21  the e-mail from Dr. Solomon.  First of
22  all, is that an e-mail that you received
23  in the normal course of business?
24      A.   Yes.  It was cc'd to me.

Page 165

1       Q.   Okay.
2          Is this an e-mail that you
3   directed Dr. Solomon to send to Merck?
4       A.   Yes.
5       Q.   And would you please --
6          Who is it sent to?
7       A.   It was sent by Dr. Solomon
8   to Dr. Cannuscio, who, as I mentioned,
9   was the epidemiologist that had trained
10  in our neighborhood and then went to work
11  as a Merck staffer.
12      Q.   Okay.
13          And would you please read
14  for the record what Dr. Solomon, at your
15  direction, told Dr. Cannuscio?
16      A.   Sure.  So, this is September
17  of 2001, which would have been a month
18  after the pharmacoepi meeting in which I
19  spoke with Dr. Guess and Dr. Solomon
20  presented our findings and about eight
21  months or seven or eight months after he
22  had initiated his first contact with Dr.
23  Cannuscio.
24          It says, "Dear Carolyn, I

Page 166

1   was pleased to hear last week that Merck
2   is indeed prepared to move forward with
3   support of our study on NSAIDs, COX-2s,"
4   including Vioxx, "and MI," which is heart
5   attack, "but as I mentioned when we
6   spoke, after so many months we really
7   need at least an e-mail note from you
8   indicating that the commitment is truly
9   there.  We will need to forego other
10  possible sources of support for this
11  project to work with Merck, and given how
12  long it has taken thus far, we're nervous
13  about rejecting other possibilities
14  without any written indication of
15  commitment."
16      Q.   Let me stop you there,
17  Doctor.
18          What was your purpose in
19  writing this to Dr. Cannuscio?
20          MR. BECK:  Object.  This
21  misstates the testimony.  He
22  didn't write it.
23  BY MR. TISI:
24      Q.   Okay.

Page 167

1          What was your purpose of --
2       A.   Okay.
3          I told Dr. Solomon to
4   essentially, after so many months from
5   February to September, particularly on
6   the heels of the meeting with Dr. Guess
7   in August, to basically tell them to fish
8   or cut bait, that I felt this was an
9   important project to do, that there were
10  important clinical and public health
11  issues at stake, and that we had been
12  working along with Merck or trying to
13  based on their indicating to us that they
14  were kind of interested in supporting the
15  study.
16          But so many months later, I
17  told Dr. Solomon to write a note saying,
18  look, if you guys aren't going to really
19  fund this study, we need to know that so
20  we can look for funding from somewhere
21  else since we don't like to peddle the
22  same study to a lot of different people
23  and hope that somebody will accept it.
24  And so it was basically I asked him to

43 (Pages 164 to 167)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

---

Page 168

1  write a fish or cut bait memo to Merck.
2      Q.   And that's what this memo
3  was?
4      A.   Yes.
5          MR. TISI:  Let's go off the
6  record.  He's got to change the
7  tape.
8          THE WITNESS:  Okay.
9          THE VIDEOTAPE TECHNICIAN:
10 This is the end of Videotape
11 Number 1.  The time is 3:24.  We
12 are off the record.
13              - - -
14         (Whereupon, a recess was
15 taken from 3:24 p.m. until
16 3:26 p.m.)
17              - - -
18         THE VIDEOTAPE TECHNICIAN:
19 We are back on the record.  This
20 is Tape Number 2.  The time is
21 3:26.
22 BY MR. TISI:
23     Q.   Doctor, were you aware when
24 you were having discussions with Merck

---

Page 169

1  about conducting a Vioxx safety study on
2  heart attacks that they were actually in
3  negotiations with the FDA over the label
4  change to the product label?
5      A.   No.
6              - - -
7         (Whereupon, Deposition
8  Exhibit Avorn-19, Letter 11-6-01
9  MRK-ABC0024417 - MRK-ABC0024525,
10 was marked for identification.)
11              - - -
12 BY MR. TISI:
13     Q.   Doctor, I'm going to hand
14 you a document which is a document sent
15 to the Food & Drug Administration by
16 Merck, and the date of the document is
17 November 6th, 2001.
18     A.   Okay.
19         We're not going to go into
20 Dr. Cannuscio's response?
21     Q.   Actually, let me ask you
22 about that real quickly.
23         What was Dr. Cannuscio's
24 response to your fish or cut bait memo,

---

Page 170

1  as you called it?
2      A.   The note that she sent to
3  both Dr. Solomon and to me on September
4  17th about two hours after Dr. Solomon's
5  note to her was that they -- she had --
6  we, I can't know who "we" was, but
7  somebody at Merck had presented the idea
8  of the study that we had proposed to
9  several groups within Merck, and that she
10 said that there was interest in working
11 with us to develop a complete protocol,
12 present the detailed protocol to Merck's
13 scientific review committee, and to
14 basically discuss having a contract.
15         And then she mentioned in
16 that last paragraph, "I have spoken with
17 Harry Guess, who heads the epidemiology
18 department."  "Though Harry and I are not
19 authorized to finalize a contract to
20 support a research project of this scale,
21 we wish to affirm our interest in
22 pursuing with you the steps outlined
23 above."  And so basically it was an
24 agreement to have further discussions

---

Page 171

1  about having an agreement.
2      Q.   Okay.
3          Doctor, at about the time
4  that you were involved with the
5  discussions with Dr. Cannuscio, were you
6  aware that the company was in discussions
7  with the Food & Drug Administration about
8  what would go into the label on the
9  results of VIGOR?
10     A.   No.
11     Q.   Doctor, I did provide you
12 material that was sent to the Food & Drug
13 Administration.  Have I showed you this
14 before today's deposition?
15     A.   Yes.
16     Q.   Have you had an opportunity
17 to take a look at it?
18     A.   Yes.
19     Q.   Is this a letter that was
20 sent to the -- appear to be a letter sent
21 to the Food & Drug Administration in part
22 referring to your study results on the
23 naproxen study?
24     A.   Yes.  It was sent by Merck

---

44 (Pages 168 to 171)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 172

1 by Dr. Silverman, I believe.
2      Q.   Okay.
3           Can you turn to Page 3 of
4 that cover letter that was sent to the
5 Food & Drug Administration.
6      A.   (Witness complies.)
7      Q.   And the top part of it
8 refers to "Thrombotic Cardiovascular
9 Data," and has some discussion about the
10 VIGOR study.  Do you see that, Doctor?
11     A.   Yes.
12     Q.   Okay.
13          If you'd go down to the
14 second full paragraph --
15     A.   Yes.
16     Q.   -- is there a reference to
17 your study?
18     A.   Yes, there is.
19     Q.   Okay.
20          Would you tell us where that
21 is, Doctor?
22     A.   Yes.  That would be
23 beginning on line 4, the last word of the
24 line, "The."  Okay.

Page 173

1           Shall I read it?
2      Q.   Yes.  Sure.
3      A.   "The concept that there are
4 differences among NSAIDs is supported by
5 external epidemiologic data from three
6 separate studies that utilized different
7 clinical databases, indicating that the
8 use of naproxen, but not other NSAIDs, is
9 cardioprotective."  And then it is
10 references 2, 3 and 4, and ours is
11 reference 4.
12          "Among these studies, is a
13 U.S. study of over 22,800 patients in New
14 Jersey by a Boston academic group
15 unaffiliated with industry."  And that's
16 us.
17     Q.   Doctor, having read this
18 document, do you have any impression
19 about what was being conveyed to the FDA
20 about your study?
21          MR. BECK:  Objection.
22          THE WITNESS:  Well, it's not
23 an impression.  It's what they
24 say.  What they say is that our

Page 174

1 study shows that naproxen protects
2 the heart.  And in the context of
3 what is on the rest of the page,
4 it is justification for the notion
5 that Vioxx does not cause heart
6 attacks, naproxen prevents them.
7 BY MR. TISI:
8      Q.   Did they specifically single
9 out your study as being, quote,
10 independent?
11     A.   Yes.
12     Q.   Doctor, were you aware at
13 the time that Merck was using your study
14 results that were presented to Dr. Guess
15 in August of 2001 to suggest that the
16 results of VIGOR were the result of the
17 cardioprotective effect of naproxen?
18     A.   No, I was not aware of that
19 at the time.
20     Q.   If you had been aware of
21 that, what would your reaction have been?
22          MR. BECK:  Objection,
23 speculation.
24          THE WITNESS:  Well, I can

Page 175

1 tell you what my reaction is right
2 now, which is I'm indignant that
3 they took a finding of ours that
4 was very clearly communicated,
5 that is, the very modest effect of
6 protection of the hearts that we
7 found with naproxen, which we
8 explicitly said was not enough to
9 explain the increase in heart
10 attacks in the naproxen/Vioxx
11 comparison in VIGOR, that Dr.
12 Guess was in the room when we
13 presented that, and I now
14 understand, even wrote down, that
15 we hypothesized that what really
16 was probably going on was an
17 increased risk from the selective
18 COX-2, or Vioxx, as an explanation
19 of the VIGOR study.
20          I am upset right now, and I
21 was the first time I saw this, to
22 know that they were essentially
23 distorting our scientific findings
24 to justify exactly the opposite

45 (Pages 172 to 175)

