Confidential - Subject to Protective Order

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
- - -

IN RE:  VIOXX      : MDL DOCKET NO.
LITIGATION         : 1657

-------------------------------------------

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - ATLANTIC COUNTY
- - -

IN RE: VIOXX
LITIGATION         : CASE NO. 619
-------------------------------------------
CAUSE NO. 05-59499

IN RE:           : IN THE DISTRICT
                      : COURT
VIOXX LITIGATION   : 157TH JUDICIAL
                      : DISTRICT
APPLIES TO ALL CASES : HARRIS COUNTY,
                      : TEXAS
-------------------------------------------
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
CENTRAL CIVIL WEST

VIOXX CASES        : JCCP NO. 4247
                      : ASSIGNED TO HON
                      : VICTORIA CHEYNEY
- - -
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
- - -
June 30, 2006
- - -

    Continued videotape deposition of
JEROME L. AVORN, M.D.

- - -

GOLKOW LITIGATION TECHNOLOGIES
1600 John F. Kennedy Boulevard
Suite 1210
Philadelphia, Pennsylvania 19103
877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

**Page 438**

```
1              - - -
2         Continued videotape deposition of
3    JEROME L. AVORN, M.D., held at The
4    Sheraton Boston Hotel, 39 Dalton Street,
5    Boston, Massachusetts, 02199, commencing
6    at 9:26 a.m., on the above date, before
7    Linda L. Golkow, a Federally-Approved
8    Registered Diplomate Reporter and
9    Certified Shorthand Reporter.
10
               - - -
11
12
13
14
15
16
17
18
19
20
21
22         GOLKOW LITIGATION TECHNOLOGIES
               Four Penn Center
23        1600 John F. Kennedy Boulevard
                  Suite 1210
24        Philadelphia, Pennsylvania 19103
                  877.DEPS.USA
```

---

**Page 439**

```
1    A P P E A R A N C E S :
2
3    ASHCRAFT & GEREL
     BY: CHRISTOPHER TISI, ESQUIRE
4    Suite 400 - 2000 L Street, N.W.
     Washington, D.C. 20036
5    (202) 783-6400
     Counsel for Plaintiffs
6
7
     KLINE & SPECTER, P.C.
8    BY: THOMAS R. KLINE, ESQUIRE
        and
9      LISA DAGOSTINO, M.D., J.D.
     19th Floor - 1525 Locust Street
10   Philadelphia, Pennsylvania 19102
     (215) 772-1000
11   Counsel for Plaintiffs
12
13   SEEGER WEISS LLP
     BY: DAVID R. BUCHANAN, ESQUIRE
14       and
       CHRISTOPHER SEEGER, ESQUIRE
15     (Via Telephone)
     Suite 920 - 550 Broad Street
16   Newark, New Jersey 07102
     (973) 639-9100
17   Counsel for Plaintiffs
18
19   THE O'QUINN LAW FIRM
     BY: STEPHANIE SHAPIRO, ESQUIRE
20   2300 Lyric Centre Building
     440 Louisiana
21   Houston, Texas  77002
     (713) 223-1000
22   Counsel for the Plaintiffs
23
24          - - -
```

---

**Page 440**

```
1    A P P E A R A N C E S :  (CONTINUED)
2
3    BARTLIT BECK HERMAN
     BY: PHILIP S. BECK, ESQUIRE
4      and
        ANDREW L. GOLDMAN, ESQUIRE
5      and
        ADAM K. MORTARA, ESQUIRE
6    Courthouse Place
     54 West Hubbard Street
7    Chicago, Illinois 60610
     (312) 494-4451
8    Counsel for Merck and Co., Inc.
9
10   STOLL, KEENON, OGDEN PLLC
     BY: SETH A. GLADSTEIN, ESQUIRE
11   2000 PNC Plaza
     500 West Jefferson Street
12   Louisville, Kentucky 40202
     (502) 333-6000
13   (Via Telephone)
14
15   DARBY AND GAZAK, P.S.C.
     BY: ROBERT J. SHILTS, ESQUIRE
16   Suite 200, 3220 Office Pointe Place
     Louisville, Kentucky 40220
17   (502) 412-5020
     Counsel for physicians
18   (Via Telephone)
19
20   O'BRYAN BROWN & TONER
     BY: JOSHUA DAVIS, ESQUIRE
21   Suite 1500 - Starks Building
     Louisville, Kentucky 40202
22   (502) 585-4700
     Counsel for Kentucky physicians
23   (Via Telephone)
24          - - -
```

---

**Page 441**

```
1    A P P E A R A N C E S :  (CONTINUED)
2
3    CRUSE, SCOTT, HENDERSON & ALLEN,
     LLP
4    BY: VICTORIA A. FILIPPOV, ESQUIRE
     7th Floor
5    2777 Allen Parkway
     Houston, Texas 77019-2133
6    (713) 650-6600
     Counsel for Texas physicians
7    (Via Telephone)
8
9
10
11
12
13
14
15
16
17
18
19
20
21          - - -
22
23
24
```

2 (Pages 438 to 441)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

## Page 442

```
 1            - - -
 2           I N D E X
 3   WITNESS              PAGE NO.
 4   JEROME L. AVORN, M.D.
 5     By Mr. Beck      447, 973
 6     By Mr. Tisi      835, 983
 7            - - -
 8         E X H I B I T S
 9   NO.     DESCRIPTION    PAGE NO.
10
     Avorn-41   Reliance letter    450
11            dated 6.8.06
12
     Avorn-42   Document entitled,   459
13            "Additional
              Documents Provided
14            to Dr. Avorn"
15
     Avorn-43   Email dated 3.12.06  472
16
17   Avorn-44   Document entitled   499
              "Vioxx Excerpts
18            from primary review
              of NDA 21-042
19            Osteoarthritis"
20
     Avorn-45   Article entitled   561
21            "Cyclooxygenase-2
              Promotes Early
22            Atherosclerotic
              Lesion Formation in
23            LDL
              Receptor-Deficient
24            Mice"
```

## Page 443

```
 1   Avorn-46   Article entitled   570
              "Overexpression of
 2            Functionally
              Coupled
 3            Cyclooxygenase-2
              and Prostaglandin E
 4            Synthase in
              Symptomatic
 5            Atherosclerotic
              Plaques as a Basis
 6            of Prostaglandin
              E2-Dependent Plaque
 7            Instability"
 8
     Avorn-47   Report of Arthritis  604
 9            Advisory Committee
10
     Avorn-48   Article entitled   617
11            "Risk of
              Cardiovascular
12            Events Associated
              with Selective
13            COX-2 Inhibitors"
14   Avorn-49   Article entitled,   675
              "Clinical
15            Pharmacology of
              Platelet, Monocyte,
16            and Vascular
              Cyclooxygenase
17            Inhibition by
              Naproxen and
18            Low-Dose Aspirin in
              Healthy Subjects"
19
20
21
22
23
24
```

## Page 444

```
 1   Avorn-50   Article entitled,   678
              "Effects of
 2            Cyclooxygenase
              Inhibitors on
 3            Vasoactive
              Prostanoids and
 4            Thrombin Generation
              at the Site of
 5            Microvascular
              Injury in Healthy
 6            Men"
 7
     Avorn-51   Website of Brigham  690
 8            and Women's
              Hospital
 9
10   Avorn-52   Article entitled,   698
              "Pharmacoepidemi-
11            ology and rheumatic
              diseases:
12            2001-2002"
13
     Avorn-53   Excerpt from      722
14            Textbook
              Pharmacoepidemi-
15            ology
16
     Avorn-54   Fax cover sheet    769
17            dated 10.1.03 with
              letter dated
18            9.30.03 with
              attachments
19
20   Avorn-55   Email dated      778
              8.25.03,
21            MRK-AAC0129304 -
              MRK-AAC0129306
22
23
24
```

## Page 445

```
 1   Avorn-56   Educational piece  788
              entitled, "COX-2
 2            inhibitors: Who
              really needs them?"
 3            March 2002
 4
     Avorn-57   Educational piece  796
 5            entitled, "COX-2
              inhibitors: Who
 6            really needs them?"
              April 2003
 7
 8   Avorn-58   Document entitled  809
              "12/18/04 Interim
 9            Review"
10
     Avorn-59   Baycol website    845
11            document
12
     Avorn-60   Emails        898
13
14   Avorn-61   Document entitled,  906
              "Vioxx Preliminary
15            Cardiovascular
              Meta-Analysis dated
16            10.18.06"
17
18
19
20
21
22
23
24
```

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Page 446

1    DEPOSITION SUPPORT INDEX
2
3
     Direction to Witness Not To Answer
4    Page Line Page Line
     (None)
5
6
7
8
     Request For Production of Documents
9    Page Line Page Line
     (None)
10
11
12
13
     Stipulations
14   Page Line Page Line
     (None)
15
16
17
18
     Questions Marked
19   Page Line Page Line
     (None)
20
21
22
23
24        - - -

Page 448

1    review; is that right?
2        A.   Thousands of pages, yes.
3        Q.   And were these documents
4    contained in binders that Mr. Tisi showed
5    to us during your first deposition?
6        A.   Yes.
7        Q.   And I think you've got those
8    binders with you today?
9        A.   Right.
10       Q.   What, are there ten or so
11   binders of documents that they gave you?
12       A.   Sounds about right, yes.
13       Q.   And all of the Merck
14   documents that you've reviewed before
15   reaching your opinion in writing your
16   report all came from the plaintiffs'
17   lawyers, right?
18           MR. TISI:  Excuse me.
19       Objection, mischaracterizes.
20           MR. BUCHANAN:  On behalf of
21   New Jersey, objection.  That
22   violates The Court's rule and
23   process concerning lawyer's
24   interactions with witnesses.

Page 447

1        - - -
2        THE VIDEOTAPE TECHNICIAN:
3    We're back on the record.  This is
4    Day 2 in the deposition of Dr.
5    Jerome Avorn.  Today's date is
6    June 30th, 2006, and the time is
7    9:26.
8        You may continue.
9        MR. TISI:  At this point, we
10   would pass the witness.
11       - - -
12       CROSS-EXAMINATION
13       - - -
14   BY MR. BECK:
15       Q.   Doctor, once again, my name
16   is Phil Beck, and I represent Merck.
17       As I understand it, sir, you
18   were retained as an expert by the
19   plaintiffs' lawyers in around May of
20   2005; is that right?
21       A.   That's right.
22       Q.   And I think Mr. Tisi
23   mentioned this, but they provided you
24   with a large number of documents to

Page 449

1    BY MR. BECK:
2        Q.   Did all of the documents
3    that you reviewed, the internal Merck
4    documents, in reaching your opinion, come
5    from the plaintiffs' lawyers?
6            MR. BUCHANAN:  Same
7        objection.
8            MR. TISI:  Same objection.
9            THE WITNESS:  Same question.
10       Yes.  That's the only way I could
11       get internal documents.
12   BY MR. BECK:
13       Q.   Now, you understand, do you
14   not, that the plaintiffs' lawyers have a
15   financial interest in the outcome of
16   these cases?
17           THE WITNESS:  As does Merck.
18           MR. BUCHANAN:  Excuse me,
19       objection, violates Rule One.
20           THE WITNESS:  Both sides
21       have a financial interest.
22   BY MR. BECK:
23       Q.   And do you think that it's
24   sound scientific methodology to rely on

4  (Pages 446 to 449)

Confidential - Subject to Protective Order

Page 450

1  lawyers who have a financial interest in
2  the outcome of the litigation to be the
3  exclusive source of the Merck documents
4  that you reviewed before you reached your
5  opinion?
6      MR. TISI: Objection.
7      MR. BUCHANAN: Objection,
8  Rule One.
9      THE WITNESS: Well, the only
10  way, as I said, that I could get
11  Merck documents was through
12  attorneys. I can't go to Merck
13  and get the documents directly.
14  BY MR. BECK:
15  Q.   Let's look at some of the
16  materials that plaintiffs' lawyers
17  provided you.
18      - - -
19      (Whereupon, Deposition
20  Exhibit Avorn-41, Reliance letter
21  dated 6.8.06 was marked for
22  identification.)
23      - - -
24  BY MR. BECK:

Page 451

1  Q.   I'm handing you what I've
2  marked as Exhibit 41.
3      MR. TISI: Thank you,
4  Counsel.
5  BY MR. BECK:
6  Q.   Do you recognize this as a
7  list of materials that the lawyers that
8  hired you compiled that's supposed to
9  represent the materials that you reviewed
10  or relied on in reaching your opinion?
11      MR. TISI: Objection.
12      MR. BUCHANAN: Objection to
13  the prefatory comments and
14  violating Rule One.
15      Phil, I don't know if you're
16  familiar, this deposition is
17  obviously cross-noticed in New
18  Jersey. I don't know to what
19  extent you're familiar with Judge
20  Higbee's rule on this, but you're
21  treading on Rule One. You can
22  proceed however you'd like to.
23      MR. BECK: Why don't we go
24  off the video record for a minute.

Page 452

1      THE VIDEOTAPE TECHNICIAN:
2  The time is 9:30. We're off the
3  record.
4      MR. BECK: In what respect?
5      MR. BUCHANAN: The Court has
6  been very clear about -- well,
7  there's separately a court rule in
8  New Jersey that protects
9  communications between the expert
10  and counsel in connection with the
11  preparation of reports.
12      Independent of that,
13  however, there is The Court's
14  admonition in New Jersey as to
15  specific inquiry with reference to
16  attorneys attempting to impugn
17  attorneys' dealings with witnesses
18  or impugning attorneys dealings
19  with experts. So, to the extent
20  you're suggesting there's
21  something improper about lawyers'
22  interactions with a witness, The
23  Court has been very clear and
24  cautious to counsel.

Page 453

1      I just wanted to give you
2  that clarification. You can
3  proceed however you'd like, but
4  we'll raise those issues down the
5  road.
6      MR. TISI: And I also think
7  that Judge Fallon has been
8  particularly sensitive to the
9  issue of, in some of the
10  depositions, conduct that seems to
11  go over the edge in terms of
12  suggesting lawyers do this,
13  lawyers do that, et cetera, et
14  cetera. So, I'll just leave that
15  as my objection as well. Go
16  ahead.
17      MR. BECK: I'll just say for
18  the record, and maybe you guys can
19  have some sort of continuing
20  objection if you want, but to the
21  extent that under New Jersey
22  procedure lawyers' communications
23  with experts cannot be inquired
24  into, that was waived yesterday by

5 (Pages 450 to 453)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

**Page 454**

1  Mr. Tisi when he said, and then I
2  met with you and we talked about
3  this, and then I provided you this
4  document, is this another document
5  that I provided.
6      So, if that would otherwise
7  be protected, Mr. Tisi explored it
8  at some length yesterday in the
9  materials that he provided to the
10  expert, and I'm certainly entitled
11  to cross-examine on that. And I'm
12  simply right now asking him
13  whether these are the materials
14  that he was provided to review.
15      MR. BUCHANAN: Just so I can
16  clarify, so that we're very clear,
17  there was a particular concern
18  that I had with regard to your
19  questions and how you are loading
20  in the plaintiffs' lawyers did
21  this or the plaintiffs' lawyers
22  did that. The Court in New Jersey
23  has given us clear guidance that
24  that's not an appropriate way to

**Page 455**

1  ask questions, I believe. I'm not
2  going to interpret the rule, I
3  just wanted to advise you of it.
4  You can proceed as you wish and
5  then the transcript will be ruled
6  on accordingly by Judge Higbee.
7      MR. BECK: Sure.
8      MR. TISI: I just want to
9  take the position, I don't want to
10  get in your way, Phil, clearly
11  there's a distinction in my mind
12  of did we provide you certain
13  information and be in
14  communication with the witness
15  about documents and different
16  things that may have transpired
17  between counsel and the witness.
18  So, I don't think I waived
19  anything.
20      MR. BECK: Well, my pending
21  question is, is this a list of
22  documents that they --
23      MR. TISI: That's fine.
24      MR. BECK: That's what you

**Page 456**

1  objected to.
2      MR. BUCHANAN: And I was,
3  frankly, Phil, trying to do you a
4  courtesy. So, however you want to
5  frame your questions. There was a
6  leading statement that prefaced
7  your question. It's probably five
8  pages up now. I don't know that
9  we can see it. But there was a
10  phrase that you led with
11  concerning the plaintiffs' lawyers
12  providing this information, and
13  that was my concern.
14      MR. TISI: And as long as
15  we're off the record, I just
16  wanted to make sure you had the
17  information so that we don't
18  interrupt you.
19      MR. BECK: Do you have
20  something to add, Tom?
21      MR. KLINE: Not on the
22  record.
23      MR. BECK: Do you want to go
24  off the record?

**Page 457**

1      MR. KLINE: Just for a
2  second.
3          - - -
4      (Whereupon, a recess was
5  taken from 9:33 a.m. until 9:36
6  a.m.)
7          - - -
8      THE VIDEOTAPE TECHNICIAN:
9  We're back on the record. The
10  time is 9:36.
11  BY MR. BECK:
12      Q.  My question concerning
13  Exhibit 41, Doctor, was you recognize
14  this as a list of materials that the
15  lawyers that hired you compiled that
16  represents materials that you reviewed or
17  relied upon in your analysis in this
18  case?
19      A.  There's about a dozen
20  single-spaced pages, lists of documents,
21  and I can only assume that counsel was
22  accurate in listing all of what they
23  provided to me on here. I can't compare
24  item for item since there's almost 200.

6 (Pages 454 to 457)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 458

1   And I also, of course, relied on material
2   that's in the public domain that I would
3   have used in my own work over the years
4   and also our own experiences in the
5   course of our research.
6        Q.   Now, a couple weeks ago in
7   your deposition, do you remember saying
8   that you wanted to give Merck a fair
9   shake, and so you asked to be provided
10  with by the lawyers who hired you any
11  evidence that would paint Merck in a
12  better light?
13       A.   Maybe we should avoid the
14  phrase "the lawyers who hired you" since
15  I'm not being paid for this.  So, do you
16  want to phrase that more accurately?
17       Q.   Well, if I say the
18  "plaintiffs' lawyers," some of them will
19  object to that.  Can I --
20       A.   The lawyers you are working
21  with.
22       Q.   Okay, fine.
23            Did you claim in your
24  deposition a few weeks ago that you

Page 459

1   wanted to give Merck a fair shake, and so
2   you asked the lawyers that you're working
3   with to provide you with any evidence
4   that would paint Merck in a better light?
5        A.   That's right.
6        Q.   And then after you made that
7   request, did the lawyers that you're
8   working with send some additional
9   documents?
10            MR. TISI:  Objection.
11            THE WITNESS:  I think I made
12       that request very early on, so, I
13       can't tell which documents were in
14       response to that request or not.
15                    - - -
16            (Whereupon, Deposition
17       Exhibit Avorn-42, Document
18       entitled, "Additional Documents
19       Provided to Dr. Avorn," was
20       marked for identification.)
21                    - - -
22  BY MR. BECK:
23       Q.   I'm handing you what we've
24  marked as Exhibit 42.

