Confidential - Subject to Protective Order

Page 614

1 the ties of Advisory Committee members to
2 industry, that that raised the question
3 as to whether there was perhaps
4 unconscious, perhaps unintentional, bias.
5 So, I don't think I can rule out that
6 possibility in relation to this Advisory
7 Committee either.
8    Q.   Your sworn testimony from a
9 few weeks ago, Page 379, line 20.
10       "Question:  There was no
11 reason" --
12       MR. BUCHANAN:  Excuse me.
13 Let me just get to the page.  I'm
14 sorry.  I'm trying to keep up.
15       MS. DAGOSTINO:  What was the
16 page number?
17       MR. BUCHANAN:  379.
18       THE WITNESS:  What tab do
19 I --
20       MR. TISI:  Just go to the
21 very beginning, Page 379.
22       THE WITNESS:  Oh, I see.
23 Okay.
24 BY MR. BECK:

Page 615

1    Q.   "Question:  There's no
2 reason to think that the Advisory
3 Committee in February of 2001 was biased
4 in favor of Merck, was there, sir?
5       "Answer:  Not to my
6 knowledge."
7       Was that your sworn
8 testimony a couple weeks ago?
9    A.   Yes.
10    Q.   You mentioned Doctor --
11       MR. TISI:  Let me just put a
12 belated objection to improper
13 impeachment.  Go ahead.
14 BY MR. BECK:
15    Q.   You mentioned Dr. Topol in
16 your testimony yesterday.  Back in the
17 August 2001 time frame, did you read an
18 article published by Dr. Topol and some
19 of his colleagues in the Journal of the
20 American Medical Association?
21    A.   Yes.
22    Q.   And I think it is Exhibit 11
23 from yesterday in the binder that Mr.
24 Tisi gave you.

Page 616

1    A.   No.  The binder was just my
2 papers.
3       MR. GOLDMAN:  They didn't
4 mark it yesterday, Phil.
5       MR. TISI:  I didn't refer to
6 it at all.
7       MR. BECK:  I'm sorry.
8       MR. TISI:  I did not refer
9 to it at all, other than did he
10 read it.
11       MR. BECK:  Okay.
12       THE WITNESS:  But if we're
13 going to talk about it, I would
14 like to see it.
15       MR. BECK:  Sure.
16 BY MR. BECK:
17    Q.   Yesterday you said -- I
18 guess you were just asked whether you
19 read it?  Is that it?
20    A.   I think that's true.
21       MR. BECK:  So I'll mark it
22 as Exhibit 48.
23           - - -
24       (Whereupon, Deposition

Page 617

1    Exhibit Avorn-48, Article
2    entitled "Risk of Cardiovascular
3    Events Associated with Selective
4    COX-2 Inhibitors," was marked for
5    identification.)
6           - - -
7 BY MR. BECK:
8    Q.   Is this the article that you
9 were referencing when Mr. Tisi asked you
10 if you'd read Dr. Topol's August 2001
11 article?
12    A.   Yes.
13    Q.   And, in fact, have you cited
14 this article in pieces that you've read?
15    A.   I probably did.
16    Q.   And in those jurisdictions
17 that allow it, is the item that I've put
18 on the screen a copy of the Topol
19 article, Exhibit 48?
20    A.   Right.
21    Q.   Would you please turn to
22 Page 957.
23    A.   Yes.
24       MR. BUCHANAN:  Counsel, what

Confidential  - Subject to Protective Order

---

Page 618

1    did you number this as?
2         MR. BECK: 48.
3         MR. BUCHANAN: 48, okay.
4    BY MR. BECK:
5    Q.    And towards the bottom of
6    the first column --
7         MR. TISI: For completeness,
8         can we just identify for the
9         record who the authors are?
10        MR. BECK: Sure.
11   BY MR. BECK:
12   Q.    Back up.
13         Who is the first listed
14   author?
15   A.    That is Dr. Mukherjee,
16   M-U-K-H-E-R-J-E-E.
17   Q.    And who is the second listed
18   article --
19   A.    Author.
20   Q.    -- author, I'm sorry?
21   A.    Dr. Nissen.
22   Q.    He's the fellow that we just
23   talked about who was involved in the
24   Advisory Committee, right?

---

Page 619

1    A.    Correct.
2    Q.    And then the third listed
3    author is?
4    A.    Dr. Topol.
5    Q.    Okay.
6         So, now, at Page 957, the
7    bottom of the first column, do they say,
8    "The results of the VIGOR study can be
9    explained by either a significant
10   prothrombotic effect from rofecoxib or an
11   anti-thrombotic effect from naproxen (or
12   conceivably both)"?
13   A.    Yes.  But I need to be able
14   to explain, because we've written things
15   like this as well.  In fairness and for
16   accuracy, I need to point out that when
17   they or anybody writes something to this
18   effect in the discussions section of the
19   paper, what it clearly means is, if drug
20   A causes more side effects than drug B,
21   it could be because drug B causes fewer
22   or because drug A causes more.
23         And I think if I was an
24   English teacher, I would probably have

---

Page 620

1    suggested they change "can be explained"
2    to "could be explained," because looked
3    at fairly in the context of this entire
4    paper, that's what they mean, could be
5    explained, not can be explained.  And if
6    one goes to the last paragraph where they
7    say, "Our findings suggest a potential
8    increase in cardiovascular event rates
9    for the presently available COX2
10   inhibitors," that indicates their overall
11   statement, and that makes it very clear
12   to me that when they say "can be
13   explained," they mean might be explained
14   or could have been explained.
15   Q.    Over on Column 2 on that
16   same page, paragraph beginning with the
17   word "Because," do they say, "Because of
18   the evidence for an anti-platelet effect
19   of naproxen, it is difficult to assess
20   whether the difference in cardiovascular
21   event rates in VIGOR was due to a benefit
22   from naproxen or to a prothrombotic
23   effect from rofecoxib"?
24   A.    Before commenting on that, I

---

Page 621

1    want to read the rest of the paragraph to
2    make sure that it is not being quoted out
3    of context.
4         (Witness reviewing
5    document.)
6         Right.  I think the only
7    fair way to look at this, Mr. Beck, is to
8    look at what he then goes on to say.  And
9    he then goes on -- they then go on to say
10   that "Therefore," in fact, in the part
11   that you cut off, "Therefore, we examined
12   results from a meta-analysis of 4 aspirin
13   primary prevention trials" --
14   Q.    Can you hold on one second?
15   A.    Yes.
16   Q.    I don't want to cut off
17   something if you want it up.  I'll put
18   the whole paragraph up if you want.
19   A.    Thank you.  I appreciate
20   that.
21   Q.    So, I had asked you whether
22   they said, "Because of the evidence for
23   an anti-platelet effect of naproxen, it
24   is difficult to assess whether the

---

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

Page 622

1  difference in cardiovascular event rates
2  in VIGOR was due to a benefit from
3  naproxen or to a prothrombotic effect
4  from rofecoxib."
5       And then you wanted to read
6  more?
7       A.   Right. And then what they
8  go on to say is, therefore, to address
9  that question, they looked at a
10 meta-analysis or a combination of many
11 studies or four aspirin primary
12 prevention trials, and then there's some
13 methodological language, but if you
14 could, please, in fairness, highlight a
15 few lines down. "The results of this
16 meta-analysis" --
17      Q.   Where are you?
18      A.   The end of that line you're
19 on now, the word "The." After
20 "Problematic." You were just on the
21 line. It is two lines down.
22      Q.   Okay.
23           Well, we'll get the whole
24 sentence. So, we have, "While

---

Page 623

1  acknowledging that comparison of patient
2  populations in 2 different trials is
3  always problematic" --
4       A.   Right.
5       Q.   Then you wanted me to
6  highlight something?
7       A.   Yes. The rest of that
8  sentence.
9       Q.   Okay.
10          How long does that sentence
11 go?
12      A.   It goes until the word
13 "NSAIDs."
14      Q.   All right.
15          I just want to make sure I
16 highlight exactly what you want, nothing
17 more.
18      A.   Thank you.
19          So, to put this in a fair
20 context, they are saying here, as they
21 did previously, as many of us were
22 saying, if you look -- and I think it's
23 important for the jury to understand
24 this.

---

Page 624

1       If you were to look at VIGOR
2  alone in isolation from anything that's
3  known, and you just have unnamed drug A
4  and unnamed drug B, and one of them has
5  five times the side effect of the other,
6  in isolation, it might be difficult if
7  you didn't know what the drugs were to
8  know whether one drug causes more side
9  effects or the other drug causes fewer or
10 some combination. And they've written
11 that and we've written that.
12          But virtually always, and
13 this is an important point, those
14 statements then go on to say, and,
15 "therefore," and in this case, the
16 "therefore" is that --
17      Q.   Do you want me to highlight
18 the "therefore" sentence too?
19      A.   No, no, no. But they then
20 did additional analyses. And to answer
21 that question, because it is hard to know
22 if you only look within VIGOR and didn't
23 know anything else about the drugs, what
24 was going on.

---

Page 625

1       And they go on to say, quite
2  simply, that when they look, although
3  there's always problems with
4  meta-analyses, and that's certainly true,
5  what they found in trying to figure out
6  this question further demonstrate --
7  right where that cursor is now.
8       Q.   Okay.
9       A.   Further demonstrated.
10      Q.   Further demonstrated?
11 Actually, you left off the word "may,"
12 right?
13      A.   I'm sorry. "May further
14 demonstrate" --
15      Q.   So, it wasn't further
16 demonstrated --
17      A.   I'm sorry.
18      Q.   -- it was "may further
19 demonstrate"?
20      A.   You're absolutely right.
21          MR. BUCHANAN: I'm just
22 going to object to cutting off the
23 witness.
24          THE WITNESS: "May further

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 626

1    demonstrate the prothrombotic
2    potential of rofecoxib and
3    celecoxib." "Prothrombotic" means
4    causing clots.
5  BY MR. BECK:
6        Q.   What does "potential" mean?
7        A.   The possibility that they
8  may cause clots.
9        Q.   "May further demonstrate"
10  the possibility?
11       A.   Right.  That rofecoxib and
12  celecoxib can cause clots, "and suggest
13  that the increased event rates with COX-2
14  inhibitors are possibly due to a
15  prothrombotic effect, not merely a
16  failure to offer the protection of
17  aspirin-like NSAIDs."
18            And so they set up the
19  question in that first sentence that you
20  quoted, but they resolved it both here
21  and later on in the paper by saying, but
22  there is evidence that the naproxen story
23  does not explain the data.
24       Q.   When you say they resolved

Page 627

1    that question, what they actually say is
2    that while it's always difficult to
3    compare two different meta-analyses, the
4    results may further demonstrate the
5    potential which suggests that it's
6    possibly due to the prothrombotic, right?
7        A.   Their statements are much
8    clearer in their last summary paragraph,
9    which reads: "Our findings suggest a
10   potential increase in cardiovascular
11   event rates for the presently available
12   COX-2 inhibitors."
13            And then the paragraph goes
14   on.  But that is the topic sentence of
15   their summary paragraph.  And I think if
16   we are going to look at, and I think if
17   you were to ask Dr. Topol as the senior
18   author what they were saying in this
19   paper --
20       Q.   I really have to stop you
21   there.  People got a chance to ask Dr.
22   Topol in his deposition.
23       A.   Fine.
24            MR. KLINE:  But my objection

Page 628

1    is, is that what was being
2    discussed a moment ago by Dr.
3    Avorn is not being displayed.
4    This is being displayed, while
5    what he was discussing in the
6    conclusion paragraph which he
7    turned to was not being displayed.
8            THE WITNESS:  And we might
9    also point out that what Mr. Beck
10   has underlined in red in I think a
11   rather unfair manner is all of the
12   words like "may" and "potential"
13   and "suggest" and "possibly,"
14   whereas he did not underline in
15   red any of the qualifiers in any
16   of the other quotations that he
17   asked me to review.  And I think a
18   fair review of that would remove
19   those reds or put in the reds in
20   other places which would just be
21   more confusing.
22           MR. KLINE:  My objection
23   still stands.
24 BY MR. BECK:

Page 629

1        Q.   Do you feel better about
2    that now?
3        A.   Much better.
4        Q.   Okay.  I've got to move on
5    now.
6            MR. TISI:  Let me get in,
7    for completeness purposes, can we
8    display the last paragraph which
9    Dr. Avorn just referred to?
10           MR. BECK:  You know, if you
11   want to cover that on redirect, go
12   ahead.
13           MR. TISI:  Well, I mean,
14   since we're in federal court and I
15   know that you've been very adamant
16   about doing things for
17   completeness purposes, I think
18   it's fair.
19           MR. KLINE:  And --
20           MR. BECK:  Okay.  We'll move
21   now.  We don't have to argue about
22   it.  We'll go.  Thank you.
23           MR. KLINE:  And insist that
24   on the paragraph being displayed

Confidential - Subject to Protective Order

Page 630

1 that that's being consistent with
2 what is being argued about. So, I
3 would ask that the paragraph be
4 displayed that the witness was
5 discussing, because he didn't have
6 a chance to be talking about --
7 what was on the screen was
8 different than what he was
9 discussing.
10     MR. BECK: Now we've got it
11 on the screen.
12 BY MR. BECK:
13     Q.  I think, is this the
14 paragraph that when I asked you about the
15 paragraph on Page 957, instead you moved
16 and wanted to talk about this paragraph?
17     A.  Not instead, Mr. Beck.
18     MR. BUCHANAN: Objection to
19 the mischaracterization.
20     THE WITNESS: Not instead.
21 I fully discussed the quotation
22 you asked me to discuss, and then
23 to put it in context, I said it
24 would only be fair for the jury to

Page 631

1     see their summary paragraph as
2 well.
3 BY MR. BECK:
4     Q.  Okay.
5     Is this the summary
6 paragraph that you want the jury to see?
7     A.  Yes, it is.  And I would
8 like to read it.
9     Q.  Okay.
10     A.  "Our findings suggest," from
11 this very same paper, "a potential
12 increase in cardiovascular event rates."
13     Q.  And we can undo these later,
14 but it suggests a potential increase.
15 Okay?
16     A.  I would appreciate it if I
17 could just read it without your
18 highlighting in red words selectively,
19 and then when I'm done, if you want to do
20 the highlighting, I would appreciate
21 that courtesy.
22     Q.  Sure. Okay. Go ahead.
23     A.  "Our findings suggest a
24 potential increase in cardiovascular

Page 632

1 event rates for the presently available
2 COX-2 inhibitors," which at the time was
3 Vioxx and Celebrex.  "It is possible that
4 concomitant use of aspirin may not fully
5 offset the risk of selective COX-2
6 inhibitors. However, definitive evidence
7 of such an adverse effect will require a
8 prospective randomized clinical trial.
9     "On the other hand, the
10 inflammatory component of atherosclerosis
11 has recently been emphasized," as we've
12 discussed, "and may be suppressible by
13 COX-2 inhibitors.  Given the remarkable
14 exposure and popularity of this new class
15 of medications, we believe that it is
16 mandatory to conduct a trial specifically
17 assessing cardiovascular risk and benefit
18 of these agents.  Until then, we urge
19 caution in prescribing these agents to
20 patients at risk for cardiovascular
21 morbidity."
22     Q.  Okay.
23     Now, in the first sentence,
24 when they talked about the findings, what

Page 633

1 they said is that their findings suggest
2 something, right?
3     A.  Right.
4     Q.  And what they suggested was
5 a potential increase in cardiovascular
6 event rates for people using the
7 available COX-2 inhibitors, right?
8     A.  That's right.
9     Q.  And that included Vioxx and
10 Celebrex, right?
11     A.  Right.  Although most of
12 their data came from Vioxx.
13     Q.  And then what they said,
14 when they said their findings suggest a
15 potential increase, they said it is
16 possible that the concomitant use, that
17 means like using it the same time --
18     A.  That's right.
19     Q.  -- it is possible that using
20 aspirin at the same time may not fully
21 offset the risks, whatever those are,
22 right?
23     A.  That's right.
24     Q.  And then they went on to say

50  (Pages 630 to 633)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 634

1  that "definitive evidence" would "require
2  a prospective randomized clinical trial,"
3  right?
4      A.  That's right.
5      Q.  And then in this next
6  sentence, you said this is something we
7  discussed before.  "On the other hand,
8  the inflammatory component of
9  atherosclerosis has recently been
10 emphasized."  And that's what we talked
11 about earlier today about the COX-2
12 enzyme may itself, through inflammation,
13 contribute to atherosclerosis, right?
14     A.  Right.
15     Q.  And that may be
16 suppressible.  When it says, "May be
17 suppressible by COX-2 inhibitors," what
18 they're saying here in August of 2001 is
19 that there may be these increased risks,
20 but on the other hand, there may also be
21 benefits in suppressing inflammation that
22 contributes to atherosclerosis.  Is that
23 a fair reading?
24     A.  Yes.  And I think which of

Page 635

1  those they took most seriously is in the
2  last sentence.
3      Q.  And they said --
4          And in the last sentence,
5  they urge caution in prescribing these
6  agents, being COX-2 inhibitors, right?
7      A.  Right.
8      Q.  To patients at risk for
9  cardiovascular morbidity?
10     A.  Right.  Which I think
11 clearly indicates that they did not
12 believe that the potential for protective
13 effect outweighed the potential for harm,
14 because they said, be careful.  They
15 didn't say, and so put patients with
16 heart disease on these drugs because it
17 might help them.  They said quite the
18 opposite.
19     Q.  They said "use caution"?
20     A.  Yes.  And to my knowledge,
21 the control trial they said was mandatory
22 was never conducted.
23     Q.  And that's --
24         I think you talked about

Page 636

1  yesterday you thought a control trial
2  should have been done, and were you
3  talking about the same sort of control
4  trial that they were referring to?
5          MR. TISI:  Objection.
6          THE WITNESS:  Yes.  A trial,
7      to read their words, "We believe
8      that it is mandatory to conduct a
9      trial specifically assessing
10     cardiovascular risk and benefit of
11     these agents."
12 BY MR. BECK:
13     Q.  And without rehashing what
14 you said yesterday about the specifics of
15 what such a trial would look like, I
16 think you indicated yesterday that you
17 discussed this with two of your
18 colleagues from Harvard, and you thought
19 it would be ethical and appropriate and
20 they did not; is that right?
21         MR. BUCHANAN:  Objection.
22         MR. TISI:  Objection to
23     form.  We don't know what the "it"
24     is, what you are referring to.  Go