Page 356

1  VIGOR findings, because everyone had it,
2  including the people who were given
3  naproxen.
4      Q.  Could you turn to Page 36,
5  please?
6      A.  Yes.
7      Q.  At the bottom of the page
8  there.
9      A.  Yes.
10     Q.  The very bottom it says,
11 "Suggested labeling."
12     A.  Yes.
13     Q.  Do you see that there?
14     A.  Yes.
15     Q.  Would you read what she says
16 about that?
17     A.  Yes.
18     Q.  Well, actually, go to the
19 second sentence, if you don't mind.
20     A.  All right.
21        In bold it suggests labeling
22 that would properly address CV risks.
23     Q.  In the last sentence there?
24     A.  "It would be difficult to

Page 357

1  imagine inclusion of VIGOR results in the
2  rofecoxib" or Vioxx "labeling without
3  mentioning cardiovascular safety results
4  in the study description as well as the
5  Warnings section."
6      Q.  Okay.
7        Do you agree with Dr.
8  Targum?
9      A.  Yes.
10     Q.  Are all the opinions —
11       So, in fairness, Doctor, I
12 just want to be clear.  The opinions that
13 you gave earlier, are they consistent
14 with what the medical officers were
15 saying at the time when they reviewed the
16 same data that you reviewed in connection
17 with this litigation?
18     A.  Yes.
19       MR. BECK:  I'm going to
20     object because it's hopelessly
21     vague.  He's given an awful lot of
22     opinions that have nothing to do
23     with what's in the Targum
24     memorandum or in the other medical

Page 358

1  officer's memorandum.
2  BY MR. TISI:
3      Q.  Let me ask you this question
4  again, Doctor.
5        Does your opinions about the
6  confluence of 090, 085, ADVANTAGE,
7  APPROVe and all the other --
8      A.  Not APPROVe.  You mean
9  VIGOR.
10     Q.  VIGOR, and all the evidence
11 surrounding that we've been talking
12 about, do you come to the same
13 conclusions about the validity of the
14 naproxen hypothesis that both of these
15 medical officers looking at the same
16 information came to?
17       MR. BECK:  I'm going to
18     object to this witness
19     characterizing the conclusions of
20     these other two individuals.
21       MR. TISI:  Go ahead.
22       THE WITNESS:  Yes, I do.
23     And I think equally importantly,
24     those are opinions which I wrote

Page 359

1      myself in our publications around
2      this period.
3  BY MR. TISI:
4      Q.  Okay.
5        We haven't talked about the
6  Alzheimer studies.
7      A.  Right.
8      Q.  Let's talk about them.
9      A.  Okay.
10     Q.  Doctor, let me -- let me.
11       I'm sorry.  We'll just go
12 on.
13       Do you have an opinion to a
14 reasonable degree of medical certainty as
15 to whether or not there was reasonable
16 evidence of increased mortality
17 associated with Vioxx?
18     A.  Yes.
19     Q.  What is that opinion?
20     A.  That opinion is that there
21 was an increase in mortality,
22 particularly as reflected in the
23 Alzheimer studies conducted by Merck with
24 Vioxx.

91 (Pages 356 to 359)

Page 360

1      Q.   Tell us a little bit about
2  the Alzheimer's studies, how they were
3  conducted, how they were designed.
4      A.   Okay.  These were studies
5  that were designed to find out, and,
6  again, it was a good question at the
7  time, whether the anti-inflammatory
8  effects of Vioxx might either treat or
9  prevent Alzheimer's disease or senility.
10  And there was reason for thinking that
11  might be a good idea.  And, first of all,
12  it was found that it didn't work, but
13  that happens.
14          But in addition, I first
15  came to be aware of these studies in
16  evaluating our own research in which Dr.
17  Reicin of Merck paid a visit to our
18  division to talk with us about the
19  findings that we were generating in our
20  own studies of heart attack.  And she
21  indicated that our findings were way off
22  base because they did not fit all of
23  Merck's data about the safety of their
24  drug and that we would be embarrassed

Page 361

1  with the findings when our paper came out
2  because they had good evidence that
3  theirs was a safe drug.
4          And one of the points that
5  was made not just by her, but in repeated
6  other statements by Merck officials, was
7  that the Alzheimer studies did not show
8  any increase in cardiovascular risk, and
9  that was in people who ought to be having
10  heart attacks, if anybody would, and that
11  was proof that there was not a problem.
12          And there are a couple of --
13      Q.   Let me ask you a question.
14      A.   Yes, I'm sorry.
15          MR. BECK:  Before you move
16  on, I'm going to move to strike.
17  There has never been a disclosure
18  and the bases of his opinion of
19  this supposed conversation with
20  Dr. Reicin.
21  BY MR. TISI:
22      Q.   Did you speak to Dr. Reicin?
23      A.   She made a presentation to
24  our group that I actually did not attend,

Page 362

1  but Dr. Solomon was there, and we
2  discussed it afterwards.
3          MR. BECK:  Now I move to
4  strike it on hearsay grounds.
5  It's apparent that what he's doing
6  is, at best, repeating what he
7  claims Dr. Solomon claims Dr.
8  Reicin said.  So, move to strike
9  on hearsay grounds, as well as
10  undisclosed bases.
11          THE WITNESS:  But if I may
12  add, this is also a statement that
13  was made in writing --
14  BY MR. TISI:
15      Q.   Actually, let me just go
16  back.
17          Have you reviewed the
18  statistical analyses done by Merck in
19  early 2001 on the Alzheimer's trials and
20  all cause mortality?
21      A.   Yes, I have.
22      Q.   What have you reviewed?
23      A.   I believe there was Dr. Chen
24  who was a statistician at Merck who

Page 363

1  analyzed the death rates in patients in
2  the combined Alzheimer's studies who were
3  on Vioxx versus placebo.
4              - - -
5          (Whereupon, Deposition
6  Exhibit Avorn-35, Memo 5-1-01
7  MRK-ABY0030000 - MRK-ABY0030030,
8  was marked for identification.)
9              - - -
10  BY MR. TISI:
11      Q.   I'm going to show you a
12  document that I have marked as Exhibit
13  Number 35 and a summary of the document
14  is dated May 1st, 2001, and it is a
15  document entitled "Program Mortality
16  Analysis Protocol 91, 78, 126," and
17  that's May 1st, 2001.  Is that a document
18  you've seen before, Doctor?
19      A.   Yes.  That's the Dr. Chen
20  memo that I've reviewed.
21      Q.   We can go into that in some
22  detail, but let me ask you this question.
23          Do you have an opinion based
24  upon Dr. Chen's analysis as to whether or

Page 364

1 not there was an increased incidence in
2 mortality in the two Alzheimer's studies,
3 078 and 091?
4      A.    Yes, I do.
5      Q.    And what is your
6 understanding of the increased mortality
7 in both of those studies?
8      A.    That there was a
9 dramatically higher mortality rate that
10 was even statistically significant as I
11 recall in the intention to treat analysis
12 of those data.
13      Q.    And what, if any,
14 significance is increased mortality?  Is
15 that something that is important to
16 epidemiologists like yourself?
17      A.    Yes.  And this also relates
18 to my expertise in geriatrics and
19 geriatric pharmacology.  Because one of
20 the key concepts in geriatrics is that it
21 is not as possible to ascertain the
22 occurrence of a heart attack, and this is
23 well known, and I've taught about this
24 and written about it over the years.

Page 365

1           Conditions present
2 differently in the elderly patient, and
3 so an older person, particularly one who
4 has senility, who are these patients, may
5 not, A, experience the typical findings
6 of crushing chest pain going down your
7 left arm, radiating to your jaw, and if
8 they do, they may not be able to
9 communicate them appropriately because
10 they are senile.
11           And even non-senile old
12 people, we know that 25 percent of heart
13 attacks in old people do not present with
14 those typical symptoms.  And the typical
15 presentation may be acute confusion or
16 lethargy or the appearance of a stroke or
17 any number of nonspecific causes.  So,
18 this is a key point in a lot of the
19 teaching that I do at Harvard about
20 geriatric medicine.
21           As a result, it is very much
22 more difficult to ascertain the
23 occurrence of specific events in an old
24 person, particularly a senile older

Page 366

1 person.  And really the most clear-cut
2 endpoint that anyone has got for problems
3 is death because you don't have a
4 difficulty ascertaining whether someone
5 is dead or not, although I've had
6 patients in which we came close.  But, in
7 fact, death is probably the cleanest
8 endpoint we have in any kind of drug
9 study because it requires no judgment on
10 the part of the researcher.
11           And that was why the
12 combination of it is much more tough to
13 spot a heart attack in an old person,
14 especially with senility, combined with
15 the fact that there was a doubling of the
16 death rate.  Most deaths in most people
17 in the U.S. are of a cardiovascular
18 nature.  So, if you tell me irregardless
19 of or regardless of the drug in question
20 that there are patients in group A that
21 had twice the death rate of patients in
22 group B, that's a very worrisome finding.
23      Q.    Doctor, when you looked at
24 cardiac death in the Alzheimer's trials,

Page 367

1 was there an imbalance?
2      A.    No.
3      Q.    Cardiac death.
4      A.    I'm sorry.  I thought you
5 meant cardiac outcomes.  I don't remember
6 the cardiac death by heart.  Let me look
7 at that.  I think that -- was the 8 to 2
8 or 8 to 3 ratio of deaths, as I recall?
9 And I can dig through it here, but if we
10 agree that it was 8 to 2 or 8 to 3, the 2
11 and 3 varied.  But there was a
12 four-foldish increase.
13      Q.    Is that significant, Doctor?
14      A.    Well, it depends on what you
15 mean by "significant."  It is striking.
16 With small numbers, I honestly don't
17 recall whether it was significant in the
18 statistical sense.  But, again, I think
19 if you tell me that there are four times
20 as many people having cardiac deaths in
21 group A versus group B, that would catch
22 my attention.
23      Q.    All right.
24           Doctor, let's move on.