Page 460

1            MR. TISI:  Thank you.
2   BY MR. BECK:
3        Q.   And I'll put this up on the
4   screen.
5            Exhibit 42 was a document
6   provided by the lawyers that you are
7   working with to us titled "Additional
8   documents provided to Dr. Avorn."  Do you
9   see that?
10       A.   Yes.
11       Q.   And do you see that there's
12  a heading at the top that says,
13  "Documents that Support Merck's
14  Defenses"?  Do you see that?
15       A.   Yes.
16       Q.   And did the lawyers that
17  you're working with give you a copy of
18  this document that we're looking at here,
19  the --
20       A.   You mean of this exhibit?
21       Q.   Right.  Exhibit 42.
22       A.   I don't know whether I've
23  gotten this list or not.
24       Q.   Okay.

Page 461

1            Do you see here that on this
2   document there's listed a grand total of
3   eight documents that support Merck's
4   defenses?
5        A.   Right.
6        Q.   Now, out of the millions of
7   pages of paper that Merck has produced in
8   this case, do you think that there's only
9   eight documents that support Merck's
10  defenses?
11            MR. TISI:  Objection, calls
12       for speculation, relevance,
13       hearsay.
14            THE WITNESS:  I expect
15       there's probably more, and I would
16       be pleased to take a look if you
17       have them.
18  BY MR. BECK:
19       Q.   Did you ask the lawyers
20  you're working with whether there were
21  other documents that Merck relied on that
22  you had not been provided?
23            MR. TISI:  Objection.
24            MR. BUCHANAN:  Objection,

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 462

1 calls for communications between
2 counsel and the witness.
3       THE WITNESS: I assume that
4 after the objections I go on and
5 answer?
6       MR. TISI: Absolutely.
7       THE WITNESS: Okay.
8       No. I made the request at
9 the beginning, and I assumed that
10 they honored it as best they could
11 during the course of what they
12 transmitted to me. I told them I
13 didn't want to get any surprises
14 and see materials at
15 cross-examination today that I had
16 not seen before.
17 BY MR. BECK:
18       Q. So, my question was, did you
19 ask the lawyers you were working with
20 whether there were other documents
21 besides these eight that Merck relied on
22 that had not been provided to you?
23       MR. TISI: Objection,
24 hearsay, relevance, argumentative.

Page 463

1       MR. BUCHANAN: Objection,
2 asked and answered.
3       THE WITNESS: I asked them
4 to send me whatever they thought I
5 needed to see on the Merck side.
6 BY MR. BECK:
7       Q. Whatever the lawyers you
8 were working with thought you needed to
9 see?
10       MR. TISI: Objection.
11       THE WITNESS: Whatever --
12 well, my request was whatever
13 there was that I needed to see.
14 Obviously, they were going to use
15 their discretion, but I told them
16 that I didn't want to get a
17 one-sided picture.
18 BY MR. BECK:
19       Q. Again, just the "they" is
20 the lawyers you were working with?
21       A. That's correct.
22       Q. Did the lawyers that you
23 were working with send you copies of any
24 of Merck's opening statements or closing

Page 464

1 arguments in the trials that have taken
2 place so that you could see what Merck
3 actually said about their view of what
4 evidence supported their case?
5       A. I don't think I've seen any
6 trial testimony on either side.
7       Q. Now, of these eight
8 documents that are listed here on the
9 document that we have up, Exhibit 42, do
10 you see that six of the eight are
11 scientific articles?
12       A. Some of them are labeled
13 protocols, but, yeah, that could be. I
14 don't know if it was the actual protocol
15 or the results of the study protocol.
16       MR. TISI: And objection.
17 Objection. Go ahead.
18 BY MR. BECK:
19       Q. Well, in any event, let's
20 focus on Item Number 3, the Alise
21 Reicin's 2002 meta-analysis. Do you
22 agree that that is a scientific article?
23       A. Yes. I think it was in the
24 American Journal of Cardiology or the

Page 465

1 American Heart Journal.
2       Q. In the expert report that
3 you filed in this case, did you discuss
4 the analysis and Ms. Reicin's or Dr.
5 Reicin's study anywhere?
6       A. No. Because I believe she
7 omitted some important data from that
8 meta-analysis.
9       Q. And another document that is
10 listed here, and I think you may have
11 mentioned it yesterday, is Dr. Konstam's
12 2001 meta-analysis?
13       A. Yes.
14       Q. Anywhere in your report that
15 you filed in this case do you discuss Dr.
16 Konstam's scientific publication?
17       A. My report doesn't discuss
18 any specific publications hardly at all,
19 and so there are no footnotes to this
20 paper or that paper. It's an overview of
21 the literature. And so I often did not
22 refer to a specific paper on either side.
23       Q. Well, your report does refer
24 to scientific articles, does it not?

8 (Pages 462 to 465)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 466

1    A.   To some.  But it is not as
2  if it is footnoted with 85 references.
3  So, no, I did not refer to Dr. Konstam's
4  meta-analysis.
5    Q.   And then there are these
6  additional analyses by Dr. Weir, for
7  example.  Do you see that?
8    A.   Yes.
9    Q.   And does your report discuss
10  Dr. Weir's meta-analysis?
11    A.   No.
12    Q.   And then there's Dr. Van
13  Hecken.  Does your report discuss Dr. Van
14  Hecken's analysis?
15    A.   No.
16    Q.   And the document provided by
17  the lawyers you are working with, it says
18  it is "Relied on mainly to support
19  Merck's naproxen theory."  Did you even
20  read Dr. Van Hecken's study?
21    A.   My recollection is, and
22  there were hundreds of documents that I
23  read, was that this was a study looking
24  at the time it required -- a bleeding

Page 467

1  time test, which is the time it requires
2  for a cut to heal and stop bleeding.
3    Q.   Did you read this before you
4  wrote your report or did you read this
5  since your deposition?
6    A.   I did not read it after my
7  deposition, and so that would have been
8  in the last two weeks, and I know I did
9  not read it in the last two weeks.
10    Q.   Do you remember at your
11  deposition that you didn't -- that the
12  Van Hecken reference did not even ring a
13  bell for you?
14    MR. TISI:  Can I see where
15    it is, Counsel, if you are going
16    to refer to it?
17    MR. BECK:  What?
18    MR. TISI:  If we are going
19    to refer to testimony, I would
20    like to know where you are
21    referring to.
22    MR. BECK:  Page 387 of your
23    deposition.
24    "Question:  Are you familiar

Page 468

1  with a study by Van Hecken?
2    "Answer:  The name doesn't
3  ring a bell initially."
4    THE WITNESS:  That's
5    correct.
6  BY MR. BECK:
7    Q.   So, a couple of weeks ago
8  when you were deposed when you were asked
9  about the Van Hecken study, the name
10  didn't ring a bell, right?
11    MR. TISI:  Objection,
12    mischaracterizes.
13    THE WITNESS:  It was not
14    referred to as a bleeding time
15    study.  It was referred to just by
16    the name of the author, and there
17    are hundreds of authors that I've
18    reviewed the papers of.
19  BY MR. BECK:
20    Q.   When you say it's a bleeding
21  time study, is it a pharmacology study
22  about platelet inhibition?
23    A.   That's my recollection.
24    Q.   And is that different from a

Page 469

1  bleeding time study?
2    A.   Well, platelets are what
3  makes you clot when you do a bleeding
4  time study.  So, bleeding time and
5  platelet effect, platelet aggregation,
6  platelet inhibition are all the same
7  thing.
8    Q.   Another one of the documents
9  referred to here is Dr. Tuleja.  Was that
10  somebody who didn't ring a bell when you
11  were asked about that in your deposition
12  also?
13    A.   I don't see that on your
14  list.
15    Q.   Oh, I'm sorry.
16    Well, whether Dr. Tuleja is
17  listed on the list or not, is that
18  somebody whose name you recognize,
19  someone who has written in this field?
20    A.   Dr. Goldman rattled off the
21  names of a number of authors without
22  indicating what the studies were about,
23  and the names of the authors, when he
24  read them off, were not familiar to me.

9 (Pages 466 to 469)

56ae81f3-615a-41a4-af82-acf966afcfcb

Page 470

1  That doesn't mean I don't know about the
2  information.
3      Q.   Well, was Dr. Tuleja, was he
4  familiar to you when -- it's actually Mr.
5  Goldman rather than Dr. Goldman.
6      A.   I'm sorry.  He actually
7  knows more about Vioxx than a lot of
8  doctors do.
9          No, the name did not ring a
10 bell.
11     Q.   How about the rabbit aorta
12 study, regardless of who the author was,
13 did you discuss that in your expert
14 report?
15     A.   I did not.
16     Q.   And the same thing with
17 what's referred to here as the arm bleed
18 study, did you discuss that in your
19 expert report?
20     A.   No.
21     Q.   When you wrote your report,
22 did the lawyers that you worked with turn
23 around and mark it up and provide you
24 with suggestions and changes from your

Page 471

1  report?
2      A.   They did not do any marking
3  up, but they did comment on aspects of
4  it.  This is unclear, this is unfair to
5  Merck, you forgot about this thing that
6  we had talked about, but they didn't make
7  any marks or changes.
8      Q.   There were no markups at
9  all?
10         MR. TISI:  Objection.
11         THE WITNESS:  I made notes
12     to myself, which normally I just
13     get rid of, but I noticed after
14     Mr. Goldman had copied all the
15     materials that there was one draft
16     of my own annotations on an
17     earlier version of the report that
18     was in one of the binders.
19 BY MR. BECK:
20     Q.   And I appreciate that.  I'm
21 not asking you about your own markups.
22     A.   Right.
23     Q.   Your testimony is that the
24 lawyers did not provide you with any

Page 472

1  markups; is that right?
2          MR. TISI:  Objection.
3          THE WITNESS:  By "markups,"
4      you mean did they make notes on my
5      report and make suggestions about
6      changing it?  That's right, they
7      did not.
8               - - -
9          (Whereupon, Deposition
10     Exhibit Avorn-43, Email dated
11     3.12.06, was marked for
12     identification.)
13              - - -
14 BY MR. BECK:
15     Q.   I'm handing you what we've
16 marked as Exhibit 43.
17         Do you see that Exhibit 43
18 is an e-mail to you from Jeff Grand?
19     A.   Yes.
20     Q.   And Jeff Grand is one of the
21 lawyers that you worked with?
22     A.   That's right.
23     Q.   Do you see at the bottom --
24 excuse me, I'll go back up to the top.

Page 473

1          And this is dated March
2  12th, 2006.  Do you see that?
3      A.   Yes.
4      Q.   And that was before the date
5  of your expert report in this case,
6  right?
7      A.   It was before it was
8  finalized, yes.
9      Q.   Okay.
10         Before it was finalized.
11         And then do you see the very
12 last thing that Mr. Grand said in his
13 e-mail to you was, "Also, tomorrow, I
14 will send you a mark-up of your report as
15 we discussed."
16         MR. BUCHANAN:  I'm going to
17     interject an objection concerning
18     communications between counsel and
19     the witness.  It is protected
20     under New Jersey law.
21         THE WITNESS:  Yes, I see
22     that.
23 BY MR. BECK:
24     Q.   Did the lawyers that you

10 (Pages 470 to 473)

Page 474

1 worked with provide you with expert
2 reports written by other plaintiffs'
3 experts before you prepared and finalized
4 your report?
5     A.   Yes, they did.
6     Q.   Am I correct that one of
7 those was a report by Dr. Ray?
8     A.   That's right.
9     Q.   And you took Dr. Ray's
10 report into account when preparing your
11 own report?
12     A.   That's right.
13     Q.   Were you ever provided or
14 have you ever seen the transcripts of the
15 cross-examinations of Dr. Ray at the two
16 trials where he's testified?
17         MR. TISI: Objection.
18         THE WITNESS: No.
19         MR. BECK: Basis?
20         MR. TISI: Relevance,
21     hearsay.
22 BY MR. BECK:
23     Q.   So, my question is, have you
24 ever seen or been provided copies of the

Page 475

1 transcript of the cross-examination of
2 Dr. Ray at the trials where he's
3 testified?
4     A.   No, I haven't.
5         MR. TISI: And I would also
6     add outside of the scope of the
7     direct.
8         THE WITNESS: Shall I
9     answer?
10 BY MR. BECK:
11     Q.   Yes, you should.
12     A.   No, I have not.
13     Q.   So, you don't have any idea,
14 or do you, from any other source of what
15 Dr. Ray admitted to under oath concerning
16 the report that you looked at and relied
17 on?
18         MR. TISI: Objection.
19         MR. KLINE: Objection.
20         THE WITNESS: Knowing Dr.
21     Ray for years, I wouldn't think
22     that what he would say under oath
23     would be any different than what
24     he would say in his report.

Page 476

1 BY MR. BECK:
2     Q.   Did the lawyers that you
3 worked with provide you with any of the
4 expert reports written by Merck's experts
5 before you sat down and prepared and
6 finalized your report?
7     A.   Not that I can recall.
8     Q.   And as I recall from your
9 deposition recently, I think while you
10 were out of the country you were provided
11 with a CD that had copies of Merck's
12 expert reports, but at least as of the
13 date of your deposition a few weeks ago,
14 you had still not looked at any of those
15 reports, right?
16     A.   Well, they arrived when I
17 was in Australia.
18     Q.   I understand.
19     A.   Yes.
20     Q.   And just to tie it down,
21 though, as of the date of your
22 deposition --
23         Well, first, as of the date
24 when you wrote and finalized your report,

Page 477

1 you had not looked at or considered any
2 of the expert reports by Merck's experts,
3 right?
4     A.   Right.  My focus was on what
5 happened at the time, not post hoc
6 constructions either by the experts
7 working with the plaintiffs or the
8 experts working with Merck.
9     Q.   Well, you did look at some
10 of the plaintiffs' expert reports
11 including Dr. Ray's?
12         MR. TISI: Objection.
13         THE WITNESS: Just one, yes.
14     But just that one, and there may
15     have been another, I don't recall,
16     but I focused on events that
17     occurred as they occurred.
18 BY MR. BECK:
19     Q.   And as of your deposition,
20 you had not read any of the expert
21 reports by Merck's experts, right?
22     A.   That's correct.
23     Q.   And as of today, have you
24 read any of the expert reports by Merck's

11 (Pages 474 to 477)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

**Page 478**

```
1    experts?
2        A.   No, I have not.
3        Q.   Okay.
4             Yesterday in response to a
5    question from Mr. Tisi, you testified
6    that you were "right" was the word that
7    he and you used in connection with your
8    expert opinions in other litigation
9    concerning Baycol, Rezulin, diet drugs
10   and PPA.  Do you remember that?
11       A.   That's right.
12       Q.   Now, these were drugs that
13   were withdrawn from the market, correct?
14       A.   Right.
15       Q.   And I just want to focus now
16   on Baycol for a minute and your claim
17   that you were right about Baycol.
18            Now, Baycol was withdrawn
19   from the market before you were ever
20   contacted by any lawyers to consult on
21   that matter, right?
22       A.   That's right.
23       Q.   And the withdrawal from the
24   market of Baycol had nothing whatsoever
```

**Page 479**

```
1    to do with the expert opinions that you
2    rendered in that litigation, correct?
3        A.   That's right.
4        Q.   And would you agree with me,
5    sir, that the fact that a manufacturer
6    withdraws a medicine from the market
7    because of a safety concern does not mean
8    that the medicine was defectively
9    designed?
10            MR. TISI:  Objection.
11            THE WITNESS:  It all depends
12       on the circumstances.
13   BY MR. BECK:
14       Q.   And would you agree that the
15   fact that the manufacturer withdraws a
16   medicine from the market does not mean
17   that the warnings that were in place
18   before the withdrawal were inadequate?
19            MR. TISI:  Objection,
20       relevance, conjecture, outside the
21       scope.
22            THE WITNESS:  Again, it all
23       depends on the case in question.
24   BY MR. BECK:
```

**Page 480**

```
1        Q.   And would you agree that the
2    fact that a manufacturer withdraws a
3    medicine from the market does not mean
4    that there was anything wrong with the
5    way that the manufacturer had marketed
6    the medicine while it was on the market?
7            MR. TISI:  Objection.
8            MR. BUCHANAN:  Objection.
9            MR. TISI:  Calls for
10       conjecture, outside the scope,
11       relevance, hearsay.
12            MR. BUCHANAN:  Calls for
13       speculation.
14            THE WITNESS:  It all depends
15       on the drug in question.
16   BY MR. BECK:
17       Q.   And would you agree that the
18   fact that a manufacturer withdraws a
19   medicine from the market does not mean
20   that any particular plaintiff actually
21   suffered injury due to any claimed
22   problem with the medicine?
23            MR. TISI:  Objection,
24       hearsay, relevance, conjecture,
```

**Page 481**

```
1        outside the scope.
2            THE WITNESS:  Well, if the
3        manufacturer withdraws a drug
4        because it causes a side effect,
5        side effect A, and there's a
6        patient who experienced that side
7        effect while they were taking the
8        drug, there could well be an
9        important relationship.
10   BY MR. BECK:
11       Q.   Could or could not be,
12   right?
13       A.   It depends on the case.
14       Q.   Right.
15            Now, you know from your work
16   on Baycol that after Baycol was withdrawn
17   from the market by — Bayer is the
18   manufacturer, right?
19       A.   Right.
20       Q.   So, Bayer withdrew Baycol
21   from the market, and after that happened,
22   then lots of lawsuits were filed and you
23   were contacted to work with lawyers on
24   those lawsuits, right?
```

12 (Pages 478 to 481)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 482

1  A.  I can't speak to when the
2  lawsuits were filed in relation to the
3  withdrawal.
4       MR. BUCHANAN: Excuse me,
5  belated objection, Rule One.
6       MR. TISI:  Also relevance,
7  outside the scope.
8  BY MR. BECK:
9       Q.  All of this goes to your
10 sworn testimony yesterday that you were
11 right?
12      MR. TISI:  Actually, it goes
13 to the cross-examination that --
14      MR. BECK:  The --
15      MR. TISI:  Well, it goes to
16 when you cross-examined him on his
17 qualifications and you raised that
18 issue and I asked followup
19 questions to your voir dire.  Go
20 ahead.
21      MR. BUCHANAN: Can I have a
22 continuing objection to the line
23 of questioning concerning Baycol?
24      MR. BECK:  Sure.