Page 637

1  ahead.
2          MR. BUCHANAN:  Objection to
3      form.
4  BY MR. BECK:
5      Q.  Okay.
6          I'll start over.
7      A.  Okay.
8      Q.  Yesterday, did you describe
9  the kind of clinical trial that you
10 thought would be appropriate to test the
11 cardiovascular risks of COX-2 inhibitors
12 or Vioxx?
13     A.  Yes.
14     Q.  And at the time, did you
15 discuss or at some point did you discuss
16 what you thought the appropriate
17 parameters of such a trial would be with
18 some of your colleagues at Harvard?
19     A.  Actually, one was a
20 colleague at Harvard and one was at
21 Dartmouth.
22     Q.  Okay.
23         And what time frame are we
24 talking now in terms of these discussions

Confidential - Subject to Protective Order

Page 638

1  you had with your colleague from Harvard
2  and the doctor from Dartmouth?
3       A.  I can't recall.  I think it
4  was later.  It might have been around the
5  time of APPROVe.
6       Q.  Which would have been, for
7  the jury's benefit, when?
8       A.  '04.
9       Q.  '04, 2004?
10      A.  That conversation.
11      Q.  And you had in your mind a
12  clinical trial that you thought would be
13  both ethical and effective in
14  establishing this question one way or
15  another; is that right?
16          MR. TISI:  Objection to
17  form.
18          MR. BUCHANAN:  Objection to
19  the term "ethically."
20          MR. BECK:  What?
21          MR. BUCHANAN:  I'm objecting
22  to the use of the term
23  "ethically."
24  BY MR. BECK:

Page 639

1       Q.  Well, yesterday when Mr.
2  Tisi asked you if it would be ethical, do
3  you remember saying, I'm glad you said
4  ethical first, because that's the most
5  important thing?  Do you remember that
6  testimony yesterday?
7       A.  Yes.
8       Q.  Okay.
9          So, when you're discussing
10 this trial that you had in mind, what
11 would be appropriate, you thought it
12 would be both ethical from a medical
13 point of view and effective in answering
14 the question; is that right?
15         MR. TISI:  Objection.
16         MR. BECK:  What's your
17 objection?
18         MR. TISI:  I think you
19 mischaracterized something that he
20 said, but --
21         MR. BECK:  Well, I'm trying
22 to ask him whether that was right
23 or not.
24         MR. TISI:  I understand.  I

Page 640

1          understand.  I think he --
2  BY MR. BECK:
3       Q.  Go ahead.
4       A.  Yes.  To be clear, the
5  conversation with Dr. Baron and Dr.
6  Ridker occurred around the time of
7  APPROVe.
8       Q.  Right.
9       A.  But my belief about the need
10 for such a study was comparable to that
11 expressed in JAMA by Dr. Topol and Dr.
12 Nissen back to 2001.
13      Q.  Okay.
14         And yesterday you said that
15 you felt, when discussing this with Dr.
16 Baron and Dr. Ridker, that such a
17 clinical trial could be devised and it
18 would be both ethical and something else.
19 What was the other thing that you said it
20 would be?
21      A.  Probably that it would give
22 the answer that was needed.
23      Q.  Okay.
24         And which of these doctors,

Page 641

1  Dr. Baron or Dr. Ridker, was from
2  Harvard?
3       A.  Ridker, R-I-D-K-E-R.  He's
4  the one from Harvard.
5       Q.  And Dr. Baron was from
6  Dartmouth?
7       A.  Right.  He was the senior
8  author of the APPROVe study.
9       Q.  Did I --
10         Neither of these doctors
11 worked for Merck, correct?
12      A.  Correct.
13      Q.  And did I understand your
14 testimony yesterday correctly that while
15 you believed that the kind of study that
16 you talked about and that Dr. Topol
17 talked about could be done ethically,
18 these two doctors disagreed with you?
19      A.  I think the most accurate
20 way of describing it was that they said,
21 Jerry, how could you do a study like that
22 ethically?  And then I proposed ways that
23 that, I felt, could be done.  And I don't
24 recall that they said it would be

Confidential - Subject to Protective Order

Page 642

1 unethical, but more that they did not
2 initially see how you would do an ethical
3 study.
4       MR. BECK:  Okay.
5       Let's take a break.
6       THE VIDEOTAPE TECHNICIAN:
7 The time is 12:40.  We are off the
8 record.
9          - - -
10      (Whereupon, a luncheon
11 recess was taken from 12:40 p.m.
12 until 1:33 p.m.)
13          - - -
14      THE VIDEOTAPE TECHNICIAN:
15 We're back on the record.  This is
16 Tape Number 3.  The time is 1:33.
17 BY MR. BECK:
18   Q.   Doctor, I'd like to now
19 spend a few minutes on study 090.
20   A.   Okay.
21   Q.   Do you remember discussing
22 that study with Mr. Tisi yesterday?
23   A.   Yes, I do.
24   Q.   And that was a clinical

Page 643

1 trial that was completed not long after
2 the completion of VIGOR; is that right?
3   A.   Right.
4   Q.   So, that would have been in
5 the 2000 time frame?
6   A.   Right.
7   Q.   Do you know whether Merck
8 provided the results of study 090 to the
9 FDA?
10   A.   I believe they did.
11   Q.   And, in fact, did the FDA
12 then make the results of study 090
13 publically available by posting it on the
14 FDA website?
15   A.   Virtually no doctor goes to
16 the FDA website to look at study results.
17   Q.   No, my --
18      Well, researchers do, do
19 they not?
20   A.   Sometimes, yes.
21   Q.   And my question wasn't what
22 prescribers do, but, rather, did the FDA
23 make the results of study 090 available
24 by publishing it on its website?

Page 644

1       MR. BUCHANAN:  Objection to
2 the form.
3       THE WITNESS:  They did
4 disseminate or not disseminate,
5 but they did make available what
6 they had received from Merck, yes.
7 BY MR. BECK:
8   Q.   And was study 090 discussed
9 by Dr. Targum in --
10      Let me start over.
11      Was study 090 discussed by
12 Dr. Targum in her memorandum that
13 appeared around the time of the February
14 2001 Advisory Committee?
15   A.   Yes.
16   Q.   Yesterday when you were
17 discussing study 090, you testified that
18 there was an increase in numbers of
19 cardiovascular events.  Do you remember
20 that?
21   A.   Right.
22   Q.   You did not testify
23 yesterday, did you, that there was a
24 statistically significant increase in

Page 645

1 cardiovascular events in study 090?
2   A.   I don't believe that I said
3 that.
4   Q.   And the reason that you did
5 not say that is because, in fact, there
6 was not a statistically significant
7 increase in cardiovascular events in
8 study 090, isn't that true?
9   A.   I'd want to look at the
10 results of study 090 before commenting on
11 that, because a lot of this has to do
12 with what events are counted, and
13 sometimes a definition is used where it
14 is not significant for these, but it is
15 for these.  So, I want to just be able to
16 look at that.
17   Q.   I can't remember as I sit
18 here whether study 090 was actually
19 marked yesterday as an exhibit.  Did you
20 go over it or did you just talk about it
21 with Mr. Tisi?
22   A.   No idea.  Can we ask Mr.
23 Tisi if it was marked?
24      MR. BECK:  Sure.

Confidential - Subject to Protective Order

Page 646

1    MR. TISI: It's here. The
2  study report or the summary of it
3  by Dr. Targum? I discussed the
4  summary of it with Dr. Targum, but
5  the report is here, and it has not
6  been marked.
7    THE WITNESS: I think the
8  Dr. Targum document was.
9    MR. TISI: The Dr. Targum
10  and the Dr. Villalba --
11    THE WITNESS: Right.
12    MR. TISI: -- discussion of
13  090 was both discussed and marked.
14    THE WITNESS: Right. So, we
15  can refer to those, since I'd
16  rather not do all of this from
17  memory.
18    MR. TISI: They should be in
19  the stack there.
20    THE WITNESS: Okay.
21  BY MR. BECK:
22    Q.   I might be able to shorten
23  it.
24    A.   Okay.

Page 647

1    Q.   Do you have your deposition
2  there?
3    A.   You mean my report?
4    Q.   No, your deposition.
5    A.   I don't, no, but somebody
6  does.
7    MR. TISI: I have it.
8  BY MR. BECK:
9    Q.   And just for purposes only
10  of refreshing your recollection and
11  hopefully shortening the process, if you
12  would turn to Page 563 and 564, just read
13  them to yourself, and then I'll ask you a
14  question after you've read that to
15  yourself.
16    A.   This first section goes to
17  432 and then is the rest -- okay.
18    MR. BUCHANAN: Did you say
19  563?
20    MR. BECK: 563 and over on
21  to 564.
22  BY MR. BECK:
23    Q.   You can start at 563, line
24  17, over to 564, line 4.

Page 648

1    A.   (Witness reviewing
2  document.)
3    MR. BUCHANAN: Just so I'm
4  clear, you asked just if it
5  refreshed his recollection?
6    MR. BECK: Yes. I asked him
7  to read it over, and then I'm
8  going to ask him a question.
9    MR. BUCHANAN: Fair enough.
10  BY MR. BECK:
11    Q.   Have you had a chance to do
12  that, Doctor?
13    A.   I'm reading it.
14    (Witness reviewing
15  document.)
16    Okay.
17    Q.   In study 090, was there a
18  statistically significant increase in
19  cardiovascular thrombotic events?
20    A.   I believe that there was,
21  but I would want to look at the study
22  document and not at my deposition from
23  two weeks ago to give you a better
24  answer.

Page 649

1    Q.   Okay.
2    You've got those ten volumes
3  of documents that --
4    A.   Yes. I should be able to
5  find it relatively quickly.
6    Q.   What are you going to look
7  at?
8    A.   I can look at the report
9  from the FDA medical officer where they
10  separate it out. I think we were looking
11  at that earlier today.
12    Q.   The Targum report?
13    A.   Villalba, Pelayo.
14    MR. TISI: I think he
15  referred to both Targum and
16  Villalba.
17  BY MR. BECK:
18    Q.   As you look at documents,
19  will you tell me which ones you are
20  looking at?
21    A.   Sure, sure.
22    MR. TISI: I'm sorry. I
23  thought you were talking to me.
24    MR. BECK: That's fine. I

Confidential - Subject to Protective Order

Page 650

1  don't care from whom.
2      MR. TISI:  When we were
3  talking about 090 and 085, it was
4  from the Targum and Villalba
5  medical officer review of 2001. I
6  can find them, if you wish.
7      THE WITNESS:  That's my
8  recollection, and I think it was
9  an exhibit, so, we can just...
10     MR. TISI:  They were both
11 exhibits.
12     THE WITNESS:  So, we can
13 just pull it out, and I'll let you
14 know when I find it.
15     Could it have been a
16 yesterday exhibit?
17     MR. TISI:  Yeah, it was --
18     THE WITNESS:  Okay.
19     Oh, here it is.  FDA
20 Advisory Committee briefing
21 document?
22     MR. TISI:  Yes.
23 BY MR. BECK:
24     Q.   What's the number?

Page 651

1      A.   Okay.
2      It's Exhibit 33.
3      MR. TISI:  And I think
4  Targum's is separate.  It is the
5  second one.
6      THE WITNESS:  Okay.
7      And this is Targum, which is
8  Exhibit 34.
9      MR. TISI:  You want me, for
10 ease of finding the page, do you
11 want me to spend time looking for
12 it or no?
13     MR. BECK:  Yeah.  That would
14 be great.
15     MR. TISI:  Okay.
16 BY MR. BECK:
17     Q.   Which document do you have
18 in front of you right now, Doctor?
19     A.   Right now it's Exhibit 33.
20     Q.   And what page are you at?
21     A.   I'm at Page 16.  Well, that
22 was the page number Mr. Tisi handed me.
23     Q.   Okay.  Fine.  What page are
24 you on in the Targum?

Page 652

1      MR. TISI:  Do you want me to
2  help you?  You can have him do it
3  if you want.
4      MR. BECK:  Just tell me what
5  page you are on.
6      MR. TISI:  It begins on Page
7  2437 and then goes through, I
8  think, 30 of 37.
9  BY MR. BECK:
10     Q.   Okay.
11     So --
12     A.   Give me a moment, Counsel,
13 to read what we're now looking at.
14     Q.   The question is, so that
15 you're focused on it, did study 090 show
16 a statistically significant increase in
17 cardiovascular thrombotic events with the
18 use of Vioxx compared to placebo?
19     A.   (Witness reviewing
20 document.)
21     Q.   Do you have my question in
22 mind?
23     A.   Yes, but it's different, Mr.
24 Beck, from the question you asked a

Page 653

1  couple of minutes ago, which we could
2  read back if you want.
3      Q.   Well, I want to focus on --
4      A.   I know you do, because the
5  placebo group was very small.
6      Q.   Well, let me ask you this.
7      A.   But that's not the question
8  that you asked me --
9      Q.   Let me ask you this.
10     A.   You are talking over me, Mr.
11 Beck.  That's not the question you asked
12 me when you asked me to look at the
13 documents.
14     Can we read back the
15 question Mr. Beck asked me before we
16 started looking for documents.
17            - - -
18     (Whereupon, the court
19 reporter read back the record.)
20            - - -
21     THE WITNESS:  Okay.
22     And that was quite different
23 from in comparison with the
24 placebo group, which is -- which

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidenti○l - Subject to Prote○ive Order

Page 654

1    question do you want me to answer,
2        Mr. Beck?
3    BY MR. BECK:
4        Q.   In comparison with the
5    placebo group.
6        A.   Of course, because that is a
7    much smaller group, where there was not a
8    significant difference.
9        Q.   So, when Vioxx was compared
10   with people who took a sugar pill or
11   placebo, there was no statistically
12   significant difference in cardiovascular
13   thrombotic events; is that correct?
14       A.   When the placebo group
15   was -- when both of the referent groups
16   were combined, I believe there was.  When
17   the placebo group, per se, which was half
18   as large as the other study groups, was
19   broken out, it was not.
20       Q.   I want to discuss some more
21   of what it was that scientists were
22   saying about the potential
23   cardioprotective effect of naproxen
24   during the 2000 through 2004 time frame.

Page 655

1    And first I would like to look at an
2    article that you wrote, which I believe
3    is Exhibit 4.  It was marked yesterday.
4        A.   Then that would be in that
5    binder.
6        Q.   That would be in the binder.
7        A.   Okay.
8        Q.   I've put up on the screen
9    Exhibit 4.  Is this an article that you
10   were an author of?
11       A.   That's right.
12       Q.   What's the subject of the
13   article?
14       A.   Nonsteroidal
15   anti-inflammatory drug use and heart
16   attack.
17       MR. BUCHANAN:  I assume my
18       continuing objection has passed
19       along past the lunch break?
20       MR. BECK:  Yes, it is,
21       although I'm not sure this is
22       within the scope of it.  This was
23       authored --
24       MR. BUCHANAN:  Fair enough.

Page 656

1    Thank you.
2        MR. BECK:  -- by the
3    witness.
4        MR. BUCHANAN:  All right.
5        I'll be so advised for the
6    next one.
7        MR. BECK:  Sure.
8    BY MR. BECK:
9        Q.   What journal was this
10   published in?
11       A.   Archives of Internal
12   Medicine.
13       Q.   And when was it published?
14       A.   It was accepted for
15   publication in January of '02, and it was
16   published in May of '02.  So, it was
17   written in the end of '01.
18       Q.   Was this a study that you
19   and some colleagues did concerning
20   potential cardioprotective effects of
21   naproxen?
22       A.   Yes.
23       Q.   Did you study patients who
24   had taken naproxen, ibuprofen and other

Page 657

1    traditional NSAIDs?
2        A.   Right.
3        Q.   Would you please turn to
4    Page 1104.  And I'm going to put up on
5    the screen the same paragraph that Mr.
6    Tisi put on the screen and the two of you
7    discussed yesterday.
8        A.   Right.
9        Q.   Do you remember this
10   paragraph?
11       A.   Yes.
12       Q.   And it starts off with, "In
13   the study by Bombardier et al."  And
14   that's in the VIGOR publication, correct?
15       A.   Correct.
16       Q.   And I think you went through
17   the first two sentences where it said,
18   "In the study by Bombardier et al.," --
19   that means and others, right?
20       A.   Right.
21       Q.   -- "in which patients with
22   rheumatoid arthritis were randomized to
23   receive rofecoxib or naproxen, the rates
24   of AMI were 4-fold higher in patients

Confidential - Subject to Protective Order

**Page 658**

1  taking rofecoxib."
2        Rofecoxib, as we know, is
3  Vioxx, right?
4      A.   Right.
5      Q.   And I think you also
6  discussed the sentence that said, "These
7  findings could have resulted from a
8  protective effect of naproxen, a risk-
9  enhancing effect of rofecoxib, or both,"
10  right?
11      A.   Right.
12      Q.   Now, did you go on to say,
13  "The selective COX-2 inhibitors were not
14  available during the period that we
15  studied"?
16      A.   Right.
17      Q.   And to be clear, now you're
18  talking about the paper we're looking at
19  right now, your 2002 publication.  Even
20  though Vioxx had been on the market since
21  May of 1999, in your, I think you might
22  have called it a look-back study --
23      A.   In our database.
24      Q.   -- you looked at a

**Page 659**

1  database --
2      A.   Right.
3      Q.   -- that went back in an
4  earlier period of time when neither
5  Celebrex nor Vioxx were on the market,
6  right?
7      A.   Or were on the market in
8  such small amounts.  No, actually, you're
9  correct.  We looked at data up until the
10  end of 1995.  So, there were no COX-2s on
11  the market in that period.
12      Q.   Okay.
13        So, just to be completely
14  clear here, the study that you did when
15  focusing on whether naproxen had a
16  cardioprotective effect, there was no
17  looking at Vioxx at all, right?
18      A.   Correct.  Not in this study.
19      Q.   Okay.
20        And because of that, did you
21  go on to say in your study that these
22  findings do not clarify --
23      A.   Can you tell me where you
24  are looking?