93  (Pages 364 to 367)

Golkow Litigation Technologies - 877.DEPS.USA

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 368

```
 1      A.   There's one point, Mr. Tisi,
 2  in answer to your question that I didn't
 3  get to say.  And that is, if one looks at
 4  the means of ascertaining events in these
 5  studies, I was struck with the fact that
 6  the studies did not seem to me as a
 7  geriatrician and as somebody who has
 8  written about geriatric pharmacology to
 9  be set up in a way that would ascertain
10  cardiac events in a systematic way so
11  that you could really be confident of the
12  results that would come from any part of
13  the study design that would identify who
14  had a heart attack or who didn't or who
15  had an angina and who didn't, who had a
16  stroke and who didn't.
17      I was underwhelmed with the
18  care with which those outcomes were being
19  looked at.  Perhaps their focus was just
20  on tracking people's mental status.  But
21  another reason that I suspect there was
22  not a clear difference seen in
23  cardiovascular events was that they were
24  not being looked for very carefully.
```

Page 369

```
 1      Q.   Do you know whether --
 2          MR. BECK:  I'm going to
 3      object and move to strike as
 4      totally volunteered and not in
 5      response to any question at all,
 6      and also including his speculation
 7      which he referred to as what he
 8      would suspect.
 9  BY MR. TISI:
10      Q.   Well, Doctor, did you review
11  the data analysis plan and the standard
12  operating procedure for ascertaining
13  cardiovascular events?
14      A.   Yes, I did.
15      Q.   Okay.  And did you find, did
16  you have an opinion as to whether or not
17  this was set up appropriately to
18  ascertain and analyze events in the Vioxx
19  clinical trials?
20      A.   Yes, I do.
21      Q.   And what is that opinion?
22      A.   Based on reviewing the
23  cardiac standard operating procedure that
24  Merck put together, which they argued was
```

Page 370

```
 1  their response to the VIGOR data to look
 2  for cardiac events in all their other
 3  studies, I was struck with the fact that
 4  a number of key presentations of heart
 5  attack, that is, key manifestations of
 6  having a heart attack, seemed to have
 7  been deleted in the course of that
 8  standard operating procedure being
 9  implemented.
10      So, for example, pulmonary
11  edema, which is well known to be a
12  presenting or a manifesting sign of a
13  heart attack, congestive heart failure,
14  arrhythmias, which is rhythm
15  disturbances, all were excised from
16  having been there before, were struck out
17  in the version of the standard operating
18  procedure at Merck that I saw, which
19  would clearly result in under
20  ascertainment or missing a lot of cases
21  of heart attack, which particularly in
22  the elderly, are going to present
23  themselves in precisely that way.
24      Q.   Doctor, do you have an
```

Page 371

```
 1  opinion to a reasonable degree of medical
 2  certainty as somebody who has taught
 3  pharmaceutical company executives about
 4  looking at signals and designing clinical
 5  trials as to whether or not it was
 6  feasible to do a cardiovascular outcomes
 7  study that would have definitively
 8  answered this question while Vioxx was on
 9  the market?
10      A.   Yes, I do.
11      Q.   And what is that opinion?
12      A.   My opinion is that it would
13  have been feasible and ethical and quite
14  doable to have such a study done in
15  response to the signals that emerged and
16  that the more than signals, the data that
17  emerged from the studies we have been
18  discussing.
19      Q.   And how would you as a
20  pharmacoepidemiologist have designed such
21  a study that would have been both ethical
22  and effective in deciding this question?
23      A.   I think you're right to
24  raise the ethical issue first because I
```

Page 372

1  really do believe in first do no harm,
2  and people with whom I've discussed this,
3  including Dr. Baron, who is one of the
4  key researchers on the APPROVe study, we
5  had a disagreement when he came to
6  Harvard after the APPROVe data were
7  released, and I said there should have
8  been a study that Merck designed that
9  would have gotten to the bottom of this
10 issue years earlier.
11        And his point, along with
12 Paul Richter, who is a cardiologist at
13 Harvard that I respect enormously, both
14 of them argued that it would have been
15 unethical to do such a study because it
16 would have been putting patients
17 intentionally at risk to see if they
18 would have heart attacks. And my
19 response to that in response to your
20 question is twofold.
21        One is, if it would have
22 been unethical to put people at risk by
23 putting them on Vioxx in a clinical
24 trial, then I didn't understand how it

Page 373

1  was ethical for the company to market the
2  drug so aggressively to tens of millions
3  of patients. That if it was too unsafe
4  to study, I didn't see how it was too
5  unsafe to advertise and promote that
6  aggressively.
7        But more importantly, if
8  there were a group of patients that might
9  have benefitted from Vioxx, that is, if
10 there were a group of patients who had
11 bad arthritis and needed to be on a
12 medication for it, because it would not
13 have been right to do a placebo study,
14 then one would have needed to identify
15 those patients who would have also been
16 able to benefit from the hoped for
17 stomach protecting effect of Vioxx.
18        And one could then ethically
19 say, here's somebody who really needs to
20 be on a drug that will protect their
21 stomach and be on a nonsteroidal like
22 Vioxx, and it makes it acceptable to
23 enroll them in a study. And the control
24 group could have been a group that was

Page 374

1  given Tylenol or acetaminophen to treat
2  their pain, which we have good evidence
3  is an effective treatment for many people
4  who have osteoarthritis.
5        And I was not the first
6  person to think of that. Actually, Dr.
7  Scolnick at Merck said that he felt that
8  that would be the definitive study to do
9  to get to the bottom of the
10 cardiovascular risk question.
11            - - -
12        (Whereupon, Deposition
13 Exhibit Avorn-36, E-mail 4-12-00
14 MRK-ABC0033809, was marked for
15 identification.)
16            - - -
17 BY MR. TISI:
18    Q.   I'm going to show you what I
19 have had marked as Exhibit Number 36. Is
20 this the document to which you refer?
21    A.   I think so.
22    Q.   Okay.
23        And when you look at the
24 e-mail from Dr. Scolnick dated April 12,

Page 375

1  2000, and this would have been right
2  after the VIGOR study, the VIGOR on our
3  timeline --
4    A.   Right.
5    Q.   -- right after VIGOR was
6  unblinded and the data became available?
7    A.   Correct.
8    Q.   Okay.
9        Would you read what Dr.
10 Scolnick has to say?
11    A.   Yes. This is to Dr. Reicin.
12 "Hi, Alise. I have been trading e-mails
13 with Doug Greene in realtime. We are all
14 online too late. I will tell you my
15 worry quotient is high. I actually am in
16 minor agony. What I really want to do is
17 a 10,000 versus 10,000 patient study in
18 mild to moderate osteoarthritis Tylenol
19 versus Vioxx with PRN," which means as
20 needed, "low-dose ASA," which is aspirin,
21 "for those judged to need it. Safety," I
22 guess he means would be the "first
23 primary endpoint and efficacy secondary
24 or co-primary. WE WILL NOT" now this is

95 (Pages 372 to 375)

3821cc6c-711a-49b8-994f-51a1f40221c0

**Page 376**

1 in capital letters, "WE WILL NOT KNOW FOR
2 SURE WHAT IS GOING ON UNTIL WE DO THIS
3 STUDY. PLEASE THINK HARD ABOUT THE
4 DESIGN BEFORE THE PAC MEETING. Thanks,
5 Ed."
6     Q.   As somebody who conducts
7 clinical trials and conducts
8 epidemiologic studies and looks at these
9 kinds of issues, would this have been an
10 ethical study to do?
11     A.   Yeah. I think he got it
12 exactly right.
13     Q.   And was any such study ever
14 done?
15     A.   Not to my knowledge.
16     Q.   Moving on, Doctor.
17         Do you have an opinion as to
18 whether or not to a reasonable degree of
19 medical certainty, having reviewed all
20 the documents you reviewed in connection
21 with your prior experience, as to whether
22 or not the benefits of Vioxx were
23 outweighed by its risks?
24     A.   Yes.