Page 483

1  BY MR. BECK:
2       Q.  So, it was --
3       Whether the suits were filed
4  before or after the withdrawal, your
5  expert report and analysis was not done
6  until after the withdrawal, right?
7       A.  That's correct.
8       Q.  And your opinion in the
9  Baycol case was that the warnings were
10 inadequate and the drug was defectively
11 designed and improperly marketed,
12 correct?
13      A.  That's correct.
14      Q.  And you said yesterday that
15 the fact that Baycol was withdrawn showed
16 that you were right in your opinions.  Do
17 you remember that?
18      A.  I think Mr. Tisi said it and
19 I concurred.
20      Q.  In fact, you know that not a
21 single plaintiff who ever took a case to
22 trial concerning Baycol ever got a
23 victory, that, in fact, Bayer won every
24 single case that went to trial?

Page 484

1       MR. KLINE:  Objection.
2       MR. BUCHANAN: Objection.
3       MR. TISI:  Relevance,
4  conjecture, outside the scope,
5  hearsay, misleading.
6       MR. KLINE:  It doesn't
7  account for the millions that were
8  paid to Baycol plaintiffs.
9       MR. BUCHANAN: Objection.
10 BY MR. BECK:
11      Q.  Do you know that in every
12 trial, every case that went to trial,
13 Bayer won and the plaintiffs lost?
14      MR. TISI:  How many "every
15 case," Counsel?
16 BY MR. BECK:
17      Q.  Do you know?
18      A.  Does that --
19      MR. BUCHANAN: Objection,
20 relevance, 403, misstates the
21 record concerning Bayer's actions
22 with regard to Baycol cases.
23 BY MR. BECK:
24      Q.  Do you know?

Page 485

1       A.  Does that include all the
2  settlements that Bayer made out of court?
3       Q.  No, no, no.  I'm asking the
4  cases that went to trial where plaintiffs
5  presented to juries the theories that you
6  had adopted in your expert opinion, do
7  you know whether a single plaintiff ever
8  won a case that went to trial?
9       MR. TISI:  Objection, lack
10 of foundation.
11      MR. KLINE:  Same objection.
12 I assume we have a continuing
13 objection to this line of
14 questioning?
15      MR. BECK:  Yes, you do.
16      MR. TISI:  Oh, okay.
17      Well, that was a different
18 question involving the basis of
19 his opinions.  Go ahead.
20      THE WITNESS:  I don't follow
21 what juries do, but I do know that
22 in a very large number of cases, a
23 company with an embarrassing track
24 record about safety will pay

Confidential - Subject to Protective Order

Page 486

1  plaintiffs a lot of money to
2  settle out of court, and a lot of
3  those cases never come to a jury.
4      MR. BECK: Move to strike as
5  nonresponsive. It's really just
6  the result of coaching and the
7  objections.
8  BY MR. BECK:
9      Q. My question, and please
10 answer this yes or no, if you can.
11     Do you know, just do you
12 know whether a single plaintiff who
13 actually took a case to trial challenging
14 the appropriateness of Bayer's conduct in
15 connection with Baycol, whether a single
16 plaintiff ever won one of those cases?
17     A. I don't know.
18     MR. TISI: Objection.
19     MR. BUCHANAN: Objection,
20     401, foundation.
21 BY MR. BECK:
22     Q. Yesterday on
23 direct-examination you testified that you
24 have done research on COX-2 inhibitors.

Page 487

1  Do you remember that?
2      A. Yes.
3      Q. And I just want to show you
4  one piece of your testimony from
5  yesterday. Starting at the bottom of
6  this page, it says, "And you have studied
7  COX-2," and then we go over to the next
8  page, "drugs?" That was the question.
9      And you said, "That's right.
10 We've been looking at that class of drugs
11 since before 1990."
12     MR. TISI: Let me just place
13     an objection, number one, and this
14     is an important objection to make.
15     Number one is I believe you
16     are using a rough draft, which is
17     not to be used for any purposes.
18     Number two, I'm not sure
19     that it's an appropriate way to
20     cross-examine a witness unless
21     you've given him an opportunity to
22     read it before you place it up on
23     the screen. So, I object to your
24     putting a rough transcript up on

Page 488

1  the screen. I don't think that's
2  a proper way of cross-examining.
3  Go ahead.
4      MR. BECK: Well, we don't
5  have the final transcript, so,
6  we're doing the best we can.
7      MR. TISI: I understand, but
8  the way to ask it, did you testify
9  yesterday X, Y and Z as opposed to
10 putting a rough transcript up on
11 the screen.
12     MR. KLINE: My objection is
13     a different one, and it is that I
14     don't know of anything that he
15     said that's inconsistent with
16     which he's being cross-examined at
17     least currently. You're just
18     putting a transcript up on the
19     screen.
20     MR. BECK: So, I've heard
21     everybody's objections now.
22 BY MR. BECK:
23     Q. Do you remember yesterday --
24 we'll take it off the screen if you want.

Page 489

1      A. No. I'd like to be able to
2  look at the question that I answered if
3  you want me to comment on my answer.
4      Q. So, you'd like to see it?
5      A. Yes.
6      Q. Okay. I'll put it back on
7  the screen.
8      A. The question, please.
9      Q. And the question. The
10 question from Mr. Tisi was, "And have you
11 studied COX-2 drugs?"
12     And the answer was, "That's
13 right. We've been looking at that class
14 of drugs since before 1990."
15     MR. TISI: Objection.
16 BY MR. BECK:
17     Q. Now, my question, sir, is
18 simply one of clarification. As far as
19 COX-2 drugs go, those didn't come around
20 until the late 1990s, correct?
21     A. Mr. Beck, the line of
22 questioning one line above that was
23 nonsteroidal drugs.
24     Q. Right.

14  (Pages 486 to 489)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 490

1    A.   And my amplification that
2  we've been looking at that class of drugs
3  was the nonsteroidal drugs, which were
4  one line above where you're referring to.
5    Q.   And all I want to do was get
6  your clarification on that, that he'd
7  asked you about nonsteroidal drugs, you
8  said you'd studied those, and then he
9  asked you if you studied COX-2 drugs, and
10 then you said, "That's right. We've been
11 looking at that since before 1990."
12         My question is simply, that
13 1990 date does not refer to COX-2
14 inhibitors since they were not even
15 around until the late 1990s, right?
16    A.   Right. That class of drugs
17 refers to nonsteroidals. You are right
18 about the date on the COX-2s.
19    Q.   Thank you.
20         I want to focus on the
21 preapproval time period, and I'll ask you
22 to keep the same distinction in mind that
23 Mr. Tisi did yesterday, that is, we have
24 the APPROVe study, which comes later in

Page 491

1  the game, and we have the actual approval
2  of Vioxx by the Food & Drug
3  Administration in, what was it, May of
4  1999?
5    A.   That's right.
6    Q.   Okay.
7         So, I'm talking about the
8  period now before the Food & Drug
9  Administration approved Vioxx.
10    A.   Right.
11    Q.   Okay.
12         And you're picking up
13 something and looking at it. What are
14 you --
15    A.   Right.
16    Q.   -- picking up?
17    A.   That's my report that
18 counsel has made a copy of. It is the
19 report as submitted with my annotations
20 about where in the tabs I should refer
21 to.
22    Q.   Okay.
23         Well, if you wouldn't mind
24 just sort of setting that aside for now,

Page 492

1  and if you feel a need in a particular
2  question to refer to it, you can open it
3  up and look at it.
4    A.   Okay.
5    Q.   But I would rather have your
6  testimony independent of the report for
7  right now.
8         MR. TISI: I object to that.
9         Go ahead.
10        THE WITNESS: Well, it was
11 based on hundreds of documents
12 which I don't all have in my head,
13 but we can --
14 BY MR. BECK:
15    Q.   Any time you need to look at
16 your report, say so, and then you can
17 look at it.
18    A.   Fine.
19    Q.   But unless you need to look
20 at it for some reference, I would rather
21 have your testimony independent of that
22 document.
23    A.   Okay.
24        MR. TISI: Let me just

Page 493

1  object to instructing the witness
2  in that fashion. I think the
3  witness is entitled to look at his
4  report or any document in response
5  to any question, and clearly he
6  was doing that. So, I don't think
7  it is appropriate to instruct the
8  witness when or when they cannot
9  refer to certain things that they
10 have relied on. But with that
11 objection, go ahead.
12 BY MR. BECK:
13    Q.   Okay.
14        Do you agree that there were
15 good public health reasons for Merck to
16 develop Vioxx?
17        MR. TISI: Objection, asked
18 and answered on direct.
19        THE WITNESS: Yes, I do.
20        MR. BECK: Excuse me. Is it
21 your position that it's
22 objectionable to ask questions on
23 cross that are within the scope of
24 the direct-examination?

15  (Pages 490 to 493)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

## Page 494

1  MR. TISI: I think it is
2  objectionable to ask the exact
3  same question that I asked.
4  BY MR. BECK:
5  Q. Do you agree that there were
6  good public health reasons for Merck to
7  develop Vioxx?
8  A. Yes, I do.
9  Q. And do you agree that one of
10  the good public health reasons for
11  developing Vioxx was that there were
12  serious gastrointestinal problems,
13  particularly gastrointestinal bleeding,
14  that resulted from the use of traditional
15  NSAIDs?
16  MR. TISI: Objection. Same
17  basis.
18  THE WITNESS: That's right.
19  BY MR. BECK:
20  Q. And were the
21  gastrointestinal bleeds an important
22  clinical problem?
23  MR. TISI: Objection, asked
24  and answered.

## Page 495

1  THE WITNESS: That's right.
2  BY MR. BECK:
3  Q. Have there been studies that
4  showed the number of hospitalizations
5  each year that came from gastrointestinal
6  complications from traditional NSAIDs?
7  A. Yes, there were.
8  Q. And does it square with your
9  recollection that these studies showed
10  that there would be over 100,000
11  hospitalizations each year due to
12  gastrointestinal complications from
13  traditional NSAIDs?
14  A. That's correct.
15  MR. BUCHANAN: Objection to
16  form, vague.
17  THE WITNESS: That's
18  correct.
19  BY MR. BECK:
20  Q. Now, you talked about some
21  FDA Advisory Committees yesterday. Do
22  you remember that?
23  A. Yes.
24  Q. And I think you talked about

## Page 496

1  the 2005 Advisory Committee meeting,
2  right?
3  A. That's right.
4  Q. And I think you may have
5  talked about the 2001 Advisory Committee?
6  A. That's right.
7  Q. Was there also an Advisory
8  Committee that was convened in 1999 to
9  consider whether Vioxx should be approved
10  by the FDA?
11  A. That's right.
12  Q. And is it the case that
13  before prescription medicines get
14  approved, the FDA often seeks the advice
15  of Advisory Committees made up of outside
16  doctors and professionals?
17  MR. BUCHANAN: Objection,
18  form.
19  MR. TISI: Objection.
20  THE WITNESS: That's right.
21  BY MR. BECK:
22  Q. And there was such an
23  Advisory Committee convened concerning
24  whether to approve Vioxx, right?

## Page 497

1  A. That's right.
2  Q. Were you asked to be on that
3  committee?
4  A. No.
5  Q. Did that committee involve
6  or include medical doctors?
7  A. Yes.
8  Q. Did it include
9  pharmacologists?
10  A. Yes.
11  Q. Other Ph.D.s?
12  A. Usually such people are on
13  those committees.
14  Q. Are you familiar with the
15  materials that were examined by that
16  committee and the conclusions that it
17  came to?
18  A. Yes.
19  Q. Did the Advisory Committee
20  in 1999 vote unanimously that Vioxx
21  should be approved for the treatment of
22  osteoarthritis?
23  A. They voted to approve. I
24  don't remember the vote numbers, but they

16 (Pages 494 to 497)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 498

1  clearly voted to approve.
2      Q.   And you do not disagree with
3  the recommendation of the Advisory
4  Committee based on the information that
5  was available at the time, do you?
6      A.   Right.
7      Q.   And as you've testified,
8  Vioxx was approved by the Food & Drug
9  Administration for use in the United
10 States in May of 1999, right?
11     A.   That's right.
12     Q.   You do not disagree with
13 that decision either, do you?
14     A.   I do not.
15     Q.   Yesterday you testified
16 about something that's been referred to
17 as an imbalance theory as a possible
18 explanation for what you say are higher
19 cardiovascular risks with Vioxx.  Do you
20 remember that?
21          MR. TISI:  Objection.
22 Objection, mischaracterizes.
23          Go ahead.
24          THE WITNESS:  That was one

Page 499

1  of the issues we discussed, yes.
2  BY MR. BECK:
3      Q.   At the time that the FDA
4  approved Vioxx in May of 1999, they were
5  aware of this imbalance theory that you
6  talked about yesterday, were they not?
7      A.   I can't speak to what FDA
8  was or wasn't aware of.
9              - - -
10         (Whereupon, Deposition
11  Exhibit Avorn-44, Document
12  entitled "Vioxx Excerpts from
13  primary review of NDA 21-042
14  Osteoarthritis," was marked for
15  identification.)
16             - - -
17 BY MR. BECK:
18     Q.   I'm handing you what I've
19 marked as Exhibit 44.
20         MR. BUCHANAN:  Counsel, just
21 so I understand the provenance of
22 this document.  Is this an FDA
23 document or is this your excerpts
24 that you've created from the FDA

Page 500

1  document?
2          MR. BECK:  These are
3  excerpts from an FDA document.
4          MR. BUCHANAN:  Created by
5  counsel?
6          MR. GOLDMAN:  Yes.  And it's
7  an exhibit that's been used in
8  multiple depositions.
9          MR. BUCHANAN:  Well, for
10 purposes of this deposition, I
11 object to not using the original
12 document.
13         MR. GOLDMAN:  Well, we can
14 substitute it in.
15         MR. BUCHANAN:  No.  The
16 witness can't be examined about
17 excerpts.  He should be given the
18 entire document to proceed
19 accordingly.
20         MR. TISI:  Same objection.
21         MR. BECK:  Let's go off the
22 record for a minute.
23         THE VIDEOTAPE TECHNICIAN:
24 The time is 10:14.  We are off the

Page 501

1  record.
2          MR. BECK:  Are you talking
3  about an entire document of like
4  7,000 pages?
5          MR. TISI:  No.  We just want
6  -- we just don't know what you're
7  going to ask him questions about.
8          MR. BUCHANAN:  I'm assuming
9  this is a medical officer review.
10 I don't know what this is.
11 Because it's got Maria Villalba's
12 name on the bottom, so, I assume
13 it is a 100-page document.  It's
14 not the NDA.  I want to understand
15 what's represented about this
16 document for the record.
17         MR. BECK:  Well --
18         MR. BUCHANAN:  I've never
19 seen it before, and I will object
20 to using excerpts of the document
21 if you are going to say, well,
22 didn't the FDA say this or didn't
23 the FDA say that if he is not
24 given the actual medical officer

17 (Pages 498 to 501)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 502

1  review to review.
2      MR. GOLDMAN:  Why don't you
3  wait to see what Mr. Beck uses.
4      MR. BUCHANAN:  I thought you
5  were trying to clarify it.
6      MR. GOLDMAN:  I'm sure you
7  saw what he's going to show you.
8      MR. BUCHANAN:  My objection
9  is my objection.  If you had the
10 actual medical officer review, it
11 would probably be a wise thing to
12 pull.
13     MR. GOLDMAN:  I can get it.
14     MR. TISI:  And can I also
15 say, there's handwriting on here.
16 Is this handwriting counsel's
17 handwriting or is this --
18     MR. BECK:  I'm not going to
19 ask him anything about any
20 handwriting.  I'm going to ask him
21 about one statement that's in it.
22     MR. TISI:  Okay.
23     I will just object to the
24 extent that this document is used

Page 503

1  and contains information in the
2  document that's not in the
3  original document like
4  handwriting, et cetera, et cetera.
5      MR. BECK:  Sure.  I
6  understand.
7      MR. KLINE:  Is the
8  handwriting yours?  Because I've
9  seen FDA marked up documents that
10 actually had their handwriting.
11 We just want to know.
12     MR. BECK:  This is not FDA
13 marked up.
14     MR. KLINE:  Okay.
15     This is like you guys marked
16 it up?
17     MR. BUCHANAN:  Yes.  I
18 wouldn't rule out that there might
19 be an excerpted medical officer
20 review on the website, which is my
21 initial concern that I wasn't sure
22 what was what.  That's why I'm
23 asking the questions.
24     MR. GOLDMAN:  Why don't you

Page 504

1  wait and see what he is going to
2  use --
3      MR. BUCHANAN:  Well, we have
4  to make an objection.
5      MR. GOLDMAN:  Let me see the
6  handwriting.
7      MR. BUCHANAN:  You can
8  proceed subject to my objections
9  that it is what it is.  There may
10 be a way to clarify the actual
11 document.
12     MR. GOLDMAN:  I believe, and
13 I'll confirm this at a break, but
14 I believe this document actually
15 came from the materials you
16 provided to Dr. Avorn.  So, these
17 markings are, I believe, Dr.
18 Avorn's.  Correct?
19     THE WITNESS:  I think that's
20 the case.
21     MR. GOLDMAN:  So, before we
22 object, why don't we --
23     MR. BECK:  They've objected.
24     MR. GOLDMAN:  That's fine.

Page 505

1      MR. TISI:  That's fine.  I
2  didn't know what it was.  Go
3  ahead.
4      THE VIDEOTAPE TECHNICIAN:
5  We are back on the record.  The
6  time is 10:17.
7  BY MR. BECK:
8      Q.  Dr. Avorn, I've handed you
9  what I've marked as Exhibit 44.  Do you
10 recognize this as one of the documents
11 that was provided to you for your review
12 and analysis by the lawyers that you've
13 been working with on this case?
14     A.  Yes.
15     Q.  And you understood it to be
16 a copy or excerpts of the report by one
17 of the medical review officers from the
18 FDA, correct?
19     A.  Right.
20     Q.  And in your analysis in this
21 case, you have relied on this document
22 and other reviews by medical officers of
23 the FDA; is that right?
24     A.  Right.