**Page 660**

1      Q.   Yes.  I'm highlighting it on
2  the screen.
3      A.   Right, right.
4      Q.   And I'll underline it.
5      A.   Right.
6      Q.   That basically because
7  rofecoxib or Vioxx wasn't even on the
8  market during the period that you
9  studied, the findings of this paper do
10  not clarify the role of Vioxx.  That's
11  what you said, correct?
12      A.   Right.  We didn't study
13  Vioxx.
14      Q.   Okay.
15        Let's go back to the first
16  page -- I'm sorry.  Before we do that,
17  let's round out the rest of the
18  paragraph.
19        You went on to say that
20  while your study did not clarify the role
21  about rofecoxib, you said, "However, the
22  data presented herein are consistent with
23  a possible protective effect of
24  naproxen," right?

**Page 661**

1      A.   That's right.  And to really
2  round it out, we need to point out that
3  the number that that refers to was a 16
4  percent reduction, not an 80 percent
5  reduction.
6      Q.   And I think yesterday you
7  used a phrase when talking about 16
8  percent, I can't remember, what was --
9        MR. GOLDMAN:  Wimpy.
10  BY MR. BECK:
11      Q.   Wimpy.  Was that a phrase
12  you used?
13      A.   In explaining an 80 percent
14  reduction, yes.  In that context, it was
15  wimpy.
16      Q.   So, yesterday you testified
17  that a 16 percent increase in
18  cardioprotective effect was a wimpy
19  increase?
20      A.   No.
21        MR. BUCHANAN:  Objection,
22  asked and answered.
23        THE WITNESS:  No.  What I
24  said was in relation to the

57 (Pages 658 to 661)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

## Page 662

```
 1    supposed 80 percent effect that
 2    Merck was attributing to Vioxx, it
 3    was wimpy --
 4  BY MR. BECK:
 5    Q.   Okay.
 6        I --
 7    A.   I'm sorry -- to naproxen.
 8    Q.   In any event, what you found
 9  without putting an adjective on it for
10  the time being, what you did find in your
11  2002 study was that the information you
12  collected was consistent with a possible
13  protective effect of naproxen, right?
14    A.   Right.  But to be fair, we
15  need to read the rest of that section
16  and line 10 of the last paragraph.
17  Perhaps you can bring that up.  It's
18  right below where you just cited, in
19  which we say, to put this in
20  perspective -- it's line 10 of the last
21  paragraph.
22    Q.   Well, are we going to read
23  the whole section or are we going to pick
24  out line 10?
```

## Page 663

```
 1    A.   Line 10.
 2    Q.   I don't know how you get to
 3  line 10.
 4    A.   I count.
 5    Q.   Okay.
 6        You counted lines?
 7    A.   Yes.
 8    Q.   All right.
 9        I'll put up the --
10    A.   No.  It's the last
11  paragraph.
12    Q.   The --
13    A.   Not that paragraph, the last
14  paragraph.
15    Q.   So, it is not the part that
16  says, "It is not clear from the data why
17  naproxen may lower the risk of" heart
18  attack?
19    A.   That's not what I'm
20  referring to.
21    Q.   Okay.
22        Then which one do you want
23  to go to?
24    A.   All right.
```

## Page 664

```
 1        If you count ten lines down
 2  from where your arrow is, the line begins
 3  with, "Risk of AMI."
 4    Q.   Is it okay if I put the
 5  whole paragraph up and then you can point
 6  it out or do you want to just have that
 7  one line?
 8    A.   Sure.  Well, we can do it
 9  your way and just pick out that one line.
10    Q.   What do you want me to blow
11  up?
12    A.   I want you to go to line 10.
13  It begins, "Risk of AMI."
14    Q.   I'll count.  1, 2, 3, 4, 5,
15  6, 7, 8, 9, 10.  This one?
16    A.   Right.  Yes.  Right where
17  your cursor is.  "To place the effect."
18    Q.   And how much do you want me
19  to blow up there?
20    A.   I think just the two
21  sentences beginning with, "To place the
22  effect of naproxen in perspective."
23    Q.   Let me see if I can do that.
24  How far down?
```

## Page 665

```
 1    A.   Ending with the line
 2  beginning "by aspirin."
 3    Q.   Okay.
 4    A.   Okay.  All right.
 5        This is our summary that
 6  follows the point that you had cited
 7  above.
 8        "To place the effect of
 9  naproxen in perspective, in a large
10  randomized trial of daily aspirin use in
11  primary prevention, patients in the
12  intervention arm experienced a 44%
13  reduction in the risk of AMI.  Therefore,
14  it would be false to equate the more
15  modest effect of naproxen suggested in
16  this study with the cardioprotection
17  afforded by aspirin."
18        And that's a key point in
19  our concluding paragraph.
20    Q.   Okay.
21        Now, let's turn to Page 1.
22    A.   Of the paper?
23    Q.   Of the paper.
24        And there you have this
```

58 (Pages 662 to 665)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 666

1  business at the top of the page that's
2  sometimes called an abstract, right?
3      A.   It's always called an
4  abstract.
5      Q.   Okay.
6          It's always called an
7  abstract, and you set forth the key
8  information in the abstract; is that
9  right?
10     A.   Right.
11     Q.   And then in the conclusions
12  in the abstract, I take it that you set
13  forth the key conclusions in this
14  section, right?
15     A.   Right.
16     Q.   So, if it's okay with you --
17     A.   Sure.
18     Q.   -- I'll blow up the whole
19  thing, the conclusion.
20     A.   Sure.
21     Q.   Was your key conclusion that
22  you put in the abstract, "Although NSAIDs
23  have anti-inflammatory and anti-platelet
24  effects similar to those of aspirin, we

Page 667

1  did not find that these drugs confer a
2  protective effect against AMI," being
3  heart attacks, right?
4      A.   Correct.
5      Q.   "However, use of one
6  specific NSAID, naproxen, appeared to be
7  associated with the reduced rate of AMI,"
8  or heart attack, "an effect recently
9  suggested by a large randomized
10  controlled trial as well." Is that
11  right?
12     A.   Correct.
13     Q.   And when you said that the
14  use of naproxen appeared to be associated
15  with a reduced rate of heart attack, that
16  was from your own data, right?
17     A.   That was the 16 percent
18  reduction.
19     Q.   And then you said that your
20  data -- that this same effect of
21  cardioprotection from naproxen was
22  recently suggested by a large randomized
23  control trial. Was that the VIGOR trial?
24     A.   Right. I believe then and I

Page 668

1  believe now that naproxen reduces the
2  rate of heart attack by about 15 or 16
3  percent.
4      Q.   And the 16 percent figure
5  comes from the VIGOR trial, right?
6      A.   No. That's from our own
7  research.
8      Q.   I'm sorry. From your own
9  research?
10     A.   Right. Others have found
11  similar things.
12     Q.   Well, in fact, others have
13  found higher rates of cardioprotection
14  from naproxen, right?
15     A.   Some lower, some higher, but
16  I think if you were to pull together all
17  the data, the most common finding is
18  about 15 percent.
19     Q.   We'll look at what you said
20  about that in a few minutes.
21          The 16 percent rate of
22  cardioprotection was from your study, not
23  from VIGOR?
24     A.   That's correct.

Page 669

1      Q.   And in VIGOR, you know that
2  the people -- it was a controlled study
3  where they were using 500 milligrams
4  twice a day, right?
5      A.   Right.
6      Q.   And I think you said the
7  average length of time that people were
8  in the study was nine months?
9      A.   That's right.
10     Q.   And your study was not a
11  controlled study where everybody took the
12  same amount of the drug every day for
13  many months, right?
14     A.   That's correct.
15     Q.   Yours was looking back at
16  medical records of people who had
17  prescriptions for naproxen and other
18  drugs, right?
19     A.   That's right.
20     Q.   And your study did not take
21  into account whether the patients were
22  taking lower doses of naproxen than they
23  were in the VIGOR study, right?
24     A.   We looked at all doses.

59 (Pages 666 to 669)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 670

1    Q.  And lots of the patients
2 were taking lower doses than 500
3 milligrams twice a day, right?
4    A.  If you can show me where we
5 said that on the paper, I'd be happy to
6 look at it.
7    Q.  Well, my question is, you
8 did the study. You know from having done
9 the study, don't you, that lots of the
10 patients were taking lower doses than 500
11 milligrams twice a day?
12    MR. BUCHANAN:  Objection to
13   form.
14    THE WITNESS:  I would just
15   want to look at where we talk
16   about dosage. Okay.
17 BY MR. BECK:
18    Q.  Where are you looking so I
19 can look at the same page?
20    A.  Well, let me find out where
21 I want to be first. I'm looking at
22 dosage on Page 1100.
23    Okay. Actually, you're
24 incorrect. If you look at Table 4 on

Page 671

1 Page 1103, we look at the very small
2 cardioprotective effect of naproxen as it
3 related to the dose. And I've got a very
4 bad Xerox, you may have a better copy,
5 but the last three lines in Table 4 look
6 at the odds ratio or the protection of a
7 number less than 1 is protection against
8 heart attack.
9    And we look at those three
10 numbers as a function of the dose, which
11 we expressed as the percent of the
12 maximum anti-inflammatory dosage. So,
13 again, it is hard to read my Xerox, but I
14 believe the top line is greater than 75
15 percent of the maximum anti-inflammatory
16 dose. The next line is 51 to 75 percent.
17 And the last line is 50 percent or less.
18    So, basically it's the
19 highest doses, the medium doses and the
20 smallest doses. And looking at those
21 three numbers, there is no relationship
22 to the cardioprotective level of any
23 meaningful kind with dose. They are all
24 between 77 percent and 81 percent. So, I

Page 672

1 would disagree with you that our findings
2 are explained by the fact that the people
3 taking naproxen in our study were taking
4 it at a lower dose.
5    Q.  Actually, my only question
6 was, do you know whether lots of people
7 in your study were taking naproxen at
8 less than 500 milligrams twice a day?
9    A.  People --
10    MR. BUCHANAN:  Objection.
11   There was a question and a prior
12   question. I think the witness was
13   answering both.
14    MR. BECK:  Well, we can go
15   back to my pending question as you
16   asked to be done before, but let's
17   save time.
18    THE WITNESS:  In
19   epidemiology --
20    MR. BUCHANAN:  I was
21   objecting to your
22   characterization.
23 BY MR. BECK:
24    Q.  Please answer this question.

Page 673

1    Do you know whether lots of
2 people in your study were taking naproxen
3 at doses lower than 500 milligrams twice
4 a day?
5    A.  Well, in epidemiology, we
6 try to avoid terms like "lots of." But I
7 can tell you that regardless of the dose,
8 people, lots of people were taking it at
9 the high dose, the medium dose and the
10 low dose, and they all had the same
11 effect.
12    Q.  You could not control in
13 your study whether the patients were
14 taking naproxen every day as they did in
15 VIGOR, correct?
16    A.  Correct.
17    Q.  Did you ever study a
18 subgroup of patients who used 500
19 milligrams twice a day to see what the
20 cardioprotective effect of naproxen would
21 be at that dose used on a regular basis
22 twice a day?
23    A.  That group -- the closest to
24 that group would be this highest greater

60 (Pages 670 to 673)

56ae81f3-615a-41a4-af82-acf966afcfcb

Page 674

1  than 75 percent of the maximum
2  anti-inflammatory doses. That would
3  calibrate with the population that you
4  described as best as possible. And that
5  group went all the way up to 19 percent
6  instead of 16 percent.
7      Q.   But you don't know if they
8  used that twice a day or day in, day out
9  for nine months, right?
10     A.   Right.
11     Q.   Have other scientists found,
12 to your knowledge, that from a
13 pharmacologic mechanistic perspective
14 that naproxen at 500 milligrams twice a
15 day mimics the anti-platelet effect of
16 low-dose aspirin?
17         MR. TISI: Objection.
18         MR. BECK: What's the
19 objection?
20         MR. TISI: Hearsay.
21         MR. BECK: Okay.
22         MR. BUCHANAN: Objection,
23 foundation.
24         THE WITNESS: I'm aware of

Page 675

1  the area of research you're
2  describing. I wouldn't use the
3  word "mimics," but it is true that
4  people have found anti-platelet
5  effects of naproxen.
6  BY MR. BECK:
7      Q.   Well, my question is, do you
8  know whether other scientists have found
9  not only anti-platelet effects of
10 naproxen, but that they mimic those of
11 low-dose aspirin?
12     A.   I just can't speak to the
13 word "mimic."
14            - - -
15         (Whereupon, Deposition
16     Exhibit Avorn-49, Article
17     entitled, "Clinical Pharmacology
18     of Platelet, Monocyte, and
19     Vascular Cyclooxygenase
20     Inhibition by Naproxen and
21     Low-Dose Aspirin in Healthy
22     Subjects," was marked for
23     identification.)
24            - - -

Page 676

1  BY MR. BECK:
2      Q.   I'm handing you an article
3  we marked as Exhibit 49, which is an
4  article written by Marta Capone and
5  others.
6      A.   Right.
7      Q.   Have you ever seen this
8  before?
9      A.   I know of the studies. I
10 couldn't identify if it's the Capone
11 study in which people have found an
12 anti-platelet effect of naproxen.
13     Q.   Okay.
14     A.   It may have been this paper.
15     Q.   All right.
16         MR. BECK: Let's put this up
17 on the screen.
18 BY MR. BECK:
19     Q.   What's the date of this
20 report?
21     A.   2004.
22     Q.   What publication was it in?
23     A.   Circulation.
24     Q.   Look at the conclusion as

Page 677

1  set forth in the abstract. Do you see
2  where Dr. Capone and her colleagues said,
3  "The regular administration of naproxen
4  500 milligrams BID can mimic the
5  anti-platelet" effect — "anti-platelet
6  COX-1 effect of low-dose aspirin"?
7      A.   Right.
8      Q.   So, this is one of the
9  studies that talks about how it can work
10 the same way that aspirin does?
11     A.   Right. This is in nine
12 subjects followed for six days, correct.
13     Q.   Have other scientists found
14 that naproxen exerts an anti-thrombotic
15 effect at least as potent as that of
16 aspirin?
17     A.   I know that there's
18 literature out there indicating that
19 there can, under some circumstances, be
20 an anti-platelet effect of aspirin.
21     Q.   My question was a little
22 more specific than that.
23         And that is, is there
24 scientific literature that says that not

61 (Pages 674 to 677)

Confidential - Subject to Protective Order

Page 678

1   only does naproxen have an
2   anti-thrombotic effect, but that that
3   anti-thrombotic effect is at least as
4   powerful as aspirin?
5       A.  If you want to show me such
6   a study, I'd be happy to evaluate it.
7       Q.  Okay.
8           - - -
9           (Whereupon, Deposition
10  Exhibit Avorn-50, Article
11  entitled, "Effects of
12  Cyclooxygenase Inhibitors on
13  Vasoactive Prostanoids and
14  Thrombin Generation at the Site
15  of Microvascular Injury in
16  Healthy Men," was marked for
17  identification.)
18          - - -
19  BY MR. BECK:
20      Q.  I've handed you what we've
21  marked as Exhibit 50.  I'll put that on
22  the screen.
23          Is Exhibit 50 a document
24  that you reviewed in preparation for

Page 679

1   writing your report and giving your
2   testimony in this case?
3       A.  I honestly can't recall one
4   way or the other.
5       Q.  Do you recognize Exhibit 50?
6       A.  I think I just answered that
7   question.  I remember that Tuleja or
8   Tuleja was a name that Mr. Goldman had
9   mentioned a couple of weeks ago, and the
10  name Tuleja didn't ring a bell.
11      Q.  Do you know whether this is
12  the --
13          Do you remember when we
14  looked at that document where there were
15  eight documents that were listed as
16  supporting Merck's defense?
17      A.  Right.
18      Q.  And one of them was referred
19  to on that document as an arm bleeding
20  study?
21      A.  I think it was bleeding
22  study or something.
23      Q.  Do you know whether this is
24  that document?

Page 680

1       A.  I don't know whether this is
2   what the counsel was referring to as "the
3   bleeding study," but it is a bleeding
4   study.  I don't know if that's what they
5   meant by it.  I've reviewed lots and lots
6   of papers.
7       Q.  You don't remember whether
8   you looked at this one or not?
9           MR. BUCHANAN:  Objection,
10          asked and answered.
11          THE WITNESS:  I know there's
12      a bleeding time study I looked at.
13      This could well be it.
14  BY MR. BECK:
15      Q.  What's the date of this
16  publication?
17      A.  June 2003.
18      Q.  And what journal was it in?
19      A.  It's not a journal I know.
20  It looks like it is arteriosclerosis --
21  well, it says "Arterioscler Throm Vasc
22  Biol," which might mean Arteriosclerosis
23  and Thrombosis and Vascular Biology.
24  It's not a journal I'm familiar with.

Page 681

1       Q.  Looking at the conclusion as
2   set forth, do you see where these
3   researchers say that "In healthy men,
4   naproxen exerts an anti-thrombotic effect
5   at least as potent as aspirin."  Do you
6   see that?
7       A.  I do.
8       Q.  I'd like you now to turn to
9   Exhibit 19 that you discussed yesterday.
10  That's the big submission by Merck to the
11  FDA.  When I say "big," I mean only in
12  terms of comparing it to the size of the
13  other --
14      A.  Right.
15      Q.  -- documents in your stack.
16      A.  Right.
17      Q.  Do you have Exhibit 19?
18      A.  I'll go digging.  Got it.
19      Q.  Do you remember discussing
20  Exhibit 19 with Mr. Tisi yesterday?
21      A.  Yes.
22      Q.  And this was a submission by
23  Merck to the FDA in November of 2001,
24  correct?