**Page 377**

1     Q.   And what is that opinion?
2     A.   That its benefits were not
3 outweighed by its risks. If one counts
4 up the number of serious gastrointestinal
5 complications that it prevented, and it
6 did at least in people not taking
7 aspirin, and you compare those with the
8 number of serious cardiovascular events
9 that it caused, the numbers are actually
10 quite close. And clinically, it is worse
11 to have a heart attack or a stroke than
12 to have a GI bleed because you can fix
13 the GI bleed by stopping the offending
14 drug, maybe the patient may need a blood
15 transfusion, and then they are as good as
16 they were before. But if you've had a
17 heart attack or a stroke, there's often
18 permanent damage to your heart or your
19 brain, and you're usually not as good as
20 you were before.
21     Q.   Doctor, that brings me to
22 another question.
23         Do you have an opinion as to
24 whether or not all NSAIDs have the same

**Page 378**

1 cardiovascular risk as Vioxx?
2     A.   I have such an opinion.
3     Q.   Okay.
4         Is that something you've
5 written about?
6     A.   Yes.
7     Q.   In fact, is that something
8 that you looked at specifically in the
9 context of your Vioxx studies compared to
10 Celebrex?
11     A.   Correct.
12     Q.   And, in fact, that's
13 something that you looked at in your
14 NSAID study comparing naproxen to other
15 drugs?
16     A.   Correct.
17     Q.   And in looking at the
18 totality of evidence, do you have an
19 opinion as to whether or not there is a,
20 quote, class effect, a cardiovascular
21 class effect between all nonsteroidal
22 anti-inflammatory drugs?
23     A.   I do have such an opinion.
24     Q.   And what is that opinion?

**Page 379**

1     A.   My opinion is that there is
2 not a unitary class effect, that is, it
3 is not the same for all drugs, and that,
4 in fact, there is a gradient of effects
5 where with some drugs, which happen to be
6 the ones that were taken off the market,
7 namely, Vioxx and Bextra, having the
8 worst risk of heart attack and stroke and
9 then lower risk for Celebrex, but
10 certainly Celebrex at high doses, and I
11 think we know that from some clinical
12 trial data, and then probably lower risk
13 for the older nonsteroidals. And then,
14 of course, aspirin, on the other end of
15 the spectrum, not only has no cardiac
16 risk, but it prevents heart attacks.
17     Q.   Have you communicated this
18 opinion to the Food & Drug
19 Administration?
20     A.   Yes, I have.
21     Q.   And is Celebrex still on the
22 market, by the way?
23     A.   Yes, it is.
24     Q.   Is naproxen still on the

96 (Pages 376 to 379)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 380

1 market?
2     A.   Yes, it is.
3     Q.   Is diclofenac still on the
4 market?
5     A.   Yes, it is.
6     Q.   Aspirin?
7     A.   Yes.
8     Q.   Naproxen?
9     A.   Yes.
10     Q.   Doctor, you testified that
11 you're an expert in the factors that go
12 into physician prescribing practices.
13 What are those factors?
14     A.   We've done a number of
15 studies about what shapes physician
16 prescribing decisions, and I mentioned
17 the first one I published in 1982. And
18 in doing that work, we tried to define
19 what predicts or drives what a doctor
20 prescribes. And a great deal of it is
21 the doctor's perception of benefit versus
22 risk which he or she learns from a
23 variety of sources.
24     Q.   What are the sources in

Page 381

1 which a pharmaceutical company
2 communicates with doctors about their
3 products?
4     A.   Well, the legal governing
5 document that is probably central because
6 it determines what the company is allowed
7 to say in all of its promotional material
8 and all of its sales presentations is
9 what FDA calls the labeling or sometimes
10 it's called the package insert. But it's
11 a lengthy document, usually in small
12 print, that describes everything about a
13 drug, what it's used for, what its
14 benefits are, what its risks are, what
15 its dose is and so forth.
16     Q.   Are there any other methods
17 by which a pharmaceutical company
18 communicates with doctors that you're
19 familiar with?
20     A.   Sure. They will also, of
21 course, send out sales reps to doctors'
22 offices to talk to us about the
23 attributes of their drug, and, of course,
24 they will take out ads in medical

Page 382

1 journals. They will also take out ads or
2 put commercials on TV for patients. And
3 they will sponsor continuing education
4 programs for physicians.
5     Q.   What about publication of
6 medical articles?
7     A.   Very often companies are
8 heavily involved, as we've learned, in
9 the publication of articles in the
10 medical literature.
11     Q.   Let me talk about some of
12 those things for a moment. Let's talk
13 about the label for a moment.
14         First of all, what's a black
15 box warning?
16     A.   A black box warning is the
17 strongest kind of warning that appears on
18 a label which is literally in a black
19 box. And if the FDA feels that there is
20 a particularly important risk for a given
21 drug, it insists that the manufacturer --
22 because the manufacturer kind of owns the
23 words in the label and negotiates with
24 the FDA, but ultimately it is the

Page 383

1 manufacturer's words, the FDA will insist
2 that a black box appear at the very
3 beginning of the description of the drug
4 in the labeling information warning about
5 a particular problem.
6     Q.   What is a warning?
7     A.   A warning is the next
8 highest level of alert, and it is a
9 section in the labeling in which the most
10 important risks of a drug are presented.
11     Q.   What about a precaution?
12     A.   That's a much milder part of
13 the labeling in which it's kind of a
14 "watch out for this," but it's known as
15 to be a lower standard of risk.
16         - - -
17         (Whereupon, Deposition
18     Exhibit Avorn-37, Vioxx label
19     1999 MRK-LBL0000035 -
20     MRK-LBL0000038, was marked for
21     identification.)
22         - - -
23 BY MR. TISI:
24     Q.   Let's look at the -- have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 384

1  you reviewed the label that was in effect
2  from 1999 through 2002?
3      A.   Yes, I have.
4      Q.   And starting from the date
5  of the VIGOR results, and let me hand
6  that to you.
7          Doctor, was there any black
8  box warning for cardiovascular disease in
9  this label?
10     A.   There was no black box
11 warning of any kind.
12     Q.   Was there a warning?
13     A.   No.
14     Q.   Was there even a precaution
15 in the original label that dealt with
16 cardiovascular disease?
17     A.   Let me just turn to the
18 precautions section because I want to be
19 sure I'm being fair to the company.
20         (Witness reviewing
21 document.)
22         No.  I've just reviewed the
23 precautions section again and I don't see
24 anything about heart attack.

Page 385

1      Q.   And that was in effect until
2  April of 2002?
3      A.   That's correct.
4      Q.   Okay.
5          And VIGOR came out, VIGOR
6  results became available in 2000, early
7  2000?
8      A.   In the spring of 2000.
9      Q.   Given what was known about
10 VIGOR, ADVANTAGE, 090 and all the studies
11 we've talked about, does the label, in
12 your opinion, fairly and accurately
13 apprise physicians of the accurate,
14 unbiased information about heart attacks
15 necessary for them to make an accurate
16 risk/benefit analysis for their patients?
17         MR. BECK: Object.  This
18 witness is not an expert in FDA
19 labeling as has been held by at
20 least one federal judge.  It's
21 also undisclosed opinion.
22         THE WITNESS:  May I answer?
23         MR. TISI:  Yes.
24         In fact, that was very

Page 386

1  specific.  The federal judge I
2  think you are referring to did say
3  that he could testify to the
4  medical accuracy and scientific
5  accuracy of the label, but you may
6  answer.
7          THE WITNESS:  Okay.
8          It's probably worth pointing
9  out that I had an article in the
10 New England Journal of Medicine
11 about labeling in the last month.
12 BY MR. TISI:
13     Q.   Actually, I'm going to ask
14 you, let me just go back and ask you.
15         Doctor, given what was known
16 about Vioxx from 2000 to 2002, does this
17 label contain information about
18 cardiovascular risks that would have
19 allowed physicians to weigh those risks
20 against the benefits?
21         MR. BECK: Objection --
22         THE WITNESS:  No, the
23 information --
24         MR. BECK:  -- not only on

Page 387

1  the grounds I articulated before
2  about the labeling, but now moving
3  to what a physician would have
4  been allowed to do in terms of
5  weighing risks and benefits.
6  BY MR. TISI:
7      Q.   Go ahead.
8      A.   Okay.
9          The information is simply
10 not there.
11     Q.   Okay.
12         So, in your opinion, is this
13 an accurate, scientifically and medically
14 accurate label insofar as cardiovascular
15 risk is concerned?
16     A.   In my opinion, it is not.
17     Q.   Increased mortality, we
18 talked about that, it became available in
19 2001.  Do you have an opinion to a
20 reasonable degree of medical certainty as
21 to whether or not there was a reasonable
22 evidence of association between Vioxx and
23 increased mortality at least in 2001?
24     A.   There's nothing in the label

98  (Pages 384 to 387)

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 388

1   that says that a doubling -- I'm sorry,
2   were you wanting to object?
3        Q.   Go ahead.  You may answer.
4            MR. BECK:  I'm going to --
5   well...
6            MR. TISI:  Objection.
7            MR. BECK:  No, I'll let you
8   finish your answer and I'll move
9   to strike because that's not the
10  question that he asked.
11  BY MR. TISI:
12       Q.   Doctor --
13           MR. BECK:  He's waving the
14       label at you, but he didn't ask
15       you anything about the label.
16  BY MR. TISI:
17       Q.   No.  Let me ask you the
18  question.
19       Does this label contain
20  accurate medical and scientific
21  information about the increased mortality
22  seen in the Alzheimer's trials?
23       A.   There's nothing in the label
24  about the doubling of the death rate in

Page 389

1   the Alzheimer's study in this label.
2        Q.   Is that, in your opinion,
3   important information for doctors to
4   consider in making a fair risk/benefit
5   analysis for their patients?
6            MR. BECK:  Same objection
7       concerning his qualifications on
8       labeling and what would enable
9       doctors to make the risk/benefit
10      analysis.
11           THE WITNESS:  As someone who
12      has published papers on doctors'
13      assessment of risk versus benefit
14      and how that drives their
15      prescribing, and as someone who
16      has conducted and studied programs
17      to present information to doctors
18      in an unbiased manner, I can
19      assert with complete confidence
20      that failing to indicate that a
21      given drug has been associated
22      with a doubling of death rate in a
23      study that was statistically
24      significant, failing to have that

Page 390

1   in the label does not give doctors
2   the information they need to use
3   that drug appropriately.
4            MR. TISI:  Doctor, let's
5   move to the 2002 label which I
6   would like to have...
7            - - -
8            (Whereupon, Deposition
9   Exhibit Avorn-38, Vioxx label
10  2002 MRK-LBL0000063 --
11  MRK-LBL0000066, was marked for
12  identification.)
13           - - -
14  BY MR. TISI:
15       Q.   Doctor, have you looked at
16  the 2002 label which I'm handing to you
17  now?
18       A.   Yes, I have.
19       Q.   And that's Exhibit Number
20  39?
21       A.   It's 38.
22       Q.   All right.  38.
23       A.   Is this really the 2000?  I
24  want to make sure we have the right one.