18  (Pages 502 to 505)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 506

1    Q.   Okay.
2         Let's turn over to the 20th
3    page in here, and I'll see how it's
4    numbered.
5    A.   I don't have any page
6    numbers.
7    Q.   Yes.  I know.  I've put up
8    on the board the page, and --
9    A.   Right.  I have it in front
10   of me.
11   Q.   You do have it in front of
12   you?
13   A.   Yes, sir.
14   Q.   Okay.
15        So that you've got the page
16   that I put up on the board that says "In
17   summary" or up on the screen it says "In
18   summary" on the top?
19   A.   Yes.
20        MR. TISI:  I'm sorry, can
21   you give me a chance to find it.
22   I'm sorry.
23        MR. BECK:  Sure.  Can you
24   help us out by --

Page 507

1         MR. TISI:  I found it.  I
2    found it.
3    BY MR. BECK:
4    Q.   Okay.
5         Do you see here that under
6    "Thromboembolic and Vascular Safety," do
7    you see that heading there?
8    A.   Yes.
9    Q.   And for the benefit of the
10   jury, what does "thromboembolic" mean?
11   A.   That refers to problems that
12   occur when there's a blood clot in the
13   artery.
14   Q.   And "vascular" refers to?
15   A.   Relating to blood vessels.
16   Q.   Okay.
17        So, this clotting in the
18   arteries safety, this document from the
19   FDA -- and I should have backed up.
20        If you look at the first
21   page, you'll see it's dated November
22   23rd, 1998, right?
23   A.   Right.
24   Q.   So, this --

Page 508

1    A.   Well, excuse me.  I think
2    that refers to the submission date of the
3    NDA.  The review date actually is on the
4    next line, which is December 1998 through
5    May of 1999.
6    Q.   Okay.
7         So, it was reviewed in
8    advance of the approval of Vioxx in May
9    of 1999, right?
10   A.   Correct.
11   Q.   And so before the FDA
12   approved Vioxx in May of 1999, the FDA
13   medical officer understood the
14   information I've blown up on the screen,
15   that "There is a theoretical concern that
16   patients chronically treated with a COX-2
17   selective inhibitor may be at higher risk
18   for thromboembolic cardiovascular adverse
19   experiences than patients treated with
20   COX-1/COX-2 inhibitors (conventional
21   NSAIDs), due to the lack of effect of
22   COX-1 inhibition on platelet function."
23        Now, that's a mouthful, but
24   would you agree with me, sir, that what's

Page 509

1    referred to there is the same imbalance
2    theory that you were talking about?
3         MR. BUCHANAN:  Objection.
4         MR. TISI:  Objection,
5    mischaracterizes.
6         MR. KLINE:  I didn't hear
7    the objection.
8         MR. TISI:  Mischaracterizes.
9         THE WITNESS:  I think it's
10   incorrect in that the so-called
11   imbalance theory has a lot more to
12   it than just platelet function.
13   There's a lot of differences in
14   prostacyclin versus thromboxane
15   balance that are not just about
16   platelet inhibition.
17   BY MR. BECK:
18   Q.   Well, let me ask this.
19        Does the imbalance theory
20   that you talked about yesterday include
21   the notion of platelet functioning as
22   described here in this excerpt that we
23   put up?
24   A.   That's one piece of it.

Confidential - Subject to Protective Order

Page 510

1    Q.   Okay.
2        So, certainly that piece of
3   the imbalance theory, at the very least,
4   was understood by the FDA when they
5   approved Vioxx in May of 1999. Would you
6   agree with that?
7        A.   Yes.
8        MR. BUCHANAN: Objection
9   form, foundation.
10  BY MR. BECK:
11       Q.   You agree with that?
12       A.   Yes.
13       MR. TISI:  Same objection.
14  BY MR. BECK:
15       Q.   Do you also agree, sir, that
16  Vioxx worked to reduce pain and
17  inflammation for the vast majority of
18  patients who used it without causing them
19  any side effects whatsoever?
20       A.   That's probably true.
21       Q.   Yesterday you testified
22  about some things that you said were
23  signals of potential cardiovascular risks
24  that you said were around in advance of

Page 511

1   the actual approval of Vioxx in May of
2   1999. Do you remember that?
3        A.   Yes.
4        Q.   And in that connection, did
5   you testify about something called
6   protocol 017?
7        A.   That's right.
8        Q.   Was it your position that
9   you thought protocol 017 was some sort of
10  a signal to Merck before Vioxx was
11  approved that Vioxx could potentially be
12  harmful to the heart?
13       A.   Right.
14       Q.   How long a study was
15  protocol 017?
16       A.   It was very brief. It may
17  have only been six weeks as I recall.
18       Q.   And what kind of patients
19  were involved in that study?
20       A.   I'd need to go back to the
21  notes. It was patients with arthritis.
22  I don't remember the exact kind of
23  reference.
24       Q.   Would you accept that it was

Page 512

1   rheumatoid arthritis?  Does that refresh
2   your recollection if I said that?
3        A.   That sounds reasonable.
4        Q.   And what doses of Vioxx were
5   these patients receiving?
6        A.   125 milligrams to 175
7   milligrams.
8        Q.   And that is five to seven
9   times the 25 milligram dose that is
10  recommended on the label when Vioxx was
11  approved, right?
12       MR. TISI:  Objection, asked
13  and answered.
14       THE WITNESS:  Right.  I
15  think I mentioned yesterday that
16  it was given in very high doses.
17  BY MR. BECK:
18       Q.   And, in fact, it's so high
19  that it would be five to seven times as
20  high as the dose that was actually
21  recommended on the label, correct?
22       A.   Right.
23       MR. TISI:  Objection.
24  BY MR. BECK:

Page 513

1        Q.   How many people actually had
2   a heart attack in this study of protocol
3   017 that you said was a signal?
4        A.   There was a very small
5   number.  It was a handful, and I can't
6   tell you the number sitting here, but it
7   was a very small number.
8        Q.   Is there something in your
9   report that you could look to and tell us
10  how small a handful it was?
11       A.   No.  I just know that it was
12  a very small brief study, but the reason
13  it seemed important was that it only
14  lasted six weeks, and Merck's review of
15  it indicated there was a worrisome
16  increase in heart attacks and unstable
17  angina.
18       Q.   Well, do you know that, in
19  fact, there was only one person in the
20  whole study who experienced a heart
21  attack?
22       A.   The review within Merck
23  spoke of a number of cardiovascular
24  outcomes, including unstable angina, and

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

**Page 514**

1  at this point I do want to refer to my
2  notes rather than try to do all of this
3  from memory.
4      Q.  Sure.  I invited you to.
5      A.  Okay.
6      Q.  I asked you if there was
7  anything in there that would help you --
8      A.  Sure, sure.
9      Q.  -- figure out how many
10  people in this study that you called a
11  signal actually had a heart attack?
12      A.  Again, the signal aspect of
13  it would not only be heart attacks, it
14  would also be if somebody develops
15  angina, which is the exact same kind of
16  illness as a heart attack, but in six
17  weeks you would be very surprised that
18  anybody would progress to actually having
19  a heart attack.  But if you want, I
20  can --
21      Q.  How many people had a heart
22  attack in this study?
23      A.  If you confine it to heart
24  attacks as opposed to heart attacks,

**Page 515**

1  unstable angina and other kinds of
2  cardiovascular disease, I wouldn't be
3  surprised that it was a very small
4  number.  It could even have been one.
5  But that was not the total number of
6  cardiovascular adverse events that were
7  observed.
8      Q.  Your deposition testimony a
9  couple of weeks ago, Page 268.
10      "Question:  How many heart
11  attacks occurred in study 017?
12      "Answer:  Okay.  I see acute
13  myocardial infarction in a white
14  73-year-old male, and -- oh, I'm
15  sorry.  Those were patients who
16  were discontinued due to clinical
17  adverse experiences as opposed to
18  having had --
19      "So there was -- there was
20  one patient who discontinued this
21  because of a heart attack, and now
22  I'm looking for total heart
23  attacks," and you go on.
24      Do you want to see this

**Page 516**

1  testimony so you can figure out --
2      MR. TISI:  Yes, I think we
3  should.
4      MR. BUCHANAN:  I'm going to
5  object to the use of the testimony
6  for purposes not yet identified.
7      THE COURT REPORTER:  I'm
8  sorry, Dave, could you repeat
9  that?
10      MR. BUCHANAN:  He just read
11  him his deposition testimony, and
12  I'm not sure for what purpose, and
13  I think it is an improper use of
14  his testimony.
15      MR. BECK:  Let me try it
16  this way.  Let me withdraw it.
17      MR. BUCHANAN:  I'm sorry.
18  I'm objecting to the improper use
19  of his deposition testimony
20  without identifying a purpose, and
21  maybe you'll clarify that.
22      MR. BECK:  Yes.  And I'm
23  going to withdraw my last
24  question.

**Page 517**

1  BY MR. BECK:
2      Q.  Page 269, and I'm asking you
3  now whether this refreshes your
4  recollection as to how many people
5  actually had a heart attack.
6      At Page 269, you were
7  asked --
8      A.  Mr. Beck, I need to look at
9  the document that I was looking at at the
10  time, and if you can show that to me, I'd
11  be happy to look at it again.
12      Q.  Let me ask you this first,
13  and then we'll do it that way if you
14  want.
15      "Question:  There was one
16  thrombotic cardiovascular event in study
17  017, right, sir?
18      "Answer:  Right.  But there
19  were a number of other cardiovascular
20  events."
21      MR. BUCHANAN:  I'm going to
22  object to improper impeachment and
23  use of the prior testimony.
24      MR. BECK:  It's not for

21 (Pages 514 to 517)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 518

1    impeachment. I'm asking him
2    whether that refreshes his
3    recollection about how many heart
4    attacks there were.
5          MR. BUCHANAN: Could you
6    show him the transcript to refresh
7    his recollection or the document
8    that he asked for?
9          THE WITNESS: It's not the
10   transcript, it is what I was
11   looking at when I was answering
12   the question a few weeks ago that
13   I think I ought to be able to look
14   at this.
15         MR. BECK: Let's go off the
16   record and we'll find a document
17   and see if it helps him figure out
18   how many heart attacks there were.
19         THE VIDEOTAPE TECHNICIAN:
20   The time is 10:28. We are off the
21   record.
22             - - -
23         (Whereupon, a recess was
24   taken from 10:28 a.m. until

Page 519

1    10:31 a.m.)
2             - - -
3          THE VIDEOTAPE TECHNICIAN:
4    We're back on the record. The
5    time is 10:31.
6    BY MR. BECK:
7          Q.   Dr. Avorn, before we broke,
8    we were talking about protocol 017 which
9    you said was a six-week study involving
10   high doses of Vioxx. And my question for
11   you, sir, was, do you know how many
12   people actually had a heart attack in
13   this study?
14         A.   Yes.
15         Q.   And how many people actually
16   had a heart attack in this study?
17         A.   One had a heart attack, and
18   about six others had what the FDA
19   characterized as cardiovascular adverse
20   experiences.
21         Q.   So, for the one person who
22   actually had a heart attack, do you know
23   what that person's risk factors were?
24         A.   It was a 73-year-old person

Page 520

1    who I believe was a male, and those are
2    risk factors in themselves. Having
3    rheumatoid arthritis is another risk
4    factor for heart disease. And I don't
5    know about other characteristics of that
6    one person.
7          Q.   Do you know what the
8    investigator said about whether he
9    believed Vioxx caused the person's heart
10   attack?
11         MR. TISI: Objection.
12         THE WITNESS: I tend to not
13   pay attention to investigator
14   attributions especially in
15   company-funded studies. I think a
16   heart attack is a heart attack.
17   BY MR. BECK:
18         Q.   Well, do you know one way or
19   another what the investigator said is my
20   question?
21         A.   No.
22         MR. BUCHANAN: Objection to
23   the form, misleading.
24   BY MR. BECK:

Page 521

1          Q.   You're not taking the
2    position in this litigation that Vioxx
3    caused the patient's heart attack in
4    protocol 017, are you?
5          MR. TISI: Objection.
6          THE WITNESS: I have no way
7    of knowing in that particular
8    instance.
9    BY MR. BECK:
10         Q.   We're done with that now.
11         Actually, we may -- you were
12   looking at -- when you were answering
13   those questions, you were looking at
14   Exhibit 44 --
15         A.   Exhibit 44.
16         Q.   -- which was Dr. Villalba's
17   medical review?
18         A.   Right.
19         Q.   Is that what it's called?
20         A.   Right. Primary review of
21   the new drug application.
22         Q.   All right.
23         Is that what you called
24   yesterday the medical reviews?

22 (Pages 518 to 521)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 522

1    A.   Medical officer review I
2  think is what I called it.
3        Q.   Okay.
4             And yesterday you talked
5  about some of the medical officer
6  reviews, right?
7        A.   Right.
8        Q.   Let's look at the 13th page
9  of this document, Exhibit 44.
10       A.   Just tell me what's on it
11 since I don't have page numbers.
12       Q.   Okay.
13            Let me put it up on the
14 screen.  It's got Table 39 on it.
15       A.   Got it.
16       Q.   And table, what must be a
17 part of Table 38.  Do you see that?
18       A.   Right.
19       Q.   And do you see, can you tell
20 from this page at the very bottom that
21 Dr. Villalba is beginning a discussion
22 there of study 017.  That's the same
23 thing that you've been referring to as
24 protocol 017, correct?

Page 523

1        A.   Right.
2        Q.   Is that right?
3        A.   Right.
4        Q.   Okay.
5             And then when we go over to
6  the next page -- and let me ask here,
7  this document that was provided to you
8  for your review has some underlinings and
9  markings.  Are those your underlinings
10 and markings?
11       A.   That's right.
12       Q.   Okay.
13            Do you see about halfway
14 down on the page there was a paragraph
15 that has a little handwritten bracket on
16 the side.  Is that your handwritten
17 bracket?
18       A.   That's right.
19       Q.   And would you read, please,
20 what this says, this paragraph that you
21 bracketed?
22       A.   Sure.  "There were more
23 patients with cardiovascular adverse
24 events in the rofecoxib or Vioxx 175

Page 524

1  milligram group than in the placebo
2  group."
3        Q.   Would you read the next
4  sentence?
5        A.   Sure.  Table 9 is where they
6  are listed.  "The number of patients
7  enrolled in this study was small and no
8  conclusions can be drawn from these
9  data."  That's why it's a signal.
10       Q.   Do you agree with the
11 medical officer from the FDA that because
12 of the small number of patients enrolled
13 in the study that no conclusions can be
14 drawn from these data?
15       MR. TISI:  Objection.
16       THE WITNESS:  I would not
17   have phrased it as "no
18   conclusions."  I would say that
19   there's no statistically
20   significant difference, there's no
21   proof, there's no hard and fast
22   evidence from this one study, but
23   I think a conclusion that I would
24   draw was that this warrants

Page 525

1      further scrutiny.
2  BY MR. BECK:
3        Q.   Do you agree, sir, that
4  based on the information that was in this
5  document that you reviewed that the
6  incidence of thromboembolic events with
7  Vioxx appeared to be similar to
8  comparator NSAIDs, to other NSAIDs?
9       MR. TISI:  Objection.
10      MR. BUCHANAN:  Can I just
11   get a read back?
12      MR. TISI:  Here, look at the
13   computer.
14      MR. BUCHANAN:  Objection,
15   vague.
16      THE WITNESS:  Can you repeat
17   the question?
18  BY MR. BECK:
19      Q.   Do you agree, sir, that
20 based on the information that was in this
21 document that you reviewed that the
22 incidence of thromboembolic events with
23 Vioxx appeared to be similar to that of
24 comparator NSAIDs?

23 (Pages 522 to 525)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 526

1  A.  So now we're not talking
2  about study 017 anymore, but the totality
3  of the document?
4  Q.  Yes.
5  A.  Okay.
6  If you can refer me to where
7  it says that, that would speed things up.
8  Q.  Okay.
9  If we can go to, I think
10 it's the next page.  No, it's not the
11 next page.  It is about seven pages
12 forward.  Let me put it up on the screen
13 and it will help you find it.  It is the
14 page that at the bottom has Table 52.
15 A.  Right.
16 Q.  And do you see where at the
17 bottom of the second paragraph Dr.
18 Villalba said, "The incidence of
19 thromboembolic events with rofecoxib
20 appears to be similar to comparator
21 NSAIDs." Do you see that, sir?
22 A.  Yes.  But it is important to
23 point out that a few lines later, to be
24 fair, in summary, which is where Dr.

Page 527

1  Villalba puts all of it together in her
2  summary statement, and if you want, we
3  can just -- perhaps you might highlight
4  that a few lines down, "With the
5  available data, it is impossible to
6  answer with complete certainty whether
7  the risk of cardiovascular and
8  thromboembolic events is increased in
9  patients on rofecoxib.  A larger database
10 will be needed to answer this and other
11 safety comparison questions."
12 So, I think the most
13 important piece on that page is her
14 summary in which she says we can't tell
15 whether Vioxx increases the risk of heart
16 disease, more information is needed to
17 answer that question.  And I think that's
18 the culmination of Dr. Villalba's
19 analysis.
20 Q.  So, she said more
21 information is needed and, of course,
22 other studies were done, correct?
23 MR. TISI:  Objection.
24 THE WITNESS:  I can't

Page 528

1  identify a single study that was
2  done to specifically address the
3  question of cardiovascular safety.
4  BY MR. BECK:
5  Q.  Okay.
6  Well, let's move to another
7  document that we spent some time on
8  yesterday, the comments of the Board of
9  Scientific Advisors within Merck.  Do you
10 remember that document?
11 A.  Yes.
12 Q.  You have it in your stack.
13 It was Exhibit 32.  Do you want to take a
14 moment and pull it out?
15 A.  I'll pull it.
16 Okay.  I have it.
17 Q.  And up on the screen, is
18 this the same document that you've got in
19 front of you, Exhibit 32?
20 A.  Right.
21 Q.  And just to kind of reset
22 the scene, this was a Board of Scientific
23 Advisors who were, in May of 1998, giving
24 advice to Merck on the question of the

Page 529

1  development of Vioxx, right?
2  A.  Correct.
3  Q.  Mr. Tisi had you focus on
4  Page 11 of this document -- I'm sorry,
5  let's see.  Is it Page 11?  Yes, it is
6  Page 11.  Do you have that in front of
7  you?
8  A.  Yes, I do.
9  Q.  This is the discussion
10 that's headed "Cardiovascular
11 Pathophysiology," right?
12 A.  Right.
13 Q.  And I want to go over some
14 of this language with you in some detail.
15 The first sentence you may
16 have discussed, it says, "The Board,"
17 that would be the Board of Scientific
18 Advisors, correct?
19 A.  Right.
20 Q.  "The Board addressed the
21 potential for either benefits or adverse
22 consequences of selective inhibition of
23 COX-2 on coronary heart disease." Right?
24 A.  Correct.