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 682

1    A.  Right.
2    Q.  And would you please turn to
3  Page 3?
4    A.  Yes.
5    Q.  There's language that you
6  and Mr. Tisi went over that I would like
7  to focus on with you.  Here we go.
8       I think this is the language
9  that you focused on where Merck is
10  writing to the FDA and Merck said, "The
11  concept that there are differences among
12  NSAIDs is supported by external
13  epidemiological data from three separate
14  studies that utilized different clinical
15  databases, indicating that the use of
16  naproxen, but not other NSAIDs, is
17  cardioprotective."
18      And then there are three
19  citations, and I think Number 4 is to
20  your paper, correct?
21    A.  Right.
22    Q.  And then it goes on to say,
23  "Among these studies is a U.S. study of
24  over 22,000 patients in New Jersey by a

Page 683

1  Boston academic group unaffiliated with
2  industry."
3      And that refers to your
4  group, right?
5    A.  That's right.
6    Q.  Yesterday you said that
7  Merck distorted the results of your
8  study.  Do you remember that?
9    A.  Yes.
10      MR. BUCHANAN:  Objection to
11  the form.
12  BY MR. BECK:
13    Q.  You do remember that?
14    A.  Yes, I remember that.
15    Q.  Now, when describing your
16  study as one of three -- well, let's just
17  go through the language here.
18      The Merck submission says,
19  "The concept that there are differences
20  among NSAIDs is supported by external
21  epidemiological data from three separate
22  studies." Now, just let me stop there.
23      Does your study support the
24  concept that there are differences among

Page 684

1  NSAIDs?
2    A.  Yes.
3    Q.  And it says, "That" used
4  "different clinical databases."  And your
5  study obviously used a different clinical
6  database than the other ones did, right?
7    A.  Right.
8    Q.  And then it goes on to say
9  that these three separate studies
10  indicate "a use of naproxen, but not
11  other NSAIDs, is cardioprotective."
12      Did your study indicate that
13  the use of naproxen, but not other
14  NSAIDs, is cardioprotective?
15    A.  Yes.
16    Q.  And then the next sentence
17  that says, "Among these studies is a U.S.
18  study of over 22,000 patients in New
19  Jersey."  And was your study of over
20  22,000 patients in New Jersey?
21    A.  Yes.
22    Q.  And then it says, "By a
23  Boston academic group."  That's where
24  you're from, right?

Page 685

1    A.  Right.
2    Q.  "Unaffiliated with
3  industry." And you are not affiliated
4  with industry, correct?
5    A.  Right.
6    Q.  You've testified both
7  yesterday and today, you've emphasized, I
8  think it's fair to say, that the
9  cardioprotective effect that you found
10  was 16 percent, right?
11    A.  Right.
12      Are we done with this
13  document?
14    Q.  Yes.
15    A.  Because I think in fairness,
16  we need to point out that the reason I
17  feel there was a distortion was that it
18  follows a paragraph in which Merck was
19  arguing to the FDA that they could not
20  tell if the difference in effect from --
21  in the VIGOR study was because it was
22  explained away by naproxen or by a
23  prothrombotic or cardiotoxic effect of
24  Vioxx.

63 (Pages 682 to 685)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 686

1 And the distortion piece has
2 to do with the fact that the paragraph
3 you just read was a justification for
4 their saying we don't know whether this
5 was because of naproxen or not, and let's
6 just not attribute it to Vioxx because we
7 can't tell. And that was the distortion
8 that I was referring to.
9 Q. Well, what they said about
10 your study was accurate, right?
11 MR. BUCHANAN: Objection,
12 asked and answered.
13 THE WITNESS: Not in the
14 context that they presented it,
15 no.
16 BY MR. BECK:
17 Q. Well, they were making their
18 position to the FDA.
19 A. And using my data to justify
20 it.
21 Q. But what they said about
22 your data, everything they said about
23 your data was correct, isn't that true?
24 A. Well, correct in the sense

Page 687

1 that there was one-fifth as many heart
2 attacks in the naproxen group. It is the
3 spin that I thought was the distortion.
4 Q. Now, back to my question.
5 You've talked repeatedly
6 about how the effect that you found was
7 16 percent, and I think you've agreed
8 that yesterday at least in one context
9 you said that that was wimpy, right?
10 MR. BUCHANAN: Objection.
11 THE WITNESS: Let me be very
12 clear. Let me be very clear on
13 this, Mr. Beck. It was wimpy, to
14 use that term, in trying to
15 explain the 80 percent reduction.
16 BY MR. BECK:
17 Q. Okay.
18 Let's look at Deposition
19 Exhibit 4. That is your article we were
20 looking at a little while ago.
21 A. Yes.
22 Q. And we're in that section
23 called the abstract at the top. And
24 under "Results," do you say, "Use of

Page 688

1 naproxen was associated with a
2 significant reduction in the risk of AMI"
3 or heart attacks? And then you set forth
4 the actual statistics.
5 MR. BUCHANAN: Objection to
6 the form.
7 THE WITNESS: I think you
8 are confused about the use of the
9 word "significant." Significant
10 refers here to statistically
11 significant, as we've discussed it
12 in the past. It does not mean
13 clinically significant or big deal
14 significant. And that is always
15 the way this word is used in
16 medical papers. And to suggest
17 that it means clinically important
18 would be incorrect.
19 BY MR. BECK:
20 Q. So, "significant" here
21 refers to this is statistically
22 significant?
23 A. Correct.
24 Q. And that concept is one I

Page 689

1 think you discussed yesterday. What that
2 means conventionally is that the relative
3 risk is above 1, and you talked about
4 the -- I'm sorry, the confidence
5 intervals would not include the number 1,
6 right?
7 A. Correct.
8 Q. And there's a p-value that
9 had to be, was it lower or higher than
10 .05?
11 A. Lower than .05.
12 Q. Lower than .05.
13 And so that's what's meant
14 in your paper here that there's a
15 statistically significant
16 cardioprotective effect of naproxen,
17 right?
18 A. That's right.
19 Q. And a 15 percent reduction,
20 would you consider that to be clinically
21 significant?
22 A. It can be. It depends what
23 you're looking at.
24 Q. Does the Brigham and Women's

64 (Pages 686 to 689)

56ae81f3-815a-41a4-af82-acf966afcfcb

## Confidential - Subject to Protective Order

Page 690

1  Hospital have some kind of a website
2  where the scientific articles are posted?
3      A.   Well, I'm not sure what you
4  mean by the hospital does.  Our division
5  has a website.  Other divisions have
6  websites.  There may well be a website
7  that the hospital as a whole has.
8          - - -
9      (Whereupon, Deposition
10  Exhibit Avorn-51, Website of
11  Brigham and Women's Hospital, was
12  marked for identification.)
13         - - -
14  BY MR. BECK:
15      Q.   I'm going to hand you what
16  we've marked as Exhibit 51.  And this, I
17  will represent to you, sir, we went on
18  the Brigham and Women's Hospital health
19  information website, and last night we
20  copied this article off of it.
21      MR. BUCHANAN:  Can I just
22  have an objection?
23      MR. BECK:  Sure.
24      MR. TISI:  I assume you're

Page 691

1  going to give him an opportunity
2  to read it?
3      MR. BECK:  Yeah.  I'm going
4  to ask him some questions about
5  it.
6      THE WITNESS:  I didn't even
7  know we had a health information
8  website.
9  BY MR. BECK:
10      Q.   You did not know that?
11      A.   No.
12      MR. TISI:  Okay.
13      Have you had an opportunity
14  to read it?
15      THE WITNESS:  No, I haven't.
16      MR. BECK:  Okay.
17      Why don't we —
18      MR. TISI:  Perhaps we can go
19  off the record for a moment and
20  let —
21      MR. BECK:  Sure.
22      Let's go off the record and
23  off the video.  It's two pages
24  long, so, we'll take a few minutes

Page 692

1  and you can read it over.
2      THE WITNESS:  Okay.
3      THE VIDEOTAPE TECHNICIAN:
4  The time is 2:19.  We are off the
5  record.
6          - - -
7      (Whereupon, a recess was
8  taken from 2:19 p.m. until
9  2:22 p.m.)
10         - - -
11      THE VIDEOTAPE TECHNICIAN:
12  We're back on the record.  The
13  time is 2:22.
14  BY MR. BECK:
15      Q.   I've put Exhibit 51 on the
16  screen.  And is this, up in the top
17  left-hand corner, the Brigham and Women's
18  Hospital, is that the logo for the
19  Brigham and Women's Hospital?
20      A.   Yes, it is.
21      MR. BUCHANAN:  I'm just
22  going to object to this
23  publication on separate grounds
24  that I don't believe a proper

Page 693

1  foundation has been laid as a
2  learned treatise.
3  BY MR. BECK:
4      Q.   And does the Brigham and
5  Women's Hospital have a website?
6      A.   Yes.
7      Q.   Okay.
8      And do you see that this a
9  paper by someone named Laurie LaRusso?
10      A.   It's not a paper.
11      Q.   It is —
12      A.   I don't know what it is, but
13  it certainly is not a paper in the sense
14  that we have been talking about papers in
15  the medical literature.
16      Q.   Okay.
17      A.   It is two pages of web text.
18      Q.   It's two pages of what's
19  called on the website of Brigham and
20  Women's Hospital "Health Information,"
21  correct?
22      A.   Right.
23      Q.   And the question that Ms.
24  LaRusso is addressing in this posting on

65 (Pages 690 to 693)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 694

1 the Brigham and Women's Hospital is, "Can
2 ibuprofen and naproxen protect against
3 heart attack?" Do you see that?
4     A.   Yes.
5     Q.   And do you see where she
6 says that "Two studies recently published
7 in the Archives of Internal Medicine
8 suggest that prescription strength
9 naproxen may be the only non-aspirin
10 NSAID that reduces the risk of heart
11 attack."
12         Do you see that?
13     A.   Right. Yes, I do.
14         MR. BUCHANAN: Can you help
15 me out, Counsel, just as to where
16 you are?
17         MR. BECK: Yeah.
18         MR. BUCHANAN: I see it on
19 the screen, I just don't know
20 where that came from.
21         MR. BECK: Right underneath
22 where the blowup is. It's the
23 line right above "About the
24 Studies."

Page 695

1         MR. BUCHANAN: Okay.
2 BY MR. BECK:
3     Q.   And having looked this over
4 and seen the second page of what sources
5 she's talking about, do you understand
6 that one of the two studies she's
7 referring to is your study?
8     A.   Right.
9     Q.   Then on the second page,
10 just going to the last paragraph, it
11 says, "Many older people take
12 prescription NSAIDs to relieve arthritis
13 symptoms. By virtue of their age, these
14 same people are at increased risk for
15 heart attack. A study published in
16 November of 2000 found that the NSAID
17 rofecoxib (Vioxx) increased the risk of
18 heart attack compared with naproxen."
19         And then she says, "These
20 two new studies in Archives suggest that
21 the apparent increased heart attack risk
22 associated with rofecoxib was likely a
23 result of the beneficial effects of
24 naproxen rather than any hazardous

Page 696

1 effects of rofecoxib."
2         Is that what she says here?
3         MR. BUCHANAN: Objection,
4 form, hearsay.
5         MR. TISI: Same objections.
6         THE WITNESS: I have been at
7 the Brigham for 14 years. I've
8 never heard of Laurie LaRusso.
9 She's not a physician, she's not
10 an epidemiologist. I don't know
11 what the degree ELS means. I
12 didn't even know our hospital had
13 a health information website. But
14 I can tell you that when I get
15 back there next week, I'm going to
16 have them take garbage like this
17 off because it's four years old.
18 It's written by somebody who
19 clearly did not understand the
20 papers. It has not been
21 peer-reviewed. It is incorrect.
22 And I don't know who Richard
23 Glickman Simon was who last
24 reviewed this site in May of 2002.

Page 697

1 BY MR. BECK:
2     Q.   That was --
3         You're just blowing up the
4 thing that I think you are referring to?
5     A.   Right.
6     Q.   "Last reviewed, May of 2002
7 by Richard Glickman-Simon, M.D."
8     A.   I know most of --
9     Q.   You know what that is --
10     A.   Yes. But I know most of the
11 doctors who are at the Brigham who are in
12 this area. I have never heard of Richard
13 Glickman-Simon. I've never heard of
14 Laurie LaRusso. I don't know what kind
15 of training she has. And this is just
16 garbage that somebody at the hospital had
17 the bad judgment to put up on the web
18 from four years ago and never had the
19 sense to take off. Her conclusions are
20 silly and really are beneath our
21 discussion.
22     Q.   Well, then, we'll move on.
23     A.   Okay.
24         MR. BUCHANAN: You're so

66 (Pages 694 to 697)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 698

1    accommodating.
2    BY MR. BECK:
3        Q.   I hope that you'll agree
4    that our next exhibit is worthy of
5    discussion.
6            MR. TISI:  We do, too.
7            - - -
8        (Whereupon, Deposition
9        Exhibit Avorn-52, Article
10       entitled, "Pharmacoepidemiology
11       and rheumatic diseases:
12       2001-2002," was marked for
13       identification.)
14           - - -
15   BY MR. BECK:
16       Q.   I'm handing you what we've
17   marked as Exhibit 52.  Do you recognize
18   that publication?
19       A.   Yes.  It is worthy of
20   discussion since I was a co-author of it.
21           Sorry.  It's late.
22           No.  In all seriousness, it
23   it's also in a real journal, and it is
24   written by people who have actually done

Page 699

1    research in this area.
2            MR. BUCHANAN:  Did you say
3    52, Counselor?
4            MR. BECK:  52, yes.
5    BY MR. BECK:
6        Q.   As you indicated, you are
7    one of the authors right?
8        A.   Right.
9        Q.   Along with your colleague,
10   Dr. Solomon, whom you referenced several
11   times yesterday?
12       A.   Correct.
13       Q.   And what's the date of this
14   study?
15       A.   It was published in 2003.
16       Q.   And what publication was it
17   in?
18       A.   Current Opinion in
19   Rheumatology.
20       Q.   Now, is this an article
21   where you, among other things, review the
22   results of studies done by other people,
23   as well as yourself?
24       A.   Yes.

Page 700

1        Q.   And let's start on Page 123.
2    So, that would be the second page of your
3    article.  I want to focus on the
4    paragraph in the first column toward the
5    bottom.  Are you with me?
6        A.   Yes, I am.  I am.
7        Q.   Okay.
8            And you say, "Four studies
9    were published in 2002 examining whether
10   naproxen is associated with a reduced
11   risk of acute myocardial infarction."
12           And then you cite those four
13   studies, right?
14       A.   Right.
15       Q.   And then you say, "All used
16   similar methods, analyzing very large
17   claims databases from a number of
18   different healthcare systems," right?
19       A.   Right.
20       Q.   "The results were quite
21   consistent.  Three found in primary
22   analyses that naproxen was associated
23   with a 17 to 39% reduction in acute
24   myocardial infarction compared with other

Page 701

1    nonselective NSAIDs," correct?
2        A.   Right.
3        Q.   And then you said that --
4    and then you talked about the fourth
5    study, which is actually your study,
6    right?
7        A.   No.  The fourth study was
8    Ray, et al.
9        Q.   Oh, I'm sorry.  This is not
10   one that you were on?
11       A.   Right.  And that's the one
12   that reported no reduction in the risk.
13       Q.   Okay.
14           So, one study by Dr. Ray
15   reported no reduction in risk compared to
16   -- with naproxen compared to other
17   traditional NSAIDs, but the three other
18   ones did find a reduction, correct?
19       A.   Correct.
20       Q.   And, like yours, found a
21   reduction, right?
22       A.   Correct.
23       Q.   And you say "yours," I think
24   you testified, yours found a reduction of

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 702

1 16 percent, which you said was kind of
2 the normal, right?
3     A.   Right.
4     Q.   These other three actually
5 found a reduction ranging from 17 percent
6 on the low side up to 39 percent on the
7 high side, right?
8     A.   Right.  But these are the
9 adjusted numbers.  And I think we need to
10 explain what -- the asterisks in the
11 table that you are referring to.
12 Maybe --
13     Q.   I wasn't referring to a
14 table.
15     A.   Well, you are referring to
16 the studies.  So, we need to -- and the
17 number you referred to is the number from
18 the table, and so we need to explain what
19 the numbers in the table are.
20     Q.   First, if you'll answer my
21 question, and then if you want to talk
22 about a table, I'll flip to the table.
23         Is it correct that these
24 three other studies found a reduction in

Page 703

1 heart attacks in people using naproxen
2 compared to other NSAIDs of 17 to 39
3 percent?
4     A.   Yes.
5     Q.   And let me ask you before we
6 go to the table, are you telling me that
7 that number can't really be compared to
8 the 16 percent that you used because it's
9 been adjusted in some way?
10    A.   Correct.  And you also need
11 to point out, as you did, that the study
12 by Ray, et al., initially found a zero
13 reduction.  And it was the adjustment
14 that I wanted to talk about that is where
15 you get the numbers that you read.
16    Q.   Okay.
17        And you want to talk about
18 an adjustment?
19    A.   Right.
20    Q.   Do you want me to show Table
21 1?
22    A.   Sure.
23    Q.   Okay.
24    A.   Because where these numbers

Page 704

1 come from was, to try and make the
2 studies comparable, we took the parent
3 findings, which for Ray, that first line,
4 would have been no reduction.  And we
5 then, as it says in the caption, excluded
6 persons with a prior heart attack or
7 stroke to reduce confounding by
8 unmeasured aspirin use.  And what that
9 means is that we wanted to make sure that
10 there were not people on aspirin in the
11 studies.  And so we looked at a subset of
12 the rate studies so that instead of no
13 effect, that caused a, I guess, 17
14 percent reduction.  And that's why our
15 number is 82 and not 86, as it was in the
16 original paper.
17    Q.   Okay.
18        So, let me ask, then.  So,
19 your study was one of the three studies
20 that's referenced --
21        Your study that we talked
22 about and we were saying 16 percent --
23    A.   Right.
24    Q.   -- is one of the three

Page 705

1 studies that is referenced in here where
2 it talks about 17-39 percent, right?
3     A.   Right.
4     Q.   And adjustments were made to
5 yours, and so which one -- where does
6 yours fall in the 17 to 39 percent?
7     A.   Well, it has to do with
8 whether you are looking at excluding
9 people who have had a heart attack or
10 stroke.  And that's what the numbers in
11 this are.
12    Q.   Right.
13    A.   Whereas the numbers in the
14 original paper are all comers, everybody.
15    Q.   Yeah, I understand that.
16 And when we look at the 17 to 39 percent
17 reduction --
18    A.   Right.
19    Q.   -- you've explained, and I
20 appreciate it, that one of the three
21 studies was actually the one that we've
22 been talking about that you did --
23    A.   Right.
24    Q.   -- before, we said 16