Page 391

1   Yes, April 2002.
2        Q.   Is it your understanding
3   that in April of 2002 the Vioxx label was
4   changed to include some information about
5   the cardiac findings in the VIGOR study?
6        A.   Yes.
7        Q.   And have you reviewed that,
8   Doctor?
9        A.   Yes, I have.
10       Q.   And where does that --
11       First of all, let me ask
12  you, is there a black box warning for
13  doctors in the 2002 label?
14       A.   No.
15       Q.   Is there a warning on
16  cardiovascular risk in the label?
17       A.   No.
18       Q.   Where does the information
19  about VIGOR appear in this label?
20       A.   It is over here in the
21  section that is called "Clinical
22  Studies."
23       Q.   Is it also in the
24  precautions section?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 392

1      A.   I believe there is a
2  precaution about gastro -- about
3  cardiovascular effects.
4      Q.   Do you know whether or not
5  the --
6          We talked about before, we
7  looked at the medical officer report of
8  Dr. Targum?
9      A.   Yes.
10      Q.   Okay.
11          Which talks about the, I
12  think her words were, it is hard to
13  conceive that this information from VIGOR
14  would not be contained in the warnings
15  section.  Do you remember that?
16      A.   Correct.
17      Q.   Okay.
18          Do you know whether or not
19  the FDA, in fact, did recommend that the
20  company include a warning about the
21  cardiovascular risk seen in VIGOR?
22      A.   Yes, I know that.
23      Q.   And do you have an opinion
24  as to whether or not there was a

Page 393

1  reasonable evidence of association
2  between Vioxx and cardiovascular disease
3  at the time that VIGOR became available?
4      A.   Certainly by --
5          MR. BECK:  Object.  It's
6      been asked and answered I think
7      several times.
8  BY MR. TISI:
9      Q.   If that is the standard for
10  placing a warning --
11      A.   Yes.
12      Q.   -- would that information
13  alone have been enough to include the CV
14  risk in the warnings section of the Vioxx
15  label?
16      A.   Yes.
17          MR. BECK:  I'm going to
18      object on the ground that he's not
19      a warning expert and you are
20      misstating the standard.
21          MR. TISI:  Okay.
22  BY MR. TISI:
23      Q.   Let me ask you this
24  question, Doctor.

Page 394

1          Do you have an opinion,
2  again, to a reasonable degree of medical
3  certainty, as to whether or not the
4  information in the warning label in 2002
5  contained information about increased
6  mortality?
7      A.   Do I have an -- I'm sorry.
8  Do I have an opinion as to whether it was
9  there?
10      Q.   Do you know whether it is
11  there or not?
12      A.   I know that it was not
13  there.
14      Q.   Okay.
15          Do you have an opinion as to
16  whether or not there was reasonable
17  evidence of an association between Vioxx
18  and increased mortality that should have
19  been contained in the warnings section?
20          MR. BECK:  Objection.
21  BY MR. TISI:
22      Q.    If that is the standard.
23          MR. TISI:  I'm sorry, go
24  ahead.  Go ahead.  I didn't mean

Page 395

1  to do that.  Go ahead.
2          MR. BECK:  Are you saying go
3      ahead to me or go ahead to him?
4          MR. TISI:  Yes, to you.
5          MR. BECK:  Okay.  Thank you.
6      I object.  This witness is
7      not an FDA labeling expert on what
8      is the appropriate or required
9      content of FDA labels.
10  BY MR. TISI:
11      Q.   Have you reviewed the
12  FDA's --
13      A.   I'm sorry, I don't know that
14  I answered the last question.
15      Q.   I'm sorry, go ahead.
16      A.   Can you rephrase the
17  question or just present it again?
18      Q.   Yes.
19          Do you have an opinion to a
20  reasonable degree of medical certainty as
21  to whether or not the evidence of an
22  association between Vioxx and increased
23  mortality should have been contained in
24  the warnings section of the Vioxx label?

Golkow Litigation Technologies - 877.DEPS.USA

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 396

1      MR. BECK: Same objection as
2 articulated.
3      THE WITNESS: We're actually
4 just trying to answer the question
5 post your objection. You already
6 objected to the question. I'm
7 just trying to answer it now.
8 BY MR. TISI:
9   Q. Go ahead.
10      MR. BECK: Well, go ahead.
11      THE WITNESS: That's the
12 same question that you just
13 objected to but I didn't get to
14 answer.
15      MR. BECK: Actually, he
16 changes the question a little bit
17 each time and I have to object
18 each time. I'm sorry, but those
19 are the rules that we live by.
20 BY MR. TISI:
21   Q. Go ahead.
22   A. Okay.
23      I have such an opinion, and
24 my opinion is that if a company is in

Page 397

1 possession of data that indicates a
2 statistically significant doubling of the
3 death rate in a placebo-controlled
4 randomized control trial that it
5 conducted, then that information needs to
6 be in the label to be able to guide
7 physicians to make appropriate decisions
8 about the use of that drug.
9   Q. Have you seen any evidence
10 that the FDA wanted to include
11 information about VIGOR and ADVANTAGE in
12 the warnings section?
13      MR. BECK: I'm going to
14 object. This is not the subject
15 for expert testimony, asking
16 whether he's seen evidence --
17      MR. TISI: I have to set it
18 up.
19      MR. BECK: What?
20      MR. TISI: I have to set it
21 up. It is a preliminary question.
22 I have to ask him the question.
23      MR. BECK: Anyway, I object.
24      MR. TISI: That's fine.

Page 398

1      MR. BECK: It is not a
2 proper subject matter for expert
3 testimony, and he's certainly not
4 qualified if it would be.
5      THE WITNESS: I have seen
6 correspondence between Merck and
7 FDA in both directions about the
8 modifications to the label that
9 were proposed.
10 BY MR. TISI:
11   Q. Okay.
12      And do you know whether or
13 not the FDA proposed that information
14 about VIGOR and ADVANTAGE on
15 cardiovascular events and cardiovascular
16 risk be placed in the warnings section?
17      MR. BECK: I'm going to
18 object on the addition – first of
19 all, he's just commenting on
20 evidence rather than eliciting
21 expert opinions or any bases.
22      Secondly, I'm going to
23 object to the form of this. You
24 keep referring to the FDA, and

Page 399

1 there is final official action by
2 the FDA, and then there's
3 exchanges with FDA staff, and I
4 object to the form of the question
5 because it presupposes that the
6 agency is making final official
7 statements.
8 BY MR. TISI:
9   Q. Now, Doctor, have you seen
10 documents which indicate that the FDA
11 wished that the company include
12 information about the cardiovascular
13 risks seen in the VIGOR trial and the
14 ADVANTAGE trial in the warnings section?
15 Have you seen it?
16      MR. BECK: Same objections.
17 BY MR. TISI:
18   Q. I'm just --
19   A. Yes.
20   Q. Okay.
21      Having seen it, and as
22 somebody who is an expert in the factors
23 that drive doctors' prescribing
24 practices, do you have an opinion as to

101 (Pages 396 to 399)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 400

1  whether or not that kind of information
2  in the warnings section would have
3  assisted doctors in making a risk/benefit
4  analysis for their patients?
5      MR. BECK: Same objection
6      that I articulated before
7      concerning his lack of expertise
8      on FDA warnings, as well as the
9      opining on what doctors would take
10     into account on risk/benefit.
11     THE WITNESS: I have such an
12     opinion that that would have been
13     an important piece of information
14     for doctors to have.
15 BY MR. TISI:
16     Q.   Do you think that the lack
17 of that information deprived doctors of
18 an important piece of information from
19 which they could make reasonable
20 prescribing choices?
21     MR. BECK: Object. That is
22     an improper question for an
23     expert. It is not the sort of
24     opinion testimony that would

Page 401

1      assist the trier of fact. It's a
2      lawyer's argument, invades the
3      province of the jury, and it lacks
4      foundation, and it is hearsay.
5      THE WITNESS: May I answer?
6 BY MR. TISI:
7      Q.   Yes.
8      A.   Okay. Ea
9          As someone who has done
10 research on published and peer-reviewed
11 journals about physicians' assessments of
12 risks and benefits, and as someone who
13 teaches physicians about weighing risks
14 and benefits, and has written a book
15 about risks and benefits as drivers of
16 drug use, and as somebody who has written
17 a paper recently in the New England
18 Journal about the effect of labeling on
19 warnings and on prescribing, I can say
20 with a great deal of certainty that a
21 physician not having information about
22 doubling of mortality risk and of
23 increased risk of heart attack caused by
24 a drug would deprive that physician from

Page 402

1  the ability to be able to make a wise
2  prescribing decision.
3      Q.   Doctor, let me ask you this.
4          Do you have any evidence you
5  have seen in this case that the addition
6  of such a warning, as opposed to a
7  precaution, would have been made a
8  difference with respect to prescribing
9  practices with respect to Vioxx?
10     A.   Yes.
11     MR. TISI: Let me show you
12     what I'd like to have marked as
13     Exhibit Number 39.
14     - - -
15     (Whereupon, Deposition
16 Exhibit Avorn-39, U.S. Long Range
17 Operating Plan Vioxx, July 2001,
18 with Chart, MRK-ABI0008659 and
19 MRK-ABI0008674, was marked for
20 identification.)
21     - - -
22     THE WITNESS: I think I have
23     two copies of this. I don't know
24     if I should return one.