24 (Pages 526 to 529)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 530

1    Q.   And when you read "selective
2  inhibition of COX-2," that's basically a
3  COX-2 inhibitor such as Vioxx, right?
4    A.   Correct.
5    Q.   So, the board was looking at
6  the potential for either good things or
7  bad things in terms of coronary heart
8  disease that could come from a drug such
9  as Vioxx; is that fair?
10   A.   That's fair.
11   Q.   And then the report goes on
12 to say, "The possible effects of COX-2
13 inhibition on three separate components
14 of the process leading to coronary
15 ischemic events were considered."  Again,
16 do you read this to mean that the
17 possible either benefits or adverse
18 consequences of a drug such as Vioxx, a
19 COX-2 inhibitor, were looked at in
20 connection with these three items that
21 are listed below?
22   A.   Correct.
23   Q.   And in your testimony
24 yesterday, isn't it true that the way you

Page 531

1  characterized this document was that the
2  Board of Scientific Advisors was alerting
3  Merck to the potential adverse
4  consequences of Vioxx when it came to
5  Item Number 1, "The development of
6  lipid-rich coronary plaques"?
7        MR. BUCHANAN:  Objection to
8    form.
9        THE WITNESS:  That was one
10   of the points that they made, yes.
11 BY MR. BECK:
12   Q.   Well, I'm talking about your
13 testimony yesterday.
14   A.   Right.
15   Q.   You characterized this
16 document, did you not, as alerting Merck
17 to the potential adverse consequences of
18 Vioxx when it came to "The development of
19 lipid-rich coronary plaque"?
20   A.   Correct.
21   Q.   And you also characterized
22 this document as alerting Merck to the
23 adverse consequences of Vioxx with the
24 second item listed, which is

Page 532

1  "destabilization of plaque," right?
2    A.   Right.
3    Q.   Now, let's look at this
4  document in a little bit more detail
5  because, in fact, maybe we can shorten
6  it.
7        Do you agree with me that,
8  in fact, the point of the document from
9  the scientific advisors was that Vioxx
10 could have benefits concerning the
11 development of lipid-rich coronary plaque
12 and could have benefits on the question
13 of destabilization of plaque?
14       MR. BUCHANAN:  Objection to
15   form.
16       MR. TISI:  Objection.
17       THE WITNESS:  In the first
18   case, the development of
19   lipid-rich coronary plaques, they
20   say this could make things worse
21   or this could make things better,
22   we don't know.
23       In the case of the second
24   point, the relevant pieces on the

Page 533

1  next page where they describe that
2  more fully, and this is the
3  destabilization of the junk in the
4  artery that when it bursts can
5  cause a heart attack and the --
6  let me just read this paragraph
7  briefly because it's what you're
8  talking about.
9       (Witness reviewing
10   document.)
11       Okay.  What they're saying
12 is that in the second sentence of
13 the paragraph on the next page,
14 "As the critical cells in this
15 process are inflammatory cells,
16 the possibility exists that the
17 products of COX-2 could regulate
18 thinning the cap of plaques and
19 render them rupture-prone."
20 BY MR. BECK:
21   Q.   And what that means, Doctor,
22 is that the COX-2 enzyme could cause
23 plaque rupture and, therefore, something
24 that inhibits the COX-2 enzyme such as

25 (Pages 530 to 533)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 534

1  Vioxx would help protect against plaque
2  rupture.  That was the real point of the
3  scientific advisors, isn't that true?
4        MR. TISI:  Objection.
5        MR. BUCHANAN:  Objection,
6  foundation.
7        MR. TISI:  Misstates.
8        THE WITNESS:  I can't tell
9        from this what their main point
10       was in that regard.
11 BY MR. BECK:
12       Q.   Yesterday you claimed that
13 their main point was the opposite, didn't
14 you?
15       A.   I claimed that they were
16 concerned that here was a brand new class
17 of drugs that had an effect on many
18 important aspects of the cardiovascular
19 system and that it was difficult, because
20 there had never been drugs like this
21 before, to know whether they would make
22 things better or make things worse.
23       Q.   Well, let's take a look in
24 more detail about what they said on both

Page 535

1  of these subjects.
2        We're going to look first at
3  the development of the lipid-rich
4  plaques.  That was Item Number 1, right?
5        A.   Right.
6        Q.   And before we get into their
7  discussion, just to back up for a minute
8  so the jury understands the significance.
9        People develop plaque in
10 their coronary arteries over time, right?
11       A.   Right.
12       Q.   And that can take many, many
13 years, decades, in fact, right?
14       A.   It can.
15       Q.   And some plaque is more
16 dangerous than others when it comes to
17 heart attacks; is that right?
18       A.   I'm not sure what you mean.
19       Q.   Sure.
20       There are some plaques that
21 are lipid rich and more prone to rupture
22 than other plaques.  Are you aware of
23 that?
24       A.   Well, but all plaques have

Page 536

1  lipid in them.
2        Q.   Yeah.  And you see that here
3  they're talking about lipid-rich coronary
4  plaques.
5        Are you aware, Doctor, that
6  cardiologists draw a distinction between
7  different kinds of plaques and say that
8  some are more dangerous than others when
9  it comes to heart attacks?
10       A.   Yes.  But they all contain
11 lipids.
12       Q.   Are you aware, sir, that
13 cardiologists, that people who actually
14 specialize in heart disease, say that the
15 plaques that have more lipids, that are
16 lipid rich, are more dangerous than the
17 plaques that have less lipid?
18       A.   Right.
19       Q.   Are you aware of that fact?
20       A.   Yes.
21       Q.   Okay.
22       So, here the Board of
23 Scientific Advisors is talking about the
24 especially dangerous lipid-rich coronary

Page 537

1  plaques.  Isn't that what you understand?
2        A.   Right.
3        Q.   Okay.
4        Down here in the middle of
5  the page, do you see where the Board of
6  Scientific Advisors says that "There is a
7  growing body of evidence indicating that
8  inflammatory disease is a risk factor for
9  myocardial infarction, and such
10 inflammatory processes almost certainly
11 are accompanied by the release of" -- how
12 do you pronounce that next word?
13       A.   Cytokines.
14       Q.   -- "cytokines that affect
15 cells in the" --
16       A.   Monocytic.
17       Q.   -- "monocytic series in
18 general, and COX-2 expression in
19 particular."
20       A.   Right.
21       Q.   Now, when it says that
22 inflammatory disease is a risk factor for
23 myocardial infarction, what you
24 understand that to mean is that

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

Page 538

1  inflammation might be a cause of heart
2  attacks, right?
3      A.   Correct.
4      Q.   And inflammation comes from
5  the COX-2 enzyme, I think you testified
6  yesterday, right?
7      A.   Right.
8      Q.   And so the point here is
9  that the COX-2 enzyme, if it's causing
10  inflammation, could cause this kind of --
11  could be a risk factor for the heart
12  attacks and contribute to the lipid-rich
13  core, right?
14      MR. TISI:  Objection.
15      THE WITNESS:  Actually, what
16      they're saying in just the next
17      sentence is it could go either
18      way.  And if you just go to that
19      very next sentence.
20  BY MR. BECK:
21      Q.   The "Accordingly"?
22      A.   Yes.
23      Q.   "Accordingly, it is
24  appropriate to ask whether COX-2

---

Page 539

1  expression in monocyte-macrophage" --
2      A.   I think maybe we can speed
3  this up, and I'll just, if you allow me,
4  skip a lot of the words, because they are
5  not germane to this argument.
6      But, accordingly, it is
7  appropriate to ask whether the COX-2
8  enzyme regulates the progression of
9  atherosclerosis either positively or
10  negatively.  And what they're simply
11  saying is, it seems to be involved in
12  this process, and it's appropriate to
13  study whether it makes things better or
14  it makes things worse.  And that's pretty
15  clearly what that next sentence says.
16      Q.   And it is pretty different,
17  actually, from how you characterized it
18  yesterday; isn't that true?
19      MR. BUCHANAN:  Objection to
20      the form.
21      MR. TISI:  Objection.
22      THE WITNESS:  No.  I
23      characterized it as they're
24      indicating that this could be a

---

Page 540

1      problem, which is exactly what
2      they said in the sentence I just
3      read.
4  BY MR. BECK:
5      Q.   Well, actually, what they
6  said in the sentence that you just read
7  was that it could be a problem or it
8  could be a benefit?
9      A.   Correct.
10      MR. BUCHANAN:  Objection,
11      argumentative.
12      MR. TISI:  Objection.
13      THE WITNESS:  Correct.
14  BY MR. BECK:
15      Q.   Okay.
16      You left that out yesterday.
17  You didn't mention that it could be a
18  benefit yesterday, did you?
19      MR. BUCHANAN:  Objection,
20      argumentative.
21      MR. TISI:  Objection.
22      THE WITNESS:  The issue at
23      hand is whether there was evidence
24      presented to Merck that there

---

Page 541

1      could be a problem, that their
2      drug caused heart attacks in 1998,
3      and I still contend that that is
4      stated here.
5  BY MR. BECK:
6      Q.   How about on the next
7  question, which is destabilization.
8  Having read this document a few minutes
9  ago and this paragraph, is it still your
10  contention that this was somehow a red
11  flag, that it indicated that there might
12  be a problem with COX-2 inhibitors?
13      MR. BUCHANAN:  Objection to
14      form, vague.
15      MR. TISI:  Objection,
16      misstates.
17      THE WITNESS:  What it states
18      here is in that second sentence,
19      "the possibility exists that the
20      products of COX-2 could regulate
21      thinning the cap of plaques and
22      rendering them rupture-prone."
23      And COX-2 has numerous different
24      products.  And it is hard to tell

---

27 (Pages 538 to 541)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 542

```
1    to what extent they were
2    referring, as they do throughout,
3    to the possible good or possible
4    bad issues.  But what was key to
5    me was that they were saying,
6    look, this is a drug that is
7    intimately involved in inhibiting
8    an enzyme that has never been
9    inhibited before, and it could
10   have an important effect on the
11   development of heart disease.
12 BY MR. BECK:
13   Q.   Well, this language that you
14 referred to, the products of COX-2, that
15 means the COX-2 enzyme, right?
16   A.   Right.
17   Q.   That the possibility exists
18 that the COX-2 enzyme could regulate the
19 thinning of the cap of the plaques and
20 render them rupture-prone.  It means that
21 the COX-2 enzyme could cause plaque
22 rupture, right?
23        MR. BUCHANAN:  Objection.
24 BY MR. BECK:
```

Page 543

```
1    Q.   Is that correct?
2    A.   The products of the COX-2
3  enzyme.
4    Q.   Right.
5         Could cause plaque rupture?
6    A.   Right.
7    Q.   And isn't the point here
8  that that's something that would inhibit
9  COX-2, that would hold down that enzyme,
10 would be potentially helpful in guarding
11 against plaque rupture?
12        MR. TISI:  Objection.
13        MR. BUCHANAN:  Objection.
14        THE WITNESS:  I think that's
15   a fair interpretation.
16 BY MR. BECK:
17   Q.   That's not the
18 interpretation you put on it yesterday,
19 is it?
20        MR. BUCHANAN:  Objection,
21   asked and answered.
22        THE WITNESS:  No.
23 BY MR. BECK:
24   Q.   I'm sorry.
```

Page 544

```
1    A.   No.
2    Q.   Before you testified about
3  the meaning of this yesterday and put a
4  different interpretation on it, had you
5  read testimony of any other witnesses
6  explaining what this document meant?
7         MR. BUCHANAN:  Objection to
8    the prefatory comments.
9         MR. TISI:  Objection.
10 BY MR. BECK:
11   Q.   Before you testified
12 yesterday about this document, had you
13 read the testimony of any other witness,
14 whether from Merck or independent experts
15 or experts testifying on behalf of the
16 plaintiffs, about the meaning of this
17 document?
18   A.   No.
19        But for the sake of
20 completeness, Mr. Beck, I think we
21 shouldn't just cherry pick which of the
22 points of this we want to discuss unless
23 you're about to get to events following
24 plaque rupture, which is the most
```

Page 545

```
1  compelling place where the board of
2  expert advisors talks about this, and I
3  think it would be fair to the jury to not
4  only talk about the first two and ignore
5  the third.
6         MR. BECK:  I move to strike
7    everything after the word "No."
8  BY MR. BECK:
9    Q.   Obviously if you didn't read
10 any testimony on this, that includes Dr.
11 Reicin's testimony, correct?
12   A.   Correct.
13        MR. BUCHANAN:  Objection.
14        THE WITNESS:  Correct.  I
15   did not read depositions or trial
16   presentations for the most part.
17   There have been dozens, scores of
18   trial testimonies and depositions.
19   There's no way I could have read
20   them.
21 BY MR. BECK:
22   Q.   So, you didn't read or learn
23 about from any other source what Dr.
24 Reicin said about this or what Dr.
```

28 (Pages 542 to 545)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 546

1  Morrison said about this; is that right?
2       MR. TISI:  Objection.
3       THE WITNESS:  That's
4  correct.
5       MR. BUCHANAN:  Objection.
6       THE WITNESS:  That's
7  correct.
8  BY MR. BECK:
9       Q.   Have you ever heard of Dr.
10 Stephen Epstein?
11      A.   The name does not ring a
12 bell.
13      Q.   He's a non-retained expert
14 for the same lawyers that you're working
15 with.  He's an expert in atherosclerosis.
16 Does that help you at all?  Does that
17 ring a bell now?
18      MR. BUCHANAN:  I'll object
19 to the characterization.
20      MR. TISI:  Objection.
21      THE WITNESS:  There's a lot
22 of Dr. Epsteins.  No, it doesn't
23 ring a bell.  He may well be a
24 fantastic expert, I just -- the

Page 547

1       name just doesn't ring a bell.
2  BY MR. BECK:
3       Q.   He, from his deposition,
4  said he took over for Dr. Eugene
5  Braunwald as chief of cardiology at the
6  National Institutes of Health.
7       MR. TISI:  Objection.
8  BY MR. BECK:
9       Q.   Does that ring a bell yet?
10      A.   No.
11      Q.   Before you testified about
12 whether the Board of Scientific Advisors
13 was a red flag or not, did you learn what
14 Dr. Epstein had to say about the meaning
15 of the points we just went over?
16      MR. TISI:  Objection,
17 improper impeachment.
18      THE WITNESS:  No.
19 BY MR. BECK:
20      Q.   Do you know what Dr. Epstein
21 has said about whether Vioxx could have a
22 beneficial effect on atherosclerosis?
23      MR. TISI:  Objection.  Can I
24 have a continuing objection to all

Page 548

1  the questions about Dr. Epstein?
2       MR. BECK:  Sure.
3       MR. TISI:  Thank you.
4       THE WITNESS:  I know there
5  was the hope when Vioxx was being
6  developed, that as an
7  anti-inflammatory drug, it might
8  have the potential for helping
9  with inflammation in the
10 cardiovascular system.  That was a
11 hoped for effect.  That actually
12 never panned out, but it was a
13 plausible hope in the mid-'90s,
14 late '90s.
15 BY MR. BECK:
16      Q.   And part of that was that it
17 was hoped that it could help reduce both
18 the formation of plaque and the
19 possibility of plaque rupture, right?
20      MR. TISI:  Objection.
21      THE WITNESS:  I think the
22 fairest way of presenting it is
23 that there was the understanding
24 that this recently described

Page 549

1  enzyme called COX-2 had a very
2  important effect on the health of
3  the arteries, and that inhibiting
4  it could do bad things or could do
5  good things.  And I think in 1998,
6  those possibilities were both on
7  the table.
8  BY MR. BECK:
9       Q.   And just on the good things
10 side, since yesterday you talked about
11 the bad things as possibilities, on the
12 good things side of the possibilities, do
13 you agree with me, sir, that scientists
14 at the time were saying that Vioxx and
15 other COX-2 inhibitors could potentially
16 protect against heart disease, first, by
17 slowing down plaque formation; and
18 secondly, by making it less likely that
19 there would be plaque rupture?
20      MR. BUCHANAN:  Objection, no
21 foundation.
22      MR. TISI:  Objection,
23 argumentative and compound.
24      MR. KLINE:  And vague as to

Confidential - Subject to Protective Order

Page 550

1  not identifying who the "they"
2  are.
3      MR. BUCHANAN: Excuse me.
4  Just the prefatory clause as well.
5  Thank you.
6      THE WITNESS: I think the
7  fairest way of stating it is that
8  in 1998, the view, as represented
9  here, was that because this drug
10 had new unprecedented and
11 potentially important effects on
12 arteries, on blood vessels
13 supplying the heart, on plaques
14 and ruptures and blood clotting
15 and all of that, that it was a
16 previously unstudied area that
17 held the potential for important
18 effects on the cardiovascular
19 system, either good or bad,
20 because nobody at that point
21 really knew what the effect of
22 COX-2 on the heart would be.
23 BY MR. BECK:
24     Q.  Well, do you remember

Page 551

1  yesterday when you went over this
2  document you had no trouble at all
3  holding yourself to talking about the
4  potential bad consequences of COX-2
5  inhibitors?  Do you remember that all you
6  talked about in connection with this was
7  the potential adverse consequences?
8      MR. BUCHANAN: Excuse me.
9      MR. TISI: Objection,
10 objection, argumentative.
11 BY MR. BECK:
12     Q.  Do you remember that that's
13 what you talked about yesterday?
14     MR. BUCHANAN: Excuse me. I
15 need to make an objection as well.
16 Also misstates and
17 mischaracterizes.
18     You can answer, Doctor.
19 BY MR. BECK:
20     Q.  Do you remember that?
21     A.  That was what we were
22 talking about.
23     Q.  Okay.
24     And so yesterday you

Page 552

1  confined yourself to the potential
2  adverse consequences, and now I'm just
3  going to ask you whether you can give me
4  answers that focus on the potential
5  positive consequences rather than this,
6  well, it may be good or it may be bad.
7  Okay?
8      A.  Yes.
9      MR. BUCHANAN: Objection to
10 the prefatory comments.
11 BY MR. BECK:
12     Q.  Now, do you agree with me,
13 sir, that back in 1998 and 1999 respected
14 scientists said that among the potential
15 good things that might come from Vioxx
16 were that it would protect -- it could
17 possibly protect against heart disease,
18 number one, by helping to guard against
19 the formation of plaque?  Do you agree
20 with that?
21     MR. KLINE: Objection.
22     MR. TISI: Objection.
23     MR. KLINE: Vague,
24 misleading.