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

Page 706

1   percent, but an adjustment has been made?
2       A.   Right.  If you take out
3   everyone who had a heart attack or
4   stroke, it goes from 16 percent to 18
5   percent.
6       Q.   18 percent.
7           So, yours is still on the
8   low side in terms of what the three
9   studies from 2002 found in terms of
10  reduction in heart attack risk?
11          MR. TISI:  Objection.
12  BY MR. BECK:
13      Q.   Is that right?
14          MR. TISI:  Objection.
15          THE WITNESS:  No.  I think
16      79, 82, 83 would all be considered
17      about the same number.
18  BY MR. BECK:
19      Q.   17 to --
20      A.   I'm sorry.  79.  I'm reading
21  the actual -- I'm reading the actual
22  adjusted risk.  So, it's 100 minus those
23  numbers.  So, what I'm saying is, if you
24  have a relative risk or an odds ratio of

---

Page 707

1   82 percent, 83 percent, 79 percent, we
2   would consider those to be pretty close
3   to being the same number.
4       Q.   Well, would you consider a
5   17 percent reduction in heart attacks to
6   be pretty close to a 39 percent reduction
7   in heart attacks?
8       A.   No.  The 39 was seen on the
9   paper by Dr. Watson, who works for Merck.
10      Q.   And yours, I guess, would be
11  18 on this scale?
12      A.   Correct.
13      Q.   Okay.
14          Please turn to Deposition
15  Exhibit 7 that you had yesterday.
16          MR. TISI:  I'm sorry, which
17      one was it?
18          THE WITNESS:  Is that one of
19      the papers in the binder, do you
20      think?
21          MR. BECK:  One of the
22      articles in the binder.
23          THE WITNESS:  Got it.
24          MR. TISI:  Which one was it,

---

Page 708

1       Phil?  I'm sorry.
2           MR. BECK:  7.
3           MR. TISI:  Thank you.
4           THE WITNESS:  It's the
5       Circulation paper.
6           MR. TISI:  Oh, okay.
7   BY MR. BECK:
8       Q.   And is Exhibit 7 the same
9   document that I am showing up on the
10  screen?
11      A.   Yes.
12      Q.   And you just indicated this
13  is a Circulation paper, meaning it was
14  the one published in the journal
15  Circulation?
16      A.   Correct.
17      Q.   And what year was this one
18  published in?
19      A.   2004.
20      Q.   And you discussed this
21  article with Mr. Tisi yesterday.  Do you
22  remember that?
23      A.   That's right.
24      Q.   And, in particular, you

---

Page 709

1   talked about the fact that Dr. Cannuscio
2   does not appear as an author on this
3   article as it was eventually published,
4   correct?
5       A.   That's right.
6       Q.   All right.
7           And I'll come back to that
8   subject in a little bit.
9           Yesterday when you were
10  testifying about the findings in this
11  article, you indicated that you found an
12  increased risk using Vioxx for 30 days.
13  Do you remember that?
14      A.   For up to 30 days.
15      Q.   Up to 30 days.
16          And you also said yesterday
17  that there was an increased risk that you
18  found using Vioxx up to 90 days.  Do you
19  remember that?
20      A.   That's right.
21      Q.   You did not testify
22  yesterday, did you, about what your paper
23  found concerning people who used Vioxx
24  for more than 90 days?

---

69 (Pages 706 to 709)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

## Page 710

1      MR. BUCHANAN: Objection,
2  form.
3      MR. TISI: Objection,
4  misstates.
5      THE WITNESS: I don't
6  remember if we covered it, but we
7  can cover it now.
8  BY MR. BECK:
9      Q.  Well, in fact, what you
10  found in your paper is that there was no
11  increased risk of heart attack for people
12  who use Vioxx after 90 days, right?
13      A.  Almost right.  I think the
14  correct way to state it is we did not
15  find an increase in risk in people who
16  used it over 90 days.  That's a little
17  different from saying we show that there
18  was no risk.
19      Q.  Okay.
20      You did not find any risk
21  whatsoever in heart attacks for people
22  who used Vioxx for 90 days or more?
23      A.  That's correct.
24      Q.  And in the conclusion

## Page 711

1  section of this article, is that what is
2  included in this sentence that I've
3  highlighted here that says, "The risk was
4  elevated in the first 90 days of use, but
5  not thereafter"?
6      A.  That's correct.  Our belief
7  is that people who were having difficulty
8  with the drug in the first 90 days
9  stopped taking it.
10      Q.  Well, what you found was
11  that there was no elevation in risk after
12  90 days of use, right?
13      A.  Right.
14      MR. BUCHANAN: Objection to
15  the form.
16      THE WITNESS: And I'm
17  explaining to you what we believe
18  was the reason for that.
19  BY MR. BECK:
20      Q.  Did you set forth that
21  belief your article?
22      A.  I can look and see, but I
23  think even Merck agrees that there is a
24  risk after 90 days.  So, I'm trying to

## Page 712

1  understand why it is that we found no
2  risk.  And I think that in an
3  observational study, as you said, where
4  we do not give people drugs in a kind of
5  clinical trial setting, we can't make
6  people stay on the drug.  And if somebody
7  is having problems with the drug, we
8  often see in an observational study that
9  people who are having difficulty with the
10  drug stop taking the drug.  And my
11  belief, as the senior author of the
12  paper, is that that is probably why we
13  did not see a risk after 90 days.
14      Q.  Well, the kind of
15  difficulties that they have on a drug
16  like this would be gastrointestinal
17  difficulties or it wasn't working to
18  relieve their pain, right?
19      MR. TISI: Objection,
20  incomplete.
21      THE WITNESS: No.  The
22  differences I'm thinking of is
23  people's whose blood pressure went
24  up, people who develop chest pain,

## Page 713

1  people who develop congestive
2  heart failure, all which are known
3  side effects of Vioxx, may well
4  have dropped out of taking the
5  drugs since they were just in
6  normal care.  And I believe that
7  that is why, after 90 days, we
8  didn't see the risk.
9  BY MR. BECK:
10      Q.  Why don't we take a break,
11  and I would like you to read through your
12  article, and when we come back from the
13  break, tell me whether there is anywhere
14  at all in your article where you say
15  anything that would support your last
16  answer.
17      A.  I can save time and tell you
18  right now that it's not there because
19  it's my current understanding of what our
20  findings -- why our findings were as they
21  are in light of the consensus opinion now
22  that Vioxx does cause heart attacks after
23  90 days, but we did not engage in that
24  speculation in the paper.

Confidential - Subject to Protective Order

Page 714

1      Q.   So, let's focus then on the
2  increased risk that you did find.  And
3  first I want to focus --
4           You compared the use of
5  Vioxx to the use of Celebrex, as well as
6  the use of other traditional NSAIDs.  And
7  did you also compare it to people who
8  didn't use any NSAIDs at all?
9      A.   Right.
10     Q.   Okay.
11          So, first, I want to talk
12  about what you found with Vioxx versus
13  Celebrex during this first 90 days of use
14  where you found an elevated risk.
15     A.   Right.
16     Q.   Okay.
17          We've talked yesterday and
18  today about the concept of statistical
19  significance.  And you talked about
20  p-values and confidence intervals.  Do
21  you remember that?
22     A.   Right.
23     Q.   And am I correct, Doctor,
24  that those things, the p-values and

Page 715

1  confidence intervals, are used to
2  basically estimate the likelihood that
3  something is due to chance?
4      A.   Exactly.
5      Q.   There's another statistical
6  concept that runs throughout many of the
7  articles we've looked at called relative
8  risk, correct?
9      A.   Correct.
10     Q.   And sometimes that's
11  abbreviated as RR, right?
12     A.   Correct.
13     Q.   And then sometimes I've seen
14  it referred to as OR.  What's that mean?
15     A.   That's odds ratio, which for
16  events that are not common, is about the
17  same as relative risk.
18     Q.   Okay.
19          Now, the statistical
20  significance and confidence intervals, as
21  we said, that's, you know, how likely
22  something is that it is due to chance,
23  but then relative risk is a different
24  concept, and am I right that it's

Page 716

1  basically a measurement of how much
2  higher is the risk?
3      A.   Exactly right.
4      Q.   Okay.
5           So, that --
6           And the way that it's
7  presented typically in one of these
8  papers is that if the relative risk is 1,
9  say if you're comparing Vioxx to no use
10  of medicine at all, and there was a
11  relative risk of 1, that would mean that
12  Vioxx was the equivalent of not using any
13  medicine at all, right?
14     A.   Correct.
15     Q.   So, 1 is kind of the
16  baseline, right?
17     A.   Correct.
18     Q.   And then, for example, if it
19  were 2, 2.0, that would mean that the
20  risk of whichever the drug was is two
21  times greater than the other one, right?
22     A.   Well, the risk of a given
23  event if you take that drug is twice,
24  yes.

Page 717

1      Q.   Okay.
2           So, if you were measuring
3  heart attacks with drug A and drug B, and
4  drug A had a relative risk of 2, then you
5  would be saying that the chance or risk
6  that that person using that drug would
7  have a heart attack is twice as high as
8  somebody using the other drug?
9      A.   Exactly.
10     Q.   10 would be 10 times as
11  high?
12     A.   Correct.
13     Q.   Okay.
14          So, let's go back to your
15  article here.  Turn over to Table 2 on
16  Page 2071.
17     A.   Got it.
18     Q.   And I'm going to highlight
19  the first half or so of that so that it's
20  just a little bit more legible.  And I
21  want to take a few minutes and walk
22  through this if you'll bear with me, and
23  I think it may help the jury understand
24  it.

71 (Pages 714 to 717)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 718

1  A.  Okay.
2  Q.  The title is "Adjusted
3  Association Between Coxibs and Acute
4  Myocardial Infarction."
5      Now, that means you're
6  looking at the relative risk comparing
7  certain drugs to other drugs or no drugs
8  at all.  And what you're doing is looking
9  at that in terms of heart attacks, right?
10  A.  Correct.
11  Q.  Okay.
12      So, just looking at the
13  first one, it says, "Exposure" and then
14  "Reference group" in the heading on the
15  first column.  Do you see that?
16  A.  Right.
17  Q.  And then we have the
18  "adjusted odds ratio," which has two
19  components to it, right?  And the
20  "p-value" over here; is that correct?
21  A.  Correct, right.
22  Q.  Okay.
23      And let's see if we can make
24  that a little more concrete by, we'll

Page 719

1  take the first example.
2      So, the exposure that the
3  drug that you're measuring the risk of in
4  this first item is rofecoxib, being
5  Vioxx, right?
6  A.  Correct.
7  Q.  And the reference group or
8  the drug that you're comparing it to is
9  celecoxib or Celebrex, right?
10  A.  That's right.
11  Q.  And is this for this 90-day
12  period or is this for --
13  A.  This is, I believe, for all
14  periods studied.
15  Q.  Okay.
16      And so when you compare it
17  in this first item, Vioxx to Celebrex,
18  what you found was a relative risk or
19  odds ratio of 1.24, right?
20  A.  Correct.
21  Q.  So, higher than even, but
22  less than twice as much, right?
23  A.  Correct.
24  Q.  And then there's this

Page 720

1  confidence interval that we talked about
2  before, and that bracket is above 1.0,
3  and, therefore, traditionally it would be
4  considered statistically significant?
5  A.  Correct.
6  Q.  And then the p-value, using
7  the p-value, would that be statistically
8  significant?
9  A.  Correct.
10  Q.  And that's because it's
11  above or below .05?
12  A.  Less than .05.
13  Q.  Less than .05.
14  A.  Right.
15  Q.  Where on this table is it
16  indicated, or is it not, how long the use
17  is for this comparison of Vioxx versus
18  Celebrex?
19  A.  This is everybody in this
20  study.  This table includes all the data
21  we had.  So, it's all durations of use.
22  Q.  Okay.
23      Now, we talked about the
24  relative risk or odds ratio, this number

Page 721

1  1.24.  Is it true, Doctor, that
2  epidemiologists generally consider an
3  association with a relative risk of less
4  than 2 to be a weak association?
5  A.  No.  That is not a universal
6  view at all.  Some people believe that,
7  others don't.
8  Q.  Are you familiar with Dr.
9  Brian Strom?
10  A.  Yes, I am.
11  Q.  And his publication,
12  Pharmacoepidemiology?
13  A.  You mean his textbook or the
14  journal?  I think you mean the textbook.
15  Q.  Yes.
16  A.  Yes.
17  Q.  In fact, I'll hand you the
18  text.
19  A.  Yes.
20  Q.  You're familiar with his
21  textbook, Pharmacoepidemiology?
22  A.  I am, yes.
23  Q.  And I think you have
24  indicated before that you consider Dr.

72 (Pages 718 to 721)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 722

1  Strom's textbook, Pharmacoepidemiology,
2  to be one of the three or four leading
3  textbooks in the field. Is that a fair
4  statement?
5      A.  Yes, right.
6      Q.  Okay.
7          I'll just hand you the
8  textbook here.
9      A.  Got it.
10         MR. BECK: And, Counsel, I'm
11  going to mark as an exhibit an
12  excerpt from the textbook.
13             - - -
14         (Whereupon, Deposition
15  Exhibit Avorn-53, Excerpt from
16  Textbook Pharmacoepidemiology,
17  was marked for identification.)
18             - - -
19  BY MR. BECK:
20      Q.  So, Exhibit 53 is an excerpt
21  from this book, and it's --
22         MR. TISI: Can we take a --
23  I'd like to take a brief look at
24  this chapter and go a little bit

Page 723

1  about that other than just the one
2  page. Do you mind if I take a
3  look at it?
4          MR. BECK: Do you want to
5  take a break?
6          THE WITNESS: That's
7  actually what I'm looking at, too.
8          MR. TISI: Okay. Then I'll
9  let you look at it. You're more
10  important than me.
11         THE WITNESS: Okay.
12         (Witness reviewing
13  document.)
14  BY MR. BECK:
15      Q.  Okay.
16          I'm referring over on Page
17  20.
18         MR. TISI: Can I take a look
19  at it now? Do you mind?
20         THE WITNESS: Sure.
21         MR. TISI: Can I take a
22  look? Can we go off the record
23  for a minute while I take a look?
24         MR. BECK: Sure.

Page 724

1          MR. TISI: Thanks.
2          THE VIDEOTAPE TECHNICIAN:
3  The time is 2:51. We're off the
4  record.
5              - - -
6          (Whereupon, a recess was
7  taken from 2:51 p.m. until
8  3:05 p.m.)
9              - - -
10         THE VIDEOTAPE TECHNICIAN:
11  We are back on the record. The
12  time is 5 minutes after 3:00.
13  BY MR. BECK:
14      Q.  Doctor, before we took a
15  break, we had looked at a table from your
16  article showing a relative risk of Vioxx
17  versus Celebrex of 1.24, and then I had
18  asked you whether a relative risk of less
19  than 2 was considered by epidemiologists
20  to be a weak association. You had
21  answered that question, and then I had
22  given you this textbook by Dr. Strom.
23  And I think you already indicated that
24  he's a leading man in the field and this

Page 725

1  book is one of the three or four most
2  authoritative textbooks in the field of
3  pharmacoepidemiology, right?
4          MR. TISI: Objection,
5  misstates. Go ahead.
6  BY MR. BECK:
7      Q.  I think you were nodding
8  yes; is that right?
9      A.  Correct.
10     Q.  Okay.
11         And when I handed it to you
12  and referred you to Page 20, you asked to
13  see the book itself, and one of the
14  reasons is you wanted to see who actually
15  wrote the chapter, right?
16     A.  Right.
17     Q.  Because it is one thing if
18  the book is edited by Dr. Strom, it's
19  another thing if the chapter is written
20  some guy you've never heard of, right?
21     A.  Correct.
22     Q.  Who wrote the chapter?
23     A.  Dr. Strom.
24     Q.  Okay.

73 (Pages 722 to 725)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 726

1    So, Dr. Strom, himself,
2  wrote the chapter that Page 20 is on, and
3  according to Dr. Strom —
4    A.   I have it here.
5    MR. TISI:   Let me just
6    object to the publication of this
7    for that reason.
8  BY MR. BECK:
9    Q.   According to Dr. Strom, does
10  he state here, "Conventionally,
11  epidemiologists consider an association
12  with a relative risk of less than 2 a
13  weak association"?
14    A.   Correct.  Correct that he
15  says that.  I don't agree with that
16  statement.
17    Q.   You disagree with Dr. Strom
18  on that?
19    A.   That's right.  And if I can
20  explain why I disagree.  I think if I
21  were to say to a patient, here's drug X,
22  it doesn't work any better than drug Y in
23  your case, but it will increase your risk
24  of heart attack or stroke by 90 percent,

Page 727

1  would you like this drug or would you
2  like the other drug, in my experience,
3  patients would say, why would I want a
4  drug that increases my risk of a heart
5  attack or stroke by 90 percent as, in
6  fact, Vioxx does?  An increase of 90
7  percent would be a relative risk of less
8  than 2.0.  Most of us would not want to
9  incur a risk of 90 percent increase.
10    Q.   Well, of course, one of the
11  things that epidemiologists and
12  statisticians do is they look at the
13  strength of associations to see how
14  likely something really is and to draw
15  judgments that lay people might not be in
16  a position to draw, right?
17    A.   Right.
18    Q.   Okay.
19    A.   And that's the disagreement
20  that I have.  I think that most of us
21  would feel that a 90 or 75 percent
22  increase in a risk is a big deal even
23  though it's less than 2. — less than a
24  doubling.

Page 728

1    Q.   Let me ask this.
2    Do you agree —
3    Whether you agree or not
4  with the concept that a relative risk of
5  less than 2 is a weak association, do you
6  agree with Dr. Strom that conventionally
7  that's what most epidemiologists believe?
8    A.   No.  I don't agree with
9  that.  I think that's what Brian Strom
10  believes.
11    Q.   In any event, the
12  association that we were looking at in
13  your article on Vioxx versus Celebrex,
14  I'll put that back up on the screen, that
15  was an association that was just 1.24,
16  right?
17    MR. TISI:   Objection to the
18    characterization.
19    THE WITNESS:   I wouldn't use
20    the "just."  The association was
21    1.24 or a nearly 25 percent
22    increase in risk.
23  BY MR. BECK:
24    Q.   Okay.