Page 403

1          (Handing over document.)
2 BY MR. TISI:
3      Q.   Doctor, have you seen this
4  before in preparation for your testimony
5  today?
6      A.   Yes, I have.
7      Q.   Would you describe --
8          First of all, this is July
9  of 2001?
10     A.   Right.
11     Q.   This is before the label
12 change?
13     A.   Right.
14     Q.   Okay.
15         Would you tell the members
16 of the jury what is significant to you as
17 somebody who studies the prescribing
18 practices of doctors and the difference
19 between the various levels of warnings as
20 conveyed in this document?
21     MR. BECK: I'm going to
22     object. This has nothing to do
23     with his area of expertise, and
24     you are just asking him to be a

Golkow Litigation Technologies - 877.DEPS.USA

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 404

1    prop to talk about Merck
2    documents.
3  BY MR. TISI:
4      Q.   Actually, let me rephrase it
5  so there is no question about what I'm
6  asking you here. I'm asking you a very
7  specific question.
8          What does this document
9  indicate as to doctors' willingness to
10 prescribe Vioxx if there is a warning
11 versus a precaution? Go ahead.
12         MR. BECK: And I object on
13     foundation grounds and on hearsay
14     grounds.
15         THE WITNESS: This document
16     indicates that the individuals at
17     Merck who prepared it had exactly
18     the same impression as I did about
19     the effect of a clear warning
20     versus what they call a mild
21     warning on utilization of the
22     drug. And what their graph
23     indicates is their projection that
24     utilization of the drug would be

Page 405

1      much lower if there was a strong
2      warning versus a mild warning.
3  BY MR. TISI:
4      Q.   And is this --
5          MR. BECK: Excuse me.
6          MR. TISI: Go ahead.
7          MR. BECK: I move to strike
8      on the ground that the witness
9      began speculating about what
10     authors understood and intended.
11         THE WITNESS: I'm simply
12     describing what the graph says.
13 BY MR. TISI:
14     Q.   Is this consistent with your
15 own research that the various levels of
16 warning make a difference with doctors?
17     A.   Yes.
18     Q.   Doctor, you mentioned
19 another method by which doctors
20 communicate -- companies communicate with
21 doctors is their statements to the press.
22 I think you mentioned that before?
23     A.   Right.
24     Q.   Have you seen statements

Page 406

1  that Merck has made to the press about
2  the cardiovascular safety of Vioxx?
3      A.   Yes.
4          MR. TISI: I'm going to hand
5      you what I would like to have
6      marked as Exhibit Number 40.
7              - - -
8          (Whereupon, Deposition
9      Exhibit Avorn-40, News Release
10     5-22-01, MRK-ABI0003228 -
11     MRK-ABI0003230, was marked for
12     identification.)
13             - - -
14         THE WITNESS: Sounds right.
15 BY MR. TISI:
16     Q.   Doctor, have you seen this
17 before as an example of the kind of
18 communication that Merck made to the
19 press?
20     A.   Yes.
21     Q.   What is this?
22         MR. BECK: Can I have one?
23         MR. TISI: I'm sorry.
24         MS. DAGOSTINO: My

Page 407

1  apologies.
2      (Handing over document.)
3          THE WITNESS: This is
4      labeled as a news release on
5      Merck's stationary for immediate
6      release, and the title of it is --
7      and it's dated May 22nd, 2001.
8      And the title is "Merck Confirms
9      Favorable Cardiovascular Safety
10     Profile of Vioxx."
11 BY MR. TISI:
12     Q.   And this talks about the
13 VIGOR study?
14     A.   Right.
15     Q.   Doctor, is there any fair
16 reading of the VIGOR study that would
17 justify this as being a medically and
18 scientifically accurate statement of what
19 was found in VIGOR?
20         MR. BECK: I object. That's
21     an improper subject for expert
22     testimony.
23 BY MR. TISI:
24     Q.   Let me rephrase the

103 (Pages 404 to 407)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 408

1 question.
2 Knowing what you know about
3 VIGOR, and looking at the medicine and
4 science surrounding VIGOR, is this
5 medically and scientifically accurate
6 information to disseminate to the public?
7 MR. BECK: Same objection.
8 This is just lawyer's argument.
9 THE WITNESS: A great deal
10 of my work, Mr. Tisi, involves
11 looking at ways of presenting
12 complicated information about drug
13 risks and drug benefits both to
14 physicians and to patients. We
15 did some of the first studies of
16 how to present information to
17 patients back in the early 1980s
18 relating to antibiotic risks and
19 benefits.
20 We have since produced
21 copious materials for patients in
22 our program in the State of
23 Pennsylvania explaining to them
24 the risks and benefits of various

Page 409

1 drugs in addition to information
2 for doctors to teach them about
3 how to balance risks and benefits
4 of drugs in a program supported by
5 the State of Pennsylvania.
6 Our other studies on
7 presenting information about risks
8 and benefits to patients and to
9 physicians have been supported by
10 the National Institutes of Health
11 and the John A. Hartford
12 Foundation and a variety of other
13 sources, including the Arthritis
14 Foundation and Merck itself in a
15 current study that I'm doing with
16 Dr. Solomon about explaining to
17 patients how to balance their
18 risks and benefits of osteoporosis
19 drugs, of which the most prominent
20 one is made by Merck.
21 I have spent 25 years
22 studying the question of how one
23 can condense complicated data,
24 epidemiologic data, clinical data,

Page 410

1 biological data, to doctors and
2 patients so as to inform their
3 prescribing in a way that is
4 driven by science and by patient
5 benefit, rather than driven by the
6 need to push or dump on a given
7 product. That is what my career
8 has been about.
9 I spend most days thinking
10 about how to present such
11 information fairly. And based on
12 that 25 and 20 years of
13 experience, published in
14 peer-reviewed journals, funded by
15 federal agencies and peer-reviewed
16 grant proposals, I can tell you
17 that this is an inadequate and a
18 deceptive way of presenting this
19 information to the press, to
20 doctors, to patients or to anyone.
21 MR. BECK: I move to strike
22 the extremely long speech about
23 his glorious career as
24 nonresponsive to the question.

Page 411

1 MR. TISI: After you
2 challenged his glorious career, I
3 think that's a totally appropriate
4 answer.
5 BY MR. TISI:
6 Q. Let's talk about medical --
7 MR. BECK: Also, I move
8 to -- even the last sentence where
9 he injects "inadequate" and
10 "deceptive way of presenting
11 information," I move to strike
12 that. It's an improper subject
13 for expert testimony. He's now
14 speculating about state of mind.
15 BY MR. TISI:
16 Q. Doctor, we have talked about
17 another method of communicating risks and
18 benefits to patients and doctors as being
19 the peer-reviewed published literature.
20 We've talked about several articles today
21 that did that.
22 A. Yes.
23 Q. Let's talk about the two
24 articles that appeared in the New England

Golkow Litigation Technologies - 877.DEPS.USA

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 412

1   Journal of Medicine, the APPROVe study
2   and the VIGOR study.  Have you reviewed
3   information about both of those studies?
4        A.   Yes.
5        Q.   Let's take VIGOR.  Was VIGOR
6   accurate, complete and a scientifically
7   appropriate way to present a fair and
8   balanced picture of the data collected in
9   that study?
10        Actually --
11        A.   I'm just waiting for the
12   objection.
13        Q.   I understand.
14        A.   No, it was not.
15        Q.   Okay.
16        Why was it not, Doctor?
17        MR. BECK:  I object to
18   anybody who doesn't work for Fox
19   News being asked to opine on
20   whether something is fair or
21   balanced.  Less facetiously, it is
22   not a proper subject matter for
23   expert testimony, and this witness
24   is not qualified on it, and it

Page 413

1        amounts to him substituting for a
2        lawyer and making your arguments
3        in the case.
4   BY MR. TISI:
5        Q.   Doctor, let me rephrase the
6   question.
7        Medically and scientifically
8   having reviewed the VIGOR data and
9   knowing what you know as an
10   epidemiologist, was the information
11   portrayed to doctors in a way that is
12   medically and scientifically accurate?
13        A.   No.
14        Q.   Why is that?
15        A.   Several reasons.  One is
16   that it is inappropriate for authors,
17   whether they work for a corporation or a
18   university, to know about important side
19   effects like a heart attack in patients
20   in a study that they are reporting and to
21   fail to include that information in the
22   published version of that paper.  That's
23   reason number one.
24        Reason number two is the