Page 553

1      THE WITNESS: They said that
2  there were both good and bad
3  potentials.
4  BY MR. BECK:
5      Q.  Now, why is it today that
6  you can't confine yourself to the good
7  side that scientists talked about, when
8  yesterday, you've already admitted, you
9  were perfectly capable of confining
10 yourself to the bad side?
11     MR. TISI: Objection,
12 argumentative.
13     MR. BUCHANAN: Objection,
14 argumentative.
15     MR. TISI: And
16 inappropriate.
17     THE WITNESS: Because today,
18 Mr. Beck, we're here to talk about
19 the fact that it is now
20 universally agreed that Vioxx
21 causes heart attacks, and we're
22 now trying to look back and find
23 out what information was available
24 to Merck.  We're not here

30 (Pages 550 to 553)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 554

1    discussing the fact that Vioxx
2    prevents heart attack, in which
3    case maybe that would be
4    appropriate.
5  BY MR. BECK:
6        Q.   Well, yesterday you were
7  talking about this as a signal, and so --
8  but anyway, I suppose I could keep asking
9  it. Let me see if I can shortcut it.
10       MR. KLINE:  Objection to the
11   prefatory comment again.
12       MR. BECK:  Strike everything
13   that I just said and start over.
14  BY MR. BECK:
15       Q.   Are you willing to discuss
16  with me the potential good things that
17  people saw in Vioxx when it came to
18  cardiovascular disease back in 1998 and
19  1999 or not?
20       MR. TISI:  Objection.
21       MR. KLINE:  Objection.
22       THE WITNESS:  I am willing.
23  BY MR. BECK:
24       Q.   Okay.

Page 555

1        MR. TISI:  And also to the
2    extent it calls for hearsay.  Go
3    ahead.  What people were saying.
4    Go ahead.
5  BY MR. BECK:
6        Q.   In the medical --
7        Were you aware back in 1998
8  and 1999 what was being discussed in the
9  scientific and medical community about
10  the potential good things or bad things
11  of COX-2 inhibitors?
12       A.   Around this period, I don't
13  know if it was 1999 or 2000, but when we
14  were doing our own work on this, we did
15  review what was known in the literature
16  about the potential for good and for bad.
17       Q.   And around the time that
18  Vioxx came on the market, do you agree,
19  sir, that one of the potential good
20  things that scientists and doctors were
21  talking about was that Vioxx potentially
22  could be protective of the heart by
23  guarding against plaque formation?
24       A.   Yes.

Page 556

1        MR. BUCHANAN:  Objection.
2        MR. TISI:  Objection.
3        MR. BUCHANAN:  Asked and
4    answered.
5        THE WITNESS:  Yes.
6  BY MR. BECK:
7        Q.   And do you agree, sir, that
8  another potential good thing that
9  scientists and doctors were talking about
10  around the time that Vioxx came on the
11  market was that Vioxx could guard
12  against -- could possibly guard against
13  heart disease by helping to prevent
14  plaque rupture?
15       MR. TISI:  Objection. Calls
16   for speculation, hearsay.
17       THE WITNESS:  That
18   possibility was raised.
19       Can we take a break?
20       MR. BECK:  Sure.
21       THE VIDEOTAPE TECHNICIAN:
22   The time is 5 minutes after 11:00.
23   We are off the record.
24           - - -

Page 557

1        (Whereupon, a recess was
2    taken from 11:05 a.m. until
3    11:21 a.m.)
4           - - -
5        THE VIDEOTAPE TECHNICIAN:
6    We are back on the record.  This
7    is Tape Number 2.  The time is
8    11:21.
9  BY MR. BECK:
10       Q.   Doctor, would you please
11  turn to what was marked yesterday as
12  Exhibit 7. It's in the folder of medical
13  articles that Mr. Tisi gave you.
14       A.   Right.  Got it.
15       Q.   And is Exhibit 7 an article
16  where you were one of the authors?
17       A.   Yes.  I was the senior
18  author.
19       Q.   And it's titled the
20  "Relationship Between Selective" -- how
21  do you pronounce that next word?
22       A.   "Cyclooxygenase."
23       Q.   Is that the same thing as
24  COX-2?

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 558

1    A.   COX-2. Yes. You can call
2  it COX.
3    Q.   So, the "Relationship
4  Between COX-2 Inhibitors and Acute
5  Myocardial Infarction in Older Adults,"
6  right?
7    A.   Correct.
8    Q.   Now, would you turn over --
9  and what's the date of this article?
10   A.   This was published in May of
11  '04, and I can look for the -- May 4th of
12  '04.
13   Q.   Okay.
14       So, some four or five years
15  after Vioxx was first approved by the
16  FDA, right?
17   A.   Right.
18   Q.   Okay.
19       Now, turn over, if you
20  would, please, to Page 2072, which I
21  think is the fifth page in.
22   A.   Got it.
23   Q.   I want to call your
24  attention in the second column and the

Page 559

1  first full paragraph to one statement
2  here about emerging data. Are you with
3  me on that?
4    A.   Yes.
5    Q.   In your copy?
6    A.   Yes.
7    Q.   "Emerging data support a
8  varied role for COX-2" -- and there we're
9  talking, again, just so the jury is
10  clear, we're talking about the enzyme,
11  not Vioxx or any other COX-2 inhibitors,
12  right?
13   A.   Correct.
14   Q.   So, "emerging data support a
15  varied role for the COX-2 enzyme," and
16  then you list various things concluding
17  with "atherogenesis." Do you see that?
18   A.   Right.
19   Q.   And then you have these
20  cites to these two items, Number 27 and
21  28?
22   A.   Right.
23   Q.   What is atherogenesis?
24   A.   It's atherogenesis.

Page 560

1    Q.   I'm sorry, atherogenesis.
2    A.   It's the development of
3  plaque in the artery wall.
4    Q.   Okay.
5       Same thing as
6  atherosclerosis?
7    A.   Well, atherosclerosis is
8  kind of the end product of atherogenesis.
9  Atherogenesis is the development of.
10   Q.   Okay.
11       The development of plaque.
12       And your statement here, at
13  least the portions I've highlighted, is
14  that there is new information. That
15  would be emerging data, right?
16   A.   Yes. Ongoing work, yes.
17   Q.   Ongoing work, new
18  information indicating that the COX-2
19  enzyme has some sort of possible role in
20  the formation of plaque, right?
21   A.   Correct.
22   Q.   And then you cite these two
23  sources, and if you go to the end of your
24  article -- those were Sources 27 and 28,

Page 561

1  and then if you go to the end of your
2  article, you've got the actual sources
3  that you were referring to, correct?
4    A.   Right.
5    Q.   And one of those is an
6  article by Burleigh, right?
7    A.   Right.
8    Q.   And the other is by -- how
9  is his name pronounced, do you know?
10   A.   After Burleigh, I think it's
11  Cipollone.
12   Q.   Cipollone. Okay.
13       You can set this aside for
14  now.
15         - - -
16       (Whereupon, Deposition
17  Exhibit Avorn-45, Article
18  entitled "Cyclooxygenase-2
19  Promotes Early Atherosclerotic
20  Lesion Formation in LDL
21  Receptor-Deficient Mice" was
22  marked for identification.)
23         - - -
24  BY MR. BECK:

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 562

1      Q.   And I will hand you what I
2  am marking as Exhibit 45.  Do you
3  recognize Exhibit 45 as the first of your
4  cited references, the Burleigh article?
5      A.   Yes.  Correct.
6      Q.   Let me put that up on the
7  screen.
8           Okay.
9           So, this is the article by
10  Burleigh that you cited when you said
11  that there's emerging data concerning the
12  role of the COX-2 enzyme in the
13  development of plaque, right?
14      A.   Right.
15      Q.   Okay.
16           And if you would please turn
17  to Page 1822.
18      A.   Yes.
19      Q.   And I'll try to turn there
20  as well.
21           MR. TISI:  I'm sorry, Phil,
22      are you with his article or the
23      Burleigh article?
24           MR. BECK:  This is the

Page 563

1      Burleigh article, so that
2  everybody is on the same --
3           MR. TISI:  Thank you.
4           MR. BECK:  -- literally on
5      the same page.
6  BY MR. BECK:
7      Q.   We were on the Burleigh
8  article, which was cited in your article
9  --
10      A.   Right.
11      Q.   -- and we're on the last
12  page of the text of the Burleigh article,
13  Page 1822, right?
14      A.   Right, yes.
15      Q.   Are you with me, Doctor?
16      A.   Yes.
17           MR. TISI:  Let me just place
18      an objection to the publication of
19      an article to the jury.  I think
20      in some jurisdictions that's
21      inappropriate unless it is
22      authored by the person sitting at
23      the table.
24           MR. BECK:  I'm sorry?

Page 564

1           MR. TISI:  Unless it is
2      authored by the person sitting at
3      the table.
4  BY MR. BECK:
5      Q.   This was not authored by
6  you, this was cited by you, right?
7      A.   Correct.
8      Q.   Okay.
9           And I've blown up here on
10  the screen the last concluding paragraph
11  of the article you cited.  Would you
12  please read that for the jury?
13      A.   Where would you like me to
14  start?  The whole paragraph?
15      Q.   "Mounting evidence."
16      A.   "Mounting evidence supports
17  an important role for inflammation in
18  atherosclerosis and plaque rupture.  We
19  present evidence that pharmacologic
20  inhibition of COX-2 reduces
21  atherosclerosis in the LDLR-deficient
22  mouse model of atherosclerosis, and we
23  provide genetic evidence indicating that
24  macrophage COX-2 promotes early

Page 565

1  atherogenesis.  These results demonstrate
2  the potential of COX-2 inhibitors in the
3  treatment of atherosclerosis and support
4  the potential of anti-inflammatory
5  approaches to the prevention of coronary
6  heart disease."
7      Q.   And this article, I think we
8  can tell from the very top, was written
9  or at least published in April of 2002,
10  right?
11      A.   Correct.
12      Q.   And do you agree with the
13  statements that are in this paragraph?
14      A.   Yes.
15      Q.   And do you agree that what
16  this paragraph indicates is that there is
17  increasing support for the notion that
18  the COX-2 enzyme can, through
19  inflammation, can contribute to plaque
20  formation?  Do you agree with that?
21      A.   I'm not sure about the
22  increasing support, where that comes
23  from.
24      Q.   "Mounting evidence

33  (Pages 562 to 565)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 566

1  supports," the very first sentence?
2      A.  Right.  That refers to just
3  inflammation.
4      Q.  Okay.
5          Well, it says, actually,
6  "Mounting evidence supports an important
7  role for inflammation in atherosclerosis
8  and plaque rupture," right?
9      A.  Right.
10     Q.  Okay.
11         And do you agree, sir, that
12 in 2002 there was evidence, number one,
13 that inflammation contributed to
14 atherosclerosis and plaque rupture?  Do
15 you agree with that?
16     A.  Correct.
17     Q.  And do you agree, number
18 two, that there was evidence that the
19 COX-2 enzyme could contribute to
20 inflammation, which, in turn, would --
21 could cause atherosclerosis and plaque
22 rupture?
23     A.  Well, the products of the
24 COX-2 enzyme, but yes.

Page 567

1      Q.  Okay.
2          The COX-2 enzyme would break
3  down into other chemicals or products?
4      A.  Well, technically, it would
5  catalyze the development of other
6  products, but, yeah, that's the basic
7  point.
8      Q.  Okay.
9          And also, do you agree that
10 in 2002 that scientists whom you cited in
11 your own article were saying that there
12 was a potential that COX-2 inhibitors,
13 and that would include Vioxx and
14 Celebrex, right --
15     A.  Right.
16     Q.  -- that COX-2 inhibitors
17 could be useful in the treatment of
18 atherosclerosis?
19         MR. TISI:  Objection.
20         THE WITNESS:  That they had
21     potential use.
22 BY MR. BECK:
23     Q.  Right.  Well, let's just
24 focus.

Page 568

1      Q.  Do you agree with this final
2  sentence of the article that you cited,
3  that the "Results demonstrate the
4  potential of COX-2 inhibitors in the
5  treatment of atherosclerosis and support
6  the potential of anti-inflammatory
7  approaches to the prevention of coronary
8  heart disease"?
9      A.  Right.  This is part of the
10 same good news/bad news issue we've been
11 talking about, that there's potential for
12 good and there's potential for harm.
13     Q.  And here they're talking
14 about the potential for good, right?
15     A.  That's right.
16     Q.  And what publication did
17 this article appear in?
18     A.  Circulation.
19     Q.  Is that the same one that at
20 least some of your articles appeared in?
21     A.  Right.
22     Q.  And I think you said
23 yesterday that it's the top cardiology
24 journal in the world, right?

Page 569

1      A.  That's right.
2          For completeness, we also
3  cite the other side of the story in our
4  paper.  You've selected one or two
5  references where we talk about the
6  potential good effects, but the entire
7  part of the paragraph before the piece
8  you pulled out also discusses the
9  potential bad.
10         MR. BECK:  And I'll move to
11     strike everything after "That's
12     right."
13 BY MR. BECK:
14     Q.  Now, I want to move to the
15 second of the cited references that we
16 looked at in your article.
17     A.  Okay.
18     Q.  Remember we looked at a --
19     A.  Yes.
20     Q.  -- sentence that talked
21 about how the COX-2 enzyme, there was --
22 we looked at your sentence that said that
23 the COX-2 enzyme, there was emerging data
24 that it had some role with atherogenesis,

34  (Pages 566 to 569)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 570

1   and there were two articles cited, and we
2   just looked at the first of the two,
3   right?
4       A.   That's correct.
5       Q.   Okay.
6            Now I want to look at the
7   next one, which was the -- was it
8   Cipollone?
9       A.   Right.
10           MR. BECK:  So, let me mark
11   that article as Exhibit 46.
12           - - -
13           (Whereupon, Deposition
14   Exhibit Avorn-46, Article
15   entitled "Overexpression of
16   Functionally Coupled
17   Cyclooxygenase-2 and
18   Prostaglandin E Synthase in
19   Symptomatic Atherosclerotic
20   Plaques as a Basis of
21   Prostaglandin E2-Dependent Plaque
22   Instability," was marked for
23   identification.)
24           - - -

Page 571

1   BY MR. BECK:
2       Q.   Is the document that is
3   marked Exhibit 46 the Cipollone article
4   that you cited in your paper?
5       A.   Yes.
6       Q.   And is that the same thing
7   that I just put up on the screen?
8       A.   Yes.
9       Q.   And what journal was this
10   published in?
11       A.   Also Circulation.
12       Q.   And what is the date of this
13   article?
14       A.   2001.  Oh, you're --
15           MR. BECK:  I'm sorry.  I put
16   the wrong thing up here.
17           THE WITNESS:  Right.
18           MR. BECK:  Both of us were
19   looking at the wrong one.  Let me
20   start over.
21           THE WITNESS:  Completely.
22   Right.  Right.
23   BY MR. BECK:
24       Q.   Now --

Page 572

1       A.   That's Cipollone.
2       Q.   Here we go.
3            Is the document that I now
4   have on the screen the same thing as the
5   one that you have in front of you, which
6   is the Cipollone article?
7       A.   Correct.
8            MR. BUCHANAN:  Excuse me,
9   Counsel.  Can we just get a
10   standing objection to the
11   publication of articles in the
12   medical literature to the extent
13   that violates court rules in other
14   jurisdictions?
15           MR. BECK:  Sure.
16   BY MR. BECK:
17       Q.   And what journal was the
18   Cipollone article published in?
19       A.   Circulation.
20       Q.   And what is the date of the
21   Cipollone article?
22       A.   2001.
23       Q.   Would you please turn to
24   Page 926.  Are you with me there?

Page 573

1       A.   Yes.
2       Q.   Again, I'm focused just on
3   the very concluding statements in this
4   second article that you cited.
5            MR. TISI:  Object to the
6   characterization.
7   BY MR. BECK:
8       Q.   Focusing on the last
9   sentence in this article, would you
10   please read that for the jury?
11       A.   Yes.  "From a practical
12   standpoint, these findings raise the
13   possibility that the selective COX-2
14   inhibitors now currently available for
15   clinical use, or future PGES inhibitors
16   might provide a novel form of therapy for
17   plaque stabilization of patients with
18   atherosclerotic disease and prevention of
19   acute ischemic syndromes."
20       Q.   And in 2001, did you agree
21   with Dr. Cipollone and his colleagues
22   that the findings in their study raised
23   the possibility that COX-2 inhibitors
24   such as Vioxx might provide a novel form

35 (Pages 570 to 573)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

**Page 574**

1  of therapy for plaque stabilization for
2  patients with atherosclerotic disease?
3      A.  No, I did not.
4      Q.  You disagreed with that?
5      A.  Correct.  Because by then,
6  there was evidence that the bad news
7  pieces, which we had previously cited,
8  were more likely to be real than a
9  theoretical study from animals.
10      Q.  And yet you cited this
11  article in your own 2002 article,
12  correct?
13      A.  That's right.
14          MR. BUCHANAN:  Objection.  I
15      think you said 2002 article.
16  BY MR. BECK:
17      Q.  I'm sorry.  Your 2004
18  article?
19      A.  2004.  Right.
20      Q.  Okay.
21          Well, do you agree with me
22  that during the entire time that Vioxx
23  was on the market, reputable scientists
24  were suggesting that Vioxx's

**Page 575**

1  anti-inflammatory properties might slow
2  down the progression of atherosclerosis
3  and help stabilize plaque?
4          MR. TISI:  Objection to the
5      form.
6          MR. BUCHANAN:  Objection.
7          MR. BECK:  What's the
8      objection?
9          MR. TISI:  Objection to the
10     form.
11         MR. BECK:  What's the form
12     objection?
13         MR. TISI:  I'm sorry.
14     "Reputable scientists."
15  BY MR. BECK:
16     Q.  Do you agree, sir, that
17  during the entire time Vioxx was on the
18  market, scientists whom you considered to
19  be reputable were suggesting that Vioxx's
20  anti-inflammatory properties might slow
21  down the progression of atherosclerosis
22  and help stabilize plaque?
23         MR. TISI:  Objection, vague.
24         THE WITNESS:  I do not agree

**Page 576**

1  with that.  By the time it got to
2  be 2003 and 2004, I don't think
3  people were any more suggesting
4  with the evidence at hand that
5  Vioxx would be used to treat heart
6  disease.
7  BY MR. BECK:
8      Q.  Your deposition of a few
9  weeks ago beginning on page 389.
10         "Question:  Were you aware
11  of any" --
12         MR. BUCHANAN:  Objection.
13     Can we have an opportunity just to
14     get to the page first?
15         THE WITNESS:  I would also
16     like to see it in context, if I
17     may.
18         MR. TISI:  384?
19         MR. BECK:  389.
20         MR. BUCHANAN:  What lines?
21         MR. BECK:  23.
22         THE WITNESS:  Is there a way
23     we can put it on the screen or
24     shall I lean over and look at

**Page 577**

1  counsel's?
2          MR. TISI:  We'll show it to
3      you.
4          THE WITNESS:  Thank you.
5  BY MR. BECK:
6      Q.  Line 23:  "Were you aware of
7  any articles published by reputable
8  scientists while Vioxx was on the market
9  which said that Vioxx's anti-inflammatory
10  properties might actually slow down the
11  progression of atherosclerosis and help
12  stabilize plaque?
13          "Answer:  Yes.
14          "Question:  And that was a
15  theory that actually scientists were
16  suggesting during the entire time Vioxx
17  was on the market, true?
18          "Answer:  Right."
19          MR. TISI:  Objection.
20  BY MR. BECK:
21      Q.  Was that your testimony a
22  few weeks ago?
23          MR. TISI:  Objection.
24      Objection.  Improper impeachment.