Page 729

1    You testified yesterday that
2  your 2004 study showed an increased risk
3  with a variety of comparison drugs.  Do
4  you remember that?
5    A.   Yes.
6    Q.   Let's look here.  Rofecoxib,
7  which is Vioxx — I just want to look
8  here.
9    We've already looked at
10  rofecoxib versus Celebrex, right?
11    A.   Right.
12    Q.   Now here is rofecoxib or
13  Vioxx versus naproxen, and there, the
14  relative risk is lower, it's 1.17, right?
15    A.   Right.
16    Q.   And also there the
17  confidence interval goes below 1.0,
18  right?
19    A.   Right.
20    Q.   And under conventional
21  approaches to this sort of thing, that
22  would not be considered statistically
23  significant, correct?
24    A.   Right.

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 730

1    Q.   And then you also -- so,
2  just to put that in layman's terms, from
3  a statistical point of view, when you
4  compared Vioxx to naproxen in your study,
5  there basically was no difference in
6  terms of the effect, no statistically
7  significant difference, right?
8    A.   Right.
9    Q.   Okay.
10        And similarly, we have Vioxx
11  down here versus ibuprofen. Do you see
12  that?
13    A.   Right.
14    Q.   That's another NSAID, right?
15    A.   Right.
16    Q.   And there the relative risk
17  is 1.21, correct?
18    A.   Right.
19    Q.   And, again, the confidence
20  interval that we talked about starts at
21  .92. So, that's below 1.0, right?
22    A.   Right.
23    Q.   So, again, that difference
24  between Vioxx and ibuprofen is not

Page 731

1  statistically significant, correct?
2    A.   That's right.
3    Q.   Yesterday you also testified
4  that your 2004 study showed an increased
5  risk of heart attacks with lower doses of
6  Vioxx. Do you remember that?
7    A.   Right.
8    Q.   Let me show you -- I'm
9  sorry. You already have this document in
10  your stack somewhere. Exhibit 28 from
11  yesterday.
12    A.   Can you tell me what it was?
13    Q.   It was a collection of
14  things that included the abstract that
15  you published.
16    A.   From the American College of
17  Rheumatology?
18    Q.   Yes. The ACR document.
19    A.   Got it.
20    Q.   And the pages aren't
21  numbered, but if you count, I think it
22  was 17 we figured out yesterday, 17 or
23  18, you'll find the abstract that you
24  testified about?

Page 732

1    A.   You mean our paper? Is that
2  what you mean?
3    Q.   Yes. Your abstract.
4    A.   Got it.
5    Q.   Okay.
6        So, do I have up on the
7  screen the abstract that you published
8  concerning this epidemiological study
9  we've been talking about?
10    A.   Right.
11        MR. TISI:  Actually, I think
12  it goes on to the next page, too.
13  I don't want there to be a...
14        MR. BECK:  Okay. Fine.
15  BY MR. BECK:
16    Q.   It goes on to the next page,
17  too. Do you see that?
18        MR. TISI:  Does it?
19        MR. BECK:  I don't know.
20        MR. TISI:  Wait. I thought
21  it did. I thought there was a
22  second page.
23        THE WITNESS:  No, not in the
24  version I have.

Page 733

1        MR. TISI:  Okay.
2        Then I misspoke. I
3  apologize.
4        THE WITNESS:  Right.
5        Now, Mr. Beck, you said that
6  we published. This does not look
7  like something that came out of a
8  journal. This is typed. And it
9  looks like it came from Merck.
10  So, I can't say that this is the
11  version that was published as the
12  abstract.
13  BY MR. BECK:
14    Q.   Well, this is the version
15  that you testified to yesterday on
16  direct-examination.
17    A.   Right. What I said was this
18  is our paper, but you just asked whether
19  this is as published, and since this is
20  not a published version, I can't testify
21  to that. If you have the published
22  version of the abstract, we could look at
23  that.
24    Q.   I just have what you and the

75 (Pages 730 to 733)

56aa81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 734

1  lawyers you're working with talked about
2  yesterday.
3      A.  Right.
4      Q.  You identified this
5  yesterday as an abstract that was
6  presented somewhere?
7      A.  Right. The American College
8  of Rheumatology.
9      Q.  And you presented this
10 abstract, and then later on you turned
11 this abstract into the full blown article
12 that we've been looking at, right?
13     A.  That's right.
14     Q.  Okay.
15         And I want to just focus on
16 this subject that I raised before we turn
17 to this document, and that is, your
18 testimony yesterday that the study that
19 resulted in this abstract and your
20 article, you said, showed an increased
21 risk of heart attacks with lower doses of
22 Vioxx. Okay?
23     A.  Right.
24     Q.  Now, does this abstract

Page 735

1  break down the results of increased risk
2  by dosage for Vioxx?
3      A.  Yes.
4      Q.  And is that in the "Results"
5  section?
6      A.  Yes.
7      Q.  Okay.
8         Let me blow up the "Results"
9  section. And there's a lot of
10 information in the "Results" section.
11 And I want to focus on where in the
12 "Results" section you show the results
13 for 25 milligrams or less of Vioxx.
14     A.  Okay.
15         Would you like me to
16 identify that for you?
17     Q.  Yes, I would.
18     A.  Sure. If you go to the
19 third line which is where it says, "The
20 adjusted relative risk of AMI."
21     Q.  Right.
22     A.  Okay.
23         It's basically that line and
24 the next line.

Page 736

1      Q.  The first line is above 25
2  milligrams, right?
3      A.  Right. Keep going.
4      Q.  Okay.
5         And rofecoxib, is it here
6  below 25 milligrams?
7      A.  Correct. And they both are
8  significantly increased.
9      Q.  So, for comparing Vioxx
10 below 25 milligrams to Celebrex --
11     A.  In the low dose. We
12 compared high dose of Vioxx to high
13 dose of Celebrex and low dose of --
14     Q.  Yeah, and I am just focusing
15 on the low dose now.
16     A.  Okay.
17     Q.  So, comparing low-dose Vioxx
18 to low-dose Celebrex, you had a relative
19 risk or odds ratio of 1.21, correct?
20     A.  Right.
21     Q.  And then you had a
22 confidence interval which starts just
23 above the 1.0 mark, which is the
24 traditional mark for statistical

Page 737

1  significance, right?
2      A.  Right.
3      Q.  So, that's the comparison of
4  Vioxx versus Celebrex?
5      MR. TISI:  At low dose?
6      MR. BECK:  At low dose, yes.
7  BY MR. BECK:
8      Q.  And then does the next line
9  talk about different doses of Vioxx
10 compared to people who did not use any
11 NSAID at all?
12     A.  Right.
13     Q.  And, again, focusing on the
14 lower dose or the 25 milligram dose,
15 there when you compare Vioxx 25 milligram
16 to people who didn't use any NSAID at
17 all, the relative risk was just 1.11,
18 correct?
19     A.  Right.
20     Q.  And there, the confidence
21 interval actually was such where the
22 lower number fell below 1.0, so, it means
23 it's not even statistically significant,
24 right?

76 (Pages 734 to 737)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order 

Page 738

1     MR. TISI: Objection.
2        THE WITNESS: Yes. But I
3  need to explain the issue of
4  significance, and it relates to
5  your question earlier about the
6  studies that compared Vioxx to
7  placebo.
8        If the comparison group --
9  if any group is of small size, it
10  is much less likely that the
11  p-value will be statistically
12  significant. Again, this is sort
13  of fancy statistics, but it is a
14  universally agreed upon concept,
15  that the smaller the group of
16  people that you are studying,
17  and/or the smaller of the
18  comparison group, the more
19  difficult it is to show
20  statistical significance because
21  that requires -- it's really a
22  combination of two things, this
23  significance stuff. One is how
24  big the effect is; and the other

Page 739

1  is the size of the population that
2  you are studying.
3        So, for example -- and I'm
4  sorry to go into length about
5  this, but it is very important.
6        If you were to do a study of
7  smoking and lung cancer, and you
8  only studied like 20 people, you
9  might find no statistically
10  significant connection between
11  smoking and lung cancer, not
12  because the effect isn't there,
13  but because the size of the group
14  that you are studying was too
15  small.
16        What we see here is that the
17  no NSAID group, and if we go back
18  to one of the tables, was a group
19  that was small in size in terms of
20  -- in our terms, we tend to have
21  huge populations, but -- or was
22  this other NSAIDs or no NSAIDs?
23  BY MR. BECK:
24     Q.  No NSAIDs.

Page 740

1     A.  No NSAIDs.
2     Q.  What are you looking at
3  right now?
4     A.  Okay.
5        I'm trying to look at the
6  sizes of the group, because what I'm
7  going by, Mr. Beck, and I think what's
8  the relevant and most important depiction
9  of the dose effect is what appears in the
10  final paper, which is when you take all
11  comers and not just pick selectively
12  which comparison group you are going to
13  look at. In the end of our results
14  section in the paper, as it was actually
15  published, what we say is that if you
16  look at rofecoxib less than 25 milligrams
17  or 25 or less, the odds ratio is 1.37 for
18  everybody with a p-value of .0004, which
19  is highly significant and was comparable
20  to what we found for rofecoxib in the
21  high dose, which was 1.38.
22        And the point about the low
23  dose is that it's a highly significant
24  association if you take all comers. If

Page 741

1  you take ever smaller comparison groups,
2  you are likely not to see significance.
3     Q.  I'm just focusing on the
4  abstract that you presented, and you did
5  include there a breakdown so that
6  somebody could look and say, okay, if I'm
7  interested in Vioxx versus somebody who
8  didn't take any pain medication at all,
9  and particularly the normal dose of Vioxx
10  of 25 milligrams, then according to your
11  abstract here, there's no statistically
12  significant difference between taking
13  Vioxx in 25 milligrams and not taking any
14  medicine at all, right?
15        MR. TISI: Let me just
16     object to the prefatory language
17     in the question.
18  BY MR. BECK:
19     Q.  Let me back up then, and
20  I'll ask it in smaller bites.
21        Am I correct, sir, that
22  according to the abstract where you first
23  presented your results, using 25
24  milligrams of Vioxx --

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 742

1    A.   Or less.
2    Q.   -- or less, there was no
3  statistically significant difference
4  between that and not using any NSAID at
5  all?
6    A.   Right.
7    Q.   Okay.
8         When you turn the abstract
9  into the article that we have talked
10  about, did you keep in the information
11  about how there was no statistically
12  significant difference between 25
13  milligrams of Vioxx and the use of no
14  NSAID at all?
15    A.   We expressed it for the
16  whole study, including all the study
17  participants.  As you know, there's a
18  limit to how many things, how much space
19  you are allowed in an article.  I vividly
20  remember that we went back and forth with
21  Merck about this, and the language that
22  we ended up with, which is the language
23  that the journal accepted, was taking all
24  comers, looking at the dose of

Page 743

1  rofecoxib/Vioxx compared to naproxen,
2  compared to other nonsteroidals, compared
3  to no use.  We looked at the entire
4  population, and that's where we came up
5  with the dose estimate because of our
6  belief, which the journal agreed with,
7  that the best way of looking at the dose
8  issue was to look at it across all comers
9  for all comparison groups.
10    Q.   Now, let me back up to my
11  question.
12         Did you or did you not
13  include in the published article the
14  information that we have been talking
15  about in the abstract that shows that
16  there is no statistically significant
17  difference between using 25 milligrams of
18  Vioxx and not taking any NSAIDs at all?
19    A.   No, we did not.
20    Q.   And you say that the journal
21  agreed with you that that was the
22  appropriate way to present the data?
23    A.   Yes.  And let me explain
24  why.  You can do a table which, as we did

Page 744

1  in Table 2, you look at different
2  comparison drugs.  And you can also
3  present data about looking at different
4  doses.  And you can also present data
5  about looking at different durations.
6  And we did all of that.
7         You can't possibly present
8  data about different comparison groups
9  for different doses and different
10  durations all in the same paper because
11  there just isn't room, and you would end
12  up with tiny, tiny cells, which would be
13  meaningless.
14         And so we have Table 2,
15  which is the different comparison groups,
16  and then in the column next to that, we
17  have the different doses.  And then in
18  the text, we have the different
19  durations.
20         But as I said, you can't do
21  all of them at once, because that's just
22  varying too many things at once and you
23  end up with gibberish numbers.
24    Q.   Is there anywhere that

Page 745

1  somebody could look at your published
2  article and see either in the statistical
3  data or in text that there was no
4  statistically significant difference
5  between using the normal dose of Vioxx,
6  the 25 milligrams, and not taking any
7  medicine at all?
8         MR. TISI:  Objection to the
9  characterization of 25 milligrams
10  as the normal dose.  Go ahead.
11         THE WITNESS:  What they can
12  find is the dose analysis, which
13  looks at high dose versus low
14  dose.  They can also find a
15  duration analysis.  They can also
16  find a comparison analysis.
17         But similarly, there's no
18  place where they can look at short
19  duration of low dose compared to
20  naproxen.  Because if you consider
21  how many different comparisons get
22  made, there would be literally
23  hundreds of comparisons, and you'd
24  need hundreds of points in your

78 (Pages 742 to 745)

56ae81f3-615a-41a4-af82-acf966afcfcb

Page 746

1  table, datapoints in your table.
2      So, if you look, for
3  example, right next to the table
4  we were just looking at, the main
5  dose analysis is high dose versus
6  low dose. And that was the one
7  that indicated a significant
8  increase for both high dose and
9  low dose.
10     You can't present dose by
11 duration by comparison for every
12 possible combination. And that's
13 why that's not there. It was not
14 an attempt to hide any findings.
15 BY MR. BECK:
16     Q. You had a fairly lengthy
17 answer telling me the things that were
18 there. My question is, if you can just
19 give me a clean answer, is there anywhere
20 you can look in the published article and
21 see the finding that for the 25 milligram
22 dose of Vioxx, there was no statistically
23 significant difference between that and
24 using no medicine at all?

Page 747

1      MR. TISI: Objection.
2      MR. BUCHANAN: Asked and
3  answered.
4      THE WITNESS: Correct. That
5  is not there.
6  BY MR. BECK:
7      Q. Okay.
8      You said that the final
9  version was -- you presented data the way
10 that the journal agreed was the right
11 way?
12     A. Correct.
13     Q. I'm going to come back to
14 that subject in little bit.
15     But first, let's talk about
16 Dr. Cannuscio and the whole authorship
17 issue that you went over yesterday.
18     A. Okay.
19     Q. Now, regardless of whether
20 you thought that Dr. Cannuscio should
21 have been included as an author, setting
22 that aside for a second, do you agree
23 that Merck never took any of the grant
24 money away from you because of the

Page 748

1  results of your study?
2      A. That's correct.
3      Q. And do you agree that Merck
4  never did anything to try to persuade you
5  not to publish your study?
6      A. That's correct.
7      Q. And do you agree that Merck
8  never tried to intimidate you in any way
9  because of the results of your study?
10     A. I'd have a hard time saying
11 yes to that in light of Dr. Reicin's
12 visit to our unit to tell us that our
13 findings didn't fit any of the other
14 findings that Merck had and that it would
15 be an embarrassment to us when our
16 findings were published because they were
17 wrong. That wasn't intimidation like
18 with a baseball bat, but it was a kind of
19 scary statement.
20     Q. Page 660 of your deposition,
21 Line 23.
22     "Did Merck ever try to
23 intimidate you because of the results of
24 your study?

Page 749

1      "Answer: No."
2      Was that your sworn
3  testimony just a couple of weeks ago?
4      A. Yes.
5      Q. And would you agree, sir,
6  that Merck never took any inappropriate
7  action after you published your study?
8      A. Well, I consider the action
9  in relation to Dr. Cannuscio
10 inappropriate. I don't know whether you
11 would call that after or during the
12 publication or before the publication,
13 but I think that was inappropriate.
14     Q. Page 661, Line 5.
15     "Did Merck ever take any
16 inappropriate action after you published
17 your study?
18     "Answer: No."
19     Was that your sworn
20 testimony just a couple of weeks ago?
21     A. Yes. But you're not talking
22 about the Dr. Cannuscio issue. And I
23 don't want to be back into answering in a
24 way that would imply that I didn't think

79 (Pages 746 to 749)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 750

1  that was inappropriate.
2      Q.   Setting aside Dr.
3  Cannuscio --
4          MR. BUCHANAN:  Excuse me,
5      Counsel.  Let me get my objections
6      on.
7          Objection, improper
8      impeachment.
9  BY MR. BECK:
10     Q.   Setting aside the authorship
11  issue, do you agree that Merck never took
12  any inappropriate action after you
13  published your study?
14     A.   I do not agree with that
15  statement.  I think that their
16  presentation of our study to their sales
17  reps, to the public through statements
18  they made was inappropriate because it
19  was scientifically wrong.
20     Q.   Page 661, Line 5 through
21  line 8.
22      "Question:  Did Merck ever
23  take any inappropriate action after you
24  published your study?

Page 751

1       "Answer:  No."
2          That was your sworn
3  testimony?
4      A.   I want to see in what
5  context that was.  661, line?
6      Q.   5.
7      A.   Okay.
8          I think what we need to
9  explain here is that --
10     Q.   First of all, was that your
11  sworn testimony?
12     A.   To the questions about what
13  Merck did to us.  And I think it's very
14  important and only fair to point out that
15  your line of questioning a few weeks ago
16  was about things that Merck did to us.
17  And I think it's a real bait and switch
18  to try and make it seem as if we were
19  talking about the same thing.
20         You were talking about did
21  they take away grant money from you?  Did
22  they try to intimidate you?  Did they try
23  to persuade you to publish the study?
24  Did they take any inappropriate action?