Page 414

1   so-called flipping of the data, and,
2   again, that's a Merck term, not mine, to
3   present the difference in the heart
4   attack rate between naproxen and Vioxx as
5   being explained by the fact that naproxen
6   was protecting patients' hearts, when at
7   least an equally plausible conclusion,
8   and, frankly, a far more plausible
9   conclusion was that Vioxx was causing the
10   heart attacks, and that inversion is
11   something which was not a fair
12   presentation of the data.
13        Q.   Let's move forward to the
14   APPROVe study.  Having reviewed the
15   APPROVe study and now knowing what you
16   know and seeing what you've seen, was the
17   evidence presented and the information
18   presented in the APPROVe study a
19   medically and scientifically accurate
20   presentation of the data collected in
21   that study so that doctors in the
22   scientific community would understand the
23   risks and benefits associated with Vioxx?
24        MR. BECK:  The same

Page 415

1   objection as before, plus an
2   undisclosed opinion.
3        THE WITNESS:  All right.
4        APPROVe was not a fair and
5   accurate depiction of the data, we
6   now know, for a couple of reasons.
7        One is that it eliminated
8   patients who had their cardiac
9   events greater than two weeks
10   after stopping the drug, and we
11   now understand that there are
12   aspects of the way that Vioxx
13   might cause damage that could
14   easily occur greater than two
15   weeks after stopping the drug,
16   and, in fact, the stroke data from
17   the APPROVe followup does indicate
18   that patients who had been on
19   Vioxx continued to have a
20   statistically significant higher
21   rate of stroke after the study was
22   completed or the active phase was
23   completed compared to the patients
24   who were on placebo.  That's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 416

1      reason number one.
2          Reason number two is that it
3      is now fairly well recognized that
4      the study used an incorrect
5      statistical approach which created
6      the misimpression that the risk
7      from Vioxx in that study only
8      began at month 18 and that anyone
9      taking the drug for less than 18
10     months, according to the way that
11     study was originally presented,
12     had no risk.
13         As of the last few days,
14     that has been corrected in the New
15     England Journal, and the statement
16     that this is not a problem before
17     18 months has been modified, as I
18     understand it, in response to this
19     becoming known by the editors of
20     the New England Journal, who, as I
21     know it, requested that change.
22         And I think those are the
23     two most important ways that, and
24     very important ways, APPROVe did

Page 417

1      not present the data in an
2      accurate and balanced manner.
3   BY MR. TISI:
4      Q.   And let me ask you this --
5          MR. BECK:  Before you go on,
6      I'm going to object and move to
7      strike on the additional ground of
8      hearsay, and also that the entire
9      question and answer make no sense
10     whatsoever since the question
11     asked whether the APPROVe study
12     presented the data so that doctors
13     in the scientific community would
14     understand the risks and benefits
15     associated with Vioxx when the
16     APPROVe study was published after
17     Vioxx had already been withdrawn
18     from the market.
19         MR. TISI:  I don't think
20     that as the question, but go
21     ahead.
22   BY MR. TISI:
23     Q.   Doctor, we talked about the
24     ADVANTAGE study and the publication of

Page 418

1      the ADVANTAGE study.  Did the publication
2      of the ADVANTAGE study contain
3      information about myocardial infarction,
4      heart attacks, as opposed to APTC events?
5          A.   No.  The endpoint --
6      although that data was collected, the
7      endpoint that was chosen for publication
8      was the so-called APTC or Anti-Platelet
9      Trialists Collaborative definition, which
10     was much broader.  That definition did
11     not reveal a striking difference in
12     outcomes, but had heart attacks, which is
13     exactly the issue at hand, been the
14     outcome that was presented, that would
15     have revealed a difference.
16         Q.   Did any of the published
17     Alzheimer's studies publish the intention
18     to treat analysis that Dr. Chen reported
19     about the increased mortality in both of
20     those studies?
21         A.   No.  Even though that
22     analysis was done by Merck and available
23     to Merck, it was not presented in
24     published form to doctors.

Page 419

1          Q.   Looking at all the major
2      publications that were submitted to the
3      medical and scientific community, do you
4      have an opinion as to whether or not the
5      medical and scientific information that
6      came to them in their totality was a
7      reasonable exposition of the medical and
8      scientific information known to Merck?
9          MR. BECK:  Object.  It's not
10     the proper subject for expert
11     testimony, and it goes to Merck's
12     state of mind, and also is
13     hopelessly vague.
14         THE WITNESS:  As someone who
15     reviews articles for the New
16     England Journal of Medicine,
17     reviews articles for JAMA, a
18     number of other publications in
19     which the editors seek my peer
20     review as to the appropriateness
21     of presentation of the data, as
22     someone who has published over 200
23     articles in which I myself have
24     been subjected to peer review

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 420

1     about the fairness of the
2     presentation of our own data, as
3     someone who has written widely
4     about physicians' and patients'
5     perception of risk and how that
6     perception drives their
7     prescribing, I can say that I have
8     never known a collection of papers
9     on any one topic in which there
10    has been such a constellation of
11    skewed and distorted presentation
12    of data in any drug studies that
13    I've ever looked at.
14 BY MR. TISI:
15    Q.   Doctor --
16        MR. BECK:  I move to strike
17    on the ground that it is an
18    undisclosed opinion and wasn't in
19    his report and for the
20    additional -- or for the same
21    reasons I articulated before about
22    him opining on state of mind of
23    others.
24 BY MR. TISI:

Page 421

1     Q.   Doctor, we talked about
2  another method of Merck communicating the
3  risks, accurate information about the
4  risks.  You do understand that there was
5  direct-to-consumer advertising for
6  patients -- directly to patients, and
7  you've written about that, correct?
8     A.   Yes.
9     Q.   Do you have an opinion as to
10 a reasonable degree of medical certainty
11 as to whether or not the
12 direct-to-consumer advertising conducted
13 by Merck played a role in what's a fair
14 and accurate depiction of the risks and
15 benefits associated with Vioxx?
16       MR. BECK:  Can I just say
17    the same objection that I have had
18    for the last ten minutes?
19       MR. TISI:  Yes.  I'll give
20    you a continuing objection on all
21    those bases.
22       THE WITNESS:  Yes.  As I
23    said in my Health Affairs article
24    about direct-to-consumer

Page 422

1     advertising a couple of years ago,
2     it's vital that patients be able
3     to get a reasonable depiction of
4     both the good news and the bad
5     news about a drug.  And given what
6     we now understand was available to
7     Merck at the time that all -- that
8     those $100 million a year of
9     commercials and ads were being
10    run, I think it is absolutely
11    correct to say that they provided
12    all the good news about the drug
13    and did an inadequate job of
14    presenting the bad news about the
15    drug to patients.
16 BY MR. TISI:
17    Q.   Now, Doctor, let me turn to
18 the one last topic I would ask you about
19 here, and that is the detailing of the
20 doctors, which is another method in which
21 companies will communicate with doctors.
22        Have you reviewed any of the
23 detailing information that was provided
24 to doctors?

Page 423

1     A.   Yes, as well as the training
2  of the sales reps, which is part of that.
3     Q.   What kinds of information
4  did you review that we provided to you?
5     A.   The materials that were put
6  together by Merck to train their sales
7  representatives about communicating with
8  doctors about Vioxx, particularly in
9  relation to its cardiovascular risk.
10    Q.   And, in fact, you had -- as
11 we talked about before, you had some
12 personal experience in the way in which
13 they answered questions about your own
14 study, correct?
15    A.   Correct.
16    Q.   Did you see the
17 cardiovascular card that was used?
18    A.   That's right.
19    Q.   Did you consider that?
20    A.   Yes, I did.
21    Q.   Did you see any information
22 about how to respond to doctors'
23 inquiries about cardiovascular events in
24 your review of the documents?