36  (Pages 574 to 577)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 578

1    Go ahead.
2        MR. BUCHANAN:  Objection,
3    improper impeachment.
4    BY MR. BECK:
5        Q.   Is that your sworn
6    testimony?
7        A.   That's my testimony, which I
8    think differs from the question you just
9    asked me.
10       Q.   Someone else will decide
11   that.
12            I want to move now to the
13   subject of the VIGOR trial.
14       A.   Okay.  Let me rid myself of
15   this binder, if I may.
16       Q.   So that we can set the
17   stage, again, the VIGOR trial involved
18   Vioxx at 50 milligrams per day, correct?
19       A.   Correct.
20       Q.   Which was twice the maximum
21   dose that had been approved by the FDA at
22   the time of the VIGOR trial, right?
23            MR. TISI:  Objection.
24            THE WITNESS:  I'd want to go

Page 579

1        back and look at the label, but
2        that sounds reasonable.  It was a
3        dose that was being used in
4        patients with arthritis commonly,
5        although it was not the dose that
6        was in the label.
7    BY MR. BECK:
8        Q.   The label, as you recall,
9    specified 25 milligrams, right?
10       A.   That's right.
11       Q.   And that was the standard
12   dose, right?
13       A.   For osteoarthritis, but not
14   for rheumatoid arthritis.
15       Q.   And the average use of the
16   people who were involved in the VIGOR
17   trial taking this 50 milligram dose was
18   how long?
19       A.   Median duration was about
20   nine months.
21       Q.   Now, do you know whether the
22   label said anything about how long, if
23   somebody is taking 50 milligrams a day
24   instead of 25 milligrams a day, how long

Page 580

1    they should take that for?
2        A.   Well, I thought you just
3    stipulated that the label didn't indicate
4    use for 50 milligrams.
5        Q.   Well, do you remember
6    whether there was anything in the label
7    about if you're going to use 50
8    milligrams, only do it for, you know,
9    five days or less?
10           MR. TISI:  Objection.
11           MR. BUCHANAN:  Objection to
12       the form, misleading.
13   BY MR. BECK:
14       Q.   The question is, do you
15   remember one way or the other?
16       A.   Yes, yes.  Typically doses
17   are recommended for a defined period of
18   time, but it's well known that doctors
19   tend to ignore that duration issue.
20       Q.   My question really is, do
21   you remember, you talked about the two
22   labels yesterday --
23       A.   Right.
24       Q.   -- with Mr. Tisi, and if you

Page 581

1    don't remember, you don't remember, but
2    my question is, do you remember what the
3    label, the first label said about how
4    long somebody should use 50 milligrams
5    if, in fact, they're going to go up to
6    that dose?
7            MR. TISI:  Objection.
8        Misstates.  Go ahead.
9            THE WITNESS:  I think there
10       was a time limit suggested in the
11       label for 50 milligrams.
12   BY MR. BECK:
13       Q.   And do you remember what
14   that time limit was?
15           MR. TISI:  Objection.
16           THE WITNESS:  Off the top of
17       my head, I would say ten days, but
18       we can check it out.
19   BY MR. BECK:
20       Q.   Okay.
21            It certainly wasn't nine
22   months, though, right?
23       A.   Right.
24       Q.   And on the --

37 (Pages 578 to 581)

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 582

1        You said that the VIGOR
2   trial involved patients who had what
3   condition?
4        A.   Rheumatoid arthritis.
5        Q.   Are people who have
6   rheumatoid arthritis by nature at
7   increased risk of heart attacks?
8        A.   Yes.
9             MR. BUCHANAN:  Objection,
10       asked and answered.
11            MR. TISI:  Objection.
12            THE WITNESS:  Yes.
13  BY MR. BECK:
14       Q.   And on the other side, on
15  the other arm of the trial, so to speak,
16  there were people who were taking
17  naproxen, right?
18       A.   Correct.
19       Q.   And how much naproxen were
20  they taking?
21       A.   I would want to look at the
22  study if we're going to be talking about
23  the study.  I don't want to be asked
24  about a study without having it in front

Page 583

1   of me.  We've got it here on the table.
2        Q.   Well, if you want to pull it
3   out, go ahead.
4        A.   Can you -- I think it was
5   previously introduced as an exhibit.
6             MR. TISI:  Exhibit 16?
7             MR. BECK:  Yes, 16.
8   BY MR. BECK:
9        Q.   Now that you have the VIGOR
10  publication in front of you --
11       A.   Yes.
12       Q.   -- can you tell me what the
13  dose of naproxen was for the participants
14  who took naproxen rather than Vioxx?
15       A.   500 milligrams twice a day.
16       Q.   In terms of the
17  gastrointestinal results, did Vioxx
18  significantly reduce the incidence of
19  perforations, ulcers and bleeds?
20       A.   Yes.
21            MR. TISI:  Objection, asked
22       and answered.
23            THE WITNESS:  Yes.
24  BY MR. BECK:

Page 584

1        Q.   Did Vioxx significantly
2   reduce serious complicated
3   gastrointestinal problems?
4             MR. TISI:  Objection.
5             THE WITNESS:  Yes.
6   BY MR. BECK:
7        Q.   Even using --
8             For the people who used
9   twice the normal dose of Vioxx for
10  several months instead of days, was there
11  any doubt that Vioxx was superior to
12  naproxen from a gastrointestinal
13  perspective?
14       A.   Yes, there was a doubt.
15       Q.   On the cardiovascular
16  results, I think you testified yesterday
17  that the difference in the CV events was
18  that there were five times as many heart
19  attacks in the Vioxx group as in the
20  naproxen group; is that right?
21       A.   As I said yesterday, the
22  numbers are variably presented, whether
23  it's four times or five times.
24       Q.   And you said they are

Page 585

1   variously presented.  And one of your
2   criticisms yesterday of Merck, as I
3   recall, was the way that this data was
4   recorded in the New England Journal
5   article.  Do you remember that?
6        A.   That's right.
7        Q.   And you spent some time with
8   Mr. Tisi on the difference between
9   presenting it as .2 and some other way,
10  right?
11       A.   That was some of what we
12  talked about.
13       Q.   Now, you know that when you
14  read the VIGOR article and you saw that
15  the risk of naproxen was represented as
16  .2 of the risk of Vioxx, you understood
17  .2 was one-fifth, right?
18       A.   Yes.
19       Q.   And you understood that what
20  that meant was that there were five times
21  as many heart attacks in the group that
22  took Vioxx as in the group that took
23  naproxen, correct?
24            MR. TISI:  Objection.

38  (Pages 582 to 585)

58ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 586

1     THE WITNESS: Well, I do
2  this for a living, but what it
3  said was that there were one-fifth
4  as many heart attacks in the
5  naproxen group.
6  BY MR. BECK:
7     Q.  My question is, when you
8  read that, you understood from reading
9  the VIGOR article that there were five
10  times as many heart attacks in the Vioxx
11  group as in the naproxen group, didn't
12  you?
13     MR. TISI: Objection.
14     THE WITNESS: If I stopped
15  and thought about it and flipped
16  around the numbers and did the
17  math, I could derive that number.
18  BY MR. BECK:
19     Q.  Your deposition Page 360,
20  line 6. "And you understood, from
21  reading the abstract, sir, that
22  therefore, there were five times the
23  number of heart attacks in the naproxen
24  arm" -- Withdrawn.

Page 587

1     "You understood, from
2  reading the results here in the abstract,
3  that there were five times the number of
4  heart attacks in the Vioxx arm than in
5  the naproxen arm, right?
6     "Answer: Right."
7     Was that your deposition
8  testimony?
9     A.  Right.
10     MR. BUCHANAN: Excuse me,
11  Counsel, if you can just let me
12  get the page.
13  BY MR. BECK:
14     Q.  Page 360, line 10.
15     "You understood, from
16  reading the results here in the abstract,
17  that there were five times the number of
18  heart attacks in the Vioxx arm than in
19  the naproxen arm, right?
20     "Answer: Right."
21     Was that your testimony?
22     A.  Correct.
23     MR. BUCHANAN: I'm going to
24  object to the impeachment, no

Page 588

1  temporal association.
2     MR. TISI:  Counsel, I'm
3  going to object on improper
4  impeachment.  Go ahead.
5  BY MR. BECK:
6     Q.  And your testimony that I
7  just read was about when you first read
8  the VIGOR article.  Do you recall that?
9     MR. TISI:  Objection,
10  improper impeachment.
11  BY MR. BECK:
12     Q.  Do you recall that or not?
13     A.  Are we talking about today
14  or at the earlier deposition?
15     Q.  In your deposition.
16     A.  I'm looking for where you
17  said when I first read.  If you could
18  point out to me where you asked it in
19  those terms?
20     Q.  We'll just move on.
21     A.  I don't think that's what
22  you said.
23     Q.  What?
24     A.  I don't think that's the way

Page 589

1  you characterized it at the deposition.
2     Q.  Well, then, let's take a
3  break so we don't waste time on the video
4  while I find the reference.
5     THE VIDEOTAPE TECHNICIAN:
6  The time is 11:51.  We are off the
7  record.
8        - - -
9     (Whereupon, a recess was
10  taken from 11:51 a.m. until
11  11:52 a.m.)
12        - - -
13     THE VIDEOTAPE TECHNICIAN:
14  We're back on the record.  The
15  time is 11:52.
16  BY MR. BECK:
17     Q.  Doctor, the question is
18  whether at the time you first read the
19  VIGOR article, my question is, did you
20  understand that there was five times as
21  many heart attacks in the Vioxx group as
22  in the naproxen group?
23     MR. TISI: Objection.
24     THE WITNESS:  I think what's

39 (Pages 586 to 589)

Confidential - Subject to Protective Order

Page 590

1    fair to say is the first time I
2    read it, I read what it said,
3    which is that there were one-fifth
4    as many heart attacks in the
5    naproxen group.
6    BY MR. BECK:
7        Q.   Did you understand from that
8    that that's the same thing as five times
9    as many heart attacks in the Vioxx group?
10       A.   To tell you the truth, the
11   first time I read it, that did not strike
12   me.
13       Q.   Do you remember that you
14   testified yesterday that you knew about
15   these results even before the publication
16   came out?
17       A.   Right.
18       Q.   And before you even read the
19   VIGOR article, you knew that it had been
20   publically reported that there were five
21   times as many heart attacks in the Vioxx
22   group as in the naproxen group; isn't
23   that right?
24       A.   No, that's not how it was

Page 591

1    publicly reported.
2        Q.   Well, did you understand
3    already by the time you read the article
4    that there were more heart attacks in the
5    Vioxx group than in the naproxen group?
6        A.   Yes.
7        Q.   And you understood there
8    were five times as many, right?
9        A.   To move things along, yes.
10       Q.   Yesterday you talked
11   about --
12           MR. BECK:  I'm sorry, were
13       you saying something?
14               - - -
15           (Whereupon, a discussion was
16       held off the record.
17               - - -
18   BY MR. BECK:
19       Q.   Yesterday you spent some
20   time talking about the New England
21   Journal article and the fact that --
22       A.   May I ask which New England
23   Journal article?
24       Q.   The same one we were just

Page 592

1    looking at, Exhibit 16.
2        A.   Okay.
3        Q.   -- that there were three
4    heart attacks that were not included in
5    the data in the New England Journal
6    article.  Do you remember that subject?
7        A.   Yes.
8        Q.   Do you know from your review
9    of materials in this case whether Merck
10   informed the FDA about these three other
11   heart attacks in October of 2000?
12           MR. TISI:  Objection.
13           THE WITNESS:  I know from my
14       conversations with editors of the
15       New England Journal that they did.
16   BY MR. BECK:
17       Q.   That Merck did inform the
18   FDA of those three heart attacks?
19       A.   Yes.
20       Q.   You testified yesterday
21   about a report written by Dr. Targum.  Do
22   you remember that?
23       A.   Yes.
24       Q.   Do you remember whether Dr.

Page 593

1    Targum's analysis included those three
2    additional heart attacks?
3        A.   I believe that it did.
4        Q.   You testified yesterday
5    about the Advisory Committee that met in
6    February of 2001 to discuss the VIGOR
7    results.  Do you remember that?
8        A.   Yes.
9        Q.   Do you know whether this
10   Advisory Committee was comprised of
11   doctors and scientists who you would
12   respect in their fields?
13       A.   I expect that it would have
14   been, yes.
15           THE COURT REPORTER:  I'm
16       sorry.
17           THE WITNESS:  Yes.  Let's
18       just make that yes.
19   BY MR. BECK:
20       Q.   Were you invited to
21   participate?
22       A.   No.  We've already
23   established that.
24       Q.   Have you read the transcript

40 (Pages 590 to 593)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 594

1   of that meeting?
2        A.   Yes.
3        Q.   And did the members of the
4   Advisory Committee also have information
5   concerning the three additional heart
6   attacks?
7        A.   I believe they did.
8        Q.   Yesterday you were asked
9   some questions about when you believe it
10  became clear that Vioxx posed a risk of
11  or an enhanced risk of heart attacks.  Do
12  you remember that?
13       A.   That was not the way it was
14  phrased.
15       Q.   Okay.
16            And I was a little -- I'm a
17  little bit hazy on it, so, how was it
18  phrased?
19            MR. TISI:  Objection.
20            THE WITNESS:  It was --
21            MR. TISI:  Are you asking
22       the witness to phrase the question
23       for you?
24            MR. BECK:  No.  He testified

Page 595

1   yesterday about a subject of when
2   something became clear.  And I
3   thought it was his testimony about
4   when he thought it became clear
5   that Vioxx posed an enhanced risk
6   of heart disease, and he tells me
7   I'm wrong about that, so, I'm
8   asking him to inform me about what
9   it was he was talking about.
10           MR. BUCHANAN:  I'm going to
11      object to the colloquy and the
12      characterization.  I just want to
13      make sure I have a clear question
14      and answer.  What is the question?
15  BY MR. BECK:
16       Q.   Here's the question.
17            Yesterday you talked about
18  something becoming clear in either the
19  2000 or 2001 time frame.  Do you remember
20  that?
21       A.   Yes.
22       Q.   My first question is, what
23  is it you were talking about that in your
24  judgment became clear?

Page 596

1            MR. BUCHANAN:  Objection to
2       the form.
3            MR. TISI:  Objection.
4   BY MR. BECK:
5        Q.   What were you talking about
6   yesterday when you said that something
7   became clear in that time frame?
8            MR. TISI:  Objection, unless
9       you are putting the testimony in
10      front of him.
11  BY MR. BECK:
12       Q.   Go ahead, answer the
13  question now.
14       A.   Answer?
15           MR. TISI:  Yes.
16           THE WITNESS:  Sure.  That by
17  the spring of 2001, when the
18  original findings from the VIGOR
19  study were released by Merck, in
20  combination with the existing
21  information from a variety of
22  other studies that we've talked
23  about that were done at around the
24  same time, as well as the

Page 597

1   information from the preapproval
2   studies and the evidence from the
3   pharmacology studies that were
4   also available by the spring of
5   2000, that at that point, there
6   was evidence of a likely
7   association or even of a possible
8   association between Vioxx and
9   cardiovascular outcomes.
10  BY MR. BECK:
11       Q.   You said spring of 2001.
12       A.   I'm sorry, I misspoke.  I
13  meant spring of 2000.
14       Q.   Okay.
15            So, by the spring of 2000,
16  several months before the publication in
17  the New England Journal, right?
18       A.   Correct.
19       Q.   You were saying that there
20  was evidence of a likely or possible
21  association between the use of Vioxx
22  and --
23       A.   And adverse cardiovascular
24  outcomes.