Page 752

1  And in the context of did they --
2      Q.   Those are exactly the same
3  four questions I just asked, aren't they?
4      A.   Right.  Well, I need to --
5          MR. BUCHANAN:  I'm going to
6      object.
7          MR. TISI:  I'm going to
8      object.  It's not fair.
9          THE WITNESS:  At some point,
10     somebody else who has more time
11     can look at the words of the
12     questions, but what is absolutely
13     clear, looking at the deposition
14     of a couple of weeks ago, you were
15     talking about things that Merck
16     had or hadn't done to us to
17     intimidate us, and it was all in
18     the context of did they take away
19     grants from you, did they try to
20     intimidate you, did they ever try
21     to persuade you not to publish
22     your study?  And what I'm
23     responding to now is did Merck
24     ever take any inappropriate

Page 753

1      action.
2          When you asked it a couple
3      of weeks ago, it was all around
4      did Merck ever do anything to you.
5      And I quite appropriately
6      responded to that in the context
7      in which you asked it, no, Merck
8      did not ever do anything
9      inappropriate to me.
10         However, if you were to take
11     the question in isolation, as we
12     are now doing, did they ever take
13     any inappropriate action at all in
14     relation to our study?  Yes, they
15     did, in the way they presented our
16     study to the world.
17  BY MR. BECK:
18     Q.   Are you done?
19     A.   Yes.
20     Q.   Okay.
21         Did Merck have a right to
22  disagree with some of the conclusions in
23  your study?
24     A.   Yes.

80 (Pages 750 to 753)

56a981f3-615a-41a4-af82-acf966afcfcb

Page 754

1    Q.   And was one of the
2  conclusions that Merck disagreed with --
3  let's look at your study now, Exhibit 7.
4  You talked about this generally
5  yesterday, although I'm not sure you
6  focused on the specific language in the
7  methods and results section.
8         But there was something in
9  the methods and results section that
10  Merck and you had a disagreement about,
11  correct?
12    A.   Yes.
13    Q.   And I'm highlighting some
14  language in there where it says, "Current
15  use of" Vioxx "was associated with an
16  elevated relative risk of AMI," or heart
17  attack, "compared with Celebrex," and
18  then it gives these statistics, "and with
19  no NSAID." Do you see that?
20    A.   Yes.
21    Q.   And was that one of the
22  areas where you and Merck had a
23  disagreement about how the data should be
24  presented?

Page 755

1    A.   Correct.
2    Q.   And was one of the points
3  that Merck made to you that if you looked
4  at NSAIDs, Vioxx versus NSAIDs at the 25
5  milligram dose, that there was no
6  statistically significant difference?
7    A.   Wait a minute. That's not
8  what we're talking about here. That's
9  not what that says.
10    Q.   No. I know that's not what
11  that says.
12         Was one of the concerns that
13  Merck articulated to you was that in the
14  actual study, as we saw in the abstract,
15  that when you compare a 25 milligram
16  Vioxx to no NSAID use, there was no
17  statistically significant difference, but
18  that here, you combined all doses instead
19  of breaking it down 25 versus 50
20  milligrams? Was that one issue that they
21  were concerned about?
22    A.   They didn't like the fact
23  that we had that line that you
24  underlined, that section in the paper.

Page 756

1  They would probably have preferred that
2  we focus on the nonsignificant finding.
3  Our response was, and I think most
4  epidemiologists and statisticians would
5  agree, that the most appropriate way to
6  present data is to take the largest group
7  possible and not present subgroups,
8  especially if dividing things into
9  subgroups makes the significance go away.
10  That would not seem to me and I think to
11  most people to be the fairest way to look
12  at data in the abstract.
13    Q.   Was one of the disagreements
14  that Merck had with you that even when
15  you combine 25 and 50 milligram use and
16  compared it with no NSAIDs that the
17  difference that you saw was not
18  statistically significant?
19       MR. BUCHANAN: Objection to
20  the form.
21       THE WITNESS: Their position
22  was that a P.054 level of
23  significance should be considered
24  not important. We differed with

Page 757

1  them and felt that .054, which I
2  think I explained the other day
3  was a 94.6 percent certainty
4  versus a 95 percent certainty,
5  that it was important enough that
6  we felt it should remain in the
7  paper. That was a point of
8  disagreement.
9  BY MR. BECK:
10    Q.   And Merck, did Merck feel
11  that in the abstract that it should be
12  pointed out that this was not
13  statistically significant?
14    A.   I believe they did.
15    Q.   And you disagreed with that?
16    A.   Correct.
17    Q.   Okay.
18    A.   I believe they wanted us to
19  say in the abstract this was not
20  statistically significant, which we
21  interpret as just an attempt to minimize
22  or undercut the finding.
23    Q.   Okay.
24         And that was a bone of

81 (Pages 754 to 757)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 758

1  contention between you and Merck?
2       A.   That was one, yes.
3       Q.   Okay.
4            Now, I think you may have
5  already agreed with this, but under a
6  conventional statistical approach, a
7  confidence interval that includes the
8  number 1 is traditionally not considered
9  statistically significant, right?
10      A.   It is right on the
11 borderline.
12      Q.   And --
13      A.   And reasonable people will
14 disagree as to whether it falls on one
15 side or the other.
16      Q.   And similarly, the .054,
17 reasonable people can differ on that,
18 whether it's statistically significant,
19 right?
20      A.   Right. Some would round it
21 to .05, which is the way you would round
22 .054, and some would say, well, it is
23 bigger than .050, so, it's not.
24      Q.   And the conventional

Page 759

1  approach is if it is bigger than .050,
2  then it is not statistically significant,
3  right?
4       A.   But another conventional
5  approach is if the rounded .05 -- if it
6  rounds to .05, that's close.
7       Q.   All right.
8            So, in any event, you do
9  agree that on both the confidence
10 interval and whether this shows
11 statistically significant, or the
12 p-value, whether that shows statistically
13 significant, reasonable people can
14 disagree about that?
15      A.   Right. But my recollection
16 was that they said take it out of the
17 abstract. And we felt that the concern
18 about the confidence interval was
19 perfectly expressed by just putting the
20 numbers up there. We put the confidence
21 interval having 1.0 in it. We put the
22 p-value of .054, even though a lot of
23 times people will round p-values to just
24 two numbers. And our position was if

Page 760

1  there's a concern about that, all the
2  data that you need to deal with that are
3  in the abstract. And I think their
4  position was, take it out of the
5  abstract.
6       Q.   Or put in the abstract the
7  statement that it is not statistically
8  significant, right?
9       A.   Right. And I don't recall
10 which option they favored. But in our
11 view, you'd need to highlight it by
12 saying this is not significant because
13 all the numbers are there for any reader
14 to judge.
15      Q.   Incidentally, do you agree
16 with Merck that this difference was not
17 statistically significant?
18      A.   No, I do not agree.
19      Q.   Let's go to Page 2071 of
20 your article. At the very bottom of the
21 left-hand column, and then continuing
22 over to the top of the right-hand
23 columns, if I can get these things
24 aligned.

Page 761

1       A.   Right.
2       Q.   Did you say in the actual
3  article, "The adjusted relative risk of
4  AMI," or heart attacks, "with rofecoxib
5  was elevated but did not reach
6  statistical significance compared to no
7  current NSAID"? Is that what you
8  actually said in the body of the article?
9       A.   Right. As I recall, that
10 was a concession that we made to Merck,
11 because they were so unhappy with that
12 number. I think what we agreed in kind
13 of a horse trading way was, we're going
14 to leave it in the abstract, but we're
15 willing to point out in the body that it
16 was not statistically significant. I
17 think that was the agreement we made.
18 Because we really were trying to come to
19 agreement with them.
20      Q.   And Merck's position was
21 it's misleading to have the information
22 in the abstract, but not the observation
23 that these numbers are not statistically
24 significant, right?

82 (Pages 758 to 761)

56ae81f3-615a-41a4-af82-acf966afcfcb

Page 762

1    MR. TISI: Objection.
2 BY MR. BECK:
3    Q.   And this back and forth,
4 that was a position that you took, right?
5    MR. TISI: Objection.
6    THE WITNESS: I'm just
7 trying to remember.
8    I'm not sure how anyone
9 could say that there was anything
10 in the abstract that did not give
11 that impression because it was all
12 there with the p-value and the
13 confidence interval. So, it's not
14 as if anybody would have missed
15 that in the abstract.
16    But I think that in an
17 attempt to come to some agreement
18 with them so that the paper could
19 actually get published, I think
20 they wanted us to say something
21 like it was numerically elevated,
22 but not significant. And we felt
23 that that was a real -- again,
24 this is just my recollection of

Page 763

1 the words from several years ago,
2 and we felt that that was not
3 acceptable because that seems to
4 really low ball the difference.
5 And I think this is what we
6 negotiated with them as the
7 wording. And we put that in in an
8 attempt to just get to yes and to
9 move forward.
10 BY MR. BECK:
11    Q.   Yesterday you talked about
12 why you thought Merck decided to remove
13 Dr. Cannuscio as an author of the study.
14 Do you remember that?
15    A.   Right.
16    Q.   Now, the truth is that based
17 on your personal interactions with Merck,
18 you do not know why Merck decided that
19 they did not want Dr. Cannuscio's name to
20 appear on your paper; isn't that true?
21    A.   True.
22    Q.   In fact, you never discussed
23 the issue of Dr. Cannuscio being an
24 author with anybody from Merck, right?

Page 764

1    A.   Right.
2    Q.   You did not have any direct
3 discussions with Dr. Santanello from
4 Merck about the issue of whether Dr.
5 Cannuscio's name would remain on the
6 paper; is that right?
7    A.   Right. I just know the
8 facts.
9    Q.   Well, you're repeating what
10 somebody else told you, right?
11    A.   No. I --
12    Q.   You did not --
13    A.   Excuse me. You just made a
14 misstatement that I need to correct.
15    I know the fact was that Dr.
16 Cannuscio indicated in correspondence
17 with both Dr. Solomon and me that she
18 wanted to be a co-author, and we
19 communicated back to her that we agreed
20 that she was to be a co-author.
21    And the other fact that I
22 know is that Dr. Santanello told Dr.
23 Solomon to take her off the paper, and
24 that I knew that that was not something

Page 765

1 that was she was keen to do.
2    MR. BECK: Move to strike
3    that last answer.
4 BY MR. BECK:
5    Q.   You did not have any
6 discussions yourself with Dr. Cannuscio
7 about whether her name would remain on
8 the paper, correct?
9    A.   That's right.
10    Q.   Now, in your testimony just
11 a few minutes ago, you said that the
12 journal agreed with you on the way that
13 the data should be presented in the
14 abstract. Do you remember that?
15    A.   Right. In the sense that
16 they accepted it and published it.
17    Q.   And the journal that we're
18 talking about is Circulation, right?
19    A.   Right.
20    Q.   Yesterday you said that you
21 had submitted your paper for publication
22 to the New England Journal of Medicine.
23 Do you remember that?
24    A.   Right.

Confidential - Subject to Protective Order

Page 766

1    Q.   And also you submitted it to
2  the Journal of the American Medical
3  Association, correct?
4    A.   Right.  Right.
5    Q.   And the phrase that you used
6  was that they passed on your paper,
7  right?
8    A.   Right.
9    Q.   In fact, the Journal of the
10 American Medical Association rejected
11 your article and refused to publish it,
12 correct?
13   A.   Well, I think that's --
14 rejected and refused.  Most submissions
15 to both of those journals do not get
16 accepted.  They accept only about 10
17 percent of submissions.  It's shooting
18 very high.  And it's no shame to not have
19 a paper in the New England Journal or
20 JAMA.
21   Q.   Well, in any event, the
22 Journal of the American Medical
23 Association rejected your article for
24 publication; is that true?

Page 767

1    A.   Sure.
2    Q.   And the New England Journal
3  of Medicine rejected your article for
4  publication; is that true?
5    A.   Sure.
6    Q.   And both of these journals
7  provided you with information explaining
8  the concerns that they had about the way
9  you presented data in your article,
10 didn't they?
11   A.   Well, they expressed
12 concerns with -- yeah, that's what
13 happens when a journal doesn't take your
14 paper.  I write letters like that to
15 journals all the time saying why they
16 shouldn't accept a given paper.  That's
17 what the peer-review process is about.
18   Q.   And the comments that you
19 received from both the Journal of the
20 American Medical Association, as well as
21 the New England Journal of Medicine about
22 concerns that they had about your paper
23 were, in some instances, exactly the same
24 concerns that Merck had expressed to you

Page 768

1  about the way that you were presenting
2  information in your paper; isn't that
3  true?
4        MR. TISI:  Objection.  Calls
5  for hearsay, speculation,
6  irrelevance, and outside the
7  scope.  Go ahead.
8        THE WITNESS:  I would need
9  to look at those reviewer's
10 comments before answering that.
11       MR. BECK:  Okay.
12       And I think we need to take
13 a break for the tape and then
14 we'll do exactly that.
15       THE VIDEOTAPE TECHNICIAN:
16 This is the end of Tape Number 3.
17 The time is 3:46.  We're off the
18 record.
19       - - -
20       (Whereupon, a recess was
21 taken from 3:46 p.m. until
22 3:52 p.m.)
23       - - -
24       THE VIDEOTAPE TECHNICIAN:

Page 769

1  We are back on the record.  This
2  is Tape Number 4.  The time is
3  3:52.
4        - - -
5        (Whereupon, Deposition
6  Exhibit Avorn-54, Fax cover sheet
7  dated 10.1.03 with letter dated
8  9.30.03 with attachments, was
9  marked for identification.)
10       - - -
11 BY MR. BECK:
12   Q.   Doctor, I've handed you what
13 I've marked as Exhibit 54.  And you said
14 you would need to see the reviewer
15 comments when they decided not to accept
16 your manuscript.  Do you see that Exhibit
17 54?  Let me put it up on the screen.
18       MR. BUCHANAN:  I'll note my
19 objection to the publication of
20 this document, and I don't mind
21 you identifying it, but I think it
22 is hearsay.
23       MR. TISI:  Right.
24 BY MR. BECK:

84  (Pages 766 to 769)

56ae81f3-615a-41a4-af82-acf966afcfcb

Page 770

1    Q.   This is a fax cover sheet
2   from Dr. Solomon to Dr. Cannuscio,
3   correct?
4    A.   Correct.
5    Q.   And then over on the next
6   page, you see that he's transmitting a
7   letter from the Journal of the American
8   Medical Association dated September 30th,
9   2003. It's addressed to him. Do you see
10  that?
11   A.   Yep.
12   Q.   And the middle paragraph of
13  the letter from JAMA to Dr. Solomon says,
14  "Based on our in-house evaluation" of the
15  comments -- I'm sorry.
16       "Based on our in-house
17  evaluation and the comments of external
18  reviewers, we will not accept your
19  article for publication. I am enclosing
20  the" relevant -- "I am enclosing the
21  reviewer's comments, which I hope you
22  will find helpful."
23       Do you see that?
24       MR. TISI: Objection,

Page 771

1       hearsay, relevance, collateral.
2   BY MR. BECK:
3    Q.   Do you see that?
4    A.   Right. Right after they say
5   that they don't accept 7/8ths of the
6   papers that are submitted to them.
7    Q.   Incidentally, you saw this
8   at the time, right?
9    A.   Yes.
10   Q.   Dr. Solomon shared it with
11  you, correct?
12   A.   Sure.
13   Q.   Including the reviewer's
14  comments?
15   A.   Yes.
16   Q.   Will you turn over, please,
17  to under the fax numbering is Page 5 of
18  7.
19   A.   Yes.
20   Q.   And this is some of the
21  comments from one of the reviewers,
22  correct?
23   A.   Right.
24   Q.   And you looked at these at

Page 772

1   the time they were transmitted?
2    A.   Yes.
3    Q.   I'm going to focus on two of
4   the comments from the reviewer. Comment
5   number one says --
6       MR. TISI: Let me just, can
7   I have a continuing objection to
8   the hearsay nature of this?
9       MR. BECK: Yes.
10      MR. TISI: Thank you.
11      MR. BUCHANAN: I'll object
12  to hearsay.
13  BY MR. BECK:
14   Q.   "In the abstract, the
15  authors report a comparison of rofecoxib
16  with no NSAID and an odds ratio of 1.14,
17  95 percent confidence interval equals 1
18  to 1.31 as an elevated risk. Only on
19  Page 11 did they point out that this did
20  not reach statistical significance."
21      Did you read that reviewer's
22  comment at the time?
23   A.   Right. And that's why Dr.
24  Solomon wrote in after that, "Include

Page 773

1   p-values in abstract." And that was our
2   response to that.
3    Q.   This was quite similar to
4   the objection that Merck raised that you
5   indicated an elevated risk in the
6   abstract, but only later in the article
7   did you acknowledge that it did not reach
8   statistical significance, correct?
9       MR. TISI: Objection.
10      MR. BUCHANAN: Objection to
11  the form, misleading,
12  mischaracterizes.
13      THE WITNESS: And our
14  response to that was in the
15  submission to Circulation to
16  include p-values in the abstract,
17  as he indicates.
18  BY MR. BECK:
19   Q.   And then the next comment
20  says, "The authors do not present actual
21  results, i.e. no AMIs in each group," or
22  "number of AMIs in each group." "This
23  information should be presented for all
24  groups and subgroups analyzed in the

56ae81f3-615a-41a4-af82-acf966afcfcb

Page 774

1  tables."
2          MR. TISI:  Objection.
3  BY MR. BECK:
4      Q.   Was this also one of the
5  points that Merck raised, that they
6  thought that you should have the
7  information for subgroups such as 25
8  milligrams Vioxx versus no NSAID use?
9          MR. BUCHANAN:  Excuse me.
10  Objection to the form.
11          MR. TISI:  Object.
12          THE WITNESS:  What the
13  reviewer is clearly talking about
14  is what we call the N or the
15  number of people who had an MI.
16  And what the reviewer actually
17  says is the information, that is,
18  the number of heart attacks should
19  be presented for all the groups
20  and subgroups analyzed in the
21  tables.  And so what the reviewer
22  is really asking for is, if you
23  have a table, you should present
24  the numbers of heart attacks for