107 (Pages 420 to 423)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 424

1    A.  Yes.
2    Q.  What did you see?
3    A.  Well, the most memorable was
4  the dodge ball game that was apparently
5  developed as a training tool for their
6  sales reps to be able to respond to
7  doctors' questions about the
8  cardiovascular risks of Vioxx
9  particularly after the APPROVe study
10 findings had come out.  And I was
11 struck --
12   Q.  You meant VIGOR, right?
13   A.  I'm sorry.  That's what I
14 meant to say.
15   Q.  All right.  Okay.
16   A.  And I was struck by the fact
17 that the purpose is pretty much summed up
18 in the name, that it was to dodge
19 questions about this very important risk
20 of the company's drug.
21       Merck's training materials
22 to their sales reps explicitly tell them,
23 do not raise or do not initiate any
24 discussion of our paper or of other

Page 425

1  papers related to cardiovascular risk.
2  And there were a number of completely
3  evasive answers that were being fed to
4  the sales reps for them to give as
5  responses to doctors who asked about
6  whether or not this drug could cause
7  heart attacks.  And that did not seem to
8  me to be a reasonable or scientifically
9  accurate presentation of the data.
10      MR. BECK:  Move to strike
11   the answer, improper subject
12   matter for expert testimony
13   concerning state of mind and
14   characterizations of documents as
15   hearsay, the lawyer's argument.
16   This witness is not qualified to
17   opine on it.  It lacks foundation.
18      THE WITNESS:  Mr. Tisi, may
19   I amplify my answer a bit in
20   response to those concerns?
21 BY MR. TISI:
22   Q.  Actually -- sure, go ahead.
23      THE WITNESS:  Okay.
24      MR. BECK:  I also -- well,

Page 426

1  go ahead.
2       THE WITNESS:  The question
3  has been raised as to whether I
4  have any expertise about the
5  training of people to go out and
6  communicate with doctors.
7  BY MR. TISI:
8    Q.  Actually, I was going to ask
9  you about that.
10      MR. BECK:  I didn't raise
11   that question.
12 BY MR. TISI:
13   Q.  Actually, let me ask you
14 about that because that was what I was
15 going to ask you.
16   A.  Fine.
17   Q.  We talked about academic
18 detailing earlier in your deposition and
19 the programs that you've developed and
20 studied and published in the New England
21 Journal of Medicine.
22   A.  Yes.
23   Q.  Do you have any experience,
24 Doctor, in the training of detailers in

Page 427

1  how to present information in a medically
2  and scientifically accurate way to
3  doctors so that they can make accurate
4  prescribing decisions?
5    A.  Yes.  I've been working in
6  that area since the early 1980s, and
7  there's a number of publications in my CV
8  in the New England Journal of Medicine on
9  two occasions and an editorial in JAMA
10 and a long list, but since the hour is
11 late, I won't get into.
12      But suffice it to say that
13 even continuing to the present, we are
14 engaged in a large program in which we
15 train nurses and pharmacists to go out
16 and teach doctors about these issues.  In
17 fact, as luck would have it, one of the
18 topics we teach them about is how to
19 present the risk and benefit information
20 about cardiovascular outcomes of coxibs
21 such as Vioxx and Celebrex, as well as
22 other nonsteroidals.
23      We have put together
24 training materials about this.  We have

108  (Pages 424 to 427)

3821cc6c-711a-49b8-994f-51a1f40221c0

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 428

1  reviewed the literature. We have a
2  fairly systematic approach to trying to
3  get a fair cut on all the available
4  information and present it as
5  even-handedly as we can to doctors. And
6  in the program in Pennsylvania, we will
7  bring the nurses and pharmacists to
8  Boston for several days, we'll provide
9  them with extensive materials summarizing
10 the world literature talking about the
11 bad news and the good news. We also
12 teach them how to communicate, how to get
13 their point across, how to engage with
14 doctors.
15      I've written a paper in JAMA
16 called "Principles of Academic Detailing"
17 in which we set forth ways of presenting
18 information to doctors in a fair manner
19 so as to guide their prescribing toward
20 the most evidence-based approach.
21      I think it's probably fair
22 to say that I'm one of the world's
23 experts of how that is done outside of
24 drug company land, but done in a public

Page 429

1  interest and evidence-based manner.
2       We go to great lengths to
3  make sure that the nurses and pharmacists
4  that we have trained over the years, and
5  there now are 25 or such years, are
6  presented with all the aspects of the
7  problem at hand. And we encourage them
8  to, as I said in the paper in JAMA in the
9  1990s, to discuss both sides of the
10 question and to make sure that physicians
11 are comfortable with the ambiguity of
12 evidence when there is some.
13      And we've been studying this
14 for a very long time. I think I know a
15 great deal about it. Most of what I
16 learned or much of what I learned, I
17 learned from people in the drug industry,
18 and we simply try to take that approach
19 of getting people out into doctors'
20 offices, but not use it in a
21 single-minded way, to push product, to
22 deemphasize the harms, and push the
23 risks, but, rather, to make sure that the
24 doctors that we are teaching are given a

Page 430

1  fair, accurate presentation of all the
2  news, and this is not at all in keeping
3  with the way we've approached it.
4       Q.  Okay.
5            Now, let me ask you, given
6  all of that experience, Doctor, in your
7  experience of 20-some odd, 30-some odd
8  years in teaching how to communicate the
9  risks and the benefits, looking at all
10 the ways in which Vioxx was communicated,
11 the risks and the benefits, the good news
12 and the bad news to doctors, press
13 releases, medical journals, labels,
14 detailers, all of those things put
15 together, do you have an opinion to a
16 reasonable degree of medical and
17 scientific certainty as to whether or not
18 an accurate picture of the risks and
19 benefits of the drugs was communicated to
20 doctors so that they can make accurate
21 prescribing decisions for their patients?
22           MR. BECK: Chris, can I
23 incorporate the objections --
24           MR. TISI: Yes, absolutely.

Page 431

1            MR. BECK: — made over the
2  last 20 minutes?
3            MR. TISI: Absolutely.
4            THE WITNESS: I have such an
5  opinion.
6  BY MR. TISI:
7       Q.  And what is that opinion?
8            MR. BECK: Same objections.
9            THE WITNESS: That there was
10 a pattern of gross distortion of
11 the risks of Vioxx, and that no
12 matter which way physicians turn,
13 whether it was looking at the
14 label, hearing what they were
15 hearing from the Merck-trained
16 sales representatives, trying to
17 read the literature in the medical
18 journals and trying to get some
19 accurate, complete depiction of
20 what was happening in the clinical
21 trials, even the information
22 patients were bringing to them
23 from the commercials and ads that
24 they had seen, across the board,

Golkow Litigation Technologies - 877.DEPS.USA

3821cc6c-711a-49b8-994f-51a1f40221c0

Page 432

1  there was a pattern of what I
2  would characterize as systematic
3  distortion that rose almost to the
4  level of grotesque. And, frankly,
5  it was an embarrassment for me as
6  a member of the medical profession
7  that this was going on in
8  presenting information to doctors
9  in such a one-sided and lopsided
10 way.
11      MR. BECK: I move to strike
12 the answer on the ground that it
13 is replete with improper
14 characterizations of the evidence,
15 it's nonresponsive to the question
16 and is a closing argument rather
17 than expert testimony.
18 BY MR. TISI:
19     Q.   Now, is that opinion you
20 just gave an opinion that you are basing
21 on the scientific and medical information
22 that you know was available at the time?
23     A.   It is the opinion of me as
24 an expert who has spent 25 years studying

Page 433

1  the risks and benefits of drugs and how
2  those risks and benefits should be
3  communicated to doctors and to patients.
4      MR. TISI: Take a break.
5      THE VIDEOTAPE TECHNICIAN:
6  The time is 7:21. We're off the
7  record.
8           - - -
9      (Whereupon, a recess was
10 taken from 7:21 p.m. until
11 7:23 p.m.)
12          - - -
13     THE VIDEOTAPE TECHNICIAN:
14 This now adjourns the deposition
15 at 7:23 p.m. We are going off the
16 record.
17          - - -
18     (Whereupon the deposition
19 adjourned at 7:23 p.m.)
20          - - -
21
22
23
24

Page 434

1      C E R T I F I C A T E
2
3      I, LINDA L. GOLKOW, a Notary
   Public and Certified Shorthand
   Reporter of the State of New
4  Jersey, do hereby certify that
   prior to the commencement of the
5  examination, JEROME L. AVORN, M.D.
   was duly sworn by me to testify to
6  the truth, the whole truth and
   nothing but the truth.
7
8      I DO FURTHER CERTIFY that
9  the foregoing is a verbatim
   transcript of the testimony as
10 taken stenographically by and
   before me at the time, place and
11 on the date hereinbefore set
   forth, to the best of my ability.
12
13     I DO FURTHER CERTIFY that I
14 am neither a relative nor employee
   nor attorney nor counsel of any of
   the parties to this action, and
15 that I am neither a relative nor
   employee of such attorney or
16 counsel, and that I am not
   financially interested in the
17 action.
18
19
20 _____
   LINDA L. GOLKOW, CSR, RDR
21 Notary Number: 1060147
   Notary Expiration: 1.2.08
22 CSR Number: 30XI00176200
   Dated: July 3, 2006
23
24

Page 435

1      ACKNOWLEDGMENT OF DEPONENT
2
3
4      I,_____, do
   hereby certify that I have read the
5  foregoing pages, 1 - 432 , and that the
   same is a correct transcription of the
6  answers given by me to the questions
   therein propounded, except for the
7  corrections or changes in form or
   substance, if any, noted in the attached
8  Errata Sheet.
9
10 _____
   JEROME L. AVORN, M.D.
11 DATE
12
13
14
   Subscribed and sworn
15 to before me this
      Day of      , 20 .
16
   My commission expires:
17
18
   _____
19 Notary Public
20
21
22
23
24

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 436

```
1      - - - - - -
         E R R A T A
2      - - - - - -
3    PAGE LINE CHANGE
4    ____ ___ _____
5    ____ ___ _____
6    ____ ___ _____
7    ____ ___ _____
8    ____ ___ _____
9    ____ ___ _____
10   ____ ___ _____
11   ____ ___ _____
12   ____ ___ _____
13   ____ ___ _____
14   ____ ___ _____
15   ____ ___ _____
16   ____ ___ _____
17   ____ ___ _____
18   ____ ___ _____
19   ____ ___ _____
20   ____ ___ _____
21   ____ ___ _____
22   ____ ___ _____
23   ____ ___ _____
24
```

3821cc6c-711a-49b8-994f-51a1f40221c0