41 (Pages 594 to 597)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 598

1    MR. TISI: Objection to
2 form.
3 BY MR. BECK:
4    Q.   Forgive me while I write it
5 down so I have the words in front of me.
6    A.   Sure.
7    Q.   And yesterday, did you say
8 that you, yourself, had concluded that
9 there was this possible association back
10 in the 2000 time frame?
11    A.   Yes.
12    Q.   Okay.
13    So, based on --
14    MR. TISI: Mischaracterizes
15 his testimony that he just gave.
16    MR. BECK: I'm sorry?
17    MR. TISI: He said likely.
18    MR. BECK: Okay.
19 BY MR. BECK:
20    Q.   In any event, you, yourself,
21 back in 2000, based on information that
22 was available to you in the spring of
23 2000, have concluded in your own mind
24 that there was a likely or possible

Page 599

1 association between Vioxx and adverse
2 cardiovascular outcomes?  Is that your
3 testimony?
4    A.   Certainly possible
5 association, so, yes.
6    Q.   Okay.
7    So, a possible association?
8    A.   Yes.
9    Q.   Rather than ask you what was
10 your testimony yesterday, I'm going to
11 try to short-circuit it.
12    Is it your position that at
13 the time of the VIGOR publication late in
14 2000 that there was no reliable evidence
15 to support the naproxen hypothesis?
16    A.   "No" is an extreme term, but
17 I would say virtually no.  There was the
18 occasional naproxen platelet study, there
19 was our own research that indicated a 16
20 percent reduction.  So, I think the
21 fairest way to characterize it would be
22 that there was no convincing evidence
23 that the so-called naproxen hypothesis
24 explained the increased rate of

Page 600

1 cardiovascular disease seen in VIGOR.
2    But, clearly, all the
3 answers were not yet in, in part because
4 the definitive clinical trial never got
5 done, and there were unresolved
6 questions.  But that's my position.
7    Q.   Well, in fact, have you
8 stated before that at the time of the
9 VIGOR study alone that you thought it was
10 fairly obvious from the absence of any
11 corroborating evidence of any kind on the
12 planet that naproxen was a major league
13 cardioprotective drug?
14    A.   Yes.
15    MR. BUCHANAN: Object to the
16 improper use of prior testimony.
17    MR. BECK: I couldn't hear
18 the objection.
19    MR. BUCHANAN: I said -- I'm
20 sorry.  Object to the improper use
21 of what appears to be prior
22 testimony.
23    MR. BECK: I didn't cite any
24 prior testimony.

Page 601

1    MR. BUCHANAN: Oh, that's
2 what I thought you were reading
3 from.
4    MR. BECK: I asked him if he
5 had previously stated.
6    MR. BUCHANAN: If he had
7 previously stated?
8    MR. BECK: Yeah.
9 BY MR. BECK:
10    Q.   So, I want to talk about
11 what you and others on the planet were
12 actually saying at the time about the
13 potential cardioprotective effect of
14 naproxen.
15    During the time that Vioxx
16 was on the market, were scientists whom
17 you considered to be reputable writing
18 articles saying that the difference in
19 heart attacks in the VIGOR results could
20 be explained by naproxen?
21    A.   You'd have to characterize
22 when you mean about while it was on the
23 market, because certainly that was being
24 said credibly in 1999.  It is much less

42 (Pages 598 to 601)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

### Page 602

1 likely that it was being said credibly in
2 2004.
3     Q.   Well, it wouldn't have been
4 said in 1999 since VIGOR hadn't come out
5 in 1999, right?
6          MR. TISI:  Objection.
7          THE WITNESS:  I'm sorry,
8     your question was about scientists
9     speaking about what?
10 BY MR. BECK:
11     Q.   About the difference in
12 heart attacks in VIGOR results could be
13 explained by naproxen.
14     A.   I'm sorry.  Yes.  2000.
15 What was said in 2000 would have been
16 more credible than what was said in 2004.
17     Q.   Do you know who Dr. Steven
18 Nissen is?
19     A.   Yes, I do.
20     Q.   Was he a member of the
21 Advisory Committee that met in February
22 of 2001 to discuss the results of VIGOR?
23     A.   I believe he was.
24     Q.   Is he a cardiologist whom

### Page 603

1 you respect?
2     A.   Yes.
3     Q.   At the time back in 2001, do
4 you know where Dr. Nissen was working?
5     A.   I think he was at the
6 Cleveland Clinic then.
7     Q.   Was he a colleague of Dr.
8 Topol's back then?
9     A.   That's right.
10     Q.   Is Dr. Nissen still at the
11 Cleveland clinic?
12     A.   Yes, he is.
13     Q.   Is Dr. Topol still at the
14 Cleveland Clinic?
15     A.   No.
16          MR. BUCHANAN:  Objection.
17          THE WITNESS:  He's moved to
18     Case Western.
19 BY MR. BECK:
20     Q.   You said you reviewed the
21 transcript of the Advisory Committee
22 meeting, right, the 2001 meeting?
23     A.   Right.
24     Q.   Do you remember whether Dr.

### Page 604

1 Nissen made a presentation at that
2 meeting?
3     A.   Yes, he did.
4     Q.   Do you remember what Dr.
5 Nissen concluded about what could be
6 gleaned from the VIGOR results?
7     A.   Well, rather than going on
8 my memory of what Dr. Nissen said, it
9 might be more helpful if I could just
10 look at the transcript you're referring
11 to.
12     Q.   Okay.
13          MR. BUCHANAN:  I just want
14     to impose a belated basis for the
15     objection, 401/403 for the
16     Topol/Nissen questions.
17          - - -
18          (Whereupon, Deposition
19     Exhibit Avorn-47, Report of
20     Arthritis Advisory Committee,
21     February 8, 2001, was marked for
22     identification.)
23          - - -
24 BY MR. BECK:

### Page 605

1     Q.   I've handed you what I've
2 marked as Exhibit 47.
3     A.   Am i knocking over the
4 screen?
5          MR. BUCHANAN:  Phil, just
6     put it on pause for a second.
7          THE WITNESS:  Is there a
8     part of this document you want to
9     refer me to?
10 BY MR. BECK:
11     Q.   Yes, there is, you'll be
12 happy to know.
13     A.   That's a relief.
14     Q.   First, let's just establish,
15 is Exhibit 47 the transcript of the
16 Advisory Committee meeting that you
17 reviewed?
18     A.   Yes.
19     Q.   And if you would please turn
20 to Page 206.  The --
21          MR. BUCHANAN:  I'm going to
22     object to the publication of the
23     document, hearsay.
24          MR. KLINE:  Have we been

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

**Page 606**

1    provided -- I apologize.
2         MS. DAGOSTINO:  Yes, he has
3    it.
4         MR. KLINE:  Who has it?
5         MR. BUCHANAN:  Chris does.
6         MR. KLINE:  Okay.
7    BY MR. BECK:
8         Q.   So, just referring to Page
9    206.  And Dr. Nissen is quoted on Page
10   206.  Did you review this quotation from
11   Dr. Nissen when considering the materials
12   in reaching your opinion?
13        A.   Yes.
14        Q.   And he's quoted here as
15   saying, "Briefly, I think what I would
16   say in the label that there was an excess
17   of cardiovascular events in comparison to
18   naproxen, that it remains uncertain
19   whether this was due to beneficial
20   cardioprotective effects of naproxen or
21   prothrombotic effects of the agent, and
22   leave it at that, that basically we don't
23   know the reason.  We do know there was a
24   difference.  That awareness should be

**Page 607**

1    made available to the prescriber and to
2    the consumer, but without necessarily a
3    final judgment as to the reasons for that
4    difference."
5         Did I read that quotation
6    correctly?
7         A.   Yes, you did.
8         MR. BUCHANAN:  Objection.  I
9    have a continuing objection on the
10   basis of hearsay and publishing --
11        MR. BECK:  Yes.
12        MR. BUCHANAN:  -- this
13   transcript as well.
14        MR. BECK:  Yes, sure.
15   BY MR. BECK:
16        Q.   After Dr. Nissen made this
17   statement, do you know whether the
18   Advisory Committee voted on whether
19   that's how they recommended the subject
20   be treated in the label?
21        A.   I would want to look at the
22   actual vote.  I know there was a vote,
23   but I would want to see just how it was
24   characterized.

**Page 608**

1         Q.   If you'd look at the next
2    page.
3         MR. BECK:  We now have
4    musical accompaniment on the
5    telephone, and if it doesn't stop,
6    we're going to disconnect
7    everybody who is listening on the
8    telephone.
9         MR. SEEGER:  This is Seeger.
10   It is not my phone, I'm listening
11   in.  If you want to disconnect, I
12   would like to be able to call back
13   in, and we'll drop the guy who's
14   doing it.
15        MR. BECK:  Okay.
16        Let's just wait, pause here
17   for a moment and see if -- I think
18   it was Dean Martin.  Let's pause
19   for a moment and see whether it's
20   still coming through.  But since
21   it was Dean Martin, I would
22   suspect it was somebody from New
23   Jersey.
24              - - -

**Page 609**

1         (Whereupon, there was a
2    discussion off the record.)
3              - - -
4    BY MR. BECK:
5         Q.   Anyway, I think the music
6    has stopped, and during our pause, during
7    the musical interlude, Doctor, did you
8    have a chance to review the transcript
9    pages around Dr. Nissen's comments?
10        A.   Yes.  But I don't think it's
11   fair to characterize it as a vote on Dr.
12   Nissen's comments.
13        Q.   Okay.
14        How would you characterize
15   the vote?
16        A.   I would characterize it as
17   -- I will read the actual question that
18   was posed.
19        Q.   What page are you on?
20        A.   207.
21        Q.   And what line?
22        A.   5.
23        "So, let me ask for those
24   feeling yes, that there needs to be

Confidential - Subject to Protective Order

Page 610

1  something, some additional language," and
2  I'm not sure that comma is placed
3  appropriately. I read it as, since it
4  doesn't make sense where the comma is,
5  "some additional language, perhaps along
6  the lines of Dr. Nissen in terms of the
7  label." And so what it seems to me a
8  fair reading of this question is, should
9  there be something more in the label that
10  describes the VIGOR findings perhaps
11  along the lines that Dr. Nissen suggests.
12     Q.  Okay.
13        So --
14     A.  And the vote was mostly on
15  should there be more language in the
16  label about the VIGOR findings.
17     Q.  Well, nobody said that.
18     A.  "That there needs to be
19  something, some additional language," and
20  the topic was the VIGOR findings,
21  "perhaps along the lines of Dr. Nissen in
22  terms of the label."
23        MR. BUCHANAN: Objection to
24  form.

Page 611

1        MR. BECK: I didn't ask
2  anything yet.
3        MR. BUCHANAN: No. That was
4  your prior question. The witness
5  just responded too quickly for me
6  to get it out.
7        THE WITNESS: I'm sorry.
8  I'll try not to do that.
9        MR. BUCHANAN: That's fine.
10       MR. BECK: That's okay.
11  BY MR. BECK:
12     Q.  In any event, the actual
13  language that was voted on was, "So, let
14  me ask for those feeling yes, that there
15  needs to be something, some additional
16  language perhaps, along the lines of Dr.
17  Nissen in terms of the label." Is that
18  the question that was posed?
19     A.  Yes.
20     Q.  And how did the vote come
21  out?
22     A.  The vote was, well, we can't
23  get a count, but it looks like everybody
24  but one voted for additional language.

Page 612

1     Q.  Well, voted for the question
2  that was "some additional language
3  perhaps along the lines of Dr. Nissen,"
4  right?
5        MR. BUCHANAN: Objection to
6  form.
7        THE WITNESS: Right. But,
8  again, having read many of these
9  transcripts and sat through some
10  of these meetings, I see the
11  question, and I think it's right
12  there in the language, that
13  "should there be something, some
14  additional language" about the
15  VIGOR findings, "perhaps along the
16  lines of Dr. Nissen."
17  BY MR. BECK:
18     Q.  Okay.
19        So, we agree that that was
20  the question, and it was everybody except
21  one person said yes to that?
22     A.  Right.
23        And my reading of that was
24  that they said yes, there should be some

Page 613

1  additional language in the label.
2        MR. BECK: And I'll move to
3  strike everything after the word
4  "Right."
5  BY MR. BECK:
6     Q.  You don't have any reason to
7  believe that the Advisory Committee
8  members in 2001 were biased in favor of
9  Merck, do you?
10     A.  The reason I'm having a hard
11  time answering that is that we know that
12  the Advisory Committee's vote later on,
13  and I simply don't know if it was the
14  same members or how many were the same,
15  definitely did split in their statements
16  about Vioxx and the other COX-2s, in
17  relation to their affiliations with
18  industry. And this has been widely
19  documented.
20        And the question has been
21  raised, I think understandably, that if
22  the votes in a subsequent meeting, the
23  one of 2005, I believe, of the Advisory
24  Committee correlated very closely with

45 (Pages 610 to 613)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 798

1    Q.   So, now, Exhibit 57, I think
2  you indicated that this was kind of an
3  updated version of what we saw before?
4    A.   Right.
5    Q.   And what's the date of this?
6    A.   April of 2003.
7    Q.   There's a section called
8  "Safety and cardiovascular disease" at
9  the bottom.  Do you see that?
10   A.   Right.
11        MR. TISI:  Let me object to
12       the use of this document for the
13       same reasons we talked about
14       before.
15 BY MR. BECK:
16   Q.   Okay.
17        And does this piece that you
18 reviewed and approved state, "The VIGOR
19 trial found a four-fold higher rate of MI
20 in rheumatoid arthritis patients
21 randomized to rofecoxib compared to
22 rheumatoid arthritis patients randomized
23 to naproxen"?
24   A.   Right.

Page 799

1    Q.   And then does the document
2  say, "More recent research suggests an
3  increased risk of myocardial infarction
4  in patients taking rofecoxib at doses
5  greater than 25 milligrams"?
6    A.   Right.
7    Q.   And then it goes on to talk
8  about the possible mechanism, right?
9    A.   Right.
10   Q.   And is there any statement
11 in here at all suggesting that there's
12 any risk of a higher rate of heart attack
13 for people who take 25 milligrams?
14   A.   No.
15        We were only able to work
16 from the evidence that we had, and we
17 were not aware of a lot of the evidence
18 that was available to the company
19 documenting the higher risk that was not
20 available to us in the medical
21 literature.
22        MR. BECK:  I move to strike
23       everything after the word "No."
24 BY MR. BECK:

Page 800

1    Q.   I want to move now to the
2  subject of Alzheimer's trials.
3        On direct-examination, you
4  talked about how the Alzheimer's trials,
5  you said, showed an increase in all-cause
6  mortality in the Vioxx arm versus the
7  placebo arm.
8        Do you remember that?
9    A.   That's right.
10   Q.   And all-cause mortality
11 means that somebody died, and regardless of
12 what somebody thinks about the cause of
13 the death, more people died in the Vioxx
14 group than in the placebo group, right?
15   A.   That's correct.
16   Q.   The -- was there also
17 information --
18        MR. BUCHANAN:  Counsel, do
19       you want to take that down?
20        MR. BECK:  Oh, I'm sorry.
21 BY MR. BECK:
22   Q.   Was there also information
23 developed in the Alzheimer's trials that
24 compared the frequency of heart attacks

Page 801

1  in the Vioxx arm versus the placebo arm?
2    A.   Yes.
3    Q.   And was this information
4  presented to the FDA, to your knowledge?
5        MR. TISI:  Objection.
6        THE WITNESS:  I can't speak
7       to how much or when it was
8       presented to the FDA.
9  BY MR. BECK:
10   Q.   Do you know what the FDA
11 concluded about whether there was a
12 statistically significant difference in
13 the heart attacks in the Alzheimer's
14 trials between the Vioxx group and the
15 placebo group?
16        MR. TISI:  Objection, calls
17       for speculation.
18        MR. BUCHANAN:  Just as a
19       form, Counsel, if you can just
20       frame the time, or you can ask it
21       the way you want to.  That's fine.
22 BY MR. BECK:
23   Q.   I'll start over.
24        As part of your work in this

92  (Pages 798 to 801)

Confidential - Subject to Protective Order

Page 802

1  case, you testified that you reviewed
2  submissions made by Merck to the FDA,
3  correct?
4      A.   Correct.
5      Q.   And you reviewed FDA medical
6  officers' evaluations of the clinical
7  trials, correct?
8      A.   Correct.
9      Q.   And do you remember what the
10 FDA medical officers concluded about
11 whether there was any statistically
12 significant difference in the heart
13 attack rates in the Alzheimer's trials of
14 the Vioxx group versus the placebo group?
15 Do you remember?
16     A.   Yes. I'm just waiting for
17 the objections.
18     MR. TISI:  Objections for
19 the reasons stated.
20     THE WITNESS:  Okay.
21     My recollection is, and we
22 discussed this yesterday, that
23 there was a real problem in the
24 detection of heart attacks in the

Page 803

1  Alzheimer studies in part because
2  of the inadequate way they were
3  looked for.
4      I also recall that there was
5  not a report of a significant
6  difference in heart attacks per
7  se, but as I think I indicated --
8  as I know I indicated yesterday, a
9  doubling of death rate for me was
10 a strong indication that there was
11 something problematic going on
12 with the safety of the drugs, and
13 we know that heart attacks are
14 often under ascertained in the
15 elderly.
16     MR. BECK:  I move to strike
17 the answer as nonresponsive.
18 BY MR. BECK:
19     Q.   Can you answer this question
20 yes or no? Did you see, sir, in the
21 materials that the FDA believed that
22 there was no statistically significant
23 difference in heart attacks in the
24 Alzheimer's trials?

Page 804

1      MR. TISI:  Objection.
2  BY MR. BECK:
3      Q.   Can you answer that yes or
4  no?
5      A.   I would be pleased to look
6  at it if you want to show it to me. I
7  have seen reports, I don't remember if it
8  was an FDA report or a Merck report or an
9  article indicating that there was not a
10 significant difference. And if you have
11 an FDA report you would like me to look
12 at, I'd be happy to look at it.
13     Q.   From your deposition, Page
14 502, Line 20.
15     "Question: Okay. Did you
16 see, sir, in the materials that the FDA
17 believed that there was no statistically
18 significant difference in heart attacks
19 in the Alzheimer's trials?
20     "Answer: Yes."
21     Was that your sworn
22 testimony a couple of weeks ago?
23     A.   I guess.
24     MR. TISI:  Well, let's look

Page 805

1  at it, okay, because I know it's
2  getting late, and I want to make
3  sure we do things the proper way.
4      Here you go.
5      (Handing over document.)
6      THE WITNESS:  Okay.
7      As I said, I know I've seen
8  reports reporting no difference,
9  and I simply cannot recall whether
10 it was an FDA report, an article
11 in the literature or a Merck
12 review.
13     MR. BUCHANAN:  I'm just
14 going to interpose an objection
15 while the witness is reading his
16 testimony of the improper use of
17 his prior testimony.
18     THE WITNESS:  Right. I
19 think the part that you didn't
20 read, Mr. Beck, was when I then
21 went on to say that I don't
22 believe that there was no
23 difference.
24 BY MR. BECK:

93 (Pages 802 to 805)

56ae81f3-615a-41a4-af82-acf966afcfcb