Page 775

1  the people that you describe in
2  the table, and that is what we
3  actually did in Table 2.
4          In the caption of the table
5  and a part that you didn't show,
6  we do present the numbers of heart
7  attacks for the people in the
8  table.  What the reviewer does not
9  say, as you imply that he does, is
10  that analysis should be done on
11  all groups and all subgroups.
12  That's not at all what's said
13  here.
14          And since you characterized
15  this, Mr. Beck, as they refused to
16  publish the article and they
17  rejected it, I think in fairness,
18  it is important to point out that
19  the reviewers -- the first
20  reviewer in his or her main
21  comment about our paper said,
22  "This manuscript reports a well
23  thought out investigation and is
24  well written and concise.  There

Page 776

1  are a number of probably minor
2  issues and one major issue."  That
3  was the first reviewer.
4          And then the other reviewer
5  said, the one whose comments you
6  are reading now, at the beginning
7  of the review as the summary
8  statement, "The authors have
9  conducted a large scale study with
10  appropriate analysis."  And then I
11  will just continue reading, "The
12  strength of the manuscript is the
13  consistency of the findings for
14  different subgroups and the
15  sensitivity analysis.  However,
16  conclusions must be tempered with
17  caveats regarding retrospective
18  data from a database, rather than
19  a prospective randomized control
20  trial," et cetera.
21          So, I think it is important
22  for the jury to understand that
23  these were both favorable reviews.
24  We often receive favorable

Page 777

1  reviews.  I often write favorable
2  reviews in which I say, this is a
3  perfectly fine study.  I even tell
4  the editors if I'm reviewing
5  something, I think you should
6  publish it.  And then the editors,
7  since they end up rejecting
8  between 80 and 90 percent of the
9  submissions because you can't fit
10  all the articles that get
11  submitted, even the good ones,
12  into a journal, will turn it down.
13  But I think you gave the
14  misimpression that they rejected
15  your paper or refused to publish
16  it as if it had gotten reviews
17  that said it was a bad study.
18          In fact, if you are fair
19  enough to read the summary
20  statements of the reviewers, they
21  say, both of them, this was a very
22  good study, and they make a couple
23  of suggestions, one of which we
24  dealt with and one of which you

86 (Pages 774 to 777)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 778

1 just mischaracterized.
2       - - -
3       (Whereupon, Deposition
4 Exhibit Avorn-55, Email dated
5 8.25.03, MRK-AAC0129304 -
6 MRK-AAC0129306, was marked for
7 identification.)
8       - - -
9 BY MR. BECK:
10      Q.   I'm handing you now Exhibit
11 55. And this is an e-mail within Merck
12 from Dr. Cannuscio to others transmitting
13 the New England Journal of Medicine
14 reviewer comments.  And you are not shown
15 on this particular document as a
16 recipient.
17      My question, though, is, did
18 you review the New England Journal of
19 Medicine reviewer's comments whether you
20 saw this document?
21      A.   Yes, I did.  This document
22 wasn't sent to us.  This was just -- it
23 looks like it was circulated internally
24 to Merck.  It wasn't sent to Dr. Solomon

Page 779

1 or to me.
2      Q.   But you did review the
3 comments themselves?
4      A.   We reviewed the original
5 reviewer's comments, yes.
6      Q.   Okay.
7      And I put it up on the
8 screen, and I'm going to go to the last
9 page of this.
10      MR. TISI:  Let me just
11 object to this not only for
12 reasons stated previously about it
13 being hearsay and inappropriate
14 publication to the jury, but also
15 because I cannot be confident that
16 this is the entire -- I mean, this
17 appears to be some version, and I
18 don't know whether it is the
19 complete statement that was sent
20 back by the New England Journal or
21 whether it was pieces pasted in an
22 e-mail.  With that comment, I
23 don't know if this is the complete
24 document, hearsay, and those

Page 780

1 things, I would go ahead.
2      MR. BECK:  Sure.
3      MR. BUCHANAN:  Excuse me.
4 I'll just add mine, and that is
5 beyond the scope of the
6 direct-examination.
7 BY MR. BECK:
8      Q.   I just want to focus on the
9 last page.
10      MR. TISI:  Let me just also
11 note to you, it says, "Attached
12 for your review is a summary of
13 the New England Journal of
14 Medicine's reviewer comments" by
15 somebody who works for Merck.  So,
16 it doesn't even appear to be
17 the -- it appears by its very
18 nature to not be the actual
19 complete.  It's a summary.
20      MR. BECK:  Well, it actually
21 says the New England Journal of
22 Medicine reviewer comments, it's
23 on the paper, and then it has
24 Reviewer 1, Reviewer 2.

Page 781

1      MR. TISI:  I understand.
2 But I'm pointing out that I'm not
3 clear about the authenticity of
4 this as a complete document.  It
5 may be.
6      MR. BECK:  And, actually,
7 the question I'm about to ask will
8 find out whether he can help us on
9 that or not.
10      MR. TISI:  I appreciate
11 that.  I'm just putting my
12 objection on the record.
13      MR. BECK:  I understand.
14 BY MR. BECK:
15      Q.   So, 3c.  My question is --
16      MR. TISI:  3c you're on?
17      MR. BECK:  Yes.  On the
18 third page.
19 BY MR. BECK:
20      Q.   Do you remember whether
21 what's contained in here as 3c was a
22 comment from Reviewer Number 3 at the New
23 England Journal of Medicine?
24      MR. TISI:  Objection.

87 (Pages 778 to 781)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 782

1    THE WITNESS:  Three years
2    later almost, I have no way of
3    telling you that.
4  BY MR. BECK:
5    Q.   The --
6    A.   If we have the actual
7  reviews, because I know we sent the
8  reviews to Merck for both of the papers.
9  In fact, we know that Merck got them
10  because this was Dr. Cannuscio's overview
11  of them.  So, if you could show me that,
12  I could look at it.  But I can't recall
13  three years later what was said and what
14  wasn't said.
15    MR. BECK:  We'll set this
16    one aside and then we'll move on.
17    MR. TISI:  Thank you.
18  BY MR. BECK:
19    Q.   Please look at Exhibit 14,
20  which is in your binder.
21    A.   Got it.
22    Q.   And is Exhibit 14 one that
23  Mr. Tisi asked you about yesterday?
24    A.   Yes.

Page 783

1    Q.   And this is an article where
2  the first listed author is Dr. Ray, and
3  then you are also an author of this
4  document; is that correct?
5    A.   That's right.
6    Q.   And what year was this
7  published in?
8    A.   It was published in 2003.
9  Actually, it was published online, it
10  says on top, in 2002.
11    Q.   So, late 2002/early 2003?
12    A.   Summarizing a
13  meeting that happened in August of 2002.
14    Q.   And what publication was
15  this in?
16    A.   Pharmacoepidemiology and
17  Drug Safety.
18    Q.   If you'll go over to the
19  second page, this language here, was this
20  language that you and Mr. Tisi discussed
21  yesterday, that these studies suggest
22  that --
23    A.   Right.
24    Q.   -- any protective effect of

Page 784

1  naproxen does not fully account for the
2  findings in the VIGOR study?
3    A.   Correct.
4    Q.   And I think you've indicated
5  already the VIGOR study involved use of
6  50 milligrams of Vioxx, right?
7    A.   Right.
8    Q.   And in this study with Dr.
9  Ray, did you look at people, 20,000
10  people or so who used 25 milligrams or
11  lower Vioxx?
12    MR. TISI:  Well, can I just
13    object to this characterization of
14    the study.  I think it's
15    commentary.
16  BY MR. BECK:
17    Q.   I'm sorry.  In his
18  commentary.
19    A.   Right.  Yeah.  This was not
20  the report of a research study.  This was
21  the proceedings of a panel discussion
22  that occurred at the pharmacoepi meetings
23  in 2002.
24    Q.   And did you attend the panel

Page 785

1  discussion?
2    A.   I was part of it, yes.
3    Q.   Okay.
4    Then let's just go to the
5  last page.  It says here, "There was no
6  evidence of an increased risk of serious
7  CHD."  What is CHD?
8    A.   Coronary heart disease.
9    Q.   "There was no evidence of an
10  increased risk of serious coronary heart
11  disease in all individuals receiving
12  naproxen, ibuprofen or Celebrex compared
13  to individuals who did not receive an
14  NSAID."
15    And then it says, "There was
16  also no evidence of increased risk for
17  doses of rofecoxib at 25 milligrams or
18  below," correct?
19    A.   I'm trying to see what --
20    MR. TISI:  I would just
21    object to context.  Go ahead.
22    THE WITNESS:  Yeah.  I'm
23    trying to understand when it says
24    "There was no evidence."  I need

88  (Pages 782 to 785)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

Page 786

1　to understand what he's talking
2　-- what this paragraph is talking
3　about. It's "we."
4　　　(Witness reviewing
5　document.)
6　　　Okay. So, what this is, the
7　"this" is a review of the paper
8　that Dr. Ray published that is
9　Reference Number 20 that was in
10　the Lancet. So, this a
11　description of that paper.
12　BY MR. BECK:
13　　Q. Okay.
14　　　And in the description of
15　that paper, does this commentary where
16　you are one of the authors say that in
17　that study he did from the Lancet that
18　there was no evidence of increased risk
19　of coronary heart disease for doses of
20　Vioxx at 25 milligrams or below?
21　　A. Right. That's a statement
22　of Dr. Ray's findings.
23　　Q. Were you present at any
24　gatherings where Dr. Ray presented his

---

Page 787

1　conclusions following his -- both before
2　and after his Lancet article?
3　　A. I am having a hard time
4　remembering that. If I had been, it
5　would have been at these annual
6　pharmacoepi meetings, and I just don't
7　remember whether he made a presentation
8　that I attended at these meetings.
9　　Q. Do you remember hearing Dr.
10　Ray in late 2000 and early 2001 after the
11　VIGOR results came out and after he did
12　his analysis telling people that in his
13　judgment, 25 milligram Vioxx was safe?
14　　　MR. TISI: Objection,
15　hearsay.
16　　　THE WITNESS: I know that
17　that was what the paper that we
18　just discussed reported, so, I
19　would expect that he would have
20　believed that.
21　　　MR. TISI: I would just
22　object to the answer to the extent
23　that it called for speculation.
24　　　- - -

---

Page 788

1　　　(Whereupon, Deposition
2　Exhibit Avorn-56, Educational
3　piece entitled, "COX-2
4　inhibitors: Who Really Needs
5　Them?" March 2002 was marked for
6　identification.)
7　　　- - -
8　BY MR. BECK:
9　　Q. I'm handing you what we've
10　marked as Exhibit 56.
11　　　MR. TISI: Exhibit 56?
12　　　MR. BECK: Yes. Exhibit 56.
13　BY MR. BECK:
14　　Q. Yesterday you talked about
15　one of the things that you do is you work
16　with the medical students and residents
17　on how they ought to go about making
18　prescribing decisions. Do you remember
19　that?
20　　A. Right.
21　　Q. And can you tell us what
22　Exhibit 56 is?
23　　A. Sure. This is an
24　educational piece that Dr. Solomon

---

Page 789

1　published, along with Cherylnn Griffin
2　and Kelly Curtis, who are two -- who were
3　two pharmacists at the Brigham on, the
4　title is, "COX-2 Inhibitors: Who Really
5　Needs Them?"
6　　Q. Does your name appear on
7　Exhibit 56?
8　　A. Right. I was the editor of
9　this series.
10　　Q. Okay. So, you say Dr.
11　Solomon, whom you've talked about a lot,
12　wrote this, but you were the editor of
13　this whole series; is that right?
14　　A. That's correct.
15　　Q. Okay.
16　　　So, you saw this at the time
17　that it was prepared and edited, right?
18　　A. That's correct.
19　　Q. Let me --
20　　　I would like you to look,
21　please, at the criteria for use, and let
22　me put this up on the screen.
23　　　Do you see at the bottom
24　there's a heading "Criteria for use"?

---

Confidential - Subject to Protective Order

Page 790

1    A.   Yes.
2    Q.   Did your colleague, Dr.
3  Solomon, tell --
4         Well, first of all, who was
5  this prepared for?  Who is it used with?
6         MR. BUCHANAN:  Objection,
7    foundation.
8  BY MR. BECK:
9    Q.   Well, you know who it was
10  used with, don't you?
11    A.   Yes.
12    Q.   Okay.
13         Who?
14    A.   The medical students and
15  interns and residents and faculty at the
16  Brigham and Women's Hospital.
17    Q.   Okay.
18         And then in the criteria for
19  use, do you see that -- and this is what
20  date?  I'm sorry.
21    A.   March 2002.
22    Q.   So, March 2002, a couple of
23  years after the VIGOR results are known,
24  right?

Page 791

1    A.   Right.  Yes.  A couple,
2  right.
3    Q.   And after the period where
4  you testified earlier that you had come
5  to the conclusion that Vioxx posed
6  serious cardiovascular risks, right?
7         MR. BUCHANAN:  Objection,
8    misstates testimony.
9         THE WITNESS:  No, I think
10    you are, once again, misstating
11    what I had said.
12  BY MR. BECK:
13    Q.   Well, let's pass that, then.
14    A.   No.  I would like to
15  recharacterize what I said accurately so
16  that we're not carrying around this
17  mischaracterization.
18    Q.   Okay.
19         By 2002, had you concluded
20  that Vioxx posed an increased risk of
21  cardiovascular disease?
22    A.   I would rather indicate what
23  I did conclude at that time, which is
24  that there was evidence of an association

Page 792

1  between Vioxx and cardiovascular disease.
2    Q.   Okay.
3         So, 2002, criteria for use
4  in the publication used with the Harvard
5  medical students, it is stated, "Because
6  of their high cost, COX-2 selective
7  inhibitors should be reserved for
8  patients at high risk of bleeding who
9  require an NSAID."  And then they go on
10  to specify who that would be appropriate
11  for.  Do you see that?
12    A.   Yes.
13    Q.   Is there any statement in
14  here that the use of COX-2 inhibitors
15  should be avoided because of an
16  association with cardiovascular disease?
17    A.   Yes.  A few lines just below
18  that it says --
19    Q.   Are we on the next page now?
20    A.   Yeah.
21    Q.   Okay.
22    A.   At the very top.
23    Q.   Okay.
24    A.   "The VIGOR trial found a

Page 793

1  four-fold higher rate of MI in rheumatoid
2  arthritis patients randomized to
3  rofecoxib compared to rheumatoid
4  arthritis patients randomized to
5  naproxen.  While it is possible that
6  naproxen confers a protective effect
7  against MI, it also may be the case that
8  COX-2 selective inhibitors are associated
9  with an increased risk of MI.  The
10  possible mechanism for this action might
11  be an imbalance in the activity of COX-1
12  to COX-2 enzymes producing a relative
13  tendency to clot or otherwise damaging
14  the endothelial surface," which is the
15  surface of the arteries.  "This is an
16  active area of research."
17    Q.   And at the time that this
18  was presented to the Harvard medical
19  students, was this a fair summary of your
20  view of the existing state of knowledge?
21         MR. TISI:  Objection.
22         THE WITNESS:  I would not --
23    no.  If these had been my words,
24    as opposed to my having presided

90 (Pages 790 to 793)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 794

1 over the series, I would have
2 said, it has been suggested that
3 naproxen confers a protective
4 effect against MI, but it is
5 likely that COX2 selective
6 inhibitors are associated with an
7 increased risk in MI. That would
8 have -- and I think that was what
9 I was writing myself in my own
10 voice during this period.
11 BY MR. BECK:
12 Q. Okay.
13 But what Dr. Solomon, your
14 colleague, was writing --
15 A. And the two pharmacists.
16 Q. -- and presenting to the
17 Harvard medical students was, "While it
18 is possible that naproxen confers a
19 protective effect against MI, it may also
20 be...that COX-2 selective inhibitors are
21 associated with an increased risk of MI."
22 A. Correct.
23 Q. I know you were the editor
24 of this series. Did you actually look at

Page 795

1 this document back at the time?
2 A. Yes.
3 Q. Okay.
4 A. And I still think that
5 naproxen does confer a very small
6 protective effect against MI.
7 Q. Then down further on the
8 page, do you see that there's a table
9 that -- well, first, there's this heading
10 "Choosing between Celebrex and Vioxx if a
11 COX-2 agent is required."
12 A. Right.
13 Q. And then there's a table
14 that, am I right, it basically summarizes
15 the pros and cons of Celebrex versus
16 Vioxx for different types of patients?
17 A. Yes.
18 Q. Is there anywhere in this
19 training piece for the Harvard medical
20 students saying that other things being
21 equal, they ought to use Celebrex versus
22 Vioxx because of an increased association
23 of cardiovascular disease?
24 A. No.

Page 796

1 - - -
2 (Whereupon, Deposition
3 Exhibit Avorn-57, Educational
4 piece entitled, "COX-2
5 inhibitors: Who really needs
6 them?" April 2003 was marked for
7 identification.)
8 - - -
9 BY MR. BECK:
10 Q. Let me show you what --
11 A. I'm sorry, Mr. Beck, there's
12 just one thing I just want to point out
13 about the authorship here. What I notice
14 is that it actually says this review was
15 prepared with help of Cherylnn Griffin
16 R.Ph., and Kelly Curtis, R.Ph., the two
17 pharmacists, and then it says, "For
18 further information, contact Dan Solomon
19 via hospital e-mail." So, I guess I
20 can't really testify to what role Dr.
21 Solomon had in the writing of this, just
22 to be clear.
23 Q. All you know is you reviewed
24 it before it was used with the Harvard

Page 797

1 medical students and approved it, right?
2 A. Right.
3 MR. BUCHANAN: I'm going to
4 object foundationally to the
5 document, given the doctor's
6 clarification on the authors. I'm
7 not sure that it qualifies for
8 publication as a learned treatise.
9 BY MR. BECK:
10 Q. Exhibit 57, is that another
11 educational piece that came out in the
12 series that you edited?
13 A. Yes. It is basically the
14 same document about a year later.
15 Q. Okay.
16 And was this used not just
17 with medical students, but with Harvard
18 faculty and interns and others?
19 A. Right.
20 Q. And Exhibit, both 56 and 57,
21 you approved of their use with the
22 medical students, with the residents and
23 with the faculty, correct?
24 A. Right.

91 (Pages 794 to 797)

56ae81f3-615a-41a4-af82-acf966afcfcb